# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | **MDL NO. 2179** <br><br> **SECTION J** <br><br><br> **HONORABLE CARL J. BARBIER** <br><br> **MAGISTRATE JUDGE SHUSHAN** |

## <u>SUPPLEMENTAL DECLARATION OF HOLLY SHARP</u>

I, Holly Sharp, submit this declaration in response to certain objections filed against the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement").

## <u>INTRODUCTION</u>

1.      I submitted a declaration on August 13, 2012 attached as Exhibit 17 in support of final approval of the Settlement Agreement ("August Declaration").   Thereafter, several objections were filed that relate to the opinions, facts and analysis I included in my August Declaration.  These include the Declaration of Marc Vellrath regarding the proposed Economic & Property Damages Settlement Agreement, filed August 31, 2012 ("Vellrath Declaration").[1] The Vellrath Declaration criticized the Settlement Agreement and took issue with several of my opinions and statements made in my August Declaration.  Nothing in the Vellrath Declaration or

---

[1]     Declaration of Marc Vellrath Regarding the Proposed Economic & Property Damages Settlement Agreement ("Vellrath Declaration"), Rec Doc. 91-2.

certain other declarations submitted by various objectors has altered the opinions, facts, or analysis I offered for the Court's assistance in my August Declaration

2.      This declaration is based upon my own personal experience, expertise, and analysis, except where otherwise indicated; and if called to testify I could testify to the opinions and analysis set forth in this declaration.  The opinions, statements, and conclusions expressed in this declaration are my own.

3.      I am a Certified Public Accountant (CPA), Certified Fraud Examiner (CFE), and Certified in Financial Forensics (CFF) and a Shareholder and Director in LaPorte CPAs and Business Advisors, a CPA firm based in Metairie, Louisiana, where I have practiced for more than 30 years.  I have a B.S. in Business Management from Tulane University and a M.S. in Tax Accounting from the University of New Orleans.  I am an Adjunct Professor of Taxation at the A.B. Freeman School of Business at Tulane University, where I have taught since 1999.  A complete description of my experience and qualifications is contained in my August Declaration.

4.      In my August Declaration, I also listed the materials I reviewed and studied in order to reach my opinions and which support my analysis and conclusions.  Those same materials were considered once more in reaching the opinions, analysis and conclusions I set forth in this declaration.  I have subsequently reviewed objections relevant to the economic loss frameworks of the Settlement Agreement and the Vellrath Declaration.[2]

---

[2]    See Rec. Doc. 6317; Rec. Doc. 6345; Rec. Doc. 6356; Rec. Doc. 6368; Rec. Doc. 6382; Rec. Doc. 6383; Rec. Doc. 6402; Rec. Doc. 6404; Rec. Doc. 6831; Rec. Doc. 6902; Rec. Doc. 7227; Rec. Doc. 7317; Obj. Doc. 32; Obj. Doc. 33; Obj. Doc. 37; Obj. Doc. 38; Obj. Doc. 44; Obj. Doc. 48; Obj. Doc. 50; Obj. Doc. 51; Obj. Doc. 54; Obj. Doc. 58; Obj. Doc. 61; Obj. Doc. 62; Obj. Doc. 66; Obj. Doc. 68; Obj. Doc. 70; Obj. Doc. 71; Obj. Doc. 72; Obj. Doc. 86; Obj. Doc. 89; Obj. Doc. 90; Obj. Doc. 91; Obj. Doc. 93; Obj. Doc. 94; Obj. Doc. 95; Obj. Doc. 96; Obj. Doc. 97; Obj. Doc. 101; Obj. Doc. 102; Obj. Doc. 103; Obj. Doc. 114; Obj. Doc. 115; Obj. Doc. 116; Obj. Doc. 117; Obj. Doc. 118; Obj. Doc. 120; Obj. Doc. 121; Obj. Doc. 122; Obj. Doc. 123; Obj.

## OPINIONS, CONCLUSIONS, AND ANALYSIS

5.      After reviewing these objections and the Vellrath Declaration, none of the opinions, conclusions and analysis I included in my previous declaration have changed.  I continue to conclude that the Settlement Agreement's compensation frameworks for business and individual economic loss are reasonable, objective, and consistent with, if not more generous than, methodologies typically used and widely recognized in economic loss damages cases.  The Business Economic Loss Framework in the Settlement Agreement ("BEL Framework") applies generally accepted and established methods for business claimants to receive compensation.  The documents required by the Settlement Agreement for business economic loss compensation are those typically required to calculate any business economic loss.  They are not burdensome for the business claimant because these documents either are routinely maintained by most businesses or can be readily produced from the contemporaneous books and records of the business.  The causation tests comparing pre- and post-Spill economic performance that are specified in the Settlement Agreement are based on exactly the type of information I would use to test whether lost revenues were caused by a particular event.

