# Exhibit 10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

_____

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | ) | MDL 2179 |
| "*Deepwater Horizon*" in the Gulf | ) | |
| of Mexico, on April 20, 2010 | ) | SECTION J |
| | ) | |
| | ) | |
| | ) | HONORABLE CARL J. |
| | ) | BARBIER |
| | ) | |
| | ) | |
| Applies to: All Cases | ) | MAGISTRATE JUDGE |
| | ) | SHUSHAN |

_____

**Supplemental Declaration of Martin D. Smith**

1.      I, Martin D. Smith, submit this supplemental declaration in support of BP Defendants'
Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages
Settlement Agreement As Amended On May 2, 2012 ("Settlement Agreement").

**I.      Assignment**

2.      I have been asked by Counsel for BP to respond to various allegations, conclusions,
representations, and/or assertions made by certain objectors to the Seafood Compensation
Plan ("SCP") component of the Settlement Agreement. Specifically, I respond in this
declaration to elements of the "Objections to the Proposed *Deepwater Horizon*
Settlement Class by Gulf Organized Fisheries in Solidarity & Hope" (the "Go Fish
Objection" or "Go Fish"), and to the "Statement of Objections to the *Deepwater Horizon*
Economic and Property Damages Settlement Agreement by Disparately Treated Class
Members" filed by Wayne Warren Werner *et al.* (the "Werner Objection" or "Werner"). I
also respond to two specific comments in the "State of Louisiana's Memorandum in
Response and in Opposition to BP's and PSC's Motions for Final Approval of Economic

1

and Property Damages Class Settlement" (the "Louisiana Objection"). Lastly, I respond briefly to certain elements of the "Declaration of Marc Vellrath Regarding the Proposed Economic & Property Damages Settlement Agreement" (the "Vellrath Declaration" or "Vellrath") that pertain to my August Declaration. I have also reviewed the "Memorandum of the United States of America in Response to 'BP Defendants' Memorandum in Support of Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement'" (the "United States Memorandum"). I have focused this declaration on the aspects of these filings that relate to and/or criticize or misrepresent opinions I expressed in the declaration I filed in this matter on August 12, 2012 (the "August Declaration").[1] I have addressed the most significant issues raised by these filings, and a lack of comment on specific points in the objections should not be construed as agreement with the objectors' points of view.

3.     In addition to the above filings, I have reviewed other materials including the "Declaration of Daniel J. Balhoff" (Aug. 10, 2012), the "Declaration of John W. Perry, Jr." (Aug. 10, 2012), the "Second Declaration of Daniel J. Balhoff" (Oct. 19, 2012), the "Second Declaration of John W. Perry, Jr." (Oct. 19, 2012), and the "Memorandum in Response to Opposition by State of Louisiana to Motion for Final Approval of Economic and Property Damages Class Settlement" (Oct. 19, 2012) along with the attached declarations.

## II.     Introduction

4.     None of the filings mentioned above provide arguments or additional information that cause me to deviate from the conclusions presented in my August Declaration and my opinion that the SCP provides fair, reasonable, and adequate compensation to claimants.

5.     The Go Fish Objection raises two broad categories of concerns with the SCP, which it terms "duration" and "parity." The Go Fish Objection defines "duration" as compensation for losses and cushion against future risk,[2] and it implies that "parity" is

---

[1] "Declaration of Martin D. Smith," August 12, 2012. A detailed description of my expertise, appointments, academic and research experience, and honors and awards is provided in Appendix A of my August Declaration.
[2] Go Fish Objection, pp. 1-2.

important to achieve between fisheries and different fishing occupations.[3] Go Fish is also dismissive of the critical role of investment in natural capital for fisheries (e.g., oyster leaseholds and Individual Fishing Quotas, or IFQs) without providing any analysis or data;[4] in particular, Go Fish attempts to create an artificial distinction between fish harvesters and natural capital investors when both are inseparable from the fishery. I find many of the implicit assumptions and analyses put forth in the Go Fish Objection to be flawed and unreliable as I outline below. The Go Fish Objection concedes that $2.3 billion is an adequate amount in aggregate to compensate fishermen.[5] Thus, most of the supposed concerns they raise about the sufficiency of compensation stem from flawed concerns with parity – primarily, but not exclusively, focused on projected payments to oyster leaseholders.[6] As discussed below, these concerns are often premised on incorrect assumptions and a misunderstanding of the facts.

6.      The Werner Objection is narrower in scope than the Go Fish Objection and deals specifically with the finfish portion of the SCP.[7] It alleges differences in impact across various species of finfish, and like Go Fish, calls into question the distribution of settlement dollars.[8] It also asserts (without support) that the loss percentage for finfish is too low and the cost percentage is too high.[9] I describe below how these arguments are inconsistent with available data and why I do not find them convincing.

7.      The parity concerns raised in Go Fish and implicit in Werner are not consistent with the way that I assess the SCP. It is my understanding that fairness requires that potential claimants receive adequate compensation. My previous declaration assessed the SCP by this standard of fairness.[10] I judged the SCP to be fair in that it leaves minimal risk that any claimant will be undercompensated.[11] Fairness by this standard is not undermined by the possibility that some claimants may be overcompensated.

---

[3] Go Fish Objection, p. 2.
[4] See for example: Go Fish Objection, pp. 2, 9, 12, 14, 15, 17, 20.
[5] Go Fish Objection, p. 3.
[6] See for example: Go Fish Objection, pp. 2, 9, 12, 14, 15, 17, 20.
[7] Werner Objection, ¶1.
[8] Werner Objection, ¶4.
[9] Werner Objection, ¶7.
[10] "Declaration of Martin D. Smith," August 12, 2012, pp. 3-4.
[11] "Declaration of Martin D. Smith," August 12, 2012, p. 10.

8.      There are a number of specific assertions contained in the Go Fish Objection, the Werner Objection, the Louisiana Objection, and the Vellrath Declaration to which I respond below.

**III.    Go Fish wrongly suggests certain claims are not revenue-related or related to fishing income.**

9.      The Go Fish Objection states that: "[p]roperty and diminution claims are not the same as lost wage claims; nor can they be properly ascribed to commercial fishermen."[12] However, attempts to distance oyster leasehold and IFQ owners from fishing are misleading and inaccurate for assessing the fairness of economic damages.

10.     Fish stocks and their habitats are essential capital assets to the fishing industry; they are the sources of profits for vessel owners and wages paid to captains and crew. What distinguishes these capital assets from other types of capital is that they are directly tied to the common-pool resource. Without these natural capital assets, there is no fishing industry. To suggest that they are "not related to fishing income"[13] is misleading and inaccurate. Go Fish attempts to distance individuals who hold IFQs and leaseholds from the fishery by likening them to individuals who have a strictly financial asset that could just as easily be an alternative asset.[14] A shareholder in McDonald's Corporation is not really engaged in the fast-food industry. Taking Go Fish's logic, leasehold and IFQ owners are like shareholders in McDonald's Corporation. However, Go Fish's logic is flawed; leasehold and IFQ owners more realistically should be compared to franchise owners who may not cook the food or design the menu, but who contribute important value and by all measures are engaged in the fast-food industry.[15]

11.     It is possible for oyster leasehold claimants to augment the oyster stock through capital investments on oyster grounds. Compensating oyster capital investors is also consistent

---

[12] Go Fish Objection, p. 8.

[13] Go Fish Objection, p. 9.

[14] Go Fish Objection, p. 8.

