# Exhibit 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | MDL NO. 2179 <br><br> SECTION J <br><br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## SUPPLEMENTAL DECLARATION OF ELLIOTT TAYLOR, PH.D.

I, Elliott Taylor, submit this supplemental declaration in support of BP Defendants' Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012.  The opinions, statements, and conclusions expressed in this declaration are my own.

*Experience*

1.      As explained in more detail in my declaration filed on August 13, 2012, I have more than 20 years of experience in preparing for and responding to major oil spills, with an emphasis on shoreline response.  Much of my work has involved the oil spill response process called Shoreline Cleanup Assessment Technique ("SCAT"), which was used in response to the Deepwater Horizon ("DWH") oil spill (the "spill").  SCAT is the standard process used world-wide to assess shoreline oiling in order to direct shoreline treatment following a spill.

2.      I began working on implementation of the SCAT program for BP within days after April 20, 2010, and have been a lead technical advisor for the SCAT program in Mississippi, Alabama, and Florida since that time.  In addition to my team, I have worked closely with other members of the DWH shoreline response and SCAT programs, including federal and

state representatives, to develop and implement procedures for assessment and treatment of shoreline oiling throughout the Gulf Coast.

***Materials Reviewed***

3.      In addition to the materials described in my declaration, filed August 13, 2012, I have reviewed and considered all objections and other filings in response to BP Defendants' Motion for Final Approval of *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012, in writing this supplemental declaration.

4.      I have also considered the following objections and other filings in response to BP Defendants' Motion for Final Approval of *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement As Amended on May 1, 2012, in writing this supplemental declaration:[1] Halliburton Energy Servs., Inc.'s Objs. to Pls.' Mem. in Support of Final Approval of Med. Benefits Class Action Settlement and BP's Mot. for Final Approval of the Med. Benefits Class Action Settlement (Doc. No. 93) (filed Aug. 31, 2012) ["Halliburton Med. Obj."];[2] Decl. of Marc Vellrath Regarding the Proposed Med. Benefits Class Action Settlement Agreement (Ex. 1 to Halliburton Med. Obj. [Doc. No. 93]) (Aug. 30, 2012) ["Vellrath Med. Decl."]; Objs. to Med. Benefits Portion of Proposed Class Action Settlement by Mike and Patricia Sturdivant, Susan Forsyth, and James H. Kirby IV (Doc. No. 124) (filed Sept. 5, 2012) ["Sturdivant Obj."];

------

[1] Objections (and responses) to the *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended On May 2, 2012 and the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement As Amended on May 1, 2012 that were filed to the master docket for MDL 2179 (2:10-md-02179) were moved to a separate docket for objections, 2:10-cv-07777.  Unless otherwise indicated by "MDL Doc. No.," document numbers are to the objections docket.

[2] I am aware that the Court has stated multiple times that Halliburton lacks standing to object to the settlements.  I considered Halliburton's "objection" and that of its declarant, Vellrath, only for the sake of completing a comprehensive review.  Nothing in those documents cause me to alter my opinions as given on August 13, 2012.

Medical Obj. Ltr. to BP from Kevin Scott Llewallen (Doc. No. 142) (filed Sept. 4, 2012)

["Llewallen Obj."].

5.      I have reviewed documentation and data from post-Hurricane Isaac Rapid

Assessments and follow-on standard surveys conducted by Shoreline Cleanup Assessment

Technique ("SCAT") teams; documentation and data, including maps, shoreline inspection

reports, and shoreline treatment recommendation forms, for SCAT surveys conducted in and

around Terrebonne Parish, Lake Pontchartrain, Lake Saint Catherine, and Fort Pike Canal,

Louisiana; SCAT team lead credentials; SCAT weekly summaries, data and documentation

created after my August 13, 2012 declaration, a report on the "Effects of Tropical Storm Lee,"

dated October 10, 2011; maps showing 2011 post-hurricane survey segments; and the Deepwater

Horizon SCAT Program Beach Profile Data Report II (dated April 2012).

