# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | |
| | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| | * | |

| | | |
|---|---|---|
| Plaisance, *et al.*, individually | * | NO. 12-CV-968 |
| and on behalf of the | * | |
| Medical Benefits Settlement Class, | * | SECTION: J |
| | * | |
| Plaintiffs, | * | |
| | * | HONORABLE CARL J. BARBIER |
| v. | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| BP Exploration & Production Inc., *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## BP'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR
## FINAL APPROVAL OF THE MEDICAL BENEFITS CLASS ACTION SETTLEMENT

*COUNSEL LISTED AT END OF MEMORANDUM*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I.      The Extremely Small Number of Objections and Opt Outs Strongly Favors Approval of the Settlement. .................................................................................... 5

II.     Several Purported Objectors Lack Standing and Their Objections Are Therefore Legally Invalid. ............................................................................................. 8

III.    The Objections to Compensation Paid Under the Settlement Are Legally Invalid. .......... 10

        A.      Nearly All Objections to the Settlement Benefits Are Nothing More Than an Attempt to Renegotiate the Terms of the SPC Matrix and Must Be Rejected. ............................................................................................ 10

        B.      The Compensation Paid Under the Specified Physical Conditions Matrix Is Fair, Reasonable, and Adequate. ................................................................. 13

        C.      The Back-End Litigation Option Is Fair and Appropriate. ............................ 23

        D.      The Gulf Region Health Outreach Program Is a Valuable Benefit to Class Members. ............................................................................................ 24

IV.     Many Objections Are Simply Wrong on the Facts, the Law, or Both. ............................ 26

        A.      The Scientific Analyses Submitted by Certain Objectors Are Seriously Flawed. ............................................................................................... 26

        B.      The Safety of Clean-Up Workers Was BP's Priority. ................................. 36

        C.      Objections Concerning Possible Re-Oiling or Potential Future Exposures Concern Events Outside the Settlement. ..................................................... 37

        D.      The Sterbcow Objectors' Analysis of the *Reed* Factors Is Fatally Flawed. ........... 39

        E.      Objections Related to OPA Requirements Are Irrelevant. ............................ 40

        F.      The Few Remaining Miscellaneous Objections Are Also Without Merit. ........... 40

V.      BP Does Not Oppose Certification of the Class for Settlement Purposes Only ................44

CONCLUSION ...........................................................................................................................44

## TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................. 44

*Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*,
    211 F.R.D. 457 (S.D. Fla. 2002)............................................ 6

*Ayers v. Thompson*,
    358 F.3d 356 (5th Cir. 2004) ................................................ 7

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001)................................................... 3

*Berardinelli v. General American Life Insurance Co.*,
    357 F.3d 800 (8th Cir. 2004) ................................................ 21

*Bertrand v. Talen's Marine & Fuel LLC*,
    2012 WL 2026998 (W.D. La. June 4, 2012) ........................ 41

*Bessard v. Superior Energy Services LLC*,
    2012 WL 37791612 (W.D. La.  Aug. 30, 2012)..................... 41

*Bowling v. Pfizer, Inc.*,
    143 F.R.D. 141 (S.D. Ohio 1992)........................................ 25

*Brainard v. American Skandia Life Assurance Corp.*,
    432 F.3d 655 (6th Cir. 2005) ............................................... 34

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)........................................... 4, 11

*Cobell v. Salazar*,
    679 F.3d 909 (D.C. Cir. 2012).............................................. 13

*Collins v. Sanderson Farms, Inc.*,
    568 F. Supp. 2d 714 (E.D. La. 2008).................................... 3

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ..................................... passim

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) .................................... 3, 11

*Dennis v. Kellogg Co.*,
    --- F.3d ----, No. 11-55674, 2012 WL 3800230 (9th Cir. Sept. 4, 2012)......................... 25

*Draney v. Wilson, Morton, Assaf & McElligott,*
    No. Civ. 79-1029, 1985 WL 5820 (D. Ariz. Sept. 30, 1985)...........................................16

*Ehrheart v. Verizon Wireless,*
    609 F.3d 590 (3d Cir. 2010)..........................................................................................3

*Fernandez v. Victoria Secret Stores, LLC,*
    No. CV 06-04149 MMM (SHx), 2008 WL 8150856 (C.D. Cal. July 21, 2008)...............7

*Fisher Brothers v. Cambridge-Lee Industries,*
    630 F. Supp. 482 (E.D. Pa. 1985) ...............................................................................14

*Freeport-McMoran Resource Partners Ltd. Partnership v. B-B Paint Corp.,*
    56 F. Supp. 2d 823 (E.D. Mich. 1999).........................................................................34

*Fussell v. Wilkinson,*
    2005 U.S. Dist. LEXIS 30984 (S.D. Ohio 2005)...........................................................11

*Geier v. Alexander,*
    801 F.2d 799 (6th Cir. 1986) ........................................................................................4

*Hammon v. Barry,*
    752 F. Supp. 1087 (D.D.C. 1990) ..................................................................................6

*In re American Bank Note Holographics, Inc.,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)..........................................................................12

*In re Austrian & German Bank Holocaust Litigation,*
    80 F. Supp. 2d 164 (S.D.N.Y. 2000).............................................................................6

*In re Cardizem CD Antitrust Litigation,*
    218 F.R.D. 508 (E.D. Mich. 2003) ................................................................................6

*In re Cendant Corp. Litigation,*
    264 F.3d 201 (3d Cir. 2001)..........................................................................................11

*In re Corrugated Container Antitrust Litigation,*
    643 F.2d 195 (5th Cir. 1981) ..................................................................................4, 11

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)*
    *Products Liability Litigation,*
    MDL 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)...................................16, 21, 25

*In re Domestic Air Transportation Antitrust Litigation,*
    148 F.R.D. 297 (N.D. Ga. 1993).................................................................................14

*In re Educational Testing Services. Praxis Principles of Learning & Teaching: Grades 7-12 Litigation,*
447 F. Supp. 2d 612 (E.D. La. 2006) ................................................................. 4

*In re Enron Corp. Securities, Derivatives & "Erisa" Litigation.,*
MDL 1446, 2003 WL 22962792 (S.D. Tex. Nov. 5, 2003)............................... 13

*In re Exxon Valdez,*
229 F.3d 790 (9th Cir. 2000) ............................................................................. 3

*In re Holocaust Victim Assets Litigation,*
413 F.3d 183 (2d Cir. 2001)............................................................................. 19

*In re Newbridge Networks Securities Litigation,*
No. 94-1678, 1998 WL 765724 (D.D.C. Oct. 23, 1998) .................................. 12

*In re Pet Food Products Liability Litigation,*
629 F.3d 333 (3d Cir. 2010)............................................................................. 22

*In re Pharmaceutical Industry Average Wholesale Price Litigation,*
520 F. Supp. 2d 274 (D. Mass. 2007) ................................................................ 4

*In re Prudential Insurance Co. of America Sales Practices Litigation,*
962 F. Supp. 450 (D.N.J. 1997) .......................................................................... 4

*In re Rio Hair Naturalizer Products Liability Litigation,*
1996 U.S. Dist. LEXIS 20440 (E.D. Mich. 1996) ........................................... 11

*In re Shell Oil Refinery,*
155 F.R.D. 552 (E.D. La. 1993)............................................................. 6, 15, 16

*In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation,*
No. 1:01-CV-9000, Dkt. 340 (N.D. Ohio May 8, 2002).................................. 25

*In re Terazosin Hydrochloride Antitrust Litigation,*
No. MDL 99-1317, 2005 WL 2451960 (S.D. Fla. July 8, 2005)....................... 3

*In re Three Mile Island Litigation,*
557 F. Supp. 96 (M.D. Pa. 1982) ..................................................................... 25

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litigation,*
No. 11–MD–2247 ADM/JJK, 2012 WL 3984542 (D. Minn. Sept. 11, 2012) .................. 4

*In re Warfarin Sodium Antitrust Litigation,*
391 F.3d 516 (3d Cir. 2004).............................................................................. 3

*In re Washington Public Power Supply System Securities Litigation,*
720 F. Supp. 1379 (D. Ariz. 1989), *aff'd*, 955 F.2d 1268 (9th Cir. 1992)................ 11, 39

*In re Wells Fargo Sec. Litig.*,
    991 F.Supp. 1193 (N.D. Cal. 1998) ................................................................ 25

*In re WorldCom, Inc. Securities Litigation*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................ 18

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr. S.D.N.Y. 2006) ............................................................ 22

*Int'l Union, United Auto, Aerospace, & Agricultural Implement Workers of America
    v. General Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) .......................................................................... 3

*IUE-CWA v. General Motors Corp.*,
    238 F.R.D. 583 (E.D. Mich. 2006) ............................................................ 2, 7

*Klein v. O'Neal, Inc.*,
    705 F. Supp. 2d 632 (N.D. Tex. 2010) ...................................................... 4, 11

*Klier v. Elf Atochem North America, Inc.*,
    658 F.3d 468 (5th Cir. 2011) .......................................................................... 24

*Laskey v. UAW*,
    638 F.2d 954 (6th Cir. 1981) .......................................................................... 12

*Lazar v. Pierce*,
    757 F.2d 435 (1st Cir. 1985) ............................................................................ 3

*Lazy Oil Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997) .................................................... 6, 12, 15

*Leigh v. Engle*,
    535 F. Supp. 418 (N.D. Ill. 1982) .................................................................... 9

*Luevano v. Campbell*,
    93 F.R.D. 68 (D.D.C. 1981) ............................................................................ 11

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) .......................................................................... 21

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*,
    877 F.2d 1333 (7th Cir. 1989) ........................................................................ 34

*Moore v. United States*,
    63 Fed. Cl. 781 (Fed. Cl. 2005) ........................................................................ 3

*Neff v. VIA Metropolitan Transit Authority*,
    179 F.R.D. 185 (W.D. Tex. 1998) .................................................................... 4

vi

*O'Keefe v. Mercedes-Benz USA, LLC*,
    214 F.R.D. 266 (E.D. Pa. 2003) .................................................................. 7

*Olden v. LaFarge Corp.*,
    472 F. Supp. 2d 922 (E.D. Mich. 2007) ...................................................... 3

*Parker v. Anderson*,
    667 F.2d 1204 (5th Cir. 1982) .................................................................. 15

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) .............................................................. 6, 16

*Phemister v. Harcourt Brace Jovanovich, Inc.*,
    No. 77 C 39, 1984 WL 21981 (N.D. Ill. Sept. 14, 1984) ............................. 19

*Reed v. General Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) ................................................................ 7, 39

*Robinson v. Ford Motor Co.*,
    No. 1:04 CV 00844, 1:04 CV 00845, 2005 WL 5253339 (S.D. Ohio June 15, 2005) .. 3, 6, 14

*Ruiz v. McKaskle*,
    724 F.2d 1149 (5th Cir. 1984) .................................................................. 13

*Smith v. Crystian*,
    91 F. App'x 952 (5th Cir. 2004) ................................................................. 3

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F.Supp.2d 254 (S.D.N.Y. 2003) ........................................................... 6

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) ....................................................................... 3

*Sunrise Toyota, Ltd. v. Toyota Motor Co.*,
    No. 71 Civ. 1335-LFM, 1973 U.S. Dist. LEXIS 14862 (S.D.N.Y. 1973) ........ 11

*Taifa v. Bayh*,
    846 F. Supp. 723 (N.D. Ind. 1994) ............................................................. 6

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007) ................................................. 3, 6, 13

*UAW v. Gen. Motors Corp.*,
    No. 05-CV-73991-DT, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006) ......... 2, 7

*United States v. New Jersey*,
    No. 88-5087, 1995 WL 1943013 (D.N.J. Mar. 14, 1995) ............................. 3

*United States v. Olis,*
    Civ. A. No. H-07-3295, Crim. No. H-03-217-01, 2008 WL 620520
    (S.D. Tex. Mar. 3, 2008) .............................................................................. 9

*Williams v. Vukovich,*
    720 F.2d 909 (6th Cir. 1983) ...................................................................... 3

*Zenith Electronics Corp. v. WH-TV Broad. Corp.,*
    395 F.3d 416 (7th Cir. 2005) ...................................................................... 34

**Statutes**

28 U.S.C. § 1715(f) ........................................................................................ 9

42 U.S.C. § 1395y(b)(2)(B)(i) ....................................................................... 40

**Other Authorities**

CMS Advance Notice of Proposed Rulemaking,
    77 Fed. Reg. 35917, 35918 and 35919 (June 15, 2012) .............................. 41

Fed. Prac. & Proc. § 1797.1 ........................................................................... 11

Newberg on Class Actions § 11.47 (2d ed. 1985) ......................................... 6

Newberg on Class Actions § 11.58 (3d ed.) .................................................. 11

**Rules**

Fed. R. Civ. P. 23 ........................................................................................... 3

Fed. R. Civ. P. 23(e)(2) .................................................................................. 44

## INTRODUCTION

In a Class with as many as 200,000 potential members, less than one-tenth of one percent has objected to the Medical Benefits Class Action Settlement.  Specifically, 150 individuals have filed purported objections and, of those, 42 do not appear to be Class Members, many of whom have opted out or by their own admission do not fall within the Class definition.  Only 153 individuals (several of whom are also not Class Members) have chosen to opt out of the Class. In contrast, approximately 3,868 individuals have already filed claims seeking the benefits of this Settlement, even though the deadline to do so is more than a year away.[1]

These statistics demonstrate overwhelming approval of the Settlement by the Medical Benefits Settlement Class.  Indeed, the miniscule number of opt outs and objections may well be unprecedented in a class action of this size and prominence.  Equally important, of the few objections that have been filed, not one is critical of the Periodic Medical Consultation Program, which experts for the Class and BP have independently praised as "a critically important benefit to class members" (Harbut Decl. ¶ 50) and "a significant and tangible benefit, especially to those class members who might not otherwise have access to or be able to afford [primary] medical services."  (Herzstein Decl. ¶ 22)[2]  Similarly, only one objection has even arguably complained about the $105 million Gulf Region Health Outreach Program—and does so in the mistaken belief that the Outreach Program involves a *cy pres* distribution.  It is hardly surprising that Class Members support the Outreach Program, as more than $20 million has already been paid to

---

[1]   The deadline to file a claim is not until one year after the Settlement is approved and all appeals are exhausted—*i.e.*, late 2013 or early 2014 at the earliest.

