# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179 SECTION: J HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,    Plaintiffs, v. BP Exploration & Production Inc., *et al.*,    Defendants. | * * * * * * * * * * * * | NO. 12-CV-968 SECTION: J HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

<u>**SUPPLEMENTAL DECLARATION OF ROBERT COX, M.D., PH.D.**</u>

I, Robert Cox, am over twenty-one years of age and of sound mind and body.  My declaration is based on personal knowledge, experience, and review of materials described herein.  If called to testify, I could testify to the matters set forth in this declaration.

1.      I submitted a declaration to the Court on August 13, 2012.  In that declaration, I concluded that: (a) Gulf Coast Residents were not exposed to airborne concentrations of the components of crude oil, dispersants, or other spill-related compounds at levels that would be expected to result in any significant adverse health effects; (b) the potential for significant dermal exposures to the components of crude oil and dispersants for Clean-Up Workers and Gulf Coast

1

Residents was very small, and any such exposures for Clean-Up Workers, who were in closer proximity to the oil and dispersants, should have been prevented by appropriate use of personal protective equipment; and (c) based on the weathered nature of the oil and the lack of opportunity for prolonged skin contact with the oil and dispersants, significant adverse health effects would not be expected from any dermal exposures that did occur in connection with the Deepwater Horizon (DWH) oil spill.

2.      I have reviewed objections to the Medical Benefits Class Action Settlement Agreement, as well as the declarations attached thereto, as set forth in Appendix A to this declaration.  None of these objections or declarations changes my opinions, conclusions, and analyses as set forth in my initial declaration.  However, because a number of the objections and declarations deviate from sound science and are based on misinformation regarding the DWH oil spill, I respond to a number of points raised therein.

3.      Numerous materials are cited throughout this declaration.  Citations are provided by numbers within parentheses next to the statement that they support — *e.g.*, (1).  The numbers within the parentheses refer to the list of materials reviewed that is set forth in Appendix B.

## GENERAL ISSUES

4.      I will first address five discrete issues that were raised in the objections and attached declarations: (1) the chemical composition of MC252 crude oil and the Corexit dispersants; (2) the potential for exposure to oil and/or dispersants after August 2010 (and particularly in the wake of Hurricane Isaac); (3) the reliability of blood testing for demonstrating exposure to the components of oil and/or dispersants in relation to the DWH oil spill; (4) the lack of any scientific basis for the theorized medical condition referred to as Multiple Chemical Sensitivities; and (5) the unfounded assertion that the DWH oil spill was the worst public health

crisis in the history of the United States.  In addition, later in this declaration, I will specifically address a number of the more scientifically flawed objections and declarations in greater detail.

### Chemical Composition of MC252 Oil and Corexit Dispersants

5.      A number of objectors raise concerns regarding a claimed lack of knowledge regarding the chemical compositions and/or toxicological properties of the MC252 oil and the Corexit dispersants.  *See, e.g.*, Objection of Lance Clay Brown, at 4 ("The chemical make up of Macondo Well crude and chemical dispersant is unknown."); Objection of Smith Stag, L.L.C., *et al.*, Decl. of William R. Sawyer, at ¶ 14 (noting that the Material Safety Data Sheet for Corexit 9500A states that "No toxicity studies have been conducted on this product" and asserting that "[t]his alone automatically renders the product as suspect in the mind of any qualified individual performing an environmental risk assessment").  Contrary to the concerns raised in these objections, and as described in my initial declaration, the chemical compositions and toxicological properties of the MC252 oil and the Corexit dispersants are in fact well known. *See* Decl. of Robert Cox, at ¶¶ 19-36.

6.      Moreover, it is not the case, as Dr. Sawyer suggests, that no toxicity studies have been conducted on the Corexit dispersants.  As discussed in greater detail in my initial declaration, the primary constituents of the Corexit dispersants have all undergone extensive toxicological evaluation and testing.  *See id.* at ¶¶ 27-33.  The vast majority of these dispersant constituents are considered to have minimal to no toxicity, and none of the constituents would be expected to cause significant human health effects at the low levels measured during the DWH oil spill.  *Id.* at ¶¶ 27-33, 62-68.  In fact, as described in my initial declaration, a number of the individual constituents of the Corexit dispersants are commonly used in consumer products and foodstuffs.  *Id.* ¶¶ 27-33.  Thus, members of the public are regularly exposed to the dispersant

3

constituents through use of soaps, makeup, toothpaste, medications, and foodstuffs, and "[t]he exposure to humans through the use of dispersant was trivial as compared with usual prescribed doses" (1).

7.       Thus, as described herein and in my initial declaration, and notwithstanding any objections to the contrary, the chemical compositions and toxicological properties of the MC252 oil and Corexit dispersants are well known.

### *Potential for Future Exposure*

8.       A number of objectors raise concerns regarding the possibility that individuals in the Gulf Coast region could be exposed to oil and/or dispersants from the DWH oil spill in the future (or after the cutoff dates provided in the Medical Benefits Class Action Settlement Agreement).   In particular, a number of objectors raise concerns regarding tar balls that have surfaced in the wake of Hurricane Isaac.

9.       With respect to the Corexit dispersants applied in response to the DWH oil spill, there is no realistic possibility that Clean-Up Workers or Gulf Coast Residents could be exposed to potentially harmful levels of the constituents of the Corexit dispersants after September 2010. As explained in my initial declaration, dispersants were not applied in connection with the DWH oil spill in any significant quantities after July 19, 2010 (there was one small application near the source-control area on September 4, 2010).  Decl. of Dr. Cox, at ¶ 55 (citing Decl. of Dr. Dutton, at ¶¶ 24, 26).  In addition, the dispersants were applied many miles away from the shoreline.  *Id.* at ¶¶ 62, 81.  Once applied to an oil slick in the ocean, the dispersant concentrations drop rapidly as a result of biodegradation, dilution, and dissolution.  *See id.*, at ¶¶ 63, 82.  As a result, even while the DWH oil spill was ongoing, only minimal quantities of dispersant constituents were detected in water and sediment near the shoreline (3).   Thus, it is virtually impossible that

individuals were or could be exposed to the dispersant components months (or even weeks) after the last application of dispersants in connection with the DWH oil spill, let alone years later.

10.     As described in my initial declaration, the conclusion that the Corexit dispersants were not present in the environment months after application because of biodegradation and dilution is supported by water and sediment sampling data collected by the Operational Science Advisory Team (OSAT).  The OSAT-1 team analyzed over five thousand water and sediment samples collected near-shore between May 13, 2010 and October 20, 2010 for dispersant-related compounds, and concluded that the concentrations of dispersant-related compounds found in water never exceeded aquatic life benchmarks (no benchmark for dispersant-related compounds in sediment exists), and only 1.4% of the samples analyzed had detectable levels of dispersant-related compounds.  *Id.* at ¶ 83.  Accordingly, there is no scientific basis for concluding that Clean-Up Workers or Gulf Coast Residents could have been exposed to the constituents of dispersants applied in connection with the DWH oil spill after September 2010.[1]

11.     The objections also raise concerns regarding the potential for future exposure to MC252 oil.  For example, in a declaration attached to the objections submitted by Smith Stagg, L.L.C., *et al.*, Dr. Sawyer states that he "strongly" disagrees with "the assertion by BP's experts who claim there were very few samples containing potentially harmful levels of oil components (PAHs or BTEX) consistent with oil form [sic] the Macondo well, and none after August 3,

---

[1]  Researchers from Auburn University also evaluated data on a number of water samples analyzed for dispersants from the Orange Beach, Alabama area between September 28, 2010 and January 26, 2011 (2).  The researchers concluded that small amounts of 2-butoxyethanol and propylene glycol in water samples from the Orange Beach area were the result of stormwater discharge, and did not originate from Corexit dispersants used during the DWH response.  As I mentioned in my initial declaration, the chemical components of the Corexit dispersants are used in a variety of common products, including soaps, shampoos, toothpaste, and medications. Given the ubiquitous nature of the chemicals in the dispersants, the presence of these chemicals in urban water runoff from other sources is not a surprise.

2010." Decl. of Dr. Sawyer, at ¶ 43. Dr. Sawyer also notes that the use of the August 3, 2010 cutoff date is a "false assertion as residual oil contamination is both ubiquitous and self-evident." *Id.* at ¶ 44.

