# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## SUPPLEMENTAL DECLARATION OF DAVID R. DUTTON, PH.D.

I, David R. Dutton, am over twenty-one years of age and of sound mind and body.  My declaration is based on personal knowledge, experience, and review of materials described herein.  If called to testify, I could testify to the matters set forth in this declaration.

1.      I submitted an initial declaration to the Court on August 13, 2012.  In that declaration, I provided an overview of a number of aspects of the Deepwater Horizon (DWH) Response, including (a) the Response structure; (b) oil spill response methods; (c) the use of dispersants; (d) industrial hygiene air monitoring; (e) training of DWH Response workers; (f) the use of personal protective equipment (PPE); (g) the use of administrative and engineering

controls; (h) Health Hazard Evaluations (HHEs) performed by the National Institute for Occupational Safety and Health (NIOSH); and (i) medical care for Response workers.

2.      I have reviewed objections to the Medical Benefits Class Action Settlement Agreement and the Economic and Property Damages Settlement Agreement, as well as the declarations attached thereto.  The list of objections that I have reviewed is set forth in Exhibit A. None of these objections or declarations changes my opinions and conclusions as set forth in my initial declaration.  However, I am submitting this supplemental declaration in order to correct and clarify a number of points raised therein because a number of the objections misstate certain facts related to the DWH Response.

### Medical Encounters Database

3.      In a declaration attached to the Smith Stagg, L.L.C. Objection, Dr. Michael Robichaux states, without basis, that "the information gleaned from BP's 'Medical Encounters Database' is probably useless."   Decl. of Dr. Robichaux, at ¶ 30.  As described below, this assertion is simply incorrect.

4.      As described in greater detail in my initial declaration, *see* Decl. of David R. Dutton, at ¶¶ 66-71, BP, in consultation with the Unified Area Command (UAC), established medic stations in Louisiana, Mississippi, Alabama, and Florida for the use and benefit of Response workers who became ill or injured during the clean-up.  The medic stations were staffed by Emergency Medical Technicians (EMTs) or paramedics employed by local companies that had contracted with BP.

5.      These medical personnel provided emergency and first aid treatment.  The EMTs and paramedics triaged Response workers' acute injuries and illnesses, and assessed whether workers should be permitted to return to work, should be referred to intermediate medical care,

or, where necessary, should be transported to a treatment facility or local emergency room by ambulance. The EMTs and paramedics recorded data about the visits, either handwritten or electronically, during or shortly after the visits.

6.     Data from each visit to a medic station were later transferred into a Medical Encounters Database maintained by BP. The Medical Encounters Database tracks over 20,000 visits by over 13,000 individuals. Tracked data include a description of the worker's symptoms, biographical information, the treatment provided, the ultimate disposition of the case (*i.e.*, whether the worker returned to work or was referred for treatment), and the location where the incident occurred, among other information. Injuries and illnesses were also coded in this database using the Occupational Injury and Illness Classification System (OIICS) developed by the NIOSH.

7.     The data collected in the Medical Encounters Database have been used for multiple purposes. For example, where appropriate, site safety leaders were informed of worksite incidents so that they could institute any necessary corrective actions. The industrial hygiene (IH) and safety groups also analyzed the data, particularly the contemporaneous descriptions of symptoms and problems reported by Response workers, so that systemic safety improvements could be made. Counsel for BP and the Plaintiffs' Steering Committee also utilized the injury trend information in the development of the Specified Physical Conditions Matrix for the Medical Benefits Class Action Settlement.

8.     In light of the large volume of contemporaneous information regarding visits to medic stations that is contained in the Medical Encounters Database, as well as the ways in which such information has been subsequently utilized to improve safety and to assess workers'

medical experiences during the Response, Dr. Robichaux's conjecture that the database is "probably useless" has no basis in fact.

### Exposure Assessment Approach

9.     In a declaration attached to the Smith Stagg, L.L.C. Objections, Dr. William R. Sawyer criticizes BP's exposure assessment approach, citing "a NIOSH document authored by Eileen Senn" for the proposition that BP, the U.S. Occupational Safety and Health Administration (OSHA), and NIOSH all conducted "quantitative" air sampling without performing "a prerequisite primary step of compiling a comprehensive and rigorous qualitative exposure assessment."  Decl. of Dr. Sawyer, at ¶¶ 3, 11-13.

10.     As an initial matter, Dr. Sawyer mischaracterizes the document authored by Eileen Senn.  Ms. Senn is not a NIOSH employee.  Rather, Ms. Senn, who is a self-employed industrial hygiene consultant, submitted the cited memorandum to NIOSH in response to a request for public comment on a draft NIOSH guidance document entitled *Emergency Responder Health Monitoring and Surveillance*.[1]

11.     On the substance, Dr. Sawyer is simply incorrect.  As described in my initial declaration, BP implemented a comprehensive air monitoring program, which was designed to be as conservative and protective of worker health as possible.  Decl. of Dr. Dutton, at ¶¶ 36-45. In implementing this air monitoring program, BP carefully considered which analytes to sample for, with significant input from federal agencies such as OSHA and NIOSH.  *Id.* at ¶ 43. Pursuant to this "qualitative exposure assessment," BP sampled for volatile components of crude oil that can be present in the air after an oil spill, with a particular focus on components of crude oil that have been associated with potential health effects and for which occupational exposure

---

[1]  *See* NIOSH Docket: 223 - Emergency Responder Health Monitoring and Surveillance, *available at* http://www.cdc.gov/niosh/docket/archive/docket223.html.

limits have been established.  In addition, BP sampled for components of the Corexit dispersants that were used during the Response.  The sampling conducted by the federal agencies was similarly comprehensive and well-considered:

- "Early in the response, OSHA personnel provided input to help BP develop a sampling strategy to address these hazards [including crude oil, weathered oil, dispersants, and solvents used to clean boats].  OSHA also developed its own sampling protocol and strategy, which is available on OSHA's website . . . . The sampling strategy OSHA developed to support the [UAC] was based on the specific tasks workers would be performing, the chemicals of concern from the oil and dispersants, and available Occupational Exposure Limits."

  – OSHA, *Deepwater Horizon Oil Spill: OSHA's Role in the Response* ("OSHA Report"), at 7 (May 2011) (attached as Exhibit B).

- "A large number of chemicals was sampled for over the course of the [Health Hazard Evaluation]. These included VOCs, PAHs, and $H_2S$ from the oil itself or cleaning chemicals used; VOCs, PAHs, aldehydes, CO, and particulates from combustion sources, including burning oil and natural gas or the use of gasoline-powered engines; VOCs, glycol ethers, and propylene glycol from dispersants; and diesel exhaust from the use of diesel engines.  Sampling was conducted at offshore and onshore worksites during activities of concern.  Our sampling strategies included full-shift air sampling using validated NIOSH sampling and analytical methods. . . .  In addition to quantitative exposure sampling, we assessed work practices in a qualitative manner to identify potential hazardous exposures."

  – NIOSH, *Health Hazard Evaluation of Deepwater Horizon Response Workers* ("NIOSH HHE"), at 13 (August 2011) (attached as Exhibit C).

12.     Dr. Sawyer also asserts that BP, OSHA, NIOSH, and others did not conduct a "careful review and summary of previous industrial hygiene and epidemiology studies on similarly exposed workers," which he notes "is part of a qualitative exposure assessment."  Decl. of Dr. Sawyer, at ¶ 12.  However, such an analysis was in fact conducted and was included in Appendix A of the *Interim Guidance for Protecting Deepwater Horizon Response Workers*, available at www.cdc.gov/niosh/topics/oilspillresponse/protecting/.  Indeed, Dr. Sawyer actually included in his declaration a table entitled "Human Health Effects Studies from Selected Oil

Tanker Spill Disasters," which was taken directly from Appendix A of the OSHA and NIOSH *Interim Guidance*.  *See* Decl. of Dr. Sawyer, at p. 13.

### Personal Protective Equipment (Including Respirators)

13.    A number of objections relate to the provision of PPE.  *See, e.g.*, Objection of Lance Clay Brown, at 5 ("Proper protective clothing wasn't provided for the cleanup of chemicals."); Objection of Albio Luis Machuca, at 1 ("I worked hands on in the oil spill daily in the elements of nature without proper protection (respirator)."); Sterbcow Objection, Decl. of Jaime Andres Restrepo Herrera, at ¶ 3 ("[M]any times, the protective equipment was not enough protection.").

14.    As discussed in my initial declaration, BP, in coordination with the UAC, provided PPE to Response workers pursuant to a PPE matrix that was developed with input from OSHA and NIOSH.  Decl. of Dr. Dutton, at ¶¶ 55-59.  In determining the appropriate level of PPE to provide to Response workers, BP, in conjunction with OSHA and NIOSH, carefully considered the types of potential hazards for each job and task, recognizing that overuse of PPE can actually result in greater potential health risk.  *See, e.g.*, OSHA and NIOSH, *Interim Guidance*, at § IX.  Accordingly, decisions about PPE use were based on a comprehensive assessment of the potential for exposure, which included evaluation of available air monitoring data.  *See* Decl. of Dr. Dutton, at ¶ 56.  This approach has been recognized as appropriate by both OSHA and NIOSH, which have issued statements emphasizing the importance of tailoring PPE use to the actual potential for exposure:

- "OSHA stressed throughout the response that decisions about PPE should be based on a scientific characterization of the hazards, including air sampling . . . . OSHA assisted the [UAC] with performing these characterizations for each job task to determine the appropriate level of protection.  Based on these hazard assessments and guidance from OSHA and NIOSH, in early May, BP

6

developed a matrix outlining the PPE that workers should use for each category of cleanup work" (OSHA Report, at 9).

- "It is imperative to conduct continual evaluations of the need for specific PPE such as full-body coveralls throughout emergency responses such as this to determine their necessity. When exposures have been evaluated and determined to be minimal or insignificant, overuse of PPE can have an unintended effect of burdening the worker with unnecessary gear that can exacerbate heat stress, limit visibility, and increase the possibility of slips and trips . . . . Balancing the need to protect workers from potential exposures without creating unnecessary hazards for workers from too high a level of PPE is critical" (NIOSH HHE, at 12-13).

15.     In addition, IH professionals from BP, OSHA, NIOSH, and the U.S. Coast Guard, among others, regularly visited work sites to ensure that Response workers were wearing appropriate levels of PPE. For instance, according to OSHA, "nearly 150 OSHA professionals were involved in protecting workers in the Gulf Region [during the DWH Response] . . . . They visited worksites each day to assess whether BP was following OSHA guidance/standards and to provide appropriate worker safety and health protections. OSHA staff made over 4,200 site visits, covering staging areas, decontamination, distribution, deployment sites, and vessels of opportunity (VOOs)." OSHA Report, at 5. Moreover, as described in my initial declaration, NIOSH, after conducting observations at a wide variety of Response-related work sites, determined that the use of PPE was typically found to be matched to the level of expected or potential dermal exposure. Decl. of Dr. Dutton, at ¶ 59.

16.     With respect to respirator use in particular, it is well recognized that decisions to use respirators should be based on the best available quantitative air monitoring data regarding the type and level of potential exposure, as respirator use can place physiological stress on the body. For instance, OSHA has stated that "respirators should be considered the protection of last resort, as they can be physically taxing on the body, particularly for workers who have not used

them before and in conditions of extreme heat.  Where feasible, engineering, work practice and administrative controls should be implemented to protect workers."  OSHA Report, at 8. Similarly, the OSHA and NIOSH *Interim Guidance* discussed above notes that "all respirators have adverse effects on breathing, vision and communication, result in some discomfort, and are associated with additional physiological stress."  OSHA and NIOSH, *Interim Guidance*, at § IX(E).

17.     Accordingly, respirators were only provided to workers engaged in activities that had some potential for elevated inhalation exposures to potentially harmful chemicals.  These limited categories of workers are described in my initial declaration.  *See* Decl. of Dr. Dutton, at ¶ 58.  For other categories of workers, BP, in conjunction with OSHA and NIOSH, determined that the potential risks of respirator use outweighed any perceived benefits, as the air monitoring data for those workers showed that airborne chemical concentrations were well below any levels of concern.  This approach was approved by both OSHA and NIOSH during the DWH Response, and has been reaffirmed by both Agencies in statements issued after the Response:

- "The intent of the air sampling was to provide an accurate assessment of the types and levels of exposures to airborne chemicals to which the workers were exposed.  On the basis of sampling results, recommendations for additional respiratory protection were not deemed necessary" (NIOSH HHE, at 13).

- "Based on the scientific evidence from the sampling data, OSHA determined that respiratory precautions were important near the source to prevent inhalation exposures from volatile chemicals, but were not necessary for most shoreline cleanup operations" (OSHA Report, at 8).[2]

---

[2] Note that even at the source, respiratory protection was required only when real-time air monitoring exceeded specified action levels, which was rare.  This approach was approved by both OSHA and NIOSH during the DWH Response.

*Access to Medical Care for Non-English Speaking Response Workers*

18.    During the Response, BP not only encouraged, but required, workers to report any incidents or injuries to their supervisor or IH or safety personnel, regardless of how insignificant the injury might seem.  This policy was explicitly communicated to workers both verbally and in the training materials.  *See* Decl. of Dr. Dutton, at Exhibit A.  This message was also reiterated in daily safety updates by the UAC at the beginning of each shift.  Our goal was to have all incidents reported within two hours, where possible.

19.    As IH lead, I received updates at least twice daily through the "all hands meetings" concerning the day's activities, problems, or incidents.  Decl. of Dr. Dutton, at ¶ 11.  I am not aware of a single instance of a worker being disciplined or dismissed as a result of reporting a medical condition.  If we had learned of a contractor or supervisor even discouraging medical attention, let alone threatening retaliation, we would have immediately disciplined that contractor or supervisor or, if necessary, dismissed that contractor or supervisor from the Response.

20.    Response workers who may have felt uncomfortable reporting an injury or illness to their direct supervisor would have had several other resources available.  For example, concerns about safety, injuries, illness, or supervisor retaliation could and should have been reported directly to BP IH personnel, safety supervisors, or members of the U.S. Coast Guard, OSHA, and NIOSH who were regularly present at work sites.  I am not aware of any concerns about supervisor retaliation or discouragement of medical treatment being reported to any of these resources.

21.    Response workers who wanted to seek medical treatment could do so regardless of whether English was their primary language, and were informed of health and safety resources

in other languages.   In this respect, training was provided in multiple languages, including English, Spanish, and Vietnamese.  As discussed in my initial declaration, all trainees, including non-English speaking trainees, were instructed to report illnesses and injuries to their supervisor or to IH or safety personnel.  *See* Decl. of Dr. Dutton, at ¶ 52.  An example of training materials addressing this issue in Spanish is attached in Exhibit D.

22.     PEC Premier, the BP contractor who conducted the training courses, identified potential Response workers by their native language, and displayed this information prominently on the PEC-issued badges.  The proof of employment submitted by several of the individuals included in the objection filed by the Sterbcow firm shows this information.  *See* PEC badges submitted by Messrs. Aparacio (Spanish), Flores (Spanish), Garcia (Spanish), Gonzalez, B. Martinez (Spanish),   G. Martinez (Spanish), G. Martinez, Jr. (Spanish), Mejia (Spanish), Quintana (Spanish), Rivas (English), and Urroz (Spanish).   This information assisted supervisors, IH and safety personnel, and OSHA staff to identify the language spoken by the workers.

23.     In addition, OSHA, which maintained strict oversight over the training and work conditions for Response workers, made reaching non-English speaking workers one of its three "strategic" objectives.  *See* OSHA Report, at 1-2.  OSHA "[e]nsured that training and written materials were provided in multiple languages . . . to all response and cleanup workers" and required BP to provide free training to all workers in a language the workers understood.  *Id.* at 2, 10.  OSHA, along with other UAC entities including the U.S. Coast Guard and NIOSH, reviewed BP's training program to assure compliance with these requirements.  *Id.* at 10.  OSHA also continually monitored these trainings, which were conducted in English, Vietnamese, and

Spanish, to ensure that they delivered the relevant health and safety information in a way that workers could understand.  *Id.*

24.    OSHA safety information was also posted in both English and Spanish, as required by federal law, and was available in Spanish on OSHA's website.  *Id.* at 12.  OSHA distributed 15,000 booklets containing information on heat injury prevention, health risks of weathered oil, PPE requirements, and general health and safety topics (such as fatigue) in English, Spanish, and Vietnamese.  *Id*.  To ensure adequate communication on health and safety issues with all workers, OSHA assigned staff fluent in Vietnamese and Spanish to the Response.  *Id.* at 6.

25.    Other Spanish language resources were available to Response workers.  For example, Response workers could report their injuries or illnesses to one of several Spanish-speaking supervisors and IH and safety personnel.  Both the medic stations and ambulance services also included Spanish-speaking personnel.

26.    These efforts were obviously effective as over 13,000 workers utilized the medic stations.  Further, my review of information contained in the Medical Encounters Database and in the underlying documentation revealed that nine of the objectors identified in the Sterbcow filing took advantage of these opportunities and sought treatment at the medic stations—a total of eleven times.  Despite the contention that such individuals feared dismissal for reporting their medical conditions, the fact that the average time between the last medical visit and the last badging activity for these individuals was approximately 45 days contradicts their claims.

### Heat-Related Illnesses

27.    The Sterbcow Objection states that the settlement is unfair because it "does not allow recovery for a heat stroke and simultaneous recovery for an unrelated chronic condition,"

and describes heat stroke as "very likely the most prevalent ailment" of the Response.  Sterbcow

Objection, at 14-15.  As described below, heat stroke was not a common ailment during the

DWH Response, and BP, in concert with the UAC, took numerous precautions to minimize the

occurrence of heat-related conditions.

28.     During the Response, it was not unusual for workers to experience heat-related

symptoms.  Given the high temperatures in the Gulf during the most intense period of the

Response in summer 2010, heat-related illnesses were a continual risk.  With one possible

exception, however, the reported instances of heat-related illness reported to medic stations were

limited to heat stress, and did not rise to the level of heat stroke.

29.     Heat stress includes a wide variety of heat-related symptoms, including heat rash,

heat exhaustion, and heat cramps, among other symptoms.  By contrast, heat stroke is the most

severe form of heat-related illness.  Heat stroke can involve hallucinations, slurred speech, and

body temperatures rising as high as 106 degrees in 10 or 15 minutes.  Heat stroke is an

emergency condition that can cause permanent damage or even death.

30.     During the DWH Response, BP was able to virtually eliminate the occurrence of

heat stroke by implementing, in concert with the UAC, a comprehensive heat management plan

for Response workers.  Early in the Response, BP retained the services of Dr. Thomas Bernard

from the University of South Florida to assist with the development of the heat management

plan.  Dr. Bernard is one of the foremost experts on heat stress-related issues.  The heat

management plan was extremely conservative, and included measures to ensure adequate

hydration, as well as mandatory rest for 20 minutes of every hour, shaded rest areas, and onsite

heat monitors.  *Id.* at 7.  In addition, OSHA required BP to implement consistent, incident-wide

controls to protect workers from heat stress, and monitored the implementation of those controls.

