# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>    Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc., *et al.*,<br><br>    Defendants. | * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**SUPPLEMENTAL DECLARATION OF LAURA C. GREEN, PH.D., D.A.B.T.**

I, Laura C. Green, submit this supplemental declaration in support of the BP Defendants' Motion for Final Approval of the Deepwater Horizon Medical Benefits Class Action Settlement Agreement. I am over the age of 18, and the opinions, statements, and conclusions expressed in this declaration are based on my personal knowledge, experience, and review of the materials described herein. If called to testify, I could testify to the matters set forth in this declaration.

1

## Introduction

1. I submitted an initial declaration to the Court on August 12, 2012. In that declaration, I concluded that the uses of oil dispersants in response to the Deepwater Horizon spill did not pose a risk to the health of the plaintiffs.

2. I have reviewed objections to the proposed Medical Benefits Class Action Settlement Agreement, and the declarations attached thereto, that were submitted by: Halliburton Energy Services, Inc.; Jason Melancon and Marx Sterbcow on behalf of a consolidated group of claimants; class members Mike and Patricia Sturdivant, Susan Forsythe, and James H. Kirby IV; and the Law Offices of Krupnick, Cambell, Malone, Buser, Slama, Hancock, Liberman & McKee, P.A. and Smith Stag, L.L.C. None of these objections or declarations changes my opinions or conclusions as set forth in my initial declaration. However, I am submitting this supplemental declaration to respond to several points raised in the declarations of William R. Sawyer, Ph.D., and Michael Robichaux, M.D., both submitted in support of the Krupnick *et al*. and Smith Stag L.L.C. *et al*. Objections.

3. The bases of the opinions, analyses, and conclusions offered below are (i) my training and experience in chemistry, exposure assessment, toxicology, and health risk assessment, and (ii) technical and scientific information contained in the materials cited below.

## Scope and Summary of Opinion

4. I have been asked to assess the scientific reliability of the opinion expressed by William R. Sawyer, Ph.D., in his September 7, 2012 Declaration in this case. In brief, his opinion is that "long-term (permanent) adverse health effects are anticipated" in the objectors due to their alleged exposure to oil and dispersant. As explained below, Dr. Sawyer's opinion is not supported by ambient air quality data collected during the Deepwater Horizon release and response, not formulated according to fundament toxicologic tenets, and is otherwise unreliable.

5. The fundamental tenet of toxicology is that "the dose makes the poison." Very large doses of any chemical can harm health; very small doses do not. Dr. Sawyer's Declaration flouts this fundamental tenet. The extensive air quality data gathered throughout the Deepwater Horizon release and response indicate that plaintiffs' exposures to (and thus doses of) the chemicals at issue were much too small to pose a significant risk of long-term health effects. Dr. Sawyer is either unaware of this extensive data set, or chooses to ignore it. Either way, his opinion is irrelevant, unreliable, or both.

6. Dr. Sawyer points out that response workers and residents affected by the Deepwater Horizon release and response were more likely than non-exposed residents to report short-term symptoms such as coughs, sore throats, or breathing difficulties. He also notes that elevated rates of these symptoms have been reported in studies of other groups of people exposed to other large oil spills and responses. But he provides no reliable basis for extrapolating from these short-term symptoms to permanent health effects — nor does he identify what specific health effects he "anticipates." This lack of specificity makes it difficult to determine what his opinion actually is.

7. I have also been asked to assess the reliability of the opinions expressed by Michael Robichaux, M.D., in his September 7, 2012 Declaration in this case. In brief, his opinions appear to be that (i) many of the plaintiffs are expected to develop "headaches, memory loss, irritability, extreme fatigue, insomnia . . . an inability to concentrate . . . [and] multiple chemical sensitivities" as a result of the Deepwater Horizon Release and response, and (ii) his "treatment" of the plaintiffs has been, or would be, beneficial.

8. With regard to the first of these opinions, Dr. Robichaux cites zero scientific papers, otherwise provides no scientific evidence, and writes of himself, "Please understand that I am not a scientist and that I do not consider myself to be distinguished." Robichaux Decl. ¶ 24.

