**KIRKLAND & ELLIS LLP**
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:

(202) 879-5200

October 23, 2012

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Room B345
500 Poydras Street
New Orleans, LA 70130

Re:   MDL No. 2179 — Subpoenas to United States Contractors

Dear Judge Shushan:

BP writes in reply to the United States' Friday, October 19, 2012 letter opposing BP's request to subpoena Rule 30(b)(6) deposition testimony from three United States-affiliated entities that provided technical analysis as part of FRTG's Reservoir Modeling and Plume Teams.

The United States' letter raises a disparate variety of points, none of which individually or collectively justifies depriving BP of testimony from these entities — Kelkar & Associates, Purdue University, and the University of California, Santa Barbara (UCSB).

**THESE REQUESTS FOR RULE 30(B)(6) TESTIMONY ARE REASONABLE**

BP's renewed subpoena requests are ripe and reasonable, and the Court and parties need to move forward with them now, given the Court's well-established Phase 2 litigation timeline.

**BP's Requests Are Timely**

In terms of timing exigencies, little need be said.  The Court's Phase 2 timeline provides that Rule 30(b)(6) depositions should conclude by the end of November.

The United States nonetheless insists that the Court should ask BP to wait still further to issue the three subpoenas now on the table — until the "relevant United States witness for the Plume Team and Reservoir Modeling Teams" have been deposed on October 24–25 and October 31–November 1, respectively.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 23, 2012
Page 2


The problem with this wait-and-see approach is that it leaves too little time for BP to renew its subpoena requests; have those requests granted; issue subpoenas to the three entities; and schedule and take the relevant depositions — all before the end of November. Indeed, putting off the Court's decision risks prompting a situation in which (in contrast to the United States' current insistence that BP's request is premature) a party may be tempted to claim later on that the clock has run out and the time for taking these depositions has passed.

### BP's Requests Are Appropriate

Contrary to the United States' claim, BP is not seeking inappropriately to depose specific individuals. BP's request does not (and could not) dictate which individuals will be designated by these entities under Rule 30(b)(6). As far as BP knows, Kelkar, Purdue, and UCSB had only a few individuals performing work related to the *Deepwater Horizon* spill, but the same can certainly be said of BP affiliates which have offered Rule 30(b)(6) testimony. (*See, e.g.,* Add Energy and Rrb Energy.) There is no justification for applying to Kelkar & Associates, Purdue University, and UCSB a rule different from the practices regarding BP-affiliated entities that already have offered, or soon will offer, Phase 2 deposition testimony.

Further, there is no comparison between BP's current request and the United States' desire to depose more than five additional BP employees.

BP will provide no fewer than 18 BP Rule 30(b)(6) witnesses, plus at least 12 BP-affiliate witnesses, plus at least the five BP Quantification fact deponents that the United States indicates that it plans to name on November 12. The United States will therefore have the opportunity to conduct fact depositions of at least 35 BP and BP-affiliated Phase 2 fact witnesses — without even counting the BP fact witnesses we expect to be identified on November 12 by the PSC, the States, Transocean, and Halliburton, and the BP trial witnesses who also will have to offer Phase 2 deposition testimony.

BP's current request asks, by contrast, that three Rule 30(b)(6) witnesses with clearly relevant testimony be immediately designated by entities that have not yet been deposed at all. BP's request for *a first* deposition from these three non-US entities thus stands in stark contrast to the United States' counter-request for still *more* depositions of BP witnesses and BP affiliates.

It is the United States, not BP, who proposes (in its words), "chasing every rainbow and looking under every log."

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
October 23, 2012
Page 3

### BP's Requests Do Not Improperly Seek Expert Testimony

The United States' suggestions that BP seeks improper expert testimony from Kelkar & Associates similarly misses the mark.

As the Court knows, the issues being contested in Phase 2 are inherently scientific and technical. Technical questions accordingly have been asked, and will continue to be asked, of percipient witnesses regarding what they said, did, saw, heard, thought, considered, relied upon, and rejected. The technical nature of those questions does not mean the questions improperly seek to elicit expert opinion testimony.

