# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:

(202) 879-5200

October 18, 2012

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Room B345
500 Poydras Street
New Orleans, LA 70130

Re:     MDL No. 2179 — Subpoenas to United States Contractors

Dear Judge Shushan:

We write to renew our request for approval of Rule 30(b)(6) depositions of three third-party entities that worked with the Flow Rate Technical Group ("FRTG").

As you recall, BP proposed back in June that it be allowed to send Rule 30(b)(6) testimonial subpoenas to the following six third-party entities:  Gemini Solutions Inc., Kelkar & Associates, R.G. Hughes & Associates, Purdue University, UC-San Diego, and UC-Santa Barbara.  The United States objected, and the issue was fully briefed for the Court.

On June 27, the Court issued an order denying BP's request for the moment but specifically contemplating the possibility that discovery from the United States alone would leave holes in the factual record.  Accordingly, the Court provided in its ruling that the ruling would be "without prejudice to the right of BP to re-urge its request for the depositions at the appropriate time."  (Rec. Doc. 6808.)

The time is now ripe for BP to re-urge its request.  At this point, however, BP seeks to depose only three of the six entities from which it had initially sought depositions — Kelkar & Associates, Purdue University, and University of California at Santa Barbara ("UCSB").  These three entities all worked closely with the United States and FRTG to understand the flow of oil released from the *Deepwater Horizon*, and each contributed significantly to the United States' efforts to quantify the *Deepwater Horizon* discharge.

Chicago        Hong Kong        London        Los Angeles        Munich        New York        Palo Alto        San Francisco        Shanghai

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 18, 2012
Page 2

### Kelkar & Associates Should Offer Rule 30(b)(6) Testimony

Kelkar & Associates was "selected by the Government to do an analysis of the Macondo reservoir." (*See* Exhibit A, Sept. 11, 2012 Dep. of P. Hsieh, 194:2–14.) This analysis is critical to understanding the FRTG's efforts to quantify the volume of oil spilled in the *Deepwater Horizon* incident.

BP has closely examined the United States' document productions, including its production on behalf of Kelkar & Associates. Those documents provide insight into the importance of Kelkar's work to the United States' FRTG estimation team, but leave unanswered a number of questions regarding the work itself and the data on which it relied. In order to understand the full picture, BP should be permitted to depose a Kelkar & Associates' Rule 30(b)(6) designee.

As one example, BP would like to question Kelkar & Associates regarding how its analysis varied from the analysis underlying official estimates publicly announced by the United States. The principal analyst for Kelkar & Associates, Mohan Kelkar, ███████████████████████████████████████████████████████████████████████ (See Exhibit B.) The documents BP has been able to review to date, however, do not pinpoint the basis for the statement that ████████████████████████████████████████████████

To be sure, the United States offered Paul Hsieh, another United States reservoir modeler, as a Rule 30(b)(6) witnesses designated to testify on topics related to the Unified Command's reservoir analysis. But during Dr. Hsieh's deposition, the United States made clear that Dr. Hsieh was not prepared to testify about the work performed for the United States by Kelkar & Associates. (*See* Exhibit A, at 37:14-38:2 (colloquy between Messrs. Boles and Leopold).) Although the United States had hopes that a future United States witness (Don Maclay) might offer further testimony about the work, BP has no assurances in this regard and, in any event, BP likely will not have time following Mr. Maclay's deposition to plug remaining gaps in the factual record.

More fundamentally, the essential thrust of Mr. Maclay's testimony will involve knowledge of FRTG work that was in the possession of the United States — as opposed to knowledge of work performed for the FRTG that is not in the United States' possession. It is self-evident that the best and most likely source for obtaining an understanding of scientific analysis performed by a United States contractor is that contractor itself, not the United States' personnel whose very need for the contractor's expertise suggests limitations on their ability to

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 18, 2012
Page 3

testify about it.  The reasons for Kelkar & Associates' disagreement with the FRTG are best learned directly from Kelkar & Associates.

## Purdue University Should Offer Rule 30(b)(6) Testimony

Purdue University has been identified by the United States as contributing key research and staff to the FRTG's Plume Team.  Further discovery regarding Purdue's work, led by Professor Steve Wereley, is therefore vital to understanding the widely publicized FRTG report which concluded that approximately 4.9 million barrels of oil were discharged over the course of the *Deepwater Horizon* oil spill. A thorough review of Purdue's document production and deposition discovery to date, however, still leaves numerous questions unanswered regarding Purdue's methodologies and conclusions as represented in the FRTG reports.

The United States has not offered testimony by other Rule 30(b)(6) witnesses regarding the work of Purdue's Wereley team.  Moreover, review of documents provided to date leaves many gaps in the record.  For example, Professor Wereley's analysis on behalf of the FRTG assigns a general uncertainty to his conclusions regarding flow rate.  But this very high-level analysis fails to specify which specific uncertainties that the Purdue team considered.  (*See* Plume Team Report: Deepwater Horizon Release Estimate of Rate by PIV 61 (July 21, 2010).)

