# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL NO. 2179<br><br>SECTION:  J |
| THIS DOCUMENT RELATES TO: | JUDGE BARBIER |
| 2:10-cv-02771, 2:11-cv-00925 | MAG. JUDGE SHUSHAN |

### MEMORANDUM IN SUPPORT OF SELLNO PLAINTIFFS' MOTION FOR NEW TRIAL, MOTION TO ALTER OR AMEND JUDGMENT, AND MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL OF JUDGMENT DISMISSING "PURE STIGMA CLAIMS" AND "RECREATION CLAIMS"

NOW INTO COURT, through undersigned counsel, come the plaintiffs in Civil Action No. 11-925 and the respondents/claimants in the limitation proceeding associated with Civil Action No. 10-2771 (Rec. Doc. 388) ("Sellno Plaintiffs"),[1] which are both consolidated with MDL 2179 pending before this Honorable Court, and pursuant to Rule 59(a) respectfully move this Honorable Court to grant the Sellno Plaintiffs' Motion for New Trial to reconsider the Court's judgment dismissing the so-called "Pure Stigma Claims" and "Recreation Claims" ("Judgment"). (Rec. Doc. 7526).  Specifically, the Sellno Plaintiffs ask the Court to revise its ruling and hold as follows: (1) that the Sellno Plaintiffs' Complaint and the Amended B1 Master Complaint sufficiently allege intentional and/or willful misconduct that precludes the application of the *Robins Dry Dock* exception to recovery of economic losses under general maritime law;

---

[1]   The named plaintiffs herein include Gary and Deborah  Sellno, Kerry and Sandra Lauricella, William and Georgia Gibson, Dale and Denise LeBrun, Larry and Kelly Tapp, E.P. and M.B. Gebhardt, Michael L. and Dawn Dawson, Michael L. Dawson Construction, Ned and Ginger Naquin, Gordon R. Cordes, James Agent, Clark Barrios, Rose Baudoin, Rex and Beverly Rambo, Vincent and Marlene Lobue, Mark and Carol Dawson, Henry J. Becnel, Jr., Anthony Caramonta, Paul Leone, David and Dodie Brown, Brian Reuther, Peter and Karen Casbarian, Gerard Cormeaux, Keith and Boksoon Fabre, Kevin and Kelly Poteet, Quality Metal Works, Inc., Kirk Fabre, Denise and Sean Migliore, Casbarian Engineering Associates, L.L.C., Jody and Tammy Sellno, Carolyn Campo, Robin Campo and Richard A. Campo III, Buddy and Luanna Cambas, Buddy and David Cambas, Cambas Electric, Inc., Doug and Mary Moore, Juro Bezmalinovic, Bez Fabrication, Inc., and Caleb H. Didriksen and Sondra Brown.

(2) that the *Robins Dry Dock* rule is an antiquated doctrine that no longer serves it purpose and, therefore, it should not be applied to bar the recovery of millions of claimants who sustained, and will continue to sustain, economic losses; and (3) that the Oil Pollution Act of 1990 allows recovery of so-called "unrealized" lost profits where a plaintiff has suffered actual economic harm, including diminution in property value caused by the oil spill.

In the alternative, the Sellno Plaintiffs respectfully move this Honorable Court to alter or amend the Judgment pursuant to Rule 59(e) to direct the entry of a partial final judgment.  Under Rule 54(b), the Court may direct the entry of a final judgment as to one or more claims if the Court "expressly determines that there is no just reason for delay."  Should the Court decline to do so, the Judgment will not be final until the Court adjudicates every claim of every party. There can be no doubt that this sprawling MDL will take years (or even decades) to reach a final resolution of all the claims of all the parties, leaving the "Pure Stigma" and "Recreation" plaintiffs who wish to appeal the Judgment in limbo indefinitely.

Again in the alternative, the Sellno Plaintiffs respectfully move this Honorable Court to certify the Judgment for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) by holding that the Judgment involves "a controlling question of law as to which there is substantial ground for difference of opinion . . . and an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  The *Robins Dry Dock* and *The Conqueror* doctrines are controlling questions of law that cause substantial grounds for difference of opinion.  Although these principles have been undisturbed for decades, this MDL represents a unique opportunity to re-examine this precedent to prevent injustice to claimants who suffered actual harm and who would under *Robins Dry Dock* be unable to recover.

The Sellno Plaintiffs also adopt and incorporate as if set forth fully herein any other post-Judgment motions filed by the Plaintiffs Steering Committee ("PSC") and any other plaintiffs/claimants to the present proceedings, except to the extent they may be inconsistent with the arguments herein.  The Sellno Plaintiffs also respectfully request oral argument to address the Court regarding the arguments set forth *infra*.

## PROCEDURAL BACKGROUND

This matter arises from the blowout, explosion, and fire aboard the DEEPWATER HORIZON semi-submersible drilling rig as it was engaged in oil exploration on the Outer Continental Shelf, and the subsequent discharge of millions of gallons of oil into the Gulf of Mexico on or after April 20, 2010. After cases were consolidated into this multidistrict litigation ("MDL"), the Court created various pleading bundles to manage the numerous claims.  Relevant to this motion is the "B1 Bundle," which covers non-governmental claims for loss of economic loss and property damage.

On December 15, 2010, the PSC filed on behalf of all claimants a B1 Master Complaint asserting detailed factual allegations and setting forth numerous claims under state and federal law, including negligence, gross negligence and willful misconduct, nuisance, trespass, punitive damages, and declaratory relief.  (Rec. Doc. 879).  The PSC subsequently filed an Amended B1 Master Complaint on February 9, 2011, alleging the same causes of action.  (Rec. Doc. 1128).

