UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | § § § § § § § § § | MDL No. 2179 SECTION: J JUDGE BARBIER MAG. JUDGE SHUSHAN |
| Relates to: *All Cases* | | |

## HESI'S RESPONSE TO MOTIONS SEEKING ADVERSE INFERENCES AGAINST HESI BASED ON ASSERTIONS OF THE FIFTH AMENDMENT

Defendant, Halliburton Energy Services, Inc. ("HESI") files this Response to Motions Seeking Adverse Inferences against HESI Based on Assertions of the Fifth Amendment ("Response"). The motions addressed in this Response were filed by BP (Rec. Docs. 7645 and 7645-1), the PSC (Rec. Docs. 5873, 5873-2, 5873-7 and 5873-8), and the United States of America (Rec. Doc. 7637).[1]

### I.  INTRODUCTION

BP seeks adverse inferences against HESI based on the Fifth Amendment assertions of HESI employee Christopher Haire ("Haire"). The PSC seeks adverse inferences against HESI based on the Fifth Amendment assertions of HESI employees Haire and Cathleenia Willis ("Willis") and BP employee Brian Morel ("Morel"). The United States incorporates by reference the adverse inferences sought by the PSC against HESI with respect to Haire, Willis,

---

[1] Additionally, Transocean ("TO") filed an Amended Motion for Adverse Inferences Based on BP Employee's Refusal to Testify (Rec. Doc. 7639) ("TO's Amended Motion"). TO's Amended Motion and its original motion (Rec. Doc. 5879) seek adverse inferences based on assertions of the Fifth Amendment by BP employees Mark Hafle, Robert Kaluza, and Brian Morel. It appears, from the context of its motions, that TO seeks adverse inferences against only BP. To the extent TO seeks adverse inferences against HESI based on the Fifth Amendment assertions by BP employees, HESI objects on the same grounds set forth in this Response. HESI also reserves its right to further object to any adverse inferences that TO may seek against HESI.

and Morel.[2]  For the reasons set forth in this Response, the adverse inferences sought against HESI are not permitted because the requesting parties fail to establish corroborating evidence in support of each inference.  Indeed, many of the questions for which adverse inferences are sought are objectionable on their face because they contradict evidence and documents in the record, call for speculation, and/or address topics that are outside the experience and knowledge of the witness.[3]  Finally, adverse inferences may not be imputed against HESI based on the assertion of the Fifth Amendment by non-HESI employees, such as BP's Brian Morel, because the requesting parties have not proffered evidence that corroborates the relationship between the invoking witness and HESI in accordance with *FDIC v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969 (5th Cir. 1995) and *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997).

## II.     ARGUMENTS

### A.     The Adverse Inferences Sought Against HESI Lack Corroborating Evidence and Should Be Denied.

#### 1.     The propriety of an adverse inference is analyzed on a case-by-case basis.

The Court previously acknowledged, and the parties agree, that adverse inferences must be analyzed on a case-by-case basis.  (*See* Order [Regarding Motions of Transocean, BP, M-I and Halliburton to Limit Scope of Adverse Inferences Drawn from Invocation of Fifth

---

[2] BP, the PSC, and the United States also seek adverse inferences against non-HESI parties based on the Fifth Amendment assertion by various witnesses.  For example, BP seeks adverse inferences against TO based on questions posed to Micah Sandell about mudlogging (Rec. Docs. 7645 and 7645-1), and the PSC and United States seek adverse inferences based on questions posed to BP employees Mark Hafle, Brian Morel, and Robert Kaluza about cementing (Rec. Docs. 5873, 5873-1, 5873-2, 7637, 7637-1, 7637-2, and 7637-3).  To the extent the inferences sought against other parties impact issues relevant to HESI, such as mudlogging and cementing, HESI objects on the same grounds set forth in this Response and reserves its right to dispute the evidentiary weight that may be given to such adverse inferences if they are permitted.

[3] As in HESI's amended motion for adverse inferences, documents referenced herein have not been attached due to potential unresolved confidentiality issues.  Upon request, copies of these materials will be made available to the Court.

Amendment Privilege Against Self-Incrimination (Rec. Docs. 5111, 5112, 5120 and 5144)], Rec. Doc. 5682, p. 3) (citing *FDIC,* 45 F.3d at 969).

