UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179  SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| …………………………………………………... | : | SHUSHAN |

## BP'S RESPONSE IN OPPOSITION TO MOTIONS FOR ADVERSE INFERENCES BASED ON ASSERTIONS OF THE FIFTH AMENDMENT

Defendants, BP Exploration & Production Inc. and BP America Production Company (collectively "BP"), files this Response In Opposition to Motions For Adverse Inferences Based On Assertions of the Fifth Amendment by the PSC, Transocean, Halliburton, and the United States (collectively, the "Requesting Parties.") *See* Doc. No. 5873 ("PSC's Mot."); Doc. No. 7639 ("Transocean's Mot."); Doc. No. 7644 ("HESI's Mot."); and Doc. No. 7637 ("US's Mot.").

## BACKGROUND

The PSC filed its Motion for Adverse Inferences from Fifth Amendment Invocations on February 24, 2012. *See* Doc. No. 5873 ("PSC's Mot."). The PSC seeks inferences against BP based on invocations of the Fifth Amendment by the following individuals (most of whom were not employed by BP):

1. Mark Hafle (BP Senior Drilling Engineer)

2. Robert Kaluza (BP Well Site Leader)

3. Brian Morel (BP Drilling Engineer)

4. Jimmy Harrell (Transocean Offshore Installation Manager)

5. Steve Bertone (Transocean Chief Engineer/Maintenance Supervisor)

6. Christopher Haire (Halliburton Service Supervisor)

1

7. Cathleenia Willis (Transocean Mud Logger)

8. James Ingram (Transocean Senior Materials Coordinator)

9. Micah Sandell (Transocean Crane Operator)

Transocean filed its Motion for Adverse Inferences Based on BP Employees' Refusal to Testify on October 10, 2012. *See* Doc. No. 7639 ("Transocean's Mot."). Transocean seeks inferences against BP based on invocations of the Fifth Amendment by the following individuals:

1. Mark Hafle (BP Senior Drilling Engineer)

2. Robert Kaluza (BP Well Site Leader)

3. Brian Morel (BP Drilling Engineer)

Halliburton filed its Amended Motion for Adverse Inference Based On Assertions of the Fifth Amendment on October 12, 2012. *See* Doc. No. 7644 ("HESI's Mot."). Halliburton seeks inferences against BP based on invocations of the Fifth Amendment by the following individuals:

1. Mark Hafle (BP Senior Drilling Engineer)

2. Robert Kaluza (BP Well Site Leader)

3. Brian Morel (BP Drilling Engineer)

The United States filed its Requested Adverse Inferences Regarding Fifth Amendment Invocations on October 12, 2012. *See* Doc. No. 7637 ("US's Mot."). The United States incorporated by reference into its Motion the adverse inferences that the PSC and Halliburton seek in their motions. The United States also seeks additional inferences against BP based on invocations of the Fifth Amendment by the following individuals:

1. Mark Hafle (BP Senior Drilling Engineer)

2. Robert Kaluza (BP Well Site Leader)

      3. Brian Morel (BP Drilling Engineer)

## LEGAL STANDARD

In *Baxter v. Palmigiano*, the Supreme Court held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. . . ." 425 U.S. 308, 318 (1976). In order to secure such an inference, however, "the party urging the use of the inference must show that the circumstances of the particular case justify the imputation of the negative inference." *State Farm Mut. Auto. Ins. Co. v. Abrams*, 96 C 6365, 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000). The Court is required to evaluate the proposed inferences on a case-by-case basis. *F.D.I.C. v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 978 (5th Cir. 1995).

But before engaging in this case-by-case analysis, the Court must undertake a threshold two-step inquiry. *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 633 (E.D. Va. 2006). "First, it is necessary to determine whether there was a valid basis for the witness' invocation of the privilege." *Id.* "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177 (2004). "The second step in the analysis requires an assessment whether the requested inferences, which are a form of evidence, comply with the Federal Rules of Evidence." *U.S. ex rel. DRC, Inc.*, 415 F. Supp. 2d at 634. Thus, only after the Court has determined that an invocation of the Fifth Amendment was valid, and has weeded out any question and suggested inference that does not comply with the Federal Rules of Evidence, can it engage in the case-by-case analysis described in *FDIC* and other decisions.

