# Exhibit A

**EXHIBIT A - MARK HAFLE**

> **Hafle No. 1:**   Hafle, as a Senior Drilling Engineer, was responsible for the design of the well, the design of the casing, the cementing job and well integrity testing. (PSC Mot. Rec. Doc. 5873-1 at 2-4.)

**Response to Hafle No. 1:**

The requested inference attempts to conflate several separate and distinct inferences into a single adverse inference.  None of the inferences sought are appropriate for several reasons, including that the inferences sought (1) are contrary to the record evidence, (2) are inappropriate because Mr. Hafle is not the sole source of the information at issue, and other witnesses and evidence speak to the truth and accuracy of the inferences sought, (3) are premised on objectionable questions, and (4) do not follow from or are incongruous with the questions posed.

First, the record evidence contradicts the requested inference to the extent it attempts to suggest that Mr. Hafle was solely or individually responsible for the overall design of the Macondo well.  (*See e.g.*, TREX-000291 ; 07/21/2011 K. Jassal 30(b)(6) Dep. at 344:16-23; 345:13-346:5 (design and planning of the Macondo well was subject to procedures in BP's "Beyond the Best" handbook, including a "stage-gate" process); 04/21/2011 G. Walz Dep. at 180:8-10, 371:5-23 (indicating that the entire BP team was involved in discussions, including risk identification and risk management "throughout the whole planning process"); 07/14/2011 P. O'Bryan Dep. at 64:5-22, 153:3-154:5 (explaining the well planning process and stating that for the Macondo well, D&C used a process referred to as "Beyond the Best" to identify and manage risks at various stages in well planning and execution).)

Similarly, Mr. Hafle was not solely or individually responsible for the design of the casing at the Macondo well, and the record evidence is clear that key casing design decisions were made based on modeling and recommendations provided by, and in conjunction with, Halliburton personnel.  BP representatives met with Jesse Gagliano on April 14, 2010 to run models on Halliburton's OptiCem software for the Macondo well.  (02/07/2012 J. Gagliano Dep. at 229:9-231:18.)  After that meeting, BP and Halliburton were satisfied with the model results and with the ability to run a long-string casing.   (03/24/2011 E. Cunningham Dep. at 381:22-382:21.)  Moreover, the record evidence is clear that the overall casing design followed internal BP procedures involving numerous personnel.  (04/28/2011 J. Sprague 30(b)(6) Dep. at 14:23-15:4, 15:12-16:13, 17:13-18:3; TREX-001312 (BP followed the proper "Beyond the Best" process steps for the Macondo Well casing design, including preparation of a Pre-Drill Data Package ("PDDP")); 04/28/2011 J. Sprague 30(b)(6) Dep. at 20:21-21:8, 21:23-22:25, 25:9-20; TREX-001861 (BP utilized its manuals and engineering standards in its Evaluation of Casing Design Basis); TREX-048055 (reflecting analysis of production casing decision).)

With regard to the cementing job, the record evidence clearly demonstrates that BP relied on Halliburton and its personnel—not Mr. Hafle—to design, recommend, and perform the cement job.  (*See e.g.*, 02/07/2012 J. Gagliano Dep. at 28:15-29:21 (Gagliano was aware of the

well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well); 02/10/2011 K. Corser Dep. at 274:21-275:22 (BP hired and relied on Halliburton for its expertise in cementing to design, test and execute the cement job); 04/22/2011 G. Walz Dep. at 618:24-619:8; 04/21/2011 G. Walz Dep. at 193:18-194:2 (BP drilling engineers are not expected to be cementing experts and BP, therefore, relied on Halliburton for the design and cementing services for the Macondo well); 03/21/2011 J. Sprague Dep. at 143:3-11, 143:24-144:4 (BP relied "first and foremost" on Halliburton for a good cement job; "[t]hey are the expert"); and TREX-000738 (email from J. Gagliano attaching Halliburton's recommended procedure for the production casing cementing job).)

Similarly, the record is clear that while BP personnel, including Mr. Hafle, designed operational procedures that called for well integrity testing, *both* Transocean and BP personnel on the rig conducted and approved the well integrity tests performed at the Macondo well. (05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test), 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the Macondo NPT).) Transocean's own CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all of its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.) Mr. Newman also testified that Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (*Id.* at 160:11-164:24; s*ee also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.)

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inferences sought.

Third, the inferences sought are inappropriate because they are premised on questions that are vague and ambiguous. As used in the questions posed to Mr. Hafle, the term "responsible" is unclear and undefined. In at least one of the questions posed to Mr. Hafle regarding the cement job, the questioner also failed to specify which of the cementing jobs performed at the Macondo well was being referred to in the question. (07/22/2011 Hafle Dep. at 48:22-23.)

Finally, the inferences sought regarding Mr. Hafle's responsibility for the cementing job and well integrity testing are inappropriate because they do not follow from and are not supported by the questions posed to Mr. Hafle. Specifically, the inference seeks to establish that Mr. Hafle was "responsible" for the certain aspects of the Macondo well, including the cementing job and the well integrity testing. But the questions posed to Mr. Hafle on these issues only address "approval" of the cementing job and well integrity testing. (*Id.* at 48:22-24; 49:2-5; 49:20-50:2.) As discussed, the record evidence contradicts the inferences sought, but even if that were not the case, questions concerning the "approval" of the cementing job and well integrity testing do not support an inference of "responsibility."

**Hafle No. 2:**   BP was concerned that there were problems with the variables that Gagliano was using in the OptiCem modeling. (PSC Mot. Rec. Doc. 5873-1 at 4-5.)

**Response to Hafle No. 2:**

The requested inference is vague, unsupported by the questioning, and contrary to the evidence.  The phrase "problems with the variables" is unclear and undefined by the requested inference.  The requested inference is also not supported by the questioning.  The questioning asks whether "team members knew that there -- there might be problems"—it does not ask whether "BP was concerned that there were problems."  (PSC Mot. Rec. Doc. 5873-1 at 4-5.) The requested inference is further contrary to the evidence.  BP representatives met with Jesse Gagliano on April 14, 2010 to run models on Halliburton's OptiCem software for the Macondo well.  (02/07/2012 J. Gagliano Dep. at 229:9-231:18.)  After that meeting, BP and Halliburton were satisfied with the model results and with the ability to run a long-string casing. (03/24/2011 E. Cunningham Dep. at 381:22-382:21.)

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Hafle No. 3:**   Hafle never saw lab test results on the slurry that was used on the final cement job. (PSC Mot. Rec. Doc. 5873-1 at 5.)

**Response to Hafle No. 3:**

The requested inference is vague and contrary to the evidence.  The phrase "lab test results" is unclear and undefined by the requested inference.  Further, the requested inference is contrary to the evidence.  Halliburton's engineer Jesse Gagliano testified that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval."  (02/08/2012 J. Gagliano Dep. at 502:18-24.)  Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well.  (02/07/2011 J. Gagliano Dep. at 28:15-29:21.)  Mark Hafle was a recipient of an email sent by Jesse Gagliano on April 18, 2010 containing a lab report containing testing results on the slurry pumped at the Macondo Well.  (TREX-000717, TREX-000717A.)

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Hafle No. 4:**   Despite his awareness of the risk of channeling, Hafle did not order a cement bond log. (PSC Mot. Rec. Doc. 5873-1 at 5-6.)

