# Exhibit B

**EXHIBIT B - ROBERT KALUZA**

> **Kaluza No. 1:**        BP placed Kaluza, an inexperienced and ill-prepared Well Site Leader, on the *Deepwater Horizon* for the critical temporary abandonment procedures at Macondo, as demonstrated by the following  (PSC Mot. Rec. Doc. 5873-3 at 2-4):

> **Kaluza No. 1a:**        Kaluza was first notified that he would be the temporary replacement Well Site Leader on April 6, 2010.  (PSC Mot. Rec. Doc. 5873-3 at 2-3.)

> **Kaluza No. 1b:**        Kaluza first arrived on the *Deepwater Horizon* on April 16, 2010.  (PSC Mot. Rec. Doc. 5873-3 at 3.)

> **Kaluza No. 1c:**        Kaluza was ranked the second lowest Well Site Leader in the Gulf by BP, and had only worked on deepwater rigs for one year.  (PSC Mot. Rec. Doc. 5873-3 at 3.)

> **Kaluza No. 1d:**        BP never provided Kaluza with any formal training on how to conduct a negative pressure test.  (PSC Mot. Rec. Doc. 5873-3 at 3-4.)

**Response to Kaluza No. 1:**

The requested inference is inappropriate.  The requested inference is not supported by record evidence.  The record is clear that Mr. Kaluza was regarded as a competent individual and well site leader and that there were no concerns about sending him to the Macondo well in April 2010.  (07/19/2011 K. Daigle Dep. at 300:15-20, 303:2-6, 349:22-350:10; 05/09/2011 A. Guide Dep. at 186:21-187:17.)  Specifically, Keith Daigle, the Gulf of Mexico Wells Operations Advisor for BP and who is also part of the well site leader deployment program, testified that he had no doubt about Mr. Kaluza's competency.  (07/19/2011 K. Daigle Dep. at 16:11-17:8, 191:18-25.)  John Guide, BP's wells team leader for the *Deepwater Horizon* also made clear that based on Mr. Kaluza's past experiences, he knew Mr. Kaluza was a competent well site leader.  (05/09/2011 A. Guide Dep. at 188:13-18.)  Mr. Kaluza was an experienced well site leader who was coming from the Thunder Horse which was "very similar to the subsea systems that were on the Horizon."  (03/21/2011 J. Sprague Dep. at 215:21-216:4; 4/22/2011 G. Walz Dep. at 652:15-653:6; 07/19/2011 K. Daigle Dep. at 187:4-188:1.)  Mr. Kaluza had served as a well site leader for approximately eleven years and  his level of experience was described as high.  (07/19/2011 K. Daigle Dep. at 297:22-298:17; 4/22/2011 G. Walz Dep. at 707:4-13.)

**Response to Kaluza No. 1a:**

BP objects to the requested inference Kaluza 1a because the timing as to when Mr. Kaluza was notified that he would serve as the temporary replacement well site leader on the *Deepwater Horizon* has no bearing on Mr. Kaluza's experience or competence as a well site leader, and therefore does not support the requested inference Kaluza 1.

**Response to Kaluza No. 1b:**

The requested inference is inappropriate and is contrary to record evidence.  Mr. Kaluza was on the *Deepwater Horizon* in 2002 for several months.  (07/19/2011 K. Daigle Dep. at 263:14-22; 03/11/2011 R. Sepulvado Dep. at 485:25-486:9.)   In fact, Transocean senior toolpusher Randy Ezell indicated that Mr. Kaluza was one of the first well site leaders on the *Deepwater Horizon* and that "seeing him again after that many years, it was actually good." (04/28/2011 M. Ezell Dep. at 615:1-16.)  April 16, 2010 was, however, the first time Mr. Kaluza arrived on the *Deepwater Horizon* while it was on the Macondo.  (TREX-003691.)  BP objects to the requested inference Kaluza 1b because the timing as to when Mr. Kaluza arrived on the *Deepwater Horizon* has no bearing on Mr. Kaluza's experience or competence as a well site leader, and therefore does not support the requested inference Kaluza 1.

**Response to Kaluza No. 1c:**

BP objects to the requested inference Kaluza 1c because the requested inference is counter to the evidence in the record.  Mr. Daigle explained that the document referenced by the PSC in support of this inference, ███████████████████████████████████████

███████████████████████████████████████                       (07/19/2011 K. Daigle Dep. at 354:13-20; 356:2-8.)

Mr. Kaluza's performance assessment for 2009 recognized Mr. Kaluza's good working relationships with other leaders on the rigs.  (*Id.* at 389:18-390:1.)  The assessment commented that Mr. Kaluza is an enthusiastic well site leader who builds and uses relationships effectively to build trust and to get things done on the rig.  (*Id.* at 390:20-391:7.)  He worked hard to improve performance and strived to incorporate lessons learned.  (*Id.* at 390:8-14; 391:12-17.)

**Response to Kaluza No. 1d:**

BP objects to the requested inference Kaluza 1d because the requested inference is counter to the evidence in the record.  Mr. Kaluza was sent to and completed well control courses, which involve the understanding of pressure testing.  (05/10/2011 A. Guide Dep. at 765:23-766:21.)   "The training that the wellsite leaders receive in estimating pressures in wellbore where there are different fluids present is applicable to negative-pressure testing." (09/28/2011 T. Emmerson Dep. at 124:24-125:23.)  Moreover, *Deepwater Horizon* well site leader Murry Sepulvado indicated that through training on the rig, a BP well site leader would know how to conduct a negative pressure test.  (05/11/2011 M. Sepulvado Dep. at 201:14-205:14.)  John Guide, BP's wells team leader for the *Deepwater Horizon* also confirmed that Mr. Kaluza knew how to perform a negative pressure test.  (05/09/2011 A. Guide Dep. at 171:1-4.)

Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle);

05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

> **Kaluza No. 2:** Despite the specified flow rate of 5-8 barrels at 500-700 psi, Kaluza authorized 9 attempts to convert the float collar with a flow of 1 barrel at 3,142 psi, which was a gross deviation of Weatherford's specified procedure. (PSC Mot. Rec. Doc. 5873-3 at 4-5.)

**Response to Kaluza No. 2:**

The requested inference is inappropriate, is not supported by any corroborating evidence and misstates record evidence. The record evidence that contradicts the requested inference also establishes that Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Before increasing pressure, BP contacted Weatherford's Bryan Clawson, who authorized the drilling team to continue to pressure up, and advised that pressuring up was the standard procedure and consistent with industry practice for clearing a blockage. (06/06/2011 B. Clawson Dep. at 316:18-21; 317:23-318:2; A. Guide Dep. at 211:11-212:7 ("before we proceeded on any of this, we called Weatherford. I didn't, Brian Morel did. We verified the pressure, that the float collar was good, too, on a differential basis.").)

Mr. Clawson also specifically informed Mr. Morel that the float collar could withstand up to 6800 psi of pressure. (06/06/2011 B. Clawson Dep. at 125:11-126:6) In addition, Vernon Goodwin, the Allamon Tool Co. representative on the rig, also recommended that the drill crew keep "rocking the casing in 1000 psi increments up to 5000 psi…" (TREX-001977)

Circulation was established at 3,142 psi and the float collar was converted. (TREX-5993 at HAL_0028668; 06/14/2011 V. Tabler Dep. at 433:9-436:5; TREX-000001 BP IIT Report at pp. 23, 70.) Mr. Chaisson, the Halliburton engineer on the rig, testified that everyone on the rig floor believed that the float collar had converted. (03/16/2011 N. Chaisson Dep. at 272:7-14 ("I thought they did convert, as did everyone else on the rig floor").) Vincent Tabler, the Halliburton cementer on the rig, reported that the Transocean crew told him that the float collar had converted. (06/14/2011 V. Tabler Dep. at 433:14-21 ("Q. Okay. Who told you they converted? A. I don't remember which driller was on—on tour at the time. Q. Okay. So a driller called you on the headset and said, we've converted, come—come back out to the floor?

A. Yes, sir.").)   Weatherford witnesses also testified that they believed that the float collar converted.   (06/06/2011 B. Clawson Dep. at 336 ("Q. Okay.   And since—since then up till today, do you have any indication that the float collar did not convert?   A.  No.").)



**Kaluza No. 3:** The Negative Pressure Test Produced Highly Irregular Results that Were Ignored, as demonstrated by the following  (PSC Mot. Rec. Doc. 5873-3 at 5-8):

**Kaluza 3a:**   The negative test was conducted by underbalancing the well, which was done by placing a spacer of highly viscous material between the mud and seawater.  (PSC Mot. Rec. Doc. 5873-3 at 5-6.)

**Kaluza 3b:**   Kaluza knew that the spacer had the potential to compromise the negative test.  (PSC Mot. Rec. Doc. 5873-3 at 6.)

**Kaluza 3c:**   The negative pressure test revealed 1,400 psi on the drill pipe, and no flow through the kill line.  (PSC Mot. Rec. Doc. 5873-3 at 6.)

**Kaluza 3d:**   Regardless of whether the pressure was measured by the drill pipe or kill line, the pressure should be equal.  (PSC Mot. Rec. Doc. 5873-3 at 6-7.)

**Kaluza 3e:**   Kaluza discussed the test results with Guide twice on the evening of April 20; Guide instructed him to finish displacement. (PSC Mot. Rec. Doc. 5873-3 at 7.)

**Kaluza 3f:**   Without consulting experts in Houston about the negative test results, Kaluza and Vidrine explained the findings of 1,400 psi and no flow out of the kill line as the result of a "bladder effect."  (PSC Mot. Rec. Doc. 5873-3 at 8.)

**Kaluza 3g:**   Kaluza attempted to explain to Guide in a post-incident email dated April 25 that the test results were due to the "bladder effect" - to which Pat O'Bryan, BP's VP of Completions in the Gulf of Mexico, responded with five lines of question marks.  (PSC Mot. Rec. Doc. 5873-3 at 8.)

