Exhibit C

**EXHIBIT C - BRIAN MOREL**

> **Morel No. 1:** Morel was the principal person in charge of well design, and approved the cementing of the well. (PSC Mot. Rec. Doc. 5873-2 at 3.)

**Response to Morel No. 1:**

The requested inference is inappropriate because it is contrary to the record evidence, Mr. Morel is not the sole source of the information at issue, the inference is premised on objectionable questions, and the inference is not supported by the questions posed.

The record evidence contradicts the requested inference in suggesting that Mr. Morel ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ of the Macondo well. (*See e.g.*, TREX-000291 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ 07/21/2011 K. Jassal 30(b)(6) Dep. at 344:16-23; 345:13-346:5 (design and planning of the Macondo well was subject to procedures in BP's "Beyond the Best" handbook, including a "stage-gate" process); 04/21/2011 G. Walz Dep. at 180:8-10; 371:5-23 (indicating that the entire BP team was involved in discussions, including risk identification and risk management "throughout the whole planning process"); 07/14/2011 P. O'Bryan Dep. at 64:5-22, 153:3-154:5 (explaining the well planning process and stating that for the Macondo well, D&C used a process referred to as "Beyond the Best" to identify and manage risks at various stages in well planning and execution).) Mr. Morel was not solely or individually responsible for the design of the casing at the Macondo well, and the record evidence is clear that key casing design decisions were made based on modeling and recommendations provided by, and in conjunction with, Halliburton personnel. BP representatives met with Jesse Gagliano on April 14, 2010 to run models on Halliburton's OptiCem software for the Macondo well. (02/07/2012 J. Gagliano Dep. at 229:9-231:18.) After that meeting, BP and Halliburton were satisfied with the model results and with the ability to run a long-string casing. (03/24/2011 E. Cunningham Dep. at 381:22-382:21.) Moreover, the record evidence is clear that the overall casing design followed internal BP procedures involving numerous personnel. (04/28/2011 J. Sprague 30(b)(6) Dep. at 14:23-15:4, 15:12-16:13, 17:13-18:3; TREX-001312 (BP followed the proper "Beyond the Best" process steps for the Macondo Well casing design, including preparation of a Pre-Drill Data Package ("PDDP")); 04/28/2011 J. Sprague 30(b)(6) Dep. at 20:21-21:8, 21:23-22:25, 25:9-20; TREX-001861 (BP utilized its manuals and engineering standards in its Evaluation of Casing Design Basis); TREX-048055 (reflecting analysis of production casing decision).)

With regard to the cementing job, the record evidence clearly demonstrates that BP relied on Halliburton and its personnel—not Mr. Morel—to design, recommend, and perform the cement job. (*See e.g.*, 02/07/2012 J. Gagliano Dep. at 28:15-29:21 (Gagliano was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well); 02/10/2011 K. Corser Dep. at 274:14-275:22 (BP hired and relied on Halliburton for its expertise in cementing to design, test and execute the cement job); 04/22/2011 G. Walz Dep. at 618:23-619:8; 04/21/2011 G. Walz Dep. at 193:18-194:2 (BP drilling engineers are not expected to be cementing experts and BP, therefore, relied on Halliburton for the design and cementing services for the Macondo well); 03/21/2011 J. Sprague

Dep. at 143:3-11, 143:24-144:4 (BP relied "first and foremost" on Halliburton for a good cement job; "[t]hey are the expert"); and TREX-000738 (email from J. Gagliano attaching Halliburton's recommended procedure for the production casing cementing job).) As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but also demonstrate the inaccuracy of the inferences sought.

The inferences sought are also inappropriate because they are premised on questions that were vague and ambiguous, or were otherwise objectionable, and in fact do not support the inference sought. For example, Mr. Morel was asked: "Q. [A]nd you and your team approved the design of the cementing of that well, did you not?" (07/21/2011 B. Morel Dep. at 19:2-4.) The questioner failed to specify which of the multiple cementing jobs performed at the Macondo well was being referred to in the question, and is seeking to draw an adverse inference from a vague and ambiguous question. Moreover, the question related to the role of Mr. Morel's team, but the requested inference seeks to create an inference that Mr. Morel alone had principal responsibility for the aspects in question. Similarly, Mr. Morel was also asked: "Q. [A]nd, sir, you, in fact, were the principal person in designing the casing of that well, were you not?" (*Id.* at 18:22-24.) The questioner does not ask whether Mr. Morel was the "principal person *in charge*" and does not define what was meant by "principal person", what a "principal person" does, whether a "principal person" exercises authority over others, and who may be under the purview of the "principal person['s]" control. The question is vague and ambiguous with respect to Mr. Morel being the "principal person *in charge*" of well design.

Finally, the inferences sought regarding Mr. Morel's responsibility for the cementing job and well integrity testing are inappropriate because they do not follow from and are not supported by the questions posed to Mr. Morel. He was asked: "Q. [A]nd you and your team *approved of* the design of the cementing of that well, did you not?" (07/21/2011 B. Morel Dep. 19:2-4) (emphasis added).) As discussed previously, the record evidence contradicts the inference sought and establishes that Halliburton and its personnel—not Mr. Morel—were responsible for designing, recommending, and performing the cement jobs at Macondo. Even if such evidence did not exist, however, the inference requested seeks to make Mr. Morel *responsible* for the cement job when the questions posed only asked if Mr. Morel's team *approved of* the cement job, the type of cement used, and the manner in which the job was performed by Halliburton.

> **Morel No. 2:** Macondo was considered a "nightmare well / a well from hell." (PSC Mot. Rec. Doc. 5873-2 at 3-4.)

**Response to Morel No. 2:**

The requested inference is inappropriate for a number of reasons. First, the requested inference, which seeks to establish as a general principle that the Macondo well was considered a "nightmare well / a well from hell," is contrary to record evidence from other witnesses. (*See e.g.* 04/21/2011 G. Walz Dep. at 220:15-221:11 (indicating he did not consider Macondo a nightmare well); 07/12/2011 M. Albertin Dep. at 194:22-196:9 ("I would agree that we had

problems on this well, but I wouldn't characterize it as a problem well or a nightmare well."); 07/19/2011 K. Daigle Dep. at 171:25-172:4.) BP's wells team leader for the *Deepwater Horizon* made clear that the Macondo Well "was not highly unusually challenging. . . ."  (05/09/2011 A. Guide Dep. at 346:19-23.)  Three of the *Deepwater Horizon* well site leaders indicated the drilling history of the Macondo "was not really uncommon[.]"  (03/10/2011 R. Sepulvado Dep. at 95:7-19; 05/11/2011 M. Sepulvado Dep. at 124:3-15 (indicating "the Macondo well don't really stand out, you know, as a real trouble well."); 06/02/2011 P. Earl Lee Dep. at 628:2-23, 631:18-632:5 (stating he did not think the Macondo was a nightmare well).)  The *Deepwater Horizon* Transocean senior toolpusher Randy Ezell indicated he had never heard anyone from BP, Transocean or any other third-party contractor refer to the Macondo as a nightmare well or anything of that sort.  (04/27/2011 M. Ezell Dep. at 136:14-137:3.)  Mr. Ezell further made clear that "all [wells] have problems" and that there "are no easy wells anymore today."  (*Id.* at 137:18-138:12.)

> **Morel No. 3:**  Morel believed that the well team was "out of control."  (PSC Mot. Rec. Doc. 5873-2 at 4-5.)

**Response to Morel No. 3:**

The requested inference is inappropriate. The exhibit referenced in the cited deposition questions, (Ex. 4507-TREX-004507), does not support such a broad inference.  Specifically, looking at the entire sentence, Mr. Morel states: ███████████████████████████ ████████████████████████████ (emphasis added) (ellipses in original).  The common sense reading of the entire quote suggests that Mr. Morel believed management was being "super conservative," in what sense is not clear from that email, but an inference that the team was "out of control" is not supported by this document.  In addition, there is nothing else in the context of the email that indicates which team Mr. Morel was referencing.  Lastly, the PSC fails to provide any other corroborating record evidence to support the inference sought.

> **Morel No. 4:**  The well posed multiple problems and occupied more and more of Morel's time as he struggled to get everything done.  (PSC Mot. Rec. Doc. 5873-2 at 5.)

**Response to Morel No. 4:**

The requested inference is inappropriate. The exhibit referenced in the cited deposition questions, (TREX-004507), does not support such a broad inference.  An inference that the Macondo well posed multiple problems is also is contrary to record evidence from other witnesses.  (*See e.g.* 04/21/2011 G. Walz Dep. at 220:15-221:11 (indicating he did not consider the Macondo a nightmare well); 07/12/2011 M. Albertin Dep. at 194:22-196:9 ("I would agree that we had problems on this well, but I wouldn't characterize it as a problem well or a nightmare well."); (07/19/2011 K. Daigle Dep. at 171:25-172:4.)  BP's wells team leader for the *Deepwater Horizon* made clear that the Macondo Well "was not highly unusually challenging . . ."  (05/09/2011 A. Guide Dep. at 346:19-23.)  Three of the *Deepwater Horizon*

well site leaders indicated the drilling history of the Macondo "was not really uncommon[.]" (03/10/2011 R. Sepulvado Dep. at 95:7-19; 05/11/2011 M. Sepulvado  Dep. at 124:3-15 (indicating "the Macondo well don't really stand out, you know, as a real trouble well."); 06/02/2011 P. Earl Lee Dep. at 628:2-23, 631:18-632:5 (stating he did not think the Macondo was a nightmare well).)   The *Deepwater Horizon* Transocean senior toolpusher Randy Ezell testified that "all [wells] have problems" and that there "are no easy wells anymore today." (04/27/2011 M. Ezell Dep. at 137:18-138:12.)

**Morel No. 5:**  On April 5, 2010, the well experienced a total loss of returns (TREX-04507, p. 12.)  (PSC Mot. Rec. Doc. 5873-2 at 6.)

**Response to Morel No. 5:**

The inference is vague and ambiguous as to the term "total loss of returns."  The requested inference is too broad and is not supported by record evidence.  The Macondo Well experienced lost returns on April 5, 2010.  The Daily Operations Reports do not support the inference of a "total loss of returns" occurring as suggested by the requested inference.  (*See* 4/4/2010 Daily Operations Report re *Deepwater Horizon*, TREX-041112; 4/5/2010 Daily Operations Report re *Deepwater Horizon*, TREX-041111.)

**Morel No. 6:**  Morel was aboard the *Deepwater Horizon* to oversee the final cementing operation due to the replacement of the previous Well Site Leader with an inexperienced Well Site Leader (Kaluza) (TREX-04507, p. 17.)  (PSC Mot. Rec. Doc. 5873-2 at 6-7.)

**Response to Morel No. 6:**

The requested inference is inappropriate and not supported by record evidence.  First, the record is clear that the suggestion in the requested inference that Mr. Kaluza was an inexperienced well site leader is contradicted by the record evidence.  Mr. Kaluza had served as a well site leader for approximately 11 years and his level of experience was described as high. (07/19/2011 K. Daigle Dep. at 297:22-298:17; 04/22/2011 G. Walz Dep. at 707:4-13.) Mr. Kaluza was an experienced well site leader who was coming from the Thunder Horse which was "very similar to the subsea systems that were on the Horizon."  (03/21/2011 J. Sprague Dep. at 215:21-216:4; 04/22/2011 G. Walz Dep. at 652:15-653:6; 07/19/2011 K. Daigle Dep. at 187:4-188:1.)  Mr. Kaluza was regarded as "a competent individual and well site leader," and that there were no concerns about sending him to the Macondo well in April 2010.  (07/19/2011 K. Daigle Dep. at 300:15-20, 303:2-6, 349:22-350:10; 05/09/2011 A. Guide Dep. at 186:21-187:17.)  Even in the document cited by the PSC for this requested inference, Mr. Morel indicates ███████████████████████████████████████ (TREX-4507, at BP-HZN-2179MDL00081572.)  Keith Daigle, the Gulf of Mexico Wells Engineering Advisor for BP who is also part of the well site leader deployment program, had no doubt about Mr. Kaluza's competency. (07/19/2011 K. Daigle Dep. at 16: 11-17:8, 191:18-25.)  John Guide, BP's wells team leader for the *Deepwater Horizon* also made clear that based on Mr. Kaluza's past

experiences, he knew Mr. Kaluza was a competent well site leader.  (05/09/2011 A. Guide Dep. at 188:13-18.)  Mr. Kaluza's performance assessment for 2009 recognized that Mr. Kaluza is an enthusiastic well site leader who builds and uses relationships effectively to build trust and to get things done on the rig.  (07/19/2011 K. Daigle Dep. at 390:20-391:7.)

