# Exhibit E

**EXHIBIT E - JIMMY HARRELL**

>**Harrell No. 1:** BP was aware of the anomalous negative pressure test results. (PSC Mot. Rec. Doc. 5873-5 at 10-11.)

**Response to Harrell No. 1:**

As a preliminary matter, the requested adverse inference sought by the PSC against BP is improper because Jimmy Harrell is *not* a BP employee and his interests are *not* aligned with BP. Under the Court's order and the Second Circuit's *LiButti* factors, Mr. Harrell's refusal to testify cannot support an adverse inference against BP because: (1) there is no relationship between BP and Mr. Harrell, an employee of an adverse party; (2) BP has no control over Mr. Harrell; and (3) there is no compatibility of interests between BP and Mr. Harrell. (Rec. Doc. 5682 at 5 (*LiButti* factors "are useful in making the case-by-case evaluation required"); *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (listing factors).) Mr. Harrell is a Transocean employee and his interests are aligned with Transocean.

The requested inference is inappropriate because it is vague and ambiguous in its use of the unclear and undefined term "anomalous." The questions posed to Mr. Harrell that provide the purported basis for the requested inference are objectionable and, if they had been answered, would have elicited an inadmissible response. The questions posed to Mr. Harrell called for speculation to the extent they sought to elicit testimony from Mr. Harrell as to the perception of BP personnel. The questions posed to Mr. Harrell were also vague and ambiguous in using the unclear phrase "should have alerted" (07/12/2011 Harrell Dep. at 14:17-15:1.) The requested inference also fails to accurately represent the questions posed to Mr. Harrell by omitting reference to Transocean's purported awareness of "anomalous" pressure test results.

Moreover, the requested inference is contrary to the record evidence, and Mr. Harrell is not the only source of the information. Specifically, the record establishes that there is no requirement to conduct a negative pressure test, that both Transocean rig crew and BP well site leaders received training in conducting pressure tests and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010, (*see* TREX-003326; TREX-003465; TREX-004640; and TREX-007652), and that the rig crew was provided with procedures for the temporary abandonment operations, which included instructions to conduct a negative pressure test.

In April 2010, there was no MMS requirement that operators conduct negative pressure tests, and, consequently, no specific requirements regarding how such tests should be performed. (*See e.g.*, 07/13/2011 F. Patton Dep. at 243-44, 298 (as of 4/16/2010 MMS did not have any regulations that applied to NPT procedures); 11/21/2011 R. Heenan Dep. at 149:12-16 ("Q: Okay. Are you aware of any law that sets forth a provision for conducting negative pressure tests? A: I'm not aware of one in Canada or the United States."); 11/29/2011 C. Barnhill Dep. at 120:9-24 (indicating that there is "no MMS requirement to do a negative test" and that BP "could have fulfilled the MMS requirement without doing a negative test.").)

Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various

Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.) Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010. (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Moreover, instructions regarding the negative pressure test in both the temporary abandonment procedures contained in the April 16, 2010 Application for Permit to Modify (TREX-000570), as well as the April 20, 2010 "Ops Note" email (TREX-000566.) Similarly, Transocean had its own protocols and instructions for negative pressure tests on the *Deepwater Horizon* (TREX-004640.) Transocean personnel involved in the negative pressure test also concluded that the test was successful. (TREX-001472 (email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ▮▮▮▮▮▮▮▮▮▮▮▮▮ Perhaps most importantly, Transocean's senior toolpusher on the rig, Randy Ezell, testified that during the negative pressure/test, BP well site leaders Bob Kaluza and Donald Vidrine informed Mr. Ezell that the test was initially not lined up as described in the procedure that was approved by the MMS, and as a result Mr. Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure. (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)

> **Harrell No. 2:** There was no protocol followed by BP on how to run and interpret the negative pressure test. (PSC Mot. Rec. Doc. 5873-5. at 11.)

**Response to Harrell No. 2:**

As a preliminary matter, the requested adverse inference sought by the PSC against BP is improper because Jimmy Harrell is ***not*** a BP employee and his interests are ***not*** aligned with BP. Under the Court's order and the Second Circuit's *LiButti* factors, Mr. Harrell's refusal to testify cannot support an adverse inference against BP because: (1) there is no relationship between BP and Mr. Harrell, an employee of an adverse party; (2) BP has no control over Mr. Harrell; and (3) there is no compatibility of interests between BP and Mr. Harrell. (Rec. Doc. 5682 at 5 (*LiButti* factors "are useful in making the case-by-case evaluation required"); *LiButti v. United*

*States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (listing factors).) Mr. Harrell is a Transocean employee and his interests are aligned with Transocean.

The requested inference is inappropriate because it is vague and ambiguous in its use of the unclear and undefined term "protocol." The question posed to Mr. Harrell that provides the purported basis for the requested inference is also objectionable for its use of the same vague and ambiguous term. The requested inference also fails to accurately represent the question posed to Mr. Harrell by omitting reference to Transocean's purported failure to follow a "protocol."

Moreover, the requested inference is contrary to the record evidence, and Mr. Harrell is not the only source of the information. Specifically, the record establishes that there is no requirement to conduct a negative pressure test, that both Transocean rig crew and BP well site leaders received training in conducting pressure tests and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010, (*see* TREX-003326; TREX-003465; TREX-004640; and TREX-007652), and that the rig crew was provided with procedures for the temporary abandonment operations, which included instructions to conduct a negative pressure test.well site leaders

In April 2010, there was no MMS requirement that operators conduct negative pressure tests, and, consequently, no specific requirements regarding how such tests should be performed. (*See e.g.*, 07/13/2011 F. Patton Dep. at 243-44, 298 (as of 4/16/2010 MMS did not have any regulations that applied to NPT procedures); 11/21/2011 R. Heenan Dep. at 149:12-16 ("Q: Okay. Are you aware of any law that sets forth a provision for conducting negative pressure tests? A: I'm not aware of one in Canada or the United States."); 11/29/2011 C. Barnhill Dep. at 120:9-24 (indicating that there is "no MMS requirement to do a negative test" and that BP "could have fulfilled the MMS requirement without doing a negative test.").)

Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.) Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010 (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.) Transocean personnel were experienced in conducting and interpreting negative pressure tests (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Moreover, instructions regarding the negative pressure test were contained in both the temporary abandonment procedures in the April 16, 2010 Application for Permit to Modify (TREX-000570), as well as the April 20, 2010 "Ops Note" email (TREX-000566.)  Similarly, Transocean had its own protocols and instructions for negative pressure tests on the *Deepwater Horizon* (TREX-004640.) Transocean personnel involved in the negative pressure test also concluded that the test was successful.  (TREX-001472 (email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Perhaps most importantly, Transocean's senior toolpusher on the rig, Randy Ezell, testified that during the negative pressure test, BP well site leaders Bob Kaluza and Donald Vidrine informed Ezell that the test was initially not lined up as described in the procedure that was approved by the MMS, and as a result Ezell instructed the Transocean rig crew to correct the issue to ensure that the negative pressure test *was* conducted in accordance with the MMS-approved procedure.  (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)

4