# Exhibit F

**EXHIBIT F - JAMES INGRAM**

>**Ingram No. 1:** BP emphasized efficiency and cost saving over safety. (PSC Mot. Rec. Doc. 5873-10 at 3-5.)

**Response to Ingram No. 1:**

As a preliminary matter, the requested adverse inference sought by the PSC against BP is improper because James Ingram is *not* a BP employee and his interests are *not* aligned with BP. Under the Court's order and the Second Circuit's *LiButti* factors, Mr. Bertone's refusal to testify cannot support an adverse inference against BP because: (1) there is no relationship between BP and Mr. Ingram, an employee of an adverse party; (2) BP has no control over Mr. Ingram; and (3) there is no compatibility of interests between BP and Mr. Ingram. (Rec. Doc. 5682 at 5 (*LiButti* factors "are useful in making the case-by-case evaluation required"); *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (listing factors).) Mr. Ingram is a Transocean employee (and had been for nearly six years at the time of the blowout) and his interests are aligned with Transocean. An example of the alignment of interests is demonstrated by Mr. Ingram's comments in his interview with Transocean. In describing his communications and contact with Shuman Consulting, Mr Ingram ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (TREX-50300 at TRN-MDL-00490947.)

The requested inference is contrary to the evidence and testimony of other witnesses. Several Transocean rig crew members testified they felt no pressure to speed up operations on the *Deepwater Horizon*. (*See* 4/28/2011 M. Ezell Dep. at 489:23-490:1 ("Q. Okay. So let me ask it a different way: Did you ever feel any pressure to rush through drilling operations? A. No."); 11/8/2011 D. Barron Dep. at 30:5-8 ("Q: [D]id you get the feeling that this well just had to be drilled as quickly as possible no matter what? A. No, sir."); 5/18/2011 C. Breland Dep. at 84:16-22 ("Q. All right. Did you feel any pressure while you were on the DEEPWATER HORIZON to speed up operations because the well was behind schedule? . . . A. No."); 5/18/2011 C. Breland Dep. at 85:23-86:2 ("Q. Did you ever feel at anytime that you were being asked to cut corners? . . . A. No."); 7/14/2011 N. Watson Dep. at 107:25-108:15 (testifying that on April 20, 2010, he did not feel any pressure to speed up operations for any reason); 7/14/2011 C. Taylor Dep. at 157:11-15 ("Q. Did anybody from Transocean ever say to you, We're rushing this too much, we're not—we're doing this job too quickly, it's not being done right? A. No.").) In addition, the testimony demonstrates that BP did not emphasize efficiency and cost saving over safety. (*See, e.g.*, 8/24/2011 D. Farr Dep. at 334:25-335:6 (Q. Has anybody from the *Deepwater Horizon* drill rig, any Transocean employee ever said to you that they thought that any step that BP took put them at a high risk during the during the activities of April 19th and April 20th? A. No."); 7/14/2011 C. Taylor Dep. at 157:7-10 ("Q. Did anybody ever say that this—this well cannot be drilled safely, in words or substance? A. No.").) Moreover, the questions giving rise to the inference would have elicited an inadmissible response based on speculation, lack of foundation and hearsay if they had been answered. As Transocean's Senior Materials Coordinator, Mr. Ingram had no involvement with BP's budget.

**Ingram No. 2:** It was BP's responsibility to assure consistency between drill pipe shearability and the blowout preventer's shearing capacity. (PSC Mot. Rec. Doc. 5873-10 at 5.)

**Response to Ingram No. 2:**

As a preliminary matter, the requested adverse inference sought by the PSC against BP is improper because James Ingram is *not* a BP employee and his interests are *not* aligned with BP. Under the Court's order and the Second Circuit's *LiButti* factors, Mr. Bertone's refusal to testify cannot support an adverse inference against BP because: (1) there is no relationship between BP and Mr. Ingram, an employee of an adverse party; (2) BP has no control over Mr. Ingram; and (3) there is no compatibility of interests between BP and Mr. Ingram. (Rec. Doc. 5682 at 5 (*LiButti* factors "are useful in making the case-by-case evaluation required"); *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (listing factors).) Mr. Ingram is a Transocean employee (and had been for nearly six years at the time of the blowout) and his interests are aligned with Transocean. An example of the alignment of interests is demonstrated by Mr. Ingram's comments in his interview with Transocean. In describing his communications and contact with Shuman Consulting, Mr Ingram ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (TREX-50300 at TRN-MDL-00490947.)

The requested inference is inappropriate because it is contrary to the record evidence, Mr. Ingram is not the sole source of the information at issue, he had no foundation to answer the question asked, and it is based on an objectionable question.

Transocean witnesses knowledgeable about the BOP – including Transocean's in-house BOP expert – have testified that it is Transocean's responsibility to calculate the BOP's shearing capacity. Geoff Boughton, Transocean's Subject Matter Expert, Subsea Equipment, testified that "[n]ormally, BP looks to [Transocean] and the manufacturer [Cameron] for the shear calculations." (07/20/2011 G. Boughton Dep. at 66:4-5.) This is further supported by Paul Johnson, Transocean's Rig Manager – Performance for the *Deepwater Horizon*, who confirmed that it was Transocean that evaluated whether the BOP would function within the range of pressures provided by BP. (03/28/2011 P. Johnson Dep. at 395:15-20 ("Q. So BP would provide you the maximum anticipated surface pressure and then you would evaluate whether or not the well control equipment would function within that range? A. Yes.").)



Mr. Ingram also has no foundation to answer this question. He was a Senior Materials Coordinator for Transocean, whereas the BOP was generally the province of Transocean's subsea department. (07/27/2011 Ingram Dep. at 8:25-9:2; 07/20/2011 J. McWhorter Dep. at 287:7-12.) There is no evidence that Mr. Ingram had any interaction with the BOP.

Furthermore, the requested inference is inappropriate because it is based on an objectionable question that would have elicited an inadmissible response had the question been answered. Specifically, the question posed to Mr. Ingram was vague and ambiguous in that it used the unclear and undefined terms "assure . . . consistency." (07/27/2011 Ingram Dep. 31:18-23.)