# Exhibit I

**EXHIBIT I - CHRISTOPHER HAIRE**

> **Haire No. 1:**  BP decided to use Kodiak base cement instead of a new slurry on the Macondo well to save money.  (PSC Mot. Rec. Doc. 5873-7 at 7.)

**Response to Haire No. 1:**

As a preliminary matter, the requested inference sought by the PSC against BP is improper because Chris Haire is ***not*** a BP employee and his interests are ***not*** aligned with BP. Under the Court's order and the Second Circuit's *LiButti* factors, Mr. Haire's refusal to testify cannot support an adverse inference against BP because: (1) there is no relationship between BP and Mr. Haire, an employee of an adverse party; (2) BP has no control over Mr. Haire; and (3) there is no compatibility of interests between BP and Mr. Haire.  (Rec. Doc. 5682 at 5 (*LiButti* factors "are useful in making the case-by-case evaluation required"); *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (listing factors).)  Mr. Haire is a Halliburton employee and his interests are aligned with Halliburton.  An example of the alignment of interests is demonstrated by Mr. Haire's complaint against BP that disclaims any allegations against Halliburton.  (TREX-0003682 at 9) ("Plaintiff CHRISTOPHER HAIRE is only bringing claims against Defendants Cameron International Corporation a/k/a Cameron Systems Corporation, BP Exploration and Production, Inc, and BP, PLC. Plaintiff CHRISTOPHER HAIRE is not bringing any claims against Defendant Halliburton Energy Services, Inc.").)[1]

The requested inference is vague, unsupported by the questioning, and contrary to the evidence.  Furthermore, there is no showing that Chris Haire has the foundation to testify concerning the decision to use the Kodiak blend.  The phrase "to save money" is unclear as it has no reference point and is undefined by the requested inference.  For example, the cost of a failed cement job would exceed the cost of shipping cement to the well.  There is no showing that Mr. Haire knew who made the decision to use the Kodiak base cement or what the basis was for that decision.  The requested inference is also not supported by the questioning.  The questioning asks whether "bringing in a new blend would have caused BP to incur additional costs"—it does not ask whether the purported BP decision was made to "save money."  (07/08/2011 C. Haire Dep. at 157:4-16.)  Further, the requested inference is contrary to the evidence.  Halliburton made the decision to use Kodiak base cement.  Mr. Gagliano testified that he recommended the Kodiak cement blend to BP.  (02/07/2012 J. Gagliano Dep. at 80:12-81:10; 02/08/2012 J. Gagliano Dep. at 585:9-586:9.)  Furthermore, Mr. Gagliano testified that it was common practice to use cement blend leftover from a prior well.  (02/07/2012 J. Gagliano Dep. at 80:12-81:10.)

As demonstrated by the record discussed above, Mr. Haire is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

---

[1]  Mr. Haire's Complaint can be found at Rec. Doc. 1-2 in *Davis v. Transocean Ltd., et al.*, 2:10-cv-03169-CJB-SS (E.D. La.).

**Haire No. 2:**  BP was aware that the cement job might fail.  (PSC Mot. Rec. Doc. 5873-. at 7-10.)

**Response to Haire No. 2:**

As a preliminary matter, the requested inference sought by the PSC against BP is improper because Chris Haire is *not* a BP employee and his interests are *not* aligned with BP. Under the Court's order and the Second Circuit's *LiButti* factors, Mr. Haire's refusal to testify cannot support an adverse inference against BP because: (1) there is no relationship between BP and Mr. Haire, an employee of an adverse party; (2) BP has no control over Mr. Haire; and (3) there is no compatibility of interests between BP and Mr. Haire.  (Rec. Doc. 5682 at 5 (*LiButti* factors "are useful in making the case-by-case evaluation required"); *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (listing factors).)  Mr. Haire is a Halliburton employee and his interests are aligned with Halliburton.  An example of the alignment of interests is demonstrated by Mr. Haire's complaint against BP that disclaims any allegations against Halliburton.  (TREX-0003682 at 9) ("Plaintiff CHRISTOPHER HAIRE is only bringing claims against Defendants Cameron International Corporation a/k/a Cameron Systems Corporation, BP Exploration and Production, Inc, and BP, PLC. Plaintiff CHRISTOPHER HAIRE is not bringing any claims against Defendant Halliburton Energy Services, Inc.").)[2]

