# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig "Deepwater         :
Horizon" in the Gulf of Mexico, on                 :
April 20, 2010                                      :          MDL No. 2179
                                                   :
These Pleadings apply to:                          :          SECTION: J
*All Cases in Pleadings Bundle B3*                 :
                                                   :          JUDGE BARBIER
These Pleadings also apply to:                     :          MAGISTRATE JUDGE SHUSHAN
No. 10-2771                                         :
………………………………………………...         :

## THE BP PARTIES' ANSWER TO THE FIRST AMENDED MASTER COMPLAINT IN ACCORDANCE WITH PTO NO. 11 [CASE MANAGEMENT ORDER NO. 1] SECTION III.B(3) ["B3 BUNDLE"]

Defendants BP Exploration & Production Inc. ("BPXP"), BP America Production Company ("BPAP"), and BP p.l.c. (collectively, the "BP Parties"), by their undersigned counsel, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer the First Amended Master Complaint in Accordance with PTO No. 11 [Case Management Order No. 1] Section III.B3 ["B3 Bundle"] as follows:[1]

## I.     INTRODUCTION

On April 20, 2010, an explosion on board the oil vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States. The explosion resulted in an oil spill of unprecedented proportions and an oil slick that grew exponentially, depleting and destroying marine and coastal environments and estuarine areas in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas and Florida (the "Gulf States"). In an ill-conceived effort to contain and to clean up the spill, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water. Vast quantities of oil and debris were burned at the surface of the Gulf or skimmed from the water. Beaches, marshes and wetlands fouled by oil and chemicals have been the focus of a variety of remedial efforts to

---

[1] Discovery with regard to the subject matter of the allegations in plaintiffs' complaint is ongoing and not complete, and certain information thus remains unavailable to BP at this time, and the BP Parties therefore specifically reserve the right to amend or supplement their answers and affirmative defenses to the allegations in plaintiffs' complaint as additional facts and expert opinions become known to them.

remove the hazardous materials from these fragile areas. Although the leaking well is now capped, the disastrous effects of the spill on the public health, the environment and the income, businesses and property of the residents, and property owners of the region are widespread and will likely remain so for decades.

Hundreds of individual and class actions were filed in state and federal courts on behalf of the thousands of victims of the spill. By order entered on August 10, 2010, the Multi-District Litigation Panel (the "MDL Panel") transferred all actions then pending to this Court. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" In the Gulf of Mexico, on April 20, 2010,* MDL No. 2179, --- F. Supp. 2d ----, 2010 WL 3166434 (JPML, August 10, 2010) (the "Transfer Order"). On October 19, 2010, this Court entered its Case Management Order No. 1 (hereinafter "CMO No. 1"), wherein it directed the filing of Master Complaints on behalf of the Plaintiffs. The Court entered Pre-Trial Order No. 25 on January 12, 2011 to clarify CMO No. 1 and the scope and effect of the Master Complaints. In accordance with CMO No. 1, Paragraph III.B(3) and PTO No. 25, Paragraph 1, this First Amended Master Complaint is filed on behalf of those plaintiffs making claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010, and who have filed their claims in this Court or whose claims have been transferred to this Court pursuant to the Transfer Order.[2]

This First Amended Master Complaint may also be joined with the Master Claim (or other Claim) in Limitation, as well as Master Answer (or other Answer) in Limitation, [No. 10-2771, Doc 249], pursuant to PTOs 24 and 25, or otherwise, and may form the basis of Claims tendered by Transocean to the plaintiffs as against the Tendered Defendants pursuant to Federal Rule of Civil Procedure 14(c) [Doc 1320].

Accordingly, pursuant to CMO No. 1, Paragraph III.B(3), as clarified by PTO No. 25, Paragraph 1, Plaintiffs, by their undersigned counsel and other counsel identified herein, for themselves and all others similarly situated, submit this First Amended Master Complaint for actual, compensatory and punitive damages and other relief arising from the oil spill by the Deepwater Horizon oil vessel in the Gulf of Mexico on April 20, 2010, and state as follows:

---

[2] While the B3 Bundle is also defined to include economic claims relating to post-explosion clean-up efforts that may be asserted by some plaintiffs against defendants not named in the Amended B1 Master Complaint, Plaintiffs do *not* assert, within this Master Complaint, damages under the Oil Pollution Act of 1990 or tort law for lost profits and/or loss of earning capacity against the Clean-Up Defendants or Chemical Manufacturing Defendants. *Nor* do the plaintiffs herein assert claims for damage to real or personal property against the Clean-Up Defendants or Chemical Manufacturing Defendants under maritime tort law or the OPA. The *only* purely economic losses or damages claimed herein are contractual damages which may be owed by BP and/or a Clean-Up Defendant under a VoO or other similar Charter Agreement or other contract, relating to the plaintiff's vessel charter or clean-up efforts.

**ANSWER:**

The BP Parties admit that on April 20, 2010, there was a loss of control of the well being drilled by the vessel *Deepwater Horizon* in the Gulf of Mexico, and that there followed one or more fires and explosions, the sinking of the vessel, and a release of oil from the *Deepwater Horizon* or its appurtenances into the Gulf of Mexico, some of which reached the shorelines of Louisiana, Mississippi, Alabama, and Florida. The BP Parties further admit that as permitted in the National Contingency Plan and with the approval of the Unified Command, dispersants were applied to mitigate the potential impacts of the oil spill. The BP Parties also admit that the well was capped, that hundreds of lawsuits related to the spill have been filed in state and federal courts, that this Court entered the orders referenced above, and that this is the MDL Plaintiffs' class-action complaint for claims for personal injury and/or medical monitoring claims, a/k/a the "B3 Bundle" claims. The BP Parties deny the remaining allegations of this Introduction.

1.     On April 20, 2010, at approximately 9:45 p.m. CST, a well blowout caused explosions on the *Deepwater Horizon*, an oil vessel in the Gulf of Mexico, igniting a raging, gas-fueled fire on the vessel. After burning for two days, the vessel sank to the ocean floor.

**ANSWER:**

The BP Parties admit that on April 20, 2010, at approximately 9:49 p.m. CST, a well blowout caused one or more fires and explosions on the *Deepwater Horizon*, a drilling rig located in the Gulf of Mexico, and that on April 22, 2010 the *Deepwater Horizon* sank. The BP Parties deny the remaining allegations of this paragraph.

2.     As the *Deepwater Horizon* tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end, as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

**ANSWER:**

The BP Parties admit that as the *Deepwater Horizon* sank it caused the riser to bend and break, that hydrocarbons escaped through portions of the riser, and that the blowout preventer installed on the *Deepwater Horizon* failed to seal the well, resulting in the further release of hydrocarbons into the Gulf of Mexico.  The BP Parties deny the remaining allegations of this paragraph.

3.      Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines, where oil made landfall on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that hydrocarbons from the *Deepwater Horizon* or its appurtenances entered the water column and reached the surface of the Gulf of Mexico and that some hydrocarbons reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties further admit that as permitted in the National Contingency Plan and with the approval of the Unified Command, dispersants were applied to mitigate the potential impacts of the oil spill.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

4.      In the wake of the disaster, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.  This disaster response plan had three primary components: subsea response; offshore containment; and shoreline protection.

**ANSWER:**

The BP Parties admit that they submitted a regional Oil Spill Response Plan for the Gulf of Mexico to the U.S. government that contained all components specified at the time by the U.S. government, that such a Plan was approved by the U.S. government and in effect at the time of the *Deepwater Horizon* incident, and that BP implemented the Plan that was approved and in effect on April 20, 2010. The BP Parties also admit that they undertook subsea response, offshore oil containment, and shoreline protection efforts in response to the *Deepwater Horizon* incident, under the supervision of the Unified Command. The BP Parties deny the remaining allegations of this paragraph.

5. BP's response to its self-created disaster included the use of chemical dispersants manufactured by Nalco that were intended to break down the oil into finely dispersed droplets. Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

**ANSWER:**

The BP Parties admit that dispersants manufactured by Nalco were used in the Response at the direction and with the approval of the Unified Command. The BP Parties further admit that those dispersants were formulated to include solvents, surface-active agents (i.e., surfactants) that break up the surface tension of an oil slick or sheen to make the oil more soluble in water, and other ingredients. The BP Parties deny the remaining allegations of this paragraph.

6. Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

**ANSWER:**

The BP Parties admit that dispersant was used in the Response at the direction and with the approval of the Unified Command.  Dispersant was applied to the water's surface through methods including aerial and vessel application and also below the surface of the ocean through subsea injection.  The dispersants used had been pre-approved for use by EPA and were applied pursuant to EPA and Coast Guard directives.  The BP Parties deny the remaining allegations of this paragraph.

7.      To date, BP and its contractors have used more than 1.8 million gallons of Nalco's chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

**ANSWER:**

The BP Parties admit that approximately 1.8 million gallons of dispersant were used in the Response at the direction of and with the approval of the Unified Command.  The dispersants used had been pre-approved for use by EPA and were applied pursuant to EPA and Coast Guard directives.  The BP Parties deny the remaining allegations of this paragraph.

8.      Many Plaintiffs are assisting in the effort to prevent oil slicks from reaching the shore, or cleaning oil spill residue from the beaches, marshes and estuaries by participating in the relief effort orchestrated by BP.  As part of this effort, Plaintiffs come into contact with crude oil, chemical dispersants and oil/chemical mixtures.  Even more disturbing, BP's aerial spray planes have negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and their crews in the vicinity of the spraying.

**ANSWER:**

The BP Parties admit that some Plaintiffs may have assisted in the Response.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

9.      Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.  Dispersant chemicals can affect many of the same organs.  These include:  respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys, endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, musculoskeletal system, hematopoietic system (blood forming), skin and integumentary system and disruption of normal metabolism.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


10.      Damage to these systems can cause a wide range of diseases and conditions.  Some of these diseases and conditions may be immediately evident, and others can appear months or years later.  The chemicals can impair normal growth and development through a variety of mechanisms, including endocrine disruption and direct fetal damage.  They can cause mutations that may lead to cancer and multi-generational birth defects.  Some of the chemicals are known carcinogens, such as benzene.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


11.      Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm.  In addition, the dispersants currently used can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.


12.      Many Plaintiffs have already experienced headaches, nausea, vomiting, dizziness, elevated blood pressure, eye and respiratory irritation, and rashes and/or chemical burns caused by coming into contact with oil and/or chemical dispersants.  Moreover, the odors emanating from the oil and/or the dispersants are foul and the fumes are harmful.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

13.     This First Amended Master Complaint is submitted pursuant to this Court's CMO No. 1, as: 1) an administrative device to serve the functions of efficiency and economy; and 2) to present certain common claims and common questions of fact and law for appropriate action by this Court in the context of this multidistrict proceeding.

**ANSWER:**

The BP Parties admit that this First Amended Master Complaint was submitted pursuant to this Court's CMO No. 1.  The BP Parties admit that the First Amended Master Complaint presents claims, questions of facts, and questions of law sufficiently common for the underlying cases to be transferred to this Court under 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings.  The BP Parties deny the remaining allegations of this paragraph.

14.     This First Amended Master Complaint does not include all claims asserted in all of the actions that have been transferred to this Court pursuant to the Transfer Order, nor is it intended to consolidate for any purposes the separate claims of the Plaintiffs.  Those claims are set forth in the individual and class actions filed by each of the respective Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

15.     This First Amended Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in the individual and class actions arising out of the Oil Spill, nor by it do the Plaintiffs relinquish the right to add or assert, or seek leave to add or assert, additional claims and parties defendant depending on further information learned through discovery or investigation.

**ANSWER:**

The BP Parties deny that this First Amended Master Complaint does not constitute a waiver or dismissal of any actions or claims, or that Plaintiffs do not relinquish the right to add

or assert additional claims and parties except as allowed by the Federal Rules of Civil Procedure and the Rules and Orders of this Court.  The BP Parties deny the remaining allegations of this paragraph.

16.	This First Amended Master Complaint makes allegations of common issues of law and/or fact relating to the liability of Defendants, and places Defendants on notice that Plaintiffs may seek certification of one or more classes and/or subclasses, as appropriate, for the class-wide determination of the common issues of law and/or fact relating to the liability of Defendants. To such classes and/or subclasses actual, compensatory and punitive damages should be awarded to Plaintiffs for the injuries they have sustained as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein.  Plaintiffs seek to maintain this action as a class action and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(3); (c)(4); and (c)(5).

**ANSWER:**

The BP Parties admit that Plaintiffs purport to make allegations of certification of one or more classes and/or subclasses under Rule 23 of the Federal Rules of Civil Procedure.  The BP Parties deny that any such class and/or subclasses are appropriate under Rule 23 of the Federal Rules of Civil Procedure at this stage of the proceedings and on the terms proposed by Plaintiffs. The BP Parties deny the remaining allegations of this paragraph.

17.	Further, additional parties will likely join as plaintiffs in this action after the filing of this First Amended Master Complaint, and those potential plaintiffs will have the opportunity to join this action by completing an online form dedicated to that purpose.

**ANSWER:**

The BP Parties deny that additional parties may join in this Complaint except as allowed by the Federal Rules of Civil Procedure and the Rules and Orders of this Court.  The BP Parties deny the remaining allegations of this paragraph.

18.	In accordance with Paragraph 18 of PTO No. 25, the factual allegations pleaded in the Amended Master Complaint for the B1 Pleading Bundle [Doc 1128] are fully incorporated into and made a part of this First Amended Master Complaint

**ANSWER:**

The BP Parties adopt and incorporate by reference all pleadings and motions filed in response to any matter that Plaintiffs purport to incorporate by reference, including but not limited to Document 1440, the BP Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) & 12(b)(6) Plaintiffs' First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses Filed in Accordance with PTO No. 11 (CMO No.1), Section III.B1 ("B1 Master Bundle"), served on all counsel on February 28, 2011 (hereafter "BP's Motion to Dismiss B1 Bundle Complaint""), filed and served on all counsel on February 28, 2011, and Document 4130, The BP Parties' Answer to the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No.11 [CMO No. 1] Section III(B1) ["B1 Bundle"], served on all counsel on September 27, 2011 (hereafter "BP's Answer to the B1 Bundle Complaint"). To the extent any more specific response is required to any purportedly incorporated allegations, the BP Parties deny them unless expressly admitted in a pleading responsive to any document from which Plaintiffs have purportedly incorporated allegations.

19.     This First Amended Master Complaint makes allegations of, and places Defendants on notice that Plaintiffs may seek, certification of one or more classes and/or subclasses, as appropriate, for the classwide determination of common issues of law and/or fact relating to the liability of Defendants to the members of such classes and/or subclasses for actual, compensatory, and punitive damages for the economic harm and damage to business and property Plaintiffs have incurred as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein. Plaintiffs will seek to maintain this action as a class action, and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(2); (b)(3); (c)(4); and (c)(5). Prior to any class certification motion, in sufficient time to place Defendants on fair notice and to enable appropriate discovery and briefing, with such scheduling subject to Court approval, Plaintiffs will identify those persons who will serve as proposed representatives for the class and/or subclasses sought to be certified and, if necessary, add or join them as parties hereto.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to make allegations of certification of one or more classes and/or subclasses under Rule 23 of the Federal Rules of Civil Procedure. The BP Parties deny that any such class and/or subclasses are appropriate under Rule 23 of the Federal Rules of Civil Procedure at this stage of the proceedings and on the terms proposed by Plaintiffs. The BP Parties deny the remaining allegations of this paragraph.

20.     Further, additional parties will likely join as plaintiffs in this action after the filing of this First Amended Master Complaint, and those plaintiffs will have the opportunity to adopt these allegations and join this action by completing a Direct File Short Form, in accordance with PTOs Nos. 24 and 25.

**ANSWER:**

The BP Parties deny that additional parties may join and adopt the allegations in this Complaint except as allowed by the Federal Rules of Civil Procedure and the Rules and Orders of this Court. The BP Parties deny the remaining allegations of this paragraph.

## II.    PARTIES

**A.    Plaintiffs**

21.     Plaintiffs are citizens of Florida, Alabama, Mississippi, Louisiana, Texas and other states, who have been exposed to harmful chemicals, odors and emissions during the clean-up following the *Deepwater Horizon* explosion. They fall into five basic categories:

(a)     Boat captains and crew involved in the Vessels of Opportunity program ("VoO program") who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities, and/or who were not adequately compensated for their work or time in the VoO program and/or whose property was damaged as a result of their work in the VoO program ("VoO Plaintiffs").

