# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | **MDL NO. 2179** |
| | | **SECTION J** |
| This document relates to all actions. | * * * * * * * | |
| | | **Honorable CARL J. BARBIER** |
| | | **Magistrate Judge SHUSHAN** |

---

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated, | * * * * | **Civil Action No. 12-970** |
| | | **SECTION J** |
| Plaintiffs, | * * * | |
| v. | * * * | **Honorable CARL J. BARBIER** |
| | | **Magistrate Judge SHUSHAN** |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * * | |
| Defendants. | | |

---

### CLASS COUNSEL'S AND BP DEFENDANTS' JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL OF *DEEPWATER HORIZON* ECONOMIC AND PROPERTY <u>DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012</u>

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

## TABLE OF CONTENTS

**Page**

I.    **Findings Of Fact** ..................................................................................................1

   A.    Procedural History ........................................................................................1

      i.     Centralization And The Filing Of The B1 Master Complaint ....................1

      ii.    Discovery And Motion Practice.................................................................4

      iii.   Settlement Negotiations ...........................................................................6

         a.    Merits Negotiations....................................................................6

         b.    Development Of The Seafood Compensation Program.................8

         c.    Fees Negotiations.......................................................................9

      iv.    Agreement In Principle And The Transition Process ...............................10

      v.     Preliminary Approval...............................................................................11

      vi.    Overview Of The Settlement ...................................................................12

      vii.   Class Notice ............................................................................................14

         a.    Individual Notice ......................................................................15

         b.    Media Notice.............................................................................16

         c.    Informational Settlement Web Site............................................17

         d.    Toll-Free Number .....................................................................18

         e.    CAFA Notice............................................................................18

         f.    Clarity Of Notice Materials ......................................................19

      viii.  Opening Of The Settlement Program .......................................................19

      ix.    Final Approval Motions And Fairness Hearing........................................20

   B.    The Settlement Agreement .............................................................................21

      i.     Procedural Elements Of The Settlement Agreement ................................21

         a.    The Court Supervised Settlement Program.................................21

         b.    Internal Appellate Procedure .....................................................27

         c.    Individual Release......................................................................28

      ii.    Substantive Elements ..............................................................................29

         a.    Numerous Unique and Claimant-Friendly Provisions.................29

         b.    Five Uncapped Claims Categories..............................................32

         c.    Seafood Compensation Program.................................................57

         d.    Additional Compensation ..........................................................69

i

|   | | e. | BP Has Provided Multiple Guarantees Supporting the Settlement. ....................................................71 |
|   | iii. | | Experience To Date With The Court-Supervised Settlement Program Shows The Program To Be Functioning Well For Class Members. ..........................................................71 |

**II.    Conclusions Of Law** ...........................................................................**71**

A.    The Court Has Jurisdiction, And Venue Is Proper. ...............................71

    i.    The Court Has Jurisdiction. .........................................................71

        a.    BP Has Accepted For Purposes Of This Case That It Is Subject To Personal Jurisdiction In This District. ........................71

        b.    The Court Has Subject Matter Jurisdiction Over This Action..........................................................................72

    ii.    Venue Is Proper In This District. ...................................................73

B.    The Court Confirms The Qualifications Of Experts Providing Opinion Testimony Supporting The Settlement Agreement And Admits Such Testimony. ..............................................................................74

    i.    The Experts Are Qualified. ..........................................................75

        a.    Joint Experts.......................................................................75

        b.    Non-Joint Class And Class Notice Experts ...................................76

        c.    Other Experts Whose Declarations Were Submitted By BP .........77

    ii.    *Daubert* Standards Are Satisfied. ..............................................82

    iii.    No Valid *Daubert* Objections Were Submitted And Thus Any Potential *Daubert* Challenges Have Been Waived. ...................83

C.    This Settlement Class May Be Certified For Purposes Of Settlement Only Pursuant To Rules 23(a) and (b)(3). ...........................................85

    i.    This Settlement Class Satisfies The Ascertainability Requirement..........87

    ii.    This Settlement Class Meets Rule 23(a)'s Requirements.........................88

        a.    Rule 23(a)(1):  Numerosity............................................................88

        b.    Rule 23(a)(2):  Commonality.........................................................89

        c.    Rule 23(a)(3):  Typicality ..............................................................91

        d.    Rule 23(a)(4):  Adequacy...............................................................93

    iii.    This Settlement Class Satisfies Rule 23(b)(3)'s Requirements. ..............108

        a.    Common Questions Of Law And Fact Predominate Over Individual Issues. ...............................................................108

        b.    Class Treatment Is Superior To Other Methods Of Adjudicating The Controversy...................................................125

ii

D.    The Settlement Agreement Is Fair, Reasonable, And Adequate. ........................129

    i.    The Economic And Property Damages Settlement Agreement Is Entitled To A Presumption Of Fairness..................................................130

    ii.    The *Reed* Factors Weigh In Favor Of Final Approval...........................131

        a.    *Reed* Factor One:  The Existence Or Lack Of Fraud Or Collusion Behind The Settlement ................................................131

        b.    *Reed* Factor Two:  The Complexity, Expense, And Likely Duration Of The Litigation ........................................................133

        c.    *Reed* Factor Three:  The Stage Of The Proceedings And The Amount Of Discovery Completed.......................................135

        d.    *Reed* Factors Four and Five:  The Probability Of Plaintiffs' Success On The Merits And The Range Of Possible Recovery ...............................................................................137

        e.    *Reed* Factor Six:  The Opinions Of Class Counsel, Class Representatives, And Absent Class Members. ...........................138

    iii.    The Class Would Face Numerous Risks If This Case Were Actually Litigated. ..................................................................149

        a.    BP Contended Under Admiralty Law That It Could Establish A Superseding Cause Defense To Compensatory Damage Liability And That BP's Conduct Did Not Constitute Gross Negligence Or Willful Misconduct.................150

        b.    OPA Creates Numerous Hurdles For Plaintiffs' Claims. ............151

        c.    BP Has Submitted Evidence To Establish That The Gulf Is Undergoing A Robust Recovery..................................................154

        d.    New Complexities And Hurdles For Plaintiffs' Claims Would Surely Arise During A Lengthy, Multi-Phased Trial Process. ......................................................................................166

E.    The Notice Program Surpassed The Requirements Of Due Process, Rule 23, And CAFA....................................................................................167

F.    None Of The Objections Counsel Against Final Approval. ...............................168

    i.    Standing Is Required To Present A Valid Objection. .............................168

        a.    Plaintiffs Falling Outside The Settlement Class Lack Standing. ..................................................................................170

        b.    Non-Settling Defendants Lack Standing. ....................................171

        c.    GO FISH Lacks Standing. ...........................................................172

        d.    The Gulf States Lack Standing. ...................................................172

    ii.    The Court Has No Authority To Modify A Settlement Agreement That Is Fair, Reasonable, And Adequate. .................................................174

iii.    Procedural Objections To The Settlement Agreement Lack Merit. ........175

        a.    The Court Supervised Settlement Program Is Processing Claims Expeditiously. ...................................................................175

        b.    Claimants Have No Right To Know Their Exact Compensation Amount Prior To The Opt-Out Date...................176

        c.    It Is Appropriate And Reasonable To Require An Individual Signature On Opt-Out Requests. ...............................177

        d.    The Settlement Program Has Provided Ample Support To Claimants. .........................................................................178

        e.    BP Has Met Its Obligations To Accept Interim OPA Claims. ...........................................................................179

        f.    The Parties Did Not Make Improper Use of GCCF Data............180

        g.    The Settlement's Provisions For Minors And Incompetents Are Reasonable. ........................................................180

        h.    The Settlement's Appellate Procedures Benefit Claimants. ........180

iv.    Substantive Objections To The Settlement Agreement Lack Merit. .......181

        a.    BP Has Taken A Reasonable Position As To Its Liability. .........181

        b.    Objections To The Economic Damage Compensation Frameworks Lack Merit.....................................................182

        c.    Objections To The Property Damage Framework Lack Merit...........................................................................191

        d.    Objections To The Vessels Of Opportunity Charter Payment Framework Lack Merit. ...............................194

        e.    Objections To The Vessel Physical Damage Framework Lack Merit.................................................................196

        f.    Objections To The Subsistence Damage Framework Lack Merit.................................................................196

        g.    Objections To The Seafood Compensation Program Lack Merit.................................................................197

        h.    The Parties' Agreement To Fund A Promotional Campaign Does Not Implicate Or Violate The *Cy Pres* Doctrine. ...............205

        i.    GCCF Comparisons Are Legally Irrelevant. ...............................206

v.    Class Members Received Clear Information About Their Rights. ..........207

vi.    The Settlement Notice Was More Than Adequate. .................................208

vii.    The Remaining Objections Lack Merit...................................................209

viii.    The Non-Objections Lack Merit.............................................................212

**APPENDIX A:  INDEX OF PARTY DECLARATIONS** ..................................................... **A-1**

**I.**     **Joint Submissions** ............................................................................................... **A-1**

**II.**    **Class Submissions** ............................................................................................... **A-1**

**III.**   **BP Submissions** .................................................................................................. **A-2**

**APPENDIX B:  CLASS DEFINITION** ...................................................................................**B-1**

**APPENDIX C:  SLIDES REGARDING SEAFOOD COMPENSATION**
                   **PROGRAM** ................................................................................................... **C-1**

The settling parties, by and through their undersigned counsel, respectfully submit the following proposed findings of fact and conclusions of law for the use and consideration of the Court in making its independent settlement approval and class certification decisions.[1]

## I.     Findings Of Fact[2]

### A.     Procedural History

#### i.     Centralization And The Filing Of The B1 Master Complaint

1.     On April 20, 2010, following a loss of well control at the Macondo well in the MC 252 block in the Gulf of Mexico, an explosion and fire aboard Transocean's drilling rig the *Deepwater Horizon* set in motion a chain of events that caused an oil spill affecting multiple Gulf Coast communities across all five of its states, as well as eleven deaths and dozens of injuries.

2.     On August 20, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized in this District all spill-related federal actions, excluding shareholder suits, and assigned them to this Court for pre-trial proceedings pursuant to 28 U.S.C. § 1407.  *See* Rec. Doc. 1.

3.     In relevant part, the JPML concluded as follows:

> The actions before the Panel indisputably share factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it.  Centralization under Section 1407 will eliminate duplicative discovery, prevent inconsistent pretrial rulings, including rulings on class certification and other issues, and conserve the resources of the parties, their counsel, and the judiciary.  Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund [the Gulf Coast Claims

---

[1] A proposed Order and Judgment Granting Final Settlement Approval and Confirming Certification of the Settlement Class is attached.

[2] The following Findings of Fact are entered upon the record as the findings and factual conclusions of the Court. To the extent that any of them might later more properly be classified as conclusions of law, they should be deemed incorporated within the Court's Conclusions of Law.

Facility ("GCCF")].[3]  In all these respects, centralization will serve the convenience of the parties and witnesses and promote the more just and efficient conduct of these cases, taken as a whole.

\*\*\*

Similarly, we do not find any strong reasons for separate treatment of claims brought under the OPA [Oil Pollution Act].  In our judgment, carving out the OPA claims would only complicate matters, and denying centralization altogether is not a viable option.  To the extent that non-compliance with the OPA's presentment requirement becomes an issue, failure to include OPA claims in centralized proceedings would raise the prospect of multiple inconsistent rulings on that issue.  *See In re: National Arbitration Forum Antitrust Litigation*, 682 F. Supp. 2d 1343, 1345 (J.P.M.L. 2010).

*Id.* at 3.

4.     The first putative class actions involving the *Deepwater Horizon* incident were filed on April 28, 2010.  *See Cooper v. BP plc*, No. 10-1229 (E.D. La. Apr. 28, 2010); *Harris v. Transocean, Ltd.*, No. 10-129 (N.D. Fla. Apr. 28, 2010); *Wetzel v. Transocean*, No. 10-1222 (E.D. La. Apr. 28, 2010).  Many other putative class actions followed.

5.     On October 8, 2010, the Court appointed the Plaintiffs' Steering Committee ("PSC") from numerous applicants, pursuant to a public application process.  *See* Rec. Doc. 506. The PSC is a geographically diverse group of leading plaintiffs' lawyers with experience in various areas of complex litigation, class actions, and admiralty proceedings, representing a broad spectrum of plaintiffs' claims and interests.  *See, e.g.*, Coffee Supp. Decl. ¶ 28.

6.     On October 19, 2010, the Court organized the numerous cases centralized before it by creating pleading bundles for various claims brought by those claiming injury due to the

---

[3] The Gulf Coast Claims Facility, or GCCF, was established by BP to satisfy its obligations to accept individual and business claims under OPA beginning August 23, 2010, through March 8, 2012.  *See* BP, BP Reports Nearly $400 Million in Claims Payments As Program Transitions To GCCF (Aug. 23, 2010), http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7064597; Rec. Doc. 5995.

explosion, the oil spill, and its aftermath.  Among the pleading bundles was the B1 bundle, which encompasses all private claims for economic loss and property damage.  *See* Rec. Doc. 569.

7.      The PSC filed a B1 Master Complaint on December 15, 2010, and it filed an Amended B1 Master Complaint on February 9, 2011.  *See* Rec. Doc. 879; Rec. Doc. 1128.

8.      The Court issued an order granting in part and denying in part various motions to dismiss the Amended B1 Complaint on August 26, 2011.  *See* Rec. Doc. 3830.  This ruling, along with others issued by the Court,[4] helped to apprise both plaintiffs and defendants of various dimensions of legal risk inherent in their positions, claims, and defenses.  Most significantly, this Order concluded that while the Oil Pollution Act did not fully displace federal maritime law, federal maritime law entirely preempted state law.  *Id.* at 38.

9.      On September 14, 2011, the Court issued Pre-Trial Order No. 41, governing the scope and structure of the Limitation and Liability trial.  Rec. Doc. 4033.  Under the Court's original trial plan:

> **Phase One ["Incident" Phase]** of the Trial will address issues arising out of the conduct of various parties, third parties, and non-parties allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU DEEPWATER HORIZON on April 20, 2010, and the sinking of the MODU DEEPWATER HORIZON on April 22, 2010, and the initiation of the release of oil from the Macondo Well or DEEPWATER HORIZON during those time periods (collectively, the "Incident"). Phase One will include issues asserted in or relevant to counterclaims, cross-claims, third-party claims, and/or comparative fault defenses as appropriate.
>
> **Phase Two ["Source Control" Phase]** of the Trial will address Source Control and Quantification of Discharge issues. "Source Control" issues shall consist of issues pertaining to the conduct of various parties, third parties, and non-parties regarding stopping the release of hydrocarbons stemming from the Incident from April 22, 2010 through approximately

---

[4] *See, e.g.,* Rec. Doc. 2784 (D1 Order dismissing private environmental claims); Rec. Doc. 3330 (B2 Order dismissing RICO claims); Rec. Doc. 4159 (B3 Order dismissing certain private injury claims in parallel to the B1 Order).

September 19, 2010. "Quantification of Discharge" issues shall consist of issues pertaining to the amount of oil actually released into the Gulf of Mexico as a result of the Incident from the time when these releases began until the Macondo Well was capped on approximately July 15, 2010 and then permanently cemented shut on approximately September 19, 2010. Phase Two will include issues asserted in or relevant to counterclaims, cross-claims, third party claims, and/or comparative fault defenses, as appropriate.

**Phase Three ["Containment" Phase]** of the Trial will address issues pertaining to the efforts by various parties, third parties, and non-parties aimed at containing oil discharged as a result of the Incident by, for example, controlled burning, application of dispersants, use of booms, skimming, etc. Phase Three of the trial will also address issues pertaining to the migration paths and end locations of oil released as a result of the Incident as carried by wind, currents, and other natural forces and as affected by efforts to contain or direct this migration. Phase Three will include issues asserted in or relevant to counterclaims, cross-claims, third party claims, and/or comparative fault defenses, as appropriate.

*Id.* at 2-3.[5]

10.     On October 18, 2011, Defendant Cameron International Corp. filed a Petition for Mandamus challenging the trial plan.   The Fifth Circuit took full briefing and heard oral argument on the challenge but denied the petition.  *See In re Cameron Int'l Corp.*, No. 11-30987 (5th Cir. Dec. 26, 2011).

11.     BP answered the Amended B1 Master Complaint on September 27, 2011.  *See* Rec. Doc. 4130.

### ii.     Discovery And Motion Practice

12.     Starting in 2010, to prepare for the trial, the parties engaged in an extraordinary amount of discovery within a compressed time period.   Prior to the parties' arrival at an agreement, this formal discovery included more than 300 witnesses deposed, approximately 90

---

[5] Pre-Trial Order No. 41 has since been repeatedly amended.  *See* Rec. Doc. 4083 (Sept. 21, 2011); Rec. Doc. 6592 (May 30, 2012); Rec. Doc. 7810 (Nov. 1, 2012).

million pages of documents produced, and more than 80 expert reports exchanged. *See* Rec. Doc. 6418 at 3; Klonoff Decl. ¶ 83; Miller Decl. ¶¶ 26-27.

13.     The Court entered a separate order on July 8, 2011, to manage the Vessels of Opportunity ("VoO") Program actions. *See* Rec. Doc. 3207. The order contemplated the selection of six VoO focus plaintiffs and related discovery and motion practice. Pursuant to the order, the parties engaged in extensive discovery that included the production of thousands of documents, deposition of the six focus plaintiffs, deposition of three BP fact witnesses and one Rule 30(b)(6) witness; summary judgment briefing; and the related oral argument which occurred on November 18, 2011. *See id.*

14.     Numerous governmental and other public investigations also were conducted and their results publicly reported. *See, e.g.*, Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling (Final Report)* (2011); Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Macondo: The Gulf Oil Disaster (Chief Counsel's Report)* (2011); Bureau of Ocean Energy Mgmt., Regulation & Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout* (2011); U.S. Coast Guard, *Report of Investigation Into the Circumstances Surrounding the Explosion, Fire, Sinking & Loss of Eleven Crew Members Aboard the Mobile Offshore Drilling Unit Deepwater Horizon in the Gulf of Mexico* (2011); Nat'l Acad. of Eng'g, *Macondo Well-Deepwater Horizon Blowout: Lessons for Offshore Drilling Safety* (2011). These reports provided a factual backdrop that informed the parties' settlement negotiations. *See* Miller Decl. ¶¶ 26-27.[6]

---

[6] The Court has ruled elsewhere on their admissibility at trial, and nothing in these Findings of Fact and Conclusions of Law should be construed as revising those rulings in any way. *See, e.g.*, Rec. Doc. 5810; Rec. Doc. 5635; Rec. Doc. 5448.

### iii.    Settlement Negotiations

15.    The Economic and Property Damages Settlement Agreement As Amended On May 2, 2012 (the "Settlement Agreement" or the "Settlement," Rec. Doc. 6430)[7] is the result of many months of arms-length negotiations between the PSC and counsel for BP, all of whom have significant experience in litigating and negotiating the settlements of complex class actions. *See* Godfrey Decl. ¶ 2; Miller Decl. ¶ 23; Rice Negotiations Decl. ¶ 16; Coffee Supp. Decl. ¶¶ 2-17, 32; Rec. Doc. 7480 at 7.

### a.    Merits Negotiations

16.    The parties initiated contact through counsel in early 2011, and negotiations were held on a sustained basis commencing in May 2011.  *See* Coffee Decl. ¶ 26; Godfrey Decl. ¶¶ 2, 6-53; Herman Decl. ¶ 5; Rice Negotiations Decl. ¶ 7.  There were 145 days of face-to-face settlement negotiation meetings.  *See* Godfrey Decl. ¶¶ 6-53.

17.    Magistrate Judge Sally Shushan played a critical role in the settlement negotiations.  She mediated the Settlement, oversaw it through its most critical stages, and met jointly and separately with each side multiple times over several months.  In particular, she met extensively with the parties in the days leading up to the Agreement-in-Principle executed on March 2, 2012, and the days leading up to the subsequent Settlement Agreement executed on April 18, 2012.  *See* Godfrey Decl. ¶ 55; Herman Decl. ¶ 9; Miller Decl. ¶ 24; Rice Negotiations Decl. ¶ 17; Rec. Doc. 7480 at 7; Nov. 8 Fairness Hr'g Tr. at 64:20-23 (Mr. Godfrey:  "I will say again, we could not have done this without Judge Shushan, but I had no idea that one judge could spend so much time with so many lawyers getting us to get our job done.").  Put simply, "to assert collusion . . . would be frivolous."  Coffee Supp. Decl. ¶ 32.

---

[7] Capitalized terms used in these Findings of Fact and Conclusions of Law generally refer to defined terms in the Settlement Agreement, to the titles of frameworks in the Settlement Agreement, or both.

18.     In negotiating the Settlement Agreement, with the exception of the Seafood Compensation Program ("SCP"), the parties did not negotiate a total monetary ceiling for the Settlement.   They instead negotiated detailed claims frameworks, addressing (i) what claims would be paid; (ii) what proof would be required; (iii) what causation presumptions would apply; and (iv) how benefits would be calculated.   *See* Coffee Decl. ¶¶ 11, 27-28; Herman Decl. ¶¶ 6, 10; Rice Negotiations Decl. ¶¶ 4, 6, 13; Rice Seafood Decl. ¶ 4.   The parties were careful to avoid and did in fact avoid trade-offs that could lead to intraclass conflicts.   *See* Rice Negotiations Decl. ¶ 10 ("Throughout the process we were cautious to avoid any negotiations that would create [intraclass] allocation conflicts.").

19.     During negotiations, negotiators consulted with (i) PSC members and other affiliated plaintiffs' counsel most familiar with each type of claim; (ii) subject-matter and legal experts; (iii) representatives of the GCCF who could provide data about past claims; (iv) lawyers for various governmental bodies and agencies; and (v) representatives of industry trade groups. *See* Herman Decl. ¶¶ 6-8; Miller Decl. ¶ 25; Rice Negotiations Decl. ¶¶ 4, 12, 15, 17.   BP exchanged data and information with the PSC during the negotiation process, and each side interrogated the other side's experts.   *See* Nov. 8 Fairness Hr'g Tr. at 59:11-60:6; 169:5-20.   As negotiations proceeded, an increasing number of PSC members participated in various aspects of the negotiations.   *See* Rice Negotiations Decl. ¶ 12.

20.     While settlement negotiations proceeded, the parties were also engaged, on a parallel track, in preparations for the Limitation and Liability Trial that was originally set to commence on February 27, 2012.   *See* Herman Decl. ¶ 12.   It was not until "literally . . . the eve of . . . trial" that the parties reported that they "were very close to reaching an agreement in

principle." Nov. 8 Fairness Hr'g Tr. at 10:25-11:5. Phase one of this trial has subsequently been rescheduled to begin on February 25, 2013. *See* Rec. Doc. 7810.

### b. Development Of The Seafood Compensation Program

21. The development of the SCP was overseen by John W. Perry, whom the Court appointed to act as a neutral on March 8, 2012. *See* Perry Decl. at 1; Rec. Doc. 5988. BP and the PSC jointly requested that the Court appoint Mr. Perry, a well-respected neutral, to preside over development of the SCP. *See* Herman Decl. ¶¶ 11-12; Rice Seafood Decl. ¶ 9.

22. Mr. Perry is a partner in the Baton Rouge office of Perry, Atkinson, Balhoff, Mengis and Burns and is the founding principal of Perry Dampf Dispute Solutions. He is an Adjunct Professor of Law at LSU and was inducted into LSU Law School's Hall of Fame. Mr. Perry has served as a mediator, arbitrator, or court-appointed special master in thousands of cases since 1995. Mr. Perry has served on both the Louisiana Trial Association Board of Governors and Louisiana Association of Defense Counsel Board of Directors. Mr. Perry was assisted by his law partner, Daniel J. Balhoff. *See* Rec. Doc. 5998; Balhoff Decl. at 2; Perry Decl. at 2. Mr. Balhoff is also a partner at Perry, Atkinson, Balhoff, Mengis and Burns and also has extensive experience as an arbitrator and special master. *See* Balhoff Decl. ¶¶ 7-10. Messrs. Perry and Balhoff are both well respected, deeply experienced members of the bar.

23. Messrs. Perry and Balhoff were provided with relevant government data, peer-reviewed studies, and expert opinions. They also consulted with PSC attorneys, other plaintiffs' attorneys, individual plaintiffs and plaintiffs' groups, including oystermen, shrimpers, crabbers, and finfishers, representatives from industry organizations, and experts. *See* Balhoff Decl. at 3-4; Herman Decl. ¶ 11; Perry Decl. at 3-4; Rice Seafood Decl. ¶ 9. Whenever Messrs. Perry and Balhoff requested additional information, they received that information from plaintiffs'

attorneys, industry representatives, or others involved in the development of the SCP.  *See* Balhoff Supp. Decl. ¶ 4; Perry Supp. Decl. ¶ 4.

24.     The Court-appointed neutral structured the SCP, with the input of all parties and numerous stakeholders, such that it should (i) be transparent and easily understandable; (ii) have consistent guidelines that apply across species, while recognizing relevant differences; (iii) be easy to administer; (iv) be as specific and detailed as possible; (v) take into account unique hardship exceptions; and (vi) provide fair and adequate compensation to each potential claimant affected by the spill.  *See* Balhoff Decl. at 4; Perry Decl. at 4-5.

25.     The Court-appointed neutral developed the SCP using a bottom-up approach.  *See* Perry Supp. Decl. ¶ 3; Balhoff Supp. Decl. ¶ 3.  The Court-appointed neutral developed formulas to account for each category of claimant, rejecting the suggestion that a specific amount of money be allocated to aggregate groups of claimants by species or otherwise.

### c.     Fees Negotiations

26.     Other than the PSC's making clear that it would eventually file a request for attorneys' fees, the parties had no discussion regarding fees for Class Counsel until April 17, 2012, the day before the Settlement Agreement was first filed in Court.  *See* Nov. 8 Fairness Hr'g Tr. at 275:22-276:2.  Before discussing fees, the parties had delivered a signed settlement agreement on all substantive non-fee issues to the Court and thereafter received express permission from the Court to begin negotiating fee and cost matters.  This approach assured that attorneys representing the class could not trade off benefits for the class in exchange for a higher fee for themselves.  *See* Issacharoff Decl. ¶¶ 21-23; Klonoff Decl. ¶ 77; Miller Decl. ¶ 28; Rice Fees Decl. ¶¶ 4-5.

### iv.      Agreement In Principle And The Transition Process

27.      On February 26, 2012, the Court briefly adjourned Phase I of the Limitation and Liability Trial from February 27, 2012, to March 5, 2012. *See* Rec. Doc. 5887. This was done to give the parties additional time to reach a settlement, if possible.

28.      On March 2, 2012, after the parties informed Judge Shushan that they had reached an agreement in principle, the Court again adjourned the trial. *See* Rec. Doc. 5955; *see also* Rec. Doc. 6592.

29.      The Court subsequently entered its First Amended Order Creating Transition Process to govern the transition from the GCCF to the Court Supervised Settlement Program envisioned by the Settlement Agreement. *See* Rec. Doc. 5995. This process was set up to provide for the continued processing and payment of claims during the time period between when the Settlement Agreement was completed and the new Settlement Program was set up, while preserving the right of claimants to realize the benefits of the Settlement Agreement.

30.      The Transition Process was handled seamlessly; information of class members who had filed claims with the GCCF was transferred from the GCCF to the new Settlement Program without any effort by class members, which provided them with a unique benefit. *See* Klonoff Decl. ¶ 65; Monger Decl. ¶ 31; Monger Supp. Decl. ¶¶ 37-41.

31.      The Transition Process was administered by Court-appointed Transition Coordinator Lynn Greer under the supervision of Court-appointed Claims Administrator Patrick Juneau. Claimants with pending GCCF offers as of March 8, 2012, as well as claimants with pending GCCF claims who subsequently received an offer during the Transition Process, could elect to receive 60% of the award amount without signing a release. Those claimants falling within the Settlement Class then had the option of receiving the greater of the remaining 40% of the GCCF offer, or the class Settlement payment less any amount previously paid by the

Transition Process.  *See* Rec. Doc. 5995 at 2-3.  Thus, there was no risk to class members that receiving a Transition Process payment would preclude a more beneficial result under the terms of the Settlement Agreement.  Those claimants not falling with the class could elect to pursue whatever legal rights were available to them or to receive the remaining 40% in exchange for a release.  Still further, any claimant who had received an offer for an interim claim during the Transition Process received 100% of the offer without being required to sign a release.  Those claimants who were eligible for the GCCF Quick Payment program also had the option of availing themselves of the benefits of this program in exchange for a release rather than participating in the Settlement.  *See id.*

32.     Such transition payments are unusual and provide a clear benefit to class members, since this provision of the Settlement Agreement afforded claimants prompt financial relief and did so even without requiring them to sign a release.  *See* Monger Decl. ¶ 34.

33.     It is also beneficial to class members that during the Transition Process interim payments on claims before the GCCF continued to be available.  *See* Settlement Agreement ¶ 4.2.6; Monger Decl. ¶ 35.  *See generally* 33 U.S.C. § 2705(a).

34.     The Transition Process lasted from March 8, 2012, to June 4, 2012, during which time nearly 16,000 claims totaling $403 million were paid.  *See* Monger Decl. ¶ 26.  The continuous review and payment of claims to class members was unique and beneficial to class members.  *See id.* ¶¶ 32-33.

### v.     Preliminary Approval

35.     On April 16, 2012, the PSC filed a new class action complaint captioned *Bon Secour Fisheries, Inc. v. BP Exploration & Production Inc.*, No. 12-970, Rec. Doc. 1 (E.D. La.). The PSC filed an amended complaint on May 2, 2012.  *See* Rec. Doc. 6412.  BP answered the amended *Bon Secour Fisheries* complaint on May 7, 2012.  *See* Rec. Doc. 6453.

11

36.     The Settlement Agreement was completed and signed on April 18, 2012.  That same day, the parties filed a joint motion for preliminary approval of the Settlement Agreement.  *See* Rec. Doc. 6266.   The PSC simultaneously moved for preliminary and conditional class certification.  *See* Rec. Doc. 6269.  The following week, BP filed a conditional non-opposition to the PSC's class certification motion.  *See* Rec. Doc. 6348.

37.     On April 25, 2012, the parties appeared before the Court for a preliminary approval hearing.  *See* Rec. Doc. 6366 (Minute Entry).

38.     On May 2, 2012 the parties filed a joint motion to approve a slightly amended Settlement Agreement.  *See* Rec. Doc. 6414.

39.     On May 2, 2012, the Court granted the joint motion, preliminarily approved the Settlement Agreement, and preliminarily and conditionally certified the class for purposes of settlement only, issuing a detailed order and opinion making preliminary approval findings under the established class action settlement approval procedure specified by Rule 23(e), applying the standards of the Fifth Circuit and the *Manual for Complex Litigation*.  *See* Rec. Doc. 6418.

### vi.     Overview Of The Settlement

40.     The Settlement provided a comprehensive resolution of economic and property damage *Deepwater Horizon* claims against BP and the provision of various monetary remedies by BP to a specifically defined class.  "The purpose of this Agreement is to settle all and only the RELEASED CLAIMS of the Economic Class, PLAINTIFFS, and ECONOMIC CLASS MEMBERS against all and only the RELEASED PARTIES."  Settlement Agreement at 1.  As in any settlement, neither side received everything it wanted — not BP, which believes that plaintiffs' claims are subject to considerable litigation risk, and not Class Counsel, who maintain that they would one day obtain larger awards for their clients if the claims were ever to proceed to trial.  The compromise of claims did, however, provide substantial important benefits to each

side in the litigation and undertake to fully compensate the demonstrated economic claims of the

class members.

41.     Professor Klonoff accurately describes the settlement class the parties carefully

defined in the Settlement Agreement as follows:

> Here, the economic and property damages class definition is objective and
> precise and does not turn on the merits.  The proposed definition is very
> detailed.  *See* Deepwater Horizon Economic and Property Damages
> Settlement Agreement (Doc. 6276-1) (filed 04/18/12) (hereinafter
> "Settlement") at ¶¶ 1.1–1.3.1.12 (setting forth class definition in full);
> Order 6418 at 19–26 (adopting proposed class definition). The definition
> sets forth the geographic scope of the settlement (Louisiana, Mississippi,
> Alabama, specified coastal counties in Eastern Texas and Western Florida,
> and specified Gulf waters and bays).
>
> To be a class member, an individual within the geographic area must have
> lived, worked, or owned or leased property in the area between April 20,
> 2010, and April 6, 2012, and businesses must have conducted activities in
> the area during that same time frame.  Six types of damages are
> recognized: specified types of economic loss, specified types of real
> property damage (coastal, wetlands, and real property sales damage),
> Vessel of Opportunity Charter Payment, Vessel Physical Damage, and the
> Seafood Compensation Program.  The definition also contains specific
> exclusions.  Some entities and individuals are excluded altogether (i.e., the
> Court, employees of BP, and those who opt out).  Other exclusions are
> based on the substantive nature of the business (i.e., financial institutions,
> certain types of funds, financial trusts, and other financial vehicles,
> gaming industry, insurance entities, oil and gas industry, defense
> contractors, and real estate developers).  Also excluded are certain defined
> government organizations as well as persons or entities who released their
> claims through the GCCF.

Klonoff Decl. ¶ 20 (paragraph break added).

42.     The remedies provided under the Settlement Agreement make undiscounted and

uncapped awards (many augmented by risk transfer premiums), except in the Seafood

Compensation Program, which features a guaranteed $2.3 billion fund.  Under the Seafood

Compensation Program, Commercial Fishermen, Seafood Boat Captains, all other Seafood

Crew, Oyster Leaseholders, and Seafood Vessel Owners will be compensated for economic loss

claims relating to Seafood, including shrimp, oysters, finfish, blue crab, and other species.   A $2.3 billion Seafood Compensation Program Amount provides the funding for eligible claims under the program including shrimp, oysters, finfish, blue crab, and other species.   As noted above, the Court-appointed neutral developed the Seafood Compensation Program to allocate the funds on multiple criteria — both between various industries and amongst different industry participants, such as vessel owners, boat captains, oyster leaseholders, and seafood crew.

43.     In exchange for providing these remedies, BP obtains a broad classwide release (if final approval is granted) as well as a signed Individual Release from each claimant that accepts a payment pursuant to the Settlement Agreement.   *See* Settlement Agreement § 10; *id.* Ex. 26.  Section 10 of the Settlement Agreement also provides that the programs and frameworks of the Settlement Agreement become the exclusive remedy for all class members, that all existing litigation in any forum must be dismissed with prejudice, and that no new litigation on Released Claims will be commenced or prosecuted.  *See id.* ¶¶ 10.12.1-10.12.3.

### vii.     Class Notice

44.     In its Preliminary Approval Order, the Court approved the Class Notice and Class Notice Plan proposed by the parties, finding that, as described, it satisfied the best practicable notice requirement of Rule 23(c)(2)(B), and appointing Hilsoft Notifications as Class Notice Administrator.  Hilsoft Notifications thereafter implemented the Notice Program.  *See* Rec. Doc. 6418 at 36-39; Azari Decl. ¶¶ 5-6.

45.     The Notice Program, as duly implemented, surpasses other notice programs that Hilsoft Notifications has designed and executed with court approval.   The Notice Program included notification to known or potential Class Members via postal mail and e-mail; an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, and Sunday local newspapers.  Notice

14

placements also appeared in non-measured trade, business, and specialty publications, African-American, Vietnamese, and Spanish language publications, and Cajun radio programming.  The Notice Program met the objective of reaching the greatest possible number of class members and providing them with every reasonable opportunity to understand their legal rights.  *See* Azari Decl. ¶¶ 8, 15, 68; Kinsella Decl. ¶ 8.

46.     The Notice Program was substantially completed on July 15, 2012, allowing class members more than adequate time to make decisions before the opt-out and objections deadlines. *See* Azari Decl. ¶¶ 14, 71.

### a.     Individual Notice

47.     Through August 8, 2012, a total of 1,113,655 individual notices had been sent by mail, and a total of 335,038 notices had been sent by e-mail.  Notice was mailed in envelopes designed to alert recipients to the important information enclosed.  Names of potential class members and their attorneys were culled from records obtained from BP, the GCCF, and short-form joinders filed in this MDL.  Names were also obtained of property owners falling within the class geography.  All names and addresses were checked against the National Change of Address Database maintained by the United States Postal Service.  For those notice packets returned as undeliverable, 57,817 additional notice packets were mailed.  As of August 8, 2012, only 7 percent of returned mailed and e-mailed notices were known to be undeliverable.  *See* Azari Decl. ¶¶ 9, 19-22, 25.

48.     On September 5, 2012, Garden City Group mailed a notice packet to an additional 1,522 persons that became eligible class members as a result of updated tax mapping data and property data released in August.  *See* Azari Supp. Decl. ¶¶ 9-12.

### b.      Media Notice

49.      The media notice effort alone reached an estimated 95% of adults in the Gulf region an average of 10.3 times each, and an estimated 83% of all adults in the United States an average of 4 times each. These figures do not include notice efforts that cannot be measured, such as advertisements in trade publications and sponsored search engine listings.  The Notice Program fairly and adequately covered and notified the class without excluding any demographic group or geographic area, and it exceeded the reach percentage achieved in most other court-approved notice programs.  *See* Azari Decl. ¶¶ 10-11, 13, 69-70, 77; Azari Supp. Decl. ¶ 6; *see also* Kinsella Decl. ¶ 8.

### i.      Print Publications

50.      The Notice Plan included placements in 343 daily and weekly newspapers in the class geography.  The Notice also appeared in an additional 17 newspapers located near, or with slight overlap with, the class geography.  The selected newspapers have a combined circulation of 6.5 million.  *See* Azari Decl. ¶¶ 30-32.

51.      The Notice also appeared in publications covering ethnic and foreign-language groups having a significant presence in the Gulf Coast.  The Notice appeared in 46 such publications with an estimated circulation of over 1.8 million.  *See* Azari Decl. ¶ 46.

52.      The Notice appeared in thirteen leading national weekly and monthly publications with a combined circulation of 114 million people.  Adults were exposed to the Notice through these publications more than 521 million times during the notice period.  *See* Azari Decl. ¶¶ 47-50.

53.      The Notice also appeared as a double-page spread in 42 publications targeted to the industries and activities most likely to have been affected by the spill.  *See* Azari Decl. ¶ 51.

### ii.      Television

54.      Over 7,900 30-second television advertisements aired on the top three local televisions stations per market and on the top six cable networks.  The television notice alone is estimated to have reached 88.3% of adults in the Gulf Coast an average of 4.2 times each.  *See* Azari Decl. ¶¶ 36-38.

55.      A television PSA was distributed to over 1,200 broadcast television stations in the United States.  As of August 10, 2012, 11 television stations had reported airing the PSA a total of 356 times.  *See* Azari Decl. ¶¶ 58-59.

### iii.      Radio

56.      The Notice Plan further included 30-second radio units.  These were targeted at (i) mainstream radio; (ii) rural communities; (iii) African American communities; (iv) Spanish-speaking communities; and (v) Cajun communities.  *See* Azari Decl. ¶¶ 40-44.

### iv.      Internet

57.      The Notice Plan included Banner Notices placed on national networks including Yahoo!, MSN, AOL, Weather.com, and 24/7 Real Media.  Banners were also placed, where possible, on the web sites of the trade and specialty publications included in the print plan, as well as on newspaper and local TV web sites.  *See* Azari Decl. ¶¶ 55.

### v.      Informational Release

58.      A neutral Informational Release was issued to approximately 4,200 print and broadcast and 5,500 online press outlets throughout the United States.  Through August 10, 2012, at least 1,023 news stories had discussed the settlements.  *See* Azari Decl. ¶¶ 56-57.

### c.      Informational Settlement Web Site

59.      A neutral, informational notice web site was created to serve as the notice page for the Settlement Agreement, and its web address was prominently displayed in all notice

documents.   *See* Deepwater Horizon Court-Supervised Settlement Program, http:// www.deepwaterhorizonsettlements.com.   On the site, Class Members can (and did) obtain additional documents and information about the Settlement Agreement.  The site is available in English, Spanish, and Vietnamese.  Sponsored search listings were acquired on Google, Yahoo!, and Bing for common searches relating to the spill.  As of October 21, 2012, over 267,198 unique visitors had accessed the web site.  *See* Azari Decl. ¶¶ 60-65; Monger Supp. Decl. ¶ 22.

60.    The web site was appropriately updated following the Court's preliminary approval of the Settlement Agreement.  *See* Azari Supp. Decl. ¶¶ 13-14.

61.    Additionally, this Court maintains its own web site to provide notices and information on MDL 2179 and the Settlement to the public.  Current developments are listed prominently at the top of this web page.  *See* http://www.laed.uscourts.gov/OilSpill/OilSpill.htm.  This web site also provides a link to the informational notice web site run by the Claims Administrator.

### d.    Toll-Free Number

62.    By May 7, 2012, a toll-free number was operational.  Class members could (and did) use this number to speak to a live operator and request that a copy of the Detailed Notice be mailed to them.  As of October 21, 2012, 181,242 calls had been fielded in the call center.  *See* Azari Decl. ¶¶ 66-67; Monger Supp. Decl. ¶ 22.

### e.    CAFA Notice

63.    The parties complied with the Class Action Fairness Act ("CAFA") by sending CAFA notice packets that included all the materials required by 28 U.S.C. § 1715 to 57 state and federal officials, including the attorneys general of the United States, each of the 50 states, the District of Columbia, and U.S. territories.  *See* Azari Decl. ¶¶ 17-18.

64.     Although not required, the parties sent a supplemental CAFA notice to these same officials as a courtesy on August 27, 2012, including updated information.  *See* Azari Supp. Decl. ¶¶ 7-8, att. 2.

65.     CAFA provides that an "order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice."  28 U.S.C. § 1715(d). Ninety days after August 27, 2012, is November 26, 2012.

### f.     Clarity Of Notice Materials

66.     The Class Notice was written in "plain language" and "contained substantial, albeit easy-to-read, summaries of all of the key information about Class Members' rights and options."  Azari Decl. ¶ 72; *see also* Wheatman Decl. ¶¶ 9, 10.  They were noticeable, clear, simple, substantive, and informative; no required information was missing.  They were also designed to be noticed, following principles embodied in the Federal Judicial Center's illustrative model notices.  *See* Azari Decl. ¶¶ 12, 72-76, 78; Wheatman Decl. ¶¶ 8-13.  The Eastern District of Louisiana's MDL No. 2179 web site and the official Settlement web site have been regularly updated to reflect ongoing proceedings and orders, including, most recently, the extension of the deadline for revocation of opt-outs to December 15, 2012. *See* Rec. Doc. 7928.

### viii.     Opening Of The Settlement Program

67.     The *Deepwater Horizon* Court Supervised Settlement Program commenced operations on June 4, 2012.   Through November 6, 2012, it had received 79,008 completed claims from class members.  *See* Rec. Doc. 7900 at 8.

68.     From the commencement of the Transition Process through November 6, 2012, the Settlement Program had issued payment notices totaling in excess of $1.3 billion.  *See* Rec. Doc. 7900 at 7.

### ix.    Final Approval Motions And Fairness Hearing

69.    The Court's preliminary approval order — which granted the parties' joint motion for preliminary approval and Class Counsel's motion for preliminary class certification — scheduled the final fairness hearing for Thursday, November 8, 2012.  *See* Rec. Doc. 6418 at 32.

70.    On August 13, 2012, BP moved for final approval of the Settlement Agreement. *See* Rec. Doc. 7114.  That same day, Class Counsel filed a memorandum seeking final approval of the Settlement Agreement and final class certification.  *See* Rec. Doc. 7104.  The Court received argument in opposition from objectors and has treated the memorandum as a motion seeking both final approval and final class certification on behalf of the Class.

71.    On September 11, 2012, the Court issued an order governing the conduct of the fairness hearing.  *See* Rec. Doc. 7358.  In accordance with common practice and authority, the Court decided to "limit presentations by any objector on the grounds of being duplicative, cumulative, or because the objection was adequately covered in written submissions," and "issue a supplemental order prior to the hearing designating objectors to be heard."  *Id.* at 4.  These procedures were designed to enable the Court to obtain the benefit of the widest spectrum of objections without duplication and best inform its independent judgment of the Settlement's fairness, adequacy, and reasonableness under Rule 23(e) standards and the Fifth Circuit's *Reed* factors.  The Court has received the written objections of those who appeared and argued at the fairness hearing, and has thoroughly reviewed, and considered, all objections, arguments, and supporting evidence.

72.    On November 1, 2012, the Court issued a supplemental order designating representative counsel to present argument on certain topics.  *See* Rec. Doc. 7819.  The Court then presided over a fairness hearing held on November 8, 2012.  *See generally* Rec. Doc. 7900; Nov. 8 Fairness H'rg Tr.

B.     The Settlement Agreement[8]

i.     Procedural Elements Of The Settlement Agreement

a.     The Court Supervised Settlement Program

i.     Court Supervised

73.     The Settlement Program is directly overseen by Patrick Juneau, whom the Court appointed Claims Administrator on April 18, 2012.  *See* Rec. Doc. 6418 ¶ 23.  Mr. Juneau has served as the mediator in over two thousand cases and has served as a Special Master in numerous federal and state court cases.  *See* Juneau David, http://www.juneaudavid.com/paj.php.

74.     The Settlement Program and Claims Administrator are subject to this Court's continuing and exclusive jurisdiction.  Section 4.4.7 of the Settlement Agreement provides that "[t]he Settlement Program and its Claims procedures shall be subject to the ongoing supervision of the Court[,]" and Section 18.1 provides that "the Court shall retain continuing and exclusive jurisdiction over the Parties and their Counsel for purpose of enforcing, implementing an interpreting this [Settlement] Agreement[.]"  As stated by Class Counsel, "the Court system of the United States of America [is] in direct supervision of every aspect of this [Settlement]."  Nov. 8 Fairness Hr'g Tr. at 22:5-6.

75.     Pursuant to Section 18 of the Settlement Agreement, the court retains exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of the Settlement Agreement, which is incorporated herein by reference.  *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 382 (1994) (a district court retains jurisdiction to enforce a settlement agreement if it either

---

[8] In this section, the Court summarizes the most significant features of the Settlement Agreement.  In the unlikely event of any conflict between the Court's description of the Settlement Agreement and the Settlement Agreement itself, however, the Settlement Agreement controls.

(1) has language in the dismissal order indicating its retention of jurisdiction, or (2) incorporates the terms of the settlement agreement into the dismissal order).

### ii.      Accessibility To Claimants

76.     The Settlement Program is large and robust.   It consists of the Claims Administrator and his staff of 25 people, who in turn employ five Claims Vendors employing more than 3,200 people working in locations throughout the country.   Its headquarters in Louisiana and nineteen Claims Assistance Centers located throughout the Gulf increase its accessibility to class members.  As of October 22, 2012, at least 41,173 visits had been made to these Claims Assistance Centers.  *See* Landry Decl. ¶¶ 41, 43; Monger Decl. ¶¶ 23-25; Monger Supp. Decl. ¶¶ 11, 20.

77.     In addition to its physical presence throughout the Gulf, the Settlement Program is easily accessible online.  Its web site offers comprehensive information about the Settlement and how to submit claims forms.  Claims guides, claims forms, and Frequently Asked Questions have been posted in multiple languages on this web site and have been updated to reflect common questions regarding the Settlement.  A multilingual toll-free hotline is also available. *See* Azari Decl. ¶ 66; Monger Decl. ¶ 29; Azari Supp. Decl. ¶ 22; *see also* Deepwater Horizon Claims Center, Economic & Property Damage Claims, http://www.deepwaterhorizon economicsettlement.com.

78.     The materials referenced above, as well as the computer programs that implement the Settlement Agreement, were developed by the Settlement Program and verified by BP and Class Counsel.  *See* Nov. 8 Fairness Hr'g Tr. at 83:20-84:4.

79.     Claimants are able to submit claims over the Internet, in person, by mail, or by fax.  The online claims portals provide for ease of submission by claimants or their counsel.  *See* Monger Decl. ¶ 28; Monger Supp. Decl. ¶¶ 30-31.

80.     In addition, Class Counsel have established a physical office in New Orleans, with a toll-free number, web site, and settlement questions e-mail address to provide additional guidance and assistance to class members.  They have undertaken to provide ongoing assistance to claimants in answering questions about the claims process, acting as a liaison between the class members and the Settlement Program, and advocating for class members' interests on an ongoing basis with the Claims Administrator.

81.     Additional *pro bono* assistance is further available to qualified claimants under a grant to the Mississippi Center for Justice and affiliated Gulf Coast legal aid societies.

### iii.     The Settlement Is Designed To Facilitate Complete Claims Submissions And Payments In Accordance With Settlement Terms

82.     The Settlement Program is accessible and user-friendly.  This is an unusual and highly beneficial feature of the Settlement Agreement for class members, and it will ensure that class members receive the full compensation to which they are entitled under the Settlement Agreement.  *See* Fishkind Decl. ¶ 39(b); Monger Decl. ¶¶ 15-16; Richardson Decl. ¶ 61; Monger Supp. Decl. ¶ 23.

83.     The Settlement Program calculates awards to class members using public, transparent frameworks that apply standardized formulas derived from generally accepted and common methodologies.   As Judge Shushan has noted, "[a]ny class member seeking to determine his compensation may simply read the settlement agreements and determine how his circumstances fit into the frameworks."  Rec. Doc. 7480 at 6.  And as the Claims Administrator has explained, "if we have ten people who have ten identical claims, they should get the identical amount of money."  Nov. 8 Fairness Hr'g Tr. at 83:8-9.

84.     This level of transparency provides additional value to class members by permitting them to understand how their claims will be evaluated under the Settlement and

facilitating the claims evaluation process.  It also ensures that similarly situated class members are treated similarly.  The Settlement Program employs specialists in a variety of fields to ensure that awards are calculated accurately, and internal audits further ensure accuracy.  *See* Coffee Decl. ¶ 62.E; Fishkind Decl. ¶ 33; Henley Decl. ¶ 8; Issacharoff Decl. ¶¶ 30, 33-34; Monger Decl. ¶ 21; Sharp Decl. ¶ 8; Richardson Decl. ¶¶ 45, 59, 75-76, 79; Monger Supp. Decl. ¶¶ 10, 28-29, 36.

85.    The Settlement Program has several unique provisions that are favorable to claimants.  For example, Section 4.3.7 provides that the Settlement Program

> shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Process.  The Settlement Program . . . shall use its best effort to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

86.    Section 4.3.8 of the Settlement Agreement further provides, with respect to claimants asserting Economic Damage claims, that

> The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest **ECONOMIC DAMAGE COMPENSATION AMOUNT** that such information and supporting documentation allows under the terms of the **ECONOMIC DAMAGE CLAIM FRAMEWORK**.  By way of example, but not to be exclusive, if the Claimant selected a **COMPENSATION PERIOD** or **BENCHMARK PERIOD** based on information in a completed Claim Form and supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied.

24

87.     Thus, the Settlement Agreement assures that even if such claimants do not select the Benchmark Period or Compensation Period most favorable to them, the Settlement Program will do so on their behalf so that they obtain the maximum recovery permitted under the Settlement based on information in a completed Claim Form and supporting documentation submitted by the Claimant.  This is an unusual and, for class members, a highly beneficial feature of the Settlement.  *See* Settlement Agreement ¶ 4.3.8; Fishkind Decl. ¶¶ 39(c), 88, 111; Henley Decl. ¶¶ 16(e), 30(f); Monger Decl. ¶¶ 10-11; Sharp Decl. ¶ 63; Richardson Decl. ¶¶ 64, 78; Monger Supp. Decl. ¶¶ 9, 16-17.

88.     The Settlement also facilitates claims for Economic Damage Compensation in other ways.  Claimants who receive Settlement Payments for Economic Damage Compensation are eligible for reimbursement of their reasonable and necessary accounting fees, as set forth in the Settlement, related to preparation of their Claim.  *See* Settlement Agreement ¶ 4.4.13.  This feature of the Settlement Agreement is both unusual and beneficial to class members because it ensures that there will be little or no reduction in their Economic Damage Compensation recovery for accounting expense incurred to submit the claim.  *See* Fishkind Decl. ¶ 39(a); Henley Decl. ¶¶ 16(d), 23, 30(e), 33; Henley Supp. Decl. ¶ 8; Klonoff Decl. ¶ 65; Monger Decl. ¶ 17; Sharp Decl. ¶¶ 13, 49, 64; Sharp Supp. Decl. ¶¶ 23, 25; Richardson Decl. ¶¶ 63, 70.  In addition, Business Economic Loss claimants that lack monthly financial statements and are unwilling to have them prepared may submit their contemporaneous business records as "alternate source documents" to the Settlement Program, which will prepare the financial statements needed to process the claim.  *See* Settlement Agreement Ex. 4A ¶ 4; *see also* Deepwater Horizon Claims Center, Economic and Property Damage Claims, Reminder Regarding Documentation Requirements for Business Economic Loss ("BEL") Claims,

25

http://www.deepwaterhorizoneconomicsettlement.com/docs/Alert_Reminder_Regarding
_Documentation_Requirements_for_BEL_Claims.pdf.

> ### iv.    Opportunity To Submit Multiple Claims Over A Long Time Period

89.    Outside the SCP, the deadline to submit claims is April 22, 2014, or six months after the Effective Date, whichever occurs later.  *See* Settlement Agreement ¶¶ 4.4.4, 5.11.8. This is an unusually long time to submit a claim, which is beneficial to class members.  *See* Monger Decl. ¶ 18.  Indeed, April 22, 2014, is more than a year beyond the point at which the statute of limitations for most OPA claims arising out of the spill would likely expire.

90.    Outside the SCP, class members have six months from the date of the first payment of their first claim by the Settlement Program in which to file additional claims.  *See* Settlement Agreement ¶ 4.4.8.  Class members are required to sign a release upon accepting payment of their first claim.  *See id.* ¶ 10.9.  This feature of the Settlement Agreement, which facilitates prompt processing and payment of claims, is unusual and beneficial to class members. *See* Monger Decl. ¶ 19; *see also infra* ¶ 693.

91.    The deadline for filing SCP claims is within 30 days of court approval of the Settlement.  The SCP is the only portion of the Settlement that anticipates a second-round distribution to eligible claimants.  *See* Balhoff Supp. Decl. ¶ 5; Perry Supp. Decl. ¶ 5.  The second-round distributions cannot be made until all claims are processed, and the 30-day claim-filing deadline from final approval of the Settlement by the Court enables prompt second-round distributions to claimants while providing class members with sufficient time to submit Seafood claims.  *See* Mosher Decl. (Rec. Doc. 7710-3) ¶ 26.

### v.       No Inference Drawn From GCCF Denials

92.      The Settlement Program does not draw any negative inference from the fact that a claim was previously denied by the GCCF; that is, a class member whose claim was denied by the GCCF may submit a claim to the Settlement Program, which will consider it *de novo*.  *See* Settlement Agreement ¶ 4.4.9.  This is an unusual feature of the Settlement Agreement, as most claims facilities adopt previous decisions.  *See* Monger Decl. ¶ 20.

### vi.      Claims Administration Panel

93.      The Settlement Agreement creates a three-member Claims Administration Panel consisting of the Claims Administrator, one representative designated by Lead Class Counsel, and one representative designated by BP.  *See* Settlement Agreement ¶ 4.3.4.  The role of the Panel is to address and resolve disagreements that may arise regarding the Claims Administrator's oversight responsibilities or implementation of the Settlement.  *See id.*  This allows class members to have confidence that the Settlement Program is functioning in accordance with the Settlement Agreement, which provides value to class members.  *See* Monger Decl. ¶ 30.

### b.       Internal Appellate Procedure

94.      The Settlement Agreement provides for robust internal appellate review of claims determinations by members of an Appeals Panelist Pool appointed by the Court.  Class members may appeal denials for insufficient documentation, as well as any final determination made in their cases.  *See* Settlement Agreement ¶¶ 6.1.1, 6.1.2.  BP may only appeal where an individual claimant is awarded more than $25,000 in base compensation.  *See id.* ¶ 6.1.2.4.  If the amount at issue is more than $1,000,000 in base compensation, an appeal will be considered by a three-member panel; if the appeal is taken by a claimant, at least one panel member must be from the

claimant's home state.  *See id.* ¶ 6.1.2.2.5.2.  Such multi-tiered appellate rights benefit class members and are uncommon.  *See* Klonoff Decl. ¶ 65; Monger Decl. ¶ 22.

95.     The Court appointed 21 appellate panelists on June 26, 2012.  *See* Rec. Doc. 6796.

### c.     Individual Release

96.     To receive payments from the Settlement Program, Class Members must execute an Individual Release.  *See* Settlement Agreement ¶ 4.4.10; *see also id.* Ex. 26.

97.     Both the Individual Release and the classwide release expressly exclude certain reserved claims, including (i) Bodily Injury Claims, (ii) claims of BP shareholders in any derivative or direct action solely in their capacity as BP shareholders; (iii) claims of Natural Persons and Entities for Moratoria Losses; (iv) claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting; and (v) claims for Economic Damage suffered by Entities or employees (to the extent they allege Economic Damage based on their employment by such an Entity during the Class Period) in the Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development, Defense Contractor Industries, and Entities selling or marketing BP-branded fuel (including jobbers and branded dealers).  *See* Settlement Agreement 10.2; *id.* Ex. 26 at 5.[9]

---

[9] In addition, the Parties, together with the Claims Administrator and Court-appointed neutral, clarified that the claims of the owners or lessees of "private" oyster beds in Louisiana, Mississippi, or Florida that are not formally registered with the State are Expressly Reserved Claims.  *See* Deepwater Horizon Claims Center: Economic & Property Damage Claims, Frequently Asked Questions ¶ 180, https://cert.gardencitygroup.com/ dwh/fs/faq?.delloginType=faqs.

### ii.   Substantive Elements

### a.   Numerous Unique and Claimant-Friendly Provisions

### i.   Predominantly Uncapped Relief

98.     With the exception of the SCP, which has a guaranteed payment of $2.3 billion, BP's liability under the Settlement is entirely uncapped.  This ensures that class members will receive full compensation for their claims.  *See* Klonoff Decl. ¶ 65; Monger Decl. ¶ 12; Richardson Decl. ¶ 32.  All of these payments are in addition to the more than $700 million paid by the GCCF to satisfy Seafood claims.  *See* Balhoff Decl. at 5; Perry Decl. at 5.

99.     Moreover, even referring to the SCP as "capped" is not entirely accurate because the amount placed into the fund far exceeds any currently reliable estimate of compensatory damages.  Instead the $2.3 billion in the SCP operates as a guaranty by BP of payments of that amount to SCP participants.  *See* Rec. Doc. 7710 at 10; *see also infra* ¶¶ 204-208.  Further, the total distribution of $2.3 billion exceeds the determination of the Court-appointed neutral, who found that a distribution of $1.9 billion, the anticipated initial distribution, is fair, reasonable, and adequate.  *See* Perry Decl. at 4-5; Balhoff Decl. at 4-5; Perry Supp. Decl. ¶ 2; Balhoff Supp. Decl. ¶ 2.  Class members agree with these conclusions:  "Not only is the amount fair and adequate, but the fact that BP has committed to pay $2.3 billion regardless of the aggregate amount of the claims submitted means that BP has no incentive to minimize any plaintiff's individual claim, and payments can be made more expeditiously as a result."  Rec. Doc. 7710 at 10 (filing in support of the Settlement by the *Thanh Hai* plaintiffs).

### ii.     Risk Transfer Premiums

100.    Under the Settlement Agreement, most claimants are eligible for a Risk Transfer Premium ("RTP"), which assure that claimants will be fully compensated.[10]  *See* Settlement Agreement Ex. 15.  The RTP compensates class members for potential future loss, as well as pre-judgment interest, any risk of oil returning, any claims for consequential damages, inconvenience, aggravation, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors.  *See* Coffee Decl. ¶ 59; Issacharoff Decl. ¶¶ 28-29; Klonoff Decl. ¶ 65; Henley Decl. ¶ 6.

### iii.    Compensation For All Damages, Notwithstanding The Significant Causal Role Of Transocean and Halliburton

101.    The Settlement Agreement satisfies (i) all compensatory economic and property damage claims by class members arising out of the oil spill, including the share of damages caused by Transocean and Halliburton; and (ii) all such claims against BP, including claims seeking both compensatory or exemplary relief.  *See* Settlement Agreement ¶ 4.4.10.3; Rec. Doc. 7114-1 at 15-16; Rec. Doc. 6418 at 6 n.12.  Significantly, it does so even though (i) every investigative body to consider the *Deepwater Horizon* incident has concluded Transocean and Halliburton share responsibility for the incident; and (ii) the Parties were prepared to put on significant evidence to this effect at trial.  *See infra* ¶¶ 517-521.  This is a remarkably beneficial result for the class members.

---

[10]   For example, if the base compensation amount is $10,000 for claimant's Economic Damages claim and the claimant is a business that satisfies the Tourism definition and is located in Zone A such that it qualifies for an RTP of 2.5, then $10,000 is multiplied by 2.5, which product is then added to the base compensation amount of $10,000 to reach the total compensation amount (*i.e.*, $10,000 + $25,000 = $35,000, less any further enumerated deductions for prior spill-related payments, etc.).

#### iv.  Assignment

102.    The Settlement Agreement assigns certain of BP's spill-related claims against Transocean and Halliburton to the class.  *See* Settlement Agreement ¶ 11; Rec. Doc. 6418 at 6-7. The class may pursue these claims for additional compensation on top of the Settlement's full compensatory payments augmented by RTPs.   Instead of creating waves of follow-on contribution litigation, the assignment to the class as a whole will make any follow-on litigation more self-contained and manageable.  *See* Coffee Decl. ¶¶ 59, 62.F; Klonoff Decl. ¶ 65.

#### v.  Amounts Equal To Recoveries For Transocean Personal Injury Settlements

103.    Under the Settlement, BP will prosecute its claims for indemnification, insurance coverage, and other recoveries against Transocean and its insurers for amounts paid by the GCCF or BP before entry of the Preliminary Approval Order to settle personal injury and wrongful death claims of employees of Transocean or its contractors.  *See* Settlement Agreement ¶ 5.14, Ex. 21 ¶ 1.1.4.2.  Certain of these claims currently are being considered by Magistrate Judge Shushan pursuant to an agreed-upon protocol.  *See* Rec. Doc. 4893; Rec. Doc. 7621.   If BP is successful in obtaining a recovery, it will pay an amount equal to the recovery to the class. *See* Settlement Agreement ¶ 5.14.  The Court will approve the use of these funds, which may include (i) *pro rata* distribution to Economic Class Members; (ii) augmentation of the SCP; or (iii) application of the funds to address extraordinary needs or circumstances as agreed to by the BP Parties.  *See* Settlement Agreement ¶ 5.14.  BP's payment of these funds offers class members an opportunity for additional recoveries on top of compensatory damages with RTPs. However, the settlement amounts offered and provided to class members under the Settlement are fair, reasonable, and adequate even if these additional recoveries are never made.

### vi.        Payments Prior To Final Approval

104.    Under the Settlement Agreement, class members have been able to submit claims and receive payments prior to the Court's grant of final approval, provided that they sign an individual release.  This is an unusual benefit for class members.  *See* Rec. Doc. 6418 at 31-32; Coffee Decl. ¶ 59; Monger Decl. ¶¶ 8-9, 32; Monger Supp. Decl. ¶¶ 5, 13; Nov. 8 Fairness Hr'g Tr. at 99:10-15 (Claims Administrator: "I have never, ever been in a case and never heard of a case . . . that ever authorized the processing and payment of claims before a fairness hearing. This is the first.").  There is no separate limitation on the compensation that claimants may receive prior to final approval, and the result is to make compensation available to claimants years before they could obtain it in litigation.

### vii.        Attorneys' Fees Separate From Payment To The Class

105.    Any common benefit Class Counsel fees and costs awarded by the Court will not be deducted from Class Members' recoveries, but will be paid by BP *in addition to* other class benefits.  This further ensures that each class member will recover at least one hundred percent of demonstrable losses.  *See* Klonoff Decl. ¶ 65.

### b.        Five Uncapped Claims Categories[11]

106.    The majority of the Settlement Agreement offers entirely uncapped relief, producing what is likely the largest class action settlement in history.  *See* Klonoff Decl. ¶ 65.

---

[11] It is important to note that the various aspects of the compensation categories are the result of a negotiated settlement between parties with differing contentions as to what is and is not recoverable under the governing law. The fact of a settlement compromise does not mean that a given aspect of the settlement would or would not be available if the matter were litigated.

### i.        Economic Damage Compensation

#### (A)        Business Economic Loss

107.    The frameworks for Business Economic Loss Claims are tailored to various types of businesses; in addition to general Business Economic Loss, there are additional frameworks for Multi-Facility Businesses, Failed Businesses and Failed Start-Up Businesses, and Start-Up Businesses.  These frameworks flexibly and comprehensively account for the circumstances of businesses that suffered economic loss due to the spill.  *See* Fishkind Decl. ¶ 98; Richardson Decl. ¶ 55; Monger Decl. ¶ 14.

#### (1)        General Business Economic Loss

108.    The documentation, causation, and compensation framework for general Business Economic Loss Claims appears as Exhibits 4A-4E of the Settlement Agreement.  The framework is fair, reasonable, and adequate for numerous reasons described more fully below.  *See* Fishkind Decl. ¶¶ 40, 79; Henley Decl. ¶ 36; Landry Decl. ¶¶ 24, 37; Richardson Decl. ¶¶ 45, 75; Henley Supp. Decl. ¶ 9.

109.    The Business Economic Loss Framework is derived from recognized and accepted methodologies applied in evaluating business economic loss claims, and it is in many respects more favorable than the rules that would apply in litigation.  Specifically, it uses a well-established two-step "before and after" method:  Step 1 provides compensation for the reduction in variable profit between the Compensation Period and the Benchmark Period, and Step 2 provides compensation for increased profits that reasonably could have been expected to be generated in 2010 but for the spill.  *See* Fishkind Decl. ¶¶ 24, 31, 40-41, 66-68, 79, 92-95; Henley Decl. ¶¶ 6, 26-29; Sharp Decl. ¶¶ 9-11; Richardson Decl. ¶¶ 45, 51, 54; Henley Supp. Decl. ¶¶ 2-3; Richardson Supp. Decl. ¶ 4(b).

(a)     **Choice of Benchmark Period and Compensation Period**

110.    The Compensation Period is any period of three or more consecutive months from May through December 2010; the same months are used for the Benchmark Period.  For the Benchmark Period, the class member may choose to use (i) the selected months from 2009; (ii) the average of the selected months in 2008 and 2009; or (iii) the average of the selected months in 2007, 2008, and 2009.  These options are reasonable, and the standardization of choices makes the claims process simple, manageable, and consistent.  *See* Settlement Agreement Ex. 4B, Ex. 4C at 1 & Addendum; Sharp Decl. ¶¶ 18-19, 22-24, 26; Sharp Supp. Decl. ¶ 14.

111.    Allowing the class member to select the Benchmark Period and Compensation Period compares favorably to litigation, where the appropriate periods would be fiercely disputed.  The flexibility is particularly beneficial to claimants in light of the effects of the national recession, which means some businesses did not perform well in 2009.  *See* Fishkind Decl. ¶¶ 36(a), 62, 88; Henley Decl. ¶ 30(a)-(c); Klonoff Decl. ¶ 65; Sharp Decl. ¶¶ 20-21; Richardson Decl. ¶¶ 39-40, 53-54.

112.    It is reasonable to limit the Compensation Period to between May 1 and December 31, 2010.  *See* Fishkind Decl. ¶¶ 32, 61; *see also infra* ¶ 634.  Moreover, to the extent any claimant may contend that it experienced continued spill-related losses after December 31, 2010, compensation for such losses is provided by the additional RTP multiple that is added to the loss calculated using the Compensation Period.  *See infra* ¶¶ 83, 109.

(b)     **Growth Factor**

113.    The two-step method applies a growth factor to account for lost growth potentially due to the spill and in order to make a claimant whole.  Growth is calculated by

considering (i) an assumed growth factor of 2% (General Adjustment Factor) and (ii) actual growth reflected in historical revenue trends prior to the spill (Claimant-Specific Growth Factor). These factors are summed and the result, up to a maximum of 12%, is applied to earnings during six or more months during the Benchmark Period to determine the incremental revenue that would have been generated during the Compensation Period but for the spill.  That incremental revenue is then multiplied by the claimant's Variable Margin in the Benchmark Period.  *See* Settlement Agreement Ex. 4C at 4-5; Henley Decl. ¶ 30(d)(i); Sharp Decl. ¶¶ 10, 25, 27; Richardson Decl. ¶ 51.

114.   The growth factor is more favorable than that which would apply to most claimants in litigation, as it (i) does not permit or recognize negative growth, even though various class members experienced such growth, and (ii) the growth factors are applied to a minimum of six months of revenues, even if the Compensation Period is shorter, and thus permit the claimant to be compensated for lost growth even in periods with no damage in fact.  *See* Settlement Agreement Ex. 4C at 4-5; Fishkind Decl. ¶¶ 36(d), 96-97; Henley Decl. ¶ 30(d)(ii)-(iii); Sharp Decl. ¶¶ 28-29; Richardson Decl. ¶ 51.

(c)    **Documentation Requirements**

115.   The documents required to support Business Economic Loss Claims are typically required to calculate business economic loss; they are the documents that businesses either keep in the ordinary course or that may readily be prepared from a business's books and records.  For that reason, the documentation requirements will not unreasonably burden valid claims.  *See* Settlement Agreement ¶ 38.38, Ex. 4A; Fishkind Decl. ¶ 80; Henley Decl. ¶¶ 7, 23; Sharp Decl. ¶ 12; Richardson Decl. ¶¶ 46-48; Landry Supp. Decl. ¶ 27; *see also supra* ¶ 87.

**(d)     Causation**

116.    The Settlement reasonably requires that some business claimants demonstrate that their business was affected by the spill.  In many other cases causation is presumed, which benefits class members.  Where class members are required to prove causation, there are multiple reasonable options for doing so.  *See* Settlement Agreement Ex. 4B; Fishkind Decl. ¶¶ 50, 60, 64, 81; Sharp Decl. ¶ 14; Richardson Decl. ¶ 49.

**i.     Causation Presumptions**

117.    Causation is presumed (i) for all businesses in Zone A; (ii) for Tourism businesses in both Zones A and B; (iii) for all Primary Seafood Industry claimants; (iv) for Secondary Seafood Industry claimants in Zones A, B, and C; and (v) for Charter Fishing businesses in Zones A, B, and C.  Where causation is presumed, the causation presumption applies to all losses established pursuant to the compensation methodology.  *See* Settlement Agreement Ex. 4C. These presumptions are favorable and would not be available in litigation.  *See* Fishkind Decl. ¶ 65; Henley Decl. ¶ 24; Richardson Decl. ¶ 35.

118.    Zone A consists of areas where the primary economic activity revolves around Gulf Coast-related tourism.  The key determinant of inclusion in Zone A is that the area relies almost entirely on Gulf beach areas as the resource enjoyed by visitors. Zone A also includes downtown New Orleans, which is the primary tourism destination in Louisiana, as well as certain feeder roads that are corridors to the coast.  *See* Settlement Agreement Ex. 1B; Landry Decl. ¶¶ 27-28; Fishkind Decl. ¶¶ 50(a), 51.

119.    Zone B consists of supplemental tourism areas that rely heavily on Gulf Coast–related tourism but whose economic activity also serves permanent residents.  *See* Settlement Agreement Ex. 1B; Landry Decl. ¶ 29; Fishkind Decl. ¶ 50(b).

120.     Zone C consists of broader areas proximate to the Gulf Coast that include businesses that rely on both Gulf-related tourism and permanent residents.   These include portions of cities (*e.g.*, New Orleans, Lafayette, Lake Charles, Pascagoula, Gulfport, Bay St. Louis, Mobile, Naples, Pensacola, Sarasota, and Tampa) where businesses generally cater primarily to permanent residents, but also might rely partially on Gulf-related tourism.   Zone C also includes some feeder roads that tourists use to travel to Zone A tourist destinations (for example, to New Orleans or Grand Isle).   *See* Settlement Agreement Ex. 1B; Landry Decl. ¶¶ 30-31; Fishkind Decl. ¶ 50(c).

121.     Zone D consists of the other areas outside of Zone A, B, and C — the remaining areas of the entirety of Louisiana, Mississippi, and Alabama, as well as certain counties in Florida and Texas.   *See* Settlement Agreement Ex. 1B; Landry Decl. ¶ 32; Fishkind Decl. ¶ 50(d).

122.     The Settlement Agreement fairly and reasonably presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the presumption are the businesses that could most likely prove causation in litigation.   Causation is presumed for Tourism businesses in both Zones A and B.   Exhibit 2 of the Settlement Agreement contains a 16-page list of NAICS industry codes identifying Tourism businesses.   The NAICS industry codes, which are routinely relied upon by economists and governmental authorities, provide an objective, transparent standard for how businesses should be classified.   *See* Fishkind Decl. ¶¶ 27-28, 30, 46-49, 52-55, 57; Landry Decl. ¶¶ 23; 33-34, 36; Richardson Decl. ¶¶ 33-34; 36, 45; Landry Supp. Decl. ¶ 7.   Other businesses, as identified in Exhibit 3 of the Settlement Agreement, also receive a presumption:     (i) all Primary Seafood Industry claimants;

(ii) Secondary Seafood Industry claimants in Zones A, B, and C; and (iii) Charter Fishing businesses in Zones A, B, and C.

123.    Similarly, the zones included in the Economic Loss Zone Map reasonably reflect the likelihood of a potential economic effect of the spill; it is generally reasonable to posit that as distance increases away from the coast, the likelihood of damage is reduced.  *See* Fishkind Decl. ¶¶ 29-30, 44, 59, 78; Landry Decl. ¶¶ 22, 26, 35-36; Richardson Decl. ¶¶ 37-38; Fishkind Supp. Decl. ¶¶ 8, 24-25; Landry Supp. Decl. ¶¶ 11, 20-24, 26; Richardson Supp. Decl. ¶ 4(a); Klonoff Supp. Decl. ¶ 13.

### ii.    Proof of Causation

124.    Where causation is not presumed, the causation tests are reasonable and flexible; they use standardized and transparent approaches.  The causation tests reflect rational expectations about the economic harm that the spill could have caused businesses.  The first option is the V-shaped revenue test, which requires proof of a downturn after the spill followed by a later upturn.  Claimants with a less severe V ("Modified V-Shaped Revenue Pattern") or whose business did not experience an upturn in 2011 ("Decline-Only Revenue Pattern") may still recover provided that they can provide certain reasonable additional information.  The causation tests are economically rational and supported by data regarding the economic impact of the oil spill on the Seafood and Tourism industries.  *See* Settlement Agreement Ex. 4B §§ II, III; Fishkind Decl. ¶¶ 61, 82-87; Henley Decl. ¶¶ 24-25; Landry Decl. ¶ 38; Sharp Decl. ¶ 15; Richardson Decl. ¶ 50; Landry Supp. Decl. ¶ 25; Sharp Supp. Decl. ¶ 10.

125.    Certain small businesses are able to rely on the proof of causation submitted by a larger business located near them ("Causation Proxy Claimant"); this feature is favorable to small businesses.  *See* Settlement Agreement Ex. 4B §§ II.E, III.F; Fishkind Decl. ¶ 91; Richardson Decl. ¶ 50; Sharp Decl. ¶ 16.

126.    Once the causation tests are satisfied, all revenue and variable profit declines during the Compensation Period are presumed to be caused entirely by the spill, with no analysis of whether such declines were also traceable to other factors unrelated to the spill.  This presumption would not be available in litigation.  *See* Fishkind Decl. ¶ 56; Sharp Decl. ¶ 17.

### (e)    Risk Transfer Premium

127.    An RTP is applied to the loss calculated using the two-step method.  Because the RTP is designed in part to compensate the class member for potential future losses that may never occur, it ensures that class members will be made entirely whole, and in many cases more than whole.  *See* Settlement Agreement Ex. 4C at 5; Fishkind Decl. ¶ 33; Henley Decl. ¶ 31; Sharp Decl. ¶ 30, Fishkind Supp. Decl. ¶ 18; Sharp Supp. Decl. ¶ 21; *supra* n.10.

### (f)    Offset For Prior Payments

128.    Any payments received by the claimant from BP or the GCCF are subtracted from the compensation that would otherwise apply.  The offset is reasonable, as it prevents double compensation.  It is also very favorable to class members because it is applied after the application of an RTP.  *See* Settlement Agreement Ex. 4C at 5; Fishkind Decl. ¶ 35; Henley Decl. ¶ 32; Sharp Decl. ¶ 32.

### (2)    Multi-Facility Business

129.    The Multi-Facility Business Framework is Exhibit 5 to the Settlement Agreement.

130.    The Settlement provides a business with multiple physical facilities in the Gulf Coast Areas with substantial flexibility by allowing it to file either one consolidated claim or separate claims for one, some, or all of its facilities.  As a result, such businesses may recover even if losses at one facility were offset by gains at another facility.  Similarly, a multi-facility business with fewer than all of its facilities in the Gulf Coast Areas may recover under the Multi-Facility Business Framework for spill-related economic losses associated with one, some or all

of its facilities located in the Gulf Coast Areas.  Such flexibility is unusual and favorable to claimants.  *See* Settlement Agreement Ex. 5; Fishkind Decl. ¶¶ 36(b), 99-100; Henley Decl. ¶ 33; Sharp Decl. ¶¶ 34, 36; Richardson Decl. ¶ 56.

131.    The documentation requirements that apply to Multi-Facility businesses are reasonable.  *See* Henley Decl. ¶ 33; Sharp Decl. ¶ 34.

132.    The Settlement allocates shared costs between the multiple facilities of a Multi-Facility business based on their share of the business's total revenue.  This is a logical, objective cost allocation that makes economic sense.  *See* Settlement Agreement Ex. 5 § IV; Sharp Decl. ¶ 35.

**(3)     Failed Businesses And Failed Start-Up Businesses**

133.    The Failed Business and Failed Start-Up Business Framework is Exhibit 6 to the Settlement Agreement.

134.    The Failed Business Framework applies to a Failed Business or a Failed Start-Up Business in Zone A, B, or C, or if in Zone D, a failed or failed start-up business in the Tourism industry or Seafood Distribution Chain.

135.    To be a Failed Business, a business must have satisfied the geographic and industry requirements set forth above, commenced operations prior to November 1, 2008, and then either ceased operations, wound down, entered bankruptcy, or initiated liquidation between May 1, 2010, and December 21, 2010, ***provided*** that it may not have reported negative Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for the twelve-month period prior to May 1, 2010, or been in default under any existing financing agreement.

136.    To be a Failed Start-Up Business, a business satisfying the geographic and industry requirements set forth above must have commenced operations on or after November 1,

2008, and then either ceased operations, wound down, entered bankruptcy, or initiated liquidation between May 1, 2010, and December 21, 2010, **provided** that it may not have reported negative EBITDA for the months during which it operated in the period prior to May 1, 2010, or been in default under any existing financing agreement.

137.    The eligibility requirements for Failed Businesses and Failed Start-Up Businesses are reasonably designed to capture businesses that failed as a result of the Spill and not as a result of some other, unrelated reason.  *See* Sharp Decl. ¶ 37; Fishkind Decl. ¶¶ 102-103, 105.

138.    Causation presumptions and requirements for Failed Businesses and Failed Start-Up Businesses are similar to those for Business Economic Loss claims, and are reasonable for the same reasons.  *Compare* Settlement Agreement Ex. 4B *with* Settlement Agreement Ex. 6; *see also supra* ¶¶ 116-126.

139.    It is reasonable not to include RTPs for Failed Businesses and Failed Start-Up Businesses because the Settlement Agreement already compensates these businesses for the value of the business, based on a calculation of projected earnings had the business not failed, and a failed business by definition cannot suffer any additional future losses.  *See* Settlement Agreement Ex. 6; Sharp Decl. ¶ 31; Fishkind Decl. ¶ 104; Henley Decl. ¶ 34.

(a)    **Failed Businesses**

140.    Compensation for Failed Businesses is calculated by applying a multiple to the business's EBITDA for the 12 months prior to May 1, 2010.  This formula calculates the Total Enterprise Value of the business prior to the spill and is a standard method to calculate the value of a business.  The industry multipliers are derived from the Pratt's Stats Database, a widely used and standard source based on actual arm's length business merger and acquisition transactions. The pre-spill Total Enterprise Value is then reduced by the Net Liquidation Value of the failed

business to yield the compensable loss. *See* Settlement Agreement Ex. 6; Fishkind Decl. ¶¶ 31, 103-104; Henley Decl. ¶ 34; Sharp Decl. ¶¶ 38-40; Richardson Decl. ¶ 57.

141.    Once the standards for causation are satisfied, the entire compensable loss is presumed to have been caused by the spill, with no analysis of whether other causes contributed to the business's failure. *See* Fishkind Decl. ¶ 103; Henley Decl. ¶ 34; Sharp Decl. ¶ 40. Such a favorable presumption would not be available in litigation.

142.    Because the owner is compensated for the entire fair market value of the business, no RTP is applied, a result that is economically appropriate. *See* Fishkind Decl. ¶ 104; Sharp Decl. ¶ 31; Henley Decl. ¶ 34.

### (b)    Failed Start-Up Businesses

143.    Failed Start-Up Businesses have no earnings history, and thus cannot be valued based on EBITDA. Such businesses are instead valued based on the book value of equity as of May 1, 2010. Book value (total tangible assets at original cost less depreciation, less liabilities) is a standard and reasonable method to value such businesses because their assets are newly acquired, and the book value should approximate the fair market value of the assets. *See* Fishkind Decl. ¶ 106; Henley Decl. ¶ 34; Sharp Decl. ¶ 41.

144.    Compensation for Failed Start-Up Businesses may also include "sweat equity" (that is, any unpaid labor contributed to the business) if the owner declares in an affidavit that he has been undercompensated for services that he provided to the business. This is a reasonable and unusually favorable method for compensating owners of Failed Start-Up Businesses. *See* Fishkind Decl. ¶¶ 34, 105-06; Sharp Decl. ¶ 42; Richardson Decl. ¶ 58; Henley Decl. ¶ 34.

### (4)    Start-Up Business

145.    The Start-Up Business Claims Framework is Exhibit 7 to the Settlement Agreement.

146.     A Start-Up Business is a business claimant with fewer than 18 months of operating history at the time of the spill.  *See* Setttlement Agreement Ex. 7 at 1; Sharp Decl. ¶ 43.

147.     Start-Up Business Claimants use either a Benchmark Period between May 2011 and April 2012, or qualified projections relied upon by third-party lenders for May 2010 through April 2011.  *See* Settlement Agreement Ex. 7 §§ I, IV.A.  This is logical and fair, as such claimants do not have a sufficient period of historical operations to determine loss.  The option to use qualified pre-spill projections is particularly favorable, as it allows such claimants to be compensated under the best objective scenario.  *See* Fishkind Decl. ¶ 101; Henley Decl. ¶ 35; Sharp Decl. ¶¶ 44-45; Richardson Decl. ¶ 59; Richardson Supp. Decl. ¶ 4(c).

### (B)     Individual Economic Loss

148.     The Individual Economic Loss Framework is Exhibits 8A-8E to the Settlement Agreement.  It is fair, reasonable, and adequate for the several reasons described more fully below.  *See* Landry Decl. ¶ 24; Henley Supp. Decl. ¶ 9; Richardson Supp. Decl. ¶ 4(d); Fishkind Decl. ¶¶ 107-115; Henley Decl. ¶¶ 9-19.

149.     The Individual Economic Loss framework calculates the difference between expected earnings during a claimant-selected Benchmark Period, or 90 or more consecutive days during the claimant selected Base Years with the claimant's actual earnings during the comparable 90-or-more–day period between April 21, 2010, and December 31, 2010 (except for certain Seafood Industry claimants for whom the end date is April 21, 2011).  This is a generally accepted and established method for determining lost earnings.  As set forth below, and as implemented in the Settlement Agreement, the methodology is more favorable in many respects than the typical lost earnings methodology.  It should make claimants whole or more than whole.  *See* Fishkind Decl. ¶¶ 24, 31, 40-41, 66-68, 109; Henley Decl. ¶¶ 6, 10, 14-15; Sharp Decl. ¶¶ 46, 53, 65; Richardson Decl. ¶¶ 62, 69.

150.    The Individual Economic Loss Framework is broad and flexible in addressing lost earnings claims by numerous types of individual claimants — people who changed jobs, people with multiple jobs, people with seasonal jobs, individual periodic vendors, festival vendors, and people who were offered and accepted employment but had their offer revoked.  Documentation requirements are tailored for class members falling into these varying circumstances, depend upon documents that are either kept by or readily available to individuals, and require less than would be required to prove a claim in litigation.  *See* Fishkind Decl. ¶¶ 36(c), 69, 107; Henley Decl. ¶¶ 9, 17, 19; Landry Decl. ¶ 42; Sharp Decl. ¶¶ 45, 59-61, 64; Richardson Decl. ¶ 65; Sharp Supp. Decl. ¶ 6.

151.    Compensation available under the Individual Economic Loss Framework includes lost earnings, RTPs, lost benefits, qualified training costs, qualified job search costs, and one-time non-recurring event commission compensation.  *See* Fishkind Decl. ¶¶ 34, 114; Henley Decl. ¶ 16(g)-(h); Sharp Decl. ¶¶ 45, 58; Richardson Decl. ¶ 66; *see also supra* n.10.

### (1)    Choice Of Benchmark Period And Compensation Period

152.    Most Individual Economic Loss claimants may choose their 90-or-more–day Benchmark Period from among the same choices available to Business Economic Loss claimants:  2009, the average of 2008 and 2009, or the average of 2007, 2008, and 2009.  The claimant-selected 90-or-more–day period is compared to the identical period in the Compensation Period.  *Compare* Settlement Agreement Exs. 4B, 4C & Addendum *with* Settlement Agreement Ex. 8A.  This provides extraordinary flexibility in the choice of a "base" or "benchmark" period that would not be available in litigation.  *See* Fishkind Decl. ¶¶ 36(a), 111; Henley Decl. ¶ 16(c); Sharp Decl. ¶ 52; Richardson Decl. ¶ 69.  Moreover, the benefits of this flexibility to claimants are further enhanced by Settlement Agreement ¶ 4.3.8, which

44

requires the Settlement Program to select the most advantageous Benchmark Period and Compensation Period in the event the claimant fails to do so.  *See supra* ¶¶ 86-87; Fishkind Decl. ¶ 111.

153.    It is reasonable to limit the Compensation Period (for most claimants) to between May 1 and December 31, 2010.  *See* Fishkind Decl. ¶ 32; *see also* supra ¶ 112; *infra* ¶ 634.

**(2)    Growth Factor**

154.    An assumed Growth Factor is applied to Benchmark Period earnings to calculate Expected Earnings. A Claimant-Specific Growth Factor is calculated for claimants with sufficient documentation, and claimants lacking such documentation are granted a presumed growth factor of either 2% or 3.5%.  *See* Henley Decl. ¶ 16(b); Sharp Decl. ¶ 54.

155.    The growth factor is generally more favorable than that which would apply in litigation, as it both presumes positive growth for claimants lacking documentation of growth and sharply curtails the possibility of negative growth for all claimants during a period of low growth and high unemployment.  *See* Fishkind Decl. ¶¶ 36(d), 112; Henley Decl. ¶ 16(b); Sharp Decl. ¶¶ 55-56.

**(3)    Documentation**

156.    Depending upon the documentation that claimants can provide, they are grouped into one of four categories.  The documents are typically required to calculate any economic loss, are relevant to analysis of causation and damages, and are the types of documents that should be kept by or are readily available to individuals.  Indeed, the Settlement Agreement is unusually flexible in allowing even individuals who lack tax documentation or pay period documentation of earnings to rely on sworn written statements.  *See* Settlement Agreement Ex. 8A § IV; Fishkind Decl. ¶ 107; Henley Decl. ¶¶ 7, 11-13, 18;  Landry Decl. ¶ 41; Sharp Decl. ¶¶ 47-48, 64; Richardson Decl. ¶¶ 63, 66-67; Sharp Supp. Decl. ¶ 18.

45

**(4)     Causation**

157.     Causation is presumed for claimants who work in certain geographies and/or industries, whereas other claimants must demonstrate that their loss was due to the spill, in which case multiple causation options are available.  The causation presumptions are fair, reasonable, and generous and they are consistent with economic reality.  *See* Fishkind Decl. ¶¶ 50, 60, 108; Sharp Decl. ¶ 45; Richardson Decl. ¶ 68.

**(a)     Causation Presumptions**

158.     Causation is presumed if an individual (i) worked in Zone A;[12] (ii) worked in the Primary Seafood Industry; (iii) worked in the Secondary Seafood Industry in Zones B or C; (iv) worked in Tourism in Zone B; or (v) worked in Charter Fishing in Zones A, B, or C.  These presumptions are rational, as the individuals who benefit from a presumption are the same individuals who could more likely prove causation in litigation.  *See supra* ¶¶ 117-121 (describing the zones); *see also* Fishkind Decl. ¶¶ 44, 51-55, 57, 65-66; Henley Decl. ¶ 16(a); Sharp Decl. ¶¶ 50-51; Sharp Supp. Decl. ¶ 16; Klonoff Supp. Decl. ¶ 13.

159.     Once causation is established, all losses are attributed to the spill.  This is a favorable feature of the Settlement Agreement that would not apply in litigation.  *See* Fishkind Decl. ¶ 56; Henley Decl. ¶ 16(a).

**(b)     Proof Of Causation**

160.     An employee for whom causation is not presumed but whose employer qualified for compensation from the Settlement Program or the GCCF can rely on those facts to support causation as to the employee.  *See* Sharp Decl. ¶ 50; Sharp Supp. Decl. ¶ 17.

---

[12] The Parties, together with the Claims Administrator, have made clear that causation is presumed for individuals who performed a majority of their services in or on Specified Gulf Waters.

161.    Individuals for whom causation is not presumed may also demonstrate causation by providing an Employer Sworn Written Statement attributing the loss of income to the oil spill, provided that the Claims Administrator finds the statement credible.  *See* Settlement Agreement Ex. 8A at 14; Sharp Decl. ¶ 50.

### (5)    Risk Transfer Premium

162.    For most individual claimants, compensation awards are increased by an RTP. *See supra* ¶ 100.  The amount of the RTP is determined by the industry of the individual's employer and the geographic zone in which it is located.  The RTPs compensate class members for, among other things, the risk of future injuries that may never occur.  *See* Fishkind Decl. ¶¶ 33, 113; Henley Decl. ¶ 16(f); Sharp Decl. ¶¶ 62, 64; Sharp Supp. Decl. ¶ 21; *see also supra* n.10, *supra* ¶ 100.

163.    The RTPs reasonably reflect the strength of different categories of claims.  *See* Fishkind Decl. ¶ 78; *see also supra* ¶¶ 100, 127.  In the few instances where RTPs are unavailable, the omission is reasonable because either the claimant is not at risk of future loss or the documentation of lost earnings is extremely poor.  *See* Settlement Agreement Ex. 8A at 43, 50-51; *id.* Ex. 8D at 15; Henley Decl. ¶ 16(f).

### (6)    Offset For Prior Payments

164.    Awards are offset by any earnings from a job forming the basis of a particular claim, as well as other earnings.  Where claimants worked additional hours to compensate for a lower wage rate, claimants are paid for that extra effort.  This offset is reasonable and consistent with what would apply in litigation.  *See* Fishkind Decl. ¶¶ 35, 110; Henley Decl. ¶ 15; Sharp Decl. ¶¶ 57, 64.

### ii.   Property Damage

165.   The Settlement Agreement compensates property owners under three frameworks: Coastal Real Property Damage, Wetlands Real Property Damage, and Real Property Sales Damage.  These frameworks are Exhibits 11A-11C, 12A-12D, and 13A-13B to the Settlement Agreement, respectively.  These compensation frameworks and the compensation they yield are fair, reasonable, and adequate for the many reasons described below.

166.   As described below, many of the geographic boundaries governing eligibility for these frameworks are defined by reference to the Shoreline Cleanup Assessment Team ("SCAT") line.  *See* Dent Supp. Decl. ¶ 9.  SCAT is based on specific, well-defined, written procedures that provide scientific data on the presence, extent, and duration of observed shoreline oiling.  *See* Taylor Decl. ¶¶ 13, 23; Taylor Supp. Decl. ¶¶ 8-18.  "At a minimum, each SCAT survey team includes a representative of the state where the survey is occurring, a representative of the federal government, and a BP representative."  Taylor Decl. ¶ 16.  It is appropriate to use the SCAT line to define these boundaries.

### (A)   Coastal Real Property Damage

167.   On top of shoreline clean-up and response efforts undertaken by BP, the Coastal Framework compensates owners and long-term lessees of shoreline properties within a specified Zone who may have experienced temporary inconvenience or partial interruption in their ability to fully enjoy their respective beach areas between April 20 and December 31, 2010.  Yet claimants need not demonstrate that they actually were prevented from using or enjoying their parcels — or even that they lived in, used, or visited their parcels during the eligible timeframe. *See* Dent Decl. ¶¶ 19, 28; Dent. Supp. Decl. ¶ 9.

168.   The Coastal Real Property Claim Zone was established using thorough and comprehensive data.  It includes properties located along the Gulf Coast shoreline where oil was

observed or where Unified Command monitored for the presence of oil.  *See* Dent Decl. ¶¶ 19, 28; Dent. Supp. Decl. ¶ 8.  Specifically, it includes parcels along the shoreline as far east as Wakulla County, Florida, west through Alabama and Mississippi and on Grand Isle, Louisiana, which (i) were monitored by SCAT; (ii) were not directly monitored by SCAT but which touch a portion of the coast that was monitored by SCAT; (iii) were not directly monitored by SCAT but are located between the termination of the areas monitored by SCAT and a physical boundary like a bridge or waterway; and (iv) where oil was observed by the Natural Resource Damage ("NRD") pre-assessment.  Parcels inadvertently excluded or misclassified after considering those four classifications can be included if relevant documentation is provided.  The boundaries of this zone accordingly are fair, reasonable, and adequate.  *See* Dent Decl. ¶¶ 21-23; Taylor Decl. ¶¶ 47-50; Dent. Supp. Decl. ¶ 16.

169.    The Coastal Framework also provides compensation for physical damage to real or personal property located on an eligible parcel where such physical damage occurred in connection with the spill or as a result of the response cleanup operations that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof, with the exception of any damage claimed for intrusion of oil, dispersant or other substances onto the eligible parcel.  *See* Dent Decl. ¶ 20; Settlement Agreement Exhibit 11A, § 3A.

170.    Compensation amounts are determined through an objective, transparent methodology that is fair and reasonable.  For each eligible property, the 2010 appraised value of the property is multiplied by a property tax rate of 1.18 percent, and the claimant is paid 30, 35, 40, or 45 percent of this base compensation amount depending upon whether oil was observed on the property and whether the property shoreline includes environmentally sensitive areas.  Base

compensation is increased by the RTP of 2.5.  *See supra* n.10.  Moreover, homestead exemptions may be added back to a property's County Appraised Value, and the 1.18-percent tax rate used for all claimants is the highest weighted average tax rate among the counties of Florida, Alabama, and Mississippi represented by the shoreline segments in the Coastal Real Properly Claim Zone.  Claimants are also guaranteed a minimum compensation if certain eligibility criteria are met, and parcels may be reclassified to higher compensation categories with sufficient documentation.  This is fair and adequate compensation, particularly in light of the fact that BP, through the Unified Command, has paid all costs to remediate the shoreline.  *See* Dent Decl. ¶¶ 24-27, 29; Taylor Decl. ¶ 59; Travis Decl. ¶ 3; Dent Supp. Decl. ¶¶ 10, 22, 25.

171.    Documentation requirements are narrowly tailored to the needs of the methodology and reasonable.  Dent Decl. ¶ 30.

172.    The Coastal Framework fairly allocates awards between eligible claimants, such as where ownership was transferred during the relevant timeframe or a party had a leasehold interest during the relevant timeframe.  *See* Dent Decl. ¶ 31.

### (B)    Wetlands Real Property Damage

173.    On top of clean-up costs separately incurred and paid by BP, the Wetlands Framework provides compensation to owners of Louisiana wetlands properties within a specified Zone to both account for the presence of oil on their properties and for any temporary or partial inconvenience or interruption to their ability to enjoy their property as a result of the spill and cleanup operations.  The framework includes areas where oil was observed ("Category A") and areas where no oil was observed ("Category B").  *See* Dent Decl. ¶ 33; Leggett Decl. ¶ 18; Wharton Decl. ¶ 22; Dent Supp. Decl. ¶ 24.

174.    The Wetlands Real Property Claim Zone includes property located in the Louisiana wetlands where oil was observed or where Unified Command monitored for the

presence of oil.  Specifically, it includes (i) all parcels along the Louisiana Gulf Coast shoreline, excepting Grand Isle, that were intersected by the SCAT line, regardless of whether oil was observed; (ii) parcels in which oil was observed; and (iii) in certain cases where there was a break in the SCAT line, parcels that would have been intersected if the line were continuous. The Zone is fair and was established using thorough and comprehensive data.  *See* Dent Decl. ¶¶ 33, 36-38; Taylor Decl. ¶¶ 51-54; Wharton Decl. ¶ 26; Dent. Supp. Decl. ¶ 8.

175.    The limited documentation requirements are reasonable; indeed, claimants may be compensated absent proof that they lived on, used, or even visited their parcel during the eligible timeframe.  The framework fairly accounts for circumstances in which a parcel was owned by multiple parties during the relevant timeframe.  *See* Dent Decl. ¶¶ 33, 47-48.

176.    The Wetlands Framework is fair, reasonable, and adequate, and will liberally compensate claimants.  The RTP of 2.5 is favorable to claimants, and because BP paid cleanup and remediation costs, eligible claimants should not have incurred any such costs and will not incur such costs in the future.  *See* Dent Decl. ¶¶ 35, 46; Leggett Decl. ¶ 17; Taylor Decl. ¶¶ 53, 59; Travis Decl. ¶ 3; Wharton Decl. ¶ 26; Dent Supp. Decl. ¶ 25.

### (1)    Oil Observed — Category A

177.    Oiled parcels are compensated using three areas:  (i) an Oiled Primary Area that extends 50 feet inland from the SCAT zone; (ii) a Buffer Area that extends 30 feet further inland; and (3) a Non-Oiled Primary Area that extends 30 feet inland from SCAT zones that do not contain the presence of oil.  *See* Dent Decl. ¶ 40; Sharp Decl. ¶ 26.

178.    Parcels in Category A receive base compensation of (i) $25,000 for every acre of Oiled Primary Area; (ii) $10,000 for every acre of Buffer Area; and (iii) $11,000 for every acre of Non-Oiled Primary Area.  An RTP of 2.5 also applies.  As a result, parcels in Category A are

guaranteed a minimum payment of $122,500.  These amounts substantially exceed the typical per acre fair market value for wetland parcels.  *See* Dent Decl. ¶ 41.

179.    The Wetlands Framework also provides compensation for physical damage to real or personal property located on an eligible parcel where such physical damage occurred in connection with the spill or as a result of the response cleanup operations that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof, with the exception of any damage claimed for intrusion of oil, dispersant or other substances onto the eligible parcel.  *See* Dent Decl. ¶ 34; Settlement Agreement Ex. 12A, § 3A.

### (2)    No Oil Observed — Category B

180.    Eligible parcels with no oil observed receive $4,500 for every acre of Non-oiled Primary Area.  With RTP, this guarantees a minimum payment of at least $15,750.  These amounts substantially exceed the typical per acre fair market value for wetland parcels.  *See* Dent Decl. ¶¶ 44-45; Wharton Decl. ¶ 26.

### (C)    Real Property Sales Damage

181.    The Real Property Sales Framework compensates owners of residential properties along the shoreline within a specified Zone that were monitored for oil following the spill and who sold their homes during the period from April 21 to December 31, 2010.  The framework fully compensates eligible claimants.  *See* Dent Decl. ¶ 12; Dent. Supp. Decl. ¶¶ 8, 20.

182.    The Real Property Sales Compensation Zone is fair and reasonable.  It includes residential parcels as far east as Wakulla County, Florida, west through Alabama and Mississippi and on Grand Isle, Louisiana, which (i) were monitored by SCAT, (ii) were not directly monitored by SCAT but which touch a portion of the coast that was assessed by SCAT; (iii) were not directly monitored by SCAT but are located between the termination of the areas

assessed by SCAT and a physical boundary like a bridge or waterway; and (4) where oil was observed by the NRD Pre-assessment. Parcels inadvertently excluded or misclassified after considering those four classifications can be included if relevant documentation is provided. *See* Dent Decl. ¶¶ 13-14; Taylor Decl. ¶¶ 55-57.

183. Eligible claimants are compensated 12.5 percent of the sale price. Causation is presumed for claimants who executed a sales contract on or after April 21, 2010; claimants who executed a sales contract prior to April 21, 2010 must establish that the contract price was reduced as a result of the Spill. *See* Dent Decl. ¶ 16.

184. The documentation requirements are narrowly tailored and reasonable, and the framework fairly accounts for circumstances in which a parcel is owned by multiple parties during the relevant timeframe. *See* Dent Decl. ¶¶ 17-18.

### iii.    VoO Charter Payment

185. The Vessels of Opportunity Program was designed to use "local commercial and charter owner/operated fishing vessels and crews of the Gulf Coast to respond to this spill and minimize the impact to the people, the environment and the fishing industry." *See* Factsheet on BP Vessels Of Opportunity Program (July 7, 2010), http://www.bp.com/liveassets/ bp_internet/globalbp/globalbp_uk_english/incident_response/STAGING/local_assets/downloads _pdfs/factsheet_bp_vessels_of_opportunity_program.pdf.[13]

---

[13] Under the VoO Program, "BP America Production Company and BP Exploration & Production Inc., as participants in the Unified Command structure, entered into Master Vessel Charter Agreements directly with vessel owners. Master Vessel Charter Agreements were established exclusively to allow for the use of the underlying vessels in connection with the Unified Command's coordinated response to the Incident." *Xtreme Fishing Charters Inc. v. BP p.l.c.*, No. 12-2155, Rec. Doc. 1-6 § 8 (E.D. La.) (Barbier, J.). "To respond to the Incident, the Unified Command structure needed the ability to manage deployment of Vessels of Opportunity in both federal and state waters in an integrated fashion. The federal nature of the Vessels of Opportunity program essentially allowed Vessels of Opportunity activities to be conducted whenever and wherever they were most needed, taking constrained response resources into account." *Id.* ¶ 10. The *Xtreme Fishing Charters* case is part of this MDL proceeding. *See Xtreme Fishing Charters*, Rec. Doc. 5.

186.    The Settlement fairly and adequately compensates participants in the VOO program.  First, all Working VoO Participants receive at least $41,600 in compensation, with the amount increasing depending on the size of the boat.  *See* Settlement Agreement ¶ 5.5.2.  To prevent double recovery, *see infra* ¶ 672, Working VoO Participants who also will receive economic loss compensation that directly involves the use of their VoO vessel (except in the case of payments under the SCP) will have their economic loss compensation partially reduced by the VoO Earned Income Offset and the VoO Settlement Payment Offset.  *See* Settlement Agreement ¶¶ 5.5.2.1, 38.161, 38.163.  The VoO Earned Income Offset is equal to 33% of the amount previously paid for services paid to the claimant under the VoO Master Charter Vessel Agreement, and the VoO Settlement Payment Offset is equal to 50% of the Working VoO Participant Settlement Payment.  *See* Settlement Agreement ¶¶ 38.161, 38.163.  The VoO Earned Income Offset and the VoO Settlement Payment Offset are applied to the claimant's economic loss compensation after any applicable RTP is applied.  *Id*.

187.    Second, VoO participants who were never placed on hire to perform actual services on the water will be entitled to receive up to $10,200, with no offset, even if such "Non-Working VoO Participants" will also receive an award under the SCP.  *See* Settlement Agreement ¶ 5.5.3.  VoO claims, because they involved one-time service agreements and thus do not involve future risk that the same course of dealings will be repeated, are not eligible for an RTP.

### iv.    Vessel Physical Damage

188.    The Vessel Physical Damage Framework is Exhibit 14 to the Settlement Agreement.  It provides fair, reasonable, and adequate compensation.

189.    Specifically, "[v]essel owners whose vessels were physically damaged as a result of the oil spill or cleanup operations may recover the lesser of the costs necessary to conduct a

reasonable repair or replace the vessel." Rec. Doc. 6418 at 9. Vessels are eligible even if they did not participate in the VoO program; the only vessels that may not recover are those that were both (i) working for an Oil Spill Response Organization or an Oil Spill Removal Organization at the time of the physical injury *and* (ii) were not participating in the VoO Program. *See* Settlement Agreement Ex. 14 at 2. No RTP is applied to this category of claims, which is reasonable given that the compensation addresses loss from the singular event of the oil spill.

### v.    Subsistence Damage

190.    The Framework for Subsistence Claims is Exhibit 9 to the Settlement Agreement. It provides fair, reasonable, and adequate compensation for the reasons described more fully below.

191.    The Subsistence Framework defines "Subsistence Claimant" as a person who fishes or hunts to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, in a traditional or customary manner, to sustain basic personal or family dietary, economic security, shelter, tool or clothing needs, and who relied upon such subsistence resources that were diminished or restricted in the geographic region used by the claimant due to or resulting from the spill. This definition accounts for the way of life, and possible spill-related interruptions to this way of life, of persons in communities along the Gulf Coast who are dependent upon natural resources for basic personal and family needs. *See* Kelley Decl. ¶¶ 14, 16. *See generally* 33 U.S.C. § 2702(b)(2)(C).

192.    The Framework for Subsistence Claims is fair, reasonable, and adequate. *See* Kelley Decl. ¶ 26. Eight features stand out.

193.    *First*, almost all state and federal waters were open by the end of November 2010, and there were no hunting closures. Yet the Settlement permits recovery for loss of subsistence

use consistent with any closures or impairments to geographic areas relied on by the claimant through 2011.  *See* Kelley Decl. ¶ 17.

194.    *Second*, subsistence claimants need only allege closures or impairments of hunting and fishing grounds; the Settlement Program will determine closures and impairments by reference to relevant maps, data, and reports.  This minimizes the burden of production on subsistence claimants who may not have access to such documents or to expert analyses of scientific and statistical data.  *See* Kelley Decl. ¶ 18.

195.    *Third*, the Settlement compensates claimants for lost subsistence use of natural resources used to barter, without considering whether claimants were legally permitted to trade or sell seafood and game.  *See* Kelley Decl. ¶ 19.

196.    *Fourth*, the Settlement acknowledges the extended family structures that on many occasions are sustained by subsistence activities, by compensating class members for seafood and game that would have been shared with extended family members.  *See* Kelley Decl. ¶ 20.

197.    *Fifth*, claimants are not required to provide documentation, such as grocery receipts, demonstrating the actual cost of substitute or replacement resources.  *See* Kelley Decl. ¶ 21.

198.    *Sixth*, the Settlement provides for an RTP intended in part to compensate for the risk of future damage, despite evidence presented by BP that the risk of future damage to subsistence claimants is low.  *See* Kelley Decl. ¶ 22; *see also infra* ¶¶ 528-570.

199.    *Seventh*, the Settlement treats commercial fishermen favorably by compensating them for any subsistence portion of their catch at retail prices, rather than the wholesale prices at which they sell their catch.  *See* Kelley Decl. ¶ 23.

200.    *Eighth*, because members of subsistence communities may have limited access to the Internet, translators, and legal services, the parties agreed to a structure in which there is a Court-Appointed Distribution Agent or "CADA" who works under the direction of the Claims Administrator and who has a dedicated team that maintains a presence in the geographic areas where subsistence claimants live so as to assist those claimants in completing forms and collecting supporting documentation, confirm the eligibility status of claimants, conduct interviews, and apply the compensation formula.  These features make the Settlement claimant-friendly, reflect a genuine effort to accept and honor the lives and customs of subsistence claimants, and help ensure subsistence claimants the ability to receive fair and adequate compensation.  *See* Kelley Decl. ¶¶ 24-25.

### c.    Seafood Compensation Program

201.    The SCP is Exhibit 10 to the Settlement Agreement.  It provides fair, reasonable, and adequate compensation for the many reasons described more fully below.

202.    The SCP fairly, reasonably, and adequately compensates class members in a manner that acknowledges characteristics of various fisheries but is simple, practical, transparent, and economically logical.  Based on the evidence before the Court, it provides claimants with more compensation than they could likely recover in litigation.  For that reason, it is more than fair, reasonable, and adequate.  *See* Balhoff Decl. at 5; Fishkind Decl. ¶¶ 37, 117, 152-153; Perry Decl. at 5; Rice Seafood Decl. ¶ 5; Smith Decl. ¶ 72; Smith Supp. Decl. ¶¶ 13-17; *see also* June Decl. (Rec. Doc. 7710-2) ¶ 31; Perret Decl. (Rec. Doc. 7710-4) ¶ 6.

203.    The SCP uses a bottom-up mode of awarding compensation: thus, fishermen with higher benchmark earnings receive higher compensation awards.  *See* Smith Supp. Decl. ¶¶ 18-22.

###### i.      General Features

##### (A)      Total Allocation Of $2.3 Billion

204.     A guaranteed total of $2.3 billion has been allocated to the SCP.  This figure represents approximately five times the annual average industry revenue for 2007 to 2009 of the Seafood industry in the region covered by the Settlement Agreement.  *See* Fishkind Decl. ¶¶ 119-120, 152; Leggett Decl. ¶ 19; Richardson Decl. ¶¶ 71, 77; Smith Decl. ¶ 12; Pls'. Ex. A (Rec. Doc. 7104-1) at 2; Rice Seafood Decl. ¶ 7.  The $2.3 billion figure does not include the more than $700 million that has already been paid to claimants by the GCCF.  *See* Balhoff Decl. at 5; Perry Decl. at 5; Rice Seafood Decl. ¶ 7.  *See generally* App'x C at 1.

205.     Judged against the industry metric of lost industry revenue, it is even more clear that the SCP provides fair and reasonable compensation.  The $2.3 billion represents 19.2 times lost industry revenue in 2010, according to the evidence provided.  *See* Smith Decl. Ex. 3.[14]  And when the $730 million in prior GCCF payments that BP funded are included, BP's payments to the Gulf Seafood industry will total 25.3 times lost industry revenue in 2010.  *See id.*; Nov. 8 Fairness Hr'g Tr. at 57:24; Perry Decl. ¶ 4; Balhoff Decl. ¶ 4.  Lost industry revenue is a more relevant industry metric than annual industry revenue because litigation would focus on provable losses for 2010, not on overall annual revenue.  But lost revenue is only the starting point for determining losses incurred by industry participants.  A comparison of the magnitude of the $2.3 billion SCP Fund to lost industry revenue understates the adequacy of compensation under the SCP.  The most appropriate metric for evaluating the adequacy of the SCP is lost industry margin, which reflects industry revenue less non-labor variable costs, principally fuel, which were avoided as a result of the spill-related decline in fishing.   Lost industry margin includes

---

[14] Lost industry revenue reflects the decline in catch volume between 2010 and the 2007-09 average valued at average 2010 price.

both lost profits of vessel owners and lost earnings of boat captains and crew.  Only these losses, not total loss in industry revenue, would be compensable in litigation.  *See* Nov. 8 Fairness Hr'g Tr. at 58:5-8.  Halliburton, which opposes the Settlement (albeit without standing), tendered expert testimony asserting that the Settlement was too generous.  "[R]esearch . . . implies . . . payments to Seafood Harvester Claimants . . . will exceed these claimants' true aggregate economic losses many times over."  Obj. Doc. 91-2 ¶¶ 255-258.[15]

206.    The $2.3 billion provided to the SCP by the Settlement, in sum, affords compensation equivalent to 34% of the present value of all future revenues of the Gulf Seafood Industry, based on the evidence provided.  *See* Smith Decl. ¶ 14.

207.    The reduction in industry revenue in 2010 for the Seafood industry for the class area is approximately $120 million, based on the evidence provided.  Lost industry revenue reflects the decline in Seafood catch volume between 2010 and the 2007-09 average valued at the average 2010 price.  *See* Smith Decl. ¶ 12 & Ex. 3.

208.    BP presented evidence that annual revenues from commercial fishing in Texas (only the class counties), Louisiana, Mississippi, and Alabama had been declining in years prior to the spill — by about $27 million between 2007 and 2008; by about $16 million between 2008 and 2009; and by about $26 million between 2009 and 2010.  *See* Richardson Decl. ¶ 74.

209.    The SCP is expected to pay out an initial $1.9 billion in compensation to class members, leaving a $400 million reserve.  The Court-appointed neutral found that a distribution of $1.9 billion, the anticipated initial distribution, is fair, reasonable, and adequate.  *See* Perry

---

[15] On June 4, 2012, the Court established No. 10 Civ. 7777 (E.D. La.) as a separate docket for the filing of objections.  *See* Rec. Doc. 6616.  Citations to "Obj. Doc." refer to documents filed on this separate objections docket.  Throughout these Findings of Fact and Conclusions of Law, the Court has endeavored to respond to, and cite to, each of the substantial arguments and objections made by the objectors.  The Court emphasizes, however, that it has read and considered ***all*** the objections (both timely and late, with or without standing, and whether appropriately filed on the objections docket or elsewhere), and the Court's failure to cite to a particular objection does not imply that the Court did not consider the objection and find it meritless.

Decl. at 3-5; Balhoff Decl at 4-5; Perry Supp. Decl. ¶ 2; Balhoff Supp. Decl. ¶ 2.  On top of that initial distribution, any reserve will be used for a second distribution, further ensuring the fairness of the SCP.  *See* Balhoff Decl. at 5; Fishkind Decl. ¶¶ 38, 117, 152; Perry Decl. at 5-6; Herman Decl. ¶ 11.  Nevertheless, the amount of compensation that will be paid out in the first distribution will itself be fair, reasonable, and adequate.  *See* Balhoff Supp. Decl. ¶ 2; Perry Supp. Decl. ¶ 2.

210.    Class Counsel agrees that the SCP is more than sufficiently funded.  $2.3 billion is "more than sufficient to adequately compensate past and future commercial fishing losses." Herman Decl. ¶ 11.  $2.3 billion will "provide much greater compensation to the claimants than they would be able to establish using the Federal Rules of Evidence, the Court's rulings, and the application of OPA and maritime law."  Rice Seafood Decl. ¶ 5.

211.    The SCP does not involve a "limited fund" with no ability for class members to opt out.

212.    For these reasons, the $2.3 billion that has been allocated to the SCP is more than sufficient to compensate the participants in the Seafood Industry who are members of the class. *See* Smith Decl. ¶ 18; Herman Decl. ¶ 11.

### (B)    Standard Approach To Compensation For Vessel Owners/Lessees And Boat Captains

213.    The general approach of the SCP to compensation for vessel owners and lessees and boat captains follows six basic steps: (i) Claimants establish baseline revenue prior to the spill; (ii) baseline revenue is adjusted for price increases that might have occurred in the absence of the spill, yielding adjusted revenue; (iii) non-labor variable costs are deducted from adjusted revenues to arrive at net revenues; (iv) net revenue is multiplied by the loss percentage, to yield base compensation; (v) base compensation for vessel owners and captains is calculated by

including an additional factor that reflects the relevant share of vessel income earned by each party; and (vi) base compensation is augmented by the addition of an RTP multiplier to arrive at final compensation.  *See* Fishkind Decl. ¶ 123; Smith Decl. ¶ 19.

214.    This approach is fair and reasonable to all potential claimants, and it reflects reasonable and transparent factors based on industry data and input from industry participants and experts.  In nearly all cases, the assumptions favor claimants.  *See* Fishkind Decl. ¶¶ 24-26; Smith Decl. ¶¶ 20-21, 23, 25.

### (1)    Choice of Baseline Period

215.    For all fisheries in the SCP except oysters, claimants may choose the Benchmark Period that applies to them:  (i) 2009; (ii) an average of 2008 and 2009; or (iii) an average of 2007, 2008, and 2009.  This provides claimants the opportunity to exclude one or two bad years, reducing any risk of under-compensation.  *See* Smith Decl. ¶ 22.

### (2)    Documentation Requirements

216.    The documentation requirements for vessel owners and captains are reasonable, as trip tickets are typically required in federally managed fisheries and many state-managed fisheries.  Where landings tickets are unavailable, the SCP accepts other documentation, such as tax returns in combination with other documentation.  Seafood crew may support their claims through tax documentation, and through alternative means when such documentation is unavailable.  *See* Fishkind Decl. ¶ 124; Smith Decl. ¶¶ 26-27.

### (3)    Causation Presumed

217.    Eligible claimants do not have to prove that their economic losses were caused by the spill; losses are presumed to have been caused by it.  *See* Fishkind Decl. ¶ 122.  In any trial, however, claimants would have to prove causation.  The causation presumption is a significant and unique benefit to eligible claimants.

**(4)     RTPs**

218.    The availability of RTPs under the SCP builds in a significant cushion to cover future harms, which BP has submitted evidence suggesting are unlikely to occur.  They thus provide a fair and reasonable approach for accounting for the possibility of future harms.  *See* Fishkind Decl. ¶ 33; Smith Decl. ¶ 24.

### ii.     Species-Specific Compensation Plans

219.    The Species-Specific Compensation Plans, comprised of Plans for Shrimp, Oysters, Finfish, and Blue Crab/Other Seafood, address claims by vessel owners and lessees, boat captains, oyster leaseholders, and finfish Individual Fishing Quota or "IFQ" holders.  SCP claimants who work across multiple fisheries may submit claims in each category in which they fish.  *See* Fishkind Decl. ¶ 38; Smith Decl. ¶ 28.  As explained below, each of the categories is fair and reasonable.

### (A)     Shrimp

220.    The Shrimp Compensation Plan is fair and reasonable.  *See* Fishkind Decl. ¶ 130. *See generally* App'x C at 2.

221.    The Shrimp Compensation Plan permits claimants to select from either one of two expedited compensation methods or the historic value method.  Claimants may choose whichever compensation scheme is most favorable to them.  Each approach is fair, reasonable, and adequate.  The shares awarded to vessel owners, captains, and crew are reasonable.  *See* Fishkind Decl. ¶¶ 126, 128; Smith Decl. ¶¶ 37-38; *see also* June Decl. (Rec. Doc. 7710-2) ¶ 31; Mosher Decl. (Rec. Doc. 7710-3) ¶ 19; Perret Decl. (Rec. Doc. 7710-4) ¶ 6.

222.    The New Entrant Compensation Method compensates vessel owners and captains who are new to the industry, provided that they can demonstrate a substantial investment prior to the 2010 season.

223.    The Historical Compensation Method that applies to shrimp is favorable to claimants in a number of ways:

224.    *First*, although all landed shrimp should be recorded on trip tickets, the "catch factors" acknowledge that some landings are not recorded but are sold directly at roadside stands.  The use of these catch factors is a fair and reasonable assumption that favors claimants. *See* Richardson Decl. ¶ 33.

225.    *Second*, baseline revenues are increased by 20 percent to account for increases in shrimp prices in 2010.  This is favorable to claimants, as it is possible that some portion of the price increase would not have occurred but for the spill.  *See* Fishkind Decl. ¶ 127; Smith Decl. ¶ 34.

226.    *Third*, the shrimp cost percentages, which are used to adjust for costs not incurred by shrimpers when they do not fish, are reasonable and generally favorable to individual claimants.  *See* Smith Decl. ¶ 35.

227.    *Fourth*, the loss percentage of 35 percent is higher than the approximate 25 percent reduction in landings between the 2007-2009 average and 2010 the evidence presented would suggest.  As a result, it is reasonable and favors potential claimants.  *See* Fishkind Decl. ¶ 127; Smith Decl. ¶ 36; *see also* Nov. 8 Fairness Hr'g Tr. at 46:24-47:4 (Mr. Herman: "[T]he actual shrimp landings volume, according to the NOAA data, are only down 13 percent . . . . Under the Seafood Compensation Program that Mr. Perry devised, you're getting paid for a 35 percent loss as opposed to a 13 percent loss.").

228.    *Fifth*, the RTPs for shrimp are large: 8.25 for vessel owners and lessees, and 7.25 for boat captains in the shrimp industry.  *See* Fishkind Decl. ¶ 129; Smith Decl. ¶ 39.

229.   BP has submitted evidence suggesting that because the Gulf shrimp industry has experienced declines in recent years (due to rising costs of fuel, rising costs of regulatory compliance, downward pressure on prices due to imports, and the effects of the Dead Zone area of seasonal hypoxia), extending the Benchmark Period for revenues further back in time than 2007 could yield results that are not representative of the catch expected in 2010 but for the spill. *See* Smith Decl. ¶¶ 29-32; Tunnell Decl. ¶ 35.

230.   For the reasons noted above, the SCP provides fair, reasonable, and adequate compensation to claimants in the shrimp industry.

### (B)   Oysters

231.   The Oyster Compensation Plan acknowledges a number of unique facts about the Gulf oyster industry, including that there is a mixture of public and private oyster grounds and that compensation must be split among harvest losses and compensation for oyster leaseholds. *See* Fishkind Decl. ¶ 131; Smith Decl. ¶ 40.

232.   The required documentation includes standard business records.  *See* Fishkind Decl. ¶ 133.

233.   For the reasons discussed in this section, the SCP provides fair and adequate compensation to claimants in the oyster industry.  *See* Fishkind Decl. ¶ 135.  *See generally* App'x C at 3.

### (1)   Oyster Leaseholders

234.   Oyster leaseholders are compensated on a per-acre basis, depending upon the location of the leasehold.  Compensation levels are tied qualitatively to expectations of future costs from the 2010 freshwater diversions authorized by Louisiana officials and distinguish between areas that are subject to more or less risk of harm, assuming that the 2010 freshwater diversions caused harm to oyster beds.  *See* Fishkind Decl. ¶ 132; Smith Decl. ¶¶ 41, 44.

### (2)    Oyster Harvesters

235.    Compensation for oyster harvesters is fair, reasonable, and adequate, and allows harvesters the benefit of a ten percent price increase notwithstanding the fact that some of this price increase might not have occurred but for the spill.  The cost percentage of 12 percent, which is used to adjust for costs not incurred by oystermen when they do not fish, is reasonable. *See* Smith Decl. ¶ 42-43.  The loss percentage of 40 percent, which is used to calculate the proportion of projected annual revenues presumed lost as a result of the spill, is fair and reasonable because it is significantly higher than the approximate 31 percent decline in landings that the evidence presented suggests occurred in the class geography in 2010 as compared to average landings in 2007-2009.  *See* Fishkind Decl. ¶ 134; Smith Decl. ¶ 45.  The calculation of the leaseholder payment cost incurred by an oyster harvester by multiplying the harvester's revenue from oysters harvested from private leases by a leaseholder payment percentage of 33% is reasonable.  *See* Smith Decl. ¶¶ 42-45.

236.    The RTPs for oysters are large: 9.75 for vessel owners and lessees, and 8.75 for boat captains.  *See* Smith Decl. ¶ 46.

### (C)    Finfish

237.    BP submitted evidence suggesting that, compared to other species, the decline in landings of finfish was modest: only approximately 15 percent in the class geography in 2010 as compared to 2007-2009.  *See* Smith Decl. ¶ 52.

238.    Finfish claimants do not receive an adjustment factor for increasing prices; that is fair and reasonable because finfish prices declined.  This approach therefore effectively attributes all finfish price decreases in 2010 to the spill.  *See* Smith Decl. ¶ 53.

239.    The finfish cost percentage of 27 percent, which accounts for costs not incurred when claimants do not fish, is fair and reasonable in light of the evidence BP submitted showing

that it is consistent with actual costs reported in industry data.  *See* Smith Decl. ¶ 54; Smith Supp. Decl. ¶ 44.

240.    The loss percentage of 25 percent, which is used to calculate the proportion of projected annual revenues presumed lost as a result of the spill, is fair and reasonable because it is significantly higher than the approximate 15 percent decline in landings that the evidence submitted suggests occurred in the class geography in 2010 as compared to 2007-2009.  *See* Fishkind Decl. ¶ 141; Smith Decl. ¶ 55; Smith Supp. Decl. ¶ 43.

241.    For finfish species subject to IFQ quotas, claimants who both harvest and own quotas may be compensated for both their lost revenue from harvesting and for direct compensation as a result of their IFQ share.  *See* Smith Decl. ¶¶ 56-57.

242.    The RTPs for finfish — 6.0 for vessel owners and lessees and 5.0 for boat captains — are sufficiently large to cover any reasonable expectation of future losses.  *See* Smith Decl. ¶ 58.

243.    The documentation requirements are tailored to the finfish industry and are limited to documents typically maintained in the ordinary course of business.  *See* Fishkind Decl. ¶ 140.

244.    For the reasons discussed above, the SCP provides fair and adequate compensation to claimants in the finfish industry.  *See* Fishkind Decl. ¶ 142.

(D)    <strong>Blue Crab/Other Seafood</strong>

(1)    <strong>Blue Crab</strong>

245.    Participants in the blue crab industry are compensated for both lost revenues and an additional $7,500 per vessel, accounting for a downturn in landings in 2010 and the possibility of capital losses, such as crab traps, caused by the spill.  *See* Fishkind Decl. ¶ 136; Smith Decl. ¶ 47.

246.     The Blue Crab Compensation Plan grants participants the benefit of a 20 percent price increase, effectively assuming that prices would have significantly increased even if the spill had not occurred.  In light of the 27 percent blue crab volume declines in landings for 2010 that the evidence BP submitted suggests occurred relative to 2007-2009, this is a highly favorable assumption for claimants.  *See* Smith Decl. ¶ 48.

247.     The blue crab cost percentage of 35 percent, which accounts for costs not incurred when claimants do not fish, is fair and reasonable in light of the evidence BP has submitted showing that costs are lower in the blue crab industry than in the shrimp industry.  *See* Fishkind Decl. ¶ 137; Smith Decl. ¶ 49.

248.     The blue crab loss percentage of 35 percent, which is used to calculate the proportion of projected annual revenues presumed lost as a result of the spill, is fair and reasonable because it is significantly higher than the approximate 27 percent decline in landings in the class geography that the evidence submitted suggests occurred in 2010 as compared to 2007-2009.  *See* Fishkind Decl. ¶ 137; Smith Decl. ¶ 50.

249.     The RTPs that apply for blue crab — 6.0 for vessel owners and 5.0 for boat captains — are sufficiently large to cover any reasonable expectation of future losses and are likely to overcompensate claimants.  *See* Fishkind Decl. ¶ 137; Smith Decl. ¶ 51.

250.     For the reasons discussed above, the SCP provides fair and reasonable compensation to participants in the Blue Crab industry.  *See* Fishkind Decl. ¶ 138.

### (2)     Other Seafood

251.     "Other Seafood" refers to the remainder of the Gulf of Mexico fisheries that were potentially affected by the spill, principally spiny lobsters and stone crabs, but not menhaden. BP submitted evidence suggesting that while this category of seafood experienced an approximately five percent decrease in landings in 2010 compared to the baseline period, the

average price increased by 35 percent.  The loss percentage of 10 percent, which is twice the percentage of landings decline in 2010 that the evidence submitted by BP suggests occurred, is therefore very favorable.  *See* Fishkind Decl. ¶¶ 143-144; Smith Decl. ¶¶ 59-60.

252.   The compensation approach inflates baseline revenues by ten percent; the cost percentage of 35 percent is in line with cost percentages for other fisheries.  *See* Smith Decl. ¶¶ 61-62.

253.   RTPs — 5.5 for vessel owners, 4.5 for captains — are sufficiently large to cover reasonable expectations of future losses.  *See* Fishkind Decl. ¶ 144; Smith Decl. ¶ 63.

254.   For the reasons discussed above, the SCP provides fair and reasonable compensation to claimants in these parts of the Seafood Industry.  *See* Fishkind Decl. ¶ 145.

### (E)   Seafood Crew

255.   The Seafood Crew Plan provides fair, reasonable, and adequate compensation to claimants.  *See* Fishkind Decl. ¶ 151; Henley Decl. ¶ 22.

256.   Seafood crew members may submit claims for lost wages associated with all activity as crew members.  It is similar to the Individual Economic Loss Framework in many respects, including that it (i) categorizes claimants by the type and quality of earnings documentation that they can provide; (ii) requires similar documentation to prove past earnings; (iii) uses earnings in a Claiming Job in a Base Year to determine lost earnings following the spill; and (iv) permits claimants who lack both Tax Information Documents and Pay Period Documentation to establish earnings history or anticipated earnings with a Sworn Written Statement and an employer Sworn Written Statement.  *See* Henley Decl. ¶ 20(a)-(d); Smith Decl. ¶ 65; Smith Supp. Decl. ¶ 21.

257.   The Seafood Crew Plan goes even further than the Individual Economic Loss Framework in allowing claimants without Tax Information Documents or Pay Period Earnings

Documentation, and who cannot provide an employer Sworn Written Statement, to nevertheless recover if they can provide a Sponsor Sworn Written Statement and, if applicable, an Attorney Sworn Written Statement.  This is extraordinarily flexible.  *See* Fishkind Decl. ¶¶ 146, 150; Henley Decl. ¶ 21; Smith Decl. ¶ 66.

258.    The loss percentage of 37 percent, which applies to Category I and Category II claimants, is fair and reasonable, as it exceeds the average reported decreases in fishing volumes in all categories falling within the SCP, according to evidence submitted by BP.  *See* Fishkind Decl. ¶¶ 147-48; Smith Decl. ¶ 64.

259.    Claimants lacking sufficient documentation to qualify for Category I or Category II treatment will still receive a lump sum of $5,000, up to a maximum of $50 million, after which compensation will be *pro rata*.  The availability of such compensation is both favorable to class members and unusual.  *See* Fishkind Decl. ¶¶ 149-150.

260.    An RTP of 2.25 applies to most claims brought under the Seafood Crew Plan; the RTP is fair and reasonable because seafood crew have invested less human and financial capital in commercial fishing than captains and vessel owners, and the barriers to entry are not as significant.  *See* Henley Decl. ¶ 20(e); Smith Decl. ¶¶ 67-71.

### d.    Additional Compensation

### i.    Promotional Fund

261.    BP has agreed to create a $57 million fund, to be administered by the Claims Administrator, to promote tourism and the seafood industry in the Gulf Coast.  *See* Settlement Agreement ¶ 5.13.  Class members will benefit from these investments above and beyond payments on their claims through increased value to their properties and businesses.  $57 million is significant compared to amounts spent on promotion by the various convention and visitors

bureaus in the Gulf Coast areas in a typical year.  *See* Coffee Decl. ¶ 60; Fishkind Decl. ¶ 116; Monger Decl. ¶ 13; Klonoff Decl.  ¶ 65.

262.    On November 9, 2012, the Claims Administrator released final recommendations for the 2012 recipients of the fund.  *See* BP Gulf Seafood and Tourism Promotional Fund Grant Proposals,    http://www.deepwaterhorizoneconomicsettlement.com/docs/Promotional%20Fund_Final%20Recommendations_Media%20List.pdf.

### ii.    Notice And Administration Expenses

263.    BP has agreed to pay not only the cost of notice to class members, but also all costs of the Settlement Program administration, without a cap or limit on such costs — which, given the scope of the Program's operations, can reasonably be expected to be substantial.  *See* Settlement Agreement ¶ 4.3.12; *see also supra* ¶ 76.  This is a significant benefit to class members, and one that distinguishes this case from virtually all other actions.  *See* Klonoff Decl. ¶ 65.

### iii.    Fees And Costs

264.    BP has agreed not to contest a request by Class Counsel for an award, in an amount to be set at a future time by the Court, not to exceed $600 million, for Class Counsel's fees, costs, and expenses.[16]  *See* Settlement Agreement Ex. 27.  These amounts will be paid separate and apart from class members' recoveries.  Class Counsel will file a fee petition that class members will be free to contest under Rule 23(h).  *See* Nov. 8 Fairness Hr'g Tr. at 155:25-156:7.  BP's agreement to pay attorneys' fees which otherwise would come out of class member recoveries is unusual and represents a substantial benefit for the class.

---

[16] Consistent with Paragraph 4 of Exhibit 27 to the Settlement Agreement, BP has (1) made a non-refundable payment of $75 million into the Common Benefit Fee and Costs Fund, and (2) has made quarterly payments equal to 6% of the aggregate payments made to Claimants who have executed an Individual Release.  These funds are being held in trust, and will not be paid to Class Counsel (or other Common Benefit Attorneys) unless and until a motion for common benefit costs and/or fees is presented, considered, and approved by the Court.

**e.  BP Has Provided Multiple Guarantees Supporting the Settlement.**

265.    Settlement payments are guaranteed by two guarantors after BP Exploration & Production Inc. and BP American Production Company — BP Corporation North America Inc., and BP p.l.c.  *See* Settlement Agreement ¶ 37.1.

**iii.  Experience To Date With The Court-Supervised Settlement Program Shows The Program To Be Functioning Well For Class Members.**

266.    As of November 6, 2012, the Court-Supervised Settlement Program ("CSSP") had already issued $1.3 billion in determinations to be paid to various class members, including: (i) over $400 million paid for claims during the transition process; and (ii) over $952 million in payment notices issued for more than 12,750 claims under the Settlement.  *See* Rec. Doc. 7900 at 7; *see also* Nov. 8 Fairness Hr'g Tr. at 84:22.

267.    As to payment notices that have been acted upon, 95% of claimants accepted their offers from the CSSP.  *See* Rec. Doc. 7900 at 14.

**II.  Conclusions Of Law[17]**

**A.  The Court Has Jurisdiction, And Venue Is Proper.**

**i.  The Court Has Jurisdiction.**

**a.  BP Has Accepted For Purposes Of This Case That It Is Subject To Personal Jurisdiction In This District.**

268.    BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. have not contested the class's allegation that they are subject to personal jurisdiction in this district for purposes of this action.  *See* Rec. Doc. 6453 ¶¶ 14-16; *see also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement

---

[17] The following Conclusions of Law are entered upon the record as the holdings and legal conclusions of the Court. To the extent that any of them might later more properly be classified findings of fact, they should be deemed incorporated within the Court's Findings of Fact.

of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.").

> **b.   The Court Has Subject Matter Jurisdiction Over This Action.**

269.   The Court has subject matter jurisdiction over all claims in this action, including VoO claims on numerous grounds.

270.   *First*, the Court has jurisdiction pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b).  That Act was designed in the wake of the *Exxon Valdez* spill to provide for federal jurisdiction, especially over large oil spills.  "Appropriate United States district courts are given jurisdiction over controversies arising under the Act."   S. Rep. No. 101-94, at 2, 16 (1989) (referencing the *Exxon Valdez* spill together with three spills within a 24-month period in the waters of Rhode Island, the Delaware River, and the Houston Ship Channel).

271.   *Second*, the claims presented in the *Bon Secour* complaint are admiralty and maritime claims within the meaning of 28 U.S.C. § 1333(1), the statute that Congress enacted to confer on federal district courts the type of jurisdiction referenced in Article III, Section 2 of the United States Constitution.

272.   *Third,* the Court has jurisdiction pursuant to the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

273.   *Fourth*, the Court also has jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), which provides the federal courts with "jurisdiction of cases and controversies arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."   43 U.S.C.

§ 1349(b)(1)-(b)(1)(A).  The *Deepwater Horizon* incident occurred while mineral development activities were taking place on the Shelf.  All claims asserted in the *Bon Secour* action and resolved by the Settlement Agreement "aris[e] out of" and "in connection with" a drilling operation on the outer Continental Shelf.  *See* Rec. Doc. 470 at 6-8; Rec. Doc. 7564 at 5.

274.    *Fifth*, the Court also has jurisdiction under 28 U.S.C. § 1331 because the claims asserted arise from an incident on an exclusive federal enclave, that is the Outer Continental Shelf.  Accordingly, such claims by their nature arise under federal law.  OCSLA not only provides that federal courts have original jurisdiction over all cases arising out of Shelf operations, it also directly specifies that federal law governs as a substantive matter.  *See* 43 U.S.C. § 1333(a)(1).  Hence, federal question jurisdiction under 28 U.S.C. § 1331 inherently and unavoidably exists over claims that arise out of Shelf conduct.

275.    Because the VoO program was directed by the Unified Command and the Federal On Scene Coordinator under the National Contingency Plan in response to the oil spill that occurred on the Shelf, there is federal jurisdiction over claims arising out of the VoO program pursuant to OCSLA.  *See supra* note 13.  Moreover, the Master Vessel Charter Agreements used with VoO participants were generally uniform contracts specifying that the parties had agreed to the application of federal maritime law, providing federal maritime jurisdiction over VoO claims pursuant to 28 U.S.C. § 1333(1) as well.

### ii.    Venue Is Proper In This District.

276.    BP Exploration & Production Inc., BP America Production Company, and BP p.l.c., have not contested the class's allegation that venue is proper in this District, and venue is proper because the *Deepwater Horizon* incident occurred approximately 50 miles off the coast of this District.  *See* Rec. Doc. 6453 ¶ 31; *see also Wachovia Bank v. Schmidt*, 546 U.S. 303, 316

(2006) ("But venue and subject-matter jurisdiction are not concepts of the same order.  Venue is largely a matter of litigational convenience; accordingly, it is waived if not timely raised.").

277.    The JPML also has concluded that this venue is the appropriate court in which to have centralized most *Deepwater Horizon*, non-shareholder litigation, in part because of its proximity to the incident.  "Upon careful consideration, however, we have settled upon the Eastern District of Louisiana as the most appropriate district for this litigation.  Without discounting the spill's effects on other states, if there is a geographic and psychological 'center of gravity' in this docket, then the Eastern District of Louisiana is closest to it."  Rec. Doc. 1 at 3.

278.    The JPML's centralization order, and the Court's conduct of these proceedings, does not violate the Supreme Court's decision in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  *See infra* ¶ 725.

279.    Numerous putative class actions and individual suits were filed in this District, vesting it with original jurisdiction for all purposes, including the ability to conduct a comprehensive trial.  Among these actions were class suits filed in the immediate wake of the oil spill, and the *Bon Secour* action in which this Settlement is presented for approval.

**B.    The Court Confirms The Qualifications Of Experts Providing Opinion Testimony Supporting The Settlement Agreement And Admits Such Testimony.**

280.    In the Findings of Fact above and the Conclusions of Law that follow, the Court refers at numerous points to the testimony of various experts submitted by means of declaration.  Where the expert declarations refer to the substantive terms of the Settlement Agreement (including Exhibits thereto) or to other facts buttressed by attachments, the Court finds the relevant facts to constitute admissible fact testimony and where the experts offer opinions, the Court finds them admissible and credits them to the extent that these opinions are cited either in the Findings of Fact sections above or in the Conclusions of Law sections below, or both.

### i.      The Experts Are Qualified.

281.    The various experts offered by the Class and BP are highly qualified and have applied accepted and standard approaches in their analyses.

### a.      Joint Experts

282.    Cameron R. Azari is the Director of Legal Notice for Hilsoft Notifications, a firm specializing in "designing, developing, analyzing and implementing large-scale, un-biased, legal notification plans" that "has been involved with some of the most complex and significant notices and notice programs in recent history"  Azari Decl. ¶¶ 3. The Court appointed Hilsoft Notifications as the Class Notice Administrator.  *See* Rec. Doc. 6418 at 38.  *See generally* Azari Decl. ¶¶ 3-7 & Ex. 1.

283.    John C. Coffee, Jr. is the Adolf A. Berle Professor of Law at Columbia Law School and a leading expert in class action law.  He has been qualified as an expert on class action issues in numerous federal courts within the Fifth Circuit and elsewhere.  Professor Coffee's declaration sets forth his independent opinions regarding certification of the Economic and Property Damages Settlement Class, which the parties agree should be considered by the Court, but which do not necessarily represent the views of all parties on all of the matters on which Professor Coffee opines.  *See generally* Coffee Decl. Ex. A.

284.    Meade Monger founded and co-leads the Information Management Service practice of AlixPartners, where he is a Managing Director.  Monger Decl. ¶ 1.  He has twenty-five years of professional consulting experience with extensive claims management experience working on many of the most complex claims assignments in history.  *Id.* ¶ 4.  "Examples include claims associated with the restructuring of General Motors Corporation, claims of Aon's insurance policyholders over a twelve year period related to contingent commission payments, investor claims subject to the Bernard L. Madoff Investments fraud, customer claims against

London based Lloyds TSB bank resulting from the UK Financial Service Authority payment protection insurance ruling of April 2011, claims associated with Kmart's restructuring that was the largest trade claims case in history, lead paint product liability claims against chemical company Lyondell and environmental claims against the large mining company Asarco." *Id.* *See generally id.* Ex. 1.

### b. Non-Joint Class And Class Notice Experts

285.    Samuel Issacharoff is the Reiss Professor of Constitutional Law at New York University School of Law and a leading expert on class action law. *See generally* Issacharoff Decl. ¶¶ 1-4. He also served as counsel to the Plaintiffs' Steering Committee during the negotiation of the Settlement Agreement. *See id.* ¶ 1. Professor Issacharoff's declaration was tendered by Class Counsel.

286.    Katherine Kinsella is President of Kinsella Media, an advertising and legal notification firm that specializes in the design and implementation of large scale, complex, and multifaceted notice programs directed to individuals and claimants in complex litigation. *See* Kinsella Decl. ¶ 1. She has over 35 years of relevant experience, including 19 years of exclusive work in the field of legal notice. *See id.* ¶ 3. She has frequently testified on class notice issues in the federal courts and is widely recognized as a preeminent notice expert. Ms. Kinsella's declaration was tendered by Class Counsel. *See generally id.* ¶¶ 1-5 & Ex. 1.

287.    Robert H. Klonoff is Dean and Professor of Law at Lewis & Clark Law School and a leading expert on class action law. *See* Klonoff Decl. ¶¶ 1-7. Professor Klonoff's declaration was tendered by Class Counsel. He served as a co-reporter with Professor Issacharoff on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION. *See generally id.* Ex. A.

288.    Geoffrey P. Miller is the Stuyvesant P. Comfort Professor of Law at New York University and a leading expert in class action law.  *See* Miller Decl. ¶ 1.  Professor Miller's declaration was tendered by BP.  *See generally* ¶¶ 1-7 & Attach.

289.    Shannon R. Wheatman is Vice President of Kinsella Media.  *See* Wheatman Decl. ¶ 1.  She has extensive experience in the field of legal notice and has been qualified as an expert in this area in many actions in federal and state courts.  *Id.* ¶ 3.  Ms. Wheatman's declaration was tendered by Class Counsel.  *See generally id.* ¶¶ 1-7 & Ex. 1.

### c.    Other Experts Whose Declarations Were Submitted By BP

290.    Jerry Dent is a Managing Director with Alvarez & Marsal in Birmingham, Alabama, and co-head of the Environmental Advisory Services practice.  He is a real estate expert accredited as a senior appraiser by the American Society of Appraisers, and he was awarded the Counselors of Real Estate designation by the National Association of Realtors. Dent Decl. ¶ 1.  His practice specializes in matters involving evaluation of properties affected by contamination or hazard, and he has significant experience with administration of settlement funds.  *Id.  See generally id.* ¶¶ 1-5 & App'x A.

291.    Dr. Henry Fishkind is an economist with over 30 years of experience in Gulf-region economic analysis and forecasting.  Fishkind Decl. ¶ 4.  He has extensive experience as a damages expert in economic loss cases.  *Id.* ¶ 21.  He is personally familiar with the Gulf Coast region, and has served as a professor at the University of Florida, the Acting Director of the Bureau of Economic and Business Research there, which publishes the Florida Statistical Abstract, a leading source of economic data regarding the State of Florida and its counties, and on the Florida Governor's Council of Economic Advisors under two different administrations, those of Governors Graham and Bush.  *See id.* ¶¶ 7, 9.  *See generally id.* ¶¶ 4-21 & Ex. A.

292.     James L. Henley, Jr., is a certified public accountant and attorney licensed and in good standing in Mississippi.  His accounting clients include individuals and small businesses.  *See* Henley Decl. ¶ 3.  He has served as a United States Chapter 13 Bankruptcy Trustee, and also as an expert witness in connection with business disputes.  *See id.*  He is also a pastor at Fresh Start Christian Church in Jackson, Mississippi.  *See id.* ¶ 4.  *See generally* ¶¶ 1-4 & Ex. A.

293.     Dr. Alan W.A. Jeffrey is an expert in geo-chemistry, oceanography, and environmental science.  He is currently a Senior Geochemist at ZymaX Forensics in Escondido, California.  He has over twenty years experience designing, implementing, and evaluating testing programs for oil and hydrocarbons following oil spills and other releases and analysis of oil samples to determine composition and source.  He holds a Ph.D. in oceanography from Texas A&M University, as well as a master's degree in organic chemistry and a bachelor's degree in biochemistry, both from Queen's University in Canada.  *See generally* Jeffrey Decl ¶¶ 1-3 & Ex. A.

294.     Dr. Laura Kelley is an historian at Tulane University who conducts research and teaches courses on Louisiana history and Gulf Coast Native Americans.  *See* Kelley Decl. ¶ 1.  She has worked with Native American populations in Southeastern Louisiana for the past seven years, including studying patterns of food acquisition, consumption, and the relationship of food to the domestic economy.  *See id.* ¶ 3.  She is also the historian of record in an application for federal recognition by some of the Native tribes in Southeastern Louisiana whose members likely fall under the subsistence framework.  *See id.* ¶ 8.  She is an editor for the KnowLA Project, an online encyclopedia guide to Louisiana history and culture.  *See generally id.* ¶¶ 1-11.

295.     Donald J. Landry is the owner of Louisiana-based Top Ten Hospitality Advisors, an independent consulting company that provides networking, marketing, and development

services to hospitality industry owners, operators, developers and suppliers.  *See* Landry Decl. ¶ 2.  He is a 43-year veteran of the lodging industry who began his career at Sonesta Hotels in New Orleans while completing his business management degree at the University of New Orleans, and he has served as president of some of the largest hotel management, real estate, and franchise companies in the world.  *See id.* ¶¶ 4-5.  He has substantial experience in the tourism and lodging industry in the Gulf Coast Areas, through which he has travelled extensively.  *Id.* ¶¶ 7-8, 12.  *See generally id.* ¶¶ 1-15 & Ex. A.

296.    Dr. Harold Leggett is a Ph.D. biologist and former Secretary of the Louisiana Department of Environmental Quality ("LDEQ") from 2008 to 2010.  Leggett Decl. ¶ 1.   At LDEQ, he was responsible for oversight of environmental compliance and emergency response activities for events such as hurricanes and oil spills.  He was "a member of the Unified Command for a number of major incident responses, including hurricanes Katrina, Rita, Gustav, and Ike."  *Id.* ¶ 3.  He is now a consultant at PPM Consultants in Baton Rouge, Louisiana.  *Id.* ¶ 1.  He has extensive experience in both the public and private sector in assessing wetlands impacts, including those caused by the oil and gas industry in Louisiana.  *See id.* ¶¶ 3-6.  *See generally id.* ¶¶ 1-10 & Ex. A.

297.    Dr. Walter H. Pearson is an oceanographer with expertise in eco-toxicology, behavioral ecology, and fisheries.  *See* Pearson Decl. ¶ 2.  His professional expertise in the Environmental Sciences spans over 40 years and includes internationally recognized leadership of multidisciplinary, multi-organizational studies that rigorously assess effects on fisheries resources and marine and aquatic environments.  *See id.*  He has experience studying numerous oil spills, including the *Exxon Valdez* spill, and has studied the effects of oil on Alaskan herring since the early 1990s.  *See generally id.* ¶¶ 1-4 & Ex. A.

298.    Dr. James A. Richardson is the John Rhea Alumni Professor of Economics, the Harris J. and Marie C. Chustz Distinguished Professor in Business Administration, and Director of the Public Administration Institute in the E. J. Ourso College of Business at Louisiana State University.  *See* Richardson Decl. ¶ 5.  Dr. Richardson has served continuously since 1987 as the private economist on Louisiana's Revenue Estimating Conference, the panel responsible for providing official revenue estimates for the state.  *See id.* ¶ 14.  He has served as a fiscal advisor to Louisiana governors, executive agencies, and local governments.  *See generally id.* ¶¶ 1-31 & Ex. A.

299.    Holly Sharp is a Certified Public Accountant, Certified Fraud Examiner, shareholder in a Louisiana CPA firm, and Adjunct Professor of Taxation at the A.B. Freeman School of Business at Tulane University, where she has taught since 1999.  *See* Sharp. Decl. ¶ 3. She has extensive experience in analyzing economic loss claims for individuals and businesses, including work on behalf of plaintiffs, defendants, and insurers in the wake of Hurricane Katrina. *See id.* ¶¶ 4-5.  *See generally id.* ¶¶ 1-5 & Ex. A.

300.    Dr. Martin Smith is the Dan and Bunny Gabel Associate Professor of Environmental Economics with tenure at Duke University.  *See* Smith Decl. ¶ 2.  He is a resource economist whose primary areas of expertise are fisheries economics, seafood markets, coastal resource management, applied econometrics, and modeling of dynamical systems.  *See id.* ¶ 3.  *See generally id.* ¶¶ 1-7 & App'x A.

301.    Dr. Elliott Taylor is a principal at Polaris Applied Sciences, Inc., an environmental consulting firm specializing in technical and scientific support for oil spill response.  *See* Taylor Decl. ¶ 5.   His expertise includes development of SCAT and implementation of clean-up techniques and technologies.  (BP hired Polaris to serve as its

representative in the SCAT process for the spill.)  Dr. Taylor is an oceanographer with "more than 20 years of experience in preparing for and responding to major oil spills, with an emphasis on shoreline response." *See id.* ¶ 1.  *See generally id.* ¶¶ 1-6 & Ex. A.

302.    Dr. John W. Tunnell, Jr. is Associate Director and Endowed Chair of Biodiversity and Conservation Science at the Harte Research Institute for Gulf of Mexico Studies, and Professor of Biology, Fulbright Scholar, and Regent's Professor in the Department of Life Sciences, College of Science and Engineering, Texas A&M University Corpus Christi (TAMU-CC).  *See* Tunnell Decl. ¶ 1.  He is a marine biologist who helped to develop and then taught for nearly twenty years at the National Spill Control School at TAMU-CC, focusing on the effects of oil spills on the marine environment.  *See id.* ¶ 2.  *See generally id.* ¶¶ 1-4 & Ex. A.

303.    Edward Briggs ("Tre") Wharton has worked for over twenty-two years on wetlands projects, focusing on Louisiana wetlands, and earned a B.S. in wildlife conservation at Louisiana Tech University.  At C-K Associates LLC, located in Baton Rouge, Mr. Wharton is both an Ecological Team Leader and Senior Project Manager for National Environmental Policy Act ( "NEPA") Investigations with responsibility for all wetland-related projects performed by the firm.  *See* Wharton Decl. ¶ 6.  In that capacity, he has been involved in hundreds of wetlands projects, *see id.* ¶ 7, and he has experience in responding to oil spills that includes field data collection, assessment of impacts, and developments of strategies to address impacts, *see id.* ¶ 9. He also serves on C-K Associates' SCAT team following unplanned releases of crude oil or petroleum products.  *See id.* ¶ 10.  He is certified by the Army Corps of Engineers in wetlands identification and delineations.  *See generally id.* ¶¶ 1-15 & Ex. A.

ii.   *Daubert* **Standards Are Satisfied.**

304.   To satisfy Federal Rule of Evidence 702, a district court must ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).[18]

305.   As the Court has concluded, all of the expert reports easily satisfy the requirements of *Daubert*: "The experts . . . have provided information, in these reports, on their knowledge, skill, experience, training and education, and on their methodologies or analyses, that is sufficient to enable the Court to consider the issues of qualification and admissibility under FRE 702 and *Daubert*, and to determine that they meet these standards, and that these reports are admitted into the fairness hearing record, to be given such weight and consideration as [the Court] deems appropriate, in its independent settlement class certification and final settlement approval evaluations and decisions."   Rec. Doc. 7866.   In making these determinations, the Court specifically considered, where applicable, reliance on peer-reviewed work, estimations of error rate, and other factors identified as useful or necessary to assessing the scientific basis for evidence in *Daubert.*   The experts have fully disclosed their qualifications; they have explained that they apply standard, accepted scientific, technical, or other specialized principles; and no objectors have meaningfully challenged any of these points.

306.   Because the Court, with its background in the law and facts relevant to the claims at issue in this litigation, which background it gained through presiding over hearings and conferences, supervising the conduct of fact and expert discovery, and in preparation for the multi-phase trial, considered the *Daubert* factors and concluded that *Daubert* was satisfied with

---

[18] The Court notes that many of the attestations contained within the declarations submitted by Class Counsel and/or BP are based upon the declarant's own personal knowledge and experience, and do not fall within the ambit of "opinion" testimony under Federal Rule 702.

respect to the experts discussed above, it declined to hold a *Daubert* hearing, as the law permits. *See, e.g.*, *United States v. Hoang*, 285 F. App'x 133, 136 (5th Cir. 2008) (per curiam); *United States v. Reaux*, No. 01-071, 2001 WL 883221, at *1 (E.D. La. July 31, 2001).

### iii. No Valid *Daubert* Objections Were Submitted And Thus Any Potential *Daubert* Challenges Have Been Waived.

307.    In addition to the fact that *Daubert* is plainly satisfied with respect to the experts discussed above, no valid *Daubert* objections were submitted, and thus the issue was waived by all objectors to the Settlement Agreement.

308.    The identities and substantive analyses and opinions of nearly all of the experts were disclosed on August 13, 2012, when BP and the Class filed their motions in support of final approval of the Settlement Agreement and accompanying exhibits.  Dr. Pearson did first appear as an expert on October 22, 2012, when BP filed its reply memorandum in support of final approval, in order to address assertions raised by several objectors regarding the future health of Gulf fisheries.  But no specific challenge to Dr. Pearson's qualifications or methodology was lodged on a timely basis (or at all) after his declaration was filed.

309.    Under the Court's preliminary approval order, all objections were due to be filed by August 31, 2012.  *See* Rec. Doc. 6418 ¶ 38.  That deadline was subsequently extended by agreement to September 7, 2012, in light of Hurricane Isaac.  *See* Rec. Doc. 7225.

310.    No class members raised any *Daubert* objections that complied with this timeline. One objector made passing reference to *Daubert* principles in an appeal from Magistrate Judge Shushan's order denying discovery, *see* Rec. Doc. 7612, and one objector filed a motion *in limine* late in the day on November 7, 2012, the afternoon before the fairness hearing, *see* Rec. Doc. 7861.

311.    Moreover, the few *Daubert* challenges (such as they are) that have been lodged have not been lodged by parties who have demonstrated their standing; these parties have entirely failed to demonstrate an injury related to the admissibility of the expert reports, such as by putting forth a valid *prima facie* claim alleging that one or more frameworks rests upon questionable expert work.

312.    Finally, even if the *Daubert* challenges that were submitted had been timely and had been submitted by parties with standing, neither made more than passing reference to *Daubert*, and neither was sufficient to call any of the experts' qualifications, methodologies, or opinions and analyses into doubt.

313.    Because no valid *Daubert* objections were filed, the issue was waived.  See *Huss v. Gayden*, 571 F.3d 442, 466 (5th Cir. 2009) ("The uniform law of the circuits, the Fifth included, is that without a **timely** objection to the admission of expert evidence, appellate review is waived absent plain error.") (footnotes omitted and emphasis added); *Bedingfield v. Deen*, No. 09-369, 2011 WL 2712950, at *1 (W.D. La. July 8, 2011) ("[C]onsidering that Plaintiffs have failed to even acknowledge their untimeliness and/or offer a good faith explanation for missing the *Daubert* motion deadline set forth in the Amended Scheduling Order, the Court will not entertain Plaintiffs' untimely *Daubert* challenge."); *Leggett & Platt, Inc. v. Yankee Candle Co.*, 2008 WL 8792255, at *1 (N.D. Tex. Apr. 4, 2008) ("The deadline for the parties to file any pretrial motions was June 29, 2007. Although that deadline excludes motions in limine, that exclusion does not operate to make an untimely filed *Daubert* motion timely because it is styled as a motion in limine.").  Any objections to the consideration of the expert declarations also were waived as a result of their complete lack of specificity and lack of any analysis and reasoning as

to any issues with respect to the various experts, individually or as a group.  Most importantly, the experts pass *Daubert* muster.

314.    Accordingly, the Court overrules all objections to the qualifications of the experts cited in these Findings of Fact and Conclusions of Law and finds the testimony of the experts is based on sufficient facts and data.

315.    The Court also overrules any objection based on the claim that the expert declarations are hearsay.  *See, e.g.*, Nov. 8 Fairness Hr'g Tr. at 102:23-24.  Such evidence may properly form the basis for granting final approval of the Settlement.  *See, e.g., Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642 (5th Cir. 2012) ("'Historically, courts have commonly relied on affidavits, declarations, arguments made by counsel, and other materials in the record without also requiring live testimony.'") (quoting *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006), *aff'd* 497 F.3d 615 (6th Cir. 2007)).[19]  And again, the objections — such as they were — were lodged long after the due date for the objections, and hence were waived.

### C.    This Settlement Class May Be Certified For Purposes Of Settlement Only Pursuant To Rules 23(a) and (b)(3).[20]

316.    For the reasons discussed below, the Economic and Property Damages Class (the "Settlement Class," set out in Appendix B) may be certified pursuant to Federal Rule of Civil

---

[19]  Additionally, approval of this Settlement is before this Court on motions to grant final approval of this class settlement pursuant to Federal Rule of Civil Procedure 23(e) and to certify a settlement class under Federal Rule of Civil Procedure 23(b)(3).  As such, Federal Rule of Civil Procedure 43(c) applies, which provides as follows: "**Evidence on a Motion.**  When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions."  *See also* 28 U.S.C. § 1746 (declarations can be used "with like force and effect" to affidavits).  It is entirely proper for this Court to make findings based on the declarations submitted into the record by the parties (or by objectors).

[20]  The following section (paragraphs 316 to 441, and any cross-references elsewhere in the document to these paragraphs), which explains that that the Settlement Class may certified for settlement purposes pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, is submitted exclusively by Class Counsel, and not by BP.  As BP has previously explained, it does not oppose Class Counsel's request for class certification on the condition that the Court grants final approval to the Settlement Agreement.  *See* Rec. Doc. 7114-1 at 10-11.

Procedure 23(a) and (b)(3), for purposes of settlement only.  The Court expresses no opinion with respect to whether the Settlement Class, or any other class, could be certified for any other purpose.

317.    Settlement classes are a typical feature of modern class litigation, and courts routinely certify them, under the guidance of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), to facilitate the voluntary resolution of legal disputes.  *See, e.g.*, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498, at *8-11 (E.D. La. Jan. 10, 2012); *Stott v. Cap. Fin. Servs.*, 277 F.R.D. 316, 324-26 (N.D. Tex. 2011); *Billitteri v. Secs. Am., Inc.*, Nos. 09-1568, 09-1084, 2011 WL 3586217, at *4-9 (N.D. Tex. Aug. 4, 2011); *In re OCA, Inc. Secs. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *7-10 (E.D. La. Oct. 17, 2008); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.612 (2004) ("Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits.").

318.    To be certified as a class, the Settlement Class must be ascertainable; must satisfy all of the requirements of Rule 23(a); and must satisfy the requirements of at least one subdivision of Rule 23(b) — here, Rule 23(b)(3).  *See* Klonoff Decl. ¶ 14.

319.    The parties have tendered either jointly or on their own behalf four experts in the law of class actions:  Professors Coffee, Issacharoff, Klonoff, and Miller.  The Court cites to, or in some instances quotes from, the opinions of these notable scholars at various points in the analysis below of class certification issues.  However, the Court underscores that at all times it has exercised its independent legal judgment on each and every class certification issue.  The Court cites to the declarations of these scholars where they encapsulate or restate the governing legal rules embodied in the text of Rule 23 and/or in the case law of the federal courts.  Since

these scholars have criticized abusive class actions, however, it remains significant that all four of them, from their various perspectives, support this Settlement in positive — indeed, enthusiastic — terms and believe that it is readily certifiable.

> **i.     This Settlement Class Satisfies The Ascertainability Requirement.**

320.    A class definition must be based on objective criteria and be sufficiently definite such that determining whether a particular individual falls into the class is administratively feasible.  *See Dell*, 669 F.3d at 639; *In re Train Derailment Near Amite, La.*, MDL No. 1531, 2006 WL 1561470, at *14-15 (E.D. La. May 24, 2006); *Sadler v. Int'l Paper Co.*, No. 09-1254, 2011 WL 3502467, at *2 (W.D. La. July 13, 2011); Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE § 1760 (3d ed. 2011 update).

321.    This settlement class satisfies all of these requirements.  It is nearly the epitome of how a class in a mass tort action ought to be defined, as it is objective, precise, and detailed, and does not turn on the merits.  *See* Coffee Decl. ¶¶ 17-20; Klonoff Decl. ¶ 20; Miller Decl. ¶ 38; Miller Supp. Decl. ¶¶ 6-9; Klonoff Supp. Decl. ¶¶ 39-40.  Objections to the contrary, *see* Obj. Doc. 228 at 7-10, lack merit.

322.    The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Specified Gulf Waters.  Nothing in the class definition requires a determination on the merits or delves into any person's subjective mental state.  The definition is based on objective criteria such as where a person resided, worked, received an offer to work, or owned property; or where an entity owned, operated, or leased a physical facility, or employed full time workers.  The Class is further delimited by providing that certain industries or types of businesses are expressly excluded and that only those business or individuals experiencing specified categories of damages are class members.

### ii.    This Settlement Class Meets Rule 23(a)'s Requirements.

#### a.    Rule 23(a)(1):  Numerosity

323.    Numerosity is satisfied when "the class is so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  To satisfy the numerosity prong, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.  *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000); *see also* Klonoff Decl. ¶ 21.

324.    The settlement class easily includes tens of thousands of members, and likely far more.  To date, although not all are class members, approximately 110,000 persons have filed short form joinders adopting the B1 Master Complaint.[21]  More than 79,000 persons have filed claims with the Settlement Program.  *See supra* ¶ 67.

325.    The Fifth Circuit has consistently held that classes only a fraction of this size satisfy Rule 23(a)(1)'s numerosity requirement.  *See, e.g.*, *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (between one hundred and one hundred fifty); *Jack v. Am. Linen Supply Co.*, 498 F.2d 122 (5th Cir. 1974) (per curiam) (fifty one); *Sagers v. Yellow Freight Sys.*, 529 F.2d 721, 734 (5th Cir. 1976) (approximately one hundred ten); *Jones v. Diamond*, 519 F.2d 1090, 1100 n.18 (5th Cir. 1975) (forty eight); *see also* Coffee Decl. ¶ 36; Klonoff Decl. ¶ 22.

326.    In addition to the sheer size of the class, members are "geographically dispersed, decreasing the practicability of joinder into one action."  *Stott*, 277 F.R.D. at 324; *accord Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981) ("Thus, a

---

[21] Although over one-hundred thousand claimants have filed short-form joinders, joining all members of the class would be impractical.  Tens of thousands of potential class members have not filed short-form joinders.  Moreover, the only practicable way of resolving the claims of the numerous plaintiffs who have filed short-form joinders is through class treatment.

number of facts other than the actual or estimated number of purported class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of the class . . . .").  As the Court preliminarily concluded on May 2, 2012, *see* Rec. Doc. 6418 at 27, numerosity is plainly satisfied here.

### b.    Rule 23(a)(2):  Commonality

327.    Commonality is satisfied when there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Rule 23(a)(2) requires that all of the class member[s'] claims depend on a common issue of law or fact whose resolution will resolve an issue that is central to the validity of each one of the class member's claims in one stroke."  *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)) (emphasis and alterations omitted); *see also* Klonoff Decl. ¶ 23; Klonoff Supp. Decl. ¶ 43.

328.    The *Wal-Mart* Court stated that commonality requires classwide proceedings to have the ability "to generate common *answers* apt to drive the resolution of the litigation."  *Id.* at 2551.  "Commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members."  *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1052-53 (S.D. Tex. 2012) (citation and quotation omitted).  "'The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence.'"  *Id.* at 1053 (quoting *Sullivan v. D.B. Invs., Inc.,* 667 F.3d 273, 335 (3d Cir. 2011) (en banc) (Scirica, J., concurring), *cert. denied*, 132 S. Ct. 1876 (2012)).

329.    In this case, there are numerous common questions of both law and fact, and it is for this reason that this action was centralized in this District by the Judicial Panel on Multidistrict Litigation.  *Cf. In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL

92498, at *10 ("Movants argue that commonality is also easily satisfied because the Judicial Panel on Multidistrict Litigation ordered the subject cases to be consolidated in the MDL based upon commonality of facts, and the factual and legal issues arising from KPT Chinese drywall are common to all claimants.  The Court agrees . . . .").

330.    Because "for purposes of Rule 23(a)(2) even a single common question will do," *Wal-Mart*, 131 S. Ct. at 2556, "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions," *Amchem*, 521 U.S. at 609.  The Court accordingly explains that the commonality standard is met in greater detail in the context of establishing below that Rule 23(b)(3)'s predominance requirement is satisfied.  *See infra* ¶¶ 381-425.

331.    While this class certification for settlement purposes does not decide any identified common issues on their merits (and any class certification decision regarding non-settled claims is reserved for another day), it cannot be denied that the overarching questions of law and fact raised by the *Deepwater Horizon* incident are common, recurring issues as they relate to the liability of BP and/or others.  Commonality cannot be frustrated merely by using sleight of hand in how questions are framed.

332.    The Court confirms its preliminary conclusion, reached on May 2, 2012, that commonality is satisfied.  *See* Rec. Doc. 6418 at 27.  Because commonality is satisfied, objections to the contrary lack merit.  *See* Obj. Doc. 91 at 7-10; Obj. Doc. 123[22] at 9-14; Obj. Doc. 198 at 63-66; Obj. Doc. 228 at 10-14; Obj. Doc. 230 at 3-4, 7-11; Obj. Doc. 234 at 7-12.

---

[22] The attorney who submitted this objection has been deemed a "serial objector" by several courts.  *See* Nov. 8 Fairness Hr'g Tr. at 223:12-224:16; *see also id.* at 224:7-10 (attorney in question admitting it was "regrettable" that he had been found to have engaged in "bad faith and vexatious conduct").

### c.    Rule 23(a)(3):  Typicality

333.    Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The test for typicality is not demanding."  *Mullen*, 186 F.3d at 625.

334.    Typicality "does not require a complete identity of claims.  Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class."  *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1054 (quotation omitted).  Where "claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."  *Id.* (quotation omitted); *accord Mullen*, 186 F.3d at 625-26 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *10  (finding typicality satisfied when "each of the plaintiffs is seeking money from the Knauf defendants for the costs of remediation and other damages"); Klonoff Decl. ¶ 25.

335.    Courts have held that "[t]he major concern under Rule 23(a)(3) is if unique defenses against a named plaintiff threaten to become the focus of the litigation," and that the key to the typicality inquiry is "whether a class representative would be required to devote considerable time to rebut the Defendants' claims."  *In re Enron Corp. Secs. Litig.*, 529 F. Supp. 2d 644, 674 (S.D. Tex. 2006) (citation and quotation omitted); *see also Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (rejecting the argument that "the presence of an arguable unique defense necessarily destroys typicality"); *Mullen*, 186 F.3d at 625 (differences in damages "will not affect their legal or remedial theories, and thus does not defeat typicality").

336.     Typicality is satisfied here, as the class representatives — like all class members — allege economic and/or property damage stemming directly from the *Deepwater Horizon* spill.  Importantly, the spill is a single-event, single-location disaster, and so the primary focus of any trial would be BP's conduct and that of its contractors.   *See* Coffee Decl. ¶¶ 39-40; Issacharoff Decl. ¶ 10; Klonoff Decl. ¶¶ 26-28; Coffee Supp. Decl. ¶¶ 12-14; Klonoff Supp. Decl. ¶ 44.

337.     The class representatives personally have claims falling within each of the claims frameworks created by Section 5 of the Settlement Agreement.  *See* Bon Secour Fisheries, Inc. Decl. ¶ 4 (Economic Damage); Friloux Decl. ¶ 4 (Seafood Compensation Program; VoO Charter Payment; Subsistence Damage); Gallo Decl. ¶ 4 (Wetlands Real Property Damage; Economic Damage); Fort Morgan Realty, Inc. Decl. ¶ 5 (Economic Damage); GW Fins Decl. ¶ 5 (Economic Damage); Hutto Decl. ¶ 4 (Seafood Compensation Program; VoO Charter Payment; Vessel Physical Damage; Subsistence Damage); Irwin Decl. ¶ 4 (Coastal Real Property Damage); Kee Decl. ¶ 4 (Seafood Compensation Program); Tesvich Decl. ¶ 4 (Seafood Compensation Program); Lake Eugenie Land and Development, Inc. Decl. ¶ 5 (Wetlands Real Property Damage); Lundy Decl. ¶ 4 (Subsistence Damage); Guidry Decl. at 64 ¶ 4 (Seafood Compensation Program; Voo Charter Payment; Vessel Physical Damage; Subsistence Damage); Panama City Beach Dolphin Tours & More LLC Decl. ¶ 5 (Economic Damage; Voo Charter Payment); Sellers Decl. ¶ 4 (Economic Damage; Coastal Real Property Damage; Real Property Sales Damage); Zeke's Charter Fleet, LLC Decl. ¶ 5 (Economic Damage; VoO Charter Payment).

338.     Here, the class representatives were all impacted by the single event of the oil spill, although they lived in different areas within the class geographic boundaries and were

engaged in an array of impacted activities.  While each and all of the class representatives have agreed to represent the entire class, every category within the Settlement includes at least one of the *Bon Secour* plaintiffs.  The range of class representatives as set out in the prior paragraph thus meets the Rule 23 requirements of typicality.  No more is required.  *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) ("Objectors . . . complain that class counsel did not provide clear documentation that each job category had a class representative for each type of discrimination claim alleged.  That level of specificity is not necessary for class representatives to satisfy the typicality requirement."); *Stott*, 277 F.R.D. at 325 ("Although certain of the class members may have dealt with different individuals associated with Capital Financial, these factual differences are not sufficient to overcome the similarity of the nature of the Representative Plaintiff's claims."); *Cornn v. UPS, Inc.*, No. 03-2001, 2005 WL 588431, at *8 (N.D. Cal. Mar. 14, 2005) ("Rule 23 does not require a class representative for each job category that may be included in the class.").

339.    The Court confirms its preliminary conclusion, reached on May 2, 2012, that typicality is satisfied.  *See* Rec. Doc. 6418 at 27.  Because typicality is satisfied, objections to the contrary must be rejected.  *See* Obj. Doc. 91 at 10-12; Obj. Doc. 123 at 14-15; Obj. Doc. 145 at 3; Obj. Doc. 228 at 15-19; Obj. Doc. 230 at 12; Obj. Doc. 234 at 12.

### d.    Rule 23(a)(4): Adequacy

340.    Rule 23(a)(4) requires the Court to find that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).  Thus, "the adequacy requirement mandates an inquiry into [1] the zeal and competence of the representatives' counsel and [2] the willingness and ability of the representatives to take an

active role in and control the litigation and to protect the interests of the absentees." *Id.* (alterations omitted). Finally, "[t]he adequacy inquiry also serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Id.* at 479-480 (quoting *Amchem*, 521 U.S. at 625); *see also* Klonoff Decl. ¶ 29; Coffee Supp. Decl. ¶ 16; *Langbecker v. Electronic Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007) ("In addition to measuring the competence of class counsel and the class representatives' willingness and ability to serve, . . . the Rule 23 adequacy inquiry also uncovers conflicts of interest between the named plaintiffs and the class they seek to represent") (quotations omitted). *See also Stott*, 277 F.R.D. at 325.

341.   In this case, (i) Class Counsel has competently prosecuted this litigation and negotiated a very favorable and generous settlement agreement; (ii) the class representatives are willing and able to actively control the litigation; and (iii) there are no conflicts of interest.  The Court confirms its preliminary conclusion that adequacy is satisfied.  *See* Rec. Doc. 6418 at 27-28.

### (A)     Class Counsel Are Adequate.

342.   The class is represented by the PSC — an experienced and diverse group of lawyers selected by the Court, after a public application process and through judicial sifting of the many applicants, for their "(a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation."   Rec. Doc. 2 at 14.   The PSC represents a diverse grouping of firms (i) geographically; (ii) in terms of the ranges of litigation expertise and experience, and (iii) in terms of the representation of the full array of economic and property claims presented in the MDL No. 2179 litigation, and resolved in the Settlement.  The Court considered such diversity in making its PSC appointments.  Since their appointment, members of the PSC have diligently prosecuted

this litigation, consulted widely among class members in negotiating the Settlement, and aggressively represented the interests of their clients.  *See* Klonoff Decl. ¶ 38.

343.    Class Counsel were not "disarmed."  Even if it were assumed that Class Counsel faced obstacles to certifying a litigation class, Class Counsel also had many clients with significant claims sufficient to give them leverage in settlement negotiations.  *See* Coffee Supp. Decl. ¶¶ 17-18.  They were fully engaged in preparing for trial, would have proceeded to trial against BP in early 2012 but for arrival at a settlement, and have subsequently been preparing for and will proceed to trial against non-settling defendants in February 2013.

344.    Contrary to the claims of some objectors, Class Counsel did not act inadequately by making the Settlement contingent upon a separate fee agreement.  *See* Obj. Doc. 230 at 17-18, 29-30, 33; Obj. Doc. 234 at 18-19.  Rather, as previously explained, (i) the parties did not begin to negotiate fees until they had already delivered an otherwise complete Settlement Agreement to the Court; and (ii) the fact that the Settlement Agreement pays Class Counsel fees separate and apart from individual recoveries for class members, and without deduction therefrom, is a unique and valuable benefit to the class.

345.    Some objectors incorrectly suggest that Class Counsel colluded with BP because the Settlement Agreement contains a so-called "clear sailing clause" in which BP agreed not to contest an award of attorneys' fees of up to $600 million.  *See* Obj. Doc. 101 at 18-28; Obj. Doc. 230 at 17-18.  These objections are meritless; the Settlement was the product of months of hard-fought negotiations and there is no evidence of collusion.  *See infra* ¶¶ 448-454.  Moreover, numerous cases, including cases decided by the Fifth Circuit, have approved agreements containing such clauses.  *See* Klonoff Supp. Decl. ¶¶ 31-34.  *See, e.g., Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 844 (E.D. La. 2007) ("In addition to specifically negotiated fees,

courts have been presented with class action settlements that include 'clear-sailing clauses,' in which the defendant agrees not to contest a court-awarded fee up to a certain amount.  In both instances, it is increasingly common for class action settlements to provide that such fees are to be paid separately by the defendant, that is, over and above the class's recovery, rather than subtracted from the common benefit fund"); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) ("Finally, a defendant in a class action settlement has no obligation to oppose the fee petition submitted by class counsel.  Thus, the fact that the proposed settlement includes these terms does not render it inherently unfair or unreasonable").

346.    Some objectors argue that if the Court fails to award the entirety of the $600 million in fees which BP has agreed not to contest (and assuming Class Counsel seek such an award), that will provide a benefit to BP.  *See, e.g.*, Obj. Doc. 123 at 6.  BP's agreement not to contest such a future fee award is not equivalent to a "reversion" since no fee award has yet occurred.  Additionally, this objection is not only unripe, it fails as it does not explain how any objector could possibly be prejudiced if Class Counsel is awarded less in common benefit fees.  That attorneys' fees for Class Counsel are entirely separate from recovery to the class operates as an advantage to the class.  *See supra* ¶ 105.

347.    Certain objectors have challenged Class Counsel's adequacy based on contentions that the Settlement's $57 million Promotional Fund allegedly violates the "*cy pres*" doctrine as applied to circumstances in which unclaimed funds are not distributed among class members.  *See, e.g.*, Obj. Doc. 123 at 19-21.  Certain objectors also have argued that Class Counsel's supposed failure to disclose the intended *cy pres* beneficiaries is fatal to the Settlement because the *cy pres* donation must be closely tied to the interests of the class members, and class members should have the right to review and comment on the *cy pres* recipients.  *Id.*

348.    As discussed above, *see supra* ¶ 261, the Promotional Fund has nothing to do with the *cy pres* doctrine.  In addition to the class payments, a promotional fund of $57 million was negotiated to be funded separately, at the outset of the process, without deduction from other payments as an independent component of the Settlement.  This is fundamentally different from the distribution of a residual amount of a capped settlement fund on a *cy pres* basis.  The Promotional Fund here is analogous to the separate fund for a "class assistance program" approved in the *Agent Orange* settlement.  *See In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 179 (2d Cir. 1987); *see also Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 149 (S.D. Ohio 1992); *In re Diet Drugs Prods. Liab. Litig.*, Nos. 1203, 99-20593, 2000 WL 1222042, *24 (E.D. Pa. Aug. 28, 2000).  Moreover, the $57 million Promotional Fund is tightly tied to the class issues in the case; it is intended to aid in the economic recovery of the Gulf region — a recovery that benefits the individuals and businesses whose economic claims are the subject of the litigation and the Settlement itself.  Hence the "*cy pres*" objections are without merit.  *See also infra* ¶¶ 707-709.

### (B)    Class Representatives Are Adequate.

349.    To be adequate, the class representatives must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001).  Thus, where the class representatives "will continue to take an active role in the prosecution of th[e] class action," Rule 23(a)(4) is satisfied.  *See Billitteri*, 2011 WL 3586217, at *5.

350.    The class representatives are clearly adequate, as they include individuals and businesses asserting each category of loss.  Significantly, the class representatives have participated in the settlement negotiations and sought to ensure that similarly situated plaintiffs will receive adequate compensation.  *Cf. Stott*, 277 F.R.D. at 325 (finding Rule 23(a)(4) satisfied

where the class representative "will continue to take an active role in the prosecution of this class action and administration of this proposed settlement to its conclusion"); *see also* Klonoff Decl. ¶ 30.

351. The class representatives personally have claims falling within each of the main claims frameworks created by Section 5 of the Settlement Agreement. *See supra* ¶ 337. Yet separate representation for all possible interests is not necessary where the class members' interests are not actually divergent. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009). *See* Coffee Supp. Decl. ¶ 24.

352. The complaint that there was an "upside down" method of selecting the class representatives, *see* Obj. Doc. 101 at 10, is without merit. There was no impropriety here. As Class Counsel has noted, the representative plaintiffs were engaged in the litigation. Some of the class representatives were named plaintiffs in underlying class actions filed early on in the wake of the oil spill. Others were active consultants during the litigation and settlement processes. All have attested in declarations filed with the Court that they reviewed and discussed the Settlement provisions with Class Counsel and they believe the Settlement is fair to the entire Class. *See* Bon Secour Fisheries, Inc. Decl. ¶¶ 6, 9; Friloux Decl. ¶¶ 5, 9; Gallo Decl. ¶¶ 5, 8; Fort Morgan Realty, Inc. Decl. ¶¶ 6, 9; GW Fins Decl. ¶¶ 6, 9; Hutto Decl. ¶¶ 5, 8; Irwin Decl. ¶¶ 5, 8; Kee Decl. ¶¶ 5, 8; Tesvich Decl. ¶¶ 5, 8; Lake Eugenie Land and Development, Inc. Decl. ¶¶ 6, 10; Lundy Decl. ¶¶ 5, 8; Guidry Decl. ¶¶ 5, 9; Panama City Beach Dolphin Tours & More LLC Decl. ¶¶ 6, 9; Sellers Decl. ¶¶ 5, 8; Zeke's Charter Fleet, LLC Decl. ¶¶ 6, 9.

353. Courts have recognized there is nothing improper about selecting class representatives later in the proceedings where, as here, the representatives' interests are aligned with the class members' interests. *See, e.g., Haggart v. United States*, 104 Fed. Cl. 484, 490

(Fed. Cl. 2012) ("While particular representatives for the subclasses have not yet been selected, they will necessarily be among those asserting the same legal claim and thus will share the same interests as the other members of their respective subclasses.  The adequacy criterion has been met.") (quotation omitted); *see also Partridge v. Shea Mortg. Inc.*, No. 07-4230, 2008 WL 5384542, at *1 (N.D. Cal. Dec. 22, 2008) (in considering whether class representative was entitled to an enhanced fee award, noting the class representative was substituted in as such only after a tentative settlement was reached); *cf.* Klonoff Decl. ¶ 30; Klonoff Supp. Decl. ¶¶ 45-46;

354.    For these reasons, objections alleging that the class representatives are inadequate lack merit.  *See* Obj. Doc. 101 at 5-6;[23] Obj. Doc. 144 at 12-14; Obj. Doc. 145 at 3; Obj. Doc. 149 at 2; Obj. Doc. 228 at 19-22.

### (C)    There Are No Conflicts Of Interest Among The Class.

355.    Finally, "there must be no significant conflict of interest between the named plaintiffs and the absent class members."  *J.D. v. Nagin*, 255 F.R.D. 406, 415 (E.D. La. 2009). No such conflicts exist here, as "all class members are united in asserting [the] common right" of "achieving the maximum possible recovery for the class."  *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981).

356.    This case suffers from none of the problems identified in *Amchem*, where the Court noted a potential intraclass conflict, in the context of a settlement with an overall cap, between individuals who had already been injured by asbestos and those who had only been

---

[23] Class Counsel have requested that the Court take judicial notice that the attorney responsible for this objection — Christopher A. Bandas, Esq. — is a professional objector.  *See* Rec. Doc. 7821.  The Court takes judicial notice of the numerous state and federal court decisions concluding that Mr. Bandas is a "professional objector" with a history of submitting "patently frivolous" objections.  *See id.* at 2-3 (citing authority).  Although "[f]ederal courts are increasingly wary of professional objectors," *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003), the Court has nevertheless given this objection full consideration on the merits and finds it baseless for the reasons discussed in the text above.

exposed to it.  *Cf. Amchem*, 521 U.S. at 626 (explaining that "for the currently injured, the critical goal is generous immediate payments" whereas "exposure-only plaintiffs [have an interest] in ensuring an ample, inflation-protected fund for the future").  Rather, the proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage, and the Settlement compensates class members for both their past losses through detailed, objective compensation programs and anticipated potential future damages through RTP payments or through other methods that take into account risk of future loss.  *See* Coffee Decl. ¶ 9; Miller Decl. ¶¶ 41-42.

357.    Both as a matter of process and as a matter of substance, this class settlement avoids all of the concerns that have prevented approval in cases such as *Amchem*, 521 U.S. 591, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010).  All class members — even those under the SCP — are protected by specific, detailed and objective frameworks that were promulgated publicly by the Court during the preliminary approval process after the parties had negotiated those frameworks.  The differences within the frameworks, developed through arms-length negotiation, are rationally related to the relative strengths and merits of similarly situated claims.  Perhaps most importantly, this Settlement does not involve a limited fund with no ability for class members to opt out, distinguishing *Ortiz* and *In re Katrina Canal Breaches Litigation.*

358.    For these reasons, objections alleging conflicts within the class, *see, e.g.*, Obj. Doc. 91; Obj. Doc. 101 at 6-9; Obj. Doc. 123 at 15-19; Obj. Doc. 145 at 3; Obj. Doc. 198 at 50-61; Obj. Doc. 230 at 4-5, 12-17; Obj. Doc. 234 at 13-17, are meritless.  Because there is an objective, valid basis to distinguish between Louisiana wetlands and other wetlands, *see infra*

¶ 665, objections alleging an intraclass conflict on this basis also fail.  *See* Obj. Doc. 101 at 14; Obj. Doc. 144 at 5-12, 14-17; Obj. Doc. 167[24] at 8; Obj. Doc. 189 at 8.

(a)    **Specific    Features    Avoiding Intraclass Conflicts**

359.    The Settlement was structured to assure adequate representation of all interests within the Class and to prevent intraclass conflict.  The Settlement includes numerous features that were specifically designed to avoid the risk of any intraclass conflicts.  According to Professor Miller, this case is "perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field" in its structural features designed to avoid intraclass conflicts.  Miller Decl. ¶ 12.

360.    *First*, the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen-member Plaintiffs' Steering Committee.  The PSC was broad and diverse, and was a participatory mechanism and sounding board.  Whenever a particular category of claims was discussed during negotiations, lawyers who had clients with such claims took an active role in advising the negotiators.  *See* Coffee Decl. ¶¶ 7, 10, 24-26, 43; Issacharoff Decl. ¶ 8; Klonoff Decl. ¶ 32; Coffee Supp. Decl. ¶¶ 19(b)(1), 27(a)-(b), 28-35; Rice Negotiations Decl. ¶¶ 15, 17; Herman Decl. ¶¶ 6-7.

361.    *Second*, the claims frameworks offering generally uncapped compensation ensure that a benefit paid to one member of the class will in no way reduce or interfere with a benefit obtained by another member.  This settlement is the antithesis of a zero-sum game.  While the

---

[24] One of the attorneys who submitted this objection purported to object based on the facts of a landscaping company in Huntsville, Alabama, but then was forced to admit he had no such client.  *See* Nov. 8 Fairness Hr'g Tr. at 108:3-108:18.

Seafood Compensation Program was funded at the specific level of $2.3 billion,[25] the parties took numerous measures to avoid the risk of intraclass conflict, including (i) using a Court-appointed neutral, who heard directly from various Seafood claimants (*e.g.*, shrimpers, crabbers, oystermen and finfishers) to determine the initial and subsequent allocations; and (ii) agreeing to a total amount of compensation that, based on available and reliable data, is more than sufficient to compensate all class members. *See* Coffee Decl. ¶¶ 8, 11-12, 14, 21-23, 34, 44; Klonoff Decl. ¶ 31; Issacharoff Decl. ¶¶ 13-17; Miller Decl. ¶¶ 29-37; Rice Negotiations Decl. ¶ 11; Coffee Supp. Decl. ¶¶ 19(b)(2), 22, 23, 27(c); Klonoff Supp. Decl. ¶ 46.

362.    *Third*, the class definition clearly and objectively defines the class in terms of time period, geographic region, and type of claim.   As a consequence, the benefits of the Settlement are directed towards those who were most impacted, while persons with marginal or worthless claims, whose presence could have complicated the settlement process, were excluded in significant part, and thus remain free to pursue their claims.  *See* Coffee Decl. ¶¶ 4, 7, 55, 62.C; Issacharoff Decl. ¶ 8; Miller Decl. ¶¶ 13-21.

363.    *Fourth*, Magistrate Judge Shushan's careful mediation efforts ensured structural integrity during the negotiations.  *See* Coffee Decl. ¶ 33; Klonoff Decl. ¶ 32; Klonoff Supp. Decl. ¶ 46.

364.    *Fifth*, there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court, so Class Counsel could not have engaged in trading off the interests of class representatives or absent class members so as to maximize their fee recovery.  *See* Klonoff Decl. ¶ 32; Klonoff Supp.

---

[25] This is sometimes referred to as a capped fund, but the Court concludes elsewhere that the SCP is more than sufficient to compensate for actual losses of SCP participants and hence is more accurately described as a guaranteed payment by BP.  *See supra* ¶ 99.

Decl. ¶¶ 35-36; *see also supra* ¶ 26.   Additionally, the amount of any fee recovery remains an issue for later resolution; since no fee petition has yet been presented to the Court, Rule 23(h)'s procedures and protections will apply to any such fee application.   BP has agreed in the Settlement to pay up to $600 million, in addition to the payouts to class members.

> **(a)**     **Subclasses Are Not Necessary To Avoid Intraclass Conflicts.**

365.   In light of the absence of conflicts between members of the Settlement Class, subclasses are neither necessary, useful, nor appropriate here.   *See* Klonoff Decl. ¶ 33; Miller Supp. Decl. ¶ 18.  Objections to the contrary lack merit.  *See, e.g.*, Obj. Doc. 123 at 15-19.

366.   Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course.   Rather, subclasses might only be needed when there is a "fundamental" conflict among class members, but no such conflict exists here.   *See Dewey v. VW Aktiengesellschaft*, 681 F.3d 170, 185-86 (3d Cir. 2012);   *Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) ("*Amchem* and *Ortiz* appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, *but may not necessarily require*, formally designated subclasses.") (emphasis added); Coffee Decl. ¶¶ 31-32; Issacharoff Decl. ¶¶ 8, 11; Klonoff Decl. ¶¶ 34-37; Coffee Supp. Decl. ¶¶ 19(a), 20-21.

367.   District courts have broad discretion in determining whether to create subclasses. Courts have often affirmed district court decisions not to establish subclasses — including where, as here, the Settlement is crafted such that different payment levels reflect the relative value of the different claims.  *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) (rejecting argument that district court should have established subclasses);[26] *In re Pet*

---

[26] Holding "subclasses are only necessary when members of the class have divergent interests and the District Court found that no such divergent interests existed between the allocation groups" and further noting the

*Food Prods. Liab. Litig.*, 629 F.3d 333, 346-47 (3d Cir. 2010) (rejecting argument that district court erred in failing to create subclasses);[27] *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) (rejecting objectors' argument that district court erred in not establishing subclasses when it approved class settlement);[28] *see also Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986) ("Intervenors' argument for subclassing, due to conflicts within the class, is rejected because such a procedure should be left to the trial court's discretion. Subclassing . . . is appropriate only when the court believes it will materially improve the litigation.").

---

Plan of Allocation was carefully devised to ensure a fair distribution of the settlement fund to the various types of claimants and was allocated in such a way that policyholders who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe. Even if some potential benefits may have been realized from utilizing subclasses, it is not at all clear that the advantages would have outweighed the disadvantages, and therefore it is difficult to say that the District Court abused its discretion by not taking this step. Consequently, we conclude that the District Court's decision not to certify separate subclasses or require separate representation did not constitute an abuse of discretion and likewise its approval of the Zurich Settlement Agreement and Plan of Allocation was also within its discretion.

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 272-73.

[27] Concluding,

the District Court here did not find divergent interests between the allocation groups. The fact that the settlement fund allocates a larger percentage of the settlement to class members with Injury Claims does not demonstrate a conflict between groups. Instead, the different allocations reflect the relative value of the different claims. Many class members are members of both allocation groups, and will be entitled to recover damages for both Purchase Claims and Injury Claims …. As with differences in settlement value, alleged differences in the strength of the various claims asserted in this class action do not, by themselves, demonstrate conflicting or antagonistic interests within the class that would require subclasses.

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d at 346-47.

[28] Reasoning that,

[a]lthough the extent of the pollution varied from property to property, possibly necessitating different awards of damages, the objectors do not clearly explain why the remedial interests of the class members are in conflict …. If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members.

*Petrovic*, 200 F.3d at 1146.

368.    Here, all claims arose from a single event and were presented against the same cohort of defendants.  *See* Coffee Decl. ¶¶ 5, 62.H; Issacharoff Decl. ¶ 11; Miller Supp. Decl. ¶ 19.

369.    If subclasses were entertained, there would be no principled basis for limiting the number of subclasses; arguably, subclasses would be needed for all five species types falling within the SCP, as well as all types of claims falling outside it (potentially down to the level of failed businesses, failed start-up businesses, individual periodic vendors, parcels with oil observed, parcels with no oil observed, etc.).  The Rules do not require such rigid formalism, which would produce enormous obstacles to negotiating a class settlement with no apparent benefit, and could even reduce the negotiating leverage of the class.  *See* Coffee Decl. ¶¶ 29-30, 45; Issacharoff Decl. ¶ 11; Klonoff Decl. ¶ 33; Coffee Supp. Decl. ¶¶ 19(a), 35-36.

370.    Subclassing would be particularly difficult here, where many class members would fall into multiple different subclasses. "For example, a VoO claimant might also be a Zone B resident; in such cases, an individual class member would have had two counsel negotiating over different components of the recovery to be paid to this single class member. This is far different from the ordinary class action where a class member generally belongs to only one subclass and can be represented by one subclass counsel.  Such complexity and overstaffing is inefficient and causes only delay for the client."  Coffee Supp. Decl. ¶ 19(c). Indeed, the use of a multitude of subclasses — each with separate class representatives and counsel — would have greatly complicated both the settlement negotiations and the overall administration of the litigation.  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 271 (affirming settlement) ("[S]ubclassing can create a 'Balkanization' of the class action and present

a huge obstacle to settlement if each subclass has an incentive to hold out for more money.")
(quoting *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005)).

371.    Virtually every class action involves class members who are differently situated
in a myriad of discrete ways.  If subclassing and separate representation were required for all
such interests, class action litigation would be all but impossible.  *See* Miller Supp. Decl. ¶ 20.
The purpose of subclassing is not to balkanize the class such that it becomes an administrative
nightmare for class/subclass counsel to represent.  *See* Coffee Supp. Decl. ¶ 21.

372.    Most significantly, the parties' arrival at a settlement agreement that is fair to all
members of the class is proof that the process was structurally fair as well.  *See* Coffee Supp.
Decl. ¶ 37.

### (D)    There Was No Duplication of Relief.

373.    Certain objectors challenge the adequacy of representation requirement on the
ground that the Settlement provides relief that the defendant was already providing,
demonstrating that class representatives did not have the best interests of class at heart.  *See* Obj.
Doc. 101 at 9.

374.    Here, the objectors have failed to articulate how the relief afforded under the
Settlement duplicates the relief that was available through the GCCF, or how the GCCF could
possibly have had any authority to award all the types of relief contemplated by this agreement.
This Court has had earlier occasion to address claimants' comments and concerns about the
operation of the GCCF, (Rec. Doc. 1098), and notes that, unlike the GCCF, the Settlement is
placed under the Court's direct supervision and ongoing jurisdiction.  *See infra* ¶ 712.  This is a
fundamental structural and functional difference.

375.    Moreover, in *Turner v. Murphy Oil USA, Inc*., 234 F.R.D. 597 (E.D. La. 2006),
the court rejected the argument that class action treatment was inappropriate where the

defendant, Murphy Oil, already had a private settlement program in place to address claims for damages from an oil spill, which was supposedly a superior method of resolving the dispute:

> Defendant argues that this element of the Rule 23 analysis is not met because Murphy's private settlement program is a superior method of resolving this dispute.  However, the merits of Murphy's settlement program aside, Murphy's argument confuses the superiority standard under Rule 23.  The analysis is whether the class action format is superior to other methods of *adjudication,* not whether a class action is superior to an out-of-court, private settlement program.  When evaluated under those terms, the Court finds that the class action format would be superior to consolidation of individual cases in this matter.  Both Murphy and Plaintiffs have expressed a desire for quick resolution of these cases, and the class action format could streamline this litigation. In addition, there appears to be little existing litigation of these claims outside of the lawsuits filed in this Court, so class certification would act to centralize these proceedings.

*Id.* at 610.

376.    While *Turner* was decided in the context of a challenge to Rule 23's superiority requirement, the court's finding that a class action was the superior method of resolving the oil spill dispute in that case is significant.   Here, plaintiffs' pursuit of class certification, which *Turner* indicates is a superior method of resolving these types of class claims, further demonstrates they do in fact have the best interests of the class at heart, and hence are adequately representing the class.

377.    If the law provided that the existence of an out-of-court dispute resolution process precluded class certification, OPA — which is designed specifically to facilitate out-of-court settlements — would instead bar the possibility of any class-wide settlement.   Neither Rule 23's adequacy provision nor its superiority provision requires such an inflexible result.   *See, e.g.*, Klonoff Supp. Decl. ¶¶ 49, 51.

### iii.     This Settlement Class Satisfies Rule 23(b)(3)'s Requirements.

378.     If a class satisfies the four requirements of Rule 23(a), it may be certified if it further satisfies one of the subsections of Rule 23(b).

379.     In this case, the settlement class is certifiable pursuant to Rule 23(b)(3), which applies if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

380.     Importantly, neither commonality nor predominance is defeated because there are "class members with different legal claims, legal claims of different strength, or claims requiring different evidence or different levels of proof."  Miller Supp. Decl. ¶ 15.  Rather, "[a]s long as the case presents sufficient commonality of law or fact, the settlement reflects a rational distribution of benefits across class members, and there are not fundamental conflicts among class members, a settlement agreement is not improper merely because some class members have claims that differ in some manner from the claims of other class members."  *Id.*; *see also id.* ¶ 17 ("But federal class action law does not call on the court to examine a settlement with a scanning electronic microscope, nor does the presence of particular differences within the class negate the presence of overarching commonality across it.").

### a.     Common Questions Of Law And Fact Predominate Over Individual Issues.

381.     The predominance requirement of Rule 23(b)(3) "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Unger v. Amedisys*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem*, 521 U.S. at 623-24).  It does not simply count the number of common versus individual issues.  The predominance inquiry ordinarily "requires

the court to assess how the matter will be tried on the merits, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'"  *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)).

382.    In the context of a settlement class, of course, there is no trial, so the predominance inquiry takes on a slightly different form.  The analysis cannot be allowed to descend into whether class members merely have "a common interest in a fair compromise" of their claims.  *Amchem*, 521 U.S. at 623.  The focus must remain on "questions that preexist any settlement."  *Id.*

383.    What "the certifying court must still determine [is] whether the 'the [sic] legal or factual questions that qualify each class member's case as a genuine controversy' are sufficiently similar as to yield a cohesive class.  [*Amchem*, 521 U.S.] at 623; *see also Sullivan v. DB Invs.*, 667 F.3d [at 338] (Scirica, J., concurring) ('Issues of predominance and fairness do not undermine this settlement.  All plaintiffs here claim injury that by reason of defendants' conduct . . . has caused a common and measurable form of economic damage. . . .  All claims arise out of the same course of defendants' conduct; all share a common nucleus of operative fact, supplying the necessary cohesion.')."  *In re American Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012); *see also Sullivan*, 667 F.3d at 303-04 & n.29 (collecting authorities); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004).

384.    As the Court preliminarily concluded on May 2, 2012, predominance is clearly satisfied here.  *See* Rec. Doc. 6418 at 28.  Objections to the contrary lack merit.  *See* Obj. Doc.

118 at 3-6; Obj. Doc. 123 at 23-27; Obj. Doc. 228 at 22-23; Obj. Doc. 230 at 19-22; Obj. Doc. 234 at 19-23.

385.    Where "defendants' liability predominates over any individual issues involving plaintiffs, and the Settlement Agreement will insure that funds are available" to compensate plaintiffs, predominance is satisfied.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *11; *see also* Coffee Decl. ¶ 49; Klonoff Decl. ¶ 30.

386.    The phased trial structure selected by the Court prior to the parties' arrival at a settlement agreement reflected the central importance of common issues to this case.  *See* Rec. Doc. 4083 at 2-3.  Indeed, the Court defined three separate trial phases all focused on common questions.

387.    A phased trial schedule investing significant time in resolving common questions of law and fact supports the conclusion that the settlement class can meet the Rule 23(b)(3) test for predominance.  *See* Coffee Supp. Decl. ¶ 11; *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 556 (5th Cir. 2011) (recognizing that a court's selection of a phased trial structure may be evidence of the importance of common questions and justify class certification on liability) (citing *Watson v. Shell Oil*, 979 F.2d 1014, 1017-18 (5th Cir. 1992) and *Turner*, 234 F.R.D. at 601).

388.    Consistent with the significance of common issues, much of the Phase I trial would have focused on the common issue of which defendants bore responsibility for the well blowout.  *See* Pre-Trial Order No. 41 (Rec. Doc. 4083) at 2.  Similarly, the Phase II trial would have exclusively focused on the common issues of how much oil escaped from the Macondo reservoir and who bore responsibility for the inability of the defendants to contain the flow earlier.  *See id.*  Finally, the Phase III trial would have focused exclusively on the common issue

of the final resting place of oil discharged from the reservoir and how efforts to collect, burn, and disperse oil flowing from the well proceeded.  *See id.* at 2-3.  The results of these proceedings would have determined the liability of BP, Transocean, and Halliburton, and the other defendants to all class members.  This is not a case where the "district court did not meaningfully consider how Plaintiffs' claims would be tried."  *Madison*, 637 F.3d at 556; *see also* Klonoff Decl. ¶ 41.

389.    In contrast, the individualized issues are narrow, discrete, and efficiently resolved.  *See* Klonoff Decl. ¶ 41.

390.    Finally, as the Second Circuit has recently noted in a persuasive analysis of the predominance requirement as applied to settlement classes:

> While the predominance inquiry will sometimes be easier to satisfy in the settlement context, other requirements of Rule 23 "designed to protect absentees by blocking unwarranted or overbroad class definitions," such as the Rule 23(a)(4) requirement of adequate representation, will "demand undiluted, even heightened, attention." [*Amchem*, 521 U.S.] at 620; *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998) (suggesting that "the key to *Amchem* appears to be the careful inquiry into adequacy of representation"); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250–55 (2d Cir. 2011) (vacating certification of settlement class of copyright owners because of conflicts among different categories of class members).

*In re Amer. Int'l Group, Inc. Sec. Litig.*, 689 F.3d at 240.  But as analyzed above, there are no adequacy of representation problems under Rule 23(a)(4) here, nor are there intraclass conflicts.

391.    Nor is the class definition overbroad, improperly sweeping in too many absent class members.  This Settlement, as the Court discusses below, is remarkable in that it seems to have touched off significant numbers of non-class members clamoring to be included in the Settlement.  *See infra* ¶ 475.  The parties were judicious in the boundary lines they drew in defining the class.  *See* Settlement Agreement ¶¶ 1.1, 1.2, 1.3.  Indeed, the existence of non-class members that lack standing but that demand to be included in the Settlement as agreed to shows

that had the parties expanded the definition of the class they would have had numerous supporters among such hypothetical absent class members.

### i.    Common Questions Of Fact Predominate Over Individual Issues.

392.    This case arises from the blowout of one well, on one date, and the discharge of oil from one location. It is therefore unsurprising that the vast majority of the contested factual questions are common to all class members and that the case includes a number of issues "whose resolution 'will resolve an issue that is central to the validity of each one of the class member's claims in one stroke.'"  *Stukenberg*, 675 F.3d at 840 (quoting *Wal-Mart Stores*, 131 S. Ct. at 2551) (emphasis and alterations omitted).

393.    As the Judicial Panel on Multidistrict Litigation explained in centralizing nearly all *Deepwater Horizon*-related litigation in this Court, actions arising from the *Deepwater Horizon* "indisputably share factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it."  Rec. Doc. 1 at 3; *see also* Coffee Decl. ¶¶ 38, 47.

394.    All of the key factual questions in this litigation are common among members of the class.  These categories of questions include BP's share of liability compared to other defendants including Transocean and Halliburton, the facts of defendants' conduct in designing the well, and the facts of BP's conduct in seeking to control and contain the spill.  At a bare minimum, each of these categories subsumes more specific fact questions that are likewise common across the class:

   (i)    Whether BP had a valid superseding cause defense on the facts, *see* Coffee Supp. Decl. ¶¶ 9(B), 9(G)(2);

   (ii)   Whether BP violated any federal safety, construction, or operating regulations, *see* Coffee Supp. Decl. ¶ 9(E)(1);

(iii)    Whether BP used an improper well design that unreasonably heightened the risk of a blowout, *see* Coffee Supp. Decl. ¶ 9(E)(2);

(iv)    Whether BP should have recognized that Halliburton's proposed cement mixture was unstable, *see* Coffee Supp. Decl. ¶ 9(E)(3);

(v)    Whether BP misinterpreted the negative pressure test, *see* Coffee Supp. Decl. ¶ 9(E)(4);

(vi)    Whether BP took appropriate and timely steps to stop the release of hydrocarbons from the well, *see* Coffee Supp. Decl. ¶ 9(E)(5); and

(vii)    Whether BP unreasonably failed to take precautions to ensure that, in the event of a blowout, the oil would be contained in the immediate vicinity of the well, *see* Coffee Supp. Decl. ¶ 9(E)(6).

395.    Moreover, not all of the factual questions must be relevant to BP's liability.  To determine the proper allocation among defendants of the class's damages, the following common factual questions would be highly relevant:

(i)    Whether Halliburton used an improper cement slurry, *see* Coffee Supp. Decl. ¶ 9(F)(1);

(ii)    Whether Transocean employees failed to take appropriate actions both to anticipate and respond to the blowout, *see* Coffee Supp. Decl. ¶ 9(F)(2); and

(iii)    Whether Transocean failed to properly maintain the blowout preventer, resulting in its failure to seal the well, *see* Coffee Supp. Decl. ¶ 9(F)(3).

396.    Finally, the mixed question of law and fact as to whether these decisions (individually or collectively) constitute negligence, gross negligence, or willful misconduct is a fundamental issue, also common to the entire class.  *See* Coffee Supp. Decl. ¶ 37.

397.    Were this case not resolved through class treatment, in theory each plaintiff would have to individually litigate each of these fact questions.   Each claimant would need to repetitively present factual evidence about BP's well design, source control, and pollution containment.   Moreover, each individual plaintiff would need to use expert modeling and testimony to establish BP's negligence or other culpable conduct.   In sum, litigation of these issues would "involve the same cast of characters, events, discovery, documents, fact witnesses,

and experts." Am. B1 Master Compl. (Rec. Doc. 1128) at 151. Relitigating these issues *seriatim* "would be a massive waste of judicial resources, as the vast majority of the issues of law and fact in this case . . . are common to all the class members." *In re Dell Inc*., No. 06-726, 2010 WL 2371834, at *4 (W.D. Tex. June 11, 2010), *aff'd, Union Asset Mgmt. Holding A.G. v. Dell, Inc*., 669 F.3d 632 (5th Cir. 2012); *see also In re Sch. Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir. 1986).

398.    Because all members of the class trace their injury to a single known accident, and a small group of defendants, this case bears no resemblance to *Amchem*, in which the class consisted of individuals "exposed to different asbestos containing products, for different amounts of time, in different ways, and over different periods." 521 U.S. at 624 (quoting the Third Circuit).

399.    Nor does this case bear any resemblance to *Wal-Mart*, 131 S. Ct. 2541, in which the Court found that plaintiffs had little in common other than "Wal-Mart's 'policy' allowing discretion by local supervisors over employment matters." *Id.* at 2554 (emphasis omitted). In contrast to *Wal-Mart*, in which the Court held that the cause of plaintiffs' injuries varied with respect to the manager to whom each was assigned, and how each manager interacted with the plaintiff in question, here each class member traces his injury directly to the same genesis — a single well blowout stemming from the same operative causes. *See* Coffee Supp. Decl. ¶ 10. Objections relying on *Wal-Mart* accordingly lack merit. *See* Obj. Doc. 91 at 7-8; Obj. Doc. 230 at 7-9.

400.    Moreover, this carefully defined class facilitates the satisfaction of predominance, as the class does not include remote claimants facing complicated proof problems. *See* Klonoff Decl. ¶ 43.

114

### ii.      Common Questions Of Law Predominate Over Individual Issues.

401.    Just as common questions of fact clearly predominate over individual issues, so do these exemplar common questions of law:

(i)      Whether BP is a responsible party under OPA, see Coffee Supp. Decl. ¶¶ 8, 9(A);

(ii)     Whether BP could limit its liability under § 2704 of OPA, *see* Coffee Supp. Decl. ¶ 9(C);

(iii)    Whether punitive damages are available as matter of law, *see* Coffee Supp. Decl. ¶ 9(D);

(iv)     Whether, because BP obeyed and was subject to the direction and control of the Federal On-Scene Coordinator, it cannot be held liable for any claim that it failed to mitigate the damages of the class, *see* Coffee Supp. Decl. ¶ 9(G)(1); and

(v)      Whether OPA requires dismissal of all claims that were filed without satisfying the presentment procedures specified in OPA, including those brought under maritime law, *see* Coffee Supp. Decl. ¶ 9(G)(3).

402.    All legal questions arise and would be determined essentially under a common legal framework of federal law, under federal statutes such as OPA or under general federal maritime law (a species of federal common law).   Accordingly, the applicable law unites the Class.  This is not an *Amchem* scenario, in which the class is fragmented by a multiplicity of state laws that control the viability of claims.

403.    Moreover, a number of jurisdictional issues were common to the class.  These issues were central to the validity of the class members' claims, and it is well established that jurisdictional issues can raise questions that satisfy the commonality standard.  *See* Coffee Supp. Decl. ¶ 9(H); *see also Sullivan*, 667 F.3d at 292; *Baxter Healthcare Corp. v. United States*, 925 F. Supp. 794, 797 (Ct. Int'l Trade 1996).

(i)      Whether federal jurisdiction exists over the claims of the class, such that these claims can be brought in or removed to federal court, *see* Coffee Supp. Decl. ¶ 9(H)(1);

(ii)    Whether OCSLA jurisdiction pursuant to 43 U.S.C. § 1349(b)(1) extends to economic loss claims, *see* Coffee Supp. Decl. ¶ 9(H)(2);

(iii)   Whether federal enclave jurisdiction exists over such claims, including as to claims relating to damages experienced outside the enclave, *see* Coffee Supp. Decl. ¶ 9(H)(3); and

(iv)    Whether there is admiralty jurisdiction over such claims under 33 U.S.C. § 1333 and/or the Admiralty Extension Act, 46 U.S.C. § 30101, *see* Coffee Supp. Decl. ¶ 9(H)(4).

404.    Requiring these issues to be litigated in thousands of individual actions would constitute a waste of judicial resources and would needlessly delay the relief to which class members are entitled.

405.    Certain of the common issues discussed above, including BP's status as a responsible party under OPA, were conceded early in this litigation.  But the fact that BP has conceded certain common issues does not make them any less common.  Coffee Supp. Decl. ¶¶ 2-7; Klonoff Supp. Decl. ¶ 42; *see also In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *Seijas v. Republic of Argentina*, 606 F.3d 53, 57 (2d Cir. 2010); *see also Schreiber v. NCAA*, 167 F.R.D. 169, 175 (D. Kan. 1996).  How such responsible party status would translate into compensation was an overarching common issue that would have had to have been resolved via the multi-phase trial absent the Settlement.

406.    While the class includes members from across the Gulf region, five states, rather than 50, are involved.  Moreover, in this case, involving a maritime casualty, state law is preempted by federal law.  *See, e.g.*, Bundle B1 Order (Rec. Doc. 3830) at 18, 38; Bundle C Order (Rec. Doc. 4578) at 17.  As a result, "the same substantive law will apply to all Plaintiffs' claims in these cases: this is not a case in which the varying laws of different states create the need for state subclasses or individual trials." *Turner*, 234 F.R.D. at 606; *see also* Coffee Decl. ¶¶ 3, 50; Klonoff Decl. ¶ 45.

### ii. Issues Of Individual Injury Do Not Defeat Predominance For Purposes Of Evaluating This Settlement Class's Certification.

407.    As described previously, the core causation issues in this litigation should be decided on a class-wide basis.  Although the common issues are numerous, certain causation issues remain that would have to be decided on an individual basis were the cases not being settled.  These include, for example, the extent to which the *Deepwater Horizon* incident versus other factors caused a decline in the income of an individual or business.   These limited individualized issues do not defeat predominance in light of the core common issues that are appropriate for classwide treatment.  *See* Coffee Decl. ¶ 52; *Mullen*, 186 F.3d at 626 ("[T]he issues to be tried commonly — seamen status, vessel status, negligence, and seaworthiness — were significant in relation to the individual issues of ***causation***, damages, and contributory negligence.") (emphasis added); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1018, 1023 (5th Cir. 1992) (affirming certification using a multi-phase trial plan where a third phase would "resolve issues unique to each plaintiff's compensatory damage claims, *e.g.*, injury, causation, and quantum").[29]

---

[29] Additionally, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006), involved an oil spill from the defendant's refinery into neighboring areas.  When nearby residents and business owners sought class certification, the defendant argued that various causation issues, such as that homes and properties received differing degrees of oil contamination, precluded class certification.  *See id.* at 606.  The court nevertheless found that common issues predominated because "the central factual basis for all of Plaintiffs' claims is the leak itself — how it occurred, and where the oil went."  *Id.*  The court further explained that "issues of whether there is crude oil on a plaintiff's property, and how much oil, do not require the type of extensive individualized proof that would preclude class treatment of the negligence claim" and that the "presence or degree of injury or damages is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary."  *Id.* at 607.  Other authorities are in accord. *See, e.g., Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (affirming certification of class alleging that defendant discharged TCE into soil and groundwater where district court reserved question of whether "a particular class member suffered any legally compensable harm" for individual hearings); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (per curiam) (affirming class certification despite defendants' arguments that differences in individual causation predominated:  "Proximate cause, however, is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification."); *Collins v. Olin Corp.*, 248 F.R.D. 95, 102-105 (D. Conn. 2008) (granting motion to certify class of homeowners harmed by weapons manufacturer's handling and disposal of hazardous waste, rejecting defendant's argument against class certification based on existence of "individual issues . . . of causation," and quoting and citing multiple authorities in support of rejection of defendant's argument); *Bates v. Tenco Servs., Inc.*, 132 F.R.D. 160, 163-64 (D.S.C. 1990)

408.   Importantly, "the necessity of calculating damages on an individual basis will not necessarily preclude class certification," particularly where damages may "be determined by reference to a mathematical or formulaic calculation." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006); *accord Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306-07 (5th Cir. 2003); *Bertulli v. Independent Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Eatmon v. Palisades Collection LLC*, No. 08-306, 2011 WL 147680, at *12 (E.D. Tex. Jan. 18, 2011); *Moore v. International Filing Co., LLC*, No. 10-0086, 2010 WL 2733116, at *3 (S.D. Miss. July 8, 2010); *Lonergan v. A.J.'s Wrecker Serv. of Dallas, Inc*., No. 97-1331, 1999 WL 527728, at *7 (N.D. Tex. July 8, 1999).

409.   Courts have repeatedly rejected the argument that different damages calculations for each class member defeats class certification.   *See, e.g*., *Bell Atl.*, 339 F.3d at 306 (recognizing that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate."); *Allapattah Servs. v. Exxon Corp*., 333 F.3d 1248, 1261 (11th Cir. 2003) ("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1026 (9th Cir. 2011) ("[T]he mere fact that there might be differences in damage calculations is not sufficient to defeat class certification."); *Brown v. Consumer Law Assocs., LLC*, No. 11-0194, 2012 WL 2236629, at *10 (E.D. Wash. June 15, 2012) (need for individualized proof of damages is

---

("Individual offers of proof of proximate cause and damages for each plaintiff will become an inevitable necessity; however, these individual questions of proof will arise whether the suit proceeds individually or as a class action."); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987) (certifying class where common questions existed as to whether the defendants were negligent in the manufacture, transportation, and distribution of hazardous chemical, even though proximate causation would have to be decided individually).

insufficient to preclude class certification); *S. States Police Benev. Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 89 (D. Mass. 2007) ("[T]he possibility of differing damages calculations is insufficient to deny certification.").

410.    Were the law otherwise, "the point of the Rule 23(b)(3) provision for class treatment would be blunted beyond utility, as every plaintiff must show specific entitlement to recovery, and still Rule 23 has to be read to authorize class actions in some set of cases where *seriatim* litigation would promise such modest recoveries as to be economically impracticable." *Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 66-67 (1st Cir. 2010) (Souter, J., sitting by designation); *see also* Klonoff Decl. ¶ 41.

411.    In this case, damages may be fairly calculated through various common methodologies or formulaic calculations; the comprehensive claims frameworks contained in the Settlement Agreement are proof of this point.  *Cf. Chauvin v. Chevron Oronite Co.*, 263 F.R.D. 364, 371 (E.D. La. 2009) (explaining that the "critical calculation of damages on an individual basis will not preclude class certification unless this calculation cannot be made with some reference to a mathematical formula"); *City of San Antonio v. Hotels.com*, No. 06-381, 2008 WL 2486043, at *12 (W.D. Tex. May 27, 2008) (finding class certification appropriate where, among other things, the "alleged damages are subject to common proof and can be calculated on a formulaic basis").

412.    Even if this case were not resolved through settlement, significant damages issues can be partially addressed through common proof, such as the impact of the spill on the Gulf economy.  *See* Coffee Decl. ¶¶ 53-54, 56; Klonoff Decl. ¶ 44.

413.    For the reasons stated above, objections contending that individual damages issues preclude class certification are rejected. *See, e.g.*, Obj. Doc. 91 at 12; Obj. Doc. 101 at 13; Obj. Doc. 234 at 19.

### iii.    Courts Have Certified Rule 23(b)(3) Classes In Environmental Accident And Other Mass Tort Suits.

414.    Courts have repeatedly held that in certain factual circumstances common issues may predominate over individual issues in environmental and other mass tort cases. *See* Klonoff Decl. ¶ 46. This is one of those cases.  As the Supreme Court recognized in *Amchem*, where "mass tort cases aris[e] from a common cause or disaster," class certification may be appropriate, and "District Courts, since the late 1970's, have been certifying such cases in increasing number." *Amchem*, 521 U.S. at 625.  The reason for this doctrine is that although each plaintiff might have suffered different damages, the heart of each plaintiff's complaint is common to the class.

415.    In *Watson*, 979 F.2d 1014, the district court certified a class of 18,000 individuals harmed by an explosion at a Shell manufacturing facility in Norco, Louisiana.  Affirming, the Fifth Circuit observed that "[t]he class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs," such that there "can be no serious contention that the district court abused its discretion in determining that these issues predominate for the purpose of class certification." *Id.* at 1022-23.  The Fifth Circuit "has affirmed and relied upon *Watson*'s holding following *Amchem*." *Madison*, 637 F.3d at 557 (Dennis, J., concurring) (citing *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006); *Mullen*, 186 F.3d at 623, 628).[30]

---

[30] Moreover, in *Madison*, the majority noted that "class treatment on the common issue of liability" in that case could "indeed be appropriate" had it been fully analyzed by the district court at the certification stage. *Madison*, 637

416.     In *Mullen*, a single-site, long-term toxic exposure case, the Court upheld the certification of a class of casino employees harmed by a defective ventilation system "because the class is . . . linked by a common complaint [and] the fact that the class is defined with reference to an ultimate issue of causation does not prevent certification." *Id.* at 624 n.1.

417.     Courts in this District agree that it is appropriate, in circumstances where the underlying facts and nature of the case warrant, to certify class actions in environmental disaster and other toxic exposure cases. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. at 462 ("Despite early skepticism, mass accident, or single-situs torts, have generally been susceptible to class certification."); *Turner*, 234 F.R.D. at 606 ("Defendant argues that the oil did not spread uniformly throughout the affected area, and that different homes in the area received differing degrees, if any, of oil contamination.  However, ***the central factual basis for all of Plaintiffs' claims is the leak itself—how it occurred, and where the oil went***.  There is a large area of factual overlap in the Plaintiffs' causes of action.") (emphasis added); *In re Shell Oil Refinery*, 136 F.R.D. 588, 589 (E.D. La. 1991) (noting that certification had been granted in a case arising "from the May 5, 1988 explosion in the catalytic cracking unit at the Shell Oil Refinery in Norco, Louisiana.").

418.     Courts around the country agree.  In *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004), the Sixth Circuit affirmed the certification of a class of 3,600 individuals whose ***property*** was damaged by toxic pollutants emitted from a cement manufacturing plant, explaining that while "individual damage determinations might be necessary . . . the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole." *Id.* at 508.  In *Bell v. DuPont Dow Elastomers,*

---

F.3d at 557.  This Court had ample opportunity and information, by virtue of its management of an intensively litigated and well addressed liability case, to conduct the requisite analysis.

*LLC*, 640 F. Supp. 2d 890 (W.D. Ky. 2009), the court certified a class of individuals residing near a DuPont facility emitting air contaminants, explaining that the "air contamination affected Plaintiffs ***and their properties*** in similar ways under the law" even though "some class members disagree about the significance of the discharges each has experienced." *Id.* at 895 (emphasis added). In *Collins v. Olin Corp.*, 248 F.R.D. 95, 103-05 (D. Conn. 2008), the court certified a class of homeowners harmed by contaminated soil and groundwater, reasoning that "differences in the amount and recoverability of damages do not defeat predominance." *Id.* at 105. *Singleton v. Northfield Ins. Co.*, 826 So. 2d 55 (La. Ct. App. 2002), affirmed certification of a class seeking damages from a gas well blowout, holding that the "liability of the defendants is the central issue, which is obviously common to all of the claimants. Moreover, this issue of liability pre-dominates over any questions important to only individual members of the class, such as the type and extent of their damages." *Id.* at 68.[31]

### iv. The VoO Claims Are Also Appropriate For Class Treatment.

419. The VoO claims are appropriate for treatment as part of the same class as those class members who suffered tort injuries without participating in the VoO program, for three reasons.

---

[31] Other courts have ruled similarly. *See, e.g.*, *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 443 (E.D. Pa. 2008); *Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*, No. 05-445, 2007 WL 28243, at *8 (W.D. Okla. Jan. 3, 2007); *Muniz v. Rexnord Corp.*, No. 04-2405, 2005 WL 1243428, at *4 (N.D. Ill. Feb. 10, 2005); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 487 (S.D. Ohio 2004); *Ludwig v. Pilkington N. Am.*, No. 03-1086, 2003 WL 22478842, at *4 (N.D. Ill. Nov. 4, 2003); *Mejdreck v. Lockformer Co.*, No. 01-6107, 2002 WL 1838141, at *6-7 (N.D. Ill. Aug. 12, 2002), *aff'd*, 319 F.3d 910 (7th Cir. 2003); *LeClercq v. Lockformer Co.*, No. 00-7164, 2001 WL 199840, at *7 (N.D. Ill. Feb. 28, 2001); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388-89 (D. Colo. 1993); *Bates v. Tenco Servs., Inc.*, 132 F.R.D. 160 (D.S.C. 1990); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D. Ohio 1991); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987).

420.     *First*, there is an additional basis for class certification of VoO claims:  these claims arise from standardized contracts.  Courts in this Circuit agree that class actions may be certified in appropriate circumstances in cases arising from the alleged breach of form contracts, as determinations of liability in each case will present substantially similar issues.  *See, e.g., Kase v. Solomon Smith Barney, Inc.*, 218 F.R.D. 149, 155 (S.D. Tex. 2003); *Durrett v. John Deere Co.*, 150 F.R.D. 555, 558 (N.D. Tex. 1993).  Numerous courts outside the Circuit agree with this analysis.  *See, e.g., Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Sys.*, 601 F.3d 1159, 1171 (11th Cir. 2010); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003).  This result has also been reached in cases involving maritime contracts like those at issue here.  *See, e.g., Dziennik v. Sealift, Inc.*, No. 05-4659, 2007 WL 1580080, at *11 (E.D.N.Y. May 29, 2007).

421.     This precedent applies fully here, where the contracts signed by each member of the class claiming VoO injury are nearly identical.  *See, e.g.*, Plaintiffs' Original Petition and Request for Disclosure, *Brannon v. BP*, No. 2011-60109 (Harris County, Tex., Oct. 6, 2011) ("Plaintiffs[] entered into contracts with BP to provide charter service to assist BP in location and clean up of oil spilled from the Macondo Well beginning on April 20, 2010 and continuing for months thereafter.  The contracts came in the form of ***identical agreements*** entitled 'Master Vessel Charter Agreement' and/or 'Master Service Contract. . . .'") (emphasis added).  Because the contracts at issue are functionally identical, BP's defenses to the VoO actions have presented a host of common issues.  *See generally* Rec. Doc. 4421.

422.     *Second*, the VoO contract cases are not disconnected from other damages claims that initially formed the basis for the creation of MDL 2179.  As the JPML found when it transferred the VoO cases into this MDL proceeding, the VoO claims "involve common

questions of fact with actions in this litigation *previously centralized* in the MDL," as the actions "arise from the explosion that destroyed the Deepwater Horizon offshore drilling rig, and the oil spill resulting therefrom."  Rec. Doc. 2041 at 1 (emphasis added).  VoO participants were subject to the direction of the Federal On-Scene Coordinator who was controlling spill response efforts in part so as to minimize tort damages.  Moreover, several VoO participants claim that their work caused property damage to their boats — a type of tort claim that falls at the heart of this Settlement.  It would create inefficiency and waste judicial resources not to adjudicate the intertwined VoO contract and tort cases in a coordinated fashion.  They are instead best adjudicated together.

423.  *Third*, like all class members, VoO plaintiffs have brought claims against BP for fraudulent concealment.[32]  *See* Rec. Doc. 6412 ¶ 259 ("From the outset, BP attempted to downplay and conceal the severity of the Oil Spill."); *id*. ¶ 409 (alleging that BP's fraud "induced Plaintiffs to act or to refrain from acting to protect their property, business, livelihoods, and income").  In other words, the VoO Plaintiffs allege that if they had been provided accurate information about the nature of the spill they may not have signed the VoO master vessel charter agreements.  Because the VoO Plaintiffs' fraudulent concealment claims depend upon the allegation that BP knowingly misled the public about the amount of oil flowing from the reservoir, the VoO plaintiffs' claims share several critical common issues of fact with the rest of the class.  These include, for instance, (i) how much oil actually came out of the reservoir, and (ii) whether BP engaged in misleading conduct concerning the magnitude of the spill.  This Settlement would terminate those claims and provide compensation to VoO Plaintiffs for their contractual participation in the program and for any property damage to their boats.

---

[32] The Court does not intend to suggest that BP engaged in fraudulent concealment, merely that the allegation that it did so creates a common issue.

424.    *Fourth*, OPA includes a mitigation requirement.  *See* 33 C.F.R. § 136.235.  And the VoO Settlement Payment Offset and VoO Earned Income Offset was negotiated against the backdrop of that requirement, *see infra* ¶ 672.  Because the VoO Charter Payment is connected to the recovery of economic losses covered by OPA claims resolved in the Settlement, it is efficient to include the resolution of VoO claims in the Settlement as well.

425.    *Finally*, many VoO plaintiffs will have other claims in the Settlement and, in fact, there are provisions in the Settlement Agreement to deal with that.  *See, e.g.*, Settlement Agreement ¶¶ 5.2.2, 5.3.2.1, 5.5.2.1.  Accordingly, there are compelling reasons to include the VoO claims in this Settlement.

### b.    Class Treatment Is Superior To Other Methods Of Adjudicating The Controversy.

426.    Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); Klonoff Decl. ¶ 49.

427.    Rule 23(b)(3) provides that in considering whether a class action is superior (as well as the issue of predominance), the court should consider the following four factors: (i) the class members' interests in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or against class members; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the likely difficulties in managing a class action.

428.    As the Court preliminarily concluded on May 2, 2012, superiority is satisfied here.  *See* Rec. Doc. 6418 at 28-29.  Objections to the contrary lack merit.  *See* Obj. Doc. 123 at 27-35; Obj. Doc. 228 at 23-24; Obj. Doc. 230 at 22-24; Obj. Doc. 234 at 23-25.

429.    As explained elsewhere, the fact that there was an existing claims process is irrelevant to the question of whether a class action is superior to other methods of adjudication. *See* Obj. Doc. 101 at 11-18; *see also supra* ¶ 375.   The Class Structure enables the claims process established by the Settlement to be administered under Court supervision and control, provides the due process protections of Rule 23 to the class member Claimants, and enables the Court to enforce the Settlement terms and administrative procedures for the benefit of class members, without necessitating new or individualized litigation.   Predecessor claims processes lacked these mechanisms and protections.

430.    "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied."   Coffee Decl. ¶ 62.I; Klonoff Decl. ¶ 59 ("[I]ndividual lawsuits are neither a feasible nor a sensible alternative to a class action in this case.").   For those reasons, there can be no serious argument that a class action is not a superior method of resolving this litigation.

431.    The parties' agreement to settle the case comports with the policy goals of OPA. *See* Coffee Decl. ¶ 13; *see also* H.R. Rep. No. 101-242, pt. 2, at 67 (1989) ("Since the primary purpose of this Act is to guarantee that claimants will receive rapid and equitable compensation for any economic loss suffered as the result of an oil spill, the Committee expects that the claims settlement procedures … will be formulated with this purpose in mind.   Particular care should be taken to avoid unnecessary procedural delays or overly complicated bureaucratic processes. Claimants should be afforded from the beginning a clear idea of their rights and obligations, and the administrative process established should recognize that severe hardships may be engendered for some claimants if there are delays in the settlement of claims.").

### i.      Interest Of Class Members In Individual Control

432.    This factor strongly counsels in favor of class certification.  Litigation of this type is extraordinarily complex and expensive, and the class action device was designed to allow individuals with comparatively modest claims to band together to bring such claims.  *See, e.g.*, Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2(a)(1), 119 Stat. 4 ("Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm.").

433.    Many plaintiffs would be able to recover only relatively small amounts of compensation, and as a result, they will have little interest in litigating outside of a class context, with the enormous expenses that such litigation would entail.  The class action device appropriately addresses the problem of these "negative value" claims and spares the court system from the burden of years of docket-clogging litigation.  *See* Coffee Decl. ¶ 57, 62.D;  Klonoff Decl. ¶¶ 42, 61; Miller Supp. Decl. ¶ 10; *see also Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  The class action solves this problem . . . .") (quotation omitted).

434.    Moreover, approximately 110,000 plaintiffs have filed short-form joinders to join the B1 bundle of litigation and more than 79,000 claimants have already filed in first few months of this Settlement.  This further indicates that many class members do not have a strong interest in individually controlling their claims.

435.    Finally, the Settlement preserved the Rule 23(b)(3) opt-out opportunity, and provided a generous opt-out period that the Court extended by order dated August 27, 2012.  *See*

Rec. Doc. 7176.   Any plaintiff who does not wish to take part in the Settlement remained free to opt out of the settlement class and pursue his own action.   *See* Klonoff Decl. ¶ 67.

### ii.       Extent Of Any Litigation Already Begun

436.   This litigation has seen several important motions resolved and different categories of claims dismissed.   But the multi-phase Limitation and Liability Trial has not yet begun.   There remains a significant amount of adjudication to be conducted.   Class settlement averts that litigation and thus is superior to expending the resources to engage in further complex and protracted proceedings.

437.   Additionally, given the centralization of virtually all *Deepwater Horizon*-related litigation in this District, the only litigation brought by members of the class that has made any meaningful progress is the litigation brought by the PSC on behalf of those who are now members of the Settlement Class.   *Cf. In re Wal-Mart Wage & Hour Employment Practices Litig.*, No. 06-225, 2008 WL 3179315, at *20 (D. Nev. June 20, 2008) ("As to the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, these cases already have been consolidated in an MDL action.").   There are no plaintiffs whose litigation efforts will be wasted by the Court's certification decision.   *See* Klonoff Decl. ¶ 61.

### iii.      Desirability Of Concentration In This Forum

438.   Consistent with the orders of the Judicial Panel on Multidistrict Litigation, virtually all *Deepwater Horizon*-related litigation is already centralized in this District.   Thus, much of the litigation will occur in this District regardless of how the Court resolves this class certification motion.   *Cf. In re Wal-Mart Wage & Hour Employment Practices Litig.*, 2008 WL 3179315, at *20 ("The desirability of concentrating the litigation of the claims in this forum, at least for pre-trial purposes, already has been decided by the MDL panel."); *In re Online DVD*

*Rental Antitrust Litig.*, No. 09-2029, 2010 WL 5396064, at *12 (N.D. Cal. Dec. 23, 2010) ("[T]he present action has already been consolidated for case management before this court as part of a multidistrict litigation proceeding . . . . Concentrating the litigation of all claims in the instant forum also further promotes manageability and efficiency.").

439.    Given the Court's familiarity with the myriad legal and factual issues at issue in this litigation, concentration is a desirable result for all parties.  *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-1486, 2006 WL 1530166, at *11 (N.D. Cal. June 05, 2006) ("Concentrating the litigation of all claims in the instant forum — which has already heard all pretrial proceedings thus far — would further promote manageability and efficiency."); *see also* Klonoff Decl. ¶ 61.

### iv.    Likely Difficulties Of Managing A Class Action

440.    The class settlement is far easier to manage than the thousands of individual actions could ever be.

441.    Because the Court "need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial," *Amchem*, 521 U.S. at 620 (citation omitted); Klonoff Decl. ¶ 13, the Court may take notice of the fact that the Settlement Agreement permits efficient and transparent payments to members of the putative class far sooner, and with more efficient and cost-effective utilization of judicial resources, than individual actions ever could.  *See* Klonoff Decl. ¶¶ 59.

### D.    The Settlement Agreement Is Fair, Reasonable, And Adequate.

442.    A Court may approve a class action settlement only upon a finding that it is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e); Miller Decl. ¶ 10.  As described below, the Settlement Agreement is more than fair, reasonable, and adequate to all class members.  While the Court need only make this finding by a preponderance of the evidence, *see Wineland v.*

*Casey's Gen. Stores, Inc.*, 267 F.R.D. 669, 676 (2009); *Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1407 (D. Minn. 1987), the Court is satisfied that the Settlement Agreement is fair, reasonable, and adequate by any standard of proof that could conceivably apply, including proof by clear and convincing evidence or by the most the most demanding standards of proof available under the law.

> ### i.  The Economic And Property Damages Settlement Agreement Is Entitled To A Presumption Of Fairness.

443.  The public interest strongly favors the voluntary settlement of class actions.  *See* 4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.); *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004) (per curiam); *Turner v. Murphy Oil USA*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *In re Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000); *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985).

444.  Because the public interest strongly favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable, and adequate.  *See Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008); *accord, e.g.*, *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998).

445.  The preference for settlement over the expenditure of scarce judicial resources gains added force under the OPA statute, which is designed to catalyze settlements.  *See, e.g.*, 33 U.S.C. § 2713; Coffee Decl. ¶ 13 ("[T]his settlement represents exactly the type of outcome that OPA was intended to produce.").  Legislative history confirms this point:

> Since the primary purpose of this Act is to guarantee that claimants will receive rapid and equitable compensation for any economic loss suffered as the result of an oil spill, the Committee expects that the claims settlement procedures … will be formulated with this purpose in mind. Particular care should be taken to avoid unnecessary procedural delays or overly complicated bureaucratic processes.  Claimants should be afforded from the beginning a clear idea of their rights and obligations, and the administrative process established should recognize that severe hardships may be engendered for some claimants if there are delays in the settlement of claims.

H.R. Rep. No. 101-242, pt. 2, at 67 (1989).

### ii.    The *Reed* Factors Weigh In Favor Of Final Approval.

446.    Even if no presumptions applied to the Settlement, it clearly satisfies the standard of Rule 23(e).  *See* Klonoff Decl. ¶ 89.

447.    The Fifth Circuit has articulated six factors to guide a court's review of whether a settlement is fair, reasonable, and adequate:  (i) whether the settlement was negotiated at arm's length or was instead the product of fraud or collusion; (ii) the complexity, expense, and likely duration of the litigation absent settlement; (iii) the stage of the proceedings and the amount of discovery completed; (iv) the probability of plaintiffs' success on the merits; (v) the range of possible recovery; and (vi) the opinions of the class counsel, class representatives, and absent class members.  *See Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) (citing *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)); *Dell*, 669 F.3d at 638; *Newby v. Enron Corp.*, 394 F.3d 296, 308 (5th Cir. 2004); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 431 (S.D. Tex. 1999); Klonoff Decl. ¶ 71.

### a.    *Reed* Factor One:   The Existence Or Lack Of Fraud Or Collusion Behind The Settlement

448.    The uncontroverted evidence establishes that the Settlement was reached only after many months of hard-fought negotiations that were conducted simultaneously with adversarial trial preparations.  *See* Klonoff Decl. ¶ 73; Miller Decl. ¶¶ 22-28.  This Court allowed

131

settlement discussions to take place, and supervised them as described above, but insisted that discovery and trial preparation continue apace, so that no time would be lost if settlement talks proved fruitless. This dual track enabled the parties to consider and negotiate a settlement fully informed by unfolding discovery and expert opinions, among other litigation events.

449. Magistrate Judge Shushan played an important supervisory role in mediating the Settlement. *See* Rec. Doc. 7480 at 7. Her efforts further counsel in favor of a finding that the Settlement was fairly negotiated. *See, e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995); *Collins*, 568 F. Supp. 2d at 725 (citing 4 NEWBERG ON CLASS ACTIONS § 11:51 (4th ed.)); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman,* 405 F. App'x 532 (2d Cir. 2010); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003), *aff'd sub nom. Smith v. Crystian*, 91 F. App'x 952 (5th Cir. 2004) (per curiam); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 497 (N.D. Miss. 1996); Coffee Decl. ¶ 33; Klonoff Decl. ¶ 74.

450. In addition, the SCP was designed by a Court-appointed neutral, who received substantial input from affected parties and experts. *See supra* ¶¶ 21-25.

451. Plaintiffs were represented by a large number of experienced attorneys on the Court-appointed PSC, who came from diverse backgrounds and geographies and represented the various types of class members, who were involved in either the negotiation or approval of this Settlement. *See* Coffee Supp. Decl. ¶¶ 19(b)(1), 27(a)-(b), 28-35; Klonoff Decl. ¶ 75.

452. The absence of collusion may also be presumed based on the overall fairness of the Settlement terms under the "proof is in the eating test." *Bowling*, 143 F.R.D. at 152; *Corrugated Container*, 643 F.2d at 211; *Turner*, 472 F. Supp. 2d at 846.

453.    There is no evidence whatsoever of any fraud or collusion in the negotiation of the Settlement.  Rather, in light of the considerations discussed above, any suggestion of fraud or collusion would be frivolous.

454.    This Settlement exceeds the first *Reed* factor.   The law merely requires the absence of fraud or collusion, not the use of Judge-mediated negotiations or a court-appointed neutral that further ensures fairness.

> **b.    *Reed* Factor Two:   The Complexity, Expense, And Likely Duration Of The Litigation**

455.    This litigation has been extraordinarily complex and expensive.   And absent settlement, the cases in MDL 2179 would have continued to be complex and to impose significant expenses on all parties.  *See* Klonoff Decl. ¶¶ 80-81.  The Court takes judicial notice of the open and obvious fact that the *Exxon Valdez* and *Amoco Cadiz* oil spill litigations took at least 15 to 20 years to resolve.

456.    The protracted *Exxon Valdez* litigation "produce[d] an independent secondary disaster" for the Alaska populace affected by the spill.   J. Steven Picou, *When the Solution Becomes the Problem*, 7 U. St. Thomas L.J. 68, 81 (2009).   This Settlement avoids such concerns.

457.    As of April 18, 2012, the day that the parties filed their joint motion seeking preliminary approval of the Settlement Agreement, the docket reflected approximately 6,200 entries, of which approximately 1,200 were motions.  This litigation has taxed the resources of both the parties and the Court.

458.    In light of the complex issues of law, engineering, science, and operative fact presented by this litigation, simply completing trial could require many years.  It is possible to manage such litigation by breaking it down into separate phases, as the Court was prepared to do

prior to the parties' reaching a settlement.  But there is no gainsaying that the issues to be tried are numerous and complex and would be time-consuming to resolve.  "We acknowledge the principle that justice delayed is justice denied."  *In re AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984).

459.   In light of the numerous complex and novel issues of law presented in this case, appeals could extend this litigation for a decade or more.  *See* Klonoff Decl. ¶ 82.

460.   Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery.  Hence, this second *Reed* factor counsels strongly in favor of granting final approval to the Settlement Agreement. *See In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *Billitteri*, 2011 WL 3586217, at *10; *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010); *Sullivan*, 667 F.3d at 320; *Collins*, 568 F. Supp. 2d at 726; *Faircloth v. Certified Fin. Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997); *Shell Oil*, 155 F.R.D. at 560; *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (per curiam); *Ayers*, 358 F.3d at 369; *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002); *Smith v. Ajax Magnethermic Corp.*, No. 02-0980, 2007 WL 3355080, at *6 (N.D. Ohio Nov. 7, 2007).

461.   The Settlement exceeds the second *Reed* factor because benefits are being provided now, without delay, prior to final approval and the conclusion of any appeals — conditions that are atypical and unique in comparison to most class action cases.

c.      *Reed* **Factor Three:  The Stage Of The Proceedings And The Amount Of Discovery Completed**

462.     This *Reed* factor asks "whether the parties have obtained sufficient information to evaluate the merits of the competing positions."  *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620 (quotation omitted).   "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ."  *Id.* at 620-21.

463.     The parties clearly had sufficient information to evaluate the merits of their competing positions.  Prior to reaching the Settlement Agreement, the parties had available the transcripts of more than 300 depositions, more than 90 million pages of produced documents, and more than 80 expert reports.   "The settlement negotiations have been informed by massive volumes of civil discovery . . . ."  Miller Decl. ¶ 26.  "Depositions were conducted on multiple tracks and on two Continents."  Rec. Doc. 6418 at 3.

464.     In light of the voluminous discovery produced, this *Reed* factor weighs strongly in favor of granting final approval to the Settlement Agreement.  *See, e.g.*, *Turner*, 472 F. Supp. 2d at 847; *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997); Issacharoff Decl. ¶ 9; Klonoff Decl. ¶ 84.

465.     The parties also negotiated with the benefit of investigations conducted by various components of the United States government.  *See supra* ¶ 14.  Although conducted outside of this multidistrict litigation and generally not admissible in evidence, these investigations are relevant to whether the parties were sufficiently informed to reach a settlement.  *See DeHoyos*, 240 F.R.D. at 292; *Garza v. Sporting Goods Props., Inc.*, No. 93-108, 1996 WL 56247, at *13 (W.D. Tex. Feb. 6, 1996).

466.    The parties had the benefit of specific data bearing on class members' damages, including statements made on short form joinders and information drawn from the record of payments by the GCCF.  *See* Miller Decl. ¶ 40; *see also, e.g.,* Gulf Coast Claims Facility, Overall GCCF Program Statistics (as appearing online Jan. 1, 2011), http://web. archive.org/web/20110101085457/http://www.gulfcoastclaimsfacility.com/reports;  Gulf  Coast Claims Facility GCCF Program Statistics — Overall Summary (As Of December 14, 2010, 5:05 PM    ET),    http://web.archive.org/web/20101216023532/http://gulfcoastclaimsfacility.com/ GCCF_Overall_Status_Report.pdf.  Claims to the contrary are simply inaccurate.  *See, e.g.*, Rec. Doc. 7420 at 3.  Settlement negotiations took place for a period of time extended enough for the parties to assess developments with regard to Gulf Coast tourism, shoreline oiling, and seafood landings as reported in published government and industry data not only for pre-Spill and immediate 2010 post-Spill time periods, but also onward into 2012.  *See, e.g.*, Fishkind Decl. ¶¶ 70-74; Landry Decl. ¶¶ 11, 20, 40, 45-47; Richardson Decl. ¶¶ 39-44; Taylor ¶¶  6, 13-23; Balhoff Decl. at 3-4; Perry Decl. at 3-4; Rice Seafood Decl. ¶ 4; Tunnel Decl. ¶¶ 28-71.

467.    The parties also negotiated in the shadow of this Court's ruling on the motions to dismiss the Amended Master B1 Complaint, as well as dozens of other rulings on significant issues.  *See, e.g.*, Rec. Doc. 3830 (B1 Order); Rec. Doc. 3330 (B2 Order); Rec. Doc. 4159 (B3 Order); Rec. Doc. 2784 (D1 Order).  This case did not present an "immature tort" whose legal and factual dimensions and implications had not been fleshed out by judicial decision.  *See* Miller Decl. ¶ 39.

468.    The Settlement exceeds the third *Reed* factor because settlements can be approved even on the basis of little or no formal discovery.  *See In re Educ. Testing Serv. Praxis*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006).

> **d.** ***Reed* Factors Four and Five: The Probability Of Plaintiffs' Success On The Merits And The Range Of Possible Recovery**

469. These two related *Reed* factors require the Court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case." *Reed*, 703 F.2d at 172. Thus, "the court must compare the terms of the compromise with the likely rewards of litigation." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007) (quotation omitted). The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (quotation and alteration omitted); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1065. The court determines "whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors" not by attempting the impossible task of deciding whether the parties have "reached 'exactly the remedy they would have asked the Court to enter absent the settlement,'" but instead by "'whether the settlement's terms fall *within a reasonable range of recovery*, given the likelihood of plaintiffs' success on the merits.'" *Id.* (citing *Maher v. Zapata Corp.*, 714 F.3d 436, 460 (5th Cir. 1983)).

470. As discussed above, the Settlement Agreement provides compensation to class members that is more than sufficient to make each and every class member more than whole for his, her, or its compensatory losses. In addition to this direct compensation to individual class members, the Settlement Agreement provides other significant benefits, including assigning BP's claims against Halliburton and Transocean to the class, paying for a promotional fund, and paying for all costs of settlement administration. BP has also agreed not to oppose a significant award of common benefit attorneys' fees and costs, effectively sparing the class from having to pay for common-benefit counsel. *See supra* ¶ 264.

471.    As discussed below, despite BP's belief that the plaintiffs' case has weaknesses that could either delay relief to the class for many years or possibly deny numerous class members relief entirely, BP has agreed to pay more than sufficient relief to all class members.

472.    For these reasons, the Court is fully satisfied that the probability of plaintiffs' success on the merits and the range of possible recovery weigh strongly in favor of approving the Settlement Agreement.

473.    This Settlement exceeds the fourth and fifth *Reed* factors.  The fourth factor is exceeded because the Settlement's benefits are available now (indeed, thousands of claims have already been paid) and there are numerous dimensions of risk that individual plaintiffs would face in litigation.  And the fifth factor is exceeded because, *inter alia*, the immediate settlement payouts provide benefits and accompanying features that are not likely to be obtained in litigation, and which BP staunchly contends it had no legal obligation to pay or provide, including (i) paying the share of damages caused by other defendants; (ii) paying RTPs; (iii) assigning additional valuable causes of action to the Class; and (iv) setting up a $57 million Promotional Fund.

> e.    ***Reed* Factor Six:   The Opinions Of Class Counsel, Class Representatives, And Absent Class Members.**

474.    Class Counsel, class representatives, and the vast majority of absent class members all agree that the Settlement Agreement is a fair, adequate, and reasonable resolution of this litigation.

475.    That this Settlement exceeds the final *Reed* factor is perhaps best illustrated by the extraordinary number of putative objectors who wish that they were included within the Settlement.  *See infra* ¶ 594.  "What the objections do illustrate — in vivid form — is the fact

that this settlement is viewed as so desirable that people are clamoring to get in."   Miller Decl. ¶ 44.

### i.       Class Counsel

476.    Class Counsel have significant experience in litigating and negotiating the settlement of complex litigation such as the instant dispute.   Indeed, Class Counsel "regularly engage in complex litigation similar to the present case and have demonstrated their dedication by devoting substantial effort, energy, and resources to the prosecution of this action."   Rec. Doc. 6418 at 27-28.

477.    Class Counsel have repeatedly stated that the Settlement Agreement is a fair, reasonable, and adequate resolution of this litigation.   *See* Joint Preliminary Approval Brief (Rec. Doc. 6266-1) at 7 (advising the Court that the Settlement Agreement "stands on its own as a comprehensive, fair, and reasonable" settlement that "makes whole the myriad of plaintiffs asserting that they have suffered economic loss or property damage as a result of the Deepwater Horizon incident."); Class Counsel Final Approval Brief (Rec. Doc. 7101-2); Class Counsel Final Approval Reply Brief (Rec. Doc. 7727); Apr. 25, 2012 Preliminary Approval Hr'g Tr.; Nov. 8, 2012 Fairness Hr'g Tr.; Plaintiffs' Steering Committee, Summary of Agreement-in-Principle Between Plaintiffs and BP, at 1 (Mar. 9, 2012), *available at* http://www.lundylawllp.com/Resources/PSC-Summary-3-9-2012.pdf ("This Settlement is an enormous victory for Gulf Coast workers, businesses and families. . . . Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole as a result of this settlement — regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF."); Press Release, Motley Rice, BP SETTLEMENT FINALIZED: Details of Agreement Submitted to the Court for Approval (Apr. 18, 2012), *available at* http://www.motleyrice.com/news/view/bp-

settles; Herman Decl. ¶ 13 ("[T]he proposed Settlement Agreements represent the most favorable resolution available to the economic and medical classes.").

478.    Class Counsel's judgment that the Settlement is fair, reasonable, and adequate speaks strongly in favor of granting final approval.  *See DeHoyos*, 240 F.R.D. at 287; *Cotton*, 559 F.2d at 1330; *Turner*, 472 F. Supp. 2d at 852; *Combustion*, 968 F. Supp. at 1128; *In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008); *San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 461 (W.D. Tex. 1999).

### ii.    Class Representatives

479.    The class representatives personally have claims falling within each of the claims frameworks created by Section 5 of the Settlement Agreement.  *See supra* ¶ 337.

480.    The fifteen class representatives uniformly believe that the Settlement Agreement is a fair, reasonable, and adequate resolution of this litigation. *See* Bon Secour Fisheries, Inc. Decl. ¶ 9; Friloux Decl. ¶ 9; Gallo Decl. ¶ 8; Fort Morgan Realty, Inc. Decl. ¶ 9; GW Fins Decl. ¶ 9; Hutto Decl. ¶ 8; Irwin Decl. ¶ 8; Kee Decl. ¶ 8; Tesvich Decl. ¶ 8; Lake Eugenie Land and Development, Inc. Decl. ¶ 10; Lundy Decl. ¶ 8; Guidry Decl. ¶ 9; Panama City Beach Dolphin Tours & More LLC Decl. ¶ 9; Sellers Decl. ¶ 8; Zeke's Charter Fleet, LLC Decl. ¶ 9.

481.    The universal agreement of the class representatives that the Settlement is fair, reasonable, and adequate further counsels in favor of granting final approval to the Settlement Agreement.

### iii.        Absent Class Members[33]

482.    As detailed below, the reaction of the absent class members to the Settlement Agreement has been overwhelmingly positive.

### (A)      The Number Of Objections Is Low.

483.    Under the Preliminary Approval Order, Class Members who wished to object to the Settlement Agreement were required to submit a written statement of the objection(s) and to include in this statement "written proof that the individual or entity is in fact an Economic Loss and Property Damage Class Member, such as proof of residency, ownership of property and the location thereof, and/or business operation and the location thereof" by August 31, 2012.  Rec. Doc. 6418 ¶ 38.

484.    Under the Preliminary Approval Order, failure to comply with its objection provisions waived and forfeited any and all of a putative objector's rights to object to the Proposed Settlement, forever foreclosing the objector from making any objection to the Proposed Settlement, and binding the objector by all the terms of the Proposed Settlement and by all proceedings, orders and judgments in this matter.  *Id.*[34]

485.    On August 31, 2012, the Court issued an Order extending the deadline for submitting written objections to the Proposed Settlement to September 7, 2012, due to the unforeseen circumstance of Hurricane Isaac.  *See* Rec. Doc. 7225.

---

[33] Pursuant to this Court's Order of November 9, 2012, *see* Rec. Doc. 7878, the parties will make a joint filing on November 21, 2012, containing a breakdown of the final objection and opt-out numbers, which are still being tabulated.  The November 21 filing will contain proposed fill-ins for the blanks in this section.

[34] The following objections were filed out of time.  Obj. Doc. 239; Obj. Doc. 240; Obj. Doc. 241; Obj. Doc. 242; Obj. Doc. 247; Obj. Doc. 250; Obj. Doc. 252; Obj. Doc. 253; Obj. Doc. 254; Obj. Doc. 255; Obj. Doc. 257; Obj. Doc. 258; Obj. Doc. 259; Obj. Doc. 261 (supplement to Obj. Doc. 117); Obj. Doc. 262; Obj. Doc. 264 (denied by Rec. Doc. 7897); Obj. Doc. 265 (supplement to Obj. Doc. 145).  The Court addresses these objections elsewhere only in the interest of completeness.

486.    As of November __, 2012, the total number of purported objections filed was __ (not counting duplicate or supplemental filings by the same objectors).  These objections were ostensibly filed on behalf of an alleged __ objectors.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

487.    The vast majority of the purported objectors — __ out of __, or __% of the purported objectors — were included in "mass" objections filed by four sets of attorneys. Specifically, Brent Coon & Associates claimed to propound objections on behalf of __ purported objectors.  *See* Obj. Doc. 122.  Farrell & Patel claimed to propound objections on behalf of __ purported objectors.  *See* Obj. Doc. 198; Rec. Doc. 7217.  Smith Stagg LLC and its co-counsel claimed to propound objections on behalf of __ purported objectors.  *See* Obj. Doc. 167; Obj. Doc. 189.  Arnold & Itkin claimed to propound objections on behalf of __ purported objectors. *See* Obj. Doc. 209.

488.    These same law firms also represent clients who have made claims under the Settlement Program.  Indeed, some of their "objecting" clients have not only made claims, but received payments and signed releases of their claims against BP from either the Settlement Program or the GCCF.  As of November __, 2102:  Brent Coon & Associates appears to represent __ objectors who are also Settlement Program registrants, __ of whom have signed releases and been paid a total of $__ by the Settlement Program, and __ GCCF claimants who have signed releases and been paid of total of $__ by the GCCF.  Farrell & Patel represents __ Settlement Program registrants and __ GCCF claimants who received $__ and signed releases of their claims against BP.  Smith Stagg LLC and its co-counsel represent __ objectors who are also Settlement Program registrants, __ of whom have signed releases and been paid a total of  $__ by the Settlement Program, and __ GCCF claimants who have signed releases and been paid a total

of $__ by the GCCF.   Arnold & Itkin represents __ settlement registrants and __ GCCF claimants who have signed releases and been paid a total of $__ by the GCCF.  *See* Rec. Doc. ___ [Forthcoming Nov. 21 Filing].

489.    The simultaneous representation of objectors and claimants in the Settlement Program is not limited to the firms that filed "mass" objections.  As of November __, 2012, law firms that have filed objections represent some __ registrants in the Settlement Program.  *See* Rec. Doc. ___ [Forthcoming Nov. 21 Filing]; *see also infra* ¶ 515.

490.    Of the __ purported objectors, __ clearly lack standing to object, either because their submission demonstrated they are not members of the class (__ purported objectors); because of their status as a non-settling defendant, governmental entity, or association (__ purported objectors); or, because they have opted-out of the Settlement (__ purported objectors). *See* Rec. Doc. ___ [Forthcoming Nov. 21 Filing]; *see also infra* ¶¶ 590-604.

491.    Additionally, __ — over __% — of the total number of purported objectors failed to comply with the requirements of the Preliminary Approval Order in that they failed to provide written proof of class membership and, therefore, forfeited and waived their objections.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

492.    Of the total number of purported objectors, only __ objectors made objections that were timely, were not made on behalf of persons or entities without standing to object, were not mooted by an opt out, and provided some evidence of membership in the Settlement Class, and had not previously signed releases in favor of BP.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

493.    The total number of valid objectors is __.  That number is:  (i) no more than __% of the total number of Short Form Joinders; (ii) just __% of the number of persons who filed

claims with the GCCF, which covered fewer claims and claimants; (iii) just __% of the __ million potential class members who received direct mail notice of the Settlement; and (iv) a small a fraction of the class size, which includes the Gulf Coast businesses and residents specified in the Class Definition.   However measured, the number of objectors is a fraction of the percentages routinely recognized in the case law as evidence that a settlement should be approved.  *See infra* ¶ 512.

### (B)    The Number Of Opt-Outs Is Low.

494.    The number of opt-outs to the Settlement Agreement was extremely low. Although the Settlement Agreement gave BP "the absolute and unconditional right, before the date of the Final Approval Hearing, solely at their option, to terminate this Agreement in the event the number of potential Economic Class Members who have filed valid and timely requests for exclusion (Opt Out) exceeds a number agreed to by the Parties and to be filed with the Court in a sealed envelope," Settlement Agreement ¶ 21.3.6, the number of opt-outs did not approach the number agreed upon or even anticipated by the parties.  *See* Nov. 8 Fairness Hr'g Tr. at 62:16 (Mr. Godfrey: "We didn't reach the numbers.").[35]

495.    Under the Preliminary Approval Order, Class Members who wished to opt out of the Settlement Class were required to send a written exclusion request as specified in the Class Notice to the Settlement Program Exclusions Department by October 1, 2012.  *See* Rec. Doc. 6418 at 40.

---

[35] Moreover, Halliburton's argument that there was an impropriety in the parties' filing of the opt-out threshold under seal, *see* Rec. Doc. 91 at 16, fails on the merits.  *See, e.g.*, *In re Red Hat, Inc. Sec. Litig.*, No. 04-473, 2010 WL 2710517, at *5-6 (E.D.N.C. June 11, 2010); *In re Remeron End-Payor Antitrust Litig.*, No. 02-2007, 2005 WL 2230314, at *18 (D.N.J. Sept. 13, 2005); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 253 (D. Del. 2002).  And even putting aside Halliburton's lack of standing, because the termination right was not exercised in light of the very low numbers of actual opt outs, the issue is now moot.

144

496.    On August 27, 2012, the Court issued an Order extending the deadline for submitting written exclusion requests to November 1, 2012.  *See* Rec. Doc. 7176.

497.    On November 21, 2012, in accordance with Paragraph 41 of the Preliminary Approval Order, *see* Rec. Doc. 6418 at 40, and the Court's Order of November 9, 2012, Rec. Doc. 7878, the parties submitted a list of all timely and valid requests for exclusion from the Settlement Class.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

498.    The Preliminary Approval Order also provided that Class Members could revoke their decision to opt out of the Settlement Class by November 5, 2012.  On November 16, 2012, the Court issued an Order extending the deadline for revocations to December 15, 2012, provided that any Class Member submitting an opt-out revocation after November 5, 2012 withdraws any pending objection, and waives any and all current or future objections, to approval of the Settlement.  *See* Rec. Doc. 7928.

499.    As of November __, 2012, a total of __ timely and procedurally valid opt out requests have been submitted by potential Class Members.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

500.    The Exclusions Department of the Settlement Program has received a total of __ opt-out submissions.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

501.    __ of these submissions were from individuals or entities who had already submitted correspondence to the Exclusions Department.  These duplicative submissions were either repetitive or intended to clarify intent or correct deficiencies in an original request. Accounting for duplicate submissions, the Exclusions Department received correspondence from a total of __ unique individuals and/or entities.

502.    Nearly half of the purported opt out submissions received failed to comply with the requirements of the Preliminary Approval Order and the Class Notice, and thus are not valid opt out requests.

503.    Of the total __ individuals and entities who submitted correspondence, __ sent submissions that did not contain a request to be excluded from the Settlement Class, and thus their submissions are not valid opt out requests.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

504.    In order to help ensure that Class Members would not be excluded from the Settlement Class without their express, written consent, the Court required opt out requests to be signed by the Class Member wishing to be excluded from the Settlement Class.  Opt out requests signed by an attorney are not valid.  These requirements are routine and routinely enforced.  *See infra* ¶ 617.

505.    A substantial number of the opt out requests, __, are invalid because they were not signed by the individual or entity purportedly wishing to be excluded from the Settlement Class.  The vast majority of these invalid opt out requests, __, were signed by counsel purporting to act on behalf of the purported Class Members.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

506.    In particular, Brent Coon & Associates submitted __ requests containing the computer-generated signature of Brent Coon without any signature of the person or entity Mr. Coon sought to exclude from the Settlement Class.  In total, some __ law firms submitted __ invalid requests containing only an attorney signature

507.    In addition, of the total number of purported opt out requests received, __ were submitted after the November 1, 2012 deadline, and are thus invalid.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

508.   At least __ of the purported opt out requests were made by individuals or entities that are not members of the Settlement Class because they had previously released their claims against BP.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

509.   In many cases, it is not possible to determine based on the information submitted by potential Class Members in connection with their opt out requests whether the individual or entity is, in fact, a member of the Settlement Class, either because of a prior release or for some other reason.  Thus an unknown portion of the total number of timely and valid requests to opt out of the Settlement Class were likely submitted by individual or entities that are not members of the Settlement Class and such requests are thus of no practical or legal effect.

510.   There are also indications that a significant percentage of the remaining purported opt out requests that comply with the procedural requirements in the Preliminary Approval Order and Class Notice were from individuals or entities that provided an address that is not within any of the class zones, thus raising the question of whether they are from class members.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].

511.   Many of those who opted out have decided to re-enter the class, in order to receive the benefits of the Settlement.  As of November __ 2012, __ revocations of opt out requests have been received.  *See* Rec. Doc. __ [Forthcoming Nov. 21 Filing].  Some of these revocations were directed at revoking opt out requests that were not valid.  In response to the wishes of those wishing to revoke their opt-outs, the Court has extended the deadline for revocations to December 15, 2012.  *See* Rec. Doc. 7928.

### (C)   The Low Numbers Of Objections And Opt-Outs Are Evidence Of The Settlement's Fairness.

512.   The low objections and opt-out rates are evidence of the Settlement's fairness.  Courts, including the Fifth Circuit, have approved settlements with far higher objection rates.

*See, e.g.*, *Reed*, 703 F.2d at 174-75 (objections by 30% of class); *see also Huguley v. Gen. Motors Corp.*, 925 F.2d 1464, at *3 (6th Cir. 1991) (table) (per curiam) (15% of the class); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987) (36% of the class); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985) (15% of the class); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974) (20% of the class); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 661 (N.D. Tex. 2010) ("significant portion of the class"); *see also* Klonoff Supp. Decl. ¶ 7.

513.    "While the fact that a relatively small percentage of the Class Members objects to a proposed settlement is not dispositive, '[c]ourts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'"  *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990) (alteration in original) (quoting 2 H. NEWBERG, NEWBERG ON CLASS ACTIONS § 11.47, at 463 (2d ed.)); *Cotton*, 559 F.2d at 1331 ("In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered . . . ."); *In re OCA, Inc. Sec. & Deriv. Litig.*, 2009 WL 512081, at *15 (same principle); *Quintanilla v. A & R Demolition Inc.*, No. 04-1965, 2007 WL 5166849, *5 (S.D. Tex. May 7, 2007) (same principle); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (same principle); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'").

514.    For those few objectors unhappy with the Settlement, their remedy was simple: opt out.  The "court will not dismantle this settlement for the sake of one class member's unique demands, particularly when the class member . . . had the right (and the means) to opt out and

pursue its individual claims without disturbing the settlement for the rest of the class." *AIG, Inc. v. ACE INA Holdings, Inc.*, Nos. 07-2898, 09-2026, 2012 WL 651727, at *11-12 (N.D. Ill. Feb. 28, 2012); *Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012) ("Indeed, the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair."); *cf. Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) ("[T]he named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands.").

515.    The Court's assessment of the significance of the relatively low number of opt outs is also supported by the fact that most of the opt outs occurred on a mass basis, meaning that they were not prepared in accord with this Court's Preliminary Approval Order, ¶ 38, because they were not individually signed.  Additionally, counsel for such mass opt outs may have breached their ethical duties to their clients; at the very least, the mass unsigned opt outs are highly indicative of a conclusion that such counsel did not spend very much time evaluating the merits of whether or not to opt out in light of the individual circumstances of each of their clients and in consultation with them.  *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 353 (6th Cir. 2009) ("[Attorney] Hadden says that was not enough — that he should have been permitted to represent class members and opted-out individuals simultaneously.  Yet he fails to come to grips with the reality that this kind of dual representation likely would have run up against Michigan's ethics laws.").

### iii.    The Class Would Face Numerous Risks If This Case Were Actually Litigated.

516.    The Settlement Agreement provides full and fair compensation to the Class notwithstanding considerable risks to Plaintiffs' case:

**a.** **BP Contended Under Admiralty Law That It Could Establish A Superseding Cause Defense To Compensatory Damage Liability And That BP's Conduct Did Not Constitute Gross Negligence Or Willful Misconduct.**

517.    The Court reinforces that the Limitation and Liability Trial is currently scheduled for February 25, 2013, *see* Rec. Doc. 7810, and that nothing in these Findings of Fact and Conclusions of Law concerning the Settlement Agreement prejudges or has the effect of prejudging any issue in that upcoming trial (or any other trial) as to non-class member plaintiffs, BP, or any other defendant.

518.    Nevertheless, every investigative body to consider the *Deepwater Horizon* spill to date has concluded that the event was a multi-party, multi-causal event.  The parties were prepared to present evidence at trial which BP contends would have established that (i) Transocean had primary responsibility for the safety of drilling operations; (ii) Transocean failed to maintain the blowout preventer ("BOP"); (iii) Transocean failed to properly monitor drilling; (iv) Halliburton designed and pumped an unstable cement slurry; (v) Halliburton's Sperry Sun division, the "second set of eyes," also failed to notice the drilling anomaly; (vi) Transocean's confusing command structure meant that there was a delay in activating the Emergency Disconnect System; and (vii) Transocean's crew failed to use diverters to shift hydrocarbons overboard.  *See generally* Rec. Doc. 7114-1 at 57-61.

519.    In light of the alleged failures of BP's co-defendants, BP's position at the time of the negotiation of the Settlement pointed to a risk to the class that any one of these failures might constitute a "later cause of independent origin that was not foreseeable," a superseding cause sufficient to break the chain of causation for purposes of common law compensatory liability. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996); *Republic of France v. United States*, 290 F.2d 395, 399-401 (5th Cir. 1961).

520.    In the alternative, BP contends that it could have established that it was not the sole cause of the class's injuries, and that liability is therefore divisible.  *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 617-18 (2009).  While this Court has previously declined to apply the divisibility doctrine, *see* Rec. Doc. 5809 at 12, BP could well have sought appeal from any final judgment that did not apply divisibility.  *See* Rec. Doc. 4392 at 13-15; Rec. Doc. 5124 at 9-10; Rec. Doc. 7114-1 at 62-63.  There is risk to the class that BP could prevail on appeal as to their divisibility defense.

521.    Finally, in light of the numerous well control and other errors BP alleges were committed by its co-defendants that BP intends to prove at trial, BP vigorously asserts that it could establish that its liability did not rise to gross negligence or willful misconduct, such that punitive damages are not available.

522.    While the Court need not make the findings described above in order to approve the Settlement, BP's arguments suffice to prove that the class would face meaningful risk if they chose to litigate their claims.

> **b.     OPA Creates Numerous Hurdles For Plaintiffs' Claims.**
>
> **i.     Outside Of The Settlement, Certain Types Of Claims Would Not Be Compensable Under OPA.**

523.    OPA creates a number of potential hurdles for the class.  Under OPA, private claimants may only recover for certain enumerated types of loss:  (i) "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property," 33 U.S.C. § 2702(b)(2)(B); (ii) "[d]amages for loss of subsistence use," *id.* § 2702(b)(2)(C); and/or (iii) "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources," *id.* § 2702(b)(2)(E). *See generally* Rec. Doc. 7526.

524.    The Settlement Agreement provides compensation for several kinds of loss that fall into none of these categories, such as to real property owners whose property was not oiled. If not for the Settlement Agreement, these claimants would likely receive no compensation whatsoever.  *See* Rec. Doc. 7526 at 4-12.

> ii.    **Outside Of The Settlement, Certain Claims Would Be Subject To Dismissal For Failure To Comply With Presentment.**

525.    OPA provides that a claimant may not file suit against BP until he or she has first presented a claim to BP, and then either (i) the claim is denied; or (ii) a 90-day negotiation period has expired without settlement — a period that begins to run after the claim has been sufficiently substantiated or "presented."  33 U.S.C. § 2713(c).  While the Court has permitted the class as a whole to survive a Rule 12 motion without a specific showing that each and every class member has complied with presentment as of the time of that ruling, *see* B1 Order (Rec. Doc. 3830) at 29-30, before any individual plaintiff could recover he would need to show that he had satisfied the presentment requirement.  This is a "mandatory condition precedent" under the statute.  *Id.* at 30.  Because claims that have not been presented are subject to dismissal, these class members face the risk that BP might successfully argue that they are unable to re-file or otherwise cure their actions after the expiration of OPA's three-year statute of limitations.  *See* 33 U.S.C. § 2717(f).

> iii.    **Outside Of The Settlement, Proof Of Causation Would Be Required.**

526.    OPA refers to damages that "result from" and are "due to" a spill.  *See* 33 U.S.C. § 2702(a), *id.* § 2702(b)(2)(B), *id.* § 2702(b)(2)(E).  The parties have vigorously contested the standard of causation that this language entails; BP has contended that it incorporates a strict proximate cause requirement.  *See, e.g.*, Rec. Doc. 1440-1 at 45 n.31; Rec. Doc. 2312 at 12; Rec.

152

Doc. 6893.  To begin with, there is risk to the class that BP would ultimately prevail on this argument.  *See Shell Oil*, 155 F.R.D. at 563 (approving settlement where "[p]roving causation could be quite troublesome for some claimants").  Moreover, regardless of what standard of causation ultimately was applied, in litigation no plaintiff would benefit from the causation presumptions that are available under the Settlement Agreement.  *See* Klonoff Decl. ¶ 86; *supra* ¶¶ 117-123; 158-159.

### iv.    Outside Of The Settlement, Punitive Damages Might Not Be Available.

527.    This Court has determined that punitive damages are unavailable under OPA.  *See* Rec. Doc. 3830 at 26.  Absent a settlement, class members would be required to overcome this ruling on appeal to have access to punitive damages on their OPA claims.  While the Court has held that OPA does not entirely displace federal maritime law and that punitive damages might be available under federal maritime law, BP has presented an argument to the contrary, and other courts have resolved the issue as BP contends is proper.  *See S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65-66 (1st Cir. 2000); *Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 747 (E.D. La. 2009); *Clausen v. M/V NEW CARISSA*, 171 F. Supp. 2d 1127, 1133 (D. Or. 2001).  There is risk to the class that either the United States Court of Appeals for the Fifth Circuit or the Supreme Court of the United States could agree with BP.  *See* Klonoff Decl. ¶ 85.[36]

---

[36] Note as well that BP indicated that it would appeal this issue by filing a motion to certify the rejection of its displacement defense for interlocutory appeal under 28 U.S.C.§ 1292(b).  *See* Rec. Doc. 4291.  The Court denied this motion, *see* Rec. Doc. 4378, but this did not eliminate BP's right to seek appeal on that issue from a final judgment, which was a possibility if settlement had not occurred.

###### c.   BP Has Submitted Evidence To Establish That The Gulf Is Undergoing A Robust Recovery

528.   A further obstacle to the class if this case were to proceed through adversarial litigation is the evidence BP has presented that the Gulf is undergoing a robust recovery.  This evidence, if credited, would weaken any claim that class members are entitled to compensation for future injury.  The Court notes that in paragraphs 529-538, 541-550, and 552-579, *infra*, it is summarizing the evidence presented by BP, not making findings of its own.  Furthermore, nothing in those paragraphs should be taken to prejudge the merits of any non-settled claims between BP and any party.

###### i.   Coastal Areas

529.   BP has presented evidence that coastal areas in the Gulf have significantly rebounded from peak oiling in the summer of 2010.  The evidence that BP has presented, which is discussed below, has not been meaningfully challenged by objectors with standing, although as noted in paragraph 528 it may become contested in non-settled litigation, which the Court does not prejudge.  While the Court need not and does not make findings concerning this information to approve the Settlement, BP's evidence that the coastal areas are recovering weighs in favor of approving the Settlement.

530.   The parties agree that at the peak of shoreline oiling, approximately 1,100 miles of the coast contained some oil, of which approximately 360 were categorized as heavy or moderate oiling.  *See* Taylor Decl. ¶ 20.  BP has submitted evidence that (i) those numbers declined to 530 total and 50 heavy/moderate within one year of the spill, (ii) two years after the spill they had declined to 430 total and 15 moderate/heavy, (iii) as of April 2012, more than 90% of the miles of shoreline surveyed by SCAT were reported as having no oil observed, and (iv) as

of April 2012, less than one half of one percent were categorized as having moderate or heavy oiling. *See* Taylor Decl. ¶¶ 20-22; Taylor Supp. Decl. ¶ 24.

531.    BP has submitted evidence that as of July 28, 2012, more than 3,900 miles of shoreline have been deemed operationally complete by Unified Command or recommended to be deemed complete, pending approval in accordance with the Shoreline Cleanup Completion Plan. *See* Taylor Decl. ¶ 33; Taylor Supp. Decl. ¶ 25.

532.    The parties agree that SCAT teams and Unified Command have worked to locate and mitigate submerged oil materials ("SOM").  BP has submitted evidence that no SOMs have been observed at any of the NRD sampling locations in the Gulf, and SOMs would not be expected to form in marsh environments like the Louisiana wetlands because of the limited sand and low wave energy.  There is also no evidence, BP contends, to support the presence of SOM in the area outward of the near-shore and intertidal zones.  Any future re-oiling would, according to BP's evidence, almost certainly be localized and discrete, and classified as trace, very light, or light oiling under SCAT criteria.  *See* Taylor Decl. ¶¶ 35-42; Dent. Decl. ¶ 27.

533.    As of August 9, 2012, according to BP, over 98% of the shoreline in the Coastal Real Property Claim Zone surveyed by SCAT has reported either no oil observed or trace oiling. *See* Dent. Decl. ¶ 27.

### ii.    Wetlands

534.    BP has presented evidence that the Louisiana wetlands have experienced a robust recovery.  The evidence that BP has presented, which is discussed below, has not been meaningfully challenged by objectors with standing, though as noted in paragraph 528 it may become contested in non-settled litigation, which the Court does not prejudge.  While the Court need not and does not decide these facts to approve the Settlement, BP's evidence that the Louisiana wetlands are recovering weighs in favor of approving the Settlement.

535.    BP submitted the declaration of an expert with significant expertise in wetlands impacts who made a series of site evaluations of the Louisiana wetlands on March 27, 2012, including aerial observations from a helicopter and ground observations from a boat.  *See* Wharton Decl. ¶¶ 17-19.  He made a series of additional visits on June 12-14, 2012, including re-visiting the sites that he had visited in March.  *See id.* ¶ 20.  Many of the sites he had visited had been heavily oiled by the spill.  According to this expert, the wetlands appeared to be recovering well, with healthy vegetation, new vegetation shoots, and a reduction in the degree of oil; he reports that oil is no longer observed at all in many areas where oil was observed following the spill.  *See* Wharton Decl. ¶ 22; *see also* Dent Decl. ¶¶ 42-43.  Following Hurricane Isaac, he made additional site visits, and he reported that nothing changed his opinion about the recovery of the wetlands.  *See* Wharton Supp. Decl. ¶¶ 4-8.  BP has presented evidence that there has been a continuing, demonstrated reduction in oiling classification over time and that the marsh vegetation has undergone continuous recovery in most areas, including some areas originally classified as heavily oiled.  Wharton Decl. ¶¶ 21, 24 & Ex. B; Wharton Supp. Decl. ¶¶ 10, 12-14; Taylor Decl. ¶¶ 21-22 & Exs. C & D; Taylor Supp. Decl. ¶¶ 16-18, 21-22, 24-26, 31-34.

536.    BP also submitted the declaration of a second expert who also made site visits on the March and June dates.  *See* Leggett Decl. ¶¶ 12-14.  This expert reported that the marsh appeared to be healthy and recovering well, such that little to no impact should be observable within a year.  According to the expert, both animal and plant life were flourishing.  *See id.* ¶ 15.

537.    According to BP, the SCAT process conducted by state and federal representatives and BP shows that no oil was observed at any time along approximately 84 percent of the Louisiana marsh shoreline assessed by SCAT.  Where oil was reported, according to BP, the degree of oiling has reduced over time and no oil is currently observed at many sites

where oil was initially reported:  as of July 28, 2012, 96 percent of the marsh shoreline surveyed by SCAT had no oil observed, and only 0.1 percent was reported as having moderate or heavy oiling.   In light of the resiliency that marsh habitats have shown to oil spills in the past, BP contends that the degree of oiling from the *Deepwater Horizon* spill should continue to decrease over time.  *See* Wharton Decl. ¶¶ 23-25; *see also* Wharton Suppl. Decl.  ¶¶  8, 21; Taylor Suppl. Decl. ¶¶ 24, 32-33.

### iii.      Water

538.     BP has presented evidence that the waters of the Gulf of Mexico have experienced a robust recovery.  The evidence that BP has presented, which is discussed below, has not been meaningfully challenged by objectors with standing, although as noted in paragraph 528 it may become contested in non-settled litigation, which the Court does not prejudge.  While the Court need not and does not find these facts to approve the Settlement, BP's evidence that Gulf waters are recovering weighs in favor of approving the Settlement.

539.     The Operational Scientific Advisory Team ("OSAT") was a government-led multi-agency team formed as part of the response to the spill.  It brought together expertise from the Bureau of Ocean Energy Management, Regulation, and Enforcement; the Environmental Protection Agency; the National Oceanic and Atmospheric Administration; the Coast Guard; the U.S. Geological Survey; the Fish and Wildlife Service; and BP.  It was broad and scientifically robust.  *See* Jeffrey Decl. ¶ 9; Tunnell Decl. ¶ 12; Jeffrey Supp. Decl. ¶¶ 8-9.

540.     OSAT-I examined over 17,000 water and sediment samples from the nearshore, offshore, and deep-water between May 5, 2010, and October 23, 2010.  The samples were taken in waters across the five Gulf States.  OSAT-II was a follow-up investigation that examined samples of different types of weathered oil taken from four sandy beaches with sensitive habitats

(one each in Louisiana, Mississippi, Alabama, and Florida) chosen as representative of oiling conditions across the Gulf. *See* Jeffrey Decl. ¶ 10; Jeffrey Supp. Decl. ¶ 12.

541.     According to BP, (i) OSAT-I found no samples in the nearshore zone that exceeded human health benchmarks, and a very low number of water and sediment samples that exceeded aquatic life benchmarks for polycyclic aromatic hydrocarbons ("PAHs"), a category of oil-related organic compounds that are potentially harmful; (ii) of 6,909 water and sediment samples, only 35 exceeded aquatic life benchmarks, and none of the exceedances in samples collected after August 3, 2010, were consistent with MC252 oil; and (iii) no exceedances of aquatic life benchmarks for dispserant compounds were detected. *See* Jeffrey Decl. ¶ 12; *see also* Tunnell Decl. ¶¶ 15, 73.

542.     According to BP, OSAT-II revealed that (i) recently collected weathered oil samples from the beach environment showed 86-98% depletion of total PAH; (ii) the risk of leaching of supratidal buried oil ("SBO") into groundwater is minimal due to the combined effects of weathering, biodegradation, and the location of the buried oil; (iii) in most locations, models predict PAH concentrations in SBO will decrease to 20% of "already substantially depleted" current levels within five years; and (iv) the risk of potential cancer and non-cancer health effects from shortand long-term exposures does not rise to the levels EPA deems to pose unacceptable health risks. *See* Jeffrey Decl. ¶ 20; *see also* Tunnell Decl. ¶ 16.

### iv.     Seafood

543.     BP has presented evidence that most seafood species included within the SCP are already within pre-spill landings and population trends. The evidence that BP has presented, which is discussed below, has not been meaningfully challenged by objectors with standing, although as noted in paragraph 528 it may become contested in non-settled litigation, which the Court does not prejudge. While the Court need not and does not find these facts to approve the

Settlement, BP's evidence that commercial seafood landings are rebounding weighs in favor of approving the Settlement.

544.     BP's expert states that recently published studies indicate that the northern Gulf coastal habitats of commercial seafood species in the SCP are recovered or recovering.  For example, according to a study of juvenile fish in seagrass beds in the Gulf, immediate, catastrophic losses of 2010 cohorts were largely avoided, and no shifts in species composition occurred following the spill.  *See* Tunnell Decl. ¶¶ 8-11.

545.     BP's expert cites to seafood testing results of State and federal agencies that consistently conclude that Gulf seafood is safe to eat.  *See* Tunnell Decl. ¶¶ 18-21, 26, 74.

546.     With the exception of three small areas of Louisiana, all spill-related commercial and recreational fishing closures have been lifted by state and federal authorities, according to BP's experts.  *See* Tunnell Decl. ¶ 26.

547.     Extensive seafood safety testing conducted by state and federal authorities, BP contends, does not suggest that the use of dispersants negatively affected the safety of Gulf seafood.  *See* Tunnell Supp. Decl. ¶ 19.

548.     According to review by BP's experts of publicly available 2011 data published by the National Oceanic and Atmospheric Administration ("NOAA"), landings for each of the species in the SCP (shrimp, oyster, blue crab, finfish, and other Seafood) were up in 2011 relative to 2010.  *See* Smith Supp. Decl. ¶ 36.  The most recent NOAA 2011 commercial landings data for fisheries of the northern Gulf of Mexico indicate that most of the fishery species relevant for the SCP appear to be within pre-spill landings and population trends in most areas of the region, according to BP's experts.  *See* Tunnell Decl. ¶ 71; Tunnell Supp. Decl. ¶ 4, 5.

### (A)     Shellfish

### (1)     Shrimp

549.     Expert declarations submitted by BP conclude that there was little effect, if any, on adult shrimp population levels in the northern Gulf of Mexico during 2010 or 2011.  Rather, BP contends, shrimp stocks appear to be normal and within annual trends of pre-spill years.  *See* Tunnell Decl. ¶¶ 33, 39.  BP contends that 2011 NOAA commercial landings data are consistent with these findings.  *See* Tunnell Supp. Decl. ¶ 6.

550.     The volume of shrimp landed in the class geography during the period from September to December 2010 was 4% above the average volume of landings between 2007 and 2009, according to evidence submitted by BP.  *See* Fishkind Decl. ¶ 77(a).  BP's expert cites to public data from the Gulf States Marine Fisheries Commission ("GSMFC") which reflects that abundance of brown and white shrimp collectively is above both the long-term average and benchmark average for 2010 and 2011.  *See* Tunnell Decl. ¶ 38.

551.     NOAA Fisheries predicted on July 5, 2012, an expected harvest of 59.2 million pounds for the harvest year starting July 2012, which is above the historical 50-year average of 56.5 million pounds.  *See* Tunnell Decl. ¶ 37.

### (2)     Oysters

552.     Since 2001, the general trend of oyster abundance on public grounds in Louisiana has been decreasing, with small amounts of inter-annual variability since 2002, according to evidence submitted by BP.  *See* Tunnell Decl. ¶¶ 48-49.

553.     According to BP's evidence, the volume of oysters landed in the class geography during the period from May to August 2011 was 71% above the same period in 2010, and only 11% below the average volume from 2007 to 2009.  *See* Fishkind Decl. ¶ 77(c).

554.    BP's expert has reviewed commercial landing data published by NOAA and the GSMFC and found that the reduced catches in 2010 are largely explained by significant fisheries closures.  They were also, according to BP's evidence, caused in part by high oyster mortalities that occurred as a result of (i) low salinities caused by freshwater diversions from the Mississippi River to flood or flush estuarine areas from April to September 2010, authorized by Louisiana officials; and (ii) high summer temperatures in Breton Sound and Barataria Basin.  Historic Mississippi River flooding in 2011 caused a second year of greatly reduced salinities in certain areas of Breton Sound.  *See* Tunnell Decl. ¶¶ 42-43.

555.    Once salinity returns to optimal conditions, and assuming other conditions remain constant, it should take approximately 18 to 24 months until oyster harvests return to normal, according to evidence submitted by BP.  *See* Tunnell Decl. ¶¶ 44, 50, 75.

556.    In 2011, oyster mortalities and reduced recruitment in Texas also occurred as a result of both a historic drought and a widespread red tide event, according to evidence submitted by BP.  *See* Tunnell Decl. ¶ 45.

557.    According to BP, 2011 NOAA landings data are consistent with these findings regarding the current status and trends of oyster populations.  *See* Tunnell Supp. Decl. ¶ 8; Tunnell Decl. ¶ 40.

### (3)    Blue Crab

558.    BP has submitted evidence suggesting that the volume of blue crab landed in the class geography during the period from September to December 2011 was 36% above the same period in 2010, and only 6% below the average volume from 2007 to 2009.  *See* Fishkind Decl. ¶ 77(d).  By the end of 2011, according to analysis of NOAA and GSMFC data by BP's expert, blue crab harvests and abundance were within historic pre-spill trends.  *See* Tunnell Decl. ¶¶ 51-53, 55.

559.    According to BP's expert, 2011 data gathered by the Louisiana Department of Wildlife and Fisheries ("LDWF") on blue crab in Louisiana indicate that abundance was above both long term and benchmark averages.  *See* Tunnell Decl. ¶ 54.

560.    According to BP's expert, harvest data do not suggest that there were any significant spill-related impacts to the blue crab fishery.  *See* Tunnell Decl. ¶ 53.

561.    Harvest data, including recent 2011 NOAA landings data, do not suggest that there were any significant spill-related impacts to the blue crab fishery, according to evidence submitted by BP.  *See* Tunnell Decl. ¶ 53; Tunnell Supp. Decl. ¶ 9.

#### (B)    Finfish

562.    BP's experts state that NOAA and GSMFC data reflect that the volume of finfish landed in the class geography during the period from September to December 2010 was 3% above the average volume of landings between 2007 and 2009, and that most finfish harvests in the Gulf appear to be within or above historic trends.  *See* Fishkind Decl. ¶ 77(b); Tunnell Decl. ¶ 56.

563.    2011 NOAA landings data are consistent with these findings, according to expert declarations submitted by BP.  *See* Tunnell Supp. Decl. ¶¶ 10-11; Smith Supp. Decl. ¶ 36.

#### (1)    Vermillion Snapper

564.    According to evidence submitted by BP, landings of vermilion snapper in 2010 were approximately 2 million pounds, and preliminary data from 2011 show landings that are over 3 million pounds.  This figure is above the long-term average and approximately the same as the 2007-2009 benchmark period average.  *See* Tunnell Decl. ¶¶ 59-60.

#### (2)    Red Snapper

565.    The parties agree that the Gulf of Mexico Fishery Management Council recently approved a 25% increase in the quota for 2012 to 3.71 million pounds.  *See* Tunnell Decl. ¶¶ 61-

62.  Any declines in catch per unit effort between 2011 to the averages of 2007 to 2009 are not statistically significant, according to BP.  *See* Smith Supp. Decl. ¶¶ 37-39.

566.  According to BP, snapper IFQ markets continue to signal confidence about the future of the fishery.  *See* Smith Supp. Decl. ¶ 35.

### (3)    Red Grouper

567.  In 2011, commercial landings of red grouper were as high as they were in 2008, and well within pre-spill trends, according to BP's evidence.  *See* Tunnell Decl. ¶¶ 63-64; Tunnell Supp. Decl. ¶ 10.

### (4)    Black Drum

568.  2011 commercial landings for black drum were as high as they had been since 2004, again according to BP's evidence.  *See* Tunnell Decl. ¶¶ 65-66; Tunnell Supp. Decl. ¶ 10.

### (5)    Yellowfin Tuna

569.  BP contends that (i) the commercial yellowfin tuna harvest declined in 2010 but increased from 2010 to 2011, and (ii) recreational landings for yellowfin tuna were within pre-spill historic ranges and greater than either 2007 or 2009.  *See* Tunnell Decl. ¶¶ 67-68; Tunnell Supp. Decl. ¶ 10.

### (C)    Other Seafood

570.  According to BP, available commercial landings data for the other species included in the SCP indicate that any spill-related effects on the harvests in 2010 and 2011 were minimal.  *See* Tunnell Decl. ¶ 70; Smith Supp. Decl. ¶ 36.

### v.    Tourism

571.  BP has presented evidence that the Gulf tourism economy has experienced a robust recovery.  The evidence that BP has presented, which is discussed below, has not been meaningfully challenged by objectors with standing, though as noted in paragraph 528 it may

become contested in non-settled litigation, which the Court does not prejudge.  While the Court need not and does not find these facts to approve the Settlement, BP's evidence that tourism is recovering weighs in favor of approving the Settlement.

572.   According to expert declarations submitted by BP, New Orleans had 8.75 million visitors in 2011, with estimated spending of approximately $5.5 billion, compared to (i) 8.3 million visitors who spent just over $5 billion in 2010, and (ii) 7.5 million visitors who spent $4.2 billion in 2009.  Tourist-related tax receipts in New Orleans increased 21.2 percent from May through August 2009 to May through August 2010, and an additional 3.8 percent from May through August 2010 to May through August 2011.  BP's experts conclude from these data that visitors to New Orleans rebounded strongly following the spill, and that the growth continued into the following year.  *See* Richardson Decl. ¶¶ 41-42; Landry Decl. ¶ 47.

573.   The increase in tourism activity in New Orleans is consistent with an increase elsewhere in Louisiana, according to BP's evidence.  BP has submitted evidence that tourism-related tax collections for the summer months of May through August were higher in 2011 than 2009 according to the Jefferson Parish Convention Center Fund-Grand Isle Account, the overall Jefferson Parish Convention Center Fund, and the Terrebonne Parish Visitor Enterprise Fund. The only tourist related fund that did not show growth between 2009  and 2011, according to the evidence submitted by BP, was the Plaquemines Parish Visitor Enterprise Fund, which showed a decline of 0.5 percent.  *See* Richardson Decl. ¶¶ 43-44.

574.   By fall 2010, Revenue Per Available Room ("RevPAR"), a standard metric used to analyze tourism performance, was 7% above 2009 levels in Florida's Emerald Coast, according to evidence submitted by BP.  The evidence submitted by BP suggests that by May through August 2011, it was 12% above 2009 levels, and that in Coastal Alabama, RevPAR for

hotel rooms in fall 2010 was 22% above 2009 levels, and for condos in fall 2010 the corresponding metric was nearly equal to 2009 levels.  Growth appears to have continued into summer 2012, according to evidence submitted by BP.  *See* Fishkind Decl. ¶¶ 70-74; Landry Decl. ¶ 20.

575.    RevPAR for May to August 2011 was higher than the same months pre-spill 2009 for Louisiana, Mississippi, Alabama, and Florida, according to evidence submitted by BP.  *See* Landry Decl. ¶¶ 38-40.

576.    Gulf Coast tourism bureaus (including the Alabama Gulf Coast Convention and Visitor's Bureau, the New Orleans Convention and Visitors Bureau, the Santa Rosa County Tourist Development Council), have reported publicly on the recovery of Gulf Coast of tourism in 2011, according to BP's expert.  Fishkind Decl. ¶¶ 71-72, 74 & Ex. B;  Landry Decl. ¶¶ 40, 45-46.

577.    According to evidence submitted by BP, (i) some tourist businesses received a positive impact from the tourist-related demand, and (ii) others will benefit from the increased exposure of the area's high-quality beaches as a result of BP-funded promotional campaigns in the period after the spill.  *See* Landry Decl. ¶¶ 44-46, 48.

578.    Tourist-related taxable sales were 19% higher in May through September 2011 than the year prior, according to evidence submitted by BP.  *See* Fishkind Decl. ¶ 76.

579.    According to evidence submitted by BP, the beaches, shopping areas, and restaurants in the Gulf have all been far more crowded than last year, or any summer in recent memory.  *See* Dent Decl. ¶ 26.

        **d.**      **New Complexities And Hurdles For Plaintiffs' Claims Would Surely Arise During A Lengthy, Multi-Phased Trial Process.**

580.    Actually litigating this case would engender innumerable complexities.  Pretrial briefing has produced a wide variety of extraordinarily difficult and unprecedented legal questions.  Were the case tried, the Court would have to resolve those questions.  A series of complex appeals to the Fifth Circuit and possibly beyond would surely follow.  At the end of that lengthy litigation odyssey, however, it is unlikely that either party would be wholly successful.  The only thing that is certain is that a trial (broken down into component phases for administrability purposes) would delay payment to class members for years — likely a decade or longer.  The Settlement, by contrast, pays substantial benefits to claimants now; indeed, unlike most class settlements, the claims administration and claims payment process has commenced during, not after, the notice and Court approval process.

*   *   *

581.    For the reasons described above, all six *Reed* factors are exceeded, and each weighs strongly in favor of granting final approval to the Settlement Agreement.  Because the Court's role is to "balance[e] the six factors," *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010), the Settlement Agreement could be approved even if one or more of these factors weighed against final approval.  In this case, however, the *Reed* factors point uniformly in the direction of final approval and together they combine to make it difficult to see how the Court could refuse to grant final approval to this Settlement without abusing its Rule 23(e) discretion.

582.    The class action expert declarations submitted jointly by the parties or by Class Counsel or BP individually sum up the excellence of this Settlement well.  Professor Coffee: This Settlement is "exactly the type of outcome that OPA was intended to produce."  Coffee

166

Decl. ¶ 13.  Professor Miller:  "[T]he single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field." Miller Decl. ¶ 12.  Professor Issacharoff:  "[A]n extraordinary achievement that realizes the great objectives behind court supervised class settlements." Issacharoff Decl. ¶ 35.  Professor Klonoff: "[O]ne of the fairest and most impressive settlements I have seen in more than 20 years of practicing, teaching, and writing in the field of class actions."  Klonoff Decl. ¶ 89.

### E.    The Notice Program Surpassed The Requirements Of Due Process, Rule 23, And CAFA.

583.   Based on the factual elements of the Notice Program as detailed above, *see supra* ¶¶ 44-66, the Notice Program surpassed all of the requirements of Due Process, Rule 23, and CAFA.

584.   The notice distribution method satisfied Rule 23(c)(2), as it was the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2); *see* Azari Decl. ¶¶ 16, 79; Azari Supp. Decl. ¶ 26; Kinsella Decl. ¶¶ 7, 12.

585.   The notice contents satisfied Rule 23(c)(2)(B)(i)-(vii), as it properly stated (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance though an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment under Rule 23(c)(3).  *See* Azari Decl. ¶¶ 12, 72-76, 78; Wheatman Decl. ¶ 13.

586.   The notice complied with Rule 23(e), as it was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*,

339 U.S. 306, 314 (1950); *accord*, *e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007).

587.     The parties fully satisfied all of their obligations under the Class Action Fairness Act, 28 U.S.C. § 1715. *See supra* ¶¶ 63-64.

### F.     None Of The Objections Counsel Against Final Approval.

588.     None of the objections that have been filed counsel against final approval. *See* Balhoff Supp. Decl. ¶ 1; Fishkind Supp. Decl. ¶¶ 2-5; Henley Supp. Decl. ¶ 2; Jeffrey Supp. Decl. ¶¶ 4-7; Landry Supp. Decl. ¶¶ 6, 10-11; Miller Decl. ¶ 43; Miller Supp. Decl. ¶¶ 3, 13, 24; Pearson Decl. ¶ 3-4, 10; Perry Supp. Decl. ¶ 1; Richardson Supp. Decl. ¶¶ 3, 4-10; Sharp Supp. Decl. ¶¶ 4-5; Smith Supp. Decl. ¶¶ 2, 4-8, 53; Taylor Supp. Decl. ¶¶ 3-4, 7; Tunnell Supp. Decl. ¶¶ 3, 19; Wharton Supp. Decl. ¶ 2; Klonoff Supp. Decl. ¶ 2.  Settlements are compromises, and the fact that some class members wish BP had paid more compensation is no reason to reject the Settlement. *See* Miller Supp. Decl. ¶ 23; Klonoff Supp. Decl. ¶¶ 5, 12.

589.     Nevertheless, that so many purported objectors who are not in the settlement class wish the class were expanded to include them is further evidence of the fairness, reasonableness, and adequacy of the Settlement Agreement, and a rare phenomenon the legal scholars all remarked upon. *See* Klonoff Decl. ¶ 66; Miller Decl. ¶ 44; Klonoff Supp. Decl. ¶ 8. *See generally infra* ¶¶ 593-594.

### i.     Standing Is Required To Present A Valid Objection.

590.     In the context of class settlements, non-settling parties have no standing to challenge the proposed settlement. *See Transamerican Refining Corp. v. Dravo Corp.*, 952 F.2d 898, 900 (5th Cir. 1992); *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992); *In re Vioxx Prods. Liab. Litig.*, 388 F. App'x 391, 395 (5th Cir. 2010) (per curiam). The Court has made this point abundantly clear. *See, e.g.*, Nov. 8 Fairness Hr'g Tr. at 15:1-4 (The Court: "If

you opt out or if you are excluded, you legally have no standing to object to the settlements because . . . the settlements do not affect your rights in any way, one way or the other.").

591.    The burden is on putative objectors to demonstrate that they have standing. *See, e.g., Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579 (5th Cir. 2007) (per curiam) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("[E]ach element [of the standing inquiry] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.")).  Because the Court is considering a request to enter a final judgment based in part on facts submitted by the parties that can be contested by objectors with standing, *Lujan* counsels that the Court should demand at least the same degree of proof of standing that it would in considering a motion for summary judgment, if not the proof that it would require at trial to prove a disputed fact.

592.    Reflecting the standing requirements, Paragraph 38 of this Court's preliminary approval order established clear requirements that each objection must satisfy in order to be considered.

> The written statement of the objection(s) must include (a) a detailed statement of the Economic Class Member's objection(s), as well as the specific reasons, if any, for each objection, including any evidence and legal authority the Class Member has to support each objection and any evidence the Class Member has in support of his/her/its objection(s); (b) the Economic Class Member's name, address and telephone number; (c) written proof that the individual or entity is in fact an Economic Loss and Property Damage Class Member, such as proof of residency, ownership of property and the location thereof, and/or business operation and the location thereof; and (d) any other supporting papers, materials or briefs the Economic Class Member wishes the Court to consider when reviewing the objection. Any Class Member who fails to comply with these provisions shall waive and forfeit any and all rights to object to the Proposed Settlement, shall be forever foreclosed from making any objection to it, and shall be bound by all the terms of the Proposed Settlement and by all proceedings, orders and judgments in this matter.

Rec. Doc. 6418 ¶ 38.[37]

### a.    Plaintiffs Falling Outside The Settlement Class Lack Standing.

593.    Plaintiffs falling outside the settlement class are entirely unaffected by the Settlement, and thus lack standing to challenge it.  *See* Rec. Doc. 6418 at 16-17; Apr. 25 Preliminary Approval Hr'g Tr. at 48:20-49:1; Rec. Doc. 7038 at 1; *Feder*, 248 F. App'x. at 580; *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989); 4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.).  That doctrine stems from the fundamental purpose of fairness review under Rule 23(e) — to ensure that absent class members are not bound by an unfair settlement.  *Piambino v. Bailey*, 610 F.2d 1306, 1327 (5th Cir. 1980); *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176-77 (5th Cir. 1975); Klonoff Decl. ¶ 63.

594.    The Court has received numerous objections for persons falling outside the Settlement Class — persons asserting claims that the parties have not agreed to settle,[38] persons falling outside the Settlement's geographic boundaries,[39] etc.  Because the Settlement Agreement

---

[37] To the extent the Court responds substantively to objections submitted by parties lacking standing, it does so only in the interest of completeness.

[38] *See, e.g.*, Obj. Doc. 34 (unrealized reduction in property value); Obj. Doc. 36 (similar); Obj. Doc. 43 (similar); Obj. Doc. 201 at 4-5 (similar); Obj. Doc. 35 (real estate sale after December 31, 2010); Obj. Doc. 46 (same); Obj. Doc. 49 (same); Obj. Doc. 67 at 1-2 (same); Obj. Doc. 90 at 13-14 (same); Obj. Doc. 152 at 2 (same); Obj. Doc. 191 (same); Obj. Doc. 253 (same); Obj. Doc. 37 (mortgage brokers); Obj. Doc. 66 (employment in oil and gas industry); Obj. Doc. 95 at 5 (oil companies and banks); Obj. Doc. 210 (adopting this objection); Obj. Doc. 131 (moratorium claims); Obj. Doc. 201 at 2-3 (moratorium claims); Obj. Doc. 161 at 1-2 (day trading losses allegedly related to the spill); Obj. Doc. 252 (loss of earnest money following decision not to close on house); Obj. Doc. 265 (supplement to Obj. Doc. 145) at 4 (gaming industry, financial institutions, etc.); Rec. Doc. 6345 (BP dealer claims); Rec. Doc. 6382 (same).

[39] *See, e.g.*, Obj. Doc. 33 (exclusion from economic loss frameworks); Obj. Doc. 42 (exclusion from Coastal Real Property Zone); Obj. Doc. 49 (real estate sale after December 31, 2010); Obj. Doc. 87 at 2-3 (exclusion from Coastal Real Property zone); Obj. Doc. 121 (exclusion from SCP); Obj. Doc. 134 at 1 (exclusion from Real Property Sales Compensation zone); Obj. Doc. 148 at 2 (exclusion from Coastal Real Property zone); Obj. Doc. 152 at 1-2 (exclusion from Real Property Sales Compensation zone); Obj. Doc. 167 at 6 (exclusion from unspecified frameworks); Obj. Doc. 189 at 6 (same); Obj. Doc. 201 at 4-7 (exclusion from Coastal Real Property zone); Obj. Doc. 225 at 3-8 (same); Obj. Doc. 237 (exclusion from economic loss frameworks); Obj. Doc. 259 (exclusion from Coastal Real Property zone); Rec. Doc. 6317 (exclusion from entire Settlement); Rec. Doc. 6383 (exclusion from SCP); Rec. Doc. 6404 (exclusion from economic loss frameworks); *see also* Letter From Pam Bondi, Fla. Att'y Gen., to John E. (Jack) Lynch, Jr. (July 31, 2012), *available at* http://myfloridalegal.com/webfiles/WF/MMFD-8WRSHG/$file/8.1.12BPMEMO.pdf (complaining that certain Floridians are excluded from the class).

does not affect these persons' legal rights, their claims remain live and they may litigate their cases as they please.  They accordingly lack standing.

595.    For the same reason, objectors who settled their claims with the GCCF lack standing.[40]  By the express terms of the Settlement Agreement, such persons are excluded from the Settlement Class, which means that the Settlement Agreement has no effect upon their legal rights.  Moreover, the Court has denied a motion to globally nullify the GCCF releases.  *See* Rec. Doc. 7615 (denying Rec. Doc. 6831; Rec. Doc. 6902; Rec. Doc. 7473 (initially filed as Rec. Doc. 7461)).

596.    The GCCF-releases exclusion from the class is easily administered.  All that the CSSP needs to do is determine whether a claimant has signed a GCCF release.  Anyone who has done so is simply not a class member.  The CSSP does not need to, and indeed is not empowered to, question or adjudicate the validity of a particular GCCF release as a factual matter.  That is an issue that can be pursued only by means of cases brought for resolution to this Court or to another appropriate court with venue and jurisdiction, at which point it would be for BP to decide whether to assert such a GCCF release as a defense and then for such a plaintiff to attempt to establish that such a release is invalid so as to overcome the defense.  *See* Rec. Docs. 7643 and 7469 (*Knotty Girl* Order and underlying opposition brief).

#### b.        Non-Settling Defendants Lack Standing.

597.    Non-settling defendants who will suffer "plain legal prejudice" as a result of a settlement have sometimes been held to have standing to challenge the settlement.  *Agretti*, 982

---

Additionally, a series of form objectors, recognizing that their properties fall outside both the Coastal Real Property zone and the Wetlands Real Property zone, describe themselves as "potential" members of the class.  *See, e.g.*, Obj. Doc. 88 at 1; Obj. Doc. 97 at 1; Obj. Doc. 98 at 1; Obj. Doc. 99 at 1; Obj. Doc. 100 at 1; Obj. Doc. 146 at 1; Obj. Doc. 157 at 1; Obj. Doc. 159 at 1; Obj. Doc. 177 at 1; Obj. Doc. 181 at 1.  These objectors also lack standing.

[40] *See, e.g.*, Obj. Doc. 70; Obj. Doc. 71; Obj. Doc. 125; Obj. Doc. 127; Obj. Doc. 154 at 2; Obj. Doc. 230 at 39-43; Obj. Doc. 234 at 34-36; Obj. Doc. 242; Obj. Doc. 244; Obj. Doc. 250; Obj. Doc. 262.

F.2d at 246-47.  In this case, non-settling defendants such as Halliburton lack standing because the Settlement Agreement does not cause them plain legal prejudice.  *See* Rec. Doc. 6418 at 17 n.18; Rec. Doc. 7038 at 2.

598.    Even if the Court did consider the objections that have been filed by Halliburton, *see* Rec. Doc. 6350; Rec. Doc. 7036; Obj. Doc. 91, the Court finds them unavailing and irrelevant to final approval of the Settlement Agreement.

### c.        GO FISH Lacks Standing.

599.    Although GO FISH has submitted an objection, *see* Obj. Doc. 226, it lacks standing; no organization may represent its members where the underlying form of relief at issue is money damages.  *See* Rec. Doc. 7747, *aff'g* Rec. Doc. 7480.

### d.        The Gulf States Lack Standing.

600.    The Gulf States, which are obviously not members of the settlement class, lack standing to submit objections.[41]  *See* Rec. Doc. 7038.

### i.        No CAFA Standing

601.    The Gulf States do not acquire standing under CAFA's notification provision, 28 U.S.C. § 1715. This statute simply requires notification; it does not create standing that a state official otherwise lacks.  *See* 28 U.S.C. § 1715(f) ("Nothing in this section shall be construed to expand the authority of . . . State officials."); *In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 09-2107, 2012 WL 4322012, at *4 (E.D. Pa. Sept. 21, 2012) ("The statute says nothing . . . of granting states a right to be heard on, or formally appeal, every class action settlement simply because residents of that state are class members.").  Nevertheless, the Court has given the States' comments due consideration, as addressed more fully herein.

---

[41] *See, e.g.*, Rec. Doc. 6356 (Mississippi); Rec. Doc. 6370 (Mississippi); Rec. Doc. 6239 (Florida); Obj. Doc. 224 (Mississippi); Obj. Doc. 227 (Louisiana).

### ii.     No *Parens Patriae* Standing

602.    The Gulf States may not invoke the *parens patriae* doctrine, as any challenge to the Settlement Agreement simply represents an effort to advance the particular financial interests of a subset of these states' citizens.  But while "a State may, for a variety of reasons, attempt to pursue the interests of a private party, and pursue those interests only for the sake of the real party in interest . . . *Interests of private parties are obviously not in themselves sovereign interests*, and they do not become such simply by virtue of the State's aiding in their achievement.  In such situations, the State is no more than a nominal party."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 602 (1982) (emphasis added).  At bottom, "the State *must articulate an interest apart from the interests of particular private parties*."  *Id.* at 607 (emphasis added); *see also Paterson v. Texas*, 308 F.3d 448, 451 (5th Cir. 2002) (overruling Texas' Attorney General's objections to a class action settlement for lack of standing).

### iii.     No Injury To The States

603.    Louisiana and Mississippi have contended that they have standing because the Settlement inadequately compensates their citizens and requires those states to pay more in unemployment insurance and other benefits.  *See* Rec. Doc. 7035 at 5 (Louisiana); Obj. Doc. 224 at 13 (Mississippi).  This argument would logically give standing to any state to challenge *any* settlement of a private dispute; thus, similar arguments have been repeatedly rejected by federal courts.  *See Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985); *People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 225 (C.D. Ill. 1989).

iv.     **The Gulf States Doubly Lack Standing Where They Seek To Assert The Rights Of Citizens Who Also Lack Standing.**

604.    Florida has argued that some of its citizens who are geographically excluded from the Settlement Class should be included.  *See* Rec. Doc. 6239.  Similarly, Mississippi has argued that certain of its citizens who are excluded from the Settlement Class because they signed GCCF releases should be included. *See* Obj. Doc. 224 at 2; Rec. Doc. 6370; *see also* Obj. Doc. 239 (adopting the arguments made by Mississippi).  These objections are inappropriate not only because the States lack standing, but because they seek to assert objections on behalf of others who themselves ***also*** lack standing.

*   *   *

605.    Although the Court concludes that the States lack standing, it has nevertheless given the States' submissions due consideration, whether styled as objections or *amicus* filings, and finds nothing in them that counsels meaningfully against approval of the Settlement Agreement.

ii.     **The Court Has No Authority To Modify A Settlement Agreement That Is Fair, Reasonable, And Adequate.**

606.    Certain objectors have suggested that the Court should "provisionally approve" the Settlement Agreement, contingent upon the parties' agreeing to certain modifications.  *See, e.g.* Nov. 8 Fairness Hr'g Tr. 232:7-10.

607.    Because the Settlement is fair, reasonable, and adequate, however, the Court is not authorized to insist upon changes that, in its judgment, might lead to a superior settlement. As the Court explained at the fairness hearing, the sole issue before the Court is "do I approve this settlement as fair, reasonable and adequate? Maybe it's not perfect. I don't think there is such a thing as a perfect settlement."  Nov. 8 Fairness Hr'g Tr. at 115:19-21; *see also, e.g.,*

174

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness. Neither the district court nor this court have the ability to delete, modify, or substitute certain provisions.") (citations and quotations omitted); *Dandridge v. Jefferson Parish Sch. Bd.*, No. 64-14801, 2009 WL 24461, at *3 (E.D. La. Jan. 5, 2009) ("It is also important to note that, although the Court has the power to approve or reject a settlement negotiated by the parties, the Court may not require the parties to accept a settlement or a consent order to which they have not agreed."). Rather, the imposition of conditions upon a grant of final approval is *only* appropriate where, absent modifications, the settlement would fail to satisfy the Rule 23(e) analysis.   Objectors wrongly urge the Court to pervert the device of conditional approval to cause the terms of an ample and fair settlement to be renegotiated in the guise of reviewing it pursuant to Rule 23(e).

### iii.    Procedural Objections To The Settlement Agreement Lack Merit.

#### a.    The Court Supervised Settlement Program Is Processing Claims Expeditiously.

608.    Certain objectors claim that the Settlement Program is not processing claims sufficiently quickly.  *See, e.g.*, Obj. Doc. 58 at 1; Obj. Doc. 122 at 9; Obj. Doc. 167 at 11; Obj. Doc. 189 at 11; Obj. Doc. 207 at 5.  This objection is meritless for two reasons.

609.    *First*, as a matter of general class action settlement law, there is no requirement that the Settlement Program pay any claims at this stage of the litigation.  In a typical class settlement, claims are not processed and there are no settlement payments at all until after final approval by the district court, and many class settlements also withhold payments until all appeals have run.  *See* Rec. Doc. 6418 at 31-32; Coffee Decl. ¶ 59; Monger Decl. ¶¶ 8-9.  By contrast, the Parties' claim-management expert estimates that "the Settlement Program will pay

over 30,000 claims before the *Vioxx* settlement ever made its first payments when comparing timelines of the two matters."  Monger Suppl. Decl. ¶ 13.

610.    *Second*, the Settlement Program is processing claims impressively quickly, especially in comparison to other claims matters, and the pace of claims determination should improve with time.  *See* Nov. 8 Fairness Hr'g Tr. at 100:5-9 (Claims Administrator:  "I've never been involved in a project that has gotten up this quick, had the involvement with the volume we had to deal with, and to either have started it earlier or gotten it paid this quickly.  It's been a remarkable experience for me."); Monger Supp. Decl. ¶¶ 6, 7-8, 12, 14-15, 32-35.  "The pace of payment determinations and payments is very high in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time."  Monger Supp. Decl. ¶ 6.

611.    As noted above, in its first several months of operation, the Settlement Program has already authorized payments of $1.3 billion.  *See supra* ¶ 67.

### b. Claimants Have No Right To Know Their Exact Compensation Amount Prior To The Opt-Out Date.

612.    Some objectors contend that the Settlement Agreement is unfair because the Settlement Program did not determine the precise award to which they were entitled prior to the opt-out date.[42]  These objections are meritless for three reasons.

613.    *First*, as Magistrate Judge Shushan has concluded, "[a]ny class member seeking to determine his compensation may simply read the settlement agreements and determine how his circumstances fit into the frameworks."  Rec. Doc. 7480 at 6.  In all cases, the frameworks

---

[42] *See* Obj. Doc. 88 at 2; Obj. Doc. 95 at 5; Obj. Doc. 210 (adopting this objection); Obj. Doc. 97 at 2; Obj. Doc. 98 at 2; Obj. Doc. 99 at 2-3; Obj. Doc. 100 at 1-2; Obj. Doc. 115 at 4; Obj. Doc. 122 at 17; Obj. Doc. 141 at 2; Obj. Doc. 146 at 2-3; Obj. Doc. 157 at 2-3; Obj. Doc. 159 at 2-3; Obj. Doc. 167 at 5; Obj. Doc. 177 at 2, 4; Obj. Doc. 178 at 3-4; Obj. Doc. 181 at 2, 4; Obj. Doc. 189 at 5; Obj. Doc. 209 at 3-5.

are detailed and transparent and a claimant can make a reasonable determination of how his claim will be resolved based on his or his business's circumstances.

614.    *Second*, "there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d. Cir. 1972); *accord Reed*, 703 F.2d at 173 ("range of possible recovery" in determining reasonableness); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1067.  For that reason, class members do not need to be able to pinpoint the compensation for which they will be eligible in order to decide whether to remain in the Settlement Class.  In most class settlements, absent the simplest formula that provides each class member with the same fixed amount, the exact amount is not known at either the opt-out or the final approval stage.

615.    *Third*, and most critically, in a typical class settlement, claims are not processed and there are no settlement payments at all until after final approval by the district court, and many class settlements also withhold payments until all appeals have run.  *See supra* ¶ 609.

### c.    It Is Appropriate And Reasonable To Require An Individual Signature On Opt-Out Requests.

616.    Certain objectors contend that the Settlement is unfair because the parties did not provide an opt-out form or make it possible to opt out electronically.  *See, e.g.*, Obj. Doc. 122 at 15-21; Obj. Doc. 209 at 5-6.  Neither is required under Rule 23 or specified by the *Manual for Complex Litigation*.  This objection has no bearing on the fairness of the Settlement.  Indeed, the Court's Preliminary Approval Order specifically approved the relevant opt-out procedures, *see* Rec. Doc. 6418 at 40, and the procedures were disclosed in the notice approved by the Court and sent to class members.  *See* Azari Decl. at 56.  No objections to the opt-out procedures were lodged for several months after preliminary approval.

617.   Similar requirements are routine and routinely enforced.  *See, e.g.*, *Moulton*, 581 F.3d at 355; *De Leon v. Bank of Am., N.A. (USA)*, No. 09-1251, 2012 WL 2568142, at *20 (M.D. Fla. Apr. 20, 2012); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *15; *In re Dow Corning Corp.*, No. 05-30387, 2007 WL 1028644, at *2 (E.D. Mich. Mar. 31, 2007).

### d.   The Settlement Program Has Provided Ample Support To Claimants.

618.   Certain objectors complain about the advice available through the Settlement Program's regional offices.  *See* Obj. Doc. 142 at 2-3; Obj. Doc. 154 at 2-3.  These isolated complaints do not call into question the competence of a Settlement Program that has provided support to thousands of class members.  *See supra* ¶¶ 76-79.  *See generally* Monger Decl.

619.   Other objectors complain that the Settlement does not increase payments to cover claimants' private attorneys' fees.  *See* Obj. Doc. 162 at 3.  Because neither OPA nor maritime law would impose any relevant obligation for BP to pay the plaintiffs' fees if this case were litigated, *see* Rec. Doc. 3830 at 35-37, BP would not be required to pay individual attorney's fees if it were found liable in litigation.  Particularly given BP's agreement not to oppose a substantial award of common benefit fees to be paid in addition to compensation paid to claimants and other benefits under the Settlement, there is no requirement that BP separately pay the cost of individual attorneys.  The Court has exercised its case management/class action authority to ensure the reasonableness and consistency of private attorneys' fees in connection with the Settlement by setting a presumptive fee cap of 25% plus reasonable costs.  *See* Rec. Doc. 6684.

620.   Other objectors complain that the amount of accounting fees reimbursable under the Settlement Agreement is limited to 2% of an individual claimant's recovery.  *See* Obj. Doc. 167 at 9; Obj. Doc. 189 at 9.  The reimbursement available under the Settlement, however, is

more than sufficient.  *See* Sharp Supp. Decl. ¶ 23; Henley Supp. Decl. ¶ 8; *supra* ¶ 88.  (In comparison, persons submitting claims to the National Pollution Funds Center may only be reimbursed for the reasonable cost of assessing damage, and not the cost of submitting a claim. *See* National Pollution Funds Center, Claimant's Guide:  A Compliance Guide For Submitting Claims Under The Oil Pollution Act of 1990, at 5, *available at* http://www.uscg.mil/ npfc/docs/PDFs/urg/Ch6/NPFCClaimantGuide.pdf.)   Similarly, the objection that accounting firms will refuse to prepare financial statements out of concern for liability, *see* Obj. Doc. 186 at 17, is not credible.  Sharp Supp. Decl. ¶¶ 25-26.  This objection also is negated by the Settlement Program's policy that Business Economic Loss claimants that lack monthly financial statements and are unable or unwilling to have them prepared may submit their contemporaneous business records as "alternate source documents" to the Settlement Program, which will prepare the financial statements needed to process the claim.  *See* Settlement Agreement ¶ 38.38, Ex. 4A ¶ 4; *see also* Deepwater Horizon Claims Center, Economic and Property Damage Claims, Reminder Regarding Documentation Requirements for Business Economic Loss ("BEL") Claims, http://www.deepwaterhorizoneconomicsettlement.com/docs/Alert_Reminder_ Regarding_Documentation_Requirements_for_BEL_Claims.pdf; *supra* ¶ 88.

     **e.**   **BP Has Met Its Obligations To Accept Interim OPA Claims.**

  621. Certain objectors contend that the Court's final approval of the Settlement Agreement will interfere with BP's obligation under OPA to pay interim claims.[43]  Because anyone may elect not to participate in the Settlement and instead submit claims, including interim claims, to BP's OPA claims facility, *see* http://www.bp.com/claims, this objection is meritless.  *See* Rec. Doc. 6418 at 18 n.19.

---

[43] *See, e.g.*, Obj. Doc. 136; Obj. Doc. 156 at 6; Obj. Doc. 167 at 9-10; Obj. Doc. 189 at 9-10; Obj. Doc. 227 at 23-24; *see also* Rec. Doc. 6239 at 4-5.

**f.      The Parties Did Not Make Improper Use of GCCF Data.**

622.     Certain objectors complain that it was improper for the GCCF to share information with BP and the PSC.  *See* Obj. Doc. 198 at 14, 18.  As the Court has previously recognized, "all information gathered from claimants will be turned over to BP, with no restrictions as to its use."  Rec. Doc. 1098 at 9-10.  Moreover, the design of OPA's presentment provision contemplates the sharing of information necessary to support a valid claim with the responsible party.  *See* 33 U.S.C. § 2713; *see also Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995); *Turner*, 2007 WL 4208986, at *2.

623.     Additionally, the PSC had access to GCCF payments data because the GCCF posted such data on its web site and because members of the PSC represented clients who had submitted GCCF claims.  *See supra* ¶ 466.  It is inaccurate to contend that BP had an unfair negotiating advantage.

**g.      The Settlement's Provisions For Minors And Incompetents Are Reasonable.**

624.     The Settlement Agreement's provisions for minors and incompetents are fair, reasonable, and adequate.  *See* Rec. Doc. 7536 (report of guardian *ad litem* Professor P. Raymond Lamonica); Rec. Doc. 7462 (order for processing claims on behalf of deceased, minor, and incompetent claimants).  Objections to the contrary, *see* Obj. Doc. 68 at 1; Obj. Doc. 193 at 1, are rejected.

**h.      The Settlement's Appellate Procedures Benefit Claimants.**

625.     One objection suggests that BP's limited appellate rights under the Settlement Agreement are unfair to claimants.  *See* Obj. Doc. 101 at 3, 29.  In reality, both BP and class members have appellate rights, though class members' rights are considerably more expansive. *See* Settlement Agreement ¶ 6.1.2.4; *supra* ¶ 94.

626.     Because appellate proceedings ensure that Settlement payments comply with the terms of the Settlement Agreement, they reduce uncertainty.  *See* Klonoff Supp. Decl. ¶ 25.  For that reason, numerous courts have approved settlements with appellate procedures.  *See, e.g., Morris v. Voinovich*, 106 F. App'x. 962, 964 (6th Cir. 2004) (per curiam); *In re Serzone Prods. Liab. Litig.*, MDL No. 1477, 2006 WL 2345988, at *1-2 (S.D. W. Va. 2006); *Foreman v. Wood, Wire & Metal Lathers Int'l Union, Local No. 46*, 557 F.2d 988, 991 (2d Cir. 1977).

627.     BP represents that it has appealed only 1.1% of Settlement Program determinations finding a claimant eligible for payment.

### iv.    Substantive Objections To The Settlement Agreement Lack Merit.

628.     The substantive objections to the Settlement Agreement uniformly lack merit.

### a.    BP Has Taken A Reasonable Position As To Its Liability.

629.     According to Louisiana (which lacks standing, as noted *supra*), the Settlement is deficient because it fails to acknowledge BP's unlimited and strict liability.  *See* Obj. Doc. 227 at 16.  BP has colorably contended that there are a number of doctrines that could limit its liability in any trial of this matter and Louisiana simply ignores the risk to it and other plaintiffs (including class members here) that such defenses would prevail in future litigation, if conducted.  Moreover, BP has, despite these defenses, agreed to make the class members entirely whole for their compensatory damages, and in many cases more than whole, especially as to claimants eligible to claim augmentations of their recoveries via RTPs.  *See supra* ¶¶ 100-101.  This objection accordingly lacks merit.

### b.   Objections To The Economic Damage Compensation Frameworks Lack Merit.

### i.   The Economic Loss Zones Are Reasonable.

630.   Various objectors complain about the zone in which they are located.[44]  But as noted above, *see supra* ¶ 122, the economic loss zones reasonably reflect the likelihood that a given class member suffered economic damage as a result of the spill.

631.   As Class Counsel has explained, the zones "were the subject of months and months of negotiations, of people sitting in rooms and going back and forth on maps and looking at the specific businesses; in fact, driving around across the coast to see where these boundaries were."  Nov. 8 Fairness Hr'g Tr. at 35:9-13.  As BP explained, they were "designed to reflect that as distance from the Gulf beaches increases, the possibility of economic damage due to the spill decreases.  It's not only common sense, it's economic reality."  *Id.* at 169:6-10.

632.   It is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims.  *See, e.g.*, *Reed*, 703 F.2d at 175; *Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1146 (8th Cir. 1999) (rejecting objectors' "challenge [to] the propriety of the award of compensation to the holders of property in Zone A, which was far greater than the compensation to the holders of property in Zone B, which in turn was far greater than the compensation to holders of property in Zone C"); *Turner*, 234 F.R.D. at 604; *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 342-43 (N.D. Ga. 1993); *see also* Miller Supp. Decl. ¶ 12 ("A class action settlement is not objectionable merely because it

---

[44] *See* Obj. Doc. 45; Obj. Doc. 61 at 4; Obj. Doc. 62 at 1; Obj. Doc. 72 at 1; Obj. Doc. 89; Obj. Doc. 90 at 2-7; Obj. Doc. 94; Obj. Doc. 115 at 3-10; Obj. Doc. 116; Obj. Doc. 117 at 3-7; Obj. Doc. 261 (supplement to this objection); Obj. Doc. 118 at 2; Obj. Doc. 138; Obj. Doc. 151; Obj. Doc. 162 at 2; Obj. Doc. 178 at 4-5; Obj. Doc. 184 at 2-5; Obj. Doc. 186 at 12-13; Obj. Doc. 189 at 6-7; Obj. Doc. 198 at 21-26; Obj. Doc. 201 at 3-4; Obj. Doc. 206 at 1; Obj. Doc. 223-1 at 1-12; Obj. Doc. 224 at 1-12; Obj. Doc. 232; Obj. Doc. 246 at 2-4; *see also id.* at 5 (complaining that community shopping centers are not treated as tourist destinations); Obj. Doc. 265 (supplement to Obj. Doc. 145) at 2; Rec. Doc. 6404.

draws lines, as long as the distinctions made reflect an informed effort to allocate settlement benefits across class members in reasonable proportion to their damages and the strength of their claims."). Disputes over where lines should be drawn do not call into question the reasonableness of the lines. *See* Nov. 8 Fairness Hr'g Tr. at 105:6-106:6 (The Court: "I'm trying to understand your logic here, because if you admit that you have to draw a line somewhere, if you draw the line where you wanted to draw it, then there could be a business across that highway or that street who could make the same argument, right? . . . Where would you draw the line, then? I don't understand the logic of what you're arguing."). Objectors' counsel provided no reasonable answers to questions like these. BP's economist and hospitality industry experts reviewed these objections, and found that they did not change their opinions that the Economic Loss Zones are fair, reasonable and adequate. Fishkind Supp. Decl. ¶¶ 24-25; Landry Supp. Decl. ¶¶ 12-26; Richardson Supp. Decl. ¶ 7.

633.    Here, a claimant's zone location does not preclude recovery; it only determines whether he will receive an enhanced opportunity for recovery, including (i) a presumption of causation that eliminates the claimant's obligation to establish causation, and/or (ii) additional recovery beyond actual compensable losses in the form of a larger RTP. Any claimant in any zone can recover if the claimant can establish causation and damages according to clearly defined criteria supported by objective economic data.

### ii.    Limiting The Compensation Period To 2010 Is Reasonable.

634.    Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011.[45]

---

[45] *See, e.g.*, Obj. Doc. 86 at 6-7; Obj. Doc. 95 at 7; Obj. Doc. 210 (adopting this objection); Obj. Doc. 103; Obj. Doc. 126; Obj. Doc. 201 at 3-4.

Yet this provision is reasonable for three reasons:  (i) the Macondo well ceased flowing in July 2010; (ii) by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels, according to BP's evidence; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010.   Thus, extending compensation to 2011 would cover losses not caused by the spill.  *See* Fishkind Decl. ¶¶ 32, 61.

### iii.    Objections To The Business Economic Loss Framework Lack Merit.

635.    Very few objections have been submitted to the Business Economic Loss Framework, and those that have been submitted fail.

### (A)    General Business Economic Loss Framework

### (1)    Base Compensation

### (a)    Benchmark Period

636.    Certain objectors contend that the Benchmark Period options are unfair because they require some consideration of 2009, which these objectors contend was a recessionary year. *See* Obj. Doc. 95 at 7-8; Obj. Doc. 210 (adopting this objection); Obj. Doc. 198 at 34-38; Obj. Doc. 155 at 1.  There is no basis for this objection.

637.    *First*, a business's most recent experience is widely accepted as the most accurate predictor of its future performance.  *See* Sharp Supp. Decl. ¶ 15; Landry Supp. Decl. ¶ 29.

638.    *Second*, because the Louisiana economy did not take a general downward turn until the first quarter of 2009, a Benchmark Period that averages 2007, 2008, and 2009 is highly favorable to claimants.  *See* Richardson Decl. ¶ 39; Landry Supp. Decl. ¶ 29.

639.    *Finally*, the RTPs are more than sufficient to overcome the purported disadvantages of including 2009 in the benchmark periods.  *See* Fishkind Decl. ¶¶ 33, 70-78.

**(b)     Causation**

640.     Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located.  Obj. Doc. 120 at 4-8; Obj. Doc. 206 at 2.  The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly favorable to claimants, which is why they were negotiated by experienced counsel in consultation with the clients and experts.  Claimants unable to satisfy any of the causation standards would likely encounter litigation difficulties.  *See* Fishkind Supp. Decl. ¶ 20.

641.     Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period.  *See* Obj. Doc. 198 at 8, 26-34.  This provision is reasonable, as losses that continued after the spill are likely to be due to factors other than the spill.  Moreover, many businesses will satisfy this test.  *See* Fishkind Decl. ¶ 61; Landry Supp. Decl. ¶¶ 12-19; Fishkind Supp. Decl. ¶¶ 11-12, 14, 20, 25.

642.     Finally, one objection complains that class members must satisfy a specified percentage of loss to invoke a causation test, though they do not indicate which test they are complaining about.  *See* Obj. Doc. 115.  Yet lines must be drawn somewhere, and the objectors have failed to demonstrate that the line drawn here was not reasonable.  *Warfield v. Fidelity & Deposit Co.*, 904 F.2d 322, 327 (5th Cir. 1990).

**(c)     Growth Factors**

643.     One objection contends that the Business Economic Loss Framework is unfair because it caps year-to-year growth at a maximum of 10%.  *See* Obj. Doc. 95 at 7; Obj. Doc. 210 (adopting this objection).  This objection misreads the Settlement Agreement.  All Business

Economic Loss claimants benefit from a 2% General Adjustment Factor, meaning that the true cap on revenue growth is 12%. *See* Settlement Agreement Ex. 4C at 2. Moreover, the cap was part of a negotiated compromise in which BP agreed that a negative growth factor would not be applied even to claimants who had experienced negative growth. Such a compromise is certainly reasonable given the recession that began in 2008 and the low rate of economic growth. *See* Fishkind Decl. ¶ 96; Sharp Decl. ¶ 56. Finally, growth exceeding 12% in one year is no guarantee that such growth would continue *ad infinitum*; claimants would be hard-pressed to prove as much in court.

### (d)  Offset Provisions

644.  One objector complains that GCCF payments are deducted from payments received from the Settlement Program. *See* Obj. Doc. 132 at 2. As noted above, however, this is a fair and reasonable method to avoid double compensation. *See supra* ¶ 128.

### (2)  Documentation

645.  Objections to the requirement that business claimants provide monthly profit and loss statements, *see* Obj. Doc. 122 at 13-14; Obj. Doc. 186 at 13-18; Obj. Doc. 198 at 41, are baseless, as (i) the majority of businesses keep such records in the ordinary course of business; (ii) accounting assistance is available for businesses that need to create such records; and (iii) the Settlement Program will accept "alternate source documents" and create monthly records on the claimants' behalf. *See* Sharp Decl. ¶ 12; Henley Decl. ¶¶ 9, 23; Landry Supp. Decl. ¶¶ 27-28; Henley Supp. Decl. ¶ 8; Sharp Supp. Decl. ¶¶ 24-26; Deepwater Horizon Claims Center, Economic and Property Damage Claims, Reminder Regarding Documentation Requirements for Business Economic Loss ("BEL") Claims, http://www.deepwaterhorizoneconomicsettlement.com/docs/Alert_Reminder_Regarding_Documentation_Requirements_for_BEL_Claims.pdf.

646.     An additional objection complains that claimants with annual revenues of less than $75,000 per year are required to submit additional documentation as to their losses.  *See* Obj. Doc. 265 (supplement to Obj. Doc. 145) at 2.  The objection misreads the Settlement; these requirements **only** apply to businesses availing themselves of the Causation Proxy Claimant method of proving causation, and the flexibility this method provides is favorable to class members.  *See supra* ¶ 125.

647.     One objector sought clarification that a business claimant in a county that does not issue occupational licenses should not be required to provide a copy of such a license because it does not exist.  *See* Obj. Doc. 241.  Indeed, there was never a requirement for a claimant in a locality where the local government does not issue occupational licenses to provide a copy of such a license.  *See* Settlement Ex. 4A ¶ 7.  Moreover, the Settlement Program, with agreement of the Parties, has implemented a claimant-friendly policy in which no claimant is required to provide an occupational license even if located in a county where such licenses are issued.  *See* Rec. Doc. 7466 at 1.

### (3)     RTPs

648.     Certain objectors complain about the RTP assigned to their type of claim.  *See, e.g.*, Obj. Doc. 59; Obj. Doc. 132 at 2; Obj. Doc. 162 at 2-3; Obj. Doc. 198 at 38-40; Obj. Doc. 257.  These objectors provide no objective evidence that the RTPs are inadequate, and thus the objections fail to overcome the presumption in favor of fairness that attends to any voluntarily negotiated settlement.  Still less can they overcome the specific declarations submitted to support the generosity of each of the frameworks and the generosity of the RTPs (where applicable).[46]

---

[46] *See generally* Rec. Doc. 7714-4 to Rec. Doc. 7714-5; Rec. Doc. 7714-9; Rec. Doc. 7714-11 to 7114-23; Rec. Doc. 7731-1 to Rec. Doc. 7731-14.

(B)     **Failed Business And Failed Start-Up Business**

(1)     **Failed Business Framework**

649.     Certain objectors contend that (i) the Failed Business Framework should permit more compensation, as failed businesses are deprived of years of future revenues, and (ii) the EBITDA multiplier should be higher.  *See* Obj. Doc. 54; Obj. Doc. 265 (supplement to Obj. Doc. 145) at 2-3.  These objections fail because the Settlement reasonably compensates the owners of failed businesses for the entire value of their firm, providing them with capital that they may use to generate future revenues.  *See supra* ¶ 140.  The multipliers used in these frameworks were derived from Pratt's Stats, a standard source.  *See id.*

650.     An objection contends that the Failed Business Framework is unfair because failed businesses in the seafood industry are treated the same as failed businesses in other industries.  *See* Obj. Doc. 86 at 7.  Because the industry multipliers are determined from a database meant to determine the correct ratio of the business's value to its past twelve months of EBITDA, this objection has no merit.  *See supra* ¶ 140.

651.     One objection complains that the Failed Business Framework requires class members to certify that as of May 1, 2010, (i) they had not initiated a bankruptcy filing, asset liquidation, or debt restructuring; (ii) they were in full compliance with all covenants as to financial condition governing outstanding borrowing or credit agreements; and (3) all documents submitted consisted of or were derived from documents maintained in the ordinary course of business.  *See* Obj. Doc. 156 at 2-3.  There requirements are a reasonable method of confirming that the business's failure was caused by the spill, and not by other factors.  *See* Fishkind Decl. ¶ 102.

652.     Another objection complains that the Failed Business Framework is inadequate because it fails to include compensation for costs incurred following a cessation of operations or

188

the costs necessary to restart a business.  *See* Obj. Doc. 156 at 4.  This objection is unavailing because compensation equal to the value of the business is sufficient to cover these costs.

### (2)  Failed Start-Up Business Framework

653.   One objection contends that failed start-up businesses should be compensated based on the average revenue of similar businesses.  *See* Obj. Doc. 72 at 1.  This objection fails; there is no reason to base compensation upon industry averages where claimant-specific data are available.  *See* Sharp Supp. Decl. ¶ 15; Fishkind Supp. Decl. ¶¶ 21-23.

### (3)  Start-Up Business Framework

654.   An objector contends that the Start-Up Business Framework should permit class members to rely on projections used by partners in the business, and not just projections relied upon by qualified third-party lenders.  *See* Obj. Doc. 140.  Because a primary role of third-party lenders is to make sure that projections are realistic, this objection fails.  *See* Henley Decl. ¶ 35; Sharp Decl. ¶ 44; Henley Supp. Decl. ¶ 9; Richardson Supp. Decl. ¶ 4(c).  The same objection also contends that it is unreasonable to deny compensation to start-up businesses with a history of negative EBITDA prior to the spill; this objection also fails.  *See* Fishkind Decl. ¶ 102.

### iv.  Individual Economic Loss Framework

### (A)  Documentation

655.   Certain objectors contend that they should be able to base their lost earnings claim solely on their own statement, without any third-party verification.  *See* Obj. Doc. 96.  This objection cannot be credited; the Settlement is already unusually flexible in permitting claimants who lack tax or payroll documentation to rely on their employers' sworn statements.  *See supra* ¶ 156.  There is no requirement that it must permit claims lacking any of the documentation necessary to support a claim in court, however.  *See* Fishkind Decl. ¶ 107; Henley Decl. ¶ 18; Sharp Decl. ¶ 48; Henley Supp. Decl. ¶ 10.

656.     One objector claimed the requirement that a claimant be at least 16 years of age as of April 20, 2010 should not apply because her state permits children to work at the age of 15. *See* Obj. Doc. 258; Settlement Ex. 8A § I.A.5.a.ii at 11.   The Settlement Program, with agreement of the parties, has implemented a policy in which a claimant under the age of 16 may pursue a claim provided that it was legally permissible for the claimant to be employed at the age she or he had attained on  April 20, 2010.  *See* Deepwater Horizon Claims Center:  Economic and Property Damage Claims:  Minimum Age Requirement for Individual Economic Loss and Seafood      Program      Seafood      Crew      Claimants,      http://www.deepwaterhorizon economicsettlement.com/docs/Alert_Minimum_Age_Requirement_for_IEL_and_Seafood_Crew _Claimants.pdf.

### (B)     Additional Benefits

657.     One objection complains that the Settlement only provides full reimbursement for training costs if the training led directly to earned income in 2010, and that the Settlement only compensates for health insurance until December 31, 2011.  *See* Obj. Doc. 265 (supplement to Obj. Doc. 145) at 3.  BP was under no obligation to provide either form of such compensation; both provisions were the result of good-faith negotiation and are reasonable.

### v.     The Vellrath Criticisms Lack Merit.

658.     The declaration of Marc Vellrath, *see* Obj. Doc. 91-2, was submitted by Halliburton, a party lacking standing to object to the Settlement.  There is accordingly no need to consider any of its criticisms of the Settlement.  *See supra* ¶ 597.

659.     In any event, Vellrath's criticisms of the Settlement are unavailing.   His fundamental objection is that the Settlement is ***too generous*** to class members, but this is not a valid objection.  *See* Fishkind Supp. Decl. ¶ 6.  His criticisms that the Settlement's economic loss zones are not supported by economic data and that the causation and compensation requirements

190

are not adequately tailored to individual claimants' claims are not correct and are refuted by the detailed declarations of a number of experts.  *See* Fishkind Supp. Decl. ¶¶ 7-19; Henley Supp. Decl. ¶¶ 4-7; Landry Supp. Decl. ¶ 30; Miller Supp. Decl. ¶¶ 16-17; Richardson Supp. Decl. ¶¶ 5-10; Sharp Supp. Decl. ¶¶ 5, 7-22; Smith Supp. Decl. ¶¶ 50-52.

### c.    Objections To The Property Damage Framework Lack Merit.

### i.    Coastal Real Property Damage

660.    Certain form objections contend that under the Coastal Real Property Framework, the compensation amounts are too low and the zone segmentation is arbitrary.[47]  Both objections fail.  *First*, the Coastal Real Property Framework provides compensation that is more than fair and adequate to compensate eligible property holders.  *See supra* ¶ 170.  *Second*, the boundaries of the Coastal Real Property Zone are reasonable.  *See supra* ¶ 168.

661.    Various objections complain that the same RTP applies whether a property was or was not oiled.[48]  But base compensation varies depending upon whether a property was oiled, and this difference in base compensation is increased by the application of an RTP multiplier.  *See supra* ¶ 170.  Moreover, properties that sustained physical damage are also eligible for repair costs.  *See* Klonoff Supp. Decl. ¶ 14.

662.    Other objections complain that the same RTP applies regardless of whether the owner sold a property after December 31, 2010.  *See* Obj. Doc. 123 at 6, 35; Obj. Doc. 230 at 2;

---

[47] *See* Obj. Doc. 88 at 6-7; Obj. Doc. 97 at 6-7; Obj. Doc. 98 at 6-7; Obj. Doc. 99 at 6-7; Obj. Doc. 100 at 3-5; Obj. Doc. 123 at 6; Obj. Doc. 146 at 4-5; Obj. Doc. 157 at 6-7; Obj. Doc. 159 at 6-7; Obj. Doc. 177 at 4-6; Obj. Doc. 181 at 4-5; *see also* Obj. Doc. 167 at 6-8 (making the same points in a different form); Obj. Doc. 189 at 6-8 (same); Obj. Doc 90 at 11- 13 (same); Obj. Doc. 225 at 3-8 (same).  Although their objections do not make the point entirely clear, each of the form objectors complains that he falls outside the Coastal Real Property Compensation Zone, making it likely that each lacks standing.  Certain other objectors also make similar objections regarding the amounts of compensation and the boundaries of the Coastal Real Property Zone.  *See, e.g.*, Obj. Doc. 61 at 4; Obj. Doc. 62 at 1; Obj. Doc. 90 at 11-13; Obj. Doc. 143; Obj. Doc. 259.

[48] *See* Obj. Doc. 123 at 6, 30-34; Obj. Doc. 230 at 2, 34-47; Obj. Doc. 234 at 26-29.

Obj. Doc. 234 at 4.  The settling parties were free, however, to negotiate an RTP for coastal real property claims as a whole without further sub-division, and that decision regarding RTPs was rational and reasonable.

663.    Certain objectors contend that the Coastal Real Property Framework should compensate for diminution in property value.  Such objections are unavailing because property values returned to pre-spill levels by December 2010, *see* Dent Supp. Decl. ¶ 21, and because unrealized reductions in property value are not valid claims under OPA, *see* Rec. Doc. 7526 at 8-12.

664.    Several objectors contend that the Coastal Framework should provide fixed minimum compensation to non-residential properties, as it does for residential parcels.  This objection fails, as such awards compensate for loss of use and enjoyment likely to be suffered only by owners of residential properties.  *See* Dent Supp. Decl. ¶ 23.[49]

### ii.    Wetlands Real Property Damage

665.    Certain objectors whose properties fall within the Coastal Real Property Zone complain that they do not instead fall within the Wetlands Real Property Zone.  *See, e.g.*, Obj. Doc. 167 at 8; Obj. Doc. 189 at 8; Obj. Doc. 183 at 17-18.[50]  These objections are unavailing. *First*, such objectors may submit Coastal Real Property claims, which provide fair, reasonable, and adequate compensation.  *See supra* ¶¶ 167-172.  *Second*, it is reasonable to limit the Wetlands Real Property Zone to Louisiana wetlands other than Grand Isle, which is dedicated to tourist, industrial, and commercial use.  There are at least five key differences between Louisiana

---

[49] Finally, a series of objections submitted on behalf of two claimants challenge their exclusion from both the Coastal Real Property zone and the Real Property Sales Compensation zone. *See* Obj. Doc. 53; Obj. Doc. 55; Obj. Doc. 64; Obj. Doc. 65; Obj. Doc. 69; Obj. Doc. 73; Obj. Doc. 74.  These objections, however, have been mooted by the parties' provision of updated mapping data to the Claims Administrator.

[50] At the same time, one objector complains that certain Louisiana land that falls within the Wetlands Real Property Zone does not instead fall within the Coastal Real Property Zone.  *See* Obj. Doc. 40.

coastal wetlands and coastal wetlands areas in Mississippi, Alabama, and Florida — including the fact that these wetlands have different soil composition and geomorphology, and generally lack protection from barrier islands — and there was more extensive oiling observed in Louisiana than in the coastal wetlands of other Gulf States.  *See* Taylor Decl. ¶ 48; Dent. Supp. Decl. ¶¶ 12-15, 18; Wharton Supp. Decl. ¶¶ 16-19; Taylor Supp. Decl. ¶¶ 19-23; Klonoff Supp. Decl. ¶ 15; *see also* Nov. 8 Fairness Hr'g Tr. at 130:24-131:1 (The Court: "I've been out in the Gulf and in marshes and the bays enough.  Louisiana is just different.").

666.   Other objectors complain that the zones are arbitrary and that the compensation is inadequate.[51]   These assertions fail; the zones were established using thorough and comprehensive data and the compensation amounts are more than adequate.  *See supra* ¶¶ 174, 176.  Objections to the use of the SCAT line to delineate the zone, *see* Obj. Doc. 90 at 7-11; Obj. Doc. 225, fail because SCAT provides accurate and reliable information.  *See* Dent Supp. Decl. ¶ 8; Taylor Decl. ¶¶ 8-23.

667.   One other objector contends that it is too difficult to establish that property was oiled and belongs in Category A.  This objection fails, as the methods used in the Settlement are reasonable.  *See* Dent Supp. Decl. ¶¶ 8, 10.

### iii.   Real Property Sales Damage

668.   Some objectors contend that they should be eligible for compensation for sales that occurred after December 31, 2010.  *See* Obj. Doc. 35; Obj. Doc. 46; Obj. Doc. 49; Obj. Doc. 67 at 1-2; Obj. Doc. 90 at 13-14; Obj. Doc. 152 at 2; Obj. Doc. 191; Obj. Doc. 253.  These objectors lack standing.  *See supra* ¶ 593.  Moreover, the objection fails, as any reduction in

---

[51] *See* Obj. Doc. 88 at 6-7; Obj. Doc. 90 at 7-11; Obj. Doc. 97 at 6-7; Obj. Doc. 98 at 6-7; Obj. Doc. 99 at 6-7; Obj. Doc. 100 at 3-5; Obj. Doc. 146 at 4-5; Obj. Doc. 157 at 6-7; Obj. Doc. 159 at 6-7; Obj. Doc. 167 at 8; Obj. Doc. 177 at 4-6; Obj. Doc. 181 at 4-5; Obj. Doc. 189 at 8; Obj. Doc. 259 at 1.

property values that persisted after that date is not predominantly attributable to the spill.  *See* Dent Supp. Decl. ¶ 5.

669.    Other objectors complain that certain parts of Florida, including the Florida Keys, are excluded from the Real Property Sales Zone.  *See* Obj. Doc. 134 at 1; Obj. Doc. 152 at 2-3. These objectors lack standing.  *See supra* ¶ 593.  Moreover, the objection fails; these areas are excluded because they fall outside the zone that was even monitored by SCAT and NRD for the presence of oil.  *See* Dent Supp. Decl. ¶ 8.  Other objections to the boundaries of this zone, *see* Obj. Doc. 40; Obj. Doc. 61 at 4; Obj. Doc. 62 at 1, similarly lack merit.

670.    It is reasonable to exclude foreclosed properties from eligibility, as "[o]wners of Gulf Coast real property that were subject to foreclosure proceedings at the time of the DWH Spill were most likely in default prior to the DWH Spill and due to reasons that have no connection with the DWH Spill."  Dent Supp. Decl. ¶ 6.

671.    It is reasonable to exclude persons who have not sold their properties, as they have suffered no economic losses.  Dent Supp. Decl. ¶ 7.  As the Court has held, "[b]efore real property is sold, there can be no 'profits' to be lost."  Rec. Doc. 7526 at 9.

### d.    Objections To The Vessels Of Opportunity Charter Payment Framework Lack Merit.

672.    Objections to the VoO offset[52] lack merit, as this provision is designed to prevent what could be considered a double recovery.  *See* 33 C.F.R. § 136.235; *see also supra* ¶ 185.

---

[52] *See, e.g.*, Rec. Doc. 6402; Rec. Doc. 6403; Rec. Doc. 6405; Rec. Doc. 6406; Rec. Doc. 6407; Rec. Doc. 6408; Obj. Doc. 2; Obj. Doc. 3; Obj. Doc. 4; Obj. Doc. 5; Obj. Doc. 6; Obj. Doc. 7; Obj. Doc. 8; Obj. Doc. 9; Obj. Doc. 10; Obj. Doc. 11; Obj. Doc. 12; Obj. Doc. 13; Obj. Doc. 14; Obj. Doc. 15; Obj. Doc. 16; Obj. Doc. 17; Obj. Doc. 18; Obj. Doc. 19; Obj. Doc. 20; Obj. Doc. 21; Obj. Doc. 22; Obj. Doc. 23; Obj. Doc. 24; Obj. Doc. 25; Obj. Doc. 26; Obj. Doc. 27; Obj. Doc. 28; Obj. Doc. 29; Obj. Doc. 30; Obj. Doc. 31; Obj. Doc. 48. Obj. Doc. 59; Obj. Doc. 60 at 1-2; Obj. Doc. 77; Obj. Doc. 78; Obj. Doc. 79; Obj. Doc. 80; Obj. Doc. 81; Obj. Doc. 82; Obj. Doc. 83; Obj. Doc. 84; Obj. Doc. 85; Obj. Doc. 133 at 2; Obj. Doc. 149 at 1-2; Obj. Doc. 166; Obj. Doc. 168 at 1; Obj. Doc. 169 at 1-2; Obj. Doc. 170 at 1; Obj. Doc. 171; Obj. Doc. 173; Obj. Doc. 174; Obj. Doc. 175; Obj. Doc. 176; Obj. Doc. 179; Obj. Doc. 254; Obj. Doc. 256.

While certain objectors complain that the offset only applies to charter boat operators, BP was willing to accept more favorable terms for commercial fishermen in light of their argument that they are not typically engaged in the business of chartering their vessels.  Finally, while some objectors allege that BP promised that no offset would be applied, questions surrounding this argument would present a risk to plaintiffs pursuing litigation.  *First*, BP disputes making such a promise.  *Second*, BP disputes the scope of parties to whom such a purported promise was given.  *Third*, any party attempting to assert the promise against BP would arguably need to demonstrate detrimental reliance, which many such plaintiffs might not be able to do.  And *finally*, such a promise, even if proven, cannot defeat the fairness of a settlement that is designed to resolve disagreements among the parties.  *See* Klonoff Supp. Decl. ¶¶ 17-19; *see also* Nov. 8 Fairness Hr'g Tr. at 39:21-43:24 (Class Counsel, making many of these points).

673.    That the VoO offset is only a partial offset is highly favorable to the class members, as in litigation the offset would be a total one.  The fact that a partial offset resulted from the process is emblematic of the fact that a settlement negotiation over this issue occurred.  Having been negotiated by learned counsel, there is no reason to overturn it as anything other than embodying a reasonable assessment of litigation risk on both sides.

674.    Objectors who allege that they were unable to participate in the VoO program, *see* Obj. Doc. 139 at 1; Obj. Doc. 141 at 1, are not class members and accordingly lack standing.  *See supra* ¶ 593.

675.    One objector contends that class members should be able to receive payment on the entirety of their GCCF offers without foreclosing their ability to accept VoO compensation under the Settlement Agreement.  *See* Obj. Doc. 102.  While there are any number of ways that one could theoretically structure options under the Settlement Agreement, the Settlement

Agreement as drafted is fair and reasonable in the optionality provided to Claimants, and goes well beyond the optionality provided in most claims programs.

### e.   Objections To The Vessel Physical Damage Framework Lack Merit.

676.   No timely objections have been submitted by parties with standing to the Vessel Physical Damage Framework.

677.   Nevertheless, the objections that have been submitted concerning this framework fail.  Contrary to the Vellrath declaration (i) determining whether a vessel was damaged does not require a highly individualized investigation; (ii) determining the economic harm suffered by a claimant is not a highly individualized issue; and (iii) because claimants under this framework are not at risk of future damage, the omission of an RTP is economically appropriate.

678.   Contrary to an untimely submission on the eve of the fairness hearing, *see* Obj. Doc. 265 (supplement to Obj. Doc. 145) at 4, it is reasonable to exclude compensation for vessels that were working for an Oil Spill Response Organization or an Oil Spill Removal Organization.  *See supra* ¶ 188.  These organizations contracted directly with BP to provide their services, and damages to vessels working for such an organization are governed by those contracts.

### f.   Objections To The Subsistence Damage Framework Lack Merit.

679.   One objection contends that the Subsistence Framework fails to address adequately the objector's Native American heritage.  *See* Obj. Doc. 245 at 2.  There is no basis in OPA for the preferential treatment of a particular ethnic community, and subsistence claimants in the Gulf belong to many ethnicities, heritages, and communities.  The Settlement strives to afford all of them honor and respect.  All subsistence claims are treated evenhandedly and, therefore, the objection lacks merit.

680.     One objection complains that the compensation available under the Subsistence Framework is inadequate, as it "does not take into account compensation for those who may have been able to barter for some value above the market value." Obj. Doc. 265 (supplement to Obj. Doc. 145) at 3-4.   Yet the Settlement Agreement is already extremely generous in compensating claimants for the retail value of their lost subsistence — before the application of an RTP.   *See supra* ¶¶ 198-199.   While the same objection contends that the "documentation requirement on Subsistence Claimants is overly burdensome," Obj. Doc. 265 at 4, the Settlement takes proactive steps to facilitate the submission of subsistence claims.   *See supra* ¶¶ 194, 200.

681.     The Vellrath declaration, which was submitted by a party lacking standing, complains that the Subsistence Framework fails to tie recovery to a commonly accepted measure of economic damages and is overly generous because it compensates class members for the retail price, rather than the wholesale price, of their losses.   *See* Obj. Doc. 91-2 ¶ 274.   Generosity is not a valid objection.   Retail prices are objective measures of value often used for replacement cost.   *See* Fishkind Supp. Decl. ¶ 19.

> **g.     Objections To The Seafood Compensation Program Lack Merit.**
>
> **i.     Objections Based On Future Risks Lack Merit.**

682.     Several objectors assert that the SCP fails to account for future risks to Gulf of Mexico fisheries.[53]   These objections fail.   *First*, the SCP includes RTPs designed specifically to compensate for such claims of uncertainty.   *See supra* ¶ 218.   *Second*, this was a reasonable compromise and BP has presented evidence, in the declarations of Dr. Tunnell and Dr. Smith, that most of the relevant commercial species appear to be within normal, pre-spill trends as a factual matter in any event.   *See supra* ¶¶ 543-559.

---

[53] Obj. Doc. 104 at 3-5; Obj. Doc. 167 at 8-9; Obj. Doc. 189 at 8-9; Obj. Doc. 227 at 21-22; Obj. Doc. 240.

683.     Certain objectors point to variances in vermilion snapper catches across certain portions of the Gulf as precursor evidence of a future fisheries collapse.  *See* Obj. Doc. 104 at 4.  The figures presented are refuted by BP's experts as unsupported by the landings data.  *See* Smith Supp. Decl. ¶¶ 33-44; Tunnell Supp. Decl. ¶ 10; Tunnell Decl. ¶¶ 60-62.   Objectors' assertions that the quotas for specific fisheries may be reduced are speculative and, according to BP's experts, also not supported by the commercial fisheries data.   *See* Tunnell Decl. ¶ 62 (noting that quotas for red snapper increased post-spill); Smith Supp. Decl. ¶¶ 35-36, 40-42 (noting that average snapper IFQ shares increased post-spill and that finfish 2011 landings exceed the benchmark period, and highlighting the mobile and cross-species nature of fin-fishing activities).

684.     Other objectors present analogies to the *Exxon Valdez* oil spill and suggest that because the herring population in Prince William Sound collapsed several years after the spill, it is reasonable to expect a future fisheries collapse in the Gulf from *Deepwater Horizon*.  *See* Obj. Doc. 227 at 21.  Even if true (*contra* Pearson Decl., esp. ¶ 10), use of the SCP was agreed to by the parties and the presumed loss percentages and RTPs within the SCP were designed by the neutral to reasonably compensate participating class members for such risk.

685.     Analogies to the *Ixtoc-I* spill are of limited relevance.   The *Ixtoc-I* oil spill lasted more than nine months and mangrove oysters were repeatedly oiled.   BP presents evidence that mangrove oysters are not found in the northern Gulf, and that Eastern oysters were not oiled during *Deepwater Horizon. See* Tunnell Supp. Decl. ¶¶ 15-16.

686.     Objections relying upon the declaration of E.W. Cake lack merit.  *See* Obj. Doc. 167; Obj. Doc. 189.  Dr. Cake admits that some of his opinions are "political" as opposed to "expert," *see* Obj. Doc. 167-19 ¶ 1, but he does not parse which of his objections fall into which

category.   Political opinions are inherently unscientific and thus flunk the requirements of Federal Rule of Evidence 702.  *See Daubert*, 509 U.S. at 590 ("The adjective 'scientific' [in Rule 702] implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.").

687.    Other objectors point to Hurricane Isaac and the oil sheen reported above the Macondo well site on October 10, 2012, as evidence of future risks.[54]  These objections are unavailing.  *See* Tunnell Supp. Decl. ¶ 12; Jeffrey Supp. Decl. ¶¶ 13-15; Taylor Supp. Decl. ¶¶ 35-37;  FOSC  Issues  Notice  of  Federal  Interest  to  BP  and  Transocean, http://www.restorethegulf.gov/release/2012/10/10/fosc-issues-notice-federal-interest-bp-and-transocean (Oct. 10, 2012).  The United States Coast Guard, BP points out, concluded that the sheen is not feasible to recover and does not pose a risk to the shoreline.  *See* FOSC issues Notice of Federal Interest to BP and Transocean, *supra*.  As explained in more detail below, moreover, Hurricane Isaac does not counsel against final approval of the Settlement.  *See infra* ¶ 724.

688.    Other objections making unsupported allegations about future risks to blue crabs and Florida oysters fail because they are not accompanied by evidence.  *See* Obj. Doc. 150 at 2; Obj. Doc. 240 at 2.   BP presents evidence that the objections regarding Florida oysters are contradicted by Governor Rick Scott's statement that the oysters are being damaged primarily by years of drought and illegal overharvesting.  *See* Tunnell Supp. Decl. ¶ 17 & Ex. A.

689.    Finally, as a matter of law, even if objectors had an evidentiary basis to conclude that the Gulf is at risk of a future fisheries collapse (which they do not), the law encourages the

---

[54] *See* Obj. Doc. 52 at 1; Obj. Doc. 88 at 3-5; Obj. Doc. 97 at 3-5; Obj. Doc. 98 at 3-5; Obj. Doc. 99 at 4-5; Obj. Doc. 144 at 17-18; Obj. Doc. 157 at 3-5; Obj. Doc. 159 at 3-5; Obj. Doc. 167 at 4; Obj. Doc. 178 at 5; Obj. Doc. 183 at 21; Obj. Doc. 186 at 5; Obj. Doc. 189 at 4-5, 12; Obj. Doc. 190 at 20-21; Obj. Doc. 201 at 7.

settlement of disputed claims.  Were the law otherwise, few cases could ever settle.  Here the Settlement is reasonable and includes RTPs to cover future injury, as remote as that may be.

### ii.    Objections From Those Outside The SCP Lack Merit.

690.    Certain seafood processors argue that they should be included within the SCP. *See* Obj. Doc. 139 at 1-2; Obj. Doc. 141; Obj. Doc. 147; Rec. Doc. 6368; Rec. Doc. 7317 (adopting Obj. Doc. 147 and Rec. Doc. 6368).  Under the Court's rulings, commercial fishermen fall within an arguable exception to *Robins Dry Dock* and thus conceivably could be eligible for punitive damages while processors are not.  *See* Rec. Doc. 3830 at 19-20;  Miller Decl. ¶ 11.  For that reason, there is nothing improper in the parties' negotiation of claims frameworks that compensate class members in light of the strength of their claims.  *See Lenahan v. Sears, Roebuck, & Co.*, 266 F. App'x 114, 119 (3d Cir. 2008); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005); *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77-39, 1984 WL 21981, at *7 (N.D. Ill. Sept. 14, 1984); Issacharoff Decl. ¶ 12; Miller Supp. Decl. ¶ 12. It should be noted, as well, that shrimp processors receive the highest RTP in the Economic Damage Claim Frameworks, an RTP of 3.  *See* Agreement Ex. 15.

691.    Certain charter fishermen also contend that it is unreasonable for them to be excluded from the SCP.  *See, e.g.*, Obj. Doc. 86 at 5-6; Obj. Doc. 133 at 2; Obj. Docs. 172-176. Charter fishermen, however, participate in a different market from those who harvest seafood with nets designed to pull in large hauls.  Maritime law recognizes these differences, and treats the claims of charter fishermen differently from the valid maritime claims of commercial fishermen.  *See In re Exxon Valdez*, 1995 A.M.C. 1429, 1433 (D. Alaska 1994).  Moreover, the RTP for charter fisherman fairly takes into account evidence of recovery of Gulf tourism by the end of 2010 and re-opening of spill-related fisheries closures by the end of 2010.  *See* Fishkind Decl. ¶¶ 70, 77, 78.

### iii.     Objections To The Benchmark Period Lack Merit.

692.    Some objectors complain about the benchmark periods under the SCP.  *See* Obj. Doc. 141 at 2; Obj. Doc. 167 at 9; Obj. Doc. 189 at 9; Rec. Doc. 6371.  These objections lack merit.  The use of a benchmark period is necessary and appropriate, and claimants are provided significant flexibility in selecting benchmark periods that would not be available in litigation.  Further, BP has submitted evidence demonstrating that extending the benchmark period to earlier than 2007 would yield a less reliable estimate of a claimant's presumed loss from the spill.  *See* Smith Decl. ¶¶ 19-22, 32; Sharp Decl. ¶ 20; Balhoff Decl. at 4-5; Perry Decl. at 4-5.

### iv.     SCP Claimants Have Adequate Time To Evaluate Their Rights.

693.    Certain objectors contend that they should not be required to submit claims to the Settlement Program before the statute of limitations expires.  *See* Obj. Doc. 122 at 21; Obj. Doc. 209 at 6.  There is no legal support for such an objection.  Moreover, requiring all claims to be submitted promptly permits a second-round distribution sooner, which favors claimants.  *See* Perry Decl. at 4; Balhoff Decl. at 4; *supra* ¶ 91.

### v.     GO FISH's Objections Fail.

694.    Because GO FISH lacks standing, there is no need to consider its objections to the Settlement.  *See supra* ¶ 599.  In any event, GO FISH's objections fail on the merits.  *See* Smith Supp. Decl. ¶ 5.

695.    *First*, GO FISH's objections regarding the second-round distribution are not ripe, as the Court-appointed neutral has yet to determine how any second-round distribution will be made.  *See* Balhoff Supp. Decl. ¶ 5; Perry Supp. Decl. ¶ 5.  GO FISH's assumptions about how the second-round distribution will be made are baseless.

696.   *Second*, while GO FISH imagines that those plying different species were competing against each other for settlement recoveries, the SCP was developed from the bottom-up to fully compensate ***all*** SCP participants.  *See* Perry Supp. Decl. ¶ 3; Balhoff Supp. Decl. ¶ 3.

697.   *Third*, GO FISH suggests that the oyster leaseholders, IFQ holders, and crab trap payments are improperly included in the SCP.  Because assets like IFQs, crab traps, and oyster leaseholds are essential capital assets to the fishing industry, this objection fails.  *See* Smith Supp. Decl. ¶¶ 9-12.   GO FISH further objects that oyster leaseholders receive compensation under the SCP that is many times the revenue they generate.  However, compensation to oyster leaseholders under the SCP is not tied to revenue in the same sense as for a vessel owner or lessee or boat captain compensation under the SCP.  While BP disputes the cause of oyster landing declines, oyster leaseholders are being compensated in the SCP, in part, to spend out-of-pocket funds to re-culch or otherwise tend to oyster leasebeds, and additional compensation reflects that oyster landings are returning to pre-spill levels more slowly than other species.  Tunnell Decl. ¶¶ 40-50; Tunnell Supp. Decl. ¶ 8.   That acre-by-acre cost to re-culch can be expensive.  *See* Nov. 8 Hr'g Tr. at 175:9.

698.   *Fourth*, GO FISH complains that persons who received funds from the GCCF for seafood losses will have their compensation amount in the initial distribution offset by the prior GCCF payment.  Nevertheless, such claimants are eligible for a second-round distribution on the full value of their seafood claims (including any GCCF payouts).  *See* Settlement Agreement Ex. 10.

699.   *Fifth*, GO FISH complains that BP and the PSC have underestimated the number of acres held by leaseholders in Louisiana that would qualify under the SCP for Oyster Leasehold Interest compensation by counting only oyster leases registered with the State.  GO

FISH is mistaken; to be eligible for Oyster Leasehold compensation under the SCP for oyster leaseholds in Louisiana, the leaseholder must be the lessee of an oyster lease for which the State has issued an oyster "lease identification number." *See* Deepwater Horizon Claims Center, Economic & Property Damage Claims, Frequently Asked Questions ¶ 169, https://cert.gardencitygroup.com/dwh/fs/faq?.delloginType=faqs; Smith Supp. Decl. ¶ 15.

700. *Sixth*, GO FISH asserts that when fish are less abundant, fishermen either continue fishing as intensely as before and catch less fish or stop fishing altogether. *See* Obj. Doc. 226 at 16. This assertion, according to expert evidence submitted by BP, "paints two extreme views of possible behavioral responses to abundance changes" that "[n]one of the empirical literature in fisheries economics supports." Smith Supp. Decl. ¶¶ 23-30. Moreover, GO FISH's reliance on basin-level landings data to criticize the loss percentages in the SCP ignores the mobility of most participants in the fishing industry. *See* Smith Supp. Decl. ¶ 32.

701. *Finally*, GO FISH's preliminary objections, Rec. Doc. 6353, also lack merit. As explained in detail in BP's memorandum in support of final approval, (i) the Seafood Compensation Program is sufficient to protect against the risk of long-term damage; (ii) the SCP provides full and fair compensation to each of the fisheries falling within it; (iii) the documentation requirements are reasonable; (iv) the benchmark years available under the SCP are reasonable; (v) the RTP for subsistence claims is reasonable; (vi) the class release is reasonable, and does not infringe upon anyone's constitutional rights; and (vii) the Settlement does not penalize those who accepted transition payments. *See* Rec. Doc. 7114-1 at 107-113.

### vi. The Remaining Objections To The SCP Fail.

702. Certain objectors contend that the SCP is unfair because it is taking them longer to fulfill their individual fishing quotas. *See* Obj. Doc. 104 at 3. Because one core purpose of an IFQ program is to slow the harvest of a single species, this objection represents proof that the

IFQ program is working.  Smith Supp. Decl. ¶ 40.  The same objectors argue that the finish compensation plan should be altered to increase the catch factor reduction and cost percentage; these arguments are unsupported by data or analysis and fail for that reason.

703.    One oyster leaseholder contends that the history of production of each individual oyster leasehold must be considered to avoid unfairness.  *See* Obj. Doc. 141.  The objection fails; the settling parties were free to decide that oyster leasehold compensation would instead be rationally based on the mapped location of such leaseholds, which makes determining such leasehold compensation far easier to administer.   See Balhoff Decl. at 4; Perry Decl. at 4. Factoring in the administrability of different potential ways to compensate for claims is inherently fair and reasonable.

704.    One group of oyster harvesters argues that they are excluded from the SCP because there are no oyster leases in Apalachicola Bay.  *See* Obj. Doc. 240.  This objection fails, as under the Settlement Agreement oyster harvesters need not hold oyster leases to be eligible for compensation.

705.    One objector objects to the cost percentages in the SCP.  *See* Obj. Doc. 135.  For the reasons expressed above, objections to the cost percentages and other calculations are unavailing.

706.    Louisiana wrongly contends that landings data are irrelevant.  *See* Obj. Doc. 227 at 12, 19.  Landings data provide essential information and are widely used to assess the status of fisheries.  *See* Smith Supp. Decl. ¶¶ 47-49; Tunnell Supp. Decl. ¶ 4.  Furthermore, contrary to Louisiana's assertion, *see* Obj. Doc. 227 at 11-12, commercial landings data were among numerous types of data considered by Dr. Smith and Dr. Tunnell in concluding that the SCP is fair and reasonable.  *See* Smith. Supp. Decl. ¶ 45, Tunnell Supp. Decl. ¶ 4.  In reviewing the

reasonableness of the SCP and sufficiency of its Fund, the Court has taken into consideration not only such evidence, but the evidence submitted by Class Counsel, the *Thanh Hai* plaintiffs, and Messrs. Balhoff and Perry.

> **h.     The Parties' Agreement To Fund A Promotional Campaign Does Not Implicate Or Violate The *Cy Pres* Doctrine.**

707.     Certain objectors contend that the parties' agreement to create a $57 million fund to promote Gulf Coast Tourism and Gulf Seafood, *see supra* ¶ 261, violates the *cy pres* doctrine. *See* Obj. Doc. 123 at 37; Obj. Doc. 230 at 17; Obj. Doc. 234 at 5, 33.  These objections must fail. This is not a situation in which a limited fund has been agreed to between the parties, distributions from such a fund have been made, and a court has converted the residual to a "next best" use not anticipated by the parties, or one that fails to operate in fact as a next-best use of that residual.  Here, ***from the outset***, a specific allotment of money was demanded by the PSC and provided by BP, in addition to compensation to individual class member claimants, to provide benefits for class members by promoting Gulf seafood and tourism.  Alleged harm to the tourism and Gulf seafood industries are core components of the damages claimed in this Settlement.

708.     Moreover, unlike in *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011), the parties have specifically agreed upon the payments.  And unlike *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012), here the Promotional Fund will provide real value to class members — on top of the full compensation that they will receive for their economic losses.  *See supra* ¶ 261; Klonoff Supp. Decl. ¶¶ 26-29.

709.     Similar programs have been approved in other class action settlements.  *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179; *Bowling*, 143 F.R.D. 141; *In re Diet Drugs Prods. Liab. Litig.* 2000 WL 1222042.

### i.    GCCF Comparisons Are Legally Irrelevant.

710.    Certain objectors complain that the Settlement Program compares poorly to the GCCF.[55]  This is not a legally relevant comparison:  while certain *Reed* factors require the Court to consider the amounts available under the Settlement with the amounts that would be available in litigation, *see supra* ¶¶ 469-473, (i) nothing requires the Court to compare the Settlement to a different extra-judicial settlement process that preceded it and (ii) there was no basis to contend it would extend for any period in the future.  *See Turner*, 234 F.R.D. at 610 ("The analysis is whether the class action format is superior to other methods of adjudication, ***not whether a class action is superior to an out-of-court, private settlement program***.") (emphasis added); Klonoff Supp. Decl. ¶¶ 23-24.

711.    Moreover, the Settlement Program improves upon the GCCF in numerous ways, including that (i) it pays claims that the GCCF would not; (ii) its decisions are made pursuant to transparent and detailed frameworks; (iii) its administrator was appointed by this Court; and (iv) its operations are designed to be claimant-responsive and claimant-friendly, and they are subject to the active supervision of this Court.  The Court notes, in this regard, that numerous Objections and other filings have raised concerns and complaints with the GCCF, and would seem to contradict the claims by some objectors that the GCCF was somehow more favorable.[56]

712.    Finally, even if a comparison to the GCCF were relevant under some construction of Federal Rule of Civil Procedure 23(b)(3), the Court finds that this Settlement is superior to the GCCF at the very least because it is judicially supervised, meaning that it is a program that must

---

[55] *See, e.g.*, Obj. Doc. 101 at 1, 2, 5, 10-18; Obj. Doc. 155 at 1-2; Obj. Doc. 198 at 43; Obj. Doc. 227 at 22-25.

[56] *See, e.g.*, Obj. Doc. 38; Obj. Doc. 50; Obj. Doc. 70; Obj. Doc. 71; Obj. Doc. 95; Obj. Doc. 97; Obj. Doc. 125; Obj. Doc. 127; Obj. Doc. 154; Obj. Doc. 239; Obj. Doc. 242; Obj. Doc. 244; Obj. Doc. 250; Obj. Doc. 226-1 at 7, 10; *see also* Rec. Doc. 912; Rec. Doc. 913; Rec. Doc. 1308; Rec. Doc. 1312; Rec. Doc. 1318; Rec. Doc. 1324; Rec. Doc. 1327; Rec. Doc. 1894; Rec. Doc. 3423; Rec. Doc. 6356-3; Rec. Doc. 7473-1.

meet heightened guarantees of consistency with due process and fairness. Additionally, this Settlement is policed by the guarantee of an Article III Judge's review of contested matters where necessary. By contrast, the GCCF was a program established at the request of the President of the United States but carried out by a private claims administrator operating pursuant to a process under OPA that was not subject to direct judicial supervision. *See* 33 U.S.C. § 2713.

### v.  Class Members Received Clear Information About Their Rights.

713.  Certain objectors complain that the Settlement Agreement is too complicated. *See* Obj. Doc. 122 at 15; Obj. Doc. 142 at 1-2. Yet the Settlement Agreement is designed to be transparent as a claimant or his or her counsel reviews the frameworks relevant to particular circumstances, but also sufficiently detailed to ensure that determinations made by the Settlement Program are consistent and predictable. Particularly because few if any claimants would need to read and understand the *entire* Settlement Agreement, this objection is meritless. *See* Azari Decl. ¶ 22. These objectors also ignore all the resources placed at their disposal to understand the Settlement Agreement, such as a comprehensive and up-to-date reference resource of "frequently asked questions" on the CSSP's web site, the availability of the toll-free hotline, and Class Counsel's office, which assists claimants and provides information on a daily basis. *See supra* ¶¶ 59-62.

714.  Two other objectors contend that the Settlement is insufficiently clear because it does not define "significant services" to the offshore oil and gas industry in Paragraph 5.10.3.2, which is used to determine if certain claims should be evaluated as possible moratorium losses. *See* Obj. Doc. 95 at 3-4; *see also* Obj. Doc. 210 (adopting this objection). Given that both objectors appear to exist primarily if not entirely to provide such services, this objection is unavailing. Moreover, the alleged consequence of which these objectors complain — arbitrary

exclusion from the class by "nearly unlimited" Settlement Program discretion, Obj. Doc. 95 at 4 — is also unavailing because the Settlement provides no such discretion.

715.    Certain objectors contend that they cannot evaluate the fairness of the Settlement because Class Counsel did not make their trial evidence available to them.[57]   Objectors have identified no authority supporting such an objection, and the Court is aware of none.   Objectors also ignore the fact that the deposition exhibits, "which constitute the key liability documents in the case," have been available for over a year to any plaintiff's attorney who executes Appendix A to Pre-Trial Order No. 13.   *See* Rec. Doc. 641.

### vi.    The Settlement Notice Was More Than Adequate.

716.    No valid objections have been submitted regarding the notice program, which surpassed all the requirements of Rule 23 and constitutional due process.   *See* Azari Supp. Decl. ¶ 15.

717.    Certain objectors speculate that BP failed to comply with its obligations under CAFA by failing to mail notice packets to all relevant state officials.   *See* Obj. Doc. 123 at 45; Obj. Doc. 234 at 34; Obj. Doc. 230 at 3.   This objection is unsupported and incorrect.   All applicable CAFA requirements were satisfied in full.   *See supra* ¶ 63.

718.    Others object that the notice did not explain the reasons justifying the negotiation of the Settlement, including its economic loss zones.   *See* Obj. Doc. 118 at 6; Obj. Doc. 163 at 6. No legal principle requires such information, and indeed because the notice must be "presented in a neutral manner," *Rodriguez*, 563 F.3d at 962, it would be inappropriate for the notice to

---

[57] *See* Obj. Doc. 88 at 3; Obj. Doc. 95 at 5-6; Obj. Doc. 97 at 2-3; Obj. Doc. 98 at 3 & n.2; Obj. Doc. 99 at 3 & n.3; Obj. Doc. 100 at 2 & n.2; Obj. Doc. 210; Obj. Doc. 146 at 2-3; Obj. Doc. 157 at 3; Obj. Doc. 159 at 3; Obj. Doc. 167 at 10; Obj. Doc. 177 at 3; Obj. Doc. 181 at 3; Obj. Doc. 189 at 10.

include detailed justifications. *See, e.g.*, *Lane*, 2012 WL 4125857, at \*10; *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); Azari Supp. Decl. ¶¶ 20-21.

719.    Another objector contends that the notice was not written in sufficiently clear language. *See* Obj. Doc. 122 at 10-14.  This objection must be rejected.  *See supra* ¶ 66; Azari Supp. Decl. ¶¶ 23-25; Wheatman Decl. ¶¶ 9-13.

### vii.    The Remaining Objections Lack Merit.

720.    Certain objectors contend that the release is impermissibly broad. *See* Obj. Doc. 114 at 5; Obj. Doc. 245 at 2; Obj. Doc. 247; Obj. Doc. 265 (supplement to Obj. Doc. 145) at 4. But the law is settled that defendants entering into a class settlement are entitled to obtain global peace and that class action releases may be broader than the claims directly compensated under the Settlement. *See, e.g.*, *Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983); *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005) (per curiam); *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 805 (8th Cir. 2004); *see also* Miller Supp. Decl. ¶¶ 21-22; Klonoff Supp. Decl. ¶ 16.

721.    Moreover, the release was crafted with care, and specifically excludes certain Reserved Claims. *See* Settlement Agreement ¶ 10.2; *supra* ¶ 97.  Such careful negotiation of the release was "an example of reasoned statesmanship."   Coffee Supp. Decl. ¶ 38; *see also DeHoyos*, 240 F.R.D. at 312 ("[T]he undisputed evidence shows the release has been executed voluntarily and with adequate knowledge, as Class Counsel have evaluated the relative merits of each party's case and entered into the settlement with a full and fair view of the case's strengths and weaknesses.") (citations omitted); *Cicero v. DirectTV, Inc.*, No. 07-1182, 2010 WL 2991486, at \*8 (C.D. Cal. July 27, 2010) ("The language of the release was the product of careful bargaining by Class Counsel and Directv and the Court sees no need to modify it.  To do

so may risk undoing a process which resulted in a very fair and reasonable settlement for the many Class Members.").

722.    Certain objectors contend that the Settlement is coercive because if they reject it, the alternative is long-running and expensive litigation.  *See* Obj. Doc. 95 at 3-4; Obj. Doc. 167 at 3; Obj. Doc. 178 at 5-6; Obj. Doc. 189 at 6.  But under the *Reed* factors, the cost and length of litigation weigh in favor of approving the Settlement, not against.  *See Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004).

723.    Contrary to the speculation of certain objectors, *see* Obj. Doc. 101 at 18-28; Obj. Doc. 230 at 17-18, Rec. Doc. 6902-1, there was no collusion in the negotiation of the Settlement. *See supra* ¶ 15; *see also* Nov. 8 Fairness Hr'g Tr. at 111:2-5 (allegations of collusion are "incredible" and "preposterous").

724.    Certain objectors contend that the possibility of re-oiling counsels against final approval, particularly in light of Hurricane Isaac.[58]  *First*, the Settlement's RTPs were specifically designed to accommodate any risk of future re-oiling.  *See* Taylor Decl. ¶ 58. *Second*, nothing has changed since the Settlement was reached, including Hurricane Isaac, that demonstrates that the RTPs and other compensation are inadequate.  *See* Taylor Supp. Decl. ¶¶ 27-34; Dent Supp. Decl. ¶ 4; Wharton Supp. Decl. ¶¶ 4-10; Tunnell Supp. Decl. ¶ 12.  And there is no substance to the suggestion that Unified Command's use of dispersants "hid" meaningful amounts of oil that could one day return to threaten the Gulf.  *See* Jeffrey Supp. Decl. ¶ 11.

---

[58] Obj. Doc. 52 at 1; Obj. Doc. 88 at 3-5; Obj. Doc. 97 at 3-5; Obj. Doc. 98 at 3-5; Obj. Doc. 99 at 4-5; Obj. Doc. 144 at 17-18; Obj. Doc. 157 at 3-5; Obj. Doc. 159 at 3-5; Obj. Doc. 167 at 4; Obj. Doc. 178 at 5; Obj. Doc. 183 at 21; Obj. Doc. 186 at 5; Obj. Doc. 189 at 4-5, 12; Obj. Doc. 190 at 20-21; Obj. Doc. 198 at 8-9; Obj. Doc. 201 at 7.

725.    Selmer Salvesen's April 8, 2012 objections, *see* Rec. Doc. 6186-1, lack merit.  To begin with, the Court's resolution of pre-trial motions does not constitute a "trial proceeding" that the Court may not conduct under *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  *See* David F. Herr, MULTIDISTRICT LITIG. MANUAL § 9:13.  Additionally, Salvesen ignores that several motions were resolved in connection with the Limitation Action.[59]  And regardless, the Court is not acting pursuant to 28 U.S.C. § 1407 with respect to this Settlement, as the *Bon Secour* complaint was filed directly into this district, *see Bon Secour Fisheries, Inc. v. BP Exploration & Prod. Inc.*, No. 12-970 (E.D. La.).

726.    Selmer Salvesen's July 2 objections, *see* Rec. Doc. 6831-1, are also rejected.  *See* Rec. Doc. 7615 (denying this motion).

727.    Certain submissions complained about the procedures by which the Court conducted the fairness hearing.  *See* Rec. Doc. 7869 (filing by Stuart Smith, Esq., requesting at least thirty minutes to speak); Rec. Doc. 7871 (filing by Daniel Becnel, Esq., complaining that he was not selected as a representative counsel).  For the reasons the Court has explained, however, the procedures by which the Court conducted the fairness hearing were well within its discretion. *See* Rec. Doc. 7358; *see also supra* ¶ 71.  These objections are accordingly overruled.

728.    Certain objections are either so idiosyncratic, incomprehensible, or mislabeled that they do not counsel against approval of the Settlement.[60]  The Court has nonetheless read

---

[59] Unique features of the Limitation Action blunt Salvesen's *Lexecon* argument in several respects:  (1) the Limitation Action was transferred to the Eastern District of Louisiana for all purposes, *see In re Triton Asset Leasing GmbH*, No. 10-1721, Rec. Doc. 207 (S.D. Tex. Aug. 16, 2010); (2) the Limitation Act and the applicable rules give the Court broad discretion and power to resolve third-party claims, *see, e.g.*, *Karim v. Finch Shipping Co.*, 265 F.3d 258, 264 (5th Cir. 2001); and (3) jury trial rights generally do not attach to Limitation Actions, *see Becker v. Tidewater, Inc.*, 405 F.3d 257, 259 (5th Cir. 2005); *Karim*, 265 F.3d at 264.

[60] *See* Obj. Doc. 32; Obj. Doc. 38; Obj. Doc. 39; Obj. Doc. 44; Obj. Doc. 51; Obj. Doc. 52; Obj. Doc. 58; Obj. Doc. 105-113 (technical supplements to other objections); Obj. Doc. 137; Obj. Doc. 188; Obj. Doc. 194; Obj. Doc. 195; Obj. Doc. 196; Obj. Doc. 197; Obj. Doc. 199; Obj. Doc. 200; Obj. Doc. 217; Obj. Doc. 244; Obj. Doc. 245; Obj. Doc. 255; Obj. Doc. 262; Rec. Doc. 7169; Rec. Doc. 7311; Rec. Doc. 7316; Rec. Doc. 7340.

and thoughtfully considered these objections — as it did with all objections, from every source — and finds nothing in them that would warrant a change to any of its conclusions in these Findings of Fact and Conclusions of Law.[61]

729.   Finally, many entries appearing on the objections docket are duplicate filings.[62]

### viii.   The Non-Objections Lack Merit.

730.   Certain parties who lack standing have made submissions that, while not challenging the fairness of the Settlement, quibble with certain statements made in BP's memorandum supporting final approval.  *See* Obj. Doc. 164 (Monroe County); Obj. Doc. 211 (Alabama); Obj. Doc. 215 (United States); Obj. Doc. 216 (City of St. Pete Beach and City of Treasure Island); Obj. Doc. 218 (Mobile County, Alabama); *see also* Obj. Doc. 187 (adopting United States filing); Obj. Doc. 219 (same); Obj. Doc. 220 (same); Obj. Doc. 221 (same); Obj. Doc. 222 (same).

731.   While these filings suggest that certain parties view the evidence differently from how BP does, none suggests that the Settlement — which is designed to *resolve* such disagreements — is anything but fair, reasonable, and adequate.

\*   \*   \*

---

[61] Additionally, two objectors complain that they should not be subject to the Court's holdback orders.  *See* Obj. Doc. 133 at 2; Obj. Doc. 136 at 1.  Complaints about the holdback orders are outside the parameters of whether to grant this Settlement final approval.  Those orders were in large measure also set in place by the Court *before* this Settlement was reached, and opt-outs lack standing to contest the Settlement.  The Court, moreover, has recently denied a variety of motions challenging the most recent hold-back order.  *See* Rec. Doc. 7786.

[62] *See* Obj. Doc. 47 (duplicate of Obj. Doc. 44); Obj. Doc. 56 (duplicate of Obj. Doc. 53); Obj. Doc. 63 (duplicate of Obj. Doc. 55); Obj. Doc. 75 (duplicate of Obj. Doc. 73); Obj. Doc. 76 (duplicate of Obj. Doc. 74); Obj. Docs. 119, 129, and 192 (duplicates of Obj. Doc. 117); Obj. Doc. 128 (duplicate of Obj. Doc. 120); Obj. Doc. 153 (duplicate of Obj. Doc. 116); Obj. Doc. 163 (duplicate of Obj. Doc. 118); Obj. Doc. 165 (duplicate of Obj. Doc. 2); Obj. Doc. 172 (duplicate of Obj. Doc. 166); Obj. Doc. 204 (duplicate of Obj. Doc. 115); Obj. Doc. 212 (duplicate of Obj. Doc. 122); Obj. Doc. 214 (duplicate of Obj. Doc. 123); Obj. Doc. 229 (duplicate of Obj. Doc. 225); Obj. Doc. 231 (duplicate of Obj. Doc. 186); Obj. Doc. 233 (duplicate of Obj. Doc. 145); Obj. Doc. 235 (duplicate of Obj. Doc. 144); Obj. Doc. 238 (duplicate of Obj. Doc. 198); Obj. Doc. 248 (duplicate of Obj. Doc. 246); Obj. Doc. 251 (duplicate of Obj. Doc. 250); Obj. Doc. 263 (duplicate of Obj. Doc. 259); Obj. Doc. 264 (duplicate of Rec. Doc. 7480, denied by Rec. Doc. 7897); Obj. Doc. 266 (duplicate of Obj. Doc. 265).

732.    None of the objections, whether filed on the objections docket or elsewhere, have shown the Settlement to not be fair, reasonable, and adequate, and all objections to the Settlement are hereby overruled on the various grounds specified above.  In sum, the Court finds that the Settlement should be approved as fair, reasonable, and adequate.

## APPENDIX A:  INDEX OF PARTY DECLARATIONS

**I.        Joint Submissions**

Azari Decl. (Rec. Doc. 7110-1) and Azari Supp. Decl. (Rec. Doc. 7726-1):  Cameron R. Azari's qualifications and experience are described in the main text.  *See supra* ¶ 282.

Balhoff Decl. (Rec. Doc. 7110-2) and Balhoff Supp. Decl. (Rec. Doc. 7726-2):  Daniel J. Balhoff's qualifications and experience are described in the main text.  *See supra* ¶ 21.

Coffee Decl. (Rec. Doc. 7110-3) and Coffee Supp. Decl. (Rec. Doc. 7726-4):  John C. Coffee, Jr.'s qualifications and experience are described in the main text.  *See supra* ¶ 283.

Monger Decl. (Rec. Doc. 7110-4) and Monger Supp. Decl. (Rec. Doc. 7726-5):  Meade Monger's qualifications and experience are described in the main text.  *See supra* ¶ 284.

Perry Decl. (Rec. Doc. 7110-5) and Perry Supp. Decl. (Rec. Doc. 7726-7):  John W. Perry, Jr.'s qualifications and experience are described in the main text.  *See supra* ¶ 21.

**II.      Class Submissions**

Herman Decl. (Rec. Doc. 7104-5):  Stephen J. Herman, Esq. is Plaintiffs' co-liaison counsel and co-lead class counsel.  Herman Decl. ¶ 2.

Issacharoff Decl. (Rec. Doc. 7104-4):  Samuel Issacharoff's qualifications and experience are described in the main text.  *See supra* ¶ 285.

Kinsella Decl. (Rec. Doc. 6266-3):  Katherine Kinsella's qualifications and experience are described in the main text.  *See supra* ¶ 285.

Klonoff Decl. (Rec. Doc. 7104-3) and Klonoff Supp. Decl. (Rec. Doc. 7727-4):  Robert H. Klonoff's qualifications and experience are described in the main text.  *See supra* ¶ 287.

Rice Negotiations Decl. (Rec. Doc. 7104-6), Rice Seafood Decl. (Rec. Doc. 7104-6 at 13), and Rice Fees Decl. (Rec. Doc. 7104-6 at 21):  Joseph F. Rice, Esq. is counsel to the Class and a member of the Plaintiffs' Steering Committee.

Wheatman Decl. (Rec. Doc. 6266-4):  Shannon R. Wheatman's qualifications and experience are described in the main text.  *See supra* ¶ 289.

Class Representatives:  The PSC/Class Counsel has submitted the declarations of all fifteen class representatives, and they appear in the record as follows:  Bon Secour Fisheries, Inc. Decl. (Rec. Doc. 7104-6 at 31); Frilioux Decl. (Rec. Doc. 7104 at 34); Gallo Decl. (Rec. Doc. 7104-6 at 37); Fort Morgan Realty, Inc. Decl. (Rec. Doc. 7104-6 at 39); GW Fins Decl. (Rec. Doc. 7104-6 at 42); Hutto Decl. (Rec. Doc. 7104-6 at 45); Irwin Decl. (Rec. Doc. 7104-6 at 48); Kee Decl. (Rec. Doc. 7104-6 at 51); Tesvich Decl. (Rec. Doc. 7104-6 at 54); Lake Eugenie Land and Development, Inc. Decl. (Rec. Doc. 7104-6 at 57); Lundy Decl. (Rec. Doc. 7104-6 at 61);

Guidry Decl. (Rec. Doc. 7104-6 at 64); Panama City Beach Dolphin Tours & More LLC Decl. (Rec. Doc. 7104-6 at 67); Sellers Decl. (Rec. Doc. 7104-6 at 70); Zeke's Charter Fleet, LLC Decl. (Rec. Doc. 7104-6 at 73).

## III.    BP Submissions

Dent Decl. (Rec. Doc. 7114-4) and Dent. Supp. Decl. (Rec. Doc. 7731-1):   Jerry Dent's qualifications and experience are described in the main text.  *See supra* ¶ 290.

Fishkind Decl. (Rec. Doc. 7114-5) and Fishkind Supp. Decl. (Rec. Doc. 7731-2):  Dr. Henry Fishkind's qualifications and experience are described in the main text.  *See supra* ¶ 291.

Godfrey Decl. (Rec. Doc. 7114-9):  Richard C. Godfrey is counsel for the BP Defendants and a senior partner at Kirkland & Ells LLP.  *See* Godfrey Decl. ¶ 1.

Henley Decl. (Rec. Doc. 7114-11) and Henley Supp. Decl. (Rec. Doc. 7731-3):   James L. Henley, Jr.'s qualifications and experience are described in the main text.  *See supra* ¶ 291.

Jeffrey Decl. (Rec. Doc. 7114-12) and Jeffrey Supp. Decl. (Rec. Doc. 7731-4):  Dr. Alan W.A. Jeffrey's qualifications and experience are described in the main text.  *See supra* ¶ 293.

Kelley Decl. (Rec. Doc. 7114-13):   Dr. Laura Kelley's qualifications and experience are described in the main text.  *See supra* ¶ 294.

Landry Decl. (Rec. Doc. 7114-14) and Landry Supp. Decl. (Rec. Doc. 7731-5):   Donald J. Landry's qualifications and experience are described in the main text.  *See supra* ¶ 295.

Leggett Decl. (Rec. Doc. 7114-15):   Dr. Harold Leggett's qualifications and experience are described in the main text.  *See supra* ¶ 295.

Miller Decl. (Rec. Doc. 7114-16) and Miller Supp. Decl. (Rec. Doc. 7731-6): Geoffrey P. Miller's qualifications and experience are described in the main text.  *See supra* ¶ 288.

Pearson Decl. (Rec. Doc. 7731-7):  Dr. Walter H. Pearson's qualifications and experience are described in the main text.  *See supra* ¶ 297.

Richardson Decl. (Rec. Doc. 7114-17) and Richardson Supp. Decl. (Rec. Doc. 7731-8): Dr. James A. Richardson's qualifications and experience are described in the main text.  *See supra* ¶ 298.

Sharp Decl. (Rec. Doc. 7114-18) and Sharp Supp. Decl. (Rec. Doc. 7731-9):  Holly Sharp's qualifications and experience are described in the main text.  *See supra* ¶ 299.

Smith Decl. (Rec. Doc. 7114-19) and Smith Supp. Decl. (Rec. Doc. 7731-10):  Dr. Martin Smith's qualifications and experience are described in the main text.  *See supra* ¶ 300.

Taylor Decl. (Rec. Doc. 7114-20) and Taylor Supp. Decl. (Rec. Doc. 7731-11): Dr. Elliott Taylor's qualifications and experience are described in the main text.  *See supra* ¶ 301.

Travis Decl. (Rec. Doc. 7731-12):  Maria Travis is Director of Claims for the Gulf Coast Restoration Organization, BP North America Inc.

Tunnell Decl. (Rec. Doc. 7114-22) and Tunnell Supp. Decl. (Rec. Doc. 7731-13):  Dr. John W. Tunnell, Jr.'s qualifications and experience are described in the main text.  *See supra* ¶ 302.

Wharton Decl. (Rec. Doc. 7114-23) and Wharton Supp. Decl. (Rec. Doc. 7731-14):  Edward Briggs Wharton's qualifications and experience are described in the main text.  *See supra* ¶ 303.

## APPENDIX B:  CLASS DEFINITION

(a)  Class Definition

Economic and Property Damages Settlement Class shall mean the NATURAL PERSONS and ENTITIES defined in this Section 1, subject to the EXCLUSIONS in Section 2 below.  If a person or entity is included within the geographical descriptions in Section 1.1 or Section 1.2, and their claims meet the descriptions of one or more of the Damage Categories described in Section 1.3, that person or entity is a member of the Economic and Property Damages Settlement Class, unless the person or entity is excluded under Section 2:

1.1.  Individuals.  Unless otherwise specified, all Natural Persons residing in the United States who, at any time between April 20, 2010 and April 16, 2012, lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, or owned or leased or worked on a vessel harbored or HOME PORTED in the States of Louisiana, Mississippi, or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida (the "GULF COAST AREAS") (Exhibit 22), or the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23 ("SPECIFIED GULF WATERS"), or worked on a vessel in Specified Gulf Waters after April 20, 2009.  With respect to SEAFOOD CREW  Claims, persons must have worked on a vessel that landed SEAFOOD in the Gulf Coast Areas after April 20, 2009.

and

1.2.  Entities.  All Entities doing business or operating in the Gulf Coast Areas or Specified Gulf Waters that:

1.2.1.  at any time from April 20, 2010 to April 16, 2012, owned, operated, or leased a physical facility in the Gulf Coast Areas or Specified Gulf Waters and (A) sold products in the Gulf Coast Areas or Specified Gulf Waters (1) directly to CONSUMERS OR END USERS of those products or (2) to another Entity that sold those products directly to Consumers or End Users of those products, or (B) regularly purchased Seafood harvested from Specified Gulf Waters in order to produce goods for resale;

1.2.2.  are service businesses with one or more full-time employees (including owner-operators) who performed their full-time services while physically present in the Gulf Coast Areas or Specified Gulf Waters at any time from April 20, 2010 to April 16, 2012; or

1.2.3.  owned, operated, or leased a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; or

1.2.4.  owned or leased REAL PROPERTY in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012;

1.3.   Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

1.3.1.   The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-15:

1.3.1.1.    Seafood Compensation Program.  Damages suffered by a COMMERCIAL FISHERMAN, Seafood Crew, or SEAFOOD VESSEL OWNER that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, inter alia, OYSTER LEASEHOLDERS and IFQ Owners.  (Exhibit 10).  Claims for Economic Damage arising from the fishing, processing, selling, catching, or harvesting of menhaden (or "pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.

1.3.1.2.    Economic Damage Category.  Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT, subject to certain Exclusions. (Exhibits 16-19)

1.3.1.3.    Subsistence Damage Category.   Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and GAME, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by the CLAIMANT due to or resulting from the Deepwater Horizon Incident.  (Exhibit 9)

1.3.1.4.    VoO Charter Payment Category.   Damages suffered by Natural Persons or Entities who registered to participate in BP's Vessels of Opportunity ("VoO") program and executed a VoO MASTER VESSEL CHARTER AGREEMENT with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as CHARTERER, and completed the initial VoO training program.

1.3.1.5.    Vessel Physical Damage Category.  Physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program.  (Exhibit 14)

1.3.1.6.    Coastal Real Property Damage Category.  Damages alleged by a Coastal Real Property Claimant that meet the requirements set forth in the Coastal Real Property Claim Framework.

1.3.1.7.    Wetlands Real Property Damage Category.   Damages alleged by a Wetlands Real Property Damage Claimant that meet the requirements set forth in the Wetlands Real Property Claim Framework.

1.3.1.8.    Real Property Sales Damage Category.  Damages alleged by a Real Property Sales Claimant that meet the requirements set forth in the Real Property Sales Framework.

1.3.1.9.    Individuals/Employees in Otherwise Excluded Oil and Gas, Gaming, Banking, Insurance, Funds, Defense Contractors, Developers Industries, and any Entity selling or marketing BP-branded fuel (including jobbers and branded dealers):  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims for Economic Damage outside of these excluded industries, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.10.   Individuals/Employees in Support Services to Oil and Gas Industry:  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses/employers in the SUPPORT SERVICES TO OIL AND GAS INDUSTRY, described in Exhibit 16 may submit Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non oil and gas industry Economic Damages due to or resulting from the Deepwater Horizon Incident, except for moratoria claims.  As is also more fully described in Exhibit 16, these individuals and employees may also

B-3

pursue Claims for other Economic Damage outside the Support Service to Oil and Gas Industry, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.11. Businesses/Employers in Otherwise Excluded Gaming, Banking, Insurance, Funds, Defense Contractors and Developers Industries: As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims only for Coastal Real Property Damage and Wetlands Real Property Damage, but are not entitled to recover under any other aspect of the Settlement.

1.3.1.12. Businesses/Employers in Support Services to Oil and Gas Industry: As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in the "Support Services to Oil and Gas Industry," described in Exhibit 16, may submit Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non-oil and gas industry Economic Damages arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, except for moratoria claims, and may pursue all other recovery permitted under other aspects of the Settlement.

(b) Exclusions from the Economic and Property Damages Settlement Class Definition

2.1. Notwithstanding the above, the following individuals and Entities, including any and all of their past and present predecessors, successors, personal representatives, agents, trustees, insurers, reinsurers, indemnitors, subrogees, assigns, and any other Natural Person, legal or juridical person or Entity entitled to assert any Claim on behalf of or in respect of any such individual or Entity in their respective capacities as such are excluded from the Economic Class.

2.2. Excluded Individuals or Entities:

2.2.1. Any Economic Class Member who or which timely elects to be excluded from the Economic Class under the deadlines and procedures to be set forth in the ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS ACTION SETTLEMENT NOTICE.

2.2.2. Defendants in MDL 2179, and individuals who are current employees, or who were employees during the CLASS PERIOD, of BP or other defendants in MDL 2179.

2.2.3. The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of the MDL, and members of any such judge's or current law clerk's immediate family.

2.2.4.   The following exclusions are based on the substantive nature of the business, not the legal or juridical form of that business.   Any of the following types of Entity, or any Natural Person to the extent he or she alleges Economic Damage based on their employment by such an Entity, during the Class Period are excluded:

2.2.4.1.   Financial Institutions as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, commercial banks; savings institutions; credit card issuers; credit insurers; factors or other sales finance entities; financial or investment advisers or portfolio managers; fund managers; investment banking entities; lending institutions; real estate mortgage or lending entities; brokers or dealers of securities, commodities, commodity contracts or loans; securities or commodities exchanges; entities serving as custodians, fiduciaries or trustees of securities or other financial assets; or entities engaged in other financial transaction intermediation, processing, reserve or clearinghouse activities, provided, that the following shall not be excluded solely pursuant to this Section 2.2.4.1 unless they are subject to a different exclusion:  stand-alone ATMs, credit unions, pawn shops, businesses engaged predominantly in making payday loans or paycheck advances and businesses that sell goods and services and offer financing on these purchases to their customers.

2.2.4.2.   Funds, Financial Trusts, and Other Financial Vehicles, as identified in the NAICS codes listed on Exhibit 18, after giving effect to the bracketed exceptions contained in NAICS Codes 525920 and 523991, which include by way of example, public-open end investment funds; investment funds; real estate investment trusts; REMICS; mutual funds; money market funds; derivatives; health and welfare funds; insurance funds; pension funds; financial trusts; and special purpose financial vehicles provided, that successions, estates, testamentary trusts, trusts of Natural Persons, bankruptcy estates, limited liability companies, corporations, Sub-Chapter "S" corporations, partnerships, limited partnerships, joint ventures, and any other businesses or juridical Entities, shall not be excluded pursuant to this Section 2.2.4.2 solely by reason of their form of legal or juridical structure or organization, except to the extent they are excluded pursuant to another exclusion in Section 2.2 of this Agreement.

2.2.4.3.   Gaming, as identified in the NAICS codes listed on Exhibit 18, which includes, by way of example,  casinos; casino hotels; off-track betting parlors; racetracks and other gambling establishments provided, that the following shall not be excluded solely pursuant to this Section 2.2.4.3 unless they are subject to a

different exclusion: (a) bingo parlors, and (b) video gaming at bars, bingo parlors, hotels, off-track betting parlors, racetracks, restaurants and truck stops.

2.2.4.4.  Insurance Entities, as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, insurance carriers issuing disability, health, life, medical, property and casualty, title or other insurance; reinsurers; insurance agencies and brokerages; underwriting agencies or organizations; claims adjusters and processors; third-party insurance or fund administrators; or other insurance-related businesses.

2.2.4.5.  Oil and Gas Industry, as identified in the NAICS codes listed on Exhibit 17, which includes by way of example, firms engaged in:  extracting crude petroleum, natural gas or other hydrocarbons; drilling wells; preparing, maintaining or constructing petroleum or natural gas well-sites or other mineral extraction sites; mining; maintaining or constructing petroleum or natural gas pipeline or distribution facilities; pipeline distribution of crude petroleum, refined petroleum, oil or natural gas; petroleum or natural gas refining or other mineral refining and/or manufacturing; manufacturing petroleum lubricating oil and grease, petrochemical products, or other petroleum and coal products or chemical products derived from extracted minerals; merchant wholesaling of construction and mining (except oil well) machinery and equipment; wholesale distribution of oil well machinery, equipment and supplies; wholesale distribution of petroleum, petroleum products, other extracted minerals, chemical products produced from extracted or refined minerals, petroleum bulk stations and terminals, petroleum and petroleum products merchant wholesalers.

2.2.4.6.    Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor.

2.2.4.7.  Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties.  This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, provided, however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9

2.2.4.8.     Any Entity selling or marketing BP-branded fuel, including jobbers and branded dealers.

2.2.5.   GOVERNMENTAL ORGANIZATIONS, as defined in this Agreement, provided that Native American tribal Entities may consent to participate in the Settlement as to otherwise eligible Claims.

2.2.6.   Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF RELEASE AND COVENANT NOT TO SUE, provided, however, that the execution of a GCCF Release and Covenant Not to Sue shall not prevent a Natural Person or Entity from making a VoO Charter Payment Claim or a Vessel Damage Claim, nor shall a release covering only bodily injury prevent a Natural Person from making Claims under this Agreement.

**APPENDIX C:  SLIDES REGARDING SEAFOOD COMPENSATION PROGRAM**







I. The Data Support Approval
– Seafood Compensation Program Size Relative to Industry Metrics – Shrimp

Shrimp ($MM)

$1,044 — Estimated SCP Shrimp Compensation

$265 — Avg. Industry Revenue (2007-09)

$70 — Lost Industry Revenue (2010)

**Note:** Assumes pro-rata second round distribution. Lost Industry Revenue reflects decline in catch volume between 2010 and the 2007-09 average valued at average 2010 price. **Sources:** Smith Decl. ¶12 & Ex. 3; Rec. Doc. 7104-1 at 3.

9



**I. The Data Support Approval – Seafood Compensation Program Size Relative to Industry Metrics – Oysters**

Oysters ($MM)

$948 — Estimated SCP Oyster Compensation

$66 — Avg. Industry Revenue (2007-09)

$23 — Lost Industry Revenue (2010)

**Note:** Assumes pro-rata second round distribution. Lost Industry Revenue reflects decline in catch volume between 2010 and the 2007-09 average valued at average 2010 price. **Sources:** Smith Decl. ¶ 12 & Ex. 3; Rec. Doc. 7104-1 at 3.

10

November 19, 2012

Respectfully submitted,

___/s/ Stephen J. Herman___

___/s/ James Parkerson Roy___

Stephen J. Herman, La. Bar No. 23129
HERMAN HERMAN KATZ & COTLAR
LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024

James Parkerson Roy, La. Bar No. 11511
DOMENGEAUX WRIGHT ROY & EDWARDS
LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796

Lead Economic and Property Damages
Class Counsel

Lead Economic and Property Damages
Class Counsel

### *ECONOMIC AND PROPERTY DAMAGES CLASS COUNSEL*
_____

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:  (843) 216-9159
Telefax: (843) 216-9290

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA 70360
Office:  (985) 876-7595
Telefax: (985) 876-7594

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:  (757) 670-3888
Telefax: (757) 670-3895

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031


Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGÉ
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax: (312) 862-2200


Daniel A. Cantor
Andrew T. Karron
Ellen K. Reisman
Matthew J. Douglas
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999


Jeffrey Lennard
Keith Moskowitz
SNR DENTON
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934


**OF COUNSEL**

    __/s/ Richard C. Godfrey, P.C__
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
Timothy A. Duffy, P.C.
R. Chris Heck
Christopher J. Esbrook
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200


Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

    __/s/ Don K. Haycraft__
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108


Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291


**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of November 2012.

/s/ Don K. Haycraft
Don K. Haycraft