# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | MDL NO. 2179 |
| "*Deepwater Horizon*" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | SECTION:  J |
| | * | |
| | * | |
| | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| | * | |

| | | |
|---|---|---|
| Plaisance, *et al.*, individually | * | NO. 12-CV-968 |
| and on behalf of the | * | |
| Medical Benefits Settlement Class, | * | SECTION:  J |
| | * | |
| Plaintiffs, | * | |
| | * | HONORABLE CARL J. BARBIER |
| v. | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| BP Exploration & Production Inc., *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## CLASS COUNSEL'S AND BP'S JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL OF THE *DEEPWATER HORIZON* MEDICAL BENEFITS CLASS ACTION SETTLEMENT, AS AMENDED ON MAY 1, 2012

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FINDINGS OF FACT............................................................................................3

**I.**      HISTORY OF THE SPILL AND RESPONSE ACTIVITIES..........................3

**II.**     POTENTIAL   HEALTH   RISKS   FROM   EXPOSURE   TO   OIL   OR
         PETROLEUM-BASED DISPERSANTS.............................................................8

**III.**    DATA COLLECTED IN CONNECTION WITH RESPONSE ACTIVITIES. ..............13

**IV.**     HISTORY OF THE LITIGATION. ...............................................................15

         A.      Consolidation   of   Lawsuits   and   Appointment   of   the   Plaintiffs'
                 Steering Committee. ...................................................................15

         B.      Master Complaint and Joinders. ....................................................16

         C.      Motions Practice and Discovery. ...................................................17

         D.      Settlement Negotiations. ..............................................................18

         E.      The Class Action Complaint...........................................................20

         F.      Preliminary Approval....................................................................22

         G.      Motions for Final Approval and Class Certification............................24

                 1.      Briefing by the Parties. ......................................................24

                 2.      Expert Declarations Submitted by the Parties. .......................24

**V.**      SUMMARY OF THE SETTLEMENT TERMS.................................................33

         A.      Medical Class Definition. ..............................................................33

         B.      Benefits under the Medical Settlement. ...........................................35

                 1.      Compensation for Specified Physical Conditions....................35

                 2.      Periodic Medical Consultation Program..................................39

                 3.      Gulf Region Health Outreach Program...................................41

4. Back-End Litigation Option for Later-Manifested Physical Conditions. ................................................. 44

5. Release. ...................................................................... 45

6. Notice and Administration Expenses. ........................................ 46

7. Guarantees. .................................................................. 47

8. Attorneys' Fees and Costs. ................................................... 47

**VI.** IMPLEMENTATION OF THE MEDICAL SETTLEMENT TO DATE. ....................... 48

A. Implementation of Class Notice Program. ................................. 48

B. Initial Funding of Projects for the Gulf Region Health Outreach Program. ......... 49

C. Implementation of the Settlement. ......................................... 50

CONCLUSIONS OF LAW ................................................................. 51

**I.** JURISDICTION AND VENUE. ...................................................... 51

**II.** STANDING. ...................................................................... 52

**III.** DISCOVERY MOTIONS. .......................................................... 56

**IV.** EXPERT DECLARATIONS. ........................................................ 58

**V.** THE SETTLEMENT CLASS MAY BE CERTIFIED FOR PURPOSES OF SETTLEMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(a) AND 23(b)(3). ................................................... 64

A. The Medical Class Meets Rule 23(a)'s Requirements. ....................... 65

1. The Medical Class Satisfies the Ascertainability Requirement. ............... 66

2. The Medical Class Meets Rule 23(a)(1)'s Numerosity Requirement. ........................................................ 68

3. The Medical Class Meets Rule 23(a)(2)'s Commonality Requirement. ........................................................ 69

4. The Medical Class Meets Rule 23(a)(3)'s Typicality Requirement. ......... 74

5. The Medical Class Meets Rule 23(a)(4)'s Adequacy Requirement. ......... 78

a. Class Counsel Are Adequate. ........................................ 78

b.      Class Representatives Are Adequate. ...........................................81

c.      There Are No Conflicts of Interest Among the Class...................82

B.     The Medical Class Meets Rule 23(b)(3)'s Requirements.....................................86

      1.      The Medical Class Meets Rule 23(b)(3)'s Predominance Requirement............................................................................................86

      2.      The Medical Class Meets Rule 23(b)(3)'s Superiority Requirement............................................................................................95

VI.     THE FAIRNESS HEARING. ............................................................................98

VII.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE. ........................101

A.     Presumption of Fairness.............................................................................101

B.     The *Reed* Factors........................................................................................104

      1.      The Settlement Negotiations...................................................................104

      2.      The Complexity, Expense, and Likely Duration of the Litigation. .........107

      3.      The Stage of the Proceedings and the Amount of Discovery Completed. ..............................................................................................109

      4.      The Probability of Plaintiffs' Success on the Merits. .............................111

      5.      The Range of Possible Recovery. ...........................................................112

      6.      The Opinions of Class Counsel, Class Representatives, and Absent Class Members........................................................................................114

VIII.   CLASS NOTICE. ...........................................................................................116

IX.     THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT....................120

A.     Objections to the Class Definition. ....................................................122

B.     Objections to the Amount of Compensation Under the Specified Physical Conditions Matrix. .......................................................................................122

C.     Objections Concerning the Medical Conditions Covered Under the Specified Physical Conditions Matrix. ..............................................................126

D.     Objections to the Procedural Aspects of the Specified Physical Conditions Matrix...........................................................................................................129

E.      Objections to the Terms of the Back-End Litigation Option. .............................132

F.      Objections Related to the Gulf Region Health Outreach Program. ....................133

G.      Objections Concerning Worker Protection. ..........................................................134

H.      Objections Concerning Possible Re-Oiling or Potential Future Exposures.........135

I.      Objections Related to the *Reed* Factors. ............................................................135

J.      Objections Related to OPA Requirements...........................................................136

K.      Objections Related to Medicare............................................................................136

L.      Objections Related to Consortium Claims...........................................................138

M.      Other Objections. ................................................................................................139

CONCLUSION...........................................................................................................................140

## INTRODUCTION

BP Exploration & Production Inc. and BP America Production Co. (collectively, "BP") and Class Counsel submit these proposed Findings of Fact and Conclusions of Law in support of Final Approval of the Medical Benefits Class Action Settlement and Plaintiffs' Motion to Certify a Medical Benefits Settlement Class.  A proposed Final Order and Judgment is attached.[1]

     1.     On April 20, 2010, the mobile offshore drilling unit *Deepwater Horizon* was in the process of temporarily closing an exploratory well at the Mississippi Canyon Block 252 lease block.  That evening, a loss of well control occurred, followed by an explosion and fire aboard the *Deepwater Horizon*.  Resulting from that event were the sinking of the *Deepwater Horizon* rig, the oil spill, and the Response Activities that are the common subjects of this litigation. (Preliminary Approval Order, Rec. Doc. 6419 at 2.)[2]

     2.     As a result of the *Deepwater Horizon* Incident, individuals who reside in certain coastal regions of Louisiana, Mississippi, Alabama, and Florida and those who performed in Response Activities[3] allege personal injury from exposure to oil and/or dispersants.[4]  These individuals filed suit against BP in a class action complaint in connection with their alleged injuries, seeking compensation and other relief.  (*See* Medical Class Action Complaint, Docket 12-CV-968, Rec. Doc. 1.)

---

[1] Terms with initial capital letters used in these Findings of Fact and Conclusions of Law have the meanings ascribed to the fully capitalized rendering of such terms in the Medical Benefits Class Action Settlement Agreement. In addition, "Class", "Class Members", "Medical Settlement Agreement" ("MSA" or "Agreement"), and "Medical Benefits Settlement" (or "Settlement") are also used herein to refer, respectively, to the Medical Benefits Settlement Class, the Medical Benefits Settlement Class Members, the Medical Benefits Class Action Settlement Agreement, and the Medical Benefits Class Action Settlement.

[2] Unless otherwise stated, all references are to Docket 10-2179.

[3] The Settlement Agreement defines "Response Activities" as the "clean-up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the release of oil, other hydrocarbons, and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances that were done under the auspices of the Unified Command, BP, or a federal, state, or local authority."  (Medical Settlement Agreement, Rec. Doc. 6427-1, § II.OOOO.)

[4] References to "oil and/or dispersants" refer to the crude oil, other hydrocarbons, dispersants, decontaminants, and/or other substances resulting from the *Deepwater Horizon* Incident, including the resulting mixture of the substances, as well as the byproducts of *in situ* burns.

3.      Before the Court is a proposed Medical Benefits Class Action Settlement (as Amended on May 1, 2012), which resolves the claims of a Medical Benefits Settlement Class of Clean-Up Workers and Residents of defined Gulf Coast beachfront and wetlands areas for specified bodily and/or personal injuries allegedly arising from exposure to oil and/or dispersants released during the *Deepwater Horizon* Incident.   (Medical Settlement Agreement ("MSA"), Rec. Doc. 6427-1.)  On May 2, 2012, the Court granted Preliminary Approval to the Settlement, certified the Class for settlement purposes only, and directed notice to the Class.  (Preliminary Approval Order, Rec. Doc. 6419.)   Thereafter, the Parties submitted voluminous evidence in support of Final Approval of the Settlement, and the Court received written objections from a small number of Class Members.

4.      On November 8, 2012, the Court conducted a Fairness Hearing to consider arguments in support of the Settlement by the Class and BP.  The Court also heard arguments by certain counsel who had objected to the Settlement.

5.      Based upon the Court's review of these written submissions, arguments of counsel at the Fairness Hearing, and the applicable law, the Court confirms the certification of the Class for settlement purposes only under Federal Rule of Civil Procedure 23(b)(3) and grants Final Approval to the Settlement.  The Court finds the Settlement fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e) and as evaluated under the standards of *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).  The Settlement provides significant and concrete benefits to qualifying Class Members, including benefits that could not, absent a settlement, be obtained in litigation or ordered by a court.  The fairness, reasonableness, and adequacy of the Settlement are demonstrated by weighing its benefits against the cost, delay, and

uncertainty of continued litigation.  Thus, the Court finds that certification of the Class for settlement purposes only and Final Approval of the Settlement is proper.

## FINDINGS OF FACT[5]

### I.  HISTORY OF THE SPILL AND RESPONSE ACTIVITIES.

6.     As described above, on April 20, 2010, a loss of well control and one or more fires and explosions occurred on the *Deepwater Horizon*, which had been engaged in drilling activities in Mississippi Canyon Block 252—the location known as "Macondo"—on the Outer Continental Shelf off the coast of Louisiana.  (BP Parties' Answer to Pls.' Medical Class Action Compl., Rec. Doc. 6454, at 15-16.)  The *Deepwater Horizon* sank to the ocean floor two days later.  (*Id.* at 16-17.)

7.     As a result of these events, oil began to discharge into the Gulf of Mexico.  The flow of oil continued for three months before the well was capped on July 15, 2010.  The MC252 Well was finally and permanently shut with the successful interception of the relief well on September 19, 2010.[6]

8.     Shortly after commencement of the spill, the United States Coast Guard named BP a "responsible party" under the Oil Pollution Act of 1990 ("OPA").  BP accepted responsible party status and assumed responsibility for "removal costs" due to the spill.  *See* 33 U.S.C. § 2702 (2012).

9.     In response to the *Deepwater Horizon* Incident, as many as 90,000 response workers engaged in near-shore and offshore Response Activities in the Gulf of Mexico, working on approximately 6,500 marine vessels, including roughly 5,800 Vessels of Opportunity, a

---

[5] The following Findings of Fact are entered upon the record as the findings and conclusions of the Court.  To the extent that any of them might more properly be deemed Conclusions of Law, they are incorporated within the Court's Conclusions of Law.

[6]  http://www.restorethegulf.gov/release/2010/09/19/statement-admiral-allen-successful-completion-relief-well.

program in which BP contracted with vessel owners to assist in Response efforts.   Response Activities included:   (i) skimming oil from the surface; (ii) conducting approximately 400 controlled *in-situ* burns; (iii) placing more than 13 million feet of containment and sorbent boom; and  (iv) applying  approximately  1.8 million gallons of dispersants.   Response workers also engaged in onshore activities such as beach clean-up and wildlife restoration.  (Rec. Doc. 6419 at 16; Declaration of David R. Dutton, Rec. Doc. 7112-2, ¶ 7.)

10.     BP submitted evidence that it organized and carried out Response Activities in accordance with the Incident Command System, as established by the National Contingency Plan ("NCP").   (Dutton Decl. ¶ 8.)   The NCP, codified at 40 C.F.R. pt. 300, is the federal government's blueprint for responding to oil spills.  It requires oil spill responses to be organized pursuant to a Unified Area Command ("UAC") structure that brings together federal and state governments and the responsible party to achieve an effective and efficient response.  Under the NCP, the Federal On-Scene Coordinator ("FOSC") maintains authority and directs response efforts.  40 C.F.R. §§ 300.105(d), 300.120(a).  In the *Deepwater Horizon* response, the Unified Area Command consisted of the U.S. Coast Guard, the U.S. Environmental Protection Agency ("EPA"), the National Oceanic and Atmospheric Administration ("NOAA"), and other government agencies.   (Dutton Decl. ¶ 8.)   Plaintiffs dispute the assertion that Response Activities adhered to the blueprint set forth in the NCP.

11.     The Unified Area Command was divided into a number of functional groups.  The Safety and Industrial Hygiene groups were responsible for developing protocols related to worker safety and health, addressing issues such as exposure assessment, safe work practices, personal protective equipment, and worker training.  (*Id*. ¶¶ 9, 10.)

12.     ***Dispersant Use.***  One aspect of the Response was the use of dispersants to break down the oil into smaller droplets, which is intended to increase the surface area of the mass and disperse oil into the water column (as opposed to allowing it to remain on the surface), increasing the oil's susceptibility to biodegradation.  (*Id.* ¶ 22; *see also* Master Complaint, Docket 12-968, Rec. Doc. 1, ¶ 46.)  Two types of dispersants were used during the Response: Corexit® EC9500A ("Corexit 9500A") and Corexit® EC9527A ("Corexit 9527A").  Both were and still are on the NCP Product Schedule, which is a list of dispersants pre-approved by the EPA for use in oil spill response efforts.  (Dutton Decl. ¶ 24.)  BP presented evidence that both BP and EPA investigated the toxicity, effectiveness, and availability of dispersants approved for use by EPA on the NCP Product Schedule, and that such testing showed that the Corexit products are as safe as other available alternatives and are more effective at dispersing oil.  (*Id.* ¶ 25.)  Plaintiffs dispute this assertion.

13.     BP has provided evidence that dispersants were applied using three methods: aerial, vessel, and subsea.  Dr. Dutton, a BP employee who was the Industrial Hygiene Team Lead for the Unified Area Command on the *Deepwater Horizon* Response, has stated that aerial dispersant operations were conducted from April 22, 2010 to July 19, 2010.   Dr. Dutton further stated that dispersants were applied by vessel, primarily near the source-control area (*i.e.*, within five miles of the MC252 Well) in order to control the airborne level of volatile organic chemicals ("VOCs") directly above the wellhead for the protection of Response workers.  Dispersants were also applied subsea directly at the wellhead.  (*Id.* ¶¶ 26, 28, 29, 31.)  BP submitted evidence that aerial dispersant operations were not conducted at night during the *Deepwater Horizon* Response because (1) as a practical matter, it would not have been feasible to do so given safety concerns related to flying close to the ocean surface at night and the need to locate dispersible oil slicks;

and (2) federal guidelines specifically require that aerial dispersant operations be conducted during daylight hours only.  (Supplemental Declaration of David R. Dutton, Rec. Doc. 7732-3, ¶ 36.)  Plaintiffs dispute these facts.

14.     Over the course of the Response Activities, approximately 970,000 gallons of dispersant were applied by aerial application to surface oil slicks, approximately 95,000 gallons of dispersant were applied by vessel application, and approximately 770,000 gallons of dispersant were applied by subsea application methods.  (Dutton Decl. ¶¶ 26, 29, 31.)

15.     Chemical dispersants, including Corexit 9500 and Corexit 9527A, are derived from petroleum and, as such, contain petroleum distillates.  Class Counsel presented evidence that the effects on human health resulting from exposure to petroleum discharged during the *Deepwater Horizon* Incident (*i.e.*, crude oil) and petroleum distillates (*i.e.*, the dispersants used to remediate the oil) are often similar if not identical because the chemicals they contain are substantially the same.  Both the oil and the dispersants used during the Response Activities are petroleum-derived, and Class Counsel presented evidence that their biological reactivity would be expected to be largely the same.  (Declaration of Michael R. Harbut, Rec. Doc. 7116-1, ¶¶ 20-24; Supplemental Declaration of Michael R. Harbut, Rec. Doc. 7728-3, ¶ 7.)

16.     BP presented evidence that the Unified Area Command implemented a number of safety controls intended to limit exposure of Clean-Up Workers and Gulf Coast Residents to aerial dispersants.  For example, BP contends that safety setbacks were implemented so that dispersant was not to be sprayed (i) within two nautical miles of any platform, rig, or vessel; (ii) within five nautical miles of controlled-burning activities; (iii) within five nautical miles of the source-control area; or (iv) within three nautical miles of the shore.  (Dutton Decl. ¶ 27.)

17.     BP's Dr. Dutton has testified that aerial dispersants were applied greater than three nautical miles offshore (with one exception in an emergency)[7] and 98% of aerial dispersant applications were applied greater than ten nautical miles offshore.   (After Action Report: *Deepwater Horizon* MC252 Response, Aerial Dispersant Response (Dec. 31, 2010), at 14; Dutton Decl. ¶ 28.)

18.     ***Response Worker Safety and Training.***   BP presented evidence that it, in coordination with the Unified Area Command and with daily input, oversight, and approval by the U.S. Occupational Safety and Health Administration ("OSHA"), developed and instituted task-specific response-worker training.   Dr. Dutton stated that this training was designed to educate Response workers concerning potential hazards and risks, functions to be performed, and relevant operating procedures.   Trained workers were provided a yellow card to certify the level of training they received and were required to show that card before entering Response work sites.   Supervisors, professional responders, workers involved in decontamination activities, and source-control workers had to complete a 40-hour Hazardous Waste Operations and Emergency Response training.   BP presented evidence, which plaintiff dispute, that workers received daily safety talks at the beginning of each shift.   (Dutton Decl. ¶¶ 47, 50-54.)

19.     BP also presented evidence that it, in conjunction with and with approval from the UAC and OSHA, developed Personal Protective Equipment ("PPE") requirements for all Response workers — typically, protective clothing, disposable gloves, protective boots, and life jackets.   (*Id*. ¶¶ 55-57.)   Plaintiffs dispute that such requirements were routinely followed.

---

[7] According to BP, the one aerial dispersant application that occurred fewer than 3 nautical miles offshore involved an emergency incident (airplane engine failure) on April 29, 2010.   Plaintiffs have contested this fact.   (*See* Declaration of Hawkins-Lodge, Rec. Doc. 6696-21, ¶¶ 5-7; Declaration of Warren Jones, Rec. Doc. 6696-23, ¶ 4; Declaration of Terry Joe Carter, Rec. Doc. 6696-18, ¶ 4.)   Approximately 1,000 gallons of Corexit 9500A were released into the western portion of Barataria Bay/Caminada Bay.   Analysis of the samples taken by BP on June 18, 2010 indicated that the dispersant was not present.   (Dutton Decl. ¶ 28 n.3.)   Plaintiffs have also submitted evidence that, contrary to the safety controls established by the Unified Area Command, aerial dispersant application occurred within three nautical miles of controlled-burning activities.   (*See*, *e.g.*, Anderson Aff., Rec. Doc. 6696-15, ¶ 2.)

20.     The Response operations plan required BP to implement a medical program that provided emergency and first aid treatment, including access to emergency medical technicians or paramedics, at numerous locations.  (*Id*. ¶¶ 66-67.)  The UAC Safety and Industrial Hygiene groups analyzed reports of work-related illnesses and injuries to identify trends so that corrective actions and improvements could be instituted.  *(Id*. ¶ 66.)

21.     BP presented evidence relating to the Coast Guard's On Scene Coordinator Report, released in September 2011, to support BP's position that Clean-Up Workers were adequately protected.  That report noted that "Health and Safety was the number one strategic goal throughout this response."  (On Scene Coordinator Report *Deepwater Horizon* Oil Spill (September 2011) at ix.)  It also stated that "the safety record of the entire response operation reflected an effective and persistent safety program" and that "the *Deepwater Horizon* response produced an exceptional safety record."  (*Id*. at 90.)  Overall, the Coast Guard concluded that "[t]he efforts and commitment to ensure the safety of those who worked on the spill, and that of the public, is one of the single most notable accomplishments of the *Deepwater Horizon* response."  (*Id*.)

22.     Plaintiffs dispute BP's evidence and this issue would be subject to extensive litigation.  (*See*, *e.g.*, Declaration of John Lide, Rec. Doc. 6696-24, ¶ 4; Declaration of Brandon Scott, Rec. Doc. 6696-26, ¶ 4; *see also* Declaration of Terrence Carroll, Rec. Doc. 6696-17, ¶ 3; Declaration of Roy Mackie, Rec. Doc. 6696-25, ¶ 4; Declaration of Victor Carias, Rec. Doc. 6696-16, ¶¶ 4-5.)

## II.     POTENTIAL HEALTH RISKS FROM EXPOSURE TO OIL OR PETROLEUM-BASED DISPERSANTS.

23.     Plaintiffs allege in the Medical Class Action Complaint that "Clean-Up Workers were exposed to oil and dispersants and other harmful chemicals by, *inter alia*, inhalation,

ingestion, dermal exposure and through contact with the eyes from spray mist." (Rec. Doc. 6250, ¶ 71.)  They also allege that "Residents of Zones A and B . . . due to the proximity of their homes to the Gulf of Mexico . . . have been exposed to oil, dispersants, and other harmful chemicals and to fumes and odors from those chemicals."  (*Id.* ¶ 73.)

24.    Zone A includes specified Gulf Coast beachfront areas, and Zone B includes specified Gulf Coast wetlands.  They are defined in Exhibits 9, 10, and 11 to the Medical Settlement.  (Rec. Doc. 6427-11; 6427-12.)  Zones A and B were drawn with reference to the Shoreline Cleanup Assessment Technique ("SCAT"), a process that involves systematically segmenting the shoreline into discrete parts, visually evaluating the presence and extent of oiling in each defined segment over time through repeat surveys, evaluating the potential for re-oiling, and recommending appropriate treatment procedures based on the level and type of oiling and the characteristics of the shoreline.  (Declaration of Elliot Taylor, Rec. Doc. 7114-20, ¶ 13.)  The SCAT process is the international standard for assessing visually observable shoreline oiling to determine the need for operational response and treatment, and it has been extensively and widely adopted by the National Oceanic and Atmospheric Administration, Environment Canada, the U.S. Coast Guard, and the Environmental Protection Agency, among others.  (Taylor Decl. ¶ 13; Supplemental Declaration of Elliot Taylor, Rec. Doc. 7731-11, ¶ 10.)

25.    BP presented evidence that Zone A and Zone B are appropriately defined with reference to the SCAT Line, which is the collection of segments inspected by SCAT teams from the inception of the spill to the present.  (Taylor Supp. Decl. ¶ 38.)  "The east and west boundaries of Zone A and Zone B include the furthest points on the SCAT Line where MC252 oil was observed by SCAT teams."  (*Id.*)

26.     Class Counsel presented evidence that, given the nature of Clean-Up Workers' responsibilities, they could have been exposed to petroleum and/or petroleum-based products either through direct dermal contact or via inhalation of airborne chemicals.  (*See* Harbut Decl. ¶¶ 18, 41-42.)  Class Counsel also presented evidence that during the course of the Response Activities, coastal populations living within one-half mile of the shoreline in Louisiana, Alabama, Mississippi, and certain coastal parts of the Florida Panhandle—defined as Zone A in the Medical Settlement—could suffer exposure to oil and/or petroleum-based dispersant merely by virtue of their residence and its proximity to the shore.  (*See id.* ¶ 39.)  Class Counsel's expert, Dr. Michael Harbut, has stated that Zone A Residents who suffered such exposures were likely to do so either through direct dermal contact or via inhalation of airborne chemicals.  (*See id.* ¶ 18.)  According to Dr. Harbut, individuals living further than one-half mile from the shoreline would not be expected to suffer exposures merely by virtue of their residency because concentrations of toxins diminish as distance from the shoreline increases.  (*See id.* ¶ 39.)  Counsel for the Parties have informed the Court that they estimate approximately 100,000 individuals resided in Zone A as of April 20, 2010.  (Rec. Doc. 6419 at 16; Rec. Doc. 6272-1 at 11 (relying on 2010 U.S. census data).)

27.     Class Counsel presented evidence that during the course of the Response Activities, and through December 31, 2010, individuals living within designated Louisiana wetlands areas that are within one mile of the shoreline—defined as Zone B in the Medical Settlement—could suffer exposure to oil and/or petroleum-based dispersant merely by virtue of their residence and its proximity to the shore.  (*See* Harbut Decl. ¶ 40.)  Dr. Harbut has stated that Zone B Residents who suffered such exposures were likely to do so either through direct dermal contact or via inhalation of airborne chemicals, and that Zone B Residents may have

suffered exposures for a lengthier duration than Zone A Residents because oil that entered the marshland areas was difficult to remove and some oil was left to naturally attenuate.  (*See id.* ¶ 18.)  Dr. Harbut has further stated that individuals residing in Louisiana marshland areas further than one mile from the shore would not be expected to suffer exposures merely by virtue of their residency because concentrations of toxins diminish as distance from the shore increases. (*See id.* ¶ 40.)  Counsel for the Parties have informed the Court that they estimate approximately 5,000 individuals resided in Zone B as of April 20, 2010.  (Rec. Doc. 6419 at 16; Rec. Doc. 6272-1 at 11 (relying on 2010 U.S. census data).)

28.    Class Counsel presented evidence that exposure at sufficient levels to oil and petroleum-based products (such as the dispersants used during the *Deepwater Horizon* Incident) can cause adverse health effects.  These effects are reflected in the Specified Physical Conditions Matrix ("Matrix") set forth in Exhibit 8 of the Medical Settlement Agreement.  Short-term exposure to petroleum and/or petroleum distillates may cause Specified Physical Conditions that are acute and/or chronic in duration.  As described more fully in the Matrix, the acute Specified Physical Conditions most likely to arise from petroleum exposure from the *Deepwater Horizon* Incident include the following types of conditions: (1) occular; (2) upper airway and respiratory; (3) otolaryngological;  (4) dermal;  and  (5) neurophysiological,  neurological,  and  odor-related. The chronic Specified Physical Conditions most likely to arise from petroleum exposure from the  *Deepwater Horizon*  Incident  include  the  following  conditions: (1) occular  damage; (2) chronic rhinosinusitis; (3) Reactive Airways Dysfunction Syndrome ("RADS"); (4) chronic contact dermatitis; and (5) chronic eczematous reaction.  (*See* Harbut Decl. ¶¶ 25-38.)

29.    BP submitted evidence that the conditions listed on the Matrix are those "for which there is a medical basis to conclude that contact with oil and/or dispersants caused those

conditions if there were exposure to sufficient amounts of such substances for a sufficient duration of time."  (Declaration of Jessica Herzstein, Rec. Doc. 7112-7, ¶ 14.)

30.     Class Counsel presented evidence that Clean-Up Workers and Residents of Zones A and B who suffered one of the conditions set forth in the Matrix likely did so because of their exposure to petroleum and/or petroleum distillates, provided that these individuals manifested the particular Specified Physical Condition within the time frames on the Matrix.  Dr. Harbut has stated that those time frames are appropriate, have a scientific basis, and support a finding that the condition is likely the result of exposure to oil and/or dispersants and not from some other cause.  (*See* Harbut Decl. ¶¶ 19, 25-38; Harbut Supp. Decl. ¶ 8.)  BP likewise presented evidence that the "timeframes between contact with oil and/or dispersants and first manifestation of a Specified Physical Condition are appropriate and have a sound medical basis.  Adverse health effects caused by contact with oil and/or dispersants or exposure to heat would manifest within the timeframes set forth on the Matrix, if not sooner."  (Supplemental Declaration of Jessica Herzstein, Rec. Doc. 7732-1, ¶ 6; *see also* Herzstein Decl. ¶ 20.)

31.     BP's Medical Encounters Database provides further support for the types of conditions included on the Matrix.  The Medical Encounters Database reflects the symptoms contemporaneously reported by Clean-Up Workers who became ill during Response Activities and sought treatment at on-site medic stations set up by BP.  The database includes entries for approximately 20,000 visits made to these medic stations by approximately 13,000 individuals. The database indicates that approximately 70% of these individuals reported conditions that are reflected in the Matrix.  The conditions and symptoms reported by the remaining 30% of the approximately 13,000 individuals consist of trauma, musculoskeletal problems, routine care, and

other events generally unrelated to exposure to oil and/or dispersants and/or heat.  (*See* Herzstein Decl. ¶ 16.)

### III. DATA COLLECTED IN CONNECTION WITH RESPONSE ACTIVITIES.

32.     Through its experts, BP presented evidence concerning the environmental and occupational exposure data related to the *Deepwater Horizon* Incident.  BP expert Dr. Peter Lees has stated that the data collection, which was guided by sampling plans jointly conceived by the members of the Unified Area Command, is sufficient to allow an expert to assess any significant adverse health effects that might result from the *Deepwater Horizon* Incident and to draw conclusions regarding any potentially harmful exposures.  (Declaration of Peter S.J. Lees, Rec. Doc. 7112-3, ¶ 12.)

33.     BP has presented evidence that, throughout the Response, the federal government, including the National Institute for Occupational Safety and Health ("NIOSH"), EPA, and OSHA, as well as BP and others, conducted extensive monitoring and sampling of air to measure for the components of oil and dispersants.  (Lees Decl. ¶¶ 19-26.)  Dr. Lees points out that numerous government studies of the exposure data collected in connection with the *Deepwater Horizon* Incident have concluded that the oil spill and Response posed a low health risk to Clean-Up Workers and Gulf Coast Residents.[8]  BP submitted evidence that air monitoring and other data show that Clean-Up Workers and Residents were not typically exposed to airborne concentrations of the components of oil and/or dispersants at levels that would be expected to result in significant or widespread health effects.  (Lees Decl. ¶¶ 45-46; *see also* Declaration of Robert Cox, Rec. Doc. 7112-4, ¶ 92; Declaration of Laura C. Green, Rec. Doc. 7112-5, ¶ 5.)  For example, BP points to the EPA monitoring for the two chemicals

---

[8] http://www.bt.cdc.gov/gulfoilspill2010/2010gulfoilspill/health_surveillance.asp.

found in Corexit dispersants that had the highest potential to get into the air in any significant amounts, EGBE (2-butoxyethanol) and dipropylene glycol monobutyl ether, and EPA's statement that "the levels found were well below those that are likely to cause health effects, and suggest that the use of dispersants on the oil spill would not have a significant impact on air quality on land."[9]   Likewise, BP has submitted expert declarations and other evidence that (i) support EPA's conclusion regarding exposure to components of dispersants, and (ii) indicate that exposure to airborne concentrations of potentially toxic components of crude oil were low and unlikely to cause significant adverse health effects.  (*See* Lees Decl. ¶ 13; Cox Decl. ¶¶ 11, 62-64; Green Decl. ¶¶ 5, 19.)   BP pointed to the fact that the spill occurred almost one mile beneath the ocean surface and 50 miles offshore as reasons why exposure levels to potentially toxic components of crude oil were low.  (Cox Decl. ¶¶ 45-47.)

34.    Further, BP presented evidence that onshore Gulf Coast Residents would have had neither dermal exposure to fresh crude oil nor any significant dermal exposure to the Corexit dispersants used during the Response.  (*Id*. ¶¶ 76, 81.)  BP contends that residents would have come into contact only with weathered oil, which according to BP's experts, was substantially depleted of toxic components.  (*Id.* ¶ 80.)  In this regard, BP's experts relied on, among other things, reports issued by the Operational Science Advisory Team.[10]  With respect to dispersants, BP's experts stated that because the dispersants biodegraded and were significantly diluted after they were applied to oil slicks on the water surface, any components of the Corexit dispersants

---

[9] EPA website (http://www.epa.gov/bpspill/taga.html#dispdata).

