UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : : | MDL NO. 2179 SECTION J |
| THIS DOCUMENT RELATES TO: | : : | JUDGE BARBIER |
| ALL ACTIONS | : : | MAGISTRATE JUDGE SHUSHAN |

..............................................................................................................................

**THE UNITED STATES OF AMERICA'S REPLY IN SUPPORT OF REQUESTED ADVERSE INFERENCES REGARDING FIFTH AMENDMENT INVOCATIONS**

Along with the adverse inferences sought by the PSC and Halliburton (Rec. Docs. 5873 and 5885), the United States, in accordance with Paragraph 3 of the Court's Order of August 13, 2012 (Rec. Doc. 7107), requested additional adverse inferences against BP from three of its employees, Mark Hafle, Robert Kaluza, and Brian Morel (Rec. Doc. 7637).[1] BP opposes the adverse inferences sought by all parties (BP's Response, Rec. Doc. 7879), but itself seeks adverse inferences against Halliburton and Transocean. The United States files this reply in support of the requests for adverse inferences in which it has joined, as well as those which it seeks independently.

//

//

//

//

---

[1]    In Rec. Doc. 7637, the United States also incorporated the adverse inferences sought by the PSC and Halliburton in Rec. Docs. 5873 and 5885.

## BACKGROUND AND SUMMARY OF THE ISSUE

The posture of the issue presently before the Court is governed by two rulings set out in the Court's Order of February 14, 2012 (Rec. Doc. 5682). The first ruling stated:

> The Court agrees with BP that:
>
> No matter what general rules can and cannot be drawn, there is universal agreement that no party, including the PSC, has yet to establish the required foundation for any particular inference – indeed, they have not even identified the specific inferences they seek.

(Rec. Doc. 5682 at 5.) Through their respective filing of specific adverse inferences, the parties now have satisfied the Court's first requirement. The Court's second ruling was as follows:

> BP also argues that the Court should defer ruling on the use of the invocation of the Fifth Amendment and adverse inferences until all phases of the trial are complete. It contends that the witnesses may waive their invocations of the Fifth Amendment and testify, thus urging that any drawing of inferences is premature. The Court declines to decide that issue now. For example, if findings of fact are issued at the conclusion of Phase One and before the start of Phase Two, it will be necessary to rule on the use of invocations for Phase One.

(*Id*. at 5.) We respectfully suggest that by referring to the issuance of findings of fact following the conclusion of Phase One (and before the start of Phase Two), the Court implicitly acknowledged that the inferences should be ruled upon in light of the totality of evidence *submitted at trial*, including live testimony of expert and percipient witnesses. Indeed, we believe that some evidence at trial will be so overwhelming as to particular core liability issues, especially as against defendant BP, that it will be unnecessary for the Court to pull the arrow of adverse inferences from the quiver of its fact finding tools.

Viewed against the foregoing practical and legal principles, we believe BP's listing of supposed counter or "non-corroborating" evidence is premature, as well as flawed and/or misleading from a purely evidentiary standpoint. The United States therefore suggests that the Court defer engaging in a point-by-counterpoint analysis of the adverse inferences sought by the

parties, and the supporting independent corroborative evidence submitted therewith, until *after* the submission of the evidence *and* testimony is completed at the Phase One trial.

Thus, if following the conclusion of the Phase One trial the United States (or any other party) seeks to have the Court draw any particular adverse inference, the proponent's proposed findings of fact would cite to the trial evidence supporting the inference. The inferences sought by the United States and other parties then can properly be drawn in the context of the corroborative evidence. In any event, at this juncture the United States believes that the better position is for the Court to rule upon the adverse inferences after the evidence is cast firmly in the record. Indeed, the testimonial and documentary components of the trial record may obviate the need to draw many of the inferences set out in some of the parties' papers.

Notwithstanding the foregoing, the United States provides below an *example* of a proposed adverse inference (dealing with Well Site Leader Kaluza) merely to demonstrate the extent to which BP's legal *and* evidentiary analysis is flawed. We begin with the legal standards governing the admission of adverse inferences.

