UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Actions ……………………………………………... | : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

### BP'S REPLY IN SUPPORT OF ITS MOTION FOR ADVERSE INFERENCES BASED ON ASSERTIONS OF THE FIFTH AMENDMENT

Defendants, BP Exploration & Production Inc. and BP America Production Company (collectively "BP"), file this Reply in Support of Its Motion for Adverse Inferences Based on Assertions of the Fifth Amendment and in support thereof, state as follows:

### BACKGROUND

BP filed its Motion for Adverse Inferences Based On Assertions of the Fifth Amendment on October 12, 2012, *see* Doc. No. 7645 ("BP's Mot."), seeking adverse inferences against Halliburton and Transocean based on invocations of the Fifth Amendment by their respective employees. Halliburton filed its Response to Motions Seeking Adverse Inferences Against HESI Based On Assertions of the Fifth Amendment, *see* Doc. No. 7848 ("HESI's Opp."), and Transocean filed its Opposition to All Motions for Adverse Inferences Against Transocean, *see* Doc No. 7844 ("TO's Opp."), on November 5, 2012.

### ARGUMENT

To start, Halliburton and Transocean both generally agree with the standard BP has articulated—specifically, that the Court must evaluate each proposed inference on a case-by-case basis. *See F.D.I.C. v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 978 (5th Cir. 1995). The test for determining whether an adverse inference is warranted ensures that:

1

- Each invocation of the Fifth Amendment supporting the inference is valid;

- Drawing an inference will not circumvent the Federal Rules of Evidence;

- Each inference is supported by independent corroborative evidence; and

- Each inference "is trustworthy under all of the circumstances and will advance the search for the truth."

In their Response briefs, however, Halliburton and Transocean often misapply and inappropriately extend the test in an attempt to support their arguments as to why the Court should not draw appropriate inferences against them.  Further, both Halliburton's and Transocean's specific objections lack merit.  A proper application of the case-by-case analysis weighs in favor of admitting the inferences BP seeks against Halliburton and Transocean.

## I. The Court Should Admit the Inferences BP Seeks Against Halliburton.

Halliburton concedes that, with respect to the inferences BP seeks against it, BP has satisfied all of the requirements necessary to establish the inferences except for one. Specifically, Halliburton's lone criticism of BP's Motion focuses on the corroborating evidence BP cites in its Motion and whether that evidence is sufficient.[1]  The Court should admit the inferences BP seeks against Halliburton because: (a) Halliburton's objections to BP's corroborating evidence are meritless; and (b) BP's corroborating evidence supports the requested inferences.

---

[1] Halliburton also argues that the Court should reject the proposed inferences against it because the inferences are based on objectionable lines of questions by BP, the PSC, and the United States. HESI's Opp. at at 8-9. But Halliburton does not state with any particularity which questions, if any, were objectionable.  Rather, Halliburton merely cites generally to its Objections to the Deposition Designations of Christopher Haire as purported support for its argument that the question underlying these inferences "contradicts evidence in the record, calls for speculation, addresses topics that are outside of the witness's knowledge, and/or otherwise lacks foundation." *Id*.  It is neither BP's nor the Court's responsibility to sift through Halliburton's deposition designation objections and determine which, if any, has merit.  If Halliburton actually believed that any of the questions underlying the inferences BP seeks circumvent the Federal Rules of Evidence, it would have—and should have—argued so with specificity in its Response.

2

A.  **Halliburton's objections to BP's corroborating evidence are meritless.**

BP cites three pieces of corroborating evidence in its initial brief that directly support the inferences that it seeks against Halliburton based on Mr. Haire's invocation of the Fifth Amendment:

- TREX-3652, a June 10, 2010 email from Mr. Haire in which he states that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* (emphasis added). TREX-3652 supports BP's requested inference because it provides direct evidence of Mr. Haire's role, in his own words, in both performing and interpreting the negative test.

