**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:   Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf Of Mexico, on April 20, 2010<br><br>This document applies to:<br>ALL CASES | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

**DEFENDANT TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., TRANSOCEAN HOLDINGS LLC, TRANSOCEAN DEEPWATER INC. AND TRITON ASSET LEASING GMBH 'S REPLY IN SUPPORT OF AMENDED MOTION FOR ADVERSE INFERENCES**

COME NOW Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively "Transocean"), by and through their undersigned counsel, and respectfully submit this reply brief in support of its October 12, 2012 Amended Motion for Adverse Inferences Based on BP Employees' Refusal to Testify.  (Rec. Doc. 7639 ("TO Mot.")).

**I.      Introduction**

Transocean has sought a limited number of adverse inferences based on the refusals to answer questions by three key BP witnesses—Mark Hafle, Robert Kaluza, and Brian Morel.  BP opposes these inferences.  Transocean agrees with BP that the Court should reject requests for adverse inferences that are not based on valid invocations of the Fifth Amendment, would circumvent the rules of evidence, are unsupported by corroborating evidence, or are untrustworthy.  The ultimate focus of the adverse inference inquiry should be on whether an inference "will advance the search for truth."  *Libutti v. United States*, 107 F.3d 110, 124 (2d Cir.

1997). And the decision whether or not to consider an inference remains within the court's sound discretion. *FDIC v. Fidelity & Deposit Co.*, 45 F.3d 969, 977, 978 (5th Cir. 1995).

BP, however, makes relatively few objections to the inferences sought by Transocean based on these principles. Instead, the overwhelming majority of BP's objections are based on BP's assertion that other evidence would impeach, undermine, or explain away the requested adverse inference.

For example, in response to inferences showing that, during a phone call with BP company man Donald Vidrine, Hafle recognized a problem with the negative pressure test and yet allowed displacement to continue, BP proffers evidence allegedly showing that Transocean bore some responsibility for interpreting the negative pressure test. (BP Opp. App. A at 18-19.) This approach, however, confuses a factual dispute with an unreliable inference. BP cites no authority to support its novel proposition that an inference may not be drawn against a party based on the party's proffer of some other evidence that it believes might be exculpatory if proven. Instead, BP relies on a handful of cases in which courts have exercised their discretion not to draw inferences where doing so was unnecessary to resolving issues. (*Id.* at 4 [citing *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210-11 (5th Cir. 1983) (trial judge's decision not to allow adverse inference to impeach witness was harmless error because defendant had ample opportunity to impeach witness with other evidence); *State Farm Mut. Auto Ins. Co. v. Abrams*, 2000 WL 574466, at *7 (N.D. Ill. May 11, 2000) (declining to draw adverse inference because it could decide summary judgment motion without it)].) BP's mistaken approach, in which it argues the merits of various issues that will be decided at trial, should not prevent this Court from drawing the narrow set of adverse inferences sought by Transocean.

In addition, even if BP's attempts to cast blame elsewhere were relevant, its recent admission in its criminal plea agreement that company negligence caused the discharge of oil and that neglect of its employees caused the deaths of eleven men aboard the *Deepwater Horizon* unequivocally demonstrates that BP bears responsibility for the blowout, explosion, and discharge of oil.  BP's extensive submission on the merits of various parts of the case in opposing the requested adverse inferences should not prevent this Court from drawing the narrow set of adverse inferences requested by Transocean.

## II.   Inferences from the Deposition of Mark Hafle

Transocean asked the Court to draw six adverse inferences from Mark Hafle's refusal to testify at his deposition.  (TO Mot. at 4).  Hafle was BP's senior drilling engineer on the Macondo well and was in charge of the well's daily operations.  (*Id.* at 3.)  Five of the requested inferences concern Hafle's role in the negative pressure test.  One inference confirms that Hafle approved the cement to be used in the final cement job.  The Court should draw inferences from Hafle's refusal to answer these six questions to which he would have provided incriminating responses.

