# EXHIBIT B

| Rob Turlak Excerpts Volume 1 | |
|---|---|
| Topic | Page/Line |
| BOP Maintenance | 127:7 – 134:3 |
| Shear Tests/Operating Envelope | 136:15 – 140:8 |
| Tandem Boosters | 154:1 – 154:16 |
| Crane Safety | 173:21 – 184:5 |
| 2008 Flooding Event | 202:2 – 202:9 |
| AMF Operation | 202:10 – 205:9 |
| EDS Sequencing | 205:10 – 208:16 |
| BOP Suitability | 212:4 – 217:25 |
| MASP | 225:1 – 226:4, 226:24 – 235:19 |
| Solenoid 103 | 247:7 – 250:2 |
| AMF/EDS Operation | 252:7 – 256:22 |

| Rob Turlak Excerpts Volume 2 | |
|---|---|
| Topic | Page/Line |
| Well Control Events Email from 2008 | 479:22   481:12 |
| 2008 Email re Flooding Incident | 481:13   483:1 |
| Performance Review by BP | 483:2 – 485:18 |
| Operational Performance Related to Rig Downtime and Planned Maintenance in the Gulf of Mexico | 486:18 – 489:24 |
| BOP Batteries | 490:3 – 490:21 |
| April 2008 Email re MASP/Kick Tolerance | 490:24 – 503:20 |
| Diverter to Mud Gas Separator | 504:25 – 507:16 |
| EDS/Operation of Shear Circuit | 509:6 – 512:1 |
| Maintenance/Personnel | 512:2 – 514:7 |
| Procedure for Closing BOP in Flowing Well | 524:25 – 529:2 |

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL        )   MDL NO. 2179

BY THE OIL RIG           )

"DEEPWATER HORIZON" IN )   SECTION "J"

THE GULF OF MEXICO, ON )

APRIL 20, 2010           )   JUDGE BARBIER

                         )   MAG. JUDGE SHUSHAN


* * * * * * * * * * * * * * * * *

VOLUME 1

* * * * * * * * * * * * * * * * *


        30(b)(6) Deposition of Robert Joseph

Turlak, Transocean, taken at the Pan-American

Building, 601 Poydras Street, 11th Floor, New

Orleans, Louisiana, 70130, on the 6th day of

November, 2012.



26

```
 1      Q. Okay. Shell and BP. And IA I'm no
 2  going to quibble over who is bigger.
 3      A. Okay.
 4      Q. Any other really big comp -- would BP
 5  'n + be in the top two, at least, then?
 6      A. Yes.
 7      Q. Okay. And, of course, Transocean has
 8  rigs in the Gulf of Mexico?
 9      A. Yes.
10      Q. Jack-up rigs?
11      A. I'm not sure we have any jack ups in the
12  Gulf of Mexico.
13      Q. Okay. What kind of rigs do you have in
14  the Gulf of Mexico?
15      A. Semisubmersibles and drillships.
16      Q. Okay. And how many? How many now? How
17  many rigs does Transocean operate in the Gulf of
18  Mexico now?
19      A. At the present time?
20      A. Yes.
21      A. I think it's around 14.
22      Q. Okay. And let's go back to April 2010.
23  About how many rigs was Transocean operating in
24  the Gulf of Mexico?
25      A. 12 or 13.
```

128

```
     Objection, scope.
         A. "Certified"?
         Q. (By Mr. Williamson) Are they certified
     under DNV or ABS?
         A. Some.
             MR. BAAY: The same objection
             MR. HAYCRAFT: Form.
         Q. (By Mr. Williamson) Some are some not?
         A. Some are, some not.
         Q. Okay. Some are certified under DNV?
         A. It's under --
         Q. It's Det Nortas Veritas, I believe.
         A. Det Norske Veritas, es, some are.
     Others, ABS, some are.
         Q. That's the American Bureau of Ship in?
         A. Correct.
         Q. And then some are not certified under
     ither?
         A. Cor
             MR. BAAY: Ob ection, form, sco e p.
         A. That's correct.
         Q. (By Mr. Williamson) Okay. Of the 14 that
     re in the Gulf of Mexico, do all 14 have blowout
     reventers?
         A. Yes.
```

127

```
 1      Q. Okay. And how many are drillships, and
 2  how many are submersibles?
 3          MR. BAAY: Objection to the scope.
 4      A. Most drillships. There's one -- one
 5  semisubmersible. One, two, three, four, four
 6  semisubmersibles right now.
 7      Q. (By Mr. Williamson) Okay. And when
 8  you're drilling in the Gulf of Mexico, what's the
 9  Regulatory authority that Transocean tries to
10  comply with?
11      A. Coast Guard and the MMS.
12      Q. Okay.
13      A. At the time, the MMS.
14      Q. All right. The -- yeah.
15      MMS has actually changed its name, but is
16  it okay with you if we call it "MMS"?
 1      A. That's fine.
18      Q. And we can both know what we're talking
19  about?
20      A. Yes.
21      Q. Okay.  he and then of course, in
22  addition to being in the Gulf of Mexico and
23  trying to compl  with MMS Regulations, I assume
 2  these rigs are all certified?
25          MR. BAAY: Objection to the form
```

129

```
     Q. How man ? Are there any that have more
     than one blowou  preventer onboard?
         A  The INSPIRATION the DEEPWATER
     INSPIRATION  which are -- or is it DISCOVERER
     INSPIRATION and DISCOVERER CLEAR LEADER both have
     two BOP stacks onboard.
         Q  Why?
             MR. BAAY: Objection to form, scope.
         A. Customer requirement.
         Q  Mr. Williamson  Okay  Transocean
     doesn't  hink that's an advantage?
             MR. BAAY: Objection to the form
         Q  By Mr. Williamson  It's all driven by
     the customer?
             MR. BAAY: Form.
         A  No. It's on the rig because the cut -
     number one, the customer wanted it, and it's an
     advantage as far as time is concerned.
         Q  By Mr  Williamson  Why?
             MR. BAAY: Object to form and scope
         A  Because there are cer  certain amounts
     of maintenance that is required  or if something
     is broken, then rather than waiting on the first
     stack to be repaired  the  can run the second
     stack
```

33 (Pages 126 to 129)



130

Q. (By Mr. Williamson) Sure. To put it simply: You have one BOP on deck that you can b e working on when you're repairing or maintaining while the other BOP is working subsea?

MR. BAAY: Objection to the form and scope.

Q. (By Mr. Williamson) Correct?

A. Yes.

Q. Okay. The -- but the only time Transocean does that is when a customer requires it?

MR. BAAY: Object to form and scope.

A. Not true anymore.

Q. (By Mr. Williamson) Okay. Why is it not true anymore? Please explain.

A. Well, we see a benefit of having an extra BOP on -- onboard.

Q. What -- what benefit does --

MR. BAAY: Jimmy.

Q. By Mr. Williamson -- does Transocean say?

MR. BAAY: Jimmy, this -- this is a Phase II deposition, so anything along this line of questions will you give me a running objection that's outside the scope of the Notice?

131

MR. WILLIAMSON: I'll give you the objection. I don't mind that. I don't necessarily agree with the conclusion. I -- I --

MR. BAAY: I'm just asking for a running objection to scope --

MR. WILLIAMSON: Sure. Happ to. y

MR. BAAY: -- to this line of questions.

MR. WILLIAMSON: I don't agree with the conclusion but okay. We can -- but you're right, we can take that up at the appropriate time.

Q. (By Mr Williamson) Sorry, Mr. Turlak. What benefit does Transocean see to having two BOPs onboard?

A. Well, it cuts -- it will cut into -- it will increase the operational time for the -- for the customer; therefore, it benefits both the customer and Transocean.

Q. Okay. h T- so does Transocean now ha e any rigs anywhere in the world where they have two BOPs onboard other than the two in the Gulf of Mexico you mentioned?

A We're building some .

Q. Oh okay. o Transocean is in the

132

process of equipping some of their drilling units with two BOPs?

A. That's correct.

Q. And is that a Transocean initiative?

A. Yes.

Q. Okay. Was Transocean doing any of that before April 20th, 2010?

MR. BAAY: Objection to form.

Q. (By Mr. Williamson) That you know of?

A. Operating?

Q. Yeah.

A. Yes.

Q. No. Were they taking on their own initia -- was Transocean taking on its own initiative to build an extra BOP and put it on a Drilling Unit before April 20th, 2010?

A. Of their own initiative?

Q. Yes.

A. No.

Q. Okay. But now they do, Transocean now does that, or now is in the process of doing it?

A. Yes.

Q. Okay. The -- is there a safety advantage to that?

133

MR. BAAY: Objection to form.

A. You could read a safety advantage into it, yes.

Q. (By Mr. Williamson What is the safety advantage?

A. That all the maintenance could be up to date.

Q. Okay.

A. If -- if you had a customer that was willing to pull a BOP stack because there was overdue maintenance, because maintenance was now due on the BOP.

Q. Okay. Well, whose decision is it to pull the BOP?

A. It's a joint decision made by the Drilling Contractor and the customer

Q. Sure. Can Transocean make it without the customer? Can Transocean pull the BOP without the customer's permission?

A. Yes.

Q. Why?

A. It's our equipment.

Q. Okay. So --

A. It has to --

Q. If Transocean -- I'm sorry

34  (Pages 130 to 133)



134

1   A   No. It has to be at -- at a time that
2   the well is secure, but, yes, we can make that
3   decision.
    Q. Right. By the way, just to -- a
5   housekeeping rule. I'm trying to ask questions,
6   you're trying to answer them. There's no reason
7   to talk over each other. It will just be
8   confusing, as well as rude. So if I
9   inadvertently interrupt you, just tell me, and
0   I'll let you finish your answer.
1   A. Okay
2   Q. Is that fair?
3   A. Yes, sir.
4   Q. Th    okay. Tab No. 1, Exhibit
5   No. 597, that's one of the -- that's a DE PWATER
6   HORIZON Emergency Response Manual?
7   A. Yes, sir.
8   Q. And it's supposed to document situations
9   that can occur?
0   A. What --
1   Q. It's supposed to document procedures one
2   would follow in the event that certain situations
3   occur?
4   A. Yes, it -- it documents the role -- the
5   duties and responsibilities for specific

135

1   emergency situations.
2   Q. Okay. By the way, do I understand you
3   graduated from Texas A&M in 1978 --
4   A. Yes, sir.
5   Q. -- and have worked in BOPs ever since
6   then? You have worked on subsea equipment,
7   including blowout preventers, in your
8   professional career for the last 30 plus years?
9   A. Some of my time at Cameron I didn't work
0   specifically on BOPs, but -- but --
1   Q. Most --
2   A. -- the majority of my years, yes.
3   Q. Okay. The majority of your 32, 33-year
4   career, you spent working in the area of blowout
5   preventers?
6   A. Yes, sir.
7   Q. Okay. And tell me what your definition
8   of a blowout preventer is?
9   A. It is -- it is a device -- let's see.
0   It's a device used to secure the well in the
1   event the primary mechanism for well control has
2   failed.
3   Q. Is it a piece of equipment that has --
4   sometimes is used in an emergency?
5   A. Correct.

136

1   Q. Okay. And as such, it's a
2   safety critical piece of equipment?
3        MR. BAAY: Objection form.
4   A. It is a safety-critical piece of
5   equipment.
6   Q. (By Mr. Williamson) Okay. Have you, in
7   your career, ever seen BOPs fail?
8   A. Yes.
9   Q. How many times?
0   A. Can you give me the defin -- your
1   defi  ion o  "failur "?
2   Q. Sure.
3   A. Different peop e say  cal  different
4   things. Go ahead.
5   Q. Sure. Have you ever seen BOPs when
6   you're testing, when you're doing shear tests,
7   where they will not achieve a shear and a seal?
8   A. Yes.
9   Q. Okay. Have you ever seen shear tests in
0   your 32-year career where BOPs, when you're
1   testing them, will not achieve a complete shear?
2   A. Yes.
3   Q. Have you ever seen a time when you have
4   erosion on elastomeric elements such that -- such
5   hat  ou lose sealing abili   ?   ty

137

1   A. I don't know that I've ever seen erosion
2   on elastomeric elements. I -- I know it can
3   happen, but I don't know that I've seen that.
4   Q. Okay. Have you ever seen times when BOPs
5   leak?
6   A. Yes.
7        MR. BAAY: Let me -- let me just --
8   so it's clear for the record, this is all Phase I
9   line of questions, so I want a continued running
0   objection to the scope of these questions.
1        MR. WILLIAMSON: I -- I
2   respectfully --
3        MR. BAAY: I'm not asking you for
4   your --
5        MR. WILLIAMSON: You have -- you
6   have the objection --
7        MR. BAAY: Frankly, you don't decide
8   it. I'm not asking for your conclusion, I want a
9   running objection as to --
0        MR. WILLIAMSON: I don't mind the
1   running objection, but I respectfully disagree
2        MR. BAAY: I'm not asking you to
3   agree or disagree. I want the objection.
4        MR. WILLIAMSON: I have agreed to
5   it. I've already told you.

35  (Pages 134 to 137)

138

Q. (By Mr. Williamson) The -- the -- okay. So it's an emergency piece of equipment that has the potential to fail? Do I understand your testimony correctly?

A. Any -- yes. It does have the potential to fail.

Q. Just like any other mechanical piece of equipment?

A. Correct.

Q. Okay. And, of course, part of your job is to figure out when it will fail, what's the -- its operating limits?

A. Prevent it from failing, yes.

Q. Right. And prevent it from failing, if you can and realize what its operating envelope is in terms of operation?

MR. BAAY: Objection, form.

A. Yes.

Q. (By Mr. Williamson) Okay. Now, since it's an emergency piece of equipment that can be used in an emergency, and since it has the potential to fail, and it -- since it's Transocean's equipment, do you need a plan for what will happen when the BOP fails?

MR. BAAY: Object to form.

139

A. Well, it was our responsibility to provide the equipment necessary to stop -- to -- well, let me back up.

We've got multiple pieces of equipment, because things can -- can fail, but if you're asking me if we should have had another device there that's capable of stopping the flow of oil, then I'd say that's not our responsibility.

Q. (By Mr. Williamson) I'm not there yet.

A. Okay.

Q. I promise you I'm going to try to ask you that question before I'm through here today.

A. Okay.

Q. But I'm not there yet.

A. Okay.

Q. My question to you right now is: It's a mechanical -- a BOP is a mechanical piece of equipment that's in a safety-critical position that can be used in an emergency.

A. Yes.

Q. We agree on that, right?

MR. BAAY: Objection to form. Form.

A. M-h'm.

Q. (By Mr. Williamson) Transocean has them in every Drilling Unit in the world, right?

140

A. Yes.

Q. You -- and you know for a fact that BOPs can fail in certain operating situations?

MR. BAAY: Object to form.

A. They can fail, yes.

Q. (By Mr. Williamson) Right. And you've seen that happen on occasion in your 32 years?

A. Yes I have.

Q. Okay. My question is, therefore, you need a plan for when a BOP fails in an emergency, correct?

MR. BAAY: Objection to form.

A. Yes.

Q. (By Mr. Williamson) Okay. What is Transocean's plan for when a BOP fails?

MR. BAAY: Object to form.

A. Well, we -- in our Well Control Manual we talk about B -- the primary source - primary control is -- is weighted mud or weighted fluid in -- in the -- in the wellbore. Secondary control is the BOP.

Q. (By Mr. Williamson) All right.

A. And if there's problems with -- with secondary control failure, you have tertiary control. And tertiary control is -- is a plan by

141

which you actually pump down a heavy barite or a -- or a plug to try to get the well un -- back under control.

Q. Is that -- is one example of tertiary control like bullheading?

A. Yes.

Q. Okay. All right. So you -- I believe -- you would agree with me, wouldn't you, that a blowout preventer is generally considered to be a secondary barrier, or sometimes called a contingent barrier --

A. It is the second --

Q. -- correct?

MR. BAAY: Objection -- objection to form. Allow a pause after his question.

THE WITNESS: Yes, sir.

Q. (By Mr. Williamson) Okay.

A. Secondary barrier.

Q. Are you saying "Yes, sir" to your lawyer or are you saying "Yes" to the question?

A. I say "Yes, sir" to him. And, "Yes," it is a secondary barrier.

Q. Thank you.

The -- okay. Because normally, in

36 (Pages 138 to 141)

14

1   normal -- you're not a Well Control Expert. I
2   believe I read that in your first deposition?
3       A. That's correct.
4       Q. And don't hold yourself out to be a Well
5   Control Expert and -- or to be here talking about
6   drillers or kicks or mud logging or cement, or
7   anything like that, right?
8       A. Correct.
9       Q. Okay. But you do know quite a bit about
10  BOPs, coming out of Texas A&M and spending
11  30-plus years studying them?
12      A. Yes, I've been around them.
13      Q. Okay. The -- but -- and you know enough
14  about well control to know normally the
15  preference is that you keep in place a primary
16  barrier, which in many, many times is a mud
17  column that weights and holds the formation in
18  place?
19      A. Correct.
20          MR. BAAY: Objection to form.
21  Objection to scope. Renew my objection to scope.
22      Q. (By Mr. Williamson) And there's times
23  when you can have a primary barrier be cement.
24  You can literally put cement in the hole and
25  cement the hole off and use that as your barrier,

143

1   correct?
2       A. Yes.
3       Q. Okay. But the blowout preventer is a
4   secondary barrier, correct?
5       A. Yes.
6       Q. And as a secondary barrier, the whole
7   purpose of a secondary barrier is to be there
8   when the primary barrier fails.
9           MR. BAAY: Objection to form.
10      Q. (By Mr. Williamson) Right?
11      A. Well, it's got other things that it's
12  there for, yes.
13      Q. Well, I'll just give you one example:
14  It's known in the industry that cement jobs can
15  fail, just to use one example.
16      A. Yes, I've heard that.
17      Q. The Macondo HORIZON is not the first
18  accident in drilling history where the cement job
19  failed, is it?
20      A. Not to my knowledge.
21      Q. That's one of the reasons you have a
22  blowout preventer, is a cement job might fail?
23          MR. HARTLEY: Objection, form.
24          MR. JONES: Objection, form.
25      A. One of the reasons, yes.

