# EXHIBIT C



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : | MDL No. 2179 |
| | : | SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| ............................................................. | : | SHUSHAN |

### AGREED 30(b)(6) DEPOSITION NOTICE OF TRANSOCEAN

By agreement of Plaintiffs' Liaison Counsel, Defense Liaison Counsel, Coordinating Counsel for the States, Coordinating Counsel for the U.S., and Counsel for Transocean shall, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and Pre-Trial Order No. 17 (as supplemented and amended by Pre-Trial Order 27),designate and produce one or more officers, managers, agents, employees, or other representatives of Transocean to discuss the Areas of Inquiry identified below. The times and locations of the depositions will be scheduled in conjunction with the designees' fact depositions in their individual capacities, or otherwise as may be scheduled with Judge Shushan and the parties.

### DEFINITIONS

As used in the list of topics contained in this notice, the following terms are defined as set forth below:

1. "Source Control Efforts" has the same meaning as "Source Control" in the Definitions contained in the United States' Initial Response to BP Exploration and Production Company's First Set of Discovery Requests served on May 19, 2011, and "Source Control Effort" refers to any specific one of those Source Control Efforts.

2. "Unified Command" means all personnel and functions of the "Unified Area Command" and the "Incident Command Post" at Houston, Texas, as the terms "Unified Area Command" and "Incident Command Post" are used in the report to the National Response Team entitled, "On Scene Coordinator Report -- *Deepwater Horizon* Oil Spill" and dated September 2011 (the "OSC Report").

3. "Transocean" means Transocean Ltd. and all of its affiliates and subsidiaries. "Transocean entity" means Transocean Ltd. or an affiliate or subsidiary of Transocean Ltd.

4. "Junk Shot" means the operation by which bridging material was injected into the Deepwater Horizon blow-out preventer either from the surface or through a subsea manifold as part of the Top Kill operations.

5. "Top Hat" means the mechanical device used to collect hydrocarbons from the top of the Lower Marine Riser Package up to the *Discoverer Enterprise* after the riser was cut off in June 2010.

6. "Top Kill" means the operations comprised of the Momentum Kill and Junk Shot attempted in May 2010 as a means to kill the MC 252 Well.

7. "Momentum Kill" means the operation by which drilling fluid was pumped into the *Deepwater Horizon* blow-out preventer at a high rate of speed in an attempt to overcome the flow of hydrocarbons as part of the Top Kill operations.

8. "Static Kill" means the operation by which drilling fluid was pumped into the *Deepwater Horizon* blow-out preventer after the well had been closed in.

## AREAS OF INQUIRY

1. Your knowledge of and involvement in the decision whether or not to undertake a specific Source Control Effort.

2. Your knowledge of and involvement in the sequencing of Source Control Efforts, including the considerations or factors that accounted for the sequence of Source Control Efforts.

3. Your position as to whether, and exactly when, BP or the Unified Command should have prepared or attempted any particular Source Control Effort.

4. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the efforts used to activate the *Deepwater Horizon* blow-out preventer on or after April 20, 2010, through the use of remotely operated vehicles ("ROVs").

5. Your knowledge of the condition and plumbing of the *Deepwater Horizon* blow-out preventer prior to the incident on April 20, 2010, your disclosure of the condition and plumbing of the blow-out preventer to BP or US personnel following the April 20, 2010 incident, and the effect of the condition and plumbing on efforts to actuate the blow-out preventer on or after April 20, 2010, through the use of ROVs.

6. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a pollution dome or cofferdam as a means to capture oil and gas from the MC252 Well.

7. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a riser insertion tube tool as a means to capture oil and gas from the MC252 Well.

8. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a second blowout preventer as a means to control or cease the flow of oil and gas from the MC252 Well.

9. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a capping stack as a means to control or cease the flow of oil and gas from the MC252 Well.

10. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Junk Shot(s) as a means to stop the flow of oil and gas from the MC252 Well.

11. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of Momentum Kill(s) as a means to stop the flow of oil and gas from the MC252 Well.

12. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a Top Kill as a means to stop the flow of oil and gas from the MC252 Well.

13. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a Top Hat as a means to capture oil and gas from the MC252 Well.

14. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of the choke or kill line of the *Deepwater Horizon* blow-out preventer as a means to capture oil and gas from the MC252 Well.

15. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of free standing risers and floating production, storage and offloading vessels as a means to capture oil and gas from the MC252 Well.

16. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of a Static Kill as a means to kill the MC252 Well.

17. Your knowledge of and involvement in the identification, design, planning, fabrication, testing, selection, and/or approval of the use of relief wells as a means to stop the flow of oil and gas from the MC252 Well.

18. Your knowledge of and understanding of the flow path of hydrocarbons from the MC252 Well between April 20, 2010, and July 15, 2010, including any information supporting that understanding.

19. Your knowledge of the role and actions of the Unified Command in Source Control Efforts.

20. Your knowledge of the role and involvement of Transocean or Transocean entity personnel in the Unified Command.

21. Your knowledge, prior to April 20, 2010, of the existence within the industry of documented procedures, designs, or devices for capping a deepwater well.

22. Your knowledge of any efforts by BP to engage, include, or provide information to Transocean or Transocean entity personnel in Source Control Efforts.

23. Your knowledge of any omissions by BP to engage, include, or provide information to Transocean or Transocean entity personnel in Source Control Efforts.

24. The training of Transocean or Transocean entity personnel, prior to April 20, 2010, to respond to, or to participate in a response to, an offshore oil well blow-out.

25. Your involvement in establishing and operating a response location at Transocean's Houston offices separate from the BP Houston Crisis Center, including the decision to establish a separate response location, the purpose and activities conducted from that location, and your interaction with United States and BP personnel in connection with activities undertaken from that location.

26. For any and all attempts by Transocean between January 1, 2001 (for the Deepwater Horizon Rig) or January 1, 2004 (for all other rigs) and April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill an uncontrolled flowing subsea Gulf of Mexico well (with a release equal to or greater than 50 BBOE or where hydrocarbons reached the rig floor) by any of the Methods and any other method(s) used but not listed above:

    a. The total cost that Transocean incurred to complete each attempt and/or Method, including, but not limited to, labor, payments made to contractors or other entities working on Transocean's behalf, materials, overhead and the cost of removal of any replaced components, parts, equipment, material, and/or supplies;

    b. The level of approval within Transocean necessary to fund and implement each attempt and/or Method, including the identity of each person who gave final approval;

    c. A description of the manner and methodology, including computer models, used by Transocean to assess each attempt and/or Method;

    d. A description of the explanations and/or justifications for each attempt and/or Method made or prepared for approval within Transocean;

    e. Dates when Transocean's planning began for each attempt and/or Method, including the length of time used to plan and budget;

    f. An explanation of and timeline for the steps involved in Transocean's planning and/or implementing each attempt and/or Method;

    g. The identity of Transocean employees and contractors who planned, managed, and/or supervised the implementation of each attempt and/or Method;

    h. A description of each office, department, or other organization at Transocean that participated in the planning, budgeting, engineering, approval, supervision, coordination, and/or implementation of each attempt and/or Method; and

    i. For each Method actually performed by Transocean, Transocean's contractors or any other entity working on Transocean's behalf, an explanation of and timeline for the steps involved in performing the Method, the identity of Transocean employees and contractors who performed each Method, and the identity of documents (with custodians) recording the performance of each Method.

27. All Transocean planning, preparations, discussions, evaluations and/or training with regard to a "Worst Case Scenario" well control / hydrocarbon discharge event, or an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico prior to April 20, 2010.

28. All knowledge or information that Transocean has relating to the conduct of any other party with regard to the reasons why the flow of hydrocarbons from Macondo was not curtailed until July 2010.

