**BINGHAM**

Warren Anthony Fitch
Direct Phone: +1.202.373.6695
Direct Fax:    +1.202.373.6001
tony.fitch@bingham.com

November 29, 2012

**Via E-Mail**

Dear Judge Shushan:

I'm writing with respect to a serious problem that arose in the deposition of Dr. Stewart Griffiths on November 13-14, 2012.

At Dr. Griffiths' deposition, the parties learned that the United States had retained Dr. Griffiths in April 2012 as an expert.  Anadarko has no objection of course to the mere fact of this retention, but for multiple lines of inquiry by various questioning parties, Dr. Griffiths was unable to offer responsive non-privileged testimony because he claimed, at the Government's prompting, that he was unable to distinguish in his mind between non-privileged work that he performed as an employee of Sandia National Laboratories through December 2010 and work that he performed at least 14 months later after his retention.

As set forth more fully hereinafter, Dr. Griffiths' inability to make this distinction, coupled with the numerous instructions from DOJ counsel not to answer, precluded the parties, including Anadarko, from obtaining relevant, non-privileged testimony within the scope of Dr. Griffiths' designation. Accordingly, Anadarko respectfully requests appropriate relief to obtain important, relevant, non-privileged testimony from Dr. Griffiths.

**Background**

Dr. Griffiths was a scientist at the Sandia National Laboratories for approximately 30 years, from 1981 until his retirement at the end of 2011.  He was originally a member of the group of scientists at various National Laboratories that Secretary Chu assembled in May 2010 to generate Flow Rate and Quantification estimates.  (That group is known as the DOE-NNSA Flow Analysis Team and is often referred to as the "Tri-Labs Team" or the "DOE Science Team" because it was comprised of various scientists from Sandia National Laboratories, Lawrence Livermore National Laboratory and Los Alamos National Laboratory.  Its report is titled *DOE-NNSA Flow Analysis Studies Associated with the Oil Release Following the Deepwater Horizon Incident*.)

Dr. Griffiths briefly worked with the Tri-Labs Team but discontinued his work with the Team because of a health issue; he subsequently resumed his work on Flow Rate and Quantification issues in July 2010 and eventually reported his conclusions in a paper that he authored, and Sandia released, titled *Oil Release from the BP Macondo MC252 Well:  Flow Rates and Cumulative Discharge Calculated Using Measured Blowout-Preventer Pressures* ("Griffiths Report").

Beijing
Boston
Frankfurt
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
2020 K Street NW
Washington, DC
20006-1806

T +1.202.373.6000
F +1.202.373.6001
bingham.com

A/75268626.1

November 29, 2012
Page 2

The United States designated Dr. Griffiths to testify regarding this paper in partial response to Topic 82 of its Rule 30(b)(6) notice:

> The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the SNL [Sandia National Laboratories'] team or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

Early in the first morning of his deposition, DOJ counsel began instructing Dr. Griffiths not to answer various questions. (Tr. 11:17-21). Dr. Griffiths complied with those instructions. (*See, e.g.*, Tr. 11-12, 98). When Transocean counsel inquired as to the basis of those instructions, DOJ counsel stated that the instructions were an assertion of privilege that arose from Dr. Griffiths' retention by the United States as a consultant. (Tr. 114:11-16). The announcement of this position clarified earlier testimony by Dr. Griffiths and statements by DOJ counsel that he had been engaged as a consultant by the United States and that he might be designated as an expert witness on behalf of the United States. (Tr. 11:2-12:1).

At the beginning of the second day of Dr. Griffiths' deposition, DOJ counsel disclosed that Dr. Griffiths had been engaged by the United States as of April 10, 2012 (Tr. 370:13-23) -- 14 months after Dr. Griffiths concluded the work that was the subject of this 30(b)(6) deposition. (Tr. 412:10-21 (testifying that the relevant non-privileged work was completed as of December 2010)).

When it retained Dr. Griffiths, the United States could have and should have implemented measures to ensure that Dr. Griffiths had a clear understanding, for purposes of his testimony on behalf of Sandia, of the non-privileged information pertaining to his 2010 modeling work and the privileged information gained in his personal capacity as a litigation expert in 2012. Unfortunately, the United States did not implement such measures.

DOJ counsel asserted that Dr. Griffiths "can't separate out what he's learned as a . . . privileged expert from what he was doing in the pre-privileged capacity." (Tr. 115:15-21). Dr. Griffiths himself then later affirmed, after having the statement read back to him, that he "largely agree[d] with that statement." (Tr. 411:5-412:1).

