EXHIBIT A

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG<br>          "DEEPWATER HORIZON" in the<br>          GULF OF MEXICO, on<br>          APRIL 20, 2010<br><br>**THIS DOCUMENT APPLIES TO:**<br>**No: 2:12-cv-02332-CJB-SS** | MDL NO. 2179<br><br>SECTION J<br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

## <u>FIRST AMENDED COMPLAINT</u>

### I.    <u>PARTIES</u>

1.     James Masters (hereinafter "Plaintiff") is a person of the full age of majority and a citizen and resident of the State of New York.  At the time of the incident at issue, the Plaintiff was a citizen and resident of the Parish of Tangipahoa, State of Louisiana.

2.     Plaintiff is an individual who was injured as a result of exposure to oil and/or oil-dispersing chemicals and/or decontaminants by virtue of his employment as a commercial diver for the purposes of surveying the oyster banks near and around the Louisiana coastline.

3.     Defendant BP Exploration & Production Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location

known as "Macondo," where the oil spill originated.[1]  BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2714.

4.    Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.   BP America was the party to the drilling contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.

5.    Defendant BP P.L.C. is a British public limited company with its corporate headquarters in London, England.   BP P.L.C. is the global parent company of the worldwide business operating under the "BP" logo.   BP P.L.C. is one of the world's largest energy companies, with over 80,000 employees and $239 billion in revenues in 2009.  BP P.L.C. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups.   BP P.L.C.'s operations are worldwide, including in the United States.   Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP P.L.C. and are sufficiently controlled by BP P.L.C. so as to be BP P.L.C.'s agents in Louisiana and the U.S. more generally.

6.    BP P.L.C. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.   A sampling of BP P.L.C.'s contacts with the U.S. are as follows: (a) BP P.L.C.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP P.L.C. is the

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the MMS throughout this document.

largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP P.L.C. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP P.L.C.'s fixed assets are located in the U.S. or the European Union; and (e) BP P.L.C. reports having 2,000 U.S.-based employees in non-Exploration and Production, non-Refining and Marketing BP entities.

7.      BP Exploration, BP America and BP P.L.C. are generally referred to herein collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

8.      Defendant Specialty Diving of Louisiana, Inc. (hereafter "Specialty Diving"), is a Louisiana corporation with its principal place of business in Loranger, Louisiana.  Specialty Diving contracted with James Masters to perform commercial diving services.  The boats and vessels that Mr. Masters performed his dive work from were owned, lease, chartered, contracted for, and/or under the direction of Specialty Diving.

9.      Defendant Specialty Offshore, Inc. (hereinafter "Specialty Offshore"), is a Louisiana corporation with its principal place of business in Loranger, Louisiana. Specialty Offshore contracted with James Masters to perform commercial diving services.  The boats and vessels that Mr. Masters performed his dive work from were owned, lease, chartered, contracted for, and/or under the direction of Specialty Offshore.

## II.    JURISDICTION AND VENUE

10.    Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

11.    In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333.

12.    The claims are based on the Jones Act, 46 U.S.C. § 30104, *et. seq.* the General Maritime Law brought on the law side of the Court pursuant to 28 U.S.C. § 1331 and the Savings Clause of 28 U.S.C. § 1333 and as such a jury trial is demanded.

13.    This Court has personal jurisdiction over BP Exploration and BP America because each is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

14.    This Court may exercise personal jurisdiction over BP P.L.C. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP P.L.C. is consistent with the United States Constitution and laws, and BP P.L.C. will be served with a summons and this Complaint.

15.    This Court also has jurisdiction over BP P.L.C. pursuant to Louisiana's long-arm statute (La. Rev. Stat. Ann. § 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal rules of Civil Procedure.  Plaintiff's causes of action arise out of wrongful conduct committed by BP P.L.C., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or

omission outside of Louisiana.  These acts or omissions took place both before the blowout resulting in the oil spill, which is described more fully below, and in the negligent conduct of BP P.L.C. after the blowout in attempting to contain the oil spill. BP P.L.C. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  BP P.L.C. has had continuous and systematic contacts with Louisiana (and with the United States more generally).

16.    In addition, this Court also has personal jurisdiction over BP P.L.C. under agency principles because BP P.L.C.'s agents, BP America and BP Exploration, do business in Louisiana.  In BP P.L.C.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP P.L.C. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial operating policies of the [subsidiary] so as to obtain benefit from its activities…."

17.    BP P.L.C.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP P.L.C., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP P.L.C., the presence (upon information and belief) of a BP P.L.C. officer or employee on the *Deepwater Horizon* for the celebration that occurred shortly before the explosions and fire, the direct

participation of BP P.L.C. employees in the post-casualty investigations, the direct participation of BP P.L.C. officers and employees in the post-casualty well-control efforts, and the direct participation of BP P.L.C. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

18.     Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District.

