

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig     MDL NO. 2179
"Deepwater Horizon" in the Gulf
of Mexico, on April 20, 2010     SECTION J

Applies to: *All Cases*     JUDGE BARBIER
    MAGISTRATE JUDGE SHUSHAN

| REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW |||||
|---|---|---|---|---|
| **STATUS REPORT NO.** | 4 | **DATE** | December 11, 2012 ||



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2012 | MDL NO. 2179<br><br>SECTION J |
| Applies to: *All Cases* | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

**REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW**

**STATUS REPORT NO. 4, DATED DECEMBER 11, 2012**

The Claims Administrator of the Deepwater Horizon Economic and Property Settlement Agreement (the "Settlement Agreement") submits this Report to inform the Court of the current status of the implementation of the Settlement Agreement. The Claims Administrator will provide any other information in addition to this Report as requested by the Court.

    I.    S<small>TATUS OF THE</small> C<small>LAIMS</small> R<small>EVIEW</small> P<small>ROCESSES AND</small> C<small>LAIM</small> P<small>AYMENTS</small>

    A.  **Registration and Claim Forms.**

The Claims Administrator opened the Settlement Program with needed functions staffed and operating on June 4, 2012, just over 30 days after the Claims Administrator's appointment. We have received 94,443 Registration Forms and 91,902 submitted Claim Forms since the Program opened, as shown in the Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement ("Public Report") attached as Appendix A.  Claimants have begun but not fully completed and submitted another 11,391 Claim Forms.  The Forms are available online, in hard copy, or at Claimant Assistance Centers located throughout the Gulf.  Of the total Claim Forms submitted, 10% of claimants filed in the Seafood Program, 29% filed Individual Economic Loss (IEL) Claims, and 28% filed Business Economic Loss (BEL) Claims (including

1

Start-up and Failed BEL Claims). *See* App. A, Table 2. DWH staff at the Claimant Assistance Centers assisted in completing 19,779 of these Claim Forms. *See* App. A, Table 3. The nineteen Claimant Assistance Centers also provide other forms, including Personal Representative Forms, Subsistence Interview Forms and Sworn Written Statements and Authorizations.

### B. Claims Review.

#### 1. Claims Reviewed and Notices Issued.

We completed our first reviews and issued our first outcome notices on July 15, 2012, and Payments on July 31, 2012. We have escalated the pace of reviews as reviewers become more adept at these new systems and as we expand the number of reviewers who are fully trained and are producing reliable results. Over the month of November, our weekly productivity for reviewing claims to the point of a Notice was approximately 4,500 claims per week.

#### 2. Order of Claims Reviewed.

The Claims Administrator frequently receives questions regarding the order in which the DWH Settlement Program reviews claims. Some claimants have received Notices on claims filed later than other claims for which no Notice has been received and wonder why these later-filed claims have been decided first. We have prepared a script for the Claimant Communications Center and Firm Contacts to use and a FAQ that is posted on the DWH Settlement website to explain the order in which claims are being processed. The Program generally tries to follow a first-in-first-out order when reviewing claims, although the Settlement Agreement does not mention or mandate this processing order. Despite the general goal to review claims in order, the following are reasons why this has not always been possible.

1) We commenced reviews of claims in certain claim types as soon as the database review module for that claim type was completed, tested, and ready. We began our reviews with the VoO Charter Payment claims, so a VoO Charter Payment claim filed after an IEL claim, for example, would have been reviewed first because the VoO system was ready

before IEL.  Even two Seafood claims might have been reviewed in reverse order if one was a Shrimp Vessel Owner's claim and another was an Oyster Boat Captain's claim, because the specific review module for Shrimp Vessel Owner claims was ready first.

2) The Program has over 1,000 trained reviewers working on claims review.  The claims are in a queue in the database, organized by claim type, and reviewers specializing in that claim type pull the claims one at a time and review them online.  Two reviewers could pull claims at exactly the same time, but the time it takes to review them may vary, depending on the complexity of the claim or the amount of documents in the file to review.  With so many reviewers pulling claims and finishing them at different times, it is impossible for claims entering review at roughly the same time to come out of review and receive Notices at the same time.

