UNITED STATES DISTRICT COURT
EASTER DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL 2179 |
| | * | |
| | * | SECTION J |
| This document relates to: | * | |
| | * | |
| No. 12-970, Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al. | * * * | JUDGE BARBIER |
| | * | |
| and All Actions | * | MAG. JUDGE SHUSHAN |

ORDER AND REASONS
[Granting Final Approval of the Economic and Property Damages Settlement Agreement]

I.      Factual and Procedural History

On April 20, 2010, a blowout, explosion, and fire occurred aboard the *Deepwater Horizon*, a semi-submersible offshore drilling rig, as it was engaged in drilling activities on the "Macondo Well" on the Outer Continental Shelf off the coast of Louisiana.  These events led to eleven deaths, dozens of injuries, and a massive discharge of oil into the Gulf of Mexico that continued for nearly three months.  On August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in this Court pursuant to 28 U.S.C. § 1407. Eventually, hundreds of cases with thousands of individual claimants would be consolidated with this Multidistrict Litigation.

On October 19, 2010, the Court issued Pretrial Order No. 11, Rec. Doc. 569 ("PTO No. 11"), creating pleading bundles for various types of claims.  Relevant here is the "B1 bundle," which

encompasses all private claims for economic loss and property damage.  In accordance with PTO No. 11, the PSC filed the B1 Master Complaint on December 15, 2010, Rec. Doc. 879, and a First Amended B1 Master Complaint on February 9, 2011, Rec. Doc. 1128.  Numerous Defendants filed motions to dismiss the First Amended B1 Complaint.  On August 26, 2011, the Court issued an Order and Reasons granting in part and denying in part these motions.  Rec. Doc. 3830. BP subsequently answered the First Amended Complaint on September 27, 2011.  Rec. Doc. 4130.

On September 14, 2011, the Court issued Amended Pretrial Order No. 41 (Case Management Order No.3), governing the scope and structure of Transocean's Limitation of Liability trial.  Rec. Doc. 4033.  Phase One of the trial, originally scheduled to commence on February 27, 2012, would address "issues arising out of the conduct of various parties, third parties, and non-parties allegedly relevant to the loss of well control at the Macondo Well, the ensuing fire and explosion on the MODU DEEPWATER HORIZON on April 20, 2010, and the sinking of the MODU DEEPWATER HORIZON on April 22, 2010, and the initiation of the release of oil from the Macondo Well or DEEPWATER HORIZON during those time periods."  *Id.* at 2.

Following the JPML's centralization order, the parties engaged in an extraordinary amount of discovery within a compressed time period to prepare for the Phase One Trial.  This included taking 311 depositions, producing approximately 90 million pages of documents, and exchanging more than 80 expert reports on an intense and demanding schedule.  Depositions were conducted on multiple tracks and on two continents.  Discovery was kept on course by weekly discovery conferences before Magistrate Judge Shushan.  The Court also held monthly status conferences with the parties.

In February 2011, settlement negotiations began in earnest for the proposed Economic and Property Damages Settlement (sometimes referred to as "Settlement Agreement" or "Settlement").[1] Talks intensified in July 2011, occurring on an almost-daily basis.  In late 2011, Magistrate Judge Shushan became involved in the negotiations as neutral mediator.  The parties report that over 145 day-long, face-to-face negotiation meetings took place, in addition to numerous phone calls and "WebEx Conferences."  On February 26, 2012, the eve of the Limitation and Liability Trial, the Court adjourned proceedings for one week to allow the parties to make further progress on their settlement talks.  Rec. Doc. 5887.  On March 2, 2012, the Court was informed that BP and the PSC had reached an Agreement-in-Principle.  Consequently, the Court adjourned Phase One of the trial, because of the potential for realignment of the parties in this litigation and substantial changes to the current trial plan.  Rec. Doc. 5955.

The parties continued to work on finalizing the details of the Settlement.  On March 8, 2012, at the parties' request, the Court entered an order creating a process to facilitate the transition from the Gulf Coast Claims Facility ("GCCF")[2] to the Court-supervised settlement program envisioned by the Settlement.  Rec. Doc. 5995.  The order also appointed a Transition Coordinator and Claims Administrator.  The Transition Process concluded on June 4, 2012 (although processing of some claims continued for some time afterwards) and ultimately paid approximately $405 million on nearly 16,000 claims.  Rec. Doc. 7900 at 4; Monger Decl. ¶ 26.  The Court also appointed a neutral party to preside over the seafood component of the Settlement.  Rec. Doc. 5998.

---

[1]  The parties also negotiated a Medical Benefits Settlement, which will be discussed in a separate Order and Reasons.

[2]  The GCCF was established by BP on August 23, 2010, to satisfy its obligations to accept claims under OPA.

On April 16, 2012, the PSC filed a new class action complaint to serve as the vehicle for the proposed Settlement. *See* No. 12-970, *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al*.[3] The Settlement Agreement was completed, signed, and filed into the Court's record on April 18, 2012. Rec. Doc. 6276. That same day, the parties filed a joint motion for preliminary approval of the Settlement Agreement. Rec. Doc. 6266. The PSC simultaneously moved for preliminary and conditional class certification. Rec. Doc. 6269. The following week, BP filed a conditional non-opposition to the PSC's class certification motion. Rec. Doc. 6348.

On April 25, 2012, the Court held a preliminary approval hearing. *See* Minute Entry, Rec. Doc. 6366. On May 2, 2012 the parties filed a joint motion to approve a slightly amended Settlement Agreement. *See* Rec. Doc. 6414. On May 2, 2012, the Court granted the joint motion, preliminarily approved the Settlement Agreement, and preliminarily and conditionally certified the class for purposes of settlement only. *See* Rec. Doc. 6418 ("Preliminary Approval Order").[4] The Preliminary Approval Order also approved the Class Notice and Class Notice Plan proposed by the parties, and appointed Hilsoft Notifications as Class Notice Administrator. *See* Rec. Doc. 6418 at 36-39. Hilsoft Notifications thereafter implemented the Notice Program, which was substantially completed by July 15, 2012, allowing class members adequate time to make decisions before the objection (Sept. 7) and op-out (Nov. 1) deadlines. The Preliminary Approval Order also scheduled a Final Fairness Hearing for November 8, 2012.

---

[3] The class action complaint was amended on May 2, 2012. Rec. Doc. 6412. BP answered the amended complaint on May 7, 2012. Rec. Doc. 6453.

[4] The final version of the Settlement Agreement, as amended and preliminarily approved by the Court, is document 6430 in the Court's record.

4

On August 13, 2012, BP moved for final approval of the Settlement Agreement. Rec. Doc. 7114. That same day, Class Counsel filed a memorandum seeking final approval of the Settlement Agreement and final class certification, which the Court has treated as a motion for final approval and final class certification. Rec. Doc. 7104. The Court received oppositions from objectors, which were filed into a special docket, No. 10-7777. BP and Class Counsel filed replies to these objections. Rec. Docs. 7731, 7727.

On September 11, 2012, the Court issued an order governing the conduct of the Final Fairness hearing. *See* Rec. Doc. 7358. In accordance with common practice and authority, the Court decided to "limit presentations by any objector on the grounds of being duplicative, cumulative, or because the objection was adequately covered in written submissions," and "issue a supplemental order prior to the hearing designating objectors to be heard." *Id.* at 4. These procedures were designed to enable the Court to obtain the benefit of the widest spectrum of objections without duplication and best inform its independent judgment of the Settlement's fairness, adequacy, and reasonableness under Rule 23(e) standards and the Fifth Circuit's *Reed* factors. On November 1, 2012, the Court issued a supplemental order designating representative counsel to present argument on certain topics. *See* Rec. Doc. 7819. The Court then presided over a fairness hearing held on November 8, 2012. *See generally* Rec. Doc. 7900; Nov. 8 Fairness Hr'g Tr., Rec. Doc. 7892.

The Court has reviewed and considered all arguments.

## II.      Overview of the Settlement[5]

The proposed Settlement resolves certain claims for economic loss and property damage resulting from the "*Deepwater Horizon* Incident."[6]  If final approval is granted, then, in exchange for the remedies summarized below, BP would obtain a broad classwide release as well as a signed Individual Release from each claimant that accepts a payment pursuant to the Settlement Agreement. An unusual feature of the Settlement Agreement, however, is that class members have been able to submit claims and receive payments prior to the Court's grant of final approval, provided that they sign an individual release.

To effectuate the settlement, Class Counsel seek to certify a class pursuant to Federal Rule 23(a) and (b)(3) for settlement purposes only.  The putative class consists of private individuals and businesses defined by (1) geographic bounds and (2) the nature of their loss or damage.  Both criteria must be met in order for the person or entity to be within the settlement class.  Claims of non-class members are unaffected by the settlement.  Where a class member has multiple claims,

---

[5] The Settlement Agreement, Rec. Doc. 6430, is a long and detailed document.  Here the Court summarizes the most significant features of the Settlement.  In the unlikely event of any conflict between the Court's description of the Settlement Agreement and the Settlement Agreement itself, however, the Settlement Agreement controls.  Unless otherwise indicated, capitalized terms used in this Order and Reasons generally refer to defined terms in the Settlement Agreement, to the titles of frameworks in the Settlement Agreement, or both.

[6]  The Settlement defines "*Deepwater Horizon* Incident" as:

> the events, actions, inactions and omissions leading up to and including (i) the blowout of the MC252 WELL; (ii) the explosions and fire on board the Deepwater Horizon on or about April 20, 2010; (iii) the sinking of the Deepwater Horizon on or about April 22, 2010; (iv) the release of oil, other hydrocarbons and other substances from the MC252 Well and/or the Deepwater Horizon and its appurtenances; (v) the efforts to contain the MC252 Well; (vi) RESPONSE ACTIVITIES, including the VoO Program; (vii) the operation of the GCCF; and (viii) BP public statements relating to all of the foregoing.

Settlement Agreement ¶ 38.43.

some falling within the Settlement and some outside the Settlement, the latter are unaffected by the Settlement.

The geographic bounds of the Settlement are Louisiana, Mississippi, Alabama, and certain coastal counties in eastern Texas and western Florida, as well as specified adjacent Gulf waters and bays. Generally, "[t]o be a class member, an individual within the geographic area must have lived, worked, or owned or leased property in the area between April 20, 2010, and April [16], 2012, and businesses must have conducted activities in the area during that same time frame." Klonoff Decl. ¶ 20. The Settlement recognizes six categories of damage: (1) specified types of economic loss for businesses and individuals, (2) specified types of real property damage (coastal, wetlands, and real property sales damage), (3) Vessel of Opportunity Charter Payment, (4) Vessel Physical Damage, (5) Subsistence Damage, and (6) the Seafood Compensation Program. These categories are further discussed below. The class definition also contains specific exclusions. For example:

> Some entities and individuals are excluded altogether (i.e., the Court, employees of BP, and those who opt out). Other exclusions are based on the substantive nature of the business (i.e., financial institutions, certain types of funds, financial trusts, and other financial vehicles, gaming industry, insurance entities, oil and gas industry, defense contractors, and real estate developers). Also excluded are certain defined government organizations as well as persons or entities who released their claims through the GCCF.

*Id.* Bodily injury claims, BP shareholder claims, Moratoria Losses (claims for losses caused by the federal moratoria on offshore permitting and drilling activities imposed after the oil spill), and claims relating to menhaden (or "pogy") fishing are also expressly excluded.

With the exception of the Seafood Compensation Program, there is no cap on the amounts that may be paid under the Settlement Agreement. The Seafood Compensation Program features a guaranteed $2.3 billion fund; i.e., $2.3 billion will be distributed to claims in this fund. Many

damage categories are augmented by risk transfer premiums ("RTP").[7]  The RTP compensates class members for potential future loss, as well as pre-judgment interest, any risk of oil returning, any claims for consequential damages, inconvenience, aggravation, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors.

The Settlement is implemented by the *Deepwater Horizon* Court Supervised Settlement Program ("Settlement Program"), which commenced operations on June 4, 2012.  The Settlement Program calculates awards using public, transparent frameworks that apply standardized formulas derived from generally accepted and common methodologies.  This level of transparency permits class members to understand how their claims will be evaluated under the Settlement.  It also ensures that similarly situated class members are treated similarly.  The Settlement Program employs specialists in a variety of fields to ensure that awards are calculated accurately, and internal audits further ensure accuracy.

The Settlement Program is extensive.  It consists of the Court-appointed Claims Administrator, Patrick Juneau,[8] and his staff of 25 people, who in turn employ five Claims Vendors employing more than 3,200 people working in locations throughout the country.  Its headquarters in Louisiana and nineteen Claims Assistance Centers located throughout the Gulf increase its accessibility to class members.  Its web site(www.deepwaterhorizonsettlements.com) offers

---

[7] For example, if the base compensation amount is $10,000 for claimant's Economic Damages claim and the claimant is a business that qualifies for an RTP of 2.5, then $10,000 is multiplied by 2.5, which product is then added to the base compensation amount of $10,000 to reach the total compensation amount (*i.e.*, $10,000 + $25,000 = $35,000, less any further enumerated deductions for prior spill-related payments, etc.).

[8]  Mr. Juneau has served as the mediator in over two thousand cases and has served as a Special Master or Claims Administrator in numerous federal and state court cases.

comprehensive information about the Settlement and how to submit claims forms.  Claims guides, claims forms, and Frequently Asked Questions have been posted in multiple languages on this web site and have been updated to reflect common questions regarding the Settlement.  A multilingual toll-free hotline is also available. Claimants are able to submit claims over the Internet, in person, by mail, or by fax.  The Settlement Agreement provides for internal appellate review of claims determinations by members of an Appeals Panelist Pool appointed by the Court.  Class members may appeal denials for insufficient documentation, as well as any final determination made in their cases.  BP may only appeal where an individual claimant is awarded more than $25,000 in base compensation.  The Settlement Program and Claims Administrator are subject to this Court's continuing and exclusive jurisdiction.

As of December 11, 2012, 91,902 claim forms have been submitted to the Settlement Program.  *See* Claims Admin. Status Report No. 4, Rec. Doc. 8068 at 1.  As of that date, the Settlement Program has reviewed and issued notices on 50,505 of those claims forms.  *Id.*, app'x A at 4.[9]  18,332 of those notices stated that the claimant was eligible for payment and made payment offers totaling approximately $1.377 billion.  *Id.* at 4 & app'x A at 4.[10]  This amount does not include the approximately $405 million in payments made under the Transition Process.  Rec. Doc. 7900 at 4.

---

[9]  Since the Settlement Program's opening, the speed with which the Settlement Program has processed claims has increased dramatically.  For example, by the end of August 2012, the Settlement Program processed approximately 1,500 claims per week.  Rec. Doc. 7594-2.  By November 2012, 4,500 claims were processed per week.  Rec. Doc. 8086 at 3.

[10]  25,044 of the notices state that the claim form is incomplete.  7,139 of the notices deny payment.  The Claims Administrator reports that 95% of the payment offers have been accepted.

Turning to the enumerated damage categories, the frameworks for Business Economic Loss Claims are tailored to various types of businesses; in addition to general Business Economic Loss, there are frameworks for Multi-Facility Businesses, Failed Businesses and Failed Start-Up Businesses, and Start-Up Businesses. With respect to general Business Economic Loss (Exhibits 4A-4E of the Settlement Agreement), that framework is derived from recognized and accepted methodologies applied in evaluating business economic loss claims. Specifically, it uses a well-established two-step "before and after" method: Step 1 provides compensation for the reduction in variable profit between the Compensation Period and the Benchmark Period, and Step 2 provides compensation for increased profits that reasonably could have been expected to be generated in 2010 but for the spill. The Compensation Period is any period of three or more consecutive months from May through December 2010; the same months are used for the Benchmark Period. For the Benchmark Period, the class member may choose to use (i) the selected months from 2009; (ii) the average of the selected months in 2008 and 2009; or (iii) the average of the selected months in 2007, 2008, and 2009. Step 2 applies a growth factor to account for lost growth potentially due to the spill. Growth is calculated by considering (i) an assumed growth factor of 2% (General Adjustment Factor) and (ii) actual growth reflected in historical revenue trends prior to the spill (Claimant-Specific Growth Factor). These factors are summed and the result, up to a maximum of 12%, is applied to earnings over six or more months during the Benchmark Period to determine the incremental revenue that would have been generated during the Compensation Period but for the spill. That incremental revenue is then multiplied by the claimant's Variable Margin in the Benchmark Period. An RTP is applied to the loss calculated using the two-step method. Compensation is offset by any payments received by the claimant from BP or the GCCF.

Some business claimants must demonstrate that the spill caused their losses. In many other cases causation is presumed. The Settlement Agreement presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the presumption are the businesses that could most likely prove causation in litigation. The documents required to support Business Economic Loss Claims are typically required to calculate business economic loss; they are the documents that businesses either keep in the ordinary course or that may readily be prepared from a business's books and records.

Other frameworks apply for Multi-Facility Businesses (Exhibit 5 to the Settlement Agreement), Failed Businesses and Failed Start-Up Businesses (Exhibit 6), and Start-Up Businesses (Exhibit 7).

The Individual Economic Loss Framework (Exhibits 8A-8E to the Settlement Agreement) calculates the difference between expected earnings during a claimant-selected Benchmark Period, or 90 or more consecutive days during the claimant selected Base Years with the claimant's actual earnings during the comparable 90-or-more–day period between April 21, 2010, and December 31, 2010 (except for certain Seafood Industry claimants for whom the end date is April 21, 2011). The Individual Economic Loss Framework is flexible in addressing lost earnings claims by numerous types of individual claimants—people who changed jobs, people with multiple jobs, people with seasonal jobs, individual periodic vendors, festival vendors, and people who were offered and accepted employment but had their offer revoked. Compensation available under the Individual Economic Loss Framework includes lost earnings, RTPs, lost benefits, qualified training costs, qualified job search costs, and one-time non-recurring event commission compensation.

Most Individual Economic Loss claimants may choose their 90-or-more–day Benchmark Period from among the same choices available to Business Economic Loss claimants:  2009, the average of 2008 and 2009, or the average of 2007, 2008, and 2009.  The claimant-selected 90-or-more–day period is compared to the identical period in the Compensation Period.  An assumed Growth Factor is applied to Benchmark Period earnings to calculate Expected Earnings. A Claimant-Specific Growth Factor is calculated for claimants with sufficient documentation, and claimants lacking such documentation are granted a presumed growth factor of either 2% or 3.5%.  Depending upon the documentation that claimants can provide, they are grouped into one of four categories.  The documents are typically required to calculate any economic loss, are relevant to analysis of causation and damages, and are the types of documents that should be kept by or are readily available to individuals.  The Settlement Agreement is flexible in allowing even individuals who lack tax documentation or pay period documentation of earnings to rely on sworn written statements.  Causation is presumed for claimants who work in certain geographies and/or industries, whereas other claimants must demonstrate that their loss was due to the spill, in which case multiple causation options are available.  For most individual claimants, compensation awards are increased by an RTP, the amount of which is determined by the industry of the individual's employer and the geographic zone in which it is located.  Awards are offset by any earnings from a job forming the basis of a particular claim, as well as other earnings.  Where claimants worked additional hours to compensate for a lower wage rate, the claimants are compensated under the Settlement for that extra effort.

Property damage is compensated under three frameworks:  Coastal Real Property Damage (Exhibits 11A-11C to the Settlement Agreement), Wetlands Real Property Damage (Exhibits 12A-

12D), and Real Property Sales Damage (Exhibits 13A-13B).  Many of the geographic boundaries governing eligibility for these frameworks are defined by reference to the Shoreline Cleanup Assessment Team ("SCAT") line.  SCAT is based on specific, well-defined, written procedures that provide scientific data on the presence, extent, and duration of observed shoreline oiling.

The Coastal Framework compensates owners and long-term lessees of shoreline properties within a specified Zone who may have experienced temporary inconvenience or partial interruption in their ability to fully enjoy their respective beach areas between April 20 and December 31, 2010. The Coastal Real Property Claim Zone includes properties located along the Gulf Coast shoreline where oil was observed or where Unified Command monitored for the presence of oil.  Parcels inadvertently excluded or misclassified can be included if relevant documentation is provided.  For each eligible property, the 2010 appraised value of the property is multiplied by a property tax rate of 1.18 percent, and the claimant is paid 30, 35, 40, or 45 percent of this base compensation amount depending upon whether oil was observed on the property and whether the property shoreline includes environmentally sensitive areas.  Base compensation is increased by the RTP of 2.5.  The Coastal Framework also provides compensation for physical damage to real or personal property located on an eligible parcel where such physical damage occurred in connection with response cleanup operations that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof (*e.g.*, physical damage to landscaping or a dock caused by a vehicle, machinery or equipment in use for cleanup operations).

The Wetlands Framework provides compensation to owners of Louisiana wetlands properties within a specified Zone to both account for the presence of oil on their properties and for any temporary or partial inconvenience or interruption to their ability to enjoy their property as a result

13

of the spill and cleanup operations.  The framework includes areas where oil was observed ("Category A") and areas where no oil was observed ("Category B").  Parcels in Category A receive base compensation of (i) $25,000 for every acre of Oiled Primary Area (extending 50 feet inland); (ii) $10,000 for every acre of Buffer Area (extending 30 feet further inland); and (iii) $11,000 for every acre of Non-Oiled Primary Area (extending 30 feet inland from SCAT zones that do not contain the presence of oil).  An RTP of 2.5 also applies.  As a result, parcels in Category A are guaranteed a minimum payment of $122,500.  Category B parcels receive $4,500 for every acre of Non-oiled Primary Area.  With the RTP of 2.5, this guarantees a minimum payment of at least $15,750.  The Wetlands Framework also provides compensation for physical damage to real or personal property located on an eligible parcel where such physical damage occurred in connection with response cleanup operations that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof, with the exception of any damage claimed for intrusion of oil, dispersant or other substances onto the eligible parcel.

The Real Property Sales Framework compensates owners of residential properties along the shoreline within a specified Zone that were monitored for oil following the spill and who sold their homes during the period from April 21 to December 31, 2010.  Eligible claimants are compensated 12.5 percent of the sale price.

With respect to Vessels of Opportunity ("VoO") Charter Payment, all Working VoO Participants receive at least $41,600 in compensation, with the amount increasing depending on the size of the boat.  Working VoO Participants who also will receive economic loss compensation that directly involves the use of their VoO vessel (except in the case of payments under the Seafood Compensation Program) will have their economic loss compensation partially reduced by the VoO

14

Earned Income Offset and the VoO Settlement Payment Offset.[11]  VoO participants who were never placed on hire to perform actual services on the water will be entitled to receive up to $10,200, with no offset, even if such "Non-Working VoO Participants" will also receive an award under the Seafood Compensation Program.  VoO claims, because they involved one-time service agreements and thus do not involve future risk that the same course of dealings will be repeated, are not eligible for an RTP.

The Vessel Physical Damage Framework (Exhibit 14) allows vessel owners whose vessels were physically damaged as a result of the oil spill or cleanup operations to recover the lesser of the costs necessary to conduct a reasonable repair or replace the vessel.  Vessels are eligible even if they did not participate in the VoO program; the only vessels that may not recover are those that were both (i) working for an Oil Spill Response Organization or an Oil Spill Removal Organization at the time of the physical injury and (ii) were not participating in the VoO Program.  No RTP is applied to this category of claims.

The Subsistence Framework (Exhibit 9) defines "Subsistence Claimant" as a person who fishes or hunts to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, in a traditional or customary manner, to sustain basic personal or family dietary, economic security, shelter, tool or clothing needs, and who relied upon such subsistence resources that were diminished or restricted in the geographic region used by the claimant due to or resulting from the spill.  The Settlement permits recovery for loss of subsistence use consistent with any closures or impairments to geographic areas relied on by the claimant through 2011.  An RTP is applied to the award.

---

[11]  The VoO Earned Income Offset is equal to 33% of the amount previously paid for services paid to the claimant under the VoO Master Charter Vessel Agreement, and the VoO Settlement Payment Offset is equal to 50% of the Working VoO Participant Settlement Payment.  The VoO Earned Income Offset and the VoO Settlement Payment Offset are applied to the claimant's economic loss compensation after any applicable RTP is applied.

Because members of subsistence communities may have limited access to the Internet, translators, and legal services, the parties agreed to a structure in which there is a Court-Appointed Distribution Agent who works under the direction of the Claims Administrator and who has a dedicated team that maintains a presence in the geographic areas where subsistence claimants live so as to assist those claimants in completing forms and collecting supporting documentation, confirm the eligibility status of claimants, conduct interviews, and apply the compensation formula.

Under the $2.3 billion Seafood Compensation Program ("SCP"), Commercial Fishermen, Seafood Boat Captains, all other Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners will be compensated for economic loss claims relating to Seafood, including shrimp, oysters, finfish, blue crab, and other species. The Seafood Compensation Program (Exhibit 10) uses a bottom-up mode of awarding compensation; thus, fishermen with higher benchmark earnings receive higher compensation awards. The SCP is expected to pay out an initial $1.9 billion in compensation to class members, leaving a $400 million reserve to be distributed in a second round. The guaranteed total of $2.3 billion allocated to the SCP represents approximately five times the annual average industry gross revenue for 2007 to 2009 of the Seafood industry in the region covered by the Settlement Agreement. $2.3 billion also represents 19.2 times lost industry revenue in 2010, according to the evidence provided.[12]   The SCP does not involve a "limited fund" with no ability for class members to opt out.

The general approach of the SCP for vessel owners and lessees and boat captains follows six basic steps: (i) Claimants establish baseline revenue prior to the spill; (ii) baseline revenue is adjusted for price increases that might have occurred in the absence of the spill, yielding adjusted

_____

[12] Lost industry revenue reflects the decline in catch volume between 2010 and the 2007-09 average valued at average 2010 price.

16

revenue; (iii) non-labor variable costs are deducted from adjusted revenues to arrive at net revenues; (iv) net revenue is multiplied by the loss percentage, to yield base compensation; (v) base compensation for vessel owners and captains is calculated by including an additional factor that reflects the relevant share of vessel income earned by each party; and (vi) base compensation is augmented by the addition of an RTP multiplier to arrive at final compensation.  There are Species-Specific Compensation Plans for Shrimp, Oysters, Finfish, and Blue Crab/Other Seafood, which address claims by vessel owners and lessees, boat captains, oyster leaseholders, and finfish Individual Fishing Quota or "IFQ" holders.  A different plan applies to Seafood Crew.  RTPs in the SCP range from 2.25 to 9.75.  Seafood Crew generally receive a lower RTP (2.25) than vessel owner and captains, because Seafood Crew have invested less human and financial capital in commercial fishing and the barriers to entry are not as significant.

