

**U.S. Department of Justice**
**Environmental Enforcement Section**
**Environment and Natural Resources Division**

---

*P.O. Box 7611*
*Ben Franklin Station*
*Washington, DC  20044-7611*

*Telephone  (202)514-0180*
*Sarah.Himmelhoch@usdoj.gov*

**BY ELECTRONIC MAIL**                                          December 21, 2012

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

              Re: MDL 2179: Insufficiency of BP's 30(b)(6) Witnesses

Dear Judge Shushan:

        BP has engaged in a concerted effort to evade discovery on flow rates from the Macondo
Well --- a subject at the heart of the Phase 2 litigation.  Specifically, individuals designated by
BP to testify in response to the Agreed 30(b)(6) Deposition Notice of BP Defendants, served
August 2, 2012 (Att. 1) ("Agreed Notice"), were unknowledgeable and unprepared to answer
questions squarely within the scope of topics for which they were designated, and BP's counsel
repeatedly made scope objections based on implausibly and unfairly constrained interpretations
of the specified topics.

        The process for Phase 2 discovery in this case was carefully formulated by this Court to
foster efficiency and to avoid pitfalls encountered in Phase 1.  *See, e.g.*, Order, 6/27/12, Doc.
6808 at 2; Order, 3/6/12, Doc. 5968 at 5; Order, 9/8/11, Doc. 3949 at 2.  The Agreed Notice
topics resulted from arduous negotiations over many months.  BP has taken unjustifiably narrow
positions regarding the scope of these topics, thus undermining the discovery process envisioned
by the Court.  The United States has attempted, unsuccessfully, to resolve these issues.  Without
Court involvement, BP will achieve the result that Rule 30(b)(6) was designed to avoid,[1] and
will prevent discovery by the United States on matters central to this litigation.[2]

        BP's reading of the topics divorces certain mechanical components of source control
methods from their intended use to capture or kill the flow from the Macondo Well.  By taking
such an implausibly narrow position, BP has avoided designating and preparing witnesses who
can testify about flow rate calculations and modeling in connection with these various response
methods — despite the centrality of flow rate estimates to the response efforts.  Nevertheless, the

---

[1] "Rule 30(b)(6) is designed to 'avoid the possibility that several officers and managing agents might be
deposed in turn, with each disclaiming personal knowledge of facts that are clearly known to persons within the
organization and thus to the organization itself.'" *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 432-
433 (5th Cir. 2006) (internal citation omitted); *United States v. J.M. Taylor*, 166 F.R.D. 356, 360 (M.D.N.C.
1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C.1996).

[2] BP responded to the United States' "meet and confer" letter of November 20, 2012, via a letter from Robert
Gasaway to Sarah Himmelhoch dated November 29, 2012 (Att. 2) ("Gasaway Letter").

United States is not seeking relief in each instance where BP has taken an unfairly constrained interpretation of the topics in the Agreed Notice. For example, Topic 8 calls for the "manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure the temperature of the discharge from the Macondo Well . . . ." Agreed Notice at 4-5. BP designated Mr. John Hughes.[3] But, at the deposition, BP argued that the Topic was limited solely to where and when the thermometer was placed, and what the reading was. Thus, BP argued that the designation did not include any analysis, estimates, accuracy, or even summarization of the measurements, and that it also did not include the accuracy or inaccuracy of the measurements as a prediction or estimate of the oil temperature. For example, regarding a list of all temperature measurements taken, BP objected to the scope, and did not prepare the witness to answer, which of the measurements was "the most accurate reflection of the temperature of the flowing oil as it exited the BOP." Deposition of John Hughes, November 27-28, 2012 (Vols. 1-2) (Att. 4) at 257:8-258:12. Similarly, the witness was not prepared to answer whether the riser temperature measurements were an accurate measurement of the temperature of the exterior of the riser. *Id.* at 306:5-307:10. Regarding the temperature measurement taken in the plume under the top hat, the witness could not answer (and counsel objected to scope) as to whether a particular temperature measurement was "a good characterization of the temperature of the oil at the wellhead." *Id.* at 373:3-374:20.

These examples are provided for illustrative purposes only. Rather, as set forth below, the United States seeks the Court's intervention on narrow issues most central to the discovery effort.

