# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

November 29, 2012

**By Electronic Mail**

Sarah D. Himmelhoch
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044

    Re:  MDL 2179 — Preparation of BP Rule 30(b)(6) Witnesses

Dear Sarah:

  I write in response to your letter of November 20, 2012, which contends that three BP Rule 30(b)(6) deponents — Robert Sanders, Kevin Devers, and Ellen Williams — were not adequately prepared to testify.

  As we explain below, your letter fails to demonstrate that any of these three witnesses were unable to (or were instructed not to) provide adequate testimony within their designated Topics. Nor does the letter show in some more general way that the witnesses' preparation was procedurally inadequate. Indeed, the adequacy of these BP witnesses' preparation and testimony is especially clear light of certain of the United States' own Rule 30(b)(6) designees' inability to provide basic answers to questions at the core of their designations.

**I.  BP'S RULE 30(B)(6) DEPONENTS WERE ADEQUATELY PREPARED TO TESTIFY**

  **A.  Robert Sanders**

  Mr. Sanders was adequately prepared to testify on the designated topic of the "use" of "analysis, calculations, assumptions, or modeling of the flow rate of hydrocarbons" (Topic 12) with respect to "the analysis, consideration, or execution" of "Macondo Relief Well No. 1 and Macondo Relief Well No. 2," as set forth in Topic 1.

  The United States' claims regarding Mr. Sanders's testimony are mistaken in three essential ways. *First*, Mr. Sanders was designated on Topic 12 as it pertains to the sub-topic of the relief wells — not the non-existent sub-topic of dynamic kills that might have been planned, but were never employed, to make use of the conduit those relief wells would provide. *Second*, as reflected in rebuttal testimony and as separately conveyed to counsel for the United States,

## KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
November 29, 2012
Page 2

Mr. Sanders took adequate steps to prepare for his actual designation on the relief wells sub-topic. *Third*, contrary to the United States' claim, BP has in fact offered a witness on the topic of the "use" of "analysis, calculations, assumptions, or modeling of the flow rate of hydrocarbons" (Topic 12) with respect to "the analysis, consideration, or execution" of the relief wells — Mr. Sanders — even though the United States apparently is now interested in an entirely separate subject.

    **1. Mr. Sanders was designated on Topic 12 with respect to the relief wells, which were not a dynamic kill method.**

  The United States claims that Mr. Sanders's designation for Topic 12 as related to the relief wells implies that he should have been prepared to testify about any dynamic kill that might have occurred *after* the relief wells intersected the original MC 252 #1 Well. This claim turns on the false premise that a relief well is a dynamic kill method. It is not.

  It is important to understand that the use of a relief well, once it has been designed and drilled, depends on a variety of conditions — making the choice and implementation of a particular kill method a separate engineering process that is different and distinct from the design and drilling of the relief well itself. One might use a relief well as a conduit for performing a dynamic kill, but the intersection of the relief well with the original well is not a "kill." It creates the entry point for performing a subsequent kill. As the United States knows, the Macondo relief wells were not actually used to conduct any dynamic kill operations due to the success of the static kill performed using the Capping Stack in August 2010.

  Accordingly, Mr. Sanders was designated on the "use[of] analysis, calculations, assumptions, or modeling of the flow rate of hydrocarbons" in "the analysis, consideration or execution of" the relief wells. Questioning of Mr. Sanders within his designation might have addressed whether any such analyses, calculations, or assumptions affected the choice of a particular well-design characteristic or affected the drilling of the wells. This appropriate hypothetical questioning would *not* address any potential subsequent dynamic kill operations. Rather, in line with Topic 12, it would address the use of any such modeling for purposes of designing and/or constructing relief wells.

  The United States nevertheless claims Mr. Sanders "acknowledge[d] that the relief wells were initially intended *to be* a dynamic kill method." (Letter at 2 (emphasis added).) As explained already, however, this premise is false as matter of fact. A relief well is not necessarily a vehicle for performing a dynamic kill operation. Instead, a relief well is simply a means of providing an access point that might, but need not be, used to perform a dynamic kill.

