
ATTORNEYS

RECEIVED

DEC 0 4 2012

600 Travis, Suite 4200
Houston, Texas 77002
713.220.4200 Phone
713.220.4285 Fax
andrewskurth.com

Georgia L. Lucier
713.220.4177 Phone
713.238.7349 Fax
georgialucier@andrewskurth.com

December 3, 2012

**VIA CERTIFIED MAIL**

Brent Coon
Brent Coon & Associates
215 Orleans
Beaumont, Texas 77701

Re:   Cause No. 2012-22886; *Harley D. Allen, et al. v. BP America Production Company*; In the 269th Judicial District Court of Harris County, Texas

Dear Mr. Coon:

Enclosed please find, Defendant BP America Production Company's Notice of Removal to the United States District Court for the Southern District of Texas.

Very truly yours,

*Georgia Lucier/by DR*

Georgia L. Lucier

9671:204022:dlr
Enclosures

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Harley D. Allen, *et al.*,<br>　　　　　　　Plaintiffs<br><br>v.<br><br>BP America Production Company,<br>　　　　　　　Defendant. | CASE NO. 4:12-cv-3506<br><br>JURY TRIAL DEMANDED<br><br>On removal from the District Court of Harris County, Texas, 269th Judicial District: Case No. 2012-22886. |

**BP'S NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS**

Pursuant to 28 U.S.C. §§ 1331, 1441, 1446 and 43 U.S.C. § 1349, Defendant BP America

Production Company ("BP"), hereby gives notice and removes this case to the United States

District Court for the Southern District of Texas, Houston Division.

BP represents the following in accordance with the requirement of 28 U.S.C. § 1446(a)

for a "short and plain statement of the grounds for removal":

**Background and Procedural Requirements**

1.　　BP is a named defendant in the matter styled "*Harley D. Allen, et al. v. BP America*

*Production Company*," pending in the 269th District Court of Harris County, Texas, and

bearing Case No. 2012-22886 ("State Court Action").

2.　　Plaintiffs filed their Original Petition on April 19, 2012, and BP was served with process

on November 6, 2012.

3.　　This Notice of Removal is timely filed, as it is being filed within thirty days after receipt

of the initial pleading setting forth the claims for relief and within thirty days of service

of process as required by 28 U.S.C. § 1446(b), as computed pursuant to Fed. R. Civ. P. 6(a).

4.     Pursuant to 28 U.S.C. § 1446(a), BP attaches as Exhibit A-E hereto a copy of all process, pleadings and orders served on BP in the State Court Action.

5.     Plaintiffs' claims are removable to federal court because they arise in connection with the Vessels of Opportunity ("VoO") program, through which BP entered contracts with vessel owners around the Gulf to assist in responding to the oil spill.  According to the Original Petition, "Plaintiffs entered into contracts with BP to provide charter service to assist BP in location and clean up of oil spilled from the Macondo Well beginning April 20, 2010 . . . ." Exhibit A, at p.4.  Plaintiffs recognize that their "[v]essels were chartered and utilized in connection with BP's VOO program." *Id.*

6.     For purposes of the applicable federal jurisdictional analysis, this case is similar to 16 actions related to the VoO program that were removed from state court and transferred by the Judicial Panel on Multidistrict Litigation ("JPML") to the Eastern District of Louisiana for inclusion in the coordinated or consolidated pretrial proceedings occurring in MDL No. 2179.  *See* Transfer Order, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, Doc. 555 (J.P.M.L. filed April 18, 2011) (attached as Exhibit G).  The plaintiffs in those actions, like Plaintiffs here, claim that BP breached contractual obligations owed to them in connection with the VoO program.

7.     To facilitate the orderly resolution of these issues, Judge Barbier ordered the filing of several "Master Complaints" on behalf of different plaintiff groups.  Relevant to the current case is the B1 Master Complaint, which includes "Boat captains, crew, charterers, workers, and/or volunteers involved in the Vessels of Opportunity program ('VoO

program') who were ***not adequately compensated*** for their work or time in the VoO program and/or whose property was damaged as a result of their work in the VoO program." Master Complaint for B1 Pleading Bundle ¶ 209(g), MDL No. 2179 (E.D. La. filed Feb. 9, 2011) (Docket No. 1128) (emphasis added) (attached as Exhibit H); *see also id.* ¶¶ 505-14 (describing VoO contract claims). Plaintiffs fall within the B1 Master Complaint because they assert claims for uncompensated economic loss. Exhibit A, at p.5.

8.  The claims Plaintiffs assert in this matter (as well as claims asserted by plaintiffs in similar matters) arise under federal law by reason of the Outer Continental Shelf Lands Act ("OCSLA") and are subject to the exclusive jurisdiction of the federal courts. Jurisdiction exists under OCSLA's jurisdictional provision, 43 U.S.C. § 1349, and because the Shelf is a federal enclave.

## Federal Jurisdiction Over the Vessels of Opportunity Program

9.  This case is removable to this Court under the jurisdictional grant of OCSLA, 43 U.S.C. § 1331, *et seq.* OCSLA provides, in relevant part, that "the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1).

10. OCSLA defines "minerals" as including "oil, gas, sulphur, geopressured geothermal and associated resources." 43 U.S.C. § 1331(q). "Exploration" is the "process of searching for minerals, including . . . any drilling." 43 U.S.C. § 1331(k)(2). And "development"

means "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered." 43 U.S.C. § 1331(l).

11.     The State Court Action arises out of and in connection with BP operations conducted on the Outer Continental Shelf within the meaning of 43 U.S.C. §§ 1331(a) and 1301(a). These operations "involve[d] exploration, development, or the production of minerals, of the subsoil and seabed of the outer Continental Shelf." 43 U.S.C. § 1349(b)(1).  As the Northern District of Florida has noted, "[w]hen it exploded, the *Deepwater Horizon* was operating on the outer continental shelf.  Its operations were part of the exploration for, and intended development and production of, continental-shelf oil." *Phillips v. BP p.l.c.*, 2010 WL 3257737, at *1 (N.D. Fla. Aug. 17, 2010).  Moreover, this Court recently held that even securities lawsuits alleging misrepresentations made in connection with Shelf drilling activities fell into OCSLA's broad sphere of federal jurisdiction.  *See* Memorandum & Order, *In re: BP p.l.c. Securities Litigation*, No. 4:10-md-2185, Rec. Doc. 441 (S.D. Tex. filed Oct. 1, 2012) ("MDL 2185").

12.     The State Court Action thus "aris[es] out of" and "in connection with" a drilling operation on the outer Continental Shelf.  Plaintiffs admit as much in noting that they worked in the VoO program engaging in "clean up of oil spilled from the Macondo Well."  Exhibit A, at p.4.  The sole reason for undertaking the clean-up effort was to eliminate oil and gas flowing from the blown-out well and to comply with related obligations of federal law.  The *Deepwater Horizon*'s operations at the Macondo well were unquestionably related to oil exploration, and that vessel is now sunk and resting on

the seabed of the Outer Continental Shelf. As a result, this Court has original subject matter jurisdiction under 43 U.S.C. § 1349(b)(1)(A).

13. Because, as Plaintiffs allege, their injuries stem from the VoO program established in the wake of the *Deepwater Horizon* incident and because details about the program are relevant to the basis of this Court's subject matter jurisdiction under OCSLA, BP sets forth the background of the program in some detail here.[1]

### A. BP's Responsibilities Under the Oil Pollution Act of 1990

14. Under OPA, where a "discharge" of oil "is of such a size or character as to be a substantial threat to the public health or welfare of the United States," the President (or his designee) "shall direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge." 33 U.S.C. § 1321(c)(2)(A) (part of the OPA session law (Pub. L. No. 101-380, 104 Stat. 484, 524 (Aug. 18, 1990)), but codified as part of the Clean Water Act). To prepare for a potential oil spill, OPA directs the President to prepare and publish a National Contingency Plan ("NCP"). *See* 33 U.S.C. § 1321(d)(1), 40 C.F.R. Part 300. In the course of responding to an oil spill, "[e]ach Federal agency, State, owner or operator, or other person participating in efforts under this subsection shall act in accordance with the National Contingency Plan or as directed by the President." 33 U.S.C. § 1321(c)(3)(A). The NCP establishes a "basic framework for the response management structure" in the form of a "unified command

---

[1] The Fifth Circuit has made clear that this Court is authorized to rely on materials such as those cited herein to determine its own jurisdiction. *See, e.g., Garcia v. Koch Oil Co. of Texas Inc.*, 351 F.3d 636, 639 (5th Cir. 2003) ("[D]efendants may support federal jurisdiction by setting forth the facts — either in the removal petition or by affidavit" (quotation marks and alterations omitted)); *see also Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 759 (11th Cir. 2010) (holding that defendants can "offer their own affidavits or other evidence to establish federal removal jurisdiction").

system" to "bring together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response, where the [Federal On-Scene Coordinator] maintains authority." 40 C.F.R. § 300.105(d).

15.  Because they are "responsible parties" under OPA, OPA imposes obligations on lessees or permittees (such as BP) in connection with spill incidents on the Shelf. *See* 33 U.S.C. §§ 2701(16) (defining "lessee"), 2701(25) (defining "Outer Continental Shelf facility"), 2701(28) (defining "permittee"), 2701(32)(C) (defining "responsible parties" to include "the lessee or permittee of the area on which the facility" on the Shelf is located). OPA specifically references the OCSLA regime. *See, e.g., id.* § 2701(16). Those "participating in" removal efforts "shall act in accordance with the National Contingency Plan and the applicable [Area] response plan . . . , or as directed by the President, except that . . . deviat[ion] from the applicable response plan [is possible] if the President or Federal On-Scene Coordinator determines that deviation from the response plan would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects." 33 U.S.C. § 1321(c)(3)(B).

**B.     Spill Response, the Unified Command, and the Vessels of Opportunity Program**

16.  Pursuant to these (and other related) statutory authorities, the federal government established a "Unified Command" structure under the National Contingency Plan, 40 C.F.R. Part 300, in the wake of the *Deepwater Horizon* spill to manage spill response. *See* Exhibit I, at ¶ 5 (attached as Exhibit I). The Unified Command brought together the federal and state governments, as well as "responsible parties" (such as BP) under OPA, to take action to counter the oil spill consistent with the NCP. *See id.* ¶ 5. The Federal

On-Scene Coordinators from the United States Coast Guard retained ultimate decision-making authority at all times over the Unified Command, however. *See id.*

17. As part of its integrated response to the oil spill, the Unified Command set up the VoO program. *Id.* ¶ 7. Under the VoO program, BP, as a participant in the Unified Command structure, entered into Master Vessel Charter Agreements with vessel owners to facilitate the use of the vessels in connection with the Unified Command's response to the spill. *Id.* ¶ 8.

18. Vessels in the VoO program performed a variety of response, recovery and containment activities directly related to the oil spill—"including towing and deploying boom, skimming oil, locating and recovering tar balls, transporting supplies and personnel, and supporting *in situ* controlled burning operations"—***all pursuant to operational directives, and hence under the direction, of the Unified Command. Id.*** ¶ 9. Thus, a July 21, 2010 Unified Command press release announcing the opening of oil spill response offices implementing the VoO program (among others), provided that those offices will be "under the joint tactical direction of the U.S. Coast Guard and BP." Exhibit J.[2]

19. VoO activities were managed as a unified whole across federal and state waters, performing any operations deemed necessary by the Coast Guard. *See* Kissinger Decl. ¶ 10. Thus, Rear Admiral Landry (at the time, the Federal On-Scene Coordinator) said at a May 27, 2010 Unified Command briefing that "We not only have National Guard troops,

---

[2] *See also* Exhibit K (Unified Command press release July 14, 2010) (announcing U.S. Coast Guard plans to improve the VoO program in Florida); Exhibit L (Unified Command press release July 16, 2010) (announcing new Louisiana Unified Command guidelines "to enhance the [VoO] program"). A recent article by Joseph E. Aldy, who worked on the Obama Administration's response to the spill, confirms that "[t]he Coast Guard worked with BP to implement the Vessels of Opportunity Program . . . ." Joseph E. Aldy, *Real-Time Economic Analysis and Policy Development During the BP* Deepwater Horizon *Oil Spill*, 64 Vand. L. Rev. 1795, 1803 (2011).

but we have every agency involved at the federal level, state level, local communities, volunteers, you know the vessel of opportunity skimming system with the — that BP-hired shrimpers who are out of work to be able to work on this and so it's been an all-hands-on-deck effort and let's not forget the private sector, the commercial people that have been trained and our staff to respond to these spills." Exhibit M.

20.    Similarly, at a June 21, 2010 press briefing, Admiral Allen (then-National Incident Commander) explained that the Unified Command "continue[d] to make progress with the vessels of opportunity, putting them into taskforces, assigning them to Coast Guard units or a larger ship that has communications capable of receiving, signing reports and making the referrals. We're also looking to putting automated identification and GPS trackers on these things so we can see them without any communication being required." Exhibit N. As Admiral Allen stated in a June 7, 2010 press briefing, that integrated response included the employment of "smaller skimmers and smaller vessels that can work in the harbors and the bays *up to 50 miles offshore*." Exhibit O (emphasis added).

21.    The schematic attached as Exhibit P shows conceptually how the Unified Command flowed directly out of the OCSLA and OPA statutes and the NCP, as well as where the VoO program fit as part of the vast range of response efforts conducted by the Unified Command at the direction of the Federal On-Scene Coordinator. Compare the highlighted sections to the schematic overall to see the VoO program in larger context. The yellow highlighting is intended to show how the VoO program might be viewed if looked at in isolation (with blinders on as to the rest of the schematic)—as simply a series of relationships between BP and VoO owners to perform targeted cleanup operations. The problem with such a view is that the yellow-highlighted areas show only a very small

portion of the full picture of the VoO program in terms of its statutory and regulatory origins or its nexus to the Shelf activities that led to the *Deepwater Horizon* oil spill. Importantly, the red-enclosed areas and red arrow on the diagram are intended to point out that the VoO program and its operations were not the result of two-party relationships between BP and VoO owners alone. Rather, the red areas on the schematic reflect the reality that the Federal On-Scene Coordinator (*i.e.*, the Coast Guard) established the VoO program with BP, oversaw its creation, and was the ultimate authority in directing VoO activities on a day-to-day basis.

22. At no point were the private parties acting within the Unified Command not subject to federal authority and control. This fact is true as to BP and the Plaintiffs operating as captains of their vessels.

### C. *Plaintiffs' Original Petition*

23. Plaintiffs' Original Petition challenges BP's administration of the VoO program, in particular by alleging that BP "refused to pay Plaintiffs pursuant to the contracts for charter of Plaintiffs' vessels." Exhibit A, at p.5. These claims are removable to federal court because they arise under OPA and OCSLA and the federal programs created under those statutes.

### Venue and Removal Under 28 U.S.C. §§ 1441(a)

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1446(a), as the United States District Court for the Southern District of Texas, Houston Division, is the District and Division in which the State Court Action was pending.

25. This matter is removable under 28 U.S.C. § 1441 as a civil action over which the United States District Court for the Southern District of Texas has original subject matter jurisdiction under 43 U.S.C. § 1349 and 28 U.S.C. § 1331.

**Effectuation of Removal**

26.    BP hereby removes this action to the United States District Court for the Southern District of Texas, Houston Division.

27.    By filing this Notice of Removal, BP expressly consents to the removal.

28.    Pursuant to 28 U.S.C. § 1446(a), copies of all pleadings, as well as copies of all process and other papers, including Plaintiffs' Original Petition, on file in the record of the State Court Action which are within the possession, custody and control of BP are attached as Exhibit A-E.

29.    The allegations of this Notice were true at the time the State Court Action was commenced and remain true as of the date of filing of this Notice of Removal.

