## FIRST AMENDED MASTER COMPLAINT, CROSS-CLAIM, AND THIRD-PARTY COMPLAINT FOR PRIVATE ECONOMIC LOSSES IN ACCORDANCE WITH PTO NO. 11 [CMO NO. 1] SECTION III(B1) ["B1 BUNDLE"]

### CLASS ALLEGATIONS

### RULE 9(h)

### Introduction

On April 20, 2010, a well blowout on the vessel Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States.  The blowout and subsequent explosions, fire, and sinking of the vessel resulted in an oil spill of unprecedented proportions that damaged, depleted and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (the "Spill").  Although the blown-out well is now capped, the disastrous environmental and economic effects of the Spill are widespread and will likely remain so for decades.

Hundreds of individual and class actions were filed in state and federal courts on behalf of the thousands of victims of the Spill.  By order entered on August 10, 2010, the Multi-district Litigation Panel (the "MDL Panel") transferred all such actions then pending to this Court.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179, --- F. Supp. 2d ----, 2010 WL 3166434, 2010 AMC 1977 (JPML, August 10, 2010) (the "Transfer Order").  On October 19, 2010, this Court entered its Case Management Order No. 1 (hereinafter "CMO No. 1"), wherein it directed the filing of Master Complaints on behalf of the Plaintiffs.

This First Amended Master Complaint, Cross-Claim, and Third Party Complaint is designated as an admiralty or maritime case as provided in Rule 9(h)(1) of the Federal Rules of Civil Procedure, and is filed pursuant to CMO No. 1, Paragraph III B (1), on behalf of those

-46-

911133.4

plaintiffs seeking non-governmental economic loss and property damages and who have filed and/or may hereinafter file their claims in this Court or whose claims have been and/or may hereafter be transferred to this Court pursuant to the Transfer Order, and as a class action.

Accordingly, pursuant to CMO No. 1, Paragraph III B(1), Plaintiffs in this MDL proceeding, Cross-Claimants in Limitation, and Third-Party Plaintiffs in Limitation, by their undersigned counsel and other counsel identified herein, for themselves and all others similarly situated (the members of the proposed Class and Subclasses), (including, but not limited to, those persons and entities who have and/or who may hereinafter adopt, incorporate or intervene into the Master Complaint for Private Economic Losses ("B1 Bundle") [Rec Doc 879] pursuant to Pre-Trial Order Nos. 11, 20, 24 and/or 25), submit this First Amended Master Complaint, Cross-Claim and Third-Party Complaint for actual, compensatory, and punitive damages arising from the well blowout, vessel explosions, and subsequent oil spill by the Deepwater Horizon oil vessel in the Gulf of Mexico on April 20, 2010, and state as follows:

198. On April 20, 2010, at approximately 9:45 p.m. CST, a well blowout caused explosions on the Deepwater Horizon, an oil vessel in the Gulf of Mexico, igniting a raging, gas-fueled fire on the vessel. After burning for two days, the vessel sank to the ocean floor.

199. As the Deepwater Horizon tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters.

200. Each day during the course of the Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a

-47-

widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, the shifting smear was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf states' coastlines, where oil made landfall on white sand beaches and in ecologically sensitive marshes and estuaries, damaging the environment and real and personal property throughout the coastal zones of the Gulf states ("Coastal Zone"). Under water, huge plumes of oil and dispersant chemicals swirled through the entire water column and came to rest on the seafloor at many different depths, damaging ecosystems and privately owned and leased sea beds throughout the Gulf of Mexico.

201. The Deepwater Horizon's well blowout and the subsequent explosions, fire, sinking, and Spill were foreshadowed by a string of disastrous incidents and near misses in Defendants' operations on land and at sea, as well as poor decision-making by Defendants and their employees, as they ignored crucial safety issues, cut corners, and violated federal and state law to save time and money in favor of production and profit and at the expense of worker safety and environmental protection. All the while, Defendants continued to evade and subvert industry regulations.

202. Defendants could have prevented this catastrophe by using deepwater drilling best practices, following required safety protocols and precautionary procedures, properly maintaining equipment, and using widely available emergency safety technology but, with little regard for the risk to the vessel workers or the environment, Defendants chose to violate or ignore operational discipline, and save money and time at the expense of safety. Their cost-cutting measures were outrageous — consistent with their long corporate histories of flagrant disregard for safety — and were taken with willful, wanton, and reckless indifference to the

-48-

disastrous results to the workers aboard the vessel, the environment, and Plaintiffs.

203.    Defendants repeatedly made decisions impacting the safety of the vessel, its workers, the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states in the direction of short-term gain, through reduced schedule and reduced cost, rejecting adequate and responsible risk analysis checks and balances to weigh cost and time versus risk and safety. The result was both predictable in outcome and unprecedented in scale. Moreover, because their conduct endangered the health and safety of a large region and population, caused and increased the risk of serious injury and bodily and emotional harm, and affected a financially vulnerable population dependent upon the Gulf of Mexico, the degree of reprehensibility of Defendants' conduct is at the highest level.

204.    The Spill has caused, and continues to cause, devastating environmental and economic damage. For example, there have been thousands of square miles of waters closed to fishing, swimming and/or boating, and thousands of square miles of historic coastal marshes, delicate estuaries, cypress forests, barrier islands, and white sand beaches compromised. Fishermen and marine-related businesses have lost and continue to lose income and their businesses; the tourism industry and hotels, resorts, restaurants, and other tourism-reliant businesses have lost and continue to lose income; and real property owners have suffered the loss, damage, and/or diminution of the value of their properties throughout the Coastal Zone.

205.    This First Amended Master Complaint, and Cross-Claim, and Third-Party Complaint is submitted pursuant to this Court's CMO No. 1, as: (1) an administrative device to serve the functions of efficiency and economy; and (2) to present certain common claims and common questions of fact and law for appropriate action by this Court, including class certification and trial, in the context of this multidistrict proceeding.

-49-

206.    This First Amended Master Complaint, and Cross-Claim, and Third-Party Complaint does not constitute a waiver or dismissal of any actions or claims asserted in the individual and class actions arising out of the Spill, nor by it do the Plaintiffs relinquish the right to add or assert, or seek leave to add or assert, additional claims, or name additional parties defendant, depending on further information learned through discovery or investigation.

207.    This First Amended Master Complaint, and Cross-Claim, and Third-Party Complaint makes allegations of, and places Defendants on notice that Plaintiffs may seek, certification of one or more classes and/or subclasses, as appropriate, for the classwide determination of common issues of law and/or fact relating to the liability of Defendants to the members of such classes and/or subclasses for actual, compensatory, and punitive damages for the economic harm and damage to business and property Plaintiffs have incurred as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein.  Plaintiffs will seek to maintain this action as a class action, and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4); (b)(1)(B); (b)(2); (b)(3); (c)(4); and (c)(5).  Prior to any class certification motion, in sufficient time to place Defendants on fair notice and to enable appropriate discovery and briefing, with such scheduling subject to Court approval, Plaintiffs will identify those persons who will serve as proposed representatives for the class and/or subclasses sought to be certified and, if necessary, add or join them as parties hereto.

208.    Further, additional parties will likely join as plaintiffs in this action after the filing of this First Amended Master Complaint, Cross-Claim, and Third-Party Complaint, and those plaintiffs will have the opportunity to adopt these allegations and join this action by completing a form dedicated to that purpose to be approved by the Court.

-50-

## PARTIES, JURISDICTION, AND VENUE

209.   Plaintiffs, Cross-Claimants in Limitation, and Third-Party Plaintiffs in Limitation (hereinafter "Plaintiffs") are individuals and/or entities who have suffered property losses, economic damages, and/or other costs (including removal costs) as a result of the Spill.  They generally fall into ten basic categories; however, in presenting these general categories of plaintiffs, Plaintiffs do not suggest or imply any exclusivity, nor hierarchy of merit, preference, or importance:

      (a)   Commercial fishermen, shrimpers, crabbers, oystermen, the owners and operators of businesses involving commercial fishing, shrimping, crabbing and oystering (the "Commercial Fishermen Plaintiffs").

      (b)   Seafood processors, distributors, retail and seafood markets, and restaurant owners and operators, and all those employed by seafood processors, distributors, retail and seafood markets, and restaurants (the "Processing and Distributing Plaintiffs").

      (c)   Recreational business owners, operators, and/or workers, including recreational fishing businesses, commercial guides, and charter fishing businesses who earn their living through the use of the Gulf of Mexico for businesses (the "Recreational Business Plaintiffs").

      (d)   Commercial businesses, business owners, operators, and/or workers, including commercial divers, offshore oilfield service, repair, and supply, real estate agents, and supply companies and their employees (the "Commercial Business Plaintiffs").

-51-

911133.4

(e)    Recreational sport fishermen, recreational divers, beachgoers, and recreational boaters (the "Recreation Plaintiffs").

(f)    Plant and dock workers, including commercial seafood plant workers, longshoremen, and ferry operators (the "Plant and Dock Worker Plaintiffs").

(g)    Boat captains, crew, charterers, workers, and/or volunteers involved in the Vessels of Opportunity program ("VoO program") who were not adequately compensated for their work or time in the VoO program and/or whose property was damaged as a result of their work in the VoO program (the "VoO Plaintiffs").

(h)    Owners, lessors, and lessees of real property alleged to be damaged, harmed, or impacted, physically or economically, including lessees of oyster beds (the "Real Property Plaintiffs").

(i)    Hotel owners and operators, vacation rental owners and agents, and all those who earn their living from the tourism industry (the "Real Property/Tourism Plaintiffs").

(j)    Banks, financial institutions, and retail businesses that suffered losses as a result of the Spill (the "Banking/Retail Business Plaintiffs").

(k)    Persons who utilize natural resources for subsistence (the "Subsistence Plaintiffs").

(l)    Oil service, exploration and/or drilling service companies, workers, providers, or suppliers who have lost income, profits and/or earning capacity as a direct result of the adverse effects of the Deepwater Horizon

-52-

explosion, blow-out, and spill on deepwater exploration and/or drilling in the Gulf of Mexico (including, but not limited to the Moratorium issued by the United States Department of Interior) (the "Moratorium Plaintiffs").

(m)   Automobile and boat businesses, dealers and service stations and the employees thereof who have suffered damages, including loss of business, loss of income and lost profits, as a result of the Spill (the "Dealer Claimants").

210.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service[1] ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.   BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

211.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. · BP America was the party to the Drilling

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it shall be referred to as the MMS throughout this document.

-53-

Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

212.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

213.    BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

214.    This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long-

-54-

arm general jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally), and has been served with a summons in individual complaints that are the subject of this First Amended Master Complaint and has been served with a summons on the original Master Complaint.

215.   Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws," and BP p.l.c. has been served with a summons in individual complaints that are the subject of this First Amended Master Complaint and has been served with a summons on the original Master Complaint.

216.   This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission outside of Louisiana, and BP, p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omissions took place both before the blowout resulting in the oil spill and in the negligent conduct of BP, p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the oil spill. In addition, BP p.l.c. has been served with a

-55-

summons in individual complaints that are the subject of this First Amended Master Complaint and has been served with a summons on the original Master Complaint.

217. In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

218. BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for the safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the Deepwater Horizon for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the Governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

219. BP Exploration, BP America, and BP p.l.c. are generally referred to herein

-56-

collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

220.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

221.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

222.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

223.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in

-57-

Limitation Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

224.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

225.    Defendants, Cross-Claim Defendants in Limitation, and/or Third-Party Defendants in Limitation Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all

-58-

times relevant to the Spill.

226.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.   Halliburton is registered to do and does business in the State of Louisiana.   Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations.   Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well.   At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

227.   Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools.   Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.   Throughout this First Amended Master Complaint, Cross-Claim, and Third-Party Complaint, "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

228.   Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and that at all relevant times was registered to do, and was doing, business in Louisiana and within this district.   M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and

-59-

911133.4

elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services.   On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well.  M-I employees planned and/or supervised key fluid-related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.

229.    BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

230.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas.   Cameron is registered to do and does business in the State of Louisiana.   Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blowout-preventer ("BOP") , which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment.  The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

231.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Weatherford U.S. L.P. ("Weatherford") is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas, and that at all pertinent times was

-60-

registered to do, and was doing business in Louisiana and within this district. Weatherford designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore.

232. Drilling Defendants, Cameron, and Weatherford are jointly, severally, and solidarily liable under various principles of federal, maritime, and/or applicable State tort law, and under the Oil Pollution Act.

233. Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Anadarko Petroleum Corporation Co. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is registered to do and does business in the State of Louisiana. Anadarko is an oil and gas exploration and production company. At all relevant times, Anadarko was a party to the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), and held a 2.5% ownership interest in the lease of the Macondo Prospect site in Mississippi Canyon Block 252 in the Gulf of Mexico.

234. Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is registered to do and does business in the State of Louisiana. Anadarko E&P is an oil and gas exploration and production company. At all relevant times, Anadarko E&P was a party to the Operating Agreement, and held a 22.5% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

235. Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in

-61-

Limitation MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore does business in the State of Louisiana and/or in state and/or federal waters off the coast of Louisiana. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, which in turn is a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd. ("MOECO"). However, MOEX Offshore is not a distinct corporate entity performing autonomous business activities, but is instead an entity wholly dominated and controlled by its ultimate parent company, MOECO, as alleged below. At all relevant times, MOEX Offshore was a party to the Operating Agreement, and held a 10% ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

236.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. However, MOEX USA is not a distinct corporate entity performing autonomous business activities, but is instead an entity created solely to serve as a holding company for other corporate entities, including MOEX Offshore, and is dominated and controlled by its parent company, MOECO, as alleged below. MOEX USA is named as a defendant herein because it is part of the corporate construct by which MOECO owns, dominates, controls, and benefits from the activities of MOEX Offshore.

237.    Defendant, Cross-Defendant in Limitation, and/or Third-Party Defendant in Limitation Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan. MOECO wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. As alleged more fully below, MOECO is named as a defendant herein because at all relevant times it dominated and controlled the activities of MOEX Offshore

-62-

and MOEX USA, such that it is the alter ego of its subsidiaries, MOEX Offshore and MOEX USA, thus requiring that the liability of MOEX Offshore and/or MOEX USA be imputed to MOECO. Alternatively, as also alleged below, MOEX Offshore and MOEX USA acted at all relevant times as agents of MOECO, and the liability of those entities should therefore be imputed to MOECO.

238.   As alleged below, MOECO's activities in the United States, including in this and all relevant jurisdictions, have been continuous and systematic. MOECO has purposely availed itself of the protections, benefits, and privileges of American law and should have reasonably anticipated being involved in this litigation in the United States. Moreover, because at all relevant times MOECO asserted domination and control over the business, operations and policy decisions of MOEX Offshore and MOEX USA, those U.S. companies were merely the alter egos and/or agents of MOECO. Thus, MOECO is subject to the exercise of both general and specific jurisdiction by this Court, an exercise of jurisdiction that will not offend traditional notions of fair play and substantial justice.

239.   MOECO is a majority-owned subsidiary of Mitsui & Co., Ltd. ("Mitsui"). Mitsui is a publicly traded company, whose American depository shares are traded on the NASDAQ Global Select Market. MOECO is listed in Mitsui's consolidated financial statements and filings with the U.S. Securities and Exchange Commission as a "major" subsidiary of Mitsui. MOECO is engaged in the business of "exploration, development, production and sales of crude oil, natural gas and other mineral resources and investment in companies engaged in these activities."

240.   MOECO operates through its own activities and those of its subsidiaries and affiliates located throughout the world, including in the United States. Since MOECO opened its

-63-

office in Houston, Texas, in February 2002, "we have been expanding our business in the USA,"

and "striving to acquire assets with high potential" in the United States. MOECO identifies the

United States as a "Focus Area" that it seeks to continue to "develop into [a] Core Area[.]"

MOECO has identified itself as having at least the following subsidiaries or affiliates in the

United States: MOEX USA, MOEX Offshore, MitEnergy Upstream LLC ("MitEnergy"), Mitsui

E&P USA LLC, MOEX Gulf of Mexico Corporation, and MOEX Oil & Gas Texas LLC. Each

of these subsidiaries of MOECO shares the same Houston, Texas, address, and many of the same

directors and managers as each other and MOECO.

241.    MOECO's expansion of its United States business ventures has included

numerous oil and gas exploration and investment activities in the Gulf of Mexico. For example,

in May 2006, MOECO and Mitsui acquired a 50% interest in an oil and gas leasehold in the Gulf

of Mexico. The Japanese companies established MitEnergy for the purpose of holding that

interest. In November 2009, MOECO and Mitsui arranged for that company to sell their Gulf of

Mexico oil and gas assets to a third party, the proceeds of which sale solely benefited MOECO.

242.    In July 2007, MOECO entered into an agreement with BP E&P for a partial

interest in an ultra-deep gas exploration project at the Gouda Prospect site in the Gulf of Mexico,

noting in a press release that its participation in this project "provides an excellent opportunity to

further expand its business in the U.S." As alleged more fully below, MOECO later orchestrated

a transaction in which it used MOEX Offshore to obtain a 10% working interest in the Macondo

Prospect site through an exchange with BP E&P, swapping MOECO's interest in the Gouda

Prospect for the 10% interest in the Macondo Prospect.

243.    More recently, in February 2010, MOECO reported that it had entered into yet

another new business in the United States when "we [MOECO and Mitsui] entered into a

definitive agreement with a partner to participate in the development and production of the Marcellus Shale Gas Project in the State of Pennsylvania."

244.    Although MOEX Offshore was the entity identified as the owner of the 10% leasehold interest in the Macondo Prospect – a 10% interest in the hydrocarbons extracted from that location – it was MOECO that was responsible for creating MOEX Offshore and its immediate holding company, MOEX USA, and for orchestrating the acquisition of the ownership interest in the Macondo Prospect.   As alleged above, in July 2007, MOECO announced it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. ... on the 29th of June, 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico ... which is being actively pursued by BP."   That gas exploration project was the exploratory drilling exercise at the Gouda Prospect site in the Garden Banks Block 997 in the Gulf of Mexico.   MOECO announced that it would own a 15% leasehold interest in the Gouda Prospect site (an interest apparently later reduced to 10%).

245.    In September 2007, MOECO, through its agent/alter ego MOEX USA, established MOEX Offshore for the purpose of holding MOECO's interests in various Gulf of Mexico projects, including the Gouda Prospect, and later, the Macondo Prospect.

246.    In November 2009, BP E&P and MOEX Offshore entered into a Lease Exchange Agreement (effective October 1, 2009), pursuant to which MOEX Offshore conveyed to BP E&P its interest in the Gouda Prospect site, and BP E&P, in exchange, conveyed to MOEX Offshore a 10% interest in the Macondo Prospect site.   A condition of the Lease Exchange Agreement was that MOEX Offshore pay BP E&P "cash consideration of 1.92 million dollars," to be "allocated" to the Macondo Prospect lease. The Lease Exchange Agreement also refers to a February 15, 2008, operating agreement between BP E&P, as operator, and the MOECO

-65-

911133.4

subsidiary, MitEnergy, as non-operator, concerning the Gouda Prospect lease. Upon information and belief, Plaintiffs allege that it was in fact MOECO that caused and directed MOEX Offshore to enter into the Lease Exchange Agreement for the purpose of obtaining a leasehold interest in the Macondo Prospect.

247.    On or about October 1, 2009, BP E&P, as the Operating Party, and MOEX Offshore, as a Non-Operating Party, entered into the Operating Agreement. On or about December 17, 2009, BP E&P, MOEX Offshore, Anadarko, and Anadarko E&P executed a "Joinder" of the Operating Agreement. Subsequently, the parties to the Operating Agreement held the following working interest ownership percentages in the lease of the Macondo Prospect: BP E&P, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and Anadarko, 2.5%.

248.    At all times relevant herein, MOECO has dominated and controlled the business, operations, policies, and actions of MOEX Offshore and MOEX USA to the extent that there is no meaningful distinction between them and MOECO, and they are more accurately described as agents and/or alter egos of MOECO, rather than simply its subsidiaries. MOECO dominates and controls MOEX Offshore and MOEX USA through, inter alia: financial, operational, and policy control; a lack of corporate formalities at MOEX Offshore and MOEX USA; and nearly identical directors, managers, and/or executive officers. For example, the same six individuals are directors, managers, and/or officers of both MOEX Offshore and MOEX USA; four of them are also MOECO directors and executive officers, and the Texas Secretary of State lists MOECO's Tokyo address for all of the overlapping directors/officers. MOEX USA and MOEX Offshore also share the same Houston, Texas, office and have a common president, Naoki Ishii. Upon information and belief, Mr. Ishii is the only management-level employee of MOEX Offshore and MOEX USA, and he reports directly to MOECO directors and/or executive officers.

-66-

249.    Although Mr. Ishii has issued public statements with regard to the Deepwater Horizon disaster and the ensuing Spill, it has been MOECO, speaking on behalf of MOEX Offshore and itself, that has been the primary source of public statements concerning the Spill and its aftermath.  MOECO's parent, Mitsui, has also made numerous public statements about the potential impact of the Spill on its financial condition.   Upon information and belief, Plaintiffs allege that all public statements about the Spill and its aftermath by or on behalf of MOEX Offshore, as well as all operational and financial decision-making concerning the Spill and its aftermath (including the payment, or non-payment, of response and clean-up expense invoices from BP E&P), have been made and directed by MOECO (and in some instances, Mitsui).

250.    Thus, neither MOEX Offshore nor MOEX USA are operated as corporations distinct from each other or from MOECO – rather, MOECO conducts its U.S. activities through these agent/alter ego entities, and all activities of MOEX Offshore and MOEX USA should be imputed to MOECO, subjecting MOECO to the exercise of general and/or specific personal jurisdiction in the United States and by this Court.

251.    To the extent necessary, Plaintiffs specifically reserve the right to amend this First Amended Master Complaint to name additional parties defendant, pursuant to future conduct, further information learned through discovery or investigation, or any other reason.

252.    Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

253.    The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Plaintiffs hereby designate this case as an

-67-

admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)

254. In addition, this Court has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA").

255. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

256. Jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

257. Prosecution of this action in this district is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims asserted herein occurred in this district. Venue is otherwise appropriate in this district consistent with 28 U.S.C. § 1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML"). *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, --- F. Supp. 2d ----, 2010 WL 3166434, 2010 AMC 1977 (JPML, August 10, 2010). Venue is also proper pursuant to the OPA, 33 U.S.C. 2717 (b), as the discharge occurred in this district. In addition, venue is proper pursuant to this Court's Pretrial Order No. 20, which allows plaintiffs to directly file their complaints arising out of the Spill in this District.

## FACTUAL ALLEGATIONS

258. On April 20, 2010, Drilling Defendants' workers on the Deepwater Horizon drilling vessel lost control of the subsea oil well they had almost completed. When highly pressurized hydrocarbons leaked into the well, the vessel's emergency equipment failed to stop the oil and gas from blowing out of the well, which led to explosions and a fire on the Deepwater

-68-

Horizon, and ultimately the sinking of the vessel and the resulting Spill.

259.   As described more fully below, the loss of well control was due to the failure of mechanical and cement barriers to seal off the well against the influx of highly pressurized hydrocarbons from the reservoirs surrounding the bottom of the well. The many indications that hydrocarbons were leaking into the well were misinterpreted and/or overlooked by Deepwater Horizon workers for 51 minutes prior to the blowout. Once the hydrocarbons reached the vessel decks, fire and gas prevention and alarm systems on the vessel failed to warn the crew and prevent ignition of a fire. The vessel's subsea BOP also failed to seal the well and stop the flow of hydrocarbons fueling the fire, which exacerbated the disaster.

260.   After the Deepwater Horizon sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for 12 weeks, fouling the environment, damaging and contaminating real and personal property, and doing immense and long-lasting damage to the environment and economy of Plaintiffs and the Gulf of Mexico. Meanwhile, BP downplayed the severity of the Spill and was unprepared for the massive clean up effort required.

