## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In re: | Oil Spill by the Oil Rig | * | |
| | "Deepwater Horizon" | * | MDL No. 2179 |
| | in the Gulf of Mexico, | * | |
| | on April 20, 2010, | * | Section: J |
| | | * | |
| This Document Relates to: | | * | Judge Barbier |
| | | * | |
| No. 10-4239; No. 10-4240; No. 10-4241 | | * | Magistrate Judge Shushan |
| | | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### MEMORANDUM IN SUPPORT OF BP DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT AGAINST THE MEXICAN STATES OF
### VERACRUZ, TAMAULIPAS, AND QUINTANA ROO ON THE ISSUE OF
### WHETHER THE MEXICAN STATES HAVE A PROPRIETARY INTEREST
### IN THE MATTERS ASSERTED IN THEIR COMPLAINTS

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Catherine Fitzpatrick
Elizabeth A. Larsen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Allison Rumsey
S. Zachary Fayne
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
E-Mail:  Allison.Rumsey@aporter.com
Telephone:  202-942-5000
Facsimile:  202-942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Jeffrey Bossert Clark
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................. 4

I.    THE MEXICAN STATES DO NOT HAVE A PROPRIETARY INTEREST
      IN THE WATERS, LANDS, NATURAL RESOURCES, AND WILDLIFE
      ALLEGEDLY DAMAGED BY THE OIL SPILL.............................................. 5

      A.    Under Mexican Law, the Relevant Waters, Lands, and Natural Resources
            Are Owned Exclusively by the Federal Government, Not by the
            Mexican States. .................................................................................... 6

            1.    The Mexican Constitution.......................................................... 7

            2.    The General Law of National Assets ......................................... 9

      B.    The Mexican States' Concurrent Jurisdiction Over Certain Environmental
            Matters Does Not Create An Interest In Property Tantamount to
            Ownership. ............................................................................................ 11

      C.    Administrative Agreements Between the Mexican Federal Government
            and the Mexican States and/or Private Parties Do Not Create Proprietary
            Rights. .................................................................................................. 13

      D.    The Mexican States Do Not Have A Proprietary Interest in Wildlife. ........ 15

II.   THE MEXICAN STATES' GENERAL MARITIME CLAIMS AGAINST BP—
      AN OPA RESPONSIBLE PARTY—ARE DISPLACED BY OPA................................ 16

CONCLUSION.............................................................................................................. 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Ins. Assoc. v. Garamendi,*
539 U.S. 396 (2003) ............................................................................................ 17

*BP N. Am. Petro., Inc. v. S/S Robert E. Lee,*
1992 WL 266153 (E.D. La. Sept. 28, 1992) ....................................................... 5

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................ 4

*Container Corp. of America v. Franchise Tax Bd.,*
463 U.S. 159 (1983) ............................................................................................ 17

*Crosby v. Nat'l Foreign Relations Trade Council,*
530 U.S. 363 (2000) ............................................................................................ 17

*IMTT Gretna v. Robert E. Lee SS,*
993 F.2d 1193 (5th Cir. 1993) ............................................................................ 5

*Little v. Liquid Air Corp.,*
37 F.3d 1069 (5th Cir. 1994) .............................................................................. 4

*Louisiana ex rel. Guste v. M/V Testbank,*
752 F.2d 1019 (5th Cir. 1985) ............................................................................ 5

*Louisville & Nashville R. Co. v. M/V Bayou Lacombe,*
597 F.2d 469 (5th Cir. 1979) .............................................................................. 6

*Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.,*
782 F. Supp. 317 (E.D. La. 1992) ...................................................................... 5

*Robins Dry Dock & Repair Co. v. Flint,*
275 U.S. 303 (1927) ...................................................................................... 4, 5, 6

*Tex. E. Transmission Corp. v. McMoran Offshore Expl. Co.,*
877 F.2d 1214 (5th Cir. 1989) ............................................................................ 5

**Other Authorities**

Zamora, Stephen, *et al*,
*Mexican Law* (2004) ........................................................................................... 12

<u>Page(s)</u>

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................... 4

Fed. R. Civ. P. 56(a) ................................................................................................. 4

Fed. R. Civ. P. 9(h) ................................................................................................. 16

**Mexican Statutes**

Federal Law of the Sea ............................................................................................ 12

General Law of Ecological Balance and Environmental Protection ("GLEBEP") ................ 12, 13

General Law of National Assets ("GLNA") .............................................................. passim

General Law of Sustainable Fishing and Aquaculture ("GLSFA") ..................................... 15

General Law of Wildlife ........................................................................................ 15, 16

Organic Law of the Federal Public Administration ........................................................ 13

**United States Statutes**

33 U.S.C. § 2701 ....................................................................................................... 2

33 U.S.C. § 2707 .................................................................................................. 2, 17

33 U.S.C. § 2707(a)(1) ............................................................................................ 17

**Mexican Constitutional Provisions**

Mexican Const. Art. 133 ............................................................................................ 6

Mexican Const. Art. 27 ....................................................................................... 7, 8, 9

Mexican Const. Art. 41 .............................................................................................. 8

Mexican Const. Art. 42 .............................................................................................. 7

Mexican Const. Art. 48 .............................................................................................. 7

Mexican Const. Art. 73 (XXIX-G) ............................................................................. 11

## INTRODUCTION

The Plaintiffs—the Mexican States of Veracruz, Tamaulipas, and Quintana Roo (collectively, the "Mexican States")—claim that they have suffered physical injury to their proprietary interests as a result of the *Deepwater Horizon* oil spill.  It has been widely reported in the media and in the academic and scientific literature that oil and dispersants from the *Deepwater Horizon* oil spill did not reach Mexican waters or the Mexican coastline.[1] Nevertheless, for purposes of this Motion for Summary Judgment, it is assumed that the oil spill has in fact impacted Mexican waters, land, natural resources, and wildlife.  Even if Plaintiffs' allegations regarding the impacts of the spill are taken as true, however, the Mexican States' claims against BP for negligence and gross negligence are legally insufficient and should be dismissed for the following two reasons.

First, the Mexican States do not have a proprietary interest in the waters, lands, natural resources, and wildlife allegedly injured by the *Deepwater Horizon* oil spill.  As previously held by this Court, in order to recover under general maritime law, the Mexican States must demonstrate "a physical injury to a proprietary interest," as required by the so-called *Robins Dry Dock* rule (C Order, Rec. Doc. 4845, at 12).  The Mexican States cannot make this showing.  Under Mexican law, the Mexican federal government, and not the Mexican states, has exclusive ownership rights and/or jurisdiction over the waters, lands, natural resources, and wildlife allegedly injured by the *Deepwater Horizon* oil spill.  Consequently, the Mexican States do not have the requisite proprietary interest, and their claims should be dismissed.

---

[1] For example, Sharon Herzka, a marine ecology specialist at the Centre for Scientific Research and Higher Education at Ensenada (CICESE), stated in a news article from April 2011 that CICESE had "not observed direct evidence of high levels of oil or oil wastes, and there have been no reports of oil from the spill reaching Mexican waters."  The article is attached hereto as Appendix B.

