**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010. | § § § § | MDL No. 2179 SECTION "J" |
| This Document Relates to: | § § § | JUDGE BARBIER MAGISTRATE SHUSHAN |
| 10-4239 10-4240 10-4241 | § § § | |

<u>**MEMORANDUM IN SUPPORT OF THE MEXICAN STATES OF QUINTANA ROO'S, TAMAULIPAS', AND VERACRUZ' JOINT MOTION FOR SUMMARY JUDGMENT REGARDING PROPRIETARY INTERESTS**</u>

## TABLE OF CASES

| Cases | Page no. |
|---|---|
| *Little v. Liquid Air Corp.*, 37. F.3d 1069 (5th Cir. 1994) | 2 |
| *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) | 2 |
| *Matsushita Elec. Indus. Co. v Zenith Radio Corp.*, 475 U.S. 574 (1986) | 2 |
| *Davis v. Chevron USA, Inc.*, 14 F.3d 1082 (5th Cr. 1994) | 2 |
| *Hopper v. Frank,* 16 F.3d 92 (5th Cir. 1994) | 2 |
| *U.S. v. BP Exploration and Production, Inc.*, Case 2:12-CR-00292 (E.D. La.) | 3 |
| *United States v. Abrams,* 427 F.2d 86, 90 (2nd Cir. 1970) *cert. denied*, 400 U.S. 832 (1970) | 4 |
| *United States v. Phipps*, 595 F.3d 243, 247 (5th Cir. 2010) *cert. denied*, 130 S. Ct. 3336 (2010) | 4 |
| *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1972) | 4 |
| *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 U.S. Dist. LEXIS 14662 (E.D. La. 1991) | 4 |
| *Vicksburg Towing Co. v. Mississippi Marine Trans. Co.,* 609 F. 2d 176, 177 (5th Cir. 1980) | 4 |
| *Dick Meyers Towing Service, Inc. v. United States,* 577 F.2d 1023 (5th Cir. 1978), *cert. denied*, 440 U.S. 908 (1979) | 5 |
| *Louisville and Nashville R.R. Co. v. M/V Bayou Lacombe*, 597 F. 2d 469 (5th Cir. 1979) | 5 |
| *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F. Supp. 2d 787, 791 (E.D. La. 2007) | 5 |
| *Dunham-Price Group, L.L.C. v. Port Aggregates, Inc.,* 2006 U.S. Dist. LEXIS 55285 (W.D. La. 2006) | 5 |
| *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 (D. Conn. 2006) | 5 |
| *CXY Energy, Inc. v. Jurisch,* | |

1992 U.S. Dist. LEXIS 12863 (E.D. La. 1992)                                        *5*

*Kaiser Aluminum & Chemical Corp. v. Citizens Casualty Co. of New York*,
455 F.2d 957 (5th Cir. 1972)                                                       5

*New Orleans Steamboat Co. v. M/V James E. Wright,*
1990 U.S. Dist. LEXIS 1147 (E.D. La. Aug. 23, 1990)                                  7

*Holt Hauling & Warehousing v. M/V Ming Joy,*
614 F. Supp. 890 (D.C. Pa. 1985)                                                     7

*In re Waterstand Marine, Ltd.,* 1988 U.S. Dist. LEXIS 3242 (E.D. Pa. 1988)          7

*McLean Contracting Co. v. Waterman Steamship Corp.,*
131 F. Supp. 2d 817 (E.D. Va. 2001)                                                 18

*In re Moran Enterprises Corp.,* 77 F. Supp.2d 334 (E.D. N.Y. 1999)                  18

*Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.,*
877 F. 2d 1214 (5th Cir. 1989)                                                    18

*Nicor Supply Ships Assoc. v. General Motors Corp.,*
876 F.2d 501 (5th Cir. 1989)                                                      19

*Amoco Transport So. V. S/S Mason Lykes*, 768 F.2d 659 (5th Cir. 1985)             21

*In re TT Boat Corp.,* 1999 U.S. Dist. LEXIS 13797 (E.D. La. Sept. 3, 1999)          22

*SEKCO Energy, Inc. v. M/V Margaret Chouest*,
820 F. Supp.1008 (E.D. La. 1993)                                                    23

<u>**MEMORANDUM IN SUPPORT OF THE MEXICAN STATES OF QUINTANA ROO'S, TAMAULIPAS', AND VERACRUZ' JOINT MOTION FOR SUMMARY JUDGMENT REGARDING PROPRIETARY INTERESTS**</u>

COME NOW Plaintiffs, the Mexican States of Quintana Roo, Tamaulipas, and Veracruz (hereinafter "the Mexican States") pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully file this Memorandum in Support of The Mexican States of Quintana Roo's, Tamaulipas', and Veracruz' Joint Motion for Summary Judgment Regarding Proprietary Interests, and respectfully show the Court as follows:

**1.     PRELIMINARY.**

Plaintiffs, the States of Tamaulipas, Veracruz, and Quintana Roo, assert federal maritime claims falling within this court's maritime and admiralty jurisdiction and Rule 9h of the Federal Rules of Civil Procedure. As noted in Judge Barbier's December 9, 2011 Order, "The Mexican States' negligence and gross negligence claims asserted against Defendants other than Anadarko are preserved, but only to the extent there has been a physical injury to a proprietary interest." (p. 12, Doc. 4845). This motion for summary judgment is filed pursuant to the Hon. Sally Shushan's September 11, 2012 order and, therefore, it is limited to the parameters set forth therein, to wit: "By January 4, 2013, the parties shall file cross-motions for summary judgment *targeted solely* at the issue of whether the Mexican States have a proprietary interest in the matters asserted in their complaints." (Par. 4, Doc. 7367)(emphasis added).

