IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, ON APRIL 20, 2010 | § | SECTION J |
| | § | |
| | § | JUDGE BARBIER |
| THIS DOCUMENT RELATES TO: | § | |
| CASE NOS. 10-4239, 10-4240, 10-4241, | § | MAGISTRATE JUDGE SHUSHAN |
| BUNDLE C, AND 10-2771 | § | |

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES
BY TRANSOCEAN AND HESI SUPPORTING THEIR
JOINT MOTION FOR COMPLETE SUMMARY JUDGMENT
REGARDING ALL REMAINING MEXICAN STATES' CLAIMS**

Transocean Offshore Deepwater Drilling Inc., Transocean Holding LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean") and Halliburton Energy Services, Inc. ("HESI"), respectfully submit this Memorandum of Points and Authorities Supporting their Motion for Complete Summary Judgment regarding all remaining claims asserted by the Mexican States of Quintana Roo, Tamaulipas, and Veracruz ("Mexican States"). For the reasons set forth below, the Court should grant Transocean's and HESI's motion.

**INTRODUCTION**

Although it has been widely reported that Macondo hydrocarbons did not reach Mexican waters or coastline,[1] the Mexican States complain of alleged injuries to a variety of natural resources due to the Macondo spill. *See, e.g.,* Case Nos. 10-4239, 10-4240, 10-4241, and 10-

---

[1] *See, e.g.,* Organización Editorial Mexicana, *Pide Calderón que BP pague daños tras derrame en Golfo de México*, La Prensa (Mex.), May 7, 2010 at http://www.oem.com.mx/ laprensa/notas/n1625536.htm (quoting President Calderon as stating that "the currents have pushed crude oil towards the coast of the United States").

2771.  The purportedly damaged resources include waters, coastal areas, and wildlife.  *See, e.g.,*
Excerpt from Plaintiffs' Objections and Answers to Defendants' Targeted Discovery Requests at
Response to Interrogatory 1, attached as Exhibit A; Second Amended Complaints at ¶¶ 291-293.
Although the three individual Mexican States are the only plaintiffs in the instant actions, they
also complain of alleged damages suffered by political subdivisions, businesses, residents, and
"others" within their borders.  Ex. A (Int. Resp. 1 at 24).

After considering motions to dismiss the Bundle C claims, the Court dismissed the
majority of the Mexican States' claims, but concluded that:  "The Mexican States' [maritime]
negligence and gross negligence claims . . . are preserved, but only to the extent there has been a
physical injury to a proprietary interest" as required by *Robins Dry Dock & Repair Co. v. Flint*,
275 U.S. 303 (1927).  *See* Bundle C Order, Rec. Doc. 4845 at 4, 11-12, *citing* Bundle B1 Order,
Rec. Doc. 3830 at 19-25.

The Court subsequently instructed the parties to (1) engage in "'targeted discovery' . . .
relat[ing] solely to the briefing of the legal issue of whether the Mexican States have a justiciable
claim" under *Robins Dry Dock* (Rec. Doc. 6702 at 2), and (2) submit cross-motions for summary
judgment regarding whether the Mexican States "have individual proprietary interests" in the
asserted claims under Mexican law (*see* Rec. Doc. 7367 at 1-2).[2]

Mexican law establishes that the Mexican States inappropriately complain of allegedly
damaged natural resource assets in which they have no proprietary interest.  Therefore, the

---

[2] Transocean's and HESI's instant motion is submitted pursuant to these Orders on the narrow
issue of whether the Mexican States "have individual proprietary interests as a matter of Mexican
law" and OPA grounds asserted herein.  Transocean and HESI reserve the right to contest the
Mexican States' claims on additional grounds, including the lack of physical damage to alleged
proprietary interests.

Mexican States' negligence and gross negligence claims are barred by the *Robins Dry Dock* rule as a matter of maritime law.  Moreover, even if, assuming *arguendo*, the Mexican States possessed a proprietary interest, their maritime claims are displaced by the Oil Pollution Act of 1990 ("OPA").  Accordingly, this Court should grant judgment in favor of Transocean and HESI on all the remaining Mexican States' claims.

## STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Catalyst Old River Hydroelectric Ltd. P'ship. v. Ingram* ("*Catalyst*"), 639 F.3d 207, 210 (5th Cir. 2011) (citing Fed. R. Civ. P. 56(c); *Maher v. Strachan Shipping Co.*, 68 F.3d 951, 954 (5th Cir. 1995)).  When evaluating a motion for summary judgment involving application of foreign law, Federal Rule of Civil Procedure 44.1 provides that "the court may consider any relevant material or source."  Fed. R. Civ. P. 44.1. "One of the objectives of Rule 44.1 was to abandon the fact characterization of foreign law and to make the process of determining alien law identical with the method of ascertaining domestic law to the extent that it is possible to do so."  9A Wright & Miller, Fed. Prac. & Proc.: Civil § 2444 at 338-42 (3rd Ed. 2008).  Resolving the content of Mexican law will result in "a ruling on a question of law."  Fed. R. Civ. P. 44.1.

## ARGUMENT

In *Robins Dry Dock*, the Supreme Court established that "maritime law bars unintentional tort claims for economic losses when they are unaccompanied by physical injury to the plaintiff's proprietary interest."  *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in Gulf of Mexico, on April 20, 2010*, MDL 2179, 2012 WL 4610381, at *3 (E.D. La. Oct. 1, 2012) (citing *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1020 (5th Cir. 1985) (en banc)).  The

Fifth Circuit has characterized the rule of *Robins Dry Dock* as "denying recovery for economic loss if that loss resulted from physical damage to the property of another." *Catalyst*, 639 F.3d at 210; *see also TESTBANK*, 752 F.2d at 1034 (Williams, J., concurring) (The "legal synonym for 'proprietary interest' is 'ownership'"); *Vicksburg Towing Co. v. Mississippi Marine Transp. Co.*, 609 F.2d 176, 177 (5th Cir. 1980) (noting that the difference between recovery by an owner when his property is damaged and recovery by others is "meaningful, real and dispositive").[3]

Here, the Mexican States' claims fail because Mexican law establishes that the Mexican States improperly complain of "physical damage to the property of another." The Mexican States seek economic damages for alleged injuries to natural resource assets in which they have no proprietary interest. Although the Mexican States argue for a proprietary interest based on the concept of Mexican concurrent jurisdiction, Mexican law precludes such a finding. Additionally, under Mexican law, none of the four types of agreements cited by the Mexican States concerning natural resource assets transfers ownership of the assets at issue to the Mexican States.

Moreover, because the Coast Guard named Transocean a "Responsible Party" under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.* for the release of surface diesel oil,

---

[3] Although the Fifth Circuit has suggested factors for consideration of whether a non-owner could have proprietary interest if such interest is tantamount to ownership in some circumstances (*see, e.g., Texas Eastern Transmission Corp. v. McMoRan Offshore Exploration*, 877 F.2d 1214, 1225 (5th Cir. 1989)), application of such factors here would be contrary to *Robins Dry Dock*, and no Fifth Circuit cases were located (a) applying such factors to allow a non-owner to recover alleged economic damages concerning natural resources, or (b) permitting a non-owner to recover economic damages absent contract provisions where owners explicitly gave non-owners such recovery rights (*see, e.g., Amoco Transport Co. v. S/S MASON LYKES,* 768 F.2d 659 (5th Cir. 1985)).

the Mexican States' "maritime causes of action against [Transocean as] a Responsible Party are displaced by OPA."  B1 Order, Rec. Doc. 3830 at 26.

Thus, because the Mexican States' remaining maritime claims fail under *Robins Dry Dock*, and the maritime claims are displaced by OPA, this Court should grant complete summary judgment as to their remaining maritime claims.

I.    The Mexican States Complain Of Alleged Injuries To Natural Resources In Which They Have No Proprietary Interest.

The Mexican States assert that they have proprietary interest in a variety of natural resources that were allegedly damaged by Macondo hydrocarbons, including (1) water, (2) coastal areas, and (3) wildlife.  *See* Ex. A (Int. Resp. 1 at 24).  It is clear, however, that under Mexican law, the Mexican States complain of alleged injuries to natural resource assets in which they have no ownership interest.  Therefore, the Mexican States' maritime negligence and gross negligence claims should be dismissed.

A.    Water

*First,* the Mexican States' assert that they "have dominion over and own" waters including those "extending into and comprising the Mexican Exclusive Economic Zone."  Ex. A (Int. Resp. 1 at 24)).  This assertion is directly contradicted by Mexico's Constitution and federal laws promulgated thereunder.

