# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater | * | |
|     Horizon" in the Gulf of Mexico, | * | MDL No. 2179 |
|     on April 20, 2010, | * | |
| | * | Section: J |
| This Pleading applies to: | * | |
| | * | Judge Barbier |
| | * | |
| *All Cases (including Case No. 2:10-cv-04536* | * | Magistrate Shushan |
| *(United States v. BP Exploration &* | * | |
| *Production Inc., et al.))* | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BP EXPLORATION & PRODUCTION INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE UNITED STATES WITH RESPECT TO ITS CLAIMS FOR CIVIL PENALTIES FOR THE MORE THAN 800,000 BARRELS OF OIL THAT WERE COLLECTED AND NEVER RELEASED INTO THE ENVIRONMENT DURING THE *DEEPWATER HORIZON* OIL SPILL

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  202-879-5000
Facsimile:  202-879-5200


Joel M. Gross
Allison Rumsey
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:  202-942-5000
Facsimile:  202-942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108


Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  312-862-2000
Facsimile:  312-862-2200


Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291


*Attorneys for BP Exploration & Production Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

INTRODUCTION ........................................................................................................................1

LEGAL BACKGROUND ..........................................................................................................3

FACTUAL BACKGROUND......................................................................................................5

SUMMARY JUDGMENT STANDARD....................................................................................8

ARGUMENT...............................................................................................................................9

I.      The Collected Oil Was Not "Discharged" "In Such Quantities As May Be
        Harmful." ......................................................................................................................10

CONCLUSION...........................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Akin v. Q-L Invs., Inc.*,
  959 F.2d 521 (5th Cir. 1992) ............................................................................ 9

*Amarillo Prod. Credit Ass'n v. Farm Credit Admin.*,
  887 F.2d 507 (5th Cir. 1989) .......................................................................... 14

*Armour v. Knowles*,
  512 F.3d 147 (5th Cir. 2007) (per curiam) .................................................... 8

*Cas. Reciprocal Exch. v. Johnson ex rel. Johnson*,
  No. 91-2357, 1992 WL 300769 (E.D. La. Oct. 6, 1992) ............................... 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................ 8

*Chevron, U.S.A., Inc. v. Yost*,
  919 F.2d 27 (5th Cir. 1990) ............................................................................ 9

*Corporate Investigative Div., Inc. v. Am. Tel. & Tel. Co.*,
  884 F. Supp. 220 (W.D. La. 1995) ................................................................. 9

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*,
  530 F.3d 395 (5th Cir. 2008). ......................................................................... 8

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ...................................................................... 14

*Gen. Serv. Emps. Union Local No. 73 v. NLRB*,
  578 F.2d 361 (D.C. Cir. 1978) ...................................................................... 14

*In re Carney*,
  258 F.3d 415 (5th Cir. 2001) .......................................................................... 8

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) .......................................................................... 8

*Malacara v. Garber*,
  353 F.3d 393 (5th Cir. 2003). ......................................................................... 8

*Monument Mgmt. Ltd. P'ship I v. City of Pearl, Miss.*,
  952 F.2d 883 (5th Cir. 1992) (per curiam) .................................................... 9

*United States v. A Female Juvenile*,
   103 F.3d 14 (5th Cir. 1996) ................................................................................. 14

*United States v. Citgo Petroleum Corp.*,
   No. 2:08-cv-893, Doc. 234 (W.D. La. Sept. 29, 2011) .......................................... 4, 12

*United States v. Colonial Pipeline Co.*,
   242 F. Supp. 2d 1365 (N.D. Ga. 2002) ............................................................... 11, 12

*United States v. One 1973 Rolls Royce*,
   43 F.3d 794 (3d Cir. 1994) .................................................................................. 15

*United States v. Righter*,
   No. 1:08-CV-0670, 2010 WL 2640189 (M.D. Pa. June 30, 2010) ......................... 15

**Statutes**

33 U.S.C. § 1251(a) .................................................................................................. 14

33 U.S.C. § 1321(a)(2) ............................................................................................. 10

33 U.S.C. § 1321(b)(3) .................................................................................... 3, 4, 9, 10

33 U.S.C. § 1321(b)(7)(D) ........................................................................................ 4

33 U.S.C. § 1321(b)(8) ............................................................................................. 4

**Rules and Regulations**

40 C.F.R. § 110.3(b) ............................................................................................ 9, 11

Exec. Order No. 12777 (Oct. 18, 1991) ................................................................... 11

