# Exhibit B

RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 9/29/11

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CIVIL ACTION 08-893 |
| VERSUS | JUDGE HAIK |
| CITGO PETROLEUM CORPORATION | MAGISTRATE JUDGE HANNA |

## JUDGMENT

### OVERVIEW

On June 24, 2008, the United States of America and the State of Louisiana filed a civil complaint against Citgo Petroleum Corporation for penalties and injunctive relief under the Clean Water Act, 33 U.S.C. section 1251 and for penalties and costs under the Louisiana Environmental Quality Act, LA R. 30:2001 et seq. The Complaint was filed as a result of a significant oil spill caused by Citgo at its Lake Charles Refinery located in Calcasieu Parish, Louisiana. Essentially, the defendant discharged over 2 million gallons of slop oil from two storage tanks and a containment beam on June 19-20, 2006. The oil flowed into the Indian Marais waterway, the Calcasieu River, the Calcasieu Ship Channel, and other waterways. The exact details of the spill and its cause are well documented in the record and will be discussed herein.

The government contends that Citgo is guilty of gross negligence and willful misconduct for its failure to remove the millions of gallons of waste oil that had accumulated in the wastewater and stormwater tanks for almost five years prior to the spill. Additionally, the

1

government claims that Citgo ignored recommendations to add storage and treatment capacity in an effort to put profit above safety and environmental protection. As such, it could have prevented the spill had it properly designed, operated, and maintained its Wastewater Treatment Plant. In light of the seriousness of the spill and Citgo's failure to respond responsibly, as well as the statutory factors, the government is seeking a penalty of at least $247 million, in addition to injunctive relief.

Citgo has admitted fault, pled guilty to a criminal negligence (misdemeanor) charge, paid a fine, and a sum of money to comply with an Environmental Compliance Plan. Citgo also incurred various costs related to the clean up of the spill. Citgo denies gross negligence or willful misconduct in connection with the incident.

**GROSS NEGLIGENCE**

"Under Louisiana law, gross negligence is willful, wanton, and reckless conduct that falls between intent to do wrong and ordinary negligence." *Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d. 528 (5th C., 2001). Gross negligence is substantially higher in magnitude than regular negligence. In this case, the government has accused Citgo of gross negligence and willful misconduct. Although the Court finds the evidence presented at trial clearly supports a finding of negligence, it does not find that Citgo's actions or inactions rise to the level of gross negligence or willful misconduct. Citgo certainly could have and should have taken additional steps to ensure this type of spill would not take place, but its failures subject it only to those penalties arising from regular fault, not fault to any heightened degree. Citgo built an adequate system in 1994 and, over the years, took steps to improve its function, even if only

2

on a sporadic basis. The Court notes that the improvements undertaken were delayed for various reasons and should have been completed earlier and that Citgo failed to comply with permit regulations at all times, as it was required to do. Citgo's actions and inactions also violated its own standard operating procedures. Additionally, and importantly, Citgo should have done a significantly better job of maintaining its system, which would have prevented this tragedy.

The tanks at the Lake Charles Refinery were overloaded and should have been addressed prior to the spill. However, testimony shows that Citgo was working on a plan to remove the excess shortly before the spill and believed it had a dike area which would contain any overflow in the interim. Although they were too slow in addressing the problem, it does not rise to the level of gross negligence or a willful act. On the day of the spill, an exceptional amount of rain fell, which led to the overflow of the tanks. It is estimated that approximately eleven (11) inches of rain fell in Lake Charles on the date of the spill. Had it not been for the excessive rain, it is unlikely the tanks would have overfilled that day.

Viewing the evidence as a whole, the Court finds no gross negligence or willful misconduct on the part of Citgo.


**PENALTY ANALYSIS–Clean Water Act**

Citgo clearly violated the Clean Water Act. Consequently, it is subject to penalties. The amount of the penalty is fully within the discretion of the Court following consideration of the evidence presented, the penalty factors set forth in section 311(b) of the Clean Water Act, and a determination of gross negligence/willful misconduct. As it has been determined that no gross negligence or willful misconduct took place, the focus will turn to the remaining factors

3

applicable for strict liability.

33 U.S.C.A. section 1321(b)(7)(A) states, "any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of Paragraph 3, shall be subject to a civil penalty..." In this case, Citgo may be liable for up to $1,100.00 per barrel of oil discharged or a per day violation rate of up to $32,500.00. *19 C.F.R. section 19.4*. Pursuant to 33 U.S.C.A. section 1321(b)(8), the Court is to consider eight factors when determining the penalty amount:

### 1. The Seriousness of the Violation

It is undisputed that this spill was a serious violation that impacted several waterways including the Indian Marais, the Calcasieu River, and the Calcasieu Ship Channel. The evidence shows that marsh habitat, vegetation, fish, crabs, shrimp, and aquatic life were affected by the oil spill. Additionally, several birds were oiled and killed by the substances spilled into the environment. Areas of shoreline and waterfront, both industrial and residential, were oiled. Navigational waterways were shut down for several days, and restricted for a significant period following their reopening. The spill disrupted both commercial and industrial businesses, as well as recreational water use for a period of time.

On the other hand, the testimony showed that the environmental impact was almost fully rectified by 2009, and the wildlife seems to be showing no adverse impacts from the spill.

4

## 2. Economic Benefit to the Violator

The second factor to be considered is the "economic benefit to the violator, if any, resulting from the violation". This penalty factor essentially seeks to recoup any economic benefit the violator gained from not complying with the law, resulting in a spill and an economic advantage over competitors. The government alleges that there was economic gain to Citgo through its failure or delays in investing in pollution control projects. Instead, Citgo used funds for projects which improved its profitability, rather than those which generated no economic gain, but protected against situations such as this.

Citgo argues that the government's theory is flawed because, even if it did delay the projects, any economic gain did not "result from the violation" as required by the statute. A strict reading of the statutory language would require a finding that the delay or failure to complete pollution control projects was a violation, which is not the case. Further, the government failed to prove that any projects were needed at a specific time to prevent the spill and, even if they were, it was more than five (5) years prior to suit and should not be considered.

The Court finds that the failure to complete projects which could have prevented the damage done by the spill in this case did result in an economic benefit to Citgo. Technically reading the statute, the Court agrees with Citgo's argument that the failure to complete the projects was not the actual violation. However, one must also look to the intent of a statutory requirement and consider what it is attempting to accomplish. Here, Citgo did gain financially from failing to have better safety measures in place. This led to the violation. One could conclude that there was a benefit from the violation which was received on the front end of the situation. As to the amount of the economic benefit, the Court has taken into account all of the

5

testimony on the subject and finds the amount of gain to Citgo was less than the $83 million argued by the government, but more than the $719.00 asserted by Citgo. The exact number is almost impossible to determine given the testimony and questions raised as to the methods employed, but the Court will account for this factor in the overall fairness of the penalty ordered.

### 3. Degree of Culpability

As discussed, Citgo is fully at fault for the spill and resulting damage, but is not guilty of gross negligence or willful misconduct.

### 4. Other penalties for same incident

Citgo paid a $13 million criminal fine, which does not directly offset any civil fine. It has not paid any other "penalties" for the incident, although Citgo has put forth funds for response costs and improvements to its facility.

### 5. History of Prior Violations

Since 1994, the government has shown that Citgo discharged oily wastewater into the surge pond on at least six (6) occasions, alleging the discharges totaled more than thirty (30) million gallons. Further, the government has shown that Citgo has over nine hundred and fifty (950) days of permit exceedances, as shown on mandatory disclosures. Citgo has argued that it has not released "any significant quantity of oil" and has not committed any violations similar to this massive spill in the past twelve (12) years. As for the permit violations, Citgo has argued that they are "irrelevant" because they differ in characteristic from what is at issue in this case.

6

The Court finds that Citgo is guilty of prior violations and does not appear to have recognized the importance of compliance, pollution control, environmental responsibility, and the overall duty imposed on businesses to operate safely.

### 6. Economic Impact of the Penalty

The Court recognizes that Citgo is a multi-billion dollar, international company. The Lake Charles Refinery is one of the largest refineries in the United States. The Court also recognizes that a fine should be based on the actions and/or inactions of the violator which led to the violation, and not on the violator's bank account. That is, simply because a violator has a significant amount of money, a Court should not impose a fine that is excessive in light of the violation. A reasonable civil fine in this case is unlikely to impact Citgo in a negative way.

### 7. The Nature, Extent, and Degree of Success of any Efforts of the Violator to Minimize or Mitigate the Effects of the Discharge

Although the Court finds that, based on the evidence presented, Citgo's initial response was lacking in that workers were not fully protected, the Coast Guard was not properly and fully informed, and the spill was not adequately contained, measures were taken by Citgo to minimize and mitigate the effects of the discharge promptly. The efforts were better organized and more effective once the Coast Guard became involved, but Citgo made a full force effort to minimize the damage from the spill.

Citgo deployed over fifteen hundred (1,500) people in response to the spill, including clean up contractors, who eventually set out over sixty (60) miles of boom, both hard and

7

sorbent, skimmers, vacuum trucks, frac tanks, boats, aircraft, and portable barges. Citgo also hired two highly respected clean-up companies in an effort to mitigate the damage. Citgo alleges it spent approximately $65 million in its clean-up efforts.

Although the spill was significant, it appears the damage from it could have been much worse. The evidence shows that the Louisiana Department of Environmental Quality and the United States Coastguard both concluded that the shorelines met the "response clean-up endpoints" by the end of 2006. Although the environment was significantly impacted, the evidence shows that it has made a good recovery over the following years. The Court finds this is the result of the well executed clean-up effort.

Further, the testimony at trial from Renee Atkins, a chemical engineer and Citgo supervisor, and others documented efforts Citgo has taken since the spill to improve its operations and help prevent spills such as this in the future. Citgo has complied with the Environmental Compliance Plan to which it agreed with the Department of Justice and has implemented further improvements including raising dike walls and sewer improvement.

## 8. Any other Matters as Justice May Require

Citgo argues that the Court should consider its positive impact and role in the community in calculating the penalty assessed-and the Court agrees. Citgo employs twelve hundred (1,200) full time employees and several hundred contract employees. The Lake Charles Refinery is one of the largest in the nation and its existence has a positive economic impact on the state of Louisiana. Although there is a huge negative effect on the local area and the state when a spill such as this takes place, it is only fair to view the role of Citgo in the community and the state as

a whole.

The government urged the Court to consider the definitions of negligence, gross negligence, and willful misconduct, which was done earlier in this ruling.

After full consideration of the factors set forth in 33 U.S.C.A. section 1321 and all evidence presented by the parties, the Court finds the fair calculation of a penalty in this situation is on a "per barrel of oil or unit of reportable quantity of hazardous substance discharged" method. 33 U.S.C.A. section 1321(b)(7)(A). The important question, then, is how much was actually discharged into the waterways?

The government argues that its expert, Dr. Michel, provided the only credible testimony on the issue and that she calculated one hundred and eleven thousand (111,000) barrels of wastewater and four hundred and eleven thousand (411,000) barrels of oily wastewater discharged from the tanks. From that, Dr. Michel testified that she believes at least seventy-six thousand eight hundred (76,800) barrels of waste oil and two hundred fifty-nine thousand (259,000) barrels of oily wastewater flowed into the waterways. (Trial Transcript, Volume I, pages 17-19). Citgo, on the other hand, calculated the amount at fifty-four thousand (54,000) barrels of oil into the waterways (Post Trial memorandum, page 1, Trial Testimony of Dr. Ogle, Citgo Calculation Tables). The Court finds the exact amount is unknowable in these situations, but believes after full consideration of the testimony presented, that the amount discharged is in the range of fifty-four (54,000) barrels. The Court found the method of calculation that arrived at this amount to be more reasonable and credible.

9

## PENALTY AND INJUNCTIVE RELIEF

As noted, Citgo may be fined a per barrel penalty of up to $1,100 dollars. Given the totality of the circumstances in this case, the Court finds a per barrel violation rate of $111.00 is reasonable, for a total penalty of **$6,000,000.00.** The Court believes this amount represents the seriousness of the violation, combined with Citgo's actions to mitigate the damages and the ultimate impact of the spill, which could have been much worse under the circumstances. Additionally, the Court considered the injunctive relief outlined below in determining an appropriate penalty. This 33 U.S.C. § 1321(s) penalty shall be deposited in the "Oil Spill Liability Trust Fund" established under 26 U.S.C. § 9509, *inter alia*, to fund cleanups of future discharges of oil and to compensate victims of oil spills.

Under the traditional four-factor test, the Court may grant injunctive relief if the following factors are met: (1) irreparable harm is likely in the absence of injunctive relief; (2) monetary damages cannot adequately compensate for the injury; (3) the remedy is warranted considering the balance of hardships between the plaintiff and defendant; and (4) the injunction would not be contrary to the public interest. *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743 (2010). In this case, the Court finds the factors have been met. Given the evidence presented, it is likely that a situation such as the 2006 discharge is likely to happen again if some measures are not taken to improve the Citgo facility. The second factor is met in that no amount of money can truly compensate in a situation such as this. Once a spill of this magnitude takes place, the damage is done. Eventually, the environment may recover to a certain point, but it will not be the same. The harm that took place to those living in the area–people,

10

animals, plant life, aquatic life, organisms--as well as the economic and community impact that occurred is over. Money can not change that. The most important thing to do at this point in the situation is to avoid it happening again.

Third, when balancing the hardships between the plaintiffs and the defendant, it is clear that injunctive relief is required. Although the improvements the Court sets forth below will have an initial economic impact on Citgo, the steps taken to prevent another damaging emergency situation are in everyone's best interest. The injunctive relief granted below is much less of a hardship than the impact of another serious spill. Finally, injunctive relief addressing potentially problematic areas at the Citgo refinery is in the public's best interest.

First, the Court is hereby ordering Citgo to perform sediment sampling in the Indian Marais to determine if there are any lingering effects from the spill. If it is found that the effects are still present, Citgo is hereby ordered to remedy the situation immediately.

Second, Citgo is ordered to conduct a stormwater drainage area calibration study so that it may fully understand the flow burdens for its current storage and treatment capacity needs. This study was recommended to Citgo following the 2006 spill and the Court believes it is an important step toward preventing a major spill such as this in the future.

Third, Citgo is ordered to construct a fourth storage tank. The Court finds, based on the testimony presented at trial, that a fourth tank will significantly help to prevent any drainage, storage, spillage, emission, and treatment problems during future major storm events and equipment maintenance periods. It is important to note that the storm event which led to the June 2006 spill was not a 1 in 25 year/24 hour storm, which the plant was supposedly designed to

11

handle. That is, as it was designed and running, the Citgo refinery was not capable of handling what it should have.

Diana LeBlanc, Citgo's section supervisor for water and waste, testified that a third storage tank was recommended several times prior to the June 2006 spill, but Citgo opted instead to pave a dike to gather overflow. This was done as a cost-saving measure. She further acknowledged that Citgo's consultants rejected the idea of using a secondary containment area for additional storage capacity because of National Emission Standards for Hazardous Air Pollutants (NESHAP) compliance issues, but Citgo failed to follow that advice. (*Trial Testimony, Diana LeBlanc, Volume 9, Page 2500*).

Following the 2006 spill, ENSR recommended the addition of a fourth storage tank. The joint Citgo/ENSR draft report notes, "The addition of a new stormwater tank would eliminate any storage, wastewater treatment, or air emission problems during a major storm event or during equipment maintenance activities." The report further recommends the combination of the fourth tank with a stormwater drainage study for "complete assurance of compliance with all regulatory requirements." (*Trial Transcript, Volume 9, Page 2506-2507*). However, Citgo's final revised version states, "The option chosen to minimize capital cost is to install diversion facilities and expand the dike area to utilize the concrete lined dike area of the existing storm tanks to store relatively clean wastewater by diverting from the inlet to the wastewater tanks." That is, post-spill, ENSR again recommended the addition of an additional storage tank and Citgo again opted to divert water to concrete lined dikes. As a cost saving measure, Citgo chose to raise the berm rather than build an additional tank. (*Trial Transcript, Diana LeBlanc, Volume 9, Page 2522*).

12

Renee Atkins, Citgo's wastewater treatment plant unit supervisor, testified that, at this time, if faced with another berm overflow/ emergency situation, Citgo would use an underflow system which would essentially discharge untreated wastewater into the Indian Marais. Citgo believes it has the option to employ this treatment bypass procedure under its permits. (*Trial Testimony, Renee Atkins, Volume 8, Pages 2369-2371*). The Court notes that companies only qualify for this bypass option if they are properly operating with adequate capacity. As discussed, the Court does not find that Citgo is currently operating with adequate capacity, so bypass is not an option. Testimony and evidence throughout the trial established permit exceedances which have taken place both before and after the 2006 spill. Some of these exceedances took place during normal heavy rain flow that did not exceed the 1 in 25 year/24 storm limit. (*Trial Testimony, Renee Atkins, Volume 8, Page 2394*). The Court finds the addition of a fourth tank is reasonable and necessary to prevent the reoccurrence of this type of spill.

Fourth, the Court is hereby ordering Citgo to install one additional API unit. The evidence shows that API units are high maintenance units. Citgo currently has four API units, with one being taken out of service once per quarter. During this service time, the maximum flows are reduced to 7,500 gallons, leaving 2,500 gallons of flow being diverted into the stormwater tanks. (*Trial Testimony, Volume 8, Pages 2415-2416*). The addition of a fifth API unit will ensure no diversion takes place and the system can continue to operate at full capacity.

As for the additional Dissolved Gas Flotation Unit (DGF), the Court does not find the evidence compelling enough to order this measure at this time. Renee Atkins testified that, even with one of the two DGF units taken out of service for some reason, Citgo still has the capacity to treat 10,000 gallons per minute, which is within the design limitations of the aeration unit. (*Trial Testimony, Volume 8, Page 2415*).

Fifth, Citgo is ordered to properly operate and maintain its oil skimming systems and all other equipment necessary to keep the treatment facility running at a level which assures compliance with all applicable laws, permits, and requirements and prevents, to the greatest degree possible, a reoccurrence of events such as those that led up to and took place in June 2006. Citgo is further ordered to remain in full compliance with the comprehensive Environmental Compliance Program into which it entered.

Sixth, the Court orders Citgo to install a fourth aeration tank as a necessary measure to reduce the risk of depositing solids into the public waters during "ramp-up type events". This measure was mentioned by Mrs. Atkins and the Court finds it is a reasonable and necessary step to making the Citgo facility more efficient and less likely to pollute.

Finally, Gary Amendola, the plaintiffs' expert in wastewater engineering and treatment, recommended the Citgo evaluate cost effective COD reduction measures. The Court agrees this is a prudent step and orders Citgo to evaluate and implement cost effective those measures in a way that ensures they remain in compliance and avoid future damaging occurrences, if such steps have not already been taken.

14

Like death and taxes, major storm events in Louisiana are a fact of life. We live in a heavy rain area and companies such as Citgo must be prepared for these events even if they do not happen on a daily basis. Learning from mistakes such as those that led to this excessive spill, and remedying those errors, in an effort to do all we can to avoid future catastrophes is the best we can do at this time.

## **STATE OF LOUISIANA CLAIMS**

The spill at issue constituted a violation of LA R.S. 30:2076(A)(1) and (A)(3), LAC 33:IX.501A, LAC 33:IX.2701.A and Citgo's Louisiana permit. Further, the State alleged the Citgo failed to properly maintain and operate the wastewater treatment and control facilities for approximately ten years prior to the spill in violation of these same statutes and permit. The Court finds Citgo failed to properly maintain and operate its facilities prior to the spill, but does not find that an exact time period has been proven.

Under the Louisiana Environmental Quality Act, La. R.S. 30:2001, *et seq.*, the State's penalty factors are substantially similar to those under the federal statute. They are:

(a) The history of previous violations or repeated non-compliance; (b) The nature and gravity of the violation; (c) The gross revenues generated by the respondent; (d) The degree of culpability, recalcitrance, defiance, or indifference to regulations or orders; (e) The monetary benefits realized through non-compliance; (f) The degree of risk to human health or property caused by the violation; (g) Whether the non-compliance or violation and the surrounding circumstances were immediately reported to the department, and whether the violation or non-compliance was concealed or there was an attempt to conceal by the person charged; (h) Whether the person

15

charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by his non-compliance or violation; and (I) The costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance. *LA R.S. 30:2025(E) and LAC 33:I.703.* LA R.S. 30:2025(E) provides for a per day penalty of up to $32,500. This section and LAC 33.I.703 also provide for an additional penalty per event in the event the violation was done "intentionally, willfully, or knowingly" or that which "causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health."

The LDEQ lays out the parameters of the daily penalty and plots them based on specific factors. The State is requesting a penalty in the range of $20,000–$32,000 per day based on this penalty matrix and the seriousness of the spill. The State is seeking this amount for the two days of discharge in June 2006, as well as for violations of state law by interfering with the designated use of a water body, and failing to maintain and operate its wastewater treatment and control facilities, including the oil skimming system. See *LAC 33:IX.1111,.LAC 33:IX.1113.B.6* and *LAC 33:IX.2701.E.* The State seeks a penalty in the $20,000–$32,000 per day range for the two (2) days of discharge in June 2006, the twenty-four (24) days the waterways were closed/impacted as a result of the spill, and the ten years prior to the spill during which time it alleges Citgo failed to properly maintain and operate the facility. Additionally, the State seeks the maximum of $1,000,000.00 additional penalty per violation for each of these.

As noted, the Court does find the record contains evidence that Citgo failed to properly maintain and operate its wastewater treatment facility. The condition of the tanks, the surrounding circumstances, and the fact this spill occurred is proof of that. There is a question

16

of whether or not the prescriptive period on this ten (10) year claim has run under LA R.S. 30:20205(H). In its Post-Trial Memorandum, the State concedes five (5) of these years and seeks the penalty for only five (5) years prior to the date of the spill in order to avoid objection. In any event, the Court does not find the record is sturdy enough to support a finding that the violations consistently lasted for the ten (10) years prior to the 2006 spill, warranting the type of penalty requested. The Court does find, based on the evidence presented, that Citgo failed to properly maintain and operate its wastewater treatment facility in violation of state law for five (5) years prior to the date of the spill. The defense argument as to prescription is **DENIED**.

Further, as discussed, the Court does not find Citgo's actions rose to the level of gross negligence or wanton disregard, even though they were sadly lacking and disappointing. Further, as serious as this spill was, it did not result in irreparable harm to the environment and, thankfully, did not put public health and life at risk. As such, an additional penalty is not warranted in this case.

As the penalty factors applicable to the State claim are so closely tied to those in the federal statute which have been discussed in detain herein, the Court does not find a second in depth analysis is necessary. For those sections that differ, the Court has considered all evidence pertaining to the State penalty factors. Based on the findings of the Court set forth above, the Court finds a per day penalty of **$1,400.00,** for the five (5) years prior to the accident, for failure to properly maintain and operate the facility, and a per day penalty of **$17,115.00** for the two (2) days of discharge and the twenty-four (24) days of waterway interruption is reasonable based on the facts of this case. This results in a total penalty of **$3,000,000.00** for Citgo's violations of State law as a result of the 2006 spill and surrounding events.

The Court recognized that Citgo's actions resulted in both State and Federal violations and both must be remedied.. The cost to Citgo in penalties and injunctive relief must be where the focus lies, though, not the individual penalty paid to each plaintiff. In this case especially, a higher penalty to the State of Louisiana would be unfair given that it participated little in the preparation and trial of this case. It appears, from the Court's perspective, that the United States did the majority of the work and this fact is reflected in the penalty assessed. Further, the injunctive relief ordered to help prevent any future violations also benefits the State of Louisiana. The Court also considered this cost in assessing the State penalty.

It is hereby **ORDERED, ADJUDGED, AND DECREED** that Citgo pay the United States of America the sum of **$6,000,000.00** in penalties and perform **all injunctive relief** detailed herein to compensate for its violation of the Clean Water Act and all other applicable federal laws resulting from the June 2006 spill and all related acts. Further, it is **ORDERED** that Citgo pay to the State of Louisiana the sum of **$3,000,000** for violations of State law resulting from same.

THUS DONE and SIGNED on this 29th day of September, 2011.

RICHARD T. HAIK, SR., DISTRICT JUDGE
**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**