# Exhibit D

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | Docket No. 08-893 |
| ET AL, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| VS | * | December 19, 2010 |
| | * | |
| CITGO PETROLUEM CORP., | * | |
| | * | |
| Defendant. | * | Lafayette, Louisiana |

*************************************************************

REPORTER'S OFFICIAL TRANSCRIPT OF THE MOTION HEARING
BEFORE THE HONORABLE RICHARD T. HAIK,
UNITED STATES DISTRICT JUDGE.

*************************************************************

APPEARANCES:

For the United States:          JASON BARBEAU
                                DAVID ASKMAN



For CITGO Petroleum:            RICHARD SARVER
                                EDWARD C. LEWIS
                                JEFF BEDNAR




REPORTED BY:    Mary Thompson, RMR, FCRR
                800 Lafayette Street, Ste. 3105
                Lafayette, Louisiana  70501
                (337)593-5222

```
1                    P R O C E E D I N G S
2              THE COURT:  Let's get appearances.
3              MR. BARBEAU:  Good morning.  Jason Barbeau for the
4    United States.
5              THE COURT:  All right.
6              MR. ASKMAN:  I'm David Askman for the United
7    States.
8              THE COURT:  All right.
9              MR. SARVER:  Richard Sarver and Eddie Lewis for
10   CITGO.  And CITGO's general counsel, Jeff Bednar, is here as
11   well.
12             THE COURT:  Very good.  All right.
13             This is a motion by the government.  You're on.
14   You can presume that I read what you have filed.
15             Let me turn this over because I have them in
16   reverse order in case I need something.
17                        (A pause in the proceedings.)
18             THE COURT:  Okay.
19             MR. BARBEAU:  Good morning, Your Honor.  Jason
20   Barbeau for the United States.  Thank you for having us here
21   today.  It's a pleasure to finally meet you.
22             THE COURT:  You filed the motion.  The door is
23   always open to he who pays his -- oh, y'all don't pay a fee.
24   Y'all just come in.  That's okay.
25             MR. BARBEAU:  The United States asked the Court to
```

```
 1   resolve two legal issues that go to the determination of the
 2   appropriate penalty for CITGO's massive oil spill.
 3           One, we ask you to rule that CITGO's oily
 4   wastewater and oily sludge fit squarely within the definition
 5   of "oil" in Section 311 of the Clean Water Act.
 6           THE COURT:  What you want me to do is you want me
 7   to say that any oil that escaped and mixed with water, the
 8   entire volume is considered oil.
 9           MR. BARBEAU:  Mixed with wastewater, that's right,
10   Your Honor.
11           THE COURT:  Mixed with wastewater, it all becomes
12   oil.
13           MR. BARBEAU:  That's right.
14           THE COURT:  Okay.
15           MR. BARBEAU:  Following the plain language of the
16   statute and the definition of "oil" in Section 311.
17           THE COURT:  Well, they don't think it's so plain.
18           MR. BARBEAU:  Our second issue is we ask you to
19   rule that the maximum potential penalty to be assessed is to
20   be based on the total volume of oil that discharged from the
21   tanks rather than some lesser amount.
22           THE COURT:  I understand.  And what they're saying
23   it that it's ridiculous to do that because why would you have
24   the ponds around the tank itself to stop it from going into
25   the water or into the riverside, et cetera?
```

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 5 of 31
Case 2:09-cv-00899-R-LFP-JH-B Document 470 Filed 12/16/10 Page 4 of 30 PageID #: 6592

4

1    MR. BARBEAU:  Those tanks have a secondary

2    containment dike around it.  The problem in this case is that

3    it breached in multiple locations and oil ran right into the

4    waterway so it didn't serve its purpose of preventing the oil

5    spill from reaching waters of the U.S.

6    THE COURT:  So you're saying the breach -- all of

7    the stuff that came out of that tank, every bit of it, went

8    into the waterway?

9    MR. BARBEAU:  No, I'm not saying that.

10   THE COURT:  Oh, okay.

11   MR. BARBEAU:  I'm saying the discharge for penalty

12   purposes is to be assessed based on the volume that came out

13   of the tanks.  To establish liability for violation of

14   Section 311 some amount -- some amount of oil has to reach a

15   waterway.  It did.

16   Then when you get to the penalty provision, which

17   is Section 311(b)(7)(A), it says that the penalty is to be

18   assessed based on the volume of oil discharged, period, full

19   stop.  Not discharged to waters of the U.S. or some other

20   place.

21   THE COURT:  Well, what if it didn't breach?

22   MR. BARBEAU:  If it didn't breach, I wouldn't have

23   a Section 311, claim to bring to you today.  It's that

24   simple.  But once they have the breach, it goes into the

25   waterway, then they're on the hook for the whole violation.

1    The whole idea of Section 311 is to prevent oil

2    spills and to deter conduct that leads to oil spills.  They

3    didn't do that.  The spill reached the water.  It caused

4    serious harm.  It had impacts.  It was a violation.  And now

5    we come to enforce on that, and it's based on the total

6    volume which gets at the goal of the Clean Water Act which is

7    to prevent and deter spills.

8            THE COURT:  Okay.  Let me hear from the other side.

9            MR. SARVER:  Good morning, Your Honor.  Richard

10   Sarver for CITGO.

11           Starting out with the last point, CITGO had

12   secondary containment as it was required to have by the

13   Environmental Protection Agency.  We had these tanks that are

14   stormwater tanks.  Around the tank we had an -- several acres

15   of bermed containment area.  The oil came out of the tanks,

16   it went into the bermed containment area, the secondary

17   containment, where it was supposed to go if something like

18   this happened.  At 3:00 in the afternoon a CITGO employee

19   measured how much oil was in that bermed area.

20           CITGO believed that the oil was contained at that

21   point.  It wasn't a good thing, but we thought we had

22   contained it.  But as you know, because of the breach -- you

23   know that underneath the ground there was a junction box that

24   was improperly sealed and it acted as a bathtub drain.  And

25   the oil drained out from the bottom and into the Indian

1    Marais and that's why we're all here.

2         But that secondary containment area contained some

3    of the oil.  About 53,000 barrels made it out of secondary

4    containment into the waters of the United States, but

5    47,000 barrels never made it out.  Those 47,000 barrels the

6    United States wants to treat exactly like those

7    53,000 barrels that did make it out, and that's not what the

8    statute provides.

9         If you look at the statute, Your Honor, if you look

10   at Section (b)(3), it says to have a violation you have a

11   discharge to the waters of the United States.  Okay?  I think

12   even the government agrees with that.  But then they said,

13   well, all right, once you've got a violation, once you

14   discharge any of it to the waters of the United States, all

15   of it that came out of your tank is subject to a penalty.

16        That's not right.  Here's why.  If you look at

17   311(b)(7) --

18             THE COURT:  Give me a case, guys.

19             MR. SARVER:  There is none.

20             THE COURT:  No case?

21             MR. SARVER:  There is Colonial Pipeline.  It's the

22   one case.  That's from the District of Georgia.  There is one

23   case, and that was the one where Colonial Pipeline had some

24   20-odd leaks from its pipeline at different places around the

25   country.  And the leaks from the pipeline didn't go into

Case 2:00md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 8 of 31
Case 2:09-cv-00899-RJH-PJH Document 170 Filed 12/16/10 Page 7 of 30 PageID #: 6595

7

1    secondary containment.  These leaks from the pipeline went

2    directly to the dirt, to the ground.

3            THE COURT:  Didn't you have one that was not lined?

4    Didn't you have one pond or one section that was not lined?

5            MR. SARVER:  No.  And I hope that we made it clear

6    in the briefing.  It was all concrete at one point, but then

7    when we decided that we needed an extra stormwater

8    containment tank, in order to add that tank we tore out a

9    section of the dike in order to have room to put the new tank

10   in.  That section that was torn out was concrete before.

11   During the construction of the tank -- and when this

12   happened, the tank was under construction -- there was an

13   earthen berm.  Now, it was still a dike area.  It was an

14   earthen berm.  And we have these earthen dikes all around

15   New Orleans.  It was an earthen dike area -- they are.  They

16   don't always work, but the earthen dike area had replaced the

17   concrete for a part of the dike area, only a part of the dike

18   area.

19           And that place where the junction box was, that was

20   dirt as well because the junction box had been dug below the

21   surface of the dike area so that you could route water from

22   one stream to another stream.  So part of it was dirt.

23           But in the Colonial Pipeline case, there was no

24   secondary containment.  The releases were directly to the

25   earth, and then some of that -- I think 14 out of the 20

1    releases -- made it -- everyone admitted made it to the

2    waters of the United States.  Six of those releases didn't

3    make it to the waters of the United States, and Colonial

4    Pipeline said, well, Judge, for those six you can't count

5    that.  And the judge in Colonial Pipeline said, no, you're

6    wrong, the dirt is the environment.  It's -- it counts.

7    That's what that judge says.

8         Our position is, one, that case is nothing like

9    ours because there was no secondary containment involved.  We

10   released it all to secondary containment.

11        Second, we think that case is clearly wrong because

12   Section 311 of the Clean Water Act, (b)(7), when it describes

13   how you can penalize, a penalty under (b)(7) says for a

14   violation under Section (b)(3).  And if you remember, (b)(3)

15   requires that the release go to the waters of the

16   United States.

17        So that's the only way that we believe the statute

18   can be read in parity with the section before it.

19        THE COURT:  Well, I'm going to presume both of you

20   have had experts who have gone out and measured and -- this

21   didn't happen yesterday.  How long ago did it happen?

22        MR. SARVER:  June 19, 2006, Your Honor.

23        THE COURT:  All right.  So I presume both of you

24   have had your experts look at -- do y'all agree that in fact

25   53 -- was it 53,000 barrels or -- went into the waterway and

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 10 of 31
Case 2:08-cv-00898-R1-49-SHH Document 1471 Filed 12/15/10 Page 9 of 304 PageID #: 6597

9

1   47,000 did not?

2          MR. SARVER:  CITGO agrees that 53,000 barrels went

3   to the waters of the United States and 47,000 did not.  The

4   Coast Guard agreed with that in their statements in the

5   documents we've found.  As I understand it, the --

6          THE COURT:  Does the lawyer agree with it?

7          MR. SARVER:  The United States does not.

8          THE COURT:  All right.

9          MR. SARVER:  They do not.

10         THE COURT:  What do y'all think it is?

11         MR. BARBEAU:  Your Honor, the volume is in dispute

12   at the summary judgment stage, but we're looking at between

13   111,000 and 135,000 barrels of oil coming out of the tank.

14   And of that amount, 77,000 of that, of the waste oil part,

15   reaching the waterway.  So a million gallons more is in

16   dispute as far as how much reached the waterways.

17         THE COURT:  You think that 77,000 barrels

18   reached --

19         MR. BARBEAU:  Reached the waterways, right.

20         THE COURT:  -- reached the waterways.

21         MR. BARBEAU:  Instead of 53?

22         THE COURT:  Instead of 53.

23         MR. BARBEAU:  Yeah.  That's about a million

24   gallons.

25         MR. SARVER:  There are experts on both sides that

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 11 of 31
Case 2:09-cv-00899-R1+P JH-BR Document 170 Filed 12/16/10 Page 10 of 30 PageID #: 6598

10

1    say different things as you might expect.

2          THE COURT:  As I expect.

3          MR. SARVER:  So that's the second issue,

4    Your Honor.  We released it to secondary containment, and it

5    would just -- it would turn the statute on its head to treat

6    a company who does the right thing, creates secondary

7    containment to prevent a release going to the waters of the

8    United States -- to treat them just like a company who says,

9    well, to heck with it, I'm not going to put in secondary

10    containment, that's expensive, and releases it directly to

11    the waters of the United States.  That doesn't make sense.

12          THE COURT:  All right.

13          MR. SARVER:  The other issue -- shall I go to the

14    other issue?

15          THE COURT:  Sure.

16          And I'm going to give you a chance to respond.

17          MR. SARVER:  Water isn't oil and --

18          THE COURT:  Let me tell you, I read your motion and

19    you're saying water isn't oil, but -- they're not saying

20    water is oil.  What you're saying is -- what they're saying

21    is the water and the oil mixed; and because it mixed, it

22    became more or less a gumbo kind of a situation.  They didn't

23    use the term "gumbo" because they're Yankees from New York or

24    Washington or wherever they are from.

25          MR. SARVER:  Never made a rue in their life.

1       THE COURT:  But if they were from here, they would
2  have used something like a gumbo and said that it mixed
3  together.  And because it mixed together, the oil and the
4  water, then you can't -- you can't separate it as easily as
5  if you had -- it hadn't breached.
6       MR. SARVER:  And here is why that --
7       THE COURT:  Am I right basically?  Is that what you
8  are saying?
9       MR. BARBEAU:  That's right, Your Honor.
10       THE COURT:  Okay.  So they're not saying oil is
11  water and water is oil.  That is --
12       MR. SARVER:  Well --
13       THE COURT:  You spent an awful lot of time saying
14  that, but that's not true.
15       MR. SARVER:  Well, Your Honor, I know they're not
16  saying it, but the facts are -- and this could be a factual
17  dispute, but I don't think it is.  I think the statute is
18  very clear.  It says that oil of any kind in any form is
19  subject to a penalty.  First, it doesn't say that water is
20  subject to a penalty or oil mixed with water is subject to a
21  penalty.
22       THE COURT:  But it says sludge is.
23       MR. SARVER:  It says sludge is.
24       THE COURT:  You admitted that.  You said, yes,
25  sludge is.

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 13 of 31
Case 2:08-cv-00899-R-JPJH Document 170 Filed 12/16/10 Page 12 of 30 PageID #: 6600

12

1    MR. SARVER: Absolutely.

2    THE COURT: Well, sludge isn't oil.

3    MR. SARVER: Sludge --

4    THE COURT: It's oil and mud and goop and crap --

5 stuff that got mixed up into everything, right?

6    MR. SARVER: That's because the statute says

7 specifically "sludge." It says it right out. And that

8 part's pretty clear.

9    Why that isn't important is that the sludge never

10 made it out of secondary containment because it's sludge. It

11 doesn't go anywhere so that issue isn't even before you. If

12 you decide as we expect you to decide -- or hope you decide,

13 want you to decide, that anything that stayed in secondary

14 containment is not subject to the penalty provisions of the

15 Clean Water Act, that doesn't mean it's not subject to a

16 penalty provision.

17    Understand that the State of Louisiana has sued

18 CITGO for the very wastewater that we're talking about. The

19 State of Louisiana has a count in its suit that calls out the

20 wastewater and says you -- we have a permit, the LPDES

21 permit. And as part of that permit, one of the parameters is

22 oil and grease. If you violate the level of oil and grease

23 that the permit allows you to discharge, you're subject to a

24 penalty.

25    Your Honor, the State of Louisiana and CITGO have

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 14 of 31
Case 2:09-cv-00899-RTH-PJH Document 170 Filed 12/16/10 Page 13 of 30 PageID #: 6601

13

1   confected in general terms a settlement on all of the State's
2   claims.
3           THE COURT:  Well, you know the government never
4   settles so you're going to go to trial on this thing.
5           MR. SARVER:  We're going to go to trial with the
6   United States.
7           THE COURT:  Yeah.
8           MR. SARVER:  But we are confident that the
9   settlement with the State of Louisiana will be confected.
10  The settlement with the State of Louisiana covers all of that
11  water.
12          Now, the United States says, no, no, no, no, we're
13  entitled as the United States to sue you for everything.  And
14  if there's another state penalty, well, the judge can simply
15  take that into account as one of the factors.
16          That isn't what the law allows.
17          THE COURT:  You find that unusual?
18          MR. SARVER:  No, I don't find it unusual, but it
19  isn't what the law allows.
20          THE COURT:  All right.
21          MR. SARVER:  If you take a look at the statutory
22  language, it's very clear that the statute wants to penalize
23  the release of oil and it doesn't want a polluter to be able
24  to get away with hiding the oil.
25          And if you take a look at the government's reply

Case 2:09-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 15 of 31
Case 2:08-cv-00899-R1171-PJH Document 170 Filed 12/16/10 Page 14 of 30 PageID #: 6602

14

1    brief, they get it right at their Footnote 11, because what
2    they say in Footnote 11 is don't let CITGO do that because
3    what you're going to allow is a polluter to dilute their oil
4    and hide their oil in some other mixture and then be able to
5    discharge it without penalty.  They are right.  We're not
6    entitled to dilute or hide the oil.  And for any oil that was
7    released, we're subject to a penalty.
8            But the statute doesn't say that any oil released
9    and whatever it is mixed with is subject to a penalty.  It
10   says the oil.  So if the United States --
11           THE COURT:  It does whatever because it says
12   sludge.
13           MR. SARVER:  Sludge.  It says sludge.
14           THE COURT:  Sludge is a mixture.
15           MR. SARVER:  Sludge is a mixture.
16           THE COURT:  That is the gumbo.  That's the rue of
17   the gumbo.
18           MR. SARVER:  That's the classic gumbo, the sludge.
19   I'm with you.
20           The sludge never made it out of secondary
21   containment.
22           THE COURT:  But if it had, your argument is --
23   well, your argument is it would be covered because it says
24   sludge?
25           MR. SARVER:  Exactly.

1      THE COURT:  But because it doesn't say sludge --

2   why don't they call the water and oil mixture sludge?

3      MR. SARVER:  Well, first, if you read -- I'm sure

4   you did -- the expert affidavit says flatly the water and the

5   oil did not mix, cannot mix, and there is no such thing as

6   oily wastewater.

7      THE COURT:  That's bull.  That's --

8      MR. SARVER:  No.

9      THE COURT:  That's bull manurer.

10      What happens is the water and the oil -- certainly

11   you're not going to put that in your vehicle to run it.

12   Okay?  But it does mix.  When water and oil are in a tank and

13   they -- it mixes -- it may not mix together well.  It may

14   not -- you may be able to get a skimmer and skim it off,

15   but --

16      MR. SARVER:  Exactly.

17      THE COURT:  But it's there.  The oil and the water

18   is mixing together and -- it's almost disingenuous to say oil

19   and water can't mix, therefore, it could never be a part of a

20   hazardous situation or problematic or it doesn't fit the --

21      MR. SARVER:  It certainly can be part of a

22   hazardous situation.  And the oil that was --

23      THE COURT:  That's why I wasn't impressed with

24   that.

25      MR. SARVER:  Well --

1          THE COURT:  I thought that was a -- I thought that

2     was a chicken manurer argument, quite frankly.

3          MR. SARVER:  I'm disappointed to hear that, Your

4     Honor, because --

5          THE COURT:  Well, I know you are, but I don't care.

6          MR. SARVER:  I understand.

7          THE COURT:  Okay.

8          MR. SARVER:  And all I'm here to do is to try to

9     make sure that we present to you the best evidence we can.

10    And if that's not something that's persuasive to you, let me

11    ask you this.

12         If the government -- the government has one sample

13    that they rely upon from this wastewater, this stormwater,

14    and it has 337 parts per million oil and grease.  Now, oil

15    and grease, you understand, is a parameter that CITGO is

16    allowed to discharge under its permit with the State of

17    Louisiana.  The 337 parts per million means that there are

18    999,667 parts of water.  So if you accept the government's

19    position that that is oil, is it all oil or is that 337 parts

20    per million oil?

21         That I think is a defensible position.  If the

22    government can prove with evidence that they can show that in

23    the water that was discharged there was .0000 amount of oil,

24    then they can simply multiply that number by the barrels of

25    oil and CITGO should be penalized for that because we're not

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 18 of 31
Case 2:09-cv-00899-RHH-PJH Document 170 Filed 12/16/10 Page 17 of 30 PageID #: 6605

17

 1    entitled to discharge oil.  We're not.  We're subject to a

 2    penalty.  You have the authority -- in fact, you have the

 3    authority if you take our number to put this company in

 4    bankruptcy ten times over.  You have plenty of authority.

 5            What they're asking for is asking you to penalize

 6    for the release of water.  What is it with this 99.9 percent

 7    water?  How does that become oil?  It shouldn't be treated as

 8    oil.

 9            THE COURT:  Okay.

10            MR. BARBEAU:  Your Honor --

11            THE COURT:  Change my mind that everything that

12    comes out of the tank they should be penalized for even if it

13    didn't come out of the -- it was retained in the reservoir

14    pond.

15            MR. BARBEAU:  Let's start with the Colonial case.

16    I think Mr. Sarver may have misread that case when he

17    reported to you that the judge held that even spills that

18    didn't reach water at all were penalized.  That's not the

19    holding of that case.  The Court held that if you have

20    liability -- if you establish that some amount of oil reached

21    the water on each individual spill of those 14 or 20 that he

22    is talking about, then you're on the hook for everything that

23    came out.  Because why?  Because harm happens.  It goes up in

24    the air.  It goes in the soil.  It goes on the neighbor's

25    tomatoes.

1      THE COURT:  But as he did say, then why take any
2  precautions whatsoever?
3      MR. BARBEAU:  There is a great reason.  Because you
4  shouldn't have an oil spill at all.  They should have --
5      THE COURT:  Well, you don't think they wanted that
6  oil spill.
7      MR. BARBEAU:  I think they --
8      THE COURT:  Why -- huh?
9      MR. BARBEAU:  I think they made serious acts and
10  omissions that led to a completely --
11     THE COURT:  You don't think they wanted that oil
12  spill?  Do you really think they wanted that to happen?
13     MR. BARBEAU:  I don't.  But I think it's the result
14  of gross negligence.
15     THE COURT:  That may be true.  Okay?  That may be
16  true.
17         But if in fact there is -- it comes out of that
18  tank and there's nothing to stop it from going right into the
19  wastewater, then -- and they penalize the same way whether
20  they have a holding pond or not, why in the world should they
21  go through the time and trouble and expense to have a holding
22  pond?
23     MR. BARBEAU:  Well, one, it would be more
24  protective of the environment to try to keep that oil out of
25  the water.

1          THE COURT:  Listen, this is a corporation.  They

2     are not worried about the environment, they are worried about

3     making money.

4          MR. BARBEAU:  Sure.

5          THE COURT:  And one of the things they don't want

6     to do is keep coming back to court because that costs them

7     money.  That lawyer is not cheap -- these lawyers are not

8     cheap.

9          MR. BARBEAU:  Sure.  I think --

10         THE COURT:  Maybe they're not -- I shouldn't say

11    they're not worried about the environment because I saw what

12    they did.  I know a lot about this case.  And what they did

13    was as soon as it happened, they sent people out and they

14    started washing the shore.  I mean, they did a lot of good

15    stuff -- a lot of really good stuff.  And the jury that heard

16    the case said that the plaintiffs got nothing on the five

17    bellwethers -- four or five bellwethers we actually tried

18    because they were concerned about that.

19         However, they're there to make money.  That's what

20    corporations -- that's what their responsibility is to their

21    shareholders.  So if it's -- if it's going to cost them the

22    same amount of money whether they have a holding pond or not,

23    then, you know, why just -- just let it go.

24         MR. BARBEAU:  You hit it exactly.  What we're

25    talking about at the summary judgment stage is to determine

Case 2:10-md-02179-CJB-DPC Document 22137 Filed 01/11/18 Page 21 of 31
Case 2:03-cv-00899-RTH-PJH Document 170 Filed 12/16/10 Page 20 of 30 PageID #: 6608

20

1   the maximum potential penalty.  That's not setting the

2   penalty.  You are going to decide the penalty.  You are going

3   to use your authority and your discretion to weigh those

4   facts.  Hey, some of it didn't get out.  I've got to consider

5   that when I'm evaluating what I'm going to do to assess the

6   penalty.

7            But for the statutory max, which is what we have to

8   do to start -- figure out what is the frame of reference for

9   this penalty action, that -- you should follow the law and

10  look at how much was discharged from the tanks.

11           THE COURT:  You've been talking to people who know

12  me that say, you know, when he gets his hard head going,

13  sometimes he doesn't follow the things he should follow.  So

14  you probably talked to Janice Hebert and --

15           MR. BARBEAU:  Well --

16           THE COURT:  -- Karen, right?

17           MR. BARBEAU:  There's no doubt that you have

18  discretion to set the appropriate penalty and we're not

19  trying to limit your discretion.  What CITGO is doing is

20  trying to prejudge your discretion and limit your authority

21  before you hear all the facts, and that's not right.

22           When we get to the facts, which Mr. Sarver got into

23  a little bit, if you look at our Exhibit 22, there are

24  multiple ways where oil got out of the berm including blowing

25  right out of the top of the tanks -- like I imagine a

1    chocolate fountain -- blowing out into the waterway itself.
2    Leaking -- this is CITGO's report listing multiple ways that
3    water got out of the dike other than this one junction box
4    spot.  Those make it completely different than a successful
5    secondary containment.  You have an instant -- the release
6    was continuous from the minute the stuff started coming out
7    of the tanks.  And to the extent they held some back, that is
8    a good thing and you can consider that.  But to say that
9    47,000 barrels didn't get out, that's completely untrue.
10           THE COURT:  Well, I don't know if that's true or
11   not.  We haven't had a trial on that.  That's his side and
12   you have your side.  That's why I asked you both.
13           MR. BARBEAU:  Volume aside, they admit that
14   something like 700,000 gallons of oil evaporated into the
15   air.  That is into the environment.
16           In Exhibit 1 they report how much of that
17   oil-contaminated sludge contaminated the soil within the
18   berm.  It's 7 million pounds.
19           THE COURT:  They've admitted the sludge -- they
20   need to be penalized for that.
21           MR. BARBEAU:  Right.  But that is into the
22   environment.  Seven million pounds of hazardous waste
23   contaminated the soil.  That had to be excavated and hauled
24   off and disposed of as hazardous waste released into the
25   environment.  Just as the oil that went into the air and into

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 23 of 31
Case 2:09-cv-00899-R117-PJH Document 170 Filed 12/16/10 Page 22 of 30 PageID #: 6610

22

1    the dike itself was released into the environment.  So the
2    idea whatever is in the dike is off limits doesn't make
3    sense, either, because a whole bunch of it got out and caused
4    additional harms, too.
5            And in the context of Section 311 where we're
6    looking to prevent that sort of conduct from happening in the
7    first place, every incentive should be placed on the company
8    to prevent the discharge from occurring at all because bad
9    things happen to people and to the environment when that oil
10   gets out of the tanks.
11           THE COURT:  Okay.  Thank you very much.
12           MR. BARBEAU:  Now, if I could just -- do you mind
13   if I --
14           THE COURT:  Sure, go ahead.
15           MR. BARBEAU:  This issue about the 337 parts per
16   million oil and grease, that gets to that dilution issue.
17   There was a ton of stormwater going into their regular oily
18   water process, so they contaminated their stormwater with
19   their oily wastewater.  Then they pump it -- and you can see
20   in Exhibit 6 CITGO's testifying wastewater engineering expert
21   agrees with all these things.  They pump it up to
22   100,000 gallons per minute over to the wastewater tanks that
23   are overflowing.  That pumping is mixing it like crazy.  And
24   it's altogether in there, but there is so much additional
25   wastewater that it certainly is diluting the content at that

1    moment in time.  It doesn't remove the volume of oil.  There

2    is still a tremendous amount of oil in that wastewater stream

3    that's being pumped in there as well as all the oily

4    wastewater that was already in the tank.

5            And if you look at Exhibit 2, as far as -- it's not

6    337 parts per million, it's talking about every day CITGO has

7    500 to a couple thousand barrels of oil in their wastewater

8    stream.  They are leaking oil every day -- every hour of

9    every day.  And so we know that.  That's not a speculation

10   about is there oil in the wastewater.  There is oil in that

11   wastewater every day, and it is going into those overflowing

12   tanks and doing all the things it does as far as some rises,

13   some settles down with particles, some stays suspend as oil

14   droplets in the middle.  And so it's all mixed together, and

15   that is the problem that we're trying to address.

16           The final point I would like to make is that on

17   oil, Mr. Sarver talked about sludge.  He talked about the

18   waste oil part.  The part he didn't mention was the final

19   provision of the definition of oil in Section 311 which is

20   oil mixed with waste other than dredge spoil.  That tells you

21   it's oil mixed with every waste except dredge spoil.  And so

22   wastewater is a waste.  I don't know how anyone can say it's

23   not.  I mean, it's self-defined as a waste.  It has oil in

24   it.  It has multiple other wastes in it as we showed in our

25   exhibits.  And that all comes together and creates a

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 25 of 31
Case 2:03-cv-00699-RTH-PJH Document 170 Filed 12/16/10 Page 24 of 30 PageID #: 6612

24

```
 1    contaminated oily wastewater, and that matters to us because
 2    when that goes out into the river, it causes sheen, it causes
 3    harm, as was evident on the first morning of the spill.  It's
 4    true that a small amount of oil can contaminate a large
 5    amount of water.  And that's why we care, because when that
 6    gets out, that causes harm, too.  It causes an oil spill in
 7    its own right even without the 4 or 5 million gallons of
 8    waste oil that came out first.
 9              Thank you.
10              THE COURT:  Your Honor, may I have one --
11              MR. SARVER:  No.
12              THE COURT:  I have a lot of people out there and
13    they all want their shot.
14              MR. SARVER:  Thank you, Your Honor.
15              THE COURT:  And I can tell you, you have addressed
16    an awful lot of things.
17              First of all I'm going to grant the government's
18    motion pertaining to the sludge because they have
19    acknowledged that, admitted that is sludge.  Whatever the
20    sludge is, it is.
21              That's all I'm going to do.  I'm going to deny
22    their motion when it comes to saying that they should be
23    fined for the maximum amount under the circumstances because
24    it was released into the reserve dike or whatever.  That
25    would in fact -- if I did that, that would encourage others
```

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 26 of 31
Case 2:09-cv-00099-RH7-PJH Document 170 Filed 12/16/10 Page 25 of 30 PageID #: 6613

25

1    not to try to prevent these spills.  I agree with that.  I
2    mean, that's -- I may be wrong because Congress, in my
3    opinion, has come up with some brilliant ideas and they
4    haven't come out brilliantly when they are on paper.  I don't
5    really care.  If that's what it is, take it to the
6    Fifth Circuit.  And if they reverse me, so be it.  I've been
7    reversed before.  I'll be reversed again before I get off the
8    bench in four years, two months, and sixteen days.

9           So I just don't think that's fair.  Fundamental
10   fairness says you get penalized for the damage that you
11   cause.  And what got out of there was -- and got into the
12   water and into the shoreline, that is the damage that was
13   caused.  Now, I don't know what the penalty is, but whatever
14   it is, that's what it's going to be.

15          When it comes to the water and oil mixture, I'm
16   going to -- I'm not ready for summary judgment on that.  I'm
17   going to have to reserve that until I see it.  Until I see
18   it, feel it, hear it, touch it.  You know, it's kind of like
19   pornography, I don't know it until I see it.  But that's how
20   it's going to be with this.  When I see it and I see if
21   you're right as to the amount of oil that's mixed with that
22   water -- the more that's mixed with the water, the more upset
23   I'm going to get, to be very honest, but I don't know that at
24   this point.  All I have is both sides saying -- of course
25   they're minimizing the situation.  You're maximizing the

1    situation.  That's what lawyers do.  That's not what I do.

2    I'm going to look at what I think is fair and we'll take it

3    from there.  That's the best I can do.

4            We're set for trial in this matter?

5            MR. SARVER:  We are, Your Honor.

6            MR. BARBEAU:  March 21st.

7            THE COURT:  March 21st?

8            MR. BARBEAU:  That's right.  Can I ask you a

9    question?

10           THE COURT:  Sure.

11           MR. BARBEAU:  You're talking about the volume for

12   the potential maximum penalty.  Are you somehow addressing

13   that evaporation from the dike as being into the environment

14   or the soil contamination or what are you thinking there?

15           THE COURT:  Whatever you prove at trial as to what

16   was sent into the environment.  Okay?

17           But I thought this was an action because of the --

18   I may be wrong about this because I read an awful lot, and,

19   quite frankly, there was so much in there.

20           I thought this motion was purely about what got

21   into the river and into the water and to the shoreline.

22           MR. BARBEAU:  We're talking about deciding what the

23   maximum potential penalty would be based on.

24           THE COURT:  The penalty is going to be whatever I

25   say it is.  I don't know what it's going to be.

Case 2:10-md-02179-CJB-DPC   Document 8213-7   Filed 01/11/13   Page 28 of 31
Case 2:09-cv-00899-R1T7-PJH   Document 170   Filed 12/16/10   Page 27 of 30   PageID #: 6615

27

 1          MR. BARBEAU:  Right, but --

 2          THE COURT:  It's whatever you prove -- listen, I'm

 3   not going to hamstring you from putting on evidence

 4   pertaining to that.

 5          MR. BARBEAU:  Okay.

 6          THE COURT:  If I find that it went into the

 7   environment and it caused problems to the environment and I

 8   think it should be included, I'm going to include it.  It's

 9   just I don't think any of this is ripe at this point for

10   summary judgment.

11          So prove up your case.  We'll go to trial.

12   Whatever is there, I'll hammer them and whatever is not

13   there, they're not going to have to pay.  That's all.

14          MR. BARBEAU:  All right.

15          THE COURT:  Do you have another question?

16          MR. BARBEAU:  It sounds like you are holding this

17   to be determined at trial, and I was trying to understand if

18   that was --

19          THE COURT:  I am holding that as far as any penalty

20   provision that may be involved in this matter, I think it

21   would be ridiculous to penalize this company for having done

22   what they thought, in my opinion, would contain the oil and

23   to penalize them for the oil that did not get out into the

24   environment that was contained within the -- within the dike.

25   I would like to call it a holding pond, but the dike or

Case 2:08-md-02179-CJB-DPC Document 2237 Filed 01/11/18 Page 29 of 31
Case 2:08-cv-00899-RHH-JH-B Document 170 Filed 12/16/10 Page 23 of 30 PageID #: 6616

28

1   holding pond or whatever.  I'm not going to penalize them for
2   that.  I think they did the right thing.  And they certainly
3   were trying to do the right thing.
4           To do otherwise and say that anytime it comes out,
5   even if you have a holding pond -- and, you know, if one
6   barrel would get out, then they would be responsible for
7   everything that came out of there.  I think that's ludicrous.
8   Now, the Fifth Circuit may say, Haik, you're dumb.  That's
9   the way it goes.  I don't come up with reasons that I think
10  necessarily satisfy the Fifth Circuit.  I'm the one that has
11  to go to sleep at night.  And I think this company should not
12  be penalized for trying to do the right thing.
13          If in fact you show that more sludge and things
14  went into the river and into the lakes and into the
15  environment, hey, knock yourself out, because that's what I'm
16  going to base the penalty on.  But I'm not going to start
17  from the maximum and then come down.  That's what they do in
18  criminal cases.  This is not a criminal case.  Okay?
19          And I know the government gets real excited about
20  these things.  It's just another case to me, and that's how
21  I'm going to handle it.  It's one other case we're going to
22  go to trial on.
23          What I would suggest is that y'all try to get
24  together and resolve this.  They could save some money that
25  they could pay more of a fine with and you could save

Case 2:09-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 30 of 31
Case 2:09-cv-00899-R1T7-J2-J Document 170 Filed 12/16/10 Page 29 of 30 PageID #: 6617

29

| | |
|---|---|
| 1 | yourself getting another trip down here, and, you know, |
| 2 | trying this case for what, two weeks -- how long will it |
| 3 | take? |
| 4 | MR. SARVER:  I believe we have scheduled it for |
| 5 | three weeks. |
| 6 | THE COURT:  Three weeks? |
| 7 | MR. SARVER:  Yes. |
| 8 | THE COURT:  Y'all aren't going to try this thing |
| 9 | for three weeks.  I'm not going to allow it.  You've been |
| 10 | with me before. |
| 11 | MR. SARVER:  I have, Your Honor. |
| 12 | THE COURT:  We'll start at 8:00 in the morning and |
| 13 | stop at 10:00 at night, but I'm not staying here for three |
| 14 | weeks.  I don't like long trials.  I don't mind working late, |
| 15 | but we're going to get it done. |
| 16 | So be -- and I mean it when I say it.  You can ask |
| 17 | them on the last one. |
| 18 | MR. BARBEAU:  That sounds good.  Thank you. |
| 19 | THE COURT:  So we'll get ready. |
| 20 | But here is the deal.  There ought to be some type |
| 21 | of compromise with this, I would think; but if not, I'll see |
| 22 | you in court as they say. |
| 23 | MR. SARVER:  Thank you, Your Honor. |
| 24 | THE COURT:  Thank you very much. |
| 25 | MR. SARVER:  Merry Christmas. |

Case 2:10-md-02179-CJB-DPC Document 8213-7 Filed 01/11/13 Page 31 of 31
Case 2:09-cv-00899-R17-PJH Document 170 Filed 12/16/10 Page 30 of 30 PageID#: 6618

30

1          THE COURT:  And I hope you have some gumbo before

2     you leave.  It was cold enough for it earlier.

3          MR. BARBEAU:  Thank you.

4          THE COURT:  Merry Christmas.

5                              (Proceedings adjourned.)

6

7                         *  *  *  *

8                         CERTIFICATE

9

10        I hereby certify this 16th day of December, 2010, that

11     the foregoing is, to the best of my ability and

12     understanding, a true and correct transcript of the

13     proceedings in the above-entitled matter.

14

15                              S/Mary V. Thompson

16     _____
                                Official Court Reporter

17

18

19

20

21

22

23

24

25