# Exhibit E

01-40986
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Kevin James Devers
#### VOLUME 1

NOVEMBER 12, 2012

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    to be moving?

2              MR. BENTSEN:  Objection, scope.

3        A.   I would -- again, you don't just go out

4    and specify -- I don't think -- a barge of a

5    certain capacity.  It's more of what vessels are

6    available and what type of storage or transport

7    capability they have.

8              And that, then, will start to dictate the

9    frequency.  I -- that -- that's my view of it.

10   Frequency of movements.

11       Q.   (By Ms. André) So does part of the plan

12   need to include how much recovered fluid needs to

13   get moved?  Whether it be what size vessels you

14   have, what size vessels you need, how many trips

15   the ve -- the vessels are going to take from

16   where the oil's being contained to where it may

17   be offloaded, regardless, isn't it important to

18   know how much fluid you're going to be collecting

19   from the containment devices?

20             MR. BENTSEN:  Objection, form and

21   scope.

22       A.   So if you want to know in advance how

23   frequently you have to lighter or not lighter

24   and -- and move, et cetera, knowing the --

25   knowing the -- the change in fill per day, if you

1  will, would be useful, yes.

2      Q.  (By Ms. André) Okay.  Okay.  So circling

3  back to factors considered in building the

4  cofferdam.

5      A.  M-h'm.

6      Q.  Oh, actually, strike that.  Let's move on

7  to the RITT.

8      A.  Okay.

9      Q.  What factors were considered in designing

10 the RITT for the Macondo incident?

11     A.  So the RITT was to be used at the end of

12 the HORIZON riser.  It had a drill pipe that

13 ex -- that was inside of the -- the -- the riser

14 that actually extended beyond the end of the --

15 the -- the riser.  I know this is confusing with

16 all these words, but the HORIZON riser had an end

17 point, and the drill pipe extended beyond that.

18         So what we were attempting to do with the

19 RITT was to insert a pipe in between the drill

20 pipe and the inside diameter of the riser.

21     Q.  Okay.

22     A.  And we wanted to put in the -- the

23 largest pipe that we thought we could

24 successfully install in that -- that area.

25     Q.  Okay.  So just to unpack that a little

1    bit, the size of the space that you had would

2    have been relevant?

3        A.  Yes.

4            MR. BENTSEN:  Objection, form.

5        A.  This -- the -- the -- the amount of area

6    or -- yeah, the amount of area we had in order to

7    put the pipe through was relevant, yes.

8        Q.  Okay.  And, again, were hydrates relevant

9    to your design?

10       A.  How do I want to answer that?  Let's see.

11   The -- the tool incorporated some features to try

12   to prevent the formation of hydrates.

13       Q.  Okay.  And were those tools informed at

14   all based on what you observed with the hydrates

15   in the cofferdam?

16       A.  Partly.  The -- the tool itself -- our --

17   our intent with this tool was -- was to capture

18   the hydrocarbon before it ever had a chance to

19   form hydrates.

20       Q.  M-h'm.  Okay.

21       A.  Now, even with that in mind, we put

22   provisions in this tool, that if seawater were to

23   find its way in, as well, we could have hydrates

24   later on, not -- not immediately at that spot but

25   as it -- as it came up the riser.  So we were

 1     Q.  Okay.

 2     A.  I don't know if that answered your

 3  question.

 4     Q.  It does.  That makes sense.  Thank you.

 5     A.  Okay.

 6          THE COURT REPORTER:  (Indicating.)

 7          THE WITNESS:  Sorry.

 8     Q.  (By Ms. André) So what else did you

 9  consider in designing the RITT tool?

10     A.  So we -- we designed three tools

11  eventually.  The second and third had what we

12  believed to be improvements on the first one.

13     Q.  Okay.

14     A.  And so I think you alluded to it, what

15  was to prevent this pipe from moving around in

16  the other one.  One of the features that we tried

17  to employ on the next two was to put a support on

18  the outside to try to stabilize or prevent it

19  from -- from rocking too much.

20     Q.  Okay.

21     A.  So that's another example that we learned

22  after we had built the first tool.

23     Q.  And --

24     A.  So --

25     Q.  -- the second one was the one that was

1    installed?

2        A.   The first one.  RITT number -- as we

3    called it, RITT No. 1 was installed and used.

4        Q.   Okay.

5        A.   So other aspects, a lot of the concern

6    was how can we get this in.  So a lot of the

7    features about it was about how the -- the

8    remote-operated vehicle could interface with this

9    pipe, and the -- and the driver of the

10   remote-operated vehicle could -- could get it in.

11   So there were lots of design features that tried

12   to help the installation process.

13       Q.   So during the installation process, oil

14   was coming out of the pipe that you were trying

15   to insert the RITT into; is that right?

16       A.   Yes.

17       Q.   Okay.  So did you have to consider how

18   hard the oil would have been pushing against the

19   RITT tool as the ROV was trying to insert it?

20                MR. BENTSEN:  Objection, form.

21       A.   No.  I'm -- I'm just hesitating.  You

22   know, if you look at the tool, there were

23   these -- some call them "baffles," some call them

24   "seals."  So that was part of what we wanted to

25   get inserted in -- into there.  But that was

1    more -- we were concerned more about when it went

2    in, how would they bend over and then flex bat --

3    flex back open.

4         Q.   (By Ms. André) Okay.

5         A.   A concern that we had was, once we got

6    the -- the ri -- the RITT inside of the riser,

7    and once we started collecting the oil, how would

8    we prevent seawater from also getting brought in.

9         So there were some devices employed on

10   the tool that -- to help avoid that situation.

11        Q.   Okay.

12        A.   But in terms of flow coming out of the

13   pipe and our inability to put the RITT in, that

14   was not -- I don't recall that being a concern.

15        Q.   Okay.  Were any other fluid properties

16   relevant to your design of the RITT?

17             MR. BENTSEN:  Objection, form.

18        A.   For RITT No. 1, no.  For -- for RITTs

19   later on, there was some discussion about the

20   hydrocarbons flowing down the HORIZON riser.

21   Could there have formed an oil later, a loo -- an

22   oil layer and a gas layer, and might we be

23   oscillating between the two regions and taking

24   some gas and taking some oil.

25        Q.   (By Ms. André) M-h'm.

1      A.  So when you ask about fluid properties,

2   later on, we considered that and made -- made

3   some adjustments on the later tools to -- to try

4   to compensate for that.

5      Q.  Okay.  So when you say some liquid, some

6   gas, do you mean that the fluid may have been

7   breaking into two phases when it -- by the time

8   it hit the rule -- RITT?

9      A.  It may have.

10      Q.  Okay.

11      A.  I don't know that we know that answer.

12      Q.  Was the kind of going back and forth

13   between gas and liquid something that you all

14   observed once the RITT was installed?

15           MR. BENTSEN:  Objection to form and

16   scope.

17      A.  So I -- I recall hearing that so-called

18   "slugging" was problematic.

19      Q.  (By Ms. André) Okay.

20      A.  And that was part of why we were asked:

21   "Can you -- can you look at something on this

22   tool?  We think that maybe one of the reasons for

23   the slugging is that we're drawing from varying

24   or inconsistently inside of this pipe at 5,000

25   feet."  So we were doing our best to try to

1      Q.  Okay.  So it wasn't considered by

2   yourself or the Design Team?

3      A.  Not in the manner that Steve is

4   presenting it here.

5      Q.  How was it considered?

6      A.  I don't believe that it was.

7      Q.  Well --

8      A.  Now, the -- yeah.  I -- I don't recall

9   any conversations about how pressure would affect

10   how we've designed -- how we designed the RITT.

11      Q.  Well, how would you know that you are

12   keeping seawater from flowing in if you didn't

13   know at what pressure that would happen?

14             MR. BENTSEN:  Objection, form and

15   scope.

16      A.  Well, I suppose if we got seawater at

17   surface, we knew that seawater was coming in.  If

18   we formed hydrates, that would be an indicator

19   that we were getting seawater in.

20      Q.  (By Ms. André) But --

21      A.  But beyond that, I -- I -- I don't know

22   how to answer that question.

23      Q.  Okay.  But after the cofferdam failed so

24   quickly because of hydrate formation, you didn't

25   think it was important to figure out that

1    question before the installation of the RITT?

2                  MR. BENTSEN:  Objection, form and

3    scope.

4        A.  So -- so I think I've answered the

5    question.  The design of the RITT was to capture

6    the hydrocarbon before it had a chance to

7    interface with seawater.

8        Q.  (By Ms. André) Okay.

9        A.  That was the primary purpose of the RITT.

10                 Now, there was a concern that if we were

11   capturing all the hydrocarbon and actually

12   lowering the pressure in that area where we were

13   sucking seawater in, that would be a -- a

14   concern.  So we added baffles to help try to

15   prevent seawater from coming in.

16                 Did we think that that would solve all of

17   it?  We weren't sure.  We didn't really know

18   what -- what was going to be happening there.

19                 Did we talk about pressures in terms of

20   psia's and that we needed to keep the flowing

21   pressure at the tip of the -- the RITT at certain

22   levels?  No, that wasn't the type of discussion

23   that we were having.

24                 The discussion was:  How do we get this

25   tool in?  How can we prevent the influx of

 1    seawater using baffles?

 2        Q.  Okay.  Did y'all do anything else to the

 3    RITT other than the use of the baffles to

 4    mitigate against hydrates?

 5        A.  We added methanol injection capability,

 6    yes.

 7        Q.  Okay.  And, again, those methanol

 8    injection rates, what were they based on?

 9        A.  They were limited by the -- the maximum

10    that we could pump.  I -- I don't recall the

11    numbers, so it could have been eight gallons per

12    minute.  I don't recall.

13        Q.  Okay.  Was anything else done, other than

14    the baffles and the methanol injection?

15             MR. BENTSEN:  Objection, form.

16        A.  Not that I recall.

17        Q.  (By Ms. André) Okay.  Do you know why a

18    meth -- methanol injection system wasn't used to

19    mitigate for hydra -- or hydrates with the

20    cofferdam?

21        A.  The -- the way we deployed the methanol

22    at that point in time was from the ENTERPRISE.

23    And we were using the Q4000 to actually install

24    the -- the cofferdam.

25        Q.  Okay.

1      A.  So the methanol was not readily

2  available.

3           And, further, the cofferdam is a very

4  large vessel, and I'm not sure how much methanol

5  would needed to have been pumped into that to

6  prevent hydrates.

7      Q.  Would it have been possible to pump

8  enough methanol into the cofferdam to prevent

9  hydrates?

10               MR. BENTSEN:  Objection, form and

11  scope.

12      A.  I -- I don't have the answer to that.  I

13  don't know.

14      Q.  (By Ms. André) Do -- can hydrates be

15  mitigated by methanol injection -- strike that.

16           So even if you don't know how big,

17  necessarily, the cofferdam was, I'm wondering if

18  methanol injection would have been a feasible

19  tool to use to mitigate hydrates?

20               MR. BENTSEN:  Objection, form and

21  scope.

22      A.  Again, I don't know the answer to that.

23  The -- the hydrates in that cofferdam formed very

24  rapidly and significantly.  I'm not -- I'm not

25  the Chemist here that can predict how much

01-40988
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )    MDL NO. 2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO, on    )    SECTION: J
APRIL 20, 2010    )
   )    JUDGE BARBIER
   )
   )    MAG. JUDGE SHUSHAN

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Kevin James Devers
## VOLUME 2

NOVEMBER 13, 2012

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    HORIZON riser for some length.

2           So one of the -- one of the factors that

3    was heavily considered was:  How do we do that?

4    So the -- the shape of the device, the dimensions

5    of the device were affected by how we would

6    exe -- execute putting the -- this RITT inside of

7    the HORIZON riser.

8        Q.  And the shape and the dimension of the

9    RITT would ultimately affect the amount of oil

10   that the -- that that tool would be able to

11   collect; is that correct?

12           MR. BENTSEN:  Objection, form.

13       A.  We did not consider flow rates in our

14   design and development of that tool, but -- yes.

15   The -- we did not consider flow rates in the

16   design of the -- of the tool.

17       Q.  (By Ms. Kinzel-Tapper) But the shape and

18   the dimension of the RITT that's being inserted

19   into the risers is going to affect the amount of

20   oil that's able to escape around the RITT; is

21   that -- isn't that correct?

22           MR. BENTSEN:  Objection, form.

23       A.  H'm.  How to answer that.

24           Whatever hydrocarbon was not being flowed

25   through the RITT would then escape out the end of

1    the HOR -- HORIZON riser.

2        Q.  (By Ms. Kinzel-Tapper) And once -- and

3    some of the factors that would account for the

4    amount of oil that does not -- does not flow

5    through the RITT would be the shape and the size

6    of the RITT?

7                MR. BENTSEN:  Objection, form.

8        Q.  (By Ms. Kinzel-Tapper) Is that correct?

9        A.  It -- it may.  In our case, it was, in my

10   view, more about the surface capacity we had to

11   process the fluids.

12       Q.  What was the overall dimension of the

13   RITT that was inserted into the riser, the --

14                MR. BENTSEN:  Objection, form.

15       Q.  (By Ms. Kinzel-Tapper) -- the opening at

16   the end?

17       A.  So approximately four inches.

18       Q.  Okay.  And --

19       A.  I don't remember the exact inside

20   diameter.

21       Q.  And were there RITTs larger in diameter

22   that were available?

23       A.  At the time that RITT No. 1 was

24   installed, no.

25       Q.  Did they become available at a later

1    point in time?

2        A.  So we then developed a RITT No. 2 and a

3    RITT No. 3.  And I need to look at the

4    schematics, but we did look at a larger diameter

5    pipes for the RITT in that case.

6            A concern that we had was we wanted to

7    give every chance of success of inserting the

8    tube, so there was a balance between the size of

9    the RITT and the opening that we had available to

10   stab it in.

11       Q.  Was there discussion, though, that a RITT

12   with a larger opening, a larger diameter, would

13   be able to capture a larger percentage of the

14   flow?

15           MR. BENTSEN:  Objection, form.

16       A.  We did not -- we did not have those --

17   those kind of con -- conversations.

18       Q.  (By Ms. Kinzel-Tapper) Why were you

19   evaluating a RITT of a larger diameter, then?

20           MR. BENTSEN:  Objection, form and

21   scope.

22       A.  We wanted the RITT to be as robust as

23   possible, so a larger diameter pipe was viewed to

24   have more robustness.

25       Q.  (By Ms. Kinzel-Tapper) Okay.  We started

```
 1    off -- I -- I think I may have taken you off on a
 2    tangent, but we were talking about the manner and
 3    methodology used to assess the RITT, and we
 4    talked about the -- well, we were talking about
 5    the ability to place the device into the riser
 6    was a -- a major consideration, correct?
 7         A.  That's correct.
 8         Q.  Okay.  What other factors did you all
 9    consider when assessing the riser design?
10              MR. BENTSEN:  Objection, form.
11         A.  The riser?
12         Q.  (By Ms. Kinzel-Tapper) I mean, excuse me,
13    the RITT -- the RITT.
14         A.  The RITT design.
15         Q.  Thank you.
16         A.  So how it would interface with a
17    remote-operated vehicle was a concern.  How we
18    could deploy methanol to help mitigate the
19    potential for hydrate formation in case seawater
20    influx could occur was a factor.
21              We had a general concern about seawater
22    finding its way to the entry of the RITT, so we
23    added baffles to the -- baffle -- we added
24    baffles to the external side of the RITT in an
25    attempt to help to prevent seawater influx to
```

1    getting to the end of the RITT tool.

2            We also had to consider how it would

3    interface with the -- the riser connected to

4    the -- to the surface vessel, and how to do that

5    in a manner to deal with heave, and, as well, if

6    there was a need to make an Emergency Disconnect,

7    to make sure that was safely incorporated into

8    the design.

9        Q.  You mentioned earlier that one of the

10   considerations with the RITT was the capacity

11   to -- was the surface capacity to process the oil

12   that was being brought up to the vessel; is that

13   correct?

14               MR. BENTSEN:  Objection, form.

15       A.  The fluids, yes.

16       Q.  (By Ms. Kinzel-Tapper) The fluids that

17   was -- that were being brought up to the vessels.

18           How did that factor into the design of

19   the RITT, that -- those considerations, the

20   capacity of the vessels?

21       A.  I don't recall it being a factor.  It was

22   a fact that there was so much processing capacity

23   topsides.  Beyond that, it wasn't considered.  It

24   was a -- just a -- a fact.

25       Q.  And what was your understanding as to

 1   the -- upon initial installation of the RITT,

 2   what was your understanding as to the processing

 3   capabilities that were on the vessel?

 4              MR. BENTSEN:  Objection, form and

 5   scope.

 6      A.   I under -- understood it to be

 7   approximately 15,000 barrels of oil per day, and

 8   some amount of gas.  I don't have a recall of the

 9   gas handling.

10      Q.   (By Ms. Kinzel-Tapper) What plans were --

11   were made in the event that the RITT collected

12   greater than 15,000 barrels of oil per day?

13              MR. BENTSEN:  Objection, form.

14      A.   So as it applies to the RITT, in that

15   scenario, and the vessel that was capturing it,

16   that was all that we could -- could process.

17          So as it pertains to the RITT in that

18   particular application there, I don't recall

19   another scenario of -- of collecting from that

20   point.

21      Q.   (By Ms. Kinzel-Tapper) What mitigation

22   efforts did you put in place, though, should the

23   RITT collect greater than 15 -- what was BP going

24   to do if it collected greater than 15,000 barrels

25   per day from the RITT?

471

1      A.   I need to look at this for a moment.

2           (Reviewing document.)

3           So my roles during this point in time did

4      not include these other elements, as I see them

5      in this letter.

6      Q.   (By Ms. Kinzel-Tapper) And just so the

7      record is clear, the other elements that are

8      outlined in Mr. Suttles' June 9, 2010 letter are

9      the "Q4000 / Choke Line," which is identified as

10     Element No. 2, correct?

11     A.   Correct.

12     Q.   And Element No. 3 is the "Clear Leader /

13     Kill Line."  Correct?

14     A.   Correct.

15     Q.   And I think those are the only ones that

16     he addresses in this letter.

17          On Page 32, under Element 2, the second

18     paragraph that be -- that begins "The objective

19     of this option..."

20     A.   Yes.

21     Q.   That -- that sentence reads:  "The

22     objective of this option is to capture any excess

23     oil that the LMRP Cap/Discoverer Enterprise

24     system cannot contain - as such it will be run in

25     parallel with Element 1."

```
1            Did you understand, as part of your

2    workings with the Top Hat Team, that additional

3    capacity was being added because the Top Hat

4    could not collect all the oil and gas flowing

5    from the well?

6                 MR. BENTSEN:  Objection, form.

7         A.   I understood that we could only process

8    up to 15,000, roughly, at the ENTERPRISE, and

9    that there was hydro -- hydrocarbon not being

10   collected, and the Q4000 was then added to the

11   system to collect.

12        Q.   (By Ms. Kinzel-Tapper) What was your

13   understanding as to the Q4000, where it would be

14   located in relation -- how that system worked in

15   general?

16                 MR. BENTSEN:  Objection, form and

17   scope.

18        A.   So there was -- there was a connection

19   from the HORIZON -- I'll -- I'll call it BOP, I'm

20   not well-versed with that equipment -- but there

21   was a connection to the -- to the HORIZON Well

22   through some sort of manifold that then was

23   connected to a riser system that was connected to

24   the Q4000.

25        Q.   (By Ms. Kinzel-Tapper) Did you have to
```

```
 1    provide any input into the design of that system

 2    as it relates to the top -- I mean, as it relates

 3    to the Top Hat?  In other words, did that Team

 4    consult you regarding the design of their system

 5    to account for where the Top Hat was located?

 6               MR. BENTSEN:  Objection, form.

 7    Objection, scope.

 8        A.  H'm.  I don't have any recall of that.

 9        Q.  (By Ms. Kinzel-Tapper) Turning to Page 34

10    of Mister -- of Exhibit 9106.  It's the final

11    page of Mr. Suttles' June 9, 2010 letter to the

12    Rear Admiral.  Under the paragraph that begins

13    "Third" -- do you see where I'm at?

14        A.  That's on Page 34?

15        Q.  Correct.

16        A.  Oh, yeah, second paragraph there,

17    "Third," yes, I see it.

18        Q.  And the second sentence there reads:

19    "The systems outlined here are designed based on

20    the current best independent assessment of flow

21    from the Flow Rate Technical Group.  We will

22    continue to adapt our plans as more is learned

23    about the flow rate from the well."

24               Did I read that correctly?

25        A.  I believe you did.
```