# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| In Re: Oil Spill by the Oil Rig | * | **MDL 2179** |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | |
| | * | **SECTION J** |
| | * | |
| **This Document Relates To:** | * | |
| | * | **JUDGE BARBIER** |
| No. 12-968, Plaisance, et al. v. | * | |
| BP Exploration & Production Inc., et al. | * | |
| | * | **MAG. JUDGE SHUSHAN** |
| and | * | |
| | * | |
| All Actions | * | |

## ORDER AND REASONS
### [Granting Final Approval of the Medical Benefits Class Action Settlement]

Before the Court is a motion (Rec. Doc. 7112) by BP seeking final approval of the Medical Benefits Class Action Settlement, as amended on May 1, 2012 (Rec. Doc. 6427-1). Also before the Court is Class Counsel's memorandum in support of final approval of the Medical Settlement, which the Court treats as a motion for final certification of the Medical Benefits Settlement Class and for final approval of the Medical Settlement. (Rec. Doc. 7116.). [1]

## I.    Factual and Procedural History

On April 20, 2010, a loss of well control and one or more fires and explosions occurred on the *Deepwater Horizon*, which had been engaged in drilling activities in Mississippi Canyon

---

[1] Terms with initial capital letters used in this Order and Reasons have the meanings ascribed to the fully capitalized rendering of such terms in the Medical Benefits Class Action Settlement Agreement. In addition, "Class", "Class Members", "Medical Settlement Agreement" ("MSA" or "Agreement"), and "Medical Benefits Settlement" (or "Medical Settlement" or "Settlement") are also used herein to refer, respectively, to the Medical Benefits Settlement Class, the Medical Benefits Settlement Class Members, the Medical Benefits Class Action Settlement Agreement, and the Medical Benefits Class Action Settlement.

Block 252—the location known as "Macondo"—on the Outer Continental Shelf off the coast of Louisiana.  The *Deepwater Horizon* sank to the ocean floor two days later.  As a result of these events, oil began to discharge into the Gulf of Mexico.  The flow of oil continued for three months before the well was capped on July 15, 2010.  The MC252 Well was finally sealed with the completion of a relief well on September 19, 2010.[2]

A massive effort responded to the oil spill.  As many as 90,000 response workers engaged in near-shore and offshore Response Activities in the Gulf of Mexico, working on approximately 6,500 marine vessels, including roughly 5,800 Vessels of Opportunity, a program in which BP contracted with vessel owners to assist in Response efforts.  Response Activities included:  (i) skimming oil from the surface; (ii) conducting approximately 400 controlled *in-situ* burns; (iii) placing more than 13 million feet of containment and sorbent boom; and—most relevant here—(iv) applying approximately 1.8 million gallons of chemical dispersants.  Response workers also engaged in onshore activities such as beach clean-up and wildlife restoration.  The response is further discussed below (Part IV, *infra*).

The *Deepwater Horizon* Incident gave rise to hundreds of lawsuits, including putative class actions, with thousands of individual claimants for both personal injury and for economic loss and property damages.  Four months after the incident, in August 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in this District and assigned them to this Court pursuant to 28 U.S.C. § 1407.  *See In re Oil Spill of the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).  In its assignment order, the JPML observed that common factual issues among the suits supported their joinder, explaining that each proceeding

---

[2] http://www.restorethegulf.gov/release/2010/09/19/statement-admiral-allen-successful-completion-relief-well.

"indisputably share[s] factual issues concerning the cause (or causes) of the Deepwater Horizon explosion/fire and the role, if any, that each defendant played in it." *Id.* at 1354.

In Pretrial Order No. 11, this Court organized the pleadings and categorized the claims and issues by creating pleading bundles. (Rec. Doc. 569.) Relevant here is the "B3 bundle," entitled "Post-Explosion Clean-Up Claims," which encompasses "all claims, of any type, relating to post-explosion clean-up efforts . . . as well as all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 10, 2010." (Pretrial Order No. 25 ("PTO 25"), Rec. Doc. 983, ¶ 1.)

On October 8, 2010, the Court appointed the Plaintiffs' Steering Committee ("PSC") from numerous applicants, pursuant to a public application process. (*See* Rec. Doc. 506.) Pursuant to pretrial orders, on December 15, 2010, the PSC filed the B3 Master Complaint, (Rec. Docs. 881, 1812), which included "all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010." (PTO 25 at 2.) Short-form joinders adopting the B3 Master Complaint have been filed by more than 17,000 plaintiffs, many of whom are likely Class Members. In addition, many plaintiffs did not adopt the Master Complaint: approximately 780 of these individuals indicated that they were pursuing a personal injury/death claim and another 12,000 indicated that they are pursuing a claim for fear of future injury and/or medical monitoring. Numerous such plaintiffs are also likely Class Members.

BP and the other Defendants moved to dismiss the B3 Master Complaint. In September 2011, the Court partially granted these motions and ruled that plaintiffs' claims were governed by maritime law and dismissed their state-law claims. (Rec. Doc. 4159.)

Phase One of a multi-phase trial was originally scheduled for February 27, 2011. The

parties engaged in extensive discovery to prepare for that trial. (*See* Order, Rec. Doc. 8138 at 2). The Parties were also engaged, on a parallel track, in extensive arm's-length negotiations over what would become the Medical Settlement. Over approximately ten months, counsel for Plaintiffs and BP engaged in intense negotiations, conducted in person and via telephone and web conferences. (Decl. of Andrew Bloomer, Rec. Doc. 7112-6, ¶¶ 2, 4, 6-62; Order, Rec. Doc. 7480, at 7 ("The Settlement Agreement was negotiated in good faith and at arm's length over many months . . . . The negotiations were extensive and highly contested."); *see also* Rec. Doc. 7600).) Negotiating teams met or spoke nearly daily between late July 2011 and the filing of the Medical Settlement Agreement with the Court on April 18, 2012. (Bloomer Decl. ¶¶ 11-61; Decl. of Robin Greenwald, Rec. Doc. 7116-2 at 94, ¶ 3.) Magistrate Judge Shushan also supervised discussions related to key terms of the Medical Settlement Agreement. (Bloomer Decl. ¶¶ 39, 45, 49, 59; Greenwald Decl. ¶ 12.)

On February 26, 2012, the eve of the Phase One Trial, the Court adjourned proceedings for one week to give the parties additional time to reach a settlement, if possible. (*See* Rec. Doc. 5887.) On March 2, 2012, after the Parties informed Judge Shushan that they had reached an agreement in principle, the Court again adjourned the trial. (*See* Rec. Doc. 5955; *see also* Second Amended Pretrial Order No. 41, Rec. Doc. 6592.)[3] On April 16, 2012, the PSC filed a new class action complaint on behalf of thousands of individuals asserting bodily and/or personal-injury claims from alleged exposure to oil and/or dispersants arising from the *Deepwater Horizon* Incident, including Response Activities. (*Plaisance, et al. v. BP Exploration & Production Inc., et al.,* No. 12-968.) On April 18, 2012, the Parties filed a joint motion for Preliminary Approval of the Medical Benefits Settlement, and Plaintiffs moved to certify the

---

[3] This trial has been rescheduled to begin on February 25, 2013. (Rec. Doc. 7810.)

Class for purposes of settlement.  (Rec. Doc. 6267.)[4]  After a hearing on April 25, 2012, the Court, on May 2, 2012, granted preliminary approval to the Medical Benefits Settlement and preliminarily and conditionally certified the Class for settlement purposes only.  (Rec. Doc. 6419.)

In the Preliminary Approval Order, the Court directed that objections to the Settlement were to be filed with the Court by August 31, 2012, and it later extended that date to September 7, 2012.  (*Id.* ¶¶ 23, 33; Order, Rec. Doc. 7225.)  The Order also required that each objection include written evidence establishing that the individual was a Class Member and also "[a]ny evidence and legal authority the Medical Benefits Settlement Class Member wishes to bring to the Court's attention, and any evidence the Medical Benefits Settlement Class Member wishes to introduce in support of his or her objection . . . ."  (Rec. Doc. 6419, at 25.)  The Court's Order explained that Class Members who failed to comply with these requirements "shall waive and forfeit any and all rights he or she may have to object to the Medical Benefits Class Action Settlement."  (*Id.* at 26.)  Requests for exclusion (opt-out) from the Class were required to be postmarked no later than October 1, 2012 (*id.*), later extended to November 1, 2012. (Rec. Doc. 6419, ¶¶ 29, 33; Order, Rec. Doc. 7176.)

The Parties submitted substantial briefs and declarations in support of final approval on August 13, 2012, and submitted reply briefs and supporting declarations on October 22, 2012. (Rec. Docs. 7112, 7113, 7116, 7728, 7730, 7732.)  Appendix A to this Order and Reasons lists and describes the expert declarants presented by BP and Class Counsel.  The Court has received and considered objections to the Settlement, which were filed into a special docket, No. 10-7777. On November 8, 2012, the Court held a final fairness hearing in accordance with Fed. R. Civ. P.

---

[4] Following the original filing, the Parties made some minor amendments to the Agreement, and executed those amendments on May 1, 2012.  On May 3, 2012, they filed the as-amended (and still current) version of the Medical Settlement Agreement with the Court.  (Rec. Doc. 6427.)

23(e)(2).

## II.     Overview of the Settlement[5]

The Parties structured the Settlement from the ground up and negotiated every aspect of the agreement, including: standards of proof, levels of compensation, and conditions to be included in the Matrix; the components, duration, and frequency of the Periodic Medical Consultation Program; scientific support for Plaintiffs' claims and BP's defenses; BP's alleged liability; the need for, components of, and funding of the Gulf Region Health Outreach Program; the circumstances under which lawsuits for Later-Manifested Physical Conditions could be brought; the terms and provisions of the written settlement agreement, notice documents, forms, and other exhibits; and procedures for resolving third-party liens. (Greenwald Decl. ¶ 8; Herman Decl. ¶ 6; Decl. of Geoffrey P. Miller, Rec. Doc. 7112-8 ¶ 31; *see also* Bloomer Decl. ¶ 2.)

### A.     Medical Class Definition

Section I.A of the Medical Settlement defines the Medical Benefits Settlement Class ("Medical Class") as:

> [A]ll Natural Persons who resided in the United States as of April 16, 2010, and who:
>
> 1)     Worked as Clean-Up Workers at any time between April 20, 2010, and April 16, 2012; or
>
> 2)     Resided in Zone A for some time on each of at least sixty days between April 20, 2010, and September 30, 2010 ("Zone A Resident"), and developed one or more Specified Physical Conditions between April 20, 2010, and September 30, 2010; or
>
> 3)     Resided in Zone B for some time on each of at least sixty days between April 20, 2010, and December 31, 2010 ("Zone B Resident").

---

[5] The Medical Settlement is a long and detailed document. Here the Court summarizes its most significant features. In the unlikely event of a conflict between the Court's description and the Settlement Agreement itself, the Settlement Agreement controls.

Section I.B of the Medical Settlement excludes from the Medical Class the following:

1)      Any Medical Benefits Settlement Class Member who timely and properly elects to be excluded from the Medical Class;

2)      Any person employed by BP Entities at any time between April 20, 2010, and April 16, 2012;

3)      The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana and their law clerks serving on or after April 20, 2010, through April 16, 2012;

4)      Any person who was on the *Deepwater Horizon* on April 20, 2010;

5)      Any person who has previously asserted and released his or her claims against BP relating to any illnesses or injuries allegedly suffered as a result of exposure to oil, other hydrocarbons, or other substances released from the MC252 and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with the Response Activities, including those persons who have provided final releases to the GCCF in exchange for payments from the GCCF for such illnesses or injuries; and

6)      Any person who is a Zone A Resident or a Zone B Resident, but not a Clean-Up Worker, and who worked in one or more of the following capacities for a cumulative duration of at least five years prior to April 20, 2010:

      a)      Cleaning or reconditioning of the tanks or holds of barges, tankers or lighters, tanker trucks, tanker rail cars, or any other tank (stationary or mobile) used to hold hydrocarbons or petrochemicals;

      b)      Storage, handling, or cleaning of naturally occurring radioactive materials ("NORMS"), including radionuclides;

      c)      Storage, transportation, distribution, or dispensing of gasoline, diesel, jet fuel, kerosene, motor fuels, or other hydrocarbon-based fuels at any bulk storage facility (not including gas stations or gas station convenience stores), bulk plant, or bulk terminal facility that stores hydrocarbons or petrochemicals;

      d)      Loading or unloading bulk crude oil or petroleum hydrocarbons

onto or from trucks, ships, barges, or other vessels; or

e)    Tar distillation.

(MSA § I.B.)

### B.    Benefits under the Medical Settlement

The Medical Settlement provides a range of benefits to Class Members, including: (1) compensation for Specified Physical Conditions; (2) the Periodic Medical Consultation Program; (3) the Gulf Region Health Outreach Program, which will help improve the healthcare system for Class Members in the Gulf Coast communities; and (4) the Back-End Litigation Option, which preserves Class Members' ability to sue BP for compensatory damages for Later-Manifested Physical Conditions.  (MSA § IV.)  In exchange for these benefits, Class Members provide a comprehensive Release of specified physical and bodily injury claims against BP and other entities involved in the *Deepwater Horizon* Incident.  (MSA § XVI.)

### 1.    Compensation for Specified Physical Conditions

The Medical Settlement provides compensation to qualifying Class Members who demonstrate that they manifested a Specified Physical Condition[6] in the time frames set forth in the Agreement.  (MSA § VI, Ex. 8.)  The level of compensation that a qualifying Class Member receives depends on various factors, including the Class Member's status as a Clean-Up Worker or Resident, whether the Class Member's Specified Physical Condition was Acute or Chronic, and the type of proof that the Class Member presents.  (MSA Ex. 8.)

The Settlement allows qualifying Class Members to receive compensation for Specified Physical Conditions even without medical records.  (MSA § VI, Ex. 8.)  However, by providing medical records or showing corroboration in the appropriate database or other data source,

---

[6] The terms "Specified Physical Conditions" and "conditions" refer both to the conditions themselves and the associated symptoms (including medically synonymous terms) as set forth on the Specified Physical Conditions Matrix.  (MSA Ex. 8.)

Class Members can qualify for a larger compensation payment. (*Id.*)

The framework for determining compensation eligibility and amounts is set forth in the Matrix. (*Id.*) The Matrix provides compensation for conditions for which there is a medical basis to conclude that they could be caused by exposure to oil and/or dispersants at sufficient levels. (Harbut Decl. ¶ 17; Herzstein Decl. ¶ 14; Herzstein Supp. Decl. ¶ 4.) The conditions on the Matrix "reflect the state of the science and conform with the world's medical literature in regard to the health effects of exposure to petroleum and/or petroleum-based dispersants." (Harbut Decl. ¶ 17.) The Matrix conditions are consistent with: (1) medical and scientific literature; (2) conditions that have actually been reported or alleged by Clean-Up Workers and Residents; (3) published health surveillance reports; and (4) conditions reported by response workers and residents in connection with other oil spills. (Herzstein Decl. ¶¶ 14–18.)

The Matrix includes a broad array of acute conditions, such as ocular, upper airway/respiratory, dermal, otolaryngological, and neurophysiological, neurological, and odor-related (including gastrointestinal distress), as well as heat-related conditions reported by Clean-Up Workers while performing Response Activities. (MSA § VI, Ex. 8; Harbut Decl. ¶¶ 25-33; Herzstein Decl. ¶ 13.) The Matrix also includes chronic conditions, including: (1) ocular, specifically sequela from direct chemical splash to the eye(s); (2) respiratory, specifically chronic rhinosinusitis and Reactive Airways Dysfunction Syndrome ("RADS"); and (3) dermal, specifically chronic contact dermatitis and chronic eczematous reaction. (MSA § VI, Ex. 8; Harbut Decl. ¶¶ 34-38; Herzstein Decl. ¶ 13.) The Medical Settlement requires that the Specified Physical Conditions manifest within time periods ranging between 24 and 72 hours after a Class Member's exposure. (MSA § VI, Ex. 8.) The time frames set forth in the Matrix accurately reflect the periods within which these conditions would be expected to manifest after

exposure to oil and/or dispersants, based on scientific evidence. (Harbut Decl. ¶ 19; Herzstein Decl. ¶ 20.)

As set forth on the Matrix, the Settlement provides compensation at various levels. For example, a Clean-Up Worker may qualify for a payment of $1,300 on Level A1 by providing a sworn declaration: (1) asserting the manifestation of one of the Specified Physical Conditions; (2) asserting that the condition manifested in the applicable time frame; and (3) identifying the route, circumstances, and date or approximate date of his/her exposure. A Clean-Up Worker may qualify for a payment of $7,750 on Level A2 by providing such a declaration plus supporting medical records establishing that his/her claimed condition persisted when he/she presented to the medical professional with the claimed condition. Finally, a Clean-Up Worker may qualify for a payment of $12,350 on Level A3 by providing a declaration if the information in that declaration is corroborated by the Medical Encounters Database (which recorded visits to medic stations) or by another qualifying data source documenting the Clean-Up Workers' contemporaneous medical information during the Response Activities. (MSA § VI, Ex. 8.)

Similarly, for Resident Class Members, the Settlement provides two levels of compensation for certain Acute Specified Physical Conditions. A Resident Class Member may qualify for a Level A1 payment of $900 by providing a declaration plus certain additional corroborating evidence such as a declaration from a family member or co-worker. A Resident Class Member may qualify for payment of $5,450 under Level A2 by providing the declaration and appropriate medical records. Resident Class Members are not eligible for payments under Level A3. (MSA § VI, Ex. 8.)

Clean-Up Workers who experienced certain heat-related conditions during or immediately following a shift performing Response Activities are eligible for a payment of

$2,700.  To qualify, the Class Member must provide a declaration describing the manifestation of the condition in the applicable time frame, and information concerning and corroborating that condition must also be found in the Medical Encounters Database or another qualifying data source.  (MSA § VI, Ex. 8.)

Under Level B1, Class Members may receive compensation for certain chronic conditions identified on the Matrix.  Clean-Up Workers may receive $60,700 and Residents may receive $36,950 under Level B1.  To receive compensation under Level B1, a Class Member must provide:  (a) a declaration; (b) supporting medical records establishing that his/her claimed condition persisted when he/she presented to a medical professional, or, for a Clean-Up Worker, corroboration of his/her condition in the Medical Encounters Database or another qualifying data source; and (c) medical records that (1) establish ongoing treatment and/or the chronic nature of the claimed condition and (2) indicate the condition was considered by either the Class Member or the medical professional to be related to exposure.  (MSA § VI, Ex. 8.)

Class Members who receive compensation payments under Levels A2, A3, A4, and B1 may also qualify for additional payments based on overnight hospitalization, ranging from $8,000 to $10,000 per day, as well as reimbursement for Actual Hospital Expenses.  (MSA § VI, Ex. 8.)

The Specified Physical Condition program is an uncapped benefit for the Class, in that all qualifying claims will be paid.  (MSA § VI, Ex. 8.)  The amounts of compensation to be paid to qualifying Class Members under the Matrix are in line with jury verdicts involving similar injuries and thus reflect litigated outcomes of such claims.  (Decl. of John C. Coffee, Rec. Doc. 7113-2, ¶ 38.)

### 2. Periodic Medical Consultation Program

The Medical Settlement also provides for a Periodic Medical Consultation Program that is available to all Clean-Up Workers and Zone B Residents, as well as to those Zone A Residents who qualify for compensation for a Specified Physical Condition. (MSA § VII.) Under the Periodic Medical Consultation Program, Class Members are entitled to an initial medical consultation followed by additional visits every three years over the 21-year life of the program. (MSA § VII.B.)

The Claims Administrator will establish a network of medical services providers that will constitute the Periodic Medical Consultation Program, selected in part based on geographic proximity to Class Members and their ability to provide the consultation services offered by the Periodic Medical Consultation Program. The Claims Administrator will communicate annually with Class Members participating in the Periodic Medical Consultation Program, and will set up a call center and website to schedule appointments for medical consultation visits to ensure maximum participation. (MSA § VII.D.) The Claims Administrator will use its best efforts to ensure that all Class Members can obtain their periodic medical consultation within 25 miles of their homes. Under the Medical Settlement, Class Members are entitled to mileage reimbursement for visits more than 25 miles away from home. (MSA § VII.D.)

The Periodic Medical Consultation Program is not medical monitoring. (Herzstein Decl. ¶ 22.) The Periodic Medical Consultation Program instead provides access to general medical services without charge to participating Class Members. (MSA § VII, Ex. 12; Herzstein Decl. ¶¶ 21, 22.) The Periodic Medical Consultation Program is based on generally accepted medical practice. (Harbut Decl. ¶ 49.) According to the Parties' medical experts, establishing a physician-patient relationship with a primary care physician is a significant and tangible benefit for those Class Members, especially because some of them currently do not have

a physician and/or cannot afford primary medical services. (Harbut Decl. ¶ 48; Harbut Supp. Decl. ¶ 1; Herzstein Decl. ¶ 22.) The consultation visits also provide an opportunity for participating Class Members to discuss individual health concerns and to address behaviors and preventive measures to improve their health. (Herzstein Decl. ¶ 22.)

The Periodic Medical Consultation Program provides that physicians performing the examinations may use their discretion to order certain blood, urine, cardiac, and respiratory tests that can help in the identification and diagnosis of certain conditions. (MSA § VII, Ex. 12; Herzstein Decl. ¶ 21.) These tests provide a benefit to Class Members because (1) some of the tests can be used to obtain information regarding certain pre-existing medical conditions; (2) some of the tests can provide diagnostic information regarding disease in symptomatic individuals; and (3) some of the tests can detect medical conditions in asymptomatic individuals. (Herzstein Decl. ¶ 25.) Such conditions may include those that are associated with exposure to petroleum and petroleum-related products. (Harbut Decl. ¶ 46.)

Experts for the Class and BP have praised the Periodic Medical Consultation Program as providing "critically important" and "significant and tangible" benefits to Class Members. (*Id.* ¶ 50; Herzstein Decl. ¶ 22.) In addition, the Court-appointed Guardian *Ad Litem* for the Medical Settlement extolled the Periodic Medical Consultation Program as "unique" and "one of the outstanding features of the settlement." (Report of the Guardian *Ad Litem*, Rec. Doc. 7587 at 7.)

### 3. Gulf Region Health Outreach Program

Another component of the Medical Settlement is the Gulf Region Health Outreach Program, which is intended "to expand capacity for and access to high quality, sustainable community-based healthcare services, including primary care, behavioral and mental health care, and environmental medicine, in the Gulf Coast." (MSA § IX.A.) Under the Medical Settlement,

BP will provide $105 million over five years to a set of integrated projects designed to improve healthcare capacity and health literacy for Class Members and others in Gulf Coast communities. (MSA § IX.)  Over $20 million has already been distributed to the Outreach Program projects to enable them to begin their work.  (Decl. of Bernard D. Goldstein, Rec. Doc. 7113-3, ¶ 36.)  The ultimate goal of the Outreach Program is to enable Class Members, as well as other Gulf Coast residents, to be educated about their own health and to have access to skilled general healthcare providers and specialists to diagnose and treat their physical, behavioral, and mental health needs.  (*Id.* ¶ 34.)

The Gulf Region Health Outreach Program consists of four integrated projects that address the fact that many Gulf Coast residents lack ready access to effective physical and mental/behavioral health care:

a) The Primary Care Capacity Project will expand access to high quality, sustainable, community-based primary care by focusing on the development of Federally Qualified Health Centers ("FQHCs") with links to specialty mental and behavioral health care, as well as environmental and occupational health services.

b) The Mental and Behavioral Health Capacity Project will provide mental and behavioral health treatment in the short term.  In the longer term, it will provide supportive services to improve the overall well-being of Class Members and other individuals affected by the *Deepwater Horizon* Incident.

c) The Environmental Health Capacity and Literacy Project is designed to build environmental health capacity to deliver coordinated specialty care; integrate community health workers with training in environmental health issues into primary care clinics; and create an environmental health science curriculum in public schools and universities across the region to promote environmental health literacy.

d) The Community Health Workers Training Program will provide training for Community Health Workers on primary care capacity.  It will also assist Class Members and others in obtaining mental and behavioral health services and environmental health care, and expand traditional health capacity by actively engaging community residents as participants to strengthen community resilience, build social capital, and improve overall health literacy.

(MSA § IX.C; Goldstein Decl. ¶ 9.)

The Parties presented evidence that there is a significant shortage of clinicians at both the primary care and specialty levels, particularly in rural areas. High poverty and lack of private insurance coverage, especially among unemployed individuals and the working poor, make it difficult to attract and sustain high-quality health care in the area. There are also insufficient numbers of clinicians who participate in federally-funded health programs. (*Id.* ¶¶ 11, 12.)

Dr. Goldstein, Chair of the Coordinating Committee for the Outreach Program, has stated that the Outreach Program is designed to build a comprehensive, integrated and sustainable network of healthcare providers across the Gulf Region, with expertise in primary care, environmental health, and behavioral and mental health. The Gulf Region Health Outreach Program will complement existing efforts being undertaken by the public health community by bringing together local community leaders, health professionals, and residents to understand the health needs and existing capacities of coastal communities across the Gulf. (*Id.* ¶¶ 16-17.) Dr. Goldstein has further stated that by bringing a significant influx of resources and talent to help address many of the needs that have previously gone unmet, the Gulf Region Health Outreach Program is expected to have a rapid, positive impact, with benefits that will be felt not just for the next five years, but long thereafter. (*Id.* ¶¶ 33, 37.)

The Gulf Region Health Outreach Program includes the creation of a Gulf Region Health Outreach Program Library. (MSA § IX.H.) The Library is a publicly-accessible, text-searchable, indexed, online electronic resource containing documents regarding:

a) composition, quantity, fate, and transport (including the timing and quantity thereof) of oil and other substances released during the *Deepwater Horizon* Incident and dispersants and decontaminants used in Response Activities;

b) nature, content, and scope of Response Activities;

c) health risks or effects from exposure to substances released during the *Deepwater Horizon* Incident and any of the dispersants and decontaminants used

15

in Response Activities;

d) natural attenuation or decomposition of oil, dispersants, decontaminants, and other substances related to the *Deepwater Horizon* Incident and Response Activities;

e) nature, content, and scope of *in situ* burning performed during the Response Activities, including any health risks and effects associated with such *in situ* burning;

f) monitoring, sampling or testing for oil, dispersants, decontaminants, and other substances related to the *Deepwater Horizon* Incident and Response Activities;

g) occupational safety, worker protection, and preventative measures for Clean-Up Workers; and

h) health studies of persons exposed to oil and other substances released during the *Deepwater Horizon* Incident and dispersants and decontaminants used in Response Activities.

(MSA § IX.H.) The library was launched on November 6, 2012. (Supp. Decl. of Matthew Garretson, Rec. Doc. 7944-1, ¶ 5.) It currently contains approximately 100,000 documents. (*Id.*)

The Outreach Program is separately funded and does not in any way limit the amount of compensation that Class Members will receive under other parts of the Settlement. (MSA § XXII.D.)

### 4. Back-End Litigation Option for Later-Manifested Physical Conditions

The Medical Settlement also provides a mediation/litigation process for Class Members who seek compensation from BP in the future for a physical condition that is claimed to have manifested after April 16, 2012 and resulted from exposure to oil and/or dispersants due to the *Deepwater Horizon* Incident during the time frames set forth in the Settlement Agreement. (MSA § VIII.) Class Members diagnosed with a Later-Manifested Physical Condition have the option to seek compensation for that condition through the Back-End Litigation Option or, as applicable, pursuant to workers' compensation law or the Longshore and Harbor Workers' Compensation Act. (MSA § VIII.B.)

16

If a Class Member elects to proceed with the Back-End Litigation Option, the Class Member must notify BP within four years of either the first diagnosis of the condition or the Effective Date of the Settlement, whichever is later. (MSA § VIII.A.) BP then has the option to mediate the claim. (MSA § VIII.C.) If the mediation does not resolve the claim, or if BP decides not to mediate, then the Class Member has the right to file a Back-End Litigation Option Lawsuit in federal district court in the Eastern District of Louisiana. (MSA §§ VIII.C.2; VIII.F.) The Parties have stipulated that in a lawsuit brought under the Back-End Litigation Option, the Class Member need not prove and may not litigate at trial: (a) the fact of exposure of the Class Member to oil and/or dispersants during the *Deepwater Horizon* Incident or Response Activities; (b) the alleged fault of BP for the *Deepwater Horizon* Incident; and (c) the fact and/or existence of the Agreement to prove liability. (MSA § VIII.G.3.b.) BP has also agreed to forego defenses based on prescription, statute of limitations or repose, laches, and certain other defenses. (MSA § VIII.G.2.) As a result, the only issues to be litigated under the Back-End Litigation Option are: (a) the fact of diagnosis; (b) the amount, location, and timing of oil and/or dispersants released and/or used during the *Deepwater Horizon* Incident or Response Activities; (c) the level and duration of the Class Member's exposure; (d) causation, including potential alternative causes; and (e) the amount, if any, of compensatory damages. (MSA § VIII.G.3.a.) The Medical Settlement provides that Class Members may not seek or recover punitive damages against BP in a Back-End Litigation Option lawsuit. (MSA § VIII.G.2.)

### 5. Release

In exchange for the benefits that the Settlement provides to Class Members, the Settlement also provides for a comprehensive Release of specified physical and bodily injury claims against BP and other parties and entities involved in the *Deepwater Horizon* Incident.

(MSA § XVI.) Under these provisions, Class Members agree to release BP and other Released Parties for any liability for all Class Members' claims that were or could have been brought arising from the *Deepwater Horizon* Incident in connection with personal or bodily injury, progression or exacerbation of an injury, loss of support, services, consortium, companionship, society, or affection, increased risk, possibility, or fear of suffering in the future, and medical screening and monitoring. (MSA § XVI.A.)

Class Members do not release claims against BP for Later-Manifested Physical Conditions provided that they follow the procedures for asserting such claims established by the Settlement Agreement. (MSA § XVI.B.) The Release also excludes medical claims (i) arising from alleged exposure of a Class Member, in utero, to dispersants and/or decontaminants used in connection with Response Activities, and (ii) for non-exposure-based physical or bodily trauma injury (other than a heat-related injury) related to the *Deepwater Horizon* Incident. (MSA § XVI.G.)

Released Parties include other defendants in the *Deepwater Horizon* litigation except Transocean and Halliburton. (MSA § II.MMMM.) Under the Settlement, Class Members agree not to accept or attempt to recover any compensatory damages from Transocean and Halliburton, but they do preserve their ability to seek and recover punitive damages from those parties. (MSA § XVII.B.)

### 6.     Notice and Administration Expenses

BP has agreed to pay not only the cost of notice to Class Members, but also all costs of the Settlement administration, which may reasonably be expected to be substantial. (*See* MSA §§ II.QQQQ, XXII.A.) This is a significant benefit to Class Members that does not reduce any other compensation or benefits provided.

### 7. Guarantees

Settlement payments are guaranteed by two guarantors beyond defendants BP Exploration & Production Inc. and BP America Production Company. These guarantors are BP Corporation North America Inc. and BP p.l.c. (the latter for five years after the Effective Date). (*See* MSA §§ XXII.A.1, XXII.A.2.)

### 8. Attorneys' Fees and Costs

The Medical Benefits Class Counsel attorneys' fees, expenses, and costs were not negotiated by counsel for the Parties until April 17, 2012—after full agreement was reached as to all other terms of the Medical Settlement and only after the Court had given its approval for attorney fee negotiations to go forward. (MSA § XIX, Ex. 19, ¶ 1.) Under the Medical Settlement Agreement, BP has agreed not to contest a request by Class Counsel for an award, in an amount to be set at a future time by the Court not to exceed $600 million, for Class Counsel's fees, costs, and expenses in connection with this Settlement and the Economic and Property Damages Settlement. (MSA § XIX, Ex. 19, ¶¶ 3, 4.) Class Counsel will file a fee petition that class members will be free to contest under Rule 23(h). Any common benefit Class Counsel fees and costs awarded by the Court will not be deducted from Class Members' recoveries, but will be paid by BP in addition to other class benefits.

## III. Implementation of the Medical Settlement to Date

### A. Implementation of Class Notice Program

Following the Court's Preliminary Approval of the Medical Benefits Settlement, Hilsoft Notifications—the Court-appointed Medical Benefits Settlement Class Notice Agent—began implementing the Notice Plan as ordered by the Court. (Decl. of Cameron Azari, Rec. Doc. 7113-1, ¶¶ 5, 6.) Implementation of the Notice Plan included dissemination of individual notice

to known potential Settlement Class Members via postal mail and email, an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, highly-trafficked websites, and Sunday local newspapers (via newspaper supplements). (*Id.* ¶ 8.) Notice placements also appeared in non-measured[7] trade, business, and specialty publications; African-American, Vietnamese, and Spanish-language publications; and Cajun radio programming. (*Id.*) The Notice Program included creation of a neutral, informational notice website (www.DeepwaterHorizonSettlements.com) to serve as the notice page for the Medical Settlement as well as the separate Economic and Property Damages Settlement, and where Class Members could obtain additional information and documents. (*Id.* ¶ 67.) The informational website was rendered in English, Spanish, and Vietnamese. The website was updated several times to reflect ongoing proceedings and Orders issued by the Court. (*Id.* ¶ 67; Supp. Decl. of Cameron Azari, Rec. Doc. 7730-1, ¶ 10.) As implemented, the Notice Program reached an estimated 95% of adults aged 18+ in the Gulf Coast Areas an average of 10.3 times each and an estimated 83% of all U.S. adults an average of 4.0 times each. (Azari Decl. ¶ 84; Azari Supp. Decl. ¶ 6.)

The Notice Program was substantially completed on July 15, 2012, allowing Class Members adequate time to make decisions before the opt-out and objections deadlines. (*See* Azari Decl. ¶¶ 14, 78.)

### B. Initial Funding of Projects for the Gulf Region Health Outreach Program

As of August 30, 2012, initial distributions totaling over $20 million have been made to the four projects of the Gulf Region Health Outreach Program. Even before final approval of the

---

[7] "Non-measured" refers to those forms of media that are not tracked to ascertain reach and frequency numbers. (*See* Azari Decl. ¶¶ 8, 11.) The enhancements to the reach and frequency numbers from these additional sources of media are either incalculable or are qualitative, not quantitative. (*Id.* at 11.)

Settlement, project leaders identified in the Medical Settlement Agreement have been implementing their projects according to the Settlement's terms. (Goldstein Decl. ¶ 36; Supp. Decl. of Bernard D. Goldstein, Rec. Doc. 7730-4, ¶ 5.)

Specifically, as of August 30, 2012, more than $10 million has been distributed to fund the Primary Care Capacity Project, with additional annual distributions planned over the next four years to bring total funding to $50 million. (Goldstein Decl. ¶ 36(a)(1).) Community health needs assessments are taking place for the 17 parishes and counties covered by the Primary Care Capacity Project to consider the adequacy of existing healthcare options and help select primary care providers in the community to receive grants and other assistance to provide higher quality health care to Class Members and other members of the community. (*Id.* ¶ 36(a)(2); Goldstein Supp. Decl. ¶4(b).) More than $6 million of a total of $36 million was distributed to fund the Mental and Behavioral Health Capacity Project in Alabama, Florida, Louisiana, and Mississippi. (Goldstein Decl. ¶ 36(b)(1); Goldstein Supp. Decl. ¶ 4(a).) Each of the state-based mental and behavioral health projects has begun to hire staff and implement its planned activities to provide immediate mental health services, including through the use of telemedicine. (Goldstein Decl. ¶ 36(b)(2); Goldstein Supp. Decl. ¶ 4(a).) Over $3 million of a slated $15 million has been distributed to fund the Gulf Region Health Outreach Program's Environmental Health Capacity and Literacy Project. (Goldstein Decl. ¶ 36(c)(1).) The Environmental Health Capacity and Literacy Project has begun to work with the Association of Environmental and Occupational Health Clinics to make a network of environmental health specialists available for consultation and referrals in the Gulf Region. (Goldstein Decl. ¶ 36(c)(2); Goldstein Supp. Decl. ¶ 4(c).) Over $1.5 million out of a total of nearly $4 million has been distributed to fund the Community Health Workers Training Program,

designed to provide high quality educational programs, disaster-related research expertise, and instructional services to community health workers. (Goldstein Decl. ¶ 36(d).)

The Claims Administrator has implemented the publicly-accessible, text-searchable, indexed, online electronic Gulf Region Health Outreach Program Library by obtaining and posting relevant Library Materials. This on-line Library, available at http://www.gulfregionhealthoutreach.com, was launched on November 6, 2012. (Garretson Supp. Decl. ¶ 5.)

### C.      Implementation of the Settlement

The Claims Administrator has successfully performed its duties to prepare for the Effective Date of the Settlement and processing of Specified Physical Condition claims, including, in relevant part: (1) employing trained and dedicated call and intake staff as well as claims processing professionals; (2) creating and launching the Medical Settlement web portal; (3) launching its claims service center in New Orleans; (4) implementing the mapping tool for zone determinations; (5) creating and staffing a call center that has been processing inquiries; (6) developing claims review and processing procedures; (7) creating a searchable data repository to assist in verification of Class Member status and responding to data disclosure requests; and (8) addressing Medicare Secondary Payer Compliance. (Aug. 13, 2012 Status Update from the Deepwater Horizon Medical Benefits Settlement Claims Administrator, Rec. Doc. 7105-1, at 3-4; Oct. 22 Garretson Status Report, Rec. Doc. 7729-1, at 2-3, 8, 11-15.) In addition, Class Counsel have established a physical office in New Orleans, with a toll-free number, website, and settlement questions e-mail address to provide additional guidance and assistance to class members. They have undertaken to provide ongoing assistance to claimants in answering questions about the claims process, providing advanced counsel, and advocating for

clients interests on an ongoing basis with the claims administrator.

## IV.     Evidence Regarding Spill Response, Exposure, and Potential Health Risks

The Parties consulted with medical and scientific experts concerning data relating to oil and dispersants; the potential health effects of possible exposure to these substances; the claims asserted by Clean-Up Workers, Residents, and others; the benefits provided under the Settlement; and the structure for providing those benefits.  (Decl. of Michael R. Harbut, Rec. Doc. 7116-1 ¶ 16; Greenwald Decl. ¶¶ 4-5; Decl. of Stephen J. Herman, Rec. Doc. 7116-2 at 89, ¶ 6; Order, Rec. Doc. 6419 at 4.)

BP submitted evidence that it organized and carried out Response Activities in accordance with the Incident Command System, as established by the National Contingency Plan ("NCP").  (Decl. of David R. Dutton, Rec. Doc. 7112-2, ¶ 8.)  The NCP, codified at 40 C.F.R. pt. 300, is the federal government's blueprint for responding to oil spills.  It requires oil spill responses to be organized pursuant to a Unified Area Command (sometimes referred to as "UAC") structure that brings together federal and state governments and the responsible party to achieve an effective and efficient response.  Under the NCP, the Federal On-Scene Coordinator ("FOSC") maintains authority and directs response efforts.  40 C.F.R. §§ 300.105(d), 300.120(a).  In the *Deepwater Horizon* response, the UAC consisted of the U.S. Coast Guard, the U.S. Environmental Protection Agency ("EPA"), the National Oceanic and Atmospheric Administration ("NOAA"), and other government agencies, and BP as a responsible party.  (Dutton Decl. ¶ 8.)  The UAC was divided into a number of functional groups. The Safety and Industrial Hygiene groups were responsible for developing protocols related to worker safety and health, addressing issues such as exposure assessment, safe work practices, personal protective equipment, and worker training.  (*Id*. ¶¶ 9, 10.)  Plaintiffs dispute BP's

assertion that Response Activities adhered to the blueprint set forth in the NCP.

*Dispersant Use.* One aspect of the Response was the use of dispersants to break down the oil into smaller droplets, which is intended to increase the surface area of the mass and disperse oil into the water column (as opposed to allowing it to remain on the surface), increasing the oil's susceptibility to biodegradation. (*Id.* ¶ 22; *see also* Master Complaint, Docket 12-968, Rec. Doc. 1, ¶ 46.) Two types of dispersants were used during the Response: Corexit® EC9500A ("Corexit 9500A") and Corexit® EC9527A ("Corexit 9527A"). Both were and still are on the NCP Product Schedule, which is a list of dispersants pre-approved by the EPA for use in oil spill response efforts. (Dutton Decl. ¶ 24.) BP presented evidence that both BP and EPA investigated the toxicity, effectiveness, and availability of dispersants approved for use by EPA on the NCP Product Schedule, and that such testing showed that the Corexit products are as safe as other available alternatives and are more effective at dispersing oil. (*Id.* ¶ 25.) Plaintiffs dispute these assertions.

BP has provided evidence that dispersants were applied using three methods: aerial, vessel, and subsea. Over the course of the Response Activities, approximately 970,000 gallons of dispersant were applied by aerial application to surface oil slicks, approximately 95,000 gallons of dispersant were applied by vessel application, and approximately 770,000 gallons of dispersant were applied by subsea application methods. (Dutton Decl. ¶¶ 26, 29, 31.) Dr. Dutton, a BP employee who was the Industrial Hygiene Team Lead for the Unified Area Command, has stated that aerial dispersant operations were conducted from April 22, 2010 to July 19, 2010. Dr. Dutton further stated that dispersants were applied by vessel, primarily near the source-control area (*i.e.*, within five miles of the MC252 Well) in order to control the airborne level of volatile organic chemicals ("VOCs") directly above the wellhead for the

protection of Response workers. Dispersants were also applied subsea directly at the wellhead. (*Id.* ¶¶ 26, 28, 29, 31.) BP submitted evidence that aerial dispersant operations were not conducted at night during the *Deepwater Horizon* Response because (1) as a practical matter, it would not have been feasible to do so given safety concerns related to flying close to the ocean surface at night and the need to locate dispersible oil slicks; and (2) federal guidelines specifically require that aerial dispersant operations be conducted during daylight hours only. (Suppl. Decl. of David R. Dutton, Rec. Doc. 7732-3, ¶ 36.) Plaintiffs dispute these facts.

Chemical dispersants, including Corexit 9500 and Corexit 9527A, are derived from petroleum and, as such, contain petroleum distillates. Class Counsel presented evidence that the effects on human health resulting from exposure to petroleum discharged during the *Deepwater Horizon* Incident (*i.e.*, crude oil) and petroleum distillates (*i.e.*, the dispersants used to remediate the oil) are often similar if not identical because the chemicals they contain are substantially the same. Both the oil and the dispersants used during the Response Activities are petroleum-derived, and Class Counsel presented evidence that their biological reactivity would be expected to be largely the same. (Harbut Decl. ¶¶ 20-24; Suppl. Decl. of Michael R. Harbut, Rec. Doc. 7728-3, ¶ 7.)

BP presented evidence that the Unified Area Command implemented a number of safety controls intended to limit exposure of Clean-Up Workers and Gulf Coast Residents to aerial dispersants. For example, BP contends that safety setbacks were implemented so that dispersant was not to be sprayed (i) within two nautical miles of any platform, rig, or vessel; (ii) within five nautical miles of controlled-burning activities; (iii) within five nautical miles of the source-control area; or (iv) within three nautical miles of the shore. (Dutton Decl. ¶ 27.) BP's Dr. Dutton has testified that aerial dispersants were applied greater than three nautical miles

offshore (with one exception in an emergency)[8] and 98% of aerial dispersant applications were applied greater than ten nautical miles offshore.  (*Id.* ¶ 28.)

***Response Worker Safety and Training.***  BP presented evidence that it, in coordination with the Unified Area Command and with daily input, oversight, and approval by the U.S. Occupational Safety and Health Administration ("OSHA"), developed and instituted task-specific response-worker training.  Dr. Dutton stated that this training was designed to educate Response workers concerning potential hazards and risks, functions to be performed, and relevant operating procedures.  (Dutton Decl. ¶¶ 47-54.)  BP also presented evidence that it, in conjunction with and with approval from the UAC and OSHA, developed Personal Protective Equipment ("PPE") requirements for all Response workers—typically, protective clothing, disposable gloves, protective boots, and life jackets.  (*Id.* ¶¶ 55-57; *see also* On Scene Coordinator Report *Deepwater Horizon* Oil Spill (September 2011) at ix.)  Plaintiffs dispute that such requirements were routinely followed.

The Response operations plan required BP to implement a medical program that provided emergency and first aid treatment, including access to emergency medical technicians or paramedics, at numerous locations.  (*Id.* ¶¶ 66-67.)  The UAC Safety and Industrial Hygiene groups analyzed reports of work-related illnesses and injuries to identify trends so that corrective actions and improvements could be instituted.  *(Id.* ¶ 66.)

Plaintiffs dispute BP's evidence and these issues would likely be subject to extensive litigation.  (*See*, *e.g.*, Decl. of John Lide, Rec. Doc. 6696-24, ¶ 4; Decl. of Brandon Scott, Rec.

---

[8] According to BP, the one aerial dispersant application that occurred fewer than 3 nautical miles offshore involved an emergency incident (airplane engine failure) on April 29, 2010.  Plaintiffs have contested this fact.  (*See* Decl. of Hawkins-Lodge, Rec. Doc. 6696-21, ¶¶ 5-7; Decl. of Warren Jones, Rec. Doc. 6696-23, ¶ 4; Decl. of Terry Joe Carter, Rec. Doc. 6696-18, ¶ 4.)  Approximately 1,000 gallons of Corexit 9500A were released into the western portion of Barataria Bay/Caminada Bay.  Analysis of the samples taken by BP on June 18, 2010 indicated that the dispersant was not present.  (Dutton Decl.¶ 28 n.3.)  Plaintiffs have also submitted evidence that, contrary to the safety controls established by the Unified Area Command, aerial dispersant application occurred within three nautical miles of controlled-burning activities.  (*See*, *e.g.*, Anderson Aff., Rec. Doc. 6696-15, ¶ 2.)

Doc. 6696-26, ¶ 4; *see also* Decl. of Terrence Carroll, Rec. Doc. 6696-17, ¶ 3; Decl. of Roy Mackie, Rec. Doc. 6696-25, ¶ 4; Decl. of Victor Carias, Rec. Doc. 6696-16, ¶¶ 4-5.)

Plaintiffs allege in the Medical Class Action Complaint that "Clean-Up Workers were exposed to oil and dispersants and other harmful chemicals by, *inter alia*, inhalation, ingestion, dermal exposure and through contact with the eyes from spray mist." (Rec. Doc. 6250, ¶ 71.) They also allege that "Residents of Zones A and B . . . due to the proximity of their homes to the Gulf of Mexico . . . have been exposed to oil, dispersants, and other harmful chemicals and to fumes and odors from those chemicals." (*Id.* ¶ 73.) Zone A includes specified Gulf Coast beachfront areas, and Zone B includes specified Gulf Coast wetlands. They are defined in Exhibits 9, 10, and 11 to the Medical Settlement. (Rec. Doc. 6427-11; 6427-12.) Zones A and B were drawn with reference to the Shoreline Cleanup Assessment Technique ("SCAT"), a process that involves systematically segmenting the shoreline into discrete parts, visually evaluating the presence and extent of oiling in each defined segment over time through repeat surveys, evaluating the potential for re-oiling, and recommending appropriate treatment procedures based on the level and type of oiling and the characteristics of the shoreline. (Decl. of Elliot Taylor, Rec. Doc. 7114-20, ¶ 13.) The SCAT process is the international standard for assessing visually observable shoreline oiling to determine the need for operational response and treatment, and it has been extensively and widely adopted by the National Oceanic and Atmospheric Administration, Environment Canada, the U.S. Coast Guard, and the Environmental Protection Agency, among others. (*Id.* ¶ 13; Supp. Decl. of Elliot Taylor, Rec. Doc. 7731-11, ¶ 10.)

BP presented evidence that Zone A and Zone B are appropriately defined with reference to the SCAT Line, which is the collection of segments inspected by SCAT teams from the inception of the spill to the present. (Taylor Supp. Decl. ¶ 38.) "The east and west boundaries of

Zone A and Zone B include the furthest points on the SCAT Line where MC252 oil was observed by SCAT teams." (*Id*.)

Class Counsel presented evidence that, given the nature of Clean-Up Workers' responsibilities, they could have been exposed to petroleum and/or petroleum-based products either through direct dermal contact or via inhalation of airborne chemicals. (*See* Harbut Decl. ¶¶ 18, 41-42.) Class Counsel also presented evidence that during the course of the Response Activities, coastal populations living within one-half mile of the shoreline in Louisiana, Alabama, Mississippi, and certain coastal parts of the Florida Panhandle—defined as Zone A in the Medical Settlement—could suffer exposure to oil and/or petroleum-based dispersant merely by virtue of their residence and its proximity to the shore. (*See id.* ¶ 39.) Class Counsel's expert, Dr. Michael Harbut, has stated that Zone A Residents who suffered such exposures were likely to do so either through direct dermal contact or via inhalation of airborne chemicals. (*See id.* ¶ 18.) According to Dr. Harbut, individuals living further than one-half mile from the shoreline would not be expected to suffer exposures merely by virtue of their residency because concentrations of toxins diminish as distance from the shoreline increases. (*See id.* ¶ 39.) Counsel for the Parties have informed the Court that they estimate approximately 100,000 individuals resided in Zone A as of April 20, 2010. (Rec. Doc. 6419 at 16; Rec. Doc. 6272-1 at 11 (relying on 2010 U.S. census data).)

Class Counsel presented evidence that during the course of the Response Activities, and through December 31, 2010, individuals living within designated Louisiana wetlands areas that are within one mile of the shoreline—defined as Zone B in the Medical Settlement—could suffer exposure to oil and/or petroleum-based dispersant merely by virtue of their residence and its proximity to the shore. (*See* Harbut Decl. ¶ 40.) Dr. Harbut has stated that Zone B Residents

who suffered such exposures were likely to do so either through direct dermal contact or via inhalation of airborne chemicals, and that Zone B Residents may have suffered exposures for a lengthier duration than Zone A Residents because oil that entered the marshland areas was difficult to remove and some oil was left to naturally attenuate. (*See id.* ¶ 18.) Dr. Harbut has further stated that individuals residing in Louisiana marshland areas further than one mile from the shore would not be expected to suffer exposures merely by virtue of their residency because concentrations of toxins diminish as distance from the shore increases. (*See id.* ¶ 40.) Counsel for the Parties have informed the Court that they estimate approximately 5,000 individuals resided in Zone B as of April 20, 2010. (Rec. Doc. 6419 at 16; Rec. Doc. 6272-1 at 11 (relying on 2010 U.S. census data).)

Class Counsel presented evidence that exposure at sufficient levels to oil and petroleum-based products (such as the dispersants used during the *Deepwater Horizon* Incident) can cause adverse health effects. These effects are reflected in the Specified Physical Conditions Matrix ("Matrix") set forth in Exhibit 8 of the Medical Settlement Agreement. Short-term exposure to petroleum and/or petroleum distillates may cause Specified Physical Conditions that are acute and/or chronic in duration. As described more fully in the Matrix, the acute Specified Physical Conditions most likely to arise from petroleum exposure from the *Deepwater Horizon* Incident include the following types of conditions: (1) ocular; (2) upper airway and respiratory; (3) otolaryngological; (4) dermal; and (5) neurophysiological, neurological, and odor-related. The chronic Specified Physical Conditions most likely to arise from petroleum exposure from the *Deepwater Horizon* Incident include the following conditions: (1) ocular damage; (2) chronic rhinosinusitis; (3) Reactive Airways Dysfunction Syndrome ("RADS"); (4) chronic contact dermatitis; and (5) chronic eczematous reaction. (*See* Harbut Decl. ¶¶ 25-38.)

BP submitted evidence that the conditions listed on the Matrix are those "for which there is a medical basis to conclude that contact with oil and/or dispersants caused those conditions if there were exposure to sufficient amounts of such substances for a sufficient duration of time." (Decl. of Jessica Herzstein, Rec. Doc. 7112-7, ¶ 14.) Class Counsel presented evidence that Clean-Up Workers and Residents of Zones A and B who suffered one of the conditions set forth in the Matrix likely did so because of their exposure to petroleum and/or petroleum distillates, provided that these individuals manifested the particular Specified Physical Condition within the time frames on the Matrix. Dr. Harbut has stated that those time frames are appropriate, have a scientific basis, and support a finding that the condition is likely the result of exposure to oil and/or dispersants and not from some other cause. (*See* Harbut Decl. ¶¶ 19, 25-38; Harbut Supp. Decl. ¶ 8.) BP likewise presented evidence that the "timeframes between contact with oil and/or dispersants and first manifestation of a Specified Physical Condition are appropriate and have a sound medical basis. Adverse health effects caused by contact with oil and/or dispersants or exposure to heat would manifest within the timeframes set forth on the Matrix, if not sooner." (Supp. Decl. of Jessica Herzstein, Rec. Doc. 7732-1, ¶ 6; *see also* Herzstein Decl. ¶ 20.)

BP's Medical Encounters Database provides further support for the types of conditions included on the Matrix. The Medical Encounters Database reflects the symptoms contemporaneously reported by Clean-Up Workers who became ill during Response Activities and sought treatment at on-site medic stations set up by BP. The database includes entries for approximately 20,000 visits made to these medic stations by approximately 13,000 individuals. The database indicates that approximately 70% of these individuals reported conditions that are reflected in the Matrix. The conditions and symptoms reported by the remaining 30% of the approximately 13,000 individuals consist of trauma, musculoskeletal problems, routine care, and

other events generally unrelated to exposure to oil and/or dispersants and/or heat. (*See* Herzstein Decl. ¶ 16.)

Through its experts, BP presented evidence concerning the environmental and occupational exposure data related to the *Deepwater Horizon* Incident. BP expert Dr. Peter Lees has stated that the data collection, which was guided by sampling plans jointly conceived by the members of the Unified Area Command, is sufficient to allow an expert to assess any significant adverse health effects that might result from the *Deepwater Horizon* Incident and to draw conclusions regarding any potentially harmful exposures. (Decl. of Peter S.J. Lees, Rec. Doc. 7112-3, ¶ 12.)

BP has presented evidence that, throughout the Response, the federal government, including the National Institute for Occupational Safety and Health ("NIOSH"), EPA, and OSHA, as well as BP and others, conducted extensive monitoring and sampling of air to measure for the components of oil and dispersants. (Lees Decl. ¶¶ 19-26.) Dr. Lees points out that numerous government studies of the exposure data collected in connection with the *Deepwater Horizon* Incident have concluded that the oil spill and Response posed a low health risk to Clean-Up Workers and Gulf Coast Residents.[9] BP submitted evidence that air monitoring and other data show that Clean-Up Workers and Residents were not typically exposed to airborne concentrations of the components of oil and/or dispersants at levels that would be expected to result in significant or widespread health effects. (Lees Decl. ¶¶ 45-46; *see also* Decl. of Robert Cox, Rec. Doc. 7112-4, ¶ 92; Decl. of Laura C. Green, Rec. Doc. 7112-5, ¶ 5.) For example, BP points to the EPA monitoring for the two chemicals found in Corexit dispersants that had the highest potential to get into the air in any significant amounts, EGBE (2-

---

[9] http://www.bt.cdc.gov/gulfoilspill2010/2010gulfoilspill/health_surveillance.asp.

butoxyethanol) and dipropylene glycol monobutyl ether, and EPA's statement that "the levels found were well below those that are likely to cause health effects, and suggest that the use of dispersants on the oil spill would not have a significant impact on air quality on land."[10] Likewise, BP has submitted expert declarations and other evidence that (i) support EPA's conclusion regarding exposure to components of dispersants, and (ii) indicate that exposure to airborne concentrations of potentially toxic components of crude oil were low and unlikely to cause significant adverse health effects. (*See* Lees Decl. ¶ 13; Cox Decl. ¶¶ 11, 62-64; Green Decl. ¶¶ 5, 19.) BP pointed to the fact that the spill occurred almost one mile beneath the ocean surface and 50 miles offshore as reasons why exposure levels to potentially toxic components of crude oil were low. (Cox Decl. ¶¶ 45-47.)

Further, BP presented evidence that onshore Gulf Coast Residents would have had neither dermal exposure to fresh crude oil nor any significant dermal exposure to the Corexit dispersants used during the Response. (*Id.* ¶¶ 76, 81.) BP contends that residents would have come into contact only with weathered oil, which according to BP's experts, was substantially depleted of toxic components. (*Id.* ¶ 80.) In this regard, BP's experts relied on, among other things, reports issued by the Operational Science Advisory Team.[11] With respect to dispersants, BP's experts stated that because the dispersants biodegraded and were significantly diluted after they were applied to oil slicks on the water surface, any components of the Corexit dispersants that did reach shore would have done so at levels too low to have a meaningful impact on human

---

10 EPA website (http://www.epa.gov/bpspill/taga.html#dispdata).

[11] The Operational Science Advisory Team ("OSAT") was formed by the Unified Area Command as an interagency team to assess real-time data collected as part of the *Deepwater Horizon* Response, to identify sampling gaps as part of an adaptive sampling strategy, and to conduct a risk-based Net Environmental Benefits Analysis associated with removing remnant oil from the near shore, surf zone, and shoreline sandy beach areas. OSAT was composed of members from the U.S. Coast Guard, NOAA, the U.S. Geologic Survey, the Bureau of Ocean Energy Management, Regulation and Enforcement, EPA, and BP. OSAT provided its findings and recommendations to the Federal On-Scene Coordinator of the U.S. Coast Guard in two summary reports: Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring ("OSAT-1") (Dec. 17, 2010); and Summary Report for Fate and Effects of Remnant Oil in the Beach Environment ("OSAT-2") (Feb. 10, 2011).

health.  (*Id.* ¶ 82.)

BP also presented evidence that Clean-Up workers located directly above the MC252 Well were typically not exposed to "fresh" crude oil, as the released oil traveled through approximately one mile of water before reaching the ocean surface, during which time it was significantly "scrubbed" of a number of the more water-soluble, volatile components.  (*Id.* ¶¶ 85-86.)

Plaintiffs contend that the health impacts of the oil spill are not insignificant, as evidenced by the number of clean-up workers who reported illness during their shifts and the number of short form joinders and complaints seeking damages for personal injuries filed alleging health effects from exposure to oil and/or dispersants.

## V. The Settlement Class May Be Certified for Purposes of Settlement Pursuant to Rules 23(a) and 23(b)(3)

Settlement classes are a typical feature of modern class litigation, and courts routinely certify them, under the guidance of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), to facilitate the voluntary resolution of legal disputes.  *See, e.g.*, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 09-6828, 2012 WL 92498, at *8-11 (E.D. La. Jan. 10, 2012); *Stott v. Cap. Fin. Servs.*, 277 F.R.D. 316, 324-26 (N.D. Tex. 2011); *Billetteri v. Secs. Am., Inc.*, No. 09-1568, 2011 WL 3586217, at *4-9 (N.D. Tex. Aug. 4, 2011); *In re OCA, Inc. Secs. & Deriv. Litig.*, No. 05-2165, 2008 WL 4681369, at *7-10 (E.D. La. Oct. 17, 2008); *see also* MANUAL FOR COMPLEX LITIGATION § 21.612 (4th ed. 2004) ("Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits.").  The party seeking certification bears the burden to demonstrate that the requirements of Rule 23 have been satisfied.  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003).  Plaintiffs thus bear

the burden of proof in this proceeding. For the reasons provided in detail below, the Medical Class may be certified pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). [12]

## A. The Medical Class Meets Rule 23(a)'s Requirements

Compliance with Rule 23(a) necessitates a showing that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition to the four explicit prerequisites of Rule 23(a), courts have read an "implied requirement of ascertainability" into Rule 23(a). *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 376 (S.D.N.Y. 2010) (internal quotation marks omitted). In the December 21, 2012 Order and Reasons approving the Economic and Property Damages Settlement, the Court further described the legal standards relating to Rule 23(a). (Rec. Doc. 8138 at 19-22; *see also id.* at 24-37). Rather than repeat that discussion, it is incorporated here by reference.

## 1. The Medical Class Satisfies the Ascertainability Requirement

The Medical Class is limited to individuals who suffered past exposure to oil and/or dispersants during a well-defined, finite time period. Inclusion in the Medical Class is based upon objective criteria, including participation in Response Activities, residency in objectively-defined geographic areas, and the manifestation of clearly-identified Specified Physical

---

[12] The Parties have tendered either jointly or on their own behalf four experts in the law of class actions: Dean Klonoff and Professors Coffee, Issacharoff, and Miller. The Court cites to, or in some instances, quotes from the opinions of these notable scholars at various points in the analysis below of class certification issues. However, the Court underscores that at all times it has exercised its independent legal judgment on each and every class certification issue. The Court cites to the declarations of these scholars where they encapsulate or restate the governing legal rules embodied in the text of Rule 23 and/or in the case law of the federal courts. Since these scholars have criticized abusive class actions, however, it remains significant that all four of them, from their various perspectives, support this Settlement in positive terms and believe that it is readily certifiable.

Conditions.  Each of these criteria is meticulously defined in the Medical Settlement.  (*See* Coffee Decl. ¶¶ 10, 52-53; Decl. of Robert H. Klonoff, Rec. Doc. 7116-2, ¶¶ 18-22; Miller Decl. ¶ 15.)  The Medical Class is adequately defined and clearly ascertainable.

The Attorney General of Louisiana ("Attorney General") purports to object to the ascertainability of the Medical Class, arguing that class membership requires a Zone A Resident to show that he or she developed a Specified Physical Condition between April 20, 2010 and September 30, 2010.  Thus, argues the Attorney General, class membership turns on a causal inquiry and, as such, improperly compels an individual to "prove his case to qualify as a Zone A class member."  (Docket 10-7777, Rec. Doc. 228 at 9.)  The Attorney General is incorrect. Because each Specified Physical Condition is clearly defined, no causal inquiry is necessary. Rather, to meet the relevant criteria, a Class Member need only show the fact that he or she suffered from one of the defined conditions.  In other words, the manifestation of a Specified Physical Condition is an objective benchmark requiring no causal determination.  (*See* Klonoff Decl. ¶ 20 (explaining that "the class definition is objective and precise and does not turn on the merits"); *see also Union Asset Mgmt. Holding v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012) (approving definition that included those who purchased common stock and were "damaged thereby"; "this language is routine in class definitions").)  The objection is overruled.

The Court confirms its preliminary conclusion that the ascertainability requirement is satisfied.  (*See* Rec. Doc. 6419 at 16.)

### 2.   The Medical Class Meets the Numerosity Requirement of Rule 23(a)(1)

The Medical Class includes approximately 90,000 Clean-Up Workers and nearly 5,000 Zone B Residents.  Approximately 100,000 individuals reside in Zone A.  In addition, over 17,000 persons have filed short form joinders in MDL No. 2179 asserting a claim for personal or

bodily injury as a result of the *Deepwater Horizon* Incident, and more than 4,546 persons have filed claims with the Claims Administrator. (Garretson Supp. Decl. ¶ 4.) The Medical Class is reasonably estimated to consist of as many as 200,000 Class Members. *See In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564 (E.D. Tex. 2005) ("The numerosity prong is satisfied if plaintiffs demonstrate some evidence of a reasonable numerical estimate of purported class members."), *aff'd* 429 F.3d 125 (5th Cir. 2005). Joinder of all members of the Medical Class is impracticable. The Court confirms its preliminary conclusion that the numerosity requirement is satisfied. (*See* Rec. Doc. 6419 at 16-17.)

### 3. The Medical Class Meets the Commonality Requirement of Rule 23(a)(2)

In this case, there are numerous common questions of both law and fact, and it is for this reason that this action was centralized in this District by the Judicial Panel on Multidistrict Litigation. *Cf. In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 09-6828, 2012 WL 92498, at *9 (E.D. La. Jan. 10, 2012) ("Movants argue that commonality is also easily satisfied because the Judicial Panel on Multidistrict Litigation ordered the subject cases to be consolidated in the MDL based upon commonality of facts, and the factual and legal issues arising from KPT Chinese drywall are common to all claimants. The Court agrees . . . .").

Common questions of fact exist because the *Deepwater Horizon* Incident was the single common event giving rise to the claims of each of the Class Members. These common fact questions are numerous: for example, shared among the Medical Class are factual queries such as what, if anything, BP could have done to prevent the blowout; whether BP could have stopped the flow of oil sooner than it did; or whether BP should have used different dispersant

chemicals.[13]

All legal questions arise and would be determined essentially under a common legal framework of general federal maritime law (a species of federal common law). Accordingly, the applicable law unites the Class. This is not an *Amchem* scenario, in which the class is fragmented by a multiplicity of state laws that control the viability of claims. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). Common questions of law exist because each Class Member must resolve whether BP was legally liable under general maritime law for the April 20, 2010 explosion and its aftermath. Medical Class Members are "[e]ssentially asserting a negligence cause of action, which places [BP's] course of conduct at center stage." (*See* Coffee Decl. ¶ 61.) Indeed, because BP was named a "responsible party" under OPA, its alleged negligence for the blowout underpins the entirety of its post-explosion conduct, including its application of dispersant chemicals. *See, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 604 (E.D. La. 2006) (finding common negligent conduct where some plaintiffs in personal injury class were injured during initial oil spill and others were injured during post-spill remediation process). BP's liability for the spill will thus drive the resolution of each Class Member's case. (*See* Coffee Decl. ¶ 61 (stating that "[e]stablishing the negligence of the BP Parties on the theories advanced . . . does significantly advance each individual case.")); *see also Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992), *on reh'g*, 53 F.3d 663 (5th Cir. 1994) (finding common questions arising from an oil refinery explosion that injured more than 18,000

---

[13] According to Professor Coffee, questions of fact that are common to the Class include: "(1) BP's decision to use a long string design, rather than a liner tieback; (2) whether BP properly converted the float collar; (3) whether BP should have used more centralizers; (4) whether BP should have run a full 'bottoms-up' circulation; (5) whether BP should have run a cement bond log; (6) whether BP should have developed the casing hangar lockdown sleeve before displacement; (7) whether BP used 'unusual' spacer during displacement; (8) whether BP negligently misinterpreted the failed negative pressure tests; (9) the propriety and soundness of BP's decisions, along with Unified Command, concerning use of dispersants, boom, and other containment options in response to the oil spill; and (10) whether BP failed to ensure adequate procedures and safeguards for Clean-Up Workers who participated in oil spill remediation and Zones A and B residents." (Coffee Decl. ¶ 61.)

plaintiffs); *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004) (affirming certification of a class of 3,600 individuals whose property was damaged by toxic pollutants caused by a single defendant)). In sum, as Professor Coffee explained, "[t]his class has many common characteristics and few, if any, dissimilar ones." (*See* Coffee Decl. ¶ 52.)

The Louisiana Attorney General objects to a finding of commonality, claiming that the Class Members proffer two distinct theories of BP's liability—some allege liability based on their exposure to oil from the Macondo well blowout, while others allege liability based on their exposure to dispersants during the Response Activities. (Docket 10-7777, Rec. Doc. 228 at 14.) The objection, however, attempts to interpose an illusory distinction.[14] BP was named, and accepted its designation as, a responsible party for the spill; by law, it was required to take remedial action. *See* 33 U.S.C. § 2702. Thus, BP's use of dispersants stems directly from the spill itself; the two are inseparable, and BP's negligence for the blowout underpins the entirety of its post-explosion conduct. *E.g.*, *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 604 (E.D. La. 2006). BP's liability does not differ among, but serves as a common course of conduct central to, all Class Members' claims. *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1052 (S.D. Tex. 2012) ("Commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members." (internal quotations omitted)). The objection is overruled.

The Sturdivant Objectors and Halliburton contend, without citing any evidence, that commonality is lacking because not all Class Members manifested the same Specified Physical Condition, and some Class Members may not yet have manifested a Specified Physical

---

[14] No evidence has been proffered to suggest there is a "dispersant-only" Class Member—*i.e.*, one who was only exposed to dispersants and not oil. This omission alone provides grounds to overrule the Attorney General's objection. There is also, however, some reason to question whether a "dispersant-only" Class Member exists. (*See* Supp. Decl. of John C. Coffee, Rec. Doc. 7730-2, ¶¶ 5-6, 8 & n.1.)

Condition. (Docket 10-7777, Rec. Docs. 213 at 7-8, 93 at 8-9.) Commonality, however, simply requires one common issue of fact or law capable of driving the resolution of each Class Member's claim. *Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S. Ct. 2541, 2556 (2011). Where, as here, BP's claimed tortious conduct is common to all Class Members, some variation in injury is acceptable under Rule 23(a)(2). The basic question in this litigation is whether BP was negligent in causing the *Deepwater Horizon* Incident. That question is common to the Class. The fact that Class Members manifested different Specified Physical Conditions does not defeat commonality. The objection is overruled.

In addition, the fact that some Class Members may not have manifested a Specified Physical Condition does not defeat commonality. Each Class Member suffered a past exposure to essentially the same substance. (*See* Harbut Decl. ¶ 20.) As a result, each Class Member was "injured" under general maritime law. (Coffee Decl. ¶¶ 54-56.) That injury, in turn, flows from the *Deepwater Horizon* Incident, an event that raises common factual and legal questions among the Class. That Class Members may have some variation in damages resulting from this single incident does not defeat the commonality inquiry.

Halliburton argues that commonality is not satisfied because the "geographic boundaries and time horizons" set forth in the Class definition are arbitrary. (Docket 10-7777, Rec. Doc. 93 at 9-10.) This is not an objection to commonality, and it is overruled for that reason alone. The objection also ignores the record evidence to the contrary. The Court finds that the boundaries of Zone A and Zone B were carefully drawn to encompass those individuals who, "merely by virtue of their residency," were likely to suffer a short-term exposure and/or manifest a Specified Physical Condition. (Harbut Decl. ¶¶ 39-40.) Moreover, the Medical Settlement's distance-from-the-coastline requirements remove from the Class individuals who were unlikely to suffer

exposure simply because of where they lived. (*Id.*) Finally, the narrow time-of-manifestation requirements make causation more certain by minimizing the possibility that a condition was the result of an intervening or alternate cause other than exposure to oil and/or dispersants. (*See* Coffee Decl. ¶ 47 (stating that "the short (24 to 72 hour) latency period significantly reduces the possibility of alternative causes for the symptom or condition"); *see also* Harbut Supp. Decl. ¶ 8.) The geographic boundaries and timing requirements, in sum, are reasonable and ensure that the Medical Class is not over- or under-inclusive. The Court confirms its preliminary conclusion that the commonality requirement is satisfied. (*See* Rec. Doc. 6419 at 17.)

### 4. The Medical Class Meets the Typicality Requirement of Rule 23(a)(3)

Typicality is satisfied here because the Class Representatives' claims, like those of the Class Members, arise out of the events surrounding the *Deepwater Horizon* Incident and focus upon BP's course of conduct leading up to and during the spill. Each Class Representative and Class Member asserts a cause of action for negligence, gross negligence, and medical monitoring under general maritime law. All members of the Class allege harm from past exposure to oil and/or dispersants. From a human health standpoint, these exposures are the same. (*See* Harbut Decl. ¶¶ 20-24; Harbut Supp. Decl. ¶ 7.) Moreover, the exposures occurred during a relatively short period of time in a tightly defined geographic area. Each Class Member alleges injury through either one of two exposure pathways—inhalation and/or dermal/ocular exposure. In short, the Class Representative's claims have the same essential characteristics of those of the Medical Class Members; typicality is satisfied. *See James v. City of Dallas,* 254 F.3d 551, 571 (5th Cir. 2001), *abrogated in part by, Wal-Mart, supra, as recognized in M.D. ex rel. Sukenberg,* 675 F.3d 832, 839-40 (5th Cir. 2012); (Coffee Decl. ¶ 63; Klonoff Decl. ¶ 28).

The Louisiana Attorney General argues, again without citing any evidence, that the

claims of the Class Representatives are not typical because some were exposed to oil while some were exposed to dispersants, and because Class Members suffered different "types" of exposure—*i.e.*, some inhaled toxic fumes, some physically touched oiled booms, etc. (Docket 10-7777, Rec. Doc. 228 at 16-18.) Typicality, however, does not require identical exposures; the standard is met where "the class representative's claims have the same essential characteristics of those of the putative class." *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1054 (internal quotation marks omitted). Class Members assert the same causes of action—negligence, gross negligence, and medical monitoring—each of which root back to BP's alleged liability for the Macondo blowout and its subsequent OPA-mandated remediation efforts. The essential characteristics of each Class Member's case are the same, even if some were exposed to oil while some were exposed to dispersant. (*See* Coffee Supp. Decl. ¶¶ 7-8 (explaining that even if there are "dispersant-only" Class Members, typicality is satisfied because "the physical conditions manifested from exposure to oil and dispersant are the same, and thus the claim of an alleged dispersant-only exposure claimant is essentially no different from that of a claimant alleging exposure to oil or a mixture of oil and dispersant")); *see also Mullen*, 186 F.3d at 625 (finding typicality among exposure class where, although some members incurred varying levels of exposure, all members premised liability for personal injury under the Jones Act and the doctrine of seaworthiness); *Turner*, 234 F.R.D. at 605 (finding typicality where, although exposures varied, all harms derived from defendant's negligent maintenance of its oil refinery, and all or almost all plaintiffs raised property damage and personal injury claims pursuant to theories of negligence, strict liability, and absolute liability under the Louisiana Civil Code).

Moreover, the Attorney General's objection fails to grapple with the testimony of Dr. Harbut, who explained that exposure to oil and dispersant chemicals is, from a medical

perspective, the same. (Harbut Decl. ¶ 20; Harbut Supp. Decl. ¶ 7.) This testimony is uncontradicted in the record. Accordingly, that some Class Members may have been exposed to oil while some were exposed to oil and dispersant (or dispersant only, as unlikely as that might be) is, for purposes of typicality, irrelevant.[15] (Coffee Supp. Decl. ¶¶ 8, 11.) There is simply no material difference between the exposures. The objections of the Attorney General are overruled.

The Sturdivant Objectors contend that typicality is not satisfied because there are numerous factual variations among the Class relating to causation. (Docket 10-7777, Rec. Doc. 213 at 8.) This objection is supported by no record evidence. Class Members were exposed to the same petroleum-based substances through one of two exposure pathways. (*See* Harbut Decl. ¶¶ 18, 20.) Further, because Class Members must manifest a Specified Physical Condition relatively immediately after exposure, causation is "straightforward" in this case. (*See* Coffee Decl. ¶¶ 45-47 (relying on declarations of Drs. Harbut and Herzstein).) The Sturdivant Objectors' contention is without merit.

Finally, both the Attorney General and the Sturdivant Objectors argue that typicality cannot be satisfied because Class Members suffered from different Specified Physical Conditions, and some members suffered an exposure but have not manifested a Specified Physical Condition. (Docket 10-7777, Rec. Docs. 228 at 18; 213 at 18.) Both objections misunderstand the typicality requirement. Typicality is not defeated when class members present the same theory of liability but suffer varying harms or varying degrees of injury. *See*

---

[15] Again, whether there are Class Members who were exposed to dispersant but not oil is a matter of speculation because the Attorney General has not identified any. Even if such Class Members exist, however, this fact would have no bearing on the typicality inquiry. (*See* Coffee Supp. Decl. ¶ 7 (stating that the claims of the Class Representatives are typical even if one assumes that there are some members who were exposed to only oil or only dispersant, and explaining that "class representatives suffered in all relevant medical senses the same injury as that experienced by any 'dispersant only' class members, because in both cases any injury was caused by exposure to petrochemicals that are for all practical purposes medically indistinguishable in effect").)

*James*, 254 F.3d at 571; *Mullen*, 186 F.3d at 625.  Because the Class Representatives and Class Members proffer similar theories of liability and were exposed to the same substances in the same general manner, it makes no difference, for purposes of Rule 23(a)(3), that one Class Representative suffered a skin rash (or any other Specified Physical Condition) while another Class Member was afflicted with nausea or vomiting (or any other Specified Physical Condition).

The Court confirms its preliminary conclusion that the typicality requirement is satisfied. (*See* Rec. Doc. 6419 at 17.)

### 5. The Medical Class Meets the Adequacy Requirement of Rule 23(a)(4)

In this case, (1) Class Counsel has competently prosecuted this litigation and negotiated a favorable settlement agreement; (2) the Class Representatives are willing and able to actively control the litigation; and (3) there are no intra-class conflicts.

### a. Class Counsel Are Adequate

The Class is represented by the PSC—an experienced and diverse group of lawyers selected by the Court, after a public and detailed application process, for their "(a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation."  (Rec. Doc. 2 at 13-14.)  The PSC represents a diverse grouping of firms (i) geographically; (ii) in terms of the ranges of litigation expertise and experience, and (iii) in terms of the representation of the full array of claims presented in the MDL No. 2179 litigation and resolved in the Settlement.  The Court considered such diversity in making its PSC appointments.  Further, as this Court has previously explained, "Class Counsel have substantial experience prosecuting environmental, mass tort, and complex class actions, and have dedicated substantial resources to the prosecution of this

action."  (Rec. Doc. 6419 at 17.)  Class Counsel are adequate for purposes of Rule 23(a)(4).  (*See* Klonoff Decl. ¶ 40.)

Some objectors suggest that Class Counsel colluded with BP because the Medical Settlement contains a "clear sailing clause" in which BP agreed not to contest an award of attorneys' fees of up to $600 million.  (Docket 10-7777, Rec. Doc. 213 at 14.)  This objection is meritless; the Medical Settlement was the product of months of hard-fought negotiations and there is no evidence of collusion.  Moreover, numerous cases, including cases decided by this Court, have approved agreements containing such clear-sailing clauses.  (*See* Klonoff Supp. Decl. ¶¶ 25-28.)  *See, e.g.*, *Turner*, 472 F. Supp. 2d at 844 ("In addition to specifically negotiated fees, courts have been presented with class action settlements that include 'clear-sailing clauses,' in which the defendant agrees not to contest a court-awarded fee up to a certain amount. . . .  [I]t is increasingly common for class action settlements to provide that such fees are to be paid separately by the defendant, that is, over and above the class's recovery, rather than subtracted from the common benefit fund."); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) ("Finally, a defendant in a class action settlement has no obligation to oppose the fee petition submitted by class counsel.  Thus, the fact that the proposed settlement includes these terms does not render it inherently unfair or unreasonable.").)

Contrary to the claims of some objectors, Class Counsel did not act inadequately by making the Settlement contingent upon a separate fee agreement.  (*See* Docket 10-7777, Rec. Doc. 213 at 14.)  Rather, (1) the Parties did not begin to negotiate fees until they had already delivered an otherwise complete settlement agreement to the Court, and (2) the fact that the Medical Settlement pays Class Counsel fees separate and apart from individual recoveries for Class Members is a unique and valuable benefit to the Class.  Indeed, as Dean Klonoff has

explained, "this fee structure indicates a decreased likelihood of collusion." (Klonoff Supp. Decl. ¶ 31.) In addition, Magistrate Judge Shushan's involvement further ensured structural integrity during the negotiations.[16] (*See* Klonoff Decl. ¶ 75.)

The Sturdivant objectors have alleged that Class Counsel "breached their duty to the absent class members by including a *cy pres* payment in the Settlement Agreement." (Docket 10-7777, Rec. Doc. 213 at 13.) Specifically, these objectors allege that the Medical Settlement's $105 million Outreach Program contravenes the *cy pres* doctrine that unclaimed funds should be distributed among the Class, not to third parties. (11/8/12 Hearing Tr. at 225:20–22.) The Outreach Program, which provides a direct benefit to all Class Members, is in no sense an "unclaimed" distribution. *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (explaining that *cy pres* doctrine applies where court must "distribute unclaimed funds"). Nor does funding for the Outreach Program detract from the compensation that Class Members receive for Specified Physical Conditions; to the contrary, Class Members are fully compensated for their Specified Physical Conditions and the compensation available to Class Members for these conditions is uncapped. Because the Outreach Program is a fully funded program that provides a direct benefit to the Class, on top of full compensation, it does not constitute an improper *cy pres* distribution. Eliminating the Outreach Program would not result in higher payments on the Matrix, which are based on negotiation of the fair value of those claims. Rather, elimination of the Outreach Program would result in the loss of additional funding that will strengthen the healthcare infrastructure across the Gulf Coast, directly

---

[16] In addition, and contrary to the claims of the Sturdivant objectors, Class Counsel were not "disarmed" because they did not certify a litigation class before settling this matter. (Docket 10-7777, Rec. Doc. 213 at 10.) They were fully engaged in preparing for trial, would have proceeded to trial against BP in earlier 2012 but for arrival of a settlement, and have subsequently been preparing for and will proceed to trial against non-settling defendants in February 2013. Even if one assumes that Class Counsel faced obstacles to certifying a litigation class, Class Counsel also had many clients with significant claims sufficient to provide leverage in settlement negotiations.

benefitting both Class Members and their communities.

### b. Class Representatives Are Adequate

To be adequate, the class representatives must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001). Thus, where the class representatives will take an active role in the prosecution of the class action, Rule 23(a)(4) is satisfied.

Here the Class Representatives are adequate. (Klonoff Decl. ¶ 32.) Each has closely followed and actively participated in the Medical Settlement, and each has expressed his or her support of the Settlement and believes the Settlement is fair to the entire Class. (Decl. of Kip Plaisance, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Jason Perkins, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Thelma Warren, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Christian Pizani, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Max Plaisance, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Benjamin Barbee, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Cornelius Divinity, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Janice Brown, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Carlson Caster, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of George Baker, Rec. Doc. 7116-2, ¶¶ 5-9; Decl. of Duffy Hall, Rec. Doc. 7116-2, ¶¶ 5-9.)

The Attorney General argues that the Class Representatives are inadequate because they waived Jones Act claims for those Clean-Up Workers that worked aboard vessels during the Response Activities. (Docket 10-7777, Rec. Doc. 228 at 21.) Under the Medical Settlement, however, such Class Members (all of whom would be Clean-Up Workers) recoup exactly what they could under the Jones Act—compensatory damages for personal injury—and retain something even more valuable: Back-End Litigation Option rights to sue for future injury and access to the 21-year Periodic Medical Consultation Program—both benefits that would not be

available through litigation.[17]   The Attorney General's objection is overruled.

### c.        There Are No Conflicts of Interest Among the Class

There are no intra-class conflicts and the interests of the Class are aligned.  (Coffee Decl. ¶ 66; Klonoff Decl. ¶ 38; Miller Decl. ¶ 12.)  Indeed, the Class Representatives and the absent Class Members are "united by the fact that their injuries emanate contemporaneously and directly from a common occurrence."  (Coffee Decl. ¶ 65.)  All members of the Class who manifested a Specified Physical Condition are entitled to full compensatory damages.  To the extent there is some difference between Class Members who manifested a Specified Physical Condition and those who did not, it is not a difference that creates an intra-class conflict and, accordingly, it is a difference that is irrelevant for Rule 23(a)(4) purposes.[18]  *See Mullen*, 186 F.3d at 625-26 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."); (*see also* Supp. Decl. of Gregory P. Miller, Rec. Doc. 7732-4, ¶ 15).  Further, all Class Members are eligible for the 21-year Periodic Medical Consultation Program, have the right to the Back-End Litigation Option, and can take advantage of the benefits provided by the Outreach Program, irrespective of whether they manifested a Specified Physical Condition.  With the exception of the Outreach Program, BP's financial liability for these benefits is uncapped.

This case suffers from none of the problems identified in *Amchem*, where the Court noted a potential intra-class conflict between individuals who had already been injured by asbestos and

---

[17] Although some Class Members relinquish the maritime right to maintenance and cure in exchange for Back-End Litigation Option rights and the ability to participate in the Periodic Medical Consultation Program, this is simply the nature of settlement.  If there is a Clean-Up Worker who believed that recovery under the Jones Act would be greater than that under the Medical Settlement, he or she was free to opt out and pursue that course.

[18] In this vein, the objections of the Attorney General and the Sturdivant objectors are without merit. (Docket 10-7777, Rec. Docs. 228 at 21; 213 at 10-11.)

those who had only been exposed to it. *Cf. Amchem*, 521 U.S. at 626 (explaining that "for the currently injured, the critical goal is generous immediate payments" whereas "exposure-only plaintiffs [have an interest] in ensuring an ample, inflation-protected fund for the future"). Rather, the Class in this case consists exclusively of individuals who have suffered a past exposure and, by definition, an injury. All Class Members retain the right to sue for Later-Manifested Physical Conditions under the Back-End Litigation Option. There is thus no "future" injury released by the Settlement. (*See* Klonoff Decl. ¶ 38.)

This class Settlement avoids the concerns that have prevented approval in cases such as *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010). All class members are protected by a specific, detailed and objective Specified Physical Condition Matrix, based on medical and empirical data, developed through arms-length negotiations, and related to the relative strengths and merits of similarly situated claims. Perhaps most importantly, this Settlement does not involve a limited fund with no ability for class members to opt out, distinguishing *Ortiz* and *In re Katrina Canal Breaches Litigation.* (*See* Coffee Decl. ¶ 66 (stating that "class members are not in competition with each other for a limited amount of money"); Coffee Supp. Decl. ¶ 13 (explaining that "the fact that overshadows all other considerations [regarding the intra-class conflict] is that this settlement is uncapped"); *see also* Klonoff Decl. ¶ 34; Decl. of Samuel Issacharoff, Rec. Doc. 7116-2, ¶ 16.)

In light of the absence of conflicts between members of the Medical Class, subclasses are neither necessary, useful, nor appropriate here. Subclassing is but one of many available options for limiting the possibility of intraclass conflicts; it is not required as a matter of course. Rather subclasses might only be needed when there is a "fundamental" conflict among class members, but no such conflict exists here. (Coffee Supp. Decl. ¶ 12 (explaining that "subclassing is not

required by the language of Rule 23, and is only appropriate when there are 'fundamental' conflicts among class members that would deny one group adequate representation under Rule 23(a)(4)"); Klonoff Decl. ¶ 35 (stating that subclasses are unnecessary in this Class and would likely make the case more "complex")); *see also Dewey v. VW Aktiengesellschaft*, 681 F.3d 170, 185-86 (3d Cir. 2012).

The Sturdivant Objectors contend that the Class should include subclasses for those who developed a Specified Physical Condition and those who did not. (Docket 10-7777, Rec. Doc. 213 at 13.) The objectors identify no purported intra-class conflict that results from this distinction among Class Members. Those Class Members who developed a Specified Physical Condition have every incentive to protect the interests of all Class Members, each of whom retains Back-End Litigation Option rights for future manifested conditions. (*See* Coffee Supp. Decl. ¶ 13 (stating that "the gain of any subgroup does not occur at the expense of any other subgroup and they all share a common interest in maximizing recovery").) The Court therefore overrules the objection. To create such subclasses in the Medical Class would inject unnecessary complexity. (*See* Coffee Supp. Decl. ¶ 12, 14; Klonoff Decl. ¶ 35.)

The Court confirms its preliminary conclusion that the adequacy requirement is satisfied. (*See* Rec. Doc. 6419 at 17.)

### B. The Medical Class Meets the Requirements of Rule 23(b)(3)

To be certified as a Rule 23(b)(3) class, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In the December 21, 2012 Order and Reasons approving the Economic and Property Damages Settlement, the Court further discussed

the legal standards regarding Rule 23(b)(3). (Rec. Doc. 8138 at 22, *see also id.* at 38-55). Rather than repeat that discussion, the Court incorporates it here by reference.

### 1. The Medical Class Meets the Predominance Requirement of Rule 23(b)(3)

The claims of each of the Medical Class Members arise out of a single event—the Macondo well blowout, the resulting oil spill, and the Response thereto. This mass disaster can be traced to a single root: a chain of decisions made and actions taken by BP leading up to the spill. Predominance is more easily satisfied in a single-event, single-location mass tort actions such as this because the defendant allegedly caused all of the plaintiffs' harms through a course of conduct common to all class members. (*See* Klonoff Decl. ¶ 47 (citing cases and explaining that there is a "long line of cases finding 'single incident' tort cases to be suitable for class certification"); Coffee Decl. ¶¶ 22-28 (citing cases and observing that personal injury classes have "frequently" been certified in single-event mass disaster cases)); *see also Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 298 (3d Cir. 2011) (en banc); *Turner,* 234 F.R.D. at 606 (finding predominance where single defendant was responsible for oil spill, and though different plaintiffs suffered different degrees of contamination to their property, "the central factual basis for all of Plaintiffs' claims is the leak itself—how it occurred, and where the oil went").)[19]

Class Members allege exposure to petroleum products. (Harbut Decl. ¶ 20.) Short-term exposure to petroleum products has known outcomes. (*Id.* ¶¶ 22, 24.) Those known outcomes are reflected in the Settlement Agreement's Specified Physical Condition Matrix. (*Id.* ¶ 25; Herzstein Decl. ¶¶ 14-15, 20.) Further, the exposures occurred through one of two pathways. (Harbut Decl. ¶ 18.) The time lapse between exposure and manifestation of a Specified Physical

---

[19] Some objectors contend that the certification of a mass personal injury class is precluded by circuit precedent. (*See* Docket 10-7777, Rec. Docs. 228 at 23; 213 at 17-18.) These objections are incorrect as a matter of law, and are overruled.

Condition is brief: 24 to 72 hours. The Medical Class is therefore cohesive—Class Members allege exposure to the same products for a similar duration through similar pathways with similar, known short-term effects. *See In re Diet Drugs Prods. Liab. Litig. (Phentermine, Fenfluramine, Dexenfluramine)*, 2000 WL 12222042, at *42 (E.D. Pa. Aug. 28, 2000) (finding that predominance was satisfied in putative personal injury class when two diet products caused identifiable injury through a single method of exposure over a "finite and relatively short period" of use—approximately sixty days). The disparities of time, place, defendants, and circumstances of exposure that were of concern in *Amchem* are absent here. The conditions the Medical Settlement compensates arose, by definition, within hours—not weeks, months, or years—of exposure. Thus, all Class Members know whether they were afflicted with a Specified Physical Condition.

The above-described features of the Medical Class also distinguish it from the sprawling personal injury class decertified in *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), whose members "were exposed to nicotine through different products, for different amounts of time, and over different time periods." *Id.* at 742 n.15; (*see also* Coffee Decl. ¶ 10 (observing that the Medical Class "could scarcely be more different from *Castano*")). Here, the time between exposure and manifestation of a Specified Physical Condition is tightly confined, and causation is therefore "straightforward" and common to the class. (*See* Coffee Decl. ¶¶ 32, 42-51 (explaining "straightforward" causation and contrasting the Medical Class with classes alleging harm from long-term asbestos exposure, tobacco exposure, or injury from silicone gel breast implants); Coffee Supp. Decl. ¶ 16 (explaining that "[t]his class action satisfies Rule 23 because of its deliberately close linkage between exposure and the manifestation of illness").) The Settlement structure and the Class definition link the compensated symptoms in time, place,

and cause to the single unfolding incident. The questions of law and fact arising from the conduct that led to that incident, the nature and scope of the incident itself, and the questions relating to liability for that incident are properly considered as common questions, whose answers are both significant and uniform with respect to all Medical Class Members, and which thus predominate over questions (such as individual damages) that would affect the individual Class Members differently. Each of these factors indicates that the Medical Class is a cohesive one that meets the criteria set forth in *Amchem*. (*See* Coffee Decl. ¶ 52.)

Similarly, there are no significant questions of liability that affect individuals in different ways. Significant common factual issues will be resolved under the uniform principles of general maritime law. *Compare Mullen*, 186 F.3d at 626 (noting that where each of the class member's claims arose under a single body of law, and no "complex choice-of-law issues" were present, predominance was satisfied), *with Castano*, 84 F.3d at 741-44 (explaining that a multitude of choice of law issues may, in certain situations, recommend against class certification).

Nor are there individualized damage issues that overwhelm the common issues concerning liability. Class Members' damages differ only in their qualification for Specified Physical Condition compensation. It is well-settled, however, that the necessity of calculating damages on an individual basis does not defeat predominance.[20] *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (holding that a common question of causation was "a predominate issue central to each of Plaintiff's claims and subject to generalize proof" notwithstanding need to review each plaintiff's individual account); *see also Bell Atl. Corp.*, 339 F.3d at 306 (recognizing that "[e]ven wide disparity among class members as to the amount of

---

[20] The objection of Halliburton to the contrary is, accordingly, overruled. (*See* Docket 10-7777, Rec. Doc. 93 at 11.)

damages suffered does not necessarily mean that class certification is inappropriate"); *Bertulli v. Indep. Ass'n of Continental Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Sterling v. Veliscal Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Eatmon v. Palisades Collection LLC*, Civil Action No. 2:08-CV-306-DF-CE, 2011 WL 147680, at *12 (E.D. Tex. Jan. 18, 2011); *Moore v. Int'l Filing Co., LLC*, 2010 WL 2733116, at *3 (S.D. Miss. July 8, 2010); *Longergan v. A.J.'s Wrecker Serv. Dallas, Inc.*, Nos. Civ.A. 3:97CV1311D, Civ. A. 3:97CV2398D, Civ.A. 3:98CV3020D, 1999 WL 527728, at *7 (N.D. Tex. July 8, 1999).

The Fifth Circuit has presented a methodology to determine whether common questions predominate under Rule 23(b)(3), which it has applied to toxic exposure cases. In *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011), the court described this analysis as follows:

> Before certifying a class under Rule 23(b)(3) a court must determine that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires district courts to consider 'how a trial on the merits would be conducted if a class were certified.' *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). This, in turn, "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," a process that ultimately "prevents the class from degenerating into a series of individuals trials."

In *Madison* itself, class certification was reversed because the district court did not conduct this analysis, and "did not meaningfully consider how Plaintiffs' claims would be tried." 637 F.3d at 556. The *Madison* court observed, however, that had the trial court weighed the considerations set forth above, "class treatment on the common issues of liability" might indeed have been appropriate. *Id.* at 557. The Fifth Circuit remanded for just such an analysis, and

explained that class treatment of toxic exposure claims may well be proper where, in the course of planning and organizing the issues for trial, significant common questions emerged. *Id.* at 556. *Madison* cites as examples the grant of class certification in *Turner*, 234 F.R.D. at 606 ("Critical to the court's predominance inquiry was the fact that 'Plaintiffs submitted a proposed trial plan to the Court. The plan provides for a three-phase trial.'"), and *Watson*, 979 F.2d at 1011-18 (certifying court had "issued orders detailing a four-phase plan for trial").

In this litigation, the Court considered, early on, how the Plaintiffs' claims would be tried, and how to organize, sequence, and conduct a trial that prioritized the most significant questions of law and fact in the case, including the relative fault of defendants, for each phase and for each consequence of the *Deepwater Horizon* Incident. The Court's multi-phase trial plan was developed with the input of the Parties, the assistance of the Magistrate Judge and a Special Master, and long experience and familiarity with the issues and procedures of admiralty and maritime law involved in this litigation. Pretrial Order No. 41, which has been amended and refined as the litigation has progressed, describes the multi-phase trial, now scheduled to commence on February 25, 2013, and sets forth the scope and structure of the Trial of Liability, Limitation, Exoneration, and Fault, which includes two liability phases, corresponding to the "Incident" phase, and the "Source Control" and "Quantification" phase of the *Deepwater Horizon* Incident. The process of determining this trial structure, in prioritizing, for early determination, questions that are of greatest significance to all parties, has enabled the Court to conform to the Fifth Circuit's recommended predominance analysis, as described above.

The Court notes that this analysis was articulated in *Madison* as a guide to determining predominance with respect to class certification for trial purposes. This Court has no such motion before it: the Medical Class is one proposed to be certified for settlement purposes only,

and is without prejudice to, or predetermination of, any class certification motion that may be made, for this or any other class, for trial purposes. Hence, trial manageability is not a necessary determination here, as *Amchem* itself held, "for the proposal is that there be no trial." *Amchem*, 521 U.S. at 619. Class certification in *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006), fell short for failure to consider the conduct of trial. In contrast, manageability considerations, and the resulting development of multi-phase trial structures, enabled class certification to succeed in *Watson* and *Turner* where it failed in *Steering Committee.* While in this case, settlement class certification does not require such consideration, in fact it has occurred, outside the context of settlement negotiations, in the course of preparing this litigation for trial. This process has entailed "identifying the substantive issues that will control the outcome" and "assessing which issues will predominate," as *Madison* recommended. Further, this process has enabled the Court to determine, within the context of the instant Medical Settlement, that there are issues that are common to the Class, and that these common issues predominate.

The Medical Class further contrasts with that denied certification in *Steering Committee* because the instant claims are much more cohesive. In *Steering Committee*, plaintiffs proposed an exposure class that brought claims for personal injury (exposure) and property damage, as well as harder-to-quantify emotional injury. 461 F.3d at 602. The Fifth Circuit affirmed the district court's denial of certification because, *inter alia*, "each individual plaintiff suffered different alleged period and magnitudes of exposure . . . ." *Id.* Medical Class Members, however, suffered short-term exposure and relatively immediate illness; causation is straightforward. (*See* Coffee Decl. ¶ 47.) Moreover, the *Steering Committee* class asserted claims for emotional injury—claims that the Fifth Circuit characterized as the type that

"necessarily implicate[] the subjective differences of each plaintiff's circumstances." *Steering Committee*, 461 F.3d 602. No such "necessarily" subjective and individualized claims are at issue herein.[21]

The fact that the Parties have reached a class settlement further underscores the cohesiveness of this Class. *See Sullivan*, 667 F.3d at 297. As Professor Coffee explained in his declaration:

> [w]here there is [a] core nucleus of common facts (as there is in this single event, single location disaster that affects a geographically closely knit class), the cohesion of class members is more evident. That a sizable class was able to achieve a complicated settlement without its also sizable Plaintiffs' Steering Committee fracturing (and some members dissenting) also demonstrates cohesion. Ultimately, under *Amchem Products*, the bottom line issue is whether the class is "sufficiently cohesive to warrant adjudication by representation." Here, the unity of the class clearly justifies the vicarious representation of the class by its class representatives and counsel.

(Coffee Decl. ¶ 73 (quoting *Amchem*, 521 U.S. at 623).)

In sum, the Court finds that common issues predominate among the Medical Class, and confirms its preliminary conclusion that the predominance requirement is satisfied. (*See* Rec. Doc. 6419 at 17-18.)

### 2.    The Medical Class Meets the Superiority Requirement of Rule 23(b)(3)

Personal injury class settlements such as *Amchem* may fail to meet the superiority requirement of Rule 23(b)(3) because they seek to resolve claims of wrongful death or general personal injury with high economic value; claims which the plaintiffs may have an interest in pursuing individually, and which are economically feasible to prosecute alone. The proposed Medical Settlement Class does not include such claims. The claims of those killed or injured on

---

[21] Accordingly, the objection raised by the Attorney General and the Sturdivant Objectors—that *Steering Committee* precludes class certification in this case—is overruled. (Docket 10-7777, Rec. Docs. 228 at 23; 213 at 18.)

the *Deepwater Horizon* rig have been excluded at the outset, reserved (to the extent they are still unresolved) for individual trial or settlement.  The Medical Settlement claims, which are for conditions arising within 24 to 72 hours of exposure to oil and/or dispersants during the Class period within the Class boundaries, are what the Courts have considered "negative value claims"—that is, claims that "provide the most compelling rationale for finding superiority in a class action" because their monetary value does not warrant individual prosecution due to discovery and expert witness expense and other costs.  *See Castano*, 84 F.3d at 748; *see also* 2 Newberg on Class Actions § 4:27 (4th ed.) ("When the claims of class members are small, denial of a class action would effectively exclude them from judicial redress."); *Young*, 693 F.3d at 545 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (quoting *Amchem*, 521 U.S. at 617).

As the Parties and their experts have pointed out, the monetary awards approved by other courts for similar medical symptoms in other trials or settlements are generally lower than those provided under the Medical Settlement.  (*See, e.g.*, Coffee Decl. ¶ 38 (citing cases).)  This fact not only supports the fairness, reasonableness, and adequacy of the Medical Settlement's terms, but demonstrates the "negative value" of the underlying claims, establishing the superiority of the class mechanism for their resolution.  (Coffee Decl. ¶ 76; Klonoff Decl. ¶ 61.)

Accordingly, the Court overrules the objections of those who contend, without evidentiary support, that the claims in the Medical Class are not "negative value."  (*See* Docket 10-7777, Rec. Doc. 213 at 19; *but see* Docket 10-7777, Rec. Doc. 158 at 2 (conceding claim values are too small to justify individual litigation).)

That so many (approximately 90%) of the claims made under the Settlement thus far

appear to be *pro se* claims, made without individual counsel's assistance, further demonstrates the superiority of the class structure for the Medical Settlement (as well as the claimant-accessible design of the program, its documents and systems, and the efficacy of the Class notice) for enabling and compensating these claims in a consistent, cost-effective, predictable and transparent manner. (Garretson Supp. Decl. ¶ 4.) In short, the Medical Class is largely composed of "negative value claims," and thus there are compelling reasons to justify class treatment. (*See* Coffee Decl. ¶ 76; Klonoff Decl. ¶ 61.)

Class treatment is also superior to litigation via multiple trials. Over 17,000 short form joinders have been filed to date. At the very least, some percentage of these plaintiffs would sue individually absent class certification. Each individual suit would relitigate many of the same issues. As Professor Coffee has stated, such "large-scale individual litigation of modest value claims would represent a serious misallocation of judicial resources." (Coffee Decl. ¶ 75.)

Finally, the Medical Settlement contains several benefits that could only be obtained through a comprehensive class settlement. The Periodic Medical Consultation Program will provide all Class Members with a regular comprehensive medical, occupational, and environmental history and physical examination, which includes testing that may identify diseases caused by exposure, whether to petroleum products or some other source.[22] (*See* Harbut Decl. ¶¶ 46-47.) This program will continue for 21 years. Further, all Class Members retain

---

[22] The Periodic Medical Consultation Program is not medical monitoring, and therefore cases in which courts have "declined to certify classes that seek medical monitoring because of the individualized factual issues involved" do not apply. *See Duncan v. N.W. Airlines, Inc.*, 203 F.R.D. 601, 612 (W.D. Wash. 2001) (collecting cases); *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011). The Periodic Medical Consultation Program provides primary healthcare services to Class Members, not medical monitoring. (Herzstein Decl. ¶ 22.) It is made available on the same terms to all Clean-Up Workers and all Zone B Resident Class Members, as well as all Zone A Resident Class Members who qualify for compensation for a Specified Physical Condition, without regard to any individual Class Member's amount or duration of exposure. The Program also allows participating physicians to use their discretion in determining the tests to order for an individual. While some of the tests available in the Program can help provide diagnostic information regarding manifest and latent physical disease, such as cancer, the Program is not a medical monitoring program for such conditions. (*Id.* ¶¶ 22, 25b, 25c.)

Back-End Litigation Option rights to seek relief should they develop a Later-Manifested Physical Condition at some point in the future. In this fashion, the Periodic Medical Consultation Program and the Back-End Litigation Option work in tandem to protect Class Members who may fall ill at some future point because of their past exposure to oil and/or dispersants. Finally, the Outreach Program provides $105 million in grants to fund and improve healthcare services throughout the Gulf. It also creates an online library of health and environmental-related materials relevant to the *Deepwater Horizon* Incident, which will be updated regularly for 21 years. The library already contains approximately 100,000 documents, accessible by all Class Members. (Garretson Supp. Decl. ¶ 5.) The Outreach Program benefits each member of the Class by improving the ability of Gulf Coast residents to access quality healthcare and information. Each of these benefits was realized because of the Class Settlement, but would not be obtainable through litigation. Class treatment is therefore a superior method for adjudication of this controversy.

The Court confirms its preliminary conclusion that the superiority requirement is satisfied. (*See* Rec. Doc. 6419 at 18.)

## VI. The Settlement Is Fair, Reasonable, and Adequate

### A. Policy Favoring Settlement

The Court evaluates the proposed Settlement in light of the general federal policy favoring the settlement of class actions. *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir.1986) (per curiam); *see*, *e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *see also Int'l Union, United Auto., Aerospace, & Agric. Implement Workers v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007). "[T]he public interest in amicable

resolution of cases is particularly strong in the context of mass tort and similar litigation." *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007) ("[T]here is a 'strong judicial policy favoring the resolution of disputes through settlement. . . . The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.") (quoting *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004)).

### B.   The *Reed* Factors

In *Reed v. General Motors Corp.*, the Fifth Circuit identified the factors to evaluate to determine whether to grant final approval to a class action settlement: (1) the assurance that there is no fraud or collusion behind the settlement; "(2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." 703 F.2d 170, 172 (5th Cir. 1983); *see also Newby* 394 F.3d at 308. Here, all six *Reed* factors support final approval of the Settlement.

### 1.   Settlement Negotiations

The Parties reached agreement after lengthy, hard-fought negotiations. (*See* Bloomer Decl. ¶ 2.) Counsel for Plaintiffs and for BP are thoroughly familiar with the factual and legal issues in this action and vigorously represented their respective clients' interests throughout the litigation, including in the negotiation process. (*See* Greenwald Decl. ¶ 6; *see also* Order, Rec. Doc. 7480 at 7 ("the Settlement Agreement was negotiated in good faith and at arm's length over many months . . . . The negotiations were extensive and highly contested."); *see also* Order, Rec.

Doc. 7600 at 1.)  This nearly year-long arm's-length negotiation process supports Final Approval of the Settlement.  *See In re Train Derailment Near Amite, La.*, MDL 1531, 2006 WL 1561470, at *19 (E.D. La. May 24, 2006) ("that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate"); *see also Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) ("trial court 'should be hesitant to substitute its own judgment for that of counsel'" when the settlement has been reached at arm's length without fraud or collusion) (citation omitted).

Final Approval is also supported by the fact and nature of Magistrate Judge Shushan's involvement in supervising negotiations over crucial elements of the Agreement. (Bloomer Decl. ¶¶ 39, 45, 49, 59; Greenwald Decl. ¶ 12.)  Judge Shushan brokered agreement between Class Counsel and BP's counsel on key compensation elements of the Matrix and the Outreach Program.  This sort of involvement of a Magistrate Judge helps demonstrate a lack of fraud or collusion behind the settlement.  *See, e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("[T]he supervision of settlement negotiations by a magistrate judge, as occurred here, makes it less likely that . . . [class counsel have promoted] their own interests over those of the class."); *Domingue v. Sun Elec. & Instrumentation*, Civil Action No. 09-682, 2010 WL 1688793, at *1 (M.D. La. Apr. 26, 2010) ("[T]hat this settlement is the negotiated result of an adversarial proceeding is an indication of its fairness."); *see also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009).

In addition, as mentioned above, the Parties did not negotiate attorneys' fees for Class Counsel until after they agreed on the relief to be afforded Class Members and after the Court gave its approval for fee negotiations to commence.  (MSA § XIX, Ex. 19, ¶ 1.)  "'Because the parties have not agreed to an amount or even a range of attorneys' fees, there is no threat of the

issue explicitly tainting the fairness of settlement bargaining.'" *In re Heartland Payment Sys.*, 851 F. Supp. 2d 1040, 1064 (S.D. Tex. 2012) (*quoting Turner*, 472 F. Supp. 2d at 845).

No objector has provided evidence of collusion. The Parties, by contrast, presented evidence of extensive arms-length negotiations over many months. *See e.g.*, Order, Rec. Doc. 7480 at 7 ("The Settlement Agreement was negotiated in good faith and at arm's length over many months . . . . The negotiations were extensive and highly contested."); *see also* Order, Rec. Doc. 7600 at 1; Klonoff Decl. ¶¶ 72-79.

In sum, the Court finds there was no collusion, which supports final approval of the Settlement.

### 2.        The Complexity, Expense, and Likely Duration of the Litigation.

In assessing this factor, courts consider the uncertainties of litigation and compare the settlement to potential future relief. *In re Shell Oil Refinery*, 155 F.R.D. 552, 563 (E.D. La. 1993); *see Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-00400-BR, 2009 WL 2208131, at *26 (E.D.N.C. July 22, 2009) ("[T]he settlement terms reflect plaintiffs' counsel's consideration of the strength of their case, and the delay and cost of proceeding to trial balanced against the certainty, relative promptness, and amount of relief the settlement provides."). As in *Shell Oil*, there can be "no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases" in the history of the United States. 155 F.R.D. at 559. "Such complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *see also Billitteri v. Secs. Am., Inc.*, 2011 WL 3586217, at *10 (noting that the time it would take to recover "would measure in years rather than the months contemplated by the parties at this stage.")

The burdens of litigation here are immense. Pre-trial orders provide for at least three trial phases for the Limitation and Liability Trial, each of which would last months. These three phases would only partially address the claims of the Plaintiffs and the more than 17,000 claimants who have filed MDL 2179 B3 Bundle Short Form Joinders alleging injury from exposure to oil and/or dispersants. These individual claims would entail many years of expensive litigation and require separate trials and testimony from numerous witnesses and medical experts, with no certainty as to the outcome. Appeals by the losing parties would be a virtual certainty. *Cf. Collins*, 568 F. Supp. 2d at 726 (potential trial lasting "several weeks" favored settlement approval); *Faircloth v. Certified Fin., Inc.*, No. Civ. A. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001) (approving settlement where trial "was estimated to last at least two weeks"); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997); *In re Shell Oil*, 155 F.R.D. at 560 ("[E]ven a six month trial is considered extremely lengthy and the expense for the parties, the claimants, and the judicial system would be enormous.").[23]

Without a settlement, Plaintiffs face significant further expenses in time, money, and resources—with no assurance of recovery. *See Smith v. Ajax Magnethermic Corp.*, No. 4:02CV-0980, 2007 WL 3355080, at *6 (N.D. Ohio Nov. 7. 2007). These costs would likely outweigh the recovery that most Class Members could hope to receive. (*See* Coffee Decl. ¶ 18.) In contrast, for Class Members with qualifying Specified Physical Conditions, compensation under the Settlement is certain. In addition to compensation, Clean-Up Workers, Zone B Residents,

---

[23] The *Exxon Valdez* litigation is instructive. Nearly twenty years elapsed between the *Exxon Valdez* Oil Spill and the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008). Many of the plaintiffs had died before the case reached the Supreme Court, *see* Brief for Respondents, *Exxon Shipping Co. v. Baker*, No. 07-219, 2008 WL 194284, at *16 (U.S. Jan. 22, 2008), and many others suffered due to the lengthy litigation process. Indeed, experts who studied the effects of the *Exxon Valdez* litigation on the local populace have said that the litigation "produce[d] an independent secondary disaster, which [rather than the original spill] is the primary source of ongoing secondary trauma." J. Steven Picou, *When the Solution Becomes the Problem: The Impacts of Adversarial Litigation on Survivors of the Exxon Valdez Oil Spill*, 7 U. St. Thomas L.J. 68, 81 (2009).

and qualifying Zone A Residents will for 21 years receive the opportunity for regular primary-care medical examinations to assist them in managing their health. This Periodic Medical Consultation Program—along with the benefits under the Outreach Program—could not be obtained through litigation. (Miller Decl. ¶¶ 43, 44, 46; Coffee Decl. ¶ 79.)

Because many of "the most controversial and hard-fought of all the issues in this case" remain to be litigated, *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986), the Settlement "eliminates the transaction costs that further proceedings would impose" and "provides relief for the class sooner than continued litigation would." *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004).

This factor supports approval of the Settlement.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

This factor "asks whether the parties have obtained sufficient information to evaluate the merits of the competing positions." *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620 (quotations omitted). "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ." *Id.* at 620-21. Here, the Parties have obtained extensive information through both formal discovery and informal alternatives, including the use of experts and consultants, and there can be no doubt that the Parties have the necessary information to evaluate all aspects of the case and the merits of the Settlement.

Specifically, during the 19-month period before a Settlement was reached, the Parties deposed more than 300 fact and expert witnesses in connection with preparation for the Limitation and Liability Trial. (Rec. Doc. 6419 at 3.) In addition, the Parties in MDL 2179

produced approximately 90 million pages of documents and exchanged more than 80 expert reports. (*Id.*) The depth and breadth of discovery already completed provides the Parties with necessary and extensive information regarding the potential liability of BP and other defendants for the bodily and personal-injury claims alleged by the Class. By any measure, the amount of discovery that has already occurred is more than sufficient to ensure a fair settlement.[24]

In addition to formal discovery, the Parties benefited from numerous other sources of information, including: (1) extensive scientific data in the public domain concerning the effect of oil exposure on health, specific exposure and sampling data collected during the *Deepwater Horizon* Incident, and analyses from government agencies; (2) health incident reports relating to Clean-Up Workers; (3) investigations and analyses conducted by the Parties and their consultants; and (4) government investigations and hearings. (Greenwald Decl. ¶¶ 4–5; Harbut Decl. ¶¶ 16–17, 22–24.) Although this information was gathered outside of the formal discovery process and, in some cases, may not be admissible in any trial on the merits, these extensive alternate sources of information underscore that the Parties were sufficiently informed to reach a settlement. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007).

Here, in light of the substantial amount of formal and informal discovery and investigation, the Court concludes that the Settlement represents an informed, educated, and fair resolution of this dispute. Extensive information allowed the Parties to assess their positions in great detail and make a reasonable decision on settlement, which is all that is required. *See, e.g., In re Combustion*, 968 F. Supp. at 1127; *Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 26

---

[24] The Fifth Circuit has made clear that formal discovery is not a prerequisite to the approval of a class settlement. Even when "very little formal discovery was conducted," this "does not compel the conclusion that insufficient discovery was conducted." *Cotton*, 559 F.2d at 1332; *see also In re Corrugated Container*, 643 F.2d at 211, 204 n.10 (noting that even if little formal discovery has been completed, plaintiffs may still have access to information obtained in other ways; "we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table"); *cf. Newby*, 394 F.3d at 306 ("Generally speaking, a settlement should stand or fall on the adequacy of its terms.").

(D.D.C. 2011) ("Counsel should have 'sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success . . . .") (quoting *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 62 (D.D.C. 2010)).  This factor supports settlement approval.

### 4.    The Probability of Plaintiffs' Success on the Merits

Under this factor, the Court must compare the Settlement terms with the likely rewards the Class would receive at trial.  *Reed*, 703 F.2d at 172; *see also In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007).  If further litigation is unlikely to lead to greater relief for the Class, then this factor weighs in favor of settlement.  *Ayers*, 358 F.3d at 373.

According to BP, if the claims in this case were to be tried, Plaintiffs would face significant factual and legal hurdles, including with respect to liability and damages.  Plaintiffs disagree and believe they could be successful at trial.  Nevertheless, damages, particularly for the acute, short-term conditions claimed by most Plaintiffs, would likely be modest compared to the burdens and cost of pursuing legal action.  (*See* Coffee Decl. ¶ 76 ("[B]ecause this case is disproportionately composed of 'negative value' claims, it must be expected that many claimants will not assert them"); *id.* ¶¶ 38-41 (discussing recoveries in cases involving oil spills or toxic chemical discharges); Miller Decl. ¶ 37.)  *See also In re Diet Drugs*, 2000 WL 1222042, at *61 (noting difficulty of establishing damages for limited exposure to drug or minor injuries).[25]

Even assuming a favorable liability verdict and damages awarded at trial, the resulting recovery, likely years from now, would be diminished by the costs of litigation.  In light of these

---

[25] In addition, the Class's claims on the merits are complicated by various defenses.  BP claims immunity under both the Clean Water Act and the Federal Tort Act, and asserts that Plaintiffs' state and maritime law claims are preempted by federal law because it was following directives from the FOSC to implement a comprehensive federal response scheme created by the Clean Water Act, the Oil Pollution Act, and the National Contingency Plan.  BP would also argue that its decisions related to, for example, the training and protection of workers and that the use of the dispersants were all done with the input and approval of the government, and were therefore reasonable and cannot form the basis for any liability.

considerations, counsel could reasonably conclude that certain recovery through settlement is the preferred result.  This factor weighs in favor of approving the Settlement.

### 5.    The Range of Possible Recovery

To merit approval, the Settlement need only represent a fair, reasonable, and adequate estimation of the value of the case.  *In re Combustion*, 968 F. Supp. at 1129.  Because the Settlement compares favorably with the range of possible recovery through litigation, this factor also supports settlement approval.

The Medical Settlement provides compensation for qualifying Specified Physical Conditions without the need for protracted litigation.  The Matrix sets forth recoveries based on whether a condition is acute or chronic, the level of proof submitted by the Class Member, and whether the Class Member is a Resident or Clean-Up Worker.  These payments are well in line with damage awards for similar injuries at trial.[26]

The proposed Settlement also provides medical consultations under the Periodic Medical Consultation Program for all qualifying Class Members, including Clean-Up Workers and Zone B Residents who have not claimed a Specified Physical Condition.  This Periodic Medical Consultation Program provides a substantial benefit to the Class that could not be achieved through litigation.  (Miller Decl. ¶ 43.)  The Outreach Program likewise provides benefits to the

---

[26] *See, e.g., Howard v. Union Carbide Corp.*, 50 So.3d 1251, 1256 (La. 2010) (holding that trial court's awards of $1,500 to $3,500 to plaintiffs exposed to a chemical  leak were a clear abuse of discretion given that the "damages proven, such as eye, nose, and throat irritations, are not unlike the symptoms suffered by persons afflicted with common seasonal allergies . . . [and] might be characterized as mere annoyances"; reducing damages to $100 to $500); *Arabie v. CITGO Petroleum Corp.*, 89 So. 3d 307 (La. 2012) (awarding damages of $7,000 to $15,000 to plaintiff refinery construction workers exposed to toxic chemicals due to oil spill; damages were awarded for symptoms of eye irritation, nausea, nasal and throat irritation, and difficulty in breathing, as well as for fear of developing future injuries such as cancer); *Doerr v. Mobil Oil Corp.*, 935 So. 2d 231 (La. App. 2006) (affirming damage awards of $500 to $2,000 to plaintiffs for physical injuries related to the ingestion of drinking water contaminated with oil, grease, and other contaminants); *Rivera v. United Gas Pipeline Co.*, 697 So.2d 327 (La. App. 1997) (affirming jury verdicts that declined to award damages to plaintiffs who as a result of exposure to natural gas suffered "minimal" injuries such as nausea and headaches); *see also* Coffee Decl. ¶¶ 38-41.

Class (as well as other residents of the Gulf Coast) that could only be achieved through settlement. (*Id.* ¶¶ 44, 46.)

### 6. The Opinions of Class Counsel, Class Representatives, and Absent Class Members

In evaluating a settlement, the Court should rely on counsel who know the strengths and weaknesses of their cases. *See Turner*, 472 F. Supp. 2d at 852 ("Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit."). Where "counsel for both parties have significant experience in litigating and negotiating settlement of class actions," this fact is strong evidence that the settlement is fair and reasonable. *DeHoyos*, 240 F.R.D. at 287 (citation omitted) (internal quotation marks omitted); *see Cotton*, 559 F.2d at 1330 ("In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties."). Class Counsel and counsel for BP have thorough knowledge of the case and substantial experience litigating and settling complex matters and class actions. (Bloomer Decl. ¶¶ 3–4; Herman Decl. ¶ 6; Greenwald Decl. ¶ 2, 5.) After evaluating the risks and benefits of continued litigation, Class Counsel believe that settlement is more beneficial to the Class than litigation. Their informed views are entitled to substantial weight. *See In re Combustion*, 968 F. Supp. at 1128; *San Antonio Hispanic Police Officers Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 461 (W.D. Tex. 1999) ("[C]ounsel for each side possess the unique ability to assess the potential risks and rewards of litigation . . . ." (internal quotation marks omitted)).

Additionally, the Class Representatives uniformly believe that the Settlement Agreement is a fair, reasonable, and adequate resolution of this litigation. (*See* Plaisance Decl. ¶ 8; Perkins Decl. ¶ 8; Warren Decl. ¶ 8; Pizani Decl. ¶ 8; Plaisance Decl. ¶ 8; Barbee Decl. ¶ 8; Divinity Decl. ¶ 8; Brown Decl. ¶ 8; Caster Decl. ¶ 8; Baker Decl. ¶ 8; and Hall Decl. ¶ 8.)

Class Members also support the Settlement; only 150 purported objectors have filed objections to Final Approval of the Settlement. And, of those, 55 appear not to be Class Members. (Garretson Supp. Decl. ¶ 3.) In a Class with potentially 200,000 members, this represents less than one-tenth of one percent of the Class. Of those 95 objectors who appear to have standing, 73 (or 77%) are represented by a single firm. (*Id.* ¶ 3 & n.2) Only 1,747 persons have submitted requests to opt out; 65% of these are represented by just a few law firms. (*Id.* ¶ 2 & n.1) These numbers clearly demonstrate that the vast majority of Class Members favor settlement. "While the fact that a relatively small percentage of the Class Members objects to a proposed settlement is not dispositive, '[c]ourts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'" *Hammon v. Barry*, 752 F. Supp. 1087, 1092-93 (D.D.C. 1990) (citing 2 Newberg on Class Actions § 11.47 (2d ed.), at 463); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (same); *see also In re Shell Oil*, 155 F.R.D. at 566-67 (relatively few number of objections and opt outs supported fairness and adequacy of the settlement).

In this case, the number of individuals who have already filed claims seeking the benefits of the Settlement (4,546 to date),[27] (*see* Garretson Supp. Decl. ¶ 4), even though no payments will be made until the Effective Date, demonstrates widespread, affirmative approval of the Settlement, and their interests should be protected against objections by a small minority. *E.g.*, *DeHoyos*, 240 F.R.D. at 286.[28] This factor favors approval of the Settlement.

---

[27] Some objectors have also filed Proof of Claim forms seeking Settlement benefits. (*See* Declaration of Matthew Garretson, October 22, 2012, Rec. Doc. 7730-3, ¶ 9(a).) In addition, at the Fairness Hearing, counsel for a number of objectors indicated that their clients also were filing claims for Settlement benefits. (*See also* 11/8/12 Hearing Tr. 227:1-6 and 230:24-231:15.)

[28] Indeed, even a large number of objections would not establish unfairness. According to the Fifth Circuit, "'[a] settlement can be fair notwithstanding a large number of Class Members who oppose it.'" *Reed*, 703 F.2d at 174 (quoting *Cotton*, 559 F.2d at 1331); *see also Ayers v. Thompson*, 358 F.3d 356, 373 (5th Cir. 2004) ("[o]ur jurisprudence . . . makes clear that a settlement can be approved despite opposition from Class Members"). In fact, courts regularly approve settlements as fair, reasonable, and adequate even when a relatively high percentage of

In sum, the Medical Settlement satisfies each of the six *Reed* factors, which supports the Court's finding that the Settlement is fair, reasonable, and adequate.

## VII.    Class Notice

In the December 21, 2012 Order and Reasons approving the Economic and Property Damages Settlement, the Court discussed the legal standards relating to providing notice of class certification and a class settlement. (Rec. Doc. 8138 at 23-24.)   Rather than repeat that discussion, it is incorporated here by reference.

Through August 9, 2012, 366,242 individual notices had been sent to potential Settlement Class Members by postal mail and 56,136 individual notices had been e-mailed.   Only 10,700 mailings—or 3.3%—were known to be undeliverable. (Azari Decl. ¶¶ 8, 9.) Notice was also provided through an extensive schedule of local newspaper, radio, television and Internet placements, well-read consumer magazines, a national daily business newspaper, highly-trafficked websites, and Sunday local newspapers (via newspaper supplements). Notice was also provided in non-measured trade, business and specialty publications, African-American, Vietnamese, and Spanish language publications, and Cajun radio programming. The combined measurable paid print, television, radio, and Internet effort reached an estimated 95% of adults aged 18+ in the Gulf Coast region an average of 10.3 times each, and an estimated 83% of all adults in the United States aged 18+ an average of 4 times each. (*Id.* ¶¶ 8, 10.) All notice documents were designed to be clear, substantive, and informative. (*Id.* ¶ 5.)

The Court received no objections to the scope or content of the Notice Program. (Azari Supp. Decl. ¶ 12.)   The Court finds that the Notice and Notice Plan as implemented

---

Class Members opt out or object.  *See, e.g., Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("only" 29 objections in 281 member class "strongly favors settlement"); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (settlement approved despite opposition of 36% of the total class).

satisfied the best notice practicable standard of Rule 23(c) and, in accordance with Rule 23(e)(1), provided notice in a reasonable manner to Class Members who would be bound by the Settlement, including individual notice to all Class Members who could be identified through reasonable effort. Likewise, the Notice and Notice Plan satisfied the requirements of Due Process. The Court also finds the Notice and Notice Plan satisfied the requirements of CAFA.[29]

## VIII. The Objections to the Settlement Are Without Merit

The Court's Order and Reasons of December 21, 2012, concerning the Economic and Property Damages Settlement, explained that certain objectors lacked standing to object to the settlement. (Rec. Doc. 8138 at 75-79.) For those reasons, the Court finds the 55 purported objectors listed on Exhibit A of the Garretson Supplemental Declaration (Rec. Doc. 7944-1 ¶ 3, Ex. A), Halliburton, and the State of Louisiana lack standing to object to the Medical Settlement. Nevertheless, the Court has considered these objections—in addition to those with standing— and, as discussed in this Order, finds nothing to call into question the fairness, reasonableness, and adequacy of the Settlement or the propriety of certifying the Class for settlement purposes.

Of the relatively small number of objections that have been filed, none are critical of the Periodic Medical Consultation Program. Similarly, only one objection criticizes the Outreach Program—and does so in the mistaken belief that the Outreach Program involves a *cy pres* distribution. The objections instead focus almost exclusively on the Settlement's Matrix, arguing that it should contain different dollar values, different conditions, payments based on severity of disease and impairment, payments for relocation costs, and/or different standards of proof— essentially seeking to renegotiate Settlement terms that were negotiated at arm's length by Class

---

[29] On April 26, 2012, timely notice was provided under the federal Class Action Fairness Act of 2005, 28 U.S.C. § 1715, by certified mail to 57 federal and state officials, including the attorneys general of the United States, each of the 50 states, the District of Columbia, and the U.S. Territories of Puerto Rico, the Northern Mariana Islands, American Samoa, the Virgin Islands, and Guam. (Azari Decl. ¶ 17.)

Counsel and BP over several months as part of a compromise of highly disputed claims.

Such objections are without merit. Where a few individuals complain about this or that term of a settlement, their objections serve only to delay and frustrate the interests of the majority of class members in receiving settlement benefits as expeditiously as possible. *See Cotton*, 559 F.2d at 1330 ("trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes'") (citation omitted). Objections that seek to renegotiate terms of the settlement based on individual preferences are unhelpful and improper. *See Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010) ("'whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance.'") (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 212).

The few objections filed are often contradictory. For example, some complain that BP is too generous and "is clearly paying a premium" for Class Members' claims. (Docket 10-7777, Rec. Docs. 243 at 1, 93 at 18.) Others "object" because they are not within the Class, but want to participate in the Settlement, presumably because they believe the terms of the Settlement are fair. (*E.g.*, Docket 10-7777, Rec. Docs. 182, 203, 205.) Some individuals complain that opting out, if they dislike the Settlement, is not a viable option, acknowledging that their claims would cost more to litigate than their likely recovery. (Docket No. 10-7777, Rec. Doc. 158.) This is a reason to favor settlement, not object to it. Some argue that proof standards are too high, while others complain that those with significant proof and those with little proof are being treated alike. (Docket No. 10-7777, Rec. Docs. 92 at 12-14, 180 at 2, 185 at 2, 202 at 2.)

Some Objectors provide either no evidence at all or only irrelevant, unreliable, and

unscientific "evidence" that fails to support their positions. (*E.g.*, Docket 10-7777, Rec. Docs. 57, 158, 213.) Those objections that lack factual, scientific, or legal support are deficient and are hereby rejected because they do not aid the Court in its evaluation of the settlement: "To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process." *Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986). For example, there is no evidence whatsoever to support the existence of large numbers of silently disapproving Class Members, as hypothesized by the Sterbcow Law Group. (Docket 10-7777; Rec. Doc. 92 at 19-20.)

### A.     Declarations in Support of Objectors

Various objectors submitted declarations in support of their objections. Many of the declarants appear to be unqualified to offer the opinions articulated. For example, James H. Kirby III is a graduate student in coastal geology. Mr. Kirby does not have a degree or training in environmental or analytical chemistry, and his resume does not reflect any experience with oil spill clean-up, biodegradation processes, the design of properly controlled environmental studies, putative contaminants analysis, or human health issues—even though he purports to opine on these issues. [30]

Likewise, Dr. William Sawyer, though a trained toxicologist, asserts conclusions without supporting evidence, mischaracterizes the circumstances of the *Deepwater Horizon* oil spill and response, misstates and omits data from the articles he cites, and offers evidence that does not appear to be tied in any way to the *Deepwater Horizon* Incident.[31] In addition, the Court notes

---

[30] Similarly, Halliburton does not explain how Dr. Vellrath, an economist and financial analyst, is qualified to offer opinions on the appropriateness of class certification in this case. (*See* Declaration of Marc Vellrath, Docket 10-7777, Rec. Doc. 93-1, ¶ 4.)

[31] On the evening before the fairness hearing, objectors represented by Robert J. McKee and others filed a motion for leave to supplement the record with an additional declaration by Dr. Sawyer. (Rec. Doc. 7864.) Because

that Dr. Sawyer has been disqualified as an expert in several cases, including *Whitlock v. Pepsi Americas*, No. C-08-2742, 2011 WL 2746494 (N.D. Cal. Jul. 13, 2011); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009); *Hill ex. rel. Hill v. Koppers, Inc.*, Civ. Action No. 3:03CV60–P–D, 2009 WL 4908836 (N.D. Miss. Dec. 11, 2009); and *Adams v. Cooper Indus., Inc.*, Civ. A. 03- 476- JBC, 2007 WL 1805586 (E.D. Ky. June 21, 2007).

Objectors submitted a declaration from Ms. Wilma Subra, who purports to have conducted environmental sampling and health surveys in relation to the *Deepwater Horizon* Incident. However, Ms. Subra fails to provide any results of such sampling or surveys indicating a potential for adverse health effects as a result of the oil spill. Ms. Subra's assertion that, if asked, she "would have presented the results of [her] evaluations of the environmental damage due to the BP Crude Oil spill" to the PSC does little to help the Court in this matter. (Decl. of Ms. Wilma Subra (Rec. Docs. 185-9, 202-9) ¶ 7.) Similarly, Ms. Subra notes that she has observed and received reports of oiling along the Gulf Coast in Summer 2012, but again fails to provide evidence that such re-oiling presents a potential health risk to Clean-Up Workers or Gulf Coast Residents. Ms. Subra's conclusory and unsupported assertions are not helpful to the Court, a deficiency for which numerous other courts have criticized her submissions. *See, e.g., Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 825 (5th Cir. 1993) ("Like [plaintiff's other expert] Ms. Subra did not conduct any chemical analysis. . . . Unlike [that expert], she did not even base her conclusions on any chemical analysis or testing by a third party. Instead she relied solely on physical observations of waste at a site unrelated to this case, with no chemical analysis of the waste to determine whether it was toxic.") (internal citation omitted); *Edmundson Bros. v. F.M. Carriere & Son, Inc.*, 552 So. 2d 1229 (La. Ct. App. 1989) (Plaintiff hired Subra as a

---

the September 7, 2012 deadline for filing briefs and supporting evidence had long passed, the Court denied this motion and struck the motion and declaration in their entirety from the Record. (Order, Rec. Doc. 7870.)

chemist to test properties of guar gum in food product action; court found that Subra's results were contradicted by defendants' chemist and that plaintiffs failed to prove product was defective).

Objectors also submitted a declaration from Dr. Michael Robichaux, an ear, nose and throat doctor, who concedes that he is "not a scientist and [he does] not consider [himself] to be distinguished." (Decl. of Dr. Michael Robichaux, Rec. Docs. 185-3, ¶ 24; 202-3, ¶ 24.) Dr. Robichaux purported to offer an opinion related to environmental and occupational medicine and toxicology, but does not claim to have any training or expertise in these areas. In his declaration, Dr. Robichaux also claims that Chronic Specified Physical Conditions on the Matrix do not reflect the vague types of neurological conditions described by one of his alleged patients which he claims are typical of others. However, neither Dr. Robichaux nor the objectors who submitted his declaration have provided competent evidence of those conditions his patients claim to have, the testing and examination methodology he uses to diagnose such conditions, or the basis for asserting that such diseases or conditions were improperly excluded from the Matrix. (*See*, *e.g.*, Harbut Supp. Decl. ¶ 4; Herzstein Supp. Decl. ¶¶ 4.i., 4.j.) Similarly, Dr. Robichaux claims that some of his patients have improved with detoxification treatment, but BP has presented uncontradicted evidence that detoxification programs are generally not recognized by the scientific or medical communities. (*See* Supp. Decl. of Robert Cox, Rec. Doc. 7732-2, ¶ 23.) To the extent that Dr. Robichaux, Ms. Subra, or others claim that "detoxification" treatment can "remove" VOCs from the blood, BP has presented evidence that VOCs actually have short half lives of hours to a few days, and thus there would be nothing left to "detoxify" in the months or years after exposure. (*See* Cox Supp. Decl. ¶¶ 18-20; Herzstein Supp. Decl. ¶ 7.) BP has also presented evidence, again uncontradicted, that there is no credible, peer-reviewed

scientific evidence that detoxification treatment improves symptoms or that any improvement is not the result of the placebo effect or other causes. (*See* Herzstein Supp. Decl. ¶¶ 8, 8.b.) Dr. Robichaux also offers an unsupported opinion that the Medical Encounters Database is "probably useless" based on his discussion with a single individual; similarly he states that the Zones are probably unfair to Louisiana's citizens, but provides not a single reason why. (Robichaux Decl. ¶¶ 12, 28-30.) Dr. Robichaux wholly failed to provide any competent evidence in support of the assertions he makes.[32]

Attorney Robert McKee submitted a declaration in which he provides conclusory statements regarding his clients' alleged injuries, causation, and damages. (Docket 10-7777, Rec. Docs. 185-4, 202-4.) While Mr. McKee says that he has litigated many cases relating to exposure to organic chemicals, he does not claim to have any actual, recognized education, training or experience in medicine or toxicology. Mr. McKee's unsupported statements are not credible medical or scientific evidence to support his clients' objections to the Settlement.

Nevertheless, the Court has carefully considered these submissions and the issues raised and concludes that, even if they were admissible, they would simply serve to demonstrate the existence of disputed factual and medical issues, but would not undermine the fairness, reasonableness, and adequacy of the Medical Settlement.

### B.    Objections to the Class Definition

Some individuals object to the Medical Settlement on the basis that the Zones should have been drawn differently such that those individuals would be included in the Class.[33] Other individuals have objected to the exclusion from the Class of tourists, visitors, or those residents

---

[32] After the Fairness Hearing, Dr. Robichaux has continued to mail *ex parte* communications to the Court. Such communications are inappropriate and have not been considered by the Court.

[33] Docket 10-7777, Rec. Docs. 185-1 and 202-1 (listing Class Members joining objection due to "unfair exclusion"), 203, 205.

who lived in the Zones for a shorter or different duration than that described in the Class definition.[34]   As discussed above, such non-Class Members lack standing to object to the Settlement Agreement.  Because these individuals are not Class Members, they retain any claims they might have against BP, and their interests are not affected by the Settlement Agreement.

### C.      Objections to the Amount of Compensation Under the Specified Physical Conditions Matrix

Several objectors argue that additional compensation should be awarded to Class Members with Specified Physical Conditions.  (*See*, *e.g.*, Docket 10-7777, Rec. Docs. 41, 124, 130, 160, 185, 202, 203, 205, 243.)   But these individuals do not raise any objections to the structure or process of the settlement negotiations or make any non-speculative allegations of collusion or fraud.   (*See*, *e.g.*, Docket 10-7777, Rec. Docs. 41, 124, 185, 202, 203, 205.) Accordingly, the payments negotiated by Class Counsel and reflected in the Settlement are presumed reasonable.  *See Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984); *Turner*, 472 F. Supp. 2d at 852.  This is because, under Rule 23, Class Counsel "are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit."  *Turner*, 472 F. Supp. 2d at 852.  If the settlement was reached at arm's length by knowledgeable counsel, the "trial court 'should be hesitant to substitute its own judgment for that of counsel.'"  *Ruiz*, 724 F.2d at 1152 (citation omitted).

Furthermore, the payment amounts reflected on the Matrix represent just one component of the Settlement and are the product of a hard-fought, arm's length compromise that also included, for example, the conditions to be included in the Matrix, standards of proof, and levels of compensation and enhancers for overnight hospitalization, as well as the components,

---

[34] Docket 10-7777, Rec. Docs. 180 at 3; 185-1 and 202-1 (listing non-Class Members joining objection due to "unfair exclusion") and 185-12 and 202-12 (non-Class Member who visited the Gulf and claims illness due to exposure to oil and/or dispersants).

duration, and frequency of the Periodic Medical Consultation Program, the specifics of the Back-End Litigation Option, the Outreach Program, and many other negotiated terms.  (*See* Rec. Doc. 7112-1 at 25.)  Objectors also disregard that the Settlement provides a mechanism for the timely and efficient administration of benefits to claimants, compared with the cost and delay of obtaining any recovery following trial (even assuming a favorable judgment, which is not certain).  This Court must consider the whole Settlement and all of the benefits it provides.  *See Robinson*, 2005 WL 5253339, at *5 ("In considering the extent and significance of the objections, 'the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis.'") (citation omitted); *Mich. Hosp. Ass'n* 1991 U.S. Dist. LEXIS 2058, at *11-12.  "In assessing the settlement, the Court must determine 'whether it falls within the range of reasonableness, not whether it is the most favorable possible result in the litigation.'"  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993) (citation omitted); *see also Cotton*, 559 F.2d at 1330.  Finally, as stated above, the compensation structure in the Matrix is in line with court decisions valuing similar injuries.

The Parties have presented evidence that the amounts paid under the Matrix are well within the range of jury verdicts involving similar injuries and thus reflect litigated outcomes of those claims. (*See* note 26, *supra*.)  In contrast, objectors have presented neither case law nor any competent evidence demonstrating that the payment amounts do not fairly compensate them, particularly given the inherent risks and uncertainty of trial.  *See*, *e.g.*, *In re Shell Oil Refinery*, 155 F.R.D. at 565 (finding that although "the range of possible recovery by jury verdict could have been less or more than the settlement," it was "significant that there has been no evidence offered to show that the settlement value is inadequate in relation to the amount that a jury could have awarded").

Other objectors argue that awards should be higher because they would be entitled to recover punitive damages at trial. (Docket No. 10-7777, Rec. Doc. 130, 180, 185, 202, 208, 236.) Given that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award. *See*, *e.g.*, *In re Shell Oil*, 155 F.R.D. at 563 (approving settlement when it was "not clear that the plaintiffs could prove punitive liability and obtain a punitive damage award in excess of [defendant's] . . . settlement offer"); *Petrovic*, 200 F.3d at 1150 (district court did not abuse its discretion in approving settlement where there was "speculative possibility of punitive damages"); *In re Diet Drugs*, 2000 WL 1222042, at *49 n.22 ("punitive damage claims are often illusory"); *Draney v. Wilson, Morton, Assaf & McElligott*, No. Civ. 79-1029, 1985 WL 5820, at *3 (D. Ariz. Sept. 30, 1985) (approving settlement when "[a]ny award of punitive damages would be highly speculative"). Furthermore, in this case, BP asserts that it conducted all Response Activities under the direction of the United States government and, therefore, BP argues that an award of punitive damages at trial is particularly unlikely.[35] Plaintiffs dispute BP's factual and legal positions, and the issues would be exhaustively litigated. It is therefore reasonable for the Parties to have compromised punitive damages in exchange for the Settlement's many benefits.

Those objectors who are unhappy with their anticipated settlement compensation could have opted out and pursued additional remedies through individual litigation. The D'Amico Objectors claim that opt-out rights are not a solution because many claims are of negative value. (Docket No. 10-7777, Rec. Doc. 158 at 1–2.) Under Rule 23, the Class Representatives and Class Counsel are charged with protecting the interests of all Class Members, including those with negative value claims, and the D'Amico Objectors offer no valid basis to question their

---

[35] Class Members do retain the right to seek punitive damages from Transocean and Halliburton. (MSA § XVI.G.)

adequacy.   Moreover, that many claims are of negative value is a reason to approve the Settlement, not reject it.   (*See* Coffee Decl. ¶ 9(d) ("This is a largely 'negative value' class action which presents a 'compelling rationale' for certification"); *id.* ¶¶ 38-41; Miller Decl. ¶ 37.)

The Sterbcow Objectors also complain that the Settlement does not provide for an "initial diagnosis" that would allow class members to see a medical professional in order to "figure out whether or not they have a chronic problem that is associated from their exposure" to oil and/or dispersants.   (11/8/12 Hearing Tr. at 244:16-17.)   But it is entirely reasonable for the Parties to agree to compensate Class Members for the acute or chronic Specified Physical Conditions they can demonstrate, rather than provide medical services to determine whether they have a particular condition in the first place.   After all, in the absence of a settlement, these objectors would be required to prove their claims in a court of law under evidentiary standards that are more rigorous than anything in the Medical Settlement.   This objection is overruled.[36]

### D.   Objections Concerning the Medical Conditions Covered Under the Specified Physical Conditions Matrix

Certain objectors argue that the Settlement should include additional or different conditions.[37]   However, the Parties negotiated the Matrix to include "those conditions for which there is a medical basis to conclude that contact with oil and/or dispersants caused them if there were exposure to sufficient amounts of such substances for a sufficient duration of time." (Herzstein Decl. ¶ 14; *see also* Harbut Decl. ¶¶ 17, 25–38.)   The objectors have provided no

---

[36]   At the Fairness Hearing, counsel for the Sterbcow Objectors suggested that the Settlement may "interrupt" a Class Member's rights under workers' compensation laws to pursue a claim for a Specified Physical Condition, before admitting that he does not know whether, in fact, this is the case.   (11/8/12 Hearing Tr. at 245:9-246:3.)   The Court has reviewed the Agreement and finds that it does not alter the existing rights, if any, of Class Members under workers' compensation laws.

[37]   Docket 10-7777, Rec. Docs. 92, 180, 182, 185, 202, 208; *see also* Hearing Tr. (233-238, 243-244) (asserting that the Matrix unfairly excludes vague, unspecified types of chromosomal, liver, renal, immunological, and neurological effects); *see also* Herzstein Supp. Decl. ¶ 4 for additional discussion.

reasonable medical or scientific basis to conclude that any of the additional conditions they mention fit those criteria, nor have they provided any competent medical evidence that they actually have those claimed conditions.[38]

For example, declarant Dr. William Sawyer references literature regarding prior oil spills in arguing that the Settlement does not account for the full spectrum of medical conditions that can result from exposures after an oil spill. As a threshold matter, the Matrix does in fact includes many of the conditions and symptoms that are referenced in the literature regarding previous oil spills that Dr. Sawyer cites in his declaration. (Herzstein Supp. Decl. ¶ 4.h.) However, the literature that Dr. Sawyer relies upon does not support including other conditions on the Matrix as to the facts of the oil spill here. This is because different oil spills release different types and concentrations of chemicals, and the geographic and temporal proximity to the source of a spill can vary significantly. (*Id.*; *see also* Cox Supp. Decl. ¶¶ 36-37.) BP presented evidence that many of the medical conditions Dr. Sawyer references, such as peripheral neuropathy, would not occur at the levels of exposure measured during the *Deepwater Horizon* oil spill, and Dr. Sawyer provides no evidence to the contrary. (Cox Supp. Decl. ¶¶ 36-37.)

In addition, some of the conditions objectors raise are not medically recognized conditions. For example, declarant Dr. Michael Robichaux suggests that many of his patients have developed multiple chemical sensitivity ("MCS").[39] MCS is not recognized as a disease or medical condition by the International Classification of Disease (ICD-10), the medical

---

[38] A related objection argues that the Settlement should provide for simultaneous recovery for a heat-related condition as well as an unrelated condition due to exposure to oil and/or dispersants. (Docket 10-7777, Rec. Doc. 92 at 14–15.) The Settlement provides that a Class Member may receive a single recovery under the Matrix for the most highly-compensated condition for which he or she qualifies. As with other allocations of compensation negotiated by the Parties, the objectors have presented no evidence that would merit the Court revisiting those fairly negotiated terms.

[39] Docket 10-7777, Rec. Doc. 185-3 at 6.

organization responsible for assigning codes for recognized diseases. In addition, a number of medical organizations have published strong position statements against the concept of MCS because of the lack of science demonstrating that MCS is a real condition. (Cox Supp. Decl. ¶ 7.) In any event, those with conditions not on the Matrix had the right to opt out and litigate their claims. These objections are overruled.

Some objectors assert that they developed certain conditions classified on the Matrix as Acute Specified Physical Conditions, but that those conditions persist to the present. (*E.g.*, Docket 10-7777, Rec. Doc. 92.) Class Counsel and BP have presented evidence that the Matrix includes the appropriate conditions. (Harbut Decl. ¶¶ 17, 25-38; Herzstein Decl. ¶ 14.) BP has presented evidence that while a few of the Acute Specified Physical Conditions are similar to corresponding Chronic Specified Physical Conditions (*i.e.*, dermatitis, eczematous reaction, rhinosinusitis, and ocular), there is no scientific evidence that the other Acute Specified Physical Conditions would persist if they were in fact caused by the Class Members' contact with oil and/or dispersants. (Herzstein Supp. Decl. ¶ 5.) Objectors have presented no competent medical or scientific evidence to the contrary.

Some objectors criticize the Matrix because it does not include "chronic effects" of exposure to oil and/or dispersants which have latency periods of decades or longer following exposure. (Docket 10-7777, Rec. Docs. 185, 202; Hearing Tr. (233-234).) The Parties dispute whether exposures from the *Deepwater Horizon* Incident would be expected to result in latent disease. (Harbut Decl. ¶ 45; Herzstein Decl. ¶¶ 26-28.) However, BP presented evidence that, to the extent that latent diseases could be caused by exposure to oil and/or dispersants at sufficient doses, such diseases would not be expected to manifest in Class Members for years after exposure. (Herzstein Decl. ¶ 16.) Accordingly, to the extent that Class Members manifest a

latent condition that they attribute to their exposure to oil and/or dispersants, the Back-End Litigation Option, not the Matrix, provides an appropriate mechanism for Class Members to seek compensation for such conditions.

### E. Objections to the Procedural Aspects of the Specified Physical Conditions Matrix

Some objectors argue that the proof requirements for compensation under the Matrix are too stringent, while others argue that the proof requirements unfairly fail to distinguish between those with substantial proof of their conditions from those with little proof. The Matrix, however, provides for a range of potential proof, tying the amount of payments to the amount and quality of evidence presented. Providing a spectrum of settlement awards linked to a Class Member's level of proof is entirely appropriate. *See*, *e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005) ("Settlement proceeds may be allocated according to the strengths and weaknesses of the various claims possessed by Class Members.") (citing *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001)). They are also tied to the reality of litigating; the greater the proof, the more likely a plaintiff will recover at trial.

Other objectors criticize the time periods in which Specified Physical Conditions must manifest themselves. The evidence presented shows that the time periods agreed to by the Parties are appropriate and scientifically supported. (Harbut Decl. ¶ 26; Harbut Supp. Decl. ¶ 8; Herzstein Decl. ¶ 20; Herzstein Supp. Decl. ¶ 6.)

One group of objectors complains that the Settlement inappropriately releases claims for certain alleged past exposures (after September 30, 2010 for Zone A Residents, after December 31, 2010 for Zone B Residents, and after April 16, 2012 for Clean-Up Workers) without providing compensation. (Docket No. 10-7777, Rec. Doc. 124 at 15–16.) This objection misconstrues the Settlement terms. Claims for injuries based on exposures to oil or

dispersants after April 16, 2012 are not released. Zone A Residents who claim injuries for exposures after September 30, 2010 are also not Class Members, and thus do not release those claims. Zone B Residents who claim injuries from exposures after December 31, 2010 but before April 16, 2012 do release those claims, in exchange for the benefits the Settlement provides. It is well established that parties can settle claims without providing compensation for every alleged injury. *See*, *e.g.*, *Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983); *see also Berardinelli v. General Am. Life Ins. Co.*, 357 F.3d 800, 805 (8th Cir. 2004). Further, Class Members not satisfied with the benefits provided in the Settlement may opt out of the Settlement.

The same group of objectors argues that the Settlement should provide for an appeals process. The Settlement does provide for a right to cure defective claims (MSA § V.F.) and a right of review for erroneous determinations (MSA § V.M), additional features not found in many class settlements. Further, the claims administration process is governed by a Matrix with objective proof standards that minimize the Claims Administrator's discretion. The review process embodied in the Settlement is more than adequate. An appeals process would likely result in delayed compensation to claimants and increased costs of claims administration, with little additional benefit. It is thus routine to approve settlements without such a process. *See*, *e.g.*, *In re WorldCom, Inc.*, 347 B.R. 123, 155 (Bankr. S.D.N.Y. 2006); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 339 (3d Cir. 2010).

Another objector criticizes the absence of an arbitration/mediation mechanism in the Matrix, and suggests a "front-end" provision similar to the Back-End Litigation Option. (Docket 10-7777, Rec. Doc. 160.) However, such a provision would effectively eliminate the fair, simple, and efficient mechanism for determining compensation provided by the Matrix, which is

one of the positive features of the Settlement for Class Members.  This objection is overruled.

**F.      Objections to the Terms of the Back-End Litigation Option**

Some objectors argue that the Back-End Litigation Option's election of remedy provision is unfair because a Class Member may not pursue BP through the Back-End Litigation Option if the Class Member also files a claim, even if unsuccessful, under workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (Docket 10-7777, Rec. Doc. 124 at 29–30.)  The Court finds nothing unfair about the compromise reached by the Parties.  As with the other provisions of the Back-End Litigation Option, both sides exchanged valuable consideration related to these issues.   While Class Members must elect a remedy and waive any right to punitive damages, BP conceded that in a Back-End Litigation Option Lawsuit, it will not assert any defense based on exclusivity of remedies under workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  (MSA § VIII.G.2.d.)  BP further agreed not to contest Class Member's exposure to oil and/or dispersants, or BP's liability in connection with the *Deepwater Horizon* Incident.   BP waived other defenses as well, including that such a lawsuit is untimely, and that it is barred by a claim-splitting defense.  This objection is overruled.

Another group of objectors assert that exacerbation of pre-existing conditions diagnosed before April 16, 2012, should be included in the Back-End Litigation Option. (Docket No. 10-7777, Rec. Doc. 92 at 15–16.)  The Parties have stated that exacerbation of such conditions, if they meet the other requirements of a Later-Manifested Physical Condition (including time of exposure), is covered by the Back-End Litigation Option.  To the extent an individual has already recovered under the Matrix for such a condition, there is no unfairness in excluding double recoveries.  This objection is overruled.

### G. Objections Related to the Gulf Region Health Outreach Program

One group of objectors, represented by attorney Darrell Palmer,[40] who spoke on this issue at the Fairness Hearing, contends that the Medical Settlement contains a "*cy pres*" component and thus cannot be approved. (Docket No. 10-7777, Rec. Doc. 124 at 21.) Mr. Palmer did not specifically identify the allegedly objectionable portion of the Medical Settlement in his written objection, but apparently was referring to the Outreach Program, as he confirmed at the Fairness Hearing. (11/8/12 Hearing Tr. at 225:20-22.) As previously discussed, the Outreach Program does not constitute an improper *cy pres* distribution. (*See* Part V.A.5.a, *supra*.)

Other objectors complain that the Settlement contains no provision for mental health benefits. (Docket No. 10-7777, Rec. Docs. 182 at 2-3, 180, 185, 202, and 208.) This objection is simply wrong. The Outreach Program directs significant funding—$36 million—toward improving mental healthcare capacity in the region and providing mental health counseling. Accordingly, this objection has no merit.

### H. Objections Concerning Worker Protection

A small number of objectors claim that the Settlement Agreement provides insufficient compensation because Clean-Up Workers were not adequately protected from chemical exposures during the *Deepwater Horizon* Response.[41] Specifically, these objectors claim that they were not provided with adequate levels of personal protective equipment ("PPE").

BP contests this fact and provided fact witness declarations that it, in coordination with the Unified Area Command, provided PPE to Clean-Up Workers pursuant to guidelines that

---

[40] Mr. Palmer has been deemed a "serial objector" by several courts. (*See* 11/8/12 Hearing Tr. at 223:12-224:16; *see also id.* at 224:7-10 (Mr. Palmer admitting it was "regrettable" that he had been found to have engaged in "bad faith and vexatious conduct").)

[41] Docket 10-7777, Rec. Docs. 130 at 5, 57 at 1.

were developed with input from qualified federal professionals from OSHA and NIOSH. (Dutton Decl. ¶¶ 55-59; Dutton Supp. Decl. ¶ 14.) BP also presented evidence that industrial hygiene professionals from BP, OSHA, NIOSH, and the U.S. Coast Guard, among others, regularly visited work sites to ensure that Clean-Up Workers were wearing appropriate levels of PPE, and these objectors have not provided competent evidence to the contrary. (Dutton Supp. Decl. ¶ 15.) In any event, these objections provide no basis to question the fairness, reasonableness, or adequacy of the Settlement. The Settlement provides compensation for exposure-related injuries regardless of whether such injuries occurred while using PPE or not.

## I.      Objections Concerning Possible Re-Oiling or Potential Future Exposures

Some objectors raise concerns that the Medical Settlement fails to compensate for harm based on future exposures to oil and/or dispersants.[42] These objections misconstrue the Settlement Agreement. Class Members are not releasing claims based on future exposure to oil and/or dispersants. Only claims for conditions caused by past exposures (as defined in the Settlement Agreement) are released. In addition, Back-End Litigation Option rights related to later-manifesting conditions are based on past—not future—exposures. Class Members retain the right to sue in the event that they are allegedly exposed to oil and/or dispersants in connection with the *Deepwater Horizon* oil spill after the cut-off dates provided in the Settlement Agreement.

## J.      Objections Related to the *Reed* Factors

The Sterbcow Objectors argue that the *Reed* factors weigh in favor of rejecting the Settlement Agreement. For example, with respect to the fourth *Reed* factor (the probability of plaintiffs' success on the merits), the Sterbcow Objectors argue that "it is hard to see how the

_____

[42] Docket 10-7777, Rec. Docs. 124 at 12, 182 at 4, 185-5 at 18; 202-5 at 18.

Claimants will not prevail at trial." (Docket No. 10-7777, Rec. Doc. 92 at 16.) Such conclusory assertions of assured victory for the Claimants do not provide a valid basis for rejecting the Settlement Agreement. *See*, *e.g.*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1394 (D. Ariz. 1989) (rejecting objections based on "fallacious" assumption that "the case assured certain victory for Plaintiffs"), *aff'd*, 955 F.2d 1268 (9th Cir. 1992). The Sterbcow Objectors' remaining arguments on the *Reed* factors are likewise unsupported and insufficient to show that the Medical Settlement should not be approved.

### K.      Objections Related to OPA Requirements

Certain objectors criticize the Settlement Agreement for disallowing interim claims as required by OPA.[43]  OPA does not provide for any compensation for personal injury claims. Accordingly, such objections are legally irrelevant and require no further response.

### L.      Objections Related to Medicare

One objector criticizes the Settlement Agreement's provisions related to the protection of Class Members' and Medicare's interests regarding reimbursement for medical items, services, and prescription drugs.[44]  Medicare is entitled to reimbursement for payments for medical items, services, and prescription drugs already paid by Medicare prior to the Medical Settlement. *See* 42 U.S.C. § 1395y(b)(2)(B)(i).  Medicare also asserts that settling claimants must protect the Medicare Trust Fund's interest when future medical care is claimed in litigation or the settlement releases claims for future medical care. *See*, *e.g.*, Medicare Program; Medicare Secondary Payer and "Future Medicals," 77 Fed. Reg. 35917, 35918 and 35919 (proposed June 15, 2012) (to be codified at 42 C.F.R. pts. 405 & 411).

---

[43] Docket 10-7777, Rec. Docs. 180 at 2–3, 185 at 3, 202 at 3.

[44] Rec. Doc. 130 at 25.

As part of the Settlement Agreement, the Claims Administrator is negotiating a written agreement with the Centers for Medicare & Medicaid Services ("CMS") to establish a global resolution program, as set forth in Section XXIX.A.1 of the Settlement Agreement, to resolve all of the Medicare Program's interest in Fee-for-Service Medicare Part A and Part B recovery obligations in the settlement funds of Class Members who are or were entitled to receive benefits under the Medicare Program.[45] This global resolution program will, if achieved, provide an efficient way to protect the Medicare Program's interests in the settlement funds while also providing significant benefits to Class Members. As set forth in Section XII of the Claims Administrator's October 22, 2012 Status Update, the global resolution program will provide numerous practical benefits to Class Members who are or were entitled to receive original Medicare benefits, ensuring that Medicare will not deny relevant Class Members coverage for any future medical expenses they might incur in connection with their alleged injuries. (Rec. Doc. 7729-1.) The lien resolution provisions in the Settlement Agreement are structured to benefit Medicaid beneficiaries in similar ways. (*See* MSA § XXIX.) The global resolution mechanism ensures that claims payments to Medicare-entitled Class Members are not significantly delayed, which would be contrary to Class Members' interest in timely and efficient compensation. The global resolution approach has been successfully utilized in almost all MDL settlements involving personal injury claims since 2005. (October 22, 2012 Garretson Status Update, Rec. Doc. 7729-1 at 13.)

### M. Objections Related to Consortium Claims

The spouses of certain purported Class Members object that the Settlement Agreement

---

[45] The potential rights of Medicare Advantage and Medicare prescription drug ("Part D") plan sponsors would be handled in a different manner, which is likewise structured to protect Class Members from future recovery claims through satisfaction and discharge of identified lien and other interests. (MSA § XXIX.A, C, E, G–L.)

should also compensate them for their loss of consortium claims. Spouses of Class Members do not have standing to object to the Settlement Agreement. The Settlement Agreement does not release spouses' consortium claims, which will be governed by applicable law. *Compare with Amchem*, 521 U.S. at 603-04 (spouses of exposed and injured Class Members were themselves Class Members, and thus their claims for loss of consortium were extinguished under the settlement).

### N.    Other Objections

A few filings styled as objections raised no substantive issues concerning the settlement. These include objectors Ilease Bartlette (Doct 10-7777, Rec. Doc. 51), Jason Sims (Docket 10-7777, Rec. Doc. 61), and Stella Chagares (Docket 10-7777, Rec. Doc. 250). Ms. Bartlette filed a letter concerning alleged injuries involving another company, wholly unrelated to either BP or the *Deepwater Horizon* Incident. Mr. Sims discusses the *Deepwater Horizon* Incident as he believes it relates to his religious views. Ms. Chagares appeared to argue that she disagreed with the decision to set up the Gulf Coast Claims Facility, as well as how her claim to the GCCF was handled. These objections are overruled. [46]

### IX.    Conclusion

For the foregoing reasons, the Court confirms its preliminary decision to certify the

---

[46] Halliburton and Malcolm Coco also filed objections to preliminary approval of the Settlement. (Rec. Docs. 6350, 6318.) The Court overruled these objections at the preliminary approval stage and nothing has occurred to justify a different result now. (Rec. Doc. 6419 at 14.) Indeed, as this Court has already ruled, Halliburton has no standing to challenge the Settlement. (Rec. Doc. 7038.) Mr. Coco has opted out of the Settlement, and also lacks standing. Their objections also fail on the merits. Mr. Coco argued that the Settlement discriminates against parties whose claims are resolved outside of the Medical Settlement Agreement because the Court's pre-settlement holdback order continues to apply to such claims. The fee award under the Settlement, which BP has agreed not to contest, relates to the common benefit that Class Counsel provided in connection with the Settlement itself. The PSC's original holdback motion described its many efforts (unrelated to settlement) that have purportedly provided a common benefit to all those making claims related to the *Deepwater Horizon* Incident. (Rec. Doc. 4507.) Moreover, the funds assessed under the holdback order will be held in an escrow account until the Court ultimately determines whether the PSC is entitled to a common benefit award based on the PSC's non-settlement efforts. The continued application of the holdback is therefore not improper and does not provide any reason to reject the Settlement.

Medical Class for settlement purposes only. Furthermore, the Court approves the Parties' Settlement Agreement in all respects and as to all Parties, including BP, Class Representatives, and Class Members. The Court has considered and overrules all the objections to the Settlement that have been made, regardless of whether or not the purported objector had standing or timely objected. A separate "Order and Judgment" will issue with this Order and Reasons.

Signed in New Orleans, Louisiana, this 11th day of January, 2013.

_____
United States District Judge

# APPENDIX A: INDEX OF DECLARATIONS SUBMITTED BY BP AND/OR CLASS COUNSEL

**Joint Submissions:**

Azari Decl. (Rec. Doc. 7113-1) and Azari Supp. Decl. (Rec. Doc. 7730-1)

Coffee Decl. (Rec. Doc. 7113-2) and Coffee Supp. Decl. (Rec. Doc. 7730-2)

Garretson (Rec. Doc. 7730-3) and Garretson Supp. Decl. (Rec. Doc. 7944-1)

Goldstein Dec. (Rec. Doc. 7113-3) and Goldstein Supp. Decl. (Rec. Doc. 7730-4)

**Class Counsel Submissions:**

Greenwald Decl. (Rec. Doc. 7116-2 at 94)

Harbut Decl. (Rec. Doc. 7116-1) and Harbut Supp. Decl. (Rec. Doc. 7728-3)

Herman Decl. (Rec. Doc. 7116-2 at 89)

Issacharoff Decl. (Rec. Doc. 7116-2 at 73)

Klonoff Decl. (Rec. Doc. 7116-2) and Klonoff Supp. Decl. (Rec. Doc. 7728-2)

Class Representatives: Kip Plaisance Decl. (Rec. Doc. 7116-2 at 102), Perkins Decl. (Rec. Doc. 7116-2 at 105), Warren Decl. (Rec. Doc. 7116-2 at 108), Pizani Decl. (Rec. Doc. 7116-2 at 111), Max Plaisance Decl. (Rec. Doc. 7116-2 at 114), Barbee Decl. (Rec. Doc. 7116-2 at 117), Divinity Decl. (Rec. Doc. 7116-2 at 120), Brown Decl. (Rec. Doc. 7116-2 at 123), Caster Decl. (Rec. Doc. 7116-2 at 126), Baker Decl. (Rec. Doc. 7116-2 at 129), Hall Decl. (Rec. Doc. 7116-2 at 132)

**BP Submissions:**

Bloomer Decl. (Rec. Doc. 7112-6)

Cox Decl. (Rec. Doc. 7112-4) and Cox. Supp. Decl. (Rec. Doc.7732-2)

Dutton Decl. (Rec. Doc. 7112-2) and Dutton Supp. Decl. (Rec. Doc. 7732-3)

Green Decl. (Rec. Doc. 7112-5) and Green Supp. Decl. (Rec. Doc. 7732-6)

Herzstein Decl. (Rec. Doc. 7112-7) and Herzstein Supp. Decl. (Rec. Doc. 7732-1)

Lees Decl. (Rec. Doc. 7112-3) and Lees Supp. Decl. (Rec. Doc. 7732-5)

Miller Decl. (Rec. Doc. 7112-8) and Miller Supp. Decl. (Rec. Doc. 7732-4)

Taylor Decl. (Rec. Doc. 7114-20) and Taylor Supp. Decl. (Rec. Doc. 7731-11)

**Backgrounds of Select Declarants (for backgrounds not provided here, see the declarations in the Court's record):**

*John C. Coffee, Jr.* is the Adolf A. Berle Professor of Law, Columbia University Law School. (Coffee Decl. ¶ 1.) Professor Coffee has taught at Columbia since 1980, and one of his principal academic interests has been class action litigation (with a special focus on the organization and management of the large class action). (*Id.* ¶ 2.) His articles on class actions have been cited on several occasions by the United States Supreme Court, including in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 850 n.28 (1999). (*Id.*) Professor Coffee's declarations set forth his independent opinions regarding certification of the Medical Benefits Settlement, (*see* Coffee Decl. ¶ 1; *see also* Coffee Supp. Decl.), which the Parties agree should be considered by the Court, but which do not necessarily represent the views of all Parties on all of the matters on which Professor Coffee opines. He has served as an expert witness in a number of class actions, in the Fifth Circuit and other courts, including *Amchem*; *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); and *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000), *aff'd* 264 F.3d 201 (3d Cir. 2001). Professor Coffee's declarations were submitted jointly by the Parties.

*Robert Cox, M.D., Ph.D.* is a board-certified emergency physician and medical toxicologist. He has a doctorate in Analytical Chemistry from the University of Iowa and a doctorate in Medicine from the University of Texas Southwestern Medical School. Dr. Cox also holds board certifications in Medical Toxicology and Emergency Medicine through the American Board of Medical Specialties, and a certification in Toxicology through the American

Board of Toxicology.  (Cox Decl. ¶¶ 1-2.)

Dr. Cox is currently a professor in the School of Medicine at the University of Mississippi Medical Center in Jackson, Mississippi.  In addition, Dr. Cox serves as the Director of the Mississippi Poison Control Center and the Director of the Medical Toxicology Service at the University of Mississippi Medical Center.  During the *Deepwater Horizon* Response, Dr. Cox worked with the Mississippi State Department of Health on issues relating to the protection of Mississippi residents from potential exposures to contaminants released in connection with the oil spill.  In that role, Dr. Cox reviewed, on a daily basis, environmental monitoring data collected along the Gulf Coast of Mississippi, received calls directed to the state poison control center related to potential exposures, and assisted with the review of hospital admissions data.  (*Id.* ¶¶ 1, 4.)

Dr. Cox, whose declarations were submitted by BP, offered opinions on the toxicological properties of the components of MC252 oil and the two Corexit dispersants used during the Response and on the potential for significant adverse health effects for Clean-Up Workers and Gulf Coast Residents from inhalation and dermal exposures to the components of oil, dispersants, and other spill-related compounds in connection with the *Deepwater Horizon* Incident.

**David Dutton, Ph.D.**, a BP employee, was the Industrial Hygiene Team Lead for the Unified Area Command on the *Deepwater Horizon* Response.  Dr. Dutton is a toxicologist and certified industrial hygienist who has practiced in these fields for over 20 years.  He received a Bachelor of Science degree in biology, and Masters and Doctorate degrees in toxicology. Dr. Dutton's experience includes occupational exposure assessments at a refinery and a petrochemical plant, identification and communication of potential risks, oversight of

toxicology testing programs, regulatory compliance, community exposure assessments, and oversight of toxicological research regarding chemical products. (Dutton Decl. ¶¶ 1-2.)

As Industrial Hygiene Team Lead, Dr. Dutton was responsible for designing, implementing, and overseeing BP's industrial hygiene program during the Response, which included establishing programs to monitor workers' potential exposure to potentially hazardous materials, developing policies and protocols related to worker safety and health, and designing and implementing worker training, among other duties. Dr. Dutton worked directly with federal government and Coast Guard personnel on virtually every aspect of the Response, and received updates at least twice daily on activities and potential problems. (*Id.* ¶¶ 3-4.)

Dr. Dutton authored two declarations that were submitted by BP. (Rec. Docs. 7112-2 and 7732-3.) Dr. Dutton utilized his personal knowledge, professional education, and experience to describe the Response effort. He explained both the structure and scope of the Response, including the application of dispersants, health and safety training, and the activities of Clean-Up Workers during the Response.

***Bernard D. Goldstein*, M.D.** is a Professor of Environmental and Occupational Health and the former Dean of the University of Pittsburgh Graduate School of Public Health. He is a physician, board certified in Internal Medicine, Hematology, and Toxicology. He was the founding Director of the Environmental and Occupational Health Sciences Institute, a joint program of Rutgers University and the Robert Wood Johnson Medical School, where he established and directed the Environmental and Occupational Health Sciences Institute, the largest academic environmental and occupational health program in the United States. (Goldstein Decl. ¶¶ 1-4.)

Dr. Goldstein has published in the areas of blood toxicity, the formation of cancer-

causing substances (free radicals) following exposure to inhalants, various aspects of public health decision-making, and global issues in environmental medicine.  He recently published an article examining the public health consequences following the *Deepwater Horizon* oil spill, specifically: the toxicological effects in workers, visitors, and community members following the spill; mental health effects from social and economic disruption; and ecosystem effects that have consequences for human health.  (*See* Bernard D. Goldstein, M.D., Howard J. Osofsky, M.D., Ph.D., & Maureen Y. Lichtveld, M.D., M.P.H., The Gulf Oil Spill, 364 NEW ENG. J. MED. 1334-1348 (2011).)

Dr. Goldstein serves as chair of the Coordinating Committee for the Gulf Region Health Outreach Program (the "Program" or "Outreach Program") and offered his expert opinions concerning that Program.  His declarations, which were submitted jointly by the Parties, describe the four projects that make up the Program:  the Primary Care Capacity Project, the Mental Behavioral Health Capacity Project, the Environmental Health Capacity and Literacy Project, and the Community Health Workers Training Program.  (*See* Goldstein Decl. ¶ 9.)  According to Dr. Goldstein, the four projects provide much needed public health benefits to the Gulf Coast region, a region that has been plagued by public health problems related to disease prevention, health literacy, and basic health maintenance.  (*Id.* ¶¶ 10-15.)  The Outreach Program is designed to respond to these community issues by improving the region's healthcare infrastructure and access to care for those most medically at risk through the use of Federally Qualified Health Centers ("FQHCs") and other clinics as the hub of the Program's healthcare structure.  (*Id.* ¶¶ 16, 19.)  Over the past two months, the projects in the Outreach Program have made significant progress in the planning and implementation of their operations, having received $20,732,508 in funding since June 2012.  (*See* Supp. Decl. of Bernard D. Goldstein, Rec. Doc. 7730-4, ¶¶ 3-5.)

*Laura Green, Ph.D., D.A.B.T.* is a Senior Scientist and the founder and President of Cambridge Environmental Inc., a consulting and research company that addresses health and environmental issues. (Green Decl. ¶ 1.) Dr. Green has a Bachelor's degree in chemistry from Wellesley College and a Ph.D. in food science and technology from MIT. She is board-certified in toxicology by the American Board of Toxicology. (*Id.*) Dr. Green has conducted research in chemical carcinogenesis and biochemical epidemiology at MIT, and was the Director of the Scientific Conflict Mapping Project at the Harvard School of Public Health. (*Id.*)

Dr. Green has provided expert testimony in toxicology, epidemiology, and health risk-assessment in numerous state and federal courts and administrative law hearings. Cases involving residential and/or occupational exposures to petroleum and associated chemicals include *Martin v. Amoco Oil Co.*, 696 N.E.2d 383 (Ind. 1998), and three cases consolidated for purposes of discovery and pre-trial proceedings with *Bly v. Tri-Continental Industries, Inc.,* 663 A.2d 1232 (D.C. 1995): *Bradley v. Tri-Continental Industries, Inc.*, C.A. No. 90-11383, *Carter v. Tri-Continental Industries, Inc.*, C.A. No. 90-11384, and *Taylor v. Tri-Continental Industries, Inc.*, C.A. No. 90-11385.

Dr. Green authored two declarations submitted by BP. (Rec. Docs. 7112-5 and 7732-6.) In those declarations, she opined that the low levels of exposure to dispersants and other chemicals experienced by Clean-Up Workers and Residents in connection with the *Deepwater Horizon* Incident were unlikely to pose a risk to their health.

*Michael R. Harbut, M.D., M.P.H., F.C.C.P.* is the Director of the Environmental Cancer Program at Karmanos Cancer Institute, which is affiliated with Wayne State University in Detroit, Michigan, where he is a Clinical Professor of Internal Medicine in the School of Medicine. He is the Chief of Occupational and Environmental Medicine at Providence Hospital

in Southfield, Michigan. He is board certified in Occupational Medicine, and has a Masters of Public Health, Environmental and Industrial Health. Dr. Harbut is the Director of the National Center for Vermiculite and Asbestos Related Cancers, and co-authored the American Thoracic Society's most recent guidelines for the diagnosis and treatment of asbestos-related disease.

Dr. Harbut has more than two decades of experience diagnosing and treating patients with workplace and/or environmental exposure to various chemicals, including certain constituents of oil and/or dispersants. In connection with the *Deepwater Horizon* Incident, Dr. Harbut has consulted with the United States Navy regarding its analysis of the safety of training missions.

In this case, Dr. Harbut authored two declarations submitted by Class Counsel, regarding the medical and scientific bases for the Matrix and the Periodic Medical Consultation Program. (Rec. Docs. 7116-1 and 7728-3.) Dr. Harbut has testified as an expert witness in other cases involving occupational and environmental exposure. *See, e.g., Jason Matteucci v. EQ - The Environmental Quality Co.*, 08-119374-NO (Mich. Cir. Ct. 2011); *Martinski v. Celotex*, No. 87-74688 (E.D. Mich. Oct. 20, 1988); *Martinski v. Owens Corning, et al.*, No. 87-74688 (E.D. Mich. Oct. 24, 1988).

**Jessica Herzstein, M.D, M.P.H.** is an occupational and environmental physician, with a focus on developing, implementing, and overseeing global health programs for thousands of workers, including those who have been exposed to potential environmental and occupational hazards. (Herzstein Decl. ¶¶ 1-2.) Dr. Herzstein, who is board certified in Internal Medicine and Occupational Medicine, is the Global Medical Director for Air Products and Chemicals, Inc., a chemical manufacturing company, and the President of Environmental Health Resources, P.C. From 1995 to 1997, Dr. Herzstein was a Medical Director for the Department of Defense, where

she oversaw national medical programs for the Department, and served as a consultant to the Department of Justice, Environmental Health and Biomonitoring, from 1992 to 1996.

Since February 2012, Dr. Herzstein has served on the United States Preventive Services Task Force, an independent, volunteer group of national experts in prevention and evidence-based medicine that makes recommendations about clinical preventive services such as screening tests, counseling services, and preventive medications. Dr. Herzstein previously served on the Agency for Toxic Substances and Disease Registry expert panel that developed the Final Criteria for Determining the Appropriateness of a Medical Monitoring Program under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 60 Fed. Reg. 38840-01. She is a co-editor of three books on environmental health and occupational medicine, and has contributed chapters to multiple books on occupational health and toxicology.

Dr. Herzstein has authored two declarations submitted by BP regarding the medical and scientific bases of the Matrix, the Periodic Medical Consultation Program, and the Back-End Litigation Option. (Rec. Docs. 7112-7 and 7732-1.) She has testified as an expert witness in other cases involving potential exposures. *See, e.g., Doris Baity. v. Gen. Elec. Co.*, Index No. 2001-524, Supreme Court of New York, Cayuga County (June 14-15, 2012); *Perrine, et al. v. E.I. DuPont De Nemours & Co..*, Civ. Action No. 04-C-296-2, Circuit Court of West Virginia, Harrison County (May 1, 2006) (class certification hearing).

**Samuel Issacharoff** is the Reiss Professor of Constitutional Law, New York University School of Law. (Issacharoff Decl. ¶ 4.) Professor Issacharoff specializes in complex litigation and has published many articles on various aspects of complex litigation, including matters such as class actions and attorneys' fees, which have been cited by numerous courts, including the United States Supreme Court. Professor Issacharoff has served as an expert and as a consultant

in numerous complex cases, including dozens of class actions, and has served as a special master in a mass tort class action in the Eastern District of Texas. Professor Issacharoff also served as Reporter for the Project on Aggregate Litigation of the American Law Institute, which unanimously approved its proposed final report three years ago, and was published in 2010 as *Principles of the Law of Aggregate Litigation*. In this case, Professor Issacharoff served as a consultant to the PSC during settlement negotiations, and he offered in his declaration, which was submitted by Class Counsel, various opinions concerning the Settlement, including those regarding conflicts of representation, intra-class allocation, attorneys fees and settlement value. (*Id.* ¶¶ 7-9.)

**Robert H. Klonoff** is Dean and Professor of Law, Lewis & Clark Law School. Dean Klonoff is co-author of the first casebook devoted specifically to class actions (Robert J. Klonoff, Edward K.M. Bilich, and Suzette Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed. 2012)), and the author of the *Nutshell* on class actions. (*See* Klonoff Decl. ¶¶ 2-3.) Dean Klonoff served for five years as an Associate Reporter for the American Law Institute's ongoing class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation,* and is the principal author of the chapter addressing class action settlement and attorneys' fees. In this case, Dean Klonoff authored two declarations, submitted by Class Counsel, regarding the certifiability of the Class and the fairness of the Settlement. (*See* Rec. Docs. 7116-2 at 14 and 7728-2.)

**Peter S.J. Lees, Ph.D.**, **C.I.H.** is an expert in environmental health sciences, specializing in industrial hygiene and exposure assessment. Dr. Lees is currently a professor and director of the Division of Environmental Health Engineering at the Johns Hopkins University Bloomberg School of Public Health in Baltimore, Maryland. Dr. Lees holds a Doctorate in Environmental

Health Sciences and has been certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene since 1978. (Lees Decl. ¶¶ 1-3.) Dr. Lees has conducted extensive research related to the assessment of occupational and environmental exposures, and teaches graduate-level courses in industrial hygiene, occupational health, and epidemiology, with a special emphasis on exposure assessment for individuals and populations.

Dr. Lees has authored two declarations submitted by BP regarding the exposure assessment conducted in relation to the *Deepwater Horizon* Incident and the potential for Clean-Up Workers to have adverse health effects from inhalation exposures to the components of oil, dispersants, and other spill-related compounds. (Rec. Docs. 7112-3 and 7732-5.) Dr. Lees has served as an expert in approximately 25 proceedings in which he has provided expert testimony regarding his review, assessment, and evaluation of alleged chemical exposures to asbestos, polychlorinated biphenyls ("PCBs"), gasoline, acrylamide, and various solvents. (Lees Decl. ¶ 8.)

*Geoffrey P. Miller* is the Stuyvesant P. Comfort Professor of Law, New York University. Professor Miller has been involved for more than twenty years in the area of class action litigation as a teacher, scholar, attorney, consultant, and expert witness, and has written numerous research articles dealing with class action law and practice, with a focus on standards for judicial review of class action settlement. (Miller Decl. ¶¶ 2-6; *see also* Miller Supp. Decl.) His articles on class action law have been cited by state and federal courts across the United States. Professor Miller opined on various topics in this case, including the appropriateness of the claims for class litigation and settlement, the Settlement benefits, the negotiation process, and the objections to the Settlement. His two declarations were submitted by BP. He has been qualified as an expert witness in various cases in federal courts, including

*In re Cell Therapeutics, Inc., Sec. Litig.*, No. C10-414 (W.D. Wash. 2012); *In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. 2012); *In re Vioxx Prods. Liab. Litig.*, No. 2:05-MD-01657 (E.D. La. 2009); *John Hancock Life Ins. Co. v. Goldman, Sachs & Co.*, No. 01-10729-RWZ (D. Mass. 2007); and *Figueroa v. Sharper Image Co.*, No. 05-21251 (S.D. Fla. 2007).