**KIRKLAND & ELLIS LLP**
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 7, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

        Re:    MDL 2179 — The United States' Inadequate Preparation of Certain Rule 30(b)(6) Witnesses

Dear Judge Shushan:

As recently discussed in Court, BP respectfully requests that the Court direct the United States to provide adequate Rule 30(b)(6) testimony on the specific matters discussed below, which are squarely within the Rule 30(b)(6) deposition topics the United States has previously agreed upon.

Per the Court's January 7, 2013 Working Group Order, (Rec. Doc. 8184, at 5), BP respectfully requests expedited consideration of this motion.

## INTRODUCTION

On November 29, 2012, BP provided to the United States a meet-and-confer letter detailing the questions that certain United States Rule 30(b)(6) witnesses were unable to answer. The United States' December 21, 2012, letter to Court regarding BP witnesses, which purported to respond to BP's November 29 letter, fails to address in any fashion BP's requests regarding the inadequacy of the United States' own Rule 30(b)(6) deposition testimony.

Given the need to move quickly regarding deficiencies in Rule 30(b)(6) testimony, as reflected in the Court's January 2 and 7, 2013 Orders, (Rec. Docs. 8149, 8184), BP now respectfully requests that the Court order the United States to provide additional witnesses to address these testimonial deficiencies.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 7, 2013
Page 2

As further described below, BP makes modest requests for additional, targeted depositions narrowly focused on certain missing Rule 30(b)(6) testimony — including reasonable follow-up questioning.

## DISCUSSION

Under Federal Rule of Civil Procedure 30(b)(6), the United States has a duty to produce for deposition corporate designees who are able to "answer fully, completely, unevasively the questions posed … as to the relevant subject matters." *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (quoting *Bank of New York v. Meridian BIAO Bank Tanzania, Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997)). "Where corporate designees are not prepared to testify on the topics about which they are to be questioned, it is appropriate that the court order the corporation to re-designate witnesses and mandate their preparation for the renewed deposition." *Cox Communications of Louisiana, LLC v. I.C. Fiber Louisiana, LLC*, No. 01-3828, 2003 WL 22326400, at *1 (E.D. La. Oct. 6, 2003).

As discussed below, United States Rule 30(b)(6) deponents Dr. Arthur Ratzel and Admiral Mary Landry were not adequately prepared to testify to certain relevant subject matters within their designations, and accordingly, the United States should provide adequately prepared witnesses for renewed depositions on these subject matters.

**I.    Dr. Ratzel Is A Key Quantification Witness, But Was Unable To Answer Questions About Important Matters At The Core Of Phase 2 Quantification Issues.**

Dr. Ratzel's flow rate estimation team, and the work of his team is at the heart of the Phase 2 Quantification case. Dr. Ratzel authored a report, *DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident*, that comprehensively explains the work performed by the three teams comprised of DOE and National Laboratories scientists.

Each team used pressure measurements taken from the capping stack over three days, July 12-15, 2010, to estimate a flow rate during this period of around 53,000 barrels per day. With this estimate, the United States then extrapolated back 87 days, arriving at a cumulative flow rate estimate over that period of approximately 4.9 million barrels, with a stated uncertainty estimate of +/-10 percent. Dr. Ratzel was not only instrumental in that scientific work, but coordinated the July 30 and 31, 2010 meetings where various government teams arrived at this specific estimate as the final government flow rate estimate. That estimate has been referred to as the "ground truth" against which all other estimates would be measured. *See Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill* ("FRTG Report"), at 2.

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 7, 2013
Page 3

      The United States designated Dr. Ratzel on 23 topics (two of them partially) related to the DOE-NNSA Report and flow rate work performed by Los Alamos, Lawrence Livermore, and Sandia National Labs ("Tri-labs team").  *See*, Attachment 2, N. Chakeres Sept. 18, 2012 Email (designating Dr. Ratzel for Topics 38(partial), 60-73, 81, 82(partial), 83-88).  As described in BP's November 29 letter, Dr. Ratzel was unable to provide basic testimony on key aspects of that "ground truth" estimate, and BP is entitled to examine an adequately prepared United States witness on the following aspects of this central, published, and publicly touted estimate, which fall squarely within Dr. Ratzel's designation.

      Specifically, Dr. Ratzel was not prepared to:

- Identify any gas-oil ratio that the Tri-Labs team used for the flow rate estimates in the DOE-NNSA Flow Analysis report, (Ratzel Dep. Tr. 283:1-25).  As the Court well knows, this parameter is crucial for estimating the percentage of the discharge that is actually oil.  **(Topics 61, 68, 82, 88.)**

- Describe how each of the Tri-Labs teams converted mass flow of hydrocarbons to stock tank barrels of oil for the flow rate estimates contained in that report. (Ratzel Dep. Tr. 27:23-29:23.)  Because a barrel of oil at the point of discharge has a different volume than oil collected on the surface, this information is necessary to form an accurate understanding of the Tri-Labs team's ultimate cumulative flow estimate.  **(Topics 61, 68, 82, 88.)**

- Provide a straightforward answer to basic questioning regarding the methods used to derive the estimate of 53,000 barrels of oil per day, first stating that three separate methods provided the estimate, and then changing his mind to say that only two were used.  (Ratzel Dep. Tr. 81:14-82:5.)  Such basic information is crucial to understanding how the United States arrived at the 53,000 barrels per day estimate for the July 15, 2010 discharge, which it then "extrapolated back" to generate its publicly touted cumulative flow rate estimate.  **(Topics 61, 68, 82, 88.)**

- Confirm whether roughness-related friction factors were used by the Tri-Labs team in the work it performed for the DOE-NNSA Flow Analysis Report. (Ratzel Dep. Tr. 288:20-289:7.)  Use of a roughness-related friction factor will have an effect on flow rate, yet Dr. Ratzel was unable to confirm whether such factors were even used, let alone testify to what numbers were used for these important parameters.  **(Topics 61, 68, 82, 88.)**

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 7, 2013
Page 4

- Provide any testimony regarding the 4.4 "correction factor" that Lawrence Livermore National Laboratory applied to its calculations. (Ratzel Dep. Tr. 289:13-16, 290:6-291:9.) Without this correction factor, Lawrence Livermore's flow rate estimates would have been at odds with those from Sandia and Los Alamos National Laboratories, the other two members of the Tri-labs team, but the United States has not explained the basis for this adjustment. **(Topics 67-73.)**

- Describe any analyses performed to arrive at an uncertainty estimate of +/- 10 percent for the United States' 53,000-barrels-per-day capping stack estimate and the extrapolation back model the United States has employed to calculate an overall discharge of approximately 5 million barrels. (Ratzel Dep. Tr. 648:2-14, 650:11-651:6.) **(Topics 61, 68, 82, 88.)**

- Describe which parameters had been varied to assess the uncertainty of the Tri-Labs Flow Team's estimate as well as the individuals who performed the sensitivity analysis. (Ratzel Dep. Tr. 648:23-651:6.) Parameter variation is one way of measuring uncertainty, wherein parameters are varied to determine the effect that each parameter has on the flow exiting the well. Without knowledge of which parameters were considered, it is virtually impossible for BP to analyze and critique the Tri-Labs team's uncertainty estimate. **(Topics 61, 68, 82, 88.)**

Further, Dr. Ratzel was identified by Dr. Marcia McNutt as the Rule 30(b)(6) witness who would discuss the July 30 and July 31 flow rate meetings, two key government meetings that were held in an effort to reconcile the government teams' divergent flow rate estimates. (McNutt Dep. Tr. 383:7-15.) As you know, these meetings formed the basis for the calculations put forth in the FRTG Report and the DOE-NNSA Flow Analysis report. Nevertheless, Dr. Ratzel disclaimed knowledge of the content of key discussions that occurred at the July 30 and July 31 flow rate meetings, despite acknowledging that he coordinated the meetings and was present at them. (Ratzel Dep. Tr. 468:7-10, 468:19-471:1, 473:5-475:10, 475:23-477:25.) In effect, the United States has not yet provided testimony on the manner in which key decisions were made to adopt the "ground truth" flow rate estimate. *See* FRTG Report, at 1-2. **(Topics 62-64, 69-71, 76-78, 83-85, 88.)**

BP respectfully requests additional deposition time with an adequately prepared Dr. Ratzel, or another suitable designee, narrowly targeted to providing answers to the unanswered questions detailed above and any reasonable follow-up questions.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 7, 2013
Page 5

### II. Admiral Landry Was Unprepared To Provide Basic Information Within Her Designated Topics.

Admiral Landry's testimony also demonstrated significant gaps in preparation. She was designated to testify as the United States' corporate representative for three Topics, including portions of Topics 34 and 35 related to the United States' announcement of the 1,000 bpd and 5,000 bpd flow rate estimates, respectively. *See* Attachment 2.

Admiral Landry, however, had apparently not prepared to testify on these topics beyond what she could remember from personal knowledge. Tellingly, she could not provide the source of the 1,000 bpd estimate that she announced. Admiral Landry testified that Captain James Hanzalik informed her that BP was the "source" for the 1,000 bpd estimate announced on April 24, 2010, though she did know who, when, or how that information was provided to Captain Hanzalik. (Landry Dep. Tr. 30:13-19, 31:12-32:11, 35-16-37:19, 109:11-15, 113:4-17, 131:17-136:14.) But Landry also testified she did not learn that BP was the "source" for the 1,000 bpd estimate from Captain Hanzalik until August or September of 2010 while she was preparing to be interviewed by the Presidential Commission. (*Id.* at 34:23-35:15, 135:9-136:14.) Landry did not recall speaking with Captain Hanzalik about the estimate before making the announcement, and was not prepared to provide any testimony about the United States' actual source for announcing the 1,000 bpd estimate to the public. (*Id.* at 106:11-21, 113:4-17.)

> Q. Okay. So sitting here, you don't have any recall of where you got the thousand barrel estimate, prior to making the announcement, correct?
> A. No.
> Q. Is -- is my statement correct?
> A. Yes.

(Landry Dep. Tr. 136:2-8.)

Nor had Admiral Landry prepared to testify about meetings and conversations in which she participated leading up to her announcement of the 1,000 bpd number — including meetings with senior Administration officials and members of Congress where she discussed the 1,000 bpd estimate. (*See, e.g.*, Landry Dep. Tr. 108-09, 114-16, 136-38, 146-52, 159-62.)

Similarly, Admiral Landry offered minimal details about the lead up to the announcement of the 5,000 bpd number. Admiral Landry could not initially recall the date of the 5,000 barrel announcement. (Landry Dep. Tr. 25:22-26:6.) Nor was she prepared to testify regarding discussions in advance of announcing the 5,000 bpd estimate about which other witnesses have testified. (*See, e.g., id.* at 205-209; Charlie Henry Dep. Tr. 180:20-185:2; Doug Suttles Dep. Tr. 403:5-404:14.) And as to the one meeting about which she did testify, Admiral Landry claimed

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 7, 2013
Page 6

a "vivid" and "more clear recollection" than the recollection of Charlie Henry, who also attended the meeting. (Landry Dep. Tr. 23:13-24:3.)

Admiral Landry's preparation regarding the material supporting the 5,000 bpd estimate she announced was even more sparse. Admiral Landry was unable to provide any testimony regarding the work of Bill Lehr, a NOAA employee who apparently developed the flow rate estimate on which the 5,000 bpd announcement appears to have been based. (*Id.* at 125:10-14, 179:4-8, 185:17-19, 257:1-10, 264:8-267:14, 272:20-274:16.) Before Admiral Landry announced the 5,000 bpd estimate, Dr. Lehr possessed NOAA estimates showing a flow rate far in excess of 5,000 bpd. (*Id.* at 257:11-266:3; Dep. Ex. 9612.) Nevertheless, during this same timeframe, Dr. Lehr appears to have created a document that shows an estimated flow rate of 5,000 bpd. (Landry Dep. Tr. 272:20-275:21; Dep. Exs. 9614, 8897B, 8897C.) The other estimates in Dr. Lehr's possession were not publicly announced. Admiral Landry did not have sufficient knowledge of Dr. Lehr's work to testify why.

(Charlie Henry, who was also designated to testify on Topic 35, was likewise unprepared to explain the effect of these other NOAA estimates on Dr. Lehr's 5,000 bpd estimate, which Admiral Landry ultimate announced. When asked whether Dr. Lehr took into consideration the flow rate analyses done by other NOAA personnel, he responded, "I would be totally -- I'd have no way to know. It'd be speculation." (Henry Dep. Tr. 349:14-23.))

Despite Admiral Landry's claim to have spent approximately 30 hours over 5 days preparing for her Rule 30(b)(6) deposition, (*id.* at 19:7-20), she apparently had not reviewed many of the undeniably key documents related to her testimony on Topics 34 and 35 — most notably, notes taken from her own Presidential Commission interview discussing the 1,000 bpd and 5,000 bpd estimates and basis for the announcements. (*Id.* at 325:1-326:12; Dep. Ex. 7802.)

Additionally, the only substantive conversation between Admiral Landry and a non-attorney to prepare for her Rule 30(b)(6) deposition was a thirty-minute conversation with Charlie Henry in which they discussed the announcement of the 5,000 bpd estimate, but not the 1,000 bpd estimate. (Landry Dep. Tr. 23:14-23:19, 34:17-22.) And as to the subject of this conversation, Mr. Henry's recollection was precisely the opposite of Admiral Landry's — that the two discussed the 1,000 bpd estimate but not the 5,000 bpd estimate. (Henry Dep. Tr. 22:1-23:23.)

The United States failed to prepare Admiral Landry to answer questions at the core of the designated Topics. Although Admiral Landry was involved in these decisions, the United States still had an obligation to prepare this Rule 30(b)(6) witness to answer completely as to the relevant subject matters. *See Bergstrom, Inc. v. Glacier Bay, Inc.*, No. 08-50078, 2010 WL 3516190, at *2 (N.D. Ill. Aug. 31, 2010); *Weintraub v. Mental Health Auth. of St. Mary's, Inc.*,

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 7, 2013
Page 7

No. 08-2669, 2010 WL 347882, at *1-*4 (D. Md. Jan. 22, 2010) (ruling inadequate Rule 30(b)(6) testimony even though the witness initially designated was personally acquainted with the subject matter at issue).

The United States also had an obligation to prepare Admiral Landry as a Rule 30(b)(6) witness on matters that may have been beyond her initial personal involvement. Fed. R. Civ. P. 30(b)(6); *Alexander v. F.B.I.*, 186 F.R.D. 148, 152 (D.D.C. 1999) ("Obviously, the purpose of a Rule 30(b)(6) deposition is to get answers on the subject matter described with reasonable particularity by the noticing party, not to simply get answers limited to what the deponent happens to know.")

The United States has offered little to no testimony on the basis for the decision to announce the 1,000 bpd and 5,000 bpd estimates. As described above, inadequate preparation resulted in Admiral Landry's inability to answer many questions in numerous areas within the scope of her designated topics. But BP is conscious of the limited time available to correct inadequate Rule 30(b)(6) testimony.

Accordingly, BP respectfully requests testimony from Admiral Landry, or another suitably prepared witness, on the following specific information squarely within Admiral Landry's original designation on Topics 34 and 35 and for which the United States did not adequately prepare Admiral Landry to testify:

- The factual basis and source for the 1,000 bpd announcement. (Landry Dep. Tr. 31:23-32:5, 36:20-37:4, 113:4-7, 134:4-9, 136:2-8.) **(Topic 34.)**

- Conversations with Doug Suttles and BP preceding the 1,000 bpd announcement (Landry Dep. Tr. 112:10-24.) Specifically, this testimony would include a witness who can speak to the material in Deposition Exhibits 8890 and 9601 stating that after conversations between BP and the United States the "handshake agreement was to place it [the estimate] at 1,000 bbls/day…." (Landry Dep. Tr. 116:4-119:14, 124:11-127:19.) **(Topic 34.)**

- The congressional briefing described in Deposition Exhibit 9605 that, according to the document, Admiral Landry was to conduct, but for which she provided no testimony. (Landry Dep. Tr. 158:1-159:6.) **(Topic 34.)**

- The wording of the April 24th announcement of the 1,000 bpd estimate. (Landry Dep. Tr. 161:11-162:5.) **(Topic 34.)**

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 7, 2013
Page 8

- The effect of Bill Lehr's work on the United States' decision to announce the 5,000 bpd estimate. (*See, e.g.*, Landry Dep. Tr. 125:10-14, 179:4-8, 185:17-19, 257:1-10, 264:8-267:14, 272:20-274:16.) **(Topic 35.)**

\*   \*   \*

For the foregoing reasons, BP respectfully requests the Court grant BP's request for additional deposition time with United States witnesses adequately prepared to provide testimony on the matters described above, together with any reasonable follow-up questioning.

Sincerely,

*[signature]*

Robert R. Gasaway

cc (via electronic mail):

United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross