# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

J. Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
alangan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

January 14, 2013

**Via E-mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the Eastern
District of Louisiana
500 Poydras Street, Room B345
New Orleans, Louisiana 70130

    **RE: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010, MDL No. 2179**

Dear Judge Shushan:

  This letter responds to the United States's letter of January 11, 2013 objecting to the addition of Frank Patton to BP's Phase 1 Good Faith Will Call Witness List. For the reasons described below, the United States should not be allowed to benefit from its withholding of numerous and relevant documents until *after the Phase 1 trial was scheduled to have already begun* by now hiding behind an argument that those late-produced documents relate to a variety of topics and may not happen to include Mr. Patton's name.

  If Mr. Patton is called to testify at this trial, he will be the *only* live fact witness called from the United States. This is true despite the important role that the U.S. Government representatives play in reviewing well planning submissions to the Mineral Management Service ("MMS," now "BOEM" and "BSEE") and in regulating deepwater drilling in the Gulf of Mexico and the claims the United States is making against BP in this litigation, many of which bear directly upon the United States's and Mr. Patton's role at Macondo.

  To resist having Mr. Patton called to testify live at trial, the United States asserts that BP had the opportunity to fully question Mr. Patton at his July 13-14, 2011 deposition and points to a "lack of connection between [the documents identified in BP's January 6, 2013 letter] and Mr. Patton" as demonstrating that "the United States properly produced Mr. Patton's documents before his deposition and that BP had an opportunity to question him fully." (Jan. 11, 2013 U.S. Letter at 2.) Contrary to this assertion, all of the late-produced documents identified by BP to the United States in its January 7, 2011 letter discuss issues relevant to core disputed issues in this

Hong Kong London Los Angeles Munich New York Palo Alto San Francisco Shanghai Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 2


litigation, and relate to Mr. Patton's duties as a drilling engineer for the MMS.  BP did not have an opportunity to question Mr. Patton regarding any of these key documents at his deposition because the United States did not timely produce them.  Moreover, with the exception of IMS176-051916 (which specifically relates to Mr. Patton's basis for approving the April 16, 2010 APM and had not been produced as of the date of Mr. Patton's deposition), all of the documents in the list provided by BP to the United States were not produced until *after the parties' Phase 1 Will Call Witness Lists were submitted and after the date that the Phase 1 trial was scheduled to commence*.  The statements in those documents are admissions by United States government employees relating to issues at the core of this dispute, and BP should have an opportunity to question a United States fact witness about them.  Under the circumstances — and as a result of the extremely untimely production of those documents by the United States — that opportunity must be of Mr. Patton, live at the Phase 1 trial.

Should he testify live at trial, Mr. Patton would be the *only* fact witness from the United States to provide testimony on a number of important regulatory issues, as described more fully below.

**Temporary Abandonment Procedure**.  The United States asserts that BP "knew about Mr. Patton's action in approving its temporary abandonment application" and that "Mr. Patton testified extensively about the temporary abandonment application and the negative testing." (Jan. 11, 2013 U.S. Ltr. at 1-2.)  Not only is this incorrect, but it misses the point.  While Mr. Patton did testify about the fact that he approved the April 16, 2010 APM, BP *did not* have an opportunity to fully question Mr. Patton regarding his bases for the approval.  The United States admits that the non-Zantaz document listed in BP's January 7, 2013 letter was produced on July 18, 2011 — four days *after* Mr. Patton's deposition.  (Jan. 11, 2013 U.S. Letter at 3.)[1]  This document reveals that, in fact, Mr. Patton did not formulate a basis for his approval of the TA Procedure submission until *six months after* the incident.  The United States insists that BP should have asked MMS District Manager David Trocquet about this document during his September 23, 2011 deposition.  Asking Mr. Trocquet about this document would not have provided *Mr. Patton's explanation* for *Mr. Patton's basis* for approving that submission (or the lack thereof, as the case may be).  Given the United States's allegations about the TA Procedure approved by Mr. Patton, BP should have an opportunity to ask Mr. Patton, not his supervisor, about Mr. Patton's reasons for approving the TA Procedure submission and about his after-the-fact conversations with his supervisor in which it appears that he generated his basis for approving that submission for the first time.

---

[1] IMS176-051916.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 3

**Maximum Anticipated Surface Pressure ("MASP")**.  BP disclosed to the MMS and Mr. Patton approved formulas BP used to calculate MASP in the APD for the Macondo well. Mr. Patton testified that the MMS evaluated BP's MASP calculation using the eWells system. The calculation is based on "formulas that the MMS at the time used for evaluating casing and well design." (7/13/11 Patton Dep. Tr. at 70:21-71:9.) Long *after* Mr. Patton's deposition and after the date the Phase 1 trial was scheduled to commence, the United States produced documents containing the MMS's internal formulas for calculating MASP, as well as correspondence regarding the manner in which those formulas were devised and applied.[2]  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about these documents, including, but not limited to, who drafted these formulas, how he used the formulas in assessing BP's submissions, or whether he performed any independent analyses of the original APD using these formulas, and if so, which of the formulas he used.

**SAFE Award**.  Mr. Patton testified at his deposition regarding the MMS SAFE Award that he was unsure whether BP was nominated for the award in 2010.  (7/13/11 Patton Dep. Tr. at 177:15-24.)  Documents produced *after* Mr. Patton's deposition and after the Phase 1 trial was scheduled to commence confirm that BP was, in fact, nominated for the 2010 SAFE award, and contain statements about the basis for that nomination.  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about these documents or the specific statements in those documents.[3]

**BOP**.  Mr. Patton confirmed that the MMS reviewed and approved the *Deepwater Horizon* BOP configuration.  (7/13/11 Patton Dep. Tr. at 48:25-49:11.)  Documents produced by the United States *after* Mr. Patton's deposition and after the Phase 1 trial was scheduled to commence relate, among other things, to certain modifications that Transocean made to the *Deepwater Horizon* BOP without BP's knowledge and to whether BP could have or should have reported those modifications to the MMS.[4]  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about the statements in these documents.

**Drilling Margin**.  BP was granted permission from the MMS in October 2009, February 2010, and March 2010 to drill with a 0.3 drilling margin.  (7/13/11 Patton Dep. Tr. at 191:5-192:1.)  Documents produced *after* Mr. Patton's deposition and after the Phase 1 trial was scheduled to commence include internal MMS documents relating to its interpretation of the term "safe drilling margin," and MMS approvals for other wells to drill with a 0.2 drilling

---

[2] *See* ZAN010-023444, ZAN010-071895, ZAN025-005104, ZAN051-048772, ZAN051-053254, ZAN051-09831, ZAN062-282504.
[3] *See* ZAN038-233988, ZAN038-292712, ZAN055-017528, ZAN037-070571, ZAN037-010013.
[4] *See* ZAN037-005043.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 4

margin.[5]  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about these documents, which demonstrate that, contrary to the United States's litigation position, the MMS granted approval to other operators to drill with less than a 0.5 drilling margin.

**Other Regulatory Issues**.  Mr. Patton testified at his deposition that he would only approve an MMS filing if he believed it complied with all applicable regulations.  (7/13/11 Patton Dep. Tr. at 154:17-155:1.)  Documents produced long *after* Mr. Patton's deposition and after the date the Phase 1 trial was scheduled to commence include discussion by MMS officials of the MMS's interpretation of certain regulations as well as of the inspection history of the *Deepwater Horizon*.[6]  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about the impact of the MMS interpretation of the regulations discussed in these documents on the applications that he approved or about the MMS records relating to the inspection history of the *Deepwater Horizon*.

As discussed in BP's January 4, 2013 letter, Mr. Patton's testimony is of critical importance because of the United States's more prominent role in the upcoming Phase 1 trial.  The United States asserts that "it made no secret about its position in this case since the filing of its Complaint in December 2010."  (Jan. 11, 2013 U.S. Ltr. at 3.)  Putting aside whether the most recent submissions by the United States provide a much clearer pronouncement as to the United States's positions in this litigation than it previously had provided (one would question why such a submission would have been necessary if it did not), as a result of the United States's dilatory production practices, BP did not have the opportunity to question any government witness regarding these key documents.  The documents contain admissions by United States government employees and directly contradict the United States's arguments on key issues, including as to the negative pressure test, BP's culture, and a recently alleged series of regulatory violations.  There should be no prejudice to the United States in producing Mr. Patton to testify as, according to his deposition, he lives and works within the jurisdiction (and is thus within the subpoena power of this Court), and the United States has been aware that he is a relevant fact witness in this case since he was deposed as a Phase 1 fact witness.  Accordingly, BP has good cause for seeking Mr. Patton's live testimony on each of these topics.

---

[5] *See* ZAN010-024501, ZAN010-046287, ZAN010-125391, ZAN051-080166.
[6] *See* ZAN062-361097, ZAN055-038231, ZAN055-044875, ZAN036-118835, ZAN007-78609, ZAN010-008539, ZAN037-074391.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 5

       Thank you for the Court's consideration of this issue.

                                                  Sincerely,

                                                  J. Andrew Langan, P.C.

cc:     Liaison Counsel
        States' Coordinating Counsel
        Mike Underhill, Esq.