UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179  SECTION: J |
| This Document Relates To: All Actions | : : | JUDGE BARBIER MAGISTRATE JUDGE |
| …………………………………………………... | : | SHUSHAN |

**BP'S MEMORANDUM IN SUPPORT OF ITS MOTION
*IN LIMINE* TO CLARIFY THE COURT'S ORDER REGARDING
THE *DEEPWATER HORIZON* STUDY GROUP REPORT**

On February 24th, 2012, the Court ruled that the internal investigation reports prepared by BP and Transocean were business records within the meaning of Rule 803(6) and, therefore, admissible subject to objection to "inner hearsay" within the reports. Rec. Doc. 5834 (Order). The Court also included the *Deepwater Horizon* Study Group Report – the so-called Berkeley Report – in the same category. *Id.* The Court's February 24, 2012 Order did not address any of the arguments made by the parties in detail, and BP believes there may have been some misunderstanding of the relevant facts.[1]

While the BP and Transocean reports were prepared by established companies in accordance with their usual and customary procedures for investigating the causes of incidents, the Berkeley report is an *ad hoc*, one-off document prepared by a loose affiliation of researchers, environmentalists, and engineers, several of whom the PSC has retained as expert witnesses. BP therefore seeks clarification of the Court's February 24, 2012 Order to determine if, in fact, the

---

[1] BP intended to seek this clarification prior to the scheduled start of the Phase I trial on February 27, 2012, but did not do so pursuant to the deferral and subsequent adjournment of the trial date and further briefing on pretrial motions.

1

Court intended to qualify the Berkeley report[2] as a business record within the meaning of Rule 803(6), which BP respectfully suggests may not have been the case.

## BACKGROUND

In May 2010, a group of self-described "experienced professionals, experts, and scholars" decided to create, *sua sponte*, the "*Deepwater Horizon* Study Group" ("DHSG"). DEEPWATER HORIZON STUDY GRP., FINAL REPORT ON THE INVESTIGATION OF THE MACONDO WELL BLOWOUT 14 (2011) ("Berkeley Report") (Ex. A).  The group's purpose, inquiry, and work product were limited to the Macondo well and included "produc[ing] a final report documenting results from the studies of failures of the . . . Macondo well drilling project." *Id*.  The DHSG noted that it had no institutional ties, organizational mandates, or operational requirements:

> An important part of the DHSG was its organizational independence.  The DHSG did not have nor currently has any organization or organizations to which it reports.  The DHSG did its work without financial support—other than provided by its members.  The DHSG members have volunteered their time, paid their expenses, and provided other resources without compensation.

*Id.* at 16.  The group's self-imposed structure and mandate, however, was not clear to all its members.  The co-chair of its "Technical Committee," also responsible for "the [t]echnical writing of th[e] [r]eport regarding Well Planning and Hazards," David Pritchard, was under the misimpression that the group's work was being done under the auspices of and "commissioned by the President of the United States . . . ."  Pritchard Dep. at 23:11-12, 23:16-17; *see id.* at 23:7-24:15.

The DHSG's report was released on March 1, 2011.  The exact identity of its authors and reviewers is unknown.  The report claims that the DHSG was comprised of sixty-four members.

---

[2] BP's arguments against the admissibility of the report necessarily also apply to any other reports or "progress reports" published by the Deepwater Horizon Study Group (meaning, the interim reports of the DWH Study Group termed "progress reports") (Ex. A at 5-6).  These interim documents suffer from all of the same flaws as the final report, with the added problem that they do not even reflect final conclusions of the authors.

2

However, that same report lists only forty authors as having consented to the publication of their names. Ex. A at 14, 99-100. It is not clear whether this discrepancy results from any lack of communication, disagreement, dissent, or something else. However, at least one of the supposed DHSG members (Kevin Lacy) expressed surprise at the inclusion of his name on the report, as he never was given an opportunity to review the report prior to its publication and disagreed with some of its content. *See* Lacy Dep. at 489:2-490:4, 591:20-593:4. And whomever participated in drafting the report, which was issued before much of the discovery in MDL 2179 had occurred, "relied upon information, data, and testimony[,]" Ex. A at 15, from numerous sources that this Court has since found inadmissible in the Phase I trial, including the National Commission Report and the Coast Guard / BOEMRE Joint Investigation.

Within weeks after the issuance of the Berkeley Report, the PSC retained three members of the DHSG — each of whom had been a core author of the Berkeley Report — to serve as experts in the upcoming trial. The report's primary author, Professor Robert Bea, was retained as a PSC expert on or about March 15, 2011, following discussions with PSC counsel as far back as January 2011 — two months prior to the report's publication. *See* Bea Dep. at 28:3-29:9. William Gale and David Pritchard, also authors of the report, were similarly retained by the PSC. *See* Gale Dep. at 25:6-9; Pritchard Dep. at 22:24-23:2.

## ARGUMENT

**I.     The Report Does Not Qualify as a Business Record Under Rule 803(6).**

The Berkeley Report fails to satisfy the business-record exception to the hearsay rule on three basic grounds. *First*, because the DHSG did not have a business duty to report its findings, the Berkeley Report does not qualify as a "record . . . kept in the course of a regularly conducted activity . . . ." FED. R. EVID. 803(6). *Second*, given the *ad hoc*, exceptional nature of its creation

3

and the detached, unguided character of its authoring group, the report does not qualify as a "record [made as] a regular practice of that [regularly conducted] activity." *Id.* **Third**, several of the report's core authors — including lead author Professor Bea, who had contact with PSC lawyers even before the report was issued — are testifying litigation experts for the PSC and thus the report fails to qualify as "trustworth[y]." *Id.*

### A. The *Deepwater Horizon* Study Group Had No Business Duty to Report.

For a document to qualify as a business record under Rule 803(6), the document's authors must have had a "business duty" to record its contents. This principle has been recognized and affirmed at least twice in these very proceedings. *See* Rec. Doc. 5615 at 3 (Shushan, J.) (recognizing need for there to be a "policy or business duty" to create document's contents for document to be admissible under Rule 803(6)); Rec. Doc. 5143 at 6-7 & n.6 (Barbier, J.) (same).

This requirement applies not only to the direct author of the nonparty document, but also to the document's underlying constituent sources. *See, e.g.*, *United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir. 2011) ("If the person who provides the information is an outsider to the business who is not under a business duty to provide accurate information, then the reliability rationale that underlies the business records exception ordinarily does not apply"); *United States v. Hussein*, 151 F. App'x 257, 259 (4th Cir. 2005) ("The essential premise underlying the business records exception is that 'each actor in the chain of information is under a business duty or compulsion to provide accurate information.'" (quoting *United States v. McIntyre*, 997 F.2d 687, 699 (10th Cir. 1993)) (unpublished).

The presence of a business duty provides the requisite "circumstantial guarantee[] of trustworthiness" that will enable a court to presume a document's reliability and accuracy when

4

it is admitted under Rule 803(6).  FED. R. EVID. 803 advisory committee's notes; *see White Indus. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1060 (W.D. Mo. 1985) (documents will only be admitted under Rule 803(6) upon showing that "each person involved in transmitting the information, including the original source" held "a 'business duty' to the business activity in question").  Where, however, a business duty is absent (*e.g.*, where there is no contractual duty to create a record), those same circumstantial guarantees of trustworthiness are unavailable.  *See, e.g.*, *MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp.*, 2012 WL 19654, at *11 (10th Cir. Jan. 5, 2012) (describing how a business duty "presumptively guarantees the reliability of evidence admitted under [the] exception" and declaring that, in its absence and for lack of alternative bases of admissibility, "it was error [for the trial court] to admit th[e] document" at issue).

In the case of the Berkeley Report, the document's authors all but admit to the lack of a business duty to record their findings.  The report begins with an acknowledgment that its authors created the project *sua sponte*, absent any request or organizational mandate. Ex. A at 14.  The authors then emphasize that the group lacked any imposed mandates or strictures.  *Id.* at 16.  These statements amount to express acknowledgments that there was no business duty to report.  Without such a duty, a basic, foundational requirement for admissibility under Rule 803(6) is absent.

      **B.**    **The Report Was Not Made as Part of a Regularly Conducted Business Activity.**

The report also fails to satisfy the business records exception because it was not created as part of a regularly conducted business activity as required under Rule 803(6).  The linchpin of admissibility under Rule 803(6) is ***regularity***.  *See Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*, 2011 WL 890680, at *4 & n.31 (E.D. La. Mar. 11, 2011).  When the document in question is

shown to have been made in the *regular* course of business activity, it gains a strong presumption of trustworthiness and reliability and, by extension, admissibility. *Id.* By contrast, where a document is *ad hoc*, irregular, or non-routine, courts will refuse to admit it under Rule 803(6). *See*, *e.g.*, *In re Nassau Cnty. Strip Search Cases*, 742 F. Supp. 2d 304, 319 (E.D.N.Y. 2010) (refusing to admit one-off document under Rule 803(6) on grounds it had only been prepared one time); *United States v. Reyes*, 239 F.R.D. 591, 600 (N.D. Cal. 2006) (refusing to admit documents under Rule 803(6) encompassing "full-fledged, one-time internal investigation into alleged corporate malfeasance" on grounds that documents were not "kept in the course of a regularly conducted business activity").[3]

The Berkeley Report was created in a setting antithetical to the requirement of regularity. The DHSG bore no affiliation with or responsibility to any organization, institution or entity. Indeed, even if the report had been recorded within some larger organizational context, the document itself remains *ad hoc* and non-routine and thus still would fail to satisfy the basic requirement of regularity under Rule 803(6). Of their own accord, a group of individuals got together and endeavored to investigate this particular incident. This one-off self selection defies classification as "regular course" conduct. *See, e.g.*, *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 566 (Fed. Cl. 2003) (refusing to admit e-mails and memoranda under business records exception because "documents that are created solely at the author's discretion raise motivational concerns and lack the reliability and trustworthiness that business records are ordinarily assumed to have"), *aff'd in part and rev'd in part on other grounds*, *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005).

---

[3] *See also, e.g.*, *Ebenhoech v. Koppers Indus.*, 239 F. Supp. 2d 455, 463-64 (D.N.J. 2002) (refusing to admit incident report under Rule 803(6) on multiple grounds, including fact that report was not "routinely created"); *Griggs v. Allstate Ins. Co.*, 1997 WL 1764777, at *7 n.6 (S.D. Ohio Sept. 15, 1997) (refusing to admit document generated as a "one-time occurrence").

6

C. **The *Deepwater Horizon* Study Group's Report Is Not Trustworthy.**

Even if the Berkeley Report had been prepared under a business duty, had been generated by an identifiable standing organization rather than a loosely affiliated group of individuals that organized itself solely to analyze the *Deepwater Horizon* incident, and had been created as part of that organization's regular conduct rather than as a one-off document, the report fails to satisfy Rule 803(6)'s requirement of trustworthiness.

Courts have shown a consistent reticence to admit the written materials of a party's expert litigation witness under the business records exception. *See, e.g.*, *Cooley v. Lincoln Elec. Co.*, 693 F. Supp. 2d 767, 783-84 (N.D. Ohio 2010) (discussing prior ruling rejecting party's request to admit as business record an autopsy report created by party's own expert on grounds that report presented obvious motivational concerns); *cf., e.g.*, *Granite Partners, L.P. v. Lynch*, 2002 WL 826956, at *7 (S.D.N.Y. May 1, 2002) (excluding document authored by expert on grounds that expert would testify live at trial and thus document failed to qualify for hearsay exception and was redundant of anticipated testimony).

The involvement of several of the Berkeley Report's core authors as expert witnesses in this litigation, particularly given the proximity between the issuance of the report and their formal retention by the PSC as experts, raises serious concerns as to the report's trustworthiness. The Berkeley Report was issued on March 1, 2011. The report's primary author, Professor Bea, was retained as a PSC expert two weeks later, following discussions with PSC counsel that took place in January and February 2011 as the report was being finalized. Bea Dep. at 28:3-29:9. Two other core authors, William Gale and David Pritchard, were also retained by the PSC as experts in the immediate aftermath of the report's issuance. Gale Dep. at 25:6-9; Pritchard Dep. at 22:24 - 23:2.

Under such circumstances, the guarantees of trustworthiness required to admit a document under Rule 803(6) are not present. Regardless of the lack of independence of these three authors of the report — Professor Bea, who was in talks with the PSC two months before the report's issuance; Dr. Gale, who testifies regularly as an expert witness in litigation matters;[4] and Mr. Pritchard, who mistakenly claimed that the DHSG operated under a presidential mandate — their retention as experts by an adverse party in this proceeding casts an irremediable shadow on their prior work, particularly given that the retention occurred essentially contemporaneous with their report's publication.[5]

## II.  The Report Is Beset with and Based on Inadmissible Content.

The Berkeley Report also should be excluded given the sheer volume of otherwise inadmissible content in the document. The report extensively references, reproduces and relies on: (1) materials this Court has ruled inadmissible in its earlier orders; and (2) other materials constituting double hearsay.

### A.  The Report Contains Content Precluded by this Court's Prior Orders.

Through its evidentiary rulings, this Court has recognized as inadmissible: (1) the report, hearing transcripts and other materials of the Coast Guard / BOEMRE Joint Investigation, Rec. Doc. 5448; (2) various governmental reports, including the reports of the National Commission and the Chief Counsel, Rec. Doc. 5635; and (3) materials related to past incidents such as the

---

[4] *See* Gale Dep. at 31:15-35:21 (acknowledging that he has consulted on litigation matters since the early 1990s, estimating that he has testified in depositions or trials approximately seventeen times in the last five years and sixty-five times in the last twenty years, and estimating that he has provided litigation support to at least 200 companies or law firms in the last twenty years).

[5] It also raises the question of why, if the views of these individuals are expressed in both their expert reports and the DHSG report, there is any need to supplement the presentation of the former with the latter — other than to give a false patina of an "independent" or "objective" report that just happens to agree with their litigation opinions.

Texas City refinery fire (including the Chemical Safety and Hazard Investigation Board's report), Rec. Doc. 5634; *see also* Rec. Doc. 5635.

The Berkeley Report cites, references, and reproduces all these inadmissible materials. For example, the report includes:

- At least twenty citations to hearing transcripts of the Joint Investigation (including at least three instances of direct quotation), usually as the sole supporting reference for the fact being offered. Ex. A, *passim*;

- A direct quotation from the National Commission Report regarding well design decisions, *id.* at 54-55 n.22; a dozen exact reproductions of demonstrative exhibits from National Commission deliberations, *id.*, *passim*; and a citation to the National Commission Report for the proposition that the *Deepwater Horizon* incident involved a series of cascading failures, *id.* at 10 & n.6; and

- At least seven instances where the Texas City incident is highlighted, both through discussions in the main body of the Berkeley Report and citations to the investigations of the Chemical Safety and Hazard Investigation Board and the Baker Panel. *Id*. at 5, 10 & nn. 3-5, 87.

**B.     The Report Contains Otherwise Inadmissible Double Hearsay.**

As this Court previously recognized, a finding that a document qualifies as a business record under Rule 803(6) does not render the double hearsay within that document admissible. Rec. Doc. 5143 at 9 & n.12. Rather, the party proffering the document must independently establish why each separate layer of hearsay is excepted from the hearsay rule. *See id.*; FED. R. EVID. 805.

The Berkeley Report is laden with such double hearsay. Examples include:

- Extensive quotations to "progress report[s]" ostensibly prepared by DHSG members. Ex. A at 5-6.

- Reproductions of non-attributed criticisms of BP. *E.g.*, *id.* at 9, 79 ("It has been observed that BP's system 'forgot to be afraid'").

- Page-long excerpts from unevaluated (by this Court or the parties to the litigation) industry monographs on safety. *Id.* at 78-79.

9

- Statements by the "Norwegian Petroleum Safety Authority" on best approaches to regulation. *Id.* at 114 & n.15.

- Statements by "the UK's Court of Appeal" regarding the legal definition of "reasonably practicable . . . ." *Id.* at 109 (internal quotation marks omitted).

These examples of non-attributed hearsay within the Berkeley Report further illustrate the many reasons why the report is neither trustworthy nor reliable and thus fails to satisfy several of the elements of the business-records exception under Rule 803(6).

## **CONCLUSION**

BP respectfully requests that the Court clarify its February 24th, 2012 ruling and enter an Order finding the Berkeley Report to be inadmissible at the upcoming trial.

Dated:  January 18, 2013

Respectfully submitted,

/s / Don K. Haycraft

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

and

J. Andrew Langan, P.C.
(andrew.langan@kirkland.com)
Timothy A. Duffy, P.C.
(tim.duffy@kirkland.com)
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

10

and

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

*Attorneys for the BP Exploration & Production Inc. & BP America Production Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of January, 2013.

                                                                                       /s/  Don K. Haycraft__