# EXHIBIT C



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE  OF
ADMINISTRATION
AND RESOURCES
MANAGEMENT

## <u>REVISED ACTION REFERRAL MEMORANDUM</u>

<u>SUBJECT:</u>    Request for the Immediate Suspension of:

**BP PLC**
EPA Case No. 12-0295-00

**BP AMERICA, INC.**
EPA Case No. 12-0295-02

**BP CORPORATION NORTH AMERICA INC.**
EPA Case No. 12-0295-03

**BP AMERICA PRODUCTION COMPANY**
EPA Case No. 12-0295-04

**BP EXPLORATION AND PRODUCTION, INC.**
EPA Case No. 12-0295-05

**BP PRODUCTS NORTH AMERICA, INC.**
EPA Case No. 12-0295-06

**BP OIL INTERNATIONAL LTD.**
EPA Case No. 12-0295-07

**AIR BP LTD.**
EPA Case No. 12-0295-08

**BP MARINE LTD.**
EPA Case No. 12-0295-09

**BP WEST COAST PRODUCTS LLC**
EPA Case No. 12-0295-10

**BP SINGAPORE PTE LTD.**
EPA Case No. 12-0295-11

**BP AUSTRALIA PTY LTD.**
EPA Case No. 12-0295-12

**BP MARINE GLOBAL INVESTMENTS SALALAH COMPANY LLC**
EPA Case No. 12-0295-14

**BP ENERGY CO.**
EPA Case No. 12-0295-15

**ATLANTIC RICHFIELD COMPANY**
EPA Case No. 12-0295-16

**BP AMOCO CHEMICAL COMPANY**
EPA Case No. 12-0295-17

**BP COMPANY NORTH AMERICA, INC.**
EPA Case No. 12-0295-18

**BP EXPLORATION (ALASKA), INC.**
EPA Case No. 12-0295-19

**STANDARD OIL COMPANY**
EPA Case No. 12-0295-20

**BP INTERNATIONAL LTD.**
EPA Case No. 12-0295-21

**BP MARINE AMERICAS**
EPA Case No. 12-0295-22

**IGI RESOURCES, INC.**
EPA Case No. 12-0295-23

FROM:   M. Carson Hodges, Debarment Counsel
        Suspension and Debarment Division (3902R)

TO:     Richard A. Pelletier, Suspension and Debarment Official
        Office of Grants and Debarment (3901R)

DATE:   November 23, 2012

2

The following facts have come to my attention and are offered in support of this request for the immediate suspension of BP PLC; BP AMERICA, INC.; BP CORPORATION NORTH AMERICA INC.; BP AMERICA PRODUCTION COMPANY; BP EXPLORATION AND PRODUCTION, INC.; BP PRODUCTS NORTH AMERICA, INC.; BP OIL INTERNATIONAL LTD.; AIR BP LTD.; BP MARINE LTD.; BP WEST COAST PRODUCTS LLC; BP SINGAPORE PTE LTD.; BP AUSTRALIA PTY LTD.; BP MARINE GLOBAL INVESTMENTS SALALAH COMPANY LLC; BP ENERGY CO. ; ATLANTIC RICHFIELD COMPANY; BP AMOCO CHEMICAL COMPANY; BP COMPANY NORTH AMERICA, INC.; BP EXPLORATION (ALASKA), INC.; STANDARD OIL COMPANY; BP INTERNATIONAL LTD.; BP MARINE AMERICAS; and IGI RESOURCES, INC. (hereinafter collectively referred to as "Respondents"). The Federal Acquisition Regulation ("FAR") provides for the suspension and debarment of contractors at 48 C.F.R. Subpart 9.4. The FAR further notes that Public Law 103-355 § 2455 and Executive Order 12689 provide for the reciprocal effect of a debarment and/or suspension action taken under the Nonprocurement Common Rule. Accordingly, the U.S. Environmental Protection Agency ("EPA") Suspension and Debarment Division ("SDD") recommends that this action be taken pursuant to 2 C.F.R. Part 180, EPA's nonprocurement debarment regulations.

## I. PARTIES INVOLVED

### *Respondents*

1.      **BP PLC** is a multinational energy corporation based in London, U.K. *See* Exhibit 1, Information, *U.S. v. BP Exploration and Production, Inc.*, at 1; *also see* Exhibit 2, BP Present Responsibility Presentation to U.S. EPA (July 16, 2012), at 7; *and see* Exhibit 3, BP PLC Annual Report and Form 20-F 2011. BP PLC is the ultimate parent company for the BP Group ("BP") global family of businesses. *See* Exhibit 1 at 7; *also see* Exhibit 3.

2.      **BP AMERICA, INC.** ("BPA") is a Delaware corporation with executive offices in Houston, Texas. *See* Exhibit 4, LexisNexis Dun & Bradstreet Worldbase data re: BPA; *also see* Exhibit 5, Simplified BP US Trading Corporate Entity Chart. BPA is a wholly owned subsidiary of BP PLC and is BP's top-tier parent company operating in the United States. *See* Exhibit 2 at 8; *also see* Exhibit 3 at 251; *and see* Exhibit 5. BPA has numerous direct and indirect subsidiaries, including BPXP. *See* Exhibit 5.

3.      **BP CORPORATION NORTH AMERICA, INC.** ("BPCNA") is an Indiana corporation with a principal operating office in Warrenville, Illinois. *Id.* BPCNA is a wholly owned subsidiary of BPA and BP PLC. *Id.*; *also see* Exhibit 3 at 251.

4.      **BP AMERICA PRODUCTION COMPANY.** ("BPAPC") is a Delaware corporation operating principally from Houston, Texas, and is a wholly owned subsidiary of BP PLC. *See* Exhibit 6, LexisNexis Dun & Bradstreet Worldbase info re: BPAPC; *also see* Exhibit 3 at 251; *and see* Exhibit 5. BPAPC is an "employing entity" for the BP Group in the U.S., and BPAPC employees work on assets owned by several BP affiliates, including BP EXPLORATION AND PRODUCTION, INC. ("BPXP") (BPXP is not an employing entity). *See* Exhibit 7, Letter from BP to EPA (Oct. 24, 2012), at 39. BPAPC is the direct parent company of BPXP. *Id*

3

5.    **BP EXPLORATION & PRODUCTION, INC.** ("BPXP") is a Delaware corporation headquartered in Houston, Texas. *See* Exhibit 8, LexisNexis Dun & Bradstreet Worldbase info re: BPXP; *also see* Exhibit 1 at 1-2. BPXP is a wholly owned subsidiary of BPAPC, BPA, and BP PLC. *See* Exhibit 9, Bloomberg Businessweek data re: BPXP; *also see* Exhibit 3 at 251; *and see* Exhibit 7. BPXP is responsible for all of the BP Group's deepwater oil and gas drilling activities in the Gulf of Mexico, and oversees the BP Group's Exploration and Production unit/function in the United States. *See* Exhibit 1 at 1-2.

6.    **BP PRODUCTS NORTH AMERICA, INC.** ("BPPNA") is a Maryland corporation operating principally from Warrenville, Illinois and with operations in Houston, Texas. *See* Exhibit 5. BPPNA is a subsidiary of BPCNA, BPA, and BP PLC. *See* Exhibit 10, Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPPNA; *also see* Exhibit 5; *and see* Exhibit 3 at 251.

7.    **BP OIL INTERNATIONAL LTD.** ("BPOI") is a London, U.K.-based entity. BPOI is an international business arm of BP PLC, and shares a business address with that parent company. *See* Exhibit 11, Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPOI; *also see* Exhibit 3 at 251.

8.    **AIR BP LTD.** ("Air BP") is London, U.K.-based entity and a wholly owned subsidiary of PB PLC. *See* Exhibit 12, Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: Air BP Ltd.; *also see* Exhibits 10-11.

9.    **BP MARINE LTD.** ("BP Marine") is a Middlesex, U.K.-based entity, and is a subsidiary of BP PLC. *See* Exhibit 13, Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BP Marine Ltd.

10.    **BP WEST COAST PRODUCTS LLC** ("BPWCP") is a d/b/a of BPPNA and/or wholly owned subsidiary of BP PLC doing business from La Palma, California. *See* Exhibit 14, Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPWCP; *also see* Exhibit 3 at 251.

11.    **BP SINGAPORE PTE LTD.** ("BP Singapore") is a Singapore-based business arm of BP PLC. *See* Exhibit 15, Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BP Singapore; *also see* Exhibit 16, BP.com info re: BP Singapore.

12.    **BP AUSTRALIA PTY LTD.** ("BP Australia") is a Melbourne, Australia-based business arm of BP PLC. *See* Exhibit 17, LexisNexis Dun & Bradstreet Worldbase info re: BP Australia.

13.    **BP MARINE GLOBAL INVESTMENTS SALALAH COMPANY LLC** ("BPMGISC") is a Salalah, Oman-based business arm of BP PLC. *See* Exhibit 18, BP.com info re: BPMGICS; *also see* Exhibit 19, LexisNexis Dun & Bradstreet Worldbase info re: BPMGICS.

14.     **BP ENERGY COMPANY** ("BPEC") is a Delaware corporation principally operating from Houston, Texas. *See* Exhibit 20, Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPEC; *also see* Exhibit 5. BPEC is a wholly owned subsidiary of BPAPC. *See* Exhibit 5.

15.     **ATLANTIC RICHFIELD COMPANY** is a wholly owned subsidiary of BP PLC. *See* Exhibit 21, LexisNexis Dun & Bradstreet Worldbase info re: Atlantic Richfield Co.; *also see* Exhibit 3 at 251.

16.     **BP AMOCO CHEMICAL COMPANY** is a wholly owned subsidiary of BP PLC. *See* Exhibit 22, LexisNexis Dun & Bradstreet Worldbase info re: BP Amoco Chemical Co.; *also see* Exhibit 3 at 251.

17.     **BP COMPANY NORTH AMERICA, INC.** is a wholly owned subsidiary of BP PLC. *See* Exhibit 23, LexisNexis Dun & Bradstreet Worldbase info re: BP Company North America, Inc.; *also see* Exhibit 3 at 251.

18.     **BP EXPLORATION (ALASKA)** ("BPXA") is a wholly owned subsidiary of BP PLC. *See* Exhibit 24, LexisNexis Dun & Bradstreet Worldbase info re: BPXA; *also see* Exhibit 3 at 251.

19.     **STANDARD OIL COMPANY** is a wholly owned subsidiary of BP PLC. *See* Exhibit 25, LexisNexis Dun & Bradstreet Worldbase info re: Standard Oil Co.; *also see* Exhibit 3 at 251.

20.     **BP INTERNATIONAL LTD.** ("BP International") is a wholly owned subsidiary of BP PLC. *See* Exhibit 26, Dun & Bradstreet Worldbase info re: BP International, Ltd.

21.     **BP MARINE AMERICAS** is a division of BP Marine, Ltd. and is thus part of a wholly owned subsidiary of BP PLC. *See* Exhibit 27, BP.com info re: BP Marine Americas.

22.     **IGI RESOURCES, INC.** is a subsidiary of BP PLC. *See* Exhibit 28, LexisNexis Dun & Bradstreet Worldbase info re: IGI Resources.

### *Non-Respondents to this Action*

23.     **David Rainey** ("Rainey") is or was BP PLC's Vice President of Exploration for the Gulf of Mexico during the *Deepwater Horizon* blowout and resulting events, and served on behalf of BP PLC as Deputy Incident Commander at the *Deepwater Horizon* Unified Command ("Unified Command") based in Robert, Louisiana, discussed further below. *See* Exhibit 1 at 8.

24.     **Robert Kaluza** ("Kaluza") is or was a BPXP Well Site Leader, and was stationed on the *Deepwater Horizon* rig prior to the blowout, discussed below. *Id.* at 5-6.

25.     **Donald Vidrine** ("Vidrine") is or was a BPXP Well Site Leader, and was stationed on the *Deepwater Horizon* rig prior to the blowout, discussed below. *Id.* at 5-6.

26.    **Kurt Mix** ("Mix") is or was a BP PLC drilling and completions project engineer tasked with working on internal BP efforts to estimate the amount of oil leaking from the *Macondo* well following the blowout, and was involved in various efforts to stop the resultant oil leak into the Gulf of Mexico. *See* Exhibit 29, DOJ Press Release re: Kurt Mix.

## II. SUMMARY

27.    SDD Counsel respectfully requests the immediate suspension of Respondents based on a criminal Information filed in the U.S. District Court for the Eastern District of Louisiana ("District Court"), charging BPXP with:

      a.    Eleven counts of Seaman's Manslaughter, 18 U.S.C. § 1115;

      b.    One count of violating the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3);

      c.    One count of violating the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703 and 707(a); and

      d.    One count of Obstruction of Congress.

      *See* Exhibit 1.

28.    This request for suspension is also based on a Plea Agreement, signed on behalf of BPXP, BP CORPORATION NORTH AMERICA, INC. and BP PLC in which the parties agree for BPXP to plead guilty to the above charges. *See* Exhibit 30, Guilty Plea Agreement, *U.S. v. BP Exploration and Production, Inc.*, at 12.

## III. BACKGROUND and NARRATIVE

### *History and Background*

#### *Deepwater Horizon* Blowout

29.    In the Gulf of Mexico, massive reservoirs of oil and natural gas were trapped deep below the seabed. BPXP drills wells in the Gulf seabed in order to tap those reservoirs, extract the oil and natural gas, and sell the extracted product at a profit. *See* Exhibit 1 at 2.

30.    BPXP's deepwater drilling is conducted from sophisticated drilling rigs stationed on the surface of the Gulf's waters. Early in the drilling/extraction process, such rigs lower a multi-story safety device known as a "blowout preventer" ("BOP") and attach the device to the seafloor. The rig then connects to the seafloor by a wide metal pipe known as a "riser," which is attached on one end to the BOP and on the other end to the rig. Drilling contractors then lower drilling tools and pumping fluid (drilling "mud") down through the riser and BOP and drill holes through the thousands of feet of rock beneath the seabed. *Id.* at 2.

6

31.     Such drilling operations are dangerous by nature. As drilling proceeds deeper beneath the seabed, natural temperatures and pressures increase, and the drilling opens pockets of pressurized gases and fluids trapped in porous areas in the rock. If such gasses or fluids are not controlled, they can enter the well (known in the industry as a "kick"), potentially resulting in a catastrophic blowout up the riser and onto the rig, which can in turn lead to ignition, explosions, casualties, death, and extensive environmental impacts. *Id.* at 3.

32.     To address the significant dangers present in drilling wells in the Gulf, the deepwater oil exploration industry developed a fundamental concept and duty known as "well control," which included customs, standards and practices designed to ensure the pressures inside a well were safely managed at all times. *Id.* at 2.

33.     One significant precaution BPXP took to ensure well control was to assign Well Site Leaders onboard each rig. The Well Site Leaders were responsible for, among other things, supervising the implementation of BPXP's drilling plan and ensuring that well drilling operations were performed safely in light of the intrinsic danger and complexity of deepwater drilling. *Id.* at 3.

34.     BPXP's Well Site Leaders had a duty to maintain well control and received training on well control safety procedures. *Id.* at 3-4.

35.     On or about May 2, 2008, BPXP entered into a lease with the Minerals Management Service ("MMS"), granting BPXP the rights to oil and natural gas reservoirs at a site called Mississippi Canyon #252 on the Outer Continental Shelf in the Gulf of Mexico. The first well drilled by BPXP at Mississippi Canyon #252, which BPXP referred to as the *Macondo* well, is approximately 48 miles from the Louisiana shoreline. The seabed in that area is approximately 5,000 feet below sea level and related oil and gas reservoirs are located more than 13,000 feet below the seabed. *Id.* at 4.

36.     BPXP, as the designated operator of the *Macondo* well under the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") regulations, was ultimately responsible for conducting operations at *Macondo* in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment. *See* Exhibit 30 at Exhibit A.

37.     Pursuant to contracts between BPXP and Transocean Ltd. ("Transocean"), the owner of the *Deepwater Horizon* drilling rig, Transocean provided, among other things, a drilling rig and rig crew to drill the *Macondo* well under the supervision of BPXP. *See* Exhibit 1 at 4.

38.     On or about October 6, 2009, BPXP began drilling the *Macondo* well using the *Marianas* drilling rig and Transocean crew. On or about November 9, 2009, work was halted on the *Macondo* well due to Hurricane Ida. *Id.* at 4.

39.     On or about February 10, 2010, BPXP resumed drilling the *Macondo* well using Transocean's *Deepwater Horizon* drilling rig and rig crew. *Id.* at 4.

7

40.     On or about April 9, 2010, the *Deepwater Horizon* operation reached an oil and natural gas reservoir at a depth of over 18,000 feet below sea level. Thereafter, BPXP's personnel and the rig crew oversaw placement of a metal pipe, called a casing, at the bottom of the well, pouring of cement down and around the casing, and preparations to complete what is known in the industry as temporary abandonment. Temporary abandonment involved various steps to ensure oil and natural gas did not flow up the well either while the drilling rig prepared to depart the site or after the rig left the location. *Id.* at 4-5.

41.     One critical part of the temporary abandonment procedure for the *Macondo* well was what was known in the industry as "negative testing" or "negative pressure testing." Negative testing assessed whether the cement pumped to the bottom of the well had hardened and formed an effective barrier between the well and the oil and natural gas reservoir. *Id.* at 5.

42.     To conduct a negative test, the pressure exerted by drilling mud and other fluids in the well outward toward the reservoir is reduced below the pressure exerted inward by the reservoir toward the well, creating what was known in the industry as an "underbalanced condition." During this process, wells are closely monitored for any increase in pressure in the well, or flow of oil or gas up the well, as any pressure increase or fluid flow was an indication that the well is not secure and that the oil and natural gas could be entering the well. If such indications arose, BPXP's Well Site Leaders were trained to take appropriate precautions to ensure well control, including shutting in the well, communicating with BPXP personnel onshore in Houston, Texas to notify them of the situation, and ceasing operations unless and until the indications had been appropriately addressed and remediated. *Id.* at 5.

43.     BPXP's Well Site Leaders had a duty to maintain well control at all times. This duty included ensuring that negative testing was conducted in accordance with the standard of care applicable in the deepwater oil exploration industry. *Id.* at 5.

44.     On April 20, 2010, the *Deepwater Horizon* remained temporarily attached to and erected on the seabed at the *Macondo* well, within the meaning of the Outer Continental Shelf Lands Act, 43 U.S.C. §1333(a)(1). *Id.* at 5.

45.     BPXP had two Well Site Leaders stationed on the *Deepwater Horizon* – Robert Kaluza and Donald Vidrine. BPXP, through Kaluza and Vidrine, was responsible for, among other things, supervising the negative testing, and had the ultimate authority on the rig to determine whether the negative testing was successful. *Id.* at 5.

46.     During the negative testing on April 20, 2010, BPXP monitored a drill pipe inserted several thousand feet into the well. BPXP, through Kaluza and Vidrine, became aware of multiple indications from the drill pipe that the well was not secure. Among other things, pressure on the drill pipe quickly built up significantly above expected values. Each time the pressure was bled off of the valve connected to the drill pipe, the pressure again built unexpectedly. Abnormal fluid flow also occurred. *Id.* at 6.

47.     Despite these significant indications that the well was not secure, BPXP, through Kaluza and Vidrine, failed to phone engineers onshore at that time to alert them to the problems. Instead, BPXP, through Kaluza and Vidrine, accepted an explanation from one or more members of the rig crew attributing the drill pipe pressure to an alleged "bladder effect." This explanation was scientifically illogical and is not recognized within the deepwater oil exploration industry. BPXP, through Kaluza and Vidrine, nonetheless accepted the explanation, and failed to consult with onshore engineers to discuss whether this alleged "bladder effect" was a realistic explanation for the observed pressures. *Id.* at 6.

48.     BPXP, through Kaluza and Vidrine, eventually decided to begin monitoring the negative testing on an additional pipe, known as a "kill line." After making this change, BPXP, through Kaluza and Vidrine, was aware of continued, abnormal, high pressure on the drill pipe. *Id.* at 6.

49.     Despite these ongoing indications on the drill pipe that the well was not secure, BPXP, through Kaluza and Vidrine, again failed to phone engineers onshore to alert them to the problem, and failed to investigate any further. *Id.* at 6-7.

50.     Instead, BPXP, through Kaluza and Vidrine, deemed the negative testing a success based on observations of the kill line. *Id.* at 7.

51.     On or about April 20, 2010, between approximately 5:00 and 8:00 PM Central Daylight Time, BPXP's Well Site Leaders supervised the negative pressure test, failed to alert engineers on the shore of these indications, and, along with others, ultimately deemed the negative pressure test a success, all in violation of the applicable duty of care. The conduct of BPXP's Well Site Leaders is attributable to BPXP. *See* Exhibit 30 at Exhibit A.

52.     As a result of deeming the negative pressure test a success, the rig crew began to remove thousands of feet of heavy drilling mud in the riser and to replace it with lighter-weight seawater, allowing natural gas and oil to migrate up through the riser and onto the rig floor. *See* Exhibit 1 at 7.

53.     Later that same evening (April 20, 2010) BPXP lost control of the *Macondo* well. Natural gas, oil and mud blew out of the *Macondo* well at tremendous pressures onto the rig, quickly igniting and causing explosions that killed eleven men onboard, all of whom were BP subcontractors. *Id.* at 7.

54.     BPXP's conduct was a proximate cause of the deaths of eleven men. *Id.* at 8.

55.     BPXP's conduct, through Kaluza and Vidrine, also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico. The oil was discharged into the Gulf of Mexico on the seabed, in the water column, at the surface, and across hundreds of miles of beaches and coastline of the Gulf States of Louisiana, Mississippi, Alabama, and Florida. *Id.* at 8.

56.     The spill adversely affected many species of wildlife, including migratory birds. *Id.* at 8.

### BP's Response to the Blowout

57.     Immediately after the Deepwater Horizon blowout, BP PLC's (former) Vice President of Exploration for the Gulf of Mexico, David Rainey, served on behalf of BP PLC as Deputy Incident Commander at the *Deepwater Horizon* Unified Command ("Unified Command") based in Robert, Louisiana. The Unified Command consisted of representatives from the U.S. government as well as BP PLC and Transocean Ltd., the designated "responsible parties" for purpose of responding to the spill. Led by the U.S. Coast Guard, Unified Command coordinated the oil spill response. Rainey was BP PLC's second highest-ranking representative at Unified Command. *Id.* at 8.

### Early Flow-Rate Estimates

58.     On or about April 24, 2010, very soon after it was determined that the *Macondo* well was leaking oil and natural gas, Unified Command, with BP PLC.'s input, issued a preliminary public estimate that oil was flowing from the well at a rate of approximately 1,000 barrels of oil per day ("BOPD"). *Id.* at 9.

59.     The amount of oil leaking from the *Macondo* well was directly relevant to various efforts to stop the leak and also relevant to potential civil and criminal litigation, including the calculation of penalties. *Id.* at 9.

60.     On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") prepared a written flow-rate estimate of approximately 5,000 BOPD. The NOAA scientist's estimate, which was based in part on a very preliminary assessment of oil that had started to float to the surface of the Gulf, cautioned that the methodologies used were "highly unreliable" and that the estimate was accurate "to only an order of magnitude," such that the actual flow amount could exceed 5,000 BOPD by ten times. As a result of this NOAA estimate, on or about April 28, 2010, Unified Command raised its public estimate to 5,000 BOPD. *Id.* at 9.

### Rainey's "Estimates"

61.     After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimate, Rainey, an executive who had no prior experience in spill estimation, surfed the Internet for information about how to conduct oil-spill-volume estimates based on observations of oil floating on the surface of a water body, known as "mass balance" estimates. Rainey's internet search led him to a website where he found a Wikipedia entry that described some generally accepted mass balance methodologies, including the American Society for Testing and Materials ("ASTM") method and the European "Bonn" method. *Id.* at 9.

62.     Between on or about April 26, 2010 and on or about April 30, 2010, despite having no experience performing mass balance estimates and despite knowing that BPXP had employees who were trained in generating such estimates, BPXP, through Rainey, performed and caused to be performed daily estimates purportedly using the ASTM and Bonn methods. *Id.* at 10.

63.     BPXP's Bonn estimates, prepared by Rainey, resulted in "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD. BPXP, through Rainey, withheld these Bonn estimates from individuals working on flow rate within Unified Command and, later, also withheld them from Congress. *Id.* at 10.

64.     BPXP's ASTM estimates, prepared by Rainey, did not conform to ASTM standards but instead were manipulated to consistently arrive at or near a "best guess" of between 5,000 and 6,000 BOPD. In effect, BPXP, through Rainey, conducted the estimates in a manner designed to reverse engineer results consistent with NOAA's preliminary 5,000 BOPD estimate. BPXP, through Rainey, labeled the estimates as "ASTM" estimates even though the estimates did not conform to the ASTM method. *Id.* at 10.

65.     As described below, BPXP, through Rainey and other BP PLC executives, consistently maintained that 5,000 BOPD was the "best guess" estimate, without disclosing internal BP PLC information suggesting the flow rate was considerably higher. *Id.* at 10.

<u>BPXP's Actual Estimates</u>

66.     In its engineering response to the *Macondo* oil spill, BPXP did not rely internally on Rainey's contrived and inaccurate flow-rate numbers. Instead, BPXP and its affiliated companies had numerous expert teams assessing the flow rate using sophisticated methodologies that focused on the conditions at the seafloor where the oil and natural gas were gushing out. These teams were generating flow-rate estimates much higher than Rainey's purported "best guess" of between 5,000 and 6,000 BOPD. *Id.* at 10-11.

67.     For example, on or about April 22, 2010, BP PLC subsurface engineers, including Kurt Mix, estimated "various release scenarios" with potential flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates"). *Id.* at 11.

68.     Also, on or about May 11, 2010, a team of BP BLC engineers working under the direction of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged from 14,000 BOPD to 82,000 BOPD depending on potential flow paths and other known and unknown variables (the "Engineer 1 Slide Deck"). *Id.* at 11.

<u>BPXP's Public Estimates Questioned</u>

69.     On or about May 13, 2010, a university professor with expertise in fluid mechanics measurement publicly estimated that the *Macondo* well was leaking oil at a rate of approximately 70,000 BOPD, based on a review of video footage of the leak that BP PLC had recently released. *Id.* at 11.

70.     On or about May 14, 2010, BPXP and its affiliated companies publicly rejected the university's professor's work and continued defending 5,000 BOPD as the "best" estimate, even though 70,000 BOPD was within the range of Rainey's Bonn estimates and other internal BP PLC engineering estimates, including the work of Engineer 1 described above. *Id.* at 11.

71.     On or about May 14, 2010, Engineer 1 sent an email to two executives at BP PLC, including BP PLC's then Chief Executive Officer for Exploration and Production, expressing concern over BP PLC's continued public embrace of the 5,000 BOPD number. The email stated:

> I just read an article on CNN (May 14, 2010 1:00 p.m.) stating that a researcher at [a university] believes that the *Macondo* well is leaking up to 70,000 bopd and that BP stands by a 5,000 BOPD figure. With the data and knowledge we currently have available, we cannot definitively state the oil rate from this well. We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

> *Id.* at 11-12.

72.     Engineer 1's email caused concern with BP PLC because it contradicted BP PLC's public position regarding flow rate. *Id.* at 12.

<u>The Rainey Memo</u>

73.     On or about May 17, 2010, BPXP, through Rainey, prepared a memorandum purporting to summarize the efforts that had been undertaken within Unified Command to estimate flow rate (the "Rainey Memo"). The Rainey Memo, which sought to justify BP PLC's 5,000 BOPD estimate, was false and misleading in numerous respects, including:

   a.   BPXP, through Rainey, omitted Rainey's Bonn estimates, which were significantly higher than 5,000 BOPD.

   b.   BPXP, through Rainey, falsely labeled the estimates in the memorandum as "ASTM" calculations.

   c.   BPXP, through Rainey, omitted that the estimates included in the memorandum were premised on data and other inputs BPXP, through Rainey, knew were inaccurate.

   d.   BPXP, through Rainey, omitted other documents relating to flow-rate estimates that contradicted BPXP's 5,000 BOPD estimate, including, among others, the work performed by Engineer 1, the Subsurface Team Estimates, and a critique by another BP PLC engineer ("Engineer 2") of the university professor's work that used different assumptions than those used by the professor and concluded that 15,000 BOPD was an appropriate assessment of the flow rate based on the same video footage of the spill.

e.  BPXP, through Rainey, falsely stated that Rainey's estimates ranging from 5,000 to 6,000 BOPD "played an important part in Unified Command's decisions [on April 28, 2010] to raise the estimates of flow rate from 1,000-5,000 barrels per day." In fact, as BPXP, through Rainey well knew, BPXP had not yet provided these purported "ASTM" estimates to Unified Command by the time that Unified Command raised its estimated flow rate to up to 5,000 BOPD.

*Id.* at 12.

## The Flow Rate Technical Group

74.  On or about May 19, 2010, as a result of the growing concern that BP PLC was understating the amount of oil spilling from *Macondo* well, Unified Command announced the creation of the Flow Rate Technical Group ("FRTG"), made up of independent and government experts, to determine the flow rate. Later, following independent analysis, the FRTG announced on or about August 2, 2010, its conclusion that the flow rate after the blowout had initially been approximately 62,000 BOPD – over twelve times BP PLC's public estimate of 5,000 BOPD – and had been approximately 53,000 BOPD at the time the well was shut in or about July 15, 2010. The FRTG concluded that a total of approximately 4.9 million barrels of oil had been released during the course of the spill. *Id.* at 13.

## The Congressional Inquiry and Investigation

75.  The House Subcommittee on Energy and Environment (the "Subcommittee") was a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress. The Subcommittee had oversight authority over matters including the regulation of energy, drinking water and soil and water contamination. The Subcommittee's oversight authority included the authority to analyze the effectiveness of existing laws and to evaluate the need to propose new or additional legislation. The Subcommittee was a "Committee" for purposes of Title 18 U.S.C. § 1505. *Id.* at 13-14.

76.  Following the Deepwater Horizon blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well. Congress's inquiry and investigation included, among other things, requests for information from BP PLC. *Id.* at 14.

77.  On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, BPXP, through Rainey, falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate. BPXP, through Rainey, further stated to Congress that, while BPXP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, the worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which remained in place at the time. During the May 4 briefing, BPXP, through Rainey, did not disclose any information that contradicted BPXP's purported "best guess" of 5,000 BOPD, including the Bonn estimates and other BP PLC internal information of which BPXP, through Rainey, was aware indicating that the actual flow – not a

hypothetical worst case scenario assuming the non-existent condition of the blowout preventer being removed – was much higher than 5,000 BOPD. *Id.* at 14.

78.     On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP PLC accusing BP PLC of understating the amount of oil leaking from the well. The letter noted that BP PLC had recently "reaffirmed the 5,000 barrels per day estimate" despite recent news that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels per day." The letter further stated that Congress was concerned that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster." The Subcommittee requested answers to fifteen questions relating to flow rate and requested that BP PLC "update [its] response or provide additional documents at such time as such information becomes available." Among other things, the Subcommittee requested:

   a.   "What is the BP method and scientific basis for the estimate of 5,000 barrels per day? Was this estimate based solely on the surface monitoring of the size of the spill?"

   b.   "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

   c.   "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

   *Id.* at 14-15.

79.     On or about May 21, 2010, BPXP, through Rainey, began working on a response to the May 14 Congressional request. Rainey was the primary source of flow-rate information for BPXP's eventual written response to Congress on or about May 24, 2010 (the "BP Response") that continued to embrace 5,000 BOPD as the "best guess" estimate. During the preparation of the BP Response, BPXP, through Rainey, continued to receive information that contradicted a "best guess" of 5,000 BOPD, including that the amount of oil actually being collected via a riser insertion tube tool (the "RITT") confirmed that the flow rate was in excess of 5,000 BOPD and an email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low." Aware of this and other information contradicting the 5,000 BOPD estimate, BPXP, through Rainey, withheld such information from other BP PLC employees and from BP PLC in-house and outside lawyers on the BP Response. BPXP, through Rainey, also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response. *Id.* at 15-16.

80.     On or about May 24, 2010, BPXP, through Rainey, caused to be submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by BPXP, through Rainey. As a result of BPXP's actions, through Rainey, in withholding information and also providing false and misleading information, the BP Response made false and misleading statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation. *Id.* at 16.

14

### *Criminal Proceedings*

81.     On May 2, 2012, a Grand Jury issued an Indictment charging Mix in the District Court with two counts of Obstruction of Justice, 18 U.S.C. § 1512(c)(1). *See* Exhibit 31, Indictment, *U.S. v. Kurt Mix.*

82.     On November 14, 2012, the U.S. Attorney for the Eastern District of Louisiana as well as the Assistant Attorney General for the Criminal Division filed a Superseding Indictment in the District Court charging both Kaluza and Vidrine with eleven counts of Involuntary Manslaughter, 18 U.S.C. §1112, eleven counts of Seaman's Manslaughter, 18 U.S.C. §1115, and one count of violating the CWA, 33 U.S.C. §§1319(c)(1)(A) and 1321(b)(3). *See* Exhibit 32, Superseding Indictment, *U.S. v. Robert Kaluza and Donald Vidrine.*

83.     On November 14, 2012, the U.S. Attorney for the Eastern District of Louisiana as well as the Assistant Attorney General for the Criminal Division filed an Indictment in the District Court charging Rainey with one count of Obstruction of Congress, 18 U.S.C. §1505 and one count of making False Statements, 18 U.S.C. §1001(a)(2). *See* Exhibit 33, Indictment, *U.S. v. David Rainey.*

84.     On November 15, 2012, the U.S. Attorney for the Eastern District of Louisiana and the Assistant Attorney General for the Criminal Division of the Department of Justice filed an Information in the District Court charging BPXP with eleven counts of Seaman's Manslaughter, 18 U.S.C. §1115, one count of violating the CWA, 33 U.S.C. §§1319(c)(1)(A) and 1321(b)(3), one count of violating the MBTA, 16 U.S.C. §§703 and 707(a), and one count of Obstruction of Congress, 18 U.S.C. §1505. *See* Exhibit 1.

85.     Also on November 15, 2012, Mark Filip and Joseph Warin, PC, signed a Plea Agreement in their capacity as Counsel for BPXP, BPCNA, and BP PLC under which, if accepted by the District Court, BPXP will plead guilty to the charges in the Information. *See* Exhibit 30. A sentencing date has not yet been scheduled.

### *Present Responsibility Submissions and Draft Order*

86.     On July 16, 2012, the BP Group, submitted a Present Responsibility Presentation to the SDD intended to address any statutory ineligibility and discretionary debarment issues surrounding the Deepwater Horizon blowout. Exhibit 2. On October 24, 2012 and October 31, 2012, the BP Group supplemented its July 16, 2012 submission. Exhibit 7; Exhibit 34, Letter from BP to EPA (Oct. 31, 2012). In addition, BPXP, acting through counsel, signed the aforementioned Plea Agreement, which included a draft order as to potential remedial steps the court may direct BPXP to take, including various safety and ethics-related requirements. *See* Exhibit 30 at Exhibit B. However, BP has not yet sufficiently demonstrated that the actions and measures taken by the company and reflected in these submissions have fully rectified the systemic, cultural, and corporate attitude/governance problems that led to the DWH event and are reflected in the Information and Plea Agreement.

Accordingly, and in order to protect federal dollars and the best interests of the federal government, SDD is recommending suspension of the above-named Respondents pending conclusion of administrative, criminal, and/or civil proceedings and/or deliberations pertaining to this matter.

### *EPA Administrative Action to Date*

87.    On July 30, 2012, the EPA Suspension and Debarment Official issued a Notice of Suspension to Mix. *See* Exhibit 35, Notice of Suspension re: Kurt Mix, EPA Case No. 12-0295-01.

### IV. STATEMENT OF AUTHORITIES

88.    Suspension of BPXP is warranted under 2 C.F.R. § 180.700(a) and (c) where the criminal Information discussed above constitutes evidence of multiple offenses – specifically eleven counts of Seaman's Manslaughter; one count of violating the CWA; one count of violating the MBTA; and one count of Obstruction of Congress – listed under 2 C.F.R. § 180.800(a)(4), in that each of those charges indicates a lack of business integrity or business honesty that seriously and directly affects BPXP's present responsibility, and immediate action is necessary to protect the public interest, as described in Section V below.

89.    Suspension of BPXP is warranted under 2 C.F.R. § 180.700(b) and (c) where the criminal Information discussed above constitutes evidence of misconduct – culminated in eleven counts of Seaman's Manslaughter; one count of violating the CWA; one count of violating the MBTA; and one count of Obstruction of Congress – of so serious and compelling a nature as to affect BPXP's present responsibility, and immediate action is necessary to protect the public interest, as described in Section V below.

90.    Suspension of BPXP is warranted under 2 C.F.R. § 180.700 (a) and (c) where:

    a.    The inappropriate conduct of Kaluza – culminating in his Indictment for eleven counts of Involuntary Manslaughter, eleven counts of Seaman's Manslaughter, and one count of violating the CWA – may be imputed to BPXP under 2 C.F.R. § 180.630(a), as his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BPXP, or with its knowledge, approval or acquiescence, and indicates a lack of business integrity or business honesty that seriously and directly affects BPXP's present responsibility; and

    b.    Immediate action is necessary to protect the public interest, as described in Section V below.

91.    Suspension of BPXP is warranted under 2 C.F.R. § 180.700 (b) and (c) where:

    a.    The inappropriate conduct of Kaluza – culminating in his Indictment for eleven counts of Involuntary Manslaughter, eleven counts of Seaman's Manslaughter, and one count of violating the CWA – may be imputed to BPXP under 2 C.F.R. § 180.630(a), as

his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BPXP, or with its knowledge, approval or acquiescence, and is of so serious and compelling a nature as to affect BPXP's present responsibility; and

b.      Immediate action is necessary to protect the public interest, as described in Section V below.

92.      Suspension of BPXP is warranted under 2 C.F.R. § 180.700 (a) and (c) where:

a.      The inappropriate conduct of Vidrine – culminating in his Indictment for eleven counts of Involuntary Manslaughter, eleven counts of Seaman's Manslaughter, and one count of violating the CWA – may be imputed to BPXP under 2 C.F.R. § 180.630(a), as his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BPXP, or with its knowledge, approval or acquiescence, and indicates a lack of business integrity or business honesty that seriously and directly affects BPXP's present responsibility; and

b.      Immediate action is necessary to protect the public interest, as described in Section V below.

93.      Suspension of BPXP is warranted under 2 C.F.R. § 180.700 (b) and (c) where:

a.      The inappropriate conduct of Vidrine – culminating in his Indictment for eleven counts of Involuntary Manslaughter, eleven counts of Seaman's Manslaughter, and one count of violating the CWA – may be imputed to BPXP under 2 C.F.R. § 180.630(a), as his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BPXP, or with its knowledge, approval or acquiescence, and is of so serious and compelling a nature as to affect BPXP's present responsibility; and

b.      Immediate action is necessary to protect the public interest, as described in Section V below.

94.      Suspension of BP PLC is warranted under 2 C.F.R. 180.700 (a) and (c) where:

a.      The inappropriate conduct of BPXP – culminating in the Information charging that company with eleven counts of Seaman's Manslaughter; one count of violating the CWA; one count of violating the MBTA; and one count of Obstruction of Congress – may be imputed to BP PLC under 2 C.F.R. § 180.630(c) where BP PLC is the 100% owner of, and has the power to manage, control or influence the activities of, BPXP (as evidenced by BP PLC's coordination of BP Group participation in the Unified Command and responses to Congressional inquiries relating to the *Deepwater Horizon* blowout and subsequent events), and BPXP's inappropriate conduct indicates a lack of business integrity or business honesty that seriously and directly affects BP PLC's present responsibility; and

b.      Immediate action is necessary to protect the public interest, as described in Section V below.

95.     Suspension of BP PLC is warranted under 2 C.F.R. 180.700 (b) and (c) where:

a.      The inappropriate conduct of BPXP – culminating in the Information charging that company with eleven counts of Seaman's Manslaughter; one count of violating the CWA; one count of violating the MBTA; and one count of Obstruction of Congress – may be imputed to BP PLC under 2 C.F.R. § 180.630(c) where BP PLC is the 100% owner of, and has the power to manage, control or influence the activities of, BPXP (as evidenced by BP PLC's coordination of BP Group participation in the Unified Command and responses to Congressional inquiries relating to the *Deepwater Horizon* blowout and subsequent events), and BPXP's inappropriate conduct is of so serious and compelling a nature as to affect BP PLC's present responsibility; and

b.      Immediate action is necessary to protect the public interest, as described in Section V below.

96.     Suspension of BP PLC is warranted under 2 C.F.R. § 180.700 (a) and (c) where:

a.      The inappropriate conduct of Rainey – culminating in his Indictment for one count of Obstruction of Congress and one count of False Statements – may be imputed to BP PLC under 2 C.F.R. § 180.630(a), as his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BP PLC, or with its knowledge, approval or acquiescence, and indicates a lack of business integrity or business honesty that seriously and directly affects BP PLC's present responsibility; and

b.      Immediate action is necessary to protect the public interest, as described in Section V below.

97.     Suspension of BP PLC is warranted under 2 C.F.R. § 180.700 (b) and (c) where:

a.      The inappropriate conduct of Rainey – culminating in his Indictment for one count of Obstruction of Congress and one count of False Statements – may be imputed to BP PLC under 2 C.F.R. § 180.630(a), as his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BP PLC, or with its knowledge, approval or acquiescence, and is of so serious and compelling a nature as to affect BP PLC's present responsibility; and

b.      Immediate action is necessary to protect the public interest, as described in Section V below.

98.     Suspension of BP PLC is warranted under 2 C.F.R. § 180.700 (a) and (c) where:

a.      The inappropriate conduct of Mix– culminating in his Indictment for two counts of Obstruction of Justice – may be imputed to BP PLC under 2 C.F.R. § 180.630(a), as

his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BP PLC, or with its knowledge, approval or acquiescence, and indicates a lack of business integrity or business honesty that seriously and directly affects BP PLC's present responsibility; and

b.    Immediate action is necessary to protect the public interest, as described in Section V below.

99.    Suspension of BP PLC is warranted under 2 C.F.R. § 180.700 (b) and (c) where:

a.    The inappropriate conduct of Mix – culminating in his Indictment for two counts of Obstruction of Justice – may be imputed to BP PLC under 2 C.F.R. § 180.630(a), as his inappropriate conduct occurred in connection with his performance of duties for or on behalf of BP PLC, or with its knowledge, approval or acquiescence, and is of so serious and compelling a nature as to affect BP PLC's present responsibility; and

b.    Immediate action is necessary to protect the public interest, as described in Section V below.

100.    BP PLC is the owner of, and thus controls or has the power to control, the following entities: BPA; BPCNA; BPAPC; BPXP; BPPNA; BPOI; AIR BP; BP MARINE; BPWCP; BP SINGAPORE; BP AUSTRALIA; BPMGISC; BPEC; ATLANTIC RICHFIELD COMPANY; BP AMOCO CHEMICAL COMPANY; BP COMPANY NORTH AMERICA; BPXA; STANDARD OIL COMPANY; BP INTERNATIONAL; BP MARINE AMERICAS; and IGI RESOURCES, INC. As such, these entities are all "affiliates" of each other and of BP PLC within the meaning of 2 C.F.R. § 180.905.[1] Accordingly, any suspension or debarment of BP PLC or any of the entities named in this paragraph extends to all other entities named in this paragraph pursuant to 2 C.F.R. § 180.625.

## V. IMPACT ANALYSIS

101.    Through its various operating entities, the BP Group is one of the largest fuel suppliers to the federal government. The BP Group currently holds contracts with the U.S. worth more than $1.34 billion, under which it provides jet fuel, marine fuel, diesel fuel, lubricants and natural gas. The majority of these contracts are issued or administered by the U.S. Defense Logistics Agency ("DLA") and DLA Energy and were awarded to a number of BP entities, including BPPNA; BPWCP; AIR BP; BP ENERGY and IGI RESOURCES. BP's domestic federal contracts include an award to BPWCP with a projected value of nearly $781,824,000 for the provision of jet fuel to DLA Energy, and awards to BPPNA for fuel, marine lube and gasoline, with a projected value of nearly $240 million. *See* Exhibit 2 at 9; *also see* Exhibit 36, Fedspending.org info re: BP plc.

102.    BP PLC and its subsidiaries are also major providers of supplies and services in support of the federal government's efforts abroad. Among other things, BP entities have federal contracts in excess of $180 million to provide jet and military diesel fuel to U.S. operations

---

[1] Under 2 U.S.C. 180.905, "[p]ersons are *affiliates* of each other if, directly or indirectly, either one controls or has the power to control the other or a third person controls or has the power to control both."

overseas. The total value of BP's international U.S. contracts exceeds $224 million. *See* Exhibit 2 at 9.

103.    Based on the BP Group's extensive experience as a federal government contractor, including BP PLC and its numerous subsidiaries either directly or through affiliation principles, it is reasonably likely that BP PLC and its subsidiaries may act as a contractor, or as an agent or representative of a contractor, within the meaning of the FAR at 48 C.F.R. § 9.403.

104.    Through BPXP, BP holds the most federal deepwater lease acreage in the Gulf of Mexico, and is one of the industry's leading producers of oil and gas from this area. During 2011, BP's production from the Gulf of Mexico amounted to 261,000 barrels of oil equivalent per day. BP currently holds interests in 740 leases in the Gulf of Mexico, nearly all of them in deepwater. *See* Exhibit 2 at 9.

105.    Based on BP PLC's and its subsidiaries' history of holding numerous oil and gas leases and as a federal grant recipient, it is reasonably likely that BP PLC and its subsidiaries, either directly or through affiliation principles, may be a "participant" or "principal" within the meaning of 2 C.F.R. §§ 180.980, 180.995, and 1532.995.

## VI.  RECOMMENDATION

106.    Upon the basis of the information and authority provided herein, the SDD respectfully recommends the immediate suspension of **BP PLC; BP AMERICA, INC.; BP CORPORATION NORTH AMERICA INC.; BP AMERICA PRODUCTION COMPANY; BP EXPLORATION AND PRODUCTION, INC.; BP PRODUCTS NORTH AMERICA, INC.; BP OIL INTERNATIONAL LTD.; AIR BP LTD.; BP MARINE LTD.; BP WEST COAST PRODUCTS LLC; BP SINGAPORE PTE LTD.; BP AUSTRALIA PTY LTD.; BP MARINE GLOBAL INVESTMENTS SALALAH LLC; BP ENERGY CO.; ATLANTIC RICHFIELD COMPANY; BP AMOCO CHEMICAL COMPANY; BP COMPANY NORTH AMERICA, INC.; BP EXPLORATION (ALASKA); STANDARD OIL COMPANY; BP INTERNATIONAL LTD.; BP MARINE AMERICAS; and IGI RESOURCES, INC.**

## VII.  ADMINISTRATIVE COORDINATION

107.    EPA has submitted relevant information on this matter to the ISDC, and has been designated as Lead Agency on this matter pursuant to the ISDC process.

## List of Exhibits

Exhibit 1:      Information, *U.S. v. BP Exploration and Production, Inc.*

Exhibit 2:      BP Present Responsibility Presentation to U.S. EPA (July 16, 2012).

Exhibit 3:      BP PLC Annual Info and Form 20-F 2011.

Exhibit 4:      LexisNexis Dun & Bradstreet Worldbase info re: BPA.

Exhibit 5:      Simplified BP US Trading Corporate Entity Chart.

Exhibit 6:      LexisNexis Dun & Bradstreet Worldbase info re: BPAPC.

Exhibit 7:      Letter from BP to EPA (Oct. 24, 2012).

Exhibit 8:      LexisNexis Dun & Bradstreet Worldbase info re: BPXP.

Exhibit 9:      Bloomberg Businessweek data re: BPXP.

Exhibit 10:     Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPPNA.

Exhibit 11:     Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPOI.

Exhibit 12:     Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: Air BP Ltd.

Exhibit 13:     Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BP Marine Ltd.

Exhibit 14:     Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPWCP.

Exhibit 15:     Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BP Singapore.

Exhibit 16:     BP.com info re: BP Singapore.

Exhibit 17:     LexisNexis Dun & Bradstreet Worldbase info re: BP Australia.

Exhibit 18:     BP.com info re: BPMGICS.

Exhibit 19:     LexisNexis Dun & Bradstreet Worldbase info re: BPMGICS.

Exhibit 20:     Combined LexisNexis Dun & Bradstreet Worldbase and SAM.gov info re: BPEC.

Exhibit 21:   LexisNexis Dun & Bradstreet Worldbase info re: Atlantic Richfield Co.

Exhibit 22:   LexisNexis Dun & Bradstreet Worldbase info re: BP Amoco Chemical Co.

Exhibit 23:   LexisNexis Dun & Bradstreet Worldbase info re: BP Company North America, Inc.

Exhibit 24:   LexisNexis Dun & Bradstreet Worldbase info re: BPXA.

Exhibit 25:   LexisNexis Dun & Bradstreet Worldbase info re: Standard Oil Co.

Exhibit 26:   LexisNexis Dun & Bradstreet Worldbase info re: BP International, Ltd.

Exhibit 27:   BP.com info re: BP Marine Americas.

Exhibit 28:   LexisNexis Dun & Bradstreet Worldbase info re: IGI Resources.

Exhibit 29:   DOJ Press Release re: Kurt Mix.

Exhibit 30:   Guilty Plea Agreement, *U.S. v. BP Exploration and Production, Inc.*

Exhibit 31:   Indictment, *U.S. v. Kurt Mix.*

Exhibit 32:   Superseding Indictment, *U.S. v. Robert Kaluza and Donald Vidrine.*

Exhibit 33:   Indictment, *U.S. v. David Rainey.*

Exhibit 34:   Letter from BP to EPA (Oct. 31, 2012).

Exhibit 35:   Notice of Suspension re: Kurt Mix, EPA Case No. 12-0295-01.

Exhibit 36:   Fedspending.org info re: BP plc.