IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL NO. 2179 |
| THIS DOCUMENT RELATES TO: | SECTION:  J |
| *In re the Complaint and Petition of Triton Asset Leasing GmbH, et al, No. 10-2771* | |
| *SDTX 2012-22886; Harley D. Allen, et al v. BP American Production Company* | JUDGE BARBIER |
| *NDFL 3 11-00189; Abbasi, et al v. Transocean Deepwater, Inc. et al* | |
| *4:11-cv-06055; Kevin Brannon, et al v. BP American Production Company;* | MAG. JUDGE SHUSAN |
| *4:11-cv-06055; Harley D. Allen, et al v. BP American Production Company;* | |
| *And* | |
| *Unfiled Economic and Property Damages Class Members* | |

---

**PLAINTIFFS REPRESENTED BY BRENT COON & ASSOCIATES MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AN EXTENSION OF TIME TO  SUBMIT SEAFOOD CLAIMS TO THE SEAFOOD COMPENSATION PROGRAM**

**INTRODUCTION**

The Gulf of Mexico is a vast landscape where Mother Nature at her best provides accessibility to diverse and abundant natural resources.  Within its estuaries, marshes and seagrasses is an ecosystem that not only supports wildlife and fisheries, but contributes substantially to the economy of coastal areas.  America's first immigrants, the Native

1

American Indians, recognized these abundances that were available for their sustenance hundreds if not thousands of years ago. While Mother Nature has occasionally been known to unleash her fury in the Gulf of Mexico, it has for the most part gently sustained tens of millions of people over the years. The core of such resources, even to this day, is the Gulf's fisheries, which can produce tremendous markets of fish, shrimp, oysters and other marine life. While tourism and industry have thrived from the resources of the Gulf in more recent years, it is this abundance and wealth of its marine life that has provided a foundation to the area's economy, culture and way of life.

The tragedy aboard the Deepwater Horizon was a near mortal blow to all that the Gulf of Mexico had stood for. Not only did it take the souls of 11 innocent victims, it ripped apart the mental health of all the men and women working aboard it, along with their families. It polluted the Gulf in such an enormous fashion that the long-term economic impact may not fully be known for generations to come. It crippled the economies of every community touching the Gulf of Mexico and its tentacles stretch far into the interior of every industry dependent upon it.

No industry was more harmed from this needless tragedy than the seafood industry. Families who for generations labored as fishermen, shrimpers, and oystermen were almost immediately put out of work. These families were the backbone of those industries and have been a part of the Gulf of Mexico's culture for generations. They grew up in towns and villages along coastal areas and bayous and often toiled seven days a week, several months at a time, as seasons and conditions permitted. And while their responsibilities and duties have always been labor-intensive, they support a seafood trade that has existed within their families for generations. Many are uneducated, illiterate, lack transferability of employment skills,

spend their entire lives within a few miles from their homes, and do without land-based transportation. These people, although rugged and independent, have very few transferable work skills, are ill prepared to transition into other trades, and are typically unable to move away to new locales outside of the Gulf and integrate elsewhere.

Compounding upon and exacerbating these limitations is the plight of the similarly situated Southeast Asian communities. These families came over to the Gulf of Mexico en masse in the 1970s as a result of the political instability of their own countries. The United States government proactively assisted this transition into the Gulf seafood trades in recognition that it was one of the limited skill sets transferrable from their native country. For many of these immigrants it was a "forced migration", which has further alienated and isolated them away from American customs and policies. That is why today most of these immigrants in the Gulf area have never really integrated themselves into American society. They remain in tight knit enclaves or communities that allow them to speak their native language and retain their native culture.

The parties in this case apparently recognize that an implementation of rules and protocols associated with the *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 (hereinafter referred to as "Settlement Agreement") (Rec. Doc. *See* Rec. Doc. 6430) are difficult to understand and apply, and as such aggrieved parties are allowed to submit claims through April 22, 2014—approximately 16 months from now. Yet in spite of the fact that the seafood industry was most harmed by the Deepwater Horizon spill, the Settlement Agreement mandates that the Seafood Claimants submit an unduly onerous form and supporting documentation in support of their claims to the class administrator under a much shorter deadline, which triggers on January 22, 2013. Such

disparate treatment of the poorest group of peoples in this class, who are harmed most by the conduct of the defendants, is patently unfair.

## ANALYSIS

The Brent Coon & Associates Seafood Plaintiffs, (hereinafter referred to as the "Plaintiffs" or "Seafood Claimants") request that they be provided an extension under the conditions of the Settlement Agreement to submit their seafood claims to the Seafood Compensation Program by April 22, 2014**.**  This extension request is based on several factors, many of which stem from the fact that this Court just recently approved the Settlement Agreement—and denied various objections to it—only thirty days ago on December 22, 2012.

Such factors include the following:

(a) **Previous Request for Flexibility for Seafood Claimants Denied**.  The Plaintiffs in this case have timely objected to and opposed the Amended May 2, 2012 Deepwater Horizon Economic and Property Damages Settlement Agreement (hereinafter referred to as the "Settlement Agreement"). Rec. Doc. 7224.  The settlement is massive, extraordinarily complicated, and confusing to read and interpret.  Its notification and claims process is cumbersome, especially for those claimants who are illiterate and uneducated and for whom English is not their native language.  The Plaintiffs notified the Court that based on conversations with hundreds of fisherman, shrimpers, oystermen and crabbers that "the seafood compensation plan, which is a major pillar of this settlement, disproportionally includes more poorly educated members than society at large." *Id.* at 14.  To combat this disparate treatment of the Seafood Claimants, an objection was made to this court to simply extend the Settlement Agreement claims process and deadline in accordance with the Oil Pollution Act of 1990. *Id.* at 21-22.  The Court disregarded the Plaintiffs objections.  Now this

disparate group of claimants have been singled out and unfairly forced to deal with complicated procedures under extremely difficult circumstances—in accordance with an order that was signed by this Court only four weeks ago.

(b) **Difficulty in Complying with Cumbersome Seafood Claim Form**. The seafood claim form is an onerous and lengthy 25-page document that each BCA Seafood Claimant must fill out for each and every eligible seafood activity. This form is neither prescribed nor authorized by any statute in the United States, including the Oil Pollution Act of 1990. It is designated to intimidate and deter the Seafood Claimants from submitting seafood compensation claims to the Seafood Compensation Program. Since many of the Seafood Claimants are uneducated and illiterate—whether they speak English, Spanish or Vietnamese—they require assistance in filling out their forms. Therefore the mandate that every Seafood Claimant fully and completely respond to every element of the seafood compensation form and strictly adhere to every procedure of the application process under the present time constraints is patently unfair and prejudicial.

(c) **Difficulty in Complying with Seafood Claims Process Due to Socioeconomic Status**. Compounding further upon the constraints associated with the seafood claim submission process is that many if not most of the Seafood Claimants are illiterate, marginally illiterate, or do not have the capacity to read or write in English or in any language. As the Court is aware, a major portion of the seafood industry is populated by immigrants from Mexico and Southeast Asia, including those from Vietnam, Cambodia, Laos and Thailand. The majority of these immigrants are not well acquainted with United States judicial systems, banks, accountants, and other constituents which would be normally relied upon, nor are they able to readily comply with the mandates of the Seafood Compensation Program. In fact the

present complexity of the Seafood Compensation Program and the accompanying compensation forms are so tedious, specific and detailed that it intrinsically effects to intimidate, discourage, and frustrate the Seafood Claimants to the point that they give up.

      (d) **<u>Difficulty in Complying with Cumbersome Seafood Claim Deadline</u>**. Out of all the types of claims in this case, only those associated with the seafood industry are under an unfair and abbreviated deadline. All the other claims are given over an additional year to remit their claims for processing. Generally speaking, the vast majority of Seafood Claimants are uneducated, live and work in rural areas within remote jurisdictions within the Gulf, and are difficult to contact due to a lack of a home phone, computers, emails accounts, cell phones, and cell phone service within the remote rural areas of the Gulf. Many of these claimants are difficult to locate because of work within a seafood industry that are known to be highly transitory and migratory. Due to their migratory culture and seasonal nature of their work, these disenfranchised people often work away from home more than a month at a time, do not always have homes, may live on boats, cannot be contacted through their employers, and regularly move to or live with other family members in the United States or travel back to their native country to visit with their families. Therefore the abbreviated period by which the Seafood Claimants must respond to the requirements of the Settlement Agreement is patently unfair. It also is expressly designed to effectively exclude large numbers of otherwise eligible claimants from collecting compensation from the Seafood Compensation Program. The parties to the class settlement acknowledged the seafood industry was most harmed by the oil spill—and yet concomitantly mandated an extraordinarily demanding submission process with far more onerous deadlines than any other type of claim, a decision that is baffling on one side and oxymoronic on the other.

The Plaintiff's Steering Committee ("PSC"), the Deep Horizon Economic Claims Center ("DHECC") and BP may argue that the accelerated timeframe for the seafood claims is necessary in order to effectuate a "second payment" from the fund. This is an illogical position as the first payments are designed to fully compensate claimants, therefore ameliorating the need for a swift second payment. Second, it is not been established that there will be a second payment, nor who will be the recipients of the second payment. Third, if any of the opponents were concerned about it, more would have been done to effectuate full payment for the claimants a long time ago so this issue about "second payment" would be moot. All of this begets the question: why is there such a hurry?

The United States class actions were created to improve judicial efficiency in cases involving large numbers of injured parties with common complaints, and to ensure that parties are afforded their fair participation within the class. Manual for Complex Litigation, *Fourth* § 21. The standard is that a court must determine whether the requirements of Rule 23 have been satisfied. *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 178 (1974). In doing so, courts must find for the equitable treatment of all claimants by independently and objectively analyzing their circumstances in order to determine whether the settlement is fair. *Ortiz v. Fibreboard Corp.*, 527, U.S. 815, 841, *Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980). Therefore the Seafood Claimants, as disparate members of this class, request that they be afforded fairness in meeting the requirements for submission of their Seafood Claims to the Seafood Compensation Program, which neither unreasonable nor is it prejudicial to the defendants.

Once a settlement is deemed fair, approval can be conditioned on the parties' adopting changes specific by a court. *See*, Manual for Complex Litigation, *Fourth* § 21.61 citing to *In*

*re Auction Houses Antitrust Litig.,* No, 00 Civ. 0648, 2001 WL 170792, at *18 (S.D.N.Y. Feb. 22, 2001).  A court can also suggest changes to a settlement.  *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).  Even an order granting class certification can be altered as a case develops.  *See, e.g.*, *Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 602 (D. Colo. 1990); *Dubin v. Miller*, 132 F.R.D. 269, 270-75 (D. Colo. 1990).   Yet while a court's power to approve or reject settlements usually does not permit it to alter the terms of a negotiated settlement, modifications to settlement agreements have been authorized by federal district courts in the United States, as related to deadline dates and "slowing the pace" so that eligible class individuals can meet the criteria of settlement agreements.  (See **Exhibit 1**: Notice of Modification of Settlement Class Action, U.S. District Court for the District of Oregon, and **Exhibit 2**: Modification of December 7, 2009 Class Action Settlement, U.S. District Court for the District of Columbia.)   Therefore the Plaintiffs' request that this Court modify the Seafood Compensation Program claims deadline to April 22, 2014 is reasonable in light of the willingness of federal district courts to address the adequacy of class settlement agreements.

In addition to the difficulties of meeting these deadlines involving claimants who have undertaken representation, there is a general recognition that many potential claimants to the Seafood Compensation Program have not retained representation and are completely unaware of the deadlines.  While there was some effort made to announce a potential class settlement, details, and an understanding of the details, was never clearly communicated to Seafood Compensation Fund candidates. Likewise, there has been little, if any, formal effort to communicate the fact that this Court has approved this settlement. First, it was approved on the eve of an extended holiday.  There has been little if any evidence remitted of the extent and duration of notice given of this Court's ruling on the Economic and Property Damages

Settlement, nor specificity as to the terms and conditions of the Seafood Compensation Fund since then. What has been generally conveyed in the mainstream media is that this class generally extends to claimants another year to make their claims. There is concern that the class extending the submission process on all claims EXCEPT for seafood claims creates a fundamental and potentially fatal presumption on the part of the unsuspecting.

We have been forced to reject recent applications from callers or potential referral sources because of these deadlines. Whether those claimants can fend for themselves on such short notice is very debatable, but they too should be afforded a reasonable opportunity to participate.

## CONCLUSION

For the reason set forth herein, and in accordance with under Rule 6(b)(1)(A) and Rule 23 of the Federal Rule of Civil Procedure, the Seafood Claimants request that this Court provide discretionary approval and grant them relief from the January 22, 2013 seafood claim submission deadline as provided in the Settlement Agreement and set a new deadline for submission of their seafood claims to the Seafood Compensation Program to April 22, 2014. It is only fair that these Plaintiffs be afforded an additional year to meet the application requirements that under the current deadline is impossible to meet due to a system that is just not working and is not set up to meet their best interests.

The Plaintiffs also request a hearing for an extension of time to submit their seafood claims to the Seafood Compensation Program, along with reasonable modifications to the criteria as presently set out in the Settlement Agreement in order to achieve fair compensation for their losses.

**DATED on this the 21st day of January, 2013.**

Respectfully submitted,

BRENT COON & ASSOCIATES

*/s/ Brent W. Coon*_____
Brent W. Coon
Federal Bar No. 9308
Texas Bar No. 04769750
215 Orleans
Beaumont, Texas 77701
Tel.: (409) 835-2666
Fax: (409) 835-1912
*Attorney for the Plaintiffs*

CERTIFICATE OF SERVICE

1 hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on January 21, 2013.

*/s/ Brent W. Coon*_____
Brent W. Coon