# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

Mark J. Nomellini
To Call Writer Directly:
(312) 862-2410
mark.nomellini@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

January 22, 2013

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

> Re: MDL 2179 – BP's Response to Transocean's and the United States'
> Objection to BP's Motion to Add Phase One Trial Exhibits for "Good
> Cause"

Dear Magistrate Judge Shushan:

BP submits this reply to Transocean's and the United States' oppositions to BP's Motion to Add Phase One Trial Exhibits for Good Cause (Rec. Doc. 8288 and 8276, respectively).

The United States and Transocean ignore the elephant in the room. Long ago, the Court put in place a discovery schedule for the production of documents in Phase One.  The United States and Transocean did not abide by the Court's schedule, or even come close.   Instead, they produced huge numbers of documents after the deadlines and even after the original Phase One trial setting. That is precisely why late-produced documents need to be added to the exhibit list.

Indeed, after the Phase One trial was scheduled to begin, the United States produced 1,168,006 Zantaz documents after February 20, 2012, with a page count totaling 3,263,245. These documents mainly relate to Phase One.  BP committed over one hundred attorneys to reviewing these late-produced documents, and several thousand attorney hours were spent separating the wheat from the chaff.  Through long hours of careful review (described in part in the attached declaration of BP attorney Yates French (Ex. 1), BP whittled the list of good-cause additions to under 100 United States-late-produced documents.  In other words, for every late-produced United States document BP added to its exhibit list, BP (after thousands of hours of

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 22, 2013
Page 2

careful weeding) left off over 9,999 other documents that the United States had also produced late. [1]

There is obviously good-cause for BP adding these documents to its original exhibit list. Specifically, it would have been physically impossible for BP to have added them before February 20, 2012, because they had not been produced by the United States in accordance with the Court's discovery schedule. How can the United States complain that a document should have been included on a prior version of a Phase One exhibit list given that the United States failed--in contravention of the Court's schedule--to produce the document before the Phase One exhibit list was prepared? If this is not good cause, then there is no such thing as good cause.

As the Court is aware, there have also been controversies surrounding Transocean's late-production of Phase One documents. Transocean produced over one hundred thousand Phase One documents in 2012, leading to the PSC's successful effort (discussed below) to add late-produced Transocean documents to its exhibit list. BP followed the same process for Halliburton's late produced documents. Again by dint of extensive attorney effort, BP whittled its list of late-produced Transocean additions down to a handful of documents.[2]

**"Relevance to the Phase One Trial" Is Not the Standard For Good Cause Additions to the Exhibit List. As Judge Shushan Ruled On August 3, 2012, The Standard Is That "The Content of the Document Has Not Previously Been Produced."**

Transocean and the United States do not dispute that the documents BP seeks to add as good-cause additions were late-produced. Nor do they dispute the assertion in BP's opening motion that there are "material" differences between these post-February 20, 2012-produced documents and any versions produced before February 20, 2012. (BP Motion, Rec. Doc. 8225, at 1) Instead, Transocean and the United States try to move the goal posts. Transocean argues that, to demonstrate good cause, BP must show that the documents have "***relevance to the Phase I trial***" (TO Brief, Rec. Doc. 8288, at 3) (emphasis added), or even "high relevance" with respect

---

[1] The U.S. had originally promised to complete its production of all Phase One documents by August 1, 2011. After missing this initial deadline, on August 3, 2011 the U.S. indicated that it would no longer produce responsive, non-privileged documents from its BOEMRE Zantaz email archive server, even though the BOEMRE document-production otherwise would not include numerous search-term responsive documents available solely from the Zantaz server. This led to an extensive meet-and-confer and briefing process that resulted in this Court's 12/29/11 Order compelling the U.S. to produce the documents BP sought from the Zantaz database.

[2] BP notes that only a single BP-produced document was added to any other party's Phase One Exhibit List with good cause for being late produced, out of the more than 75 that were added from the late productions of various parties. In any event, this document was not responsive to the agreed Phase One search terms.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 22, 2013
Page 3

"to the Phase One trial." (TO Brief at 2) Transocean then picks out several documents, and argues why they do not have "relevance to the Phase I trial." (*Id.* at 3-4)

But the question of "good cause" to add documents to an exhibit list has already been addressed by Judge Shushan, who provided guidance months ago that Transocean and the United States now ignore. This has led to the present unnecessary briefing of an already-decided issue, at a time when the parties have many other things to do.

At the August 3, 2012 Working Group conference, the PSC raised the issue of documents that had been late-produced by Transocean in 2012. Transocean argued then, as it argues now, that in order to establish good cause, the PSC had to show *inter alia* that the documents were relevant to the issues in Phase One: "With respect to relevancy, Transocean's counter-argument is: We don't think they're relevant. Well, you know, I guess relevance, like beauty, is in the eye of the beholder." (8/3/2012 Hearing at 45-46) (remarks of Transocean counsel)

In response, the Court clarified what it meant by "good cause" and "relevance." Relevant in the context of good cause for adding documents to an exhibit list ***does not mean (as Transocean suggests in its January 18 response) "relevance to the Phase One trial."*** Rather, ***"relevant" means that "the content of the document has not been previously produced."***

> **THE COURT:** As far as I'm concerned, we are in the can in Phase One. Now, if there are relevant documents produced after we seal the can, then the can will have to be unsealed only for those purposes and to ***revise your exhibit list to include late-produced relevant documents***. So then the issue is: ***How do we decide what are the late-produced relevant documents?***
>
> Transcript of Proceedings before M.J. Shushan, Aug. 3, 2012, p. 45, lns. 16-23 (emphasis added).
>
> **MR. NOMELLINI:** I am concerned in terms of relevance or responsiveness. You know, the parties have always been of the view that, you know, we were adding relevant documents to exhibit lists, but we've never had to pre-clear that with the other parties. Otherwise, that's going to add a huge -- a huge amount of burden when we're doing Phase Two exhibit lists. So we all make our own subjective determinations of relevance; and then, you know, in terms of documents contested at trial for relevance, that's another story. But I think the "adding to exhibit lists stage," once

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 22, 2013
Page 4

>good cause is met, I don't think we need to take on that extra burden.
>
>**THE COURT:**  Well, I agree with you on Phase Two.  **_On Phase One, maybe we are using the word [relevant] improperly_**. What I think that **_I mean by relevant is that the nature of the content of the document has not previously been produced so that it's duplicative of information the PSC had prior to the cutoff_**. But that's something I have to go through and look at a on a document-by-document basis.
>
>*Id.,* p. 50, lns. 1-5 (bold emphasis added).

Following the Court's statements, Transocean agreed to allow the PSC to add 37 exhibits to its exhibit list.  (Rec. Docs. 7175, 7635)  Yet, disregarding the Court's guidance from the August 3 hearing, Transocean now again argues that BP must show not only that the documents are materially different from any potential duplicates that had been produced before, but also "relevance to the Phase One trial." (TO Brief at 3)  Transocean's brief is effectively a motion for reconsideration, although it is not labeled as such.

Indeed, Transocean also argues for a standard of "high relevance" based on an order governing when a witness should be called back for a second deposition. (TO Brief at 2)  However, even putting aside the fact that the Court has already articulated a different test for exhibit lists at the August 3 hearing (quoted above), obviously the standard for making a witness travel and sit for another deposition is different from the standard for adding a document to an exhibit list, particularly when the document was belatedly produced contrary to the Court's schedule.[3]

Consistent with the standard articulated by the Court on August 3, BP has determined after thousands of hours of analysis that the late-produced United States and Transocean documents BP has added to its exhibit list for good-cause contain materially different information from the documents produced prior to February 20, 2012.  The United States incorrectly contends:  "The total sum of BP's demonstration of 'good cause' appears in the following ispe (sic) dixit contained in a single brief sentence of its motion: 'BP hereby moves to add those post-2/20/12-produced documents for good cause.'"  (US Brief, Rec. Doc. 8276, at 2)

---

[3] Transocean also argued something similar to a "high relevance" standard on August 3, 2012: "substantively new and different and impactful and relevant. . . " (August 3 Transcript at 48-49)

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 22, 2013
Page 5

This is untrue.  The sentence in BP's Motion immediately prior to the one quoted by the United States stated that "the document or a ***material*** part of the document or its family was produced after 2/20/2012."  (BP Motion at 1) (emphasis added).  The United States also does not mention that BP attached a chart to its Motion, showing, for each document, whether it was produced for the first time after February 20, 2012.  (Rec. Doc. 8225-1)

The United States and Transocean do not dispute that BP's good-cause additions contain materially different information from anything produced prior to February 20, 2012.  Nor could they dispute this point:  BP's determination of whether a late-produced document was "materially" different from the documents produced prior to February 20, 2012 was rigorous.  As set forth in the attached declaration of BP attorney Yates French, BP used various strategies to compare the documents produced after February 20, 2012 to all documents produced prior to February 20, 2012, in order to determine if there were duplicates previously produced by any party.  (Ex. 1, French Decl. at ¶ 4)  And even where there were no exact duplicates, BP evaluated whether any differences between the late-produced versions and the pre-February 20, 2012 versions were substantive and material.  (*Id.* at ¶ 8)  The French Declaration sets forth one example where the differences were deemed immaterial, and one example where the differences were deemed substantive and material.  (*Id.* at ¶¶ 9-10)

Unlike Transocean and the United States, Halliburton and the PSC apparently took heed of the Court's guidance regarding good-cause at the August 3, 2012 hearing.  Similar to BP's motion, Halliburton's motion for good-cause stated:

> Pursuant to PTO 54, HESI moves this Court, with good cause shown, to permit the addition of exhibits consisting of documents or materials first produced after February 20, 2012, and after the filing of HESI's last filed Good Faith Trial Exhibit List on February 16, 2012 (See Rec. Docs. 8173 and 5731). These exhibits are marked as 'New (Good Cause)' in the Status column in Exhibit A.  (HESI Mot., Rec. Doc. 8228, at 1)

The PSC similarly added to its exhibit list documents that were late-produced by Transocean.[4]

---

[4] Based on its own motion, the United States agrees when it suits its purpose that late production of documents is good cause for adding them to its own exhibit list. Its motion for leave to add exhibits for good cause stated that "[t]he documents that the United States seeks to add to the MDL Combined Plaintiffs' First Amended Good Faith Phase I Trial Exhibit List were first produced by Halliburton on February 29th, March 2nd, and April 5th, 2012."  US Memorandum in Support of Motion for Leave to Add Exhibits for Good Cause. The fundamental reason for the United States' addition was that "[t]hese documents were not previously provided to the parties during Phase One discovery."  *Id.*  This is simply another way of stating that the documents were not produced before February 20, 2012.  Transocean similarly stated that the documents for which it sought leave to add to its exhibit list for good cause were being added because they were created after February 20, 2012. Transocean

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 22, 2013
Page 6

BP respectfully submits that the effort detailed in the French Affidavit is more than BP should have had to bear, given that these problems resulted from the United States' and Transocean's collective production of over a million documents after the Court-mandated schedule and after the Phase One trial was scheduled to have begun.  BP notes that hundreds if not thousands of other documents were compared for this purpose during the many hours BP attorneys spent on this tasks, and those documents would fill several boxes if printed in hard copy.  (French Decl. at ¶ 11)  Nonetheless, BP is willing to share with the Court any of the documents reviewed in determining whether the late-produced documents were materially different from what had come before, such as the examples attached to the French Affidavit.  On the other hand, BP views this as unnecessary, given that the United States and Transocean do not (and cannot) contest that the late-produced documents were materially different from prior documents.

Furthermore, Transocean's claim that BP never demonstrated good cause for trial exhibits TREX-48144, TREX-48145, TREX-48146, TREX-48147, TREX-48148, and TREX-48183 is simply incorrect, in addition to being untimely.  In the cover pleadings for its February 20 and 24, 2012 Phase One Trial Exhibit Lists (Rec. Docs. 5787, 5881), BP clearly stated that it was adding Transocean documents for good cause because Transocean produced hundreds of thousands of pages in late-January and February, 2012.  Now, almost a year later, Transocean's argument is a bold attempt to take advantage of its inability to meet Phase I discovery deadlines.  Transocean should have raised this argument in February, 2012, although it would have been just as incorrect then.

**If Transocean's Request for Reconsideration Is Granted, BP Respectfully Requests an Opportunity to Meet the New Standard**.

As discussed above, Transocean's arguments that BP must show "relevance to the Phase One trial" is effectively a motion for reconsideration of this Court's August 3, 2012 directive in open court.  Because this motion is made in the context of a response brief and is procedurally improper, it should be denied.

In addition to being procedurally improper, Transocean's request for reconsideration is substantively flawed.  The question of whether a document is properly added to the exhibit list is

---

Memorandum in Support of Motion for Leave to Add Documents to Its Phase One Trial Exhibit List, Rec. Doc. 8223-1, at 1-2.  Notably, Transocean did not hold itself to its own standard of relevance for its additions - Transocean sought to add certain documents that only "may" be relevant to the Phase I trial. *Id.* at 2.  Needless to say, BP would ask that the same standard be applied to BP's exhibit additions as is applied to HESI, Transocean, and the United States, as the door in this litigation has always "swung both ways."

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 22, 2013
Page 7

separate and distinct from whether it is admissible in the Phase One trial.  Indeed, at the January 18, 2013 hearing, Judge Shushan ruled that, while objections regarding whether a document was properly added to the exhibit list are due on January 18, objections (such as hearsay, *etc.*) to the admissibility of any specific document are due February 8.  (Transcript of Proceedings before M.J. Shushan, Jan. 18, 2013, p. 9, lns. 7-20)  Objections regarding relevance to the Phase One trial fall in the latter category, with objections due February 8.  If Transocean or the United States want to argue that these documents are irrelevant to the Phase One trial, they may do so on February 8.  BP will disagree with Transocean's and/or the United States' arguments if they make them on February 8,[5] but this dispute has nothing to do with whether the documents are properly added to BP's exhibit list.

The United States contends that BP should not raise new arguments in a reply brief.[6] And BP does not undertake to show in this brief how each of the late-produced good-cause additions are "highly relevant" to "the Phase One trial," the reconsideration standard suggested by Transocean.  But if somehow the Court were to reconsider and hold that a showing of relevance (or "high relevance") "to the Phase One trial" is required, that is a standard that BP can and will meet with respect to each of the documents at issue here.  (Indeed, as shown by BP's briefs on the addition of Frank Patton as a witness (Ex. 2), the late-produced Zantaz documents are of critical importance to the Phase One trial.)  In those circumstances, BP would request the opportunity to file a brief aiming at the moved goal posts.

## CONCLUSION

For the foregoing reasons, BP requests that its motion to add late-produced documents to its trial exhibit list be granted.  The Court has already decided the principle that is dispositive of this motion in BP's favor.

---

[5] As BP would show at the appropriate time, Transocean's arguments against the relevance of TREX-048200 and TREX-048249 to the Phase I trial are incorrect.  Documents related to Transocean rig safety and blowout preventers are relevant to Phase One trial issues.  As discussed above, Transocean's reliance on an order governing when a witness should be called back for a second deposition is inapposite here.

[6] Urging a level of formality that the United States does not follow in practice before Judge Shushan, the United States suggests that BP should file a memorandum in addition to a motion.   Meeting formality with formality, BP notes that the document was not deemed deficient by the docket clerk.

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 22, 2013
Page 8

Respectfully submitted,


/s/ Mark Nomellini

Mark Nomellini

cc (via electronic mail):

Andrew Langan
Don K. Haycraft
R. Michael Underhill
Steven O'Rourke
Sarah D. Himmelhoch
Steve Herman
Anthony Irpino
Defense Liaison Counsel
Corey Maze
Luther Strange

**<u>EXHIBIT 1</u>**

**Declaration of Yates M. French**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * | MDL NO. 2179 SECTION: J |
| THIS DOCUMENT RELATES TO ALL CASES | * * * | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DECLARATION OF YATES M. FRENCH

I, Yates M. French, declare as follows:

1.      I am an attorney, licensed to practice law in the state of Illinois.  I am an associate at the law firm Kirkland & Ellis LLP.  I am one of the attorneys representing Defendants BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively "BP") in this and other matters.  If called, I would testify to the following.

2.      I was involved in the effort to identify documents produced after 2/20/2012 that BP wished to move the Court for leave to add to the BP Phase One Trial Exhibit List for good cause (the "Good Cause Additions").

3.      The overall general review of the approximately 1,168,008 Zantaz documents produced by the United States involved over 100 attorneys and staff and over 40,000 hours of attorney and staff time.

4.      In addition, in order to comply with Amended Pre Trial Order 54, and other direction from the Court, I supervised a project to determine that, for each proposed Good Cause Addition, it contained information that was materially different from documents produced prior to 2/20/2012.  All told, this process involved 7 attorneys and staff and involved many additional hours of attorney and staff time.

5.      The project to ensure that the Good Faith Additions all contained substantive content first produced after 2/20/12 involved two distinct processes.  First, the team reviewed the Bates ranges of each proposed Good Cause Addition, and cross referenced it with our production log to ensure that no Good Cause Addition was produced prior to 2/20/2012.

6.      Second, the team conducted a "duplicate search" by running text based searches-among the millions of documents in the database-for excerpts of each proposed Good Cause Addition across our production databases.  This process identified both "exact duplicates," documents that were completely identical to the proposed Good Cause Addition, and "near duplicates," in which a portion of the content in the proposed Good Cause Addition was identical to a portion of a document produced prior to 2/20/2012.  This process also identified late produced documents that were unique, and did not contain content that had been produced before 2/20/2012.

7.      Based on our duplicate searches, we removed all proposed Good Cause Additions that had exact duplicates produced before 2/20/2012 from the list of additions.

8.      Once a document reached this stage and it was determined that no exact duplicate had been produced, the team further reviewed each document to determine whether the proposed Good Cause Addition contained information that was materially different from any document produced before 2/20/2012.  This involved the review of hundreds, if not thousands, of proposed additions and near duplicates.  In all cases where it was not clear that the late produced documents included substantive information that had not been produced prior to 2/20/12 we excluded the document from the list of Good Cause Additions.

9.      In some cases, the proposed Good Cause Addition did not contain sufficient new content to be included on the list.  For example, ZAN010-029906 (Ex. 1), produced by the United States on 4/26/2012, is not an exact duplicate of HAL_0897806 (Ex. 2), produced on 5/27/2011.  However, because the only content in ZAN010-029906 that was not produced before 2/20/2012 is

the topline email from Scherie Douglas to David Trocquet saying "thanks," the team determined that the proposed Good Cause Addition did not contain sufficient content that had not been previously produced prior to 2/20/2012.

10.     In other cases, the proposed Good Cause Addition contained sufficient new content that had not been produced before 2/20/2012.  An example of a Good Cause Addition that the team determined contained new substantive information is ZAN062-282504 (Ex. 3), produced on 3/2/2012.  This document contains the same 3/25/2010 email from Joseph Levine as IMV048-003719, produced on 12/10/2011 (Ex. 4).  But, ZAN062-282504 also contains the 4/7/2010 email attaching Mr. Levine's comments on MASP definitions, and the team determined that it contained sufficient new content that had not previously been produced before 2/20/12 to be included on the list.

11.     In making these determinations, the team reviewed hundreds if not thousands of documents for comparison purposes, such as Exs. 1-4. These documents would likely fill several boxes if printed to hard copy.

12.     During a meet and confer call with counsel for Transocean on January 17, 2013, Transocean's counsel explained that they believed that, as a component of showing "good cause" to add a document produced after 2/20/12, the designating party must make an affirmative showing that the document was relevant to the Phase One Trial.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Yates M. French
Yates M. French

Executed on January 22, 2013

**EXHIBIT 1**

**From:** Douglas, Scherie D
**To:** Trocquet, David
**Sent:** 3/10/2010 5:07:24 PM
**Subject:** Re: MC 252 #001 - Plugback approval requested


Thanks.

Scherie Douglas
Sr. Regulatory Specialist
BP America

"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."

---

**From:** Trocquet, David <David.Trocquet@mms.gov>
**To:** Douglas, Scherie D
**Cc:** Patton, Frank <Frank.Patton@mms.gov> ; Guide, John; Powell, Heather (JC Connor Consulting)
**Sent:** Wed Mar 10 22:58:40 2010
**Subject:** RE: MC 252 #001 - Plugback approval requested

Scherie,

After further consideration, an extension is approved to delay the BOP test until the lower cement plug is set.  Before testing BOP's, please wait for the cement plug to set up and verify its successful placement by tagging with 15000# pipe weight.  Please note the depth of the cement top and BOP test extension in the IADC report (because of well control operations).

Thanks,
David Trocquet

---

**From:** Douglas, Scherie D [mailto:Scherie.Douglas@bp.com]
**Sent:** Wednesday, March 10, 2010 3:41 PM
**To:** Trocquet, David
**Cc:** Patton, Frank; Guide, John; Powell, Heather (JC Connor Consulting)
**Subject:** FW: MC 252 #001 - Plugback approval requested

Dave,

John Guide and I would like to have a conversation with you in the morning to discuss the BOP test. We have major concerns about coming out without getting at least one cement plug set to secure the well.

I realize the guidance on BOP test extensions comes from the region office, but we wanted to discuss with you first. What is a convenient time for you tomorrow (between 8-10 in the morning would be great if possible)?

Thanks for your help.


*Scherie Douglas*
*Sr. Regulatory & Advocacy Advisor*
*BP Exploration & Production Inc.*
*281.366.6843 (office)*
*713.702.7673 (cell)*

*"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."*

**From:** Patton, Frank [mailto:Frank.Patton@mms.gov]
**Sent:** Wednesday, March 10, 2010 3:23 PM
**To:** Douglas, Scherie D
**Cc:** Trocquet, David; Powell, Heather (JC Connor Consulting)
**Subject:** RE: MC 252 #001 - Plugback approval requested

Scherie,

Sorry, we cannot grant a departure on the BOP test further than when you get the well under control.  It is OK to not place a cement plug across the 4 foot stringer since you can't.

Thanks,

*Frank Patton*

District Drilling Engineer
MMS New Orleans District
(504) 734-6748

---

**From:** Douglas, Scherie D [mailto:Scherie.Douglas@bp.com]
**Sent:** Wednesday, March 10, 2010 1:57 PM
**To:** Patton, Frank
**Cc:** Trocquet, David; Powell, Heather (JC Connor Consulting)
**Subject:** RE: MC 252 #001 - Plugback approval requested

Frank,

We have a partial log over the area below 12,900' that has a 4' stringer that shows some resistivity which has bridged over. We are packed off and unable to circulate through the bit or under reamer, indicating we are packed off above the under reamer. There is no way for us to perforate to put cement across that stringer.

With the give and take of the well and hole behavior we would feel much more comfortable getting at least one of the two plugs set in order to fully secure the well prior to testing BOPs.

Please let me know if you have further questions or comments. Thanks.

*Scherie Douglas*
*Sr. Regulatory & Advocacy Advisor*
*BP Exploration & Production Inc.*
*281.366.6843 (office)*
*713.702.7673 (cell)*

*"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."*

---

**From:** Patton, Frank [mailto:Frank.Patton@mms.gov]
**Sent:** Wednesday, March 10, 2010 12:12 PM
**To:** Douglas, Scherie D
**Subject:** RE: MC 252 #001 - Plugback approval requested

Scherie,

Are there any hydrocarbon bearing zones below 12,900 feet?

Thanks,

*Frank Patton*

District Drilling Engineer
MMS New Orleans District
(504) 734-6748

---

**From:** Douglas, Scherie D [mailto:Scherie.Douglas@bp.com]
**Sent:** Wednesday, March 10, 2010 11:11 AM
**To:** Patton, Frank
**Cc:** Powell, Heather (JC Connor Consulting)
**Subject:** MC 252 #001 - Plugback approval requested
**Importance:** High

Frank,

We are in the midst of a well control situation on MC 252 #001 and have stuck pipe. We are bringing out equipment to begin operations to sever the drillpipe, plugback the well and bypass.

The APM for the plugback is submitted in Ewell.

***The BOP test is due tomorrow. We would like to set the plugs (2) after we kill the well and then test BOPs per the procedure in the APM. Please advise if this is acceptable.***

Please let me know if you have any questions or require additional information. Thanks.

*Scherie Douglas*
*Sr. Regulatory & Advocacy Advisor*
*BP Exploration & Production Inc.*
*281.366.6843 (office)*
*713.702.7673 (cell)*

*"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."*

**EXHIBIT 2**

**From:** Douglas, Scherie D
**Sent:** Wednesday, March 10, 2010 5:07 PM
**To:** Guide, John; Hafle, Mark E; Morel, Brian P; Cocales, Brett W; Sepulvado, Ronald W; Sepulvado, Murry R
**Cc:** Powell, Heather (JC Connor Consulting)
**Subject:** Fw: MC 252 #001 - Plugback approval requested
Note BOP test extension and cement top on IADC per David's note below.

Scherie Douglas
Sr. Regulatory Specialist
BP America

"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."

**From:** Trocquet, David [██████████@mms.gov>
**To:** Douglas, Scherie D
**Cc:** Patton, Frank [████████████]; Guide, John; Powell, Heather (JC Connor Consulting)
**Sent:** Wed Mar 10 22:58:40 2010
**Subject:** RE: MC 252 #001 - Plugback approval requested

Scherie,

After further consideration, an extension is approved to delay the BOP test until the lower cement plug is set. Before testing BOP's, please wait for the cement plug to set up and verify its successful placement by tagging with 15000# pipe weight. Please note the depth of the cement top and BOP test extension in the IADC report (because of well control operations).

Thanks,
David Trocquet

**From:** Douglas, Scherie D [███████████████████]
**Sent:** Wednesday, March 10, 2010 3:41 PM
**To:** Trocquet, David
**Cc:** Patton, Frank; Guide, John; Powell, Heather (JC Connor Consulting)
**Subject:** FW: MC 252 #001 - Plugback approval requested

Dave,

John Guide and I would like to have a conversation with you in the morning to discuss the BOP test. We have major concerns about coming out without getting at least one cement plug set to secure the well.

I realize the guidance on BOP test extensions comes from the region office, but we wanted to discuss with you first. What is a convenient time for you tomorrow (between 8-10 in the morning would be great if possible)?

Thanks for your help.

*Scherie Douglas*
*Sr. Regulatory & Advocacy Advisor*
*BP Exploration & Production Inc.*
[████████] *(office)*
[████████] *(cell)*

*"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."*

CONFIDENTIAL TREATMENT REQUESTED

BP-HZN-CEC018375

**From:** Patton, Frank 
**Sent:** Wednesday, March 10, 2010 3:23 PM
**To:** Douglas, Scherie D
**Cc:** Trocquet, David; Powell, Heather (JC Connor Consulting)
**Subject:** RE: MC 252 #001 - Plugback approval requested

Scherie,

Sorry, we cannot grant a departure on the BOP test further than when you get the well under control.  It is OK to not place a cement plug across the 4 foot stringer since you can't.

Thanks,

*Frank Patton*
District Drilling Engineer
MMS New Orleans District

---

**From:** Douglas, Scherie D
**Sent:** Wednesday, March 10, 2010 1:57 PM
**To:** Patton, Frank
**Cc:** Trocquet, David; Powell, Heather (JC Connor Consulting)
**Subject:** RE: MC 252 #001 - Plugback approval requested

Frank,

We have a partial log over the area below 12,900' that has a 4' stringer that shows some resistivity which has bridged over. We are packed off and unable to circulate through the bit or under reamer, indicating we are packed off above the under reamer. There is no way for us to perforate to put cement across that stringer.

With the give and take of the well and hole behavior we would feel much more comfortable getting at least one of the two plugs set in order to fully secure the well prior to testing BOPs.

Please let me know if you have further questions or comments. Thanks.


*Scherie Douglas*
*Sr. Regulatory & Advocacy Advisor*
*BP Exploration & Production Inc.*
*(office)*
*(cell)*

*"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."*


---

**From:** Patton, Frank
**Sent:** Wednesday, March 10, 2010 12:12 PM
**To:** Douglas, Scherie D
**Subject:** RE: MC 252 #001 - Plugback approval requested

Scherie,

CONFIDENTIAL TREATMENT REQUESTED

BP-HZN-CEC018376

HAL_0897807

Are there any hydrocarbon bearing zones below 12,900 feet?

Thanks,

*Frank Patton*
District Drilling Engineer
MMS New Orleans District


**From:** Douglas, Scherie D
**Sent:** Wednesday, March 10, 2010 11:11 AM
**To:** Patton, Frank
**Cc:** Powell, Heather (JC Connor Consulting)
**Subject:** MC 252 #001 - Plugback approval requested
**Importance:** High

Frank,

We are in the midst of a well control situation on MC 252 #001 and have stuck pipe. We are bringing out equipment to begin operations to sever the drillpipe, plugback the well and bypass.

The APM for the plugback is submitted in Ewell.

***The BOP test is due tomorrow. We would like to set the plugs (2) after we kill the well and then test BOPs per the procedure in the APM. Please advise if this is acceptable.***

Please let me know if you have any questions or require additional information. Thanks.

*Scherie Douglas*
*Sr. Regulatory & Advocacy Advisor*
*BP Exploration & Production Inc.*
(office)
(cell)

"CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential. If you have received this message in error, please notify the sender immediately and delete the E-mail and any attachments from your computer and files. Thank you."

CONFIDENTIAL TREATMENT REQUESTED

BP-HZN-CEC018377

**EXHIBIT 3**

**From:** Levine, Joseph
**To:** Hoshman, Russell; Conner, George M.; Runge, Amanda; Hauser, William
**Sent:** 4/7/2010 9:41:18 AM
**Subject:** FW: Masp defs
**Attachments:** Maximum anticipated surface pressure Reg.doc

My comments on MASP defs

As I am sure Amanda has told you a definite rulemaking in my view. Not appropriate for an NTL.

I support the overall idea of making MASP defs consistent from drilling, to completion to workover.

I am available to discuss if need be.

thanks

---

**From:** Hoshman, Russell
**Sent:** Friday, March 26, 2010 8:12 AM
**To:** Levine, Joseph
**Subject:** RE: Masp defs

<<Maximum anticipated surface pressure Reg.doc>>

Russell M Hoshman
Minerals Management Service
1201 Elmwood Park Blvd
New Orleans, La 70123-2394

Phone No. 504-736-2627

---

**From:** Levine, Joseph
**Sent:** Thursday, March 25, 2010 6:13 AM
**To:** Hoshman, Russell
**Subject:** Masp defs

Can you send me the proposed masp definitions you have come up with?
thanks

ZAN062-282504

**EXHIBIT 4**

**From:**      Levine, Joseph
**Sent:**      Thursday, March 25, 2010 6:13:06 AM
**To:**        Hoshman, Russell
**Subject:**   Masp defs

Can you send me the proposed masp definitions you have come up with?
thanks

CONFIDENTIAL                                              IMV048-003719

**EXHIBIT 2**

**1/14/2013 Letter Brief**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

J. Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
alangan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

January 14, 2013

**Via E-mail**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the Eastern
District of Louisiana
500 Poydras Street, Room B345
New Orleans, Louisiana 70130

> RE:   **In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
> Mexico on April 20, 2010, MDL No. 2179**

Dear Judge Shushan:

This letter responds to the United States's letter of January 11, 2013 objecting to the addition of Frank Patton to BP's Phase 1 Good Faith Will Call Witness List. For the reasons described below, the United States should not be allowed to benefit from its withholding of numerous and relevant documents until *after the Phase 1 trial was scheduled to have already begun* by now hiding behind an argument that those late-produced documents relate to a variety of topics and may not happen to include Mr. Patton's name.

If Mr. Patton is called to testify at this trial, he will be the *only* live fact witness called from the United States. This is true despite the important role that the U.S. Government representatives play in reviewing well planning submissions to the Mineral Management Service ("MMS," now "BOEM" and "BSEE") and in regulating deepwater drilling in the Gulf of Mexico and the claims the United States is making against BP in this litigation, many of which bear directly upon the United States's and Mr. Patton's role at Macondo.

To resist having Mr. Patton called to testify live at trial, the United States asserts that BP had the opportunity to fully question Mr. Patton at his July 13-14, 2011 deposition and points to a "lack of connection between [the documents identified in BP's January 6, 2013 letter] and Mr. Patton" as demonstrating that "the United States properly produced Mr. Patton's documents before his deposition and that BP had an opportunity to question him fully." (Jan. 11, 2013 U.S. Letter at 2.) Contrary to this assertion, all of the late-produced documents identified by BP to the United States in its January 7, 2011 letter discuss issues relevant to core disputed issues in this

Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai     Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 2

litigation, and relate to Mr. Patton's duties as a drilling engineer for the MMS.  BP did not have an opportunity to question Mr. Patton regarding any of these key documents at his deposition because the United States did not timely produce them.  Moreover, with the exception of IMS176-051916 (which specifically relates to Mr. Patton's basis for approving the April 16, 2010 APM and had not been produced as of the date of Mr. Patton's deposition), all of the documents in the list provided by BP to the United States were not produced until ***after the parties' Phase 1 Will Call Witness Lists were submitted and after the date that the Phase 1 trial was scheduled to commence***.  The statements in those documents are admissions by United States government employees relating to issues at the core of this dispute, and BP should have an opportunity to question a United States fact witness about them.  Under the circumstances — and as a result of the extremely untimely production of those documents by the United States — that opportunity must be of Mr. Patton, live at the Phase 1 trial.

Should he testify live at trial, Mr. Patton would be the ***only*** fact witness from the United States to provide testimony on a number of important regulatory issues, as described more fully below.

**Temporary Abandonment Procedure**.  The United States asserts that BP "knew about Mr. Patton's action in approving its temporary abandonment application" and that "Mr. Patton testified extensively about the temporary abandonment application and the negative testing." (Jan. 11, 2013 U.S. Ltr. at 1-2.)  Not only is this incorrect, but it misses the point.  While Mr. Patton did testify about the fact that he approved the April 16, 2010 APM, BP ***did not*** have an opportunity to fully question Mr. Patton regarding his bases for the approval.  The United States admits that the non-Zantaz document listed in BP's January 7, 2013 letter was produced on July 18, 2011 — four days *after* Mr. Patton's deposition.  (Jan. 11, 2013 U.S. Letter at 3.)[1]  This document reveals that, in fact, Mr. Patton did not formulate a basis for his approval of the TA Procedure submission until ***six months after*** the incident.  The United States insists that BP should have asked MMS District Manager David Trocquet about this document during his September 23, 2011 deposition.  Asking Mr. Trocquet about this document would not have provided ***Mr. Patton's explanation*** for ***Mr. Patton's basis*** for approving that submission (or the lack thereof, as the case may be).  Given the United States's allegations about the TA Procedure approved by Mr. Patton, BP should have an opportunity to ask Mr. Patton, not his supervisor, about Mr. Patton's reasons for approving the TA Procedure submission and about his after-the-fact conversations with his supervisor in which it appears that he generated his basis for approving that submission for the first time.

---

[1]  IMS176-051916.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 3

     **Maximum Anticipated Surface Pressure ("MASP")**.  BP disclosed to the MMS and Mr. Patton approved formulas BP used to calculate MASP in the APD for the Macondo well. Mr. Patton testified that the MMS evaluated BP's MASP calculation using the eWells system. The calculation is based on "formulas that the MMS at the time used for evaluating casing and well design." (7/13/11 Patton Dep. Tr. at 70:21-71:9.)  Long *after* Mr. Patton's deposition and after the date the Phase 1 trial was scheduled to commence, the United States produced documents containing the MMS's internal formulas for calculating MASP, as well as correspondence regarding the manner in which those formulas were devised and applied.[2] BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about these documents, including, but not limited to, who drafted these formulas, how he used the formulas in assessing BP's submissions, or whether he performed any independent analyses of the original APD using these formulas, and if so, which of the formulas he used.

     **SAFE Award**.  Mr. Patton testified at his deposition regarding the MMS SAFE Award that he was unsure whether BP was nominated for the award in 2010. (7/13/11 Patton Dep. Tr. at 177:15-24.)  Documents produced *after* Mr. Patton's deposition and after the Phase 1 trial was scheduled to commence confirm that BP was, in fact, nominated for the 2010 SAFE award, and contain statements about the basis for that nomination.  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about these documents or the specific statements in those documents.[3]

     **BOP**.  Mr. Patton confirmed that the MMS reviewed and approved the *Deepwater Horizon* BOP configuration. (7/13/11 Patton Dep. Tr. at 48:25-49:11.)  Documents produced by the United States *after* Mr. Patton's deposition and after the Phase 1 trial was scheduled to commence relate, among other things, to certain modifications that Transocean made to the *Deepwater Horizon* BOP without BP's knowledge and to whether BP could have or should have reported those modifications to the MMS.[4]  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about the statements in these documents.

     **Drilling Margin**.  BP was granted permission from the MMS in October 2009, February 2010, and March 2010 to drill with a 0.3 drilling margin. (7/13/11 Patton Dep. Tr. at 191:5-192:1.)  Documents produced *after* Mr. Patton's deposition and after the Phase 1 trial was scheduled to commence include internal MMS documents relating to its interpretation of the term "safe drilling margin," and MMS approvals for other wells to drill with a 0.2 drilling

---

[2] *See* ZAN010-023444, ZAN010-071895, ZAN025-005104, ZAN051-048772, ZAN051-053254, ZAN051-09831, ZAN062-282504.
[3] *See* ZAN038-233988, ZAN038-292712, ZAN055-017528, ZAN037-070571, ZAN037-010013.
[4] *See* ZAN037-005043.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 4

margin.[5]  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about these documents, which demonstrate that, contrary to the United States's litigation position, the MMS granted approval to other operators to drill with less than a 0.5 drilling margin.

**Other Regulatory Issues**.  Mr. Patton testified at his deposition that he would only approve an MMS filing if he believed it complied with all applicable regulations.  (7/13/11 Patton Dep. Tr. at 154:17-155:1.)  Documents produced long ***after*** Mr. Patton's deposition and after the date the Phase 1 trial was scheduled to commence include discussion by MMS officials of the MMS's interpretation of certain regulations as well as of the inspection history of the *Deepwater Horizon*.[6]  BP did not have an opportunity to ask Mr. Patton — or any other U.S. Government witness — about the impact of the MMS interpretation of the regulations discussed in these documents on the applications that he approved or about the MMS records relating to the inspection history of the *Deepwater Horizon*.

As discussed in BP's January 4, 2013 letter, Mr. Patton's testimony is of critical importance because of the United States's more prominent role in the upcoming Phase 1 trial. The United States asserts that "it made no secret about its position in this case since the filing of its Complaint in December 2010." (Jan. 11, 2013 U.S. Ltr. at 3.)  Putting aside whether the most recent submissions by the United States provide a much clearer pronouncement as to the United States's positions in this litigation than it previously had provided (one would question why such a submission would have been necessary if it did not), as a result of the United States's dilatory production practices, BP did not have the opportunity to question any government witness regarding these key documents.  The documents contain admissions by United States government employees and directly contradict the United States's arguments on key issues, including as to the negative pressure test, BP's culture, and a recently alleged series of regulatory violations.  There should be no prejudice to the United States in producing Mr. Patton to testify as, according to his deposition, he lives and works within the jurisdiction (and is thus within the subpoena power of this Court), and the United States has been aware that he is a relevant fact witness in this case since he was deposed as a Phase 1 fact witness.  Accordingly, BP has good cause for seeking Mr. Patton's live testimony on each of these topics.

---

[5] *See* ZAN010-024501, ZAN010-046287, ZAN010-125391, ZAN051-080166.
[6] *See* ZAN062-361097, ZAN055-038231, ZAN055-044875, ZAN036-118835, ZAN007-78609, ZAN010-008539, ZAN037-074391.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 14, 2013
Page 5

Thank you for the Court's consideration of this issue.

Sincerely,

J. Andrew Langan, P.C.

cc:     Liaison Counsel
        States' Coordinating Counsel
        Mike Underhill, Esq.