# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 18, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

> Re:   MDL 2179 — BP's Limited Motion for Reconsideration on the Court's
> January 2, 2013 Order Regarding BP Rule 30(b)(6) Witnesses, (Rec. Doc.
> 8149)

Dear Judge Shushan:

BP writes regarding the Court's January 2, 2013 Order regarding BP Rule 30(b)(6) witnesses, (Rec. Doc. 8149).

As mentioned at this morning's Working Group Conference, BP and the United States are meeting and conferring about implementing the Order.  The meet-and-confer process to date has been met with some success, but is not yet complete.  As further described below, BP offered on January 11, 2013, to provide the United States with the non-privileged testimony on behalf of the company the Court's Order envisions, and to do so in an efficient, cost-effective fashion. (Attachment 1.)  As of this morning's Working Group Conference the United States had not yet responded to this proposal, but this evening, the United States did finally respond with a brief letter rejecting BP's proposals and renewing its requests.  (Attachment 2.)

Ideally, BP would continue discussions with the United States in an effort to reach further agreement on the Court's Order.  To this end, BP appreciates the Court's offer of an additional extension of time to move for reconsideration so that BP might continue the meet-and-confer process with the United States.

But, with the close of the fact-discovery period quickly approaching, BP writes to respectfully request reconsideration of the Order to the extent it could be interpreted to seek

Chicago     Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 18, 2013
Page 2

relief beyond that which BP has offered to provide.  In short, and for reasons stated below, BP stands by its January 11 offer to the United States of further fact discovery, (Attachment 1), and seeks reconsideration of the Court's Order only to the extent it requires BP to provide discovery beyond the scope of that offer.  Of course, the filing of this motion for reconsideration is prompted by the Court's fact discovery deadlines, not from any desire by BP to short-circuit its ability to reach agreement with the United States.

## Discussion

In an effort to move forward, BP sought to implement the Court's order in efficient fashion, beginning with the Court's ruling regarding the Hill deposition.  As the Court knows, this relief was granted after the United States had raised an issue about testimony it contended was wrongfully denied; filed extensive (and sometimes accusatory) briefing; consumed the Court's time preparing an Order; engaged in extended negotiations with BP; and secured 50 additional minutes to question Mr. Hill as a Rule 30(b)(6) witness regarding work Mr. Hill did critiquing Professor Wereley's analysis and the basis for this work.  (Rec. Doc. 8149, at 4.)

At Mr. Hill's deposition, however, the United States, surprisingly, used less than half of its hard-won 50 minutes of Rule 30(b)(6) questioning time to inquire about this topic or to ask the questions Dr. Williams allegedly was unable to answer at her prior 30(b)(6) deposition.  (*See* Attachment 3, Hill Dep. Tr. 251-280.)  As Mr. Hill's deposition demonstrates, the discovery the Court has directed BP to provide often can be efficiently supplied with little or no additional deposition testimony.

Against this backdrop, BP proposes that some — but not all — of the discovery that the January 2 Order contemplates be provided via deposition testimony and that the rest be provided via written discovery.

## Sanders

BP continues to be willing to provide a Rule 30(b)(6) witness to testify by deposition (for no more than two hours) on the subject of the Bottom Kill — a contemplated, but unused method for dynamically killing the well.

During a Tuesday, January 8, 2013 meet-and-confer discussion, the United States specifically mentioned an interest in determining (i) whether BP personnel performed any "flow rate modeling" in connection with a possible Bottom Kill operation — in addition to any modeling performed by Wild Well Control and Add Energy — and (ii) BP's opinion of modeling Wild Well Control and Add Energy performed as part of the operation.  As stated in

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 18, 2013
Page 3

our January 11 letter, BP is willing to put forward a Rule 30(b)(6) witness to testify as to these subjects.

As the United States has appeared to recognize, however, employees of Wild Well Control and Add Energy were in charge of and largely staffed the dynamic kill team; hence, identifying an appropriate witness and preparing the person to testify has proved somewhat challenging.  BP understands the Court has set February 8, 2013, as the date for concluding all fact depositions, and BP is working hard to meet this goal.  Nonetheless, BP may need some additional time to identify and prepare an appropriate witness to testify.

Under no circumstances, however, will the United States have the opportunity to disagree with the witness BP designates or otherwise guide the designation process.  Meet and confer discussions about the appropriate relief regarding the Sanders Rule 30(b)(6) deposition are thus concluded.

## Devers

BP understands from its January 8 discussion with the United States, that the United States seeks testimony regarding any "design phase" analysis of flow rates "into" the RITT and Top Hat devices.

The important point here, however, is that Mr. Devers has already provided testimony on this subject.  Significantly, Mr. Devers was the leader of the RITT and Top Hat teams, (Attachment 4, Devers Dep. Tr. 32:20-33:11), and therefore has direct personal knowledge of the design process.  Moreover, Mr. Devers has specifically testified that there was no such design phase consideration of flow rates.

> Q.   (By Mr. Dart) As a spokesman for BP, were any such analyses done in preparation for or in consideration of or execution of the cofferdam, the RITT, or the Top Hat?
> MR. BENTSEN:  Objection, form.
> A.       Not by me.  And I'm not aware of others that -- that may have.
> Q.       (By Mr. Dart) So BP says there was no consideration of flow rate in the cofferdam, RITT, and Top Hat; is that right?
> MR. BENTSEN:  Objection, form.
> Q.       (By Mr. Dart) Is that BP's position?
> MR. BENTSEN:  Same objection.
> A.       From -- from a cofferdam, RITT, Top Hat, I believe that to be true.
> (Attachment 4, Devers Dep. Tr. 429:3-430:17.)

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 18, 2013
Page 4


*     *     *


Q.     (By Mr. Bentsen) Is the collection limit of the RITT based on the design of the RITT itself or on the surface collection capacity?

MR. DART:  Object to the form.

A.     On the surface collection capacity.

Q.     (By Mr. Bentsen) Is that the same with the cofferdam?

A.     It is.

MR. DART:  Objection, form.

Q.     (By Mr. Bentsen) Is the collection limit of the Top Hat based on surface collection capacity? A.  It is.

Q.     And what happens if a -- each of those devices reach their collection capacity at the surface?

A.     Then excess fluids would be discharged to the environment.

Q.     All right.  Did the Team developing and designing and implementing the RITT use flow rate estimates in its design or implementation?

A.     We did not.

Q.     Same question as to the cofferdam?

A.     They did not.

Q.     Same question as to the Top Hat?

A.     We did not.

Q.     You were asked some questions just a little bit ago about a letter from Mr. Suttles to the Unified Area Command.  Was Mr. Suttles involved in the design of the Top Hat?

A.     He was not on the Team, so, no. All right.  And did that letter that you were asked questions predate or postdate the design and implementation of the Top Hat?

A.     It postdated the implementation of the Top Hat.

(*Id.* at 501:18-503:3.)


Any additional testimony the United States seeks is therefore likely to be limited, and in this context, an additional deposition is an unnecessary and inefficient way to cover this familiar ground.

As the Court knows, other disagreements between parties about the need for Rule 30(b)(6) deposition testimony have been addressed successfully via interrogatories.  (*See* June 13, 2012 Working Group Order, Rec. Doc. 6664, at 4-6.)  As the Court will remember, both Halliburton's proposed Rule 30(b)(6) Topic as regards M57 sands and the PSC's pursuit of the "Cost Topics" regarding BP's response costs have been successfully addressed through interrogatories, rather than through deposition testimony.  In fact the United States, in its January

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 18, 2013
Page 5

16, 2013 letter on *its* witnesses has offered to provide interrogatories *in lieu* of additional deposition testimony sought by BP.

BP thus proposes to follow these precedents and address the portion of the Court's order regarding the Devers deposition (Rec. Doc. 8149, at 3-4) via interrogatories.  BP requests that the Court order that the United States may serve an additional interrogatory for each Source Control Method — for a total of up to two interrogatories — questioning BP as to any "design phase" analysis of flow rates "into" the RITT and Top Hat that may have been performed by BP.

## Williams (Topic 9)

As previously reported to the Court, BP and the United States successfully negotiated a resolution regarding the Trevor Hill deposition and Topic 4.  The last issue regarding the Williams deposition, then, is the Court's ruling on Topic 9 — awarding the United States some additional testimony regarding BP's May 24, 2010 response to Congressman Markey.

The discussions between BP and the United States regarding this aspect of the Court's ruling, and the testimony the United States is seeking, indicate that for several reasons little or no additional testimony is in order.

At the outset, BP has not previously had an opportunity to address this requested testimony either in a meet-and-confer context or before the Court.  The United States' meet-and-confer letter on BP's Rule 30(b)(6) witnesses neither mentioned BP's response to Congressman Markey nor cited to the very limited portions of the deposition transcript containing questioning on this submission.  (Attachment 5, at 5-8.)

But now that the Court's Order has nonetheless mentioned this testimony, the United States acknowledged, during the January 8 meet-and-confer discussion, that BP's corporate representative has already testified with knowledge regarding the observational evidence work attached to the letter to Congressman Markey.  The United States further clarified that it is not interested in additional testimony regarding this observational evidence work itself — for example, the work performed by Mr. David Rainey.

Rather, the United States explained that what it seeks under this heading of the Court's ruling is a BP Rule 30(b)(6) witness to testify regarding the deliberative process used in connection with the drafting of the May 24, 2010 letter sent to Congressman Markey.

But as BP has explained to the United States, and as the Court has previously recognized, this drafting process is privileged.  As the Court knows, the United States and BP each submitted extensive briefing this summer as part of the Schedule 1 privilege challenges process on

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 18, 2013
Page 6

documents related to the drafting of BP's response to Congressman Markey.  (*See* Rec. Docs. 7009 to 7011.)  As part of this briefing, BP's July 19, 2012 submission explained as follows:

> Congressional requests received by the company in this time period were handled through a process organized and directed by lawyers in which information was gathered from personnel within the company. Congressional responses were then drafted in a collaborative process led by WilmerHale and involving both in-house and external lawyers along with appropriate BP personnel. Although not every communication regarding the effort to collect information and to respond to requests involved the direct participation of an attorney, the overall process was a lawyer-directed effort seeking to ensure that BP received appropriate legal advice with respect to the requests and the company's responses.
> (Attachment 6, Rec. Doc. 7009, at 5.)

The Court ruled in light of the parties' submissions that the specific documents at issue related to the drafting of BP's response to Congressman Markey are protected by attorney-client privilege.  (*See* Attachment 7, July 30, 2012 Order, Rec. Doc. 7012 (upholding BP's privilege claims on Document Nos. 26, 28, 30, 45, and 46).)

In sum, testimony about the actual estimation work contained in the submission is the material arguably relevant to the Phase 2 Quantification case.  But the United States, by its own admission, already received relevant testimony on this subject.

On the other hand, testimony about the deliberative process used to draft a letter to Congress is only remotely relevant, if at all, and has already been determined to be privileged.

The United States confirmed, in its response today, that it recognizes this additional deposition will largely implicate privileged information.  The United States nevertheless claims it requires an additional Rule 30(b)(6) examination "to obtain specific objections or responses … [and] to probe … the circumstances surrounding the privilege assertion."  (Attachment 2.)

But arranging a new deposition to obtain a very limited amount of non-privileged information would be unnecessarily inefficient (as well as potentially contentious).  Even more so when the United States already has elicited much of the non-privileged information it could ever hope to learn about the drafting of the Markey letter, including through the recent deposition of Trevor Hill.  (*See* Attachment 3, Hill Dep. Tr. 310-318.)

Indeed, the potential for an additional deposition of this nature to be inefficient is underscored by the United States' decision at Mr. Hill's deposition not to use its hard-won Rule 30(b)(6) examination time to question Mr. Hill on the topics for which it sought additional testimony.  (*See* Attachment 3, Hill Dep. Tr. 251-280.)

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 18, 2013
Page 7


BP respectfully submits that the Court likely does not envision an additional Rule 30(b)(6) deposition, whose primary purpose is to elicit information about a privileged drafting process.  Especially so, since it is now clear, that the United States seeks testimony similar to the deposition testimony that it sought regarding the privileged drafting of BP's submission to the Presidential Commission — a deposition request this Court appropriately denied.  (Rec. Doc. 8149, at 4.)

The extensive privilege issues implicated by this discovery, and any related discussions about those privilege issues, are undoubtedly most efficiently addressed by attorneys, and in writing, rather than during or after a deposition that yields little to no substantive testimony.  BP therefore proposed that the United States submit an agreed-upon interrogatory or written question that BP would answer in writing and on behalf of the Company — to the extent privileged information is not called for as part of the response.

*       *       *

For the foregoing reasons, BP respectfully requests the Court order that its Order of January 2, 2013, is herby clarified and/or reconsidered as appropriate to provide the relief described above.

Sincerely,

Robert R. Gasaway


cc (by electronic mail):

Michael O'Keefe
United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross

# Attachment 1

# KIRKLAND & ELLIS LLP

#### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

January 11, 2013

**By Electronic Mail**

Sarah D. Himmelhoch
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044

Re:     MDL 2179 —Meet and Confer on the Court's Order Regarding BP's Rule
30(b)(6) Witnesses, (Rec. Doc. 8149)

Dear Sarah:

Following up Tuesday's meet-and-confer discussion, BP writes to address the various items that remain open from that discussion — now that the scope and length of the Trevor Hill deposition have been resolved by separate communications.

Thank you for your helpful clarifications of the additional Rule 30(b)(6) testimony the United States seeks in light of the Court's January 2, 2012 Order, (Rec. Doc. 8149).

As discussed below, BP is willing to agree to some, but not all, of the United States' proposals.

**Sanders**

BP is willing to provide a Rule 30(b)(6) witness to testify for no more than two hours on the subject of Bottom Kill.  During Tuesday's conference call, the United States specifically mentioned its interest in determining (i) whether BP personnel performed any "flow rate modeling" leading up to the Bottom Kill operation — in addition to any modeling performed by Wild Well Control and Add Energy — and (ii) BP's opinion of modeling Wild Well Control and Add Energy performed as part of the operation.  Any BP witness will be prepared to address these two areas.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

# KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
January 11, 2013
Page 2

Because Mr. Sanders worked on the relief wells, and not on the dynamic kill team, BP is working to identify an appropriate witness.  We will contact you further regarding deposition timing, location, and logistics once we have identified our witness.

**Devers**

With respect to the RITT and Top Hat devices, we understand from Tuesday's discussion that the United States seeks testimony about any design phase analysis that BP performed regarding the flow into these devices.  You further analogized the testimony being sought here to the Bottom Kill testimony that the United States is also seeking (with the difference being that Bottom Kill was not implemented and the RITT and Top Hat were implemented).  Bear in mind, however, that Mr. Devers has already provided testimony on this issue.  Specifically, Mr. Devers has testified that there was no such design phase consideration of flow rates.  (Devers Dep. Tr. 429:3-430:17, 501:18-502:18.)  Any additional testimony of the kind the United States seeks is therefore likely to be limited, and in these circumstances an additional deposition seems costly and inefficient.

Previous disagreements about the scope of Rule 30(b)(6) Topics have been addressed successfully via interrogatories.  (*See* June 13, 2012 Working Group Order, Rec. Doc. 6664, at 4-6.)  BP proposes to follow that prior example here and to address the portion of the Court's order regarding the Devers deposition, (Rec. Doc. 8149, at 3-4), by providing interrogatory answers responding to one or two additional interrogatories questioning BP as to any analysis of flow from the Macondo reservoir that BP may have performed in connection with the "design phase" of the RITT and Top Hat.

**Williams (Topic 9)**

Regarding the portion of the Court's Order addressing Topic 9, the United States acknowledged on Tuesday that BP's corporate representative has testified with knowledge regarding the observational evidence work attached to the May 24, 2010 response to Congressman Markey, and the United States is not interested in testimony regarding the observational evidence work attached to the Markey response — for example, Dave Rainey's work.

Instead, the United States requests a BP Rule 30(b)(6) witness to testify regarding the drafting of the May 24, 2010 letter sent to Congressman Markey.

During our discussion we reiterated that this drafting process is privileged.  Indeed, the Court has recognized and upheld this privilege in the context of the United States' challenges to specific documents on BP's privilege logs.  (*See* July 30, 2012 Order, Rec. Doc. 7012.)  As a result, the vast majority of the questioning on this topic is likely to draw privilege objections, and

# KIRKLAND & ELLIS LLP

Sarah D. Himmelhoch
January 11, 2013
Page 3

proceeding with a deposition to obtain very limited non-privileged information is a costly and inefficient way to proceed.

The extensive privilege issues implicated by this discovery, and any related discussions about those privilege issues, are more efficiently addressed by attorneys and in writing rather than during or after a deposition that yields little to no testimony.

Accordingly, BP proposes that it will forgo its right to seek reconsideration of the portion of Court's Order on Topic 9, if the United States in turn agrees to submit some form of agreed-upon interrogatories or written questions that BP would answer in writing and on behalf of the Company — to the extent privileged information is not called for as part of the response.

\*      \*      \*

We look forward to your response on our proposals above.  As always, we are willing to meet and confer with the United States.

Sincerely,

Robert R. Gasaway

cc (by electronic mail):

United States' MDL Counsel
Joel M. Gross

# Attachment 2



**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

January 18, 2013

**BY ELECTRONIC MAIL**

Robert R. Gasaway
Kirkland & Ellis, LLP
655 15th Street, NW
Washington, DC  20005
robert.gasaway@kirkland.com

       Re:    MDL 2179 – BP's Rule 30(b)(6) Witnesses

Dear Mr. Gasaway:

     I write in response to your letter of January 11, 2013.  As you reported to Judge Shushan, out of the four issues, two have been resolved.  Trevor Hill has already testified and you committed to identifying to us very soon a suitable Rule 30(b)(6) designee to cover Topic 12 as it relates to the relief wells.  We appreciate your efforts to resolve those issues related to BP's Rule 30(b)(6) designees.

     Unfortunately, we cannot agree to your proposals with respect to the Devers and remaining Williams topics.  It is true that certain other issues related to Rule 30(b)(6) depositions have been addressed using interrogatories.  In fact, the United States has proposed doing that with respect to two discrete areas related to its own Rule 30(b)(6) witnesses.  Where interrogatories are helpful is in a situation where there is a narrow question that can be answered with a simple interrogatory response.

     The outstanding topics from the Devers and Williams deposition, however, do not fall into this category.  With respect to the drafting of the letter to Congressman Markey, the United States is entitled to ask specific questions regarding the drafting and to obtain specific objections or responses.  Moreover, only with a live witness will the United States be able to probe, as it is entitled to do, the circumstances surrounding the privilege assertion.  Similarly, with respect to the question of whether or not flow analyses were performed in designing the RITT and Top Hat, it has come to our attention through the Trevor Hill deposition that at least some BP employees have adopted a very narrow definition of flow rate analyses that excludes information specifically called for by the topic.  Accordingly, we need to question a live witness to ensure that any assertion that no flow rate analyses were performed is founded on a common and appropriate definition of the term.

Page 2


       For these reasons, we renew our requests for a new designee for the remaining two outstanding topics and for no more than 2 hours of time with each such designee.

                                    Sincerely,

                                      /s/ Sarah D. Himmelhoch

                                      Sarah D. Himmelhoch
                                      Senior Litigation Counsel for E-Discovery

cc:    Liaison & Coordinating Counsel

# Attachment 3

01-41871
DG/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the ) | |
| GULF OF MEXICO, on ) | SECTION: J |
| APRIL 20, 2010 ) | |
| ) | JUDGE BARBIER |
| ) | |
| ) | MAG. JUDGE SHUSHAN |

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Trevor J. Hill

JANUARY 14, 2013

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group◆Court Reporting◆Video Production◆Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1    stream trying to establish the correct piping

2    factors and then passing that information along to

3    the national labs?

4             MS. KARIS:  Object to form.

5        A.  From this, I don't believe that was the

6    case, no.

7        Q.  (BY MR. CERNICH)  Okay.

8        A.  No.

9        Q.  Okay.  So you never followed up to provide

10   them with any additional information?

11            MS. KARIS:  Object to form, asked and

12   answered.

13       A.  I don't recall.

14       Q.  (BY MR. CERNICH)  Can we go to Tab 136?

15            MR. CERNICH:  Actually, let's go off

16   the record for a moment.

17            THE VIDEOGRAPHER:  The time is

18   4:02 p.m.  We're going off the record.

19            (Break from 4:02 p.m. to 4:21 p.m.)

20            THE VIDEOGRAPHER:  The time is

21   4:21 p.m.  We're back on the record, beginning

22   Tape 7.

23       Q.  (BY MR. CERNICH)  Mr. Hill, as you're

24   probably aware, you've been designated as a

25   30(b)(6) witness for -- for BP regarding your

 1   critique of Dr. Steve Wereley's work.  Are you --
 2   do you understand that to be the case?
 3        A.   Yes.
 4        Q.   Okay.  So I'm going to ask you some
 5   questions for the next 40 or so minutes related to
 6   that -- that work.
 7             Now, you created a critique of a flow
 8   rate estimate that was created by Dr. Steve
 9   Wereley from Purdue; is that right?
10        A.   That's correct.
11        Q.   Okay.  And can you briefly describe
12   Dr. Wereley's technique as you understand it?
13        A.   That he tracked a -- a particle or a
14   feature of the flow coming out of the end of the
15   fallen riser pipe from a video and came up with
16   a -- a measurement of the -- the -- a measurement
17   to the velocity of that particle or -- or feature.
18   And I don't -- at least once.  And then he
19   converted that measurement of velocity to a flow
20   rate.
21        Q.   Okay.  Now, you were -- were working on
22   or -- or considering a similar -- similar type of
23   methodology as early as May 3rd, 2010, weren't
24   you?
25             MS. KARIS:  Object to form.

1           MS. AVERGUN:  Objection; form.

2      A.  I had made a suggestion of tracking

3  velocity from video, yes.

4      Q.  (BY MR. CERNICH)  Okay.  And if we can go

5  to Tab 15, please.

6           MR. CERNICH:  I'm going to mark this

7  as Exhibit 11180.

8           (Marked Exhibit No. 11180.)

9           MS. KARIS:  Tab 15?

10           MR. CERNICH:  Tab 15, yes.

11      A.  I'll just skim through this, please.

12           MR. CERNICH:  It's quite a long

13  E-mail string.  If Mr. Hill wants to read the

14  whole thing, I respectfully request that we do it

15  off the record.

16           MS. KARIS:  We're not going to do it

17  off the record; the same we've done it for any

18  others.

19           MR. CERNICH:  We've had the same

20  request for many of our other witnesses.

21           MS. KARIS:  I understand Dr. McNutt

22  would not go off the record to review documents,

23  so -- Admiral Landry, same thing.

24           MR. CERNICH:  Okay.  Then can I get

25  an agreement that the same rule will apply going

 1   forward with BP witnesses?

 2              MS. KARIS:  Today in this deposition,

 3   we're not going off the record.  You can continue

 4   asking your questions.

 5       A.  Okay.  For a quick skim.

 6       Q.  (BY MR. CERNICH)  Okay.  And at the -- the

 7   top there, this is an E-mail from Andrew Hall to

 8   yourself, dated May 4th, 2010; is that right?

 9              MS. KARIS:  I'm going to object to

10   scope with respect to the 30(b)(6).

11       A.  It is an E-mail to me, yeah.

12       Q.  (BY MR. CERNICH)  Okay.  And in the prior

13   E-mail dated May 3rd, 2010, you write to Mr. Hall

14   on the second paragraph:  "Tim and Farah have

15   already built the OLGA model - many assumptions

16   made.  We are linked closely with Base Management

17   using PROSPER.  We have the flowing velocity

18   estimates from the model, and I am looking at the

19   video footage to try to pick out particle movement

20   to get a velocity.  We also have a possible

21   dispersant injection location upstream to try to

22   get a time of flight."

23              Did I read that correctly?

24              MS. AVERGUN:  Object to form and

25   scope.  Can I have a standing objection with

1    respect to this document for scope so I don't have

2    to make it each time?

3                    MR. CERNICH:  You may.

4                    MS. AVERGUN:  Thank you.

5        A.  So you -- you read it correctly.

6        Q.  (BY MR. CERNICH)  Okay.  And here, you

7    were looking at trying to get flowing velocity

8    estimates from the -- from the end of the riser,

9    and you were going to use the dispersant -- the

10   dispersant injection as -- as a potential feature

11   to track to get a time of flight; is that right?

12       A.  In terms of the last phrase, "We also have

13   a possible dispersant injection location

14   upstream," I don't believe it was physically in

15   place.

16       Q.  Okay.  And could I ask you to go to the --

17   the very end of this document, the first E-mail

18   here.  Do you see the -- the E-mail dated April

19   27th, 2010 from Donald Campbell Brown to a number

20   of individuals there?

21       A.  Yes.

22       Q.  Do you know who Mr. Campbell Brown is?

23       A.  I do, yes.

24       Q.  And who is he?

25       A.  At the time, he was the chief engine --

1   well, let me -- my -- my belief is at the time, he

2   was the chief engineer for instrument, controls,

3   and electrical.  At least he had been in that

4   position.

5         Q.  Okay.  Thank you.

6             And if we look down towards --

7         A.  Sorry, just to clarify, it says it at the

8   end of the E-mail.

9         Q.  That confirms your -- you answer.  Your

10  memory -- your memory is pretty good.

11            And he writes:  "Mark Nicholas called

12  to relay a question from Andy on how we might

13  (reasonably accurately) measure the multiphase

14  flow rate from the severed end of the 21.5 inch

15  rier, which is lying on the seabed.  This is key

16  to predicting environmental impact as well as to

17  understanding the stability of the flow

18  restriction that is limiting the flow rate, and

19  the possible original failure mechanisms.  We do

20  not know (but are modeling) the possible range of

21  gas/oil ratios - and Julian Austin has the latest

22  on the current assumptions around this."

23            Did I read that correctly?

24        A.  Yes.

25        Q.  Okay.  And so here, Mr. Nichols is

1    relaying a question from Andy.  Would you assume

2    that's Andy Inglis?

3           A.  I assume.  That's likely, yeah.

4           Q.  Mr. Nichols works with Mr. Inglis?

5           A.  Why -- he -- he works in Mr. Inglis'

6    hierarchy of folk.

7           Q.  Okay.

8           A.  He was the chief engineer for mechanical

9    engineering, Mark Nichols.

10          Q.  Okay.  And Mr. Nichols is writing that the

11   multiphase flow rate from the severed end of the

12   riser is a key to predicting environmental impact

13   as well as to understanding the stability of the

14   flow restriction; is that right?

15          A.  As written, that's right, yes.

16          Q.  Okay.  And -- and that observation or --

17   or that comment is part of what prompted you to

18   consider trying to determine if there was a way to

19   predict flow rate from the end of the -- the

20   riser?

21                    MS. AVERGUN:  Objection to form.

22                    MS. KARIS:  Object to form and scope.

23          A.  Yeah, I can't recall specifically that --

24   that was the cause of it.  I don't recall reading

25   this --

```
1          Q.  (BY MR. CERNICH)  Okay.

2          A.  -- in that time.

3          Q.  But later on in this E-mail string, you do

4    enter into a discussion about how you might be

5    able to use velocity estimates in order to -- to

6    come up with a flow rate, correct?

7                    MS. AVERGUN:  I'm going to object to

8    form.

9          Q.  (BY MR. CERNICH)  Actually, I'll withdraw

10   the question.

11         A.  Okay.

12         Q.  The subject line of this E-mail stream is

13   "Riser Flowrate," isn't it?

14         A.  Yes, it is.

15         Q.  Okay.  Are you aware that Dr. Ollie Rigg

16   performed a similar analysis on or around May 10th

17   and estimated a flow rate of 40,000 barrels per

18   day --

19                    MS. KARIS:  Object to form.

20         Q.  (BY MR. CERNICH)  -- at the end of the

21   riser.

22                    MS. KARIS:  Sorry.  Object to form

23   and scope.  And, Counsel, if you would, tell me

24   how this is related to the Wereley critique in

25   Mr. Hill's -- because that's what the order
```

 1   allowed for.

 2                    MR. CERNICH:  Can we go off the

 3   record?

 4                    MS. KARIS:  Sure.

 5                    MS. AVERGUN:  Objection; form.

 6                    THE VIDEOGRAPHER:  The time is

 7   4:31 p.m.  We're off the record.

 8                    (Break from 4:31 p.m. to 4:33 p.m.)

 9                    THE VIDEOGRAPHER:  The time is

10   4:33 p.m.  We're back on the record.

11        Q.  (BY MR. CERNICH)  There's a -- there's a

12   question pending.

13        A.  Sorry.

14        Q.  Okay.  I'll ask it again.

15        A.  Yeah, please.

16        Q.  Are you aware of Dr. Ollie Rigg's analysis

17   using imaging technology and velocities of flow

18   from the end of the riser where he estimated a

19   flow rate of 40,000 barrels per day?

20                    MS. KARIS:  Object to form and scope.

21        A.  Not to that level of detail in the

22   question, no.  I would -- I had been made aware

23   that he did that work.

24        Q.  (BY MR. CERNICH)  Were you aware of that

25   when you prepared your critique of Dr. Wereley's?

1       A.   No, I was not.

2       Q.   Would you have liked to have had that

3   information when you prepared your critique of

4   Dr. Wereley's analysis?

5                MS. KARIS:   Object to form.

6                MS. AVERGUN:   Objection; form.

7       A.   Looking back, I don't think it was a

8   direct -- of direct interest.   Because I didn't

9   comment on Professor Wereley's measurements, just

10  his interpretation.

11      Q.   (BY MR. CERNICH)   And Dr. Rigg also

12  performed an interpretation of the -- of the

13  measurements, correct?

14               MS. KARIS:   Object to form and scope.

15      A.   I don't know what he did.

16      Q.   (BY MR. CERNICH)   You don't know?

17      A.   No.

18      Q.   Did you ever review his work?

19      A.   Not on that subject, no.

20      Q.   You never reviewed his -- his estimates

21  based on the velocity of the plume coming out of

22  the -- of the separate riser?

23               MS. KARIS:   Object to form and scope.

24      A.   No, I never did.

25      Q.   (BY MR. CERNICH)   Can we go to Tab 29,

 1    please.
 2                    MR. CERNICH:  We'll mark this as
 3    Exhibit 11181.
 4                    (Marked Exhibit No. 11181.)
 5         Q.  (BY MR. CERNICH)  This is a slide show
 6    marked, "Observations on flow coming from the
 7    Macondo System, Prepared by:  Trevor Hill, 14 May
 8    '10."
 9                    Do you see that?
10         A.  Yes.
11         Q.  Did you -- did you prepare this?
12         A.  Yes.
13         Q.  Did you review this document in
14    preparation for your deposition today?
15         A.  Yes.
16         Q.  Okay.  And this document is your -- your
17    initial critique of Dr. Wereley's work; is that
18    right?
19         A.  That's right, yes.
20         Q.  Okay.  And why did you prepare this
21    document?
22         A.  My -- my recollection is I -- I had seen
23    Professor Wereley speak on the Anderson Cooper
24    program, and I was checking some of his
25    assertions.

```
 1          Q.   Okay.  Could we turn to Tab 207, please.
 2                    MR. CERNICH:   We're going to mark
 3     this as Exhibit 11182.
 4                    (Marked Exhibit No. 11182.)
 5          Q.  (BY MR. CERNICH)   This is an E-mail dated
 6     May 14, 2010 from Mr. Holden Zhang to yourself,
 7     with copies to Taras Makogon, George Shoup, Oris
 8     Hernandez, James Bill, and Cem Sarica; is that
 9     right?
10          A.   That's correct.
11          Q.   And the subject is "Steve Wereley weak
12     estimation."
13                    Is that right?
14          A.   That's correct.
15          Q.   And this is Mr. Zhang providing you with
16     some comments regarding Dr. Wereley's flow rate
17     estimate; is that right?
18          A.   That's correct.
19          Q.   And did you receive this E-mail before or
20     after you prepared the slide show that we were
21     looking at a few moments ago?
22          A.   I don't recall specifically.
23          Q.   Did you rely on any of the information in
24     this E-mail from Mr. Zhang to prepare your --
25          A.   No.  I don't believe so.
```

1      Q.   Do you know who Mr. Zhang is?

2      A.   Yes.

3      Q.   And who is he?

4      A.   He is -- exact position, bear with me, but

5  he is -- he is in Tulsa University, either as a --

6  a research associate or a professor.  I'm not sure

7  at that time what he was.

8      Q.   Okay.  Do you know Mr. Zhang

9  professionally?

10     A.   Yes.

11     Q.   Do you work with him on a regular basis?

12     A.   Regular but infrequent, yes.

13     Q.   Okay.  And prior to this, had you been

14  discussing flow rate issues related to the Macondo

15  Well?

16     A.   With him?

17     Q.   With him, yes.

18     A.   Not that I recall, no.

19     Q.   Okay.  So this -- did this E-mail just

20  come out of the blue?

21     A.   Yes.

22     Q.   Okay.

23     A.   That's my recollection.

24     Q.   Did you ever reply to Mr. Zhang?

25     A.   I don't recall now.

1      Q.  Okay.  And you -- you sent this -- this

2  slide show, Exhibit 11181, that we were looking

3  at -- you sent that to Los Alamos National Labs

4  for them to review; is that right?

5      A.  I'd be happy to see the E-mail.  I don't

6  recall if it was this document specifically.

7      Q.  You didn't review that E-mail in preparing

8  for your deposition today?

9      A.  Yes, but I can't recall which attachments

10  these were.

11      Q.  Okay.  If we can go to Tab 196 then.

12  We're going to mark this as Exhibit 11183.

13              (Marked Exhibit No. 11183.)

14      Q.  (BY MR. CERNICH)  That's an E-mail from

15  yourself dated May 14th, 2010, to a Dr. DeCroix.

16  Do you see that?

17      A.  Yes.

18      Q.  And actually I misspoke.  You didn't

19  actually send the May 14th slide show.  You sent a

20  write-up, a memo, "Observations on Flow Coming

21  From the Macondo Riser."  Is that -- is that the

22  correct attachment?

23      A.  That's correct.

24      Q.  Okay.  And this was a more detailed

25  analysis than your 14th -- 14th of May 2010 slide

1    show?

2                    MS. AVERGUN:  Objection to form.

3         A.  I -- I don't believe it was a more

4    detailed analysis.  It -- it was a fuller

5    description.

6         Q.  (BY MR. CERNICH)  Okay.  And -- and why

7    did you send this to -- to Dr. DeCroix?

8         A.  I had spoken with Mr. Tooms about my

9    observations, and he had asked if there was anyone

10   external to the company with whom we could consult

11   and get a second opinion.

12        Q.  And why did you pick Mr. DeCroix?

13                   MS. AVERGUN:  Objection to form.

14        A.  To him exactly, I don't -- I don't recall.

15   There were a number of folk involved in that

16   process and I -- we -- Kate Baker there on the

17   list.

18        Q.  (BY MR. CERNICH)  Okay.  And who is

19   Ms. Baker?

20        A.  She was one of the team working with Paul

21   Tooms.

22        Q.  Okay.  Was she -- was she involved at all

23   with any of the privileged work streams that we've

24   discussed today?

25                   MS. KARIS:  Object to form and scope.

1      A.  In a consultancy perhaps, but I -- I don't

2  recall specifically.

3      Q.  (BY MR. CERNICH)  Okay.  Can we go to

4  Tab 209, please.

5              (Marked Exhibit No. 11184.)

6      Q.  (BY MR. CERNICH)  We marked this as

7  Exhibit 11184.  This is an E-mail from yourself to

8  David Rainey dated May 21st, 2010.  "Subject:

9  Professor Wereley Presentation to Congress."

10              Is that right?

11      A.  That's correct.

12      Q.  And you sent along this copy of

13  Professor Wereley's slide presentation to

14  Mr. Rainey on that date; is that right?

15      A.  Excuse me.  Yes, that's correct.

16      Q.  And why did you send this to Mr. Rainey?

17              MS. AVERGUN:  Objection to form.  I'm

18  going to instruct my client not to answer to the

19  extent it calls for privileged information.

20      A.  I -- I don't recall the exact

21  circumstances.

22      Q.  (BY MR. CERNICH)  Okay.  Do you recall

23  whether counsel or an agent of counsel suggested

24  that you send this to -- to Mr. Rainey?

25      A.  I don't recall that, no.

 1       Q.  And if we could go to Tab 210?  Mark that
 2   as Exhibit 11185.
 3                  (Marked Exhibit No. 11185.)
 4       Q.  (BY MR. CERNICH)  This is an E-mail dated
 5   Saturday, May 22nd, from yourself to Mr. Rainey
 6   with a copy to Kent Wells; is that right?
 7       A.  Yes, it is.
 8       Q.  Okay.  And this is a -- a copy of the --
 9   of the memo that we were looking at earlier,
10   "Observations on Flow Coming From the Macondo
11   System"?
12       A.  Yes.
13       Q.  Okay.  And you -- you write to
14   Mr. Rainey -- do -- do you recall why you sent
15   this to -- to Mr. Rainey?
16       A.  Having answered the question on the first
17   one, he then came back with a comment.  And so I
18   was then responding to his comment there.
19       Q.  Okay.  With additional information?
20       A.  Yes, there is.
21       Q.  Okay.  And in the middle of that
22   paragraph, you write:  "Understanding the
23   uncertainty in the measurement is important,
24   though the error could be down or up.  We are
25   getting original video files from offshore which

1    will have better resolution than the compressed

2    feed into the ROV room which the first public

3    video release was made."

4              Did I read that correctly?

5         A.  Almost.  "From -- from which," but yeah.

6         Q.  "From which."  Yes, thank you.

7              And so you were telling him that

8    the -- that the error in the measurement could

9    be -- could be down or up; is that right?

10        A.  That's correct.

11        Q.  Okay.  Can we turn to Tab 212?  I'm going

12   to mark this as Exhibit 11186.

13              (Marked Exhibit No. 11186.)

14        Q.  (BY MR. CERNICH)  This is a document with

15   the title "Proposal For Work on Flow Rate

16   Estimation."

17              Is that right?

18        A.  It is.

19        Q.  Okay.  And did you prepare this document,

20   Mr. Hill?

21        A.  I believe so, yeah.

22        Q.  Okay.  And why -- why did you prepare

23   this -- this document?

24        A.  I don't recall specifically.

25        Q.  Okay.  Did you prepare it in reaction to

1    Professor Wereley's work?

2        A.  I don't recall and have no indication of

3    date either to --

4        Q.  Okay.  And who did you -- did you send

5    this document to anyone at BP or otherwise?

6            MS. KARIS:  Object to scope.

7        A.  I don't recall.

8        Q.  (BY MR. CERNICH)  Okay.  And you write in

9    the summary:  "Given the measured flow rate

10   information now available from the riser insertion

11   tool production to Enterprise, we should engage

12   with the relevant internal and external experts to

13   quantify the flow rate."

14           Is that right?

15           MS. KARIS:  Object to form and scope.

16       A.  Yes.  As written here.

17       Q.  (BY MR. CERNICH)  Okay.  And so you are

18   writing in this -- this document that -- that we

19   should -- and when you say "we," you're referring

20   to BP; is that right?

21       A.  Effectively, yes.

22       Q.  Yeah.  "We should engage with the relevant

23   internal and external experts to quantify the

24   total flow rate."

25           Is that right?

```
 1            MS. KARIS:  Object to form and scope.
 2        A.  As written, yes.
 3        Q.  (BY MR. CERNICH)  Okay.  And then you --
 4   you -- further down, you list some -- well,
 5   actually, you write in here that video is
 6   available of flow with four different rates of
 7   extraction to the Enterprise.  Do you see down
 8   there, I guess it's the fourth paragraph?
 9        A.  Yes.  I'm actually going to take a read
10   through now.
11        Q.  Okay.
12            MS. KARIS:  I want -- I object --
13   while he's reading, I object to form and scope
14   with respect to all the questions on this
15   document.
16        A.  Okay.  I've read it.
17        Q.  (BY MR. CERNICH)  Okay.  So this document
18   describes a means of trying to quantify the flow
19   rate by using video imaging; is that right?
20            Let me direct you to the fourth
21   paragraph.  It says:  "Video is available of flow
22   to Enterprise (none, 1550 barrels per day, 3500
23   barrels per day, and 5100 barrels per day)."
24            Did I read that correctly?
25        A.  Yes.
```

1          MS. KARIS:  Object to form.

2     Q.  (BY MR. CERNICH)  And so this document

3     describes using video analysis to quantify total

4     flow rate?

5               MS. KARIS:  Object to form and scope.

6               MR. CERNICH:  Counsel, the document

7     is dated May 21st, 2010.  It was created at the

8     same time that he was performing his analysis of

9     Dr. Wereley's work.

10               MS. KARIS:  That certainly doesn't

11     mean that it's related to his critique of Wereley.

12     The fact that it was created around the same

13     time -- a bunch of documents created around the

14     same time.

15               MR. CERNICH:  A bunch of documents

16     relating to video imaging of the -- of the flow

17     from the end of the riser pipe?

18               MS. KARIS:  This was specifically the

19     subject of negotiation and was in discussion

20     between the U.S. and BP with respect to what the

21     proper scope of his examination was.

22               MR. CERNICH:  Okay.  Well, we can

23     argue about the objection.

24               MS. KARIS:  I'll let him answer, but

25     to respond to your question that it's dated May

1    21st doesn't say anything about it being related

2    to the Wereley critique or the basis for that

3    critique.

4         A.  Sorry.  I lost the -- can -- may I ask you

5    to repeat the question because I've lost it up

6    there.

7         Q.  (BY MR. CERNICH)  All I did was -- all I

8    asked was:  So this document describes a means of

9    trying to quantify the flow rate by using video

10   imaging?

11              MS. KARIS:  Object to form and scope.

12        A.  I would -- I would accept it states the --

13   the video is an available with four different

14   rates of extraction.  I don't believe it describes

15   the methodology that would be used to do it.

16        Q.  (BY MR. CERNICH)  So your saying that

17   video is available doesn't -- doesn't imply in any

18   way that that video would actually be used to

19   quantify the total flow rate?

20              MS. KARIS:  Object to form and scope.

21        A.  It -- it does list as the last point the

22   issue of the riser insertion tool in the flow,

23   which fundamentally changes how the flow came out.

24        Q.  (BY MR. CERNICH)  Right.  And you were

25   going to look at the riser insertion tool at

1    different extraction rates and look at video --

2    video of the plume and try to determine whether

3    you could use that to quantify the total flow rate

4    from the --

5              MS. KARIS:  Object to --

6         Q.  (BY MR. CERNICH) -- end of the riser?

7              MS. KARIS:  Object to form and scope.

8         A.  Sitting here now, I don't believe it goes

9    to that level.

10        Q.  (BY MR. CERNICH)  Okay.  And at the end,

11   you say --

12             MR. CERNICH:  Oh, actually,

13   counsel -- I'm sorry.  I missed this.

14        Q.  (BY MR. CERNICH)  "Proposed Work."  If we

15   look down there on the third point:  "To contact

16   Professor Wereley, the originator of public

17   statements on flow rate made from the

18   interpretation of particle image velocimetry

19   measurements, to determine what measurements and

20   assumptions were made in his analysis."

21             Did I read that correctly, Mr. Hill?

22        A.  Yes, you did.

23             MS. KARIS:  And I'll respond if

24   you're asking me -- that, nonetheless, has nothing

25   to do with the Wereley critique.

```
 1              MR. CERNICH:  Okay.
 2              MS. KARIS:  I'll note for the record
 3    that Counsel for Halliburton and Mr. Cernich are
 4    laughing.  Laugh all you want, but I think we all
 5    know that that doesn't pertain to the Wereley
 6    critique.
 7         Q.  (BY MR. CERNICH) And you have a request
 8    listed there:  "Permission to release further
 9    video clips from periods of known extraction rates
10    to Enterprise."
11              Did I read that correctly?
12         A.  You did.
13         Q.  Okay.  And then you said:  "Permission to
14    recontact Bill Lehr of NOAA to offer support to
15    the Flow Rate Technical Team."
16              Did I read that correctly?
17         A.  You did.
18         Q.  "And permission to contact external
19    experts, including Professor Wereley."
20              Did I read that correctly?
21         A.  You did.
22         Q.  Okay.  And so you were proposing to get
23    permission here to do these -- these three --
24    these three things listed in your -- your memo; is
25    that right?
```

274

```
 1                    MS. KARIS:  Object to form and scope.
 2          A.  As stated there, yes.
 3          Q.  (BY MR. CERNICH)  Okay.  Now, who were you
 4     seeking permission from?
 5          A.  My -- my contact was with Mr. Tooms.
 6          Q.  You were seeking permission from
 7     Mr. Tooms?
 8          A.  Yeah.
 9          Q.  Who -- your contact from Mr. Tooms?
10          A.  Yeah.  Mr. Tooms is who I spoke to, yeah.
11          Q.  Okay.  And you sent this document to
12     Mr. Tooms?
13          A.  I don't recall.
14          Q.  Okay.  Did you send this document to
15     anyone besides Mr. Tooms?
16          A.  I don't recall.
17          Q.  Did you need to get permission from
18     Counsel to do this work?
19          A.  No.  I don't believe so.
20          Q.  Did you ever seek permission from counsel
21     to do this work?
22          A.  No.
23          Q.  Did you ever do this work?
24                    MS. KARIS:  Object to form and scope.
25          A.  I -- I know that we -- I know that I was
```

 1   not involved in contacting Professor Wereley.  As

 2   to the first two, I -- I don't recall that I had

 3   sufficient information.

 4        Q.  (BY MR. CERNICH)  But -- but you didn't --

 5   you didn't accomplish these three tasks, did you?

 6              MS. KARIS:  Object to form and scope.

 7        A.  To my recollection, I -- I didn't

 8   personally do 1 and 3; and I had further contact,

 9   I believe, with Bill Lehr but not at my

10   initiation.

11        Q.  (BY MR. CERNICH)  Okay.  And you didn't,

12   in fact, carry out this -- carry out this proposal

13   and quantify a total flow rate from the well,

14   correct?

15        A.  That's correct.

16        Q.  Could we go to Tab 70 -- no.  Tab 71,

17   please.

18              MR. CERNICH:  Okay.  Let me mark this

19   as Exhibit 11187.

20              (Marked Exhibit No. 11187.)

21        Q.  (BY MR. CERNICH)  Do you see that's an

22   E-mail dated June 6, 2010, at the top there from

23   Steve Haden to Brittany Benko, Max Easley, and

24   yourself?

25        A.  Yes.

1      Q.  The subject is "Crater Riser End Section
2   exposed."
3            Is that right?
4      A.  That's correct.
5      Q.  Okay.  And you wrote -- if you look
6   further down in that E-mail, on June 6, 2010, you
7   wrote to Mr. Easley and Ms. Benko and Mr. Haden:
8   "Good afternoon.  Please see the attached photos.
9   Not sure if flow rate estimation from the original
10  plume site is still an issue; but if it is, these
11  photos give an idea of the extent of the
12  deformation on the pipe end - I have not yet tried
13  to measure it, but by eye I think the original
14  estimate I made of 60 percent of round pipe flow
15  area available through the deformed end may even
16  have been a bit high."
17           Did I read that correctly?
18     A.  You did.
19     Q.  Okay.  And that -- that 60 percent number
20  is the number that you used in your critique of
21  Dr. Wereley's work; is that right?
22     A.  I -- I believe that, yes, the last version
23  was that.
24     Q.  Okay.  And so you looked at these photos
25  by eye and came up with an idea that the -- that

1   the flow area may have been lower than 60 percent?

2       A.  That's correct.

3       Q.  You didn't do any sort of measurements to

4   confirm that observation before you sent this

5   E-mail?

6       A.  No, I didn't.

7       Q.  Okay.  And then you -- Ms. Benko writes on

8   June 6, 2010:  "Thanks, Trevor.  Very interesting

9   and, yes, flow rate estimates is still an issue."

10              And then writes:  "Max, would you

11  like me to pass these photos along to Bill Lehr

12  and Marcia McNutt?"

13              Did I read that correctly?

14      A.  Yes.

15      Q.  Okay.  And so Ms. Benko told you on

16  June 6th that flow rate estimate was still an

17  issue; is that right?

18      A.  That's correct.

19      Q.  Okay.  And -- and I think we talked

20  earlier when you told me that Ms. Benko -- on

21  May 22nd, you learned that Ms. Benko was working

22  on behalf of BP's counsel?

23      A.  That's correct.

24      Q.  And so this would indicate that, in

25  Ms. Benko's mind, flow rate estimate from the end

1 of the riser is still an issue; is that right?

2     MS. KARIS:  Object to form and scope

3 and foundation.

4     MS. AVERGUN:  And I'll add asked and

5 answered.

6   A.  I can't specifically -- speak for what she

7 was thinking, but she has made a statement "flow

8 rate estimate is still an issue."

9   Q.  (BY MR. CERNICH)  And this is June 6th,

10 2010.  So the riser has already been cut off the

11 top of the BOP, right?

12   A.  That's correct.

13   Q.  So there's no flow going through the --

14 going through the riser pipe anymore?

15     MS. KARIS:  Object to form and scope.

16   A.  That is correct.

17   Q.  (BY MR. CERNICH)  Okay.  Do you have any

18 idea why the flow rate from the end of the -- from

19 the end of the riser that's now being cut off of

20 the BOP is still an issue?

21     MS. KARIS:  Object to form and scope.

22     Counselor, are you speaking with

23 respect to the Wereley critique now?

24     MR. CERNICH:  Well, this all -- this

25 all follows from the -- the Wereley critique.  He

```
 1   mentioned the work he did on the Wereley critique.
 2              MS. KARIS:  I'm not sure the witness
 3   has established this work follows from that, but
 4   that contains the same number he did say.
 5      Q.  (BY MR. CERNICH)  So I just wanted to know
 6   if you had any idea why flow rate from the end of
 7   the -- the riser that had been already cut by this
 8   point off the top of the BOP was still an issue.
 9              MS. KARIS:  Object to form and scope.
10      A.  Yeah, I'm not sure I can -- I can say
11   that's what she was thinking.  I don't know.
12      Q.  (BY MR. CERNICH)  Okay.  And then
13   Mr. Haden writes:  "Do we want to annotate what we
14   think are the new dimensions on these photos?  I
15   think once we did that, it wouldn't be a bad idea
16   to share with Marcia and Bill.  Probably should
17   run it through Murray and Bernard before we
18   release."
19              Did I read that correctly?
20              MS. KARIS:  Object to form and scope.
21      A.  You did.
22      Q.  (BY MR. CERNICH)  Is that Murray
23   Auchinlouse [sic]?
24              MS. KARIS:  -closs.
25      Q.  (BY MR. CERNICH)  Auchincloss and Bernard
```

```
 1    Looney to which Mr. Haden is referring?
 2         A.  I believe that's a fair assumption.
 3         Q.  Okay.  And do you know why he would say
 4    that they should run it through Murray and Bernard
 5    before it was released?
 6              MS. AVERGUN:  Objection to form.
 7         A.  I don't believe so, no.
 8         Q.  (BY MR. CERNICH)  Okay.  Do you know if
 9    Murray and Bernard were -- had to approve any
10    information that was released to the flow rate
11    technical group or the U.S. Government?
12              MS. KARIS:  Object to form and
13    foundation.
14         A.  I -- I don't know that, no.  I don't
15    believe so.
16              MR. CERNICH:  Okay.  Done with the
17    30(b)(6) time, so I'll just continue.
18              MS. KARIS:  Sure.
19              MR. CERNICH:  With Mr. Hill's
20    personal knowledge.
21              THE VIDEOGRAPHER:  Do you want to go
22    off the record?
23              MR. CERNICH:  Do we need to go off?
24              We'll stop.  We'll stop.  I think he
25    had segregated the tape, so we'll stop.
```

310

```
 1        A.  Yes, that's correct as far as my
 2   understanding goes here.
 3        Q.  (BY MR. CERNICH)  And it was your
 4   understanding when you -- when you were having
 5   these -- these conversations and in this E-mail
 6   and the -- the prior days discussion with
 7   Ms. Benko and Mr. Morgheim that they were working
 8   on behalf of counsel?
 9             MS. KARIS:  Object to form.
10        A.  That date I'm not sure.
11        Q.  (BY MR. CERNICH)  Okay.  I thought --
12   earlier, I thought I heard you say and if -- if I
13   missed this correct me.
14             I'm not trying to mischaracterize his
15   testimony.
16             I think you said on May 22 you
17   learned that Ms. Benko at least was working on
18   behalf of counsel; is that correct?
19        A.  That's correct.
20        Q.  Did you ever come to learn that
21   Mr. Morgheim was working on behalf of counsel?
22        A.  Yes.
23        Q.  Okay.  Do you recall when you learned
24   that?
25        A.  On the same day.
```

1       Q.   Okay.   And that was at the same time that

2    you were requested to provide information in

3    response to the -- the request for information

4    from Congressman Markey; is that right?

5       A.   That's correct.

6       Q.   Okay.   And do you recall who else besides

7    lawyers you learned were working as part of the --

8    the legal team at that time on May 22, anyone

9    besides Mr. Morgheim, Ms. Benko, Mr. Haden, I

10   think?

11      A.   Those three.

12      Q.   Those three.   Anyone else?

13      A.   No.

14      Q.   Okay.   And who is Mr. Morgheim?

15      A.   Aside from being a BP employee, I don't

16   recall his -- his then title.

17      Q.   Okay.   Was he -- was he an engineer?

18      A.   I can't recall.

19      Q.   Okay.   Describe your -- describe what you

20   did to assist in preparing the -- the response to

21   Congressman Markey request for information.

22           MS. KARIS:   Object to form and

23   instruct the witness not the answer because it

24   calls for privileged information.

25      A.   Which it does.

```
1              MR. CERNICH:  Well, I'm not asking
2     for communications, Counsel, I'm asking what he
3     did.
4              MS. KARIS:  I'm not sure he can
5     separate those two.
6              MR. CERNICH:  For example, if he
7     gathered information, if he prepared materials,
8     none of that is -- is privileged.
9              MS. KARIS:  We would instruct the
10    witness not to answer with respect to work he did
11    in connection with Markey as this question is
12    phrased.
13             MR. CERNICH:  I just asked
14    Mr. Hill -- let's go off the record, please.
15             THE VIDEOGRAPHER:  The time is
16    6:05 p.m.  We're going off the record.
17             (Break from 6:05 p.m. to 6:07 p.m.)
18             THE VIDEOGRAPHER:  The time is
19    6:07 p.m.  We're back on the record.
20       Q.  (BY MR. CERNICH)  Mr. Hill, aside from
21    communications between yourself and counsel or
22    representatives of counsel, can you tell me what
23    you did to assist with the preparation of the
24    response to Congressman Markey's request for
25    information?
```

```
 1              MS. KARIS:  I'm sorry.  One second.
 2         Can I confer with Mr. Hill?
 3              MR. CERNICH:  Off the record, please.
 4              THE VIDEOGRAPHER:  The time is
 5    6:08 p.m.  We're off the record.
 6              (Break from 6:08 p.m. to 6:10 p.m.)
 7              THE VIDEOGRAPHER:  The time is
 8    6:10 p.m.  We're back on the record.
 9         Q.  (BY MR. CERNICH)  Okay.  If you can just
10    read him my question and answer it, that would be
11    great.
12         A.  Yeah.  Nothing else.
13         Q.  Okay.  Nothing else?
14         A.  Aside from communications between myself
15    and counsel, representatives of counsel.
16         Q.  So you didn't gather any materials?
17         A.  No, aside -- aside from communicating.
18         Q.  Well, I'm not sure if we -- that we're
19    drawing a distinction here.  Did you gather
20    materials to provide to counsel?
21              MS. KARIS:  Counsel, maybe I can
22    clarify for you, if you want.  When you say, "Did
23    you gather materials," Mr. Hill is excluding from
24    his answer to the extent he prepared any written
25    communications.  If that's what you're calling
```

 1     "materials," I want to make sure we're not

 2     speaking past each other.

 3                    MR. CERNICH:  Can we go off the

 4     record?

 5                    THE VIDEOGRAPHER:  The time is

 6     6:11 p.m.  We're off the record.

 7                    (Break from 6:11 p.m. to 6:24 p.m.)

 8                    THE VIDEOGRAPHER:  The time is

 9     6:24 p.m.  We're back on the record.

10                    MR. CERNICH:  Counsel for BP and I

11     had a discussion partially on the record,

12     partially off the record, regarding the scope of

13     the -- the attorney-client privilege.

14                    I think we've agreed that I may ask

15     certain questions regarding materials or things

16     that Mr. Hill may have done in response to

17     requests from attorneys related to the

18     Congressman -- Markey's request and I made it

19     clear that I'm not seeking the actual

20     communications with counsel, but I believe that

21     actions that were taken at -- at the behest of

22     counsel and the fact that the witness provided

23     materials or prepared materials for counsel is not

24     privileged.

25                    MS. KARIS:  The only nuance I would

```
 1    put to that is documents prepared -- I mean, at
 2    the request of counsel or those working at the
 3    request of counsel.
 4              MR. CERNICH:  Understood.
 5              MS. KARIS:  Let's take them one
 6    question at a time.  At least off the record we
 7    had an agreement.  So let's see.
 8         Q.  (BY MR. CERNICH)  Mr. Hill, did you
 9    prepare any -- any documents for counsel in
10    response to counsel or agent of counsel's request
11    for assistance related to the -- to Congressman
12    Markey's request?
13         A.  Yes, I did.
14         Q.  And you prepared some written material and
15    provided that to counsel?
16              MS. KARIS:  Object to form.
17         A.  That's correct.
18         Q.  (BY MR. CERNICH)  Okay.  Did you gather
19    any documents to provide to counsel related to
20    the -- the response to Congressman Markey's
21    information request?
22         A.  I -- I didn't solicit documents from
23    anyone else, no.
24         Q.  Did you collect any documents out of your
25    own files and provide those to counsel?
```

316

```
 1          A.  Yes.

 2          Q.  Okay.  And do you recall what documents

 3     those were?

 4          A.  Yes.

 5          Q.  Okay.  And what were those documents?

 6               MS. KARIS:  We're going to have to

 7     confer now.

 8               MR. CERNICH:  Off the record.

 9               MS. KARIS:  Sorry.

10               THE VIDEOGRAPHER:  The time is

11     6:26 p.m.  We're off the record.

12               (Break from 6:26 p.m. to 6:29 p.m.)

13               THE VIDEOGRAPHER:  The time is

14     6:29 p.m.  We're back on the record.

15          Q.  (BY MR. CERNICH)  And the question was:

16     Do you recall what documents you collected out of

17     your own files and provided to counsel?

18          A.  So I need to clarify the answer to the

19     previous question about did you collect any

20     documents after your own files.  I didn't collect.

21     I created a written document.

22          Q.  Okay.  So the only thing you provided to

23     counsel was a -- a new creation, a new document

24     that you created for the purposes of responding to

25     counsel?
```

```
 1        A.   That's correct.
 2        Q.   You didn't provide them with any modeling
 3   information or any prior material you had
 4   generated -- any prior information that -- sorry.
 5   Strike that.
 6             You didn't provide them with any
 7   other materials that -- that you had prepared in
 8   the course of the response, modeling runs or slide
 9   shows or anything like that?
10        A.   No, I didn't.
11        Q.   Okay.  Did you provide them with a list of
12   documents related to flow rate?
13        A.   I didn't provide a formal list, no.
14        Q.   Okay.  What do you mean by "formal list"?
15        A.   A -- a written list of documents.
16        Q.   Okay.  And what would be an informal list?
17        A.   I would say informal representation was
18   included in -- in discussions between me and
19   the -- and the three folk.
20        Q.   Okay.  And you may have -- you may have
21   referenced other materials in what you provided to
22   Counsel?
23             MS. KARIS:  Object to form now.
24             I would instruct the witness not to
25   answer to the extent that involves communication
```

 1    with those working at the direction of counsel.

 2                 MR. CERNICH:   Okay.  I'll accept the

 3    instruction on that.

 4         Q.  (BY MR. CERNICH)  Could we turn to

 5    Tab 186, please.

 6                 (Marked Exhibit No. 11191.)

 7         Q.  (BY MR. CERNICH)  I'm going to mark this

 8    as Exhibit 11191.  I'll note for the record that

 9    this exhibit number is out of order.

10                 This was a note that was produced

11    from your scanned custodial files.  Is that your

12    handwriting, Mr. Hill?

13         A.   No, it's not.

14         Q.   Do you know whose handwriting it is?

15         A.   No, I don't know.

16         Q.   Okay.  Do you recognize it as Ms. Saidi's

17    handwriting?

18         A.   I don't recognize the handwriting, per se.

19         Q.   Okay.  And tell me if I read this

20    correct -- correct.  It says:  "K factor

21    calculated based on 3-K method and results

22    tabulated for kill side (more accurate calculation

23    than choke side due to less complex geometry.

24    Government prediction verified.  51 to 54K."

25                 Did I read that correctly?

# Attachment 4

01-40986
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG     )    MDL NO. 2179
"DEEPWATER HORIZON" in the     )
GULF OF MEXICO, on     )    SECTION: J
APRIL 20, 2010     )
    )    JUDGE BARBIER
    )
    )    MAG. JUDGE SHUSHAN

# CONFIDENTIAL

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Kevin James Devers
## VOLUME 1

NOVEMBER 12, 2012

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1      A.  I -- I just don't have a recall that

2  the -- the efforts that I was working on during

3  that first week was referred to as Phase II.

4  It --

5      Q.  (By Mr. Lundy) Okay.

6      A.  -- may have been, must have been, but I

7  don't -- I don't recall that.

8      Q.  Okay.  Then it says:  "Stan debriefed me

9  on current status of containment plan."

10         Did I read that correctly?

11     A.  You did.

12     Q.  What did Mr. Bond discuss with you in

13  that debriefing?

14            MR. BENTSEN:  Objection, scope.

15     A.  Basically, it was a -- a description of

16  that at the end of the HORIZON riser, there were

17  efforts being undertaken to put a device over

18  that to collect the escaping hydrocarbons and

19  that he wanted another Group to look at the

20  possibilities of putting a collection device over

21  the top of the HORIZON BOP in case that need

22  became -- in -- in -- in case there was a need to

23  do that at a later time.

24     Q.  (By Mr. Lundy) Okay.  Were you asked to

25  be involved in the Project of -- of putting a

1     device over the riser and over the BOP?

2                   MR. BENTSEN:  Objection, form.

3        A.  Do you mean the HORIZON BOP here?

4        Q.  (By Mr. Lundy) Yes.

5        A.  So the answer is yes, a device over

6     the -- over -- over the HORIZON BOP.

7        Q.  All right.  Look at -- the reason I ask

8     is because you said that he talked to you about

9     the fact that there was some plans underway to

10    put a device over the -- at the end of the

11    HORIZON riser and then there was discussion about

12    putting something over the HORIZON BOP, as well.

13    And what I want to know is if you were involved

14    in -- in both Projects, putting a device over the

15    riser and putting a device over the HORIZON BOP?

16                  MR. BENTSEN:  Objection, form.

17                  MR. PINEIRO:  Objection, form.

18       A.  So at -- at that time, it was only over

19    the HORIZON BOP.  Later I was involved with

20    the -- the RITT.

21            I'm not sure if I've answered your

22    question there.

23       Q.  (By Mr. Lundy) Okay.  So was your Team

24    involved in -- in putting a device over the

25    HORIZON BOP and with the RITT?

1    A.   There were two different Teams.

2    Q.   Okay.  That's what I'm trying to clear

3  up.

4    A.   (Nodding.)

5    Q.   What Team were you involved with?

6    A.   At this point in time, it was only that

7  over the HORIZON BOP.

8    Q.   Okay.  And then another Team was formed

9  and -- to handle the RITT?

10          MR. BENTSEN:  Objection, form.

11  Ob -- objection, scope.

12    A.   Correct.

13    Q.   (By Mr. Lundy) Okay.  For the purpose of

14  the record, explain what the RITT is.

15    A.   The -- "RITT" is an acronym for Riser

16  Insertion Tube Tool.

17    Q.   Okay.  And what was its purpose?

18    A.   To collect hydrocarbons from the end of

19  the HORIZON riser.

20    Q.   Was the Team in charge of that different

21  than the Team involved with putting a -- a device

22  over the HORIZON BOP?

23    A.   It was a -- it was a different Team

24  makeup, but some of the people that were working

25  on the device over the HORIZON BOP did not

1    continue on and work on the RITT.  Others did.

2        Q.  All right.  Did you lead both Teams?

3        A.  Yes.

4            MR. BENTSEN:  Objection, form.

5        Q.  (By Mr. Lundy) Okay.  Did you lead

6    anoth -- any other Teams?

7        A.  Yes.

8        Q.  Which Teams did you lead?

9        A.  I led the Top Hat Team and then later

10   another Team that was working on what we called

11   the single-valve manifold.

12       Q.  M-h'm.  Was the Top Hat Team comprised of

13   the same members as the Team that was working on

14   putting the device over the HORIZON BOP?  Is that

15   the same Team?

16       A.  There -- not -- not totally.  There --

17   there were -- there were some people that were

18   working on the device over the HORIZON BOP that

19   did not continue on with the -- with the RITT

20   or -- or the Top Hat.

21       Q.  Okay.  The device that you -- that we're

22   discussing to -- that was contemplated to put

23   over the BOP was called what?

24            MR. BENTSEN:  Objection, scope.

25       A.  We called it the "Super Dome."

1    Q.   (By Mr. Lundy) That's the Shell Super

2    Dome?

3              MR. BENTSEN:  Objection, scope.

4    A.   Yes.

5    Q.   (By Mr. Lundy) Okay.  Describe what the

6    Shell Super Dome is.

7              MR. BENTSEN:  Objection, scope.

8    A.   It is a, h'm, steel -- round steel --

9    what visually looks like a -- a tank, that I

10   believe had previously been used by Shell for

11   pipeline repairs.  It was available.  It looked

12   the -- the size that we could set it over the

13   HORIZON BOP and, with some modifications, be able

14   to then connect it to a vessel topsides to cap --

15   to recover hydrocarbons.

16   Q.   (By Mr. Lundy) Okay.  And when you were

17   brought in by Mr. Bond, the -- the Super Dome was

18   already under consideration; is that correct?

19             MR. BENTSEN:  Objection, scope.

20   A.   It was.

21   Q.   (By Mr. Lundy) Okay.  And did you get

22   involved in detail with the Super Dome Project?

23             MR. BENTSEN:  Objection, scope.

24   A.   Yes.

25   Q.   (By Mr. Lundy) Okay.  Was it ever

01-40988
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

## *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Kevin James Devers
## VOLUME 2

NOVEMBER 13, 2012

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    the Unified Command in connection with the

2    analysis, consideration or execution of any

3    Method (as that term is defined in Topic 1.)"

4            Did I read that correctly?

5        A.  I -- I don't have it in front of me.

6        Q.  I did.

7        A.  Okay.

8        Q.  I did read it correctly.

9        A.  All right.

10           (Laughter.)

11       Q.  (By Mr. Dart) I -- we -- we can swap

12   places, if you like.

13       A.  (Nodding.)

14       Q.  And -- and you've been designated to

15   discuss that Topic as it concerns the cofferdam,

16   the RITT, and the Top Hat, correct?

17       A.  That is correct.

18       Q.  Okay.  Now, in order to -- for me not to

19   have to repeat this, when I say "any such

20   analysis," what I'm referring to is "The use of

21   any analysis, calculations, assumptions or

22   modeling of the flow rate of hydrocarbons from

23   the Macondo MC252 well undertaken by or on behalf

24   of BP or the Unified Command."  Okay?

25           So when I say "such analysis" or "this

1    analysis," that's what I'm talking about.  You --

2         A.  I'll try to remember that.

3         Q.  Okay.  First of all, what did you do to

4    prepare to respond to this Topic?

5         A.  Not much.

6         Q.  What did you do?

7         A.  I tried to recall if there were any

8    discussions that were relevant to the -- to the

9    Top Hat or the RITT or the cofferdam that was

10   flow rate-related.

11        Q.  Did you review any documents?

12        A.  I reviewed documents, but --

13        Q.  In connection with this Topic.

14        A.  I don't recall seeing any documents that

15   related to -- to this.

16        Q.  Did you speak to anyone other than

17   Counsel in preparation for this Topic?

18        A.  No.

19        Q.  So how did you prepare?  Just what you

20   could recall?

21        A.  Yes, sir.

22             MR. BENTSEN:  Objection, form.

23             THE WITNESS:  Oh.

24        A.  Ye -- ye -- yes, sir.  I don't recall

25   flow rates being a factor in the design and

```
 1    deployment of the cofferdam, the RITT, and the
 2    Top Hat.
 3         Q.  (By Mr. Dart) As a spokesman for BP, were
 4    any such analyses done in preparation for or in
 5    consideration of or execution of the cofferdam,
 6    the RITT, or the Top Hat?
 7              MR. BENTSEN:  Objection, form.
 8         A.  Not by me.  And I'm not aware of others
 9    that -- that may have.
10         Q.  (By Mr. Dart) So BP says there was no
11    consideration of flow rate in the cofferdam,
12    RITT, and Top Hat; is that right?
13              MR. BENTSEN:  Objection, form.
14         Q.  (By Mr. Dart) Is that BP's position?
15              MR. BENTSEN:  Same objection.
16         A.  From -- from a cofferdam, RITT, Top Hat,
17    I believe that to be true.
18              THE COURT REPORTER:  Three minutes.
19         Q.  (By Mr. Dart) Let me ask you one more
20    thing about the cofferdam.  This device weighed
21    98 tons, as I read it somewhere.  Is that about
22    right?
23         A.  H'm.  170 -- 85, 90 tons, thereabouts.  I
24    don't remember the exact weight.
25         Q.  It was heavy.
```

431

```
1          A.  Yes, sir, it's heavy.
2          Q.  Okay.  Now, this cofferdam was supposed
3    to be lowered down onto the end of the riser
4    where the plu -- where the oil was coming out,
5    correct?
6          A.  H'm --
7                    MR. BENTSEN:  Objection, form.
8          A.  Yes.  One -- one face of it was to go
9    over the HORIZON riser, yes.
10         Q.  (By Mr. Dart) And was any consideration
11   given to what the weight of that cofferdam would
12   have on the riser itself as 98 tons of the edge
13   of that cofferdam came down on the top of the
14   riser?
15                   MR. BENTSEN:  Objection, form.
16         A.  Maybe not directly.
17         Q.  (By Mr. Dart) How about indirectly?
18         A.  Yes.  So the -- the cofferdam had
19   so-called "mud mats" extending from the sides of
20   the cofferdam.
21         Q.  What are mud mats?
22         A.  In this case, maybe "wing" is a way to
23   describe it.  It's a -- an extension, a -- a
24   horizontal extension, steel.  And the intent was,
25   as the cofferdam bottom touched the seabed, which
```

 1    here.  Who is next?
 2                    THE VIDEOGRAPHER:  Cameron.
 3                    MS. BERTAUT:  No questions.
 4                    THE COURT REPORTER:  Fair enough.
 5                    THE VIDEOGRAPHER:  BP.
 6                    MR. BENTSEN:  Can you give us a
 7    couple of minutes?
 8                    THE COURT REPORTER:  Of course.
 9              (Recess from 11:28 a.m. to 11:33 a.m.)
10                    MR. BENTSEN:  I'm ready.
11                    THE VIDEOGRAPHER:  All set?
12              The time is 11:33 a.m.  We're back on the
13    record, beginning Tape 15.
14                       EXAMINATION
15    QUESTIONS BY MR. BENTSEN:
16       Q.  Good morning, sir.  My name's Derek
17    Bentsen, and I represent BP.  I just have a
18    couple of questions for you this morning.
19            Are you familiar with the term "open
20    collection system"?
21       A.  I am.
22       Q.  Could you briefly describe what an open
23    collection system would be within the context of
24    a -- of the Macondo response?
25                    MS. ANDRÉ:  Objection, scope.

 1          A.  So open collection, in my words, would be

 2     a collection system that collects fluids in an

 3     environment that is not sealed or contained.

 4          Q.  (By Mr. Bentsen) Okay.  Would the RITT

 5     have been an open collection system?

 6          A.  I would characterize it as that --

 7          Q.  How about --

 8          A.  -- yes.

 9          Q.  -- the cofferdam?

10          A.  Yes.

11          Q.  And the Top Hat?

12          A.  Yes.

13          Q.  All right.  And as to the limits on the

14     collection systems that I just mentioned, are

15     those limits based on the design of the -- let me

16     strike that, and we'll go through each

17     individually.

18              Is the collection limit of the RITT based

19     on the design of the RITT itself or on the

20     surface collection capacity?

21                  MR. DART:  Object to the form.

22          A.  On the surface collection capacity.

23          Q.  (By Mr. Bentsen) Is that the same with

24     the cofferdam?

25          A.  It is.

1          MR. DART:  Objection, form.

2     Q.  (By Mr. Bentsen) Is the collection limit

3  of the Top Hat based on surface collection

4  capacity?

5     A.  It is.

6     Q.  And what happens if a -- each of those

7  devices reach their collection capacity at the

8  surface?

9     A.  Then excess fluids would be discharged to

10 the environment.

11    Q.  All right.  Did the Team developing and

12 designing and implementing the RITT use flow rate

13 estimates in its design or implementation?

14    A.  We did not.

15    Q.  Same question as to the cofferdam?

16    A.  They did not.

17    Q.  Same question as to the Top Hat?

18    A.  We did not.

19    Q.  You were asked some questions just a

20 little bit ago about a letter from Mr. Suttles to

21 the Unified Area Command.  Was Mr. Suttles

22 involved in the design of the Top Hat?

23    A.  He was not on the Team, so, no.

24    Q.  All right.  And did that letter that you

25 were asked questions predate or postdate the

1       design and implementation of the Top Hat?

2           A.   It postdated the implementation of the

3       Top Hat.

4           Q.   All right.  You were asked a -- a few

5       questions about approval.  Are you aware of what

6       entity had final approval for each of the areas

7       in which you're designated to testify today?

8           A.   Referred to as UAC, Unified Area Command.

9           Q.   And did the Unified Area Command approve

10      the final installation procedure for the

11      cofferdam?

12          A.   They did.

13          Q.   Did the Unified Area Command approve the

14      final installation procedure for the RITT?

15          A.   They did.

16          Q.   Did the Unified Area Command approve the

17      final installation procedure for the Top Hat?

18          A.   They did.

19          Q.   Now, this is just in your personal

20      knowledge, Mr. Devers.  I believe you said you

21      were involved with the development of the

22      single-valve manifold capping option throughout

23      June?

24          A.   Correct.

25          Q.   And was one of the -- the objects of the

504

1   capping options being developed during that

2   period to create additional collection

3   capacities?

4      A.  To create addition -- to -- to have

5   off-takes from the device in order to create

6   additional collection capacity, yes.

7      Q.  And was that, again, limited based on the

8   collection capacity at the surface?

9            MR. DART:  Object to the form.

10     A.  Yes.

11           MR. BENTSEN:  No further questions.

12   Thank you.

13           THE VIDEOGRAPHER:  The time is

14   11:36 a.m.  We're off the record, ending Tape 15.

15        (Recess from 11:36 a.m. to 12:41 p.m.)

16           MR. LUNDY:  Okay.  We can start.

17           THE VIDEOGRAPHER:  All set?  The

18   time is 12:41 p.m.  We're back on the record,

19   beginning Tape 16.

20                REDIRECT EXAMINATION

21   QUESTIONS BY MR. LUNDY:

22     Q.  Good afternoon, Mr. Devers.  Matt Lundy

23   again, here on behalf of the PSC, and I'm going

24   to have a few questions for you this afternoon,

25   and then I think you'll be done.

# **Attachment 5**



**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

November 20, 2012

**BY ELECTRONIC MAIL**

Robert R. Gasaway
Kirkland & Ellis, LLP
655 15th Street, NW
Washington, DC  20005
robert.gasaway@kirkland.com

    Re:  MDL 2179 – Rule 30(b)(6) Deposition of BP

Dear Mr. Gasaway:

   I write because several of the individuals designated by BP to testify in response to the agreed Rule 30(b)(6) notice have been unprepared to answer questions regarding the flow rate and because BP's counsel have argued that questions regarding flow rate are outside the topics set forth in the notice.

**1.   Robert Sanders – Topic 12**

   As you know, the Rule 30(b)(6) Notice to BP that was served on August 2, 2012 included the following topic:

   12. The use of any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo MC252 well undertaken by or on behalf of BP or the Unified Command in connection with the analysis, consideration or execution of any Method (as that term is defined in Topic 1).

*See* Agreed 30(b)(6) Deposition Notice of BP Defendants at 5.

   In your September 27, 2012 letter to the Court, BP designated Robert Sanders as the corporate designee for Topic 12 as it relates to relief wells.  *See* Gasaway Letter at Att. Page 7. When asked about his preparation for testimony with respect to Topic 12, Mr. Sanders testified:

Q. (By Ms. Himmelhoch) Well, did -- including -- I won't ask about the substance of it, but other than -- let me start here: Other than communications with Counsel, did you do anything to prepare for Topic 12?

A. Other than Counsel discussion, no.

Q. Okay. So your only preparation with respect to "The use of...analysis" -- "...use of any analysis, calculations, assumptions or modeling of the flow rate..." with respect to the relief wells was information you obtained from Counsel?

A. As far as flow rates or the whole sentence of No. 12?

Q. "The use of any analysis, calculations, assumptions or modeling of the flow rate of the hydrocarbons from the...MC252..." with respect to the relief well method, your only information is that which you obtained from Counsel?

A. Yes.

Sanders Tr. at 123:19-124:13.  Moreover, Mr. Sanders testified that he "wasn't party to all of the type of calculations that were done and by whom. . . ."  *Id.* at 127:15-127:16.  Accordingly, without preparation and review of documents, Mr. Sanders *could not* be prepared to testify regarding the analyses of flow rate that were used in analyzing, considering, or executing the relief wells.

Mr. Sanders did acknowledge, however, that the relief wells were initially intended to be a dynamic kill method:

A. The "dynamic kill process" refers to establishing a fluid column, which is a hydrostatic, which equates to a pore pressure -- a pressure, together with the friction involved in that target wellbore, will generate enough pressure to overcome a flowing well.

* * *

Q. (By Ms. Himmelhoch) And that was the method that BP intended to use with the relief wells until the capping stack was put in place; is that correct?

MR. BENTSEN: Objection, form.

Objection, scope.

A. The method that was chosen was a dynamic kill for the relief wells.

*Id.* at 125:12-126:10.  Moreover, Mr. Sanders acknowledged that to design a dynamic kill you must determine the appropriate rate at which to pump the mud down the well.  He further testified:

Q. (By Ms. Himmelhoch) In your over 30 years of experience, is it your understanding that in order to identify the pump rate, you need to assume a flow rate from the well you are trying to dym -- dynamically kill?

MR. EPPEL: Objection, form.

MR. BENTSEN: Objection, form.

Objection, beyond the scope.

A.  It is one of the inputs, I believe.

*Id.* at 127:20-128:03.

In other words, Mr. Sanders acknowledged that the relief wells were intended to be a dynamic kill and that, in order to perform a dynamic kill, BP needed to perform an estimate of the flow rate. Yet, BP claimed that questions regarding those flow rate calculations were beyond the scope of the deposition notice. Instead, counsel asserted that:

> MR. BENTSEN: Bottom kill was not a designated topic in this -- in the new round of depositions. Mark Mazzella previously testified on behalf of BP on bottom kill.

*Id*. at 135:20-135:23.

Mr. Mazella was a Rule 30(b)(6) designee in response to the 2011 agreed notice to BP. He was designated to testify as follows:

> 4. Potential costs, risks, benefits and other analyses or evaluations of potential methods to cap, control, contain, shut-in and/or kill the Macondo Well after April 20, 2010.
> **RESPONSE:**
> The BP Parties designate the following individuals to testify on the indicated aspects of this topic.
> * * *
> • Mark Mazzella – kill operations (*e.g.*, top kill and static kill) and relief wells. . . .

BP Response to 2011 Deposition Notice at 2-3. When asked, Mr. Mazella was unprepared to testify regarding flow rate analyses:

> Q. Was there an estimate when -- just prior to the beginning of the momentum-kill [a.k.a. junk shot] efforts, was there an estimate of hydrocarbon flow at that time?
> MR. OCCHUIZZO:
> Objection to form.
> A. To the best of -- of my recollection, there were opinions about the flowrates, and they were pretty variable.
> Q. Do you recall what BP's opinion or opinions of the flowrate was?
> A. No, sir, I don't.
> Q. You don't recall what they were at the time?
> A. No, sir, I don't. I -- I was pretty involved in top kill.

Mazella Tr. at 51:07-51:22; *accord id.* at 112:21-113:04. Throughout his deposition, Mr. Mazella offered no testimony regarding flow rate analyses related to the relief wells.

In short, BP has never offered a Rule 30(b)(6) designee prepared to testify regarding the flow rate analyses related to planning the relief wells. Because this topic was an agreed upon element of the 2012 Deposition Notice, we ask that BP provide an adequately prepared witness and allow that witness to testify as to this topic.

## 2.      Kevin Devers – Topics 1 and 2

Mr. Devers was designated to testify regarding Topics 1 and 12 as they related to the cofferdam, RITT, and Top Hat.  Like Mr. Sanders, Mr. Devers was unprepared and BP objected to proper questions as beyond the scope of the designation.

For instance, Topic 1 included "[t]he identity of BP employees and contractors who planned, managed, and/or supervised the implementation" of the cofferdam.  *See* Agreed 30(b)(6) Deposition Notice of BP Defendants at 2.  Yet, when asked about this topic, Mr. Devers testified:

> Q. So the only two BP employees involved with the Cofferdam Project were Mr. Lynch and Mr. Bond?
> A. Those --
> MR. BENTSEN: Objection, form.
> A. Those are the two that I am aware of, yes.
> Q. (By Mr. Dart) Well, I --
> A. I don't know that that would be only -- there -- there could have been other BP employees involved with it.
> Q. Well, I'm here to find out who they were.
> A. Yes, sir.
> Q. You can't answer that on behalf of BP?
> MR. BENTSEN: Objection, form.
> A. So I -- I know that Richard Lynch and Stan Bond were involved.
> Q. (By Mr. Dart) Right. We did -- we -- we've established that. Anyone else?
> A. I don't know.

Devers Tr. at 396:01-396:21.  In addition, when discussing preparation for his deposition, he testified:

> Q. Okay. Did you talk to Members of the Team that worked on the cofferdam, for example, Farah Saidi?
> A. In preparation of this?
> Q. Yes, sir.
> A. No, I did not.

*Id.* at 278:19-278:23.

When it came to preparation regarding the flow rate, his preparation was even more sparse:

> Q. And -- and you've been designated to discuss that Topic [12] as it concerns the cofferdam, the RITT, and the Top Hat, correct?
> A. That is correct.

Q. Okay. Now, in order to -- for me not to have to repeat this, when I say "any such analysis," what I'm referring to is "The use of any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo MC252 well undertaken by or on behalf of BP or the Unified Command." Okay? So when I say "such analysis" or "this analysis," that's what I'm talking about. You --
A. I'll try to remember that.
Q. Okay. First of all, what did you do to prepare to respond to this Topic?
A. Not much.

\* \* \*

A. I tried to recall if there were any discussions that were relevant to the -- to the Top Hat or the RITT or the cofferdam that was flow rate-related.
Q. Did you review any documents?
A. I reviewed documents, but --
Q. In connection with this Topic.
A. I don't recall seeing any documents that related to -- to this.
Q. Did you speak to anyone other than Counsel in preparation for this Topic?
A. No.
Q. So how did you prepare? Just what you could recall?
A. Yes, sir.

*Id*. at 427:18-428:21.

Again, Mr. Devers was unprepared to testify regarding topics on which he had been designated.  As a result, the United States has been denied discovery into relevant and agreed upon deposition topics and we request that BP designate another witness who will be prepared to testify regarding the individuals who "planned, managed, and/or supervised" the implementation of the cofferdam and Topic 12 as it relates to the cofferdam, top hat, and RITT.

**3.      Ellen Williams – Topics 4, 9, and 16**

Dr. Williams was designated to testify regarding three topics, again all related to flow rate:

4. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction, used to predict, estimate, characterize and/or measure [using observational methods] the daily amount of hydrocarbons flowing from the Macondo Well from:
a. April 20, 2010 through July 15, 2010;
b. July 16, 2010 through September 19, 2010; and
c. September 20, 2010 through the present,
Including the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based.

\* \* \*

    9. Your efforts (including all communications, modeling, calculations and analysis) undertaken or used in connection with: the flow rate estimate of 1,000 bopd announced by Admiral Landry on April 24, 2010; the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010; the flow rate estimate announced by the Flow Rate Technical Group ("FRTG") on or about May 27, 2010 (according to National Commission Staff Working Paper #3); the flow rate estimate announced by the FRTG on or about June 10, 2010 (according to National Commission Staff Working Paper #3); the flow rate estimate announced by the FRTG on or about June 15, 2010 (according to National Commission Staff Working Paper #3); and the flow rate estimate announced on or about August 2, 2010 (according to National Commission Staff Working Paper #3, at page 17, "The Current Estimate").

                            \* \* \*

    16. All analyses, calculations, assumptions, and data cited and/or relied upon in "BP's Preliminary Response to the Flow Rate and Volume Estimates Contained in Staff Working Paper No. 3" submitted by BP to the National Oil Spill Commission on or about October 21, 2010.

*See* Gasaway Letter at Att. Page 3, 7, and 8.

    At Dr. William's deposition, however, BP refused to allow Rule 30(b)(6) testimony regarding several areas squarely within these topics.  For instance, with respect to Topic 9, BP limited Rule 30(b)(6) testimony to efforts leading up to the announcement of the estimate itself, ignoring the fact that the topic also called for testimony regarding "efforts (including all communications, modeling, calculations and analysis) undertaken or used in connection with" the estimate:

    MS. CHANG: I'm reading from No. 9.
    MS. KARIS: Okay. "Your efforts...undertaken...in connection with: the flow rate estimate..."
    MS. CHANG: "...or used in connection with..."
    16 MS. KARIS: Well, please – please let me finish.
    "Your efforts (including all communications, modeling, calculations and analysis) undertaken or used in connection with: the flow rate...1,000...announced by Admiral Landry on April 24...the flow rate estimate of 5,000...announced by Admiral Landry on April 28..."
    So it's work undertaken in connection with the 5,000 barrel estimate announced on 2 April 28th.
                        \* \* \*
    MS. CHANG: So is it your position that anything beyond or after the actual announcement is outside the scope?
    MS. KARIS: In connection with Topic 9? Yes.

                            \* \* \*

MS. CHANG: So with respect to the 1,000 barrel announcement, BP's position is that any communications, modeling, calculations, or analysis conducted after April 24th is outside the scope?

MS. KARIS: If it doesn't pertain to the announcement of that estimate, so I'm not sticking to the date. I'm sticking to the announcement of the estimate, which is how it's phrased, "announced by."

Williams Tr. at 156:11-158:12.

Further, Dr. Williams was unprepared to testify regarding Topic 16:

Q. (By Ms. Chang) What analyses were relied upon in preparing BP's preliminary response to the flow rate and volume estimates contained in "STAFF WORKING PAPER NO. 3" --

MS. KARIS: Objection --

Q. (By Ms. Chang) -- this document?

MS. KARIS: Sorry. Object to form, foundation and instruct the witness not to answer, as that calls for privileged information as acknowledged by the Court's Order.

Q. (By Ms. Chang) Prior to July 17th, 2010, what analyses were relied upon, by BP, in preparing this document, Exhibit 10338?

A. I don't know.

Q. Prior to July 17th, 2010, what calculations were relied upon, by BP, in preparing this document, Exhibit 10338?

A. I don't know.

Q. Prior to July 17th, 2010, what assumptions were relied upon by BP in preparing this document, Exhibit 10338?

A. I don't know.

Q. And prior to July 17, 2010, what data was relied upon, by BP, in preparing this document, Exhibit 10338?

A. I don't know.

* * *

Q. (By Ms. Chang) What did you do to try to determine the analyses, calculations, assumptions, and data existed prior to July 17, 2010, and were relied upon by BP in preparing this Exhibit 10338?

A. Okay. I asked Counsel whether any work done before July 17th was relied on for -- in preparing this document.

Q. All right.

*Id*. at 96:24-99:02.

Dr. Williams was similarly unprepared with respect to Topic 4:

Q. (By Ms. Chang) So when we broke, Dr. Williams, we were talking about Exhibit 10334, and you had just indicated that BP had done some analyses using

observational flow techniques that took into account Item No. 1, which is the drill pipe protruding from the end of the riser; is that correct?

A. That is my recollection.

Q. Okay. Can you describe for me what those analyses were?

A. All right. I -- if my memory is correct, I believe that when Trevor Hill described to me the eyeball estimate that I told you about earlier, if I remember correctly, I believe he accounted for the 10 percent reduction in area of the drill pipe.

Q. Okay. Are you aware of any other analyses that BP performed or had performed on its behalf that took into account the drill pipe protruding from the end of the riser?

A. No, not with respect to observational evidence.

Q. What is -- what was the basis for the 10 percent reduction?

A. I don't know specifically.

*Id.* 58:13-59:12; *accord* 61:01-62:03.

Again, BP has refused to let the witness answer as a Rule 30(b)(6) designee questions that were squarely within the topics for which they were designated and has failed to adequately prepare that witness. We request that BP produce a properly prepared witness and permit that witness to respond to questions regarding the flow rate estimates as specified in Topics 4, 9, and 16.

* * * * * * * * * * * *

Because the time period for Rule 30(b)(6) depositions is rapidly coming to a close and the Court has expressed a desire to keep Phase II discovery moving, we request that BP respond to our request on or before November 26, 2012.

Sincerely,

/s/ Sarah D. Himmelhoch

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery

cc:     Liaison & Coordinating Counsel

# Attachment 6

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:                                      (202) 879-5000                                      Facsimile:
(202) 879-5175                                                                                                    (202) 879-5200
robert.gasaway@kirkland.com                          www.kirkland.com

July 19, 2012

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

> Re:   MDL 2179 — United States Challenges to Schedule I Privilege
>         Documents; Order Regarding *In Camera* Inspection of BP's Claimed
>         Privilege in Schedule I

Dear Judge Shushan:

On July 13, 2012, the Court ruled on the United States', Halliburton's, Transocean's, and Louisiana's challenges to BP's assertion of attorney-client privilege and work product protection. (Dkt. No. 6904.)

As discussed on the recent calls of July 17 and July 19, there were several documents for which BP asserted attorney-client privilege and work-product protection, but the United States challenged only BP's assertion of work product, and the Court did not address BP's attorney-client claim. For example, for *In Camera* Submission No. 28, a document for which BP asserted attorney-client privilege, the Court stated that "BP does not argue that the document is protected by the attorney-client privilege." (Dkt. No. 6904, at 27.) BP noted its attorney-client privilege assertion for No. 28 in an attachment BP submitted to the Court and the parties via Rob Gasaway's email of June 26, 2012, at 11:42 pm CT (the "Attachments").[1]  (*See* Ex. 1, Document Showing BP's Claim of Attorney Client Privilege on No. 28, Included as Attachment to R.

---

[1]   BP noted all privileges claimed over each of the challenged documents in the three attachments it submitted to the Court on June 27, 2012: BP Responses to US-LA AC Challenges (documents for which the United States and Louisiana had challenged attorney-client privilege); BP Responses to US-LA WP Challenges (documents for which the United States and Louisiana had challenged work product protection); and BP Responses to HESI-TO Challenges (documents for which Halliburton and Transocean had challenged attorney-client privilege or work product protection). BP's attorney-client privilege and work product protection assertions are included here as Exhibit 1.

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 2

Gasaway's Email on June 26, 2012). However, considering the large size of the parties' submissions and attachments, the Court may not have noticed all the privilege assertions in this attachment, thus explaining the Court's statement that "BP does not argue that the document is protected by the attorney-client privilege." (Dkt. No. 6904, at 27.) On this basis, the Court ordered BP to produce No. 28, although the attorney-client privilege assertion had not been addressed.

Similarly, for a number of other documents for which BP asserted both attorney-client privilege and work-product protection, but the United States challenged only work product, the Court did not address the attorney-client privilege issue, and ordered that at least some[2] of the documents be produced. The documents at issue are Nos. 26, 28, 30, 45, 46, 51, and 54. Citing Document No. 28, the United States asserts in its letter of July 18: "This appears to be an isolated issue related to this one document." Respectfully, this is speculative. The fact that the Court did not state that BP did not assert a privilege claim does not mean that the Court considered such a claim. For each document, only the Court knows whether it considered (1) the *challenges* asserted by the U.S.; or (2) also all of BP's privilege *assertions*, which were attached to Rob Gasaway's email of June 26, 2012, at 11:42 pm CT (and are attached hereto as Exhibit 1).

Given the procedural history of the representative privilege challenges, there is a significant difference between the United States' challenges to representative documents and BP's assertions. The Court's May 11, 2012 Order limited the United States to 50 representative challenge documents for attorney-client privilege, and 50 for work product production. (Dkt. No. 6510, at 4.) On June 16, 2012 the United States provided with its brief a list of 81 representative documents, and broke those documents into two non-overlapping lists — representative challenges to BP's claims of attorney-client privilege and representative challenges to BP's claims of work-product protection. (*See* Exhibit 2, Document Listing Representative Challenges by the United States.) The United States could have covered its bases by challenging both attorney-client privilege and work-product protection for each document—which would have limited the number of BP documents at issue to approximately 50—but the United States chose not to. Under the alternative strategy the United States adopted, it covered a significantly greater range of BP documents (81 instead of 50), but could not challenge both attorney-client privilege and work-product protection for each sample document, given the limits of the May 11, 2012 Order.

---

[2]   It is not always clear.  *Compare* Order at 29 ("Document 51 is not protected from disclosure.") *with id.* ("Document 54 is not protected from disclosure by the work-product doctrine.") *and* Order at 26 ("For the reasons discussed with Document 25, Document 46 is not protected as work-product.").

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 3


On the parties' July 18 call, the United States claimed for the first time that for each of the 81 representative documents, the United States on June 16 actually challenged all privileges asserted by BP, even where the United States expressly challenged only work product for a particular document.  For example, Exhibit 2 shows that on June 16 the United States only expressly challenged BP's work-product assertion for Doc. No. 28, although the United States now claims it was contemporaneously challenging attorney-client privilege for Doc. No. 28 and every other document on the list.  BP disagrees with the United States' position.  If the United States on June 16 challenged attorney-client privilege even where it only expressly challenged work-product protection, this would have meant that the United States exceeded the Court's Order by challenging attorney-client privilege for 81 representative documents, and by challenging work product for 81 representative documents.  But the Court's Order only permitted 50 representative challenges for work product, and 50 for attorney-client privilege.  The United States should not be permitted to have more representative challenges than the Court's Order allowed.

In any event, the United States indicated on the call this morning that it does challenge BP's assertion of attorney-client privilege with respect to Doc. No. 28, and believes the balance of the documents should be produced.  Assuming *arguendo* that the Court considers the submission of representative attorney-client challenges to these documents to be appropriate as part of the pre-extrapolation process, BP requests that the Court proceed to the merits of the claims and rule that documents 26, 28, 30, 45, 46, 51, and 54 are attorney-client privileged.[3]  (BP suggests that the United States be permitted to file a response on July 24, 2012, and that BP be permitted to reply on July 27.)

## I.     Documents for Which BP Claimed Attorney-Client Privilege But The U.S. Did Not Challenge Attorney-Client Privilege

### A.     Documents Relating to Congressional Responses

The following are documents relating to Congressional responses for which:  (1) BP claimed attorney-client privilege and work-product protection (as set forth in one of BP's Attachments submitted with Mr. Gasaway's June 26 email, which is attached as Exhibit 1 hereto); (2) the United States challenged only work-product protection (Exhibit 2); and (3) the Court ruled only on the work-product challenge and did not address the claim of attorney-client privilege.

---

[3] In that event, BP also requests that the Court rule that Document No. 11 is protected by the work-product doctrine.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 4

- **Document No. 30** – May 22, 2010 email from Jeffrey Morgheim to Trevor Hill. (Morgheim's role as the primary person tasked to assist the lawyers working on congressional responses is discussed below.) The redacted portion of this document contains a request from Morgheim, which he again indicates is being made "at the direction of counsel for BP" as part of the process of gathering information relevant to the May 24 response to Congressman Markey. This communication is covered by the attorney-client privilege.

- **Document No. 46** – May 22, 2010 email chain between Morgheim and Hill. The initial email in this chain is the same as Document No. 30. Following the request that Morgheim made on behalf of counsel in connection with the Markey response, Hill provided information for Morgheim to evaluate for potential use in constructing the response to Congressman Markey.

- **Document No. 26** – Hard copy document from David Rainey's custodial files. The redacted portion of this document is on the first page; it contains Rainey's draft answer to Request No. 4 in Congressman Markey's May 14 request. Rainey drafted this answer after Morgheim emailed him for assistance with the Markey response; in the email to Rainey, Morgheim explicitly stated that he was working "at the direction of counsel for BP." Rainey sent his draft answers, prepared following the request from counsel transmitted by Morgheim, to Rainey, Kirkland & Ellis attorney Brian Kavanaugh, BP attorney Frank Monago, and BP employee Doug Suttles. Rainey's draft answers were then forwarded to other attorneys working on the May 24 response to Congressman Markey.

- **Document No. 45** – May 25, 2010 email chain. In the initial email in the chain, in connection with preparing a response to Congressman Cassidy, Morgheim wrote to Mike Mason, with a copy to Kirkland & Ellis attorney Mark Nomellini, with the subject line: "ATTORNEY-CLIENT PRIVELEDGE [sic] – Urgent: Congressional response" and a request "[o]n direction of counsel." Mason then forwarded the request Morgheim made on behalf of BP's counsel to Hill.

- **Document No. 28** – June 22, 2010 email chain. A WilmerHale attorney, Tonya Robinson, emailed a draft letter regarding Representative Markey's release of two pages related to worst-case discharge calculations that were attachments to BP's May 24 response to Congressman Markey. Robinson sent the draft letter for comment to a BP attorney, Kevin Bailey, and three BP non-attorneys, Elizabeth Reicherts, Morgheim, and Kathleen Lucas, all of whom were involved in the process of preparing congressional responses. The email also copied two other

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 5

> WilmerHale attorneys. The chain includes responses from Lucas and Bailey providing comments on the draft letter. In the final email, Morgheim forwarded the email chain and the draft response to another BP employee, Rainey, and requested that Rainey also review the letter. The drafting and review of a letter to Congress by and at the direction of counsel falls within the protections of the attorney-client privilege.

Below, in summary form, are key points regarding why Document Nos. 26, 28, 30, 45, and 46 are attorney-client privileged (assuming again that the Court does not adopt BP's argument that the U.S. was limited to 50 representative challenges for attorney-client privilege):

- During the relevant period in which these documents were created, oil was still flowing from the damaged Macondo well. BP's energies were focused primarily on efforts to cap the well and contain the spill. Engineers with relevant expertise, along with 40,000 other BP employees and personnel from the government and other companies in the oil industry, were working around-the-clock in that effort. At the same time, BP was receiving a steady stream of requests for information from members of Congress and other public officials. In May 2010 alone, BP received more than 70 requests from members or committees of Congress, and the Company was already facing dozens of lawsuits and many government investigations.

- BP retained several law firms, including WilmerHale and Kirkland & Ellis, shortly after the incident to assist in various respects with responding to these many lawsuits, investigations, and information requests. Congressional requests received by the company in this time period were handled through a process organized and directed by lawyers in which information was gathered from personnel within the company. Congressional responses were then drafted in a collaborative process led by WilmerHale and involving both in-house and external lawyers along with appropriate BP personnel. Although not every communication regarding the effort to collect information and to respond to requests involved the direct participation of an attorney, the overall process was a lawyer-directed effort seeking to ensure that BP received appropriate legal advice with respect to the requests and the company's responses.

- Given the number and urgency of the requests BP received, lawyers at and for the company had to rely on non-attorney BP employees, who were familiar with BP's operations and personnel, to facilitate the collection of potentially responsive information. Communications by and to these individuals as part of that process were made for the purpose of securing or providing legal advice and are covered by the

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 6

attorney-client privilege, just as they would be if made directly by or to an attorney.[4] Most relevant to the documents discussed herein, Jeffrey Morgheim was the primary non-attorney who was tasked to work with counsel in connection with congressional responses. At the time, Morgheim was BP's Director of Climate Change and had no independent reason to participate in the effort aside from his efforts to assist the attorneys coordinating these responses, including the May 24 letter to Congressman Markey that BP sent in response to a May 14 request from the Congressman.

- In his role as an agent of the attorneys, Morgheim contacted BP employees who may have had relevant information to respond to Markey's May 14 request, including David Rainey and Trevor Hill. Rainey was at the time BP vice president for Gulf of Mexico Exploration and BP's Deputy Incident Commander within the Unified Command, and Hill was heavily involved in efforts to address the spill; thus, Morgheim's participation helped to ensure that responding to Congress did not interfere with BP's primary mission of stopping the leak and containing the spill.

## B.    Document Nos. 51 and 54

The documents listed in Section A above relate to Congressional responses. There are two non-Congressional documents (Document Nos. 51 and 54) for which:  (1) BP claimed attorney-client privilege and work product protection (*see* Exhibit 1); (2) the United States

---

[4]    *See, e.g.*, *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (given the "complexities of modern existence," attorney-client privilege "'must include all the persons who act as the attorney's agents'"). *See also, e.g.*, *Gucci America, Inc., v. Guess?, Inc.*, 271 F.R.D. 58, 70-74 (S.D.N.Y. 2010) (discussing principles and collecting cases regarding roles of in-house counsel, outside counsel, and non-attorney agents for purposes of attorney-client privilege); *id.* at 71 (privilege applied where employee was "deputized to gather information from [client] employees to assist in the litigation"); *Ferko v. National Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 134 (E.D. Tex. 2003) (when an attorney "'direct[s] the client . . . to tell his story in the first instance to an [agent, in this case, an accountant] engaged by the lawyer . . . so that the lawyer may better give legal advice, communications by the client reasonably related to th[ose] purpose[s] ought to fall within the privilege.'" (quoting *Kovel*, 296 F.2d at 922 (certain alterations in original) (internal quotation and citation omitted)).

Even where a document or information is itself not privileged, BP is entitled to protect from disclosure the fact that a particular piece of information or document was shared with the attorney for the purpose of seeking legal advice or collected by one client-representative from another for the same reason. *See, e.g., United States v. Hankins*, 631 F.2d 360, 364-65 (5th Cir. 1980) (attorney-client privilege prevented disclosure of what documents client sent lawyer for examination, even where no privilege was claimed over the documents themselves).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 7

challenged only work-product protection (*see* Exhibit 2); and (3) the Court ruled only on the work-product challenge and did not address the claim of attorney-client privilege.

- **Document No. 51** - September 21, 2010 draft of a presentation by Doug Suttles to the National Commission. Document No. 51A is an email from a BP attorney, Stephen Palmer, circulating an earlier draft version of the presentation to attorneys from BP, WilmerHale, and Kirkland & Ellis. Mr. Palmer states: "I am attaching the draft written statement for Doug's appearance before the Presidential Commission . . . ."

- **Document No. 54** - BP sought approval from the Coast Guard for the Top Hat procedure and another option. Document No. 54 is a draft of the letter which was prepared by BP attorney Karen Westall. The Court ruled that "Document 54 is not protected from disclosure by the work-product doctrine." (July 13 Order at 29.)

When BP employees were required to make official responses to the many inquiries from other government entities, such as the U.S. Coast Guard or the Presidential Commission, they sometimes sought legal advice from both BP attorneys and outside counsel. BP attorneys and outside counsel were intimately involved in drafting and revising such submissions. Such drafts, as in the case of Document Nos. 51 and 54, are covered by the attorney-client privilege under applicable law.[5]

## II.     Document For Which BP Claimed Work-Product Protection But the United States Did Not Challenge Work Product

The Court has ruled that the "Flow Rate Team" was an attorney-directed project that began on July 18, 2010, and that it was an "attorney-client privileged investigation" entitled to work product protection. (Dkt. No. 6904, at 14-24.)

---

[5] *See, e.g.*, July 13, 2012 Order, (Dkt. No. 6904), at 27 ("An attorney's editorial changes to such documents" intended for eventual public disclosure "should be privilege protected"); *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789, 802-803 (E.D. La. 2007) (noting that, in the context of responding to warning notices from a Government regulator, attorney-client privilege covers "(1) the attorney's drafts of those responses, (2) communications in which the attorney sought information from corporate employees in her efforts to prepare those drafts, and (3) the responsive comments solicited from the corporate employees on the drafts. Following the trigger of the warning letter, every communication to and from the attorney and among corporate employees that were primarily in furtherance of legal assistance on that matter were considered privileged, *even if the initial draft of the response was prepared for the lawyer by a non-lawyer*.") (emphasis added) (footnotes omitted).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 8

The following is a document for which:  (1) BP claimed attorney-client privilege and work product protection (*see* Exhibit 1); (2) the United States challenged only attorney-client privilege (*see* Exhibit 2); and (3) the Court ruled only on the attorney-client privilege challenge, but not on BP's assertion of work product protection.

- **Document No. 11** - Document No. 11A is an October 15, 2010, email from Tim Lockett to Kurt Mix, copying BP attorney Stephen Palmer, and BP non-attorneys Trevor Hill and Farah Saidi. Hill and Saidi were initial members of the privileged flow rate estimation team, and Lockett joined later. The email contains "[p]rivileged and confidential" in the subject line, and Lockett asked Mix for information about top kill mud for the flow rate work he was performing with Hill and Saidi. Document No. 11B includes a reply to 11A from Mix, indicating that Daryl Patterson and Bonsall Wilton may have relevant information. It demonstrates that a meeting between these individuals was scheduled for that day. Document No. 11 is an October 18-20, 2010, email string beginning with an email from Lockett to Mix, including Patterson and Wilton, and copying Saidi, Hill, and Palmer, concerning Top Kill mud. It references a previous discussion. It includes a specific request for information from Add Energy. On October 18, 2010, Mix emailed Ole B. Rygg of Add Energy (a third-party contractor for BP in the effort to control the well), highlighting Lockett's specific request for information from Add Energy. On October 20, Rygg replied.  BP asserted work product, but the U.S. did not challenge BP's work product assertion, and the Court did not address BP's work product assertion in its ruling.

Assuming *arguendo* that a work-product protection challenge to this document is properly included in the representative sample, the work-product assertion should be sustained:

- In not adopting BP's attorney-client privilege assertion, the Court ruled that any privilege was waived because the document was shared with Add Energy, a third-party contractor to BP.  (Dkt. No. 6904, at 22.)  However, unlike the attorney-client privilege, the work product doctrine is not waived by virtue of a document being shared with a third party:  "[M]ore than once, the Fifth Circuit has held that the mere voluntary disclosure of work-product to a third person is insufficient in itself to waive the work product privilege." *PBC Mgmt., Inc. v. Roberson*, No. 10-798, 2010 WL 4553507, at *2 n.2 (E.D. La. Oct. 28, 2010) (citing *In re Grand Jury Proceedings*, 43 F.3d 966, 970 (5th Cir. 1994); *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 9

- Indeed, the Court found that the United States has not waived work product protection for certain communications with third-party members of the FRTG plume team (not all of whom, to BP's knowledge, were then retained experts) and over which the United States claimed work-product protection. *See, e.g.*, Dkt. No. 6905, at 2 (discussing NOA023-001598). The Court's Order described NOA023-001598 as an email string "concerning a lawyer's request for a category of information." Similarly, Document No. 11 is a request for a category of information for use in preparation for litigation by Tim Lockett, an internal BP expert, who copies two attorneys. That request is then forwarded to a third-party contractor for BP.

\*       \*       \*

For the foregoing reasons, we respectfully request that the Court find that BP does not have to produce representative documents 11, 26, 28, 30, 45, 46, 51, and 54.

We would be pleased to answer any questions the Court has about this letter at the Court's convenience.

Sincerely,

Robert R. Gasaway

Exhibits

cc (via electronic mail):

| | |
|---|---|
| R. Michael Underhill | Thomas A. Benson |
| Steven O'Rourke | Joel M. Gross |
| Sarah D. Himmelhoch | Allison B. Rumsey |
| Scott M. Cernich | Don K. Haycraft |
| A. Nathaniel Chakeres | Plaintiffs' Liaison Counsel |
| Bethany Engel | Defense Liaison Counsel (dsc2179@liskow.com) |

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
July 19, 2012
Page 10

# Attachment 7

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig        MDL NO. 2179
      "Deepwater Horizon" in the Gulf
      of Mexico, on April 20, 2010        SECTION J

Applies to: *All Cases*        JUDGE BARBIER
       MAGISTRATE JUDGE SHUSHAN

## ORDER

### [Regarding BP's Request for Reconsideration (Rec. doc. 7009)]

On July 13, 2012, an order was issued regarding the *in camera* inspection of BP's claim of privilege for Schedule I. Rec. doc. 6904. BP requests reconsideration of this order for certain documents. The U.S. and BP submitted letter briefs. Rec. docs. 7009 to 7011.

A.    <u>Document Nos. 26, 28, 30, 45, 46, 51 and 54</u>.

For the reasons presented by BP, these documents are protected from disclosure by the attorney-client privilege.

B.    <u>Document No. 11</u>.

For the reasons presented by BP, the document is entitled to work–product protection.

Any appeal of the July 13, 2012 order (Rec. doc. 6904) and the instant order must be filed by the close of business on **Friday, August 3, 2012.**

New Orleans, Louisiana, this 30th day of July, 2012.

**SALLY SHUSHAN**
**United States Magistrate Judge**