**KIRKLAND & ELLIS LLP**
AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

| Robert R. Gasaway | | |
|---|---|---|
| To Call Writer Directly: | (202) 879-5000 | Facsimile: |
| (202) 879-5175 | | (202) 879-5200 |
| robert.gasaway@kirkland.com | www.kirkland.com | |

January 21, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

        Re:    MDL 2179 — The United States' Inadequate Preparation of Certain Rule 30(b)(6) Witnesses

Dear Judge Shushan:

      BP writes in brief reply to the United States' January 16, 2013 letter regarding its Rule 30(b)(6) witnesses.

      The United States begins its letter brief on this ordinary discovery item by criticizing in somewhat grandiose fashion BP's routine, legitimate choice, upheld over the United States' challenge by this Court (Rec. Doc. 6904), to perform its flow estimation work to date as privileged litigation work product.

      The United States fails to mention, of course, that its own (and opposite) choice to rush inflated estimates to press has allowed many members of the public to become confused as to the true flow estimation facts. In the upcoming Phase 2 trial, BP's Quantification experts will demonstrate through written reports and deposition testimony how the United States' published flow estimates significantly overstate the amount of oil released from the *Deepwater Horizon*.

      Should the United States submit new estimates containing similar analytical errors, BP's Quantification experts will also demonstrate these new estimates are unreliable and inaccurate for similar, or perhaps for entirely new, reasons.

      Until then, BP is entitled to adequate discovery to understand how and why the United States reached the inflated flow estimates that have been shared with the public to date.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 21, 2013
Page 2

**Dr. Ratzel**

The United States, in its discretion, designated Dr. Ratzel for twenty-three topics from its agreed Rule 30(b)(6) notice. Now, the United States has been forced to acknowledge the consequences of expecting one Rule 30(b)(6) witness to adequately testify on 23 complex and often technical topics.

BP appreciates the United States' offer of additional discovery via interrogatory and believes this is often an appropriate way to proceed given the juncture this case has reached. (*See* S. Himmelhoch Jan. 16, 2013 Ltr., at 3 ("Letter").) But the United States has unsuccessfully attempted to limit the scope of these interrogatory responses to just two narrow subjects — the conversion of the mass flow rate to stock tank barrels and roughness-related friction factors.

In fact, however, Dr. Ratzel was inadequately prepared, and failed, to provide sufficient testimony on all of the areas specified in BP's January 7, 2013 letter, and that letter, together with the portions of the deposition transcript cited, demonstrates this inadequate preparation. Accordingly, the parties to this litigation, including BP, deserve discovery into all of the areas Dr. Ratzel left unaddressed — via an adequately prepared United States witness.

In an effort to reach closure on these issues, and in response to the United States' acknowledgment of the inadequacies in Dr. Ratzel's testimony, we have further focused the request for testimony presented in our January 7 letter. We thus request that the Court direct the United States to provide interrogatory answers that addresses the six interrogatories, covering four substantive areas, provided in Attachment A to this letter, each of which relates to key information critical to understanding the calculations behind the United States' "ground truth" estimate presented in the *DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident* ("Flow Analysis Report"). Significantly, each of these four areas of inquiry relates to a line of questions posed to Dr. Ratzel at his deposition that he was unable to adequately answer.

BP and the other parties to this case are now entitled to answers to these key questions that Dr. Ratzel was unable to provide the first time around.

    **Interrogatories**

1. Describe how each of the Tri-Lab Teams converted mass flow of hydrocarbons to stock tank barrels of oil for the flow rates reported in the *DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident*, including any conversion factors that were used and how such conversion factors were determined. **(Topics 61, 68, 82, 88.)**

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 21, 2013
Page 3

2. Explain whether a roughness-related friction factor is incorporated into the K factors attributed to each Tri-Lab Teams in Table 3 on page 24 of the report *DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident*. If a roughness-related friction factor is incorporated into the K factors, please identify the roughness-related friction factor that was used by each Tri-Lab Team for each instance in which such a factor was included in the K factors. (**Topics 61, 68, 82, 88**.)

3. Identify the gas-oil ratio that each Tri-Lab Team used for the flow rates reported in the DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident. (**Topics 61, 68, 82, 88**.)

4. Describe the parameter variation analyses (formal or informal) identified by Dr. Ratzel in his Rule 30(b)(6) deposition that were performed to arrive at an uncertainty estimate for the 53,000 barrels per day capping stack estimate. Please include a description of the parameters that were varied and how each was varied. (**Topics 61, 62, 68, 69, 82, 83**.)

5. For any analyses identified in Question 4, identify all individuals who participated in the analysis. (**Topics 61, 62, 68, 69, 82, 83**.)

6. Identify which non-attorneys assisted in the preparation of the answers to questions 1-5, and the documents that were consulted in preparing such answers.

*Interrogatory 1 (Formation Volume Factor)*. The United States has already agreed to an interrogatory response "regarding the use of a 'formation volume factor' or equivalent analysis by the Tri-Lab Teams." (Letter at 3.) As the Court can appreciate, this information is important because oil has a different volume under the pressure and temperature conditions from which it exited the wellhead than it does at surface conditions (a stock tank barrel). This conversion or "formation volume factor" is essential to understanding the United States' estimate of how much oil flowed from the wellhead, and, in turn, how much oil might have entered the environment.

Despite its offer of an interrogatory answer, the United States seems to argue that Dr. Ratzel's testimony together with the Flow Analysis Report already provide this information. (Letter at 2.) They do not.

The appendices corresponding to both the Los Alamos and Lawrence Livermore teams list "black oil tables" which provide various conversion factors to be used at various temperatures — one table for oil at 40°F, another for oil at 80°F, and so on for 120°F, 160°F, 200°F, and 240°F. (*See* Letter, Ex. 4, Appendix B (DSE031-001854 - 59), Appendix D (DSE031-001870) (incorporating tables from Appendix B).) Both the Los Alamos and Lawrence Livermore teams performed their analysis using a temperature of 180°F, however, for

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 21, 2013
Page 4

which no black oil table is listed.  (*Id.* at Ex. 4 (DSE031-001818, DSE031-001822).)  This means the teams likely interpolated between two tables to locate an appropriate formation volume factor.  But because neither lab "showed its work," in this respect, BP cannot verify what factors two of the Tri Labs Team used for its formation volume factor without more information not contained in the report.

Because Dr. Ratzel was not attuned to this fact, counsel for BP did not inquire further, and instead moved to address one of the many other areas of inquiry from among the 23 topics for which Dr. Ratzel was designated.

BP appreciates the United States offer to supply this information via interrogatory response.

*Interrogatory 2 (Roughness Related Friction Factor)*.  Dr. Ratzel testified regarding a specific table in his report (Table 3, page 24), but that table contains figures that allegedly incorporated an unspecified friction factor.  (*Id.* at Ex. 4 (DSE031-001817).)  Dr. Ratzel was unable to separate the friction factor used from the figures displayed in the table and was also unable to direct BP to a location where those numbers might be located.  The friction factors may have a sizeable (and perhaps significant) effect on the flow estimate, and BP appreciates the United States' offer of an interrogatory regarding "roughness related friction factors applied by each laboratory."

*Interrogatory 3 (Gas-to-Oil Ratio)*.  The United States again claims that citing the "black oil tables" in the Appendices to the Flow Analysis Report addressed BP's questions or that BP should have followed up.

The problem with the United States' response, as described above, is that the report does not include a table that provides conversations at the temperature that the Labs actually used.  It is therefore impossible to confirm the work from Los Alamos and Lawrence Livermore scientists without more information than the report supplies.  This is just as true of formation volume factor (for which the United States offered an interrogatory response) as it is for the gas-to-oil ratio (for which the United States should have also offered an interrogatory response).

Because Dr. Ratzel could not provide the answer to this question, and because BP cannot discover the discrete, limited piece of information through reference to the Flow Analysis Report, BP respectfully requests that the Court direct the United States to answer proposed Interrogatory 3.

*Interrogatories 4 and 5 (Sensitivity Analysis)*.  Dr. Ratzel was the United States' witness for the uncertainty estimates performed by the Tri-Lab Teams.  In addition to 17 other topics, Dr. Ratzel was designated as the United States' Rule 30(b)(6) expert on the "methods, calculations,

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 21, 2013
Page 5

analyses, estimates, factors, data and assumptions considered or employed by the [Los Alamos, Lawrence Livermore, and Sandia, teams] or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well." (Topics 61, 68, 82.) He was also designated regarding "all communications involving the [Los Alamos, Lawrence Livermore, and Sandia teams] or any of its members regarding the difficulty, quality, accuracy or uncertainty associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well." (Topics 62, 69, 83.) Additionally, Dr. Ratzel was designated with respect to the preparation of the Flow Analysis Report, which contained an uncertainty bound of plus or minus 10 percent. (Letter, Ex. 4, (DSE031-001806).)

In his role as Rule 30(b)(6) witness for uncertainty analysis, Dr. Ratzel testified that the Tri-Lab Teams did not perform an uncertainty analysis, but instead performed a sensitivity analysis, where they "varied the parameters and we assessed the effects of those parameters…." (*Id.* at 58:11-19; *see also* 644:14-23.) The varying of certain parameters was then "factored into our decision to come up with a plus or minus 10 percent [uncertainty] number." (*Id.* at 53:9-22; *see also* 651:13-24.)

As the United States' letter admits, Dr. Ratzel was unable to explain the sensitivity studies performed. (*See* Letter at 3.) Dr. Ratzel was unable to identify all the parameters that were varied as part of the sensitivity analysis, nor could he point to the data underlying the Tri-Lab Teams' choice of a 10 percent uncertainty. For instance, Dr. Ratzel did not know whether temperature was varied — and therefore necessarily did not know where BP might find the results of that variation. (Ratzel Dep. Tr. 646:18-647:10.) And he did not know whether density was varied — and so would not know the location of any potential results. (*Id.* at 647:17-22.) Other than pressure, Dr. Ratzel could not provide adequate testimony identifying the parameters the labs varied as part of their sensitivity analysis.

> Q.   Do you know what parameters were varied as part of the sensitivity analysis besides pressure?
> MR. CERNICH: Objection; form.
> A.   I do not know the full -- I do not know the extent of sensitivity -- a parameter est- -- parameter variation performed by the lab. I just know that we always asked to get information around certain nominals. Pressure was one nominal that I was interested in. The other one -- and that was principally where I was asking for sensitivity.
> (*Id.* at 648:2-14).

More still, Dr. Ratzel could neither describe nor point to the results of this sensitivity analysis. Dr. Ratzel testified that a sensitivity analysis was performed by him and other Tri-Labs Team scientists (Ratzel Dep. Tr. 648:18-649:11), but he was not aware of any document

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 21, 2013
Page 6

describing the analysis done, (*id.* at 652:11-653:14). Dr. Ratzel's testimony, in essence, was that the unspecified sensitivity analysis contributed to the 10 percent number, (*see, e.g.*, Ratzel Dep. Tr. 53:5-22). Without more, BP and the other parties have no reasonable way to evaluate the Tri-Labs sensitivity analysis or the plus or minus 10 percent uncertainty figure that was included in the Flow Analysis Report and was the subject of Topics 61, 62, 68, 69, 82, 83, 88 of the United States' agreed Rule 30(b)(6) deposition notice.

The United States attempts to place this missing testimony in "context" by citing other portions of Dr. Ratzel's testimony. (Letter at 3.) But the testimony the United States cites does little or nothing to explain the results of the sensitivity analysis or how that alleged analysis contributed to the 10 percent uncertainty estimate.

Nor do the United States' citations to Dr. Hunter's deposition shed light on the Tri-Lab Teams' work. (*See* Letter at 4.) As an initial matter, Dr. Hunter was not designated to testify regarding the uncertainty estimates of the Tri-Lab Teams or implied in the Flow Analysis Report. (*See* Letter, Ex. 2.) Dr. Ratzel was.

As a result, and understandably, the testimony the United States claims provides BP with the information sought bears no relevance to the Tri-Lab Teams' sensitivity analysis conducted on the "ground truth" Flow Analysis Report. (*See* Letter at 4, citing Hunter Dep. Tr. 154:12-161:12 (uncertainty analysis in broad concept); 185:01-190:11 ("uncertainty" about the well bore, not an uncertainty or sensitivity analysis); 229:01-230:11 (again, "uncertainty" about the accuracy of data in the context of a May 2010 estimate using visual evidence, not about a sensitivity analysis, and, in any event, not the Flow Analysis Report); 308:08-316:16 (although this cited text eventually mentions the Flow Analysis Report, nothing in the transcript sheds any light on the Tri-Lab Teams' sensitivity analysis — which is understandable as Dr. Hunter was not designated on that subject).)

Additional deposition time is appropriate in this instance, so that BP and other parties can fully explore the sensitivity analysis performed. But BP wishes to find a practical solution to this missing testimony, and instead, respectfully requests the Court direct the United States to answer Interrogatories 4 and 5.

### Landry

Regarding Admiral Landry, the United States has "interpreted the negotiated deposition topics in an unreasonably narrow manner" — despite its claim to have issues "different in kind" from those it raised regarding BP's witnesses. (*See* Letter at 1.)

**KIRKLAND & ELLIS LLP**

The Honorable Sally Shushan
January 21, 2013
Page 7

The United States designated Admiral Landry on Topics 34 and 35, specifically on the "Announcement." (Letter, Ex. 2.) The United States now claims that meant "the announcements and her decisions regarding how, when and where to make them." (Letter at 5.)

Whatever this *post hoc* definition might include, "the announcement" as originally drafted would naturally include the factual basis of the announcement — the information considered, information rejected, and the non-privileged aspects of any deliberations leading up to the announcement. This deliberative process is entirely separate from any "modeling, calculations, and analysis" that the United States' scientists might have conducted and for which Charlie Henry was designated.

To be sure, Admiral Landry testified, based on her recollection, where she, personally, received the information that she announced, and BP agrees with the United States that "Admiral Landry was [] the best person to describe where she received the information for her announcements." (Letter at 11.)

But the parties did not negotiate a Rule 30(b)(6) notice to Admiral Landry, nor does the agreed notice to the United States request testimony on Admiral Landry's personal knowledge. Under the plain terms of the negotiated Rule 30(b)(6) notice to the United States, BP is entitled to know what information formed the factual basis of the United States' announcements of the 1,000 bpd and 5,000 bpd estimates.

*1,000 bpd Estimate*. The agreed deposition notice to the United States includes "all communications … leading to the flow rate estimate of 1,000." Both Admiral Landry, who was designated to know this information, and Charlie Henry, who was not, testified that "BP" is the source of the 1,000 bpd estimate. But "BP" is an ambiguous term. It is a large organization with many constituent organizations and individuals. Neither Rule 30(b)(6) witness could provide any testimony about the source of the 1,000 bpd estimate other than the non-specific, ambiguous (and accusatory) testimony regarding "BP."

The United States now cites Charlie Henry's testimony in support of its claim that the United States has provided all the testimony it reasonably can regarding its announced 1,000 bpd estimate. (*See* Letter at 7.) To be clear, Mr. Henry's testimony, taken together with the designated testimony from Admiral Landry, is that the basis for the 1,000 bpd estimate is Captain Hanzlik. (Henry Dep. Tr. 25:13-29:14; Landry Dep. Tr. 109:11-15, 111:9-13, 26:4-12.) According to this testimony, Captain Hanzlik received the 1,000 bpd estimate from "BP."

But supposedly Captain Hanzlik and the United States — through its Rule 30(b)(6) designees, Mr. Henry and Admiral Landry — do not know who at BP provided this information, (Landry Dep. Tr. 31:23-25; Henry Dep. Tr. 27:5-11), when it was provided, (Landry 36:9-12),

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 21, 2013
Page 8

how it was provided, (Henry 27:12-18), what information was provided, (Henry 28:25-29:10), or any other information to support the number, (Landry 113:8-17; Henry 28:9-13).

In light of the fact that Charlie Henry was not the appropriate designee to offer this testimony regarding the factual basis for the announcement (Mr. Henry was the designee for "science" for Topics 34 and 35), and that Admiral Landry was unable to offer the testimony that she was bound to provide, BP suggests, as an efficient solution to this missing Rule 30(b)(6) testimony, that the United States answer a single interrogatory that would provide the information. (*See* Attachment A.) In addition, and in light of the subsequent United States correspondence, the Court should issue an order deeming lines 22:22-29:14 of Charlie Henry's deposition transcript as additional Rule 30(b)(6) testimony on behalf of the United States regarding "the announcement" portion of Topic 34.

*5,000 bpd Estimate*. BP simply seeks the factual basis of the United States' announced 5,000 bpd estimate and discovery into what information was considered, and rejected, as part of the United States' choice to make this announcement.

As Admiral Landry was designated for "the announcement," a natural reading of this designation includes the factual basis of the announcement. To be sure, Admiral Landry did, in fact, explain "where she obtained the information that became the 5,000 bpd announcement." (Letter at 10-11.) As such, she was an appropriate Rule 30(b)(6) designee on Admiral Landry's personal knowledge. But she was unable to offer any information about the *United States*' factual basis for going forward with the 5,000 bpd estimate.

A simple, inexpensive solution to this missing testimony would be for the United States to answer a single interrogatory regarding the factual basis for the 5,000 bpd estimate. (*See* Attachment A.)

Additionally, by citing to large portions of Charlie Henry's deposition transcript, the United States has, in effect, requested that the Court deem Mr. Henry's testimony as the United States' Rule 30(b)(6) testimony regarding "the announcement." BP respectfully requests that the Court formally designate the pages of Mr. Henry's transcript to which the United States' letter cites as the United States' Rule 30(b)(6) testimony regarding the factual basis for "the announcement" of the 5,000 bpd estimate — pages 313-362 and 373-443. (*See* Letter at 10.)

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
January 21, 2013
Page 9

*     *     *

For the foregoing reasons, BP respectfully requests the Court order the relief described above.

Sincerely,

Robert R. Gasaway

Attachment
cc (by electronic mail):

Michael O'Keefe
United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross

# Exhibit A

**Interrogatories to Supplement United States Rule 30(b)(6) Testimony**

1. Describe how each of the Tri-Lab Teams converted mass flow of hydrocarbons to stock tank barrels of oil for the flow rates reported in the *DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident*, including any conversion factors that were used and how such conversion factors were determined. **(Topics 61, 68, 82, 88.)**

2. Explain whether a roughness-related friction factor is incorporated into the K factors attributed to each Tri-Lab Teams in Table 3 on page 24 of the report *DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident*. If a roughness-related friction factor is incorporated into the K factors, please identify the roughness-related friction factor that was used by each Tri-Lab Team for each instance in which such a factor was included in the K factors. **(Topics 61, 68, 82, 88.)**

3. Identify the gas-oil ratio that each Tri-Lab Team used for the flow rates reported in the DOE-NNSA Flow Analysis Studies Associated with the Oil Release following the Deepwater Horizon Accident. **(Topics 61, 68, 82, 88.)**

4. Describe the parameter variation analyses (formal or informal) identified by Dr. Ratzel in his Rule 30(b)(6) deposition that were performed to arrive at an uncertainty estimate for the 53,000 barrels per day capping stack estimate. Please include a description of the parameters that were varied and how each was varied. **(Topics 61, 62, 68, 69, 82, 83.)**

5. For any analyses identified in Question 4, identify all individuals who participated in the analysis. **(Topics 61, 62, 68, 69, 82, 83.)**

6. Identify which non-attorneys assisted in the preparation of the answers to questions 1-5, and the documents that were consulted in preparing such answers.

7. Identify the source of the 1,000 bpd flow estimate announced by Admiral Landry on April 24, 2010, including (but not limited to) the person or persons who provided any estimate to Captain Hanzlik before April 24, what information was provided, when it was provided, and how provided, and what information regarding the 1,000 bpd flow estimate was provided to Admiral Landry, when it was provided, and how it was provided. **(Topic 34.)**

8. Explain whether any work by Dr. Bill Lehr, or other NOAA scientists, was relied upon or included as a basis for the decision to announce a 5,0000 bpd estimate on April 28, 2010, and if so, specifically what information. **(Topic 35.)**