

**U.S. Department of Justice**

Environment and Natural Resource Division

---

*P.O. Box 761*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

January 16, 2013

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
 Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

    Re:    MDL No. 2179 — United States Rule 30(b)(6) Deposition

Dear Judge Shushan:

    The party that has shrouded much of its work on flow rate in privilege now challenges the adequacy of two of the United States' fifteen Rule 30(b)(6) designees. At a time when flow rate analysis was relevant to decisions regarding the design of the various methods to kill the well (*see e.g.,* Sanders Dep. at 127:20-128:03 (Ex. 1)), the United States pulled together scientists from several federal agencies and the academic community and publicly announced not only its estimates of the flow, but the methods and uncertainties associated with those estimates. As a result of these efforts, the United States produced detailed reports of its flow rate estimates and BP had the benefit of those reports in preparing for the depositions in question.

    BP's assertion that it is entitled to yet more detail regarding the United States' flow rate estimates is simply unsupported by the record. The two witnesses about whom BP complains were individuals with extensive personal knowledge of the topics on which they were designated who also reviewed documents and spoke with other knowledgeable individuals in preparation for the deposition.

    The issues BP raises with respect to the United States' designees are different in kind from those this Court has ruled on with respect to BP's designees. This Court found that BP had interpreted the negotiated deposition topics in an unreasonably narrow manner so as to prevent questioning regarding analyses of flow rate conducted by BP. By contrast, BP complains only

that the United States did not provide sufficient detail in its testimony.  While, in the spirit of compromise, the United States is offering to work with BP to address two discrete areas of testimony, that spirit should not be taken to undermine the clear record that BP has received the testimony to which it is entitled.

### A.     Dr. Ratzel

Dr. Ratzel, the primary author of the Tri-Lab Teams report, was designated to testify regarding twenty-three topics associated with the work of the three NNSA National Laboratories in estimating the flow rate from BP's disastrous well.  *See* Chakeres, Email to J. Shushan (Sept. 18, 2012) (Ex. 2).  BP has identified five areas in which it claims that Dr. Ratzel was unprepared.  These five areas fall into two categories: (1) details of topics that reveal the failure of human memory and not a failure to adequately prepare and (2) topics for which BP has received an answer from Dr. Ratzel and for which BP is entitled to no more.

#### 1.     Questions Related to Specific Details

Two of the areas about which BP complains are of the type that courts have recognized call for a level of detail a witness could not reasonably be expected to anticipate and be prepared to answer in such detail.  *See, e.g., United States ex. rel. Fago v. M & T Mortgage Corp.,* 235 F.R.D. 11, 25 (D.D.C. 2006) ("Without a photographic memory, [the witness] could not reasonably be expected to testify as to the loan numbers ... for sixty-three different loans.").  Specifically, BP asserts that Dr. Ratzel was unable to describe how the flow rate estimates were converted to stock tank barrels – *e.g.* what "formation volume factor" was used in the calculations.  BP Letter at 3.  In addition, BP asserts that Dr. Ratzel was unable to testify regarding the roughness related friction factors for the Tri-Lab Team's work.  In both of these instances, Dr. Ratzel was reasonably and appropriately prepared.

With respect to the formation volume factor, Dr. Ratzel testified that, in performing the flow rate analyses, the Laboratories relied on equations of state and the black oil tables and directed the questioner to the Tri-Lab Team's report.  Ratzel Dep. at 234:20-235; 284:01-284:08 (Ex. 3).  The appendices to the Tri-Lab Team Report describe how the teams modeled the fluid, including, among other things, how each laboratory described the volume of the fluid at stock tank conditions.  The Los Alamos team relied entirely on black oil models provided by BP.  *See* Appendix B to Dep. Ex. 9361 (Ex. 4).  The Sandia team developed its own equation of state and explicitly spelled out the formation volume factor used in its calculations.  *Id.* at Appendix C.  The Lawrence Livermore team also described their treatment of the fluids in the model they used.  *Id.* at Appendix D.  Accordingly, counsel familiar with the very exhibits he introduced in the deposition could have directed Dr. Ratzel to the information sought and inquired further about it.  BP's counsel, however, did not do so.

As its next challenge, BP contends Dr. Ratzel was unable to "confirm whether roughness-related friction factors were used" in the Tri-Labs Team's analyses.  In fact, Dr. Ratzel testified to the best of his knowledge that Sandia did use such a factor and that Los Alamos and Lawrence Livermore did not.  *See* Ratzel Dep. at 287:19-288:12 (Ex. 3).  Dr. Ratzel did express some

2

caution in his answer, suggesting he would like to confirm his answers. *See id.* at 288:20-289:07. In short, Dr. Ratzel was again familiar with and answered the questions posed.

Nonetheless, in the spirit of cooperation, for these two discrete areas of inquiry the United States would be willing to work with BP to develop an interrogatory regarding the use of a "formation volume factor" or equivalent analysis by the Tri-Lab Teams and roughness-related friction factors applied by each laboratory and to provide a written answer to each interrogatory.

2.  **Questions that Were Answered**

    a.  **Uncertainty Analysis**

BP contends that Dr. Ratzel was inadequately prepared to discuss the uncertainty analysis performed by the Tri-Labs Team. Dr. Ratzel was prepared to and did testify regarding this uncertainty analysis, stating:

> So let's be clear. No formal uncertainty analysis was performed. We looked at these numbers, and we used these numbers to guide us in appreciating the major and minor effects. The bulk of these are very minor effects on the flow condition for this particular method that we were using, but we did cite them for you.

*Id.* at 52:22-53:04; *see also id.* at 57:20-58:03; 58:13-59:12. Dr. Ratzel then went on to testify regarding analysis of the effect of various factors on the flow rate estimate, including the assumption regarding changes in density (*id.* at 46:47:10-49:20), identified unknowns and uncertainties (*id.* at 49:21-52:15), the question of whether it was two-phase flow (*id.* 54:03-55:22), and the uncertainty related to the K value (*id.* at 56:04-56:13). He also answered questions regarding issues that were not considered in the uncertainty analysis, such as "preferential flow." *Id.* at 65:04-64:18. Dr. Ratzel was also familiar with and testified regarding a mathematical analysis of the three lab estimates and how that mathematical estimate related to the uncertainty analysis. *Id.* at 67:12-69:13. In short, Dr. Ratzel was prepared to and did testify regarding the uncertainty analysis performed by the Tri-Labs Team.

BP claims that Dr. Ratzel's preparation was inadequate nonetheless because Dr. Ratzel did not anticipate every single question and could not answer with respect to every detail of the calculations. For instance, though Dr. Ratzel could and did speak knowledgeably regarding the sensitivity studies conducted by the laboratories and the effect of variations of the pressure, he did acknowledge that he did not know the "full . . . extent of sensitivity . . . parameter variation performed by the lab." *Id.* at 648:02-648:14. This answer must be put in the context of the entirety of the deposition, in which Dr. Ratzel answered as to what parameters were the key influences on the flow rate analysis, the approach to evaluating uncertainty related to these key parameters, and the communications between lab team members regarding the uncertainty analysis. *See QBE Ins. Corp. v. Jorda Enterps., Inc.*, 277 F.R.D. 676, 691 (S.D. Fla. 2012) ("Absolute perfection is not required of a 30(b)(6) witness. The mere fact that a designee could not answer every question on a certain topic does not necessarily mean that the corporation failed

to comply with its obligation." (citing *Costa v. County of Burlington*, 254 F.R.D. 187, 191 (D.N.J. 2008)).

Moreover, Dr. Ratzel was not the only witness designated by the United States on the topic of uncertainty analyses. Rather, Dr. Tom Hunter was designated as to topic 42 – "all . . . analysis identifying or relating to factors affecting the ability to estimate the flow of hydrocarbons from the MC252 well or the accuracy of any such estimate." *See* Chakeres, Email to Judge Shushan (Sept. 18, 2012) (Ex. 2). Dr. Hunter testified at length regarding the uncertainty analyses. *See, e.g.*, Hunter Dep. at 154:12-161:12; 185:01-190:11; 229:01-230:11; 308:08-316:16 (Ex. 5). If BP felt Dr. Ratzel's testimony was inadequate, it could have questioned Dr. Hunter on those issues, since Dr. Hunter's deposition occurred *after* Dr. Ratzel's deposition.

### b. Aspects of the July 30-31, 2010 Meeting

Similarly, BP claims that Dr. Ratzel was unable to answer questions regarding the July 30-31, 2010 meeting. Dr. Ratzel answered the questions posed. Though Dr. Ratzel sometimes could not recall the precise language used during the meeting, he was prepared to and did answer questions regarding the substance of the discussion at the meeting. For instance, BP questioned Dr. Ratzel using Ex. 8827, which is a document prepared by an employee of the Department of the Interior who was also a Rule 30(b)(6) designee for the United States. *See* Sogge Dep. at 13:16-14:11; 194:12-194:19 (Ex. 6). BP's counsel read a statement from these notes and then asked Dr. Ratzel whether he recalled a "statement to that effect during the meeting." *See* Ratzel Dep. at 477:05-477:19 (Ex. 3). Dr. Ratzel responded:

> A. I remember, I recall at the close of the meeting the request to come back the next day. I do not remember the specific dialogue that you're reading to me, the specifics. I just remember the end state of the meeting.

*Id.* at 477:20-477:25. In short, Dr. Ratzel answered questions regarding the meeting, he simply did not recall certain aspects reflected in the notes taken by another witness. This testimony is the Rule 30(b)(6) testimony of the United States with respect to communications involving the Sandia, Los Alamos, and Lawrence Livermore National Laboratories. As such, Dr. Ratzel answered the questions within his designation – communications involving the NNSA laboratories.

### c. Gas-Oil Ratio

BP contends that Dr. Ratzel was not prepared to "identify any gas-oil ratio that the Tri-Labs team used" for the flow rate estimate. The very testimony cited by BP, however, demonstrates that Dr. Ratzel indeed was prepared for and answered the question. Ratzel Dep. at 282:14-283:25. Dr. Ratzel directed BP to two locations within the Tri-Lab Team's report: the "equation of state charts" and the black oil tables. *Id.* BP's counsel asked no further questions and there is no basis for suggesting that had counsel requested additional details they would not have been forthcoming.

    **d.**  **Methods Used in Performing Estimate**

Further, BP asserts that Dr. Ratzel failed to provide a "straightforward" answer to a question regarding whether the laboratories relied on two methods or three to derive the 53,000 barrel per day estimate. BP is confusing its desire for the United States' witnesses to achieve oratorical perfection with the requirement to provide a prepared witness. Dr. Ratzel did not avoid the question, express confusion, or refuse to answer. Rather, Dr. Ratzel responded that a particular page in the report "just listed two [methods] to derive the 53, but we looked at all three." *Id.* at 82:24-83:03. In short, BP obtained an answer to the question it asked. Counsel was free to ask additional questions to clarify Dr. Ratzel's point if it was unclear. BP's counsel chose not to do so.

    **e.**  **Correction Factor Used by Lawrence Livermore National Laboratory**

Similarly, BP argues that Dr. Ratzel failed to provide "any testimony" regarding the correction factor used by Lawrence Livermore National Laboratory. While Dr. Ratzel initially did not recall the correction factor (*see id.* at 289:13-289:16), when his recollection was refreshed by reference to the report (*see id.* at 289:17-290:05), Dr. Ratzel answered each question posed to him regarding the 4.4 correction factor (*see id.* at 290:06-292:25; 528:16-528:19). If BP had further questions, it did not pose them and, for that, Dr. Ratzel cannot be faulted.

**B.**  **Admiral Landry**

Admiral Mary Landry was the Federal On-Scene Coordinator (FOSC) from April 23, 2010 to June 1, 2010 for the Macondo oil spill and was designated by the United States on a very narrow portion of the two topics for which BP complains she was unprepared. Specifically, the notice to the United States included the following two topics:

> 34.  Your efforts (including all communications, modeling, calculations and analysis of any kind) leading to the flow rate estimate of 1,000 bopd announced by Admiral Landry on April 24, 2010.

> 35.  Your efforts (including all communications, modeling, calculations and analysis of any kind) leading to the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010.

*See* Chakeres, Email to J. Shushan (Sept. 18, 2012) (Ex. 2). As the United States made clear in its designations, Admiral Landry was designated solely as to the "announcement itself," while Charles B. Henry, Jr., the NOAA Scientific Support Coordinator, who worked with Admiral Landry at the Unified Area Command, was designated as to the "science" for these two topics. *Id.* In other words, the only aspects of these topics for which Admiral Landry was designated to testify were the announcements and her decisions regarding how, when and where to make them.

BP's complaints about Admiral Landry's preparation focus on areas for which she was *not* the United States' designee.  As will be shown she was prepared to and did testify regarding her announcements and her decisions regarding how, when, and where to make them.  If her memory on these topics was not perfect, or is contradicted in BP's opinion by other evidence, BP is still entitled to nothing further on these topics because the Admiral provided the United States' best recollection on the narrow aspects on which she was designated.

### 1.     Admiral Landry's Testimony About the 1,000 BOPD Announcement

Admiral Landry testified that the 1,000 bpd estimate came from BP.  She could not name the source at BP and could only say that the number came to her from BP through her Deputy, Captain James Hanzlik.  Landry Dep. at 131:17-21, 132:19-25, 133:1-3 (Ex. 7).  BP asserts that her testimony reveals a lack of preparation.

To the contrary, that the Admiral does not recall the specific conversation with the Captain is not surprising given that she was charged with responding to a rapidly worsening disaster and was in almost constant communication with the Captain during the early days of the spill and given that it was standard procedure to ask the responsible party – BP – for an estimate of the volume of the spill.  Landry Dep. at 151:16-25, 152:1-20 (Ex. 7).  To the best of the United States' knowledge, there are no contemporaneous records or notes reflecting the substance of the conversation between the Captain and the Admiral.

BP asserts that Admiral Landry should have reviewed notes taken several months after the events by an interviewer for the Incident-Specific Performance Review.[1]  Such a review, however, would not have refreshed the Admiral's recollection, since the document simply states as to the 1,000 bpd estimate: "Initially, BP provided the 1,000 barrels per day estimate."  Dep. Ex. 7802 at 3 (Attached to BP's Letter).  Thus, while it would have done no harm for her to have reviewed the notes, such a review would not have better prepared the Admiral to testify regarding the topic on which she was designated.

Further, BP asserts that Admiral Landry did not discuss the 1,000 bpd estimate with Charlie Henry and, therefore, was unprepared.  BP Letter at 6.  BP's contention is completely contrary to the testimony of Admiral Landry:

> Q. Okay. Can you tell me what you discussed with respect to the 1,000 barrel estimate with Mr. Henry?
> A. Just basically did he remember anything about how we arrived at that number.
> Q. So you asked him what his recollection was about how you arrived at the thousand barrel number; is that correct?

---

[1] BP identifies Ex. 7802 as notes from "her own Presidential Commission interview" based on Admiral Landry's assumption that these were the notes of her interview by the National Commission on the BP/Deepwater Horizon Oil Spill. These August 27, 2010 notes, however, are Coast Guard notes (as evident from the "HCG" Bates prefix) and were, in all likelihood, part of the Incident-Specific Performance Review.

> A. If he might have had involvement in how we arrived at that number, yes.
> Q. Okay. So you asked him what his recollection was and if he had involvement, correct?
> A. That's correct.

Landry Dep. at 21:01-21:14 (Ex. 7).

BP also complains that the Admiral did not speak with Capt. Hanzlik again in preparation for her deposition and that, therefore, it is entitled to more time to question the Admiral. This argument fails for two reasons. First, Admiral Landry did not require an additional conversation with Captain Hanzlik since she had already refreshed her recollection regarding the 1,000 bpd estimate in preparation for an interview with the National Commission on the BP/Deepwater Horizon Oil Spill. Landry Dep. at 135:15-25, 136:1-14 (Ex. 7). Second, BP obtained testimony from a U.S. Rule 30(b)(6) designee on the source of the 1,000 barrel per day number. Specifically, Mr. Henry testified as a Rule 30(b)(6) designee that he had spoken with Captain Hanzlik and testified further as follows:

> Q.   When you -- was your purpose of talking with Admiral Hanzlik to determine the source of his information for the 1,000 barrel per day estimate?
> A.   Yes, to follow up after the discussion, yes.
> Q.   What did Admiral Hanzlik tell you about the 1,000 barrel per day estimate?
> A.   Captain Hanzlik --
> Q.   Oh, I'm sorry, Captain.
> A.   No problem. Captain Hanzlik said his recollection was that that in --that information had been passed from BP to him, and he had provided it to Admiral Landry in conversation and discussion.
> Q.   Did he indicate to you on what date he passed this information from BP to Admiral Landry?
> A.   He stated that he wasn't sure if it was that Friday night or that Saturday morning, but it was during that time frame.
> Q.   The Friday night or Saturday morning prior to the announcement?
> A.   That would be the 23rd -- yeah, well, the 23rd, early on the 24th, so during that time frame. But he didn't recall specifically when he had that talk with -- you know, or -- or provided that information to Admiral Landry in discussion. They worked off and on in pretty close communication, so it was during that time period was all he could recall.
> Q.   Did Captain Hanzlik indicate from whom at BP he believed he received the information in support of the 1,000 per day estimate?
> A.   He stated to me that he did not recall specifically who gave him that information.
> * * *
> Q.   Captain Hanzlik obviously indicated that he believed that he received the 1,000 barrel per day estimate from BP. That's what he said to you, correct?
> A.   Yes, sir.

Henry Dep. at 24:23-27:11 (Ex. 8). In short, BP received full and complete testimony from the United States regarding the source of the 1,000 barrel per day estimate.

BP claims that Admiral Landry's testimony is contrary to that of BP's Doug Suttles' recollection, but the fact that the United States' Rule 30(b)(6) testimony is at odds with the recollection of a BP employee does not mean that the designees were unprepared. Even if Admiral Landry, Charlie Henry, Bill Lehr, Captain Hanzlik and Doug Suttles all have somewhat different recollections of the events, this does not mean that Admiral Landry was unprepared on her topics.

BP also points to certain Exhibits, none of which were authored by Admiral Landry, that indicate there were individuals at NOAA, including Bill Lehr, who will be deposed January 17, 2013, that were also trying to estimate the flow rate in those early days. Because Admiral Landry was only designated to testify regarding the source of the number she announced, whether she was familiar with these other estimates is irrelevant to whether she was prepared to testify on her designated topic. Moreover, Mr. Henry testified at length about NOAA's calculations at the time and any role they played in the Admiral's public announcements.

As part of its argument for lack of preparation as to the 1,000 bpd announcement, BP also points to an email dated April 24, 2010, from DOI Deputy Secretary David Hayes to other DOI staff. Dep. Ex. 9605 (Ex. 9). In it, Mr. Hayes notes that Admiral Landry was expected to issue a public statement of the 1,000 bpd flow rate later that day at 5:00 P.M. The message also says that "Congressional staff will be briefed on these same points at 4 eastern time." At the deposition, the Admiral could not recall such a briefing by her or her staff that day. Admiral Landry was not listed as a receiver of this message and the message is not clear as to who was to brief Congressional staff, or who the latter would be. BP now demands that she (or another government witness) be ordered to discuss the congressional briefing. BP offers no evidence that the briefing actually occurred or, if it did, that the congressional briefing was part of the "announcement itself" for which Admiral Landry was designated to testify.

### 2. Admiral Landry's Testimony About the 5,000 BOPD Announcement

BP next claims Admiral Landry could offer only "minimal details" about how she obtained the 5,000 bpd amount announced four days after the first announcement. In fact, Admiral Landry had a quite good recollection of how the 5,000 bpd announcement came about:

> Q. (By Mr. Li) Now, I'm going to move, if we could, to how the 5,000 barrels a day number came up. And could you tell us again what your best recollection is of how you became aware of the 5,000 barrels a day figure?
> A. My best recollection of how I became aware of the use of the 5,000 ba -- barrel a day estimate was NOAA, Charlie Henry, coming to me and reporting that his folks were concerned, from what they were seeing, that there was more oil out there. I asked Doug Suttles to provide us with a response to that. And Doug

8

Suttles and his office provided an easel and gave a range of 1,000 to 5,000 barrels and proffered an estimate of 2500.
Q. And when you say an "easel," was it like a white board?
A. It was a -- it was an -- it was on an easel, metallic easel holder, and it was a post -- a -- a white board. It wasn't a board on the wall. It was an easel, three-legged easel.
Q. Okay. And when you say "a board on the wall," do you mean -- I just want to know, is it one of these white boards, or is it a --
A. No.
Q. -- just a butcher paper kind of --
A. It was -- it was your standard easel-size paper, the pad.
Q. Okay.
A. A large pad. And it was on a three --three-legged eas -- easel, just like the tripod for the camera.
Q. Okay. And did he -- did he write the numbers for you, or had they been prepared before you showed up?
A. He wrote the numbers as we were discussing -- as he was presenting to me what his estimate was.
* * *
Q. (By Mr. Li) Now, who else was in the room when Mr. Suttles drew this chart for you?
A. I remember Charlie Henry being in the room.
Q. Was anybody else in the room?
A. I don't recall who else might have been in the room.
Q. Now, you had said earlier that Mr. Suttles had mentioned that the calculations came from a woman in Houston.
A. M-h'm.
Q. You said yesterday that -- that her name might be Barbara. Did it sound like "Barbara"?
Could it have been Farah Saidi or Kelly –
Ms. Sargent: McAughan.
Q. (By Mr. Li) -- McAughan?
A. It could have been any one of those names. I just remember a "she" --
Q. (By Mr. Li) Okay.
A. -- a reference to "she."
Q. And that she had done the calculations in Houston?
A. She had provided and assisted Doug Suttles with these estimates, yes.
* * *
Q. Okay. Now, when you picked the 5,000 barrel a day estimate, did Mr. Suttles object?
A. No.
Q. Did he say, "That's inaccurate"?
A. He said that he was estimating or the woman he was talking to figured it could be 2,500. And I looked at Charlie Henry, and Charlie Henry kind of rolled his eyes, as if, and I said, "5,000, we're going to go with 5,000."

9

> Q. And did Mr. Suttles say anything after you said, "We're going with 5,000"?
> A. I don't recall him saying anything or objecting. He -- we basically chose the higher end number.
> Q. And Mr. Suttles didn't say to you, "Admiral, that's inaccurate, I don't want to mislead anybody with this particular figure"?
> A. No, he did not.

Landry Dep. at 565:13-567:1, 568:6-569:4, 570:10-571:3 (Ex. 7). Admiral Landry testified that Mr. Henry had a different recollection of this discussion. *Id.* at 25:2-28:22.[2] She was prepared to testify as to the United States' knowledge regarding the "announcement itself" and did testify, including what Mr. Henry's recollection of the encounter was. In short, Admiral Landry was fully prepared on the topic for which she was designated – "the announcement itself".

BP asserts two further arguments in support of its claim that the Admiral was unprepared with respect to the announcement of the 5,000 bpd estimate. First, BP argues her testimony is inaccurate. Second, BP argues she was not able to testify about the science underlying the estimate. Both of these arguments fail as a basis for obtaining additional deposition time.

Whether BP agrees that the above encounter between Admiral Landry, Doug Suttles and Charlie Henry occurred as described is irrelevant to the question of whether the Admiral was adequately prepared. Nor can BP claim she is a deficient witness because this recollection is inconsistent with its assertion that it had nothing to do with the 5,000 bpd announcement and the figure was solely based on a NOAA calculation. BP is not entitled to Rule 30(b)(6) testimony that supports its case, it is only entitled to truthful testimony by a person with knowledge regarding the topic on which she has been designated. Admiral Landry provided just that.

BP's assertion that Admiral Landry was unprepared because she could not answer questions regarding the underlying science behind the 5,000 bpd estimate fails because she was not the designee on this topic. The United States clearly designated Mr. Henry with respect to the "science" related to the 5,000 bpd estimate. As with the 1,000 bopd announcement, Mr. Henry was questioned extensively on NOAA's own estimates at the time and any role they played in the announcements. And certainly Mr. Henry, as the lead NOAA representative at the UAC, was the most knowledgeable witness the United States could offer on that part of the topics.

Mr. Henry also testified extensively on his colleague Bill Lehr's role in attempting to calculate flow and to what end his work was put. *Id.* at 313-362, 373-443. Whether Admiral Landry was specifically aware of Bill Lehr's work at the time for NOAA is not important because she explained where she obtained the information that became the 5,000 bpd

---

[2] Although it is not important to BP's assertion that Admiral Landry was poorly prepared, in fact Mr. Henry's testimony is consistent with her recollection that NOAA had scientists that did not think the 1,000 bopd could be correct and BP should be asked for a better estimate. Henry Dep. at 475:1-25, 476:1-25, 477:1-25 (Ex. 8).

announcement, and if BP wanted to explore NOAA's collective input into those numbers it had ample opportunity when questioning the appropriate designee.[3]

In sum, as to both flow rate estimates Admiral Landry announced, she was clear where she received the information. The mere fact BP believes others at NOAA or elsewhere had additional information about flow rates that was consistent with, or inconsistent with, the two amounts hardly means Admiral Landry was not the best person to describe where she received the information for her announcements.

**C.     Conclusion**

Despite facing a deposition notice with more than one hundred detailed topics, the United States undertook a thorough good faith preparation of knowledgeable individuals. In selecting its designees, the United States began with the individuals most likely to have extensive personal knowledge of the topics and then educated the witnesses with relevant documents. Thus, while not every question was anticipated and not every document was reviewed, BP had access to knowledgeable, prepared witnesses. Similarly, though BP may not agree with every answer given, BP has received an adequate answer to its questions. Accordingly, BP has identified no grounds for providing BP with additional time to question either Dr. Ratzel, Admiral Landry, or another Rule 30(b)(6) designee.

                                                                  Respectfully submitted,

                                                                  /s/ Sarah D. Himmelhoch

                                                                  Sarah D. Himmelhoch
                                                                  Senior Litigation Counsel for E-Discovery

---

[3] BP states that Mr. Henry was "unprepared to explain the effect of these other NOAA estimates on Dr. Lehr's 5,000 bpd estimate" and cites to the deposition transcript at 349:14-349:23. BP truncates the transcript, quoting Mr. Henry as saying 'I'd have no way to know. It'd be speculation." In the very next page, however, when asked the same question slightly more clearly, Mr. Henry was prepared to and did answer and explain that he spoke with Dr. Lehr before the deposition and was prepared to answer questions regarding this analysis. *Id.* at 349:24-353:04.