# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: **Oil Spill by the Oil Rig** | * | |
| **"Deepwater Horizon"** | * | **MDL No. 2179** |
| **in the Gulf of Mexico,** | * | |
| **on April 20, 2010,** | * | **Section: J** |
| | * | |
| **This Document Relates to:** | * | **Judge Barbier** |
| | * | |
| *No. 10-4239; No. 10-4240; No. 10-4241* | * | **Magistrate Judge Shushan** |
| | * | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BP DEFENDANTS' OPPOSITION TO THE JOINT MOTION FOR SUMMARY JUDGMENT REGARDING PROPRIETARY INTERESTS FILED BY THE MEXICAN STATES OF QUINTANA ROO, TAMAULIPAS, AND VERACRUZ

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Catherine Fitzpatrick
Elizabeth A. Larsen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:  312-862-2000
Facsimile:  312-862-2200

Allison Rumsey
S. Zachary Fayne
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
E-Mail:  Allison.Rumsey@aporter.com
Telephone:  202-942-5000
Facsimile:  202-942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139-5099
Telephone:  504-581-7979
Facsimile:  504-556-4108

Jeffrey Bossert Clark
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  202-879-5000
Facsimile:  202-879-5200

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:  202-662-5985
Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.      THE MEXICAN STATES DO NOT HAVE PROPRIETARY INTERESTS ...................2

      A.     Federal Maritime Law and Mexican Law Are Both Relevant in Determining Whether the Mexican States Have a Proprietary Interest ..................2

      B.     Under Federal Maritime Law, the Mexican States Must Demonstrate an Ownership Interest in the Relevant Natural Resources and Wildlife to Have a Proprietary Interest ..................................................................................4

      C.     Under Mexican Law, the Mexican States Do Not Have Sufficient "Incidents of Ownership" to Have a Proprietary Interest in the Relevant Lands, Waters, Natural Resources, and Wildlife ......................................................9

            1.     The Mexican States Do Not Own the Lands, Waters, Natural Resources, and Wildlife Allegedly Injured By the Oil Spill ....................10

            2.     The Mexican Federal Government Has Exclusive Jurisdiction Over the Relevant Natural Resources and Wildlife ...........................................12

            3.     The Mexican States Have Failed to Point to Any Evidence That the Mexican Federal Government Transferred an Ownership Interest or a Proprietary Right Over the Relevant Natural Resources ...................14

II.     ROBINS DRY DOCK APPLIES TO THE MEXICAN STATES' CLAIMS OF NEGLIGENCE AND GROSS NEGLIGENCE AND BP'S ADMISSION OF CRIMINAL CONDUCT IS IRRELEVANT .................................................................17

CONCLUSION ....................................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CXY Energy, Inc. v. Jurisch,*
    1992 WL 211649 (E.D. La. Apr. 17, 1992) .................................................................... 19

*Dick Meyers Towing Serv., Inc. v. United States,*
    577 F.2d 1023 (5th Cir. 1978) .............................................................................. 18, 19

*Dunham-Price Group, L.L.C. v. Port Aggregates, Inc.,*
    2006 WL 2112953 (W.D. La. July 26, 2006) .............................................................. 19

*IMTT-Gretna v. Robert E. Lee SS,*
    993 F.2d 1193 (5th Cir. 1993) ...................................................................................... 7

*In re Compl. of Clearsky Shipping Corp.,*
    1999 WL 729251 (E.D. La. Sept. 16, 1999) ................................................................. 4

*Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co.,*
    455 F.2d 957 (5th Cir. 1972) ...................................................................................... 19

*Louisiana ex rel. Guste v. M/V Testbank,*
    752 F.2d 1019 (5th Cir. 1985) ............................................................................... 3, 19

*Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,*
    597 F.2d 469 (5th Cir. 1979) ......................................................................... 5, 6, 7, 18

*Nautilus Marine, Inc. v. Niemela,*
    170 F.3d 1195 (9th Cir. 1999) .................................................................................... 19

*Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.,*
    782 F. Supp. 317 (E.D. La. 1992) ................................................................................ 5

*Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.,*
    497 F. Supp. 2d 787 (E.D. La. 2007) ............................................................. 4, 6, 7, 19

*Robins Dry Dock & Repair Co. v. Flint,*
    275 U.S. 303, 308-09 (1927) ............................................................................... passim

*Texas Eastern Transmission Corp. v. McMoran Offshore Exploration Co.,*
    877 F.2d 1214 (5th Cir. 1989) ..................................................................................... 5

*Vicksburg Towing Co. v. Miss. Marine Transp. Co.,*
    609 F.2d 176 (5th Cir. 1980) ................................................................................. 3, 18

**Page(s)**

**United States Statutes**

18 U.S.C. § 1505 ................................................................................................................ 18

**Mexican Statutes**

General Law of National Assets ("GLNA") ................................................ 10, 12, 13, 15

**Mexican Constitutional Provisions**

Mexican Const. Art. 27 .................................................................................. 10, 11, 12

Mexican Const. Art. 73 (XXIX-G) ................................................................................ 13

iii

**INTRODUCTION**

In order to recover under general maritime law, the Mexican States must demonstrate "a physical injury to a proprietary interest."  (C Order, Rec. Doc. 4845, at 12); *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308-09 (1927).  In attempting to satisfy this requirement, the Mexican States claim to have a proprietary interest in their coastlines, beaches, estuaries, and wildlife, all of which they allege were injured by the *Deepwater Horizon* oil spill.  However, as explained herein and in BP's Memorandum in Support of BP Defendants' Motion for Summary Judgment Against the Mexican States of Veracruz, Tamaulipas, and Quintana Roo on the Issue of Whether the Mexican States Have a Proprietary Interest in the Matters Asserted in Their Complaints ["BP's Memorandum"] (Rec. Doc. 8176-1), the Mexican States do not have a proprietary interest in these resources.

First, the Mexican States do not own the relevant natural resources and wildlife.  As clearly established by *Robins Dry Dock* and its progeny, ownership is the bedrock of a proprietary interest.  Indeed, the Fifth Circuit has *never* found a non-owner to possess a proprietary interest.  Here, however, the Mexican Constitution clearly and unequivocally grants ownership over the relevant natural resources to the Mexican *federal government*.  The Mexican States' lack of an ownership interest in this case is dispositive.  Because the Mexican States do not own the relevant natural resources, they do not have the requisite proprietary interest.

Second, even if the Court applies some lesser standard whereby absolute ownership is not required, the Mexican States have not demonstrated that they possess an interest in the relevant natural resources and wildlife that could be deemed sufficient to constitute a proprietary interest. In this respect, because, as BP has demonstrated, the Mexican States do not *own* the relevant natural resources and wildlife, the Mexican States would face a significant hurdle to show that they nevertheless possess an interest in the natural resources and wildlife that is so substantial

that it is tantamount to ownership.  The Mexican States cannot meet this high burden.  Though they claim to possess a proprietary interest, the Mexican States have pointed to no credible evidence that they own the relevant natural resources and wildlife.  Likewise, they have pointed to no creditable evidence that they possess primary control of and responsibility for the relevant natural resources and wildlife to such an extent that they could be deemed, for all intents and purposes, the owners of the property.  In these circumstances, there is little argument that the Mexican States possess an interest that could even meet a tantamount-to-ownership standard.

Finally, the Mexican States' argument that *Robins Dry Dock* does not apply in this case because of BP's admission of criminal conduct is baseless and, indeed, contrary to this Court's ruling rejecting an essentially identical argument in connection with its order dismissing "Pure Stigma Claims."  (Rec. Doc. 7526.)

Accordingly, for the reasons stated herein and in BP's Memorandum (Rec. Doc. 8176-1), the Mexican States' motion for summary judgment should be denied.

## ARGUMENT

## I.      THE MEXICAN STATES DO NOT HAVE PROPRIETARY INTERESTS

As explained below and in BP's Memorandum (Rec. Doc. 8176-1), the Mexican States do not have a proprietary interest in the lands, waters, natural resources, and wildlife allegedly injured by the *Deepwater Horizon* oil spill.  Accordingly, pursuant to *Robins Dry Dock* and this Court's December 9, 2011 Order (Rec. Doc. 4845), the Mexican States' general maritime law claims are barred, and their motion for summary judgment should be denied.

### A.      Federal Maritime Law and Mexican Law Are Both Relevant in Determining Whether the Mexican States Have a Proprietary Interest

The Mexican States argue that the appropriate source of law for evaluating whether they possess a proprietary interest is federal maritime law.  *See* Mex. States Mem. at 9-10 (Rec. Doc.

8178-1).  The BP Defendants agree that federal maritime law provides the applicable standard for determining what constitutes a proprietary interest.  In this respect, the Fifth Circuit has found a proprietary interest to exist only when the plaintiff is the owner of the allegedly damaged property.  *See, e.g.*, *Vicksburg Towing Co. v. Miss. Marine Transp. Co.*, 609 F.2d 176, 177 (5th Cir. 1980) ("Unlike the plaintiffs in [other cases in which courts found no proprietary interest], the plaintiff here is the owner of the damaged property. . . .  The difference is meaningful, real and dispositive."); *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1034 (5th Cir. 1985) (Williams, J., concurring) ("[T]he common legal synonym for 'proprietary interest' is ownership . . . .").  Thus, to the extent Mexican law employs a different definition of proprietary interest— for example, if, hypothetically, Mexican law deemed a right to use property for a specific purpose sufficient to create a proprietary interest—the federal maritime standard would govern.

However, to determine whether the Mexican States possess the requisite interest in property, one must look to Mexican law.  The Mexican States are themselves a creation of Mexican law, and the contours of their rights to own, regulate, and use Mexican natural resources are delineated exclusively by Mexican law.  For obvious reasons, federal maritime law does not speak to the issue of ownership rights over Mexican natural resources.  The Mexican States do not explain, nor could they, how one could evaluate the extent of the Mexican States' interest in the allegedly injured lands, waters, natural resources, and wildlife without relying in part on Mexican law.  And in fact, the Mexican States themselves rely on elements of Mexican law—such as administrative agreements and principles of concurrent jurisdiction—in attempting to show that they meet the federal maritime standard for a proprietary interest as they interpret it (*i.e.*, actual possession or control, responsibility for repair, and responsibility for maintenance).

3

In short, federal maritime law creates the applicable standard for determining whether the Mexican States have a proprietary interest.  To apply this standard, one must turn to Mexican law, which delineates the characteristics of the Mexican States' interest in the relevant lands, waters, natural resources, and wildlife.  These ownership characteristics, or lack thereof, can then be used to determine whether the Mexican States possess an interest in the relevant natural resources that meets the federal maritime standard for a proprietary interest.

**B.  Under Federal Maritime Law, the Mexican States Must Demonstrate an Ownership Interest in the Relevant Natural Resources and Wildlife to Have a Proprietary Interest**

As discussed above, under federal maritime law, the Fifth Circuit has found a proprietary interest to exist only where the plaintiff is the owner of the allegedly damaged property.  *See also* BP Mem. at 5-6 (Rec. Doc. 8176-1).  Although the Fifth Circuit has suggested, in dicta, that a non-owner might be able to possess a proprietary interest in certain circumstances, the Fifth Circuit has never found a non-owner to have the requisite proprietary interest.  *Id.*  Moreover, lower courts in the Fifth Circuit have generally followed this approach, finding a proprietary interest to exist only where the plaintiff is the owner of the allegedly damaged property.  *See, e.g.*, *Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.*, 497 F. Supp. 2d 787, 796-97 (E.D. La. 2007) (holding that drilling company had a proprietary interest in a production well that it owned, but not in drilling mud that it did not own); *In re Compl. of Clearsky Shipping Corp.*, No. 96-4099, 1999 WL 729251, at *2 (E.D. La. Sept. 16, 1999) (holding that a tenant lacked a proprietary interest in a riverwalk that it maintained but did not own).

Even if the Court were to find that a non-owner could possess a proprietary interest in certain circumstances, such circumstances would have to be extremely limited to remain consistent with *Robins Dry Dock* and its progeny.  For instance, some courts have suggested that a non-owner can possess a proprietary interest, but only if that party's interest in the property is

4

*tantamount* to full ownership.  *See, e.g.*, *Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.*, 782 F. Supp. 317, 320 (E.D. La. 1992) (holding that to have a proprietary interest, "a party must have control over the property tantamount to full ownership").  In other words, even if ownership were not strictly required (and it is), what would be required is an interest in property that is so substantial as to be equivalent to full ownership.

The cases cited by the Mexican States do not contradict this conclusion.  For example, the Mexican States cite *Texas Eastern Transmission Corp. v. McMoRan Offshore Exploration Co.*, 877 F.2d 1214 (5th Cir. 1989), for the proposition that "a proprietary interest may be established by demonstrating 'actual possession or control, responsibility for repair, and responsibility for maintenance.'"  Mex. States Mem. at 21 (citing *Texas Eastern*, 877 F.2d at 1224-25).  As discussed above, although the Fifth Circuit in *Texas Eastern* suggested in dicta that such factors might be relevant to the analysis, the court ultimately held that, such factors notwithstanding, the plaintiff gas producer did *not* have a proprietary interest in the pipeline that it used under contract.  877 F.2d at 1224-25.  In addition, even where courts have pointed to certain factors that may inform the determination of whether a non-owner has a proprietary interest, it is clear that those factors are relevant, if at all, only to the extent that they demonstrate that the plaintiff has an interest in property that is *tantamount to ownership.*  For example, in *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469 (5th Cir. 1979), upon which *Texas Eastern* relied, the Fifth Circuit held that the plaintiff did not have a proprietary interest because it had "none of the incidents of ownership . . . that would justify recovery for damage to physical property."  *Id.* at 474.  Thus, factors such as actual possession or control, responsibility for repair, and responsibility for maintenance are relevant, if at all, only to the extent that they demonstrate an interest in property that is *tantamount to ownership.*

5

As another example, the Mexican States cite a number of cases for the proposition that a demise charterer, in contrast to the time charterer in *Robins Dry Dock*, has a proprietary interest in the chartered vessel.  *See* Mex. States Mem. at 21-23.  As a threshold matter, the Mexican States do not cite a single case in which a court actually held that a demise charterer has a proprietary interest.  Rather, the cases cited merely suggest in dicta that a demise charterer might have a proprietary interest.  *See, e.g.*, *Bayou Lacombe*, 597 F.2d at 473-74; *Nexen Petroleum*, 497 F. Supp. 2d at 796.

In addition, the demise charterer example illustrates that, to the extent a non-owner can have a proprietary interest, the non-owner's interest in the property must be so significant as to be tantamount to ownership.  As explained by the Fifth Circuit in *Bayou Lacombe*, "[t]he demise-charterer stands in the shoes of the owner of the vessel for the duration of the contract while the shipowner retains merely a right of reversion.  The demise-charterer has full responsibility for managing and maintaining the vessel. . . .  'He becomes, in effect, the owner *pro hac vice* . . . .'"  597 F.2d at 473-74 & n.3 (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 4-1 at 194 (2d ed. 1975)).  The Mexican States do not explain how their interests in the allegedly injured lands, waters, natural resources, and wildlife are analogous to those of a demise charterer, who, for the term of the charter, has all of the indicia of ownership except the ability to sell the vessel.  To the contrary, as described below and in BP's Memorandum, the Mexican States' interest in the relevant natural resources and wildlife is expressly limited by the terms of the Mexican Constitution and laws and is in no way comparable to the level of virtual ownership and control that a demise charterer has over a vessel.

In an apparent attempt to further confuse the issue, the Mexican States cite a number of cases as illustrative of certain principles of federal maritime law.  In all instances, these

"principles" are either misstated by the Mexican States or entirely inapplicable in this case.  For example, the Mexican States assert that "[a]n element of ownership includes the 'right of use' which right is itself 'a thing of value.'"  Mex. States Mem. at 25.  Although it is of course true that an element of ownership is the right of use, it is also well established that a right of use is not alone sufficient to create a proprietary interest.  *See, e.g.*, *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1194 (5th Cir. 1993) (finding that lessee did not have a proprietary interest in a pipeline which the lessee had an exclusive right to use); *Bayou Lacombe*, 597 F.2d at 474 (finding that railroad did not have a proprietary interest in a bridge which the railroad had a contractual right to use).  In fact, the whole crux of the *Robins Dry Dock* line of cases is that interference with a party's right of use is not alone a sufficient basis on which to base recovery.

Similarly, the Mexican States argue that a right to exploit natural resources is sufficient to create a proprietary interest.  *See* Mex. States Mem. at 21.  However, the cases on which the Mexican States rely do not stand for such a blanket proposition.  In *Nexen Petroleum*, for example, the court held that the plaintiff had a proprietary interest in a production well that it *owned* and operated pursuant to an offshore exploration lease, and could potentially recover for mitigation costs necessary to prevent structural damage to the well hole.  *See Nexen Petroleum*, 497 F. Supp. 2d at 797 (citing *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 202 (5th Cir. 1995)).  Thus, in that case, it was the plaintiff's ownership of the well, and not its generalized right to exploit natural resources, that created the proprietary interest. The Mexican States can point to no analogous ownership interest in this case.

Finally, the Mexican States argue that an "insurable interest" is evidence of a proprietary interest.  *See* Mex. States Mem. at 24-25.  The Mexican States appear to reason that because they can "erect buildings and structures on the coastal lands and otherwise exploit these territories,

thereby creating insurable interests," they have a proprietary interest in the coastal lands themselves. *Id.* at 25. This line of argument is entirely misguided. First, the Mexican States cannot freely erect buildings and structures on coastal lands and otherwise exploit these territories; rather, any construction, if permitted at all, would be subject to all of the environmental and settlement limitations set by the Mexican federal government. Second, to the extent the Mexican States have erected structures on coastal lands, they have, at most, created insurable interests in the *structures*. That the Mexican States may be able to erect structures on coastal lands does not thereby give them an insurable interest in the coastal lands themselves. Plaintiffs have not alleged that structures erected by the Mexican States on coastal lands have been injured by the oil spill. Rather, they allege that the coastal lands themselves, over which they do not have insurable interests, have been harmed by the oil spill. Consequently, the Mexican States' discussion of the relationship between insurable interests and proprietary rights is simply irrelevant when applied to the facts of this case.

Thus, notwithstanding the case law cited by the Mexican States, in order to have a proprietary interest, the Mexican States must demonstrate an ownership interest in the lands, waters, natural resources, and wildlife allegedly injured by the *Deepwater Horizon* oil spill. Moreover, even if the Court finds that absolute ownership is not required, at the very least, the Mexican States would have to show that—based on their rights, responsibilities, and obligations under Mexican law—they possess an interest in the relevant natural resources and wildlife that is tantamount to ownership. As described below and in BP's Memorandum (Rec. Doc. 8176-1), the Mexican States cannot make this showing.

C. **Under Mexican Law, the Mexican States Do Not Have Sufficient "Incidents of Ownership" to Have a Proprietary Interest in the Relevant Lands, Waters, Natural Resources, and Wildlife**

As discussed above, in order to determine whether the Mexican States have an interest in the relevant natural resources sufficient to meet the federal maritime law standard for a proprietary interest, one must look to Mexican law. Under Mexican law, and in particular the Mexican Constitution, it is clear that the Mexican federal government, and not the Mexican States, owns the waters, lands, and natural resources allegedly damaged by the *Deepwater Horizon* oil spill. *See* BP Mem. at 6-11 (Rec. Doc. 8176-1). Given the explicit and unequivocal nature of the Mexican federal government's ownership interest in the lands, waters, and natural resources allegedly injured by the oil spill, it is apparent that the Mexican States do not possess the requisite proprietary interest in this case.

Moreover, even if the Court looks to certain factors in order to assess whether the Mexican States possess an interest that is *tantamount* to ownership—which BP submits is not necessary given the absolute ownership rights of the Mexican federal government in this case—it is evident that the Mexican States do not possess the requisite proprietary interest. Under Mexican law, the Mexican federal government, and not the Mexican States, retains primary (and often exclusive) jurisdiction over the relevant natural resources and wildlife. *See* BP Mem. at 11-13, 15-16 (Rec. Doc. 8176-1). In addition, even where the federal government allows for the use or exploitation of these resources, Mexican law is clear that a grant of use or exploitation does not transfer ownership or a proprietary right. *Id.* at 13-14; *see also* Section I.C.3, *infra*. Accordingly, the Mexican States do not, and indeed cannot, have a proprietary interest in the lands, waters, natural resources, and wildlife allegedly injured by the *Deepwater Horizon* oil spill, and their motion for summary judgment should be denied.

1.    **The Mexican States Do Not Own the Lands, Waters, Natural Resources, and Wildlife Allegedly Injured By the Oil Spill**

The Mexican States argue that they "own the coastlines, beaches, estuaries, coastal areas, wildlife, flora, fauna, and other features along their Gulf Coasts." Mex. States Mem. at 20. As previously explained by BP, this argument is entirely without merit. *See* BP Mem. at 6-11 (Rec. Doc. 8176-1). Pursuant to the Mexican Constitution and its implementing statutes, the Mexican federal government, and not the Mexican States, has exclusive ownership rights over the Mexican lands, waters, and natural resources allegedly damaged by the oil spill. *Id.* Specifically, the Mexican federal government, and not the Mexican States, owns the territorial seas, inland marine waters, and estuaries, Const. Art. 27, ¶ 5 (Rec. Doc. 8167-8, at 3; Rec. Doc. 8167-6, at 3); the Mexican Exclusive Economic Zone, Const. Art. 27, ¶ 8 (Rec. Doc. 8167-8, at 4); and the maritime beaches and the federal maritime zone (defined to include the stretch of land measuring twenty meters wide from the sea), GLNA, Arts. 6, 7 (Rec. Doc. 8167-8, at 27-28; Rec. Doc. 8167-6, at 7-8). In addition, under Mexican law, wildlife is not owned by any sovereign, and thus cannot be owned by the Mexican States. *See* Decl. of L. Burguete-Stanek, at 9 (Rec. Doc. 8167-7); González Márquez Rpt., ¶ 25 (Rec. Doc. 8167-10).

The Mexican States nevertheless maintain that they do in fact own their coastlines, beaches, and other features along their Gulf Coasts. For example, the Mexican States assert that the "Mexican Nation" is comprised of the following constituent elements: (a) the Mexican people; (b) the Mexican Republic; and (c) the National territory. Mex. States Mem. at 11. On this basis alone, the Mexican States conclude: "Therefore, the States of Tamaulipas, Veracruz and Quintana Roo are the rightful owners of their state territories, which include their shores, beaches and the flora and fauna in them." *Id.* at 12. It is not at all clear, and the Mexican States

do not explain, how the purported composition of the "Mexican Nation" grants the Mexican States an ownership interest over coastal areas and natural resources.

Presumably, the Mexican States are relying on the expert report submitted by Carlos A. Gabuardi.  In his report, Mr. Gabuardi reaches the untenable conclusion that because Mexico is composed of the Mexican people, the Mexican Republic (the states, municipalities, and the federal union), and the National territory, the term "Nation" in Article 27 of the Mexican Constitution must therefore refer to all of these constituent parts.  Consequently, Mr. Gabuardi reasons that because "domain over Mexican seawaters, coastal areas and islands is held by the Mexican Nation," the "proprietary interest held by [the Mexican States] over such zones is fully existent and justified."  Gabuardi Rpt. at 23 (Rec. Doc. 8167-2).  Such an argument defies common sense, as it would imply that *all* Mexican citizens—who, according to Mr. Gabuardi, are also constituent parts of the Mexican Nation—also have proprietary interests in the coastal areas.  Moreover, as BP explained previously, the Mexican Supreme Court has explicitly held that the term "Nation" in the Mexican Constitution refers to the Mexican federal government. *See* BP Mem. at 7-8 (Rec. Doc. 8176-1).

Notably, the Mexican States later appear to concede that the term "Nation" in the Mexican Constitution means the Mexican federal government, asserting that "[b]y the authority of Article 27 of the Mexican Constitution, federal coastal zones and lands reclaimed from the sea, can be bought and sold by the Mexican Federal Government [the "Nation"] to private individuals and corporations."  Mex. States Mem. at 12.  However, the Mexican States' apparent suggestion that Article 27 provides support for their assertion of a proprietary interest in this case misses the mark.  First, Article 27 explicitly states that certain categories of land and water, including the territorial sea, inland marine waters, and estuaries, among others, are inalienable

11

(*i.e.*, not subject to sale to private individuals).  Const. Art. 27, ¶ 6 (Rec. Doc. 8167-8, at 3; Rec. Doc. 8167-6, at 3); *see also* BP Mem. at 8 (Rec. Doc. 8176-1).  Likewise, the General Law of National Assets ("GLNA") states that assets subject to the federal government's public domain regime, which include, among others, beaches and the federal maritime zone, are also inalienable.  GLNA, Art. 13 (Rec. Doc. 8167-8, at 27; Rec. Doc. 8167-6, at 8); *see also* BP Mem. at 9-10 (Rec. Doc. 8176-1).  Thus, although certain categories of federal land are subject to sale to private parties, the land, waters, and natural resources potentially at issue in this case are not.  Second, the Mexican States do not explain, nor could they, how the sale of land to *private individuals and corporations* is indicative of a proprietary interest held by the *Mexican States*.  To the contrary, such land transfers have no bearing on whether the Mexican States have a proprietary interest in this case.

Accordingly, despite the Mexican States' unsupported assertions to the contrary, the Mexican States do not own the lands, waters, natural resources, and wildlife allegedly injured by the *Deepwater Horizon* oil spill.  The Mexican federal government's ownership interest in these resources, and the Mexican States' complete lack thereof, is sufficient basis for this Court to conclude that the Mexican States do not possess the requisite proprietary interest.

### 2.   The Mexican Federal Government Has Exclusive Jurisdiction Over the Relevant Natural Resources and Wildlife

Given the clear and unequivocal nature of the Mexican federal government's ownership interest in the relevant natural resources, it is apparent that the Mexican States cannot have a proprietary interest.  However, even if the Court determines that absolute ownership is not required, the Mexican States still do not have the requisite interest because they cannot demonstrate an interest in the relevant natural resources and wildlife that is so substantial as to be *tantamount* to ownership.  In this respect, under Mexican law, the Mexican federal government,

and not the Mexican States, has primary (and often exclusive) jurisdiction over the lands, waters, natural resources, and wildlife allegedly injured by the oil spill.

In this respect, the Mexican federal government, and not the Mexican States, has *exclusive* jurisdiction over many of the areas allegedly damaged by the oil spill. For instance, the Mexican federal government has exclusive jurisdiction over assets subject to the federal government's public domain regime, which include, among others, the territorial sea, inland marine waters, beaches, the federal maritime zone, the continental shelf, the Mexican Exclusive Economic Zone, estuaries, the seabed, and the subsoil. GLNA, Art. 9 (Rec. Doc. 8167-8, at 28; Rec. Doc. 8167-6, at 8); *see also* BP Mem. at 12-13 (Rec. Doc. 8176-1). Accordingly, even if the Court looks to factors such as possession and control, responsibility for repair, and responsibility for maintenance, there is little argument that the Mexican States possess an interest in these areas—which they do not own and over which they have no jurisdiction or authority— that is tantamount to ownership.

Moreover, even for matters over which the Mexican federal government and the Mexican States exercise concurrent jurisdiction, the Mexican federal government maintains a dominant role. *See* BP Mem. at 11-12 (Rec. Doc. 8176-1). In this respect, it is not true, as the Mexican States suggest, that Article 73, Section XXIX-G of the Mexican Constitution stands for the proposition that "the Federal Government, the governments of each State, and the Municipalities in each State must and should intervene and act in conjunction when protecting, preserving and restoring the environment and ecological balance of the Gulf of Mexico." Mex. States Mem. at 12-13. Rather, that provision merely authorizes the Mexican *federal government* to enact laws establishing concurrent jurisdiction, thereby allowing the federal government to determine the precise balance of federal and state authority. Const. Art. 73 (XXIX-G) (Rec. Doc. 8167-8, at

10; Rec. Doc. 8167-6, at 5).  As such, the Mexican States may only exercise authority over environmental matters when that authority is explicitly granted to them by the Mexican federal government.  As BP explained previously, because the federal government determines the balance of authority, the role of the Mexican States is limited and secondary to that of the federal government, particularly with regard to matters of the environment and wildlife.  *See* BP Mem. at 11-12, 15-16 (Rec. Doc. 8176-1).

To summarize, under the Mexican Constitution and its implementing statutes, it is undisputed that the Mexican States do not have an ownership interest in the relevant natural resources and wildlife.  Further, even if the Court applies a lesser standard whereby ownership is not strictly required to demonstrate a proprietary interest, the Mexican States still do not have the requisite interest in the relevant lands, waters, natural resources, and wildlife.  Rather, the Mexican federal government, and not the Mexican States, is largely (if not exclusively) responsible for managing and overseeing these areas and resources.  Accordingly, even under a tantamount-to-ownership standard, the Mexican States have failed to demonstrate an interest in the relevant natural resources and wildlife substantial enough to justify recovery in this case.

> ### 3.    The Mexican States Have Failed to Point to Any Evidence That the Mexican Federal Government Transferred an Ownership Interest or a Proprietary Right Over the Relevant Natural Resources

As described above, the Mexican federal government has exclusive ownership and jurisdiction over the relevant natural resources and wildlife.  Nonetheless, the Mexican States attempt to argue that "through Coordination Agreements, Decrees, Grants, Sale Agreements, and other federal instruments," the federal government has somehow transferred ownership rights over the relevant lands, waters, and natural resources.  Mex. States Mem. at 13-14.  As previously explained by BP, such instruments cannot transfer ownership or any interest that is

tantamount to ownership.  *See* BP Mem. at 13-14 (Rec. Doc. 8176-1).  In addition, as described below, the Mexican States dramatically overstate the significance of certain of these instruments.

For example, the Mexican States argue that the "Administrative Agreements incorporated in Gabuardi's Expert Report (Exhibit B), grant federal land zones and lands reclaimed from the sea to the State of Tamaulipas (Exhibit B, pgs. 92-96) (such land grant constitutes half of the coast and land of the sea of the State of Tamaulipas)."  Mex. States Mem. at 15.  Similarly, with respect to Quintana Roo, the Mexican States assert that "Administrative Agreements (See Gabuardi's Expert Report Exhibit B pgs. 96-205) grant federal land zones and land reclaimed from the sea to the State, thereby giving the State complete control and authority over such lands."  *Id.*  However, the Mexican States fail to mention an important caveat from Mr. Gabuardi's report.  Specifically, with respect to each administrative agreement, Mr. Gabuardi notes: "This clause [GLNA Art. 70] provides [that] administrative agreement[s] granting the benefit upon federal assets *only transfer the right to use them but do not transfer the property on the same or create any other real rights on such assets* and hence cannot be transferred to anyone else."  *See, e.g.*, Gabuardi Rpt. at 94 n.373, 98 n.395 (Rec. Doc. 8167-2) (emphasis added).  Mr. Gabuardi is correct.  Under Mexican law, administrative agreements only grant the beneficiary a right to use the property for a specific purpose, and do not transfer any real interest in the property.  *See* GLNA, Art. 70 (Rec. Doc. 8167-9, at 6).  Accordingly, contrary to the Mexican States' assertions, administrative agreements cannot create a proprietary interest.

Similarly, the Mexican States egregiously misrepresent the import of a Decree issued on April 14, 2005 by the Ministry of the Environment and Natural Resources, which the Mexican States highlight as "further and unique proof of the Mexican Republic's transfer of federal lands, federal maritime zone, and lands reclaimed from the sea."  Mex. States Mem. at 15.  In this

respect, the Mexican States incorrectly assert that the "decree granted the land identified in the attached map (*attached to Exhibit E*) (almost half of the state coastline and previous federal maritime zones) to the State of Tamaulipas, along with the authority to possess, control, and manage such areas, as well as the obligation to maintain, restore, and repair these lands out of the State's own funds." *Id.*  As described below, the Mexican States' characterization of the Decree is grossly inaccurate.

Contrary to the Mexican States' characterization, the Decree provides as follows: "The region known as Laguna Madre y Delta del Rio Bravo is hereby *declared to be a natural protected area*, with special consideration for plants and wildlife (flora and fauna)." (Rec. Doc. 8178-8 (emphasis added)).  The decree further provides:

> The Ministry of the Environment and Natural Resources [a component of the federal government] shall enter into coordination agreements with the Government of the State of Tamaulipas . . . in order to comply with the provisions of this Decree.  Such instruments shall include, at least, the following:  (I) The manner in which the Government of the State, the municipalities and the private and social sectors shall take part in the management of the protection zone for flora and fauna; (II) The coordination of applicable federal policies . . . .
>
> The inspection and vigilance of the zone of protection for flora and fauna of the Laguna Madre y Delta del Rio Bravo *shall be charged to the Ministry of the Environment and Natural Resources*, with the corresponding participation of other Federal agencies, the State and the municipalities with competence thereto.

(*Id.* (emphasis added)).

As is clear from this excerpt, the Decree in no way grants the identified land to the State of Tamaulipas.  Instead, the Decree simply designates certain federal land as a natural protected area.  Similarly, the Decree does not grant the State authority to "possess, control, and manage" the protected area.  Rather, pursuant to the plain terms of the Decree, the Mexican federal government, through the Ministry of the Environment and Natural Resources, retains primary authority over the protected area.  And although the federal government is tasked with

16

coordinating with the State of Tamaulipas and other parties in order to comply with the provisions of the Decree, the Ministry of the Environment and Natural Resources retains ultimate responsibility for coordinating the management of the protection zone, and is charged with the "inspection and vigilance" of area. (*Id.*) Thus, notwithstanding the Mexican States' mischaracterizations, the Decree is in fact further evidence that the Mexican States do not possess a proprietary interest in the lands, waters, natural resources, and wildlife allegedly injured by the oil spill.

Thus, the Mexican States' attempts to muddy the waters notwithstanding the Mexican federal government's clear and unequivocal ownership rights in the relevant natural resources are unavailing. The Mexican States have failed to provide any evidence that the Mexican States own the relevant natural resources or wildlife, or even that the Mexican States have control of and responsibility for the relevant natural resources and wildlife. As such, the Mexican States have failed to show that they possess the requisite proprietary interest, and their motion for summary judgment should be denied.

## II. ROBINS DRY DOCK APPLIES TO THE MEXICAN STATES' CLAIMS OF NEGLIGENCE AND GROSS NEGLIGENCE AND BP'S ADMISSION OF CRIMINAL CONDUCT IS IRRELEVANT

There is also no merit to the Mexican States' argument that the economic loss doctrine of *Robins Dry Dock* does not apply because of BP's admission of criminal conduct. This Court has already rejected an essentially identical argument in connection with its order dismissing "Pure Stigma Claims." (Rec. Doc. 7526.) There, certain plaintiffs argued that their claims were not defeated by *Robins Dry Dock* because they alleged intentional tort claims. The Court rejected this argument:

> "[I]ntentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998) (citing *Restatement (Second) of Torts* § 8A, Comment a, p.15 (1964)).

17

Having reviewed the B1 Master Complaint and the Sellno Plaintiffs' complaint, the Court finds that neither plausibly allege facts that would take the Pure Stigma Claims outside the *Robins Dry Dock* rule.  For example, although the Sellno Plaintiffs' repeatedly refer to Defendants' "intentional acts," they do not allege facts that would lead to the reasonable inference that the Defendants intended either the oil spill or the purported diminution in property value. . . .  Thus, the Sellno Plaintiffs' argument regarding intentional conduct is unavailing.

(*Id.* at 5-6 (footnotes omitted).)  The Mexican States likewise do not allege any facts that would take their claims outside of the *Robins Dry Dock* rule.  Instead, they allege only negligence and gross negligence; they allege no "facts that would lead to the inference that the Defendants intended either the oil spill" or the alleged harm to the Mexican States.

In addition, as the Mexican States implicitly acknowledge, only one count of BP's plea agreement (obstruction of justice under 18 U.S.C. § 1505) even involves intentional conduct. *See* Mex. States Mem. at 6 (noting that "[s]ignificantly" that count involved actions by which BP acted "*corruptly*, that is, with an improper purpose" (emphasis in original)).  The other counts all sound in negligence.  The Mexican States' reliance on the obstruction of justice count is unavailing, because any intent under this count is causally unrelated to the oil spill or the alleged harm to the Mexican States.

Finally, the cases cited by the Mexican States are not to the contrary, and indeed, the Mexican States' use of case law is inaccurate and misleading.[1]  Contrary to the Mexican States'

---

[1]      For example, the Mexican States claim that the Fifth Circuit has "clearly noted" that "the limiting rationale of *Robins* applies only to *civil negligence cases*."  Mex. States Mem. at 7 (emphasis in original).  In support of this assertion, they cite *Vicksburg Towing Co. v. Mississippi Marine Transport Co.*, 609 F.2d 176, 177 (5th Cir. 1980). In *Vicksburg*, the Fifth Circuit held that *Robins Dry Dock* did not apply because the plaintiff owned the allegedly damaged property.  The court distinguished this situation from two earlier cases, *Dick Meyers Towing Serv., Inc. v. United States*, 577 F.2d 1023 (5th Cir. 1978), and *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469 (5th Cir. 1979), in which the court had applied *Robins Dry Dock* because the plaintiff had not owned the property in question.  In all three of these cases, only negligent conduct was alleged, and neither *Vicksburg* nor *Bayou Lacombe* even mentioned intentional conduct.  The court in *Dick Meyers* noted that "a plaintiff may not recover for interference with his contractual relations unless he shows that the interference was intentional or knowing," 577 F.2d at 1025, but this language is *dicta* given that no intentional conduct was alleged.

In another misleading citation, the Mexican States cite the Fifth Circuit opinion in *Dick Meyers* first in a string cite of cases to support the proposition that "[w]here the plaintiff asserts an intentional tort, the plaintiff's
Footnote continued on next page

18

assertions, the scope (or even existence) of any intentional conduct exception for *Robins Dry Dock* is not clear in the Fifth Circuit.  Despite *dicta* in some Fifth Circuit cases distinguishing intentional from negligent conduct under *Robins Dry Dock*, BP has not found a Fifth Circuit decision that permitted a plaintiff to proceed because it alleged intentional rather than negligent conduct.  The Fifth Circuit *en banc* court in *Testbank*, 752 F.2d 1019 (5th Cir. 1985), did not rule on the question, noting instead that it was not "address[ing] intentional tort."[2]  *Id.* at 1020 n.1.  At any rate, whatever the scope of any intentional conduct exception to *Robins Dry Dock*, the exception does not apply here where (1) the Court has already rejected an essentially identical argument; (2) the Mexican States allege only negligence and gross negligence; and (3) the criminal plea largely sounds in negligence, and the only intentional conduct has no connection to the damages alleged by the Mexican States.

---

Footnote continued from previous page

claim is taken 'out of the *Robins Dry Dock* parameters.'"  Mex. States Mem. at 7.  But the quoted language is not found in *Dick Meyers* (although it does appear in other (district court) cases in the Mexican States' string cite).  Furthermore, even the *dicta* in *Dick Meyers* does not provide support for the Mexican States' claim that any intentional tort takes a case outside of the *Robins Dry Dock* rule.

[2]       The Ninth Circuit has squarely ruled on the issue and found that "nothing in *Robins Dry Dock* or its progeny . . . supports [an] exception" for intentional conduct, except in the limited circumstance where the conduct at issue is intentional interference with contractual relations.  *Nautilus Marine, Inc. v. Niemela*, 170 F.3d 1195, 1195-97 (9th Cir. 1999) (holding "that the *Robins Dry Dock* rule applies to this case despite [plaintiff's] allegations that [defendant] acted intentionally or recklessly" and distinguishing *Dick Meyers*).  Almost all of the cases cited by the Mexican States (to the extent they mention intentional conduct at all) present only *dicta* related to intentional conduct, describe the exception involving intentional interference with contractual relations identified by the *Nautilus* court, or both.  *See Dick Meyers*, 577 F.2d at 1025 (discussed *supra*); *Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co.*, 455 F.2d 957, 958 (5th Cir. 1972) (holding that plaintiff may not proceed when it has not alleged "anything more than merely the negligent interference with contract rights"); *Dunham-Price Group, L.L.C. v. Port Aggregates, Inc.*, 2006 WL 2112953, at *4 (W.D. La. July 26, 2006) (permitting plaintiff to amend its complaint to include a claim for intentional interference with contractual relations); *CXY Energy, Inc. v. Jurisch*, 1992 WL 211649, at *2 (E.D. La. Apr. 17, 1992) (similar); *Nexen Petroleum U.S.A., Inc. v. Sea Mar Division of Pool Well Servs. Co.*, 497 F. Supp. 2d 787, 791 (E.D. La. 2007) (noting in *dicta* that *Robins Dry Dock* was governing law because plaintiffs did not allege that defendant committed an intentional tort ).

19

## CONCLUSION

For the reasons stated herein and in BP's Memorandum (Rec. Doc. 8176-1), BP respectfully requests that the Court deny the Mexican States of Quintana Roo's, Tamaulipas', and Veracruz' joint motion for summary judgment regarding proprietary interests.


Dated: January 25, 2013                                Respectfully submitted,


                                                       /s/ Don K. Haycraft
Richard C. Godfrey, P.C.                               Don K. Haycraft (Bar #14361)
J. Andrew Langan, P.C.                                 R. Keith Jarrett (Bar #16984)
Catherine Fitzpatrick                                  LISKOW & LEWIS
Elizabeth A. Larsen                                    701 Poydras Street, Suite 5000
KIRKLAND & ELLIS LLP                                   New Orleans, LA  70139-5099
300 North LaSalle                                      Telephone:  504-581-7979
Chicago, IL  60654                                     Facsimile:  504-556-4108
Telephone:  312-862-2000
Facsimile:  312-862-2200                               Jeffrey Bossert Clark
                                                       KIRKLAND & ELLIS LLP
Allison Rumsey                                         655 Fifteenth Street, N.W.
S. Zachary Fayne                                       Washington, D.C. 20005
ARNOLD & PORTER LLP                                    Telephone:  202-879-5000
555 Twelfth Street, NW                                 Facsimile:  202-879-5200
Washington, DC  20004-1206
E-Mail:  Allison.Rumsey@aporter.com                    Robert C. "Mike" Brock
Telephone:  202-942-5000                               COVINGTON & BURLING LLP
Facsimile:  202-942-5999                               1201 Pennsylvania Avenue, NW
                                                       Washington, DC 20004-2401
                                                       Telephone:  202-662-5985
                                                       Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 25th day of January, 2013.

Dated: January 25, 2013                              Respectfully submitted,


                                                     */s/ Don K. Haycraft*
                                                     Don K. Haycraft