IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | *<br>*<br>*<br>*<br>* | MDL NO. 2179<br><br>SECTION J |
| This document relates to: | * | Judge Barbier |
| *Nos. 10-4239; 10-4240; 10-4241* | *<br>*<br>* | Magistrate Judge Shushan |

BRIEF OF DEFENDANT CAMERON INTERNATIONAL CORPORATION
IN OPPOSITION TO THE MEXICAN STATES OF QUINTANA ROO'S,
TAMAULIPAS', AND VERACRUZ', JOINT MOTION FOR
SUMMARY JUDGMENT REGARDING PROPRIETARY INTERESTS

Cameron International Corporation ("Cameron") respectfully submits this brief in opposition to The Mexican States of Quintana Roo's, Tamaulipas', and Veracruz', Joint Motion for Summary Judgment Regarding Proprietary Interests, Doc. 8178, primarily to address the arguments advanced in the Mexican States' supporting brief, Doc. 8178-1 (the "Mexican States' Brief").

SUMMARY OF OPPOSITION

In this summary judgment proceeding to address application of the *Robins Dry Dock* rule, the Mexican States' Brief ignores not only the *Robins Dry Dock* decision itself, but also the Fifth Circuit's *en banc* decision in *Testbank*, and the Fifth Circuit's most recent decisions on the meaning of "proprietary interest," *see* Docs. 4845 at 12; 3830 at 19-25. In short, the Mexican States' Brief fails to demonstrate that they have any interest that could be considered a "proprietary interest" in allegedly damaged property to support their claims against Cameron.

Under the Fifth Circuit's en banc holding in *Testbank*, *Robins Dry Dock* established a "bright line rule," based on the "character of the interest harmed," to determine whether

1

allegedly injured property "belongs" to the plaintiff.  Mexican law, in turn, vests the Mexican Nation with "full" and "inalienable" "ownership" of allegedly harmed Mexican coastal property and Gulf resources, and forecloses the transfer of the Nation's interests to the Mexican States in the only contracts the Mexican States can identify.  Because the allegedly damaged property does not belong to the Mexican States, they have not suffered any harm to a proprietary interest as a matter of the law of Mexico.  The Mexican States' remaining negligence claims against Cameron therefore fail as a matter of law.

## ARGUMENT IN OPPOSITION

As it pertains to *Robins Dry Dock*, the Mexican States' Brief proceeds in a curious manner.  First, the Mexican States argue that maritime law rather than Mexican law determines whether they have a proprietary interest in allegedly injured property in Mexico.  Mexican States' Brief, pp. 9-10.  Second, the Mexican States nevertheless argue that they do hold proprietary interests as a matter of Mexican law.  *Id.*, pp. 11-20.  Third, the Mexican States argue that even if they hold no ownership interest as a matter of Mexican law, "there is no requirement of ownership" under *Robins Dry Dock*.  *Id.*, pp. 20-27.  The Mexican States are wrong on all three counts.

Fundamentally, the Mexican States do not affirmatively show that they can satisfy *Robins Dry Dock*.  Under the law of Mexico, the Mexican States hold even less of an interest in allegedly damaged national "common use" assets than the interests in damaged property that were held by the time charterers who were denied recovery as a matter of law in *Robins Dry Dock*.  Simply stated, the Mexican States' claims against Cameron fail because Mexican coastal and Gulf resources do "not belong to" them.

### A. The Law of Mexico Determines the Character of the Interests Held by the Mexican States

According to the Mexican States, "[w]hether a party has a proprietary interest is not determined by looking to state law." Mexican States Brief, p. 10. This argument not only defies common sense, but it also cannot be squared with the Fifth Circuit's decision in *Louisville & Nashville RR. v. M/V Bayou Lacombe*, 597 F.2d 469 (5th Cir. 1979) ("*L&N*").

To determine whether a party has a "proprietary interest" in damaged property, it is necessary to look to the property law that governs that interest. To be sure, if the damaged property is a vessel or part of a vessel, a "proprietary interest" is determined by the maritime law applicable to the vessel. However, if the damaged property is inland property (other than a navigable water), the law of the jurisdiction in which the property is located would determine whether an interest is proprietary. Therefore, if the damaged property is located in a foreign country, the law of that foreign country – here Mexico – would determine whether the interest is proprietary.

The *L&N* decision adopted this common sense approach. The L&N had a contract for joint use of a bridge in Alabama owned by Southern Railway. When a tug collided with the bridge, L&N sued for losses (rerouting expenses) caused by its inability to use the bridge. The Fifth Circuit held that L&N's right to recover was governed by *Robins Dry Dock*, and that "the critical factor in applying *Robins* is 'the character of the interest harmed.'" *Id.* at 472-73 (quoted citation omitted); *accord*, *State of Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019,1024 (5th Cir. 1985) (en banc).

Maritime law, of course, would not have spoken to the "character" of a contractual interest in use of an Alabama railroad bridge. The Fifth Circuit in *L&N* therefore applied Alabama law, finding that an Alabama Supreme Court decision "fully disposes of the plaintiff's

3

contention that it has an easement in the bridge." 597 F.2d at 473.  In addition, the Alabama Supreme Court had held that the agreement with Southern Railway was "a contract and not a conveyance of property."  *Id.*  The Fifth Circuit also rejected L&N's argument based on the Alabama Supreme Court holding that the agreement provided a "right of user in the nature of an easement," concluding that such a contractual right of use was not a "property interest under Alabama law."  *Id.*  Consequently, determining the "character of the interest harmed" for purposes of *Robins Dry Dock* depended on application of local Alabama law.

In this case, therefore, the "character" of the allegedly harmed "interest" of the Mexican States in Mexican Gulf and coastal resources must be determined by the law of Mexico.

### B. The Mexican States Hold No Interests in Allegedly Harmed Property under the Law of Mexico

Having argued that the proprietary interest issue is "not determined by looking to state law," the Mexican States nevertheless look to the law of Mexico.  They rely in general on reports from hired lawyers from Mexico, and merely pass along, without explanation or citation, the conclusions in those reports that the Mexican States somehow hold the required proprietary interests.  Mexican States Brief, p. 11.

This reliance on reports of Mexican lawyers is misplaced.  The Fifth Circuit has held that "federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities."  *Access Telecom, Inc. v. MCI Telecomunications Corp.,* 197 F.3d 694, 713 (5th Cir. 1999).

Even though the reports submitted by the Mexican States are thoroughly refuted by the reports submitted by the Defendants in this case, this remains an appropriate case to apply the *Access Telecom* principle.  The parties have submitted translations of the relevant Mexican legal authorities, including the text of the Mexican Constitution, the national laws of Mexico, and

4

decisions of the Mexican Supreme Court.  Docs. 8167-1, 5, 6, 8, 9; 8186-2.  There is no meaningful dispute about the accuracy of these translations.  For example, the Mexican States *and* defendants rely on the official translation of the Mexican Constitution issued by the Mexican Supreme Court.  *Compare* Doc. 8167-5 *with* Doc. 8186-2.  In these circumstances, the Court is well equipped to resolve Mexican law issues on the basis of an independent examination of the Mexican legal authorities, just as the Fifth Circuit did in *Access Telecom*, 197 F.3d at 715-16.

1. **The Content of Mexican Law**

Mexican law governing Mexican Gulf and coastal property vests full ownership in the Mexican Nation rather than the Mexican States.  Under the Mexican Constitution,

- "The Mexican Nation is one and indivisible."  Art. 2, Doc. 8186-2 at 2.

- "The Nation has full ownership over all natural resources of the continental shelf and the seabed and subsoil of the submarine areas of the islands."  Art. 27 ¶ 4, Doc. 8186-2 at 66.

- "The Nation has full ownership over the waters of the territorial sea . . .; over internal waters; waters of lagoons and estuaries permanently or intermittently connecting with the sea."  Art. 27 ¶ 5, Doc. 8186-2 at 66.

- "In the cases established in the two paragraphs hereinbefore, the Nation's dominion is inalienable and not subject to the statute of limitations and the . . . use or enjoyment of the resources . . . may be undertaken by means of concessions . . . and in accordance with the rules and conditions set forth by [national] Laws."  Art. 27 ¶ 6, Doc. 8186-2 at 69.

The Constitution vests "full" and "inalienable" "ownership" of the allegedly damaged property in the "one and indivisible" Mexican "Nation."  The Constitution therefore precludes the Mexican States from obtaining a "proprietary interest" in these resources, and any interest they do obtain is subject to "rules and conditions" established by the "Laws" of Mexico.

In this context, the national statutes of Mexico faithfully implement the Constitution by setting out "rules" that acknowledge full ownership of pertinent property in the Nation, while

providing "conditions" on intergovernmental agreements that preclude transfer of a proprietary interest in that national property to the Mexican States.

According to Article 6 of the General Law of National Assets, "the following will be subject to the public domain of the Federation regime:

> II. The assets of common use referred to in article 7 of this law;
>
> IV. The seabed and subsoil of the territorial sea and of the inland marine waters;
>
> IX. The lands gained naturally or artificially from the sea, rivers, . . ., [or from] lagoons or estuaries of national property."

In turn, under article 7, the "following are assets of common use:

> II. The inland marine waters . . . ;
>
> III. The territorial sea . . .;
>
> IV. The beaches, . . . ;
>
> XIV. Other assets considered of common use by other laws that regulate national assets . . .;"

Under article 9,

> all such "assets subject to the public domain of the Federation regime will be exclusively under the jurisdiction of the federal branches."

Under article 13,

> all such "assets . . . are inalienable, not subject to the statute of limitation and cannot be seized, also, they cannot be the object of an action reclaiming ownership or definitive or provisional possession or any other action brought by a third party."

Under article 15,

> "public institutions can only acquire . . . the use, enjoyment and exploitation of [such] assets subject to the regime of public domain of the Federation, the rights regulated by this Law and in any others issued by the Congress of the Union." and

Under article 16,

> "[c]oncessions, permits and authorization over [such] assets . . . do not create proprietary rights ['*derechos reales*']."

Doc. 8167-5 at 7-9. One of the Mexican States' reports on Mexican law, that of Dr. Guabardi, cites and paraphrases these provisions of the General Law of National Assets, or similarly worded provisions of other national laws made applicable by article 15. *See, e.g.*, Doc. 8178-5 at 133-35 and fns. 625-29 and 643. The Mexican States Brief itself and the other reports on Mexican law submitted by the Mexican States ignore these critical provisions of Mexican law.

Most importantly, the Guabardi Report repeatedly recites the following dispositive provision of article 70 of the General Law of National Assets: ***"administrative agreements"*** with public authorities like the Mexican States "***granting the benefit upon federal assets only transfer the right to use them but do not transfer the property on the same or create any other real right son [sic] such assets***." Doc. 8178-5 at 94 & fn. 373 (emphasis added); *accord*, fns. 395, 417, 439, 461, 483, 505, 527, 571, 615, 637, 659, 681, 703, 725, 747, 813, 835, 879, 901, 923, 945, 967, 989, 1011, 1033, 1055, 1077, 1099; Doc. 8167-9 at Exh. 1, p. 6.

Plainly, these clear and dispositive provisions of the Mexican Constitution and national law defeat the Mexican States' arguments about Mexican law.

### 2. The Arguments of the Mexican States Under the Mexican Constitution Are Demonstrably Invalid

The Mexican States argue that the States own national property because the States are part of the "Nation." Mexican States' Brief, pp. 11-12. For this proposition, however, the Mexican States cite provisions of Title Two of the Mexican Constitution concerning the republican form of the Mexican government. Doc. 8168-2 at 102-30. None of these Articles purports to refer to the ownership rights of the "Nation," which are plainly vested by Article 27, which appears in Title One of the Constitution concerning "rights." *Id.* at 1. Moreover, the

7

Mexican States' argument is directly contrary both to the provision of Constitution Article 2 of the Constitution that defines the character of the "Nation" for purposes of Article 27 – namely the "Nation is one and indivisible" – and to the provisions of Article 27 ¶¶ 4-6 and the General Law of National Assets that preclude the States from obtaining any such ownership interest.

Next, the Mexican States refer to the first sentence of Article 27, saying that it permits the Nation to convey national property to "individuals."  Mexican States' Brief, p. 12.  In the official translation submitted by the Mexican States themselves, however, the Mexican Supreme Court translates the quoted phrase "*los particulares*" as "private persons," corresponding to the final phrase of the sentence: "*la propiedad privada*" or "private property."  Doc. 8186-2, p. 12. Demonstrating that this part of Article 27 deals with transfers of national land to private persons, the Mexican States cite as examples (although they do not include them in the summary judgment record) contracts relating to the La Pesca development.  *Id.*  Neither the opening sentence of Article 27 nor the La Pesca development contracts conveying national land to the private developer are material to establish any proprietary interests held by the Mexican States. Private acquisition of "beachfront" land does not create any proprietary interest of the States in either the Nation's beaches or the private party's acquired land.  Indeed, if the first sentence of Article 27 permitted conveyances to the States despite the clear terms of Article 27 ¶¶ 4-6, the States should be able point to a contract containing such a conveyance to the States themselves. This they cannot do.

The Mexican States also rely on Article 73 § XXIX-G of the Mexican Constitution, arguing that it obligates the States to undertake environmental control and resource conservation efforts.  Mexican States' Brief, pp. 12-13.  This argument transparently misrepresents the content of the cited section.  Article 73 sets out "powers" of the national "Congress," not any obligations

or rights of the states.  Doc. 8186-2 at 155.  Section XXIX-G specifically empowers the national Congress "[t]o enact laws establishing the concurrence of the Federal Government, the States and the municipalities, within their respective jurisdictions, on matters concerning environmental protection and preservation of ecological balance."  Doc. 8186-2 at 167-68.  Obviously, a constitutional provision granting a legislative power to the national Congress, particularly one empowering the national legislature to dictate to the States what they may or may not do in the realm of environmental protection, does not create a proprietary interest for a State.

Undeterred, the Mexican States boldly argue that "even if Article 27 of the Mexican Constitution labels such assets as belonging to the Nation, Articles 116 Section VII, Article 73 Section XXIX, and Article 124 of the Constitution <u>provide for the transfer off [sic] those land rights</u>."  Mexican States' Brief, p. 13 (emphasis in original).  But the Mexican States fail to quote language from any of these provisions of the Constitution to support their assertion.  Indeed, they cannot.

As noted above, Article 73 § XXIX deals with the legislative powers of the national Congress, not with any transfer of land rights.

Article 116 correspondingly deals with the "States' government power." Doc. 8186-2 at 282.  In that context, Section VII permits the States to enter into "agreements where a State takes upon itself the exercise of certain functions of the Federation, such as the undertaking and performance of works and the rendering of public services." *Id.* at 292.  Section VII has nothing to do with a transfer of land rights either.

Article 124 provides that "[a]ll powers not explicitly vested by this Constitution on federal authorities, are reserved to the States." *Id.* at 347.  This has to do with powers, not land rights.  That is why Article 124 refers to "federal authorities," who exercise powers, rather than

9

the Nation, which owns national property. But even if Article 124 had to do with property rights rather than "powers," pertinent land rights are still "explicitly vested by" Article 27 of the Constitution in the Nation rather than the States. Article 124, therefore, in no way alters the explicit provisions of Article 27 vesting "full" and "inalienable" ownership of allegedly injured property in the Nation, nor does it transfer any land rights to the States.

### 3. The Arguments Based on Intergovernmental Agreements, Irrelevant Statutes, and State Constitutions Are Demonstrably Invalid

No doubt aware that their constitutional arguments must fail, the Mexican States rely on a variety of intergovernmental agreements with the Nation. Mexican States' Brief, pp. 14-16. But if the States truly owned proprietary rights to national property because they are part of the Article 27 "Nation," they would not need any contract with the national government to participate in joint governance of the Nation's property.

In any event, the Mexican States must rely on the Guabardi report for their "agreement" argument, because the only part of the summary judgment record even mentioning those agreements is the Guabardi report. Doc. 8165-5. However, the agreements themselves are *not* part of the report and are therefore *not* part of the summary judgment record. Consequently, any statements in the Guabardi report purporting to describe those contents are not admissible to prove the contents of those agreements under FED. R. EVID. 1002, 1003.

But the Mexican States face a more fundamental problem. According to the Guabardi report itself, section 70 of the General Law of National Assets provides that

> **administrative agreements" with public authorities like the Mexican States "granting the benefit upon federal assets only transfer the right to use them but do not transfer the property on the same or create any other real right son [sic] such assets."**

Doc. 8178-5 at 94 & fn. 373; *accord*, fns. 395, 417, 439, 461, 483, 505, 527, 571, 615, 637, 659, 681, 703, 725, 747, 813, 835, 879, 901, 923, 945, 967, 989, 1011, 1033, 1055, 1077, 1099.  The difference between a joint right of use and property ownership is meaningful and dispositive.  As acknowledged in the Guabardi report, the law of Mexico affirmatively disproves that these agreements transfer any ownership or proprietary interest from the Nation to any State.

The Mexican States next attempt to rely on Mexican statutes.  Mexican States Brief, pp. 16-17.  Yet the cited statutes have nothing to do with proprietary interests.  To cite the Mexican States' first example, the Mexican General Statute on Wildlife, according to the Mexican States, gives the States responsibility "for developing local policy."  Mexican States' Brief, p. 17.  A government's ability or responsibility to develop local wildlife policy is not a proprietary interest under Mexican law or U.S. maritime law.

As a last resort, the Mexican States rely on provisions of their own state constitutions.  Mexican States' Brief, pp. 18-20.  However, Article 133 provides in pertinent part as follows:

> "This Constitution [and] the laws of the Congress of the Union which shall be enacted in pursuance thereof . . . shall be the supreme law of the Union.  The Judges of the Federal District and of the States shall be bound thereby, notwithstanding any provision to the contrary in the local constitutions . . .."

Doc. 8186-2 at 355.  Nothing in the States' constitutions, therefore, could supply the States with a proprietary interest denied by the Constitution and national laws of Mexico.

### C. The *Robins Dry Dock* Rule Requires Ownership of Allegedly Damaged Property

Finally turning to *Robins Dry Dock*, the Mexican States make a "straw man" argument, questioning the claim that the Mexican States do not hold any proprietary interest because they "do not hold 'title.'"  Mexican States' Brief, p. 20.  That argument addresses a claim that Cameron has not made.

11

1116037v1

### 1. *Robins Dry Dock* Does Require Ownership

However, the Mexican States go further and argue that "[n]either *Robins* nor any other court applying the *Robins* principles has held that ownership of the property is necessary to establish the required proprietary interest." Mexican States' Brief, p. 20. To the contrary, the time charterers in *Robins* unquestionably lost because the damaged vessel did not "belong" to them: "The injury to the propeller was no wrong to the [charterers] but only to those whom it **belonged**." 275 U.S. 303, 308 (1927) (emphasis added), quoted in *Wiltz v. Bayer Cropscience, L.P.*, 645 F.3d 690, 696 (5th Cir. 2011).

In *Testbank*, the Fifth Circuit used the phrase "proprietary interest," but as a proxy for ownership. The en banc decision quoted *Robins* for the proposition that "a tort to the person or **property of one man** does not make the tort-feasor liable to another merely because the injured person was under a contract with that other." 752 F.2d 1019, 1022 (5th Cir. 1985) (emphasis added), quoting 275 U.S. at 309. The en banc opinion in *Testbank* also reiterated that "the distinction between recovery by an **owner** when his property was damaged and recovery by others, as applied in *Robins*" and other prior Fifth Circuit cases "was 'meaningful, real and dispositive.'" 752 F.2d at 1024 (emphasis added), quoting *Vicksburg Towing Co. v. Mississippi Marine Transport Co.*, 609 F.2d 176, 177 (5th Cir. 1980), and quoted in *Catalyst Old River Hydroelectric L.P. v. Ingram Barge Co.*, 639 F.3d 207, 211 (5th Cir. 2011).

After the en banc holding in *Testbank*, ownership of damaged property has remained the crux of Fifth Circuit *Robins Dry Dock* decisions. One decision refers to the "long established **requirement of ownership**" that was "enunciated" in *Robins Dry Dock*. *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1194 (5th Cir. 1993) (emphasis added). Implicitly acknowledging that *Testbank* had recognized the value of *Robins Dry Dock* as a "bright line rule," 752 F.2d at 1029,

12

the Fifth Circuit in *IMTT-Gretna* commented that this "bright line rule serves as notice to ***non owners*** that they ***cannot claim damages*** in maritime" cases. 993 F.2d at 1194 (emphasis added).

The Mexican States cite *Texas Eastern Transmission Corp. v. McMoRAN Offshore Exploration Co.*, 877 F.2d 1214 (5th Cir. 1989). Mexican States' Brief, p. 21. But that decision likewise acknowledges "*Robins'* ***ownership requirement***." *Id.* at 1224 (emphasis added). *See also Wiltz*, 645 F.3d at 696 (quoting *Robins Dry Dock* language focusing on ownership); *Catalyst Old River*, 639 F.3d at 209 (5th Cir. 2011) (identifying at the outset what "Catalyst owns").

### 2. The Concluding Language in *L&N*

To be sure, litigants have made "attempts to circumvent *Robins'* ownership requirement" by resorting to language originating in the closing paragraphs of the *L&N* decision. *Texas Eastern*, 877 F.2d at 1224-25 (5th Cir. 1989); *see IMTT-Gretna*, 993 F.2d at 1194. However, a careful reading of the *L&N* decision reveals the lack of merit in the Mexican States' effort to do the same here.

The Fifth Circuit in *L&N* concluded, on the basis of Alabama law and a decision of the Alabama Supreme Court, that L&N could not satisfy *Robins Dry Dock*. 597 F.2d at 474. According to Judge Wisdom, the author of the *L&N* decision, the holding in *L&N* had everything to do with ownership:

> "Although L&N did not ***own*** the bridge, it sought to place itself in the same position as the ***owner*** of the bridge through its contractual agreement with the bridge's ***actual owner***. The court found that the agreement placed ***no ownership*** interest in the L&N. Therefore, under *Robins*, as construed by this Court, L&N had no right to recover."

*Testbank*, 752 F.2d at 1037 (Wisdom, J., dissenting) (emphasis added).

The additional comments in the *L&N* opinion do not help the Mexican States. "Even if the Alabama courts would classify the plaintiff's rights in the bridge as a form of property

interest, . . . , that interest would form too slender a reed upon which to base a right of recovery despite *Robins*." 597 F.2d at 474.  The Fifth Circuit posited that the Supreme Court in *Robins Dry Dock* had "recognized that recovery might be possible if the charterer of the vessel had been a demise-charterer with a property right in the vessel rather than a time-charterer." *Id.*  However, it was clear that L&N's right to use the bridge had "none of the incidents of ***ownership*** attributable to the demise-charterer that would justify recovery for damage to physical property." *Id.* at 474 (emphasis added).  The L&N "never had possession or control of the bridge, did not maintain the bridge, and had no obligation to repair the bridge or contribute to the cost of repairs in the event of damage." *Id.*

Finally, the Fifth Circuit has never **held** that *Robins Dry Dock* could be satisfied in the face of applicable property law denying a maritime claimant an ownership interest.  In the *Texas Eastern* case, the Fifth Circuit applied *Robins Dry Dock* and held that Marathon could not recover for damage to a pipeline owned by Texas Eastern.  877 F.2d at 1224.  The court nevertheless addressed **and rejected** Marathon's attempt to rely on *L&N*, holding that some maintenance responsibilities fall far short of the required ownership.  *Id.*  Likewise in *IMTT-Gretna*, the Fifth Circuit rejected the attempts of a "non owner" to rely on this passage from *Texas Eastern* to evade the "bright line" rule of *Robins Dry Dock*, concluding that the claimant's limited rights to use a pipeline did not establish the requisite proprietary interest.  993 F.2d at 1194.

Even from the perspective of the closing language in *L&N*, it is clear that the Mexican States cannot satisfy *Robins Dry Dock*.  The Mexican States have an even weaker claim than the time charterers in *Robins Dry Dock*.  The intergovernmental contracts invoked by the Mexican States are all governed by Mexican law that forecloses State ownership.  In addition, the time

14

1116037v1

charterers did have the often exclusive right (a) to control the voyage of the vessel and (b) thereby to use the vessel to deliver their cargo. By contrast, under Mexican law, Mexican coastal beaches and waters remain available for "common use," *i.e.*, by Mexican citizens and foreign tourists. The Mexican States, therefore, have no exclusive right to use that property. Similarly, the Mexican States' limited right to participate in governance of national property under intergovernmental contracts falls far short of the control exercised by the time charterers over the damaged vessel in *Robins Dry Dock*. For these reasons, the entire closing argument of the Mexican States (Mexican States' Brief, pp. 20-27) fails as a matter of U.S. maritime law.

### D. Other Defendants' Plea Agreements Cannot Support Claims Against Cameron

The Mexican States also argue that BP's criminal plea agreement with the United States somehow takes this case out of the *Robins Dry Dock* rule. Mexican States' Brief, pp. 5-8. Of course, no such agreement by some other defendant could take the Mexican States' surviving ***negligence claims against Cameron*** outside of the *Robins Dry Dock* rule.

### Conclusion

The Mexican States cannot satisfy *Robins Dry Dock*. The allegedly damaged property is "fully owned" by the Mexican Nation, and under unambiguous terms of Mexican law, no proprietary interest in that property can be or has been transferred to the States. Accordingly, while preserving its legal positions (*see* Rec. Doc. 6921 at 2-3), Cameron respectfully requests that this Court deny the Mexican States' motion for summary judgment.

Respectfully submitted,

| | */s/ Phillip A. Wittmann* |
|---|---|
| David J. Beck, T.A. | Phillip A. Wittmann, 13625 |
|   *dbeck@beckredden.com* |   *pwittmann@stonepigman.com* |
| Joe W. Redden, Jr. | Carmelite S. Bertaut, 3054 |
|   *jredden@beckredden.com* |   *cbertaut@stonepigman.com* |
| David W. Jones | Keith B. Hall, 24444 |
|   *djones@beckredden.com* |   *khall@stonepigman.com* |
| Geoffrey Gannaway | Jared Davidson, 32419 |
|   *ggannaway@beckredden.com* |   *jdavidson@stonepigman.com* |
| BECK REDDEN L.L.P. | STONE PIGMAN WALTHER |
| One Houston Center | WITTMANN L.L.C. |
| 1221 McKinney St., Suite 4500 | 456 Carondelet Street |
| Houston, TX 77010 | New Orleans, Louisiana 70130 |
| Phone: (713) 951-3700 | Phone: (504) 581-3200 |
| Fax: (713) 951-3720 | Fax: (504) 581-3361 |

*Attorneys for Cameron International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Brief of Defendant Cameron International Corporation in Opposition to the Mexican States of Quintana Roo's, Tamaulipas', and Veracruz', Joint Motion for Summary Judgment Regarding Proprietary Interests has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 25th day of January, 2013.

                                                                  */s/ Phillip A. Wittmann*

1116037v1