# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010. | §<br>§<br>§<br>§ | MDL No. 2179<br>SECTION "J" |
| This Document Relates to: | §<br>§ | JUDGE BARBIER<br>MAGISTRATE SHUSHAN |
| 10-4239<br>10-4240<br>10-4241 | §<br>§<br>§ | |

## MEXICAN STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S CAMERON INTERNATIONAL CORPORATION MOTION FOR SUMMARY JUDGMENT

## TABLE OF CASES

| Cases | Page no. |
|---|---|
| *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1972) | 6 |
| *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 U.S. Dist. LEXIS 14662 (E.D. La. 1991) | 6 |
| *Vicksburg Towing Co. v. Mississippi Marine Trans. Co.,* 609 F. 2d 176, 177 (5th Cir. 1980) | 6 |
| *Dick Meyers Towing Service, Inc. v. United States,* 577 F.2d 1023 (5th Cir. 1978), *cert. denied*, 440 U.S. 908 (1979) | 6 |
| *Louisville and Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F. 2d 469 (5th Cir. 1979) | 6 |
| *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F. Supp. 2d 787, 791 (E.D. La. 2007) | 7 |
| *Dunham-Price Group, L.L.C. v. Port Aggregates, Inc.,* 2006 U.S. Dist. LEXIS 55285 (W.D. La. 2006) | 7 |
| *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 (D. Conn. 2006) | 7 |
| *CXY Energy, Inc. v. Jurisch,* 1992 U.S. Dist. LEXIS 12863 (E.D. La. 1992) | 7 |
| *New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 1147 (E.D. La. Aug. 23, 1990) | 7 |
| *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. 890 (D.C. Pa. 1985) | 7 |
| *In re Waterstand Marine, Ltd.,* 1988 U.S. Dist. LEXIS 3242 (E.D. Pa. 1988) | 8 |
| *Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.,* 877 F. 2d 1214 (5th Cir. 1989) | 8 |
| *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817 (E.D. Va. 2001) | 9 |

*In re Moran Enterprises Corp.,*
77 F. Supp.2d 334, 341 (E.D. N.Y. 1999)                                    21

*Domar Ocean Trans., Ltd. v. M/V Andrew Martin,*                           23
754 F. 2d. 616 (5th Cir. 1985)

*In re TT Boat Corp.,* 1999 U.S. Dist. LEXIS 13797 (E.D. La. Sept. 3, 1999)   23

*Nicor Supply Ships Assoc. v. General Motors Corp.,*
876 F.2d 501 (5th Cir. 1989)                                               23

*SEKCO Energy, Inc. v. M/V Margaret Chouest*,
820 F. Supp.1008, 1012 (E.D. La. 1993)                                     25

*Garbick v. Larin (Am.) Maritime,*
623 F. Supp. 2d 741, 748 (E.D. La. 2009)                                   27

*National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.,*        27
924 F. Supp. 1436, 1447 (E.D. Va. 1996)

*U.S. v. Locke*, 529 U.S. 89, 120 (U.S. 2000)                              27

*Tanguis v. M/V Westchester, 153 F. Supp. 2d 859 (E.D. La. 2001)*          27

*Isla Corp. v. Sundown Energy, LP,*                                        27
2007 U.S. Dist. LEXIS 31259 (E.D. La. 2007)

*Williams v. Potomac Elec. Power Co.,*
115 F. Supp. 2d 561 (D. Md. 2000)                                          28

*The St. Joe Co. v. Transocean Offshore Deepwater Drilling, Inc.,*
2011 U.S. Dist. LEXIS 26391 (D. Del. 2011)                                 28

**Secondary Sources**

*Black's Law Dictionary,* 960 (6th ed.1990)*.*                             *9*

*Webster's New Collegiate Dictionary,* p. 400 (1979)                       9

**MEXICAN STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S
CAMERON INTERNATIONAL CORPORATION MOTION FOR SUMMARY
JUDGMENT**

COME NOW Plaintiffs, the Mexican States of Quintana Roo, Tamaulipas, and Veracruz (hereinafter "the Mexican States") pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully file this Brief in Opposition to Defendant Cameron International Corporation's Motion for Summary Judgment and respectfully shows the Court as follows:

Plaintiffs respectfully submit that Defendant Motions should be denied. Plaintiffs incorporate herein by reference, *verbatim,* their Statement of Undisputed Facts In Support of The Mexican States Of Quintana Roo's, Tamaulipas', And Veracruz', Motion For Summary Judgment Regarding The Issue Of Proprietary Interests In The Matters Asserted In Their Complaints (hereinafter "Statement of Undisputed Facts") and Exhibits A through M submitted as part of Plaintiffs' Motion for Summary Judgment. Plaintiffs further rely on the attached Exhibits N through Z. Plaintiffs respectfully submit that Defendant Motions for Summary Judgment should be denied since Defendant are not entitled to judgment as a matter of law. Furthermore, the undisputed facts submitted by Plaintiffs demonstrate that they do have proprietary interests herein. Alternatively, Plaintiffs submit that if the Court should find to the contrary with respect to the evidentiary record herein, there exist genuine issues of material facts regarding the Plaintiffs' ownership, management, control, possession, obligations to repair and maintain, governance, and other exertions of authority over their coastlines, waters,

4

islands, wildlife, and other matters herein such as would render summary judgment against them improper.

1.      **PRELIMINARY**

The affidavit of one of Plaintiffs' experts Dr. Sergio Jimenez (attached hereto as Ex. U) establishes that the Macondo oil reached the coastlines of Plaintiff States. (*Id.*).

II.     ***ROBINS DRY DOCK* DOES NOT APPLY BECAUSE OF BP'S AND TRANSOCEAN'S ADMISSIONS  OF CRIMINAL CONDUCT.**

BP and Transocean have admitted that they engaged in criminal actions or omissions in violation of federal law. BP Exploration and Production, Inc. (guaranteed by BP PLC, and BP Corporation North America, Inc.) has *tentatively* admitted to criminal actions (some of which resulted in the deaths of eleven persons) and others involving "corrupt" practices. (Ex. F; Order of Dec. 11, 2012 [Doc. 25]; *U.S. v. BP Exploration and Production, Inc.*, Case 2:12-CR-00292 (E.D. La.). Nevertheless, BP Exploration and Production, Inc. ("BP") agreed in writing to plea guilty to criminal charges in connection with BP's conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and response. (Ex. F and its Ex. A-D). Of course, the plea encompassed only a few of the many other criminal allegations in the federal indictment.

BP's admissions of criminal violations of 18 U.S.C. §1505 include actions by which "BP did *corruptly*, that is, with an improper purpose, endeavor to influence, obstruct, and impede" an inquiry and investigation into the amount of oil flowing from the Macondo well through "omissions and false and misleading statements." (Subparagraphs 1-6  of Ex. A to Ex. F (emphasis added). Therefore, it is undisputed that BP has admitted engaging in criminal actions that led to the deaths of eleven persons, "corrupt" actions and omissions that included false and misleading statements, and other

unlawful conduct. Furthermore, Defendant Transocean Deepwater, Inc. and Transocean Ltd executed a Cooperation Guilty Plea Agreement whereby Transocean Deepwater, Inc. regarding federal criminal violations of the Clean Water Act, 33 U.S.C. §§ 1319 (c) (1) (A) and 1321 (b)(3). (Ex. Z).

The Supreme Court's articulation of its principle demonstrates its inapplicability to criminal conduct such as that of BP and Transocean: "[T]here can be no recovery for economic losses caused by an *unintentional* maritime tort absent physical damage to property in which the victim has a proprietary interest."(emphasis added). *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1972); *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 U.S. Dist. LEXIS 14662 *2 (E.D. La. 1991). The rule of *Robins* was formulated in the context of a *civil* negligence claim, *i.e.,* "unintentional" conduct—not criminal actions and omissions such as those herein. See, *Id.; See Vicksburg Towing Co. v. Mississippi Marine Trans. Co.,* 609 F. 2d 176, 177 (5th Cir. 1980)(employees *negligently* damaged the vessel"); *Dick Meyers Towing Service, Inc. v. United States,* 577 F.2d 1023 (5th Cir. 1978), *cert. denied,* 440 U.S. 908 (1979)(Defendants negligence); *Louisville and Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F. 2d 469 (5th Cir. 1979)(negligence). Where the plaintiff asserts an intentional misconduct, the plaintiff's claim is taken "out of the *Robins Dry Dock* parameters." 577 F.2d at 1025; *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.,* 497 F. Supp. 2d 787, 791 (E.D. La. 2007); *Showa Line, Ltd. v. Diversified Fuels, Inc.,* 1991 U.S. Dist. LEXIS 14662 *2 (E.D. La. 1991); *Dunham-Price Group, L.L.C. v. Port Aggregates, Inc.,* 2006 U.S. Dist. LEXIS 55285 *14 (W.D. La. 2006); *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 *30 (D. Conn. 2006); *CXY Energy, Inc. v.*

*Jurisch*, 1992 U.S. Dist. LEXIS 12863 (E.D. La. 1992). BP's and Transocean's admitted criminal conduct underlying its actions and omissions go well beyond the intentional torts that take this matter outside of the *Robins'* doctrine. As a matter of policy and judicial interpretation, there is nothing in the *Robins* principle that is intended to shield admitted criminals from the consequences of their admitted criminal actions. BP's and Transocean's execution of the plea agreement constitute admissions of criminal conduct and the nature of same. Therefore, the *Robins'* proprietary interest prerequisite does not apply herein. *Id.*

## III.   THE MEXICAN STATES HAVE PROPRIETARY INTERESTS UNDER BOTH FEDERAL COMMON LAW AND MEXICAN LAW.

### A.   Federal Maritime Law Determines "Proprietary Interest."

In urging the application of Mexican law to determine the existence of proprietary interests, Defendant ask this Court to deviate from well-established principles. Federal common law is used to determine a party's proprietary interest. *New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 1147 *24, 25 (E.D. La. Aug. 23, 1990)(inquiry is whether the lessor had sufficient "incidents of ownership" to render it "proprietary" *as a matter of federal maritime law*.); *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. 890, 893 (D.C. Pa. 1985)(existence of proprietary interest is *not* determined by state law.); *In re Waterstand Marine, Ltd.,* 1988 U.S. Dist. LEXIS 3242 (E.D. Pa. 1988). The focus on maritime law is underscored by judicial comparisons of plaintiffs' asserted interests to those of a demise charterer—a creature of maritime law. See, *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. at 308; *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469 (5th Cir. 1979); *Nexen v Petroleum U.S.A., Inc.,* 497 F. Supp. 2d at 796. Since the "proprietary interest" requirement was a creation

of maritime law, its existence should also be determined based on principles of maritime common-law. *Id.* Therefore, the proper inquiry is not the rights under state law or, in this case, under Mexican law. *Id.* The undisputed evidence herein establishes that the Mexican States do have proprietary interests in the matters asserted in their complaints under the federal maritime principles. Alternatively, the undisputed facts herein also establish that the Mexican States also have the requisite proprietary interests under Mexican law.

**B.    Defendant Own Experts Admit Plaintiffs Possess A Proprietary Interest.**

Although denying that Plaintiffs have any "proprietary interest," Defendant experts, in fact, confirm that Plaintiffs *do* possess proprietary interests, regardless of whether Mexican or federal maritime law is used in making this determination. At a minimum, BP's own expert agrees, "Mexican Law allows for a system under which the States [Plaintiffs] may be permitted to ***manage, control***, enjoy, ***exploit***, or use the beaches, waters, and other natural resources …" (Burguete-Stanek Report, p. 6, Ex. 7). The right to *control,* which BP admits Plaintiffs possess, is one of the factors relied upon in determining the existence of a proprietary interest. *Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.*, 877 F. 2d 1214, 1224-5 (5th Cir. 1989). Moreover, the right to "manage" (also admitted to exist) includes not only "control," but also other rights of governance and possession: "To control and direct, to administer, to take charge of. To conduct; to carry on the concerns of a business or establishment." *Black's Law Dictionary,* 960 (6th ed.1990). Similarly, "management" is defined as "Government, control, superintendence, physical or manual handling or guidance; act of managing by direction or regulation, or administration, as management of . .  great enterprises, or of

great affairs." *Id.* Without more, BP's expert confirms that Plaintiffs have a proprietary interest in that they have the rights to control, manage [implicitly including repairs and maintenance] direction, physical or manual handling [*i.e.*, possession], govern, direct, administer, be in "charge of" the geographical areas. *E.g., McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817, 821 (E.D. Va. 2001). Of course, if as BP's expert opines, the Mexican States are "in charge of" [*i.e.*, managing] the geographical areas, the federal government is *not* in charge of the areas. Additionally, as seen below, all of Defendant experts acknowledge the states have the right to "exploit" the natural resources and areas. "Exploit" includes profit-making activities: "To turn to economic account; to take advantage of." *Webster's New Collegiate Dictionary,* p. 400 (1979). As defined, "exploitation" involves an "Act or process of exploiting, making use of, or working up. Utilization by application of industry, argument, or other means of turning to account, as the exploitation of a mine or a forest." *Id. at 579.* With respect to real property, the term "exploit" certainly includes the right to develop commercially; construct structures such as piers, wharves, and hotels; and the right to explore, develop, and produce mineral and other natural resources. In short, by the BP's own admission, the Mexican States [not the federal government] are "in charge of" managing, controlling, regulating, governing, physically handling [possessing], and economically developing [exploiting] the beaches, waters, coastal areas, *etc.* which, of course, includes making all necessary decisions and actions to exercise those rights, including maintenance and repairs. Without more, BP's expert has established the Mexican States' proprietary interests.

9

Defendant other experts further underscore Plaintiffs' proprietary interests since they agree that the Plaintiff States possess the following rights:

- "[T]he right to use, enjoy or *exploit* those assets." (Halliburton's David Lopez—p. 9, Ex. 11, citing Article 15 and 16 of GLNA).
- "[T]he right to use, enjoy and *exploit* the marine-land zone and land reclaimed from the sea." (Halliburton's David Lopez—p. 10, Ex. 11).
- General Law of National Assets "simply" grants the States the "right to use, enjoy or *exploit* those assets…" (p. 4, Burguet-Stanek Report, Ex. 7);
- The federal government can grant the States the "rights of use, enjoyment, or *exploitation* of National Assets through "concessions, allotment, or Agreement of Destination." (*Id.*, p. 5);
- Agreements of Destination carry out "a change in the user of a National Asset, without having to privatize the asset. They allow a "particular user to *exploit*, use, or enjoyment [*sic*] a specific National Asset. (*Id.* p. 5);
- Regulations allow the federal government to assign States the rights to use and *exploit* federal maritime and terrestrial zones, any land reclaimed from the sea, or any other body of water. (*Id*. p. 6);
- States [Plaintiffs] may be permitted to ***manage, control***, enjoy, ***exploit***, or use the beaches, waters, and other natural resources …" (Burguete-Stanek Report, p. 6, Ex. 7).
- Concession titles or agreements of destination give the right to use and/or ***exploit*** a national asset; (*Id., p. 8*);
- Marquez concedes that concessions by the federal government give rights to "enjoy" the federal maritime zone. (Par. 21, p. 6 Ex. 10).
- Lands reclaimed from the sea may be conveyed to the owner of the adjacent beachfront property after they are disincorporated from the public domain by Executive decree. (Par. 22, p. 6 Ex. 10).
- Lands reclaimed from the sea may be assigned to the use and enjoyment of the states *without* the need to disincorporate them. (Par. 22, p. 6 Ex. 10, citing Art. 70, GLSNA).
- Owners or *legitimate holders of land* where wildlife is distributed have sustainable utilization rights. . ." (Par. 25, p. 7, Ex. 10).

Defendant experts further agree that under the concept of "concurrent" jurisdiction, the States do have arenas in which they govern, own, maintain, and control their coastlines and wildlife along the coastlines. Halliburton's expert admits, "the Mexican Constitution establishes that governmental authority in certain environmental matters is to be **shared concurrently** among the federal government, states, and municipalities….". (emphasis added) (Ex. 11, p. 6; see also Par. 5.3, p. 11—*Id.,* which

repeatedly references the states' concurrent jurisdiction as to the environment, wildlife; Par. 5.4, p. 12. which references state concurrent jurisdiction over fishing and aquaculture; Burquette-Stanek: Par. 4, p. 6; Marquez: Par. 29, p. 8 "…Mexican States have concurrent and limited jurisdiction over some natural resources …"). Ignoring the Mexican Constitution, the States' Constitutions, recent pronouncements from the Mexican Supreme Court, and a vast body of state statutory and regulatory law, Defendant experts attempt to characterize the "federal" role as dominating and primary. (*E.g.,* Lopez: p. 5, 6). Crucially, even by Defendant own reports, the States' jurisdiction over coastal areas and wildlife is not extinguished. As Halliburton's Lopez admits, it **does** exist, even though he attempts to diminish its scope. It is evident that Defendant experts opinions are fatally flawed, unreliable, and misstatements of the applicable law.

In fact, Plaintiffs' proprietary interests are much more extensive than Defendant admit. (*E.g.,* Ex. B, C, H, K, L, R, S). Plaintiff states do own, manage, possess, control, govern, regulate, and otherwise exercise dominion over the areas in question and that the states have the right, duty, and obligation to maintain, repair, restore, and preserve the beach areas and wildlife along the coasts. (*Id*). As an example, Tamaulipas has the authority and power to permit development of its coast lines and dredging of its beaches and seabed adjoining its coastline, and it approved same. (*E.g.*, Ex. H). Additionally, the States do have proprietary interests as demonstrated by the authority and rights they have exercised. (Ex. R, S). Defendant has not presented any "facts" that would dispute the foregoing and, therefore, the facts in Ex. R and S are undisputed.

### IV.    a)    State Proprietary Interest Under Mexican Constitutional Law.

BP, Transocean, Halliburton and Cameron, all contest the fact that the Mexican States have a proprietary interests in lands, waters, natural resources and wildlife. However, they have not presented any "facts" to dispute those presented by Plaintiffs and rely on erroneous "legal" arguments. The pivotal underpinning of Defendant argument is that the federal government "owns" certain properties and that "ownership" can never be conveyed to others. That argument is quickly eviscerated and rendered implausible by even a cursory reading of Article 27 of the Mexican Constitution. (Pls' Ex. "A"). The first paragraph of Article 27 provides in clear language: "Ownership of lands and waters within the boundaries of national land territory is vested originally in the Nation, which has had and has, **the right to transmit title thereof to private persons**, **thereby constituting private property**. (emphasis added) (pg. 64, 65 of Exhibit "A").[1]

The foregoing language clearly establishes not only that "title" of lands and waters can be conveyed to private persons, but also that such conveyance will result in the creation of "**private property**" interests in the recipient.  By ignoring this constitutional language, Defendant reach the patently false conclusion that the Mexican Federal Government is the owner **of all the land**, seas and territory at all times and forever. (*Id.*). Defendant argument also ignores the undisputed facts presented by Plaintiffs that establish that beach property and other coastal lands are sold by the government to private individuals who then have the rights to sell them to others who also have the right to resell the property to others. (Ex. H and B). These are sales for money, and none of the sales proceeds are turned over to the federal government. (*Id.*) Defendant further ignores the undisputed facts that the federal government has

---

[1] The translated version of the Constitution (Exhibit A) attached to the State's Motion for Summary Judgment is a pure translation authored by the Mexican Supreme Court.

transferred the rights and obligations of ownership to the Plaintiff states through numerous concessions and decrees. (*See* Plaintiff's Statement of Facts pp.8-19, 25-29, 30-34). As a matter of fact, Tamaulipas, Veracruz, and Quintana Roo have the right to use, enjoy, and tax coastal areas (beaches, federal maritime-land zones, and land reclaimed from the sea) extending along broad swaths of their respective Gulf Coasts. (Ex. B, pp. 206, 214, 218). Defendant arguments, therefore, are both legally and factually insupportable.

Defendant also wrongly applies and misinterprets the concept of the "Nation." They erroneously conclude that the term "Mexican Nation" is synonymous with "the Mexican Federal Government." (See Halliburton's Lopez report, Ex. 11,Par. 4.3). Ignoring more recent judicial pronouncements by the Mexican Supreme Court, Lopez relies on a non-binding, isolated opinion of the *2d chamber of the Mexican Supreme Court issued in 1937*. Under Mexican law, an opinion by the Mexican Supreme Court is not binding and does not constitute precedent unless the holding is repeated in at least five subsequent opinions.(Ex. "P" pg. 1). This has not occurred with respect to Lopez' "authority" and, therefore, the case relied upon has no precedential value. (*Id*.). Mr. Lopez' error can be understood when one notes his resume reveals he is not a lawyer licensed in Mexico or a practitioner in that country. Stated simply, he is a Texas lawyer attempting to interpret Mexican Law, a task which he did not perform accurately to *any* extent in this case. (See, Ex. "P").  Recent binding precedents from the Mexican Supreme Court (Ex. P, N, O), recognize that the States of Mexico (Plaintiffs) have jurisdictional autonomy and powers, as do the Federal and Local Governments:

**CONTITUTIONAL CONTROVERSY.  THE SEVERAL LEGAL ORDERS SET FORTH IN THE FEDERAL CONSTITUTION HAVE FUNCTIONAL**

**AUTONOMY AND JURISDICTIONAL ATTRIBUTES OF THEIR OWN.** … **there can be identified four legal orders in the Mexican System, namely: the federal, the local or state, the one of the Federal District and the Constitutional.** Each one has attributes of their own that, generally speaking, are non-inclusive among them, having autonomy for the enforcement belonging to each one of the appropriate agencies. Exhibit "N" and "P", *Constitutional Controversy 31/97. City Counsel of Temixco, Morelos. August 9, 1999. Eight Vote Majority. Register No. 193 262 (j); 9th Era Plenary, Gazette, Volume X September 1999, Page 709).*

**MEXICAN STATE, LEGAL ORDERS WITHIN.** … **we found that there are five legal orders in the Mexican State, namely: the federal, the local or state, the municipal, the one for the Federal District and the Constitutional. (**Exhibit "O" and "P", *Constitutional Controversy 14/2001. Municipality of Pachuca de Soto, Hidalgo. July 7, 2005. Ten Vote Unanimous Majority. Register No. 177 006 (j); 9th Era Plenary, JFW Gazette, Volume XXII, October 2005, Page 2062).*

The legal and factual reality is that the Mexican States have exercised dominion, ownership, governance, policing, taxing, administration, possession, management, regulation, enforcement, development, and control over its coastal lands, while repairing and maintaining them at their own expense, thus demonstrating their ownership of their geographical areas and territories. (*E.g.*, Ex. R, S, B). Article 42 of the Mexican Constitution provides: "The National territory shall be integrated by: I.- The Federations integrant portions;" (Ex. "A" pg.50). Article 43 defines the integrant portions: The Federations' integrant portions are States as follows: ..Quintana Roo, Tamaulipas and Veracruz. (See Exhibit "A" pg.51). Therefore, the Mexican States are among the holders of the original domain that Article 27 of the Mexican Constitution assigns to the "Mexican Nation." (*See* Ex. "B" p. 3.) "Nation" is simply then a collective description of the components that integrate the Mexican System, and the States are clearly one of those components. Therefore, when the Constitution speaks in terms of the "Nation" having rights or ownership, it is

declaring that the States as a component of the "nation" have those same rights, interests, and ownership.  (*See* Ex. "N" "O" and "P.").

      **b)**      **Mexican States Legislate Environmental Proprietary Interests.**

Defendant fail to mention that pursuant to the Mexican Constitution and their own constitutions, the Mexican States can enact and have enacted state legislation aimed at protecting their environment and proprietary interests: Under Article 124 of the Mexican Constitution, "All powers not explicitly vested by this Constitution on federal authorities, are reserved to the States."  (Ex. "A" p. 347 and Ex. L.) The Mexican Constitution does not prohibit the States from enacting legislation to protect their environment, *i.e.,* their coastal areas such as beaches. The only constitutional prohibitions are contained in Article 117 of the Mexican Constitution which prohibits State legislatures from legislating only in the following matters: Currency. (Ex. "A" p. 293, Transit of people and merchandise across its territory *See* Ex. "A" p. 293, Foreign trade *See* Ex. "A" p. 293, Taxes regarding merchandises origin that could affect other Federal taxes *See* Ex. "A" p.293. Clearly absent, is any prohibition against environmental legislation.

In fact, the Mexican Constitution expressly provides for the States' concurrent powers with respect to the protection and preservation of the environment and ecological matters. Thus, Article 73 of the Mexican Constitution provides: "The Congress shall have the powers to: XXIX-G To enact laws establishing the concurrence of the Federal Government, the States and the municipalities, within their respective jurisdictions, on matters concerning environmental protection and preservation and restoration of ecological balance." (Exhibit 'A' pp. 38, 401). Therefore, in addition to the powers conferred by Article 27, 40, 41 and 43 giving the States Proprietary rights in the waters,

shores, natural resources, wildlife, *etc*., the States of Quintana Roo, Tamaulipas and Veracruz, based on <u>Article 124, 117 and 73 XXIX-G</u>, can enact their own environmental legislation to defend, protect, exploit, use and regulate their shores, coastline and all proprietary interests within their territory.

      c)      **Federal Statutes Grant States Exclusive Control of Environmental Emergencies.**

In addition to constitutional authority to act in matters involving the environment, the States have additional authority to do so which is derived from a federal statute.

Article 7 of the current text in the General Law of Ecological Balance and Environmental Protection (dated June 4th, 2012), confers to the States the following rights, obligations, and powers to legislate in the following areas: XI.- Dealing with matters which affect the ecological balance or the environment of two or more Municipalities; **XII.- Participation in environmental emergencies and contingencies, pursuant to the civil defense policies and programs which are provided therefore;** XIV.- The management of state information policy and information on environmental subject matters.[2]

The States of Quintana Roo, Tamaulipas and Veracruz (due to their geographical proximity and direct and preponderant interest in the preservation of their environment) have the obligation and right to immediately intervene to preserve and protect their environments—and they did so. (Ex. "R" and "S"). As another example of the States' legislative power in the field of environmental protection, Plaintiffs note the Code for Sustainable Development for the State of Tamaulipas which sets out the following responsibilities of the State:

**Article 7**. It is considered to be of public interest: VI. The execution of any works intended for the environmental prevention, conservation and protection, as well as the

---

[2] Chamber of Deputies. General Law of Ecological Balance and Environmental Protection, June 4th, 2012. http://www.diputados.gob.mx/LeyesBiblio/pdf/148.pdf

**reparation of polluted sites** when such reparations are necessary in order to reduce any health risks; (emphasis added). **Article 8.** It is considered as social interest: V. **Regarding pollution, any emergency measures which authorities should take in case of acts of God or force majeure; and VI. Emergency actions in order to contain health risks caused by any kind of pollution. Article 44.**Imposes on the State, through the Environmental Agency, the following duties: XXXIII. Execute any security and corrective measures, as well as administrative sanctions that may be appropriate, due to violations in this Code; **Article 120:** The State Executive, through the Environmental Agency, shall have the following faculties: XXV. Impose any sanctions and security measures that may be appropriate according to the applicable regulation and the provisions set forth in the agreements signed with the Federation and with the Municipalities, pursuant to the provisions set forth herein; (*See* Exhibit "Q").

Under the Environmental Codes of Tamaulipas, Quintana Roo and Veracruz and their inherent powers under their respective State Constitutions, the States' Governors are authorized to take any measures to protect and defend the environment such as monitoring the Macondo oil spill, as well as cleaning up and restoring beaches. (Ex. R, S, and Ex. B p.234).

> d) **Mexican States Have Proprietary Interest in Wildlife.**

Contrary to Defendant contentions, the states do have a proprietary interest in their wildlife.

**Article 7 of the General Statute on Wildlife**, provides for concurrency on all matters pertaining to wildlife among the Municipalities, State, Federal District, and Federal governments. According to the concurrency authority and obligations, the three levels of government [which include the States] must: I. Guarantee that the actions of the different levels of government are united in purposes and congruent regarding the execution of national policy regulations in wildlife matters; III. Recognize duties to the State and Federal District´s Governments, to be executed within the limits of its territory, regarding the execution and compliance or the national policy regulations in wildlife and habitat matter; IV. Specify the duties that must be executed exclusively by the State powers of the Federated Entities and to the Federation on the matter of Wildlife. *See* (Ex. "T" General Law of Wildlife).

> e) **The States' Constitutions Further Establish The Proprietary Interests of Quintana Roo, Tamaulipas and Veracruz**

Under Article 2 of the Constitution of the State of Tamaulipas, "The territory of the State includes the historical Province called New Santander, with the limitations made by the Treaty of Guadalupe Hidalgo." (Ex. D). As a matter of historical fact, Tamaulipas, has governed, defended and policed the interior maritime waters, the coasts, and the adjacent seas and islands of Tamaulipas. (see, p. 19, Statement of Facts for list of islands). Under Article 3 the Constitution of the State of Veracruz, "The territory of the State has the extension and limits that it possessed historically, including the capes, islands, islets adjacent to its seashore in conformity with that set forth by the Federal Constitution and the law." (Ex. D). As a matter of fact, the State of Veracruz, has governed, and historically defended and policed the interior maritime waters, the coasts and the adjacent seas, islands and islets of Veracruz. (See p. 20 of Statement of Facts for list of islands). Under Article 46 of the Constitution of the State of Quintana Roo, "The territory of the State of Quintana Roo includes all Islands. As a matter of fact, the State of Quintana Roo, has governed and still governs, defends and polices the interior maritime waters, the coasts and the adjacent seas, keys, reefs, islands and islets of Quintana Roo. (See p. 21 of Statement of Facts for list of islands).

**f)   The States Have the Power and Authority to Bring Suit.**

Plaintiffs submit that the issue of whether the Plaintiff States have the authority to bring suit is a  "red herring." At best it is a political issue to be resolved among the various entities (and people) of Mexico and one in which this United States federal court should not interject itself. In other words, it is a matter that should be determined politically in Mexico. Certainly, these lawsuits are public information and the federal

government is aware of their existence because the States and the Federal Government have joint "Deepwater Horizon" scientific workgroups and shared science.

At the outset, it is important to note that the Plaintiff States, like other Mexican states, are "free and sovereign" entities that retain every right and power that *they* have not explicitly given up to the federal government because they have suffered their own particular damages and have spent their own resources remediating the spill impact on their shores. (Ex. "R" and "S"). The States have not given up any right to bring suit to protect their interests, quite to the contrary the States decided as early as June 8, 2010 to bring suit against Defendant due to the Environmental Consequences of the spill. (Ex. W).  Moreover, The Governors' authority to represent their respective States may be found in Article 91, section XXIII of the Constitution of the State of Tamaulipas, in correlation with Article 4 of the Constitution of the State of Tamaulipas and Article 115 first paragraph of the Mexican Constitution; Article 49, sections XVIII & XXIII of the Constitution of the State of Veracruz in correlation with Article 115 first paragraph of the Mexican Constitution; and Article 90, sections XIII & XVIII of the Constitution of the State of Quintana Roo, in correlation with Article 4 of the Constitution of the State of Tamaulipas and Article 115 first paragraph of the Mexican Constitution. (Ex. "D").

**g)  The States are the Original Owners of Their Islands and Territory**

The Islands of the State of Quintana Roo belong to Quintana Roo according to its own State Constitution, as described above and as more described in the Statement of Fact Paragraph 20. *Id.*  The islands of Tamaulipas and Veracruz were part of their territory before 1857 therefore before the constitution of 1917, and thus, do not constitute part of the Federation as provided in Article 48 of the Mexican Constitution since

Tamaulipas and Veracruz claim their ownership. (Ex "A" and Ex. "P" p.5). Moreover, the Mexican Supreme Court has confirmed the States' ownership of States have ownership of the islands. (Ex. P).

**THE PLAINTIFFS' PROPRIETARY INTERESTS UNDER MARITIME LAW.**

**1.      Federal Maritime Law: There is No Requirement of Ownership.**

As demonstrated above, Plaintiffs *own* the coastlines, beaches, estuaries, coastal areas, wildlife, flora, fauna, and other features along their Gulf Coasts. Moreover, they control, govern, administer, and possess these areas and are responsible for maintaining, restoring, governing, managing, and maintaining and repairing them at their own expense. (*E.g.*, Ex. R, S, H).

Ignoring well-established precedent, Defendant misstates the law through their erroneous argument that "title" or ownership is necessary to establish a proprietary interest. Defendant fails to note that numerous courts have specifically held that actual title, or ownership of record, is *not* required if there is an actual proprietary interest. *E.g., New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 11447 *25 (E.D. La. Aug. 23, 1990)*("Dock lessors may properly be considered 'owners' in certain circumstances."); *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817, 821 (E.D. Va. 2001); *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 *18 (D. Conn. 2006)*("Actual ownership or title is not necessary to demonstrate that a proprietary interest exists."); *In re Moran Enterprises Corp.,* 77 F. Supp.2d 334, 341 (E.D. N.Y. 1999)*("In order to have a proprietary interest actual ownership or title is not necessary.").

Instead of requiring ownership, courts have consistently held that a proprietary interest may be established by demonstrating "actual possession or control, responsibility for repair, and responsibility for maintenance." *Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.*, 877 F. 2d 1214, 1224-5 (5th Cir. 1989); *McLean Contracting Co. v. Waterman Steamship Corp.*, 131 F. Supp. at 821 (proprietary interest existed where owner's contract gave contractor "charge and care" of bridge repair project and required repairs until job accepted by owner); see *Louisville & Nashville R.R. Co. v. M/V Bayou Lacomb*, 597 F. 2d 469, 473-74 (5th Cir. 1979). "Put differently, if [a plaintiff] shows that it has interests in the [property] *similar* to the interests it would acquire in a vessel from a demise charterer or in real estate *from a lease*, then it can satisfy the requirements of *Robins Dry Dock*." *Nexen v Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.*, 497 F. Supp. 2d 787, 796 (E.D. La. 2007)(citing *Louisville & Nashville R.R. Co.*, 597 F. 2d at 473-74).

The absence of any ownership requirement is also evident from the Supreme Court's decision articulating the principle in the first place. Thus, *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 308 (1927) considered that a demise charter would create the necessary proprietary interest. A demise charter is simply a lease: "Under a demise (or "bareboat") charter, there is but a hiring of the vessel, **under which no title passes** to the charterer but merely the right to possess and control it for a limited period." (emphasis added) *Black's Legal Dictionary,* 431 (1990). To "charter" means "to hire, rent or lease for a temporary use; *e.g.*, to hire or lease a vessel for a voyage." *Id.* at 235.

Subsequent decisions have consistently held that such a demise charter *does* create the necessary proprietary interest, even though such a charter is for a limited time

and does not transfer ownership. *E.g., Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d at 472 n. 3 (lessor of house is analogous to a demise charterer); *Nexen Petroleum U.S.A., Inc.,* 497 F. Supp. 2d at 796 ("[I]f [a plaintiff] shows that it has interests in the [property] *similar* to the interests it would acquire in a vessel from a demise charterer or in real estate *from a lease*, then it can satisfy the requirements of *Robins Dry Dock.*"). Under a demise charter, the charterer, of course, does not *own* the vessel. There is no transfer of title that is operative under such a charter. The owner of the vessel remains the owner throughout the charter and afterward. Moreover, the charter lasts only as long as the term of the charter and upon its expiration, possession and control revert to the owner. In essence, the demise charter is a lease. See, *Nexen Petroleum U.S.A., Inc.,* 497 F. Supp. 2d at 796. Accordingly, any argument by Defendant based on the absence of "title" or the possibility of a reversion would be inapposite, especially since during the period of any concession or decree, the Mexican States would have the unquestionable right and authority to control, possess, develop, manage, exploit, govern, protect, and repair and maintain at their own expense. Moreover, Defendant has presented no evidence that *any* concessions issued by the federal government have ever been revoked. In fact, rights secured under concessions and decrees can be sold and resold without any approval from the federal government and the sales proceeds are kept by the seller. (Ex. H). Truly, the nature of the concessions and decrees permitting sale for profit are equal to ownership or a proprietary interest under any definition.

Numerous other decisions demonstrate the erroneous character of Defendant positions that title is necessary to hold a proprietary interest. In *Domar Ocean Trans., Ltd. v. M/V Andrew Martin,* 754 F. 2d. 616 (5th Cir. 1985)(owner of damaged barge who

had lease on undamaged tug could recover economic damages for the loss of the use of the tug); *Louisville & Nashville R.R. Co.,* 597 F.2d at 472 n. 3 (finding a lessee of a house and lot to be "analogous" to a demise charterer); *In re TT Boat Corp.,* 1999 U.S. Dist. LEXIS 13797 (E.D. La. Sept. 3, 1999)(working interests in oil platform created by lease with the U.S. government were "owners" of platform since they shared in construction costs, possessed right to inspect it, and possessed right to sell it and share in proceeds); *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 at *20-21.; *New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 11447 *25 (E.D. La. Aug. 23, 1990)(citing *Holt Hauling & Warehousing v. M/V Ming Joy,* 614 F. Supp. 890, 899 (D.C. Pa. 1985)).   Even time charterers have a direct proprietary interest in physical property added to the leased vessel when the property will be reclaimed. *Nicor Supply Ships Assoc. v. General Motors Corp.,* 876 F.2d 501, 506 (5th Cir. 1989). Thus, all development, improvements, and other exploitation of the beaches and coastal areas create proprietary interests. The necessary proprietary interest can also be established by agreements between an owner and a user of property. *In re Moran Enterprises Corp.,* 77 F. Supp.2d 334, 341 (E.D. N.Y. 1999)(utility company that did not own damaged submarine cables created fact issue where under agreement with owner, it had paid for a *pro rata* share of the construction and was responsible for its share of the repair expenses and jointly and severally liable for any environmental harm caused by the cables). Other arrangements have been found to create proprietary interests despite the absence of ownership. *McLean Contracting Co. v. Waterman Steamship Corp.,* 131 F. Supp. 2d 817 (E.D. Va. 2001)(contractor who did not own bridge had proprietary interest in repair project since the construction contract with the state provided that the contractor

would have "charge and care" of the project and required the contractor to rebuild, repair, and restore any damages to the work until it was accepted by the state); *MTA Metro-North R.R. v. Buchanan Marine, L.P.,* 2006 U.S. Dist. LEXIS 89617 at *20-21 (non-owner who is a "primary user" of a property and performs some day-to-day operations and performs repairs and maintenance has proprietary interest); *Holt Hauling & Warehousing Systems, Inc.* 614 F. Supp. at 898("It would serve no purpose to limit recovery to those who, under state property law, 'owned' the facility in question."); *New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 11447 *25 (E.D. La. Aug. 23, 1990)(Performance of routine maintenance, payment of utility bills, and lack of use by the record owner are factors to be considered in determining whether a lessor has a proprietary interest); *Holt Hauling & Warehousing,* 614 F. Supp. at 899 (lessee of a pier could establish a proprietary interest since he did not merely use the pier, but was the primary user of the pier and also purchased liability insurance on it, performed routine maintenance, and paid for all utilities.). Thus, a steamboat company leasing a dock owned by the Board of Commissioners of the Port of New Orleans had a sufficient proprietary interest where the lease not only allowed the steamboat company to use the dock for its excursions, but also required the company to repair damages to the wharf and maintain it. *New Orleans Steamboat Co.,* 1990 U.S. Dist. LEXIS 11447. Furthermore, a proprietary interest exists where the plaintiff has an "insurable interest" in the damaged property even though the property is owned by another. *McLean Contracting Co.,* 131 F. Supp. 2d at 821 (insurable interest in work in progress on non-owned bridge); see *Vicksburg Towing Co. v. Mississippi Marine Trans. Co.,* 609 F. 2d 176, 177 (5th Cir. 1980)(insurable interest element in determining existence of proprietary

interest); *In re Moran Enterprises Corp.,* 77 F. Supp.2d at 341 (E.D. N.Y. 1999)(fact issue created by non-owner's joint maintenance of insurance policy). It is undisputed that the Mexican States can erect buildings and structures on the coastal lands and otherwise develop and exploit these territories, thereby creating insurable interests. Defendant experts further concede that among Plaintiffs' rights is the right to use the assets. The "right of use" is itself "a thing of value." *Vicksburg Towing Co.,* 609 F. 2d. at 177; *New Orleans Steamboat Co.,* 1990 U.S. Dist. LEXIS 1147 at *25; *SEKCO Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp.1008, 1012 (E.D. La. 1993). This is especially true since the Plaintiff States not only have the right to use the areas, but also to commercially exploit, manage, control, develop, regulate, possess, and the attendant responsibilities of paying for their maintenance and reparations. Moreover, the right to exploit (explore for and produce minerals) pursuant to an exploration lease is sufficient to create a proprietary interest. *Nexen v Petroleum U.S.A., Inc.,* 497 F. Supp. 2d at 796.

The rights, authority, and responsibilities that the Mexican States possess, even according to Defendant experts, go far beyond those of a demise charterer or a lessor of property, which courts agree constitute a proprietary interest. *E.g., Louisville & Nashville R.R. Co.,* 597 F.2d at n. 3 (5th Cir. 1979)(holding lessor of a house is analogous to a demise charterer); *Nexen Petroleum U.S.A., Inc.,* 497 F. Supp. 2d at 796 (interests in property *similar* to those of a demise charterer or in real estate *from a lease* satisfy the requirements of *Robins Dry Dock.*"); *New Orleans Steamboat Co.,* 1990 U.S. Dist. LEXIS 1147 at *25 (lessor of dock had proprietary interest). Here, as BP's expert concedes, the Mexican States are in charge of managing, governing, regulating, directing, and determining how and when to exploit the assets, *e.g.,* commercial development,

physical alterations, mineral exploitation, *etc.* Here, the undisputed facts demonstrate that the Mexican States have even greater rights than lessors or demise charterers since they undisputedly also have the authority, right, and power to excavate and physically alter the beaches and coastal waters in their exploitation of same. (Ex. H—GTT Declaration). Clearly, the Mexican States "own" the geographical areas at issue. (Ex. B, I, C, L). Regardless of any contention that they are not "owners," it is clear that the Mexican States can do whatever an owner could do with respect to the natural resources at issue. Accordingly, Defendant is not entitled to summary judgment since the undisputed facts and the applicable law establishes that the Plaintiffs have proprietary interests in the areas in question.   In view of the foregoing applicable principles and the undisputed facts herein, the Mexican States have established that they have proprietary interests under both Mexican law and the principles applicable under federal maritime law.

WHEREORE PREMISES CONSIDERED, Plaintiffs' respectfully request that this Court DENY Defendant's Motion for Summary Judgment.

Respectfully Submitted,

DATED: January 25, 2013

**SERNA & ASSOCIATES PLLC**

By:

**/s/ Enrique G. Serna**
**Enrique G. Serna, Esq.**
SBOT 00789617
20985 IH 10 West
Serna Building
San Antonio, Texas 78257
(210) 2280095 – Telephone
(210) 2280839 – Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, pursuant to Judge Shushan's Order of September 11, 2012, I have caused the foregoing to be served on all counsel via the Lexis Nexis File & Serve system, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, who will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on January 25th, 2013

/s/ Enrique G. Serna
Enrique G. Serna