# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. |
| TRANSOCEAN DEEPWATER INC. | : | |

## COOPERATION GUILTY PLEA AGREEMENT

Under Rule 11 of the Federal Rules of Criminal Procedure, and in compliance with the holding of <u>Bryan v. United States</u>, 492 F.2d 775 (5th Cir. 1974), the government, the defendant, and the defendant's counsel enter into the following guilty plea agreement.   Any reference to the United States or the government in this agreement shall mean the United States Department of Justice, including, but not limited to, the Deepwater Horizon Task Force, the Criminal Division and all of its sections, and all the United States Attorney's Offices for each judicial district of the United States.

1.      The defendant agrees to waive prosecution by indictment and plead guilty to Count One of an information charging it with negligently discharging oil into the Gulf of Mexico, in violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3), arising from the defendant's negligent conduct regarding the drilling rig *Deepwater Horizon* in the Gulf of Mexico on April 20, 2010.   The defendant agrees to the factual allocution contained in Exhibit A to this plea agreement.

2.      The defendant and Transocean Ltd., and all successors and assigns of thereof, agree to cooperate fully and truthfully with the Deepwater Horizon Task Force in any criminal investigation related to or arising from the *Deepwater Horizon* blowout, explosion, oil

spill and response, and further agree to cause any other present or future parent, affiliate, division

or subsidiary of the defendant or of Transocean Ltd. (collectively, "any other Transocean Ltd.

entity" or "the other Transocean Ltd. entities") to cooperate fully and truthfully as to the same

matters.   Cooperation shall include but not be limited to (a) promptly disclosing any and all

criminal or potentially criminal conduct of which the defendant, Transocean Ltd. or any other

Transocean Ltd. entity is currently aware relating to or arising from the *Deepwater Horizon*

blowout, explosion, oil spill and response; (b) promptly producing documents to the Deepwater

Horizon Task Force upon request, (c) promptly making current employees and agents available,

and promptly making best efforts to make former employees and agents available, to the

Deepwater Horizon Task Force upon request for interview or for testimony in any proceeding,

subject to those employees' and agents' own legal rights, and (d) making reasonable efforts to

ensure its current and former employees and agents provide full and truthful information;

provided, however, that compliance with this paragraph shall not be construed as requiring or

effecting a waiver of the attorney-client privilege or work production protections.

      3.     The defendant understands, agrees, and has had explained to it by counsel

that the Court may impose the following statutory maximum sentences: Count One, violation of

the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3):

      (a)     A fine of $200,000, or $25,000 per day of the violation, or twice the

gross gain or loss, whichever is greater;

      (b)     Five years of probation; and

      (c)     A $125 special assessment.

      4.     The parties agree that this plea agreement is made pursuant to

Fed.R.Crim.P. 11(c)(1)(C) and that the following specific sentence is the appropriate disposition

of this case.   If the Court rejects this plea agreement, it is further agreed that the defendant may withdraw its plea.   If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Fed. R. Crim. P. 32(c), and ask that defendant be sentenced at the time the guilty plea is entered.   This agreed-upon sentence is as follows:

        (a)      Payment of criminal recoveries totaling $400 million ($400,000,000), as set forth in paragraphs 4(b) and 4(c)(viii) below.

        (b)      Payment of a criminal fine of $100 million ($100,000,000), to be paid in full within 60 days of sentencing.

        (c)      A statutory-maximum term of five years of probation.   Probation shall include the following mandatory and discretionary special conditions, pursuant to 18 U.S.C. § 3563(a) and (b):

                (i)      The defendant shall not commit another federal, state, or local crime.

                (ii)      The defendant shall notify the probation officer within seventy-two hours of any criminal prosecution against the defendant.

                (iii)      The defendant shall answer truthfully all inquires by the probation officer.

                (iv)      The defendant shall provide to the probation officer full access to any of the defendant's business operating locations.

                (v)      The defendant shall give ten days' prior notice to the probation officer of any intended change in principal

business location or mailing address.

(vi)    The defendant shall notify the Court and the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay the fines and other financial obligations set forth herein.

(vii)   The defendant shall pay the fines set forth in paragraph 4(b) above.

(viii)  Pursuant to 18 U.S.C. § 3563(b)(22), an order, attached hereto as Exhibit B, shall be entered.   The terms of the order shall be enforceable as additional special conditions of probation.

The parties agree and stipulate that the specific discretionary terms of probation enumerated herein are appropriate, and further agree that no additional discretionary terms of probation should be imposed.   The defendant, Transocean Ltd. and any other Transocean entity shall not capitalize into inventory or basis or take as a tax deduction, in the United States or elsewhere, any portion of the monetary payments made pursuant to this plea agreement, and will treat such monetary payments as a non-deductible expense for purposes of computing earnings and profits under Section 312 of the Internal Revenue Code as amended.   The defendant, Transocean Ltd. and any other Transocean entity shall not reference this plea agreement and any payments pursuant hereto or other compliance herewith in any public relations, marketing or advertising; provided, however, that the defendant, Transocean Ltd. and any other Transocean entity shall be permitted to make required disclosures under applicable legal or regulatory requirements.   The defendant

further agrees that payments made pursuant to paragraph 4(c)(viii) above shall have no effect on, and shall not be argued by the defendant, Transocean Ltd. or any other Transocean entity, to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

(d)    The defendant further agrees to pay the special assessment in the amount of $125 before the time of sentencing and shall provide a receipt from the Clerk to the government before sentencing as proof of this payment.

(e)    Pursuant to 18 U.S.C. § 3663(a)(1)(B)(ii), the parties agree and submit to the Court that restitution is not appropriate because (i) restitution need not be addressed in this matter given that compensation for victims has been or is being addressed in other proceedings, including in MDL-2179 and (ii) fashioning of any restitution order would unduly complicate and prolong the sentencing process.

5.    The defendant stipulates that there is a factual basis for the imposition of a criminal fine in the amount of $100 million ($100,000,000) pursuant to 18 U.S.C. § 3571(d) and that the payments made pursuant to paragraphs 4(b) and 4(c)(viii) do not together exceed the statutory-maximum fine available under that statute.    The defendant hereby waives any right to jury or bench trial as to those payments.

6.    The defendant will acknowledge acceptance of this plea agreement by the signature of its counsel and shall provide to the Department, as Exhibit C hereto, a certified resolution of the Board of Directors of Transocean Deepwater Inc. authorizing the defendant to enter a plea of guilty and authorizing an agent to execute this agreement.    The defendant will further provide, no later than the next business day after the next regularly-scheduled meeting of the Board of Directors of Transocean Ltd. a certified resolution providing as follows:

(a)     Transocean Ltd. shall be bound by those specific terms of this agreement that expressly apply to Transocean Ltd., and other Transocean entities shall be bound by those specific terms that expressly apply to other Transocean entities. Transocean Ltd. shall issue and deliver to the Department a guarantee by Transocean Ltd. of all payments due from the defendant under this agreement.    Transocean Ltd. consents to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantee.   Any legal successor or assign of Transocean Ltd. shall remain liable for the guarantee of defendant's payment obligations hereunder, and an agreement to   remain so liable shall be included by Transocean Ltd. in the terms of any sale of Transocean Ltd., acquisition of Transocean Ltd. by any other entity, or merger of Transocean Ltd. into any other entity. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to remain so liable shall be included by defendant in the terms of any sale of defendant, acquisition of defendant by another entity, or merger of defendant into another entity.

(b)     The defendant, Transocean Ltd. and other Transocean entities waive any applicable federal criminal statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

7.     The government agrees that, subject to paragraph 2 of this agreement, the government shall not further prosecute the defendant, Transocean Ltd. and any other Transocean Ltd. entity, including all predecessors, successors and assigns of the above, for any conduct regarding any matters under investigation by the Deepwater Horizon Task Force relating to or

arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.   Should a court

determine that the defendant has breached this agreement, the defendant will not be entitled to

withdraw its plea of guilty, and the Department may prosecute the defendant, Transocean Ltd. and

any other Transocean Ltd. entity, and any predecessors, successors and assigns of any of the

above, for any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil

spill and response, notwithstanding the expiration of any applicable statute of limitations

following the signing of this plea agreement.   In any such prosecution, the Department may use

the defendant's admissions of guilt as admissible evidence against the defendant, Transocean Ltd.

and any other Transocean Ltd. entity.   Other than as set forth in paragraph 6(a) above, this

agreement does not waive any jurisdictional defense of Transocean Ltd. or any Transocean entity

other than the defendant.

8.     The Department agrees that, if requested to do so, it will advise any

appropriate suspension or debarment authorities that, in the Department's view, the defendant has

accepted responsibility for the defendant's conduct relating to the *Deepwater Horizon* blowout,

explosion, oil spill and response by virtue of this guilty plea, and that the defendant has

cooperated during the course of the Deepwater Horizon Task Force's investigation and has agreed

to continue to cooperate in any ongoing criminal investigation by the Department relating to the

*Deepwater Horizon* blowout, explosion, oil spill and response.   Nothing in this agreement limits

the rights and authority of the United States of America to take further civil or administrative

action against the defendant including but not limited to any listing or debarment proceedings to

restrict rights and opportunities of the defendant to contract with or receive assistance, loans and

benefits from United States government agencies.

9.      In exchange for the undertakings made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant=s conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

10.     The defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

11.     The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the criminal investigation or prosecution of this criminal case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

12.     The defendant is satisfied with the legal representation provided by the defendant's lawyer; the defendant and its lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that it is guilty.

13.     It is agreed that the parties' guilty plea agreement contains no additional promises, agreements, or understandings other than those set forth in this written guilty plea

agreement, and that no additional promises, agreements, or understandings will be entered into unless in writing and signed by all parties.

**LANNY A. BREUER**
**Assistant Attorney General**
**Criminal Division**

**JOHN D. BURETTA, Director**
**DEREK A. COHEN, Deputy Director**
**Deepwater Horizon Task Force**


**TRANSOCEAN DEEPWATER INC. and TRANSOCEAN LTD.**

BY: **BRAD BRIAN, ESQ.**
**MICHAEL R. DOYEN, ESQ.**
Counsel for Transocean Deepwater Inc. and Transocean Ltd.


BY: **PHILIPPE A. HUBER**
Associate General Counsel and Corporate Secretary
Transocean Ltd.

Date:    January 3, 2013

<u>Exhibit A</u>

Defendant Transocean Deepwater Inc. (hereinafter, "TRANSOCEAN") agrees that, if the case were to proceed to trial, the government could establish beyond a reasonable doubt that:

1.      Defendant TRANSOCEAN employed hundreds of employees who worked throughout the Gulf of Mexico on deepwater oil and natural gas drilling operations.  At all relevant times, defendant TRANSOCEAN resided in, and engaged in regular business throughout, the states bordering the Gulf of Mexico, including in the Eastern District of Louisiana, and maintained headquarters offices for Gulf operations in Houston, Texas.

2.      On or about May 2, 2008, BP Exploration and Production, Inc. ("BP") entered into a lease with the Minerals Management Service, granting BP the rights to oil and gas reservoirs at a site called Mississippi Canyon Prospect # 252 ("MC # 252") on the Outer Continental Shelf in the Gulf of Mexico.  A well drilled at MC # 252, which BP referred to as the Macondo well, lay approximately 48 miles from the Louisiana shoreline in approximately 5,000 feet of seawater.

3.      An affiliate of defendant TRANSOCEAN was contracted to provide BP with a mobile offshore drilling unit and crew employed by defendant TRANSOCEAN to implement BP's drilling plan for the Macondo well.  Defendant TRANSOCEAN, along with BP, had a duty to maintain well control.  Entailed in this duty were responsibilities related to conducting safe drilling and rig operations, ensuring the safety of personnel onboard and preventing accidents which could impact the environment.

4.      On or about October 6, 2009, defendant TRANSOCEAN began drilling the well using the *Marianas* drilling rig.  On or about November 9, 2009, work was halted on the Macondo well due to Hurricane Ida.

5.      On or about January 31, 2010, using the *Deepwater Horizon* drilling rig, defendant TRANSOCEAN resumed drilling of the Macondo well pursuant to BP's well design,

drilling program, and instructions.  On or about April 9, 2010, drilling of the Macondo well was completed, at a total depth of approximately 18,360 feet below sea level.

6.      On or about April 20, 2010, after the Macondo well was cased and cemented, the *Deepwater Horizon* remained, within the meaning of the Outer Continental Shelf Lands Act,  43 U.S.C. §1333(a)(1), temporarily attached to and erected on the seabed of the Outer Continental Shelf in the Gulf of Mexico, to assist BP, as defined by contract, in BP's exploration and development of resources from the Outer Continental Shelf, to wit: oil and natural gas.  On that date, preparations began to temporarily abandon the well.  Temporary abandonment is the process of securing a well to allow a rig safely to remove its blow-out preventer and riser from a well and depart the site without oil or natural gas leaking from the reservoir.  Such a reservoir leak can be catastrophic.

7.      A critical part of the temporary abandonment procedure for the Macondo well was what is known in the industry as negative testing or negative pressure testing.  Negative testing assesses whether the cement pumped to the bottom of the well has isolated the reservoir's oil and natural gas from the pipe, known as the casing, which runs from the bottom of the well up to the wellhead at the seafloor.

8.      To conduct a negative test, the pressure exerted by drilling mud and other fluids in the well outward toward the oil and natural gas reservoir is reduced below the pressure exerted inward by the reservoir toward the well, creating what is known in the industry as an underbalanced condition.  The well is then monitored for any increase in pressure or flow indicating that fluid is flowing up the well.  During a negative test, if pressure is bled off to zero, then a pressure increase above zero pounds per square inch or fluid flow not otherwise accounted for may be an indication that the well is not secure and that natural gas, oil or other fluids from the reservoir are entering the well.  Rig personnel who observe any indication of a potential influx from the formation into the well are trained, as part of their well control duties, to ensure the well is shut in so that the indication of an influx may be appropriately addressed.

9.      As part of their duties, defendant TRANSOCEAN and BP were required to monitor the well and take appropriate action during the negative test in accordance with the standard of care applicable in the deepwater oil exploration industry.

10.     During the evening of April 20, 2010, defendant TRANSOCEAN, together with BP, conducted negative testing on the Macondo well.  During approximately the first two hours of testing, a drill pipe inserted several thousand feet into the well was monitored for pressure. Defendant TRANSOCEAN and BP observed pressure build up on the drill pipe multiple times. The crew commenced, but did not complete, investigation of the pressure anomalies.

11.     BP's Well Site Leaders eventually instructed defendant TRANSOCEAN, and defendant TRANSOCEAN agreed, to begin monitoring the negative testing on the kill line instead of on the drill pipe.  Both BP and defendant TRANSOCEAN continued to observe abnormal pressure on the drill pipe while monitoring the kill line for flow.  Based on the lack of flow on the kill line, the negative testing ultimately was deemed successful notwithstanding the continuing abnormal pressure on the drill pipe.  BP and defendant TRANSOCEAN did not take further steps to investigate the source of the abnormal drill pipe pressure, which was neither correctly explained nor remediated.

12.     Following the negative testing, at approximately 8:00 p.m., BP's Well Site Leaders instructed defendant TRANSOCEAN, and defendant TRANSOCEAN agreed, to proceed with displacing the heavier drilling mud in the well with lighter weight seawater. Hydrocarbons migrated up the well and towards the *Deepwater Horizon* on the surface of the Gulf.

13.     Later that same evening, a blowout occurred.  Natural gas and oil that had entered the well rushed up the riser and onto the rig floor.  The natural gas ignited, causing multiple explosions.  A fire onboard the *Deepwater Horizon* burned for two days, and resulted in the Deepwater Horizon sinking on or about April 22, 2010.  Beginning at the time of the blowout, oil and natural gas flowed into the Gulf of Mexico.

14.     Defendant TRANSOCEAN's conduct violated its duty to exercise well control in accordance with the standard of care applicable in the deepwater oil exploration industry.

15.     Defendant TRANSOCEAN's negligent conduct, together with the negligent conduct of others, was a proximate cause of the blowout and the discharge of certain quantities of oil and natural gas from the Macondo well into the Gulf of Mexico.

16.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant TRANSOCEAN, together with others, did negligently discharge and cause to be discharged oil in connection with activities under the Outer Continental Shelf Lands Act and which affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, in such quantities as may be, and were in fact, harmful, in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3).

17.     In the circumstances, defendant TRANSOCEAN's conduct constituted ordinary negligence, in violation of 33 U.S.C. § 1319(c)(1) and 1321(b)(3), because such conduct violated the standard of care for the industry.  Defendant TRANSOCEAN does not admit, and nothing in this Plea Agreement establishes, that defendant TRANSOCEAN's conduct in connection with the Macondo well or the *Deepwater Horizon* was grossly negligent, reckless, or intentional.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA      :

     v.      :      CRIMINAL NO.

TRANSOCEAN DEEPWATER INC.      :

## ORDER

Pursuant to 18 U.S.C. § 3563(b)(22), IT IS HEREBY ORDERED:

### National Academy of Sciences

1. The defendant shall pay $150 million ($150,000,000) to the National Academy of Sciences
   for the purposes of oil spill prevention and response in the Gulf of Mexico, as provided for in
   an agreement between the defendant and the National Academy of Sciences attached hereto
   as Exhibit B1.

### National Fish and Wildlife Foundation

2. The defendant shall pay $150 million ($150,000,000) to the National Fish and Wildlife
   Foundation ("NFWF"), a nonprofit organization established pursuant to 16 U.S.C. § 3701-
   3710.  With respect to the work described in paragraph 4 below, the defendant shall assume
   no responsibilities or obligations other than making the payments described in paragraphs 2
   and 3.

3. The defendant's payments to NFWF shall be made according to the following schedule: (a)
   $58 million ($58,000,000) to be paid within 60 days of sentencing; (b) an additional $53
   million ($53,000,000) to be paid within one year of sentencing; and (c) an additional $39
   million ($39,000,000) to be paid within two years of sentencing.  Payments shall be made by
   certified check payable to the National Fish and Wildlife Foundation and mailed to the

attention of its Chief Financial Officer at 1133 15th Street, NW, Suite 1100, Washington, DC 20005, and including a reference to the case number in this proceeding; or by electronic funds transfer in accordance with written instructions to be provided to the defendant by NFWF at the time of transfer.

4. NFWF shall use the money it receives from the defendant pursuant to this Order for the following purposes and subject to the following conditions:

    a. To remedy harm and eliminate or reduce the risk of future harm to Gulf Coast natural resources, NFWF shall use approximately half of the payments to conduct or fund projects to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill. NFWF shall conduct or fund projects in the following states in approximately the following proportions: (1) Alabama, 28%, (2) Florida, 28%, (3) Mississippi, 28%, and (4) Texas, 16%. NFWF shall consult with appropriate state resource managers, as well as federal resource managers that have the statutory authority for coordination or cooperation with private entities, to identify projects and to maximize the environmental benefits of such projects.

    b. To remedy harm and eliminate or reduce the risk of future harm to the State of Louisiana and its natural resources, NFWF will use approximately half of the payments to create or restore barrier islands off the coast of Louisiana and/or to implement river diversion projects on the Mississippi and/or Atchafalaya Rivers for the purpose of creating, preserving and restoring costal habitat, in order to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill. In conducting or funding

these projects, NFWF will consult with State resource managers, as well as federal resource managers that have the statutory authority for coordination or cooperation with private entities regarding management or protection for coastal habitat, to identify the highest priority projects, and to maximize the environmental benefits of such projects.  In identifying projects, NFWF shall consider the State's Coastal Master Plan, as well as the Louisiana Coastal Area Mississippi River Hydrodynamic and Delta Management Study, as appropriate.

c.  In identifying and selecting projects to receive funding pursuant to this Order, NFWF shall not incur liability of any nature in connection with any act or omission, made in good faith, in the administration of the funds or otherwise pursuant to this Order, excepting, however, liability resulting from NFWF's gross negligence or willful misconduct.  In addition, if and to the extent NFWF grants funds to or contracts with any governmental entity to implement any project under this Order: (a) NFWF shall be deemed to act solely as an administrative agent in contracting for, granting to, and disbursing funds for any such project, and (b) NFWF shall not be deemed to incur any liability of any nature in connection with the design, engineering, construction, operation, or maintenance of any such project, including, without limitation, any impact or consequences of any such project on fish, wildlife, plant, or other natural resources, personal injury or property damage.

d.  NFWF's use of funds received pursuant to this Order shall be subject to the reporting requirements of 16 U.S.C. § 3706.  In addition, NFWF shall report to the Probation Officer and to the parties regarding the status and disposition of money it has received

pursuant to this Order, on at least an annual basis, until all such money has been spent.

## Successors

5.  This Order shall be applicable to the defendant, and to the extent specified herein, to Transocean Ltd. and Affiliates, during the defendant's term of probation.

6.  In the event of a sale, assignment or transfer of all of the defendant's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to the defendant and to any successor of the defendant.

7.  With respect to the sale, assignment or transfer of some but not all of defendant's assets to an unaffiliated third party pursuant to arm's-length transaction, including but not limited to the transfer of operational control of a jointly owned asset to an unaffiliated third party, such third party shall not be liable for defendant's obligations, and the defendant and, as necessary, Transocean Ltd. and Affiliates, shall remain obligated to comply with the obligations in this Order with respect to all non-disposed assets, but not with respect to the sold, assigned or transferred assets.

8.  The requirements of this Order are in addition to all other applicable requirements of law. This Order does not operate as a permit under federal, state or local regulations, and the defendant remains responsible for complying with all applicable federal, state and local laws, orders and permits. The government does not warrant that Transocean Ltd.'s compliance with this Order constitutes compliance with other applicable legal requirements.

9.  The defendant's obligations pursuant to this Order expire five years after the Order is entered, except as otherwise provided herein or as modified by the Court.

- 4 -

SO ORDERED this __ day of _____, 2013.

_____

UNITED STATES DISTRICT JUDGE

Exhibit B1

# AGREEMENT BETWEEN
# TRANSOCEAN DEEPWATER INC. AND
# THE NATIONAL ACADEMY OF SCIENCES

This Agreement is entered into by Transocean Deepwater Inc. (the "Company") and the National Academy of Sciences of the United States of America, a federally chartered private nonprofit corporation, 36 U.S.C. §§ 150301, *et seq.*, with its principal place of business in Washington, D.C., acting on behalf of its principal component organizations, the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council (collectively, "NAS"). The effective date of this Agreement is January __, 2013.

WHEREAS the *Deepwater Horizon* blowout and oil spill have demonstrated the need for improvement in offshore oil drilling safety, well monitoring, well design, oil-spill containment, oil-spill response strategies and technologies, and environmental monitoring;

WHEREAS the prevention of blowouts and oil spills resulting in harm to life, property, and the environment in the Gulf of Mexico and on the United States' outer continental shelf is a national priority;

WHEREAS reducing the environmental harm, loss of life or injury, and economic damage caused by any future blowout and discharge of oil associated with offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf is also a national priority;

WHEREAS basic and applied scientific and engineering research are essential to enhancing safety and minimizing the risk of future harm from spills from offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf; and

WHEREAS improved environmental monitoring can contribute to increased protection of the environment, human population, and natural resources in the event of future oil spills;

THEREFORE, the Company and NAS agree to the mutual covenants set forth in this Agreement:

## I.    Payments

1.    The Company shall pay $150 million to NAS according to the following schedule:

a.  $2 million to be funded within 90 days of the date this Agreement becomes effective;

b.  $7 million to be funded within one year of the date this Agreement becomes effective;

c.  $21 million to be funded within two years of the date this Agreement becomes effective;

d.  $60 million to be funded within three years of the date this Agreement becomes effective; and

e.  $60 million to be funded within four years of the date this Agreement becomes effective.

2.    The Company shall assume no other responsibilities or obligations under this Agreement other than making the payments described in paragraph 1.

## II.    Purpose

3.    NAS shall use the payments described in paragraph 1 to establish a separate segregated account for a fixed-term endowment (the "Endowment"), the principal and earnings of which will be expended over a period of 30 years, subject to the provisions of paragraphs 28 and 29.

4.    NAS shall use the Endowment to establish a program focused on human health and environmental protection including issues relating to offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf (the "Program"). The Program will carry out studies, projects, and other activities that utilize the scientific, technical, engineering, medical, and health expertise of the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, the National Research Council, and the nation's scientific, engineering, and

health-care communities.  The Program will seek to advance scientific and technical understanding with the objective of enhancing the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.  The Program will include the assessment and evaluation of strategies and technologies with the objective of enhancing the protection of human health and environmental resources in the Gulf of Mexico and on the United States' outer continental shelf.  The manner in which the studies, projects, and other activities are to be conducted will be determined solely by NAS.  In accordance with normal policies and procedures of NAS, the Program will be conducted by NAS based on scientific merit and integrity, with emphasis on freedom of inquiry and independent nonpartisan advice and recommendations.

5.      The Program shall seek to carry out studies, projects, and other activities in the public interest that would not otherwise be adequately funded or supported by private industry.

## III.   Programmatic Objectives

6.      To address the purpose described in paragraph 4, the Program shall fund and carry out studies, projects, and other activities in three basic categories:  (a) research and development, (b) education and training, and (c) environmental monitoring.  The Program should strive to achieve a balance of studies, projects, and other activities, consistent with paragraphs 4 and 18.

7.      *Research and development.*  The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to research and development related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

8.      *Education and training.*  The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to enhanced education and training for undergraduate, graduate, and professional-school students, private- and public-sector employees, and Gulf Coast regional communities, related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

9.      *Environmental monitoring.*  The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to the development of

advanced environmental monitoring systems related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

## IV.   Structure and Organization

10.    NAS shall appoint a Board to provide general oversight for the Program.  The members of the Board shall be scientists, engineers, and other experts whose experience and knowledge can contribute to the oversight of the Program.  No current officer or current employee of the United States Government can serve on the Board.

11.    NAS shall appoint additional committees and panels of volunteer experts and establish or make arrangements with other entities as needed to carry out the Program.  At a minimum, NAS shall appoint committees for the following three topics:  (1) research and development, (2) education and training, and (3) environmental monitoring.  No current officer or current employee of the United States Government can serve on a committee or panel appointed by NAS under this paragraph.

12.    At least once a year, NAS shall seek the recommendations of each of the following entities (or its designees) concerning the administration of the Program, provided that the role of each such entity shall be solely advisory:

a.  In accordance with its statutory responsibilities and as necessary to meet the statutory requirement that it coordinate a comprehensive program "in cooperation and coordination with industry, universities, research institutions, State governments, and other nations, as appropriate," 33 U.S.C. § 2761, the Interagency Coordinating Committee on Oil Pollution Research (ICCOPR), including the Department of the Interior's Bureau of Safety and Environmental Enforcement (BSEE) and Bureau of Ocean Energy Management (BOEM); and

b.  The environmental-protection departments and other coastal natural-resource managers for the States of Alabama, Florida, Louisiana, Mississippi, and Texas.

13.    Appointments to the Board, committees, and panels shall be in accordance with (a) principles similar to those underlying section 15 of the Federal Advisory Committee Act, 5 U.S.C. App. 2; and (b) the implementing procedures of NAS, as applicable, including the Conflicts of Interest Policy for Committees Used in the Development of Reports, and the Policy on Conflicts of Interest for Institutional Oversight and Non-Advisory Services.

4

adopted by the NAS Council on May 12, 2003, and June 11, 2004, respectively, as may be amended or modified in the future.

14.     NAS shall establish periodic reporting procedures for grant recipients, including a statement of project accomplishments and a report on grant expenditures until project completion, as well as a final report after project completion. Each final report shall address the original objectives of the project as identified in the approved proposal, describe any changes in objectives, and provide a final project accounting. The final report of project accomplishments described in this paragraph shall be available to the public.

15.     NAS shall publish an annual report on studies, projects, and other activities funded or carried out by the Program during the preceding year. The annual reports shall be made available to the public and shall be disseminated in print and on the NAS Web site. Each annual report shall contain financial statements for the Program that are consistent with the audited financial statements of NAS, including a full and complete statement of income, expenditures, and investments. The report shall also include a list of each recipient of any grant funded by the Endowment, the amount of the grant, and a summary of the purpose of each grant made during the preceding year.

16.     The Company, its officers, and its employees shall not be involved in any decisions regarding the selection of studies, projects, activities, or award recipients.

## V.     Management of Funds

17.     NAS shall manage the Endowment in accordance with the policies established by the NAS Council, in accordance with the laws of the District of Columbia, including the Uniform Prudent Management of Institutional Funds Act of 2007, D.C. Code, Chapter 16A, as it may be amended from time to time, and any successor acts. NAS will invest the Endowment in a prudent manner for a 30-year fixed-term endowment whose entire principal and earnings will be expended within the 30-year period. NAS shall have the discretion to determine how to invest the funds in accordance with this standard of prudence, provided that at least half of all funds held in the Endowment shall be invested in United States Government securities, United States Government agency securities, and United States Government-backed securities.

18.     Nothing about the list of three categories of studies, projects, and other activities in paragraph 6 is meant to imply a relative priority or a particular funding allocation. NAS should strive to achieve a balance of studies, projects, and other activities that supports the Program's overall purpose and programmatic objectives.

19.     All expenditures of Endowment funds by NAS for Program studies, projects, and other activities shall comply with OMB Circular A-122, 2 C.F.R. Part 230, as it may be revised from time to time, the NAS indirect-cost recovery rates established by the Office of Naval Research and any successor cognizant administrative contracting office, and the NAS disclosure statement on file with that Office (or an equivalent disclosure requirement).

20.     The funds expended from the Endowment for studies, projects, and other activities shall be audited annually by independent accountants in accordance with U.S. generally accepted accounting principles.

21.     NAS may at any time add to the Endowment using other sources of funding.

22.     NAS may not use the Endowment to support any study, project, or other activity that would expend funds for a purpose for which Congress has prohibited funding.

23.     If carrying out the Program's studies, projects, or other activities requires acquisition of real property, the property shall be located in the Gulf Coast region.

24.     NAS shall not use any money from the Endowment for the purpose of lobbying, attempting to influence legislation, participating in a political campaign, or otherwise influencing the outcome of any public election.

## VI.    Access to and Dissemination of Research

25.     The copyrights in all written materials, photographs, drawings, software, and other works subject to copyright protection created or generated under any grant made using the Endowment shall be owned by the recipient of the grant. NAS will encourage the publication and dissemination and other use of these materials. With respect to such copyrighted works, the United States Government and NAS shall have a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use such copyrighted works for Government or NAS purposes. In addition to any other rights it may have, the United States Government shall have the rights provided in paragraph .36(d) of OMB Circular A-110, as it may be revised from time to time, subject to the terms and conditions set forth in that Circular.

26.     With respect to research data, which shall include the recorded factual material commonly accepted in the scientific community as necessary to validate research findings (but not any preliminary analyses, drafts of scientific papers, plans for future research, peer reviews, or communications with colleagues), the researcher shall retain all rights in said data but shall provide timely and unrestricted access to the data to NAS and the United States

6

Government. Without limitation of the foregoing, the United States Government and NAS shall have the right to (1) obtain, reproduce, publish, or otherwise use the research data first produced under any grant funded by the Endowment, and (2) authorize others to receive, reproduce, publish, or otherwise use such data for Government or NAS purposes.

27.    The policies on patents outlined in 35 U.S.C. §§ 200-211, in 37 C.F.R. § 401, and in the Presidential Memorandum on Government Patent Policy dated February 18, 1983, will serve as basic guidance on patent rights so as to encourage the maximum participation in the Program by a diverse set of research entities. Grantees will have the right to elect title to the patent rights in inventions resulting from work under any grant, subject to the United States Government and NAS each acquiring a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States or NAS, but in the case of NAS, solely in connection with the Program, the invention throughout the world in those inventions for which title is elected, and also subject to the "march-in-rights" of the United States Government as set forth in the above-cited statute and regulation. Without limitation of the foregoing, the license provided herein to NAS shall include the right of NAS to sublicense its rights to contractors and grantees that perform studies, projects, or other activities under the Program, except that NAS shall not have the right to commercialize its rights outside the Program.

## VII.  Modification

28.    NAS shall conduct periodic reviews of the Endowment and Program at five-year intervals, to determine whether there is a continuing need for the Endowment and whether there is a need to modify the Agreement. Any modification of the Agreement will be subject to paragraph 29.

29.    This Agreement may be modified only through application by NAS to the appropriate court in the District of Columbia pursuant to § 44-1635(b) or (c) of the Uniform Prudent Management of Institutional Funds Act, D.C. Code Ann. § 44-1635(b) or (c), as it may be amended from time to time, pursuant to comparable authority under a successor statute, or, in the absence of statutory authority, pursuant to principles of equitable deviation or cy pres. This Agreement cannot be modified in a manner that violates paragraph 1, 2, or 22.

## VIII.  Miscellaneous Provisions

30.     NAS shall comply with all local, State, Federal, and international laws or requirements that apply in connection with the performance of any studies, projects, or other activities of the Program.

31.     This Agreement shall not be construed to create any rights in, or grant any cause of action to, any person not a party to this Agreement.

32.     This Agreement shall be interpreted according to the laws of the District of Columbia.

33.     The provisions governing the Endowment and Program are severable.  Should any portion of the Endowment or Program, or its studies, projects, or other activities, be declared illegal or inoperable, the remaining provisions shall remain in effect so long as there remain valid purposes and continued funding to carry out any study, project, or other activity within the scope of the Program.

34.     This Agreement may be signed in counterparts, each of which shall be an original and all of which together shall constitute the same Agreement.

FOR TRANSOCEAN DEEPWATER INC.

1/3/13

Date

FOR THE NATIONAL ACADEMY OF SCIENCES

# Exhibit C



TRANSOCEAN DEEPWATER INC.

4 GREENWAY PLAZA (77046)

POST OFFICE BOX 2765

HOUSTON, TEXAS 77252-2765

December 27, 2012


I, Jill Snowden Greene, a duly authorized representative of Transocean Deepwater Inc., a company incorporated under the laws of Delaware, do hereby certify that the following is a true and correct copy of the minutes of a meeting and certain resolutions adopted by the Board of Directors of Transocean Deepwater Inc. at a meeting held on December 27, 2012, at which all members of the Board of Directors were present and that such resolutions remain in full force and effect as of the date hereof.

Signed this 27th day of December, 2012

**Jill S. Greene**
Associate General Counsel, Acting Secretary

MINUTES OF MEETING

BOARD OF DIRECTORS

TRANSOCEAN DEEPWATER INC.

December 27, 2012

1. <u>Date and Place</u>:   A meeting of the board of directors (the "Board") of Transocean Deepwater Inc., a Delaware corporation (the "Company") was held via conference call commencing at 9:00 a.m. Houston, Texas time on December 27, 2012.

2. <u>Directors Present</u>:   Keelan Adamson (Chairman)
   Robert L. Herrin
   David A. Tonnel

   constituting all of the members of the Board

3. <u>Company Representatives Present</u>:
   Steven L. Newman
   Allen Katz
   Kathleen McAllister
   R. Thaddeus Vayda
   David Schwab
   Jill Greene (acting as secretary)

---

1. <u>Introduction</u>:  Serving as Chairman for the meeting, Mr. Adamson noted that the meeting was validly called pursuant to notice properly given.  Indicating that a quorum was present, Mr. Adamson called the attendees to order and declared the meeting open.

2. <u>Approval of the Plea Agreement (as defined below)</u>:   Making reference to the preceding Board Meetings and informational session held on December 21, 2012 and the Plea Agreement (as defined below) distributed in advance of the meeting for review, the Chairman asked whether there were any additional questions of the Board with respect to the proposed order of business.  The Board considered and weighed the terms of the Plea Agreement, alternatives and requirements thereof.  Discussion continued regarding the timing and requirements for public disclosure of the Plea Agreement, and the Board called for additional arrangements to be made to plan for and implement various requirements the Company and Board must undertake for compliance with the Plea Agreement. At the conclusion of discussion and upon motion duly made and seconded, the Board unanimously approved the following resolutions:

1

**WHEREAS,** Transocean Deepwater Inc. (the "Company") has been engaged in discussions with the United States Department of Justice (the "DOJ") in connection with the DOJ's investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon (the "Investigations");

**WHEREAS,** the Company's board of directors (the "Board") has been advised by executive management as well as internal and external legal counsel on the progress of the Investigations on an on-going basis;

**WHEREAS,** the Company has engaged executive management and both internal and external counsel to negotiate resolution to the Investigation in a manner that is satisfactory to the Company and the DOJ;

**WHEREAS,** the Board has, on December 21, 2012, previously approved the settlement of certain civil claims, penalties and damages through a Partial Consent Decree, and authorized the completion of a global settlement resolution by its company representatives and legal counsel;

**WHEREAS,** the Board has convened in informational sessions and been advised by executive management as well as internal and external legal counsel of the terms and conditions set forth in that certain Cooperation Guilty Plea Agreement, Allocution Exhibit and related appendices (collectively, the "Plea Agreement") circulated to the Board in draft form on December 21, 2012 and in final form on December 24, 2012, which is attached hereto as Exhibit A; including but not limited to, the criminal fine payment schedule, remediation payments, restitution payments, and terms of probation; and

**WHEREAS,** the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States with respect to all criminal violations identified during the Investigations and that no additional promises or representations have been made to the Company by any officials of the United States or the States in connection with the disposition of the Investigations other than those set forth in the Plea Agreement and Partial Consent Decree.

**NOW, THEREFORE, IT IS HEREBY:**

**RESOLVED,** that the Cooperation Guilty Plea Agreement (the "Plea Agreement") among the United States of America, the Company and Transocean Ltd., under which, among other things, the Company pleads guilty to certain charges and agrees to make certain payments to the United States and, pursuant to the order in the form attached as Exhibit B thereto (the "Order"), to the National Academy of Sciences and to the National Fish and Wildlife Foundation, is hereby authorized, approved, adopted, ratified and confirmed in all respects, in substantially the form presented to the Board, but with such changes, additions

and deletions thereto as shall be approved by any officer of the Company executing the same on behalf of the Company with such consultation from counsel as such officer shall deem appropriate, such officer's (or, as provided below, counsel's) execution thereof to be conclusive evidence of such approval and the approval of the Board, without the necessity of further approval by this Board; and further

**RESOLVED,** that the terms of that certain agreement made pursuant to the Order by and between the Company and the National Academy of Sciences of the United States of America in substantially the same form as Exhibit B-1 attached to the Order are hereby authorized, approved, adopted, ratified and confirmed in all respects in substantially the same form presented to the Board, but with such changes, additions and deletions thereto as shall be approved by any office of the Company executing the same on behalf of the Company with such consultation from counsel as such officer shall deem appropriate, such officer's (or as provided below, counsel's) execution thereof to be conclusive evidence of such approval and the approval of the Board, without the necessity of further approval by the Board; and further

**RESOLVED,** that Brad Brian, counsel to the Company, and any officer of the Company are hereby authorized and empowered, for and on behalf of the Company, to execute and deliver the Plea Agreement; and further

**RESOLVED,** that without limiting the generality of the foregoing resolution, the Board authorizes the Company, pursuant to the Plea Agreement, to (i) waive prosecution by indictment and plead guilty to Count One of an information charging it with negligently discharging oil into the Gulf of Mexico, in violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3), arising from the Company's negligent conduct regarding the drilling rig *Deepwater Horizon* in the Gulf of Mexico on April 20, 2010 and (ii) agree to the factual allocution contained in Exhibit A to the Plea Agreement; and further

**RESOLVED,** that any officer of the Company is hereby authorized and empowered, for and on behalf of the Company, from time to time to take such actions and to execute and deliver such acknowledgements, agreements, amendments, certificates, contracts, instruments, notices and other documents, or to effect such filings with any and all appropriate regulatory authorities, as may be required or as such officer may deem necessary. advisable or appropriate in order to carry out the transactions contemplated by, and the purposes and intents of, the foregoing resolutions; all such actions to be performed in such manner, and all such acknowledgments, agreements, amendments, certificates, contracts, instruments, notices and other documents to be executed and delivered in such form, as the officer performing or executing the same shall approve, the performance or execution thereof by such officer to be conclusive evidence of the approval thereof by such officer and by this Board, without the necessity of further approval by this Board; and further

**RESOLVED,** that the Secretary, any Assistant Secretary, or Jill Greene acting in the capacity of acting Secretary of the Company is hereby authorized to certify and attest any documents which he or she may deem necessary, advisable or appropriate to consummate the transactions contemplated by the documents heretofore authorized and approved, provided that such attestation shall not be required for the due authorization, execution and delivery or validity of the particular document; and further

**RESOLVED,** that the authority granted to the officers of the Company under the foregoing resolutions shall be deemed to include, in the case of each such resolution, the authority to perform such further acts and deeds as may be necessary, advisable or appropriate, in the judgment of such officers, to carry out the transactions contemplated thereby, and all acts and deeds previously performed by the officers of the Company prior to the date of these resolutions that are within the authority conferred hereby, are approved, adopted, ratified and confirmed in all respects as the authorized acts and deeds of the Company.

3. <u>Adjournment</u>.   There being no further business to be transacted, the meeting was adjourned.



**U.S. Department of Justice**

**Criminal Division**

*Deepwater Horizon Task Force*
*400 Poydras St. – Suite 1000*
*New Orleans, Louisiana 70130*

Telephone *(504) 593-1800*
Facsimile *(504) 593-1889*

January 3, 2013

Honorable United States District Judge Jane Triche Milazzo
Eastern District of Louisiana
500 Poydras Street, C-206
New Orleans, Louisiana 70130
Phone: (504) 589-7585

Re:   *United States v. Transocean Deepwater Inc.*
      *Case No: 13-001 "H"*

Dear Judge Milazzo:

Please find a copy of the plea agreement and the factual basis enclosed for your review in connection with Transocean's plea of guilty. Should you have any questions, please contact us at your earliest convenience.

Sincerely yours,

DEREK A. COHEN
*Deputy Director*
*Deepwater Horizon Task Force*

cc: Brad D. Brian, Esq.
    Munger Tolles & Olson LLP
    355 South Grand Avenue
    Los Angeles, CA 90071
    (Counsel for Transocean Deepwater Inc.)
    w/enclosures