IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF OF | § | |
| MEXICO, ON APRIL 20, 2010 | § | SECTION J |
| | § | |
| | § | JUDGE BARBIER |
| THIS DOCUMENT RELATES TO: | § | |
| CASE NOS. 10-4239, 10-4240, 10-4241, | § | MAGISTRATE JUDGE SHUSHAN |
| BUNDLE C, AND 10-2771 | § | |

**TRANSOCEAN'S AND HESI'S OPPOSITION TO THE JOINT MOTION FOR
SUMMARY JUDGMENT REGARDING PROPRIETARY INTERESTS FILED BY THE
MEXICAN STATES OF QUINTANA ROO, TAMAULIPAS, AND VERACRUZ**

Transocean Offshore Deepwater Drilling Inc., Transocean Holding LLC, Transocean

Deepwater Inc., and Triton Asset Leasing GmbH (collectively "Transocean") and Halliburton

Energy Services, Inc. ("HESI"), respectfully submit this opposition to the Joint Motion for

Summary Judgment Regarding Proprietary Interests filed by the Mexican states of Quintana

Roo, Tamaulipas, and Veracruz ("Mexican States") (Rec. Docs. 8178 and 8186). As set forth

herein and in the Joint Local Rule 56.2 Statement Controverting the Local Rule 56.1 Statement

of the Mexican States (Rec. Doc. 8361), in attempting to support their claims, the Mexican States

rely on misinterpretations of law, conclusory allegations unsupported by admissible evidence,

and materials not admitted in evidence. Accordingly, the Court should deny the Mexican States'

motion and grant Transocean's and HESI's cross-motion for summary judgment (Rec. Doc.

8179) dismissing all remaining claims brought by the Mexican States.

**INTRODUCTION**

To survive Defendants' motion for summary judgment regarding the Mexican States'

remaining maritime negligence and gross negligence claims, the Mexican States must establish

that they have a proprietary interest under federal maritime law as required by *Robins Dry Dock*

20021736.1

& *Repair Co. v. Flint*, 275 U.S. 303 (1927).  *See* Rec. Doc. 7367; Bundle C Order, Rec. Doc. 4845 at 4, 11-12, *citing* Bundle B1 Order, Rec. Doc. 3830 at 19-25.  The Mexican States attempt to evade dismissal by arguing that (1) Mexican law is irrelevant to the determination of proprietary interest, (2) there is no requirement of ownership to establish proprietary interest under *Robins Dry Dock*, and, alternatively, (3) their maritime negligence claims should survive summary judgment because Mexican law allegedly provides interests to the Mexican States in certain Mexican natural resource assets at issue.  Mex. Sts. Mem. at 9-27 (Rec. Doc. 8178-1).

Contrary to these arguments, Mexican law is essential to determine whether the Mexican States own the natural resource assets at issue as required to establish proprietary interest under *Robins Dry Dock*.  *See* TO HESI Mem. at 3-5; 16-17 (Rec. Doc. 8179-1).  In their memorandum supporting their position, the Mexican States fail to establish that they have a proprietary interest under federal maritime law in the allegedly damaged Mexican natural resource assets.  Mexican law confirms that the Mexican States do not own the assets at issue and that they improperly complain of "physical damage to the property of another."  *Catalyst Old River Hydroelectric Ltd. P'ship. v. Ingram* ("*Catalyst*"), 639 F.3d 207, 210 (5th Cir. 2011).  Moreover, even if the Court applied a standard less than ownership to determine the Mexican States' proprietary interests, such would be contrary to *Robins Dry Dock* here, and the Mexican States have failed to point to any credible evidence that they possess such interests under Mexican law or that their purported interest could be deemed tantamount to full ownership.  Thus, despite the Mexican States' efforts, their remaining maritime claims fail, and this Court should grant complete summary judgment as to these claims.

2

**ARGUMENT**

I.    Application Of Mexican Law To The Federal Maritime Rule Of *Robins Dry Dock* Is
      Necessary To Establish Whether The Mexican States Have Proprietary Interest In The
      Natural Resource Assets At Issue.

       In the Fifth Circuit, the proprietary interest rule of *Robins Dry Dock* bars "recovery for
economic loss if that loss resulted from physical damage to the property of another." *Catalyst*,
639 F.3d at 210.   The Mexican States contend that Mexican law is irrelevant in determining
whether they have proprietary interest under this rule of federal maritime law.   *See* Mex. Sts.
Mem. at 9.   To the contrary, Mexican law is essential to this inquiry.

       In the instant case, the Mexican States allege that transnational pollution purportedly
damaged Mexican natural resource assets.   *See, e.g.,* Mex. Sts. Second Amended Complaints at
¶¶ 291-293.   To determine whether the Mexican States own the natural resource assets at issue, it
is necessary to turn to Mexican law governing such ownership.   *See, e.g., Louisville &
Nashville R.R. Co. v. M/V BAYOU LACOMBE*, 597 F.2d 469 (5th Cir. 1979) ("*Bayou Lacombe*")
(applying Alabama law to determine the nature of the property interest at issue under *Robins Dry
Dock*).   Because the Mexican States are creatures of Mexican law, their rights regarding Mexican
natural resource assets are determined by Mexican law.   Thus, analysis of the nature of the
Mexican States' property interest in the Mexican natural resources at issue must be evaluated
under Mexican law to determine whether their claims survive the *Robins Dry Dock* rule of
federal maritime law.

II.    Under *Robins Dry Dock*, The Mexican States Must Demonstrate Ownership Of The
       Relevant Natural Resource Assets At Issue To Have A Proprietary Interest.

       Ownership is necessary to establish proprietary interest under *Robins Dry Dock* in the
Fifth Circuit.   *See* TO HESI Mem. at 3-4.   Despite this established principle, the Mexican States
argue that "[n]either *Robins* nor any other court applying the *Robins* principles has held that

ownership of the property is necessary to establish the required proprietary interest." Mex. Sts. Mem. at 20. To the contrary, as noted in Transocean's and HESI's Memorandum, the plaintiffs in *Robins Dry Dock* were unable to recover damages because the injury to the property at issue was no wrong to them, "but only to those whom it belonged." *See also, TESTBANK*, 752 F.2d at 1034 (Williams, J., concurring) (The "legal synonym for 'proprietary interest' is 'ownership'"); *Vicksburg Towing Co. v. Mississippi Marine Transp. Co.*, 609 F.2d 176, 177 (5th Cir. 1980) (noting that the difference between recovery by an owner when his property is damaged and recovery by others is "meaningful, real and dispositive"). Ownership remains the core of the *Robins Dry Dock* analysis in the Fifth Circuit. *See, e.g., IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1194 (5th Cir. 1993) (noting the "long established requirement of ownership" that was "enunciated" in *Robins Dry Dock*).

Nevertheless, in support of their argument, the Mexican States contend that "a proprietary interest may be established by demonstrating 'actual possession or control, responsibility for repair, and responsibility for maintenance.'" Mex. States Mem. at 21 (citing *Texas Eastern Transmission Corp. v. McMoRan Offshore Exploration*, 877 F.2d 1214, 1224-25 (5th Cir. 1989)). Although the Fifth Circuit has suggested these factors for consideration of whether a non-owner could have proprietary interest if such interest is tantamount to full ownership in some circumstances (*see, e.g., Texas Eastern*, 877 F.2d at 1225), the Fifth Circuit has not applied factors other than ownership to permit a non-owner to recover economic damages absent contract provisions where owners explicitly gave non-owners such recovery rights. *See, e.g., Amoco Transport Co. v. S/S MASON LYKES,* 768 F.2d 659 (5th Cir. 1985).

For example, in *Bayou Lacombe* where these factors originated in *dicta*, the court found that the plaintiff's right to use the bridge at issue had "none of the incidents of ownership." 597 F.2d at 474. The plaintiff "never had possession or control of the bridge, did not maintain the

bridge, and had no obligation to repair the bridge or contribute to the cost of repairs in the event of damage." *Id.* Additionally, in *Texas Eastern*, the Fifth Circuit rejected the plaintiff's attempt to rely on the factors of "actual possession or control, responsibility for repair, and responsibility for maintenance" finding that some maintenance responsibilities fall short of ownership. 877 F.2d at 1224-25. Accordingly, in the Fifth Circuit, ownership remains the determining factor under the *Robins Dry Dock* analysis.

Moreover, the Fifth Circuit has not referenced the factors mentioned in *Texas Eastern* in recent recitations of the *Robins Dry Dock* rule (*see, e.g., Catalyst*, 639 F.3d at 210). Further, application of such factors here would be contrary to *Robins Dry Dock*. In this case, natural resources within the territory of a foreign sovereign nation, the United Mexican States, were allegedly damaged by transnational pollution. Federal Mexican law clearly establishes ownership rights over such resources. Additional factors are not necessary to determine whether political subdivisions of the Mexican nation are entitled to maintain their causes of action under federal maritime law. Just as ownership was the determining factor in *Robins Dry Dock*, there is no need for the injection of factors other than ownership to determine proprietary interest in the natural resource assets at issue in the instant case.

Accordingly, because ownership is necessary to establish proprietary interest under *Robins Dry Dock* in the Fifth Circuit, and the Mexican States have failed to establish ownership of any of the natural resources at issue as set forth below and in Transocean's and HESI's Memorandum, the Mexican States' maritime claims should be dismissed.

III.     The Mexican States Do Not Have Proprietary Interest In The Natural Resource Assets At Issue.

The Mexican States' claims fail because Mexican law establishes that the Mexican States improperly complain of "physical damage to the property of another" as prohibited by *Robins*

5

*Dry Dock*.  *See Catalyst*, 639 F.3d at 210.  As noted in Transocean's and HESI's Memorandum (TO HESI Mem. at 5-11), the Mexican States seek economic damages for alleged injuries to natural resource assets in which they have no ownership interest.  Moreover, even if the Court looks to factors other than ownership to assess whether the Mexican States possess an interest that is tantamount to ownership (which Transocean and HESI contend is improper here), it is evident that the Mexican States do not possess the requisite interests.  For example, under Mexican law, the Mexican federal government, and not the Mexican States, retains primary jurisdiction over environmental administrative matters.  *See* TO HESI Mem. at 11-16.  Additionally, even where the federal government allows for the use or exploitation of these resources, Mexican law is clear that a grant of use or exploitation does not transfer ownership or a proprietary right.  *Id*.  Accordingly, the Mexican States do not have a proprietary interest in the waters, coastal areas, and wildlife allegedly injured by Macondo hydrocarbons, and their motion for summary judgment should be denied.

Nevertheless, the Mexican States assert that they have proprietary interests under Mexican law based on their interpretation of (1) the Mexican Constitution (Mex. Sts. Mem. at 11-14); (2) federal administrative agreements (*id*. at 12, 15-16); (3) federal statutes; and (4) their state constitutions (*id*. at 18-20).  Their arguments are rife with mischaracterizations and unsupported conclusory allegations.

     A.    <u>The Mexican States' arguments based on the Mexican Constitution are unsupported by Mexican law.</u>

The Mexican States mischaracterize the following concepts under the Mexican Constitution in a vain attempt to support their claims:  (1) the meaning of the term "Nation" within the Mexican Constitution (Mex. Sts. Mem. at 11-14); (2) the right of the Mexican federal

government to convey lands reclaimed from the sea to private owners after disincorporation (*id.* at 12-13); and (3) the concept of concurrent jurisdiction (*id.* at 12-14).

*First*, the Mexican States allege that they are entitled to recovery because they, along with all residents of Mexico, municipalities, and the national territory, are constituent parts of the Mexican "Nation" under the Mexican Constitution, and thus own the Mexican natural resource assets at issue.  Mex. Sts. Mem. at 11-12.  If this proposition was true, it would open the door for complaints by all political subdivisions and the 100 million or so residents of Mexico to complain of alleged damages to national property.  This limitless recovery is just the type of snowball effect that *Robins Dry Dock* was crafted to prevent.

Contrary to their assertion, the Mexican States' broad definition of the Mexican "Nation" is unsupported by Mexican law.  The term "nation" as used in the Mexican Constitution means the federal government, not the Mexican States.   Rec. Doc. 8167-10, Exhibit 3 (Mexican Supreme Court decision holding that "[t]he nation cannot be mistaken for a state" and that the nation "is unique and represented by its federal agencies.").   Moreover, the articles of the Mexican Constitution cited by the Mexican States' address the form of Mexican government rather than ownership of Mexican natural resource assets.  *See, e.g.*, Articles 39 ("National sovereignty is originally vested essentially in the people"); 42 (composition of "National territory).   Thus, the constitutional authority upon which the Mexican States rely does not support their allegations and is inapplicable to the issue of ownership of Mexican natural resources.

*Second*, the Mexican States paraphrase selected portions of Article 27 of the Mexican Constitution insinuating that "individuals" may acquire ownership of *any* national property. Mex. Sts. Mem. at 12.  As alleged evidence of this, the Mexican States assert that an agreement

between the Mexican federal government and a private company regarding a public beach at "La Pesca," as well as other agreements not admitted into the record, demonstrate that "federal coastal zones and lands reclaimed from the sea can be bought and sold by the Mexican Federal Government to private individuals and corporations."  Mex. Sts. Mem. at 11.

These assertions are flatly refuted by Mexican law and the text of the agreements at issue. For example, Article 2 of the "La Pesca" agreement at issue provides:

> This Order only grants to the Government of the State of Tamaulipas the right to use the surface destined for achieving the purpose indicated in article one of this instrument, does not assign ownership nor does it create any real right to the recipient.

*See, e.g.*, Rec. Doc. 8178-11, ¶11.  Additionally, contrary to the Mexican States' arguments, certain Mexican federal natural resource assets may not be conveyed.  For example, the federal maritime zone, and all "assets subject to the Federal Government's public domain regime are inalienable, imprescriptible and unseizable" national property that may not be conveyed.  Article 13, General Law on National Assets.  "Lands reclaimed from the sea" are owned by the Nation, but may be conveyed to the owner of the adjacent beachfront property only after such lands are disincorporated from the public domain by Executive decree (*see* Halliburton's and Transocean's Joint Identification of Legal Authorities, Rec. Doc. 8167-8 ("Legal Auth.") at 27 (Article 6, Paragraph IX, General Law on the National Assets)).

Moreover, as noted in Transocean's and HESI's Memorandum, the Mexican States have failed to produce evidence of gained lands disincorporated from the public domain that were transferred to them and allegedly damaged by Macondo hydrocarbons.  TO HESI Mem at 14. The sale of land to private individuals and corporations is irrelevant to ownership interest held by the Mexican States.  *Id.* at 15.

*Third*, the Mexican States assert that the concept of concurrent jurisdiction dictates that political subdivisions of Mexico "must and should intervene and act in conjunction when protecting, preserving, and restoring the environment and ecological balance of the Gulf of Mexico." Mex. Sts. Mem. at 12-14. As noted in Transocean's and HESI's Memorandum, this assertion is unsupported by Mexican law. TO HESI Mem. at 11-13. The Mexican States' ability to act regarding environmental matters under the concept of concurrent jurisdiction is dictated by the Mexican federal government.

Article 73, Section XXIX-G of the Mexican Constitution provides that only the Mexican national congress is empowered to "enact laws establishing the concurrence of the Federal Governement, the States, and the municipalities, within their respective jurisdictions, on matters concerning environmental protection and preservation and restoration of ecological balance." The Mexican Supreme Court has confirmed that under Article 73, Section XXIX-G, the Mexican States are dependent on, and subordinate to, the federal government in the area of environmental administrative matters. Doc. 8167-10 at 44 (Exhibit 2) (*Concurrent Powers in the Mexican Legal System. Their General Characteristics*, 9th Era; Plenary; S.J.F.; XV; Pag. 1042 (Record No. 187982)). Although the Mexican federal government may expressly grant concurrent jurisdiction of certain environmental administrative matters to the Mexican States, such grants do not convey ownership of any natural resource under Mexican law. TO HESI Mem at 11.

B.    The Mexican States' interpretation of federal administrative agreements, federal statutes, and state constitutional provisions are unsupported by Mexican law.

In an attempt to bolster their baseless arguments made under the Mexican Constitution, the Mexican States mischaracterize the nature and applicability of select (1) federal administrative agreements, (2) federal statutes, and (3) state constitutional provisions, to the *Robins Dry Dock* analysis.

*First*, the Mexican States contend that "through Coordination Agreements, Decrees, Grants, Sale Agreements, and other federal instruments" not admitted into the record, the Mexican federal government transferred ownership rights in the natural resources at issue to the Mexican States.  Mex. Sts. Mem. at 13-14.  As previously explained by Transocean and HESI, however, such agreements cannot transfer ownership interest.  *See* TO HESI Mem. at 13-16. Nevertheless, the Mexican States attempt to support their argument through mischaracterization of the rights transferred in the referenced agreements.

For example, the Mexican States allege that administrative agreements cited in Gabuardi's report "grant federal land zones and lands reclaimed from the sea" to the Mexican states of Tamaulipas and Quintana Roo, "thereby giving the [Mexican States] complete control and authority over such lands."  Mex. States Mem. at 15.  This characterization is incorrect because as noted above, federal maritime zone land is not transferrable, and an executive decree of disincorporation is necessary before conveyance of gained lands.  *See* TO HESI Mem. at 8-9; Articles 3 and 13, Paragraph IX, General Law on the National Assets.

Moreover, as acknowledged in Gabuardi's report, Article 70 of the General Law of National Assets provides that "administrative agreement[s] granting the benefit upon federal assets only transfer the right to use them but do not transfer the property on the same or create any other real rights on such assets and hence cannot be transferred to anyone else."  *See* Article

70, General Law of National Assets, (Rec. Doc. 8169-9, at 6); *see also* Gabuardi Rpt. at 94 n. 373, 98 n. 395 (Rec. Doc. 8178-5).   Accordingly, contrary to the Mexican States' assertions, administrative agreements do not transfer ownership interest.

The Mexican States also mischaracterize a Decree issued on April 14, 2005 by the Ministry of the Environment and Natural Resources.   Mex. States Mem. at 15.   The Mexican States incorrectly assert that the "decree granted the land identified in the attached map (*attached to Exhibit E*) [Rec. Doc. 8178-8] (almost half of the state coastline and previous federal maritime zones) to the State of Tamaulipas, along with the authority to possess, control, and manage such areas, as well as the obligation to maintain, restore, and repair these lands out of the State's own funds."   *Id.*

Contrary to the Mexican States' misrepresentation of the nature of this document, the Decree states that: "The region known as Laguna Madre y Delta del Rio Bravo is hereby *declared to be a natural protected area*, with special consideration for plants and wildlife (flora and fauna)."   (Rec. Doc. 8178-8 (emphasis added)).   The Decree further provides in Article Two:

> The Department of the Environment and Natural Resources (*federal entity*) shall be charged with preserving, managing and administering the ecosystems of the area and their elements, as well as supervising preservation, protection and supervision tasks of the Laguna Madre and Rio Grande Delta flora and fauna area.

*Id.*   Additionally, Article Eight thereof states:

> The owners, possessors or holders of other rights over land, waters and forests comprised within the surface of the Laguna Madre and Rio Grande Delta flora and fauna protection area shall be subject to the limitations set forth by the General Law of Ecological Balance and Environmental Protection and in this declaration.

*Id.*   Accordingly, as established by the text of the Decree, the Mexican federal government did not grant ownership of the land at issue to the State of Tamaulipas.   The Decree also does not grant the State authority to "possess, control, and manage" the protected area.   The Mexican

11

federal government, through the Department of the Environment and Natural Resources, retains primary authority over the protected area.  Moreover, nothing in the Decree obligates the state to "maintain, restore, and repair these lands out of the State's own funds."  Thus, the Decree refutes the Mexican States' characterization of the nature of this document, and refutes their claims of proprietary interest in the waters, coastal areas, and wildlife allegedly injured by Macondo hydrocarbons based on this and similar agreements.

Next, the Mexican States overstate their power to tax federal natural resources under unidentified tax coordination agreements.  Mex. Sts. Mem. at 16.  Although the Mexican States may be permitted to collect taxes concerning the federal maritime-land zone, they may not levy such taxes.  Article 73, Section XXX, Subparagraph 2 of the Mexican Constitution establishes that the Mexican federal Congress has the exclusive power to lay taxes on the utilization and exploitation of natural resources listed in Article 27, Paragraphs 4 and 5 of the Mexican Constitution.  Therefore, the Mexican States may not lay taxes on the federal maritime-land zone because they would be violating the provisions of the Mexican Constitution.  Regardless, tax powers and coordination agreements are irrelevant to the summary judgment analysis as they do not transfer ownership interest to the Mexican States under Mexican law.  TO HESI Mem. at 14.

*Second*, the Mexican States imply that their limited grants of administrative authority to develop local wildlife policies supports their position.  Mex. Sts. Mem. at 16-17.  To the contrary, no Mexican federal statute establishes ownership interest in wildlife or gives the states a position superior to that of the federal government on environmental administrative issues.  TO HESI Mem. at 11-13.  In fact, the Mexican States' powers under the General Law of Wildlife, the Mexican States' powers are practically limited to those concerning stray cats and dogs.  *See, e.g.,* Article 3, Section XLVI, General Law of Wildlife.  Rec. Doc. 8167-9 at 17.  Further, the

20021736.1

Mexican federal government remains in charge of matters of wildlife conservation and grants exclusive power to the Federal Office of Environmental Protection to file legal actions to protect wildlife. Articles 9, Section VI and 107, General Law of Wildlife.

*Third*, the Mexican States rely on their state constitutions and assert that "there is no provision in the Mexican Constitution limiting the power and authority of the States constituent the [sic] Mexican Federation to represent their own interest and affairs, either domestically or internationally." Mex. Sts. Mem. at 19. Once again, the Mexican States inappropriately inflate the scope of their power through mischaracterization of Mexican law.

Contrary to the Mexican States' argument, numerous Mexican Constitutional and federal statutory provisions limit Mexican state powers in domestic and foreign affairs. For example, the Mexican States are constrained in their ability to exercise domestic environmental administrative powers by Mexican Constitutional Articles 73 and 124. Moreover, the General Law of Ecological Balance and Environmental Protection clearly establishes in Article 5, Section III that the Mexican federal government, not the Mexican States, is empowered with:

> III. Attending to matters affecting the ecological balance in the national territory or in the areas subject to the nation's sovereignty and jurisdiction, originating in the territory or areas subject to other States' sovereignty and jurisdiction, or in areas beyond the jurisdiction of any State.

Article 119 of the Mexican Constitution also limits the power of the Mexican States as follows:

> It is the duty of the Powers of the Union to protect the States against all invasions or outside violence. In each case of internal uprising or disruption, the same protection shall be provided, as long as they are motivated by the Legislature of the State or by its Executive, if the former is not assembled.

20021736.1

Per Article 133 of the Mexican Constitution, the Mexican Constitution and federal laws are "the supreme law" of Mexico.  Nothing in the state constitutions, therefore, could provide the Mexican States with proprietary interests denied them by Mexican federal law.

The Mexican States are also constrained in their ability to act extraterritorially.  The Mexican Constitution provides in Article 117 as follows: "In no case shall the States: I. Celebrate alliances, treaties or coalitions with any other States or with foreign powers."   Doc. 8186-2 at 293.[1]  Per the Mexican Statute on the Signing of Treaties, the Mexican States may execute "Inter-institutional Agreements" under two limitations:

> a)      The material sphere of the inter-institutional agreements shall be restricted exclusively to the own attributes of the decentralized agencies and entities of the aforementioned levels of government signing them.
>
> b)      Require prior ruling from the Department of Foreign Affairs regarding the merits of signing said agreement  (see Article 7. "The decentralized agencies and entities of the Federal, State or Municipal Public Administration shall keep the Department of Foreign Affairs informed about any inter-institutional agreement intended to be executed with foreign government entities or international organizations.  The Department shall prepare the corresponding ruling about the merits of signing it and, when applicable, shall record it in the respective Registry.")

Thus, the Mexican States may enter inter-institutional agreements, but only under the supervision of the federal Department of Foreign Affairs.

In sum, the Mexican States' attempts to cloud the issues, notwithstanding the Mexican federal government's clear and unequivocal ownership rights in the national natural resource assets at issue, are futile.  The Mexican States have failed to provide any evidence that the Mexican States own the relevant waters, coastal areas or wildlife, or even that the Mexican

---

[1] Although the Mexican States reference the MEXUS Gulf Plan as "an example of a State signing an international agreement" and delegating responsibilities (Mex. Sts. Mem. at 19-20 (citing Rec. Doc. 8178-15), Tamaulipas is not a signatory thereto.  *See* Rec. Doc. 8178-15 at 2.

States have primary control of or responsibility for such. Therefore, the Mexican States have failed to show that they possess the proprietary interest, and their motion for summary judgment should be denied.

C. **Even if non-owners were entitled to recover economic damages under *Robins Dry Dock*, which Defendants dispute, the Mexican States have failed to demonstrate that they have interests tantamount to full ownership of the natural resource assets at issue.**

Assuming *arguendo* that it is appropriate to consider factors other than ownership to analyze whether the Mexican States have proprietary interest in these circumstances, which Defendants deny, courts referencing additional factors apply them to determine whether non-owners have interests in the property at issue so significant that they are tantamount to full ownership. *See, e.g.*, *Naviera Maersk Espana, S.A. v. Cho-Me Towing, Inc.*, 782 F. Supp. 317, 320 (E.D. La. 1992) (holding that to have a proprietary interest, "a party must have control over the property tantamount to full ownership"). The Mexican States cannot demonstrate such interest.

Nevertheless, because the Mexican States do not have ownership of the national natural resource assets at issue under Mexican law, they attempt to establish that they have the requisite proprietary interest based on discussions of cases referencing (1) a demise charterer; (2) a primary user with an absentee owner; (3) a party with an insurable interest; (4) a contractual party; and (5) a party with the right to exploit the land. However, these efforts are unavailing because the cited cases are either misinterpreted by the Mexican States or inapplicable to the instant action.

---

While the On-Scene Coordinator ("OSC") is located in Tamaulipas, the OSC appears to be an officer of the federal government, *i.e.* the Navy. *Id.* at 12.

20021736.1

*First,* the Mexican States attempt to analogize themselves to a demise charterer in an effort to overcome the fact that their alleged right to use certain federal lands is subject to the right of reversion.  Mex. Sts. Mem. at 21-22.  They cite several cases in an effort to distinguish themselves from the unsuccessful time charterer plaintiffs in *Robins Dry Dock*.  *See* Mex. States Mem. at 21-23.  However, the Mexican States do not cite any case where a court actually found that a demise charterer had a proprietary interest.  *Id.*  Rather, the cases cited merely suggest in *dicta* that a demise charterer might have a proprietary interest.  *See, e.g.*, *Bayou Lacombe*, 597 F.2d at 473-74; *Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Serv. Co.*, 497 F. Supp. 2d 787, 796 (E.D. La. 2007).

 Even if a court had held that a demise charter had proprietary interests, the Mexican States have produced no admissible evidence demonstrating that their use of certain national natural resource assets justifies comparing themselves to a demise charterer.  As explained by the Fifth Circuit in *Bayou Lacombe*, "[t]he demise-charterer stands in the shoes of the owner of the vessel for the duration of the contract while the shipowner retains merely a right of reversion. The demise-charterer has full responsibility for managing and maintaining the vessel. . . .  'He becomes, in effect, the owner *pro hac vice* . . . .'"  597 F.2d at 473-74 & n.3 (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 4-1 at 194 (2d ed. 1975)).

As described herein and in Transocean's and HESI's Memorandum, the Mexican States' interest in the natural resource assets at issue is expressly limited by the terms of the Mexican Constitution and federal laws, as well as agreements executed thereunder.  Thus, the Mexican States' alleged proprietary interest fails to rise even to the level of the unsuccessful time charterer in *Robins Dry Dock*.  The time charter there had the exclusive right to use and control the vessel.  Unlike the time charterer, however, the Mexican States are required to keep Mexican

federal waters and coastal areas available for "common use" by individuals.  Additionally, the Mexican States' limited ability to participate in administrative environmental affairs concerning national natural resource assets does not compare to the control exercised over the vessel by the time charterer in *Robins Dry Dock*.  Accordingly, the Mexican States' maritime claims, like those of the time charter in *Robins Dry Dock*, fail and should be dismissed.

*Second,* the Mexican States cite a 1985 case from the Eastern District of Pennsylvania, *Holt Hauling & Warehouse Systems, Inc. v M/V MING JOY* ("*Holt Haulting*")*,* 614 F. Supp. 890, 900 (1985) (E.D. Pa. 1985), and cases citing same, for the proposition that a right to use property as a "primary user" with an absentee owner establishes a sufficient proprietary interest to survive the *Robins Dry Dock* test.  Mex. Sts. Mem. at 24-26.  The Mexican States insinuate that because they allegedly repair, pay utilities, and primarily use certain unidentified property regarding which the Mexican federal government is a purported absentee owner, they have a proprietary interest in such unidentified federal natural resource assets.  *Id.*

However, the Mexican States have produced no credible evidence regarding their alleged use of federal Mexican natural resources justifying a comparison of themselves to such primary users with absentee owners.  They also fail to point to non-conclusory, admissible evidence demonstrating that the Mexican federal government is an absentee owner of any natural resource asset at issue.  In fact, the Mexican States are just the type of non-primary users that the court in *Holt Hauling,* 614 F. Supp. at 900, noted could not establish the requisite interest under its standard:

> *Bayou Lacombe* plainly stands for the proposition that a joint user of property cannot recover for negligently inflicted damage to it when effective ownership of the property is vested in another.  If [a plaintiff] simply used the [property] alongside [the owner] and subject to [the owner's] priority, then the [plaintiff's] interest is no different from the [plaintiff's] interest in *Bayou Lacombe*" and its claim should be dismissed."

As noted above, the Mexican States jointly share the federal property and waters at issue with others subject to the federal government's priority.  Such use does not establish ownership interest in such assets under Mexican law.  Because the Mexican States can neither meet the *Robins Dry Dock* nor the *Holt Hauling* analysis, their claims should be dismissed.

*Third,* the Mexican States imply that they have an "insurable interest" in unidentified natural resource assets that is evidence of a proprietary interest under U.S. maritime law.  *See* Mex. States Mem. at 24-25.  The Mexican States suggest that because they allegedly can "erect buildings and structures on the coastal lands and otherwise exploit these territories, thereby creating insurable interests," they have a proprietary interest in such unidentified Mexican natural resource assets.  *Id.* at 25.  Assuming that the Mexican States may have built structures (of which there is no admissible evidence) on unidentified Mexican natural resource assets, they may have created insurable interests in the structures themselves, but not in assets on which such structures reside.

However, under Mexican law, such interest is temporary.  Article 48 of the Regulation For Use and Exploitation Of Territorial Sea, Navigable Ways, Beaches, Federal Maritime Land and Lands Gained From The Sea provides that when a consession to use such resources is extinguished, all construction and facilities are directly and permanently destined to the aims of the concession and all plans and projects shall also be conveyed to the public domain of  the federal government.  Because there is no admissible evidence of structures erected by the Mexican States that were allegedly damaged by Macondo hydrocarbons, and such structures would revert to the Mexican federal government at the end of any concession, the Mexican States' discussion of the insurable interests and proprietary rights is irrelevant to the instant case.

18

*Fourth*, the Mexican States assert that they have agreements concerning the allegedly damaged natural resources giving rise to proprietary interests.  *See* Mex. States Mem. at 23-25.  Although the Fifth Circuit has held that non-owners may seek economic losses in circumstances where recovery for such losses has been contractually shifted (*see, e.g., Amoco Transport*, 768 F.2d at 668), it is well established that mere contractual or lease rights are not sufficient to give rise to a proprietary interest.  *See, e.g., IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1194 (5th Cir. 1993) (finding that lessee did not have a proprietary interest in a pipeline which the lessee had an exclusive right to use); *Bayou Lacombe*, 597 F.2d at 474 (finding that railroad did not have a proprietary interest in a bridge which the railroad had a contractual right to use).  *Robins Dry Dock* rejects the notion that interference with a party's contractual right of use alone is a sufficient basis for recovery.  Moreover, as noted above, the Mexican States have failed to produce any agreements transferring rights or interests sufficient to give rise to a proprietary interest tantamount to full ownership.  Accordingly, this argument is unavailing.

*Finally,* the Mexican States argue that an alleged right to exploit natural resources is sufficient to create a proprietary interest.  *See* Mex. States Mem. at 21.  However, the Mexican States fail to point to any agreement identifying the specific natural resources that they are or were allegedly exploiting that were damaged by Macondo hydrocarbons.  Additionally, any such right to use Mexican natural resource assets does not convey ownership interest therein.  TO HESI Mem. at 14.  Moreover, the *Nexen Petroleum* case upon which the Mexican States rely does not support their baseless assertion.  There, the court found that the plaintiff was an offshore well owner that could potentially recover for costs necessary to prevent damage to the well hole.  *See Nexen Petroleum*, 497 F. Supp. 2d at 797 (citing *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 202 (5th Cir. 1995)).  Thus, in *Nexen*, it was the ownership

19

interest in the well that was central to the court's analysis of proprietary interest.  The Mexican States have failed to point to a similar ownership interest here.

Accordingly, because the Mexican States fail both the ownership test of *Robins Dry Dock*, as well as the lesser standard for proprietary interest urged by the Mexican States, the Mexican States' claims should be dismissed.

D.   BP's Plea Agreement is immaterial to the claims against Transocean and HESI and presents no genuine issue of material fact regarding whether the Mexican States have a proprietary interest in the natural resource assets at issue.

The Mexican States contend that BP's plea agreement removes its maritime claims from the *Robins Dry Dock* rule.  Mex. Sts. Mem. at 5-8.  BP's Plea Agreement is immaterial to the Mexican States' surviving negligence claims against Transocean or HESI.  The Mexican States must set forth facts demonstrating their ownership interest under *Robins Dry Dock* to survive summary judgment.  *See, e.g.*, *Sekco Energy v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1015 (E.D. La. 1993).

## CONCLUSION

Based on the foregoing and the reasons in Transocean's and HESI's Memorandum supporting its cross-motion for summary judgment (Rec. Doc. 8179-1), the Mexican States' maritime negligence and gross negligence claims fail under *Robins Dry Dock* and OPA. Accordingly, Transocean and HESI respectfully request that this Court deny the Mexican States' motion and grant Transocean's and HESI's cross-motion for summary judgment (Rec. Doc. 8179) dismissing all remaining claims brought by the Mexican states of Quintana Roo, Tamaulipas, and Veracruz.

20

20021736.1

DATED: January 25, 2013                          Respectfully Submitted,

By:   _s/ Brad D. Brian_                    By:   _s/ Steven L. Roberts_
      Brad D. Brian                               Steven L. Roberts
      Michael R. Doyen                            Rachel Giesber Clingman
      Daniel B. Levin                             Sean D. Jordan
MUNGER TOLLES &OLSON LLP                    SUTHERLAND ASBILL & BRENNAN LLP
355 So. Grand Avenue, 35th Floor            1001 Fannin Street, Suite 3700
Los Angeles, CA 90071                       Houston, Texas 77002
Tel: (213) 683-9100                         Tel: (713) 470-6100
Fax: (213) 683-5180                         Fax: (713) 354-1301
Email: brad.brian@mto.com                   Email: steven.roberts@sutherland.com
       michael.doyen@mto.com                       rachel.clingman@sutherland.com
       daniel.levin@mto.com                        sean.jordan@sutherland.com


By:   _s/ Edwin G. Preis_                   By:   _s/ Kerry J. Miller_
      Edwin G. Preis, Jr.                         Kerry J. Miller
PREIS &ROY PLC                              FRILOT, LLC
Versailles Blvd., Suite 400                 110 Poydras St., Suite 3700
Lafayette, LA 70501                         New Orleans, LA 70163
(337) 237-6062                              Tel: (504) 599-8194
_and_                                       Fax: (504) 599-8154
601 Poydras Street, Suite 1700              Email: kmiller@frilot.com
New Orleans, LA 70130
(504) 581-6062


John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

*Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater*
*Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH*

20021736.1

GODWIN LEWIS PC

By: _s/ Donald E. Godwin_____

Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com
Renaissance Tower
1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No. 24032277
Misty.Cone@GodwinLewis.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone:  713.595.8300
Facsimile:  713.425.7594

*Attorneys for Defendant Halliburton Energy Services, Inc.*

20021736.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Transocean's and HESI's Opposition to the Joint Motion for Summary Judgment Regarding Proprietary Interests Filed by the Mexican States of Quintana Roo, Tamaulipas, and Veracruz has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 25th day of January, 2013.

/s/ Donald E. Godwin
Donald E. Godwin

20021736.1