

**U.S. Department of Justice**

**Civil Division, Torts Branch**
**Aviation/Admiralty Litigation**
**P.O. Box 36028**
**450 Golden Gate Avenue**
**San Francisco, CA 94102-3463**
*Overnight Delivery Address:*
*7th Floor, Room 7-5395*
*450 Golden Gate Avenue*
*San Francisco, CA 94102-3463*

Telephone: (415) 436-6648
Facsimile: (415) 436-6632
Email: mike.underhill@usdoj.gov

Via E-Mail

January 28, 2013

The Honorable Sally Shushan
United States Magistrate Judge
500 Poydras Street, Room B-345
New Orleans, Louisiana 70130

Re: United States' Response to BP's Letter of January 24th [Rec. Doc. 8343]

Dear Magistrate Judge Shushan:

On Thursday, January 24th, BP sent the Court and the parties its letter dealing with confidentiality issues. [Rec. Doc. 8343.] *See also*, the Court's Working Group Conference Order, page 7, paragraph 19, at Rec. Doc. 8373. BP's letter summed up its position regarding the confidentiality treatment at trial for documents that we generically shall refer to as the "TIMS e-well" databases. As explained below, the issue is no longer a matter of "confidentiality," but PTO 54.

The TIMS e-well databases are archives of highly proprietary "coke formula" type data belonging to all of BP's competitors. BP and its competitors are required by law to submit extremely confidential data to the Bureau of Ocean Energy and Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"), successors to the Minerals Management Service ("MMS"). The Companies submit the data under strict privacy provisions, the violation of which carry criminal penalties. The reason that the data is so highly protected is that, among other things, it can provide a significant competitive advantage when oil companies such as BP decide to bid on oil and gas leases, as well as on how much to bid. The data, if used for competitive advantage, can mean the difference of literally hundreds of millions and even billions of dollars in the case of lucrative deepwater leases of oil and gas wells. In turn, its effect on the public bidding process affects the revenue generated for the federal treasury by the leases of oil and gas rights. Pursuant to BP's assertions in the MDL that it was entitled to the TIMS e-well databases, it has had the benefit of its competitors' industry data, subject to the requirements of PTO 13 and other applicable orders of the Court.

Prior to the scheduled February 2012 trial date, BP argued that it wished to use documents from the TIMS e-well databases at trial. The Court determined that financial harm to non-parties (*i.e.*, BP's competitors) could be alleviated by BP's redaction of certain data. So that

we are clear, we did not challenge the Court's ruling concerning what type of redactions would (or wouldn't) be necessary and, insofar as an exhibit has properly been made an exhibit in accordance with the requirements of PTO 54, we would not challenge the scope of redactions now. We stress again, the Court did its job of attempting to protect BP's competitors, and its determination concerning the scope of redactions is not being challenged.

The present issue for the parties is not the matter of confidentiality, however, but the requirements of Pretrial Order No. 54. PTO 54 was issued on December 7, 2012 [Rec. Doc. 8080], and now controls exhibits and exhibit lists to be used at the Phase One trial scheduled for February 25, 2013. On January 11, 2013, BP filed its 381 page exhibit list. On the list, BP identified 67 purported "good cause" exhibits and another 35 "free" exhibits, for a total of 102 exhibits. The right hand column of the exhibit list, which was supposed to alert parties to exhibits being added, *e.g.*, whether for "good cause" or as part of the 35 "free" exhibits, did not contain any notation for the relevant "exhibits" concerning the TIMS e-well database. Likewise, BP's page and one-half "Motion" to add "good cause" exhibits [Rec. Doc. 8225] made no mention whatsoever of the TIMS e-well database documents. In other words, a party looking at the exhibit list for new exhibits (other than the 102 identified above) would have to have examined all 8,046 lines of BP's 381 page January 2013 exhibit list, then compare it to the January 2012 list, to determine if exhibits were the same or different.

BP's TREX-45482 and 45483, as well as other exhibits, appear to be "placeholders" for tens of thousands of non-identified exhibits. For example, TREX-45483 is a one page "exhibit" that says it "consists of a DVD containing 6 Access Databases." TREX-45482 is a one page exhibit that states it "consists [sic] BOEMRE TIMS, e-well databases, and Performance Measures Program databases on Gulf of Mexico Outer Continental Shelf (OCS) Region, and other documents accessed from bibitseomre.gov on various dates between March 8, 2011 and October 15, 2011."

BP has phrased the issue of these stealth exhibits as a "confidentiality issue," whereas the matter now is a PTO 54 issue, PTO 54 having been issued approximately eleven months *after* the Court's determination of the scope of TIMS database redactions. Using TREX-45482 and 45483 as but two examples, BP has embedded a Grand Canyon-size "loophole" in its exhibit list whereby potentially tens of thousands of exhibits have in fact *not* been made exhibits and instead are listed, to use one example, as "a DVD containing 6 Access Databases"; whereby they have not been provided to the parties; and whereby, according to BP, they would be disclosed to the United States, and presumably to the other parties, upon two days' notice before their use at trial against the PSC, Halliburton, the United States, or any other party against whom BP might intend to use them.

Once the Court continued the trial from February 2012 to February 2013, and even assuming for the sake of argument that the "clock" only started to run in February 2012, BP had the benefit of a full year to determine which of the TIMS e-well documents it would use from the mass of documents within the TIMS e-well database.[1] PTO 54 was the result of much

[1] We note that BP has proffered the excuse that the TIMS e-well database was not produced with Bates Nos. That is obviously not an excuse for failing to list the exhibits on its exhibit list. As demonstrated throughout the case, BP and its vendors are more than capable of Bates stamping documents and, indeed, it has had over a year and many months to do so.

discussion and collaboration by and between the parties and the Court, with BP proposing much of the language finally adopted. Indeed, the best argument against what BP has attempted here has been provided by BP itself. BP objected to "several hundred" exhibits sought to be added by Transocean, and also falsely stated that BP had not done the same thing it was accusing Transocean of doing. In its letter to the Court BP stated:

> These [Transocean's] exhibits *improperly combine multiple documents produced before February 20, 2012* [the TIMS e-well databases were produced before February 2012], *circumventing the Court's restriction on adding only 35 new trial exhibits without good cause. See Amended PTO 54, Rec. Doc. 8173, p. 2 ("Each party may add up to 35 exhibits to its Exhibit List without showing 'good cause'").* The 35 exhibit limit should not be surprising to Transocean – it was negotiated among the parties, and approved by the Court. By our count, Transocean has listed several hundred document families on its list of 33 new 'exhibits,' spread out over more than 75 non-contiguous bates ranges, each of which is associated with at least one family. For example, TREX-52667 lists as two of its 11 multiple Bates ranges ABSDWH001217 through ABSDWH004096, and OSE212-040531 through OSE212-040600; TREX-52667 also includes 335 separate families. Transocean has indicated that it will point to examples from various parties' exhibit lists (including, perhaps, BP's) that include multiple families or non-contiguous bates ranges. *But there are not any on BP's list--as there are on Transocean's in the examples above--that include 11 bates ranges and 335 families (as in TREX-52667), or that were cobbled together for the obvious purpose of avoiding the 35-document limit.* TREX-52666 and TREX-52668 are also improper because they reference and rely upon the improper additions discussed above. These exhibits do, however, illustrate BP's point that Transocean is trying to shoehorn scores of new, separate documents into its list of 35 'exhibits.'

Letter from BP's Mark Nomellini to the Court, January 18, 2013 (emphasis added). BP's closing paragraph eloquently sums up, while simultaneously understating, what BP has itself attempted in the case of the TIMS e-well databases (emphasis added):

> Quite simply, allowing Transocean to list hundreds of new, separate documents in the space of six 'trial exhibits' *makes a mockery of the negotiated and approved limit of 35 new trial exhibits. This should not be permitted.*

BP leveled the charge that Transocean attempted to add "hundreds" of stealth exhibits, whereas BP has attempted to add thousands of exhibits to be identified for the first time ***during*** trial. Moreover, whereas Transocean actually *identified* for the parties and the Court the exhibits it seeks to add, BP has not -- unless referring in a one page cover sheet to a DVD containing thousands of documents in "databases" counts for exhibit identification.

//

//

BP failed to identify on its final exhibit list which of the documents from the TIMS e-well database it plans to use and, pursuant to PTO 54, as well as its own arguments against Transocean, it may not do so now.

Respectfully submitted,

/s/ R. Michael Underhill

R. Michael Underhill
Attorney in Charge
Dept. of Justice, Torts Branch
West Coast and Pacific Rim Office

cc: (via e-mail)
PSC Liaison Counsel
Defendants' Liaison Counsel
States' Coordinating Counsel
Steve O'Rourke, DOJ ENRD