# Exhibit 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL | ) | MDL NO. 2179 |
| BY THE OIL RIG | ) | |
| "DEEPWATER HORIZON" IN | ) | SECTION "J" |
| THE GULF OF MEXICO, ON | ) | |
| APRIL 20, 2010 | ) | JUDGE BARBIER |
| | ) | MAG. JUDGE SHUSHAN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of TREVOR J. HILL, taken at
Kirkland & Ellis International, 30 St. Mary Axe,
22nd Floor, London EC3A 8AF, England, United
Kingdom, on the 14th of January, 2013.

```
1          A.   Yeah.
2          Q.   Okay.  If we could go to Tab 70, please.
3     And this was formerly marked -- or previously
4     marked Exhibit 3225, and this is an E-mail from
5     Doug Wood dated June 4th, 2010, to Max Easley,
6     Steven Haden, Brittany Benko, with a copy to
7     yourself and Mr. Tooms; is that right?
8          A.   It is.
9          Q.   And the subject is "Change in Plume Volume
10    (End of Riser Versus Top of BOP)," correct?
11         A.   Correct.
12         Q.   Okay.  And you asked Mr. Wood to provide
13    this background information; is that right?
14         A.   Yeah.  And this one, I'd like to -- to
15    read please.
16         Q.   Certainly.
17         A.   Okay.
18         Q.   Okay.  And so the question I asked was:
19    Did you -- so you asked Mr. Wood to provide
20    this -- this background information; is that
21    right?
22         A.   As from the document, yes.
23         Q.   And do you have any recollection
24    otherwise?
25         A.   I don't actually, no.
```

```
 1          Q.  Okay.  And you didn't write back Mr. Wood
 2   and tell him he was mistaken?
 3               MS. KARIS:  Object to form.
 4          A.  I don't believe so.
 5          Q.  (BY MR. CERNICH)  Okay.  Can you tell me
 6   who Mr. Haden is?
 7          A.  I can't actually recall his then title or,
 8   in fact, his current title.
 9          Q.  Well, what about Ms. Benko, do you recall?
10          A.  Again, my recollection is she -- she had a
11   more environmental background.
12          Q.  Okay.  Do you know why -- why Mr. Wood was
13   sending this E-mail to Ms. Benko, Mr. Haden, and
14   Mr. Easley?
15          A.  I don't recall.
16          Q.  Okay.
17               Did you ever speak with Ms. Benko,
18   Mr. Haden, or Mr. Easley during the response?
19          A.  Yes.
20          Q.  And you corresponded by E-mail with them
21   as well, correct?
22          A.  Yes.
23          Q.  Okay.  And -- and what was the purpose of
24   your communications with those individuals?
25               MS. KARIS:  I'm going to instruct the
```

```
 1   witness not to answer to the extent this calls for
 2   any privileged information.  So outside of any
 3   discussions that you had regarding privilege --
 4   for work that was related to privilege, then you
 5   can answer.
 6                 THE WITNESS:  Yeah.
 7        A.   My recollection of Max -- Max Easley was
 8   that he was temporarily deputizing for David
 9   Rainey and that he had come through the crisis
10   center in Houston on the way to New Orleans, and I
11   had met with him on that occasion.
12        Q.   (BY MR. CERNICH)  Okay.
13        A.   Steve Haden, I don't recall the -- the
14   direct context in which he got in contact with me,
15   but I met him in the -- sometime in the 20s of
16   May.  And obviously, Ms. Benko, I don't actually
17   recall the first -- first interaction with -- with
18   Ms. Benko.
19        Q.   Okay.  And what -- you mentioned the --
20   the 20th of May.  Why did that date stick in your
21   mind as far as your -- your first meeting with
22   Mr. Haden?
23        A.   In preparation.
24        Q.   In preparation for the deposition?
25        A.   Yes.
```

```
 1          Q.  Okay.  And was it your understanding that
 2    any or all of these individuals were working on
 3    behalf of counsel at this time?
 4          A.  At this time, I don't believe so, no.
 5    That wasn't my recollection.
 6          Q.  You didn't know at the time?
 7          A.  At that --
 8               MS. KARIS:  Counsel, just for
 9    clarification, "at this time."  You mean at the
10    time of this E-mail dated June 4?
11               MR. CERNICH:  Yeah, at the time of
12    the E-mail.
13               MS. KARIS:  So as of June 4th.
14          A.  So --
15          Q.  (BY MR. CERNICH)  Let me -- I'll ask the
16    question again.
17          A.  Yeah.
18          Q.  As of June 4th, did you know whether
19    Mr. Easley, Mr. Haden, and/or Ms. Benko -- so any
20    or all of them -- were working on behalf of
21    counsel?  Did you personally know on June 4th?
22          A.  Yes, I did.
23          Q.  Okay.
24          A.  Yeah.
25          Q.  Okay.  And when did you learn that they
```

1    were working on behalf of counsel?

2        A.   The -- Max Easley, I don't recall knowing

3    one way or the other.

4        Q.   Okay.

5        A.   For Haden and Benko, May 22nd.

6        Q.   May 22nd?

7        A.   Yeah.

8        Q.   Okay.  And that's the -- the same date of

9    the -- the holistic system draft report we looked

10   at earlier, correct?

11       A.   I don't recall specific, but I'd be happy

12   to say that.

13       Q.   Okay.  And do you know what -- what they

14   were doing on behalf of counsel?

15            MS. KARIS:  I'm going to object and

16   instruct the witness not to answer to the extent

17   it divulges privileged information.

18       A.   Which is my understanding.

19       Q.   (BY MR. CERNICH)  They were collecting

20   flow rate information on behalf of counsel,

21   weren't they?

22            MS. KARIS:  Object to form.  Instruct

23   the witness not to answer.

24            MS. AVERGUN:  Same -- same

25   instruction.

```
 1          Q.   (BY MR. CERNICH)  Even though the E-mail
 2     references flow rate estimation work?
 3               MS. KARIS:  Object to the form.
 4          A.  Yeah.  I believe that title originated
 5     with the E-mails before I was on the circulation
 6     list.
 7          Q.   (BY MR. CERNICH)  Okay.  But -- but --
 8     again, you never told anyone -- you never told
 9     Mr. Leonard that you were not engaged in flow rate
10     estimation work; is that right?
11               MS. KARIS:  Object to the form.
12          A.  As a direct statement, no.
13          Q.   (BY MR. CERNICH)  You would -- you would
14     acknowledge that the influence of flow rate in the
15     assessment of the likely overall or -- I'm sorry.
16     Let me start that again.  Strike that.
17               You would acknowledge the influence
18     of flow rate in the assessment of the likely
19     overall effectiveness of source control methods,
20     right?
21               MS. KARIS:  Object to form.
22          A.  Yes.  Yes.
23          Q.   (BY MR. CERNICH)  Okay.  And so flow rate
24     was relevant to -- to source control?
25          A.  Flow rate was relevant to source control.
```

```
 1          Q.   Throughout the -- throughout the response?
 2          A.   That's correct.
 3          Q.   And it was also relevant at the time of a
 4     well integrity test, correct?
 5          A.   At the -- yes.  At the time of the test,
 6     it was relevant.
 7          Q.   Okay.  Because having an idea of -- of the
 8     flow rate would provide you with a better
 9     opportunity to -- to characterize the -- the
10     reservoir and the depletion from the reservoir; is
11     that right?
12          A.   It -- it's a contributing factor, yes.
13          Q.   Okay.  And depletion of the reservoir was
14     a -- was a critical issue during the well
15     integrity test, correct?
16               MS. AVERGUN:   Objection to form.
17          A.   It's outside of my direct subject area, so
18     I -- to use the word "critical," I don't know that
19     it was a factor.
20          Q.   (BY MR. CERNICH)  Okay.  Because in order
21     to try to determine whether the -- the shut-in
22     wellhead pressure reflected a -- an integral well,
23     you -- you -- you needed to characterize the --
24     the depletion of the -- the reservoir.  So, in
25     other words, if the reservoir had depleted
```

1    significantly, that might be an explanation for a

2    low shut-in wellhead pressure, correct?

3                    MS. AVERGUN:  Objection to form.

4                    MS. KARIS:  Object to form,

5    foundation.

6         A.   The depletion of the reservoir would be an

7    explan- -- explanation, at least in part, for a --

8    a low shut-in wellhead pressure.

9         Q.   (BY MR. CERNICH)  And another explanation

10   could be -- could be flow through the burst disks,

11   correct?

12        A.   That's correct.

13        Q.   And at the time of the well integrity

14   test, you were trying to distinguish -- or BP was

15   trying to distinguish whether or not the -- the

16   wellhead pressure reflected a depleted reservoir

17   or flow through the -- the burst disks; is that

18   right?

19        A.   I think I would say at that time, it

20   was -- it was BP and government representatives

21   jointly trying to do that.

22        Q.   Okay.  Fair enough.  And one way to be

23   able to -- to characterize the -- the reservoir

24   would be able to -- would be to have a -- a flow

25   rate at the time of -- of shutting in the well; is

1   that right?

2       A.   Again, it's a contributing factor out of

3   many.

4       Q.   Okay.  And if you -- if you had a -- a

5   flow rate or a reservoir engineer would be able to

6   do some calculations that would -- would back

7   calculate into the -- the reservoir and be able to

8   allow a reservoir engineer to refine the reservoir

9   model; isn't that right?

10              MS. AVERGUN:  Objection to form.

11              MS. KARIS:  Object to form.

12      A.   I think the way -- the way its -- the flow

13   rate at the time of shutting in the well is only

14   the flow rate at that time.  So it -- again, it's

15   a contributing factor, but it doesn't -- doesn't

16   give the whole history.

17      Q.   (BY MR. CERNICH) Okay.  But closing

18   that -- that choke in steps was, in effect, a well

19   test, correct, that would allow the reservoir

20   engineer to better characterize the -- the

21   depletion of the reservoir?

22              MS. KARIS:  Object to form.

23      A.   My -- my recollection -- again I'm -- that

24   would be slightly out of discipline.  But my

25   recollection is that it -- it couldn't be that,

```
 1          A.  Yes, that's correct as far as my
 2     understanding goes here.
 3          Q.  (BY MR. CERNICH)  And it was your
 4     understanding when you -- when you were having
 5     these -- these conversations and in this E-mail
 6     and the -- the prior days discussion with
 7     Ms. Benko and Mr. Morgheim that they were working
 8     on behalf of counsel?
 9               MS. KARIS:  Object to form.
10          A.  That date I'm not sure.
11          Q.  (BY MR. CERNICH)  Okay.  I thought --
12     earlier, I thought I heard you say and if -- if I
13     missed this correct me.
14               I'm not trying to mischaracterize his
15     testimony.
16               I think you said on May 22 you
17     learned that Ms. Benko at least was working on
18     behalf of counsel; is that correct?
19          A.  That's correct.
20          Q.  Did you ever come to learn that
21     Mr. Morgheim was working on behalf of counsel?
22          A.  Yes.
23          Q.  Okay.  Do you recall when you learned
24     that?
25          A.  On the same day.
```

```
1           Q.  Okay.  And that was at the same time that
2    you were requested to provide information in
3    response to the -- the request for information
4    from Congressman Markey; is that right?
5           A.  That's correct.
6           Q.  Okay.  And do you recall who else besides
7    lawyers you learned were working as part of the --
8    the legal team at that time on May 22, anyone
9    besides Mr. Morgheim, Ms. Benko, Mr. Haden, I
10   think?
11          A.  Those three.
12          Q.  Those three.  Anyone else?
13          A.  No.
14          Q.  Okay.  And who is Mr. Morgheim?
15          A.  Aside from being a BP employee, I don't
16   recall his -- his then title.
17          Q.  Okay.  Was he -- was he an engineer?
18          A.  I can't recall.
19          Q.  Okay.  Describe your -- describe what you
20   did to assist in preparing the -- the response to
21   Congressman Markey request for information.
22              MS. KARIS:  Object to form and
23   instruct the witness not the answer because it
24   calls for privileged information.
25          A.  Which it does.
```

```
 1                    MR. CERNICH:  Well, I'm not asking
 2     for communications, Counsel, I'm asking what he
 3     did.
 4                    MS. KARIS:  I'm not sure he can
 5     separate those two.
 6                    MR. CERNICH:  For example, if he
 7     gathered information, if he prepared materials,
 8     none of that is -- is privileged.
 9                    MS. KARIS:  We would instruct the
10     witness not to answer with respect to work he did
11     in connection with Markey as this question is
12     phrased.
13                    MR. CERNICH:  I just asked
14     Mr. Hill -- let's go off the record, please.
15                    THE VIDEOGRAPHER:  The time is
16     6:05 p.m.  We're going off the record.
17                    (Break from 6:05 p.m. to 6:07 p.m.)
18                    THE VIDEOGRAPHER:  The time is
19     6:07 p.m.  We're back on the record.
20          Q.   (BY MR. CERNICH)  Mr. Hill, aside from
21     communications between yourself and counsel or
22     representatives of counsel, can you tell me what
23     you did to assist with the preparation of the
24     response to Congressman Markey's request for
25     information?
```

```
 1                      MS. KARIS:  I'm sorry.  One second.
 2                 Can I confer with Mr. Hill?
 3                      MR. CERNICH:  Off the record, please.
 4                      THE VIDEOGRAPHER:  The time is
 5      6:08 p.m.  We're off the record.
 6                      (Break from 6:08 p.m. to 6:10 p.m.)
 7                      THE VIDEOGRAPHER:  The time is
 8      6:10 p.m.  We're back on the record.
 9           Q.   (BY MR. CERNICH)  Okay.  If you can just
10      read him my question and answer it, that would be
11      great.
12           A.   Yeah.  Nothing else.
13           Q.   Okay.  Nothing else?
14           A.   Aside from communications between myself
15      and counsel, representatives of counsel.
16           Q.   So you didn't gather any materials?
17           A.   No, aside -- aside from communicating.
18           Q.   Well, I'm not sure if we -- that we're
19      drawing a distinction here.  Did you gather
20      materials to provide to counsel?
21                      MS. KARIS:  Counsel, maybe I can
22      clarify for you, if you want.  When you say, "Did
23      you gather materials," Mr. Hill is excluding from
24      his answer to the extent he prepared any written
25      communications.  If that's what you're calling
```

```
 1        "materials," I want to make sure we're not
 2        speaking past each other.
 3                   MR. CERNICH:  Can we go off the
 4        record?
 5                   THE VIDEOGRAPHER:  The time is
 6        6:11 p.m.  We're off the record.
 7                   (Break from 6:11 p.m. to 6:24 p.m.)
 8                   THE VIDEOGRAPHER:  The time is
 9        6:24 p.m.  We're back on the record.
10                   MR. CERNICH:  Counsel for BP and I
11        had a discussion partially on the record,
12        partially off the record, regarding the scope of
13        the -- the attorney-client privilege.
14                   I think we've agreed that I may ask
15        certain questions regarding materials or things
16        that Mr. Hill may have done in response to
17        requests from attorneys related to the
18        Congressman -- Markey's request and I made it
19        clear that I'm not seeking the actual
20        communications with counsel, but I believe that
21        actions that were taken at -- at the behest of
22        counsel and the fact that the witness provided
23        materials or prepared materials for counsel is not
24        privileged.
25                   MS. KARIS:  The only nuance I would
```

```
1    put to that is documents prepared -- I mean, at
2    the request of counsel or those working at the
3    request of counsel.
4                   MR. CERNICH:  Understood.
5                   MS. KARIS:  Let's take them one
6    question at a time.  At least off the record we
7    had an agreement.  So let's see.
8         Q.  (BY MR. CERNICH)  Mr. Hill, did you
9    prepare any -- any documents for counsel in
10   response to counsel or agent of counsel's request
11   for assistance related to the -- to Congressman
12   Markey's request?
13        A.  Yes, I did.
14        Q.  And you prepared some written material and
15   provided that to counsel?
16                   MS. KARIS:  Object to form.
17        A.  That's correct.
18        Q.  (BY MR. CERNICH)  Okay.  Did you gather
19   any documents to provide to counsel related to
20   the -- the response to Congressman Markey's
21   information request?
22        A.  I -- I didn't solicit documents from
23   anyone else, no.
24        Q.  Did you collect any documents out of your
25   own files and provide those to counsel?
```

```
1          A.  Yes.
2          Q.  Okay.  And do you recall what documents
3     those were?
4          A.  Yes.
5          Q.  Okay.  And what were those documents?
6               MS. KARIS:  We're going to have to
7     confer now.
8               MR. CERNICH:  Off the record.
9               MS. KARIS:  Sorry.
10              THE VIDEOGRAPHER:  The time is
11    6:26 p.m.  We're off the record.
12              (Break from 6:26 p.m. to 6:29 p.m.)
13              THE VIDEOGRAPHER:  The time is
14    6:29 p.m.  We're back on the record.
15         Q.  (BY MR. CERNICH)  And the question was:
16    Do you recall what documents you collected out of
17    your own files and provided to counsel?
18         A.  So I need to clarify the answer to the
19    previous question about did you collect any
20    documents after your own files.  I didn't collect.
21    I created a written document.
22         Q.  Okay.  So the only thing you provided to
23    counsel was a -- a new creation, a new document
24    that you created for the purposes of responding to
25    counsel?
```

1      A.  That's correct.

2      Q.  You didn't provide them with any modeling

3  information or any prior material you had

4  generated -- any prior information that -- sorry.

5  Strike that.

6          You didn't provide them with any

7  other materials that -- that you had prepared in

8  the course of the response, modeling runs or slide

9  shows or anything like that?

10     A.  No, I didn't.

11     Q.  Okay.  Did you provide them with a list of

12  documents related to flow rate?

13     A.  I didn't provide a formal list, no.

14     Q.  Okay.  What do you mean by "formal list"?

15     A.  A -- a written list of documents.

16     Q.  Okay.  And what would be an informal list?

17     A.  I would say informal representation was

18  included in -- in discussions between me and

19  the -- and the three folk.

20     Q.  Okay.  And you may have -- you may have

21  referenced other materials in what you provided to

22  Counsel?

23          MS. KARIS:  Object to form now.

24          I would instruct the witness not to

25  answer to the extent that involves communication

```
 1    with those working at the direction of counsel.
 2                 MR. CERNICH:  Okay.  I'll accept the
 3    instruction on that.
 4         Q.  (BY MR. CERNICH)  Could we turn to
 5    Tab 186, please.
 6                 (Marked Exhibit No. 11191.)
 7         Q.  (BY MR. CERNICH)  I'm going to mark this
 8    as Exhibit 11191.  I'll note for the record that
 9    this exhibit number is out of order.
10                 This was a note that was produced
11    from your scanned custodial files.  Is that your
12    handwriting, Mr. Hill?
13         A.  No, it's not.
14         Q.  Do you know whose handwriting it is?
15         A.  No, I don't know.
16         Q.  Okay.  Do you recognize it as Ms. Saidi's
17    handwriting?
18         A.  I don't recognize the handwriting, per se.
19         Q.  Okay.  And tell me if I read this
20    correct -- correct.  It says:  "K factor
21    calculated based on 3-K method and results
22    tabulated for kill side (more accurate calculation
23    than choke side due to less complex geometry.
24    Government prediction verified.  51 to 54K."
25                 Did I read that correctly?
```

```
 1   would -- that's a fair assumption.
 2        Q.  Okay.  And in the initial comments, you
 3   write:  "Scale of response to the spill was not
 4   affected by flow rate estimates."
 5             Did I read that correctly?
 6        A.  Yes, you did.
 7        Q.  And you would agree that that statement is
 8   different from saying that -- that the individual
 9   source control efforts were not affected by flow
10   rate estimates; is that right?
11             MS. KARIS:  Object to form.
12        A.  Yes.  That's -- that's right.
13        Q.  (BY MR. CERNICH)  So BP was bringing all
14   resources to bear in response to the spill
15   generally, but it was -- it was useful to have
16   flow rate estimates in order to undertake certain
17   source control -- source control operations; is
18   that right?
19             MS. AVERGUN:  Objection to form.
20        A.  It was -- it was useful to have flow rate
21   estimates but not exclusively so, depending on the
22   situation and the date and the method.
23        Q.  (BY MR. CERNICH)  Right.  Right.  So it
24   might vary from source control method to source
25   control method.  And if flow rates were useful
```

1    to -- to planning for source control methods, you

2    would have wanted to use the best data you had

3    available to you to come up with the most

4    reasonable and reliable flow rate estimates

5    possible at that particular time, correct?

6          A.   I think the prioritization of work at a

7    particular time is very variable, and the flow

8    rate is not necessarily the top of the list.

9          Q.   Right.  But if flow rate was important to

10   a particular source control technique and you were

11   going to use source control to access -- assess

12   the -- the likelihood of success or determine how

13   you were going to plan that particular source

14   control technique, you certainly would want to

15   have the best estimate of flow rate that you could

16   have at that particular moment in time, correct?

17                   MS. AVERGUN:  Objection to form.

18                   MS. KARIS:  Object to form.

19          A.   You would want to have the best estimate

20   that you could have at that particular moment.

21   But there's, as I say, a lot of qualifications to

22   what's required for assessing a source control

23   method, and flow rate was not necessarily top of

24   the list.

25          Q.   (BY MR. CERNICH)  But it was on the list?

1          A.   It was on the list.

2          Q.   Okay.

3                     MR. CERNICH:   We can break for the

4     day.

5                     THE VIDEOGRAPHER:   The time is

6     6:44 p.m.   We're off the record, ending Tape 8.

7                (Deposition recessed at 6:44 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN     )   SECTION "J"

THE GULF OF MEXICO, ON     )

APRIL 20, 2010             )   JUDGE BARBIER

                           )   MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    Deposition of TREVOR J. HILL, taken at

Kirkland & Ellis International, 30 St. Mary Axe,

22nd Floor, London EC3A 8AF, England, United

Kingdom, on the 15th of January, 2013.

```
 1   Towards mid-May.
 2        Q.  So towards mid -- mid-May, you no longer
 3   felt that 5,000 barrels per day was the best
 4   estimate of the flow rate?
 5        A.  As of that date.
 6        Q.  As of that date, yes?
 7        A.  Mid-May, yeah.
 8        Q.  As of mid-May, what did you feel was the
 9   best estimate of the flow rate?
10        A.  That again, in the context of my
11   definitions, I had done a -- a very brief eyeball
12   look at a movement of the fluid, and that had come
13   to an estimate, at that time, of -- of 20 to 25 in
14   the context of a rapid piece of work with no
15   further elaboration of it.
16        Q.  When did you perform the estimate that
17   generated -- let me strike that.
18             When did you perform the analysis
19   that generated an estimate of 20- to 25,000
20   barrels per day?
21        A.  To the best of my recollection, mid-May.
22        Q.  And when you say "20- to 25,000 barrels
23   per day," are you talking about stock tank
24   barrels?
25        A.  Yes.
```

1    barrel-per-day estimate in this document?

2         A.   No.  And I think, as I said earlier, I

3    believe it was superceded by the work on Professor

4    Wereley's estimate.

5         Q.   When you say "superceded," is it your view

6    that Professor Wereley's estimate was better than

7    your estimate that had resulted in 20,000 to

8    25,000 barrels per day?

9              MS. KARIS:  Object to form.

10        A.   No.  I think the specific revision is on

11   the areas of pipe flow that we began to discuss

12   earlier with the drill pipe.  By that time, I was

13   aware of the compression at the end of the riser

14   pipe and the reduced flow area.

15        Q.   (BY MR. DAVIS-DENNY)  So at some point in

16   May of 2010, you become aware that the end of the

17   riser pipe has -- was compressed?

18        A.   That's correct.

19        Q.   When you learned that the riser pipe was

20   compressed, did you recalculate the -- the numbers

21   that had led to your 20,000 to 25,000

22   barrel-per-day estimate?

23              MS. AVERGUN:  Objection to form.

24        A.   To the extent that I had my eyeball rough

25   measurement, I did reconvert with a simple ratio

1  of area, yes.

2      Q.   (BY MR. DAVIS-DENNY)   And what did that --

3  what estimate did that generate?

4      A.   It generated a number of 15- to 20,000.

5      Q.   Do you recall exactly when in May you

6  determined that the -- you determined this flow

7  rate estimate of 15- to 20,000 barrels per day?

8      A.   Not the exact date.

9      Q.   Did you communicate your estimate of

10 15,000 to 20,000 barrels per day to anyone?

11     A.   I believe in discussions with Mr. Tooms.

12     Q.   Did you communicate your estimate of

13 15,000 to 20,000 barrels per day with any employee

14 or official of the United States Government?

15     A.   I don't recall.

16     Q.   You have no memory of doing so?

17     A.   I don't remember doing so or specifically

18 not doing so, no.

19     Q.   Doesn't it stand to reason that if you

20 have a memory of communicating it to Mr. Tooms, if

21 you had, in fact, communicated it to a United

22 States Government employee or official, that you

23 would also remember that communication?

24          MS. KARIS:   Object to form.

25          MS. AVERGUN:   Objection; form.

```
 1         A.  It depends on the context of each
 2    discussion.
 3         Q.  (BY MR. DAVIS-DENNY)  When did you share
 4    your 15,000- to 20,000 barrel-per-day estimate
 5    with Mr. Tooms?
 6         A.  I believe in the context of talking about
 7    the critique of Professor Wereley's measurement.
 8         Q.  Do you recall when that conversation
 9    occurred?
10         A.  I'm trying to remember back to the dates
11    we produced yesterday, but if -- I believe it was
12    the 14th or 15th of May, the dates of -- of those
13    documents.
14         Q.  Did you propose to David Rainey that his
15    document that was eventually sent to Admiral Allen
16    and Admiral Landry -- did you propose that that
17    document include your 15,000 to 20,000
18    barrel-per-day estimate?
19         A.  I don't recall making any comment at all
20    to David Rainey about the document.
21         Q.  Did you review the document when you
22    received it from David Rainey?
23              MS. AVERGUN:  Objection to form.
24         A.  I -- I may have skimmed it.  I don't -- I
25    don't recall cri- -- review it in a critical
```

1    mid -- mid-May.

2         Q.  (BY MR. DAVIS-DENNY)  So in your work in

3    source control, you didn't think it was important

4    to evaluate the relative merits of the different

5    flow rate estimates that you had seen and -- and

6    developed yourself?

7              MS. AVERGUN:  Objection to form.

8         A.  I don't recall ever expressing it in terms

9    of comparing the -- the relative merits of

10   different flow rate estimates.

11        Q.  (BY MR. DAVIS-DENNY)  But you didn't

12   compare the relative merits of flow rate estimates

13   in May of 2010; that's your testimony, right?

14        A.  Yeah.  I don't -- don't believe I compared

15   the relative merits, no.

16        Q.  And that's true even though you also

17   believed in May of 2010 that understanding the

18   flow rate was important to evaluating source

19   control options like the Top Kill, right?

20        A.  That is one of the factors, and I think I

21   previously said it's not necessarily the top of

22   the list.

23        Q.  I'm going to hand you another document.

24   It's Tab 47 in the TransOcean binder.  It will be

25   marked as Exhibit 11210.

```
 1    I'm going to stop the clock right now, go off the
 2    record, and we'll --
 3              THE VIDEOGRAPHER:  The time is
 4    3:48 p.m.  We're going off the record.
 5              (Break from 3:48 p.m. to 3:49 p.m.)
 6              THE VIDEOGRAPHER:  The time is
 7    3:49 p.m.  We're back on the record.
 8         Q.  (BY MR. DAVIS-DENNY)  Okay.  I'm handing
 9    you what we've marked as Exhibit 11212.  It's
10    TransOcean Binder Tab 42.  Is this an E-mail that
11    you sent to Steven Haden on May 22nd of 2010?
12              (Marked Exhibit No. 11212.)
13         A.  Yes, it is.
14         Q.  (BY MR. DAVIS-DENNY)  And you've copied
15    James Dupree, Kent Wells, Kate Baker, and David
16    Rainey, all of whom are with BP; is that correct?
17         A.  Apart from the clarification of Kate Baker
18    being on contract as a retiree.
19         Q.  And your subject line was "Flow rate
20    estimation."  Is that correct?
21         A.  That's correct.
22         Q.  And you wrote:  "Spreadsheet (draft) for
23    adjusting flow rate estimate from velocity
24    measurement made by Professor Wereley," in your --
25    in the third line of your E-mail.  Was what you
```

1    included in this spreadsheet -- was that a flow

2    rate estimate?

3         A.   It was Professor Wereley's work with a

4    reinterpretation of his measurement.

5         Q.   But you didn't consider Professor

6    Wereley's work to be a flow rate estimate, right?

7         A.   No, I -- I didn't comment on his

8    measurement or the -- the methodology used to --

9    to make the measurement.

10        Q.   Let me ask it this way:  Did you consider

11   Professor Wereley's measurement to be a flow rate

12   estimate?

13             MS. KARIS:   Object to form.

14        A.   No, I don't recall considering his -- his

15   measurement as a -- a flow rate estimate.  I was

16   concerned with the interpretation of that

17   measurement.

18        Q.   (BY MR. DAVIS-DENNY)   What Professor

19   Wereley did did not meet your definition of -- of

20   "flow rate estimate."

21             Is that right?

22        A.   I guess two points my definition is

23   concerned, what I felt was a BP estimate; and,

24   secondly, I believe he only had a couple of

25   measurements to work on.  Like I said, I don't

1    recall specifically how many.

2        Q.  So it did not meet your definition of a

3    "flow rate estimate"?

4        A.  Compared to the -- the rigor that I would

5    have expected in an estimate, personally, no.

6        Q.  The -- please turn to the spreadsheet that

7    you attached to your E-mail.  It's a spreadsheet

8    that you prepared on or about May 22nd of 2010; is

9    that correct?

10       A.  Yes.

11       Q.  Now, when you prepared this spreadsheet,

12   it was your intent to be as accurate as possible?

13       A.  With the conversion factors, yes.

14       Q.  You, in the spreadsheet, take Professor

15   Wereley's PIV estimate and you apply certain

16   adjustments; is that right?

17       A.  I take his quoted PIV measured velocity

18   and then apply some factors to convert from that

19   velocity to stock tank oil rate.

20       Q.  Okay.  For example, you reduced the

21   estimate by 30 percent because you assume a 30

22   percent reduction in the riser internal flow area

23   due to riser pipe deformation; is that correct?

24       A.  That's correct.

25       Q.  Okay.  You acknowledge, however, in the

1    spreadsheet that this 30 percent reduction needed
2    further analysis; is that right?
3         A.  That's correct.
4         Q.  Okay.  And you recognize that 30 percent
5    adjustment that you made could lead to the flow
6    rate going up or the flow rate going down, right?
7         A.  As stated, yes.
8         Q.  At this time, how much did you believe the
9    flow rate could have gone up or down based on
10   further analysis?
11        A.  I don't recall having a -- a view on that.
12        Q.  Okay.  You suggested two actions for
13   follow-up on the area of deformation; is that
14   right?
15        A.  Yes.  It appears so.
16        Q.  The first recommendation you had was to
17   get "More images and analysis to confirm the
18   initial deformation estimate"?
19        A.  That's correct.
20        Q.  Was that done?
21        A.  Yes, it was.
22        Q.  When was that done?
23        A.  After the cutting of the riser around
24   early June, when flow out into the end of the
25   riser ceased.

```
 1         Q.  Was -- you also recommended doing a
 2    "Search for other end of failed riser to determine
 3    profile open area."  Was that done?
 4         A.  I don't believe so, no.
 5         Q.  Okay.  When the additional images and
 6    analysis was performed on the deformation at the
 7    end of the riser, what adjustment factor did you
 8    arrive at?
 9         A.  My recollection was that it was around 50
10    percent, but I believe that includes the drill
11    pipe, as well.
12         Q.  And that was something you didn't learn
13    until after the riser was cut; is that correct?
14         A.  That's correct.
15         Q.  You concluded at the bottom of your
16    spreadsheet that the -- the adjusted flow rate
17    given Professor Wereley's velocity measurement was
18    15,180 barrels per day; is that correct?
19         A.  That's what's reported in the spreadsheet,
20    yes.
21         Q.  Okay.  Did you share this with the United
22    States Government?
23         A.  Are you asking about the -- the document
24    or about the number?
25         Q.  It's a fair question.  Let's ask about the
```

```
 1    document first.
 2         A.   I -- I don't recall actually with either,
 3    but...
 4         Q.   Okay.  So you don't recall sharing with
 5    the United States Government your finding that a
 6    more appropriate interpretation of Professor
 7    Wereley's velocity measurement was 15,180 barrels
 8    per day?
 9              MS. KARIS:  Object to form.
10         A.   I don't have a specific recollection of
11    doing that.
12         Q.   (BY MR. DAVIS-DENNY)  Let me ask:  As BP's
13    30(b)(6) witness, did BP share with the United
14    States Government your conclusion that a more
15    appropriate interpretation of Professor Wereley's
16    velocity measurement is 15,180 barrels per day?
17              MS. KARIS:  Object to form.  Also
18    beyond the scope as negotiated by the parties.
19    You can answer.
20              MR. CERNICH:  How is it beyond the
21    scope, Counsel?
22              MS. KARIS:  The scope was limited to
23    what Mr. Hill himself -- in fact, the word
24    "himself" was in the agreement -- did in
25    connection with the Wereley analysis, aimed
```

```
 1    specifically at not what BP or anybody else within
 2    BP did with the Wereley analysis.
 3                   So I'll let him answer, but it is
 4    beyond the scope as agreed to.  We had that
 5    conversation with Ms. Himmelhoch.
 6                   MR. CERNICH:  Okay.  I just want to
 7    make sure I understand.  Okay.
 8        A.  Yeah.  I don't recall.  I don't know what
 9    was done.
10                   MR. DAVIS-DENNY:  Mr. Hill, I think
11    that's all I have.  Thank you for your time.
12                   THE WITNESS:  Okay.
13                   THE VIDEOGRAPHER:  The time is 3:59
14    p.m.  We're off the record.
15                   (Break from 3:59 p.m. to 4:12 p.m.)
16                   THE VIDEOGRAPHER:  The time is 4:12
17    p.m.  We're back on the record.  Beginning
18    Tape 15.
19                 E X A M I N A T I O N
20    BY MS. RICHARD:
21        Q.  Good afternoon, Mr. Hill.
22        A.  Good afternoon.
23        Q.  My name is Gwen Richard.  I'm here with
24    Lauren Hill, my associate.  We're representing
25    Halliburton today.  Do you understand that?
```

```
 1              Q.   (BY MS. KARIS)  Okay.  And did any -- at
 2     any time did anyone assign you the responsibility
 3     within BP of determining what the flow rate was
 4     once the Flow Rate Technical Group is formed?
 5                   MR. CERNICH:  Objection; form.
 6              A.   Not until late July.
 7              Q.   (BY MS. KARIS)  Right.  Okay.  At any time
 8     until late July were you ever assigned the
 9     responsibility of determining what the
10     contemporaneous flow rate from the Macondo Well
11     was?
12              A.   No, I was not.
13                   MR. DAVIS-DENNY:  Objection.
14              Q.   (BY MS. KARIS)  Switching topics.  I'm
15     going to go to U.S. Tab 51.  This has -- actually,
16     this has not been previously marked, and we
17     have -- I say that, but I believe -- just a second
18     before we go give another exhibit number.
19                   This is an E-mail from you to
20     Mr. Haden, Mr. Dupree, Mr. Wells, Ms. Baker, and
21     Mr. Rainey forwarding your observations of flow.
22                   I stand corrected.  It was previously
23     marked as Exhibit 11212, which is found at U.S.
24     Tab 51.  I'll hand you what has been previously
25     marked as U.S. 11212.
```

1            Is this a document that you created?

2       A.   Yes, it is.

3       Q.   Okay.

4       A.   The -- the E-mail I created.

5       Q.   All right.  And what information are you

6  forwarding to Mr. Haden as of May 22nd?

7       A.   My written description of the

8  interpretation of Professor Wereley's

9  measurements; the background calculation

10  spreadsheet; and his own slides as presented, I

11  believe, to Congress.

12       Q.   Okay.  Now, you testified in response to

13  Mr. Cernich's question that you did not provide

14  any documents to the team that you met with on

15  May 22nd, specifically Ms. Benko, Mr. Morgheim,

16  and possibly Mr. Haden.

17       A.   That's correct.

18       Q.   Can you explain -- can you reconcile what

19  you mean when you say you didn't provide any

20  documents to Mr. Haden given what is in

21  Exhibit 11212?

22       A.   I had met with Mr. Haden earlier that same

23  day and I can't recall the specifics of the

24  discussion but the resulting request for

25  information, I presume, and I sent him as

1    requested.

2         Q.   Okay.  And when you met with Mr. Haden,

3    did you have any understanding as to whether --

4    that morning, did you have any understanding as to

5    whether he was working at the direction of

6    counsel?

7         A.   No, I did not.

8         Q.   Okay.  Switching topics.

9              Now we're going to go to Exhibit

10   9132.  I'm handing you what's been previously

11   marked as Exhibit 9132, and this is behind

12   TransOcean Tab 34.  You were asked numerous

13   questions regarding Top Kill, and I want to follow

14   up on some of those questions.

15              First of all, who is Kate Baker?

16        A.   Kate Baker is a BP retiree who was working

17   in Paul Tooms' team.

18        Q.   Okay.  And what is the date of this

19   document?

20        A.   May 18.

21        Q.   Okay.  When was the first Top Kill effort

22   performed?

23        A.   I believe it was May 26th.

24        Q.   So this E-mail would have been circulated

25   in advance of Top Kill being performed; is that

1   designated a 30(b)(6) deponent, Dr. Williams.

2       Q.  (BY MR. CERNICH)  Your -- your estimate,

3   Mr. Hill, can you ex- -- did you have to have some

4   information about the speed of the -- the camera

5   and the movement of the frames per second of the

6   camera in order to perform your estimate?

7       A.  No, I didn't.  It was just as -- as

8   presented.

9       Q.  Okay.  But you say "as presented."  How

10  did you decide that it was moving at 2 feet per

11  second --

12      A.  Because I --

13      Q.  -- the particle?

14      A.  -- I saw the particle and did a simple

15  count of roughly a second into Mississippi 1,

16  Mississippi 2.

17      Q.  Did you use a -- did you use a watch or a

18  clock?

19      A.  No, I didn't.

20      Q.  Okay.  Did you document your estimate

21  anywhere?

22      A.  No, I did not.

23      Q.  Okay.  I'm giving you back what Counsel

24  marked as -- Counsel for BP marked as 11212.  It's

25  the E-mail from yourself to Steve Haden, dated

1    May 22nd, 2010.  Do you see that there?

2          A.  Yes, I do.

3          Q.  Okay.  And you -- you had a conversation

4    with -- and attached to there is your critique of

5    Mr. Wereley's estimate; is that right --

6    Dr. Werely's estimate?

7          A.  Yes.  The -- that's the critique of his

8    interpretation of his measurement.

9          Q.  And the spreadsheet with calculations?

10         A.  That's correct.

11         Q.  Correct?  Your calculations?

12         A.  As -- as listed in that column, yes.  In

13   the column labeled "Value results," yes.

14         Q.  Right.  And you prepared that spreadsheet?

15         A.  Yes, I did.

16         Q.  And also attached is our -- is a slide

17   show that Dr. Werely presented; is that right?

18         A.  That's correct.

19         Q.  Now, you sent that to Mr. Haden after a

20   meeting you had with him on that morning of

21   May 22nd; is that right?

22         A.  Yes, that's correct.

23         Q.  What did you discuss with him at that

24   meeting?

25         A.  I -- I don't recall.

```
 1          Q.   Did you discuss Dr. Werely's flow rate
 2     estimates?
 3          A.   I -- I don't recall specifically what I
 4     did.
 5          Q.   Okay.  But something at that meeting must
 6     have prompted you to send this -- this E-mail to
 7     Mr. Haden; is that right?
 8          A.   I agree with that, yes.
 9          Q.   Okay.  Who else was in that meeting?
10          A.   My -- my recollection is it was -- it was
11     just him and me.
12          Q.   Okay.  Ms. Benko wasn't there?
13          A.   I don't believe so, no.
14          Q.   Mr. Morgheim?
15          A.   No.
16          Q.   Okay.  And then after you sent this to
17     Mr. Haden, you had a subsequent meeting on that
18     same day with Mr. Haden, Ms. Morg- --
19     Mr. Morgheim, and Ms. Benko; is that correct?
20          A.   My recollection is -- is Jeff Morgheim,
21     Brittany Benko, and -- and perhaps Steve.
22          Q.   Okay.  And at that point, did they tell
23     you not to perform any -- not to create any more
24     documents like this?
25                    MS. KARIS:  Objection.
```

```
 1    THE STATE OF TEXAS    )
 2    COUNTY OF HARRIS      )
 3
 4            I, Donna L. Garza, Certified Shorthand
      Reporter in and for the State of Texas, do hereby
 5    certify that the above and foregoing contains a
      true and correct transcription of all portions of
 6    evidence and other proceedings in the above-styled
      and numbered cause, all of which occurred and were
 7    reported by me.
              I further certify that I am neither
 8    counsel for, related to, nor employed by any of
      the parties or attorneys in the action in which
 9    this proceeding was taken, and further that I am
      not financially or otherwise interested in the
10    outcome of the action.
              GIVEN UNDER MY HAND AND SEAL OF OFFICE,
11    on this, the _____ day of January, 2013.
12
13            Donna Garza
14            DONNA L. GARZA
              TEXAS CSR NO. 4785
15            Expiration Date:
              12-31-13
16
17
18    WORLDWIDE COURT REPORTERS, INC.
      Firm Registration No. 223
19    3000 Weslayan, Suite 235
      Houston, Texas  77027
20    (800) 745-1101
21
22
23
24
25
```

Worldwide Court Reporters, Inc.
PURSUANT TO CONFIDENTIALITY ORDER