# Exhibit 8

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL            )    MDL NO. 2179
     by the OIL RIG,              )
 4   DEEPWATER HORIZON in         )    SECTION "J"
     the GULF OF MEXICO,          )
 5   April 20, 2010               )    JUDGE BARBIER
                                  )
 6                                )    MAG. JUDGE
                                  )    SHUSHAN
 7




13

14
                         VOLUME 1
15

16
            Deposition of DAVID RAINEY, taken at
17   Pan-American Building, 601 Poydras Street,
     11th Floor, New Orleans, Louisiana, 70130, on
18   June 2, 2011.

19

20   APPEARANCES:

21
     Mr. Duke Williams
22   Mr. Christopher Zainey
     WILLIAMS LAW GROUP
23   909 Poydras Street, Suite 1650
     New Orleans, Louisiana 70112
24   (985) 876-7595

25
```

GAUDET, KAISER, L.L.C.
Board-Certified Court Reporters

1   making observations on the surface and then
2   relating those surface observations to
3   thickness and subsequently to volume per
4   area.  We were working with observations that
5   were coming in from the field that were
6   sheen, dull oil and dark oil.
7           The various -- and there are --
8   there's a number of protocols and these are
9   not the only two ultimately that I
10  considered.  And they -- they all have
11  different descriptors for surface oil.
12          But the Bonn Agreement at its
13  upper end in terms of what thickness it
14  forces you to apply to the oil on the surface
15  is many times the thickness of all of the
16  other protocols.
17      Q.   Okay.
18      A.   And that's what drives the
19  difference between the different worksheets.
20      Q.   Okay.  Okay.  Take that.  Thank
21  you.  I'm going to mark this as Exhibit 3212.
22          (Exhibit No. 3212 was marked.)
23      Q.   (BY MR. CERNICH)  I apologize
24  for the problems with the attachments.
25  Hopefully we won't continue to run into that,

```
 1   but of course we will.
 2              Okay.  If you'll turn to Tab 6,
 3   please.  This is an e-mail from yourself
 4   dated Tuesday, April 27th, to Ian Cavanaugh,
 5   Subject: spill vol 4-27.
 6              And who is Mr. Cavanaugh?
 7        A.    His role in BP is he's the
 8   technology vice president for subsurface and
 9   wells.  His role in the response by this time
10   was I think best described as science advisor
11   to the incident commander in Houma.
12        Q.    And were you sending -- do you
13   recall sending this e-mail to Mr. Cavanaugh?
14        A.    I don't actually recall doing
15   it.  Of course, I've seen the documents
16   and --
17        Q.    Okay.  And were you sending this
18   to Mr. Cavanaugh like the -- like when you
19   sent the other e-mail to Ms. Wallace to
20   distribute for a meeting?
21        A.    No.  This is -- this is later.
22   This is after the meeting.
23        Q.    Okay.
24        A.    My belief is, and this -- this
25   is reconstructed from looking at the
```

```
 1   documents and my notes, is that Ian would
 2   have been on the 4:30 telecom, and he simply
 3   expressed interest as a scientific advisor
 4   for Houma in what I was doing, and he thought
 5   it might help him as he was working in Houma
 6   to assist in planning and applying
 7   dispersants.
 8          Q.     So he was using this -- using
 9   these numbers to consider how much dispersant
10   he was going to --
11          A.     He needed --
12                 (Multiple voices.)
13                 MR. HEBERLIG:  Objection; form.
14          (Discussion off the record.)
15          A.     My belief is he thought it might
16   be useful, but I don't know what he did with
17   it after he got it.
18          Q.     (BY MR. CERNICH)  Did you ever
19   discuss these -- these calculations with him?
20          A.     I can't say specifically.  I
21   have many phone calls with Ian during this
22   period, and I can't say specifically whether
23   I talked about this with him or not.
24          Q.     Okay.  If you'll look at the
25   attachment, your attachment has the Bonn
```

```
 1   Agreement approach there and includes --
 2            MR. HEBERLIG:  Counsel, I'm familiar
 3   with this document and it's not complete.
 4            MR. CERNICH:  (Hands document to
 5   Mr. Heberlig.)
 6            MR. HEBERLIG:  Thank you.
 7        A.       Okay.
 8            MR. CERNICH:  Does that satisfy you,
 9   Counsel?
10            MR. HEBERLIG:  Yes, that's got all
11   three pages.
12            MR. CERNICH:  Okay.
13        Q.       (BY MR. CERNICH)  And if you'll
14   look at the first spreadsheet, which is
15   using -- I'm trying to recall, is that one
16   using the ASTM method or the Metcalf method?
17        A.       Neither, actually.  The heading
18   says it's using ASTM, but what it's actually
19   using is a hybrid between ASTM and Bonn.
20        Q.       Okay.  Is that a method that you
21   found on the Internet?
22        A.       No.  It's the method that I
23   created having had conversations with the
24   folk in the science room, conversations with
25   various other people and at least one other
```

```
 1  person in NOAA, a senior NOAA official in
 2  Seattle, and then more ongoing conversations
 3  with folk in the science room.  That's --
 4  that's where it came from.
 5       Q.    Is the NOAA official that you're
 6  referring to Bill Lehr?
 7       A.    That's correct.
 8       Q.    And who did you discuss it with
 9  in the science room?
10       A.    I can't specifically remember,
11  but there were a lot of folk in that room.
12       Q.    Did you discuss it with Doug
13  Suttles?
14       A.    I did discuss it with Doug
15  Suttles, yes.
16       Q.    Did you show him the -- your
17  hybrid calculations?
18       A.    I showed him the -- I don't know
19  whether I showed him the Metcalf & Eddy or
20  the ASTM, but one or other of those two and
21  the Bonn and we discussed the differences in
22  the results.  And we discussed sort of the
23  relevance of the upper end of the Bonn
24  Agreement to this particular situation and
25  agreed that it wasn't relevant to this
```

```
 1    you could please turn to Tab 23 in your
 2    binder.
 3         A.      Okay.
 4         Q.      And this is an e-mail, it starts
 5    at the top:  From Doug Suttles to John Lynch
 6    and Andy Inglis.
 7                 But if we work down the e-mail
 8    chain, it starts with you forwarding a flow
 9    rate note to Mr. Suttles.  And the attachment
10    to -- and this e-mail is dated May 19th,
11    2010.
12                 And the attachment is -- is a
13    document that is entitled:  Mississippi
14    Canyon 252 #1 Flow Rate Calculations.
15                 Mr. Rainey, is this the memo
16    that you referred to earlier when you were
17    discussing or we were discussing your
18    May 17th calculations?
19         A.      I believe it is, yes.  I'm not
20    used to seeing it printed in this format
21    but --
22         Q.      Yeah, for whatever reason that's
23    the way it printed when we got it.  And if
24    you take a look at that and tell me whether
25    it appears that the memo and the attachments
```

```
 1    to that memo appear to be complete to you.
 2             (Discussion off the record.)
 3        A.      Yes, this looks to be complete
 4    at first glance.
 5        Q.      (BY MR. CERNICH)  And did you
 6    prepare this memo, Mr. Rainey?
 7        A.      Yes, I did.
 8        Q.      And did anyone assist you in
 9    preparing this memo?
10        A.      It was reviewed by Doug Suttles.
11        Q.      Did he ask you to prepare this
12    memo?
13        A.      No.
14        Q.      Did someone ask you to prepare
15    this memo?
16        A.      A request was made.  This was my
17    response to the request, not a specific
18    request to prepare a memo.
19        Q.      Okay.  And what was -- what was
20    the request?
21        MR. LANCASTER:  Object and ask you to
22    lay some additional foundation as to who,
23    what and where because I'm going to be
24    instructing the witness not to answer some
25    questions based upon privilege grounds.
```

```
 1          MR. CERNICH:  Okay.
 2      Q.     (BY MR. CERNICH)  Why did you
 3  prepare this memo?
 4          MR. LANCASTER:  That would call for
 5  disclosure of conversations with counsel, so
 6  I instruct the witness not to answer based
 7  upon privilege.  You could get the "who" out
 8  there, if you want.
 9      Q.     (BY MR. CERNICH)  Who asked you
10  to prepare this memo?
11      A.     Nobody asked me to prepare the
12  memo.  I prepared the memo in response to a
13  request from BP's counsel.
14      Q.     From BP's?
15      A.     Counsel.
16      Q.     Counsel.  Did BP's counsel
17  review drafts of this memo?
18      A.     Yes, they did.
19      Q.     And is this the final version of
20  that memo?
21      A.     I believe it is.  The only --
22  there was one edit that was made to the final
23  sentence, and I can't remember whether this
24  is the final or the original version.
25      Q.     Did you --
```