# Exhibit 13

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) CIVIL ACTION |
|  | ) |
|  | ) NUMBER: |
| Plaintiff, | ) |
|  | ) SECTION: |
| v. | ) |
|  | ) |
| BP p.l.c., | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.       On April 20, 2010, an explosion occurred on the offshore oil rig Deepwater
Horizon (the "Deepwater Horizon" or the "rig") leased by a subsidiary of BP p.l.c. ("BP").
Following the explosion, oil soon began spilling into the Gulf of Mexico. In three public filings
furnished to the Commission and made available to investors, BP misled investors by
misrepresenting and omitting material information known to BP regarding the rate at which oil
was flowing into the Gulf and, thus, the resulting liability for the oil spill.

2.       On April 20, 2010, high pressure methane gas was released onto the rig and
exploded, engulfing the Deepwater Horizon in flames. The Deepwater Horizon was a nine-year-
old semi-submersible mobile offshore drilling unit and dynamically positioned drilling rig that
was designed to operate in waters up to 8,000 feet deep and drill down to approximately 30,000
feet. During April 2010, the Deepwater Horizon was located above the Macondo Prospect, in
the Mississippi Canyon Block 252 of the Gulf of Mexico in the United States exclusive

economic zone, about forty-one miles off of the Louisiana coast. A BP subsidiary was the operator, principal developer, and sixty-five percent owner of the Macondo Prospect.

3.      As a result of the explosion, eleven crew members died. For approximately thirty-six hours following the explosion, the rig remained on the surface of the water, engulfed in flames. On the morning of April 22, 2010, the rig sank approximately 5,000 feet to the seafloor. As the Deepwater Horizon sank, the riser pipe (the pipe that connected the oil wellhead at the seafloor) disconnected from the rig. The detached end of the riser pipe sank to the seafloor, still connected at the other end to the wellhead. This created a bend, or "kink," in the riser pipe directly above the wellhead.

4.      For a day after the rig sank, no oil was believed to be leaking from the well, and the small oil slick on the surface of the water was thought to be oil that had been in the riser pipe at the time of the explosion. On the evening of April 23, 2010, a video streaming to the BP crisis center from a remotely operated subsea camera revealed that the open end of the riser pipe, which was now lying on the seafloor, was leaking oil into the Gulf of Mexico.

5.      Following the discovery that oil was spilling into the Gulf of Mexico, BP materially misrepresented and understated the estimated range of flow rate of oil leaking from the well in three public filings furnished to the Commission. BP also omitted material information from these three public filings regarding its own internal data, estimates, and calculations indicating that the flow rate estimate contained in these filings was unjustifiably low. BP made these material misrepresentations and omissions in, inter alia, its Reports on Form 6-K furnished to the Commission on April 29 and 30 and May 4, 2010. In these Reports on

2

Form 6-K, BP stated that the flow rate estimates were "up to 5,000 bopd"[1] or that 5,000 bopd was the current estimate, despite higher internal data, estimates, and calculations. At all relevant times, BP knew or was severely reckless in not knowing that it was making these material misrepresentations and omissions to investors.

6.    Information regarding the rate of oil flowing from the well was material to BP's investors. The amount of oil spilled would inform any consideration of the costs of offshore and onshore spill response, claims for natural resource damage under the Oil Pollution Act of 1990 [33 U.S.C. § 2701 et seq.], penalties for strict liability under the Clean Water Act [33 U.S.C. § 1251 et seq.], as well as other potential liability arising from claims, lawsuits, and enforcement actions related to the explosion and the sinking of the Deepwater Horizon.

7.    As a result of the three materially misleading public filings discussed above, BP violated Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 12b-20, and 13a-16 thereunder. The Commission accordingly seeks a final judgment (a) permanently enjoining BP from violating Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, & 240.13a-16], (b) ordering BP to pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C § 78u(d)], (c) ordering, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, as amended by Section 929B of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, that the amount of civil penalties against and paid by BP be added to and become part of a fund for the benefit of American Depositary Shares ("ADS") holders at the time of the violations alleged in this complaint; and (d) granting such other relief as the Court deems just and appropriate.

---

[1]    The acronym "bopd" stands for "barrels of oil per day." A barrel of oil is equivalent to 42 U.S. gallons.

3

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to Section 21(d) of the Exchange Act
[15 U.S.C. § 78u(d)] to enjoin such transactions, acts, or practices, and to obtain civil penalties
and such other and further relief as the Court may deem just and appropriate.

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and
27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), & 78aa].

10.     Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C.
§ 78aa]. Certain of the transactions, acts, or practices constituting the violations of the federal
securities laws alleged herein occurred within the Eastern District of Louisiana. Also, BP
transacts business within the Eastern District of Louisiana.

11.     BP, directly and indirectly, has engaged in transactions, acts, or practices that
violate Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules
10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, & 240.13a-16].

## DEFENDANT

12.     BP p.l.c. ("BP") is an international oil and gas company, headquartered in
London, England. BP's U.S. business is based in Houston, Texas. BP's securities are registered
with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and, in
the United States, listed in the form of American Depositary Shares ("ADS") on the New York
Stock Exchange under the ticker symbol "BP." BP's ordinary shares are listed on the London
Stock Exchange and the Frankfurt Stock Exchange. One ADS is equal to six ordinary shares.
From April 29, 2010, through May 28, 2010, there were approximately 127,500 ADS holders.
As a result of the Deepwater Horizon Incident, the closing price for BP ADS shares declined
from $52.56 on April 29, 2010 to $36.52 on June 1, 2010, with over 1 billion ADS shares traded

4

during this period. As of June 25, 2012, BP's price per ADS was $37.66. BP has

approximately 19 billion shares in issue (excluding Treasury shares) and a market capitalization

of approximately $120 billion. In 2011, BP had sales and operating revenues of $375.52 billion,

a profit of approximately $25.7 billion, and a replacement cost profit of approximately $23.9

billion. For the quarter ending March 31, 2012, BP had sales and operating revenues of

approximately $94 billion, a profit of approximately $5.9 billion, and a replacement cost profit of

approximately $4.9 billion. As a foreign filer, BP is required to file annual reports such as Form

20-F, and to make reports on Form 6-K.

## FACTS

**I. On April 20, 2010, There Was an Explosion on the Deepwater Horizon, and, in the Wake of That Incident, the Federal Government Activated a "Unified Command" to Coordinate Response Efforts.**

13. On April 20, 2010, there was an explosion on the Deepwater Horizon in the Gulf

of Mexico, which was followed by a massive oil spill that affected, inter alia, commercial and

other interests in the Gulf of Mexico, other nearby waterways, and the coastal areas of Alabama,

Florida, Louisiana, Mississippi, and Texas.

14. Shortly after the explosion on the Deepwater Horizon, the federal government,

pursuant to statutory authority, activated a "Unified Command" to coordinate activities in

response to the explosion and resultant oil spill. Ultimately, the Unified Command included

representatives from BP, the U.S. Coast Guard, and the National Oceanic and Atmospheric

Administration ("NOAA"), among other entities.

## II.   A Former BP Senior Executive, with No Experience Estimating Oil Flow Rates, Created Spreadsheets That Showed a Flow Rate Close to That Estimated by NOAA.

15.     On April 26, 2010, a NOAA senior scientist authored a memorandum in which he estimated the flow rate to be 5,000 bopd. This memorandum was circulated within Unified Command, and was received by at least one Former BP senior executive (hereinafter "Former Senior Executive A") and several BP employees. BP used the 5,000 bopd figure publicly, and understood that it could have the effect of significantly downplaying the severity of the spill and thus BP's strict liability under the Clean Water Act for barrels spilled, liability for claims under the Oil Pollution Act of 1990, and other liability arising from claims, lawsuits, and enforcement actions.

16.     Former Senior Executive A, who was assigned to the Unified Command and who received the NOAA April 26 memorandum, undertook the task to create a BP flow rate estimate. Former Senior Executive A had no prior experience calculating oil spill flow rates.

17.     Beginning on April 26, 2010, Former Senior Executive A created, or caused to be created, several spreadsheets that purported to show a "best guess" of flow rate at 5,000 to 6,000 bopd. In creating this "best guess," Former Senior Executive A – lacking any experience – initially consulted the online encyclopedia "Wikipedia" for guidance, before reviewing more established sources. Ultimately, Former Senior Executive A developed his own methodology for estimating flow rates, which did not comport with established industry standards. Former Senior Executive A's application of his methodology was rife with mathematical and procedural inaccuracies. Despite the inaccuracies and the visual expansion of the spill, the "analysis" in each instance, yielded a desired result: a "best guess" of the range of flow rate that came close to the April 26 NOAA estimate of 5,000 bopd.

6

18. Although Former Senior Executive A's flawed spreadsheets reflected a range of 5,000 to 6,000 bopd, they also showed a high flow rate estimate of approximately 14,000 bopd.

## III. On April 28, 2010, the Unified Command Raised its Public Estimate to 5,000 bopd Based, in Part, on Information It Received from a BP Senior Executive.

19. On April 28, 2010, NOAA's representative within the Unified Command told senior members of the Unified Command that sources within NOAA believed that the flow rate was higher than what had been publicly reported by the Unified Command (1,000 bopd). Upon hearing this, a senior member of the Unified Command approached a then BP senior executive, who was BP's highest ranking officer within the Unified Command (hereinafter "Former Senior Executive B"), and asked for BP's flow rate estimate so the Unified Command could update the publicly disclosed flow rate number.

20. According to a senior member of Unified Command, Former Senior Executive B apparently contacted a BP employee or agent and responded to the senior Unified Command member that BP's internal flow rate estimate was between 1,000 bopd and 5,000 bopd, with 2,500 bopd being the most likely flow rate number. No document exists to support this statement.

## IV. Statements in BP's April 29, 2010 and April 30, 2010 Commission Filings that the Flow Rate was "up to 5,000" Barrels Per Day Were False and Misleading.

21. On April 29, 2010, BP furnished to the Commission a Report on Form 6-K in which it addressed the explosion on and sinking of the Deepwater Horizon. In part, BP stated: "Efforts continue to stem the flow of oil from the well, currently estimated at up to 5,000 barrels a day." (Emphasis added.)

22. On April 30, 2010, BP furnished to the Commission a Report on Form 6-K in which it addressed the response effort and stated in part: "Efforts to stem the flow of oil from

7

the well, currently estimated at up to 5,000 barrels a day, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the blow out preventer (BOP) on the sea bed." (Emphasis added.)

23.     On April 30, 2010, BP published on its website the same materially false and misleading information found in the Report on Form 6-K of that date.

24.     When BP made the statements set forth in paragraphs 21 through 23, supra, it knew them to be false or was severely reckless in not knowing them to be false. By April 28, 2010, BP possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 bopd:

> A.     By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates between 64,000 bopd and 146,000 bopd.
>
> B.     On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of approximately 100,000 bopd.
>
> C.     By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 bopd.
>
> D.     On April 27, 2010, a BP engineer estimated the flow to be approximately 5,000 to 22,000 bopd on the basis of temperature readings along the riser pipe, among other factors.
>
> E.     By April 28, 2010, Former Senior Executive A's spreadsheets showed a flow rate ranging from 1,000 bopd to over 14,000 bopd.

8

25. On April 28, 2010, BP also learned that there was now oil leaking from the "kink," where the riser pipe had bent before it came to rest on the sea floor. This was an additional separate leak point.

26. Given that BP possessed data, estimates, and calculations significantly above the 5,000 bopd figure, to publicly disclose (in the two Reports on Form 6-K furnished to the Commission on April 29 and April 30, 2010) that the flow rate was estimated as "up to 5,000" bopd was materially false and misleading. Failing to disclose even the existence of data, estimates, and calculations that showed a higher flow rate also constituted omissions of material information regarding the flow rate.

V. **BP Obtained Additional Information Showing a Range of Flow Rates Well in Excess of 5,000 bopd but Nonetheless Furnished Another Report on Form 6-K Citing That Incorrect Estimate, and a Former Senior Executive at BP Continued to Present the 5,000 bopd Figure in Statements to the Press.**

27. Following the fraudulent Report on Form 6-K furnished to the Commission on April 30, 2010, until May 24, 2010, BP generated or was aware of eleven additional pieces of data, estimates, and calculations showing a range of flow rates significantly higher than 5,000 bopd:

> A. On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates from 5,000 bopd to 40,000 bopd.
>
> B. In early May 2010, a video analysis by a BP engineer resulted in an estimate of 20,000 bopd, attributable just to the riser pipe.
>
> C. On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates from 37,000 to 87,000 bopd.

9

D.    On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be "ruled out" that the flow rate was "in the order of 40,000 bopd."

E.    On or about May 10 and 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates from 14,000 bopd to 96,000 bopd.

F.    From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 bopd. The critique identified what the BP engineer stated were potential errors made by the professor that, when corrected for, yielded a revised estimate of 15,000 bopd, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made.

G.    On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer, yielded a flow rate calculation of 86,600 bopd, based on the then-estimated pressure.

H.    From May 19 to 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool (the "RITT") showed average collection rates of approximately 5,000 bopd for a 12-hour period, capturing a portion of the oil leaking from the riser, indicating that the total amount of oil leaking was in excess of 5,000 bopd.

I.    On May 22, 2010, an external surface expression analysis showed a range of estimated flow rate from 6,154 to 11,609 bopd.

10

J. On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 bopd.

K. On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil emanating from the well.

28. These eleven additional pieces of data, estimates, and calculations strongly indicated that the range of flow rate was in excess of 5,000 bopd. None of the additional pieces of data, estimates, and calculations suggested that 5,000 bopd was the current estimate of flow rate or that a flow rate of 5,000 bopd was the best estimate.

29. Former Senior Executive B received at least six of the eleven additional pieces of data, estimates, and calculations. Former Senior Executive A received at least four of the eleven additional pieces of data, estimates, and calculations.

30. On May 4, 2010, BP furnished another Report on Form 6-K to the Commission, which stated in pertinent part: "Accurate estimation of the rate of flow is difficult, but current estimates by the US National Oceanic and Atmospheric Administration (NOAA) suggest some 5,000 barrels (210,000 US gallons) of oil per day are escaping from the well."

31. BP omitted from its May 4, 2010, Report on Form 6-K the material fact that, by this date, its own engineers and scientists had generated or received at least six pieces of data, estimates, and calculations regarding flow rate estimates that far exceeded 5,000 bopd. BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 bopd was the best estimate of the amount of oil flowing into the Gulf of Mexico. Similarly, as of this date, for the same reasons, it was misleading to use

11

NOAA's 5,000 bopd as the "best estimate" as the basis for any public disclosure when BP had

its own, higher range of flow rate estimates.

    32.    Former Senior Executive B made the following public statements during April

and May 2010, all of which continued to set forth, inter alia, the 5,000 bopd estimate:

    A.    On ABC's "Good Morning America" of April 29, 2010:

> Q: [T]he Coast Guard is now saying that it's more likely
> that 5,000 barrels of oil leaking into the Gulf per
> day. That's five times the original estimation. Is that your
> estimate as well?
>
> Former Senior Executive B: Well, we can say based on
> what's - what we're picking up on the surface, it looks like
> it is more. So I think something between one and 5,000
> barrels a day is a reasonable estimate.

    (Emphasis added.)

    B.    On CBS's the "Early Show" of April 29, 2010:

> Q: This morning, we're learning that the leak from this
> well is five times worse than originally estimated. Yet, we
> just heard you say in our report that you don't believe this
> will change the amount that's estimated to be released into
> the ocean. I'm not an expert. But how is it possible that
> four thousand additional gallons leaking a day does not
> change the equation?
>
> Former Senior Executive B: . . . I should probably explain
> that on the -- the difference between one and five thousand
> barrels a day and -- and what we tried to explain is that,
> what we're seeing through the remote-operated vehicle
> cameras on the sea floor hasn't actually changed. So,
> physically those images are the same. And that of course is
> horribly difficult to estimate what the flow is. But what we
> can see is the amount of oil on top of the water. And based
> on the fact of what we're seeing on the surface, that's
> actually we can almost measure. We can take these aerial
> views. We think that the range has increased of what the
> estimate has been. So, I think that somewhere between one
> and five thousand barrels a day is probably the best
> estimate we have today.

(Emphasis added.)

C. On <u>NBC</u>'s "Today Show" of April 29, 2010:

> Q: So let's get back to numbers here, though, Mr. [Former
> Senior Executive B]. What do you think is leaking from
> that? And is it possible the truth is somewhere in the
> middle, which would still be a substantially bigger leak that
> you're predicting?
>
> Former Senior Executive B: What it is is that thousand
> barrels a day was a number that the NOAA scientists,
> working with our own staff, agreed was the best estimate at
> the time. What we can't do is measure the flow at the
> seabed. So as time's gone on, what we [can] see is what's
> on the surface. And using the satellite imagery and our
> overflights, we can now say it looks like it's probably more
> than a thousand. It's within the range. So I actually don't
> think there's a difference between NOAA's view and our
> view. <u>I would say the range is 1,000 to 5,000 barrels a day.</u>

(Emphasis added.)

D. On <u>ABC</u>'s "Good Morning America" of May 14, 2010:

> Q: Don't you need to know the amount and the speed in
> which it is leaving in order to better contain it? Isn't that
> fair to say?
>
> Former Senior Executive B: Well - Robin, I think, you
> know, as you said, what we're focused on is, you know,
> stopping the flow and minimizing the impact. And since
> the beginning, we've said, you know, it's, it's almost
> impossible to get a precise number. <u>But ourselves and
> people from NOAA and others believe that something
> around 5,000, that's actually barrels a day, is the best
> estimate.</u> And we look at that. Not only do we, we, we
> look at what's occurring on the seabed, we look at what's
> occurring on the surface. And actually we know that on the
> good weather days when we can apply all of our tools, we
> can actually shrink the size of this spill. And those are the,
> the ways we actually think that that's probably a reasonable
> number. But we know it's highly uncertain.

(Emphasis added.)

13

E.      On NBC's "Today Show" of May 14, 2010:

        Q: . . . Scientific experts are questioning whether your
        company has again underplayed the size of this leak. Some
        suggest it could be up to 26,000 barrels [of oil], five times a
        day your current estimate. Are you guessing? And if you
        don't know the true volume of this leak, how can you stop
        it?

        Former Senior Executive B: Well, Ann, since the very
        beginning we've said it's highly uncertain. And the two
        things we can do is we can watch what we observe on the
        sea floor and we can see what happens on the surface. And
        what we do know is when we get good weather and can
        apply all of our techniques, we can actually shrink this
        spill. We've actually done that. I think the number is
        probably reasonable. But I can tell you, actually, we're
        putting every resource against this problem. It isn't related
        to the amount coming out. We're actually applying
        everything we can. We've mounted the largest response
        effort ever done in the world.

        Q: But is it possible that you are actually leaking more
        than 5,000 barrels a day? Yes or no.

        Former Senior Executive B: I think, Ann, it could be
        higher or lower. I don't think it's wildly different than that
        number, but it could be – we've said since the beginning it
        could be a bit above or below.

        (Emphasis added.)

F.      At a Unified Command press briefing on May 17, 2010:

        Q: You said you're hoping that the riser tool could capture
        perhaps about half of the oil coming out, which I think you
        said is about 2,000 barrels. Does that mean you know –
        you're certain how much is actually leaking and that it is
        about that 5,000-barrel figure we used to hear before? Or, I
        mean, how do you know actually how much might be
        captured if you're not sure how much is actually coming
        out?

        Former Senior Executive B: Well, how we'll know how
        much is captured is, we can actually meter it on board the

                                    14

drill ships. So actually we can measure what's being
recovered up there. What we actually don't know is the
exact rate on the seabed. We've talked about this a great
many times. And that's our best estimate today. Clearly
people are constantly asking that question. But I think the
thing we always come back to is our response, the Unified
Command's response, BP's response to this event, is not
dependent upon what that flow rate is. We are responding
with everything we have to minimize the impact. And the
one thing we will know is the rate that - the amount of oil
that comes aboard the drill ship Enterprise that we actually
can measure.

(Emphasis added.)

G.    On ABC's "Good Morning America" of May 21, 2010:

Q: People have really had enough of this. You know,
initially, you were saying 5,000 barrels were leaking. Now
we can see for ourselves that it's far more than that. Could
be - approaching 100,000. Did you deliberately
underestimate the size of the spill and mislead the public?

Former Senior Executive B: Robin, you know, from the
beginning, we've, we, we've worked with the government
on this estimate. In fact, I should actually point out that the
5,000 barrels a day, which we've stated since the
beginning, obviously has a lot of uncertainty. That was not
just BP's estimate. That was the estimate of the unified
command, including NOAA and the Coast Guard. And
that's the best estimate we have. We can't put a meter on
this thing. We can see what you can see. We can see
what's on the surface. But what I can tell you it hasn't
impacted what we've done with our response. We've
thrown absolutely everything at that. And I think the Coast
Guard and others have actually said that.

(Emphasis added.)

H.    At a Unified Command press briefing on May 21, 2010:

Q:  . . . And then the second question is, if you don't know
the flow rate that's coming from the leak, then how do you
know how much material you need to use and at what
pressure and what rate you need to jam the well shut using
the top kill technique?

15

Former Senior Executive B: ... [W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times. <u>And we've said since quite early on in this that our best estimate was around 5,000 barrels a day but with a wide range.</u> And actually as we do design for top kill, that same assessment is what we're designing that (job ?) off of and the same assessment as what we designed the application of dispersants off of as well, subsea. <u>So at the moment, that's our best estimate,</u> but I would, once again, stress we've said this since the very beginning, there's a huge amount of uncertainty around that number and it could have a fairly wide range.

(Emphasis added.)

I.   On <u>NPR</u>'s "Weekend Edition" of May 22, 2010:

Q:  And how much oil is billowing into the Gulf right now?

Former Senior Executive B:  Well, Scott, I precisely don't know. We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others. We can monitor what comes out of that pipe, but that's visual. It's very difficult to measure that. There's no meter. But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at that difference. <u>And those are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do, but we've also stressed since the beginning that that number is very uncertain because we can't meter it.</u>

Q:  Now, you know there's independent scientists who've made their own estimates at NPR's request, and they've come up with a substantially higher figure than 5,000. They say as much as 70,000 barrels a day.

Former Senior Executive B: <u>I've heard those [70,000 barrels a day] estimates and seen them and I don't believe it's possible that it's anywhere near that number ... since I can't meter it, I can't actually say it couldn't be. But all of our techniques would say that that's highly unlikely.</u> And I

16

think some of the reasons these estimates may not be able to accurately calculate is there's a large volume of gas coming out of the end of that pipe with the oil. And in addition to that, we, particularly over the last few days, when we've had very good weather, we've actually seen the size of the spill and the amount of the oil on the surface go down. So those are the things that lead me to believe that those estimates are way too high.

Q: What I'm trying to understand is if, and I will split the difference, but let's say that it's 30,000 barrels a day that are spilling - if you try to top kill, as I guess it's called, seal the leak, cap it off, do you risk using a technique that could make the spill even worse?

Former Senior Executive B: No, I don't believe that's the case, Scott, and we don't think the rate's anywhere near that high.

(Emphasis added.)

## VI.  A Senior BP Engineer Raised Concerns to a Former Senior Executive About Standing by the 5,000 BOPD Estimate.

33.    A BP senior engineer who performed the work that resulted in the estimated range

of flow rates from 14,000 to 96,000 bopd set forth in paragraph 27.E., supra, shared his work

internally with senior executives, during the second week of May 2010. In the early morning

hours of May 15, 2010, the same senior engineer read an article on CNN.com in which BP

continued to assert publicly that the flow rate estimate was 5,000 bopd, despite a Purdue

University professor's estimate that the flow rate was 70,000 bopd. After reading the article, the

senior engineer wrote the following e-mail to a former senior executive within BP's Exploration

& Production business segment and a junior executive tasked to support him:

> I just read an article in CNN (May 14, 2010 1:00pm) stating that a
> researcher at Purdue believes that the Macondo well is leaking up
> to 70,000 bopd and that BP stands by a 5,000 bopd figure. With
> the data and knowledge we currently have available we cannot
> definitively state the oil rate from this well. We should be very
> cautious standing behind a 5,000 bopd figure as our modeling

17

> shows that this well could be making anything up to ~100,000
> bopd depending on a number of unknown variables, such as: flow
> path either through the annulus behind the production casing or
> through the production casing float shoe, the height of reservoir
> exposed, if drill pipe is suspended in the [blow out preventer] and
> sealed by [variable bore] rams, reservoir skin damage, choking
> effects and etcetera. We can make the case for 5,000 bopd only
> based on certain assumptions and in the absence of other
> information, such as a well test.

(Emphasis added.)

34.     This e-mail failed to spur a discussion regarding whether BP should update or

correct the disclosures in its three Reports on Form 6-K.

## VII. The Flow Rate Technical Group Publicly Released Its Final Estimate of Flow Rate at 52,700 to 62,200 Barrels of Oil Per Day, with the Total Oil Spilled As a Result of the Deepwater Horizon Disaster Being Approximately 4.9 Million Barrels.

35.     On or around May 19, 2010, the Flow Rate Technical Group ("FRTG"), a group

of scientists and engineers from federal agencies and universities charged with creating an

estimate of the oil flow from the Deepwater Horizon incident, was created.

36.     On May 27, 2010, the FRTG issued its first public report and statement, setting

forth flow rate estimates ranging from 11,000 bopd to 25,000 bopd.

37.     On June 10, 2010, the FRTG publicly released a second report, in which the flow

rate was estimated to be between 12,600 bopd and 40,000 bopd.

38.     Five days later, on June 15, 2010, the FRTG publicly released another report

estimating the flow rate to be between 35,000 bopd and 60,000 bopd.

39.     On August 2, 2010, the FRTG publicly released its final estimate of oil flow rate

and amount, concluding that the flow rate ranged from 52,700 bopd to 62,200 bopd during the

course of the leak and that approximately 4.9 million barrels of oil flowed from the well overall.

40.     BP ADS investors suffered substantial losses following BP's fraud.

18

## FIRST CLAIM FOR RELIEF
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

41. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 40, inclusive, as if they were fully set forth herein.

42. Defendant BP, by engaging in the conduct described above, with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above, knowingly or severely recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43. BP acted knowingly or severely recklessly in connection with the above-described acts and omissions with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above. BP knew, or was severely reckless in not knowing, that the above-mentioned filings with the Commission and statements to the public contained material misrepresentations and omissions.

44. By engaging in the foregoing conduct with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above, Defendant BP violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

19

## SECOND CLAIM FOR RELIEF
### Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-16 Thereunder

45.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 44, inclusive, as if they were fully set forth herein.

46.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-16 thereunder [17 C.F.R. § 240.13a-16] require, inter alia, a foreign private issuer to make certain periodic and other reports including Reports on Form 6-K. Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

47.     By engaging in the foregoing conduct with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above, Defendant BP violated, and unless enjoined and restrained will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20 & 240.13a-16].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant BP from violating Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-16];

**II.**

Ordering Defendant BP to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

**III.**

Ordering, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, as amended by Section 929B of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, that the amount of civil penalties against and paid by Defendant BP be added to and become part of a fund for the benefit of ADS holders at the time of the violations alleged in this complaint; and

**IV.**

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Daniel M. Hawke (D.C. Atty. Id. No. 424874)
Elaine C. Greenberg
Colleen K. Lynch
G. Jeffrey Boujoukos
Michael J. Rinaldi, T.A. (Pa. Atty. Id. No. 89693)
Brian P. Thomas
Matthew S. Raalf
Kelly L. Gibson
Michael F. McGraw

Attorneys for Plaintiff

Securities and Exchange Commission
701 Market St., Ste. 2000
Philadelphia, Pa. 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
RinaldiM@sec.gov

Dated: November _15_, 2012.

21

JS 44   (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| U.S. Securities and Exchange Commission | BP p.l.c. |

| (b) County of Residence of First Listed Plaintiff _____ *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   United Kingdom *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
|---|---|

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* <br> Daniel M. Hawke, Esquire <br> U.S. Securities and Exchange Commission <br> 701 Market Street, Suite 2000, Phila., PA 19106 (215) 597-3100 | Attorneys *(If Known)* <br> Howard M. Shapiro, Esq. <br> Wilmer Cutler Pickering Hale and Dorr LLP,   (202) 663-6606 <br> 1875 Pennsylvania Ave., N.W. Washington, D.C. 20006 |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury <br> ☐ 362 Personal Injury - Med. Malpractice <br><br> **PERSONAL INJURY** <br> ☐ 365 Personal Injury - Product Liability <br> ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br><br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 840 Trademark | ☐ 375 False Claims Act <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 490 Cable/Sat TV <br> ☒ 850 Securities/Commodities/ Exchange <br> ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts <br> ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information Act <br> ☐ 896 Arbitration |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ Accommodations <br> ☐ 445 Amer. w/Disabilities - Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☐ 448 Education | **PRISONER PETITIONS** <br> ☐ 510 Motions to Vacate Sentence <br> **Habeas Corpus:** <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br> ☐ 560 Civil Detainee - Conditions of Confinement | **LABOR** <br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act <br><br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) <br> ☐ 465 Other Immigration Actions | **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br><br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district *(specify)*   ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 78j(b) and 78m(a)
Brief description of cause:
Securities fraud

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: <br> JURY DEMAND:   ☐ Yes   ☒ No |
|---|---|---|---|

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE   Honorable Carl J. Barbier   DOCKET NUMBER   MDL-2179

DATE
November 15, 2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 09/11)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.  (a) Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.  Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdicti on arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.  Residence (citizenship) of Principal Parties. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.  Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.  Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause Do not cite jurisdictional statutes unless diversity.  Example:  U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

VII.  Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  Related Cases. This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

| | |
|---|---|
| Securities and Exchange Commission | ) |
| | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| BP p.l.c. | ) |
| | ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* BP p.l.c.
1 St. James's Square
London, United Kingdom

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Daniel M. Hawke, Esquire
Securities and Exchange Commission
701 Market Street, Suite 2000
Philadelphia, PA 19106

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                    *Server's signature*

                                    _____
                                    *Printed name and title*

                                    _____
                                    *Server's address*

Additional information regarding attempted service, etc: