UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| ALL CASES | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF PREVIOUSLY-WITHHELD DOCUMENTS PURSUANT TO THE CRIME-FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE

I.      INTRODUCTION ........................................................................................... - 1 -

II.     FACTUAL BACKGROUND ......................................................................... - 2 -

        A.      Procedural History ........................................................................ - 3 -

        B.      BP Provided False and Misleading Communications Regarding the Oil Spill
                from the Macondo Well ................................................................... - 5 -

                1.      BP Provided False and Misleading Information to Congress Regarding
                        the Oil Spill ......................................................................... - 5 -

                2.      BP Submitted the False and Misleading Rainey Memo to Federal
                        On-Scene Coordinator Admiral Mary Landry ................................... - 8 -

                3.      BP Submitted Materially Misleading Securities Filings Regarding the
                        Scope of the Oil Spill ............................................................. - 10 -

        C.      BP Admits – Indeed, Contends – that the Preparation of the False and
                Misleading Documents in Question Were Attorney-Directed Efforts ........ - 12 -

                1.      BP's Attorney-Directed Drafting Process ........................................ - 12 -

                2.      BP Attorneys and Representatives Continued to Directly Participate in
                        BP Flow Rate Work Leading Up to BP's June 25, 2010 Letter to
                        Congressman Markey .............................................................. - 14 -

III.    LEGAL STANDARD APPLICABLE TO THE CRIME-FRAUD EXCEPTION TO
        THE ATTORNEY-CLIENT PRIVILEGE ....................................................... - 15 -

        A.      Showing Necessary for Crime-Fraud Exception ................................... - 15 -

        B.      The Attorney Need Not Be Aware of the Crime or Fraud ...................... - 18 -

        C.      *In Camera* Review Is Not Required ................................................. - 18 -

IV.     THE CRIME-FRAUD EXCEPTION APPLIES TO COMMUNICATIONS
        BETWEEN BP AND ITS COUNSEL RELATED TO PREPARATION OF CERTAIN
        DOCUMENTS ........................................................................................... - 20 -

        A.      Documents Related to Preparation of BP's Communications with Congress in
                the Spring and Early Summer of 2010 ............................................. - 20 -

        B.      Documents Related to Preparation of BP's May 19, 2010 Email to Admiral
                Landry and its Attachments .......................................................... - 22 -

        C.      Documents Related to Preparation of BP's Forms 6-K Filed with the SEC - 23 -

V.      CONCLUSION .......................................................................................... - 24 -

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Chevron Corp. v. Salazar*, 275 F.R.D. 437 (S.D.N.Y. 2011) ............................ 17

*Chevron Corp. v. Weinberg Group*, No. 11-409 (JMF),
2011 WL 4056270 (D.D.C. Sept. 13, 2011) .......................................... 20

*Clark v. United States*, 289 U.S. 1 (1933) .................................... 1, 15, 18

*Coleman v. American Broadcasting Cos.*, 106 F.R.D. 201(D.D.C. 1985) ................. 17

*In re Grand Jury Proceedings*, 680 F.2d 1026 (5th Cir. 1982) ....................... 1, 18

*In re Grand Jury Proceedings*, 87 F.3d 377 (9th Cir. 1996) ........................... 18

*In re Grand Jury Subpoena*, 220 F.3d 406 (5th Cir. 2000) ...................... 16, 17, 20

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) .................... 16, 17, 18, 19

*In re Hunt*, 153 B.R. 445 (N.D. Tex. 1992) .......................................... 20

*In re Sealed Case*, 676 F.2d 793 (D.C.Cir. 1982) .................................... 17

*Madanes v. Madanes*, 199 F.R.D. 135 (S.D.N.Y. 2001) ............................... 17

*Moody v. I.R.S.*, 654 F.2d 795 (D.C. Cir. 1981) ..................................... 17

*Rambus, Inc. v. Infineon Techonologies AG*, 222 F.R.D. 280 (E.D.Va. 2004) ............. 15

*Speciality Minerals, Inc. v. Pleuss-Stauffer AG*,
No. 98 Civ. 7775, 2004 WL 42280 (S.D.N.Y. Jan. 7, 2004) ........................... 17

*United States v. Ballard*, 779 F.2d 287 (5th Cir. 1987) ........................... 16, 18

*United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983) ................................. 16

*United States v. Friedman*, 445 F.2d 1076 (9th Cir. 1971) ............................ 18

*United States v. Hodge and Zweig*, 548 F.2d 1347 (9th Cir. 1977) ..................... 18

*United States v. Kaplan*, No. 02 CR 883 (DAB),
   2003 WL 22880914 (S.D. N.Y. Dec. 5, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Neal*, 27 F.3d 1035 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Zolin*, 491 U.S. 554 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19, 20, 21


## FEDERAL STATUTES

18 U.S.C. § 1505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

33 U.S.C. § 1321(b)(7)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3


## FEDERAL REGULATIONS

17 C.F.R. § 202.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17 C.F.R. § 202.5(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


## FEDERAL RULES

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


## OTHER AUTHORITIES

Deborah F. Buckman, Annotation, *Crime-Fraud Exception to Work Product*
   *Privilege in Federal Courts*, 178 A.L.R. FED. 87 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF EXHIBITS

Ex. #   Description

1   BP Letter to Judge Shushan, dated July 19, 2012, Re: United States Challenges to Schedule I Privilege Documents; Order Regarding *In Camera* Inspection of BP's Claimed Privilege in Schedule I [Rec. Doc. 7009].

2   Excerpts of Deposition of Robert Sanders, dated November 5, 2012.

3   Excerpts of Deposition of Admiral Thad William Allen, dated September 25, 2012.

4   Excerpts of  Deposition of Simon Bishop, dated September 27-28, 2012.

5   Excerpts of  Deposition of Trevor J. Hill, dated January 14-15, 2013.

6   Information for Seaman's Manslaughter, Clean Water Act, Migratory Bird Treaty Act and Obstruction of Congress in *United States v. BP Exploration and Production, Inc.*, No. 2:12-cr-00292-SSV-DEK [filed 11/15/2012, Doc. 1].

7   Proposed Plea Agreement and Factual Basis in *United States v. BP Exploration and Production, Inc.*, No. 2:12-cr-00292-SSV-DEK [Doc. 2].

8   Excepts of Deposition of David Rainey, dated June 2, 2011.

9   Email dated May 19, 2010 from COO Suttles to Admirals Landry & Allen attaching Rainey Memo (Dep. Ex. 3218) (BP-HZN-2179MDL01446217-01446230) [*Confidential*].

10   Letter from BP to Congressman Markey, dated May 24, 2010 (HCG042-004845).

11   BP June 25, 2012 Letter to Congressman Markey.

12   Letter from Mary Landry, U.S. Coast Guard, to Doug Suttles, BP, dated May 17, 2010 (HCG042-004845).

13   Complaint in *Securities and Exchange Commission v. BP p.l.c.*, No. 2:12-cv-02774 [filed 11/15/2012, Doc. 1].

14   Proposed Consent Judgment in *Securities and Exchange Commission v. BP p.l.c.*, No. 2:12-cv-02774 [Doc. 2].

15   BP Letter from Robert Gasaway to Sarah Himmelhoch re "Meet and Confer on the Court's Order Regarding BP's Rule 30(b)(6) Witnesses", dated January 11, 2013.

16    BP Letter to Judge Shushan Re: BP's Limited Motion for Reconsideration on the Court's
      January 2, 2013 Order Regarding BP Rule 30(b)(6) Witnesses, dated January 18, 2013
      (Rec. Doc. 8149) [Rec. Doc. 8330].

17    May 22, 2010 email from Jeffrey Morgheim, BP, to Trevor Hill, BP, Re: "Urgent:
      Request for Documents," attaching Congressman Markey's May 14, 2010 information
      request to BP (BP-HZN-2179MDL04820728-0732) [*Confidential*].

18    Eng Team Organagram (Dep. Ex. 11188) [*Confidential*].

19    Email dated May 22, 2010 from Hill to Haden and others, Subject: Flowrate estimation
      (Dep. Ex. 11212) (BP-HZN-2179MDL00985574-00985590) [*Confidential*].

20    June 4, 2010 email from Doug Wood to Mr. Easley, Mr. Haden, Ms. Benko, cc: Hill re
      "Change in Plume Volume (End of Riser Versus Top of BOP)" (Dep. Ex. 3225) (BP-
      HZN-2179MDL01831936-01831937).

21    Email dated June 6, 2012, from Haden to Benko and others, Subject: Re: Crater Riser
      End Section exposed (Dep. Ex. 11187) (BP-HZN-2179MDL04864491-04864492)
      [*Confidential*].

## I.     INTRODUCTION

BP pled guilty to the crime of obstructing justice by providing false and misleading flow rate information to the federal government during the oil spill response.    BP affirmatively represented in multiple filings in this Court that its attorneys were not only intimately involved in the communications that led to its felony guilty plea, but that those communications were "handled," "directed," and a "lawyer-directed effort . . . in a collaborative process . . . involving both in-house and external lawyers, along with appropriate BP personnel."    July 19, 2012 Letter from R. Gasaway to Judge Shushan, Dkt. No. 7009 (Ex. 1) ("July 19, 2012 Letter") at 5.    Under blackletter law, BP's use of attorneys to aid in its wrongdoing destroys any privilege for communications related to the criminal or fraudulent activity.    This bedrock principle of privilege law is known as the crime-fraud exception to the attorney-client privilege.    As the Supreme Court has explained, "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. *He must let the truth be told*." *Clark v. United States*, 289 U.S. 1, 15 (1933) (emphasis added).    The exception applies whether the attorneys had knowledge of the crime or not.    *See e.g., In re Grand Jury Proceedings, 680 F.2d 1026, 1028* (5th Cir. 1982) ("The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose.").

Based on its own admissions in settling criminal and securities charges, BP misled Congress, oil spill responders, shareholders, and the public by presenting flow rate numbers that the company knew were too low.    For instance, BP insisted to United States officials and the public that the flow rate from the well was only 5,000 barrels of oil per day ("BOPD") – while knowing full well that the flow rate was much more, and could be close to 100,000 BOPD.    In doing so, BP used "a process organized and directed by lawyers."    July 19, 2012 Letter (Ex. 1) at 5.    BP used its attorneys in preparing: (1) fraudulent communications to Congress on May 4,

- 1 -

2010 and fraudulent letters to Congressman Markey dated May 24 and June 25, 2010; (2) a fraudulent statement to Federal On-Scene Coordinator Admiral Mary Landry on May 19, 2010; and (3) fraudulent securities statements on April 29 and 30 and May 4, 2010.   Later, in this civil action, BP withheld an unknown, unlogged, number of documents related to these fraudulent communications based on assertion of the attorney-client privilege.

The United States moves for disclosure of all documents related to the preparation of BP's fraudulent statements and representations to United States government officials, BP's shareholders, and the public regarding the flow rate, notwithstanding BP's claims of privilege. Specifically, the United States seeks disclosure of all documents related to preparation of (1) fraudulent communications to Congress on May 4, 2010 and fraudulent letters to Congressman Markey dated May 24 and June 25, 2010; (2) a fraudulent statement to Federal On-Scene Coordinator Admiral Mary Landry on May 19, 2010; and (3) fraudulent securities statements on April 29 and 30 and May 4, 2010.   Because BP has now admitted that it endeavored to influence, obstruct, and impede a Congressional investigation, and long ago admitted that these responses were crafted through a process organized and directed by lawyers, these documents must be disclosed.   Any discussions by BP about flow rate are highly relevant to the issues in play in Phase 2, including BP's understanding of the flow and its impact on source control decisions.

## II.   FACTUAL BACKGROUND

On the evening of April 20, 2010, a blowout, explosions, and fire occurred on the deepwater drilling rig *Deepwater Horizon*, situated in the Gulf of Mexico in approximately 5,000 feet of water above the wellhead of the Macondo well.   The disaster resulted in the deaths of eleven men, scores of personal injuries, and economic and environmental devastation across the Gulf of Mexico and a swath of Gulf Coast States.

For the next 87 days, hydrocarbons gushed uncontrolled from BP's Macondo well into the Gulf. Under the supervision of the Federal On-Scene Coordinator, BP engaged in a number of unsuccessful attempts to "shut in" the well and/or to collect a portion of the hydrocarbons. Most of those "source control" and collection attempts were dependent in part or in whole on the flow rate from the well. *See* Robert Sanders Deposition (Ex. 2) at 127:20-128:3, 212:10-213:1; Thad Allen Deposition (Ex. 3) at 514:16-516:22; Simon Bishop Deposition (Ex. 4) at 230:6-12, 242:25-243:9, 486:5-10, 488:24-489:7; Trevor Hill Deposition (Ex. 5) at 293:17-294:12.

The United States oversaw BP's efforts to arrest the flow of hydrocarbons from the Macondo Well. As part of that effort, the United States needed truthful and accurate information regarding quantification of the oil spill and the flow rate of the hydrocarbons.

As was known to BP and its counsel at the outset of the oil spill, substantial civil penalties can be assessed under the Clean Water Act on a per barrel basis for oil discharged in the Gulf of Mexico in connection with activities under the Outer Continental Shelf Lands Act. 33 U.S.C. § 1321(b)(7)(D).[1]

## A.   Procedural History

Acceptance of BP's Guilty Plea by the Court in its criminal case makes this motion ripe, as does BP's January 18, 2013 admission that the Plea is admissible as evidence in the MDL civil action. Dkt. No. 8296-1.[2] In a prior privilege ruling, the Court held that the work product protection is not applicable to the preparation of documents in response to questions from Congress. *See* July 13, 2012 Order, Dkt. No. 6904 at 24-27. The Court also reviewed sets of exemplar privilege claims *in camera* in June and July, 2012, and found that attorney-client privilege could apply to certain documents related to responses to Congress. *See* Dkt. No.

---

[1] By way of example, penalties of up to $4,300 per barrel of oil can be assessed in the event BP is found grossly negligent or to have exercised willful misconduct. Thus, for each additional 5,000 barrels discharged per day, the company could face an additional $21.5 million in penalties, every day of the spill.

[2] As BP noted in Rec. Doc. 8296-1 at fn. 1, the Plea Agreement was subject to court approval. Had the Court not approved the Plea, BP had the right to withdraw it.

7012.   However, those rulings predated BP's criminal plea and a Consent executed by BP resolving claims filed by the Securities and Exchange Commission ("SEC") related to public filings (both filed November 15, 2012) and the acceptance of the criminal plea by the Court (January 29, 2013).

As described below, BP's criminal plea and the Consent in the civil case brought by the SEC establish that certain communications by BP were criminal and/or fraudulent.   As also described below, the use of legal advice in the commission of a future wrong nullifies the attorney-client privilege – regardless of whether the attorney was aware of any improper endeavor.   Now that BP's criminal plea agreement has been accepted by the Court in the criminal case, *United States v. BP Exploration and Production, Inc.*, Criminal Case 2:12-cr-00292-SSV-DEK (E.D. La.), the matter is fully ripe for the application of the crime-fraud doctrine in this case.

The documents at issue in this motion to compel include some documents at issue in the prior ruling and also some documents not previously considered by this Court.   This motion seeks to compel production of all documents related to preparation of specified communications by BP and withheld on a privilege claim including:

- Documents previously addressed by the Court in Dkt. 6904 and 7012,

- Documents on privilege logs (including those placed on the privilege log prior to the Court's rulings and those subsequently added) but not previously addressed by the Court; and

- Documents not required to be logged under PTO 14.

Given both the non-specific descriptions used in BP's privilege logs and the fact that not all responsive documents were required to be logged, it is not possible for the United States to provide a specified list of all documents subject to this motion to compel.

B.   **BP Provided False and Misleading Communications Regarding the Oil Spill from the Macondo Well**

BP received numerous requests from various offices of the United States' government, up to and including the United States Congress, for information regarding quantification and flow rate of the hydrocarbons released during the oil spill, including BP's internal communications. BP also provided information on that subject in public filings with the Securities and Exchange Commission ("SEC").

1.   **BP Provided False and Misleading Information to Congress Regarding the Oil Spill**

BP's communications with Congress are detailed in the Criminal Information and Guilty Plea Agreement filed by the United States on November 15, 2012.   *United States v. BP Exploration and Production, Inc.*, Criminal Case 2:12-cr-00292-SSV-DEK (E.D. La.) Dkt. No. 1 (Ex. 6) ("Criminal Information"); Dkt. No. 2 (Ex. 7) ("Guilty Plea Agreement").   Among other charges, the United States alleged that BP violated 18 U.S.C. § 1505 by obstructing an inquiry and investigation by the House Subcommittee on Energy and Environment ("the Subcommittee"), a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress.   Criminal Information (Ex. 6) ¶¶ 76-77.

As alleged in the Criminal Information, BP informed the Subcommittee on May 4, 2010 that 5,000 BOPD was the most accurate flow rate estimate.   *Id.* ¶ 46.   The then-Chairman of the Subcommittee ("the Subcommittee Chairman") responded with a letter on May 14, 2010 accusing BP of understating the amount of oil leaking from the well and posing fifteen questions relating to flow rate.   *Id.* ¶ 47.   On May 17, 2010, at the request of BP counsel, former BP vice president David Rainey prepared a memorandum purporting to summarize the efforts that had been undertaken within the Unified Command to estimate flow rate (the "Rainey Memo").   *Id.* ¶ 42; *see* Deposition of David Rainey (Ex. 8) at 182:4-184:15; May 19, 2010 D. Suttles Email to

Admiral Landry, Dep. Ex. 3218 (Ex. 9) ("May 19, 2010 Email").   BP submitted a response to
the Subcomittee on May 24, 2010 and included the Rainey Memo as an attachment.   *See* May
24, 2010 Letter from R. Bailey to Congressman Markey, Dep. Ex. 1651 (Ex. 10) ("May 24, 2010
Letter").

BP provided a further response to Congressman Markey on June 25, 2010.   June 25,
2010 Letter from D. Nagle to Congressman Markey ("June 25, 2010 Letter") (Ex. 11).   As set
forth in the June 25, 2010 Letter, the letter addressed an apparent discrepancy between
information related to the worst case discharge ("WCD") from the well provided by BP in a
briefing to the Subcommittee on May 4, 2010 (that the WCD was 60,000 BOPD) and statements
in the Rainey Memo (that the WCD was 100,000 BOPD).   The June 25, 2010 Letter attributed
the discrepancy to new information based on "pressure data … obtained from the BOP stack."
*Id.*

On November 15, 2012, the United States filed a proposed plea agreement and factual
basis.   Guilty Plea Agreement (Ex. 7).   That plea agreement was approved by Judge Vance on
January 29, 2013.   In Exhibit A to the "Guilty Plea Agreement" included in that filing, BP
"*agrees* that if the case were to proceed to trial, *the Government could establish beyond a
reasonable doubt*" (emphasis added) specified facts including the following:

> On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP
> did corruptly, that is, with an improper purpose, endeavor to influence, obstruct,
> and impede the due and proper exercise of the power of inquiry under which an
> inquiry and investigation was being had by a Committee of the United States
> House of Representatives into the amount of oil flowing from the Macondo Well
> ("flow rate") through the following omissions and false and misleading statements
> in its May 24, 2010 response ("Markey Response") to the Committee on Energy
> and Commerce:
>
> 1.    BP, through a former vice president, withheld information and documents
>        relating to multiple flow-rate estimates prepared by BP engineers that
>        showed flow rates far higher than 5,000 BOPD, including as high as
>        96,000 BOPD

2.  BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3.  BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.   At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4.  BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.   At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5.  BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."   In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6.  On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."   At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

Guilty Plea Agreement (Ex. 7) at 16-18.   BP admitted that Mr. Rainey's knowledge and actions are attributable to the company.   *Id.* at 18.   Counsel for BP signed the Guilty Plea Agreement.   *Id.* at 12.

In summary, the United States' criminal charges related to communications from BP to Congress dated May 4, 2010, May 24, 2010, and June 25, 2010.   As part of the Guilty Plea

Agreement, BP agreed that if the case were to proceed to trial, the Government could establish beyond a reasonable doubt that BP "withheld information and documents relating to multiple flow rate estimates prepared by BP engineers" and that BP "falsely represented" various information regarding the flow rate from the Macondo Well.

### 2. BP Submitted the False and Misleading Rainey Memo to Federal On-Scene Coordinator Admiral Mary Landry

By letter dated May 17, 2010, then-Rear Admiral Mary Landry, the Federal On-Scene Coordinator ("FOSC") for the Macondo oil spill appealed to Doug Suttles, BP America Inc.'s Chief Operating Officer and BP's representative to the Unified Command, to provide the Unified Command with "full access to all information related to the oil discharge rate as soon as possible," in order to "help us continue to hone our efforts to respond most effectively to the spill and to mitigate the ongoing threat to our environment and coastal communities." *See* May 17, 2010 Letter from Admiral Landry to D. Suttles (Ex. 12).   Redacted by BP Request

May 19, 2010 Email (Ex. 9).   Redacted by BP Request

*Id.*

The Rainey Memo submitted to Admirals Landry and Allen was also attached by BP to its May 24, 2010 letter to Congress.   As discussed above, the Rainey Memo was prepared by BP Vice-President Rainey on or about May 17, 2010.   *See* May 24, 2010 Letter (Ex. 10).   The Rainey Memo contained many of the statements which BP agreed in Exhibit A to the Guilty Plea Agreement that the United States could prove beyond a reasonable doubt were false and misleading.   Specifically, in the Rainey Memo, BP:

- 8 -

        a.    <u>Omitted Mr. Rainey's Bonn estimates, which were significantly higher than 5,000 BOPD.</u>  As set forth in the Criminal Information, BP, through Mr. Rainey, used a method known as the "Bonn method" to estimate volume of the oil spill in late April 2010 and, pursuant to this method produced "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD.  Criminal Information (Ex. 6) ¶¶ 31-32.  In the Guilty Plea Agreement, BP agreed that the United States could establish beyond a reasonable doubt that in the May 24, 2010 Letter BP, through Mr. Rainey, "withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis."  Guilty Plea Agreement (Ex. 7) at 16, ¶ 2.  Since the Rainey Memo was an attachment to the May 24, 2010 letter to Congress, the Guilty Plea Agreement establishes that the flow rate estimates prepared using the Bonn Agreement analysis are omitted from the Rainey Memo.

        b.    <u>Falsely labeled the estimates in the memorandum as "ASTM" calculations.</u>  In the Guilty Plea Agreement, BP agreed that the United States could establish beyond a reasonable doubt that in the May 24, 2010 letter BP, through Mr. Rainey, "falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology."  *Id.* at 17, ¶ 3.  Indeed, the Rainey Memo was attached to the May 24, 2010 Letter to Congress and the estimates attached to the Rainey Memo all had a heading which stated "Using 'Standard Guide for Visually Estimating Oil Spill Thickness on Water, ASTM F 2534 – 06.'" May 24, 2010 Letter (Ex. 10) at BP-HZN-CEC020095-99; *see also* Rainey Depo. (Ex. 8) at 145:20-149:4 (Mr. Rainey confirms that the heading misrepresented the method used at 148:13- 149:19).  Redacted by BP Request

[REDACTED] May 19, 2010 Email (Ex. 9) at BP-HZN-2179MDL01446223-01446227.

        c.    <u>Omitted other documents related to flow rate estimates that contradicted</u>

<u>BP's 5,000 BOPD estimate, including work by other BP engineers.</u>   In the Guilty Plea

Agreement, BP agreed that the United States could establish beyond a reasonable doubt that in the

May 24, 2010 Letter BP, through Mr. Rainey:

> withheld information and documents relating to multiple flow-rate estimates
> prepared by BP engineers that showed flow rates far higher than 5,000 BOPD[.]

Guilty Plea Agreement (Ex. 7) at 16, ¶ 1.   Since the Rainey Memo was an attachment to the May

24, 2010 letter to Congress, the Guilty Plea Agreement establishes that the flow rate estimates

prepared by BP engineers are omitted from the Rainey Memo.

        d.    <u>Falsely stated that Mr. Rainey's estimates ranging from 5,000 to 6,000</u>

<u>BOPD "played an important part in Unified Command's decision [on April 28, 2010] to raise the</u>

<u>estimate of flow rate from 1,000-5,000 barrels per day."</u>   In the Guilty Plea Agreement, BP agreed

that the United States could establish beyond a reasonable doubt that in the May 24, 2010 letter

"BP, through a former vice president, falsely represented that the flow-rate estimates included in

the Markey Response had played 'an important part' in Unified Command's decision on

April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD."   *Id.* at 17, ¶ 4.   In the

May 24, 2010 letter to Congress, that statement is found in the attached Rainey Memo.   *See* May

24, 2010 Letter (Ex. 10) at BP-HZN-CEC020103.   <span style="background:black;color:white">Redacted by BP Request</span>

<span style="background:black;color:white"> </span>   May 19, 2010 Email (Ex. 9) at

BP-HZN-2179MDL01446220.

        **3.**    **BP Submitted Materially Misleading Securities Filings Regarding the Scope of the Oil Spill**

On or about October 3, 2012, BP p.l.c., of which BP, the Defendant in this action, is a

wholly owned subsidiary, entered into a "Consent" regarding a civil action brought by the SEC.

In its Complaint, the SEC alleged that BP p.l.c. made at least three materially misleading public

filings in violation of the Exchange Act and its implementing regulations. *Securities and Exchange Commission v. BP p.l.c.*, Civil Action No. 2:12-cv-02774 (E.D. La.), Complaint, Dkt. No. 1 (Ex. 13) ("SEC Complaint"). Specifically, the SEC complaint alleges:

> Following the discovery that oil was spilling into the Gulf of Mexico, BP [p.l.c.] materially misrepresented and understated the estimated range of flow rate of oil leaking from the well in three public filings furnished to the Commission. BP [p.l.c.] also omitted material information from these three public filings regarding its own internal data, estimates, and calculations indicating that the flow rate estimate contained in these filings was unjustifiably low. BP [p.l.c.] made these material misrepresentations and omissions in, inter alia, its Reports on Form 6-K furnished to the Commission on April 29 and 30 and May 4, 2010. In these Reports on Form 6-K, BP [p.l.c.] stated that the flow rate estimates were "up to 5,000 bopd" or that 5,000 bopd was the current estimate, despite higher internal data, estimates, and calculations. At all relevant times, BP [p.l.c.] knew or was severely reckless in not knowing that it was making these material misrepresentations and omissions to investors.

*Id.* ¶ 5.

The Consent, which is signed by BP p.l.c.'s counsel, includes an explicit agreement by BP p.l.c. not to deny the allegations in the SEC's Complaint:

> Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceeding." 17 C.F.R. § 202.5 In compliance with this policy, Defendant acknowledges the guilty plea for related criminal conduct described in paragraph 2 above [referencing BP Exploration & Production, Inc.'s plea agreement in Criminal Case 2:12-cr-00292-SSV-DEK (E.D. La.)], and *agrees . . . not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint* or creating the impression that the complaint is without factual basis . . . .

*Securities and Exchange Commission v. BP p.l.c.*, Civil Action No. 2:12-cv-02774 (E.D. La.), Dkt. No. 2-1 (Ex. 14) at ¶ 13 ("SEC Consent") (emphasis added).[3]

---

[3] Regulations at 17 C.F.R. § 202.5(e) provide:

> The Commission has adopted the policy that in any civil lawsuit brought by it or in any administrative proceeding of an accusatory nature pending before it, it is important to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur. Accordingly, it hereby announces its policy not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings.

In summary, Defendant BP's corporate parent, BP p.l.c., executed a Consent in which it agreed not to deny, directly or indirectly, the SEC's allegations in the complaint.    The complaint includes the allegation that BP p.l.c. made "material misrepresentations and omissions in, inter alia, its Reports on Form 6-K furnished to the Commission on April 29 and 30 and May 4, 2010."

C.    **BP Admits – Indeed, Contends – that the Preparation of the False and Misleading Documents in Question Were Attorney-Directed Efforts**

BP has previously explained that the statements giving rise to its guilty plea were the product of an attorney-directed process, and has withheld communications with attorneys and at the direction of attorneys on the basis of privilege in this litigation.

1.    **BP's Attorney-Directed Drafting Process**

BP has repeatedly argued that communications with counsel and counsel-representatives related to BP's congressional responses are protected by the attorney-client privilege.    BP claims that the entire drafting process is privileged.    For example in a recent letter regarding BP's failure to present a 30(b)(6) witness to testify regarding the May 24, 2010 Markey Response, BP contended:

> During our discussion we reiterated that this drafting process is privileged. Indeed, the Court has recognized and upheld this privilege in the context of the United States' challenges to specific documents on BP's privilege logs.    (*See* July 30, 2012 Order, Rec. Doc. 7012.)

January 11, 2013 Letter from R. Gasaway to S. Himmelhoch (Ex. 15) at 2.

BP made the same point to the Court in a recent pleading:

But as BP has explained to the United States, and as the Court has previously recognized, this drafting process is privileged. As the Court knows, the United States and BP each submitted extensive briefing this summer as part of the Schedule 1 privilege challenges process on documents related to the drafting of BP's response to Congressman Markey. (*See* Rec. Docs. 7009 to 7011.) As part of this briefing, BP's July 19, 2012 submission explained as follows:

> Congressional requests received by the company in this time period *were handled through a process organized and directed by lawyers*

> in which information was gathered from personnel within the company. *Congressional responses were then drafted in a collaborative process led by WilmerHale and involving both in-house and external lawyers along with appropriate BP personnel.* Although not every communication regarding the effort to collect information and to respond to requests involved the direct participation of an attorney, *the overall process was a lawyer-directed effort seeking to ensure that BP received appropriate legal advice with respect to the requests and the company's responses.*

January 18, 2013 Letter from R. Gasaway to Judge Shushan, Dkt. No. 8830 (Ex. 16) at 5-6

(emphasis added).

The available record confirms what BP told the Court:   BP counsel and their

representatives were intimately involved in flow rate issues, including the preparation of BP's

Congressional responses.[4]   Redacted by BP Request

May 22, 2010 Email from Jeffrey Morgheim to Trevor Hill (Ex. 17).

*See*

May 30, 2010 Organization Chart, Dep. Ex. 11188 (Ex. 18).

Also on May 22, 2010, Mr. Hill met with Steven Haden, another BP employee assisting

BP counsel.   Hill Depo. (Ex. 5) at 622:23:624:8.   Following their meeting, Mr. Hill provided

Mr. Haden with flow rate calculations Mr. Hill had prepared based on the work of Professor

Steve Wereley.   *See id.* at 622:23-624:8; 531:8-537:9; May 22, 2010 Email from T. Hill to S.

Haden, et al., Dep. Ex. 11212 (Ex. 19).   Later, on May 22, 2010, Mr. Hill met in person with

BP attorney representatives Brittany Benko, Jeffrey Morgheim, and possibly Steven Haden to

---

[4] Because PTO 14 does not require parties to log privileged communications on which an attorney appears, we do not have a full understanding of the volume of documents related to the preparation of the false and misleading flow rate statements.   Nor can we comprehensively identify the lawyers who were involved in such efforts.   The discussion in the text serves merely to illustrate the attorney involvement in developing those statements.

assist in preparing BP's response to Congressman Markey's request.   Hill Depo. (Ex. 5) at 310:3-318:3; 170:18-171:7.

After the May 22 meeting regarding the Markey request, Mr. Hill prepared a "privileged" memo on flow rate for Ms. Benko and Mr. Morgheim.   *See id.* at 315:8-17; 316:15-317:1.   Mr. Hill also provided them with an "informal" list of documents related to flow rate.   *See id.* at 317:11-318:3.   During Mr. Hill's deposition on January 15, 2013, BP counsel (along with Mr. Hill's personal counsel) instructed Mr. Hill not to answer questions regarding the communications among Mr. Hill, Ms. Benko, and Mr. Morgheim during the May 22, 2010 meeting and the contents of the "privileged" memo.[5]

### 2.   BP Attorneys and Representatives Continued to Directly Participate in BP Flow Rate Work Leading Up to BP's June 25, 2010 Letter to Congressman Markey

Communications and legal advice between BP and its attorneys on the subject of flow rate continued after the May 24, 2010 Letter was submitted to Congress and were relied on by BP when preparing the June 25, 2010 Letter to Congress.   Examples of such communications that have come to light through discovery are described below, although, for the reasons described in Section A above, this is not a comprehensive list of all communications related to preparation of the June 25, 2010 Letter.

Some of Mr. Hill's flow rate correspondence with Ms. Benko and Mr. Haden also included Max Easley who had been deputized for Mr. Rainey, author of the false and misleading "Rainey Memo."   *Id.* at 167:2-169:11; June 4, 2010 Email from D. Wood, Dep. Ex. 3225 (Ex. 20).   Throughout the response to the Macondo blowout, to the best of our knowledge, the same

---

[5] As of early May 2010, Mr. Hill no longer considered 5,000 bpd to be the best estimate of flow rate.   Hill Depo. at 394:2-7.   Mr. Hill had come up with his own estimate of 20,000-25,000 bpd.   *See id.* at 394:8-21.   Later in May 2010, Mr. Hill revised that estimate to 15,000-20,000 bpd and communicated that estimate to Paul Tooms on or about May 14 or 15, 2010.   *See id.* at 424:19-426:13.   Presumably, Mr. Hill shared these estimates with BP attorneys and attorney-agents in preparing BP's response to Congressman Markey's information request.   These estimates were not included in BP's responses to Congressman Markey's information requests.

BP attorney representatives who had facilitated the preparation of the false and misleading

May 24, 2010 Letter that included the Rainey Memo continued to engage Mr. Hill on flow rate.



Dep. Ex. 11187 (Ex. 21). Redacted by BP Request

*Id.*

     The specific documents and individuals identified in this section are merely examples.

As explained above in Section II.A (Procedural History), the United States is not in a position to

identify all of relevant communications, documents, lawyers, and laypersons involved.   Thus,

there may have been many other individuals involved.

## III.   LEGAL STANDARD APPLICABLE TO THE CRIME-FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE

### A.   <u>Showing Necessary for Crime-Fraud Exception</u>

     The crime-fraud exception is a "generally recognized exception" to the attorney-client

privilege.   *United States v. Zolin*, 491 U.S. 554, 556 (1989).[6]   Once established, the

crime-fraud exception renders communications that otherwise were privileged subject to

disclosure – "the privilege takes flight if the relation is abused."   *Clark v. United States*, 289

U.S. 1, 15 (1933).   As the Court noted in *Zolin*, "courts long have viewed [the attorney-client

privilege's] central concern as one to encourage full and frank communication between attorneys

and their clients and thereby promote broader public interests in the observance of law and

administration of justice."   491 U.S. at 562 (internal quotes and citations omitted).   This

---

[6] Although generally referred to as an "exception" to attorney-client privilege and work product doctrine, the crime-fraud exception is not truly an "exception."   Instead, it is an *exclusion* of activity from the protective reach of the privilege given that the attorney-client privilege does not attach *in the first instance* if the legal services are sought for the purpose of committing or furthering a crime or a tort.   *See, e.g., Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 280, 287 (E.D. Va. 2004).   Nevertheless, because most cases use the term "crime-fraud exception," we use that term here.

rationale applies to clients making "full disclosure to their attorneys of *past* wrongdoings."   *Id.*
(emphasis added, internal quotes and citations omitted).   However, the reason for the protection
of attorney-client communications "ceas[es] to operate at a certain point, namely, where the
desired advice refers not to *prior* wrongdoing, but to *future* wrongdoing."   *Id.* at 562-63
(emphasis added, internal quotes and citations omitted).   Where the attorney-client privilege
communication relates to "future wrongdoing" the privilege is destroyed.   *See, e.g., United
States v. Ballard*, 779 F.2d 287, 292-293 (5th Cir. 1987) ("Once the party seeking disclosure
makes a *prima facie* case that the attorney-client relationship was used to promote an intended
criminal activity, the confidences within the relationship are no longer shielded.").

      Consistent with the principles outlined in *Zolin*, the Fifth Circuit has stated that the
assertion of the attorney-client privilege "can be overcome by the crime-fraud exception where
communication or work product is intended 'to further continuing or future criminal or
fraudulent activity.'"[7]   *In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (quoting
*United States v. Dyer*, 722 F.2d 174, 177 (5th Cir. 1983)).   As the proponent of the crime-fraud
exception, "[t]he proponent has the burden of establishing a *prima facie* case that the
attorney-client relationship was intended to further criminal or fraudulent activity."   *In re
Grand Jury Subpoena*, 220 at 410 (affirming application of the crime-fraud exception where the
government "made out a *prima facie* case of crime or fraud . . . .").   In order to "make the
necessary *prima facie* showing for the application of the crime-fraud exception . . . , the
government must produce evidence such as will suffice until contradicted and overcome by other
evidence . . . a case which has proceeded upon sufficient proof to that stage where it will support
[a] finding if evidence to the contrary is disregarded."   *In re Grand Jury Subpoena*, 419 F.3d

---

[7]While not relevant here, the crime-fraud exception also applies to the work product privilege.   *In re Grand Jury
Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005) ("The work product privilege is subject to the same crime-fraud
exception.").

329, 336 (5th Cir. 2005) (upholding application of the crime-fraud exception where, based on "the government's submitted affidavits and exhibits and the in camera examination of [attorney], the district court found that the government had made a *prima facie* showing . . . .").

While application of the crime-fraud exception does not abolish the application of the attorney-client privilege for *all* documents in a case, the Fifth Circuit has made it plain that the exception applies broadly to communications related to the crime or fraud:

> [T]he proper scope of the crime-fraud exception must necessarily be limited to those attorney-client communications and work products *reasonably related to the furtherance of the ongoing or future crime or fraud* at issue.

*In re Grand Jury Subpoena*, 419 F.3d at 347 (5th Cir. 2005) (emphasis added).

The communications need not facilitate a crime *per se* in order to be subject the crime-fraud exception. The exception applies to the facilitation of "wrongdoing" that is "not specifically criminal or fraudulent." Deborah F. Buckman, Annotation, Crime-Fraud Exception Work Product Privilege in Federal Courts, 178 A.L.R. FED. 87, §2[a] (2002). The exception can include "crime, fraud, or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system," *Coleman v. American Broadcasting Cos.*, 106 F.R.D. 201, 208 (D.D.C. 1985) (quoting *In re Sealed Case*, 676 F.2d 793, 812 (D.C. Cir. 1982)), such as professional misconduct, 178 A.L.R. 87, p. 12; *Moody v. I.R.S.*, 654 F.2d 795 (D.C. Cir. 1981), and tortious conduct that "undermines the adversary system itself." *Madanes v. Madanes*, 199 F.R.D. 135, 149 (S.D.N.Y. 2001) (civil RICO action alleging plaintiff's brothers defrauded her of her share of family's assets); *Chevron v. Salazar*, 275 F.R.D. 437, 452-453 (S.D.N.Y. 2011) ("There is no question that the crime-fraud exception embraces common law fraud . . . [and] there is a large body of caselaw that recognizes its applicability even to non-fraud intentional torts.") (quoting *Specialty Minerals, Inc. v. Pleuss-Stauffer AG*, No. 98 Civ. 7775, 2004 WL 42280, at *9 (S.D.N.Y. Jan. 7, 2004)).

## B.     The Attorney Need Not Be Aware of the Crime or Fraud

No showing that the attorney was aware of the client's intentions is required.    "The

crime or fraud exception applies even where the attorney is completely unaware that his advice is

sought in furtherance of such an improper purpose."    *In re Grand Jury Proceedings*, 680 F.2d

1026, 1028 (5th Cir. 1982).[8]    "The test is whether a *client's* purpose is the furtherance of a

future fraud or crime."    *In re Grand Jury Subpoena*, 419 F.3d 966, 347 (5th Cir. 2005)

(emphasis in original, citations omitted).    As clearly stated in *In re Grand Jury Proceedings*, 87

F.3d 377, 381 (9th Cir. 1996):

> As we have previously said, for the crime-fraud exception to apply, 'the attorney
> need not himself be aware of the illegality involved; it is enough that the
> communication furthered, or was intended by the client to further, that illegality.'
> Friedman, 445 F.2d at 1086; see also Hodge & Zweig, 548 F.2d at 1354 ('The
> crime or fraud exception applies even where the attorney is completely unaware
> that his advice is sought in furtherance of such an improper purpose.'). Inasmuch
> as today's attorney-client privilege exists for the benefit of the client, not the
> attorney, [footnote omitted] it is the client's knowledge and intentions that are of
> paramount concern to the application of the crime-fraud exception; the attorney
> need know nothing about the client's ongoing or planned illicit activity for the
> exception to apply. It is therefore irrelevant, for purposes of determining whether
> the communications here were made 'in furtherance of' Corporation's criminal
> activity, that Roe and Doe may have been in the dark about the details of that
> activity.

As a result of the foregoing well-settled principle, the Court need not determine – nor do

we ask it to determine – whether the attorneys themselves were aware of the acts of the client

that vitiate the privilege pursuant to the crime-fraud exception.

## C.     *In Camera* Review Is Not Required

Most of the reported cases relate to situations in which, unlike the present case, the

proponent of the crime-fraud exception was not fully able to carry its burden without reference to

---

[8] *See also Clark*, 289 U.S. at 15 ("The attorney may be innocent, and still the guilty client must let the truth come
out."); *United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir. 1994) ("[T]he [attorney-client] privilege ends when a
client consults an attorney seeking advice that will promote intended or ongoing criminal activity."); *Ballard*, 779
F.2d at 292-293 ("Once the party seeking disclosure makes a prima facie case that the attorney-client relationship
was used to promote an intended criminal activity, the confidences within the relationship are no longer shielded.").

the disputed materials themselves.   In such a circumstance, the court may appropriately conduct *in camera* review of the documents at issue.   In *Zolin*, the Court established a procedure for determining when an *in camera* review is appropriate:

> Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

> Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Zolin*, 491 U.S. at 572 (internal quotations and citations omitted).[9]   The procedure set forth in *Zolin* has been applied by the Fifth Circuit.   *See, e.g., In re Grand Jury Subpoena*, 419 F.3d at 335-36.

    While an *in camera* review is one option available to the Court and is the option at the center of most of the reported cases, the *Zolin* Court made it plain that *in camera* review is not required before finding the crime-fraud exception applicable.   After describing the procedure for determining when *in camera* review is appropriate, the Court went on to state that "[t]he district court is also free to defer its *in camera* review if it concludes that additional evidence in support of the crime-fraud exception may be available that is not allegedly privileged, and that production of the additional evidence will not unduly disrupt or delay the proceedings."   491 U.S. at 572.   The clear implication of this statement is that *in camera* review is not required where other evidence not subject to a claim of privilege is sufficient to make the necessary *prima facie* showing for the

---

[9] "[A] lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege."   *Zolin*, 491 U.S. at 572.

application of the crime-fraud exception.    District courts in the Fifth Circuit and elsewhere

applying *Zolin* have recognized this principle.[10]

## IV.   THE CRIME-FRAUD EXCEPTION APPLIES TO COMMUNICATIONS BETWEEN BP AND ITS COUNSEL RELATED TO PREPARATION OF CERTAIN DOCUMENTS

As discussed above, in order to establish the applicability of the crime-fraud exception,

the United States has the burden of "establishing a *prima facie* case that the attorney-client

relationship was intended to further criminal or fraudulent activity."    *In re Grand Jury*

*Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000).    That burden is satisfied by BP's own admissions.

Since the United States can carry its burden of proof without reference to the documents for

which a privilege is claimed, no *in camera* review of documents is required, and the Court

should compel BP to produce those documents without delay.

### A.   Documents Related to Preparation of BP's Communications with Congress in the Spring and Early Summer of 2010

BP's admissions in the Guilty Plea Agreement establish proof, not merely a *prima facie*

case, that the crime-fraud exception applies to documents related to preparation of BP's

communications with Congress in the Spring and early Summer of 2010.    With regard to those

communications, BP agreed in the Guilty Plea Agreement that the Government could establish

beyond a reasonable doubt that:

> BP did corruptly, that is, with an improper purpose, endeavor to influence,
> obstruct, and impede the due and proper exercise of the power of inquiry under
> which an inquiry and investigation was being had by a Committee of the United
> States House of Representatives into the amount of oil flowing from the Macondo
> Well . . . .

---

[10]*In re Hunt*, 153 B.R. 445, 455 (N.D. Tex. 1992) ("In sum, if the crime-fraud exception is invoked, its proponents must establish a prima facie case of crime or fraud, including the requisite intent.    If in camera review is to be part of the prima facie showing . . . , the proponents must follow the procedure mandated by *Zolin* regarding the "threshold" showing of extrinsic evidence of crime or fraud."); *Chevron Corp. v. Weinberg Group*, No. 11–409 (JMF), 2011 WL 4056270, at *2 (D.D.C. Sept. 13, 2011) ("[A]n in camera review is not required once a prima facie showing of fraud has been established, as it has been here."); *United States v. Kaplan*, No. 02 CR. 883(DAB), 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2003) ("*Zolin* and its progeny make clear that in camera review is a discretionary alternative to establishing the crime-fraud exception with independent evidence.").

- 20 -

Guilty Plea Agreement (Ex. 7) at p. 16.   This statement is more than sufficient to establish that BP's communications with Congress on May 4, 2010, May 24, 2010, and June 25, 2010 were "intended to further criminal or fraudulent activity."   Indeed, BP has pled guilty to obstruction of justice.

Since BP's communications with Congress were "intended to further criminal or fraudulent activity," any legal advice obtained by BP for the purpose of preparing those communications was, necessarily, used by BP to further its criminal activity.   Therefore, the crime-fraud exception applies to all communications between BP and its counsel (or those working on counsel's behalf) that are related to preparation of BP's communications with Congress.   Multiple, affirmative, and unsolicited representations by BP's own counsel to this Court establish not only that the communications with Congress were "drafted in a collaborative process led by WilmerHale and involving both in-house and external lawyers along with appropriate BP personnel," but that those communications were "handled," "directed," and a "lawyer directed effort . . . ."   Since this "collaborative" and "lawyer directed" process related to *preparation* of communications with Congress, *i.e.* "to <u>future</u> wrongdoing," *Zolin*, 491 U.S. at 562-63, the crime-fraud exception strips these communications of any privilege.

BP's own statements demonstrate that the crime-fraud exception applies here, eliminating the need for *in camera* review.   Indeed, the Court already has reviewed a number of these documents and describes them in its July 13, 2012 Order.   Dkt. No. 6904 at 24-27.   The Court ruled that those documents were in fact attorney-client communications related to the drafting of BP's May 24, 2010 Markey Response and BP's June 25, 2010 letter to Congressman Markey, *Id.*, both of which form the basis for BP's guilty plea.   BP's admission of the crime nullifies the privileged status of the documents, and given the stage of the litigation they should be produced as soon as possible.   Accordingly, the United States respectfully requests that the Court order BP to

- 21 -

produce to the United States all documents related to preparation of responses to Congressional inquiries in the Spring and early Summer of 2010.

**B.    Documents Related to Preparation of BP's May 19, 2010 Email to Admiral Landry and its Attachments**

The May 19, 2010 Email sent by BP to FOSC Landry provided false and misleading information on flow rates.    The Rainey Memo attached to the May 19, 2010 email is the same Rainey Memo that was later attached to the May 24, 2010 Letter to Congress.    Therefore, BP's admissions in the Guilty Plea Agreement regarding the Rainey Memo are sufficient to establish a *prima facie* case that the crime-fraud exception applies to documents related to preparation of BP's submission to FOSC Admiral Landry.

In the Guilty Plea Agreement, BP agreed that the Government could establish beyond a reasonable doubt that BP made false and misleading statements to Congress regarding BP's flow rate estimates in, *inter alia*, the May 24, 2010 letter to Congress.    The Rainey Memo was attached to that letter.    As detailed in Section II.B.2 above, the Rainey Memo contains many of the statements which BP, in the Guilty Plea Agreement, agreed that the Government could establish beyond a reasonable doubt were false and misleading.    When BP provided the same Rainey Memo to FOSC Landry, it also provided the same statements.

In addition to the false and misleading statements in the Rainey Memo, the May 19, 2010 email from BP transmitting that Memo also contained false and misleading statements.    ▮▮▮

Redacted by BP Request

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮    May 19, 2010 Email (Ex. 9).    Given that the Rainey Memo contains many of the statements which BP agreed that the Government could establish beyond a reasonable doubt were false and misleading, Suttles' representation to Adm. Landry was, simply put, not true.

Therefore, the crime-fraud exception applies to all BP documents related to the preparation of both the Rainey Memo and the May 19, 2010 response to Adm. Landry. Accordingly, the Court should compel BP to produce any documents related to BP's preparation of the Rainey memo and submission of that memo to Admiral Landry.

### C.   Documents Related to Preparation of BP's Forms 6-K Filed with the SEC

Under the terms of the Consent executed by BP p.l.c. in the civil action brought by the SEC, BP p.l.c. agreed not to deny, directly or indirectly, facts sufficient to establish a *prima facie* case that the crime-fraud exception applies to documents related to preparation of BP p.l.c.'s Forms 6-K furnished to the SEC on April 29 and 30 and May 4, 2010 by BP p.l.c.   This commitment is more than broad enough to prohibit any denial by Defendant BP Exploration and Production, Inc., a wholly owned subsidiary of BP p.l.c.

As detailed in Section II.B.3 above, BP's corporate parent, BP p.l.c., executed a Consent in which it agreed:

> not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis

SEC Consent (Ex. 14) at ¶13.   Based on the Consent, BP p.l.c. cannot deny the allegations of the SEC Complaint, including the following allegations:

> Following the discovery that oil was spilling into the Gulf of Mexico, BP [p.l.c.] materially misrepresented and understated the estimated range of flow rate of oil leaking from the well in three public filings furnished to the Commission.   BP [p.l.c.] also omitted material information from these three public filings regarding its own internal data, estimates, and calculations indicating that the flow rate estimate contained in these filings was unjustifiably low.   BP [p.l.c.] made these material misrepresentations and omissions in, inter alia, its Reports on Form 6-K furnished to the Commission on April 29 and 30 and May 4, 2010.   In these Reports on Form 6-K, BP [p.l.c.] stated that the flow rate estimates were "up to 5,000 bopd" or that 5,000 bopd was the current estimate, despite higher internal data, estimates, and calculations.

*Id.* at ¶ 5.   These allegations establish that BP p.l.c.'s Forms 6-K furnished to the SEC on April 29 and 30 and May 4, 2010 by BP p.l.c. were fraudulent.   Therefore, the crime-fraud exception applies to all documents related to the preparation of the three SEC filings.   Accordingly, the Court should compel BP to produce any documents related to BP p.l.c.'s preparation of these SEC filings.

## V.    CONCLUSION

BP has admitted to a crime and must accept the consequences, including the loss of privilege over its internal communications related to false and misleading flow rate statements it made to Congress, the National Incident Command, and the public.   For the reasons set forth above, the United States respectfully requests that the Court enter the proposed Order requiring BP to produce to the United States all documents related to the preparation of (1) BP's statements to Congress on May 4, 2010, and BP's correspondence with Congress on May 24, 2010 and June 25, 2010; (2) the May 19, 2010 email from Suttles to Adm. Landry; and (3) the Forms 6-K furnished to the SEC on April 29 and 30 and May 4, 2010 by BP p.l.c.

Respectfully submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:  415-436-6648
Facsimile:  415-436-6632
E-mail:  mike.underhill@usdoj.gov

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
SCOTT CERNICH
THOMAS BENSON
Senior Attorneys
DEANNA CHANG
A. NATHANIEL CHAKERES
JUDY HARVEY
ABIGAIL ANDRE
RACHEL HANKEY
BETHANY ENGEL
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:  202-514-2583
E-mail:  steve.o'rourke@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA  70130
Telephone:  (504) 680-3000
Facsimile:  (504) 680-3184
E-mail:  sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:   January 30, 2013.

/s/   Steve O'Rourke
U.S. Department of Justice