# Exhibit 6

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2012 NOV 15 AM 11: 24

LORETTA G. WHYTE
CLERK



**FELONY**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### INFORMATION FOR SEAMAN'S MANSLAUGHTER, CLEAN WATER ACT, MIGRATORY BIRD TREATY ACT AND OBSTRUCTION OF CONGRESS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** 12-292 |
| **v.** | * | **SECTION:** SECT. R MAG 3 |
| **BP EXPLORATION AND PRODUCTION, INC.** | * | **VIOLATIONS:** |
| | * | **16 U.S.C. §§ 703 and 707(a)** |
| | | **18 U.S.C. §§ 1505 and 1115** |
| | * | **33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3)** |
| | * | |

\* \* \*

**THE UNITED STATES DEPARTMENT OF JUSTICE CHARGES THAT:**

At all times relevant to this Information:

<u>The Defendant</u>

1.     Defendant BP EXPLORATION AND PRODUCTION, INC. ("defendant BP"), headquartered in Houston, Texas, was a wholly-owned subsidiary of BP plc, a multinational energy corporation based in London, England (collectively "BP"). Defendant BP was responsible for all of BP plc's deepwater oil and gas drilling activities in the Gulf of Mexico, and

___Fee _____
___Process _____
_X_ Dktd _____
___CtRmDep_____
___Doc. No._____

oversaw the Exploration and Production Business Unit in the United States. Defendant BP resided in, and engaged in regular business throughout, the states bordering the Gulf of Mexico, including in the Eastern District of Louisiana, and employed thousands of people directly and indirectly in those states.

<u>The Dangers of Deepwater Drilling</u>

2.      In the Gulf of Mexico, massive reservoirs of oil and natural gas were trapped deep below the seabed. Defendant BP drilled wells in the Gulf to try to tap these reservoirs, extract the oil and natural gas, and sell them at a profit.

3.      Defendant BP's deepwater drilling was conducted from sophisticated drilling rigs stationed on the surface of the Gulf's waters, thousands of feet above the seabed. Early in the drilling process, the rig ordinarily lowered a multi-story safety device known as a blowout preventer down through the water and attached it to the seafloor. The rig was then connected to the seabed by a wide metal pipe thousands of feet long, known as a riser, attached on one end to the top of the blowout preventer and on the other end to the rig. Subcontractors for defendant BP based on the rig lowered drilling tools and pumped fluids, including what is known as drilling "mud," down through the riser and drilled a hole thousands of feet through the rock beneath the seabed.

4.      These drilling operations were dangerous by their nature. As drilling proceeded deeper and deeper, natural temperatures and pressures increased, and pockets of pressurized gases and fluids trapped in porous areas in the rock sometimes were encountered. Successful drilling could only occur by maintaining a delicate balance. On the one hand, defendant BP had to counteract the natural pressures deep below the seabed sufficiently – through use of heavy drilling mud and other means – to prevent dangerous amounts of fluids and gases in the rock from flowing

into the well. On the other hand, defendant BP had to avoid drilling the hole so forcefully that it broke apart the rock formation walls surrounding the hole.

5.     Unless this balance was maintained, there were serious risks that fluids and gases could flow from the surrounding rock into the well. If uncontrolled, such an influx, known in the deepwater oil exploration industry as a "kick," could cause a catastrophic blowout up the well and onto the rig, with the potential for ignition, explosions, casualties, death and extensive environmental damage to the Gulf. A kick could also cost days of drilling time as the rig crew sought to counteract it. Such down time directly translated into money lost by defendant BP.

6.     The risks to rig crew safety and to the efficacy of a well remained once the drilling reached the area of a target oil and natural gas reservoir deep below the seabed. These reservoirs were naturally highly pressurized, and various precautions were required to ensure that reservoir oil and gas did not breach the well and cause a blowout.

7.     To address the significant dangers present in drilling wells in the Gulf, the deepwater oil exploration industry developed a fundamental concept and duty known as "well control," which included customs, standards and practices designed to ensure the pressures inside a well were safely managed at all times. Applying these customs, standards and practices, defendant BP issued internal safety requirements, including policies, procedures and guidance on how to maintain well control consistent with the industry standards of care.

8.     One significant precaution defendant BP took to ensure well control was to assign Well Site Leaders onboard each rig. The Well Site Leaders were responsible for, among other things, supervising the implementation of defendant BP's drilling plan and ensuring that well drilling operations were performed safely in light of the intrinsic danger and complexity of deepwater drilling. Defendant BP's Well Site Leaders had a duty to maintain well control and

3

received training on well control safety procedures. Personnel onboard the rig often referred to defendant BP's Well Site Leaders as the "company men."

The Macondo Well

9.      On or about May 2, 2008, defendant BP entered into a lease with the Minerals Management Service ("MMS"), granting defendant BP the rights to oil and natural gas reservoirs at a site called Mississippi Canyon # 252 ("MC # 252") on the Outer Continental Shelf in the Gulf of Mexico. The first well drilled by defendant BP at MC # 252, which defendant BP referred to as the Macondo well, lay approximately 48 miles from the Louisiana shoreline. The seabed in that area was approximately 5,000 feet below sea level, and the series of potential oil and natural gas reservoirs was located more than 13,000 feet below the seabed.

10.     Pursuant to contracts between defendant BP and affiliated companies of Transocean Ltd. ("Transocean"), Transocean provided, among other things, a drilling rig and rig crew to drill the Macondo well under the supervision of defendant BP.

11.     On or about October 6, 2009, defendant BP began drilling the Macondo well using Transocean's *Marianas* drilling rig and rig crew. On or about November 9, 2009, work was halted on the Macondo well due to Hurricane Ida.

12.     On or about February 10, 2010, defendant BP resumed drilling of the Macondo well using Transocean's *Deepwater Horizon* drilling rig and rig crew.

13.     On or about April 9, 2010, defendant BP reached an oil and natural gas reservoir at a depth of over 18,000 feet below sea level. Thereafter, defendant BP's personnel and the rig crew oversaw placement of a metal pipe, called a casing, at the bottom of the well, pouring of cement down and around the casing, and preparations to complete what is known in the industry as temporary abandonment. Temporary abandonment involved various steps to ensure oil and natural

4

gas did not flow up the well either while the drilling rig prepared to depart the site or after the rig left the location.

<u>Negative Testing</u>

14.     One critical part of the temporary abandonment procedure for the Macondo well was what was known in the industry as negative testing or negative pressure testing. Negative testing assessed whether the cement pumped to the bottom of the well had hardened and formed an effective barrier between the well and the oil and natural gas reservoir.

15.     To conduct a negative test, the pressure exerted by drilling mud and other fluids in the well outward toward the reservoir was reduced below the pressure exerted inward by the reservoir toward the well. This created what was known in the industry as an underbalanced condition. The well was then monitored for any increase in pressure in the well, or flow of oil or gas up the well. During a negative test, any pressure increase or fluid flow was an indication that the well was not secure and that oil and natural gas could be entering the well. If such indications were observed, defendant BP's Well Site Leaders were trained to take appropriate precautions to ensure well control, including shutting in the well, communicating with defendant BP personnel onshore in Houston, Texas to notify them of the situation, and ceasing operations unless and until the indications had been appropriately addressed and remediated.

16.     Defendant BP's Well Site Leaders had a duty to maintain well control at all times. This duty included ensuring that negative testing was conducted in accordance with the standard of care applicable in the deepwater oil exploration industry.

<u>Defendant BP's Negligent Supervision of the Macondo Negative Testing</u>

17.     During the evening of April 20, 2010, the *Deepwater Horizon* remained temporarily attached to and erected on the seabed at the Macondo well, within the meaning of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(1). Defendant BP had two Well Site

5

Leaders stationed on the rig -- Robert Kaluza and Donald Vidrine, separately charged. Defendant BP, through Kaluza and Vidrine, was responsible for, among other things, supervising the negative testing, and had the ultimate authority on the rig to determine whether the negative testing was successful.

18.     During the negative testing that evening, a drill pipe inserted several thousand feet into the well was monitored. Defendant BP, through Kaluza and Vidrine, became aware of multiple indications from the drill pipe that the well was not secure. Among other things, pressure on the drill pipe quickly built up significantly above expected values. Each time the pressure was bled off of the valve connected to the drill pipe, the pressure again built unexpectedly. Abnormal fluid flow also occurred.

19.     Despite these significant indications that the well was not secure, defendant BP, through Kaluza and Vidrine, failed to phone engineers onshore at that time to alert them to the problems. Instead, defendant BP, through Kaluza and Vidrine, accepted an explanation from one or more members of the rig crew attributing the drill pipe pressure to an alleged "bladder effect." This explanation was scientifically illogical and was not recognized within the deepwater oil exploration industry. Defendant BP, through Kaluza and Vidrine, nonetheless accepted the explanation, and failed to consult with onshore engineers to discuss whether this alleged "bladder effect" was a realistic explanation for the observed pressures.

20.     Defendant BP, through Kaluza and Vidrine, eventually decided to begin monitoring the negative testing on an additional pipe, known as a "kill line." After making this change, defendant BP, through Kaluza and Vidrine, was aware of continued, abnormal, high pressure on the drill pipe. Despite these ongoing, glaring indications on the drill pipe that the well was not secure, defendant BP, through Kaluza and Vidrine, again failed to phone engineers onshore to alert them to

the problem, and failed to investigate any further. Instead, defendant BP, through Kaluza and Vidrine, deemed the negative testing a success based on observations of the kill line. As a result, the rig crew began to remove thousands of feet of heavy drilling mud in the riser and to replace it with lighter-weight seawater, inviting natural gas and oil to migrate up through the riser and onto the rig floor.

21. Defendant BP, through Kaluza and Vidrine, in violation of its duty of care, negligently failed to maintain control of the Macondo well. Among other things, defendant BP, through Kaluza and Vidrine, negligently: failed to phone engineers onshore to advise them during the negative testing of the multiple indications that the well was not secure; failed to adequately account for the abnormal readings during the testing; accepted a nonsensical explanation for the abnormal readings, again without calling engineers onshore to consult; eventually decided to stop investigating the abnormal readings any further; and deemed the negative testing a success, which caused displacement of the well to proceed and blowout of the well to later occur.

22. Later that same evening of April 20, 2010, control of the Macondo well was lost. Natural gas, oil and mud blew out of the Macondo well at tremendous pressures. The gas from the blowout ignited onboard the *Deepwater Horizon* and quickly caused explosions that killed eleven men onboard, all of whom were subcontractors assisting in drilling the Macondo well for defendant BP. The eleven men who were killed were:

> Jason Christopher Anderson
>
> Aaron Dale Burkeen
>
> Donald Neal Clark
>
> Stephen Ray Curtis

7

Gordon Lewis Jones

Roy Wyatt Kemp

Karl Dale Kleppinger Jr.

Keith Blair Manuel

Dewey Allen Revette

Shane Michael Roshto

Adam Taylor Weise

23.    The negligent conduct of defendant BP, through Kaluza and Vidrine, proximately caused the deaths of these eleven men.

24.    The negligent conduct of defendant BP, through Kaluza and Vidrine, also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico. The oil was discharged into the Gulf of Mexico on the seabed, in the water column, at the surface, and across hundreds of miles of beaches and coastline of the Gulf States of Louisiana, Mississippi, Alabama, and Florida.

25.    The spill adversely affected many species of wildlife, including migratory birds.

### Defendant BP's Response To The Blowout

26.    Immediately after the *Deepwater Horizon* blowout, BP's then-Vice President of Exploration for the Gulf of Mexico, David Rainey, separately charged, served on behalf of BP as Deputy Incident Commander at Unified Command, headquartered in Robert, Louisiana, in the Eastern District of Louisiana.  Unified Command consisted of representatives from the U.S. government as well as BP and Transocean Ltd., the designated "responsible parties" for purposes of responding to the spill.  Led by the United States Coast Guard, Unified Command coordinated the oil spill response.  Rainey was BP's second highest-ranking representative at Unified Command.

8

<u>Early Flow-Rate Estimates</u>

27.     The amount of oil leaking from the Macondo well was directly relevant to various efforts to stop the leak and also relevant to potential civil and criminal litigation, including the calculation of penalties.

28.     On or about April 24, 2010, very soon after it was determined that the Macondo well was leaking oil and natural gas, Unified Command, with BP's input, issued a preliminary public estimate that the well was flowing at a rate of approximately 1,000 barrels of oil per day ("BOPD").

29.     On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") prepared a written flow-rate estimate of approximately 5,000 BOPD. The NOAA scientist's estimate, which was based in part on a very preliminary assessment of oil that had started to float to the surface of the Gulf, cautioned that the methodologies used were "highly unreliable" and that the estimate was accurate "to only an order of magnitude," such that the actual flow amount could exceed 5,000 BOPD by ten times. As a result of this NOAA estimate, on or about April 28, 2010, Unified Command raised its public estimate to 5,000 BOPD.

<u>Rainey's "Estimates"</u>

30.     After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimate, Rainey, an executive who had no prior experience in spill estimation, surfed the Internet for information about how to conduct oil-spill-volume estimates based on observations of oil floating on the surface of a water body, known as "mass balance" estimates. Rainey's internet search led him to a website where he found a Wikipedia entry that described some generally accepted mass balance methodologies, including the American Society for Testing and Materials ("ASTM") method and the European "Bonn" method.

9

31.     Between on or about April 26, 2010 and on or about April 30, 2010, despite having no experience performing mass balance estimates and despite knowing that BP had employees who were trained in generating such estimates, defendant BP, through Rainey, performed and caused to be performed daily estimates purportedly using the ASTM and Bonn methods.

32.     Defendant BP's Bonn estimates, prepared by Rainey, resulted in "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD. Defendant BP, through Rainey, withheld these Bonn estimates from individuals working on flow rate within Unified Command and, later, also withheld them from Congress.

33.     Defendant BP's "ASTM" estimates, prepared by Rainey, did not conform to ASTM standards but instead were manipulated to consistently arrive at or near a "best guess" of between 5,000 and 6,000 BOPD.  In effect, defendant BP, through Rainey, conducted the estimates in a manner designed to reverse engineer results consistent with NOAA's preliminary 5,000 BOPD estimate.  Defendant BP, through Rainey, labeled the estimates as "ASTM" estimates even though the estimates did not conform to the ASTM method.

34.     As described below, defendant BP, through Rainey and other BP executives, consistently maintained that 5,000 BOPD was the "best guess" estimate, without disclosing internal BP information suggesting the flow rate was considerably higher.

### Defendant BP's Actual Estimates

35.     In its engineering response to the Macondo oil spill, defendant BP did not rely internally on Rainey's contrived and inaccurate flow-rate numbers.  Instead, defendant BP and its affiliated companies had numerous expert teams assessing the flow rate using sophisticated methodologies that focused on the conditions at the seafloor where the oil and natural gas were

10

gushing out. These teams were generating flow-rate estimates much higher than Rainey's purported "best guess" of between 5,000 and 6,000 BOPD.

36.     For example, on or about April 22, 2010, BP subsurface engineers, including Kurt Mix, separately charged, estimated "various release scenarios" with potential flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates").

37.     Also, on or about May 11, 2010, a team of BP engineers working under the direction of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged from 14,000 BOPD to 82,000 BOPD depending on potential flow paths and other known and unknown variables (the "Engineer 1 Slide Deck").

<u>Defendant BP's Public Estimates Questioned</u>

38.     On or about May 13, 2010, a university professor with expertise in fluid mechanics measurement publicly estimated that the Macondo well was leaking oil at a rate of approximately 70,000 BOPD, based on a review of video footage of the leak that BP had recently released.

39.     On or about May 14, 2010, defendant BP and its affiliated companies publicly rejected the university professor's work and continued defending 5,000 BOPD as the "best" estimate, even though 70,000 BOPD was within the range of Rainey's Bonn estimates and other internal BP engineering estimates, including the work of Engineer 1 described above.

40.     On or about May 14, 2010, Engineer 1 sent an email to two executives at BP, including BP's then-Chief Executive Officer for Exploration and Production, expressing concern over BP's continued public embrace of the 5,000 BOPD number. The email stated:

> I just read an article on CNN (May 14, 2010 1:00 p.m.) stating that a researcher at [a university] believes that the Macondo well is leaking up to 70,000bopd and that BP stands by a 5,000bopd figure. With the data and knowledge we currently have available, we cannot definitively state the oil rate from this well. <u>We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything</u>

11

up to ~100,000 bopd depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

(emphasis added).

41.     Engineer 1's email caused concern within BP because it contradicted BP's public position regarding flow rate.

The Rainey Memo

42.     On or about May 17, 2010, defendant BP, through Rainey, prepared a memorandum purporting to summarize the efforts that had been undertaken within Unified Command to estimate flow rate (the "Rainey Memo"). The Rainey Memo, which sought to justify BP's 5,000 BOPD estimate, was false and misleading in numerous respects, including:

    a.   Defendant BP, through Rainey, omitted Rainey's Bonn estimates, which were significantly higher than 5,000 BOPD.

    b.   Defendant BP, through Rainey, falsely labeled the estimates in the memorandum as "ASTM" calculations.

    c.   Defendant BP, through Rainey, omitted that the estimates included in the memorandum were premised on data and other inputs defendant BP, through Rainey, knew were inaccurate.

    d.   Defendant BP, through Rainey, omitted other documents relating to flow-rate estimates that contradicted defendant BP's 5,000 BOPD estimate, including, among others, the work performed by Engineer 1, the Subsurface Team Estimates, and a critique by another BP engineer ("Engineer 2") of the university professor's

12

work that used different assumptions than those used by the professor and
concluded that 15,000 BOPD was an appropriate assessment of the flow rate based
on the same video footage of the spill.

e. Defendant BP, through Rainey, falsely stated that Rainey's estimates ranging from
5,000 to 6,000 BOPD "played an important part in Unified Command's decision
[on April 28, 2010] to raise the estimate of flow rate from 1,000-5,000 barrels per
day." In fact, as defendant BP, through Rainey, well knew, defendant BP had not
yet provided these purported "ASTM" estimates to Unified Command by the time
that Unified Command raised its estimated flow rate to up to 5,000 BOPD.

## The Flow Rate Technical Group

43.     On or about May 19, 2010, as a result of the growing concern that BP was
understating the amount of oil spilling from the Macondo well, Unified Command announced the
creation of the Flow Rate Technical Group ("FRTG"), made up of independent and government
experts, to determine the flow rate. Later, following independent analysis, the FRTG announced on
or about August 2, 2010, its conclusion that the flow rate after the blowout had initially been
approximately 62,000 BOPD – over twelve times BP's public estimate of 5,000 BOPD – and had
been approximately 53,000 BOPD at the time the well was shut in on or about July 15, 2010. The
FRTG concluded that a total of approximately 4.9 million barrels of oil had been released during
the course of the spill.

## The Congressional Inquiry and Investigation

44.     The House Subcommittee on Energy and Environment (the "Subcommittee") was a
subcommittee of the Committee on Energy and Commerce of the House of Representatives of the
United States Congress. The Subcommittee had oversight authority over matters including the
regulation of energy, drinking water and soil and water contamination. The Subcommittee's

13

oversight authority included the authority to analyze the effectiveness of existing laws and to evaluate the need to propose new or additional legislation. The Subcommittee was a "Committee" for purposes of Title 18, United States Code, Section 1505.

45. Following the *Deepwater Horizon* blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well. Congress's inquiry and investigation included, among other things, requests for information from BP.

46. On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant BP, through Rainey, falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate. Defendant BP, through Rainey, further stated to Congress that, while defendant BP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, the worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which remained in place at that time. During the May 4 briefing, defendant BP, through Rainey, did not disclose any information that contradicted defendant BP's purported "best guess" of 5,000 BOPD, including the Bonn estimates and other BP internal information of which defendant BP, through Rainey, was aware indicating that the actual flow – not a hypothetical worst case scenario assuming the non-existent condition of the blowout preventer being removed – was much higher than 5,000 BOPD.

47. On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP accusing BP of understating the amount of oil leaking from the well. The letter noted that BP had recently "reaffirmed the 5,000 barrels per day estimate" despite recent news reports that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels per day." The letter further stated that Congress was concerned

14

that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster." The Subcommittee requested answers to fifteen questions relating to flow rate and requested that BP "update [its] response or provide additional documents at such time as such information becomes available." Among other things, the Subcommittee requested:

    a. "What is the BP method and scientific basis for the estimate of 5,000 barrels per day? Was this estimate based solely on surface monitoring of the size of the spill?"

    b. "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

    c. "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

48. On or about May 21, 2010, defendant BP, through Rainey, began working on a response to the May 14 Congressional request. Rainey was the primary source of flow-rate information for defendant BP's eventual written response to Congress on or about May 24, 2010 (the "BP Response") that continued to embrace 5,000 BOPD as the "best guess" estimate. During the preparation of the BP Response, defendant BP, through Rainey, continued to receive information that contradicted a "best guess" of 5,000 BOPD, including that the amount of oil actually being collected via a riser insertion tube tool (the "RITT") confirmed that the flow rate was in excess of 5,000 BOPD and an email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low." Aware of this and other information contradicting the 5,000 BOPD estimate, defendant BP, through Rainey, withheld such information from other BP employees and from BP in-house and outside lawyers working on the BP Response. Defendant BP,

15

through Rainey, also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response.

49.     On or about May 24, 2010, defendant BP, through Rainey, caused to be submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by defendant BP, through Rainey. As a result of defendant BP's actions, through Rainey, in withholding information and also providing false and misleading information, the BP Response made false and misleading statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation. For example:

    a.  The BP Response omitted all of Rainey's Bonn estimates, which contained estimates of the oil spill up to 92,000 BOPD.

    b.  The BP Response omitted key parts of Engineer 1's work, including flow-rate estimates up to 82,000 BOPD.

    c.  The BP Response omitted Engineer 1's email expressing concern about BP's public defense of the 5,000 BOPD estimate.

    d.  The BP Response falsely labeled Rainey's estimates as having been calculated using the "ASTM" method, when, in fact, the estimates did not conform to that method.

    e.  The BP Response omitted that Rainey's purported "ASTM" estimates were premised on data and other inputs Rainey knew were inaccurate.

    f.  The BP Response omitted that Rainey had manipulated his purported "ASTM" estimates to arrive near 5,000 BOPD.

    g.  The BP Response omitted Engineer 2's conclusion that a proper assessment of the video footage relied upon by the university professor resulted in an estimate of

15,000 BOPD – three times higher than the 5,000 BOPD estimate contained in the BP Response that Rainey asserted was the best estimate.

h. The BP Response omitted the Subsurface Team Estimates ranging from 64,000 to 146,000 BOPD.

i. The BP Response falsely stated that Rainey's purported "ASTM" estimates played an important part in Unified Command's decision to raise its early estimate from 1,000 to 5,000.

j. The BP Response omitted data Rainey received on or about May 22, 2010, that the amount of oil actually being collected via the RITT confirmed that the flow rate was in excess of 5,000 BOPD.

k. The BP Response omitted a May 23, 2010 email from the head of the FRTG to Rainey and others stating, among other things, that "everyone is at least comfortable with saying that the 5,000 barrels/day was too low."

## COUNT ONE
### (Seaman's Manslaughter)

50.    The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

51.    On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law, and inattention to duties on such vessel by which the life of a person, to wit:  Jason Christopher Anderson, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT TWO
### (Seaman's Manslaughter)

52.    The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

53.    On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law,  and inattention to duties on such vessel by which the life of a person, to wit:  Aaron Dale Burkeen, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT THREE
**(Seaman's Manslaughter)**

54.     The allegations contained in paragraphs one through twenty-three above are reilleged and incorporated as if fully set forth herein.

55.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

## BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law, and inattention to duties on such vessel by which the life of a person, to wit: Donald Neal Clark, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT FOUR
**(Seaman's Manslaughter)**

56.     The allegations contained in paragraphs one through twenty-three above are reilleged and incorporated as if fully set forth herein.

57.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

## BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law, and inattention to duties on such vessel by which the life of a person, to wit: Stephen Ray Curtis, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT FIVE
### (Seaman's Manslaughter)

58.    The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

59.    On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law,  and inattention to duties on such vessel by which the life of a person, to wit: Gordon Lewis Jones, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT SIX
### (Seaman's Manslaughter)

60.    The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

61.    On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law,  and inattention to duties on such vessel by which the life of a person, to wit: Roy Wyatt Kemp, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT SEVEN
### (Seaman's Manslaughter)

62.     The allegations contained in paragraphs one through twenty-three above are reTrolled and incorporated as if fully set forth herein.

63.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law, and inattention to duties on such vessel by which the life of a person, to wit: Karl Dale Kleppinger, Jr., was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT EIGHT
### (Seaman's Manslaughter)

64.     The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

65.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law, and inattention to duties on such vessel by which the life of a person, to wit: Keith Blair Manuel, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT NINE
### (Seaman's Manslaughter)

66.     The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

67.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law,  and inattention to duties on such vessel by which the life of a person, to wit: Dewey Allen Revette, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT TEN
### (Seaman's Manslaughter)

68.     The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

69.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law,  and inattention to duties on such vessel by which the life of a person, to wit: Shane Michael Roshto, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT ELEVEN
### (Seaman's Manslaughter)

70.     The allegations contained in paragraphs one through twenty-three above are realleged and incorporated as if fully set forth herein.

71.     On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

being the charterer of a vessel, to wit: the *Deepwater Horizon*, and acting through persons employed on that vessel, engaged in negligence, neglect, violation of law, and inattention to duties on such vessel by which the life of a person, to wit: Adam Taylor Weise, was destroyed.

All in violation of Title 18, United States Code, Section 1115.

## COUNT TWELVE
### (Clean Water Act Violation)

72.     The allegations contained in paragraphs one through and twenty-five above are realleged and incorporated as if set forth fully herein.

73.     On or about and between April 20, 2010 and July 15, 2010, both dates being approximate and inclusive, in the Eastern District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

did negligently discharge and cause to be discharged oil in connection with activities under the Outer Continental Shelf Lands Act and which affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, in such quantities as may be and were in fact harmful.

All in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3).

## COUNT THIRTEEN
### (Migratory Bird Treaty Act Violation)

74.    The allegations contained in paragraphs one through twenty-five above are

realleged and incorporated as if set forth fully herein.

75.    On or about and between April 20, 2010, and December 31, 2010, in the Eastern

District of Louisiana and elsewhere, defendant

### BP EXPLORATION AND PRODUCTION, INC.,

did unlawfully kill and cause to be killed one or more migratory birds, including Brown Pelicans,

Laughing Gulls, Northern Gannets, and other protected species, when defendant discharged and

caused to be discharged oil from the Macondo well.

All in violation of Title 16, United States Code, Sections 703 and 707(a).

## COUNT FOURTEEN
### (Obstruction of Congress)

76.    The allegations contained in paragraphs twenty-six through forty-nine above are

realleged and incorporated as if fully set forth herein.

77.    On or about and between May 4, 2010 and May 24, 2010, both dates being

approximate and inclusive, in Robert, Louisiana, in the Eastern District of Louisiana and elsewhere,

defendant

### BP EXPLORATION AND PRODUCTION, INC.,

did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the

due and proper exercise of the power of inquiry under which an inquiry and investigation was being

had by a Committee of the United States House of Representatives to wit: the Subcommittee on

Energy and Environment of the Committee on Energy and Commerce.

All in violation of Title 18, United States Code, Sections 1505.

**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF LOUISIANA**

_____
JIM LETTEN [8517]
United States Attorney
RICHARD R. PICKENS, II [22593]
Assistant United States Attorney

**ASSISTANT ATTORNEY GENERAL**
**CRIMINAL DIVISION**

_____
LANNY A. BREUER [Member of DC Bar]
Assistant Attorney General
JOHN D. BURETTA [Member of NY Bar]
Director, Deepwater Horizon Task Force
DEREK A. COHEN [Member of NY Bar]
Deputy Director, Deepwater Horizon Task Force
AVI GESSER [Member of NY Bar]
Deputy Director, Deepwater Horizon Task Force
SCOTT M. CULLEN [Member of MD Bar]
Trial Attorney, Deepwater Horizon Task Force
COLIN L. BLACK [Member of NY Bar]
Trial Attorney, Deepwater Horizon Task Force
ROHAN A. VIRGINKAR [Member of DC Bar]
Trial Attorney, Deepwater Horizon Task Force
EDWARD KANG [Member of NY Bar]
Trial Attorney, Deepwater Horizon Task Force

New Orleans, Louisiana
November 15, 2012

25

No. _____

# United States District Court

## FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

_____

UNITED STATES OF AMERICA

*vs.*

BP EXPLORATION & PRODUCTION, INC.

_____

BILL OF INFORMATION FOR SEAMAN'S
MANSLAUGHTER, CLEAN WATER ACT,
MIGRATORY BIRD TREATY ACT AND
OBSTRUCTION OF CONGRESS

Violation(s): 16 U.S.C. §§ 703 and 707(a)
18 U.S.C. § § 1505 and 1115
33 U.S.C. § § 1319(c)(1)(A) and 1321(b)(3)

_____

*Filed* _____ *, 20* 12

_____, *Clerk.*

*By* _____

_____, *Deputy*

_____

RICHARD R. PICKENS, II
Assistant United States Attorney

PER 18 U.S.C. 3170

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ INFORMATION ☐ INDICTMENT

Matter Sealed: ☐ Juvenile ☐ Other than Juvenile
☐ Pre-Indictment Plea ☐ Superseding ☐ Defendant Added
                      ☐ Indictment
                      ☐ Information ☐ Charges/Counts Added

Name of District Court, and/or Judge/Magistrate Location (City)

UNITED STATES DISTRICT COURT **EASTERN**
DISTRICT OF LOUISIANA    Divisional Office

Name and Office of Person Furnishing Information on THIS FORM: **Racheal Guerra**
☒ U.S. Atty ☐ Other U.S. Agency
Phone No. (504) 680-3000

Name of Asst. U.S. Attorney (if assigned): **Richard R. Pickens, II**

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)
**Federal Bureau of Investigation**

☐ person is awaiting trial in another Federal or State Court (give name of court)

☐ this person/proceeding transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Atty ☑ Defense

☐ this prosecution relates to a pending case involving this same defendant. (Notice of Related Case must still be filed with the Clerk.)

    SHOW DOCKET NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate Judge regarding this defendant were recorded under

    MAG. JUDGE CASE NO.

Place of offense: **New Orleans, Louisiana**   County **Orleans**

---

CASE NO.

**12-292**
**SECT. R MAG 3**

USA vs.
Defendant: BP EXPLORATION AND PRODUCTION, INC.

Address:

☐ Interpreter Required  Dialect: _____

Birth Date: _____ ☐ Male ☐ Alien
                ☐ Female (if applicable)

Social Security Number   XXX-XX-

### DEFENDANT

Issue: ☐ Warrant ☑ Summons

Location Status:

Arrest Date _____ or Date Transferred to Federal Custody _____

☐ Currently in Federal Custody
☐ Currently in State Custody
    ☐ Writ Required
☐ Currently on bond
☐ Fugitive

Defense Counsel (if any): **Mark Filip**

☐ FPD ☐ CJA ☑ RET'D
☐ Appointed on Target Letter

☐ This report amends AO 257 previously submitted

---

## OFFENSE CHARGED - U.S.C. CITATION - STATUTORY MAXIMUM PENALTIES - ADDITIONAL INFORMATION OR COMMENTS

Total # of Counts **14**   (for this defendant only)

| Offense Level (1, 3, 4) | Title & Section/ (Petty = 1 / Misdemeanor = 3 / Felony = 4) | Description of Offense Charged | Count(s) |
|---|---|---|---|
| 4 | 18:1115 | Seaman's Manslaughter | 11 |
| 4 | 33:1319(c)(1)(A) & 1321(b)(3) | Clean Water Act Violation | 1 |
| 4 | 16:703 & 707(a) | Migratory Bird Treaty Act Violation | 1 |
| 4 | 18: 1505 | Obstruction of Congress | 1 |
| | | | |

# *NO MAGISTRATE PAPERS WERE FOUND*

## *for*

*NAME: BP EXPLORATION AND*

*PRODUCTION, INC.*

*Initials:* __*BB*___