# Exhibit 8

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL           )    MDL NO. 2179
     by the OIL RIG,             )
 4   DEEPWATER HORIZON in        )    SECTION "J"
     the GULF OF MEXICO,         )
 5   April 20, 2010              )    JUDGE BARBIER
                                 )
 6                               )    MAG. JUDGE
                                 )    SHUSHAN
 7
```

**VOLUME 1**

Deposition of **DAVID RAINEY**, taken at Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on June 2, 2011.

**APPEARANCES:**

Mr. Duke Williams
Mr. Christopher Zainey
WILLIAMS LAW GROUP
909 Poydras Street, Suite 1650
New Orleans, Louisiana 70112
(985) 876-7595

GAUDET, KAISER, L.L.C.
Board-Certified Court Reporters

```
 1   making observations on the surface and then
 2   relating those surface observations to
 3   thickness and subsequently to volume per
 4   area.  We were working with observations that
 5   were coming in from the field that were
 6   sheen, dull oil and dark oil.
 7             The various -- and there are --
 8   there's a number of protocols and these are
 9   not the only two ultimately that I
10   considered.  And they -- they all have
11   different descriptors for surface oil.
12             But the Bonn Agreement at its
13   upper end in terms of what thickness it
14   forces you to apply to the oil on the surface
15   is many times the thickness of all of the
16   other protocols.
17        Q.    Okay.
18        A.    And that's what drives the
19   difference between the different worksheets.
20        Q.    Okay.  Okay.  Take that.  Thank
21   you.  I'm going to mark this as Exhibit 3212.
22             (Exhibit No. 3212 was marked.)
23        Q.    (BY MR. CERNICH)  I apologize
24   for the problems with the attachments.
25   Hopefully we won't continue to run into that,
```

```
 1  but of course we will.
 2              Okay.  If you'll turn to Tab 6,
 3  please.  This is an e-mail from yourself
 4  dated Tuesday, April 27th, to Ian Cavanaugh,
 5  Subject: spill vol 4-27.
 6              And who is Mr. Cavanaugh?
 7       A.     His role in BP is he's the
 8  technology vice president for subsurface and
 9  wells.  His role in the response by this time
10  was I think best described as science advisor
11  to the incident commander in Houma.
12       Q.     And were you sending -- do you
13  recall sending this e-mail to Mr. Cavanaugh?
14       A.     I don't actually recall doing
15  it.  Of course, I've seen the documents
16  and --
17       Q.     Okay.  And were you sending this
18  to Mr. Cavanaugh like the -- like when you
19  sent the other e-mail to Ms. Wallace to
20  distribute for a meeting?
21       A.     No.  This is -- this is later.
22  This is after the meeting.
23       Q.     Okay.
24       A.     My belief is, and this -- this
25  is reconstructed from looking at the
```

```
 1   documents and my notes, is that Ian would
 2   have been on the 4:30 telecom, and he simply
 3   expressed interest as a scientific advisor
 4   for Houma in what I was doing, and he thought
 5   it might help him as he was working in Houma
 6   to assist in planning and applying
 7   dispersants.
 8        Q.    So he was using this -- using
 9   these numbers to consider how much dispersant
10   he was going to --
11        A.    He needed --
12              (Multiple voices.)
13              MR. HEBERLIG:  Objection; form.
14        (Discussion off the record.)
15        A.    My belief is he thought it might
16   be useful, but I don't know what he did with
17   it after he got it.
18        Q.    (BY MR. CERNICH)  Did you ever
19   discuss these -- these calculations with him?
20        A.    I can't say specifically.  I
21   have many phone calls with Ian during this
22   period, and I can't say specifically whether
23   I talked about this with him or not.
24        Q.    Okay.  If you'll look at the
25   attachment, your attachment has the Bonn
```

```
 1   Agreement approach there and includes --
 2         MR. HEBERLIG:  Counsel, I'm familiar
 3   with this document and it's not complete.
 4         MR. CERNICH:  (Hands document to
 5   Mr. Heberlig.)
 6         MR. HEBERLIG:  Thank you.
 7         A.    Okay.
 8         MR. CERNICH:  Does that satisfy you,
 9   Counsel?
10         MR. HEBERLIG:  Yes, that's got all
11   three pages.
12         MR. CERNICH:  Okay.
13         Q.    (BY MR. CERNICH)  And if you'll
14   look at the first spreadsheet, which is
15   using -- I'm trying to recall, is that one
16   using the ASTM method or the Metcalf method?
17         A.    Neither, actually.  The heading
18   says it's using ASTM, but what it's actually
19   using is a hybrid between ASTM and Bonn.
20         Q.    Okay.  Is that a method that you
21   found on the Internet?
22         A.    No.  It's the method that I
23   created having had conversations with the
24   folk in the science room, conversations with
25   various other people and at least one other
```

```
 1   person in NOAA, a senior NOAA official in
 2   Seattle, and then more ongoing conversations
 3   with folk in the science room.  That's --
 4   that's where it came from.
 5        Q.    Is the NOAA official that you're
 6   referring to Bill Lehr?
 7        A.    That's correct.
 8        Q.    And who did you discuss it with
 9   in the science room?
10        A.    I can't specifically remember,
11   but there were a lot of folk in that room.
12        Q.    Did you discuss it with Doug
13   Suttles?
14        A.    I did discuss it with Doug
15   Suttles, yes.
16        Q.    Did you show him the -- your
17   hybrid calculations?
18        A.    I showed him the -- I don't know
19   whether I showed him the Metcalf & Eddy or
20   the ASTM, but one or other of those two and
21   the Bonn and we discussed the differences in
22   the results.  And we discussed sort of the
23   relevance of the upper end of the Bonn
24   Agreement to this particular situation and
25   agreed that it wasn't relevant to this
```

```
 1   you could please turn to Tab 23 in your
 2   binder.
 3          A.    Okay.
 4          Q.    And this is an e-mail, it starts
 5   at the top:  From Doug Suttles to John Lynch
 6   and Andy Inglis.
 7                But if we work down the e-mail
 8   chain, it starts with you forwarding a flow
 9   rate note to Mr. Suttles.  And the attachment
10   to -- and this e-mail is dated May 19th,
11   2010.
12                And the attachment is -- is a
13   document that is entitled:  Mississippi
14   Canyon 252 #1 Flow Rate Calculations.
15                Mr. Rainey, is this the memo
16   that you referred to earlier when you were
17   discussing or we were discussing your
18   May 17th calculations?
19          A.    I believe it is, yes.  I'm not
20   used to seeing it printed in this format
21   but --
22          Q.    Yeah, for whatever reason that's
23   the way it printed when we got it.  And if
24   you take a look at that and tell me whether
25   it appears that the memo and the attachments
```

```
 1   to that memo appear to be complete to you.
 2          (Discussion off the record.)
 3          A.    Yes, this looks to be complete
 4   at first glance.
 5          Q.    (BY MR. CERNICH)  And did you
 6   prepare this memo, Mr. Rainey?
 7          A.    Yes, I did.
 8          Q.    And did anyone assist you in
 9   preparing this memo?
10          A.    It was reviewed by Doug Suttles.
11          Q.    Did he ask you to prepare this
12   memo?
13          A.    No.
14          Q.    Did someone ask you to prepare
15   this memo?
16          A.    A request was made.  This was my
17   response to the request, not a specific
18   request to prepare a memo.
19          Q.    Okay.  And what was -- what was
20   the request?
21          MR. LANCASTER:  Object and ask you to
22   lay some additional foundation as to who,
23   what and where because I'm going to be
24   instructing the witness not to answer some
25   questions based upon privilege grounds.
```

```
 1            MR. CERNICH:  Okay.
 2       Q.      (BY MR. CERNICH)  Why did you
 3   prepare this memo?
 4            MR. LANCASTER:  That would call for
 5   disclosure of conversations with counsel, so
 6   I instruct the witness not to answer based
 7   upon privilege.  You could get the "who" out
 8   there, if you want.
 9       Q.      (BY MR. CERNICH)  Who asked you
10   to prepare this memo?
11       A.      Nobody asked me to prepare the
12   memo.  I prepared the memo in response to a
13   request from BP's counsel.
14       Q.      From BP's?
15       A.      Counsel.
16       Q.      Counsel.  Did BP's counsel
17   review drafts of this memo?
18       A.      Yes, they did.
19       Q.      And is this the final version of
20   that memo?
21       A.      I believe it is.  The only --
22   there was one edit that was made to the final
23   sentence, and I can't remember whether this
24   is the final or the original version.
25       Q.      Did you --
```