# EXHIBIT A

Customer service
Jobs | Cars | Homes
MotorSpaceNW
Place classified ad
Search classifieds
Subscribe

Get email alerts
Report problem
Submit a news tip

**SPOKESMANREVIEW.COM**          Thursday, May 30, 2002

**News**
Local/Regional
Idaho
Business
Nation/World
Voices
Handle Extra
Weather
Columnists
Newstracks
Full headline list
Archives
Photo reprints

**Opinion**
Letters

**Sports**
Blogs
Preps
Outdoors
Fantasy Sports
NW Sports Stats
GoGolfNW »

**Community**
Legal Info
For the record
Obituaries
Announcements
Listings

**Lifestyle**
Food
Travel
Comics survey »
Book Club »
Movie listings »
Calendar »
Blogs »

**Weekly sections**
7 »

**Extra**
awayfinder »
BizFinderNW »
Buy photo reprints
Comics
Crossword
DownToEarthNW
Health

**NATIONAL**

# Bush prevents oil, gas drilling off Florida coast

Government to buy back leasing rights

**From wire reports**

WASHINGTON -- With his brother, Gov. Jeb Bush, looking on, President Bush sealed a deal Wednesday to prevent further oil and gas drilling off the white sand beaches of the Florida Gulf Coast and in the cypress swamps near the Everglades.



*Associated Press*
President Bush and Florida Gov. Jeb Bush meet in the Oval Office on Wednesday.

The unexpected announcement would require the federal government to repurchase $235 million worth of oil and gas leasing rights in the Destin Dome area, about 25 miles south of Pensacola, and in three wildlife areas including Big Cypress National Preserve.

Jeb Bush acknowledged that the Oval Office announcement would boost his re-election campaign in Florida, the swing state in the 2000 presidential election and a tourism mecca where polls show 75 percent oppose offshore drilling.

Afterward, the clearly buoyed governor spoke to Florida reporters on a car phone and was not at all flustered by a suggestion that his brother George W. Bush was only mining environmental votes in Florida and oil contributions in Alaska, where the president supports drilling in the Arctic National Wildlife Refuge.

"I disagree with that, but you know what?" Jeb Bush said. "I don't really care. How about that? I'm the governor of Florida and I am incredibly proud that this historic day has come."

President Bush said Wednesday's action "once again demonstrates that my administration will take seriously the views of local communities. The federal government should continue to work closely with states and local communities in solving issues that affect energy security, the economy and the environment."

• **Printer Friend**
• **E-mail this sto**

**INTERACT**

• **Submit a lette**
• **Ask a question**
Editors"



**Money Saving**
Save money by
from local retaile
coupons from ma
SpokesmanRevi
where great savi
for you.
**Online Coupon**

**Lil' Ones Ann**
A keepsake sp
that parents ar
grandparents c
for a lifetime. T
Annual provide
opportunity to
share your pre
one.
**Lil' Ones Ann**

**SPOKESMAN**REVIEW.COM

Thursday, May 30, 2002

**NATIONAL**

*[handwritten: took BRIBES from BP, Shell oil condoned, took georges may oil, gas, minerals, $80 Billion Dollar Contract]*

# Bush prevents oil, gas drilling off Florida coast

*[handwritten: And tortiously interfered with georges may contract, and prospective]*

President Bush and Florida Gov. Jeb Bush meet in the Oval Office on Wednesday.

Associated Press

From wire reports

WASHINGTON -- With his brother, Gov. Jeb Bush, looking on, President Bush sealed a deal Wednesday to prevent further oil and gas drilling off the white sand beaches of the Florida Gulf Coast and in the cypress swamps near the Everglades. *[handwritten: economic advantage far]*

The unexpected announcement would require the federal government to repurchase $235 million worth of oil and gas leasing rights in the Destin Dome area, about 25 miles south of Pensacola, and in three wildlife areas including Big Cypress National Preserve. *[handwritten: political gain prohibited]*

Jeb Bush acknowledged that the Oval Office announcement would boost his re-election campaign in Florida, the swing state in the 2000 presidential election and a tourism mecca where polls show 75 percent oppose offshore drilling. *[handwritten: by U.S. Const, Amendment 4, 5, 6, 13, 14]*

Afterward, the clearly buoyed governor spoke to Florida reporters on a car phone and was not at all flustered by a suggestion that his brother George W. Bush was only mining environmental votes in Florida and oil contributions in Alaska, where the president supports drilling in the Arctic National Wildlife Refuge. *[handwritten: numerous]*

"I disagree with that, but you know what?" Jeb Bush said. "I don't really care. How about that? I'm the governor of Florida and I am incredibly proud that this historic day has come." *[handwritten: producing, existing]*

President Bush said Wednesday's action "once again demonstrates that my administration will take seriously the views of local communities. The federal government should continue to work closely with states and local communities in solving issues that affect energy security, the economy and the environment."

Jeb Bush and Interior Secretary Gale Norton told reporters after a brief meeting with the president that the actions will help preserve the Florida Panhandle's pristine coastline. *[handwritten: oil, gas wells near]*

"It just didn't seem right that 25 miles off that coast there would be the possibility of drilling, and today that possibility no longer exists," Bush said. *[handwritten: my property, near raccoon]*

The governor called the agreement to also repurchase oil drilling rights near the Everglades "a win-win for our state as well." *[handwritten: point oil gas fields]*

Wednesday's decision drew rare praise for the president from environmentalists and criticism from his usual allies in the energy industry.

The reaction also underscored the difficulty the administration and Congress have experienced in developing a national energy policy in the wake of California's power crisis last year.

"National energy supply has certainly been handed a setback today," said R. Skip Horvath, president of the Natural Gas Supply Association. He noted that the now-abandoned offshore drilling tract in Florida potentially contained large natural gas reserves -- up to 2.6 trillion cubic feet (the United States consumes almost 22 trillion cubic feet of natural gas annually).

"We cannot continue to chisel away at America's own resources and expect to continue to be self-sufficient in filling future demand," Horvath said.

**Return**

*[handwritten: OiL COMPANiES PAiD George W. Bush FOR CORRUPTION OF THE]*

Published on Wednesday, May 5, 2010 by **Huffington Post**

## Sex, Lies and Oil Spills

by **Robert F. Kennedy Jr.**

*[handwritten: MiNERALS MANAGEMENT SERViCES, Judge Zloch]*

A common spin in the right wing coverage of BP's oil spill is a gleeful suggestion that the gulf blowout is Obama's Katrina.

*[handwritten: to CAUSE THE BP P.L.C OiL SPiLL]*

In truth, culpability for the disaster can more accurately be laid at the Bush Administration's doorstep. For eight years, George Bush's presidency infected the oil industry's oversight agency, the Minerals Management Service, with a septic culture of corruption from which it has yet to recover. Oil patch alumnae in the White House encouraged agency personnel to engineer weakened safeguards that directly contributed to the gulf catastrophe.

*[handwritten: Rob George MAY OF his LAND, OiL, GAS]*

The absence of an acoustical regulator -- a remotely triggered dead man's switch that might have closed off BP's gushing pipe at its sea floor wellhead when the manual switch failed (the fire and explosion on the drilling platform may have prevented the dying workers from pushing the button) -- was directly attributable to industry pandering by the Bush team. Acoustic switches are required by law for all offshore rigs off Brazil and in Norway's North Sea operations. BP uses the devise voluntarily in Britain's North Sea and elsewhere in the world as do other big players like Holland's Shell and France's Total. In 2000, the Minerals Management Service while weighing a comprehensive rulemaking for drilling safety, deemed the acoustic mechanism "essential" and proposed to mandate the mechanism on all gulf rigs.

*[handwritten: Limestone, Contracts,]*

Then, between January and March of 2001, incoming Vice President Dick Cheney conducted secret meetings with over 100 oil industry officials allowing them to draft a wish list of industry demands to be implemented by the oil friendly administration. Cheney also used that time to re-staff the Minerals Management Service with oil industry toadies including a cabal of his Wyoming carbon cronies. In 2003, newly reconstituted Minerals Management Service genuflected to the oil cartel by recommending the removal of the proposed requirement for acoustic switches. The Minerals Management Service's 2003 study concluded that "acoustic systems are not recommended because they

tend to be very costly." *TERRORIST ACT by GEORGE W. BUSH AN EXPORT OIL WELL DRILLER*

The acoustic trigger costs about $500,000. Estimated costs of the oil spill to Gulf Coast residents are now upward of $14 billion to gulf state communities. Bush's 2005 energy bill officially dropped the requirement for the acoustic switch off devices explaining that the industry's existing practices are "failsafe."

Bending over for Big Oil became the ideological posture of the Bush White House, and, under Cheney's cruel whip, the practice trickled down through the regulatory bureaucracy. The Minerals Management Service -- the poster child for "agency capture phenomena" -- hopped into bed with the regulated industry -- literally. A 2009 investigation of the Minerals Management Service **found that agency officials** "frequently consumed alcohol at industry functions, had used cocaine and marijuana and had sexual relationships with oil and gas company representatives." Three reports by the Inspector General describe an open bazaar of payoffs, bribes and kickbacks spiced with scenes of female employees providing sexual favors to industry big wigs who in turn rewarded government workers with illegal contracts. In one incident reported by the Inspector General, agency employees got so drunk at a Shell sponsored golf *RICO* event that they could not drive home and had to sleep in hotel rooms paid for by Shell. *WITH KNOWLEDGE, MALICE, INTENT, EVIL TERRORIST INTENTIONAL ACT,*

Pervasive intercourse also characterized their financial relations. Industry lobbyists underwrote lavish parties and showered agency employees with illegal gifts, and lucrative personal contracts and treated them to regular golf, ski, and paintball outings, trips to rock concerts and professional sports events. The Inspector General characterized this orgy of wheeling and dealing as "a culture of ethical failure" that cost taxpayers millions in royalty fees and produced reams of bad science to justify unregulated deep water drilling in the gulf. *IN CONSPIRACY WITH OIL, GAS COMPANIES, IRAN*

It is charitable to characterize the ethics of these government officials as "elastic." They seemed not to have existed at all. The Inspector General reported with some astonishment that Bush's crew at the MMS, when confronted with the laundry list of bribery, public theft and sexual and financial favors to and from industry "showed no remorse." *THEFT OF GEORGE MAY LAND, OIL, GAS RESOURCES*

BP's confidence in lax government oversight by a badly compromised agency still staffed with Bush era holdovers may have prompted the company to take two other dangerous shortcuts. First, BP failed to install a deep hole shut off valve -- another fail-safe that might have averted the spill. And second, BP's reported willingness to violate the law by drilling to depths of 22,000-25,000 feet instead of the 18,000 feet maximum depth allowed by its permit may have contributed to this catastrophe. *Knowledge of terrorist Act by George W. Bush,*

And wherever there's a national tragedy involving oil, Cheney's offshore company Halliburton is never far afield. In fact, stay tuned; Halliburton may emerge as the primary villain in this caper. The blow out occurred shortly after Halliburton completed an operation to reinforce drilling hole casing with concrete slurry. This is a sensitive process that, according to government experts, can trigger catastrophic blowouts if not performed attentively. According to the Minerals Management Service, 18 of 39 blowouts in the Gulf of Mexico since 1996 were attributed to poor workmanship injecting cement around the metal pipe. Halliburton is currently under investigation by the Australian government for a massive blowout in the Timor Sea in 2005 caused by its faulty application of concrete casing.

The Obama administration has assigned nearly 2,000 federal personnel from the Coast Guard, the Corps of Engineers, the Department of Defense, the Department of Commerce, EPA, NOAA and Department of Interior to deal with the spill -- an impressive response. Still, the current White House is not without fault -- the government should, for example, be requiring a far greater deployment of absorbent booms. But the real culprit in this villainy is a negligent industry, the festering ethics of the Bush Administration and poor oversight by an agency corrupted by eight years of grotesque subservience to Big Oil. *TERRORIST, CONSPIRACY RICO, PATRIOT ACT VIOLATIONS, BRIBERY IS THE CAUSATION*

*Robert F. Kennedy Jr. is chairman of the **Waterkeeper Alliance** and senior attorney for the **Natural Resources Defense Council**. He is the author of **Crimes Against Nature: How George W. Bush and His Corporate Pals Are Plundering the Country and Hijacking Our Democracy**.*

**more Robert F. Kennedy Jr.**

Posted in **oil**

**Comments are closed**

Article printed from **www.CommonDreams.org**

**Source URL: http://www.commondreams.org/view/2010/05/05-10**

Case 2:10-md-02179-CJB-DPC   Document 8420-1   Filed 01/29/13   Page 8 of 101

# Youngstown Sheet & Tube Co. v. Sawyer – Case Brief Summary

**AdWords: marketing online**
AdWords.Google.com
Paga únicamente por resultados. ¡Crea una cuenta de AdWords ahor

➡

AdChoices

Summary of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

The Steel Seizure Case

## Facts

The Korean war effort increased the demand for steel. Disputes arose between steel industry management and labor that culminated in an announcement of a strike by the union. President Truman authorized Secretary of Commerce Sawyer to take possession of the steel industry and keep the mills operating.

## Issue

- Does the President of the United States have executive power under the war powers clause of the U.S. Constitution, or any implied powers gleaned therefrom, to authorize the Secretary of Commerce to seize the nation's steel mills? *does not have power to take property without payment of*

## Holding and Rule (Black)

- No. The President does not have implicit or explicit executive power under the war powers clause of the U.S. Constitution, or any implied powers gleaned therefrom, to authorize the Secretary of Commerce to seize the nation's steel mills. *full compensation*

The court held that there was no explicit statute or act of Congress which authorized the President to act in such a manner. The only two statutes which authorized the acquisition of personal and real property were not met here. Not only were such acts unauthorized, Congress specifically refused to grant such authorization. The court held that in order for the President to have this authority, it must be found somewhere explicitly in the Constitution, or implicitly in some historical context or

Select Language ▲                    Share                    📺 ooVoo Video Chat

60(b) ] on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 727 (10th Cir.1993) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990)). *Interference by USO of*

11 *The prohibited by OATH, OATH OF*

Plaintiff argues that, under this circuit's case law, the Secretary's motion was untimely with respect to Rule 60(b)(1). We agree. This court has held, without qualification, that "a mistake of law cannot be reached under [Rule] 60(b)(1) where [as here] no notice of appeal was timely filed from the order in which the mistake is alleged to have occurred, and the time for filing such a notice of appeal had expired when the [Rule] 60(b) motion was filed." Morris v. Adams-Millis Corp., 758 F.2d 1352, 1358 (10th Cir.1985); see also Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992). Consequently, Rule 60(b)(1) was not available to the district court as a basis upon which to grant the Secretary discretionary relief from its judgment regarding EAJA fees. *OFFICE "DEVICE" OF*

12 *Void UNConstitutional orders*

That conclusion does not end our inquiry, however, as we may affirm challenged decisions of the district court on alternative grounds, so long as the record is sufficient to permit conclusions of law. United States v. Roederer, 11 F.3d 973, 977 (10th Cir.1993). We recognize that the assessment of a motion for relief from judgment under the various subsections of Rule 60(b) is committed, in the first instance, to the discretion of the district court. Thus, a remand would be the usual disposition following appellate detection of error with respect to any one particular basis for granting such relief. However, as explained below, "remanding on the basis of [the court's] legal error [granting relief under Rule 60(b)(1) ] would be pointless, because it would have been an abuse of discretion for the trial court to [rule otherwise] under Rule 60(b)[ (4) ]." Lyons, 994 F.2d at 729. *Judgments, PRESIDENTIAL*

13 *orders for political GAIN*

Unlike its counterparts, Rule 60(b)(4), which provides relief from void judgments, "is not subject to any time limitation." V.T.A., Inc. v. Airco, Inc., 597 F.2d 220, 224 n. 9 and accompanying text (10th Cir.1979) ("if a judgment is void, it is a nullity from the outset and any 60(b)(4) motion for relief is therefore filed within a reasonable time"); see also Venable v. Haislip, 721 F.2d 297, 299-300 (10th Cir.1983). Furthermore, when Rule 60(b)(4) is applicable, "relief is not a discretionary matter; it is mandatory." V.T.A., Inc., 597 F.2d at 224 n. 8; see also Venable, 721 F.2d at 300. *Robbery*

14 *High CRIMES*

This court has indicated on a number of occasions that a judgment may be void for purposes of Rule 60(b)(4) if entered in a manner inconsistent with due process. See, e.g., V.T.A., Inc., 597 F.2d at 224-25; Arthur Andersen & Co. v. Ohio (In re Four Seasons Sec. Laws Litig.), 502 F.2d 834, 842 (10th Cir.), cert. denied, 419 U.S. 1034, 95 S.Ct. 516, 42 L.Ed.2d 309 (1974). We ultimately rejected the due process arguments asserted in the cited cases because fundamental procedural prerequisites--particularly, adequate notice

We proceed to the merits.

6

The 1933 order was extremely broad in its terms. It restrained the defendant from publishing any report, past, present or future, about certain named persons. It is true that the order arose out of a libel action. But even assuming, contrary to authority, American Malting Co. v. Keitel, 209 F. 331 (2 Cir., 1913), that it is proper for a federal court to enjoin a libel, the order here in question was not directed solely to defamatory reports, comments or statements, but to 'any' statements. In fact, from all that appears, it would seem that whatever The Bradstreet Company published in 1932 was not libelous as to Lloyd Crosby.

*INTERFERENCE by USE OF THE*
*Prohibited by OATH, OATH OF*

7

Lloyd Crosby contends that the order was entered on consent and that Bradstreet is bound by contract to refrain from publishing matter about him. We disagree. We are concerned with the power of a court of the United States to enjoin publication of information about a person, without regard to truth, falsity, or defamatory character of that information. Such an injunction, enforceable through the contempt power, constitutes a prior restraint by the United States against the publication of facts which the community has a right to know and which Dun & Bradstreet had and has the right to publish. The court was without power to make such an order; that the parties may have agreed to it is immaterial.

*OFFICE "DEVICE" OF VOID*
*INVALID, UNCONSTITUTIONAL ORDERS*

8

The order dated July 8, 1933 was in violation of the First Amendment to the Constitution, see Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) indicates that the First Amendment limits court action. The order was void, and under Rule 60(b)(4) of the Federal Rules of Civil Procedure, the parties must be granted relief therefrom.

*JUDGMENTS, PRESIDENTIAL ORDERS*

9

In any event, there does not seem to be any equity in Lloyd Crosby's position since he requests the continuation of an injunction which should never have been entered in the first place.4

*For POLITICAL GAIN, SELF*
*Profit, GRAND THEFT,*

10

We reverse the order of April 10, 1962, with directions that the district court nullify the order of July 1933.

*Robbery, High CRIMES*

1

In 1933 Stanford Crosby was using the name S. Stewart Crosby

2

'(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.

FindLaw   SUPREME COURT

View enhanced case on Westlaw
   KeyCite this case on Westlaw                              **http://laws.findlaw.com/us/274/341.html**
Cases citing this case: Supreme Court
Cases citing this case: Circuit Courts

# U.S. Supreme Court

## PHELPS v. UNITED STATES, 274 U.S. 341 (1927)

### 274 U.S. 341

#### PHELPS
#### v.
#### UNITED STATES.
#### No. 531.

**Argued March 3, 1927.**
**Decided May 16, 1927.**

[274 U.S. 341, 342]   Mr. H. S. Deming, of New York City, for petitioner.

Mr. H. J. Galloway, Asst Atty. Gen., for the United States.

Mr. Justice BUTLER delivered the opinion of the Court.

Plaintiffs were partners doing business as Phelps Bros. & Co.; the petitioner is the survivor. They owned a lease on Pier No. 7 of the Bush Terminal in New York Harbor. December 31, 1917, pursuant to an Act of August 29, 1916, c. 418, 39 Stat. 619, 645 (Comp. St. 1974a), and an Act of August 10, 1917, 10, c. 53, 40 Stat. 276, 279 (Comp. St. 3115 1/8 ii), the Secretary of War by direction of the President requisitioned that pier and other portions of the Bush Terminal for use in carrying on the war. Plaintiffs vacated, and the United States took possession of the property and continued to occupy it until May 14th, 1919. The Secretary's order stated that steps would be taken to ascertain fair compensation for the temporary use of the property; and a board of appraisers was created for that purpose. The plaintiffs continued to pay rent to the lessor, and, in accordance with the finding of the board, the amount of such payments, $ 79,890.42, was repaid to plaintiffs by the United States. The board also found the value per month of the use of the plaintiffs' property less the monthly rents paid. The amount calculated on that basis was not satisfactory to plaintiffs; they elected to take 75 per cent. of the award and there was paid them [274 U.S. 341, 343]   $44,733.79 on account. They sued to recover an amount sufficient to make up just compensation. The court found the value per day of the use of their property; the amount calculated on that basis was $254,175.79 over and above the sums paid; and that amount was included in the judgment entered March 8, 1926. Petitioner was granted a

writ of certiorari. 273 U.S. 67 , 47 S. Ct. 107, 71 L. Ed. -.

He contends that there should be added such sums as will produce the equivalent of the value of the use of the leased property paid contemporaneously, and that interest at a reasonable rate from the date of the use to the time of payment is a good measure of the amount to be added in order to make just compensation.

This action was brought under section 145 of the Judicial Code (Comp. St. 1136). That section gives to the Court of Claims jurisdiction to hear and determine 'all claims (except for pensions) founded upon the Constitution of the United States or ... upon any contract, express or implied, with the Government of the United States. ...' Section 177 ( Comp. St. 1168) provides that no interest shall be allowed on any claim up to the time of the rendition of judgment unless upon a contract expressly stipulating for its payment. Under the Fifth Amendment plaintiffs were entitled to just compensation, and, within the meaning of section 145, the claim is one founded on the Constitution. Moreover, it has long been established that where, pursuant to an act of Congress, private property is taken for public use by officers or agents of the United States, the government is under an implied obligation to make just compensation. That implication being consistent with the constitutional duty of the government as well as with common justice, the owner's claim is one arising out of implied contract. United States v. Great Falls Manufacturing Co., 112 U.S. 645, 656 , 5 S. Ct. 306; Duckett v. United States, 266 U.S. 149, 151 , 45 S. Ct. 38; Campbell v. United States, 266 U.S. 368, 370 , 45 S. Ct. 115. The distinction between the cause [274 U.S. 341, 344]   of action considered in United States v. North American Co., 253 U.S. 330 , 40 S. Ct. 518, and a taking under the power of eminent domain was pointed out in Seaboard Air Line Ry. v. United States, 261 U.S. 299 , 43 S. Ct. 354. Plaintiffs' property was taken before its value was ascertained or paid. Judgment in 1926 for the value of the use of the property in 1918 and 1919, without more, is not sufficient to constitute just compensation. Section 177 does not prohibit the inclusion of the additional amount for which petitioner contends. It is not a claim for interest within the purpose or intention of that section. Acts of Congress are to be construed and applied in harmony with and not to thwart the purpose of the Constitution. The government's obligation is to put the owners in as good position pecuniarily as if the use of their property had not been taken. They are entitled to have the full equivalent of the value of such use at the time of the taking paid contemporaneously with the taking. As such payment has not been made, petitioner is entitled to the additional amount claimed. Seaboard Air Line Ry. v. United States, supra, 304 (43 S. Ct. 354); Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 123 , 44 S. Ct. 471; Liggett & Myers Tobacco Co. v. United States, 274 U.S. 215 , 47 S. Ct. 581.

Judgment reversed.

*A Constitutional Required min isterial Act, Statutory mandated, non Discretionary OATH of office Act*

| | |
|---|---|
| **RESEARCH THE LAW** | Cases & Codes / Opinion Summaries / Sample Business Contracts / Research an / |
| **MANAGE YOUR PRACTICE** | Law Technology / Law Practice Management / Law Firm Marketing Services / Corp |
| **MANAGE YOUR CAREER** | Legal Career Job Search / Online CLE / Law Student Resources |
| **NEWS AND COMMENTARY** | Legal News Headlines / Law Commentary / Featured Documents / Newsletters / Bl |
| **GET LEGAL FORMS** | Legal Forms for Your Practice |
| **ABOUT US** | Company History / Media Relations / Contact Us / Privacy / Advertising / Jobs |
| **FIND US ON** | |

Case 2:10-md-02179-CJB-DPC Document 8420-1 Filed 01/29/13 Page 13 of 101



Justia.com    Lawyer Directory    Legal Answers    Law Blogs    **Law**    more ▼

# Justia US Law

Search for...                                    in

Justia > US Law > US Case Law > Oklahoma Case Law > Oklahoma Supreme Court Decisions > April, 1976 OK 53

**NEW** - **Receive Justia's FREE Daily Newsletters of Opinion Summaries** for the US S Courts & the 50 US State Supreme Courts and Weekly Practice Area Opinion Summaries

# ALLEN v. TRANSOK PIPE LINE COMPANY

Share |    **Tweet**    Like    0

ALLEN v. TRANSOK PIPE LINE COMPANY

1976 OK 53

552 P.2d 375

Decided: 04/20/1976

Supreme Court of Oklahoma

RICHARD R. ALLEN, AN INDIVIDUAL, APPELLANT,

v.

TRANSOK PIPE LINE COMPANY, A CORPORATION, APPELLEE.

Appeal from the District Court of Major County; Joe Young, Judge.

¶0 Appellant, Richard R. Allen, appeals from an order of the District Court of Major County finding that his sole and exclusive remedy for Appellee's construction of a pipeline across Appellant's property under the authority of eminent domain is an action in reverse condemnation and that he cannot also maintain an action for trespass and punitive damages. REVERSED AND REMANDED WITH INSTRUCTIONS.

Lytle, Soule & Emery, by Robert J. Emery and Peter T. Van Dyke, Oklahoma City, for appellant.

McKeever, Glasser, McKeever & Conrad, by Douglas C. McKeever, Enid, for appellee.

BARNES, Justice.

[552 P.2d 377]

¶1 This appeal involves an action by a landowner seeking punitive and other non-land

enters upon and appropriates the land or rights in property of a private citizen, absent an agreement with the owner to so do, or without acting to secure a determination of damages as by law provided, it may be held accountable for willful trespass, regardless of its motive, need or purpose for so doing.

"In such case the aggrieved property owner may maintain a common law action for damages. Also he may, in a proper case, have both actual and punitive damages. On the other hand, as aforesaid, he can elect to waive the tort and by mandamus compel the taker to institute proceedings in eminent domain. * * * (Cases cited.)" (Emphasis ours)

¶27 It reasonably follows that in the case at bar, a public utility invested by law with the power to exercise the right of eminent domain is not thereby clothed with an immunity not possessed by others who trespass upon the property or rights of private citizens, and must answer for its wrongs the same as any other trespasser.

[552 P.2d 382]    *UNLIMITED, PUNITIVE DAMAGES REQUIRED*

¶28 We, therefore, hold Appellant has a separate and distinct cause of action in trespass for damages and for punitive damages. However, in those cases in which the landowner elects to sue in tort, the defendant pipeline company can cross-petition for condemnation, and the two causes of action can be tried in the same case.

¶29 In other cases where the landowner thinks the trespasser could have exercised the power of eminent domain, he can recover in one lawsuit all damages sustained as a result of the trespasser's willful and wanton conduct, as well as damages in reverse condemnation, by setting forth in the same suit two separate causes of action; the first based on trespass to recover his damages and for punitive damages, and, second, a separate cause of action under the reverse condemnation statute.

¶30 We believe that to hold otherwise would bring about the legalization of willful and wanton trespass and would preclude the full tort recovery available to landowners not forced to proceed under the condemnation statutes.

¶31 Finally, we re-affirm the applicable law in situations where the landowner sits idly by allowing one vested with the power of eminent domain to erect improvements on the land without first resorting to condemnation proceedings.

¶32 In the case of Peckham et al. v. Atchison, T. & S.F. Ry. Co. et al., 88 Okl. 174, 212 P. 427 (1923), we said in the first syllabus:

"Where a public service corporation, vested with the power of eminent domain, enters


FLORIDA

# Department of
# Environmental Protection

Oil & Gas Section / Florida Geological Survey
Division of Resource Assessment & Management
3900 Commonwealth Blvd, MS 725 • Tallahassee, FL 32399-3000
Phone: (850) 245-3194 • Fax: (850) 245-3136



Jeb Bush
Governor

Walter Schmidt
State Geologist & Chief

October 21, 2005

Mr. George May
Florida 2000, Inc.
Buy Today, Inc.
Value Investments, Inc.
Speculative Investments, Inc.
Increased Value, Inc.
P.O. Box 32247
Palm Beach Gardens, FL 33420

Dear Mr. May,

Lighting Horse I through V Saturn

The Oil & Gas Section received your application forms for the five referenced proposed oil and gas wells in Broward and Dade Counties on October 20, 2005. This letter is to inform you that in accordance with Chapter 62C-26.003, Florida Administrative Code (F.A.C.), we can neither review nor accept what you have submitted as drilling permit applications because the following documentation was not included for each or your proposed wells:

1. A $2,000 processing and regulatory fee by check made payable to the Department of Environmental Protection for costs incurred by the Department (62C-26.003(9), F.A.C.).
2. Organization Report (Form 1; 62C-25.008, F.A.C.).
3. Performance security (62C-25.008, 62C-26.002, F.A.C.).
4. Location plat certified by a Florida registered land surveyor (62C-26.003(7), F.A.C.).
5. Site construction plans (62C-26.003(9), F.A.C.).
6. Casing and cementing program (62C-26.003(5), F.A.C.).
7. Contingency plan if appropriate (62C-27.001(7), F.A.C.).
8. Lease map and letter of justification, both as described in 62C-26.004(6)(d), F.A.C., if applicable, in the case of proposed nonroutine surface hole locations.
9. Geological or geophysical data, analysis, and interpretation demonstrating that the proposed drilling and production activities are reasonable in consideration of the proven or indicated likelihood of commercially profitable quantities of oil and gas (Chapter 377.241(3), Florida Statutes).
10. Additionally, an application to drill cannot be considered complete until the applicant has requested a preliminary site inspection. In the case of proposed well sites in Broward and Dade Counties, a request for preliminary site inspection should be directed to our Ft. Myers field office (62C-26.003(4), F.A.C.).

We recognize that your cover letter indicated that all necessary funds and information are held in trust by the State of Florida, but we cannot accept information, fees, and security deposits by reference for the purpose of consideration of issuing a drilling permit. Enclosed you will find our Prospector Package, which includes rules, forms, and instructions for submitting a complete oil and gas drilling permit application. If you have additional questions please contact Steve Spencer, our permitting geologist, at (850) 245-3194.

Sincerely,

Ed Garrett, PG, CPM
Oil & Gas Section Administrator
Florida Geological Survey

Copy: Ft. Myers Office



# Department of
# Environmental Protection

Oil & Gas Section / Florida Geological Survey
Division of Resource Assessment & Management
3900 Commonwealth Blvd, MS 725 • Tallahassee, FL 32399-3000
Phone: (850) 245-3194 • Fax: (850) 245-3136



Jeb Bush
Governor

Walter Schmidt
State Geologist & Chief

December 9, 2005

Mr. George May
Executive 100, Inc.
Kings Ridge 239, Inc.
New I-95, Inc.
New I-75, Inc.
P.O. Box 32247
Palm Beach Gardens, FL  33420

Dear Mr. May,

Lighting Hawk I-IV Saturn

The Oil & Gas Section received your application forms for the four referenced proposed oil and gas wells in Citrus, Martin and Sumter Counties on December 2, 2005. This letter is to inform you, as we did in our letter dated October 21, 2005, that in accordance with Chapter 62C-26.003, Florida Administrative Code (F.A.C.), we can neither review nor accept what you have submitted as drilling permit applications because the following documentation was not included for each or your proposed wells:

1. A $2,000 processing and regulatory fee by check made payable to the Department of Environmental Protection for costs incurred by the Department (62C-26.003 (9), F.A.C.).
2. Organization Report (Form 1; 62C-25.008, F.A.C.).
3. Performance security (62C-25.008, 62C-26.002, F.A.C.).
4. Location plat certified by a Florida registered land surveyor (62C-26.003 (7), F.A.C.).
5. Site construction plans (62C-26.003 (9), F.A.C.).
6. Casing and cementing program (62C-26.003 (5), F.A.C.).
7. Contingency plan if appropriate (62C-27.001 (7), F.A.C.).
8. Lease map and letter of justification, both as described in 62C-26.004 (6) (d), F.A.C., if applicable, in the case of proposed nonroutine surface hole locations.
9. Geological or geophysical data, analysis, and interpretation demonstrating that the proposed drilling and production activities are reasonable in consideration of the proven or indicated likelihood of commercially profitable quantities of oil and gas (Chapter 377.241(3), Florida Statutes).
10. Additionally, an application to drill cannot be considered complete until the applicant has requested a preliminary site inspection. In the case of proposed well sites in Broward and Dade Counties, a request for preliminary site inspection should be directed to our Ft. Myers field office (62C-26.003 (4), F.A.C.).

We recognize that your cover letter indicated that all necessary funds and information are held in trust by the State of Florida, but we cannot accept information, fees, and security deposits by reference for the purpose of consideration of issuing a drilling permit. Enclosed you will find our Prospector Package, which includes rules, forms, and instructions for submitting a complete oil and gas drilling permit application. If you have additional questions please contact me at (850) 245-3194.

Sincerely,

Steven M. Spencer, PG
Oil & Gas Section
Florida Geological Survey

CERTIFIED MAIL
Copy: Ft. Myers Office

"More Protection, Less Process"

## Resource Summary

The USGS assessed undiscovered conventional oil and gas resources in the North Cuba Basin, exclusive of reserve growth. For the three AUs, estimated means are 4.6 billion barrels of oil (BBO), 9.8 trillion cubic feet (TCF) of natural gas (8.6 TCF of associated-dissolved gas and 1.2 TCF of nonassociated gas), and 0.9 billion barrels of natural gas liquids (table 1). Of the mean of 4.6 BBO, 0.49 BBO are estimated to be in the North Cuba Fold and Thrust Belt AU, 3.2 BBO are estimated to be in the North Cuba Foreland Basin AU, and 0.9 BBO are estimated to be in the North Cuba Platform Margin Carbonate AU (table 1). All of the nonassociated gas (1.2 TCF; gas in gas fields) was assessed in the North Cuba Foreland Basin AU.

This assessment of undiscovered oil and gas resources was completed in 2004, and as of mid-2008 we have not received any publically available information that would significantly alter the assessment results.

## For Further Information

Supporting geologic studies of the Jurassic-Cretaceous Composite TPS and AUs in the North Cuba Basin and the methodology used in the assessment are in Chapter 2 of this CD-ROM. Assessment results are available at the USGS Central Energy Resources Team web site: http://energy.cr.usgs.gov/oilgas/.

## North Cuba Basin Assessment Team

Christopher J. Schenk (Task Leader, schenk@usgs.gov); Thomas S. Ahlbrandt, Ronald R. Charpentier, Mitchell E. Henry, Timothy R. Klett, Richard M. Pollastro, and Jean N. Weaver.

## Reference Cited

Magnier, C., Moretti, I., Lopez, J.O., Gaumet, F., Lopez, J.G., and Letouzey, J., 2004, Geochemical characterization of source rocks, crude oils, and gases of northwest Cuba: Marine and Petroleum Geology, v. 21, p. 195-214.

FloRiDA IS OVER
THE SAME
BASIN
Mississippi
CANYON



**Click here to return to Volume Title Page**

CAUSED
OVER
$400 Billion
DollARs iN
DAMAGES to
GEORGE MAY
ContRActs And
PROspective
Economic ADvANtAGE
And his AttoRNEY's

# Blogger News Network

High-quality English language analysis and editorial writing on the news.



- Home
- About BNN
- BNN Editorial Policies
- BNN Radio
- Forums
- Posting Guidelines
- Write for BNN
- Login & Write!

# Shell in U.S. Gov. Sex, Drugs and Corruption Scandal ←

Posted on January 24th, 2009
by John Donovan in All News, Breaking News

Read 2,337 times.

24 January 2009

By John Donovan of royaldutchshellplc.com



The Minerals Management Service (MMS) of the U.S. Department of The Interior (DOI) and the Office of Inspector General initiated an investigation in 2006 after receiving allegations from a confidential source (CS) that improprieties were occurring within the MMS Royalty in Kind Program (RIK).

A number of oil companies are indentified in the findings of the investigation. The following extracts focusing on the involvement of companies within the Royal Dutch Shell Group, are taken directly from the official report.

Although several MMS employees are named in the report as accepting inappropriate gifts from Shell,

the extracts deal mainly with the interactions between Shell and two MMS employees - Stacy Leyshon (employed by MMS since 1986) and Crystel Edler, an MMS employee since 1989.

Perhaps Richard Wiseman, Shell's Chief Ethical & Compliance Officer, would care to explain how the behaviour revealed in the report, including Shell yet again playing fast and loose with confidential information belonging to a third party company, is compatible with Shell's claimed business principles? Is it not time that Shell admitted that the principles are nothing but a PR sham?

In the hard commercial world, Shell is, as always, prepared to do whatever it takes to meet its objectives, whether in the USA (bribery and corruption), Nigeria (fuelling corruption and violence, with no end to the gas flaring), the North Sea (production and profit before offshore worker lives) or in Russia (bribery and corruption on the Sakhalin-2 project). *TERRORIST ACTS*

**EXTRACTS**   *CONTINUING CRIMINAL "RICO" ENTERPRISE*

The CS specifically alleged that RIK marketers had developed inappropriate relationships with representatives of oil companies doing business with the U.S. Department of the Interior (DOI).

The CS asserted that the inappropriate relationships included RIK employees frequently attending oil and gas industry social functions and accepting gifts from company representatives.

Our investigation confirmed that between January 1,2002, and July 2006, 19 RIK marketers and other RIK employees- **approximately 1/3 of the entire RIK staff** - had socialized with, and had **received a wide array of gifts from, oil and gas companies with whom the employees were conducting official business.** *CONTINUING "TERRORIST" ENTERPRISS*

Agent's Note: During the course of our investigation, we informed Secretary Dirk Kempthorne and Assistant Secretary for Land and Minerals Management Stephen Allred of the improper behavior we were uncovering within the RIK Program. The Secretary immediately directed Assistant Secretary Allred to transfer RIK employees Greg Smith, Crystel Edler, and Richard Fantel out of the RIK Program after we specifically identified their personal behavior as particularly troubling. Stacy Leyshon had previously been transferred out of the RIK Program. *by "BRIBED" Judges*

Between October 2007 and May 2008, we undertook extensive efforts to interview five Chevron employees. Despite these efforts, these employees ultimately declined to be interviewed. *PAID by* Additionally, **a former Shell employee declined to be interviewed by DOI-DIG agents.** *Big Oil,*

In e-mails we retrieved from computer hard drives and network servers, we found numerous *GAS* indications that many of the events that RIK employees attended with industry officials were purely social. For instance, e-mail from **Shell Pipeline Company** representative to RIK employee Crystel Edler, regarding attending **"tailgating festivities"** at a Houston Texans game, stated, **"You're invited have you and the girls meet at my place at 6am for bubble baths and final prep. Just kidding..."**

The **Shell Pipeline Company** representative's previous e-mail inviting people to the event was **laden with sexual innuendo** such as, "We've always provided the patrons with **beer on demand, but the ever-depleting supplies have dwindled beer storage to dangerously low volumes on occasion.... Although it's a given that the horsemen will indeed 'bring the meat to the table.'**

Agent's Note: The **Shell Pipeline Company** representative declined to be interviewed.

We determined Chevron, **Shell**, Gary Williams Energy Corporation (GWEC), and Hess Corporation

*Prohibited by*
**StarTribune.com** MINNEAPOLIS - ST. PAUL, MINNESOTA *OATH, LAW*

# AP IMPACT: Many Gulf federal judges have oil links, *"DEVICE"*
## complicating assignments on spill lawsuits *void, Invalid,*

**By CURT ANDERSON** , Associated Press *UNCONSTITUTIONAL ORDERS*
June 6, 2010 *by Judges, Presidents used to Rob*
*Citizen, Property Owners*

MIAMI - More than half of the federal judges in districts where the bulk of Gulf oil spill-related lawsuits are pending have financial connections to the oil and gas industry, complicating the task of finding judges without conflicts to hear the cases, an Associated Press analysis of judicial financial disclosure reports shows.

Thirty-seven of the 64 active or senior judges in key Gulf Coast districts in Louisiana, Texas, Alabama, Mississippi and Florida have links to oil, gas and related energy industries, including some who own stocks or bonds in BP PLC, Halliburton or Transocean — and others who regularly list receiving royalties from oil and gas production wells, according to the reports judges must file each year. The AP reviewed 2008 disclosure forms, the most recent available.

Those three companies are named as defendants in virtually all of the 150-plus lawsuits seeking damages, mainly for economic losses in the fishing, seafood, tourism and related industries, that have been filed over the growing oil spill since the Deepwater Horizon drilling rig exploded April 20, killing 11 workers. Attorneys for the companies and those suing them are pushing for consolidation of the cases in one court, with BP recommending Texas and others advocating for Louisiana and other states.

A Washington-based federal judicial panel is scheduled to meet next month to decide whether to consolidate the cases and, if so, which judge should be assigned the monumental task. The job would include such key pretrial decisions as certifying a large class of plaintiffs to seek damages, a potential multibillion-dollar settlement, whether to dismiss the cases and what documents BP and the other companies might be forced to produce in court.

The AP review of disclosure statements shows the oil and gas industry's roots run as deep in the Gulf Coast's judiciary as they do in the region's economy. For example, one federal judge in Texas is a member of Houston's Petroleum Club, an "exclusive, handsome club of, and for, men of the oil industry."

Federal judicial rules require judges to disqualify themselves from hearing cases involving a company in which they have a direct financial interest, and some Louisiana judges have already done so. For example, U.S. District Judge Mary Ann Vial Lemmon in New Orleans, who reported ownership of BP stock, issued an order in early May that the court

clerk not allot cases involving BP or related entities to her docket.

Another New Orleans jurist, U.S. District Judge Carl Barbier, said in court Friday he is selling his oil and gas investments — which included Transocean and Halliburton — to avoid any perception of a conflict. Barbier is presiding over about 20 spill-related lawsuits and some attorneys are recommending that he be chosen to oversee all cases filed nationally.

Still another judge in Louisiana, U.S. District Judge Eldon Fallon, recused himself because his attorney son-in-law is representing several people and businesses filing suits against BP and the other companies over the rig explosion.

In many ways, the financial conflict rules are murky. For example, a judge does not have to step aside if the investments are part of a mutual fund over which they have no management control. Mere ties to companies or entities in the same industry, no matter how extensive, also don't require disqualification, according to legal experts.

"The specific rule forbids judges from hearing a case in which they have a financial interest. The more general rule forbids them from hearing cases in which their impartiality might reasonably be questioned," said Charles Geyh, an Indiana University law professor who has closely studied judicial ethics.

So a judge like U.S. District Judge Stanwood Duval of New Orleans would not have to disqualify himself even though he reported royalties from "mineral interest No. 1 and No. 2" in Terrebonne Parish, La., on his 2008 forms. Likewise for Senior U.S. District Judge William Barbour Jr. of Mississippi, who listed at least 30 oil and gas interests in three states including "McGowan Working Partners" and "Petro-Hunt Bovina Field," both in Mississippi.

Some judges have close ties to the energy industry that aren't for financial gain, but could still raise questions of potential bias.

The judge BP wants to hear all of the spill-related cases, U.S. District Judge Lynn Hughes of Houston, for the past two years has been a "distinguished lecturer" focusing on ethical issues for the 35,000-member American Association of Petroleum Geologists.

Hughes is not paid a fee but does receive reimbursements for travel, food and lodging, said association spokesman Larry Nation. Hughes has appeared at petroleum geologist meetings in several Texas cities, in New Orleans and also in Cape Town, South Africa. He is scheduled to give a lecture later this month in Calgary, Canada, the oil and gas capital of that country.

"Under the circumstances, I can see why the questions are being raised," Nation said. "But one of the reasons Judge Hughes was chosen to be a lecturer is that he is known as

a very ethical person. I would think his being an ethics lecturer for our organization would be a positive, not a negative."

Hughes said at a hearing Friday that his work for the geologists poses no conflict and that his other oil and gas investments — which include royalties from several mineral rights interests — are not connected to BP or the other companies involved in the spill lawsuits.

Florida attorney Scott Weinstein, whose firm represents charter captains and other companies suffering economic loss from the spill — including the owners of the Ripley's Believe It or Not museum in Key West — said people might think it's unfair for BP to win its wish with a Texas judge rather than one seated in Louisiana or Florida, where the spill's impacts are greater.

"I would never assume that a judge is biased because of the jurisdiction that he or she sits in," Weinstein said. Still, "if this case winds up in Houston, many of the victims will feel very distant from where that justice is being handed out. It will not make sense to them."

Another Florida plaintiffs' attorney, Stuart Smith, was more blunt about the companies' aims.

"They would get much more sympathetic judges and perhaps a more sympathetic jury," Smith said.

In court papers, BP says that Hughes has the "experience and capacity" to handle the lawsuits and that Houston is the ideal location because most of the defendants' companies have headquarters or major operations there. BP spokesman have repeatedly declined to comment on pending lawsuits.

Some attorneys have come up with an unusual assertion: import a New York federal judge with a strong background in environmental lawsuits to Louisiana to preside over the cases.

They are recommending that the U.S. Judicial Panel on Multidistrict Litigation appoint U.S. District Judge Shira Scheindlin. Scheindlin presided over settlement of some 200 lawsuits brought against BP and other oil companies over a toxic additive called MTBE that contaminated drinking supplies nationally — and she has no oil and gas investments, according to her financial disclosure forms.

Attorneys with the Weitz & Luxenberg firm in New York said they recommended Scheindlin rather than a Louisiana judge because "most or all of the judges in the (Louisiana) district have a conflict and cannot preside" over the consolidated cases.

Scheindlin's deputy said Friday she was out of town and unavailable to comment on whether she would accept such an appointment.

The judicial panel meets July 29 in Boise, Idaho, to hear arguments on consolidation of the oil spill cases. Recommendations also have been made for sending the cases to Alabama, Mississippi and South Florida.

———

The Associated Press National Investigative Team can be reached at investigate(at)ap.org

© 2012 Star Tribune. All rights reserved.

01/11/2004 02:57 a.m.

ALABAMA STATE et al v. BP, PLC et al | ACE Insurance Litigation Watch

http://ace-insurance-litigation.com/ace-ina-litigation/case/alabama-state-et-al-v-bp-plc-et-al

| Home | Litigation Index | ACE Corporate Information | About Us | Log |

*The Collaborative Clearinghouse for Lawsuits and Other Claims Against ACE Group Insu...*

More

STATE (
Motion

STATE (

STATE (
Compla

STATE (
Docket

STATE (
Motion

Home › Litigation Index ›

# ALABAMA STATE et al v. BP, PLC et al

|  |  |
|---|---|
| **Case Number:** | 2:11-cv-01597 Search Pacer |
| **ACE Group party(s):** | ESIS, Inc. |
| **Opposing Party:** | Alabama State |
| **Court Type:** | Federal |
| **US District Court:** | Eastern District of Louisiana |
| **Date Filed:** | Jul 11 2011 |
| **Status:** | open |
| **Complaint:** | ALABAMA STATE et al v. BP, PLC et al Complaint |
| **Docket:** | ALABAMA STATE et al v. BP, PLC et al Docket (2:11-cv-01597) |

1. Plaintiff CMCO, LLC brings this class action against the BP Defendants, the Worley Defendants, Defendant ESIS, Inc., and Defendant Brett Robinson Gulf Corporation ("Brett Robinson") for racketeering and corruption in connection with what Defendants refer to as the "BP Claims Process." Through this lawsuit, Plaintiffs seek to recover damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, et. seq. Plaintiff CMCO, LLC also seeks to enjoin the above-named Defendants from continuing to engage in a pattern of racketeering activity, corruption, wire fraud, mail fraud, unauthorized practice of law, violation of state insurance laws and regulations, and other criminal or unlawful activity.

2. Plaintiffs claim that the Defendants are engaged in a pattern of racketeering activity involving the unauthorized practice of

Acces

The PACE
federal ar

01/11/2004 08:18 a.m.

law and other criminal acts that are ultimately designed to delay and reduce the payment of legitimate legal damages by lulling class members into a false understanding of the availability of recoverable damages at law. The BP Defendants are actively soliciting third parties, including Defendant Brett Robinson to provide services tantamount to the giving of legal advice to Plaintiffs regarding their claims, losses, and recoverable damages. Moreover, the BP Defendants have authorized third parties, including Defendant Brett Robinson and others, to evaluate and present damage claims of claimants in a manner which constitutes criminal conduct in Alabama and Florida. See Exhibit A, attached hereto and made a part hereof by reference (Letter from Brett Robinson dated June 11, 2010).

3.  Likewise, the Worley Defendants, Defendant ESIS, Inc., and Defendant Brett Robinson are actively engaging in the above-described pattern of racketeering and corruption, in an effort to gain a pecuniary benefit, to the detriment of Plaintiffs and the putative class members. Defendant Brett Robinson is charging fees to Plaintiffs and certain putative class members to evaluate and present Plaintiffs' claims for legal damages. Upon information and belief, and in furtherance of the racketeering activity, the Worley Defendants and/or Defendant ESIS, Inc. are knowingly aiding Defendant Brett Robinson and other third parties in evaluating and presenting legal damage claims on behalf of Plaintiffs. Furthermore, the Worley Defendants and/or Defendant ESIS, Inc. are believed to be conspiring with the BP Defendants to engage third parties, like Brett Robinson, in the unauthorized practice of law.

4.  Plaintiffs contend that the BP Defendants, Worley Defendants, and Defendant ESIS, Inc. have colluded with Defendant Brett Robinson and other similarly situated third parties who are not licensed, not qualified, and who are otherwise inept to evaluate or present legal damage claims within the BP Claims Process – all as part of a greater scheme to delay paying certain claims and to avoid paying certain other damages altogether. As a direct result of the Defendants' collusion and corruption, claims for payment of damages made in the BP Claims Process have been delayed, underpaid, and even denied.

5.  Plaintiff CMCO, LLC requests that this Honorable Court enjoin Defendants from:

1) authorizing unlicensed and unqualified third parties to evaluate and/or present legal damage claims within the BP Claims Process;

2) engaging in the unauthorized practice of law and/or soliciting third parties to engage in the unauthorized practice of law and/or engage in violations of state insurance laws and regulations within the State of Alabama and the State of Florida; and

3) engaging in other criminal or unlawful activity designed to delay, underpay, or avoid payment of claims within the BP Claims Process.

6.  Plaintiff Ben Chenault, as relator of the State of Alabama, alternatively seeks a Writ of Quo Warranto to stop the Defendants from engaging in criminal or other illegal activity including the unauthorized practice of law and violation of state

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig     *     MDL NO. 2179
"Deepwater Horizon" in the Gulf     *
of Mexico, on April 20, 2010        *     SECTION: J
                                    *
                                    *     HONORABLE CARL J. BARBIER
                                    *     MAGISTRATE JUDGE SHUSHAN
————————————————————————————————————*————————————————————————————————
                                    *
BON SECOUR FISHERIES, INC.          *
ET. AL.                             *     CIVIL ACTION NO. 12-970
                                    *
              Plaintiff's           *     SECTION: J
                                    *
v.                                  *     JUDGE BARBIER
                                    *
BP EXPLORATION & PRODUCTION         *     MAGISTRATE JUDGE SUSHAN
INC.: BP AMERICA PRODUCTION         *
COMPANY; BP P.L.C.                  *
                                    *
              Defendant's           *
                                    *
————————————————————————————————————*
                                    *
GEORGE MAY, GEORGE MAY ON           *     MDL NO. 2179
BEHALF OF THE STATE OF              *
FLORIDA INTERVENER                  *     SECTION: J
                                    *
              Plaintiff's           *     JUDGE BARBIER
                                    *
v.                                  *     MAGISTRATE JUDGE SUSHAN
                                    *
BP P.L.C., THEIR TERRORIST,         *
RICO AIDERS, ABETTERS, THOSE        *
IN CONSPIRACY, ASSOCIATES,          *
TERRORIST COUNTRY'S, STATES,        *
UNKNOWN, UNADDED PARTIES            *
ET. AL.                             *
                                    *
              Defendant's           *
                                    *
————————————————————————————————————*

    GEORGE MAY, GEORGE MAY ON BEHALF OF THE STATE OF FLORIDA,
    INTERVENER NOTICE OF AUTOMATIC DISQUALIFICATION, RECUSAL
    OF HONORABLE CARL J. BARBIER PARTY, WITNESS TO THIS CASE,
    NOTICE OF MODIFICATION OF DEFAULT JUDGEMENT FOR
    CONTINUOUS TORTIOUS INTERFERENCE WITH CONTRACT, PROSPECTIVE

-1-

ECONOMIC ADVANTAGE OF GEORGE MAY, GEORGE MAY ON BEHALF OF
THE STATE OF FLORIDA, PLAINTIFF, INTERVENER, WITH
INCORPORATED MEMORANDUM OF LAW, FACT, EVIDENCE OF ECONOMIC
TERRORISM, TERRORISM, BIOLOGICAL TERRORISM, WEAPONS OF
MASS DESTRUCTION BY DEFENDANT'S BP P.L.C. THEIR TERRORIST,
RICO AIDERS, ABETTERS, THOSE IN CONSPIRACY, ASSOCIATES,
TERRORIST COUNTRY'S, STATES, UNKNOWN, ADDED PARTIES
ALL INTERRELATED, INTERCONNECTED BY CONTRACTS, THEIR ACTS
OF TERRORISM, ECONOMIC TERRORISM, BIOLOGICAL TERRORISM

COMES NOW, George May, George May on behalf of the State

of Florida, and files this his notice of automatic recusal,

disqualification of Honorable Carl J. Barbier Party, Witness

in this case, notice of modification of default judgement for

continuous Tortious Interference with Contract, Prospective

Economic Advantage of George May, George May on behalf of the

State of Florida, Plaintiff, Intervener, with Incorporated

Memorandum of Law, Fact, Evidence of Economic Terrorism,

Terrorism, Biological Terrorism, Weapons of Mass Destruction

by defendant's BP P.L.C., their Terrorist RICO aiders, abetters,

those in conspiracy, associates, Terrorist Country's, States,

unknown and added parties all interrelated, interconnected by

their Contracts, their Acts of Terrorism, Economic Terrorism,

Biological Terrorism for cause herein as follows:

1. That on April 17, 2011 George May, George May on behalf

of the State of Florida claim for damages in the amount of

$27.5 Billion Dollars was filed with this Court, Judge Carl J.

Barbier by Fax, attached here is the Fax Verification. That

on May 16, 2011 George May, George May filed his Notice of

default, request for default judgement, judgement as a matter

-2-

of Law with this Honorable Court, Judge Carl J. Barbier by Fax. Attached here is the Fax Verification, Copy of the Claim, Request for Judgement for Judgement for George May, George May on behalf of the State of Florida, Plaintiff.

2. That on October 26, 2012 long after default by defendant's instead with knowledge, intent, malice, malice of aforethought, unlawful means, unlawful methods, Carl J. Barbier did not enter or cause the Clerk of the United States District Court for the Eastern District of Louisiana as required by Federal Rule of Civil Procedure 77, 71 default **judgement with added Terrorist defendant's to be entered.**

3. Carl J. Barbier in Clear Absence of All Authority, Jurisdiction to Change the Federal Rules of Civil Procedure, the Rules Enabling Act, Orders by the United States Supreme Court caused to be issued a Void, Unconstitutional, Invalid Order Prohibited by the America Bill of Rights, the Magna Carta, the United States of America Constitution Amendments 1, 5, 13, 14, the Civil Rights Act against Discrimination, the Louisiana Constitution Section 22, Right to Access the Courts, the Florida Constitution Section 21, Orders by the United States Supreme Court, Rules Enabling Act that Court Papers by E-Mail or Fax are not Accepted by the United States District Court Eastern District of Louisiana, Carl J. Barbier Order Closed Access to this Court to aid, abet, in conspiracy with the Terrorist Defendant's here, Terrorist on the United

-3-

States of America Terrorist List, Iran, providing "Material Support, Resources" to the Terrorist here, a Criminal Act pursuant to 18 U.S.C. §2339A, §2339B, §2339C, and to Civil Liability pursuant to 18 U.S.C. §2333 (See Boim v. Holy Land Foundation, 549 F.3d 685, 690-91 (7th Cir. 2008)(en banc), making Carl J. Barbier a Party, Witness, in this case automatically disqualifying, recusing Carl J. Barbier by his Oath, Oath of Office, Louisiana Bar Oath. See Article VI, Section 3, United States Constitution, 5 U.S.C. 3331, 5 U.S.C. §7311, Presidential Executive Order 10450, 18 U.S.C. §1918, Scheuer v. Rhodes, 94 S. Ct. 1683, 1687 (1974); Cooper v. Aaron, 78 S. Ct. 1401, (1958); U.S. v. Will 101 S. Ct. 471, Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 504, thus Continuing Tortious Interference with George May, George May on behalf of the State of Florida, Plaintiff, Intervener Contract and Prospective Economic Advantage. See Pennzoil Co. v. Texaco, Inc., 481 U.S. 1,4, (1987). Attached here is George May, George May on behalf of the State of Florida, Plaintiff, Intervener Default Judgement, Tortious Interference with Contract and Prospective Economic Advantage Claim filed with this Court on May 16, 2011 to be automatically trebled by 18 U.S.C. §2333, with Attorney fees.

4. That on October 26, 2012 after default by the Terrorist defendant's named herein who are not permitted to file any

-4-

denial of the essential allegations of their Criminal Offenses

in any Subsequent Civil Proceedings here 18 U.S.C. §2333,

caused Carl J. Barbier to enter a void, invalid, without

jurisdiction, in clear absence of all authority, prejudice,

Bias, Discriminatory order against George May, George May

on behalf of the State of Florida, Plaintiff, Intervener

denying George May, George May on behalf of the State of

Florida Court Access, Prohibited by Carl J. Barbier Oath,

Oath of Office, his Louisiana Bar Oath, Federal Statutes

§2333, §2339A,B,C, §2332 as a unlawful, prohibited "DEVICE" to

Commit Criminal Conversion, Theft, Robbery, Criminal Anarchy,

of George May, George May on behalf of the State of Florida,

Plaintiff, Intervener Money, Personal Property, Default

Judgement, with knowledge, Criminal Intent, Malice, Malice of

Aforethought, Knowledge, Knowledge of Aforethought, Evil

Purpose Prohibited by Louisiana Criminal Law RS 14.24, RS

14.26, RS 14.65, RS 14.67, RS 14.67.10, RS 14.360, RS 14.134.2,

RS 14.72, RS 14.59, RS 14.113, RS 14.114, RS 14.115, RS 14.120,

RS 14.128.1, RS 14.128.2, RS 14.130.1, RS 14.134, RS 14.230,

RS 14.353, Rs 14.73.5, RS 14.67.18, Louisiana Bar Rules

Part 8., Rule 8.1, 8.2, 8.3, 8.4, 8.5, the Civil Rights Acts,

the United States of America Constitution Federal, State of

Louisiana Criminal Law, and used Improper Methods, Unlawful

Means to again Tortiously Interfere with George May, George

-5-

May on behalf of the State of Florida, Plaintiff, Intervener
on a continuing basis his Contracts and Prospective Economic
Advantage becoming a Party, Witness in this case herein and
committing fraud on this court. See Bulloch v. United
States, 763 F.2d 1115, 1121 (10th Cir. 1985); 455(a) of the
Judicial Code, 28 U.S.C. §455(a); See Lilieberg v. Health
Services Acquisition Corp. 106 S. Ct. 2194 (1988); United
States v. Balistrieri, 779 F. 2d 1191, (7th Cir. 1985);
Florida Statutes §38.01, Pennzoil v. Texaco, Inc., 481 U.S. 1,
4, (1987); Queenie Ltd v. Nygard Int'l, 321 F.3d 282, 290,
(2d Cir. 2003); Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401,
(1958); In Re Sawyer, 124 U.S, 200 (1988); U.S. v. Will, 449
U.S. (6 Wheat) 254, 404, (1821); Orner v. Shalala 30 F.3d 1307;
Crosby v. Bradstreet, Co. 312 F.2d 483, disqualifying Carl J.
Barbier. Attached herein is the Invalid, Void, in clear
absence of all authority, Unconstitutional Order by Carl J.
Barbier closing access to the Court by E Mail, Fax, stating
discrimination, prejudice, Bias Procedure against George May,
George May on behalf of the State of Florida, Plaintiff,
Intervener."Venzor v. Gonzalez, 936 F. Supp. 445, Fixed Case."

5. The defendant's named herein in George May, George May
on behalf of the State of Florida, Plaintiff, Intervener
Addendum -A- Attached here are aiders, abetters, in conspiracy,
with Terrorists, Interrelated by Contracts, Acts of Terrorism,
RICO Acts with Terrorist on the United States Terrorist List.

-6-

committing Terrorist Acts against George May, George May on
behalf of the State of florida, Plaintiff, Intervener
causing megalith damages to George May, George May, Plaintiff,
on behalf of the State of Florida, Plaintiff, Intervener,
his Business, State of Florida Business. See <u>Havlish v. Bin
Laden, 03 Civ. 9848(GBD)(FM); In the Matter of Arab Bank PLC,
Number 2005-2; the Holy Land Foundation for Relief and
Development; Indonesia Lawsuit against Exxon Mobil; Exxon
Mobil Corporation; British Petroleum; Royal Dutch Shell Group,
BHP Billiton; Rio Tinto; all interconnected, interrelated
by Contracts, their Criminal Traitor, Treason, RICO, Patriot
Act Violations, Grand Theft, Robbery, Trespassing, Stalking,
Rape, Pillage, Plunder, Enslaving Terrorist Acts, Economic
Terrorist Acts, Biological Terrorist Acts, Tortious
Interference with Contracts, and Prospective Economic Advantage
of George May, George May on behalf of the State of Florida,
Plaintiff, Intervener.</u>  See 18 U.S.C. §2, §3, §4.

6. The Honorable Carl J. Barbier is as the defendant's
here in George May, George May on behalf of the State of
Florida, Plaintiff, Intervener Addendum -A- Attached here
jointly and severally have defaulted on George May, George
May on behalf of the State of Florida, Plaintiff, Intervener
Tortious Interference with Contract and Prospective Economic
Advantage Claim filed April 17, 2011, May 16, 2011 pursuant

to **18 U.S.C. §2, §3, §4, §2333, §2339A,B,C, §2332** Mandatory
Required to Perform his Constitutional Duty to enter
Default Judgement, Judgement as a Matter of Law for George
May, George May on behalf of the State of Florida, Plaintiff,
Intervener in the amount of **$27.5** Billion Dollars Trebled,
plus interest at the Statutory Rate Compounded Annually,
plus Attorney Fee's of 50% for Nicolas Jesus Gutierrez, Jr.,
required by George May, George May on behalf of the State of
Florida, Plaintiff, Intervener contract, Prejudgement interest
from May 16, 2011. See <u>370 Limited Partnership v. SRC, 337
MD 490, 880 A.2d 307 (1995); Casino Redevelopment Authority
v. Hauck, 317 Super 584 (app. div. 1999); A Ministerial Act
Not Requiring a Hearing. See Fisher v. Knuck, 497 So. 2d 240</u>.

WHEREFORE George May, George May on behalf of the State
of Florida, Plaintiff, Intervener files this his notice of
the Automatic Disqualification, Recusal of Honorable Carl J.
Barbier, Party, Witness in this case, George May, George
May on behalf of the State of Florida Plaintiff, Intervener
Notice of Modification of Default Judgement for Continuous
Tortious Interference with contract, and Prospective
Economic Advantage of George May, George May on behalf of the
the State of Florida, Plaintiff, Intervener and against all
Terrorist defendant's in George May, George May on behalf of
of the State of Florida, Plaintiff, Intervener list

-8-

Addendum -A-, Jointly and Severally. Attached here is Addendum -A- which is Kenneth R. Feinberg, et. al. list with required added aiders, abetters, those in conspiracy, associates Terrorists, Economic Terrorist BHP Billiton, ExxonMobil, BHP, Rio Tinto, Statoil, Shell Oil, Royal Dutch Shell Group, Daewoo Shipbuilding and Marine Engineering Company Ltd., Kiewit Offshore Services Ltd. Iran, all defendant's guilty, inter-related, interconnected by their Contracts, Agreements, Criminal Enterprise, Terrorism, Terrorist Acts, with Assets of in Excess of $10 Trillion Dollars, Dominance of all the Worlds Resources of Oil, Gas, Minerals of in excess of a Trillion Trillion Dollars.

"A JUDGE CARL J. BARBIER CANNOT BE A JUDGE ON HIS OWN CASE IN WHICH HE IS A PARTY, WITNESS, AIDER, ABETTER, IN CONSPIRACY WITH THE TERRORIST DEFENDANT'S SEE 28 U.S.C. §453, §455, THUS MAKING ALL HIS ORDERS IN THIS CASE, THESE CASES VOID, UNCONSTITUTIONAL, OF NO EFFECT WHAT-SO-EVER, INVALID. SEE UNITED STATES OF AMERICA V. JOSEF ALTSTOTTLER, ET. AL. 14 ANN. DIG. 278 (1946); 18 U.S.C. §2,§3,§4, §371,."

I George May, George May on behalf of the State of Florida Plaintiff, Intervenor, Movant declare, certify, verify, under the penalty of perjury under the laws of the United States of of America that the foregoing, Motion For Default, Default Judgement, Judgement as a Matter of Law, Summary Judgement is true and correct. George May, George May on behalf of the State of Florida, Plaintiff, Intervenor, Movant certifies that his statements are made in good faith and from his personal knowledge.

George May, George May,
on behalf of the State
of Florida, Plaintiff,
Intervenor Economically
Destroyed by Terrorist
BP P.L.C., those in
Conspiracy, Aiders,
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph./Fax. 561-290-4384

    I hereby certify that a copy of the foregoing was mailed,

faxed this 21 day of December 2012 to:

Clerk U.S. District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130
Ph. 504-589-7600
Fax. 504-589-7697

Special Master
Francis E. McGovern
Duke University of Law
Durham, NC 27708
Ph. 919-613-7095
Fax. 919-613-7165
BAR ID NO. Not Admitted

Plaintiff's Liaison Counsel
Stephen J. Herman
820 O'Keefe Avenue
New Orleans, LA 70113
Ph. 504-581-4892
Fax. 504-561-6024
BAR ID NO. ADMITTED

Defense Liaison Counsel
David J. Beck
1221 McKinney Street
Houston, TX 77010
Ph. 713-951-3700
Fax. 713-951-3720
BAR ID NO. 00000070

Honorable Judge
Carl J. Barbier
500 Poydras Street RM C256
New Orleans, LA 70130
Ph. 504-589-7525
Fax. 504-589-4536
BAR ID NO. ADMITTED

Coordinating Counsel for
Federal Government
R. Michael Underhill
450 Golden Gate Avenue
San Francisco, CA 94102
Ph. 415-436-6648
Fax. 415-436-6632
BAR ID NO. 104986

Pamula Bondi
Office of Attorney General
Soliciter General
The Capitol
Tallahassee, Fl. 32399
Ph. 850-414-3300
Fax. 850-410-2672
BAR ID NO. 886440

The United States Department
of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Ph. 202-353-1555
Fax. 202-307-4613

Nicolas J. Gutierrez, Jr.
601 Brickell Key Dr. Ste 702
Miami, Fl. 33131
Ph. 305-371-8064
Fax. 305-371-4967

Lawrence K. Fagan
2100 N. Florida Mango Rd.
West Palm Bch., Fl. 33409
Ph. 561-689-3745
Fax. 561-687-0154

Jo Ann Barone
249 Royal Palm Way
Palm Bch., Fl. 33480
Ph. 561-655-8478
Fax. 561-655-8478

Stuart L. Stein
P.O. Box 29598
Sante Fe,
New Mexico 87592
Ph. 505-450-5002
Fax. 505-889-0953

George May

-11-



# U.S. District Court
# Eastern District of Louisiana



General Info
Directories
Motion Days
CM/ECF
Case Info
Attorney Info
Jury
Local Rules
Drywall MDL
Vioxx MDL
Canal Breaches
Murphy Oil
Mass Litigation
Forms
Links
Employment

*IN MEMORIAM*
**Honorable Charles Schwartz, Jr.**
August 20, 1922 - November 3, 2012

U.S. District Judge, 1976 - 2012

*CARL J. BARBIER ORDER to CLOSE THE COURT ACCESS*

**Court News**

· NOPD Consent Decree, USA v. City of New Orleans, 12-1924

· MDL-2179 Oil Spill by the Oil Rig "Deepwater Horizon"

· Mandatory Electronic Filing ←

· CLICK HERE to Update Attorney e-Mail Addresses ←

*DISCRIMINATION Civil Rights, Bill OF Rights Constitutional Rights VIOLATION*

**Court News Archive**
Click to view

The Eastern District of Louisiana celebrates the 200th anniversary of Louisiana statehood with 200 years of the federal courts in Louisiana.
Now available: Video Clips from the 200th Anniversary CLE
Click one of the images below to learn more about this court's 200 year history.

*MAGNA CARTA VIOLATION*

**The President of the United States of America,**
To the Marshal of the Eastern District of Louisiana, or his lawful Deputy, Greeting:
YOU ARE HEREBY COMMANDED, ...

DISTRICT COURT OF THE UNITED STATES, for the Eastern District of Louisiana, to be holden ...

Welcome to the United States District Court for the Eastern District of Louisiana. We are authorized 12 Active <u>Judges</u>, have 3 Senior <u>Judges</u> and 6 <u>Magistrate Judges</u>.

**The court does not accept documents submitted for filing by email or fax.** ←

| | |
|---|---|
| Address: | U.S. District Court |
| | 500 Poydras Street, Room C-151 |
| | New Orleans, LA 70130 |
| Phone: | (504) 589-7600 |
| Fax: | (504) 589-7697 |

*Void, INVALID, UNCONSTITUTIONAL ORDER by CARL J. BARBIER to Aid, Abet TERRORIST, ENSlAVE US CITIZENS*

· Judicial Misconduct and Disability Procedures

<u>Comments and Suggestions</u>

Last updated on: Tuesday, November 06, 2012 09:04 AM
`00075644`

1 of 1                                                                  01/11/2004 02:08 a.m.

# U.S. District Court
# Eastern District of Louisiana

## Section J - Judge Carl J. Barbier

*CARI J, BARbicR*

500 Poydras Street
Room C256
New Orleans, LA 70130

| COURTROOM | CHAMBERS | PHONE |
|-----------|----------|-------|
| C268 | C256 | 504-589-7525 |

*CANNOT Close Court*

**Staff**

| | | |
|---|---|---|
| Hope McDonald | Judicial Assistant | 504-589-7525 |
| Amanda Callais | Law Clerk (odd cases) | 504-589-7525 |
| Keriann Langley | Law Clerk (even cases) | 504-589-7525 |
| Ben Allums | Law Clerk (MDL) | 504-589-7525 |
| Stephanie Kall | Case Manager | 504-589-7694 |
| Gail Chauvin | Docket Clerk | 504-589-7704 |

*ACCESS*

[ Home ] [ District Judges ] [ Clerk's Office ] [ Court Reporters ] [ U.S. Probation Office ] [ Pre-trial Services ]
[ U.S. Bankruptcy Court ] [ U.S. Court of Appeals ] [ U.S. Attorney's Office ] [ Federal Public Defender ] [ U.S. Marshals Service ]
[ Magistrate Judges ] [ Louisiana State Bar ] [ Federal Bureau of Prisons ] [ Louisiana Supreme Court ]

revised: 08/31/12 09:16

*CARl J. BARbiER IS A PARTy, WiTNESS AutomATicAlly disquAlifiEd FoR HiS USE of HiS Prohibited by HiS OATH of OfficE ("DEVicE") of void, INVAlid UNCONSTiTuTioNAl ORdERs to DENY CouRT ACCESS*

*Aids, Abets, iN CoNSpiRAcy with CRiMiNAl, TRAiTOR, TREASON, Robbing, GRANd ThEFT, StAlking, TRESpASSiNg, ENSlAvING ECONOMIC TERRORIST, TERRORIST BRibiNg, RICO, PAtRiot Act TERRORIST*

01/11/2004 02:11 a.m.

: **Home** : **Members Log In** : **Members Services** : **Inside the LSBA** : **Programs & Affiliates** : **Cont**

# Louisiana State
# Bar Association
Serving the Public, Serving the Profession

: **News Resources** : **CLE Programs** : **LSBA Calendar** : **Public Resources** : **Member Directory** : **Pi**

## The LSBA Membership Directory

### Carl J Barbier

*is*

Primary Address: 500 Poydras St Rm 256

City: New Orleans

State: LA

Zip: 70130

Telephone: (504) 589-7525

Fax: (504) 589-4536

Email: barbier@laed.uscourts.gov

\* Parish: ORLEANS

Law Firm: US District Court

\* Board District: 1st - LSBA Board District

\* Judicial District : Orleans Parish

Date Admitted: 9/11/1970

*A OFFICOR*
*OF THE*
*COURT*
*MUST*
*ACCEPT*
*FILING FOR*
*THE COURT &*

*\* Based on member's preferred mailing address which may differ from th
address show above*

*DID ACCEPT*

: **Directions** : **Disclaimer of Liability** : **Advertisement Disclaimer** : **Site Map**
: **Louisiana State Bar Association** : **601 St. Charles Avenue** : **New Orleans, LA 70130** : **(800) 421-LSBA(5722) /**

*CARL J. BARBIOR
IS BOUND BY
HIS OATH,
OATH OF OFFICE,
LOUISIANA BAR
OATH TO ACCEPT
FILING BY FAX*

# THE CONSTITUTIONAL RIGHT TO A REMEDY
## Chief Justice Tom Phillips[1]

The American Bill of Rights, to which United States Supreme Court Justice
William J. Brennan was so devoted, is one of the supreme achievements of
the human spirit.  In ten concise paragraphs, it encapsulates most of the basic
rights and freedoms that  most of the world now regards as the basis of
individual liberty and human dignity.[2]  But Justice Brennan, for one, never
forgot that every American had even more protection from government
oppression.  Ever mindful of his roots as a state judge (with stints on the New
Jersey trial, appellate and supreme court benches ), he urged the bench and
bar to rely on state bills of rights as well as the federal one.[3]  He recognized
thatstate constitutions, too, are a font of individual liberties, their protections
often extending beyond those required by the Supreme Court's interpretation
of federal law.  The legal revolution which has brought federal law to the fore
must not be allowed to inhibit the independent protective force of state law
—- for without it, the full realization of our liberties cannot be guaranteed.[4]
Most state bills of rights are longer than the first ten amendments, and thus
they contain rights and guarantees not found in the federal constitution.  The
most widespread and important of these unique state provisions is probably
the guarantee of a right of access to the courts to obtain a remedy for injury.
It is one of the oldest of Anglo-American rights, rooted in Magna Carta[5]
and nourished in the English struggle for individual liberty and conscience
rights.[6]  Today, it expressly or implicitly appears in forty state
constitutions.[7]



While there are thirty-two different versions[8] among the forty states, there
are  two major variants.  Ten states use language  devised in the seventeenth
century by Sir Edward Coke.[9] Their constitutions provide something like
this:
That every person for every injury done him in his goods, land or person,
ought to have remedy by the course of the law of the land and ought to have
justice and right for the injury done to him freely without sale, fully without
any denial, and speedily without delay, according to the law of the land.



Twenty-eight states use a more compact form,[10] reading something  like
this:
That all courts shall be open, and every person, for an injury done him in his
person, property or reputation, shall have remedy by the due course of the
law.
Today, these traditional words are invoked to challenge procedural
impediments to judicial access or to block substantive modifications to
established causes of action or remedies. In the last quarter century alone,
state supreme courts have relied on the right to a remedy to strike down laws
that lacked discovery rule exceptions to a time bar on bringing suit,[11]
allowed limitations to run against minor plaintiffs,[12] or interposed terms of
repose on claims against architects and builders,[13] engineers,[14]
suppliers[15] and manufacturers.[16] Repose statutes have also been

### §18. Right to Bail

Section 18.(A) Excessive bail shall not be required. Before and during a trial, a person shall be bailable by sufficient surety, except when he is charged with a capital offense and the proof is evident and the presumption of guilt is great. After conviction and before sentencing, a person shall be bailable if the maximum sentence which may be imposed is imprisonment for five years or less; and the judge may grant bail if the maximum sentence which may be imposed is imprisonment exceeding five years. After sentencing and until final judgment, a person shall be bailable if the sentence actually imposed is five years or less; and the judge may grant bail if the sentence actually imposed exceeds imprisonment for five years.

(B) However, a person charged with a crime of violence as defined by law or with production, manufacture, distribution, or dispensing or possession with intent to produce, manufacture, distribute, or dispense a controlled dangerous substance as defined by the Louisiana Controlled Dangerous Substances Law, and the proof is evident and the presumption of guilt is great, shall not be bailable if, after a contradictory hearing, the judge or magistrate finds by clear and convincing evidence that there is a substantial risk that the person may flee or poses an imminent danger to any other person or the community.

*Acts 1997, No. 1498, §1, approved Oct. 3, 1998, eff. Nov. 5, 1998.*

### §19. Right to Judicial Review

Section 19. No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. This right may be intelligently waived. The cost of transcribing the record shall be paid as provided by law.

### §20. Right to Humane Treatment

Section 20. No law shall subject any person to euthanasia, to torture, or to cruel, excessive, or unusual punishment. Full rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense.

### §21. Writ of Habeas Corpus

Section 21. The writ of habeas corpus shall not be suspended.

### §22. Access to Courts

Section 22. All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.

### §23. Prohibited Laws

Section 23. No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted.

**guardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# BP oil concession in Abu Dhabi at risk in political row between UK and UAE

## BP's exclusion from bidding to renew its concession thought to be reprisal for British criticism of crackdown on Islamist groups

*HE, HE WHAT CONSTITUTION*

**Terry Macalister**
The Guardian, Monday 5 November 2012

*HA, HA    WE PAY*



*FOR NO COURT ACCESS, ECONOMIC TERRORISM, TERRORISTS WE ARE THE MINISTRY OF JUSTICE THS*

The government of UAE president Sheikh Khalifa bin Zayed al-Nahyan has been criticised for its recent crackdown on Islamist groups. Photograph: AFP/Getty Images

*GESTAPO IN*

One of BP's longest-running energy concessions is threatening to become a high-profile victim of tensions between the United Arab Emirates and Britain over criticism of the Middle East state's crackdown on Islamist extremist groups.   *AMERICA*

BP was first given a stake in a vast onshore oil field in Abu Dhabi back in 1939, but the concession comes up for renewal in 2014 and BP has been excluded from the bidding list.   *LAND OF THE ENSLAVED*

BP oil concession in Abu Dhabi at risk in political row between UK ...    http://www.guardian.co.uk/business/2012/nov/03/bp-oil-concession...

The UAE is one of the top five oil exporters in the world and Abu Dhabi is the headquarters for BP's entire exploration and production operation across the Middle East – the birth place a century ago of the business as the Anglo-Persian Oil Company.

BP said "discussions are still continuing" with the UAE authorities but its exclusion from the bid is a major blow. The company is already in the middle of a row with Azerbaijan over falling output there, and has been hit by a series of serious problems in recent years, most notably the Deepwater Horizon oil spill in the Gulf of Mexico.

The oil major is privately said to be still hopeful the British government can sweet-talk the UAE into changing its mind at a time when its chief rivals, Royal Dutch Shell, ExxonMobil and others have been accepted as prequalified to bid.

UAE officials have also accepted privately that BP's failure to make the list of bidders is a problem associated with the UK government rather than the company. Oil analysts in London, who preferred not to be named, said it was generally accepted that BP was the victim of a wider political row.

The UAE has indicated that it is still to make a final decision on the issue, giving it leverage to encourage the UK government to dissuade political commentators in Britain from giving what it perceives as support to Islamist groups such as al-Islah.

According to Human Rights Watch, the group – whose name translates as Reform and Social Guidance – is a "non-violent political assocation advocating greater adherence to Islamic precepts".

BP holds a 9.5% holding in the 1.4m barrels-a-day concession alongside four western oil majors and the local state-owned group Abu Dhabi National Oil Company.

The loss of its interests would deprive the company of 125,000 barrels a day, which is around 3.5% of its total global production.

This is a significant amount given that BP is struggling to keep its volumes from falling, especially at a time when it is in the middle of selling its 50% stake in TNK-BP, its highly productive Russian operation.

The financial loss from Abu Dhabi, however, would be less pronounced as the company is only paid around $1 for each barrel produced under the terms of the concession, which is structured as a "contractor fee".

Abu Dhabi is one of the few Gulf states that allow western companies to explore for oil, and BP's exit would be a blow to the company's image as a blue-chip operator in

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## TITLE 28 - JUDICIARY AND JUDICIAL PROCEDURE
### PART I - ORGANIZATION OF COURTS
#### CHAPTER 21 - GENERAL PROVISIONS APPLICABLE TO COURTS AND JUDGES

### § 455. Disqualification of justice, judge, or magistrate judge

(a)  Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b)  He shall also disqualify himself in the following circumstances:

    (1)  Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

    (2)  Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

    (3)  Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

    (4)  He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

    (5)  He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

        (i)  Is a party to the proceeding, or an officer, director, or trustee of a party;

        (ii)  Is acting as a lawyer in the proceeding;

        (iii)  Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

        (iv)  Is to the judge's knowledge likely to be a material witness in the proceeding.

(c)  A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d)  For the purposes of this section the following words or phrases shall have the meaning indicated:

    (1)  "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

    (2)  the degree of relationship is calculated according to the civil law system;

    (3)  "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

    (4)  "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

        (i)  Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

        (ii)  An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

        (iii)  The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

        (iv)  Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e)  No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification

## 2471  18 U.S.C. § 2

The first provision one finds in Title 18 of the United States Code regarc accessories to crime. Title 18, United States Code § 2 now provides:

(a) Whoever commits an offense against the United States or aids, abet counsels, commands, induces or procures its commission, is punishable a principal.

(b) Whoever willfully causes an act to be done which if directly perform by him or another would be an offense against the United States, is punishable as a principal.

Aider and abettor liability is distinct from accessory after the fact under U.S.C. § 3. *United States v. James*, 998 F.2d 74, 80 (2d Cir.), *cert. denied*, U.S. 958, 114 S.Ct. 415, 126 L.Ed.2d 362 (1993). An aider and abettor, unl accessory after the fact, is punishable as a principal. *Id.*

[updated October 1998]

# Summary

Zacarias Moussaoui, members of the Colombian drug cartels, members of organized crime, and some of the former Enron executives have at least one thing in common: they all have federal conspiracy convictions. The essence of conspiracy is an agreement of two or more persons to engage in some form of prohibited misconduct. The crime is complete upon agreement, although some statutes require prosecutors to show that at least one of the conspirators has taken some concrete step or committed some overt act in furtherance of the scheme. There are dozens of federal conspiracy statutes. One, 18 U.S.C. 371, outlaws conspiracy to commit some other federal crime. The others outlaw conspiracy to engage in various specific forms of proscribed conduct. General Section 371 conspiracies are punishable by imprisonment for not more than five years; drug trafficking, terrorist, and racketeering conspiracies all carry the same penalties as their underlying substantive offenses, and thus are punished more severely than are Section 371 conspiracies. All are subject to fines of not more than $250,000 (not more than $500,000 for organizations), most may serve as the basis for a restitution order, and some for a forfeiture order.

The law makes several exceptions for conspiracy because of its unusual nature. Because many united in crime pose a greater danger than the isolated offender, conspirators may be punished for the conspiracy, any completed substantive offense which is the object of the plot, and any foreseeable other offenses which one of the conspirators commits in furtherance of the scheme. Since conspiracy is an omnipresent crime, it may be prosecuted wherever an overt act is committed in its furtherance. Because conspiracy is a continuing crime, its statute of limitations does not begin to run until the last overt act committed for its benefit. Since conspiracy is a separate crime, it may be prosecuted following conviction for the underlying substantive offense, without offending constitutional double jeopardy principles; because conspiracy is a continuing offense, it may be punished when it straddles enactment of the prohibiting statute, without offending constitutional ex post facto principles. Accused conspirators are likely to be tried together, and the statements of one may often be admitted in evidence against all.

In some respects, conspiracy is similar to attempt, to solicitation, and to aiding and abetting. Unlike aiding and abetting, however, it does not require commission of the underlying offense. Unlike attempt and solicitation, conspiracy does not merge with the substantive offense; a conspirator may be punished for both.

An abridged version of this report without footnotes and most citations to authority is available as CRS Report R41222, *Federal Conspiracy Law: A Sketch*, by Charles Doyle.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig      *      MDL, NO. 2179
     "Deepwater Horizon" in           *
     the Gulf of Mexico, on           *      SECTION: J
     April 20, 2010                   *
                                      *      HONORABLE JUDGE
     Applies to All Cases             *
                                      *      CARL J. BARBIER
**********************************

GEORGE MAY, PLAINTIFF CLAIM FOR DAMAGES, DAMAGES
FOR THE STATE OF FLORIDA, AGAINST BP P.L.C., ALL
TERRORIST BUSINESS ASSOCIATES PERTAINING TO BP
P.L.C., HALLIBURTON, MOTION FOR DEFAULT, DEFAULT
JUDGEMENT, SUMMARY JUDGEMENT FOR GEORGE MAY,
PLAINTIFF, AND THE STATE OF FLORIDA

COMES NOW, George May, Plaintiff claim for damages,

damages for the State of Florida, and against BP P.l.c.,

all business associates pertaining to Bp p.l.c.,

Halliburton, and files this his motion for default,

default judgement, summary judgement against Bp p.l.c.

for cause herein as follows:

    1. George May, Plaintiff, George May on behalf of

the State of Florida filed his Claim, Quo Warranto for

payment With the Honorable Court, honorable Judge Carl

J. Barbier on April 17, 2011, attached here is the fax

proof of service.

-1-

2. That Bp p.1.c. all defendant's in George May, Plaintiff, George May on behalf of the State of Florida in George May, Plaintiff Attachment A, attached herein and unnamed defendant's in complicity have refused to answer, or file any affirmative defense within the required 20 days required by Federal Rules of Civil Procedure 8(b),(c),(d),(e),. 12(a),(1),(A),(b),(c),(h),(1),(A),(B), and have admitted, plead guilty to all claims by George May, Plaintiff, George May on behalf of the State of Florida, requiring that a default, default judgement, summary judgement be entered for George May, Plaintiff, and the State of Florida under Federal Rule of Civil Procedure 54,(c), 56(a), 57.

3. George May, Plaintiff, George May on behalf of the State of Florida are here entitled to immediate judgement for payment of treble damages against Bp p.1.c., all defendant's listed in his Attachment A, attached herein and unnamed defendant's not listed in Attachment A, attached herein under 18 U.S.C. §2333(a),(b),(c),. Quo Warranto is a demand that the defendant's herein have refused to answer within the required 20 days required by Florida Statutes 80.31. The Rules of pleading and practice of Mandamus apply here.

-2-

4. That under the Erie Doctrine, diversity this United States District Court is required to Florida State Law, English Common Law regarding Quo Warranto proceedings. <u>Martinez v. Martinez, 545 So. 2d at 1339.</u>

5. George May, Plaintiff, George May on behalf of the State of Florida has asked the United States President to remove these Judges, Governor's being paid by Bp p.l.c., Shell Oil, Arab Bank, Imam Musri, Imam Enrique Rasheed, Al-Qaeda, Bassem Alhalabi, Ahemid Bedler, Ala'a Al Ali, Terrorists, under 18 U.S.C. §2381, §2384, §2332(a), §2339 (A),(B). <u>United States v. Josef Altstotter, et. al. 14 Ann. Dig. 278 (1948).</u>

I hereby certify that a copy of the foregoing was mailed/faxed this April 17, 2011, to:

Honorable Judge
Carl J. Barbier
500 Polydras Street
Room C-256
New Orleans, Louisiana 70130
Ph. 504-589-7525
Fax. 504-589-4536

Docket Clerk
Stephanie Kall
Ph. 504-589-7709
Fax. 504-589-3199

Daniel E. Becnel, Jr.
106 West 7th Street
Reserve, LA 70084
Ph. 985-536-1186
Fax. 985-536-6445

Charles S. Yerrid Att
101 E. Kennedy Blvd.
Ste 3910
Tampa, Fl. 33602
Ph. 813-222-8222
Fax. 813-222-8224

Francis E. McGovern, Special Master
Duke University School of Law
Cornor of Science & Tower Drives
Durham, NC 27708
Ph. 919-613-7035
Fax. 919-613-7165

George May as Alter Ego,
Last Remaining Asset Holder
of His Florida Corporations

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph. 305-508-5011

-4-

TRANSMISSION VERIFICATION REPORT

```
TIME  : 04/17/2011 15:05
NAME  : GEORGE MAY
FAX   : 305-508-5011
SER.# : BROF9F206587
```

```
DATE,TIME              04/17  14:45
FAX NO./NAME           0015045894536
DURATION               00:19:36
PAGE(S)                47
RESULT                 OK
MODE                   STANDARD
                       ECM
```

HONORABLE
JUDGE
CARL J. BARBIER

QUO WARRANTO
AND CLAIM Filed
4/17/11

Affairs in an appropriately convened court-martial action as provided by law, shall impose a sentence of imprisonment, nor shall it impose any other penalty except as provided by law.

# Section 19

### Text of Section 19:

### Costs

No person charged with crime shall be compelled to pay costs before a judgment of conviction has become final.

# Section 20

### Text of Section 20:

### Treason

Treason against the state shall consist only in levying war against it, adhering to its enemies, or giving them aid and comfort, and no person shall be convicted of treason except on the testimony of two witnesses to the same overt act or on confession in open court.

# Section 21

### Text of Section 21:

### Access to Courts

The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.

# Section 22

*NO ANSWER to STATE OF FloridA GooRge MAY CLAIM by ANYONE*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig    *    MDL, No. 2179
       "Deepwater Horizon" in the    *
       Gulf of Mexico, on April    *    SECTION: J
       20, 2010.    *
                              *    HONORABLE
       Applies to: All Cases    *    JUDGE BARBIER
                              *    MAGISTRATE SHUSHAN

**********************************

       GEORGE MAY, PLAINTIFF CLAIM FOR DAMAGES, DAMAGES
FOR THE STATE OF FLORIDA, AGAINST BP, ALL TERRORIST
BUSINESS ASSOCIATES PERTAINING TO BP, HALLIBURTON
UNDER 18 U.S.C. §2381, §2384, §2333,

       COMES NOW, George May, Plaintiff, and files this his

claim for damages, damages for the State of Florida agaunst

Bp, all terrorist business associates pertaining to BP,

Halliburton, under 18 U.S.C. §2381, §2384, §2333, for

cause herein as follows:

       1. That BP, their terrosist associates, Shell Oil,

have obstructed justice of this honorable court by paying

off Charlie Crist, pretending to be Governor of Florida,

Richard L. Scott, to not file a claim for Florida within

the required deadline of April 20, 2011, prohibited by

18 U.S.C. §666, §371, §1951, §1349, §1001,

       2. That Bp, their terrorist associates have obstructed

justice, of the Federal District Courts in Florida by

-1-

their use of the prohibited, unlawful device, prohibited
by a judges oath, oath of office of void, invalid, null,
of no effect what-so-ever, unconstitutional, recalled,
vacated orders, judgements to rob the oil, gas, mineral
rights of over 9,000 private property owners in South West
Dade County, and all of Florida.

   3. George May, plaintiff here has had all of his land,
oil, gas, mineral, limestone, sand, rock, gravel reserves
robbed from him by Bp, Shell Oil, Terrorist before mentioned
here in Florida.

   4. That BP, Shell Oil, their Terrorist Assosicate,
Business Partners in Complicity have paid off the judges,
in the State of florida to not sign my default judgements,
for the payment of the Condemnation of my Liberty, Property,
Limestone, Sand, Rock, Gravel, Oil, Gas Reserves. Attached
herein are my default judgements, Writ of Quo Warranto to
remove pretend Richard L. Scott.

   5. That Bp, Shell Oil Company in complicity with their
Terrorist associates have robbed billions of dollars from
George May, Plaintiff, the private property owners of Florida,
and have destroyed Florida by their Criminal, Traitor, Treason,
Terrorist Acts against the Citizens of Florida the United

-2-

States.

6. BP, their terrorist associates are committing these criminal, traitor, treason, terrorist acts against George May, Plaintiff, the Citizens of Florida, the United States, Citizens of the World, to destroy their economy's, murder citizens for their obscene profit by fixing the price of oil, gas as they did silver.

Wherefore George May, Plaintiff, George May on behalf of the State of Florida, it's Citizens request that treble damages of $27.5 Billion dollars be awarded for them and against BP, Oil Company, Shell Oil Company, Halliburton, their Terrorist Associates for their using the unlawful, prohibited "DEVICE" of void, invalid, null, of no effect what so ever, vacated, recalled, unconstitutional orders, judgements, obstruction of justice to rob George May, Plaintiff, the private property owners of Florida, Florida, the Citizens of Florida required by 18 U.S.C. §2333.

Respectfully submitted

George May, as Alter Ego
of His Florida Corporations

George May

-3-

WHEREFORE, George May, Plaintiff, George May on behalf
of the State of Florida, it's Citizens here respectfully
requests that the Honorable Carl J. Barbier, Court enter
it's order for default, default judgement, declaratory
judgement, summary judgement for George May, plaintiff,
and the State of Florida, and against Bp p.l.c, BP Oil,
all defendant's in Attachment A, attached herein, for
treble damages of $27.5 Billion Dollars plus interest
from April 20, 2010 sua sponte, forth with, under
18 U.S.C. §2333(a),(b),(c), <u>Curd v. Mosaic, 993 So. 2d 1078</u>
<u>Fla. 2d DCA 2008), S. CT. Fl. SC08-1920;</u>

Respectfully submitted

George May as Alter Ego,
Last Remaining Asset Holder
of his Florida Corporations

George May,
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
Ph. 305-508-5011

George May on behalf of
the State of Florida, it's
Citizens destroyed Ecomnomically
by Bp p.l.c., BP Oil, it's
Terrorist Associates

-4-

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was

mailed/faxed this May 16, 2011, to:

Honorable Judge
Carl J. Barbier
500 Polydras Street
Room C-256
New Orleans, Louisiana 70130
Ph. 504-589-7525
Fax. 504-589-4536

Michael Shane Lucado
1 Perimeter Park S.
Suite 125S
Birmingham, AL 352-43
Ph. 205-278-0025
Fax. 205-278-0030

Thomas J. Perrelli
United States Attorney
U.S. Department
of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Ph. 202-353-1555
Fax. 202-307-4613

Enoch J. Whitney
Office of Attorney
General
State of Florida
Ph. 850-414-3672
Fax. 850-488-4872

George May

-5-

TRANSMISSION VERIFICATION REPORT

```
TIME    : 05/16/2011 11:16
NAME    : GEORGE MAY
FAX     : 305-508-5011
SER.#   : BROF9F206587
```

| | |
|---|---|
| DATE,TIME | 05/16  10:58 |
| FAX NO./NAME | 0018504804872 |
| DURATION | 00:18:08 |
| PAGE(S) | 41 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

Att
Goneral
Plorida

TRANSMISSION VERIFICATION REPORT

```
TIME  : 05/16/2011 10:54
NAME  : GEORGE MAY
FAX   : 305-508-5011
SER.# : BROF9F206587
```

```
DATE,TIME          05/16  10:35
FAX NO./NAME       0012023074613
DURATION           00:18:45
PAGE(S)            49
RESULT             OK
MODE               STANDARD
                   ECM
```

US ATT

PORROLLI

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 05/16/2011 07:40
                                    NAME  : GEORGE MAY
                                    FAX   : 305-508-5011
                                    SER.# : BROF9F206587
```

```
        DATE,TIME              05/16  07:23
        FAX NO./NAME           0015045894536
        DURATION               00:16:41
        PAGE(S)                40
        RESULT                 OK
        MODE                   STANDARD
                               ECM
```

Judge
CARL J BARbiER

## Attachment "A" Listing Released Parties

Abdon Callais Offshore, Inc.
Admiral Robert J Papp Jr.
Admiral Thad Allen
Admiral Towing, LLC
Aerotek, Inc.
Airborne Support, Inc.
Airborne Support International, Inc.
Alford Safety Services Inc.
Alford Services Inc.
Ameri-Force, Inc.
Ameri-Force Craft Services, Inc.
American Pollution Control Corporation
Anadarko Petroleum Company
Anadarko Petroleum Corporation
Anadarko E&P Company LP
Apex Environmental Services, LLC
Art Catering, Inc.
Ashland Services, LLC
B&B Environmental Services, Inc.
Belle Chasse Marine Transportation, Inc.
BJ Services Company, USA
Blue Marlin Services of Acadiana, LLC
Bobby Lynn's Marina, Inc.
BP America Inc.
BP America Production Company
BP Company North America Inc.
BP Corporation North America Inc.
BP Energy Company
BP Exploration (Alaska) Inc.
BP Global Special Products (Americas) Inc.
BP Holdings North America Limited
BP Exploration & Production Inc.
BP p.l.c.
BP Products North America Inc.
BP International Ltd.
BP Corporation North America Inc. Savings Plan Investment Oversight Committee
Brett Cocales
Brian Morel
Cabildo Services, LLC
Cabildo Staffing, LLC
Cahaba Disaster Recovery LLC
Cal Dive International, Inc.
Cameron Corporation
Cameron International Corporation
Cameron International Corporation f/k/a Cooper Cameron Corporation
Cameron International Corporation d/b/a/ Cameron Systems Corporation
Center for Toxicology and Environmental Health L.L.C.
Chill Boats L.L.C.
Chouest Shorebase Services, LLC
Clean Harbors, Inc.
Clean Tank LLC
Clean Tank Inc.
Core Industries, Inc.
Core 4 Kebawk, LLC

029282

Crossmar, Inc.
Crowder/Gulf Joint Venture
Crowder Gulf Disaster Recovery
Danos and Curole Marine Contractors, LLC
Danos & Curole Staffing, L.L.C.
David Sims
Deepwater Horizon Oil Spill Trust
Diamond Offshore Company
DOF Subsea USA, Inc.
Don J. Vidrine
DRC Emergency Services, LLC
DRC Marine, LLC
DRC Recovery Services, LLC
Dril-Quip, Inc.
Dynamic Aviation Group, Inc.
Eastern Research Group, Inc.
Environmental Standards, Inc.
Environmental Safety & Health Consulting Services
Environmental Safety & Health  Environmental Services
ES&H, Inc.
ESIS, Inc.
Exponent, Inc.
Faucheaux Brothers Airboat Services, Inc.
Global Diving & Salvage, Inc.
Global Employment Services, Inc.
Global Fabrication, LLC
Global Marine International, Inc.
Graham Gulf Inc.
Grand Isle Shipyard Inc.
Gregg Walz
Guilbeau Marine, Inc.
Guilbeau Boat Rentals, LLC
Gulfmark Offshore, Inc.
Gulf Offshore Logistics, LLC
Gulf Offshore Logistics International, LLC
Gulf Services Industrial, LLC
HEPACO, Inc.
Hilcorp Energy Company
Hyundai Heavy Industries Co. Ltd, Inc.
Hyundai Motor Company
I-Transit Response, L.L.C
International Air Response, Inc.
Island Ventures II, LLC
JMN Specialties, Inc.
JNB Operating LLC
John Guide
K & K Marine, LLC
LaBorde Marine Services, LLC
Lane Aviation
Lawson Environmental Service LLC
Lawson Environmental Service & Response Company
Lee Lambert
Lord Edmund John Browne
Lynden Air Cargo, LLC
Lynden, Inc.
Maco of Louisiana, LLC

16

029283

Maco Services, Inc.
Marine Spill Response Corporation
Mark Bly
Mark Hafle
M-I L.L.C.
M-I Drilling Fluids L.L.C.
M-I Swaco
Miller Environmental Group, Inc.
Mitchell Marine
Mitsui & Co. (USA), Inc.
Mitsui & Co. Ltd.
Mitsui Oil Exploration Co. Ltd.
ModuSpec USA, Inc.
Monica Ann LLC
Moran Environmental Recovery, LLC
MOEX Offshore 2007 LLC
MOEX USA Corporation
M/V Monica Ann
M/V Pat Tilman
M/V Damon B. Bankston
M/V Max Chouest
M/V Ocean Interventions
M/V C. Express
M/V Capt. David
M/V Joe Griffin
M/V Mr. Sidney
M/V Hilda Lab
M/V Premier Explorer
M/V Sailfish
M/V Seacor Washington
M/V Emerald Coast
M/V Admiral Lee
M/V Seacor Vanguard
M/V Whuppa Snappa
Nalco Energy Services, LP
Nalco Holding Company
Nalco Finance Holdings LLC
Nalco Finance Holdings Inc.
Nalco Holdings LLC
Nalco Company
National Response Corporation
Nature's Way Marine, LLC
Nautical Ventures, LLC
Nautical Solutions, LLC
O'Brien's Response Management, Inc.
Ocean Runner, Inc.
Ocean Therapy Solutions, LLC
Oceaneering International, Inc.
Odyssea Marine, Inc.
Offshore Cleaning Systems L.L.C.
Offshore Service Vessels, LLC
Offshore Inland Marine & Oilfield Services, Inc.
Oil Recovery Company, Inc. of Alabama
Oilfield Marine Contractors, LLC
Parsons Commercial Services Inc.
Parsons Services Company

029284

Parsons Facility Services Company
Parsons Corporation
Patriot Environmental Services Incorporated
Peneton Company
Perennial Contractors, LLC
Peneton Corporation
Production Services Network U.S., Inc.
Quality Container, Inc.
Quality Energy Services, Inc.
Ranger Offshore, Inc.
Reel Pipe, LLC
Resolve Marine Services, Inc.
Robert Kaluza
Ronald W. Sepulvado
Schlumberger, Ltd.
Seacor Holdings Inc.
Seacor Marine, LLC
Seacor Marine, Inc.
Seacor Marine International, Inc.
Seacor Offshore LLC
Seacor Worldwide, Inc.
Sealion Shipping LTD
Sea Support Services, L.L.C.
Sea Tow of South Miss, Inc.
Seafairer Boat, LLC
Shamrock Management LLC et al.
Shoreline Services, LLC
Siemens Financial, Inc.
Shoreline Construction, LLC
Smith Marine, Inc.
Southern Cat, Inc.
Southern Environmental of Louisiana, LLC
Stallion Offshore Quarters, Inc.
Subsea 7 LLC
Tamara's Group, LLC
Team Labor Force, LLC
Technical Marine Maintenance Services, L.L.C.
The Modern Group, Ltd.
The Modern Group GP-SUB, Inc.
The O'Brien Group, LLC
The Response Group, Inc.
Tiburon Divers, Inc.
Tidewater, Inc.
Tidewater Marine LLC
Tiger Rentals, Ltd.
Tiger Safety, LLC
Toisa Limited
Total Safety U.S., Inc.
Twenty Grand Offshore, LLC
Twenty Grand Marine Service, LLC
Twenty Grand Offshore Inc.
USES/Construct Corps
United States Environmental Services, LLC
United States Maritime Services, Inc.
Viscardi Industrial Services, LLC
Weatherford International Ltd.

18

029285

Weatherford U.S. L.P.
Wood Group Production Services, Inc.
Worley Catastrophe Services, LLC
Worley Catastrophe Response, LLC

029286

# History

## Construction and ownership

*Deepwater Horizon* was built for R&B Falcon (which later became part of Transocean)[7] by Hyundai Heavy Industries in Ulsan, South Korea.[2] Construction started in December 1998, the keel was laid on 21 March 2000,[6] and the rig was delivered on 23 February 2001,[6] after the acquisition of R&B Falcon by Transocean.[17]

Transocean, through its Steinhausen, Switzerland[18] subsidiary[19] Triton Asset Leasing GmbH,[6] operated the rig under the Marshalese flag of convenience.[20] The rig was leased to BP on a 3 year contract for deployment in the Gulf of Mexico following construction.[21] The lease was renewed in 2004 for a year,[22] 2005 for 5 years,[23] and 2009 for 3 years covering 2010 to 2013.[8][20] The last contract was worth $544 million, or $496,800 a day,[24] for a "bare rig",[25] with crew, gear and support vessels estimated to cost the same.[25]

According to R&B Falcon's filings to SEC in 2001, the transfer document between R&B Falcon and Transocean was dated 17 August 2001,[26] and the rig was specified as "official registration number of 29273-PEXT-1, IMO number of 8764597, with gross tonnage of 32,588 and net tonnage of 9,778"[26] and the transfer value as US $340 million.[26] As of 2010, the rig was insured for US $560 million covering the replacement cost and wreckage removal.[17]

## Drilling operations

*Deepwater Horizon* worked on wells in the Atlantis (BP 56%, BHP Billiton 44%) and Thunder Horse (BP 75%, ExxonMobil 25%)[27] oil fields. It was described at times as a "lucky" and "celebrated" rig.[28] and in 2007 was still described as "one of the most powerful rigs in the world".[29] In 2006 it discovered oil in the Kaskida oil field, and in 2009 the "giant" Tiber field.[30][31] The well in the Tiber field has a vertical depth of 35,050 ft (10,683 m) and a measured depth of 35,055 ft (10,685 m), below 4,132 ft (1,259 m) of water.[32] The well was the deepest oil well in the world,[31][32][33][34] and more than 5,000 feet (1,500 m) further below the seabed than the rig's official drilling specification stated on the company's fleet list.[35]

In February 2010, *Deepwater Horizon* commenced drilling an exploratory well at the Macondo Prospect (Mississippi Canyon Block 252), about 41 miles (66 km) off the southeast coast of Louisiana, at a water depth of approximately 5,000 feet (1,500 m).[36] The Macondo prospect exploration rights were acquired by BP in 2009,[37] with the prospect jointly owned by BP (65%), Anadarko (25%) and MOEX Offshore 2007 (10%).[38] *Deepwater Horizon* was still working on the Macondo site on 20 April 2010, when a violent explosion occurred leading to destruction of the rig and resulting oil spill.[30][39][40][41] The well was in the final stages of completion at the time; its cement casing was injected and hardening, and the rig was due to move shortly to its next role as a semi-permanent production platform at the Nile site following by a return to the Kaskida field.[28] The exploratory work was described as "concluded" and permission had already been requested from MMS to terminate operations at the Macondo site.[42]

10

# Thunder Horse PDQ

Coordinates: 28.1091°N 88.4944°W

From Wikipedia, the free encyclopedia

***Thunder Horse PDQ*** is a BP plc and ExxonMobil joint venture semi-submersible oil platform on location over the Mississippi Canyon Thunder Horse oil field (Block 778/822), in deepwater Gulf of Mexico, 150 miles (240 km) southeast of New Orleans, moored in waters of 1,840 metres (6,040 ft).[4] The "PDQ" identifies the platform as being a **P**roduction and oil **D**rilling facility with crew **Q**uarters.[5]

*Thunder Horse PDQ* is the largest offshore installation of its kind in the world. The vessel's hull was built by Daewoo Shipbuilding & Marine Engineering (DSME) in Okpo, South Korea, then loaded aboard the heavy lift ship, *MV Blue Marlin* and transported to Kiewit Offshore Services in Ingleside, Texas where it was integrated with its topsides modules that were built in Morgan City, Louisiana.[6] The 15,813 nautical miles (29,286 km; 18,197 mi) journey around the Cape of Good Hope took eight weeks (63 days) from 23 July to 23 September 2004.[7] Construction costs were around US$5 billion, and the platform is expected to operate for 25 years.[8]

*Kiewit*

*Daewoo*

*left out*

## Contents

- 1 Hurricane Dennis
- 2 See also
- 3 References
- 4 External links



Thunder Horse semi-submersible platform, July 2005

### Career

| | |
|---|---|
| Name: | ***Thunder Horse PDQ*** |
| Owner: | BP plc (75%) |
| | ExxonMobil (25%) |
| Operator: | BP plc |
| Port of registry: | 🇺🇸 United States |
| Builder: | Daewoo Shipbuilding & Marine Engineering |
| | Okpo, South Korea |
| Cost: | US$5 billion |
| Laid down: | 19 May 2003 |
| Launched: | 2004 |
| Completed: | 2005 |
| In service: | First oil June 2008 |
| Identification: | ABS class no.: 07113112 |
| | Call sign: WPXF501 |
| | MMSI no.: 3660478 |
| Status: | Operational 28.1091°N 88.4944°W |

### General characteristics

| | |
|---|---|
| Class & type: | ABS: A1, column stabilized unit, floating offshore installation (FOI) |
| Tonnage: | 59,500 tonnes (65,600 tons) |

## Hurricane Dennis

*Thunder Horse PDQ* was evacuated with the approach of Hurricane Dennis in July 2005. After the hurricane passed, the platform fell into a 20 degree list and was in danger of foundering.[9][10]

The platform was designed for a 100 year event, and

Bloomberg.com | Businessweek.com | Bloomberg TV | Premium

MARKET SNAPSHOT

| | U.S. | EUROPE | ASIA | | |
|---|---|---|---|---|---|
| DJIA | 12,638.80 | -117.42 | -0.92% | | |
| S&P 500 | 1,368.95 | -5.58 | -0.41% | | |
| NASDAQ | 2,867.02 | -16.87 | -0.58% | | |

Our Company    Professional    Anywhere

HOME    QUICK    NEWS    OPINION    MARKET DATA    PERSONAL FINANCE    TECH    POLITICS    SUSTAINA

# Daewoo Shipbuilding & Marine Engineering Co Ltd    + Add to Watch

## 042660:KS    22,250 KRW    400    1.83%    Share

As of 01:29:59 ET on 11/14/2012.

More on 042660

Snapshot

News & Press Releases

Stock Chart

Company Profile & Executives

Browse All Companies

Snapshot for Daewoo Shipbuilding & Marine Engineering Co Ltd (042660)

| | | | | |
|---|---|---|---|---|
| Open: | 22,000 | Day's Range: | 21,850 - 22,250 |
| Previous Close: | 21,850 | 52wk Range: | 21,500 - 36,600 |

Stock Chart for 042660



Interactive 042660 Chart    ••• Previous Close

Key Statistics for 042660

| | |
|---|---|
| Current P/E Ratio (ttm) | 6.1278 |
| Estimated P/E(12/2012) | 9.6770 |
| Relative P/E vs. KOSPI | 0.3876 |
| Earnings Per Share (KRW) (ttm) | 3,631.0000 |

## Jobs Done Well

Kiewit Offshore Services, Ltd. (KOS) is a leading fabricator for the oil and gas industry. We have a reputation for successfully delivering large offshore projects on time and within budget. Our projects include construction of offshore oil and gas structures and large structural steel components. We specialize in massive and complex steel erection, using state-of-the-art facilities and methods.

### Safety

Project safety is a core value of KOS. We are committed to sound construction practices and the highest possible safety performance standards. We develop a safety program for every project we construct. Providing a safe work environment is our top priority. At KOS, safety is everyone's responsibility, and our people seek to continually improve upon our safety performance. In October 2007, KOS was designated by OSHA as a Voluntary Protection Program Star Worksite. In 2009 and 2010, OSHA awarded KOS the honor of Stars Among Stars.

*Convicted of RICO Patriot Act violations*

### Quality

We define quality as delivering a project that meets or exceeds our client's expectations. Kiewit's quality programs are customized to each project ensuring the work is in full compliance with the project requirements, terms and conditions.

Every KOS employee takes personal responsibility for constructing a quality project by performing work "right the first time." Employees are well trained and our quality program measures and tracks performance. We actively solicit owner feedback and require suppliers' and subcontractors' to achieve the same level of quality as our own employees. The KOS quality program is AISC-certified and complies with ISO 9001:2008 standards.

### Corpus Christi

Kiewit Offshore Services, Ltd.
2440 Kiewit Rd.
Ingleside, TX 78362
(361) 775-4300
(361) 775-4433 fax

**Stay connected with Kiewit:**    

© 2002-12 Kiewit Corporation, an Equal Opportunity Employer • Use of this website signifies your agreement to

Convicted
of RICO

Aidors,
Abettors
in
Conspiracy
in RICO,
TERRORISM
—
Convicted
TERRORIST
PAYS
OFF
Judges,
GOVERNOR
to Ruin,
Destroy
FLORIDA
ITS
citizens

### British Petroleum

**British Petroleum (BP).** British Petroleum has four main businesses: (1) Exploration and production of oil; (2) Gas, power and renewables; (3) Refining and marketing; and (4) Petrochemicals. BP is a large oil company with its stock worth $139 billion, annual revenues of over $362 billion and net income of $23 billion. The stock price was down slightly during the year.

Detailed technical discussion of BP is not presented at this time due to the Gulf Of Mexico oil spill. The total magnitude of reparations that BP will have to make because of the spill is not known at this time but will be massive. It almost certainly will be at least $25 - $30 billion. However, BP is a very powerful and profitable large oil company and I believe their stock will survive and prosper.

### Total

**Total (TOT).** A large oil company with interests in oil and gas (including LNG), electricity generation, petrochemicals, oilfield services and engineering industries. Its oil and gas activities are scattered over Africa, Europe, the North Sea, the Caspian Sea, Australia, the Gulf of Mexico, and Latin America. Market cap $117 billion; revenue = $213 billion; Income = $16 billion. Total was down slightly during the past 12 months.

Total has interests in 16,000 retail stations.

01/11/2004 03:17 a.m.



# Large Oil Company Stocks

## Shell

**Royal Dutch (RDS-B).** Royal Dutch owns a majority interest in Royal Dutch/Shell Group.    The Royal Dutch/Shell Group companies, based in the Netherlands, are engaged in all the principle aspects of the oil and natural gas industry, renewable energy, chemicals, and other. Shell operates over 43,000 service stations.

Shell stock has a market cap of $228 billion, annual revenue of over $455 billion and profits of $31 Billion.

Shell and the Russian oil giant, Gasprom, have recently signed an agreement to continue and expand their partnership on projects both inside and outside Russia.
Shell stock was essentially unchanged over the past year.

Shell's work in alternative energy - LNG, wind power, solar energy, shale oil, GTL (natural gas to liquid fuels), Alberta oil sands, etc. - is of interest.

For more information on alternative energy sources, see **alternative energy sources.**

*Aidors, Abettors in conspiracy in Terrorism — Convicted Terrorist pays off Judges, Governor to commit Terrorist Acts Against Florida, its citizens*

Truly a large oil company, second only to Exxon/Mobil and,
possibly, British Petroleum!  Also, a very innovative company.

### GeoTerra Portable Mats

**Presto Durable Construction Mats Oil Field Site
Drilling Access**
**www.prestogeo.com**

AdChoices ▷

### Exxon

**Exxon/Mobil (XOM).**  This large oil company is the world's most
profitable company.  Engaged in the exploration and production
of oil and natural gas and the manufacture of petroleum
products.  Exxon stock was up slightly from one year ago.

Market cap of Exxon is $420 billion, revenue is $420 billion and
profit ois $41 billion.

Exxon has a major stake in developing and exporting LNG from is
Qatar.  Qatar has enormous reserves of natural gas (see Natural
Gas....could the LNG prospects change with the enormous U.S.
reserves of natural gas being found recently in shale formations).

Exxon has very large reserves of oil and other petroleum liquids
and natural gas. Exxon is making a major move in the natural gas
area by moving to acquire XTO (acquisition value = $41 billion),
one of the most aggressive natural gas companies in the industry.
Also, it should have been noted that XOM has interests in 30,000
oil and/or gas wells.

Exxon is truly a **largeoil company stock.** Question: Will Exxon
stock be worth a trillion dollars a few years from now?

*[handwritten in right margin:]* Adors, Abetters in conspiracy in RICO, terrorism

John DOE VII v EXXON Mobil Corp

CASE NO. 09-7125

Crimes Against Humanity Terrorist

01/11/2004 04:57 a.m.

# BHP, Rio still worth more than world's biggest company

Stephen Mayne | Jun 03, 2010 1:17PM | EMAIL | PRINT

- Share
  - 👍 1
  - 📘 Me gus

- 
  - **2**
  - 🐦 Tweet
  - 
  - 📌 Pin it
  - 💼
  - 💼 Share

*Aidors,*
*Abottors*
*in*
*Conspiracy*
*in RICO,*
*TORRORISM*

*The Australian* today ran a big photo with its lead business story of former Rio Tinto CEO Leigh Cliffo Kloppers at a mining industry function in Canberra last night.

Clifford was laughing away and the lads could well have been amused to have together amassed a net v exploitation of Australia's mineral wealth during the China boom.

Indeed, even after all these claims that the proposed RSPT has smashed resource company share prices Rio today is about $400 billion.

That's more than the market capitalisation of the world's most valuable company, Texan oil giant Exxo $US285 billion ($A341 billion).

Rio Tinto director Sir Rod Eddington last night entered the fray slamming the Rudd government's polic

This was a powerful hit given Sir Rod is chairman of Infrastructure Australia and also chaired the long : Kevin Rudd established when opposition leader.

However, there is one fundamental problem with the mining industry's complaints about a lack of cons a monumental tax slug anyway.

Like most democracies, a combination of unprecedented stimulus spending and plunging revenues has the debt-funded government spending by Canberra and the states exceeds revenues by about $80 billio

Rather than sending more than $50 billion a year offshore to the foreign owners of more than $500 billi it makes sense to tax more of this capital flow given that prices for commodities such as iron ore have i

This would improve Australia's current account deficit and the Budget position of the federal governme spending.



Home / News & Media / News / News 2012

# Third quarter results 2012

Stock Market Announcement

Statoil's (OSE:STL, NYSE:STO) third quarter 2012 net operating income was NOK 40.9 billion, a 4% increase compared to NOK 39.3 billion in the third quarter of 2011.

*Convicted of Corruption*



"Statoil delivered solid financial results in the quarter. By ramping up new fields, we have grown production year to date by 10% compared to the same period last year, and 8% compared to the 2011 average. This is in line with our plans. Our operational performance is solid and we progressed an extensive maintenance programme according to plan. We are on track, and maintain our guidance for 2012," says Helge Lund, Statoil's president and CEO.

In 2012, Statoil has increased cash flows from underlying operations [8] by 12% to NOK 188 billion. Successful exploration activities have added larger volumes to Statoil's resource base in the first nine months of 2012 than in all of 2011.

"We maintain momentum in realising our strategy for growth towards 2020, with new discoveries and investments for improved oil recovery on the NCS, and continued profitable growth in our production outside Norway," says Lund.



01/11/2004 05:48 a.m.

Case 2:10-md-02179-CJB-JPC   Document 8420-1   Filed 01/29/13   Page 75 of 101

# BP/Statoil JV to resume oilsearch in deep offshore Nigeria

Jun 26, 1997 02:00 AM

June 7, 1997 A British Petroleum/Statoil joint venture is planning to resume drilling operations in Nigeria after recalling its drilling staff in May, the company has said. The move followed its failure to find oil in the five wells it drilled previously in the deep offshore zone of the country.
Industry sources said the joint venture, which pioneered operations in the deep offshore, had said it would now shift to the very deep offshore with depths running down to 1,500 meters. "We have gone to the market to search for a rig, or probably a drill-ship, capable of operating at 1,500 meters of depth," the BP/Statoil source said. Another industry source said the success achieved by Shell in crude oil exploration in Nigeria's deep offshore should have prompted the latest move by the BP/Statoil alliance. Shell made substantial discoveries in its efforts at the deep offshore. Shell's first well, drilled in OPL 212, produced reserves of about 575 million barrels, while a second well held 700 million barrels. The Shell Nigeria Exploration and Production Company (Snepco) was engaged in the offshore drilling and made a discovery with an estimated reserve of about one billion barrels. The outgoing managing director of Shell Nigeria, Brian Anderson, recently said Shell would start producing from the wells before the end of this century with a budget of about $ 80 million.

Source: not available

*Homeland Security News Wire*

# Homeland Security News Wire

## Terrorism
## Critics charge satellite company Inmarsat violates Iran sanctions

Published 26 July 2012

Share (http://www.addthis.c
(http://www.addthis.com/boo
iran-sanctions&title=Terrorism%2
%2Fwww.google.hn%2Furl%3Fsa'
critics-charge-satellite-company-ir

**A legal organizations specializing in fighting legal battles against terror sponsors – they say their goal is to bankrupt the terror groups and grind their activities to a halt, one lawsuit at a time – warned mobile satellite company Inmarsat PLC against providing prohibited guidance services to Iranian oil tankers and Iranian military vessels; in 2008, a United States Supreme Court ruling made the determination that individuals or companies that materially support terrorist organizations are liable for the murder and injuries they cause, according to *Boim v. Holy Land Foundation***



Tanker under way loaded with Iranian oil // Source: presstv.ir

Shurat HaDin–Israel Law Center (http://www.israellawcenter.org/), an organization with a reputation for fighting legal battles against terror sponsors, the other day sent a letter (http://www.scribd.com /doc/101021494/Shurat-HaDin-s-July-25-2012-Letter-to-Inmarsat) to mobile satellite company Inmarsat PLC (http://www.scribd.com/doc/101019427/Inmarsat-Fact-Sheet), warning it against providing prohibited guidance services to Iranian oil tankers and Iranian military vessels.

The warning letter stressed that Inmarsat's actions would expose the telecommunications giant to criminal prosecution and civil liability from Americans and others who suffer as a result of Iran's international sponsorship of terrorism.

The move followed a recent Obama administration decision to slap additional Treasury Department sanctions (http://www.scribd.com /doc/101019424/Dept-of-State-Fact-Sheet-Increasing-Sanctions-Against-Iran) on Iranian

vessels, which have been found to be facilitating Teheran's nuclear weapons program and global terrorist network. Despite this, the London-headquartered Inmarsat, with offices in Miami and Washington, D.C., continues to provide mobile satellite services to Iranian ships.

Shurat HaDin's director, and civil rights activist, Nitsana Darshan-Leitner said, "We will not tolerate Inmarsat's — or any corporation's — profiting from the blood of innocent people. Anything short of immediate and decisive action on our part would be akin to acceptance. It is a simple issue of justice: Inmarsat must uphold its legal obligations in compliance with U.S. Treasury regulations and immediately cease its support for Iran."

In 2008, a United States Supreme Court ruling made the determination that individuals or companies that materially support terrorist organizations are liable for the murder and injuries they cause, according to *Boim v. Holy Land Foundation*. Based on that ruling, Shurat HaDin submitted a letter alerting Inmarsat's leadership that its actions are illegal and serve as a civil liability to American citizens and others who suffer as a result of Iran's sponsorship of terror.

Shurat HaDin says that the action represents the latest example of the Law Center's "harnessing of American and international law to knock down the financial and technological buttresses of terrorism."

In June 2011, Shurat HaDin brought legal action (http://www.scribd.com /doc/101019445/Warning-Letters-Sent-to-Inmarsat-During-Flotilla) against Inmarsat for continuing to support ships seeking to breach Israel's naval blockade of Gaza. Shurat HaDin underlined that Inmarsat's services provided communications to the Mavi Marmara and other ships which participated in the Gaza flotilla of May 2010. The case was filed in a Federal Court in Miami.

The warning letter additionally noted that previous judgments allowed victims of terrorism to file suit against an oil and gas company, as well as against its officers, for engaging in business with a state sponsor of terrorism. Additionally, Darshan-Leitner stressed that by providing aid to Iran, Inmarsat subjects itself to forfeiture of its assets to judgment creditors who hold unenforced judgments against the Islamic regime. Shurat HaDin moreover stressed that it is prohibited for any party (including non-Americans) to transport, sell, transfer, or deal with any property (including oil) that Iran has any interest in.

Shurat HaDin says it intends on pursuing the company, its officers, and directors for providing aid to Teheran, and will continue to expose such companies to forfeitures of assets and severe financial penalties.

Shurat HaDin-Israel Law Center was established in 2003. It says its goal is to bankrupt the terror groups and grind their activities to a halt — one lawsuit at a time. The organization is based in Tel Aviv and it works together with Western intelligence agencies and volunteer lawyers around the world to file legal actions on behalf of victims of terror. Shurat HaDin says it has succeeded in winning more than $1 billion in judgments, freezing more than $600 million in terrorist assets, and in collecting $120 million in actual payments to the victims and their families.

01/11/2004 12:49 a.m.

and goals - with a view toward detecting, preventing, and prosecuting the enterprise's criminal activities. Criminal intelligence investigations, usually of a long-term nature, may provide vital intelligence to help prevent terrorist acts.

Authorized criminal intelligence investigations are of two types: racketeering enterprise investigations (Part III.A) and terrorism enterprise investigations (Part III.B).

A racketeering enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in a pattern of racketeering activity as defined in the Racketeer Influenced and Corrupt Organizations Act (RICO). However, the USA PATRIOT ACT (Public Law 107-56) expanded the predicate acts for RICO to include the crimes most likely to be committed by terrorists and their supporters, as described in 18 U.S.C. 2332b(g)(5)(B). To maintain uniformity in the standards and procedures for criminal intelligence investigations relating to terrorism, investigations premised on racketeering activity involving offenses described in 18 U.S.C. 2332b(g)(5)(B) are subject to the provisions for terrorism enterprise investigations rather than those for racketeering enterprise investigations.

A terrorism enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of: (1) furthering political or social goals wholly or in part through activities that involve force or violence and a federal crime, (2) engaging in terrorism as defined in 18 U.S.C. 2331(1) or (5) that involves a federal crime, or (3) committing any offense described in 18 U.S.C. 2332b(g)(5)(B). As noted above, criminal intelligence investigations premised on a pattern of racketeering activity involving an 18 U.S.C. 2332b(g)(5)(B) offense are also treated as terrorism enterprise investigations.

As with the other types of full investigations authorized by these Guidelines, any lawful investigative technique may be used in terrorism enterprise investigations, including the development of sources and informants and undercover activities and operations. The "reasonable indication" standard for commencing a terrorism enterprise investigation is the same as that for general crimes and racketeering enterprise investigations. As noted above, it is substantially lower than probable cause.

In practical terms, the "reasonable indication" standard for opening a criminal intelligence investigation of an enterprise in the terrorism context could be satisfied in a number of ways. In some cases satisfaction of the standard will be apparent on the basis of direct evidence of an enterprise's involvement in or planning for the commission of a federal offense involving the use of force or violence to further political or social goals, terrorism as defined in 18 U.S.C. 2331(1) or (5), or a crime described in 18 U.S.C. 2332b(g)(5)(B). For example, direct information may be available about statements made in furtherance of an enterprise's objectives which show a purpose of committing such crimes or securing their commission by others.

In other cases, the nature of the conduct engaged in by an enterprise will justify an inference that the standard is satisfied, even if there are no known statements by participants that advocate or indicate planning for violence or other prohibited acts. For example, such activities as attempting to obtain dangerous biological agents, toxic chemicals, or nuclear materials, or stockpiling explosives or weapons, with no discernible lawful purpose, may be sufficient to reasonably indicate that an enterprise aims to engage in terrorism.

Moreover, a group's activities and the statements of its members may properly be considered in

and directors to criminal prosecution and civil liability to American citizens and others who suffer as a result of Iran's international sponsorship of terrorism. (*See Abecassis v. Wyatt*, 785 F.Supp.2d 614 (S.D. Tex. 2011) (allowing a suit to go forward against an oil and gas company and its officers and directors for engaging in business with a terrorist state.)) Additionally, by providing aid to Iran, Inmarsat subjects itself to forfeiture of its assets to judgment creditors who hold unenforced judgments against Iran. (*See* 28 U.S.C. § 1610 note and 28 U.S.C. § 1610(g) (permitting judgment creditors to execute judgments against the property of terrorist states); 31 C.F.R. §§ 535.311, 535.312 (defining "property" to include any "property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent" and defining "interest," as used in this sentence, to mean "an interest of any nature whatsoever, direct or indirect."))

Since January 19, 1984, Iran has been and continues to be designated by the United States, pursuant to Section 6(j) of the Export Administration Act, Section 40 of the Arms Export Control Act, and Section 620A of the Foreign Assistance Act, as a State Sponsor of Terrorism. As a result of that designation, it is subject to numerous restrictions and sanctions under United States law and subjects those organizations that do business with it to numerous restrictions. According to the U.S. State Department, Iran is the world's "most active state sponsor of terrorism." Further, "Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf, and undermined the growth of democracy.... Iran [remains] the principal supporter of groups implacably opposed to the Middle East Peace Process."

Moreover, the international economic sanctions regime imposed against Iran along with the regulations enacted by the United States Treasury and the European Union are intended to deter the Iranian government from advancing its nuclear weapons program in violation of international law.

By materially supporting Iran's oil industry, Inmarsat facilitates Iran's terrorist activities and nuclear weapons program. To the extent that Inmarsat's satellite support is utilized by Iran's military agencies, Inmarsat is a direct participator in Iran's terrorist activities and nuclear weapons program.

Provision of communications services constitutes the provision of "material support or resources" pursuant to 18 U.S.C. § 2339A. Such provision therefore subjects Inmarsat to *criminal* liability pursuant to 18 U.S.C. §§ 2339A, 2339B, 2339C and to civil liability pursuant to 18 U.S.C. § 2333 (*see Boim v. Holy Land Foundation*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc)). The United States Supreme Court has ruled that material support liability exists without regard to the criminal or terror-inducing intent of the material supporter. Indeed, gifts to the purely charitable objectives of a terrorist state or organization are actionable because, in the words of
the Court,

> Money is fungible, and when foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put. But there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds

Anti-Terror Powerhouse Shurat HaDin Targets OurBroadPCC's Dutiful http://www.prillions.clickability.com/ept/expire/&title=Anti-Terr...

raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives.

*Holder v. Humanitarian Law Project*

, ___ U.S. ___, 130 S. Ct. 2705, 2720, 2729 (2010). (Internal citations and quotation marks omitted). The analysis in *Holder* is no less accurate (or binding) when applied to the business activities of a sophisticated sovereign entity that orchestrates terrorist operations globally. (A copy of *Holder* is attached to this letter for your review.)

Moreover, 31 C.F.R. § 535.201, *et seq.*, prohibits all parties (including non-Americans) from transporting, selling, transferring, exporting, or dealing with any property (including oil) that Iran has any interest of any nature whatsoever. The regulations freeze all such property within the United States and expressly prohibit any action designed to evade the regulations. Violators are subject to a civil penalty not to exceed the greater of $250,000 or an amount that is twice the amount of the transaction that is the basis of the violation and a criminal penalty not to exceed $1,000,000, twenty years in prison, or both. 31 C.F.R. § 535.701. While Inmarsat might not operate the vessels that carry Iranian property, Inmarsat's services enable those vessels to operate and is thus the proximate cause, acting pursuant to contract, of the illegal actions of another.

That Iran pretends that its vessels are owned by another sovereign is not sufficient to avoid liability under the above sections. Nor is it sufficient if Iran has actually effected legal transfer of its vessels (or reflagging) if Iran retains effective control over the vessels or if the vessels are primarily or materially dedicated to the support of Iran.

In light of the above, we request that you immediately provide us written confirmation that Inmarsat has <u>permanently</u> discontinued the provision of all services, including satellite and communications services, to Iran, all of its vessels, all vessels effectively controlled by Iran, and all vessels primarily or materially dedicated to servicing, aiding, or trading on behalf of Iran.

Absent such immediate confirmation, we will seek all available relief and remedies against Inmarsat in all relevant jurisdictions.

Very truly yours,

Nitsana Darshan-Leitner, Esq., Director
Shurat HaDin – Israel Law Center

* All references in this letter to "Inmarsat" include Inmarsat PLC and Inmarsat Inc., as well as all subsidiaries thereof and all entities affiliate therewith. Where appropriate, it also includes Inmarsat's officers and directors.

**Shurat HaDin—Israel Law Center** is an Israeli based civil rights organization and world leader in combating terrorist organizations and the regimes that support them through lawsuits litigated in courtrooms around the world. Fighting for the rights of hundreds of terror victims, Shurat HaDin seeks to bankrupt the terror groups and grind their criminal activities to a halt - one lawsuit at a time.

# Newsmax

## BP's Iranian Ties Could Haunt Oil Giant, Too

Tuesday, June 22, 2010 05:42 PM

**By: Ken Timmerman**

BP's troubles in the United States might be just beginning.

Potentially more damaging to the beleaguered British oil giant than its problems in the Gulf of Mexico are BP's ongoing ties to the Islamic Republic of Iran, which include multibillion-dollar joint ventures in Britain and Azerbaijan and the Iranian government's own massive direct investment in BP stock.

BP won applause from public-interest groups in the United States in 2008 when it announced it was halting shipments of refined petroleum products to Iran.

"British Petroleum stopped its shipments to Iran after deciding that the company's extensive North American business interests were more valuable than access to the Iranian market," a news release from the Foundation for the Defense of Democracies trumpeted at the time.

The conservative foundation, which has made getting refined petroleum sanctions passed its key legislative agenda, understandably considered BP's very public pullback as a supplier to Iran of refined gasoline and fuel oil as a success for its lobbying activities.

But it turns out that BP has continued to maintain extensive ties with Iran that are less visible that those gasoline sales, including joint ventures in British North Sea natural gas fields.

Iran's joint ventures with BP and a host of other international oil firms now should be included in new Iran sanctions legislation, says Mark Dubowitz, executive director of the foundation.

"If Washington doesn't close this loophole, Iran could soon be a partner in energy projects off our own shores," he was quoted as saying in Time magazine last week.

But the legislation that finally cleared a House-Senate conference committee on Monday said nothing about joint ventures.

BP doesn't trumpet its ongoing business with Iran in its statutory reporting to the U.S. Securities and Exchange Commission.

In a note to the U.S. version of its 2009 Annual Report, submitted as form 20-F to the SEC, BP glossed over its extensive ties to the Iranian regime.

"BP has interests in, and is the operator of, two fields and a pipeline located outside Iran in which the National Iranian Oil Company and an affiliated entity have interest," the company stated.

In addition, the company "buys crude oil, refinery and petrochemicals

*Handwritten annotations in right margin:*

NO MONEY
to PAY
FLORIDA
ITS
CITIZENS

"WHY" does
FLORIDA
HAVE
ECONOMIC
RUIN
AND
IRAN
HAVE
$100's OF
BillioN
OF
DOLLARS

feedstocks, blending components and LPG of Iranian origin or from Iranian counterparties."

The legalese disguises a business relationship that goes back to BP's origins 100 years ago as the Anglo-Persian Oil Co. Ltd.

"We've had a long experience with BP," Iranian activist Roozbeh Farahanipour tells Newsmax. "They've acted against our national interest [in Iran] even before the nationalization of oil in Iran in 1953. Just after I arrived in the United States in 2000, my organization, Marze por Gohar, called for a boycott against BP and Shell because of their ongoing involvement with the Iranian regime."

The "interests" BP alluded to in its 2009 annual report include a 50-50 joint venture with Iran to develop a North Sea natural gas field, Hood block 15/13A, that today is extracting around 4 million cubic meters a day of natural gas worth around $1 million a day at current prices.

They also include a joint BP-Iranian government effort in Azerbaijan that produces 8 billion cubic meters of gas a year, worth up an estimated $2.4 billion a year.

"BP remains one of the most active major western oil companies engaged in joint venture energy projects with the Iranian Ministry of Petroleum outside of Iran," Time magazine reported last week.

BP's partner in these ventures is Naftiran Intertrade Co., a wholly-owned subsidiary of the National Iranian Oil Co., with offices in Switzerland and the Jersey Channel islands.

Iran's joint ventures with BP have paid off. At the time that Naftiran's deals with BP were coming online, the Iranian group's revenues jumped by 50 percent, from $14.7 billion to $21.9 billion, Time reported.

Naftiran Intertrade isn't BP's only Iranian partner. In the Rhum gas field in the North Sea, BP has teamed up in a 50-50 joint venture with the Iranian Oil Co. (IOC UK Ltd.) that now produces about 4 million cubic meters of natural gas a day.

The Treasury Department designated IOC UK Ltd. on June 16 in the latest round of United Nations Security Council sanctions on Iran's nuclear weapons programs.

The designation of IOC UK Ltd, and a series of Naftiran subsidiaries and affiliates, is intended to "highlight for the international community Iran's use of its financial sector, shipping industry and Islamic Revolutionary Guards Corps to carry out and mask its proliferation activities," said a Treasury Department statement.

In 2008, Treasury had identified Naftiran Intertrade as a "specially designated national" that was owned and controlled by the government of Iran, and warned U.S. companies that transactions with the company "are severely restricted" under several executive orders involving terrorism and weapons of mass destruction.

*Handwritten margin notes:*

SEE GRYNBERG V. BP plc, STATOIL, ASA ROYAL DUTCH, SHELL plc, EXXON Mobil BP, SHELL ARE CURRENTLY being SUED FOR TERRORIST ACTS, RICO CRIMES AGAINST HUMANITY

WIWA V ROYAL DUTCH SHELL

FOUND GUILTY OF AIDING, ABETTING

# Jack Grynberg Battles On

Tuesday, February 2, 2010 at 5:48PM

The FCPA Blog in BP, British Gas, Exxon, Jack Grynberg, James Giffen, Kazakhstan, Private Right of Action, Shell, Statoil



Jack Grynberg: "I have been pursuing fraud in the energy industry for the past 15 years." Colorado-based independent oilman Jack Grynberg filed a 311-page complaint in December with the European Commission. He's asking for an investigation into alleged bribery and tax evasion in Kazakhstan by several oil companies he once partnered with. His claims relate to oil and gas developments dating back to the early 1990s -- the same ones at the center of the U.S. prosecutions of James Giffen and Brian Williams. See our post

Grynberg, 78, who speaks six languages including Russian, is alleging "wholesale bribery and corruption of top Kazakh government officials." He claims the corruption led to his company's loss of rights in the Greater Kashagan and Karachaganak Oil Fields -- estimated to hold more than 9 billion barrels of recoverable oil and 25 trillion cubic feet of natural gas.

His complaint names BP plc, StatoilHydro A.S.A., Total S.A., Royal Dutch Shell plc, ENI S.p.A., ExxonMobil, ConocoPhillips, and Inpex.

In a release he sent to the FCPA Blog, he said:

> My lawsuit in Brussels will attempt to open the window on this large scale bribery, tax evasion and corruption scheme, obtain subpoena power, and finally answer . . . questions which have remained unanswered for too long. It is unfortunate that the U.S. Department of Justice is attempting to prosecute the messengers, namely Mr. James H. Giffen and Mr. Brian J. Williams, instead of the main criminals and their cheif executives. My hope is that the European Commission will take a more balanced and assertive approach.

The complaint to the EC asserts that the alleged bribery infringed Articles 81 and 82 of the EEC Treaty (antitrust and abusive behavior).

Why the European Commission? Grynberg says he's exhausted his potential U.S. remedies and hasn't been able to subpoena the witnesses he needs (he deposed Giffen, who asserted his 5th Amendment privilege). Grynberg's civil fraud suit filed in 2007 in the District Of Columbia against BP, Statoil, British Gas, and their top executives was bounced last year. The court ordered private arbitration in Canada under agreements Grynberg had signed for the projects.

# BP Will "Kill Again," Former EPA Officials, Attorney Warn

Sunday, 18 November 2012 08:27
By *Jason Leopold*, *Truthout* | *Report*

*Truthout combats corporatization by bringing you trustworthy news: click here to join the effort.*

Is a record $4.5 billion fine, guilty pleas to 14 charges and the indictment of three employees enough of a deterrent to stop "serial environmental criminal" BP from placing profits before safety?

If history is any guide, Scott West believes the answer is a resounding, "No."

West is a former veteran special agent-in-charge at the Environmental Protection Agency's (EPA) Criminal Investigation Division. In 2006, he led an investigation into BP and the oil behemoth's senior officials for alleged crimes associated with an oil spill that year at BP's Prudhoe Bay operations on Alaska's North Slope, which spilled more than 200,000 gallons of oil across two acres of frozen tundra - the second largest spill in Alaska's history.

But just as West began collecting evidence against the company's top executives, his investigation was abruptly shut down. On October 25, 2007, BP and the Department of Justice (DOJ) announced a settlement to resolve all of BP's pending major criminal cases.



Fire on BP's Deepwater Horizon oil rig, April 22, 2010. (Photo: US Coast Guard)

The company agreed to pay a $20 million fine and plead guilty to a criminal violation of the Clean Water Act related to the Alaska oil spill. BP also pled guilty to a felony and a paid a $50 million fine over a deadly explosion at the company's Texas City refinery in 2005, which claimed the lives of 15 employees and injured and maimed 170 others. BP also entered into a deferred prosecution agreement with the DOJ, paid a $373 million fine, and admitted that it had manipulated the propane market in 2004.

West, who was profiled in an investigative report published in Truthout a month after the explosion aboard the Deepwater Horizon in the Gulf that killed 11 rig workers, said he felt if he were allowed to continue his investigation it "would have revealed enough evidence to convict the company and very senior officials on felony charges."

But, "the Bush DOJ shut it down before it had reached any logical conclusion," West told Truthout. "My investigation should have lasted another two years or so."

So when West, who retired in late 2008 and blew the whistle on what took place behind-the-scenes related to his probe of BP, heard that the company had reached its latest settlement with the government in mid-November to resolve all of the federal criminal charges (pending court approval) over its role in the worst man-made environmental disaster in US history, he couldn't help but feel a sense of déjà vu.

"I'm not convinced the fine, as large as it is, will get BP to change its behavior," West said in an interview with Truthout. "BP can easily pay it. It may not be enough to get BP to change its corporate culture until senior people are actually held personally accountable for decisions that led to the Texas City refinery explosion, the spills in Alaska and Deepwater Horizon."

Brent Coon agrees.





THE UNITED STATES
DEPARTMENT *of* JUSTICE

Home   » Briefing Room   » Justice News

**JUSTICE NEWS**

## Department of Justice

### Office of Public Affairs

FOR IMMEDIATE RELEASE                              Thursday, November 15, 2012

## BP Exploration and Production Inc. Agrees to Plead Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress Surrounding Deepwater Horizon Incident

*BP Agrees to Pay a Record $4 Billion in Criminal Fines and Penalties*
*Two Highest-Ranking BP Supervisors on Deepwater Horizon Oil Rig*
*Charged with Manslaughter and Former Senior BP Executive*
*Charged with Obstruction of Congress*

BP Exploration and Production Inc. (BP) has agreed to plead guilty to felony manslaughter, environmental crimes and obstruction of Congress and pay a record $4 billion in criminal fines and penalties for its conduct leading to the 2010 Deepwater Horizon disaster that killed 11 people and caused the largest environmental disaster in U.S. history, Attorney General Eric Holder announced today.  The 14-count information, filed today in U.S. District Court in the Eastern District of Louisiana, charges BP with 11 counts of felony manslaughter, one count of felony obstruction of Congress, and violations of the Clean Water and Migratory Bird Treaty Acts.

 BP has signed a guilty plea agreement with the government, also filed today, admitting to its criminal conduct.  As part of its guilty plea, BP has agreed, subject to the Court's approval, to pay $4 billion in criminal fines and penalties – the largest criminal resolution in United States history.

"The $4 billion in penalties and fines is the single largest criminal resolution in the history of the United States and constitutes a major achievement toward fulfilling a promise that the Justice Department made nearly two years ago to respond to the consequences of this epic environmental disaster and seek justice on behalf of its victims," said Attorney General Holder.  "We specifically structured this resolution to ensure that more than half of the proceeds directly benefit the Gulf Coast region so that residents can continue to recover and rebuild."

"The explosion of the rig was a disaster that resulted from BP's culture of privileging profit over prudence," said Assistant Attorney General Lanny A. Breuer of the Justice Department's Criminal Division.  "We hope that BP's acknowledgment of its misconduct – through its agreement to plead

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA      :

    v.            :     CRIMINAL NO.

BP EXPLORATION & PRODUCTION, INC.    :

## GUILTY PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in compliance with the holding of Bryan v. United States, 492 F.2d 775 (5th Cir. 1974), the Department, the defendant, and the defendant's counsel enter into the following guilty plea agreement. Any reference to the Department in this agreement shall mean the United States Department of Justice, including, but not limited to, the *Deepwater Horizon* Task Force, the Criminal Division of the Department of Justice and all of the Criminal Division's sections, and all of the United States Attorney's Offices for each judicial district of the United States.

1. The defendant agrees to waive prosecution by indictment and plead guilty to an information charging it with: eleven counts of violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), one count of a violation of 18 U.S.C. § 1505 (Obstruction of Congress), one misdemeanor count of a violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act), and one misdemeanor count of a violation of the 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), all arising from the defendant's conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and response. The defendant agrees to the factual allocution contained in Exhibit A to this plea agreement.

1

2.     The defendant, BP plc and any other BP plc entity, including but not limited to any former, present or future parent, affiliate, division and subsidiary (collectively, "any other BP plc entity" or "the other BP plc entities"), and all predecessors, successors and assigns of any of the above, agree to cooperate fully and truthfully with the *Deepwater Horizon* Task Force in any criminal investigation related to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and response.   Cooperation shall include but not be limited to (a) promptly disclosing any and all related criminal or potentially criminal conduct of which the defendant, BP plc or any other BP plc entity are currently aware, (b) promptly producing documents to the *Deepwater Horizon* Task Force upon request, (c) promptly making employees and agents available to the *Deepwater Horizon* Task Force upon request for interview or for testimony in any proceeding, subject to those employees' and agents' own legal rights, and (d) making reasonable efforts to ensure its employees and agents provide full and truthful information; provided, however, that compliance with this paragraph shall not be construed as requiring or effecting a waiver of the attorney-client privilege or work product protections.   *HAS NOT Produced Their*

3.     The defendant understands, agrees, and has had explained to it by counsel that the Court may impose the following statutory maximum sentences:   *CONTRACTS*

(a)     Counts One through Eleven, 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), for each count:   *Agreements With TERRORIST*

(i)     A fine of $500,000 or twice the gross gain or loss,   *IRAN* whichever is greater;

(ii)    Five years of probation; and

(iii)   A $400 special assessment;

*HAS Violated its probation by paying Judge BARbion to Block Court Access*

2

(b)     Count Twelve, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean

Water Act):

        (i)     A fine of $200,000, or $25,000 per day of the violation, or

            twice the gross gain or loss, whichever is greater;

        (ii)    Five years of probation; and

        (iii)   A $125 special assessment;

(c)     Count Thirteen, 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty

Act):

        (i)     A fine of $15,000 or twice the gross gain or loss, whichever

            is greater;

        (ii)    Five years of probation; and

        (iii)   A $50 special assessment;

(d)     Count Fourteen, 18 U.S.C. § 1505 (Obstruction of Congress):

        (i)     A $500,000 fine;

        (ii)    Five years of probation; and

        (iii)   A $400 special assessment;

4.      The parties agree that this plea agreement is made pursuant to Rule

11(c)(1)(C) of the Federal Rules of Criminal Procedure and that the following specific sentence is

the appropriate disposition of this case.   If the Court rejects this plea agreement, it is further agreed

that the defendant may withdraw its plea.   If acceptable to the Court, the parties agree to waive the

presentence investigation and report pursuant to Fed. R. Crim. P. 32(c), and to request that the

3

(c)    A statutory-maximum term of five years of probation.   Probation shall include the following mandatory and discretionary special conditions, pursuant to 18 U.S.C. §§ 3563(a) and (b):

BP
HAS
Committed
Federal,
State,
Local
Crime
by
PAYIng
Judge
BARBIER
to Block
George
MAY
court
ACCESS
by FAX

(i)     The defendant shall not commit another federal, state, or local crime.

(ii)    The defendant shall notify the probation officer within seventy-two hours of any criminal prosecution against the defendant.

(iii)   The defendant shall answer truthfully all inquires by the probation officer.

(iv)    The defendant shall provide to the probation officer full access to any of the defendant's business operating locations.

(v)     The defendant shall give ten days' prior notice to the probation officer of any intended change in principal business location or mailing address.

(vi)    The defendant shall notify the Court and the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay the fines and other financial obligations set forth herein.

(vii)   The defendant shall pay the fines set forth in paragraph 4(b) above.

(viii)  Pursuant to 18 U.S.C. § 3563(b)(22), an order, attached

6

agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA.   BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees.   Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities.   Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

(b)   The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

7.   The Department agrees that, subject to paragraph 2 of this agreement, the Department shall not further prosecute the defendant, BP plc or any other BP plc entity, including all predecessors, successors and assigns of any of the above, for any conduct regarding any matters under investigation by the *Deepwater Horizon* Task Force relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.   This agreement shall not apply to individuals.   Should a court determine that the defendant has breached this agreement, the defendant will not be entitled to withdraw its plea of guilty, and the Department may prosecute the defendant, BP plc and any other BP plc entity, and any predecessors, successors and assigns of any

9

of the above, for any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, notwithstanding the expiration of any applicable statute of limitations following the signing of this plea agreement.   In any such prosecution, the Department may use the defendant's admissions of guilt as admissible evidence against the defendant, BP plc and any other BP plc entity.  *18 U.S.C, 2333, 2339 ABC*

8.    The Department agrees that, if requested to do so, it will advise any appropriate suspension or debarment authority that, in the Department's view, the defendant has accepted criminal responsibility for its conduct relating to the Deepwater Horizon blowout, explosion, oil spill and response by virtue of this guilty plea, and that BP is obligated pursuant to this agreement to cooperate in any ongoing criminal investigation by the Department relating to the Deepwater Horizon blowout, explosion, oil spill and response.   Nothing in this agreement limits the rights and authority of the United States of America to take further civil or administrative action against the defendant including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans and benefits from United States government agencies.

9.    In exchange for the undertakings made by the Department in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

10





Shop Seahawks Gear ▶

**seattle**(PI)

Thursday, N

⋀Ω°F

Q Search    ⊙ seattlepi.com    ⊙ Web Search by YAHOO!    ⊙ Businesses

Home   Local   U.S./World   Business   Sports   Entertainment   Life   Comics   Photos   Blogs   Fo

## AG Holder: Investigation of BP spill to continue

MICHAEL KUNZELMAN, Associated Press
Updated 11:54 a.m., Thursday, November 15, 2012

Ads by Google

### God can change your life

Learn from this true life story How God can give you new hope www.LifesGreatestQuestion.net

*BP their terrorist associates all participate in a common plan conspiracy to commit crimes against, humanity, terrorism*

VIEW: LARGER  |  HIDE    1 of 35    ◀ PREV  NEXT ▶



FILE - In this April 21, 2010 file image provided by the U.S. Coast Guard, fire boat response crews battle the blazing remnants of the off shore oil rig Deepwater Horizon. British oil company BP said Thursday Nov. 15, 2012 it is in advanced talks with U.S. agencies about settling criminal and other claims from the Gulf of Mexico well blowout two years ago. In a statement, BP said "no final agreement has yet been reached" and that any such deal would still be subject to court approvals. Photo: US Coast Guard / AP



0      9

**Tweet**    Me g    **Share**

A Larger | Smaller     Email This

Printable Version     Font

*Download the seattlepi.com mobile apps for iPhone and Android. Follow us on Facebook and Twitter.*

NEW ORLEANS (AP) — Two men who worked for BP during the 2010 Gulf oil spill disaster have been charged with manslaughter and a third with lying to federal investigators, according to indictments made public Thursday, hours after BP announced it was paying $4.5 billion in a settlement with the U.S. government over the disaster.

A federal indictment unsealed in New Orleans claims BP well site leaders Robert Kaluza and Donald Vidrine acted negligently in their supervision of key safety tests performed on the Deepwater Horizon drilling rig before the explosion killed 11 workers in April 2010. The indictment says Kaluza and Vidrine failed to phone engineers onshore to alert them of problems in the drilling operation. *IS RICO*

Another indictment charges David Rainey, who was BP's vice president of exploration for the Gulf of Mexico, on counts of obstruction of Congress and false statements. The indictment claims the former executive lied to federal investigators when they asked him how he calculated a flow rate estimate for BP's blown-out well in the days after the disaster.

Earlier in the day, BP PLC said it would plead guilty to criminal charges related to the deaths of 11 workers and lying to Congress.

*RICO, PATRIOT ACT, CRIMINAL ENTERPRISE TERRORIST. PLEAD GUILTY TO CRIMINAL,*

Ads by Google

**Portfolio Survival Guide**
The 18 Things You Must Do Now To Save Your Portfolio From Ruin
WealthDaily.com/Survival_Guide

**Ambulancias Aereas 24 hrs**
No pague su vuelo en efectivo aceptamos todas las aseguradoras
jetrescue.com.mx

*RICO, PATRIOT ACT, VIOLATIONS, TERRORIST ACTS CONSPIRACY, CORRUPTION CASE FIXING, CASE 2179, 12-970*

branches of the United States government refused to label members of the Irish Republican Army (IRA) as terrorists while the IRA was using methods against one of the United States' closest allies (the United Kingdom) which the UK branded as terrorism. This was highlighted by the Quinn v. Robinson case.[68][69]

*For these and other reasons, media outlets wishing to preserve a reputation for impartiality try to be careful in their use of the term.*[70][71]

# Types of terrorism

In early 1975, the Law Enforcement Assistant Administration in the United States formed the National Advisory Committee on Criminal Justice Standards and Goals. One of the five volumes that the committee wrote was entitled *Disorders and Terrorism*, produced by the Task Force on Disorders and Terrorism under the direction of H.H.A. Cooper, Director of the Task Force staff.[72] The Task Force classified terrorism into six categories.



A view of damages to the U.S. Embassy in Beirut caused by a terrorist bomb attack, April 1983

- **Civil disorder** -- A form of collective violence interfering with the peace, security, and normal functioning of the community.
- **Political terrorism** – Violent criminal behaviour designed primarily to generate fear in the community, or substantial segment of it, for political purposes.
- **Non-Political terrorism** – Terrorism that is not aimed at political purposes but which exhibits "conscious design to create and maintain a high degree of fear for coercive purposes, but the end is individual or collective gain rather than the achievement of a political objective."
- **Quasi-terrorism** – The activities incidental to the commission of crimes of violence that are similar in form and method to genuine terrorism but which nevertheless lack its essential ingredient. It is not the main purpose of the quasi-terrorists to induce terror in the immediate victim as in the case of genuine terrorism, but the quasi-terrorist uses the modalities and techniques of the genuine terrorist and produces



Sbarro pizza restaurant bombing in Jerusalem, in which 15 Israeli civilians were killed and 130 were wounded by a Hamas suicide bomber.

similar consequences and reaction.[73] For example, the fleeing felon who takes hostages is a quasi-terrorist, whose methods are similar to those of the genuine terrorist but whose purposes are quite different.

- **Limited political terrorism** – Genuine political terrorism is characterized by a revolutionary approach; limited political terrorism refers to "acts of terrorism which are committed for ideological or political motives but which are not part of a concerted campaign to capture control of the state.
- **Official or state terrorism** –"referring to nations whose rule is based upon fear and oppression that reach similar to terrorism or such proportions." It may also be referred to as **Structural**

"Revolutionary tax" is another major form of funding, and essentially a euphemism for "protection money".[113] Revolutionary taxes are typically extorted from businesses, and they also "play a secondary role as one other means of intimidating the target population".[113]

Other major sources of funding include kidnapping for ransoms, smuggling, fraud and robbery.[113]

The Financial Action Task Force is an inter-governmental body whose mandate, since October 2001, has included combatting terrorist financing.[117]

# Tactics

*Main article: Tactics of terrorism*

Terrorism is a form of asymmetric warfare, and is more common when direct conventional warfare will not be effective because forces vary greatly in power.[118]

The context in which terrorist tactics are used is often a large-scale, unresolved political conflict. The type of conflict varies widely; historical examples include:



- Secession of a territory to form a new sovereign state or become part of a different state
- Dominance of territory or resources by various ethnic groups
- Imposition of a particular form of government
- Economic deprivation of a population
- Opposition to a domestic government or occupying army
- Religious fanaticism

The Wall Street bombing at noon on September 16, 1920 killed thirty-eight people and injured several hundred. The perpetrators were never caught.

Terrorist attacks are often targeted to maximize fear and publicity, usually using explosives or poison.[119] There is concern about terrorist attacks employing weapons of mass destruction. Terrorist organizations usually methodically plan attacks in advance, and may train participants, plant undercover agents, and raise money from supporters or through organized crime. Communications occur through modern telecommunications, or through old-fashioned methods such as couriers.

# Responses

Responses to terrorism are broad in scope. They can include re-alignments of the political spectrum and reassessments of fundamental values.

Specific types of responses include:



- Targeted laws, criminal procedures, deportations, and enhanced police powers
- Target hardening, such as locking doors or adding traffic

X-ray backscatter technology (AIT)

# Judges' Trial

From Wikipedia, the free encyclopedia

Coordinates: 49°27.2603'N 11°02.9103'E

The **Judges' Trial** (or the **Justice Trial**, or, officially, *The United States of America vs. Josef Altstötter, et al.*) was the third of the 12 trials for war crimes the U.S. authorities held in their occupation zone in Germany in Nuremberg after the end of World War II. These twelve trials were all held before U.S. military courts, not before the International Military Tribunal, but took place in the same rooms at the Palace of Justice. The twelve U.S. trials are collectively known as the "Subsequent Nuremberg Trials" or, more formally, as the "Trials of War Criminals before the Nuremberg Military Tribunals" (NMT).



A witness testifies in the Judges' Trial

The defendants in this case were 16 German jurists and lawyers. Nine had been officials of the Reich Ministry of Justice, the others were prosecutors and judges of the Special Courts and People's Courts of Nazi Germany. They were — amongst other charges — held responsible for implementing and furthering the Nazi "racial purity" program through the eugenic and racial laws.

The judges in this case, heard before Military Tribunal III, were Carrington T. Marshall (presiding judge), former Chief Justice of the Supreme Court of Ohio; James T. Brand, Associate Justice of the Supreme Court of Oregon; Mallory B. Blair, formerly judge of the Third Court of Appeals of Texas; and Justin Woodward Harding of the Bar of the State of Ohio as an alternate judge. Marshall had to retire due to illness on June 19, 1947, at which point Brand became president and Harding a full member of the tribunal. The Chief of Counsel for the Prosecution was Telford Taylor; his deputy was Charles M. LaFollette. The indictment was presented on January 4, 1947; the trial lasted from March 5 to December 4, 1947. Ten of the defendants were found guilty; four received sentences for lifetime imprisonment, the rest prison sentences of varying lengths. Four persons were acquitted of all charges.

## Contents

- 1 Indictment
- 2 Defendants
- 3 Notes
- 4 References

*BP Think terrorist Associates All Abuse The Judicial, Penal process by Void, Invalid, Unconstitutional orders*

## Indictment

1. Participating in a common plan or conspiracy to commit war crimes and crimes against humanity;
2. War crimes through the abuse of the judicial and penal process, resulting in mass murder, torture, plunder of private property.
3. Crimes against humanity on the same grounds, including slave labor charges.
4. Membership in a criminal organization, the NSDAP or SS leadership corps.

01/11/2004 01:03 a.m.

# LAW REPORTS
## OF
# TRIALS OF
# WAR CRIMINALS

*Selected and prepared by*
THE UNITED NATIONS
WAR CRIMES COMMISSION

VOLUME VI

*LONDON*
PUBLISHED FOR
THE UNITED NATIONS WAR CRIMES COMMISSION
BY HIS MAJESTY'S STATIONERY OFFICE

1948

*Price 5s. od. net*

CASE NO. 35

THE JUSTICE TRIAL

TRIAL OF JOSEF ALTSTÖTTER AND OTHERS

UNITED STATES MILITARY TRIBUNAL, NUREM-
BERG, 17TH FEBRUARY–4TH DECEMBER, 1947

*Liability for War Crimes, Crimes against Humanity and
Membership of Criminal Organisations of German Judges,
Prosecutors and Officials of the Reich Ministry of Justice.*

Altstötter and the other accused in this trial were former
German Judges, Prosecutors or officials in the Reich
Ministry of Justice. All were charged with committing
war crimes and crimes against humanity between Septem-
ber, 1939, and April, 1945 and with conspiring between
January, 1933 and April, 1945 to commit such offences.
Several were also charged with membership of criminal
organisations as defined in the judgment of the Nurem-
berg International Military Tribunal.

The Count alleging conspiracy was attacked by Defence
Counsel and the Tribunal ruled that it had no jurisdiction
to try a defendant upon a charge of conspiracy con-
sidered as a separate offence.

One accused died before the opening of the trial and the
Tribunal declared a mis-trial as regards a second. Four
accused were found not guilty and the remaining ten were
held guilty of war crimes, crimes against humanity,
membership of criminal organisations, or of two or all
three of the foregoing. Sentences imposed ranged from
imprisonment for life to imprisonment for five years.

In its judgment the Tribunal dealt, *inter alia*, with the legal
basis of the Tribunal and of the Law which it applied, the
scope of the concept of crimes against humanity, the legal
position of countries occupied by Germany during the
war, the illegality of condemning to death nationals of
such territories for high treason against Germany, the
illegality of proceedings taken under the Nacht und
Nebel plan, and in general the legal aspects of the part
taken in furthering the persecution of Jews and Poles and
other aspects of Nazi policy by various of the accused
acting in their official or judicial capacities.

1

2          JOSEF ALTSTÖTTER

## A. OUTLINE OF THE PROCEEDINGS

### 1. THE COURT

The Court before which this trial was held was a United States Military Tribunal set up under the authority of Law No. 10 of the Allied Control Council for Germany and Ordinance No. 7 of the Military Government of the United States Zone of Germany.(¹)

### 2. THE CHARGES

The accused whose names appeared in the Indictment were the following: Josef Altstötter, Wilhelm von Ammon, Paul Barnickel, Hermann Cuhorst, Karl Engert, Guenther Joel, Herbert Klemm, Ernst Lautz, Wolfgang Mettgenberg, Guenther Nebelung, Rudolf Oeschey, Hans Petersen, Oswald Rothaug, Curt Rothenberger, Franz Schlegelberger and Carl Westphal.

Detailed allegations were made against them in the Indictment and were arranged under four Counts, headed: *The Common Design and Conspiracy*, *War Crimes, Crimes against Humanity, and Membership in Criminal Organisations.* The first three counts related to all accused, but the fourth to some only.

The essence of Count One (*Common Design and Conspiracy*) is contained in the first three paragraphs appearing under this heading, which run as follows:

" 1. Between January, 1933 and April, 1945, all of the defendants herein, acting pursuant to a common design, unlawfully, wilfully, and knowingly did conspire and agree together and with each other and with divers other persons, to commit War Crimes and Crimes against Humanity, as defined in Control Council Law No. 10, Article II.

" 2. Throughout the period covered by this Indictment all of the defendants herein, acting in concert with each other and with others, unlawfully, wilfully, and knowingly were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving, the commission of War Crimes and Crimes against Humanity.

" 3. All of the defendants herein, acting in concert with each other and with others, unlawfully, wilfully, and knowingly participated as leaders, organisers, instigators, and accomplices in the formulation and execution of the said common design, conspiracy, plans, and enterprises to commit, and which involved the commission of, War Crimes and Crimes against Humanity, and accordingly are individually responsible for their own acts and for all acts performed by any person or persons in execution of the said common design, conspiracy, plans, and enterprises."

The crimes involved were said to embrace " atrocities and offences against persons and property, including plunder of private property, murder,

(¹) For a general account of the United States law and practice regarding war crime trials held before Military Commissions and Tribunals and Military Government Courts, see Volume III of this series, pp. 103-120. The present is the first report in this series of volumes to deal with a case tried before such a *Military Tribunal*. Reports on others of the twelve trials held before the United States Military Tribunals in Nuremberg will appear in subsequent volumes.

*[handwritten top margin: TERRORISM / ECONOMIC / TERRORISM]*

JOSEF ALTSTÖTTER                    3

extermination, enslavement, deportation, unlawful imprisonment, torture, persecutions on political, racial and religious grounds, and ill-treatment of, and other inhumane acts against thousands of persons, including German civilians, nationals of other countries, and prisoners of war ''.   The methods allegedly used were described in these terms : '' It was a part of the said common design, conspiracy, plans, and enterprises to enact, issue, enforce, and give effect to certain purported statutes, decrees, and orders, which were criminal both in inception and execution, and to work with the Gestapo, SS, SD, SIPO and RSHA for criminal purposes, in the course of which the defendants, by distortion and denial of judicial and penal process, committed the murders, brutalities, cruelties, tortures, atrocities, and other inhumane acts, more fully described in Counts Two and Three of this Indictment ''. The Indictment subsequently went on to claim that : '' The said common design, conspiracy, plans, and enterprises embraced the use of the judicial process as a powerful weapon for the persecution and extermination of all opponents of the Nazi régime regardless of nationality and for the persecution and extermination of ' races '.''

*[handwritten right margin: AS A "DEVICE" USED VOID, INVALID, UNCONSTITUTIONAL ORDERS PROHIBITED BY THEIR OATH, LAW]*

Paragraph 8 of the Indictment set out the substance of Count Two (War Crimes) :

'' Between September, 1939 and April, 1945, all of the defendants herein unlawfully, wilfully, and knowingly committed War Crimes, as defined by Control Council Law No. 10, in that they were principals in, accessories to, ordered, abetted, took a consenting part in, and were connected with plans and enterprises involving the commission of atrocities and offences against persons and property, including, but not limited to, plunder of private property, murder, torture, and illegal imprisonment of, and brutalities, atrocities, and other inhumane acts against thousands of persons.   These crimes included, but were not limited to, the facts set out in Paragraphs 9 to 18, inclusive, of this Indictment, and were committed against civilians of occupied territories and members of the Armed Forces of nations then at war with the German Reich and who were in the custody of the German Reich in the exercise of belligerent control.''

In paragraph 9 it was alleged that all defendants used '' extraordinary irregular courts, superimposed upon the regular court system . . . to suppress political opposition to the Nazi régime ''.

*[handwritten right margin: OIL, GAS / COMPANIES / BP / THEIR AIDORS, ABETTER / TERRORIST ASSOCIATES]*

Paragraphs 10 to 18 alleged against various named accused in particular, inter alia, the trial by Special Courts, involving the '' denial of all semblance of judicial process '', of Jews of all nationalities, Poles, Ukrainians, Russians, and other nationals of the occupied Eastern territories, indiscriminately classed as '' Gipsies '' ;   the extension of discriminatory German laws to non-German territories for the purpose of exterminating Jews and other nationals of occupied countries ;   the denial of access to impartial justice to these nationals ;   participation on the part of the Ministry of Justice with the OKW[1] and the Gestapo, in the execution of Hitler's decree of '' Night and Fog '' (Nacht und Nebel) whereby civilians of occupied territories who had been accused of crimes of resistance against occupying forces were

[1] I.e. Oberkommando Wehrmacht (Army High Command).

# NEW YORK POST

# Judge: Al-Qaeda owes $9.3 billion for 9/11 harm

*Last Updated:* 9:35 PM, October 14, 2011
*Posted:* 9:34 PM, October 14, 2011

A magistrate judge in New York has recommended al-Qaeda be assessed $9.3 billion for the damage done to properties and businesses in the Sept. 11 attacks.

Federal Magistrate Judge Frank Maas in a ruling Friday sent the recommendation to a district judge presiding over a lawsuit brought by several insurance companies.

The companies in 2003 sued various defendants, seeking damages for the 2001 terror attacks, which demolished the World Trade Center's twin towers. Al-Qaeda never responded to the lawsuit and was found in default in 2006. Maas determined the actual damages and then tripled them as allowed by law.

At this time, the companies were only seeking an assessment of damages against al-Qaeda. The organization founded by Osama bin Laden is blamed for orchestrating the terror attacks.

*Florida's HARM, Economic DAMAGES, TERRORIST ENORMITY FAR EXCEED 9/11*

NEW YORK POST is a registered trademark of NYP Holdings, Inc.

nypost.com , nypostonline.com , and newyorkpost.com are trademarks of NYP Holdings, Inc.

Copyright 2012 NYP Holdings, Inc. All rights reserved. Privacy | Terms of Use