UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010. | § § § § | MDL No. 2179 SECTION "J" |
| | § | JUDGE BARBIER |
| This Document Relates to: | § § | MAGISTRATE SHUSHAN |
| 10-4239 | § | |
| 10-4240 | § | |
| 10-4241 | § | |

**REPLY TO DEFENDANTS BRITISH PETROLEUM, CAMERON INTERNATIONAL, HALLIBURTON AND TRANSOCEAN'S RESPONSES TO THE MEXICAN STATES OF QUINTANA ROO, VERACRUZ AND TAMAULIPAS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF PROPIETARY INTERESTS ASSERTED IN THE MEXICAN STATE COMPLAINTS.**

1

# TABLE OF CASES

| **Cases** | **Page no.** |
|---|---|
| *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982). | 4 |
| *Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.*, 877 F. 2d 1214 (5th Cir. 1989). | 12 |
| *New Orleans Steamboat Co. v. M/V James E. Wright*, 1990 U.S. Dist. LEXIS 1147 (E.D. La. Aug. 23, 1990). | 12 |
| *IMTT-GRETNA v. Robert E. Lee SS*, 993 F.2d 1193 (5th Cir.1993) | 12 |
| *State of Louisiana v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir. 1985 (en banc), cert.Denied, 477 U.S. 903 (1985). | 13 |
| *Louisville & Nashville R.R. Co.*, 597 F.2d 469, 472 n3 (5th Cir. 1979). | 13 |
| *Domar Ocean Trans., Ltd. v. M/V Andrew Martin*, 754 F.2d 616, (5th Cir. 1985). | 13 |
| *Catalyst Old River Hydroelectric Ltd. v. Ingram Barge Co.*, 639 F. 2d 207, 212-13 (5th Cir.2011). | 13 |
| Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2nd 1465, 1473 (5th Cir. 1991). | 14 |

Authorities Cited:

| | |
|---|---|
| *Article III Sec. US Constitution* | 4 |
| *Blacks Law Dictionary, 960 (6TH ed.1990).* | 4 |
| *Constitution of Quintana Roo* | 5 |
| *Constitution of Tamaulipas* | 7 |
| *Constitution of Veracruz* | 6 |
| *Mexican Constitution* | 7 |
| *Mexican General Law of National Assets* | 8 |

*General law of Ecological Balance and Environmental Protection*     11

*The General Statute on Wildlife*     11

1.  **PRELIMINARY**

In addition to the admiralty jurisdiction of this Court and other bases, Plaintiffs assert their claims based on Art. III, §2 of the U.S. Constitution, which confers jurisdiction as to, claims by foreign states such as these Plaintiffs. In addition to maintaining claims on their own behalf for there own damages, the Plaintiff States also assert claims on behalf of their citizens, residents, and businesses under the doctrine of *parens patria. See, Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592 (1982).

Although Defendants contend that the issues presented are purely of Mexican law, any legal conclusion depends on facts, *i.e.*, the facts to which the law be applied. Therefore, there are mixed questions of law and fact—not just law. The undisputed *facts* (as well as the law) demonstrate that the Mexican States <u>do</u> own the natural resources and geographical areas at issue. Defendants have not refuted any of the facts demonstrating that the Plaintiffs own, govern, exploit, develop, use, manage, regulate, protect, posses, control, repair and maintain at their own expense, and otherwise exert dominium over the areas and resources at issue. (*E.g.,* Ex. R, S, H). In fact, Defendants admit "Mexican Law allows for a system under which the States [Plaintiffs] may be permitted to ***manage, control***, enjoy, ***exploit***, or use the beaches, waters, and other natural resources …" (Burguete-Stanek Report, p. 6, Ds' Ex. 7). (Pg.10, Pls'Resp.). "Manage" includes rights of governance and possession: "To control and direct, to administer, to take charge of. To conduct; to carry on the concerns of a business or establishment." *Black's Law Dictionary,* 960 (6th ed.1990). Therefore, Defendants agree that, at a minimum, Plaintiffs are in charge of managing, exploiting, governing, *etc*. Thus, according to Defendants'

own experts, the federal government is not. The undisputed facts and law demonstrate even greater authority, as well as ownership.

Defendants ignore the unique status of Mexican States. As their constitutions declare, they are "free and sovereign" States and they retain *all* powers and rights that they have not specifically transferred to the federal government. (Art. 1 Ex. "D" pgs.1, 2,3). The Mexican States even have the authority to enter into foreign treaties like the MEXUS Plan (Exhibit "M."). As another example, Art. 3 of the Constitution of Quintana Roo declares: "The State of Quintana Roo hereby reserves the sovereign exercise of all powers that are not expressly granted to the Federal or Municipal government." (Ex. D pg.1). Therefore, the focus is not what the Mexican federal government allows the States to do (as Defendants mistakenly contend), but, instead, what the States permit the federal government to do on their behalf. *Defendants have not identified any constitutional provision or any other provisions whereby these States have given up any of the rights or interests at issue herein, e.g., to sue on their own behalf to recover for damages caused by Defendants to the States' own property, rights, natural resources, and other proprietary interests*. In the absence of any such provision *by the States*, which Defendants have not and cannot identify, the States unquestionably have the rights asserted herein. (Ex. C, B, L).

Defendants do not and cannot dispute the following provisions of Mexican law and facts:

Each of the three Mexican States are **free and autonomous** entities that own, govern, possess, control, exploit, use, patrol, protect, restore and repair at their own expense their islands located in the Gulf of Mexico that were contaminated by Macondo

Oil, in addition to their territory, beaches, capes, cays, reefs, the administrative land grants and the concessions of land reclaimed from the sea from the Federal Government.

Furthermore, Defendants cannot and do not dispute that the Governors of each State can defend the interests of all citizens of the State. By way of example, the three State Constitutions provide as follows:

> *CONSTITUTION OF VERACRUZ*:
>
> Article 1. The State of Veracruz Ignacio de la Llave is an integral part of the Mexican Federation, **free and autonomous** in its internal administration and government.
>
> Article 3. The territory of the State has the extension and limits that historically correspond to it, and **it includes the capes, islands and islets adjacent to its coastline over which it holds jurisdiction**, pursuant with the provisions of the Federal Constitution and the Law. (emphasis added).
>
> Article 49. The Governor has the following duties: XVII. **Enter into, acting in his capacity as representative of the Government of the State**, pursuant with the provisions established by the law, **agreements and contracts in all diverse branches of public administration**, with the federal, state or municipal governments, as well as with decentralized entities of such governments **and private individuals and companies whether public or private;** (Ex. "B" p. 233; Ex. A).
>
> *CONSTITUTION* OF QUINTANA ROO:
>
> ARTICLE 1.- Quintana Roo constitutes a **free state** as its members determine the organization, function and purposes of the community that they integrate, and sovereign because all of the powers exercised therein arise from its collective will, exclusively as per its internal order and in participation with the national order.
>
> ARTICLE 3.- The State of Quintana Roo hereby reserves the sovereign exercise of all powers that are not expressly granted to federal or municipal governments.
>
> ARTICLE 46.- The territory of the State of Quintana Roo is made up by:

I. The Eastern portion of the Yucatan peninsula, bordered by a divisionary line that, starting from the northern coast of the Yucatan Canal, follows the meridian 87 degrees, 32 minutes, east Greenwich longitude, until it intersects the 21 degree parallel.

6

**II.** **The islands of: Cozumel, Cancún, Mujeres, Blanca, and Contoy, in the Caribbean Sea and the Island of Holbox in the Gulf of Mexico, as well as the islands, islets, cays and reefs adjacent to its coastline.** *See Exhibit "R" page 1. Item 4.*

*CONSTITUTION* **OF TAMAULIPAS:**

ARTICLE 1.- The State of Tamaulipas **is free, sovereign and independent** as per its interior government and administration; but it is linked to the Powers of the Union as an integral part of the United Mexican States, in all matters expressly established in the Political Constitution of the United Mexican States and the laws arising thereof. (emphasis added) (*Ex. "D" and "B"*).

ARTICLE 91 – Powers and Duties of the Governor are:

XXIX.- To represent the State Government in all acts inherent in his position. This representation may be delegated or granted to third parties in the broadest terms, to that effect, as may be established by law. (*Ex. "D."*).

Additionally, the islands of Tamaulipas and Veracruz were part of their territory before 1917 and the States claim their original domain. Therefore, the islands of Tamaulipas and Veracruz are not under the jurisdiction of the Federal Government, but under the Jurisdiction of the States of Tamaulipas and Veracruz, as provided in Article 48 of the Mexican Constitution. (Ex. "P" p. 5. Item 7 and Ex. "A."). Moreover, the State Constitutions clearly give ownership over the islets, cays, reefs, capes and beaches along the Gulf Coast.

It is also undisputed that the powers, rights, and authorities of the States include the rights such as those exerted by Tamaulipas, to permit developing, dredging, sale and resale and other physical and economic development of their shores. Defendants have not refuted the Declaration of Gabriel Maldonado Exhibit "H" which states:

"Later in August 2008, an agreement for Collaboration for the Compliance of Environmental Restrictions was entered into between GTT and the State of Tamaulipas, such instrument duly empowered GTT to perform the Works and construction of the aforementioned lake and beachfront interface and to carry out the schedule for environmental restoration of the mangroves located in the zone to

7

be developed.  The other environmental restrictions mentioned before were also covered therein. (emphasis added)(Ex. H subparagraph v., p.6).
\*\*\*
On August 20, 2008, GTT and the State of Tamaulipas entered into an agreement whereby the execution of the aforementioned dredging and building Works were to be performed by GTT on behalf of the State. (Ex. H subparagraphs vi, p.6).

It is further undisputed that each of the Plaintiff states have, in fact, exerted and possessed ownership, regulation, governance, possession, exploitation, patrolling, repairing, maintaining at their own expense the coast line areas and wildlife on their beaches and coasts. (Ex. R, S, H). For example, the following is undisputed:

> Pursuant to the aforesaid during the monitoring and clean up campaign after the Macondo April, 20, 2010 oil spill, the Authorities of the State of Quintana Roo, who were in office at the time of the Oil Spill, on behalf of the State of Quintana Roo, actually recovered, cleaned up and restored the beach and water areas where the Macondo oil spill landed.  All of the foregoing activities were paid by the State out of its own funds. (Ex. R p.2, item 6).
> \*\*\*
> ……..The monitoring and clean up campaign consisted of setting up patrols and brigades of State employees who would patrol and observe the coastline, waters, lagoons, reefs, docks, ports, waterways and environmental sensitive areas of the State. Ex. "S" p.1 item 3).

> During the monitoring and clean up campaign after the Macondo April 20, 2010 oil spill, the State recovered, cleaned up and restored the beach and water areas where the Macondo oil spill landed.  All of the foregoing activities were paid by the State out of its own funds. (Ex. S, item 2, p. 2).

Defendants erroneously argue that under the "General Law of National Assets," the Mexican federal government has title to all assets including those covered by concessions and administrative agreements regarding reefs, beaches, and land reclaimed from the sea. Such statement is completely erroneous as all the Gulf islands, cays, reefs, capes, etc., belong to the States pursuant to their own constitutions (see above), as well as Article 120 of the GLNA which provides:

> ARTICLE 120.- The Federal Executive Power, through the Ministry of the Environment and Natural Resources, **shall promote the sustainable use and exploitation of the federal maritime land zone and lands reclaimed from the**

8

**sea**. With this purpose, such Ministry, having previously coordinated with all other ministries which, pursuant with the matter, must also intervene, shall establish the rules and policies that are applicable, **in consideration of the plans and programs for urban development, environmental statutes, the satisfaction of the requirements for sea navigation and commerce, the defense of the country, support for fishing and aquaculture activities, as well as support for recreational and tourism activities.** The **Federal Executive** branch, through the Ministry of the Environment and Natural Resources, **will be able to enter into coordination agreements with the purpose of having the state governments and the municipalities, administer, conserve and monitor such assets**. **Such faculties shall be exercised pursuant with the provisions of this Law and all other applicable federal and state rules**, as well as any other laws from which such laws may arise. (emphasis added).

Defendants cannot deny that all of the administrative agreements and concession agreements listed and incorporated into Dr. Gabuardi's report – Exhibit "B" pgs. 38-236 transfer Federal Management to State Management including the rights to **"administer, conserve** [*i.e.*, repair and maintain] **and monitor" the federal maritime land zone and lands reclaimed from the sea."** *Id*. Art. 120, above. It should also be noted that BP has misleadingly twisted an excerpt from Gabuardi's report on page 94, footnote 373 in a fallacious attempt to use it as evidence that proprietary rights transferred do not create real rights. Footnote 373 states:

> *373 - This clause provides administrative agreement granting the benefit upon federal assets only transfer the right to use them but do not transfer the property on the same or create any other real rights on such assets and hence cannot be transferred to anyone else.*

The aforesaid footnote is **not** Gabuardi's opinion. It is simply a footnote referenced in an administrative agreement. To the contrary, in the La Pesca administrative **land grant to the State of Tamaulipas, the Federation transfers the full right of use, exploitation, preservation, maintenance and vigilance of the seabed to the State of Tamaulipas** *See pg.94 footnote 370 of Exhibit "B."* The true meaning of

9

Footnote 373 is that Tamaulipas cannot sell the seabed to a third party because it is destined for a "public beach" *Id*. The agreement, which was incorporated and translated into Gabuardi's report, **irrefutably transfers 684,366.65 m2 of the federal maritime zone exclusively for the use, exploitation, preservation, maintenance and vigilance of the State of Tamaulipas**.

<u>On the Definition of Mexican Nation</u>:

Defendants rely on the opinion of David Lopez (Halliburton's Expert) to equate the term "nation" in all the Mexican law they cite in their briefs to mean the Federal Government. In actuality, such definition is invalid and erroneous. David Lopez report states, "The Mexican Supreme Court has held that the term "Nation" as it appears in the Mexican Constitution means and refers to Mexico's federal government, not the States." (Page 7 of Lopez Report to Halliburton). This is false. The correct holding of the case is as follows:

> "The **nation** must not be confused with a federal entity, and the officers of one State are not empowered to, consequently, represent it, as the nation is unique and is represented by its federal organs, pursuant with article 41 of the Supreme Law." **SECOND COURT** Tome LII, page 2895. Alphabetical Indez. Amparo 453/37. Prado Pedro Vicente. June 4, 1937. Four vote majority. Dissident: Agustín Aguirre Garza. Tome LII, page 72. Amparo administrativo en revisión 6656/37. Ahumada Antonio. April 5, 1937. Four vote Majority. Relator y disidente: Agustín Aguirre Garza. Engrose: José M. Truchuelo.

<u>Transocean's Expert Jose Juan Gonzalez Marquez agrees with the Mexican States that the aforesaid is the correct holding</u>. *See* Gonzalez Marquez Report pg. 45. The true holding of the case, contrary to what Lopez concludes, is that the nation will be represented by the federal government, and not a member of a State government. The holding also establishes that the States can represent themselves, but they cannot

represent the Nation. The Mexican States agree. However, the definition of "Nation" equating it to the "Federal Government" is an erroneous opinion by a Texas lawyer that attempts to interpret Mexican law. The exact opposite of Lopez' opinion is true – "The Nation must not be confused with the federal entity, i.e., the federal government. The Mexican States herein are *not* representing Mexican Government Federal Interests, but only representing their interests in seeking damages for the harms caused to their proprietary interests. Indisputably, they have the right to do so.

<u>Mexican Federal Statutes Grant States Exclusive Control of Environmental Emergencies</u>.

In addition to constitutional authority to act in matters involving the environment, the States have additional authority to do so which is derived from a federal statute.

<u>Article 7</u> of the current text in the <u>General Law of Ecological Balance and Environmental Protection</u> (dated June 4th, 2012), confers to the States the following rights, obligations, and powers to legislate in the following areas: XI.- Dealing with matters which affect the ecological balance or the environment of two or more Municipalities; **XII.- Participation in environmental emergencies and contingencies, pursuant to the civil defense policies and programs which are provided therefore;** XIV.- The management of state information policy and information on environmental subject matters.[1]

The States of Quintana Roo, Tamaulipas and Veracruz (due to their geographical proximity and direct and preponderant interest in the preservation of their environment) have the obligation and right to immediately intervene to preserve and protect their environments—and they did so as a result of the Macondo Spill. (Ex. "R" and "S").

<u>Article 7 of the General Statute on Wildlife</u>, provides for concurrency on all matters pertaining to wildlife among the Municipalities, State, Federal District, and Federal governments. According to the concurrency authority and obligations, the three levels of government [which include the States] must: I. Guarantee that the actions of the different levels of government are united in purposes and congruent regarding the execution of national policy regulations in wildlife matters; III. Recognize duties to the

---

[1] Chamber of Deputies. General Law of Ecological Balance and Environmental Protection, June 4th, 2012. http://www.diputados.gob.mx/LeyesBiblio/pdf/148.pdf

State and Federal District´s Governments, to be executed within the limits of its territory, regarding the execution and compliance or the national policy regulations in wildlife and habitat matter; IV. Specify the duties that must be executed exclusively by the State powers of the Federated Entities and to the Federation on the matter of Wildlife. *See* (Ex. "T" General Law of Wildlife).

3.      **PROPRIETARY INTEREST STANDARDS**

As noted in Plaintiffs' Motion for Summary Judgment, regardless of whether the existence of a proprietary interest is determined under Mexican law or federal maritime law, Plaintiffs have established such interests. The undisputed facts and applicable law establish that the Plaintiff States do own the areas and resources at issue. They also control, govern, possess, protect, repair and maintain at their own expense, *etc.*, these areas and resources. Contrary to Defendants' contentions, the focus is not ownership. *Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.*, 877 F. 2d 1214, 1224-5 (5th Cir. 1989);(additional cases cited in Pls' Resp.). Plaintiffs have cited literally a dozen cases, including those of the Eastern District of Louisiana, holding ownership is not necessary to establish a proprietary interest. (*E.g.*, *Texas Eastern Transp. Corp. v. McMoran Offshore Exploration Co.*, 877 F. 2d 1214, 1224-5 (5th Cir. 1989), *cert. denied,* 493 U.S. 937 (1989); *New Orleans Steamboat Co. v. M/V James E. Wright,* 1990 U.S. Dist. LEXIS 11447 *25 (E.D. La. Aug. 23, 1990); additionally, see cases on pp. 20 to 27 of Mem in Support of Pls' MSJ). Even the authorities relied upon by Defendants undermine their positions. For example, Defendants misread *IMTT-GRETNA v. Robert E. Lee SS*, 993 F. 2d 1193 (5th Cir. 1993), misinterpreting it as holding that ownership is required. In fact, the Court defined proprietary interest as consisting of "actual possession or control, responsibility for repair and responsibility for maintenance." 993 F. 2d at 1194

(citing *Texas Eastern Trans.*, 877 F. 2d at 1225). This enunciated test was crucial to the Court's holding since it analyzed the facts by applying the foregoing factors. *Id.*

The Fifth Circuit has generally avoided using the term ownership, as did the *Robins* court. Obviously, if the Court had intended "ownership," it would have been a simple matter to say so, but it has deliberately chosen not to do so. For example, despite the lengthy opinion of *State of Louisiana v. M/V TESTBANK*, 752 F. 2d 1019 (5th Cir. 1985 (*en banc*), *cert. denied*, 477 U.S. 903 (1985) ("TESTBANK"), there is nothing in its language that requires ownership. Rather, the opinion speaks repeatedly of "proprietary interest." The Court even noted (but did not decide) that a "substantial argument" could be made that fishermen had a proprietary interest in fish in the waters they normally harvest. *Id*. at 1027. Rather than requiring ownership, the Fifth Circuit has consistently made comparisons to rights under leases such as a demise charter, where ownership is not transferred, possession is for a limited amount of time, and possession reverts to the owner at the end of the lease. *Louisville & Nashville R.R. Co.,* 597 F.2d 469, 472 n. 3 (5th Cir. 1979)(finding a lessee of a house and lot to be "analogous" to a demise charterer and sufficient to create a proprietary interest); *Domar Ocean Trans., Ltd. v. M/V Andrew Martin,* 754 F. 2d. 616, (5th Cir. 1985) (proprietary interest existed as to a *leased* tugboat when it was used in combination with a barge).

The Fifth Circuit recently demonstrated that a *leasehold* interest is sufficient to establish a proprietary interest. *Catalyst Old River Hydroelectric Ltd. v. Ingram Barge Co.,* 639 F. 2d 207, 212-13 (5th Cir. 2011). In that case, the defendant's barge ran aground in the inlet channel that supplied water to the plaintiff's power plant. The barge was plaintiff's "private *leasehold* property." *Id.* Nevertheless, the Court described the *leased*

inlet channel as "owned" by plaintiff. 639 F. 2d at 212("The intake channel, owned by Catalyst, is an integral part of its facility…"). Significantly, the damage to the proprietary interest consisted of a loss of the *use* of the facility: "[T]he presence of the barge on Catalyst's property [*i.e.,* the leased channel] physically interfered with the flow of water through the intake channel to the turbines, *interfering with Catalyst's use of the property as a hydroelectric station*." (emphasis added) *Id.*

In another post-*TESTBANK* application of *Robins Dry Dock*, the Fifth Circuit held the necessary proprietary interest could be established through a mere showing of something more than the loss of use of property. *Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F. 2d 1465, 1473 (5th Cir. 1991)("[I]f a plaintiff has a claim for more than simple loss of use of some facility due to the tort of some third party, its claim is not barred by *Robins Dry Dock.*").

Accordingly, the Mexican States have established their proprietary interests, regardless of whether Mexican law or maritime law is used to determine their existence.

Dated: January 31, 2013

Respectfully submitted,

**SERNA & ASSOCIATES PLLC**

/s/ Enrique G. Serna
Enrique G. Serna
enrique@serna-associates.com
20985 IH 10 W
San Antonio, Texas
Telephone: 210.472.2222
Facsimile: 210.228.0839

**CERTIFICATE OF SERVICE**
I hereby Certify that the above and foregoing pleading, **REPLY TO DEFENDANTS BRITISH PETROLEUM, CAMERON INTERNATIONAL,**

14

**HALLIBURTON AND TRANSOCEAN'S RESPONSES TO THE MEXICAN STATES OF QUINTANA ROO, VERACRUZ AND TAMAULIPAS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF PROPIETARY INTERESTS ASSERTED IN THE MEXICAN STATE COMPLAINTS**, has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No.12, and that the foregoing was electronically filed by using the CM/ECF System which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this the 31th of January 2013.

/s/ Enrique G. Serna
Enrique G. Serna