1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  OIL SPILL BY THE OIL RIG    *   10-MD-2179-CJB-SS
            *DEEPWATER HORIZON* IN THE      *
6           GULF OF MEXICO ON              *
            APRIL 20, 2010                 *   October 19, 2012
7                                          *
                                           *
8   Applies to:  All Cases                 *   8:30 a.m.
    * * * * * * * * * * * * * * * * * *

9

10                    WORKING GROUP CONFERENCE
                BEFORE THE HONORABLE SALLY SHUSHAN
11                UNITED STATES MAGISTRATE JUDGE

12

    Appearances:
13

14  For the Plaintiffs:         Levin Papantonio Thomas Mitchell
                                   Rafferty & Proctor
                                BY:  BRIAN H. BARR, ESQ.
15                              316 South Baylen Street
                                Suite 600
16                              Post Office Box 12308
                                Pensacola, Florida 32591
17

18

19  For the Plaintiffs:         Breit Drescher Imprevento & Walker
                                BY:  JEFFREY BREIT, ESQ.
20                              1000 Dominion Tower
                                999 Waterside Drive
21                              Norfolk, Virginia  23510

22

23

24  For the Plaintiffs:         Williamson & Rusnak
                                BY:  JIMMY WILLIAMSON, ESQ.
                                4310 Yoakum Boulevard
25                              Houston, Texas 77006

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:        Irpino Law Firm
                                BY:  ANTHONY IRPINO, ESQ.
 3                              One Canal Place
                                365 Canal Street
 4                              Suite 2990
                                New Orleans, Louisiana  70130
 5

 6
     For the Federal           U.S. Department of Justice
 7   Government Interests:      Torts Branch, Civil Division
                                BY:  SARAH D. HIMMELHOCH, ESQ.
 8                              BY:  R. MICHAEL UNDERHILL, ESQ.
                                450 Golden Gate Avenue
 9                              Rm. 7-5395
                                San Francisco, California 94102
10

11
     For the United            Environmental Enforcement Section
12   States of America:        U.S. Department of Justice
                                BY:  A. NATHANIEL CHAKERES, ESQ.
13                             BY:  SCOTT CERNICH, ESQ.
                                P.O. Box 7611
14                             Washington, D.C. 20044

15

16   For the State of          Attorney General of Alabama
     Alabama:                  BY:  COREY L. MAZE, ESQ.
17                             500 Dexter Avenue
                                Montgomery, Alabama 36130
18

19
     For the State of          Kanner & Whiteley
20   Louisiana:                BY:  DOUGLAS R. KRAUS, ESQ.
                                701 Camp Street
21                             New Orleans, Louisiana 70130

22

23   For BP:                   Kirkland & Ellis
                                BY: ROBERT R. GASAWAY, ESQ.
24                             655 Fifteenth Street, N.W.
                                Washington, D.C. 20005
25
```

1    APPEARANCES CONTINUED:

2    For BP:                        Kirkland & Ellis, LLP
                                    BY:  J. ANDREW LANGAN, ESQ.
3                                   BY:  MARK J. NOMELLINI, ESQ.
                                    300 N. Lasalle
4                                   Chicago, Illinois 60654

5

6    For Transocean:                Frilot, Partridge, Kohnke
                                      & Clements
7                                   BY:  KERRY J. MILLER, ESQ.
                                    1100 Poydras Street
8                                   Suite 3600
                                    New Orleans, Louisiana 70163
9

10

11   For Transocean:                Sutherland Asbill & Brennan, LLP
                                    BY: DAVID A. BAAY, ESQ.
12                                  1001 Fannin Street
                                    Suite 3700
13                                  Houston, Texas 77002

14

15   For Halliburton:               Godwin Ronquillo, PC
                                    BY:  DONALD E. GODWIN, ESQ.
16                                  1201 Elm Street, Suite 1700
                                    Dallas, Texas 75270
17

18

19   For Halliburton:               Godwin Ronquillo, PC
                                    BY:  R. ALAN YORK, ESQ.
20                                  1331 Lamar, Suite 1665
                                    Houston, Texas 77010
21

22

23   For Anadarko:                  Bingham McCutchen, LLP
                                    BY:  WARREN ANTHONY FITCH, ESQ.
24                                  2020 K Street NW
                                    Washington, DC 20006
25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1  APPEARANCES CONTINUED:

2  Official Court Reporter:       Jodi Simcox, RMR, FCRR
                                  500 Poydras Street
3                                 Room HB-406
                                  New Orleans, Louisiana 70130
4                                 (504) 589-7780
                                  Jodi_Simcox@laed.uscourts.gov
5

6

7

8  Proceedings recorded by mechanical stenography using

   computer-aided transcription software.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# I N D E X

| | Page |
|---|---|
| SHOW AND TELL | 6 |
| PHASE ONE EXHIBITS | 8 |
| PHASE ONE WITNESS LIST | 17 |
| MOTIONS FOR ADVERSE INFERENCES BASED ON 5TH AMENDMENT ASSERTIONS | 23 |
| INSPECTION AND TESTING OF BOP, CAPPING STACK AND EQUIPMENT | 25 |
| U.S. CLAWBACK OF DEPOSITION EXHIBIT 9146 | 29 |
| U.S. PRODUCTION OF PREVIOUSLY WITHHELD DOCUMENTS | 30 |
| PROFESSOR LEIFER DOCUMENT PRODUCTION | 34 |
| UPDATE ON PHASE TWO FACT DEPOSITIONS | 39 |
| OBJECTIONS TO DEPOSITION EXHIBITS | 58 |
| PRELIMINARY GOOD FAITH EXHIBIT LISTS | 60 |
| U.S. DOCUMENT PRODUCTION | 61 |
| PRELIMINARY GOOD FAITH MAY CALL WITNESS LIST | 62 |

1                    **WORKING GROUP CONFERENCE**

2                        **(October 19, 2012)**

3                              ******

4          (OPEN COURT)

5          THE COURT:  Good morning, everybody.  Have a seat.

6               Do we have the phone on?

7          THE DEPUTY CLERK:  Yes, ma'am.

8          THE COURT:  All right.  Hi, phone participants.

9               The map is terrible.  Why don't you think I

10    could get a more clear image of Louisiana?  Corey?

11          MR. MAZE:  Because you work for the government?

12          THE COURT:  Probably.  That's probably true.

13          MR. MAZE:  Oh, you weren't asking that rhetorically.

14    Sorry.

15          THE COURT:  No, no, no.  I was asking it

16    rhetorically.  I just can't understand why I can't get a better

17    image.

18               We had the IT people come in to see if we could

19    make it better.  What we were going to do is have non-Louisiana

20    participants identify for us where I am going today, which is

21    why we have our 8:30 conference.  We're going to Napoleonville,

22    Louisiana.

23               So, Corey, maybe if you came and held the map

24    down for me we could figure out where I'm going.

25          MR. MAZE:  I thought maybe if we googled it on the

1  iPad, I thought maybe we could get that --

2          THE COURT:  Well, try that for me.

3          MR. MAZE:  Well, I have an iPad 1, so it takes a

4  really long time.

5          THE COURT:  Yeah.  That atlas is from the old days

6  when I practiced law and I had to figure out where I was going.

7          MR. MAZE:  Okay.  I actually don't know where you're

8  going, so . . .

9          MR. HAYCRAFT:  Napoleonville.

10         MR. MAZE:  Napoleonville.

11         THE COURT:  Napoleonville.

12         MR. MAZE:  I'm going to assume that is north.

13         MR. HAYCRAFT:  Why?

14         MR. O'KEEFE:  No, west and south.

15         MR. MAZE:  I don't know.

16         THE COURT:  Michael, you can't give him hints of west

17  and south.

18             Do you see it?

19         MR. MAZE:  I do.

20         THE COURT:  Okay.  There we go.  Napoleonville,

21  Louisiana.  That is where Judge Milazzo is from and she's doing

22  a law clerk seminar this afternoon.  I might also add that that

23  is where Kerry Miller is from, and so he's just -- the late

24  Kerry Miller who is just entering the courtroom --

25         MR. HAYCRAFT:  He always chooses a dramatic entrance.

1          MR. MILLER:  Close.

2          THE COURT:  -- could not have participated in this

3   contest.

4          MR. MILLER:  I think we rephrase "the late Kerry

5   Miller."

6          THE COURT:  So that's the reason we're having the

7   8:30 conference.

8             Thank you, Corey.

9          MR. MAZE:  You're welcome, Judge.

10          MR. O'KEEFE:  You want lights?

11          THE COURT:  Yeah.  Let's get some lights, please.

12             Okay.  So, Kerry, do you know where Judge

13   Milazzo's house is in Napoleonville?

14          MR. MILLER:  I know where her dad's house is.

15          THE COURT:  This is very close by.

16          MR. MILLER:  It's on Highway 308.

17          THE COURT:  That's correct.

18          MR. MILLER:  Right past Assumption High School.

19          THE COURT:  That is correct.  It's on Highway 308, so

20   I got to find that.

21             Okay.  Let's get going.  Phase One Exhibits.

22             Phone participant, whoever is in a crowded room,

23   could you put us on mute, please?

24             Thank you.

25             Okay.  Let's hear from Alan York.  Alan York,

 1  come up, please.

 2              Phone participant, whoever is shuffling paper,

 3  put us on mute.

 4              Good morning.

 5      **MR. YORK:**  Good morning, Your Honor.  Alan York for

 6  Halliburton.

 7              Last week we had such high hopes.

 8      **THE COURT:**  I have high hopes every week, Alan.

 9      **MR. YORK:**  We have heard from the U.S., we have

10  spoken with BP and we heard from the PSC this morning and the

11  general consensus seems to be that no one -- none of those

12  parties think that the current -- actually, let me back up.

13              The U.S. and the PSC's position seems to be that

14  the current schedule will not work because they don't want --

15  they can't wait until December 15th to have a database -- a

16  clean database to pull the documents from and doing their trial

17  preparation.

18              BP has also raised some concerns, though they

19  have gone back to their team and are still talking about it,

20  with the ability of us to get things done in terms of the

21  objective redactions.

22              For our part, we are continuing -- we're just

23  trying to finish the fixing of the documents, which was

24  supposed to happen by Monday.  I think the one outlier is still

25  the PSC.  And there are some additional changes that they've

 1  said they can get through by Wednesday, which blows the Monday

 2  deadline that we had set, regardless.

 3            So we are still trying to operate at the Court's

 4  direction to try to get to a clean database.  If that's going

 5  to be something less than what we talked about last week, we

 6  just -- we're going to continue working and seek the Court's

 7  guidance as to how we should proceed.

 8            **THE COURT:**  I think that's right.  And I spoke to

 9  Underhill yesterday, who -- you know, it's 6:30 his time and

10  he's too lazy to get up to participate.

11            **MR. UNDERHILL:**  Hmm, hmm, hmm, hmm.

12            **THE COURT:**  Uh-oh.  Is that you, Mr. Underhill?

13            **MR. UNDERHILL:**  That was me.

14            **THE COURT:**  Well, okay.  I withdraw my statement

15  about *lazy*, in some regards.  But Mr. Underhill expressed

16  concern that they have loaded all their documents into their --

17  what's the name of the program, Underhill?  Trial --

18            **MR. UNDERHILL:**  That's correct, Your Honor.

19            **THE COURT:**  Huh?

20            **MR. UNDERHILL:**  I'm sorry, that was correct.  If you

21  said that we loaded our documents, correct.

22            **THE COURT:**  Into their trial program --

23            **MR. BREIT:**  Directory.

24            **THE COURT:**  -- trial directory -- thank you very

25  much -- and they don't want to have to reload, which is very

1    expensive.

2              And so could the parties work on an option

3    whereby everybody uses what's already been loaded in their

4    trial director programs and like programs, and then at the end

5    of the week for the marshaling conference, get the vendor that

6    is watermarking everything with the clean documents to marshal

7    those documents and put only the clean documents into evidence?

8    And that might work.

9         **MR. YORK:**  I think that we can work on a proposal

10   like that.  The one thing that we do want to raise is what we

11   want to avoid first and foremost is having incorrect documents

12   pulled up as exhibits at trial where people don't have an

13   agreement as to what the exhibit is supposed to be.  Because we

14   believe that that will irritate Judge Barbier if we have to

15   have those discussions during trial.

16             And there are still some of these issues and

17   we're still working through those with the PSC to try to get to

18   at least a point where we know what are the correct documents.

19        **THE COURT:**  And what's the universe of documents that

20   you believe need correcting?

21        **MR. YORK:**  With regard to that, I believe, and these

22   are rough numbers, it was a 10 percent correction number that

23   we were talking about last week that would be any substantive

24   document changes.  We think it's probably in the hundreds,

25   maybe.

1          And so we're happy to work however the Court

2    wants us to work and to proceed however the Court wants us to

3    proceed, but we do at least want to put that down as a

4    placeholder that -- two things, actually:  At a minimum, we

5    want to make sure we have the right documents; and number two,

6    we want to make sure -- and BP actually raised this as a

7    possibility, if you'll remember, the second part of the

8    schedule were objective redactions of personal information --

9          **THE COURT:**  Correct.

10          **MR. YORK:**  -- and what we're calling subjective

11   redactions of things, such as pricing information, that the

12   Court had agreed generally was not going to come in.

13          And one of the things that BP has suggested, and

14   I don't know if Mark Nomellini is on the phone and whether

15   they've gone back to their team with it, but the idea that if

16   we don't get to that back end of the process, if everybody has

17   already loaded the documents in their system, then every party

18   would be responsible for making sure that that information that

19   the Court has said it wants redacted is redacted from the

20   documents that they pull up at trial.

21          We were just trying to streamline that so that

22   everybody could pull from the same bank.

23          **THE COURT:**  Yeah, and I thought it was really a good

24   proposal.  But if we're talking in the hundreds as opposed to

25   in the thousands --

1    **MR. MAZE:**  But I do want to be clear, in fairness to

2  the U.S. and BP, the entire -- if you went through and did the

3  watermarking, it would be a replacement of the entire database;

4  if you're just correcting the documents, we think it would be

5  in the hundreds, perhaps approaching a thousand.

6              But that's what we think it would be in terms of

7  those that are incorrect being pulled and corrected.

8              **THE COURT:**  Gotcha.

9              Mr. Breit, have you got something to say?

10             **MR. BREIT:**  I would like to, if I could, Your Honor.

11             **THE COURT:**  Why don't you approach the podium.

12             Good morning.

13             **MR. BREIT:**  Good morning, Your Honor.  Jeffrey Breit

14  for the PSC.

15             What happened, which has delayed the time line a

16  little bit, BP, if you remember, last fall had curing issues in

17  the thousands and our team spent many, many months curing.  And

18  many things needed to be cured.

19             After that curing was done, remember,

20  Halliburton had not raised any issues about curing ever.

21             **THE COURT:**  Uh-huh.

22             **MR. BREIT:**  Then Halliburton gave us a list of 2,700

23  documents which they thought had mistakes.  We went through

24  each and every one of those 2,700 and fixed them, we believe.

25  When the data was sent over to them, there are Bates number

1  ranges which are not quite matching.  Yesterday afternoon

2  around 3:30, 4:00, they sent me a note highlighting 500 more.

3              Seventeen pages, I had my team pull two from

4  every page, let's just see what they're talking about.  And so

5  we went through about 34 of the documents, half of which we

6  believe they're mistaken and half of which we believe are

7  correct as sent by us.

8              We called and wrote yesterday and said, "Look,

9  by Wednesday we can go through 500.  We will have gone through

10 500 and match them up the best we can."  What's unclear, and

11 may never be cleared, is the de-duping, which is what we have

12 called trying to take Exhibits 1, 5, 10 and 15, which are the

13 same exhibit, and making sure that they are being shown at a

14 time where if I hold up 5, they'll know what 5 is, even though

15 5 may also be six other numbers.

16             Trying to bring that down into one exhibit that

17 we all agree is Exhibit 5, even though a witness called it 17.

18        **THE COURT:**  It shows up six, seven times.  Right.

19        **MR. BREIT:**  And that's what will be a problem for

20 Judge Barbier.  He'll see someone say, "Let me show you Exhibit

21 17," which is already in evidence through Exhibit 5.  And there

22 will be those happenings.

23             There will be some where lawyers put in

24 everything but Index Q of that document.  We've been trying to,

25 in the curing process, put the whole thing in.  So if Q wasn't

 1   used, at least it's a part of that exhibit which was in its

 2   original form.

 3            And so there will be mistakes.  I just can't

 4   think that in 20-, 15,000, whatever we've got, pages -- it's

 5   more than that -- there aren't going to be mistakes.  There

 6   will be notations, there will be some notes that didn't get

 7   cured.  We're doing our best to do that.

 8            One of the issues that was -- and so the

 9   watermarking issue, we agree with Mr. Underhill.  And Mike and

10   I have spoken about it many, many times, and now you know what

11   we know.  We've done the same thing.  We've marked each in our

12   exhibits.  These people all look exhausted because they've been

13   doing exhibit markings for our witness outlines, which are in.

14            **THE COURT:**  Mr. Barr looks pretty good today.

15            **MR. BREIT:**  He didn't have any.

16            Look at that man over there.

17            **THE COURT:**  On the other hand, Mr. Williamson, not so

18   much.

19            **MR. WILLIAMSON:**  New Orleans is a great city, Judge.

20            **MR. BREIT:**  And so the problem with us trying to redo

21   that, the concerns about the watermarking which is easily said

22   to whoever's doing it, it's very, very expensive.  And so we

23   have this huge rule in the office:  The bundles were not going

24   to be unbundled.  I think that was a quote from you.

25            **THE COURT:**  I remember that.

1           **MR. BREIT:**  Having these bundles pushed into the

2    center on day four of trial for non-live witnesses is going to

3    include all of those exhibits that are in the bundles,

4    computerized bundles.

5               So then we say on Thursday, "Here's our sheet,

6    Judge.  We've marshaled all of our documents.  We all agree

7    that these 737 exhibits came in through the bundled exhibit

8    witnesses that are not here live."  And those exhibits are

9    already there in those electronic bundles.

10              So then to say, okay, to InData, "Go find these

11   750, resubmit them separately from the bundles with

12   watermarks," is a problem that I'm not sure that I can see

13   through without a very, very large bill attached to it.  So

14   maybe we find out from them, what are you doing with it?

15              Because we weren't doing this before.  Remember

16   in February, there was no watermarking of exhibits or in these

17   bundles at all.  And so we see it as a problem, we see it as an

18   expensive problem.  And for purposes of Mr. Williamson and

19   myself and ten others, it's next to impossible to remark all of

20   our exhibits.

21           **THE COURT:**  Okay.  So why don't we do this, Alan, why

22   don't you get on the phone with Jeff, and perhaps

23   Mr. Underhill, if you want to include him -- if you don't want

24   to include him, that's okay -- and see if you can't work your

25   way through that problem of already having loaded their trial

1  exhibits.

2          And if, indeed, it seems to me that we're

3  talking hundreds, then maybe what we do is we clean up those

4  hundreds.  But, you know, you all are much more educated in

5  what we're talking about than I.  So why don't you all talk it

6  through and we'll cover it again next week.  Okay?

7          **MR. YORK:**  Will do.

8          **THE COURT:**  Thank you for taking the lead on it.  I

9  know your dreams are dashed, but that's the nature of this

10  litigation.

11          Okay.  Halliburton also pointed out to Mike and

12  me that we made a mistake on this week's minute entry regarding

13  last week's conference and the spreadsheet of all exhibits were

14  to be identified by October 22nd.  I guess that's a moot point

15  now anyway.

16          **MR. YORK:**  That's correct.

17          **THE COURT:**  All right.  Now, Kerry Miller, you, last

18  week, commented that you thought some witnesses for Phase One

19  could be dropped from the witness list because the party was no

20  longer at the table in Phase One.  You want to give us an

21  update on that?

22          **MR. MILLER:**  Yeah.  I will submit early next week the

23  rule to show cause we talked about last Friday with respect to

24  the parties that have been dismissed from Phase One, which are

25  Anadarko, MOEX and Weatherford.

1          Steve Herman, I think it was on Monday night or

2    Tuesday, circulated a draft PTO on further -- I would call it

3    further Phase One cleanup --

4          **THE COURT:**  Right.

5          **MR. MILLER:**  -- which would involve, you know,

6    removing potentially some other witnesses -- and I think this

7    is supposed to be consistent with all the old orders from last

8    year -- removing expert witnesses, for one, which a party can

9    do pursuant to your previous orders; notifying the others if

10   will call fact witnesses are going to be removed by the

11   sponsoring party.  Because your orders previously had said that

12   the other parties could rely upon a will call designation so

13   that there could be an exchange of an objection period.

14          Basically, if I want to take off a will call

15   witness, because the other parties relied upon that

16   representation, they can either say, "Yeah, fine, take him

17   off," or, "No, we relied on your representation.  We want that

18   witness to come."

19          So Steve sent that pretrial order out with

20   respect to further cleanup.  My only comment on Steve's draft

21   is, look, I know everybody's focused on the fairness hearing

22   that's coming up in a couple of weeks, but he put that off

23   until December.  Maybe if we could move that up some weeks into

24   November right after the final fairness hearing, that might

25   make good sense.

1          Maybe his draft needs some edits, but I thought

2   it was a good idea with respect to further cleanup.  I'll send

3   the rule to show cause out Monday or Tuesday.

4          **THE COURT:**  Yeah.  I'd like to do both, Kerry.  If

5   you would go ahead and get your rule to show cause out and list

6   those people who you think logically drop off of the witness

7   list, we'll allow everybody to look at it, comment if you think

8   that that's wrong and one of those witnesses, or more, should

9   remain on the Phase One trial list, that's great.

10         And then everybody saw, presumably, the draft

11  pretrial order that Steve circulated this past week.  And I do

12  think we should probably chew on it for a few weeks, past the

13  fairness hearing is fine with me.

14         Why don't we put it on the agenda for the Friday

15  following the fairness hearing with comments coming in between

16  now and then so that we'll have all comments for November 15th.

17         **MR. MILLER:**  That sounds good.

18         **THE COURT:**  Okay.

19         **MR. GODWIN:**  Judge, may I?

20         **THE COURT:**  Yes, you may, Don.  Good morning.

21         **MR. GODWIN:**  Thank you, Judge.  Good morning, Judge.

22  Don Godwin for Halliburton.

23         Judge, I could envision if a witness is on the

24  will call list for, say, one party, Witness X, and that party

25  says, "He or she is no longer needed.  We want to drop them

1  off," I could understand that many of us may say, "Oh, that's

2  fine.  No problem."

3            But where a witness is on, say, my witness list,

4  I want to drop them off and he or she is also on the witness

5  list of others, is the proposal that Steve and/or Kerry is

6  making that if I say I want to drop it or, say, Andy says he

7  wants to drop it and that witness is allowed to be dropped,

8  would he or she be dropped for all purposes with regard to

9  those others who may have identified someone?

10            Say, for instance, BP may have on its will call

11  list a witness it wants to drop and the Court says okay.  Well,

12  it may be that Kerry and I have that same witness on our list,

13  we may not want to drop it.  Will we be given an opportunity to

14  be heard on that?

15            THE COURT:  I think that Steve covers that in his

16  proposal.

17            MR. GODWIN:  I just don't recall it.  I saw it, but I

18  wasn't sure.

19            THE COURT:  I think he does.  But let's all look at

20  it and make sure that it's covered.  If it's not covered,

21  that's a comment you're going to want to make.

22            MR. MILLER:  I thought it was covered.

23            THE COURT:  It was covered.

24            MR. MILLER:  I think that's absolutely the idea.

25  Because your previous order said other parties can rely upon

1   the designation of a will call --
2            THE COURT:  That's right.
3            MR. MILLER:  -- such that in the instance you cited,
4   you or I would be able to say, "No, we relied upon that
5   representation.  We want that witness coming live."
6            THE COURT:  That's right.  That's right.
7            MR. GODWIN:  I just needed clarification.
8            THE COURT:  And I believe Steve has a provision
9   covering that in his draft; but if he doesn't, it's something
10  you want to point out.
11               Now, what Kerry is talking about are, for
12  example, Anadarko witnesses, and he thinks those might well be
13  able to drop off.
14           MR. GODWIN:  Right, right.
15           THE COURT:  So that's the show cause that he's going
16  to be circulating next week.
17           MR. GODWIN:  Different witnesses for different
18  parties.  Those are that out of it likely wouldn't need to be
19  called --
20           THE COURT:  Correct.
21           MR. GODWIN:  -- whereas those that are left may well
22  need to be.
23           THE COURT:  That's right.
24           MR. GODWIN:  Thank you, Judge.
25           THE COURT:  Okay.  All right.  Good enough.

1              And, by the way, I ran into Tony at the concert

2    this week and he was quite elated that he won't be at the table

3    for Phase One.  Is that true, Tony?

4              **MR. FITCH:**  Well, *elated* may be the wrong word to

5    cover the good company.

6              **THE COURT:**  Well, it looked like elation to me.

7              **MR. FITCH:**  I will say the next to last fall concert

8    over in Lafayette Square put on by the Lafayette Square

9    Association that the judge is active in was a great pleasure,

10   and a great pleasure to see the judge and not to have her rule

11   against me.

12             **THE COURT:**  That's right.  And this coming week is

13   the final week for the fall and it's the Rebirth Brass Band.

14             **MR. FITCH:**  Yes, I saw that.

15             **THE COURT:**  Okay.  I assume Corey and Win will be

16   there.

17             **MR. MAZE:**  Next Wednesday?

18             **THE COURT:**  Yeah.

19             **MR. MAZE:**  We try to be there every week.

20             **THE COURT:**  Well, Win's saying no, but okay.

21             **MR. MAZE:**  Win will be out of state next week.

22             **THE COURT:**  Out of Louisiana?

23             **MR. MAZE:**  Out of Louisiana or Alabama.

24             **MR. SINCLAIR:**  I will be at my alma mater hosting, in

25   theory, a New Orleans style shrimp boil.

1        **THE COURT:**  Have you gone to Rouses and bought crab

2    boil in which you will boil those shrimp?

3        **MR. SINCLAIR:**  Yes.  And we're going to hit Rouses

4    for French bread in the plastic.  We're hoping it will keep for

5    a week.  Otherwise, they won't sing my praises.

6        **THE COURT:**  And then just so you know, when you get

7    the crab boil, Win, you double the recommended dosage when you

8    start your boiling.  Okay?

9        **MR. SINCLAIR:**  Okay.  I've never said no to a court,

10   Your Honor.

11       **THE COURT:**  Just word to the wise:  If you really

12   want it to be tasty, you've got to double it.

13       **MR. MAZE:**  In Win's defense, these are kids from

14   Tennessee who may not be able to handle what New Orleans kids

15   can handle.

16       **THE COURT:**  Okay.  I don't know what to say about

17   that.

18            Okay.  Now, let me ask you all and maybe one

19   person can comment for me.  We got flooded this week with

20   motions regarding adverse inferences based on assertions of the

21   Fifth Amendment.  Why did those come in this week?  Had I set a

22   deadline?

23       **MR. LANGAN:**  Yes.  It's Andy, Your Honor.  Yes.

24   There was an order a few months ago setting a schedule for

25   those and the opening briefs were due, I believe, last Friday.

1  So that was the genesis of that.

2          THE COURT:  Well, it's clear that I forgot that, huh?

3  Okay.  So we'll start looking at those.

4          MR. LANGAN:  And I believe there's a response date

5  of, I want to say, the first Monday in November or something.

6          THE COURT:  We're going to rely on your memory.

7          MR. LANGAN:  November 2nd, I think.

8          THE COURT:  Okay.  Thanks, Andy.  I appreciate it.

9          MR. BREIT:  Judge, briefly on that?

10         THE COURT:  Yeah, come on up.

11         MR. BREIT:  I think what got this going is that we

12  had filed our inferences before trial, the PSC, a dozen or so

13  witnesses and then it just sat.

14         THE COURT:  It did.  It had not been ruled on by

15  Judge Barbier.

16         MR. BREIT:  Correct.  And, Judge, I believe Steve or

17  Jim, in conference with -- we wanted to know what had happened

18  and so I think it got pushed, like, "What are we doing," in

19  which case the deadlines got set.

20         THE COURT:  Correct.

21         MR. BREIT:  So ours have been filed back in January

22  and everybody else's just came in.

23         THE COURT:  Gotcha.

24         MR. BREIT:  And there was a preliminary ruling by

25  Judge Barbier in the end of January that kind of set some

1  ground rules to each of the parties for each of the inferences

2  against each other.  And then it -- just ground rules.  And now

3  people are going, "Okay.  Look, we need to know this," and

4  that's where we are.

5          THE COURT:  All right.  Well, we'll take it up.

6  Thank you for restoring -- I'm not sure it's restoring -- thank

7  you for giving me the memory.

8          MR. BREIT:  Isn't there a movie?

9          THE COURT:  That's *Thanks for the Memories.*

10         MR. BREIT:  Yeah.

11         THE COURT:  Okay.  So we're proceeding on the

12  inspection and testing of the equipment out at Michoud.  I

13  think that we are very close to finishing up.

14             Rob, you want to give us a quick report?

15         MR. GASAWAY:  Good morning, Your Honor.  Rob

16  Gasaway --

17         THE COURT:  Good morning, Rob.

18         MR. GASAWAY:  -- for BP.

19             We had high hopes for the equipment testing as

20  well, and I think they've been mostly satisfied.  I think

21  things are going well.

22         THE COURT:  I thought you were going to say your

23  hopes were dashed like Alan's.

24         MR. GASAWAY:  No, no.  No.  A better report than on

25  Phase One here.

1          We did get the Court's suggestions for

2    amendments to the protocol.  We got, obviously, the United

3    States' suggestions for amendments to the protocol.  We will be

4    making those amendments.

5          One of the logistical issues we have is the

6    United States has asked for references to voluminous standard

7    operating procedures.  We're going to try to get all of them

8    in, all of them produced and all of them attached to the

9    protocols.  But we should be sending that no later than Monday.

10         **THE COURT:**  I think that rather than attaching them

11   to the protocol that you're okay referencing them --

12         **MR. GASAWAY:**  Thank you, Your Honor.

13         **THE COURT:**  -- if, indeed, you produce the standard

14   operating procedures to all parties.

15         **MR. GASAWAY:**  Your Honor, that's much more convenient

16   and that's what we'll do.

17         **THE COURT:**  Yeah, yeah.  I think that's a much better

18   way to skin the cat, and then you can reference the procedures

19   in the protocol.

20         **MR. GASAWAY:**  We'll do that, Your Honor.  Thank you.

21         Now, let me go back to an issue that I put on

22   the table last week which had to do with the timing of sampling

23   and the timing of testing.

24         As the Court knows, the Court had asked that all

25   Michoud work be completed by next Thursday, the 25th.  We were

1  wondering whether we could get that done.

2            It now looks, Your Honor, like we can get that

3  done.  So we're not asking for an extension of the 25th.  If

4  something changes in the next six days, we'll hurriedly come to

5  court.  We believe we have all the sampling work for materials

6  that we need to have completed, completed.

7            We're doing the laser scanning right now.  We're

8  hoping that we're going to be able to complete that early next

9  week.  So we don't anticipate seeking an extension of that

10  deadline.

11            **THE COURT:**  Good.

12            **MR. GASAWAY:**  One thing I did want to alert the

13  parties was that in order to comply with the November 21st

14  deadline we may need to make a slight adjustment.  You recall

15  the November 21st deadline is for completing the testing and

16  disseminating results.

17            **THE COURT:**  Right.

18            **MR. GASAWAY:**  We talked about our testing facility

19  last week, which is in Pennsylvania in Allentown.  We talked

20  about having video there on-site there.  If the United States

21  wanted to send an expert to watch the testing, they certainly

22  could.

23            In order to comply with the deadline, it looks

24  like we may need to use another lab across the river in

25  New Jersey, also from Intertek.  Obviously, it will be the same

1   standard operating procedures; obviously, we'll video it; but

2   we may need to double track.

3           So to the extent that the United States or other

4   parties is interested in actually being on-site, they should

5   coordinate with us and see where what testing is going on so

6   the expert goes to the right place they want to go to.

7           THE COURT:  Good.  All right.

8           MR. GASAWAY:  And I think that's it.  I guess just

9   another note is Captain Englebert, who always is on top of

10  things, is now looking forward to the next phase which would

11  have to do with sort of post-sampling preservation.

12          As the Court knows, there's been an issue of

13  mold with some of the material samples that have been looked at

14  by other parties.  That may be inevitable, that may not be

15  inevitable.  But just so everybody knows, she's now on to the

16  next phase which is, "How do we preserve the things that have

17  been sampled?"  That conversation is starting and we'll be

18  working with her.

19          THE COURT:  Good.  Okay.  Thank you.

20          MR. GASAWAY:  Thank you, Your Honor.

21          THE COURT:  Any comments to that, guys?

22          MR. CERNICH:  Scott Cernich for the United States.

23          THE COURT:  Good morning, Scott.

24          MR. CERNICH:  Good morning.

25          I just wanted to lay a marker down that if there

```
 1  is any extension regarding this work and the results coming
 2  back, we would expect there would be an extension for expert
 3  reports as well.
 4            THE COURT:  Okay.  Thank you.
 5            Any other markers?
 6            All right.  Let's see where that brings us.
 7  We've got the issue of the clawback of Deposition Exhibit 9146.
 8  It seems to me what we need to do is set dates for the U.S. to
 9  respond on that and BP to reply.
10            Anybody want to throw some dates out at us?
11            MS. HIMMELHOCH:  Your Honor, I think we can respond
12  by Wednesday of next week and I think there may be no need for
13  a reply.
14            THE COURT:  Oh, okay.  I'm not sure Rob agrees with
15  you, but okay.
16            MS. HIMMELHOCH:  I think he might depending on what
17  our response is on Wednesday.
18            THE COURT:  Okay.
19            MS. HIMMELHOCH:  But I think we typically give three
20  days for reply.  So let's give our response on Wednesday and
21  their reply on Monday?
22            THE COURT:  That's fine.
23            MR. GASAWAY:  That's fine with us, Your Honor.  And I
24  appreciate Sarah trying to obviate the need for reply,
25  obviously; and if we can, we'll try to get it on Friday so it
```

 1   can be even sooner to the extent we do need to reply.  But we

 2   appreciate having Monday as the deadline.

 3              **THE COURT:**  Okay.  Stay there, Rob.

 4              **MR. GASAWAY:**  Okay.

 5              **THE COURT:**  Next up is the U.S. production of

 6   previously withheld documents that are now coming up through

 7   QA/QC.  Do we believe that I should probably, or not, schedule

 8   a telephone conference with you and Sarah?

 9              **MR. GASAWAY:**  Well, Your Honor, look, from our

10   standpoint, we think it would be helpful.  We appreciated

11   Sarah's letter.  I guess it came in maybe Wednesday night or

12   Thursday.  There was a lot of information in there.  You know,

13   look, there were a number of things in there, it's not going to

14   shock you, that we disagree with.  But there was a lot of

15   information in there that was useful.

16              I think that it makes sense to combine this

17   topic of discussion with the other topic of discussion that

18   Sarah threw out there having to do with the Coast Guard archive

19   and so forth.

20              And I don't want to mix and match, but Tim

21   Duffy, who has been our lead on that issue, had a very

22   different take on the situation, sort of the relevance to Phase

23   Two, what needed to be done for Phase Two.  That's an

24   in-the-weeds kind of a discussion --

25              **THE COURT:**  Okay.

1         **MR. GASAWAY:**  -- having to do with things such as
2  handwritten documents, documents that may be owed to BP in our
3  mind that should not go in the archive.
4              But when documents are given back to BP, even
5  though we think that they're our documents and they shouldn't
6  go in the archive, that doesn't mean we're asserting a
7  litigation privilege against them.  We may have to turn them
8  around and ship them back, as it were, not just to the United
9  States, but obviously to all the MDL parties.
10             So Tim was kind of looking at this from his
11  standpoint and from his team's standpoint, "What do we do next?
12  We're coming to a juncture?"
13             And without prolonging this discussion,
14  especially without Tim, what we would suggest is that we get
15  together on Thursday morning, or another time convenient for
16  you and Sarah, talk about the privilege log issue to the extent
17  there are unanswered questions after Sarah's letter and also
18  talk about where we go with the Coast Guard archive.
19         **THE COURT:**  All right.  Sarah?
20         **MS. HIMMELHOCH:**  Obviously, if you want to talk,
21  we'll talk.  I think we've provided the information we've got
22  on where -- in response to Rob's e-mail to you indicating
23  topics that needed discussion.  But, you know, if you tell me
24  to show up, I will.
25             With respect to the Coast Guard, I'm not sure

1    that's appropriate for a just BP, U.S. and the Court

2    conversation because there are many other parties interested in

3    Coast Guard documents beyond just BP.

4                And I don't know -- I didn't "cc" you, so this

5    may be coming at you out of the blue, but I had sent an e-mail

6    to all the other parties indicating that I was going to, when

7    you asked if there was anything else this morning, say that I

8    wanted to put on the agenda for discussion sometime soon the

9    fact that while the Coast Guard believes it is done with Phase

10   Two production out of the paper archives, it's continuing to

11   sort through and organize and, as Rob said, return documents to

12   BP that should go back to BP.

13               And we can continue to push those out the door,

14   and it had been our intention to, but there's been a lot of

15   inquiry of the United States of, "How much more are you going

16   to give us," that I wanted to give the parties an opportunity

17   to say, "We've got what we need for Phase Two.  Let's put

18   everything else in the Coast Guard archive on hold until we get

19   to the later phases."

20               I don't have a strong view about that.  I just

21   wanted the parties to have an opportunity to think about it and

22   to ask you to put that on the agenda for next week.

23               And I do have a view that given the PSC's

24   interest, and Halliburton and Transocean's expressed interest

25   in Coast Guard documents, that that discussion should probably

1  happen with all of the parties involved, not just the U.S. and

2  BP.

3         THE COURT:  Okay.  Rob, any comeback on that?

4         MR. GASAWAY:  Well, look, obviously, eventually, like

5  every other discussion we have that starts out with the U.S.

6  and BP, we have to widen it.

7              One of the issues that Tim had mentioned that

8  maybe doesn't apply exclusively to BP, but certainly to a much

9  greater extent to BP than anybody else, is this issue of

10  returning documents specifically to BP for possible production

11  in the MDL.

12             The thing that was worrying him was that that

13  time line seems to be slipping.  And so, you know, one of the

14  major issues that he wanted to raise was the time line for

15  getting those documents back to BP and then getting them out.

16  It may well be that other -- you know, Halliburton has

17  documents out there, but I think the volume of documents for BP

18  is greater.

19         THE COURT:  Okay.  Well, why don't we have an initial

20  telephone conference next Thursday.  Sarah, if you're

21  available, how do you look at about 9:00?

22         MS. HIMMELHOCH:  That's 10:00 eastern?

23         THE COURT:  Uh-huh.

24         MS. HIMMELHOCH:  That works for me.

25             Your Honor, I would ask that, if possible, if

1    Mr. Duffy or Mr. Gasaway could give me a call to explain this

2    issue, because this is the first I'm hearing of this concern of

3    theirs.  If we can have a meet and confer before we get in

4    front of you, I think we may be able to make that call with you

5    much shorter.

6              THE COURT:  That would be great.  So, yes, one of

7    those two gentlemen will buzz you and talk to you about what

8    their concern is.  So we'll just circulate a dial-in number for

9    the U.S. and BP to start the discussion; and if we need to

10   bring it to the bigger group, we can do that on Friday.  Okay?

11             MR. GASAWAY:  It makes sense, Your Honor.  Thank you.

12             THE COURT:  Okay.  So I'm not sure you go anywhere

13   yet, Rob.

14             Any update on Professor Leifer?

15             MR. GASAWAY:  Well, yes, Your Honor.  It's not a

16   happy one.  Let me get the exact figures here for you.

17             Okay.  So here's the issue is we've been, as you

18   know, working with our third-party vendor and with counsel for

19   the University of California at Santa Barbara.  We finally do

20   have all of his documents collected at the third-party vendor.

21             Counsel for the university has been saying that

22   they want to go through every document before they can be

23   released from the vendor to BP.  And the current counts that I

24   have here, 25,000 responsive e-mails, after the application of

25   response -- of search terms, and 23,000 attachments.

 1              So the bottom line is we have not seen document

 2     one as a BP legal team.  Obviously, our document vendor has

 3     seen 50,000 documents -- 48,000 documents.  We have not seen

 4     document one as the BP legal team.

 5              So you saw that we just sort of threw up our

 6     hands and said, look, we're going to go ahead and file our

 7     renewed motion that we've been talking about for a long time

 8     about possibly reopening the Possolo deposition or getting some

 9     of the testimonial testimony.

10              We've decided not to seek reopening the Possolo

11     deposition and to just seek three of the six original

12     deponents, including Professor Leifer.

13         THE COURT:  But we can't even consider that until we

14     get past this document production issue.

15         MR. GASAWAY:  Well, here's what I'd like to do given

16     how long we've waited on this.  I mean, we always, you know,

17     we're thinking that we would move on this.  Obviously, if we

18     depose Professor Leifer, we would like to have the documents

19     before we depose him.

20              I think that we can go ahead and have you rule

21     at least on two of the deposition requests, and maybe three.

22     Professor Kelkar and Professor Wereley -- it's not Professor

23     Kelkar, it's just Mr. Kelkar and Professor Wereley are

24     obviously not affected by these documents; Professor Leifer is

25     and he was the third.

1            And, frankly, as we said, we just thought that

2 we couldn't wait and see anymore to renew that request.  We're

3 looking at a November 30th deadline.

4            THE COURT:  What does counsel for the university say

5 about turnaround time?

6            MR. GASAWAY:  As I understand it, she says the end of

7 the month in terms of turnaround time for this.  Your Honor,

8 let me say that we continue to believe that counsel for the

9 university is acting in all good faith, that they're pushing

10 this out as quickly as they can.

11            That being said, as I think Your Honor knows,

12 we've been pushing this issue for not just weeks but months,

13 and we're getting nervous about that deadline slipping and then

14 the Rule 30(b)(6) deposition period ending without -- you know,

15 without having the three depositions that we want.

16            THE COURT:  Do we need another conference call with

17 counsel for the university?

18            MR. GASAWAY:  I don't think it could hurt.  Maybe we

19 could -- maybe we could put that on the schedule.

20            THE COURT:  Okay.  Why don't you contact her, if you

21 don't mind, and get some times next week when she might be

22 available and you're also available and we can try to

23 coordinate something.

24            MR. GASAWAY:  Okay.  I'll do that, Your Honor.

25            THE COURT:  Okay.  So now I want you to guess who's

1   standing behind you.

2          **MR. GASAWAY:**  Somebody from the United States, I'm

3   sure, who's going to agree that we need more depositions.

4          **MR. CHAKERES:**  Good morning, Your Honor.  Nat

5   Chakeres for the United States.

6          **THE COURT:**  Good morning, Nat.

7          **MR. CHAKERES:**  I have a few points in response to

8   what Rob just said.  We submitted a letter this morning in

9   response to BP's letter, and we're happy to discuss the three

10   depositions that BP is seeking.  The fact of the matter is, the

11   issue is not ripe for any of them, any of the three professors.

12   And to correct the record, Professor Kelkar is a professor at

13   the University of Tulsa.  So they all three are professors.

14          But the relevant depositions from United States

15   30(b)(6) witnesses for all three of these witnesses haven't

16   happened yet.  And I think it's very clear from the tone of

17   every request that BP has made that they want the personal

18   knowledge of these three individuals.  These aren't even really

19   30(b)(6) depositions that they're seeking.

20          And with respect to Professor Kelkar, we've laid

21   it out in our letter, I think the grounds that BP is citing for

22   that deposition is they're really trying to get an expert

23   opinion out of him, which is an improper use of Rule 30(b)(6)

24   and Rule 45.

25          So that's our first issue with respect to the

1   depositions.

2       With respect to Professor Leifer's documents,

3   BP's in a problem of its own making.  Their search terms turned

4   up 48,000 documents.  That's far more than any of the BP or the

5   United States individuals who were working on this response for

6   a lot longer, and that's because BP's search strings include

7   words like *data*, *estimate*, *rate*, I think *000* is one of the

8   search terms.  Any e-mail that Professor Leifer has sent

9   between, you know, the response and now that has the word *data*

10  in it, that's in that 48,000.

11      So it's a problem that I think could have been

12  avoided by being a bit more reasonable about the search terms.

13  That was negotiated between BP and the University of

14  California.  But to come back and say that they have to go

15  depose more people because they haven't got the documents yet,

16  they could have had the documents a lot sooner if they showed a

17  bit more restraint there.

18      So we just, A, don't think you need to rule on

19  the additional depositions; B, don't think that this document

20  production changes that.  And we're happy to provide more

21  information as the Court so requires.

22      **THE COURT:**  Good.  Well, I'm not ready to rule on it

23  today, number one, because I haven't read your submission,

24  which I think I'm probably obligated to do.  So we'll take that

25  up and get back to both of you on that.

 1          **MR. GASAWAY:**  Your Honor, a quick -- just quickly on

 2    that.  The submission did come in right before this morning's

 3    hearing.  So why don't we just send a reply in on Monday, we'll

 4    tee that up.  We'll also try to tee up a call with the

 5    University of California to see what we can do in terms of

 6    working through this.

 7          **THE COURT:**  Good.

 8          **MR. GASAWAY:**  In terms of the, you know, the search

 9    criteria, these are obviously ones that we've used before.

10    Obviously, we wish that there was a more technical term than

11    *flow* or *flow rate*, but, you know . . .

12          **THE COURT:**  Or *data*.

13          **MR. GASAWAY:**  Or something like that.  But we can

14    certainly, if you want to, get into that minutia, which I

15    doubt, and share that with you.

16          **THE COURT:**  What do you think the answer to that is?

17          **MR. GASAWAY:**  I think the answer is let's let

18    Mr. Nomellini handle that.

19          **THE COURT:**  Mr. Nomellini, that would be a correct

20    response.

21          Okay.  So, look, I've looked at the submissions

22    with regard to Marcia McNutt and we're not going to convert her

23    to a hybrid witness.  So she's going to go forward as a

24    quantification witness.

25          **MR. BARR:**  Your Honor, can we speak on that?

1          **THE COURT:**  You certainly may.

2          **MR. BARR:**  Your Honor, Brian Barr for the PSC.

3          **THE COURT:**  Good morning, Brian Barr.  And, by the

4   way, you don't look that good.

5          **MR. BREIT:**  I thought that was generous when you

6   commented to him.  When I looked back, I went, "Really?"

7          **MR. BARR:**  I even wore a tie today.

8          On Dr. McNutt, first, let me offer a mea culpa

9   since I, as BP has indicated multiple times, was the person

10   that generated the category list.

11          I did that based upon what we knew at the time

12   as a good faith effort to, at a very early point in this, try

13   to figure out where people fell in the grand scheme of things.

14   So we put her as a quantification witness given that that's

15   what the United States designated her on.  So I get that.

16          And I agree with BP, that she is a very important

17   quantification witness.  She's speaking for the United States

18   on those issues.

19          **THE COURT:**  Right.

20          **MR. BARR:**  But labeling her as a pure quantification

21   witness ignores the fact that she was sent to Houston by

22   Secretary Salazar to oversee source control efforts.  That was

23   her role there.  She was very involved in the decisions on the

24   Top Kill, very involved in the decisions on why the Top Kill

25   went wrong.

 1                    Frankly, BP doesn't want us to have significant

 2      time with her because she's very critical to BP on the

 3      decisions that led up to the Top Kill.  She states that they

 4      concocted a story to explain the Top Kill.  That concocted

 5      story, they had to spend time undoing before they could do

 6      other source control efforts, like the capping stack.

 7                    So for reasons like that, she's very important

 8      in source control; and she is, by definition, a hybrid witness.

 9      I mean, she has significant knowledge on both issues.  And she

10      can't speak for the United States on source control, but she

11      does have individual knowledge.

12                    And if we're following the one-deposition

13      rule --

14              **THE COURT:**  Yep.

15              **MR. BARR:**  -- I've got to have time with her to ask

16      those questions; or I'm going to be forced on put her on my

17      four witness list and ask her to come back, which I don't think

18      we should have to do.

19              **THE COURT:**  Let me ask you this, and this is

20      something I was going to get to after I stated that I was going

21      to deny the re-categorization.  Do any of the other defendants

22      feel generous and want to donate their time to the PSC during

23      Dr. McNutt's deposition?  And I'm specifically looking at

24      Halliburton and Transocean and Cameron and who else -- who are

25      the other miscellaneous?  You know, we can do our general horse

1  trading.

2           MR. BARR:  For a U.S. quantification witness --

3           THE COURT:  Yes, sir.

4           MR. BARR:  -- Transocean has a total of 80 minutes.

5           THE COURT:  80 minutes, Kerry.

6           MR. BARR:  Anadarko has 20 minutes.

7           THE COURT:  20 minutes, Tony.

8           MR. BARR:  Halliburton has 20; Cameron has 20.

9           THE COURT:  The bidding is open.

10           MR. FITCH:  Judge, I cannot do so.  Take the extra

11  day's deposition of another quantification witness.  It's very

12  complicated stuff.  BP used every last minute and used my 20

13  minutes as well and it was substantive from 8:34 yesterday to

14  4:45 -- Wednesday to 4:45 Friday.  All that time really is

15  needed for Ms. McNutt on quantification stuff.

16           THE COURT:  Okay.  So you're not feeling generous?

17           MR. FITCH:  I am not feeling generous, I'm sorry, on

18  that one.

19           THE COURT:  That's okay.

20           MR. FITCH:  She really could be a three-day witness,

21  if they have to get what they say about source control, but

22  that time is needed for quantification.

23           THE COURT:  Okay.  All right.  Mr. Jones, good

24  morning.

25           MR. JONES:  Good morning, Judge.  David Jones for

1   Cameron.

2           It's tough for us to know whether or not we're

3   going to need any at this time until we actually hear what she

4   has to say.  We have not been using our time generally in

5   depositions since they don't impact us.  I will note, though,

6   just for everybody in the room, that when we do give up time,

7   someone else yells at us.

8           THE COURT:  No one is to yell at them when they give

9   up time.  We're back at our old horse trading days.  No

10  yelling.

11          MR. JONES:  But all that's to say, Judge, we may very

12  well be in a position to give up time, we just can't know until

13  we go to the deposition.

14          THE COURT:  All right.  What I would ask, David, is

15  if you give up time, you give it up to the PSC.

16          MR. JONES:  Okay.

17          THE COURT:  All right.

18          MR. BARR:  Your Honor, I'm not going to complain

19  about David giving me time; but I think the difficulty with

20  that, by the time he decides to give up time, I will have

21  already gone.

22          MR. MAZE:  And so will the state.

23          THE COURT:  Okay.

24          MR. BAAY:  Your Honor, David Baay for Transocean.

25          THE COURT:  David?

1          **MR. BAAY:**  We're not feeling generous with our time

2    to give to Mr. Barr.

3          **MR. BARR:**  So BP is going to get ten hours instead of

4    seven hours that they should be getting.  I mean, ten hours

5    is -- compared to an hour and 10 minutes --

6          **THE COURT:**  A lot of time.

7          **MR. BARR:**  -- for the PSC and the states.

8          **MR. WILLIAMSON:**  Judge --

9          **THE COURT:**  Jimmy?

10          **MR. WILLIAMSON:**  -- I love Tony, but there is no

11    deposition on earth in which 10 hours of examination is all

12    substantive.  There's no deposition ever in which 10 hours of

13    examination time is all substantive.

14          **MR. BARR:**  If you look at this in the context of a

15    typical deposition, you get seven and a half hours.  We're

16    getting seven hours and 10 minutes in a hybrid.  I mean, that

17    should be sufficient time to cover the topics.

18          **THE COURT:**  All right.  Mr. Gasaway?

19          **MR. GASAWAY:**  Good morning, Your Honor.  Would you be

20    shocked if I disagreed with what Mr. Barr just said?

21          **THE COURT:**  No.  And I think that you could really

22    not have to make a statement for the record, because we know

23    what your position is.

24          **MR. GASAWAY:**  Then I will keep it very brief.  I will

25    just say that I talked to the team last night that was in the

1  Ratzell deposition because I knew this issue was going to come

2  up.

3           The report that I got, and I was not in there,

4  confirmed exactly what Mr. Fitch just said:  These are highly

5  technical issues.  These are issues that you do need a full 10

6  hours because Dr. McNutt is Dr. McNutt.  She's a Ph.D.

7  scientist.  She's not just at the top of the organizational

8  chains, but she has published papers on flow rate.

9           And so in that 10 hours, A, you have to cover

10  every topic she's been designated on; B, you have to walk

11  through complex calculations; and C, you have to ask her any

12  organizational questions you want.

13           This is the Rule 30(b)(6) period and she's a

14  quantification witness.

15           **THE COURT:**  Well, let me ask the United States this

16  question -- who wants to stand up for the United States?

17           **MR. MAZE:**  I'm just waiting in line, Your Honor.

18           **THE COURT:**  Go over by the ELMO, Corey.

19           Is there any possibility of having Dr. McNutt

20  come back for a third day where I would give a limited amount

21  of time to the PSC to cover the source control topic that they

22  want to confer with her individually?

23           **MR. CERNICH:**  Your Honor, as you can imagine, we

24  vigorously oppose the suggestion that Dr. McNutt would come

25  back for a third day.  That would be unprecedented in this

1  case.

2          **THE COURT:**  It would be.  It would be.  But that's

3  really the only other way I see of skinning the cat.  Let me

4  think about it.  I'll look at it again and carry it over.

5          **MR. CERNICH:**  Your Honor, I'd also like to point out

6  that Dr. McNutt is the head of a government agency --

7          **THE COURT:**  She is, and she's very important and --

8          **MR. CERNICH:**  -- she has important work to do on a

9  day-to-day basis in support of the central functions of

10  government for the United States.

11          **THE COURT:**  I'm with you, and everybody knows that.

12          **MR. CERNICH:**  Yes, yes.  So we -- like I said, we

13  vigorously oppose Dr. McNutt having to testify for a third day.

14  It's unprecedented in this case.

15          **THE COURT:**  It is.

16          **MR. CERNICH:**  Any suggestion that a witness be

17  brought back for a third day has been strenuously opposed by

18  BP --

19          **THE COURT:**  And my by me.

20          **MR. CERNICH:**  -- and other parties at all turns.  We

21  just think it would be inappropriate and unnecessary.

22          **THE COURT:**  Okay.  All right.

23              Mr. Maze?

24          **MR. MAZE:**  Corey Maze on behalf of the State of

25  Alabama.

1          I think that Alabama has been very clear and
2    reasonable so far in Phase Two and told you specifically what
3    claims we were pursuing.  And when we went through limiting
4    questions 1 and 3 as to which particular types of source
5    control efforts that we wanted to talk about, we narrowed it
6    down and told you specifically what we wanted and Top Kill has
7    always been number one, and the judge knows exactly what our
8    claim is.

9          **THE COURT:**  Yep.

10          **MR. MAZE:**  And if you'll look at it -- and I'm not
11    even going to go through it -- if you'll look at Attachment A,
12    page 2 and read that, you will see that Dr. McNutt is, so far,
13    the most important and most knowledgeable person on that topic
14    that we have said for months, "This is what we're going after."

15          And she was in the room that day.  She talked to
16    Richard Lynch that day.  She has inside knowledge.  She has
17    also given her opinions on what happened.  We have a letter,
18    that Your Honor didn't see yesterday, that shows that on May
19    the 7th she was dispatched by the secretary to lead the U.S.
20    Coast Guard response and to coordinate, and I'm quoting, "A
21    federal team at BP to help with well containment and ultimately
22    killing the well."

23          She was sent by the United States to lead their
24    team on source control efforts.  So to say that she is not a
25    source control witness is wrong; to say that she is not

1  directly involved with the claim that we are bringing is wrong.

2  And I'm going to channel my "inner Brian" and remind everyone

3  that we, the plaintiffs, have the burden of proof in this case

4  and to give us 70 minutes total on the claims that we're

5  bringing is unfair.

6              And so, just for the record, that's why we

7  believe that we need more than 70 minutes combined for the

8  three plaintiffs.

9              **THE COURT:**  Thank you.

10             Doug?

11    **MR. KRAUS:**  Doug Kraus on behalf of Louisiana.  I

12  would just like to reiterate, 23 minutes for each of us is just

13  not enough to develop anything with this important source

14  control witness.  We've been, for a long time, stressing that

15  we are very interested in source control, and I think Corey and

16  I are the reasons that we're having these source control

17  related depositions.  And to give us 23 minutes on a witness of

18  this importance, I just don't think is equitable at this time.

19             Thank you.

20    **THE COURT:**  Okay.  Thank you.

21             Don?

22    **MR. GODWIN:**  Judge, briefly.  Don Godwin for

23  Halliburton.

24             As with Cameron and TO, Halliburton is unable to

25  give up any time for this deposition.  I would also point out,

1   Judge, it is -- I believe I'm correct, and that no witness yet

2   who's been deposed in the over 300 witnesses from Phase One all

3   the way through has any party been given 10 hours with any

4   witness.  And there have been some very, very important

5   witnesses taken, as you know, over the course of the last

6   couple of years.  And 10 hours just seems like an awful lot of

7   time with one witness.

8            I agree with what Jimmy says, Williamson, I

9   can't imagine any witness that would take 10 hours where there

10  would be substantive questions asked for 10 hours.  So I would

11  ask two things.  One is Halliburton not be required to give up

12  any time, we only have 20 minutes over a two-day period; and

13  secondly, that BP's request for 10 hours with the witness be

14  denied.

15           **THE COURT:**  Well, let me ask you this, Don --

16           **MR. GODWIN:**  Yes, Your Honor.

17           **THE COURT:**  -- in response to a 138-page filing

18  earlier this week, shouldn't I take some time away from you?

19           **MR. GODWIN:**  I think you'd give me some time, Judge.

20           **THE COURT:**  Had to get that in.

21           **MR. GODWIN:**  Well, comment noted and appreciated.

22           Thank you, Judge.

23           **THE COURT:**  Rob?

24           **MR. GASAWAY:**  Your Honor, at the risk of overstaying

25  my welcome, let me make the point:  As a source control

1    witness, her importance is being greatly exaggerated here.

2                    If you read the Allen deposition and go to the

3    index and look where he says the word *McNutt* and just count up

4    the times that it's in the context of flow rate versus source

5    control, she was not the eyes and ears of source control at

6    Houston as perceived by Admiral Allen.

7                    She was there, she's a smart person, she

8    obviously has a good working relationship with Secretary

9    Salazar, but her role in this case is as a flow rate witness.

10                   She's perfectly capable of offering her thoughts

11   based on what she observed with respect to source control

12   issues, but I think on all of those issues she's a redundant

13   witness and the testimony is better gotten from people who were

14   more directly involved.

15                   Thank you.

16        **THE COURT:**  Okay.  I'm going to take it up again and

17   look at it again.

18        **MR. O'KEEFE:**  We'll get an order out before the end

19   of the day.

20        **THE COURT:**  We will?

21        **MR. O'KEEFE:**  Yeah.  Because the deposition is on

22   Wednesday; right?

23        **MR. GASAWAY:**  Yes.  And, Your Honor, let me just

24   say --

25        **MR. O'KEEFE:**  Or Saturday.  We'll get it out

1    Saturday.

2              **MR. GASAWAY:**  -- is the United States is correct

3    here, BP is not a fan of three-day depositions for anybody.

4    Because we think that once that two-day rule is breached --

5    although we would love, in some ways, for Dr. McNutt to have

6    more time if she could, if it did go to a third day, obviously,

7    BP's last questioning would come on that third day.  So I want

8    to put that marker down.

9              But the United States is correct, we've opposed

10   a third day deposition, and, you know, what's good for the

11   goose is good for the gander, and we would tend to stand with

12   the United States on this one.

13             **THE COURT:**  I generally don't think it's a good idea,

14   but . . . Corey?

15             **MR. MAZE:**  Only if you want us to, Judge.  Very

16   quickly.

17             **THE COURT:**  Okay.  Come on.  I don't want it to be

18   said that you didn't make your record.

19             **MR. MAZE:**  Corey Maze for Alabama.

20             First of all, we agree that we don't want it to

21   be three days, but we want to ensure that we have the time

22   that's needed.

23             The only thing, I wanted to come back to Rob's

24   point about we're overstating McNutt's significance.  First of

25   all, on the first appendix, I think this is a quote:  "What

1   triggered in the secretary's mind that I was the person who

2   should be down in Houston looking over BP's shoulder on the

3   various well intervention things they were doing because I was

4   because the person who worked in oceanography, had done ocean

5   engineering, had experience with complex undersea engineering

6   tasks and intervention."

7              So we have a very significant dispute as to what

8   her role was; and, more importantly, this is discovery.  This

9   is the chance for us to find out what her role was.

10             What we're saying is that we don't know exactly

11  what it was, but it's our right to find out and this is the

12  only avenue we have to do it.

13             **THE COURT:**  All right.

14             Let's see.  McNutt comes up three times in the

15  Admiral Allen deposition.  Do you rest your case?

16             **MR. GASAWAY:**  I rest my case.

17             **MR. BARR:**  I would check Cook as well.  Rear Admiral

18  Cook talked about her role in Houston because he was actually

19  the eyes and ears down there.

20             **THE COURT:**  Oh, I don't have Cook loaded up, so I

21  can't search for that one.

22             Okay.  I will look at it again, guys.

23             Okay.  Let's get a report from the United States

24  on where we stand on Statoil and whether we have a deadline for

25  submitting pre-marked exhibits to the witness.

1      **MR. CHAKERES:**  Your Honor, my short answer is we

2  don't have an updated -- an update on Statoil, I don't believe,

3  from what we've had last week.  I think we're still on track

4  for the November 12th deposition and we will follow-up --

5      **THE COURT:**  Yeah.

6      **MR. CHAKERES:**  -- to provide you more information.

7      **THE COURT:**  Yeah.  And I think what we should

8  probably do is why don't you think about that and let's think

9  about what a reasonable deadline would be to get the pre-marked

10  exhibits over to him so he has them so he can fully participate

11  in the deposition.

12      **MR. CHAKERES:**  We will do so, Your Honor.

13      **THE COURT:**  Okay.  Good enough.  Don't go anywhere.

14          Let's talk about Intertek and Wild Well.

15      **MR. CHAKERES:**  Your Honor, with respect to Intertek,

16  we are hopeful that we have our document issues resolved.  We

17  should be getting their documents I believe next week, their

18  supplemental production, and our target right now is a

19  November 30th deposition with them.  But that is -- that's

20  still in the hopeful category.  We'd like to make sure -- there

21  have been a number of issues with the document production and

22  that's why this has slid.

23          With respect to Wild Well Control, again, that's

24  in the hopeful category with respect to the documents.  Our

25  understanding is the Pat Campbell e-mails are to be produced

1  very soon.

2          **THE COURT:**  Good.

3          **MR. CHAKERES:**  And that should be -- you know,

4  it's -- we're talking about PTO 16 metadata issues with

5  everybody.  And what we're finding out with third parties is it

6  really is a challenge for a lot of parties.

7                  We're at a point where we want to go forward and

8  get this deposition scheduled once we have these documents.

9  And we are -- you know, once we have those documents and we're

10  comfortable, we're going to be reporting back with some dates

11  that work for Wild Well Control.

12          **THE COURT:**  Good enough.

13                  Now, how about scheduling the 10 topics and the

14  10 engineers with Stress Engineering?

15          **MR. CERNICH:**  Your Honor, Stress Engineering counsel

16  has told us that the dates at the end of the month are no

17  longer good.  We've been pushing to get a list of the topics as

18  well as the witnesses.  We still have not received those from

19  Stress Engineering counsel.  We expected to receive those this

20  week, we didn't receive them yet.

21          **THE COURT:**  Do I need to schedule a conference call

22  with you and counsel for Stress Engineering?

23          **MR. CERNICH:**  Let us follow-up with you Monday on

24  that.

25          **THE COURT:**  Okay.

1          **MR. CERNICH:**  As you know, we had originally set the

2    dates in -- or talked about dates in early October.  Stress

3    Engineering's document production was lagging and so we needed

4    to push those back.

5          **THE COURT:**  Right, right.

6          **MR. CERNICH:**  Counsel for Stress Engineering seemed

7    surprised that the lack of the documents was an issue for

8    scheduling the depositions.

9          **THE COURT:**  Really?

10         **MR. CERNICH:**  Yeah.  And so we -- as I said, we're

11   talking about dates towards the end of November now, but that

12   depends on the availability of his witnesses.

13             But I will say that the 10 topics, we may not

14   necessarily need to cover all 10 of those projects.  Obviously,

15   we'll seek input from the rest of the parties if we've decided

16   that a particular project is not germane to the Phase Two

17   issues that we're dealing with.  So we're hoping that it's a

18   more limited universe than those 10.

19             We will follow-up with you Monday if we think

20   it's necessary.

21         **THE COURT:**  Good.

22             And then last, but not -- well, not last --

23   yeah, last, but not least, is Oceaneering.

24         **MR. CERNICH:**  Oceaneering, we expect to receive the

25   ROV video and the non-e-mail documents next week.  We

1  understand that those are ready to go out today.

2                   As far as the e-mails, Oceaneering has raised an

3  issue that they have an old e-mail system and their current

4  e-mail system.  And they've quoted us a cost of $100,000 in

5  order to do an MDL compliant e-mail search of their old e-mail

6  system.

7                   We are coordinating with their IT personnel so

8  that we can get a better understanding of what the

9  complications they're seeing are, see if there's a way to work

10 through that problem without that expense.

11                 THE COURT:  Okay.  Good enough.  Thank you.

12                 Everybody knows that Rob Turlak's deposition is

13 going to be shifted from November 5th and 6th to

14 November 6th and 7th.

15                 And our last order was incorrect as to Don

16 McClay's deposition.  He is scheduled for October 31st and

17 November 1st.

18                 Rob?

19                 MR. GASAWAY:  Sorry to interrupt, Your Honor.

20                 THE COURT:  No problem.

21                 MR. GASAWAY:  On the Turlak shift, I just wanted to

22 raise an issue.  The shift means that he's now double tracked

23 with John Hughes of BP for the 7th.  We're happy to double

24 track there, but other parties had asked if we could eliminate

25 that double track and perhaps push Hughes to the 8th where he

1  would be double tracked with Miller.  We're happy to push him

2  to the 8th as well.

3          Again, BP doesn't care if people would rather

4  have him go for the 8th, but we'd just like to tee that issue

5  up, let us know if it's the 7th or the 8th and we can produce

6  him one or the other.

7          THE COURT:  Okay.  Would you all please let Rob know

8  if you have a preference for the 7th or the 8th for John

9  Hughes.

10          MR. GASAWAY:  Correct.

11          THE COURT:  And either day is fine with BP, but let's

12  make a decision on that.  Okay?

13          Let's make a deadline of Tuesday for you all to

14  let him know.

15          MR. CERNICH:  We'll consider that, Your Honor.  As we

16  discussed at one of the recent working group conferences, BP

17  added additional topics to Mr. Hughes and had offered him for

18  two days in order to address the issue of the extra topics.

19          And we would expect on the Tuesday deadline we

20  can get back to the Court with our position on that as well.

21          THE COURT:  Okay.  Great.  Good, good, good.

22          Rob?

23          MR. GASAWAY:  Well, go ahead, Your Honor, this --

24          THE COURT:  No, no.  Go ahead.

25          MR. GASAWAY:  Okay.  This is also in the deposition

1  scheduling minutia.  Ellen Williams is a UK witness for BP

2  who's scheduled for the 19th and the 20th.  Obviously, we

3  appreciate the parties going to the UK for the BP Institute

4  deposition on the 14th and 15th.

5            We didn't want to ask that they go there, but we

6  had an offline conversation with the United States about

7  perhaps splitting the difference and producing her in

8  Washington, D.C., where many of the DOJ lawyers are, and easier

9  to travel to from the UK.

10            So I'd just like to know if anybody would object

11  if we did Ellen Williams in D.C. on the 19th and 20th as

12  opposed to New Orleans.

13        THE COURT:  Okay.  Why don't you, please, let Rob

14  know if that is objectionable.  It seems reasonable to me that

15  the deposition can be taken in D.C.  Since I will be traveling

16  to the UK on November 14th and 15th for the BP Institute, it

17  makes no never mind to me about the D.C.

18        MR. MAZE:  Your Honor, is there a deadline to let BP

19  know?

20        THE COURT:  Tuesday.

21        MR. MAZE:  Tuesday.

22        THE COURT:  Tuesday, Tuesday.

23            Now, we had the issue last week and we need to

24  discuss today the proposed order that BP circulated regarding

25  objections to deposition exhibits.  BP, PSC and U.S. were to

1  meet and confer.

2  　　　　　Anybody want to report on the status of that or

3  do we want to just roll that over?

4  　　　　　**MR. BARR:**  Your Honor --

5  　　　　　**MR. NOMELLINI:**  Your Honor, it's Mark Nomellini.  Can

6  you hear me?

7  　　　　　**THE COURT:**  I can, Mark.  Good morning.

8  　　　　　**MR. NOMELLINI:**  Good morning.  I think this is the

9  proposed order you're talking about.  There was a proposed

10  order regarding admissibility of Phase Two documents and

11  objections.

12  　　　　　**THE COURT:**  Right.

13  　　　　　**MR. NOMELLINI:**  We made some good progress on that,

14  Your Honor.  We had a good call with Steve O'Rourke, Grant

15  Davis-Denny, Brian Barr and Anthony Irpino.  There were some

16  good proposals floated.

17  　　　　　We've just circulated a revised proposed order

18  to those parties and some others last night.  I don't think it

19  pleases everybody yet, but we are making progress in the right

20  direction and we're looking forward to continuing that

21  discussion next week and seeing what suggestions people have.

22  　　　　　**THE COURT:**  Terrific.  No problem.

23  　　　　　Brian, do you have something to add?

24  　　　　　**MR. BARR:**  Yes, Your Honor.  Brian Barr for the PSC.

25  　　　　　We've still got some details to work out on the

 1   order.  One of the things we wanted to suggest is given the

 2   Phase Two deadlines and what we're proposing in this order that

 3   we move the exhibit list production from the 30th and we tie it

 4   in conjunction to this order.  We think that makes more sense.

 5            THE COURT:  Yeah.  Anthony had written me, I think

 6   yesterday, about that and the fact that you all are asking for

 7   an extension, and jointly asking for an extension, of the

 8   deadline for the preliminary good faith exhibit list.  And I

 9   don't have a problem with that as long as you all are still

10   working together, that's fine.

11            Is there something that we need to know about or

12   are you just going to report back?

13            MR. BARR:  No.  I think -- you know, we're pretty

14   close on the order, so I think we'll just report back to you,

15   Judge.

16            THE COURT:  Okay.  Good enough.

17            Anthony, have you got something you want to add?

18            MR. IRPINO:  Yeah, Your Honor, thank you.  Anthony

19   Irpino for the PSC.

20            I just want to make it clear during the call

21   there was Transocean, the United States, BP, PSC.  I spoke

22   briefly with Halliburton, Carolyn Raines, but cannot speak for

23   her.  She's going to check with her team and so forth.  So I

24   don't want to represent that.  Anadarko, we didn't speak to.

25            I did not speak -- as a group, we had multiple

1   communications, e-mails, conversations with every single person

2   and everybody say, "Hey, we want the deadline."  I just wanted

3   to represent that all the people we spoke with seemed to be in

4   favor of it and then when we left the call there were at least

5   four parties, BP, PSC, Transocean, USA, who said, "We think

6   it's a good idea to move this deadline," and, as Brian said, to

7   extend it consistent with the order.

8           THE COURT:  Okay.  That's fine.  No problem.  And we

9   are going to extend it without date, hopefully, pending you all

10  working it out.  I always like to do it by agreement, so that's

11  fine.

12          Okay.  I think that's all I have for today.

13  Let's ask if anybody has anything.

14          MR. LANGAN:  Sure, Your Honor.  It's Andy Langan.

15  Can I -- one thing, please?

16          THE COURT:  Certainly, Andy.  Go ahead.

17          MR. LANGAN:  So you'll recall that last week we

18  raised an issue about any remaining issues about U.S. document

19  production and then that made its way into your order of

20  October 16th at page 4 in which it said BP was given until

21  October 19th to raise any outstanding issues regarding U.S.

22  discovery responses.

23          I just wanted to report the situation there.  We

24  have sent Sarah a letter.  I think we sent it on Wednesday, the

25  17th.  You know, we're trying to keep the Court out of this

1   unless it's necessary.  But we have raised a couple of issues

2   with Sarah and she got back to us, I think yesterday, and said

3   that they're taking at a look at our letter with care and they

4   would get back to us next week.

5            So there is a process underway there.

6   Hopefully, it can be done without court intervention, but it is

7   still a live issue, is really what I wanted to report.

8            THE COURT:  Okay.  Well, thank you.  I'm glad you

9   reminded us.

10           Kerry?

11           MR. MILLER:  Yeah, Kerry Miller for Transocean.  I

12   have a quick clarification.

13           MS. HIMMELHOCH:  Can I -- I just wanted to say it's

14  our intention to not involve you in the issues either, and we

15  are hopeful that if anything does come to you out of that last

16  letter it will be a very narrow range of issues.

17           THE COURT:  Great.  Thank you, Sarah.  I appreciate

18  it.

19           MS. HIMMELHOCH:  Sorry, Kerry.  I didn't mean to talk

20  over you.

21           MR. MILLER:  No problem at all.

22           A quick clarification question for the Court and

23  that relates to the preliminary good faith may call witness

24  list deadline you have for November 19th, 2012.  You say each

25  party shall list no more than 15 witnesses and then you set

1   forth some carve-outs for those, and those would be experts,

2   30(b)(6) deponents, or the additional fact witnesses identified

3   on November 12th, which are the ones up here.

4              A quick question:  Do the 15 that you list apply

5   to witnesses who testified in both Phase One and Phase Two

6   capacities during Phase One?

7              **THE COURT:**  Oh, boy.

8              **MR. MILLER:**  Back to the one-deposition rule.  We can

9   think about it, but it's a question.

10             **THE COURT:**  Yeah.  Let's think about that.  My

11   initial reaction is yes, but let me think about it.

12             **MR. MILLER:**  So the question would be:  Are witnesses

13   who gave Phase Two testimony during Phase One another carve-out

14   provision or are they included within the 15?

15             And the next question clarification is:  The 15

16   that are set forth here, I take it that would mean witnesses

17   employed by your company, your party, as well as witnesses

18   employed by others who don't fall within the carve-out

19   categories.

20             **THE COURT:**  That's right.  That's right.

21             **MR. MILLER:**  Okay.  Thanks.

22             **THE COURT:**  Yes.  Okay.  Mr. Barr?

23             **MR. BARR:**  Just following up on that same provision

24   from Kerry, because when we first talked about this, one of the

25   proposals on the table was the 15 or essentially parties you

1    control.  That's not what this says and so I don't think that's

2    the direction we went.

3             But I know there was discussion at one time that

4    maybe the PSC and the states wouldn't have people on this list.

5             THE COURT:  That's right.

6             MR. BARR:  And I'm trying to get clarification of

7    what it is I'm going to be producing on the 19th.  Because if

8    it's a list of 15 witnesses that I think I may want to call in

9    my case in chief and I'm expected to say what they're going to

10   testify to if I've never deposed them or --

11            It's just a little uncertain to me what it is --

12   if I'm not listing 30(b)(6) witnesses, which is what we're

13   taking now, if I'm not listing the four that we're going to

14   get, and I guess I could put Phase One people on there.

15            But, you know, are these witnesses they're going

16   to be obligated to bring to trial?  Because it's going to be

17   all adverse parties for me.

18            THE COURT:  I thought we had agreed you were not

19   going to list anybody.

20            MR. BARR:  And I thought so, too, but then you read

21   the order and it doesn't say "witnesses under your control."

22            THE COURT:  I think that was the basis of our

23   discussion is that it was people who were under the party's

24   control, they were going to take their best shot at telling us

25   who they were going to call at trial.  And that would mean that

1    you probably would have nobody on your list of 15.

2            MR. BARR:  That's my assumption, but I just wanted to

3    make sure I wasn't slipping something and nobody comes back and

4    says, "You didn't list any witnesses, Brian, you can't call

5    anybody."

6            THE COURT:  That is a clarification, isn't it?  I'll

7    think on that one as well.

8            MR. MILLER:  Yeah.  The follow-up question is the 15

9    wouldn't apply to witnesses, for example, who would be called

10   by way of designation, like so many of the Phase One witnesses

11   are being called; that is witnesses beyond the Rule 45 subpoena

12   power.

13           THE COURT:  Right, right.

14           MR. BARR:  Just a thought.

15           THE COURT:  It's a good thought.

16           MR. BARR:  I have one every now and then.  It's rare.

17           THE COURT:  Okay.  Who has anything else?  Come on

18   up, Rob.

19           MR. GASAWAY:  Your Honor, also on the designations.

20   First of all, we agree with the thrust of what Kerry was

21   saying, what the Court was saying in terms of witnesses that

22   have given Phase Two testimony, albeit during the Phase One

23   period.

24                   Obviously, we're big proponents of the two-day

25   rule and the one-bite rule.  And what we don't want to have

1   happen is to the extent there would be any witnesses there that
2   we would subject them to a second deposition here.

3              Because you remember that the way your order
4   works is you put them on the list; and then if they're on the
5   list, there's that footnote that says they're presumptively
6   going to be deposed between December 10th and January 25th.

7              **THE COURT:**  Correct.

8              **MR. GASAWAY:**  And if we're not careful here and we
9   don't make an adjustment of the type Kerry was mentioning, we
10  could run afoul of that two-day/one-bite rule; and as we've
11  talked about before, we're supporters of that rule.

12             **THE COURT:**  Okay.  Good enough.

13             **MR. GASAWAY:**  And then along the same lines of the
14  relation between these disclosures and the discussion today, I
15  just want to put a marker down in terms of the slight tweak
16  that I saw in the working group order as compared to the time
17  line order and this idea of only five quantification witnesses.

18             And this just goes back to the whole discussion
19  we're having about how difficult it is to pigeonhole people.
20  Thad Allen, for instance, was designated as a source control
21  witness.  Because he was designated as a source control
22  witness, BP lost an hour and a half of questioning it otherwise
23  would have had.

24             We didn't ask that he be redesignated.  It turns
25  out, Mr. Babish tells me, that he used the word *flow*, *flowing*,

1    *flow rate* not 3 times, but 330 times, in his deposition.
2    Obviously, there's lots of testimony about, you know, various
3    flow rate estimates and stuff like that.
4              So as the party most knowledgeable of the people
5    who are on our Hit Parade, I think it's safe to say that a lot
6    of these important witnesses/potential deponents have this same
7    sort of cross-over effect.  I don't think it's unfair to the
8    United States however we use our seven strikes.
9              Obviously, we expect that more than seven BP
10   witnesses will be asked for at the end of the day when we get
11   done with the United States and the states and the PSC and
12   Halliburton and Transocean.  So I don't think it's going to be
13   an issue.  I don't think that when you see our list of seven
14   there's going to be any unfairness to anybody.
15             But I just want to say that in terms of sort of
16   categorizing them between quantification and
17   non-quantification, there is going to be that problem.  Maybe
18   we can sort this out after you see who our seven are.
19             **THE COURT:**  Okay.  Good, Rob.  Thank you for
20   highlighting it.
21             **MR. BARR:**  Your Honor, the only thing I want to
22   follow-up on is the Admiral Allen stuff.  He says *flow*, because
23   I asked him the questions and he's trying to answer the
24   questions.  He was designated as a source control witness by
25   the United States.

1      **THE COURT:**  And you'll be pleased to know that I read

2  your questioning.

3      **MR. BARR:**  Well, I don't know if you liked it or not.

4  But they still had 7 hours and 10 minutes with him.  So the

5  idea they lost time is a little ridiculous, but . . .

6      **THE COURT:**  Ridiculous.

7      **MR. CERNICH:**  Your Honor, Scott Cernich for the

8  United States.

9      I'll renew the comment Mr. O'Rourke's made in

10  the past:  If BP gets to choose seven witnesses, the United

11  States should get to choose seven witnesses.  We shouldn't be

12  limited to five.  I think the sauce rule applies here as well.

13      And if there's not going to be any distinction,

14  we tried to do something with regard to that by distinguishing

15  between quantification and other witnesses; but if that's not

16  going to be the case, then the United States should get to

17  choose seven BP witnesses as well.

18      **THE COURT:**  Okay.  All right.

19      What else is on anybody's mind?

20      Duke, you got anything?

21      **MR. WILLIAMSON:**  No, ma'am, I sure don't.

22      **THE COURT:**  All right.  Going, going, gone.

23      Thank you very much.

24      **MS. HIMMELHOCH:**  Thank you, Your Honor.

25      (WHEREUPON, the proceedings were concluded.)

1                                    *****

2                               **<u>CERTIFICATE</u>**

3            I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4     for the United States District Court, Eastern District of

5     Louisiana, do hereby certify that the foregoing is a true and

6     correct transcript, to the best of my ability and

7     understanding, from the record of the proceedings in the

8     above-entitled and numbered matter.

9

10

11                              *s/Jodi Simcox, RMR, FCRR*
                                 Jodi Simcox, RMR, FCRR
12                               Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25