UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| *10-4536* | : | MAGISTRATE JUDGE SHUSHAN |

......................................................................................................................................................

**MEMORANDUM IN SUPPORT OF
UNOPPOSED MOTION OF THE UNITED STATES
FOR (1) ENTRY OF AND (2) AMENDMENT OF PARTIAL
CONSENT DECREE WITH THE TRANSOCEAN DEFENDANTS**

*Table of Contents*

I.     INTRODUCTION .................................................................................................1

II.    BACKGROUND ..................................................................................................2

III.   TERMS OF PROPOSED, PARTIAL CONSENT DECREE ............................................4

IV.    LEGAL STANDARD FOR JUDICIAL REVIEW OF A CONSENT DECREE ...............6

V.     PROPOSED, PARTIAL CONSENT DECREE
       SHOULD BE ENTERED AS A FINAL JUDGMENT......................................................7

       A.     The Settlement is Fair ................................................................................7

       B.     Settlement is Reasonable, Adequate and Consistent
              with the Purposes of the CWA....................................................................8

              1.   Injunctive Relief.................................................................................8

              2.   Civil Penalty.......................................................................................9

              3.   Conclusion......................................................................................14

VI.    PUBLIC COMMENT ON THE PROPOSED DECREE DOES NOT WARRANT
       WITHDRAWAL OF CONSENT BY THE UNITED STATES............................15

       A.     Comments by Gulf Restoration Network  ................................................15

       B.     Comments by Ocean Conservancy ...........................................................19

       C.     Comments by BP Commenters .................................................................20

CONCLUSION ........................................................................................................21

*Table of Exhibits*

A.    Comments by Gulf Restoration Network, January 14, 2013

B.    Comments by Ocean Conservancy, January 30, 2013

C.    Comments by BP Commenters, January 30, 2013

D.    Amendment to Partial Consent Decree Between the Plaintiff United States of America
       and Defendants Triton Asset Leasing GMBH, Transocean Holdings LLC, Transocean
       Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc.

E.    Excerpt of Flow Rate Technical Group Report, March 10, 2011 (Depo. Exh. 9005)

## I.     **INTRODUCTION**

The United States of America respectfully requests this Court to enter as a final judgment the previously-lodged Partial Consent Decree ("proposed Decree") [Doc. 8157-1] with the Transocean Defendants.[1]  The proposed Decree requires the Transocean Defendants to: (1) pay $1 billion in civil penalties to the United States, nearly 80% of which will benefit the five Gulf-Coast States by operation of the Resources and Ecosystems Sustainability, Tourist Opportunities and Revived Economies of the Gulf Coast States Act, Public Law 112-141 (a/k/a the "RESTORE Act"), and (2) implement measures to improve performance of their drilling rigs in waters of the United States and deter recurrence of disasters like those that befell *Deepwater Horizon* and the Macondo Well.  The proposed Decree does not resolve, among other things, claims for damages for injuries to natural resources or private party claims.[2]  If approved, the settlement embodied in the proposed Decree will be the largest civil penalty ever recovered by the United States under any federal environmental statute.

The Transocean Defendants have consented to entry of the proposed Decree without further notice.  (Proposed Decree ¶ 72).  Based on pre-filing consultation with counsel, no other party in *United States v. BP, et al.*, 10-4536 opposes this motion.

Consent of the United States to the entry of the proposed Decree was conditioned on the United States' review of any public comment.  (Proposed Decree ¶ 71).  The Department of Justice received three comments on the proposed Decree, attached as Exhibits A, B, and C. None of the comments discloses any fact or condition suggesting that the proposed Decree is

---

[1] The Transocean Defendants are Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Deepwater Drilling Inc., Transocean Deepwater Inc., and are referred to collectively as "Transocean Defendants."

[2] There is a related criminal plea agreement in *United States v. Transocean Deepwater, Inc.*, No. 13-cr-001.  Judge Milazzo has scheduled a hearing for February 14, 2013, to decide whether to approve that Plea Agreement. Approval of the proposed civil Decree is not contingent upon approval of the criminal plea.

inappropriate, improper, or inadequate.  However, in response to one comment, the parties have agreed to amend Paragraph 13 of the proposed Decree (attached as Exhibit D).

A court should enter a consent decree if it is fair, adequate, reasonable, and consistent with the objectives of the Clean Water Act ("CWA").[3]  Because the proposed Decree meets the standard for entry, the United States requests that this Court (1) execute page 60 of the proposed Decree, [Doc. 8157-1] (which was attached to the Notice of Lodging of Consent Decree) and enter the proposed Decree as a final judgment; and (2) execute page 2 and enter the Amendment to the proposed Decree, filed as Exhibit D to this motion.

## II.  **BACKGROUND**

On December 15, 2010, the United States filed two claims in *United States v. BP, et al.*, 10-4536, against four groups of defendants – BP Exploration and Production ("BP"), the Transocean Defendants, the Anadarko defendants (Anadarko Petroleum Corporation and Anadarko E&P Company LP) and MOEX Offshore 2007 ("MOEX") -- for: (1) civil penalties under Section 311(b) of the CWA, 33 U.S.C. § 1321(b); and (2) declaratory judgment of liability under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*  The claims against the Transocean Defendants were predicated upon its ownership and operation of the *Deepwater Horizon* and its other operation and control over the Macondo well.  The case was consolidated under PTO # 1 into the MDL 2179.

Several rulings of this Court are relevant to the proposed Decree.  First, on February 22, 2012, the Court amply described its view of the CWA and OPA statutory schemes.  *Order and Reasons [As to the United States', Transocean's, and Anadarko's Cross-Motions for Partial*

---

[3] *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, concurring); *United States v. Browning-Ferris Indus. Chem. Servs., Inc.*, 704 F. Supp. 1355, 1356 (M.D. La. 1988).

*Summary Judgment Regarding Liability under the CWA and OPA]* [Doc. 5809] ("*SJ Order*"). Thus, no further statutory background is provided.

Second, in a separate ruling, the Court explained that the primary objectives of a civil penalty are to punish and to deter future pollution. *Order and Reasons as to Transocean and BP's Cross-Motions for Partial Summary Judgment regarding Indemnity* [Doc. 5446] ("*Indemnity Order*") at 20 (and citations therein). The Court also explained that a penalty must be tailored to the specific defendant and its situation, so that an amount appropriate for one defendant might be ineffective or excessive for another. *Id.* at p. 21. The Court also ruled that as a matter of law the Transocean Defendants cannot use contractual indemnity with BP to force BP to pay for penalties assessed against the Transocean Defendants. *Id.* at 21 and 29.[4]

Third, on June 18, 2012, the Court entered a consent decree between the United States and MOEX. That consent decree provided for the recovery of $70 million in civil penalties for violations of the CWA and for violations of laws of the five Gulf Coast States (Alabama, Florida, Louisiana, Mississippi, and Texas). That consent decree also required MOEX to perform Supplemental Environmental Projects valued at $20 million in the five Gulf Coast States.

Last, as to CWA liability, the Court described at length the liability of BP and Anadarko, co-lessees and co-owners of the Macondo Well. *SJ Order* [Doc. 5809].[5] However, the Court denied the motion of the United States for summary judgment that Transocean is liable as the owner of the Deepwater Horizon. *Id.* The Court also denied the motion of Transocean for

---

[4] In the *Indemnity Order*, "BP" includes BP American Production Co. ("BPAP"), BP Exploration & Production, Inc. ("BPXP"), and BP p.l.c. *Indemnity Order*, n.1.
[5] Anadarko appealed the *SJ Order*, after which BP and the United States cross-appealed. The Fifth Circuit denied a motion filed by Transocean to dismiss these appeals

3

summary judgment that Transocean is not liable under the CWA in this matter.  The Court found

disputed facts and set the matter to be decided in the Phase One trial.  *Id.*

## III.    TERMS OF PROPOSED, PARTIAL  CONSENT DECREE

Under the proposed Decree, the Transocean Defendants agree to pay a $1 billion civil

penalty, as follows: $400,000,000, plus interest,[6] within sixty (60) days of the date of entry of the

proposed Decree; $400,000,000, plus interest, within one (1) year of entry; and $200,000,000,

plus interest, within two (2) years of entry.  The penalty is subject to the RESTORE Act, which

allocates approximately 20% to the United States -- including to the Oil Spill Liability Trust

Fund for use in responding to future oil spills -- and about 80% to fund environmental and

economic activities in the five Gulf-Coast States, under the direction and procedures of the

RESTORE Act.

Paragraph 13 of the proposed Decree prohibits the Transocean Defendants from seeking

indemnity from any of the other defendants in the matter of *United States v. BP et al*.  In other

words, the proposed Decree furthers this Court's *Indemnity Order*.  However, Paragraph 13 is

the subject of a public comment and, as discussed below, the United States and the Transocean

Defendants have agreed to a revision to Paragraph 13 that will fully address the public comment.

The Transocean Defendants have also agreed to implement measures to improve

performance and prevent recurrence of uncontrolled well flow and discharge of hydrocarbons.

In addition to other proposed Decree requirements, Paragraph 14.e of the proposed Decree

requires the Transocean Defendants to submit for approval a detailed proposed Performance Plan

for implementation of various injunctive requirements including:  Operational Oversight (¶ 15),

---

[6] "Interest" is defined in the Consent Decree as the interest earned at the rate and method specified by 28 U.S.C. § 1961(a) and (b), plus two percentage points.

Oil Spill Training (¶ 16), Oil Spill Exercises (¶ 17), Oil Spill Response Plans (¶ 18), Best Practices (¶ 19), Innovation (¶ 20), Transparency (¶ 21), Independent Consent Decree Compliance Auditor (¶ 22), and Process Safety, Including Independent Process Safety Consultant (¶ 23).[7]  The Transocean Defendants shall perform these measures under the proposed Decree for at least five years (proposed Decree ¶ 84).

The Transocean Defendants covenant not to sue the United States for costs or damage from the loss of *Deepwater Horizon* and blowout of Macondo Well, including but not limited to any action under the OPA (proposed Decree ¶ 62).   The United States covenants not to sue (under the Complaint or any other instrument) the Transocean Defendants, Transocean Ltd., and Transocean Inc., including those companies' officers, directors, employees, and agents (all in their official capacities as such), for civil or administrative penalties for defined aspects of the loss of *Deepwater Horizon* and blowout of the Macondo Well under several environmental statutes, including certain provisions of the CWA and the Outer Continental Shelf Lands Act.[8]

The proposed Decree preserves the rights of the United States against the Transocean Defendants with respect to all matters other than those set forth in the covenant not to sue and expressly reserves a number of claims, including claims for natural resource damages.  (proposed

---

[7] The proposed Decree also establishes procedures for resolving disputes, if any arise (proposed Decree Article XI), as well as stipulated penalties if the Transocean Defendants fail to meet a Consent Decree requirement (proposed Decree Article IX).

[8] *See,* the covenant not to sue for civil and administrative penalties (proposed Decree ¶ 61), listing these statutes: **(a)** CWA §§ 309(d), (g), and 311(b)(6), (7), 33 U.S.C. §§ 1319(d), (g), and 1321(b)(6), (7); **(b)** the Outer Continental Shelf Lands Act, 43 U.S.C. § 1350(b), including without limitation, "Oil and Gas and Sulphur Operation in the Outer Continental Shelf," Title 30 C.F.R. Subparts A, B, C, D, and E of Part 250; **(c)** Endangered Species Act of 1973 § 11(a)(1), 16 U.S.C. § 1540(a)(1); **(d)** Marine Mammal Protection Act of 1972 § 105(a)(1), 16 U.S.C. § 1375(a)(1); **(e)** National Marine Sanctuaries Act § 307(d), 16 U.S.C. § 1437(d); **(f)** the federal Oil and Gas Royalty Management Act, 30 U.S.C. § 1719(a); **(g)** Section 109 (a) through (c) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9609(a)–(c); **(h)** Section 325(a), (b)(1) through (3), and (c) of Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11045(a), (b)(1) through (3), and (c); and **(i)** Section 113(b), and (d) of the Clean Air Act, 42 U.S.C. 7413(b), and (d).

Decree ¶ 70). The proposed Decree does not alter the ability of the United States to pursue anyone other than the Transocean entities, either for civil penalties or otherwise, nor does the proposed Decree affect, limit, or increase the rights of the Transocean entities or the United States or of anyone who is not a party to the proposed Decree (proposed Decree ¶¶ 64 and 67).

## IV.   LEGAL STANDARD FOR JUDICIAL REVIEW OF A CONSENT DECREE

In reviewing a proposed consent decree, a court is to ascertain whether the decree is fair, adequate, and reasonable, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977), and consistent with the objectives of the statute under which the action was brought, *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, concurring). *See also United States v. Browning-Ferris Indus. Chem. Servs., Inc.,* 704 F. Supp. 1355, 1356 (M.D. La. 1988) (consent decree under several environmental statutes approved as "fair, adequate and reasonable.") "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy." *City of Miami*, 664 F.2d at 441 n.13 (Rubin concurring). The court does not "substitute its judgment for that of the parties to the decree." *United States v. Wallace*, 893 F. Supp. 627, 631 (N.D. Tex. 1995).[9]

A consent decree "is a highly useful tool for government agencies, since it maximizes the effectiveness of limited law enforcement resources." *United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir. 1975.) In addition, "[p]ublic policy strongly encourages the settlement of cases." *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547 n.2 (5th Cir. 1988). The presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the

---

[9] *See also, Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (quoting *Cotton v. Hinton*, 559 F.2d at 1330) (in the absence of fraud or collusion, the court should be hesitant to substitute its own judgment for that of counsel); *In re: Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 209 (3rd Cir. 2003) (quoting *Cannons,* 899 F.2d 79, 84 (1st Cir. 1990) (relevant standard is not whether settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute.)

6

Department of Justice on behalf of a federal administrative agency like EPA which enjoys

substantial expertise in the environmental field." *United States v. Akzo Coatings of America,*

*Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991) (citing *United States v. Cannons Eng'g Corp.*, 899

F.2d 79, 84 (1st Cir. 1990)). *Accord, United States v. City of Alexandria*, 614 F.2d 1358, 1362

(5th Cir. 1980) ("a consent decree proposed by a private defendant and government agency . . .

carries with it a presumption of validity"):

> [t]he Justice Department and the [defendant] have been in a genuinely adversary
> posture[,] . . . there is no hint that the settlement has been motivated by any improper
> considerations[,]   . . . it appears to have been arrived at after mature, deliberate and
> informed consideration on both sides[,] [and] [i]t has been approved by the Department
> of Justice and the [defendant,] . . . [s]uch a settlement is entitled to a presumption of
> validity, which ordinarily may be overcome only if its provisions are not within
> reasonable bounds or are illegal, unconstitutional or against public policy.

*United States v. Texas Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982).

## V.   THE PROPOSED DECREE SHOULD BE ENTERED AS A FINAL JUDGMENT

The proposed Decree is fair, reasonable, adequate, and consistent with the purposes of the

CWA. The "presumption of validity" stands, and the proposed Decree should be entered as a

final order of the Court.

### A.    The Settlement is Fair.

Procedural fairness requires consideration of the "candor, openness, and bargaining

balance" of the negotiation process. *See, e.g., Wallace*, 893 F. Supp. at 632.[10] The negotiations

leading up to the instant proposed Consent Decree were undoubtedly adversarial, arms-length

---

[10] Some opinions also address "substantive" fairness, which requires that a consent decree apportion liability fairly
across multiple defendants. *See, e.g., Wallace*, 893 F. Supp. at 632 (citing *Cannons*).   Substantive fairness comes
into play in multiple-defendant environmental matters when non-settlors object that a settlement leaves them too
large a share of liability.  Here, however, the settlement does not allocate proportionate liability for response costs or
damages, but rather targets a specific penalty to a specific defendant.  Thus, the substantive fairness factor is not
applicable.  In this settlement, the controlling factors will be whether the settlement is reasonable, adequate, and
consistent with the CWA.

negotiations.  The Department of Justice represented the United States, in consultation with federal agencies, including, *e.g.*, the Bureau of Safety and Environmental Enforcement, the Environmental Protection Agency, and the Coast Guard.  The Transocean Defendants were represented by outside counsel with more than thirty years of environmental and other complex law experience and were supported by a staff of other experienced attorneys.  *See,* proposed Decree at 73 (signature of counsel for the Transocean Defendants).  As the test for procedural fairness is whether there were "arms length settlement negotiations conducted in good faith by experienced legal counsel," *Wallace*, 893 F. Supp. at 632, this settlement readily meets the test.[11]

### B.    The Settlement is Reasonable, Adequate and Consistent with the Purposes of the CWA.

The proposed Decree requires the Transocean Defendants to implement measures designed to reduce the chances of hydrocarbons entering waters of the United States.

### 1.    Injunctive Relief

Under the terms of the proposed Decree, the Transocean Defendants must observe various court-enforceable strictures in its drilling operations, aimed at reducing the chances of another blowout and discharge of oil and at improving emergency response capabilities. Examples of these requirements include certifications of maintenance and repair of blowout preventers before each new drilling job, consideration of process safety risks, and personnel

---

[11] In stating that a court should attempt to assess the fairness of the negotiation process, the Northern District's *Wallace* opinion and other district court opinions within the Fifth Circuit follow the First Circuit's *Cannons* opinion. *See, e.g., Wallace*, 893 F. Supp. at 632 (citing *Cannons*, 899 F.2d at 86).  Not all courts, however, agree that inquiry into the negotiation process is necessary or advisable.  Under an alternative view, the nature of the bargaining process normally would be irrelevant because the essential question before the court is the *objective* reasonableness of the terms of the proposed decree.  *See, e.g., Spectra-Physics, Inc. v. Superior Court*, 198 Cal.App.3d 1487, 1494, 244 Cal.Rptr. 258, 261 (Cal. App. 6 Dist. 1988) ("objective reasonableness of the settlement is the matter in issue").  We are aware of no opinion in which the Fifth Circuit itself adopts *Cannons*'s holding regarding procedural fairness.  In addition, there is at least a suggestion in Fifth Circuit precedent that the Fifth Circuit might *not* follow *Cannons* on the procedural-fairness issue.  *See, e.g., Cotton v. Hinton*, 559 F.2d at 1330 ("inquiry should focus upon the terms of the settlement").  If the *Cannons* test applies, however, it was certainly met here.

training related to oil spills and responses to other emergencies. These measures apply to all rigs operated or owned by the Transocean defendants in all U.S. waters and will be in place for at least five years. The Transocean Defendants must submit to the United States for approval a detailed proposed Performance Plan for implementation of various injunctive requirements including: Operational Oversight, Oil Spill Training, Oil Spill Exercises, Oil Spill Response Plans, Best Practices, Innovation, Transparency, Independent Consent Decree Compliance Auditor, and Process Safety, including an Independent Process Safety Consultant. These injunctive provisions are reasonable, adequate, and consistent with the CWA.

### 2.   Civil Penalty.

The $1 billion civil penalty imposed in this settlement is also reasonable, adequate, and consistent with the CWA. To arrive at the penalty amount, the United States thoroughly weighed the statutory penalty factors set forth in Section 311(b)(8) of the CWA, 33 U.S.C. 1321(b)(8), against the litigation risks and evidence unique to the Transocean Defendants. In litigating to judgment, the United States ultimately might secure larger civil penalties from the Transocean Defendants. It also is possible, however, that the United States could secure smaller sums by litigating to judgment. Some of these considerations, and others, are discussed below; under all the circumstances, however, the civil penalty proposed for the Transocean Defendants is an appropriate one.

The Court has already determined that the Transocean Defendants are not liable under the CWA as the owner or operator of the Deepwater Horizon because the oil discharged from the Macondo Well, an offshore facility, not from the Deepwater Horizon vessel. *See, SJ Order* at 21-23 [Doc. 5809]. The court left open for determination whether the Transocean Defendants were operators or persons in charge of the Macondo Well, an offshore facility. At trial, the

United States would have to prove disputed facts, and the Court would have to resolve the remaining alternate theories of the Transocean Defendants' liability.

Assuming a finding of liability, the Court would calculate the likely statutory maximum penalty. The Fifth Circuit has used a "top-down" approach to determine the amount of civil penalties, under which courts "begin by calculating the maximum possible penalty, then reducing that penalty only if mitigating circumstances are found to exist." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1337 (5th Cir. 1996) (citing *Atlantic States Legal Foundation Inc. v. Tysons Food, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990)).[12]

The CWA imposes a penalty based on the number of barrels of oil discharged. 33 U.S.C. § 1321(b)(7)(A). Here, the number of barrels is disputed and will not be determined until Phase Two (Quantification Track) of the trial. Federal agencies publicly announced in 2010 that an estimated 4.9 million barrels were released from the Macondo well. *Exh. E* (excerpt of Depo. exhibit 9005). Transocean, BP, and others dispute the total volume of oil discharged from the Macondo Well, so, for settlement purposes, some uncertainty can be assumed.[13]

The maximum possible penalty exposure based on strict liability or simple negligence is $1,100 per barrel, but in cases of gross negligence or willful misconduct, the maximum possible exposure increases to $4,300 per barrel. 33 U.S.C. § 1321(b)(7)(D). Because the Transocean Defendants dispute whether they were grossly negligent and/or acted with willful misconduct,

---

[12] *See also, Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 573 (5th Cir. 1996) (affirming district court's judgment using *Tyson Foods'* top-down penalty approach); *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 858 (S.D. Miss. 1998) (reviewing Fifth Circuit practice and applying the top-down approach); *United States v. Scruggs*, No. G-06-776, 2009 WL 500608, at *3 (S.D. Tex. Feb. 26, 2009) ("The Fifth Circuit endorsed the 'top-down' methodology for calculating the appropriate civil penalty.").

[13] For example, BP has recently filed a "Motion for Partial Summary Judgment Against the United States With Respect to Its Claims for Civil Penalties for the More Than 800,000 Barrels of Oil That Were Collected and Never Released Into the Environment During the *Deepwater Horizon* Oil Spill" [Doc. 8213].

these defendants also dispute whether their per-barrel, maximum penalty exposure is $1,100 or $4,300. That issue would be a significant one for the Court to determine in the Phase One trial.

Given the disputes to be litigated, *e.g.*, liability, number of barrels, and gross negligence (or not), the potential penalty exposure ranges for the Transocean Defendants, range from a low of zero, to a high of multiples of billions.

In assessing the amount of a civil penalty to be paid (as opposed to the maximum penalty exposure), courts are directed to consider:

- the seriousness of the violation or violations;
- the economic benefit to the violator, if any, resulting from the violation;
- the degree of culpability involved;
- any other penalty for the same incident;
- any history of prior violations;
- the nature, extent, and degree of success of any efforts of the violator to minimize; or mitigate the effects of the discharge;
- the economic impact of the penalty on the violator; and
- any other matters as justice may require.

33 U.S.C. § 1321(b)(8). For the Transocean Defendants, some of these statutory penalty factors arguably augur in favor of a reduced penalty, while other factors do not favor any reduction.

Several factors weigh heavily in favor of imposing the maximum (or near maximum) penalty against the Transocean Defendants. Above all, eleven men died, many people were injured, and never before was so much oil discharged into the Waters of the United States causing significant harm to the environment and natural resources of the Gulf; the seriousness of the violation cannot be disputed. Moreover, as the United States has set forth in prior filings and expert reports, the acts and omissions of the Transocean Defendants played a role in causing the blowout, explosion, and oil spill; the culpability of the Transocean Defendants cannot be disputed. The Transocean Defendants fell short in a number of operational areas, including maintenance of safety-critical equipment, effective, monitoring of well conditions, and well

11

control.  Accordingly, the Transocean Defendants should pay a very large civil penalty, which is what they will do under the proposed Decree.  In fact, the proposed Decree imposes the largest civil penalty ever paid under the CWA or any other federal environmental statute, by a factor of ten.

Although the Transocean Defendants should pay a very large civil penalty, some of the CWA penalty factors may support a reduction from the maximum potential penalty:

*Gross negligence.*  This factor significantly affects the potential statutory maximum penalty that the Court can impose.  Gross negligence is an issue to be litigated in the Phase One trial and determined by the Court after presentation of all the evidence and legal arguments. Although the United States is confident in its case, as noted above there is some litigation risk on this issue as to the Transocean Defendants.  As noted in prior submissions to this Court [Doc. 4840, United States Memorandum in Opposition to Transocean's Motion for Partial Summary Judgment regarding Indemnity at 10, 12, and 21], the United States asserts that the Transocean Defendants acted with gross negligence and willful misconduct, but the United States also acknowledges litigation risk on that issue, especially in light of the view of the United States as to BP's central role in this disaster.

*Culpability.*  This Court has noted that the Transocean Defendants could be viewed as less worthy of punishment, in light of their status relative to the parties like BP and Anadarko – the mineral lessees who extract and sell hydrocarbons:

> Anadarko and BP were the ones directly engaged in the enterprise which caused the spill. They were the mineral lessees, they owned the well, and they stood to profit directly from the oil it produced.  Thus, Congress intended that the cost of pollution would be borne by these parties.  By contrast, Transocean was involved in the "enterprise" by virtue of its contract with BP.  Transocean was paid charter hire by BP; it did not stand to profit directly from the oil.

12

*SJ Order* at 20.  The Court reasoned that the Transocean Defendants did "not stand to profit directly from the oil," *SJ Order* at 20; so, their financial stake in the operation differs from that of defendants BP and Anadarko.  "Congress did not intend the owner or operator of the DEEPWATER HORIZON to be primarily liable under the CWA for this incident." *Id.* at 21-22. Thus, the Court at least considered the view that the Transocean Defendants' role was subsidiary to that of BP and Anadarko; accordingly, the United States has considered the Court's perspective (although this order is on appeal).

*Other penalties paid.*  It also is relevant, though not dispositive, that various Transocean entities, including one of the Transocean Defendants, agreed to accept another punishment, $400 million in a related criminal plea agreement.  *United States v. Transocean Deepwater, Inc.*, No. 13-cr-001.  Judge Milazzo has scheduled a hearing for February 14, 2013, to decide whether to approve the Plea Agreement.[14]

*Economic impact.*  As far as economic impact, the $1 billion dollar penalty is the largest ever recovered under federal environmental statutes and will have a significant impact on the Transocean Defendants.  While this settlement amount was not specifically limited to the maximum amount that the Transocean Defendants could pay without undue financial hardship, the financial wherewithal of the Transocean Defendants (like many corporations) becomes relevant as the penalty reaches numbers in the hundreds of millions or the billion dollar mark. Without suggesting that any single measure captures the financial strength of a company, a comparison of the $1 billion penalty to recent financial disclosures by the aggregated Transocean companies (*i.e.*, not just the four defendants but also including all their Transocean affiliates) is

---

[14] Meanwhile, on January 29, 2013, Judge Vance approved BP's criminal settlement, in the amount of $4 billion. *United States v. BP Exploration and Production, Inc.*, No. 12-cr-00292.

notable.  For the nine month reporting period ending September 30, 2012, the aggregated

Transocean companies reported working capital of about $3.6 billion, revenues of about $6.9

billion, and a net loss of almost $0.7 billion.[15]  Accordingly, $1 billion is not a small sum for the

Transocean Defendants, and references in the press and in public comments to CWA penalty

amounts of $20 billion may not be meaningfully relevant for a settlement with the Transocean

Defendants.

　　　*Other matters as justice may require.*  Finally, the Transocean Defendants' ultimate

willingness to enter into this settlement also warrants consideration.  Furthermore, this proposed

Decree will result in significant savings in the parties' as well as the Court's resources by

resolving the matters in this settlement as opposed to litigating them to judgment.  Also, the early

payment of penalty gets the money to projects in the Gulf States under the RESTORE Act sooner

than if the case were litigated through trial and any appeals.

### 3.　　Conclusion.

　　　The proposed Decree, designed to deter future violations, and thereby preserve and

protect natural resources and protect and improve water quality, is reasonable, adequate, and

consistent with the purposes of the CWA.  The $1 billion civil penalty is tailored to the

Transocean Defendants and the evidence adduced in discovery.  The civil penalty is reasonable,

given the evidence, and consistent with the CWA and Fifth Circuit precedent.  Reasonable

people might differ over the appropriate civil penalty; whatever those differences, however, the

civil penalty proposed here is significant; it is the largest penalty ever secured under the CWA.[16]

---

[15] *See* Transocean Ltd 10-Q Report submitted to SEC for period ending September 30, 2012, filed on November 5, 2012.

[16] The largest civil penalty previously recovered by the United States under the CWA, was $70 million recovered from MOEX in this enforcement action.

Given the absolute size of the civil penalty, the litigation risks, and giving consideration to additional sums that related Transocean entities likely will pay in the proposed criminal settlement, the penalty in the proposed Decree is appropriate.

## VI.   PUBLIC COMMENT ON THE PROPOSED DECREE DOES NOT WARRANT WITHDRAWAL OF CONSENT BY THE UNITED STATES

Under Title 28 C.F.R. § 50.7, the United States invited the public to comment on the proposed Consent Decree during the twenty-one (21) days following publication of a notice in the Federal Register. 78 Fed. Reg. 1883 (January 9, 2013). That comment period closed on January 30, 2013. The United States received comments from three groups: (A) Gulf Restoration Network[17], (B) Ocean Conservancy[18], and (C) the BP Commenters.[19]  The comments, as received, are attached to this memorandum as Exhibits A, B, and C, respectively.

After reviewing the comments, the United States remains convinced that the settlement is fair, adequate, reasonable, and consistent with the goals of the CWA. A summary of each group's comments and the response of the United States appear below.

### A.   Comments by Gulf Restoration Network.

In sum, Gulf Coast Restoration Network:

> 1) Describes the consent decree as an important step in holding those responsible, including BP and others, accountable for the disaster but concludes that the total penalty –civil and criminal – is too low. The commenter suggests fines totaling "at least 5 percent of the currently estimated $20 billion in penalties justified under the Clean Water Act, Oil Pollution Act (excluding damage to natural resources),

---

[17]  Gulf Restoration Network is "committed to uniting and empowering people to protect and restore the natural resources of the Gulf Region." healthygulf.org: "About Us, Our Mission" (last visited February 1, 2013).

[18]  Ocean Conservancy's goal is ". . . to bring people together to find solutions to our water planet. We educate and empower people to defend not only the ocean and its wildlife, but also the millions who earn their living from the ocean." Oceanconservancy.org: "What We Do" (last visited February 1, 2013).

[19]  The BP Commenters are comprised of BP Exploration and Production Inc. and BP America Production Company. BP Exploration and Production Inc. ("BPXP") is party to this civil action (10-4536), but BP America Production Company is not, so the United States will treat the submission of the BP Commenters as a public comment.

*Endangered Species Act, Marine Mammal Protection Act, and other applicable laws."*

2) *Supports the Consent Decree measures intended to improve Transocean Defendants' operating performance and to prevent occurrence of similar disasters, but the commenter also believes the consent decree lacks necessary citizen oversight ". . . of agency efforts to ensure rigorous enforcement of the provisions of this and other consent decrees, as well as general oversight of permitting and enforcement of regulations governing permitting of oil and gas exploration and development."*

3) *Recommends that this consent decree and any future consent decrees with other defendants establish a Gulf Offshore Energy Regional Citizens' Advisory Council (hereinafter RCAC), similar to the Prince William sound Regional Citizens' Advisory Council established in response to the Exxon Valdez spill by agreement and later incorporated into the Oil Pollution Act (OPA) of 1990. The Gulf RCAC could be established as either a standalone body or as an advisory board to the Department of Interior. The consent decree should also require establishment of a trust fund of $50 to $100 million for operation of the Council. Such an endowment would allow the Council to hire staff technically qualified to monitor the operations of the oil and gas industry, the development of Department of Interior regulations and its permitting process, development of oil spill response technologies and response capabilities.*

4) *Offers two objections: first, the civil and criminal penalties are not sufficient to compensate Gulf residents for the damage inflicted on Gulf resources, and second, creation of citizen's advisory council is the only way to ensure full compliance by the Transocean Defendants with the consent decree and reduce the risk of future disasters, as well as effective regulation of the oil industry in the Gulf of Mexico.*

**Response of United States**:

*Size of Civil Penalty.* The United States has described the reasons for the penalty amount above and adopts those same reasons here in response to this comment. *See supra,* Section V.B.2. The proposed civil penalty also meets the guideline set by the commenter: a $1 billion civil penalty amounts to about five percent of the $20 billion maximum posited in the comment (with interest accruing on any unpaid balance to account for the installment payments allowed under the Decree (proposed Decree ¶¶ 6.l. & 9)).

In addition, the imposition of the $1 billion civil penalty is not to compensate Gulf residents for damages inflicted on persons, businesses, or Gulf resources; other claims, not settled in the proposed Decree, address those important concerns. All claims for damages and all claims for compensation by Gulf residents are preserved and not part of this settlement.

16

(proposed Decree ¶ 67).  Instead, the penalty is imposed to punish the Transocean Defendants and deter everyone from similar violations of the CWA and other federal statutes.

*Citizen Oversight of permitting and regulation.*  Citizen participation in government may be a salutary principle, but the United States is not persuaded that this settlement is a good vehicle for changing the current arrangements for participation of the public.   While this CWA enforcement action is very large, it remains a civil enforcement action brought in a district court against specific private parties who broke the law in particular ways.  The resolution of those violations, either by litigation to judgment or through a settlement, should reflect the particular circumstances of the lawbreaker and its particular violations, and should both penalize that conduct and encourage future compliance.  The injunctive requirements of the proposed Decree apply only to the Transocean Defendants, not to other parties or other consent decrees.  Additional oversight by the public of all permitting or enforcement activities may well be a change in law or policy that should be considered, but this forum does not seem the best one to effect such change.

Meanwhile, interested components of government continue to look at the best ways to regulate these activities and guard against recurrence.  The U.S. Department of the Interior already has revised a number of the regulations that govern offshore drilling.[20]  Other changes may be considered.[21]

---

[20] *See e.g.,* Oil and Gas and Sulphur Operations on the Outer Continental Shelf--Increased Safety Measures for Energy Development on the Outer Continental Shelf, 77 Fed. Reg. 50,856 (August 22, 2012) (final rule); Oil and Gas and Sulphur Operations in the Outer Continental Shelf--Safety and Environmental Management Systems, 75 Fed. Reg. 63,610 (Oct. 15, 2010) (final rule).

[21] *See, e.g.,* Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions, 78 Fed. Reg. 1317, 1412 (Jan. 8, 2013) (identifying regulatory priorities of the Bureau of Safety and Environmental Enforcement); 77 Fed. Reg. at 50,587- 50,875 (referencing future rulemakings); Oil and Gas and Sulphur Operations in the Outer Continental Shelf--Revisions to Safety and Environmental Management Systems, 76 Fed. Reg. 56,683 (Sept. 14, 2011) (proposed rule).

In addition, the Prince William Sound Regional Citizens Advisory Council, referenced by the commenter as an example, was not established by a civil consent decree. It was established by an act of Congress. *See,* Section 5002 of the OPA, 33 U.S.C. § 2732.

As part of the injunctive relief secured from the Transocean Defendants, the Consent Decree however, does foster public involvement. The Transocean Defendants must: create a public web site, post to it all reports and other materials required by the proposed Decree, and operate the web site so that it is readily searchable and available to the public free of charge (proposed Decree ¶ 6.w). These provisions will aid any member of the public in monitoring the performance of the Transocean Defendants under this proposed Decree.

*Creation and Funding of a Citizen's Advisory Council.* As with the prior suggestion for greater, broader oversight by citizens, the proposed advisory council also may be an idea worth considering, but the proposed Decree does not appear to be the best vehicle for such a proposal. That type of policy change falls outside the scope of this enforcement action. Also, the creation and funding of instrumentalities might pose other concerns, *e.g.,* whether funds directed by law in one fashion should be directed to other recipients or purposes, 31 U.S.C. § 3302(b),[22] and whether funds of this kind are available to pay for expenses of councils or similar groups (31 U.S.C. § 1346(a)(1)(A)).[23]

Last, in this particular case, through the RESTORE Act Congress has spoken on the use of proceeds resulting from civil penalty awards in this civil enforcement action. *See* Pub. L. No. 112-141, Div. A, Title I, §§ 1602 & 1603, July 6, 2012, 126 Stat. 588; 33 U.S.C.A. § 1321 note.

---

[22] An official or agency of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim. 31 U.S.C. § 3302(b).

[23] "Except as provided in this section, public money and appropriations are not available to pay the pay or expenses of a commission, council, board, or similar group, or a member of that group . . . ." 31 U.S.C. 1346(a)(1)(A).

That Act provides standards and categories for use of such civil and administrative penalty awards, including formation of a council of federal and state representatives to implement the directions provided in the Act.

**B.    Comments by Ocean Conservancy.**

In sum, Ocean Conservancy:

1) *Supports court approval and describes the proposed Decree as appropriate, workable, and justified under the law.*
2) *Urges active, strategic coordination among all restoration activities resulting from settlements; suggests one change to the consent decree – that it provide coordination of projects supported by settlement funds.*
3) *Proposes an approach that would be appropriate for overall resolution of the case against BP, including:*
   A) *Permanent resear ch and monitoring program in the Gulf of Mexico, including identification and testing of restoration strategies and projects, evaluation of adaptive management approaches, monitoring of the Gulf ecosystem, identification of important ecological areas, building better baseline for future oil spill damage assessments, early detection of trends, and adaptive management of conservation and natural resources;*
   B) *Coordination of any phases of natural resource damage assessment and restoration in response to the DWH oil spill, including funding under the RESTORE Act and any and all future settlements;*
   C) *Use of settlement of provisions that govern reference to future settlement terms in advertising and marketing; and*
   D) *A so-called "re-opener" clause (presumably for settlement claims for natural resource damages) that would address restoration from injuries that might be chronic or not manifest themselves for some time.*

<u>**Response of United States**</u>:

These comments are aimed at settlements the United States might conclude in the future, either with other parties or with the Transocean Defendants with respect to natural resource damages, a category of claim that the United States has reserved for another day. *(see* proposed Decree ¶ 70.d). As with other suggestions for appropriate terms for future settlements, the United States will consider these suggestions in forming its approach to any future settlements in this civil enforcement action.

C.     **Comments by BP Commenters.**

The BP Commenters do not oppose entry of the Consent Decree, but make one comment

on the proposed Decree paragraph 13, which precludes the Transocean Defendants from seeking

indemnity or reimbursement for the civil penalty to be paid under the proposed Decree.   The BP

Commenters:

1) *Argue that paragraph 13 of the proposed Partial Consent Decree is, perhaps unintentionally, too narrow.  The only BP entity listed in paragraph 76 of the United States' Complaint is BPXP.  However, the Transocean Defendants have sought indemnity, including with respect to fines and penalties, from at least one BP entity beyond BPXP.  Count 7 of "Transocean's Answer to BP Exploration & Production, Inc.'s Cross-Claim and Third Party Complaint [Dkt. 2075] and Transocean's Rule 13 Cross-claims/Counterclaims and Rule 14 Third-Party Complaint" (Doc. 2574) seeks indemnity as to the claims filed by the United States, including with respect to fines and penalties, from both BPXP and BPAP (see Prayer, para. 5);*

2) *Note that this Court's decision on January 26, 2012 on the scope of any indemnity right concludes that no BP entity owes any Transocean entity indemnity to the extent Transocean is held liable for civil penalties. Citing the Indemnity Order, Doc. 5446 at 29; and*

3) *Argue that the Decree would be inconsistent with the District Court's January 26, 2012 ruling and might not achieve the resolution of pending claims in the manner intended by the United States through the Partial Consent Decree.*

4) *Request that Paragraph 13 be amended by adding the phrase, "or any corporate affiliates of such defendants."*

**Response of United States:**

The United States and the Transocean Defendants have agreed to modify the proposed

Decree consistent with the comment request.  A proposed amendment to the proposed Decree

accompanies this memorandum and would change paragraph 13 by adding the phrase "or any

corporate affiliates of such defendants."  To wit:

13. . . . Nor shall the Transocean Defendants use or allow to be used any payments of the CWA penalties to the United States made pursuant to this Consent Decree as a basis for indemnity or reimbursement for any other defendant named in paragraph 76 of the Complaint, or any corporate affiliates of such defendants.

The original version of paragraph 13 does not disturb the Court's ruling of January 26, 2012, but this revised version aligns better with that decision and reflects the intent of the United States and the Transocean Defendants.

## CONCLUSION

The proposed Consent Decree is the result of an arms-length negotiation and contains significant requirements for pollution prevention, and a stiff deterrent civil penalty. It is fair, reasonable, adequate, and consistent with the purposes of the CWA. The United States respectfully requests that the Court (1) execute page 60 of the proposed Decree [Doc. 8157-1] and enter the proposed Decree as a final judgment; and (2) sign and enter the proposed "Amendment to Partial Consent Decree Between the Plaintiff United States of America and Defendants Triton Asset Leasing GMBH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc." filed as Exhibit D herewith.

Respectfully Submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JAMES NICOLL
MICHAEL ZEVENBERGEN
PATRICK CASEY
Senior Counsel
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
ABIGAIL ANDRE
RACHEL HANKEY
Trial Attorneys

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney

21

Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:  415-436-6648
Facsimile:  415-436-6632
E-mail:  mike.underhill@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA  70130
Telephone:  (504) 680-3000
Facsimile:  (504) 680-3184
E-mail:  sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF
AMERICA

Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:  202-514-2583
E-mail:  steve.o'rourke@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on  February 6, 2013.

/s/ Steve O'Rourke
U.S. Department of Justice