# Exhibit B



Gulf Restoration Center
400 Poydras Street
Suite 1990
New Orleans, LA 70130

504.208.5813 Telephone
504.267.8541 Facsimilie
www.oceanconservancy.org

January 30, 2013

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

>RE: *U.S.* v. *BP Exploration and Production et al.,* Civil No. 10-4536 (E.D. La.) (centralized in MDL 2179: *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,* April 20, 2012), D.J. Ref. 90-5-1-1-10026.

Dear Assistant Attorney General Moreno:

Ocean Conservancy[1] appreciates this opportunity to provide comments on the consent decree between the United States and Transocean (Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., and Triton Asset Leasing GMBH), resolving a portion of claims in the MDL No. 2179 case, as published in the *Federal Register* on January 9, 2013.[2] The consent decree provides for a $1 billion penalty, subject to the Resources and Ecosystems Sustainability, Tourist Opportunities and Revived Economies of the Gulf Coast States Act of 2012 (RESTORE Act).[3]

The consent decree is appropriate, workable, and justified under the law for this responsible party. We support court approval of the decree and commend the Department of Justice for their tireless work in reaching agreements related to the Deepwater Horizon (DWH) oil disaster thus far. Importantly, the consent decree marks the first step in funding the plans and projects envisioned by Congress in the RESTORE Act. For many residents of the Gulf, including Ocean Conservancy's own experts, advocates and members living in the region, the RESTORE Act offers hope for a chance to restore an ecosystem that sustains their lives and livelihoods. We thank the Department of Justice for its leadership in holding Transocean accountable, and we look forward to full resolution of the case with other responsible parties, which will allow restoration efforts in the Gulf to get fully underway.

---

[1] Ocean Conservancy is a non-profit organization that educates and empowers citizens to take action on behalf of the ocean. From the Arctic to the Gulf of Mexico to the halls of Congress, Ocean Conservancy brings people together to find solutions for our water planet. Informed by science, our work guides policy and engages people in protecting the ocean and its wildlife for future generations.

[2] 78 Fed. Reg. 1883 (Jan. 9, 2013).

[3] Public Law 112-141, Subtitle F (July 6, 2012).

Active, strategic coordination must occur amongst any and all restoration planning and implementation functions resulting from any and all settlements, including funding subject to the RESTORE Act and funding allocated to the National Fish and Wildlife Foundation (NFWF) for restoration activities in this consent decree and plea agreement. Therefore, we suggest one significant change to the consent decree: it must provide for coordination of projects supported by settlement funds to ensure that projects are consistent, complementary and not duplicative.

As the larger case shifts focus to continuing talks between the Department of Justice and BP, we urge you to take a broad view of the needs of the Gulf region, its people, and its ecosystems in the wake of the DWH oil disaster. Adequately funding the RESTORE Act, in addition to Natural Resource Damage (NRD) funding at a level commensurate with the injuries, is a critical piece in the larger picture, and we look forward to significant funding in the future to fully realize the intent of Congress. However, a few necessary aspects of full Gulf restoration are still missing. The following comments propose an approach which Ocean Conservancy thinks is appropriate for overall resolution of the ongoing case against BP. Our comments, therefore, pertain to the issue of penalties under the Clean Water Act, Oil Pollution Act, and other natural resource statutes and to the goal of making the environment and public whole for injuries to natural resources and services resulting from the DWH oil disaster.

1.  **Endowed Permanent Research and Monitoring Program**

We urge establishment and endowment of a permanent monitoring, research and observation program for the Gulf of Mexico as part of a comprehensive settlement that will fully compensate the people of the Gulf for the impacts of the DWH oil disaster. The science program envisioned in Section 1604 of the RESTORE Act is an important step toward a comprehensive body of scientific knowledge; but, taken alone, it is not adequate to provide the much-needed baseline data and facilitate adaptive management in the future. An independent, permanently endowed program created as part of a trial resolution of claims would ensure a solid foundation of science supporting not only long-term ecosystem restoration but also the management and conservation of natural resources in the Gulf. Specifically, such a program would provide scientific data and information that would facilitate:

- Identification and testing of restoration strategies and projects,
- Evaluation and adaptive management of restoration strategies and projects,
- Monitoring the status, health and trends of the Gulf of Mexico ecosystem,
- Identification of important ecological areas,
- Building a better baseline for damage assessments in response to future oil spills,
- Early detection of problems and harmful trends, and
- Adaptive management and conservation of natural resources.

There can be no improvement in preparedness and response to future oil spills without a robust, science-based understanding of the Gulf ecosystem. Unless and until there is established a permanent science-based monitoring, observation and research program that provides a basis for improvement of preparedness and response, as well as adaptive management capabilities for various managers and regulators, there will be no true enduring progress toward ecosystem health, biodiversity, social or economic well-being of the Gulf of Mexico.

An endowment of approximately $2 billion or more would be appropriate to initiate the program. Scientifically and structurally, the endowed science program could be modeled after the Gulf Ecosystem Monitoring (GEM) program following the *Exxon Valdez* oil spill, or the North Pacific Research Board, which followed resolution of the Dinkum Sands case in Alaska.[4]

## 2. Coordination

Active, strategic coordination must occur between the phases of the Natural Resource Damage Assessment (NRDA) and restoration program conducted in response to the DWH oil spill and the broader restoration planning and implementation functions resulting from any and all settlements, including funding subject to the RESTORE Act. Future consent decrees must provide for coordination of projects supported by settlement funds to ensure that projects are consistent, complementary and not duplicative.

Future settlement negotiations must focus on a comprehensive, science-based, ecosystem-focused restoration strategy, resting on a clear vision for a healthy Gulf ecosystem and supplemented by annual work plans, progress reports and periodic requests for project proposals. Each project must have established criteria clearly linking the project to specific, measurable, feasible objectives. Projects must be subject to independent scientific peer review in selection and evaluation processes and projects must be coordinated and integrated within the framework of a comprehensive ecosystem restoration strategy. Future consent decrees must provide for adaptive management—i.e., re-evaluation of restoration strategies, priorities and projects as information on the extent and significance of injury to natural resources is obtained from the NRDA as well as other scientific sources. We believe this level of detail is appropriate for future settlements as it will help clarify and guide restoration activities that will be funded using fines and penalties negotiated under the terms of trial resolution.

## 3. Public Relations Clause

Ocean Conservancy commends the Department of Justice for prohibiting Transocean and its entities from referencing the plea agreement and any payments or compliance in any public relations, marketing or advertising.[5] Given the extensive advertising campaign launched by BP in the wake of one of the nation's greatest environmental disasters, this is an appropriate stipulation and should be included in all agreements with DWH responsible parties in the future. Agreements to settle the DWH oil disaster case are meant to provide justice to the people and natural resources of the Gulf, and any reference to payments, compliance, or resulting projects or programs is wholly inappropriate in the context of public relations and advertising. Responsible parties should not be permitted to use their culpability for the DWH oil disaster to their benefit.

---

[4] *See* Gulf of Alaska Ecosystem Monitoring and Research Program, the GEM Program Document (July 9, 2002), *available at* http://www.evostc.state.ak.us/Universal/Documents/Monitoring/GEM_Program_Document_.pdf. *See also* North Pacific Research Board, *available at* http://www.nprb.org/about/legislation.html; *United States v. State of Alaska*, 531 U.S. 1, 117 S. Ct. 1888 (1997).

[5] Transocean Plea Agreement, section 4, *available at* http://www.justice.gov/opa/documents/transocean-plea-agreement.pdf.

4.  **Reopener clause**

Future DWH settlements must include a reopener clause to address restoration from injuries documented subsequent to the effective date of the settlement (e.g., latent, chronic, delayed manifestation in long-lived species). This reopener language should be more practical than the nearly impossible standard set in the *Exxon Valdez* settlement. The *Exxon Valdez* reopener read: "[I]njury to the affected population, habitat, or species could not reasonably have been known nor could it reasonably have been anticipated by any Trustee from any information in the possession of or reasonably available to any Trustee on the Effective Date."[6] However, DWH settlement reopener language should eliminate the "anticipated" language, and should instead rely on the ability to scientifically detect injury. We suggest reopener language such as this: " Injury to the affected ecosystem, population, habitat, or species was not manifest or could not reasonably have been documented scientifically from information in the possession of or reasonably available to any Trustee on the Effective Date."

5.  **Conclusion**

In summary, Ocean Conservancy supports the consent decree between the United States and Transocean. We urge the Department of Justice to ensure that any potential agreement between the United States and BP, as well as agreements with any other responsible parties, are aligned with a comprehensive strategic vision designed to achieve meaningful restoration for the Gulf region. Moreover, we support the government's pursuit of a full and fair legal resolution of damages under NRDA.

It is not enough to restore the region back to where it was on April 19, 2010, just before the BP oil disaster. The stronger we can make our coasts and the more resilient our communities become, the better equipped the nation will be to respond to natural and human-caused disasters and protect the Gulf of Mexico's natural resources, citizens and economy for generations to come. Adopting these suggestions offered by Ocean Conservancy will help address the long-term causes of degradation that have made the Gulf region more susceptible to disasters over the years.

Thank you for your consideration. We look forward to working with the Department of Justice, as well as the Federal and State Trustees, in the future.

Sincerely,

*[signature: Bethany Kraft]*

Bethany Kraft
Director, Gulf Restoration Program
Ocean Conservancy

---

[6] Agreement and Consent Decree, *United States v. Exxon Corp.*, Nos. A91-081-083 CV PP 6, 17 (D. Alaska, Oct. 9, 1991).