# EXHIBIT 2

25th JUDICIAL DISTRICT COURT FOR THE PARISH OF PLAQUEMINES

STATE OF LOUISIANA

NO. 58-683

DIVISION "B"

GUY J. ADAMS, individually and on behalf of others similarly situated

VERSUS

THE STATE OF LOUISIANA, through the LOUISIANA DEPARTMENT OF NATURAL RESOURCES; BP EXPLORATION & PRODUCTION, INC.; BP PRODUCTS NORTH AMERICA, INC.; BP, P.L.C.; BP AMERICA, INC.; TRANSOCEAN, LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN HOLDINGS, LLC; HALIBURTON ENERGY SERVICES, INC.; CAMERON INTERNATIONAL CORPORATION; ANADARKO PETROLEUM CORPORATION; MITSUI OIL EXPLORATION COMPANY, LTD.; MOEX OFFSHORE 2007, LLC; NALCO COMPANY, PENETON COMPANY, and JMN SPECIALITIES, INC.

FILED: _____

_____
DEPUTY CLERK

## CLASS ACTION PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiff Guy J. Adams, individually and on behalf of others similarly situated, who avers as follows:

### THE PARTIES

1. Plaintiff Guy J. Adams is an adult resident of the State of Louisiana.

2. Made Defendants herein are the following parties:

a) The STATE OF LOUISIANA, through the LOUISIANA DEPARTMENT OF NATURAL RESOURCES;

b) BP EXPLORATION & PRODUCTION, INC., a foreign corporation authorized to do and doing business in the State of Louisiana;

c) BP PRODUCTS NORTH AMERICA, INC., a foreign corporation authorized to do and doing business in the State of Louisiana;

d) BP, P.L.C., a foreign corporation business in the State of Louisiana;

e) BP AMERICA, INC., a foreign corporation authorized to do and doing business in the State of Louisiana;

f) TRANSOCEAN, LTD., a foreign corporation doing business in the State of Louisiana;

1

Case 2:10-md-02179-CJB-DPC   Document 8529-2   Filed 02/08/13   Page 3 of 11

g) TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., a foreign corporation authorized doing business in the State of Louisiana;

h) TRANSOCEAN DEEPWATER, INC., a foreign corporation doing business in the State of Louisiana;

i) TRANSOCEAN HOLDINGS, LLC, a foreign corporation doing business in the State of Louisiana;

j) HALIBURTON ENERGY SERVICES, INC., a foreign corporation authorized to do and doing business in the State of Louisiana;

k) CAMERON INTERNATIONAL CORPORATION, a foreign corporation authorized to do and doing business in the State of Louisiana;

l) ANADARKO PETROLEUM CORPORATION, a foreign corporation authorized to do and doing business in the State of Louisiana;

m) MITSUI OIL EXPLORATION COMPANY, LTD., a foreign corporation doing business in the State of Louisiana;

n) MOEX OFFSHORE 2007, LLC, a foreign corporation doing business in the State of Louisiana;

o) NALCO COMPANY, a foreign corporation authorized to do and doing business in the State of Louisiana;

p) PENETON CORPORATION, a foreign corporation doing business in the State of Louisiana; and

q) JMN SPECIALITIES, INC., a Louisiana corporation authorized to do and doing business in the State of Louisiana whose principle place of business is located at 1100 Victory Drive, Westwego, Louisiana.

## JURISDICTION AND VENUE

3. Jurisdiction and venue are proper in this Court because the acts giving rise to this case are violations of Louisiana law, including but not limited to LA.C.C. Art. 2315 and LA-R.S. 56:423 *et seq.*, which occurred in Plaquemines Parish, and because the oyster leases at issue in this action are located in Plaquemines Parish.

# FACTUAL ALLEGATIONS

## A. *The Deepwater Horizon Oil Spill*

4. Defendants BP EXPLORATION & PRODUCTION, INC, BP PRODUCTS NORTH AMERICA, INC., BP AMERICA, INC., BP, P.L.C., TRANSOCEAN, LTD., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER, INC., TRANSOCEAN HOLDINGS, LLC, (collectively "Transocean Defendants), HALIBURTON ENERGY SERVICES, INC., CAMERON INTERNATIONAL CORPORATION, ANADARKO PETROLEUM CORPORATION, MITSUI OIL EXPLORATION COMPANY, LTD., and MOEX OFFSHORE 2007, LLC (collectively, the "Operator Defendants") were the lease holder and operator in the lease granted by the Minerals Management Services ("MMS") allowing oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" prospect site.

5. The Deepwater Horizon was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001. The oil rig was owned by Transocean, and BP leased the Deepwater Horizon to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, 52 miles southeast of the port of Venice, Louisiana.

6. On April 20, 2010, a well blowout caused an explosion and fire on the Deepwater Horizon that burned for two days before the vessel sank to the seafloor on April 22, 2010. The explosion and fire caused the death of 11 rig workers, injured many others onboard, and resulted in the release of tens of thousands of barrels of crude oil into the Gulf of Mexico from the Macondo site. The Deepwater Horizon Oil Spill is the worst oil spill in United States history with approximately 207 million gallons of oil being released from the April 20, 2010 explosion until the well was permanently sealed on or around September 19, 2010.

7. As the oil began to surface from seafloor and formed into large oil slicks covering thousands of square miles, Louisiana declared a state of emergency on April 29, 2010 as weather forecasts predicted the oil would reach the Louisiana coast. The following day the United States Coast Guard received reports that oil had begun washing up to wildlife refuges and seafood grounds on the Louisiana shoreline.

8. Since the oil spill began, unprecedented amounts of raw crude oil, natural gas, and other toxic pollutants have encroached on and contaminated the Gulf of Mexico and the

3

ecologically sensitive shorelines, beaches, shores, marshes, harbors, estuaries, bayous, and bays (hereinafter "Coastal Zones") of Louisiana damaging the environment and the real and personal property Plaintiff and the Class.

9. In order to combat the spreading oil, millions of gallons of chemical dispersants were sprayed over the Gulf of Mexico and the Coastal Zones. Upon information and belief, the chemical dispersants were manufactured by NALCO COMPANY, PENETON CORPORATION, and JMN SPECIALITIES, INC. (collectively, the "Dispersant Defendants"). Upon information and belief, the environmental effects of using the chemical dispersants in great magnitude and at depths was never tested, nor were all the dangers know.

### B. *The Immediate Aftermath*

10. Immediately following the April 20, 2010 oil spill, officials began monitoring the waters from which oysters and other seafood is harvested for encroachment by oil, natural gas, and the chemical dispersants which had been poured into the Gulf of Mexico and Louisiana waters.

11. By May 13, 2010, the State of Louisiana began a diversion strategy which consisted of diverting fresh water from the Mississippi River into nearby marshes and bays, i.e. the Coastal Zones, to stem the encroaching oil, natural gas, and chemical dispersants' attack on Louisiana's shoreline. That month, the State of Louisiana ordered that the Bonnet Carre Spillway be opened and allow the flow of fresh water into Lake Pontchartrain and Lake Borgne to combat oil, dispersants, and other pollutants that were being reported in Chandeleur Sound.

12. The State of Louisiana also ordered the diversion canal gates opened at the Davis Pond Diversion in St. Charles Parish; the Caernarvon Diversion and Violet Siphon in St. Bernard Parish; and the Bayou Lamoque Diversion, West Point a la Hache Diversion, Naomi Siphon and Whites Ditch Siphon in Plaquemines Parish.

13. The Caernarvon and Davis Pond diversions alone released more than 34,550 cubic feet of fresh water per second into the coastal bays and estuaries where hundreds of public oyster reefs and/or private oyster leases are located.

14. The State of Louisiana's strategy to combat the amount of oil, dispersants, and other pollutants that entered the Coastal Zones where oysters grow resulted in the influx of

4

freshwater which killed and/or damaged thousands of acres of private and public oyster beds because water salinity levels plummeted to levels that oysters cannot survive.

15. In essence, the oysters were under attack from both sides with the oil, dispersants, and other pollutants coming from one side, and fresh water coming from the other.

16. Recent tests in Barataria Bay and Breton Sound have found that roughly 40% - 70% of the oysters had died as a result of the either oil, dispersants, or other contaminates and/or the diversion of fresh water.

### C.   *The Long-Term Effects*

17. The damages caused to the oysters by the oil, natural gas, chemical dispersants, and fresh water has not ceased.

18. According to environmental experts, the use of these chemical dispersants have only exacerbated the environmental effects of the oil spill by simply spreading the oil through the water column and sinking it to the sea floor, where it can continue to cause environmental damage to the coastal wetlands, estuaries, and marine ecosystem for years to come.

19. Recent reports have indicated oil and chemical dispersants have continued to form into massive underwater plumes that will continue to threaten the Louisiana coastline, further damaging the Coastal Zones of Louisiana and destroying the habitats where fish, shellfish and crustaceans breed, spawn and mature.

20. With such reports, and with the divergent positions of the State of Louisiana and the Defendants as to the necessity of diversion, more fresh water diversion as a means of combating the continued plumes is a very real possibility that will again place the oyster beds in between the fresh water on one side, and the contaminants on the other.

21. The oil spill, use of chemical dispersants, and diversion of fresh water has caused and will continue to cause damages to individuals and entities that rely on the exclusive use of leased water bottoms and/or oyster beds for commercial or recreational benefit.

22. As these and many other damaging effects from the oil spill, the use of chemical dispersants and/or the diversion of fresh water that have not yet become known are discovered, Plaintiffs reserve the right to amend this Petition once additional information becomes available.

## CLASS ACTION ALLEGATIONS

23. Plaintiffs bring this action on behalf of themselves and all others similarly situated, in accordance with Louisiana Code of Civil Procedure Article 591, *et. seq.*

24. The proposed Class is defined as follows:

### A. Class Definition

All individuals and/or entities who are Louisiana residents and whose water bottom leases, including oyster bed leases, were contaminated by the oil released, the chemical dispersants released, and/or the diversion of fresh water released as a result of the Deepwater Horizon Oil Spill of April 20, 2010.

### B. Numerosity of the Class

25. The members of the Class are so numerous that joinder of all members is impractible. Plaintiffs do not know the exact number of class members, but they are informed, believe, and allege that at least hundreds and possibly thousands of individuals and/or entities have been legally injured by the oil spill and all actions of the Defendants in response thereto.

### C. Typicality and Commonality

26. The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, have suffered harm due to the acts and/or omissions by the Defendants.

27. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the class.

### D. Adequacy of Representation

28. The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class. The named Plaintiffs have retained counsel experienced in prosecuting environmental, mass tort, and complex class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### E. Predominance of Common Questions of Fact and Law

29. There is a well-defined community of interest in that questions of law and fact common to the Class predominate over questions affecting only individual Class Members, including but not limited to:

a. Whether Defendants' action caused and/or contributed to the contamination of the Gulf of Mexico and Coastal Zone of Louisiana that resulted in the high oyster mortality rate;

b. Whether Defendants' diversion of fresh water was a necessary or needed action;

c. Whether Defendants could or should have utilized any other methods to prevent the oil and dispersants from entering the Coastal Zone of Louisiana;

d. Whether the oil, chemical dispersants, or fresh water diversion caused irreversible damage to Plaintiffs and the Coastal Zone;

e. Whether the oil, chemical dispersants, or fresh water diversion will continue to cause damage to Plaintiffs and the Coastal Zone;

f. Whether Defendants acts and/or omissions amount to negligence; and

g. The amount of damages Plaintiffs and the Class Members should receive in compensation.

### F.  *Superiority*

30. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class Members is impracticable. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to this Court in which individual litigation of thousands of cases would proceed. Individual litigation presents a potential for inconsistent or contradictory judgments and the prospect of a race for the courthouse and an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the expense and delay to all parties and the court system in resolving the legal and factual issues common to all claims related to the Defendants' conduct alleged herein. By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

31. The various claims asserted in the action are also certifiable under the Articles of the Louisiana Code of Civil Procedure Article 591, *et. seq.*:

a. The prosecution of separate actions by thousands of individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, thus establishing incomparable standards of conduct for Defendants;

7

b. The prosecution of separate actions by individual Class Members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class Members who are not parties to such adjudications and would substantially impair or impeded their ability to protect their interests; and

c. The questions of law or fact common to the Members of the Class predominate over any questions affecting only individual Members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: NEGLIGENCE

32. Plaintiffs, on behalf of themselves and the Class Members, repeat, reiterate and reallege each and every allegation set forth above with the same force and effect as if copied herein.

33. The blowout explosion fire, and resulting oil spill were caused by the negligence of Defendants, who owed duties to Plaintiffs to exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons there from in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

34. The release of oil, spraying of chemical dispersants, and/or diversion of fresh water by Defendants in response to the blowout explosion fire and resulting oil spill was unnecessary, unneeded, negligent, and in violation of Louisiana law, including LA.C.C. Art. 2315 and LA-R.S. 56:423 *et seq.*, in the following regard:

a. Spraying and allowing the spraying of a chemical into the Gulf of Mexico and distributed into the Coastal Zones of Louisiana before its use at volume and depth had been tested;

b. Diverting fresh water into the Coastal Zones of Louisiana that caused thousands of acres of leased water bottoms and oyster beds to be devastated;

c. Introducing oil, chemical dispersants, and/or fresh water into the Coastal Zones and permanently altering the marine ecosystem therein;

d. Failing to exhaust all non-evasive and/or non-toxic safety measures to prevent oil, chemical dispersants, and/or fresh water from entering the Coastal Zone of Louisiana;

8

e. Failing to prevent physical and economic damages to all persons who lease water bottoms and oysters beds for commercial or recreational benefit;

f. Such other acts and omissions as will be shown at the trial of this matter.

35. The injuries to Plaintiffs and the Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations following the oil spill.

36. Defendants at all times material herein either owned the contents of the oil spill, owned the chemical dispersants used to contain the oil spill, and/or caused the oil spill, chemical dispersants, or diversion of fresh water which continues to date to inflict death and injury to the Plaintiffs leased property.

37. As a direct and proximate result of the Defendants' negligent actions described above, the oyster beds that are the leased property of Plaintiffs have been contaminated and such contamination has interfered with Plaintiffs' ability to use their leased property as intended, damaging Plaintiffs' livelihoods as well as the value of their leased oyster bed properties.

38. Plaintiffs and the Class Members are entitled to a judgment finding Defendants jointly, severally, and in solido liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' acts and omissions.

39. Plaintiff asserts only those causes of action specifically pled in this petition, and which have occurred within Coastal Zones of the State of Louisiana, which causes of action arise solely under the provisions of Louisiana law. Notwithstanding any language in this petition to the contrary, Plaintiff does not plead, and will never at any time in the future plead, any claim or cause of action arising under any Federal law, and asserts no such claims or cause of action herein. To the extent any state law claims expressed or implied in this petition are preempted by Federal law, such claims are not alleged herein.

## JURY DEMAND

40. Plaintiffs are entitled to and demand a trial by jury on all issues related herein.

9

## PRAYER FOR RELEIF

WHEREFORE, Plaintiffs and the Class Members demands judgment against Defendants, jointly, severally and in solido, as follows:

a. That the defendants be duly served and cited to appear and answer this class petition for damages, all as provided by law;

b. That this Court issue an order certifying the Class as set forth herein, appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as counsel for the Class;

c. Economic and compensatory damages in the amounts to be determined at trial;

d. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

e. Attorney's fees and costs of litigation;

f. Such other and further relief available under all applicable state law and any relief the Court deems just and appropriate.

Dated: April 20, 2014

Respectfully submitted,

Frank J. D'Amico, Jr.
The Law Offices of Frank J. D'Amico, Jr.
4731 Canal Street
New Orleans, LA 70119
Telephone: (504) 525-7272
Fax: (504) 525-9522
La Bar NO 17519
*Counsel for Plaintiffs and the Class*

**PLEASE HOLD SERVICE**

10