# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# F I L E D

January 9, 2013

Lyle W. Cayce
Clerk

No. 12-30136

D.C. Docket No. 2:10-MD-2179
D.C. Docket No. 2:10-CV-1768
D.C. Docket No. 2:10-CV-2454



CENTER FOR BIOLOGICAL DIVERSITY, INCORPORATED,

> Plaintiff - Appellant

v.

BP AMERICA PRODUCTION COMPANY; BP EXPLORATION &
PRODUCTION, INCORPORATED; BP, P.L.C.; TRANSOCEAN OFFSHORE
DEEPWATER DRILLING, INCORPORATED; TRANSOCEAN HOLDINGS,
L.L.C.; TRANSOCEAN DEEPWATER, INCORPORATED,

> Defendants - Appellees

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is
affirmed in part and reversed in part, and the cause is remanded to the
District Court for further proceedings in accordance with the opinion of this
Court.

_____ Fee _____
_____ Process _____
_X_ Dktd _____
_____ CtRmDep _____
_____ Doc. No. _____

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

ISSUED AS MANDATE:   FEB 0 4 2013

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: *Sabrina B Short*
Deputy
FEB 0 4 2013
New Orleans, Louisiana

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# FILED

January 9, 2013

No. 12-30136

Lyle W. Cayce
Clerk

CENTER FOR BIOLOGICAL DIVERSITY, INCORPORATED,

Plaintiff-Appellant

v.

BP AMERICA PRODUCTION CO; BP EXPLORATION & PRODUCTION, INCORPORATED; BP, P.L.C.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INCORPORATED; TRANSOCEAN HOLDINGS, L.L.C.; TRANSOCEAN DEEPWATER, INCORPORATED,

Defendants-Appellees

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

KING, Circuit Judge:

This appeal arises from the multi-district litigation spawned from the disaster on the *Deepwater Horizon* drilling rig and the resulting massive oil spill that occurred at the Macondo well site in the Gulf of Mexico. Plaintiff Center for Biological Diversity appeals from the district court's dismissal of its action brought under the citizen-suit provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9659(a), and the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C.

No. 12-30136

§ 11046(a). The district court dismissed the suit for lack of standing, mootness, and failure to state a claim for relief. We agree that most of the plaintiff's claims for relief have become moot because the Macondo well has been capped and sealed. We conclude that, at least on the current record, the EPCRA claim remains viable. We therefore AFFIRM IN PART and REVERSE IN PART the district court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Center for Biological Diversity ("the Center") is a non-profit environmental organization with over 40,000 members, including over 3,500 members living in the Gulf of Mexico region. Defendants BP, P.L.C. and its corporate subsidiaries BP America Production Co. and BP Exploration & Production, Inc. (collectively "BP") conduct exploration and drilling operations in the Gulf of Mexico. As part of those operations, BP leased the mobile offshore drilling unit known as *Deepwater Horizon* from Defendants Transocean, Ltd. and its subsidiary companies in order to drill the Macondo well, which is located on the sea floor at Mississippi Canyon Block 252.

On April 20, 2010, an explosion on *Deepwater Horizon* tragically killed eleven people and accompanied an oil spill that caused an environmental disaster of immense proportion. Millions of gallons of oil spewed from the well site over the course of several months as the defendants and government authorities sought to stop it.

In the face of an extensive oil spill, federal law directs the President to ensure the effective and immediate removal of the oil in accordance with a National Contingency Plan and to direct all federal, state and private actions in that regard. *See* 33 U.S.C. § 1321(c)(1)(A), (2)(A). Consistent with the National Contingency Plan, the President must also create a National Response System, which establishes multiple levels of federal contingency plans for addressing a discharge of oil and hazardous substances. 33 U.S.C. § 1321(j); *see also* 40 C.F.R.

2

No. 12-30136

§ 300.210. Pursuant to these plans, a Federal On-Scene Coordinator ("FOSC") will direct and coordinate all efforts at the scene of the discharge. 40 C.F.R. § 300.120(a). When a discharge occurs in a coastal zone of the United States, the Coast Guard provides the FOSC, and if the spill is especially complex the Coast Guard can name a National Incident Commander to assume the role of the FOSC. *See* 40 C.F.R. §§ 300.120(a)(1), 300.5, 300.323.

In the case of the *Deepwater Horizon* disaster, the federal government's response to the spill involved monumental efforts. Almost 50,000 people, including over 17,000 National Guard members, and over 4,000 vessels were deployed in the Gulf of Mexico and the coastal region. Federal oversight of the matter spanned multiple governmental agencies, with the President dispatching to the Gulf region the Secretaries of the Interior and Homeland Security, the Administrator of the EPA, the President's Assistant for Energy and Climate Change Policy, and the Administrator of NOAA. BP participated in the response activities at the direction of the federal authorities to stop the oil spill. On July 15, 2010, a permanent cap was put in place at the well site to halt the flow of oil. On September 19, 2010, the National Incident Commander announced that a relief well had been completed, which effectively "killed" the Macondo well.

Meanwhile, as the response efforts were ongoing, the Center filed suit against BP and Transocean on June 18, 2010, alleging that the defendants violated CWA because of the discharged oil and toxic pollutants from the ruptured well. In August 2010, the Center filed a second action against BP and Transocean asserting additional claims under CWA, CERCLA, and EPCRA. The Center asserted the following counts of statutory violations: discharge of pollutants, in violation of CWA, 33 U.S.C. § 1311 (Count 1); discharge of oil and hazardous substances, in violation of CWA, 33 U.S.C. § 1321 (Count 2); discharge of toxic pollutants, in violation of CWA, 33 U.S.C. § 1317 (Count 3); discharge of pollutants, in violation of national standards of performance for

3

No. 12-30136

offshore drilling operations under CWA, 33 U.S.C. § 1316 (Count 4); gross negligence or willful misconduct pursuant to CWA, 33 U.S.C. § 1321(b)(7)(D) (Count 5); failure to report to the National Response Center the release of hazardous substances, in violation of CERCLA, 42 U.S.C. § 9603(a) (Count 6); and failure to report the release of hazardous substances to the emergency coordinator for the local emergency planning committee, in violation of EPCRA, 42 U.S.C. § 11004 (Count 7).

In its prayer for relief, the Center sought the following: (1) a declaratory judgment that the defendants had violated, continued to violate, or were reasonably likely to continue to violate CWA, CERCLA, and EPCRA; (2) an injunction enjoining the defendants from operating their offshore facility in a manner that would result in further violation of CWA, CERCLA, and EPCRA, specifically from discharging any further pollutants or from releasing any hazardous substance without full and complete reporting under CERCLA and EPCRA, and requiring full and complete reporting for hazardous substances already released; (3) an order that the defendants divulge the complete list and amounts of toxic pollutants contained in the oil and other releases from the *Deepwater Horizon* rig and well; (4) civil penalties pursuant to CWA, CERCLA, and EPCRA; (5) an order authorizing the Center to sample any discharge of pollutants from the well for a period of ten years; (6) an order requiring the defendants to provide the Center with copies of all reports and other documents that defendants submit to regulatory authorities for a period of five years; and (7) an injunction requiring the defendants to pay the cost of any environmental restoration or remediation deemed necessary by the district court.

The Multidistrict Litigation ("MDL") Panel transferred the Center's complaints to MDL-2179 in the Eastern District of Louisiana (Judge Barbier). The MDL case before Judge Barbier consists of hundreds of cases, with over 100,000 individual claimants, all in connection with the *Deepwater Horizon*

4

No. 12-30136

disaster. In order to manage this complex litigation, the district court issued Pretrial Order No. 11 establishing several "pleading bundles" into each of which claims of similar nature would be placed for the purpose of filing a master complaint, answers, and any Rule 12 motions. The Center's complaints were placed into Pleading Bundle D1, which was for claims by private parties for injunctive relief and provided as follows:

> **D. Injunctive and Regulatory Claims.** These claims brought by private parties challenging regulatory action or authority and/or seeking injunctive relief will each be pled pursuant to Master Complaints as delineated below, and will include the following types of claims.

> **D1. Claims Against Private Parties.** These claims will be pled separately and uniformly in a Master Complaint.

For purposes of answering or otherwise responding to the complaints in Pleading Bundle D1, the allegations and prayers for relief contained in the Master Complaint were deemed to amend and supersede allegations and claims contained in the pre-existing individual complaints. The Center's individual complaints were not eliminated, however, but rather were stayed until further order of the court.

Consistent with the pretrial order, the D1 plaintiffs, including the Center, filed a Master Complaint that was in most respects similar to the Center's individual complaints. The D1 Master Complaint alleged the same violations of CWA, CERCLA, and EPCRA that had been alleged in the Center's complaints, as well as additional claims under the Endangered Species Act ("ESA"), state law, and general maritime law.[1] The Master Complaint also sought essentially the same declaratory and injunctive relief that was sought in the Center's

---

[1] The district court's resolution of the claims under ESA, state law, and general maritime law are not part of the instant appeal.

No. 12-30136

individual complaints. Unlike the Center's individual complaints, however, the D1 Master Complaint contained no prayer for civil penalties.

The district court's Pretrial Order No. 11 provided that civil penalties requested in separate suits by governmental entities were to be placed in Pleading Bundle C. The order also provided that civil penalties would not be included in any other pleading bundles or master complaints. In Pretrial Order No. 25, the district court later clarified that "[a]ny case currently pending in the MDL that does not fall within pleading bundles A or C is deemed to fall within one or more of the following: Pleading Bundle B1, Pleading Bundle B3, and/or pleading Bundle D1, as may be applicable." The Center's civil penalty claims did not fall within Pleading Bundles A or C, and the Center unsuccessfully moved on three occasions in the district court to have all of its claims moved into Pleading Bundle C.

BP and Transocean separately moved to dismiss the D1 Master Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court conducted a hearing, during which it also considered motions to dismiss other pleading bundles. The district court granted the motions to dismiss the D1 Master Complaint, finding that (1) the D1 plaintiffs lacked standing because their alleged injuries were not redressable by a favorable decision, (2) the D1 claims were moot, and (3) the D1 claims were not actionable because the defendants were not "in violation" of the alleged statutes.

The court took judicial notice that the Macondo well had been capped on July 15, 2010, thereby stopping the uncontrolled flow of oil, and that the well had been permanently killed on September 19, 2010, when a relief well was used to pump cement into the Macondo well. The court reasoned, therefore, that the D1 plaintiffs' claims were not redressable for two reasons. First, an injunction would be useless because there was no longer an ongoing release from the well, and there was no viable offshore facility from which any release could possibly

6

No. 12-30136

occur. Second, because cleanup activities were ongoing under the direction of the National Incident Commander, the FOSC, and the Unified Area Command, any order from the court would implicate parties not before the court, and the plaintiffs could not show that an order would resolve any potential deficiency in the cleanup effort. The court further held that the plaintiffs lacked standing to bring their failure-to-report claim under EPCRA "[i]n light of the fact that there is no on-going release of oil and that data regarding the spill and its cleanup are easily accessible."

Similarly, the court held that the claims for injunctive relief were moot. The court reasoned that because the Macondo well was dead and no longer discharging oil, an injunction could not provide meaningful relief in terms of stopping discharges that had already ceased. The court further noted that because Pretrial Order No. 11 had limited the D1 Master Complaint to injunctive relief, the D1 plaintiffs were not seeking the kind of civil penalties that otherwise might prevent mootness.

Finally, the court held that CWA, CERCLA, and EPCRA require plaintiffs to show a reasonable likelihood of an ongoing violation in order to have an actionable claim. But because there was no longer a viable facility from which a release could occur, there was no reasonable possibility for a future release and no ongoing violation. The district court dismissed the D1 Master Complaint in its entirety.

Following the district court's written order, the Center filed an unopposed motion for clarification pursuant to Federal Rule of Civil Procedure 59(e), asking that the district court make explicit that the order dismissing the D1 Master Complaint was a final judgment that also dismissed the Center's underlying individual complaints. Any confusion about the finality of the judgment with respect to the Center presumably existed because the district court's order had adjudicated only claims for injunctive relief and did not mention the Center's

7

No. 12-30136

individual claims for civil penalties.  Indeed, the Center's motion advised that the Plaintiffs' Steering Committee ("PSC") believed the court's order was not a final judgment under Federal Rule of Civil Procedure 54(b) but that the PSC did not oppose such a designation by the district court.

Thereafter, the Center filed a Notice of Non-Opposition, indicating that no party had opposed the motion for clarification.  The Center again asked the district court to enter a final judgment.  Approximately two months after filing the Notice of Non-Opposition, the Center filed a renewed motion for clarification, which had been temporarily withdrawn, yet again asking that an explicit final judgment be entered within 30 days.  When the district court did not enter such an order, the Center's counsel wrote a letter to the district court further raising the issue of a final judgment.  Counsel asked that the court enter a final judgment in order to "allow the Center to exercise its right of appeal in this matter."  Counsel stated that "[w]ithout an entry of final judgment, the Center is in the untenable position of not being able to participate in the ongoing MDL while also not being clear that it is able to appeal the Court's ruling."  None of the Center's pleadings or correspondence suggested or requested that any of the Center's claims would remain live following entry of the final judgment.

The district court then entered a final judgment "for the reasons stated in the Court's Order Dismissing the Bundle D1 Master Complaint . . . as that Order relates to [the Center's individual complaints]."  The Center now appeals.

## II. STANDARD OF REVIEW

A district court's dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) or for failure to state a claim pursuant to Rule 12(b)(6) is reviewed de novo.  *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).  Legal questions relating to standing and mootness are also reviewed de novo.  *Envtl.*

No. 12-30136

*Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006).

## III. STATUTORY PROVISIONS

The CWA was intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As a general matter, its provisions prohibit the unauthorized discharge of pollutants, including oil and other hazardous substances, into the waters of the United States, and set standards for evaluating discharges from various sources. *See* 33 U.S.C. §§ 1311, 1316, 1317, 1321. The CWA authorizes citizen suits to obtain injunctions and civil penalties, "payable to the United States Treasury, against any person found to be in violation of 'an effluent standard or limitation' under the Act." *Envtl. Conservation Org.*, 529 F.3d at 526 (quoting 33 U.S.C. § 1365(a)). The district court has jurisdiction to enforce such effluent standard or limitation regardless of the amount in controversy. § 1365(a).

CERCLA and EPCRA require, *inter alia*, that discharges of certain pollutants and hazardous substances be reported to the National Response Center, *see* 42 U.S.C. § 9603(a) (CERCLA), or to state and local emergency planning personnel. *See* 42 U.S.C. § 11004(b)(1) (EPCRA). Both statutes authorize citizen suits to enforce their requirements and also permit both injunctive relief and civil penalties. *See* 42 U.S.C. §§ 9659(a), (c) (CERCLA), 11046(a), (c) (EPCRA). Pursuant to CERCLA, the district court may "order such action as may be necessary to correct the violation." § 9659(c).

## IV. DISCUSSION

The Center challenges the district court's dismissal of its claims, contending that the court failed to accept the well-pleaded facts of its complaint as true. It contends that the court improperly found that injunctive relief would be moot because the Center alleged that the defendants were reasonably likely to continue to discharge pollutants from the well site. According to the Center,

9

No. 12-30136

because jurisdiction is determined at the time of filing the complaint, and the complaint alleged that there were continuing discharges of pollutants, it set forth plausible claims for relief. The Center further argues that the district court erroneously focused on the claim for injunctive relief enjoining the defendants from operating the offshore facility in violation of CWA, CERCLA, and EPCRA, while ignoring the Center's other claims. It contends that because all of its claims for relief are redressable by the district court, it has standing and the suit should be reinstated.

Upon review of the briefs, the applicable law, and the record in this case, we conclude that the district court correctly dismissed most of the Center's claims as moot. But before considering mootness with respect to the Center's individual claims and prayers for relief, we first consider the district court's taking of judicial notice that the Macondo well was capped in July 2010 and killed in September 2010, which was of central importance to the court's decision.

### A. Judicial notice

Pursuant to Federal Rule of Evidence 201, a court is "entitled to take judicial notice of adjudicative facts from reliable sources 'whose accuracy cannot reasonably be questioned.'" *Sosebee v. Steadfast Ins. Co.*, No. 11-31134, 2012 WL 5914081, at *14 n.1 (5th Cir. Nov. 27, 2012) (quoting FED. R. EVID. 201(b)). A district court's application of judicial notice under Rule 201 is reviewed for an abuse of discretion. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

Here, the district court noted at the hearing on the defendants' motions to dismiss the D1 Master Complaint that the Macondo well was dead. The court did not, either at the oral hearing or in its written decision, indicate the source or sources upon which the court relied for this information. Nevertheless, the record bears out the district court's statement.

10

For example, on September 19, 2010, National Incident Commander Admiral Thad Allen issued a formal announcement that, due to BP's completion of the relief well and cementing, the Macondo well was "effectively dead" and "poses no continuing threat to the Gulf of Mexico." Admiral Allen indicated that the relief well was completed by BP under the direction and authority of the federal government's science and engineering teams, and that the well's killing had been confirmed by the Department of the Interior's Bureau of Ocean Energy Management.  Furthermore, on September 28, 2010, the Federal On-Scene Coordinator, Rear Admiral Paul Zukunft, also stated that the well had been killed on September 19, 2010, and that there had been no new oil introduced since July 15.

The Center argues that the district court was bound to accept the well-pleaded facts of the complaint concerning alleged future discharges from the well, essentially contending that the court improperly took judicial notice of the well's closing.  The district court was not bound by the pleadings in order to decide the Rule 12(b)(1) motion, however; rather, it was empowered to make factual findings that were determinative of jurisdiction. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

The Center further complains that it requested prior notice of any facts to be judicially noticed but received no advance warning.  Ordinarily, a party should be given notice that the court intends to judicially notice facts and, when appropriate, should be given an opportunity for discovery germane to a jurisdictional dispute implicated by the noticed facts. *See id.* at 414; *see also* FED. R. EVID. 201(e).  We are not persuaded, however, that the district court's procedure was erroneous under the circumstances of this case.

The court's taking of judicial notice before notifying a party is not alone improper, as the rule specifically contemplates such a possibility but allows the party an opportunity to be heard if the party so requests. *See* FED. R. EVID.

11

201(e) ("If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard."). Here, the Center had notice from the defendants' motions to dismiss that the court was being asked to take judicial notice. BP specifically argued that the capping and killing of the well were judicially noticeable facts and that the Center's claims were moot because the well was dead. The Center therefore had an opportunity to be heard and actually did—albeit minimally—respond to BP in its opposition. *Cf. In re Eckstein Marine Serv., L.L.C.*, 672 F.3d 310, 316 (5th Cir. 2012) (holding that defendant's pleadings gave adequate notice to plaintiff that defendant was challenging the district court's jurisdiction under Rule 12(b)(1)); *see also Amadasu v. The Christ Hosp.*, 514 F.3d 504, 508 (6th Cir. 2008) (noting that Rule 201(e) "does not require 'under all circumstances, a formal hearing'" and finding no error because the plaintiff had an opportunity to be heard on judicial notice by filing objections to the magistrate judge's report and recommendations (quoting *Am. Stores Co. v. Comm'r of Internal Revenue*, 170 F.3d 1267, 1271 (10th Cir. 1999))). At the hearing on the motions to dismiss, the district court then asked the Center what evidence it had that the well was not indeed dead. The Center did not indicate that it had at that time any evidence to refute that fact, nor did it state that discovery was necessary.[2]

More importantly, even after the district court took judicial notice in its written decision, the Center could have moved for reconsideration or a further hearing but it did not do so. *See MacMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580, 587 (5th Cir. 1985) (holding that party "did not properly challenge the

---

[2] The Center's written opposition requested an opportunity to conduct discovery only if the court took judicial notice of any facts, but when the district court asked about evidence at the hearing, the Center apparently changed tracks and argued only that the court could still order injunctive relief in the form of appropriate cleanup measures. The Center indicated that at some unspecified future time hearings could be held and "experts" could educate the court, but it did not indicate a need for, nor did it request, immediate discovery on the well's status or continued discharge of pollutants from the site.

No. 12-30136

district court's procedure, for there is nothing in the record to indicate that it filed a motion after the district court took notice seeking an opportunity to be heard concerning the propriety of taking judicial notice"); *see also* 21B CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5109 (2d ed. 2005) ("[T]he party must request a retrospective hearing in order to preserve the error for appeal."). The Center fails to show even on appeal that a different result could have been obtained through discovery. The Center points to allegations and evidence that there may have been some minimal additional discharges from the well site after the well was capped on July 15, 2010, but it fails to show or even argue that there were discharges after the well was killed in September 2010. Instead, the Center concedes in its brief that the completion of the relief well in September 2010 was the only way to effectively kill the well. We therefore see no reason to believe that the Center would have been able to make different or more persuasive arguments in opposition to the judicial notice had it been given additional notice or an opportunity for discovery.

Moreover, our conclusion is informed by the atypical circumstances of this case. As part of the MDL, the district court was receiving regular status updates about the situation in the Gulf and was kept apprised of the well's condition and the ongoing efforts to shut it down. It is clear that the Government, which was in charge of the situation, acted to force BP to stop the discharge, kill the well, and abandon the site. Under all of the above circumstances, we conclude that there was no error in the district court's taking of judicial notice of the well's status. Therefore, we must next consider whether the district court, after taking judicial notice, correctly concluded that the Center's individual claims are moot.

**B. Mootness**

Federal court jurisdiction under Article III of the Constitution is limited to "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). In order to have standing to assert

federal jurisdiction, a plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks and citation omitted). A plaintiff that has sufficiently alleged an injury or a threatened injury to invoke federal jurisdiction may nevertheless lose the ability to maintain the suit. *See Envtl. Conservation Org.*, 529 F.3d at 526 ("[D]evelopments subsequent to the filing of a citizen suit may moot the citizen's case."). "[A]ny set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Ctr. for Individual Freedom*, 449 F.3d at 661.

"[M]ootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted); *see also Spencer*, 523 U.S. at 7 ("This case-or-controversy requirement subsists through all stages of federal judicial proceedings.") (internal quotation marks and citation omitted). "If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents." *Envtl. Conservation Org.*, 529 F.3d at 525. Mootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff. *See Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998); *see also Pac. Ins. Co. v. Gen. Dev. Corp.*, 28 F.3d 1093, 1096 (11th Cir. 1994).

As noted above, the district court held that the Center's case became moot after BP successfully killed the Macondo well because that event meant that any injunctive order to cease the discharge would be useless. The Center argues that the court's reasoning was flawed because under the stringent test for mootness there must be absolutely no possibility for recurrence of the alleged violations.

No. 12-30136

It points out that it alleged that the defendants were reasonably likely to continue to violate the environmental statutes. In cases dealing with alleged polluters it is often appropriate to place a "heavy" burden on defendants to prove that "it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987) (internal quotation marks and citations omitted). This standard "protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform" after a lawsuit is filed but who then continue their unlawful conduct upon dismissal of the suit. *Id.* at 67 (internal quotation marks and citation omitted).

We have explained, however, that this standard applies when a defendant's *voluntary* conduct is claimed to have mooted the plaintiff's suit. *Envtl. Conservation Org.*, 529 F.3d at 527. For example, we explained that this standard would be necessary if an alleged polluter asserted that CWA claims became moot when it "*voluntarily* hired the requisite number of compliance and monitoring staff or *voluntarily* set aside funds for supplemental environmental projects" because otherwise "there would no impediment to the [polluter's] laying off the new hires or reallocating the funds" after the suit is dismissed. *Id.* In other words, when a defendant has taken voluntary measures to stop a statutory violation because it is facing litigation but could otherwise revert to the offending conduct once litigation has ended, the defendant must bear the heavy burden of showing the impossibility of that result in order to prove mootness.

In this case, however, the defendants did not act voluntarily in a feigned effort to comply with the environmental statutes and stave off litigation. The killing of the Macondo well occurred at the insistence of the federal government acting pursuant to the extraordinary powers granted to the President to oversee and direct the emergency response to the oil spill. By all accounts in the record before us, the well site is now effectively dead. This is not the typical case where

15

No. 12-30136

defendants may claim repentance and reform through voluntary action only to revert to their old ways upon dismissal of the suit. We therefore must analyze mootness by asking whether the citizen-suit plaintiff has proven "that there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding" government-mandated corrective action. *Id.* at 528. If not, the case is moot. As we have previously explained, this "realistic prospect" standard is consistent with "Congress's intent that citizen suits 'supplement rather than . . . supplant government action.'" *Id.* (citation omitted). We therefore turn now to the Center's individual claims for relief.

           1. *Injunctive relief to stop violating CWA, CERCLA, and EPCRA*

The Center first requested declaratory and injunctive relief declaring that the defendants violated CWA, CERCLA, and EPCRA, and enjoining them from operating the offshore facility in a manner that would result in further violations. As the district court found, however, the record shows that the Macondo well has been effectively killed and cemented shut, and there is no offshore facility at the site being operated by the defendants. Therefore, because there is no realistic prospect that further discharges will occur, there can be no meaningful relief granted by an injunctive order enjoining the defendants from operating the site in violation of CWA, CERCLA, and EPCRA. The district court correctly held that this claim is moot. *See Harris*, 151 F.3d at 189 ("[A] request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined."); *see also Gwaltney*, 484 U.S. at 66 (the mootness doctrine "prevent[s] the maintenance of suit when there is no reasonable expectation that the wrong will be repeated") (citations and quotation marks omitted); *cf. S.F. BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir. 2002) (suggesting

16

No. 12-30136

that complete dismantling of a polluting facility could result in mootness of civil penalty claims).[3]

The Center argues that its claims for civil penalties keep the case alive and preclude a finding of mootness. The Center's individual complaints requested civil penalties of up to $4,300 per barrel or $37,500 per day of violation pursuant to CWA, and up to $37,500 per day of violation for each hazardous substance not reported under CERCLA and EPCRA. It is true that the potential deterrent effect of civil penalties may in some cases prevent mootness even where injunctive relief has become moot. *See Friends of the Earth*, 528 U.S. at 185–86; *Envtl. Conservation Org.*, 529 F.3d at 530; *see also Powell v. McCormack*, 395 U.S. 486, 496 n.8 (1969) ("Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests."). The Center's civil penalty claims do not save its complaint, however, because the Center abandoned those claims when it sought a final judgment from the district court for purposes of appeal.

---

[3] The Center suggests that the case is not moot because BP retains its National Pollutant Discharge Elimination System ("NPDES") permit and could return to the well site. In support, the Center cites *San Francisco BayKeeper* and *Puerto Rico Campers' Association v. Puerto Rico Aqueduct and Sewer Authority*, 219 F. Supp. 2d 201 (D.P.R. 2002). In both of those cases, however, the alleged polluting facility was still in operation; therefore, the possibility for future violations to recur was entirely reasonable even though the unlawful discharges had ceased from the specific source. *See S.F. BayKeeper*, 309 F.3d at 1160 (holding that even though defendant had sold the facility and was no longer operating it, claims were not moot because facility was still operating and civil penalties imposed on defendant could also have deterrent effect on new or future owners); *Puerto Rico Campers' Ass'n*, 219 F. Supp. 2d at 220 (holding that claim was not moot even though source of effluent had been sealed because defendant was still operating the facility, retained its NPDES permit, and was actually diverting effluent from that facility to another facility). In this case, it is undisputed that there is no facility operating at the Macondo well site and that the relief well, which was completed under the supervision and approval of the federal government, was the only way to kill the well. *See also Friends of the Earth*, 528 U.S. at 193 (recognizing that defendant's closure of its facility could moot the case but noting that disputed issues of fact remained). We are not persuaded that the speculative possibility that BP could some day return to this site, after the tremendous time, energy, and manpower expended to close it, saves the Center's current claims from a finding of mootness.

17

No. 12-30136

As noted above, the district court's Pretrial Order No. 11 placed the Center's complaints into Pleading Bundle D1. The district court's order dismissing the D1 Master Complaint did not address civil penalties, however. The district court's opinion noted that the D1 pleading bundle was limited to injunctive claims. In an action involving multiple claims, a judgment that fails to resolve all of a party's claims is not a final appealable order. *See* FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties."); *Thompson v. Betts*, 754 F.2d 1243, 1245 & n.1 (5th Cir. 1985). When the Center sought a final judgment for purposes of appeal, it even stated the position of the Plaintiffs' Steering Committee that a final order had not been entered. Yet, the Center took no action to ensure that its civil penalty claims remained live. For example, it could have asked for a certification of final judgment for purposes of an interlocutory appeal. *See* 28 U.S.C. § 1292(b); FED. R. CIV. P. 54(b). Instead, it sought an immediate final judgment ordering that its individual complaints be dismissed in their entirety along with the D1 Master Complaint.

The Center acted at its own peril and may not now complain when the district court did what it asked the court to do. *See United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 606 (5th Cir. 1991) ("A party generally may not invite error and then complain thereof."). Indeed, the Center apparently acted strategically in order to pursue its appeal to this court. As the Seventh Circuit has explained, however, "if plaintiff loses on A and abandons B in order to make the judgment final and thus obtain immediate review, the court will consider A, but B is lost forever." *Fairley v. Andrews*, 578 F.3d 518, 522 (7th Cir. 2009). We conclude, therefore, that the Center abandoned its civil penalty claims in order to obtain a final appealable judgment, and those claims may not now prevent a finding that the adjudicated claims in the complaint are moot.

18

No. 12-30136

### 2. *Authorization to sample discharge*

The Center next requested as relief an order authorizing it to sample or arrange for sampling of any discharge of pollutants from the well for a period of ten years after the defendants come into compliance with CWA, CERCLA, and EPCRA. Because the well site is now dead there is no reasonable prospect for continued discharges, and thus nothing to sample. This claim for relief is therefore moot for the same reasons that the request for injunctive relief discussed above is moot.

### 3. *Copies of reports*

Next, the Center sought an order requiring the defendants to provide, for a period of five years, copies of all reports that the defendants submit to regulatory authorities. This requested relief "cannot conceivably remedy any past wrong but is aimed at deterring" future statutory violations. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998). In *Steel Company*, the Supreme Court considered a similar request for relief under EPCRA and found it insufficient to confer Article III standing. *See id.* The Court reasoned that in order for such requested relief to provide the basis for Article III standing, there must be the prospect for continuing violations. *See id.* ("If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm."). Here, the Center did allege in its individual complaints that the defendants were likely to continue violating EPCRA by failing to report future discharges from the well site. But as already noted, the district court correctly noticed that the well has been killed and there is no competent record evidence of continued discharges from the site. Therefore, on the facts of this case, the issue of standing is not implicated, but because there is no longer a basis for the Center to seek copies of the defendants' future reports, the requested relief has become moot.

19

No. 12-30136

4. *Reporting under CERCLA and EPCRA for substances already released*

The Center further sought injunctive relief ordering the defendants to provide a complete reporting in accordance with CERCLA and EPCRA "for all hazardous substances already released." The Center alleged first that the defendants' failure to report the substances released violated Section 103 of CERCLA, 42 U.S.C. § 9603(a). That provision states, in relevant part, that the owner of an offshore facility "shall, as soon as he has knowledge of any release . . . of a hazardous substance from such . . . facility in quantities equal to or greater than those determined pursuant to section 9602 of this title, immediately notify the National Response Center . . . of such release." *See also* 40 C.F.R. § 302.6. The purpose of CERCLA's reporting requirement is to ensure "the Government's ability to move quickly to check the spread of a hazardous release." *United States v. Laughlin*, 10 F.3d 961, 966 (2d Cir. 1993) (internal quotation marks and citation omitted). It is undisputed that BP notified the National Response Center of the explosion on *Deepwater Horizon* and the oil spill soon after they occurred, which resulted in an immediate governmental response. The Center's allegations and request for relief with respect to § 9603(a) are therefore moot.[4] *See Harris*, 151 F.3d at 189.

The Center's complaint further alleged that the defendants did not report the types and quantities of pollutants released in the spill, which the Center contends was required by EPCRA, 42 U.S.C. § 11004. The district court held that the Center lacked standing to bring its EPCRA claim because it was

---

[4] The defendants make an alternative argument that the Center's CERCLA claim fails on the merits because of the so-called "petroleum exclusion," which excludes "petroleum, including crude oil or any fraction thereof" from the definition of hazardous substances to be reported under CERCLA. *See* 42 U.S.C. §§ 9601(14), 9603(a); *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 805 (9th Cir. 1989). We do not decide the question in light of our conclusion about mootness, and the fact that the district court made no findings with respect to the petroleum exclusion.

"unclear how the data collected under EPCRA can remedy the injury alleged by Plaintiffs." We conclude that the district court's conclusion was incorrect.

Pursuant to EPCRA, the owner or operator of a facility is required to provide notice of a release of certain extremely hazardous substances or substances covered under CERCLA to the "emergency coordinator for the local emergency planning committees . . . for any area likely to be affected by the release and to the State emergency planning commission of any State likely to be affected by the release. " 42 U.S.C. § 11004(a), (b)(1).  The purpose of the EPCRA framework is "to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of [a] health-threatening release." *Steel Co.*, 523 U.S. at 86; *see also* 42 U.S.C. § 11023(h). Like CERCLA, EPCRA thus ensures that appropriate government authorities are informed about the release of hazardous substances, but EPCRA also ensures that the public is given access to important health-related information.

The defendants argue that EPCRA requires no particular form of notice that a release has occurred, and they assert that the information the Center seeks about the oil spill is readily available on various government web sites. They contend, therefore, that the Center's claim is moot because it has been overtaken by the presence of information, including health and safety information, available on the Internet.  The defendants' argument essentially challenges the redressability of the Center's claimed injury, but we are not persuaded.

Under EPCRA, the initial notice to state and local emergency planners may be oral and given by "telephone, radio, or in person."   42 U.S.C. § 11004(b)(1).  But the owner or operator must also provide *written* emergency followup notice "[a]s soon as practicable after a release."  § 11004(c); *see* 40 C.F.R. § 355.41.  Both the initial notice and the written followup emergency notice are required to include, *inter alia*, the name and estimated quantity of any

substance involved in the release, the medium or media into which the release occurred, any known or anticipated acute or chronic health risks associated with the release, and precautions to take as a result of the release. § 11004(b), (c); *see also* 40 C.F.R. §§ 355.11, 355.40. The written notices must be maintained by the state emergency response commission and must be made available to members of the general public. *See* §§ 11001(a), 11044(a). The statute specifically authorizes "any person" to commence an action against an owner or operator for failing to submit the written emergency followup notice. § 11046(a)(1)(A)(i).

The Center provided affidavits from its members averring that they had been exposed to substances emanating from the disaster either through direct physical contact in the Gulf and on the shore or through contact with fish and other wildlife. Those members averred that they were concerned about breathing air or ingesting water exposed to the substances and wanted to know what types of substances were involved in the *Deepwater Horizon* release so that they could assess the possible health effects of the exposure. At least one member specifically averred that he had not seen any reports from BP documenting the substances that were released in the spill despite his search for such reports. This is the kind of concrete informational injury that the statute was designed to redress. *See FEC v. Akins*, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."); *see also Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693, 703–06 (W.D. Ky. 2003) (holding that denial of right to be informed of releases from defendant's facility afforded plaintiff standing to assert EPCRA claim for failure to report release of chemicals).

BP suggests in its brief that the Center's informational injury claim is moot because there is no continuing discharge from the well, and it cites the Supreme Court's decision in *Steel Company*. In that case, the Court did hold

No. 12-30136

that the plaintiff could not maintain its EPCRA suit based solely on past violations of the statute. *See Steel Co.*, 523 U.S. at 109. But in that case, the defendant had complied with EPCRA's reporting requirements before the plaintiff filed suit, and the issue was whether the plaintiff could sue for a violation based on the untimely reporting. *See id.* at 88. The Court held that the plaintiff lacked standing because the requested relief would not redress its claimed injury by remedying past wrongs. *See id.* at 105–09. Here, however, BP has never claimed that it has at any time complied with EPCRA's reporting requirement for a written notice. The Center's suit specifically sought relief based on a release of substances that had already occurred but remained unreported under EPCRA, namely the spill from the ruptured well. The defendants' failure to submit the required written emergency notice is thus a continuing violation of EPCRA's provisions. An order from the district court that the defendants comply with EPCRA's reporting requirement for that release could therefore redress the Center's claimed informational injury.

The defendants' insistence that the claim is moot because information about the spill is already publicly available is unavailing, at least on the current record. First, the claim that information about the disaster may be found by hunting on the Internet ignores the fact that EPCRA places an affirmative statutory duty on the owner or operator of the facility to report the information. Second, it ignores the EPCRA requirement that reports provided by owners or operators be maintained by state emergency planning authorities and be made available to the public at a designated location. *See* 42 U.S.C. §§ 11001(a), 11044(a). The obvious advantage of this requirement is to have vital health information available in one easily accessible place. Finally, although the defendants claim that the information is otherwise readily available, their citation to several government web sites is unconvincing. Our review of those web sites reveals a voluminous amount of information about the spill and the

Government's response, but the specific information required by EPCRA is not immediately apparent.[5]  To be sure, the district court held that "data regarding the spill and its cleanup are easily accessible," but it cited no sources of information and made no findings as to where the information specifically required by EPCRA may be found.  If the information required by EPCRA's reporting provisions may indeed be easily located from alternate sources, it may be that a further order from the district court would provide no meaningful relief to the Center and its members.  Such a conclusion, although not affecting the Center's standing, might render the claim moot.  *See Harris*, 151 F.3d at 189.  But we are simply unable to decide that question on this record, and the case therefore must be remanded to the district court for further proceedings.

### 5. *Remediation*

Finally, the Center also sought injunctive relief ordering the defendants to remove the pollutants from the water and affected coastal areas, and to pay the costs of any environmental restoration or remediation that the court deemed necessary and proper.  The district court held that because cleanup efforts by the defendants and by agencies from the federal government's Unified Area Command were already underway in the Gulf of Mexico there was no further relief that it could order.  The court further reasoned that it could not second-guess the Government's remediation decisions.  We agree with the district court.

The question when assessing whether a case is moot is whether *any* effective relief can be granted.  *See Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446 (5th Cir. 1991).  The Center argues here that the district court erroneously dismissed its claim for an injunction addressing remediation because a full remedial plan for the Gulf was not yet in

---

[5] Some of the web pages cited in the defendants' briefs lead to links to documents comprising thousands of pages of information.  We do not think that the intent of EPCRA is met by requiring the public to search for a needle in a cyberspace haystack.

place. It asserts that the district court should not have dismissed the complaint
on the basis of the Government's cleanup efforts before the Center could develop
its own proposed remediation plan. But the Center offers nothing more than
speculative and conclusory assertions about remediation efforts and the
existence of "vast amounts of oil" still in the Gulf rather than a coherent
assertion of what effective relief could be ordered by the district court. The
Center does not dispute that cleanup efforts are and have been ongoing in the
Gulf, and it identifies no deficiency in those efforts. Instead, the Center would
have the district court oversee remediation without identifying why or how it
should do so.[6]  As noted above, the Executive Branch is charged with the
responsibility to oversee the cleanup. *See* 33 U.S.C. § 1321(c)(1)(A), (2)(A).
Because those efforts have been ongoing, and absent a clear reason from the
Center to find them deficient, we see no error in the district court's conclusion
that it could grant no further relief to the plaintiff beyond what is already being
done. *See, e.g., 87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251
F. Supp. 2d 1215, 1219 (S.D.N.Y. 2002) (declining to order injunctive remedial
relief for oil spill because "plaintiff has been unable to describe a single action
that defendant could be ordered to take to reduce or eliminate any risk its past
actions may have caused, that is not already being undertaken by [the state
environmental agency]").  The Center asserts that it sought injunctive relief
beyond that which any government actor has already undertaken, but it cites
only to its general prayers for relief in the complaint, which we have already

---

[6] The Center asserts that the D1 plaintiffs raised concerns about the nature of the
cleanup efforts in the district court, but it cites without further discussion to the master
complaint and to its opposition to the motions to dismiss. The problem with this argument is
two-fold. First, an appellant may not incorporate by reference arguments made in the district
court. *See Turner v. Quarterman*, 481 F.3d 292, 295 n.1 (5th Cir. 2007).  Second, the
arguments to which the Center refers concerned only whether the government cleanup efforts
would resolve the D1 plaintiffs' ESA and state law trespass claims, but those claims are not
before us.

No. 12-30136

discussed above. We conclude that the district court properly dismissed this claim as moot.

## C. Case management

The Center also challenges the district court's case management of the MDL, specifically the district court's use of pleading bundles and the separation of the Center's claims for injunctive relief and civil penalties. The Center argues that the district court's failure to place its civil penalty claims into a pleading bundle (1) was contrary to the citizen-suit provisions of CWA, CERCLA, and EPCRA, which permit federal courts to impose both injunctive relief and civil penalties, and (2) resulted in a *de facto* dismissal of those claims.

A district court's decisions relating to case management are reviewed for an abuse of discretion. *See Pierce v. Underwood*, 487 U.S. 552, 558 n.1 (1988); *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977). "The trial court's managerial power is especially strong and flexible in matters of consolidation." *In re Air Crash Disaster*, 549 F.2d at 1013; *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 10.1 (2004) ("Although not without limits, the court's express and inherent powers enable the judge to exercise extensive supervision and control of litigation."). The Federal Rules of Civil Procedure specifically contemplate that in complex matters the district court may adopt "special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." FED. R. CIV. P. 16(c)(2)(L). Moreover, the district court is empowered to order separate trials of any "claim, counterclaim, crossclaim, third-party claim, or particular issue." FED. R. CIV. P. 16(c)(2)(M); *see also* FED. R. CIV. P. 42(b).

To say the least, the instant case presents an exceedingly complex matter, consisting of hundreds of individual cases and tens of thousands of claimants. In the face of this daunting litigation, and given the "broad grant of authority"

26

No. 12-30136

to the district court, we perceive no error in those aspects of the court's management of the MDL that are involved in this case. *In re Air Crash Disaster*, 549 F.2d at 1013. The decision to create pleading bundles or to separate claims for relief was well within the district court's discretion. This managerial framework did not cause a *de facto* dismissal of the Center's civil penalty claims. Rather, as noted above, those claims were dismissed at the Center's own insistence by demanding a final judgment for purposes of appeal. We therefore find no merit in the Center's challenge to the district court's case management orders.

## V. CONCLUSION

For the reasons stated above, we conclude, with one exception, that the district court did not err by dismissing the Center's claims as moot. We further conclude that, on the present state of the record, the Center has standing to assert its claim for relief based on the defendants' alleged failure to comply with the reporting requirements of EPCRA, and that the EPCRA claim is not moot. We therefore AFFIRM IN PART and REVERSE IN PART the district court's judgment and REMAND the case for further proceedings. Each party shall bear its own costs.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

February 04, 2013

Ms. Loretta Whyte
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

     **USCA No. 12-30136, In Re: Deepwater Horizon**
         USDC No. 2:10-MD-2179
         USDC No. 2:10-CV-1768
         USDC No. 2:10-CV-2454

Enclosed, for the district court only, is a copy of the judgment
issued as the mandate and a copy of the court's opinion.

The electronic copy of the record has been recycled.

            Sincerely,

            LYLE W. CAYCE, Clerk

            By: *Sabrina B. Short*
            Sabrina B. Short, Deputy Clerk
            504-310-7817

cc: (letter only)
     Honorable Carl J. Barbier
     Ms. Devorah Ancel
     Mr. Adam Babich
     Mr. Brad D. Brian
     Mr. Jeffrey Bossert Clark Sr.
     Ms. Rachel Giesber Clingman
     Mr. John Michael Elsley
     Mr. Marc David Fink
     Mr. Richard Cartier Godfrey
     Mr. Don Keller Haycraft
     Mr. James Andrew Langan
     Ms. Elizabeth A Larsen
     Mr. Daniel Benjamin Levin
     Mr. Kerry J. Miller
     Mr. Joseph Nicholas Mole
     Mr. Edwin G Preis Jr.
     Mr. Steven Lynn Roberts
     Mr. Kent C. Sullivan
     Mr. Charles M. Tebbutt

P.S. to Judge Barbier: A copy of the opinion was sent to your
office via email the day it was filed.

Fee
Proces
X Dkd
CRmDep
Doc. No.