



**U.S. Department of Justice**

Environment and Natural Resource Division

---

*P.O. Box 761*
*Washington, DC 20044*
*202-514-0180*
*Sarah.Himmelhoch@usdoj.gov*

January 30, 2013

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
  Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

   Re:  MDL No. 2179 — BP's Partial Motion for Reconsideration re its Rule 30(b)(6)
       Deposition

Dear Judge Shushan:

   I write in opposition to BP's motion for reconsideration of your January 2, 2013 Order
regarding BP's failure to provide properly prepared witnesses in response to the agreed upon
Rule 30(b)(6) deposition notice and its overly narrow cabining of the topics.  BP shows no reason
for the Court to reverse itself and deny the United States a full and fair opportunity to inquire into
the topics agreed upon by the parties after months of negotiations.  BP's proposal to replace
depositions with interrogatories will deny the United States the necessary opportunity to ask
follow up questions and establish the full basis of BP's answers on questions related to the
amount of oil that spewed from BP's well after the explosion on April 20, 2010.

   As a "backdrop" to its motion, BP asserts that the United States did not use all of the Rule
30(b)(6) time allotted to the United States to question Trevor Hill as a Rule 30(b)(6) designee.
(Mr. Hill was designated to testify regarding his analysis of Professor Wereley's flow rate
estimate after BP's original 30(b)(6) designee was unprepared on this topic.)  BP implies that the
failure to use every allotted minute justifies denying the United States the opportunity to ask
follow up questions with respect to two unrelated deposition topics.  BP's "backdrop" presents as
distorted a picture as the melted clock in Salvador Dali's *The Persistence of Memory*.

1

First, BP is incorrect that the United States "used less than half" of its allotted 50 minutes. As the transcript clearly shows, the United States' Rule 30(b)(6) examination of Mr. Hill began at 4:21 and concluded at 5:03 with one 2 minute break from 4:31-4:33, for a total of 40 minutes of examination time as a Rule 30(b)(6) designee (including multiple interruptions and speaking objections by BP counsel).  *See* Hill Dep. at 250:20-281:02 (Ex. 1).

Second, putting aside BP's time accounting error, whether the United States used some or all of its time with Mr. Hill is entirely irrelevant to the question at hand – namely, whether the United States is entitled to Rule 30(b)(6) testimony on topics squarely within the Phase II Rule 30(b)(6) notice to BP. [1]  The Court ruled in the United States' favor, and BP provides no compelling reason to revisit that ruling.

**Sanders Deposition**

The United States appreciates BP's offer to correct its failure to provide a properly prepared witness.  We must note some disagreement with BP's insistence that the "United States will have no opportunity to disagree with the witness BP designates or otherwise guide the designation process."  Given that we are facing a second deposition due to BP's unjustifiably constrained interpretation of the topics and failure to provide an adequately prepared witness, the United States reserves the right to seek additional testimony from a properly prepared witness if BP presents yet another witness who is not adequately prepared under Rule 30(b)(6).

Moreover, the United States, as always, will have an opportunity to weigh in on the date and location of the deposition.  The United States is concerned regarding issues such as location of the deposition because BP requested that Trevor Hill and Tony Liao be deposed in London despite the fact that both witnesses were able to come the United States to prepare for their depositions with BP's lawyers.  S*ee* Hill Dep. at 32:21-33:01 (Ex. 1) (Mr. Hill was in Washington, D.C. to prepare for his deposition the week before his deposition in London); s*ee* Liao Dep. at 486:09-487:14 (Ex. 2) (Mr. Liao was in Los Angeles, California to prepare for his deposition a few weeks before his deposition in London).

---

[1] As BP is well aware, when negotiating and allocating deposition time the parties make their best efforts to fairly and efficiently allocate time, but throughout the case all parties have concluded questioning without the clock running.  There are many reasons for this, sometimes the witness responds more quickly and succinctly than expected, sometimes a witness is familiar enough with the documents that reading time is not required, and sometimes a witness simply has less information to provide than expected.  BP's argument here would mean that parties would purposely consume all allocated time even when that time is not needed so as to avoid losing time in other unrelated depositions, an outcome detrimental to the witnesses, counsel, and judicial economy.

Nonetheless, the United States agrees with BP that, at this moment, there are no issues for the Court to rule upon with respect to the additional testimony necessary to address Mr. Sanders' lack of preparation.

**Devers Deposition**

BP asserts that the testimony elicited in the Devers deposition demonstrates that no "flow rate estimates" were done in connection with the design of the RITT and top hat and, therefore, that no further deposition testimony is warranted. However, BP's assertion simply reiterates the argument that has already been rejected and rests on an artificial divorce of the bottommost piece of the collection device from all of the other components necessary to bring the oil to the surface. BP asserts that "Mr. Devers was the leader of the RITT and Top Hat teams." *See* BP Letter at 3. The United States demonstrated in its motion to compel, however, that Mr. Devers testified that that Stan Bond and Richard Lynch were in charge of the overall RITT project. *See* Himmelhoch Letter at 5 (Dec. 21, 2012) (Ex. 3). Thus, BP's argument again relies on its unjustifiably narrow interpretation of the topic.

Moreover, BP's careful choice of the term "flow rate estimate" as opposed to the agreed upon topic of "any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo MC252" raises an issue that the United States is entitled to explore with a properly prepared witness. In particular, it has become clear from testimony that at least two BP witnesses applied a very narrow definition of a "flow rate estimate." Mr. Hill testified as follows:

> Q. Now, under your understanding of "flow rate estimate," one requirement for an assessment to qualify as such a flow rate estimate is that it must result from a request; is that right?
> A. I can't recall my exact words, but it would be a -- a formal request from one of BP leadership, yes.
> Q. Okay. So another requirement, aside from it being a formal request, is that it would have to come from a senior member of BP's leadership; is that correct?
> MS. AVERGUN: Objection to form.
> A. I -- a formal request from one of BP leadership.
> Q. (BY MR. DAVIS-DENNY) Okay. And I believe you said another requirement under your definition of "flow rate estimate," is that the estimate must be documented; is that correct?
> A. That's correct.
> Q. Okay. And, finally, if I understand correctly, your definition of "flow rate estimate" requires that the estimate must have uncertainty levels associated with it; is that correct?
> A. That's correct.
> Q. And if it doesn't meet all of those requirements, you don't consider it to be a flow rate estimate; is that correct?
> A. That -- yes, that -- that's -- that's correct.

Q. Okay. Are there any other requirements for an assessment of the flow rate to meet your definition of "flow rate estimate"?

A. Just -- I think just to clarify, that the -- the request was to do a piece of work with the purpose of delivering an estimate. Just to clarify what I had said about the request from BP leadership.

Q. I think I understand. So the formal request from BP leadership has to be, do this for the purpose of generating a flow rate estimate --

A. Correct.

Q. -- in order to qualify as a flow rate estimate under your definition?

A. From mine, yes.

Q. Okay. Are you aware of whether others at BP defined "flow rate estimate" in the same manner as you?

A. I'm not aware one way or the other, how others define.

Hill Dep. at 382:02-383:25 (Ex. 1).  When asked how he developed that definition of flow rate assessment, Mr. Hill was repeatedly cautioned by counsel not to "divulge[] the details of privileged communications," suggesting that this very narrow definition of flow rate assessment was suggested by counsel and may have been used by other witnesses.  *See id*. 386:02-388:07.

The suggestion that other witnesses used a similarly strained definition of flow rate estimate is strengthened by the testimony of Farah Saidi, who stated:

Q. Do you consider the work that you did for the Mason team reflected in that exhibit to be a flow rate estimate?

A. No.

Q. And why not?

A. To me a flow rate estimate is when you have enough credible data, you know your flow path, you know your reservoir. Everything that is about the system that you are designing to -- to calculate, to estimate a flow rate with 10 -- plus or minus 10 percent uncertainty.

Saidi Dep. at 439:08-439:19 (Ex. 4).  BP's proposal to respond to inquiries regarding flow rate assessments related to the RITT and top hat with a static interrogatory response will deprive the United States of the opportunity to explore whether any similarly restrictive definitions are being used in the response.

BP's restrictive definition of flow rate assessment is particularly troubling when existing evidence clearly shows that assumptions and analyses related to flow rate were considered in designing the RITT and top hat. For instance, Ex. 10299 is an email from Farah Saidi discussing various parameters considered in designing the top hat, including temperature and pressure, two parameters used in the analysis of flow rate.  *See* Devers Dep. at 435:17-437:07 (Ex. 5); Gansert Dep. at 65:02-65:18 (Ex. 6).  Similarly, Mr. Devers himself acknowledged that fluid parameters, an element of flow analyses (*id*. at 91:13-91:22), were considered and taken into account in designing some versions of the RITT:

4

> Q. Okay. Were any other fluid properties relevant to your design of the RITT?
> MR. BENTSEN: Objection, form.
> A. For RITT No. 1, no. For -- for RITTs later on, there was some discussion about the hydrocarbons flowing down the HORIZON riser. Could there have formed an oil later, a loo – an oil layer and a gas layer, and might we be oscillating between the two regions and taking some gas and taking some oil.
> Q. (By Ms. André) M-h'm.
> A. So when you ask about fluid properties, later on, we considered that and made – made some adjustments on the later tools to -- to try to compensate for that.

Devers Dep. at 314:15-315:04 (Ex. 5).

In sum, a static interrogatory response will not allow the United States the opportunity necessary to explore what was considered in terms of "analyses" of the flow rate. The Court should not reward BP's repeated efforts to avoid addressing flow rate questions through parsimonious interpretations of terms and deposition notices by allowing BP to escape the kind of examination to which it subjected the United States' witnesses regarding flow rate. For these reasons, the Court should deny BP's request to reconsider and the United States should be permitted up to two hours to question a properly prepared witness on Topic 12 as it relates to the RITT and top hat source control methods.

**Williams Deposition**

The basis of BP's motion for reconsideration with respect to the remaining Williams topic is that any discussion of the preparation of the May 24, 2010 letter to Representative Markey is privileged. As demonstrated in the United States' motion filed today, no privilege applies to these communications under the crime-fraud doctrine. Accordingly, BP's sole ground for resisting the additional deposition fails and its motion for reconsideration should be denied. The United States should be permitted up to two hours to question a properly prepared witness on Topic 9 as this Court originally ordered.

**Conclusion**

For the foregoing reasons, the United States respectfully requests that this Court deny BP's motion for reconsideration and grant the United States' request for up to 2 additional hours of deposition testimony with properly prepared witnesses for each of the topics identified above.

Respectfully submitted,

/s/ Sarah D. Himmelhoch

Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery

# EXHIBIT 1

to Letter to Judge Shushan from Sarah Himmelhoch

January 30, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          )  MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN     )  SECTION "J"

THE GULF OF MEXICO, ON     )

APRIL 20, 2010             )  JUDGE BARBIER

                           )  MAG. JUDGE SHUSHAN


* * * * * * * * * * * * * * * * * * *

VOLUME 1

* * * * * * * * * * * * * * * * * *


    Deposition of TREVOR J. HILL, taken at

Kirkland & Ellis International, 30 St. Mary Axe,

22nd Floor, London EC3A 8AF, England, United

Kingdom, on the 14th of January, 2013.

30

1    with experience in conducting well integrity tests
2    before you prepared that procedure for the well
3    integrity test for Macondo?
4            MS. KARIS:  Object to form.
5        A. Let me just -- no.
6        Q. (BY MR. CERNICH)  Okay.
7        A. No.
8        Q. Then how did you -- strike that.
9            What resources did you draw upon in
10   preparing the procedure for the Macondo Well
11   integrity test?
12       A. There was a -- a team of people who were
13   engaged in supporting the writing of procedures.
14       Q. Okay.  And who was that team of people?
15       A. At the moment, I can't -- I don't -- I
16   can't recall any of the others.
17       Q. No one at all?  Mr. Tooms?
18       A. Not in the specific team that was drafting
19   the document.
20       Q. I see.  So you're talking about a specific
21   team that was drafting the document?
22       A. Yeah.
23       Q. Did you draw on resources from anyone
24   outside of the team that was specifically drafting
25   the document?

31

1        A. Yes.
2        Q. Okay.  And who would those -- who would
3    those individuals have been?
4        A. It was Mr. Tooms, Farah Saidi, and the
5    people who were involved in the capping stack
6    design and installation.  So I recall Stan Bond as
7    the -- as the leader of that -- that activity.
8        Q. Trevor Smith as well?
9        A. Trevor Smith.
10       Q. Okay.  Mr. Lockett?
11       A. He may have been involved but I don't
12   recall specifically on -- on that.
13       Q. Mike Mason?
14       A. I don't believe so for that piece of work.
15       Q. Okay.  Bob Merrill?
16       A. I think Bob Merrill, yes, in terms of the
17   output.  So the procedure writing, no.  But in
18   terms of the interpretation, yes.
19       Q. Okay.  And you said "with regard to the
20   output," what do you mean by "the output"?
21       A. I'm just going to -- if I may, just read
22   what I said there.  Okay.  So in terms of the
23   interpretation of the pressure as measured I would
24   clarify as the output.
25       Q. Okay.  Okay.  All right.  Can you tell me

32

1    what you did to prepare for your deposition today?
2        A. Yeah.  I've met with personal and company
3    counsel on several occasions.
4        Q. Okay.  And did you review any documents in
5    preparation for your deposition?
6        A. Yes.
7        Q. Okay.  Did you review any computer
8    modeling?
9        A. There was some output from computer models
10   that was in the documentation, but not in detail.
11       Q. Okay.  But you didn't sit down at a
12   computer and review any modeling?
13       A. I didn't, no.
14       Q. Did you meet with anyone besides counsel
15   to prepare for your deposition?
16       A. No.
17       Q. Okay.  Did you speak with anyone on the
18   phone besides counsel to prepare for your
19   deposition?
20       A. No.
21       Q. Where did you prep for your deposition?
22       A. Here and briefly in Washington.
23       Q. Okay.  Washington, D.C.?
24       A. Yeah.
25       Q. All right.  And when was that?

33

1        A. Last week, three days of last week.
2        Q. Okay.  Can you tell me approximately how
3    much time you spent preparing for your deposition?
4        A. Six days.
5        Q. Okay.  Six full days?
6        A. Variable.  So it was -- it was on six
7    separate days, parts of those days, yeah.
8        Q. Okay.  Fair enough.
9            Did you review any deposition
10   transcripts in preparing for your deposition?
11       A. No.
12       Q. Okay.  Did you speak with any of your BP
13   colleagues regarding their depositions in
14   preparing for your deposition?
15       A. Only knowing their timing, but no -- no
16   substance.
17       Q. Okay.  Thank you.  Now, I think we've
18   established that you worked on the -- the
19   DEEPWATER HORIZON response; is that right?
20       A. Yes.
21       Q. And to the best of your recollection, on
22   what date did you begin working on the response?
23       A. Monday, April 26th.
24       Q. Okay.  So that would be six days after
25   the -- the blowout, correct?

9  (Pages 30 to 33)

250

1  stream trying to establish the correct piping
2  factors and then passing that information along to
3  the national labs?
4       MS. KARIS:  Object to form.
5       A. From this, I don't believe that was the
6  case, no.
7       Q. (BY MR. CERNICH) Okay.
8       A. No.
9       Q. Okay.  So you never followed up to provide
10  them with any additional information?
11       MS. KARIS:  Object to form, asked and
12  answered.
13       A. I don't recall.
14       Q. (BY MR. CERNICH) Can we go to Tab 136?
15       MR. CERNICH:  Actually, let's go off
16  the record for a moment.
17       THE VIDEOGRAPHER:  The time is
18  4:02 p.m.  We're going off the record.
19       (Break from 4:02 p.m. to 4:21 p.m.)
20       THE VIDEOGRAPHER:  The time is
21  4:21 p.m.  We're back on the record, beginning
22  Tape 7.
23       Q. (BY MR. CERNICH) Mr. Hill, as you're
24  probably aware, you've been designated as a
25  30(b)(6) witness for -- for BP regarding your

251

1  critique of Dr. Steve Wereley's work.  Are you --
2  do you understand that to be the case?
3       A. Yes.
4       Q. Okay.  So I'm going to ask you some
5  questions for the next 40 or so minutes related to
6  that -- that work.
7       Now, you created a critique of a flow
8  rate estimate that was created by Dr. Steve
9  Wereley from Purdue; is that right?
10       A. That's correct.
11       Q. Okay.  And can you briefly describe
12  Dr. Wereley's technique as you understand it?
13       A. That he tracked a -- a particle or a
14  feature of the flow coming out of the end of the
15  fallen riser pipe from a video and came up with
16  a -- a measurement of the -- the -- a measurement
17  to the velocity of that particle or -- or feature.
18  And I don't -- at least once.  And then he
19  converted that measurement of velocity to a flow
20  rate.
21       Q. Okay.  Now, you were -- were working on
22  or -- or considering a similar -- similar type of
23  methodology as early as May 3rd, 2010, weren't
24  you?
25       MS. KARIS:  Object to form.

252

1       MS. AVERGUN:  Objection; form.
2       A. I had made a suggestion of tracking
3  velocity from video, yes.
4       Q. (BY MR. CERNICH) Okay.  And if we can go
5  to Tab 15, please.
6       MR. CERNICH:  I'm going to mark this
7  as Exhibit 11180.
8       (Marked Exhibit No. 11180.)
9       MS. KARIS:  Tab 15?
10       MR. CERNICH:  Tab 15, yes.
11       A. I'll just skim through this, please.
12       MR. CERNICH:  It's quite a long
13  E-mail string.  If Mr. Hill wants to read the
14  whole thing, I respectfully request that we do it
15  off the record.
16       MS. KARIS:  We're not going to do it
17  off the record; the same we've done it for any
18  others.
19       MR. CERNICH:  We've had the same
20  request for many of our other witnesses.
21       MS. KARIS:  I understand Dr. McNutt
22  would not go off the record to review documents,
23  so -- Admiral Landry, same thing.
24       MR. CERNICH:  Okay.  Then can I get
25  an agreement that the same rule will apply going

253

1  forward with BP witnesses?
2       MS. KARIS:  Today in this deposition,
3  we're not going off the record.  You can continue
4  asking your questions.
5       A. Okay.  For a quick skim.
6       Q. (BY MR. CERNICH) Okay.  And at the -- the
7  top there, this is an E-mail from Andrew Hall to
8  yourself, dated May 4th, 2010; is that right?
9       MS. KARIS:  I'm going to object to
10  scope with respect to the 30(b)(6).
11       A. It is an E-mail to me, yeah.
12       Q. (BY MR. CERNICH) Okay.  And in the prior
13  E-mail dated May 3rd, 2010, you write to Mr. Hall
14  on the second paragraph:  "Tim and Farah have
15  already built the OLGA model - many assumptions
16  made.  We are linked closely with Base Management
17  using PROSPER.  We have the flowing velocity
18  estimates from the model, and I am looking at the
19  video footage to try to pick out particle movement
20  to get a velocity.  We also have a possible
21  dispersant injection location upstream to try to
22  get a time of flight."
23       Did I read that correctly?
24       MS. AVERGUN:  Object to form and
25  scope.  Can I have a standing objection with

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

254

1  respect to this document for scope so I don't have
2  to make it each time?
3       MR. CERNICH: You may.
4       MS. AVERGUN: Thank you.
5    A. So you -- you read it correctly.
6    Q. (BY MR. CERNICH) Okay. And here, you
7  were looking at trying to get flowing velocity
8  estimates from the -- from the end of the riser,
9  and you were going to use the dispersant -- the
10  dispersant injection as -- as a potential feature
11  to track to get a time of flight; is that right?
12    A. In terms of the last phrase, "We also have
13  a possible dispersant injection location
14  upstream," I don't believe it was physically in
15  place.
16    Q. Okay. And could I ask you to go to the --
17  the very end of this document, the first E-mail
18  here. Do you see the -- the E-mail dated April
19  27th, 2010 from Donald Campbell Brown to a number
20  of individuals there?
21    A. Yes.
22    Q. Do you know who Mr. Campbell Brown is?
23    A. I do, yes.
24    Q. And who is he?
25    A. At the time, he was the chief engine --

255

1  well, let me -- my -- my belief is at the time, he
2  was the chief engineer for instrument, controls,
3  and electrical. At least he had been in that
4  position.
5    Q. Okay. Thank you.
6       And if we look down towards --
7    A. Sorry, just to clarify, it says it at the
8  end of the E-mail.
9    Q. That confirms your -- you answer. Your
10  memory -- your memory is pretty good.
11       And he writes: "Mark Nicholas called
12  to relay a question from Andy on how we might
13  (reasonably accurately) measure the multiphase
14  flow rate from the severed end of the 21.5 inch
15  rier, which is lying on the seabed. This is key
16  to predicting environmental impact as well as to
17  understanding the stability of the flow
18  restriction that is limiting the flow rate, and
19  the possible original failure mechanisms. We do
20  not know (but are modeling) the possible range of
21  gas/oil ratios - and Julian Austin has the latest
22  on the current assumptions around this."
23       Did I read that correctly?
24    A. Yes.
25    Q. Okay. And so here, Mr. Nichols is

256

1  relaying a question from Andy. Would you assume
2  that's Andy Inglis?
3    A. I assume. That's likely, yeah.
4    Q. Mr. Nichols works with Mr. Inglis?
5    A. Why -- he -- he works in Mr. Inglis'
6  hierarchy of folk.
7    Q. Okay.
8    A. He was the chief engineer for mechanical
9  engineering, Mark Nichols.
10    Q. Okay. And Mr. Nichols is writing that the
11  multiphase flow rate from the severed end of the
12  riser is a key to predicting environmental impact
13  as well as to understanding the stability of the
14  flow restriction; is that right?
15    A. As written, that's right, yes.
16    Q. Okay. And -- that observation or --
17  or that comment is part of what prompted you to
18  consider trying to determine if there was a way to
19  predict flow rate from the end of the -- the
20  riser?
21       MS. AVERGUN: Objection to form.
22       MS. KARIS: Object to form and scope.
23    A. Yeah, I can't recall specifically that --
24  that was the cause of it. I don't recall reading
25  this --

257

1    Q. (BY MR. CERNICH) Okay.
2    A. -- in that time.
3    Q. But later on in this E-mail string, you do
4  enter into a discussion about how you might be
5  able to use velocity estimates in order to -- to
6  come up with a flow rate, correct?
7       MS. AVERGUN: I'm going to object to
8  form.
9    Q. (BY MR. CERNICH) Actually, I'll withdraw
10  the question.
11    A. Okay.
12    Q. The subject line of this E-mail stream is
13  "Riser Flowrate," isn't it?
14    A. Yes, it is.
15    Q. Okay. Are you aware that Dr. Ollie Rigg
16  performed a similar analysis on or around May 10th
17  and estimated a flow rate of 40,000 barrels per
18  day --
19       MS. KARIS: Object to form.
20    Q. (BY MR. CERNICH) -- at the end of the
21  riser.
22       MS. KARIS: Sorry. Object to form
23  and scope. And, Counsel, if you would, tell me
24  how this is related to the Wereley critique in
25  Mr. Hill's -- because that's what the order

65 (Pages 254 to 257)

258

1   allowed for.
2           MR. CERNICH:  Can we go off the
3   record?
4           MS. KARIS:  Sure.
5           MS. AVERGUN:  Objection; form.
6           THE VIDEOGRAPHER:  The time is
7   4:31 p.m.  We're off the record.
8           (Break from 4:31 p.m. to 4:33 p.m.)
9           THE VIDEOGRAPHER:  The time is
10  4:33 p.m.  We're back on the record.
11      Q.  (BY MR. CERNICH)  There's a -- there's a
12  question pending.
13      A.  Sorry.
14      Q.  Okay.  I'll ask it again.
15      A.  Yeah, please.
16      Q.  Are you aware of Dr. Ollie Rigg's analysis
17  using imaging technology and velocities of flow
18  from the end of the riser where he estimated a
19  flow rate of 40,000 barrels per day?
20          MS. KARIS:  Object to form and scope.
21      A.  Not to that level of detail in the
22  question, no.  I would -- I had been made aware
23  that he did that work.
24      Q.  (BY MR. CERNICH)  Were you aware of that
25  when you prepared your critique of Dr. Wereley's?

259

1       A.  No, I was not.
2       Q.  Would you have liked to have had that
3   information when you prepared your critique of
4   Dr. Wereley's analysis?
5           MS. KARIS:  Object to form.
6           MS. AVERGUN:  Objection; form.
7       A.  Looking back, I don't think it was a
8   direct -- of direct interest.  Because I didn't
9   comment on Professor Wereley's measurements, just
10  his interpretation.
11      Q.  (BY MR. CERNICH)  And Dr. Rigg also
12  performed an interpretation of the -- of the
13  measurements, correct?
14          MS. KARIS:  Object to form and scope.
15      A.  I don't know what he did.
16      Q.  (BY MR. CERNICH)  You don't know?
17      A.  No.
18      Q.  Did you ever review his work?
19      A.  Not on that subject, no.
20      Q.  You never reviewed his -- his estimates
21  based on the velocity of the plume coming out of
22  the -- of the separate riser?
23          MS. KARIS:  Object to form and scope.
24      A.  No, I never did.
25      Q.  (BY MR. CERNICH)  Can we go to Tab 29,

260

1   please.
2           MR. CERNICH:  We'll mark this as
3   Exhibit 11181.
4           (Marked Exhibit No. 11181.)
5       Q.  (BY MR. CERNICH)  This is a slide show
6   marked, "Observations on flow coming from the
7   Macondo System, Prepared by:  Trevor Hill, 14 May
8   '10."
9           Do you see that?
10      A.  Yes.
11      Q.  Did you -- did you prepare this?
12      A.  Yes.
13      Q.  Did you review this document in
14  preparation for your deposition today?
15      A.  Yes.
16      Q.  Okay.  And this document is your -- your
17  initial critique of Dr. Wereley's work; is that
18  right?
19      A.  That's right, yes.
20      Q.  Okay.  And why did you prepare this
21  document?
22      A.  My -- my recollection is I -- I had seen
23  Professor Wereley speak on the Anderson Cooper
24  program, and I was checking some of his
25  assertions.

261

1       Q.  Okay.  Could we turn to Tab 207, please.
2           MR. CERNICH:  We're going to mark
3   this as Exhibit 11182.
4           (Marked Exhibit No. 11182.)
5       Q.  (BY MR. CERNICH)  This is an E-mail dated
6   May 14, 2010 from Mr. Holden Zhang to yourself,
7   with copies to Taras Makogon, George Shoup, Oris
8   Hernandez, James Bill, and Cem Sarica; is that
9   right?
10      A.  That's correct.
11      Q.  And the subject is "Steve Wereley weak
12  estimation."
13          Is that right?
14      A.  That's correct.
15      Q.  And this is Mr. Zhang providing you with
16  some comments regarding Dr. Wereley's flow rate
17  estimate; is that right?
18      A.  That's correct.
19      Q.  And did you receive this E-mail before or
20  after you prepared the slide show that we were
21  looking at a few moments ago?
22      A.  I don't recall specifically.
23      Q.  Did you rely on any of the information in
24  this E-mail from Mr. Zhang to prepare your --
25      A.  No.  I don't believe so.

66 (Pages 258 to 261)

262

1    Q. Do you know who Mr. Zhang is?
2    A. Yes.
3    Q. And who is he?
4    A. He is -- exact position, bear with me, but
5 he is -- he is in Tulsa University, either as a --
6 a research associate or a professor. I'm not sure
7 at that time what he was.
8    Q. Okay. Do you know Mr. Zhang
9 professionally?
10   A. Yes.
11   Q. Do you work with him on a regular basis?
12   A. Regular but infrequent, yes.
13   Q. Okay. And prior to this, had you been
14 discussing flow rate issues related to the Macondo
15 Well?
16   A. With him?
17   Q. With him, yes.
18   A. Not that I recall, no.
19   Q. Okay. So this -- did this E-mail just
20 come out of the blue?
21   A. Yes.
22   Q. Okay.
23   A. That's my recollection.
24   Q. Did you ever reply to Mr. Zhang?
25   A. I don't recall now.

263

1    Q. Okay. And you -- you sent this -- this
2 slide show, Exhibit 11181, that we were looking
3 at -- you sent that to Los Alamos National Labs
4 for them to review; is that right?
5    A. I'd be happy to see the E-mail. I don't
6 recall if it was this document specifically.
7    Q. You didn't review E-mail in preparing
8 for your deposition today?
9    A. Yes, but I can't recall which attachments
10 these were.
11   Q. Okay. If we can go to Tab 196 then.
12 We're going to mark this as Exhibit 11183.
13        (Marked Exhibit No. 11183.)
14   Q. (BY MR. CERNICH) That's an E-mail from
15 yourself dated May 14th, 2010, to a Dr. DeCroix.
16 Do you see that?
17   A. Yes.
18   Q. And actually I misspoke. You didn't
19 actually send the May 14th slide show. You sent a
20 write-up, a memo, "Observations on Flow Coming
21 From the Macondo Riser." Is that -- is that the
22 correct attachment?
23   A. That's correct.
24   Q. Okay. And this was a more detailed
25 analysis than your 14th -- 14th of May 2010 slide

264

1 show?
2        MS. AVERGUN: Objection to form.
3    A. I -- I don't believe it was a more
4 detailed analysis. It -- it was a fuller
5 description.
6    Q. (BY MR. CERNICH) Okay. And -- and why
7 did you send this to -- to Dr. DeCroix?
8    A. I had spoken with Mr. Tooms about my
9 observations, and he had asked if there was anyone
10 external to the company with whom we could consult
11 and get a second opinion.
12   Q. And why did you pick Mr. DeCroix?
13        MS. AVERGUN: Objection to form.
14   A. To him exactly, I don't -- I don't recall.
15 There were a number of folk involved in that
16 process and I -- we -- Kate Baker there on the
17 list.
18   Q. (BY MR. CERNICH) Okay. And who is
19 Ms. Baker?
20   A. She was one of the team working with Paul
21 Tooms.
22   Q. Okay. Was she -- was she involved at all
23 with any of the privileged work streams that we've
24 discussed today?
25        MS. KARIS: Object to form and scope.

265

1    A. In a consultancy perhaps, but I -- I don't
2 recall specifically.
3    Q. (BY MR. CERNICH) Okay. Can we go to
4 Tab 209, please.
5        (Marked Exhibit No. 11184.)
6    Q. (BY MR. CERNICH) We marked this as
7 Exhibit 11184. This is an E-mail from yourself to
8 David Rainey dated May 21st, 2010. "Subject:
9 Professor Wereley Presentation to Congress."
10 Is that right?
11   A. That's correct.
12   Q. And you sent along this copy of
13 Professor Wereley's slide presentation to
14 Mr. Rainey on that date; is that right?
15   A. Excuse me. Yes, that's correct.
16   Q. And why did you send this to Mr. Rainey?
17        MS. AVERGUN: Objection to form. I'm
18 going to instruct my client not to answer to the
19 extent it calls for privileged information.
20   A. I -- I don't recall the exact
21 circumstances.
22   Q. (BY MR. CERNICH) Okay. Do you recall
23 whether counsel or an agent of counsel suggested
24 that you send this to -- to Mr. Rainey?
25   A. I don't recall that, no.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

266

1    Q.  And if we could go to Tab 210?  Mark that
2  as Exhibit 11185.
3         (Marked Exhibit No. 11185.)
4    Q.  (BY MR. CERNICH)  This is an E-mail dated
5  Saturday, May 22nd, from yourself to Mr. Rainey
6  with a copy to Kent Wells; is that right?
7    A.  Yes, it is.
8    Q.  Okay.  And this is a -- copy of the --
9  of the memo that we were looking at earlier,
10  "Observations on Flow Coming From the Macondo
11  System"?
12    A.  Yes.
13    Q.  Okay.  And you -- you write to
14  Mr. Rainey -- do -- do you recall why you sent
15  this to -- to Mr. Rainey?
16    A.  Having answered the question on the first
17  one, he then came back with a comment.  And so I
18  was then responding to his comment there.
19    Q.  Okay.  With additional information?
20    A.  Yes, there is.
21    Q.  Okay.  And in the middle of that
22  paragraph, you write:  "Understanding the
23  uncertainty in the measurement is important,
24  though the error could be down or up.  We are
25  getting original video files from offshore which

267

1  will have better resolution than the compressed
2  feed into the ROV room which the first public
3  video release was made."
4         Did I read that correctly?
5    A.  Almost.  "From -- from which," but yeah.
6    Q.  "From which."  Yes, thank you.
7         And so you were telling him that
8  the -- that the error in the measurement could
9  be -- could be down or up; is that right?
10    A.  That's correct.
11    Q.  Okay.  Can we turn to Tab 212?  I'm going
12  to mark this as Exhibit 11186.
13         (Marked Exhibit No. 11186.)
14    Q.  (BY MR. CERNICH)  This is a document with
15  the title "Proposal For Work on Flow Rate
16  Estimation."
17         Is that right?
18    A.  It is.
19    Q.  Okay.  And did you prepare this document,
20  Mr. Hill?
21    A.  I believe so, yeah.
22    Q.  Okay.  And why -- why did you prepare
23  this -- this document?
24    A.  I don't recall specifically.
25    Q.  Okay.  Did you prepare it in reaction to

268

1  Professor Wereley's work?
2    A.  I don't recall and have no indication of
3  date either to --
4    Q.  Okay.  And who did you -- did you send
5  this document to anyone at BP or otherwise?
6         MS. KARIS:  Object to scope.
7    A.  I don't recall.
8    Q.  (BY MR. CERNICH)  Okay.  And you write in
9  the summary:  "Given the measured flow rate
10  information now available from the riser insertion
11  tool production to Enterprise, we should engage
12  with the relevant internal and external experts to
13  quantify the flow rate."
14         Is that right?
15         MS. KARIS:  Object to form and scope.
16    A.  Yes.  As written here.
17    Q.  (BY MR. CERNICH)  Okay.  And so you are
18  writing in this -- this document that -- that we
19  should -- and when you say "we," you're referring
20  to BP; is that right?
21    A.  Effectively, yes.
22    Q.  Yeah.  "We should engage with the relevant
23  internal and external experts to quantify the
24  total flow rate."
25         Is that right?

269

1         MS. KARIS:  Object to form and scope.
2    A.  As written, yes.
3    Q.  (BY MR. CERNICH)  Okay.  And then you --
4  you -- further down, you list some -- well,
5  actually, you write in here that video is
6  available of flow four different rates of
7  extraction to the Enterprise.  Do you see down
8  there, I guess it's the fourth paragraph?
9    A.  Yes.  I'm actually going to take a read
10  through now.
11    Q.  Okay.
12         MS. KARIS:  I want -- I object --
13  while he's reading, I object to form and scope
14  with respect to all the questions on this
15  document.
16    A.  Okay.  I've read it.
17    Q.  (BY MR. CERNICH)  Okay.  So this document
18  describes a means of trying to quantify the flow
19  rate by using video imaging; is that right?
20         Let me direct you to the fourth
21  paragraph.  It says:  "Video is available of flow
22  to Enterprise (none, 1550 barrels per day, 3500
23  barrels per day, and 5100 barrels per day)."
24         Did I read that correctly?
25    A.  Yes.

68 (Pages 266 to 269)

270

1         MS. KARIS:  Object to form.
2         Q.  (BY MR. CERNICH)  And so this document
3    describes using video analysis to quantify total
4    flow rate?
5         MS. KARIS:  Object to form and scope.
6         MR. CERNICH:  Counsel, the document
7    is dated May 21st, 2010.  It was created at the
8    same time that he was performing his analysis of
9    Dr. Wereley's work.
10        MS. KARIS:  That certainly doesn't
11   mean that it's related to his critique of Wereley.
12   The fact that it was created around the same
13   time -- a bunch of documents created around the
14   same time.
15        MR. CERNICH:  A bunch of documents
16   relating to video imaging of the -- of the flow
17   from the end of the riser pipe?
18        MS. KARIS:  This was specifically the
19   subject of negotiation and was in discussion
20   between the U.S. and BP with respect to what the
21   proper scope of his examination was.
22        MR. CERNICH:  Okay.  Well, we can
23   argue about the objection.
24        MS. KARIS:  I'll let him answer, but
25   to respond to your question that it's dated May

271

1    21st doesn't say anything about it being related
2    to the Wereley critique or the basis for that
3    critique.
4         A.  Sorry.  I lost the -- can -- may I ask you
5    to repeat the question because I've lost it up
6    there.
7         Q.  (BY MR. CERNICH)  All I did was -- all I
8    asked was:  So this document describes a means of
9    trying to quantify the flow rate by using video
10   imaging?
11        MS. KARIS:  Object to form and scope.
12        A.  I would -- I would accept it states the --
13   the video is an available with four different
14   rates of extraction.  I don't believe it describes
15   the methodology that would be used to do it.
16        Q.  (BY MR. CERNICH)  So your saying that
17   video is available doesn't -- doesn't imply in any
18   way that that video would actually be used to
19   quantify the total flow rate?
20        MS. KARIS:  Object to form and scope.
21        A.  It -- it does list as the last point the
22   issue of the riser insertion tool in the flow,
23   which fundamentally changes how the flow came out.
24        Q.  (BY MR. CERNICH)  Right.  And you were
25   going to look at the riser insertion tool at

272

1    different extraction rates and look at video --
2    video of the plume and try to determine whether
3    you could use that to quantify the total flow rate
4    from the --
5         MS. KARIS:  Object to --
6         Q.  (BY MR. CERNICH) -- end of the riser?
7         MS. KARIS:  Object to form and scope.
8         A.  Sitting here now, I don't believe it goes
9    to that level.
10        Q.  (BY MR. CERNICH)  Okay.  And at the end,
11   you say --
12        MR. CERNICH:  Oh, actually,
13   counsel -- I'm sorry.  I missed this.
14        Q.  (BY MR. CERNICH)  "Proposed Work."  If we
15   look down there on the third point:  "To contact
16   Professor Wereley, the originator of public
17   statements on flow rate made from the
18   interpretation of particle image velocimetry
19   measurements, to determine what measurements and
20   assumptions were made in his analysis."
21        Did I read that correctly, Mr. Hill?
22        A.  Yes, you did.
23        MS. KARIS:  And I'll respond if
24   you're asking me -- that, nonetheless, has nothing
25   to do with the Wereley critique.

273

1         MR. CERNICH:  Okay.
2         MS. KARIS:  I'll note for the record
3    that Counsel for Halliburton and Mr. Cernich are
4    laughing.  Laugh all you want, but I think we all
5    know that that doesn't pertain to the Wereley
6    critique.
7         Q.  (BY MR. CERNICH)  And you have a request
8    listed there:  "Permission to release further
9    video clips from periods of known extraction rates
10   to Enterprise."
11        Did I read that correctly?
12        A.  You did.
13        Q.  Okay.  And then you said:  "Permission to
14   recontact Bill Lehr of NOAA to offer support to
15   the Flow Rate Technical Team."
16        Did I read that correctly?
17        A.  You did.
18        Q.  "And permission to contact external
19   experts, including Professor Wereley."
20        Did I read that correctly?
21        A.  You did.
22        Q.  Okay.  And so you were proposing to get
23   permission here to do these -- these three --
24   these three things listed in your -- your memo; is
25   that right?

274

1       MS. KARIS:  Object to form and scope.
2       A.  As stated there, yes.
3       Q.  (BY MR. CERNICH)  Okay.  Now, who were you
4   seeking permission from?
5       A.  My -- my contact was with Mr. Tooms.
6       Q.  You were seeking permission from
7   Mr. Tooms?
8       A.  Yeah.
9       Q.  Who -- your contact from Mr. Tooms?
10      A.  Yeah.  Mr. Tooms is who I spoke to, yeah.
11      Q.  Okay.  And you sent this document to
12  Mr. Tooms?
13      A.  I don't recall.
14      Q.  Okay.  Did you send this document to
15  anyone besides Mr. Tooms?
16      A.  I don't recall.
17      Q.  Did you need to get permission from
18  Counsel to do this work?
19      A.  No.  I don't believe so.
20      Q.  Did you ever seek permission from counsel
21  to do this work?
22      A.  No.
23      Q.  Did you ever do this work?
24      MS. KARIS:  Object to form and scope.
25      A.  I -- I know that we -- I know that I was

275

1   not involved in contacting Professor Wereley.  As
2   to the first two, I -- I don't recall that I had
3   sufficient information.
4       Q.  (BY MR. CERNICH)  But -- but you didn't --
5   you didn't accomplish these three tasks, did you?
6       MS. KARIS:  Object to form and scope.
7       A.  To my recollection, I -- I didn't
8   personally do 1 and 3; and I had further contact,
9   I believe, with Bill Lehr but not at my
10  initiation.
11      Q.  (BY MR. CERNICH)  Okay.  And you didn't,
12  in fact, carry out this -- carry out this proposal
13  and quantify a total flow rate from the well,
14  correct?
15      A.  That's correct.
16      Q.  Could we go to Tab 70 -- no.  Tab 71,
17  please.
18      MR. CERNICH:  Okay.  Let me mark this
19  as Exhibit 11187.
20      (Marked Exhibit No. 11187.)
21      Q.  (BY MR. CERNICH)  Do you see that's an
22  E-mail dated June 6, 2010, at the top there from
23  Steve Haden to Brittany Benko, Max Easley, and
24  yourself?
25      A.  Yes.

276

1       Q.  The subject is "Crater Riser End Section
2   exposed."
3       Is that right?
4       A.  That's correct.
5       Q.  Okay.  And you wrote -- if you look
6   further down in that E-mail, on June 6, 2010, you
7   wrote to Mr. Easley and Ms. Benko and Mr. Haden:
8   "Good afternoon.  Please see the attached photos.
9   Not sure if flow rate estimation from the original
10  plume site is still an issue; but if it is, these
11  photos give an idea of the extent of the
12  deformation on the pipe end - I have not yet tried
13  to measure it, but by eye I think the original
14  estimate I made of 60 percent of round pipe flow
15  area available through the deformed end may even
16  have been a bit high."
17      Did I read that correctly?
18      A.  You did.
19      Q.  Okay.  And that -- that 60 percent number
20  is the number that you used in your critique of
21  Dr. Wereley's work; is that right?
22      A.  I -- I believe that, yes, the last version
23  was that.
24      Q.  Okay.  And so you looked at these photos
25  by eye and came up with an idea that the -- that

277

1   the flow area may have been lower than 60 percent?
2       A.  That's correct.
3       Q.  You didn't do any sort of measurements to
4   confirm that observation before you sent this
5   E-mail?
6       A.  No, I didn't.
7       Q.  Okay.  And then you -- Ms. Benko writes on
8   June 6, 2010:  "Thanks, Trevor.  Very interesting
9   and, yes, flow rate estimates is still an issue."
10      And then writes:  "Max, would you
11  like me to pass these photos along to Bill Lehr
12  and Marcia McNutt?"
13      Did I read that correctly?
14      A.  Yes.
15      Q.  Okay.  And so Ms. Benko told you on
16  June 6th that flow rate estimate was still an
17  issue; is that right?
18      A.  That's correct.
19      Q.  Okay.  And -- and I think we talked
20  earlier when you told me that Ms. Benko -- on
21  May 22nd, you learned that Ms. Benko was working
22  on behalf of BP's counsel?
23      A.  That's correct.
24      Q.  And so this would indicate that, in
25  Ms. Benko's mind, flow rate estimate from the end

70 (Pages 274 to 277)

278

1   of the riser is still an issue; is that right?
2        MS. KARIS:  Object to form and scope
3   and foundation.
4        MS. AVERGUN:  And I'll add asked and
5   answered.
6        A.  I can't specifically -- speak for what she
7   was thinking, but she has made a statement "flow
8   rate estimate is still an issue."
9        Q.  (BY MR. CERNICH)  And this is June 6th,
10  2010.  So the riser has already been cut off the
11  top of the BOP, right?
12       A.  That's correct.
13       Q.  So there's no flow going through the --
14  going through the riser pipe anymore?
15       MS. KARIS:  Object to form and scope.
16       A.  That is correct.
17       Q.  (BY MR. CERNICH)  Okay.  Do you have any
18  idea why the flow rate from the end of the -- from
19  the end of the riser that's now being cut off of
20  the BOP is still an issue?
21       MS. KARIS:  Object to form and scope.
22       Counselor, are you speaking with
23  respect to the Wereley critique now?
24       MR. CERNICH:  Well, this all -- this
25  all follows from the -- the Wereley critique.  He

279

1   mentioned the work he did on the Wereley critique.
2        MS. KARIS:  I'm not sure the witness
3   has established this work follows from that, but
4   that contains the same number he did say.
5        Q.  (BY MR. CERNICH)  So I just wanted to know
6   if you had any idea why flow rate from the end of
7   the -- the riser that had been already cut by this
8   point off the top of the BOP was still an issue.
9        MS. KARIS:  Object to form and scope.
10       A.  Yeah, I'm not sure I can -- I can say
11  that's what she was thinking.  I don't know.
12       Q.  (BY MR. CERNICH)  Okay.  And then
13  Mr. Haden writes: "Do we want to annotate what we
14  think are the new dimensions on these photos?  I
15  think once we did that, it wouldn't be a bad idea
16  to share with Marcia and Bill.  Probably should
17  run it through Murray and Bernard before we
18  release."
19       Did I read that correctly?
20       MS. KARIS:  Object to form and scope.
21       A.  You did.
22       Q.  (BY MR. CERNICH)  Is that Murray
23  Auchinlouse [sic]?
24       MS. KARIS:  -closs.
25       Q.  (BY MR. CERNICH)  Auchincloss and Bernard

280

1   Looney to which Mr. Haden is referring?
2        A.  I believe that's a fair assumption.
3        Q.  Okay.  And do you know why he would say
4   that they should run it through Murray and Bernard
5   before it was released?
6        MS. AVERGUN:  Objection to form.
7        A.  I don't believe so, no.
8        Q.  (BY MR. CERNICH)  Okay.  Do you know if
9   Murray and Bernard were -- had to approve any
10  information that was released to the flow rate
11  technical group or the U.S. Government?
12       MS. KARIS:  Object to form and
13  foundation.
14       A.  I -- I don't know that, no.  I don't
15  believe so.
16       MR. CERNICH:  Okay.  Done with the
17  30(b)(6) time, so I'll just continue.
18       MS. KARIS:  Sure.
19       MR. CERNICH:  With Mr. Hill's
20  personal knowledge.
21       THE VIDEOGRAPHER:  Do you want to go
22  off the record?
23       MR. CERNICH:  Do we need to go off?
24       We'll stop.  We'll stop.  I think he
25  had segregated the tape, so we'll stop.

281

1        THE VIDEOGRAPHER:  The time is
2   5:03 p.m.  We're off the record.
3        (Break from 5:03 p.m. to 5:20 p.m.)
4        THE VIDEOGRAPHER:  The time is
5   5:20 p.m.  We're back on the record, beginning
6   Tape 8.
7        Q.  (BY MR. CERNICH)  Mr. Hill, could I ask
8   you to describe for me all of BP's flow rate
9   estimates that you're aware of for the Macondo
10  Well from April 20th through July 17?
11       MS. AVERGUN:  Objection to form.
12       MS. KARIS:  Object to form.
13       A.  I can't cover what -- what BP may have
14  had.
15       Q.  (BY MR. CERNICH)  All the ones that you're
16  aware of.  I'm just asking for you to tell me all
17  of the flow rate estimates --
18       A.  Yeah.
19       Q.  -- all of the BP flow rate estimates for
20  the Macondo Well from April 20th to July 17th.
21       A.  So refer back to my -- the comments
22  earlier about what -- what I personally view as --
23  as an estimate.  So to my knowledge, up to the
24  shut-in of the well, I was not aware of any BP
25  flow estimates, per se, as per my previously

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN     )   SECTION "J"

THE GULF OF MEXICO, ON     )

APRIL 20, 2010             )   JUDGE BARBIER

                           )   MAG. JUDGE SHUSHAN


* * * * * * * * * * * * * * * * * * * *

VOLUME 2

* * * * * * * * * * * * * * * * * * * *


Deposition of TREVOR J. HILL, taken at

Kirkland & Ellis International, 30 St. Mary Axe,

22nd Floor, London EC3A 8AF, England, United

Kingdom, on the 15th of January, 2013.

382

1    A. Yes. My -- my use of that phrase, yes.
2    Q. Now, under your understanding of "flow
3  rate estimate," one requirement for an assessment
4  to qualify as such a flow rate estimate is that it
5  must result from a formal request; is that right?
6    A. I can't recall my exact words, but it
7  would be a -- a formal request from one of BP
8  leadership, yes.
9    Q. Okay. So another requirement, aside from
10 it being a formal request, is that it would have
11 to come from a senior member of BP's leadership;
12 is that correct?
13        MS. AVERGUN: Objection to form.
14   A. I -- a formal request from one of BP
15 leadership.
16   Q. (BY MR. DAVIS-DENNY) Okay. And I believe
17 you said another requirement under your definition
18 of "flow rate estimate," is that the estimate must
19 be documented; is that correct?
20   A. That's correct.
21   Q. Okay. And, finally, if I understand
22 correctly, your definition of "flow rate estimate"
23 requires that the estimate must have uncertainty
24 levels associated with it; is that correct?
25   A. That's correct.

383

1    Q. And if it doesn't meet all of those
2  requirements, you don't consider it to be a flow
3  rate estimate; is that correct?
4    A. That -- yes, that -- that's -- that's
5  correct.
6    Q. Okay. Are there any other requirements
7  for an assessment of the flow rate to meet your
8  definition of "flow rate estimate"?
9    A. Just -- I think just to clarify, that
10 the -- the request was to do a piece of work with
11 the purpose of delivering an estimate. Just to
12 clarify what I had said about the request from BP
13 leadership.
14   Q. I think I understand. So the formal
15 request from BP leadership has to be, do this for
16 the purpose of generating a flow rate estimate --
17   A. Correct.
18   Q. -- in order to qualify as a flow rate
19 estimate under your definition?
20   A. From mine, yes.
21   Q. Okay. Are you aware of whether others at
22 BP defined "flow rate estimate" in the same manner
23 as you?
24   A. I'm not aware one way or the other, how
25 others define.

384

1    Q. Do you know whether Tim Lockett defines
2  "flow rate estimate" the same way?
3    A. I don't believe -- don't recall knowing.
4    Q. Do you know whether Farah Saidi defines
5  "flow rate estimate" in the same way that you do?
6    A. No, I don't.
7    Q. Do you know whether Mike Mason defines it
8  in the same way that you do?
9    A. No, I don't.
10   Q. Do you know of anyone else at BP who
11 subscribes to your definition of "flow rate
12 estimate"?
13   A. I'm -- I'm not aware of any -- anyone
14 else.
15   Q. When did you first formulate this
16 definition of flow rate estimate?
17   A. I -- I believe in mid- to late May.
18   Q. So it was not a definition that you had
19 used prior to the Macondo response?
20   A. I don't believe so.
21   Q. How did you come up with this definition
22 of "flow rate estimate"?
23        MS. AVERGUN: I'm going to object to
24 the form of the question and instruct my client
25 not to answer to the extent it calls for

385

1  privileged information.
2    A. So to that extent, I can't directly answer
3  that.
4    Q. (BY MR. DAVIS-DENNY) Okay. So you cannot
5  describe for us how you came up with the
6  definition of "flow rate estimate" in mid- to late
7  May 2010 without disclosing privileged
8  information; is that correct?
9    A. That's -- that's my understanding at the
10 minute, yes.
11   Q. This was not a definition -- this "flow
12 rate estimate" definition was not something you
13 learned in your studies at Cambridge?
14   A. No, it wasn't.
15   Q. It's not something you found in the
16 technical dictionary?
17   A. No.
18   Q. Okay. And you didn't develop it yourself,
19 did you?
20        MS. KARIS: Object to form.
21        MS. AVERGUN: You can answer.
22        THE WITNESS: I can answer that?
23   A. Yes, it was.
24   Q. (BY MR. DAVIS-DENNY) It was something you
25 developed yourself?

15 (Pages 382 to 385)

386

1  A. Yes.
2  Q. Okay. What was the purpose of you
3  developing this defi- -- definition in mid- to
4  late May?
5  THE WITNESS: And, again, can I...
6  MS. KARIS: I would instruct the
7  witness to answer with respect to general scope or
8  purpose, without divulging privileged details. So
9  to the extent you can do that...
10  THE WITNESS: So let me -- let me
11  begin and --
12  MS. KARIS: Sure. And if --
13  A. It was describing work that included flow
14  rate as a factor.
15  Q. (BY MR. DAVIS-DENNY) And who were you
16  describing this work to?
17  THE WITNESS: Is that okay?
18  MS. AVERGUN: You can answer that.
19  A. Jeff Morgheim; Brittany Benko; and to my
20  recollection, Steve Haden.
21  Q. (BY MR. DAVIS-DENNY) And were you doing
22  this in response to a request you had received
23  from those three individuals?
24  MS. AVERGUN: You can answer that.
25  A. Yes.

387

1  Q. (BY MR. DAVIS-DENNY) What was the nature
2  of their request?
3  MS. AVERGUN: You can answer that.
4  MS. KARIS: Very generally again,
5  without divulging the details of privileged
6  communications.
7  MS. AVERGUN: You can go ahead and
8  answer.
9  A. To describe to them work that included
10  flow rate.
11  Q. (BY MR. DAVIS-DENNY) Okay. And what did
12  you tell them?
13  MS. KARIS: No. Instruct the witness
14  not to answer with respect to that. Calls for
15  privileged communications.
16  Q. (BY MR. DAVIS-DENNY) And are you
17  following your counsel's instruction?
18  A. I am.
19  Q. When you described -- when you identified
20  the individuals that you spoke with, you said Jeff
21  Morgheim, Steve Haden, and -- there was a third
22  individual, correct?
23  A. Brittany Benko.
24  Q. Thank you.
25  MS. AVERGUN: Objection to form.

388

1  Q. (BY MR. DAVIS-DENNY) And so prior to your
2  interactions with Morgheim, Haden, and Benko, you
3  had not formulated this definition of "flow rate
4  estimate." Is that correct?
5  MS. KARIS: Objection; asked and
6  answered.
7  A. I don't believe so, no.
8  Q. (BY MR. DAVIS-DENNY) I want to just try
9  and make sure I understand your definition of
10  "flow rate estimate." So suppose you receive a
11  phone call, but not a letter, from Tony Hayward
12  asking for your best assessment of the rate of the
13  flow from the well. You take all of the
14  information in your possession, you use the best
15  model that you have available, and you come up
16  with your best assessment of 30,000 barrels per
17  day plus or minus 10 percent.
18  Since Mr. Hayward had not requested
19  this estimate -- assessment in writing, would your
20  assessment fall outside of your definition of
21  "flow rate estimate" in this hypothetical?
22  MS. KARIS: Objection to form.
23  MS. AVERGUN: Object to form.
24  A. No, I don't think it would fall outside.
25  Q. (BY MR. DAVIS-DENNY) Okay. So a phone

389

1  call could -- could be sufficient for a formal
2  request under your definition?
3  A. Yes. I believe so, yes.
4  Q. Okay. Suppose the facts are the same as
5  I've just described, except it's a formal written
6  request that you receive from Bill Lehr, rather
7  than from a senior BP official. Would an
8  assessment of the flow rate prepared in response
9  to Mr. Lehr's request qualify as a flow rate
10  estimate under your definition?
11  MS. KARIS: Object to form.
12  MS. AVERGUN: Same objection.
13  A. So I'm obviously having to answer a
14  hypothetical question after the event. I would
15  say if I had received a request from Bill Lehr, I
16  would have referred it within my reporting line in
17  BP.
18  Q. (BY MR. DAVIS-DENNY) Sorry, but that's
19  not exactly my -- my question. My question is
20  whether that request from Mr. Lehr would
21  qualify -- the response to that request from
22  Mr. Lehr would qualify as a flow rate estimate
23  under your definition.
24  MS. KARIS: Object to form.
25  A. If I had referred that request up my

16 (Pages 386 to 389)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

EXHIBIT 2

to Letter to Judge Shushan from Sarah Himmelhoch

January 30, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          )   MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN     )   SECTION "J"

THE GULF OF MEXICO, ON     )

APRIL 20, 2010             )   JUDGE BARBIER

                           )   MAG. JUDGE SHUSHAN






                  * * * * * * * * * * * * * * * * * * *

                           VOLUME 2

                  * * * * * * * * * * * * * * * * * * *



    Deposition of Tony T. Liao, Ph.D., taken at

Kirkland & Ellis International, 30 St. Mary Axe,

22nd Floor, London EC3A 8AF, England, United

Kingdom, on the 11th of January, 2013.

486

1  whether you talked to any of the other individuals
2  that worked on the Macondo effort.
3          Do you recall that discussion?
4      A.  I -- I do.
5      Q.  And we talked a little bit about the types
6  of documents that you reviewed to prepare for your
7  deposition, right?
8      A.  Yes.
9      Q.  When did you prepare for your deposition
10  with Counsel?  I'm not interested in any of the
11  conversations that you had.  I'm just wondering
12  when you were prepared for your deposition.
13      A.  For my -- in the last few weeks.
14      Q.  Within the last few weeks?
15      A.  Yes.
16      Q.  And where did that preparation take place?
17      A.  Can I call another time-out?
18      Q.  Can you -- can you answer the question?
19          MR. EHRLICH:  Why don't you just go
20  ahead and answer.  Just the places.
21          THE WITNESS:  Okay.
22      A.  The place.  One in Los Angeles.  One in --
23  here, London.
24      Q.  (BY MS. ENGEL)  Once in Los Angeles, and
25  once in London?

487

1      A.  Correct.
2      Q.  And when did the preparation in Los
3  Angeles occur?
4      A.  About two or three weeks ago.  Yeah.
5  About two or three -- two or three weeks ago.
6      Q.  Did you prepare for your deposition in
7  Houston at all?
8      A.  No, I did not.
9      Q.  Okay.  At what point did you learn that
10  your deposition was going to be here in London as
11  opposed to Azerbaijan or in New Orleans where a
12  lot of the depositions have taken place in this
13  case?
14      A.  I would say about two weeks ago.
15      Q.  Okay.
16      A.  That's from my memory.  If I can look at
17  my time -- my schedule, I will tell you for
18  certain.
19      Q.  Sure.  But that's your best recollection?
20      A.  That's right.
21      Q.  Okay.
22          MS. ENGEL:  Let's go off the record
23  for a minute.  I might be done.  I just need to
24  regroup.
25          THE VIDEOGRAPHER:  The time is

488

1  5:15 p.m.  We're off the record.
2          (Break from 5:15 p.m. to 5:19 p.m.)
3          THE VIDEOGRAPHER:  The time is
4  5:19 p.m.  We're on the record.
5      Q.  (BY MS. ENGEL)  Okay.  Dr. Liao, I have
6  just a few more questions for you about a document
7  we looked at a couple of minutes ago.  It's
8  Exhibit 11165.
9          MR. EHRLICH:  Is there a tab?
10          MS. ENGEL:  I'm sorry.
11      Q.  (BY MS. ENGEL)  It's Tab 145 and it's an
12  E-mail from you to Mike Mason and it has one
13  attachment.  Do you have it there in front of you?
14      A.  Okay.
15      Q.  One of the numbers here in the -- in the
16  text that we discussed earlier is a rate of 15,000
17  barrels per day.  Do you see that?
18      A.  I do.
19      Q.  Okay.  Why were -- why was BP focused on a
20  rate of 15,000 barrels per day at this point?
21          MR. CRAMER:  Object to the form.
22      A.  I do not know.
23      Q.  (BY MS. ENGEL)  Do you know why you
24  evaluated the 15,000 barrel-per-day number in this
25  context?

489

1          And I guess I could ask it this way,
2  which might make it a little bit easier:  Was
3  15,000 barrels per day an input to your modeling?
4      A.  No, it -- it is not.
5      Q.  It's not an input?  So is it an output
6  from the modeling?
7      A.  Yeah.  It -- it is an operative number,
8  where the company got processed data.  I don't
9  have any idea now how that works, all these arrows
10  and this -- on this one chart.
11      Q.  Okay.  So in -- you're saying in the
12  attachment here, what you did was vary some
13  certain parameters, certain inputs to generate a
14  rate of 15,000 barrels per day?
15          MR. CRAMER:  Object to form.
16      Q.  (BY MS. ENGEL)  Or the other way around
17  where 15,000 was the value that was held constant
18  as an input?
19      A.  No, no.
20      Q.  And --
21      A.  The first way.
22      Q.  The first, okay.
23          Why were you running this modeling
24  to -- that generated this rate of 15,000 barrels
25  per day?

EXHIBIT 3

to Letter to Judge Shushan from Sarah Himmelhoch

January 30, 2013



**U.S. Department of Justice**
**Environmental Enforcement Section**
**Environment and Natural Resources Division**

---

*P.O. Box 7611*                                          *Telephone  (202)514-0180*
*Ben Franklin Station*                                   *Sarah.Himmelhoch@usdoj.gov*
*Washington, DC  20044-7611*

**BY ELECTRONIC MAIL**                                   December 21, 2012

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

   Re: MDL 2179: Insufficiency of BP's 30(b)(6) Witnesses

Dear Judge Shushan:

   BP has engaged in a concerted effort to evade discovery on flow rates from the Macondo Well --- a subject at the heart of the Phase 2 litigation.  Specifically, individuals designated by BP to testify in response to the Agreed 30(b)(6) Deposition Notice of BP Defendants, served August 2, 2012 (Att. 1) ("Agreed Notice"), were unknowledgeable and unprepared to answer questions squarely within the scope of topics for which they were designated, and BP's counsel repeatedly made scope objections based on implausibly and unfairly constrained interpretations of the specified topics.

   The process for Phase 2 discovery in this case was carefully formulated by this Court to foster efficiency and to avoid pitfalls encountered in Phase 1.  *See, e.g.*, Order, 6/27/12, Doc. 6808 at 2; Order, 3/6/12, Doc. 5968 at 5; Order, 9/8/11, Doc. 3949 at 2.  The Agreed Notice topics resulted from arduous negotiations over many months.  BP has taken unjustifiably narrow positions regarding the scope of these topics, thus undermining the discovery process envisioned by the Court.  The United States has attempted, unsuccessfully, to resolve these issues.  Without Court involvement, BP will achieve the result that Rule 30(b)(6) was designed to avoid,[1] and will prevent discovery by the United States on matters central to this litigation.[2]

   BP's reading of the topics divorces certain mechanical components of source control methods from their intended use to capture or kill the flow from the Macondo Well.  By taking such an implausibly narrow position, BP has avoided designating and preparing witnesses who can testify about flow rate calculations and modeling in connection with these various response methods — despite the centrality of flow rate estimates to the response efforts.  Nevertheless, the

---

[1] "Rule 30(b)(6) is designed to 'avoid the possibility that several officers and managing agents might be deposed in turn, with each disclaiming personal knowledge of facts that are clearly known to persons within the organization and thus to the organization itself.'" *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 432-433 (5th Cir. 2006) (internal citation omitted); *United States v. J.M. Taylor*, 166 F.R.D. 356, 360 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C.1996).

[2] BP responded to the United States' "meet and confer" letter of November 20, 2012, via a letter from Robert Gasaway to Sarah Himmelhoch dated November 29, 2012 (Att. 2) ("Gasaway Letter").

United States is not seeking relief in each instance where BP has taken an unfairly constrained interpretation of the topics in the Agreed Notice. For example, Topic 8 calls for the "manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure the temperature of the discharge from the Macondo Well . . . ."  Agreed Notice at 4-5.  BP designated Mr. John Hughes.[3]  But, at the deposition, BP argued that the Topic was limited solely to where and when the thermometer was placed, and what the reading was.  Thus, BP argued that the designation did not include any analysis, estimates, accuracy, or even summarization of the measurements, and that it also did not include the accuracy or inaccuracy of the measurements as a prediction or estimate of the oil temperature.  For example, regarding a list of all temperature measurements taken, BP objected to the scope, and did not prepare the witness to answer, which of the measurements was "the most accurate reflection of the temperature of the flowing oil as it exited the BOP."  Deposition of John Hughes, November 27-28, 2012 (Vols. 1-2) (Att. 4) at 257:8-258:12.  Similarly, the witness was not prepared to answer whether the riser temperature measurements were an accurate measurement of the temperature of the exterior of the riser.  *Id.* at 306:5-307:10.  Regarding the temperature measurement taken in the plume under the top hat, the witness could not answer (and counsel objected to scope) as to whether a particular temperature measurement was "a good characterization of the temperature of the oil at the wellhead."  *Id.* at 373:3-374:20.

These examples are provided for illustrative purposes only.  Rather, as set forth below, the United States seeks the Court's intervention on narrow issues most central to the discovery effort.

A.  Duties under Rule 30(b)(6).  The Fifth Circuit mandates that a corporation's duty under Fed. R. Civ. P. Rule 30(b)(6) is twofold: "the deponent 'must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to *prepare* those persons in order that they can answer fully, completely, unevasively the questions posed . . . .'"  *Brazos River Authority v. GE Ionics, Inc*., 469 F.3d 416, 433 (5th Cir. 2006) (internal citations omitted) (emphasis in original).  "If it becomes obvious that [a designee] is deficient, the corporation is obligated to provide a substitute."  *Id*. at 433.

The rule "places the burden of identifying responsive witnesses . . . on the corporation."  *Resolution Trust Corp. v. Southern Union Co., Inc*., 985 F.2d 196, 197 (5th Cir. 1993).  "If [the designated] agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all."  *Id.; Brazos River Authority v. GE Ionics, Inc*., 469 F.3d at 433-434 (quoting *Resolution Trust Corp.*).  Also, "[t]he deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources."  *Id.* at 433. That duty includes "impart[ing] to [the witness] the information obtained from individuals with personal knowledge within the organization." *Id.* at 434.

B.  BP has failed with respect to both duties under Rule 30(b)(6) and has objected to questions squarely within the scope of the agreed topics as described below.

1.  Robert Sanders - Topic 12: The Agreed Notice includes the following topic 12:

The use of any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo MC252 well undertaken by or on behalf of BP or the

---

[3] BP Letter of September 27, 2012 to the Court ("BP Letter") (Att. 3) at 6.

Unified Command *in connection with* the analysis, consideration or execution of any Method (as that term is defined in Topic 1).

Agreed Notice at 5 (Att. 1) (emphasis added).  Topic 1 in turn provides in relevant part:

For any and all attempts after April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well by each of the following methods . . . : . . .  Macondo Relief Well No.1, and Macondo Relief Well No. 2 (hereinafter collectively referred to as "Methods"): . . . .

*Id*. at 1.  BP designated Robert Sanders for Topic 12 as it relates to "Relief Wells."  BP Letter at 7 (Att. 3).

BP, however, takes the astounding position that the planned use of the relief wells to effect a dynamic kill of the Macondo Well is outside the scope of Topic 12, when that was their very purpose.  Thus, BP's designee was unprepared to testify about the "use of any analysis, calculations, assumptions or modeling of the flow rate . . . in connection with the analysis, consideration or execution of" the relief wells. [4/]

Indeed, Mr. Sanders acknowledged, over objection of counsel, that the relief wells were initially intended to be a dynamic kill method:

A. The "dynamic kill process" refers to establishing a fluid column, which is a hydrostatic, which equates to a pore pressure -- a pressure, together with the friction involved in that target wellbore, will generate enough pressure to overcome a flowing well.
* * *
Q. (By Ms. Himmelhoch) And that was the method that BP intended to use with the relief wells until the capping stack was put in place; is that correct?
MR. BENTSEN: Objection, form.

---

[4/]This failure is especially stark given that the planning and implementation of the relief wells began on April 21, 2010 and continued throughout the period when oil was flowing into the Gulf. (See, e.g., Stipulated Facts Concerning Source Control Events, Doc. 7076, Nos. 24, 29, 47, 70, 137, & 163.)  Moreover, BP provided the following response in its May 24, 2010 letter to Congressman Markey:

12. Could an increased flow from the riser pipe affect proposed or attempted efforts to stop the flow of oil, such as . . . the drilling of relief wells for plugging the well bore?
[A.] Yes. Flow rates have been considered in connection with all efforts to stop the flow of oil."

Depo. Ex. 10358, at p. 4, No. 12 (Att. 5).  Furthermore, the 30(b)(6) designee for Wild Well Control (a BP contractor that assisted with efforts to control the Macondo well), testified that the relief well was being drilled primarily to effect a dynamic kill, and that information regarding the flow rate was necessary to establish the rate of mud to pump to dynamically kill the well.  Deposition of David Barnett, Vol. 1, December 14, 2012 (Att. 6) at 25:04-24; 57:20-58:08; 122:17-123:16; 130:20-131:04; *see also* 294:20-295:05 & 296:12-18. Finally, BP's own documents demonstrate that flow rates were essential to effecting a dynamic kill of the Macondo Well and integral to the "analysis, consideration, or execution" of the relief wells.  See, e.g.,  BP E&P "Mississippi Canyon 252 #1 Relief Well, Intercept & Kill Operations Plan, Revision 1.0 - 14 May 2010," BP-HZN-2179MDL04909491-506 (Att. 7), at pp. 1-4.

- 3 -

Objection, scope.
A. The method that was chosen was a dynamic kill for the relief wells.

Deposition of Robert Sanders, Vol. 1, November 5, 2012 (Att. 8) at 125:12-126:10.  Moreover, Mr. Sanders acknowledged that to design a dynamic kill, one must determine the appropriate rate at which to pump the mud down the well.  He further testified:

Q. (By Ms. Himmelhoch) In your over 30 years of experience, is it your understanding that in order to identify the pump rate, you need to assume a flow rate from the well you are trying to dym – dynamically kill?
MR. EPPEL: Objection, form.
MR. BENTSEN: Objection, form.
Objection, beyond the scope.
A. It is one of the inputs, I believe.

*Id.* at 127:20-128:03.  Similarly, he testified that "Flow rates would have been a – a component of a dynamic kill calculation." *Id.* at 212:19- 213:1.

In other words, Mr. Sanders acknowledged that the relief wells were intended to be used to effect a dynamic kill and that, in order to perform a dynamic kill, BP needed to perform an estimate of the flow rate.  Yet, BP claimed that questions regarding those flow rate calculations were beyond the scope of the Agreed Notice.

Because of BP's position unjustifiably constraining the scope of the agreed Topic, the witness was not prepared to testify on this subject.  Instead, he testified that he "wasn't party to all of the type of calculations that were done and by whom." *Id.* at 127:15-19; *accord* 126:11-127:08.   Similarly, he testified over counsel's objections:

Q. (By Ms. Himmelhoch) . . . . Did BP assume any particular flow rate in conducting the analysis of how to perform the dynamic kill using relief wells?
MR. EPPEL: Objection, form.
MR. BENTSEN: Objection, beyond the scope. The witness is not designated on bottom kill.
A. Again, I was not party to all of the – the interactions and calculations of bottomhole flowing pressure or rates.
Q. (By Ms. Himmelhoch) Are you telling me that BP did not do any analysis of the flow rate of hydrocarbons from the MC252 Well when it was designing the dynamic kill or the relief wells?
MR. EPPEL: Objection, form.
MR. BENTSEN: Objection, form. Objection, beyond the scope.
A. I'm not saying that. I'm saying I was not party to that effort.
Q. (By Ms. Himmelhoch) At the time -- from the time it spudded the first relief well until the capping stack was in place, the relief well was a dynamic kill method; is that correct?
MR. BENTSEN: Objection, form.
MR. EPPEL: Objection, form.
MR. BENTSEN: Objection, beyond the scope.
A. The chosen technique to kill the well, once intercepted, was a dynamic kill technique.

*Id.* at 128:4-129:11.

Thus, BP has refused to provide a Rule 30(b)(6) designee prepared to testify regarding flow rate analyses related to the planned dynamic kill using the relief wells.  The Court should

- 4 -

overrule BP's scope objections and order BP to produce a  knowledgeable, adequately prepared witness.

2.      Kevin Devers - Topic 12

Like Mr. Sanders, Mr. Devers was designated to testify regarding Topics 1 and 12 , but as they related to the Cofferdam, RITT, and Top Hat.  Like Mr. Sanders, Mr. Devers was unprepared to testify with respect to "the use of any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo . . . well *in connection with* the analysis, consideration or execution of any" of these methods.  Agreed Notice, at 5 (Topic 12) (emphasis added).  BP construes this topic to be limited to the bottom-most mechanical components of these devices, wholly separate and divorced from their intended use "to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well."

For example, Mr. Devers testified:

Q. Who was in charge of the entire RITT Project?
MR. BENTSEN: Objection, form.
A. So I'm trying to get -- when you say "RITT Project," I -- you might need to help me with that question. What -- what do you mean when you say "RITT Project"?
Q. (By Mr. Dart) From start to finish, who came up with the idea, who designed it, who implemented it through to completion?
A. So the --
MR. BENTSEN: Objection, form.
Q. (By Mr. Dart) The -- the whole ball of wax.
A. So the tool itself was separate from the riser that come -- connected it to the vessel, which would -- and the vessel was separate yet again. Different Teams were working those different aspects.
Q. Was -- I'm sorry.
A. So for the RITT device itself, that would have been me.
Q. Okay. Was there any one person at BP in charge of all of those Teams that were involved with the RITT Project?
 MR. BENTSEN: Objection, form and scope.
A. I -- I viewed that to be Stan Bond, then -- then Richard Lynch.

Deposition of Kevin James Devers, November 12-13, 2012 (Vols. 1-2) (Att. 9) at 405:10-406:13. Mr. Devers thus testified that different teams were working on different aspects of the RITT project and that he viewed the RITT tool itself as separate from aspects of the project that different teams were working on (i.e., the riser connecting the RITT tool to the surface and the vessel to which that riser would connect).

BP chose to limit its interpretation of the scope of Topic 12 along these lines to artificially divorce the bottom-most device or component of the source control method from the other aspects of the method essential to capturing and bringing the oil to the surface.  As shown above, when the witness was asked who was in charge of the different teams working on the RITT project, BP's counsel objected to the question based on scope.   BP's strained interpretation of the topic allowed BP counsel to elicit self-serving sound bites during direct questioning.  When's BP's counsel asked Mr. Devers if the "Team developing and designing the RITT use[d] flow rate estimates in its design or implementation," the witness thus was able to respond that "We did not." Id. at 502:11-14.  He provided the same self-serving responses for the cofferdam ("They did not") and Top Hat ("We did not"). *Id*. at 502:15-18.

- 5 -

Other parts of the witness' testimony, however, indicate that flow rates likely played a role in connection with these methods. For example, Mr. Devers testified that Flow Assurance Engineers "may have" been involved with the projects on which he was designated to testify:

> Q. (By Mr. Dart) Okay. Were any flow in -- Flow Assurance Engineers involved with either the cofferdam, the RITT, or the Top Hat projects?
> MR. BENTSEN: Objection, form and scope.
> A. There may have been.
> Q. (By Mr. Dart) And who might they have been?
> A. Norm McMullen and Farah Saidi. Apologies if I've mispronounced their names.
> Q. Now, was either Norm McMullen or Farah Saidi involved in the Cofferdam Project?
> MR. BENTSEN: Objection, form and scope.
> A. I don't know.

*Id.* at 403:17-404:6. He further testified:

> Q. Did either of those two individuals work on the RITT Project?
> MR. BENTSEN: Objection, form and scope.
> A. They may have.
> Q. (By Mr. Dart) In what capacity?
> A. It --
> MR. BENTSEN: Objection, form and scope.
> A. It would -- I don't know. I -- I believe their involvement would have been with the flow up the riser that connected these devices to the -- to the surface vessel.

*Id.* at 404:19-405:6. And even though Mr. Devers testified that he viewed Stan Bond and Richard Lynch to be in charge of the RITT project, he testified that he did not recall talking with these men about either McMullen's or Saidi's work on the project. *Id.* at 406:14-19. Likewise, Devers did not talk to Farah Saidi or anyone on the cofferdam team. *Id.* at 278:19-278:23.

Mr. Devers indicated that a consideration with respect to a containment system such as a cofferdam or top hat is: "once we've captured [the oil], what do we do with it. Do we have processing equipment that can — that can deal with this, can we — can we tanker it away, can we flare it . . . —what do we do with it." Id. 297:21-298:1. Yet, he did not have information about collection rates through the RITT, or why those rates might have varied, *see id.* 382:21-385:19; nor did he have information about why BP was "looking to add collection capacity" with respect to the Top Hat. *Id.* 469:06-470:09.

That BP's interpretation of Topic 12 is unjustifiably constricted is underscored by BP's scope objection to questions regarding a June 9, 2010, letter from Doug Suttles of BP to Admiral Allen. *See id.* at 475:23-476:21; *see also id.* at 465:25-469:22. That letter stated that "[t]he systems outlined here are designed based on the current best independent assessment of flow from the Flow Rate Technical Group." Depo. Ex. 9106, at 34 (Att. 10). While the witness acknowledged that the Top Hat on which he was designated to testify was one of the methods addressed in that letter, and despite the representation in that letter about the relationship of flow rate to the design of those methods, BP objected based on scope. BP's interpretation of Topic 12 cuts off the point of hydrocarbon capture (Cofferdam, RITT, the Top Hat) from the rest of the components of that source control method, without which the point of capture would be a useless piece of metal. The Court should order BP to produce a fully prepared 30(b)(6) designee to testify about flow rates in connection with the Top Hat, RITT, and Cofferdam.

3.  Ellen Williams - Topics 4, 9, and 16

Dr. Williams was designated to testify regarding three topics, all related to flow rate.

**Topic 4**:   Topic 4 reads in pertinent part:

> 4. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction, used to predict, estimate, characterize and/or measure the daily amount of hydrocarbons flowing from the Macondo Well . . . , [i]ncluding the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based.

Agreed Notice at 3 (Att. 1).  With respect to Topic 4, Dr. Williams was designated to testify on "flow rate (observational)."  *See* BP Letter at 3 (Att. 3).

Like other 30(b)(6) witnesses designated by BP, Dr. Williams had very little personal knowledge with respect to the topics for which she was designated.  Deposition of Ellen D. Williams, November 19-20, (Vols. 1-2) (Att. 11) (*See, e.g.*, "Q.  As Chief Scientist at BP, did you have any role in performing any flow rate analyses?  A.  I did not do any flow rate analyses. Q.  Okay.  Did you have any role in evaluating other people's flow rate analyses?  A.  Not specifically in the context of flow rate analysis."  *id*. at 31:3-9, *and* "Q. Okay. Have you had any job responsibilities while you're with BP in connection with actually estimating flow rate?  A. No." *Id*. at 349:16-19).

Not only did Dr. Williams lack significant personal knowledge of attempts to estimate flow rates using observational methods, she was wholly unprepared to answer questions within BP's corporate knowledge and squarely within the scope of the agreed topic.  For example, she testified:

> Q. (By Mr. Appelman) Okay. Did this internal effort to analyze the video feeds for flow rates, did it ever determine or calculate a flow rate?
> * * *
> A. I don't know.
> Q. (By Mr. Appelman) You agree with me, though, that analyzing video feeds for flow rate is an observational flow estimate, right?
> * * *
>  A. Yes -- yes.

*Id*. at 323:9-19.

Furthermore, and as another example of Dr. William's lack of preparation, BP flow engineer Trevor Hill prepared a memo titled "Observations on flow coming from the Macondo system" dated May 15, 2010 (Depo. Ex. No. 10344, Att. 12).  That memo clearly sets forth Mr. Hill's analysis of a flow rate estimate performed by Professor Steve Wereley based on observational techniques, and provides an analysis of various factors which Mr. Hill claims would reduce the flow from the well.  Mr. Hill used these factors to predict significantly lower flow rate estimates and to conclude that NOAA's estimate of 5000 bopd "does not seem un-reasonable . . . ."  *Id*.  Mr. Hill's analysis is clearly a "manner and/or methodology that BP. . . used to predict, estimate, characterize and/or measure. . . flow from the Macondo Well" using observational techniques, and thus well within the scope of Topic 4.  Dr. Williams, however, was wholly unable to provide any information regarding that analysis:

- 7 -

Q. Okay. And it reads: "Firstly there is drill pipe protruding from the end of the riser, occupying some of the original flow area, reducing by 10% the flowrate estimated from a measured velocity," by PIV "and the original pipe area." Do you see that?
A. Yes, I see that.
Q. Okay. How did Trevor Hill determine that the drill pipe protruding from the end of the riser caused a 10 percent reduction in flow rate?
A. I -- I didn't ask Trevor Hill that question.
Q. Okay. Did you do anything in your deposition to determine how Trevor Hill determined the 10 percent reduction?
A. No, I did not.
Q. Okay. Did you come across anything in preparation for your deposition that would give an indication of any type of information he was relying upon?
A. I don't know what Trevor Hill relied on.

*Id.* at 309:21 - 310:16. When asked what the basis for Trevor Hill's reduction of flow by 30% because of the damaged riser pipe, Dr. Williams responded "I – I don't believe Trevor mentioned the 30 percent number to me. * * *  All I can say is that Trevor hol – told me that after they reoriented the ROV, they were able to see the damage at the end of the tube and that should have been accounted for in the flow rate calculation.  I don't know more than that."  *Id.* at 312:14-22. The witness was similarly unprepared and failed to provide responsive information to each and every one of the factors that Trevor Hill identified as being a basis for reducing the overall flow rate estimate:

Q.  Okay.  Do you know how Trevor Hill determined that 40 percent of the average volume flow out of the pipe at seabed was gas?
A.  No, I don't.
Q.  Okay.  And if we flip to "Fourthly..."  Do you see that next paragraph?
A.  Yes, I do.
Q.  . . . Do you know how Trevor Hill determined that this would result in a further 40 percent reduction in the estimate of oil reaching the surface?
A.  No, I don't know how Trevor did that.

*Id*. at 313:2–19.

BP characterizes Mr. Hill's memorandum as a critique of a third party's estimate and takes the strained position that it is not an "estimate" that falls within the scope of Topic 4. However, this memorandum, in which a BP employee performs an analysis of another person's flow rate estimate and purports to provide a reasoned basis for discounting that estimate – including the amount of barrels of oil by which the flow rate should be reduced – most certainly describes a manner or method used by BP to "predict, estimate, characterize and/or measure" the flow rate from the Macondo Well.

Moreover, Dr. Williams testified that she believed that an "eyeball estimate" performed by Trevor Hill – which she clearly testified was an observational method of estimating flow rate -- took into account at least some of these factors.  Again, she was wholly unable to explain the basis for those numbers:

Q.  So when we broke, Dr. Williams, we were talking about Exhibit 10334, and you had just indicated that BP had done some analyses using observational flow techniques that took into account Item No. 1, which is the drill pipe protruding from the end of the riser; is that correct?
A.  That is my recollection.

- 8 -

> Q.  Okay.  Can you describe for me what those analyses were?
> A.  All right.  I – if my memory is correct, I believe that when Trevor Hill described to me the eyeball estimate that I told you about earlier, if I remember correctly, I believe he accounted for the 10 percent reduction in area of the drill pipe.
>                          ***
> Q.  What is – what was the basis for the 10 percent reduction?
> A.  I don't know specifically.

Williams Depo. at 58:13-59:12.  Dr. Williams went on to testify that the "eyeball estimate" performed by Mr. Hill took into account several of the factors mentioned in his memo, but was unable to recall the basis for the reductions he applied.  *Id.* at 60:23- 62:09.

Dr. Williams was clearly unprepared to provide even the most basic information relating to the "manner and/or methodology" used by BP "to predict, estimate, characterize and/or measure" the flow rate from the Macondo Well using observational methods.  Thus, BP should be required to produce an adequately prepared 30(b)(6) designee.

**Topic 16:**  Topic 16 reads:

> All analyses, calculations, assumptions, and data cited and/or relied upon in "BP's Preliminary Response to the Flow Rate and Volume Estimates Contained in Staff Working Paper No. 3" submitted by BP to the National Oil Spill Commission on or about October 21, 2010.

Agreed Notice at 6 (Att. 1). BP designated Dr. Williams as the sole witness for this Topic.  BP Letter at 8 (Att. 3).  The document referred to in this topic, prepared by BP, contains a detailed analysis and critique of the United States' flow rate estimate announced on August 2, 2010. Questions related to this document were limited to the time-frame prior to July 17, 2010 in light of this Court's prior Order upholding certain claims of privilege by BP.  Order, 7/13/12, Doc. 6904.  Even with this limitation, it was clear that Dr. Williams was unable to testify regarding Topic 16:

> Q. (By Ms. Chang) Prior to July 17th, 2010, what analyses were relied upon, by BP, in preparing this document, Exhibit 10338?
> A. I don't know.
> Q. Prior to July 17th, 2010, what calculations were relied upon, by BP, in preparing this document, Exhibit 10338?
> A. I don't know.
> Q. Prior to July 17th, 2010, what assumptions were relied upon by BP in preparing this document, Exhibit 10338?
> A. I don't know.
> Q. And prior to July 17, 2010, what data was relied upon, by BP, in preparing this document, Exhibit 10338?
> A. I don't know.

*Id*. at 97:9-24; *see also id*. at 86:07-87:5 (witness did not know who prepared the document).

> Q. (By Ms. Chang) What did you do to try to determine the analyses, calculations, assumptions, and data existed prior to July 17, 2010, and were relied upon by BP in preparing this Exhibit 10338?
> A. Okay. I asked Counsel whether any work done before July 17th was relied on for -- in preparing this document.

Q. All right.

*Id.* at 98:19-99:02.

Given that all contemporaneous data with respect to the flowing well necessarily was generated prior to July 17, 2010, it is implausible that BP has no information that falls within the indisputably non-privileged scope of this topic. Accordingly, BP should be prepared to produce a fully prepared 30(b)(6) designee to testify on this subject.

**Topic 9**. Topic 9 reads in pertinent part:

Your efforts (including all communications, modeling, calculations and analysis) undertaken or used in connection with: the flow rate estimate of 1,000 bopd announced by Admiral Landry on April 24, 2010; the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010; . . .

Agreed Notice at 5 (Att. 1). Again, BP designated Dr. Williams as the sole witness for this Topic. BP Letter at 6 (Att. 3). BP objected to questions that were squarely within the scope of this topic which plainly calls for BP's "efforts . . . undertaken or used in connection with" specific flow rate estimates publicly announced by the United States on specific dates. BP has offered varying justifications for its scope objections. During the deposition, BP asserted initially that the Topic was limited to efforts that pre-dated the announcement of the estimate.[5] Under that theory, any effort undertaken by BP to analyze a US flow rate estimate *after* the date of the announcement would be outside the scope of the topic. BP then claimed that the topic calls only for efforts in connection with a particular *announcement* of a flow rate. Gasaway Letter (Att. 2) at 7-8 (also appearing to assert that the Topic calls only for "technical work" in connection with the announcement, *see id.* at 8, ¶ 2.)

For example, the witness was asked a series of questions about BP's response to Congressman Markey dated May 24, 2010 (Exhibit 10358) (Att. 5) regarding a flow rate estimate of 5000 barrels per day. As BP's response clearly states, "the estimate of 5,000 barrels per day is a Unified Command estimate, not a BP estimate," *id.* at 1, and is, in fact, the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010, as described in Topic 9. *See* Depo. Ex.10347 ("Guilty Plea Agreement, United States of America v. BP Exploration and Production, Inc., Filed 11/15/12") (Att. 13) at 17, ¶¶ 4 & 5. BP's response to Congressman Markey is clearly a "communication" and an "analysis" "undertaken or used in connection with" that 5000 bopd estimate, and therefore responsive to Topic 9. Even though Dr. Williams had been shown this document in preparation for her deposition, she was unable to answer the most

---

[5]   MS. CHANG: So is it your position that anything beyond or after the actual announcement is outside the scope?
MS. KARIS: In connection with Topic 9? Yes.
* * *
MS. CHANG: So with respect to the 1,000 barrel announcement, BP's position is that any communications, modeling, calculations, or analysis conducted after April 24th is outside the scope?
MS. KARIS: If it doesn't pertain to the announcement of that estimate, so I'm not sticking to the date. I'm sticking to the announcement of the estimate, which is how it's phrased, "announced by."

Williams Depo. at 157:15-158:12.

- 10 -

basic questions about it, and BP objected to questions regarding the document on scope grounds. Williams Depo. at 360:19–363:15.

BP's strained scope objections continued through questioning regarding Depo. Ex.10347 ("Guilty Plea Agreement," Att. 13) that specifically referenced false and misleading statements made by BP in its May 24, 2010 response to Congressman Markey, and regarding flow rate estimates provided by BP in that response. Williams Depo. at 144:25-145:7, 150:7-154:13, 159:3-160:5. BP explained its scope objections by stating that "[t]his is beyond the scope of that, as the Markey letter was dated May 24th and the announcement [of the 5000 bopd flow rate] certainly predates all of that." *Id*. at 155:9-12. By taking the strained and implausible view that its effort must have occurred in connection with *an announcement*, rather than in connection with *a flow rate estimate*, BP has avoided providing important information regarding its efforts with respect to each government flow rate estimate. Given that no fair reading of Topic 9 supports BP's interpretation, the United States requests that the objections to the questions set forth at pages 150:7-154:13 and 159:3-160:5 of the deposition transcript be overruled and the answers be deemed to have been given in BP's 30(b)(6) corporate capacity.

C. Relief requested. As explained above, the United States has been denied discovery into relevant and agreed upon deposition topics. Given the impending deadlines and the Court's carefully constructed discovery process for Phase 2, BP's positions with respect to the issues set forth above are particularly untenable. Accordingly, pursuant to Fed. R. Civ. P. 37(a), the United States respectfully requests that BP be required to produce knowledgeable, fully prepared 30(b)(6) witnesses to respond to the topics as set out herein, including all follow up questions that flow from responsive answers, and that BP's objections based on scope be overruled. With respect to Topic 9, as noted above, we simply request that the Court overrule BP's objections based on scope and that the answers cited above be deemed to have been given in BP's 30(b)(6) corporate capacity. We are certainly appreciative of the need for efficiency to meet the current schedule, and suggest that in that vein, the Court might consider requiring BP to designate one or more appropriate upcoming fact witnesses as 30(b)(6) designees on one or more of the topics discussed above with appropriate additional time allocations for each. In any event, however, BP should be required to fulfill its discovery obligations to produce knowledgeable, fully prepared 30(b)(6) witnesses to respond to the topics as set forth above.

Respectfully submitted,

/s/ Sarah D. Himmelhoch
Senior Litigation Counsel for E-Discovery
Environmental Enforcement Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044

cc: Liaison & Coordinating Counsel

Attachments: See "Attachment List" appended hereto

- 11 -

**ATTACHMENT LIST**

| Att. # | Description |
|--------|-------------|
| 1 | Agreed 30(b)(6) Deposition Notice of BP Defendants, served August 2, 2012 |
| 2 | Letter from Robert Gasaway, Kirkland & Ellis LLP, to Sarah Himmelhoch, U.S. DOJ, dated November 29, 2012 |
| 3 | BP Letter to Judge Shushan, dated September 27, 2012, Re: Phase 2 Rule 30(b)(6) Deposition Scheduling |
| 4 | Deposition of John Hughes, November 27-28, 2012 (Vols. 1-2) at 257:8-258:12; 306:5-307:10; 373:3-374:20 (*Confidential*) |
| 5 | Letter from BP to Congressman Markey, dated May 24, 2010 (Depo. Ex. No. 10358) |
| 6 | Deposition of David Arnold Barnett, Volume 1, dated December 14, 2012, at pages 25:04-24; 57:20-58:08; 122:17-123:16; 130:20-131:04; 294:20-295:05; 296:12-18 (*Highly Confidential*) |
| 7 | BP Exploration & Production Mississippi Canyon 252 #1 Relief Well, Intercept & Kill Operations Plan, Revision 1.0 – May 14, 2010 (BP-HZN-2179MDL04909491 - 04909506 (*Confidential*) |
| 8 | Deposition of Robert Sanders, Volume 1, dated November 5, 2012, at pages 125:12-126:10; 127:20-128:03; 127:15-19; 126:11-127:08; 128:4-129:11; 212:19-213:1 (*Confidential*) |
| 9 | Deposition of Kevin James Devers, Volumes 1 & 2, dated November 12-13, 2012, at pages 278:19-278:23; 297:21-298:1; 382:21-385:19; 403:17-404:6; 404:19-405:6; 405:10-406:13; 406:14-19; 465:25-470:09; 475:23-476:21; 502:11-18 (*Confidential*) |
| 10 | Letter from BP, Doug Suttles, to FOSC dated June 9, 2010 (Appendix 2 to Annex B of National Incident Commander Strategy Implementation (Depo. Ex. No. 9106 to Deposition of Admiral Allen, at pages 31-35)) (*Confidential*) |
| 11 | Deposition of Ellen D. Williams, Volumes 1 & 2, dated November 19-20, 2012, at pages 31:3-9; 58:13-59:12; 60:23-62:09; 86:07-87:5; 97:9-24; 98:19-99:02; 144:7-145:7; 150:7-154:13; 155:9-12; 157:15-158:12; 159:3-160:5; 309:21 - 310:16; 312:18-22; 313:2-19; 323:9-19; 349:16-19; 360:19-363:15 (*Confidential*) |

12          BP memorandum entitled "Observations on flow coming from the Macondo
            system" dated May 15, 2010,  prepared by BP employee Trevor Hill (Depo. Ex.
            No. 10334) (*Confidential*)

13          Guilty Plea Agreement, *United States of America v. BP Exploration and
            Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La. Filed 10/15/12) (Depo.
            Ex. No. 10347)

EXHIBIT 4

to Letter to Judge Shushan from Sarah Himmelhoch

January 30, 2013

                  UNITED STATES DISTRICT COURT

                  EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          )   MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN     )   SECTION "J"

THE GULF OF MEXICO, ON     )

APRIL 20, 2010             )   JUDGE BARBIER

                           )   MAG. JUDGE SHUSHAN




                  *****************

                     VOLUME 2

                  *****************



          Deposition of FARAH SAIDI, taken

at Pan-American Building, 601 Poydras Street,

11th Floor, New Orleans, Louisiana, 70130, on

the 11th day of January, 2013.

438

1    A.    I can't say I do remember
2  direct -- you know, specifically to capping
3  stack.
4    MR. SMITH:  Okay.
5    MR. DRAKE:  Counsel, how much time have
6  you got left?
7    MR. SMITH:  I have gotten the red, out
8  of time note.
9    MR. DRAKE:  Okay.
10    MR. SMITH:  Thank you, Ms. Saidi.
11    THE VIDEOGRAPHER:  Time is 12:27 p.m.
12  We are off the record.
13    (Recess from 12:27 p.m. to 1:03 p.m.)
14    THE VIDEOGRAPHER:  This begins Tape 14
15  of today's deposition.  Time now is 1:03 p.m.
16  We are back on the record.
17       E X A M I N A T I O N
18  BY MR. DRAKE:
19    Q.    Good afternoon, Ms. Saidi.  For
20  the record, Stuart Drake and Cate Stahl
21  representing BP.
22       Ms. Saidi, do you recall before
23  the lunch break Mr. Cafferty asking you some
24  questions about Exhibit 10185, which is
25  Tab 19 in the notebook in front of you?

439

1    A.    Yes.
2    Q.    And that's -- that exhibit
3  describes work you did with Mike Mason's
4  team; is that right?
5    A.    This has some of my work, yes.
6    Q.    With Mike Mason's team?
7    A.    Yes.
8    Q.    Do you consider the work that
9  you did for the Mason team reflected in that
10  exhibit to be a flow rate estimate?
11    A.    No.
12    Q.    And why not?
13    A.    To me a flow rate estimate is
14  when you have enough credible data, you know
15  your flow path, you know your reservoir.
16  Everything that is about the system that you
17  are designing to -- to calculate, to estimate
18  a flow rate with 10 -- plus or minus
19  10 percent uncertainty.
20    Q.    All right.  And so when you did
21  the work reflected in Exhibit 10185, did you
22  have, in your view, sufficient information
23  about the system?
24    A.    No.
25    Q.    And, Ms. Saidi, do you also

440

1  recall having provided testimony about Tab 48
2  in the government's notebook?  I'll try to
3  find that one.  This has previously been
4  marked as Exhibit 10191, and the top e-mail
5  in the collection is an e-mail from Steve P.
6  Carmichael to two individuals; is that right?
7    A.    Yes.
8    Q.    All right.  And could you please
9  turn to the Excel chart contained in that
10  exhibit?  Do you recall testifying about this
11  yesterday --
12    A.    Yes.
13    Q.    -- Ms. Saidi?
14    A.    Yes.
15    Q.    All right.  And at the time that
16  you prepared the work reflected in this
17  chart, did you know the delta P value for the
18  system that you were examining?
19    A.    No.
20    Q.    So would it be possible to use
21  the Excel chart shown here to infer or
22  estimate the flow rate from the Macondo well?
23    A.    No.  And, plus, the -- the
24  length I assumed for a valve, I was -- I
25  don't know if that was the right assumption

441

1  or not.
2    Q.    All right.  And just generally,
3  Ms. Saidi, you've used the term "flow rate"
4  in -- speaking with me and with the other
5  lawyers.  Could you please define "flow rate"
6  as a term of art to you, please.
7    A.    It's a volume of the fluid that
8  flows through a pipe or channel at a given
9  time.
10    Q.    And, Ms. Saidi, I think that you
11  also spoke yesterday about the significance
12  of some of your file paths having the word
13  "confidential" in them; is that right?
14    A.    Yes.
15    Q.    And what did you try to use the
16  confidential folder for, please, ma'am?
17    A.    I tried to put everything that
18  was under privilege in that folder.
19    Q.    Is it possible that
20  inadvertently there may have been a few items
21  that you meant to treat as confidential that
22  didn't end up in that folder?
23    MR. DART:  Objection; form.
24    A.    Yes.
25    Q.    (BY MR. DRAKE)  Now, Ms. Saidi,

39 (Pages 438 to 441)

EXHIBIT 5

to Letter to Judge Shushan from Sarah Himmelhoch

January 30, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL          )   MDL NO. 2179
BY THE OIL RIG             )
"DEEPWATER HORIZON" IN )   SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010            )   JUDGE BARBIER
                          )   MAG. JUDGE SHUSHAN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VOLUME 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

30(b)(6) Deposition of Kevin James
Devers, BP, Inc., taken at the Pan-American
Building, 601 Poydras Street, 11th Floor, New
Orleans, Louisiana, 70130, on the 12th day of
November, 2012.

90

1  Q. (By Mr. Lundy) All right. How many --
2  how often -- how many discussions were you
3  involved in with respect to the three-ram capping
4  stack?
5      MR. BENTSEN: Objection, form and
6  scope.
7      MR. PINEIRO: Objection, form.
8  A. So it's difficult to answer that
9  question, because the -- the -- the Team that was
10 focused on that sat in a room very similar to
11 this, and -- and the Team working on the
12 single-valve manifold was right nearby.
13 Q. (By Mr. Lundy) In the same room?
14 A. In the same room.
15 Q. Okay. Were the two Teams working
16 together?
17     MR. BENTSEN: Objection, form and
18 scope.
19 A. Well, so -- hard -- when you say
20 "together," I'm not quite sure what you mean by
21 that, but we were in the same room. There was --
22 that Team that was focused on the three-ram
23 stack. There was another team working on the
24 single-valve manifold. There was exchange of --
25 of technical information with respect to

91

1  functionality, as I mentioned.
2  Q. (By Mr. Lundy) Okay.
3  A. Because ultimately, these outlets
4  would -- would generally be connected up the same
5  way, regardless of if it was single-valve
6  manifold or the three-ram capping stack.
7  Q. Okay. When did the discussions involving
8  the -- the single-valve manifold begin?
9      MR. PINEIRO: Objection, scope.
10     MR. BENTSEN: Objection, form and
11 scope.
12 A. I would have to look through these notes
13 to give you a date on that.
14 Q. (By Mr. Lundy) All right. Well, is it
15 your recollection that the Capping Stack Team and
16 the Single-Valve Manifold Team always met in the
17 same room?
18     MR. PINEIRO: Objection, scope.
19     MR. BENTSEN: Objection, form and
20 scope.
21 A. Again, "always met." We -- we -- we
22 worked in the same room.
23 Q. (By Mr. Lundy) Okay. Always?
24     MR. BENTSEN: Objection, form and
25 scope.

92

1  A. From the time that the single-valve
2  manifold was moving forward, yes.
3  Q. (By Mr. Lundy) Okay. So did you have
4  knowledge about decisions being made with respect
5  to the three-ram capping stack?
6      MR. PINEIRO: Objection, scope.
7      MR. BENTSEN: Objection, form and
8  scope.
9  A. As it relates to functionality, to some
10 degree, yes.
11 Q. (By Mr. Lundy) Okay. Were you involved
12 in the decision-making as to when the three-ram
13 capping stack would de -- be deployed?
14     MR. BENTSEN: Objection, form and
15 scope.
16 A. No, I don't believe so.
17 Q. (By Mr. Lundy) All right. Were -- were
18 you involved any -- in any discussions where BP
19 had decided to try the -- the top kill instead of
20 using a capping stack?
21     MR. PINEIRO: Objection, scope.
22     MR. BENTSEN: Objection, form and
23 scope.
24 A. No.
25 Q. (By Mr. Lundy) Were you aware of that?

93

1      MR. BENTSEN: Objection, form and
2  scope.
3      MR. PINEIRO: Objection, scope.
4  A. Was I aware that discussions were being
5  held or -- sorry.
6  Q. (By Mr. Lundy) Okay. Are you aware of
7  what -- whether or not a capping stack was ready
8  fairly early on, and BP elected to go with the
9  top kill instead of the capping stack?
10     MR. PINEIRO: Objection, scope.
11     MR. BENTSEN: Objection, form and
12 scope.
13 A. No.
14 Q. (By Mr. Lundy) Turn to Tab 3. And it's
15 previously been marked as Exhibit 8542.
16 A. Yes.
17 Q. This is an E-mail from James Wellings,
18 dated August 26, 2010, to himself and -- and
19 Elaine Metcalf. Do you know Mr. Wellings?
20 A. I do.
21     MR. BENTSEN: Objection, scope.
22 Q. (By Mr. Lundy) Did you work with him on
23 the Macondo Project?
24     MR. BENTSEN: Objection, scope.
25 Objection, form.

24  (Pages 90 to 93)

314

1   more -- we were concerned more about when it went
2   in, how would they bend over and then flex bat --
3   flex back open.
4        Q. (By Ms. André) Okay.
5        A. A concern that we had was, once we got
6   the -- the ri -- the RITT inside of the riser,
7   and once we started collecting the oil, how would
8   we prevent seawater from also getting brought in.
9        So there were some devices employed on
10  the tool that -- to help avoid that situation.
11       Q. Okay.
12       A. But in terms of flow coming out of the
13  pipe and our inability to put the RITT in, that
14  was not -- I don't recall that being a concern.
15       Q. Okay. Were any other fluid properties
16  relevant to your design of the RITT?
17           MR. BENTSEN: Objection, form.
18       A. For RITT No. 1, no. For -- for RITTs
19  later on, there was some discussion about the
20  hydrocarbons flowing down the HORIZON riser.
21  Could there have formed an oil later, a loo -- an
22  oil layer and a gas layer, and might we be
23  oscillating between the two regions and taking
24  some gas and taking some oil.
25       Q. (By Ms. André) M-h'm.

315

1        A. So when you ask about fluid properties,
2   later on, we considered that and made -- made
3   some adjustments on the later tools to -- to try
4   to compensate for that.
5        Q. Okay. So when you say some liquid, some
6   gas, do you mean that the fluid may have been
7   breaking into two phases when it -- by the time
8   it hit the rule -- RITT?
9        A. It may have.
10       Q. Okay.
11       A. I don't know that we know that answer.
12       Q. Was the kind of going back and forth
13  between gas and liquid something that you all
14  observed once the RITT was installed?
15           MR. BENTSEN: Objection to form and
16  scope.
17       A. So I -- I recall hearing that so-called
18  "slugging" was problematic.
19       Q. (By Ms. André) Okay.
20       A. And that was part of why we were asked:
21  "Can you -- can you look at something on this
22  tool? We think that maybe one of the reasons for
23  the slugging is that we're drawing from varying
24  or inconsistently inside of this pipe at 5,000
25  feet." So we were doing our best to try to

316

1   stabilize this so that we would only draw from
2   the -- basically the centerline of -- of the --
3   now, this was on RITTs that we did not deploy.
4        Q. Right.
5        A. So RITT 1, as I say, was what it was.
6   It -- it -- as you had movements, it -- the tip
7   of the RITT would move.
8        Q. And you had slugging as a result?
9           MR. BENTSEN: Objection, scope.
10       A. I can't answer that. I don't know if --
11  if -- I'm not sure that slugging did occur. I
12  heard that it did.
13       Q. (By Ms. André) Okay.
14       A. Now, whether -- whether the -- the cause
15  of that slugging was where we started taking the
16  hydrocarbon or something that was happening as it
17  was rising to the vessel, I -- I don't know.
18       Q. Was it useful information to have for the
19  design of RITTs No. 2 and 3, that you might have
20  that slugging problem?
21           MR. BENTSEN: Objection, form.
22       A. To the extent of what -- how we would
23  maybe put something on the tip of the RITT, or
24  externally, how we might con -- stabilize it
25  once -- once it was --

317

1        Q. (By Ms. André) Okay.
2        A. -- inserted.
3        Q. So had you known before you designed RITT
4   No. 1, that that kind of slugging was possible,
5   would you have put on those extra pieces to keep
6   the pipe from moving?
7        A. H'm.
8           MR. BENTSEN: Objection, form and
9   scope.
10       A. I don't know if I can answer that. There
11  were some other concerns that we had with 2 and 3
12  about installation.
13       Q. (By Ms. André) All right.
14       A. And we didn't attempt those. I mean,
15  we -- we did trials of it onshore, so we -- we
16  saw that we could do it onshore. But it's --
17  it's challenging in the environment that we were
18  trying to install this -- this RITT.
19       Q. You had to balance all the concerns?
20       A. Well, as -- as it turned out, we did not
21  need RITTs 2 and 3.
22       Q. Right.
23       A. We were prepared to go use them.
24       Q. Okay.
25       A. But is there certainty that we wouldn't

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL        )   MDL NO. 2179
BY THE OIL RIG           )
"DEEPWATER HORIZON" IN )   SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010           )   JUDGE BARBIER
                         )   MAG. JUDGE SHUSHAN




                  * * * * * * * * * * * * * * * * *
                        VOLUME 2
                  * * * * * * * * * * * * * * * * *



        Continuation of the 30(b)(6) Deposition
of Kevin James Devers, BP, Inc., taken at the
Pan-American Building, 601 Poydras Street, 11th
Floor, New Orleans, Louisiana, 70130, on the 13th
day of November, 2012.

432

1  tended to be soft, muddy, that, again due to the
2  weight of this thing, that it would start to sink
3  or penetrate.  And these wings were put out so
4  that it would not continue to sink till it
5  stopped on its own.  We wanted it to sink only to
6  where these mud mats were at.  And these mud mats
7  were laid out such that the intent was these
8  windows or the cutouts in the side where the
9  HORIZON riser would come, that it would come in
10  close proximity of that.
11      Q.  All right.  So the mud mats were higher
12  than the bottom edge of the cofferdam?
13      A.  Yes, sir.
14      Q.  How much higher?
15      A.  Oh.  I would have to review the -- the
16  schematics on that.  I don't recall that
17  dimension.
18      Q.  Okay.  Well, look -- there might be some
19  photos at the back of the exhibit you have in
20  front of you.
21      A.  Yes, sir.
22      Q.  Does that help you out any?
23      A.  Let me review this for a moment and see
24  if there's any dimensions.  (Reviewing document.)
25      I -- from the picture, I cannot tell you

433

1  a -- a distance from the bottom of the cofferdam
2  where the mud mats -- but approximately it's --
3  looking at the photograph --
4      Q.  On Page 17 of 21?
5      A.  I'm sorry.  I believe that is -- yes,
6  Page 17 of 21.
7      Q.  The top photograph?
8      A.  Yes, sir, the top photograph.  It's --
9      Q.  Those things in the middle, are -- are
10  those the mud mats?
11      A.  Yes, sir.
12      Q.  So around the middle of the cofferdam is
13  where the mud mats were?
14      A.  That's a close approximation, yes.
15      Q.  So the cofferdam was expected to sink
16  down into the seabed up to the point of the mud
17  mats, correct?
18      A.  That is correct.
19      Q.  And those look like -- well, maybe
20  they're not people.  But how tall was that
21  cofferdam, roughly?
22      A.  I'm hesitant to answer.  I -- I want to
23  say it's 30 to 40 feet.
24      Q.  All right.  So the cofferdam was expected
25  to sink down into the seabed approximately

434

1  fifteen feet before the mud mats hit the seabed,
2  correct?
3      A.  That --
4          MR. BENTSEN:  Objection, form.
5      A.  That could be correct.
6      Q.  (By Mr. Dart)  Yes.  And the edge of that
7  cofferdam would be sinking down on top of the
8  riser, down, down, down for fifteen feet, before
9  it stopped.  That was the intent, correct?
10          MR. BENTSEN:  Objection, form.
11      A.  So when you say "on top," on top of the
12  HORIZON riser, do you mean the bottom of the
13  cofferdam?
14      Q.  (By Mr. Dart)  The very bottom edge of the
15  cofferdam hits the riser and pushes it down
16  fifteen feet before those mud mats hit the
17  surface, right?
18      A.  No.  That -- that was not the plan.
19      Q.  It wasn't.
20      Well, let's talk about the plan after the
21  break, because I'm out of time right now.
22      A.  Okay.
23          THE VIDEOGRAPHER:  The time is
24  9:36 a.m.  We're off the record, ending Tape 10.
25      (Recess from 9:36 a.m. to 9:48 a.m.)

435

1          MR. DART:  Ready.
2          THE VIDEOGRAPHER:  All set?
3      The time is 9:48 a.m.  We're back on the
4  record.
5      Q.  (By Mr. Dart)  Mr. Devers, earlier I was
6  asking you about your preparation for Topic 12,
7  dealing with flow rate as it concerned cofferdam,
8  RITT, and Top Hat.  Do you recall that?
9      A.  I do.
10      Q.  I'm going to show you a document.  It's
11  76 in -- in the Department of Justice's second
12  volume there.
13      A.  All right.
14      Q.  Tab 76.
15      A.  One moment, please.
16      Excuse me.  Yes, sir.
17      Q.  And I'm going to mark this ex -- as
18  Exhibit 10299.
19      (Exhibit No. 10299 marked.)
20      Q.  (By Mr. Dart)  And this is an E-mail
21  string with attached PowerPoint slides, it
22  appears, dealing with Top Hat.
23      A.  M-h'm.
24      Q.  And, first of all, I'll ask you if you've
25  ever seen this document before?

16 (Pages 432 to 435)

436

1    A. Can you give me just a moment, please.
2  (Reviewing document.)
3    I don't recall seeing this document
4  before.
5    Q. Okay. Who is Theresa Elizondo?
6    A. I don't know.
7    Q. And she is, I guess, forwarding an E-mail
8  from Farah Saidi, correct, if you look at the
9  very bottom of the first page?
10    A. Yes, I believe so.
11    Q. And Ms. Saidi was the one who prepared,
12  or at least sent, these PowerPoint Presentations,
13  correct?
14    A. That's what it appears to me, yes.
15    Q. And if you look at the page ending in
16  Bates No. 5030 --
17    A. 5030.
18    Q. -- you'll see a slide entitled "Top Hat."
19    A. Yes, sir.
20    Q. "No flow restriction by the current
21  design and drill pipe size." Correct?
22    A. That's what that first bullet says, yes.
23    Q. Okay. But you -- you never talked to
24  Ms. Saidi in preparation for this deposition, did
25  you?

437

1    A. No, I didn't.
2    Q. Okay. Now, I'm going to show you a
3  document that was previously marked in
4  Mr. Ballard's deposition, but I don't have the
5  number, so I'm going to give it a new number.
6  It's Tab 1 on my CD, and we're going to mark this
7  as Exhibit 10300.
8    (Exhibit No. 10300 marked.)
9    A. Thank you.
10    Q. (By Mr. Dart) And this is a chapter from
11  a book that Mr. Ballard and two other people
12  wrote, entitled "Industrial Operating Procedures
13  for Hydrate Control."
14    Have you ever seen this book chapter
15  before?
16    A. (Reviewing document.)
17    No, sir, I don't believe I have.
18    Q. Turn to Bates page ending in 3295.
19    A. Yes, sir.
20    Q. And if you see -- Section 7.4 is headed
21  "GENERATION OF OPERATING PROCEDURES FOR HYDRATE
22  CONTROL," and Section 7.4.1 dealing with
23  "Detailed Design - Customer Engineering" reads as
24  follows, or at least the first sentence does:
25  "Clear documentation of all detailed engineering

438

1  work should be given in report format to lay out
2  all relevant hydrate information."
3    Did I read that correctly?
4    A. That's what it reads, yes.
5    Q. Do you agree with that statement?
6    MR. BENTSEN: Object -- objection,
7  form and scope.
8    A. While I'm not sure that I agree or
9  disagree, I'm not sure what the context is. I
10  don't know -- I don't know enough about this
11  document to say that I can either agree or
12  disagree with that statement.
13    Q. (By Mr. Dart) As a general principle,
14  isn't clear documentation of engineering work
15  preferable?
16    MR. BENTSEN: Objection, form and
17  scope.
18    A. I would agree with that.
19    Q. (By Mr. Dart) Okay. And look at the last
20  sentence on that same page. It reads: "Hydrate
21  risk (when and where): Clear documentation of
22  when hydrates are expected to be a concern should
23  be given."
24    Do you agree with that statement?
25    MR. BENTSEN: Objection, form and

439

1  scope.
2    A. Again, it's -- it's back to the -- the
3  context what is -- I'm not sure that what this is
4  advocating. I have a hard time giving you a
5  direct answer to that question.
6    Q. (By Mr. Dart) Okay. But it is clear that
7  BP did not document when hydrates were expected
8  to be a concern in the Cofferdam Project,
9  correct?
10    MR. BENTSEN: Objection, form.
11    A. Okay. So the Cofferdam Project, if --
12  I -- I believe that the installation procedures
13  accounted for con -- hydrate concern. It was not
14  explicitly stated. Then in the follow-on
15  procedure for controlling or mitigating hydrates,
16  at the point of the -- the drill pipe connecting
17  to the cofferdam, there were definite procedures
18  in play for mitigating hydrates.
19    Q. (By Mr. Dart) Let's go back to the
20  question I was asking you before the break.
21  And --
22    A. Yes, sir.
23    Q. -- the con -- and I want to know what
24  consideration was made by BP in the design of the
25  cofferdam to prevent the edge of the cofferdam

17 (Pages 436 to 439)

EXHIBIT 6

to Letter to Judge Shushan from Sarah Himmelhoch

January 30, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL            )   MDL NO. 2179

BY THE OIL RIG               )

"DEEPWATER HORIZON" IN       )   SECTION "J"

THE GULF OF MEXICO, ON       )

APRIL 20, 2010               )   JUDGE BARBIER

                             )   MAG. JUDGE SHUSHAN

        30(b)(6) Deposition of Tanner Gansert, BP, Inc.,
taken at the Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on the 12th day
of November, 2012.

62

1        MR. PETOSA:  "Peijs"?
2        MR. EPPEL:  "Peijs."
3    Q.  (BY MR. PETOSA) P-E-I-J-S.  Jasper Peijs.
4        Who is Jasper Peijs?
5    A.  At this time, Jasper was the team leader for the
6  subsurface exploration team.
7    Q.  (BY MR. PETOSA) Okay.  And who's Todd Rounding?
8    A.  Todd Rounding was another reservoir engineer on
9  the exploration and engineering team.
10   Q.  Okay.  And why did you send this e-mail?
11   A.  I wanted to share the calculated results for the
12 worst-case discharge value with the gentlemen in the "To"
13 line.
14   Q.  Okay.  And -- and you note in your first line,
15 "For future reference, the Macondo WCD as reported in the
16 EP is 162" -- it's barrels of oils per day, correct?
17   A.  162- --
18   Q.  -62,000.
19   A.  -- thousand.
20   Q.  Sorry.
21       And then you go on to note, sir, "This value" --
22       And did I read that correct, by the way?
23   A.  I believe so, yes.
24   Q.  Okay.  Except for I know at the end, I didn't.
25       But it's 162,000 barrels of oil per day, correct?

63

1    A.  Yes.
2    Q.  And it says, "This value was calculated using the
3  PROSPER model found at the link below and rep- --
4  represents an uncontrolled blowout at the seafloor,
5  without a drill string in the wellbore"; is that correct?
6  Did I read that correct?
7    A.  You did, yes.
8    Q.  And that's what we just talked about.  That was
9  the assumption you made, that in -- in evaluating what the
10 WCD value for MC252 in the face of an uncontrolled blowout
11 was at the seafloor mud line, correct?
12   A.  The -- the -- that calculation assumed mud line
13 discharge and no drill string in the wellbore.
14   Q.  Okay.  And then you go on to say, "For
15 comparison, an MMS worst-case discharge was also used."
16       What is that -- what is that tool?
17   A.  That refers to a spreadsheet tool that the MMS
18 at -- at some point created for worst-case discharge
19 calculations.
20   Q.  And you ran that MMS worst-case discharge tool
21 when evaluating what the WCD volume was for MC252?
22   A.  I did, yes.
23   Q.  Okay.  And you ran that in -- in addition to
24 running the PROSPER model, correct?
25   A.  That's correct.

64

1    Q.  And what did you -- what did you determine
2  running the MMS worst-case discharge tool?
3    A.  I determined that the -- the value created -- or
4  calculated using that tool was -- was not realistic.
5    Q.  Why?
6    A.  Because, as I mentioned in the e-mail, the -- the
7  MMS calculation resulted in discharge that was greater
8  than the absolute open flow potential of Macondo.
9    Q.  And who told you or how did you determine what
10 the absolute open flow potential was for MC252?
11   A.  That value is an output of the PROSPER model.
12   Q.  So after you put all the information in, PROSPER
13 tells you what the absolute open flow potential is for
14 MC252?
15   A.  It -- the -- the AOF, or absolute open flow,
16 is -- is a calculation that -- that PROSPER makes.
17   Q.  Okay.  So I'm clear, then, in understanding, when
18 you were done making -- going -- working through the model
19 and populating the model in PROSPER, in addition to
20 PROSPER telling you that the WCD volume in the face of an
21 uncontrolled blowout was 162,000 barrels of oil per day,
22 it also told you that the absolute open flow potential for
23 MC252 was 225,000 barrels of oil per day?
24   A.  The -- the calculated absolute open hole, based
25 on that -- that PROSPER model, was 225,000 barrels of oil

65

1  per day.
2    Q.  And what's the difference between a worst-case
3  discharge scenario of 162,000 barrels of oil per day in
4  the face of an uncontrolled blowout and the absolute open
5  flow potential of MC252 which PROSPER told you was
6  225,000 barrels of oil per day?
7    A.  The absolute open flow doesn't represent a case
8  that's physically possible.
9    Q.  Why?
10   A.  It -- the -- the -- the assumption for AOF
11 potential is that there is no -- no pressure loss from the
12 bottom of the wellbore to the surface.
13   Q.  Okay.  And how can pressure loss from the bottom
14 of the wellbore to the surface impact the flow?
15   A.  If -- if you assume that there is pressure loss
16 due to the hydrostatic pressure of the fluid and any
17 frictional losses in the -- in the tubing, the result of
18 the calculation is reduced.
19   Q.  And so did PROSPER determine that the difference
20 between 162,000 barrels of oil per day as a worst-case
21 discharge volume and the absolute open flow volume of
22 225,000 barrels of oil per day, that difference of about,
23 I guess, what, 63,000 barrels of oil per day, that that
24 was due to pressure loss from the bottom of the wellbore
25 to the surface?

17  (Pages 62 to 65)

90

1    volume for MC252.
2        A. Okay.
3        Q. So we're going to go backwards. Right now, we're
4    not talking about the WCD volume using Freedom as an
5    example, as in a foreign exploratory well for the OSRP.
6    Okay? Yes?
7        A. Okay.
8        Q. When we were discussing MC252 and the WCD volume
9    that you determined at 162,000 barrels of oil per day, you
10   mentioned that there was a number of different things you
11   would look at working through the PROSPER model or
12   populating the model. You mentioned reservoir rock
13   properties, and I think you also mentioned some other
14   aspect of that that we might not have covered. I want to
15   make sure I'm clear.
16           Is fluid properties a part of -- of the reservoir
17   rock properties that you would look to or have to provide
18   to PROSPER in populating the model?
19       A. I wouldn't consider -- sorry. Can you --
20       Q. Fluid properties?
21       A. I wouldn't consider fluid properties rock
22   properties, but fluid properties are inputs to PROSPER.
23       Q. Okay. I want to make sure I'm clear, because
24   I -- when we went through, we were talking about the
25   different aspects of PROSPER that you would populate, work

91

1    through, whether it was assumptions you made yourself or
2    information or data that others provided.
3        A. Okay.
4        Q. We talked about reservoir rock properties,
5    correct?
6        A. Yes.
7        Q. We've discussed the wellbore design and
8    schematics, correct?
9        A. Yes.
10       Q. And we've discussed the assumed discharge, the
11   mud line discharge, as you explained to us.
12       A. Right.
13       Q. Is fluid properties another aspect that you need
14   to consider, whether it's assumptions you make yourself or
15   information or data others provide you in populating the
16   PROSPER model?
17       A. Fluid properties are inputs to PROSPER for a WCD
18   volume calculation.
19       Q. And did you consider fluid properties in
20   populating the model in PROSPER to determine the WCD
21   volume for MC252?
22       A. Yes.
23       Q. Who provided you with that information?
24       A. As I recall, those -- those properties were
25   provided by the petroleum systems' analyst in -- who sits

92

1    on the subsurface exploration team.
2        Q. Do you know who that was?
3        A. I believe it was Pierre-Andre Depret at that
4    time.
5        Q. And that's the individual mentioned in -- if you
6    turn back to Tab 3, Exhibit 9299, we reference in the
7    second sentence of the first paragraph, "The" hydrogen
8    sulfide "H2S information will be sent to you..."
9            And I believe that's by e-mail via Pierre-Andre
10   Depret.
11       A. Yes.
12       Q. Depret. Sorry. Right?
13       A. Yes.
14       Q. Okay. So did Mr. Depret provide you with the
15   fluid properties of MC252 as you were populating the
16   PROSPER model?
17       A. He provided pre-drill estimates of API gravity
18   and -- I'm forgetting the term. The solution gas-oil
19   ratio.
20       Q. Solution gas-oil ratio?
21       A. Correct.
22       Q. Anything else?
23       A. Not that I can recall, no.
24       Q. And do you know what those two properties were,
25   the API gravity and the solution gas-oil ratio?

93

1        A. I don't recall off the top of my head, but in the
2    e-mail the API gravity is -- is listed as 33 degrees.
3        Q. Okay.
4        A. I don't recall the -- the gas-oil ratio.
5        Q. And apart from reser- -- was there anything else
6    by way of fluid properties that was either provided to you
7    by others within BP or that you had to make assumptions
8    about regarding MC252 as you were populating the PROSPER
9    model to determine the WCD volume?
10       A. The gas gravity would also be an input.
11       Q. And who provided you with that information?
12       A. I don't recall who provided that information.
13       Q. Do you know what it was for MC252?
14       A. I don't recall, no.
15       Q. Now, apart from reservoir rock properties,
16   wellbore design and schematics, the assumed discharge,
17   fluid properties, and the other assumptions we've talked
18   about that you made in determining what the WCD volume in
19   the face of an uncontrolled blowout was for MC252, was
20   there any other data or information that you relied upon
21   or that was provided to you in populating the PROSPER
22   model that we haven't talked about?
23           MR. DRAKE: Objection; form.
24       A. Right now, I can't think of any other assumptions
25   that go into that that we haven't discussed today.

24  (Pages 90 to 93)

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**