# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

February 4, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Re:     MDL 2179 — BP's Motion for Reconsideration of Rec. Doc. 8149

Dear Judge Shushan:

This letter replies to the United States' January 30, 2013 letter regarding BP's Rule 30(b)(6) witnesses ("US Letter").

As explained below, the United States' efforts to extract additional Rule 30(b)(6) testimony from BP does not establish why the information being sought is relevant to the Phase 2 Quantification case and overlooks testimony already in the record that addresses the very questions the United States contends it needs further depositions to explore.

## BACKGROUND

The central Phase 2 Quantification question is how much oil flowed from the *Deepwater Horizon*.  This question will be largely — although far from entirely — addressed through upcoming Quantification expert reports.  A related subsidiary question involves identifying the best scientific methodologies for use in estimating the amount of spilled oil.  Other questions involve the source and reliability of the best data inputs into various types of Quantification analyses, the relation between Quantification issues and Source Control issues, and the like.  Many of these other questions, too, will be addressed in whole or in part in upcoming expert submissions.

Those expert submissions will not primarily depend on determinations of the accuracy or inaccuracy of early, historical, time-crunched flow rate estimates produced while the spill was in

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 4, 2013
Page 2

progress.   Indeed, this Court recognized as much in its February 1, 2013 ruling, (Rec. Doc. 8466), ordering certain United States testimony could be designated to supplement Admiral Landry's inadequate Rule 30(b)(6) testimony, but denying BP's request for additional interrogatories.  In light of this ruling with regard to testimony by Admiral Landry, and given the duplicative and tangential nature of the information sought by the United States as further described below, BP's offer of a new witness on the dynamic kill aspects of the relief wells plus additional discovery via interrogatories appears more than generous.

## ARGUMENT

This scheduled reply is submitted now during the last week of scheduled fact depositions, long after the scheduled period for Rule 30(b)(6) depositions, and with an ambitious expert discovery schedule impending.  In light of all circumstances, BP's offer of a new dynamic kill witness and interrogatories on the RITT, Top Hat, and May 24, 2010 letter to Congressman Markey should be accepted by the Court and United States.

### Ruling Regarding Sanders Testimony

As noted at a recent Working Group Conference, BP has offered to provide two hours of testimony on the dynamic kill aspects of the relief well project.  (*See* WGC Tr. (Jan. 18, 2013), at 29-31.)  BP will soon be in touch with the United States regarding our proposed deponent, deposition date, and location.  BP will work in good faith to resolve any questions of logistical detail that may arise in connection with this deposition — as we did in the context of the recent depositions of Trevor Hill and Secretary Chu.

### Ruling Regarding Devers Testimony

BP has attempted, and continues to attempt, to provide additional testimony on Topic 12 with respect to the RITT and Top Hat in an efficient manner and in conformity with the Court's Order, (Rec. Doc. 8149).  BP does so against the backdrop of the testimony already provided on this subject and the United States' ambiguous and shifting requests for still more deposition testimony.

As Mr. Devers testified, flow rate was not a design consideration for open containment systems like the RITT and Top Hat.  (Attachment 1, Devers Dep. Tr. 429:3-430:17, 501:18-503:3.)  Mr. Devers explained that the purpose of these devices was to collect as large a fraction as possible of the oil flowing from the *Deepwater Horizon*, subject only to the limitation of surface collection capacity.  (*Id.* at 501:18-502:5.)  If that collection capacity were adequate,

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 4, 2013
Page 3

then, happily, most or all of the following oil would be collected. And if it were surpassed, "excess fluids would be discharged into the environment." (*Id.* at 502:6-10.)

For the RITT, Mr. Devers explained that BP's interest was using "the largest pipe that we thought we could successfully install." (Devers Dep. Tr. 307:9-24.) To mitigate against potential hydrate formation, "[the] plan was to inject all the methanol we were capable of injecting" — not an injection rate based on an assumed or estimated flow. (*Id.* at 309:4-8.) Mr. Devers further testified that the force of the hydrocarbons being released from the drill pipe was not a concern for inserting the RITT. (*Id.* at 313:17-314:14.)

The same is true for Mr. Devers's testimony regarding the design and installation of the Top Hat. Mr. Devers explained the two big concerns for Top Hat design were the area over which the top hat would be installed — for example the evenness of the riser cut, (*see id.* at 97:23-99:2) — and mitigating hydrate formation. (*Id.* at 318:9-18.) Along these lines, the United States asked specifically whether the amount of methanol injected into the Top Hat for hydrate mitigation depended on "how much hydrocarbon was flowing through the Top Hat." (*Id.* at 357:14-357:20.) Mr. Devers responded that BP simply pumped all of the methanol available. *Id.*

In fact, Dr. Tom Hunter, the United States' own Rule 30(b)(6) witness with respect to the National Laboratories involvement in the Top Hat (US Topic 23) — and a key Science Advisor to Secretary Chu — confirmed that the United States' *own* flow rate estimates did not "have a material effect" on the implementation of the Top Hat.

> Q. But prior to the actual execution of the Top Hat procedure, where you can look at it as it sat on the BOP, the flow rate estimates that were being issued by the Flow Rate Technical Group had not entered any of your assessments of source control activities?
>
> A. It's conceivable they were discussed. They didn't have a material effect on the outcome of the -- of the -- the -- in -- our interface with BP or advice to the Government.
> (Attachment 2, Hunter Dep. Tr. 234:4-13.)

In short, the United States already understands the topic it is seeking to delve into, and it has already received the most significant testimony on the effect of flow rate analyses and assumptions on the design and implementation of the RITT and Top Hat. Nonetheless the United States has for whatever reason refused to accept the accuracy and adequacy of this testimony and move on.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 4, 2013
Page 4

On January 10-11, 2013, after the Court's initial ruling, the United States deposed Ms. Saidi.  Were the matter in any doubt, Ms. Saidi (a flow assurance engineer who worked with Mr. Devers and others on various collection methods) explained in her testimony that the "flow rate" of the Macondo Well — using a very generic definition of the term, (*see* Attachment 3, Saidi Dep. Tr. 441:6-9) — was not a consideration in the design and execution of the RITT and Top Hat collection methods.  During her examination by BP, Ms. Saidi testified:

Q.  (BY MR. DRAKE)  Now, Ms. Saidi, do you also recall having discussed with some of the other lawyers the riser insertion tube tool, also known as the RIT[T]?

A.  Yes.

Q.  And are you aware of any consideration of potential flow rates for the Macondo well being used in the design of the RIT[T]?

A.  No.

Q.  And, to your knowledge, were the potential flow rates for the Macondo well a consideration in how the RIT[T] was actually used to collect oil?

A.  No.

Q.  And do you recall offering testimony previously on the top hat, Ms. Saidi?

A.  Yes.

Q.  And, Ms. Saidi, are you aware of any consideration of potential flow from the Macondo well being used in the design of the top hat?

A.  No.

Q.  And, Ms. Saidi, to your knowledge, were potential flow rates from the Macondo well a consideration in how the top hat was actually used to collect oil?

A.  No.

(Saidi Dep. Tr. 441:25-443:3)

The United States had an opportunity to re-examine Ms. Saidi on the above testimony in its rebuttal time, but chose not to do so.

As an alternative to an interrogatory and to the extent the Court or the United States would prefer to resolve this issue immediately, BP would be willing to designate page 441, line 25, through page 443, line 3, of Farah Saidi's deposition, quoted above, as additional Rule 30(b)(6) testimony on Topic 12.  This proposed relief closely parallels the Court's recent ruling designating testimony from Charlie Henry *in lieu* of awarding BP additional discovery.  (*See* Rec. Doc. 8466, at 2.)

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 4, 2013
Page 5

We recognize that in an effort to win additional deposition time, the United States' Letter attempts to cast doubt on the accuracy of both Mr. Devers's and Ms. Saidi's testimony by contending for the first time that, because temperature, pressure, and fluid properties were considered in designing the RITT or Top Hat (they were), BP must be wrong about the role of flow rate "analysis, calculations, assumption or modeling" in designing and implementing the RITT and Top Hat (BP is not).  (US Letter, at 4.)

As an initial matter, the United States is not contending here that it was denied discovery regarding the role of pressure, temperature, or fluid properties in designing the RITT or Top Hat. (*See* US Letter, at 4-5.)  Nor did the United States' initial motion take such a position. (*See* S. Himmelhoch Ltr. (Dec. 21, 2012), at 5-6.)  Rather, the United States is contending — for the first time — that because concepts of pressure, temperature, and fluid properties were considered in the design of the Top Hat and RITT, so too must flow rate have been considered in those design efforts.  The United States' confused argument runs: Temperature, pressure, and fluid properties are "parameters used in the analysis of flow rate" or "an element of flow analysis." (US Letter, at 4.) Temperature, pressure, and fluid properties were considered when designing the Top Hat or RITT. Ergo, or so the United States asserts, flow rate was considered when designing the Top Hat and/or RITT.

This argument, of course, is a logical fallacy — the fact that A (temperature and pressure and other properties) may relate to B (a flow rate analysis), and that A (temperature, pressure, etc.) may relate to C (RITT and Top Hat design efforts), does not mean that B must relate to C.

This fallacy is also untrue as a practical matter.  Designing two open containment systems to withstand and accommodate certain pressures and temperatures expected to be encountered during actual operations is clearly not the same thing as designing these systems in view of an estimated or assumed flow rate. Indeed the United States' fallacy is underscored by its incorrect claim that Topic 12 covers "assumptions and analyses *related to* flow rate … [in connection with] designing the RITT and Top Hat."  (US Letter, at 4 (emphasis added).)  In fact, the Topic addresses "analysis, calculations, assumptions, or modeling *of* the flow rate of hydrocarbons from the Macondo MC252 well."  *See* Attachment 4, Agreed 30(b)(6) Deposition Notice of BP ¶ 12 (emphasis added).)   The Topic thus looks to the role of analyses and assumptions "of" the flow rate itself in connection with designing and implementing the RITT and Top Hat — and not to anything at all that could be "related to" flow rate, or "an element of flow rate," or a "parameter used in the analysis of flow rate" as the United States would contend. (*See* US Letter, at 4.)

We further recognize, of course, that the United States would contend that BP witnesses have employed "very narrow" or even "strained" definitions of what constitutes a "flow rate

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 4, 2013
Page 6

estimate."  And we understand the United States contends that, because of such definitions, it must now probe further with a new Topic 12 witness. (US Letter, at 3-4.)

But the United States will find myriad terms used in this case are neither self-defining nor beyond all ambiguity.  The important point is the United States could have offered, but failed to offer, an alternative definition of "flow rate estimate" and then explored with Mr. Devers or Ms. Saidi any significant differences between its definitions and their own understandings of "flow rate estimate" or of "analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo MC252 well."  Surely the United States doesn't really mean to say (as it appears to) that the possibility that United States deposition examiners and BP witnesses might not share common definitions of "flow rate estimate" is a brand new possibility and a new issue that "has become clear" only after recent depositions.  (*See id.*, at 3.)

In summary, Topic 12 covers the effect of any flow rate "analyses, calculations, assumptions or modeling of the flow rate" — the flow rate itself — on the design or implementation of the RITT or Top Hat; BP has provided extensive testimony on this topic; and this testimonial well has now run dry.  Indeed, in view of the United States' inability to describe what more it wants, were the Court to award more deposition time for this topic, it is unclear how the parties would proceed and what new material a new BP witness could possibly address.

Nonetheless, in an effort to resolve an issue, BP stands by its accommodative offer to supplement and encapsulate prior testimony through one more interrogatory response or, as a way to resolve the issue immediately, to designate page 441, line 25, through page 443, line 3, of Farah Saidi's deposition, quoted above, as additional Rule 30(b)(6) testimony on Topic 12.  (*Cf.* Rec. Doc. 8466, at 2.)

**<u>Ruling Regarding Williams Testimony</u>**

The United States' response brief incorporates by reference its recent motion seeking to compel production of otherwise privileged documents related to the drafting of BP's May 24, 2010 letter to Congressman Markey, (Rec. Doc. 8419).  The resolution of the issues raised in that recently filed motion will naturally determine the privilege limitations on the *scope* of any additional discovery to which the United States may be entitled.  But neither the United States' Letter nor its motion establishes the relevance of this additional discovery.  And neither the letter nor the motion establishes the *form* such discovery should take — whether it be by additional deposition testimony or an additional interrogatory.

Tellingly, the United States fails to explain, either in its response letter brief or in its motion to compel, how these materials are relevant to the core Phase 2 question of how much oil

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 4, 2013
Page 7

was released from the reservoir.  In fact, the United States stated during our January 8, 2013, meet-and-confer discussion that it is not complaining about Ellen Williams's ability to testify as to the actual observational evidence estimation work attached to the May 24, 2010 letter — and that the United States is not interested in additional testimony regarding the work — even though this work is the material most relevant to Quantification issues.

The United States contends instead that it wishes to explore via deposition in this civil case the deliberative process that generated this May 24, 2010 letter containing some material about which BP has pled guilty.  The United States may well have a curiosity about the drafting of this document, and certainly it has demonstrated its interest in pursuing this discovery.  But the relevance of this information to the significant work ahead in Phase 2 remains entirely unexplained and appears tenuous at best.  All parties' Phase 2 litigation positions will be unfolded during upcoming expert discovery.  The deliberative process that produced a rushed, historical estimate — the scientific basis of which the United States has already explored and is not interested in further exploring — is unlikely to play a leading role in these expert submissions.  (*See* Rec. Doc. 8466, at 2 (ruling that an interrogatory is not necessary to address gaps in Admiral Landry's Rule 30(b)(6) testimony regarding the 5,000 bpd announcement).)

To be clear, BP stands fully behind its offer to provide some additional discovery here.  But the *form* this additional discovery takes surely should be informed by the Court's recent decision with respect to Admiral Landry, the lateness of the hour, and the tangential relevance of the information being sought.

*     *     *

It is significant that the United States' previous, unfocused requests for deposition testimony have not led to important testimony or efficient uses of the parties' valuable time.  As the Court will recall, the United States insisted that it needed to question Trevor Hill as a Rule 30(b)(6) witness regarding his critique of Dr. Wereley's estimate.  (S. Himmelhoch Ltr. (Dec. 21, 2012), at 7-8.)

But as noted in our initial submission, the Rule 30(b)(6) component of Mr. Hill's deposition only underscores why granting the United States' requests for additional deposition time is unnecessary and would very likely be inefficient.  (R. Gasaway Ltr. to Court (Jan. 18, 2013), at 2.)  Here, the United States' Letter misses the key point.  It is true that the United States "used" its additional deposition time with Mr. Hill.  (*See* US Letter, at 2.)  A mere fraction of that additional time, however, was spent actually questioning Mr. Hill on the Rule 30(b)(6) topic the United States invoked to win the time in the first instance.  (*See* Hill Dep. Tr. 251-280.)

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 4, 2013
Page 8


Against this backdrop, BP respectfully submits that the relief granted in the Court's January 2, 2013 Order, (Rec. Doc. 8149), with regard to the Devers and Williams depositions will be best satisfied by BP responding to three new United States interrogatories — one on the RITT; one on the Top Hat; and one on BP's May 24, 2010, response to Congressman Markey.


Respectfully Submitted,

Robert R. Gasaway


Attachments

cc (by electronic mail):

Michael O'Keefe
United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross

# Attachment 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL        )  MDL NO. 2179

BY THE OIL RIG           )

"DEEPWATER HORIZON" IN )  SECTION "J"

THE GULF OF MEXICO, ON )

APRIL 20, 2010           )  JUDGE BARBIER

                         )  MAG. JUDGE SHUSHAN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VOLUME 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

        30(b)(6) Deposition of Kevin James
Devers, BP, Inc., taken at the Pan-American
Building, 601 Poydras Street, 11th Floor, New
Orleans, Louisiana, 70130, on the 12th day of
November, 2012.

1    put on the -- put over the BOP?

2         A.  Can I refer to my notes here --

3         Q.  Sure.

4         A.  -- please.

5              (Reviewing document.)  June 3rd, 2010.

6         Q.  How long did it take to build Top Hat

7    No. 4?

8         A.  I don't recall exactly.  A -- a matter of

9    days.

10        Q.  Look at Tab 22 in your -- in the binder.

11        A.  (Complying.)  Yes, sir.

12        Q.  This is an -- an -- it's Bates-stamped

13   BP-HZN-BLY, B-L-Y, 00396685, and we're going to

14   mark it as Exhibit 10262.

15             (Exhibit No. 10262 marked.)

16        Q.  (By Mr. Lundy) And it's an E-mail from

17   Stan Bond, dated June 5th, 2010, to Tony

18   Emmerson, Doug Thompson, and others.  And you are

19   Cc'd on this E-mail, correct?

20        A.  Correct.

21        Q.  All right.  And it says:  "Subject: Top

22   hat."  Correct?

23        A.  Yes.

24        Q.  Do you remember receiving this E-mail?

25        A.  I -- I don't have good recall of

1   receiving it.

2       Q.  Okay.  Was it common for Mr. Bond to

3   E-mail you and others in connection with the

4   DEEPWATER HORIZON Project?

5               MR. BENTSEN:  Objection, form and

6   scope.

7       A.  I would say it was a more of a

8   combination of E-mail and personal meetings.

9       Q.  (By Mr. Lundy) Okay.  But you -- you do

10  recall him E-mailing you in the course of -- of

11  the work y'all were doing on the DEEPWATER

12  HORIZON response, correct?

13              MR. BENTSEN:  Objection, form and

14  scope.

15      A.  Correct.

16      Q.  (By Mr. Lundy) All right.  And that was

17  done in the normal course and -- and scope of the

18  work being done on the DEEPWATER HORIZON Project,

19  correct?

20              MR. BENTSEN:  Objection, form and

21  scope.

22      A.  So E-mails and meetings, yes.

23      Q.  (By Mr. Lundy) Okay.  All right.  Do you

24  see where he says:  "Yep, we're on the same page.

25  Additionally, we need to remember the Top Hat was

1    a last minute change due to the riser cut"?

2         A.  I do see that.

3         Q.  What does he mean by that?

4              MR. BENTSEN:  Objection, form.

5         A.  H'm --

6         Q.  (By Mr. Lundy) What was your

7    understanding of what he was saying?

8         A.  Okay.  So the -- we had Top Hats for

9    different scenarios.  The -- the scenario we were

10   anticipating using the Top Hat for was a scenario

11   where the -- the cut of the riser would have been

12   a very smooth cut, and we had a Top Hat design

13   that would then set down on top of that smooth

14   riser cut.  And after the riser was cut, it was

15   not a smooth cut, it was more jagged type of cut.

16             So the Top Hat that would have been used

17   for the smooth cut was set aside for the Top Hat

18   that was designed to go over that -- that piece,

19   as opposed to setting directly down on it.

20        Q.  All right.

21        A.  So whether or not that was a, quote,

22   "last minute change," I don't know that I would

23   have characterized it that way, but we were

24   planning to use the -- the clean-cut Top Hat.

25   And when it did not end up as a clean cut, we

1    went with the -- the other Top Hat, Top Hat
2    No. 4.
3        Q.  Did you have to make any changes in the
4    design to No. 3, or was No. 4 already designed
5    and contemplated in the event that the cut was
6    jagged and not smooth?
7                MR. PINEIRO:  Objection to form.
8                MR. BENTSEN:  The same objection.
9        A.  As -- as I recall, Top Hat No. 4 was
10   available at that point in time.
11       Q.  (By Mr. Lundy) Okay.  Do you know how
12   much oil was captured by Top Hat No. 4?
13               MR. BENTSEN:  Objection, scope.
14   Objection, form.
15       A.  I don't have that number.
16       Q.  (By Mr. Lundy) Do you remember an
17   estimate?
18               MR. PINEIRO:  Objection, scope.
19               MR. BENTSEN:  Objection, scope.
20   Objection, form.
21       A.  As -- as I sit here, I don't -- I don't
22   remember that -- that number.  I think -- I have
23   heard some numbers in the past, but the -- the
24   quantity that the Top Hat collected, I -- I
25   don't -- I don't have that number.

1      Q.   (By Mr. Lundy) Was it collecting all of
2  the oil coming out of the DEEPWATER HORIZON well?
3            MR. PINEIRO:  Objection, form.
4            MR. BENTSEN:  Objection, form and
5  scope.
6      A.   I would say "No," it wasn't.
7      Q.   Okay.  Were you ever told what the flow
8  rate from the well was?
9            MR. PINEIRO:  Objection, scope.
10           MR. BENTSEN:  Objection, form and
11 scope.
12     A.   No.
13     Q.   (By Mr. Lundy) Did you ever hear any
14 numbers --
15           MR. PINEIRO:  Objection, scope.
16           MR. BENTSEN:  Objection, form and
17 scope.
18     Q.   (By Mr. Lundy) -- of the flow rate?
19           MR. BENTSEN:  Same objections.
20     A.   So during that time, no.
21     Q.   (By Mr. Lundy) Later on when -- or when
22 did you first hear of -- of -- of numbers
23 regarding the flow rate?
24     A.   What the --
25           MR. PINEIRO:  Objection, form.

 1    to be moving?

 2              MR. BENTSEN:  Objection, scope.

 3        A.  I would -- again, you don't just go out

 4    and specify -- I don't think -- a barge of a

 5    certain capacity.  It's more of what vessels are

 6    available and what type of storage or transport

 7    capability they have.

 8              And that, then, will start to dictate the

 9    frequency.  I -- that -- that's my view of it.

10    Frequency of movements.

11        Q.   (By Ms. André) So does part of the plan

12    need to include how much recovered fluid needs to

13    get moved?  Whether it be what size vessels you

14    have, what size vessels you need, how many trips

15    the ve -- the vessels are going to take from

16    where the oil's being contained to where it may

17    be offloaded, regardless, isn't it important to

18    know how much fluid you're going to be collecting

19    from the containment devices?

20              MR. BENTSEN:  Objection, form and

21    scope.

22        A.  So if you want to know in advance how

23    frequently you have to lighter or not lighter

24    and -- and move, et cetera, knowing the --

25    knowing the -- the change in fill per day, if you

1   will, would be useful, yes.

2       Q.  (By Ms. André) Okay.  Okay.  So circling

3   back to factors considered in building the

4   cofferdam.

5       A.  M-h'm.

6       Q.  Oh, actually, strike that.  Let's move on

7   to the RITT.

8       A.  Okay.

9       Q.  What factors were considered in designing

10  the RITT for the Macondo incident?

11      A.  So the RITT was to be used at the end of

12  the HORIZON riser.  It had a drill pipe that

13  ex -- that was inside of the -- the -- the riser

14  that actually extended beyond the end of the --

15  the -- the riser.  I know this is confusing with

16  all these words, but the HORIZON riser had an end

17  point, and the drill pipe extended beyond that.

18          So what we were attempting to do with the

19  RITT was to insert a pipe in between the drill

20  pipe and the inside diameter of the riser.

21      Q.  Okay.

22      A.  And we wanted to put in the -- the

23  largest pipe that we thought we could

24  successfully install in that -- that area.

25      Q.  Okay.  So just to unpack that a little

1    bit, the size of the space that you had would

2    have been relevant?

3        A.   Yes.

4            MR. BENTSEN:   Objection, form.

5        A.   This -- the -- the -- the amount of area

6    or -- yeah, the amount of area we had in order to

7    put the pipe through was relevant, yes.

8        Q.   Okay.   And, again, were hydrates relevant

9    to your design?

10       A.   How do I want to answer that?   Let's see.

11   The -- the tool incorporated some features to try

12   to prevent the formation of hydrates.

13       Q.   Okay.   And were those tools informed at

14   all based on what you observed with the hydrates

15   in the cofferdam?

16       A.   Partly.   The -- the tool itself -- our --

17   our intent with this tool was -- was to capture

18   the hydrocarbon before it ever had a chance to

19   form hydrates.

20       Q.   M-h'm.   Okay.

21       A.   Now, even with that in mind, we put

22   provisions in this tool, that if seawater were to

23   find its way in, as well, we could have hydrates

24   later on, not -- not immediately at that spot but

25   as it -- as it came up the riser.   So we were

1    concerned about that and made provisions in the

2    tool to inject methanol to help prevent the

3    formation of hydrates.

4        Q.  Okay.  How did you determine how much

5    methanol you needed to inject into the riser to

6    avoid the form -- formation of hydrates?

7        A.  Our plan was to inject all the methanol

8    we were capable of injecting.

9        Q.  Okay.  So in building the RITT tool, did

10   it matter at all how much pressure would be

11   applied to the pipes that you were using?

12       A.  Okay.  I'm not sure I understand the

13   question.

14       Q.  So I'm wondering, with the pressurized

15   flow moving through the RITT, was one of the

16   things that you had to consider, in picking the

17   proper pieces to build the tool, what the

18   pressure was at the point where the RITT would be

19   installed?

20              MR. BENTSEN:  Objection, form.

21       A.  H'm.  No, I don't think so.

22       Q.  (By Ms. André) So it didn't determine

23   what kind of pipe you needed to use, or what kind

24   of connectors you needed to use?

25              MR. BENTSEN:  Objection, form.

1    A.   Not the pressure so much as the

2    structural integrity of it was going to be used

3    in a -- in a process where it needed to be

4    robust.  So the thickness of the pipe that we

5    were using was such that we thought was robust

6    for the situation it was in.  Not -- not -- it

7    wasn't sized because of the seawater pressure at

8    that point, if that's what you're asking.

9    Q.   (By Ms. André) M-h'm.  I was -- I was

10   curious more about the pressure inside the pipe.

11   So when you say it was "robust," what do you

12   mean?

13   A.   From a structural point of view,

14   because -- so imagine the -- the steel pipe

15   inside of another steel pipe.

16   Q.   M-h'm.

17   A.   And the -- just the natural motions of

18   this, it was moving around.

19   Q.   M-h'm.

20   A.   And we wanted that pipe to be robust so

21   that it could stand up to that -- that

22   environment.  That's --

23   Q.   Okay.

24   A.   That's what I mean by "robust."

25   Q.   Okay.

```
 1              (Discussion off the record.)
 2       Q.  (By Ms. André) Why was the RITT able to
 3   move around?
 4       A.  So -- h'm.  There was nothing
 5   constraining the pipe when it was inside of the
 6   other pipe.
 7       Q.  Okay.  Was that a necessary design
 8   element?
 9              MR. BENTSEN:  Objection, form.
10       A.  It was a result of the tool design.  It
11   wasn't intended that way.  We were concerned
12   about how can we insert one pipe into another
13   pipe at 5,000 feet, in a -- in a hole, poor
14   visibility, using remote-operated vehicles.  So
15   we wanted to give our chance as good a -- we
16   wanted to give ourselves as good a chance as
17   possible to actually get this pipe inside the
18   other pipe, which we did.
19              Now, if there would have been devices on
20   there to have constrained the movement of the
21   pipe --
22       Q.  (By Ms. André) M-h'm.
23       A.  -- it would have likely made it more
24   difficult to -- to -- to insert it into the other
25   pipe.
```

```
 1        Q.  Okay.
 2        A.  I don't know if that answered your
 3    question.
 4        Q.  It does.  That makes sense.  Thank you.
 5        A.  Okay.
 6                 THE COURT REPORTER:  (Indicating.)
 7                 THE WITNESS:  Sorry.
 8        Q.  (By Ms. André) So what else did you
 9    consider in designing the RITT tool?
10        A.  So we -- we designed three tools
11    eventually.  The second and third had what we
12    believed to be improvements on the first one.
13        Q.  Okay.
14        A.  And so I think you alluded to it, what
15    was to prevent this pipe from moving around in
16    the other one.  One of the features that we tried
17    to employ on the next two was to put a support on
18    the outside to try to stabilize or prevent it
19    from -- from rocking too much.
20        Q.  Okay.
21        A.  So that's another example that we learned
22    after we had built the first tool.
23        Q.  And --
24        A.  So --
25        Q.  -- the second one was the one that was
```

1    installed?

2         A.   The first one.  RITT number -- as we

3    called it, RITT No. 1 was installed and used.

4         Q.   Okay.

5         A.   So other aspects, a lot of the concern

6    was how can we get this in.  So a lot of the

7    features about it was about how the -- the

8    remote-operated vehicle could interface with this

9    pipe, and the -- and the driver of the

10   remote-operated vehicle could -- could get it in.

11   So there were lots of design features that tried

12   to help the installation process.

13        Q.   So during the installation process, oil

14   was coming out of the pipe that you were trying

15   to insert the RITT into; is that right?

16        A.   Yes.

17        Q.   Okay.  So did you have to consider how

18   hard the oil would have been pushing against the

19   RITT tool as the ROV was trying to insert it?

20             MR. BENTSEN:   Objection, form.

21        A.   No.  I'm -- I'm just hesitating.  You

22   know, if you look at the tool, there were

23   these -- some call them "baffles," some call them

24   "seals."  So that was part of what we wanted to

25   get inserted in -- into there.  But that was

1    more -- we were concerned more about when it went

2    in, how would they bend over and then flex bat --

3    flex back open.

4        Q.  (By Ms. André) Okay.

5        A.  A concern that we had was, once we got

6    the -- the ri -- the RITT inside of the riser,

7    and once we started collecting the oil, how would

8    we prevent seawater from also getting brought in.

9            So there were some devices employed on

10   the tool that -- to help avoid that situation.

11       Q.  Okay.

12       A.  But in terms of flow coming out of the

13   pipe and our inability to put the RITT in, that

14   was not -- I don't recall that being a concern.

15       Q.  Okay.  Were any other fluid properties

16   relevant to your design of the RITT?

17            MR. BENTSEN:  Objection, form.

18       A.  For RITT No. 1, no.  For -- for RITTs

19   later on, there was some discussion about the

20   hydrocarbons flowing down the HORIZON riser.

21   Could there have formed an oil later, a loo -- an

22   oil layer and a gas layer, and might we be

23   oscillating between the two regions and taking

24   some gas and taking some oil.

25       Q.  (By Ms. André) M-h'm.

1      A.   So when you ask about fluid properties,

2   later on, we considered that and made -- made

3   some adjustments on the later tools to -- to try

4   to compensate for that.

5      Q.   Okay.  So when you say some liquid, some

6   gas, do you mean that the fluid may have been

7   breaking into two phases when it -- by the time

8   it hit the rule -- RITT?

9      A.   It may have.

10     Q.   Okay.

11     A.   I don't know that we know that answer.

12     Q.   Was the kind of going back and forth

13  between gas and liquid something that you all

14  observed once the RITT was installed?

15          MR. BENTSEN:   Objection to form and

16  scope.

17     A.   So I -- I recall hearing that so-called

18  "slugging" was problematic.

19     Q.   (By Ms. André) Okay.

20     A.   And that was part of why we were asked:

21  "Can you -- can you look at something on this

22  tool?  We think that maybe one of the reasons for

23  the slugging is that we're drawing from varying

24  or inconsistently inside of this pipe at 5,000

25  feet."  So we were doing our best to try to

1    stabilize this so that we would only draw from

2    the -- basically the centerline of -- of the --

3    now, this was on RITTs that we did not deploy.

4        Q.  Right.

5        A.  So RITT 1, as I say, was what it was.

6    It -- it -- as you had movements, it -- the tip

7    of the RITT would move.

8        Q.  And you had slugging as a result?

9            MR. BENTSEN:  Objection, scope.

10       A.  I can't answer that.  I don't know if --

11   if -- I'm not sure that slugging did occur.  I

12   heard that it did.

13       Q.  (By Ms. André) Okay.

14       A.  Now, whether -- whether the -- the cause

15   of that slugging was where we started taking the

16   hydrocarbon or something that was happening as it

17   was rising to the vessel, I -- I don't know.

18       Q.  Was it useful information to have for the

19   design of RITTs No. 2 and 3, that you might have

20   that slugging problem?

21           MR. BENTSEN:  Objection, form.

22       A.  To the extent of what -- how we would

23   maybe put something on the tip of the RITT, or

24   externally, how we might con -- stabilize it

25   once -- once it was --

```
 1        Q.  (By Ms. André) Okay.

 2        A.  -- inserted.

 3        Q.  So had you known before you designed RITT

 4   No. 1, that that kind of slugging was possible,

 5   would you have put on those extra pieces to keep

 6   the pipe from moving?

 7        A.  H'm.

 8              MR. BENTSEN:  Objection, form and

 9   scope.

10        A.  I don't know if I can answer that.  There

11   were some other concerns that we had with 2 and 3

12   about installation.

13        Q.  (By Ms. André) All right.

14        A.  And we didn't attempt those.  I mean,

15   we -- we did trials of it onshore, so we -- we

16   saw that we could do it onshore.  But it's --

17   it's challenging in the environment that we were

18   trying to install this -- this RITT.

19        Q.  You had to balance all the concerns?

20        A.  Well, as -- as it turned out, we did not

21   need RITTs 2 and 3.

22        Q.  Right.

23        A.  We were prepared to go use them.

24        Q.  Okay.

25        A.  But is there certainty that we wouldn't
```

1    have had installation issues?  I -- I don't know

2    that I can say that.

3        Q.  Is there any information that, in

4    retrospect, you could have been provided that

5    would have aided you in designing the RITT?

6             MR. BENTSEN:  Objection, form and

7    scope.

8        A.  Nothing comes to mind, no.

9        Q.  (By Ms. André) Fair enough.  Okay.  So

10   let's talk, then, about the Top Hat briefly and

11   factors important for that.  What factors did you

12   consider in designing Top Hat No. 4?

13       A.  A -- a big concern about the Top Hat --

14   well, there are two really, is:  What is it that

15   we're trying to get over?  And what are the

16   issues with that?

17            And then, secondly, how do we prevent the

18   formation of hydrates?

19       Q.  Okay.

20       A.  Two big topics related to the Top Hat.

21       Q.  Okay.  All right.  So let's, before the

22   break, walk through the timeline of the

23   installation of all of these tools or attempted

24   installation.  When was the cofferdam -- when did

25   BP start working on getting the cofferdam for the

1    Macondo Well?

2         A.  I'm not sure if I've actually got that

3    date.  Can I refer to this document here?

4         Q.  Yes, sir, you may.

5         A.  (Reviewing document.)  Again, not being

6    there, I'm not sure if this is -- if that's

7    actually in here.

8                   MS. ANDRÉ:  And for the record,

9    Mr. Devers is looking at the final stipulations.

10        A.  Ah, very good.  It appears here that

11   around April 23rd.

12        Q.  (By Ms. André) Okay.  And when was the

13   cofferdam installation attempt made?

14        A.  And again, please let me refer here.

15   (Reviewing document.)

16             So approximately May 6th and 7th.

17        Q.  Okay.  And when did the cofferdam fail?

18                   MR. BENTSEN:  Objection, form.

19        A.  Either late on -- on the 7th or early on

20   the 8th.  I'm not sure of the exact time.

21        Q.  (By Ms. André) Okay.  And then when did

22   work on the RITT tool begin?

23        A.  On May 8th.

24        Q.  Okay.

25        A.  "Work" meaning the engineering, the --

```
 1        A.  So I don't know that the methanol rates

 2   did change, and if they did change, why they

 3   changed.

 4        Q.  Okay.  Okay.  Could you turn to Tab 20,

 5   please.

 6        A.  Yes, ma'am.

 7        Q.  Thank you.  We're going to mark this as

 8   Exhibit 10295.

 9            (Exhibit No. 10295 marked.)

10        Q.  (By Ms. André) For the record, it's an

11   E-mail from yourself, Mr. Devers, to Michael W.

12   Webber, and there are a couple E-mails underneath

13   it, but the most recent one, it's dated May 10,

14   2010, and the "Subject" line is Forward "Top Hat

15   Procedures."

16        A.  Yes.

17        Q.  Do you recognize this E-mail?

18        A.  Excuse me just a moment.

19        Q.  Okay.

20            THE COURT REPORTER:  Kevin.

21   (Indicating.)

22        Q.  My apologies for the inclusion of all of

23   the Wild Well control icons there.

24            (Discussion off the record.)

25        Q.  The attachment is a couple in.
```

359

1        A.   (Reviewing document.)  So I don't have

2   specific recall of -- of this.

3        Q.   Okay.  Do you remember the document

4   attached entitled:  "Flow Containment and Capture

5   Recovery System:  Drill Pipe inside Drilling

6   Riser Option"?

7             MR. BENTSEN:  Objection, form.

8        A.   So I -- I remember it in a slightly

9   different form.  That's --

10             MR. BENTSEN:  Objection, scope.

11        Q.   (By Ms. André) Okay.  And in the form

12   that you remember seeing it in, what was the

13   purpose of this document?

14        A.   So this -- this reminds me of the

15   elements that are in the procedure that describes

16   how to install the -- the Top Hat --

17        Q.   Okay.

18        A.   -- for example.

19        Q.   Okay.  I have a question about one of the

20   bullets under No. 4, which is "Position the rig

21   over the Top Hat wet parked on the sea floor."

22        The eighth bullet down reads:  "The Top

23   Hat will have (2) stabbing posts to assist in

24   alignment prior to positioning as well as provide

25   lateral support against flow."

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL        )  MDL NO. 2179

BY THE OIL RIG           )

"DEEPWATER HORIZON" IN )  SECTION "J"

THE GULF OF MEXICO, ON )

APRIL 20, 2010           )  JUDGE BARBIER

                         )  MAG. JUDGE SHUSHAN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VOLUME 2

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Continuation of the 30(b)(6) Deposition
of Kevin James Devers, BP, Inc., taken at the
Pan-American Building, 601 Poydras Street, 11th
Floor, New Orleans, Louisiana, 70130, on the 13th
day of November, 2012.

1     the Unified Command in connection with the

2     analysis, consideration or execution of any

3     Method (as that term is defined in Topic 1.)"

4             Did I read that correctly?

5         A.   I -- I don't have it in front of me.

6         Q.   I did.

7         A.   Okay.

8         Q.   I did read it correctly.

9         A.   All right.

10            (Laughter.)

11        Q.   (By Mr. Dart) I -- we -- we can swap

12     places, if you like.

13        A.   (Nodding.)

14        Q.   And -- and you've been designated to

15     discuss that Topic as it concerns the cofferdam,

16     the RITT, and the Top Hat, correct?

17        A.   That is correct.

18        Q.   Okay.  Now, in order to -- for me not to

19     have to repeat this, when I say "any such

20     analysis," what I'm referring to is "The use of

21     any analysis, calculations, assumptions or

22     modeling of the flow rate of hydrocarbons from

23     the Macondo MC252 well undertaken by or on behalf

24     of BP or the Unified Command."  Okay?

25            So when I say "such analysis" or "this

1    analysis," that's what I'm talking about.  You --

2        A.  I'll try to remember that.

3        Q.  Okay.  First of all, what did you do to

4    prepare to respond to this Topic?

5        A.  Not much.

6        Q.  What did you do?

7        A.  I tried to recall if there were any

8    discussions that were relevant to the -- to the

9    Top Hat or the RITT or the cofferdam that was

10   flow rate-related.

11       Q.  Did you review any documents?

12       A.  I reviewed documents, but --

13       Q.  In connection with this Topic.

14       A.  I don't recall seeing any documents that

15   related to -- to this.

16       Q.  Did you speak to anyone other than

17   Counsel in preparation for this Topic?

18       A.  No.

19       Q.  So how did you prepare?  Just what you

20   could recall?

21       A.  Yes, sir.

22              MR. BENTSEN:  Objection, form.

23              THE WITNESS:  Oh.

24       A.  Ye -- ye -- yes, sir.  I don't recall

25   flow rates being a factor in the design and

```
 1    deployment of the cofferdam, the RITT, and the
 2    Top Hat.
 3         Q.  (By Mr. Dart) As a spokesman for BP, were
 4    any such analyses done in preparation for or in
 5    consideration of or execution of the cofferdam,
 6    the RITT, or the Top Hat?
 7              MR. BENTSEN:  Objection, form.
 8         A.  Not by me.  And I'm not aware of others
 9    that -- that may have.
10         Q.  (By Mr. Dart) So BP says there was no
11    consideration of flow rate in the cofferdam,
12    RITT, and Top Hat; is that right?
13              MR. BENTSEN:  Objection, form.
14         Q.  (By Mr. Dart) Is that BP's position?
15              MR. BENTSEN:  Same objection.
16         A.  From -- from a cofferdam, RITT, Top Hat,
17    I believe that to be true.
18              THE COURT REPORTER:  Three minutes.
19         Q.  (By Mr. Dart) Let me ask you one more
20    thing about the cofferdam.  This device weighed
21    98 tons, as I read it somewhere.  Is that about
22    right?
23         A.  H'm.  170 -- 85, 90 tons, thereabouts.  I
24    don't remember the exact weight.
25         Q.  It was heavy.
```

1        A.  Yes, sir, it's heavy.

2        Q.  Okay.  Now, this cofferdam was supposed

3    to be lowered down onto the end of the riser

4    where the plu -- where the oil was coming out,

5    correct?

6        A.  H'm --

7                MR. BENTSEN:  Objection, form.

8        A.  Yes.  One -- one face of it was to go

9    over the HORIZON riser, yes.

10       Q.  (By Mr. Dart) And was any consideration

11   given to what the weight of that cofferdam would

12   have on the riser itself as 98 tons of the edge

13   of that cofferdam came down on the top of the

14   riser?

15               MR. BENTSEN:  Objection, form.

16       A.  Maybe not directly.

17       Q.  (By Mr. Dart) How about indirectly?

18       A.  Yes.  So the -- the cofferdam had

19   so-called "mud mats" extending from the sides of

20   the cofferdam.

21       Q.  What are mud mats?

22       A.  In this case, maybe "wing" is a way to

23   describe it.  It's a -- an extension, a -- a

24   horizontal extension, steel.  And the intent was,

25   as the cofferdam bottom touched the seabed, which

1    here.  Who is next?

2                  THE VIDEOGRAPHER:  Cameron.

3                  MS. BERTAUT:  No questions.

4                  THE COURT REPORTER:  Fair enough.

5                  THE VIDEOGRAPHER:  BP.

6                  MR. BENTSEN:  Can you give us a

7    couple of minutes?

8                  THE COURT REPORTER:  Of course.

9              (Recess from 11:28 a.m. to 11:33 a.m.)

10                 MR. BENTSEN:  I'm ready.

11                 THE VIDEOGRAPHER:  All set?

12             The time is 11:33 a.m.  We're back on the

13   record, beginning Tape 15.

14                       EXAMINATION

15   QUESTIONS BY MR. BENTSEN:

16       Q.  Good morning, sir.  My name's Derek

17   Bentsen, and I represent BP.  I just have a

18   couple of questions for you this morning.

19           Are you familiar with the term "open

20   collection system"?

21       A.  I am.

22       Q.  Could you briefly describe what an open

23   collection system would be within the context of

24   a -- of the Macondo response?

25                 MS. ANDRÉ:  Objection, scope.

1      A.   So open collection, in my words, would be

2  a collection system that collects fluids in an

3  environment that is not sealed or contained.

4      Q.   (By Mr. Bentsen) Okay.  Would the RITT

5  have been an open collection system?

6      A.   I would characterize it as that --

7      Q.   How about --

8      A.   -- yes.

9      Q.   -- the cofferdam?

10     A.   Yes.

11     Q.   And the Top Hat?

12     A.   Yes.

13     Q.   All right.  And as to the limits on the

14  collection systems that I just mentioned, are

15  those limits based on the design of the -- let me

16  strike that, and we'll go through each

17  individually.

18          Is the collection limit of the RITT based

19  on the design of the RITT itself or on the

20  surface collection capacity?

21              MR. DART:  Object to the form.

22     A.   On the surface collection capacity.

23     Q.   (By Mr. Bentsen) Is that the same with

24  the cofferdam?

25     A.   It is.

```
 1              MR. DART:  Objection, form.
 2      Q.  (By Mr. Bentsen) Is the collection limit
 3  of the Top Hat based on surface collection
 4  capacity?
 5      A.  It is.
 6      Q.  And what happens if a -- each of those
 7  devices reach their collection capacity at the
 8  surface?
 9      A.  Then excess fluids would be discharged to
10  the environment.
11      Q.  All right.  Did the Team developing and
12  designing and implementing the RITT use flow rate
13  estimates in its design or implementation?
14      A.  We did not.
15      Q.  Same question as to the cofferdam?
16      A.  They did not.
17      Q.  Same question as to the Top Hat?
18      A.  We did not.
19      Q.  You were asked some questions just a
20  little bit ago about a letter from Mr. Suttles to
21  the Unified Area Command.  Was Mr. Suttles
22  involved in the design of the Top Hat?
23      A.  He was not on the Team, so, no.
24      Q.  All right.  And did that letter that you
25  were asked questions predate or postdate the
```

1       design and implementation of the Top Hat?

2           A.  It postdated the implementation of the

3       Top Hat.

4           Q.  All right.  You were asked a -- a few

5       questions about approval.  Are you aware of what

6       entity had final approval for each of the areas

7       in which you're designated to testify today?

8           A.  Referred to as UAC, Unified Area Command.

9           Q.  And did the Unified Area Command approve

10      the final installation procedure for the

11      cofferdam?

12          A.  They did.

13          Q.  Did the Unified Area Command approve the

14      final installation procedure for the RITT?

15          A.  They did.

16          Q.  Did the Unified Area Command approve the

17      final installation procedure for the Top Hat?

18          A.  They did.

19          Q.  Now, this is just in your personal

20      knowledge, Mr. Devers.  I believe you said you

21      were involved with the development of the

22      single-valve manifold capping option throughout

23      June?

24          A.  Correct.

25          Q.  And was one of the -- the objects of the

1    capping options being developed during that

2    period to create additional collection

3    capacities?

4        A.   To create addition -- to -- to have

5    off-takes from the device in order to create

6    additional collection capacity, yes.

7        Q.   And was that, again, limited based on the

8    collection capacity at the surface?

9            MR. DART:   Object to the form.

10       A.   Yes.

11           MR. BENTSEN:   No further questions.

12   Thank you.

13           THE VIDEOGRAPHER:   The time is

14   11:36 a.m.   We're off the record, ending Tape 15.

15       (Recess from 11:36 a.m. to 12:41 p.m.)

16           MR. LUNDY:   Okay.   We can start.

17           THE VIDEOGRAPHER:   All set?   The

18   time is 12:41 p.m.   We're back on the record,

19   beginning Tape 16.

20              REDIRECT EXAMINATION

21   QUESTIONS BY MR. LUNDY:

22       Q.   Good afternoon, Mr. Devers.   Matt Lundy

23   again, here on behalf of the PSC, and I'm going

24   to have a few questions for you this afternoon,

25   and then I think you'll be done.

# Attachment 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL        )  MDL NO. 2179

BY THE OIL RIG           )

"DEEPWATER HORIZON" IN )  SECTION "J"

THE GULF OF MEXICO, ON )

APRIL 20, 2010           )  JUDGE BARBIER

                         )  MAG. JUDGE SHUSHAN

* * * * * * * * * * * * * * * * *

VOLUME 1

* * * * * * * * * * * * * * * * *

30(b)(6) Deposition of Thomas O. Hunter,
Ph.D., United States of America, taken at the
Pan-American Building, 601 Poydras Street, 11th
Floor, New Orleans, Louisiana, 70130, on the 30th
day of October, 2012.

1    Q.  Okay.  If we have you turn to Tab 55.

2    And I'll have you mark that as 9699?

3         (Exhibit No. 9699 marked.)

4    A.  M-h'm.  Got it.

5    Q.  (By Mr. Regan) And this is an E-mail from

6    Dr. Dykhuizen to you and Marjorie Tatro.  Is that

7    correct?

8    A.  Correct.

9    Q.  And -- and the Topic is:  "Pressures

10   before and after riser removal, with test rams

11   shut," correct?

12   A.  Yes.

13   Q.  And the first sentence he says:  "You

14   again have posed a difficult problem.  We

15   obviously do not know how much oil is flowing out

16   of this well.  We do not know the path of the oil

17   to the wellhead (central bore, annulus, or both).

18   We know what series of failures resulted in the

19   well to start flowing (Obviously the BOP has

20   failed, and likely some concrete seals have

21   failed).  However, we do have limited data."

22        Do you agree with Dr. Dykhuizen's

23   assessment as of June 7th, 2010?

24   A.  I agree.

25              MR. CHAKERES:  Object to form.

1      A.   I agree that we posed a difficult

2    problem, but that was just a normal course of

3    events.

4      Q.   (By Mr. Regan) Okay.  Do you agree that,

5    as of June 7th, we obviously did not know how

6    much oil was flowing out of the well?

7      A.   As of June 7th, "we" meaning the Science

8    Team, not -- not the Flow Rate Technical Group,

9    did not have an estimate of the flow out of the

10   well.

11     Q.   Okay.  And you personally, did you have

12   any idea of how much oil was flowing out of the

13   well as of June 7th --

14     A.   Not -- not on June 7th.

15     Q.   Okay.  Did you ascribe any credibility to

16   the estimates that had been issued by the Flow

17   Rate Technical Group prior to June 7th, 2010?

18              MR. CHAKERES:  Object to form.

19     A.   I'd have to compare the dates, because

20   with the addition of a Top Hat and a condition of

21   Top Hats on the -- visual observation of the Top

22   Hats, one could infer what the flow had to be --

23     Q.   (By Mr. Regan) Right.

24     A.   -- roughly speaking.  And I didn't make

25   that comparison.  I was aware of them, but at --

234

1    at that point, it hadn't enter -- entered into

2    our assessment of the -- of the containment

3    action or the subsequent steps.

4        Q.  But prior to the actual execution of the

5    Top Hat procedure, where you can look at it as it

6    sat on the BOP, the flow rate estimates that were

7    being issued by the Flow Rate Technical Group had

8    not entered any of your assessments of source

9    control activities?

10       A.  It's conceivable they were discussed.

11   They didn't have a material effect on the outcome

12   of the -- of the -- the -- in -- our interface

13   with BP or advice to the Government.

14       Q.  Would you give the same answer with

15   respect to the 1,000 barrel per day and 5,000

16   barrel per day estimates that were issued by the

17   Unified Command in late April of 2010?

18               MR. CHAKERES:  Object to form.

19               MR. DAVIS-DENNY:  Objection, form.

20               MR. KRAUS:  Objection, form.

21               MS. RICHARD:  Objection, form.

22       A.  We took them as statements that someone

23   had made.  We did not take them as -- as

24   necessarily representative of the well.  But

25   they -- they were what was on the table, and they

```
 1    were the common discussion during the -- the time
 2    in Houston.
 3         Q.  (By Mr. Regan) Okay.  With respect to
 4    Dr. Dykhuizen's E-mail to you, he first
 5    summarizes the type of pressure drops that can
 6    occur?  Do you see that?
 7         A.  I do.
 8         Q.  He talks about "Elevation head," correct?
 9         A.  Yes.
10         Q.  "Reservoir drawdown"?
11         A.  Yes.
12         Q.  "Resistance" of "flow across...concrete
13    seals," which he says is "skin" --
14         A.  Yes.
15         Q.  -- correct?
16         A.  M-h'm.
17         Q.  "Resistance to the flow up the well due
18    to friction," correct?
19         A.  Yes.
20         Q.  "Resistance to the flow across the failed
21    hanger," correct?
22         A.  Yes.
23         Q.  All right.  And in any of the three DOE
24    flow rate estimates, either the riser cut, the --
25    the June estimate or the July estimates, was any
```

# Attachment 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL        )   MDL NO. 2179

BY THE OIL RIG           )

"DEEPWATER HORIZON" IN   )   SECTION "J"

THE GULF OF MEXICO, ON   )

APRIL 20, 2010           )   JUDGE BARBIER

                         )   MAG. JUDGE SHUSHAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Deposition of FARAH SAIDI, taken
at Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on
the 11th day of January, 2013.

 1            A.      Yes.

 2            Q.      And that's -- that exhibit

 3    describes work you did with Mike Mason's

 4    team; is that right?

 5            A.      This has some of my work, yes.

 6            Q.      With Mike Mason's team?

 7            A.      Yes.

 8            Q.      Do you consider the work that

 9    you did for the Mason team reflected in that

10    exhibit to be a flow rate estimate?

11            A.      No.

12            Q.      And why not?

13            A.      To me a flow rate estimate is

14    when you have enough credible data, you know

15    your flow path, you know your reservoir.

16    Everything that is about the system that you

17    are designing to -- to calculate, to estimate

18    a flow rate with 10 -- plus or minus

19    10 percent uncertainty.

20            Q.      All right.  And so when you did

21    the work reflected in Exhibit 10185, did you

22    have, in your view, sufficient information

23    about the system?

24            A.      No.

25            Q.      And, Ms. Saidi, do you also

1    recall having provided testimony about Tab 48

2    in the government's notebook?  I'll try to

3    find that one.  This has previously been

4    marked as Exhibit 10191, and the top e-mail

5    in the collection is an e-mail from Steve P.

6    Carmichael to two individuals; is that right?

7         A.    Yes.

8         Q.    All right.  And could you please

9    turn to the Excel chart contained in that

10   exhibit?  Do you recall testifying about this

11   yesterday --

12        A.    Yes.

13        Q.    -- Ms. Saidi?

14        A.    Yes.

15        Q.    All right.  And at the time that

16   you prepared the work reflected in this

17   chart, did you know the delta P value for the

18   system that you were examining?

19        A.    No.

20        Q.    So would it be possible to use

21   the Excel chart shown here to infer or

22   estimate the flow rate from the Macondo well?

23        A.    No.  And, plus, the -- the

24   length I assumed for a valve, I was -- I

25   don't know if that was the right assumption

1    or not.

2         Q.    All right.  And just generally,

3    Ms. Saidi, you've used the term "flow rate"

4    in -- in speaking with me and with the other

5    lawyers.  Could you please define "flow rate"

6    as a term of art to you, please.

7         A.    It's a volume of the fluid that

8    flows through a pipe or channel at a given

9    time.

10        Q.    And, Ms. Saidi, I think that you

11   also spoke yesterday about the significance

12   of some of your file paths having the word

13   "confidential" in them; is that right?

14        A.    Yes.

15        Q.    And what did you try to use the

16   confidential folder for, please, ma'am?

17        A.    I tried to put everything that

18   was under privilege in that folder.

19        Q.    Is it possible that

20   inadvertently there may have been a few items

21   that you meant to treat as confidential that

22   didn't end up in that folder?

23        MR. DART:  Objection; form.

24        A.    Yes.

25        Q.    (BY MR. DRAKE)  Now, Ms. Saidi,

1      do you also recall having discussed with some

2      of the other lawyers the riser insertion tube

3      tool, also known as the RIT?

4              A.      Yes.

5              Q.      And are you aware of any

6      consideration of potential flow rates for the

7      Macondo well being used in the design of the

8      RIT?

9              A.      No.

10             Q.      And, to your knowledge, were the

11     potential flow rates for the Macondo well a

12     consideration in how the RIT was actually

13     used to collect oil?

14             A.      No.

15             Q.      And do you recall offering

16     testimony previously on the top hat,

17     Ms. Saidi?

18             A.      Yes.

19             Q.      And, Ms. Saidi, are you aware of

20     any consideration of potential flow from the

21     Macondo well being used in the design of the

22     top hat?

23             A.      No.

24             Q.      And, Ms. Saidi, to your

25     knowledge, were potential flow rates from the

```
 1    Macondo well a consideration in how the top
 2    hat was actually used to collect oil?
 3         A.    No.
 4         Q.    Oh, and, Ms. Saidi, one other
 5    thing:  Do you recall testifying about work
 6    you did prior to commencement of the
 7    privileged work stream using data from the
 8    capping stack to try to estimate flow rates
 9    from the Macondo well?
10         A.    Yes.
11         Q.    And I think you testified that
12    you had some outputs using data from the --
13    the kill side as well as the choke side; do I
14    have that right?
15         A.    Yes.
16         Q.    And did you use the same
17    methodology for the data from both the choke
18    and the kill side?
19         A.    Yes.
20         Q.    And that was during the period
21    of the response?
22         A.    Yes.
23         MR. DRAKE:  Okay.  I don't have
24    anything else, Ms. Saidi.  Thank you very
25    much.
```

```
 1            THE VIDEOGRAPHER:  The time now is
 2    1:09 p.m.  We are off the record.
 3            (Recess from 1:09 p.m. to 1:15 p.m.)
 4            THE VIDEOGRAPHER:  Time now is
 5    1:15 p.m.  We are back on the record.
 6         F U R T H E R   E X A M I N A T I O N
 7    BY MS. FLICKINGER:
 8         Q.     Good afternoon, Ms. Saidi.
 9         A.     Good afternoon.
10         Q.     Nancy Flickinger for the United
11    States again, and Erica Pencak also from the
12    Department of Justice.
13                I believe you testified
14    yesterday as to your current position.
15         A.     Uh-huh.
16         Q.     Could you restate for the record
17    what your current position is at BP?
18         A.     I'm the flow assurance
19    engineering technical authority for the local
20    project organization.
21         Q.     Okay.  And what was your
22    position in 2010 during the period of the
23    response activities?
24         A.     Flow assurance technical
25    authority for Gulf of Mexico.
```

# Attachment 4



45684062

Aug  2 2012
12:05PM

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON: IN THE | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | * | |
| *ALL CASES* | * | MAG. JUDGE SHUSHAN |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### AGREED 30(b)(6) DEPOSITION NOTICE OF BP DEFENDANTS

By agreement of Plaintiffs' Liaison Counsel, Defense Liaison Counsel,

Coordinating Counsel for the States, Coordinating Counsel for the U.S., and Counsel for

Defendants BP Exploration & Production, Inc., BP p.l.c., BP America Production

Company, and BP North America Products, Inc., (collectively the "BP Defendants"), the

BP Defendants shall—pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure

and PRE-TRIAL ORDER NO. 17 (as supplemented and amended by PRE-TRIAL ORDER 27)—

designate and produce one or more officers, managers, agents, employees, or other

representatives of the BP Defendants to discuss the Areas of Inquiry identified below.

The Parties agree that in identifying each of the Areas of Inquiry below they are not

seeking to discover privileged or work product information, waiving any applicable

privilege or work product claim, or making any representation as to the existence or

scope of responsive, non-privileged information with respect to any particular Area of

Inquiry.  The times and locations of the depositions will be scheduled in conjunction with

the designees' fact depositions in their individual capacities, or otherwise as may be

scheduled with Judge Shushan and the parties.

<u>**Areas of Inquiry**</u>

1. For any and all attempts after April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill the Macondo Well by each of the following methods (unless otherwise specified):  Actuation of the Deepwater Horizon BOP; Riser Insertion Tube Tool ("RITT"), Top Hat, Top Kill, Junk Shot, Cofferdam, Capping Stack, BOP on BOP strategies, Macondo Relief Well No. 1, and Macondo Relief Well No. 2 (hereinafter, collectively referred to as "Methods"):

   a. The process of approval to fund and/or implement each attempt and/or Method, including the responsibility and identity of each person involved;

   b. A description of the manner and methodology, including computer models, used to assess each attempt and/or Method;

   c. A description of the rationale and factors considered by BP for each attempt and/or Method made by BP to the UAC;

   d. Dates when planning began for each attempt and/or Method, including the length of time used to plan and budget;

   e. An explanation of and timeline for the steps involved in planning and/or implementing each attempt and/or Method, including both the design of any equipment and the steps involved in the Method;

   f. The identity of BP employees and contractors who planned, managed, and/or supervised the implementation of each attempt and/or Method.

2. For any and all subsea collection efforts  identified in BP's June 9, 2010, June 13, 2010, or June 21, 2010 letters to Rear Admiral James A. Watson that were considered, but not used, to cap, control, contain, shut in, limit flow from,  and/or kill the Macondo Well after April 20, 2010:

   a. The process of approval to fund and/or implement each attempt and/or effort, including the responsibility and identity of each person involved and the reasons why approval was not given and/or the attempt was not funded or implemented;

   b. A description of the manner and/or methodology, including computer models, used to assess each effort;

   c. Dates when planning or consideration for each such effort began, including the length of time used to plan and budget;

    d.  An explanation of and timeline for the steps involved in planning and/or implementing each effort, including both the design of any equipment and the steps involved in the effort.

3.  For any and all attempts between January 1, 2001 (for the Deepwater Horizon Rig) or January 1, 2004 (for all other BP contracted rigs) and April 20, 2010, to cap, control, contain, shut in, limit flow from, and/or kill a flowing subsea Gulf of Mexico well (with a release equal to or greater than 50 BBOE or where hydrocarbons reached the rig floor) in which BP has either an operational or other interest by any of the Methods and any other method(s) used but not listed above:

    a.  The process of approval to fund and/or implement each attempt and/or Method, including the responsibility and identity of each person involved;

    b.  A description of the manner and methodology, including computer models, used to assess each attempt and/or Method;

    c.  A description of the rationale for each attempt and/or Method made or prepared for approval within BP;

    d.  Dates when planning began for each attempt and/or Method, including the length of time used to plan and budget;

    e.  An explanation of and timeline for the steps involved in planning and/or implementing each attempt and/or Method, including both the design of any equipment and the steps involved in the Method;

    f.  The identity of BP employees and contractors who planned, managed, and/or supervised the implementation of each attempt and/or Method.

4.  The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction, used to predict, estimate, characterize and/or measure the daily amount of hydrocarbons flowing from the Macondo Well from:

    a.  April 20, 2010 through July 15, 2010;

    b.  July 16, 2010 through September 19, 2010; and

    c.  September 20, 2010 through the present,

Including the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based.

5.  The manner and/or methodology that BP, BP's contractors, and/or any other entity working under BP's direction used to analyze results of tests of the physical

and chemical properties -- including chemical composition, viscosity, compressibility, formation volume factor, gas/oil ratio, saturation pressure, heat capacity and density -- presented in the reports identified below, including the effects of changes in pressure and/or temperature on those physical and chemical properties, the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based:  Core Lab Report Nos. 36126-5010048448, 36126-5010068510, 36126-19-5010068508, and 36126-53-5010068379; Intertek Report No. WTC-10-001812; Isotech Report No. 13030; and Schlumberger Report Nos. 201000053, 201000101, and 201000120.

6. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure pressure depletion of the Macondo M56 hydrocarbon reservoir tapped by the Macondo Well from:

   a.  April 20, 2010 through July 15, 2010;

   b.  July 16, 2010 through September 19, 2010; and

   c.  September 20, 2010 through the present,

   Including the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based.

7. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure the pressure inside the Macondo Well (including but not limited to the reservoir pressure), pressures at the BOP, pressures through the capping stack, and pressures at whatever points hydrocarbons were being released into the Gulf of Mexico for every day from:

   a.  April 20, 2010 through July 15, 2010;

   b.  July 16, 2010 through September 19, 2010; and

   c.  September 20, 2010 through the present,

   Including the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based.

8. The manner and/or methodology that BP, BP's contractors and/or any other entity working under BP's direction used to predict, estimate, characterize and/or measure the temperature of the discharge from the Macondo Well, including but

not limited to the reservoir temperature, temperatures inside the wellbore, the temperature at the BOP, and the temperature at the point where hydrocarbons were being released into the Gulf of Mexico for every day from:

a.   April 20, 2010 through July 15, 2010;

b.   July 16, 2010 through September 19, 2010; and

c.   September 20, 2010 through the present,

Including the results of such efforts, the identity of the individuals and groups who undertook such efforts, and a description of the data, observations and assumptions on which such efforts were based.

9.   Your efforts (including all communications, modeling, calculations and analysis) undertaken or used in connection with:  the flow rate estimate of 1,000 bopd announced by Admiral Landry on April 24, 2010; the flow rate estimate of 5,000 bopd announced by Admiral Landry on April 28, 2010; the flow rate estimate announced by the Flow Rate Technical Group ("FRTG") on or about May 27, 2010 (according to National Commission Staff Working Paper #3);  the flow rate estimate announced by the FRTG on or about June 10, 2010 (according to National Commission Staff Working Paper #3); the flow rate estimate announced by the FRTG on or about June 15, 2010 (according to National Commission Staff Working Paper #3); and the flow rate estimate announced on or about August 2, 2010 (according to National Commission Staff Working Paper #3, at page 17, "The Current Estimate").

10.  All planning, preparations, discussions, evaluations and/or training with regard to a "Worst Case Discharge scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan dated June 30, 2009) well control / hydrocarbon discharge event, or an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico prior to April 20, 2010.

11.  All planning, preparations, discussions, evaluations and/or training for a) a "Worst Case Discharge scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan dated June 30, 2009) well control/hydrocarbon discharge event, or b) an uncontrolled release of hydrocarbons subsea into the Gulf of Mexico after April 20, 2010, excluding the efforts of BP, BP's contractors and/or entities under the direction of BP in the effort to cap, contain, shut-in, limit flow from and/or kill the Macondo Well.

12.  The use of any analysis, calculations, assumptions or modeling of the flow rate of hydrocarbons from the Macondo MC252 well undertaken by or on behalf of BP or the Unified Command in connection with the analysis, consideration or execution of any Method (as that term is defined in Topic 1).

13. All source control equipment, products, and/or materials presently identified, reserved, set aside, under construction / development, purchased, and/or developed by, or at the request of, BP for use in a subsea release of hydrocarbons in the Gulf of Mexico.

14. Calculations, models, programs, data, discussion, analyses, and/or communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged both internally and with third parties regarding BP's determination of what the "Worst Case Discharge scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan dated June 30, 2009) was for the Macondo Well.

15. Calculations, models, programs, data, discussion, analyses, and/or communications made, transmitted, announced, drafted, discussed, sent, received, analyzed, reviewed, considered, and/or exchanged both internally and with third parties regarding the creation of BP's "Regional Oil Spill Response Plan" dated June 30, 2009 as such document pertains to "Source Control"(as set out in Section 6.C of that Regional Oil Spill Response Plan) and the determination of the "Worst Case Discharge scenario" (as defined in BP's Gulf of Mexico Regional Oil Spill Response Plan dated June 30, 2009) for an exploration well.

16. All analyses, calculations, assumptions, and data cited and/or relied upon in "BP's Preliminary Response to the Flow Rate and Volume Estimates Contained in Staff Working Paper No. 3" submitted by BP to the National Oil Spill Commission on or about October 21, 2010.

17. All calculations and analyses performed by BP, BP's contractors and/or any other entity working under the direction of BP, to quantify the amount of oil flowing through the capping stack of the Macondo Well at any time between July 12, 2010 and July 15, 2010, and the identity of all individuals or groups who undertook such efforts.

18. The configuration of the capping stack (including ram position at all times) and all pressure measurements (including calibration measurements) and temperature measurements taken from the capping stack from July 12, 2010 and August 3, 2010.

19. All attempts by BP, BP's contractors and/or any other entity working under the direction of BP, made to measure the pressure and/or temperature of any portion of the Macondo Well or its discharge—either above or below the BOP—between April 20, 2010 and August 3, 2010.

20. All attempts by BP, BP's contractors and/or any other entity working under the direction of BP, made to measure the size of the apertures through which

hydrocarbons were being released into the environment at the Macondo Well between April 20, 2010 and August 3, 2010.

21. All efforts by BP, BP's contractors and/or any entity under the direction of BP to predict, calculate, analyze, determine, estimate, model, simulate, and/or interpret (after January 1, 2009) the geophysical or geological characteristics, and (after April 1, 2010) the petrophysical characteristics, of the Macondo M56 reservoir.

22. All efforts by BP, BP's contractors and/or any other entity working on BP's behalf to calculate, estimate, predict, and/or model the shut-in wellhead pressure of the Macondo Well after April 20, 2010.

23. All analysis, calculations, modeling, or estimates by BP, BP's contractors and/or any other entity working under the direction of BP relating to obstructions in the wellbore, the BOP, and/or the riser.

24. All analysis, calculations, modeling, or estimates by BP, BP's contractors, and/or any entity working under the direction of BP, relating to the effect of erosion on the rate of flow from the Macondo well.


This 2nd day of August, 2012.



Respectfully submitted,

IGNACIA S. MORENO                                 BRIAN HAUCK
Assistant Attorney General                        Deputy Assistant Attorney General
Environment & Natural Resources                   Civil Division
   Division

JAMES NICOLL                                      PETER F. FROST
Senior Counsel                                    Director, Torts Branch, Civil  Division
NANCY FLICKINGER                                     Admiralty and Aviation
  Senior Attorney                                 STEPHEN G. FLYNN
SARAH HIMMELHOCH                                  Assistant Director
  Senior Attorney                                 MICHELLE DELEMARRE
DEANNA CHANG                                      SHARON SHUTLER
SCOTT CERNICH                                     JESSICA SULLIVAN
BETHANY ENGEL                                     JESSICA MCCLELLAN
RACHEL HANKEY                                     JILL DAHLMAN ROSA
ABIGAIL ANDRE                                     DAVID PFEFFER
JUDY HARVEY                                       MALINDA LAWRENCE
MATT LEOPOLD                                      ROBIN HANGAR

JEFFREY PRIETO
TOM BENSON
GORDON YOUNG
Trial Attorneys
STEVEN O'ROURKE
Senior Attorney

LAURA MAYBERRY
BRIENA STRIPPOLI
Trial Attorneys
Torts Branch, Civil Division
P.O. Box 14271
Washington, D.C. 20044-4271
Telephone: 202-616-4000
Facsimile: 202-616-4002

/s/ A. Nathaniel Chakeres
A. NATHANIEL CHAKERES
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-616-6537
Facsimile: 202-514-8395
E-mail: aristide.chakeres@usdoj.gov

R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone: 415-436-6648
Facsimile: 415-436-6632
E-mail: mike.underhill@usdoj.gov

JIM LETTEN
United States Attorney
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
Hale Boggs Federal Building
500 Poydras Street, Ste. B-210
New Orleans, LA 70130

Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Notice will be served on this Date on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12.

/s/ A. Nathaniel Chakeres     Aug. 2, 2012

A. Nathaniel Chakeres       Date