UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : : | MDL NO. 2179 SECTION J |
| THIS DOCUMENT RELATES TO: | : : | JUDGE BARBIER |
| ALL CASES | : : | MAGISTRATE JUDGE SHUSHAN |

**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE*
FOR ADMISSION OF NINE TRIAL EXHIBITS**

Pursuant to the Court's Phase Two exhibits procedure, the United States seeks a ruling now on the admissibility of nine deposition exhibits ("Sample Exhibits") relevant to flow rate from the Macondo well. The Sample Exhibits are primarily analyses from BP and its spill response contractors and are admissible statements made by BP or by entities working for BP, thus satisfying Fed. R. Evid. 801(d)(2).

This small subset of documents illustrates an important fact about the flow rate issue at the heart of Phase Two. Around the time of the well shut-in, the United States and BP essentially *agreed* on the flow from the Macondo well. The United States convened government and outside engineers and scientists through the Flow Rate Technical Group ("FRTG") and employees of three Department of Energy labs. Together, the government group came to a flow rate estimate of 53,000 barrels per day ("BPD") at the time of well shut-in, which occurred July 15, 2010, the day when the capping stack finally stopped the flow of oil from Macondo. Exhibit 8804 (Attachment 1). Meanwhile, BP's engineers performed internal calculations and reached strikingly similar conclusions. ███████████████████████████████████████████████

███████████████████████████████████████  Exhibit 9453

(Attachment 2).  From what BP has stated publically since, we anticipate that BP's flow rate estimate has since diverged from what the company and the United States calculated in July 2010 – when the company's incentive was to obtain the most accurate flow rate possible to inform decisions on killing the well, rather than minimizing its penalty exposure.  Moreover, BP opposes admission of documents showing that BP itself knew that early estimates of 1,000 or 5,000 barrels per day were not reliable; the United States is entitled to use these documents to refute any attempts by BP to rely on such numbers in Phase Two.  Finally, BP seeks to exclude documents prepared by its own contractors that will assist the Court in understanding the realities of the flow conditions (*e.g.*, whether the BOP was restricting flow of oil from the reservoir to the ocean). Such documents are not hearsay and will assist the Court in understanding the facts.

The United States respectfully requests a ruling that the nine Sample Exhibits are admissible for trial.  Admitting these documents now will streamline further discussions among the Parties by providing guidance that the Parties can extrapolate to the remaining disputed documents.

## BACKGROUND

The Court created a staggered exhibit list process for Phase Two, and the Parties submitted their Installment 1 exhibit lists under that process on December 19, 2012.  Doc. 7888.  The Court's schedule allowed parties to identify sample documents with evidentiary objections and have those objections addressed.  *Id.*  The United States identified 10 exemplar documents; this brief addresses the nine documents remaining after BP withdrew one of its objections.  As the Court explained, the "process is intended to provide the parties with the option to accelerate the process for resolving objections as to certain documents and to obtain guidance for extrapolation purposes."  *Id*. at 2.  In raising objections to the Installation 1 exhibit lists, the Parties have reserved objections regarding inner hearsay.

**ARGUMENT**

Each of the nine Sample Exhibits is admissible for the reasons discussed individually below.  In most cases, the documents qualify as non-hearsay because they are BP's admissions under Fed. R. Evid. 801(d)(2).

**I.      Admissibility Of Statements By Party Opponents**

Rule 801(d)(2) allows party opponents to hold each other responsible for the actions and statements of their employees and other agents.  This Rule treats as non-hearsay statements by an opposing party's agent when such statements are made during the course of the agency and relate to the declarant's duties.  *Corley v. Burger King Corp.*, 56 F.3d 709, 710 (5th Cir. 1995) (explaining that statements do not have to be made strictly within declarant's scope of employment, but instead must concern matters related to declarant's scope of employment).  The Fifth Circuit has recognized that "courts have held that we should not be hyper-technical in construing the agency relationship of Rule 801."  *United States v. Saks*, 964 F.2d 1514, 1524 (5th Cir. 1992); *Hoptowit v. Ray*, 682 F.2d 1237, 1262 (9th Cir. 1982) (explaining that the statement itself need not be squarely "within the scope of the declarant's agency.  Rather, it need only be shown that the statement be related to a matter within the scope of the agency.").

This subsection of Rule 801(d)(2) applies to employees, contractors, and subcontractors alike.  *Beck v. Haik*, 377 F.3d 624, 639-40 (6th Cir. 2004) (consultant's statements about his work admissible against principal) (overruled on other grounds by *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009); *Triche v. Overnite Transp. Co.*, No. 95-0691, 1996 WL 272270, at *7 (E.D. La., Mar. 17, 1996).  External indicia of trustworthiness are not required to support the admission of such statements because the Rule is grounded "on a kind of estoppel or waiver theory, that a party should be entitled to rely on his opponent's statements." *Jewell v.CSX Transp.*, 135 F.3d 361, 365 (6th Cir. 1998) (internal quotations omitted).  Therefore, personal knowledge on the part of the

declarant is not required.  *Society of Roman Catholic Church v. Interstate Fire & Cas. Co.*, 126 F.3d 727, 733 (5th Cir. 1997).   Circumstantial evidence may be used to establish the scope of a declarant's agency.   *Pappas v. Middle Earth Condomunium Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992).

## II.     Documents Prepared By BP Or Its Response Contractors

Eight of the nine Sample Exhibits were created by BP or its hired response contractors. These documents qualify as party admissions within Rule 801(d)(2).   In addition, BP may have conceded that four of the documents are non-hearsay based on the logical extension of the Court's July 15, 2011 order on the Boots and Coots Report.   Doc. 3346 ("Boots & Coots Order").   In outlining which documents BP maintained objections on, BP counsel stated that "the following documents *may be impacted by the Court's July 15, 2011 Order* as to the admissibility of the Boots & Coots Report, and *BP notes objections to these documents for preservation purposes*." February 8, 2013 Email, P. Bartoszek to G. Richard, et al. (Attachment 3) (emphasis added). BP's list of documents impacted by the Boots & Coots Order included Exhibits 8865, 10346, 10518, and 10622 from the Sample Exhibits at issue in this motion.   Each of the exhibits involves statements from one of BP's contractors hired during the response.   It is not clear whether BP intended to concede that the Boots & Coots Order applies to these exhibits.   In any event, the logic of the order does apply, so the Court should order these documents admissible, as described further below.

### A.     Documents Showing BP's Internal Flow Rate Understanding During the Spill: Exhibits 3220, 8865, 10468, 10518

*Exhibit 3220*

Mike Mason was a BP vice president in Exploration and Production Technology at the time of the spill.   He worked for Gordon Birrell and Paul Tooms on a variety of tasks related to the company's spill response and headed up efforts looking at potential well and reservoir

- 4 -

performance and flow path scenario modeling.  Michael Mason Deposition (Attachment 4) at 43:3-51:6; Adam Ballard Deposition (Attachment 5) at 216:9-15.  On May 15, 2010, he wrote an email to BP Chief Executive Andy Inglis and Jasper Pejis warning against "standing behind" the company's then-public flow rate estimate – 5,000 BPD.  Exhibit 3220 (Attachment 6).  Mr. Mason told Mr. Inglis that "our modelling shows that this well could be making anything up to ~ 100,000 bopd depending on a number of unknown variables."  *Id*.  He added, "We can make the case for 5,000 bopd only based on certain assumptions."  *Id.*  Mr. Pejis forwarded the message on to John Lynch, who forwarded it to former BP vice president David Rainey and Doug Suttles, BP America Inc.'s Chief Operating Officer and BP's representative to the Unified Command.  *Id.*

BP challenges Exhibit 3220 as hearsay.  The email is admissible as a party admission. Mr. Mason's email was sent during his BP employment and as part of his role during the spill to investigate flow rates and flow scenarios at the request of top BP executives.  Mason Dep. (Att. 4) at 114:8-117:19; *see, e.g., Burger King Corp.*, 56 F.3d at 710 (explaining that statements do not have to be made strictly within a declarant's scope of employment, but instead must concern matters related to declarant's scope of employment).

BP also objects to Exhibit 3220 based on Rules 401, 402, and 403.  Exhibit 3220 is clearly relevant – it reflects one of BP's high-ranking engineers describing the state of the company's flow rate knowledge to his superiors, including top company executives.  Nor is BP's reference to Rule 403 availing.  There is no reason to suspect the exhibit will cause BP undue prejudice or waste the Court's time.  As the Court noted in the Boots & Coots Order, because the proceeding is a bench trial, "the Court will give the Report appropriate weight in light of all other admissible evidence." Doc. 3346 at 5.  The same principle applies here.

*Exhibit 8865*

████████████████████████████████████████████████████

████████████████████████████████████████ Mr. Lockett is a flow assurance engineer for BP with the title Discipline Lead for Flow Assurance.  Timothy Lockett Deposition (Attachment 7) at 29:22-30:1.  During the spill response, Mr. Lockett worked with Trevor Hill to attempt to understand the flow in order to better design and consider source control options.  *Id.* at 59:3-22; 66:4-67:22; 68:8-70:19.  Mr. Hill was a central engineer in BP's response, reporting to the head of the engineering team and working on the relationship between oil flow and source control, among other issues.  Trevor Hill Deposition (Attachment 8) at 33:11-35:5.  BP hired Ole Rygg to perform wellbore modeling to inform its consideration of various well kill options.  Ole Rygg Deposition (Attachment 9) at 60:11-61:1.  In Exhibit 8865, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ ████

████████████████████████████████████████████████████

████████████████████████████████████ Exhibit 8865 (Attachment 10).

BP objects to Exhibit 8865 as hearsay.  The email chain is admissible as a party admission.  Mr. Lockett was working as a BP employee during the response.  Lockett Dep. (Att. 7) at 63:3-8.  Mr. Rygg was working as a contractor to BP, so his email qualifies as a party admission as well.  *See, e.g.*, *Beck v. Haik*, 377 F.3d at 639-40 (consultant's statements about his work admissible against principal).  BP counsel appears to concede that the Boots & Coots Order logically applies to this exhibit.  Att. 3.

---

[1] In industry parlance, "mbd" means thousands of barrels per day.

*Exhibit 9455*

In late June 2010, a group of BP engineers performed modeling based on known data from the top kill to attempt to better understand flow path and flow rate in order to inform the discussion about whether to shut-in the well.   Tony Liao Deposition (Attachment 11) at 413:1-414:4; Ballard Dep. (Att. 5) at 200:18-203:13.   The group performing the analysis included two "experts[s]" with the Prosper model, Ashish Chitale and Metin Gokdemir.   Mason Dep. (Att. 4) at 73:7-20.

███████████████████████████████████████████████████████████

███████████████████████████████████   Exhibit 9455 (Attachment 12) at 17.

Halliburton objects to Exhibit 9455 based on Rule 702.[2]   However, Rule 702 controls admission of *testimony* not *documents*.   As the Fifth Circuit has held, "it is well settled that the opinion rule does not apply to a party's admissions."   *Owens v. Atchison, T. & S. F. Ry. Co.*, 393 F.2d 77, 79 (5th Cir. 1968); *see also* 1 McCormick on Evidence § 18 (6th ed. 2006) ("opinion rule has little or no sensible application to out-of-court statements") (citing *Owens*); Michael H. Graham, 7 Handbook of Federal Evidence § 803:0 at 8 (7th Ed. 2012) (similar).   In Phase One, parties made objections to post-blowout investigation reports as improper opinion testimony, and the Court rejected those challenges.   Doc. 5834 at 2.   The Rule 702 objection here is even less compelling than it was when the Court considered it for Phase One.   First, the Exhibit 9455

███████████████████████████████████████████████████████████

███████████████████████████████████████   Second, the exhibit is offered by BP's *opponent*, rather than BP, showing it is not self-serving, a potential concern for a party's post-incident reports.   *See, e.g., Montes v. Phelps Dodge Industries, Inc.,* 481 F. Supp. 2d 700, 709 (W.D. Tex. 2006) (in discussion of business records exception, noting that "there is no better

---

[2]  The United States notes that it did not sue Halliburton, so we question whether Halliburton has standing to object to the United States' exhibits.   Given that we anticipate a single Phase Two trial for the lawsuits within MDL 2179, we respond to these objections now to avoid the issue at trial.

proof of [trustworthiness] than the fact that Plaintiff himself relied upon the record in his Response to Defendant's Motion.").

### *Exhibit 10468*

On June 15, 2010, the Oil & Gas Journal sent out an email of headlines that included the news that BP had provided plans to the Coast Guard to collect 40,000 to 53,000 BPD by June 30, 2010. John Dribus at Schlumberger received the email and forwarded it on to several Schlumberger colleagues. Mr. Dribus, who was the "top geologist" at Schlumberger, added his own comments about the news:

> All, According to this O&G Journal article below, BP PLC has provided the US Coast Guard with plans to collect 40,000- 53,000 b/d of oil by June 30 from the deepwater Macondo blowout well. *That appears to be their admission that this well is flowing at a rate of greater than 50,000 b/d!*

Exhibit 10468 (Attachment 13) (emphasis added); Albert DeCoste Deposition (Attachment 14) at 161:23-162:2. Schlumberger was hired by BP to work on the response. Specifically, BP hired Schlumberger to analyze fluid properties in the oil collected and quantify the amount of oil collected and/or burned. DeCoste Dep. (Att. 14) at 22:21-25:16; 31:15-36:2. Schlumberger had provided similar services to BP for decades. *Id.* at 31:3-7.

BP challenges Ex. 10468 as hearsay and also claims it should be excluded based on hearsay within hearsay and Rule 403. The statement by Mr. Dribus is not hearsay because he was working for BP at the time, and the statement related to the specific work Schlumberger was performing on behalf of BP – collection and containment of oil. The flow rate was clearly related to "the scope of his employment." *Burger King Corp.*, 56 F.3d at 710. The Oil & Gas Journal statement regarding BP's plans to collect 40,000-53,000 BPD is admissible as an adoptive admission: Mr. Dribus adopted the statement by forwarding it on to his colleagues and commenting about it. His comments indicated that he believed the truth of the forwarded statement, satisfying the requirement for an adoptive admission. Doc. 5143 at 10 (emails

- 8 -

constitute adoptive admissions "where their context and content clearly indicated that the forwarding individual manifested an adoption of or belief in the truth of the statements of other people") (describing holding of *United States v. Safavian*, 435 F. Supp. 2d 36, 43-44 (D.D.C. 2006). Finally, there is no reason to suspect the exhibit will cause BP undue prejudice or waste the Court's time, so BP's Rule 403 objection is unavailing. *See* Boots & Coots Order at 5.

### *Exhibit 10518*

BP hired Stress Engineering to perform computational fluid dynamics ("CFD") in order to better understand the potential for the "BOP on BOP" source control option. Charles Holt Deposition (Attachment 15) at 261:1-18. In Exhibit 10518, Stress Engineering Principal Christopher Matice discusses the information needed for Stress to perform its work with another BP contractor, William Burch at Wild Well Control. *Id*. at 267:6-8. As they discuss the appropriate flow rate to model, Mr. Matice says, "These runs will likely take 10 - 12 hours each. *We should start with our best estimate*." Exhibit 10518 (Attachment 16) (emphasis added). At that point, BP employee Richard Simpson replies: "For the first run, use 70,000 bpd[.] For the second run, 35,000 bpd[.] Third run, 17,500 bpd." Mr. Matice replies simply: "Understood." Mr. Simpson was the primary BP contact for Stress Engineering during its work. Christopher Matice Deposition (Attachment 17) at 28:6-12.

BP challenges Ex. 10518 as hearsay. The email chain is admissible as a party admission. Each of the statements in the email chain was made by a BP employee or someone working on BP's behalf in the spill response. Mr. Holt's Rule 30(b)(6) deposition on BP's behalf confirmed that both Stress and Wild Well were working for BP at the time. Indeed, the face of the exhibit demonstrates that the discussion was part of the scope of the agency relationship: Mr. Simpson also added a note saying the email contained confidential information, and added a confidential sensitivity to the email chain heading. Exhibit 10518. Mr. Simpson thus shared information BP

considered confidential with the two contractors, demonstrating that the information was necessary for them to perform the work BP hired them to do. In his deposition, Mr. Matice noted that Mr. Simpson's email "reinforced our confidentiality agreement with BP." Matice Dep. (Att. 17) at 77:9-78:10.[3] In addition, BP counsel appeared to concede that the Boots & Coots Order logically applies to this exhibit. Att. 3.

### B.  Document Showing BP Internally Agreed with Government Flow Rate Estimate at Shut-in: Exhibit 9453

*Exhibit 9453*

At the time of the oil spill Farah Saidi was the flow assurance technical authority for the Gulf of Mexico, and she worked for Mr. Hill during the response. Farah Saidi Deposition (Attachment 18) at 29:2-22; 35:4-37:23. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ Ms. Saidi testified that she performed the calculation as part of her BP duties. Saidi Dep. (Att. 18) at 177:5-178:9. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ Exhibit 9453. Mr. Lockett testified that he believed the method Ms. Saidi used, because it was based on data that better defined the fluid and flow path, would be the most accurate calculation at the time of shut-in. Lockett Dep. (Att. 7) at 238:12-239:5; 240:6-241:11.

Halliburton objects to Exhibit 9453 based on Fed. R. Evid. 702. Assuming the Court finds that Halliburton has standing to object to the United States' exhibits, that objection fails for the reasons discussed above for Exhibit 9455.

---

[3] Mr. Matice was discussing Exhibit 10122, which is a duplicate of Exhibit 10518.

### C. Documents that Assist in Understanding Flow Conditions: Exhibits 10346 and 10622

*Exhibit 10346*

A decade ago, BP donated money to Cambridge University to endow the BP Institute. Ellen Williams Deposition (Attachment 19) at 230:18-231:3. During the spill, BP asked Professor Andrew Woods from the BP Institute to perform work related to the plume. *Id.* at 79:5-19; 174:6-23. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ June 22-23, 2010 Email Chain, Dep. Ex. 11189 (Attachment 20). ▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Exhibit 10346 (Attachment 21).

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.*

BP objects to the exhibit as hearsay. This document is admissible within Fed. R. Evid. 801(d)(2)(A) as a statement made by Trevor Hill as part of his work on the Macondo response. By sending the information to Professor Woods, Mr. Hill demonstrated that he believed the information was reliable, further strengthening the basis for its admissibility. In addition, BP counsel appeared to concede that the Boots & Coots Order logically applies to this exhibit. Att. 3.

*Exhibit 10622*

BP hired Wild Well Control to assist in source control operations, including Top Kill.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Mr. Barnett was involved in "the planning and implementation of the kill operations, both the dynamic kill that was planned for the eventual intercept of the relief well, and the top kill operations." David Barnett Deposition (Attachment 22) at 25:15-20. In his deposition, Mr. Barnett stated that Wild Well concluded that Top Kill failed because "the flow path through the BOP was too large." *Id.* at 237:16-238:7. ▬▬

- 11 -

*Id.*; Exhibit 10622 (Attachment 23).

Exhibit 10622 (Att. 23).

*Id.*

BP challenges Exhibit 10622 as hearsay. The document is admissible as a party admission. Wild Well was working for BP at the time. Barnett Dep. (Att. 22) at 238:2-20. The memo was the culmination of Wild Well's work on Top Kill, and presented the company's views to BP on why Top Kill failed. *Id.* at 237:17-239:4. BP counsel appeared to concede that the Boots & Coots Order logically applies to this exhibit. Att. 3.

## III. Document Showing Government Flow Rate Estimates During Response: Exhibit 8804

### Exhibit 8804

Exhibit 8804 is the March 10, 2011 final report ("Report") from the Flow Rate Technical Group ("FRTG"). The Report sets forth the results of each of the FRTG sub-teams and evaluates how the different methodologies performed during the response, based on the information the FRTG had during the response. The Report notes that the final government estimate made during the response was 53,000 BPD just prior to shut-in and 62,000 BPD at the beginning of the spill, for a total discharge of 4.9 million barrels.[4]

Halliburton objects based on Rules 701 and 802, while BP objects based on Rule 802 alone. The FRTG report is admissible as a public record. In advance of the Phase One trial, the

---

[4] The United States notes that while the Report is admissible as a public record, it is not the government's final word on flow rate. We anticipate providing additional analysis in this litigation that may supplement or differ from what is presented in the Report.

- 12 -

Court ruled on several government reports and found they qualified as public records. Doc. 5635. The Court cited *United States v. Central Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984), and found that the National Commission Report qualified as a public record because the commission was authorized by and had a duty to report to the President. The FRTG was created by the National Incident Command and directed to (1) quickly estimate the flow rate and (2) "use multiple, peer-reviewed methodologies to later generate a final estimate of flow rate and volume of oil released." Exhibit 8804 (Attachment 1) at 6. The Report represents the fulfillment of the second half of the FRTG's mandate.[5]

As to the Rule 701 objection, the Report is not testimony. Assuming the Court finds that Halliburton has standing to object to the United States' exhibits, Halliburton's objection can be overruled for the reasons discussed for Exhibit 9455.

### IV. The Sample Exhibits Are Also Admissible To Show What BP Knew During The Response

As described above, the Sample Exhibits are admissible as party admissions. In the alternative, they can be admitted as evidence of what BP and BP's contractors knew and believed during the response, rather than for their truth. In that circumstance, the hearsay rule would not apply.

There are two prongs to indentifying what constitutes hearsay: First, it is an out-of-court statement. Second, it is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). If the second prong is not satisfied, the statement is not hearsay. For example, "Testimony offered to prove that the party had knowledge or notice is not hearsay because the

---

[5] In Doc. 5635, the Court found that the National Commission Report qualified as a public record, but was replete with inner hearsay, and excluded the document on that basis. Here, Halliburton has not claimed inner hearsay (the Parties have reserved such objections), and the Report does not present the same inner hearsay problem as the National Commission Report because it is not reporting witness statements. To the extent any inner hearsay exists, the Court can address objections on that basis during trial, as it elected to do with certain non-governmental reports. *See* Doc. 5834 (admitting the Bly Report, Transocean's accident investigation report, and the Berkeley Report).

- 13 -

value of the statement does not rest upon the declarant's credibility and, therefore, is not subject to attack as hearsay." *In re Morrison*, 555 F.3d 473, 483 (5th Cir. 2009) (internal citations and quotation marks omitted). The Fifth Circuit has also explained that statements that qualify as verbal acts can be admitted, as can statements that are relevant to the declarant's state of mind or the impact on the recipient. *Mota v. University of Texas Houston Health Science Center*, 261 F.3d 512, 527 n.46 (5th Cir. 2001).

Each of the Sample Exhibits is admissible on a basis other than for the truth of the statement:[6]

- Exhibit 3220 is admissible to show that Mr. Mason put Mr. Inglis and other top BP executives on notice on May 15, 2010 that he believed the flow rate could be anywhere from 5,000 to 100,000 BPD. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

- Exhibit 10346 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

- Exhibit 10468 shows what Schlumberger's "top geologist" understood from news reports about BP's increased collection.

- Exhibit 10518 is admissible as a verbal act to show the directions BP provided Stress Engineering and what BP believed the best estimate of flow was at the time.

- Exhibit 10622 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Evidence of what BP knew during the response – and the extent to which its internal understanding of flow rate differed from its public pronouncements – is relevant to BP's

---

[6] No Party objected on hearsay grounds to Exhibits 9453 and 9455. This argument would be equally applicable to those exhibits, which show that BP performed analyses during the spill that resulted in flow rates of more than 50,000 BPD.

- 14 -

- 15 -

credibility in its flow rate contentions in this litigation; BP's source control efforts; and the Clean Water Act penalty factors set out in 42 U.S.C. § 1321(b)(8).

## CONCLUSION

The United States respectfully requests a ruling that the nine Sample Exhibits are admissible for trial.   These documents are admissible under established evidentiary principles and admitting these documents now will streamline further discussions among the Parties by providing guidance that the Parties can extrapolate to the remaining disputed documents.   Specifically, the United States requests a ruling that Exhibits 3220, 8804, 8865, 9453, 9455, 10346, 10468, 10518, and 10622 are admissible.

Respectfully submitted,

Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
SCOTT CERNICH
THOMAS BENSON
Senior Attorneys
DEANNA CHANG
A. NATHANIEL CHAKERES
JUDY HARVEY
ABIGAIL ANDRE
RACHEL HANKEY
BETHANY ENGEL
Trial Attorneys

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:   415-436-6648
Facsimile:   415-436-6632
E-mail:   mike.underhill@usdoj.gov

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:   202-514-2779
Facsimile:   202-514-2583
E-mail:   steve.o'rourke@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA   70130
Telephone:   (504) 680-3000
Facsimile:   (504) 680-3184
E-mail:   sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
SCOTT CERNICH
THOMAS BENSON
Senior Attorneys
DEANNA CHANG
A. NATHANIEL CHAKERES
JUDY HARVEY
ABIGAIL ANDRE
RACHEL HANKEY
BETHANY ENGEL
Trial Attorneys

/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:   415-436-6648
Facsimile:   415-436-6632
E-mail:   mike.underhill@usdoj.gov

/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:   202-514-2779
Facsimile:   202-514-2583
E-mail:   steve.o'rourke@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA   70130
Telephone:   (504) 680-3000
Facsimile:   (504) 680-3184
E-mail:   sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

- 17 -

**CERTIFICATE OF SERVICE**

       I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:   February 15, 2013.                    /s/   Steve O'Rourke
                                                               U.S. Department of Justice

ATTACHMENT LIST

[Exhibits in bold text below are the Sample Exhibits at issue in the motion]

| Attach. # | Description |
|---|---|
| **1** | **Depo. Exh. 8804 (National Incident Command, Interagency Solutions Group, Flow Rate Technical Group, Assessment of Flow Rate Estimates for the Deepwater Horizon/Macondo Well Oil Spill, U.S. Department of the Interior, dated March 10, 2011)** |
| **2** | **Depo. Exh. 9453 (Email From: Farah Saidi; To: Trevor Hill; Subject: Estimated rate technical note, dated July 17, 2010) (*Confidential*)** |
| 3 | Email From: P. Bartoszek; To: R. Gwen, et al., dated February 8, 2013 |
| 4 | Michael Mason Deposition, Vol. 1, dated January 24, 2013 (Excerpts) |
| 5 | Adam Lee Ballard Deposition, Vol. 1, dated October 16, 2012 (Excerpts) |
| **6** | **Depo. Exh. 3220 (Email From: John Lynch, Jr.; To: David Rainey; Subject: (Redacted); dated May 16, 2010)** |
| 7 | Timothy James Lockett Deposition, Vol. 1, dated December 18, 2012 (Excerpts) |
| 8 | Trevor J. Hill Deposition, Vol. 1, dated January 14, 2013 (Excerpts) |
| 9 | Ole Rygg Deposition, Vol. 1, dated October 3, 2012 (Excerpts) |
| **10** | **Depo. Exh. 8865 (Email From: Trevor Hill; To: Douglas Wood; Subject: FW: Pressure build-up, dated May 17, 2010) (*Confidential*)** |
| 11 | Tony T. Liao Deposition, Vol. 2, dated January 11, 2013 (Excerpts) |
| **12** | **Depo. Exh. 9455 (Email From: Ashish Chital; To: Tony Liao, Trevor Hill, Mike Mason; Subject: Top Kill Modeling Summary, dated June 29, 2010) (*Confidential*)** |
| **13** | **Depo. Exh. 10468 (Email From: John Dribus; To: Robert Drummond, Bud DeCoste; Subject: FW: BP plans to collect 40,000-53,000 b/d from gulf oil spill, dated June 15, 2010)** |
| 14 | Albert Jeremiah "Bud" DeCoste, Jr. Deposition, Vol. 1, dated December 15, 2012 (Excerpts) |

| | |
|---|---|
| 15 | Charles Holt Deposition, Vol. 1, dated November 28, 2012 (Excerpts) |
| **16** | **Depo. Exh. 10518 (Email From: Chris Matice; To: Richard Simpson, William Burch, Jim Wellings, Charlie Holt; Subject: Re: Flow Rate for first modeling run : BP Macondo Plume Modeling Parameters, dated April 30, 2010)** |
| 17 | Christopher Matice Deposition, dated November 28, 2012 (Excerpts) |
| 18 | Farah Saidi Deposition, Vol. 1, dated January 10, 2013 (Excerpts) |
| 19 | Ellen D. Williams Deposition, Vol. 1, dated November 19, 2012 (Excerpts) |
| 20 | Depo. Exh. 11189 (Email Chain dated June 22-23, 2010) (*Confidential*) |
| **21** | **Depo. Exh. 10346 (Email From: Trevor Hill, To: Andy Leonard; Subject: Re: Flow rate periods, dated July 22, 2010) (*Confidential*)** |
| 22 | David Arnold Barnett Deposition, Vol. 1, dated December 14, 2012 (Excerpts) |
| **23** | **Depo. Exh. 10622 (Wild Well Control Project Memo - Subject: Summary & Conclusions From Top Kill Efforts, 26 - 28 May 2010, dated May 31, 2010) (*Confidential*)** |