# Attachment 14

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL      )   MDL NO. 2179
BY THE OIL RIG         )
"DEEPWATER HORIZON" IN )   SECTION "J"
THE GULF OF MEXICO, ON )
APRIL 20, 2010         )   JUDGE BARBIER
                       )   MAG. JUDGE SHUSHAN
```

*****************
VOLUME 1
*****************

30(b)(6) Deposition of Albert Jeremiah "Bud" DeCoste, Jr., Schlumberger, Limited, taken at the Pan-American Building, 601 Poydras Street, 11th Floor, New Orleans, Louisiana, 70130, on the 5th day of December, 2012.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1                THE WITNESS:  Sorry.  Yes.
 2         Q.  (By Ms. André) What position did you hold
 3   at that time?
 4         A.  My title was Marketing Manager for the
 5   Gulf of Mexico.
 6         Q.  Okay.  And what were your job duties
 7   related to the Macondo Well?
 8         A.  So, on a daily basis, I wrote a Report to
 9   our Senior Management, including the Chief
10   Executive Officer of the Company, on our -- our
11   activities in the field, generally what was in
12   the press locally about Macondo, and then as --
13   also about, as I said earlier, about the
14   moratorium and the impact that the moratorium was
15   going to have on our business in the near term
16   and longer term.
17         Q.  Okay.  So you weren't directly involved
18   in the technical side of Schlumberger's response
19   to the Macondo spill?
20         A.  I was not.
21         Q.  Okay.  Okay.  What was Schlumberger hired
22   to do on what I'm going to call the Macondo
23   Project?
24         A.  M-h'm.  So we were -- we were hired --
25   the -- the -- the primary message that was given
```

```
 1   to us was to mobilize the -- the well testing
 2   equipment that would be used to contain and
 3   either capture or burn the maximum amount of oil
 4   possible with the vessels that were put at our
 5   disposal.
 6        Q.   Okay.  Were those the ENTERPRISE and the
 7   Q4000?
 8        A.   Yes.
 9        Q.   Any other vessels?
10        A.   Later, we began to mobilize for the
11   DISCOVERER CLEAR LEADER, but that was never
12   actually put into operation.
13        Q.   Okay.  What about the HELIX PRODUCER?
14        A.   We didn't have any -- anything to do with
15   that, other than some PVT samples that came in
16   much later.
17        Q.   Okay.  So in addition to the well testing
18   work, what else did Schlumberger do related to
19   the Macondo Project?
20        A.   So we had the wireline logging contract
21   on the -- on the DEEPWATER HORIZON, which
22   involved doing the -- the formation evaluation
23   services.
24             We did PVT work associated with both the
25   wireline logging and the well testing work, or
```

```
 1     the -- the containment work we were doing.
 2          Q.   And when you say --
 3          A.   That's it.
 4          Q.   Oh, I'm sorry.  Were you --
 5          A.   And I think that was it.
 6          Q.   Okay.  When you say that you did "PVT
 7     work related to the wireline and the well
 8     testing," do you mean that you did PVT work based
 9     for reservoir samples and for samples taken from
10     the vessels?
11          A.   Yes.
12          Q.   Okay.  Is there anything else that
13     Schlumberger was responsible for doing related to
14     the Macondo Project?
15               MR. TANNER:  That you're aware of.
16               MS. ANDRÉ:  (Nodding.)
17          A.   The -- the wireline logging, we did one
18     wireline logging job which was related to Macondo
19     on a different rig under the same Contract, which
20     was the isolation scanner job in September --
21          Q.   (By Ms. André) Okay.
22          A.   -- that was -- that was still under the
23     same -- same role.
24          Q.   And as part of the wireline logging
25     duties, Schlumberger took samples from -- of
```

1   Macondo Reservoir fluid shortly before the
2   blowout; is that correct?
3       A.  That is correct.
4       Q.  Okay.  When was Schlumberger originally
5   hired to do the well testing work for the Macondo
6   Project?
7       A.  We had a long-term Contract on the
8   ENTERPRISE, and that equipment was -- was
9   already -- most of that equipment was already
10  onboard the rig.
11      Q.  Okay.
12      A.  And that Contract had been in place since
13  2009 sometime.  Then shortly after the blowout
14  when we started to have discussions about
15  mobilizing the equipment for the Q4000.  I don't
16  know the exact date.
17      Q.  That's just fine.
18          I'm going to walk through a couple of
19  these contracts with you.  I -- I won't be asking
20  you too much detail about them.  I just want to
21  have you identify them for the record.
22      A.  Sure.
23      Q.  So, first, if you could turn to
24  Tab 38.  And we're going to hand you a copy here.
25          MR. TANNER:  Ms. Abby, you're going

```
 1    correct?
 2        A.   Yes.
 3        Q.   Okay.  Roughly how many contracts had
 4    Schlumberger entered into with BP before the
 5    Macondo Incident?
 6        A.   We've been working for BP for, you know,
 7    decades.
 8        Q.   Fair enough.
 9        A.   So that's hard to say, but the two
10    contracts you showed were -- covered a lot of our
11    work.  The underlying Master Service Agreements
12    covered a lot of our work in the --
13        Q.   Okay.
14        A.   -- Gulf of Mexico.
15        Q.   Okay.  Okay.  All right.  So first this
16    morning, I want to talk about the well testing
17    work that Schlumberger did for BP.  Generally,
18    can you describe what well testing services
19    Schlumberger provided to BP for the Macondo
20    Project?
21        A.   So -- so first of all, it's a little bit
22    of a -- of a misnomer to -- to call it "well
23    testing."  We call it "well testing."  We've
24    called it "well testing," but well testing is
25    generally about reservoir evaluation and
```

```
 1    understanding flow properties and -- and pressure
 2    buildups and things that describe the reservoir.
 3            This was the application of well testing
 4    equipment to something that we don't normally do,
 5    which is all about trying to capture and contain
 6    or burn the maximum amount of oil possible --
 7        Q.  Okay.
 8        A.  -- which is not a normal well testing
 9    operation.
10        Q.  Right.
11        A.  So what we did in the case of Macondo
12    with our well testing equipment was on the
13    ENTERPRISE.  We had what we call two trains of --
14    of well testing equipment to -- going through
15    two -- two identical systems to capture oil and
16    gas there.  And on the ENTERPRISE, the ENTERPRISE
17    itself had a fair bit of capacity for containing
18    or storing the oil, so there was no reason to --
19    to burn it.  It was captured into tanks and then
20    transferred to another vessel for transport into
21    the -- into town --
22        Q.  Okay.
23        A.  -- to the beach.  And then on the Q4000,
24    we had a single train, but because the Q4000 had
25    no built-in means of storing, we employed our
```

1  EverGreen burner to burn the oil.
2      Q.  And what's EverGreen burner?
3      A.  It's a -- it's -- it's essentially a -- a
4  sophisticated flaring device that with the use of
5  a lot of compressed air, and a special nozzle
6  designs, you can -- you can burn oil without any
7  significant fallout back into the sea.
8      Q.  Okay.
9      A.  So it's -- it's considered a green
10 burner.
11     Q.  And Schlumberger produced to BP a series
12 of Well Testing Services Reports based on these
13 activities, correct?
14     A.  Correct.
15     Q.  What's typically included in a Well
16 Testing Service Report?
17     A.  It's a combination of the sensors that
18 were deployed on the -- on the -- throughout the
19 equipment monitoring pressures and temperatures,
20 most importantly, pressure before and after the
21 choke manifold.
22     Q.  Okay.
23     A.  Then monitoring the -- the pressure and
24 temperature of the separator, and then monitoring
25 the rates of oil and gas that come out of the

1    separator.
2        Q.  Okay.
3        A.  And, of course, based on those rates, the
4    cumulative amount of oil that's captured or
5    burned.
6        Q.  So you said that the burning process that
7    went -- that happened on the Q4000 is not
8    something that Schlumberger typically does?
9        A.  (Shaking head.)
10       Q.  Is that correct?
11       A.  No, that's not what I said.
12       Q.  Please correct me.
13       A.  We -- we -- we use the EverGreen burner
14   throughout the world, but -- and have -- that --
15   that burner was first deployed in the '90s.  It's
16   just that burning of oil in the Gulf of Mexico is
17   not permitted routinely, but it is something that
18   is allowed throughout the world.  We do it in the
19   North Sea, we do it in North Africa, off West
20   Africa.
21       Q.  And it was permitted in this case
22   because --
23       A.  Because --
24       Q.  -- it was an emergency?
25       A.  Exactly.

```
 1                MR. TANNER:  Got to allow her to
 2      finish.
 3                THE WITNESS:  I've got to let her
 4      finish.  I'm sorry.
 5                MR. TANNER:  Everybody gets their
 6      turn.
 7           Q.   (By Ms. André) So you said that -- when
 8      you were talking about the well testing label on
 9      the Q4000 work being something of a misnomer,
10      that was why I was a little bit confused.  So you
11      weren't saying that the work that Schlumberger
12      did on the Q4000 is not work that Schlumberger
13      typically does?
14                That was confusing.  That was a confusing
15      question.  I can ask it again.
16                So the work that Schlumberger did on the
17      Q4000 it had done before?
18           A.   Yes.  The work we were doing on both the
19      Q4000 and the ENTERPRISE is work that we
20      routinely do.  It was the motivation for it and
21      the -- the drivers for it were different.
22           Q.   Okay.  And providing Reports about the
23      temperatures and pressures before and after the
24      sensors, before and after the choke manifolds
25      accumulated flow rate, those are things that you
```

```
 1     typically provide your clients in Reports?
 2          A.  Yes, that's routine.
 3          Q.  Okay.  Okay.  So I want to pull out some
 4     copies of the Well Testing Service Reports
 5     created by Schlumberger for both the ENTERPRISE
 6     and the Q4000.  They're on the second disc that I
 7     brought in this morning.
 8              And I've previously marked all of them.
 9     I'm going to show you an old version of the
10     ENTERPRISE Report and then the new version of the
11     ENTERPRISE Report and enter those in.
12              And then the same thing for the Q4000.
13     And then we'll talk about the Final Reports,
14     okay?
15          A.  (Nodding.)
16          Q.  Okay.  So --
17              (Discussion off the record.)
18                  MS. ENGEL:  That's the first one.
19                  MS. ANDRÉ:  Okay.
20          Q.  (By Ms. André) Okay.  So first I'm going
21     to enter as Exhibit 10438, an ENTERPRISE "Well
22     Testing Services Report," with the Bates ending
23     0908, that the "Print Date" states was created on
24     June 2nd, 2010.
25                  MR. TANNER:  Can I have one of those
```

1  Flumber -- Schlumberger on the effect of top kill
2  as it relates to the failed top kill effort?
3      A.  No, I'm not.
4      Q.  Okay.  Outside the context of this
5  E-mail, are you -- is Schlumberger aware of any
6  effect on the top kill as it relates to flow
7  rate?
8      A.  No.
9      Q.  Okay.  Those are all the questions I have
10 for that.  If you can move to Tab 5, which I've
11 premarked as Exhibit 10468.  There's an E-mail
12 from John Dribus --
13     A.  M-h'm.
14     Q.  -- to Robert Drummond and yourself with
15 cc's to William Coates and Mark Riding, dated
16 June 15, 2010, "Subject:"  "BP plans to collect"
17 50,000 to 53 b slash --
18             MR. TANNER:  Forty -- 40,000.
19     Q.  (By Mr. Kraus) I'm sorry.  "40,000 to
20 53,000 b/d from" -- "from gulf oil spill."  Is
21 that correct?
22     A.  That's what it says, yes.
23     Q.  Okay.  Who is John Dribus, Dribus?
24     A.  John is actually our Global Geology
25 Advisor.

1    Q.  Okay.
2    A.  Sort of the top Geologist in the company.
3    Q.  Okay.  And William Coates?
4    A.  He was, at the time -- well, actually
5  still is, our Worldwide Marketing Manager.
6    Q.  Okay.
7    A.  Based in Paris.
8    Q.  And Mark Riding?
9    A.  Mark Riding worked for Jesus Grande --
10   Q.  Okay.  In --
11   A.  -- as a --
12   Q.  -- in Paris?
13   A.  In Paris.
14   Q.  Okay.  The first paragraph reads:  "All,
15  According to" this is a -- Oil and Gas "Journal"?
16   A.  Yes.
17   Q.  -- "article below, BP PLC has provided
18  the US" coat -- "Coast Guard with plans to
19  collect 40,000-53,000" barrels of oil a day "by
20  June 30" for "the deepwater Macondo blowout well.
21  That appears to be their admission that this well
22  is flowing at a rate greater than 50,000" barrels
23  of oil -- or barrels -- "b/d," that's barrels --
24   A.  Barrels per day.
25   Q.  -- "per day!  Regards, JD."

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:  OIL SPILL          )    MDL NO. 2179
     BY THE OIL RIG             )
 4   "DEEPWATER HORIZON" IN     )    SECTION "J"
     THE GULF OF MEXICO, ON     )
 5   APRIL 20, 2010             )    JUDGE BARBIER
                                )    MAG. JUDGE SHUSHAN
 6

 7

 8               REPORTER'S CERTIFICATION
          TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9          ALBERT JEREMIAH "BUD" DECOSTE, JR.,
              SCHLUMBERGER LIMITED 30(b)(6)
10                   DECEMBER 5, 2012
                        VOLUME 1
11

12        I, Emanuel A. Fontana, Jr., Certified
     Shorthand Reporter in and for the State of Texas,
13   hereby certify to the following:

14        That the witness, ALBERT JEREMIAH "BUD"
     DECOSTE, was duly sworn by the officer and that
15   the transcript of the oral deposition is a true
     record of the testimony given by the witness;
16
          That the deposition transcript was submitted
17   on December 6, 2012, to the witness or to
     Attorney Hugh Tanner            for the witness to
18   examine, sign, and return to Worldwide Court
     Reporters, Inc., by January 21      , 2013.
19
          That the amount of time used by each party
20   at the deposition is as follows:

21        Ms. André    - 3 Hours, 9 Minutes
          Mr. Kraus    - 32 Minutes
22        Ms. Greenwald - 18 Minutes
          Mr. Orr     - 7 Minutes
23        Mr. Fleming - 1 Minutes
          Mr. Cramer  - 45 Minutes
24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1         I further certify that I am neither counsel
     for, related to, nor employed by any of the
 2   parties in the action in which this proceeding
     was taken, and further that I am not financially
 3   or otherwise interested in the outcome of the
     action.
 4
           SUBSCRIBED AND SWORN to by me on this 5th
 5   day of December, 2012.

 6

 7

 8                    _____
                      Emanuel A. Fontana, Jr., RPR
 9                    Texas CSR No. 1232
                      Expiration Date: 12/31/12
10                    Worldwide Court Reporters
                      Firm Registration No. 223
11                    3000 Weslayan, Suite 235
                      Houston, Texas   77027
12                    (713) 572-2000

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1
 2        I, ALBERT JEREMIAH "BUD" DECOSTE, JR.,
 3   have read the foregoing deposition and hereby
 4   affix my signature that same is true and correct,
 5   except as noted on the attached Amendment Sheet.
 6
 7                    _____
                      ALBERT JEREMIAH "BUD" DECOSTE, JR.
 8
 9
10   THE STATE OF  TX      )
     COUNTY OF  HARRIS     )
11
          Before me,  Charlotte A. Sodolak  , on
12   this day personally appeared ALBERT JEREMIAH
     "BUD" DECOSTE, JR., known to me (or proved to me
13   under oath or through
     _____) to be the person
14   whose name is subscribed to the foregoing
     instrument and acknowledged to me that they
15   executed the same for the purposes and
     consideration therein expressed.
16        Given under my hand and seal of office this
      15    day of  JANUARY              , 2013 (CAS)
17
18
19              Charlotte A. Sodolak
                NOTARY PUBLIC IN AND FOR
20              THE STATE OF  Texas
                COMMISSION EXPIRES: July 19, 2015
21
22        [Notary Seal:
23         CHARLOTTE A SODOLAK
           My Commission Expires
           July 19, 2015
24         STATE OF TEXAS]
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

| | | CHANGES AND SIGNATURE | |
|---|---|---|---|
| | WITNESS NAME: | ALBERT JEREMIAH "BUD" DECOSTE, JR. | |
| | DATE OF DEPOSITION: | DECEMBER 5, 2012 | |
| PAGE | LINE | CHANGE | REASON |
| 21 | 21 | Replace "It was--" with "It was not--" | Clarification |
| 30 | 17 | Change "Wong" to "Wang" | Misspelled |
| 57 | 3 | Replace "corrected" with "combined" | Clarification |
| 57 | 4 | Replace "we" with "BP" | Clarification |
| 57 | 5 | Replace "we" with "BP" | Clarification |
| 64 | 23 | Replace "Yeah" with "I don't know" | Clarification |
| 73 | 22 | Replace "Q4000 and the CLEAR LEADER" to "Q4000, the ENTERPRISE, and the CLEAR LEADER" | Clarification |
| 84 | 3 | Replace "Vx fluid ID and ID model" to "Vx fluid ID model" | Clarification |
| 84 | 25 | Replace "we" with "BP" (twice) | Clarification |
| 98 | 5 | Change "Wong" to "Wang" | Misspelled |
| 99 | 16 | Change "0R" to "GOR" | Misspelled |
| 114 | 8 | Replace "they'll" with "there will" | Misspelled |
| 114 | 18 | Replace "we" with "BP" | Clarification |
| 114 | 19 | Replace "we" with "BP" (twice) | Clarification |
| 153 | 9 | Replace "their" with "our" | Clarification |
| 189 | 13 | Replace "No" with "That is correct" | Clarification |
| 213 | 5 | Replace "were the surface" to "were taken at the surface" | Clarification |
| 236 | 13 | Replace "we were" to "BP was" | Clarification |

PURSUANT TO CONFIDENTIALITY ORDER