UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to: *All Cases*<br><br>(Including No. 10-2771) | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

### MEMORANDUM IN SUPPORT OF MOTION FOR ADVERSE INFERENCES FROM FIFTH AMENDMENT INVOCATIONS BY DONALD VIDRINE

Plaintiffs, through Co-Liaison Counsel and the Plaintiffs Steering Committee, respectfully submit the following Memorandum in support of their motion for adverse inferences from Fifth Amendment invocations by Donald Vidrine ("Vidrine") in response to the Interrogatories propounded by Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively, "Transocean"):

### BACKGROUND

Vidrine and Robert Kaluza ("Kaluza") were BP's Well Site Leaders on board the Deepwater Horizon at the time of the disaster. Vidrine has resisted efforts to depose him on the ground that his physicians had concluded that he is unable, for medical reasons, to give a deposition. On February 14, 2012, this Court entered an order requiring Vidrine to submit to an examination by a Court-appointed psychiatrist; the psychiatrist was then to report to the Court on whether Vidrine is able to submit to a deposition [Rec. Doc. 5681]

1

(amended by this Court's Order dated February 24, 2012 [Rec. Doc. 5875]). Vidrine appealed, and the Fifth Circuit affirmed the Court's Orders. While Vidrine's appeal was pending, on November 14, 2012, a grand jury returned a superseding indictment against him in the matter entitled *United States of America v. Robert Kaluza and Donald Vidrine*, No. 12-265, Section "K". In the indictment, the grand jury charged Vidrine and Kaluza with seaman's manslaughter and felony gross negligence.

On January 16, 2013, Vidrine and Transocean filed a Joint Consent Motion to Vacate the February 14, 2012 Order, as amended by the Order dated February 24, 2012 [Rec. Doc. 8254]. In their Joint Consent Motion, Transocean and Vidrine agreed that Transocean would propound written interrogatories to Vidrine, and Vidrine would respond without objection to those interrogatories within fourteen (14) days of service. The agreement was based on the understanding that Vidrine would invoke his Fifth Amendment rights in response to the interrogatories [Rec. Doc. 8254]. The Court granted the Motion to Vacate on January 22, 2013 [Rec. Doc. 8305].

Transocean propounded its interrogatories by email on January 29, 2013 as agreed, and Vidrine responded to each of the interrogatories on February 8, 2013 by invoking his Fifth Amendment rights. (See Donald Vidrine's Response to "Interrogatories to Donald Vidrine" Served By Transocean, attached hereto as Exhibit A.) Plaintiffs now request that the Court draw adverse inferences from Vidrine's invocations in response to Transocean's interrogatories.

2

## ARGUMENT

In its February 14, 2012 Order Regarding Motions to Limit Scope of Adverse Inferences Drawn from Invocation of Fifth Amendment Privilege [Rec. Doc. 5682], this Court instructed that it would look to the four non-exclusive factors suggested by the Second Circuit in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997) to determine whether to draw adverse inferences from invocations of the Fifth Amendment. As applied to Vidrine, they are as follows:

**(1) the nature of the relevant relationships** – This factor assesses a witness's "loyalty" and tests how "likely the non-party witness would be to render testimony in order to damage the relationship." *Libutti*, 107 F.3d at 123. As this Court noted correctly in its February 14 Order, the Fifth Circuit has refused to require a special relationship between a party and an invoking non-party witness before drawing an adverse inference against the party from the non-party's invocation. *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 978 (5th Cir. 1995). With respect to employer/employee relationships, the Fifth Circuit observed that "the fact of present employment serves primarily to reduce the chance that the employee will falsely claim to have engaged in criminal conduct for which the defendant employer is liable." *Id.* at 978 (citing ROBERT HEIDT, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982)). In *FDIC*, the Court upheld the drawing of an adverse inference where the "relationship" in question was that of a bank loan officer and a customer of the bank. Here, at all times relevant to this litigation, BP and Vidrine have been in an employer/employee relationship. Their relationship, therefore, is stronger than that presented in *FDIC*. Given his status as BP's employee, is unlikely that Vidrine would be

3

motivated to damage his relationship with BP. Accordingly, the first *Libutti* factor is satisfied here.

(2) **the degree of control of the party over the non-party witness** – In *New Hampshire Ins. Co. v. Blue Water Off Shore LLC,* No. 07-0754-WMS-M, 2009 WL 792530 (S.D. Ala. 2009), the court admitted adverse inferences drawn against the defendant by its former employee who had subjected both the defendant and the employee to liability by operating the defendant's vessel while intoxicated. In so doing, the court found that the defendant was mistaken in its interpretation of the second *Libutti* factor "as directed to the party's post-event ability to control the witness's conduct and testimony." *Blue Water, supra* at *8. "On the contrary, this factor addresses the degree of control the party 'has vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admission of a party opponent under Federal Rule of Evidence 801(d)(2)." *Id.* (quoting *Libutti*, 107 F.3d at 123). In *Blue Water*, the general subject matter of the litigation was the master's operation of the vessel while intoxicated, and the former employer vested in the master "the responsibility to operate the vessel and to do so liquor-free." *Id. See Brinks v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) (affirming admission of adverse inferences against plaintiff drawn from invocations of plaintiff's former employers who had been terminated for stealing parking meter revenues). Here, BP exercised control over Vidrine, its employee, in regard to the temporary abandonment procedure at Macondo, which is the general subject matter of this litigation. The "control" element is therefore met.

(3) **the compatibility of the interests of the party and non-party witness in the outcome of the litigation** - Vidrine and BP have similar interests; it is in Vidrine's

4

interest that BP succeed in the litigation, particularly with respect to any actions on Vidrine's part.  Vidrine thus shares BP's incentive to show that his actions were not grossly negligent.  Accordingly, the third *Libutti* element is satisfied.

(4) **the role of the non-party witness in the litigation** - As a BP Well Site Leader during the temporary abandonment procedure leading up to the blowout, Vidrine has unique and critical knowledge concerning the negative pressure test, interpretation of the negative pressure test results, discussions with BP officials concerning the results, and decisions made leading up to the blowout.  This factor therefore weighs in Plaintiffs' favor.

BP has argued that inferences should not be drawn against it from any of its employees' decisions to invoke the Fifth Amendment because: (1) its employees chose to invoke the Fifth Amendment; (2) they did not do so at BP's urging; and (3) it provided corporate designees for all topics on which its employees took the Fifth Amendment.  The Court stated in its February 14, 2012 Order that these arguments would be considered on a case-by-case basis.  Vidrine's choice to invoke the Fifth Amendment, even if not urged by BP, does not demonstrate a lack of loyalty to BP or indicate that Vidrine wishes to harm BP.  Certainly, if Vidrine wished to harm BP, he could do so much more effectively by testifying.

BP asserts that it had no control over its employees' decisions to invoke the Fifth Amendment.  However, the "control" factor of *Libutti,* as discussed above, does not involve an examination of BP's control over Vidrine's decision whether to testify; instead, this factor refers to BP's control over him during the period of time that is the subject of the litigation.  *Blue Water, supra* at *8.  Clearly, BP had control over Vidrine during his tenure as the Deepwater Horizon's Well Site Leader.

5

Finally, the corporate designees that BP provided do not have Vidrine's unique knowledge. Vidrine was on the Deepwater Horizon making critical (and reckless) decisions concerning a host of operations during temporary abandonment. He is a significant witness on the issues of BP's negligence and recklessness, and he has knowledge of facts that cannot be obtained from any other witnesses who are not also invoking the Fifth Amendment.[1]

Accordingly, Plaintiffs request that the Court draw adverse inferences against BP from Vidrine's invocation of the Fifth Amendment in response to each of the following interrogatories propounded by Transocean:

**INTERROGATORY NO. 1**

On April 20, 2010, you were one of two BP Well Site Leaders aboard the Deepwater Horizon?

**INTERROGATORY NO. 2**

On April 20, 2010, the other BP Well Site Leader aboard the Deepwater Horizon was Robert Kaluza?

**INTERROGATORY NO. 3**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU formal training on how to perform a NEGATIVE PRESSURE TEST?

---

[1] Indeed, the four BP employees with the most knowledge about the temporary abandonment procedure and the events on the vessel on April 20, 2010, Well Site Leader Kaluza, Well Site Leader Vidrine, Drilling Engineer Mark Hafle and Drilling Engineer Brian Morel have ALL invoked the Fifth Amendment privilege, thereby making the requested testimonial presumptions more necessary and compelling.

**INTERROGATORY NO. 4**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU formal training on how to interpret a NEGATIVE PRESSURE TEST?

**INTERROGATORY NO. 5**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU a written procedure detailing how to conduct a NEGATIVE PRESSURE TEST?

**INTERROGATORY NO. 6**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU a written procedure detailing how to interpret a NEGATIVE PRESSURE TEST?

**INTERROGATORY NO. 7**

Before April 20, 2010, YOU had previously performed a NEGATIVE PRESSURE TEST on the Deepwater Horizon by monitoring for pressure and/or flow on the drill pipe?

**INTERROGATORY NO. 8**

Before April 20, 2010, YOU had not previously performed a NEGATIVE PRESSURE TEST on the Deepwater Horizon by monitoring for pressure and/or flow on the kill line?

**INTERROGATORY NO. 9**

Prior to conducting the NEGATIVE PRESSURE TESTING, you read the NEGATIVE PRESSURE TEST procedure outlined in the APM?

**INTERROGATORY NO. 10**

The APM required that a NEGATIVE PRESSURE TEST be conducted prior to displacing the well to seawater down to a depth of 8367'?

**INTERROGATORY NO. 11**

The APM required that a second NEGATIVE PRESSURE TEST be conducted after

displacing the well to seawater to a depth of 8367'?

**INTERROGATORY NO. 12**

On April 20, 2010, YOU instructed the TRANSOCEAN DRILL CREW in words or substance to conduct the SECOND NEGATIVE PRESSURE TEST by monitoring the kill line for pressure and/or flow?

**INTERROGATORY NO. 13**

On April 20, 2010, prior to the start of the SECOND NEGATIVE PRESSURE TEST, you communicated with Robert Kaluza about a call to the on-shore BP engineers in Houston to tell them a second NEGATIVE PRESSURE TEST would be conducted?

**INTERROGATORY NO. 14**

You were aware that Robert Kaluza in fact called the BP on-shore engineers in Houston to advise them that a second NEGATIVE PRESSURE TEST would be conducted?

**INTERROGATORY NO. 15**

On April 20, 2010, before the BLOWOUT, YOU observed pressure on the drill pipe during the NEGATIVE PRESSURE TESTING?

**INTERROGATORY NO. 16**

The Company Man for BP has the responsibility for calculating or estimating the volume of fluid expected to bleed back during NEGATIVE PRESSURE TESTING?

**INTERROGATORY NO. 17**

Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, YOU did not calculate the volume of fluid expected to bleed back to the cement unit during any NEGATIVE PRESSURE TESTING?

**INTERROGATORY NO. 18**

Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, no BP personnel on the rig calculated the volume of fluid expected to bleed back to the cement unit during any NEGATIVE PRESSURE TESTING?

**INTERROGATORY NO. 19**

Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, YOU did not communicate to any TRANSOCEAN DRILL CREW member or HESI personnel manning the cement unit the volume of fluid calculated or expected to bleed back during any NEGATIVE PRESSURE TESTING?

**INTERROGATORY NO. 20**

On April 20, 2010, YOU instructed the TRANSOCEAN DRILL CREW in words or substance to conduct the SECOND NEGATIVE PRESSURE TEST by monitoring the kill line for pressure and/or flow because the APM required that the test be monitored on the kill line?

**INTERROGATORY NO. 21**

On April 20, 2010, before the BLOWOUT, YOU believed that the pressure on the drill pipe during the NEGATIVE PRESSURE TESTING was caused by a "bladder effect"?

**INTERROGATORY NO. 22**

On April 20, 2010, before the BLOWOUT, YOU believed that the pressure on the drill pipe during the NEGATIVE PRESSURE TESTING was caused by "annular compression"?

**INTERROGATORY NO. 23**

On April 20, 2010, YOU were present on the drill floor at the time the SECOND NEGATIVE PRESSURE TEST was completed?

**INTERROGATORY NO. 24**

On April 20, 2010, during the SECOND NEGATIVE PRESSURE TEST, you observed no fluid flowing from the kill line for a period of 30 minutes?

**INTERROGATORY NO. 25**

On April 20, 2010, before the BLOWOUT, YOU believed the SECOND NEGATIVE PRESSURE TEST was successful?

**INTERROGATORY NO. 26**

On April 20, 2010, before the BLOWOUT, YOU told Jimmy Harrell in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

**INTERROGATORY NO. 27**

On April 20, 2010, before the BLOWOUT, YOU told Jason Anderson in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

**INTERROGATORY NO. 28**

On April 20, 2010, before the BLOWOUT, YOU told Dewey Revette in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

**INTERROGATORY NO. 29**

On April 20, 2010, before the BLOWOUT, YOU told Vincent Tabler in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

**INTERROGATORY NO. 30**

On April 20, 2010, before the BLOWOUT and after the SECOND NEGATIVE PRESSURE TEST, YOU spoke to Mark Hafle via telephone?

**INTERROGATORY NO. 31**

On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that there was pressure on the drill pipe during the NEGATIVE PRESSURE TESTING?

**INTERROGATORY NO. 32**

On April 20, 2010, before the BLOWOUT and after the SECOND NEGATIVE PRESSURE TEST, YOU told Mark Hafle that the NEGATIVE PRESSURE TESTING was "squirrelly"?

**INTERROGATORY NO. 33**

On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that there was zero pressure on the kill line during the NEGATIVE PRESSURE TESTING?

**INTERROGATORY NO. 34**

On April 20, 2010, before the BLOWOUT, Mark Hafle told YOU in words or substance that you cannot have pressure on the drill pipe and zero pressure on the kill line in a NEGATIVE PRESSURE TEST that is properly lined up?

**INTERROGATORY NO. 35**

On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that if there had been a kick in the hole YOU would have seen it?

**INTERROGATORY NO. 36**

On April 20, 2010, before the BLOWOUT, Mark Hafle told YOU in words or substance that if there had been a kick in the hole we would have seen it?

**INTERROGATORY NO. 37**

On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, Mark Hafle did not instruct YOU to conduct another NEGATIVE PRESSURE TEST?

**INTERROGATORY NO. 38**

On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, YOU did not tell any member of the TRANSOCEAN DRILL CREW to conduct another NEGATIVE PRESSURE TEST?

**INTERROGATORY NO. 39**

On April 20, 2010, after completion of the SECOND NEGATIVE TEST, Mark Hafle did not tell YOU to stop the displacement?

**INTERROGATORY NO. 40**

On April 20, 2010, after speaking with Mark Hafle, YOU did not tell the TRANSOCEAN DRILL CREW to stop the displacement?

**INTERROGATORY NO. 41**

On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, Mark Hafle told YOU in words or substance that he was watching the Insite data from the Macondo well?

**INTERROGATORY NO. 42**

On April 20, 2010, at approximately 9:00 p.m., you were in the drill shack at the time the sheen test was conducted?

**INTERROGATORY NO. 43**

On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., YOU believed everything regarding the Macondo well looked fine?

**INTERROGATORY NO. 44**

On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., YOU believed that the well was not flowing?

**INTERROGATORY NO. 45**

After 9:30 p.m. on April 20, 2010, YOU received a call from Jason Anderson?

**INTERROGATORY NO. 46**

After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were getting mud back?

**INTERROGATORY NO. 47**

After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were closing the annular?

**INTERROGATORY NO. 48**

After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were diverting returns to the gas buster?

**INTERROGATORY NO. 49**

After 9:30 p.m. on April 20, 2010, YOU attempted to go to the drill floor?

**INTERROGATORY NO. 50**

After 9:30 p.m. on April 20, 2010, YOU saw mud and/or seawater blowing out of the rotary?

**INTERROGATORY NO. 51**

Despite Vincent Tabler's recommendation of a full bottoms up circulation prior to the production casing cement job, YOU conveyed to Vincent Tabler that BP was not going to do a full bottoms up circulation?

## CONCLUSION

For the reasons stated, Plaintiffs, through Co-Liaison Counsel and the Plaintiffs Steering Committee, respectfully request that the Court draw adverse inferences against BP based on Donald Vidrine's February 8, 2012 invocations of the Fifth Amendment in response to Transocean's Interrogatories propounded on January 29, 2012.

This 18th day of February, 2013.

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhklawfirm.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs Liaison Counsel* | *Plaintiffs Liaison Counsel* |

**PLAINTIFFS' STEERING COMMITTEE**

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130

Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Mikal C. Watts
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail: mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

**CERTIFICATE OF SERVICE**

      W<small>E</small> H<small>EREBY</small> C<small>ERTIFY</small> that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this <u>18th</u> day of <u>February</u>, <u>2013</u>.

                                            <u>s/  James Parkerson Roy and Stephen J. Herman</u>