**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:   Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf Of Mexico, on April 20, 2010 | MDL No. 2179<br><br>SECTION: J |
| This document applies to:<br>ALL CASES | JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

**TRANSOCEAN'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ADVERSE INFERENCES BASED ON DONALD VIDRINE'S FIFTH AMENDMENT INVOCATIONS**

Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively "Transocean"), by and through their undersigned counsel, submit this Memorandum in Support of its Motion for Adverse Inferences Based on Donald Vidrine's Fifth Amendment Invocations.

The Court should draw adverse inferences against BP based on Mr. Vidrine's invocations of his Fifth Amendment rights in response to interrogatories propounded by Transocean because: (1) at all times relevant to this litigation Mr. Vidrine has been a BP employee; (2) BP exercised control over Mr. Vidrine in regard to the April 20, 2010 operations aboard the Deepwater Horizon ("DWH"), including the negative pressure test; (3) Mr. Vidrine's and BP's interests in the outcome of the litigation are aligned; and (4) Mr. Vidrine has unique and critical first-hand knowledge of the April 20, 2010 operations aboard the DWH, including the negative pressure test.

## I. BACKGROUND

Mr. Vidrine was one of the two BP Well Site Leaders aboard the Deepwater Horizon on April 20, 2010.[1] Mr. Vidrine came on duty during the negative pressure test operations, and therefore has unique and critical first-hand knowledge regarding the April 20, 2010 operations. For example, after the negative pressure tests were completed, Mr. Vidrine called BP engineer Mark Hafle regarding the negative pressure tests' results, and subsequently instructed the crew to commence temporary abandonment operations.

Mr. Vidrine has fought efforts to depose him. On February 14, 2012, this Court entered an order requiring Mr. Vidrine to submit to an examination by a Court-appointed psychiatrist to determine if Mr. Vidrine was medically fit to be deposed.[2] Mr. Vidrine appealed, and his appeal was dismissed by the Fifth Circuit Court of Appeals.

Subsequently, in lieu of pursuing an examination by a Court-appointed psychiatrist and deposition, Transocean agreed to propound written interrogatories to Mr. Vidrine. Mr. Vidrine agreed to respond to the interrogatories, without objection.[3]

Transocean served its interrogatories, and on February 8, 2013, Mr. Vidrine responded by invoking his Fifth Amendment rights to each of Transocean's interrogatories.[4]

---

[1] The other BP Well Site Leader, Robert Kaluza, invoked his Fifth Amendment rights during his deposition. Both Mr. Vidrine and Mr. Kaluza have been indicted for involuntary manslaughter, seaman's manslaughter, and Clean Water Act violations arising from their alleged negligent and grossly negligent conduct.

[2] Rec. Doc. 5681, amended by Rec. Doc. 5875.

[3] *See* the Joint Motion of Donald Vidrine and the Transocean Defendants to Vacate Order Dated February 14, 2012, as Amended by the Order Dated February 24, 2012, Rec. Doc. 8254, and the Court's January 22, 2013 Order granting the Joint Motion. Rec. Doc.8305.

[4] Mr. Vidrine's "Response to 'Interrogatories to Donald Vidrine' Served by Transocean," is attached to the Motion as Exhibit A.

## II.  ARGUMENT

### A.  Adverse Inferences Should be Drawn Against BP Based on Mr. Vidrine's Invocation of his Fifth Amendment Rights.

In considering whether to draw an adverse inference against a party based on a non-party's refusal to testify, the "overarching concern" is to determine "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for truth."[5]  In its February 14, 2012 Order Regarding Motions to Limit Scope of Adverse Inferences Drawn from Invocation of Fifth Amendment Privilege,[6] the Court instructed the parties that it would look to the four non-exclusive *Libutti* factors to determine whether to draw adverse inferences from invocations of Fifth Amendment rights:  (1) the nature of the relationship; (2) the degree of control of the party over the nonparty; (3) the compatibility of the interests of the party and the non-party in the outcome of the litigation; and (4) the role of the non-party witness in the litigation.[7]  Here, each of the factors weighs in favor of drawing adverse inferences against BP.

### *(1) The Nature of BP's and Vidrine's Relationship.*

The Fifth Circuit does not require a special relationship between a party and an invoking non-party witness before drawing an adverse inference against the party from the non-party's invocation of his Fifth Amendment rights.[8]  For example, in *FDIC v. Fidelity & Deposit Co.*, the Fifth Circuit upheld the drawing of an adverse inference where the "relationship" in question was that of a bank loan officer and a customer of the bank.

Here, at all times relevant to this litigation, Mr. Vidrine has been a BP employee.  The fact that a witness is an employee "serves primarily to reduce the chance that the employee will

---

[5] *Libutti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997).

[6] Rec. Doc. 5682.

[7] *Libutti*, 107 F. 3d at 123-24.

[8] *FDIC v. Fidelity & Deposit Co.*, 45 F.3d 969, 978 (5th Cir. 1995).

- 3 -

falsely claim" to have engaged in conduct for which the defendant employer is liable.[9] Accordingly, the first *Libutti* factor weighs in favor of drawing adverse inferences against BP.

### *(2) The Degree of Control of BP over Mr. Vidrine.*

This factor addresses "the degree of control the party 'has vested in the non-party witness in regard to the key facts and general subject matter of the litigation' and approximates the analysis for admission of a party opponent under Federal Rule of Evidence 801(d)(2)."[10] As such, this factor does not relate to a defendant's control over a witness' choice to invoke the Fifth Amendment, but rather the defendant's control over the witness during the time period that is the subject of the litigation.

Here, BP exercised control over Mr. Vidrine, one of BP's Well Site Leaders aboard the Deepwater Horizon, in regard to the April 20, 2010 operations, including the negative pressure test. BP admitted its control over Mr. Vidrine in its Guilty Plea Agreement, which states that the "conduct of BP's Well Site Leaders is attributable to BP."[11] Therefore, the second *Libutti* factor weighs in favor of drawing adverse inferences against BP.

### *(3) The Compatibility of the Interests of BP and Mr. Vidrine in the Outcome of the Litigation.*

BP is accused of grossly negligent conduct, arising at least in part on the conduct of Mr. Vidrine on April 20, 2010. Based on that same conduct, Mr. Vidrine is under indictment for involuntary manslaughter, seaman's manslaughter, and Clean Water Act violations. Therefore,

---

[9] *Id.* at 978 n 4 (*citing* Robert Heidt, *The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1119-20 n. 214 (1982)). Further, facts "suggesting that a former employee retains some loyalty to his former employer-such as the fact that the employer is paying for his attorney-would serve the same purpose." *Id.*

[10] *New Hampshire Ins. Co. v. Blue Water Off Shore LLC*, No. 07-0754-WMS-M, 2009 WL 792530, at *8. (S.D. Ala. 2009) (quoting *Libutti*, 107 F.3d at 123).

[11] BP's Guilty Plea Agreement, Rec. Doc. 2-1 in *United States of America v. BP Exploration & Production, Inc.*, No. 12-265.

Mr. Vidrine and BP's interests are aligned, and BP acknowledged the same when it admitted in its Guilty Plea Agreement that the conduct of BP's Well Site Leaders is attributable to it.[12] Accordingly, the third *Libutti* factor weighs in favor of drawing adverse inferences against BP.

### *(4) Mr. Vidrine's Role in the Litigation.*

Independent evidence establishes that at 8:52 p.m. on April 20, 2010, Mr. Vidrine spoke with Mark Hafle, BP's senior drilling engineer for the Macondo Well, about the negative pressure test.[13] Mr. Vidrine reported to Mr. Hafle results showing zero pressure on the kill line, but pressure on the drill pipe.[14] Although Mr. Hafle told Mr. Vidrine that "[y]ou can't have pressure on the drill pipe and zero pressure on the kill line in a test that's properly line up," Mr. Vidrine did not stop work and instructed the rig to proceed with temporary abandonment operations.[15] Because Mr. Vidrine and Mr. Hafle have invoked their Fifth Amendment rights, there is no direct testimony concerning this April 20, 2010 telephone discussion or other critical facts regarding the April 20, 2010 operations. Therefore the fourth *Libutti* factor weighs in favor of drawing adverse inferences against BP.

### B.     Inferences from Mr. Vidrine's Invocations of his Fifth Amendment Rights.

As set forth above, Transocean respectfully requests that the Court draw adverse inferences against BP based on Mr. Vidrine's invocations of his Fifth Amendment rights with respect to the following questions, all of which sought specific admissible testimony within Mr. Vidrine's personal knowledge:

---

[12] *Id.*

[13] *See* TREX #3575, attached to Transocean's Motion as Exhibit B.

[14] *See* TREX #4447, attached to Transocean's Motion as Exhibit C.

[15] *Id.*

1. On April 20, 2010, you were one of two BP Well Site Leaders aboard the Deepwater Horizon?

2. On April 20, 2010, the other BP Well Site Leader aboard the Deepwater Horizon was Robert Kaluza?

3. Before the NEGATIVE PRESSURE TESTING, BP had not given YOU formal training on how to perform a NEGATIVE PRESSURE TEST?

4. Before the NEGATIVE PRESSURE TESTING, BP had not given YOU formal training on how to interpret a NEGATIVE PRESSURE TEST?

5. Before the NEGATIVE PRESSURE TESTING, BP had not given YOU a written procedure detailing how to conduct a NEGATIVE PRESSURE TEST?

6. Before the NEGATIVE PRESSURE TESTING, BP had not given YOU a written procedure detailing how to interpret a NEGATIVE PRESSURE TEST?

7. Before April 20, 2010, YOU had previously performed a NEGATIVE PRESSURE TEST on the Deepwater Horizon by monitoring for pressure and/or flow on the drill pipe?

8. Before April 20, 2010, YOU had not previously performed a NEGATIVE PRESSURE TEST on the Deepwater Horizon by monitoring for pressure and/or flow on the kill line?

9. Prior to conducting the NEGATIVE PRESSURE TESTING, you read the NEGATIVE PRESSURE TEST procedure outlined in the APM?

10. The APM required that a NEGATIVE PRESSURE TEST be conducted prior to displacing the well to seawater down to a depth of 8367'?

11. The APM required that a second NEGATIVE PRESSURE TEST be conducted after displacing the well to seawater to a depth of 8367'?

12. On April 20, 2010, YOU instructed the TRANSOCEAN DRILL CREW in words or substance to conduct the SECOND NEGATIVE PRESSURE TEST by monitoring the kill line for pressure and/or flow?

13. On April 20, 2010, prior to the start of the SECOND NEGATIVE PRESSURE TEST, you communicated with Robert Kaluza about a call to the on-shore BP engineers in Houston to tell them a second NEGATIVE PRESSURE TEST would be conducted?

14. You were aware that Robert Kaluza in fact called the BP on-shore engineers in Houston to advise them that a second NEGATIVE PRESSURE TEST would be conducted?

15. On April 20, 2010, before the BLOWOUT, YOU observed pressure on the drill pipe during the NEGATIVE PRESSURE TESTING?

16. The Company Man for BP has the responsibility for calculating or estimating the volume of fluid expected to bleed back during NEGATIVE PRESSURE TESTING?

17. Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, YOU did not calculate the volume of fluid expected to bleed back to the cement unit during any NEGATIVE PRESSURE TESTING?

18. Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, no BP personnel on the rig calculated the volume of fluid expected to bleed back to the cement unit during any NEGATIVE PRESSURE TESTING?

19. Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, YOU did not communicate to any TRANSOCEAN DRILL CREW member or HESI personnel manning the cement unit the volume of fluid calculated or expected to bleed back during any NEGATIVE PRESSURE TESTING?

20. On April 20, 2010, YOU instructed the TRANSOCEAN DRILL CREW in words or substance to conduct the SECOND NEGATIVE PRESSURE TEST by monitoring the kill line for pressure and/or flow because the APM required that the test be monitored on the kill line?

21. On April 20, 2010, before the BLOWOUT, YOU believed that the pressure on the drill pipe during the NEGATIVE PRESSURE TESTING was caused by a "bladder effect"?

22. On April 20, 2010, before the BLOWOUT, YOU believed that the pressure on the drill pipe during the NEGATIVE PRESSURE TESTING was caused by "annular compression"?

23. On April 20, 2010, YOU were present on the drill floor at the time the SECOND NEGATIVE PRESSURE TEST was completed?

24. On April 20, 2010, during the SECOND NEGATIVE PRESSURE TEST, you observed no fluid flowing from the kill line for a period of 30 minutes?

25. On April 20, 2010, before the BLOWOUT, YOU believed the SECOND NEGATIVE PRESSURE TEST was successful?

26. On April 20, 2010, before the BLOWOUT, YOU told Jimmy Harrell in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

27. On April 20, 2010, before the BLOWOUT, YOU told Jason Anderson in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

28. On April 20, 2010, before the BLOWOUT, YOU told Dewey Revette in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

29. On April 20, 2010, before the BLOWOUT, YOU told Vincent Tabler in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

30. On April 20, 2010, before the BLOWOUT and after the SECOND NEGATIVE PRESSURE TEST, YOU spoke to Mark Hafle via telephone?

31. On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that there was pressure on the drill pipe during the NEGATIVE PRESSURE TESTING?

32. On April 20, 2010, before the BLOWOUT and after the SECOND NEGATIVE PRESSURE TEST, YOU told Mark Hafle that the NEGATIVE PRESSURE TESTING was "squirrelly"?

33. On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that there was zero pressure on the kill line during the NEGATIVE PRESSURE TESTING?

34. On April 20, 2010, before the BLOWOUT, Mark Hafle told YOU in words or substance that you cannot have pressure on the drill pipe and zero pressure on the kill line in a NEGATIVE PRESSURE TEST that is properly lined up?

35. On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that if there had been a kick in the hole YOU would have seen it?

36. On April 20, 2010, before the BLOWOUT, Mark Hafle told YOU in words or substance that if there had been a kick in the hole we would have seen it?

37. On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, Mark Hafle did not instruct YOU to conduct another NEGATIVE PRESSURE TEST?

38. On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, YOU did not tell any member of the TRANSOCEAN DRILL CREW to conduct another NEGATIVE PRESSURE TEST?

39. On April 20, 2010, after completion of the SECOND NEGATIVE TEST, Mark Hafle did not tell YOU to stop the displacement?

40. On April 20, 2010, after speaking with Mark Hafle, YOU did not tell the TRANSOCEAN DRILL CREW to stop the displacement?

41. On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, Mark Hafle told YOU in words or substance that he was watching the Insite data from the Macondo well?

42. On April 20, 2010, at approximately 9:00 p.m., you were in the drill shack at the time the sheen test was conducted?

43. On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., YOU believed everything regarding the Macondo well looked fine?

44. On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., YOU believed that the well was not flowing?

45. After 9:30 p.m. on April 20, 2010, YOU received a call from Jason Anderson?

46. After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were getting mud back?

47. After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were closing the annular?

48. After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were diverting returns to the gas buster?

49. After 9:30 p.m. on April 20, 2010, YOU attempted to go to the drill floor?

50. After 9:30 p.m. on April 20, 2010, YOU saw mud and/or seawater blowing out of the rotary?

51. Despite Vincent Tabler's recommendation of a full bottoms up circulation prior to the production casing cement job, YOU conveyed to Vincent Tabler that BP was not going to do a full bottoms up circulation?

### III.  CONCLUSION

For the foregoing reasons, the Court should draw adverse inferences against BP based on Mr. Vidrine's invocations of his Fifth Amendment rights in response to interrogatories propounded by Transocean.

Dated: February 22, 2013                    Respectfully submitted,


By: /s/ Brad D. Brian                       By: /s/ Steven L. Roberts
Brad D. Brian                               Steven L. Roberts
Michael R. Doyen                            Rachel Giesber Clingman
Lisa Demsky                                 Sean Jordan
Daniel B. Levin                             SUTHERLAND ASBILL & BRENNAN LLP
Susan E. Nash                               1001 Fannin Street, Suite 3700
MUNGER TOLLES & OLSON LLP                   Houston, Texas 77002
355 So. Grand Avenue, 35th Floor            Tel:  (713) 470-6100
Los Angeles, CA 90071                       Fax:  (713) 354-1301

Tel: (213) 683-9100
Fax: (213) 683-5180
Email: brad.brian@mto.com
   michael.doyen@mto.com
   lisa.demsky@mto.com
   daniel.levin@mto.com
   susan.nash@mto.com


By: /s/ Edwin G. Preis
Edwin G. Preis, Jr.
PREIS & ROY PLC
Versailles Blvd., Suite 400
Lafayette, LA 70501
(337) 237-6062
   and
601 Poydras Street, Suite 1700
New Orleans, LA 70130
(504) 581-6062

Email: steven.roberts@sutherland.com
   rachel.clingman@sutherland.com
   sean.jordan@sutherland.com

By: /s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email: kmiller@frilot.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

*Counsel for Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC,* and *Triton Asset Leasing GmbH.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2013, I electronically filed the foregoing with the Court's CM/ECF system and service on all counsel by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12 which will send a notice of filing to all counsel accepting electronic notice.

/s/ Kerry J. Miller