UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" In the GULF OF MEXICO on April 20, 2010 | * | MDL NO. 2179 |
| | * | SECTION: J |
| | * | JUDGE BARBIER |
| Applies to: *All Cases* | * | MAG. JUDGE SHUSHAN |

**TRANSOCEAN'S WITHDRAWAL OF OBJECTIONS TO REQUESTED ADVERSE INFERENCES**

COME NOW Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, Transocean Deepwater Inc. and Triton Asset Leasing GmbH (collectively "Transocean"), by and through their undersigned counsel, and pursuant to the Order Regarding the February 15, 2013 Working Group Conference [Doc. 8611] and respectfully file this Withdrawal of Objections to Requested Adverse Inferences. Transocean is preserving all previously filed objections to requested adverse inferences not specifically referenced herein. Transocean hereby withdraws its objections to the following requested inferences:

   I.   **Requested Adverse Inferences by BP**

      A.   **Jimmy Harrell's Deposition**

| | |
|---|---|
| Transocean's drilling crew on the *Deepwater Horizon* reported to Mr. Harrell. | Q.   It's true that the Transocean crew -- isn't it true, sir, that the Transocean crew, including the driller, the senior toolpusher, the toolpusher, the drillers and the assistant drillers reported to you, not to the BP wellsite leader?<br><br>A.   I take the Fifth. (95:18-96:1). |
| Mr. Harrell was aware that the Macondo Well cement design included nitrified cement. | Q.   You were aware that the cement design included a nitrified cement that was put into -- put into the wellbore on April the 19th, 2010?<br><br>A.   I take the Fifth. (94:12-16). |

1

| | |
|---|---|
| If Mr. Harrell had any questions about the results of the negative pressure test, then he had the authority to stop the job. | Q. Isn't it true that you and the drill crew under your supervision had the stop work authority allowed by Transocean if they had any questions about the results of either the positive or the negative tests?<br><br>A. I take the Fifth. (74:14-21). |
| If anyone on Transocean's drilling crew had a question about the results of the negative pressure test, then they had the authority to stop the job. | Q. Isn't it true that you and the drill crew under your supervision had the stop work authority allowed by Transocean if they had any questions about the results of either the positive or the negative tests?<br><br>A. I take the Fifth. (74:14-21). |

### B. Curt Kuchta's Deposition

| | |
|---|---|
| As the Master of the *Deepwater Horizon*, Captain Kuchta is ultimately responsible for the safety of the rig crew. | Q. Isn't it true that as captain of the Deepwater Horizon, you are ultimately responsible for the safety of your crew?<br><br>A. Same answer. (78:6-10). |
| As the Master, Captain Kuchta is ultimately responsible for the safety of the *Deepwater Horizon*. | Q. Isn't it true that the captain is ultimately responsible for the safety of his ship under his command?<br><br>A. Same answer. (76:22-77:1). |

### C. Stephen Bertone's Deposition

| | |
|---|---|
| It was Transocean's responsibility to make sure that its rig crewmembers on the *Deepwater Horizon* were competent and able to repair and maintain equipment. | Q. And the obligation to train the employees on the Transocean rig, the obligation to make sure they were competent and able to repair and maintain equipment, that responsibility fell exclusively to Transocean, true?<br><br>A. Same answer. (46:10-17). |
| In April 2010, Transocean relied on the rig management system ("RMS") to record maintenance activities and to prompt the crew when maintenance and repair was due. | Q. And Transocean relies and did rely in April of 2010 on the RMS system to both record maintenance activities and to prompt the crew when maintenance and repair was due, correct?<br><br>A. Same answer. (52:20-53:1). |

2

### D. Alan Seraile's Deposition

| | |
|---|---|
| As the Assistant Driller, Mr. Seraile knew that it was important to monitor and record pit volume totals during drilling operations. | Q. You would agree with me that it's important to monitor pit volume totals during a drilling operation, correct?<br><br>A. Same answer.<br><br>Q. And part of your job as assistant driller is to record all the pit volume totals, correct?<br><br>A. Same answer. (101:1-7). |
| As the Assistant Driller, Mr. Seraile knew that there was never a time that he could pay less attention to monitoring the well. | Q. . . . As an assistant driller, you would agree that there is never a time that you can pay less attention to monitoring the well?<br><br>A. Same answer. (104:8-11). |
| As the Assistant Driller, Mr. Seraile knew, before April 20, 2010, that kicks could occur while cementing and that wells had been lost due to improperly designed cement slurries and spacers. | Q. Prior to April 20th, 2010, you were personally aware that kicks can occur while cementing as a result of reducing the hydrostatic pressure during the operation, correct?<br><br>A. Same answer.<br><br>Q. And prior to April 20th, 2010, you were personally aware that wells had been lost due to improperly designed cement slurries and spacers?<br><br>A. Same answer. (99:24-100:7). |
| As the Assistant Driller, Mr. Seraile understood the importance of monitoring the well carefully during and after cementing operations. | Q. Because of this knowledge, you knew it was important to monitor the well carefully during the cement operations to watch for a kick?<br><br>A. Same answer.<br><br>Q. And you also knew that it was important to monitor the well carefully after cement operations to watch for a kick?<br><br>A. Same answer. (100:18-25). |
| In well control training, Mr. Seraile learned of the importance of monitoring the well at all times, responding to kick indications in a timely manner, and minimizing the influx of any hydrocarbons in the well. | Q. Now, as part of that training for the IADC well control accreditation program, you were taught the importance of monitoring the well at all times; is that correct?<br><br>A. Same answer. |

3

| | |
|---|---|
| | Q.　And you were taught the importance of responding to kick indicators in a timely fashion?<br><br>A.　Same answer.<br><br>Q.　You were taught that you want to minimize the influx of any hydrocarbons in the well?<br><br>A.　Same answer.  (92:22-93:8). |
| Aboard the *Deepwater Horizon*, Mr. Seraile participated in well control safety drills, where Transocean emphasized that the immediate priority is to shut in the well. | Q.　And again, if you look under the comments, starting with the second sentence, it indicates: Discussed well control responsibilities with each crew member.  The next sentence: Discussed the procedures for shutting in on casing.  And then the next sentence: The immediate priority is to shut in the well.  Do you recall discussing those statements during your safety drill on April 18th, 2010, in which you participated?<br><br>A.　Same answer.  (99:12-23). |
| If Mr. Seraile or anyone involved in the negative pressure test felt that it was unsafe, then they would have exercised their stop-the-job authority to address their concerns before proceeding with displacement. | Q.　And you would agree that you didn't have any safety concerns regarding the operations on April 20th, 2010?<br><br>A.　Same answer.<br><br>Q.　And if you did have any concerns regarding those operations, you would have stopped the job until those concerns were addressed?<br><br>A.　Same answer.<br><br>. . . .<br><br>Q.　And if anyone else had concerns regarding the operations being conducted on April 20, 2010, including the negative pressure test, you would expect them to stop the job until those concerns were addressed?<br><br>A.　Same answer.<br><br>Q.　And you never heard anyone else voice concerns about the operations being conducted on April 20, 2010?<br><br>A.　Same answer.  (125:5-126:4). |

4

### E. Micah Sandell's Deposition

| | |
|---|---|
| Mr. Sandell had the authority and obligation to stop work on the *Deepwater Horizon* to correct unsafe behavior. | Q. And you're aware that if you feel that there is any situation where safe operations are not taking place, you have the obligation to stop those activities?<br><br>A. I take the Fifth. (46:5-9). |
| Every Transocean employee on the *Deepwater Horizon* had stop-the-job authority. | Q. You knew that under Transocean's policies every Transocean employee on the rig has stop-the-job authority, correct?<br><br>A. I take the Fifth. (46:1-4). |
| Task Specific Think Procedures ("TSTPs") assist the Transocean rig crew in identifying hazards. | Q. One of the purposes of this task safety think procedure is to assist the Transocean rig crew in identifying hazards; is that true?<br><br>A. Take the Fifth.<br><br>Q. It's part of Transocean's safety procedures?<br><br>A. Take the Fifth. (51:8-15). |
| By following TSTPs, the Transocean rig crew reduces the chance of an injury, reduces the chance of harm to the environment and the risks of an operation. | Q. And if you follow a task safety think procedure, you reduce the chance of an injury?<br><br>A. Take the Fifth.<br><br>Q. You reduce the chance of harm to the environment?<br><br>A. I take the Fifth.<br><br>Q. And you reduce the risk of the operation that you are conducting?<br><br>A. I take the Fifth. (51:16-25). |
| Transocean has developed TSTPs for certain crane operations. | Q. And you aware of task safety think procedures regarding crane operations such as the one in front of you, which is marked Exhibit 2338, correct?<br><br>A. Take the Fifth. (52:1-5). |

### F. Wyman Wheeler's Deposition

| | |
|---|---|
| As the Toolpusher, Mr. Wheeler knew that it was important to monitor | Q. And I'd like to ask you to turn two pages to the Bates ending in 1090. And this is still under the -- the |

5

| | |
|---|---|
| speed, pump strokes, pressure, pit volume, trip tank penetration, mud weight, and rotary torque during drilling operations. | heading of 4.1, drillers must, but .15 states that drillers must constantly monitor speed, pump strokes, pressure, pit volume, trip tank penetration, mud weight, and rotary torque, to detect anything unusual or out of the ordinary. Did I read that correctly?<br><br>A.     Same answer.  (50:9-19). |
| In well control training, Mr. Wheeler learned of the importance of monitoring the well during drilling operations, responding to kick indications in a timely manner, and minimizing the influx of any kick. | Q.     You were taught importance of monitoring?<br><br>A.     Same answer.<br><br>Q.     You were taught the importance of responding to kick indications in a timely fashion?<br><br>A.     Same answer.<br><br>Q.     You were taught that you want to minimize the influx of hydrocarbons into a well during a kick situation, correct?<br><br>A.     Same answer.  (41:1-11). |
| Aboard the *Deepwater Horizon*, Mr. Wheeler participated in well control safety drills, where Transocean emphasized that the immediate priority is to shut in the well. | Q.     Now, you participated in safety drills during your time as a Transocean employee on the DEEPWATER HORIZON, correct?<br><br>A.     Same answer.  (42:19-22). |
| As the Toolpusher, Mr. Wheeler knew before April 20, 2010, that kicks could occur while cementing and that wells had been lost due to improperly designed cement slurries and spacers. | Q.     Prior to April 20th, 2010, you personally knew that kicks can occur while cementing as a result of reducing hydrostatic pressure during the operation, correct?<br><br>A.     Same answer.<br><br>Q.     And prior to April 20th, 2010, you personally were aware that wells have been lost due to improperly designed cement slurries and spacers?<br><br>A.     Same answer.<br><br>Q.     And you would expect the Transocean drilling crew that you supervised and worked with to know that wells could be lost or have been lost due to improperly designed cement slurries and spacers, correct?<br><br>A.     Same answer.  (44:16-45:10). |

6

### G. Patrick Morgan's Deposition

| | |
|---|---|
| As the Assistant Driller, Mr. Morgan knew that it was important to monitor and record pit volume totals during drilling operations. | Q.   You'd agree that it's important to monitor pit volume totals during drilling operations?<br><br>A.   Fifth.<br><br>Q.   And that includes recording all pit volumes, which is the driller's responsibility?<br><br>A.   Fifth. (24:6-13). |
| As the Assistant Driller, Mr. Morgan knew that there was never a time that he could pay less attention to monitoring the well. | Q.   As an assistant driller, you'd agree that there's never a time that you can pay less attention to monitoring the well?<br><br>A.   Fifth. (25:21-24). |
| In well control training, Mr. Morgan learned of the importance of monitoring the well during drilling operations, responding to kick indications in a timely manner, and minimizing the influx of any kick. | Q.   As part of your training in this course with IADC well control, you were taught the importance of monitoring the well during drilling?<br><br>A.   Fifth.<br><br>Q.   You were taught the importance of responding to kick indicators in a timely fashion?<br><br>A.   Fifth.<br><br>Q.   You were taught that it's important to minimize the influx of any kick?<br><br>A.   Fifth. (17:12-23). |
| Aboard the *Deepwater Horizon*, Mr. Morgan participated in well control safety drills, where Transocean emphasized that the immediate priority is to shut in the well. | Q.   And you recall being part of safety drill on board the DEEPWATER HORIZON on April 18 --<br><br>A.   Fifth.<br><br>Q.   -- 2010? This April 18 safety drill took place two days before the incident?<br><br>A.   Fifth.<br><br>Q.   Under the "Comments" section, it's noted, "15,090 sacks of barite on board. Discussed well control responsibilities with each crew member and discussed the procedures for shutting in on casing. The immediate priority is to shut in the well." Do you recall participating in a safety drill where those issues were |

7

| | |
|---|---|
| | discussed?<br><br>A.    Fifth.  (22:16-23:8). |
| If Mr. Morgan or anyone involved in the negative pressure test felt that it was unsafe, then they would have exercised their stop-the-job authority to address their concerns before proceeding with displacement. | Q.    And you were relieved just before the negative test was conducted?<br><br>A.    Fifth.<br><br>Q.    But you are aware that the negative test was eventually conducted?<br><br>A.    Fifth.<br><br>Q.    And you're aware that the crew agreed -- agreed to proceed following the completion of the negative test?<br><br>A.    Fifth.<br><br>Q.    If anyone involved in the operations felt it was unsafe to proceed, they could exercise their stop-work authority before proceeding to displacement?<br><br>A.    Fifth.  (37:8-22). |

## II.    Requested Adverse Inferences by Halliburton

### A.    Jimmy Harrell's Deposition

| INFERENCE | CITATIONS |
|---|---|
| "The first version of the written displacement procedure that the BP Company Man provided to Harrell did not include a negative test.  Harrell told the BP Company Man that he would not perform a displacement without first conducting a negative test." | 111:23-113:19; Depo Ex. 3806; Depo Ex. 7607 |
| "Harrell was aware of some anomalous readings during the first negative test and instructed the drill crew to increase the annular pressure." | 116:6-22; Depo Ex. 3806 |

DATED:  February 22, 2013              Respectfully submitted,

By: /s/ Brad D. Brian                   By: /s/ Steven L. Roberts

Brad D. Brian
Michael R. Doyen
Daniel B. Levin
Susan E. Nash
MUNGER TOLLES & OLSON LLP
355 So. Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100
Fax: (213) 683-5180
Email: brad.brian@mto.com
    michael.doyen@mto.com
    daniel.levin@mto.com
    susan.nash@mto.com


By: /s/ Edwin G. Preis
Edwin G. Preis, Jr.
PREIS & ROY PLC
Versailles Blvd., Suite 400
Lafayette, LA 70501
(337) 237-6062
    and
601 Poydras Street, Suite 1700
New Orleans, LA 70130
(504) 581-6062

Steven L. Roberts
Rachel Giesber Clingman
Sean Jordan
SUTHERLAND ASBILL & BRENNAN LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Tel: (713) 470-6100
Fax: (713) 354-1301
Email: steven.roberts@sutherland.com
rachel.clingman@sutherland.com
sean.jordan@sutherland.com

By: /s/ Kerry J. Miller
Kerry J. Miller
FRILOT, LLC
110 Poydras St., Suite 3700
New Orleans, LA 70163
Tel: (504) 599-8194
Fax: (504) 599-8154
Email: kmiller@frilot.com

John M. Elsley
ROYSTON, RAYZOR, VICKERY & WILLIAMS LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 224-8380

*Counsel for Defendants Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.*

**CERTIFICATE OF SERVICE**

    I hereby certify that on February 22, 2013, I electronically filed the foregoing with the Court's CM/ECF system by using the LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of filing to all counsel accepting electronic notice.

        /s/ Kerry J. Miller
        Kerry J. Miller