UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | § § § § | MDL No. 2179 SECTION: J |
| Applies to: | § § | JUDGE BARBIER |
| ALL CASES AND 2:10-CV-2771 | § § § | MAG. JUDGE SHUSHAN |

**HALLIBURTON ENERGY SERVICES INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ADVERSE INFERENCES BASED ON DONALD VIDRINE'S ASSERTION OF THE FIFTH AMENDMENT**

Defendant Halliburton Energy Services, Inc. ("HESI") files this Memorandum in Support of Its Motion for Adverse Inferences Based on Donald Vidrine's Assertion of the Fifth Amendment in his February 8, 2013 Response to Interrogatories propounded by Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings LLC, Transocean Deepwater Inc., and Triton Asset Leasing GmbH (collectively, "Transocean"),[1] and in support thereof, would show as follows:

**I.   The Invocation of the Privilege Against Self-Incrimination in Civil Proceedings May Lead to the Imposition of an Adverse Inference.**

   **A.   The Fifth Amendment Protects Against Self-Incrimination.**

The Fifth Amendment protects against self-incrimination by providing that "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ."  U.S. CONST. amd. V.  The Supreme Court broadly construes this protection to ensure that an individual is not compelled to produce evidence that may later be used against him or her in a criminal

---

[1] Attached hereto as Exhibit A.

**HESI'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ADVERSE INFERENCES BASED ON DONALD VIDRINE'S ASSERTION OF THE FIFTH AMENDMENT**                                                                    **Page 1 of 14**

2098647 v8-24010/0002 PLEADINGS

proceeding. *Maness v. Meyers*, 419 U.S. 449, 461 (1975); *Kastigar v. United States*, 406 U.S. 441, 445 (1972). For Fifth Amendment protection, a statement must (1) be compelled; (2) be testimonial; and (3) potentially incriminate a person in a criminal proceeding. *See Fisher v. United States*, 425 U.S. 391, 399 (1976); *United States v. Gecas*, 120 F.3d 1419, 1428 n.11 (11th Cir. 1997) (en banc).

      **B.**      **An Adverse Inference May Be Applied to Witnesses Taking the Fifth Amendment, Provided There Is Corroborating Evidence to Support the Inference.**

In *Baxter v. Palmigiano*, the Supreme Court commented on the issue of silence by a witness in a civil proceeding: "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.'" 425 U.S. 308, 318 (1976) (internal citation omitted). Thus, in a civil case, a negative or adverse inference may be drawn against a party to the action who asserts his or her Fifth Amendment privileges. Federal and Louisiana state law are in accord in this regard. *See Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983); *Miles v. Louisiana Landscape Specialty*, 697 So. 2d 348, 351 (La. App. 5 Cir. 1997).

The evidentiary weight of an adverse inference will depend upon the circumstances, but in all cases, the inference cannot stand unsupported. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 675 (5th Cir. 1999); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990). ***The most important factor in a court's analysis of whether to apply an adverse inference is that the inference sought must be supported by corroborating or independent evidence.*** *See State Farm Life Ins. Co.,* 896 F.2d at 119. In other words, parties may not simply manufacture unsubstantiated facts and impute them to a witness taking the

Fifth Amendment. There must be independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination; otherwise, no inferences may be drawn. *See United States v. Stelmokas*, 100 F.3d 302, 311 (3rd Cir. 1996) (citing *United States v. Local 560 of the Int'l Bhd. of Teamsters*, 780 F.2d 267, 292, n.32 (3rd Cir. 1985)).

### C. Adverse Inferences Against BP are Warranted Because the *LiButti* Factors, as Applied to Vidrine, are Satisfied.

The Court previously instructed that it would look to the four non-exclusive factors set forth in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997), in its case-by-case analysis of whether adverse inferences should be drawn from witnesses' invocations of the Fifth Amendment. (Rec. Doc. 5682, p. 5). The four *LiButti* factors are: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. *See LiButti*, 107 F.3d at 123.

The first *LiButti* factor is satisfied because of the employment relationship between Donald Vidrine ("Vidrine") and BP. *See id.* at 123 (noting that the key inquiry is whether the non-party witness would be "likely to render testimony in order to damage the relationship" with the litigant). Further, Fifth Circuit law supports the application of an adverse inference against an employer based on its employee's invocation of the Fifth Amendment because an employee is unlikely to "falsely claim to have engaged in criminal conduct for which the defendant employer is liable." *See FDIC v. Fidelity & Deposit Co.*, 45 F.3d 969, 978 (5th Cir. 1995) (internal citations omitted).

The second *LiButti* factor analyzes the amount of control the party has "vested in the non-party witness in regard to the key facts and general subject matter of the litigation..." *LiButti*, 107 F.3d at 123. The general subject matter in the instant case involves the events that occurred during the temporary abandonment of the Macondo well and led to the blowout. As the Well Site Leader, Vidrine was responsible for ensuring that BP's temporary abandonment procedure was carried out accurately, effectively, and safely, thus satisfying the second factor. The third *LiButti* factor considers "[w]hether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Id.* at 123. Vidrine's interest in showing that his actions leading up to the blowout were not criminal or grossly negligent is clearly aligned with BP's desire to avoid a finding that it was grossly negligent based on the conduct of its employees, including Vidrine.

Under the last *LiButti* factor, the Court must determine "[w]hether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects..." *Id.* at 123-24. As a Well Site Leader, Vidrine played a pivotal role in BP's execution of the temporary abandonment procedures, such as the negative tests, and was heavily involved in BP's interpretation of and reaction to the results of those procedures and tests. Vidrine is one of a handful of BP employees who have personal knowledge of the events that occurred during the temporary abandonment procedures. The other BP employees with knowledge of these issues—Robert Kaluza, Mark Hafle, and Brian Morel—have similarly invoked the Fifth Amendment in lieu of providing responsive testimony.

## II. HESI Is Entitled to Adverse Inferences Against BP Based on Vidrine's Fifth Amendment Invocation.

HESI seeks the imposition of the following specific adverse inferences[2] based on Vidrine's Fifth Amendment invocation in response to each of the referenced Interrogatories:

- Before the Negative Pressure Testing[3], BP had not given Vidrine formal training on how to perform a Negative Pressure Test.[4] (Response to Interrogatory No. 3).

- Before the Negative Pressure Testing, BP had not given Vidrine formal training on how to interpret a Negative Pressure Test. (Response to Interrogatory No. 4).

- Before the Negative Pressure Testing, BP had not given Vidrine a written procedure on how to conduct a Negative Pressure Test. (Response to Interrogatory No. 5) (*See e.g.,* TREX-4; TREX-192; TREX-303).

- Before the Negative Pressure Testing, BP had not given Vidrine a written procedure detailing how to interpret a Negative Pressure Test. (Response to Interrogatory No. 6) (*See e.g.,* TREX-4; TREX-192; TREX-303).

---

[2] Where a discrete Exhibit or deposition excerpt exists that provides corroboration for the requested inference, HESI references that Exhibit or deposition excerpt to provide context. However, HESI understands that the Court does not intend that the parties attach all corroborating evidence to their motions seeking adverse inferences, and that the Court will ultimately make its rulings on adverse inferences after it has had an opportunity to receive and review the trial evidence. *See* Rec. Doc. No. 5682 at p. 5 (declining to rule on BP's request to defer ruling on adverse inference requests until all phases of trial are complete, but noting that the Court would need to rule on Fifth Amendment invocations for Phase One in the event it decides to issue findings of fact at the conclusion of Phase One). If HESI's understanding is incorrect, HESI reserves its right to supplement this motion with such evidence and/or to re-urge its request for adverse inferences at the appropriate time during the Phase One trial.

[3] A defined term in the Interrogatories propounded to Vidrine (attached as Exhibit B), as follows: "The term 'NEGATIVE PRESSURE TESTING' means all activities conducted aboard the DEEPWATER HORIZON on April 20, 2010 related to the execution of a NEGATIVE PRESSURE TEST, including the FIRST NEGATIVE PRESSURE TEST and the SECOND NEGATIVE PRESSURE TEST."

[4] A defined term in Exhibit B, as follows: "The term 'NEGATIVE PRESSURE TEST,' also commonly referred to as an 'inflow test' or 'negative test,' means a well integrity test in which pressure inside the well is reduced and the well is monitored for increased pressure and/or flow."

- Before April 20, 2010, Vidrine had previously performed a Negative Pressure Test on the *Deepwater Horizon* by monitoring for pressure and/or flow on the drill pipe. (Response to Interrogatory No. 7).

- Before April 20, 2010, Vidrine had not previously performed a Negative Pressure Test on the Deepwater Horizon by monitoring for pressure and/or flow on the kill line. (Response to Interrogatory No. 8).

- Prior to conducting the Negative Pressure Testing, Vidrine read the Negative Pressure Test procedure outlined in the APM.[5] (Response to Interrogatory No. 9) (*See e.g.*, TREX-3576).

- The APM required that a Negative Pressure Test be conducted prior to displacing the well to seawater down to a depth of 8367'. (Response to Interrogatory No. 10) (*See e.g.,* TREX-570).

- The APM required that a second Negative Pressure Test be conducted after displacing the well to seawater to a depth of 8367'. (Response to Interrogatory No. 11) (*See e.g.,* TREX-570).

- On April 20, 2010, Vidrine instructed the Transocean Drill Crew[6] in words or substance to conduct the Second Negative Pressure Test[7] by monitoring the kill line for pressure

---

[5] A defined term in Exhibit B, as follows: "The term 'APM' means the 'Application for Permit to Modify' submitted by BP to the Minerals Management Service on April 16, 2010 pertaining to the Macondo well."

[6] A defined term in Exhibit B, as follows: "The term 'TRANSOCEAN DRILL CREW' means the Transocean Offshore Installation Manager, Senior Toolpusher, Toolpushers, Drillers, Assistant Drillers, Derrickmen, Shaker Hands, and Floorhands on tour on April 20, 2010."

[7] A defined term in Exhibit B, as follows: "The term 'SECOND NEGATIVE PRESSURE TEST' means all activities conducted aboard the DEEPWATER HORIZON on April 20, 2010 that related to the execution of a NEGATIVE PRESSURE TEST during the time period of 6:31 p.m. to 8:00 p.m."

and/or flow.  (Response to Interrogatory No. 12) (*See e.g.,* TREX-4; TREX-5; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-3806; TREX-7327).

- On April 20, 2010, prior to the start of the second Negative Pressure Test, Vidrine communicated with Robert Kaluza about a call to the on-shore BP engineers in Houston to tell them a second Negative Pressure Test would be conducted.  (Response to Interrogatory No. 13) (*See e.g.,* TREX-3575; Deposition of Christopher Pleasant at 99:23-100:18; 254:2-256:19; 511:7-19; 512:7-21).

- Vidrine was aware that Robert Kaluza in fact called the BP on-shore engineers in Houston to advise them that a second Negative Pressure Test would be conducted. (Response to Interrogatory No. 14) (*See e.g.,* TREX-3575; Deposition of Christopher Pleasant at 99:23-100:18; 254:2-256:19; 511:7-19; 512:7-21).

- On April 20, 2010, before the blowout, Vidrine observed pressure on the drill pipe during the Negative Pressure Testing.  (Response to Interrogatory No. 15) (*See e.g.,* TREX-4;TREX-5; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-3576; TREX-4447; TREX-7327).

- The Company Man for BP has the responsibility for calculating or estimating the volume of fluid expected to bleed back during Negative Pressure Testing.  (Response to Interrogatory No. 16).

- Prior to conducting the Negative Pressure Testing on April 20, 2010, Vidrine did not calculate the volume of fluid expected to bleed back to the cement unit during any Negative Pressure Testing.  (Response to Interrogatory No. 17) (*See e.g.,* Deposition of Lee Lambert at 452:4-23; 453:1-2).

- Prior to conducting the Negative Pressure Testing on April 20, 2010, no BP personnel on the rig calculated the volume of fluid expected to bleed back to the cement unit during any Negative Pressure Testing. (Response to Interrogatory No. 18) (*See e.g.,* Deposition of Lee Lambert at 452:4-23; 453:1-2).

- Prior to conducting the Negative Pressure Testing on April 20, 2010, Vidrine did not communicate to any Transocean Drill Crew member or HESI personnel manning the cement unit the volume of fluid calculated or expected to bleed back during any Negative Pressure Testing. (Response to Interrogatory No. 19) (*See e.g.,* Deposition of Lee Lambert at 452:4-23; 453:1-2).

- On April 20, 2010, Vidrine instructed the Transocean Drill Crew in words or substance to conduct the Second Negative Pressure Test by monitoring the kill line for pressure and/or flow because the APM required that the test be monitored on the kill line. (Response to Interrogatory No. 20) (*See e.g.,* TREX-4; TREX-49; TREX-303; TREX-3573; TREX-3576).

- On April 20, 2010, before the Blowout[8], Vidrine believed that the pressure on the drill pipe during the Negative Pressure Testing was caused by a "bladder effect." (Response to Interrogatory No. 21) (*See e.g.,* TREX-192).

- On April 20, 2010, before the Blowout, Vidrine believed that the pressure on the drill pipe during the Negative Pressure Testing was caused by "annular compression." (Response to Interrogatory No. 22) (*See e.g.,* TREX-4; TREX-49; TREX-192; TREX-303; TREX-3576; TREX-7327).

---

[8] A defined term in Exhibit B, as follows: "The term 'BLOWOUT' means the blowout of the Macondo well that occurred on April 20, 2010."

- On April 20, 2010, Vidrine was present on the drill floor at the time the Second Negative Pressure Test was completed.  (Response to Interrogatory No. 23) (*See e.g.,* TREX-4; TREX-5; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-7327).

- On April 20, 2010, before the Blowout, Vidrine believed the Second Negative Pressure Test was successful.  (Response to Interrogatory No. 25) (*See e.g.,* TREX-4; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-3806; Deposition of Christopher Pleasant at 433:20-23; 434:3-5).

- On April 20, 2010, before the Blowout, Vidrine told Vincent Tabler in words or substance that he believed the Negative Pressure Testing was successful.  (Response to Interrogatory No. 29) (*See e.g.,* Deposition of Vincent Tabler at 637:1-13).

- On April 20, 2010, before the Blowout and after the Second Negative Pressure Test, Vidrine spoke to Mark Hafle via telephone.  (Response to Interrogatory No. 30) (TREX-4; TREX-192; TREX-303; TREX-3575; TREX-3576; TREX-4447; TREX-4453).

- On April 20, 2010, before the Blowout, Vidrine told Mark Hafle in words or substance that there was pressure on the drill pipe during the Negative Pressure Testing.  (Response to Interrogatory No. 31) (*See e.g.,* TREX-49; TREX-192; TREX-3576; TREX-4447; TREX-4448).

- On April 20, 2010, before the Blowout and after the Second Negative Pressure Test, Vidrine told Mark Hafle that the Negative Pressure Testing was "squirrelly."  (Response to Interrogatory No. 32) (*See e.g.,* TREX-49).

- On April 20, 2010, before the Blowout, Vidrine told Mark Hafle in words or substance that there was zero pressure on the kill line during the Negative Pressure Testing.  (Response to Interrogatory No. 33) (*See e.g.,* TREX-4447; TREX-4448; TREX-4453).

- On April 20, 2010, before the Blowout, Mark Hafle told Vidrine in words or substance that you cannot have pressure on the drill pipe and zero pressure on the kill line in a Negative Pressure Test that is properly lined up. (Response to Interrogatory No. 34) (*See e.g.,* TREX-4447).

- On April 20, 2010, before the Blowout, Vidrine told Mark Hafle in words or substance that if there had been a kick in the hole Vidrine would have seen it. (Response to Interrogatory No. 35) (*See e.g.,* TREX-192).

- On April 20, 2010, before the Blowout, Mark Hafle told Vidrine in words or substance that if there had been a kick in the hole we would have seen it. (Response to Interrogatory No. 36) (*See e.g.,* TREX-192).

- On April 20, 2010, after completion of the Second Negative Pressure Test, Mark Hafle did not instruct Vidrine to conduct another Negative Pressure Test. (Response to Interrogatory No. 37).

- On April 20, 2010, after completion of the Second Negative Pressure Test, Vidrine did not tell any member of the Transocean Drill Crew to conduct another Negative Pressure Test. (Response to Interrogatory No. 38).

- On April 20, 2010, after completion of the Second Negative Test[9], Mark Hafle did not tell Vidrine to stop the displacement. (Response to Interrogatory No. 39).

- On April 20, 2010, after speaking with Mark Hafle, Vidrine did not tell the Transocean Drill Crew to stop the displacement. (Response to Interrogatory No. 40).

---

[9] For purpose of this motion, HESI assumes that "Second Negative Test" in Interrogatory 39 of Exhibit A was intended to read "Second Negative Pressure Test," a defined term in Exhibit B that was previously referenced *supra*, n. 8. "Second Negative Test" was not a defined term in Exhibit B.

- On April 20, 2010, at approximately 9:00 p.m., Vidrine was in the drill shack at the time the sheen test was conducted. (Response to Interrogatory No. 42) (*See e.g.,* TREX-4; TREX-49; TREX-192; TREX-303).

- On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., Vidrine believed everything regarding the Macondo well looked fine. (Response to Interrogatory No. 43) (*See e.g.,* TREX-192; TREX-303; TREX-3576).

- On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., Vidrine believed that the well was not flowing. (Response to Interrogatory No. 44) (*See e.g.,* TREX-4; TREX-303).

- After 9:30 p.m. on April 20, 2010, Vidrine received a call from Jason Anderson. (Response to Interrogatory No. 45) (*See e.g.,* TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576).

- After 9:30 p.m. on April 20, 2010, Jason Anderson told Vidrine that they were getting mud back. (Response to Interrogatory No. 46) (*See e.g.,* TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576).

- After 9:30 p.m. on April 20, 2010, Jason Anderson told Vidrine that they were closing the annular. (Response to Interrogatory No. 47) (*See e.g.,* TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576).

- After 9:30 p.m. on April 20, 2010, Jason Anderson told Vidrine that they were diverting returns to the gas buster. (Response to Interrogatory No. 48) (*See e.g.,* TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576).

- Despite Vincent Tabler's recommendation of a full bottoms up circulation prior to the production casing cement job, Vidrine conveyed to Vincent Tabler that BP was not going

to do a full bottoms up circulation. (Response to Interrogatory No. 51) (*See e.g.,* Deposition of Vincent Tabler at 411:18-412:5, 412:21-23; 413:1-7, 415:4-25).

### III. The Court Should Defer Ruling on Adverse Inferences

As in previous briefing, HESI again respectfully urges the Court to defer ruling on the propriety of specific adverse inferences until after it has an opportunity to receive and review the Phase One trial evidence. (*See e.g.,* Rec. Doc. 8027 at p. 3). The Court will receive a significant volume of evidence during the Phase One trial. Thus, deferring a ruling on adverse inferences would be the most efficient and effective use of the Court's time. Once the trial evidence is received, the Court will be in a much better position to accurately weigh whether sufficient corroborating evidence exists for the adverse inferences sought by the parties. In fact, the Court may find it helpful for the parties to submit additional briefing on the appropriateness of the requested inferences in light of the evidence admitted at trial.

Respectfully Submitted,

**GODWIN LEWIS PC**

**By:** /s/ Donald E. Godwin
Donald E. Godwin
*Attorney-in-charge*
State Bar No. 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
State Bar No. 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
State Bar No. 24013109
Jenny.Martinez@GodwinLewis.com
Floyd R. Hartley, Jr.
State Bar No. 00798242
Floyd.Hartley@GodwinLewis.com
Gavin E. Hill
State Bar No. 00796756
Gavin.Hill@GodwinLewis.com

1201 Elm, Suite 1700
Dallas, Texas 75270-2041
Telephone: (214) 939-4400
Facsimile: (214) 760-7332

R. Alan York
State Bar No. 22167500
Alan.York@GodwinLewis.com
Jerry C. von Sternberg
State Bar No. 20618150
Jerry.VonSternberg@GodwinLewis.com
Misty Hataway-Coné
State Bar No. 24032277
Misty.Cone@GodwinLewis.com

1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**ATTORNEYS FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.**

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing HESI's Memorandum in Support of Its Motion for Adverse Inferences Based on Donald Vidrine's Assertion of the Fifth Amendment has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 22nd day of February, 2012.

                                                  /s/  Donald E. Godwin
                                                  Donald E. Godwin