6.      The Individual Economic Loss Framework ("IEL Framework") is broad and flexible in addressing the claims of individuals covered by the settlement , including individuals without prior employment experience, those who changed jobs, people with multiple jobs,

---

Doc. 125; Obj. Doc. 126; Obj. Doc. 127; Obj. Doc. 131; Obj. Doc. 132; Obj. Doc. 134; Obj. Doc. 135; Obj. Doc. 136; Obj. Doc. 137; Obj. Doc. 138; Obj. Doc. 140; Obj. Doc. 142; Obj. Doc. 144; Obj. Doc. 145; Obj. Doc. 146; Obj. Doc. 148; Obj. Doc. 151; Obj. Doc. 154; Obj. Doc. 155; Obj. Doc. 156; Obj. Doc. 157; Obj. Doc. 159; Obj. Doc. 161; Obj. Doc. 162; Obj. Doc. 167; Obj. Doc. 177; Obj. Doc. 178; Obj. Doc. 184; Obj. Doc. 186; Obj. Doc. 189; Obj. Doc. 198; Obj. Doc. 200; Obj. Doc. 201; Obj. Doc. 206; Obj. Doc. 207; Obj. Doc. 209; Obj. Doc. 210; Obj. Doc. 223; Obj. Doc. 224; Obj. Doc. 227; Obj. Doc. 228; Obj. Doc. 230; Obj. Doc. 232; Obj. Doc. 234; Obj. Doc. 237; Obj. Doc. 239; Obj. Doc. 240; Obj. Doc. 241; Obj. Doc. 244; Obj. Doc. 245; Obj. Doc. 246; Obj. Doc. 247.

seasonal workers, and individual periodic vendors and festival vendors. The IEL Framework applies generally accepted and established methods for individual claimants to receive compensation for lost earnings. The causation requirements for individual claimants provide clear, well-defined standards that offer claimants several options for establishing causation that can accommodate various claimants. Indeed, certain standardized presumptions that the parties agreed to relative to certain claimants in certain geographic areas near the Gulf shore and in industries tied to the Gulf (*e.g.,* tourism) establish causation automatically.[3] Such presumptions are rational and, indeed, generous.

7.     Standardized options for selecting the Benchmark Period and the Compensation Period that are part of both the BEL and IEL Frameworks provide an appropriate level of consistency across individual and business claimants. Dr. Vellrath argues that only small subsets of proposed Class members share similar circumstances and injuries. I disagree. To the extent Class members asserting BEL or IEL claims assert injuries due to the Spill, they all are seeking to recover for lost revenue and resulting lost variable profits, and there are standard, well-accepted and common methodologies for determining such loss. The BEL and IEL Frameworks apply those common methodologies while providing business and individual claimants the ability to choose among standardized options that are most advantageous to the claimants. Moreover, to the extent they fail to identify the most favorable option, Settlement Agreement § 4.3.8 requires the Claims Facility to do so -- an unusually generous settlement provision that also helps ensure equitable treatment among commonly situated claimants.

---

[3]     See Section I(B)(2)(a) of Exhibit 8A of the Settlement Agreement.

8.      Dr. Vellrath also is incorrect and simply wrong to argue that the frameworks require no connection between actual economic harm caused by the oil spill and eligibility to receive compensation.[4]  To the contrary, as set forth above and further detailed in my August Declaration, the relationship between a business claimant's eligibility to receive economic loss compensation and the claimant's actual economic harm suffered is established by first testing for causation, and then testing for a reduction in business variable profit after the Spill.  Regardless of whether causation is presumed (for claimants in locations and/or industries identified by the parties as most likely to have been affected by the Spill) or must be established by satisfying the specified requirements in the Settlement Agreement, the business claimant must still show a reduction in variable profit in the immediate post-Spill period to receive compensation for economic loss.  This is a common determination applicable to each claimant.

9.      The causation requirements for business economic loss claims are consistent with standard and common methodologies of establishing causation in economic loss cases, which may be brought by claimants in a wide variety of industries.  The requirements include formulas to show business revenue trends in certain consecutive months after the spill in year 2010 compared to the same months in year 2011.[5]  The compensation framework also includes formulas to calculate any reduction in variable profit and compensate for incremental profits or reduced losses that a business claimant might have expected had the spill not occurred.[6]  These formulas, based on financial performance, are sufficiently defined and flexible to take into account the financial performance of a wide range of types of business entities that allege

---

[4]    See Opinions 11-12, 14, 16 and related sections in the Vellrath Declaration at ¶¶ 31-32, 36, 38.

[5]    See Section II of Exhibit 4B of the Settlement Agreement.

[6]    See Exhibit 4C of the Settlement Agreement.

6

financial loss due to the Spill. The Settlement Agreement presumes causation for businesses in specific geographic areas and for certain defined business entities such as Seafood, Tourism, and Charter Fishing businesses.[7] It is fair and reasonable to presume that business entities located closest to the spill (Zone A) could be impacted by the spill, and that businesses further away from the spill (Zones B or C) in certain defined industries could also be impacted by the spill due to their reliance on the Gulf itself. Presumption of causation for these business entities simplifies their claim and will make claim processing faster.

10. When causation is not presumed, business entities may use several tests to show causation. The Vellrath Declaration incorrectly asserts that these "tests" do not take into account the variations and disparities for business entities possibly harmed because of the spill.[8] This, however, ignores the multiple common options defined in the BEL framework for claimants that must demonstrate causation. Revenue patterns of businesses are tested for spill-related impact by looking for a downturn, followed by a later upturn in revenues in 2011 (which I understand is based on the parties' recognition that economic data about the region's economy reflects recovery from the spill in 2011). There is both a V-test for this revenue pattern, and a modified V-test under which companies that experienced somewhat smaller downturns and upturns can establish causation by providing information showing additional evidence of spill-related impact.[9] Yet another alternative causation test permits businesses to establish causation even if they experienced a pattern of only revenue decline after the spill with no recovery, if the lack of

---

[7]   See Section I of Exhibit 4B to the Settlement Agreement.

[8]   Vellrath Declaration, p. 15:30.

[9]   See Exhibit 4B to the Settlement Agreement.

recovery was prevented by other defined circumstances beyond their control.[10] These causation tests, along with the "proxy causation" test for small businesses, provide numerous common options for business entities facing a wide variety of circumstances to demonstrate injury and establish causation. These common options and methodologies thus appropriately account for any asserted variations and disparities among business entities possibly harmed because of the spill. The Settlement Agreement's provisions for several alternative yet common causation tests provide flexibility and deal appropriately with complexity in a way that a single test could not. As a result, the Settlement Agreement's causation requirements are not arbitrary.

11.     At the same time, the defined and common causation and compensation formulas, as well as other requirements specified in the Settlement Agreement, allow for consistent, objective evaluation of claims so that similarly situated business claimants are treated similarly. The Vellrath Declaration alleges that, "[t]he Framework even allows similarly situated claimants to use different proofs for the same alleged harm,"[11] and sets forth a purported illustrative example in a footnote.[12] But the example does not support his argument. Rather, the three businesses in the footnote are represented to have the common injury of business economic loss, even though they are in different locations and experienced varying revenue patterns. For all such claimants, including those in the example, the Settlement Agreement applies a comprehensive general methodology that uses rational, objective factors to evaluate causation and, if causation is established, to determine compensation. Nothing in the example refutes this

---

[10]   See Section II-C and III-C of Exhibit 4B to the Settlement Agreement.

[11]   Exhibit 6 to the Settlement Agreement p. 60:98.

[12]   Ibid. p. 60, fn. 98.

fundamental point.  The use of Zones providing revenue test options to claimants as methods of proof of their shared harm from the spill is unremarkable and fully rational.

12.    The Vellrath Declaration asserts that business claimants with "… differences in circumstances, claims, and alleged injuries across subgroups create numerous potential conflicts among the interest of the different named plaintiffs …" but does not identify any such conflicts.[13] As shown above, the BEL framework, including its common methodologies and standardized options, produces rational outcomes for the underlying business claimants.  Moreover, the Agreement includes compensation frameworks addressing the circumstances of multi-facility businesses,[14] failed businesses,[15] and start-up businesses (including failed start-ups).  Thus, contrary to Dr. Vellrath's assertion, the Agreement is, on its face, designed to address the claims of a broad range of business claimants.[16]

13.    The Settlement Agreement compensates business claimants for incremental profits the claimant might have been expected to generate in 2010 in the absence of the spill by applying a growth factor to six, seven or eight consecutive months of revenues.[17]  This also is a benefit for the business class member.  Use of this adjustment factor is not arbitrary but instead is based on historical patterns of revenue growth and/or a generous assumption for inflation.  The Settlement Agreement did not, and does not need to, provide special explanation or support for

---

[13]   Vellrath Declaration, p. 14:26.

[14]   Exhibit 5 to the Settlement Agreement.

[15]   Exhibit 6 to the Settlement Agreement.

[16]   This point is reinforced by the lack of a cap in the business and individual economic loss frameworks.  BP has agreed to pay any Class member who is eligible and establishes a loss under one of the frameworks.

[17]   See Section II of Exhibit 4C to the Settlement Agreement- Step 2 Compensation.

inclusion of such a growth factor in the damage calculations. It is a logical part of the calculation that is consistent with standard economic loss damages methodologies. It also provides a unique economic benefit to the claimant.

14.    I also disagree with the assertion in the Vellrath Declaration that the time periods a business claimant may select for its Benchmark Period are "...varied, inconsistent, and apparently arbitrary."[18]   The Benchmark Periods from which a business claimant may choose are specific and clearly defined. A claimant that must establish causation has a choice of using as a Benchmark Period three or more consecutive months after April 20 in the year before the spill, the average of the two years before the spill, or the average of the three years before the spill and comparing them to the same months in the post-Spill portion of 2010.[19] Those periods before the spill are the ones that would normally be considered for a benchmark against which to measure a business's financial performance after the spill. The fact that, as noted in the Vellrath Declaration, these common options result in 54 causation test permutations shows that the Settlement is highly favorable to claimants, who may select the best option for them, not that it is arbitrary and unfair.[20]   Thus, contrary to Dr. Vellrath's conclusion, this flexibility favoring claimants supports the conclusion that the settlement is fair and reasonable, as it provides each claimant with awards that will ensure their compensatory damage claims are resolved.

15.    In contrast to the Vellrath Declaration's criticisms of the options available to claimants with regard to the Benchmark Period being overly generous, several other objections to the Settlement Agreement incorrectly assert that 2009 should not be used as a Benchmark

---

[18]    Vellrath Declaration, p. 60:99.

[19]    See Section I of Exhibit 4C to the Settlement Agreement.

[20]    Vellrath Declaration, p. 61:99.

Period because it was a recessionary year and will artificially depress compensation when 2009 is compared to 2010.[21] This is misplaced for at least two reasons: (a) The most recent experience of a business is traditionally and typically used as the benchmark predictor of "but for" and/or future performance in business economic loss cases because it reflects the most recent conditions and trends. To disregard 2009 would ignore a revenue trend that must be considered, as the most recent experience is typically the best predictor of future performance; (b) To the extent 2009 may have been an atypical year, the BEL Framework accounts for this by permitting claimants to choose the average of months in 2008 and 2009 or the average of months in 2007, 2008, and 2009, if that would be more advantageous to their claim or better represent what they believe is a more accurate reflection of their baseline performance. Utilization of one of these averages enables a claimant to smooth the impact of 2009 on their recent financial results.[22] Use of average revenues over the past three years is an accepted and common methodology in selection of the revenue base for measuring lost profits when a plaintiff has experienced both positive and negative growth.[23]

16. Similar to the provisions for business economic loss claims, the framework for individual loss claims presumes causation for some individuals based upon the geographic location of their employment (Zone A), or the industry definition and geographic location of

---

[21] See, e.g., Objections of Unnamed Plaintiffs, Objection #198 (Rec. Doc. 7777-198) at p. 8.

[22] For example, a business that had revenues of $100,000, $90,000 and $75,000 in the applicable months of years 2007, 2008 and 2009, respectively, could average from 2007 through 2009 to establish a Benchmark of $88,333, which is 17.8% higher than actual 2009 revenues.

[23] See *Measuring Commercial Damages* by Patrick A. Gaughan, p. 133: "[w]hen the plaintiff has experienced both positive and negative growth, the expert must apply judgment in selecting the appropriate base. One possible alternative is the use of average revenues computed over prior years, such as the past three years."

their employer (Zone A, B or C, depending on the industry definition).[24] It is fair and reasonable to presume that individuals employed in areas closest to the spill (Zone A) could be impacted by the spill, and the individuals with employers in certain defined industries that are located further away from the spill (Zone B and C) could also be impacted by the spill, while others are less likely to have been impacted. Presumption of causation for these individual claimants simplifies their claim.

17.    When causation is not presumed, individual claimants may establish causation by showing that their employment was with an Eligible Employer (who recovered for spill-related injury), or providing sworn written statements from their employer attributing the individual claimant's loss of income during the compensation period to the spill.[25]   In light of the direct linkage these tests establish between the spill and the claimant's injury, the Vellrath Declaration's assertion that these "tests" "...do not demonstrate injury or establish causation with any reasonable confidence"[26] is unsupported.

18.    The Settlement Agreement requires specific documentation from individual Class members, which includes the income tax forms 1040, 1099, and/or W-2.[27]   The Settlement Agreement includes provisions for individuals who do not have income tax forms, but do have pay stubs or bank deposit records, as well as individuals who have income tax forms or other earnings documentation for year 2010, but not for the benchmark period, and individuals with no earnings documentation other than individual and employer-sworn statements to establish

---

[24]    See Section IB of Exhibit 8a to the Settlement Agreement.

[25]    *Ibid.* Section IB-2(b).

[26]    Vellrath Declaration, p. 15:30.

[27]    See Sections I-IV to Overview of Exhibit 8A to the Settlement Agreement.

earnings. The Settlement Agreement establishes categories for individual class members based on the available earnings documentation, flexibly allowing individual claimants who do not have information that is typically required to calculate economic loss to have an opportunity to recover under the Settlement. This flexibility, which favors claimants, does not imply, as Dr. Vellrath asserts, that the Settlement is unfair because "claimants are expected to have and provide different kinds of information for use in the compensation framework."[28]

19. As with the discussion of the BEL Framework, the Vellrath Declaration erroneously asserts that the Settlement Agreement provides for different compensation amounts for similarly situated individual claimants; however, Table 27,[29] which purportedly illustrates this, actually refutes his argument. The Settlement frameworks employ a traditional methodology for valuing economic loss, with certain standardized options that can be elected by claimants. Contrary to the Vellrath Declaration's assertions, the table shows that the two claimants in the hypothetical example both assert claims for economic loss and may select different benchmark years based on their documentation. Dr. Vellrath ignores that Claimant 1 only has documentation for years 2009 and 2010, whereas Claimant 2 has documentation for years 2007 through 2010. The Settlement Agreement allows Claimant 2 the option of using 2007 through 2009 to establish Benchmark earnings; this option is not possible for Claimant 1 because Claimant 1 cannot document earnings for 2007 and 2008. The choice among the standardized options for selecting a benchmark period does not change the fact that these two claimants are both asserting claims for business economic loss under a clearly-stated general

_____

[28]   Vellrath Declaration, p. 123: 170.

[29]   *Ibid.* p. 142.

13

methodology common to all such claimants. The Settlement Agreement is favorable to these claimants because it accommodates the differences in available documentation.

20. The Vellrath Declaration questions the option for individual claimants to use up to three years of financial results prior to the spill,[30] even though it is well-established and common that consideration of several years of historical earnings is recommended when calculating individual economic loss.[31] Consideration of up to three years of results prior to an incident is fair, reasonable, and generally accepted methodology used to calculate individual economic loss.

21. The application of the RTP factors serves to increase the compensation to business and individual claimants for any future economic damages. The Settlement Agreement economic loss methodologies provide a reasonable relationship between actual economic damages and other kinds of compensatory damages and punitive damages because the RTP factors are applied to the loss amounts calculated for year 2010. Application of RTP factors to the individual economic loss amounts calculated for year 2010 is a reasonable basis for estimation of any potential future harm that an individual claimant may experience as a result of the spill.

22. In summary, the Vellrath Declaration contains numerous unsupported assertions and incorrect statements, some of which are identified and illustrated above, and fails to establish either that the Settlement Agreement is inconsistent with the methodology typically used in economic loss cases or that it is unfair to any members of the Economic and Property Damage Class. To the contrary, as I have explained in this declaration and my prior declaration, the

---

[30]   *Ibid.* p: 143:193.

[31]   See *Determining Economic Damages* by Gerald D. Martin, Ph.D., §215; *Litigation Services Handbook*, 4th ed. by Roman L. Weil, Peter B. Frank, Christian W. Hughes and Michael Wagner, 14.3(a)(ii).

14

Settlement contains many provisions that are quite favorable to claimants. Nothing in the Vellrath Declaration in any way changes my opinions, conclusions and statements as set forth in my August Declaration submitted as Exhibit 17 in support of BP Defendants' Motion for Final Approval of Deepwater Horizon Economic and Property Damages Settlement Agreement As Amended On May 2, 2012.

23.     One objector contends that the Settlement Agreement is not fair because it only reimburses accounting fees for preparation of claim forms and materials up to 2% of the final compensation amount and limits hourly rates.[32] This objection should be disregarded because the accounting fee reimbursement appears more than adequate to cover the cost of claims preparation by accountants and accounting firms. First, the required financial documents should be on hand or easily reconstructed from the claimant's records. These required financial documents would be typically used in any economic loss calculation. Second, the Settlement Agreement's hourly rates for accounting services are reasonable. They are consistent with my understanding of the local market for the type of accounting service work involved. They are also consistent with the 2010 National Management of an Accounting Practice Survey published by the American Institute of CPAs.[33] Third, for most business and individual claimants, an accountant's preparation should not be time-consuming work. The standardization of formulas in the BEL and IEL Frameworks make it very efficient for accountants to calculate compensation. Fourth, the Settlement Agreement establishes a minimum reimbursement for

---

[32]    See Objections of Unnamed Plaintiffs, Objection #198 (Rec. Doc. 7777-198) at ¶¶ 142-143.

[33]    Compare Section 4.4.13 of the Settlement Agreement to AICPA 2010 National MAP Survey. The survey included hourly rate information for 1,064 public accounting firms in the South region, and was judged reasonable by firms consulted by both BP and the PSC. Overall limitations on reimbursable accounting fees reasonably increase the available reimbursement based on the size of the claim, and establish limits well in excess of what would be expected based on the claim requirements.

15

each type of claim, which guarantees claimants who receive compensation a minimum amount for accounting fees.[34]

24. I also have reviewed objections that take issue with the requirement to provide compiled monthly profit and loss statements.[35] It is important to note that the required financial statements are compilations and not the more extensive "reviewed" or "audited" financial statements that companies often have accountants prepare. Financial statements that are compiled by accountants are presentations of financial data in the form of financial statements (*e.g.*, balance sheet and income statements); however, such statements are based upon the representation of the management or owners of a company, and do not include any assurance by the CPA about the accuracy of the financial statements presented.[36] Therefore the preparation of required financial statements for claimants should not be burdensome for accountants.

25. Other objectors claim that the accounting fee reimbursement provided for in the Settlement Agreement is inadequate because some accounting firms are unwilling to create

---

[34] See Section 4.4.13.7-8 of the Settlement Agreement.

[35] See, e.g., Objection 186 by Baudin Law Firm, APLC and Morain & Murphy, LLC Objections to Economic and Property Damages Settlement (Rec. Doc. 7777-186) at 13-18; Objections of Unnamed Plaintiffs, Objection #198 (Rec. Doc. 7777-198) at ¶¶ 142-143.

[36] The AICPA Statements on Standards for Accounting and Review Services provides the following regarding compilation engagements: "[a] compilation differs significantly from a review or an audit of financial statements. A compilation does not contemplate performing inquiry, analytical procedures, or other procedures performed in a review. Additionally, a compilation does not contemplate obtaining an understanding of the entity's internal control; assessing fraud risk; testing accounting records by obtaining sufficient appropriate audit evidence through inspection, observation, confirmation, or the examination of source documents (for example, cancelled checks or bank images); or other procedures ordinarily performed in an audit." AR Section 60.06.

16

monthly profit and loss statements due to purported liability reasons.[37]  As a CPA, I find this objection unpersuasive.

26.     As I have previously noted, the financial statements required in the Settlement Agreement are merely compilations, and in an accountant's compilation report, the accountant states "[I] have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or provide any assurance about whether the financial statements are in accordance with accounting principles generally accepted in the United States of America."[38] The Settlement Agreement does not require financial statements to be prepared in accordance with Generally Accepted Accounting Principles.  Finally, it is a core function of most accounting firms is to prepare financial statements, and I would not expect accounting firms to be unwilling to create monthly profit and loss statements due to purported liability reasons.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis. Executed this 21st day of October, 2012 in New Orleans, LA .

Holly Sharp

---

[37]   See Objection 186 by Baudin Law Firm, APLC and Morain & Murphy, LLC Objections to Economic and Property Damages Settlement (Rec. Doc. 7777-186) at 17.

[38]   AICPA Statements on Standards for Accounting and Review Services, AR Section 80.64, "Compilation of Financial Statements, Compilation Exhibit B- Illustrative Compilation Reports."