[15] Although I do not have access to data on IFQ owners, the objections in Werner anecdotally contradict the contention in the Go Fish Objection. The objectors in Werner are all commercial vessel owners, boat captains, *and* IFQ owners. (Technically, Walker Fishing Fleet, Inc. owns the vessels and IFQ, although the company is headquartered at the same address and has the same contact phone number as the individual David Walker.) The notion that these individuals are not fishermen by virtue of owning IFQs is incorrect.

with the immobility of oysters. Because adult oysters do not relocate on their own, the fishery is anchored in space more than other fisheries in the SCP. Potential use of this space is what oyster leasehold owners actually own and a part of what they are being compensated for in the SCP.

IV.   **The Go Fish Objection argues that payments to oyster leaseholders and IFQ owners should be excluded when estimating the fairness of the SCP settlement and that the amount of the settlement is not adequately generous to fishermen after doing so.[16] The facts and analysis of the data do not support this argument.**

12.   Go Fish argues that comparisons of the size of the $2.3 billion dollar SCP settlement to the size of the class fisheries are misleading because payments to oyster leaseholders and IFQ owners are included in that amount.[17] As I discuss above, I disagree with Go Fish's assertion that oyster leaseholders' and IFQ owners' claims are not related to fishing income.

13.   However, in the interests of completeness, I have augmented the analysis from my August Declaration[18] to perform a fishery-level estimate of the compensation payments under the SCP. These estimates are shown in the first row of Exhibit 1A.[19] These estimates include combined rounds 1 and 2 amounts.[20] The fishery-level totals for compensation that I estimate reinforce the conclusions from my August Declaration that the SCP provides compensation amounts that are fair, reasonable, and adequate. As I did in my August Declaration, I compare settlement amounts to revenues in perpetuity. This methodology allows me to compute the estimated payment amounts as equivalent percentages of permanent losses in the fisheries.[21] I also compute ratios of settlement

---

[16] See for example: Go Fish Objection, pp. 2, 9, 12, 14, 15, 17, 20.

[17] Go Fish Objection, pp. 7-9.

[18] "Declaration of Martin D. Smith," August 12, 2012, pp. 4-8.

[19] The compensation amounts that I estimate independently in Exhibit 1A are close but not identical to those reported in the "Seafood Compensation Program Projection." ("Memorandum (in Support of Economic Class Settlement) in Excess of Ordinary Page Limitations by Plaintiffs Economic and Property Damage Class Representatives," August 13, 2012, Exhibit A.") The overall total that I calculate is less than 2% different from the total calculated in the "Seafood Compensation Program Projection."

[20] Although I understand that the court-appointed seafood neutral has not yet determined how to allocate funds in round 2, I assume a proportional round 2 distribution on a *pro rata* basis as the Go Fish Objection assumes.

[21] "Declaration of Martin D. Smith," August 12, 2012, Exhibit 2. The calculations follow the same methodology from my August Declaration applied to each fishery. Assuming that average revenues from 2007-2009 by fishery

amounts to average revenues in the benchmark period. As can be seen in Table 1 below, by all measures, the SCP amounts are fair, reasonable, and adequate. For example, payments to the participants in the shrimp fishery represent 26% of perpetuity revenues, 43% of perpetuity revenues net of non-labor variable costs, and 3.8 times average annual revenues. Thus, this compensation is sufficient to compensate for a 26 to 43% permanent loss in shrimp fishery revenues.[22] As shown in Table 1, 2011 shrimp revenues are up relative to the benchmark period, which suggests that the settlement amounts are high relative to likely harm.

14.   Table 1 demonstrates that the SCP is similarly generous for other fisheries compensated under the SCP when considering the sizes of 2010 revenue declines from the benchmark period and apparent revenue recoveries in 2011.

**Table 1: Revenues and Revenues Net of Non-Labor Variable Costs Compared to SCP Amount[23]**

|  | Shrimp | Oyster | Blue Crab | Finfish | Other |
|---|---|---|---|---|---|
| Percent Change in Revenues: Average 2007 - 2009 to 2010 | -4% | -19% | -6% | -20% | 39% |
| Percent Change in Revenues: Average 2007 - 2009 to 2011 | 24% | -5% | 11% | 11% | 50% |
| Settlement as a Percent of Revenues in Perpetuity (7% Discount Rate) | 26% | 102% | 22% | 18% | 7% |
| Settlement as a Percent of Revenues Net of Non-Labor Variable Costs in Perpetuity (7% Discount Rate) | 43% | 116% | 34% | 24% | 10% |
| Ratio of SCP Compensation Amount to Average Annual Revenues 2007 - 2009 | 3.8 | 14.6 | 3.2 | 2.5 | 0.9 |

[22] These perpetuity values are based on the United States Office of Management and Budget's recommended real discount rate of 7% for benefit-cost analysis. (Office of Management and Budget, Circular No. A-94 Revised, available at, http://www.whitehouse.gov/omb/circulars_a094.) Exhibits 1A and 1B provide additional perpetuity calculations using a range of other possible discount rates. My conclusions are unchanged when I consider perpetuity values based on alternate discount rates.

[23] Revenues are based on publicly-available NOAA landings data. (Accessed October 6, 2012 from http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html.) The 7% discount rate is the United States Office of Management and Budget's recommended real discount rate for benefit-cost analysis. (Office of Management and Budget, Circular No. A-94 Revised, available at, http://www.whitehouse.gov/omb/circulars_a094.)

would have continued forever (in perpetuity), I calculate the present value of all future revenues by dividing average revenues by the real discount rate. Discount rates are higher for riskier industries such as fishing because the value today of the promise of a future payment is worth less than the value today of a promise of a more certain future payment.

15.     I estimate compensation to oyster leaseholders to total $579 million in the first disbursement, based on 393,506 acres of leases eligible for economic loss compensation. Go Fish argues that this total far underestimates payments to oyster leaseholders because this estimate is "based solely on oyster leases issued by state agencies,"[24] and they claim that it fails to account for oyster leaseholders who do not have a state-issued lease.[25] It is my understanding of the SCP that in order for oyster leaseholders to participate in the Oyster Compensation Plan, they must provide an "oyster lease ID number" and "provide documentation that their leasehold interest is in good standing, such as proof of renewal."[26] Thus, the number of acres used to estimate oyster leasehold compensation, which is based on oyster leases registered with the state, is a reasonable number.

16.     I recognize that Go Fish believes that payments to natural capital owners such as oyster leasehold and IFQ owners should not be compensated through the SCP amount. While I disagree with this approach, I repeat the above analysis in Table 2 below removing payments for claimants that Go Fish argues (incorrectly) are not directly related to fishing revenue. Specifically, I omit the following payments: oyster leasehold interest, payments to owners of crab traps, and payments to IFQ owners. These results thus use only the portion of the SCP that Go Fish considers appropriate. This change significantly reduces the oyster ratios and percent of perpetuity revenues, and slightly reduces the same figures for blue crab, finfish, and other.

17.     My opinion is that the resulting numbers in Table 2 still demonstrate compensation amounts for shrimp harvesters, oyster harvesters, blue crab harvesters, finfish harvesters, other seafood harvesters, and income to oyster leasehold owners that are fair, reasonable, and adequate.

---

[24] Go Fish Objection, p. 11.
[25] Go Fish Objection, p. 11.
[26] SCP, pp. 25-26.

**Table 2: Revenues and Revenues Net of Non-Labor Variable Costs Compared to SCP Amount Using Go Fish's Unreasonable Assumption (Excluding Oyster Leasehold Interest, IFQ Payments, and Crab Trap Payments)[27]**

|  | Shrimp | Oyster | Blue Crab | Finfish | Other |
|---|---|---|---|---|---|
| Percent Change in Revenues: Average 2007 - 2009 to 2010 | -4% | -19% | -6% | -20% | 39% |
| Percent Change in Revenues: Average 2007 - 2009 to 2011 | 24% | -5% | 11% | 11% | 50% |
| Settlement as a Percent of Revenues in Perpetuity (7% Discount Rate) | 26% | 27% | 18% | 12% | 5% |
| Settlement as a Percent of Revenues Net of Non-Labor Variable Costs in Perpetuity (7% Discount Rate) | 43% | 31% | 28% | 16% | 8% |
| Ratio of SCP Compensation Amount to Average Annual Revenues 2007 - 2009 | 3.8 | 3.9 | 2.6 | 1.7 | 0.8 |

## V.   The bottom-up compensation approach under the SCP is fair and reasonable.

18.     While the total estimated compensation amounts are strikingly large in aggregate and large when broken down by individual fishery, the best measure of fairness is if, at the individual level, the formulas in the SCP lead to fair, adequate, and reasonable compensation. The approach in the SCP is bottom-up in that it is grounded in the particular circumstances of individual claimants, including past earnings, roles of the claimants in their respective fisheries, sizes of operations, and amounts of natural capital owned. As discussed in my August Declaration, the bottom-up approach in the SCP is also comprehensive in its coverage of potential claimants.

19.     Within each fishery, the bottom-up approach in the SCP allows compensation amounts to scale reasonably; fishermen with higher benchmark earnings receive more compensation than fishermen with lower benchmark earnings, and owners of more natural capital prior to the Deepwater Horizon incident receive more compensation than owners of less natural capital.

---

[27] Revenues are based on publicly-available NOAA landings data. (Accessed October 6, 2012 from http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html.) The 7% discount rate is the United States Office of Management and Budget's recommended real discount rate for benefit-cost analysis. (Office of Management and Budget, Circular No. A-94 Revised, available at, http://www.whitehouse.gov/omb/circulars_a094.) Exhibits 1A and 1B provide additional perpetuity calculations using a range of other possible discount rates. My conclusions are unchanged when I consider perpetuity values based on alternate discount rates.

20.    As I discussed in my August Declaration, analyzing the SCP at the individual level reveals numerous assumptions about losses and costs that favor claimants in compensation formulas, and the compounding of these assumptions further favors claimants. RTPs used to compute individual total compensation amounts turn base compensation amounts into substantial permanent loss equivalents.

21.    For example, crew will receive payments under the SCP that are proportional to their individual earnings in the baseline period. Go Fish ignores this fundamental dimension of fairness. The option in the SCP allowing crew to choose different baseline periods (2009 earnings, the average of 2008 and 2009 earnings, or the average of 2007-2009 earnings) is favorable to crew.[28] Further, the loss percentage for crew of 37%[29] is higher than revenue declines for fisheries compensated by the SCP in 2010 **or** in 2011 relative to the benchmark period of 2007-2009.[30] This favorable assumption increases crew compensation relative to likely losses.

22.    For all of these reasons, my opinion is that the bottom-up approach in the SCP is appropriate and highly likely to result in compensation amounts that are fair, reasonable, and adequate for potential claimants.

## VI.    The Go Fish Objection and the Werner Objection incorrectly interpret the relationship between fishing costs and fish stocks.

23.    Go Fish raises a legitimate question about the treatment of cost percentages, but the inferences they draw about damages are misleading and unreasonable. In particular, the Go Fish Objection asserts that:

> "The cost and loss percentages explained by BP's expert are mutually exclusive. If saved expenses should be backed out of lost revenue because a fisherman cannot fish 'in response to a lower abundance of fish' isn't the fisherman's loss percentage 100%? Conversely, if the fisherman is still fishing but catching less, what suggests the vessel will not burn fuel? As the statements of fishermen

---

[28] SCP, p. 66.
[29] SCP, pp. 70, 77.
[30] See Table 1.

attached to this objection attest, costs naturally go up when fish is less abundant because it takes more time and effort to bring in an adequate catch. Applying both reductions dramatically reduces the base loss prior to applying the 'generous' RTP. … Under any reasonable construction of fishermen's business losses 'saved expenses' should not be assessed …."[31]

24.   The conclusions that Go Fish draws in the above paragraph rely on assumptions about potentially harmed fisheries in the Gulf that sharply contradict the peer-reviewed scientific literature on behavior of fishing fleets. Moreover, Go Fish fails to acknowledge the broader context of cost percentages and loss percentages in the SCP. It is indeed the case that costs tend to rise in fisheries when there is lower abundance. This phenomenon is known as the "stock effect" in fisheries economics, and researchers debate how significant it is.[32]

25.   That said, Go Fish's interpretation of the link between costs and stocks is incorrect and misleading. Go Fish paints two extreme views of possible behavioral responses to abundance changes: 1) fishermen stop fishing altogether ("isn't the fisherman's loss percentage 100%?") or 2) fishermen maintain, or possibly increase, their levels of fishing effort ("more time and effort to bring in an adequate catch."). The first of these suggests that fishermen go from maximum fishing effort to not fishing at all in response to even a small change in profitability. The second suggests that fishermen are completely unresponsive to changes in the economic conditions in the fishery. The Werner Objection suggests a similar supply response: "… Fishermen must now spend considerably more effort and time to harvest the same amount of fish compared with pre-Spill timeframes."[33] None of the empirical literature in fisheries economics supports either of these extreme views, and neither Go Fish nor Werner provide any statistical evidence to support their claims about fishing supply response.

---

[31] Go Fish Objection, p. 16.
[32] Some research shows that stock effects are important enough to manage fish stocks at levels that exceed what would otherwise produce maximum sustainable yield (Grafton, R. Q., Kompas T., and Hilborn, R. W., "Economics of Overexploitation Revisited," *Science*, December 7, 2007), while others show that technological change in fisheries has all but eliminated the importance of the stock effect (Squires, Dale, and Vestergaard, Niels, "Technical Change and the Commons," Working paper, 2009).
[33] Werner Objection, ¶2.

26. Empirical studies show that fishing effort is responsive over time and space to economic opportunities. In contrast with Go Fish's and Werner's claims, studies show that fishermen increase effort in response to higher prices and higher abundance, and fishermen decrease effort in response to higher costs.[34] Although some scholarly studies find evidence that fishermen do not adjust their fishing activities instantaneously to changing profit opportunities and that different fishermen respond differently to profit opportunities, none of these studies lend any empirical support to the extreme assumptions in Go Fish.[35]

27. The most likely long-term outcome in a hypothetical future with lower abundance would be some attenuation in fishing effort. Lower stocks would tend to raise costs, but less participation would reduce competition for the resources and select for more efficient vessels, potentially lowering costs. Whether the net effect on average costs for the fleet would increase or decrease is speculative.

28. In this hypothetical future of lower abundance, efficient vessels that are low-cost would be better able to mitigate hypothetical damages than inefficient high-cost vessels. The SCP implicitly addresses this fairness issue by using averages. The high-cost vessels would have received relatively more compensation for past losses than low-cost vessels

---

[34] See for example: Berman, Matthew, Haley, Sharman, and Kim, Hongjin, "Estimating Net Benefits of Reallocation: Discrete Choice Models of Sport and Commercial Fishing," *Marine Resource Economics*, Vol. 12, 1997, pp. 307-327; Bockstael, Nancy E., and Opaluch, James J., "Discrete Modelling of Supply Response Under Uncertainty: The Case of the Fishery," *Journal of Environmental Economics and Management*, Vol. 10, 1983, pp. 125-137; Curtis, Rita, and Hicks, Robert L., "The Cost of Sea Turtle Preservation: The Case of Hawaii's Pelagic Longliners," *American Journal of Agricultural Economics*, Vol. 82, December 2000, pp. 1191-1197; Kahui, Viktoria, and Alexander, William Robert James, "A Bioeconomic Analysis of Marine Reserves for Paua (Abalone) Management at Stewart Island, New Zealand," *Environmental and Resource Economics*, Vol. 40, 2008, pp. 339-367; Smith, Martin D., "Two Econometric Approaches for Predicting the Spatial Behavior of Renewable Resource Harvesters," *Land Economics*, Vol. 78, November 2002, pp. 522-538; Smith, Martin D., Zhang, Junjie, and Coleman, Felicia C., "Econometric Modeling of Fisheries and Complex Life Histories: Avoiding Biological Management Failures*," Journal of Environmental Economics and Management*, Vol. 55, May 2008, pp. 265-280; and Zhang, Junjie, "Behavioral Response to Stock Abundance in Exploiting Common-Pool Resources," *The B.E. Journal of Economic Analysis and Policy*, Vol. 11, 2011.

[35] See for example: Holland, Daniel S., and Sutinen, Jon G., "Location Choice in New England Trawl Fisheries: Old Habits Die Hard," *Land Economics*, Vol. 76, February 2000, pp. 133-149; Mistiaen, Johan A., and Strand, Ivar E., "Location Choice of Commercial Fishermen with Heterogeneous Risk Preferences," *American Journal of Agricultural Economics*, Vol. 82, December 2000, pp. 1184-1190; Smith, Martin D., and Wilen, James E., "Marine Reserves with Endogenous Ports: Empirical Bioeconomics of the California Sea Urchin Fishery," *Marine Resource Economics*, Vol. 18, 2004, pp. 85-112; Ward, John M., and Sutinen, Jon G., "Vessel Entry-Exit Behavior in the Gulf of Mexico Shrimp Fishery," *American Journal of Agricultural Economics*, Vol. 76, November 1994, pp. 916-623; and Zhang, Junjie, and Smith, Martin D., "Heterogeneous Response to Marine Reserve Formation: A Sorting Model Approach," *Environmental and Resource Economics*, Vol. 49, 2011, pp. 311-325.

because the cost percentages used in the SCP average across low-cost and high-cost vessels. This self-regulating feature of the SCP reinforces the logic of using averages.

29. With ambiguity about hypothetical future cost increases, the context of loss percentages and cost percentages in the SCP is essential. In my August Declaration, I showed how the SCP makes a number of assumptions that err on the side of being favorable to potential claimants and, importantly, that these assumptions tend to compound in ways that favor claimants.[36] This analysis went unchallenged by objectors. The compounding of assumptions favorable to claimants provides a large cushion to offset the possibility that future average costs increase.[37]

30. Claiming that a fisherman's base loss should be the loss percentage times gross revenue or claiming that base loss should be 100% of net revenues are both unreasonable from an economic perspective.[38]

**VII. Both the Go Fish and Werner Objections fail to recognize the rationale for the use of averages in the SCP and employ the wrong unit of analysis.**

31. The Go Fish Objection and Werner Objection improperly rely on the use of basin-level or Gulf sub-region-level landings.[39] These data constitute the wrong unit of analysis; Gulf-wide averages as used in the SCP are more appropriate.

---

[36] "Declaration of Martin D. Smith," August 12, 2012, p. 10, Exhibit 4.
[37] An example from my own research on the effects of hypoxia on the North Carolina shrimp fishery further demonstrates that Go Fish's assumptions are unreasonable. Colleagues and I first studied the empirical impact of hypoxia on shrimp catches and revenues, holding constant the level of fishing effort. That is, the empirical study was designed to reveal what happens to catches as a result of hypoxia but assuming fishing effort remains unchanged. We found a harvest decrease of roughly 13% corresponding to a revenue decrease of roughly 13%. (See for example: Huang, Ling, Smith, Martin D., and Craig, J. Kevin, "Quantifying the Economic Effects of Hypoxia on a Fishery for Brown Shrimp Farfantepenaeus aztecus," *Marine and Coastal Fisheries: Dynamics, Management, and Ecosystem Science*, Vol. 2, 2010, pp. 232-248.) However, accounting for the fact that the fleet adjusts to changing economic circumstances and does not always incur costs of fishing leads to a much lower estimate of actual economic losses; economic losses attributable to the hypoxia are only in the range of 3% of total revenues, less than a quarter of what one would attribute to the problem based on a simple assessment of revenues. (See for example: Huang, Ling, Nichols, Lauren A. B., Craig, J. Kevin, and Smith, Martin D., "Measuring Welfare Losses from Hypoxia: The Case of North Carolina Brown Shrimp," *Marine Resource Economics*, Vol. 27, 2012, pp. 3-23.) Similar behavioral responses would be expected for an environmental disturbance that lowers abundance of fish in the Gulf of Mexico. Of course, my empirical studies of hypoxia and shrimp were conducted on a brown shrimp fishery outside the Gulf of Mexico. However, the findings are consistent with the large body of research conducted by a range of scholars on many different fisheries in many different regions as described above.
[38] Go Fish Objection, p. 16.
[39] Go Fish Objection, pp. 18-19; Werner Objection, ¶¶2-3.

**a. Focusing on fine spatial resolution (basin- or Gulf sub-region-level) ignores the reality that most fisheries are characterized by mobility of fish stocks and mobility of fishing fleets.**

32.    The empirical literature is clear that fishing effort responds spatially to spatial changes in economic opportunities.[40] Simply put, fishermen adjust their fishing effort depending on where the fish are. Some changes, if any, in spatial fishing effort patterns subsequent to the *Deepwater Horizon* incident may have resulted from the incident and some may have occurred anyway, but what is important is that fishermen generally are not anchored in space. In such a dynamic environment, focusing on a fine spatial resolution as the basis for calculating compensation would ignore mitigation measures and fail to reflect the fishery as a whole. Interestingly, the oyster leasehold owners are tied inextricably to particular locations and thus have very limited spatial adjustment opportunities. Yet, Go Fish claims that these individuals are receiving too much compensation.[41]

**b. The numbers that Werner uses to discuss fishery performance at the basin-level are misleading, unreliable, and inaccurate.**

33.    Werner uses the example of vermilion snapper in the central and western Gulf of Mexico and states: "Vermillion [sic] snapper landings are off by 30% to 50% in some of these

---

[40] See for example: Abbott, Joshua K., and Wilen, James E., "Dissecting the Tragedy: A Spatial Model of Behavior in the Commons," *Journal of Environmental Economics and Management*, Vol. 62, November 2011, pp. 386-401; Bockstael, Nancy E., and Opaluch, James J., "Discrete Modelling of Supply Response Under Uncertainty: The Case of the Fishery," *Journal of Environmental Economics and Management*, Vol. 10, 1983, pp. 125-137; Eales, James, and Wilen, James E., "An Examination of Fishing Location Choice in the Pink Shrimp Fishery," *Marine Resource Economics*, Vol. 2, 1986, pp. 331-351; Hicks, Robert L., and Schnier, Kurt E., "Eco-labeling and Dolphin Avoidance: A Dynamic Model of Tuna Fishing in the Eastern Tropical Pacific," *Journal of Environmental Economics and Management*, Vol. 56, 2008, pp. 103-116; Holland, Daniel S., and Sutinen, Jon G., "Location Choice in New England Trawl Fisheries: Old Habits Die Hard," *Land Economics*, Vol. 76, February 2000, pp. 133-149; Mistiaen, Johan A., and Strand, Ivar E., "Location Choice of Commercial Fishermen with Heterogeneous Risk Preferences," *American Journal of Agricultural Economics*, Vol. 82, December 2000, pp. 1184-1190; Smith, Martin D., "State Dependence and Heterogeneity in Fishing Location Choice," *Journal of Environmental Economics and Management*, Vol. 50, 2005, pp. 319-340; and Zhang, Junjie, and Smith, Martin D., "Heterogeneous Response to Marine Reserve Formation: A Sorting Model Approach," *Environmental and Resource Economics*, Vol. 49, 2011, pp. 311-325.
[41] See for example: Go Fish Objection, pp. 2, 9, 11, 12, 14, 15, 17, 20.

areas. These fish have been displaced to the eastern zone of the Gulf, where landings have increased by only 7%-9%."[42]

34.     The objection provides no documentation or explanation of how these numbers were calculated. Furthermore, presenting numbers in this way is misleading because it says nothing about the relative sizes of the landings within each of the regions and thus the overall change. It turns out that the largest landings since 2007 have been in the Eastern Gulf anyway. Moreover, the overall change in vermilion snapper landings is much different than what the Werner numbers would lead a casual reader to believe. In particular, for the Gulf of Mexico, I compared 2011 landings of vermilion snapper to average landings for 2007-2009 and found a net *increase* of 5%.[43] Examining changes in landings by Gulf regions, I found a decline of 24% in the Western Gulf, a decline of 32% in the Central Gulf, and an increase of 30% in the Eastern Gulf. Thus, the reporting of the regional numbers alone masks the overall Gulf-wide change because it ignores the larger volumes in the Eastern Gulf both in 2011 and historically prior to the Deepwater Horizon incident.

**VIII.   The fishery data are not indicative of expected "catastrophic damage in the future."[44]**

**a.   The Werner Objection claims that "there is a strong indication that the Gulf fisheries will suffer catastrophic damage in the future."[45] The IFQ data do not support this claim.**

35.     Snapper IFQ markets continue to signal confidence about the future of the fishery. The average price of IFQ shares (on a percentage basis and on a pound equivalent basis) increased from 2009 to 2010; this price increased again from 2010 to 2011.[46]

---

[42] Werner Objection, ¶3. Note that the purported increases Werner discusses occur in the eastern Gulf of Mexico and the decreases occur in the Western and Central areas of the Gulf of Mexico.

[43] This factual statement, as well as all others in this paragraph, are based on my analysis of publicly-available landings data obtained from NOAA (http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html). Specifically, I downloaded region-level vermilion snapper data from NOAA. I then calculated average total landings for 2007-2009, and compared this average to 2011 vermilion snapper landings for the entire Gulf region, as well as for the Western Gulf (Texas), Central Gulf (Louisiana, Mississippi, and Alabama), and the Eastern Gulf (Western Florida).

[44] Werner Objection, ¶5.

[45] Werner Objection, ¶5.

**b. Although I am not commenting as a biologist, the landings data to date are not suggestive of catastrophic future losses.[47]**

36.    I have now examined publicly available 2011 landings data from NOAA, and my opinion is that, to the extent that landings data provide some signal about fish stock health, these data are not suggestive of catastrophic future damage. Shrimp, oyster, blue crab, finfish, and all other seafood landings are up in 2011 relative to 2010.[48] Furthermore, for both finfish and all other seafood landings, 2011 landings are greater than landings in the 2007-2009 benchmark period. Although shrimp and blue crab landings in 2011 are down slightly when compared to the 2007-2009 benchmark period, the percentage differences are small, with shrimp landings down 0.8% and blue crab landings down 1.1%. The only fishery in the SCP for which 2011 landings are much lower than the 2007-2009 benchmark period is the oyster fishery, which was down 16.5%. However, this decline in 2011 compared to the benchmark period is less than the 27.9% decline in 2010 compared to the benchmark period.[49]

**c. For the red snapper fishery, the effort data also do not suggest a looming catastrophe.**

37.    Red snapper data provide some measures of catch-per-unit-effort (CPUE) and do not provide evidence of a looming catastrophe. CPUE is a standardized measure of the ratio of catch to fishing effort and is often used as a proxy for the condition of the fish stock. I find that red snapper CPUE has declined some but not dramatically. In fact, the declines in catch per trip and catch per trip day comparing 2011 to the averages of 2007-2009 are

---

[46] "Gulf of Mexico 2011 Red Snapper Individual Fishing Quota Annual Report," NOAA, August 2, 2012, p. 11. From 2009 to 2010, the average price per 0.0001% of a red snapper IFQ share increased by 29%, and the average price per pound equivalent increased by 11%. From 2010 to 2011, these values increased an additional 41% and 15%, respectively.

[47] NOAA ALS data available at http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html.

[48] This factual statement, as well as all others in this paragraph, are based on my analysis of publicly-available landings data obtained from NOAA (http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html). Specifically, I downloaded species- and region-level data from NOAA, and calculated total landings for shrimp, oysters, blue crab, finfish, and all other Gulf species for 2007, 2008, 2009, 2010, and 2011.

[49] NOAA ALS data available at http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html.

not even statistically significant.[50] The same is true comparing 2010 catch per trip and catch per trip day to the averages of 2007-2009.[51]

38.    CPUE declines in the red snapper fishery may not even be an indication of lower abundance. The declines in 2010 and 2011 coincided with sharp increases in the annual catch limit (from 2009) and corresponding increases in effort.[52] My own research on Gulf of Mexico reef-fish fisheries shows that CPUE will decline if effort increases and the stock is held constant.[53] Modest CPUE declines may be an artifact of effort increases and not stock decline.

39.    As discussed earlier, IFQ prices in 2011 increased from 2010 both on a percentage basis and on a per pound basis.[54] The positive signals from IFQ price appreciation and the small downturn in red snapper CPUE are supportive of my opinion that the SCP provides fair, reasonable, and adequate compensation that errs on the side of overcompensating potential claimants in the red snapper fishery.

## IX.    The Werner Objection's criticisms of the distribution of benefits across finfish claimants are without merit.

40.    Comparing how annual quotas are filled before and after the Deepwater Horizon incident as a measure of loss is misleading because the IFQ programs changed the fishery management rules in the year of the incident.[55, 56] Prior to implementation of IFQs, quotas

---

[50] I calculate that landings per trip declined by 126 pounds in 2011 compared to the 2007-2009 average (a 13.0% decline). The catch per trip day declined by 2.2 pounds in 2011 compared to the 2007-2009 average (a 0.9% decline). Tests of significance of the difference between the values in 2011 and the 2007-2009 average values indicate that they cannot be statistically distinguished from each other. ("Gulf of Mexico 2011 Red Snapper Individual Fishing Quota Annual Report," NOAA, August 2, 2012, p. 38.)

[51] I calculate that landings per trip declined 24 pounds in 2010 compared to the 2007-2009 average (a 2.5% decline). The catch per trip day declined by 6.8 pounds in 2010 compared to the 2007-2009 average (a 2.9% decline). Tests of significance of the difference between the values in 2010 and the 2007-2009 average values indicate that they cannot be statistically distinguished from each other. ("Gulf of Mexico 2011 Red Snapper Individual Fishing Quota Annual Report," NOAA, August 2, 2012, p. 38.)

[52] "Gulf of Mexico 2011 Red Snapper Individual Fishing Quota Annual Report," NOAA, August 2, 2012, p. 35.

[53] See for example: Smith, Martin D., Zhang, Junjie, and Coleman, Felicia C., "Effectiveness of marine reserves for large-scale fisheries management," *Canadian Journal of Fisheries and Aquatic Sciences*, Vol. 63, January 2006, pp. 153-164; and Zhang, Junjie, and Smith, Martin D., "Estimation of a Generalized Fishery Model: A Two-Stage Approach," *The Review of Economics and Statistics*, Vol. 93, May 2011, pp. 690-699.

[54] It is my understanding that payments to IFQ owners are available to owners of IFQs as of April 20, 2012. (See SCP, p. 49.) As such, I would not expect the potential settlement to be responsible for the observed price increases.

[55] Werner Objection, ¶2.

were industry-wide.[57] This management was a form of regulated open access that is well known to trigger a race to fish.[58] In this management style, individuals compete with each other to catch fish before the aggregate quota binds and the season is closed. This fishing derby with associated truncated seasons is precisely the inefficiency that IFQs seek to ameliorate. Longer seasons after IFQ implementation in 2010 and 2011 are exactly what economists would have expected even in the absence of the *Deepwater Horizon* incident. As such, longer seasons do not provide evidence of harm.

41.   Fishermen of reef-fish have flexibility to substitute across species and regions within the Gulf to mitigate potential losses. In my own research, I have found significant evidence of vessels that substitute across reef-fish species in response to changing economic conditions.[59] When one species (or group of species) becomes relatively more abundant, fishing effort responds by fishing more intensively for that species relative to others.[60] Similarly, when one area becomes more abundant, fishermen respond by fishing more intensively in that area relative to others.[61] As such, focusing on performance at the species- or basin-level within the collection of finfish is the wrong unit of analysis for assessing losses.

42.   IFQ owners have even more flexibility to mitigate potential losses and receive additional compensation in the SCP. IFQ owners can substitute across target species and locations in the same ways that non-IFQ owners can in the reef-fish complex. If they are home ported in areas where abundance is down relative to others, they can lease their quota to other fishermen near more abundant locations. To the extent that catches are down overall for IFQ species, IFQ owners are receiving separate compensation roughly

---

[56] Note that the expansion of the IFQ program in 2010 was independent and unrelated to the *Deepwater Horizon* incident.

[57] "Gulf of Mexico 2011 Red Snapper Individual Fishing Quota Annual Report," NOAA, August 2, 2012, p. 4; "2010 Gulf of Mexico Grouper-Tilefish Individual Fishing Quota Annual Report," NOAA, December 13, 2011, p. 4.

[58] See for example: Homans, Frances R., and Wilen, James E., "A Model of Regulated Open Access Resource Use," *Journal of Environmental Economics and Management*, Vol. 32, 1997, pp. 1-21.

[59] See for example: Zhang, Junjie, and Smith, Martin D., "Heterogeneous Response to Marine Reserve Formation: A Sorting Model Approach," *Environmental and Resource Economics*, 2011.

[60] Zhang, Junjie, and Smith, Martin D., "Heterogeneous Response to Marine Reserve Formation: A Sorting Model Approach," *Environmental and Resource Economics*, 2011.

[61] See for example: Zhang, Junjie, and Smith, Martin D., "Heterogeneous Response to Marine Reserve Formation: A Sorting Model Approach*,*" *Environmental and Resource Economics*, 2011.

equivalent to 62.5% of total 2010 IFQ value.[62] To the extent that IFQ owners are invested in particular species, the IFQ compensation is sufficient to protect against future losses.

## X.   The Werner Objection's suggestions that the loss percentage for finfish is too low and the cost percentage is too high are unsupported by the data.[63]

43.    In my August Declaration, I calculated the revenue decrease in 2010 relative to the benchmark period of 2007-2009 as approximately 15% for finfish.[64] The loss percentage in the SCP is substantially larger than this percentage at 25%, which favors the claimants.[65] Moreover, finfish fishermen will have the option of choosing 2009, the average of 2008-2009, or the average of 2007-2009 for their benchmark revenues (and potentially of excluding years from those calculations under certain circumstances if approved by Claims Administrator),[66] which effectively makes the loss percentage even more generous. The claim that the loss percentage is too low is not supported by the data.

44.    In my August Declaration, I estimated that the cost percentage for finfish is approximately 30%.[67] The cost percentage in the SCP is below that level at 27%, which favors the claimants.[68] As such, the Werner objection to the cost percentage is not supported by the data.

---

[62] SCP, p. 50. In addition to relying on the 2010 IFQ values to assess the share of value paid out in the SCP, I have calculated IFQ values two alternative ways. One is based on the price of landed fish, the IFQ allocation price, landed quantities in the baseline period, and the discount rate. The other is based on the IFQ allocation price, landed quantities in the baseline period, and the discount rate. Using these alternative approaches, I find that the payout in the SCP is between approximately 30 and 115% of values of the IFQs, which supports my conclusion above.
[63] Werner Objection, ¶7.
[64] "Declaration of Martin D. Smith," August 12, 2012, Exhibit 3.
[65] SCP, p. 47.
[66] SCP, p. 43.
[67] "Declaration of Martin D. Smith," August 12, 2012, p. 21.
[68] SCP, p. 47.

**XI.    Landings data provide important information that is relevant to the SCP.**

  **a.  The Louisiana Objection mischaracterizes my August Declaration as "based almost entirely on Shoreline Cleanup Assessment Teams ('SCAT'), Operational Science Advisory Teams ('OSAT') and commercial fisheries landings data."[69]**

45.    My opinions in my August Declaration and in this declaration are based on my expertise and experience working in fisheries economics. This experience is detailed more fully in Appendix A of my August Declaration,[70] and includes writing scholarly articles, advising policy makers, conducting research, and editing the leading journal on the subject among other activities. My opinions rely upon a broad array of data including: commercial fisheries landings data; scholarly articles published in the peer-reviewed literature; extensive fisheries cost data from NOAA, from Gulf States Marine Fisheries Commission, and from a report to the Louisiana Department of Natural Resources; data on oyster prices from Louisiana State University; fuel price data from the U.S. Energy Information Agency; fuel tax information from the American Petroleum Institute; IFQ share prices, allocation prices, and trade volumes from NOAA; and, additional information from the U.S. Office of Management and the Budget and the U.S. Department of Labor, Bureau of Labor Statistics. The Louisiana Objection's claim about what I relied upon in my August Declaration is factually incorrect.

  **b.  The Louisiana Objection's characterization of the role of landings data in general is incorrect.**

46.    The Louisiana Objection states "reliance on commercial landing data is an equally unreliable and inaccurate means of assessing fish and shellfish health and population dynamics."[71] The objection later refers to "irrelevant past and current commercial fisheries landings data."[72]

47.    Landings data provide essential information for assessing fish stocks. Landings data are not the ***only*** relevant information on fish stocks. Nevertheless, landings data are routinely

---

[69] Louisiana Objection, pp. 11-12.
[70] "Declaration of Martin D. Smith," August 12, 2012, Appendix A.
[71] Louisiana Objection, p. 12.
[72] Louisiana Objection, p. 19.

used in peer-reviewed stock assessments of commercial fish stocks in the United States, including fisheries in the Gulf of Mexico.[73] In my experience on the Mid-Atlantic Council Scientific and Statistical Committee, landings data are always a portion of the information relied upon to make recommendations to the Council about Allowable Biological Catches. To argue that landings data are an "unreliable and inaccurate means of assessing …population dynamics"[74] is misleading and fails to acknowledge the important role for landings in stock assessment.

48.     Ideally, to assess fish stocks, landings data are used in conjunction with other data sources, including fishery-independent surveys, fishing effort data, and fish life history information. But these other data sources are not always available and scholars sometimes use catch records alone to assess stocks. In my opinion, landings data alone should not be used to make broad claims about the health of fisheries when other data sources are available. To the extent that landings data in isolation provide some signal, the peer-reviewed literature suggests that the signal would classify more fisheries as collapsed than a more thorough assessment would.[75]  Thus, the use of landings data alone would tend to over- rather than under-estimate harm.

---

[73] See for example: Guillory, Vincent, Perry, Harriet, Steele, Phil, Wagner, Tom, Keithly, Walter, Pellegrin, Butch, Petterson, John, Floyd, Traci, Buckson, Bruce, Hartman, Leslie, Holder, Ed, and Moss, Charles, "The Blue Crab Fishery of the Gulf of Mexico, United States: A Regional Management Plan," *Gulf States Marine Fisheries Commission,* October, 2001; "Oyster Stock Assessment Report of the Public Oyster Areas in Louisiana Seed Grounds and Seed Reservations," *Louisiana Department of Wildlife and Fisheries,* July 2010; Nance, James M., "Stock Assessment Report 2007: Gulf of Mexico Shrimp Fishery," *NOAA,* July 2008; "SEDAR 12 Stock Assessment Report: Gulf of Mexico Red Grouper," *NOAA,* 2006; and "SEDAR 17 Stock Assessment Report: South Atlantic Vermilion Snapper," *NOAA,* November 19, 2008; "Stock Assessment Report of SEDAR 7: Gulf of Mexico Red Snapper," *NOAA,* 2005.

[74] Louisiana Objection, p. 12.

[75] See for example: Wilberg, Michael J., and Miller, Thomas, "Comment on Impacts of Biodiversity Loss on Ocean Ecosystem Services," *Science,* June 1, 2007; de Mutsert, Kim, Cowan, James H. Jr., Essington, Timothy E., and Hilborn, Ray, "Reanalyses of Gulf of Mexico Fisheries Data: Landings Can Be Misleading in Assessments of Fisheries and Fisheries Ecosystems," *Proceedings of the National Academy of Sciences,* Vol. 105, 2008, pp. 2740-2744; and Anderson, Sean C., Branch, Trevor, A., Ricard, Daniel, and Lotze, Heike K., "Assessing Global Marine Fishery Status With a Revised Dynamic Catch-Based Method and Stock-Assessment Reference Points," *ICES Journal of Marine Science Advance Access,* 2012.

   **c.  Regardless of how much or how little landings data reveal about fish stocks, landings data are indispensable for understanding potential economic damages.**

49.   Landings data contain revenues from fishing.[76] These revenues pay wages in fisheries and cover other costs. What is left after costs are the returns on capital investment. Without revenues, there is no basis on which one could estimate potential losses in most fisheries. The suggestion that landings are "irrelevant" contradicts basic economic reasoning.

**XII.   The Vellrath Declaration supports my overall opinions on the SCP even while making a number of incorrect statements about conflicts among potential claimants.**

50.   Vellrath states that "…the total payments to Seafood Harvester Claimants under the Economic Damages Settlement will exceed these claimants' true aggregate economic losses many times over."[77] The argument that BP is overcompensating potential claimants reinforces my conclusions in this Declaration and in my August Declaration that claimants will receive compensation that is fair, adequate, and reasonable.

51.   Vellrath asserts that crew interests are in conflict with those of captains and vessel owners because the fund allocates estimated damages across owners, captains, and crew.[78] This claim is both false and misleading. The compensation approach in the SCP does not pit the interests of crew against those of captains and vessel owners. In fact, the SCP takes the concept of a crew "share" out of the equation entirely; crew compensation is based on documented crew earnings[79] under the SCP and not based on the share left over after captains and owners are compensated.[80] This means that crew interests are independent of the other parties and their compensation amounts will scale in accordance with their actual earnings in the benchmark period. As discussed above, I find this approach to be fair and reasonable.

---

[76] See for example: http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html.
[77] Vellrath Declaration, ¶255.
[78] Vellrath Declaration, ¶238.
[79] Crew without proper documentation of their earnings can still apply for compensation under the SCP. That compensation is also unrelated to any "share" of estimated damage. (SCP, pp. 65-84.)
[80] SCP, pp. 23, 33, 35, 48, 60, 63.

52.     Similarly, captains are not in conflict with vessel owners under the SCP. Captains who do not own vessels have the option of documenting either landings (and thus receiving the captain's share of estimated damages) *or* documenting actual earnings. The latter takes the captain's "share" out of the equation. I find this approach to be fair and reasonable.

**XIII.  Conclusions**

53.     As the above discussion demonstrates, none of the filings that I reviewed raise any credible arguments suggesting that the SCP will result in compensation amounts that are inadequate, unreasonable, or unfair. As such, the opinions I stated in my August Declaration are unchanged.

I declare under penalty of perjury under the laws of the United States of America that the above accurately states my opinions and analysis of the SCP.

Dated: October 22, 2012

_____

     Martin D. Smith

**Exhibit 1A**

**Revenues In Perpetuity and Full Compensation as Share of Revenues Based on 2007 - 2009 Average Landing Revenues**

| | Shrimp | Oyster | Blue Crab | Finfish | Other | Total |
|---|---|---|---|---|---|---|
| **SCP Compensation Amount (MM $)**[1] | $1,001 | $957 | $135 | $175 | $31 | $2,300 |
| **Average Annual Revenues 2007 - 2009 (MM $)** | $265 | $66 | $42 | $70 | $34 | $476 |
| **Revenues in Perpetuity (MM $)**[2,3] | | | | | | |
|     Discount Rate = 4.5% | $5,886 | $1,459 | $943 | $1,545 | $748 | $10,578 |
|     Discount Rate = 7.0% | $3,784 | $938 | $606 | $993 | $481 | $6,800 |
|     Discount Rate = 9.5% | $2,788 | $691 | $446 | $732 | $354 | $5,011 |
|     Discount Rate = 12.0% | $2,207 | $547 | $353 | $579 | $280 | $3,967 |
|     Discount Rate = 14.9% | $1,775 | $440 | $284 | $466 | $225 | $3,190 |
| **SCP Amount as a Percentage of Revenues in Perpetuity**[3,4] | | | | | | |
|     Discount Rate = 4.5% | 17% | 66% | 14% | 11% | 4% | 22% |
|     Discount Rate = 7.0% | 26% | 102% | 22% | 18% | 7% | 34% |
|     Discount Rate = 9.5% | 36% | 138% | 30% | 24% | 9% | 46% |
|     Discount Rate = 12.0% | 45% | 175% | 38% | 30% | 11% | 58% |
|     Discount Rate = 14.9% | 56% | 217% | 47% | 38% | 14% | 72% |

**Notes:**

[1] "SCP Compensation Amount" is the estimated amount that vessel owners and lessees, captains, crew, IFQ owners, and oyster leaseholders will receive as a result of the Seafood Compensation Plan through initial distributions by the Court-Appointed Neutral, as well as second round pro rata distributions.

[2] "Revenues in Perpetuity" is calculated by dividing the "Average Annual Revenues 2007 - 2009" by the "Discount Rate." This assumes that but-for future annual revenues can be approximated by the 2007 - 2009 average.

[3] The Office of Management and Budget (OMB) uses a real discount rate of 7.0 percent for benefit-cost analysis. Discount rates of 9.5 and 12.0 percent were used to account for the generally riskier nature of the fishing industry. The discount rate of 14.9 percent was chosen to reflect the 16.4 percent 2010 discount rate implied by the analysis of the Individual Fishing Quota program in the Gulf for Red Snapper ("Declaration of Martin D. Smith", August 12, 2012, Exhibit 9), subtracting the 1.5 percent rate of inflation in 2010 (calculated using the Bureau of Labor Statistics All Urban Consumer Price Index).

[4] "SCP Amount as a Percentage of Revenues in Perpetuity" is calculated as the "SCP Amount" divided by the "Revenues in Perpetuity."

**Sources:**

[a] NOAA ALS county-level data.

[b] "Circular No. A-94 Revised: Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs," Office of Management and Budget, October 29, 1992, available at http://www.whitehouse.gov/omb/circulars_a094#7.

[c] "Consumer Price Index, All Urban Consumers - (CPI-U)," U.S. Department of Labor, Bureau of Labor Statistics, available at ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt.

[d] SCP.

[e] Guillory, Vincent, Perry, Harriett, Wagern, Tom, et al., "The Blue Crab Fishery of the Gulf of Mexico, United States: A Regional Management Plan," Gulf States Marine Fisheries Commission, October 2001, Number 96.

[f] Liese, Christopher, Travis, Michael D., and James R. Waters, "The Annual Economic Survey of Federal Gulf Shrimp Permit Holders: Implementation and Descriptive Results for 2007," NOAA, July 2009.

[g] Liese, Christopher, Travis, Michael D., and James R. Waters, "The Annual Economic Survey of Federal Gulf Shrimp Permit Holders: Implementation and Descriptive Results for 2008," NOAA, March 2010.

[h] Miller, Alexander L. and Jack C. Isaacs, "An Economic Survey of the Gulf of Mexico Inshore Shrimp Fishery: Implementation and Descriptive Results for 2008," Gulf States Marine Fisheries Commission, September 2011 (Amended 2012).

[i] NMFS vessel data for AL, FL, LA, MS, and TX (2007-2009).

[j] "Southeastern U.S. Atlantic, Gulf of Mexico Stone Crab Trap/Pot Fishery," NOAA, 2012.

**Exhibit 1B**

**Revenues Net of Non-Labor Variable Costs In Perpetuity and Full Compensation as Share of Revenues Based on 2007 - 2009 Average Landing Revenues**

| | Shrimp | Oyster | Blue Crab | Finfish | Other | Total |
|---|---|---|---|---|---|---|
| **SCP Compensation Amount (MM $)**[1] | $1,001 | $957 | $135 | $175 | $31 | $2,300 |
| **Average Annual Revenues Net of Non-Labor Variable Costs 2007 - 2009 (MM $)** | $162 | $58 | $28 | $51 | $22 | $320 |
| **Revenues Net of Non-Labor Variable Costs in Perpetuity (MM $)**[2,3] | | | | | | |
| Discount Rate = 4.5% | $3,591 | $1,284 | $613 | $1,128 | $486 | $7,101 |
| Discount Rate = 7.0% | $2,308 | $825 | $394 | $725 | $312 | $4,565 |
| Discount Rate = 9.5% | $1,701 | $608 | $290 | $534 | $230 | $3,364 |
| Discount Rate = 12.0% | $1,347 | $481 | $230 | $423 | $182 | $2,663 |
| Discount Rate = 14.9% | $1,083 | $387 | $185 | $340 | $147 | $2,141 |
| **SCP Amount as a Percentage of Revenues Net of Non-Labor Variable Costs in Perpetuity**[3,4] | | | | | | |
| Discount Rate = 4.5% | 28% | 75% | 22% | 16% | 6% | 32% |
| Discount Rate = 7.0% | 43% | 116% | 34% | 24% | 10% | 50% |
| Discount Rate = 9.5% | 59% | 157% | 46% | 33% | 14% | 68% |
| Discount Rate = 12.0% | 74% | 199% | 59% | 41% | 17% | 86% |
| Discount Rate = 14.9% | 92% | 247% | 73% | 52% | 21% | 107% |

**Notes:**

[1] "SCP Compensation Amount" is the estimated amount that vessel owners and lessees, captains, crew, IFQ owners, and oyster leaseholders will receive as a result of the Seafood Compensation Plan through initial distributions by the Court-Appointed Neutral, as well as second round pro rata distributions.

[2] "Revenues Net of Non-Labor Variable Costs in Perpetuity" is calculated by dividing the "Average Annual Revenues Net of Non-Labor Variable Costs 2007 - 2009" by the "Discount Rate." This assumes that but-for future annual revenues net of non-labor variable costs can be approximated by the 2007 - 2009 average.

[3] The Office of Management and Budget (OMB) uses a real discount rate of 7.0 percent for benefit-cost analysis. Discount rates of 9.5 and 12.0 percent were used to account for the generally riskier nature of the fishing industry. The discount rate of 14.9 percent was chosen to reflect the 16.4 percent 2010 discount rate implied by the analysis of the Individual Fishing Quota program in the Gulf for Red Snapper ("Declaration of Martin D. Smith", August 12, 2012, Exhibit 9), subtracting the 1.5 percent rate of inflation in 2010 (calculated using the Bureau of Labor Statistics All Urban Consumer Price Index).

[4] "SCP Amount as a Percentage of Revenues Net of Non-Labor Variable Costs in Perpetuity" is calculated as the "SCP Amount" divided by the "Revenues Net of Non-Labor Variable Costs in Perpetuity."

**Sources:**

[a] NOAA ALS county-level data.

[b] "Circular No. A-94 Revised: Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs," Office of Management and Budget, October 29, 1992, available at http://www.whitehouse.gov/omb/circulars_a094#7.

[c] "Consumer Price Index, All Urban Consumers - (CPI-U)," U.S. Department of Labor, Bureau of Labor Statistics, available at ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt.

[d] SCP.

[e] Guillory, Vincent, Perry, Harriett, Wagern, Tom, et al., "The Blue Crab Fishery of the Gulf of Mexico, United States: A Regional Management Plan," Gulf States Marine Fisheries Commission, October 2001, Number 96.

[f] Liese, Christopher, Travis, Michael D., and James R. Waters, "The Annual Economic Survey of Federal Gulf Shrimp Permit Holders: Implementation and Descriptive Results for 2007," NOAA, July 2009.

[g] Liese, Christopher, Travis, Michael D., and James R. Waters, "The Annual Economic Survey of Federal Gulf Shrimp Permit Holders: Implementation and Descriptive Results for 2008," NOAA, March 2010.

[h] Miller, Alexander L. and Jack C. Isaacs, "An Economic Survey of the Gulf of Mexico Inshore Shrimp Fishery: Implementation and Descriptive Results for 2008," Gulf States Marine Fisheries Commission, September 2011 (Amended 2012).

[i] NMFS vessel data for AL, FL, LA, MS, and TX (2007-2009).

[j] "Southeastern U.S. Atlantic, Gulf of Mexico Stone Crab Trap/Pot Fishery," NOAA, 2012.