6.      I have considered a U.S. Coast Guard Press Release issued October 10, 2012,

"FOSC issues Notice of Federal Interest to BP and Transocean," and a U.S. Coast Guard Press

Release issued October 18, 2012, "ROVs investigate possible sheen source," available at

RestoreTheGulf.gov.  I have also reviewed and considered a Letter to the Hon. Sally Shushan,

United States Magistrate Judge, United States District Court for the Eastern District of

Louisiana, from Andrew Langan, Kirkland & Ellis LLP, Re Oil Sheen Observed Near MC 252,

dated October 18, 2012 (attaching BP Press Release, "BP Again Confirms Macondo Wells

Secure," issued October 18, 2012).

*Opinions*

7.      None of the above-listed objections and other filings in response to the settlement

agreements have altered the opinions I expressed in my August 13, 2012 declaration.  It remains

my opinion that the Compensation Frameworks for Coastal Real Property Claims, Wetlands Real

3

Property Claims, and Real Property Sales identify parcels eligible for compensation in a manner that is fair and reasonable.

***SCAT Program***

8.      SCAT is a multi-step process that involves systematically segmenting the shoreline into discrete parts, visually evaluating the presence and extent of oiling in each defined segment over time through repeat surveys, evaluating the potential for re-oiling, and recommending appropriate treatment procedures based on the level and type of oiling and the characteristics of the shoreline.

9.      As I explained in my prior declaration, SCAT data was used to define the Coastal Real Property Claim Zone, the Wetlands Real Property Claim Zone, and the Real Property Sales Compensation Zone in the compensation frameworks for those respective areas.  I have reviewed a number of objections asserting that these zones are arbitrary or incomplete.  In my opinion, it is fair, reasonable and adequate for parties to use SCAT data to define these zones and identify parcels that have been observed with visual oil.  SCAT data is used and relied upon by the federal and state governments involved in the DWH response.  There is no superior data set for DWH shoreline oiling than SCAT.

10.      The SCAT process is based on specific, well-defined, written procedures that have been extensively and widely used since the *Exxon Valdez* oil spill and provides scientifically defensible data on the presence, extent, and duration of observed shoreline oiling. SCAT is the international standard for assessing visually observable shoreline oiling to determine the need for operational response and treatment.  The SCAT process is part of the procedures adopted by the National Oceanic and Atmospheric Administration ("NOAA"), Environment Canada, the U.S. Coast Guard, and the Environmental Protection Agency ("EPA").

It is included in numerous U.S. Area Contingency Plans, and is used in oil spill response programs in other countries. The SCAT team leads for the DWH spill are scientists with experience in assessing shoreline oiling. To characterize the SCAT process as non-scientific assessment is simply false. In addition to the scientists that lead each team, each Gulf State, as well as federal representatives, participate on each of the SCAT teams and the SCAT surveys that take place within their geographic boundaries.

11.     The SCAT process also does much more than count linear miles, as one response contends. As part of the DWH SCAT program, the Gulf coastline was divided into relatively small segments, which typically range in size from a few hundred meters to approximately one kilometer, depending on the characteristics of the shoreline. Across these shoreline segments, the SCAT process was consistently followed throughout the response to the spill. The thoroughness of the SCAT process is well documented in the field notes, photographs, data forms, and database of information from the thousands of SCAT surveys conducted repeatedly over time by the SCAT teams, each of which includes representatives from BP, federal, and state agencies. The DWH SCAT program more than adequately assessed, and continues to assess, the presence and extent of visually observable shoreline oiling over time and the effectiveness of cleanup efforts, providing accurate and reliable observation-based information.

12.     In my opinion, it is inaccurate for objections to state that SCAT inspections failed to provide an accurate and comprehensive assessment of the Louisiana shoreline, or that the SCAT maps for Louisiana are incomplete or inaccurate. *See* Quality Metal Works Obj. (Doc. No. 90) at 9-10; Landrum Decl. (Ex. 1 to Doc. No. 90) at 1-2. To date, approximately 3,200 miles have been surveyed by SCAT in Louisiana alone, which is about 75 percent of the nearly 4,400 total miles of shoreline that have been surveyed across the Gulf coast.

13.     Strategic timing for SCAT surveys and the systematic and repetitive nature of the SCAT process facilitates a consistent and accurate assessment of observed shoreline oiling across shoreline segments.  For example, as set forth in the MC 252 Stage III SCAT - Shoreline Treatment Implementation Framework for Louisiana, the timing of SCAT surveys were planned for low tide windows with predicted water levels of 0.5 feet or less.  It is therefore inaccurate to say that "SCAT teams gave inadequate consideration to the impact of tidal flow."  Landrum Decl. (Ex. 1 to Doc. No. 90) at 2.

14.     SCAT team members have been surveying the Gulf shorelines for over two years, gaining extensive experience in identifying residual MC252 oil on the beaches, and are trained to see small amounts of oil residue on sand.  For example, a SCAT observer would easily see surface residue balls that are less than a quarter of an inch in diameter.

15.     Treatment endpoints approved by the Federal On-Scene Coordinator for residential beaches do not require there be no visible oil, but allow for very small amounts of visible oil so long as the amount is "as low as reasonably practicable, considering the allowed treatment methods and net environmental benefit."  For such small amounts of remnant oil, the government-commissioned and led Operational Science Advisory Team's February 2011 Summary Report for Fate and Effects of Remnant Oil in the Beach Environment ("OSAT-II"), concluded that the environmental effects of the residual oil remaining are relatively minor, and that aquatic and wildlife resources would likely experience a greater threat from further cleanup beyond established guidelines than from allowing the oil that still remains on the beaches to naturally attenuate.

16.     Shoreline segments surveyed by SCAT were identified in a number of ways. First, over 110,000 miles have been flown by SCAT in observation and documentation of

shoreline oiling conditions. Based on observations from these overflights, in combination with

NOAA surface oil trajectory simulations, over 4,300 miles (over 3,200 miles in Louisiana alone)

of shoreline were identified for ground-level SCAT surveys. Segments were surveyed based on

information about possible oiling obtained from ground crews conducting response activities and

aerial overflight observations; and segments were also surveyed because they are adjacent to

areas where oil was observed. SCAT teams were deployed to areas where shoreline oiling was

observed or oiling on water was observed that could have reached adjacent shorelines to conduct

detailed shoreline evaluations with full documentation of observations. Unified Command also

directed SCAT teams to survey many areas in response to third-party reports of oiling received

through the U.S. Coast Guard or the States. SCAT teams, as directed by Unified Command,

extended shoreline evaluations beyond any last observed oiling so that all shoreline areas

potentially visibly oiled were within the geographic bounds of the SCAT program. SCAT teams

generally access sites by ground, or by boat in areas of shoreline that are inaccessible from land

or where environmental sensitivities indicate boat-based surveys, as directed by Unified

Command.

      17.     The affidavit of Kenneth Landrum asserts that the SCAT process in Louisiana is

"incomplete" because it did not survey certain areas and that the distribution of SCAT team

assignments was "random." *See* Landrum Aff. (Ex. 1 to Doc. No. 90) at 2. These assertions are

not supported by fact. The implementation of the SCAT process in Louisiana following the spill

was in fact thorough, systematic, comprehensive, and based upon the best available information

about both the expected and observed oil locations and movement. The extent of shorelines that

were included in the SCAT program were agreed upon by Unified Command (i.e., U.S. Coast

Guard, State of Louisiana, and BP) and extended significantly beyond areas where oil was

observed.  In Louisiana, over 2,600 miles of shoreline were surveyed where no MC252 oil was ever observed by SCAT.

18.     I have reviewed documentation relating to the implementation of the SCAT program in Terrebonne Parish, Louisiana, including maps, Shoreline Treatment Recommendations, and SCAT team member qualifications.  Since the beginning of the response, in Terrebonne Parish, SCAT teams have completed 1,216 surveys of 228 segments, encompassing 573 miles of shoreline.  197 of the 228 segments were surveyed multiple times, and 24 were surveyed ten or more times.  In my opinion, and contrary to the allegations of Kenneth Landrum, SCAT teams in these areas were sufficiently staffed and equipped to assess the shoreline oiling in Terrebonne Parish and did so according to the SCAT procedures and in the locations agreed upon by Unified Command.  *See* Quality Metal Works Obj. (Doc. No. 90) at 9; Landrum Decl. (Ex. 1 to Doc. No. 90) at 1.

19.     Certain objectors take issue with the fact that wetlands outside Louisiana are included in the Coastal Real Property Framework, as opposed to the Wetlands Real Property Framework.  *See, e.g.*, Wolf Bay Obj. (Doc. No. 183).  I have reviewed those objections and offer the observations below.

20.     The DWH spill response treated Louisiana differently from the other Gulf States due to the predominate wetlands character of its coastline.  From the onset of the response, the shoreline program, including SCAT, was oriented into a Louisiana program and an Eastern States program.  There were separate shoreline plans for Louisiana, as SCAT teams in Louisiana faced different operational challenges.  Separate response plans applied to Louisiana wetlands relative to wetlands in other Gulf States, including different treatment methods and standards. Louisiana's interior marshes and marsh platforms where oil was observed differ from the fringe

marsh on Grand Isle and the fringe marsh where oil was observed in other Gulf States.  From a response standpoint, Grand Isle more closely resembles response areas in Mississippi, Alabama, and Florida, in that response efforts were focused on beach environments.

21.      In addition, the nature and scope of shoreline oiling was different in Louisiana in general, and in Louisiana wetlands in particular.  SCAT maximum oiling data show that of all of the miles of wetlands shoreline, as assigned by ESI codes in the SCAT database, where MC252 oil was ever observed by SCAT, 95% were in Louisiana.  Of the miles of wetlands shoreline where moderate oiling was observed, 98.9% were in Louisiana, as well as 99.9% of all the miles of heavily oiled wetlands shoreline.  Thus, compared to the over 465 miles of wetlands shoreline that was observed to be oiled in Louisiana, approximately 24 miles of wetlands shoreline was observed in the other Gulf States combined.  In fact, no oil was observed in any Florida wetlands or on any wetlands on Grand Isle.

22.      The scope and intensity of operational missions and treatment operations in most Louisiana wetlands, likewise, exceeded the scope of similar operations in the wetlands of other Gulf States — many of which occur on the backs of islands or other land that protected them from oiling.  SCAT issued significantly more shoreline treatment recommendations (STRs) for Louisiana wetlands (no STRs were needed for Grand Isle wetlands, where no oil was observed)than for wetlands in all other States combined.

23.      In my opinion, these differences between Louisiana and non-Louisiana wetlands provide a fair and reasonable basis for differentiating between wetlands properties covered by the Settlement.  It is reasonable for Grand Isle to be included in the Coastal Framework given the beach character of that shoreline and considering that the fringe marsh had no oil observed.

***Current Level of Shoreline Oiling***

24.     A contention has been made that I am of the view that initial marsh recovery has
slowed substantially, citing as support the statements in my August 13, 2012 declaration that
approximately one year after the spill, the total number of miles of shoreline that contained some
oil had decreased by roughly 50% to approximately 530 miles, and that by approximately two
years after the spill, the number of miles of shoreline that contained any oiling was less than 430.
As an initial matter, I did not opine on "marsh recovery," which covers the growth and re-growth
of vegetation, in my August 13, 2012 declaration.  Rather, I stated that the level of shoreline
oiling has decreased with time.  This continues to be true, both linearly (in terms of number of
miles) and in terms of degree of oiling.  The number of miles classified as heavy or moderate
oiling have decreased substantially over time from roughly 35% of the total oiled miles of
shoreline at the point of maximum oiling, to approximately 10% one year after the spill, and
continued to decrease markedly to about 4% two years after the spill.  At one year after the spill,
fewer than 50 miles were classified as heavy or moderate oiling and that number decreased to
approximately 15 miles two years after the spill.  The number of miles classified as light or very
light oiling have also decreased.  The number of miles classified as trace oiling have increased
due to the shift of oiled miles of shoreline into the lowest SCAT oiling category, reflecting a
substantial decrease in the degree of oiling over time due to treatment and natural attenuation.
As time goes on and less oil remains on the shoreline, the natural attenuation process becomes
less pronounced, but that process continues to decrease the level of shoreline oiling.

25.     In addition, the fact that as of July 28, 2012, more than 3,900 miles of shoreline
have been deemed operationally complete by Unified Command or recommended to be deemed
complete, pending approval in accordance with the Shoreline Cleanup Completion Plan, shows

that oiling conditions on the shoreline are improving.  The vast majority of these areas never had

any observed oil, and before a shoreline segment is deemed complete by United Command, the

Unified Command must determine that specific, environmentally-protective criteria relating to

the level of oiling observed on the segment have been met.  It is only at that point that the

Federal On-Scene Coordinator will consider formally ending treatment activities.

26.     My opinions on these issues are based on data collected through the DWH SCAT

program, which as explained above, was thorough, systematic, and comprehensive; and provides

accurate and reliable observation-based information on oiling in the Gulf of Mexico.

### Hurricane Isaac and Residual Oil

27.     Hurricane Isaac made landfall in parts of Louisiana and Mississippi on August 28,

2012.  Sustained winds of 80 miles per hour and over a foot of rainfall were reported in some

locations.  Storm events such as Isaac have the potential to remobilize sand, which can expose

residual oil (or bury it).  A number of objections to the Economic and Property Damages

Settlement Agreement and to the Medical Benefits Class Action Settlement Agreement discuss

the exposure of oil from the spill following Hurricane Isaac.  Residual oil exposure also occurred

in conjunction with other storms, including two tropical storms, Bonnie and Lee.  Storm events

move large quantities of sand along and across beaches, in places burying oil residue and in other

places exposing residue previously buried.  As was done after Hurricane Isaac, SCAT teams will

typically be redeployed to areas following storms to assess whether changes in shoreline

morphology resulted in the exposure or unburying of residual oil and to assess the presence of

exposed residual oil.

28.     During the response to the spill, SCAT has undertaken a massive effort to locate

buried oil.  For example, since the spill began, SCAT teams have dug over 6,500 pits and

Operations has excavated approximately 40,000 "auger holes" in Louisiana in an effort to locate buried oil. SCAT also used photo-documentation from overflights to help determine sections of shoreline that were oiled early in the response and subsequently covered with sediment. Across the Gulf Coast, SCAT teams along with Unified Command cleanup operations have dug over 180,000 pits to search for, delineate, and characterize buried oil.

29.     The SCAT response to Hurricane Isaac was swift, comprehensive, and effective. SCAT teams responded within days of Isaac making landfall, and post-storm surveys on segments in Louisiana, Alabama, Mississippi, and Florida were SCAT team priorities based on a plan developed jointly between BP, the Federal On Scene Coordinator, and the State On Scene Coordinators. Across the four states, SCAT conducted over 420 surveys between September 1 and October 9, 2012. In Louisiana, SCAT conducted rapid assessments on a total of 172 target segments specifically selected by the state. The surveys encompassed segments with a range of pre-Isaac conditions: segments where there had been ongoing cleanup operations prior to Hurricane Isaac, segments where removal actions were deemed complete by Unified Command, and segments where no oil had ever been observed.

30.     SCAT teams surveyed all segments identified as requiring follow-up after the hurricane by the Gulf Coast States and the Federal On-Scene Coordinator, which considered reports of oiling from outside third-parties. The SCAT surveys post-Isaac documented limited, localized residual oil in areas where possible limited residual oiling was anticipated. Out of 172 segments in Louisiana, only 19 were recommended by SCAT for further treatment because of an increase in observed residual oil after Isaac. To characterize this oil as "heavy," "widespread," "region-wide," or as "a striking repeat of conditions found in August 2010," Sawyer Decl. (Ex. 16 to Doc. 167) ¶ 47, is not supported by fact. To the contrary, the oiling was limited to areas

where cleanup operations were still active or had previously experienced some level of oiling so that some oiling after the hurricane was not unexpected.

31.   In some areas that exhibited residual oiling, SCAT was aware of the presence of buried oil, but most buried residues were in areas where operations were limited or restricted, for example by the depth of cleanup. No residual oil was observed by SCAT on any segments where no MC252 oil had ever been observed previously, with the exception of one segment in Jefferson Parish in Bay Joyeaux where very light oiling was observed. *Contra* Boggs, Loehn & Rodrigue Obj. (Doc. No. 201) at 7. I am not aware of any data to suggest that future storm events will move oil to "new locations" that had never been oiled, as argued by Quality Metal Works in its objection to the Economic and Property Damages Settlement Agreement. *See* Quality Metal Works (Doc. No. 90) at 10.

32.   SCAT will continue to assess the shoreline oiling conditions and treatment operations for segments where previously buried residual oil was exposed, or where residual oil mobilized during Isaac was observed by SCAT. As well, SCAT will continue to survey all other operationally active segments until Unified Command determines that no further treatment is required. All SCAT rapid assessment surveys following Hurricane Isaac have been completed, and the limited areas identified as requiring some additional cleanup are currently undergoing the necessary further treatment.

33.   The exposure of residual oil following Hurricane Isaac does not indicate there is a present, ongoing threat of widespread future MC252 re-oiling. In addition, continuing cleanup operations, including cleanup of oil that had been previously buried through natural processes, and the continued search for, identification, and recovery of buried oiled material, will reduce the amount of residual oil available to exposure by future events, which will almost certainly be

minimal.  As explained in my previous declaration, a variety of scientists and organizations have

searched for oil in near-shore areas for more than two years, throughout all seasons of the year.

The data collected from those surveys provide a thorough understanding of the distribution and

character of oil on the shoreline and adjacent sub-tidal areas.  Data from repeated operations and

SCAT surveys in areas with residual sub-tidal oiling continue to support my opinion that any

future MC252 re-oiling would almost certainly be localized and discrete, and classified as trace,

very light or light oiling under SCAT criteria.

      34.     It remains my opinion that the risk transfer premium concept in the Compensation

Framework for Wetlands Real Property Claims and the Compensation Framework for Coastal

Real Property Claims more than accounts for and offsets any risk of future re-oiling.  The

compensation frameworks provide compensation based on the maximum extent of oil that has

been observed on the shoreline to date.  Further, eligible claimants receive a premium (their

payments are increased by a factor of 2.5) to account for the slight risk of re-oiling in the future.

Any future MC252 re-oiling, including the exposure of residual oil following future storm

events, would almost certainly be localized and discrete, and classified as trace, very light, or

light oiling under SCAT criteria.  The location and degree of residual oil observed by SCAT

following Hurricane Isaac does not render the risk transfer premium unfair, and these factors are

consistent with my earlier expressed opinion that the compensation frameworks are fair and

reasonable and adequately account for the possibility of future re-oiling.  Thus, it is not

supported by fact to say that the risk transfer premium does not fairly take into account the

possibility of future re-oiling.  *See* Wolf Bay Obj. (Doc. No. 183) at 21.

*Sheen Observed in Vicinity of MC252*

35.     According to an October 10, 2012 press release issued by the U.S. Coast Guard, oil sheen has been observed in the vicinity of MC252, approximately 50 miles from the Louisiana coastline and samples of the sheen taken on September 26, 2012 "correlate[]" to MC252 oil. *See* U.S. Coast Guard Press Release, FOSC issued Notice of Federal Interest to BP and Transocean (Oct. 10, 2012), http://incidentnews.gov/entry/16599.  According to the Coast Guard press release, the sheen may be "residual oil associated with the wreckage and/or debris left on the seabed from the [DWH] incident." *Id.*  The Coast Guard has determined that the sheen "is not feasible to recover and does not pose a risk to the shoreline." *Id.*

36.     I have reviewed the October 18, 2012 Letter to Judge Shushan from Andrew Langan regarding oil sheen observed near MC 252 and the attached BP Press Release, which identifies the cofferdam, a piece of containment equipment used during the response, as the "probable source of the surface sheen," based on nearly three days of  visual inspection with a video camera mounted on a Remotely Operated Vehicle.  This work included a visual inspection of the Macondo well, two relief wells, riser pipe and cofferdam, which was overseen by the U.S. Coast Guard and observed by representatives for the Bureau of Safety and Environmental Enforcement ("BSEE"), Bureau of Ocean Energy Management ("BOEM"), and the State On-Scene Coordinators for Louisiana, Mississippi and Florida. *See* Ltr. to Hon. Sally Shushan, United States Magistrate Judge, United States District Court for the Eastern District of Louisiana, from Andrew Langan, Kirkland & Ellis LLP, Re Oil Sheen Observed Near MC 252 (Oct. 18, 2012).  The ROV inspection observed no oil leaking from the riser pipe and the integrity of the Macondo well and relief wells were confirmed; oil was only observed leaking from the cofferdam. *Id.*; U.S. Coast Guard Press Release, ROVs Investigate Possible Sheen

Source (Oct. 18, 2012), http://www.restorethegulf.gov/release/2012/10/18/rovs-investigate-possible-sheen-source.

37.     Assuming the source of the oil sheen is confirmed to be the cofferdam, I would not expect that source to pose a risk of shoreline oiling.  Any oil sheen observed approximately 50 miles offshore would be expected to breakdown and naturally attenuate before reaching the shoreline, and would thereby pose no risk of re-oiling of the shoreline.  Because oil sheen is only a few microns thick (1000 microns is equal to 1 mm), a few gallons of oil could cause a sheen over several miles.

### *Medical Benefits Class Action Settlement*

38.     Zone A and Zone B of the Medical Benefits Class Action Settlement are defined with reference to the SCAT Line, which is the collection of segments inspected by SCAT teams from the beginning of the spill to the present.  The east and west boundaries of Zone A and Zone B include the furthest points on the SCAT Line where MC252 oil was observed by SCAT teams.

39.     In his declaration in support of Halliburton Energy Services, Inc.'s Objections to Plaintiffs' Memorandum in Support of Final Approval of the Medical Benefits Class Action Settlement, Marc Vellrath states that the geographic boundaries prescribed for Zones A and B are "arbitrary."  Vellrath Med. Decl. at 38.  In my opinion, the SCAT line is not "arbitrary," but represents the segments inspected by SCAT teams from the beginning of the spill to the present, which were not chosen arbitrarily, but as a part of a systematic and clearly defined SCAT process for assessing and treating visible shoreline oiling.  It is likewise not supported by fact to say the SCAT Line is "inaccurate" or does not reflect "the real distribution of [oil]," as several objectors assert.  *See, e.g.*, Scott Obj. [159] at 7; Kornman Obj. (Doc. No. 88) at 7; Corey Obj. (Doc. No. 146) at 5.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Date:  October 22, 2012

_____
Elliott Taylor