[2]   This Memorandum cites the declarations submitted with the parties' August 13, 2012, filings as "[Name] Decl." Unless otherwise stated, the brief cites the supplemental declarations filed today as "[Name] Supp. Decl."

projects that are well underway to improve health capacity and literacy, and bolster mental and behavioral health services, along the Gulf Coast.  (Goldstein Supp. Decl. ¶¶ 3–5.)[3]

The objections instead focus almost exclusively on the Settlement's Specified Physical Conditions Matrix ("SPC Matrix" or "Matrix"), arguing that the Matrix should contain different dollar values, different conditions, and/or different standards of proof—essentially seeking to renegotiate settlement terms that were negotiated at arm's length by Class Counsel and BP over several months to compromise highly disputed claims.  But it is black letter law that these types of objections are without merit.  Indeed, where a few individuals complain about this or that term of a settlement, their objections serve only to delay and frustrate the interests of the overwhelming majority of class members in receiving settlement benefits as expeditiously as possible.  *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes'"); *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 600 (E.D. Mich. 2006) (the Court "'has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement'") (quoting *UAW v. Gen. Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151, at *20 (E.D. Mich. Mar. 31, 2006)).  Such objections are especially wide of the mark in this case, where other objectors complain that the compensation provided under the SPC Matrix is in fact ***too generous*** and several complain that they should have been included in the Class but were not.

The Medical Settlement is a carefully-wrought, comprehensive, and generous class action settlement, which even at this early stage has widespread support from the Class as a whole.  No

---

[3]   BP and the Plaintiffs are jointly filing the supplemental declaration of Dr. Goldstein, which is attached to their October 22, 2012 Notice of Joint Filing of Declarations.

objector has come close to demonstrating that it has any legal infirmities.  The Settlement is fair,

reasonable, and adequate under Rule 23, and it should be approved.

## ARGUMENT

The few objectors who oppose the Settlement bear the "heavy burden of demonstrating

that the settlement is unreasonable" and should not be finally approved.  *See DeHoyos v. Allstate*

*Corp.*, 240 F.R.D. 269, 293 (W.D. Tex. 2007).[4]  This reflects the "overriding public interest in

favor of settlement" of class actions.  *Cotton,* 559 F.2d at 1331.[5]  Indeed, because "settlement is

the preferred means of resolving litigation," there is a "strong presumption in favor of finding a

settlement fair."  *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008)

(quotation omitted); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007)

("a presumption is made in favor of the settlement's fairness, absent contrary evidence") (citing

*Smith*, 91 F. App'x at 955); *accord, e.g., In re Educ. Testing Serv. Praxis Principles of Learning*

---

[4]   *Accord, e.g., Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983); *Robinson v. Ford Motor Co.*, No. 1:04 CV 00844, 1:04 CV 00845, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005); *In re Terazosin Hydrochloride Antitrust Litig.*, No. MDL 99-1317, 2005 WL 2451960, at *5 (S.D. Fla. July 8, 2005); *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007); *United States v. New Jersey*, No. CIV. 88-5087 WGB, CIV. 88-4080(MTB), CIV. 87-2331(HAA), 1995 WL 1943013, at *11 (D.N.J. Mar. 14, 1995); *Moore v. United States*, 63 Fed. Cl. 781, 784 (Fed. Cl. 2005).

[5]   *See also Int'l Union, United Auto, Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (similar); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) ("[T]he public interest in amicable resolution of cases is particularly strong in the context of mass tort and similar litigation."); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) ("[T]here is a 'strong judicial policy favoring the resolution of disputes through settlement.' . . . The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.") (quoting *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004)); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011) ("'This presumption [in favor of voluntary settlement agreements] is especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts.'") (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010)); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"); *In re Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000) ("the general policy of federal courts to promote settlement before trial is even stronger in the context of large-scale class actions"); *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985) (noting "the overriding public interest in favor of the voluntary settlement of disputes, particularly where class actions are involved.").

& Teaching: Grades 7-12 Litig., 447 F. Supp. 2d 612, 619 (E.D. La. 2006); Neff v. VIA Metro.

Transit Auth., 179 F.R.D. 185, 208 (W.D. Tex. 1998).

The purpose of objections is to aid the Court in evaluating the Settlement.    Thus,

objectors may not abuse the process to serve their own individual interests rather than the

interests of the class.    See In re Pharm. Indus. Average Wholesale Price Litig., 520 F. Supp. 2d

274, 279 (D. Mass. 2007) ("[T]here are public policy reasons to prevent frivolous objectors from

threatening to hold up class distributions.").    Courts will not tie up a settlement based on the

objections of a "few naysayers . . . in pursuit of their own parochial interests."   In re Prudential

Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 564 (D.N.J. 1997).    In this regard,

objections that seek to renegotiate terms of the settlement based on individual preferences are

unhelpful and improper.    See Klein v. O'Neal, Inc., 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010)

("'whether another team of negotiators might have accomplished a better settlement is a matter

equally comprised of conjecture and irrelevance.'") (citing In re Corrugated Container Antitrust

Litig., 643 F.2d 195, 212 (5th Cir. 1981)).

Similarly, objections that lack factual, scientific, or legal support are deficient because

they do not aid the Court in its evaluation of the settlement.    To "allow the objectors to disrupt

the settlement on the basis of nothing more than their unsupported suppositions would

completely thwart the settlement process."    Geier v. Alexander, 801 F.2d 799, 809 (6th Cir.

1986) (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 449 (2d Cir. 1974)).[6]

---

[6]    Several of the objections to the Medical Settlement appear to be aimed more at abusing the approval process
rather than attempting to demonstrate that the Settlement somehow fails the requirements of Rule 23.    For
example, the Palmer Objectors—whose counsel has been characterized by at least one court as a "serial
objector" to class settlements, In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig., No. 11–MD–
2247 ADM/JJK, 2012 WL 3984542, at *3 (D. Minn. Sept. 11, 2012)—included a laundry list of class
certification and other objections that are often only loosely tied to the specifics of the Medical Settlement.
(Docket 10-7777, Rec. Doc. 124; identical copy at Docket 10-7777, Rec. Doc. 213.)   Some objectors, perhaps
making a hurried cut-and-paste job, included references to interim claims under OPA, even though OPA does

The few objectors to the Medical Settlement come nowhere close to meeting their heavy burden of showing that the parties' compromise, which provides substantial benefits to the Class, should not receive final approval.  Indeed, none of the objections provides anything that would help the Court evaluate the Settlement.[7]

## I.  THE EXTREMELY SMALL NUMBER OF OBJECTIONS AND OPT OUTS STRONGLY FAVORS APPROVAL OF THE SETTLEMENT.

Given the size and high-profile nature of the *Deepwater Horizon* multidistrict litigation, as well as the robust class notice program that was implemented as approved by this Court,[8] the tiny number of objections is remarkable and demonstrates overwhelming support for the Settlement among Class Members.   Only 20 objections to the Settlement have been filed, representing 150 individuals, which—out of a potential Class of up to 200,000 individuals—is *less than one-tenth of one percent of the Class*.[9]  Moreover, several objectors concede that they are not Class Members (but want to be part of the Class) or otherwise provide information in their objections that establishes they are not Class Members.   Several additional purported objectors have opted out of the Class.  These objectors who are outside the Class lack standing, and their objections are therefore invalid, as discussed in Section II below.

---

not cover or apply to personal injury claims and is therefore wholly inapplicable to the Medical Settlement. (Docket 10-7777, Rec. Docs. 180, 185, 202.)  The Nexsen Pruet Objectors did not even attempt to tailor their objections to their particular circumstances, but instead adopted without discussion the objections filed by the Becnel and Stag Smith objectors.  (Docket 10-7777, Rec Doc. No. 208.)  The Becnel Objectors, in turn, appear to have cut and pasted many of their objections verbatim from the Smith Stag Objectors' submission (or vice versa).

[7]  Citations to the record without a docket number refer to filings in docket 10-2179.  Citations to documents in other dockets include the relevant docket number.

[8]  No objections to the Medical Class Notice or Notice Program have been filed.  *See* Azari Supp. Decl. ¶ 12 (attached to the parties' October 22, 2012 Notice of Joint Filing of Declarations).

[9]  In addition to objections filed by individuals, non-settling defendant Halliburton Energy Services, Inc. has also filed purported objections to the Settlement.  The State of Louisiana, without seeking leave to do so, filed an *amicus* brief opposing certification of the Medical Settlement Class.  As the Court previously ruled, Halliburton and Louisiana lack standing to object to the Settlement.  (Rec. Doc. 7038 at 2.)

The number of individuals who have opted out of the Class to date is also quite small: 153, not all of whom are even Class Members. (Garretson Oct. 22, 2012 Status Update at 4-5.)[10] In contrast, 3,868 individuals have already filed proof of claim forms with the Medical Settlement Claims Administrator to obtain benefits under the Settlement—and this, despite the fact that the Settlement will not be final until it receives approval from both this Court and, in the event of an appeal, the Court of Appeals. (*Id.* at 4–5.)[11]

"It has repeatedly been held that 'one indication of the fairness of a settlement is the lack of or small number of objections.'" *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F.Supp.2d 254, 258 (S.D.N.Y. 2003) (quoting *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990)); *see also In re Shell Oil Refinery*, 155 F.R.D. 552, 566-67 (E.D. La. 1993) (relatively few number of objections and opt outs supported fairness and adequacy of the settlement); *Robinson v. Ford Motor Co.*, No. 1:04 CV 00844, 1:04 CV 00845, 2005 WL 5253339, at *5 (S.D. Ohio June 15, 2005); 2 H. Newberg, Newberg on Class Actions § 11.47, at 463 (2d ed. 1985) (same).[12] Similarly, "[a] court should not withhold approval of a settlement

---

[10]   Indeed, even if the number of opt outs were multiples higher, the overall number would still be insignificant compared to the many thousands of Class Members who support the Settlement. For example, even if there were ten times more opt outs in this case, that would still represent less than one percent of the total potential Class, which is far below the percentage of opt outs in class settlements approved by federal courts. *See, e.g.*, *Turner*, 472 F. Supp. 2d at 852-53 (approving settlement where over 6% of class opted out).

[11]   On October 4, 2002, Justice Jack C. Watson, the Guardian ad Litem for the Medical Settlement, submitted his report finding that the Settlement was fair to minors and incompetents and recommending that the Court approve the Settlement. (Rec. Doc. 7587.) Justice Watson did note that he thought there should be some protection of the funds for the benefit of minors and incompetents. The Court has since issued an order that addresses this concern. (Rec. Doc. 7672.)

[12]   *See also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999) (approving settlement where objectors represented fewer than 4% of the class); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement"); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'"); *Lazy Oil Co v. Witco Corp.*, 95 F. Supp. 2d 290, 332 (W.D. Pa. 1997) ("'[i]n the class action context, silence may be construed as assent'"); *Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (class settlement approved despite objections from more than 10% of class); *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("a small number of objectors from a plaintiff class

merely because some class members object." *IUE-CWA*, 238 F.R.D. at 600. Rather, the Court "'has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement.'" *Id.* (quoting *UAW*, 2006 WL 891151, at *20); *see also Reed v. Gen. Motors Corp.*, 703 F.2d 170, 174-75 (5th Cir. 1983) (approving settlement over objections by 30% of the class).[13]

Here, less than 0.1% of the potential Class has objected and an equally miniscule percentage has opted out. By any measure, these numbers are inconsequential and, indeed, may be unprecedented in a class action of this size. The *Deepwater Horizon* Incident was a well-known event and widely publicized across the Gulf region and beyond. The claims involve the type of alleged harm—personal and physical injury—of which Class Members would be self-aware, and the Court-approved class notice program was extensive and reached an estimated 95% of Gulf Coast residents an average of 10 times. (Azari Supp. Decl. ¶ 6.)[14] That so few Class Members have objected or opted out confirms the Settlement's fairness, reasonableness,

___

of many thousands is strong evidence of a settlement's fairness and reasonableness"). Even a large number of objections would not establish unfairness; according to the Fifth Circuit, "'[a] settlement can be fair notwithstanding a large number of class members who oppose it.'" *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983) (quoting *Cotton*, 559 F.2d at 1331); *see also Ayers v. Thompson*, 358 F.3d 356, 373 (5th Cir. 2004) ("[o]ur jurisprudence ... makes clear that a settlement can be approved despite opposition from class members").

[13] The small number of objections weighs even more strongly in favor of approval because views on the Settlement appear to be in conflict among the objectors and their counsel. In this regard, Proof of Claim Forms have been submitted by four individuals who have objected to the Medical Settlement. (Garretson Decl. ¶ 9 (attached to the parties' Oct. 22, 2012, Notice of Joint Filing of Declarations); *see Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM (SHx), 2008 WL 8150856, at *8 (C.D. Cal. July 21, 2008) (finding that small number of objections was further mitigated given that two of the objectors filed claims forms).) In addition, at least three law firms representing objectors to the Medical Settlement have submitted a total of at least thirty Proof of Claim Forms, of which at least twenty-six have been submitted by Nexsen Pruet, LLC and/or Douglas M. Schmidt, APLC, and at least four have been submitted by Lindsay & Andrews, P.A. (Garretson Decl. ¶ 9; *cf. O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 297 (E.D. Pa. 2003) (noting the "odd posture" of objectors presenting "conflicting objections" by "arguing against the entire settlement at the same time that they are attempting to force more concessions . . . within the settlement.").) These counsel are in the similarly "odd posture" of representing clients who are seeking benefits under the Settlement at the same time they are representing objectors, who, if successful, would derail the Settlement.

[14] In addition to the reach of the Notice Program estimated by Mr. Azari, approximately 30,000 unique visitors have accessed the Medical Claims Administrator's web portal since its inception in May 2012. (Garretson Oct. 22, 2012 Status Update at 4.)

and adequacy.   Moreover, where several thousands of Class Members have demonstrated widespread, affirmative approval of the Settlement by filing claims seeking benefits, the interests of the vast majority of the Class must be protected against the objections of an extremely small minority.[15]

## II.   SEVERAL PURPORTED OBJECTORS LACK STANDING AND THEIR OBJECTIONS ARE THEREFORE LEGALLY INVALID.

This Court has repeatedly held that only parties with standing may object to a class settlement.   *See* Rec. Doc. 6418 at 16-17 ("Generally, non-class members do not have standing to object to a class settlement.   Significantly, ***claims excluded from the proposed settlement are unaffected and preserved***.") (emphasis added); Rec. Doc. 7038 at 1 ("In the context of class settlements, non-settling parties generally have no standing to challenge the proposed settlement."); Rec. Doc. 7358 at 4-5 (providing that "only parties with standing shall be permitted to speak or participate in the fairness hearing" and that "plaintiffs who are not part of the class . . . may not participate in the fairness hearing"); Rec. Doc. 7480 at 8–9 (denying discovery to parties lacking standing).   Notwithstanding this well-settled law and the Court's holdings, individuals and entities who clearly lack standing have continued to submit purported objections to the Medical Settlement.[16]   These "objections" are legally improper and should be disregarded.   (*See* Section III of the BP Defendants' Reply Memorandum in Support of Their

---

[15]   There is no evidence whatsoever to support the existence of large numbers of silently disapproving Class Members, as hypothesized by the Sterbcow objectors.  (Docket 10-7777, Rec. Doc. 92 at 19-20.)

[16]   Attached as Exhibit A to the Garretson Declaration (which is itself Exhibit 3 to the parties' October 22, 2012 Notice of Joint Filing of Declarations) is a chart detailing those individuals that lack standing to object to the Settlement.  The chart also sets forth the reasons why these individuals are without standing, *e.g.*, they concede in their objection that they are not Class Members, they have opted out of the Class, or they fail to provide, as required by the Court's Preliminary Approval Order, "written evidence establishing that the individual is a Medical Benefits Settlement Class Member."  (Rec. Doc. 6419 at 25; *see also* Section III.A of BP's Economic Reply for additional discussion concerning each Class Member's burden to establish his or her standing as a member of the Class.)

Motion for Final Approval of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement ("BP's Economic Reply").)

For example, non-settling Defendant Halliburton Energy Services, Inc. lacks standing to object to the Medical Settlement. *See* Rec. Doc. 7038 at 2 (concluding that the proposed Settlements "will in no way affect any procedural or substantive rights of Halliburton"). In its objection, Halliburton simply repeats the claims of legal prejudice that this Court has already squarely rejected. (*Compare* Docket 10-7777, Rec. Doc. 93 at 14-15 *with* Rec Doc. 7036 at 5-7, 9.)[17] Accordingly, there is no need for the Court to reconsider its previous ruling.[18]

The State of Louisiana, in an apparent attempt to do an end run around the Court's ruling that it lacks standing to object, has filed an "*amicus*" brief opposing certification of both the Medical Class and the Economic and Property Damages Class. Louisiana has neither sought nor been granted leave to make any such filing.[19] Equally important, the Court previously ruled that "the proposed settlements will in no way affect any procedural or substantive rights of . . . Louisiana," Rec. Doc. No. 7038 at 2, making the State's failure to offer any explanation as to why it should be permitted to file an *amicus* brief particularly egregious.[20] Given Louisiana's failure to seek leave, the Court should disregard this *amicus* brief and strike it from the record.[21]

---

[17] Indeed, Transocean, which is legally situated in a posture **identical to Halliburton**, has **agreed** with BP that non-settling defendants are not prejudiced by the Settlement Agreement. *See* Rec. Doc. 7034.

[18] *See* Section III.F of BP's Economic Reply for additional discussion; *see also* Rec. Doc. 7033 at 2-4; Rec. Doc. 7037 at 2-5 for BP's previous arguments concerning Halliburton's lack of standing.

[19] Neither the Federal Rules of Civil Procedure nor the Local Rules of the Eastern District of Louisiana permit a State to file an *amicus* brief in a District Court without seeking (and being granted) leave to do so. Indeed, these rules do not explicitly provide for any *amicus* filings at all. "The extent to which the court permits *amicus* briefing lies solely within the court's discretion." *United States v. Olis*, Civ. A. No. H-07-3295, Crim. No. H-03-217-01, 2008 WL 620520, at *7 (S.D. Tex. Mar. 3, 2008). Moreover, "absent a statute to the contrary, no distinction is made between the request of a private person for leave to appear *amicus curiae* and one by an agent of the government." *Leigh v. Engle*, 535 F. Supp. 418, 420 (N.D. Ill. 1982) (internal citations omitted). No such statute exists here, and the Class Action Fairness Act explicitly provides that "[n]othing in this section shall be construed to expand the authority of . . . State officials." 28 U.S.C. § 1715(f).

[20] Louisiana suggests that "[i]t is the State's obligation as *parens patriae* to protect the interests of its citizens by making sure that the Rules [concerning class certification] designed to protect each individual citizen of the

Finally, even if these parties had standing—and they do not—their objections raise no genuine issues as to the fairness, adequacy, or reasonableness of the Medical Settlement, much less preclude its approval.  Accordingly, without waiving its arguments concerning standing, BP will nonetheless address the substance of all objections filed in opposition to final approval of the Settlement and explain why they are devoid of merit.[22]

### III.   THE OBJECTIONS TO COMPENSATION PAID UNDER THE SETTLEMENT ARE LEGALLY INVALID.

#### A.   Nearly All Objections to the Settlement Benefits Are Nothing More Than an Attempt to Renegotiate the Terms of the SPC Matrix and Must Be Rejected.

Virtually all of the objections to the Medical Settlement are merely attempts to re-negotiate the compensation components of the Specified Physical Conditions Matrix.[23]  There are no objections to the Periodic Medical Consultation Program and only a single and non-specific objection to the Gulf Region Health Outreach Program.  Yet in challenging the compensation under the SPC Matrix, objectors ignore entirely the benefits and value of these other Settlement components.  At any rate, objections over the SPC compensation provide no reason to reject a settlement that, like this one, was the result of hard-fought, non-collusive negotiations.  The "court should not make a proponent of a proposed settlement justify each term

---

State are followed."  (Docket 10-7777, Rec. Doc. 228 at 25.)  On the contrary, it is the obligation of the **Court** to protect the Class and to rule on whether class certification is proper.  Louisiana does not demonstrate why its brief contributes anything new or useful to the Court's analysis of this issue, or why, given the Court's ruling that the Settlement does not affect Louisana's rights, this brief should be permitted.

[21]   Although certain other governmental objectors mentioned the Medical Settlement in their filings objecting to the Economic and Property Damages Settlement, or included the Medical Class Action's docket number in the caption, none of these filings includes any arguments related to the Medical Settlement.  (Docket 10-7777, Rec. Doc. 164; Docket 10-7777, Rec. Doc. 211; Docket 10-7777, Rec. Doc. 216; Docket 10-7777; Rec. Doc. 218.)  To the extent any of these entities intended to object to the Medical Settlement, they lack standing to do so.

[22]   In its August 13, 2012 brief, BP addressed the objections of Charles A. Boggs, Albio Luis Machuca, and Ilease Bartlette.  Mr. Boggs has since opted out of the Medical Benefits Settlement Class.  Accordingly, he no longer has standing to object to the Settlement and his objection should be disregarded.  BP also notes that the objections of Jason B. Sims and Chagares (Docket 10-7777, Rec. Docs. 61, 250) do not raise any substantive issues related to the Medical Settlement, and therefore require no response.

[23]   *See, e.g.*, Docket 10-7777, Rec Docs. 92, 130, 158, 160, 180, 182, 185, 202, 203, 205, 208, 236.

of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330 (internal quotations marks omitted); *see also Klein*, 705 F. Supp. 2d at 649 ("A proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances.  'If the terms themselves are fair, reasonable and adequate, the district court may fairly assume that they were negotiated by competent and adequate counsel . . . .'") (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 212); *DeHoyos*, 240 F.R.D. at 286 ("The proposed settlement is not required to achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation.") (internal quotation marks omitted).

Furthermore, the objectors typically offer no evidence (or no credible evidence) supporting their positions.  The Court should give no weight to such unsupported objections.  *See DeHoyos*, 240 F.R.D. at 294 ("[T]here is no outside evidence to refute or contradict any of the information provided in support of the Settlement Agreement.  'To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process.'") (citing *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 464 (2d Cir. 1974)).[24]

---

[24]  *See also In re Cendant Corp. Litig.,* 264 F.3d 201, 235 (3d Cir. 2001) (discarding objections to notice that were based on speculation); *In re Rio Hair Naturalizer Prods. Liab. Litig.*, MDL NO. 1055, 1996 WL 780512, at *14 (E.D. Mich. Dec. 20, 1996) ("'General objections without factual or legal substantiation carry little weight'") (quoting 2 Newberg on Class Actions § 11.58 (3d ed.)); *Fussell v. Wilkinson*, No. 1:03-CV-704, 2005 WL 3132321, at *4 (S.D. Ohio Nov. 22, 2005) (rejecting objection not related to the substantive terms of the settlement); *Luevano v. Campbell*, 93 F.R.D. 68, 77 (D.D.C. 1981); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1394 (D. Ariz. 1989), *aff'd*, 955 F.2d 1268 (9th Cir. 1992); *Sunrise Toyota, Ltd. v. Toyota Motor Co., Ltd.*, No. 71 Civ. 1335-LFM, 1973 WL 778, at *6 (S.D.N.Y. Feb. 20, 1973) (rejecting objections based on conclusory allegations); Fed. Prac. & Proc. § 1797.1 ("Only clearly presented objections…will be considered.").

At most, the objections to the value of particular claims under the Medical Settlement reflect that there are disputed factual issues.  A disagreement over the merits is simply not a basis for disapproving a class settlement.  Compromise is the essence of every settlement agreement. *See, e.g.*, *Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981) ("the objections made indicated these employees did not want to compromise at all but wanted full benefits, rather than making any complaint directed to the adequacy of their legal representation").

Indeed, one need not agree with BP's view of the merits of plaintiffs' claims, as the law clearly favors settlement of even so-called "meritorious" claims, reflecting the fact that settlements are generally based on several different and sometimes competing considerations. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 427 (S.D.N.Y. 2001) ("[W]hile Plaintiffs believe that their claims are meritorious, the fairness and reasonableness of the proposed Settlement in light of the risks, burdens and uncertainties of continued litigation are manifest."); *In re Newbridge Networks Sec. Litig.*, No. Civ. A. 94-1678-LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 22, 1998) ("Counsel maintain that plaintiffs' legal claims are meritorious, but settlement forestalls the substantial and inevitable uncertainties attendant to proceeding to trial"); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) ("[N]o matter how confident one may be of the outcome of litigation, such confidence is often misplaced.") (quotation omitted), *aff'd*, 166 F.3d 581 (3d Cir. 1999).  If the rule were otherwise, colorable claims could never be settled.  That is not the law.

Finally, any Class Member unsatisfied with the Settlement has the right to opt out, thus preserving his or her claim.  The right to opt out fully addresses the objections of the very few who believe that this or that compensation amount under the SPC Matrix is insufficient, while making sure those benefits are available to the vast majority of Class Members who want them.

In this regard, "the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair." *See Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012)).[25]

    **B.**    **The Compensation Paid Under the Specified Physical Conditions Matrix Is Fair, Reasonable, and Adequate.**

        **1.**    The Compensation Amounts Under the SPC Matrix Are Entirely Appropriate.

Several objectors argue that additional compensation should be awarded to Class Members with Specified Physical Conditions.[26] But these individuals do not raise any objections to the structure or process of the settlement negotiations or make any non-speculative allegations of collusion or fraud.[27] Accordingly, the payments negotiated by Class Counsel and reflected in the Settlement are presumed reasonable. *See Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984); *Turner*, 472 F. Supp. 2d at 852. This is because, under Rule 23, Class Counsel "are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit." *Turner*, 472 F. Supp. 2d at 852. If the settlement was reached at arm's length by knowledgeable counsel, the "trial court 'should be hesitant to substitute its own judgment for that of counsel.'" *Ruiz*, 724 F.2d at 1152.

---

[25] The D'Amico Objectors claim that opt-out rights are not a solution because many claims are of negative value. (Docket 10-7777, Rec Doc. 158 at 1–2.) Under Rule 23, the Class Representatives and Class Counsel are charged with protecting the interests of all Class Members, including those with negative value claims, and the D'Amico Objectors offer no basis to question their adequacy. Moreover, that many claims are of negative value is a reason to approve the Settlement, not reject it. (*See* Coffee Decl. ¶ 9(d) ("This is a largely 'negative value' class action which presents a 'compelling rationale' for certification"); *id.* ¶¶ 38-41; Miller Decl. ¶ 37.)

[26] Docket 10-7777, Rec. Docs. 130, 160, 203, 205, 243.

[27] The Palmer Objectors insinuate that there was some collusion in attorneys' fees negotiations because it "is simply not believable" that the parties "began, finished, obtained PSC approval, and obtained BP corporate approval of a **$600 million deal** [for attorneys' fees] in less than a day." (Docket 10-7777, Rec. Doc. 124 at 37 (emphasis in original).) This unsupported speculation provides no competent evidence of collusion. *See, e.g., In re Enron Corp. Sec., Deriv. & "Erisa" Litig.*, MDL 1446, 2003 WL 22962792, at *10 (S.D. Tex. Nov. 5, 2003) (finding no evidence of collusion when objectors' "conclusory allegation was based on pure speculation" and timing and "settlement at issue arose during court-ordered mediation with an experienced and renowned court-appointed mediator"). Besides, the parties only began fee discussions after receiving approval from the Court—which was involved in negotiations daily over a period of several months. The objectors are wrong on the law and wrong on the facts, and their own speculation is of no relevance.

In addition, the payment amounts reflected on the SPC Matrix represent just *one* component of the Settlement and reflect a hard-fought, arm's length compromise that also included, for example, the conditions to be included in the Matrix, standards of proof, and levels of compensation and enhancers for overnight hospitalization, as well as the components, duration, and frequency of the Periodic Medical Consultation Program, the specifics of the Back-End Litigation Option, the Gulf Region Health Outreach Program, and many other negotiated terms.  (*See* Rec Doc. 7112-1 at 25.)  Objectors also disregard that the Settlement provides a mechanism for the timely and efficient administration of benefits to claimants, compared with the cost and delay of obtaining any recovery following trial (even assuming a favorable judgment, which is by no means certain).  Contrary to the objectors who focus solely on SPC compensation, the Court must consider the *whole* Settlement and all of the benefits it provides. *See Robinson*, 2005 WL 5253339, at *4 (emphasis added) ("In considering the extent and significance of the objections, 'the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis.'"); *Mich. Hosp. Ass'n v. Babcock*, Case No. 5:89-CV-00070, 1991 U.S. Dist. LEXIS 2058, at *11-12 (W.D. Mich Feb. 11, 1991). "In assessing the settlement, the Court must determine 'whether it falls within the "range of reasonableness," not whether it is the most favorable possible result in the litigation.'"  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993) (quoting *Fisher Brothers v. Cambridge-Lee Indus.*, 630 F. Supp. 482, 489 (E.D. Pa. 1985)); *see also Cotton*, 559 F.2d at 1330.

The parties have also presented evidence that the amounts paid under the Matrix are well within the range of jury verdicts involving similar injuries and thus reflect litigated outcomes of those claims.  (*See* BP's Aug. 13 Br. at 55 n. 42.)  In contrast, objectors have presented neither

case law nor any competent evidence demonstrating that the payment amounts do not fairly compensate them, particularly given the inherent risks and uncertainty of trial.  *See, e.g., In re Shell Oil Refinery*, 155 F.R.D. 552, 565 (E.D. La. 1993) (finding that although "the range of possible recovery by jury verdict could have been less or more than the settlement," it was "significant that there has been no evidence offered to show that the settlement value is inadequate in relation to the amount that a jury could have awarded").[28]

The various objectors disagree as to how hypothetical additional compensation would be awarded under the SPC Matrix (with each objector claiming only that more money should be awarded to him or her).[29]  Certain "objectors" disagree even more fundamentally, and have criticized the Settlement on the grounds that it is ***too generous***.  Ms. Barbara Adams, for example, contends that while working in an office during the response, she "saw nothing caused by the negligence of BP," and observed that BP "took every precaution to guarantee the safety of the clean up workers." (Docket 10-7777, Rec. Doc. No. 243 at 1.)  According to Ms. Adams, "enough has been paid out" already.  (*Id.*)  Halliburton similarly argues that "BP is clearly paying a premium" and that the Settlement does not "reflect a fair and reasonable estimation of the value of the case in view of what may happen at trial." (Docket 10-7777, Rec. Doc. 93 at 18.)  Objections that the Settlement compensation is "not enough" and yet "too much" underscore the highly-disputed nature of plaintiffs' claims and demonstrate why the Settlement should be approved as a reasonable compromise.

---

[28]   In fact, although this Settlement Agreement will fully and fairly compensate Class Members, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Parker v. Anderson*, 667 F.2d 1204, 1210 n.6 (5th Cir. 1982) (quotation omitted); *accord Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (collecting cases), *aff'd*, 166 F.3d 581 (3d Cir. 1999).

[29]   *See* Section III.B.3.

Certain objectors argue that awards should be higher because they would be entitled to recover punitive damages at trial.[30]  They are, of course, free to opt out and pursue that remedy through individual litigation.  But given that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award.  *See*, *e.g.*, *In re Shell Oil Refinery*, 155 F.R.D. at 563 (approving settlement when it was "not clear that the plaintiffs could prove punitive liability and obtain a punitive damage award in excess of [defendant's] . . . settlement offer"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (district court did not abuse its discretion in approving settlement where there was "speculative possibility of punitive damages"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, MDL 1203, 2000 WL 1222042, at *49 n.22 (E.D. Pa. Aug. 28, 2000) ("punitive damage claims are often illusory"); *Draney v. Wilson, Morton, Assaf & McElligott*, No. Civ. 79-1029, 1985 WL 5820, at *3 (D. Ariz. Sept. 30, 1985) (approving settlement when "[a]ny award of punitive damages would be highly speculative").  Furthermore, in this case, where BP conducted all Response Activities under the direction of the United States government, an award of punitive damages at trial is particularly unlikely.[31]

## 2.  The SPC Matrix Includes the Appropriate Medical Conditions.

The parties negotiated the SPC Matrix to include "those conditions for which there is a medical basis to conclude that contact with oil and/or dispersants caused them if there were exposure to sufficient amounts of such substances for a sufficient duration of time."  (Herzstein Decl. ¶ 14; *see also* Harbut Decl. ¶¶ 17, 25–37.)

---

[30]   Docket 10-7777, Rec. Doc. 130, 180, 185, 202, 208, 236.

[31]   In addition, Class Members retain the right to seek punitive damages from Transocean and Halliburton.  (MSA § XVI.G.)

Certain objectors argue that the SPC Matrix should include additional or different conditions.[32]  Some provide only vague descriptions of their symptoms, but nonetheless claim that they should receive compensation for these symptoms.  (Herzstein Supp. Decl. ¶ 4.a (attached as Ex 1).)  From these descriptions, it is impossible to assess what medical condition the objectors are asserting.  As a result, it would have been inappropriate to include these sorts of vague symptoms on the Matrix.  (*Id.*)

Other objectors claim that they have developed conditions (including pulmonary emboli, peripheral neuropathy, hearing loss, and phototoxicity) due to exposure to oil and/or dispersants, and that these conditions should also be included in the Matrix.  There is no reason to include any of these conditions in the Matrix, however, because there is no reasonable medical or scientific basis to conclude that any of these conditions were or could have been caused by the levels of exposure to oil and/or dispersants involved here.  (Herzstein Supp. Decl. ¶ 4.)  Indeed, for many of objectors' claims, there is no basis to connect the claimed conditions to exposure to oil and/or dispersants even at much higher levels than were present during the *Deepwater Horizon* Incident.  (*Id.* ¶¶ 4, 5)[33]

Some objectors assert that they developed certain conditions classified on the Matrix as Acute Specified Physical Conditions, but that those conditions persist to the present.  While a few of the Acute Specified Physical Conditions are similar to corresponding Chronic Specified Physical Conditions (*i.e.*, dermatitis, eczematous reaction, rhinosinusitis, and ocular), there is no

---

[32]   Docket 10-7777, Rec. Docs 92, 180, 182, 185, 202, 208; *see also* Herzstein Supp. Decl. ¶ 4 for additional discussion.

[33]   Smith Stag declarant Dr. William Sawyer states that peripheral neuropathy has been reported in certain occupational exposure settings with much higher levels of exposure than those potentially at issue here. (Docket 10-7777, Rec. Doc. 185-5 ¶ 10; Rec. Doc 202-5 ¶ 10.)  There is no reasonable basis in the literature cited by Dr. Sawyer, which describes high levels of exposure over a long duration, to support the assertion that exposure to oil and/or dispersants in connection with the *Deepwater Horizon* Incident would have caused peripheral neuropathy.  (Herzstein Supp. Decl. ¶ 4.d; Cox Suppl. Dec. ¶¶ 43–46 (attached as Ex. 2).)

scientific evidence that the other Acute Specified Physical Conditions would persist if they were in fact caused by the Class Members' contact with oil and/or dispersants.  (Herzstein Supp. Decl. ¶ 5.)[34]

> 3. The Procedural and Other Aspects of the SPC Matrix Are Fair and Appropriate.

Certain objectors complain about the proof requirements for compensation under the Matrix.  For example, the Smith Stag Objectors argue that it is inappropriate to lump claimants with "substantial proof of significant and impairing injury and illness" with those claimants who do not have such proof.  (Docket 10-7777, Rec. Doc. 185 at 2.)[35]  In contrast, other objectors contend that claimants without any medical records whatsoever should be entitled to receive the highest level of compensation under the Matrix.[36]

Both sets of objectors misconstrue the Matrix and misunderstand the law.  On its face, the Matrix comprehensively and appropriately provides for a range of potential claimants—from those with little or lesser proof to those with more substantial evidence.  This range of awards based on type and quality of proof is common in class settlements and is entirely proper.  *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005) ("Settlement

---

[34]   For example, some objectors claim that they still have intermittent headaches caused by contact with oil and/or dispersants.  While contact with oil and/or dispersants at the reported levels could have precipitated the occurrence of a headache, when the smell or irritating substance was removed, the headache would go away.  (Herzstein Supp. Decl. ¶ 5.a.)  If it persists it is likely caused by something else.  Headaches can be an acute manifestation of central nervous system toxicity associated with very high level exposure to some of the hydrocarbon constituents found in crude oil and/or dispersants.  However, the air monitoring done in connection with the *Deepwater Horizon* Incident showed levels well below those that could cause any central nervous system effects.  Moreover, even if someone were exposed to very high levels of VOCs, such as the levels associated with the recreational abuse of solvents to become intoxicated (*i.e.*, sniffing glue), they would not be expected to have ongoing headaches lasting months to years as a result.  (*Id.*)

[35]   In fact, however, the "substantial proof" claimed by the Smith Stag Objectors and described in the declarations attached to their objection is largely lacking in any scientific basis.  *See* Section IV.A.

[36]   Docket 10-7777, Rec. Docs. 92 at 7–8; 158 at 2; 236 at 1.  In arguing that medical records should not be required for the higher levels of compensation under the SPC Matrix, some objectors assert that many Class Members may not have health insurance or funds for medical care.  The Periodic Medical Consultation Program will be a particularly valuable benefit for such claimants.

proceeds may be allocated according to the strengths and weaknesses of the various claims possessed by Class Members.") (citing *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001)); *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 WL 21981, at *7 (N.D. Ill. Sept. 14, 1984) (finding a proposed distribution fair and reasonable where different class members had claims of different strength).

Other objectors also criticize the time periods in which Specified Physical Conditions must manifest themselves.  As a preliminary matter, some objectors appear to misunderstand the time frames, because they assert that it is unfair that Class Members are required to have visited a doctor to seek medical treatment within 24 to 72 hours after their contact with oil and/or dispersants.[37]  The Matrix, however, requires the Specified Physical Condition, or associated symptoms thereof, to have ***manifested*** in the individual within 24 to 72 hours after contact with oil and/or dispersants; it does not require the individual to have seen a doctor within 24 to 72 hours after his or her contact with oil and/or dispersants.  (Herzstein Supp. Decl. ¶ 6; Medical Settlement Agreement ("MSA") Ex. 8.)  Moreover, these time periods are appropriate and scientifically and medically supported.  (Herzstein Decl. ¶ 20; Herzstein Supp. Decl. ¶ 6; Harbut Decl. ¶ 26.)  Adverse health effects caused by contact with oil and/or dispersants or exposure to heat would manifest within the timeframes set forth on the Matrix, if not sooner.  (Herzstein Decl. ¶ 20; Herzstein Supp. Decl. ¶ 6; Harbut Decl. ¶ 26-38.)

The Sterbcow Objectors claim that the use of the Medical Encounters Database as a means of proving a claim at the A3 or A4 level is inappropriate because some Clean-Up Workers were allegedly discouraged from visiting medic stations and threatened with termination if they did so.  (Docket 10-7777, Rec. Doc. 92 at 9–10.)  Nothing could be further from the truth.  BP

---

[37]   Docket 10-7777, Rec. Doc. 158 at 2.

not only encouraged, but required, workers to report any incidents or injuries to their supervisor or Industrial Hygiene or safety personnel, regardless of how insignificant the injury might seem. (Dutton Supp. Decl. ¶ 18 (attached as Ex. 3).)  Moreover, if BP had learned of a contractor or supervisor even discouraging medical attention, let alone threatening retaliation, it would have immediately disciplined that contractor or supervisor or, if necessary, dismissed that contractor or supervisor from the Response.  (*Id.* ¶ 19.)

The Sterbcow Objectors also suggest that they were disadvantaged because they primarily spoke Spanish rather than English.  (Docket 10-7777, Rec. Doc. 92 at 25–26.) Response workers who wanted to seek medical treatment could do so regardless of whether English was their primary language, and were informed of health and safety resources in other languages. (Dutton Supp. Decl. ¶ 21.)

More specifically and contrary to their objections now, the Medical Encounters Database shows that nine of the objectors identified in the Sterbcow filing visited and sought treatment at the medic stations for a total of eleven visits.  (Dutton Supp. Decl. ¶ 26.)  Despite the contention that such individuals feared dismissal for reporting their medical conditions, the fact that the average time between the last medical visit and the last badging activity for these individuals was approximately 45 days contradicts their claims.  (*Id.*)  Indeed, any suggestion that workers were discouraged from visiting the medic stations is contradicted by the records in the Medical Encounters Database itself, which tracked over 20,000 reports from over 13,000 individual workers.  (*Id.* ¶ 6.)[38]

---

[38] Based on discussions with a single alleged Clean-Up Worker patient, Smith Stagg Objectors' declarant Dr. Robichaux concludes that the Medical Encounters Database is "probably useless."  (Docket 10-7777, Rec. Doc. 185-3 at 5.)  This conclusion is baseless, and, as discussed further below, Dr. Robichaux's declaration is full of similarly unsupported "expert" opinions.  *See* Section IV.A.

In addition, even if a Clean-Up Worker did not visit a medic station, he or she may still be able to receive compensation under the SPC Matrix by providing the same proof as Zone A and Zone B Residents—including (with appropriate medical records) for Chronic Conditions at the highest level of compensation available under the Matrix.  Corroboration in the Medical Encounters Database and/or other BP database is required only for payments under Levels A3 and A4 of the Matrix, and is not required for payments under Levels A1, A2, and B1 of the Matrix.  (*See* Rec. Doc. 7112-1 at 27-30 for additional description of the Matrix requirements.)

The Sterbcow Objectors claim, without offering any legal or evidentiary support, that the Settlement should provide for simultaneous recovery for a heat-related condition as well as an unrelated condition due to exposure to oil and/or dispersants.  (Docket 10-7777, Rec. Doc. 92 at 14–15.)  The Settlement provides that a Class Member may receive a single recovery under the Matrix for the most highly-compensated condition for which he or she qualifies.  The Sterbcow Objection is nothing more than a complaint about the amount and allocation of compensation under the SPC Matrix, as well as an attempt to renegotiate terms different from those agreed to by the parties.  It must therefore be rejected.

The Palmer Objectors argue that the Settlement inappropriately releases claims for certain alleged past exposures without providing compensation.  (Docket 10-7777, Rec. Doc. 124 at 15–16.)  This is not a valid objection.  It is black letter law that parties can compromise claims (including in the class action context) without providing compensation for every alleged injury. *See, e.g., Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983); *see also Berardinelli v. General Am. Life Ins. Co.*, 357 F.3d 800, 805 (8th Cir. 2004); *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 1222042, at *49 (noting that settlement effectively released claims for certain injuries even though no compensation was provided for such claims); Miller Supp. Decl. ¶¶ 22–

23 (attached as Ex. 4).   This is particularly true where, as here, the parties have crafted a settlement that provides a variety of benefits in resolution of the plaintiffs' claims.

Finally, the Palmer Objectors argue that the Settlement should provide for an appeals process.  The Settlement does provide for a right of review for erroneous determinations (MSA § V.M), an additional feature not found in many class settlements.   This right of review, performed by an employee of the Claims Administrator who was not involved in the original review of the claim, provides an avenue of relief in the event the Claims Administrator makes a clearly erroneous factual determination.   Because the claims administration process here is governed by a matrix with objective proof standards that minimize the Claims Administrator's discretion, an appeals process would likely result in delayed compensation to claimants and increased costs of claims administration, without any measurable benefit beyond the right of review already provided under the Settlement.   It is for these reasons that courts routinely approve class action settlements that do not include any appeals or review processes whatsoever. *See*, *e.g.*, *In re WorldCom, Inc.*, 347 B.R. 123, 155 (Bankr. S.D.N.Y. 2006); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 339 (3d Cir. 2010).

4.     The Court Should Ignore Unsupported Speculation about Collusion.

Two individuals (Messrs. McLane and Canipe) have premised their objections about alleged inadequate compensation on unsupported and speculative claims of collusion.[39]   Mr. McLane also alleges "suspicion" based on the fact that Class Members must opt out by October 1 (sic) "thereby 'Locking In' class members to settle for unfair compensation and 'Locking Out' plaintiffs from the 'Fairness Hearing' who disagree with the 'Pre-Approved Settlement.'"[40]

---

[39]     Docket 10-7777, Rec. Docs. 203, 205.
[40]     Docket 10-7777, Rec. Doc. 205 at 2–3.

As set forth in their objections and the documentation provided therewith, McLane and Canipe are not Class Members, so they are unaffected by the Settlement, including the opt-out deadline.   Furthermore, there is no evidence of collusion; indeed, the record is quite to the contrary.   (Order [Regarding Objectors' Requests for Discovery and GO FISH's Motion to Intervene], Rec. Doc. 7480 at 7 ("The Settlement Agreement was negotiated in good faith and at arm's length over many months . . . .  The negotiations were extensive and highly contested.").) That these individuals who are not even part of the Class would prefer a different deal does not show collusion.  "It is not the role of the Objectors to renegotiate the agreement, nor determine whether the class would receive more compensation in contested litigation."  *Id.* at 5-6.

### C.     The Back-End Litigation Option Is Fair and Appropriate.

The Back-End Litigation Option appropriately preserves Class Members' rights to bring claims against BP for injuries resulting from exposure to oil and/or dispersants from the *Deepwater Horizon* Incident that do not manifest until after April 16, 2012.  The inclusion of certain procedural requirements and the waiver of certain rights and/or defenses by both parties do not render the Back-End Litigation Option legally infirm.  (*See* BP's Aug. 13 Br. at 62-64; 73 for additional discussion.)

The Palmer Objectors argue that the Back-End Litigation Option's election of remedy provision is unfair because a claimant may not pursue BP through the Back-End Litigation Option if the claimant also files a claim, even if unsuccessful, under workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (Docket 10-7777, Rec. Doc. 124 at 29–30.)  On the contrary, there is nothing unfair about the compromise reached by the parties. As with the other provisions of the Back-End Litigation Option, both sides exchanged valuable consideration related to these issues.  Although BP bargained for the provision that the Palmer Objectors describe, BP likewise conceded that in a Back-End Litigation Option Lawsuit, it will

23

not assert any defense based on exclusivity of remedies under workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (MSA § VIII.G.2.d.)  This is a reasonable and proper compromise.  (*See also* Miller Supp. Decl. ¶ 25.)

Finally, the Sterbcow Objectors assert that exacerbation of pre-existing conditions that are diagnosed before April 16, 2012 should be included in the Back-End Litigation Option.  (Docket 10-7777, Rec. Doc. 92 at 15–16.)  Given that no objector has alleged such exacerbation, the objection appears purely hypothetical.  Nonetheless, to the extent that any Class Member has experienced an exacerbation of a pre-existing condition and therefore believes that the compensation awarded under the SPC Matrix is insufficient given their unusual circumstances, that Class Member has the ability to opt out.  But there is no unfairness in a settlement that does not permit a class member to recover compensation now and then to sue again for the same condition in the future; to permit otherwise would undermine the finality and end to litigation sought to be achieved by any settlement.  (Miller Supp. Decl. ¶ 22.)

### D.   The Gulf Region Health Outreach Program Is a Valuable Benefit to Class Members.

The Palmer Objectors vaguely contend that the Medical Settlement contains a "*cy pres*" component and is thus flawed and cannot be approved, apparently referring to the Gulf Region Health Outreach Program.  (Docket 10-7777, Rec. Doc. 124 at 21.)  They are mistaken.  As the Palmer Objectors' own authorities hold, the *cy pres* doctrine applies where a court is faced with the decision of what to do with a leftover portion of a finite fund that goes "unclaimed" by class members.  *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (*cy pres* doctrine applies where court must "distribute unclaimed funds").[41]  There is no *cy pres* disposition of

---

[41]   The Palmer Objectors rely on two additional inapposite cases besides *Klier*: *In re Wells Fargo Sec. Litig.*, 991 F. Supp. 1193, 1194–95 (N.D. Cal. 1998) (directing disbursement of residual funds following distributions to

unclaimed settlement funds in this case.  To the extent the Palmer Objectors are objecting to the Outreach Program, its funds are not from amounts remaining after individual distribution and do not limit in any way the compensation that Class Members will receive.

Furthermore, the distributions to the Outreach Program will strengthen the healthcare infrastructure in the Gulf Coast region, directly benefitting Class Members as well as making other benefits they receive, including the Periodic Medical Consultation Program, more valuable. (*See* Herzstein Decl. ¶ 23 (describing how the integration of Periodic Medical Consultation Program providers with Federal Qualified Health Centers, certain of which will benefit from the Outreach Program, will increase class member access to care).)  Indeed, settlements with similar types of benefits have been consistently approved.  *See, e.g., Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 149 (S.D. Ohio 1992) (approving settlement including funds for research to characterize or reduce the risk of heart valve replacement surgery); *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 1222042, at *24 (approving settlement including funds for medical research and education); *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, No. 1:01-CV-9000, Dkt. 340 (N.D. Ohio May 8, 2002) (approving settlement including funds for medical research relating to reconstructive orthopedic implants for the benefit of class members); *In re Three Mile Island Litig.*, 557 F. Supp. 96, 97 (M.D. Pa. 1982) (noting that the approved settlement provided for a Public Health Fund to finance public health studies and evacuation planning); *Int'l Union, UAW v. Gen. Motors Corp.*, 2:07-cv-14074-RHC-VMM, Rec. Doc. No. 27-3 ¶ 31 at 40 and 27-10 Ex. G (settlement in retiree healthcare benefits case established "National Institute for Health Care Reform" funded by defendant); Rec. Doc. No. 66 ¶ 14 (Order and Final Judgment approving

---

class members), and *Dennis v. Kellogg Co.*, --- F.3d ---, Nos. 11-55674, 11-55706, 2012 WL 3800230, at *4 (9th Cir. Sept. 4, 2012) (finding improper a cy pres distribution of residual funds, plus additional food items, to various charities that had no relation to the class or the underlying claims).   *See also* Section IV.B.8 of BP's Economic Reply.

settlement and incorporating settlement agreement and exhibits by reference).  There is no *cy pres* problem under the Medical Settlement.[42]

## IV.      MANY OBJECTIONS ARE SIMPLY WRONG ON THE FACTS, THE LAW, OR BOTH.

### A.      The Scientific Analyses Submitted by Certain Objectors Are Seriously Flawed.

The quality of the "science" relied upon by various objectors ranges from misleading discussions of cherry-picked literature to "junk science."  None of it provides any reason to doubt that the Settlement is fair, reasonable, and adequate.  In addition to the more detailed critiques of these analyses found in the supplemental declarations of BP's experts, BP addresses some of the more serious errors and misleading statements made by objectors or their purported experts.[43]

1.      The Volatile Organic Compounds Blood Tests Relied on by Certain Objectors Are Unreliable and Not a Valid Indicator of Exposure.

Some objectors rely upon blood test results allegedly showing elevated levels of volatile organic compounds ("VOCs") as support for their claims that they were exposed to high levels of the components of oil and/or dispersants in connection with the *Deepwater Horizon* oil spill.  Such claims are scientifically unfounded.  (Cox Supp. Decl. ¶ 17.)

First, VOCs associated with the MC252 oil would persist in blood for only a matter of hours (or at most, days).  According to the U.S. Centers for Disease Control and Prevention

---

[42]   Objector Llewallen complains that the Settlement contains no provision for mental health benefits.  (Docket 10-7777, Rec. Doc. 182 at 2-3.)  He is wrong.  A significant portion of the Gulf Region Health Outreach Program ($46 million) is directed towards improving mental healthcare capacity in the region and providing mental health counseling.  These mental health efforts are already underway.  (*See* Goldstein Supp. Decl. ¶¶ 3–5; *see also* Aaron Levin, MH Care Benefits from Oil Spill Settlement, 47 Psychiatric News 15 at 1b-28 (Aug. 3, 2012) ("Universities in four states will expand mental health work-force capacity and provide services to people affected by the 2010 BP oil spill in the Gulf of Mexico.").)  Accordingly, this objection has no merit.

[43]   Some of objectors' "experts" are by no means experts, especially in the fields in which they are opining.  Dr. Robichaux, for example, concedes that he is "not a scientist" and does "not consider [him]self to be distinguished."  (Rec. Doc. 185-3 ¶ 24.)  Mr. Kirby is pursuing graduate studies in coastal geology, but opines on many unrelated topics on which is not qualified.  (Rec. Doc. 185-7 at 6; Cox Supp. Decl. ¶ 51.)

(CDC), these VOCS "have a short half life in the blood and [blood] test results only reflect very recent exposures (within hours or days) prior to testing" (CDC/ATSDR Guidance on the Interpretation and Use of Blood Laboratory Analyses for Volatile Organic Compounds). (Cox Supp. Decl. ¶ 18.; Herzstein Supp. Decl. ¶ 7.)

As a result, blood testing conducted weeks or months after alleged contact with oil and/or dispersants from the *Deepwater Horizon* oil spill would not reflect exposure in connection with the spill. Rather, such test results, to the extent they are even accurate, would reflect exposures that occurred immediately before the blood was drawn. It is not surprising that some individuals might have elevated VOC levels in their blood because certain VOCs, such as BTEX and n-hexane, are present in a number of sources that are encountered in everyday life, including engine exhaust, cigarette smoke, and numerous consumer products. (Cox Supp. Decl. ¶ 19)

2. Multiple Chemical Sensitivity Is Not a Medically Recognized Condition.

Smith Stag declarant Dr. Michael Robichaux suggests that many of his patients have developed multiple chemical sensitivity ("MCS").[44] MCS is a theorized medical condition characterized by vague and non-specific symptoms—such as nausea, headaches, and fatigue— allegedly occurring after low-level exposure to chemicals. MCS was first proposed in the 1960s by an organization called the Society for Human Ecology, which later changed its name to the American Academy of Environmental Medicine. This organization has never been recognized by the American Board of Medical Specialties (the Board governing all medical specialties, from Allergy to Surgery), and the concept of MCS has been generally discredited. (Cox Supp. Decl. ¶¶ 25-28.) In this regard, MCS is not recognized as a disease or medical condition by the International Classification of Disease (ICD-10), the medical organization responsible for

---

[44] Docket 10-7777, Rec. Doc. 185-3 at 6.

assigning codes for recognized diseases.  In addition, a number of medical organizations have published strong position statements against the concept of MCS because of the lack of science demonstrating that MCS is a real condition.  (*Id.* ¶ 27.)[45]

3.      Detoxification Programs Are Not Scientifically Supported.

Some objectors assert that undergoing detoxification therapy has resulted in improvement of their symptoms and/or lowered blood VOC levels, which they claim shows that their medical conditions were caused by their contact with oil and/or dispersants from the *Deepwater Horizon* Incident.  These objectors, as well as Dr. Michael Robichaux (an ear, nose and throat specialist), point to this "successful" therapy to support their claims of serious adverse health effects from the *Deepwater Horizon* Incident.

There is no objective evidence that detoxification programs improve patients' health, and indeed there is significant evidence that they can cause harm. (Herzstein Supp. Decl. ¶ 8.) Moreover, there is no scientific support for the claim that VOCs are even present in the bloodstreams of patients undergoing detoxification or that these detoxification programs could eliminate them.  The chemical agents at issue are not permanently stored in the body and do not need to be removed, as they would have been eliminated by the body's natural processes shortly after contact, and "thus there would be nothing to be 'detoxified.'"  (*Id.* at ¶ 8.b.)  Neither the Gulf Coast Detoxification Project run by Dr. Michael Robichaux (which method was originally developed by L. Ron Hubbard of the Church of Scientology) nor the program run by Dr. Rodney Soto, both of which have been touted by objectors, have been subjected to scientific, peer review scrutiny.   There is no evidence of health benefits from either program, just subjective and

---

[45]    *See also* Herzstein Supp. Decl. ¶ 4.i for additional discussion of why MCS is not a recognized medical condition.

unproven anecdotal reports.  (*Id.* at ¶ 8.c.)  And, as Dr. Herzstein has indicated, such programs

have the potential to cause real harm to those participating in them:

> The mistaken belief in such testing and detoxification increases the likelihood that individuals will jeopardize their employment, withdraw from their social circles, and withdraw from the established medical community, and thus may not seek appropriate and needed treatment for current or future real medical conditions. There are other harms associated with such treatment, including infection from inserting and withdrawing intravenous lines and from drawing blood, adverse effects from large quantities of substances such as vitamins, adverse effects from compounded prescriptions (*e.g.*, the recent fungal meningitis outbreak seen with compounded prescriptions from the New England Compounding Center, http://www.fda.gov/Drugs/DrugSafety/ucm322734.htm), increased frequency and severity of harm from disease when people forego evidence-based medicine, and potential increased morbidity and mortality when accepted medical practices are not followed. Given the risk of harms from such testing and treatment, and the absence of any proven benefit, there is absolutely no valid medical or scientific basis for these programs to be part of the Medical Benefits Class Action Settlement.

(*Id.* at ¶ 8.d.)

4.   The Chemical Composition and Toxicological Properties of Oil and Dispersants Are Well Known.

A few objectors contend that the chemical compositions and/or toxicological properties

of the MC252 oil and the Corexit® dispersants are unknown.[46]  The chemical compositions and

toxicological properties of the MC252 oil and the Corexit® dispersants are in fact well known.

(Cox Supp. Decl. ¶¶ 5–7; Cox Decl. ¶¶ 19–36.)  Moreover, contrary to the claim of Smith Stag

declarant Dr. Sawyer, the primary constituents of Corexit® dispersants have all undergone

extensive toxicological evaluation and testing.  (Cox Supp. Decl. ¶ 6; Cox Decl. ¶¶ 27–33.)  The

vast majority of these dispersant constituents are considered to have minimal to no toxicity, and

none of the constituents would be expected to cause significant human health effects at the low

---

[46]   Docket 10-7777, Rec. Doc. 130 at 4; 185-5 at 6.

levels measured during the *Deepwater Horizon* oil spill.  (Cox Supp. Decl. ¶ 6; Cox Decl. ¶¶ 27–33, 62–68.)

Certain objectors complain that the use of Corexit® was inappropriate because its use is not permitted in certain other countries.[47]  But both Corexit® products used during the response were, and still are, on the National Contingency Plan Product Schedule approved by the United States Government.   (Dutton Decl. ¶ 24.)   Moreover, dispersants were applied during the response only under the direction and with the approval of the Unified Area Command and, in all but one isolated incident, several miles away from shore.  (*Id.* at ¶¶ 26–32.)

> 5.   Dr. William Sawyer Mischaracterizes the Exposure Assessment Conducted in Relation to the *Deepwater Horizon* Incident and Ignores the Differences Between the *Deepwater Horizon* Incident and Previous Oils Spills.

The   declaration   of   Dr.   Sawyer   reflects   fundamental   misunderstandings   or mischaracterizations of the potential exposures and health risks due to oil and/or dispersants following the *Deepwater Horizon* Incident.  Dr. Sawyer's criticism of the *Deepwater Horizon* sampling as "quantitative" rather than "qualitative" simply ignores the significant qualitative exposure assessment undertaken during the response.  (Lees Supp. Decl. ¶¶ 3–7 (attached as Ex. 5).)  He likewise mischaracterizes the scope and magnitude of the exposure assessment process undertaken by BP and federal agencies, which is unparalleled in public health history.  (*Id.* ¶ 8.)[48]

In addition, throughout his declaration, Dr. Sawyer fails to acknowledge and account for the differences between the *Deepwater Horizon* oil spill and previous spills.  (Cox Supp. Decl.

---

[47]   Docket 10-7777, Rec. Doc. 236 at 1.

[48]   Dr. Sawyer's reliance on the results of a single air sample (which does not even indicate a potential health risk) likewise reflects a flawed understanding of basic exposure assessment principles.  (Supp. Lees Decl. ¶¶ 10–14.)  *See also* Green Supp. Decl. ¶¶ 11–18 (attached as Ex. 6) for additional criticism of Dr. Sawyer's discussion of air sampling.

¶ 34.)   For example, Dr. Sawyer states that "[p]rior epidemiological studies demonstrate statistically significant increased morbidity among coastal residential communities, volunteers and clean-up workers during much smaller scale crude oil releases and exposures."  (Docket 10-7777, Rec. Doc. 185-5 ¶ 3.)  Dr. Sawyer also states that he has "summarized the known adverse health effects related to human exposures to crude oil based on peer-reviewed and published epidemiological studies of other similar, but smaller releases."  (*Id.* at ¶ 17.)

However, the *Deepwater Horizon* oil spill was unique, occurring approximately one mile beneath the ocean surface and over 100 miles from populated areas in southern Mississippi, Louisiana, and Alabama.  (*See* Cox. Decl. ¶¶ 44-47.)  As a result, most of the more water-soluble aromatic hydrocarbons were removed as the oil traveled to the ocean surface, other volatile compounds, such as n-hexane, underwent evaporation, photodegradation, and dilution prior to reaching the shoreline, and the vast majority of other potentially toxic components, such as polycyclic aromatic hydrocarbons ("PAHs"), were removed as the oil moved toward the shoreline as a result of photo-oxidation, biodegradation, evaporation, dispersion, and dissolution. (*Id.* at ¶¶ 45-47.)

In other words, the unprecedented depth and offshore nature of the spill, as compared with other spills, significantly reduced airborne concentrations of oil constituents to which individuals may have been exposed, particularly at the shoreline.  As one would expect, comprehensive air monitoring conducted by BP and numerous federal agencies over the course of the *Deepwater Horizon* spill response demonstrated that the constituents of the MC252 oil were present in air at very low levels, and far below levels at which significant adverse health effects might be expected.  (*Id.* at ¶¶ 51-74; *see also* Lees Decl. ¶¶ 13, 37–38, 45.)

The spill-related epidemiological studies cited by Dr. Sawyer are thus not relevant to the *Deepwater Horizon* oil spill because they were conducted in connection with very different types of spills and crude oil releases.  (Cox Supp. Decl. ¶ 37; Herzstein Supp. Decl. ¶ 4.h.)  For example, Dr. Sawyer discusses a study of respiratory symptoms observed in clean-up workers one year after the *Prestige* oil spill in Spain in 2002.  (Docket 10-777, Rec. Doc. ¶¶ 18-19.)  However, the *Prestige* oil spill involved heavy fuel oil—which has been shown to weather significantly slower than crude oil—that contained a high concentration of aromatic hydrocarbons (such as BTEX) and heavy metals.  (Cox Supp. Decl. ¶ 37.)  In addition, the *Prestige* spill involved a release of oil directly onto the ocean surface in a discrete area.  (*Id.*).  In contrast, the *Deepwater Horizon* oil spill involved crude oil released nearly a mile beneath the ocean surface, which significantly reduced (or eliminated) concentrations of aromatic hydrocarbons at the surface.  (*Id.*).[49]

Furthermore, the Matrix in fact includes many conditions and symptoms that are referenced in the literature regarding the previous oil spills that Dr. Sawyer cites in his declaration.  (Herzstein Supp. Decl. ¶ 4.h.)  However, other conditions referenced by Dr. Sawyer do not belong on the Matrix, because different oil spills release different types of chemicals, as well as different concentrations of the same chemicals, and the geographic and temporal proximity to the source of a spill can vary significantly.  (*Id.*)

> 6.    The Declaration of James J. Kirby III Is Full of Methodological and Scientific Errors.

The methodological and scientific errors in Mr. Kirby's article are overwhelming, resulting in conclusions that are unfounded, illogical, and simply incorrect.  (Cox Supp. Decl.

---

[49]    Indeed, the authors of the study cited by Dr. Sawyer stated that "the findings [from the *Prestige* spill] cannot be extrapolated to spills of other types of oil," yet this is exactly what Dr. Sawyer attempts to do.  (Herzstein Supp. Decl. ¶ 4.h.i.)

¶¶ 50–52.)  First, Mr. Kirby, a graduate student studying geology, relies on an ultraviolet ("UV") light methodology that has not been previously published and for which no validation data have been presented to support its sensitivity or specificity.  (*Id.* ¶¶ 53–57.)  Contrary to Mr. Kirby's claims, it is not possible to identify a specific compound or mixture of compounds with his UV method.  (*Id.* ¶ 54.)  Mr. Kirby compares his results to the UV response of an oil sample that is "physically similar"—*i.e.*, a sample of tar that looks the same—and concludes that two samples that show similar UV responses are chemically the same.  (*Id.*)  This is truly "junk science."

Second, Mr. Kirby makes a number of significant errors in concluding that the tar samples he identifies contain excessive levels of PAHs.  (*Id.* ¶ 52, 58–60.)  For example, Mr. Kirby applies a standard that applies only to ***airborne*** concentrations in assessing the potential health risk from a ***solid*** sample.  (*Id.* ¶ 59.)  Such a comparison is inappropriate because, among other reasons, air is not the same density as soil or tar, and the inhalation and dermal exposure pathways differ significantly.  (*Id.*)  Mr. Kirby therefore wildly overstates the potential health effects. (*Id.*)

Finally, Mr. Kirby grossly misapplies the dermal absorption IH SkinPerm Model in concluding that the Corexit® products in tar samples enhance the absorption of PAHs into exposed skin.  (*Id.* ¶¶ 52, 61–63.)  Mr. Kirby's "calculations" would require that an individual absorb through his or her skin all of the PAHs in 44 pounds of tar in under one minute.  (*Id.* ¶ 62.)  Such a result is simply absurd.  (*Id*)

7.    The Declaration of Dr. Michael Robichaux Lacks Scientific or Other Support.

The declaration of Dr. Michael Robichaux is replete with unsupported criticisms and unscientific speculation.  For example, Dr. Robichaux claims that, "[f]rom [his] perspective, the zone designation [in the Medical Settlement] was . . . probably unfair to the citizens of the State

33

of Louisiana," but he does not say how or why, let alone provide evidence or a scientific basis to support this assertion.  (Docket 10-7777, Rec. Doc. 185-3 at 2.)  Likewise, based on a single patient's alleged report of a visit to a medic station during the Response Activities, Dr. Robichaux believes that the "information gleaned from BP's 'Medical Encounters Database' is probably useless."  (*Id.* at 5.)[50]  Such conclusory and unsupported "expert" testimony is unhelpful and should be disregarded.  *See, e.g.*, *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) ("an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation … Given the absence of meaningful analysis or reasoning, the district court acted well within its discretion by discarding the . . . affidavit") (citations omitted); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005) (affirming exclusion of expert testimony that lacked sufficient grounding in facts; "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term. . . .  As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'") (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)); *Freeport-McMoran Res. Partners Ltd. P'ship v. B-B Paint Corp.*, 56 F. Supp. 2d 823, 834 (E.D. Mich. 1999) (striking affidavit where expert "proffered nothing except his 'experience' to support his conclusions").

8.      The "Junk Science" and Alarmist Opinions of Objectors' Experts Are Harmful to the Public.

Finally, the attempts of various declarants to characterize this sort of junk science (such as the VOC blood measurements and detoxification programs) as legitimate medical practices are themselves harmful, as the mistaken belief in the validity of VOC blood testing or the

---

[50]   *See also* Green Supp. Decl. ¶¶ 25–33 for additional criticism of Dr. Robichaux's declaration.

therapeutic benefits of detoxification programs can increase anxiety and fear, cause mistrust of evidence-based medicine, and result in harmful behavioral changes.   (Herzstein Supp. Decl. ¶ 8.d.)

Similarly, alarmist statements, such as that by Dr. Robichaux, that this is the "most serious public health crisis in the history of the United States," are inaccurate as well as likely to disturb Class Members.  (Cox Supp. Decl. ¶ 29.)  There have been no deaths attributed to the *Deepwater Horizon* oil spill since the initial explosion on April 20, 2010.  (*Id.* ¶ 30.)  Moreover, the symptoms reported by Clean-Up Workers involved in responding to the spill have been mild, with the most serious symptoms relating to heat-related conditions, and not chemical exposures. (*Id.*)  The CDC has stated in relation to the *Deepwater Horizon* oil spill that "[f]or several months CDC and state health departments tracked potential health effects related to the oil spill in the affected communities" and "[n]o trends in illnesses were identified by the multiple surveillance systems used." (*Id.*)

In contrast, during the influenza epidemic of 1918, 675,000 deaths occurred in the United States; over the course of the AIDS epidemic, over 619,000 people have died to date; 1,833 people were killed during Hurricane Katrina; during the outbreak of the West Nile virus in 2012, there were over 3,500 reported cases of the virus and 147 deaths in the United States; and even the recent outbreak of fungal meningitis due to contaminated medications has resulted in 23 deaths to date.   (*Id.* ¶ 31.) There is no comparison—and there is simply no basis for Dr. Robichaux's suggestion that the *Deepwater Horizon* oil spill is the most serious public health crisis in the history of the United States.  (*Id.* ¶ 32)[51]

---

[51]   Objector Lance Clay Brown has pointed to the study on the health of Clean-Up Workers currently being conducted by the National Institute of Health as evidence of alleged serious health risks to Clean-Up Workers. (Rec. Doc. 130 at 12.)  However, this study plans to follow Clean-Up Workers for ten years and is primarily

## B.    The Safety of Clean-Up Workers Was BP's Priority.

A small number of objectors argue that BP did not provide personal protective equipment ("PPE") to Clean-Up Workers and otherwise did not make the health of such workers a priority.[52]  These objections are baseless.  Instead, BP, in coordination with the Unified Area Command, provided PPE to Response workers pursuant to a PPE matrix that was developed with input from the Occupational Safety and Health Administration ("OSHA") and the National Institute of Occupational Health and Safety ("NIOSH").  (Dutton Decl. ¶¶ 55-59; Dutton Supp. Decl. ¶ 14.)  In determining the appropriate level of PPE to provide to response workers, BP, in conjunction with OSHA and NIOSH, carefully considered the types of potential hazards for each job and task, recognizing that overuse of PPE can actually result in greater potential health risk. (Dutton Supp. Decl. ¶ 14.)   Accordingly, decisions about PPE use were based on a comprehensive assessment of the potential for exposure, which included evaluation of available air monitoring data.  (*Id.*; *see also* Dutton Decl. ¶ 56.)[53]  Furthermore, industrial hygiene professionals from BP, OSHA, NIOSH, and the U.S. Coast Guard, among others, regularly visited work sites to ensure that response workers were wearing appropriate levels of PPE. (Dutton Supp. Decl. ¶ 15.)

In addition, with respect to respirator use in particular, it is well recognized that decisions to use respirators should be based on the best available quantitative air monitoring data regarding the type and level of potential exposure, as respirators can place physiological stress on the body.

---

intended to study potential long-term health effects rather than the already-manifested conditions covered under the Settlement.  With respect to Later-Manifested Physical Conditions, Class Members retain their rights to pursue such claims pursuant to the Back-End Litigation Option procedures.

[52]    Docket 10-7777, Rec. Doc. 130 at 5, 57 at 1.

[53]    Moreover, the extensive air monitoring data consistently demonstrate low airborne concentrations of chemical substances released into the environment as a result of the oil spill.  (Lees Decl. ¶ 13, 37.)  Indeed, the airborne concentrations were usually so low as to be undetected and very rarely at levels that exceeded even the most stringent occupational exposure limits.  (*Id.* ¶ 45.)

(Dutton Supp. Decl. ¶ 16.)   Accordingly, respirators were only provided to workers engaged in activities that had some possible risk of elevated inhalation exposures to potentially harmful chemicals.   (*Id.* ¶ 17.)[54]

### C.   Objections Concerning Possible Re-Oiling or Potential Future Exposures Concern Events Outside the Settlement.

Some objectors have argued that the Medical Settlement is inappropriate because it fails to compensate for harm based on future exposures to oil and/or dispersants.[55]   Some of these objectors point to tar balls that surfaced in the wake of Hurricane Isaac.   But Class Members are not releasing claims based on future exposure to oil and/or dispersants and they retain the right to sue in any such event.   (MSA II.V.)   Only claims for conditions caused by past exposures (as defined in the Settlement Agreement) are released.   Back-End Litigation Option rights related to later-manifesting conditions must also be based on past exposures, not exposures in the future.

In any event, as BP's experts demonstrate, there is little risk from future exposure.   With respect to the Corexit® dispersants applied in response to the *Deepwater Horizon* oil spill, there is no realistic possibility that Clean-Up Workers or Gulf Coast Residents could be exposed to potentially harmful levels of the constituents of the Corexit® dispersants after September 2010. (Cox Supp. Decl. ¶ 9.)   Dispersants were not applied in connection with the *Deepwater Horizon* oil spill in any significant quantities after July 19, 2010 (there was one small application near the source-control area on September 4, 2010).   (Cox Decl. ¶ 55 (Dutton Decl. ¶¶ 24, 26).) Moreover, once applied to an oil slick in the ocean, dispersant concentrations drop rapidly as a result of biodegradation, dilution, and dissolution.   (*Id.* ¶¶ 63, 82.)   Thus, it is virtually

---

[54]   Objector Gerald D. Porter, whose objection was received late and is not yet docketed, claims to have been harmed by the "night spraying of dispersants."   There is simply no factual basis for Mr. Porter's claim and he provided no support whatsoever for it. (Dutton Supp. Decl. ¶¶ 36–37.)

[55]   Docket 10-7777, Rec. Docs. 124 at 12, 182 at 4, 185-5 at 18; 202-5 at 18.

impossible that individuals potentially would be exposed to dispersant components months (or even weeks) after the last application of dispersants in connection with the *Deepwater Horizon* oil spill, let alone years later.  (Cox Supp. Decl. ¶ 9.)

Moreover, the presence of MC252 oil on beaches after August 3, 2010, including tar balls that surfaced in the wake of Hurricane Isaac in 2012, does not contradict the conclusion that there were few samples containing potentially harmful levels of oil components after August 3, 2010.  (*Id.* ¶ 13.)  Weathered oil and tar balls that reached shore in connection with the oil spill did not contain significant amounts (if any) of the more water-soluble, volatile compounds, as such compounds dissolved rapidly in the water column or evaporated prior to reaching the shoreline.  (Cox Decl. ¶¶ 45-47, 76-77.)  In addition, PAHs, which are the remaining potentially toxic components of the oil, were almost entirely depleted by the time the oil reached shore.  (*Id.* ¶¶ 47, 77.)

The tar balls that surfaced in the wake of Hurricane Isaac are similarly unlikely to cause potential health effects.  In a study conducted by the environmental research team at Auburn University, researchers concluded that "the concentration of [PAHs] in the post Hurricane Isaac samples are not substantially different from PAH concentrations in emulsified oil which first arrived on Alabama's beaches" immediately after the oil spill.  (Cox Supp. Decl. ¶ 14.)    As described above, weathered oil and tar balls that reached Gulf Coast beaches in the immediate aftermath of the *Deepwater Horizon* oil spill did not contain potentially harmful levels of toxic components. Thus, despite Dr. Sawyer's unsupported claims to the contrary, the scientific evidence clearly shows that weathered oil and tar balls to which individuals potentially could

have been exposed in connection with the *Deepwater Horizon* oil spill (including tar balls that surfaced in the wake of Hurricane Isaac) do not present significant human health risks.  (*Id.*)[56]

### D.     The Sterbcow Objectors' Analysis of the *Reed* Factors Is Fatally Flawed.

The Sterbcow Objectors' discussion of the *Reed* factors is legally and factually flawed.[57] They suggest, for example, that "it is hard to see how the Claimants will not prevail at trial." (Docket 10-7777, Rec. Doc. 92 at 16.)   They also argue that BP used chemicals, particularly Corexit®, that are toxic and "known to cause serious medical conditions."  *Id.*   But the Sterbcow Objectors do nothing to counter BP's expert testimony showing why Class Members were unlikely to develop serious health conditions related to any potential contact with these chemicals of low toxicity, especially at the low potential levels of exposure at issue.  (*See* Lees Decl. ¶¶ 44–46; Cox Decl. ¶¶ 92–93.)  Nor do they address BP's other defenses to liability, such as the role of the United States government in overseeing Response Activities.  *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1394 (D. Ariz. 1989) (rejecting objections based on "fallacious" assumption that "the case assured certain victory for Plaintiffs"), *aff'd*, 955 F.2d 1268 (9th Cir. 1992).

The Sterbcow Objectors also maintain that because "it is likely that much of the discovery has been completed," the additional remaining expense and discovery "is certainly far less than the parties otherwise would have had to address in the absence of the information exchanged to date."  (*Id.* at 20-21.)  The relevant question, however, is not whether substantial discovery has already been completed, but whether significant discovery, trial, and appeal delays still remain.  The Sterbcow Objectors do not, and cannot, challenge the fact that under the

---

[56]   Some individuals may also raise objections based on reports of an oil sheen observed in the vicinity of the MC252 well in September 2012.  Such objections are likewise devoid of merit.  (Cox Supp. Decl. ¶ 16.)

[57]   In *Reed*, 703 F.2d at 172, the Fifth Circuit specified the factors to be considered in evaluating a class action settlement.

Court's trial plan, it would likely be years before any Class Member plaintiff would receive a recovery (if any) at trial.  (Rec. Doc. 7112-1 at 48–50.)[58]

> **E.      Objections Related to OPA Requirements Are Irrelevant.**

Certain objectors criticize the Settlement for improperly disallowing interim claims even though they claim that OPA requires payment of such claims.[59]  But because OPA does not provide for any compensation for personal injury claims, such objections are legally irrelevant and merit no further response.

> **F.      The Few Remaining Miscellaneous Objections Are Also Without Merit.**

>> 1.      The Settlement's Provisions Related to Medicare Are Entirely Appropriate.

Objector Lance Clay Brown criticizes the Settlement's provisions related to the protection of Class Members' and Medicare's interests regarding reimbursement for medical items, services, and prescription drugs.  (Rec. Doc. 130 at 25).  The specific basis for his objection is not clear as Mr. Brown acknowledges that Medicare is entitled to reimbursement for payments for medical items, services, and prescription drugs already paid by Medicare prior to the Settlement.  *See* 42 U.S.C. § 1395y(b)(2)(B)(i).  Medicare also asserts that settling claimants must protect the Medicare Trust Fund's interest when future medical care is claimed in litigation or the settlement releases claims for future medical care or else such claimants face significant risks, such as Medicare's refusal to pay, going forward, for otherwise covered services for the conditions that are related to the claimed injury and/or Medicare's seeking to recover payments

---

[58]   The Sterbcow Objectors also suggest that the compensation awarded under the SPC Matrix is inadequate compared with the range of possible recovery at trial.  (Docket 10-7777, Rec. Doc. 92 at 17-19.)  They wholly ignore the very real possibility that they will receive nothing at trial.  Moreover, they offer nothing but speculation that they would receive higher amounts of compensation at trial—in contrast to BP's evidence showing that the compensation amounts are well in line with jury verdicts at trial.  (*See* Section IV.B.1; *see also* BP's Aug. 13 Br. at 55 n. 42.)

[59]   Docket 10-7777, Rec. Docs. 180 at 2–3, 185 at 3, 202 at 3.

for medical care related to the settlement.  *See*, *e.g.*, CMS Advance Notice of Proposed Rulemaking, 77 Fed. Reg. 35917, 35918 and 35919 (June 15, 2012); *see also, e.g.*, *Bessard v. Superior Energy Servs. LLC*, Civ. A. No. 6:11-cv-0941, 2012 WL 3779162, at *1 (W.D. La. Aug. 30, 2012) ("CMS expects the settlement funds to be exhausted on otherwise Medicare covered and otherwise reimbursable services relat[ing] to what was claimed and/or released before Medicare is billed for future medical services."); *Bertrand v. Talen's Marine & Fuel LLC*, Civ. A. No. 6:10-cv-1257, 2012 WL 2026998, at *3 (W.D. La. June 4, 2012) (Plaintiff recipient of settlement funds is "responsible as [the] primary payer for future medical items or services that would otherwise be covered by Medicare, which are related to what was claimed and released in this lawsuit.").  While Mr. Brown objects to a Medicare "set aside," the Settlement does not anticipate this kind of arrangement.  Rather, the Claims Administrator will negotiate a written agreement with the Centers for Medicare & Medicaid Services ("CMS") to establish a "global resolution program," as set forth in Section XXIX.A.1 of the Settlement Agreement, to resolve all of the Medicare Program's interest in Fee-for-Service Medicare Part A and Part B recovery obligations in the settlement funds of Class Members who are or were entitled to receive benefits under the Medicare Program.[60]

This global resolution program will, if achieved, provide an efficient way to protect the Medicare Program's interests in the settlement funds while also providing significant benefits to Class Members, including Mr. Brown.  As set forth in more detail in Section XIII of the Claims Administrator's October 22, 2012 Status Update, the global resolution program will provide numerous practical benefits to Class Members who are or were entitled to receive original

---

[60] The potential rights of Medicare Advantage and Medicare prescription drug ("Part D") plan sponsors would be handled in a different manner, which is likewise structured to protect Class Members from future recovery claims through satisfaction and discharge of identified lien and other interests.  (MSA § XXIX.A, C, E, G–L.)

Medicare benefits.  These practical benefits include (i) avoiding the delays normally associated with identifying Medicare conditional payments for the individual related to the alleged injury; (ii) satisfying all requirements of the Medicare Secondary Payer statute and its accompanying regulations to open a tort recovery record with Medicare; (iii) satisfying Class Members' conditional payment reimbursement obligations; and (iv) through recognition of "payment in full" and "final satisfaction" of all of the Medicare Program's interests, ensuring that Medicare will not deny relevant Class Members coverage for any future medical expenses they might incur in connection with their alleged injuries.  The lien resolution provisions in the Settlement Agreement are structured to benefit Medicaid beneficiaries in similar ways.  *See* MSA § XXIX. If the Settlement did not feature a global resolution mechanism, claims payments to Medicare-entitled Class Members could be significantly delayed (*e.g.*, while Medicare claims histories are gathered and reviewed to identify relevant claims), which is contrary to Class Members' interest in timely and efficient compensation.[61]  These benefits to the Class are why this sort of approach has been successfully utilized in almost all MDL settlements involving personal injury claims since 2005.  (Garretson Oct. 22, 2012 Status Update at 13.)

> 2.  Individuals Who Are Excluded from the Class Lack Standing to Object and their Criticisms of the Class Definition Are Without Merit in Any Event.

Certain individuals have objected on the basis that the Zones should be drawn differently such that they should be included in the Class.[62]   Other individuals have objected to the

---

[61]  Mr. Brown's speculation that the Medicare and Medicaid programs may evolve over time, change into voucher programs, and/or end altogether are not valid reasons to object to the applicable lien resolution provisions in the Settlement Agreement.  Conjecture about what may happen in the future regarding the Medicare Program, the Medicare Advantage program, the Medicare Part D, program and/or the Medicaid program does not in any way alter the current obligations and law governing the potential claims of such payers related to settlement benefits received under the Settlement Agreement.

[62]  Docket 10-7777, Rec. Docs. 203, 205; 202-1 (listing non-Class Members joining objection due to "unfair exclusion").

exclusion of tourists, visitors, or those residents who lived in the Zones for a shorter or different duration than that described in the Class definition.[63]  While the desire of these individuals to be part of the Class certainly supports the fairness, reasonableness, and adequacy of the parties' Agreement, such non-Class Members lack standing to object to the Settlement.  (*See* Section III of BP's Economic Reply.)  Moreover, because they are not Class Members, these individuals retain their claims and their interests are not affected by the Class Settlement.

At any rate, the Zones are appropriately drawn.  Zone A and Zone B are defined with reference to the SCAT Line, which is the collection of segments inspected by SCAT teams from the inception of the spill to the present.  The east and west boundaries of Zone A and Zone B include the furthest points on the SCAT Line where MC252 oil was observed by SCAT teams. (Taylor Supp. Decl. ¶ 38.)[64]  No objector has provided competent evidence or data to the contrary.[65]

### 3.     The Settlement Appropriately Does Not Include Consortium Claims.

The spouses of certain purported Class Members object that the Settlement should also compensate them for their loss of consortium claims.  As with others outside the Class, these spouses have no standing to object.  Moreover, the parties did not agree to include such claims, and thus these objections are merely an inappropriate attempt to negotiate different terms than

---

[63]   Docket 10-7777, Rec. Docs. 180 at 3; 202-1 (listing non-Class Members joining objection due to "unfair exclusion") and 202-12 (declaration from non-Class Member who visited the Gulf and alleges that she became ill due to exposure to oil and/or dispersants).

[64]   The Supplemental Declaration of Elliott Taylor, Ph.D is attached to BP's Economic Reply as Exhibit 11.

[65]   In his declaration in support of the objections of Halliburton (which lacks standing in any event), Marc Vellrath states that the geographic boundaries prescribed for Zones A and B are "arbitrary."  Vellrath Med. Decl. at 38. On the contrary, the SCAT line is not "arbitrary," but is part of a comprehensive process for assessing and treating visible shoreline oiling.  (Taylor Supp. Decl. 39.)

those to which the parties agreed.  The Settlement does not release spouses' consortium claims, which will be governed by applicable law.  (*See also* Miller Supp. Decl. ¶ 24.)[66]

## V.   BP DOES NOT OPPOSE CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES ONLY.

Certain objectors also argue that the Class should not be certified or that the attorneys' fees requested by Class Counsel should not be awarded.  Class Counsel will address those objections in their separate briefing.  BP does not oppose class certification for settlement purposes only, and has also agreed not to contest Class Counsel's fee award as detailed in the Agreement.[67]

## CONCLUSION

The Medical Benefits Class Action Settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and provides several substantial benefits to the Class.  The few objections that have been submitted offer no reason to reject the Settlement and do not come close to meeting the objectors' heavy burden in opposing the Settlement's approval.  The objectors' attempts to block the Settlement are particularly misguided given the cost, delay, and uncertainty of continued litigation, as well as the risk that all or many Class Members would ultimately receive no recovery at all.  There is no basis in law or fact to reject the carefully crafted compromise reached by the parties.  Accordingly, BP respectfully requests that the Court grant final approval to the Settlement.

---

[66]   This Settlement is therefore distinguishable from that found objectionable in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 603-04 (1997), where spouses of exposed and injured class members were themselves class members, and whose claims for loss of consortium were therefore extinguished under the settlement.

[67]   BP and the Plaintiffs are jointly filing the supplemental declaration of Professor John C. Coffee, Jr., which is attached to their October 22, 2012 Notice of Joint Filing of Declarations.  As with his initial declaration, Professor Coffee's supplemental declaration sets forth his independent opinions regarding certification of the Medical Benefits Settlement Class, which the parties agree should be considered by the Court.  BP agrees, for settlement purposes, with Professor Coffee's conclusion that the proposed settlement Class satisfies all the requisites for class certification in this case, even though BP does not necessarily agree with every specific statement in his declaration.  It would be inappropriate to utilize or apply this declaration outside the context of this class Settlement.

October 22, 2012

Respectfully submitted,

/s/ Richard C. Godfrey, P.C.           .
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Elizabeth A. Larsen
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX 77079
Telephone: (281) 366-2000
Telefax: (312) 862-2200

Ellen K. Reisman
ARNOLD & PORTER LLP
777 South Figueroa Street
Los Angeles, CA 90017-5844

James P. Joseph
Ethan P. Greene
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206

*Of Counsel*

/s/ Don K. Haycraft           .
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 662-5985
Telefax: (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of October, 2012.

<u>*/s/ Don K. Haycraft*</u>
Don K. Haycraft