12.     As a threshold matter, the August 3, 2010 cutoff date was not determined by BP's experts. Rather, the August 3, 2010 date was taken directly from a report prepared by the OSAT-1 team for the Federal On-Scene Coordinator (FOSC) of the U.S. Coast Guard. In that report, the OSAT-1 team concluded that: (1) "[t]he last overflight observation of potentially recoverable oil on the ocean surface was made on 3 August [2010]"; and (2) "[s]ince 3 August 2010, <1% of water samples and ~1% of sediment samples exceeded EPA's Aquatic Life benchmarks for polycyclic aromatic hydrocarbons (PAHs). Analysis of individual samples indicated that none of the water sample exceedances were consistent with MC252. Of the sediment exceedances, only those within 3 km of the wellhead were consistent with MC252." (3)

13.     Moreover, the presence of MC252 oil on beaches after August 3, 2010, including tar balls that surfaced in the wake of Hurricane Isaac in 2012, does not contradict the conclusion that there were few samples containing potentially harmful levels of oil components after August 3, 2010. As I explained in my initial declaration, weathered oil and tar balls that reached shore in connection with the DWH oil spill did not contain significant amounts (if any) of the more water-soluble and/or volatile compounds (such as BTEX and hexane), as such compounds dissolved rapidly in the water column or evaporated prior to reaching the shoreline. Decl. of Dr. Cox, at ¶¶ 45-47, 76-77. In addition, PAHs, which are the remaining potentially toxic components of the oil, were substantially depleted by the time the oil reached shore. *Id.* at ¶¶ 47, 77. As stated in the OSAT-2 report, "weathered oil samples showed 86-98 percent depletion of total polycyclic aromatic hydrocarbons (PAHs)" (4). The OSAT-2 team further concluded that

"[c]alculated potential cancer and non-cancer health effects from short and long-term exposures [to the weathered MC252 oil were] below [EPA] acceptable health based risk and hazard levels" (4).[2]

14.     The tar balls that surfaced in the wake of Hurricane Isaac are similarly unlikely to cause potential health effects.  In a study conducted by the environmental research team at Auburn University, researchers concluded that "the concentration of [PAHs] in the post Hurricane Isaac samples are not substantially different from PAH concentrations in emulsified oil which first arrived on Alabama's beaches" immediately after the DWH oil spill (5).  As described above, weathered oil and tar balls that reached Gulf Coast beaches in the aftermath of the DWH oil spill did not contain potentially harmful levels of toxic components.  Thus, despite Dr. Sawyer's unsupported claims to the contrary, the scientific evidence clearly shows that weathered oil and tar balls to which individuals potentially could have been exposed in connection with the DWH oil spill (including tar balls that surfaced in the wake of Hurricane Isaac) do not present significant human health risks.

15.     Some objectors may also raise concerns related to a sheen of oil that was observed in the vicinity of the MC252 well in September 2012.  According to an October 10, 2012 press release issued by the U.S. Coast Guard (USCG), samples of the sheen collected on September 26, 2012 "correlate[]" to MC252 oil.  The USCG stated that "[t]he exact source of the sheen is uncertain at this time but could be residual oil associated with wreckage and/or debris left on the seabed from the Deepwater Horizon incident in 2010" (6).  BP has identified the cofferdam, a piece of containment equipment used during the response, as the "probable source of the surface

---

[2] Notably, the OSAT-2 team also stated that "[a]lthough some uncertainty remains regarding the degree of exposure and risk from contact with petroleum residues on beaches, it is likely that the procedures used in the screening risk assessment overestimate risk rather than underestimate any public health threat" (4) (emphasis added).

sheen," based on nearly three days of visual inspection with a video camera mounted on a Remotely Operated Vehicle.[3]   The USCG has determined that the "sheen is not feasible to recover and does not pose a risk to the shoreline" (6).

16.     The observed sheen does not present a potential health risk to individuals residing along the Gulf Coast.  First, the sheen is located in the vicinity of the MC252 well, which is approximately 50 miles offshore and over 100 miles from populated areas along the Gulf Coast. *See* Decl. of Dr. Cox, at ¶ 46.  Second, the sheen is comprised of a relatively small quantity of oil — as demonstrated by the fact that the USCG deemed the sheen too thin to recover — and thus is not likely to impact air quality onshore.

### Blood Testing for Volatile Organic Compounds

17.     Some objectors rely upon blood test results allegedly showing elevated levels of volatile organic compounds (VOCs), including BTEX and n-hexane, as support for their claims that they were exposed to excessive levels of the components of oil and/or dispersants in connection with the DWH oil spill.  Such claims are scientifically unfounded.

18.     First, the VOCs associated with crude oil, such as BTEX and n-hexane, only persist in blood for a matter of hours (or at most, days).  According to the U.S. Centers for Disease Control and Prevention (CDC) and the Agency for Toxic Substances and Disease Registry (ATSDR), "benzene, toluene, ethylbenzene, xylene, and hexane . . . have a short half

---

[3] *See* Ltr. to Hon. Sally Shushan, United States Magistrate Judge, United States District Court for the Eastern District of Louisiana, from Andrew Langan, Kirkland & Ellis LLP, Re Oil Sheen Observed Near MC 252 (Oct. 18, 2012).  This work included a visual inspection of the Macondo well, two relief wells, riser pipe and cofferdam, which was overseen by the USCG and observed by representatives for the Bureau of Safety and Environmental Enforcement ("BSEE"), Bureau of Ocean Energy Management ("BOEM"), and the State On-Scene Coordinators for Louisiana, Mississippi and Florida.  The ROV inspection observed no oil leaking from the riser pipe and the integrity of the Macondo well and relief wells were confirmed; oil was only observed leaking from the cofferdam.  *Id.*; U.S. Coast Guard Press Release, ROVs Investigate Possible Sheen Source (Oct. 18, 2012), http://www.restorethegulf.gov/release/2012/10/18/rovs-investigate-possible-sheen-source.

life in the blood and [blood] test results only reflect very recent exposures (within hours or days) prior to testing" (7).  N-hexane, for example, has a half-life in blood of 1.5-2 hours, and n-hexane and its metabolites are cleared from the body entirely in a matter of days (8).

19.     As a result, blood testing conducted weeks or months after alleged contact with oil and/or dispersants from the DWH oil spill would not be reflective of exposure in connection with the spill.  Rather, such test results, to the extent they are even accurate, would be reflective of exposures that occurred immediately before the blood was drawn.  It is not surprising that some individuals might have elevated VOC levels in their blood because, as described in my initial declaration, BTEX chemicals (benzene, toluene, ethylbenzene, and xylenes) and n-hexane are present in a number of sources that are encountered in everyday life, including engine exhaust, cigarette smoke, and numerous consumer products.  *See* Decl. of Dr. Cox, at ¶ 23.  Because of the numerous sources of volatile hydrocarbons in the environment, the presence of small quantities of these substances in the blood is normal.  According to the CDC and ATSDR, "[d]etection of VOCs in blood is common but test results only reflect very recent exposures. . . . These chemicals only stay in the blood a short time therefore test results only reflect very recent exposures (within hours or days of testing)" (7).

20.     For example, the ATSDR toxicological profile for ethylbenzene notes that "[t]he highest exposure to ethylbenzene for the general public is most likely to occur via inhalation associated with the use of self-service gasoline pumps or while driving a gasoline-powered motor vehicle especially in high traffic areas or in tunnels" (9).  As reported in the ATSDR profile, a study measuring exposures associated with the pumping of fuel found that the "subjects in the study had significantly higher levels of gasoline components in their blood after pumping gasoline than before" (9).

21.     Second, some objectors have pointed to analyses performed by Metametrix Clinical Laboratory to support their claims that, because of alleged exposures in connection with the DWH oil spill, they have excessive levels of n-hexane and other VOCs in their blood.  I have serious concerns regarding the reliability of the clinical analyses performed by Metametrix, as explained in greater detail below.

22.     On its website, Metametrix provides a guidance document entitled *Volatile Solvents Guide*, which gives an overview of the compounds measured by the laboratory.  In the Guide, Metametrix reports that the "only published study on the level of n-hexane gives the 95th percentile level for the presence of this solvent in the blood as a range of 403-812 ppb [parts per billion]," citing a study conducted in 1991 by Brugnone, *et al* (12).  The concentration unit used in the Brugnone study was ng/L, which Metametrix erroneously concluded was equivalent to ng/mL (or parts per billion), while ng/L is actually parts per <u>trillion</u>.  Thus, the "normal" ranges for hexane quoted by Metametrix are off by a factor of 1,000.  Metametrix perpetuates this error on all of its data report sheets, using a normal range that is off by a factor of 1,000.  Such basic errors call into question the legitimacy of any blood testing results provided by this laboratory.

23.     Moreover, in the *Volatile Solvents Guide*, Metametrix espouses alternative medical therapies to clear volatile hydrocarbons from the blood, such as use of amino acids that Metametrix claims will "detoxify" solvents and improve intestinal bacteria to restore healthy elimination of toxins.  The Metametrix Guide also discusses colonic cleansing to rapidly reduce the level of circulating toxins in the body.  None of these "therapies" has ever been shown to have merit in a well-designed scientific study, and they are not recognized by the medical and scientific communities.  Considering that volatile hydrocarbons are naturally cleared from the

blood in one to several hours via the lungs and liver, it is hard to fathom how irrigating the colon could have any beneficial effect.

24.     CDC and ATSDR guidelines issued during the DWH oil spill did not recommend the use of blood testing to determine exposure to VOCs or to guide clinical care, stating: "The laboratory tests for blood VOCs are technically difficult to perform.  For example, test tubes must be prepared and stored in a specific manner.  For detecting environmental exposures, the laboratory must be equipped to perform analyses with detection limits in the parts per trillion range for these contaminants." (7)  For instance, failure to properly clean the test tubes, which requires boiling the butyl rubber tops of the test tubes in methanol and baking them in a vacuum for 21 days, can result in concentrations of n-hexane and other VOCs that are thousands of times above background (10).[4]  Based on Metametrix's baseline results, which are significantly above background levels reported in the literature (11, 12), it would appear that Metametrix is measuring n-hexane in the butyl rubber of its test tubes, and not in the patient's blood.  This methodological error, in conjunction with the unit conversion error discussed above, leads me to conclude that none of the hydrocarbon data from Metametrix is reliable.

---

[4] The Division of Laboratory Sciences of the National Center for Environmental Health (NCEH), Centers for Disease Control and Prevention is, in my opinion, the best laboratory in the world for determining background levels of chemicals in human blood.  NCEH publishes a detailed report entitled *Human Exposure to Environmental Chemicals* approximately every five years.  In one of its evaluation studies, NCEH found that the butyl rubber in vacutainer tubes used in drawing blood can produce concentrations of these substances that are thousands of times above background (10).  In another study, researchers from NCEH found that the butyl rubber tops of vacutainers produced n-hexane contamination to the level of 400 ppt.  NCEH was able to clean the vacutainer tops by boiling them in methanol and then baking them in a vacuum for 21 days (11).  Metametrix uses standard vacutainers for its analyses, but does do not appear to conduct any quality assurance measures, such as use of "blanks" or other rigorous validation measures as performed by NCEH, to ensure the validity of its results.

***Multiple Chemical Sensitivities***

25.     The objections submitted by Smith Stag, L.L.C., *et al.* raise the possibility that individuals exposed to oil and/or dispersants from the DWH oil spill may have developed multiple chemical sensitivities (MCS), stating: "One of the classic problems seen with individuals with toxic exposures is their development of multiple chemical sensitivities. A large percentage, if not a majority, of the people who have entered our program return home only to realize that chemicals they readily tolerated before their illness now cause major problems." Objections of Smith Stag, L.L.C., *et al*., Decl. of Michael Robichaux, at ¶ 33.

26.     MCS is a theorized medical condition characterized by vague and non-specific symptoms—such as nausea, headaches, and fatigue—allegedly occurring after low-level exposure to chemicals or odors. The concept of chemical sensitivity was first proposed in the 1960s by an organization called the Society for Human Ecology, which later changed its name to the American Academy of Environmental Medicine. The American Academy of Environmental Medicine has never been recognized by the American Board of Medical Specialties (a board governing all medical specialties, from Allergy to Surgery), and the concept of MCS has been discredited.

27.     MCS is not recognized as a disease or medical condition by the International Classification of Disease (ICD-10), the medical organization responsible for assigning codes for recognized diseases. In addition, a number of medical organizations have published strong position statements against the concept of MCS because of the lack of science demonstrating that MCS is a real condition, including (13, 14):

(a)      In 1992, the American Medical Association's Council on Scientific Affairs stated: "Until such accurate, reproducible, and well-controlled studies are available, that multiple chemical sensitivity should not be considered a recognized clinical syndrome" (15).

(b)      In 1991, the American College of Occupational Medicine stated: "[T]his syndrome has yet to be established by traditional investigative activities that withstand peer review" (16).

(c)      In 1999, the American Academy of Allergy Asthma and Immunology stated: "Because of the subjective nature of the illness, an objective case definition is not possible.  Allergic immunotoxic, neurotoxic, cytotoxic, psychological, sociologic, and iatrogenic theories have been postulated for both etiology and production of symptoms, but there is an absence of scientific evidence to establish any of these mechanisms as definitive. . . .A causal connection between environmental chemicals, foods, and/or drugs and the patient's symptoms continues to be speculative and cannot be based on the results of currently published scientific studies" (17).

(d)      In 2011, the National Institutes of Health stated: "Several theories have been advanced to explain the cause of multiple chemical sensitivity, including allergy, toxic effects and neurobiologic sensitization.  There is insufficient scientific evidence to confirm a relationship between any of these possible causes and symptoms" (18).

28.     In short, there is no scientific evidence that MCS is truly a disease (though there is some evidence that it may be a psychological condition).  Likewise, there is no scientific basis for the treatments often used to treat MCS, which include efforts to remove chemicals from the body by use of saunas, massages, and other such treatments.  In this respect, the California Medical Association's Scientific Task Force on Clinical Ecology concluded that "no convincing

evidence was found that patients treated by clinical ecologists have recognizable syndromes, that the diagnostic tests employed are efficacious or reliable or that the treatments used are effective" (13).

### Public Health Context

29.    Dr. Robichaux states in his declaration that the "Deepwater Horizon explosion marked the beginning of the most serious public health crisis in the history of the United States." Decl. of Dr. Robichaux, at ¶ 31.  As a physician, and one who was directly involved in the health surveillance response to the DWH oil spill for the State of Mississippi, I take serious issue with this claim, which is preposterous.

30.    There have been no deaths attributed to the DWH oil spill since the initial explosion on April 20, 2010.  Moreover, the symptoms reported by Clean-Up Workers involved in responding to the spill have been mild, with the most serious symptoms relating to heat-related conditions, and not chemical exposures (19, 20).  The CDC has stated that "[f]or several months CDC and state health departments tracked potential health effects related to the oil spill in the affected communities" and "[n]o trends in illnesses were identified by the multiple surveillance systems used" (7).

31.    Contrast this with the influenza epidemic of 1918, in which 675,000 deaths occurred in the United States; the AIDS epidemic with over 619,000 deaths to date in the United States; Hurricane Katrina in 2005, during which 1,833 people were killed; the outbreak of the West Nile virus in 2012, resulting in over 3,500 reported cases of the virus and 147 deaths in the United States (21); and even the recent outbreak of fungal meningitis due to contaminated medications with 23 deaths to date.

32.     When one examines the facts, there is no comparison — there is simply no basis for Dr. Robichaux's suggestion that the DWH oil spill is the most serious public health crisis in the history of the United States.

## DR. SAWYER'S DECLARATION

33.     I respond in greater detail to the Declaration of Dr. William Sawyer, which is provided in support of the objections submitted by Smith Stag, L.L.C., *et al*., because a number of the issues raised therein are misguided and/or deviate from sound scientific approach and analysis.

### *Relevance of Studies from Prior Spills*

34.     Throughout his declaration, Dr. Sawyer fails to acknowledge and account for the differences between the DWH oil spill and previous spills.  For example, Dr. Sawyer states that "[p]rior epidemiological studies demonstrate statistically significant increased morbidity among coastal residential communities, volunteers and clean-up workers during much smaller scale crude oil releases and exposures."  Decl. of Dr. Sawyer, at ¶ 3.  Dr. Sawyer also states that he has "summarized the known adverse health effects related to human exposures to crude oil based on peer-reviewed and published epidemiological studies of other similar, but smaller releases."  *Id.* at ¶ 17.

35.     However, as described in my initial declaration, the DWH oil spill was unique, occurring approximately one mile beneath the ocean surface and over 100 miles from populated areas in southern Mississippi, Louisiana, and Alabama.  *See* Decl. of Dr. Cox, at ¶¶ 44-47.  As a result, most of the more water-soluble aromatic hydrocarbons (such as BTEX) were removed as the oil traveled to the ocean surface, other volatile compounds such as n-hexane underwent evaporation, photodegradation, and dilution prior to reaching the shoreline, and the vast majority

15

of other potentially toxic components, such as polycyclic aromatic hydrocarbons (PAHs), were removed as the oil moved toward the shoreline as a result of photo-oxidation, biodegradation, evaporation, dispersion, and dissolution. *Id.* at ¶¶ 45-47.

36.     In other words, the unprecedented depth and offshore nature of the spill, as compared with other spills, significantly reduced airborne concentrations of the constituents of the oil to which individuals may have been exposed, particularly at the shoreline. As one would expect, comprehensive air monitoring conducted by BP and numerous federal agencies over the course of the DWH response demonstrated that the airborne concentrations of volatile hydrocarbons, such as those found in the MC252 oil, were very low both onshore and in offshore samples collected from the breathing zones of Clean-Up Workers. The levels found onshore were typical of levels measured in suburban and rural areas of the United States, and were well below levels at which significant adverse health effects might be expected. *Id.* at ¶¶ 51-74; *see also* Decl. of Peter Lees, at ¶¶ 37-39.

37.     Thus, the spill-related epidemiological studies cited by Dr. Sawyer are not relevant to the DWH oil spill because they were conducted in connection with very different types of spills and crude oil releases. For example, Dr. Sawyer discusses a study of respiratory symptoms observed in clean-up workers one year after the *Prestige* oil spill in Spain in 2002. Decl. of Dr. Sawyer, at ¶ 18-19. However, the *Prestige* oil spill involved heavy fuel oil — which has been shown to weather significantly slower than crude oil (22) — that contained a high concentration of aromatic hydrocarbons (such as BTEX) and heavy metals (23, 24). In addition, the *Prestige* spill involved a release of oil directly on to the ocean surface in a discrete area (24). In contrast, the DWH oil spill involved a light sweet crude oil released nearly a mile beneath the

ocean surface, which significantly reduced (or eliminated) concentrations of volatile aromatic hydrocarbons at the surface.

38.     Likewise, Dr. Sawyer cites to studies by Rodriguez-Trigo, *et al.* and Perez-Cadahia, *et al*., which he claims demonstrate the presence of biomarkers and elevated rates of genotoxic damage following an oil spill.  Decl. of Dr. Sawyer, at ¶¶ 28-29.  As a threshold matter, Dr. Sawyer mischaracterizes the Rodriguez-Trigo study, which states that: "[1] [t]he clinical significance of exhaled biomarkers and chromosomal findings are uncertain . . . [2] [t]he association between oil exposure and the observed changes may not be causal . . . [and] [3] the findings may not apply to spills involving other types of oil or to different populations of oil spill workers" (23).  Thus, even to the extent that genotoxic effects were observed following prior oil spills, it does not follow that such effects would be expected in relation to the DWH oil spill, which involved a different type of oil released nearly a mile beneath the surface (thus removing the vast majority of the more water-soluble aromatic hydrocarbons, such as BTEX).

39.     Moreover, genotoxic effects have not been observed after other oil spills.  For instance, a study of an exposed population following the *MV Braer* oil spill in Shetlands Island, Scotland found no evidence of genotoxic effects (26, 27).  In addition, if genotoxic effects were to occur in the wake of an oil spill, a main medical condition of concern would be an increased incidence of cancer.  Risk assessments conducted in the wake of prior oil spills have not observed significant increases in the incidence of cancer (1, 22, 27).  Accordingly, there is little scientific basis for concluding that individuals exposed to oil spills are at risk of genotoxic effects, and no basis for concluding that Clean-Up Workers or Gulf Coast Residents have the potential to develop genotoxic effects as a result of the DWH oil spill.

40.     My comments above should not be read to imply that epidemiological studies from prior oil spills are completely irrelevant in evaluating the potential for health effects from the DWH incident.  Rather, such studies can be instructive and provide a useful starting point, but they must be viewed in context and applied cautiously.  As discussed above, Dr. Sawyer fails to take into account the unique nature of the DWH oil spill and the low concentrations of oil components measured in air, and thus his recitation of the findings of studies conducted in connection with prior—and quite different—oil spills provides little insight into what health effects might be expected in connection with the DWH oil spill.

### *Relevance of Other Epidemiological Studies Cited by Dr. Sawyer*

41.     Dr. Sawyer also references a number of epidemiological studies relating to health effects associated with exposure to the components of crude oil, including toluene, ethylbenzene, n-hexane, and other petroleum hydrocarbons.  Decl. of Dr. Sawyer, at ¶¶ 10, 30-37.  In relying on such studies, Dr. Sawyer ignores the fundamental principle of toxicology that the dose makes the toxin.  *See* Decl. of Dr. Cox, at ¶ 13.  As I outlined in my initial declaration, "in order for there to be a potential health risk from particular chemicals, those chemicals must be inherently toxic and there must be a significant human exposure to those chemicals."  *Id.* at ¶ 12.  Thus, although it is certainly true that some of the components of crude oil have been associated with certain health effects, one cannot ignore the exposure component of the analysis — *i.e.*, there must be exposure to the potentially toxic compound at sufficient concentrations and for sufficient durations in order for there to be a potential health risk from the particular compound.

42.     Dr. Sawyer presents a number of studies in which health effects were observed in connection with exposure to certain crude oil components.  However, in the studies presented by Dr. Sawyer, the levels of exposure were thousands (and in some cases, millions) of times higher

than the levels measured during the DWH oil spill.  That health effects were observed in populations exposed at such high levels has absolutely no bearing on the potential for health effects for Clean-Up Workers and Gulf Coast Residents in relation to the DWH oil spill.  Two of the more egregious examples provided by Dr. Sawyer are addressed below.

43.     First, Dr. Sawyer states that n-hexane "can cause a neurological disorder called peripheral neuropathy characterized by numbness in the feet and legs," and notes (without citation) that this condition "has occurred in workers exposed to 500-2,500 PPM in the air." Decl. of Dr. Sawyer, at ¶ 10.  Dr. Sawyer's apparent suggestion that Clean-Up Workers or Gulf Coast Residents could develop peripheral neuropathy from exposures to n-hexane in relation to the DWH oil spill is completely unfounded for at least two reasons: (1) the concentrations of n-hexane measured during the DWH oil spill were significantly below the 500-2,500 ppm range reported by Dr. Sawyer; and (2) only chronic exposures to n-hexane can result in peripheral neuropathy.

44.     As discussed in my initial declaration, BP, the U.S. Environmental Protection Agency (EPA), and others conducted comprehensive air sampling at fixed-monitoring locations along the Gulf Coast over the course of the DWH oil spill.  Decl. of Dr. Cox, at ¶ 51.  The results of the EPA and BP sampling results for n-hexane are summarized in Table 1 below.

**Table 1: Community Sampling Results for n-Hexane**

| Entity | # of Results | # of Non-Detects | Percentage Non-Detects | Max (ppm) | Median* (ppm) | 99th percentile* (ppm) |
|--------|---------|------------|-------------|-------|---------|-------------|
| EPA | 1563 | 432 | 28% | 0.51 | 0.00017 | 0.0073 |
| BP | 3293 | 3045 | 92% | 0.17 | 0.0025 | 0.0091 |

* In calculating the medians and 99th percentiles, non-detect samples were treated as having a value of 1/2 the detection limit.

45.     As shown in Table 1 above, the airborne concentrations of n-hexane measured along the Gulf Coast during the DWH oil spill were far below the 500-2,500 ppm range reported

by Dr. Sawyer. Specifically, the median concentrations measured by EPA and BP during the DWH oil spill were 2.9 to 14.7 million and 200,000 to 1 million times lower respectively than the levels at which Dr. Sawyer reports peripheral neuropathy might be expected.[5] Likewise, the results of industrial hygiene sampling for n-hexane, as reported in the initial declaration of Dr. Peter Lees, were also significantly below the 500-2,500 ppm range. *See* Supp. Decl. of Dr. Lees, at ¶ 16. Thus, there is simply no scientific basis for concluding (or even suggesting) that peripheral neuropathy could be caused by exposures to n-hexane at the levels measured during the DWH oil spill.

46. In addition, as alluded to above, an isolated exposure to n-hexane at 500-2,500 ppm would not be expected to result in peripheral neuropathy. Rather, peripheral neuropathy has been associated with <u>repeated</u> exposures in occupational settings to significantly elevated levels of n-hexane (*i.e.*, 500-2,500 ppm) over a period of months to years (8). Given that the DWH oil spill lasted only a few months, and the fact that n-hexane has a short half-life in air, there was little to no potential for chronic exposures to n-hexane in relation to the spill. Accordingly, there is no evidence to suggest that Clean-Up Workers or Gulf Coast Residents could potentially develop peripheral neuropathy from exposures to n-hexane in connection with the DWH oil spill.[6]

47. Second, Dr. Sawyer describes studies showing reproductive toxicity and severe malformations associated with exposures to toluene, ethylbenzene, and other aromatic

---

[5] The concentrations of n-hexane measured during the DWH oil spill were also well below the chronic MRL for that compound. *See* Decl. of Dr. Cox, at ¶ 60.

[6] It is worth noting that peripheral neuropathy is one of the common complications of diabetes mellitus. Louisiana, Mississippi and Alabama have the highest rates in the United States of diabetes mellitus, primarily due to the high rates of obesity in those states. As a result, it is likely that many individuals in the Gulf Coast region will develop peripheral neuropathy as a complication of diabetes mellitus, but not, as described above, from n-hexane exposures in relation to the DWH oil spill.

hydrocarbons.  Decl. of Dr. Sawyer, at ¶ 35.  Some of the studies Dr. Sawyer cites relate to medical conditions experienced by women who repeatedly sniffed glue, solvents, and spray paint while pregnant (28, 29).  This form of exposure, known as solvent abuse, is associated with exposure to extremely high concentrations of toluene and other hydrocarbons, as well as hypoxia (low levels of oxygen) (30).  The concentrations to which individuals engaged in solvent abuse are exposed are over one million times higher than those measured along the Gulf Coast during the DWH oil spill.  In fact, the concentrations of toluene and ethylbenzene measured by EPA along the Gulf Coast during the DWH oil spill were lower than typical concentrations found in major urban areas in the United States.  *See* Decl. of Dr. Cox, at ¶¶ 23, 51.  Thus, there is absolutely no scientific basis for suggesting that the reproductive health effects described in the studies cited by Dr. Sawyer are likely to occur in Clean-Up Workers or Gulf Coast Residents from exposure to toluene, ethylbenzene, or other aromatic hydrocarbons released in connection with the DWH oil spill.

### *Sampling Results and Potential for Additive Toxicological Effects*

48.     Dr. Sawyer also cites to the results of a single air sample collected on May 18, 2010, in the Venice, Louisiana, marina boom off-loading/staging area.  Decl. of Dr. Sawyer, at ¶ 6.  It is not clear from Dr. Sawyer's declaration who collected the sample or by what means.  Based on the location in which the sample was collected (a marina boom off-loading/staging area), it would appear that this sample is an industrial hygiene sample, in which case the results should be compared to occupational exposure limits (OELs), and not to community screening levels established by EPA.  Such a comparison is provided in the separate declaration of Dr. Peter Lees.  *See* Supp. Decl. of Dr. Lees, at ¶ 12.

49.     Even assuming that it is appropriate to compare the sample results reported by Dr. Sawyer to community standards, however, Dr. Sawyer's analysis suffers from a number of flaws, which include the following:

(a)     Dr. Sawyer appears to assume that the airborne concentrations measured were "individually-liberated volatile components of southern Louisiana crude" (*i.e.*, components of the MC252 crude oil).  Decl. of Dr. Sawyer, at ¶ 6.  However, as discussed in my initial declaration, BTEX, hexane, and heptane are emitted from numerous sources.  Given that this sample was collected in a "marina boom off-loading/staging area," it is highly likely that other sources (such as exhaust from the use of heavy equipment, diesel engines, vehicles, and boats) contributed to the sample results.  And in fact, numerous studies have found that benzene was not present — or was present at negligible levels — in MC252 oil that reached the surface of the Gulf of Mexico (31-33).  Thus, it is highly likely that the benzene measurement reported by Dr. Sawyer was <u>not</u> the result of the MC252 oil, but rather was the result of other sources, such as engine exhaust.

(b)     It is inappropriate to draw conclusions from a single sample when thousands of samples were collected in connection with the DWH oil spill.  As discussed in my initial declaration, in assessing environmental exposures, air monitoring data that provide average or median concentrations of a chemical in air are more relevant and useful in assessing the potential for health risks than are data that provide isolated peak levels.  Decl. of Dr. Cox, at ¶ 15.  With respect to benzene, for example, Dr. Sawyer notes that the sample cited had a benzene concentration of 116 ug/m$^3$.  This single value may appear high (though, as discussed in greater detail by Drs. Lees and Green, it is still below all relevant OELs), but the sampling effort as a whole tells a different story.  For instance, out of the 1,656 24-hour air samples that EPA

collected along the Gulf Coast during the DWH oil spill, the median benzene result was 0.4 ug/m$^3$ and the 99th percentile result was 3.1 ug/m$^3$.  As I explained in my initial declaration, one elevated result (unless excessively high, which this sample was not) is not indicative of a potential human health risk.[7]

(c)     Dr. Sawyer next adds up the concentrations of the sampled compounds and notes that "additive and combined toxicological effects" are "anticipated." Decl. of Dr. Sawyer, at ¶ 6. However, additive toxicological effects would only be "anticipated" if the individual compounds act through a common mechanism and are associated with a common health end point.  For example, chronic exposures to high levels of benzene can result in decreased lymphocyte count, anemia, and leukemia, but chronic exposures to other volatile hydrocarbons do not.  Thus, being exposed to toluene in addition to benzene, for example, would not increase the risk of decreased lymphocyte count or leukemia.  Moreover, Dr. Sawyer provides no support for his assertion that additive toxicological effects would be anticipated, and fails to conduct a traditional mixture risk assessment, which, given the extremely low concentrations of the individual compounds measured in connection with the DWH oil spill, would show little to no excess risk of potential health effects.  Such a mixture risk assessment is provided in the separate declaration of Dr. Lees.  *See* Supp. Decl. of Dr. Lees, at ¶ 14.

## MR. KIRBY'S DECLARATION

50.     I would also like to comment on the declaration of James H. Kirby III, and in particular on his paper entitled *Findings of Persistency of Polycyclic Aromatic Hydrocarbons in Residual Tar Product Sourced from Crude Oil Released during the Deepwater Horizon MC252*

---

[7] There are occupational limits for one-time, short duration exposures to extremely elevated levels, known as Immediately Dangerous to Life and Health (IDLH).  The IDLH for benzene is 500 ppm (or 1,597,000 ug/m$^3$), which is 13,767 times higher than the benzene measurement cited by Dr. Sawyer.

*Spill of National Significance*, which forms the basis for his declaration.  Mr. Kirby's declaration is submitted in support of the objections filed by Smith Stag, L.L.C., *et al*, and also forms the basis for certain assertions made in the objection filed by attorney Joseph Darrell Palmer on behalf of four objectors.

51.    Mr. Kirby's paper was never published in a peer-reviewed medical journal, and Mr. Kirby is not qualified to opine on many of the topics that he addresses in his declaration. Namely, Mr. Kirby does not have a degree or training in environmental or analytical chemistry, and his resume does not reflect any previous experience with oil spill clean-up, biodegradation processes, the design of properly controlled environmental studies, putative contaminants analysis, or human health issues.

52.    Mr. Kirby's lack of familiarity, training, and education in these fields becomes apparent when reading his declaration and attached paper, which contain numerous scientific errors.  These errors can be roughly categorized into three categories: (1) Mr. Kirby relies on an ultraviolet (UV) light methodology that has not been previously published and for which no validation data has been presented to support its sensitivity or specificity; (2) Mr. Kirby makes a number of significant errors in concluding that the tar samples he identifies contain excessive levels of PAHs; and (3) Mr. Kirby grossly misapplies the dermal absorption IH SkinPerm Model in concluding that the Corexit products in tar samples enhance the absorption of PAHs into exposed skin.  In short, the methodological and scientific errors in Mr. Kirby's paper are overwhelming, resulting in conclusions that are unfounded, illogical, and simply incorrect.

### UV Methodology

53.    Mr. Kirby's paper suggests that a hand-held UV light can be employed to detect MC252 oil and Corexit products and to differentiate tar samples containing Corexit products

from those that do not contain Corexit products.  Mr. Kirby's UV test has never been published or validated, and Mr. Kirby provides no data to support the test's sensitivity or specificity. Moreover, Mr. Kirby's UV method does not meet common scientific practice, which would involve measuring the fluorescence spectra with a laboratory spectrophotometer and elaborate statistical and computer modeling (35-37).

54.    It is not possible, as Mr. Kirby suggests, to identify a specific compound or mixture of compounds with the UV method presented.  In order to identify a specific substance, Mr. Kirby would have to compare his results to a known standard at a similar concentration and under similar weathering conditions.  Instead, Mr. Kirby compares his results to the UV response of an oil sample that is "physically similar" — *i.e.*, a sample of tar that looks the same.  Based on this comparison, Mr. Kirby concludes that the two samples that show similar UV responses are chemically the same.  There is no scientific basis for such a conclusion.

55.    Mr. Kirby states that he used this UV method to inspect forty hotel rooms in a Gulf Coast hotel, all of which "were found to have some level of petroleum hydrocarbon contamination that was visible under inspection with UV light."  Decl. of Mr. Kirby, at 1.  It is true, as Mr. Kirby suggests, the PAHs and other hydrocarbons will fluoresce under UV light. However, Mr. Kirby's method could show a response even when no oil or dispersant is present, as there are a large number of organic and inorganic compounds that fluoresce in UV light (a number of which one would expect to find in a hotel room).  These compounds include, among others, bodily fluids (such as blood, urine, semen, and sweat) and many forms of laundry detergents, soaps, and cleaning liquids (38).  In addition, other substances likely to be found in a beach environment that fluoresce in UV light include chlorophyll (found in seaweed debris), algae, jellyfish, coral, and some common carbonate and silicate minerals in beach sand (39, 40).

Thus, it is not scientifically valid or appropriate to assume, as Mr. Kirby does, that any positive fluorescent response to UV light indicates the presence of hydrocarbons or dispersant.

56.     Mr. Kirby also claims on page 8 and in Figures 6 and 7 of his attached paper that fluorescent spots on a subject's legs are absorbed hydrocarbons from kneeling in Gulf waters. Mr. Kirby notes that "[t]he dermal absorption is not visible under ambient light conditions, but will show up as a fluorescent signature in response to 370 nm UV light illumination of the skin surface." However, as discussed above, fluorescence in response to UV light at 370 nm is not proof of petroleum hydrocarbons or dispersant, as a multitude of substances will fluoresce at that frequency. For instance, a number of organisms and substances that would be expected to be present in Gulf waters, such as dissolved organic material, pieces of coral, or algae, could easily get on a person's legs when kneeling along the shore (37, 40).[8]

57.     Finally, Mr. Kirby's claim of dispersants being present in the weathered oil is entirely unfounded. It is highly unlikely that any dispersant was actually associated with the oil sampled by Mr. Kirby. As described above, given the highly soluble and biodegradable nature of dispersants, it is unlikely that any dispersant arrived at the shoreline, a conclusion that was confirmed by the almost complete lack of detection of Corexit components in near-shore water and sediment samples collected by the OSAT-1 team between the Mississippi and Florida coasts. Decl. of Dr. Cox, at ¶ 83. The fluorescence response to Mr. Kirby's UV light (which he describes as a "red shift") is more likely due to the many chemical changes that occur during the weathering process of crude oil, and is not indicative of the presence of Corexit in the beach samples.

---

[8] An alternative hypothesis not considered by Mr. Kirby is that the fluorescing substance is a chemical produced by the skin in response to sun exposure (41). For example, the compound pentosidine fluoresces at 370 nm and is one of a group of compounds produced by the skin in response to sun exposure and other conditions.

### PAH Exposure Analysis

58.    Mr. Kirby notes that 48 samples of "weathered tar product sourced from crude oil dispersed with Corexit® brand chemical dispersants" were submitted to a laboratory for PAH analysis.    Mr. Kirby concludes that 90% of those samples "were found to have PAH concentrations consistently in excess of [Immediately Dangerous to Life and Health (IDLH)] limits (80 mg/m$^3$) as stated in the NIOSH/OSHA Occupational Health Guidelines for Chemical Hazards and published in the NIOSH Pocket Guide to Chemical Hazards, 2007 (third printing)."

59.    In drawing this conclusion, Mr. Kirby makes a number of critical scientific errors. Most notably, the IDLH standard applies to ***airborne*** concentrations of chemical substances, and cannot be used to assess the potential health risk from chemical concentrations in a ***solid*** sample. According to NIOSH: "An IDLH exposure condition is one that poses a threat of exposure to *airborne* contaminants when that exposure is likely to cause death or immediate or delayed permanent adverse health effects or prevent escape from such an environment" (44).    Mr. Kirby's comparison of PAH levels in solid tar samples to IDLH air standards is thus illogical and scientifically incorrect, as the IDLH has no relevance to chemicals in water, sediment, soil, or tar.[9]    Such comparisons are inappropriate because, among other reasons, air is not the same density as soil or tar, and the inhalation and dermal exposure pathways differ significantly. Thus, PAH concentrations in a solid tar sample cannot be compared to IDLH standards, which are based on the concentration of a substance per cubic meter of *air*.    By comparing the PAH concentrations in the tar samples to the IDLH standard, Mr. Kirby grossly overstates the

---

[9] The units for the IDLH are micrograms of substance per cubic meter of air (µg/m$^3$).  In Mr. Kirby's paper, the laboratory reported the units of PAHs in micrograms of substance per kilogram of material (µg/kg).  The lab results represent the weight of a chemical in the weight of a **solid sample**.  Mr. Kirby's comparison of the IDLH, expressed in µg/m$^3$, and the lab results, expressed in µg/kg, is completely erroneous, and his reporting of how many times the µg/kg value is greater than the µg/m$^3$ value is illogical and scientifically meaningless.

potential health effects from the PAHs in the tar samples.[10]  Mr. Kirby is truly comparing apples and oranges.

60.    In contrast to Mr. Kirby's deeply flawed analysis, the OSAT-2 team analyzed weathered oil samples using validated methodologies and correct benchmarks for comparison and concluded that: (1) "weathered [MC252] oil samples showed 86-98 percent depletion of [PAHs]; and (2) "[c]alculated potential cancer and non-cancer health effects from short and long-term exposures [to the weathered MC252 oil were] below [EPA] acceptable health based risk and hazard levels" (4).

*Dermal Absorption Analysis*

61.    Finally, Mr. Kirby suggests that "tar product derived from weathered crude oil dispersed with Corexit® brand dispersants behaves as though it contains a built-in absorption accelerant."  In support of this assertion, Mr. Kirby states:

> A sample of tar product was collected for analysis.  The results showed Benzo(a)anthracene, a Class B-2 probable human carcinogen, present in the tar sample at a concentration of 196 ppb.  Using the dermal toxicity model, IHSkinPerm_V1.03, and correcting for the enhancement factor caused by the presence of Corexit dispersant that elevated the solubility parameter in the model, it showed that if a person with wet skin contacted this sample, the absorbed dose would have been 3.948 mg of this toxicant and would have occurred in less than a minute of contact (Decl. of Mr. Kirby, at 3).

62.    Put simply, Mr. Kirby's conclusion borders on the absurd.  To achieve a dose of 3.948 mg from dermal contact with tar with 196 ppb (or 0.196 mg/kg) benzo(a)anthracene would require absorption of 100% of the benzo(a)anthracene in more than 20 kg (or 44 pounds) of tar in

---

[10] It should also be noted that PAHs in weathered oil and tar balls are not capable of volatilizing to produce appreciable *airborne* concentrations, much less concentrations that could pose an immediate danger to life and health.

under one minute.[11]   It is difficult to imagine a situation in which an individual would have dermal contact with 44 pounds of tar.  It is even more incredible to assume that one would absorb 100% of the benzo(a)anthracene in that tar in under one minute.

63.    As discussed above, Mr. Kirby states that the tar sample he collected had a concentration of benzo(a)anthracene of 196 ppb.  To put that number in perspective, the U.S. Food and Drug Administration (FDA) allows shampoos to contain up to 5% coal tar (containing PAHs).  *See* 21 C.F.R. § 358.  For example, 0.5% coal tar shampoos contain approximately 60,000 ppb benzo(a)anthracene (42) — *i.e.*, 300 times the amount of benzo(a)anthracene measured in Mr. Kirby's sample.  In other words, one would likely receive substantially higher dermal exposures to PAHs using a coal tar shampoo (such as those used to prevent dandruff) than one could get from contacting weathered tar on a Gulf Coast beach.

### CANIPE AND McLANE OBJECTIONS

64.    Two objectors, Matthew Canipe and Timothy McLane, raise concerns regarding exposure to airborne concentrations of the constituents of oil and dispersants downwind of the spill, noting that their prior residence in Panama City Beach, Florida was directly downwind of the spill.  These claims are scientifically unfounded.

65.    First, during the DWH oil spill, the prevailing wind conditions actually drove the oil away from the Florida coast — in late April and May 2010, the prevailing winds were directed northwest of the spill site; in June and July 2010, the prevailing winds were generally directed north of the spill site (43).   Accordingly, Panama City Beach, Florida, which is located northeast of the spill site, was not consistently located downwind of the DWH oil spill, and the

---

[11] The calculation is as follows: 3.948 mg benzo(a)anthracene / 0.196 (mg/kg tar) = 20.143 kg tar.

winds generally acted to keep the oil west of the Florida panhandle (43).  Moreover, Panama City Beach is approximately 184 miles from the MC252 well.  As described in my initial declaration, many of the more water-soluble volatile hydrocarbons dissolved in the water column prior to reaching the surface of the Gulf, and the remainder of the volatile components underwent significant photodegredation and dilution prior to reaching the Gulf Coast.  Decl. of Dr. Cox, at ¶¶ 44-46.  As a result, there was little potential for Gulf Coast Residents to be exposed to airborne concentrations of the volatile components of the MC252 oil, particularly in locations as far removed from the spill site as Panama City Beach, Florida.

66.    Second, as described in my initial declaration, over the course of the DWH oil spill, EPA and BP conducted air sampling at fixed-monitoring locations along the Gulf Coast, including at locations along the Florida coast.  Decl. of Dr. Cox, at ¶ 48.  The airborne concentrations of the constituents of the MC252 oil measured as part of this sampling effort were extremely low, and were far below levels at which any significant adverse health effects might be expected.  *Id.* at ¶¶ 51-52, 58-61.  The CDC reached a similar conclusion, stating that "[d]uring the Gulf oil spill, analyses of environmental air samples for VOCs along the Gulf shore found air concentrations that would not likely result in long term health effects to residents of Gulf coast communities" (7).  The results of the EPA fixed-monitor sampling in Panama City Beach, Florida are provided in Table 2 below, and show that none of the volatile oil components reached Panama City Beach in significant concentrations.

**Table 2: EPA Air Sampling in Panama City Beach, Florida**

| Chemical | # of Samples | Median | Max | # > EPA SL or ATSDR MRL |
|---|---|---|---|---|
| Benzene ($\mu g/m^3$) | 24 | 0.29 | 1.60 | 0 |
| Toluene ($\mu g/m^3$) | 20 | 0.44 | 1.78 | 0 |
| Ethylbenzene ($\mu g/m^3$) | 36 | 0.09 | 0.30 | 0 |
| Xylenes ($\mu g/m^3$) | 39 | 0.07 | 0.27 | 0 |

67.    Table 2 demonstrates that the airborne concentrations of BTEX measured by EPA in Panama City Beach during the DWH oil spill never exceeded the EPA Screening Levels or the ATSDR MRLs.[12]   In fact, the median concentration for benzene was 70 times lower than the benchmark levels, and the median concentrations of toluene, etylbenzene, and xylenes were 11,000 to 30,000 times lower than the benchmark levels.

68.    EPA did not conduct air sampling for components of the Corexit dispersants in Panama City Beach.  However, as described in my initial declaration, airborne concentrations of the dispersant components measured along the Gulf Coast were uniformly very low, and were well below levels at which adverse health effects might be expected.  *See* Decl. of Dr. Cox, at ¶¶ 62-68.  Thus, it can be concluded that Panama City Beach, Florida, which is located 184 miles from the MC252 well, was minimally impacted by the DWH oil spill.

I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.

Date:  October 22, 2012

_____
Robert Cox, M.D., Ph.D

---

[12] The EPA Screening Levels and ATSDR MRLs are discussed in greater detail in my initial declaration in ¶¶ 53-57.

## APPENDIX A
## Objections Reviewed

1. Objection to Medical Benefits Portion of Proposed Class Action Settlement; Susan Forsyth, *et al.* (10-cv-07777; Rec. Doc. 213) ("Joseph Darrell Palmer Objection").

2. Statement of Objections; Joseph Yerkes, *et al.*(10-cv-07777; Rec. Doc. 185) ("Smith Stag, L.L.C., *et al.* Objection").

3. Statement of Objections; Carolyn Booker and Zena Coleman (10-cv-07777; Rec. Doc. 208).

4. Objection to Medical Settlement; Lance Clay Brown (10-cv-07777; Rec. Doc. 130).

5. Objection to Terms of the Medical Benefits Class Action Settlement; Matthew Judson Canipe (10-cv-07777; Rec. Doc. 203).

6. Objection to Proposed Medical Settlement Agreement; Malcolm Coco and Jared Shane Elrod (10-cv-07777; Rec. Doc. 180).

7. Halliburton Energy Services, Inc.'s Objections to Plaintiffs' Memorandum in Support of Final Approval of Medical Benefits Class Action Settlement and BP's Motion for Final Approval of the Medical Benefits Class Action Settlement (10-cv-07777; Rec. Doc. 93).

8. Objection to Terms of the Medical Benefits Class Action Settlement; Timothy Patrick McLane (10-cv-07777; Rec. Doc. 205).

9. Notice of Consolidated Objection to the Fairness and Adequacy of the Proposed Medical Benefits Class Action Settlement Agreement; Reynaldo Abreu, *et al.* (10-cv-07777; Rec. Doc. 92).

## APPENDIX B
## Materials Reviewed

1.  Goldstein BD, Osofsky HJ, Lichtveld M. The Gulf oil spill. NEJM 2011; 364:1334-1348.

2.  Hayworth JS, Clement TB. Provenance of Corexit-related chemical constituents found in nearshore and inland Gulf Coast waters. *Mar Pollut Bull* 2012; 64:2005-2014.

3.  Operational Science Advisory Team (OSAT) Unified Area Command. Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring. Prepared for Paul F. Zukunft, RADM, U.S. Coast Guard Federal On-Scene Coordinator Deepwater Horizon MC252. December 17, 2010. Available at: CDC. Oil Spill Dispersant (COREXIT®EC9500A and EC9527A) Information for Health Professionals. Available at: http://www.restorethegulf.gov/sites/default/files/documents/pdf/OSAT_Report_ FINAL_17DEC.pdf.  Accessed on 8/10/2012.

4.  Operational Science Advisory Team (OSAT-2) Gulf Coast Management Team. Summary Report for Fate and Effects of Remnant Oil in the Beach Environment. Prepared for Lincoln D. Stroh, CAPT, U.S. Coast Guard Federal On-Scene Coordinator. February 10, 2011. Available at: http://www.restorethegulf.gov/sites/default/files/u316/OSAT-2%20Report%20no%20ltr.pdf.  Accessed on 3/31/2012.

5.  Clement TP, Hayworth JS, Mulabagal V, John GF, Yin F.  2012.  Research Brief-II.  Impact of Hurricane Isaac on Mobilizing Deepwater Horizon Oil Spill Residues along Alabama's Coastline - A Physicochemical Characterization Study.  *Available at* http://www.eng.auburn.edu/news/2012/09/ce-isaac.html.

6.  Office of Response and Restoration.  Incident News, USCG Press Release 10Oct12. Available at: http://incidentnews.gov/entry/16611. Accessed on 10/20/12.

7.  Centers for Disease Control and Prevention. CDC/ATSDR Guidance on the Interpretation and Use of Blood Laboratory Analyses for Volatile Organic Compounds.  Available at: http://emergency.cdc.gov/gulfoilspill2010/pdf/Clinician_VOC_FactSheet.pdf.  Accessed on 8/18/12.

8.  ATSDR. Toxicological Profile for N-Hexane. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 1999.

9.  ATSDR. Toxicological Profile for Ethylbenzene. Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services, Atlanta, GA, 2010.

10. Chambers DM, McElprang DO, Waterhouse MG, Blount BC. An improved approach for accurate quantitation of benzene, toluene, ethylbenzene and styrene in blood. *Anal Chem* 2006; 78:5375-5383.

11. Chambers DM, Blount BC, McElprang DO, Waterhouse MG, Morrow JC. Picogram measurement of volatile n-alkanes (n-hexane through n-dodecane) in blood using solid-phase

microextraction to assess nonoccupational petroleum-based fuel exposure. *Anal Chem* 2008; 80:4666-4674.

12. Brugnone R, Maranelli G, Romeo L, Giuliari C, et al. Ubiquitous pollution by n-hexane and reference biological levels in the general population. *Int Arch Occup Environ Health* 1991; 63:157-160.

13. Kurt TL. Multiple chemical sensitivities – a syndrome of pseudotoxicity manifest as exposure perceived symptoms. *Clin Toxicol* 1995; 33:101-105.

14. Magill MK, Suruda A. Multiple Chemical Sensitivity Syndrome. Am Fam Physician 1998; 58:721-728.

15. American Medical Association. Clinical Ecology. JAMA 268(24):3465-3467, 1992.

16. American College of Occupational and Environmental Medicine. ACOEM statement about distinctions among indoor air quality, MCS, and ETS. ACOEM, 1991.

17. American Academy of Allergy Asthma and Immunology, Position statement on Idiopathic Environmental Intolerances. Available at: http://www.aaaai.org/Aaaai/media/ MediaLibrary/PDF%20Documents/Practice%20and%20Parameters/Idiopathic-environmental-intolerances-1999.pdf.  Accessed on 9/15/12.

18. National Institutes of Health.  Environmental Health and Toxicology. IUPAC Glossary of Terms used in Toxicology. US Department of Health and Human Services.  Available at: http://sis.nlm.nih.gov/enviro/iupacglossary/glossarym.html. Accessed on 10/1/2012.

19. King BS, Gibbons JD. Health Hazard Evaluation of the Deepwater Horizon Response Workers. National Institute for Occupational Safety and Health, 2011

20. Centers for Disease Control and Prevention. Gulf Oil Spill 2010: Deep Water Horizon Oil Spill Human Health Interim Clinical Guidance. Available at: http://www.bt.cdc.gov/gulfoilspill2010/oilspill_clinical.asp. Accessed on 3/29/2012.

21. Centers for Disease Control and Prevention.  West Nile Virus.  Available at: www.cdc.gov/ncidod/dvbid/westnile/index.htm. Accessed 10/2/2012.

22. Baars B-J. The wreckage of the oil tanker 'Erika' - human health risk assessment of beach cleaning, sunbathing and swimming. *Toxicol Lett* 2002; 128:55-68.

23. Rodriguez-Trigo G., Zock JP, Pozo-Rodriguez F, Gomez FP, et al. Changes in fishermen 2 years after the *Prestige* oil spill. *Ann. Intern Med* 2010; 153(8):489-498.

24. Zock JP, Rodriguez-Trigo G, Rodriguez-Rodriguez E, et al.  Long-term health effects of Prestiage oil spill (Galicia, Spain). *Epidemiology* 2009; 20:S242-S243.

25. Rodriguez-Trigo G, Zock JP, Pozo-Rodriguez F, et al. Health changes in fisherman 2 years after clean-up of the Prestige oil spill. Ann Int Med 2010; 153:489-498.

26. Cole JB, Capulas WA, Aldridge K, et al. Biomonitoring of possible human exposure to environmental genotoxic chemicals: Lesons from a study following the wreck of the oil tanker Braer. *Environ Mutagen* 1997; 30: 97-111.

27. Aguilera F, Méndez, Pásaro E, et al.  Review on the effects of exposure to spilled oils on the human health.  *J Appl Toxicol* 2010; 30:291-301.

28. Hersh JH, Podruch PE, Rogers G, et al.  Toluene embryopathy. *Pediatrics*  1985; 106:922-927.

29. Hersh JH. Toluene embryopathy: two new cases. *J Med Genetics* 1989; 26:333-337.

30. Clinical Management of Poisoning and Drug Overdose. 3rd ED. LM Hassad ed.  WB Saunders, Philadelphia, PA, 1998.

31. Middlebrook AM, Murphy DM, Ahmadov R, *et al*. Air quality implications of the *Deepwater Horizon* oil spill. *PNAS Early Edition*, December 28, 2011. Available at: www.pnas.org/cgi/doi/10.1073/pnas.1110052108.

32. Ryerson TB, Camilli R, Kessler JD, *et al*.  Chemical data quantify *Deepwater Horizon* hydrocarbon flow rate and environmental distribution. *PNAS Early Edition*, January 10, 2012. Available at: www.pnas.org/cgi/doi/10.1073/pnas.1110564109.

33. Ryerson TB, Aiken KC, Angevine WM, et al. Atmospheric emissions from the Deepwater Horizon spill constrain air-water partitioning, hydrocarbon fate, and leak rate. *Geophys Res Lett* 2011;38: L07803, doi:10.1029/2011GL046726.

34. Centers for Disease Control and Prevention. Community Fact Sheet. Volatile Organic Compounds and Your Health. Available at: http://emergency.cdc.gov/gulfoilspill2010 /pdf/Resident_VOC_FactSheet.pdf.  Accessed on 10/17/12.

35. Abercrombie, M. 2011.  Use of in situ and remote sensors, sampling and systems for assessing impacts and mitigation of oil and dispersant.  Deepwater Horizon oil spill principal investigator workshop, October 25-26, 2011 - final report.

36. Stelmaszewski, A.  2004.  Fluorescence method for the determination of oil identity.  *Optica Applicata* 34(3): 405-418.

37. Baker A, Spencer RGM. Characterization of dissolved organic matter from source to sea using fluorescence and absorbance spectroscopy. Science Tot Environ 2004;333:217-232.

38. Science Learning.  UV and fluorescence. Available at: http://www.sciencelearn.org.nz/ Contexts/You-Me-and-UV/Science-Ideas-and-Concepts/UV-and-fluorescence.  Accessed on 10/2/2012.

39. Mail Online. The red, green, blue and yellow sea: Fluorescent lights turn the bottom of the Red Sea into a sponge disco.  Available at: http://www.dailymail.co.uk/sciencetech /article-2165450/The-red-green-blue-yellow-sea-Neon-lights-turn-the-Red-Sea-sponge-disco.html.

40. Schubert H, Schiewer U, Tschirner E. Fluorescence characteristics of cyanobacteria (blue-green algae). J Plankton Research 1989; 11:353-359.

41. Beisswenger P. Howell S, Mackensie T, Corstiens H, et al. Two fluorescent wavelengths, 440(ex)/520(em) nm and 370(ex)/440(em) nm, reflect advanced glycation and oxidation end products in human skin without diabetes. *Diabetes Technol Ther*  2012; 14(3): 285-292.

42. Neutrogenia Corporation. Letter to FDA, October 24, 2000, FDA Docket 00P-1210/CP1.

43. LeHenaff ML, Kourafalou VH, Paris CB, et al. Surface evolution of the Deepwater Horizon oil spill patch: combined effects of circulation and wind-induced drift. Environ Sci Technol 2012; 46. 7267-7273.

44. Bollinger N.  NIOSH Respirator Selection Logic (2004).  *Available at* www.cdc.gov/ niosh/ docs/2005-100/pdfs/2005-100.pdf.

45. Declaration of Dr. Peter Lees (August 13, 2012).

46. Declaration of Dr. David R. Dutton (August 13, 2012).

47. Supplemental Declaration of Dr. Peter Lees (October 22, 2012).