OSHA Report, at 1.  According to OSHA, "the heat protection program likely prevented some serious heat illnesses and possible deaths among workers."  *Id.* at 7.

### *Quality of the Response*

31.     In a memorandum submitted in opposition to the motions for final approval of the economic and property damages class settlement, the State of Louisiana states that "BP is executing one of the worst oil responses in history."  State of Louisiana's Memorandum in Response and in Opposition to BP's and the PSC's Motions for Final Approval of Economic & Property Damages Class Settlement, at 4 [Doc. 7345].  This statement is contrary to the facts.

32.     As described in my initial declaration, the DWH Response was comprised of an unprecedented armada of personnel, equipment, technologies, and methodologies that collectively constituted the very best oil spill response resources available.  Decl. of Dr. Dutton, at ¶ 7.  In this respect, BP, under the direction of the Unified Command, implemented every response method available in order to minimize potential environmental and human health impacts from the spill.  The response methods utilized over the course of the Response are discussed in greater detail in my initial declaration.  *See id.* at ¶¶ 7, 14-35.  As I said in my initial declaration, I do not believe there was any response method that could have or should have been implemented to best accomplish these objectives that was not, in fact, implemented over the course of the Response.

33.     The State of Louisiana's suggestion that the DWH Response was one of the worst in history fails to acknowledge the enormous effort of tens of thousands of people working together to implement the largest oil spill response in history.  As the Federal On-Scene Coordinator (FOSC) for the U.S. Coast Guard concluded, "[t]he Deepwater Horizon oil spill response was ultimately successful, due to the unity of effort and perseverance of more than

1000 organizations that contributed to this unprecedented response." FOSC, *On Scene Coordinator Report: Deepwater Horizon Oil Spill*, at xiv (September 2011).

### Dispersant-Related Issues

34.     As described in my initial declaration, the objective of dispersant use is to break down oil into smaller droplets, thereby dispersing the oil into the water column and rendering the oil more available for biodegradation. Decl. of Dr. Dutton, at ¶ 22. As explained by the U.S. Environmental Protection Agency (EPA):

> Oil spill dispersants are chemicals applied directly to the spilled oil in order to break it into small droplets that fall below the surface. Dispersants are usually applied to the oil slick with specialized equipment mounted on an airplane, helicopter or ship. Once applied, dispersants help break up oil into tiny micron-sized droplets which mix into the upper layer of the ocean. Dispersed oil forms a "plume" or "cloud" of oil droplets just below the water surface. The dispersed oil mixes vertically and horizontally into the water column and is rapidly diluted. Bacteria and other microscopic organisms are then able to act more quickly than they otherwise would to degrade the oil within the droplets.[3]

35.     Consistent with the general purpose of dispersants, during the DWH Response, the objective of the aerial and vessel applications of dispersants was to break up oil slicks observed on the surface of the Gulf of Mexico. Thus, as described in my initial declaration, dispersants were not applied on land or to the surface of the Gulf of Mexico in areas not observed to have dispersible oil slicks. *See* Decl. of Dr. Dutton, at ¶¶ 28-29. Once dispersants are applied to an oil slick on the ocean surface (or subsea at the source of the oil discharge), the dispersants mix with and become inseparable from the oil. It is through this mixing process that the oil is broken down into smaller droplets that can be more readily biodegraded.

---

[3] *See* EPA, *Questions and Answers on Dispersants*, *available at* http://www.epa.gov/bpspill/dispersants-qanda.html#role2.

36.     The objection submitted by Gerald Porter raises a different issue related to dispersants.  Mr. Porter claims to have been harmed by the "night spraying of dispersants."  I am not aware of any aerial dispersant operations that were conducted at night during the DWH Response.  As a practical matter, it would not have been feasible to conduct aerial dispersant operations at night because (1) the spotters would not have been able to locate the oil slicks to be dispersed; and (2) it would not have been safe at night to fly as close to the ocean surface as necessary for dispersant application.  In addition, federal guidelines specifically prohibit aerial dispersant operations at night.  In this respect, the Regional Response Teams for Regions 4 and 6 limit aerial dispersant operations to daylight hours only.[4]  And as explained in a report prepared by the FOSC, this limitation on nighttime aerial dispersant operations was implemented during the DWH Response.  *See* FOSC, *On Scene Coordinator Report: Deepwater Horizon Oil Spill*, at 36 (September 2011) ("Aerial dispersant spraying operations could occur during daylight hours only.").  Accordingly, there is no factual basis for Mr. Porter's claim that he was sprayed by nighttime aerial applications of dispersants in connection with the DWH Response.

37.     It is possible that Mr. Porter is actually referring to nighttime flights conducted by the U.S. Air Force.  In this respect, many of the aerial dispersant operations were conducted out of Stennis International Airport in Bay St. Louis, Mississippi.  The U.S. Air Force also utilizes the Stennis International Airport on occasion, and conducts flights (including nighttime training drills) out of the Airport that are entirely unrelated to the DWH oil spill.  It is possible that Mr.

---

[4] *See* Region 6 Regional Response Team, *FOSC Dispersant Pre-Approval Guidelines and Checklist*, at 1 (Jan. 24, 2001) ("Dispersant spraying operations are conducted during daylight hours only."), *available at* http://www.losco.state.la.us/pdf_docs/RRT6_Dispersant_Preapproval_2001.pdf; Region 4 Regional Response Team, *Use of Dispersants in Region IV*, at 116 (October 8, 1996) ("Dispersant operations should take place during daylight hours only"), *available at* http://www.nrt.org/production/NRT/RRTHome.nsf/Resources/DUP/$file/1-RRT4DISP.PDF.

Porter is mistaking nighttime flights conducted by the U.S. Air Force for aerial dispersant operations related to the DWH oil spill, though I cannot say for sure whether that is the case.

I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.

Date:  October 22, 2012

_____

David R. Dutton, Ph.D

# EXHIBIT A

**Objections Reviewed**

1. Objection to Medical Settlement; Barbara Adams (10-cv-07777, Rec. Doc. 243).

2. Objection to Settlement; Ilease Bartlette (10-cv-07777; Rec. Doc. 51).

3. Objection to Fairness of Proposed Personal Injury Settlement; Charles A. Boggs (10-cv-07777; Rec. Doc. 41).

4. Statement of Objections; Carolyn Booker and Zena Coleman (10-cv-07777; Rec. Doc. 208).

5. Objection to Medical Settlement; Lance Clay Brown (10-cv-07777; Rec. Doc. 130).

6. Objection to Terms of the Medical Benefits Class Action Settlement; Matthew Judson Canipe (10-cv-07777; Rec. Doc. 203).

7. Objection to Proposed Medical Settlement Agreement; Malcolm Coco and Jared Shane Elrod (10-cv-07777; Rec. Doc. 180).

8. Statement of Objections Relating to Medical Benefits Class Members; Linda Breedlove, *et al.* (10-cv-07777; Rec. Doc. 158).

9. State of Louisiana's *Amicus Curiae* Memorandum in Opposition to Motion for Certification of Economic and Property Damages Settlement Class and in Opposition to Motion for Certification of Medical Benefits Settlement Class (10-cv-07777; Rec. Doc. 228).

10. Objection to the Settlement; George R. Hall (10-cv-07777; Rec. Doc. 160).

11. Halliburton Energy Services, Inc.'s Objections to Plaintiffs' Memorandum in Support of Final Approval of Medical Benefits Class Action Settlement and BP's Motion for Final Approval of the Medical Benefits Class Action Settlement (10-cv-07777; Rec. Doc. 93).

12. Medical Objection Letter to BP; Kevin Scott Llewallen (10-cv-07777; Rec. Doc. 182).

13. Letter re: Poisoning by BP Oil Spill Fairness Hearing Statement; Deborah Lucas (10-cv-07777; Rec. Doc. 236).

14. Objection to Settlement; Albio Luis Machuca (10-cv-07777; Rec. Doc. 57).

15. Objection to Terms of the Medical Benefits Class Action Settlement; Timothy Patrick McLane (10-cv-07777; Rec. Doc. 205).

16. Objection to Medical Benefits Portion of Proposed Class Action Settlement; Susan Forsyth, *et al.* (10-cv-07777; Rec. Doc. 213).

17. Objection to Medical Settlement; Gerald Porter.

18. Letter of Objections to the Medical Benefits Class Action Settlement; Jason B. Sims (10-cv-07777; Rec. Doc. 61).

19. Statement of Objections; Joseph Yerkes, *et al.*(10-cv-07777; Rec. Doc. 185)

20. Notice of Consolidated Objection to the Fairness and Adequacy of the Proposed Medical Benefits Class Action Settlement Agreement; Reynaldo Abreu, *et al.* (10-cv-07777; Rec. Doc. 92).

21. State of Louisiana's Memorandum in Response and in Opposition to BP's and PSC's Motions for Final Approval of Economic & Property Damages Class Settlement (10-cv-3059, 11-cv-0516, and 12-970; Rec. Doc. 7345).

# EXHIBIT B

# Deepwater Horizon
# Oil Spill:

## OSHA's Role in the Response



Occupational Safety and Health Administration

May 2011



U.S. Department of Labor
Hilda L. Solis, Secretary of Labor

# Table of Contents

EXECUTIVE SUMMARY ............................................................................................................. 1

SECTION 1.  INTRODUCTION ................................................................................................. 2

SECTION 2.  OSHA ACTIVATION .......................................................................................... 3

SECTION 3.  WORKER SAFETY AND HEALTH MANAGEMENT DURING THE DEEPWATER
HORIZON OIL SPILL RESPONSE ........................................................................................... 4

SECTION 4.  OSHA ACTIVITIES ............................................................................................ 5

4.1   SITE VISITS, INTERVENTIONS, AND TECHNICAL SUPPORT ................................................. 5
4.2   CHEMICAL EXPOSURE ASSESSMENT ................................................................................. 7
4.3   PERSONAL PROTECTIVE EQUIPMENT ................................................................................ 9
4.4   TRAINING .................................................................................................................... 10
4.5   GUIDANCE AND PUBLICATIONS ...................................................................................... 12
4.6   COMMUNITY OUTREACH ................................................................................................ 13
4.7   INJURY AND ILLNESS REPORTING ................................................................................... 13
4.8   OSHA'S SUPPORT OF DEPARTMENT OF LABOR OBJECTIVES ........................................... 14
4.9   SUMMARY OF ACTIVITIES .............................................................................................. 14

APPENDIX A. BACKGROUND ON THE INCIDENT, THE NATIONAL RESPONSE SYSTEM,
AND OSHA'S ROLES/AUTHORITY/JURISDICTION ......................................................... 15

A.1   THE DEEPWATER HORIZON INCIDENT .............................................................................. 15
A.2   OVERVIEW OF THE NATIONAL RESPONSE SYSTEM ........................................................... 15
  A.2.1   The National Contingency Plan .............................................................................. 15
  A.2.2   The National Response System ............................................................................... 16
A.3   OVERVIEW OF THE INCIDENT/UNIFIED COMMAND SYSTEM ............................................. 18
  A.3.1   The Incident Command System .............................................................................. 18
  A.3.2   Local Incident Command Posts/Unified Commands ............................................... 18
  A.3.3   Unified Area Command .......................................................................................... 18
  A.3.4   National Incident Commander ............................................................................... 19
  A.3.5   National Incident Command ................................................................................... 19
A.4   OSHA'S ROLES/AUTHORITIES/JURISDICTION ................................................................. 20
  A.4.2   Worker Safety and Health in the National Contingency Plan ................................. 23
  A.4.3   OSHA's Role in the Deepwater Horizon Oil Spill Response .................................... 24

APPENDIX B. DEEPWATER HORIZON OIL SPILL RESPONSE—OSHA CHRONOLOGY
THROUGH JUNE 25 ................................................................................................................ 26

APPENDIX C. MEMORANDUM OF UNDERSTANDING (MOU) BETWEEN OSHA AND THE
FEDERAL ON-SCENE COORDINATOR (FOSC) CONCERNING OCCUPATIONAL SAFETY
AND HEALTH ISSUES ........................................................................................................... 31

APPENDIX D. ACRONYMS ................................................................................................... 34

D.1   AGENCIES AND ACTORS ................................................................................................ 34
D.2   DEEPWATER HORIZON AND EMERGENCY RESPONSE TERMS ............................................ 34

i

D.3  SAFETY AND HEALTH TERMS ................................................................................................. 35

D.4  LAWS AND REGULATIONS ..................................................................................................... 35

# EXECUTIVE SUMMARY

On the night of April 20, 2010, the Deepwater Horizon oil rig, located 45 miles off the coast of Venice, Louisiana, exploded and caught fire, resulting in the deaths of eleven workers.  The rig sank on the morning of April 22, and oil leaking from the Macondo wellhead began reaching shore in late May.

At the peak of the Deepwater Horizon response operations, more than 47,000 men and women were involved in responding to and cleaning up the oil spill each day.  The workers on the front lines of the response faced potential hazards on the job such as extreme heat, fatigue, electrical, motor vehicle, sharp objects, material handling, confined spaces, potential chemical exposures, loud noises, drowning, struck-by, slips, falls, and insect bites.

The Occupational Safety and Health Administration (OSHA) was part of the coordinated federal response to ensure that workers were protected from these hazards.  OSHA's efforts included a comprehensive assessment of hazards and aggressive oversight of BP to ensure that workers had the training and protection they needed.  OSHA's activities were guided by its strategic objectives for the response:

- Continually monitor and evaluate BP's efforts to ensure that BP implements the appropriate precautions needed to fully protect all workers from the safety and health hazards associated with their cleanup work.

- Reach out to communities to ensure that workers know their rights and that employers know their responsibilities for protecting workers. Focus efforts to increase workers' "voice in the workplace" and educate workers regarding how to obtain OSHA's assistance.

- Ensure that all workers are adequately trained for their jobs in a manner and language they understand.

OSHA conducted the following activities to protect workers, communicate with its stakeholders, and elevate safety and health in the response effort:

- Integrated staff into the overall oil spill response command structure at the local, regional, and national levels and partnered with other federal agencies to protect workers.

- Before oil reached shore, performed detailed assessments to determine what hazards response and cleanup workers were likely to face.

- Conducted more than 4,200 site visits to assess hazards and ensure that BP was protecting workers adequately.

- Compelled BP to implement consistent incident-wide controls to protect workers from heat stress, the most significant health threat to the response and cleanup workers.

- Ensured that workers were aware of their rights and had clear avenues for voicing complaints.

- Put health and safety information and data in the hands of workers and the public through printed materials and the OSHA website.

- Ensured that training and written materials were provided in multiple languages and at an appropriate literacy level to all response and cleanup workers.

- Conducted extensive air monitoring and other exposure assessments, and evaluated the exposure data of BP and other government agencies.

- Made science-based recommendations about controls, including personal protective equipment, required for specific jobs.

- Established a significant community outreach program to address community concerns and to contact hard-to-reach workers.

## Section 1.  Introduction

On the night of April 20, 2010, the Deepwater Horizon rig, located 45 miles off the coast of Venice, Louisiana, exploded and caught fire, resulting in the deaths of eleven workers. The rig sank on the morning of April 22, and on April 23 crews discovered oil leaking from the well's riser and drill pipe. Oil began reaching shore in late May.

During the peak of the operations, more than 47,000 men and women were involved in responding to and cleaning up the oil spill each day.  This included more than 42,000 response and cleanup workers employed by BP and its contractors, 1,600 members of the National Guard, and more than 2,400 federal employees.  The area of operations spanned the coastline from Louisiana to Florida, as well as offshore operations from the shoreline to the site of the release; 6,400 vessels were involved in the operations.

Many workers faced potential exposure to weathered oil, oil byproducts, dispersants, cleaning products, and other chemicals used in the cleanup process. Depending on their assignments, these workers also faced potential hazards from extreme heat, slips, falls, material handling, drowning, confined spaces, struck-by, fatigue, loud noises, sharp objects, and electrical hazards, as well as bites from insects, snakes, and other species native to the Gulf Coast region.

The Occupational Safety and Health Administration (OSHA) was part of the coordinated federal response to ensure that workers were protected from these hazards.  The U.S. Coast Guard, the National Institute for Occupational Safety and Health (NIOSH), the National Institute of Environmental Health Sciences (NIEHS), the U.S. Environmental Protection Agency (EPA), other government agencies, and BP worked together to protect workers involved in the response.  As a member of the National Response Team (NRT), the Department of Labor (DOL), through OSHA, provided guidance and safety and health expertise to the Coast Guard at the National Incident Command, the Unified Area Command (UAC), and the local incident command posts (ICPs)/unified commands.  (See Appendix A for a description of the federal government's National Response System and

Incident Command System/Unified Command.)  OSHA's role in the Unified Command (UC) was to monitor the health and safety hazards facing workers involved in the oil spill response.  OSHA continually monitored and evaluated BP's efforts to ensure that BP and its contractors were protecting workers from the hazards associated with their response and cleanup work.

OSHA's overall strategic objectives, which guided all its activities during the Deepwater Horizon oil spill response, are listed below.

---

### OSHA's Strategic Objectives for the Response

1. Continually monitor and evaluate BP's efforts to ensure that BP implements the appropriate precautions needed to fully protect all workers from the safety and health hazards associated with their cleanup work.

2. Reach out to communities to ensure that workers know their rights and that employers know their responsibilities for protecting workers. Focus efforts to increase workers' "voice in the workplace" and educate workers regarding how to obtain OSHA's assistance.

3. Ensure that all workers are adequately trained for their jobs in a manner and language they understand.

---

## Section 2.  OSHA Activation

As OSHA received reports of the Deepwater Horizon rig explosion, the Agency began monitoring the situation.  Under the Occupational Safety and Health Act (OSH Act), OSHA's authority in the Louisiana Gulf Coast region is limited to three nautical miles offshore.  While OSHA had jurisdiction over worker safety and health activities near- and onshore, the safety of offshore workers fell under the jurisdiction of the Coast Guard and the Bureau of Ocean Energy Management, Regulation and Enforcement. Despite its limited jurisdiction, OSHA anticipated that oil would approach the shoreline and began monitoring the situation immediately.

On April 22, OSHA's National Office received a notice from the Coast Guard activating the NRT.  The following day, OSHA staff attended a White House Situation Room briefing for the members of the NRT.  On April 24, the NRT began daily conference calls to provide updates to its member agencies. OSHA participated in these calls throughout the response.  Beginning the week of April 26, OSHA quickly deployed and integrated staff into the ICPs and unified commands as they stood up, and had compliance staff at staging areas on the Gulf Coast by April 30, well before oil reached the shore.

Appendix B provides a detailed chronology of OSHA's response.

## Section 3.  Worker Safety and Health Management During the Deepwater Horizon Oil Spill Response

Under the National Contingency Plan (NCP) (40 CFR 300.135), the Federal On-Scene Coordinator (FOSC) had the ultimate responsibility for directing response efforts and addressing worker health and safety concerns throughout the entire response area.  At the FOSC's request, OSHA staff provided technical assistance and support to the FOSC and the unified commands to protect the safety and health of response and cleanup workers.

BP, as an employer, was responsible under the OSH Act for providing a safe and healthful workplace for its employees, including the response workers and contractors it hired.  BP was also obligated as a "responsible party" under the NCP to implement a safety and health program consistent with Hazardous Waste Operations and Emergency Response (HAZWOPER) (29 CFR 1910.120) and other OSHA standards.  Throughout the response, OSHA provided aggressive oversight and monitoring of BP's activities and programs to ensure that BP was meeting its responsibilities under both authorities to protect response and cleanup workers.

OSHA fully integrated into the multi-agency, unified response to the Deepwater Horizon oil spill at the local, regional, and national levels.  OSHA staff rapidly deployed into the local ICPs/Unified Commands in Houma, LA, and Mobile, AL; the UAC in Robert, LA; staging areas throughout the Gulf Coast; and the National Incident Command (NIC) in Washington, DC.  Once deployed, OSHA staff worked closely with the Coast Guard; BP; and local, state, and federal health agencies to jointly plan and execute response actions and programs to protect the safety and health of the response and cleanup workers.  As part of this effort, OSHA led numerous meetings of the NRT Worker Safety and Health Subcommittee, addressing key worker safety and health issues such as safety and health training requirements, heat stress prevention, fatigue management, and personal protective equipment (PPE) requirements for response and cleanup workers.

On May 3, the OSHA leadership, together with senior staff from NIOSH, NIEHS, and EPA, traveled to Louisiana and met with the FOSC and senior BP representatives to discuss preparations for protecting workers as the oil approached the shore.  These meetings signaled the start of close collaborations and partnerships among agencies at the local, regional, and national levels that continued throughout the response and cleanup efforts.

On June 6, OSHA and the FOSC developed and signed a Memorandum of Understanding (MOU) that clarified OSHA's role with the FOSC in the UAC.  It also established procedures for consultation and coordination between the FOSC and OSHA with respect to matters affecting the safety and health of response and cleanup workers.  In addition to reinforcing OSHA's authorities, duties, and responsibilities under the NCP and the OSH Act, the MOU provides guidelines for information sharing between OSHA and the Coast Guard, including procedures for referrals and OSHA enforcement actions.  See Appendix C for a copy of the MOU.

Appendix A provides further details on the roles, authorities, and jurisdiction of OSHA, the FOSC, and the responsible party.

# Section 4.  OSHA Activities

In the days following the Deepwater Horizon rig explosion, OSHA performed detailed assessments to determine what hazards response and cleanup workers were likely to face. These assessments were based on data from similar past events, the activities workers would be performing, the location of the activities (onshore, offshore, near-shore), and the freshness of the oil. OSHA used this information to help the UC develop a comprehensive safety and health program, and updated the program as the response unfolded.  OSHA identified the most significant threats to workers' safety and health and aggressively worked to protect workers from those hazards.

This section describes the activities OSHA subsequently carried out to protect the safety and health of the response workers:

- Site Visits, Interventions, and Technical Support (Section 4.1)

- Exposure Assessment (Section 4.2)

- Personal Protective Equipment (Section 4.3)

- Training (Section 4.4)

- Guidance and Publications (Section 4.5)

- Community/Stakeholder Outreach (Section 4.6)

- Illness and Injury Reporting (Section 4.7)

- OSHA's Support of Department of Labor Objectives (Section 4.8)

## 4.1    Site Visits, Interventions, and Technical Support

Throughout the response, nearly 150 OSHA professionals were involved in protecting workers in the Gulf Region, with 25 to 40 of them assigned solely to the oil response cleanup.  OSHA staff were active in all 17 staging areas in Louisiana, Mississippi, Alabama, and Florida.  They visited worksites each day to assess whether BP was following OSHA guidance/standards and to provide appropriate worker safety and health protections.  OSHA staff made over 4,200 site visits, covering staging areas, decontamination, distribution, deployment sites, and vessels of opportunity (VOOs).[1]

One of OSHA's goals was to protect all workers in the response.  This involved providing technical support to the FOSC to assess and mitigate hazards throughout the entire theater of operation.  Under the NRT effort, OSHA provided health and safety

---

[1] VOOs were made up primarily of displaced fishing vessels and crews involved in defense booming, transporting work crews, and other types of support.

assistance for the personnel of the VOOs involved in the cleanup, even though they were working outside OSHA's geographic authority.

During its visits to onshore, near-shore, and offshore worksites, OSHA staff:

- Interviewed workers, documented observations, and collected information on the employers (BP and its subcontractors), workers, and the work being performed.

- Evaluated operations to identify occupational hazards and the necessary controls to address the hazards.

- Monitored worker exposure to toxic chemicals and physical hazards such as heat and noise (see Section 4.2, "Exposure Assessment").

- Assisted the FOSC by investigating allegations of adverse health effects from chemical exposure to oil, weathered oil, oil dispersants, cleaning agents, and other materials.

OSHA realized early on that to be effective, its field staff needed to communicate with workers in their native languages. OSHA assigned staff fluent in Vietnamese and Spanish to the oil spill response.

OSHA applied its worker interviews, observations, and sampling data to ensure that the various controls used were adequate, including worker training, work/rest schedules, and PPE.  OSHA also routinely attended briefings that BP and its contractors held at the beginning of every shift to review safety and health issues.  OSHA staff immediately brought the health and safety issues they had identified to the attention of BP and ensured that they were corrected.  OSHA also raised the concerns through the UC so that they could be addressed systematically across the entire response area.

For example, in late May, OSHA witnessed deficiencies in BP's safety and health program at several work sites and staging areas throughout the Gulf Coast region.  These included gaps in BP's heat stress program; a lack of plans for addressing inclement weather, workplace violence, and site control; as well as delays in abating worker hazards and in sharing worker injury and exposure data.  Working through the UC, OSHA brought these issues and concerns to the attention of the FOSC and the NIC Commander, provided timely feedback to BP on its incident-wide site safety and health plan, and made sure that BP incorporated supplemental plans addressing specific worker hazards, including the designation of an incident-wide safety officer.  OSHA also worked with BP to develop a Safety and Health Action Item Report to track observed safety and health hazards until they were abated.

OSHA recognized that the intense heat in the Gulf region was likely the most acute threat to the health of the response and cleanup workers.  OSHA assisted the UC in developing and ensuring the consistent implementation of a comprehensive program to protect workers from heat and ensured its consistent implementation (see below, "Protecting Workers From Heat During the Gulf Oil Response").

---

**Protecting Workers From Heat
During the Gulf Oil Spill Response**

Among the most serious health hazards faced by response and cleanup workers were heat stress and heat stroke. Many people, some wearing chemical-resistant Tyvek® coveralls, boots, and gloves, worked 12 hours a day, 7 days a week in the hot and humid weather along the Gulf.  From the outset, OSHA insisted that BP implement a robust program to protect workers from heat stress and heat stroke, including work/rest requirements, shaded rest areas, hydration liquids, and onsite heat monitors.

During site visits, OSHA staff observed inconsistent implementation of BP's heat stress program. Each staging area was implementing its own program, and some were more protective than others. OSHA made it clear that BP had to fix these deficiencies. OSHA's Assistant Secretary of Labor brought this and other issues to the attention of Admiral Thad Allen, the National Incident Commander, to ensure that the inconsistencies would be remedied. BP then implemented a system-wide, comprehensive heat protection program.

During the response, there were more than 1,000 potential heat-related incidents in which workers showed signs of heat effects. The heat protection program likely prevented some serious heat illnesses and possible deaths among workers.

---

### 4.2    Chemical Exposure Assessment

OSHA was concerned about the potential health effects to workers from inhalation and skin exposure to chemicals including crude oil, weathered oil, dispersants, and solvents used to clean boats.  Early in the response, OSHA personnel provided input to help BP develop a sampling strategy to address these hazards. OSHA also developed its own sampling protocol and strategy, which is available on OSHA's website at http://www.osha.gov/oilspills/oil_samplingstrategy.html.  The sampling strategy OSHA developed to support the UC was based on the specific tasks workers would be performing, the chemicals of concern from the oil and dispersants, and available Occupational Exposure Limits (see below, "Occupational Exposure Limits").  The strategy incorporated onshore zones, near-shore,  and offshore operations.

On May 6, OSHA deployed its specialized industrial hygienist team to Louisiana to provide technical support for the worker exposure monitoring.  During site visits, OSHA conducted the following sampling by using direct reading instruments and traditional industrial hygiene air sampling devices to evaluate worker exposure:

- Short-term and full-shift sampling of the air in the actual breathing zone of workers.

- Air sampling in areas where workers went frequently.

- Sampling directly over tar balls, inside bags containing contaminated materials, and in other locations. (These samples did not represent worker exposure but

7

provided information on the types of chemicals that might be coming off contaminated materials.)

The sampling consisted of full spectral analyses of the composite mixture of crude oil, oil by-products, dispersants, and other chemicals to determine what hazards the mixture might present to workers as they responded to and cleaned up the oil spill.

A specialized committee convened each morning, consisting of the lead industrial hygienists from OSHA, the Coast Guard, BP and its contractors, NIOSH, the U.S. Department of the Interior, and EPA. They discussed anomalies from the previous day's samples, updates to safe work practices or administrative controls, and coordinated their sampling activities for the day. This process was highly effective for identifying safety and health issues and bringing the issues to the attention of the unified commands.

Over the course of the response, BP conducted more than 119,000 exposure assessments. OSHA reviewed these assessments and validated them by performing more than 7,000 independent worker exposure measurements, both onshore and on marine vessels. Chemists at OSHA's Salt Lake Technical Center (SLTC), an accredited American Industrial Hygiene Association (AIHA) laboratory, analyzed all of OSHA's samples as well as samples from the Coast Guard. OSHA also reviewed sampling data from EPA and the National Oceanic and Atmospheric Administration (NOAA). OSHA posted the sampling data on its website at https://www.osha.gov/oilspills/index_sampling.html.

The data showed that chemical exposure levels varied greatly, depending on the location of the work and the task being performed. The source of the release was approximately 45 miles offshore. As the result of sun, water and wave action, and other environmental factors most of the toxic volatile components of the oil had dissipated during the weeks it took to reach the work areas of most cleanup workers. Based on the scientific evidence from the sampling data, OSHA determined that respiratory precautions were important near the source to prevent inhalation exposures from volatile chemicals, but were not necessary for most shoreline cleanup operations. OSHA was also aware that respirators should be considered the protection of last resort, as they can be physically taxing on the body, particularly for workers who have not used them before and in conditions of extreme heat. Where feasible, engineering, work practice and administrative controls should be implemented to protect workers.

OSHA ensured that respirators were used wherever the data indicated that they were necessary to protect workers. For example, OSHA noted exposure data from some decontamination operations that exceeded the most protective Occupational Exposure Limits. Upon investigation, OSHA confirmed that protective measures, which were based on guidance from the UC, were already in place to protect the workers and prevent them from inhaling or having skin contact with hazardous chemicals.

---

**Occupational Exposure Limits**

An Occupational Exposure Limit (OEL) is a level at which exposure to a substance for a certain frequency and duration over a working lifetime can be deemed to be safe. OELs are always based on epidemiological studies and scientific evidence. Though a number of agencies have established OELs, based on a variety of criteria, not all OELs are legally enforceable. Permissible Exposure Limits (PELs) are OSHA-specific OELs and signify the legal limit that cannot be exceeded. PELs are based on 40 hours of exposure per week over a 40-year working lifetime.

OSHA has previously acknowledged <u>that its PELs are out of date</u> and in some cases are not as protective as OELs promulgated by other agencies. To provide the oil spill workers with the greatest protection from exposure to hazardous chemicals, OSHA worked with the UC to use the most protective OELs from NIOSH, AIHA, and the American Conference of Governmental Industrial Hygienists (ACGIH), in addition to OSHA's PELs.

In characterizing worker exposure during the Deepwater Horizon oil spill response, OSHA compared the results of air monitoring to the lowest known OEL for purposes of risk assessment and protective equipment recommendations. Because oil cleanup workers would only be exposed for a few days, weeks, or months, instead of a working lifetime, using OELs was a very conservative approach for protecting response workers.

---

### 4.3    *Personal Protective Equipment*

PPE, such as boots, gloves, coveralls, hearing protection, respiratory protection, etc., was essential for protecting workers involved in cleanup operations.  OSHA recommended PPE to prevent inhalation or skin contact with toxic chemicals, hearing damage from noise, sun exposure, cuts, insect bites, and other hazards.

OSHA stressed throughout the response that decisions about PPE should be based on a scientific characterization of the hazards, including air sampling (described in Section 4.2).  OSHA assisted the UC with performing these characterizations for each job task to determine the appropriate level of protection. Based on these hazard assessments and guidance from OSHA and NIOSH, in early May, BP developed a matrix outlining the PPE that workers should use for each category of cleanup work.  OSHA posted the matrix on its website at http://www.osha.gov/oilspills/gulf-operations-ppe-matrix.pdf.

Respirators, and training in how and when to use them, were required for workers on vessels near the source of the crude oil discharge.  NIOSH and OSHA issued a guidance document recommending that workers in the close vicinity of crude oil burns have access to respirators and receive appropriate training and medical evaluation in case wind shifts or other unexpected conditions brought workers into the smoke plume.  Ships working offshore had real-time monitoring capability and procedures for protecting workers when

specific air contamination levels were reached.  There were no instances reported where workers were exposed in the plume.

NIOSH and OSHA also recommended respirators and appropriate training and medical evaluation for workers engaged in high-pressure washing of contaminated boats or boom and other materials on land.  This was based on concern that high-pressure washing could aerosolize the oil (create airborne particles that could be breathed in), increasing the risk to workers.  OSHA confirmed that BP implemented these recommendations.

For shoreline cleanup and vessels not involved in the above activities, a basic ensemble of PPE was required to protect against skin exposure, but respiratory protection was not recommended.  OSHA stressed from the outset that certain respirators, especially elastomeric air purifying respirators with disposable filter cartridges, could put a strain on the heart and lungs of some workers and therefore were not generally recommended for voluntary use.  Furthermore, respirator use could exacerbate the symptoms of heat stress.  For these workers, the health risks from using respirators in the extreme heat exceeded the low risk of chemical inhalation.

### 4.4    Training

OSHA considered training an immediate priority because of the large number of response and cleanup workers engaged in the response, and the wide variety of tasks these workers were conducting.  Early in the response, OSHA reached out to NIEHS to collaborate on training publications, materials, and oversight of training programs.  Within days of the rig explosion, and well before oil reached the shore, OSHA established requirements for training for all response workers.  OSHA also made it clear to BP that all response and cleanup workers would need to receive training, free of charge, and that the training had to be provided in a manner and language that workers understood.  This training included the specific requirements for PPE for the different job tasks.

As the training requirements were identified, a series of courses were created by BP, including a one-hour orientation, a four-hour shoreline course, and a four-hour marine cleanup course.  OSHA, along with the Coast Guard, NIOSH, and NIEHS, reviewed BP's proposed training program.  BP launched a multi-tiered training program on May 5 for workers involved in the oil spill response and cleanup.

As early as May 7, BP had issued a matrix identifying the basic training requirements for each job.  This matrix was posted on OSHA's website at http://www.osha.gov/oilspills/training.html.  Crew supervisors were required to have 40 hours of HAZWOPER training and supervised field experience.  A minimum of four hours of training was appropriate where sites were fully characterized, minimal chemical exposures were likely, and respirators were not required.

By May 21, about the time that tar balls first came ashore, approximately 10,000 workers along the shoreline and in boats had been trained.  Ultimately, in the course of the response, more than 130,000 workers along the Gulf Coast received training on how to work safely.

On June 2, OSHA instructed BP to increase the level of training provided to workers involved in oil skimming operations and operations that required contact with oil-soaked booms, due to the increased potential exposure to weathered oil.  This became an 8-hour course. OSHA and NIEHS provided oversight and direction to BP on the curriculum.  BP hired three contractors who provided all of the 4- and 8-hour training.  Limiting the number of contractors providing the training ensured that the agreed upon curricula would be used and the consistency of the training.

Worker training was provided in English, Spanish, and Vietnamese. OSHA continually monitored training sessions to ensure that they were delivered at a level and in a language appropriate for the workers being trained.

BP complied with OSHA's request to institute a credentialing program, whereby workers received certificates after completing training.  All workers engaged in response and cleanup activities had to have a training certification card showing that they had completed the BP-sponsored training program.  During OSHA's site visits, OSHA personnel interviewed workers about the training they had received and ensured that workers had training cards.  This ensured that site control was maintained and that only individuals with the proper training were present at worksites.

Supervisors and workers who faced increased risks of exposure were required to have 40-hour HAZWOPER training.  Instead of providing this 40-hour training in its Deepwater Horizon training program, BP and its contractors hired workers who had already received 40-hour training to fulfill these roles and responsibilities.  BP and its contractors were obligated to ensure that the workers' previous 40-hour training sufficed for the tasks that the workers conducted.  Otherwise, the employers would have to provide additional training.

OSHA received reports of trainers who were not part of the BP-sponsored training program conducting the "40-hour" training in less than one day and to very large groups of workers.  OSHA also received reports of trainers withholding training certificates from workers.  OSHA referred such reports to DOL's Inspector General and other authorities as possible consumer fraud.

---

### Training Requirements

Response actions conducted under the NCP must comply with the provisions of the HAZWOPER (29 CFR 1910.120) standard.  The minimum amount of training required under HAZWOPER depends on the worker's role and responsibilities during the response and cleanup.  Before they begin working, all workers must be trained on the tasks they will conduct, the hazards associated with the tasks, and the precautions needed to safely complete the tasks (e.g., use of engineering and work practice controls and PPE), and provide for actual hands-on training about PPE.  After the training is completed, the employer must provide adequate supervision to ensure that safety protocols are followed.

OSHA devoted considerable resources during the Deepwater Horizon response to determine exactly which response and cleanup workers needed training under HAZWOPER and which workers could receive shorter trainings, depending on the risks

---

associated with specific cleanup activities.

OSHA's Compliance Instruction, CPL 02-02-051, provides policy guidance on training requirements under HAZWOPER for workers involved in post-emergency response operations.  For job duties and responsibilities with a low magnitude of risk, fewer than 24 hours of training may be appropriate for these post-emergency cleanup workers.  For oil spill cleanup operations, where the site has been fully characterized, respirators are not required and minimal exposure is likely, a minimum of four hours of training would be appropriate.  Moreover, oil spills are unique in that many people who assist in the cleanup operations may not engage in this activity on a recurring basis.  Supervisors and workers involved in high-hazard operations need 40 hours of training and appropriate supervised field experience.

## 4.5    Guidance and Publications

To disseminate information to workers, OSHA developed safety and health guidance materials in both print and electronic formats.  Many of these materials were developed and distributed to the field within a matter of days. The printed materials included:

- A pocket-sized booklet, developed in partnership with NIEHS, containing information on heat injury prevention, health risks of weathered oil, PPE requirements, and general health and safety topics (such as fatigue). OSHA distributed 15,000 copies in English, Spanish, and Vietnamese.

- OSHA *Deepwater Horizon/Mississippi Canyon 252 Oil Spill* fact sheet, which explains basic health and safety information about common operations, hazards, training and protections for cleanup workers.

- Job-specific worker safety and health information sheets.

- *Severe Weather and the Deepwater Horizon Oil Spill: Health and Safety for Onshore Emergency Responders* fact sheet (in response to the threat of hurricanes hitting the region).

In conjunction with NIOSH, OSHA developed the *Interim Guidance for Protecting Deepwater Horizon Response Workers and Volunteers,* published in June 2010.  This publication addressed health effects, exposure assessment, medical evaluation and medical care, heat stress and fatigue prevention, traumatic incident stress prevention, and use of respiratory protection and other PPE.

Following reports about seven fishermen hospitalized in late May, OSHA and NIOSH instructed BP on the procedures for requesting a Health Hazard Evaluation (HHE) to have NIOSH fully investigate the cause of significant worker safety and health incidents. This led to nine NIOSH HHE reports covering a wide range of response and cleanup operations.

OSHA's webpage, *Keeping Workers Safe During Oil Spill Response and Cleanup Operations*, available at: http://www.osha.gov/oilspills/index.html, also served as a key

resource to make safety and health information readily accessible and transparent to workers and the public.  OSHA posted information about hazards, training, PPE requirements, and sampling data.  The website also provided links to data, including injury and illness reports, from other government agencies and BP's oil spill response website.  The OSHA webpage put health and safety information, in multiple languages, into the hands of workers.

OSHA initially used its own contractors to assist with translating guidance documents into the workers' primary languages, but later employed resources from the Department of State.

### 4.6     Community/Stakeholder Outreach

OSHA worked closely with other federal agencies to establish an extensive outreach program to engage a wide range of audiences that included local communities, nongovernmental organizations, state health departments, and union representatives.  Through this outreach program, OSHA helped address the safety and health concerns of community organizations.

Although OSHA activities typically focus on worksites, OSHA recognized the need for community involvement and dedicated staff to conduct outreach efforts throughout the region.  These individuals reached out to community organizations and other stakeholders, hearing concerns, answering questions, and communicating findings.  The outreach took a variety of forms, including numerous town hall meetings and face-to-face meetings.  In addition, daily conference calls provided worker safety updates to the governors of the Gulf coast states, mayors and local elected officials, and members of Congress.  Weekly calls established communication and dialogue with state health departments, environmental organizations, worker organizations, and academic experts.

OSHA also distributed more than 35,000 pamphlets and other educational materials to communities regarding the hazards facing response and cleanup workers.  In addition, OSHA encouraged the public to use OSHA's hotline (1-800-321-OSHA) and e-correspondence systems to have their questions or concerns quickly addressed.  The outreach program helped OSHA promote health and safety to hard-to-reach workers and to respond to concerns about worker health voiced by the public.

### 4.7     Injury and Illness Reporting

BP and government agencies engaged in unprecedented levels of activity to document injuries and illnesses during the Gulf oil spill response.  OSHA required BP to keep a comprehensive incident-wide log that recorded cases, including those that did not require first aid, those that did require first aid, and the traditional OSHA recordable cases (those that required more than first aid).  BP reported OSHA recordable and non-recordable illnesses and injuries during daily conference calls beginning the first week of May.  BP provided OSHA and NIOSH recordable and non-recordable injury and illness data, and OSHA posted this data on its website.

### 4.8    OSHA's Support of Department of Labor Objectives

The Department of Labor made it a priority to ensure that BP hired locally available workers. For example, DOL's Employment and Training Administration (ETA) worked with the One-Stop Career Centers in the affected area to help facilitate the hiring and training of displaced workers.  ETA published guidance and regularly communicated with state and local agencies.  OSHA added information on the One-Stop Career Centers to its communication materials and highlighted them during community meetings. OSHA ensured that these workers, many of whom had no prior experience or training for cleaning up oil spills, received the protective equipment and training they needed to safely perform response and cleanup operations.

### 4.9    Summary of Activities

The workers on the front lines of the Deepwater Horizon response faced significant hazards on the job, such as electrical hazards, motor vehicle hazards, extreme heat, fatigue, sharp objects, material handling, confined spaces, potential chemical exposures, loud noises, drowning, struck-by, slips, falls, and insect bites.  OSHA's effort included a comprehensive assessment of hazards and persistent oversight of BP to ensure that workers had the training and protection they needed.  OSHA's activities were guided by its strategic objectives for the response: to continually monitor BP's efforts to ensure protection of all workers from all hazards, to reach out to communities to ensure that workers knew their rights, and to ensure that all workers were adequately trained for their jobs in a manner and language they understood.  Through this oversight and monitoring, OSHA held BP accountable for worker health and safety, and OSHA and BP personnel were able to prevent, rapidly identify, and correct health and safety hazards in the numerous cleanup and response activities conducted over a wide geographic area.

# Appendix A. Background on the Incident, the National Response System, and OSHA's Roles/Authority/Jurisdiction

## A.1    The Deepwater Horizon Incident

On the night of April 20, 2010, the Deepwater Horizon oil rig, located 45 miles offshore southeast of Venice, LA, exploded and caught fire, resulting in the deaths of 11 workers. On the morning of April 22, 2010, the rig sank with approximately 700,000 gallons of diesel fuel onboard.  The initial Coast Guard search-and-rescue response quickly evolved into a coordinated, interagency oil spill response when the National Response Team (NRT), which includes the Department of Labor (DOL) and the Occupational Safety and Health Administration (OSHA), was activated on April 22, 2010.  Per the National Contingency Plan (NCP), the Coast Guard assumed the roles, duties, and responsibilities of the Federal On-Scene Coordinator (FOSC).  Within days of the rig sinking, officials discovered that the Macondo wellhead, which was located 5,000 feet below the ocean surface, was discharging crude oil into the Gulf of Mexico.

On Thursday, April 29, the Secretary of Homeland Security announced that the incident would be designated a Spill of National Significance (SONS), which led to the appointment of a National Incident Commander (Admiral Thad Allen) to coordinate strategic planning and response issues at the national level.  The Deepwater Horizon oil spill, the first oil spill incident in U.S. history to be declared a SONS, was unprecedented in both its scope and duration.  The continuous discharge of oil from the well from April 22 until July 15, 2010, did not produce a single large uniform spill, but rather thousands of smaller disconnected spills that repeatedly threatened hundreds of miles of coastline of five Gulf Coast States—Louisiana, Mississippi, Alabama, Florida, and Texas.  Working closely with interagency partners, including DOL and OSHA, at the local, regional, and national levels, the Coast Guard directed monumental response and cleanup efforts, including more than 47,000 workers and over 6,400 vessels, to remove and mitigate damages from the estimated 4.9 million barrels of oil discharged into the Gulf.

## A.2    Overview of the National Response System

**SUMMARY:** The **National Contingency Plan** is a regulation establishing an organizational structure and procedures for responding to oil spills in U.S. waters. The organizational structure and set of procedures is known as the **National Response System.**

### A.2.1   The National Contingency Plan

The National Oil and Hazardous Substances Pollution Contingency Plan, commonly called the National Contingency Plan (NCP) describes how the federal government responds to discharges of oil and the release of chemicals into the navigable waters or environment of the United States.  The NCP, contained in regulations at 40 CFR 300, provides the organizational structure and procedures for preparing for and responding to oil spills.

### A.2.2   The National Response System

The NCP established the National Response System (NRS).  The NRS provides for a coordinated response by all levels of government to a real or potential oil or hazardous substances incident. It functions through a network of government agencies and private sector organizations.  This federal coordination ensures that all stakeholders with jurisdiction over an incident have a place at the table and work together effectively. Under the NRS, the U.S. Environmental Protection Agency (EPA) is the lead agency for inland areas, and the U.S. Coast Guard is the lead agency for coastal areas and major navigable waterways.

Key components of the NRS include the **NRT,** the **FOSC, Regional Response Teams,** and the **responsible party,** as described below.

The **NRT** is made up of 16 federal departments and agencies, including DOL/OSHA. The NRT is responsible for coordinating nationwide interagency planning, policy, and response for oil and hazardous materials releases in support of the FOSC.

> ➢ *The Coast Guard activated the NRT, including DOL/OSHA, on April 22, 2010.*

## National Response Team Members

U.S. Environmental Protection Agency (National Response Team Chair)

U.S. Coast Guard (National Response Team Vice Chair)

U.S. Department of Agriculture

U.S. Department of Labor/OSHA

U.S. Department of Commerce/National Oceanic and Atmospheric Administration

U.S. Department of State

U.S. Department of Defense

U.S. Department of Homeland Security

U.S. Department of Energy

U.S. Federal Emergency Management Agency

U.S. Department of Health and Human Services

U.S. General Services Administration

U.S. Department of the Interior

U.S. Nuclear Regulatory Commission

U.S. Department of Justice

U.S. Department of Transportation

Other Federal agencies with appropriate jurisdiction or expertise, along with private sector responders, may also support response efforts.

The **FOSC** is the lead federal official with final decision-making authority in the spill response.  The Coast Guard provides an On-Scene Coordinator for oil spills in coastal waters, while EPA provides the On-Scene Coordinator for spills on land.

> ➢ *The Coast Guard designated Rear Admiral Mary Landry, Commander of the Eighth Coast Guard District, as the FOSC for the Deepwater Horizon oil spill on April 23, 2010.*

**Regional Response Teams** consist of regional representatives of each agency in the National Response team, state governments, and local governments.  There are 13 Regional Response Teams, one for each of the 10 federal regions plus one each for Alaska, the Caribbean, and Oceana.  The Regional Response Team does not deploy as a team to incident sites. Instead, its members reach back to their organizations for needed resources, and individual members may deploy to the site as resources from their agencies.  The Regional Response Team also oversees and reviews plans within a region.

> ➢ *Two Regional Response Teams were active in the BP Deepwater Horizon oil spill response, corresponding to the two regions involved:*
>
> o *Region 4: Mississippi, Alabama, Florida, Georgia, Tennessee, North Carolina, South Carolina, and Kentucky*
>
> o *Region 6: Arkansas, Louisiana, New Mexico, Oklahoma, and Texas*

The **responsible party** is in charge of preparing for, responding to, and paying for cleanup and damages from its pollution incidents.  The responsible party must follow procedures in its facility or vessel response plan, which provides for resources to respond to a "worst case" discharge.

> ➢ *BP was designated as  the "responsible party" for the Deepwater Horizon incident.*

---

### The National Contingency Plan vs. the Stafford Act

The role of the federal government, differs under the National Contingency Plan and the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act").  When a governor determines that state and local resources are insufficient to handle an emergency response (for example, during Hurricane Katrina), he or she may ask the president to contribute federal aid under the Stafford Act by declaring an emergency or major disaster.  The response is run by the state, supplemented with federal resources and financing.  In contrast, under the National Contingency Plan, the federal government directs the response to oil spills through the FOSC and National Incident Command, and the state participates through the UC structure.  The responsible party, rather than the taxpayer, pays for the response under the NCP.

---

### A.3     Overview of the Incident/Unified Command System

**SUMMARY:** The NRT encourages the use of an **Incident Command System (ICS)** to manage oil spill response operations.  The ICS establishes an on-scene organization within which different agencies operate.  The ICS organization includes **incident command posts** and **unified commands** at the local level.  For large spills like the BP Deepwater Horizon spill involving multiple jurisdictions, a **Unified Area Command** brings together the various agencies, the responsible party, and non-government responders.  The Unified Area Command is responsible for overall management of the incident.  In addition, the Commandant of the Coast Guard can designate a **National Incident Commander** and establish a **National Incident Command** if a SONS is declared in the coastal zone.

#### A.3.1   The Incident Command System

The federal response to the BP Deepwater Horizon oil spill used an Incident Command System (ICS).  An ICS establishes an integrated organizational structure appropriate for the complexity and demands of an incident, without being hindered by jurisdictional boundaries.  An ICS allows for inclusion of federal, state, local, and responsible party representatives.  An ICS is organized around five major management activities: command, operations, planning, logistics, and finance/administration.

The U.S. Forest Service first developed the ICS in the 1970s, in the aftermath of devastating, fast-moving wildfires in California, where communication and management problems hindered the response.  After the Exxon Valdez oil spill in 1989, the system was adapted to oil spill response operations.  The Coast Guard and EPA use ICS to achieve the coordination needed to carry out an efficient, effective oil spill response.

#### A.3.2   Local Incident Command Posts/Unified Commands

Under an ICS, local incident command posts are established for front-line responders.  Incident command posts are usually located at or in the immediate vicinity of the incident site and are the focus for the direct, on-scene tactical operations.  When a response requires that multiple agencies work together, the leadership of an ICS organization may be expanded into a unified command (Figure 1).  Agencies work together through their designated members of the unified command to establish a common set of objectives and strategies and a single Incident Action Plan.

> ➢ *The Coast Guard, federal and state agencies, and BP set up local ICPs/unified commands in Houma, LA; Mobile, AL; St. Petersburg, FL; and Houston, TX (see Figure 1).*

#### A.3.3   Unified Area Command

A Unified Area Command is an organization set up to oversee the management of large incidents that cross jurisdictional boundaries and involve multiple agencies.  It supervises the work of the Regional Response Teams and the local incident command posts/unified commands.

> *On April 23, when oil was first found to be leaking from the well riser and drill pipe, the Coast Guard established the Unified Area Command in Robert, LA. The Unified Area Command included senior representatives from the Coast Guard, the responsible party (BP), impacted states, and federal agencies involved in the oil spill response, including DOL/OSHA.*



**Figure 1. Deepwater Horizon Unified Command System**

### A.3.4   National Incident Commander

If an oil spill is classified as a SONS, the Coast Guard designates a National Incident Commander to take on the role of the On-Scene Coordinator in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level. The National Contingency Plan defines a SONS as "a spill which due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and cleanup the discharge."

> *On April 29, 2010, the Coast Guard designated the disaster a Spill of National Significance, and named Admiral Thad Allen the National Incident Commander. This was the first spill ever designated a Spill of National Significance.*

### A.3.5   National Incident Command

To support the National Incident Commander and achieve strategic unity of effort for the Deepwater Horizon oil spill response, on May 7 through September 30, 2010, the Coast Guard established a National Incident Command (NIC) with more than 150 Coast Guard and interagency staff located at Coast Guard Headquarters in Washington, DC (Figure 1). The NIC included an Interagency Solutions Group, with all of the NRT agencies, including DOL/OSHA, represented by senior staff. The NIC Interagency Solutions Group staff facilitated close communications, coordination, and collaboration, as well as the resolution of interagency response issues, including those related to protecting the safety and health of response and cleanup workers.

## A.4    OSHA's Roles/Authorities/Jurisdiction

### A.4.1  Occupational Safety and Health Act

On December 29, 1970, the Occupational Safety and Health Act of 1970 (OSH Act) was promulgated to assure safe and healthful working conditions for working men and women.  The OSH Act created the Occupational Safety and Health Administration, whose mission includes assuring the safety and health of America's workers by setting and enforcing standards; providing training, outreach, and education; establishing partnerships; and encouraging continual process improvement in workplace safety and health.

Under the OSH Act, employers are responsible for providing a safe and healthful workplace for their employees.  The OSH Act covers private sector employers and their employees in the 50 states and certain territories and jurisdictions under federal authority.  Although OSHA provisions cover the private sector only, 22 states and jurisdictions have their own OSHA-approved occupational safety and health programs, which cover private sector employees and state and local government workers, and 5 which cover public employees only.  (The Gulf Coast States affected by the Deepwater Horizon oil spill—Louisiana, Mississippi, Alabama, Florida, and Texas—do not have OSHA-approved State Plans and therefore fall under federal OSHA standards and requirements.)  The OSH Act also requires federal agencies to comply with standards consistent with those for private sector employers.

#### A.4.1.1    OSHA Standards

In general, OSHA standards require that employers:

- Maintain conditions or adopt practices reasonably necessary and appropriate to protect workers.

- Be familiar with and comply with standards applicable to their establishments.

- Ensure that employees have and use personal protective equipment when required to protect their safety and health.

OSHA issues standards for a wide variety of workplace hazards, including toxic substances, harmful physical agents, electrical hazards, fall hazards, fire and explosion hazards, dangerous atmospheres, confined spaces, hazardous waste, machine hazards, and infectious diseases.  In addition, where there are no specific OSHA standards, employers must comply with the OSH Act's "general duty clause."  The general duty clause, section 5(a)(1) of the OSH Act, requires that each employer "furnish…a place of employment which [is] free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."

#### *Hazardous Waste Operations and Emergency Response*

Because of the seriousness of the safety and health hazards related to hazardous waste operations and emergency response to hazardous substances, OSHA issued its Hazardous Waste Operations and Emergency Response (HAZWOPER) standard, Title 29 Code of

Federal Regulations (CFR) Parts 1910.120, to protect employees in this environment and to help them handle hazardous substances safely and effectively.  In addition to hazardous waste site cleanup operations, the HAZWOPER standard covers employers and employees conducting emergency response and cleanup operations for hazardous substance releases, which includes oil spills.

Under the HAZWOPER standard, employers must develop and implement comprehensive safety and health programs with the following components:

- Organizational structure

- Comprehensive workplan

- Site-specific health and safety plan

- Emergency response plan

- Safety and health training program

- Medical surveillance program

- Standard operating procedures

- Site characterization and analysis

- Exposure monitoring

- Engineering controls

- Safe work practices

- Personal protective equipment (PPE) if needed

- Handling/labeling of drums and containers

- Decontamination procedures

### *Personal Protective Equipment*

OSHA requires that employers protect their employees from workplace hazards that can cause injury.  Controlling a hazard at its source is the best way to protect employees.  When engineering, work practice, and administrative controls are not feasible or do not provide sufficient protection, employers must provide PPE to their employees and ensure its proper use and care.  PPE is equipment worn to minimize exposure to a variety of hazards.  Examples include gloves, foot and eye protection, protective hearing devices (e.g., earplugs, muffs), hard hats, respirators, and protective clothing/suits.  Specific requirements for PPE are explained in many different OSHA standards published in 29 CFR, as shown below.

# OSHA Requirements for PPE

- 29 CFR 1910.120 (HAZWOPER regulations have PPE requirements)

- 29 CFR 1910.132 (general requirements)

- 29 CFR 1910.133 (eye and face protection)

- 29 CFR 1910.134 (respiratory protection)

- 29 CFR 1910.135 (head protection)

- 29 CFR 1910.136 (foot protection)

- 29 CFR 1910.137 (electrical protective equipment)

- 29 CFR 1910.138 (hand protection)

- 29 CFR 1926 (construction industry regulations have PPE requirements)

- 29 CFR 1915 (maritime industry regulations have PPE requirements)

### *Respiratory Protection*

When toxic substances are present in the workplace and engineering and work practice controls are inadequate to reduce or eliminate them, workers may need to wear respirators to reduce exposures.  Respirators have limitations and are not a substitute for effective engineering and work practice controls.  Respirator use may increase heat stress and strain a worker's heart and lungs.  When respirators are required to protect workers' health, specific procedures are necessary to ensure the equipment's effectiveness.  OSHA's respiratory protection standard (29 CFR 1910.134) requires employers to establish and maintain an effective respiratory protection program when employees must wear respirators to protect against workplace hazards.  The standard contains requirements for program administration; worksite-specific procedures; respirator selection; employee training; fit testing; medical evaluation; and respirator use, cleaning, maintenance, and repair.  Employers must fully train employees in all aspects of the respiratory protection program.

### A.4.1.2    Jurisdictional Issues

Section 4(a) of the OSH Act limits the application of the Act to work performed in a U.S. state or territory or in facilities covered under the Outer Continental Shelf (OCS) Lands Act.  A workplace in a state or territory can be on land, inland waters, or on waters within the state territorial limit, which is 3 miles for most states (except Texas and the Gulf coast of Florida, where the state territorial limit is 9 miles).  The OCS Lands Act applies only to structures or facilities fixed to the ocean floor, not to vessels travelling over the OCS.  Per section 4(b)(1) of the OSH Act, OSHA is preempted from regulating any working

condition (e.g., occupational risk/hazard) addressed by requirements of another federal agency.  Although the OCS Lands Act applies to certain working conditions on OCS Lands, it does not apply to working conditions with respect to which the Coast Guard or other federal agencies, including the Bureau of Ocean Energy Management, Regulation and Enforcement (formerly called the Minerals Management Service), exercise statutory authority to prescribe or enforce standards affecting occupational safety and health. Hence, for oil rigs located on the OCS, OSHA authority and regulations apply only for safety and health hazards not covered by other agency regulations.

> ***Memorandum of Understanding Between the Coast Guard and OSHA Concerning Occupational Safety and Health on the Outer Continental Shelf***

On December 19, 1979, the Coast Guard and OSHA signed a Memorandum of Understanding (MOU) to establish procedures to increase consultation and coordination between the agencies with respect to matters affecting the occupational safety and health of personnel working on the OCS of the United States.  The MOU specifies that OSHA will cooperate with the Coast Guard to maximize the safety and health protection of employees, avoid duplication of effort, and avoid undue burdens on the maritime industry.

### A.4.2  Worker Safety and Health in the National Contingency Plan

The National Response System, including the NRT and the National Contingency Plan (NCP), fully incorporates and addresses worker safety and health issues, including planning for, responding to, and recovery from oil and hazardous substances that fall under the NCP.

The Response Operations section of the NCP (40 CFR 300.135, paragraph 1) states that the FOSC is responsible for addressing worker health and safety concerns at a response scene, in accordance with part 300.150.  In addition, 40 CFR 300.135(h) specifically states that the FOSC may call on OSHA for assistance on worker health and safety issues. Per 40 CFR 300.135(a), the FOSC is ultimately responsible for directing response efforts throughout the entire response area.

Section 40 CFR 300.150 of the NCP incorporates the OSHA HAZWOPER standard and addresses worker safety and health requirements, including those of the responsible party, as follows:

> (a) Response actions under the NCP will comply with the provisions for response action worker safety and health in 29 CFR 1910.120 (OSHA HAZWOPER regulations). The National Response System meets the requirements of 29 CFR 1910.120 concerning use of an incident command system.

> (b) In a response action taken by a responsible party, the responsible party must assure that an occupational safety and health program consistent with 29 CFR 1910.120 is made available for the protection of workers at the response site.

Under the NCP (40 CFR 300.170), federal departments/agencies, including DOL/OSHA, may be called upon by the FOSC during response planning and implementation (e.g., response operations) to provide assistance in their particular areas of expertise, as further described in 40 CFR 300.175, consistent with the agencies' capabilities and authorities. The NCP—40 CFR 300.175(b)(11)—specifically addresses OSHA's duties and responsibilities, which include providing technical assistance and support to the FOSC as well as fulfilling OSHA's normal duties, roles, and responsibilities under the OSH Act. **In no way does the NCP limit OSHA's existing statutory enforcement authority,** as shown by the following NCP citation from 40 CFR 300.175(b)(11)(ii):

> On request, OSHA will provide advice and consultation to EPA and other NRT/RRT agencies as well as to the OSC/RPM regarding hazards to persons engaged in response activities. OSHA may also take any other action necessary to assure that employees are properly protected at such response activities.

### A.4.3   OSHA's Role in the Deepwater Horizon Oil Spill Response

As a member of the NRT, OSHA was activated on April 22, 2010, as part of the multi-agency, coordinated federal response to the Deepwater Horizon oil spill.  As described in Section A.4.2 of this Appendix, OSHA was requested to provide technical assistance and support to the FOSC (the Coast Guard), working within the UC, to protect the safety and health of response and cleanup workers.  OSHA's technical assistance role during a SONS is guided by comprehensive national policies contained in the NCP, OSHA Directives, and other legal authorities.

Per the Coast Guard's request, OSHA's technical assistance and support role covered all Deepwater Horizon response and cleanup workers throughout the incident's wide geographical area.  This did not limit or constrain OSHA in executing its regulatory and enforcement authorities under the OSH Act, as explained in Section A.4.2.  While providing technical assistance and support to the FOSC for worker safety and health issues and concerns, OSHA provided aggressive oversight of the responsible party (BP) throughout the incident to ensure that BP was providing a safe and healthful workplace for their employees—the response and cleanup workers they hired—as required by the OSH Act.

#### A.4.3.1    Technical Assistance/Support Roles and Enforcement

Under the OSH Act, OSHA's primary duty is to ensure that employers are taking necessary actions to protect employees from work-related hazards on the job. Enforcement of standards is an important means provided by the OSH Act to achieve this end.  However, as described below, this enforcement role may not always be the most effective means of ensuring that employers protect workers during an incident of national significance, when OSHA is requested to provide technical assistance and support to the FOSC and the UC.

During the Deepwater Horizon response, workers benefited from OSHA's technical assistance role within the UC. OSHA actively monitored BP's development of site safety and health plans, provision of training, and voluntary abatement of hazards, including

where no OSHA standard existed (e.g., heat stress).  This vigorous intervention was possible, in part, because in its technical assistance role, OSHA had unlimited access to the workers and employers involved in the cleanup activities.  By working within the UC in a technical assistance role, hazards can be quickly abated.  OSHA's enforcement role can lead to litigation and potentially delay abatement of hazards.

Furthermore, when operating in the technical assistance role, OSHA can encourage employers to protect workers to a higher degree than the legally enforceable standards.  For example, In the Deepwater Horizon response, OSHA worked with the UC to use the most protective occupational exposure limits to monitor and protect workers from chemical exposures rather than solely enforcing the OSHA Permissible Exposure Limits.

### A.4.3.2    Memorandum of Understanding Between OSHA and the Federal On-Scene Coordinator Concerning Occupational Safety and Health Issues

On June 6, 2010, the Assistant Secretary of Labor for OSHA and the FOSC (Coast Guard) developed and signed an MOU to establish procedures for consultation and coordination between the FOSC and OSHA on matters affecting the safety and health of workers involved in the Deepwater Horizon oil spill.

The MOU reinforces the authorities, duties, and responsibilities of OSHA under the NCP and the OSH Act. It also provides guidelines for information-sharing between the agencies, including procedures for referrals and OSHA enforcement actions, if needed.

See Appendix C for a copy of the MOU.

## Appendix B. Deepwater Horizon Oil Spill Response—OSHA Chronology Through June 25

### Week of April 19–25

**April 20**—Fire and explosion on Deepwater Horizon rig resulting in 11 worker deaths. The site of the release is approximately 50 miles off shore of Louisiana, well outside OSHA's jurisdiction. OSHA, however, initiates monitoring of the situation, anticipating that the oil will likely approach the shoreline and involve cleanup workers on or just off shore who will fall under OSHA's jurisdiction

**April 22**—OSHA's National Office receives a notice activating the National Response Team (NRT). The Secretary of Labor's Office is briefed about the incident by OSHA in preparation of a White House briefing.

**April 23**—White House Situation Room briefing attended by OSHA staff.

**April 24**—NRT begins daily conference calls, initially led by DHS Secretary Napolitano, to provide situational updates to the NRT member agencies. OSHA participates in these calls throughout the oil spill response.

### Week of April 26–May 2

OSHA's NRT Regional Response Teams in Regions 4 (Atlanta) and 6 (Dallas) activated and representatives are deployed to the Unified Area Command Center in Robert, LA, and the Unified Incident Command Centers in Houma, LA, and Mobile, AL. Discussions begin on level of protective training required for oil spill cleanup workers.

OSHA participates in daily conference calls with BP officials in Unified Incident Command Centers in Houma, LA, and Mobile, AL, and includes OSHA's National and Regional Emergency Management personnel.

**April 28**—OSHA staff first sent to Venice, LA, to monitor worker protections at staging operation (Venice is the first of the staging areas that OSHA monitored).

**April 30**—OSHA personnel staff the begin liaison with Unified Area Command in Robert, LA. OSHA personnel first sent to Pascagoula and Biloxi, MS, staging areas and shoreline of Alabama to monitor worker protection. OSHA staff continually return to review working conditions and to monitor training programs.

**April 30**—OSHA begins review of BP's proposed training program for those involved in the cleanup of contaminated materials.

**May 1**—OSHA provides staff for Mobile Unified Command to monitor safety and health protection for workers.

**May 1**—OSHA Assistant Secretary David Michaels invites representatives of NIOSH and the National Institute of Environmental Health Sciences (NIEHS) to collaborate with OSHA on cleanup worker protection efforts.

**May 2**—Initial Safety and Health Plan reviewed and approved.

**May 2**—OSHA staff sent to Pensacola, FL, to assess situation.

**Week of May 3–May 9**

**May 3**—Dr. Michaels and OSHA staff, together with NIOSH, NIEHS, and EPA, travel to Louisiana to meet with Coast Guard Rear Admiral Landry and representatives of BP to discuss preparations for protecting workers as the oil moved towards the shore. These meetings are the beginning of a close collaboration between these four public health agencies that continue throughout the cleanup effort.  At the meetings, OSHA discusses again with BP that cleanup workers will need to be trained according to OSHA requirements, that local people will have to be hired for work in the cleanup efforts, and that training will have to be done in the language the workers understand.

OSHA launches public web site: "Keeping Workers Safe During Oil Spill Response and Cleanup Operations."

From May 3 onward, OSHA participates in daily conference calls with BP officials in Unified Incident Command Centers in Houma, LA, and Mobile, AL (and includes OSHA's National and Regional Emergency Management personnel).

**May 4**—OSHA staff first sent to Panama City staging area to monitor safety and health protections for workers. OSHA staff continually return to review working conditions.

**May 5**—OSHA approves BP's 4-hour training program with recommendations for improvement.

**May 5**—BP begins its 4-hour (Module 3) training program. All workers hired by BP and its contractors to clean up spill contaminated shoreline and vessel operations are required to complete this training prior to starting work.  Module 3 includes safety and health management, hazards and controls, including PPE requirements. (Module 1 training is the BP Health and Safety Basic Orientation [45 minutes] and Module 2 is Contractor Expectations [1.5 hours].  Both Module 1 and Module 2 are for workers not involved in cleaning up oil contaminated debris).  Emphasis is placed on ensuring that workers are trained in a language and vocabulary they understand.  OSHA, along with NIEHS, continues to monitor this program providing daily oversight on the BP training.  (Note that all work crews on shore and on vessels are supervised by individuals with 40-hour HAZWOPER training.)

**May 6**—OSHA's Health Response Team (from Salt Lake City) arrives in Louisiana to provide industrial hygiene support to OSHA response onsite personnel.

**May 7**—OSHA deploys senior staff to National Incident Command Interagency Solutions Group at the U.S. Coast Guard headquarters.  OSHA has continued agency representation at this critical post throughout the crisis.

**May 8**—OSHA personnel in Houma review BP's Offshore Sampling Plan.

HEAT: By the first week in May, OSHA is requiring BP to institute a heat stress mitigation plan.  From this point to the end of OSHA's involvement in the oil spill

response, heat stress remained one of OSHA's primary health concerns.  OSHA raised these concerns with BP and required that BP implement protective measures including tents, water, rest breaks, and sunburn protection.

**By the end of this week, OSHA had 20 staff in the field assigned solely to the Gulf response.  During the next three months, OSHA would have between 20 and 40 staff assigned every day. OSHA was on the boats and in the field ensuring that BP and its contractors were protecting workers from health and safety hazards.**

## Week of May 10–May 16

OSHA personnel in Houma review BP's direct reading sampling results for offshore vessels and continue this throughout the spill.

**May 11—**OSHA and NIEHS complete a joint pocket booklet that details health and safety concerns and protections for oil spill response workers.  The booklet contains information on heat injury prevention, health risks of weathered oil, PPE requirements and general health and safety topics (e.g., fatigue).  The booklet is sent for translation into Spanish and Vietnamese. 15,000 pocket-sized booklets are printed and distributed in all three languages.

**May 13—**Dr. Michaels meets with Dr. David C. Nagle, Executive Vice President of BP America, Inc., to discuss BP's worker safety and health efforts.  Deepwater Horizon/Mississippi Canyon 252 Oil Spill Fact Sheet finalized.

**May 13—**BP reports on daily call 952 personnel trained in Module 3.

**May 14—**OSHA publishes the OSHA Deepwater Horizon/Mississippi Canyon 252 Oil Spill Fact Sheet.  The factsheet addresses hazards during shoreline and vessel operations, training, PPE requirements and employer responsibilities.  The factsheet is subsequently translated into Spanish and Vietnamese for distribution.  Copies are distributed at all staging areas.

**May 14—**BP reports on daily call 1370 personnel trained in Module 3.

## Week of May 17–23

OSHA participates in weekly calls to stakeholders on health and safety concerns in the Gulf. The call is with 200 NGO's coordinated by CEQ.

**May 20—**The Incident Command Post in Houma reports shoreline impact at Marsh Island. Tar balls also sighted on Long Beach, MS.

**May 21—**Dr. Michaels telephones Mr. David Nagle to make him aware of numerous deficiencies in BP's oil spill response operations related to worker safety and health.  Dr. Michaels indicates his resolve to take all necessary actions to ensure that BP meets its obligation to protect workers.  OSHA is especially concerned that BP is not correcting identified problems.

**May 21—**BP reports in a daily call that 10,000 personnel have been trained in Module 3.

**Week of May 24–30**

OSHA begins weekly call solely focused on worker health and safety issues with stakeholders.

**May 24**—OSHA staff begin taking exposure samples off the coast of Louisiana, initiating the agency's own independent worker exposure sampling plan.

**May 24**—Dr. Michaels speaks with Coast Guard leadership to make them aware of the level of concern OSHA has regarding BP's commitment to protecting its workers.

**May 25**—Dr. Michaels sends a memorandum to Admiral Thad Allen, the Coast Guard's National Incident Commander, re-emphasizing OSHA's concerns with BP's systems in place for worker protection.

**May 26**—OSHA launches investigation into the illnesses of seven fishermen sent to the hospital.

**May 27**—In response to the reports of the seven fishermen who were sent to the hospital, OSHA and NIOSH use the daily conference call to inform BP of the procedures to request a Health Hazard Evaluation (HHE) to have NIOSH fully investigate the cause of these illnesses.  Later that day, BP requests that NIOSH conduct an HHE into all significant worker safety incidents during the oil spill cleanup to date. OSHA staff brief NIOSH on the situation.  NIOSH arrives on June 2 to begin the investigation of the incident involving the seven fisherman and other incidents.

**May 28**—Unified sampling strategy posted on OSHA's public website.

**Week of May 31–June 6**

OSHA begins weekly set call with state health officials (prior to this, calls are held at various times).

**May 29**—Deputy Secretary Harris holds a phone conversation with ADM Allen regarding worker safety/health issues.  Both agree that an MOU/MOA between OSHA and the Coast Guard is warranted.

**May 31**—OSHA's Deputy Assistant Secretary, Jordan Barab, goes to Louisiana to review OSHA's response efforts, speak with oil spill cleanup workers, and assist in the coordination with Coast Guard.  Mr. Barab is part of a delegation that includes NIOSH Director John Howard, U.S. Surgeon General Regina Benjamin, Health and Human Services Assistant Secretary for Preparedness and Response, Nicole Lurie, NIEHS Worker Education and Training Program Director Joseph Hughes, and OSHA staff. OSHA is on the front lines of ensuring that BP and its contractors protect workers from hazards.  Barab inspects beach cleanup operations in Port Fourchon and Vessel of Opportunity operations in Venice.  He interviews workers in both locations about health and safety training and working conditions.

**June 2**—OSHA instructs BP to increase the level of training provided to workers involved with the marine cleanup who are involved in oil skimming operations as well as operations that require contact with oil-soaked boom.  These workers are having greater

contact with the weathered oil. OSHA requests that NIEHS participate in curriculum development.  OSHA and NIEHS provide oversight and direction to BP on the curriculum. NIEHS will conduct the training.

**June 7—**OSHA posts initial data from independent worker exposure monitoring on this website.  As new data are available, they are added to the site. The data are accompanied by a narrative and sampling protocol.http://www.osha.gov/oilspills/oil_directreading_bysite.html

**June 9—**OSHA personnel sent to staff Robert, LA, Unified Area Command.

**June 9—**Secretary of Labor Hilda L. Solis and Dr. Michaels travel to Louisiana to inspect efforts to ensure the health, safety, and well-being of workers affected by the BP oil spill.  They meet with beach cleanup workers in Port Fourchon and discuss worker safety with OSHA staff in Houma, LA.  The Secretary and OSHA staff hold meetings with community organizations.  This outreach, begun in May, continues throughout the cleanup.

**June 25—**NIOSH and OSHA issue recommendations that workers in the close vicinity of crude oil burns have access to respirators and receive appropriate training and medical evaluation in case wind shifts or other unexpected problems bring workers into the smoke plume.  No cases of oil burn workers being caught in the smoke plume were ever reported.  Throughout the response, OSHA identified no exposures that exceeded any of the most recent, lowest, and most protective exposure limits set by organizations such as NIOSH, ACGIH, and AIHA for hazardous chemicals.

## Appendix C. Memorandum of Understanding (MOU) Between OSHA and the Federal On-Scene Coordinator (FOSC) Concerning Occupational Safety and Health Issues

MEMORANDUM OF UNDERSTANDING

BETWEEN THE

OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION,

DEPARTMENT OF LABOR

AND THE

FEDERAL ON SCENE COORDINATOR,

DEPARTMENT OF HOMELAND SECURITY

CONCERNING OCCUPATIONAL SAFETY AND HEALTH ISSUES RELATED TO
THE DEEPWATER HORIZON OIL SPILL RESPONSE

I.  PURPOSE AND BACKGROUND – The purpose of this Memorandum of Understanding is to establish procedures for consultation and coordination between the Federal On Scene Coordinator (FOSC) and Occupational Safety and Health Administration (OSHA) with respect to matters affecting the occupational safety and health of workers involved in the response to the Deepwater Horizon oil spill (the "oil spill").  OSHA and the FOSC recognize the importance of close cooperation and coordination among all agencies with responsibilities for response activities.

OSHA and U.S. Coast Guard (USCG) have a long history of working cooperatively to protect workers.  As set forth in two longstanding MOUs, the agencies cooperate in determining coverage, scheduling inspections, and investigating accidents, among other issues.

This cooperation between OSHA and USCG has continued since the beginning of this oil spill.  For example, OSHA, working through the Unified Area Command, has been disseminating information about necessary safety and health precautions to BP.  BP is the Responsible Party under the National Contingency Plan (40 C.F.R. Part 300) (the "NCP") and the Oil Pollution Act of 1990 and is liable for all response costs and damages from the oil spill (*See e.g.* 33 U.S.C. 2702).   OSHA has also provided this information to BP's contractors that employ the workers involved in oil spill response.  OSHA has also been assuring that workers receive appropriate training and that they use proper personal protective equipment, and is taking other actions to assure overall worker heath and safety.

II.  AUTHORITY – On April 22, 2010, the National Response Team was activated pursuant to the NCP and a Federal On Scene Coordinator was appointed.  On or about April 29 the oil spill was declared a Spill of National Significance pursuant to the NCP and Admiral Thad Allen was appointed as the National Incident Commander.  Under the NCP, all response actions must comply with OSHA's Hazardous Waste and Emergency Response Standard, 29 C.F.R. 1910.120, as well as other relevant OSHA requirements. (*See* NCP, 40 C.F.R. 300.150 – Worker Health and Safety).

The responsibilities of the Federal On Scene Coordinator include, without limitation, the authority to direct all response efforts and coordinate all other efforts at the scene of a discharge or release.  (*See e.g.,* 40 C.F.R. 300.120; 300.135).  The National Incident Commander may assume the role of the Federal On Scene Coordinator in communicating with affected parties and the public, and coordinating federal, state, local and international resources at the national level.  (*See* 40 C.F.R. 300.323)

The duties and responsibilities of Federal agencies are generally set forth in the NCP at 40 C.F.R. 300.175.  The Department of Labor, through OSHA and the states operating plans approved under section 18 of the OSH Act, 29 U.S.C. 667, has authority to conduct safety and health inspections to assure that employees are being protected and to determine if the site is in compliance with safety and health standards and regulations promulgated under the OSH Act and its general duty clause.  (*See* 40 C.F.R. 300.175(b)(11)).  In addition, OSHA may take any other action necessary to assure that employees are properly protected, and may provide advice and consultation to the FOSC and other agencies in the NRT.  *Id.*  The NCP does not limit OSHA's existing statutory enforcement authority.  (*See* 40 C.F.R. 300.150(e)).

III.  INFORMATION SHARING – The FOSC and OSHA will share relevant information with each other, while ensuring that the exchange of such information complies with applicable law.

A.  Referrals – If either the FOSC or OSHA learns of potential hazards or other conditions of concern within the other agency's responsibility or authority, it shall notify the other agency promptly.  This includes information it learns of directly, in its own response activities, as well as information received from other parties, including workers, local government officials, or anyone else.

B.  Enforcement – OSHA will notify the FOSC when it intends to take any enforcement action against BP, BP's contractors, or any other employer engaged in response activities.  This may include action in response to imminent dangers, other serious hazards, fatalities or catastrophes, serious injuries or illnesses, or other situations where OSHA determines enforcement is necessary to protect worker safety or health.

C.  Press and Public Statements – The FOSC and OSHA will notify each other about planned press releases, press conferences, and other public statements related to the occupational safety and health of workers involved in oil spill response.

D.  Other Information – The FOSC and OSHA will also share any other information relevant to the subject of this MOU.

E.  The Assistant Secretary or his designee and the FOSC or his designee will be responsible for the communications described in this section.

## IV.  EFFECTIVE DATE

This Memorandum is effective upon signature by the parties. It may be amended at any time by mutual written agreement of the agencies and may be terminated by either agency upon thirty days written notice.

## V.  EFFECT OF AGREEMENT

This agreement is an internal Government agreement and is not intended to confer any right upon any private person.

This agreement does not itself authorize the expenditure or reimbursement of any funds. Nothing in this agreement obligates the parties to expend appropriations or enter into any contract or other obligations.

Nothing in this Memorandum shall be deemed to alter, amend, or affect in any way the statutory or regulatory authority of the Federal On Scene Coordinator, the National Incident Commander (or any delegation of authority to these officers), the U.S. Coast Guard or OSHA.

This agreement will be executed in full compliance with the Privacy Act of 1974


[signature on file]

_____                    06/08/2010
DAVID MICHAELS                                          Date

Assistant Secretary for Occupational

  Safety and Health

U.S. Department of Labor




[signature on file]

_____                    06/06/2010
JAMES WATSON, RADM, USCG                                Date

Federal On Scene Coordinator

U.S. Department of Homeland Security


33

# Appendix D. Acronyms

## D.1    Agencies and Actors

DHS                    U.S. Department of Homeland Security

ETA                    Employment and Training Administration

EPA                    U.S. Environmental Protection Agency

HHS                    U.S. Department of Health and Human Services

NIEHS                  National Institute of Environmental Health Sciences, National Institutes of Health, U.S. Department of Health and Human Services

NIOSH                  National Institute for Occupational Safety and Health, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services

NOAA                   National Oceanic and Atmospheric Administration, U.S. Department of Commerce

OSHA                   Occupational Safety and Health Administration, U.S. Department of Labor

## D.2    Deepwater Horizon and Emergency Response Terms

FOSC                   Federal On-Scene Coordinator

ICP                    Incident Command Post

ICS                    Incident Command System

JIC                    Joint Information Center

MOU                    Memorandum of Understanding

NCP                    National Contingency Plan (40 CFR 300)

NEMP                   National Emergency Management Plan

NRF                    National Response Framework

NRS                    National Response System

NRT                    National Response Team

NIC                    National Incident Command

SONS                   Spill of National Significance

UAC                    Unified Area Command

UC                              Unified Command

### D.3    Safety and Health Terms

OEL                             Occupational Exposure Limit

PEL                             Permissible Exposure Limit

PPE                             Personal Protective Equipment

### D.4    Laws and Regulations

HAZWOPER            OSHA Hazardous Waste Operations and Emergency Response
                             regulations, 29 CFR 1910.120

OSH Act                  Occupational Safety and Health Act

# EXHIBIT C

# Health Hazard Evaluation of Deepwater Horizon Response Workers

**Bradley S. King, MPH, CIH**
**John D. Gibbins, DVM, MPH**



**Health Hazard Evaluation Report**
**HETA 2010-0115 & 2010-0129-3138**

**August 2011**








The front cover shows a controlled oil burn (in-situ burn) on the Gulf of Mexico during the Deepwater Horizon Response: June 2010.

# Contents

Introduction ........................................................................................................................... 1

Overview and Results ............................................................................................................. 2

    Review and Evaluation of Hospitalizations ........................................................................ 2

    Exposure Evaluations of Offshore Work ........................................................................... 3

        Oil Dispersant Release Activities ................................................................................ 3

        In-Situ Oil Burning ..................................................................................................... 4

        Oil Booming, Skimming, and Vacuuming ................................................................... 4

        Oil Source Activities .................................................................................................. 5

    Exposure Evaluations of Onshore Work ........................................................................... 6

        Wildlife Cleanup ........................................................................................................ 6

        Beach Cleanup ........................................................................................................... 6

        Decontamination and Waste Management ............................................................... 7

    Infirmary Log Reviews ...................................................................................................... 8

    Health Symptom Surveys ................................................................................................. 9

    Psychosocial and Work Organization Issues ................................................................... 11

Discussion and Conclusions .................................................................................................. 11

    Heat Stress ..................................................................................................................... 12

    Chemical Exposures ....................................................................................................... 13

    Work Organization Factors and Psychosocial Stress ...................................................... 14

    Ergonomics .................................................................................................................... 14

    Tobacco Use ................................................................................................................... 15

    Limitations of the Evaluations ....................................................................................... 15

Occupational Health Considerations for Future Large-Scale Response Events ...................... 16

    Illness/Injury Surveillance .............................................................................................. 16

    Medical Clearance and Preplacement Evaluations ......................................................... 16

    Risk Communication ...................................................................................................... 17

Reference ............................................................................................................................ 17

Acknowledgements .............................................................................................................. 18

Availability of Report ........................................................................................................... 20

# Introduction

The April 20, 2010, explosion and collapse of the BP Deepwater Horizon oil platform in the Gulf of Mexico resulted in the release of millions of barrels of oil into Gulf waters. The response to this disaster involved the efforts of tens of thousands of workers in a variety of capacities across Louisiana, Mississippi, Alabama, Florida, Texas, and in the Gulf of Mexico itself. The diverse work included oil and tar ball removal from beaches, oil skimming and booming near shores, burning of surface oil near the source of the oil release, surface application of dispersant by vessels and aircraft, and containment and recovery work on vessels at the release site. The nature of these activities raised concerns about potential occupational exposures to chemical and physical hazards and mental stressors. The Deepwater Horizon oil release was an unprecedented event in the United States in many respects, requiring response work across a vast area of multiple jurisdictions. The type, location, and quantities of oil released; the types and quantities of dispersant used; and climatic and geographical conditions differentiate this release from past oil spills.

On May 28, 2010, the National Institute for Occupational Safety and Health (NIOSH) received a request for a health hazard evaluation (HHE) from BP management concerning health effects experienced by responders to the oil release. The request was prompted by the May 26, 2010, hospitalization of seven fishermen who were working in BP's Vessels of Opportunity (VoO) program in the Gulf of Mexico. The fishermen had been hospitalized for symptoms that were initially believed to be related to exposures experienced during their response activities, particularly booming and skimming oil.

In response to this request, we began an investigation on June 2, 2010, with an opening meeting held at the BP Operations Center in Houma, Louisiana. In attendance were representatives from NIOSH, BP, the Center for Toxicology and Environmental Health (CTEH), O'Brien's Response Management, the U.S. Coast Guard (USCG), and the Occupational Safety and Health Administration (OSHA). Objectives of this opening meeting were to discuss the initial investigations conducted by CTEH and OSHA into the events surrounding the hospitalization of the fishermen and to plan the NIOSH investigation. These plans included interviews, health symptom surveys, and on-site industrial hygiene assessments of response work activities similar to those performed by the fishermen.

As the plans were developing, BP requested that we expand the scope of the HHE to include all major offshore response activities. In addition to oil booming and skimming conducted by workers on VoO vessels, these activities included aerial and vessel-based dispersant releases, in-situ surface oil burning, containment and recovery work at the oil source, and other related offshore oil removal activities. In the weeks that followed, teams of NIOSH industrial hygienists, medical officers, and other occupational health specialists conducted on-site investigations at locations throughout the Gulf region to collect quantitative and qualitative data on potential worker exposures, health symptoms, work practices and procedures, and work organization.

On June 22, 2010, NIOSH received a request from BP for a second HHE to investigate potential hazards associated with onshore response work activities. In response to this request, teams of NIOSH personnel

1

evaluated practices and procedures including wildlife cleanup operations, beach cleanup operations, and decontamination and waste management activities throughout the states of Louisiana, Alabama, Mississippi, and Florida. In contrast to the offshore evaluations, which relied on traditional industrial hygiene exposure assessment methodologies and quantitative exposure monitoring to identify potential hazards, the onshore assessment relied on qualitative assessment techniques, including the use of professional judgment and expertise during observations of onshore work activities. Health symptom surveys, however, were similar to those used for the offshore evaluations.

The goals of the NIOSH HHE assessments were to describe acute health effects, evaluate occupational exposures in qualitative or quantitative assessments, and generate hypotheses regarding symptoms potentially related to work activities. These assessments were not intended to describe or investigate potential long-term or chronic health effects. The results of these investigations were reported in a series of nine interim reports and report summaries posted on the NIOSH website. The full reports were distributed electronically to key contacts for each work activity evaluated. Included in the reports were conclusions regarding the extent of hazards and exposures identified as well as recommendations for improving workplace conditions. Furthermore, all exposure and health symptom survey data were compiled in electronic spreadsheets and posted on the NIOSH website. This information can be accessed at http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html. Additional information about other components of the NIOSH Deepwater Horizon response activities outside of the HHE investigation, including response worker rostering efforts, analyses of injury and illness data, and guidance and educational materials developed for the response can be found on the NIOSH website at http://www.cdc.gov/niosh/topics/oilspillresponse/.

This final report summarizes our evaluations made during the course of the offshore and onshore HHE investigations and describes the conditions and characteristics encountered during the event. Overarching conclusions and recommendations drawing from the entirety of the HHE investigations are also presented.

# Overview and Results

## Review and Evaluation of Hospitalizations

In response to the BP request to evaluate the May 26, 2010, hospitalizations of seven fishermen involved in VoO operations, we reviewed hospital records from West Jefferson Medical Center in Marrero, Louisiana, BP Healthcare Provider Reporting Forms completed by nurse case managers, and the OSHA preliminary Incident Report of Fishermen Evacuated near Grand Isle Shipyard. We also interviewed nurse case managers and CTEH and OSHA investigators. Although all seven fishermen were hospitalized on the same day, we found that their symptoms could not be linked to the chemical dispersant that some of the fishermen had originally suspected. The seven fishermen worked on five different vessels, none of which were operating in the area of dispersant use at the time. Most of the

seven fishermen reported headache, upper respiratory irritation or congestion, and nausea. Although these symptoms had disappeared or decreased in severity by the time the fishermen arrived at the hospital, they were admitted for observation as a precaution because they had reported chemical exposure. Two fishermen were hospitalized for potentially serious medical problems that were unrelated to oil or chemical exposure. All seven patients were discharged when their condition was determined to be stable or when test results were negative. Six were discharged within 1 day of admission, and the seventh was discharged after an additional day of testing. We concluded that the symptoms of headache, upper respiratory irritation or congestion, and nausea were unlikely to be related to dispersant exposure. Work-related factors (e.g., heat, fatigue, and unpleasant odors from undiluted terpene solutions used for cleaning boat decks and equipment) might have contributed to workers' symptoms.

In the period after these seven hospitalizations, the Louisiana Department of Health and Hospitals received reports of 10 additional hospitalized response workers. We reviewed these workers' hospital records. The conditions of these 10 hospitalized response workers were more severe than the conditions of the seven fishermen hospitalized on May 26, 2010, with hospitalization times ranging from 1 to 6 nights.

Five of the 10 workers, including onshore and offshore workers, identified heat as a major problem. The five workers who reported heat exposure also reported a variety of work-related and personal risk factors for heat illness; several reported multiple risk factors. All five of these workers had evidence of dehydration or a diagnosis of heat exhaustion or possible heat stroke. Five of the 10 workers (one of whom had also reported heat exposure) reported exposures to oil, hydrocarbons, or dispersant. The medical records of these five did not include information to identify specific chemicals, indicate how they came into contact with those chemicals, or describe how long they were exposed. It was reported that two of these workers were instructed to avoid exposures and, if exposed, to wear a respirator. However, the medical records of these two workers did not include sufficient detail about their oil and chemical exposures to determine whether their symptoms or diagnoses could have been related to chemical exposure and whether respiratory protection was necessary.

## Exposure Evaluations of Offshore Work

### Oil Dispersant Release Activities

We conducted two evaluations on board vessels releasing dispersant. These vessels were deployed to perform small-scale releases of dispersant in an area with surface oil contamination.

On June 4–5, 2010, we evaluated potential exposures experienced by workers on two vessels, the International Peace and the Warrior. During this evaluation, we conducted personal breathing zone (PBZ) and area air monitoring on both vessels (which maintained positions close to each other) during and after the application of 50 gallons of Corexit® EC9500A dispersant (Nalco, Naperville, Illinois) from the International Peace onto surface oil. An additional aerial release of 125 gallons of this dispersant onto the surface oil occurred from a support aircraft in the area. Sampling was conducted for volatile

organic compounds (VOCs), propylene glycol (a component of the dispersant), diesel exhaust, mercury (a possible component of crude oil), the benzene soluble fraction of total particulate matter, carbon monoxide (CO), and hydrogen sulfide ($H_2S$). The measured substances were either not detected or were present at low concentrations below individual occupational exposure limits (OELs).

On June 21–22, 2010, we conducted further exposure assessments on board the International Peace. During this evaluation, we conducted air monitoring for a number of the substances listed above during and after the application of 50 gallons of Corexit® EC9500A dispersant onto surface oil from the vessel. The substances measured were either not detected or were at concentrations well below OELs.


### In-Situ Oil Burning

We assessed exposures during in-situ (i.e., on site) burns of surface oil on June 8–10, 2010. The in-situ burn team was composed of a fleet of vessels including two lead vessels (the Premier Explorer and the Sea Fox), support and safety vessels, shrimping trawlers, and rigid-hulled inflatable boats. Each shrimping trawler and a partner trawler towed one end of an approximately 300-foot long boom behind them, creating a U-shaped area to contain a quantity of surface oil suitable for burning. The duration of the burn depended on the quantity of oil enclosed by the boom and ranged from 45 minutes to 6½ hours. Typically, one to five burns could be conducted by each trawler pair per day. During a burn, the trawlers were located approximately 300 feet from the area within the boom where the burn was occurring.

During the evaluation, we conducted PBZ and area air sampling on shrimping trawlers towing booms during in-situ burns and on boats from which the burns were ignited. Sampling was conducted for VOCs, aldehydes, CO, $H_2S$, benzene soluble fraction of total particulate matter, diesel exhaust, and mercury. Exposures for all compounds sampled were either below detectable concentrations or well below applicable OELs, with one exception being a peak exposure of 220 parts per million (ppm) of CO recorded on the double-engine ignition boat. This peak was likely due to the build-up of exhaust from the gasoline powered engines when idling with no movement of the boat and little wind.


### Oil Booming, Skimming, and Vacuuming

During June 10–20, 2010, we assessed exposures on six fishing and shrimping trawlers in the VoO program that were assigned to remove surface oil by booming and skimming. While coordinating and preparing for the evaluations on board the VoOs, we were informed that the presence of oil in any specific location was sporadic because the Gulf currents moved the oil patches frequently. On days when oil was not present on the water surface in the areas to which these vessels were assigned, the captains often directed their vessels through patches of foam (described by the crew as "dispersant foam") on the sea surface to break up this foam.

We conducted PBZ and area air sampling for VOCs, propylene glycol, diesel exhaust, mercury, CO, $H_2S$, total particulate matter, and the benzene soluble fraction of total particulate matter during work

activities on the six vessels. During these evaluations, the VoOs on which we were present spent most of their time scouting for oil and breaking up foam patches. Because no oil was encountered by the VoOs on these days, we did not observe any oil cleanup work. The PBZ and area air concentrations of the measured compounds were below detectable levels or well below OELs.

An exposure assessment of an offshore oil skimming and recovery mission involving a platform supply vessel, the Queen Bee, was conducted on June 14–16, 2010. The Queen Bee was retrofitted with a USCG-operated weir skimmer, skimming control stand, high volume pumping unit, boom system, three on-deck 500-barrel storage capacity tanks, and an industrial crane used to move booms and the skimmer. The vortex weir skimmer consisted of a heavy-duty frame holding a central collection bowl and three floats. The central bowl of the skimmer created a void in the water into which the oil/water mix poured. Under the bowl were the hydraulic lines and the hose for transporting the oil/water mix to the on-deck storage tanks.

We used PBZ and area air sampling to evaluate exposures to VOCs, propylene glycol, diesel exhaust, CO, $H_2S$, total particulate matter, and the benzene soluble fraction of total particulate matter. PBZ and area air concentrations of the contaminants measured were below applicable OELs. The potential existed for dermal contact with oil while placing and removing the skimmer and boom from the water and during cleaning activities on deck. However, workers wore the necessary protective equipment during tasks with increased potential for dermal contact.

On June 25, 2010, we visually inspected oil skimming operations on a set of barges located in Coup Abel Pass, offshore from Grand Isle, Louisiana. The 18 barges were divided into six sets of three barges each, with each set containing a semi-truck fitted with a vacuuming system. To vacuum oil and potentially oil-contaminated plant material from the water surface near the side of the barges, workers extended a 2-inch diameter rubber vacuum hose over the side of the barge deck and lowered it approximately 8 feet to the water surface. We noted a lack of fall protection for the workers, a lack of hearing protection during vacuuming and pile driving, and musculoskeletal risks from working in awkward postures with sustained or repeated back flexion and twisting.


### Oil Source Activities

On June 21–23, 2010, we assessed exposures aboard the Development Driller II (DDII) and the Discoverer Enterprise, located at the site of the Deepwater Horizon Mississippi Canyon 252 Well Number 1. At the time of the NIOSH evaluation, DD II was drilling a relief well for the purpose of pumping mud and concrete into the blown well to suppress the release of crude oil. The Discoverer Enterprise, which was located directly above the blown well, captured oil and gas from the damaged well through a lower marine riser package cap, which was placed on top of the failed Deepwater Horizon blowout preventer.

We conducted PBZ and area air sampling aboard the DD II on June 21, 2010, and aboard the Discoverer Enterprise on June 23, 2010. Air sampling on these vessels was conducted to characterize exposures of workers who were closest to the point of release where the potential for exposure to VOCs from the oil

was expected to be greatest. Unlike crews and cleanup workers aboard VoOs and cleanup workers onshore, the crews of the DD II and Discoverer Enterprise were performing operations that utilized their usual and standard work skills, PPE, training, and experience (i.e., well drilling aboard the DD II and storage and processing of crude oil aboard the Discoverer Enterprise). We surmised that the only source of nonroutine occupational exposures aboard these vessels to which the crews might have been exposed was oil on the sea surface that had been released from the blown well. PBZ and area air sampling was conducted for VOCs, sulfur compounds, propylene glycol ethers, polycyclic aromatic hydrocarbons (PAHs), CO, and $H_2S$. Airborne concentrations for all contaminants evaluated on the DD II and the Discoverer Enterprise were well below applicable OELs.

## Exposure Evaluations of Onshore Work

### Wildlife Cleanup

In June and July 2010, we made multiple site visits to assess factors related to potential exposures and occupational hazards at onshore wildlife cleaning and rehabilitation centers. The wildlife cleaning centers visited included two in Louisiana (Fort Jackson and Grand Isle) and one each in Alabama (Theodore), Florida (Pensacola), and Mississippi (Gulfport).

Birds were the most common type of wildlife being cleaned and rehabilitated at the centers. Common activities involved in the cleaning and rehabilitation process for most birds included search and retrieval; baseline health assessment of the birds; stabilization, including rehydration and feeding if needed; a series of cleaning steps that usually included the use of compounds derived from vegetable oils as pretreatment, followed by cleaning with repeated detergent and water rinses; and post-cleaning placement in a drying area, followed by placement in holding pens for rehabilitation while awaiting transport.

The task of wildlife cleaning and rehabilitation presented the opportunity for repeated and prolonged skin contact with water used in washing and rinsing the animals. This water varied from "oily" to "clean" as the animals went through the cleaning process. Routine use of PPE included safety glasses, gloves, sleeve protectors, rubber boots, Tyvek® suits, other protective coveralls, and plastic aprons. Workers handling the wildlife prior to cleaning had some potential for direct skin exposure to the oil on the animals; with PPE use, this exposure was observed to be minimal in most cases.

We identified heat as a primary exposure of concern. All sites were aware of concerns about heat and were taking actions to prevent heat stress in workers. Sites established either a formal work-rest schedule or managed potential heat stress in workers by requiring frequent rest breaks, encouraging fluid replacement, and observing workers for signs of heat-related illness.

### Beach Cleanup

In July 2010, we made multiple visits to onshore worksites where beach cleanup was occurring. Onshore worksites were chosen for evaluation based on input from the command centers. Among the factors

6

considered in selection of sites were estimates of the level of contamination likely to be encountered, type of work activity, and number of workers. Efforts were made to evaluate worksites in each of the four affected states of Louisiana, Mississippi, Alabama, and Florida.

Sixty-seven onshore worksites were evaluated. At 59 of the 67 sites, a structured exposure assessment checklist was used. Of those 59 sites, 36 (61%) were beach cleaning sites, with six in Alabama, seven in Florida, five in Louisiana, and 18 in Mississippi. The exposure assessment checklist included a qualitative assessment by the NIOSH investigator about the level of oil residue at the site at the time of the survey. We judged 24 sites to have a level of light residue, six to have a level of moderate residue, and three to have a level of heavy residue. All sites with heavy residue and five of the six with moderate residue were in Mississippi. Even at worksites where oil residue was judged to be heavy, worker exposure to oil residue typically was judged to be limited because of the nature of the oil residue (oil-soaked sand or solid to semisolid tar balls) and the use of PPE. We saw no evidence of exposure to dispersant at the shore cleaning sites.

During the evaluations, we observed that beach cleaning tasks involved risk factors for musculoskeletal disorders, including repetitive awkward postures of the back and upper extremities while using moderate force. Workers at the beach cleaning sites used shovels, rakes, and improvised hand tools to manually remove tar balls from the sand. The most common operation observed involved workers walking the beach using tools to collect solid or semi-solid oil residue and placing the residue in large trash bags. Generally, the workers placed two or three shovels of material into a bag; filled bags weighed about 10 to 20 pounds. The main risk factors observed in the use of these tools included the following: repetitive and sustained back flexion/twisting, squatting, ground-sitting, or kneeling; repetitive upper extremity motions; awkward wrist/forearm twisting; moderate upper extremity forces to handle tools and mixtures of sand and tar balls; and moderate low back force to handle bags of sand and tar balls. We recommended further evaluation and testing of different types of manual tools to improve their design, manufacture, and selection for future onshore oil spill cleaning work.

We identified heat to be a primary exposure of concern. Site supervisory staff measured heat and humidity in a variety of ways at the work sites. Recommended work/rest regimens were based on the heat index. The guidelines called for work/rest regimens varying from "no limit" to the most limiting regimen of 10 minutes of work followed by 50 minutes of rest. We observed variability in application of the heat stress guidelines. Some contractors appeared to do the minimum to follow the guidelines, while others followed a work/rest regimen more conservative than called for by the guidelines.

### Decontamination and Waste Management

During July and August, we conducted observational exposure assessments and site characterizations at 15 equipment and boat repair/decontamination or waste management sites throughout Florida, Mississippi, Alabama, and Louisiana. Decontamination activities provided potential for exposure to weathered oil and cleaning agents. The use of diesel- and gasoline-powered equipment also posed risks of potential exposures to diesel exhaust, CO, and noise. However, we deemed heat stress as the most

significant hazard at the visited sites; we noted that decontamination workers were at increased risk because of layering of PPE. We found that issues related to heat appeared well-managed and controlled by on-site safety contractors. For boom repair workers, skin exposures to solvent-based chemical adhesives were identified as a potential health hazard because workers had not been provided or were not wearing chemically-resistant gloves at the times of the assessments. The ergonomic hazards faced by repair/decontamination and waste management workers were unique among response workers. Work tasks such as handling and moving booms and other equipment to be cleaned and the actions associated with operating the pressure washers led to awkward and heavy lifting tasks, which could contribute to musculoskeletal symptoms.

In August, we conducted quantitative exposure assessments at two boom and vessel decontamination operations in Port Fourchon, Louisiana. Decontamination job tasks included spraying a chemical cleaner onto oil-contaminated equipment with a standard hand-held garden-type sprayer, scrubbing the equipment with brushes, and rinsing the oil-contaminated equipment with water supplied by diesel-operated pressure washers. PPE used by these workers included protective steel-toed boots, an inner nitrile glove under an outer chemical resistant glove, full-body coveralls, hard hat, safety glasses, and face shield. To minimize heat stress, work/rest regimens consisting of cycles of 20 minutes of work followed by 40 minutes of rest in a cooled or shaded environment were enforced during each work shift.

We collected PBZ and area air samples for VOCs, glycol ethers, total particulate matter, the benzene-soluble fraction of the total particulate matter, PAHs, CO, diesel exhaust, and noise during decontamination activities. Temperature and relative humidity measurements were also taken. Examples of VOCs found to be present included $C_9$-$C_{16}$ aliphatic hydrocarbons, 2-butoxyethanol, propylene glycol t-butyl ether, and limonene. The air concentrations for these and other chemicals quantified were below applicable OELs. Noise exposure monitoring showed the potential for noise exposures above the NIOSH recommended exposure limit of 85 decibels A-weighted. Recommendations were made for employees to wear hearing protection during pressure washing, to use such hearing protection within the context of a hearing conservation program, and for site safety officers to monitor these and other work practices for potential noise exposure hazards. We observed heat stress as a significant issue for workers, particularly due to the PPE required for these activities. Recommendations were made for continued application of the enforced work/rest regimen and attention to worker training in the recognition of the heat stress hazard, potential symptoms associated with heat stress, and the importance of hydration.

## Infirmary Log Reviews

We collected and reviewed daily infirmary logs from June 1–30, 2010, for response workers seen at the Deepwater Horizon Venice, Louisiana, Branch Infirmary. Among the 1004 reported visits, 363 (36%) were for ear, nose, and throat and respiratory complaints. Of the respiratory complaint visits, 230 (63%) were classified as sinus/congestion. Orthopedic/injury was the second most commonly reported complaint, accounting for 146 (15%) visits. Heat-related disorders were reported in 2% of visits; however, nonspecific signs (e.g., headache, dizziness, and cramps) recorded separately could have been early signs of heat-related disorders. Of these 1004 infirmary visits, 717 (71%) resulted in on-site

8

evaluation by emergency medical technicians and treatment with over-the-counter medications. Although this evaluation analyzed infirmary log data from only one location for 1 month of the response, we determined that these data do not reveal unrecognized or unreported occupational illness due to workplace exposures.

## Health Symptom Surveys

Voluntary health symptom surveys were distributed to workers at offshore and onshore locations where we conducted evaluations. Given the magnitude of the response and large number of response workers employed in the cleanup, we administered the survey to convenience samples of workers performing a wide variety of job tasks. Throughout our health symptom survey analysis, we compared groups of workers self-reporting exposure(s) to a comparison group of workers recruited at the Venice Field Operations Branch and the Venice Commanders' Camp who reported that they had not worked on boats and had no exposures to oil, dispersant, cleaner, or other chemicals. Although we believe our recommendations, which are based on the results of these surveys, are applicable for response workers performing similar tasks in other locations, we acknowledge that we surveyed a small subset of the entire response workforce.

From June 7–22, 2010, 826 surveys were completed by workers in the Plaquemines Branch Incident Command System, also known as the Venice, Louisiana, Field Operations Branch (FOB). Workers were asked to report symptoms they experienced while working during response activities. The most frequently reported symptoms were headache, upper respiratory symptoms, and symptoms consistent with heat stress. Workers who reported exposures to oil and dispersant reported higher prevalences of all types of symptoms compared to workers who reported no such exposures.

During the June 4–5, 2010, evaluation of dispersant release on board the International Peace and the Warrior, health symptom surveys were distributed to vessel workers immediately and 4 hours after release of the dispersant. Of the 17 respondents, very few on either vessel reported upper or lower respiratory, gastrointestinal, musculoskeletal, or psychological symptoms or injuries. Those on the International Peace reported very few symptoms, while some workers on the Warrior reported constitutional (i.e., headaches and fatigue) and skin symptoms, similar to a comparison group of workers recruited from the Venice, Louisiana FOB and the Commanders' Camp who reported that they had not worked on boats and had no exposures to oil, dispersant, cleaner, or other chemicals. Health symptom surveys were also distributed to five vessel workers on board the International Peace during the June 21–22, 2010 evaluation. Health symptoms reported by vessel workers surveyed during this evaluation included itching eyes, exhaustion, musculoskeletal pain, and feelings of "work pressure."

We distributed and collected health symptom survey forms on June 10, 2010, for workers on board the lead in-situ burn team vessels, the Sea Fox and the Premier Explorer. The types of symptoms reported by the 39 respondents were similar to those reported by response workers who were not performing in-situ burning. The most frequently reported symptoms on both vessels were similar: upper respiratory symptoms and constitutional symptoms. Workers on the Sea Fox also reported itchy eyes, coughing, musculoskeletal pain, and psychosocial symptoms (i.e., feeling worried, stressed, pressured, etc.).

Overall, workers involved in the in-situ burn did report a higher frequency of these symptoms than the comparison group.

Health symptom surveys were distributed at a USCG safety and administrative meeting on June 18, 2010, to workers who were either USCG personnel providing safety oversight to off-shore vessels or administrative/command services at the Venice, Louisiana FOB, or civilian contractors providing safety oversight for other responders working off-shore. A total of 74 attendees completed the survey. The types of symptoms reported among these USCG members and contractor safety personnel were similar to a comparison group of response workers who reported no exposures to oil, dispersant, cleaner, or other chemicals. Headaches, however, were reported more frequently in those surveyed at the USCG safety meeting. Those reporting exposure to oil and dispersants had significantly higher prevalences of upper respiratory symptoms and cough than those not exposed. Symptoms related to heat exposure were the most frequent in all groups.

We collected self-administered health symptom surveys from response workers on a floating barge hotel, Floating City #1 (located 10 miles northeast of Venice, Louisiana, at the mouth of the Baptiste Collette channel), on June 19–23, 2010. Of 500 eligible responders, captains, and deckhands, 189 completed the survey. The types of symptoms reported among respondents were similar to those reported by a comparison group of response workers who reported no exposures to oil, dispersant, cleaner, or other chemicals. Symptoms related to heat exposure and upper respiratory symptoms were the most frequently reported in both groups.

Health symptom surveys were distributed on June 21–23, 2010, to a convenience sample of workers onboard the DDII and Discoverer Enterprise at the site of the oil release. Overall, the 28 workers onboard the DDII who completed the survey reported a wider variety and a higher number of health symptoms than the 34 employees aboard the Discoverer Enterprise or the comparison group. Headache and symptoms consistent with heat stress were reported among survey respondents on both vessels, while symptoms of feeling worried or stressed, and feeling pressured were highest among respondents who worked aboard the DDII.

During June and July 2010, we asked workers at onshore wildlife cleanup sites to complete a health symptom survey. Most of the health outcomes and symptoms reported in these surveys were more prevalent in the wildlife cleaning workers than the comparison group of workers who had no reports of exposure to oil, dispersant, or other chemicals. Among the 54 wildlife cleaning workers who completed the survey, scrapes and cuts were reported by 67%, itchy or red skin or rash were reported by 46%, and symptoms of headache or feeling faint, dizzy, or fatigued were reported by 35%. Hand, shoulder, or back pain was reported by 39% of the wildlife cleaning workers. Twenty-four percent of participants reported one or more of five psychosocial symptoms (feeling worried or stressed; feeling pressured; feeling depressed or hopeless; feeling short-tempered; frequent changes in mood).

In July 2010, health symptom surveys were distributed to beach cleanup workers. More injuries and symptoms were reported among the 1,899 responding workers than among the comparison group. One or more of nine nonspecific symptoms that could be related to heat stress was reported by 37% of the

beach cleaning workers. Four or more of those symptoms, a constellation of symptoms considered in this evaluation as a more specific indicator of heat stress, were reported by 7%. Among the individual symptoms reported most frequently were headaches (28%); coughing (19%); and hand, shoulder, or back pain (17%). Eighteen percent of participants reported one or more of five psychosocial symptoms.

We distributed health symptom surveys to workers at repair/decontamination and waste management sites during July and August 2010. One or more of nine nonspecific symptoms that could be related to heat stress were reported by 38% of the 499 responding repair/decontamination and waste management workers. Four or more of the symptoms which were more specific indicators of heat stress were reported by 6%. Other individual symptoms reported most frequently were headaches, coughing, and hand, shoulder, or back pain, as well as one or more of five psychosocial symptoms.

## Psychosocial and Work Organization Issues

In August 2010, we conducted focus groups to assess work organization processes and practices as well as job stress among safety professionals involved in the response. Work organization refers to the work processes (the way jobs are designed and performed) and to the organizational practices (management and work methods and accompanying workforce policies) that influence how jobs are designed. The purpose of these focus groups was to gain a more in-depth understanding of the way the work was designed and performed, the policies that were in place, and job stress and protective (e.g., coping) factors among emergency response workers during response operations. Safety professionals operating out of Venice, Louisiana, were chosen as the target population because of their knowledge of the organization of work, policies, and procedures for response workers on the water. While not necessarily representative of the general population of response workers, this target group of safety professionals was familiar with the day-to-day operations of the Deepwater Horizon responders, and worked closely with them on health and safety-related issues.

The following themes, listed in order of most frequently reported, emerged from the discussions as work organization factors and job stressors for the safety professionals and individuals they supervise or oversee: (1) heat and environmental conditions, intensified by the use of PPE; (2) basic living issues (including physical and mental fatigue) and food arrangements; (3) job insecurity; (4) management and communication issues including a lack of clarity about the chain of command for decision-making and who had tasking authority and priority; (5) frequent changes in rules, procedures, and protocol; and (6) varying levels of safety knowledge, experience, and training. Indicators of job stress included loss of temper, acting out in frustration or anger, loss of enthusiasm, and low morale.

# Discussion and Conclusions

These evaluations revealed the potential for numerous occupational hazards. PBZ and area air sampling at specific sites and during specific activities consistently revealed nondetectable to low levels of

individual chemicals. Nonetheless, mixed low-level exposures to crude oil, dispersant, and other chemicals; heat stress, psychosocial strains, ergonomic and other injury hazards; and pre-existing personal health risk factors all may have contributed to health symptoms reported by response workers. An additional potential contributing factor for the acute respiratory symptoms reported by some response workers is the formation of reactive aldehydes and ozone from the environmental photochemical activity on volatile hydrocarbons [Goldstein et al. 2011]. Nonspecific symptoms such as headache, eye and respiratory irritation, and fatigue were more commonly reported by responders who self-reported exposures to oil, dispersants, or other chemicals compared to workers who self-reported no such exposures. While no one hazard or exposure can explain the increased reporting of such symptoms among this group of workers, eliminating or reducing all such hazards in as comprehensive a manner as possible will decrease the likelihood of health effects during future responses such as this.

## Heat Stress

In most work sites evaluated, the conditions for heat stress were present, significant, and often the most pressing concern for the health and safety of response workers. Where we measured environmental conditions, temperatures often exceeded 90°F–100°F, with high relative humidity, creating conditions for severe heat strain. With the addition of required PPE such as full body coveralls and protective gloves and boots, the possibility of health effects related to heat was intensified. In response to these conditions, heat stress management plans were developed by BP and observed in use at the sites evaluated. These protocols often centered on a work/rest regimen that provided a sufficient rest period for the worker to cool and rehydrate after a work period. A common cycle was a 20-minute work period followed by a 40-minute rest and rehydration period, but this varied by site and conditions. At many locations, these cycles were strictly enforced, as was mandatory rehydration with water or electrolyte-providing beverages, which were uniformly observed to be plentiful and readily available. However, surveillance conducted by the Louisiana Department of Health and Hospitals revealed 10 workers hospitalized between May 28, 2010, and June 22, 2010. Of these 10 workers, five identified heat as a major problem and reported a variety of work-related and personal risk factors for heat illness. These five had evidence of dehydration or a diagnosis of heat exhaustion or possible heat stroke. To prevent such health effects, it is imperative to strictly adhere to heat stress management protocols at all locations. These protocols should include the provision of shaded or cooled rest areas and the improvement of worker training regarding the hazards of heat stress and the identification of early signs and symptoms of heat strain.

The role of PPE worn by workers is intended to be a protective one to prevent harmful exposures. It is imperative to conduct continual evaluations of the need for specific PPE such as full-body coveralls throughout emergency responses such as this to determine their necessity. When exposures have been evaluated and determined to be minimal or insignificant, overuse of PPE can have an unintended effect of burdening the worker with unnecessary gear that can exacerbate heat stress, limit visibility, and increase the possibility of slips and trips. It is important that trained occupational safety and health professionals develop and implement guidelines for determining when PPE use is truly necessary. Balancing the need to protect workers from potential exposures without creating unnecessary hazards

for workers from too high a level of PPE is critical. Medical support staff was available at many sites where workers were required to wear PPE. This staff played an important role in monitoring possible health effects and providing on-site medical assessments with referral for higher levels of care as needed.

## Chemical Exposures

A large number of chemicals was sampled for over the course of the HHE. These included VOCs, PAHs, and $H_2S$ from the oil itself or cleaning chemicals used; VOCs, PAHs, aldehydes, CO, and particulates from combustion sources, including burning oil and natural gas or the use of gasoline-powered engines; VOCs, glycol ethers, and propylene glycol from dispersants; and diesel exhaust from the use of diesel engines. Sampling was conducted at offshore and onshore worksites during activities of concern. Our sampling strategies included full-shift air sampling using validated NIOSH sampling and analytical methods. Throughout the evaluation, results for all airborne chemicals sampled were uniformly nondetectable or at levels well below applicable OELs. The exception to this was peak CO levels likely due to the build-up of gasoline exhaust from idling outboard motors involved in in-situ burns. The results for all compounds measured at levels below detectable concentrations or at concentrations below OELs may reflect several important considerations. For example, the lack of significant exposures to VOCs may reflect the lack of high volatility compounds from the oil at those worksites. Higher volatility compounds initially present in the oil may have dissipated shortly after release and during the weathering process so that concentrations on vessels and onshore were minimal. Combustion byproducts produced at the in-situ burns did not appear to exist in high concentrations at the distance the boats maintained from the smoke plume, reflecting the upward migration of such compounds in the ascending column of smoke plume extending above the workers' location. Open air and wind action helped dilute airborne concentrations during the aerial and vessel-based dispersant releases evaluated so that concentrations at the vessel level were low.

We attempted to evaluate activities and job duties that were representative of the work responders conducted daily. The intent of the air sampling was to provide an accurate assessment of the types and levels of exposures to airborne chemicals to which the workers were exposed. On the basis of sampling results, recommendations for additional respiratory protection were not deemed necessary. However, it is recognized that changing conditions at worksites may present opportunities for exposures at levels differing from results obtained on the days NIOSH teams were present. Therefore, it is imperative that company and contractor health and safety representatives conduct thorough, full-shift and short-term exposure sampling throughout responses such as this to ensure that changing conditions can be immediately responded to and protections implemented, as warranted.

In addition to quantitative exposure sampling, we assessed work practices in a qualitative manner to identify potential hazardous exposures. In particular, we sought to identify potential dermal exposures to oil, dispersant, or other chemicals. Observational exposure characterization was performed at numerous beaches in Louisiana, Mississippi, Alabama, and Florida where cleanup was occurring. Even at beach cleaning worksites where oil residue was judged by our teams to be heavy, worker exposure to oil residue was typically observed to be limited, with no evidence of exposure to dispersant. While the use

13

of PPE (gloves, coveralls, face shields, goggles, etc.) was typically found to be matched to the level of expected or potential dermal exposure at many sites, PPE was not always used as directed. For example, safety protocol during in-situ burns dictated the use of flame-resistant coveralls and leather gloves by the individual placing the ignition package. On several occasions, we observed that only the top half of the coveralls was donned (i.e., the worker did not step into legs of the coveralls) and no gloves were worn. Proper training and consistent PPE use is an important component in preventing dermal exposures and injuries.

## Work Organization Factors and Psychosocial Stress

In addition to physical and chemical stressors, the mental and psychosocial stressors of performing response work for this type of event are an important aspect of worker safety and health. Our health symptom surveys asked about the extent of stress-related and mental health symptoms experienced during response work. Among those surveyed, the percentage of response workers who reported one or more symptoms related to psychosocial stress (feelings of "work pressure," being worried or stressed, depressed or hopeless, short-tempered, or experiencing frequent changes in mood) ranged from 1% to 24% of those surveyed across groups. Although it is difficult from this type of survey to assess the extent to which reported symptoms were specifically related to work, the information provided by the focus groups, discussed below, was helpful in identifying work-related factors that should be addressed.

Focus group discussions on psychosocial issues revealed several themes that increased the chances of developing symptoms of stress, including heat and environmental conditions, basic living conditions, job insecurity, and management and communications issues. For example, workers in the focus groups reported being subjected to crowded and sometimes unsanitary living quarters with limited personal space or privacy. This resulted in some reports of tension and confrontations among workers. Focus group participants also reported that the long work days (generally more than 12 hours) resulted in considerable mental and physical fatigue, with little opportunity to recuperate after working many consecutive days. Uncertainty over how long the workers could expect to be employed resulted in many of the response workers feeling on edge. Confusion and frustration due to multiple, conflicting directives from various areas of the chain of command and issues related to poor communication concerning decision-making resulted in increased stress. The difficulty of being away from home and family also was regularly reported as a source of psychosocial stress.

Work organization, basic living conditions, job insecurity, and communication should be addressed in a comprehensive occupational safety and health prevention program. Development, implementation, and enforcement of clear policies and guidelines throughout a response can minimize psychosocial impacts for workers.

## Ergonomics

Ergonomic issues were identified at several locations, and musculoskeletal symptoms were reported by workers in our health symptom surveys. We observed repetitive forceful movements and awkward postures of the back and upper extremities when performing lifting, pushing, and pulling activities at

decontamination and waste management sites, beach cleaning, wildlife cleaning, and oil skimming and vacuuming operations. Awkward and repetitive tasks can lead to increased risk of musculoskeletal disorders, particularly in the hand, shoulder, and back. In fact, musculoskeletal injuries were the second largest category of complaints found in infirmary logs we reviewed. Health and safety professionals should evaluate tasks and work practices for ergonomic hazards and devise preventive solutions to reduce the risk of musculoskeletal injury. Qualified ergonomists may contribute to the redesign of work processes and practices as well as the development of more ergonomically efficient tools appropriate for specific tasks (e.g., for beach cleaning activities).

## Tobacco Use

We observed the extensive use of tobacco, especially cigarettes and smokeless tobacco products such as chew, dip, or snuff, by response workers at the sites. The health hazards associated with the use of tobacco products are well documented; effects include cardiovascular and coronary heart disease and a wide variety of cancers, including oral cavity, laryngeal, pharyngeal, esophageal, lung, and stomach cancers. While these health effects are widely acknowledged, less is known about the role exposure to tobacco products and cigarette smoke may play in an additive or synergistic manner with exposure to other chemical or physical hazards that may be present in emergency responses. Workers should pursue strategies to quit the use of tobacco products to prevent exposures to themselves and work colleagues. Smoking should be discouraged at all worksites, including contracted vessels. Employers are encouraged to provide smoking cessation programs for employees, ideally with the goal of attaining a smoke-free workplace.

## Limitations of the Evaluations

We used a combination of quantitative and qualitative exposure methods during our evaluations. The quantitative evaluations focused on air sampling for a variety of chemicals to determine levels of exposure. Observational assessments provided a qualitative measure of potential exposures to complement sampling. The combination of these approaches provided valuable information on the types and extent of worker exposures. Despite attempts to identify potential hazards and issues of importance using these two approaches, several limitations were inherent in the investigations. These limitations include the fact that Deepwater Horizon response work was stretched over an extremely large geographical area, making the evaluation of all worksites infeasible. Response work activities and exposures were quite dynamic throughout the response, so conditions at one point in time may not fully represent all conditions encountered by workers. Despite these limitations, we believe the issues we identified are applicable to the overall response. The consistency of NIOSH results and conclusions across the sites and activities we evaluated, along with consistency of our results with the quantitative measurements reported by other investigating organizations such as OSHA, USCG, and BP and its contractors, support the idea that our results have accurately characterized occupational exposures for the types of work included in our evaluations.

# Occupational Health Considerations for Future Large-Scale Response Events

Our evaluations identified hazards and occupational health considerations for future large-scale emergency response events. The development and effective implementation of comprehensive occupational safety and health programs are essential to preventing adverse health effects during emergency responses. Although each event presents unique issues, our experiences reveal needs and suggest strategies that would apply to most situations.

## Illness/Injury Surveillance

Because of the large scale increase in the number of workers responding to the oil release, the necessity of rapidly establishing a widespread system of surveillance for illnesses and injuries was a high priority. The Louisiana Department of Health and Hospitals established a sentinel surveillance system to track and evaluate acute health effects reported through hospital emergency departments, clinics, physicians' offices, and the Louisiana Poison Control Center. The system captured reports of workers' symptoms and hospitalizations thought to be related to Deepwater Horizon response work.

For a surveillance system to capture the needed information, we recommend making occupational exposure history a component of a complete history and physical examination administered by the examining physician or healthcare professional. This occupational history would gather important information regarding the patient's exposures to chemicals or other potentially hazardous agents, including relationship of those exposures to the onset of symptoms, and any use of PPE or other protective measures. Additionally, we recommend collecting this information on incident reporting forms collected by on-site health and safety professionals so it can be relayed to physicians or other healthcare professionals should the worker require further medical attention.

## Medical Clearance and Preplacement Evaluations

Preplacement evaluations are an important component in protecting workers with job duties that pose physical, mental, and chemical hazards, especially in large-scale emergency responses where workers may be performing unfamiliar tasks in unfamiliar environments. These evaluations are not meant to be a formal fitness for duty examination, but present a unique opportunity in several respects. They help health professionals identify individuals with health concerns that need to be addressed and those with specific susceptibilities whose activities may need to be restricted or modified. They also allow health professionals to identify medication, immunization, or training needs for workers and provide valuable information to the workers themselves on their health status and potential demands of the work they will encounter. These evaluations help document the worker's health status and may provide an opportunity for the worker to be directed to further medical evaluation as necessary. Finally, these evaluations can provide baseline information on health status that may be useful for future evaluations

16

or comparisons. Recommendations on when and what types of medical evaluations should be done and the minimum information to gather during such an evaluation can be found on the NIOSH website at http://www.cdc.gov/niosh/topics/oilspillresponse/preplacement.html.

## Risk Communication

The clear and consistent use of effective risk communication strategies is critically important in emergency response events. Our experience in the Deepwater Horizon response shows that these strategies can be improved upon by all involved parties. Many groups such as response workers; the general public; the scientific and medical community; advocacy organizations; local, state, and federal government agencies; and the media sought timely and accurate information about the event. Meeting the needs of these diverse groups is challenging. We received reports that messages and information were at times insufficient for their intended audience. For example, the need for detailed, timely, and specific information on all aspects of the occupational exposure evaluations was important to the scientific community and advocacy organizations. Members of these groups described a lack of details in official reports and communications from BP. Missing details included circumstances, conditions, and specific locations during which exposure measurements were collected; specific sampling methodology used; activities the workers were performing at the time of data collection; whether the samples were general area air samples or PBZ samples; and descriptions of the quantities or presence of oil, dispersants, or other chemicals to which the workers may have been exposed. We also received reports of the necessity for improved and more widely disseminated risk messages. These messages should be conveyed in simple and easy-to-understand terms for workers and the general public. Likewise, they should be tailored to available forms of communication and use the primary language of the intended audience.

The importance of good risk communication cannot be understated. Understanding and implementing improved risk communication strategies and messages learned from the Deepwater Horizon oil release will allow for a clearer understanding of the occupational hazards faced by response workers. Such knowledge will improve our ability to respond to those hazards, and to protect workers from safety and health hazards.

# Reference

Goldstein B, Osofsky H, Lichtveld M [2011]. The gulf oil spill. N Engl J Med *364*(14): 1334–1348.

# Acknowledgements

We gratefully acknowledge the assistance of the following NIOSH staff in leading and conducting the field work associated with the Deepwater Horizon HHEs:

| | | | |
|---|---|---|---|
| Steven Ahrenholz | Walter Alarcon | Sherry Baron | Bruce Bernard |
| Donald Booher | Yvonne Boudreau | Randy Boylstein | Scott Brueck |
| Gregory Burr | Geoff Calvert | Brian Curwin | Gayle DeBord |
| Risk Driscoll | Chad Dowell | Kevin L. Dunn | Srinivas Durgam |
| Judith Eisenberg | Stefanie Evans | Kenny Fent | Alberto Garcia |
| Barbara Grajewski | Ronald Hall | Greg Kinnes | Jennifer Lincoln |
| Ken Martinez | Robert McCleery | Mark Methner | R. Todd Niemeier |
| Chris Piacitelli | Phil Somervell | Eileen Storey | Aaron Sussell |
| David Sylvain | Sangwoo Tak | Loren Tapp | Hope Tiesman |
| Doug Trout | Christine West | Douglas Wiegand | Steve Wurzelbacher |

We gratefully acknowledge the assistance of the following NIOSH staff in supporting the field work associated with the Deepwater Horizon HHEs:

| | | | |
|---|---|---|---|
| Nancy Burton | James Couch | Karl Feldman | Melody Kawamoto |
| Kathleen Kowalski-Trakofler | | Charles Mueller | Elena Page |
| Jessica Ramsey | Dori Reissman | Teresa Seitz | Allison Tepper |
| Ken Wallingford | | | |

We gratefully acknowledge the assistance of the following NIOSH staff in providing analytical laboratory support for the Deepwater Horizon HHEs:

| | | | |
|---|---|---|---|
| Ardith Grote | Alan Lunsford | Charles Neumeister | Paula Fey O'Connor |
| Stephanie Pendergrass | Robert Streicher | | |

18

We gratefully acknowledge the assistance of the following NIOSH staff in providing coordination support for the Deepwater Horizon HHEs:

| | | | |
|---|---|---|---|
| *Lisa Delaney* | *Eric Esswein* | *Renee Funk* | *John Halpin* |
| *Ryan Hill* | *Jennifer Hornsby-Myers* | | *Max Kiefer* |
| *Lauralynn McKernan* | *Jim Spahr* | | |

We gratefully acknowledge the assistance of the following NIOSH staff in providing clerical, information technology and data management, legal, medical, translation, travel, or website support for the Deepwater Horizon HHEs:

| | | | |
|---|---|---|---|
| *Faith Armstrong* | *Mary Armstrong* | *Patricia Baker* | *Joseph Cauley* |
| *Glenn Doyle* | *Bill Ehling* | *Kim Fields* | *Debbie Fite* |
| *Sue Freking* | *Pat Gabriel* | *Jean Geiman* | *Chris Gersic* |
| *Denise Giglio* | *BJ Haussler* | *Greg Hartle* | *Alice Kelley* |
| *Kim Jenkins* | *Patty Laber* | *Anne Like* | *Lian Luo* |
| *Kathleen MacMahon* | *Linda Morris* | *Hovi Nguyen* | *Kim Reeves* |
| *Judy Riley* | *Robin Smith* | *Chris Storms* | *Shawna Watts* |
| *Cindee Yancey* | | | |

We also gratefully acknowledge the participation of the Louisiana Department of Health and Hospitals for their assistance in surveillance efforts. We would also like to thank the USCG, OSHA, and BP and its contractors and response workers for the support they provided.

Additionally, we would like to acknowledge Bureau Veritas North America, Inc., and Columbia Analytical Services, Inc., for analytical laboratory support, and to SRA International, Inc., for statistical analytical support.

# Availability of Report

The Hazard Evaluations and Technical Assistance Branch (HETAB) of the National Institute for Occupational Safety and Health (NIOSH) conducts field investigations of possible health hazards in the workplace. These investigations are conducted under the authority of Section 20(a)(6) of the Occupational Safety and Health Act of 1970, 29 U.S.C. 669(a)(6) which authorizes the Secretary of Health and Human Services, following a written request from any employer or authorized representative of employees, to determine whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found. HETAB also provides, upon request, technical and consultative assistance to federal, state, and local agencies; labor; industry; and other groups or individuals to control occupational health hazards and to prevent related trauma and disease.

Mention of any company or product does not constitute endorsement by NIOSH. In addition, citations to websites external to NIOSH do not constitute NIOSH endorsement of the sponsoring organizations or their programs or products. Furthermore, NIOSH is not responsible for the content of these websites. All Web addresses referenced in this document were accessible as of the publication date.

Copies of this report have been sent to employee and management representatives at BP, the Alabama, Florida, Louisiana, and Mississippi state health departments, and the Occupational Safety and Health Administration Region 4 and Region 6 Offices. This report is not copyrighted and may be freely reproduced. The report may be viewed and printed at http://www.cdc.gov/niosh/hhe/. Copies may be purchased from the National Technical Information Service at 5825 Port Royal Road, Springfield, Virginia 22161.

**Delivering on the Nation's promise:**
**Safety and health at work for all people through research and prevention**

**To receive NIOSH documents or more information about occupational safety and health topics, please contact NIOSH:**

> **Telephone: 1-800-CDC-INFO (1-800-232-4636)**
> **TTY: 1-888-232-6348**
> **email: cdcinfo@cdc.gov**
> **or visit the NIOSH Web site at www.cdc.gov/niosh**

U.S. Department of Health and Human Services

Centers for Disease Control and Prevention

National Institute for Occupational Safety and Health






**SAFER • HEALTHIER • PEOPLE™**

# EXHIBIT D

# Reporte de Incidentes



**CUALQUIER INCIDENTE O LESIÓN DEBE REPORTARSE INMEDIATAMENTE**

- La notificación es necesaria para todos los incidentes y/o lesiones, sin importar cuan pequeños o insignificantes que estos parezcan

- Notifique a su supervisor inmediato o coordinador voluntario

- Notifique a su contacto de BP



# Detenga el Trabajo



Recuerde...

– **Si no se ve bien, ¡suspenda el trabajo!**

– **Si su plan ha cambiado, ¡suspenda el trabajo!**

– **Si sencillamente siente que no está bien, ¡suspenda el trabajo!**