9. With regard to his second opinion, Dr. Robichaux's Declaration provides (i) no evidence that any of his patients' health problems were caused by the Deepwater Horizon release and response, (ii) no description of the treatments he offers, and (iii) no evidence that such treatments are appropriate, safe, and effective.

10. In what follows, I provide additional details regarding the Declarations of Drs. Sawyer and Robichaux.

## Misrepresentation by Dr. Sawyer
## of the Extent and Results of Air Sampling

11. Dr. Sawyer misrepresents both the extent and the results of air sampling conducted during the Deepwater Horizon release and response. For example, he asserts that air was tested, by OSHA and the US Coast Guard, "for just a handful of chemicals," resulting in a "fail[ure] to assess the totality of the exposure and potential additive toxicological effects." Sawyer Decl. ¶¶ 10, 15. What he fails to note, however, is that National Institute for Occupational Safety and Health (NIOSH), as part of its Health Hazard Evaluations (NIOSH, 2011), sampled for 111 chemicals (tabulated below). Having done so, NOISH found that "measured substances were either not detected or were present at low concentrations below individual occupational exposure limits."

4

**Table 1. Chemicals sampled for by NIOSH, as reported in their Health Hazard Evaluation Exposure Monitoring Data**
**(http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html )**

| | | |
|---|---|---|
| 1,1,1-Trichloroethane | Benzo(a)pyrene | Indeno(1,2,3-cd)pyrene |
| 1,1,2,2-Tetrachloroethane | Benzo(b)fluoranthene | Isopropyl alcohol |
| 1,1,2-Trichloroethane | Benzo(e)pyrene | Limonene |
| 1,1-Dichloroethane | Benzo(g,h,i)perylene | m,p-Xylenes |
| 1,1-Dichloroethene | Benzo(k)fluoranthene | Mercury |
| 1,2,4-Trichlorobenzene | Benzyl Chloride | Methyl Methacrylate |
| 1,2,4-Trimethylbenzene | Bromodichloromethane | Methyl tert-Butyl Ether |
| 1,2-Dibromo-3-chloropropane | Bromoform | Methylene Chloride |
| 1,2-Dibromoethane | Bromomethane | Naphthalene |
| 1,2-Dichloro-1,1,2,2-tetrafluoroethane | Carbon Disulfide | n-Butyl Acetate |
| | Carbon monoxide | n-Heptane |
| 1,2-Dichlorobenzene | Carbon Tetrachloride | n-Hexane |
| 1,2-Dichloroethane | Chlorobenzene | n-Nonane |
| 1,2-Dichloropropane | Chloroethane | n-Octane |
| 1,3,5-Trimethylbenzene | Chloroform | n-Propylbenzene |
| 1,3-Butadiene | Chloromethane | Organic carbon (Diesel exhaust) |
| 1,3-Dichlorobenzene | Chrysene | |
| 1,4-Dichlorobenzene | cis-1,2-Dichloroethene | o-Xylene |
| 1,4-Dioxane | cis-1,3-Dichloropropene | Phenanthrene |
| 2-Butanone (MEK) | Cumene | Propene |
| 2-Butoxyethanol | Cyclohexane | Propylene glycol |
| 2-Hexanone | Dibenzo(a,h)anthracene | Proylene glycol ethyl ether |
| 2-Propanol (Isopropyl Alcohol) | Dibromochloromethane | Pyrene |
| 3-Chloro-1-propene (Allyl Chloride) | Dichlorodifluoromethane | Styrene |
| 4-Ethyltoluene | Dipropylene glycol butyl ether | Tetrachloroethene |
| 4-Methyl-2-pentanone | Dipropylene glycol methyl ether | Tetrahydrofuran (THF) |
| Acenaphthene | d-Limonene | Toluene |
| Acenapthylene | Elemental carbon (Diesel exhaust) | Total Hydrocarbons |
| Acetaldehyde | | Total PAHs |
| Acetone | Ethanol | Total particulates |
| Acetonitrile | Ethyl Acetate | trans-1,2-Dichloroethene |
| Acrolein | Ethyl benzene | trans-1,3-Dichloropropene |
| Acrylonitrile | Fluoranthene | Trichloroethene |
| alpha-Pinene | Fluoranthracene | Trichlorofluoromethane |
| Anthracene | Fluorene | Trichlorotrifluoroethane |
| Benzene | Formaldehyde | Vinyl Acetate |
| Benzene soluble fraction | Hexachlorobutadiene | Vinyl Chloride |
| Benzo(a)anthracene | Hydrogen sulfide | Xylenes |

12. More generally, as noted in my prior Declaration in this matter, some 30,000 personal monitoring samples were collected during the response to the Deepwater Horizon accident. These samples were obtained from clean-up workers doing tasks with the highest

5

potential for exposure, including dispersant application, decontamination, and drilling in the source area.

13.     Ignoring this extensive data set, Dr. Sawyer presents results from a single sample taken "on May 18, 2010, in the Venice, Louisiana marina boom off-loading/staging area." Sawyer Decl. ¶6. In that sample, benzene was apparently detected at a concentration of 116 micrograms per cubic meter ($\mu g/m^3$). Even were this one-time measurement representative of a long-term average — which is the metric of toxicological significance for benzene and all other chemical carcinogens — it would not amount to a dangerous concentration. This is evidenced, for example, by the fact that it is less than 4% of the permissible, health-based exposure limit (PEL) for benzene established by the federal Occupational Safety and Health Administration (OSHA), which is 3,200 $\mu g/m^3$.

14.     Dr. Sawyer notes that the reported concentration of benzene in this one sample — that is, 116 $\mu g/m^3$ — exceeds "the USEPA industrial screening limit [, which] is 1.6 $\mu g/m^3$." What he fails to note, however, is that (i) this "screening limit" is based on the entirely theoretical and scientifically questionable assumption that such exposures increase a person's chance of developing cancer by one in one million (Cox ,1996; Jandl, 1996), and, (ii) in any event, that this screening limit pertains to exposures presumed to occur over a period of 25 years (http://www.epa.gov/region9/superfund/prg/). Moreover, benzene is ubiquitous in ambient air, and most of us are exposed to benzene at concentrations at or above this screening limit (Wallace 1991a&b; Wallace *et al*., 1987a&b).

15.     The single sample result presented by Dr. Sawyer is clearly not representative of exposures to Deepwater Horizon response workers or residents. In particular, benzene was not detected in 97.7% of the 28,827 industrial hygiene samples reported by BP, and was detected at

6

low levels in the remaining 2.3% of the samples. Using these detected concentrations, along with a standard assumption about the distribution of values in the samples with too little benzene to measure,[1] I estimate that response workers could have been exposed to benzene at an average concentration of 9 μg/m$^3$— considerably less than the single measurement of 116 µg/m$^3$ reported by Dr. Sawyer. Again, such a small concentration of benzene is well within workplace limits. Moreover, residents' exposures would have been considerably smaller than response workers' exposures.

  16. As it happens, U.S. EPA also took ambient air samples on the same date (May 18, 2010) as the sample reported by Dr. Sawyer. The Agency collected three air samples from locations in Plaquemines Parish — including one in Venice — and found much smaller (indeed almost entirely non-detectable) concentrations relative to those reported by Dr. Sawyer. The data are tabulated below.

---

[1] Most sets of measurements of contaminants in air are consistent with samples from a lognormal distribution. If I assume a lognormal distribution for the distribution underlying these 28,827 measurements, then I can use maximum likelihood methods to evaluate the mean of that distribution; and I can also estimate an upper confidence bound on the mean (so that with the assumption of lognormality, there is a 95% probability that the mean is lower than this upper bound). Applying this technique, I find that the maximum likelihood estimate of the mean for benzene in this data-set is 9 μg/m$^3$, and the 95% upper confidence bound on the mean is also 9 μg/m$^3$.

Table 2   U.S. EPA ambient air sampling results for May 18, 2010 for Locations in Plaquemines Parish, LA[2], compared with results reported by Dr. Sawyer on the same date.  ND = not detected.

| Chemical | Concentration (in μg/m$^3$) measured by EPA at location: | | | Concentration (in μg/m$^3$) reported by Sawyer |
|---|---|---|---|---|
| | V02 | V03 | V05 | |
| Benzene | ND (< 0.58) | ND (< 0.61) | ND (< 0.58) | 116 |
| Ethylbenzene | ND (< 0.78) | ND (< 0.83) | ND (< 0.79) | 1.26 |
| Toluene | 1 | 0.94 | ND (< 0.69) | 57.1 |
| m&p-Xylenes | ND (< 0.78) | ND (< 0.83) | ND (< 0.79) | 5.4 |
| o-Xylene | ND (< 0.78) | ND (< 0.83) | ND (< 0.79) | |

17.   U.S. EPA took many more ambient air samples during the spring and summer of 2010.  In particular, EPA collected and analyzed 1,903 air-samples for benzene over the period from April through September 2010 (as reported in a database assembled by the National Oceanic and Atmospheric Administration).  Overall, the average concentration of benzene in ambient air was on the order of 0.4 μg/m$^3$, which, clearly, is much smaller than the single value of 116 μg/m$^3$ reported by Dr. Sawyer.

18.   Dr. Sawyer states that, beyond benzene, other chemicals that he and others have detected, such as ethylbenzene, toluene, and the xylenes, listed above, can cause nervous system damage and/or can "affect the blood, immune system, liver, spleen, kidneys, developing fetus, and lungs."  Sawyer Decl. ¶¶ 6, 10.  These assertions are meaningless without reference to actual (or at least reasonably estimated) levels and durations of exposure, and Dr. Sawyer provides no evidence that the levels of the plaintiffs' exposures were remotely close to exposure levels at which any of these health effects would be "anticipated," let alone demonstrated.  Indeed, as noted by U.S. EPA (at http://www.epa.gov/BPSpill/taga.html#tagadata), ambient air

---

[2] Sampling data downloaded from http://www.epa.gov/bpspill/air.html#airsamp in September 2012.

8

concentrations of these and other volatile organic compounds were found only at concentrations "well below levels that would cause temporary discomfort, irritation, or other minor effects." Moreover, we are all exposed to each of these, and many other, volatile organic compounds, at airborne concentrations comparable to those detected by U.S. EPA in this case (Wallace 1991a&b; Wallace *et al*., 1987a&b).

### Failure by Dr. Sawyer to Define, Let Alone to Demonstrate, Significant Risks of Any Long-Term Health Effects

19.     Dr. Sawyer fails to identify what specific health effects he believes are "anticipated" following exposures to chemicals emanating from the Deepwater Horizon release and response. For purposes of discussion, and because the following health-effects are not included in the Settlement, I assume that he "anticipates" significantly excess rates of (i) cancer, due to benzene, ¶6, (ii) brain damage, due to toluene, ¶ 10, and (iii) birth defects, due to toluene, ¶¶ 33-37. Each is discussed below.

20.     First, workers chronically exposed to *high* concentrations of benzene *indoors* are indeed at increased risk of developing a type of cancer — acute myelogenous leukemia (AML) — but those circumstances are not present here. Based on epidemiologic evidence, the smallest concentrations of benzene known or reasonably expected to pose a significant risk of AML are on the order of 32,000 μg/m$^3$ as a long-term average (Jandl, 1996) — whereas, in the case at hand, the average concentration of benzene to which workers might have been exposed (as calculated above) is on the order of 9 μg/m$^3$. Accordingly, excess rates of AML among Deepwater Horizon response workers are certainly not reasonably likely, let alone "anticipated."

21.     Second, *very high-level* exposures to toluene can act as a narcotic, and some drug-users "huff" toluene vapors to get high. The concentrations of toluene repeatedly inhaled are massive — on the order of 30,000,000 μg/m$^3$ — and well known to cause brain damage (Gospe

9

*et al.,* 1994; Filley *et al.*, 1990). Toluene is particularly toxic to the brain's white matter, as evidenced by neuroimaging studies, and by the particular behavioral defects characteristic of toluene-induced dementia, including diminishments in executive function and language skills, memory, attention-span, and mental processing-speed (Yucel *et al.*, 2008). The exposure levels of toluene at issue in this case, however, are orders of magnitude smaller than those causing narcosis, and present zero risk of brain damage. In particular, the BP industrial hygiene data suggest an average toluene concentration[3] on the order of 60 μg/m$^3$ — which is well within the OSHA permissible exposure limit for toluene (750,000 μg/m$^3$) and, of course, much smaller than narcotic concentrations.

22. Third, women who abuse toluene during pregnancy put their fetuses at increased risk of developing a characteristic set of mental and physical birth defects (Hersh,1989; Hannigan & Bowen, 2010). As noted above, toluene-abuse involves repeated exposures to massive amounts. As estimated above, occupational exposures to toluene due to the Deepwater Horizon release and response were quite small, and would have presented no risk to the fetuses of response workers who might have been pregnant.

23. Next, Dr. Sawyer seems to suggest that he "anticipates" persistent pulmonary symptoms in Deepwater Horizon respondents because such symptoms were reported in a study of workers (Zock *et al.*, 2009) who had been involved in clean-up of the spill from the wreckage of the oil tanker *Prestige* (in November 2002, off the northwest coast of Spain). Sawyer Decl. ¶ 19. However, the *Prestige* release differed from the Deepwater Horizon release in that the *Prestige* had been transporting residual fuel oil with a very high aromatic and volatile

---

[3] As explained above with regard to benzene, I have used maximum likelihood methods, along with the assumption of lognormality of the data, to estimate both a mean and a 95% upper confidence bound on the mean. So doing, for toluene, I estimate a mean of 60 μg/m$^3$ and a 95% upper confidence bound on the mean of 63 μg/m$^3$.

10

hydrocarbon content, not crude oil, which is much less volatile (Zock *et al.*, 2007). Furthermore, despite increased symptom reports among the *Prestige* spill clean-up workers, their lung function test results were normal (Rodriguez-Trigo *et al.*, 2010).

24. In general, major oil spills and responses thereto are complex situations, with each incident more or less unique. Thus, except in broad terms, one cannot reliably extrapolate symptoms and health effects reported — or not reported — in one major spill to predict health effects potentially caused by another, different spill. Moreover, one cannot survey such populations in any randomized or "blinded" way: people exposed to a spill know it, often can see and smell it, and are understandably upset by it. As a practical matter, investigators surveying such people for symptoms cannot gather wholly objective evidence, however defined. Nonetheless, it is worth noting that no specific, long-term health effect caused by oil spills and responses has been consistently identified — and this is another reason that Dr. Sawyer's "anticipation" of "permanent adverse health effects" lacks a reliable basis.

## Failure by Dr. Robichaux to "Establish Medical General and Proximate Causation"

25. In the Statement of Objections by the Law Offices of Krupnick and others, Dr. Robichaux's Declaration is introduced as a means of "establishing medical general and proximate causation." However, his Declaration does no such thing.

26. Dr. Robichaux does not establish "causation" for any specific plaintiff and/or patient, let alone for the class of plaintiffs as a whole. As far as I can tell, Dr. Robichaux alludes to only three or four specific patients (in paragraphs 27, 29, 31, and 33).

27. No information at all is given with regard to the patient mentioned in paragraph 27 (unless this is the same patient as mentioned in paragraph 29).

11

28. Of the patient in paragraph 29, all that Dr. Robichaux reveals is that according to his (Dr. Robichaux's) recollection (Dr. Robichaux does not state whether this recollection was from his history of the patient or from some other source) the patient "was told that he was either seasick, had the flu or was dehydrated." Dr. Robichaux provides no independent evidence of the actual symptoms, the relationship of any symptoms to purported exposures, or the temporal relationship between any symptoms and any purported exposures.

29. In paragraph 31, Dr. Robichaux lists the "chronic" symptoms of one of his patients as "Headaches, memory loss, irritibility [*sic*], extreme fatigue, insomnia and an inability to concentrate." He provides no information on exposure of this patient, temporality of any exposure history relative to the onset of such symptoms, or other information that might relate symptoms to exposure.

30. In paragraph 33, two specific patients are mentioned. The first is now apparently intolerant of diesel fumes after working with diesel fuel all of his life. No information is given of any exposure to Deepwater Horizon related oil, dispersants, or decontaminants, or the temporality of the onset of this intolerance relative to any purported exposure. The second patient mentioned can apparently no longer stand to put gasoline into his car, but this account is similarly non-specific. Oddly, this paragraph indicates that both these patients and a "large percentage, if not a majority, of the people who" have entered Dr. Robichaux's unspecified treatment "program" complain of intolerances *subsequent* to this treatment.

31. In each of these cases, Dr. Robichaux's Declaration describes no more than minimal anecdotal data, and otherwise fails to demonstrate that his patients "developed symptoms which are consistent with said exposure, temporal to said exposure, and in substantial conformation with Bradford Hill and other reliable methods for establishing medical general and

proximate causation," as claimed of his Declaration in the Statement of Objections by the Law Offices of Krupnick and others.

32. Dr. Robichaux provides no arguments about general causation, beyond his characterization in paragraph 33 that "One of the classic problems seen with individuals with toxic exposures is their development of multiple chemical sensitivities." However this purported multiple chemical sensitivity (MCS) syndrome is poorly characterized, and has not been demonstrated to be related to chemical exposures (AAAAI, 1999; Graveling *et al*., 1999; Eis *et al*., 2008). Self-reported MSC patients have been found to be no more sensitive to chemicals than normal controls (Haumann *et al*., 2003; Das-Munshi *et al*., 2006; Bornschein *et al.,* 2008). Application of the Bradford Hill criteria shows the toxigenic hypothesis for MCS fails (Staudenmayer *et al.* 2003a), and suggests instead a pyschogenic theory (Staudenmayer *et al.* 2003b).

33. Dr. Robichaux provides no evidence about the methodology he used (if any) to diagnose MCS, so that its reliability and error rate is unknown. He provides no information about his treatment program. And he provides no evidence to demonstrate that the symptoms experienced by his patients relate in any way to the Deepwater Horizon release and response.

**Conclusion**

34.     Overall, then, I find that Dr. William Sawyer's and Dr. Michael Robichaux's assertions with regard to long-term health effects due to the Deepwater Horizon release and response are not based on scientific evidence or reasoning, and are thus unreliable.

I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.

Laura C. Green, Ph.D., D.A.B.T.

**REFERENCES**

AAAAI. 1999. Idiopathic environmental intolerances. American Academy of Allergy, Asthma and Immunology (AAAAI) Board of Directors. J Allergy Clin Immunol. 103(1 Pt 1):36–40.

BP (2010).  BP Health Monitoring Data.

Bornschein S, Hausteiner C, Römmelt H, Nowak D, Förstl H, Zilker T. 2008. Double-blind placebo-controlled provocation study in patients with subjective Multiple Chemical Sensitivity (MCS) and matched control subjects. Clin Toxicol (Phila). 46(5):443–449.

Cox LA Jr. (1996). Reassessing benzene risks using internal doses and Monte-Carlo uncertainty analysis. *Environ Health Perspect.* 104 Suppl 6:1413-29.

Das-Munshi J, Rubin GJ, Wessely S. 2006. Multiple chemical sensitivities: A systematic review of provocation studies. J Allergy Clin Immunol. 118(6):1257–1264.

EPA (2010a).  Mobile Air Monitoring on the Gulf Coast: TAGA Buses.  Available at http://www.epa.gov/bpspill/taga.html.

EPA (2010b).  Offshore air sampling for dispersant-related compounds.  Available at http://www.epa.gov/bpspill/dispersant-air-sampling.html.

Eis D, Helm D, Mühlinghaus T, Birkner N, Dietel A, Eikmann T, Gieler U, Herr C, Lacour M, Nowak D, Pedrosa Gil F, Podoll K, Renner B, Andreas Wiesmüller G, Worm M. 2008. The German Multicentre Study on Multiple Chemical Sensitivity (MCS). Int J Hyg Environ Health. 211(5–6):658–681.

Filley, C., Heaton, R.K., Rosenberg, N.L., (1990). White matter dementia in chronic toluene abuse. *Neurology* 40:532–534.

Gospe SM Jr, Al-BayatI MAS. (1994). Comparison of oral and inhalation exposures to toluene. *J Am Coll Toxicol* 13(1):21-32.

Graveling RA, Pilkington A, George JP, Butler MP, Tannahill SN. 1999. A review of multiple chemical sensitivity. Occup Environ Med. 56(2):73–85.

Hannigan JH, Bowen SE. (2010). Reproductive toxicology and teratology of abused toluene. *Syst Biol Reprod Med*. 56(2):184-200.

Haumann K, Kiesswetter E, van Thriel C, Blaszkewicz M, Golka K, Seeber A. 2003. Breathing and heart rate during experimental solvent exposure of young adults with self-reported multiple chemical sensitivity (sMCS). Neurotoxicology. 24(2):179–186.

Hersh JH. Toluene embryopathy: two new cases. (1989). *J Med Genet.* 26(5):333-7.

Houma ICP Aerial Dispersant Group (2010). After Action Report; Deepwater Horizon MC252 Aerial Dispersant Response. December 31, 2010.

Jandl, J. (1996) *Blood: Textbook of Hematology*. Boston: Little, Brown and Co.

King BS and Gibbins JD. (2011). *Health Hazard Evaluation of Deepwater Horizon Response Workers*. Health Hazard Evaluation Report HETA 2010-0115 & 2010-0129-3138. August 2011.

NIOSH (2005). *NIOSH Pocket Guide to Chemical Hazards*. NIOSH Publication No. 2005-149. Available at www.cdc.gov/niosh/npg/default.html.

NIOSH (2011). *Health Hazard Evaluation of Deepwater Horizon Response Workers. Health Hazard Evaluation Report. HETA 2010-0115 & 2010-0129-3138.*

OSHA (2010). Laboratory Analysis Results by Site. Available at http://www.osha.gov/oilspills/oil_sltc_bysite.html.

OSHA (2011). Deepwater Horizon Oil Spill: OSHA's Role in the Response. U.S. Department of Labor, Occupational Safety and Health Administration. May 2011. Obtained from www.osha.gov/oilspills/dwh_osha_response_0511a.pdf.

Rodríguez-Trigo G, Zock JP, Pozo-Rodríguez F, Gómez FP, Monyarch G, Bouso L, Coll MD, Verea H, Antó JM, Fuster C, Barberà JA; SEPAR-Prestige Study Group. (2010). Health changes in fishermen 2 years after clean-up of the Prestige oil spill. *Ann Intern Med.* 153(8):489-98.

Staudenmayer H, Binkley KE, Leznoff A, Phillips S. 2003a. Idiopathic environmental intolerance: Part 1: A causation analysis applying Bradford Hill's criteria to the toxicogenic theory. Toxicol Rev. 22(4):235–246.

Staudenmayer H, Binkley KE, Leznoff A, Phillips S. 2003b. Idiopathic environmental intolerance: Part 2: A causation analysis applying Bradford Hill's criteria to the psychogenic theory. Toxicol Rev. 22(4):247–261.

Wallace LA. (1991). Comparison of risks from outdoor and indoor exposure to toxic chemicals. *Environ Health Perspect*. 95:7-13.

Wallace LA. (1991). Personal exposure to 25 volatile organic compounds. EPA's 1987team study in Los Angeles, California. *Toxicol Ind Health*. 7(5-6):203-8.

Wallace LA, Pellizzari ED. (1987). Personal air exposures and breath concentrations of benzene and other volatile hydrocarbons for smokers and nonsmokers. *Toxicol Lett*. 35(1):113-6.

Wallace LA, Pellizzari ED, Hartwell TD, Sparacino C, Whitmore R, Sheldon L, Zelon H, Perritt R. (1987).The TEAM (Total Exposure Assessment Methodology) Study: personal exposures to toxic substances in air, drinking water, and breath of 400 residents of New Jersey, North Carolina, and North Dakota. *Environ Res*. 43(2):290-307.

Yücel M, Takagi M, Walterfang M, Lubman DI. (2008). Toluene misuse and long-term harms: a systematic review of the neuropsychological and neuroimaging literature. *Neurosci Biobehav Rev*. 32(5):910-26.

Zock JP, Rodríguez-Trigo G, Pozo-Rodríguez F, Barberà JA, Bouso L, Torralba Y, Antó JM, Gómez FP, Fuster C, Verea H; SEPAR-Prestige Study Group. (2007). Prolonged respiratory symptoms in clean-up workers of the prestige oil spill. *Am J Respir Crit Care Med*. 176(6):610-6.