Tellingly, the United States' stated fear that some deposition questions might improperly stray into expert-opinion territory apparently is not shared by the United States' own deposition takers. The United States has repeatedly sought technical views — what the United States now inaccurately calls "expert opinions" — from BP witnesses and BP-affiliated witnesses, especially those who themselves are expert in a field of science or engineering or who have been designated to testify about other experts' work in such fields. As examples, BP attaches excerpts of the United States' questioning from the depositions of Add Energy, Simon Bishop, Isotech, Pencor, Bryan Ritchie, Pinky Vinson, and Weatherford. (*See* Attachment 1 (listing questions).)

Likewise, the subsection of Federal Rule of Civil Procedure 45 cited by the United States is of no help here. That provision specifies where fact discovery from experts crosses the line, namely where a party subpoenas "an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party...." FRCP Rule 45(c)(3)(B)(ii).

In other words, this Rule forbids a party from dragging into a deposition an expert who has had nothing to do with the case in order to "free ride" off the expert's professional work-product unrelated to the case. ("Compulsion to give evidence may threaten the intellectual property of experts denied the opportunity to bargain for the value of their services." *See* FRCP Advisory Committee Notes to 1991 Amendment re Clause (c)(3)(B)(ii)(*citation omitted)*.)

BP's proposed deposition meets none of the three criteria needed to trigger this Rule: Kelkar & Associates *was* retained by the United States to provide technical consulting services; the information BP seeks by way of 30(b)(6) depositions *does* relate to specific occurrences now in dispute (namely the Government's flow rate estimates); and the technical studies at issue *were* requested by a party to this litigation (namely the United States).

Ultimately, the United States' rejoinders are weak because the appropriateness of deposing Kelkar & Associates is plain. BP's initial letter pointed to evidence that an important

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 23, 2012
Page 4

principal at Kelkar & Associates — an entity that participated in the FRTG's reservoir modeling — determined that the United States' flow rate estimates were not defensible. Kelkar & Associates' testimony about what it said, did, saw, heard, thought, considered, relied upon, and rejected as part of the work leading up to this conclusion will likely shed further light on reasons why the United States' estimate is unreliable. By attempting to block this deposition, the United States (for whatever reason) is seeking to prevent potentially damaging information from reaching the parties to this case.

**SUGGESTIONS REGARDING BRYAN RITCHIE'S LACK OF PREPAREDNESS ARE IRRELEVANT AND UNFOUNDED**

Finally, the United States issues a "comeback" request, saying that, if BP is allowed a reasonable opportunity to depose these United States third-party affiliates (rather than relying on the limited knowledge of their work possessed by Government 30(b)(6) witnesses), then the United States should be able to take additional depositions of BP witnesses who performed reservoir analyses. The United States contends in this regard that one BP 30(b)(6) witness was supposedly unprepared to testify.

But the premise of this argument is incorrect. The BP witness in question, Bryan Ritchie, was *not* unprepared to testify about a subject within the scope of his 30(b)(6) topic. Mr. Ritchie was BP's Rule 30(b)(6) designee on the topic of BP's "geophysical or geological" analysis. (Agreed 30(b)(6) Deposition Notice of BP Defendants, Topic 21.) During his deposition, the Government's attorney asked Mr. Ritchie about the geophysical and geological analysis of potential aquifer *size*, and Mr. Ritchie provided responsive answers. But when the Government asked about "dynamic" aquifer analysis — the subject specified in the United States' Opposition letter brief, Mr. Ritchie explained that "dynamic" analysis is not done by geologists and geophysicists:

> Aquifer support is usually based on dynamic data. It's not a geophysical or geological parameter. Aquifer size is a prediction made by the Geologist and Geophysicist. Aquifer support is not.

(Ritchie Dep. Tr. 459:11–15.) In other words, the fact that the United States did not ask the right questions of the right witnesses and/or did not seek a deposition topic covering information it later deemed important is not at all relevant to BP's instant deposition request.

More fundamentally, as for each and every one of the dozen depositions of BP affiliates, the United States and other parties could just as well have relied solely on BP's testimony about the work these affiliates performed. BP's litigation opponents were permitted, however, to go to

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 23, 2012
Page 5

the source and obtain direct testimony from the entities most knowledgeable about their own work. BP should now be permitted a similar opportunity.

*   *   *

In addition to the weaknesses of the United States' rejoinders, the Court should also take note of the modest number of third-party Rule 30(b)(6) depositions that BP has sought and been granted in Phase 2 to date. Setting aside the three requests at issue here, BP has been given the opportunity to depose just two third-party affiliates of the United States — the Woods Hole Oceanographic Institute and Statoil. (Rec. Doc. 7289, at 10.) By contrast, the Court has allocated time for the depositions of twelve "BP affiliates" — ADD Energy, Rrb Energy, BP Institute, Intertek, Isotech, Oceaneering, Pencor, Schlumberger, Stress Engineering, Weatherford, Wild Well Control, and World Oil Field. (*See* Rec. Doc. 7289, at 10; Aug. 7, 2012 Dep. of Rrb Energy.)

Granting BP's instant request would thus only partially redress what at present is a striking imbalance, especially given the numbers of claims and parties arrayed against BP. Surely, there should be a strong presumption in favor of evening the playing field just a little and allowing BP to proceed with three more depositions.

For reasons stated above and in BP's initial letter, BP's requests for Rule 30(b)(6) testimony from Kelkar & Associates, Purdue University, and UCSB should now be granted.

Respectfully submitted,

Robert R. Gasaway

Attachment

cc (via electronic mail):

United States' MDL Counsel          Joel M. Gross
Plaintiffs' Liaison Counsel          Allison B. Rumsey
Defense Liaison Counsel

# ATTACHMENT

**Exhibit 1**

Examples of expert opinion questioning of fact witnesses by the U.S. Department of Justice:

| Question | Deposition |
| --- | --- |
| "Would you agree me -- agree with me that porosity data can only be measured in core samples or inferred from density, sonic, and neutron logs analog well paths?" | G. Vinson Dep. 178:3–7 (M. Leopold, USDOJ) |
| "Would you agree with me that the importance of petrophysical data collected about the Macondo well is that it's integrated and analyzed in a complete data set?" | G. Vinson Dep. 179:6–10 (M. Leopold, USDOJ) |
| "Do you -- would you agree with me that the importance of petrophysical data is not in its isolated use, but the fact that it's integrated in analysis of all the data that's collected from the well?" | G. Vinson Dep. 179:14-19 (M. Leopold, USDOJ) |
| "Would you characterize that as best estimate of porosity for the Macondo reservoir?" | G. Vinson Dep. 220:10-22 (M. Leopold, USDOJ) |
| "So all of these tests tell you, Pencor, different things about how to the fluid behaves in a system, in a reservoir? …. Okay. And it also tells you how your client can recover the greatest volume of oil in stock tank conditions?" | J. LeBlanc (Pencor) Dep. 30:10–16 (A. Andre, USDOJ) |
| "What properties would have – what properties inform a conclusion about whether or not a system is bubble point or dew point?" | J. LeBlanc (Pencor) Dep. 78:21–24 (A. Andre, USDOJ) |
| "What explains the difference in the GORs?" | J. LeBlanc (Pencor) Dep. 92:1–2 (A. Andre, USDOJ) |
| "Typically if a client were using the gas-to-oil ratio that you were providing that Pencor was providing from its PVT analysis to predict production from a reservoir, would they look to the multistage separator test? .... Or the single stage separator?" | J. LeBlanc (Pencor) Dep. 92:23–93:6 (A. Andre, USDOJ) |
| "So is it accurate to say that a system's oil has a fixed gas-to-oil ratio?" | J. LeBlanc (Pencor) Dep. 94:8-10 (A. Andre, USDOJ) |

| | |
|---|---|
| "And what effect does a high asphaltene content have on a reservoir or a gas production?" | J. LeBlanc (Pencor) Dep. 99:4–6 (A. Andre, USDOJ) |
| "What effect does – what effect does wax have on viscosity?" | J. LeBlanc (Pencor) Dep. 104:25–105:1 (A. Andre, USDOJ) |
| "And what type of modeling would you be using the results of that test for?" | J. LeBlanc (Pencor) Dep. 111:3–4 (A. Andre, USDOJ) |
| "How is the data from the air permeability test used?" | J. Loos (Weatherford) Dep. 106:20–21 (B. Engel, USDOJ) |
| "And BP also selected xylene? …. What is your understanding of why that might be used?" | J. Loos (Weatherford) Dep. 111:21–24 (B. Engel, USDOJ) |
| "So if there were to reservoirs, gas reservoirs stacked on top of each other, for instance, [GC analysis] might be used to differentiate one reservoir to another?" | S. Pelphrey (Isotech) Dep. 30:4–7 (A. Andre, USDOJ) |
| "What would the tritium analysis of methane be used for, the data that's generated?" | S. Pelphrey (Isotech) Dep. 39:11–13 (A. Andre, USDOJ) |
| "Could the data generated from the analysis run under this project No. 13404, could that be used to assess well integrity?" | S. Pelphrey (Isotech) Dep. 101:10–13 (A. Andre, USDOJ) |
| "But the data itself generated by Isotech could be used as a -- a fingerprint or a signature and it could be used to identify where a particular gas is coming from? …. What I'm asking is it that a possible way to use the data generated by Isotech?" | S. Pelphrey (Isotech) Dep. 102:16–24 (A. Andre, USDOJ) |
| "And what is your understanding of how aquifer size might have an impact on flow rate?" | B. Ritchie Dep. 150:13–15  (S. Himmelhoch, USDOJ) |
| "Is the depiction here an accurate depiction of the amplitude map for the M56 Reservoir?" | B. Ritchie Dep. 309:9–11 (S. Himmelhoch, USDOJ) |
| "Does this fault create any compartmentalization within the M56 Reservoir?" | B. Ritchie Dep. 311:14–16 (S. Himmelhoch, USDOJ) |

2

| | |
|---|---|
| "And is that -- would -- the -- the concepts we've just discussed about setting the boundary posi -- conditions for your model, would you agree that that's -- those are standard wellbore modeling techniques?" | O. Rygg (Add Energy) Dep. 75:5–9 (S. Cernich, USDOJ) |
| "And flowing -- under flowing conditions, the reservoir pressure near the wellbore is going to be lower than the reservoir pressure would be if the well were not flowing and were in static condition?" | S. Bishop Dep. 133:20-25 (N. Chakeres, USDOJ) |
| "So when you shut-in the well, pressure will build up in the wellbore because reservoir pressure from farther away in the reservoir propagates towards the wellbore in order to equilibrate reservoir pressure, correct?" | S. Bishop Dep. 134:2-7 (N. Chakeres, USDOJ) |
| "And that was the most accurate information available on the reservoir properties?" | S. Bishop Dep. 186:9-11 (N. Chakeres, USDOJ) |
| "Do you have an opinion about whether it was possible to measure flow rate once the capping stack was installed?" | S. Bishop Dep. 243:10-12 (N. Chakeres, USDOJ) |
| "So inputting pressure at the top of the well and modeling a corresponding performance of the well is -- is an acceptable common well performance modeling technique?" | S. Bishop Dep. 266:22-267:1 (N. Chakeres, USDOJ) |
| "And understanding more precisely the actual rate of flow would likely lead to a better pressure transient analysis than having to assume a range of rates; is that fair?" | S. Bishop Dep. 488:24-489:3 (N. Chakeres, USDOJ) |
| "And wouldn't a better way to estimate the error be a square root of the sum of the squares?" | M. Gochnour Dep. 300:10-11(S. Cernich, USDOJ) |
| "Did you know that such a flow measurement -- I'm sorry, such a temperature measurement would assist in the calculation of flow rates?" | M. Gochnour Dep. 345:15-346:1 (S. Cernich, USDOJ) |