Nor was Dr. Antonio Possolo, the United States' Rule 30(b)(6) witness designated to testify regarding uncertainty, able to shed light on the Purdue analysis.  Dr. Possolo testified that he asked only "minimally sufficient questions" to conduct his uncertainty analysis, admitting that the thoroughness of his analysis was "limited" and that he would have usually "been more thorough in this part of [his] work." (*See* Exhibit C, Sept. 26, 2012 Dep. of A. Possolo at 66:13-67:21.)  Dr. Possolo further testified that that he did not conduct his own assessment of the accuracy or basis of reported uncertainties, that he had no way of knowing whether Plume Team members accounted for all sources of uncertainty and that he "clearly" could have missed unreported sources of uncertainty. (*See id.* at 78:25-79:24; 81:9.)

Significantly, Professor Wereley acknowledged in a January 24, 2011 email to various members of the Plume Team that "a lot of details were glossed over last summer in the interest of getting a decent estimation quickly." (*See* Exhibit D).  These so-called "details" are directly relevant to the validity of Purdue's research and conclusions, as well as the validity of the conclusions reached in the FRTG report.  BP should be entitled to discovery regarding details that admittedly were "glossed over" by the Plume Team, admittedly were never included in the FRTG report — and that were understandably unknown to Dr. Possolo, the United States' most relevant Rule 30(b)(6) designee.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 18, 2012
Page 4

### UCSB Should Offer Rule 30(b)(6) Testimony

The team at the University of California at Santa Barbara, led by Ira Leifer, worked independently to produce a flow rate estimate critical to the final estimate of the FRTG. It is therefore unsurprising that the United States' 30(b)(6) designee regarding uncertainty, Dr. Possolo, testified unequivocally that BP would need to depose Professor Leifer in order to properly understand this work.

When asked about a June 6, 2010 email in which Professor Leifer writes that his estimates were "not science" but "a case of many many hand waving assumptions which are not based on studies or data," Dr. Possolo was unable to explain what Professor Leifer intended by this statement or the applicability of the statement to his own uncertainty work. (Exhibit C at 101:11-23.) Dr. Possolo testified that BP would need to talk to Professor Leifer because "I cannot speak for him. I do not know exactly what he had in mind." (*Id.* at 107:4-17.)

*       *       *

As the end of the period for 30(b)(6) depositions draws near, BP should be entitled to testimony on the directly relevant questions that the United States' witnesses and documents have not been able to answer. At this juncture, BP can no longer afford a "wait and see" attitude to determine whether United States witnesses can or will be able to provide testimony on these topics. As indicated above, the record establishes that the United States' witnesses are unable to answer BP's questions, leaving significant gaps that BP should now be allowed to fill.

If allowed to conduct the three depositions we request today, BP would not seek to reopen the deposition of Dr. Possolo — as BP had previously reserved the right to do — nor would BP seek depositions of Gemini Solutions, Inc., R.G. Hughes & Associates, or the University of California at San Diego.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
October 18, 2012
Page 5


On the other hand, because the factual record would be incomplete without Rule 30(b)(6) depositions of Kelkar & Associates, Purdue University, and UC-Santa Barbara, BP respectfully requests that the Court approve BP's well founded deposition requests as to those three entities.


Respectfully submitted,


Robert R. Gasaway


Exhibits

cc (via electronic mail)

United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross
Allison B. Rumsey

# Exhibit A

01-40906
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )     MDL NO.  2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO,  on    )     SECTION: J
APRIL 20, 2010    )
    )     JUDGE BARBIER
    )
    )     MAG. JUDGE SHUSHAN

# CONFIDENTIAL

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Paul Anthony Hsieh, Ph.D.
## VOLUME 1

SEPTEMBER 11, 2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group✦Court Reporting✦Video Production✦Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

1      A.   (Nodding.)

2      Q.   But was the Government Led Science Team's

3    work under the auspices of the Unified Command?

4               MR. LEOPOLD:   Object to scope.

5      A.   I -- I don't know what is meant by "under

6    the auspices of."

7      Q.   (By Mr. Boles) Under the authority of.

8      A.   I -- I don't know the chain of command of

9    the authority, so I don't know the answer to that

10   question.

11     Q.   Do you understand that you are here to

12   testify on behalf of the Government as to

13   reservoir modeling done by engin -- Government

14   Engineers and Scientists or their advisors, other

15   than the Department of Energy National

16   Laboratories and the Flow Rate Technical Group

17   Consultants?

18              MR. LEOPOLD:   Object to scope and

19   form.

20     A.   Could you --

21              MR. LEOPOLD:   And, Counsel, I mean,

22   he -- with any questions with regard to the --

23   the membership of the Science Team is outside the

24   scope of his topics today.

25              MR. BOLES:   Okay.   Would you like to

1    tell me what you think is with -- within the

2    scope, so we can save some time?

3                MR. LEOPOLD:  Sure.  His -- his work

4    with respect to the modeling that he performed

5    for the Team and his -- his two models that he's

6    described already this morning are both inside

7    the scope.  And any of the Department of Energy

8    work.

9                MR. BOLES:  I understand Department

10   of Energy, and I said twice the Department of

11   Energy's outside the scope --

12               MR. LEOPOLD:  And --

13               MR. BOLES:  -- I understand that.

14               MR. LEOPOLD:  And any of the

15   contractors for the Minerals Management Service

16   reservoir modeling are outside the scope of his

17   deposition today.

18               MR. BOLES:  You're referring to the

19   three contractors that -- who's -- Kelkar, from

20   Tulsa; Hughes; and the Gemini?

21               MR. LEOPOLD:  That's correct.  We

22   have a -- the Government has a separate --

23               MR. BOLES:  I understand.

24               MR. LEOPOLD:  -- and it's Don

25   Maclay to --

```
 1              MR. BOLES:  Okay.  I think we're on
 2      the same page.
 3              MR. LEOPOLD:  Okay.
 4              MR. BOLES:  And I was -- I'm just
 5      trying to get that.
 6          Q.  (By Mr. Boles) And I understand that some
 7      of the questions I'll be asking will go to your
 8      individual knowledge and fall outside the scope,
 9      and Counsel will be zealous in pointing it out,
10      so we'll have a strict, clear record on that.
11          Q.  (By Mr. Boles) Now, after you finished
12      your work on the first model, the leak detection
13      model --
14          A.  (Nodding.)
15          Q.  -- sometime in -- in late July --
16          A.  M-h'm.
17          Q.  -- there were still a few more days of
18      pressure data that were generated until the well
19      was killed on August 3rd?
20          A.  That's right.
21          Q.  And you used that extra pressure data to
22      adjust the parameters in Table 2 from the leak
23      detection model to come up with the parameters in
24      Table 2 for the flow rate estimation model?
25              MR. LEOPOLD:  Object to form.
```

1      A.  I -- I -- for -- to de -- to determine

2    the parameters shown on Table 2 of -- of the --

3    of Exhibit 8615, I used all the pressure data

4    that was available all the way up to August 3rd,

5    yes.

6      Q.  (By Mr. Boles) Was there anything else

7    you used to adjust the estimated parameters shown

8    in Table 2 between the first and second models?

9      A.  I -- I don't believe so.

10      Q.  Now, the -- when you estimated the

11    parameters in Table 2 for the second model, the

12    flow rate estimation model --

13      A.  (Nodding.)

14      Q.  -- to set those parameters, did you first

15    have to assume a flow rate?

16              MR. LEOPOLD:  Object to form.

17      A.  H'm.  I -- could you repeat that question

18    again?

19      Q.  (By Mr. Boles) Sure.  We're -- you've --

20    you've got Exhibit --

21              THE COURT REPORTER:  8615.

22              MR. BOLES:  Thank you.

23      Q.  (By Mr. Boles) -- in front of you.

24      A.  Yeah.

25      Q.  So I'm looking at the -- the parameters

1        A.   No, I did not have access to that report,

2    so I don't know that information.

3        Q.   (By Mr. Boles) Okay.

4             (Discussion off the record.)

5        Q.   (By Mr. Boles) Did you ever ask anybody

6    else in the Government who might have had that

7    report whether you could take a look at it?

8        A.   No, I did not.

9        Q.   Do you know how many samples Weatherford

10   tested to estimate permeability?

11       A.   No, I do not.

12       Q.   And you don't know what the range of

13   those measurements were?

14       A.   No, I don't.

15       Q.   Do you know what -- in your analysis, did

16   you take into consideration what any of the other

17   Government Investigators analyzing the reservoir

18   deduced or assumed with respect to permeability?

19             MR. LEOPOLD:  Objection, form.

20       A.   I was aware that there were other

21   analyses being done within the Government or by

22   contractors working under Contract with the

23   Government, and I -- I did see their Reports.

24       Q.   (By Mr. Boles) Okay.  Did you see the

25   Report done by Kelkar & Associates?

```
1          A.   Yes, I did see the Report done by Kelkar.

2          Q.   And Professor Kelkar, I guess it is, is

3     at the University of Tulsa?

4          A.   Is there a question?

5          Q.   Yes.

6          A.   Oh.

7          Q.   Is that correct, that he's a Professor?

8          A.   I don't know.

9          Q.   But he's a Reservoir Engineer?

10         A.   I don't know that either.

11         Q.   And in any event, he was selected by the

12    Government to do an analysis of the Macondo

13    reservoir?

14         A.   That's right.

15              MR. LEOPOLD:   Objection, form.

16    Scope.

17         Q.   (By Mr. Boles) And do you recall that in

18    his Report, he used permeability numbers of

19    around 80 millidarcies?

20              MR. LEOPOLD:   Scope.

21         A.   I don't recall the number that he used in

22    his Report.

23         Q.   (By Mr. Boles) But you would have known

24    it when you reviewed his Report?

25         A.   I would have seen it, yes.
```

1   Q. Okay. And what analysis did you do of

2 that, if any, in making your own decision about

3 what number to use for permeability? Did you

4 just disregard it?

5   A. I looked at those Reports, but they -- I

6 did not use the information in those Reports for

7 my own analysis, because those Reports were done

8 in July with limited data, and I have the shut-in

9 pressure data, which is the most informative data

10 that you can get to estimate permeability from

11 the time the well was shut-in.

12    So I feel that I have significantly more

13 data that they had, and so I should do my Report

14 based on the data, rather than based on the

15 numbers that they used.

16   Q. And by the "data," you mean the pressure

17 buildup data?

18   A. That's right.

19   Q. Can you tell me any other time when

20 anybody in Petroleum Engineering, whether in

21 published literature or in industry, has ever

22 tried to estimate permeability using pressure

23 buildup analysis, without assuming a flow rate,

24 and without knowing the configuration of the

25 outflow?

# Exhibit B

## Filed Under Seal

# Exhibit C

01-40920
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG ) MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on ) SECTION: J
APRIL 20, 2010 )
) JUDGE BARBIER
)
) MAG. JUDGE SHUSHAN

# CONFIDENTIAL

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Antonio M.G. Possolo, Ph.D.
### VOLUME 1

SEPTEMBER 26, 2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group●Court Reporting●Video Production●Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

 1    a Flow Expert, so he often contributed viewpoints

 2    and asked questions that you would expect an

 3    Expert in the area to ask of his colleagues --

 4         Q.  M-h'm.

 5         A.  -- other Members of the Flow Rate

 6    Technical Group who are in the Plume Team and who

 7    are also Experts in flow.

 8              My role was to listen to the estimates

 9    that the Members of the Plume Team advanced,

10    which typically comprised a best estimate and an

11    interval that they believed included the true

12    flow rate per day, and I also elicited from them

13    an assessment of the confidence --

14         Q.  M-h'm.

15         A.  -- that they were prepared to place on

16    their intervals.

17         Q.  M-h'm.

18         A.  My subsequent contribution consisted of

19    achieving or formulating a consensus estimate, a

20    blending or a pooling of the individual

21    assessments, considering both the best estimates,

22    as well as the uncertainty intervals that qualify

23    them.

24         Q.  Dr. Possolo, you actually took estimates

25    provided to you by the Scientists on the Plume

1    Team and pooled them on two separate occasions;

2    isn't that right?

3         A.   I would say that I pooled them on many

4    occasions, because this was an iterative process

5    over a fairly extended period of time.

6         Q.   Isn't it true, Doctor, that you actually

7    reported in writing pooled assessments on two

8    occasions?

9         A.   That is correct.

10        Q.   Did NIST attempt to Guide Members of the

11   Plume Calculation Team in their assessments of

12   uncertainty with respect to their work?

13        A.   The only guidance was my own, and it was

14   limited by the circumstances -- limited in scope

15   by the circumstances; that is, had we had more

16   time, I would have been more thorough in this

17   part of my work, and that is to elicit from the

18   participating Scientists a qualification to their

19   Statements of Uncertainty that surrounded their

20   best estimates.

21        Q.   And when you say if you had more time,

22   you would have been more thorough, how would you

23   have been more thorough, given the luxury of

24   time?

25        A.   The -- there is a whole branch of

1    statistical activity called the "elicitation of

2    probabilities."  It consists of a conversation

3    that may take the good part of a whole day with

4    an Expert, it could be a Scientist, could be a

5    risk assessor, whoever, that by posing a suitable

6    quest -- set of questions, tries to characterize

7    the meaning of an interval that someone comes up

8    with and says, "I believe the truth is between

9    this limit and that limit."

10       Q.  M-h'm.

11       A.  If I had had more time, I would have

12   engaged in this protracted exercise with each of

13   the colleagues in the flow -- in the Plume Team.

14       Q.  Is it true that you did not have time,

15   then, to ask what you considered to be a suitable

16   set of questions to each Member of the Plume Team

17   who was reporting results to you?

18           MR. MCILWAIN:  Objection, form.

19       A.  No, I disagree.  I have enough time to

20   ask the minimally sufficient questions that I

21   needed to accomplish the pooling exercise.

22       Q.  (By Ms. DeSantis) So I'm not

23   understanding you, Doctor.  What, then, would you

24   have done differently if you had had the luxury

25   of time?

1     A.   Typically, what the Scientists in this

2     case would give to me would be four pieces of

3     information:   No. 1, the best estimate of the

4     flow rate per day; No. 2, a lower bound for that;

5     No. 3, an upper bound for the same; and No. 4, a

6     statement of confidence that the truth -- the

7     true flow rate would lie between these two

8     limits.

9          It was then up to me to build a

10    probabilistic model consistent with the evidence

11    that they gave to me that I could use.

12         If I had had more time to spend with each

13    of them, I would have tried to elicit further

14    details of their belief.   For example, "Do you

15    believe that it is more likely or less likely

16    that the truth is between your best estimate and

17    the upper bound or between the best estimate and

18    the lower bound," and likely have many other

19    questions.

20         As I said, these exercises can take with

21    a particular individual the good part of a day.

22    Q.   So, Doctor, you then would have done more

23    with respect to the elicitation of a statement of

24    confidence from each of the Scientists that gave

25    some meaning to their ranges of uncertainty; is

1    asking for each Scientist to give a measurement

2    which would result -- which would include a

3    measured value, an associated measurement of

4    uncertainty reflecting all recognized sources of

5    uncertainty, and a Statement of Confidence that

6    assigns meaning to this uncertainty.

7                    MR. MCILWAIN:  Right.  I understand.

8    That's data.  That's not a method.

9         Q.  (By Ms. DeSantis) All right.  Well, da --

10   data.  Is that right, Doctor, that's what was

11   asked for?  That's the data that was asked for?

12        A.  This is data, it's not a method.

13        Q.  Was it your method in pooling these

14   results to ask for that data?

15        A.  Well, let's be a little clear about what

16   we mean by "method."

17        Q.  You had a method, did you not --

18        A.  The method is --

19        Q.  -- for pooling the numbers?

20        A.  The method is -- the method is a

21   statistical procedure to pool or blend this kind

22   of information that I was requesting.  We have

23   not yet discussed what that method was.  It was

24   part of my procedure or my modus operandi to ask

25   the Scientists to give me the information that we

1    have been discussing.

2        Q.  Okay.  Doctor, is it fair to say that

3    NIST's role in working with the Plume Calculation

4    Team was limited to pooling flow volume estimates

5    reported by the Plume Team Scientists with

6    attendant measurement uncertainty and confidence

7    assessments?

8        A.  That was part of it.  As I said earlier,

9    Pedro Espina was also a participant, and -- and

10   he contributed to many substantive discussions

11   because they fell under his area of expertise.

12       Q.  Okay.

13       A.  What you described, describes what I did.

14       Q.  All right.  Now, with respect to your

15   work -- and I'm understanding your work to have

16   been limited to the pooling of certain Plume Team

17   Scientists' flow estimates?

18       A.  That is right.

19       Q.  With respect to your work, that pooling

20   took into account the Plume Team Scientists' own

21   statements regarding uncertainty, and Statements

22   of Confidence assigning some meaning to that

23   uncertainty; isn't that right?

24       A.  That is true.

25       Q.  All right.  Doctor, you, yourself, I am

1    understanding, did not independently assess the

2    accuracy or the basis for each individual

3    Scientist's assessment of uncertainty; is that

4    right?

5        A.  I did not, neither could anyone do it

6    short of going to the bottom of the sea and

7    measure it directly, which I presume could have

8    been done at the time.

9        Q.  And it is also my understanding, Doctor,

10   that your work with pooling did not include an

11   independent assessment of the accuracy or the

12   basis for each Scientist's assessment of

13   confidence; isn't that right?

14       A.  No.  I had no means to challenge that.

15       Q.  All right.  So both the uncertainty

16   measurement and the confidence assigning meaning

17   to the uncertainty were done by the Scientists

18   doing the PIV work, not by you?

19       A.  That's right.

20       Q.  All right.  If a Scientist failed to

21   account for all sources of uncertainty in the

22   information provided to NIST, you could not

23   control that, right?

24       A.  No.

25       Q.  All right.  And if a Scientist failed to

 1    account for all sources of uncertainty in the

 2    information provided to NIST, that could have

 3    affected NIST's accuracy and results; is that

 4    correct?

 5                MR. MCILWAIN:   Objection to form.

 6        A.   The -- the statistical methods that I

 7    used, which is a method that is used often in

 8    similar circumstances, it's not my invention --

 9        Q.   (By Ms. DeSantis) M-h'm.

10        A.   -- it is amply documented in the

11    literature, has the built-in capability to

12    perceive what we sometimes call "dark

13    uncertainty."  Dark uncertainty are components of

14    uncertainty that have escaped the attention of

15    individual Scientists.  It is a common

16    occurrence, even when the participating

17    Scientists belong to the most capable

18    laboratories measuring very well-known

19    quantities.

20             The pooling exercise looks at the

21    dispersion of values that the Scientists have put

22    on the table, and that, too, is an element of

23    information to gauge the overall uncertainty,

24    above and beyond what the Scientists themselves

25    provide to me.

1      Q.   Is it your belief that your method

2   permitted you to take into account all sources of

3   uncertainty that may not have been reported to

4   you by individual Scientists?

5      A.   No.

6      Q.   So your method could have missed some

7   sources of uncertainty that were not reported to

8   you by individual Scientists?

9      A.   Clearly.

10      Q.   All right.   Now, Doctor, with respect to

11   the confidence reported to you by the individual

12   Scientists, which assigns some meaning to the

13   uncertainty, if a Scientist failed to account in

14   his reported Statement of Confidence -- let me

15   rephrase.

16         If a Scientist's reported Statement of

17   Confidence was inaccurate, you had no way of

18   controlling that, did you?

19                MR. MCILWAIN:   Objection to form.

20      A.   A Statement of Uncertainty cannot quite

21   be challenged for accuracy.

22      Q.   (By Ms. DeSantis) Doctor, no.   My

23   question was not regarding the Statement of

24   Uncertainty.   We're now talking about the

25   Statement of Confidence.

1    limitations of what they were doing.  But,

2    nonetheless, short of direct measurement of the

3    flow rate, we had to make do with what we had,

4    limitations in hand, limitations acknowledged.

5         I trusted their honesty in their

6    assessments.  I believed that they were acting on

7    behalf of -- of various institutions with great

8    honor and distinction and competence, and

9    clearly, there are shortcomings.  They're obvious

10   to everyone.  It was the best effort that this

11   National Team could put at the time.

12       Q.  And you see that Dr. Riley says:  "In

13   this situation we are dealing with many

14   unknowns."

15         Based on your personal contact with

16   Dr. Riley, do you know what the "unknowns" were

17   that he was referring to?

18       A.  That question you will have to ask

19   Dr. Riley himself, or the Representative that

20   speaks for him on behalf of the University of

21   Washington.

22       Q.  Let's turn to Tab 15.

23         (Discussion off the record.)

24             MS. DESANTIS:  Oh, okay.  Yeah.

25         (Exhibit No. 9189 marked.)

1      Q.   (By Ms. DeSantis) Okay.   Doctor, we have

2    marked the document behind Tab 15 as Exhibit

3    9189, Bates No. UCSD00006612.   This is an E-mail

4    from Dr. Leifer to Bill Lehr and Marcia McNutt,

5    copying you and others, dated June 7th, 2010.

6    The subject is:  "sample conclusion template."

7    Have you had a chance to review the E-mail?

8      A.   Yes.

9      Q.   All right.   Doctor --

10      A.   -- yes, I have.

11      Q.   -- Dr. Leifer writes the following:  "I

12    apologize in advance, my detailed analysis is not

13    finished, so I include here my preliminary

14    analysis, I will refine into a more detailed

15    report in the next few days.  Bottom line -

16    20 000 - 30 000 barrels a day from the riser - I

17    did not work on the kink.  My number one comment

18    is that this was not science - this was a case of

19    many many hand waving assumptions which are not

20    based on studies or data.  This pipe flow is a

21    mixture of oil/gas, hydrate chunks, paraffins,

22    oily bubbles, and oily droplets at hydrate

23    depths, in the acceleration phase."

24          Did I read that correctly?

25      A.   Yes, you did.

1    Q.  And you were copied on this E-mail, were

2    you not, Doctor?

3    A.  Apparently.

4    Q.  And the date on this is June 7th; is that

5    right?

6    A.  That is right.

7    Q.  All right.  So then you were aware, based

8    on having been copied on this E-mail, that at

9    least as of June 7th, one Plume Team Member

10   considered this exercise, and I quote:  "a case

11   of many many hand waving assumptions which are

12   not based on studies or data."  Is that right?

13   A.  I was aware of Ira Leifer's opinion as

14   stated here.

15   Q.  Okay.  Did you take this E-mail into

16   account in the assessment that you did on June

17   8th, one day later?

18          MR. MCILWAIN:  Objection to form.

19   A.  I do not even remember whether Dr. Leifer

20   provided one of the lines of my Data Table for

21   them to report.  I'm not sure.  I don't remember.

22   But whatever he provided is what I used.  There

23   was nothing in this E-mail that I could use.

24   Q.  (By Ms. DeSantis) Okay.  Let's go back,

25   Doctor, to Tab 4 --

1  had also the highest confidence in his results.

2      So things do change.  It is normal course

3  of the growth of knowledge.  It is perfectly

4  consistent with my experience that Scientists

5  have to be flexible, have to accommodate to new

6  data, and change their opinions in light of new

7  data.  And that's what happened throughout all

8  these days of this incident.

9      Q.  Doctor, on June 7th, Dr. Leifer sent an

10  E-mail indicating that what he was doing with

11  respect to analysis of the plume was not science;

12  is that right?

13      A.  That's what it says.

14      Q.  All right.  A day later, on June 8th, a

15  Pooling Assessment done by you and Dr. Espina

16  reported that Dr. Leifer had a confidence level

17  in his work of 77 percent.  Is that correct?

18      A.  That is what I interpreted his statement

19  to be.  Not this E-mail, but what he told me at

20  the time.

21      Q.  All right.  Does it seem incongruous to

22  you that he could have changed his mind so

23  quickly that, on June 7th, he thought what he was

24  doing wasn't science, and then on June 8th, he

25  had 77 percent confidence in his work?

1          MR. SUMMY:  Objection, form.

2          MR. MCILWAIN:  Objection to form,

3    Counselor.

4      A.  We would have to reach an agreement with

5    Ira Leifer as to what science means to him.  I

6    cannot speak for him.  I do not know what he

7    exactly had in mind when he wrote what he wrote

8    here.  All I can rely on is on the information

9    that he gave to me, that I believe was given in

10   good faith and representing the best of his

11   technical knowledge and assessment.

12     Q.  (By Ms. DeSantis) All right.  So to

13   really explore this Doctor, we would have to talk

14   to Dr. Leifer --

15     A.  You --

16     Q.  -- wouldn't we?

17     A.  -- you would have to.

18     Q.  All right.

19          THE COURT REPORTER:  Three minutes.

20     Q.  (By Ms. DeSantis) It is -- it is my

21   understanding, Doctor, that not only Particle

22   Image Velocimetry, but also other optical imaging

23   techniques were used by the Plume Calculation

24   Team to estimate flow; is that right?

25     A.  I've already explained that, in a very

1    strict sense, it can be argued that no one used

2    Particle Image Velocimetry.  Because Particle

3    Image Velocimetry presumes that particles that

4    are trackable have been deliberately inserted or

5    are naturally carried along by the fluid.  And

6    that did not happen here.

7            So what was tracked were things that are

8    proxies for that, but that everyone recognized

9    had serious limitations as to how closely they

10   could emulate real Particle Image Velocimetry.

11       Q.   Some of the Scientists on the Plume Team,

12   Doctor, used a technique called "manual feature

13   tracking" to analyze the video plume; isn't that

14   right -- to analyze the plume; is that right?

15       A.   That is my understanding.

16       Q.   All right.  And are you aware of any

17   validation of the use of manual feature tracking

18   for use as a technique in analyzing a deep sea

19   oil spill?

20       A.   I will reemphasize that I am not an

21   Expert in these matters.  My acquaintance --

22   acquaintanceship with them was obtained solely

23   during this crisis.  I cannot advance any

24   statement of worthiness on what they were

25   doing --

# Exhibit D

| From: | Franklin Shaffer |
|-------|-------------------|
| To: | ira.Leifer@bubbleology.com; savas; Bill Lehr; Wereley, Steven T.; Alberto Aliseda; Oscar Flores; rileyj; Juan Lasheras |
| CC: | Mark K Sogge; Marcia K McNutt |
| Sent: | 1/24/2011 9:25:15 AM |
| Subject: | RE: PNAS image velocimetry draft |

Steve,
We already did a blind study of manual tracking and of automatic PIV for oil leak jets. The blind study was done on the BP oil leak jets before we knew the flow rate. The results of the blind study are that manual feature tracking correctly estimated the oil flow rate; automatic PIV underestimated the oil flow rate by 50%.

Three Plume Team members did manual feature tracking and we all got the same velocity numbers. Two team members, myself and Ira, used manual tracking to estimate the flow rate to be 60,000 and 62,500 bpd respectively. Manual tracking correctly estimated the oil flow rate. So I must disagree with your statements that people are bad at manual tracking. I also do not agree that we need additional blind studies.

The three team members (or the three "teams" as your call them) who used automatic PIV estimated the flow rate to be in the range of 15,000 to 35,000 bpd (or something close to that). All three "teams" who applied automatic PIV got the similar numbers which underestimated the actual flow rate by 50%

So I do not agree with your statements that "PIV out of the box is as good as many other methods." Crone's automatic velocimetry method, for example, produced much better results than automatic PIV. Crone has tested both methods and published the results. Crone's published results agree with what we found: automatic PIV grossly underestimates oil leak rates.

I believe we should now publish the results of our blind study. This is a unique and invaluable opportunity.

I do not put much value generating new estimates of the flow rate. After someone knows the actual flow rate, there are many ways to modify the application of automatic PIV so gives you the correct number.

Regards,
Frank


>>> "Wereley, Steven T." <wereley@purdue.edu> 1/24/2011 9:51 AM >>>
Hi all. This is primarily addressing Frank's latest email but is a discussion we should all have.

Certainly a lot of details were glossed over last summer in the interest of getting a decent estimation quickly. Much work will need to be done to bring correlation-based analysis of petroleum jets to the same high level as PIV analysis in the lab. I believe that can be done and I am working on it. Certainly PIV out of the box is as good as many other methods for achieving such estimates. 3 independent teams--not just 3 team members--all came up with consistent results using PIV.

I'm sure the team members who used manual tracking will want to spend some time working on the manual tracking section of the manuscript, so here's the question the reviewers are going to ask of manual tracking: what inaccuracies and biases does manual tracking introduce? People are really bad at selecting what they believe to be representative structures. They invariably select structures with certain properties, i.e. big or fast or bright structures and hopelessly skew the statistics. In order to show the manual analysis is free from such biases, you'll want to perform a thorough manual analysis of a comparable flow in which the flow rate is known. I have such a data set and can send it to those who used manual tracking without telling you the flow rate. We can then do a single blind study in which you calculate the flow rate using your manual method and compare it to the known flow rate to determine the effect on the accuracy of any experimenter biases.

Also, those who used manual tracking should search the literature to find papers that previously used such manual tracking methods and discuss their accuracy.

PURDUE00008594

Best,

Steve Wereley, Professor of Mechanical Engineering
Birck Nanotechnology Center, Room 2019, 1205 West State Street
Purdue University
West Lafayette, IN 47907
phone: 765/494-5624, fax: 765/494-0539
web page: http://engineering.purdue.edu/~wereley


-----Original Message-----
From: Franklin Shaffer [mailto:Franklin.Shaffer@NETL.DOE.GOV]
Sent: Monday, January 24, 2011 8:22 AM
To: ira.Leifer@bubbleology.com; savas; Bill Lehr; Wereley, Steven T.; Alberto Aliseda; Oscar
Flores; rileyj; Juan Lasheras
Cc: Mark K Sogge; Marcia K McNutt
Subject: Re: PNAS image velocimetry draft

This paper appears to endorse PIV and makes it seem as though PIV was the chosen technique of
the Plume Team. By "PIV" I mean the
application of cross-correlation type PIV software that is used for laboratory measurements of
transparent fluids.

By my count, only three of the nine members of the Plume Team used PIV to estimate oil leak
rates. Three other Plume Team members concluded that PIV is inappropriate and abandoned the
use of PIV for their oil leak estimates. I do not see this reflected in the paper.

I continue to believe PIV is not appropriate for this application. PIV software was developed
for analyzing the motion of 10 micron particles in a transparent fluid/gas that is being
illuminated by a thin two-dimensional sheet of laser light under highly controlled laboratory
conditions. PIV was not developed for tracking large, opaque, evolving features of opaque
jets, and it has not been tested or proven accurate for this opaque jets.

The evidence that PIV is inappropriate and underestimates oil jet velocities seems rather
overwhelming now. We have the measured oil leak rate of ~60,000 bpd and an independent
analysis by Crone et al agreeing that the oil leak rate is 60,000 bpd. Crone also has tested
PIV software for this application and stated in his Science paper that PIV grossly
underestimates jet velocities.

I believe one of the most important findings that came out of the efforts to estimate the oil
leak rate is that PIV is the wrong technique to use. The good news that came out of this
effort is that the oil leak rate from similar oil leak jets in the future can be quickly and
easily estimated using manual feature tracking. If time is available, Crone's method can be
used. Unlike PIV, Crone's method was developed for oil leak jets and has been tested and
proven accurate for oil leak jets.

I assume our paper is going to present these facts? Or does anyone still believe PIV is the
best technique to use for measuring velocities of oil leak jets?

Regards,
Frank

>>> "Bill Lehr" <Bill.Lehr@noaa.gov> 1/21/2011 6:59 PM >>>
Dear Plume Team members,

Attached is my draft summary paper of the PNA flow rate (PIV only)
estimates for your additions and modifications.

Several points to note:

1) This is to be a summary paper with the assumption that at least 3
individuals or teams will write companion manuscripts that would
further explain their calculations

2) I have put Tables 1 and 2 in as placeholders. Rather than rehash the
results from the Plume Team report, I would prefer to have everybody
review their calculations and give their best present estimate for GOR,

correction factor, flow velocity and leak rate ( with explanatory notes
for your choices).

3) Yes, the text is not in official PMA format. I will clean it up
later. Help in completing some of the incomplete references and key
word suggestions would be appreciated.

Best Regards,

Bill Lehr

PURDUE00008594.0003