On April 20, 2011, the Sellno Plaintiffs filed their own complaint in the Eastern District of Louisiana, designated as Civil Action No. 11-925. (Rec. Doc. 1).  On the same date, the Sellno Plaintiffs filed their answer, counterclaim, cross-claim, and third party complaint (Rec. Doc. 388) in response to Transocean's complaint and petition for exoneration from or limitation of liability in Civil Action No. 10-2771.  In both actions, the Sellno Plaintiffs asserted claims for

property loss, economic damages, other costs, and general damages arising from the defendants' intentional, willful, wanton, reckless, negligent, and grossly negligent acts and omissions that caused or contributed to the oil spill and its aftermath.  Many of the Sellno Plaintiffs also claimed -- with respect to their residences and/or businesses -- diminution of value, loss of value and/or use, lost contracts and income, loss of business opportunities, lost rents, lost earning capacity, and emotional damages.  In addition to filing suit, the Sellno Plaintiffs timely filed Plaintiff Profile Forms and/or Short-Form Joinders.

On June 12, 2012, the Court ordered the defendants to file motions to dismiss the so-called "Pure Stigma Claims," defined by the Court as "claims by or on behalf of owners, lessors, and lessees of real property that they have suffered damages resulting from the taint of their property caused by the oil spill, although no oil or other contaminant physically touched the property," and the so-called "Recreation Claims," defined by the Court as "claims by or on behalf of recreational fishermen, recreational divers, beachgoers, recreational boaters, etc., that they have suffered damages that include loss of enjoyment of life from the inability to use portions of the Gulf of Mexico for recreation and amusement purposes."  (Rec. Doc. 6657).  The Court also directed the defendants to file motions to dismiss the so-called "BP Dealer Claims," which are not the subject of this motion.

On July 11, 2012, motions to dismiss the "Pure Stigma Claims" and "Recreation Claims" were filed by BP Exploration & Production Inc., BP American Production Company, and BP p.l.c. (collectively "BP") (Rec. Docs. 6894, 6895), as well as Halliburton Energy Services, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., and M-I L.L.C. (Rec. Docs. 6889, 6891).  On July 17, 2012, Cameron International Corporation filed, with leave of court, a memorandum to confirm the dismissal of the claims. (Rec. Docs. 6921, 6923).

The PSC filed oppositions to the motions to dismiss.  (Rec. Docs. 7094-7096).  The Sellno Plaintiffs likewise opposed the pending motions, asserting several arguments not raised or pursued by the PSC.  (Rec. Doc. 7099).  Additionally, the Sellno Plaintiffs requested but were denied oral argument to address the Court at the hearing.  (Rec. Docs. 7100, 7384, 7395).  On October 1, 2012, the Court issued the Judgment granting the defendants' motions to dismiss the "Pure Stigma Claims," "BP Dealer Claims," and "Recreation Claims." (Rec. Doc. 7526).  The Sellno Plaintiffs bring this motion to request relief from the Judgment.

## MOTION FOR NEW TRIAL

### A.    Legal Standard

Rule 59(a) of the Federal Rules of Civil Procedure provides that "a court may, on motion, grant a new trial, on all or some of the issues . . . after a nonjury trial, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED. R. CIV. P. 59(a)(1)(B); *see also First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans,* 891 F. Supp. 290, 296 (E.D. La. 1995), *amended*, 896 F. Supp. 634 (E.D. La. 1995), *aff'd*, 85 F. 3d 622 (5th Cir. 1996).  Although Rule 59(a) does not specifically delineate the grounds for granting a new trial, the rule provides that a district court may "amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." FED. R. CIV. P. 59(a)(2). For example, "any error of law, if prejudicial, is good grounds for a new trial." Wright & Miller, *Federal Practice & Procedure: Civil* § 2805 at 37-38.  The burden rests with "the party seeking a new trial to show harmful error." *Id.* § 2803 at 32.

The decision to grant a motion for new trial "is in the sound discretion of the trial court." *First Commonwealth Corp.*, 891 F. Supp. at 297 (quoting *United States v. Bucon Constr. Co.*, 430 F.2d 420, 423 (5th Cir. 1970)).  If the court believes the "verdict . . . will result in a

miscarriage of justice . . . or is against the clear weight of the evidence," it may choose to grant a party's motion for new trial.  *Id.* (citing *Bucon*, 430 F.2d at 423).

**B.      Numerous Courts Have Held that Intentional or Willful Misconduct May Be Inferred from Reckless Acts or Decisions.**

After correctly observing that *Robins Dry Dock* is limited to unintentional torts, the Court concluded in the Judgment that neither the Sellno Plaintiffs' Complaint nor the Amended B1 Master Complaint "plausibly allege facts that would take the Pure Stigma Claims outside the *Robins Dry Dock* rule."  Judgment, Rec. Doc. 7526, at 6.  The Court based this ruling upon finding that the complaints "do not allege facts that would lead to the reasonable inference that the Defendants intended either the oil spill or the purported diminution in property value."  *Id.*

This holding does not take into account two salient facts.  First, the Federal Rules of Civil Procedure establish a simplified notice pleading standard, as opposed to a fact pleading standard utilized in some courts.  Rule 8(a)(2) requires only that a complaint include a short and plain statement of the claim showing that the pleader is entitled to relief.  Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957).  The Fifth Circuit has held that the "mere fact that allegations can be characterized as 'conclusional' will not, alone, suffice to make them insufficient."  *Gen. Elec. Capital Corp. v. Posey*, 415 F.3d 391, 397 n. 6 (5th Cir. 2005). Instead, "the test is whether the complaint 'outlines or adumbrates' a violation of the statute, [common law theory] of recovery or constitutional provision on which the plaintiff relies . . . and connects the violation to the named defendants."  *Id.* (quoting *Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir. 1992)) (brackets and ellipsis in original).  Accordingly, the Court's observation that the Sellno Plaintiffs "repeatedly refer to Defendants' 'intentional acts'" is not sufficient grounds, by itself, to hold that the complaint deficient as a matter of law.  Judgment, Rec. Doc. 7526, at 6.

Second, the Court did not consider the line of jurisprudence cited in this litigation which stands for the proposition that a series of reckless acts -- each of which may not be deemed intentional by itself -- can give rise to an inference or finding of intentional tortious conduct. The Court stated in the Judgment that "[i]ntentional torts generally require the actor intend 'the consequences of an act,' not simply the act itself.'" *Id.* 5-6 (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998) (citing *Restatement (Second) of Torts* § 8A, Comment a, p.15 (1964)). Nevertheless, federal courts have held that intentional or willful misconduct need not be a "single act 'intentionally done . . . or [based] on a 'single proximate causation.'" *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 230 (D.D.C. 2007) (quoting *In re Tug OCEAN PRINCE*, 584 F.2d 1151, 1158 (2d Cir. 1978)).   Rather, it can be based on "'an accumulation of acts,' or circumstances, which [were] a contributing cause even though not the immediate or proximate cause of the casualty." *Id.*

The *Water Quality* case is directly analogous to this MDL.  That case concerned the recoverability of damages caused by an oil spill off the coast of Puerto Rico in 1994.  In the context of applying the OPA, the *Water Quality* court looked beyond proximate cause and instead analyzed causation under a "totality of the circumstances" approach.  *Id.* at 229.  The court focused on the question of "whether the incident was caused by the willful misconduct of the responsible party," not on the whether a single act or occurrence of the responsible party caused the "incident" as defined by the OPA.  *Id.*  Moreover, the *Water Quality* court held that "a series of occurrences having the same origin, involving one or more . . . facilities or any combination thereof" cumulated together constituted the "incident" that resulted in the oil spill. *Id.*; *see also* 33 U.S.C. § 2701(14).  The *Water Quality* court further defined willful misconduct as "an act, intentionally done, with knowledge that the performance will probably result in

injury, *or done in such a way as to allow an inference of a reckless disregard of the probable consequences*." *Id.* at 229 (emphasis added).  Thus, when a combination of factors "indicates a probable consequence of damage resulting from [past and continuing] failures to act, in the face of such probability," the responsible party's gross disregard of the consequences may be deemed the equivalent of intentional or willful misconduct.  *Id.* at 229-230.

In addition to the *Water Quality* court, numerous federal courts have held that "reckless disregard" may be synonymous with "intentional conduct" or "willful misconduct."  *See, e.g., Bryan v. United States*, 524 U.S. 184, 197 (1998) (stating that "a disregard of a known legal obligation is sufficient to establish a willful violation"); *Bayer Corp. v. British Airways*, 210 F.3d 236, 239 (D.C. Cir. 2000) (willful misconduct can be shown by the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences); *Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667 (D.C. Cir. 1996) (reckless disregard is equivalent to willful misconduct); *In re Tug OCEAN PRINCE*, 584 F. 2d 1151, 1163-64 (2d Cir. 1978) (citing *Pekelis v. Transcontinental & W. Air*, 187 F.2d 122 (2nd Cir. 1951), *cert denied*, 341 U.S. 951 (the knowledge required for a finding of willful misconduct is "either actual knowledge of the act, or if there is no actual, then the probability of harm must be so great that failure to take the required action constitutes recklessness"); *Lewis v. W. Haven*, No. 11-1451, 2012 WL 4445077 (D. Conn. Sept. 25, 2012) (citing *Milardo v. Middletown*, No. 06-1071, 2009 WL 801614 (D. Conn. Mar. 25, 2009)) (willful misconduct is synonymous with intentional conduct); *K.A. ex rel. Allebach v. Upper Perkiomen Sch. Dist.*, No. 11-2610, 2012 WL 2362565 (E.D. Pa. Mar. 12, 2012), *report & rec. adopted*, No. 11-2610, 2012 WL 2362568 (E.D. Pa. June 21, 2012); *Palmer v. Liberty Mut. Ins. Co.*, No. 10-73, 2010 WL 2773381 (S.D. Miss. July 13, 2010) (willful misconduct is essentially "an intentionally done unreasonable act . . . [equating]

recklessness to willfulness in a tort requiring intentional conduct"); *Cox v. Hackett*, No. 05-2260, 2006 WL 2129060 (E.D. Pa. July 27, 2006) (stating that "willful misconduct has been construed by the courts to be synonymous with the term intentional tort"); *Halvonik v. Dudas,* 398 F. Supp. 2d 115, 125 (D.D.C. 2005), *aff'd*, 192 F. App'x 964 (Fed. Cir. 2006) (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 187 n. 5 (1973)) ("willfulness . . . 'is a disregard of a known legal obligation… and [has also been interpreted] variously to refer to 'purposeful, intentional conduct,' indifference to the requirements of the law' . . . or merely a conscious, intentional [or] voluntary decision").

**C.    The Sellno Plaintiffs' Complaint and the Amended B1 Master Complaint Sufficiently Allege Intentional Conduct to Defeat the Application of *Robins Dry Dock* at the Rule 12 Stage of the Proceedings.**

The Sellno Plaintiffs respectfully aver that the Court erred as a matter of law in holding that neither the Sellno Plaintiffs' Complaint nor the Amended B1 Master Complaint adequately allege intentional conduct that would avoid application of the *Robins Dry Dock* rule -- particularly in light of the aforementioned jurisprudence holding that a series of reckless acts or decisions can result in a finding that the defendants committed intentional or willful misconduct.

Although BP and the other defendants predictably claim that they did not intend to cause the oil spill or its disastrous consequences, there are countless examples in the record -- and more may still be found during ongoing discovery -- that reveal the defendants' reckless, intentional, and willful misconduct, including: (1) the numerous, deliberate decisions that led to the fatal fires and explosions on the DEEPWATER HORIZON and caused the sinking of the mobile offshore drilling unit; (2) the calculated efforts to deceive the public about the volume of oil spewing from the well and the success (or lack thereof) of the efforts to cap the well for several months after the blowout; (3) the calamitous clean-up in response to the millions of gallons of

- 9 -

crude oil poured into the Gulf of Mexico; (4) the repeated public statements revealing the defendants' disregard for the environment and residents of the Gulf Coast; and (5) the purposeful maneuvering to deny and avoid all liability for their actions.

Examples of evidence demonstrating BP's intentional conduct are cited by the United States in its response to the BP defendants' motion for final approval of the proposed economic and property damages settlement. (Rec. Doc. 7229-2). The U.S. brief provides an eye-opening sampling of BP's decisions and actions that a trier-of-fact may find constitute intentional or willful misconduct. *Id.* at 6-14. Any or all of the defendants' acts that have been, or may still be, revealed in discovery could support a finding that the defendants acted with the requisite intent to "tak[e] the claims out of the *Robins Dry Dock* parameters." *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, No. 05-1978, 2006 WL 2548166, at *4 (E.D. La. Aug. 31, 2006) (quoting *Showa Line, Ltd. v. Diversified Fuels, Inc.*, No. 88-2421, 1991 WL 211527, at *1 (E.D. La. Sept. 30, 1991)).

The essential point the Sellno Plaintiffs urge to the Court is that it is premature at the Rule 12 stage to dismiss the "Pure Stigma Claims" and "Recreation Claims" when there is already evidence in the record to suggest that the intentional tort allegations may be well founded. The Amended B1 Master Complaint contains nearly 80 pages and 285 paragraphs of factual allegations concerning the defendants' tortious decisions and actions before, during, and after the blowout. *See* Amended B1 Master Complaint, Rec. Doc. 1128, at 68-146, ¶¶ 258-543. Every conceivable step in the chain of events that gave rise to this calamity and, hence, this litigation -- from BP's lease of the Macondo well in 2008 to the devastating impact of the oil spill in the months and years following the blowout -- is outlined in the complaint. Based on the

extensive facts pleaded, the PSC alleged that the defendants are guilty of willful misconduct,[2] which is relied upon by the Sellno Plaintiffs (and many other plaintiffs) to support their claims for intentional tortious conduct in their individual complaints.  Amended B1 Master Complaint, Rec. Doc. 1128, at ¶¶ 169-174.  It is difficult to envision what additional facts known at the time could have been asserted to support the claim that BP and the other defendants acted with intentional and willful misconduct.

Yet Rule 12(b)(6) does not require a plaintiff to include every fact relevant to a defendant's tortious conduct in the complaint.  To defeat a motion to dismiss, a plaintiff must merely "plead enough facts 'to state a claim to relief that is plausible on its face.'" *Wright v. Shell Offshore, Inc.*, No. 10-2108, 2011 WL 690530, at *2 (E.D. La. Feb. 17, 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Sellno Plaintiffs have met -- indeed, surpassed -- that standard.   Based on (1) the extensive factual allegations asserted, (2) the Court's acceptance of all well-pleaded facts as true, and (3) drawing all reasonable inferences in the plaintiffs' favor, it is undeniably plausible that a trier-of-fact could find that the defendants acted with such reckless disregard for the consequences of their decisions and actions that their conduct could be considered intentional or willful under the law.

The Sellno Plaintiffs have likewise met their burden of showing that the Judgment is prejudicial and constitutes harmful error.  Many of their claims may be dismissed without the opportunity to conduct further discovery and to submit their claims to the trier-of-fact. Accordingly, the Court should revise the Judgment and order that the "Pure Stigma Claims" and "Recreational Claims" are not dismissed.

---

[2]   Although the PSC did not explicitly use the term "intentional" in relation to the defendants' conduct, the word "willful" is synonymous with "intentional."  Black's Law Dictionary defines "willful" as "proceeding from a conscious motion of the will; voluntary; . . . *intentional*; not accidental or involuntary."  BLACK'S LAW DICTIONARY 1434 (5th Ed. 1979) (emphasis added).  None of the defendants have disputed that the allegations of willful misconduct are to be construed as intentional conduct.

D.    **The *Robins Dry Dock* Rule Is an Antiquated Doctrine from a Very Different Time that No Longer Serves Its Purpose and, Therefore, It Should Not Be Applied to Bar the Recovery of Millions of Claimants in this Case.**

The *Robins Dry Dock* rule was not legislatively created; it was created by the U.S. Supreme Court in 1927, 85 years ago at a time when not much of our modern world was in place. The effects of pollution were not well known. Buggy whips were still marketable and in use, most telephones required cranking, and all long distance calls required talking to an operator. The first feature film originally with synchronized words -- "a talkie" -- was The Jazz Singer, released in October 1927. Up through the date of *Robins Dry Dock*, all feature films were silent and/or were accompanied by music. Most "refrigerators" were Ice Boxes that required ice deliveries, typically off the back of a horse-drawn wagon. Asbestos was widely used and was considered the material of the future. The first round-the-world flight occurred just three years before. The Great Depression had yet to occur. The most common car in the world was the hand-cranked Ford Model T, which reached a top speed of about 45 miles per hour. Highway safety had not yet been considered important. The earliest computers had not yet been dreamed of. There was no television. Significantly, there was no offshore drilling, and there was very limited drilling in shallow waters. True offshore drilling, out of sight of land, was still 20 years in the future. To most people, daily life in 1927 is unimaginable as ancient history.

The advances in science and technology since have provided a much greater understanding of our world and of the immense impact environmental disasters such as the Exxon Valdez or BP oil spills have on people, marine life, and the environment. Yet the jurisprudence has not kept pace. The courts continue to impose a bright line rule that was not meant for a situation where millions of lives have been adversely affected by a catastrophe of this magnitude. Just because something made sense in 1927 does not mean it makes sense today.

We do not believe that the Supreme Court could have contemplated 85 years ago the disastrous effects of a tragedy such as the BP oil spill.  The courts should recognize that times have changed.  With greater knowledge of mankind's ability to spoil their own planet, and of the evils caused by pollution, the courts have a responsibility to consider fashioning new rules to allow the imposition of liability and to ensure that all parties are treated fairly.  If ever there was a time and place to re-examine the underpinnings of the *Robins Dry Dock* rule, this is it.

Over the last few decades, the federal courts in this circuit and others have increasingly recognized the inequitable nature of the rule. *See, e.g., Wiltz v. Bayer CropScience, Ltd. P'ship*, 645 F.3d 690, 696 Cir. 2011) (remarking that the "economic-loss rule may produce seemingly unfair outcomes in certain cases"); *La. v. M/V TESTBANK*, 752 F.2d 1019, 1029 (5th Cir. 1985) (noting that the rule "has the virtue of predictability with the vice of creating results in cases at its edge that are said to be 'unjust' or 'unfair'"); *Euromin, Inc. v Coastal Cargo Co.*, No. 94-3844, 1996 WL 109291 (E.D. La. Mar. 11, 1996) (observing that the strict application of *Robins Dry Dock* leads to unfair results); *Shaughnessy v. PPG Indus., Inc.*, 795 F. Supp. 193, 196 (W.D. La. 1992) (referencing the "inequitable result the [*Robins Dry Dock*] rule often mandates"); *Holt Hauling & Warehousing Sys., Inc. v. M/V Ming Joy*, 614 F. Supp. 890, 895 (E.D. Pa. 1985) (criticizing the *Robins Dry Dock* rule as resting on pragmatic concerns that have been cast aside in other areas of tort law).  Several courts, including the Eastern District of Louisiana, have recognized exceptions to the rule to allow certain special interests, such as commercial fishermen,[3] to recover economic losses in the absence of physical injury to a proprietary interest. Yet homeowners and others who have invested as much or more than fishermen in the waterfront

---

[3]   *See La. v. M/V TESTBANK*, 524 F. Supp. 1170, 1173 (E.D. La. 1981) (stating that "claims for economic loss asserted by the commercial oystermen, shrimpers, crabbers, and fishermen raise unique considerations requiring separate attention . . . seamen have been recognized as favored in admiralty and their economic interests require the fullest possible legal protection") (citing *The DEL RIO*, 209 F.2d 178, 182 (9th Cir. 1953)).

and its use are left with no legal recourse when their property values are undeniably diminished by the reckless acts of the oil company who exploited the waterways for huge profits.  Denying plaintiffs who suffer economic harm the right to conduct discovery and present their claims to a jury is a manifest injustice and can hardly be argued to be what the Supreme Court intended in establishing this precedent.

The fundamental flaw in the *Robins Dry Dock* rule is that the 1927 courts and courts that relied on *Robins Dry Dock* as precedent have thrown out the doctrine of foreseeability for the sake of judicial convenience.  The bedrock of tort law in the United States, in all 50 states, is that a defendant should be held liable for the damages it caused to the extent the damages should have been foreseen.  *See Restatement (Second) of Torts*, § 302 (1965) ("A negligent act or omission may be one which involves an unreasonable risk of harm to another through . . . the foreseeable action of the other…."); *see also Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1988) ("We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.").  Foreseeability is a flexible doctrine that allows a court to view tort liability through the prism of the "reasonable person" instead of an unbending rule like *Robins Dry Dock*.  The "reasonable person" standard evolves with the times, whereas *Robins Dry Dock* is based on a public policy that has become antiquated.

In light of the vastly improved understanding of the perils of pollution (including, importantly, the lessons learned from Exxon Valdez), it is a fair question for the plaintiffs to ask what types of damages the defendants should have foreseen, when drilling in deep open water, as a result of their decisions and actions.  Should not BP and the other defendants have foreseen that

the spewing of millions of gallons of oil and toxins into the Gulf of Mexico would cause billions in economic losses to businesses and homeowners in the Gulf South?  Should not BP and the other defendants have foreseen that thousands of homeowners would not be able to use their properties, to sell their properties, to refinance, or to obtain loans as a result of such a disaster?  Should not BP and the other defendants have foreseen that the "stigma" caused by the massive amounts of pollution would harm residents of the Gulf South even if oil did not physically touch their property?  These are legitimate questions that the plaintiffs in this MDL will be unfairly precluded from presenting to a jury if the Court abides by the outdated *Robins Dry Dock* rule.

The Court has undertaken a great responsibility in handling an MDL that is one of the biggest in United States history.  This MDL will affect millions of people's lives, and yet its true impact will not be known for decades.  With the enormity of the importance of this case in mind, the Sellno Plaintiffs respectfully suggest that this is not the proper time for the Court to take the easy road of upholding the *Robins Dry Dock* rule.  Yes, to do so would undoubtedly streamline the litigation by effectively dismissing thousands of claims.  The parties remaining in the action would be able to focus their resources on other parts of the case.  And the MDL will probably come to a final resolution sooner.

But this is a landmark case in U.S. jurisprudential history that presents the unique opportunity to revisit a nearly century-old rule that no longer serves its original purpose and the times.  This is the right time and place for the federal courts to analyze whether the inequities caused by the rule outweigh the supposed benefits.  Should the courts decline to even address the issue on its merits in this MDL, millions more lives will be adversely affected the next time an environmental disaster strikes.  And those future claimants will have to remind the courts again that the *Robins Dry Dock* rule perverts the long-standing principles of the judicial system.

The Sellno Plaintiffs are asking the Court to overturn *Robins Dry Dock* and hold that all economic damages are recoverable regardless of whether property damage has occurred.  There are also other, more gradual steps the Court can alternatively take to lessen the burden of the known inequities of *Robins Dry Dock*.  The Court can avoid the arbitrary and unjust consequences by allowing the plaintiffs to develop the evidence and let the trier-of-fact decide if the damages they have suffered are recoverable under the traditional tort doctrines that have served the judicial system well for centuries -- foreseeability, causation, measurable damages, etc.  Fundamental fairness and equity dictates that the plaintiffs should at least have that opportunity.  Accordingly, the Sellno Plaintiffs respectfully urge the Court to deny the motions to dismiss and allow the "Pure Stigma Claims" and "Recreation Claims" to go forward.

**E.     Many Plaintiffs Sustained "Lost Profits" Within the Meaning of the OPA Because So-Called "Unrealized" Losses Caused Actual Economic Harm, Including Diminution in Property Value Caused by the Oil Spill.**

The Sellno Plaintiffs further contend that the Court committed a manifest error of law in dismissing the so-called "Pure Stigma Claims" with the exception of owners who sold property.  There are many other potential claimants who suffered actual harm as a result of the oil spill though oil never touched their property.

The Oil Pollution Act of 1990, 33 U.S.C. § 2702 ("OPA"), enumerates six categories of damages under which a plaintiff can recover.  The Sellno Plaintiffs argued in their opposition to the motions to dismiss the "Pure Stigma Claims" that section 2702(b)(2)(E) allows recovery of economic losses even though no oil touched the property.  That section states that "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property . . . shall be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E).  The Court ruled in the Judgment that the so-called "Pure Stigma" claimants

- 16 -

cannot recover under the OPA because their property was not sold and, therefore, the "loss of profits" represents an "*unrealized* diminution of real property value." Judgment, Rec. Doc. 7526, at 9 (emphasis in original).  The Court further concluded that "until property is sold and a loss realized, damages are speculative…." *Id.*

However, the Court has not addressed whether claimants who could not sell their property are covered by the OPA.  At the hearing on the motions to dismiss, the Court asked BP whether a plaintiff's claim that he/she could not sell property as a result of the stigma caused by the oil spill would be covered by section 2702(b)(2)(E).  *See* Transcript, p. 18.  BP never directly answered the question, instead responding with the blanket statement that such a claim "doesn't fit within the scope of OPA."  *Id.*  Similarly, the Court asked BP how a claimant could be denied recovery under the remedial statute when the stigma caused by the spill prevented a homeowner from refinancing or securing a loan, which directly involve the value of the property.  *Id.* at 38. Once again, BP's counsel failed to provide a clear answer.

The Sellno Plaintiffs contend that these are recoverable claims under the OPA.  A plaintiff may suffer *actual harm* as a result of the purportedly "unrealized" loss of diminution in property value caused solely by the stigma surrounding the spill.  The fact that these claims are difficult (but not impossible) to measure is not a legitimate reason to dismiss all such claims as "speculative."  A simple hypothetical illustrates the point.  John Q. Owner is the owner of a residence in Lafitte, Louisiana.  He paid off his mortgage years ago, but he wants to sell so he can buy his dream house in the French Quarter.  John lists his residence for sale on January 1, 2010, with an asking price of $100,000, which is commensurate with the appraisal value.  He receives an offer for $75,000, but John declines because he thinks he can get a better deal.  After the oil spill, John obtains an appraisal indicating that his property has decreased in value to

approximately $50,000.  So he lowers the listing price to entice another buyer.  After a year on the market, John decides not to sell the house because he never received another offer.  He has no other option but to stay and hope that someday -- maybe 2, 5, 10, or 20 years from now -- he can sell the house when people have forgotten about the oil spill.  To make matters worse, John learns years later that his cousin, Suzie Q. Owner, sold her house in the months after the disaster at half its pre-spill value and then recovered the loss in her lawsuit against BP.  John is irate when his lawyer explains to him that the courts have ruled that his loss is not covered by the OPA because it is "unrealized."

John's claim is just one example of a so-called "Pure Stigma Claim" that is ostensibly dismissed by the Judgment on the basis that it is does not seek to recover for an actual loss.  Other viable claims might be brought by individuals or businesses who attempted unsuccessfully to refinance property or obtain a loan using property as collateral.  There may be any number of claims where a loss caused solely by the diminution in property value causes actual harm.  If the Judgment stands, those individuals or businesses will never have the opportunity to conduct discovery or present their evidence to the trier-of-fact, whereas owners who sold their property at a loss can recover damages in litigation or, as BP points out, from the proposed settlement.

It is telling that BP suggested at the hearing that a homeowner who was able to sell his/her property might have a claim for "loss of profits" or "loss of earnings" under 2702(b)(2)(E), whereas another homeowner who was unable to sell his/her property has no claim whatsoever.  *See* Transcript, p. 21.  In responding to the Court's questioning at the hearing, BP stated that its motion to dismiss the "Pure Stigma Claims" did not target owners who sold property and claimed that a diminution in the sales price resulted from the stigma.  *Id.* at 22.  BP even pointed out that such claims are covered by the proposed economic and property damage

settlement. *Id.* Yet BP adamantly insisted that an individual who could not or did not sell property (or who was unable to refinance or secure a loan) has no recourse under the OPA.

As the Court well knows, the OPA is a remedial statute intended to create uniformity in the recovery of oil spill claims. The outcome advocated by BP, seemingly adopted by the Court in the Judgment, is manifestly unjust and undermines the purpose of the statute. For the same reasons discussed *supra*, the Sellno Plaintiffs have met their burden of showing that the Judgment is prejudicial and constitutes harmful error. Accordingly, the Court should revise the Judgment and order that the "Pure Stigma Claims" and "Recreational Claims" are not dismissed.

## <u>MOTION TO ALTER OR AMEND JUDGMENT</u>

**A.    Legal Standard**

In the alternative, the Sellno Plaintiffs respectfully ask that the Court alter or amend the Judgment pursuant to Rule 59(e) to certify it is a partial final judgment in accordance with Rule 54(b). Rule 59(e) provides that any party, upon motion, may move to alter or amend a judgment within twenty-eight (28) days after the entry of a judgment. *See* Fed. R. Civ. P. 59(e). District courts have considerable discretion to grant or deny a motion under Rule 59(e). *Flynn v. Terrebonne Parish Sch. Bd.*, 348 F. Supp. 2d 769, 771 (E.D. La. 2004); *see also Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir.1993); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir.1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n. 14 (5th Cir.1994) (en banc). Although reconsideration of a prior order is an extraordinary remedy, a court must "strike the proper balance between the need for finality and the need to render a just decision on the basis of all facts." *Flynn*, 348 F. Supp. 2d at 771 (quoting *Bohlin*, 6 F.3d at 355). The primary purpose of a Rule 59(e) motion is to "enable a party to obtain a correct understanding of the court's findings, typically for appeal purposes,"

and to give the district court an "opportunity to correct manifest errors of law or fact" that a movant questions or believes needs reconsideration by the court.  *See Shivers v. Grubbs*, 747 F. Supp. 434 (S.D. Oh. 1990).

Furthermore, this Court has previously held that a moving party must satisfy at least one of the following criteria to prevail on a Rule 59(e) motion: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; or (4) the motion is justified by an intervening change in the controlling law.  *Flynn*, 348 F. Supp. 2d at 771; *see also Fid. & Deposit Co. v. Omni Bank*, No. 99-1167, 1999 WL 970526, at *3 (E.D. La. Oct. 21, 1999); *Jupiter v. BellSouth Telecomms.*, *Inc.*, No. 99-0628, 1999 WL 796218, at *1 (E.D. La. Oct. 5, 1999); *Burma Navigation Corp. v. Seahorse*, No. 94-0795, 1998 WL 781587, at *1 (E.D. La. Nov. 3, 1998).

**B.     The Judgment Should Be Altered or Amended to Certify It as a Partial Final Judgment Under Rule 54(b).**

The Sellno Plaintiffs respectfully ask the Court to alter or amend the Judgment to certify it is a partial final judgment pursuant to Rule 54(b).  This rule states, in pertinent part:  "When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay . . . and [such judgment] will not end the action as [to all parties]."  The Sellno Plaintiffs (and perhaps others) wish to appeal the Judgment "in order to prevent manifest injustice."

The Judgment adjudicates some claims of some plaintiffs.  It is by definition an interlocutory judgment.  Certification as a partial final judgment is necessary to allow plaintiffs the right to appeal.  To amend the Judgment in this manner is within the Court's broad

discretion, and to do so would not prejudice the other parties to these proceedings.  The proposed economic and medical benefits settlements will continue unhindered.  Phase II discovery will continue to be conducted.  The parties will try the remaining issues in January 2013 and beyond. In short, the case will go on.

However, if the plaintiffs are not permitted the right to appeal the Judgment, it will undoubtedly take many years (or even decades) before the final resolution of all claims of all parties.  Those who wish to appeal the Judgment will be left in limbo indefinitely.  This would also be unnecessarily detrimental to the many thousands of plaintiffs who will be affected by the dismissal of the "Pure Stigma Claims" and the "Recreation Claims."  The Court can avoid this manifest injustice by altering or amending the Judgment in accordance with Rule 54(b).  A final resolution of these claims on appeal will also inure to the benefit of all parties by providing legal certainty and finality.  There is simply "no just reason" for the Court to decline to certify the Judgment as a partial final judgment.

## MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL

**A.      Legal Standard**

In the alternative to altering or amending the Judgment, the Sellno Plaintiffs respectfully move this Court to certify the Judgment for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Certification of interlocutory appeal is appropriate where: (1) the order at issue involves a controlling question of law; (2) there is substantial ground for difference of opinion; and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). A controlling question of law means "an abstract legal issue" such as "the meaning of a statutory or constitutional provision, regulation, or common law doctrine that dictates the outcome as a matter of law." *Ahrenholz v. Bd. of Trustees of Univ. of*

*Illinois*, 219 F.3d 674, 676 (7th Cir. 2000). A question is "controlling" if an incorrect disposition would "require reversal of a final judgment, either for further proceedings or for dismissal that might have been ordered without ensuing district court proceedings." *See McLaurin v. United States*, No. 06-169, 2008 WL 782487, at *2 (S.D. Miss. March 24, 2008) (*quoting* 16 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3930 at 423-34 (2d ed. 1996)).

The last requirement of § 1292(b) -- that an "appeal may materially advance the ultimate termination of the litigation" -- is closely tied to the requirement that the order involve a controlling question of law.  *Id.*; *see also* 16 Wright, Miller & Cooper, *supra*, § 3930 at 432. Courts have found that an immediate appeal will materially advance the ultimate termination of the litigation in the context of section 1292(b) where the litigation is the type "which usually settles as soon as the parameters of legal liability are established." *See Collins v. Promark Prods., Inc.*, 763 F. Supp. 1206, 1208 (S.D.N.Y. 1991).

The decision to certify an interlocutory appeal under section 1292(b) is within the discretion of the trial court.  *See McLaurin*, 2008 WL 782487, at *1 (quoting *In re Air Crash Disaster*, 821 F.2d 1147, 1167 (5th Cir. 1987)).  Furthermore, courts have held there is no specific deadline to request certification of an interlocutory appeal.  Section 1292(b) "imposes no statutory deadline for certification in the district court." *Id.* at *1-2; *see also Gides v. Glens Falls Ins. Co.*, No. 02-282, 2003 WL 23486911, at *1 (M.D. Fla. Aug. 5, 2003). For example, a request for certification filed two months after the order is considered timely.  *Id.*  Thus, this motion brought within 28 days of entry of the Judgment is timely.

**B.    The Judgment Meets the Requirements of 28 U.S.C. § 1292(b) and the Court Should Exercise Its Broad Discretion to Certify the Judgment for Interlocutory Appeal.**

The Judgment meets each of the 1292(b) requirements for certification.  First, it involves a controlling question of law in several respects.  The Court's application of the *Robins Dry*

*Dock* rule, as well as *The Conqueror* case, satisfies this prong of the test.  Both of these lines of jurisprudence involve an "abstract legal issue" in that they are common law doctrines that bar recovery of particular claims.  The *Robins Dry Dock* rule is a policy-based bright line rule whose application dictates, as a matter of law, that certain economic losses are unrecoverable.  Similarly, *The Conqueror* has been applied in the Judgment to bar claims by recreational boaters, divers, fishermen, and beach-goers.  These doctrines are "controlling" questions of law as defined by the courts, because a different interpretation or application of these principles would require the reversal of the Judgment, *i.e.*, denying the defendants' motions to dismiss the "Pure Stigma Claims" and "Recreation Claims."

There is also substantial ground for difference of opinion on the application of these common law doctrines to the claims in this MDL.  As set forth in the PSC's and the Sellno Plaintiffs' oppositions (not to mention the foregoing motion for new trial), the contours of these doctrines are vehemently disputed.  There are a number of issues in addition to the above which breed substantial ground for difference of opinion, such as (1) whether CERCLA abrogates the *Robins Dry Dock* rule, (2) whether the commercial fishermen's exception should be expanded to include waterfront property owners and boat owners, and (3) whether state law should apply to the claims in this litigation.  These are all issues which have not been directly addressed by the Fifth Circuit in this context.

Finally, an immediate appeal of the Judgment will materially advance the ultimate termination of the litigation.  If no appeal is heard now, the plaintiffs will be required to wait years to raise these issues with the appellate courts.  Those appeals, once lodged, will likely extend the life of this litigation significantly.  The termination of the MDL will be materially advanced by 1292(b) certification because it will provide legal certainty and finality to these

claims which, in turn, would make settlement of claims that fall outside the proposed settlements more likely.  Therefore, the requirements of 28 U.S.C. § 1292(b) are met, and the Court should exercise its broad discretion to certify the Judgment for interlocutory appeal.

## **CONCLUSION**

For the foregoing reasons, the Sellno Plaintiffs respectfully move this Honorable Court to grant their Motion for New Trial pursuant to Rule 59(a) to reverse the Judgment dismissing the so-called "Pure Stigma Claims" and "Recreation Claims."  In the alternative, the Sellno Plaintiffs respectfully move this Honorable Court to alter or amend the Judgment pursuant to Rule 59(e) to certify it as a partial final judgment in accordance with Rule 54(b).  Again in the alternative, the Sellno Plaintiffs respectfully move this Honorable Court to certify the Judgment for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Sellno Plaintiffs respectfully request oral argument to address the arguments set forth above.

Respectfully submitted,

**DIDRIKSEN LAW FIRM**

*/s/ Caleb H. Didriksen*
**CALEB H. DIDRIKSEN**, La. Bar No. 1334
**DIANE R. COSENZA**, La. Bar No. 4419
**MICHAEL D. LANE**, La. Bar No. 30364
3114 Canal Street
New Orleans, LA 70119
Telephone:  (504) 586-1600
Facsimile:  (504) 822-3119
Email: caleb@didriksenlaw.com
        diane@didriksenlaw.com
        mike@didriksenlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel of record by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this the 29th day of October, 2012.


*/s/ Caleb H. Didriksen*