### 2. Parties must proffer probative, corroborating, and independent evidence to support an adverse inference.

There can be no adverse inference in the absence of some probative, corroborating, and independent evidence that tends to support that inference. Because BP, the PSC, and the United States fail to put forward sufficient corroborating evidence in support of the inferences sought against HESI, their requested adverse inferences should be rejected.[4]

The evidentiary weight of an adverse inference depends upon the circumstances; but in all cases, the inference cannot stand unsupported. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 675 (5th Cir. 1999); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990). The most important factor in the Court's analysis of whether to apply an adverse inference is that the inference sought must be supported by corroborating or independent evidence. *See Gutterman*, 896 F.2d at 119. In other words, parties may not simply manufacture unsubstantiated facts and impute them to a witness taking the Fifth Amendment. There must be independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination; otherwise, no inferences may be drawn. *See United States v. Stelmokas*, 100 F.3d 302, 311 (3d Cir. 1996) (citing *United States v. Local 560 of the Int'l Bhd. Of Teamsters*, 780 F.2d 267, 292, n.32 (3d Cir. 1985)).

---

[4] At a minimum, and as suggested in HESI's amended motion seeking adverse inferences against other parties (Rec. Doc. 7644 and 7644-1), this Court should defer ruling on any adverse inference requests until it has received the evidence to be presented in the Phase One trial.

Accordingly, the parties seeking adverse inferences against HESI based upon an assertion of Fifth Amendment rights must first establish corroborating evidence in support of the inference sought. Otherwise, no inference may be applied.

### 3. Adverse inferences based on objectionable questions must be rejected as uncorroborated.

An adverse inference may not be imputed to a party based upon questions that are objectionable on their face because they contradict evidence and documents in the record, call for speculation, and/or address topics that are outside the experience and knowledge of the invoking witness. Such inferences necessarily lack the requisite corroborating evidence. For example, an adverse inference can only be derived from a witness who invokes the Fifth Amendment and has personal knowledge concerning the subject matter of the requested adverse inference. *See United States v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 634 (E.D. Va. 2006). Likewise, inferences cannot be imputed to HESI based on questions that contradict evidence in the record, call for speculation, or otherwise lack foundation. Any inferences based upon these types of objectionable questions are necessarily uncorroborated either because they do not constitute evidence that can be considered at trial or because they are contrary to the evidence. *See, e.g., Gutterman*, 896 F.2d at 119 (inferences must be supported by corroborating or independent evidence). No valid inference arises from an excessively broad, ambiguous, or purely speculative question coming "out of left field." As BP has acknowledged, an adverse inference must be based on something more than "attorney generated scripts with no tether of legitimacy to the truth." (Rec. Doc. 5112-1, p. 9 (citing *Emerson v. Wembley USA, Inc.*, 433 F.Supp. 2d 1200, at 1213-14 (D. Colo. 2006)).

### 4. Adverse inferences cannot contravene the Federal Rules of Evidence.

Similarly, no valid inference can be drawn if the Court determines that it would contravene Federal Rules of Evidence 402, 403, 701, 802, or other applicable rules of evidence. *See Farace v. Independent Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983). The Federal Rules of Evidence must apply with equal force to an adverse inference; otherwise conventional evidence would be more circumscribed than evidence based merely upon inferences resulting from Fifth Amendment claims.

### 5. The adverse inferences sought against HESI based upon the questioning of Haire, Willis, and Morel lack corroborating evidence.

In their motions, BP, the PSC, and the United States fail to set forth sufficient corroborating evidence to sustain the adverse inferences they seek against HESI based on the Fifth Amendment assertions of Haire, Willis, and Morel.

#### a. The documents cited by BP, the PSC, and the United States do not constitute corroborating testimony sufficient to support adverse inferences against HESI.

BP cites three items in support of the inferences it seeks with respect to Haire: (1) TREX 3683 (NBC Houston Local 2 News article), (2) TREX 47643 (Video from Local News 2), and (3) TREX 3652 (6/10/10 email from C. Haire to V. Tabler). (Rec. Doc. 7645-1). HESI has objected to two of these purported exhibits, TREX 3683 and TREX 47643, as hearsay under Fed. R. Evid. 802. (HESI's Objections to Non-Email Exhibits Designated by Other Parties, Rec. Doc. 5320, et. seq.). These exhibits cannot be considered by the Court at trial because they constitute hearsay; consequently, they do not provide the requisite corroborating evidence needed to support the adverse inferences sought by BP. *See, e.g., Gutterman,* 896 F.2d at 119 (the inference sought must be supported by corroborating or independent evidence). With respect to

TREX 3652, this two-sentence email containing questions about two of the negative tests[5] does not support the multiple adverse inferences BP requests in connection with Haire, including proposed inferences suggesting that Haire was responsible for interpreting the negative tests or that he purportedly did not elevate his concerns about the tests.  In fact, BP's proposed inferences *contradict* evidence that Haire was not responsible for interpreting negative tests; rather, BP was tasked with the interpretation of such tests.  (*See* FN 6, *infra*, explaining that Haire was tasked with operational responsibilities and was not responsible for interpreting the negative tests, which was BP's job).  BP's proposed inferences are also contradicted by the evidence that HESI appropriately reported the bleed back volumes on the first two negative tests.[6]  Further, the proposed inference that Haire failed to stop work is contradicted by BP's other suggested inferences about a third negative test, with which Haire was not involved, and that was reported to him as being successful.  (Rec. Doc. 7645-1, pp. 8-9).

The PSC and, by incorporation, the United States, are on equally shaky ground as to the inferences they seek against HESI based on Haire's deposition.  They cite only one document, TREX 3652 (the same two-sentence email cited by BP) as corroborating evidence.  (Rec. Doc. 5873-7, p. 2).  Yet, this brief email cannot support the inferential leap made by the PSC and the United States to arrive at the conclusory and speculative inferences sought against HESI.  For example, there is no cited evidence to corroborate the requested inferences that "Haire knew that the cement job might fail," that Haire "knew that the first two negative pressure tests were unsuccessful" because he was "responsible for monitoring the two negative tests performed. . .",

---

[5] TREX 3652 is an email from Haire to Vincent Tabler dated June 10, 2010, that reads:  "I read some report that stated that the two negative tests we did were considered successful? I stated that I found them to be unsuccessful and I was checking to see if maybe you knew why Transocean and BP were calling them successful?"

[6] *See* Dep. of Vincent Tabler, 484:12-485:7; 487:14-16.

or that he "knew the dangers of the well continuing to flow while conducting the negative pressure test, but did not inform others that the well was flowing or that the well had to be shut in." (Rec. Doc. 5873-7, pp. 1-5). Further, as set out above, the requested inferences are actually contradicted by the evidence.

Similarly, with respect to Willis, the single exhibit cited by the PSC and the United States does not support the adverse inferences proposed. (*See* TREX 3200 (Tab 44 from the Willis Deposition); Rec. Doc. 5873-8). The inferences sought against HESI misrepresent the cited exhibit and are conclusory, speculative, and wholly lack foundation. By way of example, TREX 3200, a HESI/Sperry Drilling Services marketing brochure, fails to support an inference that "Sperry and Willis' role on the DWH was to provide the first line of defense. . . ." (Rec. Doc. 5873-8, p. 2). Indeed, the record evidence *contradicts* any inference that Sperry was considered the first line of defense on the DWH or Macondo well.[7] Nor does that marketing brochure contain any confirmation or comment about Willis' experience or training to support the inferences requested by the PSC and the United States. Finally, to the extent the PSC and the United States seek inferences regarding comments allegedly made by Joe Keith, they offer no

---

[7] The record shows that the TO driller, *not HESI/Sperry*, was the first line of defense for the DWH and Macondo. (*See* Dep. of James Cowie, 187:10-17; 187:25-188:4 (". . . the first line of defense for identifying a kick is the driller's responsibility;" the driller "in this occasion . . . would have been Transocean;" "In all operations that I have worked in, as I said, the first line of defense is a driller. It's his ultimate responsibility to shut the well in."); Dep. of Larry McMahan, 238:4-11 (on a rig such as the Deepwater Horizon, the driller "is one of the first lines of defense"); Dep. of Murry Sepulvado, 732:13-19; 733:13- 734:5 (agreeing with statements that "the TO driller acknowledged that the driller was the first line of defense in a well control situation," "the mudlogger is actually a backup to the -- to the driller on the well," "it's up to the driller to watch the well and watch for any event downhole that would create a cause for correction," and "if the mudlogger is doing anything, they're simply doing it as a backup to the driller")). In fact, the HESI/Sperry mudloggers were a "second set of eyes," essentially providing backup to the TO driller. (*See* Dep. of Murry Sepulvado, 733:13-18 (agreeing that "the mudlogger is actually a backup to the -- to the driller on the well"); Dep. of Skip Clark, 179:3-17 (agreeing that "the Sperry mudloggers are a second set of eyes"); Dep. of Miles Randal Ezell, 479:9-480:20 (Sperry mudloggers "were a support mechanism for the driller;" it was the driller's responsibility to record pit volume totals for purposes of monitoring the well); Dep. of Kelly S. Gray, 316:14-22; 528:1-529:13 ("we [HESI/Sperry] are a second set of eyes. The drillers are the first set of eyes. We are contracted to assist;" "[w]e are there to assist the drillers;" agreeing that "the Transocean rig crew [is] the first set of eyes")).

corroborating evidence and ignore the fact that Joe Keith testified in this case. (*See* Dep. of Joseph E. Keith).

As for the adverse inference based on the Fifth Amendment assertion by BP employee Morel, the PSC and United States rely solely on a citation to TREX 1396 in support of the overbroad, conclusory, and speculative inference they seek against HESI. (Rec. Doc. 5873-2, pp. 28-31). The questions posed to Morel, upon which the requested inference is based, essentially consist of counsel reading portions of TREX 1396 into the record. Without further elaboration or corroborating evidence, this recitation into the record of words appearing on a document is not enough to support the proposed adverse inference. This is especially true in light of the facts that Jesse Gagliano–the subject of the cited exhibit–provided deposition testimony. (*See* Dep. of Jesse Gagliano). Additionally, the evidence contradicts the requested inference because HESI timely performed pilot tests on the rig cement (*see* TREX 60457 and TREX 60409) and because it was BP's Morel who made the final call on the composition of the slurry only days before the cementing operation commenced (*see* TREX 01395).

### b. *The proposed adverse inferences against HESI are based on objectionable lines of questioning.*

HESI previously objected, generally, to imposing adverse inferences based on Fifth Amendment assertions where a party has not first established the requisite corroborating evidence. (*See* "General Objections" in HESI's Objections to the Deposition Designations of Christopher Haire and HESI's Objections to the Deposition Designations of Cathleenia Willis (submitted to the Court via WorldWide)). HESI also specifically objected to many of the deposition questions proffered by BP, the PSC, and the United States in support of their requested adverse inferences because the questioning contradicts evidence in the record, calls for

speculation, addresses topics that are outside of the witness's knowledge, and/or otherwise lacks foundation. (*See* HESI's Objections to the Deposition Designations of Christopher Haire, HESI's Objections to the Deposition Designations of Cathleenia Willis (submitted to the Court via WorldWide)).

For example, HESI objected to questions implying that Haire "knew the dangers of the well continuing to flow while conducting the negative pressure test" and that he "did not inform others that the well was flowing and the well had to be shut in." (Rec. Doc. 5873-7, pp. 4-5; HESI's Objections to the Deposition Designations of Christopher Haire (submitted to the Court via WorldWide)). This line of questioning, along with numerous other questions posed to Haire, assumes facts not in evidence, calls for speculation, is argumentative, and lacks foundation establishing that Haire possesses sufficient knowledge or is otherwise qualified to respond. Indeed, Haire–who was tasked with operational responsibilities and was not responsible for interpreting the negative tests (which was BP's job) or designing the cement–was questioned about many topics that were beyond the scope of his expertise and personal knowledge.[8]

Likewise, HESI objected to a question posed to Willis seeking to establish that "BP hired Sperry to be the first line of defense in identifying or communicating any hazardous or unusual

---

[8] Since joining HESI in 2006, Haire has held the positions of Service Operator, Service Operator 2, and Service Supervisor. (Dep. Of Christopher Haire, 14:9-15; *see also* TREX 3641, 244:3-14 (Haire was a Service Supervisor at the time of the Macondo incident)). Haire's role was operational in nature. Specifically, he was not responsible for cement design. (*See, e.g.,* TREX 3641, 256:6-257:3). Nor was he responsible for interpreting the results of the negative tests, as this was BP's responsibility. (*See, e.g.,* Dep. Of Murry Sepulvado, 207:5-25 (BP has the final say regarding the negative pressure test, after consulting with the OIM, toolpusher and driller, everybody that's involved); Dep of Randy Ezell, 716:3-717:9 (BP is responsible for designing, overseeing, and interpreting the negative test); Dep. of Paul Johnson, 476:15-478:18 (the BP company man convinced Ezell and Harrell that the negative test was successful); and 509:2-20 (The BP Well Site Leader was responsible for the final interpretation of the negative test, and the OIM and toolpusher would challenge and question things they saw as problematic)).

It should be noted that, although HESI cites to TREX 3641 (Haire's JIT testimony) for purposes of illustrating a lack of corroborating evidence for the adverse inferences sought against the company, HESI previously objected to this exhibit on hearsay grounds and does not intend to waive that objection.

conditions that occurred during the drilling of the Macondo well" because Willis was asked to confirm facts not in evidence; indeed, the facts in evidence actually contradict the question. (Rec. Doc. 5873-8, p. 2; HESI's Objections to the Deposition Designations of Cathleenia Willis (submitted to the Court via WorldWide)). Further, the question–like many others posed to Willis during her deposition–lacks foundation, as there is no showing that Willis is qualified or possessed the knowledge to make such a statement. In fact, the evidence shows that Willis was not even on duty at the time of the Macondo incident on April 20, 2010.[9]

The foregoing instances are merely examples; much of the questioning relied upon by BP, the PSC, and the United States to support their requested inferences is objectionable on the same grounds. Many of these questions are also problematic when analyzed in light of the Federal Rules of Evidence. Because BP, the PSC and the United States have failed to establish the necessary predicate for the cited deposition questions, including the witnesses' experience and personal knowledge, there is no corroborating evidence to support the requested adverse inferences.

### B. An Adverse Inference Against HESI Based Upon Morel's Assertion of the Fifth Amendment Is Unwarranted.

The Court previously determined that a case-by-case analysis must be undertaken to determine whether the assertion of the Fifth Amendment by a non-employee witness may warrant an adverse inference against a party (Rec. Doc. 5682) (citing *FDIC*, 45 F.3d at 978)). The Court also found that the factors set forth in *LiButti* are useful in making the case-by-case analysis. (Rec. Doc. 5682, p. 5). The four *LiButti* factors are: (1) the nature of the relevant

---

[9] Willis, a Service Data Mudlogger (TREX 3205, p.1), was relieved by Joe Keith between 5:00-5:30 p.m. on April 20, 2010. (*See, e.g.,* Dep. of Joseph E. Keith, 221:14-222:18).

relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. *See LiButti*, 107 F.3d at 123.

Under the circumstances, and in light of *FDIC* and the *LiButti* factors, allowing an adverse inference against HESI based on the Fifth Amendment assertion of BP's employee Brian Morel would be improper. As a BP employee, Morel lacks sufficient loyalty to–and is not controlled by–HESI, such that no adverse inference is warranted against HESI. Moreover, the interests of BP and HESI, who have asserted numerous claims against one another, are adverse enough to conclude that the nature of the relationship between HESI and Morel, a BP employee presumably loyal to BP, is also adversarial. For this same reason, HESI and Morel do not share compatible interests in the outcome of the litigation.[10] Finally, while Morel is a central figure in the events leading up to the blowout, that central role, standing alone, is insufficient to infer facts against HESI that are contradicted by record evidence. Thus, applying the *FDIC* and *LiButti* factors, no adverse inference against HESI is proper based upon the Fifth Amendment invocation by BP employee Morel.

## III.   CONCLUSION

For the reasons stated herein, HESI respectfully requests that the adverse inferences sought against HESI by BP, the PSC, and the United States be denied in their entirety.

---

[10] Indeed, the context of the proffered corroborating evidence (TREX 1396) argues against finding compatible interests between HESI and Morel because Morel's emails show that there was a divergence of interests between Morel and HESI's employee, Jesse Gagliano.

Respectfully submitted,

**GODWIN RONQUILLO PC**

**By:** /s/ *Donald E. Godwin*
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
DGodwin@GodwinRonquillo.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
BBowman@GodwinRonquillo.com
Jenny L. Martinez
State Bar No. 24013109
JMartinez@GodwinRonquillo.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
FHartley@GodwinRonquillo.com
Gavin E. Hill
State Bar No. 00796756
GHill@GodwinRonquillo.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332
and
R. Alan York
State Bar No. 22167500
AYork@GodwinRonquillo.com
Jerry C. von Sternberg
State Bar No. 20618150
JVonSternberg@GodwinRonquillo.com
Misty Hataway-Coné
State Bar No. 24032277
MCone@GodwinRonquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT HALLIBURTON ENERGY SERVICES, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing HESI's Response to Motions Seeking Adverse Inferences Against HESI Based on Assertions of the Fifth Amendment has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 5th day of November, 2012.

/s/ Donald E. Godwin
Donald E. Godwin