The case-by-case analysis must be thorough. To curb abuse, courts have articulated a number of guidelines and factors to help evaluate whether a particular inference should be drawn. First, "[b]efore an adverse inference may be drawn from a party's refusal to testify in a

civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege." *Kontos v. Kontos*, 968 F. Supp. 400, 408 (S.D. Ind. 1997); *Baxter*, 425 U.S. at 315 ("It is thus undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board."); *United States v. White*, 589 F.2d 1283, 1286-87 (5th Cir. 1979) (quoting *Baxter*).  In addition, a court should not draw an inference if there is enough other evidence and testimony to decide the issue without the aid of the inference.  *Abrams*, 2000 WL 574466, at *7 (deciding summary judgment motion "without relying on Fifth Amendment adverse inferences" because it could); *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210-11 (5th Cir. 1983) (refusing to draw an adverse inference where "the defendant ha[d] ample opportunity to impeach its witness by other means").

This Court has also agreed that the non-exclusive factors articulated in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), should be used to help evaluate the propriety of an adverse inference.  These factors include: (1) the nature of the relationship between the party against which the inference is sought and the witness; (2) the degree of control the party against which the inference is sought has over the witness; (3) the compatibility of interests of the party against whom the inference is sought and the witness in the outcome of the litigation; (4) the role of the invoker in the litigation.  *Id.* at 123-24.  This Court noted that the fourth factor, in particular, is consistent with Fifth Circuit precedent.  *See* Court's February 14, 2012 Order ("Court's Order").  Ultimately, the trial court's "***overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth.***" *Id.* at 124 (emphasis added).

Even if the Court decides to allow some inferences against the parties, that does not mean that the parties "are entitled to adverse inferences from dozens of questions asked . . . in [a]

4

deposition." *U.S. ex rel. DRC, Inc.*, 415 F. Supp. 2d at 636. The purpose of all of these guidelines and factors is to guard against the very real possibility that Fifth Amendment witnesses will be subjected to a "systematic interrogation by . . . counsel who knows they will assert the privilege against self-incrimination." *See RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 277-78 (3d Cir. 1986) (quoting *Brink's Inc. v. City of New York*, 717 F.2d 700, 715-16 (2d Cir. 1983) (Winter, J., dissenting)). By denying inferences from self-serving, fact-specific questions, the Court prevents the examining attorney from improperly testifying for the invoking witness. *Id*. at 278.

BP respectfully maintains, pursuant to its previously filed Motion in Limine and supporting memorandum, that the aforementioned guidelines and factors mandate that certain categories of adverse inferences (*i.e.*, those drawn against BP based on invocations by non-BP employees or non-corporate designees) are not trustworthy, will not advance the search for the truth, and are not admissible. *See* Doc. No. 5112 ("BP's MIL"); Doc. No. 5112-1 ("BP's MIL Mem.") at 3-9. Subject to those continuing objections, and given the guidance provided by the Court's Order, to the extent that the Court will evaluate each inference on a case-by-case basis, BP requests that the Court deny the inferences sought by the PSC, Transocean, Halliburton, and the United States against BP for the general and specific reasons set forth below.

## ARGUMENT

### I. INFERENCES BASED ON INVALID INVOCATIONS OF THE FIFTH AMENDMENT MUST BE REJECTED.

The Court must bar many of the adverse inferences sought by the Requesting Parties because they are based on invalid invocations of the Fifth Amendment. As described above, before the Court can examine the inference sought, it must determine whether it is based on a valid invocation of the Fifth Amendment. *U.S. ex rel. DRC, Inc.,* 415 F. Supp. 2d at 633. In the

Fifth Circuit, the validity of an invocation is a two-step process. *United States v. Redhead*, 194 F. App'x 234, 236 (5th Cir. 2006). First, the Court "must determine whether the summoned information is incriminating in nature, either on its face or in the context of the circumstances that the information is requested." *Id.* (citing *Hoffman v. U. S.*, 341 U.S. 479 (1951)). "Second, if the information is found to be incriminating, then the court must then determine whether the proponent's asserted apprehension of criminal prosecution is reasonable under the circumstances." *Id.* (citing *Steinbrecher v. C.I.R.*, 712 F.2d 195, 197 (5th Cir. 1983)).

With this backdrop in mind, the Court should refuse to impose adverse inferences in situations where the question posed was not likely to inculpate the witness. This is most obvious in the context of a non-BP employee invoking the privilege to a question about BP. For example, the PSC seeks an inference that "BP emphasized efficiency and cost saving over safety" because James Ingram, a Transocean employee, invoked the Fifth Amendment when asked "You'd agree with me, wouldn't you . . . that BP made numerous cost-saving decisions that increased the change of a well blowout without running any formal risk assessment; isn't that true?" Doc. No. 5873-10 at 3-4 ("Ex. 10 to PSC's Mot."). Providing the type of answer that the PSC asks the Court to infer would have done nothing to incriminate Mr. Ingram.

Similarly, the PSC seeks an inference against BP based on an invocation by Halliburton's Cathleenia Willis that "BP determined the number of mud loggers on the *Deepwater Horizon*." Doc. No. 5873-8 at 7 ("Ex. 8 to PSC's Mot."). Ms. Willis had been asked simply, "Isn't it true that BP decided how many mud loggers Sperry would have on the DEEPWATER HORIZON at one time?" *Id.* Here, too, the question and inference sought bears solely on BP. By answering "yes" or "no" to the question, Ms. Willis would not have incriminated herself in any way.

None of this is to say that every invocation of the Fifth Amendment in these depositions was invalid. Because of the underlying threat of criminal prosecution, there were certainly instances where the deponent properly invoked the privilege. But the Fifth Amendment privilege is not to be used indiscriminately; it "applies only when the possibility of self-incrimination is a real danger, not a remote and speculative possibility." *Steinbrecher*, 712 F.2d at 197. In the examples above and other examples throughout the attached exhibits—particularly where non-BP employees are questioned about BP's intent, knowledge and conduct—that standard is not met. Thus the Court must keep the issue of validity in mind in evaluating each inference sought.

## II.  INFERENCES THAT WOULD CIRCUMVENT THE RULES OF EVIDENCE MUST BE REJECTED.

Even assuming *arguendo* that all of the invocations at issue are valid, and that adverse inferences are the only means of obtaining certain evidence, the Court must still reject many of these inferences because they fail to comply with the Federal Rules of Evidence. As a form of evidence, adverse inferences are only admissible if they "comply with the Federal Rules of Evidence." *U.S. ex rel. DRC, Inc.,* 415 F. Supp. 2d at 634; *see also F.D.I.C.*, 45 F.3d at 977. Thus, no adverse inferences may be drawn from an invocation of the Fifth Amendment where the witness has no personal knowledge or otherwise lacks a proper foundation to answer. *U.S. ex rel. DRC, Inc.,* 415 F. Supp. 2d at 634 (citing Fed. R. Evid. 602). Similarly, the Court may not draw an inference where the witness's invocation answered a "broad form", compound, or ambiguous question. *Chishty v. Texas Department of Aging & Disability Services*, 562 F. Supp. 2d 790, 796-97 (E.D. Tex. 2006)..

There is no reason to differentiate between these rules and any other rule of evidence, such as inadmissible hearsay under Rule 802 or opinion testimony under Rule 701. Again, adverse inferences are a form of evidence, and are thus subject to **all** of the rules. *F.D.I.C.*, 45

7

F.3d at 977 ("Because there is no constitutional bar to the admission of this evidence, it is admissible if it is relevant *and not otherwise prohibited by the rules.*") (emphasis added); *see also S.E.C. v. Monterosso*, 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010) (holding that "all evidence must conform to the requirements of the Federal Rules of Evidence" in the context of adverse inferences). Thus, any time a question or the answer it was meant to elicit run afoul of the Federal Rules of Evidence, the Court may not draw an inference against BP.

Many of the inferences sought by the Requesting Parties amount to nothing more than thinly veiled attempts to circumvent the Federal Rules of Evidence. Often the examiner asked a question which the deponent had no foundation to answer. For example, the PSC seeks an inference that "BP was aware that the cement job might fail" based on the following question to and invocation of Halliburton's Christopher Haire:

> Q.  And I'll ask you, sir, looking at that which purports to be a model of the cement slurry that was pumped around the Macondo 252 #1 production casing, can you tell us, sir, if those different densities of fluids indicate to you a very strong likelihood of the displacement leading to the inversion of fluids, i.e., the lighter fluids exchanging place with the heavier fluids and that anyone knowing the densities of the fluids, their intended placement in the job would know that this cement job would fail?
>
> A.  Fifth.

Doc. No. 5873-7 at 7-8 ("Ex. 7 to PSC's Mot."). Any answer to this question that asks a Halliburton employee to speculate about BP's "awareness" would lack foundation under Rule 602. All the more so with regard to an inference.

Hearsay is also a frequent flaw with the inferences sought against BP. For example, the PSC seeks an affirmative inference that "Macondo was considered a 'nightmare well / a well from hell'" by using the out-of-court statement of Brian Morel's wife in an email:

> Q.  And in this E-mail chain. . . Your wife tells you, "Sorry you-all are having well issues again. This has been a nightmare well. You are smart to," quote, "let it go'" close quote "since you won't be involved in all the

8

>> conversation over the weekend. They can live with the consequences if they are poor." Is that a discussion between you and your wife, sir?
>
> A. Same answer.
>
> Q. In fact, you did believe this was a nightmare well, didn't you, sir?
>
> A. Same answer.

Doc. No. 5873-2 at 3-4 ("Ex. 2 to PSC's Mot."). Halliburton similarly uses hearsay to bolster an inference it sought from Robert Kaluza's invocation to a line of questioning regarding a "heated discussion" between him and Jimmy Harrell. Doc. No. 7644-1 at 7 ("Ex. 1 to HESI's Mot.") ("In response to the prior exchange with Kaluza at the pre-tour meeting, Harrell replied to Kaluza, "I guess that's what we have pincers for.").

Careful consideration of the Federal Rules of Evidence ensures that adverse inferences are not used as a means of introducing answers to questions that, even if explicitly given by the deponent, would be inadmissible. Put another way, adverse inferences are a means of introducing evidence that is inaccessible but hypothetically admissible—and nothing more. Thus the Court must consider the rules of evidence while deciding whether to draw an inference.

### III. INFERENCES THAT ARE UNSUPPORTED BY CORROBORATING EVIDENCE SHOULD BE REJECTED.

Many of the inferences at issue should be barred because they are not supported by independent corroborative evidence. "Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege." *Kontos v. Kontos*, 968 F. Supp. 400 at 408. This issue, while applicable to each inference, is particularly acute in the PSC's and United States' motions, which both fail to corroborate specific inferences sought with independent evidence. In contrast, BP's motion for adverse inferences—which does not seek inferences against Transocean or Halliburton based on invocations of another's employee—

9

points to independent evidence in support of its requested inferences. Thus, while evaluating each inference, the Court must also evaluate the independent evidence that corroborates it—or lack thereof.[1]

## IV.     INFERENCES THAT ARE UNTRUSTWORTHY AND WILL NOT ADVANCE THE SEARCH FOR THE TRUTH SHOULD BE REJECTED.

Even assuming that some of the invocations are valid, and that the inferences comply with the Federal Rules of Evidence and are corroborated by independent evidence, the Court must evaluate each inference on a case-by-case basis. As described above, courts have established a number of guidelines to evaluate whether an adverse inference should be drawn. These guidelines and factors clearly demonstrate that the inferences sought against BP are untrustworthy and will not advance the search for the truth.

### A.     Inferences Against BP Based On Non-BP Employee Invocations

The PSC and United States seek adverse inferences against BP based on Halliburton and Transocean employees' invocations of the Fifth Amendment. Applied in this context, the *LiButti* factors show that such inferences are untrustworthy and should be barred. To start, while the Fifth Circuit does not *require* that the deponent share a special relationship with BP (*e.g.*, an employer-employee relationship), ***that does not mean the absence of an employment relationship has no bearing on whether to admit an inference***. The nature of the relationship—described in *LiButti* as "invariably . . . the most significant circumstance"—plays a significant role in evaluating the trustworthiness of an inference. *LiButti*, 107 F.3d at 123. "The closer the bond, whether by reason of blood, friendship, or business, the less likely the non-party

---

[1]   On a related note, in light of the volume and breadth of discovery in this case, the Court really doesn't need to admit any particular inference. *See, e.g.*, *Abrams*, 2000 WL 574466, at *7 (deciding summary judgment motion "without relying on Fifth Amendment adverse inferences" because it could); *Farace v. Indep. Fire Ins. Co.*, 699 F.2d at 210-11 (refusing to draw an adverse inference where "the defendant ha[d] ample opportunity to impeach its witness by other means").

witness would be to render testimony in order to damage the relationship." Here, the absence of an employee-employer relationship certainly doesn't weigh in favor of admitting the inferences; if anything, the fact that BP, Transocean, and Halliburton are all adversaries in this litigation suggests that non-BP employee deponents have no incentive to speak up in defense of BP. *Rad Servs., Inc.*, 808 F.2d at 276 (holding inferences should be imputed from employee to employer because "an employee's self-interest would counsel him to exculpate his employer, if possible"). Allowing these adverse inferences would actually reward them for their silence because such inferences would lay fault with BP, not *their* employer (and not *them*).

Further, BP has no control over these non-BP witnesses. Again, the concern is that an employer has "vested in [the witness] key facts regarding the litigation in the instant case." *Emerson v. Wembley USA Inc.*, 433 F. Supp. 2d 1200, 1213 (D. Colo. 2006). Obviously, this factor cuts sharply against any attempt to draw inferences against BP from the "testimony" of individuals with no relationship to BP. Nor does BP share any compatible interests in the outcome of the litigation with Transocean's and Halliburton's witnesses. Here "the trial court should evaluate . . . whether the assertion of the privilege advances the interests *of both the witness and the affected party* in the outcome of the litigation." *Libutti*, 107 F.3d at 123 (emphasis added). But these invocations would only advance the interests of the employee, not BP. If the Court allows these inferences, BP is stuck with an undefended front against whatever opposing counsel wants to throw at it.

The PSC offers a slew of strained *LiButti* arguments to support their theory that these inferences are proper. First, they argue that it is enough that the Transocean and Halliburton employees worked with BP towards a common goal prior to the litigation and the fact that they worked for different companies has no bearing on the nature of their relationship with BP. But

11

while that may have been true before the incident, since then, everything has changed. The nature of the relationship between the witness and party against whom the inference is sought "should be examined . . . from the perspective of a non-party witness's loyalty to the plaintiff or defendant, *as the case may be*." *Id.* at 123 (emphasis added). As the case currently stands, BP, Transocean and Halliburton are all adverse to one another, so there is no love lost when a Transocean or Halliburton employee fails to testify in defense of BP, or vice versa.

The PSC then argues that BP controlled these employees as Operator of the *Deepwater Horizon*. This is simply inaccurate. There has been no showing, at law or in fact, that BP exercised control over these employees; and BP certainly has not exercised control over those witnesses following the *Deepwater Horizon* accident.[2]

The PSC also argues—without explanation—that it is in these employees' interests that all defendants succeed in this litigation, and that the Halliburton and Transocean employees actually helped BP by invoking the Fifth Amendment because it kept the PSC from obtaining direct testimony. The argument fails because, as explained above, their employers have advanced positions adverse to BP in this litigation. And, to imply that their hypothetical direct testimony would somehow be worse than the wish list of facts presented by opposing counsel at these depositions is not plausible. All parties knew in advance of these depositions that the deponent would be invoking the Fifth Amendment to all questions. So the "questioning" of witnesses in these depositions by the PSC was not an examination of the deponent at all. Rather

---

[2] Notably, under established Fifth Circuit law, BP did not exercise the type of control over Transocean or Halliburton that would make BP liable for the acts of either independent contractor. *See, e.g., Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003); *Coulter v. Texaco*, 117 F.3d 909, 912 (5th Cir. 1997); *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987). Just as BP cannot be vicariously liable for the acts of Transocean or Halliburton, it should not be responsible for Fifth Amendment invocations by their employees.

it was a series of closing arguments dressed up as questions so as to feign compliance with the requirements needed to establish foundation for adverse inferences.

By admitting the requested adverse inferences, the Court would be allowing the parties asking the questions to testify on behalf of these deponents. Thus the party asking the questions, in this case the PSC, is clearly better off with adverse inferences—*i.e.* their own scripted version of events—than they would be with uncontrolled direct testimony from a deponent.

### B.     Inferences Against BP Based On BP Employee Invocations

Admittedly, the employer-employee relationship between BP and its employees who invoked the Fifth Amendment calls for closer scrutiny. But refusing to admit adverse inferences drawn from invocations of employee witnesses is not unprecedented. *See, e.g.*, *Akinyemi v. Napolitano*, 347 F. App'x 604, 607 (2d Cir. 2009); *United States v. Zerjav*, 4:08CV00207 ERW, 2009 WL 912821 (E.D. Mo. Mar. 31, 2009); *Miller v. Pilgrim's Pride Corp.*, 5:05CV00064, 2008 WL 178473 (W.D. Va. Jan. 16, 2008). Again, each inference must be evaluated on a case-by-case basis.

The circumstances behind these invocations bear repeating. First, the three BP deponents who invoked the Fifth Amendment were not proffered as corporate representatives of BP. None of BP's ***twenty-two*** corporate-representative deponents invoked the Fifth Amendment, and no witness in this case did so at the request or urging of BP. BP encouraged its employees to cooperate with investigations, and it ultimately acknowledged that each employee must decide for himself or herself whether to testify or invoke their rights under the Fifth Amendment to the U.S. Constitution. So why did they invoke? As Mark Hafle explained:

> This is not an easy decision for me because I personally would like to testify, and I know that BP, my employer, would definitely like for me to testify. It would be my hope that the investigation being conducted by the Department of Justice will soon be completed or progressed to a stage where I can freely and openly discuss the case with all concerned. At that

13

>time, I'll be glad to answer all questions about whether—whatever information I may have. But until that point, I must follow my attorney's advice and invoke my Fifth Amendment rights and privileges.

Hafle Dep. Tr. at 12:17-13:3.

In this regard, this case is similar to *Emerson v. Wembley USA, Inc.*, where the defendant's former employee invoked the Fifth Amendment to virtually all questions at his deposition because he was awaiting a separate criminal trial in connection with the employer. 433 F. Supp. 2d at 1209. In *Emerson*, the plaintiff argued that this deponent "would have" made statements supporting her claims against the defendants, and thus she was entitled to an adverse inference against the defendants on each unanswered question. *Id.* at 1211. The court, however, refused to admit any adverse inferences because the plaintiff sought inferences on all of the questions the deponent refused to answer, making the scope of the request overbroad and unreasonable. *Id.* at 1213-14. Moreover, the deponent was not the sole source of the answer to several of Plaintiff's questions. *Id.* In refusing to admit any adverse inferences, the court upheld the two primary purposes of this entire analysis: first, that a court should only draw adverse inferences which are trustworthy and advance the search for the truth; and second, that no deponent is subjected to a systematic interrogation by counsel who knows the witness will assert the privilege against self-incrimination.

## IV.  SPECIFIC OBJECTIONS TO EACH INFERENCE

As required by the Court's February 14, 2012 Order, BP re-urges the denial of each inference for the general reasons cited above and the specific reasons that follow in the attached Exhibits, which are organized as follows:

| Exhibit | Fifth Amendment Deponent | Employer | Position |
|---|---|---|---|
| A | Mark Hafle | BP | Senior Drilling Engineer |
| B | Robert Kaluza | BP | Well Site Leader |
| C | Brian Morel | BP | Drilling Engineer |

| Exhibit | Fifth Amendment Deponent | Employer | Position |
|---------|--------------------------|----------|----------|
| D | Steve Bertone | Transocean | Chief Engineer/Maintenance Supervisor |
| E | Jimmy Harrell | Transocean | Offshore Installation Manager |
| F | James Ingram | Transocean | Senior Materials Coordinator |
| G | Micah Sandell | Transocean | Crane Operator |
| H | Cathleenia Willis | Transocean | Mud Logger |
| I | Christopher Haire | Halliburton | Service Supervisor |

## CONCLUSION

BP respectfully requests that the Court deny the Requesting Parties' motions for adverse inferences against BP based on invocations of the Fifth Amendment by BP and non-BP employee deponents.

Dated: November 5, 2012	Respectfully submitted,


/s / Don K. Haycraft.


Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 5th day of November, 2012.

                                                    /s/ Don K. Haycraft
                                                    Don K. Haycraft