**Response to Hafle No. 4:**

The requested inference is contrary to the evidence.  Based on risk of channeling and resulting increased circulating pressures that might cause cementing losses, BP engineers created a decision tree on actions to take based on the potential of losses.  (TREX-000908.)  Under BP's decision tree, a cement bond log would be run if there were losses during cementing.  (TREX-000908.)  Halliburton reported that there were no losses during the cement job.  (TREX-000708 at HAL_0012208.)  Further, all of the indications from the cement job were of a successful cement job, with no indications of channeling.   (06/14/2011 V. Tabler Dep. at 384:9-13.)  Thus, a cement bond log was not run based on BP's decision tree factors.  (5/10/11 A. Guide Dep. at 754:20-755:7.)  On the morning meeting of April 20, 2010, after the cement job, Guide also solicited the contractors' opinion on whether a cement bond log should be run and no one indicated that it should be run.  (*Id.* at 901:1-14.)

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Hafle No. 5:**   The cement job did not achieve the TOC required by EPT GP 10-60. (PSC Mot. Rec. Doc. 5873-1 at 6.)

**Response to Hafle No. 5:**

The requested inference is vague, contrary to the evidence and there is no showing that Mark Hafle had the proper foundation to opine on the interpretation of GP 10-60.  The phrase "TOC required by EPT GP 10-60" is unclear and undefined in the requested inference.  There is also no showing that Mr. Hafle was familiar with GP 10-60 or able to interpret this document.  Further, the requested inference is contrary to the evidence.  Darryl Kellingray, the author of GP 10-60, testified that he maintained GP 10-60 and also interpreted the document when requested.  (06/20/2011 D. Kellingray Dep. at 23:24-24:5, 27:10-21.)  He explained that GP 10-60 does not require a cement bond log before temporary abandonment. (06/21/2011 D. Kellingray Dep. at 205:5-19, 513:23-514:3, 684:15-685:10.)  The CBL requirement comes in during the permanent abandonment phase and the Macondo team's plan to run a CBL upon return for completion operations satisfied GP 10-60.  (*Id.* at 690:20-691:23.)  Therefore, his testimony contradicts the PSC's request for an adverse finding that GP 10-60 required 1000 feet of cement if a CBL was not run during the temporary abandonment phase.

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Hafle No. 6:**  Hafle knew that the OptiCem models called for 21 centralizers and was aware of the risk of gas flow problems resulting from the use of fewer centralizers. (PSC Mot. Rec. Doc. 5873-1 at 6-8.)

**Response to Hafle No. 6:**

The requested inference is vague and contrary to the evidence.  The phrase "called for 21 centralizers" is unclear and undefined in the requested inference.  The requested inference is further contrary to the evidence.  The April 18, 2010 OptiCem modeling used 21 centralizers but the number of centralizers used in that modeling was based on what BP could fly out to the rig on a helicopter, rather than on an engineering decision that 21 centralizers were necessary. (04/21/2011 G. Walz Dep. at 306:10-13 ("the 15 additional centralizers was just based on the capacity of the helicopters").)

alliburton's own literature states that foam cement is a solution for severe gas flow potential. (TREX-2125 at 8; TREX-2129 at 1; TREX-3097 at 17.) Ronnie Faul, Halliburton's Technology Manager for the Gulf of Mexico region, testified that BP could rely on Halliburton to design competent foam cement (06/30/2011 Faul Dep. at 471:13-21) and that he would not have been concerned about gas flow potential if foam were used.  (06/29/2011 Faul Dep. at 383:11-23.)

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Hafle No. 7:**  Guide made the decision not to use the additional centralizers; BP could have waited for additional centralizers. (PSC Mot. Rec. Doc. 5873-1 at 8-9.)

**Response to Hafle No. 7:**

The requested inference is inappropriate because (1) it is contradicted by the record evidence, including the testimony of Mr. Guide himself, (2) Mr. Hafle is not the sole source of the information at issue, and (3) the inference requested is premised on objectionable questions.

The PSC seeks an adverse inference, based on the testimony of Mr. Hafle, that it was Mr. Guide who "made the decision not to use the additional centralizers" and that "BP could have waited for additional centralizers."  Such an inference is flatly contradicted by the record evidence, notably the testimony of Mr. Guide himself.  Indeed, during his own deposition, Mr. Guide was directly asked if it was his decision not to use additional centralizers, and he unequivocally indicated that it was *not* his decision:  "Q. Isn't it true that you personally reversed the decision of Greg Walz and David Sims after they decided to use an additional 14 to 15 centralizers, that you reversed that decision?  Isn't that true?  A. *No.*" (05/29/2011 A. Guide Dep. at 269:15-21) (emphasis added).)  Mr. Guide went on to explain that the decision regarding centralizers "[Was] not my decision to make because it's an engineering decision" (*id.* at

272:16-18), that "I didn't make that decision . . . It was made by a concurrence of three people . . . I was not in a position to make that decision, it was not in my line to make that decision." (05/10/2011 A. Guide Dep. at 730:22-731:7.)

The record evidence also contradicts the requested inference with regard to BP's ability to wait for additional centralizers. First, Weatherford's representative Bryan Clawson testified that it would take seven to ten days to manufacture additional centralizer "subs" like the ones at the Macondo Well. (06/06/2011 Clawson Dep. at 203:8-23.) Affirmatively choosing to incur such a lengthy delay would run counter to industry standard and practices that favor limiting the amount of time with an open hole. (12/06/2011 Dr. Azar Dep. at 341:8-15 ("Q. Why did they not [wait for additional centralizers], sir? A. Because waiting on centralizers that were supposed to be brought to the rig and not knowing the time, how long, they would have left an open hole. And we teach—we promote the fact that the best way to minimize risk is don't stay in an open hole if you have any chance at all and isolate that zone.")

Moreover, an inference regarding BP's "ability" to wait for additional centralizers fails to acknowledge the record evidence concerning the other factors that went into BP's decision not to run additional centralizers. Mr. Walz testified that the decision to proceed without additional centralizers was based in part on prior experience and known problems with centralizers. (04/21/2011 G. Walz Dep. at 154:9-19; 187:15-188:1, 188:12-189:15 (indicating that BP decided not to run additional centralizers because of a concern, based on prior experience, that they could come off in the well and create a serious problem).) Similarly, Mr. Corser indicated that the BP wells team evaluated the various risks of additional centralizers in light of problems that had occurred previously on other wells (including breaking off in the hole, sticking the pipe, having problems with the pipe across the BOP or getting stuck off-bottom), and that based on their prior experience with these problems, the team decided to use six centralizers (02/10/2011 K. Corser Dep., Vol. I at 158:23-159:3; 159:12-21, Vol. II at 50:10-21.)

As demonstrated by the testimony discussed above, Mr. Hafle is hardly the only source of information regarding the decision whether to use additional centralizers. Where Mr. Hafle is not the sole source of the information at issue, the requested inference is inappropriate.

Finally, the requested inference is also inappropriate because the underlying questions upon which the inference is based lack foundation, call for speculation, and are vague and ambiguous. Specifically, the phrase "could have waited" is unclear and undefined by the requested inference.

> **Hafle No. 8:** BP made numerous changes to the Temporary Abandonment Procedure during the last week of operations. (PSC Mot. Rec. Doc. 5873-1 at 9-10.)

**Response to Hafle No. 8:**

The requested inference is inappropriate because it is contrary to the record evidence and because Mr. Hafle is not the sole source of the information at issue. ████████████████

(05/09/2011 A. Guide Dep. at 386:15-19; *see also* 05/09/2011 A. Guide Dep. at 285:23-286:22 (indicating that the April 20, 2010 "Ops Note" email did not represent a change or deviation from the procedure that was submitted to and approved by the MMS on April 16, 2010).)

The requested inference is also inappropriate because Mr. Hafle is not the sole source of the information at issue in the requested inference.  In addition to the testimony of other witnesses regarding the development of the temporary abandonment procedure, the documents reflecting BP's development of the procedure show that BP was developing its draft procedure over the course of the week of April 12, rather than making changes to an existing procedure, as the requested inference suggests. (*See e.g.*, TREX-000836 (April 12, 2010 email from B. Morel attaching draft procedure and indicating the procedure was not yet final), TREX-000537 (April 14, 2010 email from B. Morel attaching draft procedure), TREX-21109 (April 15, 2010 email from B. Morel attaching updated draft procedure), TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS), and TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

> **Hafle No. 9:**  The well design decision was driven by time and money without risk assessment. (PSC Mot. Rec. Doc. 5873-1 at 10-11.)

**Response to Hafle No. 9:**

The requested inference is inappropriate because the phrase "[t]he well design decision" is vague and ambiguous and does not clearly define what "well design decision" is at issue. Similarly, the questions posed to Mr. Hafle that the PSC cites in support of the requested inference are also vague and ambiguous.  The requested inference is also inappropriate because it is contrary to the record evidence, and because Mr. Hafle is not the sole source of the information at issue, as reflected in the evidence discussed below.

The record establishes that the overall well design process properly followed BP procedures, including risk identification and mitigation. (*See e.g.*, 07/21/2011 K. Jassal 30(b)(6) Dep. at 344:16-23, 345:13-346:5 (design and planning of the Macondo well was subject to procedures in BP's "Beyond the Best" handbook, including a "stage-gate" process); 04/21/2011 G. Walz Dep. at 180:8-10; 371:5-23 (indicating that the entire BP team was involved in discussions, including risk identification and risk management "throughout the whole planning process"), 07/14/2011 P. O'Bryan Dep. at 64:5-22, 153:3-154:5 (explaining the well planning process and stating that for the Macondo well, D&C used a process referred to as "Beyond the Best" to identify and manage risks at various stages in well planning and execution).)

To the extent that this requested inference purports to refer to the decision to utilize a long-string casing design for the final production casing, the record shows that the casing design decision was made based on modeling and recommendations provided by, and in conjunction

with, Halliburton personnel.  BP representatives met with Jesse Gagliano on April 14, 2010 to
run models on Halliburton's OptiCem software for the Macondo well.  (02/07/2012 J. Gagliano
Dep. at 229:9-231:18.)   After that meeting, BP and Halliburton were satisfied with the model
results and with the ability to run a long-string casing.   (03/24/2011 Cunningham Dep. at
381:22-382:21.)  Moreover, the record evidence is clear that the overall casing design followed
internal BP procedures involving numerous personnel. (04/28/2011 J. Sprague 30(b)(6) Dep. at
14:23-15:4, 15:12-16:13, 17:13-18:3; and TREX-001312 (BP followed the proper "Beyond the
Best" process steps for the Macondo Well casing design, including preparation of a Pre-Drill
Data Package ("PDDP")); 04/28/2011 J. Sprague 30(b)(6) Dep. at 20:21-21:8, 21:23-22:25,
25:9-20; and TREX-001861 (BP utilized its manuals and engineering standards in its Evaluation
of Casing Design Basis); and TREX-048055 (reflecting analysis of production casing decision).)

BP's use of the long string was a legitimate engineering decision, as long string
casing design is a common design in the Gulf of Mexico.   (09/23/2011 D. Trocquet Dep. at
198:2-4; 07/27/2011 M. Saucier Dep. at 207:2-9.)

> **Hafle No. 10:**  The Temporary Abandonment procedure that BP performed on the
> Macondo well was not the one sent to or approved by MMS, in violation of BP's
> permit.  (PSC Mot. Rec. Doc. 5873-1 at 11-12.)

**Response to Hafle No. 10:**

The requested inference is inappropriate because it is contrary to the record evidence, is
based on objectionable questions, and because Mr. Hafle is not the sole source of the information
at issue.

The record evidence reveals that the temporary abandonment procedures performed at the
Macondo well were consistent with the procedures that were described in the April 16, 2010
Application for Permit to Modify that was submitted to and approved by the MMS.

(05/09/2011 A. Guide Dep. at 386:15-19.)  Mr. Guide also
indicated that both documents required displacement to seawater prior to the negative pressure
test, and that he did not view the procedure outlined in the "Ops Note" email April 20, 2010 as a
change or deviation from the procedure that was submitted to and approved by the MMS on
April 16, 2010. (Guide Dep. at 285:23-286:22 ("Q. . . . But really my only question to you, you
know, isn't it true, that on April the 20th at 10:43 Brian Morel, or someone at BP changed the
order of the seawater displacement . . .  A. My answer is no, that I was always under the
impression that we were going to do the negative test with seawater at 8367 feet and that is,
indeed, what this said, what the MMS approved.").)  Likewise, Mr. Walz testified that he

"always told folks that the negative test that we needed to perform was running at 8300 feet and displacing it." (04/22/2011 G. Walz Dep. at 785:14-786:8, 788:10-13.) *See also* 09/27/2011 A. Frazelle Dep. at 505:2-15 (indicating that steps 2 and 3 on the April 16, 2010 temporary abandonment procedure that was submitted to and approved by the MMS, were actually subparts of 1, rather than sequential steps in the procedure).) In fact, Transocean's senior toolpusher on the rig, Randy Ezell, testified that during the temporary abandonment procedures, BP well site leaders Bob Kaluza and Donald Vidrine informed Ezell that the negative pressure test was initially not lined up as described in the procedure that was approved by the MMS, and as a result Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure. (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)

The requested inference is also inappropriate because Mr. Hafle is not the sole source of the information at issue in the requested inference. In addition to the testimony of other witnesses regarding the temporary abandonment procedure submitted to and approved by the MMS and the temporary abandonment operations actually performed on the Macondo well, the documents reflecting the MMS-approved procedure and the procedures followed on the rig speak for themselves. (*See e.g.*, TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS), and TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

Furthermore, the requested inference is inappropriate because it is based on objectionable questions that would have elicited an inadmissible response based on speculation and lack of foundation if they had been answered. Specifically, the questioner failed to establish a foundation that Mr. Hafle, who was stationed onshore during the temporary abandonment operations, had sufficiently detailed knowledge to assess whether the temporary abandonment procedure performed on the rig was the same as the temporary abandonment procedure submitted to and approved by the MMS. Likewise, the movant has not identified any record evidence, or otherwise laid the foundation, that the witness had personal knowledge sufficient to answer the question posed, and called for speculation concerning whether the conduct and performance of the temporary abandonment procedures constituted a violation of the regulatory permit that was submitted to and approved by the MMS.

> **Hafle 11:**    Guide made the decision to deviate from the procedure approved by the MMS; Hafle did nothing to override Guide's decision. (PSC Mot. Rec. Doc. 5873-1 at 12-13).

**Response to Hafle No. 11:**

The requested inference is inappropriate because it is contrary to the record, because Mr. Hafle is not the sole source of the information at issue and because it is premised on objectionable questions that lack foundation and presume facts not in evidence.

The record evidence reveals that the temporary abandonment procedures performed at the Macondo well were consistent with the procedures that were described in the April 16, 2010 Application for Permit to Modify that was submitted to and approved by the MMS. (TREX-002236.) Mr. Guide also indicated that both documents required displacement to seawater prior to the negative pressure test, and that he did not view the procedure outlined in the "Ops Note" email April 20, 2010 as a change or deviation from the procedure that was submitted to and approved by the MMS on April 16, 2010.

> Q. But really my only question to you, you know, isn't it true, that on April the 20th at 10:43 Brian Morel, or someone at BP changed the order of the seawater displacement … A. My answer is no, that I was always under the impression that we were going to do the negative test with seawater at 8367 feet and that is, indeed, what this said, what the MMS approved.".

(05/09/2011 A. Guide Dep. at 285:23-286:22.)

Likewise, Mr. Walz testified that he "always told folks that the negative test that we needed to perform was running at 8300 feet and displacing it." (04/22/2011 G. Walz Dep. at 785:14-786:8, 788:10-13. *See also* 09/27/2011 A. Frazelle Dep. at 505:2-15 (indicating that steps 2 and 3 on the April 16, 2010 temporary abandonment procedure that was submitted to and approved by the MMS, were actually subparts of 1, rather than sequential steps in the procedure).) In fact, Transocean's senior toolpusher on the rig, Randy Ezell, testified that during the temporary abandonment operations, BP well site leaders Bob Kaluza and Donald Vidrine informed Mr. Ezell that the negative pressure test was initially not lined up as described in the procedure that was approved by the MMS, and as a result Mr. Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure. (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Deep. at 534:17-536:11.)

The requested inference is also inappropriate because Mr. Hafle is not the sole source of the information at issue, as reflected in the discussion above. Furthermore, the questions posed to Mr. Hafle lack foundation and call for speculation concerning Hafle's knowledge of Mr. Guide's conduct. The questions posed also assume facts not in evidence, and attempt to assume facts that are contrary to the record evidence concerning whether the conduct of the temporary abandonment procedure performed at Macondo was consistent with the procedure approved by the MMS.

**Hafle No. 12:** Neither Hafle nor Morel knew the specific procedure for a negative pressure test as late as April 17, 2010. (PSC Mot. Rec. Doc. 5873-1 at 13.)

**Response to Hafle No. 12:**

The requested inference is inappropriate because it is contrary to the record, because Mr. Hafle is not the sole source of the information at issue and because it is premised on objectionable questions that are vague and ambiguous, lack foundation and call for speculation.

The requested inference is contrary to the record. Documents and testimony demonstrate that BP considered and developed the temporary abandonment procedure prior to April 17, 2010, including procedures for the negative pressure test. (*See e.g.*, TREX-000836 (April 12, 2010 email from B. Morel attaching draft procedure and indicating the procedure was not yet final), TREX-000537 (April 14, 2010 email from B. Morel attaching draft procedure), TREX-021109 (April 15, 2010 email from B. Morel attaching updated draft procedure), TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS), and TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

The record evidence shows that Messrs. Morel and Hafle worked during the week of April 12, 2010 to develop those temporary abandonment procedures in accordance with the specifics of the well and in compliance with MMS requirements (*see e.g.*, TREX-000136 (April 17, 2010 email from Mr. Morel asking the BP engineering team: "…if there is any requirements in the MMS regs for a negative test, can't find any specifics?"). To the extent that the requested inference purports to suggest that there was a single, specific procedure applicable to negative pressure tests, that suggestion is belied by the numerous temporary abandonment procedures from other wells, showing that the procedures vary by well, according to the specifics of the well design, the phase of operations, and other factors. Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*. (*See* TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

To the extent that the requested inference purports to suggest that there was a regulation that dictated the procedure for a negative pressure test, that suggestion is belied by to the applicable regulations at the time and the record evidence, both of which show that, in April 2010, there was no MMS requirement that operators even conduct negative pressure tests, let alone any specific requirements regarding how such tests should be performed. (*See e.g.*, 07/13/2011 F. Patton Dep. at 243:23-44:23, 298:1-13 (as of 4/16/2010 MMS did not have any regulations that applied to NPT procedures); 11/21/2011 R. Heenan Dep. at 149:12-16 ("Q: Okay. Are you aware of any law that sets forth a provision for conducting negative pressure tests? A: I'm not aware of one in Canada or the United States."); 11/29/2011 C. Barnhill Dep. at 120:9-24 (indicating that there is "no MMS requirement to do a negative test" and that BP "could have fulfilled the MMS requirement without doing a negative test.").)

The requested inference is also inappropriate because Mr. Hafle is not the sole source of the information at issue, as reflected in the discussion above. Furthermore, the questions posed to Mr. Hafle are vague and ambiguous because the phrase "the specific procedure for a negative test" is unclear and undefined, as there was no industry standard or regulation establishing any specific procedures for negative pressure tests. The questions posed to Mr. Hafle also lack foundation to the extent that the questioner failed to establish the existence of any "specific

MMS requirements for the test"—and because the record makes clear that there were none. The questions posed to Mr. Hafle also lack foundation and call for speculation to the extent they seek information concerning Mr. Morel's knowledge.

>    **Hafle No. 13:** Hafle was aware that the negative pressure test procedure followed
>    was not the same as the procedure approved by the MMS. (PSC Mot. Rec. Doc.
>    5873-1 at 13-14.)

**Response to Hafle No. 13:**

The requested inference is inappropriate because it is contrary to the record, because Mr. Hafle is not the sole source of the information at issue and because it is premised on objectionable questions that lack foundation and presume facts not in evidence.

The record evidence reveals that the negative pressure test procedure performed at the Macondo well was the same procedure described in the April 16, 2010 Application for Permit to Modify that was submitted to and approved by the MMS. (TREX-002236.) ████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████ Mr. Guide also
indicated that both documents required displacement to seawater prior to the negative pressure test, and that he did not view the procedure outlined in the "Ops Note" email April 20, 2010 as a change or deviation from the procedure that was submitted to and approved by the MMS on April 16, 2010. (05/09/2011 A. Guide Dep. at 285:23-286:22 ("Q. … But really my only question to you, you know, isn't it true, that on April the 20th at 10:43 Brian Morel, or someone at BP changed the order of the seawater displacement … A. My answer is no, that I was always under the impression that we were going to do the negative test with seawater at 8367 feet and that is, indeed, what this said, what the MMS approved.").) Likewise, Mr. Walz testified that he "always told folks that the negative test that we needed to perform was running at 8300 feet and displacing it." (G. Walz Dep. at 785:14-786:8; 788:10-13. *See also* A. Frazelle Dep. at 505:2-15 (indicating that steps 2 and 3 on the April 16, 2010 temporary abandonment procedure that was submitted to and approved by the MMS, were actually subparts of 1, rather than sequential steps in the procedure).) In fact, Transocean's senior toolpusher on the rig, Randy Ezell, testified that during the negative pressure test, BP well site leaders Bob Kaluza and Donald Vidrine informed Mr. Ezell that the negative pressure test was initially not lined up as described in the procedure that was approved by the MMS, and as a result Mr. Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure. (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)

The requested inference is also inappropriate because Mr. Hafle is not the sole source of the information at issue, as reflected in the discussion above. Furthermore, the requested

inference is inappropriate because it is based on objectionable questions that would have elicited an inadmissible response based on speculation and lack of foundation if they had been answered. Specifically, the questioner failed to establish a foundation that Mr. Hafle, who was stationed onshore during the temporary abandonment operations, had sufficiently detailed knowledge to assess whether the negative pressure test that was performed on the rig was the same as the negative pressure test procedure approved by the MMS. The questions posed also assume facts not in evidence and which are contrary to the record evidence concerning whether the negative pressure test conducted on the rig was the same as the negative pressure test procedure approved by the MMS.

The requested inference is also inappropriate to the extent it seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews. (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

> **Hafle No. 14:** Hafle was aware, based on discussions with Don Vidrine on the night of April 20, that there was pressure on the drill line after the negative pressure test. (PSC Mot. Rec. Doc. 5873-1 at 14-16.)
>
> **Hafle No. 15:** Although Hafle was aware of the anomalous negative pressure test results, he allowed the team to proceed to displacement. (PSC Mot. Rec. Doc. 5873-1 at 16-17.)

## Response to Hafle Nos. 14 and 15:

The requested inferences seek to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inferences are inappropriate because they are contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews. (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

Moreover, the requested inferences are vague and ambiguous because the term "drill line" and the phrase "after the negative test" are unclear and undefined. The requested inferences are inappropriate because they are based on objectionable questions posed to Mr. Hafle that, if answered, would have elicited an inadmissible response. For example, Mr. Hafle was asked if he knew that Mr. Vidrine has "some problems" with the negative pressure test, with no explanation or definition of the phrase "some problems."

The requested inference is also inappropriate because it is contrary to the record evidence. Specifically, the record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at BP-HZN-BLY00000089.) Moreover, as discussed below, Mr. Hafle did not "allow" the team to proceed to displacement because the displacement operations following the negative pressure test began nearly an hour before the phone call in which the purported discussions between Vidrine and Hafle took place.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM. (TREX-000001 at BP-HZN-BLY00000025.) Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, (11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ████████████████ ████).) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement. (TREX-000001 at BP-HZN-BLY00000025.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inference relies, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZN-BLY00144213.) By the time this telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) Furthermore, the interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZN-BLY00144213.) In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test." Moreover, as the interview notes make clear, the primary purpose of the call was

not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test."  (TREX-00004447 at BP-HZN-BLY00144213.)

Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding "[N]o evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.)  Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id.* at 426:20-427:4), and did not go into detail regarding the pressures observed during the negative pressure test (*Id.* at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id.* at 284:8-285:1),

> **Hafle No. 16:** Hafle did not provide clear instructions as to how the negative pressure test results should be interpreted. (PSC Mot. Rec. Doc. 5873-1 at 17.)

**Response to Hafle No. 16:**

The requested inference is inappropriate because it is contrary to the record evidence, and Mr. Hafle is not the only source of the information.  Specifically, the record establishes that there is no requirement to conduct a negative pressure test, that both Transocean rig crew and BP well site leaders received training in conducting pressure tests and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010, (*see* TREX-003326; TREX-003465; TREX-004640; and TREX-007652.) and that the rig crew was provided with procedures for the temporary abandonment operations, which included instructions to conduct a negative pressure test, and had an opportunity to raise any questions.

In April 2010, there was no MMS requirement that operators conduct negative pressure tests, and, consequently, no specific requirements regarding how such tests should be performed. (*See e.g.*, 07/13/2011 F. Patton Dep. at 243:23-44, 298:1-13 (as of 4/16/2010 MMS did not have any regulations that applied to negative pressure test procedures), 11/21/2011 R. Heenan Dep. at 149:12-16 ("Q: Okay.  Are you aware of any law that sets forth a provision for conducting negative pressure tests?  A: I'm not aware of one in Canada or the United States."); 11/29/2011 C. Barnhill Dep. at 120:9-24 (indicating that there is "no MMS requirement to do a negative test" and that BP "could have fulfilled the MMS requirement without doing a negative test.").)

Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010. (*See, e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.)  Similarly, Transocean's drill crew was involved with the preparation and interpretation of the Macondo negative pressure test and would have understood its general principle (09/30/2011 S. Newman Dep. at 286:1-287:14.)  Transocean personnel were experienced in conducting and interpreting negative pressure tests (*See e.g.*, 11/29/2011 C. Barnhill Dep. at

120:25-121:15.) Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*.   (*See* TREX-003326; TREX-003465; TREX-004640; and TREX-007652.) Moreover, Mr. Hafle and other BP engineers provided instructions regarding the negative pressure test in both the temporary abandonment procedures contained in the April 16, 2010 Application for Permit to Modify (TREX-000570), as well as the April 20, 2010 "Ops Note" email (TREX-000566).)  Operational information and procedures were shared with the rig crew during pre-tour meetings, the rig crew had access to operational documents such as daily planners, and had the opportunity to raise any questions during the pre-tour meetings. (04/20/2011 M. Burgess Dep. at 336:18-338:12.)

> **Hafle No. 17:** BP's filing of the fracture gradient with the MMS was outdated and wrong. (PSC Mot. Rec. Doc. 5873-1 at 17-20.)

**Response to Hafle No. 17:**

The requested inference is irrelevant, vague, unsupported by the questioning, and there is no showing that Mr. Hafle has the foundation to testify regarding BP's filings with the MMS. The inference is vague and ambiguous as to which particular filing with the MMS, if any, was allegedly "outdated and wrong" and what is meant by "fracture gradient" and "filing of the fracture gradient."   Moreover, the vagueness and irrelevance of the requested inference is highlighted by the fact that certain MMS filings appropriately and necessarily reflected pre-drill predictions of the fracture gradient of certain hole sections (Macondo MC 252 #1 Pre-Drill Data Package at 13, Sept. 3, 2009 (TREX-001312)), and that when filing a Revised APD, there is no requirement to update information relating to hole sections that had been drilled.  (10/11/2011 S. Douglas Oct. 11, 2011 Dep. at 116:8-25.)

> **Hafle No. 18:** Guide and Hafle made the decision to use 75 barrels of spacer. (PSC Mot. Rec. Doc. 5873-1 at 20.)

**Response to Hafle 18:**

The requested inference is vague, unsupported by the questioning, contrary to the evidence and there is no showing that Mr. Hafle has the foundation to testify on Mr. Guide's thoughts or decision.  The requested inference is unclear as to what cement job it is referring to. The cement job on the production interval used the 72 barrels of spacer recommended by Mr. Gagliano.  The reference to "75 barrels" appears to relate to a different cement job.  The questioning also does not support the requested inference.  The questioning asks whether Mr. Hafle and Mr. Guide "agreed that you wanted to use less spacer"--it does not ask whether they "made the decision to use 75 barrels of spacer."  There is also no showing that Mr. Hafle knew what was in Mr. Guide's mind such that he could answer questioning relating to whether "John Guide wanted to stay at 75 barrels of spacer."  (PSC Mot. Rec. Doc. 5873-1 at 20.)  The requested inference is further contrary to the evidence.  Halliburton's engineer Jesse Gagliano testified that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval."  (02/08/2012 J. Gagliano at 502:18-24.) Mr. Gagliano testified that he was aware of the well conditions and was responsible for

designing and recommending an appropriate cement slurry for the Macondo well.  (02/07/2011 J. Gagliano Dep. at 28:15-29:21.)



**Hafle No. 19:** Hafle was concerned about the well design; he was the "lone wolf" on wanting to do a "P&A." (PSC Mot. Rec. Doc. 5873-1 at 20-22.)

**Response to Hafle No. 19:**

The requested inference is vague and unsupported by the questioning, contrary to the evidence, and there is not a proper foundation laid to establish that Hafle indeed told the interviewer that he was the "lone wolf" on wanting to do a P&A.  (*See e.g.* TREX-000299.) Additionally, the questioning does not support the requested inference.  Hafle was asked "what did you mean, was the Lone-Wolf on wanting to do the P&A," *not* whether he was actually the "lone wolf" on wanting to do a "P&A."  (*See e.g.* 07/22/2011 M. Hafle Dep.  at 44:23-24.) There is no factual support in the record for the PSC's assertion that Hafle was the "lone wolf" on wanting to do a "P&A."  The requested inference is vague and ambiguous regarding whether the lone wolf on wanting to do a P&A refers to the Macondo or the Nile well.  (*See e.g.* TREX-000299 ("Have to a Nile P&A which no one wanted to do.  Was the lone-wolf on wanting to do the P&A (David Simms, John Guide, Morel, Doris Reiter, Brad Simpson, Jessie C. did cement model."); (*see also* TREX-0004453.))  Further, the record evidence contradicts the inference sought.  Brian Martin testified that his interview notes were not a verbatim record of the interview with Mr. Hafle.  (02/21/2011 B. Martin Dep. at 407:4-14 ("Q. Sure.  As you sit here today, can you say with any certainty based upon a present recollection that any given line in any of your interview notes was verbatim of what one of the interviewees actually said at the time? . . . A. Not by verbatim, no, sir.  I can't.").)  Mr. Martin further testified that he did not have any recollection of what Mr. Hafle meant regarding the "lone wolf" statement.  ("Q. Actually, if you go to the top of the second page of your handwritten [interview notes], I believe that lone wolf statement is there.  A. Yes, ma'am.  I see that.  Q.  Ok.  Do you have any recollection now what Mr. Hafle meant by that?  A. Only based on how the statement reads, it has to do something with P&A.  As far as remembering exactly how the conversation went.  I just can't recall.").) (*Id.* at 160:6-17))

**Hafle No. 20:** So you knew sir, did you not, that the rig was reporting pressure on the drill pipe at the conclusion of the negative test, didn't you? (Deposition of Mark Hafle, July 22, 2011, at 31:7-10) **[Yes.]** ((TO Mot. Rec. Doc. 7639 at 4).)

**Hafle No. 21:** [Y]ou knew, sir, there shouldn't have been any pressure on the drill pipe on the negative test; isn't that correct, sir? (*Id.* at 31:13-16) **[Yes.]** ((TO Mot. Rec. Doc. 7639 at 4).)

**Hafle No. 22:** In fact, you told Mr. Vidrine that you can't have pressure on the drill pipe and a zero pressure on the kill line in a test that's properly lined up, didn't you? (*Id.* at 31:19-23) **[Yes.]** ((TO Mot. Rec. Doc. 7639 at 4).)

**Hafle No. 23:** And, sir, you let operations go forward on the rig at that time, didn't you, sir? (*Id.* at 32:18-20) **[Yes.]** ((TO Mot. Rec. Doc. 7639 at 4).)

**Hafle No. 24:** And you let them complete a displacement of the riser, didn't you, sir? (*Id.* at 32:23-24) **[Yes.]** ((TO Mot. Rec. Doc. 7639 at 4).)

**Response to Hafle Nos. 20-24:**

The requested inferences seek to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010.  The requested inferences are inappropriate because they are contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

Moreover, the requested inferences are inappropriate because they are contrary to the record evidence.  Specifically, the record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at BP-HZN-BLY00000089.  Moreover, at the time the conversation occurred, the displacement procedure was already underway for more than 50 minutes, and as discussed below, the purpose of the conversation was not to evaluate the negative pressure tests but to discuss forward steps.  Finally, Transocean was in charge of operations on the rig, including the displacement operations.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.)  Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.   Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)   Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted

negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement. (TREX-000001 at BP-HZN-BLY00000025.) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement. (TREX-000001 at BP-HZN-BLY00000025.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inference relies, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZN-BLY00144213.) By the time this telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) Furthermore, the interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZN-BLY00144213.) In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test." Moreover, as the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZN-BLY00144213.)

Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that, based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id.* at 426:20-427:4), and did not go into detail regarding the pressures observed during the negative pressure test (*Id.* at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (S. Robinson Dep. at 284:8-285:1),

**Hafle No. 25:** [Y]our team approved of the manner and type of cement that were to be used on the Macondo well, particularly in the final cement job; is that correct, sir? (*Id.* at 49:2-5) **[Yes.]** ((TO Mot. Rec. Doc. 7639 at 4).)

**Response to Hafle No. 25:**

The requested inference is vague and contrary to the evidence, and there is no showing that Mark Hafle has the foundation to evaluate and approve foam cement slurry designs for deepwater wells. The phrase "approved of the manner and type of cement" is unclear and undefined in the requested inference. The requested inference is further contrary to the evidence. The BP engineering team relied on Halliburton to design and test the cement slurry. (04/22/2011 G. Walz Dep. 618:24-619:8.) Halliburton witnesses and experts concede that BP relied on Halliburton to design the cement slurry for the production interval of the Macondo well (12/05/2011 S. Lewis Dep. at 37:19-22; 12/22/2011 D. Bolado Dep. at 66; 06/30/2011 R. Faul Dep. at 544-545.) Halliburton's engineer Jesse Gagliano testified that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval." (02/08/2012 J. Gagliano Dep. at 502:18-24.) Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well. (02/07/2011 J. Gagliano Dep. at 28:15-29:21.) Mr. Gagliano described Mr. Morel's knowledge in cementing as limited (*Id.* at 249:13-17), and stated that he had more experience than the rest of the BP team with cement and foam cement. (02/08/2012 J. Gagliano Dep. at 423:7-15, 482:10-20, 491:2-11.) Mr. Gagliano had more knowledge about the Halliburton additives in the cement blend and recommended the Kodiak cement blend to BP. (*Id.* at 496:12-497:24, 02/07/2012 J. Gagliano Dep. at 80:12-81:10; 02/08/2012 J. Gagliano Dep. at 586:2-9.) Mr. Gagliano sent his final cement slurry recommendations to the BP team on April 18, 2010 and that was the slurry that was pumped at the Macondo Well. (TREX-000717, TREX-000708.)

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Hafle No. 26:** Hafle and Morel were the lead BP cement program engineers and both prepared a decision tree that included a Cement Bond Log (22:8-15; 23:23-24:9; Ex. 4447.) (HESI Mot. Rec. Doc. 7644-1 at 4.)

**Response to Hafle No. 26:**

The requested inference is unclear and contradicted by the evidence. The phrase "that included a Cement Bond Log" is unclear and undefined by the requested inference. The requested inference is further contrary to the evidence. The cement program was drafted by Halliburton and recommended to BP. (02/08/2012 J. Gagliano Dep. 479:10-21, 491:2-11.) One risk identified by Halliburton was increased pressures caused by channeling which may have caused losses while cementing. BP drilling engineers, Mr. Hafle and Mr. Morel, drafted a decision tree that would address the potential for cementing losses and not reaching the planned

top of cement. (TREX-000908.)  The requested inference suggests that the decision tree required a cement bond log as part of the operations.  This is contradicted by the decision tree itself, which indicates that a cement bond log would only be required if there were losses during the cement job.  (TREX-000908.)  Halliburton executed the cement job and reported full returns on the job.  (TREX-000708.)  Therefore, a cement bond log was not required under the decision tree.

> **Hafle No. 27:** Hafle talked to Well Site Leader Don Vidrine about the test results from the negative pressure test and told him that there would not be pressure on the drill pipe in a test that is properly lined up (30:19-31:24; Ex. 4447.)  (HESI Mot. Rec. Doc. 7644-1 at 4.)

> **Hafle No. 28:** Hafle talked to Vidrine, who advised that during the negative pressure test, there was zero pressure on the kill line but pressure remained on the drill pipe (174:1- 176:8; Ex. 4447; Ex. 4448.) (HESI Mot. Rec. Doc. 7644-1 at 5.)

**Response to Hafle Nos. 27 & 28:**

The requested inferences seek to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010.  The requested inferences are inappropriate because they are contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inferences are also inappropriate because they are contrary to the record evidence to the extent that they purport to suggest that Mr. Hafle was consulted during the negative pressure tests conducted at the Macondo well on April 20, 2010, or to the extent that it purports to suggest that Mr. Hafle attempted to interpret the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality."  (TREX-000001 at p. BP-HZN-BLY00000089.)  Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality."  (01/27/2011 S. Robinson Dep. at 293:17-294:7.)  Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZN-BLY00144213.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZN-BLY00144213.)

By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) Furthermore, the interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZN-BLY00144213.) In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 ████████ ████████████████████████████████████████ At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement. (TREX-000001 at BP-HZN-BLY00000025.) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement. (TREX-000001 at BP-HZN-BLY00000025.)

**Hafle No. 29:** It was Hafle's position that a cement plug should have been set, but the BP culture did not support it (43:9-46:2; Ex. 4447; Ex. 4453.) (HESI Mot. Rec. Doc. 7644-1 at 5.)

**Response to Hafle No. 29:**

The requested inference is vague and ambiguous in its failure to identify what "cement plug" is being referred to, and in using the unclear and undefined phrase "the BP culture." Similarly, the inference is inappropriate because it is based on objectionable questions posed to Mr. Hafle that, if answered, would have elicited an inadmissible response by virtue of the questioner's failure to identify what "cement plug" was being referred to, and in using the

unclear and undefined phrase "the culture trained in 1989..." (07/22/2011 M. Hafle Dep. at 43:9-46:2.)    The questions posed to Mr. Hafle are also objectionable to the extent that they mischaracterize the evidence because the questions were premised on interview notes (TREX-004447; TREX-004453 and 4453) that constitute the mental impressions of individuals who participated in an interview with Mr. Hafle, and were not intended to be a verbatim record of the interview.

The requested inference is also contrary to the record evidence that demonstrates the procedures for the temporary abandonment operations at the Macondo well—including the procedures submitted to and approved by the MMS—called for a 300 foot balanced cement plug to be set in the Macondo well. (*See e.g.*, TREX-000097, TREX-000570.)

> **Hafle No. 30:** Hafle was focused on achieving cost savings for BP, including the use of the Fast Drill method on the Macondo well for an estimated savings of $250,000 (57:24-59:22; 182:11-189:15.) (HESI Mot. Rec. Doc. 7644-1 at 5.)

**Response to Hafle No. 30:**

The requested inference is inappropriate. First, the requested inference is vague, ambiguous and misleading by not defining the "Fast Drill" method. But to the extent that the requested inference purports to suggest that such a method is focused on rushed drilling for cost savings, record evidence in the case indicates the contrary. Specifically, the fast-drill method has been explained as a procedure used to manage equivalent circulating density, which has nothing to do with achieving cost savings. (07/19/2011 K. Daigle Dep. at 76:3-77:18, 133:6-135:9.)

Looking at TREX-004455 as a whole, however, undermines HESI's inference.

Moreover, the requested inference is contrary to the established evidence in the record. Numerous Transocean rig crew members testified they felt no pressure to speed up operations on the *Deepwater Horizon*. Transocean senior toolpusher for the *Deepwater Horizon*, Randy Ezell indicated that from the time he went to the Macondo well site up through the explosion on April 20, 2010, he never felt pressure to rush through operations.  (04/28/2011 M. Ezell Dep. at 489:17-490:1 ("Q. Okay. So let me ask it a different way: Did you ever feel any pressure to rush through drilling operations? A. No."); 11/8/2011 D. Barron Dep. at 30:5-8 ("Q. [D]id you get the feeling that this well just had to be drilled as quickly as possible no matter what? A. No, sir."); 05/18/2011 C. Breland Dep. at 84:16-22 ("Q. All right. Did you feel any pressure while you were on the DEEPWATER HORIZON to speed up operations because the well was behind schedule? . . . A. No."); *Id*. at 85:23-86:2 ("Q. Did you ever feel at anytime that you were being asked to cut corners? . . . A. No."); 07/14/2011 N. Watson Dep. at 107:25-108:15 (testifying that on April

20, 2010, he did not feel any pressure to speed up operations for any reason); 07/14/2011 C. Taylor Dep. at 157:11-15 ("Q. Did anybody from Transocean ever say to you, We're rushing this too much, we're not—we're doing this job too quickly, it's not being done right? A. No.").) In addition, the testimony demonstrates that BP, including Mr. Hafle, did not place time and cost savings over safety. (*See e.g.*, 08/24/2011 D. Farr Dep. at 334:25-335:6 ("Q. Has anybody from the *Deepwater Horizon* drill rig, any Transocean employee ever said to you that they thought that any step that BP took put them at a high risk during the activities of April 19th and April 20th? A. No."); 07/14/2011 C. Taylor Dep. at 157:7-10 ("Q. Did anybody ever say that this—this well cannot be drilled safely, in words or substance? A. No.").)

> **Hafle No. 31:** Many of BP's decisions on the Macondo well focused on saving time and money, including: the decision not to use 21 centralizers, as recommended by HESI; the decision to use an LCM spacer; the decision to displace before setting the cement plug; the decision to forego further well integrity tests after anomalous negative test results; the decision to bypass the reserve pits and offload mud to the Damon Bankston; and the decision to forgo bottoms-up circulation before cementing among others (66:3-70:14;107:19-111:5; 167:12-168:10; 194:19-203:4; 205:1-11; 206:17-209:16; Ex. 4447 and 4448.) (HESI Mot. Rec. Doc. 7644-1 at 5.)

## Response to Hafle No. 31:

The requested inference is inappropriate, vague, and overly broad. Moreover, in support of this inference, HESI cites to Ex. 4448, testimony from the Joint Investigation Team "JIT" hearing, which is specifically excluded under 46 U.S.C. § 6308(a) per the Court's 1/26/12 Order (Rec. Doc. 5448.) The requested inference is also contrary to evidence established in the record as discussed below.

The decision to not run the additional 15 centralizers was not based on time or money, but around the balance of risk. (*See e.g.* 06/29/2011 J. Cowie Dep. at 144:4-17.) BP had already purchased the 15 centralizers and flown the centralizers and a Weatherford hand (to install the centralizers) out to the rig. (TREX-087083.) The decision not to run the additional centralizers was based on the risk that the centralizers may slip or break and cause additional problems. (TREX-001687; TREX-00137; 04/21/2011 G. Walz Dep. at 305:8-15, 311:15-312:8.) Even *Deepwater Horizon* Transocean senior toolpusher, Randy Ezell indicated there are risks to using centralizers and that he had been on another rig where centralizers caused a problem by "leaving pieces [] in [the] BOP stack." (M. Ezell Dep. at 561:19-562:9, 685:1-686:1.)

The decision to circulate less than bottoms up was based on the concern that the additional circulation may fracture the well. (06/13/2011 V. Tabler Dep. at 192:17-193:6; 04/22/2011 G. Walz Dep. 545:23-547:23.) The decision was discussed with Halliburtonand Halliburton cementer Vincent Tabler agreed that the decision to conduct only a partial circulation immediately prior to the cementing job due to the concern over losses made sense. (06/14/2011 V. Tabler Dep. 415:4-416:4.) Concern for specific hole conditions of a given well was the rationale for not running a complete bottoms up on prior cement jobs Mr. Tabler had

worked on with other operators besides BP.   (06/14/2011 V. Tabler Dep. 415:19-416:11.)
Moreover, a complete bottoms up circulation was performed prior to logging, on April 16, 2010.
(TREX-041069 Daily Drilling Report, Apr. 16, 2010. The April 16, 2010 procedure should have
removed any cuttings that were left in the hole at that time, and none of the operations conducted
from April 16 until the final production string cement job would have created additional cuttings.
(11/29/2011 C. Barnhill Dep. at 84:24-85:5; 06/14/2011 V. Tabler Dep. 419:1-14.)   And due to
the depth of the well, the final cementing operations themselves resulted in significant circulation
of the pay zone area that was to be cemented.  (11/29/2011 C. Barnhill Dep. at 90:1-15, 91:24-
92:8.)

     There is no evidence that BP decided to use BP lost circulation materials (LCM) as a
spacer based upon cost.  In fact, MI SWACO recommended using an LCM pill as a spacer.
(TREX-002810.)  This recommendation "was a beneficial [re]use of material that otherwise
would have gone to waste..." (D. Maxie Dep. at 254:9-13; 04/04/2011 J. LeBleu Dep. at 339:9-
25.)

     The decision to displace before setting the cement plug did not save any time or money
"because you would always have to displace the mud from the riser before you disconnected the
BOP of the riser.  So whatever sequence you did it, you would always have to displace the mud
from the riser." (06/29/2011 J. Cowie Dep. at 148:8-17.)

     The particular inference requested, *i.e.*, that BP was focused on saving time and money
by foregoing further well integrity tests is inappropriate given that the movant has not identified
any record evidence, or otherwise laid the foundation, that the witness had personal knowledge
sufficient to answer the question posed.  The inference is also clearly against the evidence in the
record.   The rig crew was making every effort to confirm the integrity of the well, as
demonstrated by the above-average time spent conducting and interpreting the negative pressure
test on the *Deepwater Horizon* on April 20, 2010.  (01/27/2011 S. Robinson Dep. at 183:9-13
("[T]he negative test took a long time.  It took three hours, and that's something that's normally
45 minutes.").)  Moreover, the inference that BP was the only party involved regarding the
decision to conduct and interpret well integrity tests is contrary to established evidence.  (TREX-
001472; 03/10/2011 R. Sepulvado Dep. at 53:20-54:22, 283:25-284:6; M. Ezell Dep. at 224:25-
225:12; 04/28/2011 M. Ezell Dep. at 541:1-20, 543:7-20; B. Ambrose Dep. at 214:23-215:4.)

     The particular inference that BP was focused on saving time and money by the decision
to bypass the reserve pits and offload mud to the Damon Bankston is also inappropriate given
that the movant has not identified any record evidence, or otherwise laid the foundation, that the
witness had personal knowledge sufficient to answer the question posed.   Moreover, the
requested inference is contrary to record evidence.  Transocean was the party responsible for
fluid transfers and ensuring pits could be monitored.  (TREX-048183 ██████████
███████████████████████████████████████); 11/29/2011 C. Barnhill Dep. at
203:9-204:19; 09/15/2011 L. Lindner Dep. at 586-87)  The displacement procedure was drafted
by the MI-Swaco mud engineer, Leo Lindner.  (09/14/2011 L. Lindner Dep. at 233:25-234:3;
TREX-3196.)  Mr. Lindner indicated coming up with the displacement procedure is "part of …
M-I's job … the Displacement Procedure is within our purview." (09/14/2011 L. Lindner Dep. at
234:16-235:24, 236:13-21.)  Mr. Lindner calculated the pump strokes needed for each step of the

displacement, including calculating the volume to pump to land the spacer above the BOP. (09/14/2011 L. Lindner Dep. at 144:1-9; 09/15/2011 L. Lindner Dep. at 622:5-24.)  Mr. Lindner also reviewed the entire displacement procedure with BP, Transocean, and Sperry-Sun personnel at the pre-job meeting on the afternoon of April 20, 2010 and was comfortable everyone understood the activity.  (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21; TREX-000326.)  No one raised any concerns about the accuracy of the pump stroke calculations, the order of the steps, or the actual operations proposed (*Id.*)  In addition, one of the *Deepwater Horizon* Sperry-Sun mud loggers Mr. Keith testified that he had no concerns regarding his ability to accurately and continuously monitor the well data, including mud, and was not concerned about displacement to the Damon Bankston.  (03/28/2011 J. Keith Dep. at 94:12-96:11; 225:24-226:15.)  A service coordinator for the Sperry SDL product service line testified that monitoring pit volumes while offloading mud was manageable and that the monitoring of flow in and flow out should not be affected.  (08/02/2011 K. Kronenberger Dep. at 118:8-22.)

> **Hafle No. 32:**   Based on the foregoing, Hafle's cost-cutting decisions on the Macondo Well significantly increased the risk of a blowout occurring.  (HESI Mot. Rec. Doc. 7644-1 at 5.)

**Response to Hafle No. 32:**

The requested inference is inappropriate and is contrary to record evidence from other witnesses and documents.  First, this requested inference is based upon other requested inferences that are themselves inappropriate requests because the record evidence runs counter to the inference requested.  (*See* BP Responses to Hafle Nos. 30 and 31.)  Moreover, the portion of this requested inference that purports to suggest that certain of Mr. Hafle's decisions "significantly increased the risk of a blowout occurring" are not supported by the record evidence.  (*See e.g.*, 12/06/2011 J. Azar Dep. at 378:12-379:14; 402:12-403:8 (indicating long string and depth of cement plug did not increase the risk of a blowout).)  Mr. Hafle and BP did not make any of the decisions at issue for cost-cutting reasons alone, nor did those decisions significantly increase the risk of a blowout occurring.

> **Hafle No. 33:** BP's MMS filings of the well's fracture gradients were outdated and/or wrong; BP drilled portions of the well without the required safe drilling margin.  (DOJ Mot.Rec. Doc. 7637-1 at 1-4.)

**Response to Hafle No. 33:**

The requested inference is irrelevant, vague, unsupported by the questioning, and there is no showing that Mr. Hafle has the foundation to testify regarding BP's filings with the MMS. The inference is vague and ambiguous as to which particular filing with the MMS, if any, was allegedly "outdated and/or wrong" and what is meant by "fracture gradients" and "safe drilling margin," and which "portions of the well" were allegedly drilled "without the required safe

drilling margin."   Moreover, the vagueness and irrelevance of the requested inference is highlighted by the fact that certain MMS filings appropriately and necessarily reflected pre-drill predictions of the fracture gradient of certain hole sections, (TREX-001312 Macondo MC 252 #1 Pre-Drill Data Package at 13, Sept. 3, 2009) and that when filing a Revised APD, there is no requirement to update information relating to hole sections that had been drilled.  (10/11/2011 S. Douglas Dep. at 116:8-25.)

> **Hafle No. 34:**  Hafle knew that certain best and safest cementing practices were not used because of concerns about fracturing the formation. (DOJ Mot.Rec. Doc. 7637-1 at 4-6.)

**Response to Hafle No. 34:**

The requested inference is vague, unsupported by the questioning and contrary to the evidence.  The phrase "certain best and safest cementing practices" is unclear and is not defined in the requested inference.  The requested inference is not supported by the questioning.  The questioning only covers BP changes to the drilling programs or its engineering decisions relating to the cement plan—it does not address so-called "best and safest cementing practices."   The requested inference is further based on questioning that is contrary to the evidence.

As demonstrated by the record discussed above, Mr. Hafle is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.