**Response to Kaluza No. 3:**

The requested inference is vague and ambiguous in its use of the unclear and undefined phrase "highly irregular results".  As discussed in detail with respect to the subparts to this

request inference below, the requested inference is further inappropriate to the extent it is based on objectionable questions posed to Mr. Kaluza that, if answered, would have elicited an inadmissible response due to the vague and ambiguous nature of the questions, the failure to establish proper foundation or demonstrate that the question was reasonably within the witness' personal knowledge, or because the question(s) posed called for speculation.

The requested inference is inappropriate because it is contrary to the record evidence. The requested inference is also inappropriate because, as discussed in response to each of the subparts below, the requested subparts are contrary to the record evidence or otherwise objectionable.  Accordingly, a general requested inference that is based upon similarly flawed subpart inferences is likewise inappropriate.

The requested inference is inappropriate because it is contrary to the evidence in that it (1) attempts to ignore the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and (2) is flatly contradicted by record evidence demonstrating that the parties involved in conducting and interpreting the negative pressure test carefully evaluated the results of the negative pressure test and reached a joint decision in determining that the negative pressure test was successful.  The record evidence that contradicts the requested inference also establishes that Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011  M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).))  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Operational information and procedures were shared with the rig crew during pre-tour meetings, the rig crew had access to operational documents such as daily planners, and had the opportunity to raise any questions during the pre-tour meetings.  (04/20/2011 M. Burgess Dep. at 336:18-338:12.) Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong.  (04/28/2011 M. Ezell Dep. at 542:19-543:20.) Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Contrary to the requested inference, the record evidence further demonstrates that the rig crew made every effort to confirm the integrity of the well, as demonstrated by the above large amount of time spent conducting and interpreting the negative pressure test on the *Deepwater Horizon* on April 20, 2010. (01/27/2011 S. Robinson Dep. at 183:9-13 ("[T]he negative test took a long time. It took three hours, and that's something that's normally 45 minutes.").) Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean Sr, Toolpusher informed the Transocean OIM that the rig crew ███████████████████████████████████).)

## **Response to Kaluza Nos. 3a and 3b:**

Requested inference 3a is vague and ambiguous to the extent it suggests that the underbalanced condition was a direct result of the placement of spacer material in the wellbore. Requested inference 3a is also inappropriate because it is based on objectionable questions posed to Mr. Kaluza that, if answered, would have elicited an inadmissible response. The questions posed to Mr. Kaluza call for speculation and fail to establish any foundation that the reasons for using a spacer and the particular type of material used for the spacer was reasonably within the witness' personal knowledge.

Requested inferences Kaluza 3a and Kaluza 3b are subpoints to requested inference Kaluza 3. A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed. The requested inference of Kaluza 3a and 3b is inappropriate for the reasons discussed below.

The requested inference is contrary to the record evidence because it attempts to ignore the role of other parties in the displacement procedure used to underbalance the well in preparation for the negative pressure test, incorrectly suggests that the placement of spacer itself created an underbalanced condition, and ignores evidence that the particular spacer material was recommended and approved by M-I SWACO.

In order to conduct a negative pressure test, the well must be placed into an underbalanced condition. To achieve the necessary degree of underbalance, the rig crew displaced the synthetic oil-based mud in the well with seawater to a depth of 8367 ft. As part of this displacement process, the rig crew pumped a high-viscosity spacer material ahead of the seawater. (*See e.g.*, TREX-000001 at 83.)

M-I SWACO recommended the use of a lost circulation material (LCM) pill as a spacer. (TREX-002810.) This recommendation was deemed by M-I SWACO to be a beneficial reuse of material that otherwise would have gone to waste. (11/09/2011 D. Maxie Dep. at 254:9-13; 04/09/2011 LeBleu Dep. at 339:9-25.) As the drilling fluids specialist contractor, M-I SWACO has the expertise and specialists to select the materials for spacers. (09/15/2011 L. Linder Dep. at 549:12-17, 555:13-558:25.) There was no pressure from BP to use the LCM pill as a spacer. (06/24/2011 B. Billon Dep. at 522:6-12.)

The M-I SWACO displacement procedure, TREX-003196, called for the use of the LCM pill as a water-based mud spacer.  (TREX-000967; 06/23/2011 B. Billon Dep. at 109:11-21.) The procedure was drafted by the MI-Swaco mud engineer, Leo Lindner, and Mr. Lindner testified that coming up with the displacement procedure is "part of . . . M-I's job . . . the Displacement Procedure is within our purview."  (09/14/2011 L. Lindner Dep. at 234:16-235:24, 236:13-21.)  Mr. Lindner calculated the pump strokes needed for each step of the displacement, including calculating the volume to pump to land the spacer above the BOP.  (*Id.* at 144:1-9; 09/15/2011 L. Lindner Dep. at 622:5-24.)  Mr. Lindner also reviewed the entire displacement procedure with BP, Transocean, and Sperry-Sun personnel at the pre-job meeting on the afternoon of April 20, 2010 and was comfortable everyone understood the planned activity. (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21; TREX-000326.)  Lindner also testified that no one raised any concerns about the accuracy of the pump stroke calculations, the order of the steps, or the actual operations proposed.  (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21.)

The record evidence discussed herein highlights that Mr. Kaluza is not the only source of information, further demonstrating that the requested inferences are inappropriate.

**Response to Kaluza No. 3c:**

Requested inference Kaluza 3c is a subpoint to requested inference Kaluza 3.  A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed.  The requested inference of Kaluza 3c is inappropriate for the reasons discussed below.

The requested inference is also inappropriate because Mr. Kaluza is not the only source of the information.  (*See, e.g.*, TREX-000001 at 87.)

**Response to Kaluza No. 3d:**

The requested inference is inappropriate because it is contrary to the evidence in that it attempts to ignore the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful, as discussed in detail above.  (*See* "Response to Kaluza 3c.")  The record evidence discussed therein highlights that Mr. Kaluza is not the only source of information, further demonstrating that the requested inferences are inappropriate.

Requested inference Kaluza 3d is a subpoint to requested inference Kaluza 3.  A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed.

The requested inference is also vague and ambiguous in failing to clearly identify the "pressure" being referenced, and in its use of the unclear and undefined phrase "the pressure should be equal."  The requested inference is inappropriate because it is based on objectionable questions posed to Mr. Kaluza that, if answered, would have elicited an inadmissible response. The questions posed to Mr. Kaluza were based on and made reference to a purported transcript of an interview with Mr. Kaluza that was conducted as part of an investigation by the Joint

Investigation Team ("JIT") of the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") and the United States Coast Guard, and is specifically excluded under 46 U.S.C. § 6308(a) per the Court's 1/26/12 Order (Rec. Doc. 5448.)

**Response to Kaluza No. 3e:**

Requested inference Kaluza 3e is a subpoint to requested inference Kaluza 3. A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed. The requested inference of Kaluza 3e is inappropriate for the reasons discussed below.

The requested inference is inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source of the information at issue. Specifically, Mr. Guide testified that he was *not* contacted on the evening of April 20, 2010 by anyone on the rig regarding the results of the negative pressure test. (05/10/11 A. Guide Dep. at 759:17-761:15, 785:8-22.)

**Response to Kaluza No. 3f:**

Requested inference Kaluza 3f is a subpoint to requested inference Kaluza 3. A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed. The requested inference of Kaluza 3f is inappropriate for the reasons discussed below.

The requested inference is inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source of the information at issue. Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

The requested inference is also contrary to the record evidence both in suggesting that the "bladder effect" explanation was advanced by Messrs. Kaluza and/or Vidrine or that it was an attempt by them to explain away the anomalous pressures observed. Such a suggestion ignores the record evidence establishing that it was Transocean personnel who suggested the "bladder effect" as an explanation for the anomalous pressure readings observed during the negative pressure test. (05/09/2011 L. Lambert Dep. at 245:11-247:10.) The "annular compression" or "bladder effect" explanation was discussed and accepted by both Transocean and BP personnel on the rig. (01/27/2011 S. Robinson Dep. at 51:19-52:15; *see also* P. O'Bryan Dep. at 177:17-24 (describing his understanding that the "bladder effect" explanation was the result of discussions

that took place between Transocean and BP personnel on the rig who were involved in the conduct and interpretation of the negative pressure test).)

Operational information and procedures were shared with the rig crew during pre-tour meetings, the rig crew had access to operational documents such as daily planners, and had the opportunity to raise any questions during the pre-tour meetings. (04/20/2011 M. Burgess Dep. at 336:18-338:12.) Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.) Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ████████████ ████████████████████████████).)

## Response to Kaluza No. 3g:

Requested inference Kaluza 3g is a subpoint to requested inference Kaluza 3. A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed. The requested inference of Kaluza 3g is inappropriate for the reasons discussed below.

The requested inference is vague and ambiguous in its use of the unclear and undefined term "test results" and the phrase "attempted to explain." The requested inference is inappropriate because it is based on objectionable questions posed to Mr. Kaluza that, if answered, would have elicited an inadmissible response. The questions posed to Mr. Kaluza call for speculation and fail to establish any foundation concerning Mr. Kaluza's knowledge of communications that he was not involved in and were not reasonably within the witness's personal knowledge.

The requested inference is inappropriate because Mr. Kaluza is not the only source of the information, and the document referred to in the requested inference speaks for itself. (TREX-003190.)

The requested inference is contrary to the record evidence both in suggesting that the "bladder effect" explanation was advanced by Messrs. Kaluza and/or Vidrine or that Mr. Kaluza's email was an attempt to explain away the anomalous pressures observed. Such a suggestion ignores the record evidence establishing that it was Transocean personnel who

suggested the "bladder effect" as an explanation for the anomalous pressure readings observed during the negative pressure test. (05/09/2011 L. Lambert Dep. at 245:11-247:10.) The "annular compression" or "bladder effect" explanation was discussed and accepted by both Transocean and BP personnel on the rig. (01/27/2011 S. Robinson Dep. at 51:19-52:15; *see also* P. O'Bryan Dep. at 177:17-24 (describing his understanding that the "bladder effect" explanation was the result of discussions that took place between Transocean and BP personnel on the rig who were involved in the conduct and interpretation of the negative pressure test).)

Patrick O'Bryan testified and explained his understanding of the information contained in the email, as well as the nature of his response. (07/14/2011 P. O'Bryan Dep. at 175:14-179:10 (discussing a different version of the same document, TREX-000759).) Notably, Mr. O'Bryan explained his understanding of the email from Mr. Kaluza: ". . . the way I took this, this was how Bob—and I'm assuming Daun—as well as the Transocean folks that were on the rig that would have been involved in the discussions came to the conclusion that the negative test was—they had—they had proven well integrity had been achieved with the negative test." (*Id.* at 177:17-24.) Contrary to the requested inference, the record evidence demonstrates that the email from Mr. Kaluza reflected the discussions that took place between Transocean and BP personnel on the rig who were involved in the conduct and interpretation of the negative pressure test—and this was not a post-incident "attempt to explain," as suggested in the requested inference.

Moreover, the requested inference is inappropriate because it is contrary to the record evidence in that it attempts to ignore the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful, as set forth in detail above. (*See* "Response to Kaluza 3c.")

> **Kaluza No. 4:**      Kaluza failed to follow BP's guidelines for well site leaders (TREX-00569), including . . . (PSC Mot. Rec. Doc. 5873-3 at 9-10):
>
> **Kaluza No. 4a:**      Confirmation of Correct Number of Centralizers. (PSC Mot. Rec. Doc. 5873-3 at 9.)
>
> **Kaluza No. 4b:**      Verification that the final cement slurry recommendation met job requirements. (PSC Mot. Rec. Doc. 5873-3 at 9.)
>
> **Kaluza No. 4c:**      Review of slurry design test results for strength development. (PSC Mot. Rec. Doc. 5873-3 at 10.)

**Response to Kaluza No. 4:**

The requested response is inappropriate because it is contrary to the record evidence. *See Below 4a, 4b, 4c.* The requested inference is also inappropriate because, as discussed in response to each of the subparts below, the requested subparts are contrary to the record evidence or otherwise objectionable. Accordingly, a general requested inference that is based upon similarly flawed subpart inferences is likewise inappropriate.

**Response to Kaluza No. 4a:**

Requested inference Kaluza 4a is a subpoint to requested inference Kaluza 4.  A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed.  The requested inference of Kaluza 4a is inappropriate for the reasons discussed below.

The requested inference is not supported by the questioning, is contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address TREX-000569.  The questioning asks whether Mr. Kaluza understood that TREX-000569, titled "Wellsite Checklists, Cementing Responsibilities" sets forth responsibilities relating to centralizers.  However, there is no showing that Mr. Kaluza was aware of this document or has the appropriate foundation to address whether it purportedly proscribed responsibilities to well site leaders.  The requested inference is also unsupported by the questioning.  The questioning asks whether Mr. Kaluza took no action to "ensure that the *correct centralizers* are available and suitable stop collars had been sup--supplied ."  (Rec. Doc. 5873-3 at 9 (emphasis added).)  It does not ask whether Mr. Kaluza confirmed the "correct *number of* centralizers" as set forth in the requested inference (emphasis added). ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Response to Kaluza No. 4b:**

Requested inference Kaluza 4b is a subpoint to requested inference Kaluza 4.  A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed.  The requested inference of Kaluza 4b is inappropriate for the reasons discussed below.

The requested inference is contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address TREX-000569.  The questioning asks whether Mr. Kaluza understood that TREX-000569, titled "Wellsite Checklists, Cementing Responsibilities" sets forth responsibilities relating to verification of the cement slurry.  However, there is no showing that Mr. Kaluza was aware of this document or has the appropriate foundation to address whether it purportedly proscribed responsibilities to well site leaders.  Further, the requested inference is contrary to the evidence.  BP relied on Halliburton to design and test the cement slurry.  Halliburton's engineer Jesse Gagliano testified that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval."  02/08/2012 J. Gagliano Dep. 502:18-24.)  Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well.  (02/07/2012 J. Gagliano Dep. 28:15-29:21.)  Mr. Kaluza received Mr. Gagliano's final slurry recommendations.  (TREX-000741.)  In sum, the requested inference is contrary to the evidence because BP relies on Halliburton, the cement

contractor, to design and test the slurry for the job requirements and Mr. Kaluza did receive Mr. Gagliano's slurry recommendation.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Response to Kaluza No. 4c:**

Requested inference Kaluza 4c is a subpoint to requested inference Kaluza 4. A requested inference premised on the acceptance of further requested inferences is inappropriate and should not be allowed. The requested inference of Kaluza 4c is inappropriate for the reasons discussed below.

The requested inference is contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address TREX-000569. The questioning asks whether Mr. Kaluza understood that TREX-000569, titled "Wellsite Checklists, Cementing Responsibilities" sets forth responsibilities relating to strength development. However, there is no showing that Mr. Kaluza was aware of this document or has the appropriate foundation to address whether it purportedly proscribed responsibilities to well site leaders. Further, the requested inference is contrary to the evidence. BP relied on Halliburton to design and test the cement slurry. Halliburton's engineer Jesse Gagliano testified that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval." (02/08/2012 J. Gagliano Dep. 502:18-24.) Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well. (02/07/2012 J. Gagliano Dep. 28:15-29:21.) ███████ ██  ██  ██     ██   ██  ██     ██ ██ In sum, the requested inference is contrary to the evidence because BP relied on Halliburton to design and test the cement slurry and Mr. Kaluza did receive the strength development testing.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Kaluza No. 5:** [Y]ou know in your experience as a BP Well Leader that four barrels per minute is less than an optimal rate of cement flow, don't you? (Deposition of Robert Kaluza, July 11, 2011, at 28:24-29:2) **[Yes.]** (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 5:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address displacement efficiency in deepwater wells. The phrase "optimal rate of cement flow" is nonsensical and undefined in the requested

inference.   There is no showing that Mr. Kaluza has the training or experience to address displacement efficiency in deepwater wells.   The requested inference is also contrary to the evidence.   The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency.   Contrary to the requested inference, the rate of pumping at the Macondo Well was appropriate for a deepwater well in the Gulf of Mexico.   Dr. Greg Garrison of Oilfield Testing & Consulting testified that, in his experience, turbulent flow rates could not be achieved in cementing programs in deepwater wells in the Gulf of Mexico.   (11/04/2011 G. Garrison Dep. 162:22-163:2.)

Halliburton's cementing expert David Bolado explained that the displacement rate is based on the well conditions and the density of the compounds being pumped.   (12/22/2011 D. Bolado Dep. 281:12-18.)   And, at the planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may already have been exceeded by the Macondo Well cement job. (12/2/2011 D. Bolado Dep. 281:19-23.)   Further, Halliburton's Technology Manager for the Gulf of Mexico region, Ronnie Faul, explained that there are multiple things that could be done to increase displacement efficiency at the Macondo well, including pumping Halliburton's Tuned Spacer III in front of the cement, pumping base oil, pumping twice the normal amount of spacer, and using an energized fluid such as foam.   (06/30/2011 R. Faul Dep. 512:5-514:17, 515:6-516:5.)

In sum, the requested inference is contrary to the evidence because BP accepted the Halliburton-recommended cement program, including the pump rate of four barrels per minute, and Halliburton's modeling indicated that a faster flow rate could not have been achieved at the Macondo well and, indeed, faster turbulent flow rates cannot be achieved in deepwater wells in the Gulf of Mexico.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Kaluza No. 6:** In fact, you know it was very—it was a very ineffective rate of flow to ensure a good cement job, isn't that correct, sir? (*Id.* at 29:24-30:2) **[Yes.]** (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 6:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address displacement efficiency in deepwater wells. The phrases "very ineffective rate of flow" and "good cement job" are unclear and undefined in the requested inference.   There is no showing that Mr. Kaluza has the training or experience to address displacement efficiency in deepwater wells.   The requested inference is also contrary to the evidence.   The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency.   Contrary to the requested inference, the rate of pumping at the Macondo well was appropriate for a deepwater well in the Gulf of Mexico.   Dr. Greg Garrison of Oilfield Testing & Consulting testified that, in

his experience, turbulent flow rates could not be achieved in cementing programs in deepwater wells in the Gulf of Mexico.   (11/04/2011 G. Garrison Dep. 162:22-163:2.)

Halliburton's expert David Bolado explained that the displacement rate is based on the well conditions and the density of the compounds being pumped.   (12/22/2011 D. Bolado Dep. 281:12-18.)   And, at the planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may already have been exceeded by the Macondo Well cement job.   (12/22/2011 D. Bolado Dep. 281:19-23.)   Further, Halliburton's Technology Manager for the Gulf of Mexico region, Ronnie Faul, explained that there are multiple things that could be done to increase displacement efficiency at the Macondo well, including pumping Halliburton's Tuned Spacer III in front of the cement, pumping base oil, pumping twice the normal amount of spacer, and using an energized fluid such as foam.  (06/30/2011 R. Faul Dep. 512:5-514:17, 515:6-516:5.)

In sum, the requested inference is contrary to the evidence because BP accepted the Halliburton-recommended cement program, including the pump rate of four barrels per minute, and Halliburton's modeling indicated that a faster flow rate could not have been achieved at the Macondo well and, indeed, faster turbulent flow rates cannot be achieved in deepwater wells in the Gulf of Mexico.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.


**Kaluza No. 7:** Yet, BP and you endorsed such a flow rate, correct? (*Id.* at 30:5-6) **[Yes.]** (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 7:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address displacement efficiency in deepwater wells. The phrase "such a flow rate" is unclear and undefined in the requested inference. There is no showing that Mr. Kaluza has the training or experience to address displacement efficiency in deepwater wells.   The requested inference is also contrary to the evidence.   The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency.   Contrary to the requested inference, the rate of pumping at the Macondo well was appropriate for a deepwater well in the Gulf of Mexico.   Dr. Greg Garrison of Oilfield Testing & Consulting testified that, in his experience, turbulent flow rates could not be achieved in cementing programs in deepwater wells in the Gulf of Mexico. (11/04/2011 G. Garrison Dep. 162:22-163:2.)

Halliburton's expert David Bolado explained that the displacement rate is based on the well conditions and the density of the compounds being pumped. (12/22/2011 D Bolado Dep. 281:12-18.)   And, at the planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may already have been exceeded by

the Macondo Well cement job. (12/22/2011 D. Bolado Dep. 281:19-23.) Further, Halliburton's Technology Manager for the Gulf of Mexico region, Ronnie Faul, explained that there are multiple things that could be done to increase displacement efficiency at the Macondo well, including pumping Halliburton's Tuned Spacer III in front of the cement, pumping base oil, pumping twice the normal amount of spacer, and using an energized fluid such as foam. (06/30/2011 R. Faul Dep. 512:5-514:17, 515:6-516:5.) ███████████████████████████

███████████ In sum, the requested inference is contrary to the evidence because BP accepted the Halliburton-recommended cement program, including the pump rate of four barrels per minute, and Halliburton's modeling indicated that a faster flow rate could not have been achieved at the Macondo well and, indeed, faster turbulent flow rates cannot be achieved in deepwater wells in the Gulf of Mexico.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Kaluza No. 8:** Although you knew at the time that you had concerns about the flow rate, correct, sir? (*Id.* at 30:14-16) [Yes.] (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 8:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address displacement efficiency in deepwater wells. There is no showing that Mr. Kaluza has the training or experience to address displacement efficiency in deepwater wells. The requested inference is also contrary to the evidence. The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency. Contrary to the requested inference, the rate of pumping at the Macondo well was appropriate for a deepwater well in the Gulf of Mexico. Dr. Greg Garrison of Oilfield Testing & Consulting testified that, in his experience, turbulent flow rates could not be achieved in cementing programs in deepwater wells in the Gulf of Mexico. (11/04/2011 G. Garrison Dep. 162:22-163:2.) ███████████████████████████

███████████████████████████████████████ Halliburton's expert David Bolado explained that the displacement rate is based on the well conditions and the density of the compounds being pumped. (12/22/2011 D Bolado Dep. 281:12-18.) And, at the planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may already have been exceeded by the Macondo Well cement job. (12/22/2011 D Bolado Dep. 281:19-23.) Further, Halliburton's Technology Manager for the Gulf of Mexico region, Ronnie Faul, explained that there are multiple things that could be done to increase displacement efficiency at the Macondo well, including pumping Halliburton's Tuned Spacer III in front of the cement, pumping base oil, pumping twice the normal amount of spacer, and using an energized fluid such as foam. (06/30/2011 R. Faul Dep. 512:5-514:17, 515:6-516:5.) ████████████████████

███████████████████████████ In sum, the requested inference is contrary to the evidence

because BP accepted the Halliburton-recommended cement program, including the pump rate of four barrels per minute, and Halliburton's modeling indicated that a faster flow rate could not have been achieved at the Macondo well and, indeed, faster turbulent flow rates cannot be achieved in deepwater wells in the Gulf of Mexico.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Kaluza No. 9:** [D]id you ever receive a report or confirm for yourself that the foam cement that Halliburton had mixed for the well was adequate for the pressure and heat present at the bottom of the Macondo Well, sir? (Id. at 37:6-11) [No.] (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 9:**

The requested inference is contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address foam cement testing for deepwater wells. There is no showing that Mr. Kaluza has the training to review or is required to review the foam cement testing results. Further, the requested inference is contrary to the evidence. BP relied on Halliburton to design and test the cement slurry. Halliburton's engineer Jesse Gagliano testified that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval." (02/08/2012 J. Gagliano Dep. 502:18-24.) Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well. (02/07/2012 J. Gagliano Dep. 28:15-29:21.) Mr. Kaluza received Mr. Gagliano's email containing the test results for the cement slurry, including the UCA compressive strength testing. (TREX-000741 at BP-HZN-2179MDL00015403-15404.) Richard Vargo, Halliburton's 30(b)(6) witness on communications with BP, testified that Halliburton did not communicate any concerns about foam stability to BP. (03/31/2011 R. Vargo Dep. at 540:23-541:2 ("I don't know of any communication from Halliburton to BP about concerns about a foam stability test on the days leading up to the job.").) In sum, the requested inference is contrary to the evidence because BP relied on Halliburton to design and test an appropriate foam slurry, Halliburton provided a recommendation for a foam slurry, and Halliburton never warned BP concerning foam stability issues.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Kaluza No. 10:** Isn't it true that the rig crew told you that they normally conducted negative tests on the pipe? (Id. at 148:13-15) **[Yes.]** (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 10:**

The requested inference is vague and ambiguous in its use of the unclear and undefined phrase "on the pipe."

The requested inference is inappropriate because Mr. Kaluza is not the only source of the information at issue.  Transocean's senior toolpusher on the rig, Randy Ezell, testified that although the rig crew usually conducted negative pressure tests on the drill pipe, they were unable to do so at Macondo "because the APD [sic] in this particular case stipulated by the MMS that we had to use a kill line for a monitoring device."  (04/28/2011 M. Ezell Dep. at 630:8-23.)  During the temporary abandonment operations, BP well site leaders Bob Kaluza and Donald Vidrine informed Mr. Ezell that the negative pressure test was initially not lined up as described in the procedure that was approved by the MMS, and as a result, Mr. Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure.  (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)  While the record evidence indicates that the Transocean rig crew usually conducted negative pressure tests on the drill pipe, it also establishes that the rig crew was experienced in conducting negative pressure tests, and Transocean created detailed procedures and THINK plans for a variety of negative pressure tests conducted on the *Deepwater Horizon* and on other rigs, including a "Negative flow test using choke and kill lines."  (TREX-004640.)

The requested inference is also inappropriate because it is contrary to the record evidence in that the inference attempts to ignore the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.  The record evidence that contradicts the requested inference also establishes that Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011  M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests,

they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.)  Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful.  Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)  Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.  (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (email indicating that Transocean Sr, Toolpusher informed the Transocean OIM that the rig crew ███████████ ████████████████████████████████).)

> **Kaluza No. 11:**       Do you deny that the Transocean rig crew was addressing the issues created by the pressure readings on the drill pipe during the negative test? (*Id.* at 217:15-18) **[No.]** (TO Mot. Rec. Doc. 7639 at 5.)

## Response to Kaluza No. 11:

The requested inference is vague and ambiguous in its use of the unclear and undefined phrase "addressing the issues."  The requested inference is inappropriate because Mr. Kaluza is not the only source of the information at issue.

The requested inference is also inappropriate because it is contrary to the record evidence in that the inference attempts to ignore the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.  The record evidence that contradicts the requested inference also establishes that Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform

his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong.  (04/28/2011 M. Ezell Dep. at 542:19-543:20.)  Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Contrary to the requested inference, the record evidence further demonstrates that the rig crew—including both BP and Transocean personnel—made every effort to confirm the integrity of the well, as demonstrated by the large amount of time spent conducting and interpreting the negative pressure test on the *Deepwater Horizon* on April 20, 2010.  (01/27/2011 S. Robinson Dep. at 183:9-13 ("[T]he negative test took a long time.  It took three hours, and that's something that's normally 45 minutes.").)  Both BP and Transocean personnel concluded that the negative pressure test was successful.  Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)  Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.  (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ████████████████████████████████████████████████████████████████).)

> **Kaluza No. 12:**     Well Site Leader Don Vidrine arrived during the discussion, and rather than complete the test on the drill pipe, Mr. Vidrine instructed the Transocean crew to line up the test with a kill line, isn't that correct?  (*Id.* at 217:21-218:1.)  **[Correct.]**  (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 12:**

The requested inference is vague and ambiguous in its use of the unclear and undefined phrase "the discussion" and in failing to clearly identify which negative pressure test is being referenced.  The requested inference is inappropriate because Mr. Kaluza is not the only source of the information at issue.

The requested inference is inappropriate because it is contrary to the record evidence to the extent it suggests that Mr. Vidrine in any way interfered with the negative pressure test.  Such an inference would be inconsistent with the record evidence that demonstrates Transocean personnel understood the requirement to conduct the negative pressure test on the kill line, in accordance with the procedure that was submitted to and approved by the MMS.  Such an inference would also be contrary to the record evidence that demonstrates that there were multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful, as described in detail below.

Transocean's senior toolpusher on the rig, Randy Ezell, testified that although the rig crew usually conducted negative pressure tests on the drill pipe, they were unable to do so at Macondo "[B]ecause the APD [sic] in this particular case stipulated by the MMS that we had to use a kill line for a monitoring device."  (04/28/2011 M. Ezell Dep. at 630:8-23.)  During the

temporary abandonment operations, BP well site leaders Bob Kaluza and Donald Vidrine informed Mr. Ezell that the negative pressure test was initially not lined up as described in the procedure that was approved by the MMS, and as a result, Mr. Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure.  (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)  While the record evidence indicates that the Transocean rig crew usually conducted negative pressure tests on the drill pipe, it also establishes that the rig crew was experienced in conducted negative pressure tests, and Transocean created detailed procedures and THINK plans for a variety of negative pressure tests conducted on the *Deepwater Horizon* and on other rigs, including a "Negative flow test using choke and kill lines."  (TREX-004640.)

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong.  (04/28/2011 M. Ezell Dep. at 542:19-543:20.)  Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful.  Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)  Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.  (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ███████████ ████████████████████████).)

> **Kaluza No. 13:**       Do you deny that the Well Site Leader makes the final decision regarding whether the negative test has passed or failed? (*Id.* at 219:13-16) **[No.]** (TO Mot. Rec. Doc. 7639 at 5.)

**Response to Kaluza No. 13:**

The requested inference is vague and ambiguous in its use of the unclear and undefined phrases "the final decision."  The requested inference is inappropriate because Mr. Kaluza is not the only source of the information at issue.

In addition, the requested inference is inappropriate because it is contrary to the record evidence.  As detailed below, the record evidence establishes that the determination as to whether a negative pressure test is successful or unsuccessful is a collaborative determination made by multiple parties including both Transocean and BP personnel.  The record also establishes that Transocean had ultimate authority for all operations, and could exercise stop work authority if there was any concern regarding the determination of a successful negative pressure test.  Moreover, multiple parties were involved in the conduct and interpretation of the negative pressure test, and observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)  Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong.  (04/28/2011 M. Ezell Dep. at 542:19-543:20.)  Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Contrary to the requested inference, the record evidence further demonstrates that the rig crew—including both BP and Transocean personnel—made every effort to confirm the integrity of the well, as demonstrated by the large amount of time spent conducting and interpreting the negative pressure test on the *Deepwater Horizon* on April 20, 2010.  (01/27/2011 S. Robinson Dep. at 183:9-13 ("[T]he negative test took a long time.  It took three hours, and that's something that's normally 45 minutes.").)  Both BP and Transocean personnel concluded that the negative pressure test was successful.  Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)  Transocean OIM Jimmy Harrell also believed the negative pressure test was

successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ███████████████████████████████████████).)

> **Kaluza No. 14:**　　At the pre-tour meeting on the morning of April 20, 2010, Kaluza and Jimmy Harrell, OIM of the *Deepwater Horizon*, had a heated discussion, wherein Harrell disagreed with the final plan of plugging and abandoning the well as a dangerous method, but Kaluza told him, "This is how it's going to be" (64:12-65:10.) In response to the prior exchange with Kaluza at the pre-tour meeting, Harrell replied to Kaluza, "I guess that's what we have pincers for." (65:11-17.) (HESI Mot. Rec. Doc. 7644-1 at 7.)

**Response to Kaluza No. 14:**

The requested inference is inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source for the information at issue.  (*See e.g.*, 04/28/2011 M. Ezell Dep. at 707:10-709:3 (indicating that he had no recollection of Mr. Harrell ever using the term "pincers" or any comment at the pre-tour meeting referring to the blind shear rams); C. Pleasant Dep. 509:8-511:5 (indicating that he never personally heard Mr. Harrell use the term "pinchers" on April 20, 2010, and never heard anyone else indicate that Mr. Harrell used that term); 09/15/2011 L. Linder Dep. at 464:2-465:17 (indicating no concerns were raised during pre-tour meeting where displacement procedure was discussed).)

Moreover, the requested inference is inappropriate because it is contrary to the evidence to the extent it purports to suggest that Mr. Kaluza alone dictated the procedures conducted on April 20, 2010.  Such an inference would be contrary to the record evidence that establishes that multiple parties were involved in the decisions and actions associated with carrying out the temporary abandonment plan, including the conduct and interpretation of the negative pressure test.

Operational information and procedures were shared with the rig crew during pre-tour meetings, the rig crew had access to operational documents such as daily planners, and had the opportunity to raise any questions during the pre-tour meetings. (04/20/2011 M. Burgess Dep. at 336:18-338:12.)  Transocean's safety system included stop work authority, and Transocean employees—including its CEO—consistently testified that they understood that it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (*See, e.g.*, 09/30/2011 S. Newman Dep. at 160:11-164:24; 04/20/2011; 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with any aspect of the planned activities associated with carrying out the temporary abandonment plan, they would have have been both authorized and required to stop and determine what was wrong. (*Id.*)

> **Kaluza No. 15:**　　Kaluza was aware on April 20th that between 1200 and 1400 psi remained on the drill pipe during the performance of all the negative test procedures (239:13-19; Ex. 05.) (HESI Mot. Rec. Doc. 7644-1 at 7.)

**Response to Kaluza No. 15:**

The requested inference is inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source of the information at issue.

The requested inference is contrary to the record evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful. The record evidence that contradicts the requested inference also establishes that Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.) Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ██████████ ██████████████████████).)

> **Kaluza No. 16:** Kaluza and Vidrine did not consult BP experts in Houston about the 1400 psi pressure on the drill pipe and lack of flow on the kill line but, instead, they explained it away with the "bladder effect" theory (48:1-10; Ex. 05.) (HESI Mot. Rec. Doc. 7644-1 at 8.)

**Response to Kaluza No. 16:**

The requested inference is vague and ambiguous in its use of the unclear and undefined phrase "experts."  The requested inference is also inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source of the information at issue.

The requested inference is contrary to the record evidence both in suggesting that the "bladder effect" explanation was advanced by Messrs. Kaluza and/or Vidrine or that it was an attempt by them to explain away the anomalous pressures observed.  Such a suggestion ignores the record evidence establishing that it was Transocean personnel who suggested the "bladder effect" as an explanation for the anomalous pressure readings observed during the negative pressure test.  (05/09/2011 L. Lambert Dep. at 245:11-247:10.)  The "annular compression" or "bladder effect" explanation was discussed and accepted by both Transocean and BP personnel on the rig.  (01/27/2011 S. Robinson Dep. at 51:19-52:15; *see also* P. O'Bryan Dep. at 177:17-24 (describing his understanding that the "bladder effect" explanation was the result of discussions that took place between Transocean and BP personnel on the rig who were involved in the conduct and interpretation of the negative pressure test).)

Moreover, the requested inference is inappropriate because it is contrary to the evidence in that it attempts to ignore the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.  The record evidence that contradicts the requested inference also establishes that Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong.  (04/28/2011 M. Ezell Dep. at 542:19-543:20.)  Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful.  Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/28/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ████████████████████ ████████████████████).)

> **Kaluza No. 17:**     The differential pressures on the drill pipe and the kill line during the second negative test indicated that there was a problem that should have been investigated (290:15-21.) (HESI Mot. Rec. Doc. 7644-1 at 8.)

**Response to Kaluza No. 17:**

The requested inference is inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source of the information at issue.

The requested inference is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.  The record evidence that contradicts the requested inference also establishes that Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.)   Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Contrary to the requested inference, the record evidence further demonstrates that the rig crew—including both BP and Transocean personnel—made every effort to confirm the integrity of the well, as demonstrated by the large amount of time spent conducting and interpreting the negative pressure test on the *Deepwater Horizon* on April 20, 2010. (01/27/2011 S. Robinson Dep. at 183:9-13 ("[T]he negative test took a long time. It took three hours, and that's something that's normally 45 minutes.").) Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (email indicating that Transocean sr. toolpusher informed the Transocean OIM that the rig crew ███████████ ████████████████████████).)

> **Kaluza No. 18:**        BP never provided Kaluza any formal training on how to conduct a negative pressure test or any training on what was required for a pressure test to be successful (144:24-145:10.) (HESI Mot. Rec. Doc. 7644-1 at 8.)

**Response to Kaluza No. 18:**

The requested inference is inappropriate because it is contrary to the record evidence, and Mr. Kaluza is not the only source of the information. Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010 (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.) Similarly, Transocean's drill crew was involved with the preparation and interpretation of the Macondo NPT and would have understood its general principle. (09/30/2011 S. Newman Dep. at 286:1-287:14.) Likewise, they were experienced in conducting and interpreting negative pressure tests (*See e.g.*, TREX-003326, TREX-003465, TREX-004640, and TREX-007652.)

> **Kaluza No. 19:**        There were no procedures or documents from BP on the rig, to which Kaluza could refer for guidance on how to conduct or interpret a negative pressure test (145:11-25.) (HESI Mot. Rec. Doc. 7644-1 at 8.)

**Response to Kaluza No. 19:**

The requested inference is vague and ambiguous in its use of the unclear and undefined phrases "procedures or documents" and "guidance on how to conduct or interpret a negative pressure test." The question posed to Mr. Kaluza that provides the purported basis for the requested inference is also objectionable for its use of the same vague and ambiguous phrase. (07/11/2011 R. Kaluza Dep. at 145:11-25.) The requested inference is also inappropriate because Mr. Kaluza is not the only source of the information at issue.

The requested inference is inappropriate because it is contrary to the record evidence which establishes (1) that there is no requirement to conduct a negative pressure test; (2) that both Transocean rig crew and BP well site leaders received training in conducting pressure tests and had experience with conducting negative pressure tests prior to conducting the negative

pressure test at Macondo on April 20, 2010, (*see* TREX-003326; TREX-003465; TREX-004640; and TREX-007652); (3) that the rig crew was provided with procedures for the temporary abandonment operations, which included instructions to conduct a negative pressure test; (4) that copies of the Transocean Well Control Handbook were available on the rig; and (5) that procedures or documents were available to be sent to the rig by way of the rig's email system.

To the extent that the requested inference purports to suggest that there was a single prescribed method of conducting or interpreting a negative pressure test at the time of the accident, it conflicts with the record evidence, which shows that in April 2010, there was no MMS requirement that operators conduct negative pressure tests, and, consequently, no specific requirements regarding how such tests should be performed. (*See e.g.*, 07/13/2011 F. Patton Dep. at 243-44, 298 (as of 4/16/2010 MMS did not have any regulations that applied to NPT procedures); 11/21/2011 R. Heenan Dep. at 149 ("Q: Okay. Are you aware of any law that sets forth a provision for conducting negative pressure tests? A: I'm not aware of one in Canada or the United States."); 11/29/2011 C. Barnhill Dep. at 120:9-24 (indicating that there is "no MMS requirement to do a negative test" and that BP "could have fulfilled the MMS requirement without doing a negative test.").)

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.) Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson and Mr. Anderson told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-1472 (Email indicating that

Transocean senior toolpusher informed the Transocean OIM that the rig crew ████████████ ███████████████████████).)

Moreover, instructions regarding the negative pressure test could be found in both the temporary abandonment procedures contained in the April 15, 2010 drilling program (TREX-00545), the April 16, 2010 Application for Permit to Modify (TREX-00570), as well as the April 20, 2010 "Ops Note" email (TREX-00566) that BP engineer, Brian Morel sent to Mr. Kaluza and others on the rig. Similarly, Transocean had its own protocols and instructions for negative pressure tests on the *Deepwater Horizon* (*See e.g.*, TREX-004640.) Copies of the Transocean Well Control Handbook were available in numerous locations aboard the *Deepwater Horizon.* (04/27/2011 M. Ezell Dep. at 290:8-20.) The Transocean rig crew also had the ability to obtain procedures or documents for guidance on how to conduct or interpret a negative pressure test via the rig's email system. (*See e.g.*, 07/27/2011 W. Sannan Dep. at 227:1-6, 227:14-18.)

> **Kaluza No. 20:** It was BP's responsibility to interpret the negative test, and the BP Well Site Leader makes the final decision regarding whether the negative test has passed or failed (219:8-18) (HESI Mot. Rec. Doc. 7644-1 at 8.)

**Response to Kaluza No. 20:**

The requested inference is inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source of the information at issue.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.) Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with

Transocean toolpusher Jason Anderson and Mr. Anderson told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-1472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ███████████ ██████████████████████████ ).)

> **Kaluza No. 21:**        Kaluza did not call BP onshore to confirm the theory that the psi found in the drill pipe during the negative pressure test was caused by a "bladder effect," despite the fact that BP had a number of experts onshore with whom he could have consulted on this bladder effect theory (53:25-54:12.) (HESI Mot. Rec. Doc. 7644-1 at 8.)

**Response to Kaluza No. 21:**

The requested inference is vague and ambiguous in its use of the unclear and undefined phrase "experts." The requested inference should not be allowed.

The requested inference is inappropriate because Mr. Kaluza is not the only source of the information. Specifically, the record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at 89; *see also* A. Guide Dep. at 759:17-761:15, 785:8-22 (Mr. Guide was not contacted on the evening of April 20, 2010 by anyone on the rig regarding the results of the negative pressure test).)

The requested inference is contrary to the record evidence to the extent that it suggests that the "bladder effect" was advanced by BP well site leaders. Such a suggestion ignores the record evidence establishing that it was Transocean personnel who suggested what is being referred to as the "bladder effect" as an explanation for the anomalous pressure readings observed during the negative pressure test. (05/09/2011 L. Lambert Dep. at 245:11-247:10.) The "annular compression" or "bladder effect" explanation was discussed and accepted by both Transocean and BP personnel on the rig. (01/27/2011 S. Robinson Dep. at 51:19-52:15; *see also* 07/14/2011 P. O'Bryan Dep. at 177:17-24 (describing his understanding that the "bladder effect" explanation was the result of discussions that took place between Transocean and BP personnel on the rig who were involved in the conduct and interpretation of the negative pressure test).)

Moreover, the requested inference is inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the

negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.) Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ████████████ ████████████████████████████████████████).)

> **Kaluza No. 22:**     Prior to April 20, 2010, Kaluza had never heard of a bladder effect with respect to negative tests (241:6-9.) (HESI Mot. Rec. Doc. 7644-1 at 8).)

**Response to Kaluza No. 22:**

The requested inference is inappropriate because it is contrary to the record evidence and Mr. Kaluza is not the only source of the information at issue.

The requested inference is contrary to the record evidence to the extent that it suggests that the "bladder effect" was advanced by the BP well site leaders. Further, Mr. Kaluza is not the only source of the information because the record evidence establishes that it was Transocean personnel who first suggested the "bladder effect" as an explanation for the anomalous pressure readings observed during the negative pressure test. (05/09/2011 L. Lambert Dep. at 245:11-247:10.) The record further establishes that the "annular compression" or "bladder effect" explanation was discussed and accepted by both Transocean and BP personnel on the rig. (01/27/2011 S. Robinson Dep. at 51:19-52:15; *see also* 07/14/2011 P. O'Bryan Dep. at 177:17-24 (describing his understanding that the "bladder effect" explanation was the result of discussions that took place between Transocean and BP personnel on the rig who were involved in the conduct and interpretation of the negative pressure test).)

**Kaluza No. 23:**       As BP Well Site Leader, Kaluza knew that cementing at four barrels per minute is less than an optimal rate of cement flow, and he described it as "odd" and "very low" (28:24-29:21, Ex. 3188.) ((HESI Mot. Rec. Doc. 7644-1 at 8).)

**Response to Kaluza No. 23:**

The requested inference is vague, contrary to the evidence and Halliburton fails to show that Mr. Kaluza has the appropriate foundation to address displacement efficiency in deepwater wells. The phrase "optimal rate of cement flow" is undefined in the requested inference. There is no showing that Mr. Kaluza has the training or experience to address displacement efficiency in deepwater wells. The requested inference is also contrary to the evidence because the rate of pumping was appropriate for a deepwater well in the Gulf of Mexico. The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency. Dr. Greg Garrison of Oilfield Testing & Consulting testified that, in his experience, turbulent flow rates could not be achieved in cementing programs in deepwater wells in the Gulf of Mexico. (11/04/2011 G. Garrison Dep. 162:22-163:2.) ███████████████████████████████████████████████████ ███████████████ Halliburton's expert David Bolado explained that the displacement rate is based on the well conditions and the density of the compounds being pumped. (12/22/2011 D. Bolado Dep. 281:12-18.) And, at the planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may already have been exceeded by the Macondo Well cement job. (12/22/2011 D. Bolado Dep. 281:19-23.) Further, Halliburton's Technology Manager for the Gulf of Mexico region, Ronnie Faul, explained that there are multiple things that could be done to increase displacement efficiency at the Macondo well, including pumping Halliburton's Tuned Spacer III in front of the cement, pumping base oil, pumping twice the normal amount of spacer, and using an energized fluid such as foam. (6/30/2011 R. Faul Dep. 512:5-514:17, 515:6-516:5.) ███████████████████████████████████████████████████ ██████████████████████████████ In sum, the requested inference is contrary to the evidence because BP accepted the Halliburton-recommended cement program, including the pump rate of four barrels per minute, and Halliburton's modeling indicated that a faster flow rate could not have been achieved at the Macondo well and, indeed, faster turbulent flow rates cannot be achieved in deepwater wells in the Gulf of Mexico.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Kaluza No. 24:**       Kaluza directed the pump rate for the cement job on Macondo (235:2-5.) ((HESI Mot. Rec. Doc. 7644-1 at 8).)

**Response to Kaluza No. 24:**

The requested inference is contrary to the evidence.  Halliburton provided BP cement job design services for the Macondo well.  (12/05/2011 S. Lewis Dep. 38:6-18.) ██████████

██████████████████████████████████████████████████████████████ Halliburton's expert David Bolado explained that the displacement rate is based on the well conditions and the density of the compounds being pumped.  (12/22/2011 D. Bolado Dep. 281:12-18.)  And, at the planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may already have been exceeded by the Macondo Well cement job.  (12/22/2011 D. Bolado Dep. 281:19-23.)

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Kaluza No. 25:**  Kaluza determined the volume of cement that was going to be pumped in the cement job (235:6-10.) ((HESI Mot. Rec. Doc. 7644-1 at 9).)

**Response to Kaluza No. 25:**

The requested inference is contrary to the evidence.  Halliburton provided BP cement job design services for the Macondo well.  (12/05/2011 S. Lewis Dep. 38:6-18.) ███████████

█████████████████████████████████████████████████ Halliburton's expert David Bolado explained that the volume of cement depends on the goals of the job in terms of annular coverage, the strength of the formation, and the annular space to be cemented.  (12/22/2011 D. Bolado Dep. 279:25-280:22.)  For a smaller casing the annular volume to be cemented is smaller.  (12/22/2011 D Bolado Dep. 280:23-281:1.)  Halliburton has pumped other jobs using 60 barrels or less of cement.  (12/22/2011 D Bolado Dep. 281:8-11.) using similar volumes of 60 barrels or less of cement.  (12/22/2011 D. Bolado Dep. 281:8-11.)  In sum, the requested inference is contrary to the evidence because BP accepted the Halliburton-recommended cement program, including the cement volume, which was designed to achieve a successful cement job without cementing losses.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Kaluza No. 26:**  Kaluza was aware that failing to perform a bottoms-up circulation increases the risk of channeling in the subsequent cement job and compromises the ability of a cement job to obtain zonal isolation due to the risk of contamination and/or channeling (236:22-237:4; 237:5-11.) ((HESI Mot. Rec. Doc. 7644-1 at 9).)

**Response to Kaluza No. 26:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Kaluza has the appropriate foundation to address displacement efficiency in deepwater wells. The phrase "zonal isolation" is unclear and undefined in the requested inference. There is no showing that Mr. Kaluza has the training or experience to address displacement efficiency in deepwater wells. The requested inference is also contrary to the evidence. Halliburton's expert David Bolado explained that a well can be cemented to isolate the hydrocarbons to the formation without achieving "zonal isolation" where each formation is isolated from each other. (12/22/2011 D, Bolado Dep. 45:3-23.) Mr. Bolado further explained that circulating more volume can have several potential disadvantages, including the washing out the formation, washing out loss-control material, and inducing further losses. (12/22/2011 D. Bolado Dep. 143:7-148:21.)

The decision to circulate less than bottoms up was based on the concern that the additional circulation may fracture the well. (06/13/2011 V. Tabler Dep. at 192:17-193:6; 04/22/2011 G. Walz Dep. 545:23-547:23.) The decision was discussed with Halliburton and Halliburton cementer Vincent Tabler agreed that the decision to conduct only a partial circulation immediately prior to the cementing job due to the concern over losses made sense. (06/14/2011 V. Tabler Dep. at 415:4-416:4.) Concern for specific hole conditions of a given well was the rationale for not running a complete bottoms up on prior cement jobs Mr. Tabler had worked on with other operators besides BP. (06/14/2011 V. Tabler Dep. at 415:19-416:11.) Moreover, a complete bottoms up circulation was performed prior to logging, on April 16, 2010. (TREX-041069 Daily Drilling Report, Apr. 16, 2010.) The April 16, 2010 procedure should have removed any cuttings that were left in the hole at that time, and none of the operations conducted from April 16 until the final production string cement job would have created additional cuttings. (11/29/2011 C. Barnhill Dep. at 84:24-85:5; 06/14/2011 V. Tabler Dep. at 419:1-14.) And due to the depth of the well, the final cementing operations themselves resulted in significant circulation of the pay zone area that was to be cemented. (11/29/2011 C. Barnhill Dep. at 90:1-15, 91:24-92:8.)

Further, Halliburton's lead cementer on the rig testified that BP explained to him that another bottoms up circulation would not be performed because of the low fracture gradient of the well. (06/19/2011 V. Tabler Dep. 415:8-25.) Mr. Tabler testified that explanation made sense to him and he had seen other operators not circulate a bottoms-up for the same reason. (*Id.* at 416:1-11.) Further, Halliburton's Technology Manager for the Gulf of Mexico region, Ronnie Faul, explained that there are multiple things that could be done to increase displacement efficiency at the Macondo well besides pre-job circulation, including pumping Halliburton's Tuned Spacer III in front of the cement, pumping base oil, pumping twice the normal amount of spacer, and using an energized fluid such as foam. (06/30/2011 R. Faul Dep. 512:5-514:17, 515:6-516:5.) ███████████████████████████████████████ In sum, the requested inference is contrary to the evidence because BP accepted the Halliburton-recommended cement program, which took into account the pre-job circulation of less than a full bottoms-up and included other design elements to achieve a successful cement job.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Kaluza No. 27:**        Kaluza was aware that crane operations affect the ability to monitor flow and pit volumes and, thus, crane operations during displacement affect the mudloggers' ability to monitor the well (159:15-160:5.) ((HESI Mot. Rec. Doc. 7644-1 at 9).)

**Response to Kaluza No. 27:**

The requested inference is inappropriate given that the movant has not identified any record evidence, or otherwise laid the foundation, that the witness had personal knowledge sufficient to answer the question posed, and the questions giving rise to the inference may have elicited an inadmissible response based on speculation and lack of foundation if they had been answered.  The requested inference is also inappropriate because it is contrary to the record evidence, as detailed below.  (01/27/2011 S. Robinson Dep. at 81:20-82:6.)

Halliburton fails to provide a single shred of evidence to corroborate this inference.  In contrast, *Deepwater Horizon* mudlogger Joseph Keith indicated the activities taking place on April 20, 2010 did not impact his ability to consistently and accurately monitor the well.  (03/28/2011 J. Keith Dep. at 59:2-21, 118:1-10.)  The Transocean senior toolpusher on the *Deepwater Horizon*, Randy Ezell also testified that no one, including Cathleenia Willis, ever suggested to Mr. Ezell that she had concerns on April 20, 2010 about her ability to monitor the well.  (04/28/2011 M. Ezell Dep. at 482:3-24.)  The U.S. Government's expert, Richard Heenan, also expressed skepticism that crane activity on April 20, 2010 would have any impact on the ability to monitor.  (11/21/2011 R. Heenan Dep. at 371:6-12 ("Now, there was some testimony as to what the crane was doing at that time and it had just been repaired.  It was, as I understand it, being lifted out of its cradle and lowered back down.  I don't see how that would cause any significant change in heel.  The weather was as calm as can be that night.").)

> **Kaluza No. 28:**        Kaluza was aware that the mudloggers were not notified that the mud offloading from the pits to the Damon Bankston had ceased. (158:15-159:1.) Without being so notified, the mudloggers would not know to monitor the volume in the pits (159:2-7.) (HESI Mot. Rec. Doc. 7644-1 at 9.)

**Response to Kaluza No. 28:**

The requested inference is inappropriate the movant has not identified any record evidence, or otherwise laid the foundation, that the witness had personal knowledge sufficient to answer the question posed, and the questions giving rise to the inference may have elicited an inadmissible response, based on speculation and lack of foundation, if they had been answered. Transocean was the party responsible for fluid transfers and ensuring pits could be monitored. (TREX-048183 ██████████████████████████████████████████████████████████████

██████████); 11/29/2011 C. Barnhill Dep. at 203:9-204:19; 09/15/2011 L. Lindner Dep. at

586-87.)  The requested inference is also inappropriate because it is contrary to the record evidence, as detailed below.

HESI fails to provide a single shred of evidence to corroborate the inference that Mr. Kaluza had any knowledge that the mudloggers were allegedly not notified regarding mud being offloaded to the Damon Bankston, and thus, would not know to monitor the volume in the pits.  In contrast, *Deepwater Horizon* mudlogger Joseph Keith indicated the activities taking place on April 20, 2010 did not impact his ability to consistently and accurately monitor the well. (J. Keith Dep. at 59:2-21, 118:1-10)  Specifically, Mr. Keith testified he was able to continuously and accurately monitor pit volumes and transfers and that he wrote down every time transfers occurred in ledger books.   (*Id*. at 57:6-23, 63:17-64:8, 227:7-13, 228:17-229:6, 274:14-19, 275:24-276:3)  Mr. Keith also admitted he never spoke with any employee from BP, including the well site leaders, on April 20, 2010.  (*Id*. at 54:22-25, 226:16-227:6)  Moreover, according to BP Internal Investigation Interview Notes, Ms. Willis had communicated concern to the Transocean assistant driller but subsequently indicated that "the AD called every time they completed a step on the programme. … During the displacement she recorded everything she could, she watched the strokes and everything went to plan."  (TREX-001427)

> **Kaluza No. 29:**      When the overboard dump line was opened during the sheen test, the Sperry flow meter was bypassed (160:22-161:3.)  (HESI Mot. Rec. Doc. 7644-1 at 9.)

## Response to Kaluza No. 29:

The requested inference is inappropriate given the movant has not identified any record evidence, or otherwise laid the foundation, that the witness had personal knowledge sufficient to answer the question posed, and the questions giving rise to the inference may have elicited an inadmissible response based on speculation and lack of foundation if they had been answered. The requested inference is also inappropriate because it is contrary to the record evidence, as detailed below.

The requested inference is also inappropriate to be drawn against BP given the fact that the Sperry-Sun flow meter was bypassed during the sheen test is not disputed by any party. Clear evidence in the record is already established that the HESI / Sperry-Sun *Deepwater Horizon* mudlogger was aware on the evening of April 20, 2010 that the Sperry-Sun flow meter was bypassed during the sheen test.  (03/28/2011 J. Keith Dep. at 89:21-90:23.)  In fact, HESI / Sperry-Sun was the party who recommended where the Sperry-Sun sensor on the *Deepwater Horizon* was to be located.  (03/28/2011 J. Keith Dep. at 175:5-19, 319:15-320:5.)  Moreover, BP's own Internal Investigation Report does not dispute that at approximately 21:10 on April 20, 2010, the rig crew opened the overboard dump valve on the flow-line which bypassed the Sperry-Sun flow meter.  (TREX-000001 BP IIT Report at BP-HZN-BLY00000093.)   The Transocean flow meter, however, was still available.  (TREX-000001 BP IIT Report; 08/24/2011 D. Farr Dep.  at 275 (when Sperry Sun flow meters are bypassed, the Hi Tech flow sensors are still available).)

**Kaluza No. 30:**      Once discharges were directed overboard, the flow could not be monitored by the Sperry flow meters (161:4-9.) (HESI Mot. Rec. Doc. 7644-1 at 9.)

**Response to Kaluza No. 30:**

The requested inference is inappropriate given the movant has not identified any record evidence, or otherwise laid the foundation, that the witness had personal knowledge sufficient to answer the question posed, and the questions giving rise to the inference may have elicited an inadmissible response based on speculation and lack of foundation if they had been answered. Evidence in the case makes clear that it is not normal practice for a well site leader to monitor well data.  (01/27/2011 S. Robinson Dep. at 81:20-82:6.)   The requested inference is also inappropriate because it is contrary to the record evidence, as detailed below.

The requested inference is also inappropriate to be drawn against BP given the fact that the Sperry-Sun flow meter was bypassed during the sheen test is not disputed by any party. Clear evidence in the record is already established that the HESI / Sperry-Sun *Deepwater Horizon* mud logger was aware on the evening of April 20, 2010 that the Sperry-Sun flow meter was bypassed during the sheen test.  (03/28/2011 J. Keith Dep. at 89:21-90:23.)  In fact, HESI / Sperry-Sun was the party who recommended where the Sperry-Sun sensor on the *Deepwater Horizon* was to be located.  (03/28/2011 J. Keith Dep. at 175:5-19, 319:15-320:5.)  Moreover, BP's own Internal Investigation Report does not dispute that at approximately 21:10 on April 20, 2010, the rig crew opened the overboard dump valve on the flow-line which bypassed the Sperry-Sun flow meter and resulted in the Sperry-Sun flow meter not being able to sense flow. (TREX-000001 BP IIT Report at BP-HZN-BLY00000093.)   The Transocean flow meter, however, was still available.  (TREX-000001 BP IIT Report, at BP-HZN-BLY00000093; 08/24/2011. D. Farr Dep.  at  275 (when Sperry Sun flow meters are bypassed, the Hi Tech flow sensors are still available).)

**Kaluza No. 31:**      Based on the foregoing, Kaluza's actions and decisions on the Macondo Well significantly increased the risk of a blowout occurring. (HESI Mot. Rec. Doc. 7644-1 at 9.)

**Response to Kaluza No. 31:**

The requested inference is inappropriate.  The requested inference is not supported by any corroborating evidence and misstates record evidence as discussed in BP's response to HESI's request for adverse inferences against BP (Kaluza 14-30) above.  Mr. Kaluza's actions and decisions on the Macondo Well did not significantly increase the risk of a blowout occurring.  (03/21/2011 J. Sprague Dep. at 215:12-20.)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent the inference ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.  The record evidence that contradicts the requested inference also establishes that

Mr. Kaluza is not the only source of the information, further highlighting that the requested inference is inappropriate.

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong. (04/28/2011 M. Ezell Dep. at 542:19-543:20.) Indeed, Transocean's CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ███████████ ██████████████████████).)

**Kaluza No. 32:**     As the Well Site Leader on duty at the time the production casing cement job was pumped, Kaluza failed to verify that the final cement slurry met the job's requirements and had been fully tested. (DOJ Mot. Rec. Doc. 7637-3 at 1-17.)

**Response to Kaluza No. 32:**

The requested inference is vague, not supported by the questioning, contrary to the evidence and there is no showing that Mr. Kaluza has the appropriate foundation to respond to the questioning. The phrase "fully tested" is unclear and undefined in the requested inference. There is also no showing that Mr. Kaluza had the ability to review or interpret foam cement testing for deepwater wells, or to interpret TREX-000970 (Wellsite Checklists: Cementing

Responsibilities).  The requested inference is also not supported by the questioning.  The questioning does not ask whether Mr. Kaluza was on duty at the time of the production casing cement job or whether the cement was "fully tested."

The requested inference is also contrary to the evidence.  Mr. Kaluza was, in fact, not the well site leader on duty at the time the production casing cement job was pumped.  (TREX-001425.)  John Sprague explained that TREX-000790 is a recommended practice for the drilling engineers to consider. (03/22/2011 J. Sprague Dep. at 557:25-558:6.)  As to the document's statement that the engineer should "confirm the test results," Mr. Sprague explained that BP relies on its contractors to test the slurries, then the contractor communicates the results to the engineers and raises any testing issues.  (03/22/2011 J. Sprague Dep. at 573:4-21.)  Further, BP relied on Halliburton to design and test the cement slurry.  Halliburton's expert Dr. Sam Lewis testified that BP relied on Halliburton to design and test the cement slurry for the Macondo well. (12/05/2011 Lewis Dep. at 37:18-38:1.)  Halliburton's engineer Jesse Gagliano agreed that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval."   (02/08/2011 J. Gagliano Dep. 502:18-24.) Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well.  (02/07/2011 J. Gagliano Dep. at 28:15-29:21.)  Mr. Kaluza received Mr. Gagliano's email containing the test results for the cement slurry.  (TREX-741.)  Richard Vargo, Halliburton's 30(b)(6) witness on communications with BP, testified that Halliburton did not communicate any concerns about foam stability to BP.  (03/31/2011 R. Vargo Dep. at 540:23-541:2 ("I don't know of any communication from Halliburton to BP about concerns about a foam stability test on the days leading up to the job.").)  In sum, the requested inference is contrary to the evidence because BP relied on Halliburton to design and test an appropriate foam slurry, Halliburton provided a recommendation for a foam slurry, and Halliburton never warned BP concerning foam stability issues.

As demonstrated by the record discussed above, Mr. Kaluza is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Kaluza No. 33:**       Kaluza observed the circulating pressure on the Macondo well was very low after BP completed its attempts to convert the float equipment. Kaluza stated that something may have blown in the well or there may have been a hole in the casing string that was causing the low circulation pressure readings. (DOJ Mot. Rec. Doc. 7637-3 at 18-22.)

## Response to Kaluza No. 33:

The requested inference is inappropriate because it is contradicted by record evidence.

First, the float collar was converted and circulation was established at 3,142 psi.  (TREX-005993 at HAL_0028668; TREX-000001 BP IIT Report at BP-HZN-BLY00000023, BP-HZN-BLY00000070; 06/14/2011 V. Tabler Dep. at 433:14-21 ("Q. Okay.  Who told you they

converted?  A. I don't remember which driller was on—on tour at the time.  Q. Okay.  So a driller called you on the headset and said, we've converted, come—come back out to the floor?  A. Yes, sir."); 06/06/2011 B. Clawson Dep. at 336:8-11 ("Q. Okay.  And since—since then up till today, do you have any indication that the float collar did not convert?  A. No.");

█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████                                          Thus, on the basis of the record evidence, all signs indicated that the float collar successfully converted.

Moreover, before increasing pressure to convert the float collar, BP contacted Weatherford's Bryan Clawson, who authorized the drilling team to continue to pressure up, and advised that pressuring up was the standard procedure and consistent with industry practice for clearing a blockage. (06/06/2011 B. Clawson Dep. at 316:18-21; 317:23-318:2; A. Guide Dep. at 211:11-212:7 ("[B]efore we proceeded on any of this, we called Weatherford.  I didn't, Brian Morel did.  We verified the pressure, that the float collar was good, too, on a differential basis.").)

Mr. Clawson also specifically informed Mr. Morel that the float collar could withstand up to 6800 psi of pressure.  (06/06/2011 B. Clawson Dep. at 125:11-126:6)  In addition, Vernon Goodwin, the Allamon Tool Co. representative on the rig, also recommended that the drill crew keep "rocking the casing in 1000 psi increments up to 5000 psi . . . ."  (TREX-001977.)



Moreover, John Guide, BP's wells team leader for the *Deepwater Horizon* testified he never heard Mr. Kaluza indicate something may have blown out higher up in the casing. (05/09/2011 A. Guide Dep. at 213:9-15.)

The rig crew took actions to confirm that there was not something "blown in the well" or "a hole in the casing string."  The diverter was checked to determine whether the well was circulating through that piece of equipment.  (05/09/2011 A. Guide Dep. at 212:8-22.)  It was determined that circulation was not through the diverter.  (*Id.*)  The rig crew also performed a positive pressure test on the casing.  The positive pressure test was successful, indicating that the long string production casing had integrity (as opposed to a hole somewhere higher up in the casing above the float collar.)  (TREX-000001 BP IIT Report at BP-HZN-BLY00000024, BP-HZN-00000082; TREX-000820; 04/20/2011 M. Burgess Dep. at 378:20-379:4.) Weatherford's Brent Lirette agreed the purpose of a positive pressure test is to determine whether or not there

may be a leak in the casing prior to proceeding with operations.  (12/22/2011 B. Lirette Dep. at 187:16-189:1.)  *Deepwater Horizon* Transocean driller Micah Brandon Burgess likewise explained a positive pressure test is to "ensure everything's good on the casing."  (04/20/2011 M. Burgess Dep. at 188:1-189:13 ("Q.  [W]hat's the purpose of doing a positive pressure test on the casing?  A.  To ensure everything's good on the casing.  Q.  When you say everything's good on the casing, is that related to the cement job on the casing?  A.  It's like your shoe float, too, and your whole casing string in general.  Q.  All right.  Now, if I were to open up this cap with this bottle of water and blow as hard as I could into it, that would induce pressure into this bottle; right?  A.  Yeah.  Q.  That would create positive pressure; right?  A.  Yeah."); *see also* 07/19/2011 B. Ambrose 482:10-21 (agreeing that the positive pressure test confirmed the casing sealed).)

Further, the requested inference is inappropriate because it is contrary to the record evidence establishing that the Internal Investigation Team interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words); 02/21/2011 B. Martin Dep. at 407:4-14 ("Q.  Sure.  As you sit here today, can you say with any certainty based upon a present recollection that any given line in any of your interview notes was verbatim of what one of the interviewees actually said at the time? . . . A.  Not by verbatim, no, sir.  I can't.").)

Therefore, the requested inference is inappropriate and contrary to record evidence that the float collar converted successfully, BP followed the float collar manufacturer's instructions regarding conversion, and that BP Internal Investigation Team interview notes of Mr. Kaluza do not represent verbatim records of the interviews.

> **Kaluza No. 34:**      BP never confirmed the casing's integrity after BP attempted to convert the float equipment and established circulation on the well. (DOJ Mot. Rec. Doc. 7637-3 at 23-25.)

**Response to Kaluza No. 34:**

The requested inference is inappropriate because it is not supported by any corroborating evidence and is contrary to record evidence.

First, the requested inference is inappropriate to the extent it suggests the float collar did not successfully convert.  The float collar was converted and circulation was established at 3,142 psi.   (TREX-005993 at HAL_0028668;  TREX-000001 BP IIT Report at BP-HZN-BLY00000023, BP-HZN-BLY00000070; 06/14/2011 V. Tabler Dep. at 433:14-21 ("Q.  Okay.  Who told you they converted?  A.  I don't remember which driller was on–on tour at the time.  Q.  Okay.  So a driller called you on the headset and said, we've converted, come–come back out to the floor?  A.  Yes, sir."); 06/06/2011 B. Clawson Dep. at 336:8-11 ("Q.  Okay.  And since–since then up till today, do you have any indication that the float collar did not convert?

A. No."); 03/17/2011 N. Chaisson Dep. at 272:7-14. █████████████

██████████████████████████       ████████████████████  Thus, on the basis of the record evidence, all signs indicated that the float collar successfully converted.

Moreover, before increasing pressure to convert the float collar, BP contacted Weatherford's Bryan Clawson, who authorized the drilling team to continue to pressure up, and advised that pressuring up was the standard procedure and consistent with industry practice for clearing a blockage. (06/06/2011 B. Clawson Dep. at 316:18-21; 317:23-318:2; A. Guide Dep. at 211:11-212:7 ("before we proceeded on any of this, we called Weatherford.  I didn't, Brian Morel did.  We verified the pressure, that the float collar was good, too, on a differential basis.").)

Mr. Clawson also specifically informed Mr. Morel that the float collar could withstand up to 6800 psi of pressure.  (06/06/2011 B. Clawson Dep. at 125:11-126:6)  In addition, Vernon Goodwin, the Allamon Tool Co. representative on the rig, also recommended that the drill crew keep "rocking the casing in 1000 psi increments up to 5000 psi…"  (TREX-001977)
████████████████████████████████████████████████████████████████████
████████████████████████

After converting the float equipment and establishing circulation on the well, the rig crew performed two separate pressure tests on the seal assembly, both of which were successful. (TREX-000001 (BP IIT Report) at BP-HZN-BLY00000023; TREX-000820; 04/20/2011, M. Burgess Dep. at 187.)
████████████████████████████████████████████████████████████████████
████████████████████████

The rig crew also performed a positive pressure test on the casing.  The positive pressure test was successful, indicating that the long string production casing held pressure and had integrity.  (TREX-000001 BP IIT Report at BP-HZN-BLY00000024, BP-HZN-BLY00000082; TREX-000820; 04/20/2011 M. Burgess Dep. at 378:20-379:4.)  Weatherford's Brent Lirette agreed the purpose of a positive pressure test is to determine whether or not there may be a leak in the casing prior to proceeding with operations.  (12/22/2011 B. Lirette Dep. at 187:16-189:1.) *Deepwater Horizon* Transocean driller Micah Brandon Burgess likewise explained a positive pressure test is to "ensure everything's good on the casing."  (04/20/2011 M. Burgess Dep. at 188:1-189:13 ("Q.  [W]hat's the purpose of doing a positive pressure test on the casing?  A.  To ensure everything's good on the casing.  Q.  When you say everything's good on the casing, is that related to the cement job on the casing?  A.  It's like your shoe float, too, and your whole casing string in general.  Q.  All right.  Now, if I were to open up this cap with this bottle of water and blow as hard as I could into it, that would induce pressure into this bottle; right?  A.  Yeah.  Q.  That would create positive pressure; right?  A.  Yeah."); *see also* 07/19/2011 B. Ambrose 482:10-21 (agreeing that the positive pressure test confirmed the casing sealed).)

Therefore, the requested inference is inappropriate and contrary to record evidence that the float collar converted successfully, BP followed the float collar manufacturer's instructions regarding conversion, and that the rig crew subsequently conducted two successful pressure tests on the seal assembly, as well as a successful positive pressure test on the casing.