Moreover, there is no evidence to support the PSC contention that Mr. Morel went out to the *Deepwater Horizon* because of his concern over Mr. Kaluza's alleged inexperience.  In fact, while Mr. Morel was not concerned with Mr. Kaluza's level of experience, Mr. Morel was concerned with the performance of Halliburton's cement engineer Jesse Gagliano.  (*See* TREX-002009.)  Evidence in the record also makes clear that it is not uncommon for BP to send a young engineer out to the rig to spend time learning as well as to provide assistance.  (04/07/2011 D. Sims Dep. at 632:4-633:3.)  Mr. Morel was on the rig to assist as needed but "[W]as not overall responsible for the execution of the cement job."  (03/22/2011 J. Sprague Dep. at 419:22-420:8; 03/16/2011 N. Chaisson Dep. at 26:1-10, 37:4-7, 214:1-18.)

> **Morel No. 7:** There Was Pressure to Save Costs for Advancement in BP; Morel's advancement within BP was predicated upon saving BP money.  (TREX-04058.)  (PSC Mot. Rec. Doc. 5873-2 at 7-9.)

**Response to Morel No. 7:**

The requested inference is inappropriate because it is vague and ambiguous in the use of the phrase "pressure to save costs for advancement," is unsupported by the questioning, and contrary to record evidence.  The questions posed to Mr. Morel do not refer to the vague and ambiguous phrase "pressure to save costs for advancement" found in the PSC's requested inference.



In addition, Mr. Morel's 2010 Personal Development Profile ("PDP"), an important tool used in the review of personnel, notes Mr. Morel's "Current Competencies, Skills, Knowledge, Experience" include "[d]eveloping and refining skills to effectively lead BP's HSE agenda" and "[s]eeks opportunities to help peers, develop young engineers and interns, share lessons learned / successes, and develop skills outside discipline." (TREX 4500; 7/14/2011 P. O'Bryan Dep. at 171:1-172:19.)

The requested inference is also inappropriate because Mr. Morel is not the only source of the information sought.  Indeed, Mr. Guide, another BP engineer, testified that annual performance appraisals included multiple components of evaluation, including safety,

performance, and development of others.  (05/09/2011 A. Guide Dep. at 398:3-14.)  Moreover, Mr. Guide testified that he received no pressure from management concerning the schedule or budget for Macondo.  (*Id.* at 364:1-6.)

> **Morel No. 8:**  BP knew that Halliburton did not allow enough time to test the final cement slurry; Morel complained on April 17th that Halliburton's procrastination in testing did not allow enough time to "tweak the slurry to meet our needs."  Morel believed that there was no excuse for this, as the cement and chemicals had been on the rig for weeks.  (TREX-01396.)  (PSC Mot. Rec. Doc. 5873-2 at 9-13.)

**Response to Morel No. 8:**

        The requested inference is vague, unsupported by the questioning, is contrary to the evidence, and does not show that Brian Morel had the foundation to testify as to what Halliburton did or did not do.  The phrase "did not allow enough time" is unclear and undefined by the requested inference.  The requested inference is not supported by the questioning.  The questioning merely reads the text of an email and asks whether the text was read correctly (PSC Mot. Rec. Doc. 5873-2 at 9-13)—it does not ask Mr. Morel to confirm the substance of the requested inference.  Further, there is no showing that Mr. Morel knew what Halliburton was doing nor that he could testify as to whether "[H]alliburton did not allow enough time to test the final cement slurry."  This requested inference is also contrary to the evidence.  First, Halliburton provided BP with certain test results for the cement slurry.  Among other communications, Mr. Gagliano sent an April 18, 2010 email transmitting cement slurry test results for the slurry that was pumped for the production casing.  (TREX-000717; TREX-000717A.)  That email did not contain any warning to BP as to the possibility that the cement slurry might fail.  Second, the evidence obtained by BP in this litigation shows that Halliburton affirmatively canceled certain tests that were not completed--not that it "did not allow enough time to test."  Moreover, the evidence shows that Mr. Gagliano never notified BP that it had cancelled those tests.  (03/31/2011 R. Vargo Dep. at 540:13-21 ("Q. All right.  And, to your knowledge, did Mr. Gagliano inform BP that he had canceled the foam stability test on the nine gallon retarder? A: I haven't seen any communication where he informed BP of that.").)  ██████████████

████████████████████████████████████    ████                                Mr. Dubois testified that Mr. Gagliano had spoken with the lab's shift manager Phyllis Stelly and canceled the tests.  (07/19/2011 R. Dubois Dep. at 96:18-97:15.)  Finally, Halliburton provided to BP its job recommendation for the cement job at Macondo, and proceeded with executing the cement job, (TREX-717; TREX-717A; TREX-708), both of which suggested to BP personnel—particularly in the absence of any communication to the contrary—that the testing performed by Halliburton had indicated that the slurry would be successful.

        As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 9:** BP never received final slurry cement test results. (PSC Mot. Rec. Doc. 5873-2 at 13.)

**Response to Morel No. 9:**

The requested inference is vague, not supported by the cited testimony and contrary to the evidence. The phrase "final slurry cement test results" is unclear and undefined by the requested inference. The requested inference is also not supported by the questioning. The questioning asks whether Mr. Morel was "aware that BP had not received all of the lab tests concerning the final slurry mix . . ." (PSC Mot. Rec. Doc. 5873-2 at 13)—it does not ask Mr. Morel to confirm whether BP received "final slurry cement test results." The requested inference is also contradicted by the evidence. Among other communications, Mr. Morel and others at BP were recipients of Mr. Gagliano's April 18, 2010 email transmitting cement slurry test results for the slurry that was pumped for the production casing. (TREX-000717; TREX-000717A.) That email did not contain any warnings as to the possibility that the cement slurry might fail. Second, the evidence obtained by BP in this litigation shows that Halliburton affirmatively canceled certain tests that were not completed—not that it "did not allow enough time to test." Moreover, the evidence shows that Mr. Gagliano never notified BP that it had cancelled those tests. (03/31/2011 R. Vargo Dep. at 540:13-21 ("Q. All right. And, to your knowledge, did Mr. Gagliano inform BP that he had canceled the foam stability test on the nine gallon retarder? A: I haven't seen any communication where he informed BP of that.").) ███████████████ ████████████████████████████████████████████████████████ Mr. Dubois testified that Mr. Gagliano had spoken with the lab's shift manager Phyllis Stelly and canceled the tests. (07/19/2011 R. Dubois Dep. at 96:18-97:15.) Finally, Halliburton provided to BP its job recommendation for the cement job at Macondo, and proceeded with executing the cement job, (TREX-717; TREX-717A; TREX-708), both of which suggested to BP personnel—particularly in the absence of any communication to the contrary—that the testing performed by Halliburton had indicated that the slurry would be successful.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 10:** Morel believed that it was "too late" to get additional centralizers and hoped that gravity would keep the pipe centralized; however, he could have ordered the work to stop until additional centralizers could be delivered. (PSC Mot. Rec. Doc. 5873-2 at 14-15.)

**Response to Morel No. 10:**

The requested inference is unsupported by the questioning and contrary to the evidence. The requested inference is not supported by the questioning. The questioning merely reads the text of an email and asks whether the text was read correctly (PSC Mot. Rec. Doc. 5873-2 at 14-

15)—it does not ask Mr. Morel to confirm the substance of the requested inference. Further, the evidence contradicts the suggestion in of the requested inference that work should have been stopped to wait for additional centralizers. BP empowers its employees and contractors to stop work that is unsafe. (TREX-004477 at BP-HZN-2179MDL00055609 and BP-HZN-2179MDL00056093; 05/09/2011 T. Probert Dep. at 407:3-15.) BP's cementing contractor, Halliburton, has stated that the result of running fewer centralizers would be the potential for channeling and that "cement channeling does not in itself create a safety concern." (TREX007729 at HAL_0048831.) Moreover, Halliburton personnel testified that they did not consider using few centralizers or the potential for channeling to pose a safety risk. (*See, e.g.*, 02/08/2012 J. Gagliano Dep. at 511-514 ("A. I -- I did not consider channeling a safety issue. It's a risk of remedial work after the fact. . . . Q. Okay. So you -- you -- you said that in your mind, going with six centralizers versus 21 was not a safety issue, right? . . . A. I -- I didn't look at it as a safety issue."); 03/16/2011 N. Chaisson Dep. 78:5-19; *see also* TREX-0002028 at 3 (in response to questions from Senator Jeff Bingaman, Tim Probert stated "Cement channeling does not in itself create a safety concern. When cement channeling occurs, it is typically remedied by pumping additional cement as a subsequent additional step in the well program.").) Weatherford's representative Bryan Clawson testified that it would take seven to ten days to manufacture additional centralizer "subs" like the ones at the Macondo Well. (06/06/2011 Clawson Dep. at 203:8-23.) Affirmatively choosing to incur such a lengthy delay would run counter to industry standard and practices that favor limiting the amount of time with an open hole. (12/06/2011 Dr. Azar Dep. at 341:8-15 ("Q. Why did they not [wait for additional centralizers], sir? A. Because waiting on centralizers that were supposed to be brought to the rig and not knowing the time, how long, they would have left an open hole. And we teach -- we promote the fact that the best way to minimize risk is don't stay in an open hole if you have any chance at all and isolate that zone.").) In sum, the requested inference is contrary to the evidence that shows it was too late to get integral centralizers, that it was contrary to industry practice to wait for integral centralizers and that the consequences of running less centralizers does not create a safety concern.

    As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought

    **Morel No. 11:** OptiCem modeling showed that the use of only seven centralizers would result in severe channeling; BP knew this, but proceeded with using only six centralizers. (PSC Mot. Rec. Doc. 5873-2 at 15.)

**Response to Morel No. 11:**

    The requested inference is vague, unsupported by the questioning and contrary to the evidence. The phrase "severe channeling" is unclear and undefined by the requested inference. The requested inference is also not supported by the questioning. The questioning does not ask whether BP knew of the purported "severe channeling." (PSC Mot. Rec. Doc. 5873-2 at 15.) Further, the requested inference relating to purported "severe channeling" is contrary to the evidence.

████████████████████████████████████████████████   (TREX-00717; TREX-00717A at 18.)  Halliburton literature and witnesses state that the mitigation for wells with SEVERE gas flow potential is foam cement.  (TREX-002125; 06/29/2011 R. Faul Dep. at 383:11-22; 06/14/2011 V. Tabler Dep. at 459:7-22.)  As set forth in the Halliburton post-job report, BP and Halliburton proceeded with the cement job using foam cement.  (TREX-000708.)

Additionally, Halliburton's modeling had the centralizers in the wrong locations. Halliburton's cementing expert David Bolado testified that the centralizers in the April 18, 2010 OptiCem Modeling were not spaced properly. (12/22/2011 D. Bolado Dep. at 203:12-16 ("Q. Okay. So you agree that the centralizers here are not spaced in the locations where Mr. Morel proposed on his April 15th E-mail to Jesse Gagliano? A. Correct.").)  Further, the evidence contradicts the suggestion in the requested inference that work should have been stopped to wait for additional centralizers.  BP empowers its employees and contractors to stop work that is unsafe.  (TREX-004477 at BP-HZN-2179MDL00055609 and BP-HZN-2179MDL00056093; 05/09/2011 T. Probert Dep. at 407:3-15.)  BP's cementing contractor, Halliburton, has stated that the result of running fewer centralizers would be the potential for channeling and that "cement channeling does not in itself create a safety concern."  (TREX007729 at HAL_0048831.) Moreover, Halliburton personnel testified that they did not consider using fewer centralizers or the potential for channeling to pose a safety risk.  (*See*, *e.g.*, 02/08/2012 J. Gagliano Dep. at 511-514 ("A.  I -- I did not consider channeling a safety issue.  It's a risk of remedial work after the fact. . . .  Q.  Okay.  So you -- you -- you said that in your mind, going with six centralizers versus 21 was not a safety issue, right? . . .  A.  I -- I didn't look at it as a safety issue."); 03/16/2011 N. Chaisson Dep. 78:5-19.)  Weatherford's representative Bryan Clawson testified that it would take seven to ten days to manufacture additional centralizer "subs" like the ones at the Macondo Well.  (06/06/2011 Clawson Dep. at 203:8-23.)  Affirmatively choosing to incur such a lengthy delay would run counter to industry standard and practices that favor limiting the amount of time with an open hole.  (12/06/2011 Dr. Azar Dep. at 341:8-15 ("Q.  Why did they not [wait for additional centralizers], sir?  A.  Because waiting on centralizers that were supposed to be brought to the rig and not knowing the time, how long, they would have left an open hole. And we teach -- we promote the fact that the best way to minimize risk is don't stay in an open hole if you have any chance at all and isolate that zone.")  In sum, the requested inference is contrary to the evidence that shows it was too late to get integral centralizers, that it was contrary to industry practice to wait for integral centralizers and that the consequences of running less centralizers does not create a safety concern.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 12:**The decision to pump 61 barrels of cement meant less cement above the hydrocarbon zone, hence displacement only 500 feet above the zone, violating BP Best Engineering Practices.  (PSC Mot. Rec. Doc. 5873-2 at 15-16.)

**Response to Morel No. 12:**

The requested inference is vague, contrary to the evidence, and the PSC has not shown that Mr. Morel had the foundation to opine on the interpretation of BP Best Engineering Practices, GP 10-60. The volume of cement to be pumped was recommended by Halliburton as set forth in the cement procedures. (*See* TREX-000717A.) ████████████
████████████████████████████████████ (TREX-007442 Expert Report of Ronald J. Crook at 39-41 and collected cites.) There is no showing that Brian Morel was familiar with GP 10-60 or capable of interpreting that document. Further, the requested inference is contrary to the evidence. The requested inference suggests that 1000' of cement is required above the hydrocarbon zone if a CBL is not run to determine top of cement before temporary abandonment. Darryl Kellingray, the author of GP 10-60, testified that he maintained GP 10-60 and also interpreted the document when requested. (06/20/2011 D. Kellingray Dep. at 23:21-24:5, 27:10-21.) He explained that GP 10-60 does not require a cement bond log before temporary abandonment. (*Id.* at 205:4-19; 06/21/2011 Kellingray Dep. at 513:23-514:3, 684:15-685:10.) The CBL requirement comes in during the permanent abandonment phase and the Macondo team's plan to run a CBL upon return for completion operations satisfied GP 10-60. (*Id.* at 690:20-691:23.) In sum, the requested inference is contrary to the evidence that indicates temporarily abandoning the well with 500' of cement above the hydrocarbon zone and without running a cement bond log is appropriate under the referenced BP practice, GP 10-60.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 13:** The lack of a cement bond log violated BP's internal procedures, and left BP with no way to verify whether there were any channeling in the cement. (PSC Mot. Rec. Doc. 5873-2 at 16.)

**Response to Morel No. 13:**

The requested inference is vague, contrary to the evidence, and does not show that Mr. Morel had the foundation to opine on the interpretation of GP 10-60 (the referenced "internal procedure".) The PSC has not shown that Mr. Morel was familiar with GP 10-60 or capable of interpreting that document. The requested inference suggests that 1000' of cement is required above the hydrocarbon zone if a CBL is not run to determine top of cement before temporary abandonment. Darryl Kellingray, the author of GP 10-60, testified that he maintained GP 10-60 and interpreted the document when requested. (06/20/2011 D. Kellingray Dep. at 23:21-24:5, 27:10-21.) He explained that GP 10-60 does not require a cement bond log before temporary abandonment. (*Id.* at 205:4-19; 06/21/2011 D. Kellingray Dep. at 513:23-514:3, 684:15-685:10.) The CBL requirement comes in during the permanent abandonment phase and the Macondo team's plan to run a CBL upon return for completion operations satisfied GP 10-60. (*Id.* at 690:20-691:23.) The portion of the requested inference stating "[n]o way to verify whether there was any channeling" is also contrary to the evidence. The Halliburton cementers on the rig

testified that there were no indications of channeling during the cement job. (06/14/2011 V. Tabler Dep. at 384:9-13; 04/27/2011 P. Anderson Dep. at 218:1-25; 03/17/2011 N. Chaisson Dep. at 108:22-109:15.) Based on the data from the cement job, they further testified that there was no reason to run a cement bond log. (04/27/2011 P. Anderson Dep. at 296:8-12; 06/14/2011 V. Tabler Dep. at 427:12-428:5; 03/17/2011 N. Chaisson Dep. at 564:15-565:6.)

The cement program was drafted by Halliburton and recommended to BP. (02/08/2012 J. Gagliano Dep. at 479:10-21, 491:2-11.) One risk identified by Halliburton was increased pressures caused by channeling which may have caused losses while cementing. BP drilling engineers, Mr. Hafle and Mr. Morel, drafted a decision tree that would address the potential for cementing losses and not reaching the planned top of cement. (TREX-000908.) The requested inference suggests that the decision tree required a cement bond log as part of the operations. This is contradicted by the decision tree itself, which indicates that a cement bond log would only be required if there were losses during the cement job. (TREX-000908.) Halliburton executed the cement job and reported full returns on the job. (TREX-000708.) Therefore, a cement bond log was not required under the decision tree.

In sum, the requested inference is contrary to the evidence that indicates temporarily abandoning the well with 500' of cement above the hydrocarbon zone and without running a cement bond log is appropriate under the referenced BP practice, GP 10-60.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 14:** The low rate of pumping decreased the efficiency of the mud to be displaced by the cement and increased the risk of channeling. (PSC Mot. Rec. Doc. 5873-2 at 16-17.)

**Response to Morel No. 14:**

The requested inference is vague and unsupported by the questioning, contrary to the evidence, and the PSC has not shown that Mr. Morel had the proper foundation to opine on the effect of pump rate on displacement efficiency or channeling. The phrase "the efficiency of the mud" is unclear and undefined by the requested inference. The requested inference is not supported by the questioning, which asks a different question about the "the efficiency with which the cement displaced the mud . . ." (PSC Mot. Rec. Doc. 5873-2 at 16-17.) The requested inference is also contrary to the evidence. ███████████████████████████████████████ ███████████████████████████████████████ The purpose of the spacer is to displace the mud in the annulus before placing the cement. The cement then displaces the spacer pumped before it. (TREX-00001 at BP-HZN-BLY 00000055.)

The requested inference is also contrary to the evidence. The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assts in displacement efficiency. Contrary to the request inference, the rate of pumping at the Macondo Well was appropriate for a deepwater well in the Gulf of Mexico. The requested

inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency. Dr. Greg Garrison of Oilfield Testing & Consulting confirmed that, in his experience, turbulent flow rates could not be achieved in cementing programs in deepwater wells in the Gulf of Mexico. (11/04/2011 G. Garrison Dep. at 162:22-163:2.) ██████████████████████████████████████████████████████████

████████████████ In fact, at planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may have been exceeded by the Macondo Well cement job. (12/22/2011 D. Bolado Dep. at 281:12-23.) In sum, the requested inference is contrary to the evidence because BP accepted the Halliburton-recommended cement program, including the pump rate of four barrels per minute, and Halliburton's modeling indicated that a faster flow rate could not have been achieved at the Macondo well and, indeed, faster turbulent flow rates cannot be achieved in deepwater wells in the Gulf of Mexico.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 15:** BP's "best and safest" practices could not be used because of concerns the weight at the bottom of the hole would cause it to fracture. (PSC Mot. Rec. Doc. 5873-2 at 17-18.)

**Response to Morel No. 15:**

The requested inference is vague, unsupported by the questioning and contrary to the evidence. The phrase "BP's 'best and safest' practices" is unclear and undefined by the questioning. The questioning also does not support the requested inference. It asks whether "BP was concerned that it could not increase the weight at the bottom of its hole on Macondo when it is circulating mud or cement to a normal amount above its static downhole mud weight, correct?" (PSC Mot. Rec. Doc. 5873-2 at 17-18)--it does not ask whether there were concerns that "weight at the bottom of the hole would cause it to fracture."

The requested inference is also contrary to the evidence. The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency. Contrary to the requested inference, the rate of pumping at the Macondo Well was appropriate for a deepwater well in the Gulf of Mexico. The requested inference suggests that a higher rate of flow that puts the cement program in the turbulent flow regime would assist in displacement efficiency. Dr. Greg Garrison of Oilfield Testing & Consulting testified that, in his experience, turbulent flow rates could not be achieved in cementing programs in deepwater wells in the Gulf of Mexico. (11/04/2011 G. Garrison Dep. at 162:22-163:2.) ████████████████████████████████████████████████████████

██████████████████████ In fact, at planned four barrels per minute, OptiCem modeling showed that the well's fracture gradient may have been exceeded by the Macondo Well cement job. (12/22/2011 D. Bolado Dep. at 281:12-23.) In sum, the requested inference is contrary to the

evidence because BP accepted the Halliburton-recommended cement program, including the pump rate of four barrels per minute, and Halliburton's modeling indicated that a faster flow rate could not have been achieved at the Macondo well and, indeed, faster turbulent flow rates cannot be achieved in deepwater wells in the Gulf of Mexico.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 16:** BP had known for some time that the reported and permitted fracture gradient was misstated to the MMS.  (PSC Mot. Rec. Doc. 5873-2 at 18-20.)

**Response to Morel No. 16:**

The requested inference is irrelevant, vague, unsupported by the questioning, and there is no showing that Mr. Morel has the foundation to testify regarding BP's filings with the MMS. The inference is vague and ambiguous as to which particular filing with the MMS, if any, was allegedly "misstated" and what is meant by "fracture gradient" and "reported and permitted fracture gradient."  Moreover, the vagueness and irrelevance of the requested inference is highlighted by the fact that certain MMS filings appropriately and necessarily reflected pre-drill predictions of the fracture gradient of certain hole sections (Macondo MC 252 #1 Pre-Drill Data Package at 13, Sept. 3, 2009 (TREX-001312), and that when filing a Revised APD, there is no requirement to update information relating to hole sections that had been drilled.  (S. Douglas Oct. 11, 2011 Dep. at 116:8-25.)

> **Morel No. 17:** BP recognized that adding retarder to the slurry would decrease its stability (TREX-00978.)  (PSC Mot. Rec. Doc. 5873-2 at 20-21.)

**Response to Morel No. 17:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Morel had the proper foundation to comment on whether additional retarder would decrease its stability.  The requested inference is also contrary to the evidence.  TREX-000978 cited in support of the requested inference is titled "Foam for Reduced Density Cementing" and does not relate to the subject matter of the questioning.  [PSC Mot. Rec. Doc. 5873-2 at 20; TREX-000978.)  TREX-000987 referenced in the questioning is an email from Brian Morel to John Guide--it is not an email from Brian Morel to Jesse Gagliano as the questioning suggests. (PSC Mot. Rec. Doc. 5873-2 at 20; TREX-000987.)  Further, there is no logical basis to suggest that Mr. Morel or BP "recognized that adding retarder to the slurry would decrease its stability." Instead, Mr. Morel writes "I would prefer the extra pump time with the added risk of having issues with the nitrogen."  (TREX-000987.)  It is nonsensical to read TREX-000987 to suggest that (1) Mr. Morel is concerned that more retarder would decrease its stability and, therefore, (2) he is adding more retarder (pump time) to address that risk.  The only logical reading of that

email is that Mr. Morel is advocating more pump time to address the risk of having issues with the nitrogen equipment--something that can be addressed with more time.  Further, there is no basis to assume that Mr. Morel knew the properties of the retarder or its effect on the cement and could answer the questioning.  Halliburton's engineer Jesse Gagliano agreed that he was the trusted advisor in cementing to the BP team and described Mr. Morel's knowledge in cementing as limited.  (02/07/2012 J. Gagliano Dep. at 249:13-17.)  Halliburton's expert, Dr. Sam Lewis, testified that the retarder used, SCR-100, was a proprietary Halliburton product and that Halliburton would have more knowledge in its use than non-Halliburton personnel.  (12/05/2011 S. Lewis Dep. at 22:21-27:14.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 18:** BP was drilling too fast to allow for full testing of pore pressure variations.  (PSC Mot. Rec. Doc. 5873-2 at 21-22.)

**Response to Morel No. 18:**

The requested inference is vague and ambiguous, unsupported by the questioning, contrary to record evidence, and the PSC has not shown that Mr. Morel has the foundation to testify regarding geological conditions relating to drilling the Macondo well.  Further, the record evidence contradicts the inference sought.  With respect to drilling too fast as it relates to testing pore pressure, Brett Cocales testified:

> Q. Was there any discussion about any problems that the geology team was having on the DEEPWATER HORIZON in obtaining accurate pore pressure and frac gradient readings given the speed at which the well was being drilled?
>
> A. No, not given the speed—nothing about given the speed at which it was drilled.
>
> Q. All right.  Are you aware of any geology concerns or concerns from the geologist assigned to the Macondo that they were unable to obtain good pore pressure, frac gradient prediction readings?
>
> A. I do recall information to that, to that aspect.  One of the issues that they were running into was they didn't have a good sand to validate what the pore pressure was.  So it's all based then on a trend and a prediction that they have to use, and without being able to actually do what's called a GeoTap to actually get a realtime measurement of what's in the sand, they can't—that's the data point that they have to use to correlate.
>
> Q. Right.

A. So it didn't have anything to do with how fast the well was being drilled, but more around them being able to validate data point.  Other than that, all they could do was follow a trend.

Q. Okay. Are you aware of any concerns from the geologists working on the Macondo well, did they express any concern at any point that, in fact, this well was being drilled too quickly?

A. No, I did not hear that from them, no.

(04/25/2011 B. Cocales Dep. at 255:21-257:8.)


**Morel No. 19:** BP used lost circulation materials as a spacer to save time and money.  (PSC Mot. Rec. Doc. 5873-2 at 22.)

**Response to Morel No. 19:**

The requested inference is inappropriate.  It is contrary to the evidence and does not show that Mr. Morel has the foundation to testify on issues related to any spacer used on the Macondo well.  There is no evidence that Mr. Morel was involved in any discussion regarding the use of spacers, or that he has expertise in selecting or building spacers.

BP used lost circulation materials (LCM) as a spacer upon the advice of MI SWACO. MI SWACO has the expertise and specialists to select the materials for spacers.  (09/15/2011 L. Lindner Dep. at 549:12-17, 555:13-558:25.)  MI SWACO recommended using an LCM pill as a spacer.  (TREX-002810.)  This recommendation was a "beneficial reuse" of material that otherwise would have gone to waste, creating "an extra waste stream."  (11/04/2011 D. Maxie Dep. at 254:9-13; 04/04/2011 J. LeBleu Dep. at 339:9-340:5.)  MI SWACO then submitted a proposed displacement procedure which included using the LCM pill as a water-based mud spacer.  (TREX-000967, 06/23/2011 B. Billon Dep. at 109:11-21.)  And there was no pressure from BP to use the LCM pill as a spacer.  (06/24/2011 B. Billon Dep. at 522:6-12.)


**Morel No. 20:** BP tweaked the numbers to get the cement modeling to come out correctly.  (PSC Mot. Rec. Doc. 5873-2 at 22-23)

**Response to Morel No. 20:**

The requested inference is vague, not supported by the questioning, contrary to the evidence, and the PSC has not shown that Mr. Morel had the proper foundation to opine on what other members of the team knew.  The phrase "tweaked the numbers" is unclear and undefined in the requested inference.  The requested inference is also unsupported by the questioning.  The questioning asks whether "your team knew that you [Mr. Morel] fudged numbers"—it does not ask whether Mr. Morel or BP actually allegedly "fudged numbers" nor does it ask whether "BP tweaked the numbers."  (PSC Mot. Rec. Doc. 5873-2 at 23.)  There is also no showing that

Mr. Morel knew or could have known what other members of the team knew. And the requested inference is contrary to the evidence. Greg Walz, who was at the April 14, 2010 meeting, testified that during the meeting between BP and Halliburton, "[w]e went through and started going through, reviewing his inputs and making some corrections of things that we spotted that were not quite right" on the OptiCem model. (04/21/2011 G. Walz Dep. at 281:15-282:21.) Finally, the questioning asks "what participation" Mr. Morel had in the purported "tricking or fudging the model." (PSC Mot. Doc. 5873-2 at 23.) A refusal to answer this open-ended question, based on a suggestion that is otherwise unsupported by the evidence as described above, does not create an inference.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 21:** BP's MMS applications provided false information. (PSC Mot. Rec. Doc. 5873-2 at 23-24.)

**Response to Morel No. 21:**

The requested inference is irrelevant, vague, unsupported by the questioning, and the PSC has not shown that Mr. Morel has the foundation to testify regarding BP's filings with the MMS. The inference is vague and ambiguous as to which MMS applications allegedly "provided false information."

**Morel No. 22:** BP made last minute changes to the Temporary Abandonment Plan, which included the procedure for the negative pressure test. The amended Temporary Abandonment Plan differed from the original procedure approved by MMS. (PSC Mot. Rec. Doc. 5873-2 at 24-25.)

**Response to Morel No. 22:**

The requested inference is inappropriate because it is contrary to the record evidence, based on objectionable questions, and because Mr. Morel is not the sole source of the information at issue.

The record evidence reveals that the temporary abandonment procedures performed at the Macondo well were the same procedures that were described in the April 16, 2010 Application for Permit to Modify that was submitted to and approved by the MMS. (TREX-002236.)

Mr. Guide also indicated that both documents required displacement to seawater prior to the negative pressure

test, and that he did not view the procedure outlined in the "Ops Note" email April 20, 2010 as a change or deviation from the procedure that was submitted to and approved by the MMS on April 16, 2010.  (05/09/2011 A. Guide Dep. at 285:23-286:22 ("Q. [B]ut really my only question to you, you know, isn't it true, that on April the 20th at 10:43 Brian Morel, or someone at BP changed the order of the seawater displacement . . .  A.  My answer is no, that I was always under the impression that we were going to do the negative test with seawater at 8367 feet and that is, indeed, what this said, what the MMS approved.").)  Likewise, Mr. Walz testified that he "always told folks that the negative test that we needed to perform was running at 8300 feet and displacing it." (04/22/2011 G. Walz Dep. at 785:14-786:8, 788:10-13.  *See also* 09/27/2011 A. Frazelle Dep. at 505:2-15 (indicating that steps 2 and 3 on the April 16, 2010 temporary abandonment procedure that was submitted to and approved by the MMS, were actually subparts of 1, rather than sequential steps in the procedure).)  In fact, Transocean's Senior Toolpusher on the rig, Randy Ezell, testified that during the temporary abandonment operations, BP well site leaders Bob Kaluza and Donald Vidrine informed Mr. Ezell that the negative pressure test was initially not lined up as described in the procedure that was approved by the MMS, and as a result, Mr. Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure. (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)

The requested inference is also inappropriate because Mr. Morel is not the sole source of the information at issue in the requested inference.  In addition to the testimony of other witnesses regarding the temporary abandonment procedure submitted to and approved by the MMS and the temporary abandonment operations actually performed on the Macondo well, the documents reflecting the MMS-approved procedure and the procedures followed on the rig speak for themselves.  (*See e.g.*, TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS), and TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

Furthermore, the requested inference is inappropriate because it is based on objectionable questions that would have elicited an inadmissible response if they had been answered. Specifically, the question posed to Mr. Morel was vague and ambiguous in that it used the unclear and undefined term "differed."  The questions posed also assume facts not in evidence, and attempt to assume facts that are contrary to the record evidence by suggesting that the temporary abandonment procedure performed at Macondo was not consistent with the procedure approved by the MMS.

**Morel No. 23:** BP chose to eliminate the use of liners instead of longstring on the basis of cost savings.  (PSC Mot. Rec. Doc. 5873-2 at 25.)

**Response to Morel No. 23:**

The requested inference is vague and unsupported by the questioning.  The requested inference is also inappropriate because it is contrary to the record evidence, and because

Mr. Morel is not the sole source of the information at issue, as reflected in the evidence discussed below.

The record establishes that the overall well design process properly followed BP procedures, including risk identification and mitigation. (*See e.g.*, 07/21/2011 K. Jassal 30(b)(6) Dep. at 344:16-23; 345:13-346:5 (design and planning of the Macondo well was subject to procedures in BP's "Beyond the Best" handbook, including a "stage-gate" process); 04/21/2011 G. Walz Dep. at 180:8-10; 371:16-23 (indicating that the entire BP team was involved in discussions, including risk identification and risk management "throughout the whole planning process"); 07/14/2011 P. O'Bryan Dep. at 64:5-22, 153:3-154:5 (explaining the well planning process and stating that for the Macondo well, D&C used a process referred to as "Beyond the Best" to identify and manage risks at various stages in well planning and execution).)

██████████████████████████████████ BP representatives met with Jesse Gagliano on April 14, 2010 to run models on Halliburton's OptiCem software for the Macondo well. (02/07/2012 J. Gagliano Dep. at 229:9-231:18.)  After that meeting, BP and Halliburton were satisfied with the model results and with the ability to run a long-string casing.  (03/24/2011 Cunningham Dep. at 381:22-382:21.)  Moreover, the record evidence is clear that the overall casing design followed internal BP procedures involving numerous personnel.  (*See e.g.*, TREX-000291████████████████████████████████████████████████████████; TREX-001312 (demonstrating BP followed the proper "Beyond the Best" process steps for the Macondo Well casing design, including preparation of a Pre-Drill Data Package ("PDDP")); 04/28/2011 J. Sprague Dep. at 20:21-21:8; 21:23-22:25; 25:9-20; TREX-001861 (indicating BP utilized its manuals and engineering standards in its Evaluation of Casing Design Basis); TREX-048055 (reflecting analysis of production casing decision).)  Moreover, the record is clear that the decision to use a long string production casing design was not on the basis of cost savings, but on assessing the risks based on conditions observed during drilling operations for the open hole area to be cased.  (TREX-00243; TREX-00244.)

BP's use of the long string was a legitimate engineering decision and long string casing design is a common design in the Gulf of Mexico. (09/23/2011 D. Trocquet Dep. at 198:2-4; 07/27/2011 M. Saucier Dep. at 207:2-9.)

**Morel No. 24:**The Temporary Abandonment Plan called for a large amount of heavy spacer, which created potential problems for running the negative pressure test. (PSC Mot. Rec. Doc. 5873-2 at 26.)

**Response to Morel No. 24:**

The requested inference is inappropriate because it is vague, unsupported by the questioning, contrary to the evidence and Mr. Morel is not the only source of the information at issue. The requested inference is unclear as to what "temporary abandonment plan" it is referring to. The temporary abandonment plan that was submitted to and approved by the MMS makes no reference to any amount of spacer. (TREX-000570.) The cement job on the production interval used the 72 barrels of spacer recommended by Mr. Gagliano. The questioning also does not support the requested inference, as the question posed to Mr. Morel assumed that *if* spacer fell below the annular, would Mr. Morel agree that it *could* cause problems with the negative pressure test. (07/21/2011 B. Morel Dep. at 126:11-13.) Such questions do not support the conclusory statement that the use of heavy spacer during the cement job did *in fact* create potential problems for the negative pressure test, as the requested inference attempts to suggest.

The requested inference is further contrary to the evidence. Halliburton's engineer Jesse Gagliano agreed that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval." (02/08/2012 J. Gagliano Dep. at 502:18-24.) Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well. (02/07/2012 J. Gagliano Dep. at 28:15-29:21.)

> **Morel No. 25:** Did you also receive, on the 18th of April, a casing design report stating that if only seven centralizers were used, that there would be a severe gas problem? (Deposition of Brian Morel, July 21, 2011, at 52:16-19) **[Yes.]** ((TO Mot. Rec. Doc. 7639 at 6).)

**Response to Morel No. 25:**

The requested inference is contrary to the evidence. The requested inference and questioning relates to whether Mr. Morel received a "casing design report" relating to use of seven centralizers. (07/21/2011 Morel Dep. at 52:16-19 ("Q. Okay. Did you also receive, on the 18th of April, a casing design report . . .").) There is no evidence that Mr. Morel received a "casing design report" from Halliburton.

(TREX-717 at HAL_0125422; TREX-717A.) Halliburton's own literature states that foam cement is a solution for severe gas flow potential. (TREX-2125 at 8; TREX-2129 at 1; TREX-3097 at 17.) Ronnie Faul, Halliburton's Technology Manager for the Gulf of Mexico region, testified that BP could rely on Halliburton to design

competent foam cement (06/30/2011 R. Faul Dep. at 471:13-21) and that he would not have been concerned about gas flow potential if foam were used (06/29/2011 R. Faul Dep. at 383:11-23.) Additionally, Halliburton's modeling had the centralizers in the wrong locations. Halliburton's cementing expert David Bolado testified that the centralizers in the April 18, 2010 OptiCem Modeling were not spaced properly. (12/22/2011 D. Bolado Dep. at 203:12-16 ("Q. Okay. So you agree that the centralizers here are not spaced in the locations where Mr. Morel proposed on his April 15th E-mail to Jesse Gagliano? A. Correct.").)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 26:** [Y]ou were aware that it was a requirement within BP that lab tests be reviewed before a cement job was pumped, correct? (*Id.* at 89:18-21) **[Yes.]** (TO Mot. Rec. Doc. 7639 at 6.)

**Response to Morel No. 26:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Morel has the foundation to testify on the existence of this purported requirement. The phrase "lab tests" is unclear in this context and undefined by the requested inference. The requested inference is also contrary to the evidence. Jesse Gagliano testified that the BP engineers focused on the thickening time and UCA tests. (02/07/2012 J. Gagliano Dep. at 265:8-21, 266:3-9.) ███████

████████████████████████████████████████████████████ There is no support for a purported BP requirement that "lab tests be reviewed before a cement job [i]s pumped" or that Mr. Morel knew of such a requirement or could testify competently regarding this purported requirement.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 27:** [Y]ou . . . allowed the cement for the production casing to be pumped and performed and allegedly completed without first receiving and reviewing all of the lab tests for the production casing, correct? (*Id.* at 89:24-90:4.) **[Yes.]** (TO Mot. Rec. Doc. 7639 at 6.)

**Response to Morel No. 27:**

The requested inference is vague, contrary to the evidence and there is no showing that there is a purported requirement that Mr. Morel receive and review all of the lab tests. The phrase "all of the lab tests" is unclear, undefined, and contrary to record evidence in this context because Halliburton does not provide BP with all of the lab tests. Jesse Gagliano testified that

the BP engineers focused on the thickening time and UCA tests.  (07/07/2012 J. Gagliano Dep. at 265:8-21, 266:3-9.) ███████████████████████████████████████████████████

███████  There is no support for a purported BP requirement that Mr. Morel review all of the lab tests before a cement job is pumped.  Richard Vargo, Halliburton's 30(b)(6) witness on communications with BP, testified that Halliburton did not communicate any concerns about foam stability to BP.  (3/31/2011 R. Vargo Dep. at 540:23-541:2 ("I don't know of any communication from Halliburton to BP about concerns about a foam stability test on the days leading up to the job.").)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 28:** You did not notify the MMS that the Temporary Abandonment Procedure used on April 20th, 2010, deviated from the Temporary Abandonment Procedure approved by the MMS, didn't you?  (*Id.* at 116:19-23)  **[No, I did not.]** (TO Mot. Rec. Doc. 7639 at 6-7.)
>
> **Morel No. 29:** You did not tell Transocean that the Transo—the Temporary Abandonment Procedure used on April 20, 2010, deviated from the Temporary Abandonment Procedure approved by the MMS, did you?  (*Id.* at 117:1-5)  **[No, I did not.]**  (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel Nos. 28 and Morel 29:**

The requested inferences are inappropriate because, to the extent that the requested inferences suggest that the temporary abandonment procedure performed by the rig crew on April 20, 2010 somehow deviated from the temporary abandonment procedure that was approved by the MMS, that suggestion is contrary to the record evidence.  The requested inferences are also inappropriate because they are based on objectionable questions, and because Mr. Morel is not the sole source of the information at issue.

The record evidence reveals that the temporary abandonment procedures performed at the Macondo well were the procedures that were described in the April 16, 2010 Application for Permit to Modify that was submitted to and approved by the MMS.  (TREX-002236.)

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████  Mr. Guide also indicated that both documents required displacement to seawater prior to the negative pressure test, and that he did not view the procedure outlined in the "Ops Note" email April 20, 2010 as a change or deviation from the procedure that was submitted to and approved by the MMS on April 16, 2010.  (05/09/2011 A. Guide Dep. at 285:23-286:22 ("Q. . . . But really my only

question to you, you know, isn't it true, that on April the 20th at 10:43 Brian Morel, or someone at BP changed the order of the seawater displacement . . .  A.  My answer is no, that I was always under the impression that we were going to do the negative test with seawater at 8367 feet and that is, indeed, what this said, what the MMS approved.").)  Likewise, Mr. Walz testified that he "always told folks that the negative test that we needed to perform was running at 8300 feet and displacing it."  (04/22/2011 G. Walz Dep. at 785:14-786:8, 788:10-13.  *See also* 09/27/2011 A. Frazelle Dep. at 505:2-15 (indicating that steps 2 and 3 on the April 16, 2010 temporary abandonment procedure that was submitted to and approved by the MMS, were actually subparts of 1, rather than sequential steps in the procedure).)  In fact, Transocean's senior toolpusher on the rig, Randy Ezell, testified that during the temporary abandonment procedures, BP well site leaders Bob Kaluza and Donald Vidrine informed Mr. Ezell that the negative pressure test was initially not lined up as described in the procedure that was approved by the MMS, and as a result, Mr. Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure. (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.) Mr. Ezell's testimony not only confirms the absence of any purported "deviation" but also makes clear that Transocean personnel were fully aware of, involved in, and responsible for the operations on April 20, 2010.   Transocean's own CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all of its operations. (09/30/2011 S. Newman Dep. at 144:23-145:12.)  Mr. Newman also testified that Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle.  (*Id.* at 286:1-287:14.)

The requested inference is also inappropriate because Mr. Morel is not the sole source of the information at issue in the requested inference.   In addition to the testimony of other witnesses regarding the temporary abandonment procedure submitted to and approved by the MMS and the temporary abandonment operations actually performed on the Macondo well, the documents reflecting the MMS-approved procedure and the procedures followed on the rig speak for themselves.  (*See e.g.*, TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS), and TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

Furthermore, the requested inference is inappropriate because it is based on objectionable questions that would have elicited an inadmissible response if they had been answered. Specifically, the question posed to Mr. Morel was vague and ambiguous in that it used the unclear and undefined term "deviated."  The questions posed also assume facts not in evidence, and attempt to assume facts that are contrary to the record evidence concerning whether the conduct of the temporary abandonment procedure performed at Macondo was consistent with the procedure approved by the MMS.

**Morel No. 30:** Did Transocean play any part in the decision not to run a bottoms-up?  (*Id.* at 119:16-17)  **[No.]**  (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 30:**

The requested inference is vague, contrary to the evidence and Transocean has not shown that Mr. Morel had the foundation to testify as to Transocean's involvement in any decision as to whether to run a bottoms up. Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with not running a bottoms up, they would have been both authorized and required to stop work. (*Id.*) The scope of the phrase "any part" is unclear and undefined by the requested inference. Further, there is no showing that Mr. Morel knew of each and every interaction between Transocean and BP or Halliburton that may have played "any part in the decision not to run a bottoms-up." And, the requested inference is contrary to the evidence.

(TREX-007685.)
(TREX-4805, 4902.)  Transocean was updated on the drilling and cementing plan on a regular basis, including on the morning meetings and in the five-day plans and so would have had an opportunity for input into those plans through, at the very least, those meetings. (04/28/2011 M. Ezell Dep. at 510:22-511:21; 513:2-8.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 31:** Did Transocean have any involvement in deciding how much cement to pump? (*Id.* at 120:12-13.)  **[No.]**  (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 31:**

The requested inference is vague, contrary to the evidence and does not show that Brian Morel had the foundation to testify as to Transocean's involvement. Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem regarding how much cement to pump, they would have been both authorized and required to stop work. (*Id.*) The scope of the phrase "any involvement" is unclear and undefined by the requested inference. Further, there is no showing that Mr. Morel knew of each and every interaction between Transocean and BP or Halliburton where Transocean may have had "any involvement in deciding how much cement to pump." And, the requested inference is contrary to the evidence.

(TREX-007685.)
(TREX-004805, TREX-004902.)  Transocean was updated on the drilling and cementing plan on a regular basis, including on the morning meetings and in the five-day plans

and so would have had an opportunity for input into those plans through, at the very least, those meetings.  (04/28/2011 M. Ezell Dep. at 510:22-511:21; 513:2-8.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 32:** You would agree that Transocean had no involvement in deciding how low or fast to pump the cement?  (*Id.* at 120:15-17)  **[Yes.]**  (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 32:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Morel had the foundation to testify as to Transocean's involvement in any decision regarding "how low or fact to pump the cement."   Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.) Thus, if the drilling crew had seen a problem with the cement job plan, they would have been both authorized and required to stop work. (*Id.*)  The scope of the phrase "no involvement" is unclear and undefined by the requested inference.   Further, there is no showing that Mr. Morel knew of each and every interaction between Transocean and BP or Halliburton such that he could state that Transocean had "no involvement in deciding how slow or fast to pump the cement."  And, the requested inference is contrary to the evidence. █████████████████████████████
██████████████
(TREX-007685.) █████████████
(TREX-004805,  TREX-004902.)  Transocean was updated on the drilling and cementing plan on a regular basis, including on the morning meetings and in the five-day plans and so would have had an opportunity for input into those plans through, at the very least, those meetings. (04/28/2011 M. Ezell Dep. at 510:22-511:21; 513:2-8.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 33:** You never told anyone at Transocean that the only stability test you ever got from [Jesse] Gagliano showed that the cement was unstable, did you?  (*Id.* at 121:6-9)  **[No.]**  (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 33:**

The requested inference is vague, contrary to the evidence and Transocean has not shown that Mr. Morel had the foundation to interpret foam cement testing for deepwater wells. Mr. Morel received numerous cement test results prior to the cement job that indicated suitability of the slurry from an operational standpoint, and therefore the phrase "only stability test" is

unclear and undefined by the requested inference.  Further, Transocean has made no showing that Mr. Morel knew how to interpret the "stability test" or that he knew that he had a test result where "the cement was unstable."  Halliburton's engineer Jesse Gagliano agreed that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval."  (02/08/2012 J. Gagliano Dep. at 502:18-24.)  Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well.  (02/07/2012 J. Gagliano Dep.  at  28:15-29:21.)

Richard Vargo, Halliburton's 30(b)(6) witness on communications with BP, testified that Halliburton did not communicate any concerns about foam stability to BP.  (03/31/2011 R. Vargo Dep. at 540:23-541:2 ("I don't know of any communication from Halliburton to BP about concerns about a foam stability test on the days leading up to the job.").)  Moreover, Halliburton proceeded to execute that cement plan, and reported that the cement job had been a success.  (TREX-000708.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 34:** You never told anyone at Transocean that you never got a good stability test for the cement, did you?  (*Id.* at 121:13-15)  **[No.]**  (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 34:**

The requested inference is vague, contrary to the evidence and does not show that Brian Morel had the foundation to interpret foam cement testing for deepwater wells.  Mr. Morel received numerous cement test results before the job that indicated suitability of the slurry from an operational standpoint, and therefore the phrase "never got a good stability test" is unclear and undefined by the requested inference.  Further, there is no showing that Mr. Morel knew how to interpret the "stability test" or that he knew that he "never got a good stability test."  Halliburton's engineer Jesse Gagliano agreed that he was the "trusted advisor to the BP Wells Team to recommend the best solution for the cement job for the Macondo production interval." (02/08/2012 J. Gagliano Dep. at 502:18-24.)  Mr. Gagliano testified that he was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well.  (02/07/2012 J. Gagliano Dep. at 28:15-29:21.)

Richard Vargo, Halliburton's 30(b)(6) witness on communications with BP, testified that Halliburton did not communicate any concerns about foam stability to BP. (03/31/2011 R. Vargo Dep. at 540:23-541:2 ("I don't know of any communication from Halliburton to BP about concerns about a foam stability test on the days leading up to the job.").)  Moreover, Halliburton proceeded to execute that cement plan, and reported that the cement job had been a success.  (TREX-000708.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 35:** Transocean had no involvement in BP's decision not to run a cement bond log, correct? (*Id.* at 123:5-7) **[Correct.]** (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 35:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Morel had the foundation to testify as to Transocean's involvement.  Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23). Thus, if the drilling crew had seen a problem with not running a cement bond log, they would have been both authorized and required to stop work. (*Id.*)   Since the decision not to run a cement bond log was discussed with Transocean and others on the April 20, 2010 morning meeting, (4/22/2011 Walz Dep. at  901:1-14; 04/28/2011 M. Ezell Dep. at 513:2-8; 584:20-585:15), the scope of the phrase "no involvement" is unclear and undefined by the requested inference.  Further, there is no showing that Mr. Morel knew of each and every interaction between Transocean and BP or Halliburton where Transocean may have had "involvement in BP's decision not to run a cement bond log."  And, the requested inference is contrary to the evidence.  Halliburton reported that there were no losses during the cement job. (TREX-708 at HAL_0012208.)  Further, all of the indications from the cement job were of a successful cement job with no indications of channeling. (06/14/2011 V. Tabler Dep. at 384:9-13.)  Thus, a CBL was not run based on BP's decision tree.  (04/22/2011 G. Walz Dep. at 636:19-637:23.)   John Guide also solicited Transocean's and other contractors' opinion on whether a CBL should be run on the morning meeting of April 20, 2010 and no one indicated that it should be run. (*Id.* 901:1-14.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 36:** You agree that Transocean had no involvement in BP's decision to run a long string instead of a liner? (*Id.* at 136:23-25) **[Yes.]** (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 36:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Morel had the foundation to testify as to Transocean's involvement in the decision to run a long string casing.  Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information

to perform his job. (09/30/2011 S. Newman Dep. at 160:11-164:24. *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the decision to run a long string, they would have been both authorized and required to stop work. (*Id.*)  Since the drilling and casing plans were reviewed with Transocean and the casing was run into the hole by Transocean, the scope of the phrase "no involvement" is unclear and undefined by the requested inference.  Further, there is no showing that Mr. Morel knew of each and every interaction between Transocean and BP or Halliburton that may have shown Transocean's "involvement in BP's decision to run a long string instead of a liner."  And, the requested inference is contrary to the evidence. ███████████████████████████████████

████████████████████ (TREX-007685.) █████████████████████

(TREX-004805, TREX-004902.)  Transocean was updated on the drilling plan on a regular basis, including on the morning meetings and in the five-day plans and so would have had an opportunity for input into those plans through, at the very least, those meetings. (04/28/2011 M. Ezell Dep. at 510:22-511:21; 513:2-8.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 37:** You never completed the checklist required by BP's Guidelines for Cement Design, did you?  (*Id.* at 208:22-24.)  **[No, I did not.]**  (TO Mot. Rec. Doc. 7639 at 7.)

**Response to Morel No. 37:**

The requested inference is vague, contrary to the evidence and Transocean has not shown that Mr. Morel has the foundation to testify on "BP's Guidelines for Cement Design."  The term "checklist" is unclear and undefined by the requested inference.  Further, there is no showing that Mr. Morel was aware of "BP's Guidelines for Cement Design" or could competently testify about it.  The requested inference is also contrary to the evidence.  The questioning relates to TREX-000791 titled "BP Guidelines for Cement Design and Operations in Deepwater Gulf of Mexico" identified by the questioner on page 193 of Morel's transcript.  John Sprague testified that TREX-000791 was a draft of a recommended practice (03/22/2011 Sprague Dep. at 561:24-562:4.)  And, even if approved, TREX-000791 was a guideline, containing mere "suggestions on certain topics for engineers to review and consider." (*Id*. at 821:9-14.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 38:** Morel was the lead engineer who was responsible for the entire drilling program on the Macondo well (Exhibit 4504.)  (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 38:**

The requested inference attempts to conflate several separate and distinct inferences into a single adverse inference.  None of the inferences sought are appropriate for several reasons, including that the inferences sought (1) are contrary to the record evidence; (2) are inappropriate because Mr. Morel is not the sole source of the information at issue, and other witnesses and evidence speak to the truth and accuracy of the inferences sought;  (3) are premised on objectionable questions; and (4) do not follow from or are incongruous with the questions posed.

First, the record evidence contradicts the requested inference to the extent it attempts to suggest that Mr. Morel was solely or individually responsible for the entire drilling program on the Macondo well.  (*See e.g.*, TREX-000291 ███████████████████████████████ ████████████████████████; 07/21/2011 K. Jassal 30(b)(6) Dep. at 344:16-23, 345:13-346:5 (design and planning of the Macondo well was subject to procedures in BP's "Beyond the Best" handbook, including a "stage-gate" process); 04/21/2011 G. Walz Dep. at 180:8-10, 371:5-23 (indicating that the entire BP team was involved in discussions, including risk identification and risk management "throughout the whole planning process"); 07/14/2011 P. O'Bryan Dep. at 64:5-22, 153:3-154:5 (explaining the well planning process and stating that for the Macondo well, D&C used a process referred to as "Beyond the Best" to identify and manage risks at various stages in well planning and execution).)

Similarly, Mr. Morel was not solely or individually responsible for the design of the casing at the Macondo well, and the record evidence is clear that key casing design decisions were made based on modeling and recommendations provided by, and in conjunction with, Halliburton personnel.  BP representatives met with Jesse Gagliano on April 14, 2010 to run models on Halliburton's OptiCem software for the Macondo well. (02/07/2012 J. Gagliano Dep. at 229:9-231:18.)  After that meeting, BP and Halliburton were satisfied with the model results and with the ability to run a long-string casing. (03/24/2011 E. Cunningham Dep. at 381:22-382:21.)  Moreover, the record evidence is clear that the overall casing design followed internal BP procedures involving numerous personnel. (04/28/2011 J. Sprague 30(b)(6) Dep. at 14:23-15:4, 15:12-16:13, 17:13-18:3; TREX-001312 (BP followed the proper "Beyond the Best" process steps for the Macondo Well casing design, including preparation of a Pre-Drill Data Package ("PDDP")); 04/28/2011 J. Sprague 30(b)(6) Dep. at 20:21-21:8, 21:23-22:25, 25:9-20; TREX-001861 (BP utilized its manuals and engineering standards in its Evaluation of Casing Design Basis); TREX-048055 (reflecting analysis of production casing decision).)

With regard to the cementing job, the record evidence clearly demonstrates that BP relied on Halliburton and its personnel—not Mr. Morel—to design, recommend, and perform the cement job.  (*See e.g.*, 02/07/2012 J. Gagliano Dep. at 28:15-29:21 (Gagliano was aware of the well conditions and was responsible for designing and recommending an appropriate cement slurry for the Macondo well), 02/10/2011 K. Corser Dep. at 274:21-275:22 (BP hired and relied on Halliburton for its expertise in cementing to design, test and execute the cement job), 04/22/2011 G. Walz Dep. at 618:24-619:8; 04/21/2011 G. Walz Dep. at 193:18-194:2 (BP drilling engineers are not expected to be cementing experts and BP, therefore, relied on Halliburton for the design and cementing services for the Macondo well), 03/21/2011 J. Sprague Dep. at 143:3-11, 143:24-144:4 (BP relied "first and foremost" on Halliburton for a good cement

job; "[t]hey are the expert"), and TREX-000738 (email from J. Gagliano attaching Halliburton's recommended procedure for the production casing cementing job).)

Similarly, the record is clear that while BP personnel, including Morel, designed operational procedures that called for well integrity testing, *both* Transocean and BP personnel on the rig conducted and approved the well integrity tests performed at the Macondo well. (05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative test and what criteria would indicate a successful test), 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the Macondo NPT).)   Transocean's own CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all of its operations.   (09/30/2011 S. Newman Dep. at 144:23-145:12.)  Mr. Newman also testified that Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (*Id.* at 160:11-164:24.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inferences sought.

Third, the inferences sought are inappropriate because they are premised on questions that are vague and ambiguous.  As used in the questions posed to Mr. Morel, the term "responsible" is unclear and undefined.

> **Morel No. 39:**  Morel was responsible for the design, monitoring, reporting, and overall safety at the Macondo well. (18:15-24; 19:1-7; 19:14-19; 19:21-20:6; 20:8-11; 20:13-17; 20:19-24; 21:1.)  (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 39:**

The requested inference is inappropriate because it is vague and ambiguous, contrary to the record evidence, Mr. Morel is not the sole source of the information at issue, the inference is premised on objectionable questions, and the inference is not supported by the questions posed.

The requested inference is vague and ambiguous as to "monitoring" and "reporting."  The record evidence contradicts the requested inference to the extent it attempts to suggest that Mr. Morel was solely or individually responsible for the design, monitoring, reporting, and overall safety the Macondo well.  (*See e.g.*, TREX-000291 ███████████████████████ ██████████████████████████████ 07/21/2011 K. Jassal 30(b)(6) Dep. at 344:16-23, 345:13-346:5 (design and planning of the Macondo well was subject to procedures in BP's "Beyond the Best" handbook, including a "stage-gate" process); 04/21/2011 G. Walz Dep. at 180:8-10, 371:5-23 (indicating that the entire BP team was involved in discussions, including risk identification and risk management "throughout the whole planning process"); 07/14/2011 P. O'Bryan Dep. at 64:5-22, 153:3-154:5 (explaining the well planning process and stating that for the Macondo well, D&C used a process referred to as "Beyond the Best" to identify and manage risks at various stages in well planning and execution).)

Mr. Morel was not solely or individually responsible for the design of the casing at the Macondo well, and the record evidence is clear that key casing design decisions were made based on modeling and recommendations provided by, and in conjunction with, Halliburton personnel.  BP representatives met with Jesse Gagliano on April 14, 2010 to run models on Halliburton's OptiCem software for the Macondo well.  (02/07/2012 Gagliano Dep. at 229:9-231:18.)  After that meeting, BP and Halliburton were satisfied with the model results and with the ability to run a long-string casing.  (03/24/2011 Cunningham Dep. at 381:22-382:21.)  Moreover, the record evidence is clear that the overall casing design followed internal BP procedures involving numerous personnel.  (04/28/2011 J. Sprague 30(b)(6) Dep. at 14:23-15:4, 15:12-16:13, 17:13-18:3; and TREX-001312 (BP followed the proper "Beyond the Best" process steps for the Macondo Well casing design, including preparation of a Pre-Drill Data Package ("PDDP")), 04/28/2011 J. Sprague 30(b)(6) Dep. at 20:21-21:8, 21:23-22:25, 25:9-20; and TREX-001861 (BP utilized its manuals and engineering standards in its Evaluation of Casing Design Basis), and TREX-048055 (reflecting analysis of production casing decision).)

With regard to safety, Transocean's own CEO, Steve Newman, confirmed that Transocean employees had primary responsibility for the safety of all of its operations.  (09/30/2011 S. Newman Dep. at 144:23-145:12.)  Mr. Newman also testified that Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (*Id.* at 160:11-164:24.)  It is Transocean's general practice and preference to have its own HSE policies govern its rigs.  (*See, e.g., Id.* at 151:4-9 ("[T]hat's our preference, because it's -- you know, it's less confusing for our people -- for our people to have to change management systems every time they change companies -- customers."); 06/29/2011 L. McMahan Dep. at 219:2-4 ("Transocean wanted to be in the position where we're leading and we use our systems, our HSE manual, not BP's.").)

Transocean was primarily responsible for safety on the *Deepwater Horizon* and Transocean's safety management system controlled.   (*See, e.g.,* TREX-4271 at § 7

; *see also* TREX-4153

Further, Transocean's own documents indicate that it was the party ultimately responsible for well-control.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inferences sought.

**Morel No. 40:**  Morel was aware that the Macondo was regarded as a "nightmare well" and "the well from hell" (21:10-11; 21:17-23:9; Ex. 126; Ex. 4507.)  (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 40:**

The requested inference is inappropriate. The requested inference is contrary to record evidence from other witnesses.  (*See e.g.* 04/21/2011 G. Walz Dep. at 220:15-221:11 (indicating he did not consider the Macondo a nightmare well); 07/12/2011 M. Albertin Dep. at 194:22-196:9 ("I would agree that we had problems on this well, but I wouldn't characterize it as a problem well or a nightmare well."; 07/19/2011 K. Daigle Dep. at 171:25-172:4.)  BP's wells team leader for the *Deepwater Horizon* made clear that the Macondo Well "was not highly unusually challenging . . ."  (05/09/2011 A. Guide Dep. at 346:19-23.)  Three of the *Deepwater Horizon* well site leaders indicated the drilling history of the Macondo "was not really uncommon[.]" (03/10/2011 R. Sepulvado Dep. at 95:7-19); 05/11/2011 M. Sepulvado Dep. at 124:3-15 (indicating "the Macondo well don't really stand out, you know, as a real trouble well."); 06/02/2011 P. Earl Lee Dep. at 628:2-23, 631:18-632:5 (stating he did not think the Macondo was a nightmare well).)  The *Deepwater Horizon* Transocean senior toolpusher Randy Ezell indicated he had never heard anyone from BP, Transocean or any other third-party contractor refer to the Macondo as a nightmare well or anything of that sort.  (04/27/2011 M. Ezell Dep. at 136:14-137:3)  Mr. Ezell further made clear that "all [wells] have problems" and that there "are no easy wells anymore today."  (*Id.* at 137:18-138:12.)

Moreover, the deposition questions cited in support of this requested inference misstate documents and pose a question that would have elicited an inadmissible response. Specifically, the deposition questions cited are in reference to TREX-004507, ███████████████████
███████████████████████████████████████████████

**Morel No. 41:** Morel was aware that the *Deepwater Horizon* took a "bad kick" on March 8, 2010 (23:15-24:7; 24:9; Ex. 4507.)  (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 41:**

The requested inference is inappropriate because the phrase "bad kick" is too broad, vague and is not supported by record evidence.  While Mr. Morel was aware that the Macondo Well experienced a kick on March 8, 2010, kicks are common to drilling operations in the deepwater environment of the Gulf of Mexico. (04/27/2011 M. Ezell Dep. at 42:11-23, 58:12-59:8; 04/28/2011 M. Ezell Dep. at 645:21-646:6.)  The March 8, 2010 kick event did, however, demonstrate poor monitoring and kick detection by the *Deepwater Horizon* Transocean drill crew and Sperry-Sun mudloggers given the failure to detect and shut-in the well for

approximately 30 minutes after the influx initiated.   (TREX-000051 at BP-HZN-2179MDL00340818); TREX-1 BP IIT Report at 107.)

> **Morel No. 42:** Morel was aware of a well control event occurring on April 5, 2010 that resulted in a total loss of returns.   (28:20-29:9; 29:11; Ex. 4507; Ex. 4549.)   (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 42:**

The requested inference is inappropriate because the phrase "total loss of returns" is overly broad, vague and is not supported by record evidence.   The Macondo Well experienced lost returns on April 5, 2010.   The Daily Operations Reports do not support the inference of a "total loss of returns" occurring as suggested by the PSC.   (*See* TREX-041111 4/4/2010 Daily Operations Report re *Deepwater Horizon*; TREX-041112 4/5/2010 Daily Operations Report re *Deepwater Horizon*, TREX-41112.)

> **Morel No. 43:** Morel had a concern with Bob Kaluza taking over as well site leader.   (33:5-22; 33:24-34:3; 34:5; Ex. 4507.)   (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 43:**

The requested inference is inappropriate.   The requested inference is not supported by the document cited by HESI and is contrary to record evidence.   The record is clear that Mr. Kaluza was regarded as "a competent individual and well site leader."   (07/19/2011 K. Daigle Dep. at 300:15-20, 303:2-6, 349:22-350:10; 05/09/2011 A. Guide Dep. at 186:21-187:17.)   Even in the document cited by HESI for this inference, Mr. Morel indicates ███████████████████████ ██████████████████████████   (TREX-4507, at  BP-HZN-2179MDL00081572.) Specifically, Keith Daigle, the Gulf of Mexico Wells Operations Advisor for BP and who is also part of the well site leader deployment program, had no doubt about Mr. Kaluza's competency (07/19/2011 K. Daigle Dep. at 16: 11-17:8, 191:18-25.)   John Guide, BP's wells team leader for the *Deepwater Horizon* also made clear that based on Mr. Kaluza's past experiences, he knew Mr. Kaluza was a competent well site leader.   (05/09/2011 A. Guide Dep. at 188:13-18.) Mr. Kaluza was an experienced well site leader who was coming from the Thunder Horse which was "[V]ery similar to the subsea systems that were on the Horizon."   (03/21/2011 J. Sprague Dep. at 215:21-216:4; 04/22/2011 G. Walz Dep. at 652:15-653:6; 07/19/2011 K. Daigle Dep. at 187:4-188:1.)   Mr. Kaluza had served as a well site leader for approximately eleven years and his level of experience was described as high.   (07/19/2011 K. Daigle Dep. at 297:22-298:17; G. Walz Dep. at 707:4-13.)   Mr. Kaluza's performance assessment for 2009 recognized that Mr. Kaluza is an enthusiastic well site leader who builds and uses relationships effectively to build trust and to get things done on the rig.   (07/19/2011 K. Daigle Dep. at 390:20-391:7.)

> **Morel No. 44:** Morel was aware that HESI had recommended the use of 21 centralizers on the production casing.   (47:18-48:21; 48:23-49:1; Ex. 4520; Ex. 1154.)   (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 44:**

The requested inference is vague, contrary to the evidence and does not show that Mr. Morel has the foundation to know what Jesse Gagliano had recommended. The phrase "recommend the use of 21 centralizers" is unclear and undefined in the requested inference. There is no showing that Mr. Gagliano discussed any recommendations with Mr. Morel because, in fact, Mr. Morel was already out on the rig at the time Mr. Gagliano ran an OptiCem with 21 centralizers. (TREX-0003691; 4/21/2011 Walz Dep. at 136-137.) Further, the requested inference is contrary to the evidence. The cited exhibit TREX-004510 does not reference the use of 21 centralizers. (TREX-004510.) On April 15, 2010, Mr. Morel received an OptiCem report from Mr. Gagliano that used 21 centralizers. (TREX-000716.) The April 18, 2010 OptiCem modeling used 21 centralizers but the number of centralizers used in that modeling was based on what BP could fly out to the rig on a helicopter, rather than on an engineering decision that 21 centralizers were necessary. (04/21/2011 G. Walz Dep. at 306:10-13.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 45:** Morel was aware that HESI's computer modeling (Ex. 4511) predicted a severe gas flow problem if only seven centralizers were used. (51:19-52:21; 52:23-53:11.) (HESI Mot. Rec. Doc. 7644-1 at 10.)

**Response to Morel No. 45:**

The requested inference is not supported by the questioning and is contrary to the evidence. The pertinent part of the questioning relates to whether Mr. Morel received a "casing design report" relating to use of seven centralizers. (07/21/2011 B. Morel Dep. at 52:16-23 ("Q. Okay. Did you also receive, on the 18th of April, a casing design report . . ").)

*(See* TREX-000717; TREX-00717A.) Halliburton's own literature states that foam cement is a solution for severe gas flow potential. (TREX-2125 at 8; TREX-2129 at 1; TREX-3097 at 17.) Ronnie Faul, Halliburton's Technology Manager for the Gulf of Mexico region, testified that BP could rely on Halliburton to design competent foam cement (06/30/2011 R. Faul Dep. at 471:13-21) and that he would not have been concerned about gas flow potential if foam were used (06/29/2011 R. Faul Dep. at 383:11-23.) As set forth in the Halliburton post-job report, BP and Halliburton proceeded with the cement job using foam cement. (TREX-000708.) Additionally, Halliburton's modeling had the centralizers in the wrong locations. Halliburton's cementing expert David Bolado testified that the centralizers in the April 18, 2010 OptiCem Modeling were not spaced properly. (12/22/2011 D. Bolado Dep. at 203:12-16 ("Q. Okay. So you agree that the centralizers here are not spaced in the locations where Mr. Morel proposed on his April 15th E-mail to Jesse Gagliano? A. Correct.").)

Further, the evidence contradicts the suggestion in the requested inference that work should have been stopped to wait for additional centralizers. BP empowers its employees and contractors to stop work that is unsafe. (TREX-004477 at BP-HZN-2179MDL00055609 and BP-HZN-2179MDL00056093; 05/09/2011 T. Probert Dep. at 407:3-15.) BP's cementing contractor, Halliburton, has stated that the result of running fewer centralizers would be the potential for channeling and that "cement channeling does not in itself create a safety concern." (TREX007729 at HAL_0048831.) Moreover, Halliburton personnel testified that they did not consider using fewer centralizers or the potential for channeling to pose a safety risk. (*See, e.g.*, 02/08/2012 J. Gagliano Dep. at 511-514 ("A. I -- I did not consider channeling a safety issue. It's a risk of remedial work after the fact. . . . Q. Okay. So you -- you -- you said that in your mind, going with six centralizers versus 21 was not a safety issue, right? . . . A. I -- I didn't look at it as a safety issue."); 03/16/2011 N. Chaisson Dep. 78:5-19.) Weatherford's representative Bryan Clawson testified that it would take seven to ten days to manufacture additional centralizer "subs" like the ones at the Macondo Well. (06/06/2011 Clawson Dep. at 203:8-23.) Affirmatively choosing to incur such a lengthy delay would run counter to industry standard and practices that favor limiting the amount of time with an open hole. (12/06/2011 Dr. Azar Dep. at 341:8-15 ("Q. Why did they not [wait for additional centralizers], sir? A. Because waiting on centralizers that were supposed to be brought to the rig and not knowing the time, how long, they would have left an open hole. And we teach -- we promote the fact that the best way to minimize risk is don't stay in an open hole if you have any chance at all and isolate that zone.").) In sum, the requested inference is contrary to the evidence that shows it was too late to get integral centralizers, that it was contrary to industry practice to wait for integral centralizers and that the consequences of running less centralizers does not create a safety concern.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 46:** Morel was aware of BP's decision to use six centralizers. (138:24-139:5; 139:7-10;139:24-140:2; 140:4-12; 140:14; Ex. 1154.) (HESI Mot. Rec. Doc. 7644-1 at 11.)

**Response to Morel No. 46:**

The requested inference is vague, not supported by the questioning, is contrary to the evidence, and Halliburton has not shown that Mr. Morel has the foundation to address the decisions relating to the number of centralizers to use purportedly made by others at BP. The phrase "BP's decision" is unclear in this context and undefined by the requested inference. The requested inference is also unsupported by the questioning. The pertinent part of the questioning relates to Mr. Guide's purported decision not to run the additional centralizers. (07/21/2011 B. Morel Dep. 139:8-12 ("Q. (BY MR. HYMEL) And Mr. Guide decided that he did not want to use the additional centralizers, correct?".) But there is no showing that Mr. Morel participated in the decision at issue in this requested inference, *i.e.*, to use six centralizers, or was aware of it. The requested inference is also contrary to the evidence to the extent that it suggests that Mr. Morel participated in the decision to use six centralizers. Mr. Walz testified that he spoke with

Mr. Guide by telephone to discuss the fact that the fifteen centralizers sent to the rig were not what they expected and should not be run. (04/21/2011 G. Walz Dep. at 310:2-312:8.) At that time, Mr. Morel was already on the rig, (*Id.* at at 136-137), and did not participate in that discussion.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

> **Morel No. 47:** Morel was focused primarily on cost cutting on the Macondo well. (35:25-36:3; 36:5-7; 36:9-18; 36:20-24; 37:1-8; Ex. 4508.) Specifically, the following decisions made on the Macondo well were cost-driven: the decision to discard the liner/tie-back design (40:3-6; 40:8-10; 40:12; 150:6-11; 150:13-16; 150:18-21; 150:23-151:1; 151:3-7; 151:9); the decision to run less than 21 centralizers (37:11-14; 37:16; 156:4-11; 156:13-15; 156:17; 157:20-158:4; 158:6); the decision to forego the cement bond log (37:24-38:1; 38:3; 158:7-13; 158:15-16; 158:18-20); the decision to use loss circulation materials as a spacer (38:3-9; 177:20-178:3; 178:6-9; 178:11); and the decision not to perform a full bottoms-up circulation (118:15-18; 118:20.) Based on the foregoing, Morel's decisions on the Macondo Well significantly increased the risk of a blowout occurring. (HESI Mot. Rec. Doc. 7644-1 at 11.)

**Response to Morel No. 47:**

 BP's use of the long string was a legitimate engineering decision and long string casing design is a common design in the Gulf of Mexico. (09/23/2011 D. Trocquet Dep. at 198:2-4; 07/27/2011 M. Saucier Dep. at 207:2-9)

 The decision not to run the additional centralizers was based on the risk that the centralizers may slip or break and cause additional problems. (TREX-001687; TREX-000137; 04/21/2011 G. Walz Dep. at 305:8-15; 311:15-312:8.)

The cement bond log decision was not based on cost. Instead, due to the risk of channeling and resulting increased circulating pressures that might cause cementing losses, BP created a decision tree on actions to take based on the potential of losses. (TREX-000908.) Under BP's decision tree, a cement bond log would be run if there were losses during cementing. (TREX-000908 at HAL 0012208.) Further, all of the indications from the cement job were of a successful cement job, with no indications of channeling. (06/14/2011 V. Tabler Dep. at 384:9-13.) Thus, a cement bond log was not run based on BP's decision tree factors. (04/22/2011 G.

Walz Dep. at 636:19-637:23.)   John Guide also solicited contractors' opinions on whether a cement bond log should be run during the morning meeting of April 20, 2010, however, no one indicated that one should be run.  (*Id*. at 901:1-14.)

████████████████████████████████████████████████████████████████████ This recommendation was a beneficial reuse of material that otherwise would have gone to waste.  (11/04/2011 D. Maxie Dep. at 254:9-13; 04/04/2011 J. LeBleu Dep. at 339:9-25.)

The decision to circulate less than bottoms up was based on the concern that the additional circulation may fracture the well.  (06/13/2011 V. Tabler Dep. at 192:17-193:6; 04/22/2011 G. Walz Dep. at 545:23-547:23.)  The decision was discussed with Halliburton and Halliburton cementer Vincent Tabler agreed that the decision to conduct only a partial circulation immediately prior to the cementing job due to the concern over losses made sense. (06/14/2011 V. Tabler Dep. 415:4-416:4.)  Concern for specific hole conditions of a given well was the rationale for not running a complete bottoms up on prior cement jobs Mr. Tabler had worked on with other operators besides BP.  (06/14/2011 V. Tabler Dep. 415:19-416:11.) Moreover, a complete bottoms up circulation was performed prior to logging, on April 16, 2010. (TREX-041069 Daily Drilling Report, Apr. 16, 2010.) The April 16, 2010 procedure should have removed any cuttings that were left in the hole at that time, and none of the operations conducted from April 16 until the final production string cement job would have created additional cuttings. (11/29/2011 C. Barnhill Dep. at 84:24-85:5; 06/14/2011 V. Tabler Dep. 419:1-14.)  And due to the depth of the well, the final cementing operations themselves resulted in significant circulation of the pay zone area that was to be cemented.  (11/29/2011 C. Barnhill Dep. at 90:1-15, 91:24-92:8.)

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 48:** BP had known for some time that the reported and permitted fracture gradients were misstated to the MMS; BP drilled part of the well without the required safe drilling margin.  (DOJ Mot. Rec. Doc. 7637-2 at 1-4.)

**Response to Morel No. 48:**

The requested inference is irrelevant, vague, unsupported by the questioning, and the U.S. Government has not shown that Mr. Morel has the foundation to testify regarding BP's filings with the MMS.  The requested inference is vague and ambiguous as to which particular "reported and permitted fracture gradients were [allegedly] misstated to the MMS," what "part of the well" was allegedly drilled "without the required safe drilling margin," and what is meant by "fracture gradients," "reported and permitted fracture gradients," and "safe drilling margin."

**Morel No. 49:** The anomaly of the bottom plug landing earlier than predicted during the cement job should have put BP on notice that the bottom plug bypassed mud on its way down the Macondo well and contaminated the cement. (DOJ Mot. Rec. Doc. 7637-2 at 4-5.)

## Response to Morel No. 49:

The requested inference is contrary to the evidence and the U.S. Government has not shown that Mr. Morel has the foundation to speak on the resulting potential effects of a bottom plug landing early. Halliburton pumped the cement job at the Macondo well and reported on the job in its post-job report. (TREX-00708.) The post-job report does not indicate that the bottom plug bumped early. And in contrast to the requested inference, Vincent Tabler, the lead Halliburton cementer on the rig, testified that the plugs bumped when they were expected based on his calculations. (06/14/2011 V. Tabler Dep. 379:15-380:16) ("Q. And did you compare the actual job data to your calculated data to determine whether or not the plugs bumped when they should have bumped? A. Yes, sir. Q. And did they bump when they should have bumped? A. Yes, sir. Everything was on track.").) There is no questioning or showing that Mr. Morel would have known of or been "on notice" of the potential resulting effects as suggested in the requested inference.

As demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

**Morel No. 50:** Morel observed the circulating pressure on the Macondo well was very low after BP completed its attempts to convert the float equipment. Morel considered that there may have been a breach somewhere in the casing string causing the lower than predicted circulating pressure readings, but he did nothing to confirm the casing's integrity. (DOJ Mot. Rec. Doc. 7637-2 at 5-7.)

## Response to Morel No. 50:

The requested inference is inappropriate because it is not supported by any corroborating evidence and is contrary to record evidence. The requested inference is also vague and not supported by the deposition questioning. The phrase "very low" describing the circulating pressure is unclear and undefined by the requested inference.

In addition, the requested inference is inappropriate to the extent it suggests the float collar did not successfully convert. The float collar was converted and circulation was established at 3,142 psi. (TREX-005993 at HAL_0028668; TREX-000001 BP IIT Report at BP-HZN-BLY00000023, BP-HZN-BLY00000070; 06/14/2011 V. Tabler Dep. at 433:14-21 ("Q. Okay. Who told you they converted? A. I don't remember which driller was on−on tour at the time. Q. Okay. So a driller called you on the headset and said, we've converted, come−come back out to the floor? A. Yes, sir."); 06/06/2011 B. Clawson Dep. at 336:8-11

("Q. Okay. And since—since then up till today, do you have any indication that the float collar did not convert? A. No."); 03/17/2011 N. Chaisson Dep. at 272:7-14.) ██████████████████

████████████████████████████████████████████████████████████████ Thus, on the basis of the record evidence, all signs indicated that the float collar successfully converted.

Moreover, before increasing pressure to convert the float collar, BP contacted Weatherford's Bryan Clawson, who authorized the drilling team to continue to pressure up, and advised that pressuring up was the standard procedure and consistent with industry practice for clearing a blockage. (06/06/2011 B. Clawson Dep. at 316:18-21, 317:23-318:2; A. Guide Dep. at 211:11-212:7 ("before we proceeded on any of this, we called Weatherford. I didn't, Brian Morel did. We verified the pressure, that the float collar was good, too, on a differential basis.").)

Mr. Clawson also specifically informed Mr. Morel that the float collar could withstand up to 6800 psi of pressure. (06/06/2011 B. Clawson Dep. at 125:11-126:6.) In addition, Vernon Goodwin, the Allamon Tool Co. representative on the rig, also recommended that the drill crew keep "rocking the casing in 1000 psi increments up to 5000 psi . . . ." (TREX-001977.) ████████████████████████████████████████████████████████████████

After converting the float equipment and establishing circulation on the well, the rig crew performed two separate pressure tests on the seal assembly, both of which were successful. (TREX-000001 (BP IIT Report) at BP-HZN-BLY00000023; TREX-000820; 04/20/2011, M. Burgess Dep. at 187.) ████████████████████████████████████████████████████████████████

The rig crew also performed a positive pressure test on the casing. The positive pressure test was successful, indicating that the long string production casing held pressure and had integrity. (TREX-000001 (BP IIT Report) at BP-HZN-BLY00000024, BP-HZN-BLY00000082; TREX-000820; 04/20/2011 M. Burgess Dep. at 378:20-379:4.) Weatherford's Brent Lirette agreed the purpose of a positive pressure test is to determine whether or not there may be a leak in the casing prior to proceeding with operations. (12/22/2011 B. Lirette Dep. at 187:16-189:1.) *Deepwater Horizon* Transocean driller Micah Brandon Burgess likewise explained a positive pressure test is to "ensure everything's good on the casing." (04/20/2011 M. Burgess Dep. at 188:1-189:13 ("Q. [W]hat's the purpose of doing a positive pressure test on the casing? A. To ensure everything's good on the casing. Q. When you say everything's good on the casing, is that related to the cement job on the casing? A. It's like your shoe float, too, and your whole casing string in general. Q. All right. Now, if I were to open up this cap with this bottle of water and blow as hard as I could into it, that would induce pressure into this bottle; right? A. Yeah. Q. That would create positive pressure; right? A. Yeah."); *see also* 07/19/2011 B. Ambrose 482:10-21 (agreeing that the positive pressure test confirmed the casing sealed).)

Therefore, the requested inference is inappropriate and contrary to record evidence that the float collar converted successfully, BP followed the float collar manufacturer's instructions regarding conversion, and that the rig crew subsequently conducted two successful pressure tests on the seal assembly, as well as a successful positive pressure test on the casing.  Further, as demonstrated by the record discussed above, Mr. Morel is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.