The requested inference is vague, unsupported by the questioning and contrary to the evidence, and there is no showing that Chris Haire has the foundation to testify on what BP was or was not aware of relating to the cement job.  The phrase "might fail" is unclear and undefined by the requested inference.  For example, as explained by cement experts for the U.S. Government and Halliburton, a cement job might "fail" to achieve zonal isolation between different sands in the well but still competently isolate the hydrocarbons from coming up the casing and be acceptable for temporary abandonment.  (11/17/2012 G. Benge Dep. at 222:25-223:10; 12/22/2012 D. Bolado Dep. at 45:3-19.)  Further, the requested inference is not supported by any of the questioning.  The questioning asks whether the testing showed the cement was stable—at no point does the questioning ask whether "BP was aware that the cement job might fail."  (07/08/2011 C. Haire Dep. at 55:24-56:14, 99:18-102:16, 162:25-165:5.)  Even if the questioning supported the requested inference, there is no showing that Mr. Haire knew what BP was or was not aware of concerning the cement job.  Further, the requested inference is contrary to the evidence.  BP was only told by Halliburton of the possibility of channeling; not of the possibility that the cement job itself would fail.  (04/22/2012 G. Walz Dep. at 643:2-23.)  BP relied on Halliburton to design and test the slurry.  (*Id.* at 618:23-619:8.)  BP was not warned by Halliburton, nor did it believe, that Halliburton's foam design was faulty.  Furthermore, the final foam stability test results were not provided to BP until after the incident.  (TREX-001709; 02/07/2012 J. Gagliano Dep. at 199:21-200:24; 268:13-24.)

As demonstrated by the record discussed above, Mr. Haire is not the sole source of the information at issue, and there are numerous other witnesses and evidence that not only speak to the same information but demonstrate the inaccuracy of the inference sought.

---

[2]  Mr. Haire's Complaint can be found at Rec. Doc. 1-2 in *Davis v. Transocean Ltd., et al.*, 2:10-cv-03169-CJB-SS (E.D. La.).

> **Haire No. 3:** Although Haire considered the first two negative tests unsuccessful, BP and Transocean reported the tests as successful.  (PSC Mot. Rec. Doc. 5873-7. at 10.)

## Response to Haire No. 3:

As a preliminary matter, the requested inference sought by the PSC against BP is improper because Chris Haire is ***not*** a BP employee and his interests are ***not*** aligned with BP. Under the Court's order and the Second Circuit's *LiButti* factors, Mr. Haire's refusal to testify cannot support an adverse inference against BP because: (1) there is no relationship between BP and Mr. Haire, an employee of an adverse party; (2) BP has no control over Mr. Haire; and (3) there is no compatibility of interests between BP and Mr. Haire.  (Rec. Doc. 5682 at 5 (*LiButti* factors "are useful in making the case-by-case evaluation required"); *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (listing factors).)  Mr. Haire is a Halliburton employee and his interests are aligned with Halliburton.  An example of the alignment of interests is demonstrated by Mr. Haire's complaint against BP that disclaims any allegations against Halliburton.  (TREX-0003682 at 9) ("Plaintiff CHRISTOPHER HAIRE is only bringing claims against Defendants Cameron International Corporation a/k/a Cameron Systems Corporation, BP Exploration and Production, Inc, and BP, PLC. Plaintiff CHRISTOPHER HAIRE is not bringing any claims against Defendant Halliburton Energy Services, Inc.").)[3]

The requested inference is vague and ambiguous in its use of the unclear and undefined phrase "reported the tests as successful."  The questions posed to Mr. Haire call for speculation and fail to establish any foundation concerning Mr. Haire's knowledge of how to conduct or interpret a negative pressure test, because the movant has not identified any record evidence, or otherwise laid the foundation, that the witness had personal knowledge sufficient to answer the question posed.  For these and the reasons set forth below, the requested inference should not be allowed.

Moreover, the requested inference is inappropriate because Mr. Haire is not the only source of the information, and the document referred to in the requested inference speaks for itself.  (TREX-003652.)  The record establishes the role of the parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test.  Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the

---

[3]   Mr. Haire's Complaint can be found at Rec. Doc. 1-2 in *Davis v. Transocean Ltd., et al.*, 2:10-cv-03169-CJB-SS (E.D. La.).

negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Operational information and procedures were shared with the rig crew during pre-tour meetings, the rig crew had access to operational documents such as daily planners, and had the opportunity to raise any questions during the pre-tour meetings.  (04/20/2011 M. Burgess Dep. at 336:18-338:12.)  Transocean's safety system included stop work authority, and it was every employee's obligation to stop work if he sees an unsafe operation or has inadequate information to perform his job.  (09/30/2011 S. Newman Dep. at 160:11-164:24.  *See also* 04/20/2011 M. Burgess Dep. at 309:6-311:23.)  Thus, if the drilling crew had seen a problem with the negative pressure tests, they would have been both authorized and required to stop and determine what was wrong.  (04/28/2011 M. Ezell Dep. at 542:19-543:20.)

Both BP and Transocean personnel concluded that the negative pressure test was successful.  Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)  Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.  (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew █████████████████
████████████████

The requested inference is also inappropriate because it is contradicted by the record evidence to the extent it suggests that Mr. Haire did not agree with the assessment of the negative pressure tests or had any concerns regarding the safety of the operations.  The record establishes that all personnel aboard the rig had stop work authority, and there is no evidence in the record to suggest that Mr. Haire ever attempted to exercise that authority.