(b)     Workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities ("Decontamination Plaintiffs").

(c)     Vessel captains and crew who were not involved in the VoO program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities ("Vessel Plaintiffs").

(d)     Clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal and intertidal zones ("Onshore Plaintiffs").

(e)     Residents who live and work in close proximity to coastal waters or who otherwise allege that they were exposed to oil and/or dipersants (e.g. while on vacation) ("Resident Plaintiffs").

**ANSWER:**

The BP Parties admit that Plaintiffs purport to categorize themselves into the above categories.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

22.     Plaintiffs worked to clean up oil and chemicals caused by BP's *Deepwater Horizon* disaster, either on the water or on the beaches and other onshore areas, or were otherwise exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

**B.      Defendants**

***The BP Defendants***

23.     Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a holder of a lease granted by the former Minerals Management Service  ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

**ANSWER:**

The BP Parties admit that BPXP is a Delaware corporation, that it was a partial lease holder in the lease granted by the MMS/Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE") pursuant to which it was allowed to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, in which the Macondo Well was located and in which the Spill originated from the *Deepwater Horizon* and its appurtenances. The BP Parties deny the remaining allegations of this paragraph.

24.     The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the MMS throughout this First Amended Master Complaint.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

25.     BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.  This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit that BPXP is registered to do business in Louisiana, has a registered agent in Louisiana, and is subject to this Court's jurisdiction, and that BPXP was, together with other entities, designated as a Responsible Party under the Oil Pollution Act for the release of oil. As a Responsible Party under OPA, the BP Parties have expressed their commitment to pay all legitimate OPA claims.  Following the incident, the BP Parties quickly established a claims process.  And while operating their OPA claims process, the BP Parties paid nearly $400 million to individuals and businesses.  Following a June 16, 2010 meeting with President Obama, the BP

Parties agreed to transition its OPA claims process for individual and business claims to a facility administered by Kenneth Feinberg and to establish a $20 billion trust fund from which individual and business claims, state and local government claims, NRD and NRDA, and settlements and judgments can be paid.  The GCCF has paid over $6.6 billion for individual and business claims.  Further, BP has now entered into two proposed class settlements, subject to court approval, which has already paid claimants over $210 million as of October 24, 2012.  Additionally, BP continues to provide an OPA claims program.  The BP Parties further admit that BPXP is subject to this Court's jurisdiction.  The BP Parties deny the remaining allegations of this paragraph.  .

26.     Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America Production was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel.  This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

**ANSWER:**

The BP Parties admit that BPAP is a Delaware Corporation, is registered to do business in Louisiana, has a registered agent in Louisiana, is subject to this Court's jurisdiction, and that BPAP, as successor to Vastar Resources Inc., and Transocean Holdings LLC, as successor to R&B Falcon Corp., were parties to a drilling contract concerning the use of the *Deepwater Horizon*.  The BP Parties deny the remaining allegations of this paragraph.

27.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

14

**ANSWER:**

The BP Parties admit that BP p.l.c. is a British Public Limited Company organized under the laws of England and Wales, which is publicly traded with its headquarters in London, England, and that BP p.l.c. is not contesting the jurisdiction of this Court in this case.  The BP Parties deny the remaining allegations of this paragraph

28.     BP p.l.c. has submitted to this Court's jurisdiction by responding to Plaintiffs' discovery requests.

**ANSWER:**

The BP Parties admit that BP p.l.c. has responded to a limited amount of discovery and that it is not contesting the jurisdiction of this Court in this case.  The BP Parties deny the remaining allegations of this paragraph.

29.     BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP p.l.c.'s contacts with the U.S. are as follows:  (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

**ANSWER:**

The BP Parties admit that BP p.l.c. lists American Depository Shares on the New York Stock Exchange and that it files an annual 20-F Report with the U.S. Securities and Exchange Commission.  The BP Parties deny the remaining allegations of this paragraph.

30.     This Court has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and with the U.S. more generally), and has been served with a summons in individual complaints that are the subject of this First Amended Master Complaint and/or has

been served with and/or has waived and/or accepted service of the original B1 Bundle and B3 Bundle Master Complaints.

**ANSWER:**

The BP Parties admit that BP p.l.c. has been served with a summons in some individual complaints which are the subject of this Complaint.   The BP Parties deny the remaining allegations of this paragraph.

31.     Alternatively, this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. and has been served with a summons in individual complaints that are the subject of this First Amended Master Complaint and/or has been served with and/or has waived and/or accepted service of the original B1 Bundle and B3 Bundle Master Complaints.

**ANSWER:**

The BP Parties admit that BP p.l.c. has been served with a summons in some individual complaints which are the subject of this Complaint.   The BP Parties deny the remaining allegations of this paragraph.

32.     This Court also has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.   Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana, and BP, p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.   These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP, p.l.c. after the blowout in attempting to contain the Oil Spill. BP p.l.c. and has been served with a summons in individual complaints that are the subject of this First Amended Master Complaint and/or has been served with and/or accepted service and/or waived service of the original B1 Bundle and B3 Bundle Master Complaints.

**ANSWER:**

The BP Parties admit that BP p.l.c. has been served with a summons in some individual complaints which are the subject of this Complaint.   The BP Parties deny the remaining allegations of this paragraph.

33.     In addition, this Court also has personal jurisdiction over BP p.l.c. under agency and alter ego principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana.   BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

34.     Moreover, BP p.l.c. undertook the duty for pay and/or gratuitously to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

35.     BP Exploration, BP America and BP p.l.c. are generally referred to collectively as "BP."   As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

**ANSWER:**

The BP Parties admit that Plaintiffs refer to BPXP, BPAP, and BP p.l.c. collectively as BP, but deny that this is appropriate.   The BP Parties further admit that BPXP was the lease operator exclusively for purposes of the Outer Continental Shelf Lands Act and its regulations of Mississippi Canyon Block 252, which contains the Macondo Well, and that BPXP had certain responsibilities with regard to assessing the geology of the prospect site, engineering the well

design, obtaining appropriate regulatory approvals for well operations, and retaining and overseeing its contractors working on various aspects of the well and drilling operations.  The BP Parties deny the remaining allegations of this paragraph.

### The Transocean Defendants

36.   Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that, upon information and belief, maintains U. S. offices in Houston, Texas, and at all pertinent times was, upon information and belief, doing business in the United States and the State of Louisiana, including within this district.

**ANSWER:**

The BP Parties admit that Transocean Ltd. is a Swiss Corporation that, on information and belief, maintains substantial U. S. offices in Houston, Texas either directly or through its affiliates.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

37.   Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas.  The BP Parties admit that Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

38.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district.  Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Transocean Deepwater Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas.  The BP Parties admit that Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

39.     Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Louisiana and within this district.  Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.   More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico.  On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the diesel fuel which escaped from the surface following the explosion aboard the Deepwater Horizon.

**ANSWER:**

The BP Parties admit that Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas.  The BP Parties admit that Transocean Holdings is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.  The BP Parties further admit Transocean Holdings and various other Transocean Ltd. affiliates including Transocean Offshore, Transocean Deepwater, and Triton participated in the *Deepwater Horizon's* offshore

oil drilling operations at the Macondo prospect.  The BP Parties further admit Transocean

Holdings, as successor to R&B Falcon Drilling Co., and BP America Production Company, as

successor to Vastar Resources, Inc., were parties to a drilling contract concerning the use of the

*Deepwater Horizon*.  On information and belief, the BP Parties further admit that on April 28,

2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil

Pollution Act for both discharges from the *Deepwater Horizon* on or above the surface of the

water and for discharges said to be from the wellhead.  The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this

paragraph, and therefore deny them.

40.     Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability
company with its principal place of business in Zug, Switzerland. Triton is affiliated with
Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the
Deepwater Horizon.

**<u>ANSWER:</u>**

The BP Parties admit that Triton is a Swiss corporation with its principal place of

business in Zug, Switzerland.  The BP Parties admit that Triton is affiliated with Transocean Ltd.

and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater*

*Horizon*.  The BP Parties lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations of this paragraph, and therefore deny them.

41.     Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore,
Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the
Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it.
At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was
responsible for maintaining well control equipment, such as the blowout preventer and its control
systems.  Transocean also provided operational support for drilling-related activities on board the
Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all
times relevant to the Oil Spill.

**ANSWER:**

The BP Parties admit that Transocean was responsible for maintaining well control equipment, such as the blowout preventer and its control systems.  The BP Parties further admit that Transocean was responsible for drilling the well, as well as onshore supervision and support for those drilling activities.  The BP Parties deny the remaining allegations of this paragraph.

### *The Anadarko and Mitsui Defendants*

42.     Defendant Anadarko Petroleum Corporation Co. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas.  Anadarko is registered to do and does business in the State of Louisiana.  Anadarko is an oil and gas exploration and production company.  At all relevant times, Anadarko was a party to the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), and held a 2.5% ownership interest in the lease of the Macondo Prospect site in Mississippi Canyon Block 252 in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that Anadarko is a Delaware corporation, is an oil and gas exploration and production company, was at relevant times a party to the Operating Agreement, and that as a result of various agreements, BPXP and Anadarko were co-lessees under the Lease. The BP Parties deny that Anadarko held a 2.5% interest in the Lease as of April 20, 2010 because Anadarko E&P Company LP had assigned its 22.5% interest to Anadarko, bringing Anadarko's total interest to 25%.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

43.     Defendant Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas.  Anadarko E&P is registered to do and does business in the State of Louisiana.  Anadarko E&P is an oil and gas exploration and production company.  At all relevant times, Anadarko E&P was a party to the Operating Agreement, and held a 22.5% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that Anadarko E&P is a Delaware limited partnership, was at relevant times a party to the Operating Agreement, and that at certain times prior to April 20, 2010, BPXP and Anadarko E&P were co-lessees under the Lease.  The BP Parties deny that Anadarko E&P held a 22.5% interest in the Lease as of April 20, 2010 because it had assigned its interest to Anadarko.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

44.    Defendant MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas.  MOEX Offshore does business in the State of Louisiana and/or in state and/or federal waters off the coast of Louisiana. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, which in turn is a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd. ("MOECO").  However, MOEX Offshore is not a distinct corporate entity performing autonomous business activities, but is instead an entity wholly dominated and controlled by its ultimate parent company, MOECO, as alleged below.  At all relevant times, MOEX Offshore was a party to the Operating Agreement, and held a 10% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that as a result of various agreements, BPXP and MOEX Offshore were co-lessees under the Lease and that MOEX Offshore held a 10% interest in the Lease as of April 20, 2010.  The BP Parties further admit, based on information and belief, that MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, and MOECO is the parent company of MOEX USA Corporation.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

45.    Defendant MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas.  However, MOEX USA is not a distinct corporate entity performing autonomous business activities, but is instead an entity created solely to serve as a holding company for other corporate entities, including MOEX

Offshore, and is dominated and controlled by its parent company, MOECO, as alleged below. MOEX USA is named as a defendant herein because it is part of the corporate construct by which MOECO owns, dominates, controls, and benefits from the activities of MOEX Offshore.

**ANSWER:**

The BP Parties admit that MOEX USA is an affiliate of MOEX Offshore.  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remaining

allegations of this paragraph, and therefore deny them.

46.    Defendant Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan.  MOECO wholly owns MOEX USA, which in turn wholly owns MOEX Offshore.  As alleged more fully below, MOECO is named as a defendant herein because at all relevant times it dominated and controlled the activities of MOEX Offshore and MOEX USA, such that it is the alter ego of its subsidiaries, MOEX Offshore and MOEX USA, thus requiring that the liability of MOEX Offshore and/or MOEX USA be imputed to MOECO.  Alternatively, as also alleged below, MOEX Offshore and MOEX USA acted at all relevant times as agents of MOECO, and the liability of those entities should therefore be imputed to MOECO.

**ANSWER:**

The BP Parties admit that MOECO is an affiliate of MOEX and MOEX Offshore.  The

BP Parties lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations of this paragraph, and therefore deny them.

47.    As alleged below, MOECO's activities in the United States, including in this and all relevant jurisdictions, have been continuous and systematic.  MOECO has purposely availed itself of the protections, benefits, and privileges of American law and should have reasonably anticipated being involved in this litigation in the United States.  Moreover, because at all relevant times MOECO asserted domination and control over the business, operations and policy decisions of MOEX Offshore and MOEX USA, those U.S. companies were merely the alter egos and/or agents of MOECO.  Thus, MOECO is subject to the exercise of both general and specific jurisdiction by this Court, an exercise of jurisdiction that will not offend traditional notions of fair play and substantial justice.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

48.     MOECO is a majority-owned subsidiary of Mitsui & Co., Ltd. ("Mitsui").  Mitsui is a publicly traded company, whose American depository shares are traded on the NASDAQ Global Select Market.  MOECO is listed in Mitsui's consolidated financial statements and filings with the U.S. Securities and Exchange Commission as a "major" subsidiary of Mitsui.  MOECO is engaged in the business of "exploration, development, production and sales of crude oil, natural gas and other mineral resources and investment in companies engaged in these activities."

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

49.     MOECO operates through its own activities and those of its subsidiaries and affiliates located throughout the world, including in the United States.  Since MOECO opened its office in Houston, Texas, in February 2002, "we have been expanding our business in the USA," and "striving to acquire assets with high potential" in the United States.  MOECO identifies the United States as a "Focus Area" that it seeks to continue to "develop into [a] Core Area[.]"  MOECO has identified itself as having at least the following subsidiaries or affiliates in the United States: MOEX USA, MOEX Offshore, MitEnergy Upstream LLC ("MitEnergy"), Mitsui E&P USA LLC, MOEX Gulf of Mexico Corporation, and MOEX Oil & Gas Texas LLC.  Each of these subsidiaries of MOECO shares the same Houston, Texas, address, and many of the same directors and managers as each other and MOECO.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

50.     MOECO's expansion of its United States business ventures has included numerous oil and gas exploration and investment activities in the Gulf of Mexico.  For example, in May 2006, MOECO and Mitsui acquired a 50% interest in an oil and gas leasehold in the Gulf of Mexico.  The Japanese companies established MitEnergy for the purpose of holding that interest.  In November 2009, MOECO and Mitsui arranged for that company to sell their Gulf of Mexico oil and gas assets to a third party, the proceeds of which sale solely benefited MOECO.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

51.    In July 2007, MOECO entered into an agreement with BP E&P for a partial interest in an ultra-deep gas exploration project at the Gouda Prospect site in the Gulf of Mexico, noting in a press release that its participation in this project "provides an excellent opportunity to further expand its business in the U.S." As alleged more fully below, MOECO later orchestrated a transaction in which it used MOEX Offshore to obtain a 10% working interest in the Macondo Prospect site through an exchange with BP E&P, swapping MOECO's interest in the Gouda Prospect for the 10% interest in the Macondo Prospect.

**ANSWER:**

The BP Parties admit that on or about July 24, 2007, Mitsui Oil Exploration Co., Ltd., issued a press release that "announce[d] that it has entered into Acquisition [sic] and Participation Agreement with BP Exploration & Production Inc. ('BP') on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico ('GOM') which is being actively pursued by BP," and went on to say that, "MOECO's participation in this project provides an excellent opportunity to further expand its business in the U.S." The BP Parties further admit that, on or about November 18, 2009, BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into a Lease Exchange Agreement, in which MOEX obtained a 10% record title interest in Mississippi Canyon Block 252 and transferred a 10% record title interest in Garden Banks Block 997 to BP. The BP Parties deny the remaining allegations of this paragraph.

52.    More recently, in February 2010, MOECO reported that it had entered into yet another new business in the United States when "we [MOECO and Mitsui] entered into a definitive agreement with a partner to participate in the development and production of the Marcellus Shale Gas Project in the State of Pennsylvania."

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

53.    Although MOEX Offshore was the entity identified as the owner of the 10% leasehold interest in the Macondo Prospect – a 10% interest in the hydrocarbons extracted from

that location – it was MOECO that was responsible for creating MOEX Offshore and its immediate holding company, MOEX USA, and for orchestrating the acquisition of the ownership interest in the Macondo Prospect.  As alleged above, in July 2007, MOECO announced it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. … on the 29th of June, 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico … which is being actively pursued by BP."  That gas exploration project was the exploratory drilling exercise at the Gouda Prospect site in the Garden Banks Block 997 in the Gulf of Mexico.  MOECO announced that it would own a 15% leasehold interest in the Gouda Prospect site (an interest apparently later reduced to 10%).

**ANSWER:**

The BP Parties admit that the November 18, 2009 Lease Exchange Agreement between

BP Exploration & Production Inc. and MOEX Offshore 2007 LLC provided MOEX Offshore

2007 LLC with a 10% record title interest in Mississippi Canyon Block 252.  The BP Parties

further admit that on or about July 24, 2007, Mitsui Oil Exploration Co., Ltd., issued a press

release that "announce[d] that it has entered into Acquisition [sic] and Participation Agreement

with BP Exploration & Production Inc. ('BP') on the 29th of June 2007 to participate in an ultra-

deep gas exploration project in the Gulf of Mexico ('GOM') which is being actively pursued by

BP," and went on to say that "interests in the project will be BP (75%), MOECO (15%) and

other (10%)."  The BP Parties lack knowledge or information sufficient to form a belief about

the truth of the allegations that "MOECO . . . was responsible for creating MOEX Offshore and

is its immediate holding company, MOEX USA, and for orchestrating the acquisition of the

ownership interest in the Macondo Prospect," and therefore deny them.  The BP Parties deny the

remaining allegations of this paragraph.

54.     In September 2007, MOECO, through its agent/alter ego MOEX USA, established MOEX Offshore for the purpose of holding MOECO's interests in various Gulf of Mexico projects, including the Gouda Prospect, and later, the Macondo Prospect.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

55.    In November 2009, BP E&P and MOEX Offshore entered into a Lease Exchange Agreement (effective October 1, 2009), pursuant to which MOEX Offshore conveyed to BP E&P its interest in the Gouda Prospect site, and BP E&P, in exchange, conveyed to MOEX Offshore a 10% interest in the Macondo Prospect site. A condition of the Lease Exchange Agreement was that MOEX Offshore pay BP E&P "cash consideration of 1.92 million dollars," to be "allocated" to the Macondo Prospect lease. The Lease Exchange Agreement also refers to a February 15, 2008, operating agreement between BP E&P, as operator, and the MOECO subsidiary, MitEnergy, as non-operator, concerning the Gouda Prospect lease. Upon information and belief, Plaintiffs allege that it was in fact MOECO that caused and directed MOEX Offshore to enter into the Lease Exchange Agreement for the purpose of obtaining a leasehold interest in the Macondo Prospect.

**ANSWER:**

The BP Parties admit that, on or about November 18, 2009, BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into a Lease Exchange Agreement with an "Effective Date" of October 1, 2009. The BP Parties further admit that the November 18, 2009 Lease Exchange Agreement provided MOEX with a 10% record title interest in Mississippi Canyon Block 252 and transferred a 10% record title interest in Garden Banks Block 997 from MOEX to BP. The BP Parties further admit that the November 18, 2009 Lease Exchange Agreement provided, "MOEX shall pay BP a cash consideration of one million nine hundred and twenty thousand dollars (US $1,920,000.00)," and that, "[t]he cash consideration shall be allocated to the BP Property." The BP Parties further admit that the November 18, 2009 Lease Exchange Agreement defines "Gouda Operating Agreement" to mean "that certain Operating Agreement dated as of February 15, 2008, between BP Exploration & Production Inc., as operator, and MitEnergy Upstream LLC, as non-operator, covering Lease OCS-G 31687 (Garden Banks Block 997)." The BP Parties lack knowledge or information sufficient to form a belief

27

about the truth of the allegation that, "it was in fact MOECO that caused and directed MOEX Offshore to enter into the Lease Exchange Agreement for the purpose of obtaining a leasehold interest in the Macondo Prospect," and therefore deny it.  The BP Parties deny the remaining allegations of this paragraph.

56.     On or about October 1, 2009, BP E&P, as the Operating Party, and MOEX Offshore, as a Non-Operating Party, entered into the Operating Agreement.  On or about December 17, 2009, BP E&P, MOEX Offshore, Anadarko, and Anadarko E&P executed a "Joinder" of the Operating Agreement.  Subsequently, the parties to the Operating Agreement held the following working interest ownership percentages in the lease of the Macondo Prospect: BP E&P, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and Anadarko, 2.5%.

**ANSWER:**

The BP Parties admit that, on or about November 2009, BP Exploration & Production Inc. and MOEX Offshore 2007 LLC entered into the Macondo Prospect Offshore Deepwater Operating Agreement ("Macondo Operating Agreement"), with an effective date of October 1, 2009.  The BP Parties further admit that, on or about December 17, 2009, BP Exploration & Production Inc., Anadarko E&P Company LP ("Anadarko E&P"), and Anadarko Petroleum Corporation ("Anadarko") entered into a Ratification and Joinder of Operating Agreement Macondo Prospect, in which Anadarko E&P and Anadarko "do hereby ratify, confirm, and adopt and join the" Macondo Operating Agreement.  The BP Parties admit that the November 18, 2009 Lease Exchange Agreement between BP Exploration & Production Inc. and MOEX Offshore 2007 LLC provided MOEX Offshore 2007 LLC with a 10% record title interest in Mississippi Canyon Block 252.  The BP Parties further admit that, on or about December 17, 2009, BP Exploration & Production Inc., Anadarko, and Anadarko E&P entered into a Lease Exchange Agreement, which provided Anadarko E&P with a 22.5% record title interest in Mississippi Canyon Block 252 and provided Anadarko with a 2.5% record title interest in Mississippi Canyon Block 252.  The BP Parties admit that BP Exploration & Production Inc. retained a 65%

record title interest in Mississippi Canyon Block 252.  The BP Parties deny the remaining allegations of this paragraph.

57.     At all times relevant herein, MOECO has dominated and controlled the business, operations, policies, and actions of MOEX Offshore and MOEX USA to the extent that there is no meaningful distinction between them and MOECO, and they are more accurately described as agents and/or alter egos of MOECO, rather than simply its subsidiaries.  MOECO dominates and controls MOEX Offshore and MOEX USA through, inter alia: financial, operational, and policy control; a lack of corporate formalities at MOEX Offshore and MOEX USA; and nearly identical directors, managers, and/or executive officers.   For example, the same six individuals are directors, managers, and/or officers of both MOEX Offshore and MOEX USA; four of them are also MOECO directors and executive officers, and the Texas Secretary of State lists MOECO's Tokyo address for all of the overlapping directors/officers.  MOEX USA and MOEX Offshore also share the same Houston, Texas, office and have a common president, Naoki Ishii.  Upon information and belief, Mr. Ishii is the only management-level employee of MOEX Offshore and MOEX USA, and he reports directly to MOECO directors and/or executive officers.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

58.     Although Mr. Ishii has issued public statements with regard to the Deepwater Horizon disaster and the ensuing Spill, it has been MOECO, speaking on behalf of MOEX Offshore and itself, that has been the primary source of public statements concerning the Spill and its aftermath.  MOECO's parent, Mitsui, has also made numerous public statements about the potential impact of the Spill on its financial condition.  Upon information and belief, Plaintiffs allege that all public statements about the Spill and its aftermath by or on behalf of MOEX Offshore, as well as all operational and financial decision-making concerning the Spill and its aftermath (including the payment, or non-payment, of response and clean-up expense invoices from BP E&P), have been made and directed by MOECO (and in some instances, Mitsui).

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

59.     Thus, neither MOEX Offshore nor MOEX USA are operated as corporations distinct from each other or from MOECO – rather, MOECO conducts its U.S. activities through these agent/alter ego entities, and all activities of MOEX Offshore and MOEX USA should be

imputed to MOECO, subjecting MOECO to the exercise of general and/or specific personal jurisdiction in the United States and by this Court.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

### *The Drilling Defendants*

60.    BP, Transocean, Moex and Anadarko, (together with Halliburton Energy Services, Inc., which has been tendered to Plaintiffs by Transocean pursuant to Rule 14(c)), are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to refer to BP, Transocean, Halliburton,

MOEX, and Anadarko as the Drilling Defendants.   The BP Parties deny the remaining

allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.

The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-

Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in

Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against

Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against

Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the

remaining allegations of this paragraph to the extent they are alleged by one or more of the BP

Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this

paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075,

and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations of this paragraph to the extent they are not directed at the

conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

61.    Drilling Defendants are jointly, severally, and solidarily liable under various principles of maritime and/or applicable State and/or Federal tort law.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

### *The Clean-Up Defendants*

62.    Defendant Marine Spill Response Corporation ("MSRC") is a Tennessee non-profit corporation with its principal place of business in Herndon, Virginia, and at all pertinent times was doing business in the State of Louisiana.  MSRC participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that MSRC provided response services.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

63.    Defendant Airborne Support, Inc. ("ASI") is a Florida corporation with its principal place of business in Houma, Louisiana, and at all pertinent times was doing business in the State of Louisiana. ASI participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that ASI provided response services.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

64.    Defendant Airborne Support International, Inc. ("ASI International") is a Louisiana corporation with its principal place of business in Houma, Louisiana, and at all pertinent times was doing business in the State of Louisiana. ASI International participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that ASI provided response services.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

65.    Defendant Lynden, Inc. is a Washington Corporation with its principal place of business in Seattle, Washington, which at all pertinent times was doing business in the State of Louisiana by virtue of its 100 percent ownership interest in Defendant Lynden Air Cargo, LLC, an Alaska limited liability company with is principal place of business in Seattle, Washington, which at all pertinent times was doing business in the State of Louisiana, (collectively "Lynden"). Lynden participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that Lynden provided response services.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

66.     Defendant Dynamic Aviation Group, Inc., ("Dynamic") is a Virginia corporation with its principal place of business in Bridgewater, Virginia and at all pertinent times was doing business in the State of Louisiana.  Dynamic participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that Dynamic provided response services.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

67.     Defendant International Air Response, Inc. ("IAR") is an Arizona corporation with its principal place of business in Coolidge, Arizona and at all pertinent times was doing business in the State of Louisiana.  IAR participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that IAR provided response services.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

68.     Defendant Lane Aviation ("Lane") is a Texas corporation with its principal place of business in Rosenberg, Texas and at all pertinent times was doing business in the State of Louisiana. Lane participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that Lane provided response services.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

69.     Defendant National Response Corporation ("NRC") is a Delaware corporation with its principal place of business in Great River, New York, and at all pertinent times was doing business in the State of Louisiana (together with SEACOR Holding, Inc., a Delaware corporation with its principal place of business in Delaware, of which NRC is a wholly-owned subsidiary). NRC participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that NRC provided response services.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

70.     Defendant O'Brien Response Management, Inc. ("O'Brien") is a Louisiana corporation with its principal place of business, upon information and belief, in the Parish of St. Tammany, State of Louisiana. O'Brien participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that O'Brien provided response services.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

71.     Defendant The Modern Group, Ltd., is a Texas for profit business entity, with its principal place of business in Beaumont, Texas. Individually, and/or through one or more of its partners, subsidiaries and/or affiliated entities, including, but not limited to, The Modern Group GP-SUB and/or Tiger Rentals, Ltd., (collectively "Modern Group"), the Modern Group, upon information and belief, participated in the post-explosion Oil Spill remediation and response efforts, through its ventures "Tiger Safety" and/or "Tiger Rentals", the names under which the Modern Group does business in the Parish of Broussard, State of Louisiana.

**ANSWER:**

The BP Parties admit that Modern Group provided response services. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

72. Defendant DRC Emergency Services, LLC ("DRC") is an Alabama limited liability company that at all pertinent times was doing business in the State of Louisiana. DRC participated in the post-explosion Oil Spill remediation and response efforts.

**ANSWER:**

The BP Parties admit that DRC provided response services. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

73. Defendants MSRC, NRC, IAR, ASI, ASI International, Lane, Lynden, Dynamic, O'Brien, Modern Group and DRC are collectively referred to as the "Clean-Up Defendants."

**ANSWER:**

The BP Parties admit that Plaintiffs refer to MSRC, NRC, IAR, ASI, ASI International, Lane, Lynden, Dynamic, O'Brien, Modern Group and DRC as Clean-Up Defendants. The BP Parties deny the remaining allegations of this paragraph.

### *The Chemical Manufacturer Defendants*

74. Defendant Nalco Company ("Nalco") is a Delaware corporation. At all pertinent times, Nalco was doing business in the State of Louisiana.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

75.     Nalco is the manufacturer of the chemical dispersants commonly referred to as Corexit® purchased by BP for use in connection with clean-up efforts in response to the Oil Spill.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

76.     Nalco, together with other John Doe manufacturers of dispersants employed by BP, are sometimes referred to herein as "Chemical Manufacturer Defendants."

**ANSWER:**

The BP Parties admit that Plaintiffs refer to Nalco and other John Doe manufacturers of dispersants as Chemical Manufacturer Defendants.   The BP Parties deny the remaining allegations of this paragraph.

### *Unknown Defendants*

77.     Defendant Corporations A-Z are corporations or companies whose identities and/or proper corporate names are currently unknown.  All allegations and claims asserted herein against Defendants are incorporated by reference against Defendants Corporations A-Z.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

78.     Defendants John and Jane Does A-Z are persons or entities whose identities and/or proper corporate names are currently unknown.  All allegations and claims asserted herein against Defendants are incorporated by reference against John and Jane Does A - Z

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

*Joint, Several and Solidary Liability*

79.     Each of the Defendants named herein is jointly, severally, and/or solidarily liable under various principles of maritime and/or applicable State and/or Federal tort law.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.


III.     **JURISDICTION AND VENUE**

80.     Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

**ANSWER:**

The BP Parties deny the allegations of this paragraph.


81.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1333.

**ANSWER:**

The BP Parties admit that Plaintiffs' claims fall within the jurisdictional grant of 28 U.S.C. § 1333.  The BP Parties deny, however, that in cases where federal statutory law displaces admiralty law the existence of maritime jurisdiction brings with it maritime law.

82.    This Court also has jurisdiction over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

**ANSWER:**

The BP Parties admit that the Court has jurisdiction over Plaintiffs' claims pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101.  The BP Parties deny the remaining allegations of this paragraph.

83.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:**

The Court dismissed state law claims in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent, however, that Plaintiffs were to reassert any state law claims, the BP Parties admit that the Court would have supplemental jurisdiction over them, but also note that such claims would also be preempted.

84.    The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and Claimants hereby designate this case as an admiralty or maritime case as provided in Rule 9(h).

**ANSWER:**

The BP Parties admit that Plaintiffs' claims fall within the jurisdictional grant of 28 U.S.C. § 1333 and that they are subject to the provisions of Rule 9(h) of the Federal Rules of Civil Procedure, and hence would be tried without a jury.  The BP Parties deny, however, that in cases where federal statutory law displaces admiralty law the existence of maritime jurisdiction brings with it maritime law.

85.     Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District.  Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order, subject to the provisions of the Direct Filing Order (PTO No. 20).

**ANSWER:**

The BP Parties admit that venue is proper in this district in accordance with the Order of this Court and the JPML, consistent with the limits on what may be properly adjudicated in multidistrict litigation.  The BP Parties reserve all of their rights under *Lexecon, Inc. v. Milberg Weiss Bershad Hines & Lerach*, 523 U.S. 26 (1998).  The BP Parties deny the remaining allegations of this paragraph.

## IV.     FACTUAL ALLEGATIONS

### A.     The *Deepwater Horizon* Catastrophe

86.     The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was leased to BP through September 2013.  It was one of the largest vessels of its kind.

**ANSWER:**

The BP Parties admit that the *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  The BP Parties deny that they leased the

*Deepwater Horizon*.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

87.    BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

**ANSWER:**

The BP Parties admit that the *Deepwater Horizon* was used to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, which is located on the Outer Continental Shelf off of the coast of Louisiana.  The BP Parties deny the remaining allegations of this paragraph.

88.    On April 20, 2010, and as described in greater detail in the Amended Master Complaint for Pleading Bundle B1 [Doc 1128], (whose factual allegations are incorporated fully by reference herein), workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

**ANSWER:**

The BP Parties adopt and incorporate by reference all pleadings and motions filed in response to any matter that Plaintiffs purport to incorporate by reference, including but not limited to BP's Motion to Dismiss B1 Bundle Complaint and BP's Answer to the B1 Bundle Complaint.  To the extent any more specific response is required to any purportedly incorporated allegations, the BP Parties deny them unless expressly admitted in a pleading responsive to any document from which Plaintiffs have purportedly incorporated allegations.

89.    The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel.  The fire burned for two days, and the vessel began to list progressively more until it finally sank on April 22, 2010.

**ANSWER:**

The BP Parties admit that one or more explosions and fires occurred on the *Deepwater Horizon*, resulting in the death of eleven persons and the injury of others. The BP Parties further admit that the vessel sank on April 22, 2010. The BP Parties deny the remaining allegations of this paragraph.

90.     The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape under water, extended from the well to 1,500 feet above the sea bed and then buckled back down. Oil flowed out from the open end of the riser and from at least two places along its length.

**ANSWER:**

The BP Parties admit that the riser connected to the *Deepwater Horizon* bent and broke as the vessel sank, resulting at that point in the release of hydrocarbons from the BOP and/or the riser. The BP Parties deny the remaining allegations of this paragraph.

91.     While crude oil was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

**ANSWER:**

The BP Parties admit that on April 20, 2010 the Macondo Well experienced a loss of well control and on July 15, 2010, the well was successfully capped. The BP Parties further admit that hydrocarbons that once existed deep inside the Outer Continental Shelf travelled during the spill out of the Macondo reservoir, through the well, and then through the Transocean owned vessel appurtenances include the BOP and riser, before discharging at that point into the Gulf of Mexico waters or being captured by various containment methods. The BP Parties deny the remaining allegations of this paragraph.

92.     After the explosions, BP attempted to downplay and conceal the severity of the Spill.  Its initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its measured leakage amount of 50,000 barrels per day.  Moreover, following the Oil Spill, BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Oil Spill.

**ANSWER:**

The BP Parties deny any and all allegations of wrongdoing against the BP Parties, including allegations that they downplayed, understated, or concealed the severity of the Spill. The BP Parties deny the remaining allegations of this paragraph.

93.     On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had actually revealed that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons per day.

**ANSWER:**

The BP Parties admit that Congressman Edward Markey released a BP document that hypothesized that the flow rate up the casing could be as high as 100,000 barrels per day "if BOP and wellhead are removed and if we have incorrectly modeled the restrictions.[3]"  BP-HZN-2179MDL01443509.  The BP Parties deny the remaining allegations of this paragraph.

94.     The flow of oil continued unabated, and the ever-expanding oil slick made landfall on April 30, 2010, and will continue to affect greater areas of the Gulf coastline as it is driven landward by currents and winds.

**ANSWER:**

The BP Parties admit that some hydrocarbons reached Louisiana on or about April 30, 2010.  The BP Parties deny the remaining allegations of this paragraph.

---

[3] By referencing BP-HZN-2179MDL01443509, the BP Parties neither admit nor imply that this document or the referenced statement is admissible into evidence and expressly reserve all objections to the use or admissibility of the document or the referenced statement.

95.     After the Oil Spill, an oil slick with a range of thousands of miles had formed and could be seen from outer space.  Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico.  The Oil Spill caused this slick and these plumes to form. Oil washed and is washing ashore in the Gulf of Mexico, posing significant environmental and public health risks.

**ANSWER:**

The BP Parties admit that hydrocarbons from the *Deepwater Horizon* or its appurtenances entered the water column and reached the surface of the Gulf of Mexico and that some hydrocarbons reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

96.     As the oil made landfall along the Gulf Coast, it infiltrated and will continue to infiltrate the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, Texas and Florida, requiring clean up.

**ANSWER:**

The BP Parties admit that some hydrocarbons from the *Deepwater Horizon* or its appurtenances reached portions of the shorelines of Louisiana, Mississippi, Alabama, and Florida.  The BP Parties deny that hydrocarbons reached Texas.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

97.     For 86 days, oil spewed into the Gulf of Mexico from the damaged well, dumping an estimated 200 million gallons of crude oil into sensitive ecosystems.

**ANSWER:**

The BP Parties admit that hydrocarbons flowed from the *Deepwater Horizon* or its appurtenances from April 20, 2010 until the well was capped on or around July 15, 2010.  The BP Parties deny the remaining allegations of this paragraph.

98.     On July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon*, BP finally capped the well.

**ANSWER:**

The BP Parties admit that the well was capped on July 15, 2010.  The BP Parties deny the remaining allegations of this paragraph.

99.     The OPA imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

**ANSWER:**

The BP Parties admit that 33 U.S.C. § 2702, the text of which speaks for itself, states the above quoted language.  The BP Parties deny the remaining allegations of this paragraph to the extent they are inconsistent with 33 U.S.C. § 2702.

100.    The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

101.    After the Oil Spill, the Coast Guard formally and/or informally designated Defendants BP Exploration, Anadarko E&P, Anadarko, MOEX and Transocean Holdings as "responsible parties" under the OPA.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

**B.      The Response Effort and the Vessels of Opportunity**

102.    After the disaster, BP began implementing a disaster response plan to prevent oil from escaping the blown out well, to manually contain the oil, and to disperse oil in the water using Nalco's chemical dispersants.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

103.    As part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct *in situ* burning of oil that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

104.    The VoO program is touted by BP as a key component to BP's response to the disaster.  BP used at least 2,000 commercial and charter fishing vessels and other boats from communities along the shoreline to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating on the water's surface.  Other VoOs worked with absorbent booms used to soak up some of the millions of gallons of oil coming to the surface of the Gulf. Still other VoOs supported *in situ* burning efforts.  Some VoOs conducted skimming operations to skim oil off the surface.  Other VoOs recover light oil and tar balls.

**ANSWER:**

The BP Parties admit that the VoO program was a program set up by the Unified Command through which BPAP and BPXP contracted directly with vessel owners in connection with the response to the MC 252 #1 Macondo Well oil spill, which occurred in connection with the sinking of the *Deepwater Horizon* mobile offshore drilling unit.  The BP Parties further admit that vessels in the VoO program performed a variety of response, recovery and containment activities, including towing and deploying of boom, skimming oil, locating and recovering tar balls, transporting supplies and personnel, and supporting controlled *in situ* burning operations. The BP Parties deny the remaining allegations of this paragraph.

105.    Plaintiff vessel owners who participated in the VoO program generally entered into Master Vessel Charter Agreements (the "Charter Agreements") under which Defendant BP (or, in some cases, sub-contractors, including, upon information and belief, one or more of the Clean-Up Defendants), chartered their vessels pursuant to the VoO program.

**ANSWER:**

The BP Parties admit that BPXP and BPAP, under the Unified Command established program, entered into Master Vessel Charter Agreements, the texts of which speak for themselves, with certain vessel owners who participated in the VoO Program. The BP Parties deny the remaining allegations of this paragraph.

106.    Pursuant to the Charter Agreements, BP agreed that the General Maritime Laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreements, and that only in the event that the general maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern.

**ANSWER:**

The BP Parties admit that BPXP and BPAP entered into Master Vessel Charter Agreements, the texts of which speak for themselves. The BP Parties further admit that the Master Vessel Charter Agreements contain the following provision: "The rights and obligations of the Parties to this Charter including all matters of construction, validity and performance, shall in all respects be governed and enforced in accordance with the general maritime laws of the United States. In the event, but only in the event, the maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern."

107.    The Charter Agreements were subsequently amended by letter agreement, stipulation and/or court order, and the amendments apply retroactively to the date of the initial signing of the Charter Agreements.

**ANSWER:**

The BP Parties admit the Master Vessel Charter Agreements were amended by letter agreement, stipulation and/or court order, the text of which speaks for itself. The BP Parties deny the remaining allegations of this paragraph.

108.    In addition, Defendant BP made various statements and representations in the press, in court proceedings, on BP's website, and/or otherwise, in which BP recognized and/or voluntarily assumed responsibility for the safety and protection of workers engaged in the VoO program. *See, e.g.,* Doc 127-7, filed in No. 10-1156 (June 16, 2010); *see also,* 40 C.F.R. ¶300.150.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

109.    Defendant BP is subject to a letter agreement and/or court order that prevents it from attempting to enforce against VoO Plaintiffs any releases contained in Charter Agreements and/or other documents engaging VoO Plaintiffs.

**ANSWER:**

The BP Parties admit that they entered into a Consent Judgment related to specific provisions of the Charter Agreements on May 4, 2010 in *Barisich v. BP, p.l.c., et al.*, case number 2:10-cv-01316-CJB-SS in the Eastern District of Louisiana, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph.

110.    The Charter Agreements provided that the charter terms continued until the vessels were detoxified and the boats received off charter dispatch notifications.  Many vessels were laid off in August and September of 2010 and were detoxified, but the owners were told that they were not released from the charters until they received off charter dispatch notifications.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

111.    In most cases, off charter dispatch notifications were not received until November 26, 2010.  The owners of these vessels did not return to fishing because they understood that they were still under charter until they received the off charter dispatch notification.  Some VoO vessel owners did not receive off charter dispatch notifications until December, 2010 or January, 2011.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

112.     Despite its detention of the VoO vessels through November 26, 2010 and beyond, BP (and/or the other contracting Clean-Up Defendant) has refused to pay these vessel owners for the period between the initial detoxification and the off charter notification during which they were unable to return to their livelihoods.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

113.     The VoO vessels sustained substantial physical damage as the result of their participation in the program.  The oil remediation efforts required of the vessels participating in the VoO program required the vessels to navigate through oil contaminated waters, staining propellers, rudders, and engines.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

114.     Initially, BP instructed the VoO vessel owners that their vessels would regularly undergo detoxification when they returned to shore on standby.  However, although large commercial vessels regularly underwent decontamination, VoO vessels did not.  As a result, large quantities of oil and other toxins accumulated on and in the VoO vessels.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

115.     When decontamination and detoxification was finally performed on the VoO vessels, the procedure was often performed inadequately, without full environmental protection, causing damage to the VoO vessels, their hulls, decks, equipment and/or other appurtenances.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

116.    Because the vessels remained covered in oil and chemicals for weeks and, in some cases, months before detoxification, oil hardened like a varnish on hulls and decks of the vessels so that when detoxification was finally performed, the removal of the contaminants would cause paint to peel from the hulls, decks, equipment and appurtenances of the vessels.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

117.    In addition, BP installed its oil containment equipment for oil remediation on the back of VoO vessels and, when that equipment was removed, the decks were often damaged with holes and dents.  BP has failed to compensate the VoO vessel owners for this damage.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

118.    BP (and/or, in some cases, a Clean-Up Defendant) has failed to pay VoO vessel owners for the period during which their vessels were inoperable due to vessel damage to oil containment operations, inadequate detoxification, and/or damage due to removal of BP (and/or other Clean-Up Defendant) equipment, and/or has otherwise failed to compensate the VoO Plaintiff per the terms of the charter agreement, and/or has otherwise, upon information and belief, withheld compensation contingent upon the execution of a full and final release of all spill-related damages and claims

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

119.    To qualify as a crew member on a VoO, a person must complete a four-hour worker safety training program.  Successful completion of the program results in the issuance of a "Petroleum Education Card."

**ANSWER:**

The BP Parties admit that VoO crew members were required to complete a four-hour worker safety training program in order to be eligible to participate in the VoO Program. The BP Parties further admit that, in many cases, crew members received a "Petroleum Education Card" following their completion of the four-hour worker safety training program. The BP Parties deny the remaining allegations of this paragraph.

120.    If BP deems that a vessel will come in contact with oil, it need only be staffed with one person who has completed a forty-hour Occupational Safety and Health Administration ("OSHA") Hazardous Waste Operations and Emergency Response awareness training class.

**ANSWER:**

The BP Parties provided all necessary safety training and equipment for the various tasks that each VoO vessel was asked to perform throughout its participation in the VoO Program. The BP Parties deny the remaining allegations of this paragraph.

121.    BP requires vessels working near the source of the Oil Spill to provide crewmembers with respirators and appropriate training and fitting, but claims that no VoOs will be deployed near the source.

**ANSWER:**

The BP Parties provided all necessary safety training and equipment for the various tasks that each VoO vessel was asked to perform throughout its participation in the VoO Program. The BP Parties also, as a term of contract, generally required their contractors and sub-contractors to comply with all appropriate health and safety standards, rules, and regulations. The BP Parties deny the remaining allegations of this paragraph.

**C.    The Use of Chemical Dispersants**

122.    In addition to directing vessels at sea, BP coordinates and directs aircraft owned and/or operated by Defendants MSRC, O'Brien, Modern Group, NRC, Lane, Dynamic, ASI,

ASI International, Lynden, IAR and others that fly out over the Gulf to spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf.

**ANSWER:**

The BP Parties admit that dispersants were used in the Response at the direction and with the approval of the Unified Command.  The dispersants used had been pre-approved for use by EPA and were applied pursuant to EPA and Coast Guard directives.  The BP Parties admit that the Federal On-Scene Coordinator approved and directed the aerial application of dispersants to the oil on the surface of the Gulf.  The BP Parties deny the remaining allegations of this paragraph.

123.    In addition to the VoO Program, Onshore Plaintiffs were hired by BP, or BP's clean up and response contractors, Defendants MSRC, O'Brien, Modern Group, DRC, NRC and perhaps other contractors, to clean up beaches, marshes, wetlands and other onshore areas by removing polluted sand, collecting tarballs, laying or collecting boom, hand-applying dispersant in inland areas, and other related clean up efforts.

**ANSWER:**

The BP Parties admit that they hired contractors MSRC, O'Brien, Modern Group, DRC, and NRC to assist with Response activities, but deny the remaining allegations of this paragraph.

124.    Defendants BP, MSRC, O'Brien, Modern Group, DRC and NRC also engaged Decontamination Plaintiffs to decontaminate vessels that had come into contact with oil and/or chemical dispersants and/or other hazardous chemicals used resulting from the Oil Spill.

**ANSWER:**

The BP Parties admit they hired contractors MSRC, O'Brien, Modern Group, DRC, and NRC to assist with Response activities, but deny the remaining allegations of this paragraph.

125.    Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants manufactured by Defendant Nalco to the resulting oil slicks and sheens on the surface of the Gulf.

**ANSWER:**

The BP Parties admit that on April 22, 2010, the aerial application of dispersant began in the Response at the direction and with the approval of the Unified Command.  The dispersants used had been pre-approved for use by EPA and were applied pursuant to EPA and Coast Guard directives.  The BP Parties deny the remaining allegations of this paragraph.

126.    Generally, the United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep. The Coast Guard's Federal On Site Coordinator (the "On Site Coordinator") must approve BP's requests to use chemical dispersants.

**ANSWER:**

The BP Parties deny the allegations in this paragraph.

127.    The Material Safety Data Sheet ("Data Sheet") – a form that sets for the properties of a particular substance, including its toxicity and health effects - for Nalco's Corexit® 9500 indicates that it contains the following hazardous substances: petroleum distillates, propylene glycol and organic sulfonic acid salt.  The Data Sheet for Nalco's Corexit® 9500 states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

**ANSWER:**

The BP Parties admit that the Material Safety Data Sheet ("MSDS") for Corexit 9500 speaks for itself, and deny the allegations of this paragraph to the extent they are not consistent with the MSDS.

128.    The Data Sheet for Nalco's Corexit® EC9527A indicates that it contains the following hazardous substances: 2-butoxyethanol (EGBE), organic sulfonic acid salt and propylene glycol.  The Data Sheet for Nalco's Corexit® EC9527A states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

**ANSWER:**

The BP Parties admit that the Material Safety Data Sheet ("MSDS") for Corexit 9500 speaks for itself, and deny the allegations of this paragraph to the extent they are not consistent with the MSDS.

129.   Both Nalco's Corexit® products used by BP contain non-specified organic sulfonic acid salt, which is "moderately toxic."

**ANSWER:**

The BP Parties admit that both Corexit products approved by, and used during the Response at the direction of, the Unified Command contain organic sulfonic acid salt.  The BP Parties deny the remaining allegations of this paragraph.

130.   On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than Nalco's Corexit® dispersants BP had been using.

**ANSWER:**

The BP Parties admit that on May 20, 2010, BP received a directive from the U.S. Coast Guard and the U.S. Environmental Protection Agency ("EPA") instructing that, within 24 hours, "BP shall identify to the FOSC and the EPA RRT Co-Chair for EPA's and the FOSC's approval, one or more approved dispersant products from the National Contingency Plan Product Schedule that are available in sufficient quantities, are as effective at dispersing the oil plume, and have a toxicity value less than or equal to 23.00 ppm LC50 toxicity value for Menidia or 18.00 ppm LC50 for Mysidopsis, as indicated on the NCP Product Schedule (http://www.epa.gov/oem/content/ncp/tox_tables.htm).  The less toxic dispersant product(s) shall be used by BP for surface application and subsurface application as directed by the FOSC. Within 72 hours after submitting the list of alternatives, and after receiving EPA approval, BP shall immediately use only the approved alternative dispersant.   Should BP not be able to

identify alternative dispersant products, BP shall provide the FOSC and EPA RRT CO-Chair a detailed description of the products investigated, the reason the products did not meet the standards described above.  Availability shall be based on existing stockpiles of dispersants, the estimated time to begin and aerial and subsurface application, time for manufacturing, shipping, and warehousing."  The BP Parties deny the remaining allegations of this paragraph.

131.    On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would continue using Nalco's Corexit®.

**ANSWER:**

The BP Parties admit that on May 20, 2010, after considering the criteria set forth in the directive, BP reported to EPA and the U.S. Coast Guard that the Corexit products, used at the direction and with the approval of the Unified Command, remained the best and most appropriate choice.  The BP Parties deny the remaining allegations of this paragraph.

132.    BP's use of chemical dispersants skyrocketed: on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

**ANSWER:**

According to information and belief, BP, at the direction and with the approval of the Unified Command, used approximately 50,000 gallons of dispersant on May 22, 2010, and approximately 18,100 gallons of dispersant on May 23, 2010.  The BP Parties deny the remaining allegations of this paragraph.

133.    On May 26, 2010, the EPA directed BP to reduce overall use of Nalco's Corexit® by 75%.  The May 26, 2010 EPA directive also required BP to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On Site Coordinator.

**ANSWER:**

The BP Parties admit that on May 26, 2010, the EPA directed BP to reduce dispersant and set a target of 75% reduction from peak usage.  The BP Parties further admit that the EPA directed that any use of dispersants on the surface would thereafter require written approval of the Federal On Scene Coordinator.  The BP Parties deny the remaining allegations of this paragraph.

134.    Since the May 26, 2010 EPA directive, BP has sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that following the May 26, 2010 EPA directive, BP requested and received approval from Unified Command to use chemical dispersants on the surface of the Gulf of Mexico.  The BP Parties deny the remaining allegations of this paragraph.

135.    According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP has applied 933,023 gallons by aerial application.  BP ordered the application by 386 flights, or sorties, as of that same date.  BP and Clean-Up Defendants have covered approximately 291 square miles of the Gulf with dispersant.  As of June 26, 2010, 718,454 gallons of Nalco's Corexit® 9500 have been sprayed on the Gulf and 214,569 gallons of Nalco's Corexit® 9527.  Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.

**ANSWER:**

The BP parties admit that the Aerial Dispersants Operations-Houma Status Report dated June 26, 2010 indicates that Unified Command had approved and directed the aerial application of 933,023 gallons of dispersants as of that date.  The BP Parties also admit that the June 26, 2010 Report states that 386 sorties had been flown as of that date and that approximately 292 square miles of the Gulf had been sprayed with dispersant.  The BP Parties also admit that the June 26, 2010 Report states that 718,454 gallons of Nalco's Corexit 9500 and 214,569 gallons of

Nalco's Corexit 9527 had been sprayed, and that May 22, 2010 was the last day that Corexit

9527 was used.  The BP Parties deny the remaining allegations of this paragraph.

136.    According to the Aerial Dispersants Operations – Houma Status Report, as of
June 26, 2010, BP makes use of at least 10 spray aircraft and eight spotter aircraft.  At least six
spray planes leave from Stennis International Airport in Alabama.  At least four spray planes
leave from Houma, Louisiana.

**ANSWER:**

The BP Parties admit that the Aerial Dispersants Operations-Houma Status Report dated

June 26, 2010 speaks for itself.  The BP Parties deny the remaining allegations of this paragraph

to the extent they are inconsistent with the Aerial Dispersants Operations-Houma Status Report

dated June 26, 2010.

137.    MSRC owns at least six of the eight spotter aircraft used in connection with BP's
aerial spraying of chemical dispersants.  MSRC and/or its contractor Dynamic operate the spotter
aircraft.

**ANSWER:**

The BP Parties admit that BP contracted with MSRC to provide services related to the

Response, including related to reconnaissance of oil and spraying dispersant used in connection

with aerial dispersant operations authorized and directed by the Unified Command.  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remainder

of the allegations of this paragraph, and therefore deny them.

138.    MSRC owns four of the ten spray planes used in connection with BP's aerial
spraying of chemical dispersants. MSRC and/or its contractors, Lynden Air Cargo and/or
Dynamic Aviation, operate the spray planes.

**ANSWER:**

The BP Parties admit that BP contracted with MSRC to provide services related to the

Response, including related to the spraying of dispersant by Dynamic Aviation and Lynden Air

Cargo as part of aerial dispersant operations authorized and directed by the Unified Command. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remainder of the allegations of this paragraph, and therefore deny them.

139.    ASI and/or ASI International own and operate at least two spotter aircraft and three spray planes used in connection with BP's aerial spraying of chemical dispersants.

**ANSWER:**

The BP Parties admit that ASI provided at least two spotter aircraft and three spray planes used in connection with aerial dispersant operations authorized and directed by the Unified Command.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remainder of the allegations of this paragraph, and therefore deny them.

140.    IAR owns and operates at least one spray plane used in connection with BP's aerial spraying of chemical dispersants.

**ANSWER:**

The BP Parties admit that IAR operated at least one spray aircraft used in connection with aerial dispersant operations authorized and directed by the Unified Command.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remainder of the allegations of this paragraph, and therefore deny them.

141.    Dynamic owns and operates at least one spray plane used in connection with BP's aerial spraying of chemical dispersants.

**ANSWER:**

The BP Parties admit that Dynamic Aviation operated at least one spray aircraft used in connection with aerial dispersant operations authorized and directed by the Unified Command. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remainder of the allegations of this paragraph, and therefore deny them.

142.    Lane owns one spray plane used in connection with BP's aerial spraying of chemical dispersants, which is operated by NRC.

**ANSWER:**

The BP Parties admit that Lane provided at least one spray aircraft used in connection with aerial dispersant operations authorized and directed by the Unified Command.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remainder of the allegations of this paragraph, and therefore deny them.

143.    Upon information and belief, aerial dispersant sorties also leave from airfields in Florida and are conducted and orchestrated by BP and Clean-Up Defendants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

144.    Defendant Nalco knew or should have known that its chemical dispersants would be applied beneath the surface of the water, on the surface of the water, and aerially from planes.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

145.    Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began authorizing the application of chemical dispersants

manufactured by other companies to contaminated vessels, containment equipment and near-shore and onshore areas to disperse the oil and clean vessels and equipment.

**ANSWER:**

The BP Parties admit that on or about April 22, 2010, the United Command began authorizing and directing the use of pre-approved dispersants to break up surface oil slicks.  The BP Parties deny the remaining allegations of this paragraph.

146.    The Data Sheet for PES51™ indicates that it contains Cyclohexene,1-methyl-4-(1-methylethenyl)-, (4R) (CAS No. 5989-27-5).  The Data Sheet for PES51™ also states that it is should be handled with gloves and that it is moderately flammable and poses a slight risk to human health.  It is an irritant and dermal exposure and ingestion should be avoided.

**ANSWER:**

The BP Parties admit that the MSDS for PES-51™ states that PES-51™ contains d-Limonene (CAS No. 5989-27-5).  The BP Parties also admit that the MSDS for PES-51™ lists chemical resistant gloves as a recommended form of personal protective equipment.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remainder of the allegations of this paragraph, and therefore deny them.

147.    The Data Sheet for OMI-500® indicates that it contains Propylene Glycol T-Butyl Ether and nonionic surfactants.  The Data Sheet for OMI-500® also states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

**ANSWER:**

The BP Parties admit that the MSDS for OMI-500® states that OMI-500® contains Propylene Glycol T-Butyl Ether and nonionic surfactants.  The BP Parties deny the remaining allegations of this paragraph.

**D.    Plaintiffs' Exposure to Harmful Chemicals**

148.    Upon information and belief, VoO Plaintiffs are working on boats, which are part of the "Vessel of Opportunity" Program that are dispatched to lay boom to absorb the oil, or to

haul in oil saturated booms, among other activities.  In this capacity, Plaintiffs are exposed to crude oil and/or crude oil mixed with chemical dispersants.  In many instances, workers get sea water mixed with crude oil and/or chemical dispersants on their skin.  They also inhale fumes from the crude oil and/or chemical dispersants.

**ANSWER:**

The BP Parties admit that persons involved in the VoO program laid and removed boom.

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations of this paragraph, and therefore deny them.

149.    Because Plaintiffs working on VoOs are not deemed by BP to be working near the source of the Oil Spill, they are not outfitted with respirators or equivalent safety devices.

**ANSWER:**

The BP Parties provided all necessary safety training and equipment for the various tasks

that each VoO vessel was asked to perform throughout its participation in the VoO Program.

The BP Parties deny the remaining allegations of this paragraph.

150.    Upon information and belief, some VoO Plaintiffs have attempted to use respirators and masks not supplied by BP and have been prevented by BP, and/or Clean-Up Defendants, as well as threatened with loss of VoO wages if they wear respirators.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

151.    Upon information and belief, when VoOs spot oil slicks, they are instructed to contact BP directly and to provide BP with the coordinates of the slick.  Upon receiving this information, Clean-Up Defendants dispatch a spray plane from an airfield to the coordinates given and instruct the pilot to spray the chemical dispersant from its cargo hold.

**ANSWER:**

The BP Parties admit that VoO vessels were instructed to inform BP of the coordinates of

any oil slicks that they spotted while performing VoO activities.  The BP Parties also admit that,

in certain situations and when appropriate, spray planes were dispatched to apply chemical

dispersants on the identified areas. The BP Parties deny the remaining allegations of this paragraph.

152. Upon information and belief, the VoOs are not given warning by BP or Clean-Up Defendants of the plane's approach and are either directly or indirectly in the path of the spray zone, and/or the chemical dispersant spray drifts over the VoOs and its crew.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

153. VoO Plaintiffs' primary tasks are to lay boom to absorb the oil, or to haul in oil-saturated booms. In this capacity, VoO Plaintiffs are exposed to crude oil, oil and dispersants and/or other harmful chemicals by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes when they haul in the booms.

**ANSWER:**

The BP Parties admit that persons involved in the VoO program laid and removed boom. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

154. Upon information and belief, Vessel Plaintiffs in the vicinity of aerial spraying have also not received warning of aerial dispersant missions and have come into contact by inhalation and dermal exposure with dispersants and oil/dispersant mixtures, oil and/or other harmful chemicals.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

155.     Onshore Plaintiffs' primary tasks are to lay boom, haul boom, install other barriers, collect tar balls, remove polluted sand contaminated with oil and/or dispersants and other activities.   In this capacity, Onshore Plaintiffs are exposed to crude oil by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes from spray mist.

**ANSWER:**

The BP Parties admit that onshore Response workers performed various tasks related to

cleaning up the spill.  The BP Parties lack knowledge or information sufficient to form a belief

about the truth of the remaining allegations of this paragraph, and therefore deny them.

156.     Upon information and belief, some Onshore Plaintiffs have attempted to use respirators and masks while hauling boom, collecting tar balls, removing oil and/or dispersant-polluted sand and other activities, and have been prevented by BP, and/or Clean-Up Defendants from using respirators or masks, as well as threatened with loss of their clean up jobs if they do not abide by the instruction.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny

them.

157.     Decontamination Plaintiffs' primary task is to spray and clean vessels that come into contact with oil and dispersants and other harmful chemicals resulting from the Oil Spill and the application of dispersants.  In this capacity, Decontamination Plaintiffs are exposed to crude oil and dispersants and other harmful chemicals by inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

158.     Resident Plaintiffs, due to the proximity of their homes and schools to the Gulf of Mexico, and the actions and omission by Defendants, have been exposed to oil, dispersants, and other harmful chemicals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

159.    Upon information and belief, when the chemical dispersant comes into contact with eyes, it causes irritation.  When the chemical dispersant comes into contact with skin, VoO Plaintiffs, Onshore Plaintiffs, Decontamination Plaintiffs, Vessel Plaintiffs and some Resident Plaintiffs complain of rashes, lesions and burns.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

160.    Resident Plaintiffs live and/or work in close proximity to areas that are the subject of Defendants' remedial activities.  Due to their physical location, Resident Plaintiffs are subjected to fumes and odors from the oil and dispersants.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

161.    Plaintiffs complain of the noxious odors and experience headaches, nausea, vomiting, respiratory problems and eye irritation, among other adverse health effects associated with exposure to chemicals in the environment resulting from the Oil Spill.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

*The Crude Oil*

162.   The crude oil contains benzene and other volatile organic compounds ("VOCs") – chemical compounds that can affect the environment and human health -- such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc.

**ANSWER:**

The BP Parties admit that, depending on its chemical state, crude oil can contain benzene and other VOCs, including polycyclic aromatic hydrocarbons.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

163.   According to a presentation made in June 2010 to the Institute of Medicine of the National Academies entitled "Assessing the Human Health Effects of the Gulf of Mexico Oil Spill: An Institute of Medicine Workshop," dermal exposure to certain VOCs in crude oil can cause redness, swelling, irritation and rash and blisters on the skin and mucous membranes. Inhalation exposure to certain VOCs in crude oil can cause ocular redness, soreness, watering and itching.  Inhalation exposure to certain other VOCs in crude oil can cause coughing, throat irritation, shortness of breath and wheezing.  Inhalation exposure to other VOCs in crude oil can also affect the nervous system causing nausea, vomiting, dizziness, irritability, confusion and weakness of extremities.  Ingestion of food or water containing VOCs from crude oil can cause nausea, vomiting and diarrhea.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

164.   Chemicals such as benzene and PAHs are toxic components of crude oil and of grave concern.  These and many other chemicals in crude oil are volatile, moving from the oil into the air.  Once airborne, they can blow over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors. Consequently, both those working on the spill and people who are a distance from it can be exposed to crude oil chemicals in the air.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

165.    According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen.  Benzene in the crude oil can cause a variety of specific effects described in the recent Centers for Disease Control ("CDC") summary of benzene toxicity: ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

**ANSWER:**

The BP Parties admit that the Agency for Toxic Substances and Disease Registry ("ASTDR") is an agency of the U.S. Department of Health and Human Services and that its pronouncements relating to benzene speak for themselves.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them, including to the extent they are not consistent with the ASTDR's pronouncements.

166.    A 2007 CDC review of benzene toxicity concluded that there is substantial human evidence that benzene causes leukemia.  It also reports aplastic anemia (a precursor of leukemia), chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system and abnormal development of blood cells.  When blood cells are deficient, this can cause other serious medical conditions, including infection due to a lack of leukocytes and increased cardiac stress due to a lack of erythrocytes.  Long term low level oral and inhalation exposures have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

167.    As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress:  "Oil can remain toxic in the environment for years."

**ANSWER:**

The BP Parties admit that Dr. Lisa Kaplowitz stated the above quoted language.[4]  The BP

Parties lack knowledge or information sufficient to form a belief about the truth of the remaining

allegations of this paragraph, and therefore deny them.

### *The Dispersants*

168.    The dispersants used by BP and the Clean-Up Defendants are known to cause
headaches, nausea, vomiting, diarrhea, abdominal pains, dizziness, chest pains and tightness,
irritation of the eyes, nose, throat and lung, decreased lung function, breathing difficulties,
respiratory system damage, rapid breathing, asthma attacks, allergic reactions, skin irritation,
damage, and sensitization, hypertension, damage to liver and kidneys, central nervous system
depression, neurotoxic effects, damage to red blood cells, genetic damage and mutations,
reproductive and developmental damage, immune system damage, cardiac arrhythmia,
cardiovascular damage and increased severity of chronic obstructive pulmonary disease.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth

of the allegations of this paragraph, and therefore deny them.

169.    BP and Clean-Up Defendants used and, upon information and belief, continue to
use the dispersants Corexit® 9500 and 9527 (more than 1.8 million gallons to date) to disperse
the crude oil on the surface of the Gulf of Mexico and to disperse the crude oil near the wellhead
5,000 feet below the surface of the Gulf of Mexico.

**ANSWER:**

The BP Parties admit that the Unified Command authorized and directed the use of

approximately 1.8 million gallons of pre-approved chemical dispersants both on the surface of

the Gulf of Mexico and below the surface of the Gulf of Mexico through subsea injection.  The

BP Parties deny the remaining allegations of this paragraph.

---

[4] By referencing the statement of Dr. Lisa Kaplowitz, the BP Parties neither admit nor imply that
the referenced statement is admissible into evidence and expressly reserve all objections to the
use or admissibility of the document or the referenced statement.

170.   Nalco's Data Sheet for Corexit® 9500 indicates that it contains petroleum distillates, propylene glycol and organic sulfonic acid salt.  The Data Sheet states that it is an eye and skin irritant.  It is harmful if inhaled, if ingested, or if it comes into contact with skin.  If it comes into contact with the eyes or skin it can cause irritation.  It is harmful if absorbed through the skin. If ingested, it may cause chemical pneumonia.  If inhaled, it may irritate the respiratory tract.

**ANSWER:**

The BP Parties admit that the MSDS for Corexit 9500 indicates that Corexit 9500 contains petroleum distillates, propylene glycol and organic sulfonic acid salt.  The BP Parties also admit that the material safety data sheet for Corexit EC9500 states that Corexit EC9500 may cause irritation to skin and eyes with prolonged contact.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

171.   Nalco's Data Sheet for Corexit® EC9527A indicates that it contains 2-butoxyethanol (EGBE), organic sulfonic acid salt and propylene glycol.  The Data Sheet states that it is an eye and skin irritant.  It is harmful if inhaled, if ingested, or if it comes into contact with skin.  If it comes into contact with the eyes or skin it can cause moderate irritation.  It is harmful if absorbed through the skin. If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract.  If inhaled, it may irritate the respiratory tract.  Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

**ANSWER:**

The BP Parties admit that the Material Safety Data Sheet for Corexit EC9527A indicates that Corexit EC9527A contains 2-butoxyethanol, organic sulfonic acid salt and propylene glycol.  The BP Parties also admit that the material safety data sheet for Corexit EC9527A states that Corexit EC9527A is an eye and skin irritant.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

172.    According to the New Jersey's EGBE Hazardous Substance Right to Know Fact Sheet, repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys and the liver.  EGBE may be carcinogenic to humans.  It is an eye, nose and throat irritant.  It can cause nausea, vomiting, diarrhea and abdominal pain.  Exposure to EGBE can also cause headache, dizziness, lightheadedness and unconsciousness.  Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to the male and female reproductive systems in animals.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

173.    Both Corexit® products used by the Clean-Up Defendants contain non-specified organic sulfonic acid salt.

**ANSWER:**

The BP Parties admit that the Material Safety Data Sheets for Corexit EC9500 and Corexit EC9527A state that Corexit EC9500 and Corexit EC9527A contain non-specified organic sulfonic acid salt.

174.    Dioctyl sodium sulfosuccinate ("DSS") is an organic sulfonic acid salt.  DSS is irritating to the eyes and throat, and it may cause aspirin's gastrointestinal effects (mucosal damage) to be increased. It is absorbed from the gastrointestinal tract and excreted largely in bile.  Like many detergents, it has laxative effects.  DSS can increase the uptake of mineral oil and phenophthalein, suggesting that it may also increase the uptake of other oils and chemicals. The Hazardous Substances Data Bank reports that the American Medical Association's Council on Drugs identified docusate salts as potentially being toxic to the liver and describes DSS as "moderately toxic."

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

175.    Corexit® 9500 contains hydrotreated light petroleum distillates, which are believed to be very similar to kerosene.  According to the CDC's profile for kerosene, it is a toxic fuel with extensive information regarding acute and chronic health effects. Kerosene can enter the body when it is absorbed through the skin, or through inhalation or ingestion.  It is

poorly absorbed in the gastrointestinal system.   Kerosene can cause serious immediate respiratory health problems if substantial amounts are inhaled. In addition, inhalation or dermal exposure to kerosene can cause bronchoconstriction, which is relevant to asthmatics and other people with respiratory disorders.   Kerosene can damage the skin directly, causing blisters, erythema, peeling skin, reddening, soreness, burning, swelling and other damage.   Kerosene vapors can cause eye irritation.   Dermal exposure has caused hyperactivity and hyper-responsiveness to tactile stimulation.  Oral exposure to kerosene can cause vomiting, abdominal pain, gastroenteritis, bleeding and diarrhea.

**ANSWER:**

The BP Parties admit that the Corexit EC9500 MSDS states that Corexit EC9500 contains hydrotreated light petroleum distillates.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

176.    Propylene glycol has solvent properties and is used as a solvent in many applications.   It is present in both Nalco's Corexit® products used by BP and the Clean-Up Defendants.   According to the ASTDR, propylene glycol is a mild irritant, and its role as an allergic dermal sensitizer is not resolved.  Exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat and lung irritation.  Some people are allergic to this chemical, and those with eczema may be at higher risk.  Erythema, edema, induration and other skin problems have been reported.

**ANSWER:**

The BP Parties admit that the MSDS for Corexit EC9500 and Corexit EC9527A state that those Corexit products contain propylene glycol.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

177.    Although not listed as a separate ingredient of the dispersants, when the dispersants are manufactured, a byproduct is formed at that time: 1,4 dioxane.  According to the Agency for Toxic Substances and Disease Registry, exposure to high levels of  1,4 dioxane can result in liver and kidney damage and death.  Inhalation of low levels of 1,4 dioxane can irritate the eyes and nose.  The U.S. Department of Health and Human Services reasonably anticipates that exposure to 1,4 dioxane causes cancer.  The California Environmental Protection Agency lists 1,4 dioxane as a known carcinogen.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

178.    The Data Sheet for PES51™ indicates that it contains Cyclohexene,1-methyl-4-(1-methylethenyl)-, (4R) (CAS No. 5989-27-5).  The Data Sheet for PES51™ also states that it is should be handled with gloves and that it is moderately flammable and poses a slight risk to human health.  It is an irritant and dermal exposure and ingestion should be avoided.

**ANSWER:**

The BP Parties admit that the MSDS for PES-51™ states that PES-51™ contains d-Limonene (CAS No. 5989-27-5).  The BP Parties also admit that the material safety data sheet for PES-51™ lists chemical resistant gloves as a recommended form of personal protective equipment.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

179.    The Data Sheet for OMI-500® indicates that it contains Propylene Glycol T-Butyl Ether and nonionic surfactants.  The Data Sheet for OMI-500® also states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

**ANSWER:**

The BP Parties admit that the material safety data sheet for OMI-500® states that OMI-500® contains Propylene Glycol T-Butyl Ether and nonionic surfactants.  The BP Parties deny the remaining allegations of this paragraph.

180.    OMI-500® can be irritating to skin and eyes. High concentrations of vapor may cause irritation of the respiratory tract, experienced as nasal discomfort and discharge, possibly with chest pain and coughing. Headache, nausea, vomiting, dizziness, and drowsiness may occur. OMI-500® may cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva. Brief contact with OMI-500® may cause slight irritation with itching and local redness. Prolonged contact, especially with concentrate, may cause more severe irritation, with discomfort or pain. Swallowing OMI-500® may cause headache, dizziness, in-coordination, nausea, vomiting, diarrhea, and general weakness.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

### E.     Willful and Wanton Conduct of the Defendants

181.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* and during the subsequent attempt to clean the Oil Spill.  As demonstrated by the examples below, and by the foregoing factual allegations, Defendants' conduct evinced an ongoing willful, wanton, or reckless disregard for and indifference toward the safety of the people in the Gulf States and the environment of the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

182.    Defendants BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

183.    Defendants BP and Transocean recklessly, willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

184. Defendants recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs.

**<u>ANSWER:</u>**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

185.     Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

**F.      Defendants' Knowledge Of The Risks**

186.     OSHA, which promulgates regulations to protect worker safety in certain contexts, including hazardous waste activities and emergency responses, alerted the Coast Guard about its concerns over significant deficiencies in BP's Oil Spill response operations relating to worker safety.   OSHA repeatedly raised these concerns with BP as early as May 2010, but remained frustrated that BP did not address the most serious problems.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

187.    Commercial fishing vessels and other vessels that make up the majority of the volunteer response vessels in the VoO are not otherwise subject to inspection by the Coast Guard, and the captains and crew are not customarily trained to recognize or to avoid health hazards in the context of an oil spill.  Using these types of vessels is not unknown in response efforts, but OSHA training is required to properly assess and to avoid risks.

**ANSWER:**

The BP Parties admit that many of the volunteer response vessels in the VoO program were commercial fishing vessels.  The BP Parties provided all necessary safety training and equipment for the various tasks that each VoO vessel was asked to perform throughout its participation in the VoO Program.  The BP Parties deny the remaining allegations of this paragraph.

188.    Uninspected fishing vessels being used in response actions without training and inspection subjects the captains and crews to exposure to harmful chemicals found in crude oil and chemical dispersants.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

189.    BP and the Clean-Up Defendants, aware of the risks that fishing vessels would face, ignored worker safety concerns, even in the face of OSHA warnings and notification by the Department of Health and Human Services that vessels and clean up workers were complaining of illnesses after being exposed to oil and dispersants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

190.    At all times relevant to this litigation, Defendants knew or should have known that:

a.     crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

b.     chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

c.     Plaintiffs should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

d.     Plaintiffs should wear proper protective clothing and respirators.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

191.    The Oil Spill and the resulting contamination and use of chemical dispersants have caused and will continue to cause harm to people living and working in the Gulf States and the Gulf of Mexico.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

## V.   DAMAGES AND OTHER RELIEF REQUESTED

192.   As a result of Defendants' acts or omissions, many Plaintiffs have suffered the following physical injury damages:

      a.   Exposure to chemicals in crude oil that have caused adverse health effects;

      b.   Exposure to chemicals in weathered crude that have caused adverse health effects;

      c.   Exposure to chemicals in dispersants that have caused adverse health effects;

      d.   Exposure to chemicals in oil and dispersant mixtures that have caused adverse health effects; and

      e.   Costs incurred and inconvenience sustained in obtaining medical treatment for exposure to chemicals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

193.    Plaintiffs have suffered a discernible physical injury from exposure to oil, dispersants, and/or oil and dispersant mixtures.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

194.    Plaintiffs also demand injunctive and equitable relief and further, that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

195.    Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth in more detail in this First Amended Master Complaint, and if Defendants are not ordered to create, fund and support a medical monitoring program.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

196.    As a result of Defendants' acts or omissions, some Plaintiffs have suffered emotional distress caused by concern over exposure to chemicals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

197. Plaintiffs do *not* in this Master Complaint assert damages under the Oil Pollution Act of 1990 or tort law for lost profits and/or loss of earning capacity against the Clean-Up Defendants or Chemical Manufacturing Defendants. *Nor* do the plaintiffs herein assert claims for damage to real or personal property against the Clean-Up Defendants or Chemical Manufacturing Defendants under tort law or the OPA. The only purely economic losses or damages sought from any Clean-Up Defendant is compensation (if any) that may be owed by a Clean-Up Defendant under a VoO or other similar Charter Agreement or other contract, relating to the plaintiff's vessel charter or clean-up efforts.[5]

---

[5] VoO Plaintiffs and other Plaintiffs seek compensation for property damage, contractual damages, loss of profits and/or earning capacity, damage to or loss of use of their vessels, and/or other economic losses under OPA, their Charter Agreements, General Maritime Law, and/or otherwise, from BP and/or the other Drilling Defendants, within the Amended B1 Master Complaint [Doc 1128]. (*See* PTOs 11, 24 and 25) In addition, VoO Plaintiffs and other Plaintiffs herein may seek what could be described as "economic damages" directly associated with post-April 20, 2010 exposure, medical monitoring and/or personal injury claims, (*e.g.* medical bills, or loss of income as a result of personal injury or disability, etc.), from the Clean-Up Defendants, the Chemical Manufacturing Defendants, and/or the Drilling Defendants, herein.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

## VI.   CLASS ALLEGATIONS

198.   Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated as members of a proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.   This action satisfies the numerosity, adequacy, typicality and commonality requirements of Rule 23(a), and the predominance and superiority requirements of Rule 23(b)(3).

**ANSWER:**

The BP Parties admit that Plaintiffs purport to bring this suit on behalf of themselves and other similarly situated as members of a proposed Class.  The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT[6] (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP

---

[6]   Terms fully capitalized used in the Answer have the meanings ascribed to the fully capitalized rendering of such terms in Doc. 6273-1, the MEDICAL BENEFITS CLASS ACTION SETTLEMENT AGREEMENT, filed and served on April 18, 2012, as amended.

Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.  To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

199.    Plaintiffs seek certification of a Class and three Subclasses.  The Class is defined as all persons who have been exposed to oil, dispersants and/or other hazardous chemicals use for or resulting from the Oil Spill.  The Class definition is subject to refinement as events unfold and discovery proceeds.

**<u>ANSWER:</u>**

The BP Parties admit that Plaintiffs purport to make allegations of certification of one or more classes and/or subclasses under Rule 23 of the Federal Rules of Civil Procedure.  The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical

Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

200.    The three Subclasses are defined as follows: all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill:

(a)    Subclass A is comprised of all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and who presently have discernable physical injuries.

      (b)     Subclass B is comprised of all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill but who yet have no manifestation of physical injuries.

      (c)     Subclass C is comprised of all persons who have been exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and whose real or personal property has been damaged as a result.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to seek certification of the above defined Class and/or Subclasses. The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS

CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation

of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that

the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny

that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be

appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of

the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining

allegations of this paragraph.

201.   Excluded from the Class are (1) Defendants, any entity or division in which
Defendants have a controlling interest, and their legal representatives, officers, directors, assigns
and successors; and (2) the judge to whom this case is assigned and any member of the judge's
immediate family.

**ANSWER:**

The BP Parties admit that Plaintiffs purport to exclude from a Class (1) Defendants, any

entity or division in which Defendants have a controlling interest, and their legal representatives,

officers, directors, assigns and successors; and (2) the judge to whom this case is assigned and

any member of the judge's immediate family.  The BP Parties admit that the action in *Plaisance*

*v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly

maintained as a class action, but only to the extent: (1) required by the MEDICAL

SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's

Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement,

Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec.

Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of

a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec.

Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of

the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP

85

Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.   To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.   The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.   The BP Parties deny the remaining allegations of this paragraph.

## A.      Numerosity

202.    On information and belief, the Class consists of thousands of individuals who reside and/or work in the Gulf States and the Gulf of Mexico and have been injured by Defendants, making joinder impracticable.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed

with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.    Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

**B.    Typicality**

203.    The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, have been placed at risk of adverse effects and/or property damage proximately caused by exposure to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of

the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

204.    Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all members of the Class.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation

of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that

the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny

that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be

appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of

the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining

allegations of this paragraph.

## C.    Adequacy

205.    Plaintiffs will fairly and adequately represent and protect the interest of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort and complex class actions, including actions involving environmental contamination.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*,

Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the

extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2)

consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed

Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed

with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition

to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed

with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not

oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for

settlement purposes only.  The BP Parties do not waive or concede any position or arguments

they have for or against class certification of any class for any other purpose in any action or

proceeding.   Any  class  certification  order  entered  in  connection  with  this  MEDICAL

SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence,

that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any

other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the

MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.

To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS

CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation

of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that

the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny

that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be

appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of

the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining

allegations of this paragraph.


206.    Plaintiffs and their counsel are committed to prosecuting this action vigorously on
behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel
have interests adverse to those of the Class.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*,

Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the

extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2)

consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed

Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed

with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition

to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed

with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not

oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for

settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.    Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

### D.    Commonality and Predominance of Common Issues

207.    There are numerous questions of law and fact common to all Class members, and those questions predominate over any questions that may affect only individual Class members that satisfy the requirements of Rule 23(a)(2) and 23(b)(3).  Defendants subjected the Class members to the same unlawful conduct.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed

Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

208.    The predominant, common questions include the following:

a.      Whether Defendants were negligent in the use of dispersants and/or other hazardous chemicals;

b.      Whether Defendants' use of oil, dispersants and/or other hazardous chemicals is a public nuisance;

c.      Whether Defendants recklessly, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs;

d.      Whether Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs;

e.      Whether Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness;

f.      Whether Defendants should be liable for the costs of future medical screening and monitoring;

g.      Whether Defendants' use of dispersants as part of their response activities constitutes a battery;

h.      Whether Defendants were negligent in failing to warn against harm that could occur if its dispersants were used in the manner contemplated by BP and the Clean-Up Defendants;

i.      Whether Defendant Nalco is strictly liable for designing a defective product as it relates to its chemical dispersants; and

j.      Whether Defendant Nalco was negligent in designing and distributing unreasonably dangerous chemical dispersants.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2)

consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

**E.      Superiority**

209.    Absent class treatment, Plaintiffs and members of the Class will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

210. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class members' claims in comparison to the high litigation costs in complex environmental mass torts cases such as this litigation, few could likely seek their rightful legal recourse. Absent a class action, Class members would continue to incur harm without remedy.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding. Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence,

that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

211.    The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments

97

they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

## F.    Federal Rules Relating to Class Actions

212.    The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class and Subclass Members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass Members that would establish incompatible standards of conduct for the party opposing the Class and Subclasses; or adjudications with respect to individual Class and Subclass Members that, as a practical matter, would be dispositive of the interests of the other Class and Subclass Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

## ANSWER:

The BP Parties deny the allegations of this paragraph.

213.   The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, so that final injunctive relief is appropriate respecting the Class and Subclasses as a whole.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

214.   The common questions set forth above predominate over Class and Subclass Members' individual issues.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only. The BP Parties do not waive or concede any position or arguments they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment.

To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.  The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.  The BP Parties deny the remaining allegations of this paragraph.

215.    A class action is superior to other methods of dispute resolution in this case.  The Class and Subclass members have an interest in class adjudication rather than individual adjudication because of the overlapping rights.   It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class and Subclass members would protect their rights on their own without this class action case.  Management of the Class and Subclasses will be efficient and far superior to the management of individual lawsuits.

**ANSWER:**

The BP Parties admit that the action in *Plaisance v. BP Exploration & Production, Inc.*, Case No. 12-CV-968 (E.D. La.) may be properly maintained as a class action, but only to the extent: (1) required by the MEDICAL SETTLEMENT AGREEMENT (Rec. Doc. 6273-1); (2) consistent with the Plaintiffs' and BP's Joint Motion for Preliminary Approval of Proposed Medical Benefits Class Action Settlement, Approval of Class Notice, and Related Matters, filed with the Court on April 18, 2012 (Rec. Doc. 6267); and (3) so as not to constitute an opposition to Plaintiffs' Motion for Certification of a Rule 23(B)(3) Class for Purposes of Settlement, filed with the Court on April 18, 2012 (Rec. Doc. 6272). The BP Parties further state that they do not oppose conditional class certification of the MEDICAL BENEFITS SETTLEMENT CLASS for settlement purposes only.  The BP Parties do not waive or concede any position or arguments

they have for or against class certification of any class for any other purpose in any action or proceeding.   Any class certification order entered in connection with this MEDICAL SETTLEMENT AGREEMENT shall not constitute an admission by BP, or finding or evidence, that the MEDICAL BENEFITS CLASS REPRESENTATIVES' claims, or the claims of any other MEDICAL BENEFITS SETTLEMENT CLASS MEMBER, or the claims of the MEDICAL BENEFITS SETTLEMENT CLASS are appropriate for litigation class treatment. To the extent the COURT enters a PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER, the FINAL ORDER AND JUDGMENT will provide for vacation of the PRELIMINARY APPROVAL AND CLASS CERTIFICATION ORDER in the event that the MEDICAL SETTLEMENT AGREEMENT does not become effective.   The BP Parties deny that any Class other than the MEDICAL BENEFITS SETTLEMENT CLASS exists, or would be appropriate under Rule 23, or that Plaintiffs have met the requirements of Rule 23 at this stage of the proceedings and on the terms proposed by Plaintiffs.   The BP Parties deny the remaining allegations of this paragraph.

## VII.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Negligence Under General Maritime Law

(All Plaintiffs v. Drilling Defendants)

216.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.  Plaintiffs further reallege each and every factual allegation contained within the Amended B1 Master Complaint, in accordance with Paragraph 18 of PTO No. 25.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The BP Parties adopt and incorporate by reference all pleadings and motions filed in response to any matter that Plaintiffs purport to incorporate by reference, including but

not limited to BP's Motion to Dismiss B1 Bundle Complaint and BP's Answer to the B1 Bundle Complaint.  To the extent any more specific response is required to any purportedly incorporated allegations, the BP Parties deny them unless expressly admitted in a pleading responsive to any document from which Plaintiffs have purportedly incorporated allegations.

217.    At all times material hereto, Drilling Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

218.    At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.   The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

219.    Anadarko, Anadarko E&P, and MOEX Offshore had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the Deepwater Horizon on April 20, 2010.  As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it. Anadarko, Anadarko E&P, and MOEX Offshore breached their duties to Plaintiffs by failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action.

**ANSWER:**

The BP Parties admit that Anadarko, Anadarko E&P, and MOEX Offshore 2007 LLC had access to the Halliburton/Sperry Sun INSITEAnywhere realtime data transmitted from the *Deepwater Horizon*.   The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties lack knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

220.    Anadarko, Anadarko E&P, and MOEX Offshore were not the passive and unknowing investors that they have portrayed themselves to be in the worldwide media.  As alleged in paragraphs 266 - 270 (incorporated herein by reference in paragraph 18) of the B1 First Amended Master Complaint, the Operating Agreement gave Anadarko, Anadarko E&P, and MOEX Offshore rights and information regarding the Macondo well that put them on actual or constructive notice of the potentially disastrous conditions at the well site.  Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to HSE information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement.  Failure to exercise this role given the known history of specific problems at the wellsite was negligence.

**ANSWER:**

The BP Parties adopt and incorporate by reference all pleadings and motions filed in response to any matter that Plaintiffs purport to incorporate by reference, including but not limited to BP's Motion to Dismiss B1 Bundle Complaint and BP's Answer to the B1 Bundle Complaint.  To the extent any more specific response is required to any purportedly incorporated allegations, the BP Parties deny them unless expressly admitted in a pleading responsive to any document from which Plaintiffs have purportedly incorporated allegations.

221.    As alleged in paragraphs 222 – 235 of the B1 First Amended Master Complaint (incorporated herein by reference in paragraph 18), at all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO.  Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities.  Thus, all activities of MOEX Offshore and MOEX USA, including activities surrounding the leasehold interest in the Macondo Prospect, should be imputed to MOECO, rendering MOECO liable to Plaintiffs for negligence.

**ANSWER:**

The BP Parties adopt and incorporate by reference all pleadings and motions filed in response to any matter that Plaintiffs purport to incorporate by reference, including but not limited to BP's Motion to Dismiss B1 Bundle Complaint and BP's Answer to the B1 Bundle Complaint. To the extent any more specific response is required to any purportedly incorporated allegations, the BP Parties deny them unless expressly admitted in a pleading responsive to any document from which Plaintiffs have purportedly incorporated allegations.

222.    The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein. The blowout and explosions on the *Deepwater Horizon,* its sinking and the resulting Spill were caused by the joint and concurrent negligence of Drilling Defendants.

**ANSWER:**

The Court dismissed state law claims in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations. The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

## SECOND CLAIM FOR RELIEF

## <u>General Maritime</u>

### (Medical Monitoring As An Element Of Damages)

### (VoO Plaintiffs v. BP Defendants)

223.   VoO Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

224.   VoO Plaintiffs were injured while acting as seamen in the service of a vessel under a Master Vessel Charter Agreement with BP as set forth herein.

**ANSWER:**

Per the Court's Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, allegations of injury are required for all medical monitoring claims.   This is an inappropriate cause of action on which to prepare a master complaint given that medical monitoring is inherently individualized.   The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.   The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

225.     VoO Plaintiffs who are vessel owners and who participated in the VoO program entered into a Master Vessel Charter Agreement ("Charter Agreement") under which Defendant BP chartered their vessels pursuant to the VoO program.

**ANSWER:**

The BP Parties admit that BPXP and BPAP, under the Unified Command established program, entered into Master Vessel Charter Agreements, the texts of which speak for themselves, with certain vessel owners who participated in the VoO Program.  The BP Parties deny the remaining allegations of this paragraph.

226.     Pursuant to the Charter Agreement, BP agreed that the General Maritime Laws of the United States should govern "all matters of construction, validity and performance" of the Charter Agreement, and that only in the event that the general maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern.

**ANSWER:**

The BP Parties admit that BPXP and BPAP entered into Master Vessel Charter Agreements, the texts of which speak for themselves.  The BP Parties deny the allegations of this paragraph to the extent they are inconsistent with the Master Vessel Charter Agreements.

227.     The Charter Agreement was subsequently amended by letter agreement, stipulation and/or court order, said amendments applying retroactively to the date of the initial signing of the Charter Agreement.  In addition, Defendant BP made various statements and representations in the press, in court proceedings, on BP's website, and/or otherwise, in which BP recognized and/or voluntarily assumed responsibility for the safety and protection of workers engaged in the VoO program.

**ANSWER:**

The BP Parties admit the Master Vessel Charter Agreements were amended by letter agreement, stipulation and/or court order, the text of which speaks for itself.  The BP Parties deny the remaining allegations of this paragraph.

228.    VoO Plaintiffs have been exposed to greater than normal background levels of the oil, dispersants, and/or other hazardous chemicals used for combating or resulting from the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

229.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which VoO Plaintiffs have been exposed.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

230.    VoO Plaintiffs' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

231.    The method and means for diagnosing the VoO Plaintiffs' potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to VoO Plaintiffs by preventing or minimizing health problems that VoO Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

232.    As a proximate result of VoO Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, VoO Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

233.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

234.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

235.    VoO Plaintiffs have required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement.

**ANSWER:**

Per the Court's Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, allegations of injury are required for all medical monitoring claims.  This is an inappropriate cause of action on which to prepare a master complaint given that medical monitoring is inherently individualized.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

236.    BP has denied such payment and/or have paid benefits in an insufficient amount.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

237.    As a result of BP's failure to pay and/or delay in timely providing and/or paying the proper amount, VoO Plaintiffs have suffered further injuries and damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

238.    Defendant BP's failure to provide benefits has been callous, willful, wanton, or otherwise tortuous, for which punitive damages are recoverable.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

239.    Defendant BP's is also liable for all reasonable and necessary attorney's fees and costs incurred on VoO Plaintiffs' behalf in seeking to secure proper benefits.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

## THIRD CLAIM FOR RELIEF

### Negligence

### (All Plaintiffs v. All Defendants Except Chemical Manufacturers)

240.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they concern the conduct or liability of the BP Parties.

241.    BP has taken control and directs all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date.  BP owed a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.  Defendants failed to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

242.    At all times relevant to this litigation, Defendants knew or should have known that:

        a.    crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

        b.    chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

        c.    Plaintiffs should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

        d.    Defendants' failure to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

243.    Defendants' conduct fell below the duty of care owed to Plaintiffs amounting to a breach of that duty.  Defendants owed Plaintiffs the following duties:

    a.      a duty to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

    b.      a duty to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts;

    c.      a duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    d.      a duty to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

    e.      a duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiffs.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

244.    Plaintiffs suffered injury and loss as a result of Defendants' breach of their aforementioned duties.  Specifically, Defendants breached their duties owed to the Plaintiffs by:

    a.      failing to warn the Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous substances which they contain, which have come into contact with Plaintiffs' persons and the local environment and ecosystems;

    b.      failing to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts;

    c.      failing to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

      d.      failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

      e.      failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiffs.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

245.    All of Plaintiffs' damages were caused in fact by Defendants' breach of their duties.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

246.    Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be

deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

247.    Defendants are liable in ordinary negligence to Plaintiffs.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

248.    The danger and risk of harm to Plaintiffs was reasonably foreseeable.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

249.    Defendants' breach of their duties was the direct and proximate cause of all of Plaintiffs' damages, and Defendants are liable therefor.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be

deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## FOURTH CLAIM FOR RELIEF

### Gross Negligence

**(All Plaintiffs v. All Defendants Except Chemical Manufacturer Defendants)**

250.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

251.    Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the manufacture, maintenance and operation of the *Deepwater Horizon*, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Oil Spill which occurred herein.  The existence and breach of these legal duties are established under the General Maritime Law and state law as deemed applicable herein.

**ANSWER:**

The Court dismissed state law claims in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the

remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

252.    Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date, including the use of Nalco's chemical dispersants.  Defendants owed and breached a duty to Plaintiffs, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.   The existence and breach of these legal duties are established under the General Maritime Law and state law as deemed applicable herein.

**ANSWER:**

The Court dismissed state law claims in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  The BP Parties deny the remaining allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this

paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

253.    Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

254.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to contain the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

255.   Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Plaintiffs' injury and/or property damage.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

256.    As a direct and proximate cause of Defendants' wanton or reckless acts, Plaintiffs have suffered physical injuries and/or property damage.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

257.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.  The amount of punitive damages recoverable by Plaintiffs is not lawfully

limited to the amount of their compensatory damages, but rather should be a multiplier of same sufficient to both punish Defendants and deter similar wrongdoing in the future.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

## FIFTH CLAIM FOR RELIEF

### Negligence *Per Se*

**(All Plaintiffs v. All Defendants Except Chemical Manufacturer Defendants)**

258.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed this claim in its Order and Reasons As to Motions to

Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

259.    Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws.  These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

260.    One or more of Defendants violated these statutory and/or regulatory standards.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

261.    Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

262.    Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which in turn caused Plaintiffs' injuries and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

263.    As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, the Plaintiffs have suffered physical injuries and/or property damage.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be

deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## SIXTH CLAIM FOR RELIEF

### Negligence

### (All Plaintiffs v. Chemical Manufacturer Defendants)

264.    Plaintiffs adopt and reallege all previous paragraphs as if fully restated here.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.


265.    Plaintiffs are entitled to recover from Nalco for its negligence with respect to the design, manufacture, marketing, sale and/or distribution of Corexit®.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.


266.    At all times relevant hereto, Nalco was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

267.    Nalco sold and delivered the Corexit® to BP and the Clean-Up Defendants immediately after the Oil Spill and placed the Corexit® in the stream of commerce.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

268.    Nalco knew that the Corexit® would be used without inspection for defects.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

269.    Nalco's chemical dispersants were unreasonably dangerous to Plaintiffs for their intended purpose when the dispersants left Nalco's control.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

270.    At all times, Nalco's dispersants were used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to BP prior to sale of the dispersants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

271.    When the Corexit® was used, it was in substantially the same condition when it was sold.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

272.    At the time the dispersants left Nalco's control, Nalco knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about

the aforementioned unreasonably dangerous conditions that dispersants would present to Plaintiffs who were not properly equipped with protective gear.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

273.    At the time the dispersants used in response to the *Deepwater Horizon* disaster left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the dispersant.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

274.    At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be

deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

275.   Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the dispersants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.   To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

276.   The design defect in the Corexit® is its toxicity to humans and its ability to cause physical injury, health hazards, and damage to property because of its toxicity.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.   To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

277.   Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Plaintiffs' injuries, and its actions and inactions were negligent, grossly negligent, reckless, willful and/or wanton.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are

therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

278.    As a direct and proximate result of the design defect, Plaintiffs have suffered physical injury damages, damage to or diminution of the value of their real and/or personal property, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual, compensatory and punitive damages.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

279.    In the alternative, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); the Alabama Extended Manufacturer's Liability Doctrine; and Florida common law.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## SEVENTH CLAIM FOR RELIEF

### <u>Nuisance</u>

### (All Plaintiffs v. All Defendants Except Chemical Manufacturer Defendants)

280.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**<u>ANSWER:</u>**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

281.    BP's oil disaster has significantly interfered with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.

**<u>ANSWER:</u>**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

282.    Prior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

283.    Since the disaster, Plaintiffs have been unable to fish or boat, and many have lost their livelihoods.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

284.    As a direct and proximate cause  of the oil disaster, and VoO, Decontamination, and Onshore Plaintiffs' work to assist in the relief effort, these Plaintiffs are exposed to harmful chemicals in the crude oil and in the chemical dispersants at levels, amounts, and under conditions different from the general public.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

285.    As a result of the oil disaster, Resident Plaintiffs are constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions different from the general public.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

286.    Moreover, all Plaintiffs are subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

287.    Plaintiffs have no adequate remedy at law.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

288.    There exists an imminent likelihood of irreparable harm if the injunction is not issued.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

289.    The threatened harm to the Plaintiffs and class members outweighs any potential harm to Defendants.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

290.    Granting the injunction does not contravene a substantial public interest.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

291.    Plaintiffs have a substantial likelihood of success based on the allegations, and Plaintiffs' allegations are likely to be proven and are not merely speculative.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

292.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages, including costs of future medical screening and monitoring, for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

**EIGHTH CLAIM FOR RELIEF**

**Battery**

**(VoO and Vessel Plaintiffs v. All Defendants Except Chemical Manufacturer Defendants)**

293.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed this claim in its Order and Reasons As to Motions to

Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

294.    Defendants place VoO Plaintiffs and Vessel Plaintiffs on vessels without adequate training, warning of risks, or safety equipment.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

295.    Defendants intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of VoO Plaintiffs or Vessel Plaintiffs.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

296.    Defendants' spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning or safety equipment has caused some VoO Plaintiffs to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

297.    Defendants spraying of chemical dispersants in the immediate vicinity of Vessel Plaintiffs without warning has caused some Vessel Plaintiffs to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

298.    VoO and Vessel Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages suffered as a result of subjecting Plaintiffs to unwanted, offensive conduct and enjoining Defendants' tortious conduct toward VoO and Vessel Plaintiffs.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## NINTH CLAIM FOR RELIEF

### Florida Medical Monitoring Claim

### (Florida Plaintiffs v. All Defendants)

299.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.  The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

300.    Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth herein, and if Defendants are not ordered to create, fund and support a medical monitoring program as set forth herein.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

301.    Plaintiffs demand injunctive and equitable relief and that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs in Florida.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

302.    Plaintiffs have been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

303.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

304.    Plaintiffs' exposures were caused by Defendants' negligence or otherwise tortious conduct.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

305.    Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

306.    The method and means for diagnosing Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be

deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

307.   As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals which have been released from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

308.   Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

309.   The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are

therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

## TENTH CLAIM FOR RELIEF

### Strict Liability Under General Maritime Law

### (All Plaintiffs v. Chemical Manufacturer Defendants)

310.    Plaintiffs adopt and reallege all previous paragraphs as if fully restated here.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here.

311.    Plaintiffs are entitled to recover from Nalco for its defective design of Corexit®.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

312.    At all times relevant hereto, Nalco was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

**ANSWER:**

The BP Parties admit the allegations of this paragraph.

313.    Nalco sold and delivered the Corexit® to BP and the Clean-Up Defendants immediately after the Oil Spill and placed the chemical dispersants in the stream of commerce.

140

**ANSWER:**

The BP Parties admit that Corexit 9527 and Corexit 9500 were used during the Response. BP further admits that Nalco supplied Corexit 9500 for use during the Response.  BP further admits that Corexit 9527 that was used during the Response was obtained from existing dispersant stockpiles, not from Nalco.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations this paragraph, and therefore deny them.

314.    Nalco knew that the Corexit® would be used without inspection for defects by consumers.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

315.    Nalco's dispersants were unreasonably dangerous to Plaintiffs for its intended purpose when it left Nalco's control.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

316.    When BP and Clean-Up Defendants used Corexit®, it was in substantially the same condition when it was sold.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

317.    At all times, Nalco's dispersants were used in a manner consistent with the uses intended by or known to Defendant and in accordance with Defendant's directions and instructions.

**ANSWER:**

The BP Parties admit that dispersants were authorized and directed by the Unified Command and used in a manner consistent with the uses intended by or known to the dispersant manufacturer and in accordance with the dispersant manufacturer's directions and instructions.

318.    At all relevant times, the dispersant was used in an intended, or in a manner reasonable foreseeable and/or actually disclosed to BP prior to sale of the dispersants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

319.    At the time the dispersants left Nalco's control, Nalco knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Plaintiffs who were not properly equipped with protective gear.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

320.    At the time the dispersants used in response to the *Deepwater Horizon* disaster left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the dispersant.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

321.    At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

**ANSWER:**

The BP Parties lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph, and therefore deny them.

322.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the dispersants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

323.    The design defect in the Corexit® is its toxicity to humans and its ability to cause physical injury, health hazards, and damage to property because of its toxicity.  The Corexit® was also defectively inspected, tested, marketed and sold.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

324.    Defendant's product was not misused or altered by any third parties, Plaintiffs or class members.

**ANSWER:**

The BP Parties admit that the BP Parties did not misuse or alter Corexit.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

325.    Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed Plaintiffs' injuries, and its actions and inactions were grossly negligent, reckless, willful and/or wanton.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

326.    As a direct and proximate result of the design defect, Plaintiffs have suffered physical injury damages, damage to or diminution of the value of their real and/or personal property, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual, compensatory and punitive damages.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

327.    In the alternative, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); the Alabama Extended Manufacturer's Liability Doctrine; and Florida common law.

**ANSWER:**

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3 Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are therefore not required to respond to these allegations.  To the extent the BP Parties may be deemed to be required to respond to these allegations, the BP Parties deny them to the extent they are directed at the BP Parties.

**ELEVENTH CLAIM FOR RELIEF**

**Punitive Damages**

**(All Plaintiffs v. All Defendants)**

328.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.


329.    Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

330.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

331.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive

damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

332.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

333.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

334.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny

the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

335.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

336.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities

150

on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

337. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.


338.    BP, Transocean, and Halliburton focused primarily on profit while disregarding
public and environmental health and safety while undertaking their highly dangerous activities
on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to
commencing the mud displacement process in the well.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim

and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and

Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20,

2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

339.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-

Claim and Third Party Complaint Against Transocean, which were served on all counsel on

April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent

they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny

the remaining allegations of this paragraph to the extent they are inconsistent with the allegations

in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to

form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos.

2074 and 2075, and therefore deny those remaining allegations.

340.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

341.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to

154

form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

342.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

343.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

344.   BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, and Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074 and 2075, and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074 and 2075. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are

not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074 and 2075, and therefore deny those remaining allegations.

345.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

346.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

**ANSWER:**

The BP Parties deny the allegations of this paragraph.

347.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

        (a)     failed to properly maintain and/or operate the Deepwater Horizon;

        (b)     operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

        (c)     ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

        (d)     failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

        (e)     violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

        (f)     failed to take appropriate action to avoid or mitigate the accident;

    (g)     failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

    (h)     failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

    (i)     failed to provide appropriate disaster prevention equipment;

    (j)     failed to have an appropriate emergency spill response plan or readily available spill response equipment.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

348. BP, Chemical Manufacturer Defendants, Clean-Up Defendants recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

349.    BP and Clean-Up Defendants recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

350.    Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are

alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the

remaining allegations of this paragraph to the extent they are inconsistent with the allegations in

Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

351.    BP, Chemical Manufacturer Defendants and Clean-Up Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico and/or caused harm to persons working to contain or clean-up the Oil Spill.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties lack knowledge or information sufficient

to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny

them.

352.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the

conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference

Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party

Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

353.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties.  The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011.  The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082.  The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they

are not directed at the conduct or liability of the BP Parties and are not addressed in Document

Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

## Declaratory Relief:  Punitive Damages

354.    The Plaintiffs, the proposed Class and Subclasses, society, and the Gulf states have a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct.  Punitive damages do not compensate for injury.   They are private fines, authorized by the General Maritime Law (and/or state law), to punish reprehensible conduct and deter its future occurrence.  Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated.  Accordingly, Plaintiffs seek a judicial declaration against Defendants and in favor of the class that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy.

## ANSWER:

The Court dismissed this claim in its Order and Reasons As to Motions to Dismiss the B3

Master Complaint, Document No. 4159, filed on September 30, 2011, and the BP Parties are

therefore not required to respond to these allegations.   To the extent the BP Parties may be

deemed to be required to respond to these allegations, the BP Parties deny them to the extent

they are directed at the BP Parties.

## TWELFTH CLAIM FOR RELIEF

## Breach of Contract

### (VoO Plaintiffs vs. BP and Clean-Up Defendants)

355.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.  Plaintiffs further reallege each and every factual allegation contained within the Amended B1 Master Complaint, in accordance with Paragraph 18 of PTO No. 25.

**ANSWER:**

The BP Parties reallege each and every answer set forth in all preceding paragraphs as if fully restated here. The BP Parties adopt and incorporate by reference all pleadings and motions filed in response to any matter that Plaintiffs purport to incorporate by reference, including but not limited to BP's Motion to Dismiss B1 Bundle Complaint and BP's Answer to the B1 Bundle Complaint. To the extent any more specific response is required to any purportedly incorporated allegations, the BP Parties deny them unless expressly admitted in a pleading responsive to any document from which Plaintiffs have purportedly incorporated allegations.

356.    Plaintiffs seek any and all compensation that might be owed by BP and/or any Clean-Up Defendant under a VoO or other similar Charter Agreement or other contract, relating to the plaintiff's vessel charter and/or other clean-up efforts.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph, and therefore deny them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class demand judgment against Defendants jointly, severally and solidarily, as follows:

1.    compensatory damages in amounts to be determined at trial;

2.    punitive damages;

3.    damages for medical screening and monitoring;

4.    the implementation of a medical screening and monitoring program to be funded by the Defendants;

5.     an order certifying the Class and/or Subclasses under the appropriate provisions of F.R.C.P. 23 as set forth herein, appointing Plaintiffs as Class and/or Subclass Representatives, and appointing undersigned counsel as counsel for the Class and/or Subclasses;

6.     pre-judgment and post-judgment interest at the maximum rate allowable by law;

7.     attorneys' fees and costs of litigation;

8.     injunction to abate the public nuisance created by Defendants;

9.     injunction to abate the unwanted, offensive conduct by Defendants;

10.     injunction to require monitoring of air and water;

11.     any other and further relief available under all applicable state and federal laws; and

12.     any other and further relief the Court deems just and proper.

**ANSWER:**

The BP Parties deny the allegations of this paragraph to the extent they concern the conduct or liability of the BP Parties. The BP Parties adopt and incorporate by reference Document 2074, the BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, Document 2075, BPXP's Cross-Claim and Third Party Complaint Against Transocean, and Document 2082, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, all of which were served on all counsel on April 20, 2011. The BP Parties admit the remaining allegations of this paragraph to the extent they are alleged by one or more of the BP Parties in Document Nos. 2074, 2075, and 2082 and deny the remaining allegations of this paragraph to the extent they are inconsistent with the allegations in Document Nos. 2074, 2075, and 2082. The BP Parties lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph to the extent they are not directed at the conduct or liability of the BP Parties and are not addressed in Document Nos. 2074, 2075, and 2802, and therefore deny those remaining allegations.

164

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

### SECOND DEFENSE

The loss of well control, explosion, and subsequent oil spill were caused by the unseaworthy condition(s) of the MODU Deepwater Horizon, and/or unseaworthy conditions, breach of contract or breaches of duty and breaches of warranty, express or implied, attributable to other entities, and the negligence of employees, agents, officers and directors of those other entities. The aforesaid unseaworthiness and negligence was within the knowledge or privity of those other entities and accordingly, plaintiffs' claims should be dismissed as to the BP Parties.

### THIRD DEFENSE

Plaintiffs' damages or injuries, if any, were the result of an occurrence and/or accident unforeseeable by the BP Parties and for which the BP Parties cannot be held legally responsible.

### FOURTH DEFENSE

The events culminating in the injuries and damage to Plaintiffs were not the result of any negligence, fault, or want of due care on the part of BP Parties. Furthermore, Plaintiffs have the burden of proof on this issue, and Plaintiffs cannot meet that burden.

### FIFTH DEFENSE

Any alleged negligence by the BP Parties, which the BP Parties specifically deny, was not the proximate cause or sole proximate cause of Plaintiffs' alleged damages and there is no causal connection between the acts complained of and the damages and injuries alleged.

### SIXTH DEFENSE

Plaintiffs' alleged damages or injuries, if any, were caused or contributed to by acts and/or omissions that constitute independent, intervening and/or superseding causes for which

the BP Parties are not legally responsible, and which preclude the finding of liability against the BP Parties.

## SEVENTH DEFENSE

In accordance with the *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830 (1996), one or more superseding and/or intervening causes preclude any finding of liability on the part of the BP Parties.

## EIGHTH DEFENSE

The claims of certain Plaintiffs are barred by the operation and effect of releases of claims against, and liability on the part of the BP Parties.

## NINTH DEFENSE

To the extent the BP Parties are found liable to Plaintiffs for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by the contributory or comparative negligence of other individuals, entities, or vessels.

## TENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to contractual indemnity from other parties or entities.

## ELEVENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to indemnity from other parties or entities.

## TWELFTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to contribution from other parties or entities.

## THIRTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to subrogation from other parties or entities.

### FOURTEENTH DEFENSE

To the extent that the BP Parties are found liable to Plaintiffs for any damages, the BP Parties are entitled to a set-off or other equitable reduction in liability for any compensation paid by the BP Parties or other parties or entities.

### FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are not entitled under the law to the damages that they seek, the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such damages.

### SIXTEENTH DEFENSE

Plaintiffs' damages are barred, in whole or in part, by a failure to mitigate damages.

### SEVENTEENTH DEFENSE

The BP Parties deny that they are liable to any extent as alleged in the Complaint, and claim exoneration from any and all liability for all losses, damages, and injuries incurred by Plaintiffs as a result of the allegations contained in the Complaint and for any other damages or claims which exist or may arise, but have not been specifically pled.

### EIGHTEENTH DEFENSE

The BP Parties may only be held liable for their own conduct and may not be held liable derivatively for the conduct of any other entity.  Similarly, one BP entity may not be held derivatively liable for the conduct of any other BP entity.

### NINETEENTH DEFENSE

The BP Parties cannot be held liable for the negligence of the BP Parties' subcontractors or other parties as the actions of independent contractors cannot be imputed to the BP Parties.

### TWENTIETH DEFENSE

The BP Parties cannot be held liable for any damages resulting from actions taken pursuant to federal, state, or local government control, direction, delegation, or authorization.

Similarly, the BP Parties may not be held liable for any damages resulting from the actions of any BP Parties exacerbated by federal, state, or local government actions.

### TWENTY-FIRST DEFENSE

The BP Parties did not violate any federal, state, or local statute, regulation, or other legally imposed mandate, restriction, or guidance.

### TWENTY-SECOND DEFENSE

The BP Parties are not liable jointly and severally to the extent divisibility can be established.

### TWENTY-THIRD DEFENSE

Maritime law preempts Plaintiffs' state law claims.

### TWENTY-FOURTH DEFENSE

To the extent Plaintiffs' claims implicate the decision making of federal agencies, and they are otherwise valid, they are potentially subject to the doctrine of primary jurisdiction.

### TWENTY-FIFTH DEFENSE

To the extent the BP Parties are found liable to Plaintiffs for any damages or injuries, the BP Parties are entitled to have any reward or recovery mitigated or reduced accordingly by any prior payment to and/or release of liability from Plaintiffs who received funds through the BP claims process and/or the GCCF. Furthermore, any settled claims accompanied by releases of rights against the BP Parties may no longer be maintained.

### TWENTY-SIXTH DEFENSE

There is no general federal common law after Erie R. Co. v. Tompkins, 304 U.S. 64 (1938); hence the BP Parties cannot be liable under some unspecified body of "Federal Tort law."

The BP Parties specifically reserve the right to amend or supplement their affirmative defenses and this Answer as additional facts concerning their defenses become known to them.

Dated:  November 16, 2012

Respectfully submitted,

/s/ Don K. Haycraft_____
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Timothy A. Duffy, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 16th day of November, 2012.

/s/  Don K. Haycraft__