[10] The Operational Science Advisory Team ("OSAT") was formed by the Unified Area Command as an interagency team to assess real-time data collected as part of the *Deepwater Horizon* Response, to identify sampling gaps as part of an adaptive sampling strategy, and to conduct a risk-based Net Environmental Benefits Analysis associated with removing remnant oil from the near shore, surf zone, and shoreline sandy beach areas.  OSAT was composed of members from the U.S. Coast Guard, NOAA, the U.S. Geologic Survey, the Bureau of Ocean Energy Management, Regulation and Enforcement, EPA, and BP.  OSAT provided its findings and recommendations to the Federal On-Scene Coordinator of the U.S. Coast Guard in two summary reports: Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring ("OSAT-1") (Dec. 17, 2010); and Summary Report for Fate and Effects of Remnant Oil in the Beach Environment ("OSAT-2") (Feb. 10, 2011).

that did reach shore would have done so at levels too low to have a meaningful impact on human health.  (*Id.* ¶ 82.)

35.     BP also presented evidence that Clean-Up workers located directly above the MC252 Well were typically not exposed to "fresh" crude oil, as the released oil traveled through approximately one mile of water before reaching the ocean surface, during which time it was significantly "scrubbed" of a number of the more water-soluble, volatile components.  (*Id.* ¶¶ 85-86.)

36.     Plaintiffs contend that the health impacts of the oil spill are not insignificant, as evidenced by the number of clean-up workers who reported illness during their shift and the number of short form joinders and complaints seeking damages for personal injuries filed alleging health effects from exposure to oil and/or dispersants.

## IV. HISTORY OF THE LITIGATION.

### A.     Consolidation of Lawsuits and Appointment of the Plaintiffs' Steering Committee.

37.     The *Deepwater Horizon* Incident gave rise to hundreds of lawsuits, including putative class actions, with thousands of individual claimants for both personal injury and for economic loss and property damages.  Four months after the incident, in August 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in this District and assigned them to this Court pursuant to 28 U.S.C. § 1407. *See In re Oil Spill of the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).   In its assignment order, the JPML observed that common factual issues among the suits supported their joinder, explaining that each proceeding "indisputably share[s] factual issues concerning the cause (or causes) of the

Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it."  *Id.* at 1354.

38.     The Court has since managed all of these lawsuits as a centralized and coordinated litigation. Pretrial Order No. 11 ("PTO 11") organized the pleadings and categorized the claims and issues by creating pleading bundles.  (Rec. Doc. 569.)  The "B3 bundle," entitled "Post-Explosion Clean-Up Claims," encompasses "all claims, of any type, relating to post-explosion clean-up efforts . . . as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 10, 2010."  (Pretrial Order No. 25 ("PTO 25"), Rec. Doc. 983, ¶ 1.)

39.     On October 8, 2010, the Court created the Plaintiffs' Steering Committee ("PSC") from numerous applicants, pursuant to a public application process.  (*See* Rec. Doc. 506.)  The PSC is a geographically diverse group of leading plaintiffs' lawyers.  (Supplemental Declaration of Dean Robert Klonoff, Rec. Doc. 7116-2 at 1, ¶ 40.)

**B.     Master Complaint and Joinders.**

40.     Pursuant to pre-trial orders, the Plaintiffs' Steering Committee filed, on December 15, 2010, the B3 Master Complaint, (Rec. Docs. 881, 1812), which included "all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010."  (PTO 25 at 2.)  Short-form joinders adopting the B3 Master Complaint have been filed by more than 17,000 plaintiffs, many of whom are likely Class Members.  In addition, many plaintiffs did not adopt the Master Complaint:  approximately 780 of these individuals indicated that they were pursuing a personal injury/death claim and another 12,000 indicated that they are pursuing a claim for fear of future injury and/or medical monitoring.  Numerous such plaintiffs are also likely Class Members.

C.      **Motions Practice and Discovery.**

41.     In the more than two years since the MDL consolidation order, the Parties have engaged in extensive discovery and motions practice to prepare for the trial.   More than 300 witnesses have been deposed, 90 million pages of documents produced, and more than 80 expert reports exchanged.   The Court conducted monthly status conferences, with Magistrate Judge Shushan conducting weekly conferences.   This intense pace of litigation, depositions, and written discovery was leading to the first phase of a multi-phase trial, which had been scheduled to commence in February 2012, focusing on liability for the explosion and the *Deepwater Horizon* Incident.

42.     Numerous governmental and other public investigations also were conducted and their results publicly reported.   *See*, *e.g.*, Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling* (*Report to the President*) (2011); Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Macondo: The Gulf Oil Disaster* (*Chief Counsel's Report*) (2011); The Bureau of Ocean Energy Mgmt., Regulation & Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout* (2011); U.S. Coast Guard, *Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking & Loss of Eleven Crew Members Aboard the Mobile Offshore Drilling Unit Deepwater Horizon in the Gulf of Mexico* (2011); Nat'l Acad. of Eng'g, *Macondo Well-Deepwater Horizon Blowout: Lessons for Improving Offshore Drilling Safety* (2012).   These reports provided a factual backdrop that informed the Parties' negotiations.   *See* Declaration of Geoffrey P. Miller, Rec. Doc. 7112-8, ¶¶ 33-34.)   The Court has ruled elsewhere on their admissibility at trial, and nothing in these Findings of Fact and Conclusions of Law should be construed as revising those rulings in any way.   (*See*, *e.g.*, Rec. Docs. 5810, 5635, and 5448.)

43.     In response to BP's motion to dismiss, the Court ruled that plaintiffs' claims were governed by maritime law and dismissed their state-law claims for negligence *per se*, battery, and nuisance.  (Plaintiffs were permitted, however, to replead the negligence-*per se* claim.) (Rec. Doc. 4159.)

### D.     Settlement Negotiations.

44.     The Medical Benefits Class Action Settlement was the result of extensive arm's-length negotiations between the Parties.  Counsel for Plaintiffs and BP engaged in protracted negotiations, conducted in person and via telephone and web conferences, over approximately ten months.   (Declaration of Andrew Bloomer, Rec. Doc. 7112-6, ¶¶ 2, 4, 6-62 Order, Rec. Doc. 7480, at 7 ("The Settlement Agreement was negotiated in good faith and at arm's length over many months . . . .  The negotiations were extensive and highly contested."); *see also* Rec. Doc. 7600).)  As this Court has pointed out, the Medical Settlement and the Economic and Property Damages Settlement "involved extended, very contentious negotiations over a long period of time."  (11/8/12 Hearing Tr. at 267:14-22.)   The Court has further noted, as to inferences of improper collusion between the Parties, that it "can guarantee you that did not occur."  (*Id.* at 275:13-16.)

45.     A core group of highly experienced personal injury and class action lawyers served as lead negotiators on behalf of the Class, and a core group of similarly experienced mass tort and complex litigation defense lawyers served as lead negotiators for BP. (Bloomer Decl. ¶ 4.)  These negotiating teams met or spoke nearly daily between late July 2011 and the filing of the Medical Settlement Agreement with the Court on April 18, 2012. (Bloomer Decl. ¶¶ 11-61; Declaration of Robin Greenwald, Rec. Doc. 7116-2 at 94, ¶ 3.)

Magistrate Judge Shushan also supervised discussions related to key terms of the Medical Settlement Agreement.  (Bloomer Decl. ¶¶ 39, 45, 49, 59; Greenwald Decl. ¶ 12.)

46.     The Parties consulted with medical and scientific experts concerning data relating to oil and dispersants; the potential health effects of possible exposure to these substances; the claims asserted by Clean-Up Workers, Residents, and others; the benefits provided under the Settlement; and the structure for providing those benefits.  (Harbut Decl. ¶ 16; Greenwald Decl. ¶¶ 4-5; Declaration of Stephen J. Herman, Rec. Doc. 7116-2 at 89, ¶ 6; Order, Rec. Doc. 6419 at 4.)

47.     The Parties crafted the Settlement from the ground up and negotiated every aspect of the agreement, including:  standards of proof, levels of compensation, and conditions to be included in the Matrix; the components, duration, and frequency of the Periodic Medical Consultation Program; scientific support for Plaintiffs' claims and BP's defenses; BP's alleged liability; the need for, components of, and funding of the Gulf Region Health Outreach Program; the circumstances under which lawsuits for Later-Manifested Physical Conditions could be brought; the terms and provisions of the written settlement agreement, notice documents, forms, and other exhibits; and procedures for resolving third-party liens.   (Greenwald Decl. ¶ 8; Herman Decl. ¶ 6; Miller Decl. ¶ 31; Order, Rec. Doc. 6419 at 3-4, *see also* Bloomer Decl. ¶ 2.)

48.     While settlement negotiations proceeded, the Parties were also engaged, on a parallel track, in preparations for the Limitation and Liability Trial that was originally set to commence on February 27, 2012.  (*See* Herman Decl. ¶ 12.)  It was not until "[l]iterally . . . the eve of . . . trial" that the Parties reported that they "were very close to reaching an agreement in principle."  (11/8/12 Hearing Tr. at 10:25-11:5.)

49.     On February 26, 2012, the Court briefly adjourned Phase I of the Limitation and Liability Trial from February 27, 2012, to March 5, 2012.  (*See* Rec. Doc. 5887.)  This was done to give the Parties additional time to reach a settlement, if possible.

50.     On March 2, 2012, after the Parties informed Judge Shushan that they had reached an agreement in principle, the Court again adjourned the trial.  (*See* Rec. Doc. 5955; *see also* Second Amended Pretrial Order No. 41, Rec. Doc. 6592.)  This trial has subsequently been rescheduled to begin on February 25, 2013.  (Rec. Doc. 7810.)

51.     Other than the PSC's making clear that it would eventually file a request for attorneys' fees, the Parties had no discussion regarding fees for Class Counsel until April 17, 2012, the day before the Settlement Agreement was agreed upon, reduced to writing, and submitted to the Court.  (*See* 11/8/12 Hearing Tr. at 275:22-276:2.)  Before discussing fees, the Parties had delivered a signed Settlement Agreement on all substantive non-fee issues to the Court and thereafter received permission from the Court to begin negotiating fee matters.  This approach assured that attorneys representing the Class could not trade off benefits for the Class in exchange for a higher fee for themselves.  (*See* Declaration of Samuel Issacharoff, Rec. Doc. 7116-2 at 73, ¶¶ 21-23; Declaration of Robert H. Klonoff, Rec. Doc. 7116-2 at 1, ¶ 77; Miller Decl. ¶ 28; Declaration of Joseph F. Rice, Rec. Doc. 7104-6, ¶¶ 4-5.)

### E.     The Class Action Complaint.

52.     On April 16, 2012, the PSC filed a new class action complaint on behalf of thousands of individuals asserting bodily and/or personal-injury claims from alleged exposure to oil and/or dispersants arising from the *Deepwater Horizon* Incident, including Response Activities.  (Rec. Doc. 6250.)  The named plaintiffs in this action are Kip Plaisance, Jason Perkins, Thelma Camille Warren, Christian Pizani, Max Plaisance, Benjamin Judah Barbee,

Cornelius Divinity, Janice Brown, Carlson Caster, George Baker, and Duffy Hall ("Class Representatives"). These Class Representatives are Clean-Up Workers and Gulf Coast Residents who suffered past exposure to oil and/or dispersants in connection with the *Deepwater Horizon* Incident.

53.     Plaintiffs Kip Plaisance, Jason Perkins, Max Plaisance, Benjamin Judah Barbee, Cornelius Divinity, Carlson Caster, George Baker, and Duffy Hall were Clean-Up Workers during the relevant time frame set forth in the Medical Settlement Agreement. (Rec. Docs. 7112-2 at 102 ¶ 4, 105 ¶ 4, 114 ¶ 4, 117 ¶ 4, 120 ¶ 4, 126 ¶ 4, 129 ¶ 4, 132 ¶ 4.)

54.     Plaintiffs Thelma Camille Warren and Janice Brown were residents of the Gulf Coast who resided in the area defined by the Medical Settlement as Zone A during the time frame set forth therein, and who suffered one or more Specified Physical Conditions within the time frames delineated by the Matrix. (Rec. Doc. 7116-2 at 108 ¶4, 123 ¶ 4.)

55.     Plaintiff Christian Pizani was a resident of the Gulf Coast who resided in the area defined by the Medical Settlement as Zone B during the time frame set forth therein. (Rec. Doc. 7116-2 ¶ 4.)

56.     The defendants are BP Exploration & Production Inc. and BP America Production Company.

57.     Plaintiffs assert claims under maritime law for negligence, negligence *per se*, and gross negligence, and seek compensatory damages, punitive damages, and costs for medical monitoring. (Rec. Doc. 6250.) BP has denied plaintiffs' allegations and claims, and asserted various legal, affirmative, and other defenses. (Rec. Doc. 6454.)

58.     Members of the Medical Class and Class Representatives are represented in this proceeding by Stephen J. Herman and James Parkerson Roy (collectively, "Co-Lead Class

Counsel"), and Brian H. Barr, Jeffrey A. Breit, Elizabeth J. Cabraser, Phillip F. Cossich, Jr., Robert T. Cunningham, Alphonso Michael "Mike" Espy, Calvin C. Fayard, Jr., Ervin A. Gonzalez, Robin L. Greenwald, Rhon E. Jones, Matthew E. Lundy, Michael C. Palmintier, Joseph F. Rice, Paul M. Sterbcow, Scott Summy, Mikal C. Watts, and Conrad S.P. "Duke" Williams (collectively, "Class Counsel").

### F.      Preliminary Approval.

59.     On April 18, 2012, the Parties filed a joint motion for Preliminary Approval of the Medical Benefits Settlement, and Plaintiffs moved to certify the Class for purposes of settlement.    (Rec. Doc. 6267.)[11]    The following week, BP filed a response to the class certification motion, indicating that it did not oppose conditional class certification for settlement purposes only.  (Rec. Doc. 6349 at 2.)  After hearing argument on April 25, 2012, the Court, on May 2, 2012, granted Preliminary Approval to the Medical Benefits Settlement and preliminarily and conditionally certified the Class for settlement purposes only.  The Court issued a detailed order and opinion making Preliminary Approval findings under the established class action settlement approval procedure specified by Rule 23(e) in the manner recommended by the Fifth Circuit and the Manual for Complex Litigation.  (Preliminary Approval Order, Rec. Doc. 6419.)

60.     The Court found, among other things, that "[t]he proposed Settlement (i) is fair, reasonable, and adequate based on the Court's preliminary inquiry; (ii) is the result of protracted and intense negotiations conducted by the parties at arms' length and in good faith, and is not the result of collusion; (iii) discloses no reason to doubt its fairness and has no obvious deficiencies; (iv) does not improperly grant preferential treatment to the Medical Benefits Class

---

[11] Following the original filing, the Parties made some minor amendments to the Agreement, and executed those amendments on May 1, 2012.  On May 3, 2012, they filed the as-amended (and still current) version of the Medical Settlement Agreement with the Court.  (Rec. Doc. 6427.)

Representatives or segments of the class; and (v) falls within the range of possible judicial approval." (*Id.* at 18.)  The Court also held that the Notice Plan would provide reasonable notice to Class Members, including individual notice to all Class Members who could be identified through reasonable effort, and complied with Federal Rule of Civil Procedure 23(e)(1), and therefore the Court directed that notice be sent to the Class.  (*Id.* at 20-21.)  The Court conditionally certified the Class, finding that it "satisfies the [ ] requirements of Federal Rule of Civil Procedure Rule 23(a) and Rule 23(b)(3) . . . ." (*Id.* at 16.)[12]

61.     In the Preliminary Approval Order, the Court directed that objections to the Settlement were to be filed with the Court by August 31, 2012, and it later extended that date to September 7, 2012.   (Rec. Doc. 6419, ¶¶ 23, 33; Order, Rec. Doc. 7225.)   The Order also required that each objection include written evidence establishing that the individual was a Class Member and also "[a]ny evidence and legal authority the Medical Benefits Settlement Class Member wishes to bring to the Court's attention, and any evidence the Medical Benefits Settlement Class Member wishes to introduce in support of his or her objection . . . ." (Rec. Doc. 6419, at 25.)  The Court's Order explained that Class Members who failed to comply with these requirements "shall waive and forfeit any and all rights he or she may have to object to the Medical Benefits Class Action Settlement." (*Id.* at 26.)

62.     Requests for exclusion from the Class were required to be postmarked no later than October 1, 2012 (*id.*), later extended to November 1, 2012.  (Rec. Doc. 6419, ¶¶ 29, 33; Order, Rec. Doc. 7176.)

---

[12] On May 2, 2012, at the joint request of the Parties, and after reviewing evidence of its qualifications, this Court preliminarily appointed Garretson Resolution Group ("GRG") as Claims Administrator of the Medical Settlement. (Order, Rec. Doc. 6419, ¶ 13.)  GRG has extensive experience in the administration of mass tort and complex class action settlements, including several high profile matters.  GRG's expertise includes areas specific to medical settlement claim resolution, including procedures related to lien resolution and Medicare Secondary Payer Act compliance.  (Declaration of Matthew Garretson, Rec. Doc. 6267-3, ¶¶ 3-4.)

63.     The Court directed the Parties to file motion papers in support of the Settlement by August 13, 2012; reply submissions were to be filed by October 22, 2012.  (Rec. Doc. 6419 at 19.)

## G.     Motions for Final Approval and Class Certification.

### 1.     Briefing by the Parties.

64.     The Parties submitted substantial briefs and declarations in support of final approval on August 13, 2012, and submitted reply briefs and supporting declarations on October 22, 2012.  (Rec. Docs. 7112, 7113, 7116, 7728, 7730, 7732.)

### 2.     Expert Declarations Submitted by the Parties.

65.     Evidence in support of the Settlement submitted by BP and the Class included declarations from the following:

66.     *John C. Coffee, Jr.* is the Adolf A. Berle Professor of Law, Columbia University Law School.  (Declaration of John C. Coffee, Jr., Rec. Doc. 7113-2, ¶ 1.)  Professor Coffee has taught at Columbia since 1980, and one of his principal academic interests has been class action litigation (with a special focus on the organization and management of the large class action).  (*Id.* ¶ 2.)  His articles on class actions have been cited on several occasions by the United States Supreme Court, including in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 850 n.28 (1999).  (*Id.*)  Professor Coffee's declarations set forth his independent opinions regarding certification of the Medical Benefits Settlement, (*see* Coffee Decl. ¶ 1; *see also* Coffee Supp. Decl.), which the Parties agree should be considered by the Court, but which do not necessarily represent the views of all Parties on all of the matters on which Professor Coffee opines.  He has served as an expert witness in a number of class actions, in the Fifth Circuit and other courts, including *Amchem*; *In re Enron Corp.*

24

*Secs., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); and *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000), *aff'd* 264 F.3d 201 (3d Cir. 2001). Professor Coffee's declarations were submitted jointly by the Parties.

67.     **Robert Cox, M.D., Ph.D.** is a board-certified emergency physician and medical toxicologist.  He has a doctorate in Analytical Chemistry from the University of Iowa and a doctorate in Medicine from the University of Texas Southwestern Medical School.  Dr. Cox also holds board certifications in Medical Toxicology and Emergency Medicine through the American Board of Medical Specialties, and a certification in Toxicology through the American Board of Toxicology.  (Cox Decl. ¶¶ 1-2.)

68.     Dr. Cox is currently a professor in the School of Medicine at the University of Mississippi Medical Center in Jackson, Mississippi.  In addition, Dr. Cox serves as the Director of the Mississippi Poison Control Center and the Director of the Medical Toxicology Service at the University of Mississippi Medical Center.  During the *Deepwater Horizon* Response, Dr. Cox worked with the Mississippi State Department of Health on issues relating to the protection of Mississippi residents from potential exposures to contaminants released in connection with the oil spill.  In that role, Dr. Cox reviewed, on a daily basis, environmental monitoring data collected along the Gulf Coast of Mississippi, received calls directed to the state poison control center related to potential exposures, and assisted with the review of hospital admissions data.  (*Id.* ¶¶ 1, 4.)

69.     Dr. Cox, whose declarations were submitted by BP, offered opinions on the toxicological properties of the components of MC252 oil and the two Corexit dispersants used during the Response and on the potential for significant adverse health effects for Clean-Up Workers and Gulf Coast Residents from inhalation and dermal exposures to the components of

oil, dispersants, and other spill-related compounds in connection with the *Deepwater Horizon* Incident.

70.     **David Dutton, Ph.D.,** a BP employee, was the Industrial Hygiene Team Lead for the Unified Area Command on the *Deepwater Horizon* Response.   Dr. Dutton is a toxicologist and certified industrial hygienist who has practiced in these fields for over 20 years.   He received a Bachelor of Science degree in biology, and Masters and Doctorate degrees in toxicology. Dr. Dutton's experience includes occupational exposure assessments at a refinery and a petrochemical plant, identification and communication of potential risks, oversight of toxicology testing programs, regulatory compliance, community exposure assessments, and oversight of toxicological research regarding chemical products.  (Dutton Decl. ¶¶ 1-2.)

71.     As Industrial Hygiene Team Lead, Dr. Dutton was responsible for designing, implementing, and overseeing BP's industrial hygiene program during the Response, which included establishing programs to monitor workers' potential exposure to potentially hazardous materials, developing policies and protocols related to worker safety and health, and designing and implementing worker training, among other duties.   Dr. Dutton worked directly with federal government and Coast Guard personnel on virtually every aspect of the Response, and received updates at least twice daily on activities and potential problems.  (*Id.* ¶¶ 3-4.)

72.     Dr. Dutton authored two declarations that were submitted by BP. (Rec. Docs. 7112-2 and 7732-3.)  Dr. Dutton utilized his personal knowledge, professional education, and experience to describe the Response effort.   He explained both the structure and scope of the Response, including the application of dispersants, health and safety training, and the activities of Clean-Up Workers during the Response.

73.    **Bernard D. Goldstein, M.D.** is a Professor of Environmental and Occupational Health and the former Dean of the University of Pittsburgh Graduate School of Public Health. He is a physician, board certified in Internal Medicine, Hematology, and Toxicology.  He was the founding Director of the Environmental and Occupational Health Sciences Institute, a joint program of Rutgers University and the Robert Wood Johnson Medical School, where he established and directed the Environmental and Occupational Health Sciences Institute, the largest academic environmental and occupational health program in the United States. (Declaration of Bernard D. Goldstein, M.D., Rec. Doc. 7113-3, ¶¶ 1-4.)

74.    Dr. Goldstein has published in the areas of blood toxicity, the formation of cancer-causing substances (free radicals) following exposure to inhalants, various aspects of public health decision-making, and global issues in environmental medicine.  He recently published an article examining the public health consequences following the *Deepwater Horizon* oil spill, specifically: the toxicological effects in workers, visitors, and community members following the spill; mental health effects from social and economic disruption; and ecosystem effects that have consequences for human health.  (*See* Bernard D. Goldstein, M.D., Howard J. Osofsky, M.D., Ph.D., & Maureen Y. Lichtveld, M.D., M.P.H., The Gulf Oil Spill, 364 NEW ENG. J. MED. 1334-1348 (2011).)

75.    Dr. Goldstein serves as chair of the Coordinating Committee for the Gulf Region Health Outreach Program (the "Program" or "Outreach Program") and offered his expert opinions concerning that Program.  His declarations, which were submitted jointly by the Parties, describe the four projects that make up the Program:  the Primary Care Capacity Project, the Mental Behavioral Health Capacity Project, the Environmental Health Capacity and Literacy Project, and the Community Health Workers Training Program.  (*See* Goldstein Decl. ¶ 9.)

According to Dr. Goldstein, the four projects provide much needed public health benefits to the Gulf Coast region, a region that has been plagued by public health problems related to disease prevention, health literacy, and basic health maintenance.  (*Id.* ¶¶ 10-15.)  The Outreach Program is designed to respond to these community issues by improving the region's healthcare infrastructure and access to care for those most medically at risk through the use of Federally Qualified Health Centers ("FQHCs") and other clinics as the hub of the Program's healthcare structure.  (*Id.* ¶¶ 16, 19.)  Over the past two months, the projects in the Outreach Program have made significant progress in the planning and implementation of their operations, having received $20,732,508 in funding since June 2012.  (*See* Supplemental Declaration of Bernard D. Goldstein, Rec. Doc. 7730-4, ¶¶ 3-5.)

76.     ***Laura Green, Ph.D., D.A.B.T.*** is a Senior Scientist and the founder and President of Cambridge Environmental Inc., a consulting and research company that addresses health and environmental issues.  (Green Decl. ¶ 1.)  Dr. Green has a Bachelor's degree in chemistry from Wellesley College and a Ph.D. in food science and technology from MIT.  She is board-certified in toxicology by the American Board of Toxicology.  (*Id.*)  Dr. Green has conducted research in chemical carcinogenesis and biochemical epidemiology at MIT, and was the Director of the Scientific Conflict Mapping Project at the Harvard School of Public Health.  (*Id.*)

77.     Dr. Green has provided expert testimony in toxicology, epidemiology, and health risk-assessment in numerous state and federal courts and administrative law hearings.  Cases involving residential and/or occupational exposures to petroleum and associated chemicals include *Martin v. Amoco Oil Co.*, 696 N.E.2d 383 (Ind. 1998), and three cases consolidated for purposes of discovery and pre-trial proceedings with *Bly v. Tri-Continental Industries, Inc.,* 663 A.2d 1232 (D.C. 1995): *Bradley v. Tri-Continental Industries, Inc.*, C.A. No. 90-11383,

*Carter v. Tri-Continental Industries, Inc.*, C.A. No. 90-11384, and *Taylor v. Tri-Continental Industries, Inc.*, C.A. No. 90-11385.

78.     Dr. Green authored two declarations submitted by BP.  (Rec. Docs. 7112-5 and 7732-6.)  In those declarations, she opined that the low levels of exposure to dispersants and other chemicals experienced by Clean-Up Workers and Residents in connection with the *Deepwater Horizon* Incident were unlikely to pose a risk to their health.

79.     **Michael R. Harbut, M.D., M.P.H., F.C.C.P.** is the Director of the Environmental Cancer Program at Karmanos Cancer Institute, which is affiliated with Wayne State University in Detroit, Michigan, where he is a Clinical Professor of Internal Medicine in the School of Medicine.  He is the Chief of Occupational and Environmental Medicine at Providence Hospital in Southfield, Michigan.  He is board certified in Occupational Medicine, and has a Masters of Public Health, Environmental and Industrial Health.  Dr. Harbut is the Director of the National Center for Vermiculite and Asbestos Related Cancers, and co-authored the American Thoracic Society's most recent guidelines for the diagnosis and treatment of asbestos-related disease.

80.     Dr. Harbut has more than two decades of experience diagnosing and treating patients with workplace and/or environmental exposure to various chemicals, including certain constituents of oil and/or dispersants.   In connection with the *Deepwater Horizon* Incident, Dr. Harbut has consulted with the United States Navy regarding its analysis of the safety of training missions.

81.     In this case, Dr. Harbut authored two declarations submitted by Class Counsel, regarding the medical and scientific bases for the Matrix and the Periodic Medical Consultation Program.  (Rec. Docs. 7116-1 and 7728-3.)  Dr. Harbut has testified as an expert witness in other cases involving occupational and environmental exposure.  *See, e.g., Jason Matteucci v. EQ -*

*The Environmental Quality Co.*, 08-119374-NO (Mich. Cir. Ct. 2011); *Martinski v. Celotex*, No. 87-74688 (E.D. Mich. Oct. 20, 1988); *Martinski v. Owens Corning, et al.*, No. 87-74688 (E.D. Mich. Oct. 24, 1988).

82.     ***Jessica Herzstein, M.D, M.P.H.*** is an occupational and environmental physician, with a focus on developing, implementing, and overseeing global health programs for thousands of workers, including those who have been exposed to potential environmental and occupational hazards.  (Herzstein Decl. ¶¶ 1-2.)  Dr. Herzstein, who is board certified in Internal Medicine and Occupational Medicine, is the Global Medical Director for Air Products and Chemicals, Inc., a chemical manufacturing company, and the President of Environmental Health Resources, P.C. From 1995 to 1997, Dr. Herzstein was a Medical Director for the Department of Defense, where she oversaw national medical programs for the Department, and served as a consultant to the Department of Justice, Environmental Health and Biomonitoring, from 1992 to 1996.

83.     Since February 2012, Dr. Herzstein has served on the United States Preventive Services Task Force, an independent, volunteer group of national experts in prevention and evidence-based medicine that makes recommendations about clinical preventive services such as screening tests, counseling services, and preventive medications.   Dr. Herzstein previously served on the Agency for Toxic Substances and Disease Registry expert panel that developed the Final Criteria for Determining the Appropriateness of a Medical Monitoring Program under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 60 Fed. Reg. 38840-01.  She is a co-editor of three books on environmental health and occupational medicine, and has contributed chapters to multiple books on occupational health and toxicology.

84.     Dr. Herzstein has authored two declarations submitted by BP regarding the medical and scientific bases of the Matrix, the Periodic Medical Consultation Program, and the

Back-End Litigation Option.  (Rec. Docs. 7112-7 and 7732-1.)  She has testified as an expert witness in other cases involving potential exposures.  *See, e.g., Doris Baity. v. Gen. Elec. Co.*, Index No. 2001-524, Supreme Court of New York, Cayuga County (June 14-15, 2012); *Perrine, et al. v. E.I. DuPont De Nemours & Co.*, Civ. Action No. 04-C-296-2, Circuit Court of West Virginia, Harrison County (May 1, 2006) (class certification hearing).

85.    **Samuel Issacharoff** is the Reiss Professor of Constitutional Law, New York University School of Law.  (Issacharoff Decl. ¶ 4.)  Professor Issacharoff specializes in complex litigation and has published many articles on various aspects of complex litigation, including matters such as class actions and attorneys' fees, which have been cited by numerous courts, including the United States Supreme Court.  Professor Issacharoff has served as an expert and as a consultant in numerous complex cases, including dozens of class actions, and has served as a special master in a mass tort class action in the Eastern District of Texas.  Professor Issacharoff also served as Reporter for the Project on Aggregate Litigation of the American Law Institute, which unanimously approved its proposed final report three years ago, and was published in 2010 as *Principles of the Law of Aggregate Litigation*.  In this case, Professor Issacharoff served as a consultant to the PSC during settlement negotiations, and he offered in his declaration, which was submitted by Class Counsel, various opinions concerning the Settlement, including those regarding conflicts of representation, intra-class allocation, attorneys fees and settlement value.  (*Id.* ¶¶ 7-9.)

86.    **Robert H. Klonoff** is Dean and Professor of Law, Lewis & Clark Law School. Dean Klonoff is co-author of the first casebook devoted specifically to class actions (Robert J. Klonoff, Edward K.M. Bilich, and Suzette Malveaux, *Class Actions and Other Multi-Party Litigation:  Cases and Materials* (West 3d ed. 2012)), and the author of the *Nutshell* on class

actions.   (*See* Klonoff Decl. ¶¶ 2-3.)   Dean Klonoff served for five years as an Associate Reporter for the American Law Institute's ongoing class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation,* and is the principal author of the chapter addressing class action settlement and attorneys' fees.  In this case, Dean Klonoff authored two declarations, submitted by Class Counsel, regarding the certifiability of the Class and the fairness of the Settlement.  (*See* Rec. Docs. 7116-2 at 14 and 7728-2.)

87.   **Peter S.J. Lees, Ph.D.**, **C.I.H.** is an expert in environmental health sciences, specializing in industrial hygiene and exposure assessment.  Dr. Lees is currently a professor and director of the Division of Environmental Health Engineering at the Johns Hopkins University Bloomberg School of Public Health in Baltimore, Maryland.  Dr. Lees holds a Doctorate in Environmental Health Sciences and has been certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene since 1978.  (Lees Decl. ¶¶ 1-3.)  Dr. Lees has conducted extensive research related to the assessment of occupational and environmental exposures, and teaches graduate-level courses in industrial hygiene, occupational health, and epidemiology, with a special emphasis on exposure assessment for individuals and populations.

88.   Dr. Lees has authored two declarations submitted by BP regarding the exposure assessment conducted in relation to the *Deepwater Horizon* Incident and the potential for Clean-Up Workers to have adverse health effects from inhalation exposures to the components of oil, dispersants, and other spill-related compounds.   (Rec. Docs. 7112-3 and 7732-5.) Dr. Lees has served as an expert in approximately 25 proceedings in which he has provided expert testimony regarding his review, assessment, and evaluation of alleged chemical exposures to asbestos, polychlorinated biphenyls ("PCBs"), gasoline, acrylamide, and various solvents. (Lees Decl. ¶ 8.)

89. ***Geoffrey P. Miller*** is the Stuyvesant P. Comfort Professor of Law, New York University.  Professor Miller has been involved for more than twenty years in the area of class action litigation as a teacher, scholar, attorney, consultant, and expert witness, and has written numerous research articles dealing with class action law and practice, with a focus on standards for judicial review of class action settlement.   (Miller Decl. ¶¶ 2-6; *see also* Supplemental Declaration of Geoffrey P. Miller, Rec. Doc. 7732-4.)  His articles on class action law have been cited by state and federal courts across the United States.  Professor Miller opined on various topics in this case, including the appropriateness of the claims for class litigation and settlement, the Settlement benefits, the negotiation process, and the objections to the Settlement. His two declarations were submitted by BP.  He has been qualified as an expert witness in various cases in federal courts, including *In re Cell Therapeutics, Inc., Sec. Litig.*, No. C10-414 (W.D. Wash. 2012); *In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. 2012); *In re Vioxx Prods. Liab. Litig.*, No. 2:05-MD-01657 (E.D. La. 2009); *John Hancock Life Ins. Co. v. Goldman, Sachs & Co.*, No. 01-10729-RWZ (D. Mass. 2007); and *Figueroa v. Sharper Image Co.*, No. 05-21251 (S.D. Fla. 2007).

## V.  SUMMARY OF THE SETTLEMENT TERMS.

### A.  Medical Class Definition.

90. Section I.A of the Medical Settlement defines the Medical Benefits Settlement Class ("Medical Class") as:

> [A]ll Natural Persons who resided in the United States as of April 16, 2010, and who:
>
> 1)      Worked as Clean-Up Workers at any time between April 20, 2010, and April 16, 2012; or
>
> 2)      Resided in Zone A for some time on each of at least sixty

days between April 20, 2010, and September 30, 2010 ("Zone A Resident"), and developed one or more Specified Physical Conditions between April 20, 2010, and September 30, 2010; or

3)      Resided in Zone B for some time on each of at least sixty days between April 20, 2010, and December 31, 2010 ("Zone B Resident).

(MSA § I.A.)

91.     Section I.B of the Medical Settlement excludes from the Medical Class the following:

1)      Any Medical Benefits Settlement Class Member who timely and properly elects to be excluded from the Medical Class;

2)      Any person employed by BP Entities at any time between April 20, 2010, and April 16, 2012;

3)      The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana and their law clerks serving on or after April 20, 2010, through April 16, 2012;

4)      Any person who was on the *Deepwater Horizon* on April 20, 2010;

5)      Any person who has previously asserted and released his or her claims against BP relating to any illnesses or injuries allegedly suffered as a result of exposure to oil, other hydrocarbons, or other substances released from the MC252 and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with the Response Activities, including those persons who have provided final releases to the GCCF in exchange for payments from the GCCF for such illnesses or injuries; and

6)      Any person who is a Zone A Resident or a Zone B Resident, but not a Clean-Up Worker, and who worked in one or more of the following capacities for a cumulative duration of at least five years prior to April 20, 2010:

a)      Cleaning or reconditioning of the tanks or holds of barges, tankers or lighters, tanker trucks, tanker rail cars, or any other tank (stationary or mobile) used to hold hydrocarbons or petrochemicals;

34

b)      Storage, handling, or cleaning of naturally occurring radioactive materials ("NORMS"), including radionuclides;

c)      Storage, transportation, distribution, or dispensing of gasoline, diesel, jet fuel, kerosene, motor fuels, or other hydrocarbon-based fuels at any bulk storage facility (not including gas stations or gas station convenience stores), bulk plant, or bulk terminal facility that stores hydrocarbons or petrochemicals;

d)      Loading or unloading bulk crude oil or petroleum hydrocarbons onto or from trucks, ships, barges, or other vessels; or

e)      Tar distillation.

(MSA § I.B.)

**B.      Benefits under the Medical Settlement.**

92.      The Medical Settlement provides a range of benefits to Class Members, including: (1) compensation for Specified Physical Conditions; (2) the Periodic Medical Consultation Program; (3) the Gulf Region Health Outreach Program, which will help improve the healthcare system for Class Members in the Gulf Coast communities; and (4) the Back-End Litigation Option, which preserves Class Members' ability to sue BP for compensatory damages for Later-Manifested Physical Conditions.  (MSA § IV.)  In exchange for these benefits, Class Members provide a comprehensive Release of specified physical and bodily injury claims against BP and other entities involved in the *Deepwater Horizon* Incident.  (MSA § XVI.)

**1.      Compensation for Specified Physical Conditions.**

93.      The Medical Settlement provides compensation to qualifying Class Members who demonstrate that they manifested a Specified Physical Condition[13] in the time frames set forth in

---

[13] The terms "Specified Physical Conditions" and "conditions" refer both to the conditions themselves and the associated symptoms (including medically synonymous terms) as set forth on the Specified Physical Conditions Matrix.  (MSA Ex. 8.)

the Agreement.  (MSA § VI, Ex. 8.)  The level of compensation that a qualifying Class Member receives depends on various factors, including the Class Member's status as a Clean-Up Worker or Resident, whether the Class Member's Specified Physical Condition was Acute or Chronic, and the type of proof that the Class Member presents.  (MSA Ex. 8.)

94.     The Settlement allows qualifying Class Members to receive compensation for Specified Physical Conditions even without medical records.  (MSA § VI, Ex. 8.)  However, by providing medical records or showing corroboration in the appropriate database or other data source, Class Members can qualify for a larger compensation payment.  (*Id.*)  The framework for determining compensation eligibility and amounts is set forth in the Matrix.  (*Id.*)

95.     The Matrix provides compensation for conditions for which there is a medical basis to conclude that they could be caused by exposure to oil and/or dispersants at sufficient levels.  (Harbut Decl. ¶ 17; Herzstein Decl. ¶ 14; Herzstein Supp. Decl. ¶ 4.)  The conditions on the Matrix "reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants." (Harbut Decl. ¶ 17.)  The Matrix conditions are consistent with:  (1) medical and scientific literature; (2) conditions that have actually been reported or alleged by Clean-Up Workers and Residents; (3) published health surveillance reports; and (4) conditions reported by response workers and residents in connection with other oil spills.  (Herzstein Decl. ¶¶ 14–18.)

96.     The Matrix includes a broad array of acute conditions, such as ocular, upper airway/respiratory, dermal, otolaryngological, and neurophysiological, neurological, and odor-related (including gastrointestinal distress), as well as heat-related conditions reported by Clean-Up Workers while performing Response Activities.  (MSA § VI, Ex. 8; Harbut Decl. ¶¶ 25-33; Herzstein Decl. ¶ 13.)  The Matrix also includes chronic conditions, including:  (1) ocular,

specifically sequela from direct chemical splash to the eye(s); (2) respiratory, specifically chronic rhinosinusitis and Reactive Airways Dysfunction Syndrome ("RADS"); and (3) dermal, specifically chronic contact dermatitis and chronic eczematous reaction.  (MSA § VI, Ex. 8; Harbut Decl. ¶¶ 34-38; Herzstein Decl. ¶ 13.)

97.     The Medical Settlement requires that the Specified Physical Conditions manifest within time periods ranging between 24 and 72 hours after a Class Member's exposure. (MSA § VI, Ex. 8.)  The time frames set forth in the Matrix accurately reflect the periods within which these conditions would be expected to manifest after exposure to oil and/or dispersants, based on scientific evidence.  (Harbut Decl. ¶ 19; Herzstein Decl. ¶ 20.)

98.     As set forth on the Matrix, the Settlement provides compensation at various levels.  For example, a Clean-Up Worker may qualify for a payment of $1,300 on Level A1 by providing a sworn declaration:  (1) asserting the manifestation of one of the Specified Physical Conditions;  (2) asserting that the condition manifested in the applicable time frame; and (3) identifying the route, circumstances, and date or approximate date of his/her exposure.  A Clean-Up Worker may qualify for a payment of $7,750 on Level A2 by providing such a declaration plus supporting medical records establishing that his/her claimed condition persisted when he/she presented to the medical professional with the claimed condition.  Finally, a Clean-Up Worker may qualify for a payment of $12,350 on Level A3 by providing a declaration if the information in that declaration is corroborated by the Medical Encounters Database (which recorded visits to medic stations) or by another qualifying data source documenting the Clean-Up Workers' contemporaneous medical information during the Response Activities. (MSA § VI, Ex. 8.)

99.    Similarly, for Resident Class Members, the Settlement provides two levels of compensation for certain Acute Specified Physical Conditions.  A Resident Class Member may qualify for a Level A1 payment of $900 by providing a declaration plus certain additional corroborating evidence such as a declaration from a family member or co-worker.  A Resident Class Member may qualify for payment of $5,450 under Level A2 by providing the declaration and appropriate medical records.  Resident Class Members are not eligible for payments under Level A3.  (MSA § VI, Ex. 8.)

100.    Clean-Up Workers who experienced certain heat-related conditions during or immediately following a shift performing Response Activities are eligible for a payment of $2,700.  To qualify, the Class Member must provide a declaration describing the manifestation of the condition in the applicable time frame, and information concerning and corroborating that condition must also be found in the Medical Encounters Database or another qualifying data source.  (MSA § VI, Ex. 8.)

101.    Under Level B1, Class Members may receive compensation for certain chronic conditions identified on the Matrix.  Clean-Up Workers may receive $60,700 and Residents may receive $36,950 under Level B1.  To receive compensation under Level B1, a Class Member must provide:  (a) a declaration; (b) supporting medical records establishing that his/her claimed condition persisted when he/she presented to a medical professional, or, for a Clean-Up Worker, corroboration of his/her condition in the Medical Encounters Database or another qualifying data source; and (c) medical records that (1) establish ongoing treatment and/or the chronic nature of the claimed condition and (2) indicate the condition was considered by either the Class Member or the medical professional to be related to exposure.  (MSA § VI, Ex. 8.)

102.    Class Members who receive compensation payments under Levels A2, A3, A4, and B1 may also qualify for additional payments based on overnight hospitalization, ranging from $8,000 to $10,000 per day, as well as reimbursement for Actual Hospital Expenses. (MSA § VI, Ex. 8.)

103.    The Specified Physical Condition program is an uncapped benefit for the Class, in that all qualifying claims will be paid.  (MSA § VI, Ex. 8.)  The amounts of compensation to be paid to qualifying Class Members under the Matrix are in line with jury verdicts involving similar injuries and thus reflect litigated outcomes of such claims.  (Coffee Decl. ¶ 38.)

## 2.    Periodic Medical Consultation Program.

104.    The Medical Settlement also provides for a Periodic Medical Consultation Program that is available to all Clean-Up Workers and Zone B Residents, as well as to those Zone A Residents who qualify for compensation for a Specified Physical Condition. (MSA § VII.)  Under the Periodic Medical Consultation Program, Class Members are entitled to an initial medical consultation followed by additional visits every three years over the 21-year life of the program.  (MSA § VII.B.)

105.    The Claims Administrator will establish a network of medical services providers that will constitute the Periodic Medical Consultation Program, selected in part based on geographic proximity to Class Members and their ability to provide the consultation services offered by the Periodic Medical Consultation Program.   The Claims Administrator will communicate annually with Class Members participating in the Periodic Medical Consultation Program, and will set up a call center and website to schedule appointments for medical consultation visits to ensure maximum participation.  (MSA § VII.D.)  The Claims Administrator will use its best efforts to ensure that all Class Members can obtain their periodic medical

consultation within 25 miles of their homes.  Under the Medical Settlement, Class Members are entitled to mileage reimbursement for visits more than 25 miles away from home. (MSA § VII.D.)

106.    The Periodic Medical Consultation Program is not medical monitoring. (Herzstein Decl. ¶ 22.)  The Periodic Medical Consultation Program instead provides access to general medical services without charge to participating Class Members.  (MSA § VII, Ex. 12; Herzstein Decl. ¶¶ 21, 22.)  The Periodic Medical Consultation Program is based on generally accepted medical practice.  (Harbut Decl. ¶ 49.)  According to the Parties' medical experts, establishing a physician-patient relationship with a primary care physician is a significant and tangible benefit for those Class Members, especially because some of them currently do not have a physician and/or cannot afford primary medical services.  (Harbut Decl. ¶ 48; Harbut Supp. Decl. ¶ 1; Herzstein Decl. ¶ 22.)   The consultation visits also provide an opportunity for participating Class Members to discuss individual health concerns and to address behaviors and preventive measures to improve their health.  (Herzstein Decl. ¶ 22.)

107.    The Periodic Medical Consultation Program provides that physicians performing the examinations may use their discretion to order certain blood, urine, cardiac, and respiratory tests that can help in the identification and diagnosis of certain conditions.  (MSA § VII, Ex. 12; Herzstein Decl. ¶ 21.)  These tests provide a benefit to Class Members because (1) some of the tests can be used to obtain information regarding certain pre-existing medical conditions; (2) some of the tests can provide diagnostic information regarding disease in symptomatic individuals; and (3) some of the tests can detect medical conditions in asymptomatic individuals. (Herzstein Decl. ¶ 25.)  Such conditions may include those that are associated with exposure to petroleum and petroleum-related products.  (Harbut Decl. ¶ 46.)

108.    Experts for the Class and BP have praised the Periodic Medical Consultation Program as providing "critically important" and "significant and tangible" benefits to Class Members.   (*Id.* ¶ 50; Herzstein Decl. ¶ 22.)   In addition, the Court-appointed Guardian *Ad Litem* for the Medical Settlement extolled the Periodic Medical Consultation Program as "unique" and "one of the outstanding features of the settlement."   (Report of the Guardian *Ad Litem*, Rec. Doc. 7587 at 7.)

109.    No objections were received from Class Members regarding the Periodic Medical Consultation Program.

### 3.    Gulf Region Health Outreach Program.

110.    Another component of the Medical Settlement is the Gulf Region Health Outreach Program, which is intended "to expand capacity for and access to high quality, sustainable community-based healthcare services, including primary care, behavioral and mental health care, and environmental medicine, in the Gulf Coast."  (MSA § IX.A.)  Under the Medical Settlement, BP will provide $105 million over five years to a set of integrated projects designed to improve healthcare capacity and health literacy for Class Members and others in Gulf Coast communities.   (MSA § IX.)   Over $20 million has already been distributed to the Outreach Program projects to enable them to begin their work.  (Goldstein Decl. ¶ 36.)

111.    The ultimate goal of the Outreach Program is to enable Class Members, as well as other Gulf Coast residents, to be educated about their own health and to have access to skilled general healthcare providers and specialists to diagnose and treat their physical, behavioral, and mental health needs.  (*Id.* ¶ 34.)

112.   The Gulf Region Health Outreach Program consists of four integrated projects that address the fact that many Gulf Coast residents lack ready access to effective physical and mental/behavioral health care:

a)   The Primary Care Capacity Project will expand access to high quality, sustainable, community-based primary care by focusing on the development of Federally Qualified Health Centers ("FQHCs") with links to specialty mental and behavioral health care, as well as environmental and occupational health services.

b)   The Mental and Behavioral Health Capacity Project will provide mental and behavioral health treatment in the short term.  In the longer term, it will provide supportive services to improve the overall well-being of Class Members and other individuals affected by the *Deepwater Horizon* Incident.

c)   The Environmental Health Capacity and Literacy Project is designed to build environmental health capacity to deliver coordinated specialty care; integrate community health workers with training in environmental health issues into primary care clinics; and create an environmental health science curriculum in public schools and universities across the region to promote environmental health literacy.

d)   The Community Health Workers Training Program will provide training for Community Health Workers on primary care capacity.  It will also assist Class Members and others in obtaining mental and behavioral health services and environmental health care, and expand traditional health capacity by actively engaging community residents as participants to strengthen community resilience, build social capital, and improve overall health literacy.

(MSA § IX.C; Goldstein Decl. ¶ 9.)

113.   The Parties presented evidence that there is a significant shortage of clinicians at both the primary care and specialty levels, particularly in rural areas.  High poverty and lack of private insurance coverage, especially among unemployed individuals and the working poor, make it difficult to attract and sustain high-quality health care in the area.  There are also insufficient numbers of clinicians who participate in federally-funded health programs.  (*Id.* ¶¶ 11, 12.)

114.    Dr. Goldstein, Chair of the Coordinating Committee for the Outreach Program, has stated that the Outreach Program is designed to build a comprehensive, integrated and sustainable network of healthcare providers across the Gulf Region, with expertise in primary care, environmental health, and behavioral and mental health.  The Gulf Region Health Outreach Program will complement existing efforts being undertaken by the public health community by bringing together local community leaders, health professionals, and residents to understand the health needs and existing capacities of coastal communities across the Gulf.  (*Id.* ¶¶ 16-17.)

115.    Dr. Goldstein has further stated that by bringing a significant influx of resources and talent to help address many of the needs that have previously gone unmet, the Gulf Region Health Outreach Program is expected to have a rapid, positive impact, with benefits that will be felt not just for the next five years, but long thereafter.  (*Id.* ¶¶ 33, 37.)

116.    The Gulf Region Health Outreach Program includes the creation of a Gulf Region Health Outreach Program Library.  (MSA § IX.H.)  The Library is a publicly-accessible, text-searchable, indexed, online electronic resource containing documents regarding:

> a)  composition, quantity, fate, and transport (including the timing and quantity thereof) of oil and other substances released during the *Deepwater Horizon* Incident and dispersants and decontaminants used in Response Activities;
>
> b)  nature, content, and scope of Response Activities;
>
> c)  health risks or effects from exposure to substances released during the *Deepwater Horizon* Incident and any of the dispersants and decontaminants used in Response Activities;
>
> d)  natural attenuation or decomposition of oil, dispersants, decontaminants, and other substances related to the *Deepwater Horizon* Incident and Response Activities;
>
> e)  nature, content, and scope of *in situ* burning performed during the Response Activities, including any health risks and effects associated with such *in situ* burning;

    f)   monitoring, sampling or testing for oil, dispersants, decontaminants, and other substances related to the *Deepwater Horizon* Incident and Response Activities;

    g)   occupational safety, worker protection, and preventative measures for Clean-Up Workers; and

    h)   health studies of persons exposed to oil and other substances released during the *Deepwater Horizon* Incident and dispersants and decontaminants used in Response Activities.

(MSA § IX.H.)  The library was launched on November 6, 2012.  (Supplemental Declaration of Matthew Garretson, Rec. Doc. 7944-1, ¶ 5.)   It currently contains approximately 100,000 documents. (*Id.*)

117.    The Outreach Program is separately funded and does not in any way limit the amount of compensation that Class Members will receive under other parts of the Settlement. (MSA § XXII.D.)

### 4.    Back-End Litigation Option for Later-Manifested Physical Conditions.

118.    The Medical Settlement also provides a mediation/litigation process for Class Members who seek compensation from BP in the future for a physical condition that is claimed to have manifested after April 16, 2012 and resulted from exposure to oil and/or dispersants due to the *Deepwater Horizon* Incident during the time frames set forth in the Settlement Agreement.  (MSA § VIII.)

119.    Class Members diagnosed with a Later-Manifested Physical Condition have the option to seek compensation for that condition through the Back-End Litigation Option or, as applicable, pursuant to workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (MSA § VIII.B.)

120.    If a Class Member elects to proceed with the Back-End Litigation Option, the Class Member must notify BP within four years of either the first diagnosis of the condition or

the Effective Date of the Settlement, whichever is later.  (MSA § VIII.A.)  BP then has the option to mediate the claim.  (MSA § VIII.C.)  If the mediation does not resolve the claim, or if BP decides not to mediate, then the Class Member has the right to file a Back-End Litigation Option Lawsuit in federal district court in the Eastern District of Louisiana.  (MSA §§ VIII.C.2; VIII.F.)  The Parties have stipulated that in a lawsuit brought under the Back-End Litigation Option, the Class Member need not prove and may not litigate at trial:  (a) the fact of exposure of the Class Member to oil and/or dispersants during the *Deepwater Horizon* Incident or Response Activities; (b) the alleged fault of BP for the *Deepwater Horizon* Incident; and (c) the fact and/or existence of the Agreement to prove liability.  (MSA § VIII.G.3.b.)  BP has also agreed to forego defenses based on prescription, statute of limitations or repose, laches, and certain other defenses.  (MSA § VIII.G.2.)  As a result, the only issues to be litigated under the Back-End Litigation Option are:  (a) the fact of diagnosis; (b) the amount, location, and timing of oil and/or dispersants released and/or used during the *Deepwater Horizon* Incident or Response Activities; (c) the level and duration of the Class Member's exposure; (d) causation, including potential alternative causes; and (e) the amount, if any, of compensatory damages.  (MSA § VIII.G.3.a.)

121.    The Medical Settlement provides that Class Members may not seek or recover punitive damages against BP in a Back-End Litigation Option lawsuit.  (MSA § VIII.G.2.)

## 5.    Release.

122.    In exchange for the benefits that the Settlement provides to Class Members, the Settlement also provides for a comprehensive Release of specified physical and bodily injury claims against BP and other parties and entities involved in the *Deepwater Horizon* Incident. (MSA § XVI.)

123.    Under these provisions, Class Members agree to release BP and other Released Parties for any liability for all Class Members' claims that were or could have been brought arising from the *Deepwater Horizon* Incident in connection with personal or bodily injury, progression or exacerbation of an injury, loss of support, services, consortium, companionship, society, or affection, increased risk, possibility, or fear of suffering in the future, and medical screening and monitoring.  (MSA § XVI.A.)

124.    Class Members do not release claims against BP for Later-Manifested Physical Conditions provided that they follow the procedures for asserting such claims established by the Settlement Agreement.  (MSA § XVI.B.)

125.    The Release also excludes medical claims (i) arising from alleged exposure of a Class Member, *in utero*, to dispersants and/or decontaminants used in connection with Response Activities, and (ii) for non-exposure-based physical or bodily trauma injury (other than a heat-related injury) related to the *Deepwater Horizon* Incident.  (MSA § XVI.G.)

126.    Released Parties include other defendants in the *Deepwater Horizon* litigation except Transocean and Halliburton.    (MSA § II.MMMM.)    Under the Settlement, Class Members agree not to accept or attempt to recover any compensatory damages from Transocean and Halliburton, but they do preserve their ability to seek and recover punitive damages from those parties.  (MSA § XVII.B.)

### 6.    Notice and Administration Expenses.

127.    BP has agreed to pay not only the cost of notice to Class Members, but also all costs of the Settlement administration, which may reasonably be expected to be substantial.  (*See* MSA §§ II.QQQQ, XXII.A.)  This is a significant benefit to Class Members that does not reduce any other compensation or benefits provided.

### 7.   Guarantees.

128.   Settlement payments are guaranteed by two guarantors beyond defendants BP Exploration & Production Inc. and BP America Production Company.  These guarantors are BP Corporation North America Inc. and BP p.l.c. (the latter for five years after the Effective Date).  (*See* MSA §§ XXII.A.1, XXII.A.2.)

### 8.   Attorneys' Fees and Costs.

129.   The Medical Benefits Class Counsel attorneys' fees, expenses, and costs were not negotiated by counsel for the Parties until April 17, 2012 — after full agreement was reached as to all other terms of the Medical Settlement and only after the Court had given its approval for attorney fee negotiations to go forward.  (MSA § XIX, Ex. 19, ¶ 1.)

130.   The Settlement provides for attorneys' fees, expenses, and costs for Medical Benefits Class Counsel.  (MSA § XIX, Ex. 19.)

131.   Under the Medical Settlement Agreement, BP has agreed not to contest a request by Class Counsel for an award, in an amount to be set at a future time by the Court not to exceed $600 million, for Class Counsel's fees, costs, and expenses.   (MSA § XIX, Ex. 19, ¶¶ 3, 4.) Class Counsel will file a fee petition that class members will be free to contest under Rule 23(h). BP's agreement to pay attorneys' fees that otherwise would come out of class member recoveries is unusual and represents a substantial benefit for the class.  Any common benefit Class Counsel fees and costs awarded by the Court will not be deducted from Class Members' recoveries, but will be paid by BP in addition to other class benefits.

132.   Any such awards must be approved by the Court, will be paid separately from amounts paid to the Class under the Settlement, and will not reduce any payments or benefits to the Class.  (MSA § XIX, Ex. 19.)

## VI. IMPLEMENTATION OF THE MEDICAL SETTLEMENT TO DATE.

### A.    Implementation of Class Notice Program.

133.    Following the Court's Preliminary Approval of the Medical Benefits Settlement, Hilsoft Notifications — the Court-appointed Medical Benefits Settlement Class Notice Agent — began implementing the Notice Plan as ordered by the Court.  (Declaration of Cameron Azari, Rec. Doc. 7113-1, ¶¶ 5, 6.)   Implementation of the Notice Plan included dissemination of individual notice to known potential Settlement Class Members via postal mail and email, an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, highly-trafficked websites, and Sunday local newspapers (via newspaper supplements).  (*Id.* ¶ 8.)   Notice placements also appeared in non-measured[14] trade, business, and specialty publications; African-American, Vietnamese, and Spanish-language publications; and Cajun radio programming.  (*Id.* ¶ 8.)  The Notice Program included creation of a neutral, informational notice website (www.DeepwaterHorizonSettlements.com) to serve as the notice page for the Medical Settlement as well as the separate Economic and Property Damages Settlement, and where Class Members could obtain additional information and documents.   (*Id.*  ¶ 67.)   The informational website was rendered in English, Spanish, and Vietnamese.  The website was updated several times to reflect ongoing proceedings and Orders issued by the Court.  (*Id.* ¶ 67; Supplemental Declaration of Cameron Azari, Rec. Doc. 7730-1, ¶ 10.)  As implemented, the Notice Program reached an estimated 95% of adults aged 18+ in the Gulf Coast Areas an average of 10.3 times each and an estimated 83% of all U.S. adults an average of 4.0 times each. (Azari Decl. ¶ 84; Azari Supp. Decl. ¶ 6.)

---

[14] "Non-measured" refers to those forms of media that are not tracked to ascertain reach and frequency numbers. (*See* Azari Decl. ¶¶ 8, 11.)  The enhancements to the reach and frequency numbers from these additional sources of media are either incalculable or are qualitative, not quantitative.  (*Id*. at 11.)

134.    The Notice Program was substantially completed on July 15, 2012, allowing Class Members more than adequate time to make decisions before the opt-out and objections deadlines.  (*See* Azari Decl. ¶¶ 14, 78.)

**B.    Initial Funding of Projects for the Gulf Region Health Outreach Program.**

135.    As of August 30, 2012, initial distributions totaling over $20 million have been made to the four projects of the Gulf Region Health Outreach Program.  Even before final approval of the Settlement, project leaders identified in the Medical Settlement Agreement have been implementing their projects according to the Settlement's terms.  (Goldstein Decl. ¶ 36; Goldstein Supp. Decl. ¶ 5.)

136.    Specifically, as of August 30, 2012, more than $10 million has been distributed to fund the Primary Care Capacity Project, with additional annual distributions planned over the next four years to bring total funding to $50 million.  (Goldstein Decl. ¶ 36(a)(1).)  Community health needs assessments are taking place for the 17 parishes and counties covered by the Primary Care Capacity Project to consider the adequacy of existing healthcare options and help select primary care providers in the community to receive grants and other assistance to provide higher quality health care to Class Members and other members of the community.  (*Id.* ¶ 36(a)(2); Goldstein Supp. Decl. ¶4(b).)

137.    By August 30, 2012, more than $6 million of a total of $36 million was distributed to fund the Mental and Behavioral Health Capacity Project in Alabama, Florida, Louisiana, and Mississippi.  (Goldstein Decl. ¶ 36(b)(1); Goldstein Supp. Decl. ¶ 4(a).)  Each of the state-based mental and behavioral health projects has begun to hire staff and implement its planned activities to provide immediate mental health services, including through the use of telemedicine.  (Goldstein Decl. ¶ 36(b)(2); Goldstein Supp. Decl. ¶ 4(a).)

138.   As of August 30, 2012, over $3 million of a slated $15 million has been distributed to fund the Gulf Region Health Outreach Program's Environmental Health Capacity and Literacy Project.   (Goldstein Decl. ¶ 36(c)(1).)   The Environmental Health Capacity and Literacy Project has begun to work with the Association of Environmental and Occupational Health Clinics to make a network of environmental health specialists available for consultation and referrals in the Gulf Region.   (Goldstein Decl. ¶ 36(c)(2); Goldstein Supp. Decl. ¶ 4(c).)

139.   As of August 30, 2012, over $1.5 million out of a total of nearly $4 million has been distributed to fund the Community Health Workers Training Program, designed to provide high quality educational programs, disaster-related research expertise, and instructional services to community health workers.   (Goldstein Decl. ¶ 36(d).)

140.   The Claims Administrator has implemented the publicly-accessible, text-searchable, indexed, online electronic Gulf Region Health Outreach Program Library by obtaining and posting relevant Library Materials.   This on-line Library was launched on November 6, 2012.   (Garretson Supp. Decl. ¶ 5.)

## C.      Implementation of the Settlement.

141.   The Claims Administrator has successfully performed its duties to prepare for the Effective Date of the Settlement and processing of Specified Physical Condition claims, including, in relevant part:   (1) employing trained and dedicated call and intake staff as well as claims processing professionals; (2) creating and launching the Medical Settlement web portal; (3) launching its claims service center in New Orleans; (4) implementing the mapping tool for zone determinations; (5) creating and staffing a call center that has been processing inquiries; (6) developing claims review and processing procedures; (7) creating a searchable data repository to assist in verification of Class Member status and responding to data disclosure

requests; and (8) addressing Medicare Secondary Payer Compliance.  (Aug. 13, 2012 Status Update from the Deepwater Horizon Medical Benefits Settlement Claims Administrator, Rec. Doc. 7105-1, at 3-4; Oct. 22 Garretson Status Report, at 2-3, 8, 11-15.)

142.   In addition, Class Counsel have established a physical office in New Orleans, with a toll-free number, web site, and settlement questions e-mail address to provide additional guidance and assistance to class members.  They have undertaken to provide ongoing assistance to claimants in answering questions about the claims process, providing advanced counsel, and advocating for clients interests on an ongoing basis with the claims administrator.

## CONCLUSIONS OF LAW

### I.  JURISDICTION AND VENUE.

1.   BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. have not contested the Class's allegation that they are subject to personal jurisdiction in this district for purposes of this action.  (*See* Rec. Doc. 6454 ¶¶ 6-8; *see also Ins. Corp. of Ire. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.").)

2.   The Court has federal jurisdiction over the Plaintiffs' claims, which, as the Court already held, arise under maritime law.  *See* 28 U.S.C. § 1333; (Rec. Doc. 4209 at 5-6 (holding that Plaintiffs' state-law claims were preempted by maritime law)).   The Court also has jurisdiction pursuant to the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

3.      BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. have not contested the Class's allegation that venue is proper in this district.  (*See* Rec. Doc. 6454 ¶ 23; *see also Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) ("But venue and subject-matter jurisdiction are not concepts of the same order.  Venue is largely a matter of litigational convenience; accordingly, it is waived if not timely raised.").)

4.      The JPML also has concluded that this venue is the appropriate court in which to have centralized most *Deepwater Horizon* non-shareholder litigation, in part because of its proximity to the *Deepwater Horizon* Incident.  "Upon careful consideration . . . we have settled upon the Eastern District of Louisiana as the most appropriate district for this litigation.  Without discounting the spill's effects on other states, if there is a geographic and psychological 'center of gravity' in this docket, then the Eastern District of Louisiana is closest to it."  *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d at 1355.

## II. STANDING.

5.      As the Court has held, "[g]enerally, non-Class Members do not have standing to object to a class settlement.  Significantly, claims excluded from the proposed settlement are unaffected and preserved."  (Rec. Doc. 6418 at 16-17; Rec. Doc. 7038 at 1 ("In the context of class settlements, non-settling parties generally have no standing to challenge the proposed settlement.").)  Notwithstanding the Court's holdings, individuals and entities outside the Class (including Halliburton, the State of Louisiana, and others) have continued to submit purported objections to the Medical Settlement.  These "objections" are legally improper.

6.      ***First***, these individuals and entities are not members of the Class, and therefore lack standing to challenge the Settlement.  Non-class members are denied standing for the simple reason that they are not bound by the Class Settlement.  *See*, *e.g.*, *Feder v. Elec. Data Sys. Corp.*,

248 F. App'x 579, 580 (5th Cir. 2007) ("[O]nly Class Members have an interest in the settlement funds, and therefore only Class Members have standing to object to a settlement.  Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing."); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 638 (5th Cir. 2012) ("Any class member has standing to object to a class settlement."); *Piambino v. Bailey*, 610 F.2d 1306, 1327 (5th Cir. 1980) ("Rule 23(e) requires the trial judge to review any proposed settlement of a class action.  The purpose of this salutary requirement is to protect the nonparty members of the class from unjust or unfair settlements ***affecting their rights***.") (emphasis added); *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176-77 (5th Cir. 1975) ("The special prophylactic function that subdivision (e) of Rule 23 was designed for is to assure that any person ***whose rights would be affected*** by a dismissal or compromise has the opportunity to contest the proposed action.") (emphasis added and quotations omitted).[15]

7.     There is a narrow exception to this standing limitation where a non-settling defendant can demonstrate "plain legal prejudice."  Such prejudice, however, does not exist here.  Rather, "plain legal prejudice" only exists where a settlement (1) strips the non-settling defendant of a legal claim or cause of action, (2) interferes with a party's contract rights, or (3) strips a party of the ability to seek contribution or indemnification.  *In re Integra Realty Res., Inc.,* 262 F.3d 1089, 1102-03 (10th Cir. 2001); *see also In re Beef Indus. Antitrust Litig.*,

---

[15] *See also Gould v. Alleco, Inc.,* 883 F.2d 281, 284 (4th Cir. 1989) (noting that "[t]he plain language of Rule 23(e) clearly contemplates allowing only Class Members to object to settlement proposals."); 4 William B. Rubenstein, *et al.*, *Newberg on Class Actions* § 11:55 (4th ed. 2002) ("[A]s a general rule, only Class Members have standing to object to a proposed settlement."); Rec. Doc. 7358 at 4-5 (providing that "only parties with standing shall be permitted to speak or participate in the fairness hearing" and that "plaintiffs who are not part of the class . . . may not participate in the fairness hearing"); Rec. Doc. 7480 at 8–9 (denying discovery to parties lacking standing); 4 William B. Rubenstein, *et al.*, *Newberg on Class Actions* § 11:55 (4th ed. 2011) ("Individuals who are not class members because they are outside the definition of the class or have opted out are on a different footing [from class members].  They are not subject to *res judicata* by the settlement.  Class action settlements typically leave intact the legal claims of others."); *McBean v. City of New York*, 233 F.R.D. 377, 384 (S.D.N.Y. 2006) ("It was perfectly reasonable—and not at all unfair or un-adversarial—for class counsel to define the class in a way that, in their opinion, would lead to the best recovery for the class. Fairness does not require class counsel to act on behalf of individuals not in the class, even if at one time those individuals were included in a pretrial class definition.").

607 F.2d 167, 172 (5th Cir. 1979); *Dunn v. Sears, Roebuck & Co.,* 639 F.2d 1171, 1173–74 (5th Cir. 1981); *Mayfield v. Barr,* 985 F.2d 1090, 1093 (D.C. Cir. 1993); 4 William B. Rubenstein, *et al.*, *Newberg on Class Actions* § 11:55 (4th ed. 2002). As this Court has already held, the Settlement Agreement does none of these things to Halliburton, and therefore it may not claim and cannot establish plain legal prejudice. (*See* Rec. Doc. 7038 at 2 (concluding that the proposed Settlements "will in no way affect any procedural or substantive rights of Halliburton"). In its purported objection, Halliburton simply repeats the claims of legal prejudice that this Court has already rejected. (*Compare* Docket 10-7777, Rec. Doc. 93 at 14-15 *with* Rec. Doc. 7036 at 5-7, 9.)[16] There is no basis for the Court to reconsider its previous ruling.[17]

8.    **Second**, the State of Louisiana — which, like Halliburton, is not a member of the settling Class and does not have legal rights affected by the Settlement Agreement — also lacks standing to object to the fairness of the Medical Settlement. (*See* Docket 10-7777, Rec. Doc. 228.) Furthermore, the Class Action Fairness Act ("CAFA") does not provide standing for Louisiana. CAFA's notification provision, 28 U.S.C. § 1715, simply requires notification; it does not create standing that a state official otherwise lacks. *See* 28 U.S.C. § 1715(f) ("Nothing in this section shall be construed to expand the authority of . . . State officials."); *In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 09-2107,

---

[16] On June 4, 2012, the Court established Docket 10 Civ. 7777 (E.D. La.) as a separate docket for the filing of objections. (*See* Rec. Doc. 6616.) Throughout these Findings of Fact and Conclusions of Law, the Court has endeavored to respond to, and cite to, the primary arguments made by the objectors. The Court emphasizes, however, that it has read and considered *all* the objections, both timely or late, with or without standing—whether appropriately filed on the objections docket or elsewhere) – and the Court's failure specifically to cite to a particular objection does not imply that the Court did not consider and overrule that objection.

[17] Halliburton also filed "preliminary objections" to the Motion for Preliminary Approval and Class Certification. (Rec. Doc. 6350.) The Court overruled these objections at the Preliminary Approval stage, and nothing has occurred to justify a different result now. (Rec. Doc. 6419 at 14.) As in its discovery motion, Halliburton complains about prejudice from the Release under the Settlement Agreement, but cannot demonstrate any legal prejudice to it as a result of that Release. (*See* MSA § XVII.B.)

2012 WL 4322012, at *4 (E.D. Pa. Sept. 21, 2012) ("The statute says nothing . . . of granting states a right to be heard on, or formally appeal, every class action settlement simply because residents of that state are class members.").

9.      Nor may Louisiana establish standing under the *parens patriae* doctrine, as any challenge to the Settlement Agreement simply represents an effort to advance the narrow financial interests of a subset of Louisiana's citizens.  But while "a State may, for a variety of reasons, attempt to pursue the interests of a private party, and pursue those interests only for the sake of the real party in interest[,] . . . [i]nterests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement.  In such situations, the State is no more than a nominal party." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 602 (1982).  At bottom, "the State must articulate an interest apart from the interests of particular private parties."  *Id.* at 607  (emphasis added);  *see also Paterson v. Texas*, 308 F.3d 448, 451 (5th Cir. 2002) (overruling for lack of standing Texas' Attorney General's objections to a class action settlement).

10.      Louisiana has filed an "*amicus*" brief opposing certification of the Medical Class, but has neither sought nor been granted leave to make any such filing.  In any event, this "*amicus*" brief is simply another attempt by Louisiana improperly to object to the Settlement. The Court previously ruled that "the proposed settlements will in no way affect any procedural or substantive rights of . . . Louisiana," and thus it has no standing or basis to object. (Rec. Doc. 7038 at 2.)

11.      ***Third***, the Court has been presented with evidence that more than one-third of the objections to the Medical Settlement were filed by individuals who lack standing.  (Garretson

Supp. Decl. ¶ 3, Ex. A.)  Certain of these individuals complain about being *excluded* from the Class because, for example, they live outside Zones A and B.  (*See*, *e.g.*, Docket 10-7777, Rec. Doc. 203.)  Forty-six others have opted out, though some were not Class Members to begin with.  (Garretson Supp. Decl., ¶ 3, Ex. A.)  Because they are outside the Class, these individuals are unaffected by the Settlement, and their objections are improper.  *See Feder*, 248 F. App'x at 580; *Union Asset Mgmt. Holding*, 669 F.3d at 638; *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989).

12.    Accordingly, the Court finds that the 55 purported objectors listed on Exhibit A of the Garretson Supplemental Declaration, Halliburton, and the State of Louisiana lack standing to object to the Medical Settlement.  On this basis alone, their objections are overruled.

13.    Although these individuals and entities lack standing, the Court has carefully considered their submissions and, as discussed below, finds nothing to call into question the fairness, reasonableness, and adequacy of the Settlement or the propriety of certifying the Class for settlement purposes.

### III. DISCOVERY MOTIONS.

14.    Even for Class Members, there is no "absolute right" to conduct discovery of a proposed class settlement.  *In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D. Ga. 1992).  Rather, courts have consistently held that those who object to a class action settlement have neither a vested "entitle[ment] to discovery," *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n.6 (6th Cir. 1984), nor an automatic privilege "to question and debate every provision of the proposed compromise."  *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).

15.    In evaluating settlements for approval, the fundamental question is whether the court has sufficient facts before it intelligently to approve or to disapprove the settlement.

*In re Gen. Tire & Rubber*, 726 F.2d at 1084 n.6.  This determination is based on whether the settlement's terms are fair, reasonable, and adequate.  *Cotton*, 559 F.2d at 1330.  Only discovery demonstrably necessary to this inquiry is appropriate.  Where this information already exists in the record (as it does here), indulging objectors' requests would only "unduly burden the parties" during the finalization of the proposed settlement, and thus should not be permitted. *In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, MDL No. 991, 1994 WL 593998, at *3 (E.D. La. Oct. 28, 1994).

16.    Although various entities and individuals requested discovery, none demonstrated that the discovery was necessary or helpful to the Court's determination of the Settlement's fairness.  Halliburton and the State of Louisiana filed motions seeking discovery on the Settlement, including deposing Class Representatives and experts.  (*See* Tr. of 7/27/12 Working Group Conf., Rec. Doc. 6992 at 15-25.)   The Court denied those motions, holding that Halliburton and Louisiana have no standing to challenge the Settlement and that the Settlement will in no way affect any of their procedural or substantive rights.  (Order, Rec. Doc. 7038 at 2.) Even if they had standing, Halliburton and Louisiana would still not be entitled to discovery. They failed to present "cogent factual objections" to the Settlement, and have made no showing that the Court lacks information needed to determine if the Settlement is fair and reasonable. *In re Ford Motor Co. Bronco II*, 1994 WL 593998, at *4.  They also failed to show "specifically what information they need from settling plaintiffs and defendant and how that information will assist the Court in its determination of the fairness of the proposed settlement."  *Id.*[18]

---

[18] Objectors represented by attorney Joseph Darrell Palmer sought discovery into the negotiations to test the veracity of the Parties' statements regarding the fee request.  (Docket 10-7777, Rec. Doc. 124 at 36-37.)  Mr. Palmer never served discovery or filed a motion seeking permission to do so, so this request is waived.  In any event, the law is clear that objectors are not entitled to discovery concerning settlement negotiations absent independent evidence of collusion or wrong-doing.  *See, e.g.*, *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 210 n.23 (5th Cir. 1981); *In re Ford Motor Co. Bronco II*, 1994 WL 593998, at *4; *In re Domestic Air*, 144 F.R.D. at 424; *Grant Thornton v. Syracuse Sav. Bank*, 961 F.2d 1042, 1046 (2d Cir. 1992); *Mars Steel Corp. v. Continental Ill. Nat. Bank*

17.     Objectors represented by the Sterbcow Law Group sought discovery of information regarding the Medical Encounters Database, which recorded information about Clean-Up Workers' visits to medic stations, arguing that it was necessary to permit the Court to know whether sufficient recovery would be available to many Class Members. (Rec. Doc. 7633.)   The Court denied their request because it was untimely, overbroad, and unnecessary as BP had already provided in its filings in support of settlement approval most of the information requested, and because BP had demonstrated that Class Members, including Clean-Up Workers, are eligible to recover meaningful settlement benefits for both acute and chronic conditions even if they did not visit a medic station and even if information about their conditions was not reflected in the Database.  (Order, Rec. Doc. 7746 at 3.)  There is no reason to revisit that ruling.[19]

## IV. EXPERT DECLARATIONS.

18.     ***Declarations submitted by BP and Class Counsel***.  On the evening before the Fairness Hearing, objectors represented by Stuart H. Smith of Smith Stagg LLC, Robert McKee of Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman & McKee, P.A., and others moved *in limine* to exclude the declarations in support of the Settlement submitted by BP and Class Counsel.  (Rec. Doc. 7861.)  The objectors asserted that the Court should not consider the

---

*and Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1989); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124-25 (7th Cir. 1979); *White v. Nat'l Football League*, 822 F. Supp. 1389, 1429 (D. Minn. 1993); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 146 (S.D. Ohio 1992); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 24, 28 (D.D.C. 2001); *Jaffe v. Morgan Stanley & Co., Inc.*, 2008 WL 346417, at *6 (N.D. Cal. Feb. 7, 2008). Mere allegations of wrongdoing are not sufficient; discovery is only permissible where the moving party "lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive."  *Mars Steel Corp.*, 834 F.2d at 684.  No objection or purported objection has offered any evidence of collusion, and the record is to the contrary.  *See* Part VII.B., *infra*; *see also* Klonoff Decl. ¶¶ 72-79; 11/8/12 Hearing Tr. at 275 (Court's comments).)

[19] Furthermore, the Medical Settlement allows Class Members to obtain their own personal information in the Medical Encounters and other similar databases before making a claim under the Settlement.  (MSA § XXI.B.3.b; *see* 5/10/12 Order Granting Joint Motion, Rec. Doc. 6505 ("The Claims Administrator may disclose Data provided to it pursuant to this Order pertaining to a person claiming to be a Medical Benefits Settlement Class Member upon its receipt of a completed and signed Data Disclosure Form from that person, or where applicable, the Authorized Representative thereof, pursuant to Section XXI.B.3.b of the Medical Settlement Agreement.").)

declarations unless the proponents demonstrated that the declarants were qualified pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  These objectors did not assert that any of the declarants were unqualified, claiming only that BP and Class Counsel had not offered any evidence that the declarations were admissible. [20] They are mistaken.  As the Court stated in denying the motion, "[t]he experts whose reports are subject to a late objector challenge on admissibility have provided information, in these reports, on their knowledge, skill, experience, training and education, and on their methodologies or analyses, that is sufficient to enable the Court to consider the issues of qualification and admissibility under FRE 702 and *Daubert*, and to determine that they meet these standards, and that these reports are admitted into the Fairness Hearing record, to be given such weight and consideration as the Court deems appropriate, in its independent settlement class certification and final settlement approval evaluations and decisions."  (Order, Rec. Doc. 7866.)

19.     The Court now also notes that the objectors' motion, filed the night before the Fairness Hearing, was untimely and thus the movants waived any right to challenge the qualifications of these experts.  (*See* Preliminary Approval Order, Rec. Doc. 7225, ¶¶ 25-27)[21]; *see also Huss v. Gayden,* 571 F.3d 442, 466 (5th Cir. 2009) ("The uniform law of the circuits, the Fifth included, is that without a ***timely*** objection to the admission of expert evidence, appellate review is waived absent plain error.") (footnotes omitted and emphasis added); *Bedingfield v. Deen*, 2011 WL 2712950, at *1 (W.D. La. July 8, 2011) (refusing to entertain *Daubert* challenge).)   In any event, the Court has examined again the expert declarations submitted by BP and Class Counsel and now confirms that the medical/scientific experts are well

---

[20] These objections were waived as a result of their complete lack of specificity and lack of any analysis and reasoning as to any issues with respect to the various experts, individually or as a group.

[21] Under the Court's Preliminary Approval Order, all objections were due to be filed by August 31, 2012.  (*See* Rec. Doc. 6418, ¶ 38.)   That deadline was subsequently extended by agreement to September 7, 2012, in light of Hurricane Isaac.  (*See* Rec. Doc. 7225.)

qualified in their fields and their analyses are based on scientific data, literature and methodology. Similarly, the legal experts are well qualified; their methodology is well established and their insight into class action settlements has been helpful to the Court. Accordingly, the Court overrules all objections to the qualifications of the experts cited in these Findings of Fact and Conclusions of Law and finds the testimony of the experts is based on sufficient facts and data.[22]

20. Finally, "[n]othing in *Daubert* . . . mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion." *Colon ex rel. Molina v. BIC USA, Inc*., 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (rejecting plaintiff's argument that *in limine Daubert* hearing was required when court had reviewed well-developed record which included two depositions, a declaration, and an expert report); *see also United States v. Hoang*, 285 F. App'x 133, 136 (5th Cir. 2008); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001) (*Daubert* hearing not required, especially where record was extensive); *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (recognizing that a *Daubert* hearing is not required to admit or exclude expert testimony); *United States v. Reaux,* Crim. A. 01-071, 2001 WL 883221, at *1 (E.D. La. July 31, 2001) (same); *Oilfield Equip. Marketing, Inc. v. New Tech Sys., Inc*., Civil Action No. MO-02-CA-1832004 WL 5499507, at *3 (W.D. Tex.

---

[22] Approval of this Settlement is before this Court on requests to grant Final Approval of this Class Settlement pursuant to Federal Rule of Civil Procedure 23(e). As such, Federal Rule of Civil Procedure 43(c) applies, which provides as follows: "**Evidence on Motion.** When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." *See also* 28 U.S.C. § 1746 (declarations can be used "with like force and effect" to affidavits). Accordingly, the Court overrules any objection based on the claim that the expert declarations are hearsay. It is entirely proper for this Court to make findings based on the declarations submitted into the record by the Parties (or by objectors). *See, e.g., Union Asset Mgmt. Holding*, 669 F.3d at 642 ("Historically, courts have commonly relied on affidavits, declarations, arguments made by counsel, and other materials in the record without also requiring live testimony.") (quoting *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006), *aff'd* 497 F.3d 615 (6th Cir. 2007)).

Mar. 26, 2004) ("A trial court is not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence.").

      21.    **_Declarations in Support of Objectors._**  Various objectors submitted declarations in support of their objections.  Many of the declarants appear to be unqualified to offer the opinions articulated.  For example, James H. Kirby III is a graduate student in coastal geology. Mr. Kirby does not have a degree or training in environmental or analytical chemistry, and his resume does not reflect any experience with oil spill clean-up, biodegradation processes, the design of properly controlled environmental studies, putative contaminants analysis, or human health issues — even though he purports to opine on these issues.

      22.    Likewise, Dr. William Sawyer, though a trained toxicologist, asserts conclusions without supporting evidence, mischaracterizes the circumstances of the *Deepwater Horizon* oil spill and Response, misstates and omits data from the articles he cites, and offers evidence that does not appear to be tied in any way to the *Deepwater Horizon* Incident.[23]  In addition, the Court notes that Dr. Sawyer has been disqualified as an expert in numerous other cases, including *Whitlock v. Pepsi Americas*, No. C-08-2742, 2011 WL 2746494 (N.D. Cal. Jul. 13, 2011); *Henricksen v. ConocoPhillips Co*., 605 F. Supp. 2d 1142 (E.D. Wash. 2009); *Hill ex. rel. Hill v. Koppers, Inc.*, Civ. Action No. 3:03CV60–P–D, 2009 WL 4908836 (N.D. Miss. Dec. 11, 2009); and *Adams v. Cooper Indus., Inc.*, Civ. A. 03- 476- JBC, 2007 WL 1805586 (E.D. Ky. June 21, 2007).[24]

---

[23] On the evening before the hearing, objectors represented by Robert J. McKee and others filed a motion for leave to supplement the record with an additional declaration by Dr. Sawyer.  (Rec. Doc. 7864.)  Because the September 7, 2012 deadline for filing briefs and supporting evidence had long passed, the Court denied this motion and struck the motion and declaration in their entirety from the Record.  (Order, Rec. Doc. 7870.)

[24] Dr. Vellrath's declaration was submitted by Halliburton in support of their objection.  Because it lacks standing, Halliburton's objection, and its declaration, are improper.  Furthermore, Halliburton does not explain how Dr. Vellrath, an economist and financial analyst, is qualified to offer opinions on the appropriateness of class certification in this case.  (*See* Declaration of Marc Vellrath, Docket 10-7777, Rec. Doc. 93-1, ¶ 4.)

23.     Objectors submitted a declaration from Ms. Wilma Subra, who purports to have conducted environmental sampling and health surveys in relation to the *Deepwater Horizon* Incident.  However, Ms. Subra fails to provide any results of such sampling or surveys indicating a potential for adverse health effects as a result of the oil spill.  Ms. Subra's assertion that, if asked, she "would have presented the results of [her] evaluations of the environmental damage due to the BP Crude Oil spill" to the PSC does little to help the Court in this matter. (Declaration of Ms. Wilma Subra (Rec. Docs. 185-9, 202-9) ¶ 7.)  Similarly, Ms. Subra notes that she has observed and received reports of oiling along the Gulf Coast in Summer 2012, but again fails to provide evidence that such re-oiling presents a potential health risk to Clean-Up Workers or Gulf Coast Residents.  Ms. Subra's conclusory and unsupported assertions are not helpful to the Court, a deficiency for which numerous other courts have criticized her submissions.  *See, e.g., Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 825 (5th Cir. 1993) ("Like [plaintiff's other expert] Ms. Subra did not conduct any chemical analysis. . . .  Unlike [that expert], she did not even base her conclusions on any chemical analysis or testing by a third party.  Instead she relied solely on physical observations of waste at a site unrelated to this case, with no chemical analysis of the waste to determine whether it was toxic.") (internal citation omitted); *Edmundson Bros. v. F.M. Carriere & Son, Inc.*, 552 So. 2d 1229 (La. Ct. App. 1989) (Plaintiff hired Subra as a chemist to test properties of guar gum in food product action; court found that Subra's results were contradicted by defendants' chemist and that plaintiffs failed to prove product was defective).[25]

---

[25] According to BP's experts, there is no scientific basis for Ms. Subra's or Dr. Robichaux's claims that blood tests for VOCs can establish prior exposure to oil and/or dispersants or a link to adverse health effects from such prior exposures.  (*See* Herzstein Supp. Decl. ¶ 8; s*ee also* Cox Supp. Decl. ¶¶ 18-20; Herzstein Supp. Decl. ¶ 7.)  Further, BP has presented uncontradicted evidence that the results of VOC blood testing performing by Metametrix are scientifically flawed and unreliable.  (*See* Cox Supp. Decl. ¶¶ 21-22.)

24.     Objectors also submitted a declaration from Dr. Michael Robichaux, an ear, nose and throat doctor, who concedes that he is "not a scientist and [he does] not consider [himself] to be distinguished."  (Declaration of Dr. Michael Robichaux (Rec. Docs. 185-3, ¶ 24; 202-3, ¶ 24.) Dr. Robichaux purported to offer an opinion related to environmental and occupational medicine and toxicology, but does not claim to have any training or expertise in these areas.   In his declaration Dr. Robichaux also claims that Chronic Specified Physical Conditions on the Matrix do not reflect the vague types of neurological conditions described by one of this alleged patients which he claims are typical of others.   However, neither Dr. Robichaux nor the objectors who submitted his declaration have provided competent evidence of those conditions his patients claim to have, the testing and examination methodology he uses to diagnose such conditions, or the basis for asserting that such diseases or conditions were improperly excluded from the Matrix.  (*See*, *e.g.*, Harbut Supp. Decl. ¶ 4; Herzstein Supp. Decl. ¶¶ 4.i., 4.j.)  Similarly, Dr. Robichaux claims that some of his patients have improved with detoxification treatment, but BP has presented uncontradicted evidence that detoxification programs are generally not recognized by the scientific or medical communities.  (*See* Supplemental Declaration of Robert Cox, Rec. Doc. 7732-2, ¶ 23.)  To the extent that Dr. Robichaux, Ms. Subra, or others claim that "detoxification" treatment can "remove" VOCs from the blood, BP has presented evidence that VOCs actually have short half lives of hours to a few days, and thus there would be nothing left to "detoxify" in the months or years after exposure.  (*See* Cox Supp. Decl. ¶¶ 18-20; Herzstein Supp. Decl. ¶ 7.)  BP has also presented evidence, again uncontradicted, that there is no credible, peer-reviewed scientific evidence that detoxification treatment improves symptoms or that any improvement is not the result of the placebo effect or other causes.  (*See* Herzstein Supp. Decl. ¶¶ 8, 8.b.)  Dr. Robichaux also offers an unsupported opinion that the Medical Encounters

Database is "probably useless" based on his discussion with a single individual; similarly he states that the Zones are probably unfair to Louisiana's citizens, but provides not a single reason why. (Robichaux Decl. ¶¶ 12, 28-30.) Dr. Robichaux wholly failed to provide any competent evidence in support of the assertions he makes.

25.    Attorney Robert McKee submitted a declaration which he provides conclusory statements regarding his client's alleged injuries, causation, and damages. (Docket 10-7777, Rec. Docs. 185-4, 202-4.) While Mr. McKee says that he has litigated many cases relating to exposure to organic chemicals, he does not claim to have any actual, recognized education, training or experience in medicine or toxicology. Mr. McKee's unsupported statements are not credible medical or scientific evidence to support his clients' objections to the Settlement.

26.    Nevertheless, the Court has carefully considered these submissions and the issues raised and concludes that, even if they were admissible, they provide little that is helpful to the Court — and nothing that undermines the fairness, reasonableness, and adequacy of the Medical Settlement.

## V.    THE SETTLEMENT CLASS MAY BE CERTIFIED FOR PURPOSES OF SETTLEMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(A) AND 23(B)(3).[26]

27.    For the reasons provided in detail below, the Medical Class may be certified pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

28.    Settlement classes are a typical feature of modern class litigation, and courts routinely certify them, under the guidance of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), to facilitate the voluntary resolution of legal disputes. *See, e.g.*, *In re Chinese-*

---

[26] This Section V., which explains that that the Medical Class may be certified for settlement purposes pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, is submitted exclusively by Class Counsel, and not by BP. As BP has previously explained, it does not oppose Class Counsel's request on the condition that the Court grants final approval to the Settlement Agreement. (*See* Rec. Doc. 7112-1 at 50 n.41.)

*Manufactured Drywall Prods. Liab. Litig.*, No. 09-6828, 2012 WL 92498, at *8-11 (E.D. La. Jan. 10, 2012); *Stott v. Cap. Fin. Servs.*, 277 F.R.D. 316, 324-26 (N.D. Tex. 2011); *Billetteri v. Secs. Am., Inc.*, No. 09-1568, 2011 WL 3586217, at *4-9 (N.D. Tex. Aug. 4, 2011); *In re OCA, Inc. Secs. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *7-10 (E.D. La. Oct. 17, 2008); *see also* MANUAL FOR COMPLEX LITIGATION § 21.612 (4th ed. 2004) ("Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits.").

29.     To approve the certification of a settlement class under Federal Rule of Civil Procedure 23(b)(3), the Court must conclude that the requirements of Rule 23(a) and 23(b)(3) have been met.  (*See* Klonoff Decl. ¶13.)[27]

30.     The party seeking certification bears the burden to demonstrate that the requirements of Rule 23 have been satisfied.  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003).  Plaintiffs thus bear the burden of proof in this proceeding.

31.     Based on the record of proceedings after the Fairness Hearing, the Court concludes that the Medical Class meets the requirements of Rule 23 and warrants certification.

### A.     The Medical Class Meets Rule 23(a)'s Requirements.

32.     Compliance with Rule 23(a) necessitates a showing that:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the

---

[27] The Parties have tendered either jointly or on their own behalf four experts in the law of class actions:  Dean Klonoff and Professors Coffee, Issacharoff, and Miller.  The Court cites to, or in some instances, quotes from the opinions of these notable scholars at various points in the analysis below of class certification issues.  However, the Court underscores that at all times it has exercised its independent legal judgment on each and every class certification issue.  The Court cites to the declarations of these scholars where they encapsulate or restate the governing legal rules embodied in the text of Rule 23 and/or in the case law of the federal courts.  Since these scholars have criticized abusive class actions, however, it remains significant that all four of them, from their various perspectives, support this Settlement in positive − indeed enthusiastic − terms and believe that it is readily certifiable.

claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

33.     In addition to the four explicit prerequisites of Rule 23(a), courts have read an "implied requirement of ascertainability" into Rule 23(a).   *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 376 (S.D.N.Y. 2010) (internal quotation marks omitted).

### 1.     The Medical Class Satisfies the Ascertainability Requirement.

34.     "[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding*, 669 F.3d at 639 (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (*per curiam*)).   A class is ascertainable when its members can be identified by reference to objective criteria. *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008); *see also Dell*, 669 F.3d at 639-40 (stating that "mechanical and objective standard[s]," which do not involve "individualized 'causal' determination[s] on the merits," provide a "clearly ascertainable" class definition); *In re Train Derailment Near Amite, La.*, MDL No. 1531, 2006 WL 1561470, at *14-15 (E.D. La. May 24, 2006) (approving a class definition that included persons residing, employed, or present within a geographic boundary, because it "makes readily ascertainable the determination whether someone is within or without the class").

35.     The Medical Class is limited to individuals who suffered past exposure to oil and/or dispersants during a well-defined, finite time period.   Inclusion in the Medical Class is based upon objective criteria, including participation in Response Activities, residency in objectively-defined geographic areas, and the manifestation of clearly-identified Specified Physical Conditions.   Each of these criteria is meticulously defined in the Medical Settlement. (*See* Coffee Decl. ¶¶ 10, 52-53; Klonoff Decl. ¶¶ 18-22; Miller Decl. ¶ 15.)   The Medical Class is adequately defined and clearly ascertainable.

66

36.     The Attorney General of Louisiana ("Attorney General") purports to object to the ascertainability of the Medical Class, arguing that class membership requires a Zone A Resident to show that he or she developed a Specified Physical Condition between April 20, 2010 and September 30, 2010.[28]  Thus, argues the Attorney General, class membership turns on a causal inquiry and, as such, improperly compels an individual to "prove his case to qualify as a Zone A class member."  (Docket 10-7777, Rec. Doc. 228 at 9.)  The Attorney General is incorrect. Because each Specified Physical Condition is clearly defined, no causal inquiry is necessary. Rather, to meet the relevant criteria, a Class Member need only show the fact that he or she suffered from one of the defined conditions.  In other words, the manifestation of a Specified Physical Condition is an objective benchmark requiring no causal determination.  (*See* Klonoff Decl. ¶ 20 (explaining that "the class definition is objective and precise and does not turn on the merits"); *see also Union Asset Mgmt. Holding*, 669 F.3d at 640 (approving definition that included those who purchased common stock and were "damaged thereby"; "this language is routine in class definitions").)  The objection is overruled.

37.     In addition, the Attorney General claims that the Class definition is fatally imprecise because the word "capacity" is not defined in § I.B. of the Medical Settlement. (Docket 10-7777, Rec. Doc. 228 at 9-10.)  Section I.B. governs exclusions from the Class and states, in pertinent part,

> B.     Excluded from the Medical Benefits Settlement Class are the following: . . .
>
> 6)     Any person who is a Zone A Resident or a Zone B Resident, but not a Clean-Up Worker, and who worked in one or more of the following capacities for a cumulative duration of at least five years prior to April 20, 2010: . . .

---

[28] For the reasons stated *supra*, the Attorney General lacks standing to object to the Medical Settlement (and, indeed, does not even claim to be objecting).  The Court nonetheless addresses his arguments in opposition to class certification as if they were "objections," and refers to them as such.

> c)    Storage, transportation, distribution, or dispensing of gasoline, diesel, jet fuel, kerosene, motor fuels, or other hydrocarbon-based fuels at any bulk storage facility (not including gas stations or gas station convenience stores), bulk plant, or bulk terminal facility that stores hydrocarbons or petrochemicals; . . . .

(MSA § I.B.)

38.    The term "capacity," as it used in this provision, is not imprecise.  A plain reading of the exclusion, read in the context of the Settlement Agreement as a whole, makes clear that it applies only to those who physically came into contact with gasoline, diesel, jet fuel, kerosene, motor fuels, and other hydrocarbon-based fuels.  The exclusion requires active engagement in storage, transportation, or dispensing tasks.  An employee (such as an office secretary) whose responsibilities require no physical contact with gasoline, diesel, jet fuel, kerosene, motor fuels, and other hydrocarbon-based fuels is not excluded.  The Attorney General's objection to the Class definition is overruled.  The Court confirms its preliminary conclusion that the ascertainability requirement is satisfied.  (*See* Rec. Doc. 6419 at 16.)

### 2.    The Medical Class Meets Rule 23(a)(1)'s Numerosity Requirement.

39.    Numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  To satisfy numerosity, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members.  *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000); (*see also* Klonoff Decl. ¶ 23).

40.    The Medical Class includes approximately 90,000 Clean-Up Workers and nearly 5,000 Zone B Residents.  Approximately 100,000 individuals reside in Zone A.  In addition, over 17,000 persons have filed short form joinders in MDL No. 2179 asserting a claim for personal or bodily injury as a result of the *Deepwater Horizon* Incident, and more than 4,546 persons have

filed claims with the Claims Administrator.  (Garretson Supp. Decl. ¶ 4.)  The Medical Class is reasonably estimated to consist of as many as 200,000 Class Members.  *See In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564 (E.D. Tex. 2005) ("The numerosity prong is satisfied if plaintiffs demonstrate some evidence of a reasonable numerical estimate of purported class members."), *aff'd* 429 F.3d 125 (5th Cir. 2005).

41.     The Fifth Circuit has consistently held that classes only a fraction of the size of the Medical Class satisfy Rule 23(a)(1)'s numerosity requirement.  *See, e.g.*, *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (between one hundred and one hundred fifty); *Jack v. Am. Linen Supply Co.*, 498 F.2d 122 (5th Cir. 1974) (fifty one); *Sagers v. Yellow Freight Sys.*, 529 F.2d 721, 734 (5th Cir. 1976) (approximately one hundred ten); *Jones v. Diamond*, 519 F.2d 1090, 1100 n.18 (5th Cir. 1975) (forty eight); (*see also* Coffee Decl. ¶ 60; Klonoff Decl. ¶ 24).

42.     Joinder of all members of the Medical Class is impracticable.  The Court confirms its preliminary conclusion that the numerosity requirement is satisfied.  (*See* Rec. Doc. 6419 at 16-17.)

### 3.     The Medical Class Meets Rule 23(a)(2)'s Commonality Requirement.

43.     Rule 23(a)(2) requires a showing of a question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2).  This standard is met where there is any common contention central to the resolution of each of the class member's claims.  *See Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2551 (2011); *see also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) ("Rule 23(a)(2) requires that all of the class member[s'] claims depend on a common issue of law or fact whose resolution will resolve an issue that is central to the validity of each one of the class member's claims in one stroke." (quoting *Wal-Mart*, 131 S. Ct.

at 2551) (emphasis and alterations omitted)).  Even a single common question will satisfy this test.  *Wal-Mart*, 131 S. Ct. at 2556.

44.    According to the *Wal-Mart* Court, commonality requires classwide proceedings to have the ability "to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551.  "Commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members."  *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 2046, 851 F. Supp. 2d 1040, 1052 (S.D. Tex. 2012) (applying *Wal-Mart*) (citation and internal quotation omitted).  Where a settlement class is proffered for certification, the focus "should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence."  *Id.* at 1053 (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 335 (3d Cir. 2011) (*en banc*) (Scirica, J., concurring), *cert. denied*, 132 S. Ct. 1876 (2012)).

45.    In this case, there are numerous common questions of both law and fact, and it is for this reason that this action was centralized in this District by the Judicial Panel on Multidistrict Litigation.  *Cf. In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *9 ("Movants argue that commonality is also easily satisfied because the Judicial Panel on Multidistrict Litigation ordered the subject cases to be consolidated in the MDL based upon commonality of facts, and the factual and legal issues arising from KPT Chinese drywall are common to all claimants.  The Court agrees . . . .").

46.    Common questions of fact exist because the *Deepwater Horizon* Incident was the common event giving rise to the claims of each of the Class Members.  These common fact questions are numerous: for example, shared among the Medical Class are factual queries such as what, if anything, BP could have done to prevent the blowout; whether BP could have stopped

the flow of oil sooner than it did; or whether BP should have used different dispersant chemicals.[29]

47.     All legal questions arise and would be determined essentially under a common legal framework of general federal maritime law (a species of federal common law). Accordingly, the applicable law unites the Class.  This is not an *Amchem* scenario, in which the class is fragmented by a multiplicity of state laws that control the viability of claims.

48.     Common questions of law exist because each Class Member must resolve whether BP was legally liable under general maritime law for the April 20, 2010 explosion and its aftermath.  Medical Class Members are "[e]ssentially asserting a negligence cause of action, which places [BP's] course of conduct at center stage."  (*See* Coffee Decl. ¶ 61.)  Indeed, because BP was named a "responsible party" under the OPA, its alleged negligence for the blowout underpins the entirety of its post-explosion conduct, including its application of dispersant chemicals.  *See, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 604 (E.D. La. 2006) (finding common negligence conduct where some plaintiffs in personal injury class were injured during initial oil spill and others were injured during post-spill remediation process).  BP's liability for the spill will thus drive the resolution of each Class Member's case.  (*See* Coffee Decl. ¶ 61 (stating that "[e]stablishing the negligence of the BP Parties on the theories advanced . . . does significantly advance each individual case.")); *see also Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992), *on reh'g*, 53 F.3d 663 (5th Cir. 1994) (finding common

---

[29] According to Professor Coffee, questions of fact that are common to the Class include: "(1) BP's decision to use a long string design, rather than a liner tieback; (2) whether BP properly converted the float collar; (3) whether BP should have used more centralizers; (4) whether BP should have run a full 'bottoms-up' circulation; (5) whether BP should have run a cement bond log; (6) whether BP should have developed the casing hangar lockdown sleeve before displacement; (7) whether BP used 'unusual' spacer during displacement; (8) whether BP negligently misinterpreted the failed negative pressure tests; (9) the propriety and soundness of BP's decisions, along with Unified Command, concerning use of dispersants, boom, and other containment options in response to the oil spill; and (10) whether BP failed to ensure adequate procedures and safeguards for Clean-Up Workers who participated in oil spill remediation and Zones A and B residents."  (Coffee Decl. ¶ 61.)

questions arising from an oil refinery explosion that injured more than 18,000 plaintiffs); *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004) (affirming certification of a class of 3,600 individuals whose property was damaged by toxic pollutants caused by a single defendant)).  In sum, as Professor Coffee explained, "[t]his class has many common characteristics and few, if any, dissimilar ones."  (*See* Coffee Decl. ¶ 52.)

49.     The Louisiana Attorney General objects to a finding of commonality, claiming that the Class Members proffer two distinct theories of BP's liability—some allege liability based on their exposure to oil from the Macondo well blowout, while others allege liability based on their exposure to dispersants during the Response Activities.  (Docket 10-7777, Rec. Doc. 228 at 14.)  The objection, however, attempts to interpose an illusory distinction.[30]  BP was named, and accepted its designation as, a responsible party for the spill; by law, it was required to take remedial action.  *See* 33 U.S.C. § 2702.  Thus, BP's use of dispersants stems directly from the spill itself; the two are inseparable, and BP's negligence for the blowout underpins the entirety of its post-explosion conduct.  *E.g.*, *Turner*, 234 F.R.D. at 604.  BP's liability does not differ among, but serves as a common course of conduct central to, all Class Members' claims.  *See In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1053 ("Commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members." (internal quotations omitted)).  The objection is overruled.

50.     The Sturdivant Objectors and Halliburton contend, without citing any evidence, that commonality is lacking because not all Class Members manifested the same Specified Physical Condition, and some Class Members may not yet have manifested a Specified Physical

---

[30] No evidence has been proffered to suggest there is a "dispersant-only" Class Member—*i.e.*, one who was only exposed to dispersants and not oil.  This omission alone provides grounds to overrule the Attorney General's objection.  There is also, however, some reason to question whether a "dispersant-only" Class Member exists.  (*See* Coffee Supp. Decl. ¶¶ 5-6, 8 & n.1.)

Condition.[31]   (Docket 10-7777, Rec. Docs. 213 at 7-8, 93 at 8-9.)   Commonality, however, simply requires one common issue of fact or law capable of driving the resolution of each Class Member's claim.  *Wal-Mart*, 131 S. Ct. at 2556.  Where, as here, BP's claimed tortious conduct is common to all Class Members, some variation in injury is acceptable under Rule 23(a)(2).  *See Mullen*, 186 F.3d at 624-25 (finding commonality satisfied where defendant's conduct was common to the class of toxic exposure plaintiffs, and stating that it was "irrelevant whether the class members uniformly allege damages from second-hand smoke").  The basic question in this litigation is whether BP was negligent in causing the *Deepwater Horizon* Incident.  That question is common to the Class.  The fact that Class Members manifested different Specified Physical Conditions does not defeat commonality.  The objection is overruled.

51.    In addition, the fact that some Class Members may not have manifested a Specified Physical Condition does not defeat commonality.  Each Class Member suffered a past exposure to essentially the same substance.  (*See* Harbut Decl. ¶ 20.)  As a result, each Class Member was "injured" under general maritime law.  (Coffee Decl. ¶¶ 54-56.)  That injury, in turn, flows from the *Deepwater Horizon* Incident, an event that raises common factual and legal questions among the Class.  That Class Members may have some variation in damages resulting from this single incident does not defeat the commonality inquiry.

52.    Halliburton argues that commonality is not satisfied because the "geographic boundaries and time horizons" set forth in the Class definition are arbitrary.  (Docket 10-7777, Rec. Doc. 93 at 9-10.)  This is not an objection to commonality, and it is overruled for that reason alone.  The objection also ignores the record evidence to the contrary.  The Court finds that the boundaries of Zone A and Zone B were carefully drawn to encompass those individuals

---

[31] Halliburton, like the Attorney General, lacks formal standing to object to the Medical Settlement.  (*See supra* ¶¶ 6-7 at 52-53)  The Court nonetheless addresses and overrules its objections.

who, "merely by virtue of their residency," were likely to suffer a short-term exposure and/or manifest a Specified Physical Condition.   (Harbut Decl. ¶¶ 39-40.)   Moreover, the Medical Settlement's distance-from-the-coastline requirements remove from the Class individuals who were unlikely to suffer exposure simply because of where they lived.  (*Id.*)  Finally, the narrow time-of-manifestation requirements make causation more certain by minimizing the possibility that a condition was the result of an intervening or alternate cause other than exposure to oil and/or dispersants.  (*See* Coffee Decl. ¶ 47 (stating that "the short (24 to 72 hour) latency period significantly reduces the possibility of alternative causes for the symptom or condition"); *see also* Harbut Supp. Decl. ¶ 8.)  The geographic boundaries and timing requirements, in sum, are reasonable and ensure that the Medical Class is not over- or under-inclusive.  The Court confirms its preliminary conclusion that the commonality requirement is satisfied.  (*See* Rec. Doc. 6419 at 17.)

### 4.  The Medical Class Meets Rule 23(a)(3)'s Typicality Requirement.

53.   A class representative's claim is typical where it arises from the same events, practices, or course of conduct that gives rise to the claims of other class members, and if the claims are based on the same legal theories.  *See, e.g.*, *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by, M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1054-55.   The test for typicality is "not demanding."  *Mullen*, 186 F.3d at 625.

54.   Typicality "does not require a complete identity of claims.  Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class."  *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (citation omitted) (internal quotation marks omitted); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1054 (same).  "If the claims arise from a similar course of conduct and share the same legal

theory, factual differences will not defeat typicality." *Id.* (citation omitted) (internal quotation marks omitted); *accord Mullen*, 186 F.3d at 625-26 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."); (Klonoff Decl. ¶ 27).

55.     Typicality is satisfied here because the Class Representatives' claims, like those of the Class Members, arise out of the events surrounding the *Deepwater Horizon* Incident and focus upon BP's course of conduct leading up to and during the spill.  Each Class Representative and Class Member asserts a cause of action for negligence, gross negligence, and medical monitoring under general maritime law.  All members of the Class allege harm from past exposure to oil and/or dispersants.  From a human health standpoint, these exposures are the same.  (*See* Harbut Decl. ¶¶ 20-24; Harbut Supp. Decl. ¶ 7.)  Moreover, the exposures occurred during a relatively short period of time in a tightly defined geographic area.  Each Class Member alleges injury through either one of two exposure pathways—inhalation and/or dermal/ocular exposure.  In short, the Class Representative's claims have the same essential characteristics of those of the Medical Class Members; typicality is satisfied.  *See James*, 254 F.3d at 571; (Coffee Decl. ¶ 63; Klonoff Decl. ¶ 28).

56.     The Attorney General argues, again without citing any evidence, that the claims of the Class Representatives are not typical because some were exposed to oil while some were exposed to dispersants, and because Class Members suffered different "types" of exposure—*i.e.*, some inhaled toxic fumes, some physically touched oiled booms, etc.  (Docket 10-7777, Rec. Doc. 228 at 16-18.)  Typicality, however, does not require identical exposures; as explained above, the standard is met where "the class representative's claims have the same essential

characteristics of those of the putative class." *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1054 (internal quotation marks omitted).  Class Members assert the same causes of action— negligence, gross negligence, and medical monitoring—each of which root back to BP's alleged liability for the Macondo blowout and its subsequent OPA-mandated remediation efforts.  The essential characteristics of each Class Member's case are the same, even if some were exposed to oil while some were exposed to dispersant.  (*See* Coffee Supp. Decl. ¶¶ 7-8 (explaining that even if there are "dispersant-only" Class Members, typicality is satisfied because "the physical conditions manifested from exposure to oil and dispersant are the same, and thus the claim of an alleged dispersant-only exposure claimant is essentially no different from that of a claimant alleging exposure to oil or a mixture of oil and dispersant")); *see also Mullen*, 186 F.3d at 625 (finding typicality among exposure class where, although some members incurred varying levels of exposure, all members premised liability for personal injury under the Jones Act and the doctrine of seaworthiness); *Turner*, 234 F.R.D. at 605 (finding typicality where, although exposures varied, all harms derived from defendant's negligent maintenance of its oil refinery, and all or almost all plaintiffs raised property damage and personal injury claims pursuant to theories of negligence, strict liability, and absolute liability under the Louisiana Civil Code).

57.     Moreover, the Attorney General's objection fails to grapple with the testimony of Dr. Harbut, who explained that exposure to oil and dispersant chemicals is, from a medical perspective, the same.  (Harbut Decl. ¶ 20; Harbut Supp. Decl. ¶ 7.)  This testimony is uncontradicted in the record.  Accordingly, that some Class Members may have been exposed to oil while some were exposed to oil and dispersant (or dispersant only, as unlikely as that might be) is, for purposes of typicality, irrelevant.[32]  (Coffee Supp. Decl. ¶¶ 8, 11.)  There is simply no

---

[32] Again, whether there are Class Members who were exposed to dispersant but not oil is a matter of speculation because the Attorney General has not identified any.  Even if such Class Members exist, however, this fact would

material difference between the exposures.   The objections of the Attorney General are overruled.

58.    The Sturdivant Objectors contend that typicality is not satisfied because there are numerous factual variations among the Class relating to causation.  (Docket 10-7777, Rec. Doc. 213 at 8.)  This objection is supported by no record evidence.  Class Members were exposed to the same petroleum-based substances through one of two exposure pathways.  (*See* Harbut Decl. ¶¶ 18, 20.)  Further, because Class Members must manifest a Specified Physical Condition relatively immediately after exposure, causation is "straightforward" in this case.  (*See* Coffee Decl. ¶¶ 45-47 (relying on declarations of Drs. Harbut and Herzstein).)   The Sturdivant Objectors' contention is without merit.

59.    Finally, both the Attorney General and the Sturdivant Objectors argue that typicality cannot be satisfied because Class Members suffered from different Specified Physical Conditions, and some members suffered an exposure but have not manifested a Specified Physical Condition.   (Docket 10-7777, Rec. Docs. 228 at 18; 213 at 18.)   Both objections misunderstand the typicality requirement.   Typicality is not defeated when class members present the same theory of liability but suffer varying harms or varying degrees of injury.  *See James*, 254 F.3d at 571; *Mullen*, 186 F.3d at 625.  Because the Class Representatives and Class Members proffer similar theories of liability and were exposed to the same substances in the same general manner, it makes no difference, for purposes of Rule 23(a)(3), that one Class Representative suffered a skin rash (or any other Specified Physical Condition) while another Class Member was afflicted with nausea or vomiting (or any other Specified Physical

---

have no bearing on the typicality inquiry.   (*See* Coffee Supp. Decl. ¶ 7 (stating that the claims of the Class Representatives are typical even if one assumes that there are some members who were exposed to only oil or only dispersant, and explaining that "class representatives suffered in all relevant medical senses the same injury as that experienced by any 'dispersant only' class members, because in both cases any injury was caused by exposure to petrochemicals that are for all practical purposes medically indistinguishable in effect").)

Condition).  Typicality is satisfied.  (*See* Coffee Supp. Decl. ¶¶ 8, 10-11.)  The Court confirms its preliminary conclusion that the typicality requirement is satisfied.  (*See* Rec. Doc. 6419 at 17.)

### 5.   The Medical Class Meets Rule 23(a)(4)'s Adequacy Requirement.

60.     The Rule 23(a)(4) adequacy inquiry tests whether Class Counsel is competent, and whether "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members."  *Stott*, 277 F.R.D. at 325 (citations and internal quotation marks omitted); (Klonoff Decl. ¶ 31).

61.     In this case, (1) Class Counsel has competently prosecuted this litigation and negotiated a favorable settlement agreement; (2) the Class Representatives are willing and able to actively control the litigation; and (3) there are no intra-class conflicts.

### a.   Class Counsel Are Adequate.

62.     The Class is represented by the PSC—an experienced and diverse group of lawyers selected by the Court, after a public and detailed application process, for their "(a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation."  (Rec. Doc. 2 at 13-14.)  The PSC represents a diverse grouping of firms (i) geographically, (ii) in terms of the ranges of litigation expertise and experience, and (iii) in terms of the representation of the full array of economic and property claims presented in the MDL No. 2179 litigation, and resolved in the Settlement.   The Court considered such diversity in making its PSC appointments.  Further, as this Court has previously explained, "Class Counsel have substantial

78

experience prosecuting environmental, mass tort, and complex class actions, and have dedicated substantial resources to the prosecution of this action."  (Rec. Doc. 6419 at 17.)  Class Counsel are adequate for purposes of Rule 23(a)(4).  (*See* Klonoff Decl. ¶ 40.)

63.    Some objectors wrongly suggest that Class Counsel colluded with BP because the Medical Settlement contains a "clear sailing clause" in which BP agreed not to contest an award of attorneys' fees of up to $600 million.  (Docket 10-7777, Rec. Doc. 213 at 14.)  This objection is meritless; the Medical Settlement was the product of months of hard-fought negotiations and there is no evidence of collusion.  (*See infra* ¶¶ 114-118; *see also* Klonoff Decl. ¶¶ 74-79.)  Moreover, numerous cases, including cases decided by this Court, have approved agreements containing such clear-sailing clauses.  (*See* Klonoff Supp. Decl. ¶¶ 25-28.)  *See, e.g.*, *Turner*, 472 F. Supp. 2d at 844 ("In addition to specifically negotiated fees, courts have been presented with class action settlements that include 'clear-sailing clauses,' in which the defendant agrees not to contest a court-awarded fee up to a certain amount. . . .  [I]t is increasingly common for class action settlements to provide that such fees are to be paid separately by the defendant, that is, over and above the class's recovery, rather than subtracted from the common benefit fund."); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) ("Finally, a defendant in a class action settlement has no obligation to oppose the fee petition submitted by class counsel.  Thus, the fact that the proposed settlement includes these terms does not render it inherently unfair or unreasonable.").)

64.    Contrary to the claims of some objectors, Class Counsel did not act inadequately by making the Settlement contingent upon a separate fee agreement.  (*See* Docket 10-7777, Rec. Doc. 213 at 14.)  Rather, as previously explained, (1) the Parties did not begin to negotiate fees until they had already delivered an otherwise complete settlement agreement to the Court, *see*

*supra* ¶ 51; and (2) the fact that the Medical Settlement pays Class Counsel fees separate and apart from individual recoveries for Class Members is a unique and valuable benefit to the Class. Indeed, as Dean Klonoff has explained, "this fee structure indicates a decreased likelihood of collusion."  (Klonoff Supp. Decl. ¶ 31; *see also id.* ¶¶ 29-30.)   In addition, Magistrate Judge Shushan's involvement further ensured structural integrity during the negotiations.[33]   (*See* Klonoff Decl. ¶ 75.)

65.     The Sturdivant objectors have alleged that Class Counsel "breached their duty to the absent class members by including a *cy pres* payment in the Settlement Agreement." (Docket 10-7777, Rec. Doc. 213 at 13.)   Specifically, these objectors allege that the Medical Settlement's $105 million Outreach Program contravenes the "*cy pres*" doctrine that unclaimed funds should be distributed among the Class, not to third parties.   (11/8/12 Hearing Tr. at 225:20–22.)  The Outreach Program, which provides a direct benefit to all Class Members, is in no sense an "unclaimed" distribution.  *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (explaining that *cy pres* doctrine applies where court must "distribute unclaimed funds").  Nor does funding for the Outreach Program detract from the compensation that Class Members receive for Specified Physical Conditions; to the contrary, Class Members are fully compensated for their Specified Physical Conditions and the compensation available to Class Members for these conditions is uncapped.  Because the Outreach Program is a fully funded program that provides a direct benefit to the Class, it does not constitute an improper *cy pres* distribution.

---

[33] In addition, and contrary to the claims of the Sturdivant objectors, Class Counsel were not "disarmed" because they did not certify a litigation class before settling this matter.  (Docket 10-7777, Rec. Doc. 213 at 10.)  They were fully engaged in preparing for trial, would have proceeded to trial against BP in earlier 2012 but for arrival of a settlement, and have subsequently been preparing for and will proceed to trial against non-settling defendants in February 2013.  Even if one assumes that Class Counsel faced obstacles to certifying a litigation class, Class Counsel also had many clients with significant claims sufficient to provide leverage in settlement negotiations.

#### b.      Class Representatives Are Adequate.

66.     To be adequate, the class representatives must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001).  Thus, where the class representatives will take an active role in the prosecution of the class action, Rule 23(a)(4) is satisfied.

67.     The Class Representatives are clearly adequate.  (Klonoff Decl. ¶ 32.)  Each has closely followed and actively participated in the Medical Settlement, and each has expressed his or her support of the Settlement and believes the Settlement is fair to the entire Class. (Declaration of Klip Plaisance, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Jason Perkins, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Thelma Warren, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Christian Pizani, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Max Plaisance, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Benjamin Barbee, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Cornelius Divinity, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Janice Brown, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Carlson Caster, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of George Baker, Rec. Doc. 7116-2, ¶¶ 5-9; Declaration of Duffy Hall, Rec. Doc. 7116-2, ¶¶ 5-9.)

68.     The Attorney General argues that the Class Representatives are inadequate because they waived Jones Act claims for those Clean-Up Workers that worked aboard vessels during the Response Activities.  (Docket 10-7777, Rec. Doc. 228 at 21.)  Under the Medical Settlement, however, such Class Members (all of whom would be Clean-Up Workers) recoup exactly what they could under the Jones Act—compensatory damages for personal injury—and retain something even more valuable: Back-End Litigation Option rights to sue for future injury and access to the 21-year Periodic Medical Consultation Program—both benefits that would not

be available through litigation.[34]   The Class Representatives, therefore, did not improperly exchange rights under the Settlement for rights available under the Jones Act.  The Attorney General's objection is overruled.

### c.      There Are No Conflicts of Interest Among the Class.

69.      Finally, adequacy of representation requires that "there must be no significant conflict of interest between the named plaintiffs and the absent class members."  *J.D. v. Nagin*, 255 F.R.D. 406, 415 (E.D. La. 2009).  No such conflicts exist here, as "all class members are united in asserting [the] common right" of "achieving the maximum possible recovery for the class."  *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981).

70.      There are no intra-class conflicts and the interests of the Class are aligned. (Coffee Decl. ¶ 66; Klonoff Decl. ¶ 38; Miller Decl. ¶ 12.)  Indeed, the Class Representatives and the absent Class Members are "united by the fact that their injuries emanate contemporaneously and directly from a common occurrence."  (Coffee Decl. ¶ 65.)  All members of the Class who manifested a Specified Physical Condition are entitled to full compensatory damages.  To the extent there is some difference between Class Members who manifested a Specified Physical Condition and those who did not, it is not a difference that creates an intra-class conflict and, accordingly, it is a difference that is irrelevant for Rule 23(a)(4) purposes.[35] *See Mullen*, 186 F.3d at 625-26 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."); (*see also* Miller Supp. Decl. ¶ 15).  Further, all Class Members are eligible for the 21-year Periodic Medical

---

[34] Although some Class Members relinquish the maritime right to maintenance and cure in exchange for Back-End Litigation Option rights and the ability to participate in the Periodic Medical Consultation Program, this is simply the nature of settlement.  Trade-offs must occur.  If there is a Clean-Up Worker who believes that his recovery under the Jones Act will be greater than that under the Medical Settlement, he is free to opt out and pursue that course.

[35] In this vein, the objections of the Attorney General and the Sturdivant objectors are without merit.  (Docket 10-7777, Rec. Docs. 228 at 21; 213 at 10-11.)

Consultation Program, have the right to the Back-End Litigation Option, and can take advantage of the benefits provided by the Outreach Program, irrespective of whether they manifested a Specified Physical Condition.  With the exception of the Outreach Program, BP's financial liability for these benefits is uncapped.

71.    This case suffers from none of the problems identified in *Amchem*, where the Court noted a potential intra-class conflict between individuals who had already been injured by asbestos and those who had only been exposed to it.  *Cf. Amchem*, 521 U.S. at 626 (explaining that "for the currently injured, the critical goal is generous immediate payments" whereas "exposure-only plaintiffs [have an interest] in ensuring an ample, inflation-protected fund for the future").  Rather, the Class in this case consists exclusively of individuals who have suffered a past exposure and, by definition, an injury.  All Class Members retain the right to sue for Later-Manifested Physical Conditions under the Back-End Litigation Option.  There is thus no "future" injury released by the Settlement.  (*See* Klonoff Decl. ¶ 38.)

72.    This class Settlement avoids, as a matter of process and a matter of substance, the concerns that have prevented approval in cases such as *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010).  All class members are protected by a specific, detailed and objective Specified Physical Condition Matrix, based on medical and empirical data, developed through arms-length negotiations, and related to the relative strengths and merits of similarly situated claims.  Perhaps most importantly, this Settlement does not involve a limited fund with no ability for class members to opt out, distinguishing *Ortiz* and *In re Katrina Canal Breaches Litigation*.  (*See* Coffee Decl. ¶ 66 (stating that "class members are not in competition with each other for a limited amount of money"); Coffee Supp. Decl. ¶ 13 (explaining that "the fact that overshadows all other

considerations [regarding the intra-class conflict] is that this settlement is uncapped"); *see also* Klonoff Decl. ¶ 34; Issacharoff Decl. ¶ 16.)

73.     In light of the absence of conflicts between members of the Medical Class, subclasses are neither necessary, useful nor appropriate here.  Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course.  Rather subclasses might only be needed when there is a "fundamental" conflict among class members, but no such conflict exists here.  (Coffee Supp. Decl. ¶ 12 (explaining that "subclassing is not required by the language of Rule 23, and is only appropriate when there are 'fundamental' conflicts among class members that would deny one group adequate representation under Rule 23(a)(4)"); Klonoff Decl. ¶ 35 (stating that subclasses are unnecessary in this Class and would likely make the case more "complex")); *see also Dewey v. VW Aktiengesellschaft*, 681 F.3d 170, 185-86 (3d Cir. 2012);  *Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) ("*Amchem* and *Ortiz* appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, **but may not necessarily require**, formally designated subclasses.") (bold emphasis added).)

74.     District courts have broad discretion in determining whether to create subclasses.  Courts have often affirmed district court decisions not to establish subclasses—including where, as here, the Settlement is crafted such that different compensation levels reflect the relative strength of the different claims.  *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) (rejecting argument that district court should have established subclasses); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 346-47 (3d Cir. 2010) (rejecting argument that district court erred in failing to create subclasses); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) (rejecting objectors' argument that district court erred in not establishing subclasses when

it approved class settlement); *see also Clark Equip. Co. v. Intern'l Union, Allied Indus. Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986), *cert. denied*, 480 U.S. 934 (1987) ("Intervenors' argument for subclassing, due to conflicts within the class, is rejected because such a procedure should be left to the trial court's discretion.  Subclassing . . . is appropriate only when the court believes it will materially improve the litigation").

75.     The Sturdivant Objectors contend that the Class should include subclasses for those who developed a Specified Physical Condition and those who did not.  (Docket 10-7777, Rec. Doc. 213 at 13.)  The objectors identify no purported intra-class conflict that results from this distinction among Class Members.  That is because no intra-class conflict exists.  Those Class Members who developed a Specified Physical Condition have every incentive to protect the interests of all Class Members, each of whom retains Back-End Litigation Option rights for future manifested conditions.  (*See* Coffee Supp. Decl. ¶ 13 (stating that "the gain of any subgroup does not occur at the expense of any other subgroup and they all share a common interest in maximizing recovery").)  The Court therefore overrules the objection.  The Court also finds baseless the similar contentions that subclasses are needed for each Specified Physical Condition, or that subclasses are needed for those exposed to oil and those exposed to dispersant. (*See, e.g.*, Docket 10-7777, Rec. Doc. 213 at 13.)  None of these arguments identifies an intra-class conflict and, as Professor Coffee and Dean Klonoff explain, to create such subclasses in the Medical Class would inject unnecessary complexity.  (*See* Coffee Supp. Decl. ¶ 12, 14; Klonoff Decl. ¶ 35.)

76.     In sum, virtually every class action involves class members who are differently situated in various ways.  If subclassing and separate representation were required for all such interests, class action litigation would be all but impossible.  (*See* Miller Supp. Decl. ¶ 16

(explaining that "[a]t some level of detail, all claims display individual characteristics").)  The purpose of subclassing is not to balkanize the class such that it becomes an administrative nightmare for class/subclass counsel to represent.  Here, there is no intra-class conflict and, thus, no reason to require the creation of subclasses.  Further, and most significantly, the Parties' arrival at a settlement agreement that is fair to all members of the Class is proof that the process was structurally fair to each member of the Class.  (*See* Coffee Sup. Decl. ¶ 13 (subclasses unnecessary because settlement is uncapped, and therefore gain of any subgroup does not occur at the expense of any other subgroup).)

77.    The Court confirms its preliminary conclusion that the adequacy requirement is satisfied.  (*See* Rec. Doc. 6419 at 17.)

**B.    The Medical Class Meets Rule 23(b)(3)'s Requirements.**

78.    To be certified as a Rule 23(b)(3) class, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).

**1.    The Medical Class Meets Rule 23(b)(3)'s Predominance Requirement.**

79.    "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623; *Unger v. Amedisys*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem*, 521 U.S. at 623-24). The predominance inquiry ordinarily "requires the court to assess how the matter will be tried on the merits, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'"  *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623).  As Professor Coffee explained, "in the Fifth Circuit, the balance between common and

86

individual issues is not computed mechanically by simply counting each issue.  Rather, the focus is on the efficiencies of class treatment."  (Coffee Decl. ¶ 71 (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)).)

80.     In the context of a settlement class, of course, there is no trial, so the predominance inquiry takes on a slightly different form.  The analysis cannot be allowed to descend into whether class members merely have "a common interest in a fair compromise" of their claims.  *Amchem*, 521 U.S. at 623.  The focus must remain on "questions that preexist any settlement."  *Id.*  What the certifying court must determine is whether the "the legal or factual questions that qualify each class member's case as a genuine controversy" are sufficiently similar as to yield a cohesive class.  *Id*.

81.     A "class issue predominates if it constitutes a significant part of the individual cases."  *Watson*, 979 F.2d at 1022-23.  Individual legal and factual issues do not defeat predominance when there is a course of conduct by the defendant that is common to the class.  As the *en banc* Third Circuit has recently explained, "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  *See Sullivan*, 667 F.3d at 298; *see also Watson*, 979 F.2d at 1022-23 (affirming certification of class of 18,000 individuals harmed by an explosion at a Shell manufacturing facility, and observing that "[t]he class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs"); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002) ("[C]ommon issues . . . predominate here because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did.") (citation and quotations omitted)); *Mullen*, 186 F.3d at 626 (finding predominance where "[t]he putative class members

are all symptomatic by definition and claim injury from the same defective ventilation system over the same general period of time"); *Mehl v. Canadian Pac. Ry. Ltd.*, 227 F.R.D. 505, 521-22 (D.N.D. 2005) (finding predominance satisfied where class of injured plaintiffs claimed defendant caused a train derailment and subsequent release of harmful chemicals, and explaining that in such a case, all class members share common issues of defendant's negligence for the accident, the toxic nature of the released chemicals, and the injuries caused by exposure to those chemicals); *In re Diet Drugs Prods. Liab. Litig. (Phentermine, Fenfluramine, Dexenfluramine)*, 2000 WL 12222042, at *41 (E.D. Pa. Aug. 28, 2000) (finding predominance satisfied where all class members' claims flowed from a common course of defendant conduct).

82.    In *Amchem*, the Supreme Court affirmed the reversal of the settlement class certification of a "sprawling," "unselfconscious and amorphous" nationwide class of millions who had been exposed to asbestos from many sources and products, made by many defendants, in many places and under many different circumstances, over a period that spanned at least several decades.  521 U.S. at 622, 624, 628.  The *Amchem* Court found that these disparities complicated the causation inquiry and precluded predominance.  *Id.* at 624.  In rejecting the class before it on predominance grounds, for failing to be "sufficiently cohesive to warrant adjudication by representation," *id.* at 623, the Court in *Amchem* nonetheless advised that mass accident cases are not categorically disqualified from class treatment:  "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement . . . ."  *Id.* at 624.

83.    The claims of each of the Medical Class Members arise out of a single event—the Macondo well blowout, the resulting oil spill, and the Response thereto.  This mass disaster can be traced to a single root: a chain of decisions made and actions taken by BP leading up to the

spill.  Predominance is more easily satisfied in a single-event, single-location mass tort actions such as this because the defendant allegedly caused all of the plaintiffs' harms through a course of conduct common to all class members.  (*See* Klonoff Decl. ¶ 47 (citing cases and explaining that there is a "long line of cases finding 'single incident' tort cases to be suitable for class certification"); Coffee Decl. ¶¶ 22-28 (citing cases and observing that personal injury classes have "frequently" been certified in single-event mass disaster cases)); *see also Sullivan*, 667 F.3d at 298; *Turner*, 234 F.R.D. at 606 (finding predominance where single defendant was responsible for oil spill, and though different plaintiffs suffered different degrees of contamination to their property, "the central factual basis for all of Plaintiffs' claims is the leak itself—how it occurred, and where the oil went").)[36]

84.     Class Members allege exposure to petroleum products.  (Harbut Decl. ¶ 20.) Short-term exposure to petroleum products has known outcomes.  (*Id.* ¶¶ 22, 24.)  Those known outcomes are reflected in the Settlement Agreement's Specified Physical Condition Matrix.  (*Id.* ¶ 25; Herzstein Decl. ¶¶ 14-15, 20.)   Further, the exposures occurred through one of two pathways.  (Harbut Decl. ¶ 18.)   The time lapse between exposure and manifestation of a Specified Physical Condition is brief: 24 to 72 hours.  The Medical Class is therefore cohesive— Class Members allege exposure to the same products for a similar duration through similar pathways with similar, known short-term effects.  *See In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 1222042, at *42 (finding that predominance was satisfied in putative personal injury class when two diet products caused identifiable injury through single method of exposure over a "finite and relatively short period" of use—approximately sixty days).  The disparities of time, place, defendants, and circumstances of exposure that were of concern in *Amchem* are absent

---

[36] Some objectors contend that the certification of a mass personal injury class is precluded by circuit precedent. (*See* Docket 10-7777, Rec. Docs. 228 at 23; 213 at 17-18.)  These objections are incorrect as a matter of law, and are overruled.

here.  The conditions the Medical Settlement compensates arose, by definition, within hours—not weeks, months, or years—of exposure.  Thus, all Class Members know whether they were afflicted with a Specified Physical Condition.

85.     The above-described features of the Medical Class also distinguish it from the sprawling personal injury class decertified in *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), whose members "were exposed to nicotine through different products, for different amounts of time, and over different time periods."  *Id.* at 742 n.15; (*see also* Coffee Decl. ¶ 10 (observing that the Medical Class "could scarcely be more different from *Castano*")). Here, the time between exposure and manifestation of a Specified Physical Condition is tightly confined, and causation is therefore "straightforward" and common to the class.  (*See* Coffee Decl. ¶¶ 32, 42-51 (explaining "straightforward" causation and contrasting the Medical Class with classes alleging harm from long-term asbestos exposure, tobacco exposure, or injury from silicone gel breast implants); Coffee Supp. Decl. ¶ 16 (explaining that "[t]his class action satisfies Rule 23 because of its deliberately close linkage between exposure and the manifestation of illness").)   The Settlement structure and the Class definition link the compensated symptoms in time, place, and cause to the single unfolding incident.  The questions of law and fact arising from the conduct that led to that incident, the nature and scope of the incident itself, and the questions relating to liability for that incident are properly considered as common questions, whose answers are both significant and uniform with respect to all Medical Class Members, and which thus predominate over questions (such as individual damages) that would affect the individual Class Members differently.  Each of these factors indicates that the Medical Class is a cohesive one that meets the criteria set forth in *Amchem*.  (*See* Coffee Decl. ¶ 52.)

86.     Similarly, there are no significant questions of liability that affect individuals in different ways.  Significant, common factual issues will be resolved under the uniform principles of general maritime law.  *Compare Mullen*, 186 F.3d at 626 (noting that where each of the class member's claims arose under a single body of law, and no "complex choice-of-law issues" were present, predominance was satisfied), *with Castano*, 84 F.3d at 741-44 (explaining that a multitude of choice of law issues may, in certain situations, recommend against class certification).

87.     Nor are there individualized damage issues that overwhelm the common issues concerning liability.  Class Members' damages differ only in their qualification for Specified Physical Condition compensation.  It is well-settled, however, that the necessity of calculating damages on an individual basis does not defeat predominance.[37]  *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (holding that a common question of causation was "a predominate issue central to each of Plaintiff's claims and subject to generalize proof" notwithstanding need to review each plaintiff's individual account); *see also Bell Atl. Corp.*, 339 F.3d at 306 (recognizing that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate"); *Bertulli v. Indep. Ass'n of Continental Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Sterling v. Veliscal Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Eatmon v. Palisades Collection LLC*, Civil Action No. 2:08-CV-306-DF-CE, 2011 WL 147680, at *12 (E.D. Tex. Jan. 18, 2011); *Moore v. Internat'l Filing Co., LLC*, 2010 WL 2733116, at *3 (S.D. Miss. July 8, 2010); *Longergan v. A.J.'s Wrecker Serv. Dallas, Inc.*, Nos. Civ.A. 3:97CV1311D, Civ. A. 3:97CV2398D, Civ.A. 3:98CV3020D, 1999 WL 527728, at *7 (N.D. Tex. July 8, 1999).

---

[37] The objection of Halliburton to the contrary is, accordingly, overruled.  (*See* Docket 10-7777, Rec. Doc. 93 at 11.)

88.      The Fifth Circuit has presented a methodology to determine whether common questions predominate under Rule 23(b)(3), which it has applied to toxic exposure cases.  In *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011), the court described this analysis as follows:

> Before certifying a class under Rule 23(b)(3) a court must determine that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires district courts to consider 'how a trial on the merits would be conducted if a class were certified.' *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003).  This, in turn, "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," a process that ultimately "prevents the class from degenerating into a series of individuals trials."

89.      In *Madison* itself, class certification was reversed because the district court did not conduct this analysis, and "did not meaningfully consider how Plaintiffs' claims would be tried."  637 F.3d at 556.  The *Madison* court observed, however, that had the trial court weighed the considerations set forth above, "class treatment on the common issues of liability" might indeed have been appropriate.  *Id.* at 557.  The Fifth Circuit remanded for just such an analysis, and explained that class treatment of toxic exposure claims may well be proper where, in the course of planning and organizing the issues for trial, significant common questions emerged. *Id.* at 556.  *Madison* cites as examples the grant of class certification in *Turner*, 234 F.R.D. at 606 ("Critical to the court's predominance inquiry was the fact that 'Plaintiffs submitted a proposed trial plan to the Court.  The plan provides for a three-phase trial."), and *Watson*, 979 F.2d at 1011-18 (certifying court had "issued orders detailing a four-phase plan for trial").

90.     In this litigation, the Court considered, early on, how the Plaintiffs' claims would be tried, and how to organize, sequence, and conduct a trial that prioritized the most significant questions of law and fact in the case, including the relative fault of defendants, for each phase and for each consequence of the *Deepwater Horizon* Incident.  The Court's multi-phase trial plan was developed with the input of the Parties, the assistance of the Magistrate Judge and a Special Master, and long experience and familiarity with the issues and procedures of admiralty and maritime law involved in this litigation.

91.     Pretrial Order No. 41, which has been amended and refined as the litigation has progressed, describes the multi-phase trial, now scheduled to commence on February 25, 2013, and sets forth the scope and structure of the Trial of Liability, Limitation, Exoneration, and Fault, which includes two liability phases, corresponding to the "Incident" phase, and the "Source Control" and "Quantification" phase of the *Deepwater Horizon* Incident.   The process of determining this trial structure, in prioritizing, for early determination, questions that are of greatest significance to all parties, has enabled the Court to conform to the Fifth Circuit's recommended predominance analysis, as described above.

92.     The Court notes that this analysis was articulated in *Madison* as a guide to determining predominance with respect to class certification for trial purposes.  This Court has no such motion before it:  the Medical Class is one proposed to be certified for settlement purposes only, and is without prejudice to, or predetermination of, any class certification motion that may be made, for this or any other class, for trial purposes.   Hence, it is not trial manageability is not a necessary determination here, as *Amchem* itself held, "for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 619.  Class certification in *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006), fell short for failure to consider the conduct of

trial.  In contrast, manageability considerations, and the resulting development of multi-phase trial structures, enabled class certification to succeed in *Watson* and *Turner* where it failed in *Steering Committee*.  While in this case, settlement class certification does not require such consideration, in fact it has occurred, outside the context of settlement negotiations, in the course of preparing this litigation for trial.  This process has entailed "identifying the substantive issues that will control the outcome" and "assessing which issues will predominate," as *Madison* recommended.  Further, this process has enabled the Court to determine, within the context of the instant Medical Settlement, that there are issues that are common to the Class, and that these common issues predominate.

93.    The Medical Class further contrasts with that denied certification in *Steering Committee* because the instant claims are much more cohesive.  In *Steering Committee*, plaintiffs proposed an exposure class that brought claims for personal injury (exposure) and property damage, as well as harder-to-quantify emotional injury.  461 F.3d at 602.  The Fifth Circuit affirmed the district court's denial of certification because, *inter alia*, "each individual plaintiff suffered different alleged period and magnitudes of exposure . . . ." *Id.*  Medical Class Members, however, suffered short-term exposure and relatively immediate illness; causation is straightforward.  (*See* Coffee Decl. ¶ 47.)  Moreover, the *Steering Committee* class asserted claims for emotional injury—claims that the Fifth Circuit characterized as the type that "necessarily implicate[] the subjective differences of each plaintiff's circumstances." *Steering Committee*, 461 F.3d 602.  No such "necessarily" subjective and individualized claims are at issue herein.[38]

---

[38] Accordingly, the objection raised by the Attorney General and the Sturdivant Objectors—that *Steering Committee* precludes class certification in this case—is overruled.  (Docket 10-7777, Rec. Docs. 228 at 23; 213 at 18.)

94.    The fact that the Parties have reached a class settlement further underscores the cohesiveness of this Class.  *See Sullivan*, 667 F.3d at 297.  As Professor Coffee explained in his declaration:

> [w]here there is [a] core nucleus of common facts (as there is in this single event, single location disaster that affects a geographically closely knit class), the cohesion of class members is more evident.  That a sizable class was able to achieve a complicated settlement without its also sizable Plaintiffs' Steering Committee fracturing (and some members dissenting) also demonstrates cohesion.  Ultimately, under *Amchem Products*, the bottom line issue is whether the class is "sufficiently cohesive to warrant adjudication by representation."  Here, the unity of the class clearly justifies the vicarious representation of the class by its class representatives and counsel.

(Coffee Decl. ¶ 73 (quoting *Amchem*, 521 U.S. at 623).)

95.    In sum, the Court finds that common issues predominate among the Medical Class, and confirms its preliminary conclusion that the predominance requirement is satisfied.  *See* Rec. Doc. 6419 at 17-18.  The objections raised to predominance are overruled.  (*E.g.*, Docket 10-7777, Rec. Docs. 228 at 23; 213 at 17-18.)

## 2.    The Medical Class Meets Rule 23(b)(3)'s Superiority Requirement.

96.    Rule 23(b)(3) directs the Court to determine whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The Court finds that the superiority requirement is met.

97.    Personal injury class settlements such as *Amchem* may fail to meet the superiority requirement of Rule 23(b)(3) because they seek to resolve claims of wrongful death or general personal injury with high economic value; claims which the plaintiffs may have an interest in pursuing individually, and which are economically feasible to prosecute alone.  The proposed Medical Settlement Class does not include such claims.  The claims of those killed or injured on the *Deepwater Horizon* rig have been excluded at the outset, reserved (to the extent they are still

unresolved) for individual trial or settlement.  The Settlement claims, which are for conditions arising within 24 to 72 hours of exposure to oil and/or dispersants during the Class period within the Class boundaries, are what the Courts have considered "negative value claims"—that is, claims that "provide the most compelling rationale for finding superiority in a class action" because their monetary value does not warrant individual prosecution due to discovery and expert witness expense and other costs.  *See Castano*, 84 F.3d at 748; *see also* 2 Newberg on Class Actions § 4:27 (4th ed.) ("When the claims of class members are small, denial of a class action would effectively exclude them from judicial redress."); *Young*, 693 F.3d at 545 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (quoting *Amchem*, 521 U.S. at 617).

98.     As the Parties and their experts have pointed out, the monetary awards approved by other courts for similar medical symptoms in other trials or settlements are generally lower than those provided under the Medical Settlement.  (*See, e.g.*, Coffee Decl. ¶ 38 (citing cases).) This fact not only supports the fairness, reasonableness, and adequacy of the Medical Settlement's terms, but demonstrates the "negative value" of the underlying claims, establishing the superiority of the class mechanism for their resolution.  (Coffee Decl. ¶ 76; Klonoff Decl. ¶ 61.)

99.     Accordingly, the Court overrules the objections of those who contend, without evidentiary support, that the claims in the Medical Class are not "negative value."  (*See* Docket 10-7777, Rec. Doc. 213 at 19; *but see* Docket 10-7777, Rec. Doc. 158 at 2 (conceding claim values are too small to justify individual litigation).)

100.    That so many (approximately 90%) of the claims made under the Settlement thus far appear to be *pro se* claims, made without individual counsel's assistance, further demonstrates the superiority of the class structure for the Medical Settlement (as well as the claimant-accessible design of the program, its documents and systems, and the efficacy of the Class notice) for enabling and compensating these claims in a consistent, cost-effective, predictable and transparent manner.  (Garretson Supp. Decl. ¶ 4.)  In short, the Medical Class is largely composed of "negative value claims," and thus there are compelling reasons to justify class treatment.  (*See* Coffee Decl. ¶ 76; Klonoff Decl. ¶ 61.)

101.    Class treatment is also superior to litigation via multiple trials.  Over 17,000 short form joinders have been filed to date.  At the very least, some percentage of these plaintiffs would sue individually absent class certification.  Each individual suit would relitigate many of the same issues.  As Professor Coffee has stated, such "large-scale individual litigation of modest value claims would represent a serious misallocation of judicial resources."  (Coffee Decl. ¶ 75.)

102.    Finally, the Medical Settlement contains several benefits that could only be obtained through a comprehensive class settlement.  The Periodic Medical Consultation Program will provide all Class Members with a regular comprehensive medical, occupational, and environmental history and physical examination, which includes testing that may identify diseases caused by exposure, whether to petroleum products or some other source.[39]  (*See* Harbut

---

[39] The Periodic Medical Consultation Program is not medical monitoring, and therefore cases in which courts have "declined to certify classes that seek medical monitoring because of the individualized factual issues involved" do not apply.  *See Duncan v. N.W. Airlines, Inc.*, 203 F.R.D. 601, 612 (W.D. Wash. 2001) (collecting cases); *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011).  The Periodic Medical Consultation Program provides primary healthcare services to Class Members, not medical monitoring.  (Herzstein Decl. ¶ 22.)  It is made available on the same terms to all Clean-Up Workers and all Zone B Resident Class Members, as well as all Zone A Resident Class Members who qualify for compensation for a Specified Physical Condition, without regard to any individual Class Member's amount or duration of exposure.  The Program also allows participating physicians to use their discretion in determining the tests to order for an individual.  While some of the tests available in the Program can help provide diagnostic information regarding manifest and latent physical disease, such as cancer, the Program is not a medical monitoring program for such conditions.  (*Id.* ¶¶ 22, 25b, 25c.)

Decl. ¶¶ 46-47.)  This program will continue for 21 years.  Further, all Class Members retain

Back-End Litigation Option rights to seek relief should they develop a Later-Manifested Physical

Condition at some point in the future.  In this fashion, the Periodic Medical Consultation

Program and the Back-End Litigation Option work in tandem to protect Class Members who

may fall ill at some future point because of their past exposure to oil and/or dispersants.  Finally,

the Outreach Program provides $105 million in grants to fund and improve healthcare services

throughout the Gulf.  It also creates an online library of health and environmental-related

materials relevant to the *Deepwater Horizon* Incident, which will be updated regularly for 21

years.  The library already contains approximately 100,000 documents, accessible by all Class

Members.  (Garretson Supp. Decl. ¶ 5.)  The Outreach Program benefits each member of the

Class by improving the ability of Gulf Coast residents to access quality healthcare and

information.  Each of these benefits was realized because of the Class Settlement, but would not

be obtainable through litigation.  Class treatment is therefore a superior method for adjudication

of this controversy.  The Court confirms its preliminary conclusion that the superiority

requirement is satisfied.  (*See* Rec. Doc. 6419 at 18.)

## VI. THE FAIRNESS HEARING.

103.  Rule 23(e)(2) requires the Court to hold a hearing to determine whether the

settlement is a "fair, reasonable, and adequate" resolution of Class Members' claims.  The Court,

in evaluating a proposed settlement, may conduct the fairness hearing in whatever manner "is

necessary to aid it in reaching an informed, just and reasoned decision.'"  *Tenn. Ass'n of Health*

*Maint. Orgs.*, 262 F.3d 559, 567 (6th Cir. 2001) (quoting *United States v. Oregon*, 913 F.2d 576,

582 (9th Cir. 1990)); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975); *Ass'n for*

*Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla.2002) ("[e]ven when the

Court becomes aware of one or more objecting parties, the Court is not 'required to open to

question and debate every provision of the proposed compromise."') (quoting *Cotton*, 559 F.2d at 1331); 4 Newberg on Class Actions § 11:57 9 (4th ed.) ("The court, in its discretion, may limit the discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement.").

104.    In evaluating the Settlement, "[t]he court may consider briefs, declarations, affidavits and the arguments of counsel and need not conduct an evidentiary hearing."  *UAW v. Gen. Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151, at 12 (E.D. Mich. Mar. 31, 2006) (citing *Tenn. Ass'n of Health Maint. Orgs.*, 262 F.3d at 567 ("we reject intervenors' suggestion . . . that the fairness hearing must entail the entire panoply of protections afforded by a full-blown trial on the merits")); *see also Newby v. Enron Corp.*, 394 F.3d 296, 307 (5th Cir. 2004); *Rutter & Wilbanks Corp. v. Shell Oil Co*., 314 F.3d 1180, 1187 (10th Cir. 2002) ("[A]n objector "'is not entitled, as a matter of right, to an evidentiary hearing during a settlement hearing.'").  "Historically, courts have commonly relied on affidavits, declarations, arguments made by counsel, and other materials in the record without also requiring live testimony."  *Union Asset Mgmt. Holding*, 669 F.3d at 642.

105.    In this case, for the reasons explained in the Court's September 11 Order, the procedures by which the Court governed the November 8 hearing were well within its discretion, designed to enable the Court to obtain the benefit of the widest spectrum of objections without duplication and best inform its independent judgment of the Settlement's fairness, adequacy, and reasonableness under Rule 23(e) standards and the Court's *Reed* factors.  Given the substantial record before it, the Court concluded that it would not "entertain duplicative or cumulative objections or objections that have been adequately expressed in written filings, except potentially in brief, supplemental oral presentations."  (Order, Rec. Doc. 7358 at 4 (citing *Canupp v. Liberty*

*Behavioral Health Corp.*, 417 Fed. App'x 843 (11th Cir. 2011)); *Cotton*, 559 F.2d at 1330; Manual for Complex Litigation § 21.634 (4th ed. 2004) ("Time limits on the arguments of objectors are appropriate, as is refusal to hear the same objections more than once.").[40]

106.   In a later order, on November 1, 2012, the Court appointed three attorneys to speak on different objections for five minutes each, as follows:  Robert McKee of Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman & McKee, P.A. was designated to speak on the objection that the Matrix provided inadequate compensation, Joseph Darrell Palmer, Law Offices of Darrell Palmer, was designated to speak on the *cy pres* objection, and Max Sterbcow, Sterbcow Law Group, was designated to speak on conditions not included in the Matrix.  (Order, Rec. Doc. 7819.)[41]

107.   Nevertheless, on the day before the Fairness Hearing, certain counsel filed two motions objecting to the Court's fairness hearing procedures.  Both sets of objectors argued, without authority, due process violations based on (in the case of Robert McKee) the time restrictions on his presentation and (in the case of attorney Daniel E. Becnel of Becnel Law Firm) the failure to allow him to speak at the hearing.  (Rec. Docs. 7869 and 7871.)  These motions were untimely and are therefore denied.  Even if they were timely, it was within the Court's discretion to limit participation at the Fairness Hearing, particularly given the size of the potential Class and the number of objectors.  Objectors provide no authority for their assertion of a due process right to appear and to speak without restriction, and these objections are denied on that basis as well.[42]  The Court has these objectors' written objections, as well as the objections

---

[40] The Court also ruled that "only parties with standing shall be permitted to speak or participate in the fairness hearing.  *See* Rec. Doc. 7038.  For example, plaintiffs who are not part of the class (including class members who have opted out in accordance with the requirements of the agreement, the class notice, and the Court's orders) may not participate in the fairness hearing."  (Rec. Doc. 7358 at 4-5.)

[41] Mr. Sterbcow subsequently requested, and the Court allowed, Mr. Jason L. Melancon to argue in his stead.

[42] Moreover, in the case of Mr. Becnel, he originally filed an objection and notice of intent to appear at the fairness hearing on behalf of two individuals (Malcolm Coco, who claims to be a Class Member, and Jarod Shane Elrod,

of others who did not present oral argument at the Fairness Hearing and has thoroughly reviewed and considered their arguments and supporting evidence.  The Court was not required to treat the Fairness Hearing as a trial and had the discretion to limit the proceeding to whatever was necessary to aid it in reaching an informed decision.  *Cannupp*, 417 F. App'x at 845 (court has discretion to limit participation and to consider objections presented in writing rather than through a personal appearance); *Tenn. Ass'n of Health Maint. Organizations, Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001) ("the district court has the discretion to limit the fairness hearing, and the consideration of those objections, so long as such limitations are consistent with the ultimate goal of determining whether the proposed settlement is fair, adequate and reasonable"); *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 385 (E.D. Mich. 2006) (the court 'may limit the fairness hearing 'to whatever is necessary to aid it in reaching an informed, just and reasoned decision.") (citations omitted) (internal quotation marks omitted); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 563 (D.N.J. 1997) ("the Court has discretion to employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement."); Manual for Complex Litigation (Fourth) § 21.634 (2004).

## VII.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

### A.   Presumption of Fairness.

108.   The Court evaluates the proposed Settlement in light of the general federal policy favoring the settlement of class actions.  *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir.1986) (per curiam); *see, e.g., Cotton*, 559 F.2d  at 1331  ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *see also Int'l*

---

who claims he is excluded from the Class) who subsequently submitted, before the Fairness Hearing, requests to opt-out of the Medical Settlement Class.  (*See* Docket 10-7777, Rec. Doc. 180; *see also* Garretson Supp. Decl. ¶ 4, Ex. A.)  Thus, Mr. Becnel, at the time of the Fairness Hearing, had no client with standing to object to the Settlement.

*Union, United Auto., Aerospace, & Agric. Implement Workers v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007). "[T]he public interest in amicable resolution of cases is particularly strong in the context of mass tort and similar litigation." *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) ("[T]here is a 'strong judicial policy favoring the resolution of disputes through settlement. . . . The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.") (quoting *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004)).

109.    Because "settlement is the preferred means of resolving litigation," there is a "strong presumption in favor of finding a settlement fair." *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008) (quotation omitted); *see Sullivan*, 667 F.3d at 311 ("'This presumption [in favor of voluntary settlement agreements] is especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts.'") (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010))*; Turner*, 472 F. Supp. 2d at 843 ("a presumption is made in favor of the settlement's fairness, absent contrary evidence") (citing *Smith*, 91 F. App'x at 955); *accord*, *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006).

110.    Once a court has granted preliminary approval to a class action settlement, the settlement is presumed reasonable and "'an individual who objects has a heavy burden of demonstrating the settlement is unreasonable.'" *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269. 293 (W.D. Tex. 2007); *accord*, *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983); *Robinson v.*

*Ford Motor Co.*, No. 04-844, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005); *In re Terazosin Hydrochloride Antitrust Litig.*, No. MDL 99-1317, 2005 WL 2451960, at *5 (S.D. Fla. July 8, 2005); *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 931 (E.D. Mich. Jan. 29, 2007); *United States v. New Jersey*, CIV. 88-5087 WGB, CIV. 88-4080(MTB), CIV. 87-2331(HAA), 1995 WL 1943013, at *11 (D.N.J. Mar. 14, 1995); *Moore v. United States*, 63 Fed. Cl. 781, 784 (Fed. Cl. 2005).

111.   Although the Court necessarily must consider the Settlement in light of the facts that have been developed and the recovery that the Class might obtain outside the Settlement, the Court's scrutiny should not rise to the level of a trial. *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) ("The court . . . must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial.") (quotations and alterations omitted); *In re Corrugated Contained Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) (evaluation of a settlement "is not and cannot involve a trial on the merits"); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 228 F.R.D. 541, 553 (S.D. Tex. 2005) (evaluation of a settlement cannot involve a trial on the merits "because the policy of encouraging settlements is effected by 'the very uncertainty of the outcome of the litigation and the avoidance of wasteful litigation and expense.'") (quoting *In re Corrugated Container*, 643 F.2d at 212).[43]

112.   Nor is it the Court's responsibility to determine whether, had negotiations proceeded differently, the class conceivably might have obtained even greater recovery. *See Sullivan*, 667 F.3d at 324 ("settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."); *Cotton* 559 F.2d at 1330.

---

[43] *See also UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) ("[A] fairness hearing is not a trial, but instead has a very singular and narrow purpose—to determine whether the settlement at issue is fair, reasonable, and adequate."); *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("In evaluating these considerations, the Court must not try the case on the merits.").

### B.     The *Reed* Factors.

113.     In *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983), the Fifth Circuit identified the factors to evaluate to determine whether to grant final approval to a class action settlement:  (1) the assurance that there is no fraud or collusion behind the settlement; "(2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Id.*; *see also Newby* 394 F.3d at 308.  Here, all six *Reed* factors fully support final approval of the Settlement.

### 1.     The Settlement Negotiations.

114.     The Parties reached agreement after lengthy, hard-fought negotiations.  (See Bloomer Decl. ¶ 2.)  Counsel for Plaintiffs and for BP are thoroughly familiar with the factual and legal issues in this action and vigorously represented their respective clients' interests throughout the litigation, including in the negotiation process.  (*See* Greenwald Decl. ¶ 6; *see also* Order, Rec. Doc. 7480 at 7 ("the Settlement Agreement was negotiated in good faith and at arm's length over many months . . . .  The negotiations were extensive and highly contested."); *see also* Order, Rec. Doc. 7600 at 1.)  This nearly year-long arm's-length negotiation process supports Final Approval of the Settlement.  *See In re Train Derailment Near Amite, La.*, 2006 WL 1561470, at *19 ("that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate"); *see also Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) ("trial court 'should be hesitant to substitute its own judgment for that of counsel'" when the settlement has been reached at arm's length without fraud or collusion) (citation omitted).

115.    Final   Approval   is   also   supported   by   the   fact   and   nature   of
Magistrate Judge Shushan's involvement in supervising negotiations over crucial elements of the
Agreement.   (Bloomer Decl. ¶¶ 39, 45, 49, 59; Greenwald Decl. ¶ 12.)   Judge Shushan brokered
agreement between Class Counsel and BP's counsel on key compensation elements of the Matrix
and the Outreach Program.   This sort of involvement of a Magistrate Judge helps demonstrate a
lack of fraud or collusion behind the settlement.   *See*, *e.g.*, *Maywalt v. Parker & Parsley
Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("[T]he supervision of settlement negotiations
by a magistrate judge, as occurred here, makes it less likely that . . . [class counsel have
promoted] their own interests over those of the class."); *Domingue v. Sun Elec. &
Instrumentation*, Civil Action No. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010)
("[T]hat this settlement is the negotiated result of an adversarial proceeding is an indication of its
fairness."); *see also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122
(S.D.N.Y. 2009).

116.    In addition, the Parties did not negotiate attorneys' fees for Class Counsel until
after they agreed on the relief to be afforded Class Members and after the Court gave its approval
for fee negotiations to commence.   (MSA § XIX, Ex. 19, ¶ 1.)   "'Because the parties have not
agreed to an amount or even a range of attorneys' fees, there is no threat of the issue explicitly
tainting the fairness of settlement bargaining.'"   *In re Heartland Payment Sys.*, 851 F. Supp. 2d
1040, 1064 (S.D. Tex. 2012) (*quoting Turner*, 472 F. Supp. 2d at 845).

117.    No objector has provided competent evidence of collusion.   For example,
objectors represented by Joseph Darrell Palmer insinuate that there was some collusion in
attorneys' fees negotiations because it "is simply not believable" that the Parties "began,
finished, obtained PSC approval, and obtained BP corporate approval of a $600 million deal [for

attorneys' fees] in less than a day."  (Docket 10-7777, Rec. Doc. 124 at 37.)  This unsupported speculation provides no competent evidence of collusion.  *See*, *e.g.*, *In re Enron Corp. Sec., Deriv. & "Erisa" Litig.*, MDL No. 1446, 2003 WL 22962792, at *10 (S.D. Tex. Nov. 5, 2003) (finding no evidence of collusion when objectors' "conclusory allegation was based on pure speculation" and timing, and "settlement at issue arose during court-ordered mediation with an experienced and renowned court-appointed mediator"); *Collins*, 568 F. Supp. at 725 (the court "may presume that no fraud or collusion occurred between counsel[] in the absence of any evidence to the contrary"); *see also* 11/8/12 Hearing Tr. at 267:14-22 ("I'm really troubled that there has been even a hint or insinuation that in this case, of all cases, that the negotiation settlements involve any kind of collusion or improper conduct by the parties who are negotiating these settlements.")   The Parties, by contrast, presented evidence of extensive arms-length negotiations over many months.  *See e.g.*, Order, Rec. Doc. 7480 at 7 ("The Settlement Agreement was negotiated in good faith and at arm's length over many months . . . .   The negotiations were extensive and highly contested."); *see also* Order, Rec. Doc. 7600 at 1; Klonoff Decl. ¶¶ 72-79; *see also* 11/8/2012 Hearing Tr. at 275:13-17 ("There was some criticism by some objectors . .  in the written objections, again, sort of inferring some sort of improper collusion by the PSC and BP.  I can guarantee you that did not occur.").)

118.    Finally, if the terms of the settlement are fair, then the reviewing court can deem the formative negotiations to have been proper.  *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 588 (N.D. Ill. 2011) ("Rather than attempt to prescribe the modalities of negotiation, the district Judge permissibly focused on the end result of the negotiation, which was more favorable to the class than any Class Member could reasonably have expected.  The proof of the pudding was indeed in the eating.") (quoting *Mars Steel Corp. v. Cont'l Ill. Nat.*

*Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir 1987)); *see also In re Corrugated Container*, 643 F.2d at 212 ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting."); *Turner*, 472 F. Supp. 2d at 846 ("[A] presumption exists that settlement negotiations were conducted properly in the absence of collusion if the terms of the proposed settlement are demonstrably fair."). In sum, there was no collusion, and this factor strongly supports final approval of the Settlement.

### 2. The Complexity, Expense, and Likely Duration of the Litigation.

119. In assessing this factor, courts consider the uncertainties of litigation and compare the settlement to potential future relief. *In re Shell Oil Refinery*, 155 F.R.D. 552, 563 (E.D. La. 1993); *see Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-00400-BR, 2009 WL 2208131, at *26 (E.D.N.C. July 22, 2009) ("[T]he settlement terms reflect plaintiffs' counsel's consideration of the strength of their case, and the delay and cost of proceeding to trial balanced against the certainty, relative promptness, and amount of relief the settlement provides."). As in *Shell Oil*, there can be "no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases" in the history of the United States. 155 F.R.D. at 559. "Such complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *see also Billitteri v. Secs. Am., Inc.*, 2011 WL 3586217, at *10 (noting that the time it would take to recover "would measure in years rather than the months contemplated by the parties at this stage.")

120. The burdens of litigation here are immense. Pre-trial orders provide for at least three trial phases for the Limitation and Liability Trial, each of which would last months. These three phases would only partially address the claims of the Plaintiffs and the more than

17,000 claimants who have filed MDL 2179 B3 Bundle Short Form Joinders alleging injury from exposure to oil and/or dispersants.  These individual claims would entail many years of expensive litigation and require separate trials and testimony from numerous witnesses and medical experts, with no certainty as to the outcome.  (*See* 11/8/2012 Hearing Tr. at 269:  ("For those parties who do not settle, the complexity, expense, and likely duration of this litigation is beyond anything most or all of us have ever seen or had to deal with.").)  Appeals by the losing parties would be a virtual certainty.  *Cf. Collins*, 568 F. Supp. 2d at 726 (potential trial lasting "several weeks" favored settlement approval); *Faircloth v. Certified Fin., Inc.*, No. Civ. A. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving settlement where trial "was estimated to last at least two weeks"); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997); *In re Shell Oil*, 155 F.R.D. at 560 ("[E]ven a six month trial is considered extremely lengthy and the expense for the parties, the claimants, and the judicial system would be enormous.").[44]

121.    Without a settlement, Plaintiffs face significant further expenses in time, money and resources—with no assurance of recovery.  *See Smith v. Ajax Magnethermic Corp.*, No. 4:02CV-0980, 2007 WL 3355080, at *6 (N.D. Ohio Nov. 7. 2007).  These costs would likely outweigh the recovery that most Class Members could hope to receive.  (*See* Coffee Decl. ¶ 18.)

122.    In contrast, for Class Members with qualifying Specified Physical Conditions, compensation under the Settlement is certain.  In addition to compensation, Clean-Up Workers, Zone B Residents, and qualifying Zone A Residents will for 21 years receive the opportunity for

---

[44] The *Exxon Valdez* litigation is instructive.  Nearly twenty years elapsed between the *Exxon Valdez* Oil Spill and the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).  Many of the plaintiffs had died before the case reached the Supreme Court, *see* Brief for Respondents, *Exxon Shipping Co. v. Baker*, No. 07-219, 2008 WL 194284, at *16 (U.S. Jan. 22, 2008), and many others suffered due to the lengthy litigation process.  Indeed, experts who studied the effects of the *Exxon Valdez* litigation on the local populace have said that the litigation "produce[d] an independent secondary disaster, which [rather than the original spill] is the primary source of ongoing secondary trauma."  J. Steven Picou, WHEN THE SOLUTION BECOMES THE PROBLEM:  THE IMPACTS OF ADVERSARIAL LITIGATION ON SURVIVORS OF THE EXXON VALDEZ OIL SPILL, 7 U. St. Thomas L.J. 68, 81 (2009).

regular primary-care medical examinations to assist them in managing their health.   This

Periodic Medical Consultation Program—along with the benefits under the Outreach Program—

could not be obtained through litigation.  (Miller Decl. ¶¶ 43, 44, 46; Coffee Decl. ¶ 79.)

123.    Because many of "the most controversial and hard-fought of all the issues in this

case" remain to be litigated, *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir.

1986), the Settlement "eliminates the transaction costs that further proceedings would impose"

and "provides relief for the class sooner than continued litigation would."  *Ayers v. Thompson*,

358 F.3d 356, 369 (5th Cir. 2004).  For the Parties, it is therefore entirely "proper to take the bird

in the hand instead of a prospective flock in the bush."  *In re Shell Oil*, 155 F.R.D. at 560.  This

factor clearly supports approval of the Settlement.

### 3.    The Stage of the Proceedings and the Amount of Discovery Completed.

124.    This factor "asks whether the parties have obtained sufficient information to

evaluate the merits of the competing positions."   *In re Educ. Testing Serv.*, 447 F. Supp. 2d

at 620 (quotations omitted).   "Thus, the question is not whether the parties have completed

a particular amount of discovery, but whether the parties have obtained sufficient information

about the strengths and weaknesses of their respective cases to make a reasoned judgment about

the desirability of settling the case on the terms proposed . . . ."  *Id.* at 620-21.  Here, the Parties

have obtained extensive information through both formal discovery and informal alternatives,

including the use of experts and consultants, and there can be no doubt that the Parties have the

necessary information to evaluate all aspects of the case and the merits of the Settlement.

125.    Specifically, during the 19-month period before a Settlement was reached, the

Parties deposed more than 300 fact and expert witnesses in connection with preparation for the

Limitation and Liability Trial.  (Rec. Doc. 6419 at 3.)  In addition, the Parties in MDL 2179

produced approximately 90 million pages of documents and exchanged more than 80 expert reports. (*Id.*) The depth and breadth of discovery already completed provides the Parties with necessary and extensive information regarding the potential liability of BP and other defendants for the bodily and personal-injury claims alleged by the Class. By any measure, the amount of discovery that has already occurred is more than sufficient to ensure a fair settlement. *See* 11/8/12 Hearing Tr. at 272 ("There is just a massive amount of information available to the parties to allow them to negotiate what they have done.")[45]

126.   In addition to formal discovery, the Parties benefited from numerous other sources of information, including: (1) extensive scientific data in the public domain concerning the effect of oil exposure on health, specific exposure and sampling data collected during the *Deepwater Horizon* Incident, and analyses from government agencies; (2) health incident reports relating to Clean-Up Workers; (3) investigations and analyses conducted by the Parties and their consultants; and (4) government investigations and hearings. (Greenwald Decl. ¶¶ 4–5; Harbut Decl. ¶¶ 16–17, 22–24; *see also* ¶ 42, *supra*.) Although this information was gathered outside of the formal discovery process and, in some cases, is not admissible in any trial on the merits, these extensive alternate sources of information underscore that the Parties were sufficiently informed to reach a settlement. *See DeHoyos*, 240 F.R.D. at 292.

127.   Here, in light of the substantial amount of formal and informal discovery and investigation, the Court can easily conclude that the Settlement represents an informed, educated, and fair resolution of this dispute. Extensive information allowed the Parties to assess their

---

[45] The Fifth Circuit has made clear that formal discovery is not a prerequisite to the approval of a class settlement. Even when "very little formal discovery was conducted," this "does not compel the conclusion that insufficient discovery was conducted." *Cotton*, 559 F.2d at 1332; *see also In re Corrugated Container*, 643 F.2d at 211, 204 n.10 (noting that even if little formal discovery has been completed, plaintiffs may still have access to information obtained in other ways; "we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table"); *cf. Newby*, 394 F.3d at 306 ("Generally speaking, a settlement should stand or fall on the adequacy of its terms.").

positions in fine-grained detail and make a reasonable decision on settlement, which is all that is required. *See*, *e.g.*, *In re Combustion*, 968 F. Supp. at 1127; *Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 26 (D.D.C. 2011) ("Counsel should have 'sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success . . . .") (quoting *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 62 (D.D.C. 2010)). This factor strongly supports settlement approval.

### 4.    The Probability of Plaintiffs' Success on the Merits.

128.    Under this factor, the Court must compare the Settlement terms with the likely rewards the Class would receive at trial. *Reed*, 703 F.2d at 172; *see also In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007). If further litigation is unlikely to lead to greater relief for the Class, then this factor weighs in favor of settlement. *Ayers*, 358 F.3d at 373.

129.    According to BP, if the claims in this case were to be tried, Plaintiffs would face significant factual and legal hurdles, including with respect to liability and damages. Plaintiffs disagree and believe they could be successful at trial. Nevertheless, damages, particularly for the acute, short-term conditions claimed by most Plaintiffs, would likely be low compared to the burdens and cost of pursuing legal action. (*See* Coffee Decl. ¶ 76 ("[B]ecause this case is disproportionately composed of 'negative value' claims, it must be expected that many claimants will not assert them"); *id.* ¶¶ 38-41 (discussing recoveries in cases involving oil spills or toxic chemical discharges); Miller Decl. ¶ 37.) *See also In re Diet Drugs*, 2000 WL 1222042, at *61 (noting difficulty of establishing damages for limited exposure to drug or minor injuries).[46]

---

[46] In addition, the Class's claims on the merits are complicated by various defenses. BP claims immunity under both the Clean Water Act and the Federal Tort Act, and asserts that Plaintiffs' state and maritime law claims are preempted by federal law because it was following directives from the FOSC to implement a comprehensive federal response scheme created by the Clean Water Act, the Oil Pollution Act, and the National Contingency Plan. BP would also argue that its decisions related to, for example, the training and protection of workers and that the use of the dispersants were all done with the input and approval of the government, and were therefore reasonable and cannot form the basis for any liability.

130.    Even assuming a favorable liability verdict and damages awarded at trial, the resulting recovery, likely years from now, would be diminished by the costs of litigation.  In light of these considerations, counsel could reasonably conclude that certain recovery through settlement is the preferred result.  This factor weighs decisively in favor of approving the Settlement.

### 5.    The Range of Possible Recovery.

131.    To merit approval, the Settlement need only represent a fair, reasonable, and adequate estimation of the value of the case.  *In re Combustion*, 968 F. Supp. at 1129.  Because the Settlement compares favorably with the range of possible recovery through litigation, this factor also supports settlement approval.

132.    The Medical Settlement provides compensation for qualifying Specified Physical Conditions without the need for protracted litigation.  The Matrix sets forth recoveries based on whether a condition is acute or chronic, the level of proof submitted by the Class Member, and whether the Class Member is a Resident or Clean-Up Worker.  These payments are well in line with (and in many cases appear to exceed) damage awards for similar injuries at trial.[47]

133.    The proposed Settlement also provides medical consultations under the Periodic Medical Consultation Program for all qualifying Class Members, including Clean-Up Workers and Zone B Residents who have not claimed a Specified Physical Condition.  This Periodic

---

[47] *See, e.g., Howard v. Union Carbide Corp.*, 50 So.3d 1251, 1256 (La. 2010) (holding that trial court's awards of $1,500 to $3,500 to plaintiffs exposed to a chemical  leak were a clear abuse of discretion given that the "damages proven, such as eye, nose, and throat irritations, are not unlike the symptoms suffered by persons afflicted with common seasonal allergies . . . [and] might be characterized as mere annoyances"; reducing damages to $100 to $500); *Arabie v. CITGO Petroleum Corp.*, 89 So. 3d 307 (La. 2012) (awarding damages of $7,000 to $15,000 to plaintiff refinery construction workers exposed to toxic chemicals due to oil spill; damages were awarded for symptoms of eye irritation, nausea, nasal and throat irritation, and difficulty in breathing, as well as for fear of developing future injuries such as cancer); *Doerr v. Mobil Oil Corp.*, 935 So. 2d 231 (La. App. 2006) (affirming damage awards of $500 to $2,000 to plaintiffs for physical injuries related to the ingestion of drinking water contaminated with oil, grease, and other contaminants); *Rivera v. United Gas Pipeline Co.*, 697 So.2d 327 (La. App. 1997) (affirming jury verdicts that declined to award damages to plaintiffs who as a result of exposure to natural gas suffered "minimal" injuries such as nausea and headaches); *see also* Coffee Decl. ¶¶ 38-41.

Medical Consultation Program provides a substantial benefit to the Class that could not be achieved through litigation.  (Miller Decl. ¶ 43.)   The Outreach Program likewise provides benefits to the Class (as well as other residents of the Gulf Coast) that could only be achieved through settlement.  (*Id.* ¶¶ 44, 46.)

134.   In evaluating the range of possible recovery, the "trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."  *Cotton*, 559 F.2d at 1330 (citation omitted) (internal quotations marks omitted).  For this reason, "[c]ourts routinely recognize that settlements do not equal the full value of the loss claimed by the plaintiffs.  'In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'"  *Int'l Union, United Auto., Aerospace, & Agric. Implement workers of Am.  v.  Gen. Motors Corp.,*  No. 07-cv-14074 DT, 2008 WL 2968408, at  *24  (E.D. Mich.  July 31,  2008)  (citing  *Weinberger v.  Kendrick,* 698 F.2d 61, 65  (2d Cir.1982)  (approving class settlement where "recovery will be only a negligible percentage of the losses suffered by the class");  *Lazy Oil  Co. v.  Witco Corp.,* 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (collecting cases where courts approved class action settlements providing from 0.2 percent to 16 percent of potential recovery), *aff'd*, 166 F.3d 581 (3d Cir. 1999)); *see also Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) (the "fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the  settlement")*;  Petrovic v.  Amoco Oil  Co.*,  200 F.3d 1140;  1150  (8th Cir. 1999)  ("[T]he speculative possibility of punitive damages" is not enough "to find that the district court abused its discretion in approving the settlement.").  Here, the Settlement provides meaningful, valuable

benefits for each qualifying Class Member — and it provides them now and in the near future rather than years from now if ever.  This factor favors approval of the Settlement.

> ### 6. The Opinions of Class Counsel, Class Representatives, and Absent Class Members.

135.    In evaluating a settlement, the Court should rely on counsel who know the strengths and weaknesses of their cases.  *See Turner*, 472 F. Supp. 2d at 852 ("Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit.").   Where "counsel for both parties have significant experience in litigating and negotiating settlement of class actions," this fact is strong evidence that the settlement is fair and reasonable.   *DeHoyos*, 240 F.R.D. at 287 (citation omitted) (internal quotation marks omitted); *see Cotton*, 559 F.2d at 1330 ("In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties.").   Class Counsel and counsel for BP have thorough knowledge of the case and substantial experience litigating and settling complex matters and class actions.  (Bloomer Decl. ¶¶ 3–4; Herman Decl. ¶ 6; Greenwald Decl. ¶ 2, 5.)   After evaluating the risks and benefits of continued litigation, Class Counsel believes that settlement is more beneficial to the Class than litigation.   Their informed views are entitled to substantial weight.  *See In re Combustion*, 968 F. Supp. at 1128; *San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 461 (W.D. Tex. 1999) ("[C]ounsel for each side possess the unique ability to assess the potential risks and rewards of litigation . . . ." (internal quotation marks omitted)).

136.    Additionally, the Class Representatives uniformly believe that the Settlement Agreement is a fair, reasonable, and adequate resolution of this litigation.  (*See* Plaisance Decl. ¶ 8; Perkins Decl. ¶ 8; Warren Decl. ¶ 8; Pizani Decl. ¶ 8; Plaisance Decl. ¶ 8; Barbee Decl. ¶ 8; Divinity Decl. ¶ 8; Brown Decl. ¶ 8; Caster Decl. ¶ 8; Baker Decl. ¶ 8; and Hall Decl. ¶ 8.)

137.    Class Members also support the Settlement; only 150 purported objectors have filed objections to Final Approval of the Settlement.  And, of those, 55 appear not to be Class Members.  (Garretson Supp. Decl. ¶ 3.)  In a Class with potentially 200,000 members, this represents less than one-tenth of one percent of the Class.  Of those 95 objectors who appear to have standing, 73 (or 77%) are presented by a single firm.  (*Id.* ¶ 3 & n.2)  Only 1,747 persons have submitted requests to opt out; 65% of these are represented by just a few law firms.  (*Id.* ¶ 2 & n.1)  These numbers clearly demonstrate that the vast majority of Class Members favor settlement.  "While the fact that a relatively small percentage of the Class Members objects to a proposed settlement is not dispositive, '[c]ourts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'"  *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990) (citing 2 Newberg on Class Actions § 11.47 (2d ed.), at 463); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (same); *see also In re Shell Oil*, 155 F.R.D. at 566-67 (relatively few number of objections and opt outs supported fairness and adequacy of the settlement).

138.    In this case, the number of individuals who have already filed claims seeking the benefits of the Settlement (4,546 to date),[48] (*see* Garretson Supp. Decl. ¶ 4), even though no payments will be made until the Effective Date, demonstrates widespread, affirmative approval of the Settlement, and their interests should be protected against objections by a small minority.  *E.g.*, *DeHoyos*, 240 F.R.D. at 286.[49]  This factor strongly favors approval of the Settlement.

---

[48] Some objectors have also filed Proof of Claim forms seeking Settlement benefits.  (*See* Declaration of Matthew Garretson, October 22, 2012, Rec. Doc. 7730-3, ¶ 9(a).)  In addition, at the Fairness Hearing, counsel for a number of objectors indicated that their clients also were filing claims for Settlement benefits.  (*See also* 11/8/12 Hearing Tr. 227:1-6 and 230:24-231:15.)

[49] Indeed, even a large number of objections would not establish unfairness.  According to the Fifth Circuit, "'[a] settlement can be fair notwithstanding a large number of Class Members who oppose it.'"  *Reed*, 703 F.2d at 174 (quoting *Cotton*, 559 F.2d at 1331); *see also Ayers v. Thompson*, 358 F.3d 356, 373 (5th Cir. 2004) ("[o]ur jurisprudence . . . makes clear that a settlement can be approved despite opposition from Class Members").  In fact, courts regularly approve settlements as fair, reasonable, and adequate even when a relatively high percentage of

139.    In sum, the Medical Settlement fully satisfies each of the six *Reed* factors, which supports the Court's finding that the Settlement is fair, reasonable, and adequate.

## VIII.   CLASS NOTICE.

140.    Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e), notice of the class settlement must meet the requirements of both Rule 23(c)(2)(B) and Rule 23(e)(1).    *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005).

141.    Pursuant to Rule 23(c)(2), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."    Fed. R. Civ. P. 23(c)(2)(B).    Rule 23(e) requires only that the Court "direct notice in a reasonable manner to all class members who would be bound by the proposal."    Fed. R. Civ. P. 23(e)(1).

142.    Here, there were no objections received that challenged the scope or content of the Notice Program.    (10/22/12 Azari Decl. ¶ 12.)    The Notice Plan was designed and endorsed by the Court-appointed Class`s Notice Agent—Hilsoft Notifications—and two other nationally-recognized leading notice experts.    Cameron R. Azari, Esq., is the Director of Legal Notice for Hilsoft Notifications, which designs, develops, analyzes and implements large-scale, un-biased, legal notification plans and has been involved with more than 200 notice programs in more than 53 languages.    (Declaration of Cameron R. Azari, Esq. on Medical Benefits Settlement Notices and Notice Plan ("Azari Prelim. Approval  Decl.") (Rec. Doc. 6267-2) at ¶¶ 3-8.)  Mr. Azari is a nationally-recognized expert in the field of legal notice who personally has 12 years' experience

---

Class Members opt out or object.  *See, e.g., Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("only" 29 objections in 281 member class "strongly favors settlement"); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (settlement approved despite opposition of 36% of the total class).

designing and implementing more than 100 notice programs and has served as an expert on media notice in dozens of federal and state cases involving class action notice plans. (Azari Prelim. Approval Decl. ¶¶ 2-3.)  Katherine Kinsella, whose opinion Class Counsel proffered as to the adequacy of the notice program, is the President of Kinsella Media, an advertising and legal notification firm specializing in the design and implementation of large scale, complex and multi-faceted notice programs which has developed or consulted on more than 700 notice programs.  (Declaration of Katherine Kinsella Rec. Doc. 6267-4 ¶¶ 1, 4-5, Ex. 1.)  Ms. Kinsella has more than 35 years' experience in communications and 19 years' experience in legal notice field.  (Kinsella Decl. ¶ 3.)  She has frequently testified on class notice issues in the federal courts and is widely recognized as a preeminent notice expert.  Shannon R. Wheatman, Ph.D., who also endorsed the Notice Program on behalf of Class Counsel, is Vice President of Kinsella Media.  (Declaration of Shannon R. Wheatman, Rec. Doc. 6267-5 ¶ 1.)  Dr. Wheatman has been qualified in state and federal courts as a notice expert for evaluating the effectiveness of class action notice programs, both qualitatively and quantitatively.  (Wheatman Decl. ¶¶ 3-5, Ex. 1.)  Moreover, Dr. Wheatman has authored and co-authored numerous articles on notice and due process.  She previously worked with the Federal Judicial Center ("FJC") and helped write and design the illustrative "model" forms of notice designed to satisfy the plain language requirements of Rule 23(c)(2).  (Wheatman Decl. ¶¶ 6-7.)

143.    In the Preliminary Approval Order, the Court found that the Notice and Notice Plan "satisf[ied] the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and (e)(1) and due process."  (Rec. Doc. 6419 at 19.)

144.    Following Preliminary Approval, the Parties implemented the Notice Plan as approved and provided Class Notice.  (Azari Decl. ¶ 8.)

145.    Individual notice was disseminated to potential Settlement Class Members via postal mail and email.  Through August 9, 2012, 366,242 individual notices had been sent by postal mail and 56,136 individual notices had been emailed.  Only 10,700 mailings—or 3.3%—were known to be undeliverable.  (*Id.* ¶¶ 8, 9.)

146.    Notice was also provided through an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, highly-trafficked websites, and Sunday local newspapers (via newspaper supplements).   Notice was also provided in non-measured trade, business and specialty publications, African-American, Vietnamese, and Spanish language publications, and Cajun radio programming.  The combined measurable paid print, television, radio, and Internet effort reached an estimated 95% of adults aged 18+ in the Gulf Coast region an average of 10.3 times each, and an estimated 83% of all adults in the United States aged 18+ an average of 4 times each.  (*Id.* ¶¶ 8, 10.)  This reach more than satisfies the guidance provided by the Federal Judicial Center and exceeds the median reach calculation of other effective court-approved notice plans. *See* Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010), at 3 (prescribing that a proposed notice effort should reach between 70-95% of the class, and observing, "[a] study of recent published decisions showed that the median reach calculation on approved notice plans was 87%").

147.    Additionally, on April 26, 2012, timely notice was provided under the federal Class Action Fairness Act of 2005, 28 U.S.C. § 1715, by certified mail to 57 federal and state officials, including the attorneys general of the United States, each of the 50 states, the District of Columbia,    and    the    U.S.    Territories    of    Puerto    Rico,    the    Northern Mariana Islands, American Samoa, the Virgin Islands, and Guam.  (*Id.* ¶ 17.)

148.    All notice documents were designed to be clear, substantive and informative.  (*Id.* ¶ 5.)  In addition to providing Class Members information such as a description of the class and litigation, their right to appear at the Fairness Hearing, and the maximum amount of attorneys' fees that may be sought by Class Counsel, the Notice provided clear and specific instructions to the Class Member regarding their options under the settlement:  (1) apply for settlement benefits; (2) opt out of the settlement; (3) object to the settlement; or (4) do nothing, in which case they will remain Class Members.  (Azari Prelim. Approval Decl. ¶¶ 25, 68.)

149.    Combined notice programs like this one, via "mail and publication[,] regularly have been deemed adequate under the . . . notice requirements . . . of Rule 23(c)(2)." *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir. 1985).  Courts have repeatedly approved such plans, often with a much less robust publication plan than that utilized here.  *See*, *e.g.*, *Silber v. Mabon*, 18 F.3d 1449, 1451-52 (9th Cir. 1994) (notice by First Class Mail to all "identified Class Members" with published notice in The Wall Street Journal and The New York Times); *Weinberger v. Kendrick*, 698 F.2d 61, 69-81 (2d Cir. 1982) (mailed notice supplemented with published notice in only one newspaper); *In re Prudential Sec. Inc. P'ships Litig.*, 164 F.R.D. 362, 367 (S.D.N.Y. 1995) (mailed notice to Class Members identifiable with "reasonable" effort with published notice twice in the national editions of *The Wall Street Journal*, *The New York Times*, and *U.S.A. Today*); *In re Four Seasons Sec. Laws Litig.*, 58 F.R.D. 19, 32 (W.D. Okla. 1972) (mailed notice to last address supplemented by publication once in the national edition of *The Wall Street Journal*).

150.    Accordingly, the Court finds that the Notice and Notice Plan as implemented satisfied the best notice practicable standard of Rule 23(c) and provided notice in a reasonable

manner to Class Members who would be bound by the Settlement, including individual notice to all Class Members who could be identified through reasonable effort.

## IX. THE OBJECTIONS TO THE SETTLEMENT ARE WITHOUT MERIT.

151.    As noted, once a court has granted preliminary approval to a class action settlement, the settlement is presumed reasonable and "'an individual who objects has a heavy burden of demonstrating the settlement is unreasonable.'" *DeHoyos*, 240 F.R.D. at 293; *accord*, *e.g.*, *William* 720 F.2d at 921; *Robinson* 2005 WL 5253339, at *3; *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 2451960, at *5.

152.    A court "should not withhold approval of a settlement merely because some Class Members object." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 600 (E.D. Mich. 2006) (citation omitted) (internal quotation marks omitted).  The Court "'has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement.'" *DeHoyos* 240 F.R.D. at 286 (quoting *Mich. Hosp. Ass'n v. Babcock*, 1991 U.S. Dist. LEXIS 2058, at *10 (W.D. Mich. 1991)); *see also Reed*, 703 F.2d at 174-75 (approving settlement over objections by 40% of the class).

153.    Of the relatively small number of objections that have been filed, none is critical of the Periodic Medical Consultation Program.  Similarly, only one objection criticizes the Outreach Program — and does so in the mistaken belief that the Outreach Program involves a *cy pres* distribution.  The objections instead focus almost exclusively on the Settlement's Matrix, arguing that it should contain different dollar values, different conditions, payments based on severity of disease and impairment, payments for relocation costs, and/or different standards of proof—essentially seeking to renegotiate Settlement terms that were negotiated at arm's length by Class Counsel and BP over several months as part of a compromise of highly disputed claims.

154.     These types of objections are without merit.  Where a few individuals complain about this or that term of a settlement, their objections serve only to delay and frustrate the interests of the majority of class members in receiving settlement benefits as expeditiously as possible.  *See Cotton*, 559 F.2d at 1330 ("trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes'") (citation omitted).  Objections that seek to renegotiate terms of the settlement based on individual preferences are unhelpful and improper.  *See Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010) ("'whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance.'") (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 212).

155.     The few objections filed are often contradictory.  For example, some "objectors" complain that BP is too generous and "is clearly paying a premium" for Class Members' claims.  (Docket 10-7777, Rec. Docs. 243 at 1, 93 at 18.)  Others "object" because they are not within the Class, but want to participate in the Settlement, presumably because they believe the terms of the settlement are fair.  (*E.g.*, Docket 10-7777, Rec. Docs. 182, 203, 205.)   Some individuals complain that opting out, if they dislike the Settlement, is not a viable option, acknowledging that their claims would cost more to litigate than their likely recovery.  (Docket  No. 10-7777, Rec. Doc. 158.)  This is a reason to favor settlement, not object to it.  Some argue that proof standards are too high, while others complain that those with significant proof and those with little proof are being treated alike.  (Docket  No. 10-7777, Rec. Docs. 92 at 12-14, 180 at 2, 185 at 2, 202 at 2.)

156.   Some Objectors provide either no evidence at all or only irrelevant, unreliable, and unscientific "evidence" that fails to support their positions.   (*E.g.*, Docket 10-7777, Rec. Docs. 57, 158, 213.)   Those objections that lack factual, scientific, or legal support are deficient and are hereby rejected because they do not aid the Court in its evaluation of the settlement.   "To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process."   *Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986)).   For example, there is no evidence whatsoever to support the existence of large numbers of silently disapproving Class Members, as hypothesized by the Sterbcow Law Group.   (Docket 10-7777; Rec. Doc. 92 at 19-20.)

A.     **Objections to the Class Definition.**

157.   Some individuals object to the Medical Settlement on the basis that the Zones should have been drawn differently such that those individuals would be included in the Class.[50] Other individuals have objected to the exclusion from the Class of tourists, visitors, or those residents who lived in the Zones for a shorter or different duration than that described in the Class definition.[51]   As discussed above, such non-Class Members lack standing to object to the Settlement Agreement.   Because these individuals are not Class Members, they retain any claims they might have against BP, and their interests are not affected by the Settlement Agreement.

B.     **Objections to the Amount of Compensation Under the Specified Physical Conditions Matrix.**

158.   Several objectors argue that additional compensation should be awarded to Class Members with Specified Physical Conditions.   *See*, *e.g.*, Docket 10-7777, Rec. Docs. 41, 124, 130, 160, 185, 202, 203, 205, 243.   But these individuals do not raise any objections to the

---

[50] Docket 10-7777, Rec. Docs. 185-1 and 202-1 (listing Class Members joining objection due to "unfair exclusion"), 203, 205.
[51] Docket 10-7777, Rec. Docs. 180 at 3; 185-1 and 202-1 (listing non-Class Members joining objection due to "unfair exclusion") and 185-12 and 202-12 (non-Class Member who visited the Gulf and claims illness due to exposure to oil and/or dispersants).

structure or process of the settlement negotiations or make any non-speculative allegations of collusion or fraud. *See*, *e.g.*, Docket 10-7777, Rec. Docs. 41, 124, 185, 202, 203, 205.

159.    Accordingly, the payments negotiated by Class Counsel and reflected in the Settlement are presumed reasonable. *See Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984); *Turner*, 472 F. Supp. 2d at 852. This is because, under Rule 23, Class Counsel "are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit." *Turner*, 472 F. Supp. 2d at 852. If the settlement was reached at arm's length by knowledgeable counsel, the "trial court 'should be hesitant to substitute its own judgment for that of counsel.'" *Ruiz*, 724 F.2d at 1152 (citation omitted).

160.    Furthermore, the payment amounts reflected on the Matrix represent just one component of the Settlement and are the product of a hard-fought, arm's length compromise that also included, for example, the conditions to be included in the Matrix, standards of proof, and levels of compensation and enhancers for overnight hospitalization, as well as the components, duration, and frequency of the Periodic Medical Consultation Program, the specifics of the Back-End Litigation Option, the Outreach Program, and many other negotiated terms. (*See* Rec. Doc. 7112-1 at 25.) Objectors also disregard that the Settlement provides a mechanism for the timely and efficient administration of benefits to claimants, compared with the cost and delay of obtaining any recovery following trial (even assuming a favorable judgment, which is not certain). This Court must consider the whole Settlement and all of the benefits it provides. *See Robinson*, 2005 WL 5253339, at *5 ("In considering the extent and significance of the objections, 'the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis.'") (citation omitted); *Mich. Hosp. Ass'n* 1991 U.S. Dist. LEXIS 2058, at *11-12. "In assessing the settlement, the Court must determine

'whether it falls within the range of reasonableness, not whether it is the most favorable possible result in the litigation.'"   *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993) (citation omitted); *see also Cotton*, 559 F.2d at 1330.  Finally, as stated above, the compensation structure in the Matrix is in line with court decisions valuing similar injuries.

161.    The fact that some objectors complain that the Settlement compensation is "not enough" and others say it is "too much" underscores the highly-disputed nature of Plaintiffs' claims and demonstrates why the Settlement is a reasonable compromise.  As discussed above, certain "objectors" have criticized the Settlement as *too generous*, such as Ms. Barbara Adams, who says, "enough has been paid out" already, (Docket 10-7777, Rec. Doc. No. 243 at 1), and Halliburton, which contends that "BP is clearly paying a premium" and the Settlement does not "reflect a fair and reasonable estimation of the value of the case in view of what may happen at trial."  (Docket 10-7777, Rec. Doc. 93 at 18.)

162.    The Parties have presented evidence that the amounts paid under the Matrix are well within the range of jury verdicts involving similar injuries and thus reflect litigated outcomes of those claims.[52]   In contrast, objectors have presented neither case law nor any competent evidence demonstrating that the payment amounts do not fairly compensate them, particularly given the inherent risks and uncertainty of trial.  *See*, *e.g.*, *In re Shell Oil Refinery*, 155 F.R.D. at 565 (finding that although "the range of possible recovery by jury verdict could have been less or more than the settlement," it was "significant that there has been no evidence offered to show that the settlement value is inadequate in relation to the amount that a jury could have awarded").

163.    Other objectors argue that awards should be higher because they would be entitled to recover punitive damages at trial.  (Docket  No. 10-7777, Rec. Doc. 130, 180, 185, 202, 208,

---

[52] *See* n.47, *supra*.

236.)  Given that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award.  *See*, *e.g.*, *In re Shell Oil*, 155 F.R.D. at 563 (approving settlement when it was "not clear that the plaintiffs could prove punitive liability and obtain a punitive damage award in excess of [defendant's] . . . settlement offer"); *Petrovic*, 200 F.3d at 1150 (district court did not abuse its discretion in approving settlement where there was "speculative possibility of punitive damages"); *In re Diet Drugs*, 2000 WL 1222042, at *49 n.22 ("punitive damage claims are often illusory"); *Draney v. Wilson, Morton, Assaf & McElligott*, No. Civ. 79-1029, 1985 WL 5820, at *3 (D. Ariz. Sept. 30, 1985) (approving settlement when "[a]ny award of punitive damages would be highly speculative"); *see also* 11/8/12 Hearing Tr. at 248:12-20 (regarding release of punitive damages, stating that "[a] release can be much broader than the claim being litigated.  There is nothing uncommon there.  You give up any rights you may have.").  Furthermore, in this case, BP asserts that it conducted all Response Activities under the direction of the United States government and, therefore, BP argues that an award of punitive damages at trial is particularly unlikely.[53]  Plaintiffs dispute BP's factual and legal positions, and the issues would be exhaustively litigated.  It is therefore reasonable for the Parties to have compromised punitive damages in exchange for the settlements' many benefits.

164.    Those objectors who are unhappy with their anticipated settlement compensation could have opted out and pursued additional remedies through individual litigation.  The D'Amico Objectors claim that opt-out rights are not a solution because many claims are of negative value.  (Docket No. 10-7777, Rec. Doc. 158 at 1–2.)  Under Rule 23, the Class Representatives and Class Counsel are charged with protecting the interests of all Class Members, including those with negative value claims, and the D'Amico Objectors offer no

---

[53] Class Members do retain the right to seek punitive damages from Transocean and Halliburton.  (MSA § XVI.G.)

sufficient basis to question their adequacy.  Moreover, that many claims are of negative value is a reason to approve the Settlement, not reject it.  (*See* Coffee Decl. ¶ 9(d) ("This is a largely 'negative value' class action which presents a 'compelling rationale' for certification"); *id.* ¶¶ 38-41; Miller Decl. ¶ 37.)

165.    The Sterbcow Objectors also complain that the Settlement does not provide for an "initial diagnosis" that would allow class members to see a medical professional in order to "figure out whether or not they have a chronic problem that is associated from their exposure" to oil and/or dispersants.  (11/8/12 Hearing Tr. at 244:16-17.)  But it is entirely reasonable for the Parties to agree to compensate Class Members for the acute or chronic Specified Physical Conditions they can demonstrate, rather than provide medical services to determine whether they have a particular condition in the first place.  After all, in the absence of a settlement, these objectors would be required to prove their claims in a court of law under evidentiary standards that are more rigorous that anything in the Medical Settlement.  This objection is overruled.[54]

### C.    Objections Concerning the Medical Conditions Covered Under the Specified Physical Conditions Matrix.

166.    Certain objectors argue that the Settlement should include additional or different conditions.[55]  However, the Parties negotiated the Matrix to include "those conditions for which there is a medical basis to conclude that contact with oil and/or dispersants caused them if there were exposure to sufficient amounts of such substances for a sufficient duration of time." (Herzstein Decl. ¶ 14; *see also* Harbut Decl. ¶¶ 17, 25–38.)  The objectors have provided no

---

[54] At the Fairness Hearing, counsel for the Sterbcow Objectors suggested that the Settlement may "interrupt" a Class Member's rights under workers' compensation laws to pursue a claim for a Specified Physical Condition, before admitting that he does not know whether, in fact, this is the case.  (11/8/12 Hearing Tr. at 245:9-246:3.)  The Court has reviewed the Agreement and finds that it does not alter the existing rights, if any, of Class Members under workers' compensation laws.

[55] Docket 10-7777, Rec. Docs. 92, 180, 182, 185, 202, 208; *see also* Hearing Tr. (233-238, 243-244) (asserting that the Matrix unfairly excludes vague, unspecified types of chromosomal, liver, renal, immunological, and neurological effects); *see also* Herzstein Supp. Decl. ¶ 4 for additional discussion.

reasonable medical or scientific basis to conclude that any of the additional conditions they mention fit those criteria, nor have they provided any competent medical evidence that they actually have those claimed conditions.[56]

167.   For example, declarant Dr. William Sawyer references literature regarding prior oil spills in arguing that the Settlement does not account for the full spectrum of medical conditions that can result from exposures after an oil spill.  As a threshold matter, the Matrix does in fact includes many of the conditions and symptoms that are referenced in the literature regarding previous oil spills that Dr. Sawyer cites in his declaration.  (Herzstein Supp. Decl. ¶ 4.h.)  However, the literature that Dr. Sawyer relies upon does not support including other conditions on the Matrix as to the facts of the oil spill here.  This is because different oil spills release different types and concentrations of chemicals, and the geographic and temporal proximity to the source of a spill can vary significantly.  (*Id.*; *see also* Cox Supp. Decl. ¶¶ 36-37.)  BP presented evidence that many of the medical conditions Dr. Sawyer references, such as peripheral neuropathy, would not occur at the levels of exposure measured during the *Deepwater Horizon* oil spill, and Dr. Sawyer provides no evidence to the contrary.  (Cox Supp. Decl. ¶¶ 36-37.)

168.   In addition, some of the conditions objectors raise are not medically recognized conditions.  For example, declarant Dr. Michael Robichaux suggests that many of his patients have developed multiple chemical sensitivity ("MCS").[57]  MCS is not recognized as a disease or medical condition by the International Classification of Disease (ICD-10), the medical

---

[56] A related objection argues that the Settlement should provide for simultaneous recovery for a heat-related condition as well as an unrelated condition due to exposure to oil and/or dispersants.  (Docket 10-7777, Rec. Doc. 92 at 14–15.)  The Settlement provides that a Class Member may receive a single recovery under the Matrix for the most highly-compensated condition for which he or she qualifies.  As with other allocations of compensation negotiated by the Parties, the objectors have presented no evidence that would merit the Court revisiting those fairly negotiated terms.
[57]   Docket 10-7777, Rec. Doc. 185-3 at 6.

organization responsible for assigning codes for recognized diseases.  In addition, a number of medical organizations have published strong position statements against the concept of MCS because of the lack of science demonstrating that MCS is a real condition.  (Cox Supp. Decl. ¶ 7.)  In any event, those with conditions not on the Matrix had the right to opt out. These objections are overruled.

169.    Some objectors assert that they developed certain conditions classified on the Matrix as Acute Specified Physical Conditions, but that those conditions persist to the present. (*E.g.*, Docket 10-7777, Rec. Doc. 92.)  Class Counsel and BP have presented evidence that the Matrix includes the appropriate conditions.  (Harbut Decl. ¶¶ 17, 25-38; Herzstein Decl. ¶ 14.) BP has presented evidence that while a few of the Acute Specified Physical Conditions are similar to corresponding Chronic Specified Physical Conditions (*i.e.*, dermatitis, eczematous reaction, rhinosinusitis, and ocular), there is no scientific evidence that the other Acute Specified Physical Conditions would persist if they were in fact caused by the Class Members' contact with oil and/or dispersants.  (Herzstein Supp. Decl. ¶ 5.)  Objectors have presented no competent medical or scientific evidence to the contrary.

170.    Some objectors criticize the Matrix because it does not include "chronic effects" of exposure to oil and/or dispersants which have latency periods of decades or longer following exposure.  (Docket 10-7777, Rec. Docs. 185, 202; Hearing Tr. (233-234).)  The Parties dispute whether exposures from the *Deepwater Horizon* Incident would be expected to result in latent disease.  (Harbut Decl. ¶ 45; Herzstein Decl. ¶¶ 26-28.)  However, BP presented evidence that, to the extent that latent diseases could be caused by exposure to oil and/or dispersants at sufficient doses, such diseases would not be expected to manifest in Class Members for years after exposure.  (Herzstein Decl. ¶ 16.)  Accordingly, to the extent that Class Members manifest a

latent condition that they attribute to their exposure to oil and/or dispersants, the Back-End Litigation Option, not the Matrix, provides an appropriate mechanism for Class Members to seek compensation for such conditions.

**D.    Objections to the Procedural Aspects of the Specified Physical Conditions Matrix.**

171.    Some objectors argue that the proof requirements for compensation under the Matrix are too stringent, while others argue that the proof requirements unfairly fail to distinguish between those with substantial proof of their conditions from those with little proof. The Matrix, however, provides for a range of potential proof, tying the amount of payments to the amount and quality of evidence presented.  Providing a spectrum of settlement awards linked to a Class Member's level of proof is entirely appropriate.  *See*, *e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005) ("Settlement proceeds may be allocated according to the strengths and weaknesses of the various claims possessed by Class Members.") (citing *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001)).  They are also tied to the reality of litigating; the greater the proof, the more likely a plaintiff will recover at trial.

172.    Other objectors criticize the time periods in which Specified Physical Conditions must manifest themselves.  The evidence presented shows that the time periods agreed to by the Parties are appropriate and scientifically supported.  (Harbut Decl. ¶ 26; Harbut Supp. Decl. ¶ 8; Herzstein Decl. ¶ 20; Herzstein Supp. Decl. ¶ 6.)

173.    Some objectors criticize the use of the Medical Encounters Database, which tracked visits to medic stations, to prove a claim at the A3 or A4 level.  For instance, declarant Dr. Michael Robichaux claims that "the information gleaned from BP's 'Medical Encounters Database' is probably useless," basing his conclusion on a single, unidentified patient's alleged

report of a visit to a medic station during the Response Activities.   Such conclusory and unsupported "expert" testimony is unhelpful.  *See*, *e.g.*, *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) ("an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation . . . Given the absence of meaningful analysis or reasoning, the district court acted well within its discretion by discarding the . . . affidavit") (citations omitted); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005) (affirming exclusion of expert testimony that lacked sufficient grounding in facts) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term. . . .   As we so often reiterate:  'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'") (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

174.   Other objectors assert that some Clean-Up Workers were discouraged from visiting medic stations and threatened with termination if they did so.  (Docket  No. 10-7777, Rec. Doc. 92 at 9–10.)   The evidence presented, however, fails to support that allegation.   BP presented evidence that its policy required workers to report any incidents or injuries to their supervisor or Industrial Hygiene or safety personnel, and workers had resources for reporting abuse of that policy.  (Dutton Supp. Decl. ¶ 18.)   BP's key safety personnel were unaware of any such incidents, and stated that had such an incident come to light, BP would have immediately disciplined the contractor or supervisor in question, or, if necessary, dismissed them from the Response.[58]  (*Id.* ¶ 19.)   Clean-Up Workers who did not visit a medic station are also still able to

---

[58] Some objectors also suggest that they were disadvantaged because they primarily spoke Spanish rather than English.  (Docket 10-7777, Rec. Doc. 92 at 2, 8-11, 18, 20.)   Response workers who wanted to seek medical treatment could do so regardless of whether English was their primary language, and were informed of health and safety resources in other languages.  (Dutton Supp. Decl. ¶ 21.)   Several of the Class Members who objected on this

receive compensation under the Matrix by providing the same proof as Zone A and Zone B Residents.  Corroboration in a BP database is required only for payments under Levels A3 and A4 of the Matrix, but is not required for payments under Levels A1, A2, and B1 of the Matrix.

175.    One group of objectors complains that the Settlement inappropriately releases claims for certain alleged past exposures (after September 30, 2010 for Zone A Residents, after December 31, 2010 for Zone B Residents, and after April 16, 2012 for Clean-Up Workers) without providing compensation.  (Docket No. 10-7777, Rec. Doc. 124 at 15–16.)  At the outset, this objection misconstrues the Settlement terms.  Claims for injuries based on exposures to oil or dispersants after April 16, 2012 are not released.  Zone A Residents who claim injuries for exposures after September 30, 2010 are also not Class Members, and thus do not release those claims.  Zone B Residents who claim injuries from exposures after December 31, 2010 but before April 16, 2012 do release those claims, in exchange for the benefits the Settlement provides.  It is well established that parties can settle claims without providing compensation for every alleged injury.  *See, e.g., Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983); *see also Berardinelli v. General Am. Life Ins. Co.*, 357 F.3d 800, 805 (8th Cir. 2004).  Further, Class Members not satisfied with the benefits provided in the Settlement may opt out of the Settlement.

176.    The same group of objectors argues that the Settlement should provide for an appeals process.  The Settlement does provide for a right to cure defective claims (MSA § V.F.) and a right of review for erroneous determinations (MSA § V.M), additional features not found in many class settlements.  Further, the claims administration process is governed by a Matrix with objective proof standards that minimize the Claims Administrator's discretion.  The review

---

point in fact visited the medic stations set up to assist workers during the Response, as did 13,000 other workers. (Dutton Supp. Decl. ¶¶ 6, 26.)

process embodied in the Settlement is more than adequate.  An appeals process would likely result in delayed compensation to claimants and increased costs of claims administration, with little additional benefit.  It is thus routine to approve settlements without such a process.  *See*, *e.g.*, *In re WorldCom, Inc.*, 347 B.R. 123, 155 (Bankr. S.D.N.Y. 2006); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 339 (3d Cir. 2010).

177.    Another objector criticizes the absence of an arbitration/mediation mechanism in the Matrix, and suggests a "front-end" provision similar to the Back-End Litigation Option. (Docket 10-7777, Rec. Doc. 160.)  However, such a provision would effectively eliminate the fair, simple, and efficient mechanism for determining compensation provided by the Matrix, which is one of the positive features of the Settlement for Class Members.  This objection is overruled.

**E.    Objections to the Terms of the Back-End Litigation Option.**

178.    Some objectors argue that the Back-End Litigation Option's election of remedy provision is unfair because a Class Member may not pursue BP through the Back-End Litigation Option if the Class Member also files a claim, even if unsuccessful, under workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (Docket 10-7777, Rec. Doc. 124 at 29–30.)  The Court finds nothing unfair about the compromise reached by the Parties.  As with the other provisions of the Back-End Litigation Option, both sides exchanged valuable consideration related to these issues.  While Class Members must elect a remedy and waive any right to punitive damages, BP conceded that in a Back-End Litigation Option Lawsuit, it will not assert any defense based on exclusivity of remedies under workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (MSA § VIII.G.2.d.)  BP further agreed not to contest Class Member's exposure to oil and/or dispersants, or BP's liability in connection with the *Deepwater Horizon* Incident.  BP waived other defenses as well, including

that such a lawsuit is untimely, and that it barred by a claim-splitting defense.  This objection is overruled.

179.    Another group of objectors assert that exacerbation of pre-existing conditions diagnosed before April 16, 2012, should be included in the Back-End Litigation Option. (Docket No. 10-7777, Rec. Doc. 92 at 15–16.)  The Parties have stated that exacerbation of such conditions, if they meet the other requirements of a Later-Manifested Physical Condition (including time of exposure), is covered by the Back-End Litigation Option.  To the extent an individual has already recovered under the Matrix for such a condition, there is no unfairness in excluding double recoveries.  This objection is overruled.

### F.    Objections Related to the Gulf Region Health Outreach Program.

180.    One group of objectors, represented by attorney Darrell Palmer,[59] who spoke on this issue at the Fairness Hearing, contends that the Medical Settlement contains a "*cy pres*" component and thus cannot be approved.    (Docket No. 10-7777,  Rec. Doc. 124  at  21.) Mr. Palmer  did  not  specifically  identify  the  allegedly  objectionable  portion  of  the  Medical Settlement in his written objection, but apparently was referring to the Outreach Program, as he confirmed at the Fairness Hearing.  (11/8/12 Hearing Tr. at 225:20-22.)  However, the *cy pres* doctrine applies only to "unclaimed" portions of class compensation.  *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468,  474  (5th Cir. 2011) (*cy pres* doctrine applies where court must "distribute unclaimed funds").  There is no *cy pres* disposition of unclaimed settlement funds in this case.

181.    Apparently recognizing that neither of the settlements in this matter contains a *cy pres* component, Mr. Palmer changed tactics at the Fairness Hearing, and, in connection with

---

[59] Mr. Palmer has been deemed a "serial objector" by several courts.  (*See* 11/8/12 Hearing Tr. at 223:12-224:16; *see also id.* at 224:7-10 (Mr. Palmer admitting it was "regrettable" that he had been found to have engaged in "bad faith and vexatious conduct").)

his similar objection to the Economic and Property Damages Settlement, he would not even commit to whether or not that settlement involved a *cy pres* component.  (11/8/12 Hearing Tr. at 149:15-150:23.)   The apparent basis for his objection, as modified, was that the money distributed to the Outreach Program was the property of the Class and could not be distributed to non-Class Members.

182.    But the Outreach Program does not limit compensation to Class Members in any way.  Instead, it is a benefit *on top of* full compensation.  Eliminating the Outreach Program would not result in higher payments on the Matrix, which are based on negotiation of the fair value of those claims.  Rather, elimination of the Outreach Program would result in the loss of additional funding that will strengthen the healthcare infrastructure across the Gulf Coast, directly benefitting both Class Members and their communities.

183.    Other objectors complain that the Settlement contains no provision for mental health benefits.  (Docket  No. 10-7777, Rec. Docs. 182 at 2-3, 180, 185, 202, and 208.)  This objection is simply wrong.  The Outreach Program directs significant funding—$36 million— toward improving mental healthcare capacity in the region and providing mental health counseling.  Accordingly, this objection has no merit.

### G.    Objections Concerning Worker Protection.

184.    A small number of objectors claim that the Settlement Agreement provides insufficient compensation because Clean-Up Workers were not adequately protected from chemical exposures during the *Deepwater Horizon* Response.[60]   Specifically, these objectors claim that they were not provided with adequate levels of personal protective equipment ("PPE").

---

[60] Docket 10-7777, Rec. Docs. 130 at 5, 57 at 1.

185.    BP contests this fact and provided fact witness declarations that it, in coordination with the UAC, provided PPE to Clean-Up Workers pursuant to guidelines that were developed with input from qualified federal professionals from OSHA and NIOSH.  (Dutton Decl. ¶¶ 55-59; Dutton Supp. Decl. ¶ 14.)  BP also presented evidence that industrial hygiene professionals from BP, OSHA, NIOSH, and the U.S. Coast Guard, among others, regularly visited work sites to ensure that Clean-Up Workers were wearing appropriate levels of PPE, and these objectors have not provided competent evidence to the contrary.  (Dutton Supp. Decl. ¶ 15.)  In any event, these objections provide no basis to question the fairness, reasonableness, or adequacy of the Settlement.  The Settlement provides compensation for exposure-related injuries regardless of whether such injuries occurred while using PPE or not.

### H.    Objections Concerning Possible Re-Oiling or Potential Future Exposures.

186.    Some objectors raise concerns that the Medical Settlement fails to compensate for harm based on future exposures to oil and/or dispersants.[61]  These objections misconstrue the Settlement Agreement.  Class Members are not releasing claims based on future exposure to oil and/or dispersants.  Only claims for conditions caused by past exposures (as defined in the Settlement Agreement) are released.  In addition, Back-End Litigation Option rights related to later-manifesting conditions are based on past—not future—exposures.  Class Members retain the right to sue in the event that they are allegedly exposed to oil and/or dispersants in connection with the *Deepwater Horizon* oil spill after the cut-off dates provided in the Settlement Agreement.

### I.    Objections Related to the *Reed* Factors.

187.    The Sterbcow Objectors argue that the *Reed* factors weigh in favor of rejecting the Settlement Agreement.  For example, with respect to the fourth *Reed* factor (the probability

---

[61] Docket 10-7777, Rec. Docs. 124 at 12, 182 at 4, 185-5 at 18; 202-5 at 18.

of plaintiffs' success on the merits), the Sterbcow Objectors argue that "it is hard to see how the Claimants will not prevail at trial."  (Docket  No. 10-7777, Rec. Doc. 92 at 16.)  In support of this position, the Sterbcow Objectors argue that BP used chemicals, particularly Corexit® dispersants, that are toxic and "known to cause serious medical conditions."  (*Id.*)  The Sterbcow Objectors do not provide any support for these assertions, which are contradicted by the expert evidence submitted by BP.  (*See* Lees Decl. ¶¶ 44-46; Cox Decl. ¶¶ 92-93.)  Such conclusory assertions of assured victory for the Claimants do not provide a valid basis for rejecting the Settlement Agreement.  *See*, *e.g.*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1394 (D. Ariz. 1989) (rejecting objections based on "fallacious" assumption that "the case assured certain victory for Plaintiffs"), *aff'd*, 955 F.2d 1268 (9th Cir. 1992).  The Sterbcow Objectors' remaining arguments on the *Reed* factors are likewise unsupported and insufficient to show that the Medical Settlement should not be approved.

### J.    Objections Related to OPA Requirements.

188.    Certain objectors criticize the Settlement Agreement for disallowing interim claims as required by OPA.[62]  OPA does not provide for any compensation for personal injury claims.  Accordingly, such objections are legally irrelevant and require no further response.

### K.    Objections Related to Medicare.

189.    One objector criticizes the Settlement Agreement's provisions related to the protection of Class Members' and Medicare's interests regarding reimbursement for medical items, services, and prescription drugs.[63]  Medicare is entitled to reimbursement for payments for medical items, services, and prescription drugs already paid by Medicare prior to the Medical Settlement.  *See* 42 U.S.C. § 1395y(b)(2)(B)(i).  Medicare also asserts that settling claimants

---

[62] Docket 10-7777, Rec. Docs. 180 at 2–3, 185 at 3, 202 at 3.
[63] Rec. Doc. 130 at 25.

must protect the Medicare Trust Fund's interest when future medical care is claimed in litigation or the settlement releases claims for future medical care. *See*, *e.g.*, Medicare Program; Medicare Secondary Payer and "Future Medicals," 77 Fed. Reg. 35917, 35918 and 35919 (proposed June 15, 2012) (to be codified at 42 C.F.R. pts. 405 & 411); *see also, e.g.*, *Bessard v. Superior Energy Servs. LLC*, Civil Action No. 6:11-cv-0941, 2012 WL 3779162, at *1 (W.D. La. Aug. 30, 2012) ("CMS expects the settlement funds to be exhausted on otherwise Medicare covered and otherwise reimbursable services relat[ing] to what was claimed and/or released before Medicare is billed for future medical services."); *Bertrand v. Talen's Marine & Fuel LLC*, Civil Action No. 6:10-cv-1257, 2012 WL 2026998, at *3 (W.D. La. June 4, 2012) (Plaintiff recipient of settlement funds is "responsible as [the] primary payer for future medical items or services that would otherwise be covered by Medicare, which are related to what was claimed and released in this lawsuit.").

190.    As part of the Settlement Agreement, the Claims Administrator is negotiating a written agreement with the Centers for Medicare & Medicaid Services ("CMS") to establish a global resolution program, as set forth in Section XXIX.A.1 of the Settlement Agreement, to resolve all of the Medicare Program's interest in Fee-for-Service Medicare Part A and Part B recovery obligations in the settlement funds of Class Members who are or were entitled to receive benefits under the Medicare Program.[64]  This global resolution program will, if achieved, provide an efficient way to protect the Medicare Program's interests in the settlement funds while also providing significant benefits to Class Members.

191.    As set forth in Section XII of the Claims Administrator's October 22, 2012 Status Update, the global resolution program will provide numerous practical benefits to

---

[64] The potential rights of Medicare Advantage and Medicare prescription drug ("Part D") plan sponsors would be handled in a different manner, which is likewise structured to protect Class Members from future recovery claims through satisfaction and discharge of identified lien and other interests.  (MSA § XXIX.A, C, E, G–L.)

Class Members who are or were entitled to receive original Medicare benefits.  These practical benefits include (i) avoiding the delays normally associated with identifying Medicare conditional payments for the individual related to the alleged injury; (ii) satisfying all requirements of the Medicare Secondary Payer statute and its accompanying regulations to open a tort recovery record with Medicare; (iii) satisfying Class Members' conditional payment reimbursement obligations; and (iv) through recognition of "payment in full" and "final satisfaction" of all of the Medicare Program's interests, ensuring that Medicare will not deny relevant Class Members coverage for any future medical expenses they might incur in connection with their alleged injuries.  (Rec. Doc. 7729-1.)  The lien resolution provisions in the Settlement Agreement are structured to benefit Medicaid beneficiaries in similar ways.  (*See* MSA § XXIX.)  The global resolution mechanism ensures that claims payments to Medicare-entitled Class Members are not significantly delayed, which would be contrary to Class Members' interest in timely and efficient compensation.  The global resolution approach has been successfully utilized in almost all MDL settlements involving personal injury claims since 2005.  (October 22, 2012 Garretson Status Update, Rec. Doc. 7729-1 at 13.)

## L.     Objections Related to Consortium Claims.

192.   The spouses of certain purported Class Members object that the Settlement Agreement should also compensate them for their loss of consortium claims.  Spouses of Class Members do not have standing to object to the Settlement Agreement.  The Settlement Agreement does not release spouses' consortium claims, which will be governed by applicable law.  *Compare with Amchem*, 521 U.S. at 603-04 (spouses of exposed and injured

Class Members were themselves Class Members, and thus their claims for loss of consortium were extinguished under the settlement).[65]

### M.     Other Objections.

193.    A few filings styled as objections raised no substantive issues concerning the settlement.  These include objectors Ilease Bartlette (Doct 10-7777, Rec. Doc. 51), Jason Sims (Docket 10-7777, Rec. Doc. 61), Stella Chagares (Docket 10-7777, Rec. Doc. 250), and Gerald Porter (undocketed).  Ms. Bartlette filed a letter concerning alleged injuries involving another company, wholly unrelated to either BP or the *Deepwater Horizon* Incident.  Mr. Sims discusses the *Deepwater Horizon* Incident as he believes it relates to his religious views.  Ms. Chagares appeared to argue that she disagreed with the decision to set up the Gulf Coast Claims Facility, as well as how her claim to the GCCF was handled.  Mr. Porter sent a letter to BP's counsel alleging that he was injured by contact with oil and/or dispersants.  BP has presented evidence that aerial disperant operations were not conducted at night, and his assertions to the contrary are unsupported.   (Dutton Supp. Decl. ¶¶ 26, 28, 29, 31.)    Stella Chagares' objection was postmarked on October 5, 2012 (*see* Docket 10-7777, Rec. Doc. 250 at 7) and Gerald Porter's objection was postmarked to BP's counsel on September 13, 2012 (undocketed).  Therefore, both have failed to submit their objections by the deadline imposed by this Court, which was first established as August 31, 2012 (Rec. Doc. 6418 ¶ 38), and later extended to September 7, 2012

---

[65] Halliburton and Malcolm Coco also filed objections to preliminary approval of the Settlement. (Rec. Docs. 6350, 6318.)  The Court overruled these objections at the preliminary approval stage and nothing has occurred to justify a different result now. (Rec. Doc. 6419 at 14.)  Indeed, as this Court has already ruled, Halliburton has no standing to challenge the Settlement. (Rec. Doc. 7038.)  Mr. Coco has opted out of the Settlement, and also lacks standing.  Their objections also fail on the merits.  Mr. Coco argued that the Settlement discriminates against parties whose claims are resolved outside of the Medical Settlement Agreement because the Court's pre-settlement holdback order continues to apply to such claims. The fee award under the Settlement, which BP has agreed not to contest, relates to the common benefit that Class Counsel provided in connection with the Settlement itself. The PSC's original holdback motion described its many efforts (unrelated to settlement) that have purportedly provided a common benefit to all those making claims related to the *Deepwater Horizon* Incident. (Rec. Doc. 4507.)  Moreover, the funds assessed under the holdback order will be held in an escrow account until the Court ultimately determines whether the PSC is entitled to a common benefit award based on the PSC's non-settlement efforts. The continued application of the holdback is therefore not improper and does not provide any reason to reject the Settlement.

(Rec. Doc. 7225).   Both Ms. Chagares' and Mr. Porters' objections are untimely, and would therefore be overruled on that basis alone.   Regardless, the Court has considered the objections of Ms. Bartlette, Mr. Sims, Ms. Chagares and Mr. Porter and overruled them.

## CONCLUSION

For the foregoing reasons, the Court APPROVES the Parties' Settlement Agreement in all respects and as to all Parties, including BP, Class Representatives, and Class Members.   The Court has considered and overrules all the objections to the Settlement that have been made, regardless of whether or not the purported objector had standing or timely objected.[66]

---

[66] Rec. Docs. 6318, 6350, Docket 10-7777, Rec. Docs. 41, 51, 57, 61, 92, 93, 124, 130, 158, 160, 180, 182, 185, 202, 203, 205, 208, 228, 236, 243, 250; Objection of Gerald Porter (undocketed).

November 20, 2012

Respectfully submitted,

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Ellen K. Reisman
ARNOLD & PORTER LLP
777 South Figueroa Street
Los Angeles, CA 90017-5844

James P. Joseph
Ethan P. Greene
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004-1206

***Of Counsel***

*/s/ Richard C. Godfrey, P.C.*
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Elizabeth A. Larsen
Catherine Fitzpatrick
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654

*/s/ Don K. Haycraft*
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

Stephen J. Herman, La. Bar No. 23129
HERMAN HERMAN & KATZ LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: **sherman@hhklawfirm.com**


*Co-Lead Class Counsel*

James Parkerson Roy, La. Bar No. 11511
DOMENGEAUX WRIGHT ROY &
EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: **jimr@wrightroy.com**


*Co-Lead Class Counsel*


### PLAINTIFFS' STEERING COMMITTEE
### AND MEDICAL BENEFITS CLASS COUNSEL

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL  32502-5996
Office:  (850) 435-7045
Telefax:  (850) 436-6187
E-Mail: **bbarr@levinlaw.com**

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA  23510
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: **jbreit@bdbmail.com**

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  **ecabraser@lchb.com**

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  **rgreenwald@weitzlux.com**

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL  36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  **rhon.jones@beasleyallen.com**

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU
& SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  **mlundy@lundylawllp.com**

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA
& TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  **pcossich@cossichlaw.com**

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  **rtc@cunninghambounds.com**

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS  39201
Office:  (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  **mike@mikespy.com**

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  **calvinfayard@fayardlaw.com**

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Office:  (843) 216-9159
Telefax: (843) 216-9290
E-Mail:  **jrice@motleyrice.com**

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  **mpalmintier@dphf-law.com**

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW
& ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  **sterbcow@lksalaw.com**

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  **ssummy@baronbudd.com**

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX  78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  **mcwatts@wgclawfirm.com**

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA  70360
Office:  (985) 876-7595
Telefax: (985) 876-7594
E-Mail:  **duke@williamslawgroup.org**

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL  33134
Office:  (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  **ervin@colson.com**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of November, 2012.

/s/ Don K. Haycraft
Don K. Haycraft