## DISCUSSION

In its response, BP does not dispute the applicable legal standards that this Court set forth in its February 14th Order. In fact, BP concedes the applicable standards in *seeking* adverse inferences it requests *against* other parties, notably Transocean and Halliburton (Rec. Doc. 7641). The parties therefore agree that when engaging in a case-by-case analysis of the requested inferences, the decision as to whether a particular inference is appropriate falls within the discretion of the district court. *FDIC v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 977-978 (5th Cir. 1995).

Before engaging in the case-by-case analysis to determine the admissibility of an adverse inference, the Court may undertake a threshold two-step inquiry. *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 633-635 (E.D. Va. 2006). First, there must be a valid basis for the witness' invocation of the privilege. *Id.* In assessing the applicability of a person's Fifth Amendment privilege, the Court first should determine whether the summoned information is incriminating in nature, either on its face or in the context of the circumstances that the information is requested. *Hoffman v. United States*, 341 U.S. 479, 486-87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). Second, if the information is found to be incriminating, then the Court must then determine whether the proponent's asserted apprehension of criminal prosecution is reasonable under the circumstances. *Steinbrecher v. C.I.R.*, 712 F.2d 195, 198 (5th Cir. 1983).

Both aspects of the first prong are easily met in this case. Messrs. Hafle, Kaluza, and Morel invoked their privileges under the Fifth Amendment and refused to testify at their depositions in this matter because of the underlying potential of criminal prosecution. Without belaboring the point, the Court and the parties are aware of the existence of indictments and a criminal investigation pertaining to the BP Oil Spill and the death of eleven people aboard the *Deepwater Horizon*.[2]

The second step of the threshold analysis requires the Court to assess whether the requested inferences comply with the Federal Rules of Evidence. *U.S. ex rel. DRC, Inc.*, 415 F. Supp. 2d at 634. The general test for admissibility of evidence is whether it is relevant, that is, whether "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 and 402. The Fifth Circuit has ruled that evidence that a witness took the Fifth to avoid responding to a

---

[2] We stress that this memorandum does not make any assertions or allegations of criminal culpability as against any individual. Instead, the foregoing references are intended solely to address the legal standards applicable to the drawing of adverse inferences.

4

potentially inculpatory question is generally relevant and therefore admissible if it is not otherwise excluded by the rules:

> Because there is no constitutional bar to the admission of this evidence, it is admissible if it is relevant and not otherwise prohibited by the rules. FED.R.EVID. 402. Certainly, evidence of this nature is generally relevant. In this case, a jury could determine that a witness who colluded with Pogue took the Fifth Amendment to avoid disclosing that collusion. District courts must evaluate each witness separately when making a relevance determination; F & D fails, however, to identify specific instances in this case where a witness's invocation of the Fifth Amendment was irrelevant.

*FDIC, supra*, 45 F.3d at 977-978. BP's Response fails to set forth evidence to suggest that the requested adverse inferences run afoul of the Federal Rules of Evidence. Accordingly, the second prong has also been met.

We also point out that BP cites to and relies upon *Kontos v. Kontos*, 968 F.Supp. 400 (S.D. Ind. 1997), and *RAD Servs., Inc. v. Aetna Casualty and Sur. Co.,* 808 F.2d 271 (3rd Cir. 1986), thereby conceding that the adverse inferences of its employees – Kaluza, Hafle, and Morel – may be imputed to BP. As stated in *RAD Services*, 808 F.2d at 275 (and quoted in *Kontos*, 968 F.Supp. at 406-407):

> [N]othing forbids imputing to a corporation the silence of its personnel. On the one hand, Fed.R.Evid. 801(d)(2)(D) excepts from the hearsay rule a statement offered against a corporate party and made by its 'agent or servant concerning a matter within the scope of his agency or employment ... during the existence of the relationship....' The bases for admitting these vicarious admissions against the corporation also justify informing the factfinder when the corporation's agent invokes the Fifth Amendment privilege.

In turning to the case-by-case analysis, the "overarching concern" in assessing the propriety of drawing a negative inference from assertion of the Fifth Amendment privilege by a non-party is "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti v. United States,* 107 F.3d 110, 124 (2d Cir. 1997). BP asserts that before an adverse inference may be drawn from a non-party's refusal to testify in a

civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege. *Kontos v. Kontos, supra,* 968 F.Supp. at 408-109 (citing cases). Regardless of whether or not that is in fact the case with respect to employees and agents of a party, the record which will be adduced at trial would more – far more – than satisfy such a criterion.

BP contends that the United States (and others) failed to corroborate specific adverse inferences with independent evidence (BP's Response at 9). As we explained above, BP's argument is premature and a *non-sequitur* given the fact that evidence has yet to be introduced at the Phase One trial. The Response also argues, notably without any legal authority, that a negative inference from a witness's invocation of the Fifth Amendment is "inappropriate" if it is "contradicted by record evidence." (BP's Response, Ex. B at 38.) As will be shown at the conclusion of the evidence at trial, *neither* argument has merit and the adverse inferences requested by the United States and others should be admitted by the Court for its consideration with the totality of the evidence presented at the trial.

In order to give context to the present discussion, the United States provides the following example of an adverse inference merely to demonstrate the extent to which BP's argument is legally and factually flawed.

> **Kaluza Proposed Adverse Inference No. 33:** Kaluza observed the circulating pressure on the Macondo well was very low after BP completed its attempts to convert the float equipment. Kaluza stated that something may have blown in the well or there may have been a hole in the casing string that was causing the low circulating pressure readings. (Rec. Doc. 7637-3 at 18-22.)[3]

---

[3] The "float equipment" refers to the "float collar," which was a mechanical device used as part of BP's disastrously unsuccessful attempt to cement the production casing. BP's own "Bly Report" admits that the float collar played a critical role in failing to prevent the fatal blowout on April 20th. [Bly Report, TREX-00001, p. 30 (BP's "Swiss Cheese" illustrative causation model, "Mechanical Barrier" failure), pp. 36-37 ("Key Finding No. 2"), pp. 70-72.]

6

BP contends that the adverse inference to be drawn from Kaluza No. 33 is inappropriate because it is contradicted by record evidence (BP's Response, Exh. B at 38). To begin with, the thrust of BP's argument borders on bad faith. The record is clear that the inference is more than adequately supported by the evidence. For example, BP ignores the corroboration provided by deposition witness Nathaniel Chaisson, who testified:

> Q. Okay. Now, when Mr. Kaluza told you that he was afraid that something had been blown higher up in the casing, who was present when he made that comment to you in addition to you and him?
>
> [Objection.]
>
> Q. If anyone?
>
> A. As I stated, he didn't make it directly to me, it was made in the presence of all the individuals on the rig floor at that particular time.

(Chaisson Deposition, Vol. 2, pp. 695-696.) In addition to Chaisson's testimony, the inference is buttressed by written notes that Chaisson took aboard the rig *contemporaneously* with Kaluza's admission and statement made, quoting Chaisson's sworn testimony, to "all the individuals on the rig floor at that particular time." (*See*, TREX-00718.) Moreover, BP's Houston-based engineer, Brian Morel, was aboard the rig and witnessed the events described in the proposed adverse inference relating to Kaluza. As declared by Morel in an admission dated April 19th (Morel also has invoked the Fifth Amendment):

> From: Morel, Brian P <Brian.Morel@bp.com>
> To: Clawson, Bryan R
> Sent: Mon Apr 19 18:29:52 2010
> Subject: RE: Circulation
> Yah we blew it at 3140, still not sure what we blew yet.

(TREX-02584 at BP-HZN-MBI 00129068, highlighting added.) In addition to the foregoing, the following are further *examples* of the corroborating evidence which will be introduced at trial:

- TREX 7 (BP Internal Investigation Team Notes of Interview of Brian Morel; Transcription of Brian Morel Interview notes - panel: Rex Anderson, Matt, Lucas, Jim Wetherbee & Warren Winters - Handwritten Interview Notes by Jim McKay)
- TREX-01814 (E-Mail - From: Maxie, Doyle Sent: Tue Apr 20 15:34:08 2010 - Subject: VH)
- TREX-03188 (Bob Kaluza Interview - Wednesday 28th April 2010 - Typed notes)
- TREX-00713 at 5-6 (Email from Chaisson to Gagliano, Subject: BP/ Horizon/ Post Job Report, attaching 9.875" x 7" Foamed Production Casing Post Job Report - Prepared for Jesse Gagliano)
- TREX-07605 (E-mail 16 April 2010 from Brian Morel to Doyle Maxie)
- Deposition testimony of Nathaniel Chaisson at pp. 266:14-274:4; 337-343; 692:2-696
- Deposition testimony of John Guide at pp. 209:20-215
- Deposition testimony of Doyle Maxie at pp. 87:2-89:8; 94:2-95:10; 215:6-216:11; 223:12-23
- Deposition testimony of Brett Cocales 832:4-834:20; 836:3-837:20
- TREX-02584 (Morel April 19th e-mail to Clawson)
- TREX-00718 (Chaisson Tally Book)

In any event, there is no prohibition to the admission of an adverse inference simply because there is some scintilla of contrary evidence in the record, and BP cites no authority for its unsupported position. In arguing that the adverse inference in Kaluza No. 33 is "inappropriate" because it is allegedly "contrary" to evidence, BP is suggesting that Mr. Kaluza's refusal to answer questions concerning the low circulating pressure is inadmissible because the inference sought from his silence is not credible. Regardless of the fact that BP's argument is not credible, a determination regarding the credibility of evidence is not valid grounds for exclusion of that evidence. *See Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1153-54 (5th Cir. 1981).

Under Rule 403 of the Federal Rules of Evidence, a district court must conduct a balancing test regarding the admissibility of the evidence and may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *Id*. "Rule 403 does not permit exclusion of evidence because the judge does not find it credible." *Id*. at 1154, *citing United States v. Thompson*, 615 F.2d 329, 333 (5th Cir. 1980).

"Weighing probative value against unfair prejudice under (Rule) 403 means probative value with respect to a material fact if the evidence is believed, not the degree the court finds it believable." *Id.* at 1154 (citations omitted). Moreover, "[w]hile the strength and cogency of the adverse inference should, of course, be tested against other evidence in the case, 'the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation.'" *LiButti,* 107 F.3d at 124, *citing United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 83 (2d Cir. 1995).

Here, the imposition of the adverse inference requested by the United States in Kaluza No. 33 conforms with Rule 403 of the Federal Rules of Evidence. Mr. Kaluza's silence in response to questions concerning the low circulating pressure is probative. *See LiButti*, 107 F.3d at 124. The exact probative value, risk of prejudice, and the extent to which the inference is supported by other evidence in the record and is otherwise trustworthy under all of the circumstances, should be addressed by the Court at the conclusion of the Phase One trial.

BP's analysis in response to Kaluza No. 33 is further flawed in that BP fails to address Mr. Kaluza's observations and comments regarding the anomalous low circulating pressure that he observed before the cement job began. (BP's Response, Exh. B at 38). Rather, BP provides the Court with a discussion of its attempts to convert the float equipment on the Macondo well.

However, the United States would seek the requested inference against BP to support the fact that Mr. Kaluza, one of BP's Well Site Leaders on board the *Deepwater Horizon* on April 19, 2010, was monitoring BP's attempts to establish circulation on the well and convert the float equipment. After circulation was established on the Macondo well and BP declared the float equipment "converted," Mr. Kaluza observed lower than anticipated circulating pressures on the Macondo well ***before*** BP authorized the cement job to begin. Mr. Kaluza acknowledged that the

9

circulating pressure was "low" and "unusual," and was an indication of a potential problem down hole by stating "something may have blown in the well" and "there may have been a hole in the casing string."

Despite Kaluza's observations and comments concerning the anomalous, low circulating pressure readings – as well as Morel's ignominiously cavalier, "Yah we blew it at 3140, still not sure what we blew yet" – *BP nonetheless proceeded with pumping the safety-critical cement job that so horribly failed, without first determining the cause of the lower than anticipated circulating pressure or understanding the reasons for the discrepancies with modeling predictions made by M-I SWACO.* This disastrous action – or, more accurately, this disastrously inexplicable omission – was yet *another* critical piece of BP's causal chain of gross negligence and willful misconduct that led to the BP Gulf Oil Spill and the tragic, entirely preventable deaths of eleven men.[4]

Accordingly, after the admission of the relevant evidence at the Phase One trial, the adverse inference will be admissible against BP.

## CONCLUSION

For the reasons set forth herein, the United States respectfully requests that at the conclusion of the presentation of the totality of the evidence at trial, the Court admit the United States' requested adverse inferences against BP.

---

[4] At trial, there will be overwhelming evidence of BP's culpability in the failure of the cement job of the production casing. For present purposes and context, it is sufficient to point out that BP's "Bly Report" accepts responsibility – albeit less than full responsibility – for the cementing failure. [Bly Report, TREX-00001, p. 30 (BP's "Swiss Cheese" illustrative causation model, "Annulus Cement" failure), pp. 33-36 ("Key Finding No. 1").]

Dated: November 21, 2012.                                Respectfully submitted,

| | |
|---|---|
| IGNACIA S. MORENO | BRIAN HAUCK |
| Assistant Attorney General | Deputy Assistant Attorney General |
| Environment & Natural Resources Div. | Civil Division |
| JAMES NICOLL | PETER F. FROST |
| Senior Counsel | Director, Torts Branch, Civil Division |
| NANCY FLICKINGER | Admiralty and Aviation Senior |
| Attorney | STEPHEN G. FLYNN |
| SARAH HIMMELHOCH | Assistant Director |
| Senior Attorney | MICHELLE DELEMARRE |
| DEANNA CHANG | SHARON SHUTLER |
| SCOTT CERNICH | JESSICA SULLIVAN |
| A. NATHANIEL CHAKERES | JESSICA MCCLELLAN |
| RACHEL HANKEY | JILL DAHLMAN ROSA |
| ABIGAIL ANDRE | MALINDA LAWRENCE |
| JUDY HARVEY | ROBIN HANGAR |
| MATT LEOPOLD | LAURA MAYBERRY |
| JEFFREY PRIETO | BRIENA STRIPPOLI |
| TOM BENSON | Trial Attorneys |
| GORDON YOUNG | Torts Branch, Civil Division |
| BETHANY ENGEL | |
| Trial Attorneys | |

| | |
|---|---|
| /s/ Steven O'Rourke | /s/ R. Michael Underhill |
| STEVEN O'ROURKE | R. MICHAEL UNDERHILL, T.A. |
| Senior Attorney | Attorney in Charge, West Coast Office |
| Environmental Enforcement Section | Torts Branch, Civil Division |
| U.S. Department of Justice | U.S. Department of Justice |
| P.O. Box 7611 | 7-5395 Federal Bldg., Box 36028 |
| Washington, D.C. 20044 | 450 Golden Gate Avenue |
| Telephone: 202-514-2779 | San Francisco, CA 94102-3463 |
| E-mail: steve.o'rourke@usdoj.gov | E-mail: mike.underhill@usdoj.gov |

JIM LETTEN, United States Attorney
SHARON D. SMITH, Assistant United States Attorney
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I hereby certify that, today, the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Dated: November 21, 2012.                                   /s/ R. Michael Underhill
                                                            United States Department of Justice