- TREX-47643, a video segment from NBC Houston Local 2 News that features Mr. Haire's statements regarding the negative pressure test.  The video segment indicates that Mr. Haire was "the man who monitored the last two negative tests performed on the well," and shows Mr. Haire *expressing in his own words* that he "didn't see anything that indicated a good negative test on the rig floor," that four Transocean employees told Mr. Haire "that they had performed their negative test up on the rig floor and they were going to carry on with operations," and that "I was instructed they had got a good negative test." *Id.* (statements made during video from 1:07 to 2:00 minute mark).

- TREX-3683, a July 28, 2010 NBC Houston Local 2 News article titled "More Doubts About Procedures Hours Before Rig Explosion," which is based on the same interview with Mr. Haire that is reflected in TREX-47643.  This news article similarly indicates that "Haire said he was also the man who monitored the last two 'negative Tests' performed on the well," that "Haire said both tests gave a definite indication there was a problem with the well" and "I didn't see anything that indicated a good negative test on the rig floor," and that "Haire said four Transocean employees explained a third pressure test had been performed on the rig floor and everything was OK." *Id.*

Notably, Halliburton's Response does not (because it cannot) challenge the authenticity of these exhibits or the substance contained therein.  As described below, the deposition questioning and BP's requested inferences directly track Mr. Haire's statements to the media as reflected in these exhibits.  At Mr. Haire's deposition, BP asked Mr. Haire to confirm the statements that he made to the media regarding his activities on the *Deepwater Horizon* on April 20, 2010, but Mr. Haire asserted the Fifth Amendment in response to even basic foundational questions regarding the interviews.  *See e.g.*, C. Haire Dep. at 120:15-121:7 ("Q. This article is based on an interview that you gave to KPRC Local 2 News, right? A. Fifth. Q. This article

3

correctly reflects what you told KPRC Local 2 News in that interview; is that correct? A. Fifth."). Mr. Haire cannot both be allowed to make public statements to the media and then refuse at his deposition to confirm those same statements with the end result being exclusion of his public statements on hearsay grounds. Indeed, this is precisely why an adverse inference is appropriate with respect to this information. Halliburton should not benefit from Mr. Haire's refusal to testify by keeping each of these exhibits (or their contents) out of the record on the basis of his refusal to authenticate them when asked directly to do so.

As shown below, BP seeks inferences that directly track Mr. Haire's public statements that he monitored the negative pressure tests, that he did not see any evidence of a successful test, that he did not consider the negative pressure tests to be successful, that Transocean personnel told him there was a successful negative pressure test that Mr. Haire was not involved in, and that he did not elevate his concerns about the lack of a successful negative test or stop the job.

In its opposition, Halliburton argues that TREX-47643 and TREX-3683 "cannot be considered by the Court at trial because they constitute hearsay." HESI Opp. at 5. But there is no dispute that Mr. Haire was a Halliburton employee performing Halliburton cement work on the *Deepwater Horizon* on April 20, 2010. As such, these exhibits contain Mr. Haire's statements and are party admissions by Halliburton, and are thus not hearsay under Fed. R. 801(d)(2). These exhibits also reflect statements against interest, and therefore fall into a permissible exception to hearsay under Fed. R. 804(b)(3).

**B.   BP's corroborating evidence supports the requested admissions.**

Halliburton contends that TREX-3652 (the June 10, 2010 email from Mr. Haire) "does not support the multiple adverse inferences BP requests." Rec. Doc. 7848 at 6. As explained above, Mr. Haire's statements are admissible against Halliburton as party admissions. Notably,

4

Halliburton does not contend that the video segment and article do not support the requested inferences. As shown in the following table, BP's requested inferences are based on questions to which Mr. Haire refused to respond at his deposition, and are consistent with the statements he made in the interview and in the email he wrote to a Halliburton cementer.

| Requested Inference | Deposition Testimony | Corroborating Evidence |
|---|---|---|
| Haire monitored the two negative tests performed through the drill pipe. | **Q. You were responsible for monitoring the two negative tests performed through the drill pipe; is that right?** A. I'll take the Fifth. (122:24-123:6) | TREX-47643: "He was also the man who monitored the last two negative tests performed on the well."<br><br>TREX-3683: "Haire said he was also the man who monitored the last two 'negative Tests' performed on the well." |
| Haire monitored pressure and bled off pressure during the negative test on April 20, 2010. | **Q. And during the negative test, you monitored and reported pressures; is that right?** A. Fifth. (123:7-10)<br><br>**Q. You also bled off pressure and reported the number of barrels that were flowing back; is that right?** A. Fifth. (123:11-14) | TREX-47643: "He was also the man who monitored the last two negative tests performed on the well. These tests determine whether the pressure in the well is stable and no fluids are shooting back to the surface."<br><br>TREX-3683: "Haire explained, among other tasks, during a negative test he monitors tanks on the rig to see if any fluid comes from the well when pressure needed to keep the well closed is relieved." |

5

| **Requested Inference** | **Deposition Testimony** | **Corroborating Evidence** |
|---|---|---|
| Haire bled back 23 barrels during the first negative test, when he only expected to get three to five barrels, which raised a red flag. | **Q. And you bled off that pressure and got back 23 barrels; is that right?** A. Fifth. (124:8-10)<br><br>**Q. And in your experience, you expected to see only three or five barrels come back from the well, right?** A. Fifth. (124:14-19)<br><br>**Q. But you got 23 barrels here, which is unusual, right?** A. Fifth. **Q. This raised a red flag to you, correct?** A. Fifth. (124:20-25) | TREX-3683:<br>"Haire said during the first test, 23 barrels of seawater filled the tanks before pressure was applied to close the well . . ."<br>"Haire said in his experience he expected to see only three to five barrels come from the well." |
| When Haire bled back pressure on the kill line during the second negative test, he observed 15 barrels of seawater and was unable to bleed pressure to zero before shutting in the well, which raised a red flag (126:3-127:2). | **Q. And when you bled off pressure through the kill line, you'd agree with me that you got 15 barrels of seawater back, correct?** A. Fifth. (126:3-7)<br><br>**Q. And you were not able to bleed the pressure down to zero before shutting in the line; is that correct?** A. Fifth.<br>**Q. Based on your experience as a cementer, this was another red flag because of the amount of volume, correct?** A. Fifth. (126:12-21) | TREX-3683:<br>"Haire said during the second test 15 barrels of seawater filled the tanks before the well was closed again." |

6

| Requested Inference | Deposition Testimony | Corroborating Evidence |
|---|---|---|
| Haire did not observe a successful negative test in the two tests that he performed. | **Q. And during the negative test that you worked on, you did not see anything indicating a successful negative test; is that right?** A. Fifth. (129:17-21) | TREX-47643:<br>"In fact, Haire tells us both tests gave a definite indication there was a problem with the well. After reporting the results to both Transocean and BP officials, he waited. After an hour of getting no word back from anyone, he walked down to the rig floor to find out what was going on."<br><br>TREX-3683:<br>"Haire said both tests gave a definite indication there was a problem with the well."<br><br>TREX-3652: |
| Haire was not satisfied with the results of the first or second negative test. | **Q. And as we discussed earlier, you were not satisfied with the results of the first negative tests, right?** A. Fifth. (134:20-23)<br><br>**Q. You were not satisfied with the second negative test; is that correct?** A. Fifth. (135:8-10) | TREX-47643:<br>"I didn't see anything that indicated a good negative test on the rig floor."<br><br>"In fact, Haire tells us both tests gave a definite indication there was a problem with the well."<br><br>TREX-3683:<br>"Haire said both tests gave a definite indication there was a problem with the well."<br><br>"'I didn't see anything that indicated a good negative test on the rig floor,' said Haire." |

| Requested Inference | Deposition Testimony | Corroborating Evidence |
|---|---|---|
| Haire went up to the rig floor to investigate. Four Transocean employees told Haire that a third negative test was successful. | **Q. And when you went to -- to the rig floor, you were told by Transocean that a third test you were not involved in had passed; is that right?** A. Fifth. (136:15-23)<br><br>**Q. You met with four Transocean employees at that time; is that right?** A. Fifth.<br><br>**Q. And these Transocean employees told you that a third negative test had been performed; is that correct?** A. Fifth again.<br><br>**Q. And they told you that this third negative test was successful; is that right?** A. Fifth. (127:22-128:14) | TREX-47643:<br>"In fact, Haire tells us both tests gave a definite indication there was a problem with the well. After reporting the results to both Transocean and BP officials, he waited. After an hour of getting no word back from anyone, he walked down to the rig floor to find out what was going on."<br><br>"They told me that they had performed their negative test up on the rig floor and they were going to carry on with operations to go ahead and get my cement job procedure ready."<br><br>"Haire says the four Transocean employees he talked to on the rig floor told him they had performed a third pressure test and everything was ok."<br><br>TREX-3683:<br>"Haire said four Transocean employees explained a third pressure test had been performed on the rig floor and everything was OK."<br><br>"'They told me they had performed their negative test on the rig floor and they were going to carry on with operations to go ahead and get my cement job procedure ready,' said Haire." |
| Haire found it strange that he was not involved in the third negative test. | **Q. You thought this was strange that you were not involved in the test, right?** A. Fifth. (136:24-137:6) | TREX-47643:<br>"Still, Haire said he found it strange a third test would have been done without telling him or giving him any information."<br><br>TREX-3683: "Still, Haire said he found it strange a third test would have been done without telling him or giving him any information." |

8

| **Requested Inference** | **Deposition Testimony** | **Corroborating Evidence** |
|---|---|---|
| And, when Haire went to the rig floor to investigate, he did not see anything indicating a successful test there. | **Q. And when you went to the rig floor, you did not see anything indicating a successful negative test; is that right?** A. Fifth. (129:22-130:4) | TREX-47643: "I didn't see anything that indicated a good negative test on the rig floor." <br><br>TREX-3683: "'I didn't see anything that indicated a good negative test on the rig floor,' said Haire." |
| Haire personally saw no evidence indicating a successful negative test. | **Q. And you personally had no indication on the rig that the negative tests were successful; is that right?** A. Fifth. (136:7-14) | TREX-47643: "I didn't see anything that indicated a good negative test on the rig floor." <br><br>TREX-3683: "'I didn't see anything that indicated a good negative test on the rig floor,' said Haire." |
| Haire did not elevate his concerns about the failed negative tests to BP, Halliburton or Transocean. | **Q. And despite your concerns, you took no action regarding the negative test, right?** A. Fifth. (137:7-14) <br><br>**Q. You did not elevate your concerns to BP about the negative test, right?** A. Fifth. (137:15-22) <br><br>**Q. You did not elevate your concerns to any supervisor within Halliburton, right?** A. Fifth. (137:23-138:3) <br><br>**Q. You did not seek out the Transocean OIM or captain to address your concerns; is that right?** A. Fifth. (138:4-9) | TREX-47643: "Haire says he trusted what he was told and went back to his quarters to begin prep work for the final cement seal to be placed in the well." <br><br>TREX-3683: "Haire said he trusted what he was told and went back to his quarters to begin prep work for the final cement seal to be placed in the well." |
| Haire did not attempt to stop work. | **Q. At any time, you did not stop work or attempt to stop work on April 20th; is that correct?** A. Fifth. (138:10-13) | TREX-3683: "Still, Haire said he is plagued by 'what if's?' 'Was there something I could have done? Was there something I could have said to have made this more of an alarm?' said Haire." |

9

**II.     The Court Should Admit the Inferences BP Seeks Against Transocean.**

The Court should admit the inferences BP seeks against Transocean because: (a) Transocean often misapplies and inappropriately extends the test for admitting an adverse inference; and (b) Transocean's objections are unexplained and largely unsubstantiated.

**A.     Transocean misapplies and inappropriately extends the standard.**

Transocean agrees with BP that the Court should set a high bar for admitting inferences. Nevertheless, Transocean inappropriately extends and misapplies the test for admitting an adverse inference. For example, Transocean correctly states that the Court may only draw an adverse inference if the inference is supported by independent, corroborating evidence. TO Opp. at 3. But Transocean then attempts to expand the test by stating that the parties must "demonstrate with adequate specificity that the witnesses invoked the Fifth Amendment rights 'in response to' corroborating evidence." TO Opp. at 3-4. In other words, Transocean argues that even if there is corroborating evidence to support an inference, the Court may not admit that inference unless the evidence was presented to the deponent at deposition and caused the deponent to invoke the Fifth Amendment. There is no support for this proposition in the case law and, not surprisingly, Transocean cites nothing in support of its argument. As long as the inference is supported by other evidence, the role of corroborating evidence has been fulfilled.

Similarly, Transocean argues that the *LiButti* factors weigh against admitting the inferences here because "a number of employees were formally adverse to Transocean, having filed lawsuits arising from the blowouts, and others had retained counsel and pursued settlements without initiating formal litigation." TO Opp. at 4. But the first *Libutti* factor—the nature of the relationship—typically weighs in favor of admitting inferences against employers based on invocations of their employees. *LiButti v. U.S.*, 107 F.3d 110, 123 (2d Cir. 1997) ("The closer

10

the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship."). Here, the Transocean employees' personal injury claims against Transocean do not extinguish that bond because drawing inferences damages them *in addition to* Transocean. Given the totality of the circumstances, these employees are more aligned with Transocean's interests than against. Thus, the fact that these witnesses had claims against Transocean does not mean the adverse inferences are untrustworthy.

### B. Transocean's objections are unexplained and unsubstantiated.

The Court should admit BP's inferences because Transocean's objections are unexplained and groundless. The thrust of Transocean's opposition is that the Court should reject the inferences BP seeks because the questions posed circumvent the Federal Rules of Evidence. TO Opp. at 6-11. In support, Transocean provides a glossary of general objections in its memorandum and then throws the kitchen sink of objections at each inference BP seeks. *See, e.g.*, TO's Opp. at A2. Transocean expects the other parties, and the Court, to figure out how and why their objections apply to each inference. It was Transocean's task to state its objections in its Response brief; neither BP nor the Court are obligated to do Transocean's work for it. Moreover, Transocean's objections lack merit, as explained below.

#### 1. Foundation

Transocean's objections to questions on foundational grounds are improper. Transocean asserts a foundation objection to questions that are themselves foundational. For example, BP seeks an adverse inference against Transocean that: "Mr. Harrell had overall responsibility for all activities on the *Deepwater Horizon* while it was latched to the well." BP Mot. at 16. Along with other objections, Transocean objects to the inference on the basis of foundation. This

adverse inference is not objectionable, however, because it is a foundational question; it seeks information about Mr. Harrell's duties as the Offshore Installation Manager ("OIM"). Furthermore, this adverse inference is supported by other evidence in the case. *See, e.g.*, TREX-0939 ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████; *see also* D. Winslow Dep. at 484:8-485:17.

As another example, BP seeks an adverse inference against Transocean that: "As Maintenance Supervisor, Mr. Bertone was responsible for planning, execution, and accurate recording of the maintenance in accordance with Transocean's maintenance management system." BP Mot. at 29. Along with other objections, Transocean objects to the inference on the basis of foundation. Again, this adverse inference is not objectionable because it is a foundational question; it seeks information about Mr. Bertone's duties as the maintenance supervisor. Moreover, this adverse inference is supported by evidence in the case. *E.g.*, TREX-3342 ████████████████████████████████████. Thus, contrary to Transocean's objections, there cannot be a valid foundation objection to questions that are themselves foundational and ask about the employee's duty or scope of knowledge.

In addition, Transocean objects on foundation grounds to questions that Transocean employees should have had the foundation to answer. Indeed, if the Transocean employees did not have the foundation to answer such questions, that fact, in and of itself, would support Transocean's liability. For instance, Transocean objects to the following adverse inferences from Mr. Harrell's testimony on the basis of foundation: "Transocean was responsible for well control on the *Deepwater Horizon* on the night of April 20, 2010" and "Transocean was responsible for constantly monitoring the well, identifying kicks and shutting in the well in the

12

case of a kick." TO Opp. at A9. Mr. Harrell, as the OIM for the *Deepwater Horizon* and the overall responsible person for drilling, should know when the drill crew is supposed to monitor the well. Similarly, Transocean objects to the following adverse inference from Captain Kuchta's testimony on the basis of foundation: "Under the Transocean dual command structure, the OIM is in charge while the rig is on station and attached to the well, while the Master is in charge when the rig is moving from Point A to Point B during an emergency." TO Opp. at A16. Again, Captain Kuchta, as the Master, should know when he is in command of the vessel as opposed to Mr. Harrell. Furthermore, the adverse inferences are supported by the record. *See, e.g.*, TREX-1452 ▮; TREX-1453, ▮; TREX-1454 ▮; TREX-1356 (Drilling Contract ¶¶ Articles 15.2, 15.6); B. Ambrose Dep. at 279:9-12, 322:20-24; 323:8-11; R. Ezell Dep. at 309:10-16. *See also* TREX-0939 ▮; TREX-3755 (Operations Manual - Deepwater Horizon, 2. Organization and Responsibilities) at BP-HZN-MBI00011579–80; J. Canducci Dep. at 453:7-15; M. Burgess Dep. at 364:20-365:21; A. Rose Dep. at 213:2-24.

2. **Foundation (Expert)**

Transocean's objections to questions on foundation (expert) grounds are improper as well. Transocean uses foundation (expert) to object to questions calling for answers that should be well within the scope of knowledge of the particular Transocean deponent. *See U.S. v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010) ("A witness who provides only lay testimony may give limited opinions that are based on the witness's perception and that are helpful in understanding the testimony or in determining a fact in issue."); *DIJO, Inc. v. Hilton Hotels*

13

*Corp.*, 351 F.3d 679, 685 (5th Cir. 2003) ("Nevertheless, it has always been the rule that lay opinion testimony may be elicited [] if it is based on the witness's first-hand knowledge or observations."); *see also U.S. v. Freeman*, 619 F.2d 1112, 1120 (5th Cir. 1980) (admitting testimony of two witnesses about their "impression" and "understanding" of defendants' relationship to each other and to the different companies because it was rationally based on the perception of the witnesses and helpful to a clear understanding of their testimony or the determination of a fact in issue).

For instance, BP seeks the following adverse inference based on the testimony of Stephen Bertone, Transocean's maintenance supervisor / chief engineer on the *Deepwater Horizon*: "Transocean failed to maintain a sufficient amount of manpower to maintain and repair the *Deepwater Horizon*." BP Mot. at 30. Transocean objects to the inference on the basis of foundation (expert). As the maintenance supervisor and chief engineer, Mr. Bertone should be able to opine about whether he has sufficient manpower to maintain the vessel. In fact, Mr. Bertone did offer opinions on this issue before the incident. *See* TREX-3405 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; TREX-5297 (10/30/09 Email from S. Bertone re: Rig Down Time) at TRN-INV-00695743 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. If Mr. Bertone actually lacks the foundation to know whether he has sufficient manpower to maintain a drilling vessel, then Transocean has inadequately trained him.

14

As another example, BP seeks the following adverse inference against Transocean based on Mr. Harrell's testimony: "If mud is coming out of the riser, Transocean should divert overboard rather than divert to the mud gas separator." BP Mot. at 19. Transocean objects to the inference on the basis of foundation (expert). As OIM, Mr. Harrell should have the foundation to answer this question as such knowledge is essential to the safety of the crew as well as the vessel. Indeed, this inference already is corroborated by statements Mr. Harrell gave in his interview with Transocean. *See* TREX-3801 (Transocean's Interviewing Form for Jimmy Harrell), at TRN-INV-00001864; *accord* B. Ambrose Dep. at 266:15-24, 286:6-18. Nonetheless, if Mr. Harrell lacks the foundation to answer such questions, then Transocean has inadequately trained him.

### 3. Opinion

Similar to Transocean's foundation and foundation (expert) objections, its objections on the basis of opinion are invalid. *See McMillan*, 600 F.3d at 456 ("A witness who provides only lay testimony may give limited opinions that are based on the witness's perception and that are helpful in understanding the testimony or in determining a fact in issue."); *DIJO*, 351 F.3d at 685 ("Nevertheless, it has always been the rule that lay opinion testimony may be elicited [] if it is based on the witness's first-hand knowledge or observations."); *see also Freeman*, 619 F.2d at 1120 (admitting testimony of two witnesses about their "impression" and "understanding" of defendants' relationship to each other and to the different companies because it was rationally based on the perception of the witnesses and helpful to a clear understanding of their testimony or the determination of a fact in issue).

For example, Transocean objects to the following adverse inference from Mr. Harrell on the basis of opinion: "Transocean was responsible for constantly monitoring the well, identifying

kicks and shutting in the well in the case of a kick." TO Mot. at A9. Based on his training and experience, Mr. Harrell, as the OIM for the *Deepwater Horizon* and the overall responsible person for drilling, should be permitted to provide an opinion as to whether Transocean is responsible for monitoring the well, identifying kicks and shutting in the well. If Mr. Harrell does not have an opinion regarding Transocean's well control responsibilities, then this reinforces Transocean's liability as it would have inadequately trained Mr. Harrell. Moreover, this adverse inference is supported by the record. *See, e.g.*, TREX-1452 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; TREX-1454 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; J. Moore Dep. at 145:25-146:11; R. Ezell Dep. at 509:23-510:9.

### 4. **Vagueness**

Transocean fails to specify why it believes particular adverse inferences it has objected to are vague and objectionable. Examples include Transocean's objections to the following adverse inferences that BP seeks against Transocean: "Captain Curt Kuchta, the Master of the *Deepwater Horizon*, reported to Mr. Harrell unless the rig was underway or there was an emergency," "Transocean's drilling crew on the *Deepwater Horizon* reported to Mr. Harrell," and "Transocean was responsible for well control on the *Deepwater Horizon*." BP Mot. at 17-18. For each of these adverse inferences, the underlying questioning was plain and the adverse inference is unambiguous.

### 5. **Invalid Inference**

Similar to its vagueness objections, what Transocean is objecting to when it claims an adverse inference is invalid is unclear. Transocean fails to specify why it believes a particular adverse inference is invalid. In any case, BP's inferences flow directly and from the questions

asked. For example, Transocean objects that the following adverse inferences are invalid: "Mr. Harrell was responsible for reviewing the temporary abandonment procedure" and "Mr. Harrell was responsible for reviewing the displacement procedure." TO Mot. at A8. These inferences are based on questions asking Mr. Harrell whether it was his responsibility to double-check, *i.e.*, review, those procedures. *See* J. Harrell Dep. at 73:17-74:5. Similarly, Transocean objects that the following adverse inference is invalid: "Transocean was responsible for well control on the *Deepwater Horizon*." TO Mot. at A8-A9. This inference is based on questions asking whether the OIM, the senior toolpusher, the toolpusher, the drillers and the assistant drillers are always responsible for well control on the *Deepwater Horizon*. *See* J. Harrell Dep. at 78:14-20. These adverse inferences directly match the questions and are valid.

## **CONCLUSION**

In sum, Transocean's and Halliburton's objection lack merit. BP respectfully requests that the Court enter an order admitting the adverse inferences BP seeks against Halliburton and Transocean based on invocations of the Fifth Amendment by their respective employees at depositions.

Dated: November 21, 2012

Respectfully submitted,

/s / Don K. Haycraft.

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Richard C. Godfrey, P.C.
(richard.godfrey@kirkland.com)
J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

  I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of November, 2012.

                       /s/  Don K. Haycraft