*First*, Hafle refused to testify about a conversation with Donald Vidrine in which he told Vidrine that a properly lined-up negative pressure test should not result in a positive pressure reading on the drill pipe and a zero pressure reading on the kill line.[1]  Hafle Depo. at 31:7-10; 31:13-16; 31:19-23; 32:18-20; 32:23-24.  Transocean requested that the Court assume that Hafle would have answered "yes" to a series of questions concerning Hafle's knowledge that the rig

---

[1] On November 14, 2012, Vidrine was charged in a first superseding indictment with eleven counts of involuntary manslaughter, eleven counts of seaman's manslaughter, and one count of negligent discharge of oil under the Clean Water Act.  *See* Superseding Indictment for Involuntary Manslaughter, Seaman's Manslaughter and Clean Water Act, *United States v. Kaluza et al.*, No. 2-12-cr-00265-NJB-ALC (E.D. La. Nov. 14, 2012).

had reported pressure on the drill pipe; that that there should have been no pressure on the drill pipe in a successful negative test; and that Hafle nevertheless let displacement continue.

There is no dispute that Hafle and Vidrine had a 10-minute phone call at 8:52 p.m. (*see* TREX 3575), at which point the crew had plenty of time to halt operations and shut-in the well if they were informed about any anomalies. BP does not claim that any of the questions posed to Hafle on these issues were objectionable, that Hafle lacked foundation to answer the questions (which asked for information plainly within his personal knowledge), or that Transocean is attempting to improperly characterize the testimony. (BP Opp. Ex. A at 17-19). BP instead discusses other evidence that purportedly shows (1) that Transocean crew members also discussed the negative pressure test with BP officials and (2) that by the time of the phone call displacement operations had already begun. (BP Opp. Ex. A at 17-19). BP's response is simply a rebuttal case that attempts to minimize or contextualize the incriminating inferences. BP may, of course, seek to introduce this evidence at trial, and the Court may consider any admissible evidence when reaching its ultimate factual conclusions, but the fact that an opposing party will introduce evidence in response to a proposed inference is not a reason to refuse to draw the inference. Transocean only asks that the Court also consider the fact that Hafle feared that giving a truthful answer to questions about a conversation in which he was personally involved would expose him to criminal liability.

*Second*, Hafle refused to answer a question about whether his team approved the manner and type of cement for the final cement job. Hafle Depo. at 49:2-5. BP argues that Hafle had no foundation "to evaluate and approve foam cement slurry designs for deepwater wells" and that the question was vague. (BP Opp. Ex. A at 20). BP also catalogues evidence that purportedly shows that Halliburton designed the cement slurry. *Id.* The question however, was

straightforward: "Your team approved of the manner and type of cement that were to be used on the Macondo well, particularly in the final cement job; is that correct sir?" And there can be no doubt that the foundation was established for Hafle to answer a question seeking specific information about "his team." Moreover, BP's argument about Halliburton's role is beside the point; BP may seek to introduce that evidence at trial to put the adverse inference into context.

### III. Inferences from the Deposition of Robert Kaluza

Transocean's motion also asks the Court to draw adverse inferences from Robert Kaluza's refusal to answer nine questions about the cement job and the negative pressure test. Kaluza was a well-site leader on the Deepwater Horizon and reported directly to John Guide. (TO Mot. at 4-5). He was accordingly closely involved in BP's final decision to use a suboptimal flow rate for the cement job and to continue with displacement after an unsuccessful negative pressure test. Indeed, on November 14, 2012, Kaluza was charged with eleven counts of involuntary manslaughter, eleven counts of seaman's manslaughter, and one count of negligent discharge of oil under the Clean Water Act, based, among other things, on his supervision of the negative pressure test. Superseding Indictment for Involuntary Manslaughter, Seaman's Manslaughter and Clean Water Act, *United States v. Kaluza*, No. 2-12-cr-00265-NJB-ALC (E.D. La. Nov. 14, 2012).

There can now be no question that Kaluza's invocation of the Fifth Amendment is attributable to BP. *See LiButti*, 107 F.3d at 124 (the "nature of the relationship" between the witness and the party is "the most significant circumstance" in determining whether to draw an adverse inference); *Fidelity & Deposit Co.*, 45 F.3d at 978 (court must determine whether adverse inference from individual's invocation of Fifth Amendment may be attributed to employer). In the factual basis of its plea agreement, BP expressly admitted that "[t]he negligent conduct of BP's Well Site Leaders [Vidrine and Kaluza] is attributable to BP." Guilty Plea

- 5 -

Agreement, Exh. A, *United States v. BP Exploration & Production Inc.*, 2-12-cr-00292-SSV-DEK (E.D. La. Nov. 15, 2012).  This admission reinforces the appropriateness of permitting adverse inferences against BP based on Kaluza's refusal to answer questions.

BP's specific objections to the limited number of adverse inferences Transocean seeks from Kaluza's invocation of the Fifth Amendment should be rejected.

*First*, the Court should infer that Kaluza would have given self-incriminating answers had he truthfully responded to Transocean's questions about his decision to use a suboptimal flow rate during the final cement job.  Kaluza Depo. at 28:24-29:2; 29:24-30:2; 30:5-6; 30:14-16.  BP argues that Kaluza lacks foundation to answer questions about displacement efficiency, making him unqualified to provide opinions about the optimal rate of cement flow for the final cement job.  (BP Opp. Ex. B at 12-16).  But none of the questions to Kaluza from which Transocean seeks adverse inferences sought Kaluza's opinion, expert or otherwise, on technical issues.  Rather, Kaluza was asked whether "in his experience" and based on what he "kn[e]w" whether four barrels per minutes was an effective flow.  (TO Mot. at 5.)  Kaluza was free to deny that he knew anything about optimal cement flow and was also free to deny that he endorsed a suboptimal flow rate.  Such denials would not have exposed him to criminal liability.  Instead, he invoked his Fifth Amendment rights, suggesting that a truthful response would result in criminal liability.

BP also points to other evidence allegedly showing that a four barrel per minute cement flow rate was reasonable and that BP relied on Halliburton's assurance that this flow rate was adequate.  (BP Opp. Ex. B at 12-16).  But even if proven, this evidence would not prevent an adverse inference from being drawn; it would simply become a counterpoint for the court to weigh in assessing all the evidence.

- 6 -

*Second*, Transocean asked the Court to infer that Kaluza would have said "no" to a question asking whether he personally received any reports that Halliburton's foam cement was adequate for the Macondo well. Kaluza Depo. at 37:6-11. BP opposes this inference by arguing (1) that Kaluza lacks foundation to review foam cementing results (or that he was required to do so) and (2) that Kaluza properly relied on Halliburton engineer Jesse Gagliano's assurances about the cement slurry. (BP Opp. Ex. B. at 16.) These arguments again miss the point. The question did not ask for an opinion, expert or otherwise, about foam cement. Rather, it asked about a simple factual matter—whether Kaluza received any report or whether he confirmed for himself that the cement was adequate. (TO Mot. at 5.) And BP is free to argue that he did not have a duty to conduct such a review or that Kaluza relied on Halliburton's assessments, but those arguments do not provide a basis for rejecting an adverse inference.

*Third*, Kaluza refused to answer four questions about his role in approving the negative pressure test on April 20, 2010. Kaluza Depo. at 148:13-15; 217:15-18; 217:21-218:1; 219:13-16. In response, BP asserts that terms such as "the pipe" were vague. (BP Opp. Ex. B at 16-17.) But of course, in context, "the pipe" refers to the "drill pipe." Beyond formulaic vagueness objections, BP alleges that Transocean was also involved in the negative pressure test and that the rig crew could have called a time out for safety if they disagreed with Kaluza's assessment. (BP Opp. Ex. B at 17-22). But these arguments, like BP's proffers of other evidence, do not go to whether an adverse inference may be drawn.

### IV.    Inferences from the Deposition of Brian Morel

Transocean has also requested that the Court infer that Brian Morel would have provided self-incriminating responses to thirteen questions about his role in the cement design and final cement job at the Macondo well. (TO Mot. at 6-7). Specifically, Transocean sought such inferences based on Morel's refusal to answer questions about the following topics:

1. Morel's awareness of inadequate cement lab testing (and BP's policies about proper testing) (Morel Depo. at 52:16-19; 89:18-21; 89:24-90:4; 121:6-9; 121:13-15; TO Mot. 6);

2. Morel's failure to tell Transocean crew members about BP's failure to receive MMS approval for its Temporary Abandonment Procedure (Morel Depo. at 116:19-23; 117:1-5; TO Mot. 6-7);

3. Transocean's lack of involvement in BP's risky decision-making, including the pumping rate and quantity for the final cement job, the decision not to run a full bottoms-up, the decision to run a long string instead of a liner, and the decision not to run a cement bond log (Morel Depo. at 119:16-17; 120:12-13; 120:15-17; 121:6-9; 121:13-15; 123:5-7; 136:23-25; TO Mot. 7); and

4. Morel's failure to follow BP's own guidelines for cement design (Morel Depo. at 208:22-24; TO Mot. 7).

For the reasons described below, the Court should infer that Morel would have provided self-incriminating answers had he truthfully and fully responded to these lines of questioning.

### A.     Inferences about Cement Testing

BP asserts three arguments against Transocean's requests for inferences arising from questions about Morel's involvement in cement testing: (1) that these inferences are "contrary to the evidence," (2) that BP's cementing decisions were driven by its reliance on Halliburton, and (3) that Morel lacks foundation to personally assess cement testing. None of these arguments invalidate the inference that Morel would have responded to these questions with self-incriminating answers.

*First*, as discussed above, BP's supposedly contrary evidence does not bear on what Morel knew about BP's cementing decisions. For example, in response to Transocean's request

for an adverse inference from Morel's refusal to answer the question, "Did you also receive, on the 18th of April, a casing design report stating that if only seven centralizers were used, that there would be a severe gas problem?," BP argues that "[t]here is no evidence that Mr. Morel received a 'casing design report' from Halliburton." (BP Mot. Ex. C at 19). But Morel was free to say this and had personal knowledge of whether he had received such a report. Instead, he refused to answer. The Court can reasonably conclude that Morel would have provided a self-incriminating response—in this example, "yes."

*Second*, BP's reliance on Halliburton, and whether that reliance was reasonable, are issues for trial, and do not bear on whether the Court should infer that Morel would have provided self-incriminating answers to his deposition questions.

*Third*, the questions from which Transocean seeks adverse inferences do not ask about Morel's personal ability to assess cement tests. Rather they ask whether he "received" a report, whether he "was aware that it was a requirement within BP that lab tests be reviewed before a cement job was pumped," and whether he allowed the cement to be pumped without reviewing lab tests. Morel plainly has a foundation to answer these questions, which ask about information that would be within his personal knowledge, not about any expert issue involving cement.

### B.     Inferences about MMS Approval

BP objects to Transocean's requested inferences from Morel's failure to respond to questions about BP's compliance with MMS requirements by citing supposedly contrary evidence. (BP Opp. Ex. C at 21-22). But this argument, once again, misses the point. Transocean's requested inferences establish that, in response to questions about BP's MMS compliance, Morel would have offered self-incriminating answers probative of BP's failure to comply with these regulations. How these inferences should be weighed against other available and admissible evidence, are issues that need not be resolved until trial.

### C. Inferences about Transocean's Lack of Involvement in BP's Decision-Making

BP objects to Transocean's request for inferences from Morel's refusal to answer questions about Transocean's involvement by arguing (1) that Morel lacked foundation to testify about Transocean's involvement, (2) that Transocean employees were authorized to stop work if they believed that BP's decisions created too much risk and (3) that BP relied on Transocean's and Halliburton's assessments for decisions about the cement job.  (BP Mot. Ex. C at 22-27).  These objections are unavailing.

*First*, BP's foundation objection again misses the mark.  Morel was the drilling engineer responsible for developing the Macondo well plan, and accordingly played a crucial role in the development of these important decisions.  (*See* TO Mot. at 6).  Morel was asked whether Transocean had any involvement in decisions for which he was responsible.  It is proper to infer from his refusal to answer that Transocean was not involved in these risky decisions.

*Second*, Transocean employees' stop work authority is immaterial to whether BP failed to involve the rig crew in crucial decisions about the risks they took.  To the contrary, Morel's invocations of the Fifth Amendment are probative of the fact that the rig crew simply lacked the information that might have prompted an exercise of their stop work authority.  The rig crew's stop work authority does not undermine the reliability of the inference that Morel would have provided self-incriminating answers to questions about Transocean's involvement in BP's risky decisions.

*Third*, BP's citation of evidence showing that it supposedly relied on the advice of Halliburton and Transocean is immaterial.

### D.     Inference about Noncompliance with Internal Guidelines

BP objects to Transocean's request that the Court infer that Morel never completed a checklist required by BP's own guidelines for cement design by arguing (1) that Morel was unaware of the checklist and (2) that the checklist was a guideline, and not a requirement.  (BP Mot. Ex. C at 27).  BP does not argue that Morel lacks foundation to testify about his own compliance (or lack thereof) with BP's internal guidelines, or that the question violated any Rules of Evidence.  Nor does BP deny that Morel failed to complete this checklist.  Instead, BP attempts to dissuade the Court from considering Morel's refusal to answer this question by asserting that its guidelines were not compulsory.  BP is free to make this argument and support it with evidence at trial.  But the Court should infer that Morel would have answered that he did not complete this checklist.

### V.     Conclusion

For the foregoing reasons, the Court should GRANT Transocean's motion for adverse inferences against BP based on the Fifth Amendment invocations of Hafle, Kaluza, and Morel.

Dated: November 21, 2012                                   Respectfully submitted,

| | |
|---|---|
| By:  s/ Brad D. Brian | By:  s/ Steven L. Roberts |
| Brad D. Brian | Steven L. Roberts |
| Michael R. Doyen | Rachel Giesber Clingman |
| Daniel B. Levin | SUTHERLAND ASBILL & BRENNAN LLP |
| MUNGER TOLLES & OLSON LLP | 1001 Fannin Street, Suite 3700 |
| 355 So. Grand Avenue, 35th Floor | Houston, Texas 77002 |
| Los Angeles, CA 90071 | Tel:  (713) 470-6100 |
| Tel: (213) 683-9100 | Fax: (713) 354-1301 |
| Fax: (213) 683-5180 | Email: steven.roberts@sutherland.com, |
| Email: brad.brian@mto.com | rachel.clingman@sutherland.com |
| michael.doyen@mto.com | |
| daniel.levin@mto.com | |

| | |
|---|---|
| By:   s/ Edwin G. Preis<br>Edwin G. Preis, Jr.<br>PREIS & ROY PLC<br>Versailles Blvd., Suite 400<br>Lafayette, LA 70501<br>(337) 237-6062<br>    and<br>601 Poydras Street, Suite 1700<br>New Orleans, LA 70130<br>(504) 581-6062 | By:   s/ Kerry J. Miller<br>Kerry J. Miller<br>FRILOT, LLC<br>110 Poydras St., Suite 3700<br>New Orleans, LA 70163<br>Tel:  (504) 599-8194<br>Fax:  (504) 599-8154<br>Email: kmiller@frilot.com<br><br>John M. Elsley<br>ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP<br>711 Louisiana Street, Suite 500<br>Houston, TX 77002<br>(713) 224-8380 |

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC,* and *Triton Asset Leasing GmbH.*

### CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2012, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

/s/ Kerry J. Miller