144

1       Q. (By Mr. Williamson) Right. So when you
2   need a blowout preventer in an emergency, you
3   have to anticipate that the blowout preventer
4   might fail, correct?
5           MR. BAAY: Objection to form.
6       A. You can do that, yes.
7       Q. (By Mr. Williamson) Well, you not only
8   can do it, you should do it?
9           MR. BAAY: Objection to form.
10      Q. (By Mr. Williamson) Right?
11      A. Well, we    in our Well Control Manual,
12  we do identify primary controls; secondary
13  control; and if secondary control, tertiary
14  control.
15      Q. Sure. Assume with me that we've lost
16  primary control for the purposes of my questions.
17  Fair?
18      A. Yes, sir.
19      Q. Okay. And assume for me it's an
20  emergency. We have gas and hydrocarbons
21  influxing into the wellbore and rising. Can you
22  make that assumption with me?
23      A. Yes.
24          MR. BAAY: Objection, form.
25      Q. (By Mr. Williamson) Okay. That's the

145

1   type of emergency you're going to need a blowout
2   preventer for, correct?
3           MR. JONES: Objection, form.
4       A. You would hope to be able to regain
5   control.
6       Q. (By Mr. Williamson) Sure. My question
7   is: What is Transocean's Emergency Plan when
8   their blowout preventer fails in that situation?
9           MR. BAAY: Object to the form.
10  Object to scope.
11      A. Our plan's in our Well Control Manual.
12      Q. (By Mr. Williamson) Sure. Tell me what
13  it is.
14      A. It says that you're -- you've got your
15  primary, your secondary has now -- you've tried
16  to inc -- incorporate the secondary control. It
17  has failed.
18          You have tertiary control. I told you
19  tertiary control is to try to regain control
20  of -- of the formation, so you're going to pump
21  in with heavier mud. You're going to put in --
22  put in barite. You're going to try to bullhead
23  in. You're going to put in -- put in junk to try
24  to bridge over in a -- in the -- in the wellbore.
25  But these situations are usually going

37 (Pages 142 to 145)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**



**156**

Q. Right. Let's say that -- I want to see
if I understand. Let's say the HORIZON had
decided to upgrade to tandem boosters. Would
your Unit have been brought in to help with that
decision and the Engineering consequences of that
decision?
A. Yes.
Q. Have y all done that? Have you ever had
rigs where you've up raded to tandem boosters on
a BOP?
MR. BAAY: Objection, scope.
A. I'm sure we have. Nothing --
Q. (By Mr. Williamson) Okay.
A. -- comes to mind right now, but -
Q. All right.
A. I'm sure we have.
Q. Anyway, but that might be the sort of
decision where your Unit would come in, help make
the Engineering decisions to make that process go
efficiently, smoothly, and correctly?
A. We would help, yes.
Q. Okay. Who do you report to -- in terms
of the Subsea Engineering Group, who do you
report to?
A. We talking about in 2010?

Q. Yes. These are New -- New -- New
uild --
Q. Sure.
A. -- BO -- New Build rigs that we're
oing -- that were being done, as well as -- as
e Technical Field Support reported to -- to the
P of Engineering.
Q. Okay. Would Technical Field Support be
omebody who was involved in helping with
aintenance decision and things like that?
A. Correct.
Q. Okay. All right. And who did the VP of
ngineering sup -- report to?
A. He reported to the Vice President of
perations. Oh, it would have been Arnaud
obillier.
Q. Okay. Who was VP of Engineering back
en?
A. Pharr Smith.
Q. Okay. Is he still with the company?
A. No, sir.
Q. Where did he go?
A. Rowan.
Q. Ah. And he went -- he was terminated or

**155**

1  Q. Yes.
2  A. Okay. Darrel Pelley, who was the
3  Director of Engineering.
4  Q. And what is Director of Engineer --
5  Director of Engineering?
6  A. And Technical Support.
7  Q. Engineering and Technical Support. Tell
8  me what all units he has under him. Obviously,
9  he has Subsea Engineering. What else?
10 A. He has Electrical Engineering, DP and
11 Controls, Rig and Mechanical System -- Rig
12 Mechanical Systems, which includes all the
13 drilling equipment on the rig.
14 Q. Would that include cranes and things like
15 that, too?
16 A. Yes.
17 Q. Okay.
18 A. DP and Controls.
19 Q. Who's -- who's he report to?
20 A. Darrel Pelley? He reported, at the time,
21 to the Vice President of Engineering.
22 Q. All right. And what Units are under the
23 VP of Engineering?
24 A. He had the New Builds.
25 Q. Which are separate from the Units you

**157**

1  just made a --
2  A. No. He --
3  Q. -- move to Rowan?
4     MR. BAAY: Objection, form.
5  Objection, scope.
6  Q. (By Mr. Williamson) Voluntarily left to
7  take a position with Rowan?
8     MR. BAAY: Form and scope.
9  A. Actually, he left and didn't -- didn't go
10 to work for a while and then several months later
11 took a --
12 Q. (By Mr. Williamson) Okay.
13 A. -- position with them.
14 Q. Okay. The VP of Operations -- we're
15 going on up the chain -- who do they report to?
16 A. I think he reported to -- to Steven
17 Newman.
18 Q. Okay. And Newman -- Steve Newman is who?
19 A. He, at the time, was the Chief Executive
20 Officer.
21 Q. Of all the Transocean entities?
22 A. Correct, yes.
23 Q. And still --
24 A. President.
25 Q. And still is?

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

170

1   Q. (By Mr. Williamson) Did you bill --
2   right. But when the Q4000 was working on
3   Macondo, it wasn't working on any other BP
4   business, was it?
5       MR. BAAY: Objection, form.
6   A. That's true.
7   Q. (By Mr. Williamson) Okay. So -- and did
8   Transocean expect, in Phase II -- in the -- in
9   the -- I'm using the wrong word.
10      Post-explosion, did Transocean say: "You
11  have to pay us for the work to close in the
12  well"?
13  A. I don't know that there was any
14  discussions of that type.
15  Q. Okay. Did you find that out, in terms of
16  the issue involving billing for your efforts,
17  when you were preparing for your Phase II
18  deposition here?
19  A. I did look into some of the billing that
20  occurred, and I did not look into the billing
21  that occurred due -- because of the relief wells.
22  Q. Okay. Well, as I understand it, and I'm
23  asking you as a Transocean Corporate
24  Representative right now, Transocean was paid for
25  drilling those two relief wells, right?

171

1   A. I don't know that for a fact, but they
2   were both -- both under Contract.
3   Q. Both those rigs were under Contract to
4   BP, anyway. That's what you mean?
5   A. That's correct.
6   Q. As far as you know, BP paid their day
7   rates during the time they were drilling the
8   re -- relief wells?
9   A. I don't know that for a fact.
10  Q. All right. Okay. As a Transocean person
11  who is here to address the relief efforts, you
12  know, would Transocean have the responsibility to
13  shut in the well, regardless of what BP did?
14      MR. BAAY: Objection to the form.
15  Q. (By Mr. Williamson) How do you see that
16  issue?
17  A. I --
18      MR. BAAY: Objection to the form.
19  A. I think we would have helped BP to shut
20  in the well.
21  Q. (By Mr. Williamson) Okay. So if I've
22  understood your answer, what you -- you think is
23  Transocean's only responsibility is to help BP?
24  A. It is, because they're -- they're
25  responsible for the oil coming out of that well,

172

1   oil and gas coming out of that well, and we
2   helped them cap that --
3   Q. Even --
4   A. -- or stop the well.
5   Q. And you feel that way, Transocean feels
6   that way, even if Transocean personnel made
7   mistakes that led to the -- to the discharge?
8       MR. BAAY: Objection to the form.
9   Q. (By Mr. Williamson) Transocean still
10  feels that way?
11      MR. BAAY: Objection to the form.
12  A. That's right.
13  Q. (By Mr. Williamson) Can you see how that
14  doesn't seems like you have a very good Corporate
15  responsibility?
16      MR. BAAY: Don't answer that
17  question.
18      It's argumentative.
19  Q. (By Mr. Williamson) Okay. Well, your --
20  this is not part of your everyday job duties
21  to -- to address issues like this, correct?
22  A. That's correct.
23  Q. So you're addressing that answer that you
24  gave me as a Corporate Representative of
25  Transocean, correct?

173

1   A. That's correct.
2   Q. Okay. Would you turn to Tab --
3       MR. WILLIAMSON: Well, I'll bet I
4   don't have the book over there for him, Billy.
5       MR. DILLS: Which one do you -- what
6   Tab is it?
7       MR. WILLIAMSON: Tab 38.
8   Q. (By Mr. Williamson) Let me hand you a
9   document, Mr. Turlak, and get it marked.
10      MR. WILLIAMSON: If you want, just
11  hand him the document, Billy.
12      MR. DILLS: Yes, sir.
13      MR. WILLIAMSON: Actually, hand it
14  to Mr. Fontana for an exhibit sticker.
15      THE COURT REPORTER: 90226.
16      (Originally marked as Exhibit No. 90226;
17  redesignated as Exhibit No. 10226.)
18      MR. DILLS: David, do you need a
19  hard copy?
20      MR. BAAY: It would be nice.
21  Q. (By Mr. Williamson) Have you e er seen
22  this E-mail before?
23  A. No.
24  Q. All right. First, tell me who Bill
25  Sannan is

44 (Pages 170 to 173)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

174

```
 1    A.  He's the General Manager of ... of North
 2  American Operations.
 3    Q.  Okay.  So a highly ... lay ... on Performance
 4  or Assets or both?
 5    A.  Operations, both.
 6    Q.  So he reports to who?
 7    A.  I think Larry McMahan.
 8    Q.  Okay.  So he's one level below
 9  Mr. McMahan in terms of the organization,
10  correct?
11    A.  Yes.
12    Q.  And this is April 17th, 2009, almost on
13  year to the day before the HORIZON disaster,
14  correct?
15    A.  Yes.
16    .  And Larry -
17        MR. BAAY:  And, Jimmy, Jimmy let me
18  interrupt you.
19        I'm going to object to the scope of any
20  question related to this document as being
21  outside the scope of what he's here to testify
22  on.
23    Q.  (By Mr. Williamson) And now the --
24  April 17th, 2009, Mr. McMahan sends an E-mail out
25  to Martin Nuttall, Bill Sannan, Bill Wainwright,
```

176

```
 1  ob duties to correspond by E-mail, as well as
 2  telephone as well as in person
 3        MR. BAAY:  Object to form.
 4    A.  Yes
 5    Q.  (By Mr. Williamson) Is that true?
 6        MR. BAAY:  Form.
 7    A.  Yes, sir.
 8    Q.  (By Mr. Williamson) Okay.  And, again
 9  I'm sure that's true for Mr. McMahan, just like
10  it's true for the other employees and
11  Representatives of Transocean, true?
12        MR. BAAY:  Objection to the form.
13    A.  Yes, we do have levels of communication.
14    Q.  (By Mr. Williamson) Right.  Y'all are
15  expected to communicate by E-mail, as well as in
16  person, as well as on the phone, correct?
17        MR. BAAY:  Objection, form.
18    Q.  (By Mr. Williamson) It's just a matter of
19  efficiency correct?
20        MR. BAAY:  Form.
21    A.  Yes.
22    Q.  (By Mr. Williamson) Okay.  And in this
23  particular one, 90226, exhibit, he -- Mr. McMahan
24  says:  "Ultimately, the OIM is accountable for
25  ensuring that the men and women operating our
```

75    1

```
 1  and Walter Cabucio, right?
 2    A.  Yes, sir
 3    Q.  Okay.  And down in the middle of that
 4  paragraph, on Exhibit 90226, would -- this kind
 5  of have went out in the ordinary course of
 6  business?  Does Mr. McMahan send E-mails as part
 7  of his business?
 8        MR. BAAY:  Object to the form.
 9    A.  Yes.
10    Q.  (By Mr. Williamson) Okay.  And would this
11  be the sort of E-mail, Exhibit 90226, that he
12  would normally send in the course of his business
13  where he's telling people under him what he wants
14  them to do?
15        MR. BAAY:  Objection, form.
16    A.  Are you asking me personally or as a
17  Corporate Representative?
18    Q.  (By Mr. Williamson) I'm asking -- I'm
19  asking -- I guess I'll ask you as a Corporate
20  Representative.
21    A.  Yeah, I would imagine he does send out
22  E-mails and --
23    Q.  Right.
24    A.  -- and correspond with his people
25    Q.  Because I'm assuming it's part of your
```

177

```
 1  equipment are trained and competent."
 2        Do you agree with Mr. McMahan on that
 3  point?
 4        MR. BAAY:  Stop, stop.  This is
 5  clearly a Phase I question.  I'm going to
 6  instruct him not to answer this.  If you want
 7  answers to these questions, then we can go talk
 8  to Judge Shushan.
 9    Q.  (By Mr. Williamson) All right.  Next
10  question is -- next sentence is --
11        MR. BAAY:  Jimmy, it's going to be
12  the same objection to any question related to
13  this document.  Unless you can somehow magically
14  lead this into a Phase II issue, or some topic --
15    Q.  By Mr. Williamson) Do you see this -
16        MR. BAAY:  -- that covers Rob
17  Turlak's deposition.
18        MR. WILLIAMSON:  I think I'm
19  required under the Rules to offer to meet and
20  confer over the fact that speaking objections are
21  not allowed.  The only objections that's
22  allowed -- I can't control what you tell your
23  witness or not tell your witness, but I'm
24  offering to go off the record and have a meet and
25  confer, rather than continue to have speaking
```

45  (Pages 174 to 177)

178

objections, because it's my express understanding that the Pretrial Orders prohibit speaking objections.

M . BAAY: Well, I disagree

MR. WILLIAMSON: I -- I  m -- sorry, let me finish, then you can say what  ou want.  And if you want, we'll go off the record and have a meet and confer.

MR. BAAY: Sounds good.

MR. WILLIAMSON: But I've now had several speaking objections in this deposit  n and -- and I would prefer not to have them.  If you want to object, object.  If you want to tell him not to answer, we can disagree, or -- we can agree to disagree, but you're not allowed to tell me and interrupt me.

MR. BAAY: Well, I disagree with your characterization of this being a speaking objection.  I've clearly stated that I think your questions are outside the scope of his deposition, which is a proper objection.  What I'm telling you is:  You continue on this document, asking Phase I questions, then yes, we can go off the record and meet and confer or call the Judge.  But I'm  oing to instruct -- instruct

179

him not to answer Phase I related questions, and if it continues with this document, I'll give him he same instruction.

Q.  (By Mr. Williamson) All right.

M  Turlak --

A   es  sir.

Q.  -- Turlak -- Turlak -- I'm sorry.  I didn't mean to mispronounce your name.

A.  Yes.  t's actually the right way to say it, "Tour-lock."

Q.  Okay.  It -- this document says, 90226:  "It is not really acceptable to have about 1 in 5 out of compliance with our minimum standards."

Do you see that sentence in Exhibit 90226?

MR. BAAY: I'll instruct the witness not to answer.

Q.  (By Mr. Williamson) Okay.  When Transocean -- tell me when you've finished looking at it.

A.  (Reviewing document.)

Q.  Mr Turlak  have you finished reading it?

A.  Yes, sir.

Q.  Okay.  The -- when Transocean was coming up with its Emergency con -- Emergency Response

180

Plan, did you consider the views of Mr  McMahan as expressed in this E-mail, 90226?

A.  Can I re -- reread it again?

MR. BAAY: Certainly.

Q.  (By Mr. Williamson  Have you reread it?

A.  Not completely.

MR. BAAY: Take your time.

Q.  (By Mr. Williamson) Have you read it no  w. Mr. Turlak?

A.  I could read it a lot better if -- if you didn't interrupt me while I'm trying to read.

Thank you very much.  Okay.  What was your question?

Q.  My question is:  Did you take into consideration the fact that it is not really acceptable to have about 1 in 5 out of complian  e with Transocean's minimum standards?

MR. BAAY: Objection.

Q.  (By Mr. Williamson) Was that given any consideration when Transocean was thinking about what its Emergency Response Plan should be for a blowout?

MR. BAAY: Objection to the form.

A  This is about crane --

MR. BAAY: Objection to the form and

181

the scope.

A.  If you're asking me as a Transocean Representative?  This is about crane training.

Q.  (By Mr. Williamson) Okay.  So the answer is this particular E-mail wasn't taken into consideration in conjunction with formulating a Response Plan --

MR. BAAY: Objection

Q.  (By Mr. Williamson) -- or an Emergency Response Plan?

MR. BAAY: Objection to the form Objection to the scope.

A.  For a crane operator.  This was crane operator training.

Q.  (By Mr. Williamson  It's a  Yes  or No  question, Mr. Turlak.

MR. BAAY: Objection  form Objection, scope.

Q.  (By Mr. Williamson) Is your answer then No," this document wasn't taken into cons deration for Emergency Response Plans?

MR. B    Y: Object to the form. Object to scope.

A.  This particular E-mail may not have been considered.

46  (Pages 178 to 181)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**



182

Q. (By Mr. Williamson) Okay.  Would you look
at what was marked as -- I think it's Tab 2.
A.  Complying.)
MR. BAAY: I'm sorry.
THE WITNESS: That's okay.
(Discussion off the record.)
Q. (By Mr. Williamson) This is Exhibit
No. 5644, marked in a previous deposition.  Can
you tell me what it is?
A.  It's a Health, Safety, and Environmental
Management System.
Q.  Okay.  Can you tell me the approximate
date of it?  I think it's at the bottom of the
page.
A.  Looks to be March 1st, 2008.
Q.  Okay.  On the back of this is there an
organizational chart for Transocean, the last
page?
A.  Okay.
Q.  Okay.  And, of course, this particular
page puts the highest person on the rig as the
OIM, correct?
A.  Correct.
Q.  Along with the Client and the Client 3rd
Party, right?

184

By Mr Williamson  Okay  Can you tell
me the Chain of Command on the rig of who the
Senior Subsea Engineer reports to
MR BAAY  I instruct you not to
answer
Q.  (By Mr. Williamson) The -- okay  The
next page back from that  still in Exhibit 5644
A  M-h'm
Q  Do you see that where it says
"CORPORATE, DIVISION AND REGION MANAGEMENT
A  Ye
Q  Okay  The - where would  let me ask
you this  How many Units within  ransocean --
this isn't from the document  this is just for
you, Mr Turlak  How many Units within
Transocean dealt with blowout preventers?
Obviously your Unit did  correct?
A  Yes
Q  Did any other Unit deal with blowout
preventers?
A  The Asset Group, we're -- we're a part of
the Asset Organization
Q  Okay
A  So the Asset Organization is responsible
for the --

183

A.  Yes, sir
Q.  And reporting directly to the OIM is the
Senior Subsea Engineer, correct?
MR. BAAY: Objection to the form.
Objection to scope.
A.  It looks like the OIM has got the RSTC,
the Senior Toolpusher, and the Captain, and the
Maintenance Supervisor reporting to him.
Q.  (By Mr. Williamson) Yeah.  Several
people, including the Senior Subsea Engineer,
correct?
A.  It's not clear from this.
Q.  Oh  it's not clear to you who the Senior
Subsea Engineer reports to?
A  No  I didn't say that.
Q.  Okay.
A.  I said from the --
Q.  Who does the Senior Subsea Engineer
report to?
A.  Well --
MR. BAAY: Don't interrupt him,
Jimmy.  This is another line of questions that's
Phase I.  I'm going to instruct him not to answer
if you ask him Phase I questions based on this
document.

185

Q.  I know.
A.  -- for the blow --
Q.  Go ahead.  I didn't mean to interrupt
you.
A.  Sorry.  What are you --
Q.  I'm trying to figure out, your
organizational Group was responsible for
engineering assistance in connection with blowout
preventer issues, correct?
A.  Engineering issues -- yes.
Q.  Okay.  Was there anybody else in your --
the Transocean organization that was also
responsible for Engineering blowout preventer
issues?
MR. BAAY: Objection to the form.
A.  Can you be more specific as far as
engineering blowout preventer issues?
Q.  (By Mr. Williamson) Well, is there any
other Group that would also be concerned with
blowout preventers?
A.  The Maintenance organization.
Q.  All right.  Other than Maintenance, any
other Group, yours and Maintenance, any other
Group?
MR. BAAY: Objection, form.

47 (Pages 182 to 185)

202

1   A. Yes, sir.

2       Q. (By Mr. Williamson) Okay. Did anyone in
3   Transocean, after Mr. Polhamus wrote this E-mail
4   on June 1st, 2008, use this information to
5   update, modify change, or revise their Emergency
6   Response Planning?
7       MR. BAAY: Object to form.
8   Objection to scope.
9       A. I'm not aware of any.
10      Q. (By Mr. Williamson) Okay. What is a
11  Dea     an S st m, when we talk about a  a BOP?
12      MR. BAAY: Object to form. Object
13  to scope.
14      A. Deadman System is when you have lost all
15  hydraulics and a l communication, electrical
16  communication, from the rig to the BOP stack.
17      Q. (By Mr. Williamson) Right. And it's a
18  term that's commonly used in en ineering
19  a plications, correct?
20      A. That's correct.
21      MR. BAAY: Object to form.
22      Q. (By Mr. Williamson) It -- because it
23  implies you do not need human intervention in
24  order to activate the system. No one needs to be
25  there for the -- for the system to be activated.

203

1       MR BAAY: Objection to form.
2       Q. (By Mr Williamson) Correct?
3       A. Yes. The first I've ever heard of it was
4   on the train.
5       Q. Okay. But what happens is if -- if a
6   certain predetermined set of parameters are
7   established, then the system activates,
8   independent of human intervention --
9       MR. BAAY: Objection, form.
10      Q. (By Mr Williamson) -- correct?
11      MR. BAAY: Objection, scope.
12      A  Correct
13      Q. (By Mr Williamson) And that's sometimes
14  enerically called a "Deadman System," right?
15      MR. BAAY: The same objections.
16      A  That's correct.
17      Q. (By Mr Williamson) Okay. How was that
18  system incorporated into the emergency response
19  planning in connection with a blowout scenario on
20  th HORIZON.
21      MR BAAY  Objection to form
22      Q. (By Mr Williamson) How was the
23  engineering concept employed in terms of
24  emergency planning?
25      MR. BAAY  Objection form.

204

1       A. I don't know that it was
2       Q. (By Mr. Williamson) Okay
3       A. Our system incor -- has incorporated a
4   Deadman System into the -- into the BOP stack.
5       M-h'm
6       THE WI ESS: Oh, sorry.
7       Q. (By Mr. Williamson) And. in fact,
8   that system -- Cameron sometimes uses the words
9   "AMF," as a synonym for the Deadman System,
10  correct?
11          . BAA  Objection to form.
12  Objection, scope.
13      A. Yes, Cameron does use that.
14      Q. (By Mr. Williamson) Okay. On the
15  HORIZON, the AMF system, sometimes called the
16  Deadman, fed into the blind shear ram component,
17  correct?
18      MR. BAAY: Objection, form.
19  Objection, scope.
20      A. Can you repeat that question?
21      Q. (By Mr. Williamson) Sure. The AMF
22  function on the HORIZON fed into the blind shear
23  rams, correct? In other words, if the system was
24  activated, it activated the blind shear rams?
25      A. It did several things. That's correct.

205

1       Q. Okay. And the EDS system on the HORI ON
2   if it activated, it activated the blind shear
3   rams, correct?
4       MR. BAAY: Objection, form. I'm
5   going to instruct the witness not to answer.
6   This is Phase I Discovery.
7       MR. WIL IAM ON: It's not Phase I
8   Discovery.
9       MR. BAAY: The same instruction.
10      MR. WILLIAM ON: Okay.
11      Q. (By Mr. Williamson) All right. Did you
12  ever look at the HORIZON configuration befor
13  April 20th, because I thought your testimony is
14  you had -- did not?
15      A. That's correc ,  did not.
16      Q. Okay. And  --
17      A. This is me, personally, no.
18      Q. Right.
19      A. Okay.
20      Q. Did you look at the BOP HORIZON
21  onfiguration after April 20th?
22      A. No.
23      Q. Okay. So you don't know how many shear
24  ams it had or the how the EDS system was set up
25  or how the AMF was set up. You don t have

52 (Pages 202 to 205)



206

1  ersonal knowledge of that?
2      MR. BAAY:  Object to form.  Object
3  to scope.
4      A  Well, I d .  I e you asked me if I
5  studied it.  I didn't study it.  I looked at a
6  drawing, becau e during -- while the -- while we
7  were doing the BOP-on-BOP and the cappin  stack,
8  I had to look at the configuration of the -- of
9  the BOP.  I knew there was two shear rams.
10      Q  (By Mr. Williamson)  Okay.  I'm getting to
11  a v  rye  I thin  I'm getting to a very simpl
12  question  The AMF fed to the blind shear rams,
13  the EDS fed to the blind shear rams, and the high
14  pressure blind shear function fed to the blind
15  shear rams on the HORIZON, correct?
16      MR. BAAY:  Object to form.
17  Object to scope of the question.
18      A  Fed  DDS activated the -- the she --
19  blind shear rams.  The AMF actuated the blind
20  shear rams.  The --
21      Q  (By Mr. Williamson)  And the high pressure
22  blind shear function actuated the blind shear
23  rams  ?
24      MR. BAAY:  Object to form.  Object
25  to scope.

207

1      A  I don't know what you're talking about,
2  the blind she -- blind --
3      Q  (By Mr. Williamson)  Okay.
4      A  -- the hi  h pressure blind shear
5  function.
6      Q  All right.  One more, the Autoshear --
7      A  Yes, sir.
8      Q  -- also activated -- or actuated, to use
9  your word, the blind shear rams, right?
10      MR. BAAY:  Object to form.  Object
11  to scope.
12      A  That's correct.
13      Q  (By Mr. Williamson)  Okay.  Was there any
14  other emergency vode act -- emergency mode of
15  actuation of the BOP other than those three:
16  AMF, EDS, and Autoshear?
17      MR. BAAY:  You talking about the
18  HORIZON BOP?
19      MR. WILLIAMSON:  The HORIZON BOP
20  Thank you.
21      A  Automatically?
22      Q  (By Mr. Williamson  Yeah.
23      A  No.  That was it.
24      Q  All right.  Did you ever take into
25  account that every emergency BOP actuation went

208

1  to one single component when you were thinkin  g
2  about your Emergency Response Plan?  And I'm
3  asking that to you as a Corporate Representative.
4      MR. BAAY:  Objection to the form.
5  Objection to the scope of the question.
6      A  Can you repeat that, please --
7      Q  (By Mr. Williamson  Sure. )
8      A  -- because --
9      Q  Every single BOP emergency function on
10  the HORIZON fed to one single component; namely
11  the blind shear rams.  Did Transocean tak  th  t
12  into account when they were determining what
13  their Emergency Response Plan would be?
14      MR. BAAY:  Objection to form
15  Objection, scope.
16      A.  No.
17      Q.  (By Mr. Williamson)  Okay.  The -- woul  d
18  you please turn to Tab No. 4, which I think we've
19  previously marked as Exhibit No. 90223.
20      THE COURT REPORTER:  (Indicating.)
21      THE WITNESS:  Oh, yeah.
22      MR. BAAY:  Does that make it easier?
23      THE WITNESS:  (Nodding.)
24      A.  Here, I've got it right here.
25      Q.  (By Mr. Williamson)  Oh, sorry.  Are you

209

1  it?
2      A.  Yes, sir.
3      Q.  Do you recognize that document?
4      A.  This is a nontank Vessel Response Plan.
5      Q.  What does --
6      A.  The --
7      Q.  -- that mean?
8      Let me ask you as Corporate
9  epresentative in connection with emergency
10  sponses what you think this document is or what
11  s supposed to cover?
12      A.  Just give me a second, please.
13      Q.  Sure.
14      A.  (Reviewing document.)
15      This is a Vessel Response Plan for in the
16  vent -- in the event to -- to assist in the
17  revention of operational or accidental discharge
18  f oil into a marine environment.
19      Q.  Is it really supposed to address -- is
20  is particular exhibit supposed to address a
21  lowout situation, or is it supposed to address
22  ore a situation, for example, you had a leak on
23   oil container on deck?
24      A.  That's correct.
25      MR. BAAY:  Objection to form.

53 (Pages 206 to 209)



**210**

Q. (By Mr. Williamson) Which -- which one? Which one's correct?

A. It's for oil that is inherent to the -- to the rig.

Q. Right. For example, if you had a diesel container on deck, this might deal with what you -- would happen if that diesel container had a leak?

A. That's correct.

Q. Okay. This document doesn't really speak to how you would respond to an uncontrolled blowout hyd -- of car -- hydrocarbons?

A. That's correct.

Q. Okay. Would you please turn to Tab No. 5, which I think we have marked as Exhibit No. 90224.

A. (Complying.)
Okay.

MR. WILLIAMSON: (Indicating.)

THE VIDEOGRAPHER: (Indicating.)

Q. (By Mr. Williamson) Could you please tell me what this document is, Exhibit 90224? And I'm asking this as a Corporate Representative in connection with your emergency response -- Transocean's emergency responses, systems.

**211**

A. (Reviewing document.)
This --

MR. BAAY: Objection, form.

A. This is a general emergen -- Emergency Response Manual on how people should respond to -- to emergencies onshore or offshore.

Q. (By Mr. Williamson) Okay. And this includes utilizing a program that's called THINK or START or MoC?

A. Well, by utilizing T INK START, or MoC, you avoid -- you can avoid emergencies.

Q. Okay. And, of course, that's the best way of controlling an emergency is to avoid it altogether?

A. Yes, sir.

Q. Okay. Did you ever see -- in connect'on with your preparation as the Corporate Representative of Transocean, did you ever see that Transocean had done any documented Risk Assessment on the blowout preventer before the disaster, in connection with the Macondo Well?

MR. BAAY: Objection to form. Objection to scope.

A. The Risk Assessment on the BOP --

Q. (By Mr. Williamson) M-h'm.

**212**

A. -- on the Macondo Well?

Q. Correct.

A. No.

Q. Have you ever hear of a Program called "Well Advisor"?

A. Yes, sir.

Q. Okay. Did Transocean make available, or did it have Well Advisor as one of its options available?

A. Yes.

MR. BAAY: Objection, form. Objection, scope.

A. Yes.

Q. (By Mr. Williamson) You know it wasn't used on the Macondo Well?

MR. BAAY: Objection, form Objection, scope.

A. I don't know that for a fact.

Q. (By Mr. Williamson) All right. What's your belief as the Corporate Representative in connection with emergency responses?

A. I think --

MR. BAAY: Objection, form. Objection, scope.

A. I don't know that the kick tol -- that

**213**

Well Advisor was not used, but I do know that there was a minimal -- there wasn't a -- a kick tolerance for that well.

Q. (By Mr. Williamson) All right.

A. So I don't know if the -- if -- if Well Advisor had been utilized to -- to come up with that or not.

Q. Okay. I think it may be -- and I'll stand corrected, because the documents are whatever they are -- that it may have been used for that one purpose and wasn't used otherwise. Does that sound correct to you, or do you know?

MR. BAAY: Objection, form. Objection, scope.

A. I don't know.

Q. (By Mr. Williamson) Okay. All right. Well, if -- is there an operating limitation whereby BOPs will have a point at which time wellbore pressure will affect their ability to successfully shoe -- shear and seal a well?

MR. BAAY: Instruct he witness not to answer. This is another attempt at Phase I Discovery.

MR. WILLIAMSON: No.

Q. (By Mr. Williamson) I'm trying to figure

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**



**214**

1  out how that played into your emergency response
2  plannin   Did you take into consi --
3      MR. WILLIAMSON: I'll rephrase the
   question, and I disagree with Counsel's comment
5  and it's a speaking objection, you know.
6      Q   (By Mr. Williamson) Did the capacity of
7  the BOP ever get considered by Transocean when
8  Transocean was deciding what sort of Emergency
9  Response Plan it would have on the Macondo Well?
10     MR. BAAY: Objection to form.
11 Objection to scope of the question.  It's outside
12 the Notice.
13     A   As far as the BOP con -- was concerned,
14 what was taken into account was whether or not
15 the BOP was -- the shear rams were capable of
16 shearing that size pipe that was being used, and
17 whether or not there was adequate volume in
18 the -- in the accumulators in the event there was
19 an emergency.
20     Q   (By Mr. Williamson) Okay.
21     A   That was s part of the -- what was
22 done in --
23     (Discussion off the record.)
24     Q   (By Mr. Williamson) I'm sorry --
25     A   -- in response -- in respon --

**215**

1      Q   -- go ahead and finish.
2      A   -- in -- in response to -- to looking at
3  an emergency situation.
4      Q   Okay.  So Transocean should if they're
5  planning for an emergency evaluate the capacity
6  of the blowout preventer to handle the conditions
7  on Macondo, correct?
8      MR. BAAY: Objection to form.
9  Objection scope.
10     A   They're looking at the conditions, as far
11 as being in an emergency their capability of the
12 BOP to shear.
13     Q   (By Mr. Williamson) I know.
14     A   And seal.
15     Q   Transocean should look to that issue
16 before they util -- they splashed the BOP on the
17 Macondo, they should do emergency planning over
18 whether the BOP has the capacity to handle the
19 conditions at Macondo?
20     MR. BAAY: Objection  form.
21 Objection, outside the scope of the Notice.
22     Q   (By Mr. Williamson) True?
23     A   I --
24     MR  BAAY: Same -- same objections
25     A   Our requirements are the what -- what the

**216**

1  sus 1- suspected pressure that was going to be
2  seen on the well is to provide a piece of
3  equipment that was capable of sealing that
4  pressure.
5      Q   Sealing, what do you mean, shearing and
6  sealing pipe at that pressure?
7      A   In the event of an emergency, yes.
8      Q   Okay.  That's my point.  Let me back up
9  and see if I can ask the question:  As part of
10 emergency planning, should Transocean evaluate
11 the capacity of the blowout preventer to prevent
12 an uncontrolled blowout?
13     A   And we --
14     MR. BAAY: Objection to form.
15 Objection, scope.
16     Q   By Mr. Williamson  I'm sorry.  Should
17 you?
18     MR. BAAY: Objection, form.
19 Objection, scope.
20     A   You can answer.
21     A   And we did.
22     Q   (By Mr. Williamson) Okay.  The answer s
23 "Yes," you should, correct?
24     A   Yes.
25     Q   And then you're saying  ou did?

**217**

1      A   Yes.
2      Q   Okay.  Please tell me how.
3      MR. BAAY: Objection, form.
4      Q   (By Mr. Williamson) What was done by
5  Transocean employees -- who does it, let's start
6  there?  What Transocean employee is given the
7  responsibility of evaluating the BOP's res --
8  capacity to respond to an emergency?
9      MR. BAAY: Objection to form.
10 Objection, scope.
11     A   The Subsea Engineer is to make sure
12 along with -- with the Management, whether
13 onshore or -- offshore, to make sure that the
14 BOP can respond in shearing and sealing under
15 emergency situations for the drill pipe that
16 would be in the hole -- in the hole, along with
17 the responsibilities of the Operator.
18     Q   (By Mr. Williamson) All right.  And who
19 on Macondo, on the HORIZON  at Transocean did
20 that?
21     MR. BAAY  Objection to form
22 Objection, scope
23     Q   (By Mr  Williamson) I'm -- I m trying to
24 find out a name of the person who did it
25     A   I don't remember who actually did that

55 (Pages 214 to 217)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

218

1      Q. Okay.
2          MR. BAAY: Let's take a break.
3          MR. WILLIAMSON: Okay.
4          THE VIDEOGRAPHER: It's 2:22 p.m.
5  We're off the record.
6          (Recess from 2:22 p.m. to 2:36 p.m.)
7          MR. BAAY: We're ready when you guys
8  are.
9          MR. WILLIAMSON: Give me a couple of
10 seconds.
11         (Discussion off the record )
12         MR. BAAY: Ready when
13 everybody else is.
14         THE VIDEOGRAPHER: All set?
15 The time is 2:36 p.m. -- sorry.
16 The time is 2:36 p.m. We're back on the
17 record, beginning Tape 6.
18     Q. (By Mr. Williamson) Mr. Turlak, I want
19 you to return your attention to Exhibit
20 No. 90224. It's the "EMERGENCY MANAGEMENT
21 PROCEDURES MANUAL." I suspect it's out here in
22 this stack in front of you.
23         THE COURT REPORTER: Jimmy, I'm
24 sorry. What exhibit number did you say?
25         MR. WILLIAMSON: 90224.

219

1      A. Okay.
2      Q. (By Mr. Williamson) Okay. And you were
3  saying this is a document that kind of puts in
4  place a method of approaching issues like the
5  Think Method, the Start Method, Management of
6  Change. Correct?
7      A. Yes. I think this references other --
8  other manuals.
9      Q. Okay. Because you're going to use this
10 Management System, the Think System, the Start
11 System, and the MoC System, you're going to use
12 them in connection with operational
13 decision-making, correct?
14         MR. BAAY: Objection to form.
15     Q. (By Mr. Williamson) Transocean is going
16 to use them in connection with operational
17 decision-making?
18         MR. BAAY: Objection to form.
19     A. Yes.
20     Q. Okay. Did you see
21 any evidence in preparing for this deposition as
22 a Corporate Representative that Transocean used
23 Management of Change process, the MoC process, in
24 connection with their Emergency Response
25 Planning?

220

1          MR. BAAY: Objection to form.
2      A. How they used the Management of Change
3  process for Emergency --
4      Q. (By Mr. Williamson) -- Response Planning.
5  When they were dev -- when Transocean was
6  developing its Emergency Response Planning, did
7  you see any evidence that they used MoC in
8  connection with that development?
9          MR. BAAY: Objection to form.
10     A. No.
11     Q. (By Mr. Williamson) Okay. When
12 Transocean was developing its Emergency Response
13 Planning, did you find any Documented Risk
14 Assessments of -- and -- oh, I'm sorry. Let me
15 back up. I want to talk about blowouts, okay?
16     There's Emergency Planning. These
17 Emergency Planning manuals deal with all sorts of
18 situations, not -- other than blowouts, correct?
19     A. It deals with all emergencies.
20     Q. So, well, I noticed last night, when I
21 was looking at it, one of these manuals deals
22 with what happens if you have a man overboard?
23     A. Correct.
24     Q. One of them deals with what happens if
25 you're evacuated from a country?

221

1      A. That's right.
2      Q. One of them deals with what happens if
3  you spi -- spill one barrel of oil, right?
4      A. That's correct.
5      Q. One of them deals with what happens if
6  you have an act of sabotage?
7      A. Correct.
8      Q. One of them deals with what happens if
9  your helicopter has an accident while it's trying
10 to land on the rig?
11     A. Yes.
12     Q. Okay. Okay. So these are supposed to
13 deal with different aspects of the oil and gas
14 drilling business, correct?
15         MR. BAAY: Objection to the form --
16     A. That's correct.
17         MR. BAAY: -- and to scope.
18     Q. (By Mr. Williamson) Okay. Did you see
19 one instance in which Transocean used a
20 documented Risk Assessment in terms of developing
21 their Emergency Response Planning?
22         MR. BAAY: Objection to form.
23 Objection to scope of the question.
24     A. I -- I don't know if they used a Risk
25 Assessment, but we do have outside consultants

56 (Pages 218 to 221)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

222

1  come in, O'Brien's, whenever we have an emergency
2  response meeting or emergency response drill.
3      Q. (By Mr. Williamson) Okay. One question
4  at a time. Did you find one single documented
5  Risk Assessment dealing with Emergency Response
6  Planning as regards an uncontrolled well blowout?
7          MR. BAAY: Objection to form.
8  Objection to scope.
9      A. No.
10     Q. (By Mr. Williamson) Even after the Jim
11 Cunningham Well blew out in 2005?
12         MR. BAAY: Objection to form.
13     Q. (By Mr. Williamson) Correct?
14     A. Well, I said I didn't find -- I didn't
15 see one, and it would have -- necessarily had to
16 have been after 2005.
17     Q. Okay. And turn your attention to Tab --
18 what was Tab No. 6. I believe it's now been
19 marked as 90225.
20     A. Okay.
21     Q. Okay. Can you tell me what this is?
22 It's title is "GULF OF MEXICO SECTOR EMERGENCY
23 RESPONSE MANUAL," and it's dated, apparently,
24 December 15th, 2008.
25     A. This is the Emergency Response Manual for

223

1  the Gulf of Mexico.
2      Q. Okay. Does it deal with an uncontrolled
3  blowout?
4      A. No.
5      Q. Okay. Does it deal with a whole lot of
6  other things, like man overboard, hostages,
7  hurricanes, bombs, bad publicity, tornados?
8          MR. BAAY: Objection, form.
9      Q. (By Mr. Williamson) It deals with a lot
10 of those things, doesn't it?
11         MR. BAAY: Object to form.
12     A. It deals with "Fire Explosion" --
13 personally, I don't know about the ones that you
14 said but "Fire Explosion," "Personal
15 Injury Illness," AED instructions, "Bomb Threat &
16 Checklist," "Civil Unrest," "Hostage
17 Situation...," "Vehicle Accident," environmental
18 incidents, hurricanes, and "Severe Weather,"
19 tornados.
20     Q. (By Mr. Williamson) Sure. Where do you
21 rank an uncontrolled hydrocarbon blowout in the
22 Gulf of Mexico in 5,000 feet of water? Where
23 does Transocean rank that, in terms of risk
24 severity or risk consequence or risk probability?
25         MR. BAAY: Objection to form.

224

1      A. The consequences are high. The
2  probability is -- is pretty low.
3      Q. (By Mr. Williamson) Okay. But do you
4  rank it ahead or behind the hostage problem?
5          MR. BAAY: Objection to form.
6      Q. (By Mr. Williamson) Or do you know? Has
7  ever such a ranking ever been done by Transocean?
8      A. I'm not aware of how that sort of ranking
9  is -- has been done.
10     Q. Okay. I'm asking that question as a
11 Corporate Representative. To your knowledge,
12 Transocean has never tried to assess or rank or
13 put in order those different risks?
14     A. No. That we --
15         MR. BAAY: Objection to form.
16     A. We look at emergencies, and we list those
17 emergencies. They're not necessarily ranked.
18     Q. (By Mr. Williamson) I know. That's what
19 I -- that was my question.
20     A. That's right. They're not.
21     Q. You haven't ranked them in terms of
22 trying to come up with some sort of matrix about
23 how they should be identified, or how much
24 attention should be given to them?
25     A. That's correct.

225

1      Q. Okay. Have you ever heard the term
2  "Maximum Anticipated Surface Pressure"?
3      A. Yes.
4      Q. Does it have anything to do with the
5  capacity of a blowout preventer?
6      A. Yes.
7      Q. What?
8      A. Well, maximum --
9          MR. BAAY: Object to form. Object
10 to scope.
11     A. Maximum anticipated pressure -- surface
12 pressure is what's anticipated for the blowout
13 preventer to seal at the surface.
14     Q. (By Mr. Williamson) Okay. Does it
15 increase the amount of force necessary? I'm
16 going to -- I'm going to deal with 5,000 feet of
17 water -- blowout preventer in 5,000 feet of water
18 to try to make my comments more simple.
19     A. M-h'm.
20     Q. Is that okay?
21     A. Sure.
22     Q. Because that's what Macondo had, correct?
23     A. Yes.
24     Q. Okay. Would -- would MASP for a blowout
25 preventer in 5,000 feet of water, would that

57 (Pages 222 to 225)



226

affect the capability of the blowout preventer to shear and seal a well?

MR. BAAY: I'm going to instruct the witness not to answer based on Phase I discovery.

Q. (By Mr. Williamson) All right. Would you please turn to Tab No. 24.

MR. WILLIAMSON: And mark it as the next exhibit.

(Originally marked as Exhibit No. 90228; redesignated as Exhibit No. 10228.)

A (Complying.)

MR. WILLIAMSON: Well, do we need to give them one of our copies, or is this our copy?

MR. DILLS: They should have them.

MR. WILLIAMSON: Here, you can mark this one. (Tendering.)

MR. WILLIAMSON: And if you would tell me the number, please, I'd appreciate it.

A. 90228.

Q. Thank you.

This is an E-mail -- tell me when you're ready. Are you ready, Mr. Turlak?

A. Yes, sir.

Q. This is an E-mail chain dated 2008. Have you ever seen it before? And I will represent to

227

you I do not see your name in the E-mail headings.

A. (Reviewing document.) I don't think so.

Q. Okay. Do you see where Mr. Newman is in the E-mail chain on Exhibit No. 90228?

A. Yes, sir.

Q. Okay. And then I want you to turn the next page, where Mr. Newman, July 25th, 2008, he says: "I assume that your update to the" Well Control "manual will give clear guidance on how to calculate MASP as well as operatin procedures for drilling uch a well."

Do you see where Mr. Newman said that?

MR. BAAY: And I'll save time. I'm going to instruct him not to answer any questions related to --

MR. WILLIAMSON: The only question is --

MR. BAAY: -- Exhibit 90 --

MR. WILLIAMSON: -- did I --

MR. BAAY: -- 228.

MR. WILLIAMSON: -- did I read it correctly.

I -- I apologize for interrupting, Counsel.

228

A. I --

Q. (By Mr. Williamson) My -- the question on the table is: Did I read that sentence correctly?

A. I hadn't gotten to where you were because this is --

MR. BAAY: Look, Jimmy, he's not going to go through and verify if you've read this document correctly if you don't have a Phas II question associated with it.

MR. WILLIAMSON: I do.

MR. BAAY: Let's hear it.

MR. WILLIAMSON: Well, I need to know if I -- I -- that's the predicate for the question. And by the wa , that's another speaking objection.

MR. BAAY: Well, we have attempted to meet and confer. These aren't speak -- speaking objections. We can go off the record and get clear what's Phase I and what's Phase II. But there is an Order in place that makes real clear that Phase I discovery is closed.

So unless and until you stop wrapping all of these E-mails from 2008 into the Emergency Res onse Plans, I'm oin to instruct the witness

229

not to answer.

Q. (By Mr. Williamson) Well, I just asked you a question. Did I read this correctly?

A. I wasn't that far.

Q. That's okay.

A. I was on the wrong page --

Q. That's okay.

A. -- when you were reading it.

Q. It's at the top of the second page. My only question to you on the moment -- I'm going to ask a followup question for the record, that will tie directly to my area of inquiry.

A. Okay.

Q. But my first question is: Mr. Newman sent an E-mail that says: "I assume that your update to the" Well Control "manual will" go -- Well Control "manual will give clear guidance on how to calculate MASP..."

Do you see that in Mr. Newman's E mail ?

A. Yes.

Q. Okay. Here's my question: Did Mr. Newman, or Mr. Hand, or Mr. Pathak, or Mr. Braniff, or Mr. McMahan, did they conta t you to ask you about the subject of MASP as it affects the emergency use of blowout prevent r es

58  (Pages 226 to 229)



**230**

```
 1   after July 25th, 2008?
 2        MR. BAAY:  Objection to form.  I'll
 3   instruct the witness not to answer, as it relates
 4   to Phase I discovery.
 5        MR. WILLIAMSON:  That's just
 6   outrageously wrong.
 7        MR. BAAY:  Okay.  Well then call
 8   the Judge, Jimmy.
 9        MR. WILLIAMSON:  No, I don't want to
10   take up the Judge's time.  I will --
11        MR. BAAY:  Then ask        --
12        MR. WILLIAMSON:  I will figure
13   that --
14        MR. BAAY:  -- Phase II questions.
15        MR. WILLIAMSON:  I'm sorry.  I
16   didn't interrupt you.  I don't want to -- I -- we
17   can -- I -- I want to be polite, even while we're
18   disagreeing.  So I'm not trying to interrupt you,
19   and I don't want to be interrupted.
20        It's just outrageously wrong that this
21   question doesn't relate to one of the Topics, p
22   but no I'm not going --
23        MR. BAAY:  Point me to the Topic.
24        MR. WILLIAMSON:  -- to call --
25        MR. BAAY:  Point me to the Topic.
```

**231**

```
 1   Show me the Topic.
 2        MR. WILLIAMSON:  The training and
 3   preparation for "Worst Case Scenario," Topic
 4   No. 27 and Number -- "Tokic" No. 24 in the --
 5        MR. BAAY:  So you're agreeing
 6   that --
 7        MR. WILLIAMSON:  -- 30 c -- ( )
 8   30 b)(6 ( )
 9        MR. BAAY:  -- how MASP relates to
10   training and preparation for an --
11        MR. WILLIAMSON:  Absolute --
12        MR. BAAY:  -- uncontrolled blowout?
13        MR. WILLIAMSON:  Absolutely.
14        MR. BAAY:  Well, that's not the
15   question you asked.  So is that your --
16        MR. WILLIAMSON:  Yeah.
17        MR. BAAY:  -- new question?
18        Q.  (By Mr. Williamson)  Yeah, the question --
19   the question on the table is:  Did the
20   Management, Mr. Newman, after he got this E-mail
21   and sent these E-mails dealing with clear
22   guidance on how to calculate MASP -- did anyone
23   from Management contact you to discuss that issue
24   for the purpose of planning how to evaluate and
25   use BOPs for emergency well control?
```

**232**

```
 1        MR. BAAY:  Objection to the form.
 2   Objection to the scope.
 3        A.  Well, Steve, who he directed it to, was
 4   Well Operations Manager at the time, who worked
 5   in the -- the Performance Division of the
 6   company.  And in -- within the Performance
 7   Division of the company is where the
 8   requirement -- or where the information would
 9   have come from the -- from the customer as to
10   what the MASP would be.  Performance wa -- dealt
11   directly with the customer.  The Asset people
12   handled the equipment.  So Steve was part of the
13   Performance Division, who dealt with the
14   customer.
15        Q.  (By Mr. Williamson)  Oka.)  My questions
16   a little different
17        A.  Okay.
18        Q.  My question is:  After Mr. Newman made a
19   comment that he wanted clear guidance on how to
20   calculate MASP, did anyone contact you and your
21   Unit to discuss how that should be calculated for
22   the purpose of emergency  BOP use and containment?
23        A.  Well, first of all --
24        MR. BAAY:  Ob -- objection to the
25   form.  Objection to the scope.
```

**233**

```
 1        A.  Well, for the -- the Well Operations
 2   Man -- Engineers know much better how to
 3   calculate MASP than we do.  We take that
 4   information and make sure that the equipment that
 5   we have on the rig are good enough -- is good
 6   enough to meet those requirements.  The Well
 7   Operations people are Drilling Engineers.
 8        Q.  (By Mr. Williamson)  Okay.  But the
 9   consequence of the way you calculate MASP may
10   affect whether the BOP is underrated or not.
11        MR. BAAY:  Objection --
12        Q.  (By Mr. Williamson)  Correct?
13        MR. BAAY:  Objection to form.
14   Instruct the witness not to answer.
15        Q.  (By Mr. Williamson)  Okay.  Well, whether
16   the BOP is underrated for the well is something
17   that should be considered for emergency response,
18   correct?
19        MR. BAAY:  No.  Object to form.
20   Instruct the witness not to answer.
21        Q.  (By Mr. Williamson)  Okay.  Turn to the
22   first p e of Exhibit 90228
23        MR. WILLIAMSON:  That's also just
24   outrageously wrong.  I'm talking about the way to
25   use an emergency piece of equipment in an
```

59  (Pages 230 to 233)

236

emergency response situation and you're claiming it's not dealing with a -- an emergency response.

Q. (By Mr. Williamson) See the bottom -- the E-mail at the bottom of the first age?p

A. Yes, sir.

Q. Do you see where Mr. Hand, while he's writing to Mr. Newman, says: "To refuse to drill a well by not accepting the assumptions for the well design calculations will have serious consequences - not only could the BOP become under-rated, but also the casing design," okay, "(in some cases the casing grade required for full evacuation does not exist ."

Did I read it correctly?

A. That's -- yes, sir, you did.

Q. Okay. Do you agree with that sentiment, that miscalculation of MASP could cause the BOP an emergency piece of equipment, to become underrated in an emergency?

MR. BAAY: I'll instruct the witness not to answer as this constitutes Phase I discovery.

Q. (By Mr. Williamson I have another uestion Mr. Turlak.

A. Yes, sir.

OP-on-BOP options, correct?

A. That's correct.

Q. Okay. You said there were two different OP-on-BOP options. Can you tell me what those ere?

A. Well, it was the DISCOVERER ENTERPRISE --

Q. M-h'm.

A. -- was first considered for -- to go onto e lower BOP stack of the HORIZON. To do that, e would have to cut the riser, pull the LMRP f, and land the -- the ENTERPRISE BOP stack on p of the lower BOP stack.

That got put to the side because the NTERPRISE was going to -- was being sent to -- r containment, or to -- to catch the oil and s, first with the RITT tool and then later with e -- with the cap, or with the Top Hat.

The second one was to utilize the DDII r BOP-on-BOP. We looked at that for a while. at would have required the same type of rangement.

Q. Both of those -- were you finished?

A. Yes, sir.

Q. Both of those would have required you to, at, pull the LMRP?

235

MR. WILLI   SON: And I'll repeat for the record, with all due respect to Counsel, how strenuously I object with Counsel's imposition and violation of a Pretrial Order, which -- instructing him not to answer based on grounds other than pri ilege, and not only that, the uestions are legitimate.

MR. BAAY: Jimmy, this -- it -- we have made valid objections based on the fact that you are asking questions that relate back to Phase I discovery. There is an Order in place signed by Judge Barb er that says that Phase I discovery is over.

You are trying to use this Phase II deposition, and you are wasting this witness' time, who has been designated as a Corporate Representative on Phase II Topics, to ask your Phase I questions. And that's why we have instructed him not to answer.

Q. (By Mr. Williamson) Mr. Turlak, I want to switch subjects.

A. (Nodding.) Okay.

Q. When you were called in shortly after the HOR ZON disaster, you started looking at different ca -- capping options, including

237

A. Yes, sir.

Q. Okay. How much of a trouble would it ve been to pull the LMRP? How much of a allenge is that?

MR. BAAY: Objection, form.

A. Well, that would have required cutting e ri -- riser off, as we eventually did, as -- d to attach lugs -- I'm sorry -- to attach -- a lifting device or lifting cables to the MRP plate, unlatch the connector, the riser onnector, and unlatch the mini connectors on the oke and kill lines.

Q. (By Mr. Williamson) Had the LMRP been esigned for this to happen?

A. For emergency recovery? Yes.

Q. Okay. So if you get the riser cut --

A. M-h'm.

Q. -- you could get the LMRP disconnected d removed?

A. Correct.

Q. Okay. By the way, did they try to cut e riser first with a saw?

A. I think they initially tried to cut ser with a saw, and I think they had some chnical difficulties.

60  (Pages 234 to 237)



**Page 246**

A. Yes, sir.

Q. - what would Transocean know about the issue of whether you should limit the pressure you're going to try to use in the top kill operation?

MR. BAAY: Objection, form.

A. We didn't really have any information. I mean, there was discussions about what the pressure should be, or -- but we weren't in -- in the - we didn't have enough information. The only information we wanted to mak  su  of is that we didn't overpressurize our BOP stack or any of the equipment on it.

Q. (By Mr. Williamson) You're talking about when you were actually shooting down the materials into the choke/kill lines?

A. That's what we were -- you know, if we were -- had -- if we had any involvement at all, because we were going to have to help BP function the valves for the -- for the top kill.

Q. Through ROVs?

A. No, sir.

Q. Okay. Go ahead.

A. That was done through the Yellow Pod. The Yellow Pod was originally removed, and some

**Page 247**

work done to it, and then the Yellow Pod was put back on, and we had the capability of -- of being able to operate some of the -- some of the equipment on the lower stack, specifically the valves, so that you could have communication from -- from the manifold.

Q. We'll make sure I understand. When the Yellow Pod was reinstalled -- and by the way, the Solenoid 103Y was changed in the Yellow Pod when it was pulled in early May, correct?

MR. BAAY Objection, form, scope.

A. I believe it was changed.

Q. (By Mr. Williamson) Right. And I believe you said in your first deposition, you really do not know enough about solenoids to figure out whether Solenoid 103Y was correctly wired or not wired?

A. I did not have enough -- enough information to -- to -- to say one -- one way or the other.

Q. Do you have -- do you now -- do you now know whether Solenoid 103Y was wired correctly or not?

MR. BAAY: Object to form. Object to scope.

**Page 248**

A. I don't remember, but I -- I think it I think it was -- wasn't wired correctly, but it had no impact on the operation.

Q. (By Mr. Williamson) Okay. And -- and what leads -- okay. So you're saying Solenoid 103Y was not wired correctly on the Yellow Pod, correct?

A. I believe that's correct.

Q. Okay. You added something there, where you said you did not think it had an impact?

A. That's correct.

Q. Okay. And your reasoning for that is?

A. Based on testing done after the fact.

Q. I assume that is the testin  done by Mr. Childs?

MR. BAAY: Ob ection to form Objection to scope

A. That's the testin  that was referenced by Mr. Childs.

Q. (By Mr. Williamson) Were you -- it's my understanding, in your deposition, you had said you were not part of any of that testing and weren't actuall  doing that testing or observing it?

A. That's correct.

**Page 249**

MR. BAAY: Jimmy, come on. You were doing so well. Stay on Phase II. Stay on Phase II

MR. WILLIAMSON: That's -- that's a speaking --

MR. BAAY: You're right, it is. And I'll continue to make speaking objections or instruct the witness not to answer so long as you sta  on Phase I discovery.

MR. WILLIAMSON: That's another speaking objection.

MR. BAAY: You're right. I agree.

MR. WILLIAMSON: Okay. Bring -- okay.

Q. (By Mr. Williamson) The -- the question becomes, so when you say the testing shows that it didn't have an impact, you're really relying not on anything you observed or any testing you did, you're relying upon what you read from Mr. Childs?

A. I was --

MR. BAAY: Instruct the witness not to answer, as it relates to Phase I discovery.

MR. WILLIAMSON: You won t let him answer where he got the opinion that he had just



**250**

1  ex   ressed a couple of minutes ago?  Correct?
2       MR. BAAY:  Correct.
3       Q.  (By Mr. Williamson)  Okay.
        THE COURT REPORTER:  Bob --
5  (Indicating.)
6       THE WITNESS:  Oh, okay.
        (Discussion off the record.)
8       Q.  (By Mr. Williamson)  What provision did
you have to make in order for the top kill to
have a conduit by which fluids could be put into
th  blowout preventer?
        MR. BAAY:  Object to the form.
        Q.  (By Mr. Williamson)  You understand what
mean?
        A.  Yes, sir.
        Q.  It was run down the choke line, wasn't
it?
        A.  Yes, sir.  The -- the --
        Q.  Do l remember that correctly, does -- it
came down the choke line?
        A.  M-h'm.
        Q.  Okay.
        A.  I remember it the same way.
        Q.  So somebody had to somehow configure the
choke line to accept the materials that would be

**251**

injected into the line, correct?
        A.  The Coflexip line, the -- the flexible
hose from the flex joint, down to the -- the
connection above the mini collet connector or the
isolation -- above the mini -- isolation valve,
the -- there was a clamp, and the clamp was a
four-bolt clamp, and the ROV was able to loosen
the clamp, and take the Coflexip hose away and
able to put on another connection.
        Q.  Okay.  Had the BOP been designed for that
to occur?
        A.  That specific?
        Q.  Yeah.
        A.  No.
        Q.  Okay.  When you first arrived, one of the
options that was considered to be one of the
first options to be explored was to try to use
the BOP that actually existed on the wellhead
correct?
        MR. BAAY:  Objection to form.
        A.  For what --
        Q.  (By Mr. Williamson)  When you became first
involved after the Macondo disaster, one of the
options was to try to utilize the BOP that
actually was sitting on the wellhead to try to

**252**

close the wellhead?
        A.  Yes.
        Q.  Okay.  At that point in time, did you
know whether the AMF had fired or not?
        A.  No, sir.
        MR. BAAY:  Objection to form.
        Q.  (By Mr. Williamson)  At that point in
time, did you know whether the AMF has be   en --
was armed at the time of the disaster?
        MR. BAAY:  Objection to form.
        A.  Specifically, at that time?  N
        Q.  (By Mr. Williamson)  Okay.  Okay.  What is
the policy of Transocean with respect to whether
the AMF should have been armed or not?
        MR. BAAY:  Object, and instruct the
witness not to answer.
        Q.  (By Mr. Williamson)  Why did you not know
whether the AMF was armed, when you arrived and
started looking at the BOP as a possible way to
close in the well?
        MR. BAAY:  Objection, form.
Instruct the witness not to answer.
        Q.  (By Mr. Williamson)  This was one of the
things you looked at, after the disaster, when
you show up:  "Gee, can we use the BOP to close

**253**

the well?"  Correct?
        MR. BAAY:  I instruct the witness
not to answer.
        MR. WILLIAMSON:  (Laughing.)  You   er
not going to let him answer, post-incident, what
he was looking at for the purpose of closing i   n
the well?
        MR. BAAY:  That's not the question
you asked.  You were asking about AMF operation.
        MR. WILLIAMSON:  Right.
        MR. B      Y:  Show me a Topic that
deals with the AMF operation, and I'll let you
ask it.
        Q.  (By Mr. Williamson)  Okay.  Did you look
at using the BOP to close in the well when you
first got on this Project?
        A.  Yes.
        Q.  Did you look and try to figure out
hether the AMF was armed?
        MR. BAAY:  Objection to the form.
        A.  I don't know if there was a way to tell
whether or not the AMF was armed.  It should ha   ve
been.
        Q.  (By Mr. Williamson)  Is there a way that
you can carry BOP data to shore so that the



254

1  question of what -- whether it was armed, whethe
2  the BOPs were actuated, when they were actuated
3  what pressure they were actuated at, that
4  information would be available onshore?
5          MR. BAAY:  Objection to form.
6      Q.  (By Mr. Williamson) Does that technology
7  exist in April 2010?
8          MR. BAAY:  Object.  Object
   to the scope.
10     A.  I would be guessin.  I don't know if it
11 existed in 010.
12     Q.  (By Mr. Williamson  Was it available on
13 the HORIZON?
14         MR. BAAY:  Objection to form, scope.
15     A.  I don't know that.
16     Q.  (By Mr. Williamson) Okay.  Would it have
17 been good information to have?  Then you knew
18 whether the AMF had been fired, you knew whether
19 the EDS had fired, you knew whether the upper
20 annular had been actuated, would that be useful
21 information to have known in the first da  s as
   ou're trying to utilize the BOP?
23         MR. BAAY:  Objection to form.
24 Objection, scope.
25     A.  Well, we know the EDS didn't work because

255

1  the rig was still attached to the BOP, so
   that's --
3      Q.  (By Mr. Williamson) Okay.  But the
4  question on the table is:  Would that be good
5  information to know --
6          MR. BAAY:  Were you finished with
7  your first answer?
8      Q.  (By Mr. Williamson) -- the --
9          MR. BAAY:  Were you finished with
   the answer?
11         THE WITNESS:  Yeah.  With what I was
12 going to answer, yes.
13     Q.  (By Mr. Williamson) Yeah.  Would it be
14 good information to know whether the annulars had
15 been actuated, wh'ch one had been actuated;
16 whether the VBRs had been actuated, the time they
17 were actuated, would that have been helpful
18 information to have shoreside in the first days
19 after this disaster?
20         MR. BAAY:  Objection, form and
21 scope.
22     A.  Yes.
23     Q.  (By Mr. Williamson) Okay.  But you did
24 not have that information?
25         MR. BAAY:  Object to form.

256

1      A.  That's correct.
2      .  (By Mr. Williamson) Do you know why?
3          MR. BAAY:  Objection to form.
4      A.  Well, we know what our Subsea Engineer
   had told us --
6      Q.  (By Mr. Williamson  Okay.)
7      A.  -- and --
8      Q.  What did he tell you?
9      A.  That he had tried to -- to perform --
10     Q.  Oh.  Go ahead.
11     A.  No  He tried to perform   do the EDS
   but he got low alarms on accumulators.
13     Q.  Right.  So you knew -- that was
   Mr. Pleasant, ri ht?
15     A.  Correct.
16     Q.  Mr. Pleasant said, "I pushed the EDS
   button and, in effect, nothin  happened"?
18     A.  Correct.
19     Q.  Okay.  Other than that piece of
   information, you do not have any other
   information the first days after this?
22     A.  Other than verbal, that's correct.
23     Q.  Okay.  Would it have been helpful
   information to have correct schematic drawings of
   the BOP?

257

1      A.  Yes, sir.
2      Q.  And you did not have them, did you?
3      A.  They were not correct, that's correct.
4      Q.  Okay.  Who is supposed to maintain
   orrect schematic drawings of the BOP?
6      A.  We are.
7      Q.  "We" being Transocean?
8      A.  Yes, sir.
9      Q.  Okay.  Would it have been helpful in the
   ays after the disaster to have the ROV hot stab
   ooked up to the middle VBR rams, instead of
   eing hooked up to the bottom test ram?
13         MR. BAAY:  Object to form.
14     A.  Yes, because we -- then we would have
   een able to verify a little bit earlier that it
   as already closed.
17     Q.  (By Mr. Williamson) And I'm sure you've
   ow found out that the bottom VBR was tran --
   onfirmed, converted to a test ram in
   pproximately late 2004, early 2005?
21     A.  Yes.
22     Q.  Okay.  And the ROV's hot stab should have
   een changed to go to the middle VBR at that
   me, correct?
25     A.  Yes, sir.

65 (Pages 254 to 257)

258

1     Q. But it wasn't?
2         MR. BAAY: Objection to form.
3     Q. (By Mr. Williamson) It -- it wasn't
4 replumbed to the middle VBR, was it?
5         MR. BAAY: Objection to form.
6     A. That's correct.
7     Q. (By Mr. Williamson) Okay. Whose
8 responsibility was to make sure that happened?
9     A. The Subsea Engineer.
10     Q. And that would be Transocean?
11     A  Yes, sir
12     Q. Okay. And -- and when you discovered or
13 started inspecting or trying to figure out the
14 status of the stack, you realized the middle VBR
15 ST locks were not closed at that time?
16         MR. BAAY: Objection to the form.
17     Q. (By Mr. Williamson) Or do you remember?
18     A. Don't remember.
19     Q. Okay. Do you know -- if you were trying
20 to seal in an uncontrolled well --
21     A. M-h'm.
22     Q. -- in an emergency, would you want the ST
23 locks to be operating?
24     A. I don't remember that they weren't
25 closed.

259

1     Q. I didn't say they were or they weren't.
2 I -- right now, I'm asking a different question.
3 The question is --
4     A. You would want them to be able to be
5 locked, yes.
6     Q. Right. If you were trying to seal a well
7 in in an actual uncontrolled flow blowout event,
8 would you want to actuate the ST locks?
9     A. Yes, sir.
10     Q. Were the ST locks actuated, or do you
11 know?
12     A. Yes, sir, they were.
13     Q. Okay. On all VBRs?
14     A. Yes.
15     Q. Okay. None were --
16     A. No, not on the -- there was no ST lock
17 actuated on the test ram --
18     Q. Okay.
19     A. -- because they weren't in there.
20     Q. Okay. But you remember every other ST
21 lock was actuated?
22     A. That's correct.
23     Q. When, or do you know?
24         MR. BAAY: Objection to form.
25     A. It would have been activated when the AMF

260

1 was fired.
2     Q. (By Mr. Williamson) And when did the AMF
3 fire?
4     A. My belief is, is that it fired the night
5 of the 20th.
6     Q. Okay. Now, the AMF would have only fired
7 the ST locks on the blind shear ram --
8         MR. BAAY: Objection to form.
9     Q. (By Mr. Williamson) -- correct?
10     Whenever the AMF -- if the AMF fired, the
11 AMF would trigger the ST locks on the blind shear
12 ram, true?
13         MR. BAAY: Objection to form.
14     A. I believe we actually sent the -- the -- the --
15 the -- it did close the ST locks on the blind
16 shear ram, but it sent pre -- also pressure to
17 the other ST locks, from the high pressure shear
18 function.
19     Q. (By Mr. Williamson) Okay. So your belief
20 is that the bli -- the AMF would have actuated
21 the ST locks upon the upper VBRs and the middle
22 VBRs?
23     A. Yes.
24     Q. Okay. Can you tell me what documents you
25 rely upon for that?

261

1     A. The schematic that I -- I looked at. I
2 don't remember the document number.
3     Q. Tell me where I can go look for it and
4 find it myself. Just give me some sort of
5 description of it, so I can figure out what
6 document --
7     A. It's the schematic --
8     Q. -- you're referring to.
9     A. It's the schematic of the hydraulic
10 system on the -- the ENTERPRISE -- I mean, of the
11 HORIZON.
12     Q. You're going to find this hard to
13 believe, but there's multiple pieces of paper
14 that say that they are that thing.
15     A. I understand.
16     Q. You know, any more descriptive that you
17 can give to me?
18     A. Well, that's one of those.
19     Q. One of those. Okay.
20     A. I'm not -- you know --
21     Q. No. I wasn't -- I didn't think you were
22 being smart about it.
23     A. No, sir.
24     Q. I -- I didn't -- and I wasn't laughing at
25 you.

66 (Pages 258 to 261)

318

1  is, you, Transocean, understand that BP could not
2  act unilaterally in a source control decision,
3  but, rather, had to have that decision approved
4  by the National Incident Command?
5          MS. SHUTLER:  Objection, form.
6          MR. BAAY:  Objection, form.
7          MR. KRAUS:  Objection to form.
8      A.  I did see some of the -- of letters
9  written to Admiral Landry from Don Suttles
10 informing them of what was going to happen.
11     Q   (By Mr. Haycraft) And did you       SEE
12 correspondence of -- of a -- of a nature of a
13 response approving a particular decision or
14 option?
15         MR. KRAUS:  Objection, form.
16     A.  I did see on one.  I don't know that I
17 saw it on every one.
18     Q.  (By Mr. Haycraft) Okay.  Well, I'm not
19 asking for your personal testimony, but, rather,
20 Transocean's point of view.  And you recall this
21 discussion began with this sentence: "As the
22 Task Forces developed options, both the Incident
23 Command and the RP Senior Management reviewed and
24 selected options, and made priority
25 determinations for review and approval by the

319

1  National Incident Commander and the FOSC."
2          So I'm -- I'm not just asking for the one
3  time you may have seen a document of that sort,
4  but I'm asking you, as Transocean's Corporate
5  Representative, whether this statement that I
6  just read from the OSC Report is, in fact, a true
7  statement of what hap -- what was happening, in
8  Transocean's experience?
9          MR. BAAY:  Objection to the form.
10         MR. KRAUS:  Objection, form.
11     A.  Based on what I know, that's correct.
12         MR. HAYCRAFT:  And we'll close with
13 that --
14         THE VIDEOGRAPHER:  The time is --
15         MR. HAYCRAFT:  -- and come back
16 tomorrow?
17         THE VIDEOGRAPHER:  -- 4:57 p.m.
18 We're off the record, ending Tape 8.
19         (Deposition recessed at 4:57 p.m.,
20 resuming on Wednesday, November 7, 2012, at
21 8:30 a.m.)
22
23
24
25

320

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  ROBERT JOSEPH TURLAK
3  DATE OF DEPOSITION:  NOVEMBER 6, 2012
4  PAGE LINE     CHANGE     REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

321

1
2          I, ROBERT JOSEPH TURLAK, have read the
3  foregoing deposition and hereby affix my
4  signature that same is true and correct, except
5  as noted on the attached Amendment Sheet
6
7
8          ROBERT JOSEPH TURLAK
9
10 THE STATE OF _____ )
   COUNTY OF _____ )
11
12     Before me, _____, on
   this day personally appeared ROBERT JOSEPH
   TURLAK, known to me (or proved to me under oath
13 or through _____) to be the
   person whose name is subscribed to the foregoing
14 instrument and acknowledged to me that they
   executed the same for the purposes and
15 consideration therein expressed
16     Given under my hand and seal of office this
   _____ day of _____, 2012
17
18 _____
19     NOTARY PUBLIC IN AND FOR
   THE STATE OF _____
20 COMMISSION EXPIRES: _____
21
22
23
24
25

81  (Pages 318 to 321)

322

```
 1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
 2
 3    IN RE: OIL SPILL     ) MDL NO. 2179
      BY THE OIL RIG       )
 4    "DEEPWATER HORIZON" IN ) SECTION "J"
      THE GULF OF MEXICO ON )
 5    APRIL 20, 2010        ) JUDGE BARBIER
                            ) MAG. JUDGE SHUSHAN
 6
 7
 8
 9          REPORTER'S CERTIFICATION
      TO THE ORAL AND VIDEOTAPED DEPOSITION OF
10          ROBERT JOSEPH TURLAK
            TRANSOCEAN 30(b)(6)
11          NOVEMBER 6, 2012
               VOLUME II
12
13       I, Emanuel A. Fontana, Jr., Certified
      Shorthand Reporter in and for the State of Texas,
14    hereby certify to the following:
15       That the witness, ROBERT JOSEPH TURLAK, was
      duly sworn by the officer and that the transcript
16    of the oral deposition is a true record of the
      testimony given by the witness;
17
         That the deposition transcript was submitted
18    on        , 2012, to the witness or to
      Attorney _____ for the witness to
19    examine, sign, and return to Worldwide Court
      Reporters, Inc., by        , 2012.
20
         That the amount of time used by each party
21    at the deposition is as follows:
22       Ms. Hankey - 2 Hours, 24 Minutes
         Mr. Williamson - 2 Hours, 21 Minutes
23       Mr. Kraus - 16 Minutes
         Mr. Haycraft - 46 Minutes
24
25
```

323

```
 1       I further certify that I am neither counsel
      for, related to, nor employed by any of the
 2    parties in the action in which this proceeding
      was taken, and further that I am not financially
 3    or otherwise interested in the outcome of the
      action.
 4
         SUBSCRIBED AND SWORN to by me on this 6th
 5    day of November, 2012.
 6
 7
 8
         _____
 9       Emanuel A. Fontana, Jr., RPR
         Texas CSR No. 1232
         Expiration Date: 12/31/12
10       Worldwide Court Reporters
         Firm Registration No. 223
11       3000 Weslayan, Suite 235
         Houston, Texas  77027
12       (713) 572-2000
13
14
15
16
17
18
19
20
21
22
23
24
25
```

82  (Pages 322 to 323)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

324

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN )   SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010             )   JUDGE BARBIER
                           )   MAG. JUDGE SHUSHAN


* * * * * * * * * * * * * * * * *
VOLUME 2
* * * * * * * * * * * * * * * * *


         Continuation of the 30(b)(6) Deposition
of Robert Joseph Turlak, Transocean, Ltd., taken
at the Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on the
7th day of November, 2012.


**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**



477

and say that?

A. No, sir.

Q. Did anyone from BP come to you and say, "We at, BP, are running several rigs in the Gulf of Mexico and around the world. We want to know what you think about the best way to close in a BOP is"?

A. No, sir.

Q. All right. And so -- and no one from Transocean Management, not Mr. McMahan, not Mister   Mr. Arnaud  --

A. Arnaud Bobillier.

Q. -- Arnaud Bobillier, not Mr. Newman, they came  - none -- none of them came to you with instructions or questions or issues about that?

A. No, sir.

Q. If they had, of course you would have been able -- you would have been willing to cooperate w` h them and try to comply with their request?

A. Yes, sir.

Q. Okay. And what was the Best Available Technology for closing in a well when you've lost the BOP, you're in deepwater, and you do not have tertiary barriers available to you?

478

A. Are you asking for my opinion?

Q. M-h'm.

A. In my opinion, a BOP-on-BOP would have been the best option because it's really a -- a redundant, it's a -- it's nothing -- it's -- it's not any new technology, and it's something that's used   o close in -- close in during well control events a l  the time.

Q. Al  r`ght! And, in fact, this particular BO   s ack, the HORIZON BOP stack, had two components. One component is the BOP stack, and one component is the Lower Marine Riser Package, right?

A. That's correct, sir.

Q. And the  ower Marine Riser Package is actually designed to be taken off the BOP stack?

A. That's correct, sir.

Q. Okay. So in your opinion, it could have been removed, right?

A. In my opinion, yes, it could have been removed.

Q. And in this particular BO --

A. Yes.

Q. The same rule, by the way. If I inadvertently interrupt you because I'm trying to

479

cover it, I'll let you finish if you tell me.

A. Sure.

Q. Okay?

The same thing, once you pull the LMRP, what type of connector is on the top of the BOP? I thought it was a Cameron --

A. It's got a -- it's an adapter spool with a Cameron HC profile.

Q. And is that a -- is that a standard configuration in the industry? In other words, you will be able to find BOPs that you can hook up to that connection?

A. Yes, sir.

Q. Okay. In other words, Cameron -- the connection that was on HORIZON that's at the top of the BOP stack is a relatively standard Cameron connection that you could connect the BOP to?

A. That's correct. Or we could put -- or -- or we could change out the -- whatever connec or t that's on the bottom of a BOP stack and put tha  t connector on it.

Q. All right. I'm going to hand you what I marked -- what was in my book marked as Tab N`. 34, and what's now been marked as Exhibit N`. 90239. It's an E-mail stack dealing with

480

"Loss of Control Events" dated March 18th, 2008.

Do you see that?

A. Yes, sir.

Q. It says: "Please..." -- and the -- it says: "Please see the memo below from Larry McMahan pointing out the number of significant events where loss of control barriers have not been in place or overlooked at some..." place.

Do you see him sa  ing that?

A. Yes, sir.

Q. I want you to turn to the last page of that E-mail, which comes from Larry McMahan. You sa` he -- Larry McMahan is Head of what, the Performance?

A. Yes.

Q. Right. And when he talks about these E-mails that he has entitled "Loss of Control Events," he has a statement in this that says, second sentence, third page: "The problem is that we are having e  en s at a rate that is overwhelming."

Do you see Mr. McMahan's statement?

A. Yes.

Q. To your knowledge, was the fact that Transocean, in March of 2008, "having events at a

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

481

```
 1   rate that was overwhelming," according to their
 2   Senior Management, did they modify or change
 3   their Emergency Response Plans in the Gulf of
 4   Mexico as a result of that development?
 5          MR. BAAY:  Object to form.
 6      A.  Not that I'm aware of.
 7      Q.  (By Mr. Williamson) Okay.  And you
 8   understand I'm asking you that question as the
 9   Representative with respect to -- the Transocean
10   Corporate Representative with respect to Re --
11   Emergency Response Planning, correct?
12      A.  Correct.
13      Q.  I'd like to hand you your next exhibit,
14   which, in my book, was Tab No. 35.  It's now been
15   marked as Exhibit 90242 -- 240.  It's an E-mail
16   chain.  And this is from Jimmy Moore.  Do you
17   know who Jimmy Moore is?
18      A.  I don't think so.
19      Q   And Chris Knight, it's an E-mail chain
20   between Chris Knight.  Do you know who Chris
21   Knight is?
22      A.  I don't think so.
23      Q.  You'll notice Mr. Knight identifies
24   himself in the E-mail as a "Transocean Senior HSE
25   Advisor," and the E-mail is dated May 31st, 2008,
```

482

```
 1   correct?
 2      A.  Yes, sir.
 3      Q.  Okay.  Mr. Knight says:  "After my recent
 4   visit to the Horizon to conduct the investigation
 5   into the flooding I would say it is not that they
 6   do not understand but more it is not being
 7   implemented to the extent it needs to be."
 8          Did I quote Mr. Knight correctly?
 9      A.  Yes, sir.
10      Q.  And Mr. Moore replies:  "I assure you
11   these issues are fleetwide."
12          Right?
13      A.  Yes, sir.  That's what it says.
14      Q.  Okay.  After Mr. Knight and Mr. Moore
15   investigated the flooding incident on the
16   HORIZON, and Mr. Moore said the issues were
17   "fleetwide," did Transocean modify or change its
18   Emergency Response Planning in response to this
19   development?
20          MR. BAAY:  Object to form.
21      A.  I'm not aware if they did or not.
22      Q.  (By Mr. Williamson)  Okay.  And I'm asking
23   you that question as a --
24      A.  I -- I --
25      Q.  -- Corporate Representative, correct?
```

483

```
 1      A.  I unders -- I understand.
 2      Q.  (By Mr. Williamson) I'm going to hand you
 3   the next one, which I had marked in my book as
 4   Tab 48.  It's now been marked 90241.
 5   (Tendering.)  Okay?  And this is from Steve Hand.
 6   Do you know Mr. Hand?
 7      A.  Yes, sir.
 8      Q.  Okay.  Who is Mr. Hand?
 9      A.  He is the -- at this point in time, or --
10   or at that -- during this ti -- in 2010?
11      Q   Ah.  April 6, 2010, 14 days before the
12   Macondo disaster.
13      A.  I think he was Manager of Well
14   Operations.
15      Q.  Okay.  Would you like to turn to the
16   attached PowerPoint to this E-mail?  And I really
17   want to turn you first to Page 16 of that
18   PowerPoint.  Okay?  Maybe two PowerPoints
19   actually.
20      A.  M-h'm.
21      Q.  The page I want you to go to is called
22   "BP SPU Commentary - GoM," and it's marked
23   Page 16.
24      A.  Okay.  Okay.
25      Q.  Okay?
```

484

```
 1      A.  All right.
 2      Q.  Have you got it?
 3      A.  Yes, sir.
 4      Q.  All right.  This was apparently dealing
 5   with the rigs, the, -- the ENTERPRISE, the
 6   HORIZON, the DDII, and the DDIII, correct?
 7      A.  Yes, sir.
 8      Q.  Those are all Gulf of Mexico rigs --
 9      A.  Yes, sir.
10      Q.  -- in 2010?
11      A.  Yes, sir.
12      Q.  Okay.  And this is actually feedback from
13   BP, one of Transocean's largest customers  on
14   their commentary on the -- on Transocean
15   correct?
16      A.  Yes, sir.
17      Q.  And, anyway, BP, one of your large t  s
18   customers, says there's a:  "Lack of visibl  e
19   leadership on HSE.
20          "TOI is not proactive in addressing
21   issues, have to be pushed by BP."
22          Its:  "Difficult to get quality people
23   from TOI to lead HSE and Performance at the
24   wellsite."
25          And:  "Asset and Performance" Manag r e s
```

41  (Pages 481 to 484)

485

1  "not always aligned and not working as a team."
2     Do you see where that's the feedback that
3  BP is giving Transoc an on April 6th, 2010?
4     A. Yes, sir.
5     Q. Okay. Did Transocean, in any way,
6  modify change it Emergency Response Planning in
7  response to the comments from BP that are
8  reflected her in Exhibit 90 --
9        MR. WILLIAMSON: What's the number,
10  u.y ?
11        M DILLS: 241
12     Q. (By Mr. W lliamson) -- 41?
13     A. I'm n t aware of an chang es that were
14  made
15     Q. The same question. You know I'm askin
16  that question as your Corporate Re -- as a
17  orporate Representative, correct?
18     A. Correct.
19     . All right. I want you to turn o one
20  more page. There's a page further back that's
21  actually marked Page 13. I assume that's the
22  second.
23        The page I want you to look for is the
24  page that says "2009 Performance Overview -
25  Operational."

78

1  look at the one I have, and then we -- and I want
2  you to look at the pa e that I marked out of
3  Exhibit No. 9024 --
4        MR. WILLIAMSON: What number is it?
5        MR. DILLS: -- 46.
6     Q. (By Mr. Williamson -- 46.)
7     A. 90246, yeah.
8     Q. (By Mr. Williamson) Thank you. And, in
9  fact, that shows that -- the feedback shows
10  operational performance in the Gulf of Mexico is
11  poor, with a large incidence of major and minor
12  events, correct?
13        MR BAAY: Object to form.
14     A (Reviewing document )
15     Q (By Mr Williamson) I'm talking about the
16  part I -- sir, you happen to be looking at my
17  work --
18     A. I understand -- I understand --
19     Q. Oh, I didn't --
20     A. -- I was just trying to --
21     Q. -- mean to be ugly -- I --
22     A. -- I don't know --
23     Q. -- didn't mean to be ugly --
24     A. No. I'm just trying to read and trying
25  to figure out exactly what they're talking about

486

1     I'll -- you -- it's further back.
2  Even --
3     A. 13.
4     Q. It's marked 13. I suspect it's part of
5  the second PowerPoint.
6     A. (Nodding.)
7     Q. I've marked it all as one attachment,
8  because it was all attached to the  -mail
9     A. I only have one PowerPoint.
10     Q. Okay.
11     A. Because it's -- it goes to Page 24.
12        MR. DILLS: Do you know what the Tab
13  number is?
14        MR. WILLIAMSON: I don't know.
15  Maybe -- it is Tab No. 50. Okay. I'll --
16     What's our next exhibit number?
17        THE COURT REPORTER: 90246.
18     Q. (By Mr. Williamson) Okay. I'm going to
19  hand you my copy. This is Tab No. 50 in the
20  book. I actually have this highlighted. We'll
21  put a clean copy in the record.
22        (Originally marked as Exhibit No 90246
23  redesignated as Exhibit No. 10246.)
24     A. Okay.
25     Q. (By Mr. Williamson) But I want you to

88

1  ere  h
2     Q. Fair enough.
3     A. Reviewing document.)
4        MR. DILLS: (Indicating.)
5        MR. WILLIAMSON: Yeah. (Tenderin .) g
6        THE COURT REPORTER: 46.
7     A. Okay.
8     Q. (By Mr. Williamson) And, in fact, the
9  feedback we have on this is, that the
10  "Operational performance in" the Gulf of Mexico
11  "(5th Generation rigs) is poor with" a huge --
12  with -- I'm sorry -- a "high number of Major and
13  Minor events and" a "large percentage of rig
14  downtime."
15     Did I read that correctly?
16     A. Yes.
17     Q. All right. In response to the criticism
18  that's leveled in Exhibit 90246, on April 12th
19  2010, in BP's offices, did Transocean change or
20  modify its Emergency Response Planning?
21     A. I don't know what these events actually
22  are.
23     Q. Okay. As a Corporate Representative,
24  when dealing with Emergency Response, I'm trying
25  to figure out if the major and minor events that

42  (Pages 485 to 488)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

489

1   had occurred wh re incorporated any -- into any
2   sort of emergenc  training or Emergency Response
3   modification, that you know of, as a -- speaking
4   for Transocean?
5       MR. BAAY:  Object to form.
6       A.  Wel , this operational performance is on
7   rig downt me and planned maintenance.
8       Q.  (By Mr. Williamson) Okay.
9       A.  So how would that have anything to do
10  with -- with Emergency Response?
11      Q.  All right.  So you're thinking these may
12  or may not have something to do with it, without
13  more specific information?
14      A.  Yeah.  Because on this page, you're
15  talking about r g downtime, which can be caused
16  by a lot of th ngs.  Planned maintenance, as far
17  as PM time -- how much time it takes to do the
18  planned maintenance, and then rating Transocean
19  aga nst a competitor's as far as downtime --
20      Q.  Okay.
21      A.  -- percentage.  So I -- I'm -- I have a
22  hard time -- have a hard time understanding how
23  operational performance can be drug into
24  Emergency Response.
25      Q.  Al right.  Could I have my work copy

491

1   t's an E-mail string, correct?
2       A.  Yes, sir.
3       Q.  It's April 23rd, 2008, from -- the top
4   E-mail is from a Mandar Pathak to Barry Brani   ff
5   and Dave Cameron, right?
6       A.  Yes.
7       Q.  Who is Mr. Cameron?
8       A.  Dave Cameron works in the Well -- Well
9   Construction Group, but he works in Aberdeen.
10      Q.  And then below, the E-mail below, is
11  Alistair Walker, Steve Hand, Gordon Jaglar, Terry
12  Rutherford, and Allen Thain, correct?
13      A.  Yes.
14      Q.  All Transocean employees?
15      A.  Based on the -- based on what the -- by
16  the E-mail, yes.
17      Q.  Okay.  And what -- in April 23rd, 2008, I
18  want to turn you to the bottom E-mail  the one,
19  two  three, fourth paragraph.  It's a single
20  sentence.  It's on the first page.  And it says.
21  "You have correctly noted that the maximum
22  anticipated surface pressure exceeds the BOP
23  rating."
24      Do you see that?
25      A  Sorry.  Where is it on the she t.  Whi h  c

0  49

1   back?
2       A.  Sure.
3       Q   It's the one I handed you to read for
4   convenience  which is my work copy.  Thank  ou  y
5       You're aware of course  that on the BOP
6   that was on the HO   ZON, the batteries in that
7   BOP were not rechargeable and were not able to be
8   monitored when the BOP was subsea?  You're aware
9   of that fact?
10      A.  I'm aware of it after the fact, that's
11  correct.
12      Q.  Right.  My question is:  Did anyone come
13  to you, before April 2010 and said, "We would
14  like to think about that issue, that we're using
15  in our emergency piece of equipment, a -- a
16  battery that we can't recharge and we can't
17  monitor it"?  Did that fact get incorporated into
18  any Emergency Response Planning Analysis by
19  Transocean?
20      MR BAAY:  Objection to form.
21      A  No
22      Q.  (By Mr. Williamson) Your answer was "No"?
23      A.  Yes, sir.
24      Q   I'd like to hand you what I've marked as
25  Tab No  89  what  now been marked as 90242.

92

1   paragraph?
2       Q.  It's the fourth paragraph, the   nten e
3   that says:  "You have correctly noted" --
4       A  Yes.
5       Q.  -- "that the maximum anticipated surfa e  e
6   pressure exceeds the BOP rating."
7       Do you see that sentence?
8       A  Yes, sir.
9       Q  Here's my question to you:  Did you know
10  of any effort by Transocean to use MASP
11  calculations in order to evaluate what Emergency
12  Respon  e Plan they should have in place on a
13  well
14      A  Our Well Control Manual states that we're
15  to know what the Maximum Anticipated   urface
16  Pressure, and for offshore rigs  The floating
17  rigs  we re to know  hat th  Maximum Anticipated
18  Wellhead Pressure is
19      Q  Okay.
20      A  N  w -- if you ll please let me finish
21  Now, we also expect that in -- information from
22  our -- from -- to get that information from our
23  customer, or the Operator, to try to help us
24  evaluate whether or not the BOP that we have
25  for -- for that particular rig is going to be

43  (Pages 489 to 492)

493

1  ood enough for that well.
2  Q. Okay. And my point is, that should be
3  evaluated by Transocean before they start on any
4  iven well with any given rig, correct?
5  A  With the customer, yes.
6  Q. Right. So Transocean should do it, and
7  Transocean should also coordinate with their
8  customer, in this case, BP, re arding that g
9  matter?
10  A. That's correct.
11  Q. Okay. Did that, in any way, play any
12  part in the Emergency Response Planning in terms
13  of what Transocean thought? If they had a MASP
14  that exceeded the BOP component ratings, did
15  Transocean ever chan e their Emer ency Response
16  Plannin procedures?
17  MR. BAAY: Object to form.
18  A  Not that I'm aware of.
19  Q  (By Mr. Williamson) Right. Let me give
20  you any -- concrete example. You're aware that
21  on -- the HORIZON u per annular component was
22  rated to 10,000 psi?
23  A. Yes, sir.
24  Q. And you're aware that the lower annular
25  component, because it was a stripping packer, was

945

1  't down until you can shut something else.
2  Q. Okay. Were you aware that that happened
3  on the HORIZON?
4  A. No, sir.
5  Q. Okay. Should it have -- if it did
6  happen, they used a kick, and the potential
7  existed for more than 5,000 psi, should they have
8  used the lower annular to shut in the well?
9  MR. BAAY: Objection to form.
10  A. If I had to, I would have shut it in. I
11  would have closed the u er anr -- lower annular
12  and the upper annular.
13  Q. (By Mr. Williamson) Right. Because
14  that's my point. You should plan for which one
15  you're going to use in the event ou have a Well
16  Control Event.
17  MR. BAAY: Objection to form.
18  Q. (By Mr. Williamson Correct?
19  A. Okay.
20  Q. And you should -- in your opinion, if you
21  had a well that was capable of producing more
22  than 5,000 psi at the wellhead, you should use a
23  component that is rated higher than 5,000 psi to
24  shut it in.
25  A. Well, in this case, the annular acker

9 4 4

1  rated to 5,000 psi?
2  A. The packer was rated to five. The body
3  and the rest of the annular were rated to ten.
4  Q. Okay. So you're thinking that you could
5  use the lower annular for pressures greater than
6  the 5,000?
7  A. We wouldn't have.
8  Q. I know. Do you think it's rated -- do
9  you think Cameron --
10  A. The body, the enclosure itself is rated
11  for 10.
12  Q. I'm talking about the seal, though, the
13  seal is only rated for 5.
14  A. We wouldn't use it for that.
15  Q. I didn't --
16  A. We would only --
17  Q. -- say you'd use it for that. I'm asking
18  a question. The seal on the lower annular on the
19  HORIZON, April 2010, was rated to 5,000 psi by
20  its manufacturer Cameron correct?
21  A. That's right.
22  Q. So you wouldn t wan to use it to shut in
23  a well that was capable of producing more than
24  5,000 psi, would you?
25  A. Unless you -- all you want to do is slow

96

1  was rated for 5,000, but if it leaked, so what.
2  You could -- you've still ot the annular above
3  it to close it.
4  Q. Ah. So Transocean's policy would be,
5  we'll close it with the lower annular --
6  A. Never said it a policy.
7  Q. Okay. Well, I'm trying to figure out --
8  that's what I'm trying to figure out. As
9  Transocean, would you say that the correct
10  procedure is to close in a well that's capable of
11  producing more than 5,000 psi at the wellhead, to
12  close it in with a 5,000 psi component?
13  A. No.
14  MR. BAAY: Objection to form.
15  Q. (By Mr. Williamson) That's not the proper
16  Emergency Response Plan, is it?
17  MR. BAAY: Objection to form.
18  A. You're using Emergency Response Plan as a
19  very general statement.
20  Q. (By Mr. Williamson) I am.
21  A. That's a Well Control -- that's a Well
22  Control process --
23  Q  All right.
24  A. -- to close --
25  Q. Okay.

44  (Pages 493 to 496)

**Page 497**

A. -- the upper -- close the upper --
MR. BAAY: Let him finish.
A. -- annular. Sorry.
Q. (By Mr. Williamson) No, go ahead.
MR. BAAY: No, you finish.
Q. (By Mr. Williamson) You --
MR. BAAY: You can finish.
Q. (By Mr. Williamson) -- you can finish.
A. Now, you -- you're using the -- you're
uling -- using the Emergency Res onse as a -- in
everything. And --
Q. Well --
A. Excuse me?
Q. Go ahead.
A. You're using it for everything. When --
when we -- when we at Transocean talk about
Emergency Responses, we talk about several
different ways of -- of identifying an Emergency
Response for -- and -- and it's outlined in
our -- in our procedures as far as how we handle
emergencies. And I don't think that how you
close in an annular is -- is actually looked at
in the Emergency reps -- Response Plan. That's
looked at in our Well Control --
Q. Oka y.

**Page 498**

A. -- Manual
Q. Is a 25-barrel kick an emergency -- an
uninvited influx out of 25 barrels of
hydrocarbons or more, an emergency the way
Transocean sees it?
A. It depends --
MR. BAAY: Object to the form.
A. It depends on what the kick tolerance is.
Q. (By . Williamson All right. If
there's no kick tolerance?
A. H'm --
Q. Because I'll represent to you the Well
Advisor -- there's a Transocean document, I
believe it's Exhibit 4902, that says the -- on
Macondo there was a zero tick -- kick tolerance.
If there's no kick tolerance, would Transocean
consider a 25-barrel influx an emergency?
MR. BAAY: Objection to form.
A. It's a Well Control Event.
Q. (By Mr. Williamson Would you consider it
an emergency?
MR. BAAY: Objection to form
A. H'm. I guess I'm not able to quantify
Q. B (Mr Williamson Okay. I'm going
to --

**Page 499**

A. They don't --
Q. -- ask you as the Corporate
Representative who's here to talk about an
emergency plan, whether you think that's an
emer ency? g
R. BAAY: Objection to form.
Q. (By Mr. Williamson) As to what -- does
Transocean think a 25-barrel influx in a well in
which there's zero kick tolerance is an
emergency?
A. I don't know -- I don't know that
you're -- the answer to your question --
Q. Well, how does --
A. -- because --
MR. BAAY: Let him finish his
answer --
A. -- because I --
MR. BAAY: -- Jimmy. Let him
finish.
A. -- because I don't know that -- if
there's a difference between 25 barrels and 26
other than one barrel.
Q. (By Mr. Williamson) Okay. I'm trying to
figure out, how does Transocean characterize a
25-barrel influx in a well that's dee water hi h g

**Page 500**

pressure, high temperature, narrow margin
between pore pressure and fracture gradient, how
does Transocean characterize the 25-barrel kick?
Do they characterize it as an emer ency or do
ey not,th or do you not know?
MR. BAAY: Objection to form.
A. We characterize that as a Well Control
Event.
Q. (By Mr. Williamson) Not an emergency?
A. May -- maybe someone does. But
Transocean characterizes a Well Control Event.
Q. Well, you're here speaking for Transocean
today.
A. Okay.
Q. You don't character -- Transocean, in
your mind, doesn't characterize that as an
emergency, they characterize that as a Well
Control issue?
A. Well Control Event.
Q. Correct?
A. Yes.
Q. Okay. at about 50 barrels? In a --
A. I just told you.
Q. Well, okay.
A. I don't -- you know, I don't --

45 (Pages 497 to 500)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

501

Q. You still don't --
A. -- I don t --
Q. -- can't answer?
A. I don't know the -- what -- whether or not there's a drastic difference between a 25 barrel kick and a 26 barrel, other than one barrel.
Q. You're the person here today to talk about emergency plan and emergency plan res onse --
MR. BAAY: Jimmy, stop, stop. You're harassing the witness. Ask a reasonable question, and let's go.
MR. WILLIAMSON: Okay.
Q. (By Mr. Williamson) Okay. I'm asking you questions that I think deal with the emergency --
MR. Y And he's answered.
Q. (By Mr. Williamson) -- plan response You understand that, right?
A. Yes, sir.
Q. As part of that, we're now talking about what Transocean thinks of as an emergency in a 5 000-foot well, 50 miles off the Louisiana oast, 5,000 feet of water, narrow ore pres ur fracture gradient margins --

502

A Okay.
Q -- high temperature, high pressure --
A M-h m
Q -- would a hundred barrel influx be considered an  mergency by Transocean, or do you know?
A. I didn t prep --
MR. BAAY: Objection to form.
A. I didn't pre are myself to answer that question.
Q. (By Mr. Williamson) Okay. So you can't tell me whether Transocean thinks that's an  mergency or not?
MR. BAAY: Objection to form.
A. What -- which question is that?
Q. By(Mr. Williamson The question is: Do you --
A. No. Which question in the -- which question in the -- in the list is really --
MR. BAAY: Topic.
Q. (By Mr. Williamson) I'm not allowed - it's not proper, and I'm not allowed to answer your questions.
A. Okay. Well --
Q And it's also not a very productive use

503

of my time.
A. I --
Q. So -- so --
A. I'm not -- I'm not prepared to answer that question. That's my answer.
Q. Okay. What about a 500 barrel influx, would a 500 barrel influx into a narrow margin, high pressure, high temperature well, would Transocean treat that with -- well with no kick tolerance, would Transocean treat that as an emergency?
MR. BAAY: Object to form.
A. I'm not prepared to answer that question. I don't know.
Q. (By Mr. Williamson) You don't know?
A. Yes, sir, that's correct.
Q. Did you ask anybod ?
A. No, sir.
Q. Okay. Has anybody ever told you?
A. No, sir.
Q. Okay. So you don't know?
A. That's correct.
Q. Okay. M-h'm. I'm going hand you next what has been marked as 90243, and it was Tab No. 95. And it talks about -- it's a 2001 E-mail

40

from Doug Halkett, John Wilson, Kevin Wink, John Keeton, and some others, right?
A. Yes, sir.
Q. You know Mr. Keeton, right?
A. No, sir.
Q. Okay. Do you - I will represent to you these were -- you weren't with Transocean in 2001, in fairness to you, correct?
A. That's correct.
Q. All right. My question's on the second page. Okay? Next to the last paragraph, where Mr. Halkett says, second to the last paragraph: "To take a decision on this we would like to have the probability of having a major catastrophic explosion in the moonpool."
Do you see Mr. Halkett's request?
A. Yes, sir.
Q. Okay. To your knowledge, was that ever done or calculated?  In connection with Emergency Response Planning, did anyone ever tell you what the probability was of having a major catastrophic event in the moonpool?
MR. BAAY: Objection to form.
A. No sir.
Q. (By Mr. Williamson) Okay. I'd like to

46  (Pages 501 to 504)



505

1    hand you the next exhibit, which is 90244. It's
2    Tab No. 73 of my binder.
3        Do you consider yourself al -- does your
4    unit also deal with the diverter?
5        A. Yes sir.
6        Q. And the diverter system actually
7    consists - consists of the diverter, as well as
8    the mud gas/separator?
9        A. Yes, sir.
10       Q. Sometimes called the MGS, correct?
11       A. Correct.
12       Q. Okay. And you said you actually -- did I
13   understand in response to BP's Counsel's
14   questions, you actually said there were two
15   different instances in, what, 2009 in the Gulf of
16   Mexico, where the MGS system was overwhelmed?
17       A. Yes, sir.
18           MR. BAAY: Objection, form.
19       Q. (By Mr. Williamson) By downhole - by the
20   intrusion of hydrocarbons coming above the riser?
1        A. Being circulated out of the riser, yes.
2        Q. Being circulated out of the riser. Thank
3    you.
4        You know -- if you look at this E-mail
5    from Steve Smith, Ken Pearce to Bill Muir, Ken

506

    Pearce, Mark Lunney, and William Thompson -- do
    you know any of those gentlemen?
        A. Nope. No, sir.
        Q. Okay.
        -- it says -- it's talking about the
    diverter system right?
        A. Yes, sir.
        Q. And he actually says: "From the analysis
    it can be concluded that the system shall fail in
    one of two ways; either the number of elbows and
    tees that exist within the system pipe route
    shall erode aggressively due to the fluid
    velocity within the system and cause the well
    bore fluids to escape prior to reaching the end
    of the vent line pipe route, or the diverter seal
    assembly will not withstand the back pressure
    from the vent line pipe route."
        Did you see where I read that?
        A. Yes sir.
        Q. Okay. The fact that BP -- I'm sorry.
    misspoke.
        The fact that Transocean had two
    different events where hydrocarbons overcame the
    MGS, and also Exhibit No. 90244, were any of
    those the problems with the diverter han -- and

507

    the MGS handling this pressure, were those taken
    into account in any emergency response planning?
        MR. BAAY: Objection, form.
        A. Not that I'm aware of.
        Q. (By Mr. Williamson) Okay. If you have
    hydrocarbons get in the riser and get to the MGS
    diverter system, does Transocean consider that an
    emergency?
        MR. BAAY: Objection to form.
        A. That's part of a well contr -- that's
    part of a well control event.
        Q. (By Mr. Williamson) Okay. So Transocean
    would not define that as an emergency. They
    would -- Transocean would define that as a well
    control event?
        A. Correct.
        Q. We'll hand you what's been marked as
    90245. There's Tab No. 27 and, I believe, 28 in
    my booklet.
        This is an E-mail from 2005, isn't it?
        A. Yes, sir.
        Q. You weren't with -- in fairness to you
    personally, you were not with Transocean in
    2005 --
        A. That's right.

508

        Q. -- correct?
        But I'm asking you this question in
    capacity as the Corporate Representative on Well
    Response. Would you turn to the third page from
    the back, the third and fourth page from the back
    of this PowerPoint. The first one says
    "Observation" and starts off "Key Subsea and
    D/PH Systems..."
        MR. HAYCRAFT: Third from the back.
        Q. (By Mr. Williamson) Should be third from
    the back. I bet I've got more than one
    PowerPoint again.
        (Reviewing document.)
        MR. WILLIAMSON: Billy, I think
    that's Tab 29. I don't think I've attached the
    right --
        MR. DILLS: Should be Tab 30?
        MR. WILLIAMSON: It's either Tab 29
    or Tab 30.
        Q. (By Mr. Williamson) Mr. Turlak, I don't
    think I've handed you the right --
        A. Okay.
        Q. -- document. So if you'll hand that back
    to me, Billy, will look for that one while I go
    to the next one.

47 (Pages 505 to 508)

509

1    MR. WILLIAMSON:  I'm looking for
2 is one, tha  page --
3    MR. DILLS:  Okay.
4    MR. WILLIAMSON:  -- and the page
5 after it.
6    Q   (By Mr. Williamson) The question I had
7 yesterday was:  The EDS system on the HORIZON
8 activated th  blind shear rams, correct?
9    A.  No, sir.
10    Q.  Okay.  EDS-I on the HORIZON activated the
11 blind shear rams?
12    A.  When are you speakin  about, what day?
13    Q.  April 2010.
14    A.  April 20th?
15    Q.  Yes.
16    A.  No.
17    Q.  Okay.  What did the EDS system activate?
18    A.  Nothing.
19    Q.  I'm sorry, I meant before it was -- it
20 was in the explosion.  I was talkin  about the
21 design.
22    A.  Oh.
23    MR. HAYCRAFT:  Objection, form.
24    A.  I'm not aware of which ED -- which EDS
25 did what.

510

1    Q.  (By Mr  Williamson) Okay.  I'm going to
2 ask you to make an assumption, then.  I want you
3 to assume for me the Autoshear system on the
4 HORIZON activated the blind shear rams, I want
5 you to assume for me the AMF on the HORIZON
6 activated the blind shear rams, and I want you to
7 assume for me the EDS-I system that was activated
8 at the time of the explosions activated the blind
9 shear rams.  Do you understand those assumptions?
10    MR. BAAY:  Objection, form.
11    MR. HAYCRAFT:  Objection form..
12    A.  Okay.
13    Q.  (By Mr. Williamson) And they -- all of
14 those -- if I -- my assumptions are correct, all
15 of those go to one single component, namely the
16 blind shear ram blocks, correct?
17    A.  The oper -- the Operating System.
18    Q.  Now, my question to you is:  Did
19 Transocean ever take into account the fact that
20 every emergency BOP shearing/sealing operation
21 was relying upon a single component, namely the
22 blind shear ram blocks, did Transocean take that
23 into account when they were doing emergency
24 response planning?
25    MR  BAAY:  Objection, form.

511

1    A.  The BOP is designed according to the
2 Industry Standards, and it is the -- according to
3 the Industry Standards, that's what's supposed to
4 happen when you have an EDS, is you close the
5 blind shear rams.  When you have a -- and a
6 Deadman situation, that's part of the
7 requirements, is to close the -- the blind shear
8 rams and seal.  The same with the Autoshear  , is
9 to activate the blind shear rams.
10    So we're -- we're operating that BOP
11 according to Industry Standards.
12    Q.  (By Mr. Williamson) Okay.  That wasn  't
13 quite my question.  My question was --
14    A.  You wanted me to -- you wanted me to
15 to make assumptions --
16    Q.  No.  I --
17    A.  -- I'm telling you facts.
18    Q.  Okay.  I want to know:  Is it a fact that
19 every emergency system on that BOP used the blind
20 shear rams as their solution?
21    A.  I hope so, yes.
22    Q.  And is it a fact that Transocean did not
23 take that into consideration when Transocean was
24 coming up with its Emergency Response Plan?
25    MR. BAAY:  Objection, form.

512

1    A.  That's correct.
2    Q.  (By Mr. Williamson) Okay.  I'm going to
3 now hand you the PowerPoint -- I need anothe
4 sticker.  I'm going to hand you a PowerPoint
5 that's marked 90247.
6    MR. WILLIAMSON:  What tab was it?
7    MR. DILLS:  31.
8    Q.  (By Mr. Williamson  It was  Tab 31 in my
9 booklet.
10    (Originally marked as Exhibit No. 90247;
11 redesignated as Exhibit No. 10247.)
12    MR. WILLIAMSON:  And for the record,
13 it actually goes, I think, as an attachment to
14 90245.
15    Q.  (By Mr. Williamson) Would you, please,
16 turn to the fourth page from the back in that
17 PowerPoint.
18    A.  (Complying.)
19    Q.  Are you there?
20    A.  Yes, sir.
21    Q.  Okay.  This is a 2005 PowerPoint and with
22 a Transocean PowerPoint.  It says: "Key Subsea
23 and TD/PH Systems have inherent design weaknesses
24 making them susceptible to failure."
25    My first question to you is:  What is



48  (Pages 509 to 512)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**



513

TD PH, do you know?

A   Doesn't -- doesn't come to mind.  I'm sorry.

Q   Okay.  All right.  Let's go down below.  The last point on this particular one, out of Exhibit Number -- please tell me what the number is.  What's the exhibit number?  I apologize Mr. Turlak.

A   90247.

Q   90247  the last one is: "Rig Teams Often Driven to Defer Maintenance to reach Budget Objectives  All (to often hear, 'We don't have the money')."

Do you see in that PowerPoint, that Transocean PowerPoint that statement?

A   Yes, sir.

Q   Was that taken into account when you were doing your emergency response planning?

MR. BAAY:  Objection, form.

A   No, sir.

Q   (By Mr. Williamson) Next page, there's an Observations page that says: "Observations"

"Lack of Experienced Personnel

"Particular Shortage of Skilled Personnel looking after critical equipment like Subsea."

514

Did I read that correctly?

A   Yes, sir.

Q   Was that taken into consideration by Transocean when Transocean was coming up with its Emergency Response Plan?

MR. BAAY:  Object to form.

A   No, sir.

MR. WILLIAMSON:  I'd like to take a break off the record for a second and look at my notes.

THE VIDEOGRAPHER:  It's 1:52 p.m. We're going off the record.

(Recess from 1:52 p.m. to 2:01 p.m.)

MR. WILLIAMSON:  I'm ready.

THE VIDEOGRAPHER:  All set?

The time is 2:01 p.m.  We're back on the record, beginning Tape 16.

Q   (By Mr. Williamson) After April 20th, 2010, when you got called into this matter --

A   Yes, sir.

Q   -- okay, you, of course, were willing to do -- at that point, you were willing to do anything you could to help, of course.

A   Yes, sir.

Q   Right?  Did BP ever come to you and say:

515

" his is your BOP   What's the best way to close i in?"

MR. HAYCRAFT:  Object to form.

A   I'm not sure th -- that specific question was asked, but soon after the -- soon after the fire on the rig and -- and the BOP wasn't shut-in, there were -- people were already get -- gathering to try to put together a plan to utilize ROVs to -- to close-in the -- the BOP.

Q   Let me hand you what was marked in a previous deposition as Exhibit 4621.

A   Okay.

Q   That's actually an E-mail chain that you were part of, correct, dated approximately May 24th, 2010?

MR. DAVIS-DENNY:  Do you have a Tab?

MR. WILLIAMSON:  Oh, yeah.  I'm sorry.

THE WITNESS:  Forty --

MR. WILLIAMSON:  82.

MR. DAVIS-DENNY:  Thanks.

MR. WILLIAMSON:  Tab 82.

Q   (By Mr. Williamson) And it's actually from Dean Williams, one of the people working under you, correct?

516

A   Yes.

Q   And if you look towards the bottom of the E-mail "Cc's," you'll see your name  right?

A   Yes, sir.

Q   You know, Mr. Williams actually  of -- course, this is one month in -- one month-plus into the oil spill, the Macondo disaster, correct?

A   Yes, sir.

Q   Okay.  He says down there about one, two, three, four, five, six paragraphs from the bottom -- Mr. Williams, your employee, says: "We must step back, take a long hard look with no legacies applied and come up with systems that perform, not just comply."

Do you --

A   Yes, sir.

Q   -- see that statement?

A   Yes, sir.

Q   Is it true?

MR. BAAY:  Objection to form.

A   Yes.

Q   (By Mr. Williamson) And then a two -- two paragraphs above that, Mr. Williamson, your -- Mr. Williams, your employee, says: "Conventional

49 (Pages 513 to 516)

521

```
 1        A. That --
 2           MR. BAAY: -- form.
 3        A. That's right.
 4        Q. (By Mr. Williamson) Okay.  The -- I'm
 5     going to hand you what was marked in a previous
 6     deposition as Exhibit 7107.  Do you remember
 7     seeing that?  Oh, I'm sorry.  It's Turlak --
 8     Turlak Tab 60.
 9        A. Yes, sir.
10        Q. Okay.  Is this a pretty good summary --
11     this is a Transocean PowerPoint, correct?  I
12     mean, attached to the E-mail is a Transocean
13     PowerPoint.
14        A. Yes, sir.
15        Q. Is this a pretty good summary of the
16     various Capping Stack Strategies or Capping
17     Strategies that were being looked at?
18        A. It was put together by Dave Cameron when
19     he was asked to put together a summary.
20        Q. I know.  That's my point.  You can kind
21     of look at this and get a shorthand version of
22     the different Capping Stack Capping Strategies
23     that were being examined.
24        A. Yes, sir.
25        Q. There -- there's more details to each one
```

522

```
 1     of them, but this gives you an overview.
 2        A. Yes --
 3        Q. Fair?
 4        A. Yes, sir.
 5        Q. By the way, do I understand that one of
 6     the concerns that you've now become aware of is
 7     that, "Gee, we may lose casing integrity"?  When
 8     you ca -- when you stop the well, when you cap
 9     the well, you're going to have a buildup in
10     pressure in the wellbore, correct?
11        A. Yes.
12        Q. And if that wellbore pressure builds up
13     high enough, you could lose casing integrity?
14     You could --
15           MR. BAAY: Objection, form.
16        Q. (By Mr. Williamson) -- lose wellbore
17     integrity, correct?
18           MR. BAAY: Form.
19        A. According to what was -- what BP had
20     said, yes.
21        Q. (By Mr. Williamson) Okay.  And that's
22     going to happen.  When you -- when you cap the
23     well and seal it in, the pressure is going to
24     start rising, correct --
25        A. Yes.
```

523

```
 1        Q. -- as the downhole formation puts
 2     pressure up on the wellbore, correct?
 3        A. Well, after it's shut-in, the -- the
 4     shut-in pressure is going to be higher than the
 5     flowing pressure, yes.
 6        Q. Right.  And that's my point, and that
 7     actually happened here.  If you actually go back
 8     from July 13th through August 1st, you can see --
 9     actually see pressure in the wellbore increase,
10     correct?
11        A. Sure.
12        Q. Okay.  Wouldn't that have happened if you
13     had shut the blind shear ram and it would have
14     sealed the well on April 20th?
15        A. Well, if you -- if you would have -- have
16     completely evacuated the -- the hole down -- down
17     below the BOP, if it was completely evacuated, I
18     mean, the -- the pressure at -- at the bottom
19     of -- of the hole and the pressure in the BOP
20     were going to be different.
21        Q. Fair enough.  Let me ask it this way.
22        A. M-h'm.
23        Q. If, after the explosion, hydrocarbons had
24     evacuated all the drilling mud out --
25        A. Yeah.
```

524

```
 1        Q. -- and you were having hydrocarbon flow
 2     out --
 3        A. Yes.
 4        Q. -- and you were successful in closing the
 5     HORIZON BOP and sealing the well, you would have
 6     had an increase in wellbore pressure, right?
 7        A. Sure.
 8        Q. And that increase in wellbore pressure,
 9     if the HORIZON BOP had been successful, would
10     also put at risk the wellbore integrity?
11        A. I'm not a downhole expert and --
12        Q. All right.
13        A. -- and I'm not -- I don't know that much
14     about the casing design --
15        Q. Okay.
16        A. -- so I -- I'm not prepared to answer
17     that.
18        Q. Sure.  Here, you can give one of these to
19     your Counsel because I didn't have a Tab.  This
20     is Exhibit No. 9835.  This is a HAZID report that
21     was marked in a previous deposition.
22        Q. Do you remember seeing this document for
23     the dual ram capping option?
24        A. Yes, sir.
25        Q. I want to turn you to page   h   -t e
```

51 (Pages 521 to 524)

5 5

**Page 525**

1  Bates-stamp-numbered page is going to end in the
2  four digits 2846.  If ou'll turn to that page
3  for me.
4       MR. BAAY:      e Bates are cut off.
5       MR. WILLIAMSON:  Oh, I'm sorry.
6  Q.  By Mr. Williamson  Well, it's Page 27 of
7  39.
8  A.  Two ram stack.  Dual ram stack.
9  Reviewing document.)
10       MR. JONES:  Jimmy, what's the title
11  of this document?
12       MR. WILLIAMSON:  "Gulf of Mexico
13  Strategic Performance Unit H   ID Report MC-252
14  Dual Ram Stack Capping Option."  I believe it was
15  used as an exhibit in the Trevor Smith
16  deposition.
17  Q.  (By Mr. Williamson) Did you find it?
18  A.  What is "dual ram  tack"?  Is this
19  upposed to be BOP-on-BOP?
20  Q   This is BP's document, so if  ou're
21  a king me --
22  A.  Okay.  Let me move on.
23  Q.  I'm making -- I'm makin  one point off of
24  it on one page.
25  A.  Okay.

527

**Page 527**

1  slowing flow," right?
2  A.  Okay.
3  Q.  So what they're talking about here is if
4  you close the ENTE   RISE BOP under flow
5  conditions, you may have erosion of the
6  elastomers.  That's a risk.
7  A.  That's what it says.
8  Q.  Right.  And that's what this document is.
9  This document is trying to identify hazards.
10  A.  Yes.
11  Q.  Right.  And it says the solution to that
12  is to close a ram below the sealing ram in order
13  to slow the flow and protect against erosion,
14  correct?
15  A.  Okay.
16  Q.  Do you --
17  A.  Yes.
18  Q.  -- agree with that?
19  A.  Do I agree about doing that?
20  Q.  Yeah, do you agree it's a good idea to
21  close the lower r   first, slow the flow, protect
22  the sealing elements of the upper ram?
23       MR. BAAY:  Objection, form.
24  Q.  (By Mr. Williamson)  Do you believe that's
25  a good idea when the  were lookin  at this

526

**Page 526**

1  Q.  And that will be Page 27.
2  A  (Reviewing document.       )
3  Q.  You on Page 27?
4  A.  I think -- yes, ma'am -- yes, sir
5  Q.  I'm on the top entry of that spread heet  s
6  where it talks about you "Close the" ra -- "Lower
7  Shear Rams " and then you see over there where it
8  sa s "Threat" or "Causes"?  See that?
9  A.     Wh  what nu -- what number are on
10  you?
11  Q.  The top one.
12  A  Very top.  Okay.
13  Q.  Right.  And it says:  "Erosion/wash out
14  of testing element in the DEN BOP preventing
15  closure," right?
16       MR. JONES:  Objection, form.
17  A.  "Close the Lower Shear...Capping Assembly
18  with a minimum"...  Reviewing document.      )
19  Okay.
20  Q.  (By Mr. Williamson) And then the next  it
21  says the "Consequence" is the "Inability t
22  seal," right?
23  A  Yes.
24  Q   And then it says the "Safeguard" is the
25  asing Shear Rams and Lower Blind Shear Ram

528

**Page 528**

1  option --
2  A.  Yes.  That's what we did on the ca  ping
3  stack.
4  Q.  Okay.  That's what should be done.  Do
5  you think --
6       MR. BAAY:  Objection --
7  Q.  (By Mr. Williamson) -- that's what should
8  have been done on the capping stack?
9  A.  This was done on the capping stack.
10  Q.  I know.  Should it have been done?  Was
11  it the --
12  A.  Well, we did it --
13  Q.  -- right procedure?
14  A.  -- so it should have been done.
15  Q.  Right.  You think that's the right way to
16  approach sealing a flowing well?
17       MR. HAYCRAFT:  Object to form.
18  A.  In this case, it was, yes.
19  Q.  (By Mr. Williamson) Okay.  In this case
20  with a well that was flowing, closing th  lower
21  ram and protecting the upper ram would be an
22  appropriate BOP technique?
23       MR. HAYCRAFT:  Form.
24  Q.  (By Mr. Williamson  Do I under tand you
25  correctly.

52  (Pages 525 to 528)

529

1    MR. BAAY:  Object to form
2    A.  On the HORIZON BOP, it was
3    Q.  (By Mr. Williamson)  Okay.  The --
4    (Discussion off the record.)
5    THE WITNESS:  On top of the HORIZON
6    BOP.
7    MR. BAAY:  (Indicating.)
8    MR. WILLIAMSON:  Pass the witness.
9    THE VIDEOGRAPHER:  The time is
10   2:16 p.m.  We're off the record.
11   (Recess from 2:16 p.m. to 2:21 p.m.)
12   MR. BAAY:  Kym, can you mark this as
13   our next exhibit, please.
14   THE COURT REPORTER:  Yes, sir.
15   (Originally marked as Exhibit No. 90249;
16   redesignated as Exhibit No. 10249.)
17   (Discussion off the record.)
18   THE VIDEOGRAPHER:  The time is
19   2:21 p.m.  We're back on the record, beginning
20   Tape 17.
21   EXAMINATION
22   QUESTIONS BY MR. BAAY:
23   Q.  Good afternoon, Mr. Turlak.
24   A.  Good afternoon, sir.
25   Q.  Dav -- David Baay and Grant Davis-Denny

531

1    A.  Correct.
2    Q.  Did Mr. Wellings send you any other
3    E-mails or tell you verbally that BP had decided
4    to abandon the BOP-on-BOP?
5    MR. HAYCRAFT:  Objection, form.
6    A.  Not that I remember.
7    Q.  (By Mr. Baay)  And what he says here in
8    this E-mail is:  "BP has decided to go another
9    route and will not be doing the" B on P -- "the
10   BOP on BOP for awhile."
11   A.  Yes, sir.
12   Q.  Is that what he says?
13   A.  Yes, sir.
14   Q.  Now, if you'll turn to Tab 23, I'm going
15   to ask you some questions about the exhibit
16   marked 9103.
17   A.  Okay.
18   Q.  You're there?
19   A.  (Nodding.)
20   Q.  If you look to the bottom of the page,
21   it's the same area pointed out to you by BP's
22   lawyer, which says:  "BOP on BOP not advisable,
23   now or in the future..."
24   And this is on an E-mail from Kevin Cook
25   to Thad Allen; is that right?

530

1    for Transocean.
2    I want to ask you a -- a series of
3    questions about a few documents that BP's lawyer
4    showed you.  All right?
5    A.  Yes, sir.
6    Q.  If you'll turn to Tab 21 of their binder,
7    for exhibit marked 5386 and turn to the third
8    page of that document.
9    A.  Yes, sir.
10   Q.  Mr. Haycraft asked you about the
11   notification from Mr. Wellings on May 30th, 2010.
12   Do you remember that series of questions?
13   A.  Yes, sir.
14   Q.  And I believe you testified that your
15   memory was or -- or that you remember getting
16   this notification from Mr. Wellings on May 30th?
17   A.  Actually, I didn't get it from
18   Mr. Wellings.  I got it from Charlie Curtis.  I
19   was not on the original re -- reception list.
20   Q.  Okay.  So Mr. Wellings sent this to
21   several individuals, but didn't include you on
22   his original E-mail?
23   A.  Correct.
24   Q.  And he did include Mr. Curtis, and
25   Mr. Curtis was kind enough to tell you?

532

1    A.  Yes, sir.
2    Q.  And you weren't included on this
3    correspondence, were you?
4    A.  No, sir.
5    Q.  And what Mr. Cook says or Admiral Cook
6    says is, that the:  "BOP on BOP is not
7    advisable...," and he -- skipping what I just
8    read, then he says:  "...because of rupture disk
9    issue (as in #1)," which he's referring to his --
10   his statement above that; is that right?
11   A.  Yes.
12   Q.  Okay.  So here's my question:  Did
13   Mr. Wellings include this information as to the
14   reason why the BOP-on-BOP was being abandoned in
15   his correspondence that's been marked
16   Exhibit 5386?
17   A.  No.
18   Q.  Did he ever communicate to you or
19   Transocean the reason why BP decided to abandon
20   the BOP-on-BOP following top kill?
21   MR. HAYCRAFT:  Objection, form.
22   A.  No.  I mean, they were making decisions
23   and going different routes a lot.
24   Q.  (By Mr. Baay)  And you were on one of the
25   Capping Teams stationed at BP?

53  (Pages 529 to 532)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

557

559

```
 1
 2      I ROBERT JOSEPH TURLAK  have read the
 3   foregoing deposition and hereby affix my
 4   signature that same is true and correct, except
 5   as noted on the attached Amendment Sheet
 6
 7
 8          ROBERT JOSEPH TURLAK
 9
10   THE STATE OF _____)
     COUNTY OF _____)
11
        Before me, _____ on
12   this day personally appeared ROBERT JOSEPH
     TURLAK, known to me (or proved to me under oath
13   or through _____) to be the
     person whose name is subscribed to the foregoing
14   instrument and acknowledged to me that they
     executed the same for the purposes and
15   consideration therein expressed.
        Given under my hand and seal of office this
16   _____ day of _____, 2012
17
18
19          NOTARY PUBLIC IN AND FOR
            THE STATE OF _____
20          COMMISSION EXPIRES: _____
21
22
23
24
25
```

```
 1      I further certify that I am neither counsel
     for, related to, nor employed by any of the
     parties in the action in which this proceeding
     was taken, and further that I am not financially
     or otherwise interested in the outcome of the
     action.

 4      SUBSCRIBED AND SWORN to by me on this 7th
     day of November, 2012.

 8
 9          Emanuel A. Fontana, Jr., RPR
            Texas CSR No. 1232
10          Expiration Date: 12/31/12
            Worldwide Court Reporters
11          Firm Registration No. 223
            3000 Weslayan, Suite 235
12          Houston, Texas  77027
13          (713) 572-2000
14
15
16
17
18
19
20
21
22
23
24
25
```

558

```
 1      UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF LOUISIANA

     IN RE: OIL SPILL   ) MDL NO 2179
     BY THE OIL RIG    )
 4   "DEEPWATER HORIZON" IN ) SECTION "J"
     THE GULF OF MEXICO, ON )
     APRIL 20, 2010   ) JUDGE BARBIER
                ) MAG JUDGE SHUSHAN
 6
 7
 8      REPORTER'S CERTIFICATION
     TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9        ROBERT JOSEPH TURLAK
        TRANSOCEAN, LTD. 30(b)(6)
10         NOVEMBER 7, 2012
             VOLUME 2
11
12      I, Emanuel A. Fontana, Jr., Certified
     Shorthand Reporter in and for the State of Texas,
13   hereby certify to the following:
14      That the witness, ROBERT JOSEPH TURLAK, was
     duly sworn by the officer and that the transcript
15   of the oral deposition is a true record of the
     testimony given by the witness;
16
        That the deposition transcript was submitted
17   on _____, 2012, to the witness or to
     Attorney _____ for the witness to
18   examine, sign, and return to Worldwide Court
     Reporters, Inc., by _____, 2012.
19
        That the amount of time used by each party
20   at the deposition is as follows:
21      Mr. Haycraft - 2 Hours, 24 Minutes
        Mr. Hartley - 10 Minutes
22      Mr. Jones - 5 Minutes
        Mr. Williamson - 54 Minutes
23      Mr. Baay - 29 Minutes
24
25
```

60  (Pages 557 to 559)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**