29. The amount you billed or invoiced to BP in connection with your involvement in Source Control Efforts.

30. The manner and/or methodology Transocean used to predict, estimate, characterize and/or measure the daily amount of discharge from the Macondo Well from:

    a. April 20, 2010 through July 15, 2010;

    b. July 16, 2010 through September 19, 2010; and

    c. September 20, 2010 through the present,

    including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all custodians (with documents), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by Transocean.

31. The manner and/or methodology Transocean used to predict, estimate, characterize and/or measure the discharge of oil and/or other pollutants, other than hydrocarbons from the Macondo well, from the Deepwater Horizon MODU:

    a. April 20, 2010 through July 15, 2010;

   b. July 16, 2010 through September 19, 2010; and

   c. September 20, 2010 through the present,

   including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all custodians (with documents), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by Transocean.

32. The manner and/or methodology Transocean used to predict, estimate, characterize and/or measure the physical or chemical properties of any substance contained in the daily discharge from the Macondo Well from:

    a. April 20, 2010 through July 15, 2010;

    b. July 16, 2010 through September 19, 2010; and

    c. September 20, 2010 through the present,

    including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all custodians (with documents), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by Transocean.

33. The manner and/or methodology Transocean used to predict, estimate, characterize and/or measure the potential or actual daily depletion of the hydrocarbon reservoir tapped by the Macondo Well from:

    a. April 20, 2010 through July 15, 2010;

    b. July 16, 2010 through September 19, 2010; and

    c. September 20, 2010 through the present,

    including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all custodians (with documents), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by Transocean.

34. The manner and/or methodology Transocean used to predict, estimate, characterize and/or measure the pressure inside the Macondo Well, including but not limited to the reservoir pressure, the pressure inside the wellbore, the pressure at the BOP, and the pressure above the BOP for every day from:

    a. April 20, 2010 through July 15, 2010;

b. July 16, 2010 through September 19, 2010; and

c. September 20, 2010 through the present,

including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all custodians (with documents), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by Transocean.

35. The manner and/or methodology Transocean used to predict, estimate, characterize and/or measure the temperature of the discharge from the Macondo Well for every day from:

   a. April 20, 2010 through July 15, 2010;

   b. July 16, 2010 through September 19, 2010; and

   c. September 20, 2010 through the present,

   including the identity of individuals involved in each prediction, estimate, characterization and/or measurement and the identity of all custodians (with documents), data, observations, calculations and/or measurements that were predicted, taken, used, relied upon, or considered by Transocean.

36. Your knowledge of all person(s) and/or entities charged with predicting, calculating, analyzing, determining, estimating, modeling, simulating, reporting, presenting, and/or releasing to the media and/or the public any information regarding the amount of hydrocarbons released from the Macondo Well into the atmosphere, ocean, and/or environment for every day from:

   a. April 20, 2010 through July 15, 2010; and

   b. July 16, 2010 through September 19, 2010.

37. All calculations and analyses performed by Transocean to quantify the amount of oil flowing through the capping stack at any time between the installation of the capping stack and the shut-in of the Macondo Well.

38. The configuration of the capping stack (including ram position) and all pressure measurements (including calibration measurements) and temperature measurements taken from the capping stack between the installation of the capping stack and the commencement of the static kill.

39. All operations by Transocean related to the installation, operation, or manipulation of the capping stack, whether by ROV or otherwise, between commencement of installation of the capping stack and commencement of the static kill.

40. All attempts, both successful and unsuccessful, Transocean made to measure the pressure and/or temperature of any portion of the Macondo Well or its discharge either above or below the BOP between April 20, 2010 and the static kill.

41. All analysis, calculations, modeling, or estimates by Transocean relating to the effect of obstructions in the wellbore, the BOP, and/or the riser on the rate of flow from the Macondo Well.

Dated: August 6, 2012

Respectfully submitted,

By: /s/ J. Andrew Langan, P.C.

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

and

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Parties*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, which will send a notice in accordance with the procedures established in MDL 2179, on this 6th day of August, 2012.

/s/  J. Andrew Langan, P.C.