This asserted confusion pervaded the deposition. In response to one line of inquiry, Dr. Griffiths testified that "I have not answered yet because I don't know whether -- whether the answer involves my expert work or my Sandia work." (Tr. 451:14-19). Dr. Griffiths also testified that he was unable to provide a yes or no answer with regard to whether an underlying assumption made in his report was still correct. (Tr. 289:17-292:11). And in response to yet another line of questioning Dr. Griffiths responded:

> I'm -- let's see. I'm trying to figure out how to answer this without crossing into -- to privileged information. So I apologize, but I -- I don't know -- I'm just a deer in the headlight at the moment, not

November 29, 2012
Page 3

because of the question, but because I don't know what I should and shouldn't be saying.  (Tr. 242:6-12.)

Throughout the two days of the deposition, DOJ counsel repeatedly instructed Dr. Griffiths not to answer questions dealing with crucial aspects of the analytical modeling that he had performed in connection with his non-privileged work.   These objections precluded testimony on the following key topics: Dr. Griffiths' present view on what should have been the proper "offset" (correction) of a malfunctioning BOP pressure gauge whose measurements were crucial to the modeling/estimates that he and other scientists did (Tr. 97:24-98:11), whether he considers the Kill Line pressure gauge readings to be accurate (Tr. 114:2-117:4), whether he still believes today that the 500 psi offset that he eventually used in his modeling was appropriate (Tr. 230:10-231:4), whether he still believes that the flow coefficients that he used account for all conditions in the well (Tr. 289:20-292:11), what the correct offset for the PTB pressure gauge should have been (Tr. 407:10-410:5), whether Sandia still agrees with the 500 psi offset that he used (Tr. 410:6-412:1), and whether since doing his report he has become aware of any pressure measurements done before the May 8, 2010 pressure measurements that he used (Tr. 445:3-19, 446:9-21, 453:19-25).

Needless to say, the mere presence of potentially privileged information does not excuse a deponent from testifying to non-privileged information. *Cf. Oubre v. Entergy Operations, Inc.*, 1999 WL 143093, at *2 (E.D. La. Mar. 12, 1999) (Shushan, M.J.) ("[Q]uashing the entire deposition based on the fear that some expert witness testimony 'may' occur is not supported by law or judicial efficiency.")   And the parties are entitled to examine Dr. Griffiths on that non-privileged information without the impediment of repeated assertions of confusion regarding what information in his mind is and is not privileged and without repeated instructions not to answer questions *at all* when the answer *may* implicate privileged information.

As the Court knows, the Quantification issues affected by the foregoing methodological questions are the central concern of Anadarko in this case and entail potentially huge ramifications for Anadarko and other defendants as well.   The Government's arbitrary delimitation of Dr. Griffiths' explanation of and responses to questions about his work contravenes the core purpose of this and every Phase Two Rule 30(b)(6) deposition — to enable the parties at this point in time to explore and at least begin to understand the underpinnings of this and all the other complex Quantification estimates and thereby provide a basis for the parties' counsel, expert consultants and expert witnesses to fully assess the validity and reliability of Dr. Griffiths' methodology and the similar methodologies of other researchers who generated flow rate estimates in the various reports and papers that will be at issue in Phase Two and later phases of the case.

The Government's apparently careless decision to engage as a consultant the author of an important report, who was certain to be deposed, and then to fail to assure that he would keep separate his prior work and his consulting work has the effect of leaving Anadarko and other defendants in the position of not being able to fully explore Dr. Griffiths' methodology and conclusions prior to trial (for, without his new-found consultant status, Dr. Griffiths certainly would be expected to answer questions about his and Sandia's present opinions of

November 29, 2012
Page 4

and present information about his methodology and its results).  We face, therefore, with
respect to this witness and others who used some of the same methodology, the prospect of
trial by surprise when the Government presents its Quantification case at trial (or relies upon
it in settlement negotiations) -- precisely the situation which it is the fundamental purpose of
Rules 26-37 to prevent.

Understandably, in light of this situation, counsel for Halliburton and BP joined in
Anadarko's objections to the Government's privilege assertions and reservation of its right
to seek relief from the Court on this matter.  (Tr. 528-533, 551, 630).

### Relief Requested

It is unclear from the Government's representations in the course of Dr. Griffiths' deposition
whether Dr. Griffiths is a testifying expert or only a consulting expert — or even whether
the United States has made this determination.  This uncertainty bears on the question of an
appropriate remedy for this situation.

If Dr. Griffiths is going to be a testifying expert, then I respectfully request that defendants
be allowed an additional two hours at his expert deposition to resume our examination of
him in his individual and corporate representative capacity and receive answers on the
matters on which examination was precluded by the Government's instructions not to
answer.  If Dr. Griffiths is not going to be a testifying expert, then I respectfully request that
Dr. Griffiths (or another appropriate designee) be required to appear for a two-hour
resumption of this Rule 30(b)(6) deposition.

(In either event, the two additional hours could be divided among the parties in proportion to
the time allocations for the original deposition.)

Thank you for your consideration of this submission.

November 29, 2012
Page 5

Respectfully submitted,

Warren Anthony Fitch

Enclosure


cc:    Plaintiffs Liaison Counsel
       Defendants Liaison counsel
       Michael Underhill, Esq.
       Scott M. Cernich, Esq.
       A. Nathaniel Chakeres, Esq.
       Steven O'Orourke, Esq.
       Ky E. Kirby, Esq.
       Phase Two Distribution List

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL        )    MDL NO. 2179
by the OIL RIG,          )
DEEPWATER HORIZON in     )    SECTION "J"
the GULF OF MEXICO,      )
April 20, 2010           )    JUDGE BARBIER
                         )
                         )    MAG.  JUDGE
                         )    SHUSHAN

Videotaped deposition of STEWART
GRIFFITHS, taken at Pan-American Building, 601
Poydras Street, 11th Floor, New Orleans,
Louisiana, 70130, on the 13th of November,
2012.

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER

1      currently employed, Dr. Griffiths?

2          A.     I -- I am not currently employed

3      at Sandia.  I am currently doing some

4      consulting work.

5          Q.     Okay.  Can you tell us who you're

6      doing consulting work with?

7          A.     The Department of Justice.

8          Q.     Okay.  Is that work related to

9      this particular matter, the DEEPWATER HORIZON

10     matter?

11         A.     Yes, it is.

12         Q.     Okay.  Are you being paid for that

13     work?

14         A.     Yes, I am.

15         Q.     Okay.  Can you tell us how much

16     you're being paid for that work?

17              MR. CHAKERES:  We're going to

18     instruct the witness not to answer -- well, to

19     the extent necessary to disclose compensation

20     to experts, we will do so in accordance with

21     the guidelines of Rule 26.

22              MR. NAKAYAMA:  Okay.

23     Mr. Chakeres, are you saying he's an expert?

24              MR. CHAKERES:  I'm saying if we

25     decide to use him as an expert, we will

```
 1              disclose his compensation.
 2                       MR. NAKAYAMA:  Okay.
 3                  Q.    Dr. Griffiths, who was your
 4              employer at the time you prepared the work
 5              that you are here to testify about?
 6                  A.    Sandia National Laboratories.
 7                  Q.    Okay.  And when were you employed
 8              by Sandia National Laboratories?
 9                  A.    Overall?  From 1980 -- I don't
10              remember the month.  I think it was
11              September to December of 2011.
12                  Q.    Okay.  So Sandia was -- was the
13              employer at the time you -- you prepared this
14              work we're about to talk about?
15                  A.    Yes.
16                  Q.    Okay.  Have you ever been deposed
17              before?
18                  A.    No, I have not.
19                  Q.    Okay.  Do you understand that you
20              have been designated as a Rule 30(b)(6)
21              representative in this case?
22                  A.    I do.
23                  Q.    Okay.  Do you understand what that
24              means?
25                  A.    At some level, yes.
```

```
 1              MR. CHAKERES:  Object to scope.
 2         A.     I imagine that I was comparing the
 3    BOP pressures to the capping stack pressures.
 4         Q.     And when you say an offset of
 5    1655, what -- what do you mean when you say an
 6    offset of 1655 psi?
 7         A.     That -- that -- that was the
 8    difference between the two gauges.  And if I
 9    attributed that to an offset in the BOP gauge,
10    it would -- it would imply that I believed the
11    capping stack pressure and -- and felt that
12    the BOP pressure was in error or offset by
13    that amount.
14         Q.     Would that be a high offset?  In
15    other words, would the BOP pressure gauge be
16    reading low by 1655, or does it -- is it
17    reading -- the BOP pressure gauge reading high
18    so you'd need to subtract 1655 psi from the
19    reading of the BOP gauge?
20              MR. CHAKERES:  Object to scope.
21         A.     I -- I believe -- and as I look at
22    the figure, I believe the BOP gauge was
23    reading high by 1655.
24         Q.     Okay.  Do you still think that
25    there's a 1655 psi offset for that gauge?
```

```
1              MR. CHAKERES:  Cautionary
2      instructions to the witness.
3           A.    I do not.
4           Q.    You do not believe there's a
5      1655 psi offset for that gauge?
6           A.    That is correct.
7           Q.    What do you think the offset is
8      for that gauge?
9              MR. CHAKERES:  Instruct the
10     witness not to answer.
11                  Don't answer.
12          Q.    When does the 1655 psi offset
13     apply to the gauge?
14             MR. CHAKERES:  Object to scope.
15          A.    I -- I -- in this context, it --
16     it was applied throughout the shut-in.
17          Q.    Let's go to tab 10 --
18               (Exhibit Number 9898 marked.)
19          Q.    -- which is marked as
20     exhibit 9898.
21                  Now, this is an e-mail from
22     Ron Dykhuizen on July 20th, 2010 to a number
23     of people in the government; is that correct,
24     Dr. Griffiths?
25          A.    Yes.
```

```
 1          the BOP reported pressure by 2560 psi.
 2               Q.     Okay.  Do you believe the kill
 3          line pressure gauge was accurate?
 4                    MR. CHAKERES:  Instruct you not to
 5          answer that question.
 6               Q.     Do you believe the pressure -- do
 7          you believe the -- the kill line pressure
 8          gauge was accurate?
 9                    MR. CHAKERES:  I'm going to
10          instruct you not to answer that question.
11                    MS. YAN:  I'm sorry.  What's the
12          basis for your instructions?
13                    MR. CHAKERES:  Because it's
14          calling for his current opinion as to a matter
15          upon which he has been retained by the
16          Department of Justice.
17                    MR. NAKAYAMA:  Let me ask it
18          again.
19                    MR. CHAKERES:  If you want to
20          ask --
21               Q.     Do you believe the kill line
22          pressure gauge was accurate?
23                    MR. CHAKERES:  I'm going to
24          instruct you not to answer that question.
25                         If you want to ask for whether
```

1     in this -- in the course of the work that's

2     the subject of this 30(b)(6) deposition he has

3     any analysis of the kill line pressure gauge's

4     accuracy, you can answer that question.

5              MR. NAKAYAMA:  I want to be clear,

6     Counsel.  I'm not asking for any privileged

7     information.

8              MR. CHAKERES:  He can --

9              MR. NAKAYAMA:  And I want to make

10    sure that -- that we all understand that

11    Dr. Griffiths is giving testimony both as a

12    30(b)(6) witness and in his personal capacity.

13             MR. CHAKERES:  I --

14             MR. NAKAYAMA:  Is that correct?

15             MR. CHAKERES:  That is correct.

16    He is currently reviewing information related

17    to this case in a privileged capacity.  In his

18    current opinion, he can't separate out what

19    he's learned as a -- as a privileged expert

20    from what he was doing in the pre-privileged

21    capacity.

22             So if you're asking his

23    current opinion on the pressure gauge

24    accuracy, I'm going to instruct him not to

25    answer it.

1           MR. NAKAYAMA:  And then you also

2      understand, Counsel, that the testimony today

3      is not limited to the topic for which

4      Dr. Griffiths has been designated, correct?

5           MR. CHAKERES:  I agree with that.

6      I don't think that his deposition is going to

7      go into privileged information.  You can ask

8      him any question.  If it's privileged, I'm

9      going to instruct him not to answer.

10          MR. NAKAYAMA:  I'm asking him for

11     personal knowledge, and to the extent he has

12     personal knowledge and to the extent that that

13     personal knowledge is not privileged, he

14     should be able to answer.  To the extent that

15     he or -- or -- has been -- is -- is -- has

16     personal knowledge related to this topic, I

17     think he's -- we're entitled to an answer, and

18     he should answer that question.

19          MR. CHAKERES:  Not if that

20     personal knowledge was gathered as a result of

21     his privileged work.

22          MR. NAKAYAMA:  Right.  And so if

23     there's -- if that knowledge was only obtained

24     as a result of his privileged work, I'm not

25     asking about that.  I want to be clear on

```
1     that.
2                MR. CHAKERES:  And if his opinion
3     was informed by his privileged work, I'm
4     instructing him not to give that opinion.
5           Q.    Let's go back to this question
6     here, then.  It says -- this slide states,
7     quote, the BOP -- BOP -- the slide states,
8     quote, BOP has significant zero shift (plus
9     2560 psi), close quote, correct?  That's what
10    the slide says, right, Dr. Griffiths?
11          A.    Yes, but please don't infer from
12    that that I -- that this a -- the BOP gauge.
13    It is -- these are pressures at the BOP.
14          Q.    It says BOP has significant zero
15    shift.
16          A.    The BOP pressure has a significant
17    zero shift.
18          Q.    And at the time you wrote this,
19    what did you mean by that?
20          A.    I mean that -- that it disagreed
21    with what I presume is PT3 K1 and 2 by roughly
22    this 2560 psi.
23          Q.    Okay.  And at that, time was it
24    your belief that the BOP pressure gauge was
25    correct or the kill line pressure gauge was
```

1   more appropriate.  But I don't want the --

2   the -- the strength of my conclusions, the

3   convictions of my conclusions in that report

4   overstated by agreeing with your statement

5   of -- of my conclusion.

6              That's why I said I -- I

7   would have to look at the report and see how

8   strongly, you know, I -- I stated that --

9   that -- that 500 was a better number than 966.

10      Q.    Is 500 psi a better offset to use

11   on the -- on the gauge than 966 psi on the --

12   on the BOP pressure gauge?

13              MR. CHAKERES:  Counsel the witness

14   to answer in a manner that would not reveal

15   privileged information.

16      A.    At -- at the time I wrote this

17   report, I -- I had reasonable confidence

18   that -- that the offset was closer to nine --

19   to 500 than it was to 966.

20      Q.    You still have that confidence?

21              MR. CHAKERES:  I'm going to

22   instruct the witness not to answer that

23   question.

24              MR. NAKAYAMA:  What's the basis

25   for the objection?

```
1       the pressure above the test ram, is it
2       physically possible for the pressure below the
3       test ram to be lower, to be approximately
4       2820 psi?
5                   MR. CHAKERES:  Object to form.
6             A.    I'm -- let's see.  I'm trying to
7       figure out how to answer this without crossing
8       into -- to privileged information.  So I
9       apologize, but I -- I don't know -- I'm just a
10      deer in the headlight at the moment, not
11      because of the question, but because I don't
12      know what I should and shouldn't be saying.
13                  MR. CHAKERES:  Is it all right if
14      we take -- I think we're off.
15                  MR. NAKAYAMA:  Well, I'd like the
16      pending question to be answered before we take
17      a break.
18                  MR. CHAKERES:  Well, I think the
19      witnesses are entitled to confer with counsel
20      regarding privileged matters before answering
21      questions.
22            A.    Let me see if --
23                  MR. CHAKERES:  You can answer the
24      question.
25            A.    Let me see if I can do it
```

1        A.    Well, I don't -- I don't think

2    it -- it sort of says that here but I wouldn't

3    think of this really as being at nodes, but --

4    but something that's -- that's between nodes.

5        Q.    So an example would be, let's say,

6    between the -- the reservoir and the bottom of

7    the well, or between the bottom of the well

8    and the BOP?

9        A.    Yeah, exactly.

10       Q.    Right?

11       A.    Yeah.

12       Q.    Okay.  All right.

13                   And the underlying assumption

14   here is that the densities do not change

15   with -- with pressure or flow rate or anything

16   else, is that correct, at each of those CVs?

17       A.    That -- that is what I state.  And

18   that was -- was certainly my -- my

19   understanding of it at that time.

20       Q.    Okay.  Has your understanding of

21   that changed?

22             MR. CHAKERES:  Caution the witness

23   to not reveal any understanding he's gained

24   since March 2012.

25       A.    I -- I think maybe I can't answer

1      the question even yes or no.

2          Q.     You can't answer whether your

3      understanding has changed whether that -- that

4      underlying assumption is correct?

5              MR. CHAKERES:  Same cautionary

6      instruction.

7          A.     Well, yes -- yes, because I think

8      you -- you know, you could infer certain

9      things from the answer that -- that -- that

10     would -- would say something about what I

11     learned since March.  And so -- so I think

12     even a yes-or-no answer might -- might, you

13     know, provide some -- some insight into what I

14     have learned under contract.

15         Q.     So you're saying you can't answer

16     the question whether the -- you still --

17     whether -- you can't answer whether your

18     understanding has changed whether the basic

19     assumption underlying that model -- that

20     densities at each CV location do not change

21     with pressure or flow rate, you can't answer

22     whether your understanding of -- of -- of

23     whether that assumption is correct has

24     changed?

25              MR. CHAKERES:  Since March 2012.

1    Q.   Since March?

2    A.   Well, I know the answer.  I just

3    don't feel like I'm -- I'm -- I'm allowed to

4    tell you.

5              MR. CHAKERES:  If you can't do so,

6    then don't do so.

7    Q.   But you are the 30(b)(6) witness

8    for the -- for this -- this topic, right,

9    your -- your study of the -- of the flow?

10   A.   Yes.

11   Q.   And you have personal knowledge,

12   right, about the -- the work you did to

13   produce that study?  You were the author of

14   that study?  And this is a document you wrote

15   that I'm asking about now.  This is the

16   document behind tab 26, which is

17   exhibit 10021.

18              So these are all documents

19   you wrote and I'm asking you just about that

20   document.  And you're saying it's not possible

21   to answer that question?

22              MR. CHAKERES:  So to the extent

23   you can testify about what the assumptions

24   were underlying the report, you can answer.

25   But to the extent your current understanding

1    is informed by your privileged work, then I'll

2    instruct you not to answer.

3         A.    At the time I wrote the report, I

4    believed that the -- the -- the assumption

5    that the density was constant, again, over --

6    not everywhere, but over individual flow

7    segments, that that density over individual

8    flow segments over the range of pressures of

9    interest in an effective manner were constant,

10   and that assumption was a key underlying

11   assumption in the analysis.

12            MR. NAKAYAMA:  Okay.  I think

13   it's -- can we go off the record.

14            VIDEOGRAPHER:  Time is 4:30 p.m.

15   We are off the record.

16                 (Off the record.)

17            VIDEOGRAPHER:  Time is 4:42 p.m.,

18   and we are back on the record.

19        Q.    Okay, Dr. Griffiths, let's turn to

20   tab 27.

21            MR. NAKAYAMA:  And, again, we'll

22   mark this exhibit 10022, or 10,022.

23            (Exhibit Number 10022 marked.)

24        Q.    Do you see tab 27?

25        A.    Yes.

```
 1                    VIDEOGRAPHER:  This is volume 2

 2         for the 30(b)(6) deposition of Stewart

 3         Griffiths for the U.S.  Today's date is

 4         November 14th, 2012.  The time is 8:34 a.m.

 5         We are now on the record.

 6                    STEWART GRIFFITHS,

 7         having been previously sworn, testified as

 8         follows:

 9                         EXAMINATION

10         BY MR. NAKAYAMA:

11              Q.     Good morning, Dr. Griffiths.

12              A.     Good morning.

13              Q.     Before we get started, I think

14         there was a pending -- excuse me -- there was

15         a question we had regarding the date of your

16         retention.

17                    MR. NAKAYAMA:  And I think counsel

18         had some information for us?

19                    MR. CHAKERES:  Yes.  We went

20         and -- and checked the -- the records, and the

21         contract for expert services was issued on

22         April 10th, 2012.  So he was authorized to

23         provide expert services as of that date.

24                    MR. NAKAYAMA:  Thank you.

25              Q.     Dr. Griffiths, I just want to
```

```
1     fact, I have seen data where -- where
2     measurements, PTB, pressures measured before
3     May, were corrected.
4                    So I -- I think it's -- it's
5     hard to say.  And in some data sets, they are
6     corrected and in some data sets, they are not
7     corrected and in some data sets, they are
8     corrected some of the time and not other
9     times.
10         Q.    You said before May, so did the --
11    you refer to PTB pressure measurements before
12    May.
13                    Are you aware of any PTB
14    pressure measurements before May?
15              MR. CHAKERES:  Object to form.
16         A.    No.  I think I was referring --
17    no.  I was referring to the May 25, 26, 27
18    time frame when I made that statement.
19                    I may have said before May,
20    but what I intended to mean was before May 25,
21    6, 7, et cetera.
22         Q.    Now, as a 30(b)(6) witness on
23    behalf of Sandia, what is the correct offset
24    for PTB?
25              MR. CHAKERES:  Object to scope,
```

1    and counsel the witness to not answer the

2    question.

3            MR. FITCH:  Counsel, what's the

4    basis for instructing him as Sandia's

5    representative not to answer that question?

6    He's a consultant to you in his personal

7    capacity.  This is a question to him in his

8    capacity as Sandia's 30(b)(6) representative.

9    You have no basis for telling him -- for

10   instructing him not to answer that question.

11           MR. CHAKERES:  He is the witness

12   for the United States in his 30(b)(6)

13   capacity, not Sandia.  The topic for which he

14   is designated is a portion of topic 82, which

15   is flow analysis performed by Sandia Labs or

16   its members.  And the portion of that is the

17   flow analysis performed by Dr. Griffiths.

18            Dr. Griffiths will be able to

19   testify regarding what offset analysis was

20   done in relation to that flow analysis, what

21   discussion he made of the offset in his

22   report.  His current opinion about the offset

23   is informed by privileged work he's performed

24   on behalf of the Department of Justice.

25           MR. FITCH:  He wasn't asked for

1    his current opinion.  He was asked for

2    Sandia's opinion, and every other aspect of

3    your explanation just now went to scope, not

4    anything else.  You cannot instruct him not to

5    answer that question on the basis of scope.

6            MR. CHAKERES:  I'll inform the

7    witness he can answer the question with

8    respect to what was the correct offset used in

9    the context of the flow analysis summarized in

10   the report.

11        A.    July 13, 14, 15 and beyond, the

12   difference in pressure between PTB and PT3K is

13   very near 600 psi.  PTB is reading high, as

14   reported by BP.  I do not know whether those

15   values have anything added, subtracted,

16   multiplied, something adjusted in some other

17   way, so I cannot say that is a gauge offset.

18   All I know is that there is a difference of

19   600 or slightly over 600 psi, and PTB reads

20   high.  Whether that is a gauge offset in the

21   true sense of the word or is some anomaly

22   associated with BP reporting, I cannot say.

23            Prior to July 11th, I state

24   in my report that I believe that the offset is

25   on the order of 500 psi with PTB reading low.

```
 1      And, again -- excuse me -- but, again, I do
 2   not know what corrections may or may not have
 3   been applied to that data with certainty, and
 4   so I do not know whether that reflects a true
 5   offset in the gauge, per se, or not.
 6          Q.     And as a 30(b)(6) witness on
 7   behalf of Sandia Labs, is that offset reported
 8   that you're describing still -- still -- still
 9   a position of Sandia?
10              MR. CHAKERES:  I'm going to object
11   to scope and instruct the witness not to
12   answer.
13              MR. NAKAYAMA:  On what basis are
14   you instructing the witness not to answer?
15              MR. CHAKERES:  The 30(b)(6) notice
16   calls for the flow analysis performed by
17   Sandia, and he testified to that.  The
18   30(b)(6) notice did not call for the current
19   view of Sandia on a given issue, and his
20   current view is informed by privileged work.
21              MR. NAKAYAMA:  Do you know his
22   answer would contain privileged material?
23              MR. CHAKERES:  Based on conferring
24   with him, yes.
25              MR. NAKAYAMA:  So you're
```

1    representing for the record that he can't

2    answer that question because it would

3    definitely contain privileged material?

4            MR. CHAKERES:  Yes.

5        Q.    Dr. Griffiths, Mr. Chakeres made a

6    statement yesterday about your past work

7    reviewing information related to your

8    privileged work.  I'm going to quote from --

9    from that statement he made.  He stated,

10    quote -- Mr. Chakeres stated, quote, he's

11    currently reviewing information related to

12    this case in a privileged capacity.  In his

13    current opinion, he can't separate out what

14    he's learned as -- as a privileged expert from

15    what he's doing in the pre-privileged

16    capacity, close quote.

17            Do you agree that you're not

18    able in your -- today to separate out what

19    you've learned as a privileged expert from

20    what you've been doing -- what you did in a

21    pre-privileged capacity?

22            MR. CHAKERES:  Object to form.

23        A.    I -- I would largely agree with

24    that statement.  I -- I -- I -- I -- I do know

25    there are things I have learned that I did not

1    know at the time I wrote the report.

2         Q.      You mention this 500 psi offset we

3    talked about on PTB.

4         A.      Yes.

5         Q.      Did you consider whether that

6    offset was correct in the period from when you

7    finished work on the report, which I believe

8    you said was December 2010, in the period up

9    to your retention on April 10th, 2012?

10        A.      Did -- did I -- did I think about

11   that or -- while I was -- while I was -- well,

12   while I was at Sandia up to -- up to my

13   retention?  I don't -- I don't believe I did

14   any -- any work on this.  I -- I -- I think in

15   one of my e-mails to Art Ratzel, I said, done,

16   done, done.  I was -- I -- I had very

17   important work I needed to be doing.  We had a

18   crisis at Sandia that I was engaged in, and I

19   was not working on this after it was done.

20        Q.      So after December 2010?

21        A.      I believe that's correct.

22        Q.      With respect to other gauges,

23   other pressure gauges, such as the gauges on

24   the kill line -- I think that's PT3 K1 and 2

25   on the capping stack, and then on the BOP PTK

1      far as I knew, there were no measurements at

2      the -- using PTB prior to May 8th.

3              Q.    And as A 30(b)(6) witness for

4      Sandia, are you aware of pressure measurements

5      before May 8th at this time?

6                   MR. CHAKERES:   Counsel the witness

7      to not answer with respect to privileged work.

8              A.    I won't be able to answer that.

9              Q.    Why won't you be able to answer

10     that?

11             A.    Because I have obtained knowledge

12     since my retention that would influence my

13     answer.

14             Q.    And this is your retention as an

15     expert?

16             A.    Yes.

17             Q.    Okay.  And this is under that

18     April 10th, 2012 contract?

19             A.    Yes.

20             Q.    Okay.  But you're being

21     compensated under that contract for your time

22     today at this deposition; isn't that correct?

23             A.    I -- as I said earlier, I -- I had

24     presumed that I would be.  I don't know for a

25     fact that I will be.

```
 1              Q.     Well, you submitted invoices in
 2       preparing for this deposition for your time?
 3              A.     I did.   That was my presumption.
 4              Q.     Okay.   You know, you talk about
 5       information you've become -- that you've
 6       become aware of -- excuse me -- since your
 7       retention.
 8              A.     Uh-huh.
 9              Q.     But let's just talk about the
10       pressure data in general.
11                     Is there pressure data before
12       May 8th that's been produced in -- in this
13       litigation?
14                     MR. CHAKERES:   Counsel the witness
15       to not answer with respect to information he
16       learned in the course of privileged work.
17              A.     I can't answer.
18              Q.     And that's, again, because of your
19       retention under the April 10th, 2012 expert
20       agreement?
21              A.     It is.
22              Q.     Okay.   If there were changes that
23       occurred below the BOP and the well, they
24       occurred before May 8th, isn't it true that
25       the model as described in tab 66,
```

451

1                MR. CHAKERES:  You can answer that
2       question with respect to the deposition
3       preparation and not with respect to privileged
4       work.
5            A.    I'm afraid I don't know which is
6       which in this case.
7            Q.    So, Dr. Griffiths, you said, I
8       believe, you don't know which is which in this
9       case.  And -- and I'd like to establish why
10      you're not able to answer my question.
11                So are you not answering my
12      question because you think your answer could
13      be based upon your expert work?
14           A.    Am I not answering your question
15      because I -- it is based on my expert work.  I
16      am -- I am not -- I have not answered yet
17      because I don't know whether -- whether the
18      answer involves my expert work or my Sandia
19      work.
20           Q.    So you don't know whether your
21      answer would be based upon your expert work?
22           A.    I -- I just do not know how to
23      categorize that.  I guess I would categorize
24      it as -- as part of my expert work, and so I
25      think I should not answer.

1              MR. CHAKERES:  You can answer with

2     respect to non-privileged analysis.

3          A.    I have no idea because I have no

4     idea what the data is.

5          Q.    So you have no idea about any

6     pressure data from the DEEPWATER HORIZON rig?

7          A.    I don't believe that at the time

8     I -- I wrote my report I had any knowledge

9     of -- of any pressures measured on the rig.

10         Q.    And as a 30(b)(6) witness today on

11    behalf of Sandia, are you aware of any

12    pressure measurements associated with the

13    DEEPWATER HORIZON rig?

14             MR. CHAKERES:  Answer with respect

15    to non-privileged analysis.

16         A.    I believe I am not -- was not.

17         Q.    I think you mentioned pressure

18    data before May 8th.

19                   Can you tell us what that

20    pressure data is that existed before May 8th?

21             MR. CHAKERES:  Answer with respect

22    to -- I instruct you not to answer with

23    respect to information you learned in the

24    course of privileged work.

25         A.    I can't answer that question.