19.     The amount in controversy exceeds $75,000.00 exclusive of interests and costs.

### III.     FACTUAL ALLEGATIONS

**A. The *Deepwater Horizon* Catastrophe**

20.     The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was one of the largest vessels of its kind.

21.     BP leased the *Deepwater Horizon* through September 2013 to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

22.     On April 20, 2010, workers on the *Deepwater Horizon* oil rig lost control of the Macondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

23.     The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel.  After burning for two days, the vessel sank to the ocean floor.

24.     The *Deepwater Horizon* had been connected to the wellhead at the

seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* tipped into the sea, it pulled the riser down with it, bending and breaking the pipe.  Oil flowed out from the now-open end of the riser, as well as through two breaks along its length.  An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

25.     Crude oil was discharged before the *Deepwater Horizon* finally sank on April 22, 2010, and the rate of discharge increased once the *Deepwater Horizon* sank to the ocean floor.

26.     After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill.  Government investigators have found BP's initial leak estimate of 1,000 barrels per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day.  Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

27.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines.

28.     Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in

ecologically sensitive marshes and estuaries.  Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

29.     The oil spewed from the well for over twelve weeks until BP finally capped the well on July 15, 2010.  Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

30.     The crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

**B. The Response Effort and the Use of Chemical Dispersants**

31.     The OPA imposes liability upon a "responsible party for a … facility from which oil is discharged … into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

32.     The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

33.     After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

34.     In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.  This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

35.     As part of its offshore containment response program, BP directed the use of vessels to, *inter alia*, recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that had reached the surface of the water.  BP also employed vessels to tow and deploy booms–floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

36.     In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

37.     The dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

38.     To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

**C. Plaintiff's Exposure to Oil and Harmful Chemicals and their Resulting Injuries and Damages**

39.     Between late July, 2010 and the end of November, 2010, Plaintiff performed commercial diving work in the navigable waters near and around Jean Lafitte, Venice, Gulf Shore and Port Fourchon, Louisiana.  The commercial diving work was performed from boats and vessels that were owned, leased, chartered, contracted

for, and/or under the direction and control of Specialty Offshore and Specialty Diving in the navigable waters of the Gulf of Mexico.

40.     Prior to July, 2010, Specialty Offshore and Specialty Diving entered into one or more contracts with the National Oceanic and Atmospheric Administration (hereinafter "NOAA")  in connection with providing commercial diving services for the purposes of surveying oyster banks located in and around Louisiana's navigable waters. Plaintiff and his dive team were transported to multiple oyster banks, by boats and vessels under the control of Specialty Offshore and Specialty Diving, which were covered and surrounded with oil from the spill caused by the *Deepwater Horizon* explosion.  Plaintiff, during his many dives, observed a strong petroleum smell, large amounts of oil and dead sea-life and vegetation.  Concerned by his dive surroundings, Plaintiff asked representatives from Specialty Diving, Specialty Offshore and NOAA if additional protective gear was required.  Officials from Specialty Diving, Specialty Offshore and NOAA stated that it was unnecessary for him, or his crew members, to wear "haz-mat" diving suits.  Further, neither Specialty Offshore nor NOAA warned Plaintiff about the dangers that the cleaning dispersants presented.  In addition to the representations made by Specialty Offshore and NOAA, a BP representative also told Plaintiff that "haz-mat" diving suits were not necessary.

41.     Based on that information, and the fact that Specialty Diving and Specialty Offshore did not provide Plaintiff or his dive team any warnings or other information concerning any potential health problems associated with the waters into which they would be diving and working, Plaintiff continued to dive approximately twelve (12) hours a day, seven (7) days a week, for nearly two (2) months.  It will be proven that the

waters where Plaintiff conducted his dives, and spent considerable amounts of time, were contaminated with crude oil from the *Deepwater Horizon* explosion and cleaning dispersants.  At all times material hereto, the vessels from which they conducted their commercial diving activities were owned, provided, supplied, leased, and/or chartered by Specialty Diving and Specialty Offshore.  During the diving operations with Specialty Diving and Specialty Offshore, Plaintiff and his diving crew stayed ashore to sleep and were transported to and from the dive locations by vessels owned, provided, supplied, leased, and/or chartered by Specialty Diving and Specialty Offshore.

42.    Prior to the performance of the aforementioned commercial dive work, Plaintiff was in good health.  Immediately before Plaintiff began the aforementioned diving, he completed a required physical on July 21, 2010, which was performed by a licensed medical doctor in compliance with the standards of the Association of Diving Contractors International. The physical indicated Plaintiff's lungs were normal and that he was fit for diving.

43.    The night before his last dive in November of 2010, Plaintiff experienced symptoms that he describes as "stroke-like."   He experienced similar bouts approximately five (5) times within the month following his last dive.  Since then, Plaintiff's health problems have progressed and his current symptoms include, but are not limited to, respiratory difficulty, trouble urinating, skin lesions, rashes, headaches, nerve issues and abdominal pains.  He is also experiencing psychological conditions, among them anxiety and depression.  Since his exposure to the crude oil and cleaning dispersants, Plaintiff has suffered from acute bronchitis, and has been hospitalized for

four (4) days due to atypical pneumonia.  He is also suffering from and diagnosed with chronic obstructive pulmonary disease.

44.     On January 12, 2012, Plaintiff failed an Association of Diving Contractors International physical because of his poor pulmonary function.  The physical, which was Plaintiff's first and only one following his exposure to the crude oil and cleaning dispersants in the Gulf, revealed that his pulmonary function is inadequate to dive and that his lungs are severely damaged.  His poor pulmonary condition has rendered it impossible to seek other employment that involves physical labor and has essentially left him totally disabled and home-bound.

45.     Plaintiff has suffered injuries and damages, including, *inter alia*, exposure to dangerous chemicals, physical injuries and diseases, accompanying physical, mental and emotional pain, suffering and anguish, the need for medical monitoring, costs and inconvenience of obtaining past and future medical treatment for exposure to chemicals, and increased risk and fear of future disease as a result of exposure to oil, dispersants, and/or oil and dispersant mixtures.

46.     Plaintiff has been placed at risk of developing additional diseases over the decades and becoming saddled with the financial burden, inconvenience, and emotional strain of monitoring his compromised health.  Plaintiff has already manifested injuries and illnesses associated with exposure to chemicals in the environment resulting from the Oil Spill.

### D.  BP's Willful and Wanton Conduct

47.     BP focused primarily on profit and disregarded public and environmental health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon*

by, among other things:

a. performing a critical well pressure test with untrained and unqualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

b. using a well design with too few barriers to gas flow;

c. failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

d. failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

e. failing to run a cement bond log to evaluate the integrity of the cement job;

f. failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

g. using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

h. grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon*;

i. failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

j. failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill; and

k.  failing to use reasonably safe dispersant chemicals in the attempt to respond to the Oil Spill.

48.  BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

49.  In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and the damage caused by, the spill by willfully, wantonly, and/or recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

50.  BP, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, displayed gross negligence, reckless indifference, willfulness, and/or wantonness.

IV.  **CAUSES OF ACTION**

## A. FOR A FIRST CAUSE OF ACTION AS TO SPECIALTY DIVING AND SPECIALTY OFFSHORE (THE JONES ACT)

51.  Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

52.     The Plaintiff on the dates of his exposure was a seaman, as he was more or less permanently attached to a vessel or a fleet of vessels, and Specialty Diving and Specialty Offshore as the owners *pro hac vice* of the vessels were the Plaintiff's Jones Act employers on the dates of the exposure.

53.     The vessels were being operated in a grossly negligent willful manner including, but not limited to, the following:

    a. Operating without the proper safety equipment;

    b. Failing to recognize the peril caused by working in close proximity to crude oil and chemical dispersants;

    c. In failing to exercise that amount of care which would have been reasonable and prudent in the circumstances.

54.     As a direct and proximate cause of Defendant's negligence, the Plaintiff has suffered injuries and is entitled to actual and punitive damages.

**B. FOR A SECOND CAUSE OF ACTION AS TO SPECIALTY DIVING AND SPECIALTY OFFSHORE (BREACH OF WARRANTY OF SEAWORTHINESS *IN PERSONAM* AGAINST SPECIALTY DIVING AND SPECIALTY OFFSHORE)**

55.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

56.     Defendants, as owners *pro hac vice* of the vessels owed a non-delegable duty to the Plaintiff that the vessels to which he was assigned would be reasonably fit for the vessels' intended mission.

57.     The vessels were unseaworthy and not reasonably fit for their intended mission based on the following:

    a.     There was not a safe place to work and there was not a competent and

trained crew;

b.  The personnel involved in operating the boats and vessels were not properly trained in their duties;

c.  There were no warnings, orders and/or instructions to the personnel involved in operating said vessels regarding exposure to crude oil and chemical dispersants.

d.  The specific job hazards for divers in waters containing crude oil and cleaning dispersants were not identified or analyzed;

e.  The necessary gear, equipment, and work methods that would have made it safer for divers being exposed to crude oil and cleaning dispersants were not available to Plaintiff.

58.  As a direct and proximate cause of Defendant's negligence, the Plaintiff has suffered injuries and is entitled to actual and punitive damages.

## C. FOR THIRD CAUSE OF ACTION AS TO AS TO SPECIALTY DIVING AND SPECIALTY OFFSHORE (MAINTENANCE AND CURE)

59.  Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

60.  The Plaintiff, by virtue of his service as a seaman from boats and vessels that were owned, leased, chartered, contracted for, and/or under the direction and control of Specialty Offshore and Specialty Diving, claims maintenance and cure for the period of his disability.

## D. FOR A FORTH CAUSE OF ACTION AS TO BP (NEGLIGENCE UNDER GENERAL MARITIME LAW)

61.  Plaintiff realleges each and every allegation set forth in all preceding

paragraphs as if fully restated herein.

62.     The existence and breach of Defendant BP's legal duties are established under general maritime law.

63.     At all times material hereto, BP owed duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations and maintenance of the *Deepwater Horizon*, including its appurtenances and equipment.  BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

64.     Further, BP owed a duty to Plaintiff to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

65.     BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants and/or other hazardous chemicals.

66.     The risk of injury and loss to Plaintiff was reasonably foreseeable, and BP knew of the dangers associated with deep water drilling.  Specifically, at all times relevant to this litigation, BP knew or should have known that:

a.     crude oil contains chemicals hazardous to human health;

b.     chemical dispersants contain chemicals hazardous to human health;

c.     Plaintiff should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances that they contain; and

d.     failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery

measures would result in harm to Plaintiff.

67.     BP breached its duty of care to the Plaintiff in the following non-exclusive respects:

e.      failing to prevent the explosion on board the *Deepwater Horizon*;

f.      failing to cap the Macondo well in a timely manner;

g.      failing to warn Plaintiff, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

h.      failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

i.      failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

j.      failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

68.     BP's breach of their duties posed an unreasonable risk of harm to Plaintiff.

69.     Plaintiff suffered injury, loss, and damages as a direct and proximate result of Defendants' willful, wanton, reckless, and/or grossly negligent breach of their aforementioned duties and, therefore, Plaintiff is entitled to recover actual and punitive damages.

**E.  FOR A FIFTH CAUSE OF ACTION AS TO BP (GROSS NEGLIGENCE UNDER GENERAL MARITIME LAW)**

70.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

71.     BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil dispersants, and/or other hazardous chemicals.

72.     BP breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to prevent and contain the Oil Spill.

73.     BP knew or should have known that their willful, wanton, and reckless conduct would cause injury to Plaintiff.

74.     BP's willful, wanton, reckless, and/or grossly negligent conduct is the factual and legal cause of Plaintiff's injuries and damages and, therefore, Plaintiff is entitled to recover actual and punitive damages.

## F.  FOR A SIXTH CAUSE OF ACTION AS TO BP (NEGLIGENCE PER SE UNDER GENERAL MARITIME LAW AND FEDERAL LAW)

75.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

76.     BP's conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws.  These laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiff, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan,

*see, e.g.*, 40 C.F.R. § 300.150.  BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.120.  BP therefore breached its responsibilities under this regulatory provision.

77.   In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

a.   BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

b.   BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

c.   BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. § 250.401(a);

d.   BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §§ 250.420(a)(1) and (2);

e.   P failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

f.   P failed to maintain the *Deepwater Horizon*'s BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

g.   BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(a);

h.   BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

i.   BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427 9b).

78.   BP's violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law.

79.   BP had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiff's injuries, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

80.   As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, the Plaintiff has suffered injuries and is entitled to actual and punitive damages.

## IV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.   compensatory damages in amounts to be determined at trial;

2.   actual damages including, but not limited to:
    a.   past and future loss wages;
    b.   past and future medical expenses;
    c.   past and future loss of personal services; and
    d.   past and future intangible losses, including those for pain and suffering

3.   punitive damages;

4.   pre-judgment and post-judgment interest at the maximum rate allowable by law;

5.   attorneys' fees and costs of litigation; and

6.  any other and further relief the Court deems just and proper.


Respectfully submitted,


/s/ Paul A. Dominick

Paul A. Dominick                    Fed ID No. 577
NEXSEN PRUET, LLC
205 King Street, Suite 400 (29401)
P.O. Box 486
Charleston, SC  29402
PHONE:  843.577.9440
FACSIMILE:  843.720.1777
PDominick@nexsenpruet.com

And


/s/ Douglas M. Schmidt

Douglas M. Schmidt     Fed ID No. 11789
Douglas M. Schmidt, APLC
335 City Park Avenue
New Orleans, LA 70119
PHONE:  504.482.5711
FACSIMILE:  504.482.5755
Dglsschmdt@yahoo.com

Attorneys for Plaintiff
James Masters