3) Even claims of the exact same claim type may have been reviewed out of chronological order, depending on the completeness of the files submitted and specific reasons why files were incomplete.  As we reviewed claims, we discovered that certain of the documents required by the Settlement Agreement were missing in many of the files, and we realized that some documents required by the Settlement Agreement were not necessary for an accurate review of the claim.  Starting in August, we worked with the Parties to change policies on document requirements, and many of the requirements in the Settlement Agreement have been relaxed as a result.  During the period when these policies were under consideration, we did not send Notices on claims that would be affected by the change and reviewed to conclusion a claim that was not affected by the change, even though it may have been filed later.

4)  The Claims Administrator's goal has been to review before the opt-out deadline and Fairness Hearing a sufficient sampling of claims in each of the claim types, presenting as many unique situations as possible, so that firms and claimants know how the Program will treat other similar claims. This sampling has resulted in certain claims being processed ahead of others, but the Program's overall goal of transparency and opportunity to test the process has been paramount.

Any number of other unique reasons may explain why one claim filed after another may be processed first, but these are the major reasons.

### C. Claim Payments.

We issued our first payments to claimants on July 31, 2012.  Tables 4 and 5 of the Public Report attached at Appendix A provide detail on the notices and payments issued to date.  The non-Economic Loss claim types involve fewer documents and calculations, and thus have moved more quickly than the more complex steps required by the Settlement Agreement on the

3

Economic Loss claim types. As of December 11, 2012, we have issued 18,332 Eligibility Notices with Payment Offers totaling $1,377,256,036 billion. As of that date, we also have made over $824.4 million in payments on 10,960 claims.

### D. Subsistence Claims.

The Claims Administrator's office is working with a nutritional expert and the Parties to define the Subsistence criteria. The Claims Administrator submitted his proposed Subsistence damage calculator and criteria to the Parties for their review. We expect to conclude these extensive discussions and begin processing Subsistence claims soon.

## II. CLAIMANT OUTREACH EFFORTS

During the week of October 8, 2012, the Claims Administrator began a Claimant Outreach Program to reach out to claimants and their attorneys to help them complete their claims. The Claimant Assistance Centers ("CACs") and members of Garden City Group began making phone calls to unrepresented claimants who had received Incompleteness Notices but had not yet responded. Through these outreach efforts, the Claims Administrator hopes to help claimants understand the documents required by the Settlement Agreement, where to find them, and how to submit them to the Settlement Program. Since it began, the Outreach Program has expanded to include calls to claimants and attorneys to help them provide adequate documents required to process payments for their claims, outreach to claimants who began but never completed filing a Claim Form in a Claimant Assistance Center, calls to claimants who responded to an Incompleteness Notice but were still missing required documents, and outreach to claimants who needed to submit additional documents so the Claims Administrator could verify the claimant's identity. The report below summarizes some of those efforts.

| Row | Location | Calls Made | Incomplete Claims Affected | Claims With New Docs After Call | % of Claims With New Docs After Call | Claimants Visiting CAC After Call | % of Claimants Visiting CAC |
|---|---|---|---|---|---|---|---|
| | **Outreach Call Volume (As of 12/11/12)** | | | | | | |
| 1. | BrownGreer | 12,772 | 6,954 | 4,082 | 59% | 2,320 | 33% |
| 2. | Garden City Group | 12,611 | 3,647 | 1,877 | 51% | 132 | 4% |
| 3. | P & N | 1,306 | 657 | 449 | 68% | 28 | 4% |
| 4. | PWC | 275 | 131 | 99 | 76% | 4 | 3% |
| 5. | Totals | 26,964 | 11,389 | 6,507 | 57% | 2,484 | 15% |

**A. Incompleteness Notices.**

During the week of October 8, 2012, we launched an outreach effort to claimants who have received an Incompleteness Notice. The Garden City Group and the Claimant Assistance Centers call unrepresented claimants to discuss the Incompleteness Notice and document requirements. The CAC staff is also scheduling appointments so claimants can bring their documents into the CAC to go over them with a Claimant Assistant who can help them identify the documents that they must submit to complete their claims.

The Seafood Team and the accountants have coordinated to organize an outreach effort to claimants who filed Seafood Compensation Program claims. The Seafood Team and the accountants have performed a preliminary review of a number of Seafood claims and are reaching out to those claimants who are missing certain required documents in an attempt to complete the files prior to review so as to avoid an Incompleteness Notice. Members of the Claimant Communications Center are assisting with this outreach effort by placing phone calls to claimants identified through this effort and are using information provided by the accountants to elicit complete documents from the claimants.

On October 12, 2012, Law Firm Contacts began calling firms with claimants who had received Preliminary IEL Incompleteness Notices. We sent Preliminary IEL Incompleteness

5

Notices to claimants with one of the following situations: (1) no documentation submitted; (2) documentation submitted, but no financial documentation; (3) no tax documentation; or (4) no pay period documentation. For any firm representing nine or more claimants receiving this Notice, the Law Firm Contact called the firm to notify them of the affected claimants. We also identified law firms with the highest number of incomplete IEL claims and started outreach efforts to these firms during the week of October 22, 2012. The Law Firm Contacts performed another calling campaign on November 28, 2012, this time to firms representing ten or more claimants who had received an Incompleteness Notice for their BEL claims. All of these outreach programs to law firms have resulted in positive feedback from the firms, who generally appreciate the efforts of the Settlement Program to help them understand the documents required by the Settlement Agreement.

In addition to the outreach calls described above, on November 8, 2012, we began issuing Follow-Up Incompleteness Notices to claimants who either did not respond to the initial Incompleteness Notice within 30 days, or who responded but did not submit sufficient documents to cure the stated Incompleteness reasons. The Follow-Up Notice identifies the required documents the claimant must submit and gives the claimant 30 additional days to submit those documents.

B. **Incomplete Claim Forms.**

On October 26, 2012, and then again on November 29, 2012, the CACs reached out to claimants who had started to file a Claim Form in a CAC but had not finished submitting the Form. The CACs contacted these claimants to see if they still wished to pursue a claim with the Settlement Program and then helped them finish filing the claim online or by mail, or scheduled

6

an appointment for the claimant to visit a CAC to work personally with a CAC staff member to complete the claim filing process. This outreach has resulted in a number of new claim filings.

### C. Missing Payment and Release Information.

On October 16, 2012, Law Firm Contacts began calling law firms about missing payment information. We identified any outstanding claims missing the required payment documents, such as a claimant W-9 or Attorney Fee Acknowledgment Form, and provided this information to the Law Firm Contacts. In addition to the payment outreach calls described above, we also send claimants written notification of any missing or incomplete payment documents. To date, we have issued 681 Payment Document Incomplete Notices seeking additional information from claimants who submitted incomplete or otherwise deficient payment documents. In conjunction with the payment document outreach and notice program, we also notify claimants if they have submitted an incomplete or deficient Release that would prohibit acceptance of the Release and block payment of any payable claims. To date, we have issued 770 Release Incomplete Notices seeking additional information from claimants who submitted incomplete or otherwise deficient Releases.

### D. Incomplete Identity Verification Documents.

On November 21, 2012, the CACs began contacting claimants who had not provided sufficient documents for the Settlement Program to confirm their SSN, ITIN or EIN. The CACs called these claimants to ask them to provide documents such as a Social Security Card, an ITIN card, or a letter from the IRS displaying the claimant's name and EIN so we could verify the claimant's identity and proceed with reviewing the claim. To date, we have issued 4,179 Identity Verification Notices seeking information from claimants who did not provide sufficient documents for the Settlement Program to confirm their SSN, ITIN, or EIN numbers, and 959

Follow-Up Identity Verification Notices to claimants who did not respond to the initial Verification Notice.

### III.   CONCLUSION

We offer this Report to ensure that the Court is informed of the status of the Program to date. If the Court would find additional information helpful, we stand ready to provide it at the Court's convenience.

/s/ Patrick A. Juneau<br>
PATRICK A. JUNEAU<br>
CLAIMS ADMINISTRATOR

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/EDF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of December 2012.

                                                    /s/ Patrick M. Juneau
                                                     Claims Administrator