The Settlement has several other unique provisions that are favorable to claimants.  The Settlement Agreement purports to assign certain of BP's spill-related claims against Transocean and Halliburton to the class.[13]  Any common benefit Class Counsel fees and costs awarded by the Court will not be deducted from Class Members' recoveries, but will be paid by BP in addition to other class benefits.  BP has agreed to pay for the cost of notice to class members and the costs of the Settlement Program administration.  BP has agreed to create a $57 million fund, to be administered by the Claims Administrator, to promote tourism and the seafood industry in the Gulf Coast.

There are also several "claimant friendly" procedures within the Settlement Program.  For example,  Section 4.3.7 provides that the Settlement Program

---

[13] The Court notes that Transocean and Halliburton argue that such an assignment is not valid or enforceable.  In approving this Settlement, the Court does not express any opinion as to the validity of these assignments.

> shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Process.  The Settlement Program . . . shall use its best effort to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

Some claimants are eligible for reimbursement of their reasonable and necessary accounting fees related to preparation of their claim.  In addition, Business Economic Loss claimants that lack monthly financial statements and are unwilling to have them prepared may submit their contemporaneous business records as "alternate source documents" to the Settlement Program, which will prepare the financial statements needed to process the claim.  Section 4.3.8 of the Settlement Agreement further provides, with respect to claimants asserting Economic Damage claims, that

> The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest **ECONOMIC DAMAGE COMPENSATION AMOUNT** that such information and supporting documentation allows under the terms of the **ECONOMIC DAMAGE CLAIM FRAMEWORK**.

Thus, the Settlement Agreement assures that even if such claimants do not select the Benchmark Period or Compensation Period most favorable to them, the Settlement Program will do so on their behalf so that they obtain the maximum recovery permitted under the Settlement.  Also, the Settlement Program does not draw any negative inference from the fact that a claim was previously denied by the GCCF.

Outside the SCP, the deadline to submit claims is April 22, 2014, or six months after the Effective Date, whichever occurs later.  This is more than a year beyond the expiration of the statute

of limitations for most OPA claims arising out of the spill.  The deadline for filing SCP claims is within 30 days of court approval of the Settlement.  The SCP is the only portion of the Settlement that anticipates a second-round distribution to eligible claimants.  The second-round distributions cannot be made until all claims are processed, and the 30-day claim-filing deadline from final approval of the Settlement by the Court enables prompt second-round distributions to claimants while providing class members with sufficient time to submit Seafood claims.

## III.   Legal Standards

### A.   Class Certification

Rule 23 of the Federal Rules of Civil Procedure provides, in pertinent part:

(a) **Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
    (1) the class is so numerous that joinder of all members is impracticable;
    (2) there are questions of law or fact common to the class;
    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
    (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Types of Class Actions**.  A class action may be maintained if Rule 23(a) is satisfied and if:
. . .
    (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
        (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
        (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
        (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
        (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(a), (b)(3).  "Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997).  However, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.  But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.* at 620.

Rule 23(a) contains an implied requirement that the class be adequately defined and clearly ascertainable by reference to objective criteria. *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008).  In order to stratify Rule 23(a)(1)'s numerosity requirement, the mover typically must show that joinder is impracticable through some evidence or reasonable estimate of the number of purported class members.  *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000).  Commonality under Rule 23(a)(2) requires  "that all of the class member's claims depend on a common issue of law or fact whose resolution 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke.'" *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, -- U.S. --, 131 S. Ct. 2541, 2551 (2011)) (emphasis omitted). Thus, classwide proceedings must have the ability "to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551.  However, "even a single common question will do." *Id.* at 2556 (quotations, brackets, and citations omitted).  "The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the

injury suffered as a consequence." *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1053 (S.D. Tex. 2012) (citation and quotations omitted).

The typicality requirement under Rule 23(a)(3) is not demanding; "[i]t focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999), *abrogated in part by, Wal-Mart, supra, as recognized in M.D. ex rel. Sukenberg*, 675 F.3d at 839-40. "Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated in part by, Wal-Mart, supra, as recognized in M.D. ex rel. Sukenberg*, 675 F.3d at 839-40; *see also Mullen*, 186 F.3d at 625 ("Any variety in the illnesses the Named Plaintiffs and the class members suffered will not affect their legal or remedial theories, and thus does not defeat typicality."). Courts have held that "[t]he major concern under Rule 23(a)(3) is if unique defenses against a named plaintiff threaten to become the focus of the litigation," and that the key to the typicality inquiry is "whether a class representative would be required to devote considerable time to rebut the Defendants' claims." *In re Enron Corp. Secs. Litig.*, 529 F. Supp. 2d 644, 674 (S.D. Tex. 2006) (citation and quotation omitted).

Rule 23(a)(4)'s adequacy requirement "encompasses class representatives, their counsel, and the relationship between the two." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). Thus, "the adequacy requirement mandates an inquiry into [1] the zeal and competence of the representatives' counsel and [2] the willingness and ability of the representatives to take an

21

active role in and control the litigation and to protect the interests of the absentees." *Id.* (citations, quotations, and alterations omitted). Finally, "'[t]he adequacy inquiry also serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Id.* at 479-480 (quoting *Amchem*, 521 U.S. at 625).

Under Rule 23(b)(3), "common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy. In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (citations, quotations, and alterations omitted). The predominance inquiry ordinarily "requires the court to assess how the matter will be tried on the merits, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'" *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)). "[C]ommon issues must constitute a significant part of the individual cases." *Mullen*, 186 F.3d at 626. This is a matter of weighing, not counting, issues. *Id.* As mentioned above, the Court need not consider whether the class action would create intractable management problems.

### B.     Settlement Evaluation

Proponents of a class settlement must show by a preponderance of the evidence that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Wineland v. Casey's Gen.*

*Stores, Inc.*, 267 F.R.D. 669, 676 (S.D. Iowa 2009).  The Fifth Circuit has articulated six factors to guide a court's review of whether a settlement is fair, reasonable, and adequate:

> (1) the existence of fraud or collusion behind the settlement;
> (2) the complexity, expense, and likely duration of the litigation;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the probability of plaintiffs' success on the merits;
> (5) the range of possible recovery; and
> (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

### C.    Notice Criteria

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e), notice of the class settlement must meet the requirements of both Rule 23(c)(2)(B) and Rule 23(e)(1). *In re CertainTeed Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005); *see also Manual for Complex Litigation* 4th § 21.633 (2004) ("For economy, the notice under Rule 23(c)(2) and the Rule 23(e) notice are sometimes combined.").  Rule 23(c)(2)(B) states:

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:
>
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. Proc. 23(c)(2)(B).

The notice requirements of Rule 23(e)(1) are less stringent: "The court must direct notice in a reasonable manner to all class members who would be bound by the [settlement] proposal." Subject to the requirements of due process, notice under Rule (e)(1) gives the Court discretion over the form and manner of notice. *See Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979). Significantly, compliance with Rule 23(c)(2)(B) can satisfy the Due Process Clause. *See In re Enron Corp. Secs., Derivs., & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008).

The Class Action Fairness Act ("CAFA") requires that notice of the proposed settlement be served "upon the appropriate State official of each State in which a class member resides and the appropriate Federal official. 28 U.S.C. § 1715(b). CAFA further states, "An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice requirement under subsection (b)." *Id.* § 1715(d).

## IV.     Discussion

### A.     **This Settlement Class May Be Certified For Purposes Of Settlement Only Pursuant To Rules 23(a) And (b)(3).**

For the reasons discussed below, the Economic and Property Damages Class (the "Settlement Class," set out in Appendix B to this Order and Reasons) may be certified pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), for purposes of settlement only.

Settlement classes are a typical feature of modern class litigation, and courts routinely certify them, under the guidance of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), to facilitate the voluntary resolution of legal disputes. *See, e.g.*, *In re Chinese-Manufactured Drywall Prods. Liab.*

24

*Litig.*, MDL No. 2047, 2012 WL 92498, at *8-11 (E.D. La. Jan. 10, 2012); *Stott v. Cap. Fin. Servs.*, 277 F.R.D. 316, 324-26 (N.D. Tex. 2011); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.612 (2004) ("Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits.").

The parties have tendered either jointly or on their own behalf four experts in the law of class actions:  Professors Coffee, Issacharoff, Klonoff, and Miller.  The Court cites to, or in some instances quotes from, the opinions of these experts at various points in the analysis below of class certification issues.  However, the Court underscores that at all times it has exercised its independent legal judgment on each and every class certification issue.  The Court cites to the declarations of these experts where they summarize the governing legal rules embodied in the text of Rule 23 and/or in the case law of the federal courts.  Since these same scholars have often criticized abusive class actions, however, it is significant that all four of them, from their various perspectives, support this class settlement and believe that it is certifiable.

### i.   This Settlement Class Satisfies the Ascertainability Requirement

Again, the class definition is fully set out in Appendix B.  This Settlement is nearly the epitome of how a class in a mass tort action ought to be defined, as it is objective, precise, and detailed, and does not turn on the merits.  *See* Coffee Decl. ¶¶ 17-20; Klonoff Decl. ¶ 20; Miller Decl. ¶ 38; Miller Supp. Decl. ¶¶ 6-9; Klonoff Supp. Decl. ¶¶ 39-40.  The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Specified Gulf Waters.  Nothing in the class definition requires a determination on the merits or delves into any person's subjective mental state.

25

The definition is based on objective criteria such as where a person resided, worked, received an offer to work, or owned property; or where an entity owned, operated, or leased a physical facility, or employed full time workers.  The Class is further delimited by providing that certain industries or types of businesses are expressly excluded and that only those business or individuals experiencing specified categories of damages are class members.

### ii.   This Settlement Class Meets Rule 23(a)'s Requirements.

#### a.      Rule 23(a)(1): Numerosity

The settlement class easily includes tens of thousands of members, and likely far more.  To date, although not all are class members, approximately 110,000 persons have filed short form joinders adopting the B1 Master Complaint.[14]  More than 91,000 persons have filed claims with the Settlement Program.  The Fifth Circuit has consistently held that classes only a fraction of this size satisfy Rule 23(a)(1)'s numerosity requirement.  *See, e.g.*, *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (between one hundred and one hundred fifty); *Jack v. Am. Linen Supply Co.*, 498 F.2d 122 (5th Cir. 1974) (per curiam) (fifty one); *Sagers v. Yellow Freight Sys.*, 529 F.2d 721, 734 (5th Cir. 1976) (approximately one hundred ten); *Jones v. Diamond*, 519 F.2d 1090, 1100 n.18 (5th Cir. 1975) (forty eight); *see also* Coffee Decl. ¶ 36; Klonoff Decl. ¶ 22.  In addition to the sheer size of the class, members are "geographically dispersed, decreasing the practicability of joinder into one action."  *Stott*, 277 F.R.D. at 324; *accord Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981) ("Thus, a number of facts other than the actual or estimated number of purported class members may be relevant to the 'numerosity' question; these

---

[14]Although over one-hundred thousand claimants have filed short-form joinders, joining all members of the class would be impractical.  Tens of thousands of potential class members have not filed short-form joinders.  Moreover, the only practicable way of resolving the claims of the numerous plaintiffs who have filed short-form joinders is through class treatment.

include, for example, the geographical dispersion of the class . . . .").  As the Court preliminarily concluded on May 2, 2012, *see* Rec. Doc. 6418 at 27, numerosity is plainly satisfied here.

### b.     Rule 23(a)(2): Commonality

Because "for purposes of Rule 23(a)(2) even a single common question will do," *Wal-Mart*, 131 S. Ct. at 2556, "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions," *Amchem*, 521 U.S. at 609.  The Court accordingly explains that the commonality standard is met in greater detail in the context of establishing below that Rule 23(b)(3)'s predominance requirement is satisfied.

While this class certification for settlement purposes does not decide any identified common issues on their merits (and any class certification decision regarding non-settled claims is reserved for another day), the overarching questions of law and fact raised by the *Deepwater Horizon* incident are common, recurring issues as they relate to the liability of BP and/or others.  The Court confirms its preliminary conclusion, reached on May 2, 2012, that commonality is satisfied.  *See* Rec. Doc. 6418 at 27.

### c.     Rule 23(a)(3): Typicality

Typicality is satisfied here, as the class representatives—like all class members—allege economic and/or property damage stemming directly from the *Deepwater Horizon* spill. Importantly, the spill is a single-event, single-location disaster, and so the primary focus of any trial would be BP's conduct and that of its contractors.  *See* Coffee Decl. ¶¶ 39-40; Issacharoff Decl. ¶ 10; Klonoff Decl. ¶¶ 26-28; Coffee Supp. Decl. ¶¶ 12-14; Klonoff Supp. Decl. ¶ 44.  The class representatives personally have claims falling within each of the claims frameworks created by

Section 5 of the Settlement Agreement.  *See* Bon Secour Fisheries, Inc. Decl. ¶ 4 (Economic

Damage); Friloux Decl. ¶ 4 (Seafood Compensation Program; VoO Charter Payment; Subsistence

Damage); Gallo Decl. ¶ 4 (Wetlands Real Property Damage; Economic Damage); Fort Morgan

Realty, Inc. Decl. ¶ 5 (Economic Damage); GW Fins Decl. ¶ 5 (Economic Damage); Hutto Decl.

¶ 4 (Seafood Compensation Program; VoO Charter Payment; Vessel Physical Damage; Subsistence

Damage); Irwin Decl. ¶ 4 (Coastal Real Property Damage); Kee Decl. ¶ 4 (Seafood Compensation

Program); Tesvich Decl. ¶ 4 (Seafood Compensation Program); Lake Eugenie Land and

Development, Inc. Decl. ¶ 5 (Wetlands Real Property Damage); Lundy Decl. ¶ 4 (Subsistence

Damage); Guidry Decl. at 64 ¶ 4 (Seafood Compensation Program; Voo Charter Payment; Vessel

Physical Damage; Subsistence Damage); Panama City Beach Dolphin Tours & More LLC Decl. ¶

5 (Economic Damage; Voo Charter Payment); Sellers Decl. ¶ 4 (Economic Damage; Coastal Real

Property Damage; Real Property Sales Damage); Zeke's Charter Fleet, LLC Decl. ¶ 5 (Economic

Damage; VoO Charter Payment).

Here, the class representatives were all impacted by the single event of the oil spill, although

they lived in different areas within the class geographic boundaries and were engaged in various

impacted activities.  While each and all of the class representatives have agreed to represent the

entire class, every category within the Settlement includes at least one of the *Bon Secour* plaintiffs.

The range of class representatives as set out in the prior paragraph thus meets the Rule 23

requirements of typicality.  No more is required.  *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 957

(9th Cir. 2003) ("Objectors . . . complain that class counsel did not provide clear documentation that

each job category had a class representative for each type of discrimination claim alleged.  That level

of specificity is not necessary for class representatives to satisfy the typicality requirement."); *Stott*,

277 F.R.D. at 325 ("Although certain of the class members may have dealt with different individuals associated with Capital Financial, these factual differences are not sufficient to overcome the similarity of the nature of the Representative Plaintiff's claims."); *Cornn v. UPS, Inc.*, No. 03-2001, 2005 WL 588431, at *8 (N.D. Cal. Mar. 14, 2005) ("Rule 23 does not require a class representative for each job category that may be included in the class.").

The Court confirms its preliminary conclusion, reached on May 2, 2012, that typicality is satisfied. *See* Rec. Doc. 6418 at 27.

### d.       Rule 23(a)(4): Adequacy

In this case, (i) Class Counsel has competently prosecuted this litigation and negotiated a very favorable and generous settlement agreement; (ii) the class representatives are willing and able to actively control the litigation; and (iii) there are no conflicts of interest.  The Court confirms its preliminary conclusion that adequacy is satisfied. *See* Rec. Doc. 6418 at 27-28.

### 1.       Class Counsel Are Adequate.

The class is represented by the PSC—an experienced and diverse group of lawyers selected by the Court, after a public application process and through judicial screening of the many applicants, for their "(a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation." Rec. Doc. 2 at 14.  The PSC consists of firms that are diverse (i) geographically; (ii) in terms of the ranges of litigation expertise and experience, and (iii) in terms of the representation of the full array of economic and property claims presented in the MDL No. 2179 litigation, and resolved in the Settlement.  The Court considered such diversity in making its PSC appointments.  Since their appointment, members of the PSC have diligently prosecuted this litigation, consulted widely among

29

class members in negotiating the Settlement, and aggressively represented the interests of their clients.  *See* Klonoff Decl. ¶ 38.

### 2.     Class Representatives Are Adequate.

The class representatives are clearly adequate, as they include individuals and businesses asserting each category of loss.  Significantly, the class representatives have participated in the settlement negotiations and sought to ensure that similarly situated plaintiffs will receive adequate compensation.  *Cf. Stott*, 277 F.R.D. at 325 (finding Rule 23(a)(4) satisfied where the class representative "will continue to take an active role in the prosecution of this class action and administration of this proposed settlement to its conclusion"); *see also* Klonoff Decl. ¶ 30.  The class representatives personally have claims falling within each of the main claims frameworks created by Section 5 of the Settlement Agreement.  Yet separate representation for all possible interests is not necessary where the class members' interests are not actually divergent.  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009).  *See* Coffee Supp. Decl. ¶ 24.  All class representatives have attested in declarations filed with the Court that they reviewed and discussed the Settlement provisions with Class Counsel and they believe the Settlement is fair to the entire Class.  *See* Bon Secour Fisheries, Inc. Decl. ¶¶ 6, 9; Friloux Decl. ¶¶ 5, 9; Gallo Decl. ¶¶ 5, 8; Fort Morgan Realty, Inc. Decl. ¶¶ 6, 9; GW Fins Decl. ¶¶ 6, 9; Hutto Decl. ¶¶ 5, 8; Irwin Decl. ¶¶ 5, 8; Kee Decl. ¶¶ 5, 8; Tesvich Decl. ¶¶ 5, 8; Lake Eugenie Land and Development, Inc. Decl. ¶¶ 6, 10; Lundy Decl. ¶¶ 5, 8; Guidry Decl. ¶¶ 5, 9; Panama City Beach Dolphin Tours & More LLC Decl. ¶¶ 6, 9; Sellers Decl. ¶¶ 5, 8; Zeke's Charter Fleet, LLC Decl. ¶¶ 6, 9.

### 3.      There Are No Conflicts Of Interest Among The Class.

This case suffers from none of the problems identified in *Amchem*, where the Court noted a potential intraclass conflict, in the context of a settlement with an overall cap, between individuals who had already been injured by asbestos and those who had only been exposed to it.  *Cf. Amchem*, 521 U.S. at 626 (explaining that "for the currently injured, the critical goal is generous immediate payments" whereas "exposure-only plaintiffs [have an interest] in ensuring an ample, inflation-protected fund for the future").  Rather, the proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage, and the Settlement compensates class members for their past losses through detailed, objective compensation criteria and for their anticipated potential future damages through RTP payments or through other methods that take into account risk of future loss.  *See* Coffee Decl. ¶ 9; Miller Decl. ¶¶ 41-42.

Both as a matter of process and as a matter of substance, this class settlement avoids all of the concerns that have prevented approval in cases such as *Amchem*, 521 U.S. 591, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010).  All class members—even those under the SCP—are protected by specific, detailed and objective frameworks that were promulgated publicly by the Court during the preliminary approval process after the parties had negotiated those frameworks.  The differences within the frameworks, developed through arms-length negotiation, are rationally related to the relative strengths and merits of similarly situated claims.  Perhaps most importantly, this Settlement does not involve a limited fund with no ability for class members to opt out, distinguishing *Ortiz* and *In re Katrina Canal Breaches Litigation*.

31

### (A)    Specific Features Avoiding Intraclass Conflicts

The Settlement was structured to assure adequate representation of all interests within the Class and to prevent intraclass conflict.  The Settlement includes numerous features that were specifically designed to avoid the risk of any intraclass conflicts.  According to Professor Miller, this case is "perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field" in its structural features designed to avoid intraclass conflicts.  Miller Decl. ¶ 12.

*First*, the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen-member Plaintiffs' Steering Committee.  The PSC was consulted and participated throughout the settlement process.  Whenever a particular category of claims was discussed during negotiations, lawyers who had clients with such claims took an active role in advising the negotiators.  *See* Coffee Decl.  ¶¶ 7, 10, 24-26, 43; Issacharoff Decl. ¶ 8; Klonoff Decl. ¶ 32; Coffee Supp. Decl. ¶¶ 19(b)(1), 27(a)-(b), 28-35; Rice Negotiations Decl. ¶¶ 15, 17; Herman Decl. ¶¶ 6-7. *Second*, the claims frameworks offering generally uncapped compensation ensure that a benefit paid to one member of the class will in no way reduce or interfere with a benefit obtained by another member.  This Settlement is not a zero-sum game.  While the Seafood Compensation Program was funded at the specific level of $2.3 billion,[15]  the parties took numerous measures to avoid the risk of intraclass conflict, including (i) using a Court-appointed neutral, who heard directly from various Seafood claimants (*e.g.*, shrimpers, crabbers, oystermen and finfishers) to determine the initial and subsequent allocations; and (ii) agreeing to a total amount of compensation that, based on available

---

[15]  This is sometimes referred to as a capped fund, but the Court concludes that the SCP is more than sufficient to compensate for actual losses of SCP participants and hence is more accurately described as a guaranteed payment by BP.

and reliable data, is more than sufficient to compensate all class members.  *See* Coffee Decl. ¶¶ 8, 11-12, 14, 21-23, 34, 44; Klonoff Decl. ¶ 31; Issacharoff Decl. ¶ 13-17; Miller Decl. ¶¶ 29-37; Rice Negotiations Decl. ¶ 11; Coffee Supp. Decl. ¶¶ 19(b)(2), 22, 23, 27(c); Klonoff Supp. Decl. ¶ 46.

*Third*, the class definition clearly and objectively defines the class in terms of time period, geographic region, and type of claim.  As a consequence, the benefits of the Settlement are directed towards those who were most impacted, while persons with marginal or potentially worthless claims, whose presence could have complicated the settlement process, were excluded from the proposed class, and thus remain free to pursue their claims.  *See* Coffee Decl. ¶¶ 4, 7, 55, 62.C; Issacharoff Decl. ¶ 8; Miller Decl. ¶ 13-21. *Fourth*, Magistrate Judge Shushan's mediation efforts ensured structural integrity during the negotiations.  *See* Coffee Decl. ¶ 33; Klonoff Decl. 32; Klonoff Supp. Decl. ¶ 46.  *Fifth*, there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court,[16] so Class Counsel could not have engaged in trading off the interests of class representatives or absent class members so as to maximize their fee recovery.  *See* Klonoff Decl. ¶ 32; Klonoff Supp. Decl. ¶ 35-36. Additionally, the amount of any fee recovery remains an issue for later resolution by the Court. Since no fee petition has yet been presented to the Court, Rule 23(h)'s procedures and protections will apply to any such fee application.  BP has agreed in the Settlement to pay up to $600 million, in addition to the payouts to class members.

---

[16]  This occurred on April 17, 2012, the day before the Settlement Agreement was filed in the record.  Prior to April 17, the parties had no discussions regarding fees other than the PSC's making clear that it would eventually file a request for attorneys' fees.

**(B)     Subclasses Are Not Necessary To Avoid Intraclass Conflicts**

In the absence of conflicts between members of the Settlement Class, subclasses are neither necessary, useful, nor appropriate here.  *See* Klonoff Decl. ¶ 33; Miller Supp. Decl. ¶ 18. Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course.  Rather, subclasses might only be needed when there is a "fundamental" conflict among class members, but no such conflict exists here.  *See Dewey v. VW Aktiengesellschaft*, 681 F.3d 170, 185-86 (3d Cir. 2012); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) ("*Amchem* and *Ortiz* appear to hold that Rule 23(a)(4) calls for some type of adequate structural protection, which would include, but may not necessarily require, formally designated subclasses."); Coffee Decl. ¶¶ 31-32; Issacharoff Decl. ¶¶ 8, 11; Klonoff Decl. ¶¶ 34-37; Coffee Supp. Decl. ¶¶ 19(a), 20-21.  District courts have broad discretion in determining whether to create subclasses.   Courts have often affirmed district court decisions not to establish subclasses—including where, as here, the Settlement is crafted such that different payment levels reflect the relative value of the different claims.  *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) (rejecting argument that district court should have established subclasses);[17]

---

[17] Holding "subclasses are only necessary when members of the class have divergent interests and the District Court found that no such divergent interests existed between the allocation groups" and further noting the

> Plan of Allocation was carefully devised to ensure a fair distribution of the settlement fund to the various types of claimants and was allocated in such a way that policyholders who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe.  Even if some potential benefits may have been realized from utilizing subclasses, it is not at all clear that the advantages would have outweighed the disadvantages, and therefore it is difficult to say that the District Court abused its discretion by not taking this step. Consequently, we conclude that the District Court's decision not to certify separate subclasses or require separate representation did not constitute an abuse of discretion and likewise its approval of the Zurich Settlement Agreement and Plan of Allocation was also within its discretion.

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 272-73.

34

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 346-47 (3d Cir. 2010) (rejecting argument that district court erred in failing to create subclasses); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) (rejecting objectors' argument that district court erred in not establishing subclasses when it approved class settlement); *see also Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986) ("Intervenors' argument for subclassing, due to conflicts within the class, is rejected because such a procedure should be left to the trial court's discretion. Subclassing . . . is appropriate only when the court believes it will materially improve the litigation.").

Here, all claims arose from a single event and were presented against the same defendants. *See* Coffee Decl. ¶¶ 5, 62.H; Issacharoff Decl. ¶ 11; Miller Supp. Decl. ¶ 19. If subclasses were entertained, there would be no principled basis for limiting the number of subclasses; arguably, subclasses would be needed for all five species types falling within the SCP, as well as all types of claims falling outside it (potentially down to the level of failed businesses, failed start-up businesses, individual periodic vendors, parcels with oil observed, parcels with no oil observed, etc.). Such rigid formalism, which would produce enormous obstacles to negotiating a class settlement with no apparent benefit, is not required and could even reduce the negotiating leverage of the class. *See* Coffee Decl. ¶¶ 29-30, 45; Issacharoff Decl. ¶ 11; Klonoff Decl. ¶ 33; Coffee Supp. Decl. ¶¶ 19(a), 35-36.

Subclassing would be particularly difficult here, where many class members would fall into multiple different subclasses. "For example, a VoO claimant might also be a Zone B resident; in such cases, an individual class member would have had two counsel negotiating over different components of the recovery to be paid to this single class member. This is far different from the

ordinary class action where a class member generally belongs to only one subclass and can be represented by one subclass counsel.  Such complexity and overstaffing is inefficient and causes only delay for the client."  Coffee Supp. Decl. ¶ 19(c).  Indeed, the use of a multitude of subclasses—each with separate class representatives and counsel—would have greatly complicated both the settlement negotiations and the overall administration of the litigation.  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 271 (affirming settlement) ("[S]ubclassing can create a 'Balkanization' of the class action and present a huge obstacle to settlement if each subclass has an incentive to hold out for more money.") (quoting *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005)).

### 4.     There Was No Duplication of Relief.

Certain objectors challenge the adequacy of representation requirement on the ground that the Settlement provides relief that the defendant was already providing, demonstrating that class representatives did not have the best interests of class at heart.  *See* Obj. Doc. 101 at 9.  Here, the objectors have failed to articulate how the relief afforded under the Settlement duplicates the relief that was available through the GCCF, or how the GCCF could possibly have had any authority to award all the types of relief contemplated by this agreement.   This Court has had earlier occasion to address claimants' comments and concerns about the operation of the GCCF, Rec. Doc. 1098, and notes that, unlike the GCCF, the Settlement is placed under the Court's direct supervision and ongoing jurisdiction.  This is a fundamental structural and functional difference.

Moreover, in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006), the court rejected the argument that class action treatment was inappropriate where the defendant, Murphy

Oil, already had a private settlement program in place to address claims for damages from an oil spill, which was supposedly a superior method of resolving the dispute:

> Defendant argues that this element of the Rule 23 analysis is not met because Murphy's private settlement program is a superior method of resolving this dispute. However, the merits of Murphy's settlement program aside, Murphy's argument confuses the superiority standard under Rule 23. The analysis is whether the class action format is superior to other methods of *adjudication,* not whether a class action is superior to an out-of-court, private settlement program. When evaluated under those terms, the Court finds that the class action format would be superior to consolidation of individual cases in this matter. Both Murphy and Plaintiffs have expressed a desire for quick resolution of these cases, and the class action format could streamline this litigation. In addition, there appears to be little existing litigation of these claims outside of the lawsuits filed in this Court, so class certification would act to centralize these proceedings.

*Id.* at 610. While *Turner* was decided in the context of a challenge to Rule 23's superiority requirement, the court's finding that a class action was the superior method of resolving the oil spill dispute in that case is significant. Here, plaintiffs' pursuit of class certification, which *Turner* indicates is a superior method of resolving these types of class claims, further demonstrates they do in fact have the best interests of the class at heart, and hence are adequately representing the class.

If the law provided that the existence of an out-of-court dispute resolution process precluded class certification, OPA—which is designed specifically to facilitate out-of-court settlements—would instead bar the possibility of any class-wide settlement. Neither Rule 23's adequacy provision nor its superiority provision requires such an inflexible result. *See, e.g.*, Klonoff Supp. Decl. ¶¶ 49, 51.

37

### iii.    This Settlement Class Satisfies Rule 23(b)(3)'s Requirements.

#### a.    Common Questions Of Law And Fact Predominate Over Individual Issues.

As the Court preliminarily concluded on May 2, 2012, predominance is clearly satisfied here. *See* Rec. Doc. 6418 at 28.

Where "defendants' liability predominates over any individual issues involving plaintiffs, and the Settlement Agreement will insure that funds are available" to compensate plaintiffs, predominance is satisfied. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *11 (E.D. La. Jan. 10, 2012); *see also* Coffee Decl. ¶ 49; Klonoff Decl. ¶ 30. The phased trial structure selected by the Court prior to the parties' arrival at a settlement agreement reflected the central importance of common issues to this case. *See* Rec. Doc. 4083 at 2-3. Indeed, the Court defined three separate trial phases all focused on common questions. A phased trial schedule investing significant time in resolving common questions of law and fact supports the conclusion that the settlement class can meet the Rule 23(b)(3) test for predominance. *See* Coffee Supp. Decl. ¶ 11; *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 556 (5th Cir. 2011) (recognizing that a court's selection of a phased trial structure may be evidence of the importance of common questions and justify class certification on liability) (citing *Watson v. Shell Oil*, 979 F.2d 1014, 1017-18 (5th Cir. 1992) and *Turner*, 234 F.R.D. at 601).

Consistent with the significance of common issues, much of the Phase One trial would have focused on the common issue of which defendants bore responsibility for the well blowout. *See* Pre-Trial Order No. 41 (Rec. Doc. 4083) at 2. Similarly, the Phase Two trial would have exclusively focused on the common issues of how much oil escaped from the Macondo reservoir and who bore responsibility for the inability of the defendants to contain the flow earlier. *See id.* Finally, the

38

Phase Three trial would have focused exclusively on the common issue of the final resting place of oil discharged from the reservoir and how efforts to collect, burn, and disperse oil flowing from the well proceeded. *See id.* at 2-3. The results of these proceedings would have determined the liability of BP and the other defendants to all class members. This is not a case where the "district court did not meaningfully consider how Plaintiffs' claims would be tried." *Madison*, 637 F.3d at 556; *see also* Klonoff Decl. ¶ 41. In comparison, the individualized issues are narrow, discrete, and efficiently resolved. *See* Klonoff Decl. ¶ 41.

Finally, as the Second Circuit has recently noted in a persuasive analysis of the predominance requirement as applied to settlement classes:

> While the predominance inquiry will sometimes be easier to satisfy in the settlement context, other requirements of Rule 23 "designed to protect absentees by blocking unwarranted or overbroad class definitions," such as the Rule 23(a)(4) requirement of adequate representation, will "demand undiluted, even heightened, attention." [*Amchem*, 521 U.S.] at 620; *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998) (suggesting that "the key to *Amchem* appears to be the careful inquiry into adequacy of representation"); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250–55 (2d Cir. 2011) (vacating certification of settlement class of copyright owners because of conflicts among different categories of class members).

*In re Amer. Int'l Group, Inc. Sec. Litig.*, 689 F.3d at 240. But as analyzed above, there are no adequacy of representation problems under Rule 23(a)(4) here, nor are there intraclass conflicts.

Nor is the class definition overbroad, improperly sweeping in too many absent class members. This Settlement, as the Court discusses below, is remarkable in that it seems to have resulted in large numbers of non-class members objecting to being excluded from the Settlement. The parties were careful in the boundary lines they drew in defining the class. *See* Settlement Agreement ¶¶ 1.1, 1.2, 1.3.

1.      Common Questions Of Fact Predominate Over Individual
        Issues

This case arises from the blowout of one well, on one date, and the discharge of oil from one location. It is therefore clear that the vast majority of the contested factual questions are common to all class members and that the case includes a number of issues "whose resolution 'will resolve an issue that is central to the validity of each one of the class member's claims in one stroke.'" *Stukenberg*, 675 F.3d at 840 (quoting *Wal-Mart Stores*, 131 S. Ct. at 2551) (emphasis and alterations omitted).   As the Judicial Panel on Multidistrict Litigation explained in centralizing nearly all Deepwater Horizon-related litigation in this Court, actions arising from the Deepwater Horizon "indisputably share factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it."  Rec. Doc. 1 at 3; *see also* Coffee Decl.  38, 47.

All of the key factual questions in this litigation are common among members of the class. These categories of questions include BP's share of liability compared to other defendants, the facts of defendants' conduct in designing the well, and the facts of BP's conduct in seeking to control and contain the spill.   At a bare minimum, each of these categories subsumes more specific fact questions that are likewise common across the class:

   (i)      Whether BP had a valid superseding cause defense on the facts, *see* Coffee Supp. Decl. ¶ 9(B), 9(G)(2);

   (ii)     Whether BP violated any federal safety, construction, or operating regulations, *see* Coffee Supp. Decl. ¶ 9(E)(1);

   (iii)    Whether BP used an improper well design that unreasonably heightened the risk of a blowout, *see* Coffee Supp. Decl. ¶ 9(E)(2);

   (iv)     Whether the cement mixture was unstable, and, if so, whether BP should have prevented its use,  *see* Coffee Supp. Decl. ¶ 9(E)(3);

(v)     Whether BP misinterpreted the negative pressure test, *see* Coffee Supp. Decl. 9(E)(4);

(vi)    Whether BP took appropriate and timely steps to stop the release of hydrocarbons from the well, *see* Coffee Supp. Decl. ¶ 9(E)(5); and

(vii)   Whether BP unreasonably failed to take precautions to ensure that, in the event of a blowout, the oil would be contained in the immediate vicinity of the well, *see* Coffee Supp. Decl. ¶ 9(E)(6).

Finally, the mixed question of law and fact as to whether these decisions (individually or collectively) constitute negligence, gross negligence, or willful misconduct is a fundamental issue, also common to the entire class.  *See* Coffee Supp. Decl.  37.

If this case is not resolved as a class action, in theory each plaintiff might have to individually litigate each of these fact questions.  Each claimant might need to repetitively present factual evidence about BP's well design, source control, and pollution containment.  Moreover, each individual plaintiff would need to use expert modeling and testimony to establish BP's negligence or other culpable conduct.  In sum, litigation of these issues would "involve the same cast of characters, events, discovery, documents, fact witnesses, and experts."  Am. B1 Master Compl. (Rec. Doc. 1128) at 151.  Relitigating these issues *seriatim* "would be a massive waste of judicial resources, as the vast majority of the issues of law and fact in this case . . . are common to all the class members."  *In re Dell Inc.*, No. 06-726, 2010 WL 2371834, at *4 (W.D. Tex. June 11, 2010), *aff'd, Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012); *see also In re Sch. Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir. 1986).

Because all members of the class trace their injury to a single known accident, and a small group of defendants, this case bears no resemblance to *Amchem*, in which the class consisted of individuals "exposed to different asbestos containing products, for different amounts of time, in

41

different ways, and over different periods." 521 U.S. at 624 (quoting the Third Circuit). Nor does this case bear any resemblance to *Wal-Mart*, 131 S. Ct. 2541, in which the Court found that plaintiffs had little in common other than "Wal-Mart's 'policy' allowing discretion by local supervisors over employment matters." *Id.* at 2554 (emphasis omitted). In contrast to *Wal-Mart*, in which the Court held that the cause of plaintiffs' injuries varied with respect to the manager to whom each was assigned, and how each manager interacted with the plaintiff in question, here each class member traces his injury directly to the same genesis-a single well blowout stemming from the same operative causes. *See* Coffee Supp. Decl. 10. Moreover, this carefully defined class facilitates the satisfaction of predominance, as the class does not include remote claimants facing complicated proof problems. *See* Klonoff Decl. ¶ 43.

## 2. Common Questions Of Law Predominate Over Individual Issues

Just as common questions of fact clearly predominate over individual issues, so do these common questions of law:

(i)      Whether BP is a responsible party under OPA, *see* Coffee Supp. Decl. ¶¶ 8, 9(A);

(ii)     Whether BP could limit its liability under § 2704 of OPA, *see* Coffee Supp. Decl. ¶ 9(C);

(iii)    Whether punitive damages are available as matter of law, *see* Coffee Supp. Decl. ¶ 9(D);

(iv)     Whether, because BP obeyed and was subject to the direction and control of the Federal On-Scene Coordinator, it cannot be held liable for any claim that it failed to mitigate the damages of the class, *see* Coffee Supp. Decl. ¶ 9(G)(1); and

(v)      Whether OPA requires dismissal of all claims that were filed without satisfying the presentment procedures specified in OPA, including those brought under maritime law, *see* Coffee Supp. Decl. ¶ 9(G)(3).

All legal questions arise and would be determined essentially under a common legal framework of federal law, under federal statutes such as OPA or under general maritime law (a species of federal common law). Accordingly, the applicable law unites the Class. This is not an *Amchem* scenario, in which the class is fragmented by a multiplicity of state laws that control the viability of claims.

Moreover, a number of jurisdictional issues were common to the class. These issues were central to the validity of the class members' claims, and it is well established that jurisdictional issues can raise questions that satisfy the commonality standard. *See* Coffee Supp. Decl. ¶ 9(H); *see also Sullivan*, 667 F.3d at 292; *Baxter Healthcare Corp. v. United States*, 925 F. Supp. 794, 797 (Ct. Int'l Trade 1996). These jurisdictional issues include:

> (i)      Whether federal jurisdiction exists over the claims of the class, such that these claims can be brought in or removed to federal court, *see* Coffee Supp. Decl. ¶ 9(H)(1);
>
> (ii)     Whether OCSLA jurisdiction pursuant to 43 U.S.C. § 1349(b)(1) extends to economic loss claims, *see* Coffee Supp. Decl. ¶ 9(H)(2);
>
> (iii)    Whether federal enclave jurisdiction exists over such claims, including as to claims relating to damages experienced outside the enclave, *see* Coffee Supp. Decl. ¶ 9(H)(3); and
>
> (iv)     Whether there is admiralty jurisdiction over such claims under 33 U.S.C. § 1333 and/or the Admiralty Extension Act, 46 U.S.C. § 30101, *see* Coffee Supp. Decl. ¶ 9(H)(4).

Requiring these issues to be litigated in thousands of individual actions would constitute a waste of judicial resources and would needlessly delay the relief to which class members are entitled.

Certain of the common issues discussed above, including BP's status as a responsible party under OPA, were conceded early in this litigation. But the fact that BP has conceded certain common issues does not make them any less common. Coffee Supp. Decl. 2-7; Klonoff Supp. Decl. 42; *see also In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *Seijas v. Republic of Argentina*, 606 F.3d 53, 57 (2d Cir. 2010); *see also Schreiber v. NCAA*, 167 F.R.D. 169,

175 (D. Kan. 1996).  How such responsible party status would translate into compensation was an overarching common issue that would have had to have been resolved via the multi-phase trial absent the Settlement.

While the class includes members from across the Gulf region, five states, rather than 50, are involved.  Moreover, in this case, involving a maritime casualty, state law is preempted by federal law.  *See, e.g.*, Bundle B1 Order (Rec. Doc. 3830) at 18, 38; Bundle C Order (Rec. Doc. 4578) at 17.  As a result, "the same substantive law will apply to all Plaintiffs' claims in these cases: this is not a case in which the varying laws of different states create the need for state subclasses or individual trials."  *Turner*, 234 F.R.D. at 606; *see also* Coffee Decl. ¶¶ 3, 50; Klonoff Decl. ¶ 45.

### 3. Issues of Individual Injury Do Not Defeat Predominance For Purposes Of Evaluating This Settlement Class's Certification.

As described previously, the core causation issues in this litigation should be decided on a class-wide basis.  Although the common issues are numerous, certain causation issues remain that would have to be decided on an individual basis were the cases not being settled.  These include, for example, the extent to which the *Deepwater Horizon* incident versus other factors caused a decline in the income of an individual or business.  These limited individualized issues do not defeat predominance in light of the core common issues that are appropriate for classwide treatment.  *See* Coffee Decl. ¶ 52; *Mullen*, 186 F.3d at 626 ("[T]he issues to be tried commonly —seamen status, vessel status, negligence, and seaworthiness—were significant in relation to the individual issues of causation, damages, and contributory negligence."); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1018, 1023 (5th Cir. 1992) (affirming certification using a multi-phase trial plan where a third phase

44

would "resolve issues unique to each plaintiff's compensatory damage claims, *e.g.*, injury, causation, and quantum").[18]

Importantly, "the necessity of calculating damages on an individual basis will not necessarily preclude class certification," particularly where damages may "be determined by reference to a mathematical or formulaic calculation."  *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006); *accord Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306-07 (5th Cir. 2003); *Bertulli v. Independent Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Eatmon v. Palisades Collection LLC*, No. 08-306, 2011 WL 147680, at *12 (E.D. Tex. Jan. 18, 2011); *Moore v. International Filing Co., LLC*, No. 10-0086, 2010 WL 2733116, at *3 (S.D. Miss. July 8, 2010); *Lonergan v. A.J.'s Wrecker Serv. of Dallas, Inc.*, No. 97-1331, 1999 WL 527728, at *7 (N.D. Tex. July 8, 1999).  Courts have repeatedly rejected the argument that different damages calculations for each class member defeats class

---

[18] Additionally, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006), involved an oil spill from the defendant's refinery into neighboring areas.  When nearby residents and business owners sought class certification, the defendant argued that various causation issues, such as that homes and properties received differing degrees of oil contamination, precluded class certification.  *See id.* at 606.  The court nevertheless found that common issues predominated because "the central factual basis for all of Plaintiffs' claims is the leak itself—how it occurred, and where the oil went." *Id.*  The court further explained that "issues of whether there is crude oil on a plaintiff's property, and how much oil, do not require the type of extensive individualized proof that would preclude class treatment of the negligence claim" and that the "presence or degree of injury or damages is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary." *Id.* at 607.  Other authorities are in accord.  *See, e.g., Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (affirming certification of class alleging that defendant discharged TCE into soil and groundwater where district court reserved question of whether "a particular class member suffered any legally compensable harm" for individual hearings); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (per curiam) (affirming class certification despite defendants' arguments that differences in individual causation predominated:  "Proximate cause, however, is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification."); *Collins v. Olin Corp.*, 248 F.R.D. 95, 102-105 (D. Conn. 2008) (granting motion to certify class of homeowners harmed by weapons manufacturer's handling and disposal of hazardous waste, rejecting defendant's argument against class certification based on existence of "individual issues . . . of causation," and quoting and citing multiple authorities in support of rejection of defendant's argument); *Bates v. Tenco Servs., Inc.*, 132 F.R.D. 160, 163-64 (D.S.C. 1990) ("Individual offers of proof of proximate cause and damages for each plaintiff will become an inevitable necessity; however, these individual questions of proof will arise whether the suit proceeds individually or as a class action."); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987) (certifying class where common questions existed as to whether the defendants were negligent in the manufacture, transportation, and distribution of hazardous chemical, even though proximate causation would have to be decided individually).

45

certification.  *See, e.g.*, *Bell Atl.*, 339 F.3d at 306  (recognizing that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate."); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1026 (9th Cir. 2011) ("[T]he mere fact that there might be differences in damage calculations is not sufficient to defeat class certification."); *Brown v. Consumer Law Assocs., LLC*, No. 11-0194, 2012 WL 2236629, at *10 (E.D. Wash. June 15, 2012) (need for individualized proof of damages is insufficient to preclude class certification); *S. States Police Benev. Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 89 (D. Mass. 2007) ("[T]he possibility of differing damages calculations is insufficient to deny certification.").  Were the law otherwise, "the point of the Rule 23(b)(3) provision for class treatment would be blunted beyond utility, as every plaintiff must show specific entitlement to recovery, and still Rule 23 has to be read to authorize class actions in some set of cases where *seriatim* litigation would promise such modest recoveries as to be economically impracticable."  *Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 66-67 (1st Cir. 2010) (Souter, J., sitting by designation); *see also* Klonoff Decl. ¶ 41.

In this case, damages can be fairly calculated through various common methodologies or formulaic calculations by means of the comprehensive claims frameworks contained in the Settlement Agreement.  *Cf. Chauvin v. Chevron Oronite Co.*, 263 F.R.D. 364, 371 (E.D. La. 2009) (explaining that the "critical calculation of damages on an individual basis will not preclude class certification unless this calculation cannot be made with some reference to a mathematical formula"); *City of San Antonio v. Hotels.com*, No. 06-381, 2008 WL 2486043, at *12 (W.D. Tex.

46

May 27, 2008) (finding class certification appropriate where, among other things, the "alleged damages are subject to common proof and can be calculated on a formulaic basis").

### 4.      Courts Have Certified Rule 23(b)(3) Classes In Environmental Accident And Other Mass Tort Suits.

Courts have repeatedly held that in certain factual circumstances common issues may predominate over individual issues in environmental and other mass tort cases. *See* Klonoff Decl. ¶ 46. This is one of those cases. As the Supreme Court recognized in *Amchem*, where "mass tort cases aris[e] from a common cause or disaster," class certification may be appropriate, and "District Courts, since the late 1970's, have been certifying such cases in increasing number." *Amchem*, 521 U.S. at 625. The reason for this doctrine is that although each plaintiff might have suffered different damages, the heart of each plaintiff's complaint is common to the class.

In *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992), the district court certified a class of 18,000 individuals harmed by an explosion at a Shell manufacturing facility in Norco, Louisiana. Affirming, the Fifth Circuit observed that "[t]he class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs," such that there "can be no serious contention that the district court abused its discretion in determining that these issues predominate for the purpose of class certification." *Id.* at 1022-23. The Fifth Circuit "has affirmed and relied upon *Watson*'s holding following *Amchem*." *Madison*, 637 F.3d at 557 (Dennis, J., concurring) (citing *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006); *Mullen*, 186 F.3d at 623, 628).[19] In *Mullen*, a single-site, long-term toxic exposure case, the

---

[19] Moreover, in *Madison*, the majority noted that "class treatment on the common issue of liability" in that case could "indeed be appropriate" had it been fully analyzed by the district court at the certification stage. *Madison*, 637 F.3d at 557. This Court has had ample opportunity and information, by virtue of its management of an intensively litigated and well addressed liability case, to conduct the requisite analysis.

Court upheld the certification of a class of casino employees harmed by a defective ventilation system "because the class is . . . linked by a common complaint [and] the fact that the class is defined with reference to an ultimate issue of causation does not prevent certification." *Id.* at 624 n.1.

Courts in this District agree that it is appropriate, in circumstances where the underlying facts and nature of the case warrant, to certify class actions in environmental disaster and other toxic exposure cases. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. at 462 ("Despite early skepticism, mass accident, or single-situs torts, have generally been susceptible to class certification."); *Turner*, 234 F.R.D. at 606 ("Defendant argues that the oil did not spread uniformly throughout the affected area, and that different homes in the area received differing degrees, if any, of oil contamination. However, ***the central factual basis for all of Plaintiffs' claims is the leak itself—how it occurred, and where the oil went***. There is a large area of factual overlap in the Plaintiffs' causes of action.") (emphasis added); *In re Shell Oil Refinery*, 136 F.R.D. 588, 589 (E.D. La. 1991) (noting that certification had been granted in a case arising "from the May 5, 1988 explosion in the catalytic cracking unit at the Shell Oil Refinery in Norco, Louisiana.").

Courts around the country agree. In *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004), the Sixth Circuit affirmed the certification of a class of 3,600 individuals whose ***property*** was damaged by toxic pollutants emitted from a cement manufacturing plant, explaining that while "individual damage determinations might be necessary . . . the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole." *Id.* at 508. In *Bell v. DuPont Dow Elastomers, LLC*, 640 F. Supp. 2d 890 (W.D. Ky. 2009), the court certified a class of individuals residing near a DuPont facility emitting air

contaminants, explaining that the "air contamination affected Plaintiffs *and their properties* in similar ways under the law" even though "some class members disagree about the significance of the discharges each has experienced." *Id.* at 895 (emphasis added).  In *Collins v. Olin Corp.*, 248 F.R.D. 95, 103-05 (D. Conn. 2008), the court certified a class of homeowners harmed by contaminated soil and groundwater, reasoning that "differences in the amount and recoverability of damages do not defeat predominance." *Id.* at 105.  *Singleton v. Northfield Ins. Co.*, 826 So. 2d 55 (La. Ct. App. 2002), affirmed certification of a class seeking damages from a gas well blowout, holding that the "liability of the defendants is the central issue, which is obviously common to all of the claimants.  Moreover, this issue of liability pre-dominates over any questions important to only individual members of the class, such as the type and extent of their damages." *Id.* at 68.

### 5.    The VoO Claims Are Also Appropriate For Class Treatment.

The VoO claims are appropriate for treatment as part of the same class as those class members who suffered tort injuries without participating in the VoO program, for several reasons. *First*, there is an additional basis for class certification of VoO claims:  these claims arise from standardized contracts.  Courts in this Circuit agree that class actions may be certified in appropriate circumstances in cases arising from the alleged breach of form contracts, as determinations of liability in each case will present substantially similar issues.  *See, e.g., Kase v. Solomon Smith Barney, Inc.*, 218 F.R.D. 149, 155 (S.D. Tex. 2003); *Durrett v. John Deere Co.*, 150 F.R.D. 555, 558 (N.D. Tex. 1993).  Numerous courts outside the Circuit agree with this analysis.  *See, e.g., Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Sys.*, 601 F.3d 1159, 1171 (11th Cir. 2010); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003).  This result has also been reached in cases involving maritime contracts like those at issue here. *See, e.g., Dziennik v. Sealift,*

49

*Inc.*, No. 05-4659, 2007 WL 1580080, at *11 (E.D.N.Y. May 29, 2007).  Because the contracts at issue are functionally identical, BP's defenses to the VoO actions have presented a host of common issues.  *See generally* Rec. Doc. 4421.

*Second*, the VoO contract cases are related to other damages claims that initially formed the basis for the creation of MDL 2179.  As the JPML found when it transferred the VoO cases into this MDL proceeding, the VoO claims "involve common questions of fact with actions in this litigation previously centralized in the MDL," as the actions "arise from the explosion that destroyed the Deepwater Horizon offshore drilling rig, and the oil spill resulting therefrom."  Rec. Doc. 2041 at 1.  VoO participants were subject to the direction of the Federal On-Scene Coordinator who was controlling spill response efforts in part so as to minimize tort damages.  Moreover, several VoO participants claim that their work caused property damage to their boats—a type of tort claim that is at the heart of this Settlement.  It would create inefficiency and waste judicial resources not to adjudicate the intertwined VoO contract and tort cases in a coordinated fashion.

*Third*, like all class members, VoO plaintiffs have alleged claims against BP for fraudulent concealment.  *See* Rec. Doc. 6412 ¶ 259 ("From the outset, BP attempted to downplay and conceal the severity of the Oil Spill."); *id*. ¶ 409 (alleging that BP's fraud "induced Plaintiffs to act or to refrain from acting to protect their property, business, livelihoods, and income").  In other words, the VoO Plaintiffs allege that if they had been provided accurate information about the nature of the spill they may not have signed the VoO master vessel charter agreements.  Because the VoO Plaintiffs' fraudulent concealment claims depend upon the allegation that BP knowingly misled the public about the amount of oil flowing from the reservoir, the VoO plaintiffs' claims share several common issues of fact with the rest of the class.  These include, for instance, (i) how much oil

50

actually came out of the reservoir, and (ii) whether BP engaged in misleading conduct concerning the magnitude of the spill.  This Settlement would terminate those claims and provide compensation to VoO Plaintiffs for their contractual participation in the program and for any property damage to their boats.

*Fourth*, OPA includes a mitigation requirement.  *See* 33 C.F.R. § 136.235.  And the VoO Settlement Payment Offset and VoO Earned Income Offset was negotiated against the backdrop of that requirement.  Because the VoO Charter Payment is connected to the recovery of economic losses covered by OPA claims resolved in the Settlement, it is efficient to include the resolution of VoO claims in the Settlement as well.

*Finally*, many VoO plaintiffs will have other claims in the Settlement and, in fact, there are provisions in the Settlement Agreement to deal with that.  *See, e.g.*, Settlement Agreement ¶¶ 5.2.2, 5.3.2.1, 5.5.2.1.  Accordingly, there are good reasons to include the VoO claims in this Settlement.

> **b.    Class Treatment Is Superior To Other Methods Of Adjudicating The Controversy.**

As the Court preliminarily concluded on May 2, 2012, superiority is satisfied here.  *See* Rec. Doc. 6418 at 28-29.  The fact that there was an existing claims process is irrelevant to the question of whether a class action is superior to other methods of adjudication.  The Class Structure enables the claims process established by the Settlement to be administered under Court supervision, provides the due process protections of Rule 23 to the class member Claimants, and enables the Court to enforce the Settlement terms and administrative procedures for the benefit of class members, without necessitating new or individualized litigation.  The previous claims programs lacked these mechanisms and protections.

51

"Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied."  Coffee Decl. ¶ 62.I; Klonoff Decl. ¶ 59 ("[I]ndividual lawsuits are neither a feasible nor a sensible alternative to a class action in this case.").  For those reasons, there can be no serious doubt that a class action is a superior method of resolving this litigation.

### 1.    Rule 23(b)(3)(A):  Interest Of Class Members In Individual Control

This factor strongly weighs in favor of class certification.  Litigation of this type is extraordinarily complex and expensive, and the class action device was designed to allow individuals with comparatively modest claims to band together to bring such claims.  *See, e.g.*, Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2(a)(1), 119 Stat. 4 ("Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm.").  Many plaintiffs would be able to recover only relatively modest amounts of compensation, and as a result, they will have little interest in litigating outside of a class context, with the enormous expenses that such litigation would entail.  The class action device appropriately addresses the problem of these "negative value" claims and spares the court system from the burden of years of docket-clogging litigation.  *See* Coffee Decl. ¶ 57, 62.D; Klonoff Decl. ¶¶ 42, 61; Miller Supp. Decl. ¶ 10; *see also Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  The class action solves this problem . . . .") (quotation omitted).  Moreover, approximately 110,000 plaintiffs have filed short-form joinders to join the B1 bundle of litigation and more than 91,000

52

claimants have already filed in first few months of this Settlement. This further indicates that many class members do not have a strong interest in individually controlling their claims.

Finally, the Settlement preserved the Rule 23(b)(3) opt-out opportunity, and provided a generous opt-out period that the Court later extended to November 1, 2012. *See* Rec. Doc. 7176. Any plaintiff who does not wish to take part in the Settlement remained free to opt out of the settlement class and pursue his own action. *See* Klonoff Decl. ¶ 67.

### 2. Rule 23(b)(3)(B): Extent Of Any Litigation Already Begun

This litigation has seen several important motions resolved and different categories of claims dismissed. But the multi-phase Limitation and Liability Trial has not yet begun. There remains a significant amount of adjudication to be conducted. Class settlement averts that litigation for class members and thus is superior to expending the resources to engage in further complex and protracted proceedings. Additionally, given the centralization of virtually all *Deepwater Horizon*-related litigation in this District, the only litigation brought by members of the class that has made any meaningful progress is the litigation brought by the PSC on behalf of those who are now members of the Settlement Class. *Cf. In re Wal-Mart Wage & Hour Employment Practices Litig.*, No. 06-225, 2008 WL 3179315, at *20 (D. Nev. June 20, 2008) ("As to the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, these cases already have been consolidated in an MDL action."). There are no plaintiffs whose litigation efforts will be wasted by the Court's certification decision. *See* Klonoff Decl. ¶ 61.

### 3. Rule 23(b)(3)(C): Desirability Of Concentration In This Forum

Consistent with the orders of the Judicial Panel on Multidistrict Litigation, virtually all *Deepwater Horizon*-related litigation is already centralized in this District. Thus, much of the litigation will occur in this District regardless of how the Court resolves this class certification motion. *Cf. In re Wal-Mart Wage & Hour Employment Practices Litig.*, 2008 WL 3179315, at *20 ("The desirability of concentrating the litigation of the claims in this forum, at least for pre-trial purposes, already has been decided by the MDL panel."); *In re Online DVD Rental Antitrust Litig.*, No. 09-2029, 2010 WL 5396064, at *12 (N.D. Cal. Dec. 23, 2010) ("[T]he present action has already been consolidated for case management before this court as part of a multidistrict litigation proceeding . . . . Concentrating the litigation of all claims in the instant forum also further promotes manageability and efficiency."). Given the Court's familiarity with the myriad legal and factual issues at issue in this litigation, concentration is a desirable result for all parties. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-1486, 2006 WL 1530166, at *11 (N.D. Cal. June 05, 2006) ("Concentrating the litigation of all claims in the instant forum — which has already heard all pretrial proceedings thus far — would further promote manageability and efficiency."); *see also* Klonoff Decl. ¶ 61.

### 4. Rule 23(b)(3)(D): Likely Difficulties Of Managing A Class Action

The class settlement is far easier to manage than the thousands of individual actions could ever be. The Court "need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (citation omitted); Klonoff Decl. ¶ 13. The Court also may take notice of the fact that the Settlement

Agreement permits efficient and transparent payments to members of the putative class far sooner, and with more efficient and cost-effective utilization of judicial resources, than individual actions ever could.  *See* Klonoff Decl. ¶¶ 59.

   **B.   The Settlement Agreement Is Fair, Reasonable, And Adequate.**

   As described below, the Settlement Agreement is clearly fair, reasonable, and adequate to putative class members.

   **i.   The Settlement Agreement Is Entitled To A Presumption Of Fairness.**

   The public interest strongly favors the voluntary settlement of class actions.  *See* 4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.); *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *Smith v. Crystian,* 91 F. App'x 952, 955 (5th Cir. 2004) (per curiam); *Turner v. Murphy Oil USA*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *In re Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000); *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985). Because the public interest strongly favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable, and adequate.  *See Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008); *accord*, *e.g.*, *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998).  The preference for settlement over the expenditure of scarce judicial resources gains added force under the OPA statute, which is designed to catalyze settlements.  *See, e.g.*, 33 U.S.C. § 2713; Coffee Decl. ¶ 13 ("[T]his settlement represents exactly the type of outcome that OPA was intended to produce.").

ii.   The *Reed* Factors Weigh In Favor Of Final Approval.

a.   *Reed* Factor One: The Existence Or Lack Of Fraud Or Collusion Behind The Settlement

The uncontroverted evidence establishes that the Settlement was reached only after many months of hard-fought negotiations that were conducted simultaneously with adversarial trial preparations. *See* Klonoff Decl. ¶ 73; Miller Decl. ¶¶ 22-28. This Court allowed settlement discussions to take place, and supervised them as described above, but insisted that discovery and trial preparation continue apace, so that no time would be lost if settlement talks proved fruitless. This dual track enabled the parties to consider and negotiate a settlement fully informed by unfolding discovery and expert opinions, among other litigation events.

Magistrate Judge Shushan played an important supervisory role in mediating the Settlement. *See* Rec. Doc. 7480 at 7. Her efforts further weigh in favor of a finding that the Settlement was fairly negotiated. *See, e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995); *Collins*, 568 F. Supp. 2d at 725 (citing 4 NEWBERG ON CLASS ACTIONS § 11:51 (4th ed.)); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman,* 405 F. App'x 532 (2d Cir. 2010); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003), *aff'd sub nom. Smith v. Crystian*, 91 F. App'x 952 (5th Cir. 2004) (per curiam); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 497 (N.D. Miss. 1996); Coffee Decl. ¶ 33; Klonoff Decl. ¶ 74. In addition, the SCP was designed by a Court-appointed neutral, who received substantial input from affected parties and experts.

Plaintiffs were represented by a large number of experienced attorneys on the Court-appointed PSC, who came from diverse backgrounds and geographies and represented the various

types of class members, who were involved in either the negotiation or approval of this Settlement. *See* Coffee Supp. Decl. ¶¶ 19(b)(1), 27(a)-(b), 28-35; Klonoff Decl. ¶ 75.

There is no evidence whatsoever of any fraud or collusion in the negotiation of the Settlement.  Rather, in light of the considerations discussed above, any suggestion of fraud or collusion is baseless.

### b.   *Reed* Factor Two: The Complexity, Expense, And Likely Duration Of the Litigation

This litigation has been extraordinarily complex and expensive.  Absent settlement, the cases in MDL 2179 would continue to be complex and to impose significant expenses on all parties.  *See* Klonoff Decl. ¶¶ 80-81.  The Court takes judicial notice of the open and obvious fact that the *Exxon Valdez* and *Amoco Cadiz* oil spill litigations took at least 15 to 20 years to resolve.  The protracted *Exxon Valdez* litigation "produce[d] an independent secondary disaster" for the Alaska populace affected by the spill.  J. Steven Picou, *When the Solution Becomes the Problem*, 7 U. St. Thomas L.J. 68, 81 (2009).  This Settlement avoids such concerns.

As of April 18, 2012, the day that the parties filed their joint motion seeking preliminary approval of the Settlement Agreement, the docket reflected approximately 6,200 entries, of which approximately 1,200 were motions.[20]  This litigation has taxed the resources of both the parties and the Court.  In light of the complex issues of law, engineering, science, and operative fact presented by this litigation, simply completing trial could require several years.  It is possible to manage such litigation by breaking it down into separate phases, as the Court was prepared to do prior to the parties' reaching a settlement.  But there is no question that the issues to be tried are numerous and complex and would be time-consuming to resolve.  In light of the numerous complex and novel

---

[20] As of the date of this Order and Reasons, the docket for MDL 2179 exceeds 8,000 entries.

issues of law presented in this case, appeals could extend this litigation for a decade or more.  *See* Klonoff Decl. ¶ 82.

Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery.  Hence, this second *Reed* factor weighs strongly in favor of granting final approval to the Settlement Agreement.  *See In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *Billitteri*, 2011 WL 3586217, at *10; *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010); *Sullivan*, 667 F.3d at 320; *Collins*, 568 F. Supp. 2d at 726; *Faircloth v. Certified Fin. Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997); *Shell Oil*, 155 F.R.D. at 560; *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (per curiam); *Ayers*, 358 F.3d at 369; *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002); *Smith v. Ajax Magnethermic Corp.*, No. 02-0980, 2007 WL 3355080, at *6 (N.D. Ohio Nov. 7. 2007).

        **c.**      ***Reed* Factor Three: The Stage Of The Proceedings And The Amount Of Discovery Completed**

This *Reed* factor asks "whether the parties have obtained sufficient information to evaluate the merits of the competing positions."  *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620 (quotation omitted).  "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ."  *Id.* at 620-21.  The parties clearly had sufficient information to evaluate the merits of their competing positions.  "The settlement negotiations have been

58

informed by massive volumes of civil discovery . . . ."  Miller Decl. ¶ 26.  "Depositions were conducted on multiple tracks and on two Continents."  Rec. Doc. 6418 at 3.

In light of the voluminous discovery produced, this *Reed* factor weighs strongly in favor of granting final approval to the Settlement Agreement.  *See, e.g.*, *Turner*, 472 F. Supp. 2d at 847; *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997); Issacharoff Decl. ¶ 9; Klonoff Decl. ¶ 84.

The parties also negotiated with the benefit of investigations conducted by various components of the United States government.  Although conducted outside of this multidistrict litigation and perhaps not admissible in evidence, these investigations are relevant to whether the parties were sufficiently informed to reach a settlement.  *See DeHoyos*, 240 F.R.D. at 292; *Garza v. Sporting Goods Props., Inc.*, No. 93-108, 1996 WL 56247, at *13 (W.D. Tex. Feb. 6, 1996).

The parties had the benefit of specific data bearing on class members' damages, including statements made on short form joinders and information drawn from the record of payments by the GCCF.  *See* Miller Decl. ¶ 40.  Settlement negotiations took place for a period of time extended enough for the parties to assess developments with regard to Gulf Coast tourism, shoreline oiling, and seafood landings as reported in published government and industry data not only for pre-Spill and immediate 2010 post-Spill time periods, but also onward into 2012.  *See, e.g.*, Fishkind Decl. ¶¶ 70-74; Landry Decl. ¶¶ 11, 20, 40, 45-47; Richardson Decl. ¶¶ 39-44; Taylor ¶¶  6, 13-23; Balhoff Decl. at 3-4; Perry Decl. at 3-4; Rice Seafood Decl. ¶ 4; Tunnel Decl. ¶¶ 28-71.

The parties also negotiated in light of this Court's ruling on the motions to dismiss the Amended Master B1 Complaint, as well as dozens of other rulings on significant issues.  *See, e.g.*, Rec. Doc. 3830 (B1 Order); Rec. Doc. 3330 (B2 Order); Rec. Doc. 4159 (B3 Order); Rec. Doc. 2784

59

(D1 Order).  This case did not present an "immature tort" whose legal and factual dimensions and implications had not been fleshed out by judicial decision.  *See* Miller Decl. ¶ 39.

**d.    *Reed* Factors Four and Five: The Probability Of Plaintiffs' Success On the Merits And The Range Of Possible Recovery**

These two related *Reed* factors require the Court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case." *Reed*, 703 F.2d at 172.  Thus, "the court must compare the terms of the compromise with the likely rewards of litigation."  *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007) (quotation omitted).  The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (quotation and alteration omitted); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1065.  The court determines "whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors" not by attempting the impossible task of deciding whether the parties have "reached 'exactly the remedy they would have asked the Court to enter absent the settlement,'" but instead by "'whether the settlement's terms fall *within a reasonable range of recovery*, given the likelihood of plaintiffs' success on the merits.'"  *Id.* (citing *Maher v. Zapata Corp.*, 714 F.3d 436, 460 (5th Cir. 1983)).

As discussed above, the Settlement Agreement provides compensation to class members that appears sufficient to make each and every class member whole for his, her, or its compensatory losses.   In addition to this direct compensation to individual class members, the Settlement Agreement provides other significant benefits, including paying for a promotional fund, and paying for all costs of settlement administration.  BP has also agreed not to oppose a significant award of

60

common benefit attorneys' fees and costs, effectively sparing the class from having to pay for common-benefit fees and expenses.

The Court is satisfied that the probability of plaintiffs' success on the merits and the range of possible recovery weigh strongly in favor of approving the Settlement Agreement.

This Settlement meets or exceeds the fourth and fifth *Reed* factors. The Settlement's benefits are available now (indeed, thousands of claims have already been paid) and there are numerous types of risks that individual plaintiffs would face in litigation. And, the immediate settlement payouts provide benefits and accompanying features that may not be obtained in litigation, and which BP contends it had no legal obligation to pay or provide, including (i) paying any share of damages caused by other defendants; (ii) paying RTPs; (iii) assigning additional causes of action to the Class; and (iv) setting up a $57 million Promotional Fund.

### e. *Reed* Factor Six: The Opinions Of Class Counsel, Class Representatives, And Absent Class Members.

Class Counsel, class representatives, and the vast majority of absent class members all agree that the Settlement Agreement is a fair, reasonable, and adequate resolution of this litigation. This is perhaps best illustrated by the extraordinary number of putative objectors (non-class members) who wish to be included within the Settlement (discussed below). "What the objections do illustrate—in vivid form—is the fact that this settlement is viewed as so desirable that people are clamoring to get in." Miller Decl. ¶ 44.

### 1. Class Counsel

Class Counsel have significant experience in litigating and negotiating the settlement of complex litigation such as the instant dispute. Indeed, Class Counsel "regularly engage in complex litigation similar to the present case and have demonstrated their dedication by devoting substantial

effort, energy, and resources to the prosecution of this action." Rec. Doc. 6418 at 27-28. Class Counsel have repeatedly stated that the Settlement Agreement is a fair, reasonable, and adequate resolution of this litigation. *See* Joint Preliminary Approval Brief (Rec. Doc. 6266-1) at 7 (advising the Court that the Settlement Agreement "stands on its own as a comprehensive, fair, and reasonable" settlement that "makes whole the myriad of plaintiffs asserting that they have suffered economic loss or property damage as a result of the Deepwater Horizon incident."); Class Counsel Final Approval Brief (Rec. Doc. 7101-2); Class Counsel Final Approval Reply Brief (Rec. Doc. 7727); Apr. 25, 2012 Preliminary Approval Hr'g Tr.; Nov. 8, 2012 Fairness Hr'g Tr.; Plaintiffs' Steering Committee, Summary of Agreement-in-Principle Between Plaintiffs and BP, at 1 (Mar. 9, 2012), *available at* http://www.lundylawllp.com/Resources/PSC-Summary-3-9-2012.pdf ("This Settlement is an enormous victory for Gulf Coast workers, businesses and families. . . . Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole as a result of this settlement — regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF."); Press Release, Motley Rice, BP SETTLEMENT FINALIZED: Details of Agreement Submitted to the Court for Approval (Apr. 18, 2012), *available at* http://www.motleyrice.com/news/view/bp-settles; Herman Decl. ¶ 13 ("[T]he proposed Settlement Agreements represent the most favorable resolution available to the economic and medical classes."). Class Counsel's judgment that the Settlement is fair, reasonable, and adequate speaks strongly in favor of granting final approval. *See DeHoyos*, 240 F.R.D. at 287; *Cotton*, 559 F.2d at 1330; *Turner*, 472 F. Supp. 2d at 852.

## 2.    Class Representatives

The class representatives personally have claims falling within each of the claims frameworks created by Section 5 of the Settlement Agreement.  The fifteen class representatives uniformly believe that the Settlement Agreement is a fair, reasonable, and adequate resolution of this litigation. *See* Bon Secour Fisheries, Inc. Decl. ¶ 9; Friloux Decl. ¶ 9; Gallo Decl. ¶ 8; Fort Morgan Realty, Inc. Decl. ¶ 9; GW Fins Decl. ¶ 9; Hutto Decl. ¶ 8; Irwin Decl. ¶ 8; Kee Decl. ¶ 8; Tesvich Decl. ¶ 8; Lake Eugenie Land and Development, Inc. Decl. ¶ 10; Lundy Decl. ¶ 8; Guidry Decl. ¶ 9; Panama City Beach Dolphin Tours & More LLC Decl. ¶ 9; Sellers Decl. ¶ 8; Zeke's Charter Fleet, LLC Decl. ¶ 9.  The universal agreement of the class representatives that the Settlement is fair, reasonable, and adequate further weighs in favor of granting final approval to the Settlement Agreement.

## 3.    Absent Class Members[21]

As detailed below, the reaction of the absent class members to the Settlement Agreement has been overwhelmingly positive.

### (A)    The Number Of Objections Is Low.

Under the Preliminary Approval Order, Class Members who wished to object to the Settlement Agreement were required to submit a written statement of the objection(s) and to include in this statement "written proof that the individual or entity is in fact an Economic Loss and Property Damage Class Member, such as proof of residency, ownership of property and the location thereof, and/or business operation and the location thereof" by August 31, 2012.  Rec. Doc. 6418 ¶ 38.  Under the Preliminary Approval Order, failure to comply with its objection provisions waived and forfeited

---

[21]  Pursuant to this Court's Order of November 9, 2012, *see* Rec. Doc. 7878, the parties have made a joint filing, Rec. Doc. 8001, containing a breakdown of the final objection and opt-out numbers.

any and all of a putative objector's rights to object to the Proposed Settlement, forever foreclosing the objector from making any objection to the Proposed Settlement, and binding the objector by all the terms of the Proposed Settlement and by all proceedings, orders and judgments in this matter. *Id.*[22]  On August 31, 2012, the Court issued an Order extending the deadline for submitting written objections to the Proposed Settlement to September 7, 2012, due to the unforeseen circumstance of Hurricane Isaac. *See* Rec. Doc. 7225.

As of November 15, 2012, the total number of purported objections filed was 223 (not counting duplicate or supplemental filings by the same objectors).  These objections were ostensibly filed on behalf of an alleged 13,786 objectors. *See* Rec. Doc. 8001.  The vast majority of the purported objectors—13,382 or 97% of the purported objectors—were included in "mass" objections filed by four sets of attorneys.  Specifically, Brent Coon & Associates claimed to assert objections on behalf of 11,245 purported objectors. *See* Obj. Doc. 122.  Farrell & Patel claimed to propound objections on behalf of 949 purported objectors. *See* Obj. Doc. 198; Rec. Doc. 7217.  Smith Stagg LLC and its co-counsel claimed to assert objections on behalf of 644 purported objectors. *See* Obj. Doc. 167; Obj. Doc. 189.  Arnold & Itkin claimed to propound objections on behalf of 544 purported objectors. *See* Obj. Doc. 209.

These same law firms also represent clients who have made claims under the Settlement Program.  Indeed, some of their "objecting" clients have not only made claims, but received payments and signed releases of their claims against BP from either the Settlement Program or the GCCF.  As of November 15, 2102:  Brent Coon & Associates appears to represent 5,534 objectors

---

[22] The following objections were filed out of time.  Obj. Doc. 239; Obj. Doc. 240; Obj. Doc. 241; Obj. Doc. 242; Obj. Doc. 247; Obj. Doc. 250; Obj. Doc. 252; Obj. Doc. 253; Obj. Doc. 254; Obj. Doc. 255; Obj. Doc. 257; Obj. Doc. 258; Obj. Doc. 259; Obj. Doc. 261 (supplement to Obj. Doc. 117); Obj. Doc. 262; Obj. Doc. 264 (denied by Rec. Doc. 7897); Obj. Doc. 265 (supplement to Obj. Doc. 145).  The Court addresses these objections elsewhere only in the interest of completeness.

who are also Settlement Program registrants, 56 of whom have signed releases and been paid a total of $9,095,810 by the Settlement Program, and 875 GCCF claimants who have signed releases and been paid of total of $18,941,463 by the GCCF.  Farrell & Patel represents 481 Settlement Program registrants and 22 GCCF claimants who received $455,523 and signed releases of their claims against BP.  Smith Stagg LLC and its co-counsel represent 281 objectors who are also Settlement Program registrants, 8 of whom have signed releases and been paid a total of  $551,306 by the Settlement Program, and 51 GCCF claimants who have signed releases and been paid a total of $2,078,695 by the GCCF.  Arnold & Itkin represents 104 settlement registrants and 85 GCCF claimants who have signed releases and been paid a total of $1,687,861 by the GCCF.  *See* Rec. Doc. 8001.  The simultaneous representation of objectors and claimants in the Settlement Program is not limited to the firms that filed "mass" objections.  As of November 15, 2012, law firms that have filed objections represent some 6,458 registrants in the Settlement Program.  *See* Rec. Doc. 8001.

Of the 13,786 purported objectors, 2,016 clearly lack standing to object, either because their submissions demonstrated they are not members of the class (77 purported objectors); because of their status as a non-settling defendant, governmental entity, or association (17 purported objectors); or, because they have opted-out of the Settlement (1,928 purported objectors).  *See* Rec. Doc. 8001. Additionally, 12,970—over 94% — of the total number of purported objectors failed to comply with the requirements of the Preliminary Approval Order in that they failed to provide written proof of class membership and, therefore, forfeited and waived their objections.  *See* Rec. Doc. 8001.

Of the total number of purported objectors, only 599 objectors made objections that were timely, were not made on behalf of persons or entities without standing to object, were not mooted

65

by an opt-out, and provided some evidence of membership in the Settlement Class, and had not previously signed releases in favor of BP.  *See* Rec. Doc. 8001.

Thus, the total number of valid objectors is 599.  That number is:  (i) no more than  0.55% of the total number of Short Form Joinders; (ii) just 0.1% of the number of persons who filed claims with the GCCF, which covered fewer claims and claimants; (iii) just 0.05% of the 1.1 million potential class members who received direct mail notice of the Settlement; and (iv) a small a fraction of the class size, which includes the Gulf Coast businesses and residents specified in the Class Definition.

### (B)      The Number Of Opt-Outs Is Low.

Under the Preliminary Approval Order, Class Members who wished to opt out of the Settlement Class were required to send a written exclusion request as specified in the Class Notice to the Settlement Program Exclusions Department by October 1, 2012.  *See* Rec. Doc. 6418 at 40. On August 27, 2012, the Court issued an Order extending the deadline for submitting written exclusion requests to November 1, 2012.  *See* Rec. Doc. 7176.  On November 21, 2012, in accordance with Paragraph 41 of the Preliminary Approval Order, *see* Rec. Doc. 6418 at 40, and the Court's Order of November 9, 2012, Rec. Doc. 7878, the parties submitted a list of all timely and valid requests for exclusion from the Settlement Class.  *See* Rec. Doc. 8001. The Preliminary Approval Order also provided that Class Members could revoke their decision to opt out of the Settlement Class by November 5, 2012.  On November 16, 2012, the Court issued an Order extending the deadline for revocations to December 15, 2012, provided that any Class Member submitting an opt-out revocation after November 5, 2012 withdraws any pending objection, and waives any and all current or future objections, to approval of the Settlement.  *See* Rec. Doc. 7928.

As of November 15, 2012, a total of 13,123 timely and procedurally valid opt-out requests have been submitted by potential Class Members.  *See* Rec. Doc. 8001.  The Exclusions Department of the Settlement Program has received a total of 25,866 purported opt-out submissions.  *See* Rec. Doc. 8001.  Of this total, 2,117 were from individuals or entities who had already submitted correspondence to the Exclusions Department.  These duplicative submissions were either repetitive or intended to clarify intent or correct deficiencies in an original request.  Accounting for duplicate submissions, the Exclusions Department received correspondence from a total of 23,749 unique individuals and/or entities.

Nearly half of the purported opt-out submissions received failed to comply with the requirements of the Preliminary Approval Order and the Class Notice, and thus are not valid opt-out requests.  Of the total 23,749 individuals and entities who submitted correspondence, 126 sent submissions that did not contain a request to be excluded from the Settlement Class, and thus their submissions are not valid opt-out requests.  *See* Rec. Doc. 8001.

In order to help ensure that Class Members would not be excluded from the Settlement Class without their express, written consent, the Court required opt-out requests to be signed by the Class Member wishing to be excluded from the Settlement Class.  Opt out requests signed by an attorney are not valid.  These requirements are common and routinely enforced.  A substantial number of the opt out requests, 9,460, are invalid because they were not signed by the individual or entity purportedly wishing to be excluded from the Settlement Class.  The vast majority of these invalid opt out requests, 9,296, were signed by counsel purporting to act on behalf of the purported Class Members.  *See* Rec. Doc. 8001.

In particular, Brent Coon & Associates submitted 7,925 requests containing the computer-generated signature of Brent Coon without any signature of the person or entity Mr. Coon sought to exclude from the Settlement Class. In total, some four law firms submitted 9,179 invalid requests containing only an attorney signature

In addition, of the total number of purported opt-out requests received, 83 were submitted after the November 1, 2012 deadline, and are thus invalid. *See* Rec. Doc. 8001.

At least 1,552 of the purported opt-out requests were made by individuals or entities that are not members of the Settlement Class because they had previously released their claims against BP. *See* Rec. Doc. 8001. In many cases, based on the information submitted by potential Class Members in connection with their opt-out requests, it is not possible to determine whether the individual or entity is, in fact, a member of the Settlement Class, either because of a prior release or for some other reason. Thus an unknown portion of the total number of timely and valid requests to opt out of the Settlement Class were likely submitted by individual or entities that are not members of the Settlement Class and such requests are thus of no practical or legal effect. There are also indications that a significant percentage of the remaining purported opt-out requests that comply with the procedural requirements in the Preliminary Approval Order and Class Notice were from individuals or entities that provided an address that is not within any of the class zones, thus raising the question of whether they are from class members. *See* Rec. Doc. 8001.

Many of those who opted out have decided to re-enter the class, in order to receive the benefits of the Settlement. In response to the wishes of those desiring to revoke their opt-outs, the Court has extended the deadline for revocations to December 15, 2012. *See* Rec. Doc. 7928. The Settlement Program reports that it has received 1,805 opt-out revocation submissions for 1,759

distinct individuals and entities.  Some of these revocations were directed at revoking opt-out requests that were not valid.

> ### (C)   The Low Numbers Of Objections And Opt-Outs Are Evidence Of The Settlement's Fairness.

The low objections and opt-out rates are evidence of the Settlement's fairness.  Courts, including the Fifth Circuit, have approved settlements with far higher objection rates.  *See, e.g.*, *Reed*, 703 F.2d at 174-75 (objections by 30% of class); *see also Huguley v. Gen. Motors Corp.*, 925 F.2d 1464, at *3 (6th Cir. 1991) (table) (per curiam) (15% of the class); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987) (36% of the class); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985) (15% of the class); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974) (20% of the class); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 661 (N.D. Tex. 2010) ("significant portion of the class"); *see also* Klonoff Supp. Decl. ¶ 7.  "While the fact that a relatively small percentage of the Class Members objects to a proposed settlement is not dispositive, '[c]ourts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'"  *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990) (alteration in original) (quoting 2 H. NEWBERG, NEWBERG ON CLASS ACTIONS § 11.47, at 463 (2d ed.)); *Cotton*, 559 F.2d at 1331 ("In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered . . . ."); *In re OCA, Inc. Sec. & Deriv. Litig.*, 2009 WL 512081, at *15 (same principle); *Quintanilla v. A & R Demolition Inc.*, No. 04-1965, 2007 WL 5166849, *5 (S.D. Tex. May 7, 2007) (same principle); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (same principle); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("That the overwhelming majority of class members

have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'").

For those few objectors unhappy with the Settlement, their remedy was simple: opt out.  The "court will not dismantle this settlement for the sake of one class member's unique demands, particularly when the class member . . . had the right (and the means) to opt out and pursue its individual claims without disturbing the settlement for the rest of the class." *AIG, Inc. v. ACE INA Holdings, Inc.*, Nos. 07-2898, 09-2026, 2012 WL 651727, at *11-12 (N.D. Ill. Feb. 28, 2012); *Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012) ("Indeed, the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair."); *cf. Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) ("[T]he named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands.").  The Court's assessment of the significance of the relatively low number of opt-outs is also supported by the fact that most of the opt outs occurred on a mass basis, meaning that they were not prepared in accord with this Court's Preliminary Approval Order, ¶ 38, because they were not individually signed. Additionally, counsel for such mass opt-outs may have breached their fiduciary and ethical duties to their clients; at the very least, the mass unsigned opt outs are highly indicative of a conclusion that such counsel did not spend very much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them.  *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 353 (6th Cir. 2009) ("[Attorney] Hadden says that was not enough—that he should have been permitted to represent class members and opted-out individuals

70

simultaneously.  Yet he fails to come to grips with the reality that this kind of dual representation likely would have run up against Michigan's ethics laws.").

     **C.**     **The Notice Program Surpassed The Requirements Of Due Process, Rule 23, And CAFA.**

Based on the factual elements of the Notice Program as detailed below, the Notice Program surpassed all of the requirements of Due Process, Rule 23, and CAFA.

The Notice Program, as duly implemented, surpasses other notice programs that Hilsoft Notifications has designed and executed with court approval.  The Notice Program included notification to known or potential Class Members via postal mail and e-mail; an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, and Sunday local newspapers.  Notice placements also appeared in non-measured trade, business, and specialty publications, African-American, Vietnamese, and Spanish language publications, and Cajun radio programming.  The Notice Program met the objective of reaching the greatest possible number of class members and providing them with every reasonable opportunity to understand their legal rights.  *See* Azari Decl. ¶¶ 8, 15, 68; Kinsella Decl. ¶ 8.  The Notice Program was substantially completed on July 15, 2012, allowing class members adequate time to make decisions before the opt-out and objections deadlines.  *See* Azari Decl. ¶¶ 14, 71.

The media notice effort alone reached an estimated 95% of adults in the Gulf region an average of 10.3 times each, and an estimated 83% of all adults in the United States an average of 4 times each. These figures do not include notice efforts that cannot be measured, such as advertisements in trade publications and sponsored search engine listings.  The Notice Program fairly and adequately covered and notified the class without excluding any demographic group or

71

geographic area, and it exceeded the reach percentage achieved in most other court-approved notice programs.  *See* Azari Decl. ¶¶ 10-11, 13, 69-70, 77; Azari Supp. Decl. ¶ 6; *see also* Kinsella Decl. ¶ 8.

A neutral, informational notice web site was created to serve as the notice page for the Settlement Agreement, and its web address was prominently displayed in all notice documents.  *See* Deepwater Horizon Court-Supervised Settlement Program, http://www.deepwaterhorizonsettlements.com.  On the site, Class Members can (and did) obtain additional documents and information about the Settlement Agreement.  The site is available in English, Spanish, and Vietnamese.  Sponsored search listings were acquired on Google, Yahoo!, and Bing for common searches relating to the spill.  As of October 21, 2012, over 267,198 unique visitors had accessed the web site.  *See* Azari Decl. ¶¶ 60-65; Monger Supp. Decl. ¶ 22.  The web site was appropriately updated following the Court's preliminary approval of the Settlement Agreement.  *See* Azari Supp. Decl. ¶¶ 13-14.

Additionally, this Court maintains its own web site to provide notices and information on MDL 2179 and the Settlement to the public.  Current developments are listed prominently at the top of this web page.  *See* http://www.laed.uscourts.gov/OilSpill/OilSpill.htm.  This web site also provides a link to the informational notice web site run by the Claims Administrator.

By May 7, 2012, a toll-free number was operational.  Class members could (and did) use this number to speak to a live operator and request that a copy of the Detailed Notice be mailed to them.  As of October 21, 2012, 181,242 calls had been fielded in the call center.  *See* Azari Decl. ¶¶ 66-67; Monger Supp. Decl. ¶ 22.

The Class Notice was written in "plain language" and "contained substantial, albeit easy-to-read, summaries of all of the key information about Class Members' rights and options." Azari Decl. ¶ 72; *see also* Wheatman Decl. ¶¶ 9, 10. They were noticeable, clear, simple, substantive, and informative; no required information was missing. They were also designed to be noticed, following principles embodied in the Federal Judicial Center's illustrative model notices. *See* Azari Decl. ¶¶ 12, 72-76, 78; Wheatman Decl. ¶¶ 8-13. The Eastern District of Louisiana's MDL No. 2179 web site and the official Settlement web site have been regularly updated to reflect ongoing proceedings and orders, including, most recently, the extension of the deadline for revocation of opt-outs to December 15, 2012. *See* Rec. Doc. 7928.

The notice distribution method satisfied Rule 23(c)(2), as it was the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2); *see* Azari Decl. ¶¶ 16, 79; Azari Supp. Decl. ¶ 26; Kinsella Decl. ¶¶ 7, 12. The notice contents satisfied Rule 23(c)(2)(B)(i)-(vii), as it properly stated (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance though an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment under Rule 23(c)(3). *See* Azari Decl. ¶¶ 12, 72-76, 78; Wheatman Decl. ¶ 13. The notice complied with Rule 23(e), as it was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord, e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007).

73

The parties fully satisfied all of their obligations under the Class Action Fairness Act, 28 U.S.C. § 1715.  The parties sent CAFA notice packets that included all the materials required by 28 U.S.C. § 1715 to 57 state and federal officials, including the attorneys general of the United States, each of the 50 states, the District of Columbia, and U.S. territories.  *See* Azari Decl. ¶¶ 17-18. Although not required, the parties sent a supplemental CAFA notice to these same officials as a courtesy on August 27, 2012, including updated information.  *See* Azari Supp. Decl. ¶¶ 7-8, att. 2. CAFA provides that an "order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice."  28 U.S.C. § 1715(d).  Ninety days after August 27, 2012, was November 26, 2012.

### D.    None Of The Objections Warrant Denial Of Final Approval.

None of the objections that have been filed prevent final approval.  *See* Balhoff Supp. Decl. ¶ 1; Fishkind Supp. Decl. ¶¶ 2-5; Henley Supp. Decl. ¶ 2; Jeffrey Supp. Decl. ¶¶ 4-7; Landry Supp. Decl. ¶¶ 6, 10-11; Miller Decl. ¶ 43; Miller Supp. Decl. ¶¶ 3, 13, 24; Pearson Decl. ¶¶ 3-4, 10; Perry Supp. Decl. ¶ 1; Richardson Supp. Decl. ¶¶ 3, 4-10; Sharp Supp. Decl. ¶¶ 4-5; Smith Supp. Decl. ¶¶ 2, 4-8, 53; Taylor Supp. Decl. ¶¶ 3-4, 7; Tunnell Supp. Decl. ¶¶ 3, 19; Wharton Supp. Decl. ¶ 2; Klonoff Supp. Decl. ¶ 2.  Settlements are compromises, and the fact that some class members wish BP had paid more compensation is no reason to reject the Settlement.  *See* Miller Supp. Decl. ¶ 23; Klonoff Supp. Decl. ¶¶ 5, 12.  Nevertheless, that so many purported objectors who are not in the settlement class wish the class were expanded to include them is further evidence of the fairness, reasonableness, and adequacy of the Settlement Agreement, and a rare phenomenon all of the legal scholars remarked upon.  *See* Klonoff Decl. ¶ 66; Miller Decl. ¶ 44; Klonoff Supp. Decl. ¶ 8.

### i.      Standing Is Required To Present A Valid Objection.

In the context of class settlements, non-settling parties generally have no standing to challenge the proposed settlement. *See Transamerican Refining Corp. v. Dravo Corp.*, 952 F.2d 898, 900 (5th Cir. 1992); *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992); *In re Vioxx Prods. Liab. Litig.*, 388 F. App'x 391, 395 (5th Cir. 2010) (per curiam). The Court has made this point abundantly clear. *See, e.g.*, Nov. 8 Fairness Hr'g Tr. at 15:1-4 (The Court: "If you opt out or if you are excluded, you legally have no standing to object to the settlements because . . . the settlements do not affect your rights in any way, one way or the other.").

### a.      Plaintiffs Falling Outside The Settlement Class Lack Standing.

Plaintiffs falling outside the settlement class are entirely unaffected by the Settlement, and thus lack standing to challenge it. *See* Rec. Doc. 6418 at 16-17; Apr. 25 Preliminary Approval Hr'g Tr. at 48:20-49:1; Rec. Doc. 7038 at 1; *Feder*, 248 F. App'x. at 580; *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989); 4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.). That doctrine stems from the fundamental purpose of fairness review under Rule 23(e)—to ensure that absent class members are not bound by an unfair settlement. *Piambino v. Bailey*, 610 F.2d 1306, 1327 (5th Cir. 1980); *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176-77 (5th Cir. 1975); Klonoff Decl. ¶ 63.

The Court has received numerous objections from persons falling outside the Settlement Class—persons asserting claims that the parties have not agreed to settle,[23] persons falling outside

---

[23] *See, e.g.*, Obj. Doc. 34 (unrealized reduction in property value); Obj. Doc. 36 (similar); Obj. Doc. 43 (similar); Obj. Doc. 201 at 4-5 (similar); Obj. Doc. 35 (real estate sale after December 31, 2010); Obj. Doc. 46 (same); Obj. Doc. 49 (same); Obj. Doc. 67 at 1-2 (same); Obj. Doc. 90 at 13-14 (same); Obj. Doc. 152 at 2 (same); Obj. Doc. 191 (same); Obj. Doc. 253 (same); Obj. Doc. 37 (mortgage brokers); Obj. Doc. 66 (employment in oil and gas industry); Obj. Doc. 95 at 5 (oil companies and banks); Obj. Doc. 210 (adopting this objection); Obj. Doc. 131 (moratorium claims); Obj. Doc. 201 at 2-3 (moratorium claims); Obj. Doc. 161 at 1-2 (day trading losses allegedly related to the spill); Obj. Doc. 252 (loss of earnest money following decision not to close on house); Obj. Doc. 265 (supplement to Obj. Doc. 145) at 4 (gaming industry, financial institutions, etc.); Rec. Doc. 6345 (BP dealer claims); Rec. Doc. 6382 (same).

the Settlement's geographic boundaries,[24] etc.  Because the Settlement Agreement does not affect these persons' legal rights, their claims remain viable and they may continue to litigate their cases, but lack standing to object.

For the same reason, objectors who settled their claims with the GCCF lack standing.[25]  By the express terms of the Settlement Agreement, such persons are excluded from the Settlement Class, which means that the Settlement Agreement has no effect upon their legal rights.  Moreover, the Court has denied a motion to globally nullify the GCCF releases.  *See* Rec. Doc. 7615 (denying Rec. Doc. 6831; Rec. Doc. 6902; Rec. Doc. 7473 (initially filed as Rec. Doc. 7461)).

The GCCF-releases exclusion from the class is easily administered.  All that the Settlement Program needs to do is determine whether a claimant has signed a GCCF release.  Anyone who has done so is simply not a class member.  The Settlement Program does not need to, and indeed is not empowered to, question or adjudicate the validity of a particular GCCF release as a factual matter.  That is an issue that can be pursued only by means of cases brought for resolution to this Court or to another appropriate court with venue and jurisdiction, at which point it would be for BP to decide

---

[24] *See, e.g.*, Obj. Doc. 33 (exclusion from economic loss frameworks); Obj. Doc. 42 (exclusion from Coastal Real Property Zone); Obj. Doc. 49 (real estate sale after December 31, 2010); Obj. Doc. 87 at 2-3 (exclusion from Coastal Real Property zone); Obj. Doc. 121 (exclusion from SCP); Obj. Doc. 134 at 1 (exclusion from Real Property Sales Compensation zone); Obj. Doc. 148 at 2 (exclusion from Coastal Real Property zone); Obj. Doc. 152 at 1-2 (exclusion from Real Property Sales Compensation zone); Obj. Doc. 167 at 6 (exclusion from unspecified frameworks); Obj. Doc. 189 at 6 (same); Obj. Doc. 201 at 4-7 (exclusion from Coastal Real Property zone); Obj. Doc. 225 at 3-8 (same); Obj. Doc. 237 (exclusion from economic loss frameworks); Obj. Doc. 259 (exclusion from Coastal Real Property zone); Rec. Doc. 6317 (exclusion from entire Settlement); Rec. Doc. 6383 (exclusion from SCP); Rec. Doc. 6404 (exclusion from economic loss frameworks); *see also* Letter From Pam Bondi, Fla. Att'y Gen., to John E. (Jack) Lynch, Jr. (July 31, 2012), *available at* http://myfloridalegal.com/webfiles.nsf/WF/MMFD-8WRSHG/$file/8.1.12BPMEMO.pdf (complaining that certain Floridians are excluded from the class).  Additionally, a series of form objectors, recognizing that their properties fall outside both the Coastal Real Property zone and the Wetlands Real Property zone, describe themselves as "potential" members of the class.  *See, e.g.*, Obj. Doc. 88 at 1; Obj. Doc. 97 at 1; Obj. Doc. 98 at 1; Obj. Doc. 99 at 1; Obj. Doc. 100 at 1; Obj. Doc. 146 at 1; Obj. Doc. 157 at 1; Obj. Doc. 159 at 1; Obj. Doc. 177 at 1; Obj. Doc. 181 at 1.  These objectors also lack standing.

[25] *See, e.g.*, Obj. Doc. 70; Obj. Doc. 71; Obj. Doc. 125; Obj. Doc. 127; Obj. Doc. 154 at 2; Obj. Doc. 230 at 39-43; Obj. Doc. 234 at 34-36; Obj. Doc. 242; Obj. Doc. 244; Obj. Doc. 250; Obj. Doc. 262.

whether to assert such a GCCF release as an affirmative defense and then for such a plaintiff to attempt to establish that such a release is invalid so as to overcome the defense.  *See* Rec. Docs. 7643 and 7469 (*Knotty Girl* Order and underlying opposition brief).

### b.    Non-Settling Defendants Lack Standing.

Non-settling defendants who will suffer "plain legal prejudice" as a result of a settlement have sometimes been held to have standing to challenge the settlement. *Agretti*, 982 F.2d at 246-47. In this case, non-settling defendants such as Halliburton lack standing because the Settlement Agreement does not cause them plain legal prejudice.  *See* Rec. Doc. 6418 at 17 n.18; Rec. Doc. 7038 at 2.

### c.    GO FISH Lacks Standing.

Although GO FISH has submitted an objection, *see* Obj. Doc. 226, it lacks standing; no organization may represent its members where the underlying form of relief at issue is money damages.  *See* Rec. Doc. 7747, *aff'g* Rec. Doc. 7480.

### d.    The Gulf States Lack Standing

The Gulf States, which are obviously not members of the settlement class, lack standing to submit objections.[26]  *See* Rec. Doc. 7038.

### 1.    No CAFA Standing

The Gulf States do not acquire standing under CAFA's notification provision, 28 U.S.C. § 1715. This statute simply requires notification; it does not create standing that a state official otherwise lacks.  *See* 28 U.S.C. § 1715(f) ("Nothing in this section shall be construed to expand the authority of . . . State officials."); *In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 09-2107, 2012

---

[26] *See, e.g.*, Rec. Doc. 6356 (Mississippi); Rec. Doc. 6370 (Mississippi); Rec. Doc. 6239 (Florida); Obj. Doc. 224 (Mississippi); Obj. Doc. 227 (Louisiana).

WL 4322012, at *4 (E.D. Pa. Sept. 21, 2012) ("The statute says nothing . . . of granting states a right

to be heard on, or formally appeal, every class action settlement simply because residents of that

state are class members.").   Nevertheless, the Court has given the States' comments due

consideration, as addressed more fully herein.

## 2.      No *Parens Patriae* Standing

The Gulf States may not invoke the *parens patriae* doctrine, as any challenge to the

Settlement Agreement simply represents an effort to advance the particular financial interests of a

subset of these states' citizens.   But while "a State may, for a variety of reasons, attempt to pursue

the interests of a private party, and pursue those interests only for the sake of the real party in

interest . . . Interests of private parties are obviously not in themselves sovereign interests, and they

do not become such simply by virtue of the State's aiding in their achievement.   In such situations,

the State is no more than a nominal party."   *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel.*

*Barez*, 458 U.S. 592, 602 (1982).   At bottom, "the State must articulate an interest apart from the

interests of particular private parties." *Id.* at 607; *see also Paterson v. Texas*, 308 F.3d 448, 451 (5th

Cir. 2002) (overruling Texas' Attorney General's objections to a class action settlement for lack of

standing).

## 3.      No Injury To The States

Louisiana and Mississippi have contended that they have standing because the Settlement

inadequately compensates their citizens and requires those states to pay more in unemployment

insurance and other benefits.   *See* Rec. Doc. 7035 at 5 (Louisiana); Obj. Doc. 224 at 13

(Mississippi).  This argument would logically give standing to any state to challenge ***any*** settlement

of a private dispute; thus, similar arguments have been repeatedly rejected by federal courts.   *See*

*Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985); *People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 225 (C.D. Ill. 1989).

### 4. The Gulf States Doubly Lack Standing Where They Seek To Assert The Rights Of Citizens Who Also Lack Standing.

Florida has argued that some of its citizens who are geographically excluded from the Settlement Class should be included. *See* Rec. Doc. 6239. Similarly, Mississippi has argued that certain of its citizens who are excluded from the Settlement Class because they signed GCCF releases should be included. *See* Obj. Doc. 224 at 2; Rec. Doc. 6370; *see also* Obj. Doc. 239 (adopting the arguments made by Mississippi). These objections are inappropriate not only because the States lack standing, but because they seek to assert objections on behalf of others who themselves *also* lack standing.

### ii. The Court Has No Authority To Modify A Settlement Agreement That Is Fair, Reasonable, And Adequate.

Certain objectors have suggested that the Court should "provisionally approve" the Settlement Agreement, contingent upon the parties' agreeing to certain modifications. *See, e.g.* Nov. 8 Fairness Hr'g Tr. 232:7-10. Because the Settlement is fair, reasonable, and adequate, however, the Court is not authorized to insist upon changes that, in its judgment, might lead to a superior settlement. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness. Neither the district court nor this court have the ability to delete, modify, or substitute certain provisions.") (citations and quotations omitted); *Dandridge v. Jefferson Parish Sch. Bd.*, No. 64-14801, 2009 WL 24461, at *3 (E.D. La. Jan. 5, 2009) ("It is also important to note that, although the Court has the power to approve or reject a settlement negotiated by the parties, the Court may

79

not require the parties to accept a settlement or a consent order to which they have not agreed."). Rather, the imposition of conditions upon a grant of final approval is **only** appropriate where, absent modifications, the settlement would fail to satisfy the Rule 23(e) analysis.

### iii.   Procedural Objections To The Settlement Agreement Lack Merit.

#### a.   The Court Supervised Settlement Program Is Processing Claims Expeditiously.

Certain objectors claim that the Settlement Program is not processing claims quickly enough. *See, e.g.*, Obj. Doc. 58 at 1; Obj. Doc. 122 at 9; Obj. Doc. 167 at 11; Obj. Doc. 189 at 11; Obj. Doc. 207 at 5.  This objection is meritless for two reasons.

*First*, as a matter of general class action settlement law, there is no requirement that the Settlement Program pay **any** claims at this stage of the litigation.  In a typical class settlement, claims are not processed and there are no settlement payments at all until after final approval by the district court, and many class settlements also withhold payments until all appeals have run.  *See* Rec. Doc. 6418 at 31-32; Coffee Decl. ¶ 59; Monger Decl. ¶¶ 8-9.  By contrast, the Parties' claim-management expert estimates that "the Settlement Program will pay over 30,000 claims before the *Vioxx* settlement ever made its first payments when comparing timelines of the two matters." Monger Suppl. Decl. ¶ 13.

*Second*, the Settlement Program is processing claims in an impressive fashion, especially in comparison to other claims programs, and the pace of claims determination should continue to improve with time.  *See* Nov. 8 Fairness Hr'g Tr. at 100:5-9 (Claims Administrator:  "I've never been involved in a project that has gotten up this quick, had the involvement with the volume we had to deal with, and to either have started it earlier or gotten it paid this quickly.  It's been a remarkable experience for me."); Monger Supp. Decl. ¶¶ 6, 7-8, 12, 14-15, 32-35.  "The pace of

80

payment determinations and payments is very high in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time."  Monger Supp. Decl. ¶ 6.  As noted above, the Settlement Program processed 4,500 claims per week during the month of November 2012, and has authorized payments of $1.377 billion (not including Transition Process payments).

### b. Claimants Have No Right To Know Their Exact Compensation Amount Prior To The Opt-Out Date.

Some objectors contend that the Settlement Agreement is unfair because the Settlement Program did not determine the precise award to which they were entitled prior to the opt-out date.[27] These objections are meritless for three reasons.

*First*, as Magistrate Judge Shushan has concluded, "[a]ny class member seeking to determine his compensation may simply read the settlement agreements and determine how his circumstances fit into the frameworks."  Rec. Doc. 7480 at 6.  In all cases, the frameworks are detailed and transparent and a claimant can make a reasonable determination of how his claim will be resolved based on his or his business's circumstances.  *Second*, "there is a range of reasonableness with respect to a settlement."  *Newman v. Stein*, 464 F.2d 689, 693 (2d. Cir. 1972); *accord Reed*, 703 F.2d at 173 ("range of possible recovery" in determining reasonableness); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1067.  For that reason, class members do not need to be able to pinpoint the compensation for which they will be eligible in order to decide whether to remain in the Settlement Class.  In most class settlements, absent the simplest formula that provides each class member with

---

[27] *See* Obj. Doc. 88 at 2; Obj. Doc. 95 at 5; Obj. Doc. 210 (adopting this objection); Obj. Doc. 97 at 2; Obj. Doc. 98 at 2; Obj. Doc. 99 at 2-3; Obj. Doc. 100 at 1-2; Obj. Doc. 115 at 4; Obj. Doc. 122 at 17; Obj. Doc. 141 at 2; Obj. Doc. 146 at 2-3; Obj. Doc. 157 at 2-3; Obj. Doc. 159 at 2-3; Obj. Doc. 167 at 5; Obj. Doc. 177 at 2, 4; Obj. Doc. 178 at 3-4; Obj. Doc. 181 at 2, 4; Obj. Doc. 189 at 5; Obj. Doc. 209 at 3-5.

the same fixed amount, the exact amount is not known at either the opt-out or the final approval stage. *Third*, and most critically, in a typical class settlement, claims are not processed and there are no settlement payments at all until after final approval by the district court, and many class settlements also withhold payments until all appeals have run.[28]

> ### c.      It Is Appropriate And Reasonable To Require An Individual Signature On Opt-Out Requests.

Certain objectors contend that the Settlement is unfair because the parties did not provide an opt-out form or make it possible to opt out electronically. *See, e.g.*, Obj. Doc. 122 at 15-21; Obj. Doc. 209 at 5-6. Neither is required under Rule 23 or specified by the *Manual for Complex Litigation.* This objection has no bearing on the fairness of the Settlement. Indeed, the Court's Preliminary Approval Order specifically approved the relevant opt-out procedures, *see* Rec. Doc. 6418 at 40, and the procedures were disclosed in the notice approved by the Court and sent to class members. *See* Azari Decl. at 56. No objections to the opt-out procedures were lodged for several months after preliminary approval. Similar requirements are routine and routinely enforced. *See, e.g.*, *Moulton*, 581 F.3d at 355; *De Leon v. Bank of Am., N.A. (USA)*, No. 09-1251, 2012 WL 2568142, at *20 (M.D. Fla. Apr. 20, 2012); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2012 WL 92498, at *15; *In re Dow Corning Corp.*, No. 05-30387, 2007 WL 1028644, at *2 (E.D. Mich. Mar. 31, 2007).

---

[28] The Court also takes notice of the fact that a number of law firms and accounting firms claim to have used proprietary software to calculate settlement claims for their clients.

### d.       The Settlement Program Has Provided Ample Support To Claimants.

Certain objectors complain about the advice available through the Settlement Program's regional offices.  *See* Obj. Doc. 142 at 2-3; Obj. Doc. 154 at 2-3.  These isolated complaints do not call into question the competence of a Settlement Program that has provided support to thousands of class members.  *See generally* Monger Decl.

Other objectors complain that the Settlement does not increase payments to cover claimants' private attorneys' fees.  *See* Obj. Doc. 162 at 3.  Because neither OPA nor maritime law would impose any legal obligation for BP to pay the plaintiffs' fees if this case were litigated, *see* Rec. Doc. 3830 at 35-37, BP would not be required to pay individual attorney's fees if it were found liable in litigation.  Particularly given BP's agreement not to oppose a substantial award of common benefit fees to be paid in addition to compensation paid to claimants and other benefits under the Settlement, there is no requirement that BP separately pay the cost of individual attorneys.  The Court has exercised its case management/class action authority to ensure the reasonableness and consistency of private attorneys' fees in connection with the Settlement by setting a presumptive fee cap of 25% plus reasonable costs.  *See* Rec. Doc. 6684.

Other objectors complain that the amount of accounting fees reimbursable under the Settlement Agreement is limited to 2% of an individual claimant's recovery.  *See* Obj. Doc. 167 at 9; Obj. Doc. 189 at 9.  The reimbursement available under the Settlement, however, is reasonable. *See* Sharp Supp. Decl. ¶ 23; Henley Supp. Decl. ¶ 8.  This objection also is negated by the Settlement Program's policy that Business Economic Loss claimants that lack monthly financial statements and are unable or unwilling to have them prepared may submit their contemporaneous business records as "alternate source documents" to the Settlement Program, which will prepare the

financial statements needed to process the claim. *See* Settlement Agreement ¶ 38.38, Ex. 4A ¶ 4; *see also* Deepwater Horizon Claims Center, Economic and Property Damage Claims, Reminder Regarding Documentation Requirements for Business Economic Loss ("BEL") Claims, http://www.deepwaterhorizoneconomicsettlement.com/docs/Alert_Reminder_ Regarding_Documentation_Requirements_for_BEL_Claims.pdf.

### e.    BP Continues To Accept Interim OPA Claims.

Certain objectors contend that the Court's final approval of the Settlement Agreement will interfere with BP's obligation under OPA to pay interim claims.[29]  Because any class member could have elected not to participate in the Settlement and instead submit claims, including interim claims, to BP's OPA claims facility, *see* http://www.bp.com/claims (last visited Dec. 19, 2012), this objection is meritless. *See* Rec. Doc. 6418 at 18 n.19.

### f.    The Parties Did Not Make Improper Use Of GCCF Data.

Certain objectors complain that it was improper for the GCCF to share information with BP and the PSC. *See* Obj. Doc. 198 at 14, 18.  As the Court has previously recognized, "all information gathered from claimants will be turned over to BP, with no restrictions as to its use."  Rec. Doc. 1098 at 9-10.  Moreover, the design of OPA's presentment provision contemplates the sharing of information necessary to support a valid claim with the responsible party.  *See* 33 U.S.C. § 2713; *see also Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 238-39 (11th Cir. 1995); *Turner*, 2007 WL 4208986, at *2.  Additionally, the PSC had access to GCCF payments data because the GCCF posted such data on its web site and because members of the PSC represented

---

[29] *See, e.g.*, Obj. Doc. 136; Obj. Doc. 156 at 6; Obj. Doc. 167 at 9-10; Obj. Doc. 189 at 9-10; Obj. Doc. 227 at 23-24; *see also* Rec. Doc. 6239 at 4-5.

clients who had submitted GCCF claims.   It is inaccurate to contend that BP had an unfair negotiating advantage.

> **g.**      **The Settlement's Provisions For Minors And Incompetents Are Reasonable.**

The Settlement Agreement's provisions for minors and incompetents are fair, reasonable, and adequate.  See Rec. Doc. 7536 (report of guardian ad litem Professor P. Raymond Lamonica); Rec. Doc. 7462 (order for processing claims on behalf of deceased, minor, and incompetent claimants).

> **h.**      **The Settlement's Appellate Procedures Benefit Claimants.**

One objection suggests that BP's limited appellate rights under the Settlement Agreement are unfair to claimants.  *See* Obj. Doc. 101 at 3, 29.  In reality, both BP and class members have appellate rights, though class members' rights are considerably more expansive.  *See* Settlement Agreement ¶ 6.1.2.4; *supra* ¶ 0.  Because appellate proceedings ensure that Settlement payments comply with the terms of the Settlement Agreement, they reduce uncertainty.  *See* Klonoff Supp. Decl. ¶ 25.  For that reason, numerous courts have approved settlements with appellate procedures. *See, e.g., Morris v. Voinovich*, 106 F. App'x. 962, 964 (6th Cir. 2004) (per curiam); *In re Serzone Prods. Liab. Litig.*, MDL No. 1477, 2006 WL 2345988, at *1-2 (S.D. W. Va. 2006); *Foreman v. Wood, Wire & Metal Lathers Int'l Union, Local No. 46*, 557 F.2d 988, 991 (2d Cir. 1977).   BP represents that it has appealed only 1.1% of Settlement Program determinations finding a claimant eligible for payment.

> **iv.**      **Substantive Objections To The Settlement Agreement Lack Merit.**

The substantive objections to the Settlement Agreement uniformly lack merit.

### a.    BP's Position As To Its Liability

According to Louisiana (which lacks standing, as noted above), the Settlement is deficient because it fails to acknowledge BP's unlimited and strict liability.  *See* Obj. Doc. 227 at 16.  BP has contended that there are a number of doctrines that could limit its liability in any trial of this matter and that Louisiana simply ignores the risk to it and other plaintiffs (including class members here) that such defenses would prevail in future litigation, if conducted.  Most significantly, however, BP has agreed to make the class members whole for their compensatory damages, and in many cases perhaps more than whole, especially as to claimants eligible to claim multiples of their losses via RTPs.  This objection accordingly lacks merit.

### b.    Objections To The Economic Damage Compensation Frameworks Lack Merit.

### 1.    The Economic Loss Zones Are Reasonable.

Various objectors complain about the zone in which they are located.[30]  But the economic loss zones reasonably reflect the likelihood that a given class member suffered economic damage as a result of the spill.  As Class Counsel explained, the zones "were the subject of months and months of negotiations, of people sitting in rooms and going back and forth on maps and looking at the specific businesses; in fact, driving around across the coast to see where these boundaries were."  Nov. 8 Fairness Hr'g Tr. at 35:9-13.  As BP explained, they were "designed to reflect that as distance from the Gulf beaches increases, the possibility of economic damage due to the spill decreases.  It's not only common sense, it's economic reality."  *Id.* at 169:6–10.

---

[30] *See* Obj. Doc. 45; Obj. Doc. 61 at 4; Obj. Doc. 62 at 1; Obj. Doc. 72 at 1; Obj. Doc. 89; Obj. Doc. 90 at 2-7; Obj. Doc. 94; Obj. Doc. 115 at 3-10; Obj. Doc. 116; Obj. Doc. 117 at 3-7; Obj. Doc. 261 (supplement to this objection); Obj. Doc. 118 at 2; Obj. Doc. 138; Obj. Doc. 151; Obj. Doc. 162 at 2; Obj. Doc. 178 at 4-5; Obj. Doc. 184 at 2-5; Obj. Doc. 186 at 12-13; Obj. Doc. 189 at 6-7; Obj. Doc. 198 at 21-26; Obj. Doc. 201 at 3-4; Obj. Doc. 206 at 1; Obj. Doc. 223-1 at 1-12; Obj. Doc. 224 at 1-12; Obj. Doc. 232; Obj. Doc. 246 at 2-4; *see also id.* at 5 (complaining that community shopping centers are not treated as tourist destinations); Obj. Doc. 265 (supplement to Obj. Doc. 145) at 2; Rec. Doc. 6404.

It is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims. *See, e.g.*, *Reed*, 703 F.2d at 175; *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) (rejecting objectors' "challenge [to] the propriety of the award of compensation to the holders of property in Zone A, which was far greater than the compensation to the holders of property in Zone B, which in turn was far greater than the compensation to holders of property in Zone C"); *Turner*, 234 F.R.D. at 604; *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 342-43 (N.D. Ga. 1993); *see also* Miller Supp. Decl. ¶ 12 ("A class action settlement is not objectionable merely because it draws lines, as long as the distinctions made reflect an informed effort to allocate settlement benefits across class members in reasonable proportion to their damages and the strength of their claims."). Disputes over where lines should be drawn do not necessarily call into question the reasonableness of the lines. Economic and hospitality industry experts reviewed these objections, and found that they did not change their opinions that the Economic Loss Zones are fair, reasonable and adequate. Fishkind Supp. Decl. ¶¶ 24-25; Landry Supp. Decl. ¶¶ 12-26; Richardson Supp. Decl. ¶ 7.

Here, a claimant's zone location does not preclude recovery; it only determines whether he will receive an enhanced opportunity for recovery, including (i) a presumption of causation that eliminates the claimant's obligation to establish causation, and/or (ii) additional recovery beyond actual compensable losses in the form of a larger RTP. Any claimant in any zone can recover if the claimant can establish causation and damages according to clearly defined criteria supported by objective economic data.

2. **Limiting The Compensation Period To 2010 Is Reasonable.**

Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011.[31]  Yet this provision is reasonable for three reasons:  (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010.  Thus, extending compensation to 2011 would cover losses not likely caused by the spill.  *See* Fishkind Decl. ¶¶ 32, 61.

3. **Objections To The Business Economic Loss Framework Lack Merit.**

Very few objections have been submitted to the Business economic Loss Framework, and those that have been submitted lack merit.

(A) **General Business Economic Loss Framework**

(i) **Base Compensation**

(a) **Benchmark Period**

Certain objectors contend that the Benchmark Period options are unfair because they require some consideration of 2009, which these objectors contend was a recessionary year.  *See* Obj. Doc. 95 at 7-8; Obj. Doc. 210 (adopting this objection); Obj. Doc. 198 at 34-38; Obj. Doc. 155 at 1. There is no basis for this objection.  *First*, a business's most recent experience is widely accepted as the most accurate predictor of its future performance.  *See* Sharp Supp. Decl. ¶ 15; Landry Supp.

---

[31] *See, e.g.*, Obj. Doc. 86 at 6-7; Obj. Doc. 95 at 7; Obj. Doc. 210 (adopting this objection); Obj. Doc. 103; Obj. Doc. 126; Obj. Doc. 201 at 3-4.

Decl. ¶ 29.  *Second*, because the Louisiana economy did not take a general downward turn until the first quarter of 2009, a Benchmark Period that averages 2007, 2008, and 2009 is highly favorable to claimants.  *See* Richardson Decl. ¶ 39; Landry Supp. Decl. ¶ 29.  *Finally*, the RTPs are sufficient to overcome the purported disadvantages of including 2009 in the benchmark periods.  *See* Fishkind Decl. ¶¶ 33, 70-78.

(b)      Causation

Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located.  Obj. Doc. 120 at 4-8; Obj. Doc. 206 at 2.  The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly favorable to claimants, which is why they were negotiated by experienced counsel in consultation with their clients and experts.  Claimants unable to satisfy any of the causation standards would likely encounter litigation difficulties.  *See* Fishkind Supp. Decl. ¶ 20.

Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period.  *See* Obj. Doc. 198 at 8, 26-34.  This provision is reasonable, as losses that continued after the spill are likely to be due to factors other than the spill.  Moreover, many businesses will satisfy this test.  *See* Fishkind Decl. ¶ 61; Landry Supp. Decl. ¶¶ 12-19; Fishkind Supp. Decl. ¶¶ 11-12, 14, 20, 25.

Finally, one objection complains that class members must satisfy a specified percentage of loss to invoke a causation test, though they do not indicate which test they are complaining about.  *See* Obj. Doc. 115.  Yet lines must be drawn somewhere, and the objectors have failed to

89

demonstrate that the line drawn here was not reasonable. *Warfield v. Fidelity & Deposit Co.*, 904 F.2d 322, 327 (5th Cir. 1990).

### (c)     Growth Factors

One objection contends that the Business Economic Loss Framework is unfair because it caps year-to-year growth at a maximum of 10%. *See* Obj. Doc. 95 at 7; Obj. Doc. 210 (adopting this objection). This objection misreads the Settlement Agreement. All Business Economic Loss claimants benefit from a 2% General Adjustment Factor, meaning that the true cap on revenue growth is 12%. *See* Settlement Agreement Ex. 4C at 2. Moreover, the cap was part of a negotiated compromise in which BP agreed that a negative growth factor would not be applied even to claimants who had experienced negative growth. Such a compromise is certainly reasonable given the recession that began in 2008 and the low rate of economic growth. *See* Fishkind Decl. ¶ 96; Sharp Decl. ¶ 56.

### (d)     Offset Provisions

One objector complains that GCCF payments are deducted from payments received from the Settlement Program. *See* Obj. Doc. 132 at 2. However, this is a fair and reasonable method to avoid double compensation.

### (ii)     Documentation

Objections to the requirement that business claimants provide monthly profit and loss statements, *see* Obj. Doc. 122 at 13-14; Obj. Doc. 186 at 13-18; Obj. Doc. 198 at 41, are baseless, as (i) the majority of businesses keep such records in the ordinary course of business; (ii) accounting assistance is available for businesses that need to create such records; and (iii) the Settlement Program will accept "alternate source documents" and create monthly records on the claimants'

behalf.  *See* Sharp Decl. ¶ 12; Henley Decl. ¶¶ 9, 23; Landry Supp. Decl. ¶¶ 27-28; Henley Supp.

Decl. ¶ 8; Sharp Supp. Decl. ¶¶ 24-26; Deepwater Horizon Claims Center, Economic and Property

Damage Claims, Reminder Regarding Documentation Requirements for Business Economic Loss

("BEL") Claims,

http://www.deepwaterhorizoneconomicsettlement.com/docs/Alert_Reminder_Regarding_Docum

entation_Requirements_for_BEL_Claims.pdf.

An additional objection complains that claimants with annual revenues of less than $75,000

per year are required to submit additional documentation as to their losses.  *See* Obj. Doc. 265

(supplement to Obj. Doc. 145) at 2.  The objection misreads the Settlement; these requirements ***only***

apply to businesses availing themselves of the Causation Proxy Claimant method of proving

causation, and the flexibility this method provides is favorable to class members.

One objector sought clarification that a business claimant in a county that does not issue

occupational licenses should not be required to provide a copy of such a license because it does not

exist.  *See* Obj. Doc. 241. In actuality, there was never a requirement for a claimant in a locality

where the local government does not issue occupational licenses to provide a copy of such a

license. *See* Settlement Ex. 4A ¶ 7. Moreover, the Settlement Program, with agreement of the

Parties, has implemented a claimant-friendly policy in which no claimant is required to provide an

occupational license even if located in a county where such licenses are issued. *See* Rec. Doc. 7466

at 1.

### (iii)   RTPs

Certain objectors complain about the RTP assigned to their type of claim.  *See, e.g.*, Obj.

Doc. 59; Obj. Doc. 132 at 2; Obj. Doc. 162 at 2-3; Obj. Doc. 198 at 38-40; Obj. Doc. 257.  These

objectors provide no objective evidence that the RTPs are inadequate, and thus the objections fail to overcome the presumption in favor of fairness that attends to any voluntarily negotiated settlement. Such objections cannot overcome the specific declarations submitted to support the generosity of each of the frameworks and the generosity of the RTPs (where applicable).[32]

### (B)   Failed Business And Failed Start-Up Business

### (i)   Failed Business Framework

Certain objectors contend that (i) the Failed Business Framework should permit more compensation, as failed businesses are deprived of years of future revenues, and (ii) the EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) multiplier should be higher. *See* Obj. Doc. 54; Obj. Doc. 265 (supplement to Obj. Doc. 145) at 2-3. These objections fail because the Settlement reasonably compensates the owners of failed businesses for the entire value of their firm, providing them with capital that they may use to generate future revenues. *See* Sharp Decl. ¶ 31; Fishkind Decl. ¶ 104; Henley Decl. ¶ 34. The multipliers used in these frameworks were derived from Pratt's Stats Database, a standard source based on actual arm's length business merger and acquisition transactions. *See* Fishkind Decl. ¶¶ 31, 103-04; Henley Decl. ¶ 34; Sharp Decl. ¶¶ 38-40; Richardson Decl. ¶ 57.

An objection contends that the Failed Business Framework is unfair because failed businesses in the seafood industry are treated the same as failed businesses in other industries. *See* Obj. Doc. 86 at 7. Because the industry multipliers are determined from a database meant to determine the correct ratio of the business's value to its past twelve months of EBITDA, this objection has no merit.

---

[32] *See generally* Rec. Doc. 7714-4 to Rec. Doc. 7714-5; Rec. Doc. 7714-9; Rec. Doc. 7714-11 to 7114-23; Rec. Doc. 7731-1 to Rec. Doc. 7731-14.

One objection complains that the Failed Business Framework requires class members to certify that as of May 1, 2010, (i) they had not initiated a bankruptcy filing, asset liquidation, or debt restructuring; (ii) they were in full compliance with all covenants as to financial condition governing outstanding borrowing or credit agreements; and (3) all documents submitted consisted of or were derived from documents maintained in the ordinary course of business. *See* Obj. Doc. 156 at 2-3. These requirements are a reasonable method of confirming that the business's failure was caused by the spill, and not by other factors. *See* Fishkind Decl. ¶ 102.

Another objection complains that the Failed Business Framework is inadequate because it fails to include compensation for costs incurred following a cessation of operations or the costs necessary to restart a business. *See* Obj. Doc. 156 at 4. This objection is unavailing because compensation equal to the value of the business fairly covers these costs.

### (ii)     Failed Start-Up Business Framework

One objection contends that failed start-up businesses should be compensated based on the average revenue of similar businesses. *See* Obj. Doc. 72 at 1. This objection fails; there is no reason to base compensation upon industry averages where claimant-specific data are available. *See* Sharp Supp. Decl. ¶ 15; Fishkind Supp. Decl. ¶¶ 21-23.

### (iii)     Start-Up Business Framework

An objector contends that the Start-Up Business Framework should permit class members to rely on projections used by partners in the business, and not just projections relied upon by qualified third-party lenders. *See* Obj. Doc. 140. Because a primary role of third-party lenders is to make sure that projections are realistic, this objection fails. *See* Henley Decl. ¶ 35; Sharp Decl. ¶ 44; Henley Supp. Decl. ¶ 9; Richardson Supp. Decl. ¶ 4(c). The same objection also contends that

it is unreasonable to deny compensation to start-up businesses with a history of negative EBITDA prior to the spill; this objection also fails.  *See* Fishkind Decl. ¶ 102.

### 4.    Individual Economic Loss Framework

### (A)    Documentation

Certain objectors contend that they should be able to base their lost earnings claim solely on their own statement, without any third-party verification.  *See* Obj. Doc. 96.  This objection lacks merit.  The Settlement is flexible in permitting claimants who lack tax or payroll documentation to rely on their employers' sworn statements.  However, there is no requirement that the Settlement pay claims lacking ***any*** of the typical documentation necessary to support a claim in court.  *See* Fishkind Decl. ¶ 107; Henley Decl. ¶ 18; Sharp Decl. ¶ 48; Henley Supp. Decl. ¶ 10.

One objector claimed the requirement that a claimant be at least 16 years of age as of April 20, 2010 should not apply because her state permits children to work at the age of 15. *See* Obj. Doc. 258; Settlement Ex. 8A § I.A.5.a.ii at 11.   The Settlement Program, with agreement of the parties, has implemented a policy in which a claimant under the age of 16 may pursue a claim provided that it was legally permissible for the claimant to be employed at the age she or he had attained on  April 20, 2010. *See* Deepwater Horizon Claims Center:  Economic and Property Damage Claims: Minimum Age Requirement for Individual Economic Loss and Seafood Program Seafood Crew Claimants, http://www.deepwaterhorizon economicsettlement.com/docs/Alert_Minimum_Age_Requirement_for_IEL_and_Seafood_Crew _Claimants.pdf.

**(B)     Additional Benefits**

One objection complains that the Settlement only provides full reimbursement for training costs if the training led directly to earned income in 2010, and that the Settlement only compensates for health insurance until December 31, 2011.  *See* Obj. Doc. 265 (supplement to Obj. Doc. 145) at 3.  BP was under no obligation to provide either form of such compensation; both provisions were the result of good-faith negotiation and are reasonable.

**5.     The Vellrath Criticisms Lack Merit.**

The declaration of Marc Vellrath, *see* Obj. Doc. 91-2, was submitted by Halliburton, a party lacking standing to object to the Settlement.  There is accordingly no need to consider any of its criticisms of the Settlement.  In any event, the Court finds such criticisms to be unpersuasive in light of the substantial evidence supporting the Settlement.  *See* Fishkind Supp. Decl. ¶¶ 7-19; Henley Supp. Decl. ¶¶ 4-7; Landry Supp. Decl. ¶ 30; Miller Supp. Decl. ¶¶ 16-17; Richardson Supp. Decl. ¶¶ 5-10; Sharp Supp. Decl. ¶¶ 5, 7-22; Smith Supp. Decl. ¶¶ 50-52.

**c.     Objections To The Property Damage Framework Lack Merit.**

**1.     Coastal Real Property Damage**

Certain form objections contend that under the Coastal Real Property Framework, the compensation amounts are too low and the zone segmentation is arbitrary.[33]  Both objections fail. *First*, the Coastal Real Property Framework provides compensation that is fair and adequate to

---

[33] *See* Obj. Doc. 88 at 6-7; Obj. Doc. 97 at 6-7; Obj. Doc. 98 at 6-7; Obj. Doc. 99 at 6-7; Obj. Doc. 100 at 3-5; Obj. Doc. 123 at 6; Obj. Doc. 146 at 4-5; Obj. Doc. 157 at 6-7; Obj. Doc. 159 at 6-7; Obj. Doc. 177 at 4-6; Obj. Doc. 181 at 4-5; *see also* Obj. Doc. 167 at 6-8 (making the same points in a different form); Obj. Doc. 189 at 6-8 (same); Obj Doc 90 at 11- 13 (same); Obj. Doc. 225 at 3-8 (same).  Although their objections do not make the point entirely clear, each of the form objectors complains that he falls outside the Coastal Real Property Compensation Zone, making it likely that each lacks standing.  Certain other objectors also make similar objections regarding the amounts of compensation and the boundaries of the Coastal Real Property Zone. *See, e.g.*, Obj. Doc. 61 at 4; Obj. Doc. 62 at 1; Obj. Doc. 90 at 11-13; Obj. Doc. 143; Obj. Doc. 259.

compensate eligible property holders.  *Second*, the boundaries of the Coastal Real Property Zone are reasonable.  Various objections complain that the same RTP applies whether a property was or was not oiled.[34]   But base compensation varies depending upon whether a property was oiled, and this difference in base compensation is increased by the application of an RTP multiplier.  Moreover, properties that sustained physical damage are also eligible for repair costs.  *See* Klonoff Supp. Decl. ¶ 14.

Other objections complain that the same RTP applies regardless of whether the owner sold a property after December 31, 2010.  *See* Obj. Doc. 123 at 6, 35; Obj. Doc. 230 at 2; Obj. Doc. 234 at 4.  The settling parties were free, however, to negotiate an RTP for coastal real property claims as a whole without further sub-division, and that decision regarding RTPs was rational and reasonable.

Certain objectors contend that the Coastal Real Property Framework should compensate for diminution in property value.  Such objections are unavailing because there is evidence that property values returned to pre-spill levels by December 2010, *see* Dent Supp. Decl. ¶ 21, and because unrealized reductions in property value are not valid claims under OPA, *see* Rec. Doc. 7526 at 8-12.

Several objectors contend that the Coastal Framework should provide fixed minimum compensation to non-residential properties, as it does for residential parcels.  This objection fails, as such awards compensate for loss of use and enjoyment likely to be suffered only by owners of residential properties.  *See* Dent Supp. Decl. ¶ 23.[35]

---

[34] *See* Obj. Doc. 123 at 6, 30-34; Obj. Doc. 230 at 2, 34-47; Obj. Doc. 234 at 26-29.

[35] Finally, a series of objections submitted on behalf of two claimants challenge their exclusion from both the Coastal Real Property zone and the Real Property Sales Compensation zone. *See* Obj. Doc. 53; Obj. Doc. 55; Obj. Doc. 64; Obj. Doc. 65; Obj. Doc. 69; Obj. Doc. 73; Obj. Doc. 74.  These objections, however, have been mooted by the parties' provision of updated mapping data to the Claims Administrator.

## 2.    Wetlands Real Property Damage

Certain objectors whose properties fall within the Coastal Real Property Zone argue that they should instead fall within the Wetlands Real Property Zone.  *See, e.g.*, Obj. Doc. 167 at 8; Obj. Doc. 189 at 8; Obj. Doc. 183 at 17-18.[36]   These objections are unavailing.  *First*, such objectors may submit Coastal Real Property claims, which provide fair, reasonable, and adequate compensation. *Second*, it is reasonable to limit the Wetlands Real Property Zone to Louisiana wetlands other than Grand Isle, which is dedicated to tourist, industrial, and commercial use.  There are several key differences between Louisiana coastal wetlands and coastal wetlands areas in Mississippi, Alabama, and Florida—including the fact that these wetlands have different soil composition and geomorphology, and generally lack protection from barrier islands—and there was more extensive oiling observed in Louisiana than in the coastal wetlands of other Gulf States.  *See* Taylor Decl. ¶ 48; Dent. Supp. Decl. ¶¶ 12-15, 18; Wharton Supp. Decl. ¶¶ 16-19; Taylor Supp. Decl. ¶¶ 19-23; Klonoff Supp. Decl. ¶ 15.

Other objectors complain that the zones are arbitrary and that the compensation is inadequate.[37]   These assertions fail; the zones were established using thorough and comprehensive data and the compensation amounts are fair and adequate.  Objections to the use of the SCAT (Shoreline Assessment Team) line to delineate the zone, *see* Obj. Doc. 90 at 7-11; Obj. Doc. 225, fail because SCAT provides accurate and reliable information.  *See* Dent Supp. Decl. ¶ 8; Taylor Decl. ¶¶ 8-23.

---

[36] At the same time, one objector complains that certain Louisiana land that falls within the Wetlands Real Property Zone does not instead fall within the Coastal Real Property Zone.  *See* Obj. Doc. 40.

[37] *See* Obj. Doc. 88 at 6-7; Obj. Doc. 90 at 7-11; Obj. Doc. 97 at 6-7; Obj. Doc. 98 at 6-7; Obj. Doc. 99 at 6-7; Obj. Doc. 100 at 3-5; Obj. Doc. 146 at 4-5; Obj. Doc. 157 at 6-7; Obj. Doc. 159 at 6-7; Obj. Doc. 167 at 8; Obj. Doc. 177 at 4-6; Obj. Doc. 181 at 4-5; Obj. Doc. 189 at 8; Obj. Doc. 259 at 1.

One other objector contends that it is too difficult to establish that property was oiled and belongs in Category A.  This objection fails, as the methods used in the Settlement are reasonable.  *See* Dent Supp. Decl. ¶¶ 8, 10.

### 3.      Real Property Sales Damage

Some objectors contend that they should be eligible for compensation for sales that occurred after December 31, 2010.  *See* Obj. Doc. 35; Obj. Doc. 46; Obj. Doc. 49; Obj. Doc. 67 at 1-2; Obj. Doc. 90 at 13-14; Obj. Doc. 152 at 2; Obj. Doc. 191; Obj. Doc. 253.  These objectors lack standing.  Moreover, the objection fails, as any reduction in property values that persisted after that date is less likely to be predominantly attributable to the spill.  *See* Dent Supp. Decl. ¶ 5.

Other objectors complain that certain parts of Florida, including the Florida Keys, are excluded from the Real Property Sales Zone.  *See* Obj. Doc. 134 at 1; Obj. Doc. 152 at 2-3.  These objectors lack standing.  Moreover, the objection fails; these areas are excluded because they fall outside the zone that was even monitored by SCAT and NRD for the presence of oil.  *See* Dent Supp. Decl. ¶ 8.  Other objections to the boundaries of this zone, *see* Obj. Doc. 40; Obj. Doc. 61 at 4; Obj. Doc. 62 at 1, similarly lack merit.

It is reasonable to exclude foreclosed properties from eligibility, as "[o]wners of Gulf Coast real property that were subject to foreclosure proceedings at the time of the DWH Spill were most likely in default prior to the DWH Spill and due to reasons that have no connection with the DWH Spill."  Dent Supp. Decl. ¶ 6.

It is reasonable to exclude persons who have not sold their properties, as they have suffered no economic losses.  Dent Supp. Decl. ¶ 7.  As the Court has held, "[b]efore real property is sold, there can be no 'profits' to be lost."  Rec. Doc. 7526 at 9.

d.      **Objections To The Vessels Of Opportunity Charter Payment Framework Lack Merit.**

Objections to the VoO offset[38] lack merit, as this provision is designed to prevent what could be considered a double recovery. *See* 33 C.F.R. § 136.235. While certain objectors complain that the offset only applies to charter boat operators, BP was willing to accept more favorable terms for commercial fishermen in light of their argument that they are not typically engaged in the business of chartering their vessels. Finally, while some objectors allege that BP promised that no offset would be applied, questions concerning the validity this argument would present a risk to plaintiffs pursuing litigation. *First*, BP disputes making such a promise. *Second*, BP disputes the scope of parties to whom such a purported promise was given. *Third*, any party attempting to assert the promise against BP would arguably need to demonstrate detrimental reliance, which many such plaintiffs might not be able to do. And *finally*, such a promise, even if proven, cannot defeat the fairness of a settlement that is designed to resolve disagreements among the parties. *See* Klonoff Supp. Decl. ¶¶ 17-19; *see also* Nov. 8 Fairness Hr'g Tr. at 39:21-43:24 (Class Counsel, making many of these points). That the VoO offset is only a partial offset is highly favorable to the class members, as in litigation the offset would be a total one. The fact that a partial offset resulted from the process is indicative of the fact that a settlement negotiation over this issue occurred. Having been negotiated by learned counsel, there is no reason to overturn it as anything other than being a reasonable assessment of litigation risk on both sides.

---

[38] *See, e.g.*, Rec. Doc. 6402; Rec. Doc. 6403; Rec. Doc. 6405; Rec. Doc. 6406; Rec. Doc. 6407; Rec. Doc. 6408; Obj. Doc. 2; Obj. Doc. 3; Obj. Doc. 4; Obj. Doc. 5; Obj. Doc. 6; Obj. Doc. 7; Obj. Doc. 8; Obj. Doc. 9; Obj. Doc. 10; Obj. Doc. 11; Obj. Doc. 12; Obj. Doc. 13; Obj. Doc. 14; Obj. Doc. 15; Obj. Doc. 16; Obj. Doc. 17; Obj. Doc. 18; Obj. Doc. 19; Obj. Doc. 20; Obj. Doc. 21; Obj. Doc. 22; Obj. Doc. 23; Obj. Doc. 24; Obj. Doc. 25; Obj. Doc. 26; Obj. Doc. 27; Obj. Doc. 28; Obj. Doc. 29; Obj. Doc. 30; Obj. Doc. 31; Obj. Doc. 48. Obj. Doc. 59; Obj. Doc. 60 at 1-2; Obj. Doc. 77; Obj. Doc. 78; Obj. Doc. 79; Obj. Doc. 80; Obj. Doc 81; Obj. Doc. 82; Obj. Doc. 83; Obj. Doc. 84; Obj. Doc. 85; Obj. Doc. 133 at 2; Obj. Doc. 149 at 1-2; Obj. Doc. 166; Obj. Doc. 168 at 1; Obj. Doc. 169 at 1-2; Obj. Doc. 170 at 1; Obj. Doc. 171; Obj. Doc. 173; Obj. Doc. 174; Obj. Doc. 175; Obj. Doc. 176; Obj. Doc. 179; Obj. Doc. 254; Obj. Doc. 256.

Objectors who allege that they were unable to participate in the VoO program, *see* Obj. Doc. 139 at 1; Obj. Doc. 141 at 1, are not class members and accordingly lack standing.

One objector contends that class members should be able to receive payment on the entirety of their GCCF offers without foreclosing their ability to accept VoO compensation under the Settlement Agreement. *See* Obj. Doc. 102. While there are any number of ways that one could theoretically structure options under the Settlement Agreement, the Settlement Agreement as drafted is fair and reasonable in the options provided to Claimants, and goes well beyond those provided in most claims programs.

### e. Objections To The Vessel Physical Damage Framework Lack Merit.

No timely objections have been submitted by parties with standing to the Vessel Physical Damage Framework. Nevertheless, the objections that have been submitted concerning this framework fail. Contrary to one objection, (i) determining whether a vessel was damaged does not require a highly individualized investigation; (ii) determining the economic harm suffered by a claimant is not a highly individualized issue; and (iii) because claimants under this framework are not at risk of future damage, the omission of an RTP is economically appropriate.

Contrary to an untimely submission on the eve of the fairness hearing, *see* Obj. Doc. 265 (supplement to Obj. Doc. 145) at 4, it is reasonable to exclude compensation for vessels that were working for an Oil Spill Response Organization or an Oil Spill Removal Organization. These organizations contracted directly with BP to provide their services, and damages to vessels working for such an organization are governed by those contracts.

f.      Objections To The Subsistence Damage Framework Lack
        Merit.

One objection contends that the Subsistence Framework fails to address adequately the objector's Native American heritage. *See* Obj. Doc. 245 at 2.  There is no basis in OPA for the preferential treatment of a particular ethnic community, and subsistence claimants in the Gulf belong to many ethnicities, heritages, and communities.  The Settlement strives to afford all of them honor and respect.  All subsistence claims are treated evenhandedly and, therefore, the objection lacks merit.

One objection complains that the compensation available under the Subsistence Framework is inadequate, as it "does not take into account compensation for those who may have been able to barter for some value above the market value."  Obj. Doc. 265 (supplement to Obj. Doc. 145) at 3-4.  Yet the Settlement Agreement is already extremely generous in compensating claimants for the retail value of their lost subsistence—before the application of an RTP.  While the same objection contends that the "documentation requirement on Subsistence Claimants is overly burdensome," Obj. Doc. 265 at 4, the Settlement takes proactive steps to facilitate the submission of subsistence claims.

g.      Objections To The Seafood Compensation Program Lack Merit.

1.      Objections Based On Future Risks Lack Merit.

Several objectors assert that the SCP fails to account for future risks to Gulf of Mexico fisheries.[39]   These objections fail.  *First*, the SCP includes RTPs designed specifically to compensate for such claims of uncertainty.  *Second*, this was a reasonable compromise considering

_____

[39] Obj. Doc. 104 at 3-5; Obj. Doc. 167 at 8-9; Obj. Doc. 189 at 8-9; Obj. Doc. 227 at 21-22; Obj. Doc. 240.

evidence,[40] in the declarations of Dr. Tunnell and Dr. Smith, that most of the relevant commercial species appear to be within normal, pre-spill trends.

Certain objectors point to variances in vermilion snapper catches across certain portions of the Gulf as precursor evidence of a future fisheries collapse.  *See* Obj. Doc. 104 at 4.  The figures presented are contested by BP's experts as unsupported by the landings data.  *See* Smith Supp. Decl. ¶¶ 33-44; Tunnell Supp. Decl. ¶ 10; Tunnell Decl. ¶¶ 60-62.  Objectors' assertions that the quotas for specific fisheries may be reduced are speculative and, according to BP's experts, also not supported by the commercial fisheries data.  *See* Tunnell Decl. ¶ 62 (noting that quotas for red snapper increased post-spill); Smith Supp. Decl. ¶¶ 35-36, 40-42 (noting that average snapper IFQ shares increased post-spill and that finfish 2011 landings exceed the benchmark period, and highlighting the mobile and cross-species nature of fin-fishing activities).

Other objectors present analogies to the *Exxon Valdez* oil spill and suggest that because the herring population in Prince William Sound collapsed several years after the spill, it is reasonable to expect a future fisheries collapse in the Gulf from *Deepwater Horizon*.  *See* Obj. Doc. 227 at 21.  Even if true (*contra* Pearson Decl., esp. ¶ 10), use of the SCP was agreed to by the parties and the presumed loss percentages and RTPs within the SCP were designed by the neutral to reasonably compensate participating class members for such risk.  Analogies to the *Ixtoc-I* spill are of limited relevance.  The *Ixtoc-I* oil spill lasted more than nine months and mangrove oysters were repeatedly oiled.  BP presents evidence that mangrove oysters are not found in the northern Gulf, and that Eastern oysters were not oiled during *Deepwater Horizon*.  *See* Tunnell Supp. Decl. ¶¶ 15-16.

---

[40]  The Court emphasizes that by summarizing the evidence presented by BP, it does not make any findings of its own, and that nothing here should be taken to prejudge the merits of any non-settled claims between BP and any party.

Other objectors point to Hurricane Isaac and the oil sheen reported above the Macondo well site on October 10, 2012, as evidence of future risks.[41] These objections are unavailing. *See* Tunnell Supp. Decl. ¶ 12; Jeffrey Supp. Decl. ¶¶ 13-15; Taylor Supp. Decl. ¶¶ 35-37; FOSC Issues Notice of Federal Interest to BP and Transocean, http://www.restorethegulf.gov/release/2012/10/10/fosc-issues-notice-federal-interest-bp-and-transocean (Oct. 10, 2012). The United States Coast Guard, BP points out, concluded that the sheen is not feasible to recover and does not pose a risk to the shoreline. *See* FOSC issues Notice of Federal Interest to BP and Transocean, *supra*. As explained in more detail below, moreover, Hurricane Isaac does not counsel against final approval of the Settlement.

Other objections making unsupported allegations about future risks to blue crabs and Florida oysters fail because they are not accompanied by evidence. *See* Obj. Doc. 150 at 2; Obj. Doc. 240 at 2. There is evidence that the oysters are being damaged primarily by years of drought and illegal overharvesting. *See* Tunnell Supp. Decl. ¶ 17 & Ex. A.

Finally, as a matter of law, even if objectors had an evidentiary basis to conclude that the Gulf is at risk of a future fisheries collapse, the law encourages the settlement of disputed claims. Were the law otherwise, few cases could ever settle. Here the Settlement is reasonable and includes RTPs to cover potential future injury.

### 2. Objections From Those Outside The SCP Lack Merit.

Certain seafood processors argue that they should be included within the SCP. *See* Obj. Doc. 139 at 1-2; Obj. Doc. 141; Obj. Doc. 147; Rec. Doc. 6368; Rec. Doc. 7317 (adopting Obj. Doc. 147

---

[41] *See* Obj. Doc. 52 at 1; Obj. Doc. 88 at 3-5; Obj. Doc. 97 at 3-5; Obj. Doc. 98 at 3-5; Obj. Doc. 99 at 4-5; Obj. Doc. 144 at 17-18; Obj. Doc. 157 at 3-5; Obj. Doc. 159 at 3-5; Obj. Doc. 167 at 4; Obj. Doc. 178 at 5; Obj. Doc. 183 at 21; Obj. Doc. 186 at 5; Obj. Doc. 189 at 4-5, 12; Obj. Doc. 190 at 20-21; Obj. Doc. 201 at 7.

and Rec. Doc. 6368).  Under the Court's rulings, commercial fishermen fall within an arguable exception to *Robins Dry Dock* and thus conceivably could be eligible for punitive damages while processors are not.  *See* Rec. Doc. 3830 at 19-20; Miller Decl. ¶ 11.  For that reason, there is nothing improper in the parties' negotiation of claims frameworks that compensate class members in light of the strength of their claims.  *See Lenahan v. Sears, Roebuck, & Co.*, 266 F. App'x 114, 119 (3d Cir. 2008); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005); *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77-39, 1984 WL 21981, at *7 (N.D. Ill. Sept. 14, 1984); Issacharoff Decl. ¶ 12; Miller Supp. Decl. ¶ 12.  It should be noted, as well, that shrimp processors receive the highest RTP in the Economic Damage Claim Frameworks, an RTP of 3.  *See* Agreement Ex. 15.

Certain charter fishermen also contend that it is unreasonable for them to be excluded from the SCP.  *See, e.g.*, Obj. Doc. 86 at 5-6; Obj. Doc. 133 at 2; Obj. Docs. 172-176.  Charter fishermen, however, participate in a different market from those who harvest seafood with nets designed to pull in large hauls.  Maritime law recognizes these differences, and treats the claims of charter fishermen differently from the valid maritime claims of commercial fishermen.  *See In re Exxon Valdez*, 1995 A.M.C. 1429, 1433 (D. Alaska 1994).  Moreover, the RTP for charter fisherman fairly takes into account evidence of recovery of Gulf tourism by the end of 2010 and re-opening of spill-related fisheries closures by the end of 2010.  *See* Fishkind Decl. ¶¶ 70, 77, 78.

### 3.    Objections To The Benchmark Period Lack Merit.

Some objectors complain about the benchmark periods under the SCP.  *See* Obj. Doc. 141 at 2; Obj. Doc. 167 at 9; Obj. Doc. 189 at 9; Rec. Doc. 6371.  These objections lack merit.  The use of a benchmark period is necessary and appropriate, and claimants are provided significant

flexibility in selecting benchmark periods that would not be available in litigation.  Further, there is evidence demonstrating that extending the benchmark period to earlier than 2007 would yield a less reliable estimate of a claimant's presumed loss from the spill.  *See* Smith Decl. ¶¶ 19-22, 32; Sharp Decl. ¶ 20; Balhoff Decl. at 4-5; Perry Decl. at 4-5.

### 4.     SCP Claimants Have Adequate Time To Evaluate Their Rights.

Certain objectors contend that they should not be required to submit claims to the Settlement Program before the statute of limitations expires.  *See* Obj. Doc. 122 at 21; Obj. Doc. 209 at 6. There is no legal support for such an objection.  Moreover, requiring all claims to be submitted promptly permits a second-round distribution sooner, which favors claimants.  *See* Perry Decl. at 4; Balhoff Decl. at 4.

### 5.     GO FISH's Objections Fail.

Because GO FISH lacks standing, there is no need to consider its objections to the Settlement.  In any event, GO FISH's objections fail on the merits.  *See* Smith Supp. Decl. ¶ 5.

*First*, GO FISH's objections regarding the second-round distribution are not ripe, as the Court-appointed neutral has yet to determine how any second-round distribution will be made.  *See* Balhoff Supp. Decl. ¶ 5; Perry Supp. Decl. ¶ 5.  GO FISH's assumptions about how the second-round distribution will be made are baseless.  *Second*, while GO FISH imagines that those fishing different species were competing against each other for settlement recoveries, the SCP was developed from the bottom-up to fully compensate ***all*** SCP participants.  *See* Perry Supp. Decl. ¶ 3; Balhoff Supp. Decl. ¶ 3.  *Third*, GO FISH suggests that the oyster leaseholders, IFQ holders, and crab trap payments are improperly included in the SCP.  Because assets like IFQs, crab traps, and

oyster leaseholds are essential capital assets to the fishing industry, this objection fails.  *See* Smith Supp. Decl. ¶¶ 9-12.

GO FISH further objects that oyster leaseholders receive compensation under the SCP that is many times the revenue they generate.  However, compensation to oyster leaseholders under the SCP is not tied to revenue in the same sense as for a vessel owner or lessee or boat captain compensation under the SCP.  While BP disputes the cause of oyster landing declines, oyster leaseholders are being compensated in the SCP, in part, for out-of-pocket funds to re-culch or otherwise tend to oyster leasebeds, and additional compensation reflects that oyster landings are returning to pre-spill levels more slowly than other species.  Tunnell Decl. ¶¶ 40-50; Tunnell Supp. Decl. ¶ 8.  Acre-by-acre cost to re-culch can be expensive.  *See* Nov. 8 Hr'g Tr. at 175:9.

*Fourth*, GO FISH complains that persons who received funds from the GCCF for seafood losses will have their compensation amount in the initial distribution offset by the prior GCCF payment.  Nevertheless, such claimants are eligible for a second-round distribution based on the full value of their seafood claims (***including*** any GCCF payouts).  *See* Settlement Agreement Ex. 10. *Fifth*, GO FISH complains that BP and the PSC have underestimated the number of acres held by leaseholders in Louisiana that would qualify under the SCP for Oyster Leasehold Interest compensation by counting only oyster leases registered with the State.  GO FISH is mistaken; to be eligible for Oyster Leasehold compensation under the SCP for oyster leaseholds in Louisiana, the leaseholder must be the lessee of an oyster lease for which the State has issued an oyster "lease identification number."  *See* Deepwater Horizon Claims Center, Economic & Property Damage C l a i m s ,   F r e q u e n t l y   A s k e d   Q u e s t i o n s   ¶   1 6 9 , https://cert.gardencitygroup.com/dwh/fs/faq?.delloginType=faqs; Smith Supp. Decl. ¶ 15. *Sixth*, GO

106

FISH asserts that when fish are less abundant, fishermen either continue fishing as intensely as before and catch less fish or stop fishing altogether.  *See* Obj. Doc. 226 at 16.  This assertion, according to expert evidence submitted by BP, "paints two extreme views of possible behavioral responses to abundance changes" that "[n]one of the empirical literature in fisheries economics supports." Smith Supp. Decl. ¶¶ 23-30.  Moreover, GO FISH's reliance on basin-level landings data to criticize the loss percentages in the SCP ignores the mobility of most participants in the fishing industry.  *See* Smith Supp. Decl. ¶ 32.  *Finally*, GO FISH's preliminary objections, Rec. Doc. 6353, also lack merit.  As explained in detail in BP's memorandum in support of final approval, (i) the Seafood Compensation Program is sufficient to protect against the risk of long-term damage; (ii) the SCP provides full and fair compensation to each of the fisheries falling within it; (iii) the documentation requirements are reasonable; (iv) the benchmark years available under the SCP are reasonable; (v) the RTP for subsistence claims is reasonable; (vi) the class release is reasonable, and does not infringe upon anyone's constitutional rights; and (vii) the Settlement does not penalize those who accepted transition payments.  *See* Rec. Doc. 7114-1 at 107-113.

### 6.    The Remaining Objections To The SCP Fail.

Certain objectors contend that the SCP is unfair because it is taking them longer to fulfill their individual fishing quotas ("IFQ").  *See* Obj. Doc. 104 at 3.  Because one core purpose of an IFQ program is to slow the harvest of a single species—as compared to an industry-wide quota, which created a race to fish among individuals before the aggregate quota was met and the season closed—this objection is not necessarily evidence of lingering harm.  Smith Supp. Decl. ¶ 40.  It is important to note that the IFQ program changed the management rules in 2010, and that these changes were made for reasons unrelated to the *Deepwater Horizon*.  *Id.*  The same objectors argue

that the finfish compensation plan should be altered to increase the catch factor reduction and cost percentage; these arguments are unsupported by data or analysis and fail for that reason.

One oyster leaseholder contends that the history of production of each individual oyster leasehold must be considered to avoid unfairness. *See* Obj. Doc. 141. The objection fails; the settling parties were free to decide that oyster leasehold compensation would instead be rationally based on the mapped location of such leaseholds, which makes determining such leasehold compensation far easier to administer. See Balhoff Decl. at 4; Perry Decl. at 4. Factoring in the administrability of different potential ways to compensate for claims is fair and reasonable.

One group of oyster harvesters argues that they are excluded from the SCP because there are no oyster leases in Apalachicola Bay. *See* Obj. Doc. 240. This objection fails, as under the Settlement Agreement oyster harvesters need not hold oyster leases to be eligible for compensation.

One objector objects to the cost percentages in the SCP. *See* Obj. Doc. 135. For the reasons expressed above, objections to the cost percentages and other calculations are unavailing.

Louisiana wrongly contends that landings data are irrelevant. *See* Obj. Doc. 227 at 12, 19. Landings data provide essential information and are widely used to assess the status of fisheries. *See* Smith Supp. Decl. ¶¶ 47-49; Tunnell Supp. Decl. ¶ 4. Furthermore, contrary to Louisiana's assertion, *see* Obj. Doc. 227 at 11-12, commercial landings data were among numerous types of data considered by Dr. Smith and Dr. Tunnell in concluding that the SCP is fair and reasonable. *See* Smith. Supp. Decl. ¶ 45, Tunnell Supp. Decl. ¶ 4. In reviewing the reasonableness of the SCP and sufficiency of its Fund, the Court has taken into consideration not only such evidence, but the evidence submitted by Class Counsel, the *Thanh Hai* plaintiffs, and Messrs. Balhoff and Perry (Court-appointed neutrals for the SCP).

h.   **The Parties' Agreement To Fund A Promotional Campaign Does Not Implicate Or Violate The *Cy Pres* Doctrine.**

Certain objectors contend that the parties' agreement to create a $57 million fund to promote Gulf Coast Tourism and Gulf Seafood, violates the *cy pres* doctrine. *See* Obj. Doc. 123 at 37; Obj. Doc. 230 at 17; Obj. Doc. 234 at 5, 33.  These objections fail.  This is not a situation in which a limited fund has been agreed to between the parties, distributions from such a fund have been made, and a court has converted the residual to a "next best" use not anticipated by the parties, or one that fails to operate in fact as a next-best use of that residual.  Here, from the outset, a specific allotment of money was demanded by the PSC and provided by BP, in addition to compensation to individual class member claimants, to provide benefits for class members by promoting Gulf seafood and tourism.  Alleged harm to the tourism and Gulf seafood industries are core components of the claimed damages being compensated by this Settlement.  Moreover, unlike in *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011), the parties have specifically agreed upon the payments.  And unlike *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012), here the Promotional Fund will provide real value to class members—on top of the full compensation that they will receive for their economic losses.  Klonoff Supp. Decl. ¶¶ 26-29.  Similar programs have been approved in other class action settlements.  *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179; *Bowling*, 143 F.R.D. 141; *In re Diet Drugs Prods. Liab. Litig.* 2000 WL 1222042.

i.   **GCCF Comparisons Are Legally Irrelevant.**

Certain objectors complain that the Settlement Program compares poorly to the GCCF.[42] This is not a legally relevant comparison:  while certain *Reed* factors require the Court to consider the amounts available under the Settlement with the amounts that would be available in litigation,

---

[42] *See, e.g.*, Obj. Doc. 101 at 1, 2, 5, 10-18; Obj. Doc. 155 at 1-2; Obj. Doc. 198 at 43; Obj. Doc. 227 at 22-25.

(i) nothing requires the Court to compare the Settlement to a different extra-judicial settlement process that preceded it and (ii) there was no basis to contend it would extend for any period in the future.  *See Turner*, 234 F.R.D. at 610 ("The analysis is whether the class action format is superior to other methods of adjudication, ***not whether a class action is superior to an out-of-court, private settlement program***.") (emphasis added); Klonoff Supp. Decl. ¶¶ 23-24.

Moreover, the Settlement Program actually improves upon the GCCF in a number of important ways, including that (i) it pays claims that the GCCF would not; (ii) its decisions are made pursuant to transparent and objective frameworks; (iii) its administrator was appointed by this Court; and (iv) its operations are designed to be claimant-responsive and claimant-friendly, and they are subject to the active supervision of this Court.  The Court notes, in this regard, that numerous Objections and other filings have raised concerns and complaints with the GCCF, and would seem to contradict the claims by some objectors that the GCCF was somehow more favorable.[43]

Even if a comparison to the GCCF were relevant under some construction of Federal Rule of Civil Procedure 23(b)(3), the Court finds that this Settlement is superior to the GCCF at the very least because it is judicially supervised, meaning that it is a program that must meet heightened guarantees of consistency with due process and fairness.

### v. Class Members Received Clear Information About Their Rights.

Certain objectors complain that the Settlement Agreement is too complicated.  *See* Obj. Doc. 122 at 15; Obj. Doc. 142 at 1-2.  Yet the Settlement Agreement is designed to be transparent as a claimant or his or her counsel reviews the frameworks relevant to particular circumstances, but also

---

[43] *See, e.g.*, Obj. Doc. 38; Obj. Doc. 50; Obj. Doc. 70; Obj. Doc. 71; Obj. Doc. 95; Obj. Doc. 97; Obj. Doc. 125; Obj. Doc. 127; Obj. Doc. 154; Obj. Doc. 239; Obj. Doc. 242; Obj. Doc. 244; Obj. Doc. 250; Obj. Doc. 226-1 at 7, 10; *see also* Rec. Doc. 912; Rec. Doc. 913; Rec. Doc. 1308; Rec. Doc. 1312; Rec. Doc. 1318; Rec. Doc. 1324; Rec. Doc. 1327; Rec. Doc. 1894; Rec. Doc. 3423; Rec. Doc. 6356-3; Rec. Doc. 7473-1.

sufficiently detailed to ensure that determinations made by the Settlement Program are objective, consistent, and predictable.  Particularly because few if any claimants would need to read and understand the entire Settlement Agreement, this objection is meritless.  *See* Azari Decl. ¶ 22.  These objectors also ignore all the resources placed at their disposal to understand the Settlement Agreement, such as a comprehensive and up-to-date reference resource of "frequently asked questions" on the Settlement Program's web site, the availability of the toll-free hotline, and Class Counsel's office, which assists claimants and provides information on a daily basis.  *See also* note 28, *supra*.

Two other objectors contend that the Settlement is insufficiently clear because it does not define "significant services" to the offshore oil and gas industry in Paragraph 5.10.3.2, which is used to determine if certain claims should be evaluated as possible moratorium losses.  *See* Obj. Doc. 95 at 3-4; *see also* Obj. Doc. 210 (adopting this objection).  Given that both objectors appear to exist primarily if not entirely to provide such services, this objection is unavailing.  Moreover, the alleged consequence of which these objectors complain—arbitrary exclusion from the class by "nearly unlimited" Settlement Program discretion, Obj. Doc. 95 at 4—is also unavailing because the Settlement provides no such discretion.

Certain objectors contend that they cannot evaluate the fairness of the Settlement because Class Counsel did not make their trial evidence available to them.[44]  Objectors have identified no authority supporting such an objection, and the Court is aware of none.  Objectors also ignore the fact that the deposition exhibits, "which constitute the key liability documents in the case," have

---

[44] *See* Obj. Doc. 88 at 3; Obj. Doc. 95 at 5-6; Obj. Doc. 97 at 2-3; Obj. Doc. 98 at 3 & n.2; Obj. Doc. 99 at 3 & n.3; Obj. Doc. 100 at 2 & n.2; Obj. Doc. 210; Obj. Doc. 146 at 2-3; Obj. Doc. 157 at 3; Obj. Doc. 159 at 3; Obj. Doc. 167 at 10; Obj. Doc. 177 at 3; Obj. Doc. 181 at 3; Obj. Doc. 189 at 10.

been available for over a year to any plaintiff's attorney who executes Appendix A to Pre-Trial Order No. 13.  *See* Rec. Doc. 641.

### vi.   The Settlement Notice Was Clearly Adequate.

No valid objections have been submitted regarding the notice program, which surpassed all the requirements of Rule 23 and constitutional due process.  *See* Azari Supp. Decl. ¶ 15.  Certain objectors speculate that BP failed to comply with its obligations under CAFA by failing to mail notice packets to all relevant state officials.  *See* Obj. Doc. 123 at 45; Obj. Doc. 234 at 34; Obj. Doc. 230 at 3.  This objection is unsupported and incorrect.  All applicable CAFA requirements were satisfied in full.  Others object that the notice did not explain the reasons justifying the negotiation of the Settlement, including its economic loss zones.  *See* Obj. Doc. 118 at 6; Obj. Doc. 163 at 6. No legal principle requires such information, and indeed because the notice must be "presented in a neutral manner," *Rodriguez*, 563 F.3d at 962, it would be inappropriate for the notice to include detailed justifications.  *See, e.g.*, *Lane*, 2012 WL 4125857, at *10; *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); Azari Supp. Decl. ¶¶ 20-21.  Another objector contends that the notice was not written in sufficiently clear language.  *See* Obj. Doc. 122 at 10-14. This objection is rejected.  *See* Azari Supp. Decl. ¶¶ 23-25; Wheatman Decl. ¶¶ 9-13.

### vii.   The Remaining Objections Lack Merit.

Certain objectors contend that the release is impermissibly broad.  *See* Obj. Doc. 114 at 5; Obj. Doc. 245 at 2; Obj. Doc. 247; Obj. Doc. 265 (supplement to Obj. Doc. 145) at 4.  But the law is settled that defendants entering into a class settlement are entitled to obtain global peace and that class action releases may be broader than the claims directly compensated under the Settlement. *See, e.g.*, *Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983); *In re Holocaust Victim Assets*

*Litig.*, 413 F.3d 183, 186 (2d Cir. 2005) (per curiam); *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 805 (8th Cir. 2004); *see also* Miller Supp. Decl. ¶¶ 21-22; Klonoff Supp. Decl. ¶ 16.  Moreover, the release was crafted with care, and specifically excludes certain Reserved Claims.  *See* Settlement Agreement ¶ 10.2.  Such careful negotiation of the release was "an example of reasoned statesmanship."  Coffee Supp. Decl. ¶ 38; *see also DeHoyos*, 240 F.R.D. at 312 ("[T]he undisputed evidence shows the release has been executed voluntarily and with adequate knowledge, as Class Counsel have evaluated the relative merits of each party's case and entered into the settlement with a full and fair view of the case's strengths and weaknesses.") (citations omitted); *Cicero v. DirectTV, Inc.*, No. 07-1182, 2010 WL 2991486, at *8  (C.D. Cal. July 27, 2010) ("The language of the release was the product of careful bargaining by Class Counsel and Directv and the Court sees no need to modify it.  To do so may risk undoing a process which resulted in a very fair and reasonable settlement for the many Class Members.").

Certain objectors contend that the Settlement is coercive because if they reject it, the alternative is long-running and expensive litigation.  *See* Obj. Doc. 95 at 3-4; Obj. Doc. 167 at 3; Obj. Doc. 178 at 5-6; Obj. Doc. 189 at 6.  But under the *Reed* factors, the cost and length of litigation weigh in favor of approving the Settlement, not against.  *See Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004).

Contrary to the speculation of certain objectors, *see* Obj. Doc. 101 at 18-28; Obj. Doc. 230 at 17-18, Rec. Doc. 6902-1, there was no collusion in the negotiation of the Settlement.

Certain objectors contend that the possibility of re-oiling counsels against final approval, particularly in light of Hurricane Isaac.[45]  *First*, the Settlement's RTPs were specifically designed to accommodate any risk of future re-oiling.  *See* Taylor Decl. ¶ 58.  *Second*, nothing has occurred since the Settlement was reached, including Hurricane Isaac, that demonstrates that the RTPs and other compensation are inadequate.  *See* Taylor Supp. Decl. ¶¶ 27-34; Dent Supp. Decl. ¶ 4; Wharton Supp. Decl. ¶¶ 4-10; Tunnell Supp. Decl. ¶ 12.

Selmer Salvesen's April 8, 2012 objections, *see* Rec. Doc. 6186-1, lack merit. To begin with, the Court's resolution of pre-trial motions does not constitute a "trial proceeding" that the Court may not conduct under *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998). *See* David F. Herr, MULTIDISTRICT LITIG. MANUAL § 9:13. Additionally, Salvesen ignores that several motions were resolved in connection with the Limitation Action.[46]  And regardless, the Court is not acting pursuant to 28 U.S.C. § 1407 with respect to this Settlement, as the *Bon Secour* complaint was filed directly in this district, *see Bon Secour Fisheries, Inc. v. BP Exploration & Prod. Inc.*, No. 12-970 (E.D. La.).  Selmer Salvesen's July 2 objections, *see* Rec. Doc. 6831-1, are also rejected.  *See* Rec. Doc. 7615 (denying this motion).

Certain submissions complained about the procedures by which the Court conducted the fairness hearing.  *See* Rec. Doc. 7869 (filing by Stuart Smith, Esq., requesting at least thirty minutes

---

[45]  Obj. Doc. 52 at 1; Obj. Doc. 88 at 3-5; Obj. Doc. 97 at 3-5; Obj. Doc. 98 at 3-5; Obj. Doc. 99 at 4-5; Obj. Doc. 144 at 17-18; Obj. Doc. 157 at 3-5; Obj. Doc. 159 at 3-5; Obj. Doc. 167 at 4; Obj. Doc. 178 at 5; Obj. Doc. 183 at 21; Obj. Doc. 186 at 5; Obj. Doc. 189 at 4-5, 12; Obj. Doc. 190 at 20-21; Obj. Doc. 198 at 8-9; Obj. Doc. 201 at 7.

[46]  Unique features of the Limitation Action blunt Salvesen's *Lexecon* argument in several respects:  (1) the Limitation Action was transferred to the Eastern District of Louisiana for all purposes, *see In re Triton Asset Leasing GmbH*, No. 10-1721, Rec. Doc. 207 (S.D. Tex. Aug. 16, 2010); (2) the Limitation Act and the applicable rules give the Court broad discretion and power to resolve third-party claims, *see, e.g.*, *Karim v. Finch Shipping Co.*, 265 F.3d 258, 264 (5th Cir. 2001); and (3) jury trial rights generally do not attach to Limitation Actions, *see Becker v. Tidewater, Inc.*, 405 F.3d 257, 259 (5th Cir. 2005); *Karim*, 265 F.3d at 264.

to speak); Rec. Doc. 7871 (filing by Daniel Becnel, Esq., complaining that he was not selected as a representative counsel).  However, the procedures by which the Court conducted the fairness hearing were well within its discretion.  *See also* Rec. Doc. 7358.

Certain objections are either so idiosyncratic, incomprehensible, or mislabeled that they do not warrant detailed consideration.[47]  The Court has nonetheless read and thoughtfully considered these objections—as it did with all objections, from every source—and finds nothing in them that would warrant a change to any of its conclusions in this Order and Reasons.[48]  Finally, many entries appearing on the objections docket are duplicate filings.[49]

### viii.   The Non-Objections Lack Merit.

Certain parties who lack standing have made submissions that, while not challenging the fairness of the Settlement, dispute certain statements, representations, and evidence made in BP's memorandum and submissions supporting final approval.  *See* Obj. Doc. 164 (Monroe County); Obj. Doc. 211 (Alabama); Obj. Doc. 215 (United States); Obj. Doc. 216 (City of St. Pete Beach and City

---

[47] *See* Obj. Doc. 32; Obj. Doc. 38; Obj. Doc. 39; Obj. Doc. 44; Obj. Doc. 51; Obj. Doc. 52; Obj. Doc. 58; Obj. Doc. 105-113 (technical supplements to other objections); Obj. Doc. 137; Obj. Doc. 188; Obj. Doc. 194; Obj. Doc. 195; Obj. Doc. 196; Obj. Doc. 197; Obj. Doc. 199; Obj. Doc. 200; Obj. Doc. 217; Obj. Doc. 244; Obj. Doc. 245; Obj. Doc. 255; Obj. Doc. 262; Rec. Doc. 7169; Rec. Doc. 7311; Rec. Doc. 7316; Rec. Doc. 7340.

[48] Additionally, two objectors complain that they should not be subject to the Court's holdback orders.  *See* Obj. Doc. 133 at 2; Obj. Doc. 136 at 1.  Complaints about the holdback orders are outside the parameters of whether to grant this Settlement final approval.  Those orders were in large measure also set in place by the Court *before* this Settlement was reached, and opt-outs lack standing to contest the Settlement.  The Court, moreover, has recently denied a variety of motions challenging the most recent hold-back order.  *See* Rec. Doc. 7786.

[49] *See* Obj. Doc. 47 (duplicate of Obj. Doc. 44); Obj. Doc. 56 (duplicate of Obj. Doc. 53); Obj. Doc. 63 (duplicate of Obj. Doc. 55); Obj. Doc. 75 (duplicate of Obj. Doc. 73); Obj. Doc. 76 (duplicate of Obj. Doc. 74); Obj. Doc. 119, 129, and 192 (duplicates of Obj. Doc. 117); Obj. Doc. 128 (duplicate of Obj. Doc. 120); Obj. Doc. 153 (duplicate of Obj. Doc. 116); Obj. Doc. 163 (duplicate of Obj. Doc. 118); Obj. Doc. 165 (duplicate of Obj. Doc. 2); Obj. Doc. 172 (duplicate of Obj. Doc. 166); Obj. Doc. 204 (duplicate of Obj. Doc. 115); Obj. Doc. 212 (duplicate of Obj. Doc. 122); Obj. Doc. 214 (duplicate of Obj. Doc. 123); Obj. Doc. 229 (duplicate of Obj. Doc. 225); Obj. Doc. 231 (duplicate of Obj. Doc. 186); Obj. Doc. 233 (duplicate of Obj. Doc. 145); Obj. Doc. 235 (duplicate of Obj. Doc. 144); Obj. Doc. 238 (duplicate of Obj. Doc. 198); Obj. Doc. 248 (duplicate of Obj. Doc. 246); Obj. Doc. 251 (duplicate of Obj. Doc. 250); Obj. Doc. 263 (duplicate of Obj. Doc. 259); Obj. Doc. 264 (duplicate of Rec. Doc. 7480, denied by Rec. Doc. 7897); Obj. Doc. 266 (duplicate of Obj. Doc. 265).

of Treasure Island); Obj. Doc. 218 (Mobile County, Alabama); *see also* Obj. Doc. 187 (adopting United States filing); Obj. Doc. 219 (same); Obj. Doc. 220 (same); Obj. Doc. 221 (same); Obj. Doc. 222 (same).  While these filings suggest that certain parties view the evidence differently from how BP does, none suggests that the Settlement—which is designed to ***resolve*** such disagreements—is anything but fair, reasonable, and adequate.  By approving this settlement between BP and the members of the class, the Court does not make any factual findings or reach any conclusions of law that bind or affect the substantive rights of any other party.

*    *    *

None of the objections, whether filed on the objections docket or elsewhere, have shown the Settlement to be anything other than fair, reasonable, and adequate.  All objections to the Settlement are hereby overruled on the various grounds specified above.  The Court finds that the Settlement should be approved as fair, reasonable, and adequate.

*    *    *

**SO ORDERED.**

The Court will issue a separate "Order and Judgment" to accompany this Order and Reasons.

Signed in New Orleans, Louisiana, this 21st day of December, 2012.

_____
United States District Judge

## APPENDIX A:  INDEX OF DECLARATIONS

**I.      Joint Submissions**

Azari Decl. (Rec. Doc. 7110-1) and Azari Supp. Decl. (Rec. Doc. 7726-1).

Balhoff Decl. (Rec. Doc. 7110-2) and Balhoff Supp. Decl. (Rec. Doc. 7726-2).

Coffee Decl. (Rec. Doc. 7110-3) and Coffee Supp. Decl. (Rec. Doc. 7726-4).

Monger Decl. (Rec. Doc. 7110-4) and Monger Supp. Decl. (Rec. Doc. 7726-5).

Perry Decl. (Rec. Doc. 7110-5) and Perry Supp. Decl. (Rec. Doc. 7726-7)

**II.     Class Submissions**

Herman Decl. (Rec. Doc. 7104-5).

Issacharoff Decl. (Rec. Doc. 7104-4).

Kinsella Decl. (Rec. Doc. 6266-3).

Klonoff Decl. (Rec. Doc. 7104-3) and Klonoff Supp. Decl. (Rec. Doc. 7727-4).

Rice Negotiations Decl. (Rec. Doc. 7104-6), Rice Seafood Decl. (Rec. Doc. 7104-6 at 13), and Rice Fees Decl. (Rec. Doc. 7104-6 at 21).

Wheatman Decl. (Rec. Doc. 6266-4).

Class Representatives:  The PSC/Class Counsel has submitted the declarations of all fifteen class representatives, and they appear in the record as follows:  Bon Secour Fisheries, Inc. Decl. (Rec. Doc. 7104-6 at 31); Friloux Decl. (Rec. Doc. 7104 at 34); Gallo Decl. (Rec. Doc. 7104-6 at 37); Fort Morgan Realty, Inc. Decl. (Rec. Doc. 7104-6 at 39); GW Fins Decl. (Rec. Doc. 7104-6 at 42); Hutto Decl. (Rec. Doc. 7104-6 at 45); Irwin Decl. (Rec. Doc. 7104-6 at 48); Kee Decl. (Rec. Doc. 7104-6 at 51); Tesvich Decl. (Rec. Doc. 7104-6 at 54); Lake Eugenie Land and Development, Inc. Decl. (Rec. Doc. 7104-6 at 57); Lundy Decl. (Rec. Doc. 7104-6 at 61); Guidry Decl. (Rec. Doc. 7104-6 at 64); Panama City Beach Dolphin Tours & More LLC Decl. (Rec. Doc. 7104-6 at 67); Sellers Decl. (Rec. Doc. 7104-6 at 70); Zeke's Charter Fleet, LLC Decl. (Rec. Doc. 7104-6 at 73).

**III.    BP Submissions**

Dent Decl. (Rec. Doc. 7114-4) and Dent. Supp. Decl. (Rec. Doc. 7731-1).

Fishkind Decl. (Rec. Doc. 7114-5) and Fishkind Supp. Decl. (Rec. Doc. 7731-2).

Godfrey Decl. (Rec. Doc. 7114-9).

Henley Decl. (Rec. Doc. 7114-11) and Henley Supp. Decl. (Rec. Doc. 7731-3).

Jeffrey Decl. (Rec. Doc. 7114-12) and Jeffrey Supp. Decl. (Rec. Doc. 7731-4).

Kelley Decl. (Rec. Doc. 7114-13).

Landry Decl. (Rec. Doc. 7114-14) and Landry Supp. Decl. (Rec. Doc. 7731-5).

Leggett Decl. (Rec. Doc. 7114-15).

Miller Decl. (Rec. Doc. 7114-16) and Miller Supp. Decl. (Rec. Doc. 7731-6).

Pearson Decl. (Rec. Doc. 7731-7).

Richardson Decl. (Rec. Doc. 7114-17) and Richardson Supp. Decl. (Rec. Doc. 7731-8).

Sharp Decl. (Rec. Doc. 7114-18) and Sharp Supp. Decl. (Rec. Doc. 7731-9).

Smith Decl. (Rec. Doc. 7114-19) and Smith Supp. Decl. (Rec. Doc. 7731-10).

Taylor Decl. (Rec. Doc. 7114-20) and Taylor Supp. Decl. (Rec. Doc. 7731-11).

Travis Decl. (Rec. Doc. 7731-12).

Tunnell Decl. (Rec. Doc. 7114-22) and Tunnell Supp. Decl. (Rec. Doc. 7731-13).

Wharton Decl. (Rec. Doc. 7114-23) and Wharton Supp. Decl. (Rec. Doc. 7731-14).

<u>**APPENDIX B:  CLASS DEFINITION**</u>

(a)  Class Definition

Economic and Property Damages Settlement Class shall mean the NATURAL PERSONS and ENTITIES defined in this Section 1, subject to the EXCLUSIONS in Section 2 below.  If a person or entity is included within the geographical descriptions in Section 1.1 or Section 1.2, and their claims meet the descriptions of one or more of the Damage Categories described in Section 1.3, that person or entity is a member of the Economic and Property Damages Settlement Class, unless the person or entity is excluded under Section 2:

1.1.    Individuals.  Unless otherwise specified, all Natural Persons residing in the United States who, at any time between April 20, 2010 and April 16, 2012, lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, or owned or leased or worked on a vessel harbored or HOME PORTED in the States of Louisiana, Mississippi, or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida (the "GULF COAST AREAS") (Exhibit 22), or the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23 ("SPECIFIED GULF WATERS"), or worked on a vessel in Specified Gulf Waters after April 20, 2009.  With respect to SEAFOOD CREW  Claims, persons must have worked on a vessel that landed SEAFOOD in the Gulf Coast Areas after April 20, 2009.

and

1.2.    Entities.  All Entities doing business or operating in the Gulf Coast Areas or Specified Gulf Waters that:

1.2.1.  at any time from April 20, 2010 to April 16, 2012, owned, operated, or leased a physical facility in the Gulf Coast Areas or Specified Gulf Waters and (A) sold products in the Gulf Coast Areas or Specified Gulf Waters (1) directly to CONSUMERS OR END USERS of those products or (2) to another Entity that sold those products directly to Consumers or End Users of those products, or (B) regularly purchased Seafood harvested from Specified Gulf Waters in order to produce goods for resale;

1.2.2.  are service businesses with one or more full-time employees (including owner-operators) who performed their full-time services while physically present in the Gulf Coast Areas or Specified Gulf Waters at any time from April 20, 2010 to April 16, 2012; or

1.2.3.  owned, operated, or leased a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2)  landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; or

1.2.4.  owned or leased REAL PROPERTY in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012;

1.3.  Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

1.3.1.  The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-15:

1.3.1.1.  Seafood Compensation Program.  Damages suffered by a COMMERCIAL FISHERMAN, Seafood Crew, or SEAFOOD VESSEL OWNER that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, inter alia, OYSTER LEASEHOLDERS and IFQ Owners.  (Exhibit 10).  Claims for Economic Damage arising from the fishing, processing, selling, catching, or harvesting of menhaden (or "pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.

1.3.1.2.  Economic Damage Category.  Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT, subject to certain Exclusions. (Exhibits 16-19)

1.3.1.3.  Subsistence Damage Category.  Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and GAME, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by the CLAIMANT due to or resulting from the Deepwater Horizon Incident.  (Exhibit 9)

1.3.1.4.    VoO Charter Payment Category.  Damages suffered by Natural Persons or Entities who registered to participate in BP's Vessels of Opportunity ("VoO") program and executed a VoO MASTER VESSEL CHARTER AGREEMENT with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as CHARTERER, and completed the initial VoO training program.

1.3.1.5.    Vessel Physical Damage Category.  Physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program.  (Exhibit 14)

1.3.1.6.    Coastal Real Property Damage Category.  Damages alleged by a Coastal Real Property Claimant that meet the requirements set forth in the Coastal Real Property Claim Framework.

1.3.1.7.    Wetlands Real Property Damage Category.   Damages alleged by a Wetlands Real Property Damage Claimant that meet the requirements set forth in the Wetlands Real Property Claim Framework.

1.3.1.8.    Real Property Sales Damage Category.  Damages alleged by a Real Property Sales Claimant that meet the requirements set forth in the Real Property Sales Framework.

1.3.1.9.    Individuals/Employees in Otherwise Excluded Oil and Gas, Gaming, Banking, Insurance, Funds, Defense Contractors, Developers Industries, and any Entity selling or marketing BP-branded fuel (including jobbers and branded dealers):  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims for Economic Damage outside of these excluded industries, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.10.    Individuals/Employees in Support Services to Oil and Gas Industry:  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses/employers in the SUPPORT SERVICES TO OIL AND GAS INDUSTRY, described in Exhibit 16 may submit Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non oil and gas industry Economic Damages due to or resulting from the Deepwater Horizon Incident, except for moratoria claims.  As is also more fully described in Exhibit 16, these individuals and employees may also

pursue Claims for other Economic Damage outside the Support Service to Oil and Gas Industry, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.11.   Businesses/Employers in Otherwise Excluded Gaming, Banking, Insurance, Funds, Defense Contractors and Developers Industries:  As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims only for Coastal Real Property Damage and Wetlands Real Property Damage, but are not entitled to recover under any other aspect of the Settlement.

1.3.1.12.   Businesses/Employers in Support Services to Oil and Gas Industry:  As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in the "Support Services to Oil and Gas Industry," described in Exhibit 16, may submit Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non-oil and gas industry Economic Damages arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, except for moratoria claims, and may pursue all other recovery permitted under other aspects of the Settlement.

(b)   Exclusions from the Economic and Property Damages Settlement Class Definition

2.1.   Notwithstanding the above, the following individuals and Entities, including any and all of their past and present predecessors, successors, personal representatives, agents, trustees, insurers, reinsurers, indemnitors, subrogees, assigns, and any other Natural Person, legal or juridical person or Entity entitled to assert any Claim on behalf of or in respect of any such individual or Entity in their respective capacities as such are excluded from the Economic Class.

2.2.   Excluded Individuals or Entities:

2.2.1.   Any Economic Class Member who or which timely elects to be excluded from the Economic Class under the deadlines and procedures to be set forth in the ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS ACTION SETTLEMENT NOTICE.

2.2.2.   Defendants in MDL 2179, and individuals who are current employees, or who were employees during the CLASS PERIOD, of BP or other defendants in MDL 2179.

2.2.3.   The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of the MDL, and members of any such judge's or current law clerk's immediate family.

B-4

2.2.4.   The following exclusions are based on the substantive nature of the business, not the legal or juridical form of that business.   Any of the following types of Entity, or any Natural Person to the extent he or she alleges Economic Damage based on their employment by such an Entity, during the Class Period are excluded:

2.2.4.1.   Financial Institutions as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, commercial banks; savings institutions; credit card issuers; credit insurers; factors or other sales finance entities; financial or investment advisers or portfolio managers; fund managers; investment banking entities; lending institutions; real estate mortgage or lending entities; brokers or dealers of securities, commodities, commodity contracts or loans; securities or commodities exchanges; entities serving as custodians, fiduciaries or trustees of securities or other financial assets; or entities engaged in other financial transaction intermediation, processing, reserve or clearinghouse activities, provided, that the following shall not be excluded solely pursuant to this Section 2.2.4.1 unless they are subject to a different exclusion:  stand-alone ATMs, credit unions, pawn shops, businesses engaged predominantly in making payday loans or paycheck advances and businesses that sell goods and services and offer financing on these purchases to their customers.

2.2.4.2.  Funds, Financial Trusts, and Other Financial Vehicles, as identified in the NAICS codes listed on Exhibit 18, after giving effect to the bracketed exceptions contained in NAICS Codes 525920 and 523991, which include by way of example, public-open end investment funds; investment funds; real estate investment trusts; REMICS; mutual funds; money market funds; derivatives; health and welfare funds; insurance funds; pension funds; financial trusts; and special purpose financial vehicles provided, that successions, estates, testamentary trusts, trusts of Natural Persons, bankruptcy estates, limited liability companies, corporations, Sub-Chapter "S" corporations, partnerships, limited partnerships, joint ventures, and any other businesses or juridical Entities, shall not be excluded pursuant to this Section 2.2.4.2 solely by reason of their form of legal or juridical structure or organization, except to the extent they are excluded pursuant to another exclusion in Section 2.2 of this Agreement.

2.2.4.3.   Gaming, as identified in the NAICS codes listed on Exhibit 18, which includes, by way of example,  casinos; casino hotels; off-track betting parlors; racetracks and other gambling establishments provided, that the following shall not be excluded solely pursuant to this Section 2.2.4.3 unless they are subject to a

different exclusion: (a) bingo parlors, and (b) video gaming at bars, bingo parlors, hotels, off-track betting parlors, racetracks, restaurants and truck stops.

2.2.4.4.  Insurance Entities, as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, insurance carriers issuing disability, health, life, medical, property and casualty, title or other insurance; reinsurers; insurance agencies and brokerages; underwriting agencies or organizations; claims adjusters and processors; third-party insurance or fund administrators; or other insurance-related businesses.

2.2.4.5.  Oil and Gas Industry, as identified in the NAICS codes listed on Exhibit 17, which includes by way of example, firms engaged in:  extracting crude petroleum, natural gas or other hydrocarbons; drilling wells; preparing, maintaining or constructing petroleum or natural gas well-sites or other mineral extraction sites; mining; maintaining or constructing petroleum or natural gas pipeline or distribution facilities; pipeline distribution of crude petroleum, refined petroleum, oil or natural gas; petroleum or natural gas refining or other mineral refining and/or manufacturing; manufacturing petroleum lubricating oil and grease, petrochemical products, or other petroleum and coal products or chemical products derived from extracted minerals; merchant wholesaling of construction and mining (except oil well) machinery and equipment; wholesale distribution of oil well machinery, equipment and supplies; wholesale distribution of petroleum, petroleum products, other extracted minerals, chemical products produced from extracted or refined minerals, petroleum bulk stations and terminals, petroleum and petroleum products merchant wholesalers.

2.2.4.6.   Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor.

2.2.4.7.  Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties.  This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, provided, however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9

2.2.4.8.    Any Entity selling or marketing BP-branded fuel, including jobbers and branded dealers.

2.2.5.  GOVERNMENTAL ORGANIZATIONS, as defined in this Agreement, provided that Native American tribal Entities may consent to participate in the Settlement as to otherwise eligible Claims.

2.2.6.  Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF RELEASE AND COVENANT NOT TO SUE, provided, however, that the execution of a GCCF Release and Covenant Not to Sue shall not prevent a Natural Person or Entity from making a VoO Charter Payment Claim or a Vessel Damage Claim, nor shall a release covering only bodily injury prevent a Natural Person from making Claims under this Agreement.