A. <u>Duties under Rule 30(b)(6)</u>. The Fifth Circuit mandates that a corporation's duty under Fed. R. Civ. P. Rule 30(b)(6) is twofold: "the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to *prepare* those persons in order that they can answer fully, completely, unevasively the questions posed . . . .'" *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (internal citations omitted) (emphasis in original). "If it becomes obvious that [a designee] is deficient, the corporation is obligated to provide a substitute." *Id.* at 433.

The rule "places the burden of identifying responsive witnesses . . . on the corporation." *Resolution Trust Corp. v. Southern Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir. 1993). "If [the designated] agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all." *Id.; Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d at 433-434 (quoting *Resolution Trust Corp.*). Also, "[t]he deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Id.* at 433. That duty includes "impart[ing] to [the witness] the information obtained from individuals with personal knowledge within the organization." *Id.* at 434.

B. <u>BP has failed with respect to both duties under Rule 30(b)(6) and has objected to questions squarely within the scope of the agreed topics as described below.</u>

1. <u>Robert Sanders - Topic 12</u>: The Agreed Notice includes the following topic 12:

The use of any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo MC252 well undertaken by or on behalf of BP or the

---

[3] BP Letter of September 27, 2012 to the Court ("BP Letter") (Att. 3) at 6.

> Unified Command *in connection with* the analysis, consideration or execution of any Method (as that term is defined in Topic 1).

Agreed Notice at 5 (Att. 1) (emphasis added).  Topic 1 in turn provides in relevant part:

> For any and all attempts after April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well by each of the following methods . . . : . . . Macondo Relief Well No.1, and Macondo Relief Well No. 2 (hereinafter collectively referred to as "Methods"): . . . .

*Id*. at 1.  BP designated Robert Sanders for Topic 12 as it relates to "Relief Wells."  BP Letter at 7 (Att. 3).

BP, however, takes the astounding position that the planned use of the relief wells to effect a dynamic kill of the Macondo Well is outside the scope of Topic 12, when that was their very purpose.  Thus, BP's designee was unprepared to testify about the "use of any analysis, calculations, assumptions or modeling of the flow rate . . . in connection with the analysis, consideration or execution of" the relief wells. [4]

Indeed, Mr. Sanders acknowledged, over objection of counsel, that the relief wells were initially intended to be a dynamic kill method:

> A. The "dynamic kill process" refers to establishing a fluid column, which is a hydrostatic, which equates to a pore pressure -- a pressure, together with the friction involved in that target wellbore, will generate enough pressure to overcome a flowing well.
> * * *
> Q. (By Ms. Himmelhoch) And that was the method that BP intended to use with the relief wells until the capping stack was put in place; is that correct?
> MR. BENTSEN: Objection, form.

---

[4] This failure is especially stark given that the planning and implementation of the relief wells began on April 21, 2010 and continued throughout the period when oil was flowing into the Gulf. (See, e.g., Stipulated Facts Concerning Source Control Events, Doc. 7076, Nos. 24, 29, 47, 70, 137, & 163.)  Moreover, BP provided the following response in its May 24, 2010 letter to Congressman Markey:

> 12. Could an increased flow from the riser pipe affect proposed or attempted efforts to stop the flow of oil, such as . . . the drilling of relief wells for plugging the well bore?
> [A.] Yes. Flow rates have been considered in connection with all efforts to stop the flow of oil."

Depo. Ex. 10358, at p. 4, No. 12 (Att. 5).  Furthermore, the 30(b)(6) designee for Wild Well Control (a BP contractor that assisted with efforts to control the Macondo well), testified that the relief well was being drilled primarily to effect a dynamic kill, and that information regarding the flow rate was necessary to establish the rate of mud to pump to dynamically kill the well.  Deposition of David Barnett, Vol. 1, December 14, 2012 (Att. 6) at 25:04-24; 57:20-58:08; 122:17-123:16; 130:20-131:04; *see also* 294:20-295:05 & 296:12-18.  Finally, BP's own documents demonstrate that flow rates were essential to effecting a dynamic kill of the Macondo Well and integral to the "analysis, consideration, or execution" of the relief wells. See, e.g.,  BP E&P "Mississippi Canyon 252 #1 Relief Well, Intercept & Kill Operations Plan, Revision 1.0 - 14 May 2010," BP-HZN-2179MDL04909491-506 (Att. 7), at pp. 1-4.

Objection, scope.
A. The method that was chosen was a dynamic kill for the relief wells.

Deposition of Robert Sanders, Vol. 1, November 5, 2012 (Att. 8) at 125:12-126:10. Moreover, Mr. Sanders acknowledged that to design a dynamic kill, one must determine the appropriate rate at which to pump the mud down the well. He further testified:

> Q. (By Ms. Himmelhoch) In your over 30 years of experience, is it your understanding that in order to identify the pump rate, you need to assume a flow rate from the well you are trying to dym – dynamically kill?
> MR. EPPEL: Objection, form.
> MR. BENTSEN: Objection, form.
> Objection, beyond the scope.
> A. It is one of the inputs, I believe.

*Id.* at 127:20-128:03. Similarly, he testified that "Flow rates would have been a – a component of a dynamic kill calculation." *Id.* at 212:19- 213:1.

In other words, Mr. Sanders acknowledged that the relief wells were intended to be used to effect a dynamic kill and that, in order to perform a dynamic kill, BP needed to perform an estimate of the flow rate. Yet, BP claimed that questions regarding those flow rate calculations were beyond the scope of the Agreed Notice.

Because of BP's position unjustifiably constraining the scope of the agreed Topic, the witness was not prepared to testify on this subject. Instead, he testified that he "wasn't party to all of the type of calculations that were done and by whom." *Id.* at 127:15-19; *accord* 126:11-127:08. Similarly, he testified over counsel's objections:

> Q. (By Ms. Himmelhoch) . . . . Did BP assume any particular flow rate in conducting the analysis of how to perform the dynamic kill using relief wells?
> MR. EPPEL: Objection, form.
> MR. BENTSEN: Objection, beyond the scope. The witness is not designated on bottom kill.
> A. Again, I was not party to all of the – the interactions and calculations of bottomhole flowing pressure or rates.
> Q. (By Ms. Himmelhoch) Are you telling me that BP did not do any analysis of the flow rate of hydrocarbons from the MC252 Well when it was designing the dynamic kill or the relief wells?
> MR. EPPEL: Objection, form.
> MR. BENTSEN: Objection, form. Objection, beyond the scope.
> A. I'm not saying that. I'm saying I was not party to that effort.
> Q. (By Ms. Himmelhoch) At the time -- from the time it spudded the first relief well until the capping stack was in place, the relief well was a dynamic kill method; is that correct?
> MR. BENTSEN: Objection, form.
> MR. EPPEL: Objection, form.
> MR. BENTSEN: Objection, beyond the scope.
> A. The chosen technique to kill the well, once intercepted, was a dynamic kill technique.

*Id.* at 128:4-129:11.

Thus, BP has refused to provide a Rule 30(b)(6) designee prepared to testify regarding flow rate analyses related to the planned dynamic kill using the relief wells. The Court should

overrule BP's scope objections and order BP to produce a knowledgeable, adequately prepared witness.

2.      Kevin Devers - Topic 12

Like Mr. Sanders, Mr. Devers was designated to testify regarding Topics 1 and 12 , but as they related to the Cofferdam, RITT, and Top Hat. Like Mr. Sanders, Mr. Devers was unprepared to testify with respect to "the use of any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo . . . well *in connection with* the analysis, consideration or execution of any" of these methods. Agreed Notice, at 5 (Topic 12) (emphasis added). BP construes this topic to be limited to the bottom-most mechanical components of these devices, wholly separate and divorced from their intended use "to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well."

For example, Mr. Devers testified:

Q. Who was in charge of the entire RITT Project?
MR. BENTSEN: Objection, form.
A. So I'm trying to get -- when you say "RITT Project," I -- you might need to help me with that question. What -- what do you mean when you say "RITT Project"?
Q. (By Mr. Dart) From start to finish, who came up with the idea, who designed it, who implemented it through to completion?
A. So the --
MR. BENTSEN: Objection, form.
Q. (By Mr. Dart) The -- the whole ball of wax.
A. So the tool itself was separate from the riser that come -- connected it to the vessel, which would -- and the vessel was separate yet again. Different Teams were working those different aspects.
Q. Was -- I'm sorry.
A. So for the RITT device itself, that would have been me.
Q. Okay. Was there any one person at BP in charge of all of those Teams that were involved with the RITT Project?
 MR. BENTSEN: Objection, form and scope.
A. I -- I viewed that to be Stan Bond, then -- then Richard Lynch.

Deposition of Kevin James Devers, November 12-13, 2012 (Vols. 1-2) (Att. 9) at 405:10-406:13. Mr. Devers thus testified that different teams were working on different aspects of the RITT project and that he viewed the RITT tool itself as separate from aspects of the project that different teams were working on (i.e., the riser connecting the RITT tool to the surface and the vessel to which that riser would connect).

BP chose to limit its interpretation of the scope of Topic 12 along these lines to artificially divorce the bottom-most device or component of the source control method from the other aspects of the method essential to capturing and bringing the oil to the surface. As shown above, when the witness was asked who was in charge of the different teams working on the RITT project, BP's counsel objected to the question based on scope. BP's strained interpretation of the topic allowed BP counsel to elicit self-serving sound bites during direct questioning. When's BP's counsel asked Mr. Devers if the "Team developing and designing the RITT use[d] flow rate estimates in its design or implementation," the witness thus was able to respond that "We did not." Id. at 502:11-14. He provided the same self-serving responses for the cofferdam ("They did not") and Top Hat ("We did not"). *Id*. at 502:15-18.

Other parts of the witness' testimony, however, indicate that flow rates likely played a role in connection with these methods. For example, Mr. Devers testified that Flow Assurance Engineers "may have" been involved with the projects on which he was designated to testify:

> Q. (By Mr. Dart) Okay. Were any flow in -- Flow Assurance Engineers involved with either the cofferdam, the RITT, or the Top Hat projects?
> MR. BENTSEN: Objection, form and scope.
> A. There may have been.
> Q. (By Mr. Dart) And who might they have been?
> A. Norm McMullen and Farah Saidi. Apologies if I've mispronounced their names.
> Q. Now, was either Norm McMullen or Farah Saidi involved in the Cofferdam Project?
> MR. BENTSEN: Objection, form and scope.
>  A. I don't know.

*Id.* at 403:17-404:6. He further testified:

> Q. Did either of those two individuals work on the RITT Project?
> MR. BENTSEN: Objection, form and scope.
> A. They may have.
> Q. (By Mr. Dart) In what capacity?
> A. It --
> MR. BENTSEN: Objection, form and scope.
> A. It would -- I don't know. I -- I believe their involvement would have been with the flow up the riser that connected these devices to the -- to the surface vessel.

*Id.* at 404:19-405:6. And even though Mr. Devers testified that he viewed Stan Bond and Richard Lynch to be in charge of the RITT project, he testified that he did not recall talking with these men about either McMullen's or Saidi's work on the project. *Id.* at 406:14-19. Likewise, Devers did not talk to Farah Saidi or anyone on the cofferdam team. *Id.* at 278:19-278:23.

Mr. Devers indicated that a consideration with respect to a containment system such as a cofferdam or top hat is: "once we've captured [the oil], what do we do with it. Do we have processing equipment that can — that can deal with this, can we — can we tanker it away, can we flare it . . . —what do we do with it." Id. 297:21-298:1. Yet, he did not have information about collection rates through the RITT, or why those rates might have varied, *see id.* 382:21-385:19; nor did he have information about why BP was "looking to add collection capacity" with respect to the Top Hat. *Id.* 469:06-470:09.

That BP's interpretation of Topic 12 is unjustifiably constricted is underscored by BP's scope objection to questions regarding a June 9, 2010, letter from Doug Suttles of BP to Admiral Allen. *See id.* at 475:23-476:21; *see also id.* at 465:25-469:22. That letter stated that "[t]he systems outlined here are designed based on the current best independent assessment of flow from the Flow Rate Technical Group." Depo. Ex. 9106, at 34 (Att. 10). While the witness acknowledged that the Top Hat on which he was designated to testify was one of the methods addressed in that letter, and despite the representation in that letter about the relationship of flow rate to the design of those methods, BP objected based on scope. BP's interpretation of Topic 12 cuts off the point of hydrocarbon capture (Cofferdam, RITT, the Top Hat) from the rest of the components of that source control method, without which the point of capture would be a useless piece of metal. The Court should order BP to produce a fully prepared 30(b)(6) designee to testify about flow rates in connection with the Top Hat, RITT, and Cofferdam.

3. <u>Ellen Williams - Topics 4, 9, and 16</u>

Dr. Williams was designated to testify regarding three topics, all related to flow rate.

**Topic 4**:   Topic 4 reads in pertinent part:

> 4. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction, used to predict, estimate, characterize and/or measure the daily amount of hydrocarbons flowing from the Macondo Well . . . , [i]ncluding the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based.

Agreed Notice at 3 (Att. 1).  With respect to Topic 4, Dr. Williams was designated to testify on "flow rate (observational)." *See* BP Letter at 3 (Att. 3).

Like other 30(b)(6) witnesses designated by BP, Dr. Williams had very little personal knowledge with respect to the topics for which she was designated.  Deposition of Ellen D. Williams, November 19-20, (Vols. 1-2) (Att. 11) (*See, e.g.*, "Q.  As Chief Scientist at BP, did you have any role in performing any flow rate analyses?  A.  I did not do any flow rate analyses.  Q.  Okay.  Did you have any role in evaluating other people's flow rate analyses?  A.  Not specifically in the context of flow rate analysis." *id.* at 31:3-9, *and* "Q.  Okay. Have you had any job responsibilities while you're with BP in connection with actually estimating flow rate?  A. No." *Id.* at 349:16-19).

Not only did Dr. Williams lack significant personal knowledge of attempts to estimate flow rates using observational methods, she was wholly unprepared to answer questions within BP's corporate knowledge and squarely within the scope of the agreed topic.  For example, she testified:

> Q. (By Mr. Appelman) Okay. Did this internal effort to analyze the video feeds for flow rates, did it ever determine or calculate a flow rate?
> * * *
> A. I don't know.
> Q. (By Mr. Appelman) You agree with me, though, that analyzing video feeds for flow rate is an observational flow estimate, right?
> * * *
>  A. Yes -- yes.

*Id.* at 323:9-19.

Furthermore, and as another example of Dr. William's lack of preparation, BP flow engineer Trevor Hill prepared a memo titled "Observations on flow coming from the Macondo system" dated May 15, 2010 (Depo. Ex. No. 10344, Att. 12).  That memo clearly sets forth Mr. Hill's analysis of a flow rate estimate performed by Professor Steve Wereley based on observational techniques, and provides an analysis of various factors which Mr. Hill claims would reduce the flow from the well.  Mr. Hill used these factors to predict significantly lower flow rate estimates and to conclude that NOAA's estimate of 5000 bopd "does not seem un-reasonable . . . ." *Id.*  Mr. Hill's analysis is clearly a "manner and/or methodology that BP. . . used to predict, estimate, characterize and/or measure. . . flow from the Macondo Well" using observational techniques, and thus well within the scope of Topic 4.  Dr. Williams, however, was wholly unable to provide any information regarding that analysis:

Q. Okay. And it reads: "Firstly there is drill pipe protruding from the end of the riser, occupying some of the original flow area, reducing by 10% the flowrate estimated from a measured velocity," by PIV "and the original pipe area." Do you see that?
A. Yes, I see that.
Q. Okay. How did Trevor Hill determine that the drill pipe protruding from the end of the riser caused a 10 percent reduction in flow rate?
A. I -- I didn't ask Trevor Hill that question.
Q. Okay. Did you do anything in your deposition to determine how Trevor Hill determined the 10 percent reduction?
A. No, I did not.
Q. Okay. Did you come across anything in preparation for your deposition that would give an indication of any type of information he was relying upon?
A. I don't know what Trevor Hill relied on.

*Id.* at 309:21 - 310:16. When asked what the basis for Trevor Hill's reduction of flow by 30% because of the damaged riser pipe, Dr. Williams responded "I – I don't believe Trevor mentioned the 30 percent number to me. * * * All I can say is that Trevor hol – told me that after they reoriented the ROV, they were able to see the damage at the end of the tube and that should have been accounted for in the flow rate calculation. I don't know more than that." *Id.* at 312:14-22. The witness was similarly unprepared and failed to provide responsive information to each and every one of the factors that Trevor Hill identified as being a basis for reducing the overall flow rate estimate:

Q. Okay. Do you know how Trevor Hill determined that 40 percent of the average volume flow out of the pipe at seabed was gas?
A. No, I don't.
Q. Okay. And if we flip to "Fourthly..." Do you see that next paragraph?
A. Yes, I do.
Q. . . . Do you know how Trevor Hill determined that this would result in a further 40 percent reduction in the estimate of oil reaching the surface?
A. No, I don't know how Trevor did that.

*Id.* at 313:2–19.

BP characterizes Mr. Hill's memorandum as a critique of a third party's estimate and takes the strained position that it is not an "estimate" that falls within the scope of Topic 4. However, this memorandum, in which a BP employee performs an analysis of another person's flow rate estimate and purports to provide a reasoned basis for discounting that estimate – including the amount of barrels of oil by which the flow rate should be reduced – most certainly describes a manner or method used by BP to "predict, estimate, characterize and/or measure" the flow rate from the Macondo Well.

Moreover, Dr. Williams testified that she believed that an "eyeball estimate" performed by Trevor Hill – which she clearly testified was an observational method of estimating flow rate -- took into account at least some of these factors. Again, she was wholly unable to explain the basis for those numbers:

Q. So when we broke, Dr. Williams, we were talking about Exhibit 10334, and you had just indicated that BP had done some analyses using observational flow techniques that took into account Item No. 1, which is the drill pipe protruding from the end of the riser; is that correct?
A. That is my recollection.

Q. Okay.  Can you describe for me what those analyses were?
A. All right.  I – if my memory is correct, I believe that when Trevor Hill described to me the eyeball estimate that I told you about earlier, if I remember correctly, I believe he accounted for the 10 percent reduction in area of the drill pipe.

***

Q. What is – what was the basis for the 10 percent reduction?
A. I don't know specifically.

Williams Depo. at 58:13-59:12.  Dr. Williams went on to testify that the "eyeball estimate" performed by Mr. Hill took into account several of the factors mentioned in his memo, but was unable to recall the basis for the reductions he applied.  *Id.* at 60:23- 62:09.

Dr. Williams was clearly unprepared to provide even the most basic information relating to the "manner and/or methodology" used by BP "to predict, estimate, characterize and/or measure" the flow rate from the Macondo Well using observational methods.  Thus, BP should be required to produce an adequately prepared 30(b)(6) designee.

**Topic 16:**  Topic 16 reads:

All analyses, calculations, assumptions, and data cited and/or relied upon in "BP's Preliminary Response to the Flow Rate and Volume Estimates Contained in Staff Working Paper No. 3" submitted by BP to the National Oil Spill Commission on or about October 21, 2010.

Agreed Notice at 6 (Att. 1). BP designated Dr. Williams as the sole witness for this Topic.  BP Letter at 8 (Att. 3).  The document referred to in this topic, prepared by BP, contains a detailed analysis and critique of the United States' flow rate estimate announced on August 2, 2010.  Questions related to this document were limited to the time-frame prior to July 17, 2010 in light of this Court's prior Order upholding certain claims of privilege by BP.  Order, 7/13/12, Doc. 6904.  Even with this limitation, it was clear that Dr. Williams was unable to testify regarding Topic 16:

Q. (By Ms. Chang) Prior to July 17th, 2010, what analyses were relied upon, by BP, in preparing this document, Exhibit 10338?
A. I don't know.
Q. Prior to July 17th, 2010, what calculations were relied upon, by BP, in preparing this document, Exhibit 10338?
A. I don't know.
Q. Prior to July 17th, 2010, what assumptions were relied upon by BP in preparing this document, Exhibit 10338?
A. I don't know.
Q. And prior to July 17, 2010, what data was relied upon, by BP, in preparing this document, Exhibit 10338?
A. I don't know.

*Id.* at 97:9-24; *see also id.* at 86:07-87:5 (witness did not know who prepared the document).

Q. (By Ms. Chang) What did you do to try to determine the analyses, calculations, assumptions, and data existed prior to July 17, 2010, and were relied upon by BP in preparing this Exhibit 10338?
A. Okay.  I asked Counsel whether any work done before July 17th was relied on for -- in preparing this document.

Q. All right.

*Id.* at 98:19-99:02.

Given that all contemporaneous data with respect to the flowing well necessarily was generated prior to July 17, 2010, it is implausible that BP has no information that falls within the indisputably non-privileged scope of this topic.  Accordingly, BP should be prepared to produce a fully prepared 30(b)(6) designee to testify on this subject.

**Topic 9**.   Topic 9 reads in pertinent part:

Your efforts (including all communications, modeling, calculations and analysis) undertaken or used in connection with: the flow rate estimate of 1,000 bopd announced by Admiral Landry on April 24, 2010; the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010; . . .

Agreed Notice at 5 (Att. 1).  Again, BP designated Dr. Williams as the sole witness for this Topic. BP Letter at 6 (Att. 3).  BP objected to questions that were squarely within the scope of this topic which plainly calls for BP's "efforts . . .  undertaken or used in connection with" specific flow rate estimates publicly announced by the United States on specific dates.  BP has offered varying justifications for its scope objections.  During the deposition, BP asserted initially that the Topic was limited to efforts that pre-dated the announcement of the estimate.[5] Under that theory, any effort undertaken by BP to analyze a US flow rate estimate *after* the date of the announcement would be outside the scope of the topic.  BP then claimed that the topic calls only for efforts in connection with a particular *announcement* of a flow rate.  Gasaway Letter (Att. 2) at 7-8 (also appearing to assert that the Topic calls only for "technical work" in connection with the announcement, *see id.* at 8, ¶ 2.)

For example, the witness was asked a series of questions about BP's response to Congressman Markey dated May 24, 2010 (Exhibit 10358) (Att. 5) regarding a flow rate estimate of 5000 barrels per day.  As BP's response clearly states, "the estimate of 5,000 barrels per day is a Unified Command estimate, not a BP estimate," *id.* at 1, and is, in fact, the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010, as described in Topic 9. *See* Depo. Ex.10347 ("Guilty Plea Agreement, United States of America v. BP Exploration and Production, Inc., Filed 11/15/12") (Att. 13) at 17, ¶¶ 4 & 5.  BP's response to Congressman Markey is clearly a "communication" and an "analysis" "undertaken or used in connection with" that 5000 bopd estimate, and therefore responsive to Topic 9.  Even though Dr. Williams had been shown this document in preparation for her deposition, she was unable to answer the most

---

[5]   MS. CHANG: So is it your position that anything beyond or after the actual announcement is outside the scope?
MS. KARIS: In connection with Topic 9? Yes.
* * *

MS. CHANG: So with respect to the 1,000 barrel announcement, BP's position is that any communications, modeling, calculations, or analysis conducted after April 24th is outside the scope?
MS. KARIS: If it doesn't pertain to the announcement of that estimate, so I'm not sticking to the date. I'm sticking to the announcement of the estimate, which is how it's phrased, "announced by."

Williams Depo. at 157:15-158:12.

basic questions about it, and BP objected to questions regarding the document on scope grounds. Williams Depo. at 360:19–363:15.

BP's strained scope objections continued through questioning regarding Depo. Ex.10347 ("Guilty Plea Agreement," Att. 13) that specifically referenced false and misleading statements made by BP in its May 24, 2010 response to Congressman Markey, and regarding flow rate estimates provided by BP in that response. Williams Depo. at 144:25-145:7, 150:7-154:13, 159:3-160:5. BP explained its scope objections by stating that "[t]his is beyond the scope of that, as the Markey letter was dated May 24th and the announcement [of the 5000 bopd flow rate] certainly predates all of that." *Id.* at 155:9-12. By taking the strained and implausible view that its effort must have occurred in connection with *an announcement*, rather than in connection with *a flow rate estimate*, BP has avoided providing important information regarding its efforts with respect to each government flow rate estimate. Given that no fair reading of Topic 9 supports BP's interpretation, the United States requests that the objections to the questions set forth at pages 150:7-154:13 and 159:3-160:5 of the deposition transcript be overruled and the answers be deemed to have been given in BP's 30(b)(6) corporate capacity.

C. Relief requested. As explained above, the United States has been denied discovery into relevant and agreed upon deposition topics. Given the impending deadlines and the Court's carefully constructed discovery process for Phase 2, BP's positions with respect to the issues set forth above are particularly untenable. Accordingly, pursuant to Fed. R. Civ. P. 37(a), the United States respectfully requests that BP be required to produce knowledgeable, fully prepared 30(b)(6) witnesses to respond to the topics as set out herein, including all follow up questions that flow from responsive answers, and that BP's objections based on scope be overruled. With respect to Topic 9, as noted above, we simply request that the Court overrule BP's objections based on scope and that the answers cited above be deemed to have been given in BP's 30(b)(6) corporate capacity. We are certainly appreciative of the need for efficiency to meet the current schedule, and suggest that in that vein, the Court might consider requiring BP to designate one or more appropriate upcoming fact witnesses as 30(b)(6) designees on one or more of the topics discussed above with appropriate additional time allocations for each. In any event, however, BP should be required to fulfill its discovery obligations to produce knowledgeable, fully prepared 30(b)(6) witnesses to respond to the topics as set forth above.

Respectfully submitted,

/s/ Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environmental Enforcement Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044

cc: Liaison & Coordinating Counsel

Attachments: See "Attachment List" appended hereto

## ATTACHMENT LIST

| Att. # | Description |
|---|---|
| 1 | Agreed 30(b)(6) Deposition Notice of BP Defendants, served August 2, 2012 |
| 2 | Letter from Robert Gasaway, Kirkland & Ellis LLP, to Sarah Himmelhoch, U.S. DOJ, dated November 29, 2012 |
| 3 | BP Letter to Judge Shushan, dated September 27, 2012, Re: Phase 2 Rule 30(b)(6) Deposition Scheduling |
| 4 | Deposition of John Hughes, November 27-28, 2012 (Vols. 1-2) at 257:8-258:12; 306:5-307:10; 373:3-374:20 (*Confidential*) |
| 5 | Letter from BP to Congressman Markey, dated May 24, 2010 (Depo. Ex. No. 10358) |
| 6 | Deposition of David Arnold Barnett, Volume 1, dated December 14, 2012, at pages 25:04-24; 57:20-58:08; 122:17-123:16; 130:20-131:04; 294:20-295:05; 296:12-18 (*Highly Confidential*) |
| 7 | BP Exploration & Production Mississippi Canyon 252 #1 Relief Well, Intercept & Kill Operations Plan, Revision 1.0 – May 14, 2010 (BP-HZN-2179MDL04909491 - 04909506 (*Confidential*) |
| 8 | Deposition of Robert Sanders, Volume 1, dated November 5, 2012, at pages 125:12-126:10; 127:20-128:03; 127:15-19; 126:11-127:08; 128:4-129:11; 212:19-213:1 (*Confidential*) |
| 9 | Deposition of Kevin James Devers, Volumes 1 & 2, dated November 12-13, 2012, at pages 278:19-278:23; 297:21-298:1; 382:21-385:19; 403:17-404:6; 404:19-405:6; 405:10-406:13; 406:14-19; 465:25-470:09; 475:23-476:21; 502:11-18 (*Confidential*) |
| 10 | Letter from BP, Doug Suttles, to FOSC dated June 9, 2010 (Appendix 2 to Annex B of National Incident Commander Strategy Implementation (Depo. Ex. No. 9106 to Deposition of Admiral Allen, at pages 31-35)) (*Confidential*) |
| 11 | Deposition of Ellen D. Williams, Volumes 1 & 2, dated November 19-20, 2012, at pages 31:3-9; 58:13-59:12; 60:23-62:09; 86:07-87:5; 97:9-24; 98:19-99:02; 144:7-145:7; 150:7-154:13; 155:9-12; 157:15-158:12; 159:3-160:5; 309:21 - 310:16; 312:18-22; 313:2-19; 323:9-19; 349:16-19; 360:19-363:15 (*Confidential*) |

12          BP memorandum entitled "Observations on flow coming from the Macondo
            system" dated May 15, 2010, prepared by BP employee Trevor Hill (Depo. Ex.
            No. 10334) (*Confidential*)

13          Guilty Plea Agreement, *United States of America v. BP Exploration and
            Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La. Filed 10/15/12) (Depo.
            Ex. No. 10347)