**KIRKLAND & ELLIS LLP**

Sarah D. Himmelhoch
November 29, 2012
Page 3

      Accordingly, the United States' further questioning about the substance of dynamic kills — as opposed to the analytical relation of the topic of dynamic kills to the topic of relief wells — was beyond the scope of Mr. Sanders's designation. (Letter at 2-3 (quoting Sanders Dep Tr. 127:20-128:03).) As the text quoted in the United States' letter demonstrates, Mr. Sanders provided an answer in his individual capacity after an appropriate "scope" objection by BP's counsel. *Id.* Mr. Sanders's testimony about dynamic kills therefore cannot form the basis for the United States' erroneous claim that Mr. Sanders was inadequately prepared to testify about the designated topic of relief wells.

      **2.**    **Mr. Sanders was adequately prepared to testify on Topic 12 regarding the relief wells.**

      Your letter appears to contend, in any event, that Mr. Sanders was not even adequately prepared to testify on Topic 12 as regards the relief wells. But here the letter omits both relevant testimony and a separate conversation between counsel demonstrating Mr. Sanders's adequate preparation.

      Although the United States' letter excerpts Mr. Sanders's initial answer regarding his preparation for the deposition, (Letter at 2 (quoting Sanders Dep. Tr. 123:19-124:13)), counsel for the United States was informed during a break that Mr. Sanders had inadvertently omitted aspects of his preparation to testify so that counsel could ask Mr. Sanders additional questions regarding his preparation. Counsel for the United States did not, however, choose to ask Mr. Sanders any such additional questions. But on re-direct examination Mr. Sanders confirmed under oath his adequate preparation for the appropriate deposition topic. (Sanders Dep. Tr. 230:24-231:21.)

      In light of these facts, it is evident Mr. Sanders adequately prepared for his Rule 30(b)(6) deposition.

      **3.**    **The United States improperly requests, in effect, testimony on an additional BP Rule 30(b)(6) topic.**

      The United States incorrectly claims that "BP has never offered a Rule 30(b)(6) designee prepared to testify regarding flow rate analysis related to planning the relief wells." (Letter at 3.)

      The United States' letter does not appear to reflect any interest in the "use" of "analysis, calculations, assumptions, or modeling of the flow rate of hydrocarbons" as related to the "analysis, consideration or execution" of the relief wells. The United States, instead, appears interested in models of the flow rate itself or other work done on a possible planning of

**KIRKLAND & ELLIS LLP**

Sarah D. Himmelhoch
November 29, 2012
Page 4

unimplemented dynamic kills. The United States' interest in this separate and distinct area of inquiry has no bearing on Mr. Sanders's adequate preparation for the relief wells sub-topic of Topic 12, on which he was designated to testify.

    **4. Mr. Mazzella's Phase 1 testimony is not at issue, and in any event, he was adequately prepared to testify.**

  Mr. Mazella's testimony (16 months ago) is irrelevant to the question at hand — the adequacy of Mr. Sanders' preparation and testimony on his designated Topics.

  Nonetheless, the United States appears to believe that Mr. Mazzella's prior testimony on Kill Operations and Relief Wells (which were listed separately as his designated topics because, as noted above, relief wells and kill operations are distinct topics) bears upon whether Mr. Sanders was adequately prepared. It does not, but given that the United States has raised the issue, BP will briefly respond.

  Initially, as explained to counsel at Mr. Sanders's deposition, the scope objection to the questioning of Mr. Sanders was not based on the assertion that Mr. Mazzella's prior testimony precluded such inquiries. Rather, BP simply explained that dynamic kills were not an agreed upon sub-topic to be addressed at Mr. Sanders's deposition. (Sanders Dep. Tr. 126:2-3.)

  The United States cites questions to Mr. Mazzella about his knowledge of "estimates" or "BP opinion" of flow rate at the time of Top Kill in an apparent attempt to show that Mr. Mazzella was unprepared to testify at his deposition 16 months ago regarding issues that are allegedly now covered by current Topic 12. But these questions are addressed to estimates of flow rates themselves, not the use — if any — of analysis, calculations, assumptions, or modeling of the flow rate for the consideration of a source control method. Indeed, when Mr. Mazzella was asked if "an estimation of flow rate" was a "consideration" in the design and implementation of Top Kill he provided a substantive answer. (Mazzella Dep. Tr. at 49-50; *see also id.* at 109:9-140.)

  More fundamentally, neither the United States nor any other party asked Mr. Mazzella any questions about the impacts of any assumed or estimated flow rate on the relief wells or even about any dynamic kill planning. The United States cannot now reasonably contend that Mr. Mazzella was unprepared to answer such questions.

4

**KIRKLAND & ELLIS LLP**

Sarah D. Himmelhoch
November 29, 2012
Page 5

### B. Kevin Devers

The United States' complaints regarding Mr. Devers's testimony are not altogether clear, but there appear to be two of them. *First*, the letter mentions Mr. Devers's alleged inability to recall the identity of *every* BP employee involved on the Cofferdam team. This allegation, however, speaks to a question beyond the scope of Topic 1. *Second*, without citing a single question Mr. Devers was allegedly unable to answer, the letter complains that Mr. Devers did not jump through enough procedural hoops to prepare for his deposition. But this apparent complaint overlooks unquoted testimony that demonstrates Mr. Devers's adequate preparation and explains the non-existence of the information the United States seeks.

#### 1. Mr. Devers was adequately prepared regarding those who planned, managed, and/or supervised the implementation of the Cofferdam.

As the letter demonstrates, "Topic 1 included '[t]he identity of BP employees and contractors who *planned*, *managed*, and/or *supervised* the implementation' of the cofferdam." (Letter at 4 (emphasis added).)

The Topic does not, as the United States now claims, require Mr. Devers to submit to a memory test on each and every BP employee who participated in the implementation of the Cofferdam. Instead, Mr. Devers provided the names of the two senior BP employees who "planned, managed, and/or supervised the implementation of" the Cofferdam — Mr. Lynch and Mr. Bond. (Devers Dep Tr. 395:17-25.) In the same answer, Mr. Devers also provided the names of two Wild Well employees who were involved with the Cofferdam — Mike Cargol and Rob Ratliff. *Id.*

If the United States needed to know more than this about the identity of the BP employees involved in the implementation of the Cofferdam, it could easily have shown Mr. Devers a relevant document related to the Cofferdam team, just as the United States showed Mr. Devers a document containing the identities of members of the near term containment team as of June 1, 2010. (*Id.* at 283:2-14; Dep. Ex. 10287.)

#### 2. Mr. Devers took adequate steps to prepare for his deposition.

Without citing a single question that Mr. Devers allegedly was unable to answer, the United States mistakenly claims Mr. Devers was not adequately prepared to testify because he did not properly prepare for his deposition.

**KIRKLAND & ELLIS LLP**

Sarah D. Himmelhoch
November 29, 2012
Page 6

*First*, the United States certainly does not mean to claim, as it appears to, that speaking with Farah Saidi was a pre-requisite for adequately preparing to testify on Topic 12 as regards the Cofferdam. (Letter at 4.) Such a claim, whatever its import, overlooks that Mr. Devers prepared to testify on the Topic by speaking with the lead BP member of the Cofferdam team, Richard Lynch. (Devers Dep. Tr. 276:19-277:4.) Mr. Devers also reviewed documents related to the Cofferdam and the transcript of Mr. Lynch's previous Rule 30(b)(6) deposition for which he was designated regarding the Cofferdam. *Id.*

The United States does not explain why it believes Mr. Devers's conversation with Mr. Lynch and related document review constitutes insufficient preparation on Topics 1 and 12 regarding the Cofferdam. Nor does the United States disclose whether it is prepared to apply a similarly stringent definition of adequate preparation to its own Rule 30(b)(6) witnesses.

*Second*, the United States asserts that Mr. Devers was unprepared to discuss the "use" of "analysis, calculations, assumptions, or modeling of the flow rate of hydrocarbons" as related to the Top Hat, RITT, and Cofferdam. As Mr. Devers explained, however, flow rate was not a concern during the development of these three procedures because collection was limited by top-side processing capacity. *Id.* at 429:3-430:17, 501:18-502:18. The United States therefore seeks testimony about a subject that Mr. Devers explained does not exist.

On a final note regarding Mr. Devers, the second sentence in Section 2 of the United States' letter seems to claim BP interposed improper "scope" objections during Mr. Devers's deposition. (Letter at 4.) The United States then fails to describe or cite any such objections and, more importantly, fails to tie this claim to the United States' request for an additional witness. In fact, BP never instructed Mr. Devers not to answer any question — regardless of whether counsel believed the question beyond the scope of Mr. Devers's Rule 30(b)(6) designation — so the scope objections never denied the United States any answers to questions actually posed.

    **C.**    **Ellen Williams**

BP and the United States have a fundamental disagreement about the proper scope of the topics for which Dr. Williams was designated to testify — Topic 4 limited to observational evidence, Topic 9 as expressly worded, and Topic 16. Dr. Williams was prepared to and did testify regarding each of these topics.

## KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
November 29, 2012
Page 7

    **1.    BP never instructed Dr. Williams not to answer a question because it was outside the scope of the Topics for which she was designated.**

As with Mr. Devers, and despite the assertions in the United States' letter, at no time did BP "refuse[] to allow" Dr. Williams to answer a question outside the scope of her designation. (Letter at 6; *see id.* at 8.)  BP did raise objections regarding the scope of certain lines of questioning, but it is commonly understood that a questioning attorney can proceed with deposition questioning notwithstanding such objections unless the defending attorney specifically instructs the deponent not to answer (and the deponent accepts that instruction). That never occurred in Dr. Williams's deposition.

Accordingly, the United States was always free to proceed with a given line of questioning over BP's objections regarding the scope of a particular topic.  On many occasions, counsel for the United States elected to not proceed with the question after a scope objection. (*See, e.g.*, Williams Dep. Tr. 63:23-66:13.)  The fact that the United States chose to deviate from its questioning when a beyond-the-scope objection was correctly made for the record does not mean that BP acted improperly in asserting such objections, nor does it mean that the United States deserves an opportunity to question a second witness.

    **2.    The United States' apparent interpretation of Topic 9 is inconsistent with its plain language and creates an impermissible redundancy with Topic 4.**

Topic 9 clearly calls for testimony on BP's efforts undertaken or used "in connection with" specific enumerated flow rate estimates announced by the government.  Although the United States' letter does not state clearly its current position regarding the scope of Topic 9, the apparent interpretation offered, (*see* Letter 6-7), suggests that the United States does not view the announcements of the 1,000 bpd and 5,000 bpd estimates as limits to the scope of Topic 9.  This view is flawed for three reasons.

*First*, your letter appears to suggest that BP took the position that any work occurring after the actual announcement is outside the scope of Topic 9.  But this is not the case, as your letter elsewhere concedes.  (*See* Letter at 7.)  BP's position was and is that work undertaken after a given announcement may have been within the scope of Topic 9 as long as the work was done *in connection with* the announcement.

> MS. CHANG: So with respect to the 1,000 barrel announcement, BP's position is that any communications, modeling, calculations, or analysis conducted after April 24th is outside the scope?

**KIRKLAND & ELLIS LLP**

Sarah D. Himmelhoch
November 29, 2012
Page 8

> MS. KARIS: *If it doesn't pertain to the announcement of that estimate*, so I'm not sticking to the date. I'm sticking to the announcement of the estimate, which is how it's phrased, "announced by."

(Williams Dep. Tr. 158:3-158:12 *quoted in* Letter at 7 (emphasis added).)

***Second***, and similarly, the United States' apparent interpretation of Topic 9 causes the topic substantially and impermissibly to overlap Topic 4. Of course, it is impermissible to interpret Topic 9 in a manner that fails to give it meaning distinct from and not duplicative of another topic in the same deposition notice.

As you know, Topic 4 calls for testimony, *inter alia*, on the manner and/or methodology that BP used to estimate the daily discharge of hydrocarbons from the Macondo Well. Topic 9, in contrast, calls only for technical work "undertaken in connection with" or "used in connection with" six specifically identified flow rate estimates announced by federal officials and entities.

Hence, if one were to accept the United States' apparent position that *all* efforts undertaken both before and after each of the six enumerated flow rate announcements necessarily falls within the scope of Topic 9, without any indication that the work was "undertaken in connection with" or "used in connection with" one or more announcements, then Topic 9 would threaten to consume the entirety of Topic 4.

Worse still, given the fact that the United States' various announcements relied heavily on observational evidence methodologies, this impermissible redundancy would be most clear and most pronounced with respect to the very observational evidence methodologies for which Dr. Williams served as BP's Topic 4 designee. As BP's designee for Topic 4's observational aspects, as well as for all of Topic 9, Dr. Williams's testimony properly kept the two topics different and distinct — unlike the misguided interpretation for which the United States now contends.

***Finally***, as a practical matter, your letter does not identify a single document, topic, or workstream post-dating, but "in connection with," an enumerated announcement on which Dr. Williams was allegedly unprepared to testify and on which the United States was allegedly deprived of testimony it otherwise would have obtained. Nor could it have done so. As explained above, counsel for BP repeatedly explained to counsel for the United States that BP's disagreement regarding the scope of Topic 9 did not have to be resolved at the deposition and that the United States was free to pursue its line of questioning. In any event, however, the United States chose not to raise such questions.

**KIRKLAND & ELLIS LLP**

Sarah D. Himmelhoch
November 29, 2012
Page 9

### 3. Dr. Williams was adequately prepared to testify on Topic 16

Dr. Williams was adequately prepared on Topic 16. On July 13, 2012, the Court ruled that BP did not waive work-product protection over the Flow Rate Team's work from July 18, 2010, to October 21, 2010, through its October 21, 2010, submission to the National Oil Spill Commission. (Rec. Doc. 6904, at 13.) Hence, the only non-privileged flow estimation work on which Dr. Williams might properly have been questioned would have been work occurring before July 17, 2010. In fact, however, no pre-July 17 work was included in the October 21 submission. As a result, Dr. Williams had no testimony to offer on this point.

In addition, the United States could have questioned Dr. Williams about the actual language in the public, non-privileged October 21 submission, but chose not to do so. The United States' decision not to pursue this available line of questioning speaks to the United States' legitimate draw as a matter of deposition strategy, but not to the adequacy of Dr. Williams's preparation.

### 4. Trevor Hill's critique of Prof. Wereley is not a flow rate estimate and therefore is not within Topic 4.

The United States' letter also appears to suggest that Dr. Williams was unprepared to testify regarding her designation on Topic 4 because she was unable to answer questions regarding Trevor Hill's critique of Professor Steven Wereley's video analysis flow rate estimate. But Mr. Hill's critique of Professor Wereley's estimate is not within the scope of Topic 4 because it is not an "estimate."

Dr. Williams made clear throughout her deposition that the only observational estimate performed by Trevor Hill was his "eyeball estimate," which was distinct from the critique he did of Prof. Wereley's work. (Williams Dep. Tr. 21:14-22:16, 45:22-46:2, 179:22-180:9, 181:11-182:4, 358:5-14.)

Additionally, counsel for BP made clear the distinction between these two workstreams.

Q. Okay. When you're talking about an observational evidence estimate done by Mr. Hill, are you referring to his Wereley critique or something else?

A. In that case, I would be referring to his eyeball estimate.

Q. Okay. And is his eyeball estimate something different than the Wereley critique?

9

## KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
November 29, 2012
Page 10

> A. Yes. Those are two different pieces of work.

(Williams Dep. Tr. 358:5-14 (questioning by BP counsel).)

Dr. Williams was adequately prepared to discuss Mr. Hill's critique and, if asked, she also would have explained why the critique of Prof. Wereley's work was not an "estimate" within Topic 4.

## II. THE LEVEL OF PREPARATION DEMONSTRATED BY CERTAIN UNITED STATES RULE 30(B)(6) WITNESSES UNDERSCORES THAT BP WITNESSES WERE MORE THAN ADEQUATELY PREPARED.

By any reasonable standard, Mr. Sanders, Mr. Devers, and Dr. Williams were adequately prepared to testify at their respective Rule 30(b)(6) depositions. Significantly, however, your letter overlooks the United States' own demonstrated standard for preparing 30(b)(6) witnesses. Consider as but two examples, the preparation of Dr. Ratzel and Admiral Landry.

### A. Dr. Ratzel

Dr. Ratzel, as you know, was designated for many Quantification topics, including Topic 88 — "Preparation of the report 'DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident.'"

During his Rule 30(b)(6) deposition, however, Dr. Ratzel was unable to identify any gas-oil ratio that the Tri-Labs teams used for the flow rate estimates in the DOE-NNSA Flow Analysis report, which Dr. Ratzel principally authored. (Ratzel Dep. Tr. 283:1-25.) Nor could he describe how each of the Tri-Labs teams converted mass flow of hydrocarbons to stock tank barrels of oil for the flow rate estimates contained in that report. (*Id.* at 27:23-29:23.) Further, Dr. Ratzel was unable to confirm whether roughness-related friction factors were used by any of the Tri-Labs Teams in the work they performed for the DOE-NNSA Flow Analysis Report. (*Id.* at 288:20-289:7.) Dr. Ratzel was also unfamiliar with the 4.4 correction factor that Lawrence Livermore applied to its calculations. (*Id.* at 289:13-16, 290:6-291:9.) Without this correction factor, Lawrence Livermore's flow rate estimates would have been at odds with those of the other Tri-Lab teams.

Furthermore, Dr. Ratzel was unable to articulate what change in fluid density would be considered "significant" without going back to look at the exact numbers the team had arrived at, despite his own use of the word in a Power Point presentation. (*Id.* at 45:4-17.) Dr. Ratzel was also unable to give a straightforward answer with respect to the methods used to derive the estimate of 53,000 barrels of oil per day, first stating that three separate methods provided the

10

KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
November 29, 2012
Page 11

estimate, and then changing his mind to say that only two were used. (*Id.* at 81:14-82:5.) Dr. Ratzel was also unable to confirm whether or not the Tri-Labs Teams accounted for certain information in calculating their K factors. (*Id.* at 257:13-258:7.)

Dr. Ratzel was identified by Dr. Marcia McNutt as the 30(b)(6) witness who would discuss the July 30 and July 31 flow rate meetings, two key government meetings that were held in an effort to reconcile the government teams' divergent flow rate estimates. (McNutt Dep. Tr. 383:7-15.) As you know, these meetings formed the basis for the calculations put forth in the FRTG's *Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill* ("FRTG Report") and the DOE-NNSA Flow Analysis report. Nevertheless, Dr. Ratzel disclaimed knowledge of the content of key discussions that occurred at the July 30 and July 31 flow rate meetings, despite acknowledging that he coordinated the meetings and was present at them. (Ratzel Dep. Tr. 468:7-10, 468:19-471:1, 473:5-475:10, 475:23-477:25.) Dr. Ratzel's failure to prepare for this deposition topic effectively precluded BP and the other parties from understanding the manner in which key decisions were made by high-level government officials regarding the "ground truth" flow rate estimate. *See* FRTG Report at 1-2.

Dr. Ratzel also was designated on Topics 62, 69, and 83 regarding communications involving these three National Laboratories about uncertainty estimates, but he could not describe any analyses performed to arrive at an uncertainty estimate of +/- 10 percent for the United States' 53,000-barrels-per-day capping stack estimate and the extrapolation back model the United States has employed to calculate an overall discharge. (*Id.* at 648:2-14, 650:11-651:6.) Importantly, Dr. Ratzel was likewise unable to describe which parameters had been varied to assess the uncertainty of the Tri-Labs Flow Team's estimate as well as the individuals who performed the sensitivity analysis. (*Id.* at 648:23-651:6.)

**B.  Admiral Landry**

Admiral Landry's testimony also exhibited significant gaps. She was designated to testify as the United States representative for only three Topics, including Topics 34 and 35 concerning the announcement of the 1,000 bpd and 5,000 bpd flow rate estimates. Nonetheless, Admiral Landry was unable to recall conversations she had about the 1,000 bpd estimate before it was made public, nor could she recall meetings leading up to the announcement of the 1,000 bpd number — including meetings with senior Administration officials and members of Congress where she discussed the 1,000 bpd estimate. (*See, e.g.*, Landry Dep. Tr. 108-09, 114-16, 136-38, 146-52, 159-62.)

Similarly, Admiral Landry offered minimal details about the lead up to the announcement of the 5,000 bpd number. Admiral Landry could not initially recall the date of the 5,000 barrel

## KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
November 29, 2012
Page 12

announcement. (Landry Dep. Tr. 25:22-26:6.) Nor could she recall discussions in advance of announcing the 5,000 bpd estimate about which other witnesses have testified. (*See, e.g., id.* at 205-209; Charlie Henry Dep. Tr. 180:20-18-185:2; Doug Suttles Dep. Tr. 403:5-404:14.) And as to the one meeting she did discuss, Admiral Landry claimed a "vivid" and "more clear recollection" than the recollection of Charlie Henry, who also attended the meeting. (Landry Dep. Tr. 23:13-24:3.)

Admiral Landry's knowledge about the material supporting the 1,000 bpd and 5,000 bpd estimates she announced was even more sparse. She testified that she did not even know who George Graettinger is, not least the fact that he received flow rate estimates from Tony Parkin at BP as of April 28, 2010, that were well in excess of the 5,000 'official' estimate. (*Id.* at 284:12-285:2, 352:4-355:15.) Similarly, she was entirely unaware of, and therefore unable to testify about, Bill Lehr's involvement in settling on the 5,000 bpd estimate — testifying that she simply had no knowledge of his involvement in generating these flow rate estimates. (*Id.* at 55:25-56:14, 125:10-14, 186:4-9, 256:20-25.)

Despite Admiral Landry's claim to have spent approximately 30 hours over 5 days preparing for her 30(b)(6) deposition, (*Id.* at 19:7-20), she apparently had not reviewed many of the undeniably key documents related to her testimony on Topics 34 and 35 — most notably, notes taken from her own interview discussing the 1,000 bpd and 5,000 bpd estimates and basis for the announcements. (*Id.* at 325:1-326:12; Dep. Ex. 7802.)

Additionally, the only substantive conversation between Admiral Landry and a non-attorney to prepare for her Rule 30(b)(6) deposition was a thirty-minute conversation with Charlie Henry in which they discussed the announcement of the 5,000 bpd estimate, but not the 1,000 bpd estimate. (Landry Dep. Tr. 23:14-23:19, 34:17-22.) And as to the subject of this conversation, Mr. Henry's recollection was precisely the opposite of Admiral Landry's — that the two discussed the 1,000 bpd estimate but not the 5,000 bpd estimate. (Henry Dep. Tr. 22:1-23:23.)

**KIRKLAND & ELLIS LLP**

Sarah D. Himmelhoch
November 29, 2012
Page 13

\* \* \*

BP is willing to meet and confer with the United States about the issues raised in your letter. Ultimately, however, the United States is seeking additional witnesses to provide testimony that the United States has not and cannot demonstrate was not forthcoming in the recently concluded round of depositions.

Sincerely,

Robert R. Gasaway

cc (via electronic mail):

United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross
Allison B. Rumsey

# Attachment 2