30.    Undersigned counsel certifies that a notice of filing removal, along with a copy of this Notice of Removal, will be promptly filed with the District Court of Harris County, Texas, 269th Judicial District.

WHEREFORE, BP hereby removes this action to the United States District Court for the Southern District of Texas, Houston Division.

Respectfully submitted on December 3, 2012.

/s/ Thomas W. Taylor

Thomas W. Taylor (#3906)
Texas Bar No. 19723875
ANDREWS KURTH LLP
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
ttaylor@andrewskurth.com

ATTORNEY-IN-CHARGE DEFENDANT BP
AMERICA PRODUCTION COMPANY

Of Counsel:

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
richard.godfrey@kirkland.com
andrew.langan@kirkland.com

Jeffrey Bossert Clark
Dominic E. Draye
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jeffrey.clark@kirkland.com

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and foregoing instrument have been served pursuant to the Federal Rules of Civil Procedure on all counsel of record on this 3rd day of December 2012.

/s/ Thomas W. Taylor
Thomas W. Taylor

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFF
Harley D. Allen, et al.

**DEFENDANTS**
BP America Production Company

(b) County of Residence of First Listed Plaintiff   unknown
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.  DEFENDANTS

(c) Attorneys (Firm Name, Address, and Telephone Number)

Brent W. Coon
Texas Bar No. 04769750
Eric W. Newell
Texas Bar No. 24046521
Brent Coon & Associates
215 Orleans
Beaumont, Texas 77701
Telephone: (409) 835-2666
Facsimile:  (409) 835-1912

Thomas W. Taylor
Texas Bar No. 19723875; Federal ID 3906
600 Travis Street, Suite 4200, Houston, Texas  77002
Telephone: 713-220-4200
Facsimile:  713-220-4285
*See* "LIST OF COUNSEL OF RECORD" for additional counsel

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suit<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury- Med. Malpractice<br>☐ 365 Personal Injury- Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities- Employment<br>☐ 446 Amer. w/Disabilities- Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
OCSLA, 43 U.S.C. § 1331 et. seq.

Brief description of cause: **Claims arising out of operation of the Deepwater Horizon in the Gulf of Mexico.**

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND** UNSPECIFIED

CHECK YES only if demanded in complaint
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)

JUDGE   SEE ATTACHED

DOCKET NUMBER   2:10-md-02179

DATE
December 3, 2012

SIGNATURE OF ATTORNEY OF RECORD
*s/Thomas W. Taylor*

FOR OFFICE USE ONLY

RECEIPT         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE

CIVIL COVER SHEET
VIII. RELATED CASE(S) IF ANY

- *Action Restoration, Inc. v. BP America Inc., et al.*, Civil Action No. 1:12-cv-00240, In the United States District Court for the Eastern District of Texas, Beaumont Division, Honorable Ron Clark.

- *Juan J. Aguilar, et al, v. Transocean, Ltd., et al*, Civil Action No. 3:10-cv-00215, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Alpasito, Inc., et al, v. BP Company North America Inc., et al*, Civil Action No. 1:10-cv-00236, In the United States District Court for the Southern District of Texas, Brownsville Division, Honorable Hilda G. Tagle.

- *Jack Arias, et al, v. BP Company North America Inc., et al*, Civil Action No. 3:10-cv-00353, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Benny Arispe, et al, v. BP Exploration & Production Inc., et al*, Civil Action No. 4:10-cv-03197, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Oleander Benton and Gregory Luke Meche v. Transocean, Ltd., et al*, Civil Action No. 4:10-cv-02765, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Kevin D. Brannon, et al. vs. BP America Production Company*, Civil Action No. 4:11-cv-04055, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *BP Exploration & Production Inc., et al. v. Halliburton Energy Services, Inc.*, Civil Action No. 4:11-cv-01526, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Douglas Harold Brown, et al. v. BP Exploration & Production Inc., et al.*; Civil Action No. 4:11-2510; In the United States District Court for the Southern District of Texas, Houston Division, Honorable Keith P. Ellison.

- *Le Bui, et al. v. BP Exploration & Production Inc., et al.*,  Civil Action No. 4:11-cv-01657, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Oscar Bui, et al. v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:11-cv-00472, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Vanessa D. Gilmore.

- *Abelardo Carbajal v. BP Products North America Inc.*, Civil Action No. 3:11-cv-00379, In The United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth Hoyt.

- *Michael Chatman, et al, v. BP Exploration & Production Inc., et al*, Civil Action No. 4:10-cv-04329, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth Hoyt.

- *M.P. Cheng, et al, V. BP Company North America Inc., et al*, Civil Action No. 4:10-cv-02717, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Samuel Chernin, et al, v. BP Company North America et al*, Civil Action No. 3:10-cv-00350, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Alberto Tecun Chimin v. Transocean, Ltd., et al*, Civil Action No. 3:10-cv-00212, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Shun Y. Chu, et al, v. BP, PLC. et al*, Civil Action No. 4:10-cv-01972, In the United States District Court for the Southern District of Texas, Honorable Lee H. Rosenthal.

- *Charles J. Contegni, Jr., d/b/a Chips Shrimp, Inc., individually and on behalf of those similarly situated, v. Transocean Ltd, et al*, Civil Action No. 4:10-cv-01989, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Billy Coon, et al, v. BP Exploration & Production Inc., et al*, Civil Action No. 3:10-cv-00290, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Nyoka Curtis, as Next Friend of Treavor Ray Curtis, a Minor, et al v. BP Exploration & Production Inc., et al,* Civil Action No. 4:11-cv-02231, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lee H. Rosenthal.

- *Matthew Davis, et al, v. Cameron International Corp., et al*, Civil Action No. 4:10-cv-01852, In the United States District Court for the Southern District of Texas, Honorable Sim Lake.

HOU:3083235.1

- *Liem V. Do, et al, v. BP Exploration & Production Inc., et al*, Civil Action No. 4:10-cv-02256, In the United States District Court for the Southern District of Texas, Houston Division, Honorable David Hittner.

- *Steve Dorst, et al. vs. BP Exploration & Production Inc., et al.*, Civil Action No. 4:12-cv-00832, In the United States District Court for the Southern District of Texas, Houston Division, Keith P. Ellison.

- *Tran Ngoc Dung, et al, v. BP Exploration & Production Inc., et al*, Civil Action No. 4:10-cv-02129, In the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Ecco Solutions, et al, v. BP Company North America Inc., et al*, Civil Action No. 3:10-cv-00354, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Esquivel v. BP Company North America Inc., et al*, Civil Action No. 1:10-cv-00227, In the United States District Court for the Southern District of Texas, Brownsville Division, Honorable Hilda G. Tagle.

- *Shane Faulk v. Transocean, Ltd., et al*, Civil Action No. 4:10-cv-02766, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Raymond Gore, et al v. BP Company North America Inc., et al*, Civil Action No. 3:10-cv-00486, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Guindon v. BP PLC, et al*, Civil Action No. 3:10-cv-00317, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Gulf King Services, Inc. v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:11-cv-00312, In the United States District Court for the Southern District of Texas, Houston Division, Honorable David Hittner.

- *Halliburton Energy Services, Inc. v. BP Exploration & Production Inc.,* Civil Action No. 4:11-cv-01687, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Halliburton Energy Services, Inc. v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:11-cv-03392, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Keith P. Ellison.

HOU:3083235.1

- *David Hogan, et al. v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:12-cv-01608, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Magistrate Judge Frances H. Stacy.

- *In Re The Complaint and Petition of Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc., as Owner, Managing Owners, Owners Pro-Hac Vice, And/or Operators of the MODU Deepwater Horizon, in a Cause for Exoneration from or Limitation of Liability*, Civil Action No. 4:10-cv-01721, In the United States District Court for the Southern District of Texas, Houston, Honorable Keith Ellison.

- *Lance John v. Transocean, Ltd., et al*, Civil Action No. 4:10-cv-02947, In the United States District Court for the Southern District of Texas, Houston Division, Honorable David Hittner.

- *Brad Jones, et al, v. Cameron International Corporation, et al*, Civil Action No. 4:10-CV-2354, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Peggy Kemp vs. BP Exploration & Production Inc., et al.*, Civil Action No. 4:12-cv-01989, In the United States District Court for the Southern District of Texas, Houston Division, Honorable David Hittner.

- *William Kibby vs. BP PLC., et al.*, Civil Action No. 3:12-cv-00102, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Hank J. Kiff vs. BP America Production Company*, Civil Action No. 4:12-cv-3179; In the United States District Court for the Southern District of Texas, Houston Division, Honorable Stephen W. Smith.

- *Tracy Kleppinger v. Transocean Offshore Deepwater Drilling, Inc., et al*, Civil Action No. 4:10-cv-01851, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Joshua Kritzer, et al, v. BP America Inc., et al*, Civil Action No. 4:10-cv-01854, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Roy Lam, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-02261, In the United States District Court for the Southern District of Texas, Houston Division, Honorable David Hittner.

HOU:3083235.1

- *Duc Trong Le, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-01971, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Thum M. Le, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-01970, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Tien Le, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-02619, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Trung Le, et al. v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:11-cv-01397, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Richard M. Leagre, individually and on behalf of those similarly situated, v. BP PLC, et al*, Civil Action No. 4:10-cv-02446, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *A. Binh Luu, et al. v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:11-cv-01660, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Amelia Mai, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-02621, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lee H. Rosenthal.

- *Paul Meinhart v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:11-cv-00073, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lee H. Rosenthal.

- *Morales v. BP Exploration & Production Inc. et al*, Civil Action No. 3:10-cv-00477, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Patrick Morgan et al, v. Transocean Ltd., et al*, Civil Action No. 4:10-cv-04926, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *The National Vietnamese American Fishermen Emergency Association, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-01607, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn Hughes.

HOU:3083235.1

- *Ben Nelson and Jeri Nelson, d/b/a Jeri's Seafood, Inc., et al, v. Transocean Ltd, et al,* Civil Action No. 3:10-cv-00172, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Keit Ngo, et al, v. BP Exploration & Production, Inc. et al,* Civil Action No. 4:10-cv-03071, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Keith P. Ellison.

- *Ann H. Nguyen, et al, v. BP PLC, et al,* Civil Action No. 4:10-cv-02259, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Cheiu H. Nguyen, et al, v. BP PLC, et al,* Civil Action No. 4:10-cv-02625, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Ewing Werlein, Jr.

- *Cindy T. Nguyen, et al. v. BP PLC, et al,* Civil Action No. 4:10-cv-02030, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lee H. Rosenthal.

- *Cuch Nguyen, et al, v. BP Exploration & Production Inc., et al,* Civil Action No. 4:10-cv-02484, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Dong Nguyen, et al, v. BP PLC, et al,* Civil Action No. 4:10-cv-01969, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Dong Van Nguyen v. BP Exploration & Production Inc., et al.;* Civil Action No. 4:12-cv-03059, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Susie Nguyen v. BP Exploration & Production Inc., et al,* Civil Action No. 4:10-cv-03072, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Trinh Nguyen, et al, v. BP PLC, et al,* Civil Action No. 4:10-cv-03068, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Keith P. Ellison.

- *Xuan V. Nguyen, et al, v. BP PLC, et al,* Civil Action No. 4:10-cv-01968, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

HOU:3083235.1

- *Oak Island Seafood, LLC, et al. v. BP Exploration & Production Inc., et al.*, Civil Action No. 4:11-cv-03808, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Pappas Restaurants, Inc. v. Transocean Offshore Deepwater Drilling, Inc., et al,* Civil Action No. 4:10-cv-01912, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Vanessa Gilmore.

- *Pleasure Island Commission of the City of Port Arthur, Texas v. BP America Inc., et al.,* Civil Action No. 1:12-cv-00244, In the United States District Court for the Eastern District of Texas, Beaumont Division, Honorable Ron Clark.

- *Doan V. Pham v. BP Exploration & Production Inc., et al,* Civil Action No. 4:10-cv-03346, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Alberto Rojas Rodriguez, et al, v. Transocean, Ltd., et al,* Civil Action No. 3:10-cv-00221, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Sabine Pass Port Authority v. BP America Inc., et al.,* Civil Action No. 1:12-cv-00245, In the United States District Court for the Eastern District of Texas, Beaumont Division, Honorable Thad Heartfield.

- *Kurt Satchfield, et al, v. BP PLC,, et al,* Civil Action No. 4:10-cv-02397, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Kevin P. Senegal v. BP Exploration & Production Inc., et al;* Civil Action No. 4:11-cv-1796, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Joe D. Seta, et al, v. BP PLC, et al,* Civil Action No. 4:10-cv-02448, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Charles Smith v. BP Company North America Inc., et al,* Civil Action No. 4:10-cv-04288, In the United States District Court for the Southern District of Texas, Houston Division, Honorable David Hittner.

- *Sterling Shipyard, LP v. BP America Inc., et al.,* Civil Action No. 1:12-cv-00241, In the United States District Court for the Eastern District of Texas, Beaumont Division, Honorable Marcia Crone.

HOU:3083235.1

- *Supply Pro, Inc. vs. BP Exploration and Production, Inc., et al.*, Civil Action No. 4:12-cv-00737, In the United States District Court for the Southern District of Texas, Houston Division, Melinda Harmon.

- *Timmons Restaurant Partners, et al, v. BP Company North America Inc. et al*, Civil Action No. 4:10-cv-03201, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Kenneth M. Hoyt.

- *Dora Gastian Todd v. Transocean, Ltd., et al*, Civil Action No. 3:10-cv-00213, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Buddy Trahan v. BP PLC, et al*, Civil Action No. 4:10-cv-03198, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Doahn Tran, et al, v. BP Exploration & Production Inc. et al*, Civil Action No. 4:10-cv-02897, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Phong Tran, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-02624, In the Southern District of Texas, Houston Division, Honorable Lee H. Rosenthal.

- *Sang Tran, et al, v. BP Exploration & Production Inc., et al*, Civil Action No. 4:10-cv-03069, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Tam Tran, et al, v. BP Exploration & Production Inc., et al*, Civil Action No. 4:10-cv-03070, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy F. Atlas.

- *Thong Tran, et al. v. BP America Inc., et al*, Civil Action No. 4:10-cv-02254, In the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Sergio Valdivieso v. Southern Cat, Inc., et al.*, Civil Action No. 4:12-cv-01018; In the Southern District of Texas, Houston Division, Honorable David Hittner.

- *Dan A. Van, et al, v. BP PLC, et al*, Civil Action No. 4:10-cv-02257, In the Southern District of Texas, Houston Division, Honorable Lee H. Rosenthal.

- *Tung Vo, et al v. BP PLC, et al*, Civil Action No. 4:10-cv-02622, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Melinda Harmon.

HOU:3083235.1

- *Keith Woodward, d/b/a S S L International, Inc. v. Transocean, Ltd., et al*, Civil Action No. 3:10-cv-00211, In the United States District Court for the Southern District of Texas, Galveston Division, Honorable Kenneth M. Hoyt.

- *Worldwide Sorbent Products, Inc. vs. BP Exploration and Production, Inc., et al.* Civil Action No. 4:12-cv-00705, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Sim Lake.

- *Micah Wright, individually and on behalf of those similarly situated, v. BP PLC, et al*, Civil Action No. 4:10-cv-02088, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Lynn N. Hughes.

- *Robert Young vs. BP Exploration and Production Inc., et al.*, Civil Action No. 4:12-cv-00989, In the United States District Court for the Southern District of Texas, Houston Division, Honorable David Hittner.

- *Dong V. Nguyen vs. BP Exploration & Production Inc.; Deepwater Horizon Oil Spill Trust,* Civil action No. 4:12-cv-02854, In the United States District Court for the Southern District of Texas, Houston Division, Honorable Nancy J. Atlas.

HOU:3083235.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| Harley D. Allen, *et al.*, <br>        Plaintiffs <br><br> v. <br><br> BP America Production Company, <br>        Defendant. | CASE NO.  4:12-cv-3506 <br><br> JURY TRIAL DEMANDED |

**INDEX OF DOCUMENTS BEING
FILED WITH NOTICE OF REMOVAL**

Civil Cover Sheet

List of Counsel of Record

| Exhibits to the Notice of Removal | Exhibit |
|---|---|
| Plaintiff's Original Petition | A |
| Civil Case Information Sheet | B |
| Harris County Docket Sheet | C |
| Defendant BP America Production's Original Answer | D |
| Civil Process Requests | E |
| Notice of Removal of State Court Action | F |
| Transfer Order, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, Doc. 555 (J.P.M.L. filed April 18, 2011) | G |
| Master Complaint for B1 Pleading Bundle ¶ 209(g), MDL No. 2179 (E.D. La. filed Feb. 9, 2011) | H |
| Declaration of Mathew Kissinger | I |
| Unified Command press release July 21, 2010 | J |

Unified Command press release July 14, 2010                                    K

Unified Command press release July 16, 2010                                    L

Unified Command press briefing May 27, 2010                                 M

Unified Command press briefing June 21, 2010                                N

Unified Command press briefing June 7, 2010                                  O

Schematic of the Governing Law of Unified Command                    P

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| Harley D. Allen, *et al.*,<br>                    Plaintiffs<br><br>v.<br><br>BP America Production Company,<br>                    Defendant. | CASE NO.  4:12-cv-3506<br><br>JURY TRIAL DEMANDED |

## LIST OF COUNSEL OF RECORD

| PARTY AND PARTY TYPE | ATTORNEY |
|---|---|
| **Harley D. Allen (Book Me A Charter)**<br>**James Allen**<br>**Thomas Brewer**<br>**Buoi Van Chau**<br>**Keith Donsanouphith**<br>**Robert Fore**<br>**Brent Granda (Shallow Waters, II)**<br>**Pedro Jiminez**<br>**Wilson Johnson, Jr.**<br>**Hilton J. Landry**<br>**James McNeir, Jr.**<br>**Bruce Millender (Reel Time)**<br>**William Moses**<br>**Michael Murphy**<br>**John Norman**<br>**Greg Pollock**<br>**Joseph Reno**<br>**John Robin**<br>**Anthony Rice**<br>**Lexis Schubert (Genesis Charters, Inc. ) and**<br>**(Hattatude Sportfishing Charters)**<br>**James G. Stone**<br>**Steven Wilkins**<br><br>*Plaintiffs* | Brent W. Coon<br>Eric W. Newell<br>Brent Coon & Associates<br>215 Orleans<br>Beaumont, Texas 77701<br>(409) 835-2666<br>(409) 835-1912 (fax) |

**BP America Production Company**

*Defendant*

Thomas W. Taylor
Southern District No. 3906
Texas Bar No. 19723875
Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, TX 77002
(713) 220-4200
(713) 220-4285 (fax)
ttaylor@andrewskurth.com

*Of Counsel:*

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
(312) 862-2200 (fax)
richard.godfrey@kirkland.com
andrew.langan@kirkland.com

# EXHIBIT A



# BRENT COON & ASSOCIATES

215 Orleans • Beaumont, TX 77701 • 409-835-2666 • 409-835-1912 Facsimile

April 19, 2012

**FILED**
Chris Daniel
District Clerk
APR 19 2012
Harris County, Texas

Mr. Chris Daniel
Harris County District Clerk        **2012 22886**
201 Caroline, Suite 210
Houston, TX 77002

RE:   HARLEY D. ALLEN, ET AL V. BP AMERICAN PRODUCTION COMPANY

Dear Mr. Daniels:

Enclosed please find the Plaintiff's First Amended Petition which we ask be filed as styled above. Also enclosed is our firm check in the amount of $290.00 for the filing fee, processing of citation and jury demand.

Please contact Victor at 1-713-225-1682 once the citations have been prepared and are ready for pick up.

Please place your file mark stamped copy on the extra copy of these instruments and return in the self addressed, stamped envelope.

Thank you for your cooperation.

Sincerely

Diane Findley
Legal Assistant to Brent W. Coon

Enclosures

Beaumont, TX • Dallas, TX • Houston, TX • San Francisco, CA • Baton Rouge, LA

Boston, MA • Jackson, MS • St. Louis, MO • Cleveland, OH • Philadelphia, PA

CONFIRMED FILE DATE: 4/19/2012

Certified Document Number: 51974587 - Page 1 of 1



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 30, 2012

Certified Document Number:      51974587

*Chris Daniel*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com

CONFIRMED FILE DATE: 4/19/2012

Certified Document Number: 51974585 - Page 1 of 6



CAUSE NO. **2 0 1 2   2 2 8 8 6**

| | | |
|---|---|---|
| HARLEY D. ALLEN (BOOK ME A CHARTER), JAMES ALLEN, THOMAS BREWER, BUOI VAN CHAU, KEITH DONSANOUPHITH, ROBERT FORE, BRENT GRANDA (SHALLOW WATERS, II), PEDRO JIMINEZ, WILSON JOHNSON, JR., HILTON J. LANDRY, JAMES MCNEIR, JR., BRUCE MILLENDER (REEL TIME), WILLIAM MOSES, MICHAEL MURPHY, JOHN NORMAN, GREG POLLOCK, JOSEPH RENO, JOHN ROBIN, ANTHONY RICE, LEXIS SCHUBERT (GENESIS CHARTERS, INC.) AND (HATTATUDE SPORTFISHING CHARTERS), JAMES G. STONE and STEVEN WILKINS | § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § § | HARRIS COUNTY, TEXAS |
| v. | § § § | |
| BP AMERICA PRODUCTION COMPANY | § § § | |
| *Defendant.* | § § § | 269 JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, HARLEY D. ALLEN (BOOK ME A CHARTER), JAMES ALLEN,

THOMAS BREWER, BUOI VAN CHAU, KEITH DONSANOUPHITH, ROBERT FORE,

BRENT GRANDA (SHALLOW WATERS, II), PEDRO JIMINEZ, WILSON JOHNSON, JR.,

HILTON J. LANDRY, JAMES MCNEIR, JR., BRUCE MILLENDER (REEL TIME),

WILLIAM MOSES, MICHAEL MURPHY, JOHN NORMAN, GREG POLLOCK, JOSEPH

RENO, ANTHONY RICE, JOHN ROBIN, LEXIS SCHUBERT (GENESIS CHARTERS, INC.)

AND (HATTATUDE SPORTFISHING CHARTERS), JAMES G. STONE and STEVEN

WILKINS (collectively referred to as "Plaintiffs"), and file this, their Original Petition and Request for Disclosure complaining of BP AMERICA PRODUCTION COMPANY ("BP"), Defendant, and in support of which would respectfully show unto the Court as follows:

### I. DISCOVERY CONTROL PLAN

Plaintiffs intend to conduct discovery under Level 3 pursuant to Rule 190.4 of the Texas Rules of Civil Procedure, and request that this Court issue an appropriate discovery control plan tailored to the circumstances of this suit.

### II. PARTIES

1.  Plaintiff, Harley D. Allen ("Book Me a Charter") is a resident of Eastpoint, FL.

2.  Plaintiff, James Allen ("Allen") is a resident of Apalachicola, FL.

3.  Plaintiff, Thomas Brewer ("Brewer") is a resident of Pensacola, FL.

4.  Plaintiff, Buoi Van Chau ("Chau") is a resident of Pensacola, FL.

5.  Plaintiff, Keith Donsanouphith ("Donsanouphith") is a resident of Irvington, AL.

6.  Plaintiff, Robert Fore ("Fore") is a resident of Grand Bay, AL.

7.  Plaintiff, Brent Granda ("Shallow Waters II") is a resident of Jupiter, FL.

8.  Plaintiff, Pedro Jiminez ("Jiminez") is a resident of Irvington, AL.

9.  Plaintiff, Wilson Johnson, Jr. ("Johnson") is a resident of Coden, AL.

10.  Plaintiff, Hilton J. Landry ("Landry") is a resident of Port St. Joe, FL.

11.  Plaintiff, James McNeir, Jr. ("McNeir") is a resident of Mobile, AL.

12.  Plaintiff, Bruce Millender ("Millender") is a resident of Eastpoint, FL.

13.  Plaintiff, William Moses ("Moses") is a resident of Eastpoint, FL.

14.  Plaintiff, Michael Murphy ("Murphy") is a resident of Gulfshores, AL.

15.  Plaintiff, John Norman ("Norman") is a resident of Florence, AL.

Certified Document Number: 51974585 - Page 2 of 6

16.     Plaintiff, Greg Pollock ("Pollock") is a resident of Moss Point, MS.

17.     Plaintiff, Joseph Reno ("Reno") is a resident of Hammond, LA.

18.     Plaintiff, Anthony Rice ("Rice") is a resident of Irvington, AL.

19.     Plaintiff, John Robin ("Robin") is a resident of Gretna, LA.

20.     Plaintiff, Lexis Schubert ("Genesis Charters, Inc. and Hattatude Sortfishing Charters") is

        a resident of Davie, FL.

21.     Plaintiff, James G. Stone ("Stone") is a resident of Pensacola, FL.

22.     Plaintiff, Stephen Wilkens ("Wilkens") is a resident of Mobile, AL.

23.     Defendant, BP America Production Company is a foreign corporation with its principal

        place of business in Harris County, Texas and may be served with process through its

        registered agent located at CT Corporation System, 350 North St. Paul Street, Suite 2900,

        Dallas, Texas 75201.

### III. VENUE

Venue for this suit is mandatory in Harris County under Texas Civil Practice & Remedies

Code section 15.020(b) because this is a "major transaction" as defined by that section.

Furthermore, this county has been designated in writing as the county for suit.

Specifically, the contracts designate Houston, Texas as one of only two choices of venue for any

action connected with the contracts at issue.

Alternatively, general venue exists in Harris County under Civil Practice and Remedies

Code section 15.002(a)(3) because it is the county of Defendant's principal office in Texas.

### IV. JURISDICTION

The contracts at issue contain a choice-of-law provision which dictates that general

maritime law will apply to its terms.

Certified Document Number: 51974585 - Page 3 of 6

Accordingly, jurisdiction is appropriate in the Courts of the State of Texas under the Savings to Suitors Clause, 28 U.S.C. § 1333, which permits Plaintiffs to file this action for damages under both state law and federal maritime law, and permits the state court to apply maritime substantive law. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628 (1959).

## V. BREACH OF CONTRACT

Plaintiffs, entered into contracts with BP to provide charter service to assist BP in location and clean up of oil spilled from the Macondo Well beginning April 20, 2010 and continuing for months thereafter. The contracts came in the form of identical agreements titled "Master Vessel Charter Agreement" and/or "Master Service Contract" (hereinafter referred to as "Vessel Agreements").

The Vessel Agreements executed by all of the following parties were related to BP's "Vessels of Opportunity" (hereinafter referred to as "VOO") program. The Vessels were chartered and utilized in connection with BP's VOO program. Each vessel was hired a daily rate based on the size of the vessel ranging from $1,200.00-$3,000 per 24 hour day. Additionally, each vessel was paid $200 per 8 hour day for each crewmember and reimbursement at cost plus 10% for any specialized equipment required by BP.

All of the Vessels were duly tendered to BP as provided in the Vessel Agreements. Daily charter hire was to be paid by BP to all Plaintiffs from time to time as provided in the Vessel Agreements.

Under Article 2(A) of the Vessel Agreements, the Vessels were:

(a) to be "employed exclusively" for BP's use as a vessel of opportunity in the carriage of personnel, equipment and provisions and in the performance of various tasks associated with oil spill responses and containment efforts as directed by BP;

(b) to be available and at BP's disposal "for operation twenty-four (24) hours per day"; and

(c) not to be used for any purpose other than performance of Services during the Charter Term.

The Vessel Agreements further provided under Article 1(A) that BP has the right to terminate the Vessel Agreement at any time, "as set out in Paragraph B of this Article 1."

Paragraph B of Article 1 states that the Vessels shall be redelivered to Plaintiffs at the close of each charter term to the original point of delivery, "as determined by off-hire dispatch notification."

Defendant BP has failed and/or refused to pay Plaintiffs pursuant to the contracts for charter of Plaintiffs' vessels.

Plaintiffs have suffered specific contractual damages as the proximate consequence of the breach of various contractual obligations owed to the Plaintiffs.

## VI. DAMAGES

Plaintiffs seek contractual damages within the jurisdictional limits of this Court.

Plaintiffs are further entitled to recover reasonable and necessary attorney's fees under Texas Civil Practice and Remedies Code chapter 38 because this is a suit for breach of contract.

## VII. JURY DEMAND

Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

## VIII. CONDITIONS PRECEDENT

All conditions precedent to Plaintiffs' claims for relief has been performed or has occurred.

Certified Document Number: 51974585 - Page 5 of 6

## IX. REQUEST FOR DISCLOSURE

Under Texas Rule of Civil Procedure 194, Plaintiffs request that Defendant BP disclose, within 50 days of service of this request, the information or material described in Rule 194.2.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs ask that this Court issue citation for Defendant BP to appear and answer, and that Plaintiffs be awarded a judgment against Defendant for the following:

a.   Actual damages;

b.   Prejudgment and post judgment interest;

c.   Court costs;

d.   Attorney's fees; and

e.   All other relief to which Plaintiff may be justly entitled.

Respectfully submitted,

**BRENT COON & ASSOCIATES**

BRENT W. COON
Texas State Bar No. 04769750
ERIC W. NEWELL
Texas State Bar No. 24046521
215 Orleans
Beaumont, Texas 77701
Tel.:   (409) 835-2666
Fax:   (409) 835-1912

**ATTORNEYS FOR PLAINTIFFS**

Certified Document Number: 51974285 - Page 6 of 6



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 30, 2012

Certified Document Number:        51974585

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# EXHIBIT B

RECEIPT NUMBER ____12149____   ____0.00____
TRACKING NUMBER ___72840229___   ___ATY___

CAUSE NUMBER ____201222886____

| PLAINTIFF: ALLEN, HARLEY D (BOOK ME A CHARTER) | In The   269th |
| vs. | Judicial District Court of |
| DEFENDANT: BP AMERICA PRODUCTION COMPANY | Harris County, Texas |

### CITATION CORPORATE

THE STATE OF TEXAS
County of Harris

    TO: BP AMERICA PRODUCTION COMPANY (A FOREIGN CORPORATION) BY SERVING
       THROUGH ITS REGISTERED AGENT CT CORPORATION SYSTEM

       350 NORTH ST PAUL STREET SUITE 2900  DALLAS TX 75201

    Attached is a copy of ___PLAINTIFF'S ORIGINAL PETITION_____.

This instrument was filed on the ____19th___ day of ____April_____, 20__12__, in the
above cited cause number and court. The instrument attached describes the claim against you.

    YOU HAVE BEEN SUED; you may employ an attorney. If you or your attorney do not file a written answer with the
District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were
served this citation and petition, a default judgment may be taken against you.

TO OFFICER SERVING:

    This Citation was issued under my hand and seal of said Court, at Houston, Texas, this __29th__ day of
_____October_____, 20__12__.

Issued at request of:
COON, BRENT WAYNE
215 ORLEANS
BEAUMONT, TX 77701
Tel: (409) 835-2666
Bar Number:  4769750

**CHRIS DANIEL, District Clerk**
Harris County, Texas
201 Caroline, Houston, Texas 77002
P.O. Box 4651, Houston, Texas 77210

Generated by: DOZIER, ANGELLIA P   Y9V/9T7/927119

### OFFICER/AUTHORIZED PERSON RETURN

I received this citation on the _____ day of _____, 20____, at _____ o'clock ___.M., endorsed

the date of delivery thereon, and executed it at _____,
                                    (street address)               (city)

in _____ County, Texas on the _____ day of _____, 20____, at _____ o'clock ___. M.,

by delivering to _____, by delivering to its
          (the defendant corporation named in citation)

_____, in person, whose name is _____,
(registered agent, president, or vice-president)

a true copy of this citation, with a copy of the _____ Petition attached,
                          (description of petition, e.g., "Plaintiffs Original")

and with accompanying copies of _____.
                         (additional documents, if any, delivered with the petition)

I certify that the facts stated in this return are true by my signature below on the _____ day of _____, 20____.

FEE: $ _____

                   By: _____
                          (signature of officer)

Printed Name: _____

_____    As Deputy for: _____
Affiant Other Than Officer                          (printed name & title of sheriff or constable)

On this day, _____, known to me to be the person whose signature
appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was
executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this _____ day of _____, 20 _____

_____
                            Notary Public

N INT.CITC P

**FILED**
Chris Daniel
District Clerk

NOV 15 2012

Time: _____
Harris County, Texas
By _____
Deputy

**AFFIDAVIT ATTACHED**

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Certified Document Number: 53972086 - Page 1 of 2

# EXHIBIT C

**Harris County Docket Sheet**

# 2012-22886

**COURT:**   269th
**FILED DATE:**  4/19/2012
**CASE TYPE:**   BREACH OF CONTRACT



### ALLEN, HARLEY D (BOOK ME A CHARTER)
Attorney: COON, BRENT WAYNE

### vs.

### BP AMERICA PRODUCTION COMPANY
Attorney: TAYLOR, THOMAS W.

| Docket Sheet Entries | |
|---|---|
| Date | Comment |



STATE OF TEXAS
COUNTY OF HARRIS

I, Chris Daniel, District Clerk of Harris County, Texas, certify that
this is a true and correct copy of the original record filed and or recorded
in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this 11/30/12

CHRIS DANIEL, DISTRICT CLERK
HARRIS COUNTY, TEXAS

_____ Deputy

# EXHIBIT D

Filed 12 November 26 P2:10
Chris Daniel - District Clerk
Harris County
ED101J017197338
By: Charlie Tezeno

Trace Number - ED101J017197338

## CAUSE NO. 2012-22886

| | | |
|---|---|---|
| HARLEY D. ALLEN, ET AL. | § | IN THE DISTRICT COURT OF |
| Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| BP AMERICA PRODUCTION | § | |
| COMPANY | § | |
| Defendant | § | |
| | § | 269th JUDICIAL DISTRICT |

## DEFENDANT BP AMERICA PRODUCTION COMPANY'S ORIGINAL ANSWER

Defendant BP America Production Company ("BP" or "Defendant") files this Original Answer in response to Plaintiffs' Original Petition.

Defendant asserts a general denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, and requests that Plaintiffs be required to prove the charges and allegations contained in their petition by a preponderance of the evidence.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that upon final hearing the Court enter judgment that Plaintiffs take nothing and that Defendant be awarded its costs of court and such other and further relief to which it may be justly entitled.

HOU:3268271.1

Respectfully submitted,

*/s/ Thomas W. Taylor*
Thomas W. Taylor
Texas State Bar No. 19723875
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
ttaylor@andrewskurth.com

J. Andrew Langan, P.C.
Texas Bar No. 24066576
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Phone: 312.862.2000
Fax: 312.862.2200
andrew.langan@kirkland.com

ATTORNEYS FOR DEFENDANT
BP AMERICA PRODUCTION
COMPANY

## CERTIFICATE OF SERVICE

   This is to certify that a true and correct copy of the above and foregoing has been forwarded to counsel of record pursuant to the Texas Rules of Civil Procedure on this 26th day of November, 2012.

   Brent W. Coon
   Eric W. Newell
   Brent Coon & Associates
   215 Orleans
   Beaumont, Texas 77701

*/s/ Georgia L. Lucier*
Georgia L. Lucier



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 30, 2012

Certified Document Number:        54017121

*Chris Daniel*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# EXHIBIT E



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

### Civil Process Pick-Up Form
*All Information on this form is required.

## *CAUSE NUMBER 2012 - 22886

*ATY ☑    *CIV ☐                                    *Court # 269

| REQUESTING ATTORNEY/FIRM NOTIFICATION |
| --- |
| *ATTORNEY: Coon, Brent          * PH: 409-835-2666 |
| *CIVIL PROCESS SERVER: _____ |
| *PH: _____ |
| *PERSON NOTIFIED SVC READY: _____ |
| *DATE: _____ |
| *30th day after date of issuance _____-_____-2012__ |

Type of Service Document: _Citation_ Tracking Number: _7284 0229_
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____
Type of Service Document: _____ Tracking Number: _____

*Civil Process papers prepared by: ANGELLIA P. DOZIER

*Date: _10-29_ -2012____

| |
| --- |
| *Process papers released to: _1485 25  victor bymo_ |
| *Process papers released by: _LAlen fax Jackson_ |
| *Date: _10-29_ ,2012  Time: _2.05_  AM (PM) |

Certified Document Number: 53782221 - Page 1 of 1

CONFIRMED FILE DATE: 10/29/2012

Revised 02/20/12



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this    November 30, 2012

Certified Document Number:          53782221

*Chris Daniel*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com

**IN THE 269th
JUDICIAL COURT OF
HARRIS COUNTY, TEXAS**

**CAUSE NUMBER 201222886**

PLAINTIFF: ALLEN, HARLEY D (BOOK ME A CHARTER)

vs.

DEFENDANT: BP AMERICA PRODUCTION COMPANY

**AFFIDAVIT OF SERVICE
CITATION CORPORATE**

**THE STATE OF TEXAS
County of Harris**

I Robert McDougall, being duly sworn, depose and say, I have been duly authorized by the Supreme Court of Texas to serve Citations and other Notices as well as make service of the document(s) to the individual(s) referenced at the following dates and times.

**Date Received:** November 3, 2012 at 2:30 PM
**Document(s):** The State of Texas Citation and Plaintiff's Original Petition
**Deliver to:** BP America Production Company (A Foreign Corporation) by Serving Through its Registered Agent CT Corporation System
**Address:** 350 N St Paul Street
Suite 2900
Dallas, Texas 75201

1.   On November 6, 2012 at 1:45 PM, I Robert McDougall delivered by hand in person a true copy of The State of Texas Citation, Plaintiff's Original Petition to BP American Production Company (A Foreign Corporation) by Serving its Registered Agent CT Corporation System, Jennifer Duddington, at 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

I am of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated. I am an adult over the age of 18 years of age and I am not a party to this suit and have no interest in the outcome of the suit. I have never been convicted of any felony or crime involving moral turpitude and am competent to make this oath. I am able to perform the service of citation, summons, and notice or subpoena promptly and correctly pursuant to the Texas Rules of Civil Procedure, Rule 103. Under penalties of perjury, I declare that I have read the foregoing Return of Service and that the facts stated in it are true and correct and am within my personal knowledge.

_Robert McDougall_                                    11-6-2012
Robert McDougall   SCH 3921 Exp 06/30/2014            Date

State of Texas
Subscribed and sworn to before me, a notary public, on _November 6_____, 2012.

_____
Notary Public
Collin County, Texas



BENNIE GRAY MCDOUGALL
My Commission Expires
August 5, 2013



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 30, 2012

Certified Document Number:          53972086

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com

# EXHIBIT F

CAUSE NO. 2012-22886

| | | |
|---|---|---|
| HARLEY D. ALLEN, *et al.* | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| BP AMERICA PRODUCTION | § | HARRIS COUNTY, TEXAS |
| COMPANY | § | |
| | § | |
| *Defendant.* | § | |
| | § | 269th JUDICIAL DISTRICT |

## NOTICE OF REMOVAL OF STATE COURT ACTION

PLEASE TAKE NOTICE that Defendant BP America Production Company in the above captioned action, pursuant to federal law, on December 3, 2012, filed with the Clerk of the United States District Court for the Southern District of Texas a Notice of Removal. Pursuant to 28 U.S.C. § 1446(d), this court is respectfully requested to proceed no further in this action, unless and until the action is remanded by the United States District Court.

A copy of the Notice of Removal filed with the United States District Court is attached and filed with this document. Notice of the Removal has also been given to all of the other parties in this action.

This action was removed to the United States District Court under the authority of 28 U.S.C. § 1446.

Respectfully submitted,   *v/permission S.B.*

*Thomas W. Taylor*
Thomas W. Taylor
Texas State Bar No. 19723875
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
ttaylor@andrewskurth.com

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Texas Bar No. 24066576
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Phone: 312.862.2000
Fax: 312.862.2200
andrew.langan@kirkland.com

ATTORNEYS FOR DEFENDANT
BP AMERICA PRODUCTION COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and foregoing instrument have been served on all parties of record, on this 3rd day of December, as follows:

Brent W. Coon
Eric W. Newell
Brent Coon & Associates
215 Orleans
Beaumont, Texas 77701

*Thomas W. Taylor*   *v/permission S.B.*
Thomas W. Taylor

# EXHIBIT G

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON"
IN THE GULF OF MEXICO, ON APRIL 20, 2010                    MDL No. 2179

TRANSFER ORDER

Before the Panel:[*]  Defendant BP America Inc. (BP) has moved, pursuant to 28 U.S.C. § 1407(c)(ii), to transfer the sixteen actions listed on Schedule A to the Eastern District of Louisiana for inclusion in MDL No. 2179.  Responding plaintiffs[1] oppose the two motions.

After considering all argument of counsel, we find that these actions involve common questions of fact with actions in this litigation previously centralized in the MDL, and that transfer of these actions to the Eastern District of Louisiana for inclusion in the centralized proceedings will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.  Like the already-centralized actions, these sixteen actions arise from the explosion and fire that destroyed the Deepwater Horizon offshore drilling rig, and the oil spill resulting therefrom.  *See In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352, 1353 (J.P.M.L. 2010).

In opposing transfer, responding plaintiffs argue, *inter alia*, that these actions are all contract-based actions involving allegations that defendants breached obligations to charter parties who agreed to allow their vessels to be used, under the so-called "Vessels of Opportunity" (VoO) program, in Deepwater Horizon oil spill clean-up operations.  As such, they contend, the actions involve completely different factual issues from the personal injury and economic loss actions in the MDL.  Responding plaintiffs further argue that the Panel should not rule on BP's transfer motions until the putative transferor courts have determined whether federal subject matter jurisdiction exists.[2]

---

[*]      Judge John G. Heyburn II took no part in the disposition of this matter.

[1]      Responding plaintiffs include plaintiff in the one Southern District of Texas action and plaintiffs in thirteen of the fifteen Southern District of Alabama actions (all but *Ladd* and *Brabner*).

[2]      All sixteen actions were brought in state court, but each was removed on the grounds that the subject plaintiff's claims arise under the Outer Continental Shelf Lands Act, and that claims "involving federal enclaves like the Outer Continental Shelf inherently arise under federal law."  In most of the Southern District of Alabama actions, the presiding judges have issued orders, *sua sponte*, directing the removing defendant to file a memorandum of law setting forth the legal basis for its removal of the action.

- 2 -

In these circumstances, we do not find responding plaintiffs' arguments persuasive.   VoO-related claims already are being litigated in the centralized proceedings.  A VoO contract action[3] quite similar to the sixteen actions here was recently added to the MDL, and an amended complaint was recently filed in the centralized proceedings on behalf of, *inter alia,* "[b]oat captains, crew, charterers, workers, and/or volunteers involved in the [VoO] program who were not adequately compensated for their work or time in the VoO program."  The jurisdictional issues that these sixteen actions may pose do not present an impediment to transfer. *See In re Ivy,* 901 F.2d 7, 9 (2d Cir. 1990) (holding that the Panel "has jurisdiction to transfer a case in which a jurisdictional objection is pending").  Indeed, because those issues appear to be essentially identical from action to action, *see* footnote 2, transfer of the actions prior to resolution of the issues is entirely consistent with a long line of our decisions in which we have cited the prevention of inconsistent pretrial rulings as one of the key benefits of Section 1407 centralization. *See, e.g., In re: Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices, and Prod. Liab. Litig.,* 732 F. Supp. 2d 1375, 1376 (J.P.M.L. 2010).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A are transferred to the Eastern District of Louisiana, and, with the consent of that court, assigned to the Honorable Carl J. Barbier for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

PANEL ON MULTIDISTRICT LITIGATION

*Kathryn H. Vratil*

Kathryn H. Vratil
Acting Chairman

David R. Hansen                 W. Royal Furgeson, Jr.
Frank C. Damrell, Jr.           Barbara S. Jones
Paul G. Barbadoro

---

[3]     *DiStefano, et al. v. BP America Production Co., et al.,* E.D. Louisiana, C.A. No. 2:11-54.

**IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON"**
**IN THE GULF OF MEXICO, ON APRIL 20, 2010**          MDL No. 2179

## SCHEDULE A

### Southern District of Alabama

Lane Brabner v. BP America Production Co., Inc., C.A. No. 1:10-692
Jane P. Brooks v. BP America Production Co., Inc., et al., C.A. No. 1:11-33
Joseph Cain v. BP America Production Co., Inc., C.A. No. 1:10-685
Tommy G. Cain v. BP America Production Co., Inc., C.A. No. 1:10-687
Kimberly Johnson v. BP America Production Co., Inc., C.A. No. 1:10-693
Sean Johnson v. BP America Production Co., Inc., C.A. No. 1:10-686
John F. Ladd, Jr. v. BP America Production Co., Inc., C.A. No. 1:10-694
William Clay McClain v. BP America Production Co., Inc., C.A. No. 1:10-689
Somvang Pakhamma v. BP America Production Co., Inc., C.A. No. 1:10-690
Vannalinh Pakhamma v. BP America Production Co., Inc., C.A. No. 1:10-691
Scott Russell v. BP America Production Co., Inc., et al., C.A. No. 1:11-32
David Secor v. BP America Production Co., Inc., C.A. No. 1:10-684
Bradley D. Shivers v. BP America Production Co., Inc., et al., C.A. No. 1:11-34
Bridget Sprinkle v. BP America Production Co., Inc., C.A. No. 1:10-683
William R. Sprinkle v. BP America Production Co., Inc., C.A. No. 1:10-688

### Southern District of Texas

Jesco Construction Corp. of Delaware v. BP America Production Co. Inc., et al.,
     C.A. No. 4:10-4964

# EXHIBIT H

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | **MDL No. 2179** |
| | **SECTION: J** |
| These Pleadings apply to: *All Cases in Pleading Bundle B1.* | **JUDGE BARBIER** |
| These Pleadings apply to: No. 10-2771 | **MAGISTRATE SUSHAN** |

## FIRST AMENDED MASTER ANSWER TO COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL FOR EXONERATION FROM OR LIMITATION OF LIABILITY (Rule 9(h))

## FIRST AMENDED MASTER CLAIM IN LIMITATION [NO. 10-2771] (Rule 9(h))

## AND

## FIRST AMENDED MASTER COMPLAINT, CROSS-CLAIM, AND THIRD-PARTY COMPLAINT FOR PRIVATE ECONOMIC LOSSES IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III (B1) ["B1 BUNDLE"]

## Complaint in Admiralty

## Rule 9(h)

# TABLE OF CONTENTS

**Page**

CFIRST AMENDED MASTER ANSWER TO COMPLAINT AND PETITION OF
TRITON ASSET LEASING GMBH, ET AL FOR EXONERATION FROM OR
LIMITATION OF LIABILITY (RULE 9(H)) ........................................................ 1

FIRST AMENDED MASTER CLAIM IN LIMITATION (NO. 10-2771) (RULE 9(H)) .......... 7

FACTUAL ALLEGATIONS ...................................................................... 9

    A.    A Series of Reckless Decisions Leading Up To The Blowout ............... 10

    B.    The Final Hours – The Blowout, Explosions, Fire, and Spill ................. 12

    C.    The Failure of the Poorly-Maintained Blowout Preventer and
        Petitioners' Knowledge of its Defects, Deficiencies, and
        Vulnerabilities Before the Blowout ...................................... 15

    D.    Petitioners' Knowledge of Other Safety, Operational, Equipment,
        and Maintenance Issues on the Deepwater Horizon Before the
        Blowout ........................................................................ 21

    E.    The Spill's Impact on Claimants ........................................... 24

CLAIMS .................................................................................... 28

    I.    Negligence ...................................................................... 28

    II.    Gross Negligence and Willful Misconduct ................................. 34

    III.    Nuisance ........................................................................ 35

    IV.    Trespass ........................................................................ 37

    V.    Punitive Damages ............................................................. 38

    VI.    Declaratory Relief ............................................................. 39

PRAYER FOR RELIEF ....................................................................... 40

FIRST AMENDED MASTER COMPLAINT, CROSS-CLAIM, AND THIRD-PARTY
COMPLAINT FOR PRIVATE ECONOMIC LOSSES IN ACCORDANCE WITH PTO
NO. 11 [CMO NO. 1] SECTION III(B1) ["B1 BUNDLE"] ............................... 42

INTRODUCTION ............................................................................. 42

PARTIES, JURISDICTION, AND VENUE .................................................. 46

FACTUAL ALLEGATIONS .................................................................. 64

    A.    The Process of Deepwater Offshore Drilling .............................. 65

    B.    The Macondo Lease, and BP's Exploration Plan and Drilling
        Permit .......................................................................... 68

-i-

**TABLE OF CONTENTS**
(continued)

Page

C.    The Macondo Prospect Operating Agreement .......................................... 70

D.    The Deepwater Horizon's Poor Safety and Maintenance Record ........... 71

E.    Macondo: A Troublesome Well ................................................................ 73

F.    Reckless Decision-Making in the Rush to Complete the Well ................ 76

        1.    Cutting Corners on Well Design .................................................. 77

        2.    Using Too Few Centralizers ......................................................... 80

        3.    Skipping Critical "Bottoms Up" Mud Circulation ...................... 82

        4.    Cementing: the Incorrect Cement Mixture and a Failed
            Seal ................................................................................................. 83

        5.    Despite Red Flags, Drilling Defendants Skip Crucial "Bond
            Log" Test of Cement Integrity ..................................................... 90

        6.    The Casing Hanger Lockdown Sleeve: Another Skipped
            Safety Precaution ......................................................................... 91

G.    Premature and Nonstandard Mud Displacement Begins ......................... 93

H.    The Well Fails Key Pressure Tests, Yet Drilling Defendants Press
      On ............................................................................................................. 94

I.    Unorthodox Spacer Fluid Mixture and Volume Potentially
      Interfered with Pressure Tests and BOP Functionality ............................ 97

J.    Drilling Defendants Ignore and Overlook Warning Signs of the
      Imminent Blowout ................................................................................... 99

K.    Attempts at Well Control: Too Little, Too Late ..................................... 104

L.    Faulty Vessel Safety Equipment Exacerbates the Blowout, Causing
      Vessel Explosions, Fire, and Sinking .................................................... 106

        1.    The Failure of the BOP .............................................................. 107

        2.    Poor Vessel Maintenance and Reckless Bypass Of Safety
            Systems ....................................................................................... 117

M.    Drilling Defendants' Culture of Complacency ...................................... 120

N.    Defendants Misrepresent the Severity of the Spill and their Oil
      Spill Response Capabilities .................................................................... 127

O.    The Spill's Impact on Plaintiffs, the Environment, and the Coastal
      Zone Economy ....................................................................................... 130

CLASS ACTION ALLEGATIONS ................................................................... 139

**TABLE OF CONTENTS**
**(continued)**

Page

A.   Numerosity of the Class and/or Subclasses — F.R.C.P. 23(a)(1) ......... 140

B.   Commonality — F.R.C.P. 23(a)(2)...................................................... 140

C.   Typicality — F.R.C.P. 23(a)(3) ........................................................... 142

D.   Adequacy of Representation — F.R.C.P. 23(a)(4) ............................... 142

E.   Class Certification under F.R.C.P. 23(b)(3) — Predominance and
     Superiority............................................................................................ 143

F.   Class Certification under F.R.C.P. 23(b)(1) ........................................ 144

G.   Class Certification under F.R.C.P. 23(b)(2) ........................................ 147

H.   Class Certification of Particular Issues under F.R.C.P. 23(c)(4) and
     Subclasses under 23(c)(5) ................................................................... 147

CLAIMS FOR RELIEF ................................................................................... 147

I.   Claims Under General Maritime Law.................................................... 147

     A.   Negligence ..................................................................................... 147

     B.   Gross Negligence and Willful Misconduct............................................ 160

     C.   Strict Liability For Manufacturing And/Or Design Defect.................... 161

     D.   Strict Liability For Manufacturing And/Or Design Defect.................... 165

II.  The Oil Pollution Act............................................................................. 168

III. State Law Claims For Relief.................................................................... 171

     A.   Nuisance......................................................................................... 171

     B.   Trespass........................................................................................... 172

     C.   Fraudulent Concealment ................................................................ 174

     D.   Strict Liability Pursuant To The Florida Pollutant Discharge
          Prevention And Control Act Fla. Stat. § 376.011, et seq...................... 177

IV.  Punitive Damages Under All Claims........................................................ 180

V.   Declaratory Relief: Punitive Damages.................................................... 185

VI.  Declaratory Relief Against BP................................................................ 185

PRAYER FOR RELIEF ................................................................................... 185

911133.4

### FIRST AMENDED MASTER ANSWER TO COMPLAINT AND PETITION OF TRITON ASSET LEASING GMBH, ET AL FOR EXONERATION FROM OR LIMITATION OF LIABILITY (Rule 9(h))

Claimants, individuals and/or entities who have suffered property losses, economic damages, and/or other costs (including removal costs) as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, allege as follows, for themselves and all others similarly situated, (including, but not limited to, those persons and entities who have and/or who may hereinafter adopt, incorporate or intervene into the Master Answer [Rec Doc 244] pursuant to Pre-Trial Order Nos. 11, 20, 24 and/or 25), as their First Amended Answer to the Complaint and Petition for Exoneration from or Limitation of Liability filed by Triton Asset Leasing GmbH, Transocean Holdings, L.L.C, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc. (the "Petitioners"):

#### FIRST DEFENSE

The allegations of the Complaint fail to state a claim upon which relief may be granted.

#### SECOND DEFENSE

The Limitation of Liability Act, 46 U.S.C. § 30501, *et seq.*, is discriminatory and, thus, unconstitutional in that it deprives the Claimants of rights without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and does not provide for equal protection of the laws pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

#### THIRD DEFENSE

The limitation fund is inadequate, and the Complaint should be dismissed because Petitioners have failed to deposit adequate security for the vessel identified in the Complaint for Exoneration From or Limitation of Liability. Pursuant to Rule F(1) of the Supplemental Rules

- 1 -

for Certain Admiralty and Maritime Claims, the proper limitation fund must be deposited at the time of filing. Petitioners' deposit, at the time of filing, did not meet this standard.

## FOURTH DEFENSE

The Limitation of Liability Act is not applicable to the instant case because, at all times pertinent herein, the Deepwater Horizon was operated in a willful, wanton, and reckless manner. Moreover, the conduct and actions which lead to Claimants' injuries took place with the privity or knowledge of the owners, managing owners, owners *pro hac vice*, and/or operators of the vessel involved.

## FIFTH DEFENSE

To the extent that Petitioners' insurers attempt to avail themselves of the limitation/exoneration defense, Claimants assert that the protections of the Limitation of Liability Act are unavailable to insurers of vessel owners under the circumstances. Moreover, no *prima facie* case has been made establishing that they are entitled to avail themselves of the Limitation of Liability Act.

## SIXTH DEFENSE

The Complaint for Exoneration From or Limitation of Liability contains vague and ambiguous statements that are deficient under Federal Rule of Civil Procedure 12(e), and Claimants seek definitive statements of the allegations.

## SEVENTH DEFENSE

The events culminating in the injuries to Claimants were the result of the negligence, fault, or want of due care on the part of Petitioners and/or those for whom Petitioners are responsible, and/or the unseaworthiness of the Deepwater Horizon, all of which was within the

-2-

911133.4

privity and knowledge of Petitioners, for which the Complaint for Exoneration From or Limitation of Liability should be denied.

### EIGHTH DEFENSE

The events culminating in the injuries and damage to Claimants were not the result of any negligence, fault, or want of due care on the part of Claimants or those for whom Claimants may be responsible. Furthermore, Petitioners have the burden of proof on this issue, and Petitioners cannot meet that burden.

### NINTH DEFENSE

Claimants further allege that there was insurance coverage on the Deepwater Horizon insuring Petitioners in the event of an occurrence such as that which is the subject of Claimants' claims, and the proceeds of said insurance policy should be included in the limitation proceeding in the event the Court determines that the limitation proceeding is appropriate.

### TENTH DEFENSE

Claimants state that the proceeds of any judgment, award, or settlement which may be received by Petitioners from any third party in recompense of any losses or damages sustained to the property or interests of Petitioners, as a result of the fault or alleged fault of said third party, must be included in the limitation fund.

### ELEVENTH DEFENSE

Claimants reserve the right to contest the appraisal value of the Deepwater Horizon, its engines, apparel, appurtenances, pending freight, etc., and the adequacy of the security.

### TWELFTH DEFENSE

The limitation fund is inadequate and should be increased and/or the limitation action should be dismissed because the limitation fund does not properly account for the value of the

911133.4

minerals and other appurtenances, attachments, freight and/or cargo aboard the vessel, subject to the control of the vessel, and/or owned by Petitioners.

AND NOW, specifically reserving all defenses asserted herein, Claimants respond to the individual Paragraphs of the Complaint for Exoneration From or Limitation of Liability, upon information and belief, as follows:

1.    The allegations contained in Paragraph 1 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

2.    The allegations contained in Paragraph 2 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

3.    The allegations contained in Paragraph 3 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

4.    The allegations contained in Paragraph 4 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

5.    The allegations contained in Paragraph 5 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

6.    The allegations contained in Paragraph 6 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

7.    The allegations contained in paragraph 7 of the Complaint are denied.

8.    The allegations contained in Paragraph 8 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

9.    The allegations contained in Paragraph 9 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

10.    The allegations of Paragraph 10 of the Complaint are denied.

911133.4

11.     The allegations of Paragraph 11 of the Complaint are denied.

12.     The allegations of Paragraph 12 of the Complaint are denied.

13.     The allegations contained in Paragraph 13 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

14.     The allegations contained in Paragraph 14 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

15.     The allegations contained in Paragraph 15 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

16.     The allegations contained in Paragraph 16 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

17.     The allegations contained in Paragraph 17 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

18.     The allegations of Paragraph 18 of the Complaint are denied.

19.     The allegations contained in Paragraph 19 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

20.     The allegations contained in Paragraph 20 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

21.     The allegations contained in Paragraph 21 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

22.     The allegations contained in Paragraph 22 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

23.     The allegations contained in Paragraph 23 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

-5-

24.     The allegations contained in Paragraph 24 of the Complaint are denied for lack of knowledge or information sufficient to form a belief about the truth of said allegations.

25.     The allegations contained in the prayer for relief are not statements of facts, but conclusions of law, from which no response is necessary from these Claimants.   However, if a response is necessary, said allegations are denied.  Claimants specifically deny the adequacy of the valuation of the Deepwater Horizon as asserted by Petitioners.   Claimants further re-urge their prior objections to Petitioners' failure to include in the limitation fund any insurance proceeds and any sums received or which may be received by Petitioners from any third party as a result of the fault or alleged fault of said third party.   Claimants further deny the adequacy of Petitioners' *Ad Interim* Stipulation for an amount equal to the value of their interest in the Deepwater Horizon and its appurtenances and hereby makes demand for Petitioners to either deposit cash proceeds into the registry of the Court in the amount of the stated value of the vessel and/or provide a bond for the value of the vessel issued by a reputable surety company to be approved by the Court.  In so doing, Claimants specifically reserve the right to contest the stated value of the vessel and the limitation fund as aforesaid.  Claimants further deny the applicability of Petitioners' Complaint to claims arising under the Oil Pollution Act of 1990.

26.     A non-jury trial pursuant to Rule 9(h) of the Federal Rules of Civil Procedure is requested.

WHEREFORE, Claimants, individuals and/or entities who have suffered property losses, economic damages, and/or other costs (including removal costs) as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, pray that the Petition filed herein seeking exoneration from or limitation of liability and any and all injunctions or restraining orders granted in this matter be dismissed and dissolved and, in the alternative, that

-6-

Petitioners be required to deposit additional security in the amount required by law, in default of which the exoneration/limitation complaint should be dismissed and pending which any injunction or restraining order should be dissolved.

911133.4

**FIRST AMENDED MASTER CLAIM IN LIMITATION (NO. 10-2771) (Rule 9(h))**

Claimants, individuals and/or entities who have suffered property losses, economic damages, and/or other costs (including removal costs) as a result of the oil spill by the oil rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010, while specifically reserving all defenses asserted herein, file, for themselves and those similarly situated, (including, but not limited to, those persons and entities who have and/or who may hereinafter adopt, incorporate or intervene into the Master Claim in Limitation [Rec Doc 244] pursuant to Pre-Trial Order Nos. 11, 20, 24 and/or 25), their First Amended Master Claim in Limitation in response to the Complaint for Exoneration from or Limitation of Liability filed herein by Petitioners, Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc., as owners, managing owners, owners *pro hac vice* and/or operators of the oil rig Deepwater Horizon (hereinafter "Petitioners"), and, in support thereof, state as follows:

27.     The claims presented in this First Amended Master Claim in Limitation are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and Claimants hereby designate this case as an admiralty or maritime case, and a non-jury trial pursuant to Rule 9(h) is requested.

28.     Claimants general fall into ten basic categories; however, in presenting these general categories of claimants in the following order, Claimants do not suggest or imply any exclusivity, nor hierarchy of merit, preference, or importance:

      (a)     Commercial fishermen, shrimpers, crabbers, oystermen, the owners and operators of businesses involving commercial fishing, shrimping, crabbing and oystering (the "Commercial Fishermen Claimants").

(b)     Seafood processors, distributors, retail and seafood markets, and restaurant owners and operators, and all those employed by seafood processors, distributors, retail and seafood markets, and restaurants (the "Processing and Distributing Claimants").

(c)     Recreational business owners, operators, and/or workers, including recreational fishing businesses, commercial guides, and charter fishing businesses who earn their living through the use of the Gulf of Mexico for businesses (the "Recreational Business Claimants").

(d)     Commercial businesses, business owners, operators, and/or workers, including commercial divers, offshore oilfield service, repair, and supply, real estate agents, and supply companies and their employees (the "Commercial Business Claimants").

(e)     Recreational sport fishermen, recreational divers, beachgoers, and recreational boaters (the "Recreation Claimants").

(f)     Plant and dock workers, including commercial seafood plant workers, longshoremen, and ferry operators (the "Plant and Dock Worker Claimants").

(g)     Boat captains, crew, charterers, workers, and/or volunteers involved in the Vessels of Opportunity program ("VoO program") whose property was damaged as a result of their work in the VoO program (the "VoO Claimants").

-9-

(h)   Owners, lessors, and lessees of real property alleged to be damaged, harmed, or impacted, physically or economically, including lessees of oyster beds (the "Real Property Claimants").

(i)   Hotel owners and operators, vacation rental owners and agents, and all those who earn their living from the tourism industry (the "Real Property/Tourism Claimants").

(j)   Banks, financial institutions, and retail businesses that suffered losses as a result of the Spill (the "Banking/Retail Business Claimants").

(k)   Persons who utilize natural resources for subsistence (the "Subsistence Claimants").

(l)   Oil service, exploration and/or drilling service companies, workers, providers, or suppliers who have lost income, profits and/or earning capacity as a direct result of the adverse effects of the Deepwater Horizon explosion, blow-out, and spill on deepwater exploration and/or drilling in the Gulf of Mexico (including, but not limited to the Moratorium issued by the United States Department of Interior) (the "Moratorium Claimants").

(m)   Automobile and boat businesses, dealers, and service stations, and their owners, operators, and employees, that have suffered damages, including loss of business, loss of income and lost profits, as a result of the Spill (the "Dealer Claimants").

-10-

911133.4

## FACTUAL ALLEGATIONS

29.     At all time pertinent hereto, including on or about April 20, 2010, Petitioners were the owners, managing owners, owners *pro hac vice*, charterers, supervisors and/or operator of the oil rig Deepwater Horizon, and participated in the Deepwater Horizon's offshore oil drilling operations at in Mississippi Canyon Block 252, the location known as "Macondo," in the Gulf of Mexico.

30.     At all times pertinent hereto, including on or about April 20, 2010, the Deepwater Horizon was a movable drilling rig and a vessel in navigation upon the navigable waters of the United States off the coast of Louisiana.

31.     The Deepwater Horizon was a $560,000,000 dynamically-positioned, semi-submersible deepwater drilling vessel built for Petitioners and put into service in February 2001.

32.     At all times pertinent hereto, the Deepwater Horizon was owned by Petitioners and leased to BP Exploration & Production, Inc. (for purposes of this pleading, "BP") for drilling exploratory wells at the Macondo prospect site.

33.     As part of their agreement with BP, Petitioners provided employees, contractors, and other officials who assisted Halliburton Energy Services, Inc. ("Halliburton"), the company engaged as the cementing advisor and cement product and equipment provider for the Macondo well in their oil exploration and drilling activities at the Macondo site.

34.     On or about April 20, 2010, during drilling operations at the Macondo site, a blowout, explosions, and fire occurred aboard the Deepwater Horizon which resulted in the sinking of the vessel and an oil spill (the "Spill"), that has caused, and will continue to cause, devastating damage.

35.     The blowout, explosions, fire, and Spill were caused and/or contributed to by the

-11-

911133.4

Petitioners' negligence, gross negligence, and reckless, willful and wanton conduct, as set forth below.

**A.** **A Series of Reckless Decisions Leading Up To The Blowout**

36. At the time of the blowout, drilling at Macondo was months behind schedule and over budget, and Petitioners repeatedly chose to violate industry guidelines and government regulations, and ignore warnings from their own employees and contractors on board the vessel to reduce costs and save time.

37. Before the blowout, Petitioners made and/or acquiesced to a host of reckless decisions concerning well design, cementing, and integrity testing that prioritized speed and cost-savings over safety and industry best practices.

38. Petitioners chose and/or acquiesced to BP's choice of a "long string" casing system as opposed to a "liner/tieback" design, which would have provided more barriers against blowouts. Petitioners knew that the long string design was a risky option and that it was especially inappropriate for a well as difficult as Macondo.

39. Petitioners chose and/or acquiesced to BP's choice of metal casings, which they knew or should have known might collapse under the high pressure surrounding the well.

40. Petitioners decided and/or acquiesced to BP's decision to use only six centralizers (which are used to ensure that the casing is centered in the well), despite their knowledge that the use of too few centralizers presented a severe risk that the cement job would fail to create a proper seal and cause a gas flow problem.

41. Petitioners also decided and/or acquiesced to BP's decision not to use a "bottoms up" circulation of drilling mud which would have allowed for testing the mud for gas influx, release of gas pockets, and removal of debris from the bottom of the well so that the cement

-12-

911133.4

would not become contaminated. A bottoms up circulation could have revealed the severity of the situation at Macondo before disaster struck.

42.     Petitioners further acquiesced to the faulty cementing job performed by Halliburton, despite its actual or constructive knowledge that Halliburton's foam cement slurry design would be unstable.

43.     Petitioners had actual and/or constructive knowledge before the Spill that a negative pressure test indicated that the cement had failed to form a seal at the casing nearest the hydrocarbon reservoir. Petitioners, however, elected to ignore the ominous testing results, and continue with the plan to seal the well as if the cement job had been a success.

44.     Petitioners also decided and/or acquiesced to the decision to cancel a crucial cement bond log test, in violation of industry standard and MMS regulation. The cement bond log test would have determined the integrity of the cement job.

45.     Petitioners also decided and/or acquiesced to the decision not to deploy the casing hanger lockdown sleeve, which ties down the top of a well and provides an extra layer of protection against a blowout, and would have prevented the wellhead seal from being blown out by pressure from below, as it ultimately was on April 20, 2010.

46.     Petitioners also decided and/or acquiesced to the decision to use an abnormally large quantity of mixed and untested spacer material, which confounded the results of later pressure tests and adversely affected the functioning of the blowout preventer (the "BOP"), a subsea device installed for the purpose of closing the well in the event of an emergency, which was at all material times herein, an appurtenance of the vessel and part of its equipment.

47.     Petitioners also decided and/or acquiesced to the decision to perform simultaneous operations on the Deepwater Horizon in an effort to expedite the project, which

-13-

caused rig workers to become distracted and fail to take heed of the alarming signs of imbalance in the well. A few hours after the mud displacement process began at noon, Petitioners began a four-hour offload of mud to the nearby supply vessel M/V Damon Bankston. There is no evidence that Petitioners had any reason to perform these activities during the mud displacement process other than time savings.

### B.  The Final Hours – The Blowout, Explosions, Fire, and Spill

48.     Pressure data from the vessel in the two-hour period before the explosions, during the process of displacing drilling mud with seawater, should have put Petitioners on notice that there was a problem and that pressure was building in the wellbore, yet Petitioners completely ignored this additional red flag and simply carried on displacing the drilling mud. At 8:52 p.m., the pumps displacing the mud with seawater were slowed, but instead of flow out of the well decreasing as expected, it increased — a clear "red flag" indicating that hydrocarbon pressure from the reservoir below was pushing the mud out of the well faster than the seawater that was supposed to be displacing the mud was being pumped in. Yet Petitioners appear to have completely ignored this red flag and simply carried on with the mud displacement process.

49.     By 9:08 p.m., 39 barrels of hydrocarbons had leaked into the well, but Petitioners still had not noticed the pressure and flow indications of the influx. It was not until 9:41 p.m., a scant four minutes before the blowout, that Petitioners finally noticed that the well was filling with hydrocarbons and immediate well control action was needed.

50.     From 9:08 p.m. to 9:30 p.m. drill pipe pressure continued to increase, with hydrocarbons were flowing into the well at about nine barrels per minute. The pressure data should have prompted the Petitioners to start well kill operations to restore control over the pressure, but instead it was ignored or overlooked.

-14-

51.     The mud pumps were shut down completely at around 9:30 p.m., at which point hydrocarbons had been continuously flowing into the well for 38 minutes.  Modeling data from BP's disaster investigation showed that about 300 barrels of hydrocarbons had flowed into the well by this time.  The hydrocarbons entered the riser through the wide-open BOP at 9:38 pm.

52.     While Petitioners' crew was distractedly working miles above, highly-pressurized hydrocarbons leaked in through the bottom of the casing and into the casing string, rising up the casing through the BOP and riser to the surface.

53.     Mud began spilling out of the riser onto the vessel floor at 9:40 p.m., 48 minutes after the leak had started at the bottom of the well.  This was apparently the first sign of hydrocarbon influx that Petitioners noticed.

54.     Petitioners' policies and instructions regarding well control procedures in emergencies addressed relatively small influxes, and were therefore woefully inadequate to provide guidance to the crew as the mud spewed out of the riser.  At 9:41 p.m., the vessel crew reacted to the flowing mud by diverting it from the well into the mud-gas separator, a device used to separate gas out of the drilling fluid and vent it safely into the air in the event of a kick; this only exacerbated the disaster, because the venting pipes on the mud-gas separator vented gas downwards toward the vessel, spreading gas all over the vessel and overwhelming the separator entirely.  As a result, at 9:49 p.m., the Deepwater Horizon's drill floor ignited into a deadly blast of flames.

55.     Investigations and testimony suggest that the initial explosion on the Deepwater Horizon on the night of April 20, 2010, was caused by an engine on the rig deck that sucked in the gas vapors blasting out of the well and began to rev uncontrollably.

56.     Gas sensors, which shut down rig engines when dangerous vapors are present, are

-15-

critical to preventing explosions in such situations. However, the gas sensors on the Deepwater Horizon were not operational on the night of the blowout.

57.     In addition, the air intake valves, which should have closed upon sensing gas entering the engine room, failed to operate.

58.     Moreover, the engine room was not equipped with a gas alarm system that could have shut off the power. The installation and maintenance of these sensors, alarms, and emergency shutdown systems were Petitioners' responsibility.

59.     Eleven crewmembers were killed as the fire spread. The rig's Emergency Disconnect System, which was designed to separate the vessel from the riser in case of an emergency such as an explosion, failed to activate. As a result, gas continued to rush up uncontrollably through the riser and feed the raging fire on the Deepwater Horizon platform.

60.     The vessel burned for two days before it sank to the ocean floor. As it sank, the long riser pipe connecting it to the wellhead on the seafloor bent and broke, causing the blown-out well to spew oil into the Gulf waters at a rate of tens of thousands of barrels per day.

61.     The Deepwater Horizon Study Group found no evidence that any of the rig workers or onshore employees directly involved with the Macondo well had formal training or qualifications in risk assessment and management of complex systems such as found aboard the Deepwater Horizon.

### C.     The Failure of the Poorly-Maintained Blowout Preventer and Petitioners' Knowledge of its Defects, Deficiencies, and Vulnerabilities Before the Blowout

62.     Immediately after the explosion, desperate rig workers tried in vain to activate the BOP, which had been installed at the wellhead on the sea floor early in the drilling process to obstruct an uncontrolled gas or oil surge in just such an emergency.

-16-

63. The BOP was equipped with a "blind shear ram," which, when activated, was supposed to shear the drill pipe and seal the wellbore. Closure of the blind shear ram was the only way to isolate the well at the BOP.

64. There were two emergency methods available to rig personnel to close the blind shear ram from the vessel. One was a high-pressure closure of the blind shear ram, and the other was the emergency disconnect sequence (EDS). Both methods could be activated by pushing buttons on the BOP control panel on the vessel, and both required communication between the vessel and the BOP through multiplex cables running from the vessel to the BOP. The fire and explosions on board the Deepwater Horizon disabled both of these methods, because the multiplex cables were not protected against explosions or fire; hence, the rig workers were unable to communicate with the BOP.

65. Petitioners' subsea supervisor, Christopher Pleasant, pressed the EDS button after the explosion, but the EDS failed to initiate, indicating that the explosion and fire damaged the multiplex cables to the extent that the communication line and electrical power necessary to initiate these functions was no longer available to rig workers.

66. The BOP was also equipped with two other emergency methods of sealing the wellbore: the automatic mode function ("AMF", or "deadman switch"), and activation by remotely operated vehicles (ROVs) on the seafloor using the "hot stab" or autoshear functions.

67. The AMF sequence activates the blind shear ram to shear the drill pipe and seal the wellbore in the event of a catastrophic failure of the riser. It is initiated if certain conditions, including the loss of electrical power, communications and hydraulic power, are met. At least one of the BOP's control pods must be operational for the AMF sequence to function. Each of the conditions necessary to initiate the AMF sequence was certainly met when the unprotected

-17-

multiplex cables and hydraulic conduit hose were damaged by explosions and/or fire; however, because both of the pods had insufficient battery charge and one pod had a failed solenoid valve, neither pod was capable of completing an AMF sequence.

68.     Petitioners' BOP maintenance records from 2001 to 2010 indicate that the control pod batteries were changed far less frequently than the manufacturer's recommended annual replacement. Unlike the solenoid valve failure, the BOP's diagnostic function did not measure battery charge, all the more reason for Petitioners to change the batteries frequently to avoid failure. The records indicate that in December 2007, the batteries in one of the pods was fully depleted when the BOP was brought to the surface.

69.     After the explosions, as the vessel was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or autoshear functions. An ROV performs a hot stab by injecting hydraulic fluid into dedicated ports on the BOP, bypassing the usual methods for activating BOP functions like the blind shear ram. Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure. Over the course of these events, several leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket BOP modifications.

70.     Ultimately, six leaks were discovered in the hydraulic system of the BOP. Petitioners were aware of at least two, but likely almost all, of these leaks prior to April 20, 2010. One such leak was discovered as early as February 2010, but was never repaired or otherwise addressed.

71.     Also, there was no indication that the AMF and ROV intervention systems were tested at the surface, as required by Petitioners' testing policy, prior to the BOP's deployment on

-18-

the well.

72.     Petitioners were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to the incorrect aftermarket hydraulic plumbing, Petitioners had switched out one of the Deepwater Horizon's variable bore rams with a test ram. However, because Petitioners failed to update the BOP's schematic diagram to reflect the aftermarket changes, in violation of 29 C.F.R. § 1910.119, which requires, inter alia, up-to-date process and safety system equipment drawings as a part of basic process safety management, emergency responders spent a day futilely trying to close a variable bore ram, not knowing it had been replaced with a useless test part.

73.     Despite rig workers' efforts just after the blowout, and emergency engineers' efforts in the weeks after the blowout and sinking, the Deepwater Horizon's blind shear ram never successfully sealed the well, and investigations since the blowout have been unable to determine why it failed to do so. Because the official investigation of the BOP retrieved from the seafloor is still ongoing, Claimants reserve the right to amend their Master Claim once further information from that and any other investigations becomes available.

74.     At the time of the disaster, the Petitioners were certainly aware that in addition to increasing the risk of blowouts, deep-sea drilling also increases the risk of BOP failure. Despite being aware of the risk of the BOP failing at greater depths, Petitioners did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Plaintiffs, and the environment from the catastrophic results of a well blowout.

75.     Inasmuch as all of the methods available to seal the well by way of the BOP rely on a properly-functioning blind shear ram, it is critical that a BOP be equipped with redundant

-19-

features in the event the blind shear ram fails. This is particularly true since blind shear rams are vulnerable to a "single-point failure," meaning that if just one of the small shuttle valves that carry hydraulic fluid to the ram blades jams, the BOP will be unable to seal the well. In a 2000 report on the Deepwater Horizon's BOP, consultants attributed 56 percent of the BOP's "failure likelihood" to this one small valve. Indeed, evidence suggests that when the crew attempted to activate the Deepwater Horizon's BOP's blind shear ram, the blades could not cut the drill pipe because one or more of the shuttle valves leaked hydraulic fluid.

76.     Because BOPs are vulnerable to single-point failure, offshore drillers now commonly equip their BOPs with two blind ram shears. In fact, when the Deepwater Horizon went into service in 2001, Petitioners were already equipping their new rigs with BOPs that could accommodate two blind shear rams, and today eleven of Petitioners' fourteen rigs operating in the Gulf of Mexico have two blind shear rams. On the Deepwater Horizon, however, Petitioners failed to ensure that the BOP had sufficient, functional built-in redundancy to eliminate single-point failure modes.

77.     Petitioners failed to ensure that all foreseeable repairs, if any, and foreseeable modifications, if any, to the Deepwater Horizon's BOP were performed, completed, and tested with the vessel's operations shut down and the well secured.

78.     Petitioners failed to ensure the testing, if any, of the Deepwater Horizon's BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV connection points, and verifying the functionality of the AMF, autoshear, or ROV "hot stab" connection points.

79.     Petitioners failed to ensure that the BOP present on the Deepwater Horizon

-20-

possessed reasonably safe, adequate, functional technology to prevent foreseeable blowouts.

80.     Petitioners could have ensured that a BOP and/or back-up BOP with sufficient strength for deepwater drilling was present and available on the Deepwater Horizon, but did not do so.

81.     Petitioners could have installed a back-up trigger to activate the Deepwater Horizon's BOP in the event that the main trigger failed to activate.

82.     Petitioners were aware that in addition to increasing the risk of blowouts, deep-sea drilling also increases the BOP failure risk.  Despite being aware of the risk of the BOP failing at greater depths, Petitioners did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Claimants, and the environment from the catastrophic results of a well blowout.

83.     Moreover, during drilling operations at Macondo, the Deepwater Horizon's BOP was out of certification and long overdue for extensive maintenance and repair.  It had not undergone a thorough series of maintenance checks since 2005, despite the significant problems uncovered within the device during that inspection.  Moreover, although the BOP's manufacturer required that the device undergo testing by the manufacturer every five years, the Deepwater Horizon's BOP had not been inspected by its manufacturer since 2000.

84.     According to Petitioners' maintenance documents from the 2005 inspection, the BOP's control panels gave unusual pressure readings and flashed inexplicable alarm signals, while a "hot line" connecting the vessel to the BOP was leaking fluid badly.  An independent engineering company was hired to assess the BOP, but could not perform all of its examinations, including verification that the BOP could effectively shear drill pipe and seal off wells in high pressure, deepwater conditions, because the BOP was in use and inaccessible on the sea floor,

-21-

and Petitioners would not stop work to bring it to the surface.

85.     An independent audit of the vessel commissioned by Petitioners in April 2010, just before the explosion, revealed a range of problems with the Deepwater Horizon's BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves.  BP well site leader Ronald Sepulvado testified in August 2010 that he too had raised concerns about Petitioners' maintenance of the BOP, reporting that several pieces of equipment had been out of service for extended periods of time, but that Petitioners "always told [him] that they didn't have the parts" to make the necessary repairs.

86.     In fact, federal regulators at the MMS communicated to Petitioners in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."  Despite this notice, and although the backup BOP trigger is a common drill-rig requirement in other oil producing nations, including other areas where the Petitioners operate, the Deepwater Horizon was not equipped with this backup remote BOP trigger.

87.     If the BOP on the wellhead had been functional and properly maintained and/or equipped by Petitioners, it could have been manually or automatically activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the Spill to a minute fraction of its ultimate severity and thereby sparing Claimants millions of dollars in losses and damage.

### D.     Petitioners' Knowledge of Other Safety, Operational, Equipment, and Maintenance Issues on the Deepwater Horizon Before the Blowout

88.     Prior to the blowout, Petitioners had actual knowledge that improving safety performance during offshore drilling operations was necessary.  As Steven L. Newman, chief executive of Defendant Transocean Holdings LLP, admitted prior to the Spill, "we have to improve our safety performance."

-22-

911133.4

89.     Prior to the blowout, Petitioners had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance, including the electronic alarm systems, and the ballast systems used to stabilize the vessel in the water.

90.     Prior to the blowout, Petitioners had actual knowledge, based on an independent equipment assessment they had commissioned, that the Deepwater Horizon had significant deficiencies in at least 36 pieces of "critical equipment items" that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."

91.     The investigators also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship.   The vessel also had a malfunctioning pressure gauge and multiple leaking parts. The report faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

92.     The equipment assessment commissioned by Petitioners echoed the results of a similar BP-commissioned audit conducted in September 2009, which found that Petitioners had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

93.     In addition, in the weeks before the disaster, the vessel experienced power blackouts, computer glitches and a balky propulsion system.  In some cases, Petitioners' officers even purposely overrode or disabled vital safety mechanisms.

94.     Rig-wide electrical failures had occurred two or three times before the blowout, and the driller's control chair had lost power just a few days prior to the blowout.  The primary computer used to control all vessel drilling functions routinely crashed and had to be restarted, interfering with workers' ability to monitor well data.   One of the vessel's thrusters, an

-23-

underwater propeller that helps the floating vessel move and stabilize itself in the water, had been "having problems" for eight months prior to the blowout.

95.     Further, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved.  Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel and in need of maintenance were not registered by the computer.

96.     Petitioners bypassed or disabled key safety systems on the vessel, including a gas safety valve and the fire alarm system, that were intended to monitor for fire and explosive and toxic gases, with utter disregard for the safety ramifications.

97.     Had Petitioners not disabled the alarm systems, the system would have sounded before the explosion, shut down all potential ignition sources, and activated the drilling vessel's emergency disconnect system, which would have prevented the explosion and saved the lives of the 11 vessel workers who perished and prevented the multiple personal injuries resulting from the disaster.

98.     Petitioners' entire fleet bypassed certain vital safety systems as a matter of practice.  Also, Petitioners' workers were inexperienced and too readily promoted without sufficient on-the-job training to fully recognize and appreciate the risks.  Fake data entered into Petitioners' program for tracking health and safety issues provided a distorted picture of safety on the vessel.

99.     When the Deepwater Horizon lost power during the blowout, none of the backup or emergency generators that were on board to provide power to alarm and safety systems in just such an emergency were working.  There was no general alarm, no internal communication, and

-24-

no power to the vessel's engines.

100.    Without power, the crew was also unable to engage the Emergency Disconnect
System that would have halted the flow of gas fueling the fire on the vessel, and many other
alarm and safety systems were rendered silent and useless.

101.    In a confidential worker survey conducted on the Deepwater Horizon in the weeks
before the disaster, workers voiced concerns about poor equipment reliability, and one worker
noted that the vessel had not once in its nine-year career been taken to dry dock for necessary
repairs.    As he stated, "we can only work around so much."    Another worker described
Petitioners' policy of running equipment ragged before making even the bare minimum of
repairs. As he explained, "[r]un it, break it, fix it. ... That's how they work."

102.    The Deepwater Horizon disaster was "entirely preventable," according to one of
the world's leading experts on oil well management, Dr. Nansen Saleri.    "There are many ...
redundant elements in a robust safety management system," Saleri said.    "The first line of
defense is not ever to let that kind of pressure build up.    The reason this happened was a series of
bad decisions about the well that are human-based and that completely disregarded the risks."    At
bottom, "[t]he whole episode was systemic failure on a grand scale."

103.    All of the facts alleged herein were within the privity or knowledge of Petitioners
before the blowout, explosions, and Spill.

E.    **The Spill's Impact on Claimants**

104.    The Spill has impacted and continues to impact the Gulf Coast and the shorelines
of Florida, Alabama, Mississippi, Texas, and Louisiana.    The Spill has grievously harmed the
beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters in Florida, Alabama,
Mississippi, Texas, and Louisiana.

-25-

105.    The Spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses that cannot use the Gulf of Mexico and the coasts of Louisiana, Texas, Mississippi, Alabama, and Florida to work and earn a living.

106.    The Commercial Fishermen Claimants, Processing and Distributing Claimants, Commercial Business Claimants, Recreational Business Claimants, Recreation Claimants, Plant and Dock Worker Claimants, and Real Property/Tourism Claimants have suffered, and will continue to suffer, economic loss due to the Spill and response-related injury to marine life and tourism in and around the Gulf of Mexico.

107.    The Real Property and Real Property/Tourism Claimants have suffered, and will continue to suffer as a result of the destruction, loss of use, and diminution in the value of their property caused by the Spill and the response efforts thereafter.

108.    There are a wide variety of commercially valuable fish species in the Gulf of Mexico that have been and will continue to be harmed by the Spill, including, but not limited to, shrimp, crabs, oysters, menhaden, and finfish.

109.    Major shrimp species in the Gulf of Mexico, including white, pink, and brown shrimp, are mainly located in coastal areas. During the Spill, these species were harmed due to mortality of adults, as well as that of postlarval shrimp, whose migrations out of inshore waters coincided precisely with the Spill, devastating current as well as future shrimp catches. In 2009, Gulf region shrimp landings were the nation's largest with 241 million pounds, which was 80 percent of the national total and worth $313.8 million, according to NOAA sources.

110.    According to NOAA, the Gulf region also leads the nation in the production of oysters in 2009, harvesting 22.1 million pounds of meats, a catch worth almost $85 million and making up over 62 percent of the nation's total.

-26-

911133.4

111.    Three valuable crab species live in the Gulf of Mexico:  blue crab, Gulf stone crab, and stone crab.  As with shrimp, crab spawning and larval seasons coincided disastrously with the Spill, putting future harvests at risk for years to come.

112.    In 2009, the Gulf region harvested almost 40% of the nation's blue crab catch: 59.1 million pounds of hard blue crab landings worth $57.3 million, according to the National Marine Fisheries Service.  Louisiana alone landed approximately 33 percent of the total national blue crab catch:  50.78 million pounds, a catch worth $49.17 million.

113.    According to NOAA, surface-oriented marine life was most harmed by the early stages of the Spill, but as the crude oil sinks and is dispersed throughout the water column, bottom-oriented fish such as snappers and groupers are also at risk.  The major harms will be to near-shore species or species that may be currently spawning.

114.    Moreover, as sunken and dispersed oil resurfaces, additional harm to marine ecosystems will occur and continue.  As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress, "Oil can remain toxic in the environment for years."

115.    According to NOAA, as oil and/or dispersants from the Spill reach the bottom or near-shore/inshore areas, the majority of the 42 reef fish species (which include juvenile snappers and groupers) in the Gulf of Mexico will be harmed.

116.    The Gulf of Mexico is one of only two major spawning grounds for the endangered Atlantic Bluefin tuna; each year from March to June the fish converge there between latitudes 25-28°N to breed.  Not only did the Spill's timing coincide precisely with the peak of the Bluefin's Gulf spawning season, but NOAA maps show that the Spill and its underwater plumes of oil and dispersants spread between latitudes 25-28°N, directly polluting the tuna's

-27-

limited spawning area.

117.   The effects of the Spill will also threaten pelagic fish, including the Bluefin species, for years to come.  Bluefin tuna are large, slow-growing fish that take ten years to reach sexual maturity.  The destruction or severe damage to an entire generation of fish in 2010 will therefore continue to affect the tuna population for at least a decade; if next year's spawning season is also affected by resurfacing oil or the remaining underwater plumes, the damage will be catastrophic.  Already severely overfished, the Atlantic Bluefin species may not survive this massive disruption to an entire spawning season, let alone the potentially long-term devastation of one of its annual spawning sites.

118.   The Spill has not only had a potentially severe impact on fisheries in the Gulf, but it has also dealt a devastating blow to tourism in the region and the individuals and businesses that ordinarily thrive on tourism and tourism-related business, which accounts for about 46 percent of the Gulf Coast economy.  The Spill will result in at least $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association.

119.   The Spill may become the worst disaster in the history of Florida tourism. Some analysts have preliminarily estimated that the impact on tourism along Florida's Paradise Coast could reach $3 billion.

120.   Because of the Spill, the Mississippi coast has had a 50 percent cancellation rate on reservations generally.

121.   Twenty-six percent of Americans who had planned to visit Louisiana stated they were no longer planning to visit after the Spill, according to a nationwide survey taken by the Louisiana Tourism Commission in May 2010.  Prior to the Spill, Louisiana hosted 24.1 million visitors per year, which supported a $9.4 billion tourism industry and sustained more than

-28-

200,000 direct and indirect jobs for Gulf residents, according to the Louisiana Tourism Commission.

122.    In addition, Alabama has seen a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals.  Overall, the combination of tourism and fishing losses in Alabama in 2010 will probably yield adverse impacts of $1.7 billion in economic output, $498.9 million in earnings, and 24,880 jobs, according to a report by the Center for Business and Economic Research at the University of Alabama.

123.    The VoO Claimants sustained substantial property damage as a result of their participation in the Vessels of Opportunity ("VoO") program.

124.    The VoO vessels sustained substantial physical damage as the result of their participation in the program.  The oil remediation efforts required of the vessels participating in the VoO program required the vessels to navigate through oil contaminated waters, staining propellers, rudders, and engines.

125.    The VoO vessels remained covered in oil and chemicals for weeks and, in some cases, months before detoxification, oil hardened like a varnish on hulls and decks of the vessels so that when detoxification was finally performed, the removal of the contaminants would cause paint to peel from the hulls, decks, equipment and appurtenances of the vessels.

126.    The Moratorium Claimants also suffered severe economic hardship as a result of the Spill.   These claimants include deepwater drilling rig workers, rig support personnel, transport personnel and indirect support workers such as restaurant employees and fueling personnel.  They have suffered losses and damages as the result of the Six-Month Deepwater Drilling Moratorium issued by the United States Department of Interior on May 28, 2010, in response to the Spill.

-29-

911133.4

127.   On May 28, 2010, the United States Department of the Interior Minerals Management Service, as a direct, proximate and foreseeable result of the Deepwater Horizon / Macondo Well blow-out and spill, issued a six-month moratorium on all new and existing deepwater drilling in the Gulf of Mexico, effectively shutting down oil and gas industry operations along the Gulf Coast.

128.   The Moratorium Notice to Lessees and Operators (NTL No. 2010-N04) states, "under current conditions, deepwater drilling poses an unacceptable threat of serious and irreparable harm or damage to wildlife and the marine, coastal and human environment." The policy halted approval of any new permits for deepwater drilling and suspended production in the Gulf, affecting 33 offshore oil rigs operated by various oil companies. With 88% of U.S. offshore rigs located on Louisiana's Outer Continental Shelf ("OCS"), Louisiana businesses and coastal communities felt the majority of the moratorium's impact.

129.   Following its directive to implement the Deepwater Moratorium, the Obama administration issued a second notice to lessees and operators of federal oil and gas leases (NTL No. 2010-N05) on June 8, 2010, calling for increased safety measures for energy development on the OCS.   The recommendations therein applied to all activities on the OCS, including deepwater drilling activity suspended under NTL No. 2010-N04.

130.   On June 22, 2010, the United States District for the Eastern District of Louisiana granted a preliminary injunction, lifting the drilling moratorium.

131.   The U.S. Department of the Interior's appeal was denied, and in response the agency issued new suspensions on July 12, 2010.   This new document is very similar to its predecessor, the first deepwater drilling moratorium, with more substantial rationale for the ban and a focus on technologies used in drilling rather than water depth stating "the new suspensions

-30-

apply to drilling operations that use subsea blowout preventers (BOP) or BOPs on floating facilities." The new version also allowed for the possibility of the moratorium being lifted before November 30, 2010.

132.    On October 12, 2010, the U.S. Department of Interior's Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") announced that the federal government would lift the drilling moratorium. The October announcement indicated an early end to the moratorium, which had been scheduled to run through the month of November 2010.

133.    Although the moratorium was officially lifted on October 12, drilling did not resume quickly because of the need for more inspections and compliance with new regulations.

134.    On January 3, 2011, BOEMRE notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

135.    The economic impacts of the moratorium are diverse and far-reaching, affecting individuals and businesses in various industries across the Gulf Coast. These impacts were direct (e.g., drilling rig workers) and indirect (e.g., drilling equipment suppliers and restaurants).

136.    On January 13, 2011, the Greater New Orleans Inc. Regional Economic Alliance issued a report about the economic repercussions of the deepwater drilling moratorium.

137.    The report found that the moratorium shut down 33 deepwater rigs, affecting more than 13,000 workers. It further found that, although the moratorium ended in October 2010, only two deepwater permits had been issued since then, compared with 5.8 per month issued before the Deepwater Horizon oil spill.

138.    The report further found that deepwater drilling contributes about $2.3 million to $3.2 million in direct tax revenue to the State of Louisiana and parish governments each month and more than $7 million in indirect monthly revenue to state and local governments.

-31-

139.    The report concluded that if the rate of issuance of drilling permits remains unchanged, unemployment will likely dramatically increase as businesses continue to diminish their savings.  This would be a huge blow to the State of Louisiana and coastal parishes - still recovering from the hurricanes of 2005 and 2008.   Additionally, rigs and entire drilling operations may move to other areas or even overseas, taking with them valuable jobs and tax revenue.  The report observed that many small, family-owned businesses which support the oil and gas industries are vulnerable.  The report claimed that without increased business in the form of drilling activity these companies may not survive.

## CLAIMS

### I.    Negligence

140.    Claimants reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

141.    As the owners, managing owners, owners *pro hac vice*, charters, supervisors and/or operators of the Deepwater Horizon, Petitioners owed duties of care to Claimants to, *inter alia*, navigate, man, possess, manage, control, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

142.    Petitioners were under a duty to exercise reasonable care while participating in drilling operations to ensure that an oil spill did not occur.

143.    Petitioners were also under a duty imposed by their discharge permit not to release any oil into the navigable waters of the United States.

144.    Petitioners breached their duties to Claimants by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shut down systems, and BOP, and in

-32-

disabling vital alarm systems on the Deepwater Horizon before the blowout.

145.    Petitioners also breached their duties to Claimants by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, simultaneous and distracting operations, and diversion of the flowing mud to the mud-gas separator.

146.    In addition, Petitioners breached their duties to Claimants in the following non-exclusive particulars:

    (a)    Failing to properly operate the Deepwater Horizon;

    (b)    Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

    (c)    Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purposes;

    (d)    Failing to properly assess the risk of failure of key safety and emergency equipment;

    (e)    Acting in a careless and negligent manner without due regard for the safety of others;

    (f)    Failing to implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

    (g)    Operating the Deepwater Horizon with untrained and unlicensed personnel;

-33-

(h)     Negligently hiring, retaining and/or training personnel;

(i)     Failing to take appropriate action to avoid or mitigate the accident;

(j)     Negligently implementing or failing to implement policies and procedures
        to safely conduct offshore operations in the Gulf of Mexico;

(k)     Failing to warn in a timely manner;

(l)     Failing to timely bring the oil release under control;

(m)    Failing to provide appropriate accident prevention equipment;

(n)     Failing to observe and read gauges that would have indicated excessive
        pressures in the well;

(o)     Failing to react to danger signs; and

(p)     Such other acts of negligence and omissions as will be shown at the trial
        of this matter; all of which acts are in violation of the general maritime
        law.

147.    Petitioners knew of the dangers associated with deep water drilling and failed to
take appropriate measures to prevent damage to Claimants and the Gulf of Mexico's marine and
coastal environments and estuarine areas.

148.    Petitioners knew or should have known that the acts and omissions described
herein could result in damage to Claimants.

149.    The injuries to Claimants were also caused by or aggravated by the fact that
Petitioners failed to take necessary actions to mitigate the danger associated with their
operations.

150.    The Petitioners' conduct with regard to the maintenance and/or operation of
drilling operations and oil vessels such as the Deepwater Horizon is governed by numerous state

-34-

and federal laws and permits issued under the authority of these laws, including its water discharge permit that prohibited the release of any free oil into the environment. These laws and permits create statutory standards that are intended to protect and benefit Claimants. Petitioners violated these statutory standards.

151.    Petitioners also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

152.    In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Claimants were caused by the acts and/or omissions of the Petitioners that are beyond proof by the Claimants, but which were within the knowledge and control of the Petitioners, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Petitioners. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Petitioners satisfied the duty of care imposed on them and Claimants, therefore, plead the doctrine of *res ipsa loquitur*.

153.    Claimants are entitled to a judgment finding Petitioners liable to Claimants for damages suffered as a result of Petitioners' negligence and awarding Claimants adequate compensation therefor in amounts determined by the trier of fact.

154.    As a result of Petitioners' acts or omissions, the Commercial Fishermen Claimants have suffered a loss of income, loss of the right of use of the Gulf of Mexico, and

-35-

Louisiana, Texas, Mississippi, Alabama and Florida saltwater areas, and costs associated and inconvenience sustained as a result of the closure of the Gulf water areas.

155.   As a direct and proximate result of the Petitioners' negligence, the Processing and Distributing Claimants have suffered damages associated and inconvenience sustained by the closure of the Gulf water areas, harbors, marinas, boat launches and waterways including loss of their livelihood which directly depend upon a supply of fish, shrimp, oysters and crabs from the Gulf of Mexico.

156.   As a direct and proximate result of the Petitioners' negligence, the Commercial Business Claimants have suffered damages including, *inter alia,* loss of income and inconvenience due to the inability to conduct offshore oil exploration activities.

157.   As a direct and proximate result of the Petitioners' negligence, the Recreational Business Claimants have suffered damages including, *inter alia,* loss of income and inconvenience due to the inability of their customers and clients to use the Gulf of Mexico and the Coastal Zone for recreational purposes.

158.   As a direct and proximate result of the Petitioners' negligence, the Recreation Claimants have suffered damages including, *inter alia,* loss of deposits for vacation rentals, loss of enjoyment of life from the inability to use the Gulf of Mexico for recreation and amusement purposes.

159.   As a direct and proximate result of the Petitioners' negligence, the Plant and Dock Worker Claimants have suffered damages including, *inter alia,* loss of income due to the inability of fishermen and other seamen to use the Gulf of Mexico for commercial purposes, and inconvenience caused by the closure of the Gulf water areas, harbors, marinas, boat launches and waterways.

911133.4

160. As a direct and proximate result of Petitioners' negligence, the VoO Claimants sustained property damage as a result of the contamination of their vessels by oil and chemicals and the detoxification process.

161. As a direct and proximate result of the Petitioners' negligence, the Real Property Claimants have suffered damages including, *inter alia,* damage to their property, diminution of value and/or loss of use of their property, stigma damages resulting from the taint of their property caused by the Spill, some have been forced to evacuate their homes, and they have been otherwise injured.

162. As a direct and proximate result of the Petitioners' negligence, the Real Property/Tourism Claimants have suffered damages including, *inter alia,* property damage, diminution in value and/or loss of use of their property, stigma damages resulting from the taint of their property caused by the Spill, and loss of income and inconvenience resulting from the decrease in tourism due to the pollution of the Gulf resulting from the Spill.

163. As a direct and proximate result of the Petitioners' negligence, the Banking/Retail Business Claimants have suffered damages including, *inter alia,* loss of income, loss of profits, and inconvenience due to increased foreclosures, diminution in property values, and loss of business resulting from the Spill.

164. As a direct and proximate result of the Petitioners' negligence, the Subsistence Claimants have suffered damages including, *inter alia,* loss of income, loss of profits, and loss of use, due to the inability to use the natural resources of the Gulf of Mexico for their income and subsistence.

165. As a direct and proximate result of Petitioners' negligence, the Dealer Claimants have suffered damages, including, *inter alia,* loss of business, loss of income and lost profits, and

-37-

911133.4

inconvenience due to the decrease in business resulting from the Spill.

166.   As a direct and proximate result of Petitioners' negligence, the Moratorium Claimants have suffered damages, including *inter alia,* the loss of their livelihoods, business, income, and profits caused by the moratorium placed on deepwater drilling in the Gulf of Mexico by the Department of Interior on May 28, 2010 in response to the Spill.

## II.   Gross Negligence and Willful Misconduct

167.   Claimants reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

168.   Petitioners owed and breached duties of ordinary and reasonable care to Claimants in connection with the maintenance and operation of the Deepwater Horizon, and additionally owed and breached duties to Claimants to guard against and/or prevent the risk of the Spill which occurred herein.  The existence and breach of these legal duties are established under the General Maritime Law and state law as deemed applicable herein.

169.   Petitioners failed to exercise reasonable care.  Moreover, given the grave risks incident to their operations and the many cavalier ways in which Petitioners ignored those risks in the interest of speedy operations and greater profits, Petitioners conduct was grossly negligent. Petitioners' conduct showed their repeated and conscious disregard of high risks of harm to others; such conduct amounted to reckless and willful misconduct.

170.   Petitioners acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, disabling the gas alarm system aboard the Deepwater Horizon.

171.   Petitioners acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Claimants by making

-38-

or acquiescing to a number of reckless decisions on the Deepwater Horizon, including, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

172.    In addition, Petitioners acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Claimants by making or acquiescing to reckless decisions to, *inter alia*, use an inappropriate cement mixture for the well; test that cement mixture prior to using it in the well; run a cement bond log to evaluate the integrity of the cement job; and deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

173.    Petitioners acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Claimants by, *inter alia*, recklessly maintaining and/or altering, and/or wantonly operating and/or using the BOP appurtenant to the Deepwater Horizon.

174.    As a direct and proximate result of the Petitioners' wanton and reckless conduct, Claimants have suffered injuries, including, *inter alia*, damage to or diminution of the value of their property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which they are entitled to actual and compensatory damages.

### III.    Nuisance

The Property Claimants

175.    Claimants reallege each and every allegation set forth in all preceding paragraphs

-39-

as if fully restated here.

176.    At all times material hereto, the Real Property Claimants and the Real Property/Tourism Claimants (the "Property Claimants") were owners, lessors, or lessees of residential, commercial, and/or investment properties in or near the coastal zones of the Gulf states.

177.    Petitioners' negligence directly and proximately caused the blowout and subsequent Spill and Petitioners' wrongful conduct resulted in an economic and ecological disaster that has directly and proximately caused an invasion and continuing and unreasonable interference with the Property Claimants' use and enjoyment, as owners, lessors, and/lessees of residential, commercial, and/or investment properties, of their properties.

178.    Petitioners were under a duty to take positive action to prevent or abate the interference, but failed to do so.

179.    The harm suffered by the Property Claimants was significant and of a kind that would be suffered by a normal person in the community or by property in normal condition and used for normal purpose.

180.    The Property Claimants have also suffered the migration of contaminants and noxious odors as a result of the Spill.

181.    Petitioners acted in an unreasonable manner in creating the nuisance described herein.

182.    The Spill caused and/or contributed to by Petitioners has polluted the Property Claimants' property, constituting a nuisance that has caused and will continue to cause injury to the Property Claimants, including, but not limited to, damages to and diminution in the value of their residential, commercial, or investment properties and the surrounding marine and coastal

-40-

environments, and stigma damages resulting from the taint of their properties as a result of the Spill.

183.    Petitioners are liable to the Property Claimants for actual and compensatory damages sustained as the direct and proximate result of the nuisance created by Petitioners.

## IV.    Trespass

### Real Property Claimants and Real Property/Tourism Claimants

184.    Claimants reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

185.    Petitioners knew of the risks of a blowout on the Deepwater Horizon and that a blowout would result in an explosion and oil spill, and that the oil from such a spill would wash ashore and cause devastating damage to real property along the shores of Alabama, Florida, Mississippi, Texas, and Louisiana.

186.    Petitioners caused polluting substances to be discharged beyond the boundary of the Property Claimants' property in such a manner that it was reasonably foreseeable that the pollutants would, in due course, invade the Property Claimants' property and cause harm.

187.    By discharging pollutants, Petitioners entered, invaded, and intruded on the properties of the Property Claimants.

188.    Petitioners had a duty to use reasonable care not to enter, intrude on, or invade the Property Claimants' properties.   Petitioners also owed a duty to the Property Claimants to exercise reasonable care in the design, execution, and operation of the Macondo well and the maintenance and operation of the Deepwater Horizon.

189.    Petitioners breached the duty they owed to the Property Claimants when they outrageously and maliciously, owing to gross negligence, willful, wanton and reckless

-41-

indifference for the rights of others, or behavior even more deplorable, failed to exercise reasonable care in the design, execution, and operation of the Macondo well and the maintenance and operation of the Deepwater Horizon, which conduct resulted in the entry, intrusion, or invasion on the Property Claimants' properties.

190.    Petitioners' grossly negligent, willful, reckless, and wanton conduct, as described herein, entitles the Property Claimants to compensatory and punitive damages.

191.    These acts on the part of Petitioners have caused oil from the Spill to come ashore in Louisiana, Mississippi, Alabama, Florida, and Texas.   This deliberate invasion and contamination of the property owned by the Property Claimants constitutes a trespass in violation of Louisiana, Mississippi, Alabama, Florida, and Texas law.

192.    As a direct and proximate result of the Petitioners' unauthorized invasion, entry and contamination, Petitioners have caused and continue to cause the Property Claimants real and personal property damage, economic and business loss, loss of income, loss of value of their property, inconvenience and out-of-pocket expenses, and the creation of conditions that are harmful to human health and the environment, for which Petitioners are liable in damages.

### V.    Punitive Damages

193.    Claimants reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

194.    Petitioners' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

    (a)    failed to properly maintain and/or operate the Deepwater Horizon;

    (b)    operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

-42-

(c)     ignored warnings that the integrity of the well, the cementing job, and the

vessel were in jeopardy;

(d)     failed to implement, and enforce proper rules and regulations to ensure the

safe operations of the Deepwater Horizon;

(e)     violated MMS regulations for the safe design and operation of oil wells

and drilling vessels in the Gulf of Mexico;

(f)     failed to take appropriate action to avoid or mitigate the accident;

(g)     failed to implement policies and procedures to safely conduct offshore

operations in the Gulf of Mexico;

(h)     failed to ensure that the Deepwater Horizon and its equipment were free

from defects, properly maintained and/or in proper working order;

(i)     failed to provide appropriate disaster prevention equipment; and

(j)     failed to have an appropriate emergency spill response plan or readily

available spill response equipment.

195.    Petitioners' conduct, as described more fully hereinabove, is at the highest level

of reprehensibility, warranting and necessitating the imposition of punitive damages at the

highest level, because Petitioners' conduct was motivated by financial gain; because it injured

and endangered human and environmental health and safety; because it caused devastating

damage and loss to the livelihoods, businesses, and properties of Claimants; because it involved

deliberate decisions that recklessly and callously disregarded or discounted risk of harm to

persons, property, and the environment; because it was part of a culture and ongoing pattern of

conduct that consistently and repeatedly ignored such risks to others in favor of financial

advantage to Petitioners; and because it has accordingly caused societal harm, moral outrage and

-43-

public condemnation, and the need to punish Petitioners and deter further repetition by Petitioners or others.

196.    Accordingly, Claimants are entitled to an award of punitive damages in an amount to be determined at trial.

## VI.    Declaratory Relief

197.    The claimants, society, and the Gulf states have a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct.  Punitive damages do not compensate for injury.  They are private fines, authorized by the General Maritime Law (and/or state law), to punish reprehensible conduct and deter its future occurrence. Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the Petitioners' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated.  Accordingly, Claimants seek a judicial declaration against Petitioners and in favor of the Claimants that any settlement provisions that purport, directly or indirectly, to release, or to affect the calculation of, punitive damages, without a judicial determination of fairness, adequacy, and reasonableness, are ineffective as contrary to law, equity and public policy.

## PRAYER FOR RELIEF

WHEREFORE, Claimants demand judgment against Petitioners, jointly, severally, and solidarily, as follows:

(a)    Economic and compensatory damages in amounts to be determined at trial;

-44-

911133.4

(b)     punitive damages;

(c)     pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d)     attorneys' fees and costs of litigation;

(e)     declaratory and injunctive relief, including but not limited to that described and requested in Paragraph 174 of this Master Claim in Limitation; and

(f)     Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

911133.4