261.   All of these failures – to plan, monitor, control, contain, mitigate, and clean up – sprang from decades-long histories of organizational malfunction and myopia on the part of the Drilling Defendants. As the co-chairman of the National Commission investigating the Spill said: "There is virtual consensus among all the sophisticated observers of this debacle that ... leading players in the industry made a series of missteps, miscalculations and miscommunications that were breathtakingly inept and largely preventable."

A.   **The Process of Deepwater Offshore Drilling**

262.   Deepwater offshore drilling for hydrocarbons such as oil and natural gas is an immensely complex, technical process, and a relatively new one that has only developed over the

-69-

last five years. The first challenge is finding the hydrocarbons. Seismic and/or magnetic surveys are taken of the geological formations deep in the Earth's crust below the sea floor, in the hopes of finding "traps:" rock formations that have trapped a reservoir of hydrocarbons beneath an impermeable layer, preventing them from migrating to the surface and escaping.

263.     Upon locating a promising trap of hydrocarbons, drilling vessels such as the Deepwater Horizon are positioned on the sea surface above the proposed well site, and from there begin drilling an "exploratory" well to investigate the viability of the trap. Once the trap is determined to be a worthwhile source of hydrocarbons, the drilling vessel performs "completion" operations to transform the exploratory well into a "production" well that will extract oil or gas from the trap. At this point, wells are sometimes temporarily abandoned — sealed with cement so they are secure against any influx of hydrocarbons from the reservoirs they have penetrated — so they can be reopened by a production vessel at some later date, when the well owner is ready to begin extracting hydrocarbons for production. At the time of the April 20, 2010, blowout, the Deepwater Horizon crew was in the process of preparing the Macondo well for temporary abandonment.

264.     An exploratory well begins with a wide-diameter "pilot" hole drilled into the seabed, generally to a depth of about 300 to 400 feet. The pilot hole is then "cased," or lined with pipe. "Casing" describes both the actual pipe lining a well, in addition to the act of lining the drilled hole — the well bore — with such pipe.

265.     The first section of casing pipe lowered into the pilot hole generally anchors a safety device known as a blowout preventer ("BOP"), which is an appurtenance of the drilling vessel and a part of the vessel's equipment. The BOP is an assembly of hydraulically-operated rams that can be used to partially or totally seal the well during routine drilling activities as well

as in the event of a well control emergency.  In the event of an influx of hydrocarbons into the well, closure of the BOP rams can prevent a "kick" — a small leak of hydrocarbons into the well — from escalating into a "blowout" — the uncontrolled release of hydrocarbons from a well into the surrounding environment.  A BOP can be activated manually from the drilling vessel, or automatically via the automatic mode function ("AMF"), also known as a "deadman switch," which closes the device's most secure rams if both electrical and hydraulic connections to the drilling vessel are severed.  BOP functions can also be activated by using remotely operated vehicles ("ROVs") on the sea floor via the "hot stab" or autoshear functions, which are explained more fully below.

266.    The risk of a blowout is one of the most dangerous and common risks in deepwater drilling, hence the installation of the BOP so early in the well drilling process.  The reservoirs of hydrocarbons trapped in the rock formations miles beneath the sea floor are often highly pressurized, and managing the pressures in a well is a vital — and often volatile — task during drilling operations.  Proper well monitoring will catch small hydrocarbon influxes early, so a kick can be contained and the source of the leak repaired before well control is jeopardized.  All workers on a drilling vessel have the authority to call for work on a well to stop if they have a safety concern, including any indication that hydrocarbons are leaking into the well.  The BOP is then a crucial last line of defense for a drilling vessel and its workers if all other attempts to balance well pressure and counter an influx fail, and the well begins to flow out of control.

267.    Once the BOP is properly positioned and secured over the pilot hole, the drilling apparatus and additional casing sections are lowered down through the BOP into the well, while a pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

268.    As the drilling apparatus moves downward drilling out the well bore hole, drilling

fluid called "mud" is pumped down the center of the drill pipe. Drilling mud is a thick mixture of barite, water, clay, and chemicals that cools and lubricates the drill bit and suspends and carries rock fragments and other drilling debris to the surface as the mud circulates.

269.    Drilling mud is carefully formulated so that its hydrostatic pressure[2] slightly exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process. The weight of the mud pushes back against the pressure of the hydrocarbons in those formations, helping to control against the ever-present risk of kicks and blowouts in the well.

270.    As the well bore is drilled deeper and deeper, additional sections of casing are added to line each newly-drilled open hole section with pipe. Each casing section is secured with a plug of cement. If a well is to be temporarily abandoned before production, then when drilling reaches the hydrocarbon reservoir, the cementing contractor temporarily seals the well off from the hydrocarbon reservoir it has penetrated, isolating the oil and gas to prevent it from leaking into the well, and then places a temporary cement plug below the BOP at the top of the well.

271.    Assuming the design of the well is stable, and proper testing and analysis confirm the integrity of the cement plugs, casing string, and other well components, the drilling vessel can disconnect from the well, temporarily abandoning it until a permanent oil production platform is put into place on the sea surface above the well to begin extracting oil or gas.

**B.    The Macondo Lease, and BP's Exploration Plan and Drilling Permit**

272.    On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and

---

[2] Hydrostatic pressure is the pressure exerted by a fluid due to the force of gravity. The denser a fluid, the higher its hydrostatic pressure. Drilling mud is often very dense (12-16 pounds per gallon), so it can counter the highly pressurized hydrocarbons surrounding a well. In comparison, seawater is relatively light, only 8.6 ppg.

911133.4

exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana.

273.    Before BP could begin operations at the Macondo site, federal regulations required BP to submit an Exploration Plan ("EP") demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.

274.    Federal regulations required that the EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information."   30 C.F.R. §§ 250.212, 250.219, 250.227.

275.    Among the information required to accompany the EP was a "blowout scenario," described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons. Include the estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well.

30 C.F.R. § 250.213 (g).

276.    The oil and hazardous spills information accompanying the EP was required to include an oil spill response plan providing the calculated volume of BP's

> worst case discharge scenario (see 30 C.F.R. 254.26(a)), and a comparison of the appropriate worst case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst case discharge scenario that could result from [its] proposed exploration activities (see 30 C.F.R. 254.26(b), (c), (d), and (e)).

30 C.F.R. § 250.219.

277.   Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

278.   In February 2009, BP filed its 52-page Initial EP for the Macondo prospect site with the MMS. In the Environmental Impact Analysis section, BP repeatedly asserted that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities." In the unlikely event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount it assured the MMS that it was prepared to respond to. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

279.   Based on these assurances, the MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act. As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical exclusion from environmental analysis were predicated on BP's flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill.

280.   After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

## C.   The Macondo Prospect Operating Agreement

281.   Once the EP and drilling permits for Macondo were approved, BP then entered into an Operating Agreement with Anadarko, Anadarko E&P, and MOEX Offshore, as described in paragraph 232 above.

282.   The Operating Agreement defined the roles and responsibilities of the three joint

-74-

leaseholders, including a series of checks and balances regarding health, safety, and environment issues in which the non-operational leaseholders Anadarko, Anadarko E&P, and MOEX Offshore were to receive significant information from BP regarding those issues and had the right to demand further information, as well as to call for meetings on those subjects and conduct their own inspections of the Deepwater Horizon vessel.

283.    As a condition to acquiring their leasehold interests in the Macondo prospect, BP required Anadarko, Anadarko E&P, and MOEX Offshore to execute BP's well plan and Authorizations for Expenditure (AFEs) for Macondo. This put Anadarko, Anadarko E&P, and MOEX Offshore on notice of the following relevant provisions of that well plan: (a) location; (b) the anticipated time necessary to conclude the operation; (c) total depth and target zones; (d) the proposed drilling and completion plans, including the casing program and directional details; (e) details of all coring, logging, and other evaluation operations conducted; (f) information about the drilling rig to be used. The AFEs informed Anadarko, Anadarko E&P, and MOEX Offshore about the financial aspects of the well plan.

284.    The Operating Agreement also granted Anadarko, Anadarko E&P, and MOEX Offshore the rights to suggest their own proposed well plans for drilling exploratory and appraisal wells within the Macondo prospect, to place their own personnel on key drilling and well development teams, to receive substantial information and data about operations (including Insite real-time well data) on an ongoing basis, to call meetings with BP and other parties regarding any aspect of the Macondo prospect, and the right of unanimous approval of all press releases regarding the prospect.

285.    Moreover, a November 2009 amendment to the Operating Agreement gave Anadarko, Anadarko E&P, and MOEX Offshore the right to conduct "health, safety, and

-75-

environmental inspection[s]" with a "right of access to activities and operations" on the rig, as well as to access BP's files, audits, and statistics on health, safety, and environmental issues.

**D.    The Deepwater Horizon's Poor Safety and Maintenance Record**

286.    The Deepwater Horizon was a $560,000,000 dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

287.    At all times relevant herein, the Deepwater Horizon was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D Deepwater Horizon ("Drilling Contract"), and later amendments to that agreement.[3]

288.    Prior to the Spill, Drilling Defendants had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor. Transocean CEO Steven L. Newman admitted prior to the Spill that "we have to improve our safety performance." Just a month before the Spill, in response to "a series of serious accidents and near-hits within the global organization," Transocean commissioned a broad review of the safety culture of its North American operations, including the Deepwater Horizon.

289.    Also prior to the Spill, Drilling Defendants had actual and/or constructive knowledge of significant problems related to the Deepwater Horizon's equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast

---

[3] The parties to the 1998 Drilling Contract, Vastar Resources, Inc. and R&B Falcon Drilling Co., are now BP and Transocean entities, respectively. The Deepwater Horizon, formerly known as RBS-8D, was in the process of being built for R&B Falcon Corp. between 1998 and 2001, during which time Transocean purchased R&B Falcon Corp. Upon completion, the Deepwater Horizon was delivered to Transocean. BP America is a successor-in-interest to Vastar Resources, Inc. Amendments to the Drilling Contract were subsequently signed by representatives of Transocean and BP.

systems used to stabilize the vessel in the water, and other significant deficiencies that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." These equipment and maintenance problems are discussed more fully below.

290. Even if Drilling Defendants' equipment and operations inspection reports were ostensibly in compliance with MMS regulations, reports have surfaced that oil companies often authored their own inspection reports, submitting them for rubber-stamping by the MMS. Thus any seeming compliance with MMS inspection report regulations lacks credibility and does not protect Drilling Defendants' actions.

### E.  Macondo: A Troublesome Well

291. The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations. At the Macondo site, the Deepwater Horizon was conducting drilling operations in excess of 18,000 feet. Drilling Defendants knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

292. Drilling Defendants had been struggling with the Macondo well even before the catastrophic events of April 20, 2010. In emails weeks before the blowout, BP employees referred to it as a "crazy," "nightmare" well. At depths almost 3.5 miles below the sea floor, the pressures within and strengths of the various formation layers the Deepwater Horizon was drilling through varied widely and changed often, requiring constant adjustments to drilling fluid density and other factors. In some places the subsea rock formations were so brittle that they fractured, letting gallons of expensive drilling mud escape into the cracked and porous rock

-77-

around the drill.

293.    Deepwater Horizon workers reported that since drilling began on October 7, 2009, they had struggled to control the problematic well, as kicks of natural gas regularly burst into the well, halting the drilling progress.  According to a NOAA Flow Rate Technical Group report, the hydrocarbon reservoirs the Macondo well drilled through have high ratios of gas to oil.  The MMS had even warned BP that the gas buildup in this well was a concern and that BP should "exercise caution."

294.    As the drilling schedule fell farther behind due to these and other problems, Drilling Defendants, and BP in particular, increased the pressure on the Deepwater Horizon's crew to "bump up" the speed of the drilling effort at Macondo.

295.    On March 8, 2010, Drilling Defendants experienced serious problems with the well, including a hydrocarbon influx into the well and loss of well control.  The hydrocarbons leaking into the well went unnoticed for about 33 minutes, allowing 40 barrels of hydrocarbons to flow into the well before it was shut in to restore well control — a "near miss" of what could have been a lethal blowout.

296.    The March 8, 2010, influx was caused by damage to the formation the Deepwater Horizon was drilling through — the brittle rock fractured, swallowing up drilling tools and fluids, in addition to allowing hydrocarbons into the well.  A BP analysis of the March 8, 2010 near miss deemed the drilling vessel team's 33-minute response time to the hydrocarbon influx was too slow.  A "lessons learned" document was distributed to BP employees, and both BP and Transocean leaders on the Deepwater Horizon were given verbal feedback about the handling of the event.  Several key individuals who were present during the March 8, 2010 incident were also working on the Deepwater Horizon six weeks later at the time of the April 20, 2010,

-78-

911133.4

blowout.

297.    The formation damage from the March 8, 2010, incident was so severe that a length of drilling pipe became stuck in the open hole of the well bore, and Drilling Defendants were forced to abandon the lower part of the well bore, plug it with cement, and begin drilling anew in a different direction, setting then back several days and $25 million.  According to Mike Williams, a Transocean electronics technician on the Deepwater Horizon, it also caused BP and the other Drilling Defendants to further increase their demands that the drilling vessel's crew complete drilling operations at the well at a dangerously increased pace.

298.    Pursuant to their Drilling Contract, BP was paying Transocean approximately $500,000 per day to lease the Deepwater Horizon, not including contractors' fees.  BP had planned for the drilling work at Macondo to take 51 days, at a cost of approximately $96,000,000.

299.    At the time of the blowout, drilling at Macondo was already months behind schedule, costing BP over $1 million per day in vessel lease and contractor fees and putting them increasingly over budget.  This excess cost put the Macondo project in conflict with BP's recent mandate of a 7% reduction in costs for all of its drilling operations in the Gulf of Mexico.  In spite of the difficult and dangerous nature of the Macondo well, Drilling Defendants made multiple decisions about the drilling plan for economic reasons, even though those decisions increased the risk of the catastrophic failure of the "nightmare" well.

300.    After investigating the disaster, Robert Bea, an oil industry expert leading the Deepwater Horizon Study Group, wrote: "Pressures to complete the well as soon as possible and minimize costs as much as possible are evident in the cascade of decisions and choices that led to the blowout."

-79-

301. Drilling Defendants repeatedly chose to violate industry guidelines and government regulations, and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well. Testimony of employees on the drilling vessel highlights the time pressure BP and the other Drilling Defendants were putting on workers as they rushed them to double up on tasks and finish quickly so the well could be sealed and the Deepwater Horizon moved to another well prospect site to begin searching for even more oil.

302. This emphasis on speed and thrift over safety led to errors and omissions by Drilling Defendants which, in turn, caused and/or contributed to the blowout and the subsequent Spill.

F.    **Reckless Decision-Making in the Rush to Complete the Well**

303. By April 9, 2010, Drilling Defendants had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained. In their rush to complete the well, Drilling Defendants made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

304. Since the Spill, a series of governmental investigations and hearings has gradually produced evidence and testimony about the bad decisions, tradeoffs, actions, and inactions that led to this disaster, revealing a "ghastly" story of Drilling Defendants making "one bad call after another," according to the chairmen of the presidential commission investigating the Spill at a November 10, 2010 hearing.

305. In short, as Robert Bea put it, "critical things were compromised for the wrong reasons in the wrong ways at the wrong times."

-80-

911133.4

306.   "Each company is responsible for one or more egregiously bad decisions" in "a suite of bad decisions," many still inexplicable, involving tests that were poorly run, alarming results that were ignored, proper warning systems that were disabled and safety barriers that were removed prematurely at the high-pressure well, the presidential commission chairmen said. Taken together, these actions constituted "a cascade of deeply flawed failure and signal analysis, decision-making, communication, and organizational-managerial processes" that led to the blowout, in the words of the independent experts in the Deepwater Horizon Study Group.

307.   Even BP has admitted that no one company's single action or inaction caused this disaster, but rather "a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interfaces" by "multiple companies, work teams and circumstances" came together to cause the blowout and the Spill.   Deepwater Horizon Accident Investigation Report, BP (September 8, 2010).

## 1.   Cutting Corners on Well Design

308.   For the behind-schedule and over-budget Macondo well, Drilling Defendants chose a vulnerable well design with relatively few barriers against the ever-present risk of hydrocarbon blowouts because the safer option — which had been part of their original well design and was recommended by their contractors — would have taken longer to complete and would have cost up to an additional $10 million.

309.   In keeping with Macondo's intractable nature, the last section of the well had been difficult to drill because of the narrow margin between the minimum pressure needed to keep the hydrocarbons in the surrounding reservoirs from leaking into the well, and the maximum pressure the rock formations themselves could take before fracturing and causing damage, delay, or loss of well control.  The limited range of safe operating pressures in this last

-81-

open-hole section of the well required careful choices to maintain well integrity and safety during the drilling and cementing processes.

310.    In order to strengthen the well design and provide multiple barriers against blowouts, drilling companies often use a redundant casing design called a "liner/tieback," which provides four barriers against blowouts, while the "long string" casing design chosen by BP only provided two: the cement sealing off the hydrocarbons in the reservoirs from entering the well and, more than 18,000 feet above that, the seal assembly at the top of the well.

311.    Although the liner/tieback design is more expensive and takes more time to install, it provides four barriers against hydrocarbons leaking into the well and causing blowouts: (1) the cement at the bottom of the well; (2) the hanger that attaches the liner pipe to the existing casing in the well; (3) the cement that secures the tieback pipe on top of the liner; and (4) the seal assembly at the wellhead.

312.    Drilling Defendants were aware that the long string design was the riskier option. An undated BP "Forward Review Plan" recommended against the long string option because of the risks: "Long string of casing *was* the primary option" but a "Liner[/Tieback] ... is now the recommended option."

313.    The BP Forward Review Plan identified several arguments against using the long string casing design, including the high risk of a failed cement job, the inability to comply with MMS regulations, and the need to verify the cement job with a cement bond log test and most likely perform remedial cement job(s).

314.    The BP Forward Review Plan also noted a number of advantages to using the liner/tieback design, including the liner hanger acting as an additional barrier against influxes, a higher chance for a successful cement job on the first try, and the flexibility to postpone a

-82-

remedial cement job, if it was found that one was required.

315.   The long string casing design was especially inappropriate for a difficult and kick-prone well like Macondo.   Documents show that BP had originally planned to use the safer liner/tieback design, but rewrote the drilling plan just weeks before the disaster — against the advice of its contractors and its own employees — because the project was behind schedule and over budget.  Internal BP emails from late March 2010 acknowledged the risks of the long string design but chose it as the primary option because it "saves a lot of time...at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case."

316.   Despite the known and documented operational risks and advantages to the respective well design options, one or more of the Drilling Defendants chose (or acquiesced to the choice) to install the long string casing instead of the safer liner/tieback design. There is no evidence that there was any motivation behind that decision other than the desire to save time and cut costs on the behind-schedule and over-budget well.

317.   Drilling Defendants also made a risky choice for the casing pipe material itself, using metal well casings that raised concerns from their own engineers.  Federal investigators cited internal documents showing that as early as 11 months prior to the blowout, BP engineers worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well.  Senior drilling engineer Mark E. Hafle warned other BP employees that "I have seen it happen so know it can occur."  Using the metal casings also violated BP's own safety policies and design standards.  Nevertheless, the riskier metal casings were used after special permission was granted by BP supervisors.  The internal reports do not explain why BP allowed for such a risky departure from its own safety standards, nor why the other Drilling Defendants allowed BP to use unsafe casings inappropriate for use in the highly pressurized

-83-

environment in the Macondo well bore.

318.   In addition to the casing-related problems, the Weatherford-manufactured float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20,2010 blowout.

319.   A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.  A check-valve assembly fixed within the float collar works like a one-way valve, allowing drilling fluids or cement to be pumped in one direction through the valve, but preventing backflow of the fluids or cement when pumping is stopped, and preventing any influx of hydrocarbons below the float collar from rising farther up the casing.  Failure of the Macondo well's float collar would have allowed hydrocarbons to flow up through the casing, towards the riser and the Deepwater Horizon at the surface, contributing to the blowout and the subsequent explosions, fire, sinking, and Spill.

320.   To properly prevent against backflow of fluids or hydrocarbons into the casing, a float collar must be "converted," or closed after installation.  Prior to conversion, an "auto-fill tube" holds the float collar's one-way check valves open so that mud can flow through without having to be pumped through with high force that could damage the formation –especially important when working in brittle formations like those at the bottom of the Macondo well.  A float collar is converted by partially blocking the bottom of the autofill tube, which essentially pops the autofill tube out of the check valves, allowing them to close.

321.   Drilling Defendants installed the Macondo well's float collar after the final casing was installed in the well.  When they attempted to convert the float collar, however, there seemed to be some blockage preventing the mud circulation that would have completed the conversion.  The drilling vessel crew made nine attempts to re-establish circulation by increasing

-84-

pressure in the casing, eventually succeeding with a pressure of 3142 psi — six times higher than the normal pressure needed to convert a float collar. In their report, BP's disaster investigation team questioned whether this burst of high pressure actually converted the float collar, or just cleared the blockage that had been preventing circulation in the first place.

322.    Later, vessel workers had to use another burst of abnormally high pressure to rupture a "burst disk" in one of the well's Weatherford-manufactured wiper plugs. The burst disk did not rupture until 2900 psi was applied — three times the amount of pressure usually required. The various post-Spill investigations have been unable to explain the need for such atypically high pressures to convert the float collar (if it even converted at all) and to rupture the burst disk. At the time they occurred, these anomalies should certainly have raised concern in the minds of Drilling Defendants' and Weatherford's personnel.

### 2.    Using Too Few Centralizers

323.    Drilling Defendants also cut corners — again despite multiple warnings from their employees and contractors — with the number of centralizers used on the last piece of casing pipe. Centralizers ensure that the casing pipe is centered in the well bore; if the pipe is not centered, the cement placed around it often fails to create a secure seal against the highly-pressurized hydrocarbons surrounding the well. The cement around the casing is intended to seal the space (the "annulus") between the rock walls of the drilled out well bore hole and the casing that runs through the well bore. If the casing is not centered within the wellbore, the pipe can lay near or against the sides of the bore hole, creating too narrow of a space for the cement to set properly and leaving "channels" of empty space or weak areas in the cement. Those channels and imperfections can allow hydrocarbons to escape out of the formations and into the well, causing a kick or a blowout. An email from shore-based BP Operations Vice President Brett

-85-

Cocales to rig-based BP drilling engineer Brian Morel acknowledged the importance of centralizers, noting that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."

324.   The American Petroleum Institute ("API") Recommended Practice 65 explains: "If casing is not centralized, it may lay [sic] near or against the borehole wall....It is difficult if not impossible to displace mud effectively from the narrow side of the annulus if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation."

325.   On or about April 5, 2010, BP notified one or more of the other Drilling Defendants that it was planning to use only six centralizers on the final casing section at the Macondo well. Halliburton engineer Jesse Gagliano spent a day running models to determine if six centralizers would be enough to prevent channeling that gaseous hydrocarbons could seep through. Halliburton's analysis concluded that 21 centralizers was the recommended number to ensure a secure cement job; using ten would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem. This information was provided to BP. Additional centralizers were available on the Deepwater Horizon, but BP well site leaders erroneously believed they were the wrong type, and did not want to wait for more. In the same email that had recognized the risks of proceeding with insufficient centralizers, BP official Brett Cocales shrugged off using only six, flippantly concluding, "who cares, it's done, end of story, will probably be fine."

326.   Halliburton, hired for its cementing expertise, was fully aware that the number of centralizers BP chose to use was unsafe. Halliburton employee Marvin Volek had warned the BP well site team that BP's cementing plan "was against our best practices." Yet even after running the models that made it clear proceeding with only six centralizers would lead to "failure

-86-

of the cement job," Halliburton did not stop work or insist that BP use additional centralizers, instead recklessly proceeding with the cement job it knew was destined to fail.

### 3.   Skipping Critical "Bottoms Up" Mud Circulation

327.   Another questionable decision made by one or more of the Drilling Defendants was the failure to fully circulate the drilling mud through the entire length of the well before beginning the cementing job.  This procedure, known as "bottoms up," cleans the well bore and prepares the annular space for cementing by completely circulating the drilling fluids from the bottom of the well all the way to the surface.  A bottoms up circulation also ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement, permits a controlled release of gas pockets that may have entered the mud during the drilling process, and allows workers on the drilling vessel to test the mud for influxes of gas. Given that gaseous hydrocarbons leaking into the well was what ultimately caused the blowout, a bottoms up circulation could have revealed the severity of the situation at Macondo before it was too late.

328.   The API guidelines recommend a full bottoms up circulation between installing the casing and beginning a cementing job.  The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility.  The drilling fluid should be conditioned until equilibrium is achieved.  At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."

329.   Halliburton technical advisor Jesse Gagliano told BP that Halliburton's "recommendation and best practice was to at least circulate one bottoms up on the well before doing a cement job."  Yet again, Halliburton knew of the risk but did not insist that BP follow

-87-

safe and recommended practices.

330.   Even BP's own April 15, 2010 operations plan for the Deepwater Horizon called for a full "bottoms up" procedure to "circulate at least one (1) casing and drill pipe capacity, if hole conditions allow."

331.   But a full bottoms up circulation would have taken up to 12 hours on the deep Macondo well, so against the recommendations of the API and Halliburton, and against industry standards and its own operations plan, BP chose to save time and money at the expense of safety by circulating only a small fraction of the drilling mud before beginning cementing.  This too put the cement job further at risk.

332.   Notwithstanding all of Drilling Defendants' risky choices and skipped safety precautions up to this point, and despite knowing the risks of using insufficient centralizers and skipping the bottoms up circulation, Halliburton began the cementing job on the Macondo well.

### 4.   Cementing: the Incorrect Cement Mixture and a Failed Seal

333.   Creating solid cement seals on a well is delicate, precise work, and among the most critical tasks to ensure the integrity and safety of the well.  Nevertheless, after cutting corners on well design and the number of centralizers, and incomprehensibly skipping the bottoms up circulation, Drilling Defendants made even more cost-cutting, careless decisions about the crucial cementing work in the Macondo well.

334.   Drilling Defendants knew or should have known that poor cementing increases the risk of a blowout.  In a 2007 study, the MMS expressed concerns about drilling vessel blowouts caused by ineffective and/or improper cementing work.  Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continue with some regularity, and most frequently in the Gulf of Mexico.  The study

-88-

found that cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991. Nearly all of the blowouts examined occurred in the Gulf of Mexico.

335.    Drilling Defendants also knew or should have known that careless, ineffective, negligent, or reckless cementing work by Halliburton caused an August 2009 blowout at the Montara well in the Timor Sea off the coast of Australia. During that incident, a sequence of events almost identical to those at Macondo led to a similarly disastrous blowout, and a spill that gushed oil for ten weeks, causing environmental damage across a 200-mile radius.

336.    Prior to beginning cementing operations on the last section of the Macondo well, Halliburton had to make decisions about the type, volume, placement, and pumping of the cement, while taking into account the narrow range of safe operating pressures at the bottom of the well, in addition to the gaseous nature of the hydrocarbon reservoirs surrounding the well.[4] Halliburton also knew that BP had not properly prepared the annulus for the cement job by performing a bottoms up circulation, and that BP was not planning to use the recommended number of centralizers on the casing pipe.

337.    This cementing job was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the casing pipe to prevent an influx. The composition of the cement mixture ("slurry") that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well. During placement, the slurry would have to be light enough to avoid fracturing the brittle formations surrounding the

---

[4] The ratio of gas to oil in the hydrocarbon reservoirs is significant because it increases the likelihood that gas will permeate the cement as it is setting, channeling and weakening the cement, and preventing it from forming a secure seal against hydrocarbon pressure.

well, but once set, the slurry would have to be strong enough to resist the intense, nearly 12,000 psi pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well. Despite these challenges, Drilling Defendants, including BP and Halliburton, improperly designed the cement slurry and failed to thoroughly conduct and/or review the results of laboratory testing of the cement slurry stability under conditions that would be found in the Macondo well.

338. Halliburton ultimately recommended a foamed cement mixture to seal the bottom of the Macondo well. Foam cement is cement that has been injected with nitrogen gas to lower its density. But high temperatures and pressures in wells like Macondo can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

339. On October 28, 2010, Fred Bartlitt, Jr., the lead investigator for the presidential commission investigating the Spill, reported that tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo well.

340. Halliburton and BP already knew the Macondo well was located in brittle, variable, challenging rock formations laced with volatile high temperature, high pressure, gaseous hydrocarbon reservoirs that had plagued drilling operations in the past. Using Halliburton's recommended cement mixture in Macondo's rock formations was "a recipe for disaster," Robert Bea told the *Washington Post*.

341. The presidential commission's investigators asked Halliburton to provide them with samples of materials like those used at the Macondo well; independent testing of those

-90-

samples could not generate stable foam cement in the laboratory using the materials provided by Halliburton, which, according to Bartlitt, strongly suggests that the foam cement used at Macondo was unstable during that cement job as well.

342.    Independent tests conducted for BP's investigation of the disaster were also unable to generate a stable slurry using a mixture as similar as possible to Halliburton's slurry in conditions like Macondo's.

343.    Prior to using its slurry mixture in the Macondo well, Halliburton conducted at least four foam stability tests on it, or on similar formulations, but the tests were incomplete and substandard, and mostly indicated the slurry would not be stable in the Macondo well.

344.    In February 2010, Halliburton conducted the first two tests on a cement slurry that was slightly different than that ultimately used; both tests indicated that this foam slurry design was unstable if used in Macondo conditions. According to Bartlitt's report, Halliburton provided the results of the February testing to BP by e-mail on March 8, 2010.

345.    Halliburton conducted two other foam stability tests in April 2010, this time using the actual slurry mixture and design ultimately used in the Macondo well. On April 13, seven days before the blowout, testing indicated the foam slurry design was unstable. Bartlitt reports that the results of this test were reported internally within Halliburton by at least April 17, 2010. In a second April test, Halliburton modified the testing procedure and the data indicated, for the first time, that the foam slurry mixture would be stable if used at Macondo. It is not clear if BP received the results of either of the April tests from Halliburton before it allowed Halliburton to begin cementing.

346.    Oil industry expert Robert Bea told the Washington Post that drillers will often run one test on a proposed cement mixture, then a second test as a backup. Bea considered

-91-

Halliburton's four tests "unusual... [T]hat's telling me they were having trouble getting to a stable design."

347.    Despite the four tests Halliburton did run on the slurry mixture, the testing was not comprehensive, thorough, or consistent with industry standards.   For example, as BP's investigation team noted, Halliburton did not provide results for such commonly tested cement slurry parameters as fluid loss, free water, foam/spacer/mud compatibility, static gel strength transition time, zero gel time, or settlement.

348.    Bartlitt reported to the presidential commission that, taken together, the Halliburton documents indicated that:

      (a)    Only one of the four tests .... that Halliburton ran on the various slurry designs for the final cement job at the Macondo well indicated that the slurry design would be stable;

      (b)    Halliburton may not have had — and BP did not have — the results of that test [showing stable results] before the evening of April 20, meaning that the cement job may have been pumped without any lab results indicating that the foam cement slurry would be stable;

      (c)    Halliburton and BP both had results in March showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data; and

      (d)    Halliburton (and perhaps BP) should have considered redesigning the foam slurry before pumping it at the Macondo well.

349.    In addition to having seen slurry test results showing the instability of Halliburton's proposed cement mixture, BP was also aware of the incomplete, substandard

-92-

nature of Halliburton's tests, which failed to provide results for several commonly tested parameters. Nevertheless, BP did not insist that Halliburton reformulate its cement slurry or perform the missing standard tests before proceeding with this tricky and important final cement job. Indeed, in its rush to complete the well, BP likely charged ahead having only ever seen Halliburton's first three slurry test reports – all of which indicated the cement would be unstable in the well.

350.    Unstable foam cement slurry can result in nitrogen breakout, when bubbles of nitrogen create tiny holes in the cement as it is setting, leaving the cement porous and unable to form a seal against the hydrocarbon pressure. Nitrogen breakout not only jeopardizes the foam cement itself, but can also contaminate the other types of cement it is pumped with, interfering with their proper placement and/or degrading their ability to form a secure seal. Nitrogen breakout in the unstable foam slurry used at Macondo could have weakened the denser, non-foamed cement used to plug the very bottom of the last casing pipe, leaving it also unable to withstand the pressure of the hydrocarbons surrounding the well.

351.    In addition to the formulation of the cement mixture, the volume of cement used is another factor in ensuring a successful cement job. Halliburton used a small volume of cement for this last section of the Macondo well. According to the interim report by the National Academy of Engineering ("NAE") scientists investigating the Spill, the concern with using a small volume of cement is "the potential for contamination of the entire slurry volume simply because less cement is present." This was especially relevant at Macondo, where the high gas-to-oil ratio in the hydrocarbon reservoirs surrounding the well presented a risk of gas contaminating the cement during the setting process.

352.    The NAE panel also expressed concern that the flow rate Halliburton chose to use

-93-

when pumping the cement into the well was too low to achieve "turbulent flow," a condition that helps push the mud out of the annulus during the cement placement.

353.    Given the extremely narrow range of safe operating pressures Drilling Defendants were faced with in this last section of the well, it was all the more important to monitor well flow during the cementing process, to ensure there were no indications of fluid loss or fracturing of the formations around the bottom of the well.  By monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that every barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well.  These "full returns" indicate that the cement is displacing mud from the annulus as planned.  If less mud flows out of a well than the amount of cement that is pumped in, fluid is being lost, most likely into fractures in the brittle formations.

354.    Although BP claimed there were full returns during the last cementing job at Macondo, Halliburton cementer Nathaniel Chaisson testified that there was no monitoring system in place that could have confirmed full returns during cementing operations.  Moreover, data presented to the congressional investigators by Halliburton cementer Vincent Tabler indicated that about 80 more barrels of cement were pumped into the well than barrels of mud that flowed out.  This fluid loss would indicate that the brittle formations at the bottom of the well had fractured during the cementing process, allowing fluids and cement to escape into the fissures in the rock, and ruining the cement job.  During its congressional testimony in September 2010, BP suggested that 50 barrels of the apparent fluid loss were due to compression of nitrogen in the cement.  Nevertheless, BP should have had a flow monitoring system in place during the cementing process, and any losses due to nitrogen compression should have been anticipated and compensated for during the interpretation of the flow monitoring data.

-94-

**5.    Despite Red Flags, Drilling Defendants Skip Crucial "Bond Log" Test of Cement Integrity**

355.    After having made risky choices on well design, casing choice, the number of centralizers, skipping the bottoms up circulation, and using an unstable cement slurry, all of which sharply increased the risk that the cement job would fail, BP then made the unfathomable decision to cancel the "cement bond log" test, which would have checked the integrity of the completed cement job by using an imaging tool to gauge the thickness of the cement, and to determine if the cement was properly bonded to the casing and the rock formations surrounding the well.

356.    This decision was again contrary to BP's own original drilling plan, which included the cement bond log test.  Skipping the cement bond log was also contrary to BP's own internal standards, which do not consider full fluid returns a "proven cement evaluation technique," and furthermore require a cement bond log test if a well's cement design provides for less than 1000 feet of cement above the highest hydrocarbon layer — BP's Macondo plan only provided for 500 feet.

357.    But despite its own drilling plan, internal standards, and the simulations predicting cement failure, and despite warnings from its contractors and its employees regarding the risk of cement failure due to well design and insufficient centralizers, BP again rewrote its drilling plan on the fly, cancelling the cement bond log test and turning back the team from Schlumberger Ltd. that had arrived on the drilling vessel specifically and solely to perform the test.

358.    BP's only reasoning for skipping this absolutely critical and required test seems to have been a savings of approximately $128,000 and less than 12 hours of work.

359.    Gordon Aaker, Jr., an engineering consultant hired by the Congressional

-95-

committee investigating the disaster, testified that it was "unheard of" and "horribly negligent" not to perform a cement bond log test on a well using a single casing design like the Macondo's.

360.    Moreover, skipping the test was a violation of MMS regulations, which require that a cement bond log test be conducted if there are indications of an inadequate cement job. 30 C.F.R. § 250.428.

361.    Tommy Roth, a Halliburton Vice President of Cementing, also said BP should have conducted a cement bond log: "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test." Yet on board the Deepwater Horizon, neither Halliburton nor any of the other Drilling Defendants called to stop work or otherwise insisted that BP run the cement bond log test before proceeding.

### 6.    The Casing Hanger Lockdown Sleeve: Another Skipped Safety Precaution

362.    As discussed above, the riskier long string well design Drilling Defendants chose for Macondo meant that there were only two barriers to a hydrocarbon blowout: Halliburton's cement job isolating the hydrocarbon reservoirs from the well and the seal assembly at the wellhead on the sea floor.   Given the insufficient number of centralizers, the failure to run a bottoms up mud circulation prior to cementing, and the results of Halliburton's and BP's own simulations, the risk of a failed cement job at Macondo was already high, making the strength and integrity of the seal assembly at the wellhead — the second and final barrier against a blowout — paramount.  Yet here again BP made a decision based on time and money rather than well, worker, and environmental safety: it did not deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below, as it likely was on April 20, 2010.

-96-

363.   A casing hanger lockdown sleeve ties down the seal assembly at the top of a well, providing an extra layer of protection against a blowout, much like the wire cage over the cork on a champagne bottle. During drilling, heavy mud counters the pressure from the hydrocarbons around the well, preventing their influx into the annulus and the casing. Once the well is properly sealed, with the cement isolating the pressurized hydrocarbons from the well, the heavy mud is pumped out and replaced by less dense seawater. Usually the casing hanger lockdown sleeve is deployed before the heavy drilling mud is pumped out of the well, so that it can offer an extra shield against any problems during and after the mud displacement process.

364.   Contrary to industry standard, BP's plan was to deploy the casing hanger lockdown sleeve *after* the heavy mud had been displaced with seawater. A well design expert at another major oil company expressed surprise at BP's choice to displace the mud before deploying the casing hanger lockdown sleeve, saying it was "not the norm." BP had chosen to shake the champagne bottle with only a faulty cork — Halliburton's unsound cement job — standing in the way of disaster.

### G.   Premature and Nonstandard Mud Displacement Begins

365.   BP and the other Drilling Defendants were so focused on speed that they could not even wait the 72 hours required for the cement job to fully set before pressing forward with the mud displacement. Without the heavy drilling mud to counter the reservoir pressure, any hydrocarbon influx into the well could turn dangerous very quickly, with only comparatively light seawater blocking the path up through the well and the riser to the surface. Given the danger of hydrocarbons springing through a faulty, unset cement job, Halliburton should not have permitted BP to begin mud displacement unless it was absolutely certain that its cement job had successfully isolated the hydrocarbon reservoirs and sealed the well, yet there is no evidence

-97-

that Halliburton ever protested BP's premature mud displacement.

366. Unlike Halliburton, Transocean officials did initially protest BP's displacement plan, getting into a "skirmish" with a BP official at a meeting about the drilling procedures. But even so, Transocean never exercised its right to stop work on the well in protest of BP's unsafe plan, and indeed soon acquiesced to BP's desire to rush the mud displacement at Macondo.

367. On the morning of April 20, 2010, the day of the blowout, BP informed M-I drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet. In his congressional testimony, Lindner did not mention why BP was displacing almost 28 times the usual amount of heavy mud, nor did he say that he questioned the decision, despite its atypicality.

368. Lindner calculated a mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job. Lindner testified that he distributed copies of his mud displacement plan to BP, Transocean, and M-I employees on the drilling vessel; thus some, if not all, of the Drilling Defendants were aware of and complicit in BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

**H.    The Well Fails Key Pressure Tests, Yet Drilling Defendants Press On**

369. Two types of pressure tests are used to confirm the integrity of a well. The integrity of the casing pipes and assembly is assessed with a "positive pressure" test, which involves increasing pressure in the casing string and observing the pressure response. If the

increase in pressure bleeds off, it indicates a problem with the pressure integrity of the casing: the pumped-in pressure is escaping through a leak somewhere along the line. However, if the increased pressure stays constant, it does not necessarily mean the casing assembly is secure — the external pressure from the hydrocarbons around the well can be sufficient to maintain the increased pressure reading in the casing string even if there is a breach. Thus, a negative result (where the pressure leaks off) is useful because it is diagnostic of a leaky casing string. A positive result (where the pressure remains constant), is not diagnostic of a secure casing string or a leaky casing string, and basically tells workers nothing about the integrity of a well's casing and pipe assembly.

370.     On April 20, 2010, the Macondo well had a positive result to its positive pressure test, which neither confirmed nor denied the integrity of its casing string.

371.     At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process. According to M-I's mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

372.     The BOP's annular preventer was closed to seal casing string for the negative test, but for some reason did not form a secure seal, which allowed about 50 barrels of spacer fluid to leak through the BOP and into the well. This meant that dense, viscous spacer fluid was across the inlets to several small-bore pipes that were to be used for the negative pressure test, rather than the plain seawater that should have been across the pipe inlets. Drilling Defendants were aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet they took no steps to remedy the situation.

-99-

373. The negative pressure tests were intended to assess the security of Halliburton's cement job at the bottom of the Macondo well. With the casing string sealed, pressure was bled off from inside the well, "underbalancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself. If Halliburton's cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flow out of the well and the pressure in the casing would remain at the reduced, underbalanced level. An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and repressurize the casing string.

374. Drilling Defendants' two negative pressure tests on the Macondo well both yielded abnormal results. In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state. In the other test, the pressure in the well *increased* from 50 psi to 1,400 psi – a highly diagnostic "red flag" result indicating that Halliburton's cement job had failed to seal off the well from the surrounding hydrocarbon reservoirs. The 1,400 psi pressure response and the excess fluid returns were indications that hydrocarbons were flowing into the well, re-pressurizing it after it had been underbalanced for the negative pressure test. The pressure tests themselves may have further damaged and weakened the cement in the well. Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

375. It is also possible that the pressure tests themselves further damaged and weakened the cement in the well. Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet

-100-

above the bottom of the well during the tests.

376.   Experts later testified that BP's interpretation of the pressure tests was not industry standard, while BP itself admitted to Congressional investigators that continuing work on the well after such alarming test results may have been a "fundamental mistake."   In May 2010, BP admitted to congressional investigators that these pressure test results were clear warning signs of a "very large abnormality" in the well.

377.   Later, in its September 8, 2010, disaster investigation report, BP concluded that the negative pressure test result of 1,400 psi was misinterpreted by Transocean and BP employees on the Deepwater Horizon, leading the vessel crew to the erroneous view that the test was a success and well integrity had been established.   Moreover, BP's investigation found no evidence that the drilling vessel's workers consulted anyone outside their teams on the vessel or onshore about the abnormal pressure reading, as they should have, before coming to their incorrect conclusion that the well was secure.   The well site leader should have called experts on the drilling vessel or on the beach to discuss the results, BP Vice President Steve Robinson testified in congressional hearings in December 2010.

378.   Halliburton was also grossly negligent in ignoring the pressure test results and not insisting that a remedial cement job be done right away to correct the imperfections in the cement.   Given its experience and expertise with cementing wells, and the recent disaster its poor cementing work had caused at the Montara well off Australia, Halliburton was certainly aware of the environmental and safety risks of a failed cement job, yet it did not insist that the appropriate action be taken to correct the Macondo well's cement seal.

379.   In their November 16, 2010, interim report, the NAE panel wrote that "it is clear that pressure buildup or flow out of a well is an irrefutable sign that the cement did not establish

-101-

a flow barrier" against the entry of hydrocarbons into the well. At Macondo, there was both pressure buildup to 1400 psi and unexpected flow out of the well during the negative pressure tests.

380.   There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct Halliburton's obviously-flawed cement job and shore up the seal against the highly pressurized hydrocarbon reservoirs. Drilling Defendants, however, elected to ignore the "red flag" results of these, the only cement integrity tests they had even bothered to perform, and continue with their well completion plan as if Halliburton's cement job had been a success.

### I.    Unorthodox Spacer Fluid Mixture and Volume Potentially Interfered with Pressure Tests and BOP Functionality

381.   During the mud displacement process, two or more of the Drilling Defendants, specifically including BP and M-I, used an unconventional fluid mixture — and an unusually large volume of it — as "spacer" fluid. This novel composition and amount of fluid may have interfered with the negative pressure test results and/or caused damage or clogging in the BOP.

382.   In oil wells, a "spacer" is a fluid used to create a division between two other fluids, with the spacer fluid physically preventing the two other fluids from coming into contact and mixing with or contaminating one another. In the mud displacement process at Macondo, the spacer was intended to separate the synthetic drilling mud from the seawater displacing it.

383.   Spacer fluid is usually water-based mud, but according to testimony from M-I drilling fluid specialist Leo Lindner, an uncommon mixture of fluids was used as a spacer during the Macondo well's mud displacement process. Instead of mixing a batch of the usual water-

-102-

911133.4

based mud spacer fluid, Lindner combined two "pills"[5] of lost circulation material ("LCM") that had been previously prepared for use in the event of any fluid loss during the cementing job. Unlike the water-based mud typically used as spacer, LCM pills are highly viscous fluid that coagulates to create an extremely thick, stringy mass intended to fill the lost circulation zone, clogging fractures in the rock so that other drilling fluids can no longer escape into the formation. Lindner testified that it was "not common" to use LCM as a spacer, and that he had never done so before, but that BP, Transocean, and MI employees on the Deepwater Horizon were all aware of the unorthodox LCM-based spacer and either approved the use or allowed it to occur without comment.

384.    In addition to the atypical composition of spacer Drilling Defendants used in the Macondo well, the volume of that fluid used was also nonstandard.   Lindner testified that normally a spacer is around 200 barrels of fluid, but in the Macondo well, the two LCM pills that were used as spacer had a combined volume over twice as large: 450 barrels.

385.    Upon information and belief, Drilling Defendants used this aberrant fluid composition and volume as spacer in the Macondo well solely to skirt environmental regulations that would have required more costly and time-consuming hazardous waster disposal procedures for the two unused LCM pills.

386.    As discussed above, the LCM used as a spacer leaked past the annular preventer through the BOP and into the well before the negative pressure test was run.   Drilling Defendants' unusual use of LCM as spacer fluid could have confounded the negative pressure test results by blocking the small-bore pipes used for the tests, and could have negatively affected the functionality and effectiveness of the BOP itself.

---

[5] A "pill" is any small (<200 barrels) quantity of fluid particularly formulated for a specific task that regular drilling fluid cannot perform, such as prevention of circulation fluid loss.

911133.4

J.    **Drilling Defendants Ignore and Overlook Warning Signs of the Imminent Blowout**

387.    Constantly monitoring a well for signs of hydrocarbon influx is so vital for well safety that it is common practice in the industry for employees of several companies on a drilling vessel – the mud-logging company, the drilling contractor, and the lease operator – to focus on it and be ready to take immediate remedial action, according to the NAE's interim report.

388.    After the litany of flippant, short-cutting operational decisions Drilling Defendants made to save time and money completing the Macondo well, they should have been especially attuned to any signs of trouble from the historically intractable well.  But instead of the requisite vigilance, Drilling Defendants had "turned to complacency in the haste to wrap up" operations at Macondo, according to the Deepwater Horizon Study Group, failing to properly monitor the well and ignoring and/or missing an increasingly ominous series of warnings and red flags exhibited by the well in the hours before the fatal blowout.

389.    Pressure and flow data from well in the two hours before the blowout should have put Drilling Defendants on notice that there was a problem and that hydrocarbons were leaking into the well.  Post-spill review of the real-time data that was available on the drilling vessel on April 20, 2010, showed that the first indications of hydrocarbons flowing into the well started at 8:52 p.m., and went unnoticed by Drilling Defendants.  Post-spill modeling indicated that by 9:08 p.m., 39 barrels of hydrocarbons had leaked into the well, but Drilling Defendants still had not noticed the pressure and flow indications of the influx.  It was not until 9:41 p.m., a scant four minutes before the blowout, that Drilling Defendants finally noticed that the well was rapidly filling with hydrocarbons and that immediate well control action was needed.

390.    At 8:52 p.m., the pumps displacing the heavy mud with seawater were slowed, but instead of flow out of the well decreasing accordingly, as it should have, flow increased — a

-104-

clear "red flag" indicating that hydrocarbon pressure from the reservoir below was pushing the mud out of the well faster than the seawater that was supposed to be displacing the mud was being pumped in. Yet Drilling Defendants appear to have completely ignored this first red flag and simply carried on with the mud displacement process.

391.    From 9:08 p.m. to 9:30 p.m. on the night of the blowout, when the mud displacement pump was either running at constant flow or was shut off, pressure in the well steadily increased. Modeling data from BP's investigation of the disaster showed that at this point, hydrocarbons were flowing into the well at about nine barrels per minute. Again, this pressure data should have triggered Drilling Defendants to start well-kill operations to restore control over the pressure, but instead the increasing pressure was ignored or overlooked. In congressional testimony from December 2010, Halliburton mudlogger Joseph Keith admitted that he stepped away from his monitors for a coffee break on the night of the blowout; depending on when he took his break, Keith could have missed key data from the well.

392.    Throughout the evening of April 20, 2010, the actions of the Deepwater Horizon workers were not consistent with a crew that was suspicious of any problems in the Macondo well. In fact, according to congressional testimony, when contacted by a superior at 9:21 p.m., the toolpusher reported that the negative pressure test result had been "good" and that the mud displacement process was "going fine," neglecting to mention the increased flow out of the well or the increasing well pressure.

393.    The mud displacement pumps were shut down completely at around 9:30 p.m., at which point hydrocarbons had been continuously flowing into the well for 38 minutes. Modeling data from BP's disaster investigation showed that about 300 barrels of hydrocarbons had flowed into the well by this time. A few minutes later, at 9:38 p.m., the steadily increasing

-105-

level of hydrocarbons passed through the wide-open BOP into the riser.

394.   Although there may have been some discussion of "differential pressure" in the well once the mud displacement pumps were turned off, there is no other evidence that Drilling Defendants noticed or properly interpreted the many warning signs of the imminent blowout until drilling mud began to spill out of the riser onto the vessel deck at 9:41 p.m., just four minutes before the blowout.

395.   Inexperience may also have affected the choices and competency of the Deepwater Horizon workers during these critical hours.  In BP's chain of command for Macondo operations, five employees had less than five months in their respective positions.  BP's well site leader Robert Kaluza had mostly land-based drilling experience, and admitted he was working on the Deepwater Horizon "to learn about deepwater."  BP also complained to Transocean that turnover on the drilling vessel had been high, including the replacement of experienced drillers with new hires.  "Any further dilution of experienced personnel may be detrimental to the performance of the rig," BP told Transocean in an audit last year.

396.   Investigators for the safety review commissioned by Transocean itself prior to the Spill found that a lack of hands-on experience for Transocean workers and managers contributed to safety concerns, as many workers were too readily promoted without sufficient on-the-job experience to fully appreciate the risks.  "[C]rews are potentially working with a mind-set that they believe they are fully aware of all the hazards when it is highly likely that they are not," the investigators wrote.  Moreover, the Deepwater Horizon Study Group found no evidence that any of the drilling vessel workers or onshore employees directly involved with the Macondo well had formal training or qualifications in risk assessment and management of complex systems such as were found aboard the Deepwater Horizon.

-106-

397.    In addition to carelessness, nonchalance, and/or inexperience causing them to ignore or overlook the harbingers of a blowout, it is also possible that drilling vessel workers, pushed by BP and the other Drilling Defendants to work faster and combine multiple tasks during these final completion operations, were too distracted to properly monitor the well and to notice the alarming signs of imbalance.  A BP well site leader said after the disaster that workers may have taken unusual steps "to save time," such as performing other tasks simultaneously during the mud displacement process.

398.    One vessel worker testified that he was told to clean two tanks during his shift instead of the usual one: "To me it looked like they were trying to rush everything."  A mud logger later testified that he felt uncomfortable with the number of activities being done simultaneously on the day of the blowout.

399.    As hydrocarbons were steadily filling the well and mounting towards the riser, vessel workers' attention was split between mud displacement and other simultaneous tasks like a "sheen test" (which required a change in flow line configuration, depriving workers of data from one of the two flow meters that had been measuring flow from the well until that point), preparations for the upcoming cement plug insertion, the investigation of a problem that had arisen with one of the mud pumps, and the entertainment of BP and Transocean executives ironically onboard to celebrate the Deepwater Horizon's supposedly spotless safety record.

400.    Several of these simultaneously occurring activities impaired vessel workers' ability to monitor pit fluid levels, effectively eliminating that important source of well flow monitoring information.[6]  A few hours after the mud displacement process began at noon,

---

[6] Pit fluid levels provide well flow information by indicating the volume of fluids at the surface. If the volume of fluid pumped into the well equals the volume of fluid returned from the well, pit levels will remain constant.  If there is a hydrocarbon influx flowing into the well, the volume of

*Footnote continued on next page*

-107-

Drilling Defendants began a four-hour offload of mud to the nearby supply vessel M/V Damon Bankston. In addition, some of the mud pits and the trip tanks were being cleaned and emptied during the course of the afternoon. These activities all affected the pit fluid levels, compromising their usefulness as indications of well flow. There is no evidence that Drilling Defendants had any reason to perform these activities during the mud displacement process other than time savings.

401.    Even if there had been a compelling reason to perform the mud offload and pit cleaning activities simultaneously with the mud displacement process, Drilling Defendants could have preserved the useful monitoring function of pit fluid level information by isolating one or more of the pits for well flow monitoring. At the very least, Drilling Defendants could have begun monitoring pit fluid levels again at 5:17 p.m., once the mud offload task was complete, but there is no evidence that pit fluid levels were ever monitored again that afternoon or evening.

402.    The multiple distractions and interference with well data caused by the drilling vessel crew's multitasking left them unable to "detect, analyze, and effectively react to the developing blowout," according to the Deepwater Horizon Study Group. The Group also noted that "perils of parallel processing" have underlain past oil and gas disasters such as the Piper Alpha blowout in the North Sea, and the Exxon Valdez crash. Just as sending text messages and driving a car are each individually safe tasks that can be deadly when combined, the tasks the Deepwater Horizon's crew were performing simultaneously fractured their attention at critical times, with catastrophic results.

### K.    Attempts at Well Control: Too Little, Too Late

403.    While the Deepwater Horizon's crew was distractedly working miles above,

---

*Footnote continued from previous page*
fluid returned from the well will be larger than the amount pumped into the well.

911133.4

highly-pressurized hydrocarbons leaked through Halliburton's faulty, channeled cement and into the casing string of the Macondo well.   Several investigations have concluded that the hydrocarbons flowed into the well through the bottom of the last section of casing pipe, flowing up the casing string, and through the BOP and riser to the surface.

404.   Because of their inattention to proper well monitoring during the mud displacement process, the first sign of this hydrocarbon influx Drilling Defendants seemed to notice was the mud that began spilling out of the riser onto the vessel deck at about 9:41 p.m., 49 minutes after the leak had started at the bottom of the well.

405.   For emergencies like this one, Drilling Defendants' policies and instructions regarding well control procedures for their vessel workers were woefully inadequate.   The procedures only contemplated relatively small influxes into the well, and did not provide guidance on what to do if the initial procedures fail to stop the influx, or whether and when to activate emergency BOP functions such as the emergency disconnect system.

406.   In response to the mud spurting out of the riser at 9:41 p.m., the drilling vessel crew diverted flow from the well into the mud-gas separator, a device used to separate gas out of the drilling fluid and vent it safely into the air.   This diversion would have been the correct protocol if this incident had been a mere kick.   But for a blowout caused by hundreds of barrels of hydrocarbons blasting out of the well, the decision to divert well flow through the mud-gas separator only exacerbated the disaster.

407.   Diversion to the mud-gas separator not only contributed to the explosions on the Deepwater Horizon, but it likely caused them to happen sooner than they might have if well flow had been directed overboard instead.   The gas venting pipes on the Deepwater Horizon's mud-gas separator were goose-necked, which meant they directed the vented gas downwards towards

-109-

the vessel.   When huge volumes of gas began to hiss out of the Macondo well, these goosenecked vents effectively spread highly flammable gas all over the vessel's decks, increasing the likelihood that the gas would find an ignition source.[7]

408.   The volume and pressure of the gas rushing out of the well eventually overwhelmed the mud-gas separator entirely, bursting its seals, and allowing the gas to spread directly under the vessel deck as well, effectively enveloping the Deepwater Horizon in a highly flammable cloud of gas.

409.   The blowout worsened as the high pressure gas flow caused the failure of surface equipment on the drilling vessel, most of which was rated to withstand only 60 – 100 psi.  As each of these seals and systems gave way under the immense pressure, additional flow paths were opened and the blowout gained strength.

410.   The drilling vessel workers, following Transocean's insufficient well shut-in protocol, closed two of the BOP's non-shearing rams, which eventually sealed around the drill pipe at 9:47 p.m.  At this point, all flow paths from the well to the drilling vessel were sealed off except for the drill pipe.  Flow up the drill pipe was prevented by pressure in that pipe.  With the BOP rams now blocking hydrocarbons from entering the riser along the sides of the drill pipe, the blowout could have been contained at this point, had the gas on the drilling vessel not exploded.

### L.   Faulty Vessel Safety Equipment Exacerbates the Blowout, Causing Vessel Explosions, Fire, and Sinking

411.   Investigations and testimony suggest that the initial explosion on the Deepwater

---

[7] Hydrocarbons are in both gaseous and fluid forms in reservoirs, but since gas is less dense than oil, it blew out of the well ahead of the fluid oil.  Thus gas spewed out of the well onto the Deepwater Horizon, and later oil (and gas-oil mix) gushed out of the well into the Gulf of Mexico.

-110-

Horizon on the night of April 20, 2010, was caused by an engine on the vessel deck that sucked in the gas blasting down on the decks from the mud-gas separator vents.

412.    Gas sensors, designed to shut down vessel engines when dangerous vapors are present, are critical to preventing explosions in such situations. Testifying before investigators in May 2010, the Transocean rig mechanic Douglas Brown said gas sensors — and the emergency engine shutdown systems connected to them — were not operational aboard the Deepwater Horizon on the night of the blowout.  Moreover, the automated feature that should have closed the engine's air intake valves upon sensing gas entering the engine room also failed.

413.    Brown further testified that the Deepwater Horizon's engine room was not equipped with a gas alarm system that could have shut off the power.  The installation and maintenance of these sensors, alarms, and emergency shutdown systems on the Deepwater Horizon were the responsibility of Transocean, the vessel's owner.

414.    At approximately 9:48 p.m., the gas sucked into one of the Deepwater Horizon's engines caused it to begin to overspeed.  The vessel lost power less than a minute later, almost immediately followed by two explosions, which ignited the gas enveloping the vessel.  The blaze intensified as damage from the explosions and fire opened new flow paths for the flammable gaseous hydrocarbons spewing out of the well.  BP's investigators found potential flow paths through the mud pumps and through the top of the drill string, as well as the possibility that movement of the drill pipe broke the seal that the BOP rams had made around the drill pipe, re-opening the direct flow path from the casing into the riser.  Via all or some of these flow paths, gaseous hydrocarbons poured onto the vessel, feeding the inferno that engulfed the Deepwater Horizon and ultimately killed 11 crew members, injured 17 others, and destroyed the vessel.

-111-

### 1.    The Failure of the BOP

415.   Immediately after the explosion, desperate vessel workers tried in vain to activate the emergency disconnect sequence on the Deepwater Horizon's BOP. As reports and testimony have shown, problems and failures with each of the BOP's emergency activation methods prevented the use of the Deepwater Horizon's BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and quelling the blowout.

416.   The Macondo well's Cameron-manufactured BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence[8] ("EDS"), the automatic mode function[9] ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab"[10] or autoshear[11] functions. None of these were able to activate the BOP to seal the well.

417.   The explosions and fire on the Deepwater Horizon disabled the only two emergency activation methods available to workers on the vessel: the high-pressure closure of the blind shear ram and the EDS. From the BOP control panels on the vessel, workers could push buttons for either of these functions, but both required communication with the BOP itself via multiplex cables running from the vessel to the BOP on the seafloor. On the vessel, these multiplex cables were not protected against explosions or fire; according to BP's disaster

---

[8] The EDS disconnects the drilling vessel from the well by detaching the riser from the top of the BOP, allowing the vessel to move away from the well. The EDS also triggers the closure of the blind shear ram to seal off the well itself.

[9] The AMF is activated when electricity, hydraulics, and communications from the drilling vessel are all severed. Powered by hydraulic pressure from accumulators and batteries on the BOP itself, the AMF's functionality is independent from the vessel and is not affected by loss of power or hydraulics on the vessel itself.

[10] An ROV can activate certain BOP functions, such as the blind shear ram, by performing a hot stab, injecting hydraulic fluid into dedicated ports on the BOP to close the rams.

[11] An ROV can activate the autoshear function by snipping a rod on the BOP, triggering the closure of the blind shear ram.

-112-

investigation, it is likely that they were damaged during or immediately after the first explosion, effectively disabling the vessel workers' ability to communicate with the BOP.

418.    According to his own testimony, and that of several witnesses, Transocean subsea supervisor Christopher Pleasant pressed the EDS button after the explosions. "Everything in the [BOP control] panel did like was supposed to at the panel, but it never left the panel," Pleasant testified, which supports the likelihood that damage to the multiplex cables on the vessel severed communication between the vessel and the BOP after the explosions.

419.    The AMF sequence initiates when electrical power, communications, and hydraulic pressure are lost to both control pods on the BOP, circumstances that were certainly satisfied once the multiplex cables and the also-unprotected hydraulic conduit hose on the Deepwater Horizon were damaged by the explosions and/or fire. But poor maintenance of the BOP itself prevented the completion of the AMF sequence to close the blind shear ram.

420.    The Deepwater Horizon's BOP had two independent control pods, a redundancy intended to reduce the risk that control pod failure would jeopardize BOP functionality, but Transocean's shoddy BOP maintenance prevented either of the two pods from completing the AMF sequence on the night of the blowout. Examination and tests performed on the control pods after the disaster found a faulty solenoid valve and one battery with low charge in one pod, and two dead batteries in the other pod. Investigators concluded that these problems existed prior to April 20, 2010, and were significant enough to prevent either control pod from completing the AMF sequence to close the BOP's blind shear ram.

421.    BOP maintenance was Transocean's responsibility, but BP and the other Drilling Defendants were aware of Transocean's infrequent and inadequate maintenance of the device. The faulty solenoid valve on one of the control pods would have shown up on the BOP control

-113-

diagnostic system on board the drilling vessel, which was accessible to all and should have alerted all of the Drilling Defendants to the problem.

422.   Transocean's BOP maintenance records from 2001 to 2010, which were also available to Drilling Defendants at all times, indicate that the control pod batteries were changed far less frequently than the manufacturer's recommended annual replacement.   Unlike the solenoid valve failure, the BOP's diagnostic function would not have shown a low battery charge, all the more reason for Transocean to proactively change the batteries frequently to avoid failure.  But, as the other Drilling Defendants knew, Transocean had neglected the BOP batteries before – a November 2007 activity report recorded that when the BOP was brought to the surface, all of the batteries in one of the pods were dead.

423.   Beyond these specific BOP maintenance issues, Drilling Defendants were also aware that during the entire duration of operations at Macondo, the Deepwater Horizon's BOP was out of certification and long overdue for extensive maintenance and repair.  Although the BOP's manufacturer, Cameron, required manufacturer testing of the device every five years, the Deepwater Horizon's BOP had not been sent to Cameron for inspection since 2000.

424.   The BOP had not undergone a thorough series of maintenance checks since 2005, despite the significant problems uncovered within the device during that inspection.  According to Transocean maintenance documents from the 2005 inspection, the BOP's control panels gave unusual pressure readings and flashed inexplicable alarm signals, while a "hot line" connecting the vessel to the BOP was leaking fluid badly.  An independent engineering company was hired to assess the BOP, but could not perform all of its examinations — including verification that the Deepwater Horizon's BOP could effectively shear drill pipe and seal off wells in high pressure, deepwater conditions — because the BOP was in use and inaccessible on the sea floor, and BP

-114-

and Transocean would not stop work to bring it up.

425.    A Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, again revealed a range of problems with the Deepwater Horizon's BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves.  BP well site leader Ronald Sepulvado testified in August 2010 that he too had raised concerns about Transocean's maintenance of the BOP, reporting that several pieces of equipment had been out of service for extended periods of time, but that Transocean "always told me that they didn't have the parts" to make the necessary repairs.

426.    In keeping with its lax approach to BOP maintenance, Transocean had also failed to recertify the Deepwater Horizon's BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime.  During his congressional testimony, one Transocean subsea supervisor brushed off the need for BOP recertification, testifying that Transocean considered it sufficient to simply monitor the device's condition while it was in use, rather than having to bring it to dry dock to get a full recertification.

427.    In its disaster investigation, BP noted that Transocean did not record well control-related equipment maintenance, including that of the BOP, accurately or completely in the regular maintenance management system, sometimes even recording work performed on the BOP that could not possibly have taken place since the BOP was in use on the seafloor at the time of the supposed repair.

428.    After the explosions, as the Deepwater Horizon was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using

-115-

the "hot stab" or autoshear functions. Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure. Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket modifications to the BOP.

429.    Hydraulic system integrity is critical to the proper functioning of a BOP. Hydraulic pressure supplies the force used to close the various rams in the device — if there is insufficient hydraulic pressure due to leaks, the system will not be powerful enough to close the rams with enough pressure to create a seal against highly pressurized hydrocarbons in the well.

430.    Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP. From investigation and testimony, Drilling Defendants were aware of at least two, but likely almost all, of these leaks prior to April 20, 2010. One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by Drilling Defendants. Vessel workers testified to awareness of other leaks during their congressional testimony. Not least, the weekly BOP function tests should have made Drilling Defendants aware of the other hydraulic system leaks identified during the ROV intervention.

431.    Drilling Defendants were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to incorrectly installed aftermarket hydraulic plumbing, Drilling Defendants had switched out one of the Deepwater Horizon's variable bore rams with a non-functional test ram. But after the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because Drilling Defendants hadn't updated the BOP's schematic diagram to reflect the aftermarket changes – a

-116-

violation of 29 C.F.R. § 1910.119, which requires, *inter alia*, up-to-date process and safety system equipment drawings as a part of basic process safety management.

432.   Drilling Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems, perhaps because additional delays and costs would accrue as all well work stopped and the BOP was raised from the sea floor for repairs.  In addition to posing a significant safety risk, Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

433.   Despite vessel workers' efforts just after the blowout, and emergency engineers' efforts in the weeks after the blowout and sinking, the Deepwater Horizon's blind shear ram never successfully sealed the well.  Although tests determined that the ROVs had activated the high-pressure blind shear ram close function by cutting the autoshear rod, the well continued to spew oil into the Gulf of Mexico.  Investigations thus far have been unable to conclude why the blind shear ram failed to seal the well, but possible causes include insufficient hydraulic power to shear the drill pipe and seal the well, or seal failure due to the high pressure flow of hydrocarbons gushing through the BOP at the time the blind shear ram was attempting to close.

434.   As the time of this writing, the official investigation of the BOP retrieved from the seafloor at the Macondo well is still ongoing.  Thus Plaintiffs reserve the right to amend this First Amended Master Complaint Cross-Claim and Third-Party Complaint once further information from that and any other future investigations becomes available.

435.   At the time of the disaster, Drilling Defendants were certainly aware that in

-117-

addition to increasing the risk of blowouts, deep-sea drilling also increases the risk of BOP failure. Drilling Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the Deepwater Horizon.[12] A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 74 vessels studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said. Moreover, the study singled out Defendant Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the necessary strength for its BOP equipment to function properly at ultra-deepwater depths.

436. Despite being aware of the risk of the BOP failing at greater depths, Drilling Defendants did not install backup BOP activation systems, backup BOPs or other secondary redundant precautionary measures available to protect the vessel, its workers, Plaintiffs, and the environment from the catastrophic results of a well blowout.

437. The Deepwater Horizon's BOP was outfitted with only one blind shear ram. But blind shear rams are vulnerable to a "single-point failure" — if just one of the small shuttle valves that carry hydraulic fluid to the ram malfunctions, the BOP cannot seal the well. A 2000

_____

[12] *See, e.g.* Joint Industry Project (Phase I-Subsea), "Final Report, Blow-out Prevention Equipment Reliability," Report to MMS (May 2009); E. Shanks, "Deepwater BOP Control Systems – A Look at Reliability Issues," Proc. Offshore Technology Conference (2003); Tetrahedron, Inc., "Reliability of Blowout Preventers Tested Under Fourteen and Seven Days Time Interval," Report to MMS (Dec. 1996); Per Holland, "Reliability of Deepwater Subsea Blowout Preventers," Society of Petroleum Engineers (2000); Per Holland and P. Skalle, "Deepwater Kicks and BOP Performance," Report to MMS (July 2001).

-118-

report on the Deepwater Horizon's BOP concluded that the shuttle valve was the BOP's weak spot — consultants attributed 56 percent of the BOP's "failure likelihood" to this one small valve — and indeed, evidence suggests that when the Deepwater Horizon crew attempted to activate the BOP's blind shear ram, the ram's blades could not cut through the drill pipe because one or more of the shuttle valves leaked hydraulic fluid.

438.    Vulnerabilities like the BOP blind shear ram's single-point failure risk were well understood by Drilling Defendants and the rest of the oil industry.  In fact, offshore drillers now commonly add an extra layer of protection against this single-point failure risk by equipping their BOPs with two blind shear rams.  In 2001, when the Deepwater Horizon went into service, Transocean was already equipping its newer drilling vessels with BOPs that could accommodate two blind shear rams, and today 11 of Transocean's 14 Gulf of Mexico vessels have two blind shear rams.  (The three that do not were built before the Deepwater Horizon.)  Nevertheless, neither Transocean nor BP retrofitted the Deepwater Horizon's BOP with two blind shear rams. BP's explanation was that the drilling vessel needed to carry the BOP from well to well and there were space limitations, but oil industry experts have dismissed that explanation, saying an additional blind shear ram on the BOP would not necessarily have taken up any more space on the vessel.

439.    Drilling Defendants were also well aware of the benefits of redundant blind shear rams.  In May 2003 the Discoverer Enterprise — a Transocean vessel operated by BP, just like the Deepwater Horizon — was rocked when the riser pipe connecting the vessel to the wellhead cracked open in two places.  The BOP was activated and the first blind shear ram closed.  After robots checking the integrity of the BOP noticed damage, the second blind shear ram was also closed to provide an extra layer of protection against a blowout.  Despite this firsthand

-119-

experience of the necessity of redundant blind shear rams, BP and Transocean used one of the slots on the BOP for the non-functional test ram, which would save them money by reducing the time it took to conduct certain well tests, instead of installing a second blind shear ram there. In a joint letter, BP and Transocean acknowledged their awareness that installing the test ram instead of a functional ram would "reduce the built-in redundancy" and raise the "risk profile" of the Deepwater Horizon.

440. If the BOP on the Macondo wellhead had been functional and properly manufactured by Cameron and/or maintained by Transocean, it could have been manually or automatically activated right after the explosion, stopping the blowout at the wellhead, limiting the Spill to a minute fraction of its ultimate severity, and thereby sparing Plaintiffs millions of dollars in losses and damage.

441. Defendants BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

442. Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that the Deepwater Horizon's BOP had sufficient, functional, built-in redundancy to eliminate single-point failure modes.

443. Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that all foreseeable repairs, if any, and foreseeable modifications, if any, to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

444. Defendants Cameron, BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the testing, if any, of the Deepwater Horizon's BOP was

comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV connection points, and verifying the functionality of the AMF and/or autoshear.

445. Defendant Cameron failed to ensure and verify that the BOP it designed, manufactured, marketed, and sold, and which was appurtenant to the Deepwater Horizon drilling vessel, was suitable for the types of drilling conditions, drill pipes, and casing assembly designs that would foreseeably be used during the Deepwater Horizon's drilling and exploration operations.

446. Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the Deepwater Horizon, but did not do so.

447. Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have installed a back-up acoustic trigger to activate the Deepwater Horizon's BOP in the event that the main trigger failed to activate. In fact, federal regulators at the MMS communicated to one or more of the Drilling Defendants in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."

448. Despite this notice, and although the back-up acoustic BOP trigger is a common drilling vessel requirement in other oil-producing nations, including other areas where Drilling Defendants operate, the Deepwater Horizon was not equipped with this back-up acoustic BOP trigger.

449. Defendant Cameron designed and manufactured the Deepwater Horizon's BOP device. Defendant Cameron failed to effectively design the BOP, install sufficiently independent

-121-

911133.4

452.    Further, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved.  Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel and in need of maintenance were not registered by the computer.

453.    Even worse, some key safety systems and alarms on the Deepwater Horizon had been intentionally bypassed or disabled by Transocean.  Mike Williams, a chief electronics technician working for Transocean aboard the Deepwater Horizon, testified that on the night of the blowout, a pressure regulator valve, which automatically cuts off gas flow at a certain pressure point and could have helped stop the blowout, was in "bypass" mode when the gaseous hydrocarbons blew out of the Macondo well.  Williams had repeatedly expressed concern about bypassed safety systems to Transocean supervisors, only to be upbraided for his efforts.  In one instance, Williams activated a gas safety valve that he thought was erroneously in "bypass" mode.  Williams testified that Transocean subsea supervisor Mark Hay reprimanded him for it, saying: "'The damn thing has been in bypass for five years.  Why did you even mess with it?' … And [Hay] said, 'As a matter of fact, the entire fleet [of Transocean drilling vessels] runs them in bypass.'"

454.    Williams said a fire alarm system on the vessel was also partially disabled at the time of the blowout, and had been for at least a year since Williams first noticed it.  The system was set to "inhibited" mode, meaning that the control panel would indicate a problem, but a general alarm would not sound throughout the vessel unless manually activated.  Transocean supervisors told Williams "they did not want people to wake up at 3 a.m. due to false alarms." Williams testified that he complained regularly about the practice of disabling and bypassing

-123-

found that Transocean had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

459.    In a confidential worker survey conducted on the Deepwater Horizon just weeks before the blowout, Transocean employees voiced concerns about poor equipment reliability. One worker noted that the drilling vessel had not once in its nine-year career been taken to dry dock for necessary repairs: "we can only work around so much." Another worker described Transocean's policy of running equipment to failure before making just the bare minimum repairs: "[r]un it, break it, fix it. … That's how they work."

460.    The other Drilling Defendants were all aware of Transocean's poor maintenance of the Deepwater Horizon and its practice of disabling or bypassing vital safety systems, and alarms, yet none of them called for work to stop until vessel safety was improved, and none of them reported Transocean's actions and inactions to the MMS.

### M.    Drilling Defendants' Culture of Complacency

461.    All the evidence of Drilling Defendants' misguided priorities and imprudent decisions regarding the Macondo well and the Deepwater Horizon described above is part of a pattern of cocksure behavior — "a culture of complacency," as the chairmen of the presidential commission investigating the Spill called it during a hearing on November 10, 2010.  In essence, "[l]eaders did not take serious risks seriously enough and did not identify a risk that proved to be fatal," the commission chairmen said.

462.    This complacency was especially deplorable considering the fact that workers and leaders on the Deepwater Horizon had just survived a near miss – the March 8, 2010, influx that went unnoticed for 33 minutes, allowing 40 barrels of hydrocarbons to leak into the well before it was shut in.   That brush with disaster should have been a lesson learned for Drilling

-125-

intended to maintain public safety.  Pursuant to 33 C.F.R. 250.107, Drilling Defendants were required to protect health, safety, property, and the environment by (1) performing all operations in a safe and workmanlike manner; and (2) maintaining all equipment and work areas in a safe condition.  They were further required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the "best available and safest technology" whenever practical on all exploration, development, and production operations.  Drilling Defendants' violation of these regulatory mandates caused and/or contributed to the Macondo well blowout and the subsequent explosions, fire, sinking, and Spill.

467.   This culture of carelessness and impudence was not limited to Drilling Defendants' actions and decisions on the Deepwater Horizon at the Macondo well.  In fact, Drilling Defendants have a history of foolhardy, irresponsible behavior across their operations on land and at sea – a record littered with accidents, spills, regulatory violations, fines, and lawsuits.

468.   Defendant BP has an especially sordid history of cutting corners on safety to reduce operating costs.  In 2005, a blast at a Texas refinery killed 15 people and injured more than 170; Federal investigators found the explosions were in part due to cost-cutting and poor facility maintenance.  Also in 2005, a large production platform in the Gulf of Mexico began listing severely and nearly sank due to a defective control system.  And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.  As noted by the Deepwater Horizon Study Group in its second Progress Report, all the investigations of BP's previous disasters "noted that cost cutting, lack of training, poor communication, poor supervision and fatigue were contributors" to the various calamitous incidents.

-127-

911133.4

Workers on the Deepwater Horizon also described "a corporate culture of …ignoring warning signs ahead of the [April 20th] blast," saying that "BP routinely cut corners and pushed ahead despite concerns about safety." After all, as one Alaska worker was pointedly told when he raised a safety concern: "Safety doesn't make money."

471. Prior incidents, investigations and testimony from Congressional hearings has shown that BP actively discourages workers from reporting safety and environmental problems. Reports from multiple investigations of the Texas City and Alaska disasters all indicate a pattern of intimidating — and sometimes firing — workers who raise safety or environmental concerns. In Alaska, pressure for increased production with fewer safety reports created "an environment where fear of retaliation [for reporting problems] and intimidation did occur." Also in Alaska, a pipeline safety technician working for a BP contractor was scolded, harassed, and ultimately fired for reporting a crack in a pipe that was dangerously close to an ignition source, despite that other reports indicated he was one of the top-performing employees in his position. "They say it's your duty to come forward," he said of BP's official corporate policies, "but then when you do come forward, they screw you." In a more extreme example, in the 1990s a BP executive was involved in a scandalous scheme involving spies hired to track down a whistleblower who had leaked information about BP spills to the press.

472. When Tony Hayward took office as CEO of BP p.l.c. in 2007, he pledged to change BP's culture with a renewed commitment to safety. Yet according to the Occupational Safety and Health Administration ("OSHA"), over the past three years — during which time BP was under Mr. Hayward's leadership — BP has committed 872 safety violations — most categorized by OSHA as "egregious willful" — a number made even more shocking when compared to BP's competitors, who average about five violations each. Two refineries owned

-129-

475. Investigators also found that a stifling bureaucracy imposed by onshore management bred resentment among Transocean vessel workers. Workers complained that past problems were only investigated by the company in order to place blame, rather than to learn from the mistakes. Although workers "often saw unsafe behavior at the rig" many expressed fears of reprisals for reporting problems, especially to supervisors based in Houston. This tension between the vessel and the beach likely played a role in discouraging workers on Deepwater Horizon from reporting problems or anomalies like the abnormal negative pressure results to their supervisors onshore.

476. As Defendants internally prioritize profits over safety at every level of their companies, they continue to resist and evade regulation of the oil exploration and production industry. For example, despite the known vulnerabilities and shortcomings of BOPs in deepwater drilling, this year BP helped finance a study to support their argument that BOP pressure tests should be required with less frequency — every 35 days rather than the current frequency of every 14 days. This change would save the industry $193 million per year in "lost productivity." BP has also actively opposed MMS rules requiring drilling vessel lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon disaster is a tragic example to the contrary.

477. Decisions tradeoffs, actions, and inactions by Drilling Defendants, including the risky well design, inadequately tested cement, tests that were skipped or misinterpreted, and procedures that deviated from industry norms, all contributed to, and practically ensured the blowout of the Macondo well. At no time did any of Drilling Defendants report regulatory violations to the authorities, or call to stop work because of unsafe decisions, plans, actions, or

-131-

as well as the tourism industry and property values in the Coastal Zone.

480.    From the outset, BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its actual measured leakage amount of 50,000 barrels per day. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had shown that the rate of oil spillage could reach as high as 100,000 barrels, or 4,200,000 gallons, per day. BP's may have understated the Spill size because certain pollution-related fines against BP will ultimately be calculated based on the volume of oil and other pollutants spilled.

481.    BP's obstructionist behavior regarding accurate data continued as the Spill progressed; BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Spill, and stymied scientists' efforts to gauge the scope of the disaster on land and at sea. *The New York Times* reported on May 16, 2010, that "BP has resisted entreaties from scientists that they be allowed to use sophisticated instruments at the ocean floor that would give a far more accurate picture of how much oil is really gushing from the well."

482.    Just as BP was now understating the severity of the Spill, it soon became clear that BP had previously overstated its ability to respond to a spill. In its Initial EP, submitted prior to beginning work at Macondo, BP had assured the MMS that it could effectively contain any spill of up to 250,000 barrels of oil per day, using "proven equipment and technology." In reality, BP was not at all prepared for an oil spill of any size. The spill-prevention plan BP had submitted to the MMS was an obvious cut-and-paste job that had not been updated to current conditions – not only did it reference Arctic wildlife not indigenous to the Gulf of Mexico, such

-133-

> Much of the response and implementation of spill control
> technologies appears to be taking place on an ad hoc basis.

486.   Upon information and belief, BP also hindered efforts to kill the Macondo well

and stop the flow of oil and gas into the Gulf waters. Engineers knowledgeable about blowout

responses told BP how to kill the well as early as June 2010, but BP, after conferring with its

Macondo lease partners Anadarko, Anadarko E&P, and MOEX Offshore, chose to ignore the

engineers' well-kill procedure, because BP did not want to damage the well – or its chance to

make a profit at Macondo. Because BP, along with its lease partners, hoped to retap the

Macondo well and the large, valuable reservoirs beneath it, they ignored expert well-kill

information that could stopped the Spill many weeks earlier.

### O.   The Spill's Impact on Plaintiffs, the Environment, and the Coastal Zone Economy

487.   Since the Spill began, unprecedented amounts of raw crude oil, emulsified and

weathered oil, natural gas, chemical dispersants, and other toxic pollutants have contaminated

the Gulf of Mexico and the Coastal Zone – a total petroleum discharge of 6.9 million barrels, not

including the million gallons of chemical dispersants and any other toxic pollutants that were

also released as a result of the Spill.

488.   The oil released during the Spill contains benzene, toluene, polyaromatic

hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons,

or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified

in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene,

polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene,

benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and

idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are

hazardous to the health of humans and marine life. Upon information and belief, BP has

-135-

493.   The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico – up to 88,552 square miles at the restriction's greatest extent – causing damage to some Plaintiffs' livelihoods.  Fishing of certain species and in certain areas of the Gulf is currently still restricted until further notice from NOAA.

494.   According to the National Marine Fisheries Service, commercial fishermen harvested 1.4 billion pounds of fish from the Gulf of Mexico in 2009, resulting in $614.5 million in total landings revenue for the region.

495.   Major shrimp species in the Gulf of Mexico, including, but not limited to, white, pink, Red Royal, and brown shrimp, are mainly located in coastal areas.  During the Spill, the Gulf's various shrimp species were harmed due to mortality of adults, as well as that of postlarval shrimp, whose migrations out of the inlets, shallows, and estuaries where they were born coincided precisely with the timing of the Spill, devastating current as well as future shrimp catches.

496.   In 2009, Gulf of Mexico shrimp landings were the nation's largest at 241 million pounds, which was 80 percent of the national total and worth $313.8 million, according to NOAA sources.  Louisiana led all Gulf states with nearly 109.8 million pounds, worth $89.2 million; followed by Texas, almost 89.7 million pounds, worth $72.9 million; Alabama, almost 21.7 million pounds, worth $17.6 million; Mississippi, 10.1 million pounds, worth $8.2 million; and Florida's Gulf Coast, 9.7 million pounds, worth $7.8 million.

497.   According to NOAA, the Gulf region also leads the nation in the production of

_Footnote continued from previous page_
East Coast of the United States, serving as an invaluable prey species for many predatory fish, such as striped bass, bluefish, mackerel, flounder, tuna, and sharks.  Menhaden are also a very important food source for many Gulf Coast birds, including egrets, ospreys, seagulls, northern gannets, pelicans, and herons.

911133.4

this endangered tuna species; each year from March to June the fish converge there between latitudes 25-28°N to breed. Not only did the Spill's timing coincide precisely with the peak of the Bluefin's Gulf of Mexico spawning season, but NOAA maps show that the Spill and its underwater plumes of oil and dispersants spread across latitudes 25-28°N, directly polluting the tuna's limited spawning area.

503.    During the spawning season, Bluefin tuna release their eggs near the surface of the water, meaning oil and dispersants from the Spill likely coated and destroyed millions of tuna eggs. Oil skimming activities could also have physically damaged the eggs, or broken surface water tension, allowing the eggs to sink too deep to properly develop.

504.    The effects of the Spill will continue to threaten the Bluefin species for years to come. Bluefin tuna are large, slow-growing fish that take ten years to reach sexual maturity. The destruction of, or severe damage to, an entire generation of fish in 2010 will therefore continue to affect the tuna population for at least a decade; if next year's spawning season is also affected by resurfacing oil or the remaining underwater plumes, the damage to the species will be catastrophic. Already severely overfished, the Atlantic Bluefin tuna may not survive this massive disruption to an entire spawning season, let alone the potentially long-term devastation of one of its annual spawning sites.

505.    The Spill also caused economic damages to the VoO Plaintiffs. As part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct in situ burning of that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

506.    The VoO program is touted by BP as a key component to BP's response to the

-139-

512.    The Charter Agreements provided that the charter terms continued until the vessels were detoxified and the boats received off charter dispatch notifications.  Many vessels were laid off in August and September of 2010 and were detoxified, but the owners were told that they were not released from the charters until they received off charter dispatch notifications.

513.    In most cases, off charter dispatch notifications were not received until November 26, 2010.  The owners of these vessels did not return to fishing because they understood that they were still under charter until they received the off charter dispatch notification.  Some VoO vessel owners did not receive off charter dispatch notifications until December, 2010 or January, 2011.

514.    Despite its detention of the VoO vessels through November 26, 2010 and beyond, BP has refused to pay these vessel owners for the period between the initial detoxification and the off charter notification during which they were unable to return to their livelihoods.

515.    The VoO vessels sustained substantial physical damage as the result of their participation in the program.  The oil remediation efforts required of the vessels participating in the VoO program required the vessels to navigate through oil contaminated waters, staining propellers, rudders, and engines.

516.    Initially, BP instructed the VoO vessel owners that their vessels would regularly undergo detoxification when they returned to shore on standby.  However, although large commercial vessels regularly underwent decontamination, VoO vessels did not.  As a result, large quantities of oil and other toxins accumulated on and in the VoO vessels.

517.    When decontamination and detoxification was finally performed on the VoO vessels, the procedure was often performed inadequately, without full environmental protection,

-141-

"under current conditions, deepwater drilling poses an unacceptable threat of serious and irreparable harm or damage to wildlife and the marine, coastal and human environment." The policy halted approval of any new permits for deepwater drilling and suspended production in the Gulf, affecting 33 offshore oil rigs operated by various oil companies. With 88% of U.S. offshore rigs located on Louisiana's Outer Continental Shelf ("OCS"), Louisiana businesses and coastal communities felt the majority of the moratorium's impact.

524.    Following its directive to implement the Deepwater Moratorium, the Obama administration issued a second notice to lessees and operators of federal oil and gas leases (NTL No. 2010-N05) on June 8, 2010, calling for increased safety measures for energy development on the OCS.   The recommendations therein applied to all activities on the OCS, including deepwater drilling activity suspended under NTL No. 2010-N04.

525.    On June 22, 2010, the United States District for the Eastern District of Louisiana granted a preliminary injunction, lifting the drilling moratorium.

526.    The U.S. Department of the Interior's appeal was denied, and in response the agency issued new suspensions on July 12, 2010.   This new document is very similar to its predecessor, the first deepwater drilling moratorium, with more substantial rationale for the ban and a focus on technologies used in drilling rather than water depth stating "the new suspensions apply to drilling operations that use subsea blowout preventers (BOP) or BOPs on floating facilities."   The new version also allowed for the possibility of the moratorium being lifted before November 30, 2010.

527.    On October 12, 2010, the U.S. Department of Interior's Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") announced that the federal government would lift the drilling moratorium.   The October announcement indicated an early end to the

911133.4

and gas industries are vulnerable.  The report claimed that without increased business in the form of drilling activity these companies may not survive.

535.    The Spill has not only had a severe impact on fisheries in the Gulf of Mexico, but it has also dealt a devastating blow to tourism in the Coastal Zone and the individuals and entities that ordinarily rely on tourism for their livelihood.  Tourism accounts for about 46 percent of the Gulf Coast economy annually.  The Spill will result in at least $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association.

536.    The Spill may become the worst disaster in the history of Florida tourism.  Some analysts have preliminarily estimated that the impact on tourism along Florida's Paradise Coast could reach $3 billion.

537.    During the Spill, the Mississippi coast had a 50 percent cancellation rate on reservations generally.

538.    Twenty-six percent of Americans who had planned to visit Louisiana stated they were no longer planning to visit after the Spill, according to a nationwide survey taken by the Louisiana Tourism Commission in May 2010.  Prior to the Spill, Louisiana hosted 24.1 million visitors per year, whose purchases fueled a $9.4 billion tourism industry and sustained more than 200,000 direct and indirect jobs for Gulf residents, according to the Louisiana Tourism Commission.

539.    Alabama has also seen a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals.  Overall, the combination of tourism and fishing losses in Alabama in 2010 will probably yield adverse impacts of $1.7 billion in economic output, $498.9 million in earnings, and 24,880 jobs, according to a report by the Center for Business and Economic Research at the University of Alabama.

-145-

All individuals and entities residing or owning property in the United States who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

545.   Plaintiffs may also seek certification, to the extent necessary or appropriate, of the following OPA Subclass, and/or state-wide subclasses (the "Subclasses") of individuals and entities residing or owning property in the states of Alabama, Florida, Louisiana, Mississippi, and Texas, pursuant to the laws of their respective states.

The OPA Subclass:

All individuals and entities entitled to make a claim under the Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon and resulting Spill, and who have timely complied with all administrative requirements therein.

The Alabama Subclass:

All individuals and entities residing or owning property in the State of Alabama who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

The Florida Subclass:

All individuals and entities residing or owning property in the State of Florida who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

The Louisiana Subclass:

All individuals and entities residing or owning property in the State of Louisiana who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

The Mississippi Subclass:

All individuals and entities residing or owning property in the State of Mississippi who claim economic losses, or damages to their occupations, businesses, and/or property as a result of the April 20, 2010 explosions and fire aboard, and sinking of, the Deepwater Horizon, and the resulting Spill.

-147-

outrageous, willful, reckless, wanton, and deplorable conduct and liability.

550.    Defendants' conduct presents common factual questions, including:

(a)    Whether Defendants negligently, outrageously, willfully, wantonly, and/or recklessly caused and/or contributed to the blowout, explosions, fire, and the resulting Spill;

(b)    Whether Defendants knew or should have known of the risk of a blowout and/or major failure of the vessel such as those which caused the blowout, explosions, fire, and Spill;

(c)    Whether Defendants' conduct in failing to utilize all available deepwater drilling best practices and drilling vessel safety mechanisms to prevent the Spill was outrageous, grossly negligent, willful, wanton, or reckless, or behavior even more deplorable;

(d)    Whether Defendants acted outrageously or with willful, wanton, and reckless indifference to the risk of a major failure of the drilling vessel, its pipes, valves, and other machinery and materials.

(e)    The degree of each Defendant's reprehensibility under the Supreme Court guidelines articulated in, for example, *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

551.    Common questions of fact also exist with respect to the punitive damages liability of Defendants to the Class and/or Subclasses, including Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct; the calculation of the amount of punitive damages that may be imposed upon each of the Defendants consistent with due process; intra-

-149-

E.    **Class Certification under F.R.C.P. 23(b)(3) — Predominance and Superiority**

554.    Common issues of fact and law predominate concerning the claims of the Class and/or Subclasses.

555.    Defendants' conduct presents predominant common factual questions. Fundamentally, all Plaintiffs' claims arise out of a single course of conduct by Defendants that caused the Macondo well blowout, the Deepwater Horizon explosions, and the subsequent Spill. Although this is a single-event, single-location mass disaster that has affected, and will continue to affect a large geographic area and many individuals and businesses, for a long time to come — its wide-ranging effects can be traced back to one single root: a chain of decisions and actions made jointly, severally, and solidarily by the small group of Defendants named here. Plaintiffs will present common proof with respect to Defendants' failure to use deepwater drilling best practices or take adequate safety precautions in the operation and maintenance of the Macondo well and the Deepwater Horizon — proof that is the same for each member of the Class and/or Subclasses. Plaintiffs' proof of Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.   Common questions of fact also predominate concerning the determination of the aggregate quantum of punitive damages, necessary to fulfill the punishment and deterrence goals of such damages.

556.    Because Defendants' behavior here is governed by federal regulations, federal maritime law, and federal legislation like the Oil Pollution Act and the Clean Water Act, the Class and/or Subclass members will be subject to common questions of law.

557.    A class action is superior to the only other method available for the adjudication of Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct — individual

-151-

multi-state, region-wide course of conduct (which has impacted more individuals, groups, and categories of claims and claimants, on a more sustained basis, than any other course of tortious conduct).

562.    Plaintiffs here seek class-wide adjudication as to the issue of punitive damages, with respect to the total amount Defendants may be constitutionally or equitably required to pay into a nationwide punishment fund (the "limits of punishment"), and the appropriate allocation and distribution of such damages to any member of the Class and/or Subclasses for their benefit, and that of society.  The prosecution of separate actions by individual members of the Class and/or Subclasses on such claims and issues would create an immediate risk of inconsistent or varying adjudications.  These varying adjudications would be prejudicial to members of the Class, Subclasses, and Defendants, would frustrate the purposes and policies of punitive damages by fostering sub-optimal punishment and deterrence, and would establish incompatible standards of conduct for Defendants.

563.    Piecemeal adjudications will frustrate the efforts of this or any court to determine and enforce the constitutional limits of aggregate punishment for this course of misconduct, thereby (a) forcing victims to compete in a race for judgments in order to claim against a diminishing res, resulting in recoveries for some victims and worthless judgments for the rest; (b) ignoring what the Supreme Court has termed the substantive limit that due process places on the amount of punitive damages that may be awarded; and (c) thereby creating inequitable disparities among members of the Class and/or Subclasses.

564.    Moreover, individual awards of punitive damages in the context of mass misconduct would frustrate the broader societal interest in not only punishing Defendants for their misconduct, but in directing an appropriate share of any award toward the greatest possible

-153-

### G.    Class Certification under F.R.C.P. 23(b)(2)

567.    Defendants have acted or refused to act, and continue to act and refuse to act, on grounds that apply generally to the Class and/or Subclasses, so that final injunctive relieve and/or corresponding declaratory relief is appropriate respecting the Class and/or each of the Subclasses as a whole.

### H.    Class Certification of Particular Issues under F.R.C.P. 23(c)(4) and Subclasses under 23(c)(5)

568.    Certification of the Class and/or Subclasses with respect to common factual and legal issues concerning Defendants' outrageous, grossly negligent, willful, wanton, and reckless conduct and the resulting necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Rule 23(c)(4).

## CLAIMS FOR RELIEF

### I.    Claims Under General Maritime Law

#### A.    Negligence

### All Plaintiffs v. All Defendants

569.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

570.    At all times material hereto, Drilling Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

571.    At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

-155-

911133.4

dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO.  Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities.  Thus, all activities of MOEX Offshore and MOEX USA, including activities surrounding the leasehold interest in the Macondo Prospect, should be imputed to MOECO, rendering MOECO liable to Plaintiffs for negligence.

576.    The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

577.    Plaintiffs, as owners lessors, lessees, and/or operators of real property at or near the coast of the Gulf of Mexico and/or businesses or employees of businesses that are dependent upon the Gulf of Mexico's marine and coastal environments for their livelihood and income, were within an appreciable zone of risk and, as such, were obligated to protect them.

578.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to Plaintiffs.

579.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs and the Gulf of Mexico's marine and coastal environments and estuarine areas.

580.    Defendants were under a duty to exercise reasonable care while participating in drilling operations on the Deepwater Horizon to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

-157-

911133.4

588.   At all times material hereto the Deepwater Horizon was owned, navigated, manned, possessed, managed, and controlled by Transocean.

589.   As the owner and manager of the Deepwater Horizon, Transocean owed duties of care to Plaintiffs to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

590.   Transocean breached its duties to Plaintiffs by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shut down systems, and BOP, and in disabling vital alarm systems on the Deepwater Horizon before the blowout.

591.   Transocean also breached its duties to Plaintiffs by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

592.   Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses.  *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

593.   At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between Transocean and BP.  Together, Transocean and BP and other Drilling Defendants were responsible for design and well control.

594.   BP owed duties to Plaintiffs to, *inter alia*, exercise reasonable care to design,

-159-

(i)    failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon;

(j)    requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore; and,

(k)    causing property damage to the vessels involved in the VoO program, and failing to properly administer and provide payment for work, time, and/or property damage to those entities and workers participating in the VoO program.

596.    All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiffs' injuries and damages.

597.    At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

598.    At all times material hereto, Halliburton owed duties to Plaintiffs to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well.

599.    Halliburton breached its duties to Plaintiffs by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Deepwater Horizon's well. Halliburton was negligent by, *inter alia*, failing to use a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which

-161-

casing assembly design which would foreseeably be used during the Deepwater Horizon's drilling and exploration operations; designing the BOP such that it was vulnerable to a single-point failure; failing to install a backup activation system for the BOP; and failing to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

607.    At all times relevant hereto, Weatherford designed, manufactured and supplied the float collar used in the Macondo well.

608.    Weatherford owed duties of care to Plaintiffs to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture of the float collar in the long string casing.

609.    Weatherford breached its duties to Plaintiffs in designing and manufacturing a float collar that failed to seal properly and which allowed hydrocarbon backflow into the casing, which proximately caused and/or contributed to the blowout, explosions, fire, and Spill, resulting in Plaintiffs' injuries and damages.

610.    In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiffs were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants.  The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

611.    In addition to the foregoing acts of negligence, Plaintiffs aver that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and

-163-

911133.4

(n)    Failing to observe and read gauges that would have indicated excessive

pressures in the well;

(o)    Failing to react to danger signs; and

(p)    Such other acts of negligence and omissions as will be shown at the trial

of this matter; all of which acts are in violation of the general maritime

law.

612.    Plaintiffs are entitled to a judgment finding Defendants liable, jointly, severally,

and solidarily, to Plaintiffs for damages suffered as a result of Defendants' negligence and

awarding Plaintiffs adequate compensation therefor in amounts determined by the trier of fact.

613.    The injuries to Plaintiffs were also caused by and/or aggravated by the fact that

Defendants failed to take necessary actions to mitigate the danger associated with their

operations.

614.    As a direct and proximate result of Defendants' acts and/or omissions, the

Commercial Fishermen Plaintiffs have suffered , *inter alia*, damages resulting from the closure

and pollution of the Gulf water areas, harbors, marinas, boat launches and waterways, including

the loss of their livelihoods which directly depend upon a supply of fish, shrimp, oysters and

crabs from the Gulf of Mexico, loss of income, loss of the right of use of the Gulf of Mexico, and

Louisiana, Texas, Mississippi, Alabama, and Florida saltwater areas, and costs associated and

inconvenience sustained as a result of the closure and pollution of the Gulf water areas.

615.    As a direct and proximate result of Defendants' acts and/or omissions, the

Processing and Distributing Plaintiffs have suffered, *inter alia*, damages associated and

inconvenience sustained by the closure and pollution of the Gulf water areas, harbors, marinas,

boat launches and waterways including loss of their livelihood which directly depend upon a

and/or loss of use of their property, stigma damages resulting from the taint of their property caused by the Spill, some have been forced to evacuate their homes, and they have been otherwise injured.

622.   As a direct and proximate result of the Defendants' acts and/or omissions, the Real Property/Tourism Plaintiffs have suffered, *inter alia,* damage to their property, diminution in value and/or loss of use of their property, stigma damages resulting from the taint of their property caused by the Spill, and loss of income and inconvenience resulting from the decrease in tourism due to the pollution of the Gulf resulting from the Spill

623.   As a direct and proximate result of the Defendants' acts and/or omissions, the Banking/Retail Business Plaintiffs have suffered damages including, *inter alia,* loss of income, loss of profits, and inconvenience due to increased foreclosures, diminution in property values, and loss of business resulting from the Spill.

624.   As a direct and proximate result of Defendants' acts and/or omissions, the Subsistence Plaintiffs have suffered damages including, *inter alia,* loss of income, loss of profits, and loss of use, due to the inability to use the natural resources of the Gulf of Mexico for their income and subsistence.

625.   As a direct and proximate result of Defendants' acts and/or omissions, the Dealer Plaintiffs have suffered damages, including, *inter alia,* loss of business, loss of income and lost profits, and inconvenience due to the decrease in business resulting from the Spill.

626.   As a direct and proximate result of Defendants' acts and/or omissions, the Moratorium Plaintiffs have suffered damages, including *inter alia,* the loss of their livelihoods, business, income, and profits caused by the moratorium placed on deepwater drilling in the Gulf of Mexico by the Department of Interior on May 28, 2010 in response to the Spill.

-167-

job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

634.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

635.    BP, Transocean, and M-I acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

636.    BP, Transocean, and Cameron acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the Deepwater Horizon.

C.    **Strict Liability For Manufacturing And/Or Design Defect**

**All Plaintiffs v. Cameron**

637.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

638.    Plaintiffs are entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the Deepwater

-169-

911133.4

functioning, renders those methods useless.

645. In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with the BOP.

646. Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades. If the shuttle valve fails, the blind shear ram will be unable to seal the well.

647. Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

648. Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

649. Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when it left Cameron's control.

650. At all times, Cameron's BOP was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

651. At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to Plaintiffs in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

-171-

911133.4

654.  At all relevant times, the BOP appurtenant to the Deepwater Horizon was used in an intended and/or reasonably foreseeable manner.

655.  Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's BOP.

656.  Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and/or inactions were grossly negligent, reckless, willful, and/or wanton.

657.  As a result of the defective design and/or manufacture of the BOP, Plaintiffs have suffered damage to or diminution of the value of their property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which they are entitled to actual and compensatory damages.

658.  In the alternative to the foregoing claim arising under the general maritime law against Cameron for its defective design and/or manufacture of the BOP, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*); the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*); the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine.

### D.  Strict Liability For Manufacturing And/Or Design Defect

### All Plaintiffs v. Weatherford

659.  Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

660.  Plaintiffs are entitled to recover from Weatherford for its defective design and/or manufacture of the float collar on the Deepwater Horizon pursuant to Section 402A of the

-173-

670.    At all times, Weatherford's float collar was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Weatherford prior to April 20, 2010.

671.    At the time the float collar used at the Deepwater Horizon site left Weatherford's control, Weatherford knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

672.    At the time the float collar used at the Deepwater Horizon site left Weatherford's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the float collar.

673.    At all relevant times, the float collar used on the Deepwater Horizon site was used in an intended and/or reasonably foreseeable manner.

674.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's float collar.

675.    Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar that caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

676.    As a result of manufacturing and/or defects in the Weatherford float collar, Plaintiffs have suffered damage to and/or diminution of the value of their property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which they are entitled to actual, compensatory and punitive damages.

677.    In the alternative, to the foregoing claim arising under the general maritime law

-175-

911133.4

OPA. As such, they are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

682.    As alleged above in paragraphs 222 - 235, at all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the Macondo Prospect in the Mississippi Canyon Block 252, where the Macondo well is located, should be imputed to MOECO. MOECO is therefore a "responsible party" under OPA and liable to Plaintiffs for damages available under that statute.

683.    Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

684.    Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

685.    As a result of the Spill, Plaintiffs have not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO for such damages in

-177-

### III.   State Law Claims For Relief

**A.**   **Nuisance**

**The Property Plaintiffs v. Drilling Defendants, Cameron, and Weatherford**

691.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

692.   At all times material hereto, the Real Property Plaintiffs and the Real Property/Tourism Plaintiffs (the "Property Plaintiffs") were owners, lessors, or lessees of residential, commercial, and/or investment properties on or near the Coastal Zone.

693.   The negligence of Drilling Defendants, Cameron, and Weatherford caused and/or contributed to the blowout and subsequent Spill and resulted in an economic and ecological disaster that has directly and proximately caused an invasion that has interfered with the Property Plaintiffs' interests as owners, lessors, and/lessees of residential, commercial, and/or investment properties to use and enjoy their properties.

694.   Drilling Defendants, Cameron, and Weatherford were under a duty to take positive action to prevent or abate the interference, but failed to do so.

695.   The harm suffered by the Property Plaintiffs was significant and of a kind that would be suffered by a normal person in the community or by property in normal condition and used for normal purpose.

696.   The Property Plaintiffs have also suffered the migration of contaminants and noxious odors as a result of the Spill.

697.   Drilling Defendants, Cameron, and Weatherford acted in an unreasonable manner in creating the nuisance described herein.

698.   The Spill that Drilling Defendants, Cameron, and Weatherford caused and/or

-179-

not to enter, intrude on, or invade the Property Plaintiffs' properties. Drilling Defendants, Cameron, and Weatherford also owed a duty to the Property Plaintiffs to exercise reasonable care in the design, execution, and operation of the Macondo well and the manufacture, maintenance, and operation of the Deepwater Horizon and its appurtenances and equipment.

705.    Drilling Defendants, Cameron, and Weatherford breached the duties they owed to the Property Plaintiffs when they outrageously and maliciously, owing to gross negligence, willful, wanton and reckless indifference for the rights of others, or behavior even more deplorable, failed to exercise reasonable care in the design, execution, and operation of the Macondo well and the manufacture, maintenance, and operation of the Deepwater Horizon and its appurtenances and equipment, which conduct resulted in the entry, intrusion, or invasion on the Property Plaintiffs' properties.

706.    BP also breached the duty it owed to the Property Plaintiffs when it outrageously and maliciously, owing to gross negligence, willful, wanton and reckless indifference for the rights of others, or behavior even more deplorable, failed to request permission to enter and use the Property Plaintiffs' property as a disaster relief staging area, or exercise reasonable care when using the Property Plaintiffs' property for those activities, which conduct resulted in the rude, aggravated, and oppressive entry, intrusion, or invasion on Plaintiffs' properties.

707.    The outrageous, malicious, rude, oppressive, grossly negligent, willful, reckless, and wanton conduct of Drilling Defendants, Cameron, and Weatherford, as described herein, entitles the Property Plaintiffs to compensatory and punitive damages.

708.    The Property Plaintiffs have also suffered the migration of contaminants and noxious odors onto their properties as a result of the Spill.

709.    These acts on the part of Drilling Defendants, Cameron, and Weatherford have

-181-

per day.

715.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

716.    In addition, BP misrepresented its capabilities to respond to the Spill.   BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

717.    In fact, BP did not have proven equipment and technology to respond to the Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico."   As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

718.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

719.    Despite its inability to respond and control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.   .

720.    BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Spill.

721.    The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to disclose.

-183-

730.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, Plaintiffs suffered damage to their businesses, livelihood, income and damage to and diminution in value of their property, for which they are entitled to compensation.

731.    Moreover, the acts of misrepresentation and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, Plaintiffs are entitled to an award of punitive damages.

**D.    <u>Strict Liability Pursuant To The Florida Pollutant Discharge Prevention And Control Act Fla. Stat. § 376.011, <em>et seq.</em></u>**

**Florida Subclass Members v. BP, Transocean, Anadarko, Anadarko E&P, MOEX**

**Offshore, MOEX USA, and MOECO**

732.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

733.    At all relevant times, BP and Transocean owned, leased, operated, and/or maintained the Deepwater Horizon and the Macondo well.  Following the April 20, 2010 explosions, fire, and ultimate sinking of the Deepwater Horizon, the Macondo well began spewing crude oil into the Gulf of Mexico.

734.    At all relevant times, Defendants had a statutory duty to Plaintiffs and Florida Subclass Members to maintain and operate the Deepwater Horizon and the Macondo well so as to not create or sustain hazardous conditions due to the discharge of pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. § 376.031.

735.    At all relevant times, Defendants breached their statutory duty to the Plaintiffs and Florida Subclass Members by discharging, or allowing to be discharged, crude oil into the

-185-

740.    As alleged above in paragraphs 222 - 235, at all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO.   Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities.   All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the Macondo Prospect in the Mississippi Canyon Block 252, where the Macondo well is located, should be imputed to MOECO.   Thus MOECO is a "responsible party" under the Florida Act and liable to Florida Subclass Members for damages available under that statute.

741.    The private cause of action under the Florida Act is a strict liability cause of action.  The Plaintiffs and Florida Subclass Members "need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred." Fla. Stat. § 376.205.  The Spill constitutes a prohibited discharge within the meaning of the Florida Act and it has occurred.

742.    The immediate discharge from the Spill occurred into waters outside the territorial limits of Florida; however, lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected.

743.    As a result of the Spill, certain Plaintiffs and Florida Subclass Members have sustained damage to their personal property as a result of the post-Spill clean-up activity, and they are entitled to recover from BP Exploration, BP America, Anadarko E&P, Anadarko, MOEX Offshore, MOEX USA, MOECO, and Transocean Holdings for such damages in amounts to be determined by the trier of fact.

-187-

911133.4

750.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

751.   BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

752.   Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

753.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

754.   BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

755.   BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

operation and use of the BOPs appurtenant to the Deepwater Horizon.

762.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

763.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

764.    BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

765.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

766.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

767.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

-191-

repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

769.     Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## V.     Declaratory Relief:  Punitive Damages

770.     The Plaintiffs, the proposed Class and Subclasses, society, and the Gulf states have a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct.  Punitive damages do not compensate for injury.  They are private fines, authorized by the General Maritime Law (and/or state law), to punish reprehensible conduct and deter its future occurrence. Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated.  Accordingly, plaintiffs seek a judicial declaration against Defendants and in favor of the class that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy .

## VI.     Declaratory Relief Against BP

Plaintiffs seek a declaration by the Court that the conduct of BP and its agents and representatives, including the Gulf Coast Claims Facility ("GCCF"), in obtaining releases and/or

Dated: February 9, 2011

Respectfully submitted,


___/s/   Stephen J. Herman___          ___/s/ James Parkerson Roy___
Stephen J. Herman, La. Bar No. 23129          James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR          DOMENGEAUX WRIGHT ROY &
LLP          EDWARDS LLC
820 O'Keefe Avenue          556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113          Lafayette, Louisiana 70501
Telephone: (504) 581-4892          Telephone: (337) 233-3033
Fax No. (504) 569-6024          Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com          E-Mail: jimr@wrightroy.com

*Plaintiffs Liaison Counsel*          *Plaintiffs Liaison Counsel*
*MDL2179*          *MDL2179*


## PLAINTIFFS' STEERING COMMITTEE


Brian H. Barr          Robin L. Greenwald
LEVIN, PAPANTONIO, THOMAS,          WEITZ & LUXENBERG, PC
MITCHELL, ECHSNER & PROCTOR, PA          700 Broadway
316 South Baylen St., Suite 600          New York, NY 10003
Pensacola, FL 32502-5996          Office: (212) 558-5802
Office: (850) 435-7045          Telefax: (212) 344-5461
Telefax: (850) 436-6187          E-Mail: rgreenwald@weitzlux.com
E-Mail: bbarr@levinlaw.com


Jeffrey A. Breit          Rhon E. Jones
BREIT DRESCHER IMPREVENTO &          BEASLEY, ALLEN, CROW, METHVIN,
WALKER, P.C.          PORTIS & MILES, P. C.
999 Waterside Drive, Suite 1000          218 Commerce St., P.O. Box 4160
Norfolk, VA 23510          Montgomery, AL 36104
Office: (757) 670-3888          Office: (334) 269-2343
Telefax: (757) 670-3895          Telefax: (334) 954-7555
E-Mail: jbreit@bdbmail.com          E-Mail: rhon.jones@beasleyallen.com


-195-

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing has been served on All Counsel

by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial

Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the

United States District Court for the Eastern District of Louisiana by using the CM/ECF System,

which will send a notice of electronic filing in accordance with the procedures established in

MDL 2179, on February 9, 2011.


_____/s/   Stephen J. Herman and James Parkerson Roy_____

-197-

911133.4

## EXHIBIT

## DECLARATION OF MATTHEW KISSINGER

I, Matthew Kissinger, declare that:

1. I am over the age of twenty-one (21) and not under any disability that would preclude my making this declaration.

2. I am employed by BP Alaska Gas Pipelines LLC.

3. During the response to the oil spill from the MC 252 #1 Macondo Well ("Incident"), I served as a Vessels of Opportunity Branch Director in the Logistics Section at the Mobile Incident Command Post ("ICP") in Mobile, Alabama.  The ICP was part of the Unified Command structure.  As a Vessels of Opportunity Branch Director, I led the logistics component of the Vessels of Opportunity program for the Mobile ICP and was responsible for, among other things, recruiting vessels for the Vessels of Opportunity program and delivering the appropriate vessels to meet the operational needs for oil spill response activities.

4. Having acted as a Vessels of Opportunity Branch Director, I am fully knowledgeable of the facts stated herein.  I am competent to testify about the facts in this Declaration, if called on by the Court to do so.

5. To manage the response to the Incident, which originated on the Outer Continental Shelf ("Shelf") in connection with the sinking of the *Deepwater Horizon* mobile offshore drilling unit, the federal government established a Unified Command structure pursuant to the National Contingency Plan ("NCP"), 40 C.F.R. Part 300.  While the Unified Command structure brought together the functions of the federal and state governments, as well as BP, to respond to the Incident consistent with the NCP, the designated Federal On-Scene

and state waters in an integrated fashion. The federal nature of the Vessels of Opportunity program essentially allowed Vessels of Opportunity activities to be conducted whenever and wherever they were most needed, taking constrained response resources into account.

11. The activities in which vessels in the Vessels of Opportunity program engaged and the areas in which they operated were demand-driven and based on operational directives issued within the Unified Command structure.

## CERTIFICATE

Pursuant to the provisions of 28 U.S.C. § 1746, I declare, certify, verify and state under penalty of perjury that the foregoing is true and correct. Executed on this 10th day of February 2011, at _10 : 00 a_.m.

3

*An Official Website of the United States Government*

Follow us:  | Join Mailing List | About Us | Contact Us | Site Map

Search

Home › News › Press Releases?page=13 › Four Branch Offices Along Florida Panhandle Serve as Front Line for Oil Spill Response Efforts

# Four Branch Offices Along Florida Panhandle Serve as Front Line for Oil Spill Response Efforts

July 21, 2010 | 5:49:00 AM EDT

0
tweets

tweet

TALLAHASSEE, Fla. --- With another opening in Port St. Joe last week, the Florida Panhandle now has four branch offices dedicated to providing coordinated and rapid oil spill response efforts to nearshore and inland waterway areas.

The branches, under the joint tactical direction of the U.S. Coast Guard and BP, are responsible for beach cleaning, implementing the Vessel of Opportunity programs, and boom deployment and maintenance.

"The focus of the branches is to manage our response efforts in a smart, coordinated manner that draws on local knowledge of the region," said U.S. Coast Guard Cmdr. Joe Boudrow, Deputy Incident Commander for the Florida Panhandle region.

Coast Guard men and women, BP contractors, and representatives from the Florida Department of Environmental Protection, Florida Division of Emergency Management, the Environmental Protection Agency, and county representatives will continue to work around the clock to mitigate the impact along the Florida coastline. The goal of this organizational effort is to more quickly and efficiently coordinate critical assets such as skimmers, cleanup crews, reconnaissance teams, Vessel of Opportunity boats and wildlife response teams.

Branches are currently located in Pensacola, Destin, Panama City, and Port St. Joe. They serve Escambia, Santa Rosa, Okaloosa, Walton, Bay, Gulf, Franklin, Wakulla, and Jefferson counties.

For more information, please contact the Mobile Joint Information Center at 251-445-8965.

\###

| Home | Response | Assistance | Health & Safety | Fish & Wildlife | Environment | News |
|---|---|---|---|---|---|---|
| | Current Operations | File a Claim | Boating | Birds | Air | Press Releases |
| | Education Resources | Other Assistance | Drinking Water | Fish | Beaches | Response Updates |
| | Federal Partners | Small Business | Health Matters | Turtles | Coral | Transcripts & Docs |
| | Recovery Plan | | Mental Health | Other Wildlife | Waste | Events |
| | Investigation | | Seafood Safety | Fish & Wildlife Reports | Water | Features |
| | Ongoing Administration Response | | Workers and Volunteers | | | FOIA Library |
| | State and Local | | | | | Maps & Data |
| | | | | | | Multimedia |

Follow us: 

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

*An Official Website of the United States Government*

Follow us:  [Twitter] [Facebook] [RSS] [Mail]  | Join Mailing List | About Us | Contact Us | Site Map

Home › U.S. Coast Guard announces plans to improve Vessel of Opportunity Program in Florida

## U.S. Coast Guard announces plans to improve Vessel of Opportunity Program in Florida

July 14, 2010 | 4:36:00 PM EDT

**0** tweets

tweet

Today, Commander Joe Boudrow announced plans to form a working group to improve the Vessel of Opportunity Program (VoO) in Florida, which employs boat owners and their crews to help in the response across the Gulf. The Commander announced the working group after hearing concerns at a community meeting with commercial fisherman and other community members in Apalachicola, FL.

To date, more than 2,700 vessels have been hired through the VoO program and are working aggressively to perform a variety of important tasks, including deploying and monitoring containment boom, transporting equipment and personnel and surface and subsurface surveillance.

"In order to ensure that local residents continue to participate in the VoO program and to streamline the hiring process, this new working group will be composed of commercial fisherman, community leaders, along with representatives from the U.S. Coast Guard and BP," said Commander Boudrow. "With the working groups help, we will continue to aggressively hire local crews with the necessary local knowledge of these waterways to support our efforts to provide the largest response to an oil spill in this country's history."

The VoO program hires vessels of all sizes - with a priority placed on commercial vessels that make their living on the sea. Compensation depends on the size of the vessel and ranges from $1,200-$3,000 per day.
Crew members are paid $200 per eight-hour shift.

Vessel owners interested in the VOO program should call the VOO Hotline at (866) 279-7983 or visit www.restorethegulf.gov.

| Home | Response | Assistance | Health & Safety | Fish & Wildlife | Environment | News |
|------|----------|------------|-----------------|-----------------|-------------|------|
| | Current Operations | File a Claim | Boating | Birds | Air | Press Releases |
| | Education Resources | Other Assistance | Drinking Water | Fish | Beaches | Response Updates |
| | Federal Partners | Small Business | Health Matters | Turtles | Coral | Transcripts & Docs |
| | Recovery Plan | | Mental Health | Other Wildlife | Waste | Events |
| | Investigation | | Seafood Safety | Fish & Wildlife Reports | Water | Features |
| | Ongoing Administration Response | | Workers and Volunteers | | | FOIA Library |
| | State and Local | | | | | Maps & Data |
| | | | | | | Multimedia |

Follow us: 

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

Case 2:10-md-02179-CJB-DPC Document 8147-4 Filed 12/31/12 Page 119 of 130
Louisiana Unified Command Announces New Guidelines to Improve Vessels of Opportu... Page 1 of 1
Case 4:12-cv-03506 Document 1-15 Filed in TXSD on 12/03/12 Page 2 of 2

*An Official Website of the United States Government*

Follow us: Join Mailing List | About Us | Contact Us | Site Map

Search

Home › Louisiana Unified Command Announces New Guidelines to Improve Vessels of Opportunity Program

## Louisiana Unified Command Announces New Guidelines to Improve Vessels of Opportunity Program

July 16, 2010 | 11:49:00 AM EDT

0 tweets
tweet

Today, the Louisiana Unified Command announced new guidelines to enhance the Vessels of Opportunity (VoO) program, which employs boat owners and their crews to help in the response across the Gulf. The new guidelines will ensure that more local residents on local, commercial vessels are able to participate in the program and benefit through their efforts to help respond to the oil spill. Louisiana Unified Command announced the changes to address concerns voiced by commercial fisherman and communities across the coast of Louisiana.

"The new Vessel of Opportunity program guidelines will allow Gulf Coast Residents to participate in the nations largest oil spill response effort," said Captain Roger Laferriere. "By setting up a rotation of vessels and crews, it allows more residents to get back to work and will improve our cleanup efforts by ensuring residents with local knowledge are involved in the fight."

"Unified Command is committed to using the commercial fishing vessels and crews of the Gulf Coast to respond to this spill and minimize the impact on the people, the environment, and the fishing industry," said Judith Paul, VoO Program Director. "These changes take critical steps to make the program operate more smoothly and continue to make a significant contribution to the response."

Under the updated protocols, crews will embark on 14-day, 30-day and long term charters, depending on the size and capabilities of each vessel:

- 14 day crews will recover sheen and light oil, transport oily waste, clean up in shallow water, transport critical supplies and personnel, conduct surveillance, and maintain boom across the Gulf.
- 30 day crews will transport wildlife rescue vessels and deploy boom across the Gulf.
- Offshore skimming vessels and vessels larger than 65-feet will continue work under long-term charters because their crews are trained, activity-specific equipment has already been installed to make them capable of skimming oil or conducting controlled burns.
- Some vessels will also carry media to observe the largest response to an oil spill in this nation's history.

The VoO program hires vessels of all sizes, with a priority placed on local, commercial vessels that make their living on the sea. Compensation depends on the size of the vessel and ranges from $1,200-$3,000 per day. Crew members are paid $200 per eight-hour shift.

To date, more than 900 vessels in the VoO program are working in Louisiana waters to perform a variety of important tasks, including deploying and monitoring containment boom, transporting equipment and personnel and surface and subsurface surveillance.

Vessel owners interested in the VoO program should call the VoO Hotline at (866) 279-7983.

| Home | Response | Assistance | Health & Safety | Fish & Wildlife | Environment | News |
|------|----------|------------|-----------------|-----------------|-------------|------|
| | Current Operations | File a Claim | Boating | Birds | Air | Press Releases |
| | Education Resources | Other Assistance | Drinking Water | Fish | Beaches | Response Updates |
| | Federal Partners | Small Business | Health Matters | Turtles | Coral | Transcripts & Docs |
| | Recovery Plan | | Mental Health | Other Wildlife | Waste | Events |
| | Investigation | | Seafood Safety | Fish & Wildlife Reports | Water | Features |
| | Ongoing Administration Response | | Workers and Volunteers | | | FOIA Library |
| | State and Local | | | | | Maps & Data |
| | | | | | | Multimedia |

Follow us: 

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-ins

An Official Website of the United States Government

Follow us:  [icons]   | Join Mailing List | About Us | Contact Us | Site Map

Home › Transcript UAC Briefing May 27

## Transcript UAC Briefing May 27

May 28, 2010 | 8:00:00 PM EDT

0
tweets

tweet

UNIFIED AREA COMMAND PRESS BRIEFING

Moderator  LT Commander Robert Wyman

May 27, 2010 4 30 p.m. CT

Operator: Good afternoon, my name is Ryan and I will be your conference operator today. At this time, I would like to welcome everyone to the press briefing Deep Water Horizon BP Oil Spill Response Current Operation Update. All lines have been placed on mute to prevent any background noise. After these speakers' remarks, there will be a question–and–answer session. If you would like to ask a question during this time, simply press star then the number one on your telephone keypad. If you would like to with draw your questions, press the pound key. Please note that today's call is being recorded. Thank you. I would now like to turn the call over to Lieutenant Commander Rob Wyman. Sir, you may begin your conference.

Rob Wyman: Thank you and good afternoon everybody. I'm the Chief of the Joint Information Center here at the Unified Area Command in Robert Louisiana. Thank you for attending.

With us today is Rear Admiral Mary Landry – L-A-N-D-R-Y, the federal on-scene coordinator. We also have Mr. Doug Suttles – S-U-T-T-L-E-S, BP's Chief Operating Officer. We have Mr. Mike Prendergast – P-R-E-N- D-E-R-G-A-S-T, the Mineral Management Services Chief of Staff for the Gulf of Mexico Region.

We'll begin today with opening remarks and then we'll take questions from members in the audience and at that time, we'll open up the phone lines for those who dialed in.

If you would, please silence your cell phones or turn them off. If you would, raise your hand, wait to be called upon, we'll bring you a microphone since we're capturing the audio for today's conference. Please provide your name and affiliation before asking a question and we will try to allow some time for follow ups. Thank you.

Mary Landry: Good afternoon, everyone. Yesterday – yesterday the top kill operations commenced and Mr. Suttles from BP is going to give you some updates on how that's going. Before that, I'd like to give you a little background.

Yesterday some of you asked if we were going to get information about the estimated flow from the release from this well and we actually, as the National Incident Commander reported, Admiral Thad Allen, the flow rate technical group has determined the overall estimate potentially flowing from the well is at a range of 12,000 to 19,000 barrels per day is what could have been emanating from this well and this is an estimate, but it's a very rigorously reviewed estimate, which means we could have anywhere from 18.6 million to 29 million gallons have estimated to have been spilled from this incident.

The focus of this group from day one has been to prepare to – for a worse– case scenario, to fight this as far offshore as possible, obviously focus on securing on a source, and then if oil hits the shoreline, to be ready to respond to that shoreline.

So we've been involved in this for over 30 days obviously and we have had pretty good success fighting this offshore I would say. We do have over 101 miles of shoreline impacted in Louisiana, but right now we're focused on about 30 miles that are able to be cleaned actually. Some of that is beach area, which is obviously easier to clean. Some of it is marsh, which you have to work through very carefully and we are very involved in that. We have nine areas where workers are out there today and we will get reports at the end of the day, but so far, very good efforts on the shoreline.

We have also – there's been some discussion and I've read where folks think you know the military should be involved in this. I want to reemphasize again, from day one, every federal agency is involved, the coast guard is a military service and a federal law enforcement agency and we respond to oil spills. But what's so important is to recognize the great work of the National Guard. They not only serve overseas with the department of defense but Secretary Gates purposely made national guard available to the governors of the Gulf Coast states and we've had over 1,000 national guard from Louisiana, Mississippi, we've had 63, Alabama 312, Florida six thus far, but all of these national guard are authorized to have up to 17,000 national guard troops if we needed them to respond to this fight. So we thank the efforts of the National Guard certainly serving under their governors and we also thank Secretary Gates for his support.

We not only have National Guard troops, but we have every agency involved at the federal level, state level, local communities, volunteers, you know the vessel of opportunity skimming system with the – that BP–hired shrimpers who are out of work to be able to work on this and so it's been an all–hands– on–deck effort and let's not forget the private sector, the commercial people that have been trained and our staff to respond to these spills. So it's an all– hands–on–deck effort.

As you all know, the heat and humidity in Louisiana can be challenging and we did have an incident yesterday where we had seven people that were hospitalized with various symptoms, headaches, nausea, vomiting, shortness of breath.

We've had changes. We've had safety officers as part of this response and we've also had members of OSHA and BP's safety officers as well as the Coast Guard's industrial hygienists and safety officers. So we are basically – these folks have all had the proper personal protective equipment on, they'd all received the required training to do this response and fortunately everyone is fine.

We – what we will do is examine and conduct an investigation to make sure what we can do to ensure that these workers are all working in safe conditions.

There is extensive air monitoring, water sampling and work being done by both the state and the EPA, so we will continue to monitor this situation very carefully so that nobody is put in harm's way as they respond to this spill. Finally, I want to mention extensive work that we've done on logistics, I call it logistics support, a response of this magnitude. Certainly we have seen the active work by over 1300 vessels but we now have reached a crescendo of more than a million feet of boom has been mobilized to this site and the boom keeps coming in.

We've had over 100,000 feet arise just today for Louisiana alone and we continue to ramp up as much as we need, but boom isn't the only thing that'll fight the spill and some of these marsh areas with the tides the way they are and as fast as the current flows, boom isn't always going to be the answer. However we work very hard to boom off these areas as much as possible, use sorbents and other means. We have shallow water skimmers, near shore skimmers, we have skimming going on offshore and there's a tremendous amount of resources down here to fight this fight.

We have used dispersants, I know that people are very concerned about the volume of dispersants. The EPA and the Coast Guard actually requested that we reduce it to as much as possible and issue a directive to BP. We have not had to apply surfaces dispersants recently and are using Sub C injection as we go through this top kill procedure, it's very important to be able to minimize any hazardous conditions on the surface with oil coming up from the well. I think I'll stop there and let Doug give you an update on top kill because you're probably very eager to hear about that and then we're obviously available for any questions you might have. No, you – I'm sorry.

Mike Prendergast: It's all right. Thank you, Admiral Landry. Good afternoon, I'm Mike Prendergast, I serve as Chief of Staff for the Gulf of Mexico region. As Chief of Staff for the Gulf of Mexico region (inaudible). I'm here today on behalf of (Lawrence Hope) (MMS) Gulf of Mexico regional director, (Lars) in the Houston Infinite Command Center all this week and he has been there with other MMS engineers who continue to provide oversight on the development of the methods and procedures necessary to secure the well. This week they are witnessing and participating through MMS's regulatory role in the well diagnostic test, in the top kill procedure from the command center.

going to follow those three things that we've been directed to do and we will do those three things.

Mary Landry: Can I also add, though, it's very important to know some extensive monitoring is taking place. We did three subsurface tests before we even began subsurface injection. We also did a smart – there's a smart protocol that is ongoing for the surface dispersant.

So I think it's important to understand how much the – how much care and time is taken and how much transparency the – the information is being provided to everyone that were getting very good data from the use of disbursements.

But more importantly, when you start to talk about plumes, I think if I could just assure everyone that not only NOAAA and the EPA, but many agencies are being brought together and there is going to be extensive science. We have three areas particularly that we're very focused on right now. First of all, it's the safety of seafood and seafood sampling so that we can open up fisheries. The National Marine Fishery Services closed some fisheries until we can – as a caution to make sure we can test and see what impact this oil spill has had on the fisheries. The state of Louisiana has done the same thing, these are vital fisheries both for commercial and recreational fisheries.

The other point is NOAA vessels coming to really study the impact that all this activity has had on this wonderful ecosystem and to make sure we continue to study and provide information to everyone about what the impact of this oil has had, what the impact disbursements have had on this important marine ecosystem.

And then finally, the constant air and water quality monitoring that we must do while you're engaged in operations with a volatile and you know a high heat index everything. So we're doing that as well.

Alan Johnson: Can we address this specific question about Mobile Bay and about the

Mary Landry: It's my understanding there were two vessels, one that the fishing vessel (Weather Bird II) is on a – it's a Florida vessel contracted by NOAA that's returning from its mission tomorrow so we're going to be able to look at the results and work with them collaboratively to analyze whatever information they found, and then we know there's also the Gordon Gunter the ship that's departing past Pascagoula. So those are just two, we have several other research vessels that are coming and I know NOAA is doing its own – or BP, excuse me, is doing its own research. So there's going to be extensive research and analysis of what's going on and that will be shared with everyone.

Male: If I can add just one more point. In fact, the data from our monitoring program is actually on the internet. You can go look at the results from that data. I think you'll actually see that in three specific areas. I think the first five monitoring trips from the monitoring vessel are posted. First thing is is that the oil and water measurements are very low. They're measured in parts per billion – oil in parts per billion.

The second is the toxicity is well within EPA limits and the oxygen levels are also well within EPA limits.

But that data's being shared transparently and actually, there's a good deal of cooperation going on between all of the parties involved here and there'll be considerably more data coming in very soon as the Admiral's already mentioned.

(David Magna): (David Magna) from CNN. Will the injection of this bridging material or the junk shot, result in that plume diminishing or disappearing?

Doug Suttles: The purpose of using a bridging material, the junk shot, is to ensure that the mud we're injecting into the well goes down the well bore as opposed to out to the end of the riser. So that's its purpose. I think it's going to be very, very difficult as you watch the activity take place to know the success just from the short term pictures of the plume itself.

What you saw yesterday for instance is that large amounts of the drilling mud came out the end of the riser and actually that's what obscures the visibility, it's the solids and the drilling mud. But ultimately if the bridging material and the junk shot do their purpose, it will divert more of the mud down the well bore so that it stops the flow and less of the fluid escapes out the end of the riser. That's its purpose.

Greg Bluestein: Greg Bluestein, Associated Press. Earlier — you mentioned this earlier, you said their there would be a 24–hour window (inaudible)? Is there any timeline (inaudible) top four technically? What can you say about reports that too much of the boom fluid was escaping from the (inaudible)?

Doug Suttles: Yes, on the first one, I – if you recall, I actually said 24 hours or it may take longer, based on operational requirements and I'll stress that again, we might finish this in the next 24 hours or it may take longer because we're going to do the job as best we can. We're going to take the time it requires to do it and if that takes more than 24 hours then it'll take more than 24 hours. What we will do is continue to update you as we do the work. And I can assure you if we're successful in stopping the flow, once we're convinced that has occurred, you will all know quite quickly, probably from the roar that comes out of this building, I suspect.

The second part of the question, actually the amount of fluid coming out of the riser and the visual observation, very very difficult to interpret that, as I said, because the drilling mud has a lot of solid materials in it, that's what actually makes it a lot – what you think of as almost sediment, that's what makes it heavy. And therefore, it makes it quite cloudy and the currents down there, they're not strong, but they do move back and forth. So at times what they do is they flow back on to the remote vehicles, the robotic submarines with their cameras, and that's what obscures it. But today we think that the visual observations aren't showing any new leak points or leak sources at this point.

Male: We have time for maybe two or three more questions from the audience.

Louis Sahagun: Louis Sahagun, with the L.A. Times. I don't mean to belabor this, but yesterday you said that about this – by this time today you would know whether it was successful or not. I'm wondering if you plan now to inject cement by the end of (inaudible)? And in fact, at what point will you know? It sounds like it's become more difficult than perhaps you thought it would be yesterday?

Doug Suttles: I can appreciate why you'd think that. But actually, with this type of operation, what we're trying to establish is make sure we get this heavy drilling mud to go down the well bore so that it stops the flow of the well. And when we planned this job we recognize that that could have difficulties because we have this riser going the opposite direction.

So are we surprised that the job is taking this long? No, not particularly. Are we at any point saying we're finished with this operation? We're not doing that as well. The fact that it's taken more than 24 hours is not a big surprise. In fact, I think as many people have pointed out numerous times, some of the things we've done have taken longer than we thought, largely because it's hard to do things in 5,000 feet of water on the seabed.

I can tell you one thing that's gone very well with the job so far is the equipment itself has performed according to plan. Both the equipment on the surface and the equipment on the seabed, that element of the job has gone very well, but we'll stay at this until either we're successful or we've determined we can't be successful with this technique.

Male: You had a follow up?

Ben Nuckols: Last question. Can you put any kind of – sorry, Ben Nuckols with AP again. Can you put any kind of likelihood on the prospect of doing the junk shot, do you know how likely it is that you'll do it?

Doug Suttles: Actually, hey, I wouldn't want to say that. What we've done at this point is working with people like the MMS. And Secretary Chu is actually in our operations center in Houston as part of this job as well. And when we go to the pumping phase, we turn over operational control to the experts in the field on the vessels who are doing their job and they have a number of tools available to them, including materials that can pump from the surface or use the junk shot. That's been carefully analyzed today. And based on what they see occurring with the pumping pressures, they'll determine right then whether it's the appropriate next step. But that's all been very, very carefully analyzed with MMS and others, the best minds we can get, to make sure it's the appropriate next step.

Male: Operator, at this time please open the line to callers.

Operator: OK, your first question comes from Jessica Resnick with Bloomberg.

Jessica Resnick: Hi. Thank you for taking my call. Mr. Suttles, I'm curious, as I look at the process you described for us in terms of what happened last night with pausing putting in the drilling mud so you could see what the effects were. When do you next expect to take a pause like that? Can you walk us through what you expect to do in the next 24 to 48 hours because obviously there were certain parts of the planned activities that I didn't understand as clearly as one might have liked after yesterday's press conference?

Doug Suttles: Yes, happy to do that.

Doug Suttles: No. Well, the first part of your question is actually during the job we clearly did, while we were pumping, we clearly had suppressed the amount of oil and gas coming out. But what we have to be able to do is suppress it to the point it won't restart flowing. So clearly during the pumping operation, we were suppressing the amount of oil and gas coming out and if that's what Admiral Allen said, that's actually exactly what occurred.

The – but that operation until such time as we've (got) the well so it can no longer flow to surface it isn't complete. So that's what we must do to finish the job.

Carol Rosenberg: And did you run out of mud?

Doug Suttles: No, we didn't run out of mud. Someone asked earlier and I don't believe I ever got back to it – how much did we pump in total. I don't have the exact figure, I think it was somewhere less than 15,000 barrels. We have a total of about – we had a total about 50 – five zero, thousand barrels available to us, it was in different quantities, but of course before we go to the next pumping operation, we want to make sure we have sufficient volume to finish the next pumping phase. So while we were analyzing what we did, we've restocked these vessels so we had the full complement for the next phase.

(Carol Rosenberg): Thank you.

Male: Last question, please.

Operator: Your final question comes from Paula Dittrick with the Oil and Gas Journal.

Paula Dittrick: Hi. Thanks for taking my question. I wondered if you could tell me about the – at what rate the mud is being pumped in? I know there was mention before of how much horsepower you had.

Doug Suttles: Yes, the – once again I'd just stress that the equipment has worked very, very well since the beginning. We pumped at rates as high as almost 70 barrels a minute, between 65 and 70 barrels per minute which is a very, very high rate and we still have that capability, but we've also gone to very, very low rates as well as we've worked on the job. And so the – I think the point to stress here is the equipment we've brought to the location and we have triple redundancy in this operation is working very well.

Male: Thank you. That concludes today's press conference, the transcripts from this will be available online at the website deepwaterhorizonsresponse.com.

END

---

| Home | Response | Assistance | Health & Safety | Fish & Wildlife | Environment | News |
|---|---|---|---|---|---|---|
| | Current Operations | File a Claim | Boating | Birds | Air | Press Releases |
| | Education Resources | Other Assistance | Drinking Water | Fish | Beaches | Response Updates |
| | Federal Partners | Small Business | Health Matters | Turtles | Coral | Transcripts & Docs |
| | Recovery Plan | | Mental Health | Other Wildlife | Waste | Events |
| | Investigation | | Seafood Safety | Fish & Wildlife Reports | Water | Features |
| | Ongoing Administration Response | | Workers and Volunteers | | | FOIA Library |
| | State and Local | | | | | Maps & Data |
| | | | | | | Multimedia |

Follow us:   

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

An Official Website of the United States Government

Follow us: [icons]   Join Mailing List | About Us | Contact Us | Site Map

Home › Transcript - Press Briefing by National Incident Commander June 21, 2010

# Transcript - Press Briefing by National Incident Commander June 21, 2010

June 21, 2010 | 9:54:00 AM EDT

0 tweets

NEW ORLEANS -- Coast Guard Adm. Thad Allen, the National Incident Commander for the Deepwater BP Oil Spill response, briefed the media Friday morning.

Audio of the conference call is available here; a transcript follows:

tweet

**Moderator  Joe Klinker**

June 21, 2010
11 00 a.m. CT

JOE KLINKER: OK.  Good morning, everyone.  This is Lt. Joe Klinker, Press Secretary for Admiral Allen, National Incident Commander.  Thank you for joining us today.

Because this brief will be done entirely by conference call, following Admiral Allen's remarks there will be 20 minutes of questions from the phone.  I'll ask you to please ensure that your name and affiliation is stated prior to your question.

And, with that, I'll turn it over to Admiral Allen.

ADMIRAL ALLEN:  Thank you, Joe.

Good morning, folks.  A couple of updates to get us started here this morning.  I'd be glad to take your questions.

The total amount of oil that we recovered in the last 24-hour period (inaudible) midnight last night was 23,291 barrels.  That is slightly below what we've been getting over the last couple of days, anywhere from 2,000 to 3,000 gallons—2,000 to 3,000 barrels short.  That was due to lightning in the area that forced them to shut down the Discovery Enterprise for a while, then they had to do some maintenance.

I'd only make that point is that in the future we're trying to get redundant systems out there, and this is a good example of what happens when we have to stop for either an emergency because of the lightning in the area or maintenance on the lines.

The split between the two—the Discovery Enterprise process of 14.6 thousand barrels and the Q 4000 flared off 8.7 thousand barrels.  Again, the total combined just about 23 3 thousand barrels.

We continue to make progress on the—on the drilling on the relief wells.  Development Driller III, depth below the sea floor is 10,677 feet.  They're in a position now where they're closing on the wellbore.  They're going to do something that's called ranging where they actually send electrical current down the wellbore.

That puts out an electro-magnetic field around the wellbore and it could actually read that.  It allows them to get an accurate reading about how far away from the pipe—the wellbore they are getting as they get closer to making the intercept here in the next few weeks.  But that ranging operation is scheduled to start in the next 24 hours.  Development Driller II is 4,662 feet below the sea floor.

In general, some things we're working on this week of note, we're having discussions with the U.S. Air Force regarding the management of the airspace over the Gulf region there.  It's very busy around the well head, and we also have a lot of flights out there they're operating for logistics, (inaudible) over the skimming vessels and other airplanes that are flying around out there.  In addition to the over 1,000 flights a day that take place over that airspace, working with the ways to improve airspace safety and management, plus a way to get better linkage with sighting information so we can pass that back down to our surface units to improve the effectiveness and efficiency of our skimming operations.

That leads in the second update.  We continue to make progress with the vessels of opportunity, putting them into taskforces, assigning them to Coast Guard units or a larger ship that has communications capable of receiving, signing reports and making the referrals.  We're also looking to putting automated identification and GPS trackers on these things so we can see them without any communication being required.

That's continuing as well, and we are well over 2,600 vessels of opportunity now.  This continues to grow.  The good news is there's a lot of passion out there.  People want to use these boats and get on the water.  The challenge for us is assigning the right roles for these vessels.  It could be as small as an open vessel with an outboard motor to a very sophisticated shrimping or outsource supply vessel capable of handling skimming equipment and so forth.  But we will continue to do that moving forward.

The—I want to point out the very excellent operations in Barataria Bay where we have a good cooperation between Plaquemines and Jefferson Parish.  Both work the waterway and shared between them.  And down at the interest of Barataria Bay, we're working on options to be able to control the oil as it comes in one of the four passes into Barataria Bay.

Based on following discussions after the president and I were in Grand Isle several weeks ago, we are looking at putting a combination of barge and a pile driving and boom systems in there that will allow us to be able to deal with the heavy currents that are there and still supposed to protect it from oil.  It's similar to an operation that we're trying to put into place in Perdido Pass over between Alabama and Florida.

Now, with that, I'd be glad to go to your questions today.

OPERATOR: At this time, if you will like to ask a question, please press star and the number one on your telephone keypad.  Again, that's star one to ask a question.  We'll pause for just a moment to compile the Q&A roster.

And our first question comes from the line of Ray Henry with the Associated Press.

Q: Admiral, good morning.

On the 18th you mentioned that there were some concerns or question about the integrity of the wellbore.  I want to ask you if you have any information that raises those concerns in your mind.  Have you got any reports from MMS or other engineers?  What are the particular problems that you're worried about and how might that play into effect when you're going for the relief well or doing other operations?

So basically what's your information on the status of the wellbore and how can that affect you going forward?

ADMIRAL ALLEN:  Well, one of the issues is we don't know the exact status of the wellbore.

A while back, in fact, many weeks ago when we were discussing the top kill operation, we were having a significant discussion and we had a two-hour conference call on a Sunday, which

ADMIRAL ALLEN: They are now at a total depth below the sea floor of about—a little over 10,600 feet.

Q: OK.

ADMIRAL ALLEN: They are—they are slightly ahead of schedule, but I am not coming off the second week in August date, because as we know, you know, things can happen. But right now second week of August is the goal.

Q: OK. So

ADMIRAL ALLEN: Next question?

OPERATOR: Next question comes from the line of Brad Johnson with ThinkProgress.

Q: Hi, Admiral Allen.

This morning, Plaquemines Parish President Billy Nungesser expressed his frustration with how the vacuum barge's decision making was made and he said that Thad Allen has shown no leadership in this whole thing, and recognizing the complexities from the outside, it's troublesome that the local elected leaders are unhappy or not trusting or frustrated with the command process. And he was talking also about how he talks with the local level officials and they try to—they make request up the line and then they don't get responses back.

What are you doing to either improve the (inaudible) or the confidence in the command decision making process at the local level in the cleanup?

ADMIRAL ALLEN: Well, first let me comment on the—on the vacuum barges. We looked at the safety issues on the vacuum barges at the request of the operators. At no time did we ever try and inhibit their operation. They requested us to take a look.

The Coast Guard and BP officials were out there and took a look at the barges and there were some problems with the electrical grounding (inaudible) of the—of the tanks and some other problems that we thought could cause safety issues on the barges, and the owner agreed with that and voluntarily kept the vessels in port until we could go through a check list and find out what we can do to improve the safety. I dont think President Nungesser or anybody else would want to hazard anybody's life, even if we're—they're trying to get out there and get the oil off the water as fast as we can.

So I'm satisfied that the owner-operator did the right thing. I'm satisfied that we cooperated with him to identify the safety issues, and they're correcting those, and those will be deployed right now. And, again, I think a safety (inaudible) has to come number one, and I don't have any problem with the activities. Our people were on the scene down there.

In fact, over the last—over the life cycle of this event, we have continually pressed decision making authority down at the parish level and down to the forward staging areas. We've assigned the Coast Guard leaders and officer to President Nungesser and he has total, free communication with them and I'm sure utilizes that and makes his—makes his requirements known, and we're working very hard down there.

And I would tell you that I was down on—at Port Sulphur myself on Friday. I was out with the vessels of opportunity. I talked to the local folks down there and things were being coordinated, in my view, pretty well. The vessels of opportunity will be employed. I see a lot of cooperation between Jefferson Parish and Plaquemines Parish on Barataria Bay.

So, I—you're going to have different views of how these things go. I think throughout the course of this entire event we've been responsive to his needs, and including putting the Coast Guard officers into his office to personally handle any issues he may have.

Q: Do you think that part of the problem is just that this is an overwhelming disaster or in—or that it's new? I mean, in—or is this made more complex by the relationship between the government, BP and all of these contractors?

ADMIRAL ALLEN: Well, it certainly is a complex organizational structure, driven largely by the statutory and regulatory requirements and how we execute the national contingency plan. It was always anticipated that the person responsible for the spill will be actively involved, providing contractor support and paying for things. To do that, there has to be a level of coordination between the federal on-scene coordinator and the responsible party, and the model usually works. The third party and all of that is the state representing the interest of the state.

It's a little bit more complex and challenging with the autonomous home rule that they have with the parish setup in Louisiana. That's the reason we decided we'd move the decision making authority now and then put the liaisons out with the local parishes. The Louisiana, the governance model, doesn't quite match the other states, and the national contingency plan was always premised on the fact there'd be a responsible party, the federal on-scene coordinator and the state representing the local interest.

As you could well imagine, in Louisiana, there are lots of local interests and we're adapting to accommodate that because we understand that is (inaudible) to Louisiana, but that is their form of governance.

KLINKER: Operator, next question please.

OPERATOR: Our next question comes from the line of Bigad Shaban with WWLTV.

Q: Admiral Allen, thanks for taking the time talking to us today.

I had a question about the latest estimate in terms of the crude that continues to gush out there. I know that on the high five, I believe, it was 60,000 barrels. I'm wondering if that's standing true today. And what would need to happen for that estimate to change in terms of you getting a better handle or a more exact estimate.

Then if you could also reiterate, I know that you hope to get to 53,000 barrels of oil collected through the siphoning, if you could reiterate what that is now as well and also again how much you're estimating is actually coming out everyday.

ADMIRAL ALLEN: Well, we estimate to somewhere between 30,000 and 60,000 is coming out a day because it's a range the—the folks and the flow rate technical group—they're a lot of different academicians that are involved with this and they have varying opinions on the data that we looked at as far as the volume and the velocity of what was coming out of the pipe. And this is about as close as they've been able to narrow it. Now, we continue to say this is a range we need to understand that it is a range.

Regarding the 53,000, in the last 24 hours we were able to produce about 23.3 thousand barrels, which has either flared off or brought into the tanker that's up there. As we get to 53,000 barrel capacity with the current system we've got related to fix the riser pipe that we have right now that are killing the choke lines, we are going to see whether or not that that oil that's coming out of the vents diminishes so we can close the vents.

I dont think we really are going to know the actual flow rate until we completely contained the flow and actually measure it as we're producing. That would be the second system we'd like to bring online in July.

In the meantime, I've challenged the technical group, every time we get some new data or assumptions to take a look at, we either continue to refine and understand what it is we think is going on there. But in the meantime, I think the only way we're really going to know is what exact readings with a close system where there's no leak is when we can actually measure the pressure.

One of the things we have done, we have directed BP as they are completing the new containment caps that could be put on in July to replace the current ones and actually come up with a seal, actually both are flanged on the flange on the pipe, we're actually going to have them actually put sensors into those things so we will be able to tell the flow better than we have.

We've been sending sensors down in deployment with ROVs and there never was a requirement in the past for BP to put sensors into that type of equipment, but we're going to direct them to do that and the set that will be put on in July.

Is that responsive?

OPERATOR: Our next question comes from the line of Rosalind Jordan with Al-Jazeera, English.

Administration
Response
State and Local

Multimedia

Follow us:   

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

*An Official Website of the United States Government*

Follow us: [icons]   | Join Mailing List | About Us | Contact Us | Site Map

search

Home › Transcript - National Incident Commander and White House Press Secretary - Press Briefing

# Transcript - National Incident Commander and White House Press Secretary - Press Briefing

June 7, 2010 | 10:21:00 AM EDT

0
tweets

tweet

10:10 A.M. EDT

MR. GIBBS:  Good morning, everyone.  We are joined this morning by -- with Thad Allen, our national incident commander dealing with the oil spill in the Gulf of Mexico.  He is also here for a meeting with Cabinet agencies that are dealing with this crisis, as well -- that begins in a little less than an hour.  So let me turn it over to him to walk through the stages of our response.  And we'll both take your questions.

Sir.

ADMIRAL ALLEN:  Thanks, Robert.  Appreciate it.

Good morning.  First a quick operational update.  In the last 24 hours, the production of the Discover Enterprise over the wellhead produced 11,000 barrels of oil.  They continue to increase -- over the first three days of operation we have gone from 6,000 to 11,000 -- trying to increase that production rate, ultimately close the venting valves and move to a greater capacity.

BP anticipates moving another craft in that can actually handle additional production, and the combination of these two -- the vessel is actually called the Q4000 -- combined will have a production capability of about 20,000 barrels a day.  And were looking to increase production, as I said, so we can slowly close those vents and see how the containment cap is working and whether or not any oil is forced down by the pressure through the rubber seals, as weve talked about before.

In the long run, British Petroleum is also looking at bringing larger production vessels in, create a more permanent connection that can be disconnected easily in case we have a hurricane or bad weather later on in the hurricane season, and will continue to optimize the production out of the well to contain it.

As Ive said on several occasions, though, the long-term solution to this is going to be drilling the relief wells, which, again, are targeted at early August.  There are two relief wells in progress right now:  Development Driller Three is down between 7,000 and 8,000 below the sea floor; Development Driller Two is down around 3,000.

Those will continue.  The second one is a risk mitigater, as we move towards what will be the final solution, which will be the relief wells.  And following the intersection of the well bore with those relief wells, they will put heavy mud down there to suppress the pressure of the oil coming up from the reservoir, put a cement plug in and effectively do what I would call a bottom kill, as opposed to the top kill, which was not successful a couple of weeks ago.

What I'd like to kind of talk to you about is the area of operations out there.  And we're going to try something on you today, and you like it, we'll continue to refine it.  Take this as a work in progress, but -- can we go ahead and put the slide up, please?  And there are copies available on the web and we'll get it to you, but basically we're going to try and start giving you a three-dimensional look at what the world of work is like out there.

We're dealing with basically four areas of operations.  One is the subsea area, where we're trying to do containment on the well.  The second is trying to deal with the oil thats on the surface above the well, where it comes up in large quantities and could be dealt with effectively through mechanical skimming and in-situ burning.

We all know about the recovery on shore, but the emphasis over the last couple of weeks has shifted to the area between the shoreline and out about 50 miles.  Because what's happened, over the last several weeks, this spill has disaggregated itself.  We're no longer dealing with a large, monolithic spill; we're dealing with an aggregation of hundreds or thousands of patches of oil that are going a lot of different directions.  And we've had to adapt and we need to adapt to be able to meet that threat.

When this operation started, we were controlling all skimming and in-situ burning operations out of the Incident Command Post in Houma, Louisiana, which has responsibility for the area where the well is at.  In the last week, we have shifted control of skimming assets to the commander and the Incident Command Post in Alabama, who is responsible for Mississippi, Alabama and Florida -- and actually have detached a task force to work for him to push out 50 miles offshore and find these smaller patches and try and deal with them before they get to shore.

This is an adaptation to the changing characteristics of the spill, which is no longer a single spill but a massive collection of smaller spills moving forward.  And in regards to that, what is becoming critical, in the near future we'll be able to get skimming capability offshore and be able to work those small patches.

We've made some significant progress in bringing more folks into the fight in terms of vessels of opportunity.  These are local fishing vessels and workboats that we certify to help us, and then also certify the individuals and train them thereon.  Between Louisiana, Mississippi, Alabama and Florida, right now we have about 1,500 vessels of opportunities where we've certified the crews and put them out there.

What we now have is an opportunity to match vessels of opportunity with skimmers.  So the next critical component or resource we're going to be looking for is to increase the amount of skimmers now that we have these vessels that can deploy them.

We have over 100 large vessels that are skimming offshore in and around the surface area above the well.  What we want to do is take this down to a slightly lower level -- smaller skimmers and smaller vessels that can work in the harbors and the bays up to 50 miles offshore.  And we are moving those assets into place right now, and we'll be looking nationally at our skimmer inventory and try and get those matched up with the vessels of opportunity as we move forward.

We continue to move Coast Guard units in as well.  We have Coast Guard cutters that have skimming capability stationed off of Mississippi, Alabama, and Florida.  We have a Coast Guard cutter out there conducting command and control, helicopters for surveillance.  And we have small Coast Guard patrol boats that can actually do scouting, work with the vessels of opportunity, to identify the small patches of oil and deal with it there.

I would tell you this, though:  Boom is not a silver bullet against oil.  We had a situation over the weekend where we had boom in place back behind Dauphin Island, Alabama, and the sea state actually defeated the boom and we had some oil come ashore there and had to deal with that.  We will continue to press forward.  I think we have to deal with the reality that no matter how much boom we have out there, that this aggregation of this slick is going to cause oil to come ashore from time to time.

The question for us and the challenge for us is get quicker and agile where smaller units can get to back-bay shallow areas, and work offshore to find smaller patches of oil and deal with them as quickly as we can moving forward.

With that, Ill be glad to take any questions you might have for me.

Q  Admiral Allen, what percentage of oil do you think is being captured at this point by the containment device?

ADMIRAL ALLEN:  Let me give you two answers to that, and I think we're going to have to get more fidelity on this as we get the actual flow rate established.  We have two models for a flow out of

Q   So do you know if there are big, large oil plumes underwater yet?  Or that has not been --

ADMIRAL ALLEN:  t hasn't been established by testing.  We understand there are densities down there, but as she would say, they haven't been characterized yet.  And thats the reason theyre doing the sampling right now and testing it.

Q   And then also there are conflicting reports whether or not there are birds that are covered in oil from Texas, as far as Texas.  Is that true or not?

ADMIRAL ALLEN:  I haven't got that report, but we'll certainly follow up and get it back to you on that.  I personally haven't been given a report on Texas.

Q   Following up on the issue of -- you were saying over the weekend that it could take -- the cleanup could take months, I've talked to environmental groups this morning who say that thats a pipe dream.  They believe that based on the Exxon Valdez situation, it's going to be minimum of three, four, five years -- maybe much more than that, that this cleanup operation is going to be going on in a major way.  Do you simply disagree with that?

ADMIRAL ALLEN:  No, I dont -- maybe it's how we're characterizing it.  Dealing with the oil spill on the surface is going to go on for a couple of months.  After that, it will be taken care of.  I agree with you -- long-term issues of restoring the environment and the habitats and stuff will be years.  I separated out two different functions, I guess.

Q   Okay -- the Exxon Valdez, it's been --

ADMIRAL ALLEN:  I have no argument with that characterization.

Q   One other thing.  When we were down there this week with the President, we wanted to get shots of work crews on the beaches, and there apparently are rules that they can only work 20 minutes in every hour.  And we cruised down the beach past six different tents of people; we could not get a shot of anybody working in the hour or so we were on the beach.  And I know people in Grand Isle are irate because they say, look, let us go out and do it.  Why do you have all these rules and all this bureaucracy?  Would you oppose people -- or is there any kind of mechanism that could be used to let people who are really fired up to clean this up --

ADMIRAL ALLEN:  Sure.

Q   -- because they live there and let them do it?

ADMIRAL ALLEN:  We have a program where we -- it's called qualified community responders, where we bring them in and we teach them to do certain tasks.  And it could be driving the vehicles up and down the beach, some basic training on raking and removing debris and those sort of things.  And in a number of states, we've actually trained these folks and put them out to work there.  I dont know about the particulars of your particular situation, but that capability is available.

Q   Are you aware of this -- is there really, as we were told, a 20-minute limit in each hour that they can work --

ADMIRAL ALLEN:  Not familiar personally, but we will get the information to follow with you.

Q   Thanks.

MR. GIBBS:  Obviously, Chip, anybody that deals with and comes into contact with this substance, there is -- as the Admiral said, there's a training program that is involved in -- and we're taking worker health extremely seriously.  We don't want to find, as you said, months, weeks -- weeks, months, or years later that we didn't put enough safeguard in on the front end to ensure the health of those that have either been contracted or want to volunteer to help at the beaches.

ADMIRAL ALLEN:  We've actually got an agreement with the Department of Labor and OSHA on how we're going to use their protocols and make sure that they're fully integrated into our response as well.

Q   Sir, as I understand it, the containment cap is now putting out more oil than the ship above it is able to carry.  You mentioned that BP is going to bring another ship in.  Why is the company just doing that now?  Why does it seem like we're always just one step behind here?

ADMIRAL ALLEN:  Well, they're not at a production rate yet that will tax -- they potentially could be there -- as they're spooling it up, there's going to be a second vessel brought in.

Q   Isn't that why they didn't close that fourth valve, because they didn't want to get to a rate that they couldn't --

ADMIRAL ALLEN:  They are not at a full rate yet, is my understanding.

MR. GIBBS:  There's also -- as I understand it also, there are -- as you said, there is concern about hydrates, there's concern about pressure.  This is a delicate cap and we want to ramp this thing up so that this is a solution that we can work with for weeks and months and don't do something too rapidly to cause something tragic to happen.

ADMIRAL ALLEN:  I would tell you, several weeks ago they started converting to a much larger production platform in anticipation that they would replace this one with a much higher capacity platform.  That's being done right now.  But it's very large barge ship and some of these are coming as far away as the North Sea to actually bring in the type of production platforms that are floating that could do this at a much larger rate, and that had already been in progress.

Q   Bottom line, BP has consistently underestimated the amount of the flow, the flow rate.  The U.S. government doesn't seem to know it.  Why is this so difficult?

ADMIRAL ALLEN:  Frankly, BP is not doing any estimates on flow rate.  We've established our own group and we do that now and it's independent of British Petroleum.  Those estimates I gave you are estimates that we are doing.  I mean, they can do it if they want, but I think we need to have the American people understand that any flow rates that are being developed under any models, those are governmental with third parties involved, not BP.  And that's what's happening.

Q   Is that because you don't trust BP?

ADMIRAL ALLEN:  Well, I think there's a lot of talk about transparency.  I think you guys need to be assured that we are doing this, and we are.

MR. GIBBS:  Well, not to mention, as we've talked about here, Chip, the amount of oil that leaks will help determine the fine that BP incurs.  So while our interests align on capping this well, we would never ask BP to tell us how much oil they think has leaked in order for us to determine the compensation and penalty that is to be derived from it.

Understanding that, again, the Flow Rate Technical Group was stood up -- and as Admiral Allen has said countless number of times, our response was not dictated upon a flow mechanism.  But the Flow Rate Technical Group was set up, and because we had a better idea and could use better equipment, NASA equipment, equipment from all over the government, to get as best an estimate as we could for an event that is happening 5,000 feet below the surface of the water.

The analogy that somebody used to me was it is -- we are trying to measure, 5,000 feet below the surface, the amount of material that is coming up if you were to shake a Coke can.  Now, thats not a perfect analogy, because most Coke cans are 12 ounces and you know the amount.

So the Flow Rate Technical Group is going back and looking at the information that we have now, the information post the shear cut, and whether or not, as the Admiral said, we can get a closer range as to what has happened.

Q   There was a time when you guys were saying a lot that the flow rate wasn't essential because you were planning for the worst-case scenario.  But there's now a couple of examples --

MR. GIBBS:  Well, we've said that always and thats --

Q   Right.  But it is relevant, right, I mean, to how much you're able to capture --

ADMIRAL ALLEN:  Exactly.  Youre making a good point.

Q   And have you brought up the claims issues with --

ADMIRAL ALLEN:  Yes, yes, I did.

Q   -- either of them directly.  And what has been their response?

ADMIRAL ALLEN:  They said theyre looking for any type of input, direction that we will give them because they obviously want to do this right.  Thats not a core competency of BP, so we need to give them some help and some direction and guidance.  And thats what we're doing.

Q   And the meeting that you're having this week, will that be with Tony Hayward?

ADMIRAL ALLEN:  No, it will be the person that runs their claims processing for BP.  And if I need to meet with Tony Hayward after that, we'll do that.  It will be myself, Tracy Wareing and their claims processor.

Q   When you speak to Tony Hayward or Mr. Dudley, do you trust the information that theyre giving you?

ADMIRAL ALLEN:  I get this question all the time.  I'm not sure it's a matter of trust.  We're working together; it has to be cooperative.  We're trying to create unity of effort.  If I ask them for information, I get it.  If I think I need more information, I go back and ask them.  If there's an ambiguity or something that needs to be clarified, I go back and I do that.  I have given them directions sometimes, saying we're not going to go forward until you give me this.  It's an ongoing, constant dialogue.  You can call it partnering, cooperation, trust, whatever, but thats the way it works.

MR. GIBBS:  And we're asking for, and we'll be asking for at this meeting, some greater transparency on this claims process, trying to shorten the window for what BP is legally required to do in filling those claims, but in having a broader understanding through transparency about what has yet to be fulfilled.

ADMIRAL ALLEN:  There are some complicating factors.  We are dealing with personally identifiable information, so there are privacy issues and data associated with the folks that are filing claims, and how you actually manage this process -- we just need to make sure we get it right.

MR. GIBBS:  Major.

Q   Three issues, Admiral.  One, dispersants.  Can you catch the nation up on what we've used so far?  Are you still using them?  What's the environmental feel you have for them now as this continues?

Secondly, on the sand berms in Louisiana, where are they?  Is one halfway constructed?  Do you have two up, or where are we in that process?  And are they being contemplated anywhere else along the possible spill target areas as the spill continues?

And lastly, you said on one of the shows yesterday that you would look into this issue whether or not BP withheld or ordered you to withhold video early on in the disaster from public release?  Do you have anything further on that?

ADMIRAL ALLEN:  Yes, I think we issued a statement on that.  I dont think there was any indication that they did do that.  And my press assistant can make it available to you.  If you go -- I forgot the first question now.  (Laughter.)

Q   Dispersants and the sand berms.

ADMIRAL ALLEN:  Dispersants, good.  Dispersants -- as you know, we recently reached the 1 million gallon threshold, not a threshold of any particular importance other than its sheer magnitude.

Q   Never before has that level?

ADMIRAL ALLEN:  Never before, never before.  I've had frequent contact with Lisa Jackson on this, and the overall approach is to minimize the amount of dispersants being used on the surface because theyre not as effective as the dispersants used in the subsea area.  And the reason theyre not as effective is they go on top of the oil, and you get less effect because there's oil -- if the oil is several inches deep, the dispersant kind of react on the top, and you actually need to kind of mix it up and emulsify it for the dispersants to have the greatest effect.

When we apply dispersants with a wand at the point of discharge, there's a better mixing already, so we're much more effective at a much lower rate.  So our general strategy is to use subsea dispersants wherever possible and minimize the amount on the surface to what's needed for safety or exigent circumstances.

And I'll give you one.  If you saw, we did some video out on the oil rigs last week when I was out there.  In the background one of the offshore supply vessels was actually spraying water all around the Discover Enterprise.  That was to put down volatile organic compounds that were coming up out of the oil that was sitting around the ship that was actually producing -- there actually is a threat to personal safety and health there on those vapors.  Dispersants put those down.  You'd rather use water to do it.  There may be times where because of the situation you may want to use dispersants to reduce those vapors.  But those are the types of things we would talk about.

They give us a dispersant plan, and EPA is aware of that.  Our federal on-scene coordinator is trying to minimize dispersants on the surface, but there may be times that theyre going to use them, but we need to use those in very judicious quantities.  That means we're going to be relying on in-situ burning and mechanical skimming in and around the wellhead.

Q   And sand berms?

ADMIRAL ALLEN:  Sand berms -- at this point, the President made the decision last week, we authorized the six segments that were created by the Corps of Engineers.  The state of Louisiana is working with British Petroleum.  I understand they've got the funding mechanisms in place.

I think the real issue right now is availability of barges.  There are a couple of barges that are starting to work right away, and I can verify this for you, but I believe the first place theyre going to start working is somewhere around the Chandeleur Islands because the sand source is close enough where they can get to work right away.  When you go to the west of the Mississippi River, theyre actually going to have to take sand from offshore, actually deposit it on the seabed and then retransmit it to make the berms on the islands.  Thats a much longer process.

I've talked with Lieutenant General Van Antwerp, head of the Corps of Engineers, about their ability to free up dredges from other projects to be able to help them.  The state of Louisiana is also looking nationally at dredge capability.  And right now it's a matter of finding the dredge capacity to be able to start doing some work.  But theyre ultimately going to have to take a lot of sand, move it in close to shore, and then move it again.

If they come up against a capacity problem in dredges, we can do something called a waiver of the Jones Act, which would allow us to bring foreign-flagged dredges in.  But that would be -- I would consider that only as a last-gap fill-in that might be needed.  I dont think we're there yet.  And Louisiana has not come and told me that yet.

MR. GIBBS:  Just so -- I think you're aware and if I'm not mistaken, each night the Joint Information Center's fact sheet contains an updated number in the amount of surface and subsea dispersants used so people should be able to track each day how much is used.

Q   On the claims process, what role is the government playing or could the government be playing in going in there and actually managing it for and with BP?  And also, I want to ask you, on royalties, is BP committed to paying federal royalties as far as you're concerned on the oil that's collected?

ADMIRAL ALLEN:  I'm not sure on the royalty issue.

MR. GIBBS:  Let me check on that.

ADMIRAL ALLEN:  On the claims process, what we're trying to do is create independent government teams for every state, facilitate them, the state getting together with the BP claims processor to identify problems and move ahead.  There's actually a fairly novel idea being approached in Alabama right now and that's training National Guardsmen to go out and assist folks in filing claims.  So you actually kind of have a multiplier effect.  And that's being discussed actually today between Tracy Wareing and the folks in Alabama.

Follow us:   

Cambodian | Croatian | Español | Français | Korean | Kreyòl ayisyen | Lao | Russian | Thai | Vietnamese

Site Map | Site Notices & Plug-Ins