Second, the Mexican States' general maritime claims for negligence and gross negligence against BP, which is a "Responsible Party" under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, are superseded by the exclusive remedies provided by OPA. As this Court held previously, "maritime causes of action against a Responsible Party are displaced by OPA," such that all claims against a Responsible Party for damages covered by OPA must comply with OPA's procedural requirements. (B1 Order, Rec. Doc. 3830, at 26.) OPA creates a comprehensive remedial scheme to address responsibility for oil spills that occur in U.S. waters, and establishes a specific process by which foreign claimants can seek damages from a Responsible Party. *See* 33 U.S.C. § 2707. As this Court held previously, the Mexican States have not complied with this process. (C Order, Rec. Doc. 4845, at 11.) Under these circumstances, to allow the Mexican States to maintain a general maritime claim against BP, a Responsible Party, "would serve to frustrate and circumvent the remedial scheme in OPA." (B1 Order, Rec. Doc. 3830, at 26.)

## BACKGROUND

### A.    Procedural Background

The Mexican States of Veracruz, Tamaulipas, and Quintana Roo each brought separate, but substantially similar, actions against BP, Transocean, Halliburton, Anadarko, and Cameron in relation to the *Deepwater Horizon* oil spill (Civ. A. Nos. 10-4239, 10-4240, 10-4241). These actions were consolidated with MDL 2179. In these actions, the Mexican States asserted claims under OPA, as well as claims of negligence, gross negligence, negligence per se, private nuisance, and public nuisance.

In ruling on the Motions to Dismiss individual actions falling within Pleading Bundle "C," this Court dismissed the Mexican States' claims under OPA, finding that the Mexican States had "failed to demonstrate that 'recovery is authorized by a treaty or executive

2

agreement between the United States and the claimant's country,'" as required by OPA. (C Order, Rec. Doc. 4845, at 11.)   The Court also dismissed the Mexican States' claims of negligence per se and nuisance.  (*Id.* at 11-12.)  Finally, the Court held that the Mexican States' negligence and gross negligence claims were preserved, "but only to the extent there has been a physical injury to a proprietary interest."  (*Id.* at 12.)

### B.      Alleged Proprietary Interests

The Mexican States' First Amended Complaints (collectively, the "Complaints") allege that the Mexican States have suffered and will continue to suffer physical injury as a result of the *Deepwater Horizon* oil spill.[2]  For example, the Complaints each contain the allegation that the oil spill "will cause and will continue to cause severe injury to the Plaintiff's coastal waters, offshore waters, beaches, lagoons, estuaries, delicate wetlands, and intertidal zones." (Tamaulipas Am. Compl. ¶ 39; Quintana Roo Am. Compl. ¶ 39; Veracruz Am. Compl. ¶ 39.) Similar allegations of future physical injury can be found throughout the Complaints.  (*See*, *e.g.*, *id.* at ¶¶ 4, 5, 37, 55.)

The Mexican States provided additional detail regarding the proprietary interests alleged to have been injured in their Objections and Answers to Defendants' Targeted Discovery Requests, attached hereto in relevant part as Appendix A.   In their discovery responses, the Mexican States claim to have a proprietary interest over their "shores, waterways, lagoons, bays, water ways, estuaries, beaches, reefs, sea beds, and waters extending into and comprising the Mexican Exclusive Economic Zone, including, but not limited to, the marine life, fish, fauna, flora, amphibians including (all turtle species), birds, mammals, wildlife, plankton,

---

[2] The Court denied the Mexican States' motion for leave to file Second Amended Complaints.  (Order, Rec. Doc. 2403, May 18, 2011.)

ichthyoplankton, zooplankton and all plankton species, micro-organisms, and living species that inhabit, feed, reproduce, traverse, and are otherwise found in the foregoing areas, locations, and geological features."  Specifically, the Mexican States claim to have "dominion over and own, control, manage, maintain, tax, economically exploit and develop, restore and conduct reparations, regulate, use, and police" these lands, waters, natural resources, and wildlife.

The available scientific data, as well as media reports, indicate that oil and dispersants from the *Deepwater Horizon* oil spill did not reach the Mexican Exclusive Economic Zone ("EEZ") or the Mexican coastline.  However, for purposes of this Motion, the BP Defendants assume that the above-listed lands, waters, natural resources, and wildlife, over which the Mexican States' claim to have a proprietary interest, were in fact impacted by the oil spill.

## ARGUMENT

The Mexican States do not have a proprietary interest in the lands, waters, natural resources, and wildlife allegedly damaged by the *Deepwater Horizon* oil spill, as required by this Court's December 9, 2011 Order (Rec. Doc. 4845) and the Supreme Court's decision in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).  Moreover, even if the Mexican States did have a proprietary interest in these resources, their general maritime claims of negligence and gross negligence against BP, which is a "Responsible Party," are displaced by OPA.  Accordingly, the Mexican States' claims should be dismissed pursuant to Federal Rule of Civil Procedure 56.  Summary judgment is appropriate where, as here, "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

I.      **THE MEXICAN STATES DO NOT HAVE A PROPRIETARY INTEREST IN THE WATERS, LANDS, NATURAL RESOURCES, AND WILDLIFE ALLEGEDLY DAMAGED BY THE OIL SPILL**

The Mexican States do not possess a proprietary interest as required to maintain a claim for negligence or gross negligence in this matter.  In order to recover under general maritime law, the Mexican States must demonstrate "a physical injury to a proprietary interest."  (C Order, Rec. Doc. 4845, at 12); *see also Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. at 308-09. The Mexican States do not have a proprietary interest in the waters, lands, natural resources, or wildlife allegedly damaged by the *Deepwater Horizon* oil spill.  Accordingly, pursuant to the *Robins Dry Dock* rule and this Court's December 9, 2011 Order (Rec. Doc. 4845), the Mexican States' claims should be dismissed.

Courts in the Fifth Circuit have defined "proprietary interest" to mean an interest in property that is "tantamount to full ownership."  *Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.*, 782 F. Supp. 317, 320 (E.D. La. 1992); *see also Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1034 (5th Cir. 1985) (Williams, J., concurring) ("[T]he common legal synonym for 'proprietary interest' is ownership . . . ."); *BP N. Am. Petro., Inc. v. S/S Robert E. Lee*, Nos. 92-0174, 92-0295, 1992 WL 266153, at *1 (E.D. La. Sept. 28, 1992) ("'Proprietary interest' typically equates to ownership.").  Although the Fifth Circuit has suggested, in dicta, that a non-owner might be able to have a proprietary interest if that party's interest is *tantamount to full ownership*, the Fifth Circuit has never found a non-owner to have the requisite proprietary interest.  *See IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1194 (5th Cir. 1993) (suggesting that three factors may inform the determination of whether a non-owner has a proprietary interest — actual possession or control; responsibility for repair; and responsibility for maintenance — but finding that a lessee did not have a proprietary interest in a leased dock and pipelines); *Tex. E. Transmission Corp. v. McMoran Offshore Expl. Co.*,

877 F.2d 1214, 1224-25 (5th Cir. 1989) (finding that a gas producer did not have proprietary interest in a pipeline that it used under contract); *Louisville & Nashville R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469, 474 (5th Cir. 1979) (finding that a railroad did not have a proprietary interest in a damaged bridge that it used under contract).   In addition, in *Robins Dry Dock*, the Supreme Court made clear that a tortfeasor is liable only to the *owner* of the damaged property, noting that "[t]he injury to the propeller was no wrong to the respondents but only to those *to whom it belonged*."   275 U.S. at 308 (emphasis added).   Accordingly, the Mexican States must demonstrate ownership over the relevant natural resources in order to have the requisite proprietary interest.

As described below, the Mexican Constitution explicitly grants ownership of the relevant natural resources to the Mexican federal government, and not to the Mexican States.  In addition, even where the federal government allows for the use or exploitation of these resources, Mexican law is clear that a grant of use or exploitation does not transfer ownership or a proprietary right. Therefore, under Mexican law, the Mexican States do not own the waters, lands, natural resources, and wildlife allegedly damaged by the *Deepwater Horizon* oil spill.   Nor do the Mexican States possess an interest in these waters, lands, natural resources, and wildlife that can be said to be *tantamount* to full ownership.   Consequently, the Mexican States do not have a proprietary interest as required by *Robins Dry Dock* and this Court's December 9, 2011 Order.

### A.   Under Mexican Law, the Relevant Waters, Lands, and Natural Resources Are Owned Exclusively by the Federal Government, Not by the Mexican States.

The Mexican federal government has exclusive ownership rights over the Mexican lands, waters, and natural resources allegedly damaged by the *Deepwater Horizon* oil spill.   Two sources of Mexican law delineate these ownership rights:  (1) the Mexican Constitution, which is Mexico's supreme law (*see* Const. Art. 133); and (2) the General Law of National Assets.  These

legal authorities establish that: (i) the Mexican federal government, and not the Mexican States, has full ownership of the lands, waters, and natural resources allegedly damaged by the oil spill, including the Mexican EEZ, the beaches, the territorial sea, the continental shelf, the seabed and subsoil, inland marine waters, lagoons and estuaries, natural inland lakes, rivers, and streams; (ii) the Mexican federal government's ownership rights over these lands, waters, and natural resources are inalienable and not subject to adverse possession; and (iii) the Mexican federal government has exclusive jurisdiction over these lands, waters, and natural resources. Accordingly, the Mexican states do not own, and cannot have a proprietary interest in, the allegedly injured waters, lands, and natural resources.

### 1.    The Mexican Constitution

The key provision of the Mexican Constitution with respect to ownership rights over Mexican waters, lands and natural resources is Article 27.[3]   Article 27 clearly and explicitly grants to the Mexican federal government, and not the States, sole ownership of Mexican lands and waters: "[o]wnership of the lands and waters within the boundaries of the national territory is vested originally in the Nation, which has had, and has, the right to transmit title thereof to private persons, thereby constituting private property."  Const. Art. 27, ¶ 1 [Ex. 8, at 2; *see also* Ex. 6, at 1].[4]   According to the Mexican Supreme Court, the term "Nation" as it appears in the

---

[3] Other relevant constitutional provisions include Article 42 and Article 48.  Article 42 states that the "national territory" is composed of, among others:  (1) the "territory of the integral parts of the Federation"; (2) the "territory of the islands, including reefs and cays in adjacent seas"; (3) the "continental shelf and the submarine shelf of the islands, cays and reefs"; and (4) the "territorial seas' waters  in accordance with the scope and terms set forth by International Law and inland maritime waters."  Const. Art. 42 [Ex. 8, at 9; *see also* Ex. 6, at 5].  Article 48 states: "The islands, keys and reefs of the adjacent seas that pertain to national territory, the continental shelf, the submarine shelf of the islands, keys and reefs; the territorial seas, inland marine waters, and the space situated above the national territory, shall be direct dependencies of the Federal Government, with the exception of those islands over which to date the states have exercised jurisdiction."  Const. Art. 48 [Ex. 8, at 10].

[4] The exhibit numbers cited herein refer to the exhibits in Defendants' Joint Submission of Exchanged Material on Mexican Law, Rec. Doc. 8167.

Mexican Constitution refers to Mexico's federal government, not the Mexican States.  *See Nacion, Representacion de la*, [TA]; 5a. Epoca; 2a. Sala; S.J.F.; LII; Pag. 72 (Registro No. 332930)[5]; *see also* Decl. of David Lopez, at ¶ 4.3 [Ex. 11].

Article 27 further establishes that certain categories of land, water, and natural resources are fully and exclusively owned by the federal government.  Specifically, paragraph 4 of Article 27 provides that in "the Nation is vested the direct ownership of all natural resources of the continental shelf and the submarine shelf of the islands. . . ."  Const. Art. 27, ¶ 4 [Ex. 8, at 2; *see also* Ex. 6, at 2].  Likewise, paragraph 5 of Article 27 states that in "the Nation is vested the ownership of the waters of the territorial seas, within the limits and terms fixed by international law; inland marine waters; those of lagoons and estuaries permanently or intermittently connected with the sea; those of natural, inland lakes which are directly connected with streams having a constant flow; those of rivers and their direct or indirect tributaries," and of other specified bodies of water.  Const. Art. 27, ¶ 5 [Ex. 8, at 3; *see also* Ex. 6, at 3].  Article 27 further establishes that with respect to the categories of water, land, and natural resources described in paragraphs four and five, "ownership by the Nation is inalienable and imprescriptible [immutable], and the exploitation, use, or appropriation of the resources concerned . . . may not be undertaken except through concessions granted by the Federal Executive, in accordance with rules and conditions established by law."  Const. Art. 27, ¶ 6 [Ex. 8, at 3; *see also* Ex. 6, at 6].  In short, even if the Mexican federal government grants a State the right of use or exploitation of a natural resource, that grant is limited in nature.  It does not, and indeed cannot, create a proprietary interest in the resource.

---

[5] In *Nacion, Representacion de la*, the Mexican Supreme Court interpreted the term "Nation" in the Mexican Constitution and held: "The nation cannot be mistaken for a state, and consequently, State officials are not the ones who represent it because it is unique and represented by its federal agencies, pursuant to Article 41 of the Federal Constitution."  [Ex. 8, at 12.]

Finally, paragraph 8 of Article 27 provides that the Mexican federal government has sovereign authority over the Mexican EEZ, stating that "[t]he Nation shall exercise its sovereign rights and jurisdictions, as determined by Congress, in an exclusive economic zone located outside the territorial sea." Const. Art. 27, ¶ 8 [Ex. 8, at 4].

In other words, under the Mexican Constitution, the Mexican federal government, and not the Mexican States, has exclusive ownership—which cannot be transferred—over certain waters, lands, and natural resources, including, among others, the territorial sea, the Mexican EEZ, the continental shelf, inland marine waters, lagoons, estuaries, the seabed, and the subsoil.

### 2.      The General Law of National Assets

The General Law of National Assets ("GLNA") implements Article 27 of the Mexican Constitution and confirms that the Mexican federal government, and not the Mexican States, owns the waters, lands, and natural resources allegedly damaged by the *Deepwater Horizon* oil spill. *See* Decl. of Leopoldo Burguete-Stanek, at 3-4 [Ex. 7]; Decl. of D. Lopez, ¶ 4.7 [Ex. 11]. In this respect, the GLNA establishes a category of "assets" that are "subject to the Federal Government's public domain regime." *See* GLNA, Art. 6 [Ex. 8, at 27; *see also* Ex. 6, at 7]. According to the GLNA, assets subject to the Federal Government's public domain regime have the following characteristics:

(1)     Assets subject to the public domain regime are "exclusively under the jurisdiction of the Federal Powers," GLNA, Art. 9 [Ex. 8, at 28; *see also* Ex. 6, at 8];

(2)     Assets subject to the public domain regime are "inalienable, imprescriptible and unseizable and shall not be subject to any recovery or temporary or permanent possession actions, or any other [action] by third parties," GLNA, Art. 13 [Ex. 8, at 29; *see also* Ex. 6, at 8]; and

(3)     "Private parties and public institutions may only acquire on the *use, utilization and exploitation* of the assets subject to the public domain regime of the federation," GLNA, Art. 15 [Ex. 9, at 6; *see also* Ex. 6, at 9] (emphasis added).

In other words, assets subject to the public domain, as defined in Article 6 of the GLNA, are exclusively under the ownership and jurisdiction of the Mexican federal government. Consequently, the Mexican States cannot have a proprietary interest over these assets even if they have a right to use or otherwise exploit these resources. *See* Decl. of L. Burguete-Stanek, at 4 [Ex. 7]; Decl. of D. Lopez, ¶ 4.7 [Ex. 11].

Article 6 of the GLNA states that the following assets, among others, are subject to the Federal Government's public domain regime: (1) the assets referred to in paragraphs four, five, and eight, among others, of Article 27 of the Mexican Constitution (*e.g.*, natural resources of the continental shelf and the submarine shelf of the islands, waters of the territorial seas, and the Mexican EEZ); (2) "assets of common use," as defined in Article 7 of the GLNA; (3) insular shelves; (4) the seabed and subsoil of the territorial sea and of the inland marine waters; and (5) the lands gained naturally or artificially from the sea, rivers, streams, lakes, lagoons or estuaries of national property. *See* GLNA, Art. 6 [Ex. 8, at 27; *see also* Ex. 6, at 7]. The following are "assets of common use" (and thus subject to the public domain regime): inland marine waters, the territorial sea, maritime beaches (defined as "the parts of the land which by virtue of the tide are covered and uncovered by the water, from the boundaries of the lowest annual ebb to the boundaries of the highest annual flood"), the federal maritime zone,[6] stream beds and lake, lagoon and estuaries owned by the Nation, and other assets considered of common

---

[6] The federal maritime zone is defined in part as: (1) "the band measuring twenty meters wide of firm land, passable and contiguous to said beaches or, when applicable, to riverbanks, from their mouth in the sea, to one hundred meters upstream"; and (2) "[t]he whole surface of cays and reefs located in the territorial sea." GLNA, Art. 119 [Ex. 8, at 29].

use by other laws that regulate national assets.  *See* GLNA, Art. 7 [Ex. 8, at 27-28; *see also* Ex. 6, at 7-8].

As discussed above, the Mexican States claim in their interrogatory responses to have "dominion over and own," and thus have a proprietary interest in, their "shores, waterways, lagoons, bays, water ways, estuaries, beaches, reefs, sea beds, and waters extending into and comprising the Mexican [EEZ]."  (App. A, at 24.)  However, quite to the contrary, the Mexican Constitution and the GLNA unequivocally and clearly state that these lands, waters, and natural resources are owned exclusively by the Mexican federal government, and not by the Mexican States.  Accordingly, the Mexican States do not, and cannot, have a proprietary interest in these lands, waters, and natural resources, and their claims should be dismissed.

### B.      The Mexican States' Concurrent Jurisdiction Over Certain Environmental Matters Does Not Create An Interest In Property Tantamount to Ownership.

As the Mexican States' legal experts point out, Mexican law grants the federal government, states, and municipalities "concurrent jurisdiction" over certain matters.  For example, the Mexican Constitution grants the Mexican Congress the power "[t]o enact laws establishing concurrent jurisdictions of the Federal Government and of the State and Municipal governments, in the scope of their respective jurisdictions, in environmental protection and ecological balance preservation and restoration matters."  Const. Art. 73 (XXIX-G) [Ex. 8, at 10; *see also* Ex. 6, at 5].  Such laws generally provide that the Mexican federal government may enter into "coordination agreements" with the states under which the states assume certain administrative powers within their territorial bounds.  *See* Decl. of D. Lopez, ¶ 5.3 [Ex. 11].

However, as explained by Halliburton's legal expert, David Lopez, "a grant of jurisdiction to the States is not the equivalent of granting the States an ownership or proprietary interest in the lands, waters and natural resources within that jurisdiction."  *Id.* ¶ 5.  Rather, such

grants of jurisdiction are limited and, in most areas, the federal government maintains a dominant role.  As explained in Mr. Lopez's declaration:

> To say that power is shared between the state and local governments would give a mistaken impression, however.  In most areas, it is the federal government that determines the precise balance of state and federal authority in cases of concurrent jurisdiction, through the passage of enabling legislation (leyes generales).  By itself determining the balance, the Federal Congress has tended to endow the federal government with the bulk of legislative power and executive authority.

Decl. of D. Lopez, ¶ 3.4 (quoting Stephen Zamora, *et al*, *Mexican Law* 77-94, at 112 (2004)) [Ex. 11].  Thus, as Mr. Lopez explains, "in fields such as environmental protection and taxation where Mexican law provides for concurrent governmental authority, the role of the Mexican states is limited and secondary to that of the federal government."  Decl. of D. Lopez, ¶ 3.4 (citing Zamora, *supra*, at 122, 129) [Ex. 11].

In addition, with respect to the waters, lands, and natural resources potentially at issue in this case, the Mexican federal government retains exclusive jurisdiction.  As described above, the GLNA states that "[a]ssets subject to the public domain regime of the Federal Government shall be exclusively under the jurisdiction of the Federal Powers. . . ."  GLNA, Art. 9 [Ex. 8, at 28; *see also* Ex. 6, at 8].  The Mexican federal government also has exclusive authority and jurisdiction over international and interstate environmental matters.  *See* General Law of Ecological Balance and Environmental Protection ("GLEBEP"), Arts. 5(III)-(IV) (international), 5(XX) (interstate) [Ex. 8, at 23-24; Ex. 6, at 10-11].  Similarly, the Mexican federal government has exclusive authority to govern in the Mexican "marine zones," which include the territorial sea, inland marine waters, the Contiguous Zone, the Mexican EEZ, the continental shelf, and insular shelves.  *See* Federal Law of the Sea, Arts. 2, 4, 7 [Ex. 8, at 30-31].  And the Department of the Environment and Natural Resources (a component of the Mexican federal government) is charged with "[e]xercising the Nation's possession and ownership of beaches, federal maritime

zone and land reclaimed from the sea." Organic Law of the Federal Public Administration, Art. 32 Bis. [Ex. 8, at 14; *see also* Ex. 6, at 13].

Indeed, only the Mexican federal government has the authority to bring a lawsuit to pursue claims of alleged injury to natural resources arising from violations of federal environmental law. *See* GLEBEP, Art. 202 [Ex. 8, at 25]. And the Mexican federal government also has exclusive jurisdiction over matters affecting the ecological equilibrium in national territory or federal zones in cases where the harm originates in the territory or zones subject to the sovereignty or jurisdiction of other countries or in a zone beyond the jurisdiction of any country. *See* GLEBEP, Art. 5(III) [Ex. 8, at 23; Ex. 6, at 10].

Thus, although Mexico utilizes a system of concurrent jurisdiction, such grants of limited authority to the Mexican States, allowing the States to exercise certain administrative powers within their territorial bounds, do not: (1) transfer the federal government's ownership interests in the relevant lands, waters, or natural resources; or (2) transfer sufficient authority and control to the States such that the States could be said to have an interest in the lands, waters, or natural resources that is tantamount to ownership. Moreover, with respect to the lands, waters, and natural resources allegedly impacted by the *Deepwater Horizon* oil spill, the Mexican federal government exercises exclusive jurisdiction. Accordingly, that the Mexican federal government and the Mexican States exercise concurrent jurisdiction over certain matters is insufficient to provide the Mexican States with the requisite proprietary interest.

C.     **Administrative Agreements Between the Mexican Federal Government and the Mexican States and/or Private Parties Do Not Create Proprietary Rights.**

As alluded to above, the Mexican federal government is authorized to grant rights of use, enjoyment, or exploitation over certain "assets" (such as assets subject to the public domain) through administrative agreements, which include concessions, permits, allotments, and

agreements of destination.  *See* Decl. of L. Burguete-Stanek, at 5 [Ex. 7].  Importantly, such administrative agreements only afford the beneficiary a limited and revocable right to use the property for a specific purpose, and do not transfer ownership or any interest that is tantamount to ownership.  *See id.* at 5; Decl. of D. Lopez, ¶ 4.7 [Ex. 11].

For example, Article 16 of the GLNA states that "[c]oncessions, permits and authorizations on assets subject to the public domain regime of the Federal Government do not create *in rem* rights; they simply grant . . . the right to make use, utilization or exploitation, in accordance with the rules and conditions set forth by the laws and the corresponding title of concession, permit or authorization."  GLNA, Art. 16 [Ex. 9, at 6; *see also* Ex. 6, at 9]. Likewise, for agreements of destination, Article 70 of the GLNA states that the "destination only grants the user institution the right to use the real property destined for the authorized use, but does not transmit ownership thereof, nor does it grant any real rights thereon."  GLNA, Art. 70 [Ex. 9, at 6].

In other words, Mexican law expressly provides that administrative agreements do not create or transfer ownership rights or any interest in property that is tantamount to full ownership.  Accordingly, administrative agreements between the Mexican federal government and the Mexican States or private parties are insufficient to create the requisite proprietary interest over the subject property, as they do not in any way alter the ownership rights established by the Mexican Constitution and the GLNA.

D.  <u>The Mexican States Do Not Have A Proprietary Interest in Wildlife.</u>

The Mexican States also do not have a proprietary interest in wildlife allegedly injured by the *Deepwater Horizon* oil spill.[7]  Under Mexican law, with limited exceptions not relevant here,[8] wildlife may not be owned by any sovereign.  *See* Decl. of L. Burguete-Stanek, at 9 [Ex. 7]; González Márquez Rpt., ¶ 25 [Ex. 10].  In addition, the Mexican federal government, and not the Mexican States, retains primary jurisdiction over matters concerning Mexican wildlife.[9]  For example, the General Law of Wildlife ("GLW") grants the federal government exclusive authority over matters relating to conservation and sustainable use of national wildlife in the case of acts originating in other countries that might affect Mexican wildlife.  GLW, Art. 9(VI) [Ex. 9, at 12; Ex. 6, at 21-22]; *see also* Decl. of D. Lopez, ¶ 5.3 [Ex. 11].  Likewise, the General Law of Sustainable Fishing and Aquaculture ("GLSFA") states that the Mexican federal government is authorized to "[r]egulate, promote and administrate the enjoyment of the fisheries and aquaculture resources."  GLSFA, Art. 8 [Ex. 6, at 20].

However, perhaps the clearest indication that the Mexican States do not have a proprietary interest in the wildlife allegedly injured by the oil spill—and thus cannot file a lawsuit in the United States to recover damages for injuries to those wildlife—is that only the

---

[7] In their interrogatory responses, the Mexican States claim that the following species of wildlife, among others, were injured by the *Deepwater Horizon* oil spill: marine life, fish, fauna, flora, amphibians including (all turtle species), birds, mammals, wildlife, plankton, ichthyoplankton, zooplankton and all plankton species, micro-organisms, and living species that inhabit, feed, reproduce, traverse, and are otherwise found in the foregoing areas, locations, and geological features."  (App. A, at 24.)

[8] Wildlife may be owned in three circumstances:  (1) "specimens type" of flora and fauna are owned by the Nation; (2) wildlife may be appropriated by hunting; and (3) wildlife may be purchased in a legal market.  *See* González Márquez Rpt., ¶ 26 [Ex. 10].

[9] Note that Article 11 of the General Law of Wildlife provides that the federal government can enter into coordination agreements with the States under which the States assume certain administrative powers within their territorial bounds, such as the power to apply measures relative to critical habitat and refuge areas of aquatic species. However, as discussed in Section I.B, *supra*, such concurrent jurisdiction does not create the requisite proprietary interest.

Mexican federal government (specifically, the Federal Attorney General's Office for Environmental Protection) is authorized to file an action in Mexican courts to recover for "damage caused to wildlife and its habitat."  GLW, Art. 107 [Ex. 9, at 13]; *see also* Decl. of D. Lopez, ¶ 6.5 [Ex. 11]; González Márquez Rpt., ¶ 27 [Ex. 10].  In other words, the Mexican States are not authorized to file a lawsuit in Mexican courts to recover for harm done to Mexican wildlife.  Accordingly, there is little argument that the Mexican States have a proprietary interest in wildlife such that they could maintain an action in U.S. courts to recover damages for injuries to wildlife allegedly caused by the *Deepwater Horizon* oil spill.

## II.  THE MEXICAN STATES' GENERAL MARITIME CLAIMS AGAINST BP—AN OPA RESPONSIBLE PARTY—ARE DISPLACED BY OPA

Even if the Mexican States did possess a proprietary interest in the lands, waters, natural resources, and wildlife allegedly damaged by the oil spill, which they do not, their general maritime claims of negligence and gross negligence are displaced by OPA.  This Court has already had occasion to address the question of whether general maritime claims are displaced by OPA for claims covered by OPA.  Specifically, the Court previously issued rulings in this MDL on Motions to Dismiss the B1 Master Complaint (Rec. Doc. 3830) and the Local Government Entity Master Complaint and certain other cases falling within Pleading Bundle "C" (Rec. Doc. 4845).  As explained below, these two prior decisions of the Court lead to the conclusion that the Mexican States' general maritime claims for negligence and gross negligence against BP, which is a Responsible Party under OPA, are displaced by OPA and therefore should be dismissed.[10]

---

[10] The issue of displacement of maritime law based on a plaintiff's failure to meet the requirements for foreign states was not briefed in the Bundle C motion to dismiss because the Mexican States neither alleged that maritime law applied to their claims nor designated an admiralty claim under Fed. R. Civ. P. 9(h).  Displacement based on the failure to meet the foreign states requirements was also not briefed in the B1 motion to dismiss, which concerned only domestic plaintiffs.

First, in ruling on the Motions to Dismiss the B1 Master Complaint, this Court held that the "claimants' maritime causes of action against a Responsible Party are displaced by OPA, such that all claims against a Responsible Party for damages covered by OPA must comply with OPA's presentment procedure."  (B1 Order, Rec. Doc. 3830, at 26.)  In so holding, the Court reasoned that "[t]o allow a general maritime claim against the Responsible Party would serve to frustrate and circumvent the remedial scheme in OPA."  (*Id.*)

The same is true here.  OPA explicitly contemplates recovery of damages by foreign claimants injured by an oil spill in certain situations.  *See* 33 U.S.C. § 2707.  However, OPA imposes a procedural requirement on these foreign claimants, requiring that they demonstrate that "recovery is authorized by a treaty or executive agreement between the United States and the claimant's country, or the Secretary of State, in consultation with the Attorney General and other appropriate officials, has certified that the claimant's country provides a comparable remedy for United States claimants."  *Id.* § 2707(a)(1).  In enacting OPA, Congress clearly intended that foreign claimants be able to recover for damages related to oil spills in the United States only where such claims were specifically authorized by treaty or executive agreement, or where the claimant's country provided a comparable remedy for U.S. claimants.[11]  As with the B1 claimants, to allow the Mexican States to pursue general maritime claims against a Responsible Party, such as BP, without complying with this procedural requirement "would

---

[11] Displacement of general maritime law and other common law remedies is particularly appropriate with respect to foreign claims, as it is well established that the Executive Branch and Congress have primacy over matters that relate to foreign policy.  *See, e.g., Crosby v. Nat'l Foreign Relations Trade Council*, 530 U.S. 363, 386 (2000) (noting that the Supreme Court has "consistently acknowledged that the 'nuances' of 'the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court'") (quoting *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983)); *cf. American Ins. Assoc. v. Garamendi*, 539 U.S. 396 (2003) (holding that state statute was preempted where it impermissibly interfered with the President's handling of foreign affairs).

serve to frustrate and circumvent the remedial scheme in OPA."  (B1 Order, Rec. Doc. 3830, at 26.)

Second, this Court has already ruled that "the Mexican States have failed to demonstrate that 'recovery is authorized by a treaty or executive agreement between the United States and the claimant's country," as required by OPA.[12]  (C Order, Rec. Doc. 4845, at 11.)  Accordingly, the Court dismissed the Mexican States' claims under OPA.  (*Id.*)  However, the Court did not directly address the question of whether the Mexican States' general maritime claims for negligence and gross negligence against BP, which is a Responsible Party, are displaced by OPA.  As explained above and in this Court's prior orders, such claims are, in fact, displaced by OPA, and consequently should be dismissed.

## CONCLUSION

Mexican waters and the Mexican coastline were not impacted by the *Deepwater Horizon* oil spill.  However, even assuming that oil from the Macondo well did reach the Mexican EEZ and travelled even further into Mexican waters and to the Mexican coastline, the Mexican States do not have a proprietary interest in those resources and cannot maintain their claims.  Further, even if the Mexican States did have the requisite proprietary interest, their claims against BP, a Responsible Party, are displaced by OPA.

For the reasons stated herein, BP respectfully requests that the Court grant its motion for summary judgment against the Mexican States of Veracruz, Tamaulipas, and Quintana Roo, and dismiss the Mexican States' general maritime claims for negligence and gross negligence in their entirety.

---

[12] The Mexican States did not contend that "the Secretary of State, in consultation with the Attorney General and other appropriate officials, has certified that the claimant's country provide a comparable remedy for United States claimants."  (C Order, Rec. Doc. 4845, at 9-10.)

Dated: January 4, 2013

Respectfully submitted,

/s/ Don K. Haycraft

| | |
|---|---|
| Richard C. Godfrey, P.C. | Don K. Haycraft (Bar #14361) |
| J. Andrew Langan, P.C. | R. Keith Jarrett (Bar #16984) |
| Catherine Fitzpatrick | LISKOW & LEWIS |
| Elizabeth A. Larsen | 701 Poydras Street, Suite 5000 |
| KIRKLAND & ELLIS LLP | New Orleans, LA  70139-5099 |
| 300 North LaSalle | Telephone:  504-581-7979 |
| Chicago, IL  60654 | Facsimile:  504-556-4108 |
| Telephone:  312-862-2000 | |
| Facsimile:  312-862-2200 | Jeffrey Bossert Clark |
| | KIRKLAND & ELLIS LLP |
| Allison Rumsey | 655 Fifteenth Street, N.W. |
| S. Zachary Fayne | Washington, D.C. 20005 |
| ARNOLD & PORTER LLP | Telephone:  202-879-5000 |
| 555 Twelfth Street, NW | Facsimile:  202-879-5200 |
| Washington, DC  20004-1206 | |
| E-Mail:  Allison.Rumsey@aporter.com | Robert C. "Mike" Brock |
| Telephone:  202-942-5000 | COVINGTON & BURLING LLP |
| Facsimile:  202-942-5999 | 1201 Pennsylvania Avenue, NW |
| | Washington, DC 20004-2401 |
| | Telephone:  202-662-5985 |
| | Facsimile:  202-662-6291 |

**Attorneys for BP Exploration & Production Inc.**

19

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 4th day of January, 2013.

Dated: January 4, 2013                                    Respectfully submitted,


                                                          */s/ Don K. Haycraft*_____
                                                          Don K. Haycraft

# APPENDIX A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010. | §<br>§<br>§<br>§ | MDL No. 2179<br>SECTION "J" |
| This Document Relates to: | §<br>§ | JUDGE BARBIER<br>MAGISTRATE SHUSHAN |
| 10-4239<br>10-4240<br>10-4241 | §<br>§<br>§ | |

## PLAINTIFFS' OBJECTIONS AND ANSWERS TO DEFENDANTS' TARGETED DISCOVERY REQUESTS

NOW COME, the Mexican States of Quintana Roo, Veracruz and Tamaulipas (herein "Plaintiffs") through their counsel Enrique G. Serna, and, pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure, hereby submit the following responses and objections to Defendants' Targeted Discovery Requests to the Mexican States of Veracruz, Tamaulipas and Quintana Roo, Republic of Mexico.

## PLAINTIFFS' OBJECTIONS TO
## EACH AND EVERY INTERROGATORY AND REQUEST FOR PRODUCTION:

1.      In addition to any objection stated below to a particular interrogatory or request for production, Plaintiffs object to each and every interrogatory and request for production to the extent that it would require Plaintiffs to provide information, reference or identify documents, produce documents or other matters which any other Plaintiff or Plaintiffs have already produced or disclosed herein, which is available from public sources, which any other party herein has already produced or disclosed, and/or which Defendants have already produced and/or disclosed.

1

In Response to BP's 1st Request for Production, Volumes 01-10, 11, 12, 14, 15 16, 17,

"19 Sea Turtle" labeled as Contents: NOAA Production Documents, including Images,

Text, Narratives, and Load Files.

Please also See TVQR 00001 – 005136.

22. All documents that you consulted in responding to the Interrogatories below and/or that provide support for your response to the Interrogatories.

**RESPONSE:** Plaintiffs refer Defendants' to all documents produced in *United States v.*

*BP Exploration*, Case No. 2:10-CV-04536-CJB-SS, including those documents produced

In Response to BP's 1st Request for Production, Volumes 01-10, 11, 12, 14, 15 16, 17,

"19 Sea Turtle" labeled as Contents: NOAA Production Documents, including Images,

Text, Narratives, and Load Files.

Please also See TVQR 00001 – 005136.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

1. Identify with specificity the proprietary interests that you allege were physically damaged due to the *Deepwater Horizon* Incident and how and when such alleged damage occurred.

**OBJECTIONS:** Plaintiffs object on the following separate and independent grounds:

1.      Plaintiffs object to this interrogatory to the extent that it seeks information of an

"expert" nature and/or which is within the knowledge and expertise of Plaintiffs' experts.

Said information will be provided through its experts and/or expert reports.

23

2.      Plaintiffs further object to this interrogatory on the grounds that it is unreasonably burdensome, purporting to require Plaintiffs to marshall forward all of their evidence and present all of their evidence in their response rather than at the trial of this matter.

**ANSWER:**    Subject to the foregoing objections and without waiver of same, Plaintiffs respond as follows:

Plaintiffs have dominion over and own, control, manage, maintain, tax, economically exploit and develop, restore and conduct reparations, regulate, use, and police their shores, waterways, lagoons, bays, water ways, estuaries, beaches, reefs, sea beds, and waters extending into and comprising the Mexican Exclusive Economic Zone, including, but not limited to, the marine life, fish, fauna, flora, amphibians including (all turtle species), birds, mammals, wildlife, plankton, ichtplankton, zooplankton and all plankton species, micro-organisms, and living species that inhabit, feed, reproduce, traverse, and are otherwise found in the foregoing areas, locations, and geological features.

The government, residents, citizens, businesses, visitors, and others within the Plaintiff states use, own, maintain, enjoy, develop, and economically exploit the natural resources, fish, marine life, and areas (land and water) in the Mexican EEZ, the state territorial waters, and other areas and sites along the coast of the states. Many businesses and political subdivisions have been granted proprietary interests to develop, manage, lease, own, control, repair, restore and enjoy the coastal areas. The legal instruments and documents granting to the Plaintiff states, their businesses, residents, and citizens, proprietary interests are listed and disclosed in Attachment 2-A of Plaintiffs' initial Rule 26 Disclosures.   Furthermore, for the legal basis, rights, and obligations see answer to Interrogatory number #5.

Please see Articles 27, 40, 42, 43, 48, 73 Section XXIX-G, 115 Section V, Sub Section i, 116, Section VII, and 27 of the Political Constitution of the United Mexican States (the "Mexican Constitution"), Articles 120, 121, and 127 of the General Law of National Assets, Federal Law of Ecological Equilibrium and Protection of the Environment, articles 11 sections I through IX and 12 sections I through X, plus all of the coordination agreements, covenants, published laws, codified laws and decrees mentioned in Attachment 2-A of the Rule 26 initial Disclosures filed previously and other legal instruments mentioned. The interplay and interrelationship of the provisions and articles of the Mexican Constitution, statutes, concessions, agreements, coordination agreements, decrees, public published laws and public codified laws and other legal instruments giving rise to the described and State's Proprietary Interests will be provided through Plaintiff's legal experts.

Beginning on or about June 2010 and continuing thereafter (see by way of example ROFFS satellite images, summaries, and analysis, as well as NOAA's charts, graphs, analysis, pictures, videos, satellite images), superficial oil and dispersants from the Macondo well drifted into the areas over which Plaintiffs have dominion and which they own, control, manage, maintain, tax activities, economically exploit, develop, regulate, repair and use.

Beginning on or about October of  2010 and continuing thereafter, the plumes and dispersants from the Macondo well drifted into the areas over which Plaintiffs have dominion and which they own, control, manage, maintain, tax activities, repair, economically exploit, develop, regulate, and use.

Defendants' oil, dispersants, and plumes contaminated and physically damaged Plaintiffs' Proprietary Interests.  By way of example, Defendants' oil, dispersants and plumes, polluted, and physically damaged the quality of the waters and other above-referenced areas, causing great injury and physically damage to the fish, quality of the sea waters, marine life, turtles, dolphins, tuna, shrimp, oysters, plankton, flora, fauna, sediments, beaches, sands, lagoons, bays, estuaries and such physical damage which will continue long into the future.

Tar balls and weathered oil originating at the Macondo well washed ashore on the beaches of the Plaintiff Mexican states impacting and physically damaging Quintana Roo first and then Tamaulipas and Veracruz.

As a result of the oil spill, dispersants and plumes in the waters of the Mexican States, in June 2010 a bio-toxin was created and this bio-toxin has physically damaged and injured shallow water marine life in Tamaulipas and Veracruz.  By way of example, the aforesaid bio-toxin swept along the coasts of Tamaulipas and Veracruz and worked its way into the bio-systems including oyster beds located in the "Morales Lagoon" of La Pesca, Soto la Marina, Tamaulipas, the "Laguna Brasil" and "Laguna Rio Carrizales" in Altamira, Tamaulipas.  Such biotoxin is named Okadic Acid, which in the presence of a red tide, is produced by the Dinoflagellate Dinophysis sp.  This microorganism had never been seen in the Coasts of Tamaulipas and Veracruz in the past and it is directly caused by excess organic material from the Deepwater Horizon Oil Spill. The combined toxin and red tide contaminated and physically damaged the waters along the coast as well as the marine life, flora and fauna of Tamaulipas and Veracruz.

26

The entire Tamaulipas and Veracruz sea turtle population suffered tremendous losses, *i.e.* they were physically injured and they died.  As a particular example, the Ridley Marine Sea Turtle suffered a tremendous reduction in hatchings and returns, being killed by Defendants' oil and plumes.  In addition, more than 40 turtles that were tagged and followed by GPS that originate and start their journey from Rancho Nuevo, Tamaulipas were all killed or disappeared in the Louisiana and Alabama Coasts during the summer of 2010 as a result of the Macondo oil spill.  All of this has been confirmed by the NOAA and USA production in MDL-2179.

More specific answers on other aspects of the flora and fauna and affected species of the coastal areas, Mexican EEZ and Gulf of Mexico will be supplemented through upcoming fact and expert depositions.

2. Describe how decisions regarding sampling of environmental media and wildlife were made, including but not limited to how and why decisions were made to begin and cease any sampling; how and why decisions were made to conduct or not conduct sampling in any particular location; how and why decisions on which wildlife types to sample were made; who was involved in the decisions concerning sampling; whether any pre-*Deepwater Horizon* Incident sampling strategies were used; and whether any procedures or protocols regarding sampling were drafted, developed, and/or implemented.

**OBJECTION**:

1. Plaintiffs object on grounds of attorney client privilege and also assert their claim that the attorney-client privilege protects from discovery the information, records and materials sought by these requests. Plaintiffs assert that these requests and interrogatories seek post April 20, 2010 documents, records, information and other matters protected from discovery by the attorney-client privilege inasmuch as they seek discovery of documents, records, information and other matters which constitute and/or contain legal advice, legal opinions, legal conclusions, legal recommendations, and legal analysis by

# APPENDIX B

Español | Português

2:23 PM | Thursday, January 3, 2013          HOME PAGE          ABOUT US          ARCHIVE          [SEARCH]

send   print



Current
Edition
Report
Accents
Analysis
Dialogues
Notable
Writings
Eco-Briefs
Gallery
Video

CONNECT
YOURSELF

Contacts
Permisos
de uso

**Report**
## Impacts of BP Oil Spill Remain Hidden in Mexican Waters
By Emilio Godoy

**Researchers believe that the BP oil spill's effects on the Mexican portion of the Gulf of Mexico will become evident in the coming years.**

Sea turtles are among the larger animal species whose reproduction could be seriously affected.
Credit: Mauricio Ramos/IPS

MEXICO, Apr 18 (Tierramérica).- One year after the British Petroleum (BP) oil spill in the Gulf of Mexico, the worst accidental offshore oil spill in history, the search for damages in Mexican territory remains inconclusive, while scientists continue gathering and testing samples.

Between Apr. 20 and Jul. 15, 2010, almost five million barrels of oil were released into the Gulf from a BP well in the United States' exclusive economic zone, according to figures from the U.S. federal authorities. It was the worst accident of this kind in the history of the oil industry. And of those five million barrels, only 800,000 were captured through containment efforts. (Each barrel of oil is equivalent to 159 litres.)

While the damages are still visible in the waters and on the coasts of the United States, "we have not observed direct evidence of high levels of oil or oil wastes, and there have been no reports of oil from the spill reaching Mexican waters," said Sharon Herzka, a marine ecology specialist at the Centre for Scientific Research and Higher Education at Ensenada (CICESE), based in the northwestern Mexican state of Baja California, on the Pacific Ocean.

This is "probably due to the fact that the closest point between the well and Mexican waters is around 400 kilometres," she told Tierramérica.

Herzka is the coordinator of research into the effects of the spill being undertaken jointly by a number of institutions, including the Autonomous University of Baja California (UABC) and the Mexican Petroleum Institute and National Institute of Ecology, both government agencies.

During the first phase of research, carried out Nov. 6 to 22, a team on board the XIXIMI-1 research vessel collected more than 1,000 water samples and hundreds of sediment samples at depths between 1,000 and 3,500 metres.

The second phase involves the chemical and biological analysis of the samples and definition of the characteristics of the water, such as salinity and temperature, in the central area of the Gulf. The results will be ready in June.

But Herzka noted that "in the coming years there could be indirect negative effects," such as impacts on the reproduction of "mammals, sea turtles and species of large fish that sustain major fishing industries."

The Gulf of Mexico, an arm of the Atlantic Ocean covering 1.55 million square kilometres, contains significant offshore oil deposits shared among the countries that surround it: the United States to the north and northeast, Mexico to the west and south, and Cuba to the east.

Oil operations compete with fishing industries that are vital for many coastal populations and are dependent on the Gulf's rich biodiversity.

The second worst offshore oil spill in history also took place in the Gulf of Mexico, when an explosion on the Mexican oil rig Ixtoc released 3.3 million barrels of oil in 1979.

"The Gulf has a high natural capacity for the degradation of hydrocarbons. This means that, apparently, much of the oil that was in the water and that wasn't captured near the well or didn't evaporate has been broken down," said Herzka.

On Apr. 20, 2010 the Deepwater Horizon drilling rig, which BP was leasing from the Swiss company Transocean, was hit by an explosion off the coast of the southeastern U.S. state of Louisiana and sunk two days later.

"We are carrying out an alert on migratory species, like Kemp's ridley sea turtles, bluefin tuna and pelicans, which have been affected and come to the coasts of Veracruz and the Yucatán," Alejandro Olivera, the coordinator of Greenpeace Mexico's oceans and coasts campaign, told Tierramérica.

Olivera took part in a Greenpeace expedition in which 32 experts toured the area contaminated by the spill in October and November. The results of their research will be released in the coming weeks.

In the section of the Gulf that falls within U.S. jurisdiction, the research team identified a strip of water several kilometres in size with a low concentration of oxygen, which is a symptom of contamination and could also appear off Tamaulipas, the closest Mexican state, said Olivera.

In addition to its coastal mangroves, which play an important biological role and act as barriers against hurricanes and the erosion of its beaches, Tamaulipas is the leading producer of brown shrimp (Farfantepenaeus aztecus), with an output of 10,784 tons annually.

"In the medium to long term, the spill could affect the reproduction of yellowfin and bluefin tuna," UABC researcher Rafael Solana told Tierramérica.

The yellowfin tuna (Thunnus albacares) and bluefin tuna (Thunnus thynnus) are overfished in the Mexican waters of the Pacific Ocean and Gulf of Mexico. Annual production in the latter is estimated at around 1,000 tons by the International Commission for the Conservation of Atlantic Tunas.

**Internal links**

- Despite Heavy Oil, Louisiana Keeps Fisheries Open
- Environmental Forensics for BP Gulf Spill

**External links**

- Lawsuit Filed Against BP Compensation Czar
- U.S.: Sick Gulf Residents Beg Officials for Help
- Ixtoc Disaster Holds Clues to Evolution of an Oil Spill
- MEXICO: Oil Spill Fuels Debate on Environmental Safety
- Center for Scientific Research and Higher Education at Ensenada
- Autonomous University of Baja California
- Mexican Petroleum Institute
- National Institute of Ecology
- Greenpeace México
- International Commission for the Conservation of Atlantic Tunas
- PEMEX
- National Hydrocarbons Commission
- The Gulf oil spill according to the Ministry of Environment and Natural Resources, in Spanish
- The Gulf oil spill according to XIXIMI-1, in Spanish
- Treaty on the Delimitation of the Continental Shelf in the Western Gulf of Mexico Beyond 200 Nautica

Tierramérica is not responsible for the content of external sites

**Subscription**

Sign up for Tierramérica's free weekly newsletter!

[su email] [ok]

**In This Issue...**

Accents
PERU: Guardians of the Dry Forest

Eco-briefs
BRAZIL: Madeira River Home to World's Greatest Fish Diversity...
MEXICO: Ban on Toxic Insecticide Demanded...
ARGENTINA: Campaign to Oppose Nuclear-Generated Electricity...
HONDURAS: More Military Troops to Fight Forest Fires...

**More Reports**

Indigenous Chileans Continue to Oppose Pinochet-Era Highway Project

New Patient Profile and Treatment for Chagas Disease

Chile Follows in South Africa's Footsteps for Climate Change Mitigation

Between September and November 2010, the state governments of Tamaulipas, Veracruz and Quintana Roo filed two lawsuits in U.S. courts against BP, Transocean and other companies for possible damages to the marine environment, coasts and estuaries.

These suits were incorporated into multidistrict litigation MDL-2179, filed in a Louisiana court, along with hundreds of other consolidated cases with thousands of claimants, including cases involving 11 deaths and personal, environmental and economic damages. The trial is currently expected to begin in February 2012.

Something that particularly troubles scientists are the balls of oil deposited on the sea floor. These balls were formed after toxic chemical substances were sprayed on the spill to disperse the oil floating on the water. Some species could ingest these balls, introducing the toxins into the food chain. BP has acknowledged spraying 6.8 million litres of the chemical dispersant Corexit.

"Chemical pollutants seriously affect the physiology of fish species, which has direct repercussions on the reproductive cycle. This will be reflected in fishing yields, economic terms and conservation of these resources," said Solana.

The Mexican government is providing support for the research conducted by CICESE and has been monitoring the country's territorial waters in the Gulf, although it has yet to find traces of oil. The government has also activated the National Contingency Plan for Oil and Hazardous Substances Spills, drafted in the 1990s.

"Specialists estimate that it might even take decades for the real consequences of the spill to be determined," stated the last Mexican government report, published online last Aug. 5.

Determining the environmental impact of the BP spill is crucial given the eagerness of the countries that border the Gulf to explore its oil reserves.

Mexico and the United States agreed in 2000, through the Treaty on the Delimitation of the Continental Shelf in the Western Gulf of Mexico Beyond 200 Nautical Miles, to impose a 10-year moratorium on offshore oil drilling within this area, while negotiating an exploration and drilling agreement.

The moratorium expired in January of this year, but in 2010 the two governments agreed to extend it until 2014.

Given the evidence of how quickly the United States has been moving in granting deepwater drilling concessions, the Mexican state-owned oil company Petróleos Mexicanos (PEMEX) is working to catch up.

The National Hydrocarbons Commission, established in 2008, has issued regulations on the use of technology, environmental protection, industrial security and the contracting of insurance against accidents like the Deepwater Horizon disaster.

*

Copyright © 2013 Tierramérica. All Rights reserved