In support of their Joint Motion for Summary Judgment, Plaintiffs rely on the undisputed facts contained in their Statement of Undisputed Material Facts in Support of the Mexican States of Tamaulipas, Quintana Roo, and Veracruz Joint Motion for Partial Summary Judgment Regarding Proprietary Interests ("Statement of Undisputed Material

Facts") filed contemporaneously herewith, the exhibits filed herewith, as well as the argument and authorities discussed below.

**2.      STANDARD UNDER FED. R. CIV. P. 56.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "This burden is not satisfied with some metaphysical doubt as to the material facts'…by 'conclusory allegations,'…by 'unsubstantiated assertions'…or by only a 'scintilla' of evidence…We resolve factual controversies in favor of the nonmoving party, but only when there is no actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37. F.3d 1069, 1075 (5th Cir. 1994) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)); *Matsushita Elec. Indus. Co. v Zenith Radio Corp.*, 475 U.S. 574 (1986); *Davis v. Chevron USA, Inc.*, 14 F.3d 1082 (5th Cr. 1994); *Hopper v. Frank,* 16 F.3d 92 (5th Cir. 1994)) (internal citations omitted). If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted. Plaintiffs, Mexican States, respectfully submit that the undisputed evidence and the applicable authorities establish that they do have proprietary interests with respect to the matters alleged in their respective complaints and that they, therefore, are entitled to summary judgment in their favor.

**3.      THE "ECONOMIC LOSS" DOCTRINE OF *ROBINS DRY DOCK* DOES NOT APPLY BECAUSE OF BP'S ADMISSIONS OF CRIMINAL CONDUCT HEREIN.**

BP Exploration and Production, Inc. (guaranteed by BP PLC, and BP Corporation North America, Inc.) has *tentatively* admitted to engaging in criminal actions, some of which resulted in the deaths of eleven persons and other actions involving "corrupt"

practices. As of the date of this Motion, the guilty plea is still subject to the Court's

acceptance. (Order of Dec. 11, 2012 [Doc. 25]; *U.S. v. BP Exploration and Production,*

*Inc.*, Case 2:12-CR-00292 (E.D. La.). However, BP Exploration and Production, Inc.

("BP") agreed to plea guilty to violating the following federal laws in connection with

BP's conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and

response:

1.    Eleven counts of violations of 18 U.S.C. §1115 through which the lives
      of eleven individuals were lost;
2.    One count of a violation of 18 U.S.C. § 1505 (obstruction of justice);
3.    One misdemeanor count of a violation of 33 U.S.C. §§1319(c)(1)(A)
             and 1321(b)(3)(Clean Water Act); and
4.    One misdemeanor count of a violation of 16 U.S.C. §§703 and 707(a).

(P. 1, Guilty Plea Agreement and its Exhibits A-D filed 11/15/12—Attached hereto
collectively as Exhibit F).

Exhibit F establishes that BP executed the plea agreement and other related BP

companies guaranteed performance of its terms. Significantly, the criminal violations of

18 U.S.C. §1505 to which BP has agreed to plea guilty involved actions by which "BP

did *corruptly*, that is, with an improper purpose, endeavor to influence, obstruct, and

impede" an inquiry and investigation into the amount of oil flowing from the Macondo

well through "omissions and false and misleading statements" set forth in subparagraphs

1-6 (3rd, 4th, and 5th unnumbered pages) of Exhibit A to the Guilty Plea Agreement

(emphasis added). *E.g., United States v. Abrams,* 427 F.2d 86, 90 (2nd Cir. 1970)(defining

"corruptly" in 18 U.S.C. §1505 as actions with "an improper motive, a bad and evil

purpose"), *cert. denied*, 400 U.S. 832 (1970); see *United States v. Phipps*, 595 F.3d 243,

247 (5th Cir. 2010)(A defendant acts "corruptly" under §7212(a) when s/he acts "with the

intention of securing improper benefits or advantages for one's self or others."), *cert.*

*denied,* 130 S. Ct. 3336 (2010). Therefore, it is undisputed that BP has admitted, *albeit* tentatively, that it engaged in criminal actions that led to the deaths of eleven persons, "corrupt" actions and omissions that included false and misleading statements, and other unlawful conduct in violation of federal penal statutes.

There is nothing in the language of *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1972) or its underlying policies allowing its principles to be utilized where much of the underlying conduct at issue is criminal in nature. The Supreme Court's articulation of its principle demonstrates its inapplicability to the field of criminal conduct: "[T]here can be no recovery for economic losses caused by an *unintentional* maritime tort absent physical damage to property in which the victim has a proprietary interest."(emphasis added). *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1972); *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 U.S. Dist. LEXIS 14662 *2 (E.D. La. 1991). The rule of *Robins* was formulated in the context of a *civil* negligence claim, *i.e.,* "unintentional" conduct. *Id.; See Vicksburg Towing Co. v. Mississippi Marine Trans. Co.,* 609 F. 2d 176, 177 (5th Cir. 1980)("… whose employees had *negligently* damaged the vessel"). As clearly noted by the Fifth Circuit, the limiting rationale of *Robins* applies only to *civil negligence* cases. *Vicksburg Towing Co.* 609 F. 2d at 177 (describing *Dick Meyers Towing Service, Inc. v. United States,* 577 F.2d 1023 (5th Cir. 1978), *cert. denied,* 440 U.S. 908 (1979) as involving "defendant's negligence" and *Louisville and Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F. 2d 469 (5th Cir. 1979) as involving negligent damage). Where the plaintiff asserts an intentional tort, the plaintiff's claim is taken "out of the *Robins Dry Dock* parameters." *Dick Meyers Towing Service, Inc. v. U.S.* 577 F.2d at 1025; *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F.

Supp. 2d 787, 791 (E.D. La. 2007); *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 U.S. Dist. LEXIS 14662 *2 (E.D. La. 1991); *Dunham-Price Group, L.L.C. v. Port Aggregates, Inc.,* 2006 U.S. Dist. LEXIS 55285 *14 (W.D. La. 2006); *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 *30 (D. Conn. 2006); *CXY Energy, Inc. v. Jurisch*, 1992 U.S. Dist. LEXIS 12863 (E.D. La. 1992); *See, Kaiser Aluminum & Chemical Corp. v. Citizens Casualty Co. of New York,* 455 F.2d 957 (5th Cir. 1972)(affirming summary judgment under *Robins* where only negligence asserted).

BP's admitted criminal conduct underlying its actions and omissions if accepted by the Court, would go well beyond the intentional torts that take this matter outside of the *Robins* doctrine. As a matter of policy and judicial interpretation, there is nothing in the *Robins* principle that is intended to shield admitted criminals from the consequences of their admitted criminal actions. Even without acceptance by the Court, BP's execution of the plea agreement constitutes admissions of its conduct and the nature of same. Therefore, the *Robins'* requirement of demonstrating injury to a proprietary interest as a prerequisite for recovery of economic damages does not apply herein.

## 4.   THE MEXICAN STATES HAVE PROPRIETARY INTERESTS.

Even if the principle of *Robins* does apply herein, the undisputed facts demonstrate that the Mexican States have proprietary interests in the matters asserted in their respective complaints. The States of Tamaulipas, Veracruz, and Quintana Roo have proprietary interests in and to their coastlines, beaches, islands, estuaries, natural resources, marine, coastal and estuarine environments, marine life, beaches, other parts of the Gulf of Mexico, waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, marshlands, and other natural and economic resources, eco-

systems of offshore waters, fish, oysters, shrimp crabs, crayfish, other marine life, lagoons, wetlands, intertidal zones, fishing operations, fishing industry, coastlines, animals, plants, marine life and wildlife along and off the State's coast.(For example: Par. 2, 5, 6, 37, 39, 40, 51bb, 55, 55A, and 55 L of Complaint [Tamaulipas]; Par. 2, 5, 6, 37, 39, 40, 51bb, 55, 55A, and 55L  of Complaint [Veracruz]; Par. 2, 5, 6, 37, 39, 40, 41, 51bb, 55, 55A, and 55L of Complaint [Quintana Roo].

The body of law to be examined in determining whether the Mexican States have a proprietary interest has not been definitively addressed by the Fifth Circuit.[1] Thus it may be argued that the "source" law is either the common-law principles developed under maritime law or Mexican law. The Mexican States submit that, as discussed below in Subpart 4A, the applicable source law is found in federal maritime law, not Mexican law. Under these applicable maritime principles, the Mexican States have established their proprietary interests. However, the Mexican States also fulfill the requirements of a proprietary interest under Mexican law. Therefore, regardless of which body of law is examined, the Mexican States have the necessary proprietary interest.

### A.     The Appropriate Source Law is Federal Maritime Law.

Federal common law is used to determine a party's property interest. *New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 1147 *24 (E.D. La. Aug. 23, 1990); *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. 890, 899 (D.C. Pa. 1985). The proper inquiry is whether the lessor had sufficient "incidents of

---

[1] In *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469 (5th Cir. 1979), the Court referred to state law to assess plaintiff's arguments that it had a right in the nature of an easement. However, the Court did not rule that an examination of state law was the appropriate focus. Rather, the Court formulated the often-cited test based on control or possession, obligations to pay for repairs, and obligations to pay for maintenance--factors which were not derived from state law. *Id.* at 472.

ownership" to render it "proprietary" *as a matter of federal maritime law*. 1990 U.S. Dist. LEXIS 1147 at *25 (emphasis added). Whether a party has a proprietary interest is *not* determined by looking to state law. *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. at 893; *In re Waterstand Marine, Ltd.,* 1988 U.S. Dist. LEXIS 3242 (E.D. Pa. 1988). Since *Robins Dry Dock* and its progeny establish a federal common law limitation on maritime tort recovery, the scope of which turns not on the "fine points of state property law but on the judicial economy concerns which spawned the limitation and which give it content." 614 F. Supp. at 893.  The question is "whether [the plaintiff's] interest in the [property] had sufficient 'incidents of ownership' to render it 'proprietary' as a matter of federal maritime law." 614 F. Supp. at 899(quoting *Bayou Lanscombe)*. The focus on maritime law is also evident from the judicial comparison of a plaintiff's asserted interests to those of a demise charterer—a creature of maritime law. See, *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 308 (1927); *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469 (5th Cir. 1979); *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F. Supp. 2d 787, 796 (E.D. La. 2007).

    Since the "proprietary interest" requirement was a creation of maritime law, its existence should also be determined based on principles of maritime common-law. *Id.* As the foregoing cases establish, the proper inquiry is not the rights under state law or, in this case, under Mexican law. *Id.* The undisputed evidence herein establishes that the Mexican States do have proprietary interests in the matters asserted in their complaints under the federal maritime principles. Alternatively, the undisputed facts herein also establish that the Mexican States also have the requisite proprietary interests under Mexican law.

**B.      The Mexican States Have Proprietary Interests Under Mexican Law.**

As noted above, the Mexican States assert that the appropriate focus for determining whether they have proprietary interests herein is federal maritime common-law. However, in the interests of avoiding duplication of the undisputed facts, the Mexican States will first address the Mexican Law establishing the existence of their proprietary interests.

Expert legal opinions conclude that Tamaulipas, Veracruz and Quintana Roo have proprietary interests in their state waters, islands, shores, beaches, bays, coastlines, sea life, flora, fauna, estuaries, and natural resources in, along, and from the Gulf of Mexico. *(See Declarations and Expert Reports of Gabuardi, Gutierrez and Chavira Exhibits "B", "C", "I", "J", "K", and "L".)*

The proprietary interest rights and jurisdiction of the Mexican States of Tamaulipas, Veracruz and Quintana Roo with respect to Mexican sea waters, coastal seashore, maritime flora and fauna, as well as the islands in Mexican territory, can be classified into several (non-exclusive) categories:

   *a.      Mexican and State Constitution Grant of Proprietary Interests.*

The Mexican Constitution (Attached as Exhibit A) states that the "Mexican Nation" is constituted with the following constituent elements:

   (a) The Mexican people, upon who resides the National sovereignty. (Article 39 of the Mexican Constitution),
   (b) The Mexican Republic, constituted by its free and independent States, the Municipalities thereto, and the federal union.  (Articles 39 and 115 of the Mexican Constitution), and
   (c) the National territory, including all parts which make up the Mexican federation (States, Municipalities and the Federal District), the island and coastal seas, the continental platform and underwater soil of islands, keys and reefs, as well as the of territorial. (Article 42 of the Mexican Constitution). (*See Gabuardi's Expert Report, Exhibit B pg.21-22.)*

Therefore, the States of Tamaulipas, Veracruz and Quintana Roo are the rightful owners of their state territories, which include their shores, beaches and the flora and fauna in them. Article 27 of the Mexican Constitution of 1917, which was later amended and published in the Official Federal Newspaper on February 6, 1976, provides as follows with its new language:

> **Article 27. -** "The ownership of the lands and waters which are located within national territory, originally corresponds to the Nation, which has had and does have the right to transfer proprietary interests thereof to individuals".   (*See Gutierrez Expert Report, Exhibit C, pg. 6.*)

A factual application of Article 27's execution, and of the Republic's transfer of lands and waters is the area known as La Pesca, Tamaulipas. Under an Agreement entered into by Grupo Turistico Tamaulipas S.A de C.V. (hereinafter "GTT"), and the Mexican Federal Government, GTT acquired for a price the surface of 801,408.43 square meters, made up by 684,366.65 square meters of the federal coastal zone and 117,042.18 square meters of land reclaimed from the sea, for the purpose of establishing a public beach to be enjoyed by national and international tourists, *(Please see Gabuardi´s Expert Report Exhibit B, pg. 92). (See Also Declaration of Gabriel Maldonado of GTT attached as Exhibit "H")*.   By the authority of Article 27 of the Mexican Constitution, federal coastal zones and lands reclaimed from the sea, can be bought and sold by the Mexican Federal Government to private individuals and corporations. Examples of such sales to private individuals are contained in Gabuardi's Expert Report, Exhibit B, pp. 96-205 and Statement of Undisputed Facts pp.8—19.

Furthermore Article 73, Section XXIX-G of the Mexican Constitution expresses that based on the principle of concurrency, the Federal Government, the governments of

each State, and the Municipalities in each State <u>must and should intervene and act in</u> <u>conjunction when protecting, preserving and restoring the environment and ecological</u> <u>balance of the Gulf of Mexico, as in this particular case.</u>  Thus, Article 73 emphasizes concurrency as a necessity for the protection of the environment, placing the burden on all three levels of government including <u>federal, state and municipal</u>. Concurrence is not a limitation over a State´s faculties, but rather it is the vehicle by means of which each State can properly act and assume federal duties over specific issues, as well as the obligation of the Federal Government to create the means for each State to be able to act in such a manner. (*See Gutierrez Exhibit C, pg. 12)*.

Therefore, pursuant to Article 73 and 27, the States of Tamaulipas, Veracruz and Quintana Roo themselves are vested with the rights and obligations of custody, possession, control, governance, regulation, development, exploitation, and management of federal maritime zones and coastal zones, and therefore they are legally authorized and obligated to act in defense thereof, in the protection, management, governance, exploitation, development and regulation of their proprietary interests which includes beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters, in addition to acting in the defense of wildlife and plant life found thereon. Considering that even if Article 27 of the Mexican Constitution labels such assets as belonging to the Nation, Articles 116 Section VII, Article 73 Section XXIX, and Article 124 of the Constitution <u>provide for the transfer off those land rights</u>. The Federal Government through Coordination Agreements, Decrees, Grants, Sale Agreements, and other federal instruments allowed by the Constitution, has effectuated such land transfers with the

purpose of achieving social and economic development in favor of each State´s population. *(See Gutierrez Expert Report Exhibit C, pg.6, 11,12).*

Since its enactment in 1917, the Mexican Constitution (Attached as Exhibit A) has experienced more than 500 amendments over time. As a result, the federalist system in Mexico has evolved over the last 95 years, giving way to a two state system between the Mexican Federal Government and State Governments.  As of 2012, at least 204 decrees have amended the original text of the Mexican Constitution after issuance. (*See Gutierrez Expert Report, Exhibit C, pg 14.)*

> **b.      *Concurrent Powers between the Federal Republic and States – Proprietary Interests.***

Mexican constitutional theory acknowledges two categories of concurrent powers: (a) concurrent powers on matters that may be regulated and administrated by the States of the Union because the Mexican Congress has not yet legislated upon topics assigned to the Federal Government, and (b) coincidental concurrent powers, that is when various of the constituent parts of the Mexican Republic may act upon the same field. The Mexican Supreme Court in an Opinion issued on the Concurrent Powers in the Mexican Legal System that:

> . . . the reformer of the Constitution has provided for various clauses through which the Congress of the Union may establish a distribution of jurisdiction among the Federal Union, the Federated States and the Municipalities, and even the Federal District, called "concurrent powers", in matters such as: education (articles 3, section VIII, and 73, section XXV), health (articles 4, third paragraph, and 73, section XVI), human settlements (articles 27, third paragraph, and 73, section XXIX-C), public security (article 73, section XXIX-C), **the environment (article 73, section XXIX-G)**. (See Guabardi Expert Report pg. 86-87 attached hereto as Exhibit B).

Accordingly, in the Mexican legal system, concurrent powers concludes that the States which make up the Federal Union, as well as the Federal District, the

Municipalities and the Federal Union, may act upon the same matters, but the Congress of the Union shall be the one establishing the form and terms corresponding to each one of them through a general statute. (See Guabardi Expert Report pg. 86-87 attached hereto as Exhibit B). The Administrative Agreements incorporated in Gabuardi's Expert Report (Exhibit B), grant federal land zones and lands reclaimed from the sea to the State of Tamaulipas (Exhibit B, pgs. 92-96) (such land grant constitutes half of the coast and land of the sea of the State of Tamaulipas). Furthermore, as it pertains to the State of Quintana Roo, Administrative Agreements (See Gabuardi's Expert Report Exhibit B pgs. 96-205) grant federal land zones and land reclaimed from the sea to the State, thereby giving the State complete control and authority over such lands.  As a result, *the States of Tamaulipas and Quintana Roo, both beneficiaries of the land grants by way of Administrative Agreements, are legally responsible for the preservation, maintenance, vigilance, use, benefit, control, and exploitation of the federal lands granted to them.*

As further and unique proof of the Mexican Republic's transfer of federal lands, federal maritime zones, and lands reclaimed from the sea, on April 14, 2005, the Mexican Ministry of the Environment and Natural Resources issued a Decree executed by former Mexican President Vicente Fox Quesada and published in the Official Federal Newspaper on April 14, 2005, over the region known as the Laguna Madre and Delta of the Rio Bravo, in the State of Tamaulipas (*attached as Exhibit E*).  The decree granted the land identified in the attached Map (*attached to Exhibit E*) (almost half of the state coastline and previous federal maritime zones) to the State of Tamaulipas, along with the authority to possess, control, and manage such areas, as well as the obligation to maintain, restore, and repair these lands out of the State's own funds.

**c.**    ***Concurrent Coordination Agreements – Proprietary Interests***

The Coordination Agreements identified in pages 206 to 228 of *Gabuardi's Expert Report (Exhibit B)* further identify areas of federal lands de-incorporated and transferred, granted, and or conveyed in favor of the States.  These shared proprietary rights upon Mexican federal lands and the manner in which the lands are managed and controlled by way of overlapping concurrent powers, establish by law that the Mexican States have proprietary interests in all lands including those that may be labeled federal land zones, which include waters, beaches, coastal areas, estuaries, flora, and fauna, classified as lands of National domain.

As further evidence of the States of Tamaulipas, Veracruz, and Quintana Roo proprietary interests, the States impose and collect property taxes upon all land located in all their territory, including land located on their coastal seashores, lagoon coasts, river side's, estuaries coast, islands, islets, keys, etc. (*See Gabuardi Expert Report, Exhibit B, pgs. 206 – 228).*   Furthermore, as additional evidence of the overlapping concurrent powers between the Mexican States and the Mexican Federal Government, all Mexican States – including the States of Tamaulipas, Veracruz, and Quintana Roo, individually execute, carry out, and implement law-enforcement activities to maintain law and order, including police patrolling and vigilance on the beaches, shores, coastlines, sands and other similarly situated areas, including those that may be designated as lands of the National domain.

**d.**    ***Statutes Granting Proprietary Interests***

In addition to the Administrative Decrees, Grants, and other Federal Instruments that convey the authority to possess, control, govern, and manage areas labeled as

belonging to the domain of the Nation to the States, as well as the obligations of the States to maintain, restore, and repair these same lands out of the State's own funds, the Mexican Congress has passed specific laws by which the States are given authority to pass and enforce additional laws over the same lands.   Under Articles 7, 8, 10, and 13 the General Statute on Wild Life*; (See Guabardi Expert Report pg. 30*) the State of Tamaulipas, Veracruz and Quintana Roo and Municipalities in those States are responsible for developing the local policy of their own States as it pertains to wild life matters, in addition to enforcing federal laws over the same subject.   Another example of the State's being given authority to manage and control areas that may be federal maritime zones is the authority of Article 13 of the General Statute on Sustainable Fisheries and Aquaculture (*See Exhibit "B" pg.32*) (*Ley General de Pesca y Acuacultura Sustentables*). Through this federal law, the Mexican State Governments are in charge, among other matters, of developing and enforcing State policies and programs on fisheries and sustainable aquaculture in coordination with national programs, in addition to developing and enforcing State vigilance and inspection measures in coordination with the Federal Government.   Under Article 15 of the General Statute on Sustainable Fisheries and Aquaculture the Legislatures of each state (including the states of Tamaulipas, Veracruz and Quintana Roo) are authorized to enact legislation on matters of their own jurisdiction, and shall also provide the administrative legal measures required for the enforcement of such legislation. (*See Guabardi Expert Report, Exhibit B, pg. 32*) This federal statute authorizes the States the direct right to enact legislation for the enforcement and protection over their proprietary interests as it pertains to fisheries, aquaculture, flora and fauna within their state jurisdiction.

### aa.        Proprietary Interests Under Constitution of Tamaulipas

Under Article 2 the Constitution of Tamaulipas, "The territory of the State includes the historical Province called New Santander, with the limitations made by the Treaty of Guadalupe Hidalgo." As a matter of fact, in historical terms the former Province of New Santander, as well as its successor, the State of Tamaulipas, has governed, defended and policed the interior maritime waters, the coasts and the adjacent seas and islands of said State. Furthermore the Mexican States of Tamaulipas, Veracruz and Quintana Roo shall act and respond in cases of emergencies, natural disasters or other urgent needs where the Federal Government does not respond as quickly as required or abstains from performing its duties and responsibilities such as in natural disasters like hurricanes, earthquakes, floods, landslides, etc. (*Please see Exhibits D, E and F and Gabuardi Expert Report, Exhibit B, pgs. 82-84*).

### bb.        State Constitution of Veracruz

Under Article 3 the Constitution of Veracruz, "The territory of the State has the extension and limits that it historically, including the capes, islands, islets adjacent to its seashore in conformity with that set forth by the Federal Constitution and the law. "As a matter of fact, the State of Veracruz, has governed, and historically defended and policed the interior maritime waters, the coasts and the adjacent seas, islands and islets of said State. (See *Gabuardi Expert Report, Exhibit B, Pgs. 82-84*).

### cc.        State Constitution of Quintana Roo

Under Article 46 of the Constitution of Quintana Roo, "The territory of the State of Quintana Roo includes: II. The islands of Cozumel, Cancun, Mujeres, Blanca and Contoy, located in the Caribbean Sea and Holbox in the Gulf of Mexico, as well as the

islands, islets, keys, reefs adjacent to its seashore." As a matter of fact, the State of Quintana Roo, has governed and still governs, defends and polices the interior maritime waters, the coasts and the adjacent seas, keys, reefs, islands and islets of said State. (See *Gabuardi Expert Report, Exhibit B, pgs. 82-84.)* Under the authority of their respective State Constitutions, the Governors of each one of these States, namely Tamaulipas, Veracruz and Quintana Roo, have the constitutional power and authority to act on behalf of their respective States and represent them.[2]  Additionally, there is no provision in the Mexican Constitution limiting the power and authority of the States constituent the Mexican Federation to represent their own interest and affairs, either domestically or internationally.  Therefore, the Governors of the States of Tamaulipas, Veracruz and Quintana Roo were authorized pursuant to the Mexican Constitution and their States Constitutions to file suit on September 16, 2010 against British petroleum and the rest of the defendants as a result of the sinking of the "Deepwater Horizon" on April 20, 2010.

Moreover, Article 1 of the Mexican Statute on the Signing of Treaties (*Ley Sobre la Celebración de Tratados*), authorizes State and Municipal Governments to enter into international agreements with one or more international foreign government agencies or with international organizations. (See *Gabuardi Expert Report, Exhibit B, pg. 232-243).* As an example of a State signing an international agreement, the state of Tamaulipas along with the Republic of Mexico is an independent member of the MEXUS Gulf Plan

---

[2] The Governors' authority to represent their respective States may be found in Article 91, section XXIII of the Constitution of the State of Tamaulipas, in correlation with Article 4 of the Constitution of the State of Tamaulipas and Article 115 firs paragraph of the Mexican Constitution; Article 49, sections XVIII & XXIII of the Constitution of the State of Veracruz in correlation with Article 115 firs paragraph of the Mexican Constitution; and Article 90, sections XIII & XVIII of the Constitution of the State of Quintana Roo, in correlation with Article 4 of the Constitution of the State of Tamaulipas and Article 115 first paragraph of the Mexican Constitution.

and Annex, which specifically deals with the release of hydrocarbons into the Gulf of Mexico and delegates independent responsibilities to all the subscribers as they create contingency plans to protects their own individual shores, beachfront, flora and fauna. *See Exhibit "M."*

**C.    The Mexican States Have Proprietary Interests Under Federal Maritime Law.**

**1.    There is No Requirement of Ownership.**

As demonstrated in the foregoing section, the Mexican States own the coastlines, beaches, estuaries, coastal areas, wildlife, flora, fauna, and other features along their Gulf Coasts. Moreover, they control and possess these areas and are responsible for maintaining, restoring, governing, managing, and repairing them at their own expense.

Even if Defendants were to argue that the Mexican States do not hold "title" to these areas, such an argument would be misplaced, as well as factually erroneous. Neither *Robins* nor any other court applying the *Robins'* principles has held that ownership of the property is necessary to establish the required proprietary interest. To the contrary, numerous courts have specifically held that actual title, or ownership of record, is *not* required to create standing to sue as long as there is an actual proprietary interest. *E.g., New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 11447 *25 (E.D. La. Aug. 23, 1990)("Dock lessors may properly be considered 'owners' in certain circumstances."); *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817, 821 (E.D. Va. 2001); *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 *18 (D. Conn. 2006)("Actual ownership or title is not necessary to demonstrate that a proprietary interest exists."); *In re Moran Enterprises Corp.,* 77 F.

Supp.2d 334, 341 (E.D. N.Y. 1999)("In order to have a proprietary interest actual ownership or title is not necessary.").

Rather than establishing an ownership requirement, courts have consistently held that a proprietary interest may be established by demonstrating "actual possession or control, responsibility for repair, and responsibility for maintenance." *Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.*, 877 F. 2d 1214, 1224-5 (5th Cir. 1989); *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. at 821 (proprietary interest existed where contract gave contractor "charge and care" of bridge repair project and required repairs until job accepted by owner). "Put differently, if [a plaintiff] shows that it has interests in the [property] *similar* to the interests it would acquire in a vessel from a demise charterer or in real estate *from a lease*, then it can satisfy the requirements of *Robins Dry Dock*." *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F. Supp. 2d 787, 796 (E.D. La. 2007)(citing *Louisville & Nashville R.R. Co. v. M/V Bayou Lacomb,* 597 F. 2d 469, 473-74 (5th Cir. 1979). Furthermore, it is undisputed that the Mexican States have the rights to "exploit" the beaches, coastal waters, estuaries, lagunas, and other coastal areas and resources. The right to exploit (explore for and produce minerals) pursuant to an offshore exploration lease is sufficient to create a proprietary interest. *Id.* As further demonstrated, the Mexican States, in addition to owning the areas at issue, control, possess, at their own expense repair and maintain, manage, develop, protect, and otherwise are responsible for governing these areas.

Lest it be argued that the Mexican States do not have a proprietary interest because their rights to and in certain properties may be subject to reversion to another

owner, it is clear that such a condition would not negate the existence of a proprietary interest. In *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 308 (1927), the Court implied that under a demise charter, the plaintiff would have held the necessary proprietary interest. Importantly, the charterer in *Robins* was a time charterer and not a demise charterer and the owners of the vessel remained in possession of the vessel at the time of the accident. *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817, 820 (E.D. Va. 2001). Additionally, even a time charterer has a direct proprietary interest in physical property that it adds to, has the legal right to remove, and will, as a matter of economic reality, likely reclaim from a leased vessel in which it does not have a proprietary interest. *Nicor Supply Ships Assoc. v. General Motors Corp.,* 876 F.2d 501, 506 (5th Cir. 1989). Courts have consistently held that such a demise charter *does* create the necessary proprietary interest, even though there is no transfer of ownership, the owner retains reversion rights, and the charter is for a limited time. *E.g., Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469 (5th Cir. 1979); [3] *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F. Supp. 2d 787, 796 (E.D. La. 2007)("Put differently, if [a plaintiff] shows that it has interests in the [property] *similar* to the interests it would acquire in a vessel from a demise charterer or

---

[3] As explained by the Court, in a time charter, the owner's personnel continue to navigate and manage the vessel but the ship's carrying capacity is taken by the charterer for a fixed time for transporting goods during the charter period. The time charter is used when the charterer deems it desirable to control the tonnage, but without undertaking the responsibilities of ship navigation and management of the financial commitments of vessel ownership. In contrast, in a demise or bareboat charter, the charterer takes over the ship, lock, stock and barrel, and staffs her with his own personnel.  He becomes, in effect, the owner *pro hac vice*, just as does the lessee of a house and lot, to whom the demise charterer is analogous. Such an arrangement is suitable to the needs of anyone who wants, **for a time,** to be in the position of the owner of a vessel, but who does not want to go to the expense and trouble of buying or building one. 597 F.2d at 472 n. 3 (quoting *Gilmore & Black, The Law of Admiralty § 4-1 at 194 (2d ed. 1975)*(emphasis added).

in real estate *from a lease*, then it can satisfy the requirements of *Robins Dry Dock.*").
Under a demise charter, the charterer, of course, does not *own* the vessel. There is no
transfer of title that is operative under such a charter. The owner of the vessel remains the
owner throughout the charter and afterward. Moreover, the charter lasts only as long as
the term of the charter and upon its expiration, possession and control revert to the owner.
Accordingly, any argument by Defendants based on the possibility of a reversion would
be inapposite, especially since during the period of any concession or decree, the
Mexican States would have the unquestionable right and authority to control, possess,
develop, manage, exploit, govern, protect, and repair and maintain at their own expense.

It is also evident that agreements between an owner and a user of property can
create the necessary proprietary interest. *In re Moran Enterprises Corp.,* 77 F. Supp.2d
334, 341 (E.D. N.Y. 1999). Thus, a utility company that admittedly was not the owner of
damaged submarine cables was found to have created a fact issue sufficient to survive
summary judgment where pursuant to its agreement with the owner, it had paid for a *pro
rata* share of the construction and was responsible for its share of the repair expenses and
jointly and severally liable for any environmental harm caused by the cables. *Id.*
Moreover, *Robins Dry Dock* does not prevent recovery for economic losses by a person
to whom they have been contractually shifted. *Amoco Transport So. V. S/S Mason Lykes*,
768 F.2d 659, 668 (5th Cir. 1985)("Nor does *Robins Dry Dock* prevent recovery for such
losses by a person to whom they have been contractually shifted."); *Showa Line, Ltd. v.
Diversified Fuels, Inc.,* 1991 U.S. Dist. LEXIS 14662 *2 (E.D. La. 1991). As another
example, where the actual owner is an absentee owner and another party pursuant to an
agreement with the owner has a stronger possessory interest and more closely involved in

ordinary management and maintenance of the property, the non-owner may be found to hold a sufficient proprietary interest. *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 at *20-21. Thus, a party who is a "primary user" of a property and performs some day-to-day operations and performs repairs and maintenance may be found to have a proprietary interest in the property even though it does not own it. *Id.* The rationale for this principle has been explained as follows:

> Because the actual owners of property may be "absentees, having little to do with the day-to-day management of their property," and because "some other party, having a stronger possessory interest and more closely involved in ordinary management and maintenance of the property, may be better able to protect the property by promptly discovering damage, identifying those responsible, and "bringing suit against them," courts have taken a practical, rather than a formalistic approach to the question of whether a particular plaintiff's interest is one which falls outside *Robins Dry Dock's* proscription. [citations omitted].

*Id.; Holt Hauling & Warehousing Systems, Inc.* 614 F. Supp. at 898.

"It would serve no purpose to limit recovery to those who, under state property law, 'owned' the facility in question." 614 F. Supp. at 898. Thus, courts have considered whether a particular plaintiff was the only party present at or using the property and whether the actual owner was an "absentee" owner. *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 at *20-21; New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 11447 (E.D. La. Aug. 23, 1990).

Additionally, a proprietary interest exists where the plaintiff has an "insurable interest"[4] in the damaged property that is owned by another. *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817, 821 (E.D. Va. 2001)(where contractor

---

[4] As explained by one court, an insurable interest is defined as 'a real and substantial interest in specific property as will prevent a contract to indemnify the person interested against its loss from being a mere wager policy or such an interest as will make the loss of the property of pecuniary damage to the insured. *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817, 821 (E.D. Va. 2001)(quoting *Black's Law Dictionary* 720 (5th Ed. 1979)).

had insurable interest in work in progress on bridge it did not own, it nevertheless had a proprietary interest); see *Vicksburg Towing Co. v. Mississippi Marine Trans. Co.,* 609 F. 2d 176, 177 (5th Cir. 1980)(insurable interest element in determining existence of proprietary interest); *In re Moran Enterprises Corp.,* 77 F. Supp.2d at 341 (E.D. N.Y. 1999)(one of the factors creating fact issue regarding proprietary interest was a non-owner's joint maintenance of insurance policy on the property at issue). It is undisputed that the Mexican States can erect buildings and structures on the coastal lands and otherwise exploit these territories, thereby creating insurable interests.

Other arrangements conferring interests have been found to constitute proprietary interests. For example, lessors (who by the nature of their interests do not own the property and whose rights will terminate at the end of the lease) may properly be considered "owners" in certain circumstances. *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469, 472 n. 3 (5th Cir. 1979)(finding a lessee of a house and lot to be "analogous" to a demise charterer); *In re TT Boat Corp.,* 1999 U.S. Dist. LEXIS 13797 (E.D. La. Sept. 3, 1999)(working interests as to oil platform created by lease with the U.S. government and working interest holders were "owners" of platform where under operating agreement, they shared in construction costs, possessed right to inspect it, and possessed right to sell it and share in proceeds); *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 at *20-21.; *New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 11447 *25 (E.D. La. Aug. 23, 1990)(citing *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. 890, 899 (D.C. Pa. 1985)). An element of ownership includes the "right of use" which right is itself "a thing of value." *Vicksburg Towing Co. v. Mississippi Marine Trans. Co.,* 609 F.

2d. at 177; *New Orleans Steamboat Co.,* 1990 U.S. Dist. LEXIS 1147 at *25; *SEKCO Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp.1008, 1012 (E.D. La. 1993). The proper inquiry is whether the lessor had sufficient "incidents of ownership" to render it "proprietary" as a matter of federal maritime law. 1990 U.S. Dist. LEXIS 1147 at *25; *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. 890, 899 (D.C. Pa. 1985). Performance of routine maintenance, payment of utility bills, and lack of use by the record owner are factors to be considered in determining whether a lessor has a proprietary interest sufficient to withstand the *Robins* test. *Id.* Thus, the court in *New Orleans Steamboat Co.* held that a steamboat company leasing a dock owned by the Board of Commissioners of the Port of New Orleans had a sufficient proprietary interest where the lease not only allowed the steamboat company to use the dock for its excursions, but also required the company to repair damages to the wharf and maintain it. Similarly, in *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617, the court found that a transportation authority created a fact issue as to its proprietary interest in a bridge and its substructures through evidence that it repaired and maintained the property even though the state held all right, title, and interest in the bridge and the state was statutorily required to maintain the bridge where the transportation agency was the primary user and conducted daily repairs on the structures. Furthermore, in *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. 890, 899 (D.C. Pa. 1985), the court found that a lessee of a pier could establish a proprietary interest since he did not merely use the pier, but was arguably the primary user of the pier and also purchased liability insurance on it, performed routine maintenance, and paid for all utilities.

In *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817 (E.D. Va. 2001) a contractor repairing a bridge sued the owner of a barge that had broken free and collided with the bridge and damaged the work in progress. The bridge was owned by the state and the contractor had been performing its work under a contract with the state. It was undisputed that the contractor did not own the bridge. The contract provided that the contractor would have "charge and care" of the project and required the contractor to rebuild, repair, and restore any damages to the work until it was accepted by the state. Similarly, it has been held that a non-owner of property has a sufficient proprietary interest where the owner has shifted responsibility for repairs to the non-owner. *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F. Supp. 2d at 796.

In view of the foregoing applicable principles and the undisputed facts herein, the Mexican States have established that they have proprietary interests under both Mexican law and the principles applicable under federal maritime law.

WHEREFORE PREMISES CONSIDERED, Plaintiffs respectfully request that this Court grant The Mexican States Of Quintana Roo's, Tamaulipas', And Veracruz' Joint Motion For Summary Judgment Regarding Proprietary Interests

Respectfully Submitted,

DATED: January 4, 2013

SERNA & ASSOCIATES PLLC

By:

**/s/ Enrique G. Serna**
**Enrique G. Serna, Esq.**
SBOT 00789617

20985 IH 10 West
Serna Building
San Antonio, Texas 78257
(210) 2280095 – Telephone
(210) 2280839 – Facsimile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, pursuant to Judge Shushan's Order of September 11, 2012, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on January 4th, 2013

/s/ Enrique G. Serna
Enrique G. Serna