According to Article 27 of the Mexican Constitution, ownership of all waters within the boundaries of the national territory is vested originally in the nation.  Halliburton's and Transocean's Joint Identification of Legal Authorities, Rec. Doc. 8167-8 ("Legal Auth.") at 7.[4]

---

[4] Translated Mexican law, including Halliburton's and Transocean's original and supplemental Mexican legal authorities, as well as expert reports exchanged by the parties are filed in the

The Mexican Supreme Court has held that the term "nation" in the Mexican Constitution refers to Mexico's federal government, not the Mexican States.  Expert Report of José Juan González Márquez, Rec. Doc. 8167-10 ("Gonzalez Rpt.") at ¶ 35 (referencing Exhibit 3 thereto (Nation, Representation of the; 5a. Epoca; 2a. Sala; S.J.F.; LII; Pag. 72 (Registro No. 332930) ("[t]he nation cannot be mistaken for a state")); Declaration of David Lopez, Rec. Doc. 8167-11 ("Lopez Rpt.") at ¶ 4.3 (same).

Although the Mexican nation may convey some types of these waters into private ownership, Article 27 expressly lists those waters that may *not* be conveyed into private ownership as follows:

> the waters of the territorial seas, within the limits and terms fixed by international law; [5] inland marine waters;[6] those of lagoons and estuaries[7] permanently or intermittently connected with the sea; those of natural, inland lakes which are directly connected with streams having a constant flow; those of rivers and their direct or indirect tributaries from the point in their source where the first permanent, intermittent, or torrential waters begin, to their mouth in the sea, or a lake, lagoon, or estuary forming a part of the public domain; those of constant or intermittent streams and their direct or indirect tributaries, whenever the bed of the stream, throughout the whole or a part of its length, serves as a

---

instant action as Defendants' Joint Submission of Exchanged Material on Mexican Law at Rec. Doc. 8167.

[5] The United Nations Convention of the Law of the Sea establishes the Mexican territorial sea as 12 nautical miles seaward from the low-water line along the coast as marked on large-scale charts officially recognized for the coastal states.  González Rpt. at ¶ 16 (citing United Nations Convention of the Law of the Sea, art. 2, ¶¶ 1, 3, 5, Dec. 10, 1982, 1833 U.N.T.S. 3.; Article 25, Federal Law of the Sea (Legal Auth. at  37)).

[6] Inland marine waters are defined in Article 36 of the Federal Law of the Sea as those waters located between the coast and the baselines, normal or straight, from which the territorial sea is measured.  González Rpt. at ¶ 17; Halliburton's and Transocean's Supplemental Joint Identification of Legal Authorities at Rec. Doc. 8167-9 ("Supp. Legal Auth.") at 12.

[7] Article 3, Paragraph XXVI  of  the National Waters Law defines estuaries as "[l]ow, swampy land, which is commonly filled with rainwater or by overflow from a current, or a near lagoon or by the sea."  González Rpt. at ¶ 19; Supp. Legal Auth. at 13.

boundary of the national territory or of two federal divisions, or if it flows from one federal division to another or crosses the boundary line of the Republic; those of lakes, lagoons, or estuaries whose basins, zones, or shores are crossed by the boundary lines of two or more divisions or by the boundary line of the Republic and a neighboring country or when the shorelines serve as the boundary between two federal divisions or of the Republic and a neighboring country; those of springs that issue from beaches, maritime areas, the beds, basins, or shores of lakes, lagoons, or estuaries in the national domain; and waters extracted from mines and the channels, beds, or shores of interior lakes and streams in an area fixed by law.

Legal Auth. at 8.

Article 27 states that as to these waters, "ownership by the Nation is inalienable and imprescriptible, and the exploitation, use, or appropriation of the resources concerned, by private persons or by companies organized according to Mexican laws, may not be undertaken except through concessions granted by the Federal Executive, in accordance with rules and conditions established by law."  Legal Auth. at 8.

The Mexican Supreme Court of Justice confirmed that these waters may not be conveyed into private ownership, and that the Executive Branch of the federal government has exclusive enforcement and control of these waters.  González Rpt. at ¶ 15 (referencing Exhibit 1 thereto (*Federal Waters*, 5th Era; Plenary; S.J.F.; XIV; Pag. 157 (Record No. 285270)); Lopez Rpt. at ¶ 4.8 (same).  *See also Waters Owned by the Nation, Law of, Matters it Regulates are of Transcendental Importance for the National Interest,* 7th Era; Ancillary; S.J.F., 23 Part 7; Pag. 74 (Record No. 9587/65) (holding that the nation "does have full ownership" of the waters in paragraphs 5 and 6 of Article 27 of the Constitution, and "thus it is entitled to sovereignty and ownership of those assets") (González Rpt. at Exhibit 1).   Regarding the Mexican Exclusive Economic Zone ("EEZ"), Article 27, paragraph 8 of the Mexican Constitution provides that the federal government, not the Mexican States, has sovereign authority over the Mexican EEZ. Lopez Rpt. at ¶ 4.6; Legal Auth. at 9 ("The Nation shall exercise its sovereign rights and

jurisdictions, as determined by Congress, in an exclusive economic zone located outside the territorial sea.").

Thus, Mexican law establishes that the Mexican States do not "have dominion over and own" national waters including waters "extending into and comprising the Mexican Exclusive Economic Zone."  Accordingly, the Mexican States' claims regarding such aquatic assets should be dismissed.

B.     Coastal Areas

*Second,* the Mexican States claim that they own and have dominion over Mexican coastal areas, including reef, shores, and beaches.  *See* Ex. A (Int. Resp. 1 at 24).  Contrary to this claim, Mexican law establishes that the Mexican States complain of alleged injuries to coastal assets owned by the Mexican nation.

Regarding reefs, Article 48 of the Mexican Constitution declares that keys and reefs are owned by the nation.  González Rpt. at ¶ 18; Lopez Rpt. at ¶ 6.4; Legal Auth. at 15.  Moving inland from reefs to coastal areas, beaches[8] are also owned by the nation.  González Rpt. at ¶ 23 (citing Article 6, Paragraph II of the General Law on National Assets (Legal Auth. at 32)); Lopez Rpt. at ¶ 4.7 (same).  Moreover, Article 14 of Ports Law states that the land and waters in port areas are also owned by the nation.  Lopez Rpt. at ¶ 4.9; Supp. Legal Auth. at 14.  Additional waterfront property known as the "federal maritime-land zone"[9] is similarly a national asset.

---

[8] Beaches are defined by Article 7, Paragraph IV of the General Law on National Assets as the land between the lowest annual ebb of the tide and the highest flood of the tide.  Legal Auth. at 33.

[9] Federal maritime-land zone is defined as "the band of twenty meters wide of firm land, passable and contiguous to beaches or, when applicable, to riverbanks, from their mouth in the sea to one hundred meters upstream."   National official standard, "NORMA OFICIAL

González Rpt. at ¶¶ 20-21; Lopez Rpt. at ¶ 4.10; Articles 3, 14, 20 and 40, Regulation for the Use and Enjoyment of the Territorial Sea, Navigable Waterways, Beaches, Federal Maritime Zone and Lands Reclaimed from the Sea (Legal Auth. at 74; Supp. Legal Auth. at 20).   The federal maritime-land zone is "subject to the Federal Government's public domain regime," and is thus "inalienable, imprescriptible and unseizable" property of the nation that may not be conveyed.  *See* Article 13, General Law on National Assets (Legal Auth. at 34).

Another national coastal asset is known as "lands reclaimed from the sea" under Mexican law.  These are gained lands created by the action of the sea.  *See* national standard NORMA OFICIAL MEXICANA NOM-146-SEMARNAT-2005 (Supp. Legal Auth. at 23)).  Article 70 of the General Law on National Assets (Supp. Legal Auth. at 11) provides that such gained lands are owned by the nation, but may be conveyed to the owner of the adjacent beachfront property only after such lands are disincorporated from the public domain by Executive decree (*see* Article 6, Paragraph IX, General Law on the National Assets (Legal Auth. at 32)).  The Mexican States have produced no evidence of gained lands disincorporated from the public domain and conveyed to them that were allegedly damaged by Macondo hydrocarbons.  González Rpt. at ¶ 22, 30.

Based on the foregoing, Mexican law establishes that the Mexican States do not "have dominion over and own" national reef and coastal assets.  Accordingly, the Mexican States' claims regarding such assets should be dismissed.

---

MEXICANA NOM-146-SEMARNAT-2005," issued by the Department of Environment and Natural Resources in 2005 (Supp. Legal Auth. at 23).

C.     <u>Wildlife</u>

*Third*, the Mexican States claim to own and have dominion over wildlife and marine life. *See* Ex. A (Int. Resp. 1 at 24).  Under Mexican law, with limited exceptions that do not apply here,[10] wildlife may not be owned by any sovereign.  González Rpt. at ¶ 25 (citing Article 4, General Law of Wildlife (Legal Auth. at 72).  However, the Mexican federal government rather than the Mexican States retains primary jurisdiction over matters concerning Mexican wildlife. For example, Article 9(VI) of the General Law of Wildlife places the Mexican federal government in charge of matters relating to conservation and sustainable use of national wildlife in the case of acts originating in other countries that might affect Mexican wildlife. Significantly, under Article 107 of the General Law of Wildlife, only the Mexican federal government (specifically, the Federal Attorney General's Office for Environmental Protection) is authorized to file an action in Mexican courts to recover for "damage caused to wildlife and its habitat."  Supp. Legal Auth. at 18.

Regarding aquatic species, Article 8 of the General Law of Sustainable Fishing and Aquaculture provides that the Mexican federal government (specifically, the Ministry of Agriculture, Livestock, Rural Development, Fisheries and Food) is authorized to "[r]egulate, promote and administrate the enjoyment of the fisheries and aquaculture resources."  BP Supp. Legal Auth., Rec. Doc. 8167-6 at 20.  Additionally, under the principle of *Accesorium non ducit, sed sequitur suum principale*, aquatic species in national waters are national property as they are an accessory of national waters.  *See* Article 886 of the Federal Civil Code (Supp. Legal Auth. at 21).     Fishermen must obtain a concession from the federal government to fish in national

waters.  Articles 40-41, General Law of Sustainable Fishing and Aquaculture (Supp. Legal Auth. at 15-16).   Accordingly, the Mexican nation, not the Mexican States, has ownership and jurisdiction regarding such national aquatic assets under Mexican law.

Based on the foregoing, the Mexican States' claims regarding wildlife and fish should be dismissed.

II.     The Mexican States' Concurrent Jurisdiction Over Certain Environmental Administrative Matters Does Not Convey Ownership Interest In Natural Resources To The Mexican States.

In support of the Mexican States' claims of proprietary interest, their experts rely heavily on the concept of concurrent jurisdiction.  Report of Dr. Carlos Gabuardi, Rec. Doc. 8167-2 ("Gabuardi Rpt.") at 26-29; Report of Dr. Julio César Cruz Chavira, Rec. Doc. 8167-3  ("Cruz Rpt.") at 8-24; Report of Dr. Sergio Elías Gutíerrez Salazar, Rec. Doc. 8167-4 ("Gutíerrez Rpt.") at 4-13.  This reliance is misplaced.  Although the Mexican federal government may expressly grant concurrent jurisdiction of certain environmental administrative matters to the Mexican States, such grants do not convey ownership of any natural resource under Mexican law. González Rpt. at ¶ 29 (citing Articles 27, 70, and 73 Section XXIX-G, Mexican Constitution (Legal Auth. at 7-16; Supp. Legal Auth. at 6); Article 11, General Law of Ecological Balance (Supp. Legal Auth. at 10); Article 11, General Law of Wildlife (Supp. Legal Auth. at 17); Article 24, General Law of Sustainable Forest Development (Supp. Legal Auth. at 19)); Lopez Rpt. at ¶¶ 5.1, 5.3-5.4 (same; adding Article 11, General Law of Sustainable Fishing and Aquaculture (Supp. Legal Auth. at 15)).

---

[10] Wildlife may be owned in three circumstances:  (1) "specimens type" of flora and fauna are owned by the nation; (2) wildlife may be appropriated by hunting; and (3) wildlife may be purchased in a legal market.  *See* González Rpt. at ¶ 21 (cit. omitted).

Additionally, the Mexican Supreme Court has confirmed that the Mexican States are dependent on, and subordinate to, the federal government in the area of concurrent jurisdiction of environmental administrative matters. González Rpt. at Exhibit 2 (*Concurrent Powers in the Mexican Legal System. Their General Characteristics*, 9th Era; Plenary; S.J.F.; XV; Pag. 1042 (Record No. 187982)). Each of the Mexican States' experts cite this same precedent as purportedly supporting the notion of the states' independence in environmental matters. Gabuardi Rpt. at 27 (describing the opinion as the "State of the Art" on concurrent powers"); Cruz Rpt. at 9; Gutíerrez Rpt. at 5-6. However, even a cursory examination of the Mexican Supreme Court's opinion and the Mexican constitutional provisions cited therein disproves the Mexican States' assertion of environmental administrative independence.

In *Concurrent Powers in the Mexican Legal System,* the Mexican Supreme Court explains that the Mexican Congress determines whether states may exercise concurrent jurisdiction:

> While it is true that Article 124 of the Political Constitution of the United Mexican States sets forth that: "The powers not expressly vested in the federal officials by this Constitution shall be understood as vested in the States," the Constitution Amending Organism decided, in different precepts, *the possibility for the Congress of the Union to establish a distribution of jurisdictions, called "concurrent jurisdictions,"* among the Federation, the States and the Municipalities and even the Federal District, in certain matters, such as: . . . environmental (Article 73, Section XXIX–G)[11] . . . That is, in the Mexican legal system concurrent powers allow for the States, even the Federal District, the Municipalities and the Federation to act with respect to one same matter, *but it shall be the Congress of the Union the one to determine the manner and the terms of participation by said entities through a general law*.

---

[11] Article 73, Section XXIX-G of the Mexican Constitution provides that the Mexican Congress shall have power to "enact laws establishing concurrent jurisdictions of the Federal Government and of the State and Municipal governments" concerning environmental administrative matters. (Legal Auth. at 15).

González Rpt. at Exhibit 2 (*Concurrent Powers in the Mexican Legal System. Their General Characteristics*, 9th Era; Plenary; S.J.F.; XV; Pag. 1042 (Record No. 187982) (emphasis added)).

Thus, although Article 124 generally allows the Mexican States to exercise powers not expressly reserved by the Mexican federal government, because Article 73, Section XXIX–G explicitly addresses the Mexican Congress' power to establish concurrent jurisdiction in environmental administrative matters, there is no void there for the states to fill. The Mexican States may only exercise concurrent jurisdiction with the federal government over environmental administrative functions through express grants by the Mexican Congress.

Accordingly, because concurrent jurisdiction does not convey ownership interest in any natural asset to the Mexican States, and the Mexican States are dependent on, and subordinate to, the federal government in the area of concurrent jurisdiction of environmental administrative matters, the concept of Mexican administrative concurrent jurisdiction does not support the Mexican States' claims.

III.    The Mexican States' Cited Agreements Concerning Certain Natural Resource Assets Do Not Convey Ownership Interest Therein To The Mexican States.

The Mexican States' also rely on various federal administrative agreements concerning federal assets in a futile attempt to establish their claims. *See, e.g.,* Mexican States' Translated Authority, Rec. Doc. 8167-1; Gabuardi Rpt. at 38-242. They contend that such agreements confer "equally shared proprietary rights upon Mexican National Territory." Gabuardi Rpt. at 246. One of the Mexican States' experts, Dr. Gabuardi, dedicates over two hundred pages of his report to a discussion of numerous such agreements. Gabuardi Rpt. at 38-242. However, the Mexican States' reliance on these agreements undermines their position. Under Mexican law,

none of the four types of agreements cited by the Mexican States transfer ownership of the natural resources discussed therein to the Mexican States.  González Rpt. at ¶ 30.

*First*, destination agreements wherein certain national assets are destined to the service of an entity do not confer any ownership interest to the Mexican States under Mexican law. González Rpt. at ¶ 31 (citing Article 27, Mexican Constitution (Legal Auth. at 7-8); Article 70, General Law on the National Assets (Supp. Legal Auth. at 11) ("The destination only grants the user institution the right to use the real property destined for the authorized use, but does not transmit ownership thereof, nor does it grant any real rights thereon.")); Lopez Rpt. at ¶ 4.7.

*Second,* concessions granted by the federal government permitting private persons or states to enjoy national assets subject to the public domain regime do not transfer property rights. González Rpt. at ¶ 21 (citing Article 16, General Law on National Assets (Supp. Legal Auth. at 11)); Lopez Rpt. at ¶ 4.7 (same).  As noted above, land in the "public domain regime," and is "inalienable, imprescriptible and unseizable" property of the nation that may not be conveyed. *See* Article 13, General Law on National Assets (Legal Auth. at 34).

*Third,* tax coordination agreements do not confer any ownership interest to the Mexican States under Mexican law.  González Rpt. at ¶ 32 (citing Article 27, Mexican Constitution (Legal Auth. at 7-9); Article 1o and 10, Law on Tax Coordination (Supp. Legal Auth. at 22)).

*Fourth*, although "lands reclaimed from the sea" may be disincorporated from the public domain by Executive decree (*see* Article 6, Paragraph IX, General Law on the National Assets (Legal Auth. at 32)), the Mexican States have produced no evidence of gained lands disincorporated from the public domain and transferred to them that were allegedly damaged by Macondo hydrocarbons.  González Rpt. at ¶ 22, 30.

Of note, the Mexican States are not parties to many of the agreements referenced by Dr. Gabuardi.   The majority of the agreements involve private individuals, businesses, and municipalities.   *See, e.g.,* Gabuardi Rpt. at 58 (private individual) and 113 (municipality). However, neither private citizens, nor businesses, nor municipalities[12] within the Mexican States are parties to the instant actions; only the Mexican States are named plaintiffs.   *See, e.g.*, 10-4239, 10-4240, 10-4241, 10-2771.   The Mexican States have failed to allege any basis under United States or Mexican law permitting them to bring civil actions on behalf of others in domestic or foreign courts for alleged natural resource damages.   *See, e.g.,* González Rpt. at ¶¶ 33-34; Lopez Rpt. at ¶ 6.5 (only the Mexican federal government can initiate civil actions to recover damages to national lands, waters, and natural resources); *Arias v. Dyncorp,* 738 F.Supp.2d 46, 53 (D.C. Cir. 2010) ("*Parens patriae* [standing] is a doctrine that is reserved for the U.S. States"); Article 202, General Law of Ecological Balance and Environmental Protection (Legal Auth. at 30) (noting that specific procedures must be followed under the recently enacted Article 585 of the Mexican Federal Code of Civil Procedure for collective civil actions to be filed in Mexican courts concerning environmental issues).

Further, the Mexican States may not represent the Mexican nation's interests in any action.   González Rpt. at ¶ 35 (referencing Exhibit 3 thereto (Nation, Representation of the; 5a. Epoca; 2a. Sala; S.J.F.; LII; Pag. 72 (Registro No. 332930) ("[t]he nation cannot be mistaken for a state, and consequently, state officials are not the ones who represent it because it is unique and represented by its federal agencies, pursuant to Article 41 of the Federal Constitution.")).   The Mexican States have failed to allege any support for the proposition that any political subdivision

---

[12] Under Mexican law, municipalities are autonomous and independent entities.   Article 115, Mexican Constitution (Supp. Legal Auth. at 6).

of Mexico may seek damages in a foreign court for alleged transnational pollution.  Moreover, it is the Mexican federal government that is empowered with "[a]ttending to matters affecting the ecological balance in the national territory or in areas subject to the nation's sovereignty and jurisdiction, originating in the territory or areas subject to other States' sovereignty and jurisdiction, or in areas beyond the jurisdiction of any State."  Article 5, Section III, General Law of Ecological Balance and Environmental Protection (Legal Auth. at 28).

Based on the foregoing, the agreements cited by the Mexican States fail to support their proprietary interest claims.

IV.   <u>Application Of *Robins Dry Dock* To The Mexican States' Claims Establishes That The Mexican States Do Not Have Proprietary Interests In The Natural Resource Assets At Issue</u>.

Just as the Supreme Court affirmed denial of economic loss damages to a non-owner of an injured asset in *Robins Dry Dock*, the Mexican States' claims should also be denied.  In *Robins Dry Dock*, the claimants were time charterers of a steamship.  275 U.S. at 307.  While the vessel was in dry dock for routine maintenance, the dry dock damaged a propeller.  *Id.* Because the accident caused extended loss of use of the vessel during the propeller repair, the charterers sought recovery of their economic loss damages suffered by the delay.  *Id.*  The Supreme Court denied the charterers' claim.  *Id.* at 308.

The Court explained that, "[t]he damage was material to [the charterers] only as it caused the delay in making the repairs, and that delay would be a wrong to no one except for the petitioner's contract with the owner.  *The injury to the propeller was no wrong to the respondents but only to those whom it belonged*."  *Robins Dry Dock,* 275 U.S. at 308 (emphasis added).  *See also Catalyst*, 639 F.3d at 210 (noting that the rule of *Robins Dry Dock* can be stated as "denying recovery for economic loss if that loss resulted from physical damage to the property of another").

16

Under Mexican law, the Mexican States have failed to identify natural resource assets "belonging" to them under Mexican law that were allegedly damaged by Macondo hydrocarbons.  The purported injury was "no wrong" to the Mexican States.  Under *Robins Dry Dock*, therefore, the Mexican States cannot maintain maritime claims for negligence and gross negligence against Transocean and HESI.

V.      The Mexican States' General Maritime Claims Fail Under OPA.

Even if, assuming *arguendo*, the Mexican States could pass the *Robins Dry Dock* test, their general maritime claims fail under OPA and should be dismissed.  As this Court held in ruling on motions to dismiss the Bundle B1 claims, "maritime causes of action against a Responsible Party are displaced by OPA."  Bundle B1 Order, Rec. Doc. 3830 at 26.  Before foreign claimants such as the Mexican States may recover against a Responsible Party under OPA, however, Congress explicitly requires that such claimants must demonstrate that "recovery is authorized by a treaty or executive agreement between the United States and the claimant's country, or the Secretary of State, in consultation with the Attorney General and other appropriate officials, has certified that the claimant's country provides a comparable remedy for United States claimants."  33 U.S.C. § 2707(a)(1).  Because the Mexican States failed to meet this requirement, their OPA claims were dismissed.  Bundle C Order, Rec. Doc. 4845 at 11.

However, in ruling on the Bundle C motions to dismiss, the Court did not directly address the question of whether the Mexican States' general maritime claims for negligence and gross negligence against Transocean, which is designated as a Responsible Party for the release of surface diesel oil, are displaced by OPA.   Bundle C Order, Rec. Doc. 4845 at 11-12.  Nevertheless, because the Mexican States are precluded from recovering under OPA, and

maritime claims are displaced by OPA, their remaining maritime claims pending against Transocean should be dismissed.[13]

## CONCLUSION

The Mexican States' maritime negligence and gross negligence claims fail under *Robins Dry Dock*.  Mexican law establishes that the Mexican States do not have proprietary interest in national natural resource assets allegedly damaged by Macondo hydrocarbons.  Moreover, even if the Mexican States' maritime claims survived under *Robins Dry Dock*, such claims against Transocean fail under OPA.

Accordingly, while preserving their legal positions (*see* Rec. Docs. 2657, 1781-1784), Transocean and HESI respectfully request that this Court grant complete summary judgment denying any and all recovery to the Mexican states of Quintana Roo, Tamaulipas, and Veracruz.


DATED: January 4, 2013                    Respectfully Submitted,

By:  *s/ Brad D. Brian*                 By:   *s/ Steven L. Roberts*
     Brad D. Brian                            Steven L. Roberts
     Michael R. Doyen                         Rachel Giesber Clingman
     Daniel B. Levin                          Sean D. Jordan
MUNGER TOLLES &OLSON LLP             SUTHERLAND ASBILL & BRENNAN LLP
355 So. Grand Avenue, 35th Floor     1001 Fannin Street, Suite 3700
Los Angeles, CA 90071                Houston, Texas 77002
Tel: (213) 683-9100                  Tel: (713) 470-6100
Fax: (213) 683-5180                  Fax: (713) 354-1301
Email: brad.brian@mto.com            Email: steven.roberts@sutherland.com
       michael.doyen@mto.com                rachel.clingman@sutherland.com
       daniel.levin@mto.com                 sean.jordan@sutherland.com


By:  *s/ Edwin G. Preis*                By:   *s/ Kerry J. Miller*
     Edwin G. Preis, Jr.                      Kerry J. Miller

---

[13] It is HESI's position that OPA also displaces claims against non-Responsible Parties.  *See* Rec. Docs. 1781-1784.  For this reason, HESI notes that the arguments noted in this Section V apply with equal force to any claims against HESI.  Transocean takes no position on this issue.

PREIS &ROY PLC
Versailles Blvd., Suite 400
Lafayette, LA 70501
(337) 237-6062
*and*
601 Poydras Street, Suite 1700
New Orleans, LA 70130
(504) 581-6062

FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email: kmiller@frilot.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

*Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC,* and *Triton Asset Leasing GmbH*

GODWIN LEWIS PC

By:  *s/ Donald E. Godwin*

Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No.  00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No.  24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

*Attorneys for Defendant Halliburton Energy Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 4th day of January, 2013.

Dated: January 4, 2013                                Respectfully submitted,

                                                       /s/ Kerry J. Miller_____

                                                       Kerry J. Miller