Fed R. Civ. P. 56(c)(1)(A) ......................................................................................... 8

Fed. R. Civ. P. 56(a) .................................................................................................. 8

**Other Authorities**

Oral Argument Tr., Doc. 170,
   *United States v. Citgo Petroleum Corp.*, No. 2:08-cv-893
   (W.D. La. Dec. 16, 2010) .................................................................................... 11

U.S. Br., Doc. 00511821287,
   *United States v. Citgo Petroleum Corp.*,
   No. 11-31117 (5th Cir. Apr. 13, 2012) ................................................................. 12

U.S. Mem. in Supp. of Second. Mot. for Partial Summ. J.,
   Doc. 115-1, *United States v. Citgo Petroleum Corp.*, No. 2:08-cv-893 (W.D. La. June 15,
   2010) .................................................................................................................. 11

**INTRODUCTION**

The *Deepwater Horizon* blow-out was the first oil spill in the United States to occur in deepwater, and it required enormous effort and innovation for the flow of oil into the Gulf of Mexico to be successfully stopped on July 15, 2010.  Before stopping the oil flow altogether, BP successfully developed new technologies for collecting a substantial amount of the hydrocarbons escaping through the *Deepwater Horizon* blowout preventer ("BOP"), lower marine riser package ("LMRP"), and broken riser.  BP worked with well control experts from government, the oil industry, and academia to identify and implement these oil collection options, all of which were undertaken with the approval of the Unified Command.  Through these efforts, BP successfully collected oil from the broken riser, the top of the BOP/LMRP, and the choke and kill lines of the BOP.  The best available calculation of the amount of this "Collected Oil" — that is, oil from the reservoir that never entered the Gulf of Mexico because it was captured and piped to surface vessels and, from there, either shipped to shore or disposed of by flaring — is 812,630 barrels.

In Phase 2 of this Court's Limitation and Liability trial, BP will prove that the total number of barrels of oil released from the Macondo reservoir is substantially lower than the United States Government's public estimates.  Today's motion is a significant, efficiency-promoting first step in the overall Phase 2 trial process, as BP now seeks rulings as a matter of law arising from its extensive, successful oil collection efforts during the spill.  *First*, BP seeks a ruling as a legal matter that at least 810,000 barrels of oil were collected, and then either flared or shipped to shore, without entering the waters of the Gulf of Mexico.  As noted above, the best view of the evidence is that 812,630 barrels were collected before entering the Gulf.  But this precise figure is necessarily an estimate based on the best data available; the actual amount of oil collected, if it could be precisely known, might be slightly higher or lower than this number.

Accordingly, the ruling that BP requests today is a conservative one, which understates the actual success of BP's collection efforts working under the Unified Command.

Significantly, the United States has already admitted in an RFA response that approximately 833,000 barrels of oil were "recovered" during the response using the methods at issue in this motion.  U.S. Second Response to BP Exploration & Production Inc.'s Second Set of Discovery Requests to the United States of America ¶ 505 (Aug. 29, 2011) ("RFA 505") (Ex. A).  Against this backdrop, BP requests that the Court now rule as a matter of law as to a fact the United States already has admitted; namely that at least 810,000 barrels of oil were collected during the spill without entering the waters of the Gulf of Mexico.

*Second*, BP seeks a ruling as a legal matter that the 810,000 barrels of oil that indisputably were collected during the spill without entering the Gulf may not be counted toward the maximum penalty amount potentially to be assessed against BP (or other parties) under the Clean Water Act ("CWA").  BP takes no position today on a quantification of the total number of barrels discharged; rather, BP seeks an order holding that the 810,000 barrels of oil that indisputably were collected during the spill cannot be included in the Clean Water Act penalty calculations, given that these barrels did not enter the Gulf and did not cause environmental harm.  As explained below, through an enormously complex series of engineering achievements, BP was able to reduce the overall magnitude of the spill by collecting hundreds of thousands of barrels of oil before they could enter the Gulf of Mexico and cause environmental harm.  As a matter of law and logic, these barrels should not form a basis for penalizing BP.

Of course, BP does not dispute that a larger amount of oil was discharged into the waters of the Gulf of Mexico.  And, of course, BP is aware that on August 2, 2010, very soon after the spill's conclusion, the Flow Rate Technical Group ("FRTG") issued a 4.9 million-barrel estimate

of the total amount of oil that had escaped the reservoir — that is, the estimated total amount considering both oil that was collected and oil that entered the Gulf.  *See* Press Release, U.S. Scientific Teams Refine Estimates of Oil Flow from BP's Well Prior to Capping (Aug. 2, 2010), *available    at*    http://www.restorethegulf.gov/release/2010/08/02/us-scientific-teams-refine-estimates-oil-flow-bps-well-prior-capping.  To be sure, BP continues to believe that the FRTG's 4.9 million-barrel estimate significantly overstates the size of the spill.  But the important point is that this disagreement over the size of the spill is a matter for resolution in the Phase 2 trial.  For present purposes, it suffices to observe that Section 311 of the Clean Water Act imposes civil liability only if there has been a "discharge of oil . . . into or upon the navigable waters of the United States . . . in such quantities as may be harmful."  33 U.S.C. § 1321(b)(3).  The barrels of oil that were collected from the broken riser, the top of the BOP/LMRP, and the choke and kill lines of the BOP never entered the waters of the Gulf of Mexico.  As a legal matter, then, such barrels of oil may not be counted toward CWA liability.

Accordingly, BP hereby moves for partial summary judgment against the United States, seeking a judgment that BP is not liable for Clean Water Act civil penalties for at least 810,000 barrels of oil that indisputably were collected during the response without entering the waters of the Gulf of Mexico.  To the extent that this motion is more properly deemed a motion *in limine*, BP requests that the motion be so deemed, and granted.

## LEGAL BACKGROUND

As the Court knows, the United States is asserting a large claim for civil penalties under Section 311 of the Clean Water Act.

CWA Section 311 prohibits the "discharge of oil . . . into or upon the navigable waters of the United States" and provides that a court may impose a civil penalty of up to $1,100 per barrel

of oil so discharged.  33 U.S.C. § 1321(b)(3), (7).  (This maximum penalty amount is increased in the event of gross negligence or willful misconduct.  *See* 33 U.S.C. § 1321(b)(7)(D).)

It bears emphasis, however, that this statutorily authorized per-barrel penalty represents only a maximum penalty amount.  As a matter of law, courts enjoy broad discretion based on consideration of eight mandated penalty factors to assess a penalty anywhere between zero and the statutory maximum.  Accordingly the court will consider "the seriousness of the violation or violations, the economic benefit to the violator, if any resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require."  33 U.S.C. § 1321(b)(8).

As a matter of practice, courts rarely assess a penalty approaching the full maximum statutory penalty amount.  For example, in *United States v. Citgo Petroleum Corp.*, No. 2:08-cv-893, Doc. 234 (W.D. La. Sept. 29, 2011) (Ex. B), Judge Haik considered the CWA penalty factors.  In doing so, he found relevant testimony that "showed that the environmental impact was almost fully rectified by 2009 [after a 2006 spill], and the wildlife seems to be showing no adverse impacts from the spill," *id.* at 4; and that "measures were taken by Citgo to minimize and mitigate the effects of the discharge promptly," *id.* at 7.  Notwithstanding the seriousness of the oil spill, the Court found a per barrel violation rate of $111 per barrel (significantly less than the per barrel maximum of $1,100) to be reasonable, for a total federal penalty of $6,000,000.  *See id.* at 10.

Against this backdrop, this motion constitutes a timely first step in the multi-years-long process of resolving the Government's claim for a CWA assessment.  BP recognizes that at this

point the Court has not established a schedule for conducting the discovery needed as a prerequisite to assessing a CWA penalty, and that it has not yet framed the trial phase(s) in which the parties' opposing views of the eight CWA penalty factors will be aired and adjudicated — much less set a date to begin those trial proceedings.  This motion is timely nonetheless, because quantification of the amounts of oil collected during the response naturally falls within the Source Control and Quantification subject matter for the Phase 2 trial projected to begin on September 9 of this year.  While an overall penalty assessment may well be years away, the facts and legal relevance of the amount of oil collected during the response are ripe for adjudication now as one component part of the overall Phase 2 proceeding.

## FACTUAL BACKGROUND

BP brings this motion based on undisputed facts that are well-known to the United States. From May 16 to July 15, 2010, BP and its contractors collected oil from the Macondo reservoir on three vessels located over the site of the Macondo well, using equipment and procedures approved by the Unified Area Command for the Macondo response.  The oil collected on those three vessels was either shipped to the shore or safely burned at sea, without ever coming into contact with the waters of the Gulf of Mexico.  In November 2010, the Federal Inter-Agency Solutions Group stated that more than 800,000 barrels of oil had "not enter[ed] the Gulf waters" because they had been "directly recovered" on the collection vessels commissioned for that purpose.[1]

---

[1] *See* Federal Interagency Solutions Group, Oil Budget Calculator Science and Engineering Team, Oil Budget Calculator – Deepwater Horizon – Technical Documentation (Nov. 2010) at 5, 39-40, *available at* http://www.restorethegulf.gov/sites/default/files/documents/pdf/ OilBudgetCalc_Full_HQ-Print_111110.pdf*; see also* RFA 505 (Ex. A) (approximately 17 percent of oil was "directly recovered from the wellhead").  Since completion of the November 2010 estimate and the United States' discovery responses, estimates of the oil directly collected from the Macondo Well have been adjusted downward based on further analysis of the available

The first vessel used to collect oil during the response was the *Discoverer Enterprise*, which collected oil between May 16 and July 10, 2010. *See* Statement of Material Facts ("Statement") ¶¶ 2-8. The *Enterprise* collected oil from the *Deepwater Horizon*'s riser, first by using a purpose-built tube fitted inside the end of the riser (called the Riser Insertion Tube Tool, or "RITT") and later by using what was called a "Top Hat," a collection dome placed on the riser above the *Deepwater Horizon*'s Lower Marine Riser Package (or "LMRP") flange. *Id.* ¶¶ 2-4, 6. No seawater was collected by the *Enterprise* during these processes. *Id.* ¶¶ 5, 7. The oil collected on the *Enterprise* was transported to shore by the *AT/B Paul T. Moran/Massachusetts* and the *Overseas Cascade. Id.* ¶ 8.

The second vessel used to collect oil flowing out of the Macondo reservoir was the *Q4000*, which collected oil between June 16 and July 15, 2010. *Id.* ¶ 9. During this time period, oil collected by the *Q4000* was immediately "flared" using a special assembly installed on board the ship called the EverGreen burning system. *Id.* ¶¶ 9, 11-12. This oil was taken directly from piping connected to the *Deepwater Horizon* blow-out preventer; hence none of this oil ever came into any contact with the Gulf. *Id.* ¶¶ 9, 10.

Finally, between July 12 and 15, 2010, a third vessel, the *Helix Producer I*, collected oil flowing from the reservoir. *Id.* ¶ 13. The oil collected by the *Helix Producer I*, like the oil collected by the *Q4000*, was taken directly from piping connected to the *Deepwater Horizon* blow-out preventer and thus never came in any contact with the Gulf. *Id.* ¶¶ 13-14. The oil

---

Footnote continued from previous page

information. *See* Deposition of Stephen Paul Carmichael (Dec. 18-19, 2012) (Ex. C) at 78:6-82:5; 194:1-22. This motion is based on the post-adjustment total amount of oil collected from the wellhead, including metering data for the oil collected by the *Q4000* and sales invoices for the oil collected by the *Discoverer Enterprise* and *Helix Producer I.*

collected by the *Helix Producer I* was transferred to the *Loch Rannoch*, which subsequently transferred the oil to the *AT/B Paul T. Moran/Massachusetts*.  *Id.* ¶ 15.

Based on the data taken from the *Q4000* meters and after deducting the methanol fraction of the total liquid collected by the *Q4000*, BP flared 225,950 barrels of oil collected by the *Q4000* from the *Deepwater Horizon* BOP choke line from June 16 to July 15, 2010.  *Id.* ¶ 16. Additionally, reports and supporting sales invoices submitted by BP show that a total of 220,684 barrels of oil were sold from the *AT/B Paul T. Moran/Massachusetts*, and that a total of 365,996 barrels of oil were sold from the *Overseas Cascade*.  *Id.* ¶¶ 17-18.  (BP made a donation to the National Fish and Wildlife Foundation to offset net proceeds from the sale of oil recovered as part of the *Deepwater Horizon* response.  *See* National Fish and Wildlife Foundation, National Fish and Wildlife Foundation Announces *Recovered Oil Fund for Wildlife*, http://www.nfwf.org/AM/Template.cfm?Section=Publications2&TEMPLATE=/CM/ ContentDisplay.cfm&CONTENTID=16537 (acknowledging BP's gift).)  In total, the evidence demonstrates that BP and its contractors collected and then either flared or shipped to shore a total of 812,630 barrels of oil from the *Deepwater Horizon* BOP, LMRP, and riser.  *Id.* ¶ 19.

| Flaring Vessel or Transportation Barge/Vessel | Collection Vessel | Barrels of Oil |
|---|---|---|
| *Q4000* | *Q4000* | 225,950 |
| *AT/B Paul T. Moran/Massachusetts* | *Discoverer Enterprise* and *Helix Producer I* | 220,684 |
| *Overseas Cascade* | *Discover Enterprise* | 365,996 |

Indeed, in its Second Response to BP's Second Set of Discovery Requests from the United States, the United States has admitted that more than 810,000 barrels of oil were collected.  The United States stated in response to BP's Request for Admission ¶ 505 that "based upon an estimated release of 4.9 million barrels of oil, . . . 17% [was] directly recovered from the

wellhead." RFA 505 (Ex. A). The United States has thus stated that about 833,000 barrels of oil — 17% of 4.9 million barrels — were "recovered" during the response. This admission is binding on the United States. *See Armour v. Knowles*, 512 F.3d 147, 154 (5th Cir. 2007) (per curiam).

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine issue as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.* 530 F.3d 395, 398-99 (5th Cir. 2008). Although all reasonable inferences are to be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. Likewise, disputes as to material facts are found "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id.*

A moving party may satisfy its summary judgment burden by pointing to undisputed evidence in the record. *See, e.g.*, *Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003). Given such undisputed evidence, the nonmoving party may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See Celotex*, 477 U.S. at 324. Summary judgment is appropriate, and indeed is commonplace, based on factual admissions made by the non-moving party. *See* Fed R. Civ. P. 56(c)(1)(A); *see also In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001) ("Since Rule 36 admissions, whether express or by default, are conclusive as to the matters admitted, they cannot be overcome at the summary [judgment] stage

by contradictory affidavit testimony or other evidence in the summary judgment record."); *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 530 (5th Cir. 1992).

Significantly, summary judgment is appropriately granted to narrow the scope of a party's damages liability (or here penalty liability) with respect to a particular claim for relief. *See, e.g.*, *Monument Mgmt. Ltd. P'ship I v. City of Pearl, Miss.*, 952 F.2d 883, 885 (5th Cir. 1992) (per curiam) (summary judgment ruling "disposed of most of the elements of damages . . . but it did not dispose of th[e] claim in its entirety"); *Corporate Investigative Div., Inc. v. Am. Tel. & Tel. Co.*, 884 F. Supp. 220, 222 (W.D. La. 1995) (granting partial summary judgment motion that "seeks to limit the amount of damages recoverable"); *Cas. Reciprocal Exch. v. Johnson ex rel. Johnson*, No. 91-2357, 1992 WL 300769, at *2 n.1 (E.D. La. Oct. 6, 1992) (Clement, J.) ("It is not unusual for courts to consider, prior to a finding of liability, questions that are only relevant if the defendant is liable.  For example, litigants often move for partial summary judgment on the availability of punitive damages, particular elements of damages (e.g., lost profits, emotional distress) and prejudgment interest.").

## ARGUMENT

Section 311(b)(3) of the CWA prohibits "[t]he discharge of oil . . . (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act [OCSLA] . . . in such quantities as may be harmful."  33 U.S.C. § 1321(b)(3).  A discharge is "harmful" *if and only if* it "cause[s] a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause[s] a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."  40 C.F.R. § 110.3(b); *Chevron, U.S.A., Inc. v. Yost*, 919 F.2d 27, 29-30 (5th Cir. 1990).  The thousands of barrels of oil that were collected through various mechanisms employed by BP, by definition, could neither have caused nor

contributed to any sheen, discoloration, sludge, or emulsion.  Moreover, penalizing such successful oil collection efforts would only discourage similar remedial measures in response to future spills and thus would be inconsistent with foundational premises of CWA penalty liability. Accordingly, the Collected Oil should be excluded from the CWA penalty calculation as a matter of law.

## I.   The Collected Oil Was Not "Discharged" "In Such Quantities As May Be Harmful."

For purposes of the Clean Water Act, the Collected Oil indisputably was not "discharged" "into or upon the navigable waters of the United States" in a quantity "as may be harmful."   33 U.S.C. § 1321(b)(3).   That result is dictated by the text of the statute, accompanying regulations, applicable precedents, and plain common sense.

*First*, the Collected Oil was not "discharged" within the meaning of the CWA.  Section 311(a)(2) of the CWA defines "discharge" in a manner that includes, but is not limited to, "any spilling, leaking, pumping, pouring, emitting, emptying or dumping."  33 U.S.C. § 1321(a)(2). The statute thus defines "discharge" to encompass situations in which oil or hazardous substances are released in an *uncontrolled* manner into a marine environment.  *Cf.* Rec. Doc. 5809 at 19 n.28 (Feb. 22, 2012) ("[T]he Court's interpretation of Section 311(b)(7) is . . . based . . . on the source of the *uncontrolled movement* of oil toward the marine environment.").  The Collected Oil, however, was not "spilled," "leaked," "pumped," "poured," "emitted," "emptied," "dumped," or otherwise uncontrollably released to a marine environment.

*Second*, the Collected Oil was not discharged in "harmful" quantities as required in order for the Government to show that CWA Section 311 was violated — instead, the oil was collected such that it did not harm, or even have the chance to harm, Gulf waters.  In the case of oil, the concept of a harmful amount is defined by EPA regulations to mean an amount that "cause[s] a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause[s]

-10-

a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."   40 C.F.R. § 110.3(b); *see also* Exec. Order No. 12777 § 8 (Oct. 18, 1991) (delegating to the Administrator of the EPA the President's authority "[r]especting the determination of quantities of oil and any hazardous substances the discharge of which may be harmful").

Accordingly, "discharges" in less-than-harmful quantities are simply not subject to penalties under the CWA.  *See Yost*, 919 F.2d at 30 ("Congress could have prohibited all discharges through a specific declaration and chose not to.") (quotation omitted).  In *Citgo*, for example, the court held that only oil discharged to a waterway or adjoining shoreline is subject to civil penalties under CWA Section 311(b)(7).  In so holding, the court rejected the Government's bid to include amounts of oil collected in CITGO's secondary containment systems in the determination of a statutory maximum penalty.  In particular, the district court rejected the Government's assertion that the "plain language of the Clean Water Act compels a ruling that the civil penalty for CITGO's oil spill must be based on the total volume discharged from CITGO's tanks, not on any lesser amount that reached waters or adjoining shorelines."  U.S. Mem. in Supp. of Second. Mot. for Partial Summ. J., Doc. 115-1, *Citgo*, No. 2:08-cv-893 at 13 (W.D. La. June 15, 2010) (citing *United States v. Colonial Pipeline Co.*, 242 F. Supp. 2d 1365, 1376-77 (N.D. Ga. 2002)).

In declining the Government's invitation to impose a penalty for oil that had been collected, the Court noted that "[f]undamental fairness says you get penalized for the damage that you cause," which means the oil that "got into the water and into the shoreline." Oral Argument Tr., Doc. 170, *Citgo*, No. 2:08-cv-893, at 24-25 (W.D. La. Dec. 16, 2010) (Ex. D). The Court further stated that "it would be ridiculous to penalize [CITGO] for having done what

they thought . . . would contain the oil. . . .  To do otherwise and say that anytime [oil] comes

out, even if you have a holding pond . . . , if one barrel would get out, then they would be

responsible for everything that came out of there.  I think that's ludicrous."  *Id.* at 27-28.  The

court concluded that "[t]he important question . . . is how much [oil] was actually discharged into

the waterways[.]"  *Citgo*, Judgment, Doc. 234, at 9 (W.D. La. Sept. 29, 2011) (Ex. B).

Significantly, although the United States appealed a number of issues related to the

district court's penalty ruling in *Citgo*, it declined to appeal the district court's finding that only

oil that reached water should be counted in determining the maximum CWA penalty amount.

Accordingly, the United States had to specify in its appellate brief that it would "assume

*arguendo* that CITGO's penalty in this case will be based on the volume of oil that entered the

waterways."  *See* U.S. Br., Doc. 00511821287, *United States v. Citgo Petroleum Corp.*, No. 11-

31117, at 59 n.5 (5th Cir. Apr. 13, 2012).

BP is aware of only one case that reaches a contrary conclusion — *United States v.

Colonial Pipeline Co.*, 242 F. Supp. 2d 1365 (N.D. Ga. 2002).  In *Colonial Pipeline*, a pipeline

leaked oil onto the ground, some of which reached navigable waters, and some of which did not.

The Government argued in that case that all of the spilled oil — not just the oil that reached a

waterway — should be included in determining the CWA penalty amount, and the district court

agreed.  The district court stated that Section 311 penalties are based on the amount of oil

"released into the environment," not "the amount of oil or hazardous substance discharged into

or upon navigable waters or adjoining shorelines of the United States."  *Id.* at 1376–77.  To the

best of our knowledge, *Colonial Pipeline* has not been followed in subsequent cases, *see, e.g.*,

*Citgo*, Judgment, Doc. 234, No. 2:08-cv-893 (W.D. La. Sept. 29, 2011) (Ex. B) (rejecting the

Government's argument, which relied in part on *Colonial Pipeline*), and BP respectfully submits that, for the reasons addressed above, it was wrongly decided.

But more importantly, even under *Colonial Pipeline*'s uniquely expansive interpretation of CWA penalty liability, the Collected Oil at issue here still should not be included in a CWA penalty calculation.   As an initial matter, *Colonial Pipeline* held that the "penalty to be assessed [under Section 311] is to be based upon the entire amount of oil or hazardous substance *released into the environment*."  242 F. Supp. 2d at 1377 (emphasis added).  In *Colonial Pipeline* itself, the oil in question was uncontrollably discharged directly into soils that were part of the environment, because there was no man-made containment system to prevent such an environmental discharge.  Here, however, as in *Citgo*, the Collected Oil was collected at the source, and at no point was this oil released into the environment.

More fundamentally, in *Colonial Pipeline*, there was no practical way to estimate or determine a bound on how much oil actually entered water as opposed to seeping into the ground.  It conceivably made some sense in that situation to set a maximum penalty based on the total amount of oil discharged into the environment, regardless of whether the oil was discharged to land or water.  Here, however, BP merely seeks a ruling that at least 810,000 barrels of oil were collected without entering the waters of the Gulf of Mexico — a figure that surely understates the actual success of BP's collection efforts. Hence, no legal or practical impediment prevents this Court from excluding these 810,000 barrels of oil from the (estimated) total volume of oil discharged as part of its exercise of penalty-setting discretion.  In short, *Colonial Pipeline*, even if correctly decided, is distinguishable.  But the better view remains that of Judge Haik in *Citgo* — namely, only oil that reaches water or an adjoining shoreline in harmful quantities should be considered in determining a maximum penalty under Section 311.

*Third*, the Act as a whole must be construed in a way that does not lead to absurd or unreasonable results. *See United States v. A Female Juvenile*, 103 F.3d 14, 16-17 (5th Cir. 1996) ("Axiomatic in statutory interpretation is the principle that laws should be construed to avoid an absurd or unreasonable result."). Statutes should instead "be interpreted in light of the spirit in which they were written and the reasons for their enactment." *Gen. Serv. Emps. Union Local No. 73 v. NLRB*, 578 F.2d 361, 366 (D.C. Cir. 1978); *see also Amarillo Prod. Credit Ass'n v. Farm Credit Admin.*, 887 F.2d 507, 511 (5th Cir. 1989) ("[T]he statutory terms should be interpreted in a manner consistent with congressional intent.").

The formal name for the statute commonly called the Clean Water Act is the Federal Water Pollution Control Act. As this name suggests, the statute was enacted to protect the Nation's *waters* from pollution. *See* 33 U.S.C. § 1251(a). Against this backdrop, expanding the definition of "discharge" to include controlled collections that prevent oil from ever reaching the waters of the United States would turn the statute on its head. Under such an expansive, alternative, statutory interpretation, even a small leak in a production well that at least creates a film or sheen might well subject *all* oil produced by the well (that is, all oil forming part of one contiguous flow, and not just the small portion that leaked to water) to a Clean Water Act civil penalty. The statute should not be interpreted in a manner that produces such unreasonable results.

*Fourth*, even in the event the terms of the Act were determined to be unclear in these circumstances (in fact, they are not), due process and the rule of lenity dictate that any ambiguity should be resolved in favor of BP and the other defendants. *See, e.g.*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) (fair notice is required prior to "depriv[ing] a party of property by imposing civil or criminal liability" when the regulation at issue "is not sufficiently

clear to warn a party about what is expected"); *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 819 (3d Cir. 1994) (applying the rule of lenity to civil forfeiture proceeding that was punitive or quasi-criminal); *United States v. Righter*, No. 1:08-CV-0670, 2010 WL 2640189, at *3 (M.D. Pa. June 30, 2010) (recognizing that the rule of lenity applies to civil penalties under the CWA, but finding the provision at issue to be unambiguous).

*Fifth and finally*, treating the Collected Oil no differently from the oil that entered the waters of the Gulf would undoubtedly discourage parties potentially liable for penalties arising from future spills from expending resources to collect oil that might otherwise be spilled.  Here, BP took extraordinary measures to collect oil from the blowout, harnessing its engineering resources and engaging its best minds to develop a variety of tools to collect as much oil as possible.  These costly efforts overcame difficult engineering challenges and required enormous resources.  The efforts bore fruit as at least 810,000 barrels of oil were collected and brought safely to the surface rather than being discharged into the Gulf of Mexico.  BP's efforts were thus entirely consistent with Section 311's fundamental goal of preventing discharges of oil into the waterways of the United States and the incentives the Clean Water Act creates to avoid and minimize spills.  Because of these efforts, much less oil reached the waters of the Gulf of Mexico than otherwise would have been the case.

Surely, neither BP in this spill nor a future defendant in some future spill should be penalized for not only trying to do the right thing, but *successfully* doing the right thing and keeping oil out of the marine environment.

## CONCLUSION

For these reasons, BP respectfully requests that the Court grant partial summary judgment against the United States and find that (1) as the United States has admitted, at least 810,000 barrels of oil were collected during the response under the direction of the Unified

-15-

Command; and (2) these 810,000 collected barrels of oil, which were not discharged to water, may not form a basis for an imposition of civil penalties under Clean Water Act Section 311.

Dated:  January 11, 2013                         Respectfully submitted,

                                                 /s/ Don K. Haycraft
Robert R. Gasaway                                Don K. Haycraft (Bar #14361)
Jeffrey Bossert Clark                            R. Keith Jarrett (Bar #16984)
Aditya Bamzai                                    Liskow & Lewis
Kirkland & Ellis LLP                             701 Poydras Street, Suite 5000
655 Fifteenth Street, N.W.                       New Orleans, Louisiana 70139-5099
Washington, D.C. 20005                           Telephone:  504-581-7979
Telephone:  202-879-5000                         Facsimile:  504-556-4108
Facsimile:  202-879-5200

                                                 Richard C. Godfrey, P.C.
Joel M. Gross                                    J. Andrew Langan, P.C.
Allison Rumsey                                   Kirkland & Ellis LLP
Arnold & Porter LLP                              300 North LaSalle Street
555 Twelfth Street, NW                           Chicago, IL 60654
Washington, DC  20004-1206                       Telephone:  312-862-2000
Telephone:  202-942-5000                         Facsimile:  312-862-2200
Facsimile:  202-942-5999

                                                 Robert C. "Mike" Brock
                                                 Covington & Burling LLP
                                                 1201 Pennsylvania Avenue, NW
                                                 Washington, DC 20004-2401
                                                 Telephone:  202-662-5985
                                                 Facsimile:  202-662-6291

                    **Attorneys for BP Exploration & Production Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of January, 2013.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft