# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * | MDL No. 2179 |
| | * | Section: J |
| This Pleading Applies to: | * | |
| | * | Judge Barbier |
| | * | |
| *All Cases (including Case No. 2:10-cv-04536 (United States v. BP Exploration & Production Inc., et al.))* | * * * | Magistrate Judge Shushan |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BP EXPLORATION & PRODUCTION INC.'S OPPOSITION TO THE UNITED STATES' MOTION TO COMPEL PRODUCTION OF PREVIOUSLY-WITHHELD DOCUMENTS PURSUANT TO THE <u>CRIME-FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE</u>

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: 202-879-5000
Facsimile: 202-879-5200

Joel M. Gross
Brian Israel
Allison Rumsey
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, D.C. 20004-1206
Telephone: 202-942-5000
Facsimile: 202-942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: 504-581-7979
Facsimile: 504-556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone: 202-662-5985
Facsimile: 202-662-6291

*Attorneys for BP Exploration & Production Inc.*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

     A.    BP's Guilty Plea and Allocution ...............................................................4

     B.    BP's Stipulated Consent with the SEC ....................................................6

SUMMARY OF ARGUMENT ...............................................................................................6

ARGUMENT ........................................................................................................................8

I.    Under Applicable Legal Standards, the United States Must Demonstrate a
*Prima Facie* Case of Crime or Fraud ................................................................8

     A.    The United States Has the Burden of Demonstrating a *Prima Facie*
Case of Crime or Fraud ..........................................................................8

     B.    The United States Misstates the Standard for Applying the Crime-
Fraud Exception. ...................................................................................9

          1.    The United States' "Reasonably Related to" Standard Misstates the
Law. ........................................................................................9

          2.    A Party Seeking to Invoke the Crime-Fraud Exception Must Show
that the Privileged Communications It Challenges Are in
"Furtherance of" a Crime or Fraud. ........................................12

     C.    BP Would Be Entitled to Further Process, Including Potentially A
Full Evidentiary Hearing Before Disclosures Are Ordered Based
on Conduct Beyond the Scope of BP's Guilty Plea Allocution ............15

II.    Under the Proper Standards, the United States Is Not Entitled to Pierce
BP's Privilege with Respect to Particular Contested Documents ......................16

     A.    The United States' Motion to Compel Does Not Establish a *Prima
Facie* Case for BP's SEC Submissions and the May 4 Briefing. .........17

          1.    The United States Is Not Entitled to Documents Related to
Preparation of BP's Forms 6-K Filed with the SEC. ................17

          2.    The United States Is Not Entitled to Documents Related to the
May 4 Congressional Briefing Session ....................................19

     B.    The United States Is Entitled Only to Documents that Meet the "In
Furtherance" Legal Test .......................................................................20

i

1.      The United States Is Not Entitled to All Documents that Are Merely "Related to" Preparation of BP's May 24 Communications with Congress.............................................................................................20

2.      The United States Is Not Entitled to All Documents Merely "Related to" Preparation of BP's June 25 Communications with Congress....................................................................................................22

3.      The United States Is Not Entitled to All Documents Merely "Related to" Preparation of BP's May 19, 2010 Email to Admiral Landry and Its Attachments. ...............................................................23

III.    BP Will Cooperatively Provide Logs and Documents for *In Camera* Review. ..............................................................................................................24

CONCLUSION..................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Aguinaga v. John Morrell & Co.*,
  112 F.R.D. 671 (D. Kan. 1986) ............................................................................... 16

*Armoyan v. Armoyan*,
  64 So. 3d 198 (Fla. Ct. App. 2011) ........................................................................ 16

*Duplan Corp. v. Deering Milliken, Inc.*,
  540 F.2d 1215 (4th Cir. 1976) ................................................................................ 16

*First Union Nat. Bank v. Turney*,
  824 So. 2d 172 (Fla. Ct. App. 2001) ...................................................................... 16

*Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*,
  2004 WL 3661433 (E.D. Va. Mar. 31, 2004) ........................................................ 16

*Haines v. Liggett Group Inc.*,
  975 F.2d 81 (3d Cir. 1992) ..................................................................................... 15

*In re BankAmerica Corp. Sec. Litig.*,
  270 F.3d 639 (8th Cir. 2001) .................................................................................. 14

*In re Burlington Northern, Inc.*,
  822 F.2d 518 (5th Cir. 1987) .................................................................................. 13

*In re GMC Corp.*,
  153 F.3d 714 (8th Cir. 1998) .................................................................................. 15

*In re Grand Jury Investigation*,
  231 F. App'x 692 (9th Cir. 2007) ........................................................................... 14

*In re Grand Jury Proceedings in Matter of Fine*,
  641 F.2d 199 (5th Cir. Unit A 1981) ................................................................. 11, 12

*In re Grand Jury Subpoena*,
  419 F.3d 329 (5th Cir. 2005) ............................................... 6, 9, 10, 12, 13, 14, 18

*In re Int'l Sys. & Controls Corp. Sec. Litig.*,
  693 F.2d 1235 (5th Cir. 1982) ................................................................................ 13

*In re M&L Bus. Mach. Co. v. Bank of Boulder*,
  167 B.R. 937 (D. Colo. 1994) ................................................................................. 16

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
  2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ........................................................ 18

*In re Murphy*,
   560 F.2d 326 (8th Cir. 1977)...................................................................... 14

*In re Napster Inc. Copyright Litig.*,
   479 F.3d 1078 (2007) ................................................................................ 15

*In re Richard Roe, Inc.*,
   68 F.3d 38 (2d Cir. 1995) .......................................................................... 14

*In re Sealed Case*,
   107 F.3d 46 (D.C. Cir. 1997) ..................................................................... 12

*Laser Indus., Ltd. v. Reliance Techs., Inc.*,
   167 F.R.D. 417 (N.D. Cal. 1996) ............................................................... 16

*LRC Electronics, Inc. v. John Mezzalingua Associates, Inc.*,
   974 F. Supp. 171 (N.D.N.Y. 1997) ............................................................ 24

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2007) .................................................................................. 15

*Prudential Ins. Co. of Am. v. Massaro*,
   2000 WL 1176541 (D.N.J. Aug. 11, 2000) ................................................ 16

*RCA Corp. v. Data General Corp.*,
   No. 84–270, 1986 WL 15684 (D. Del. Oct. 27, 1986) ............................... 18

*Sigma-Tau Industrie Farmaceutiche Riunite, S.p.A. v. Lonza, Ltd.*,
   48 F. Supp. 2d 16 (D.D.C. 1999) .............................................................. 16

*Swidler & Berlin*,
   524 U.S. 399 (1998) .................................................................................. 12

*Tindall v. H&S Homes, LLC*,
   757 F. Supp. 2d 1339 (M.D. Ga. 2011)..................................................... 16

*Turner v. Pleasant*,
   No. 10-1823, 2012 WL 3270373 (E.D. La. Aug. 10, 2012) ....................... 14

*United States v. Bauer*,
   132 F.3d 504 (9th Cir. 1997) ..................................................................... 10

*United States v. Dyer*,
   722 F.2d 174 (5th Cir. 1983)........................................................... 11, 15, 18

*United States v. Stewart*,
   No. 03 CR. 717, 2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003) ............... 10

*United States v. White*,
   887 F.2d 267 (D.C. Cir. 1989) ................................................................... 15

*United States v. Zolin*,
   491 U.S. 554 (1989) ............................................................................................... 10

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ............................................................................................... 12

**Other Authorities**

1 Corporate Counsel Guidelines § 1:26 (2012) ..................................................... 15

## **INTRODUCTION**

In a criminal plea recently submitted to, and accepted by, the Honorable Sarah S. Vance of this District, BP Exploration & Production Inc. ("BP") accepted responsibility for its role in the tragic loss of life that resulted from the *Deepwater Horizon* explosion.  BP accepted responsibility for its role in the environmental damage from the resulting oil spill.  And BP accepted responsibility for certain May 2010 misstatements made to Congress concerning the rate of flow of oil into the Gulf of Mexico.  Specifically, and most important for present purposes, BP pleaded guilty to obstruction of Congress in relation to a letter to Congressman Markey, sent May 24, 2010, that contained communications by "BP, through a former vice president," Mr. David Rainey.  (Ex. 1.)  Although not charged with the conduct, BP also admitted that the same former vice president inserted a misstatement into a separate letter to Congress, dated June 25, 2010.

In light of its guilty plea, BP will be forthcoming and aid the Court and parties in evaluating the United States' recent motion.  Shortly after this filing, BP will submit (under seal) three privilege logs listing documents related to the May 24 and June 25, 2010 letters to Congressman Markey, as well as a preceding May 19, 2010 communication to Admiral Landry that formed an attachment to the May 24 letter.  These documents were located through a reasonable, good-faith review of documents previously withheld as privileged as will be further described in BP's upcoming privilege log submission.

For the Court's convenience, all documents appearing on these new logs will be categorized into one of the following five mutually exclusive categories:

- Category A:  Documents in which Mr. Rainey is an active participant and that relate to the matters in BP's guilty plea allocution.

- Category B: Documents in which Mr. Rainey is a passive recipient of a communication (either as a recipient or as someone on the "cc" line).

- Category C: Documents in which Mr. Rainey is an active participant in the communication but that do not relate to the matters in BP's guilty plea allocution.

- Category D: Documents in which Mr. Rainey is not part of the communication but where the participants refer to or recount a prior interaction with Mr. Rainey.

- Category E: Documents that relate to a communication as to which BP allocuted but that post-date the communication and/or that concern an aspect of the communication that was not the subject of BP's guilty plea allocution.

BP hereby officially continues to assert privilege over all five categories of documents that will appear on these logs. Nonetheless, without waiver of BP's position that such documents are privileged, BP understands that it may be debatable how to apply the crime-fraud exception to certain of these documents following BP's guilty plea and factual allocution. BP therefore would fully understand, and has prepared itself promptly to implement, a court order requiring the production of documents listed under Category A on these three privilege logs. In fact, had the United States been willing to pursue good faith meet-and-confer discussions regarding this motion, BP expects that agreement may well have been reached as to the status of substantial numbers of these documents.

As an *in camera* review of documents would reveal, however, the United States' request for documents beyond those falling into Category A on BP's new privilege logs exceeds what is justified under the legal standards for the crime-fraud exception and extends into matters far outside the scope of the factual allocution supporting BP's guilty plea. The production of such documents, were it pursued by the United States, would grant the United States unwarranted tactical advantages from BP's acceptance of responsibility. Indeed, as the new privilege logs will demonstrate, a great number of documents being sought by the United States do not even reflect communications involving Mr. Rainey—the former BP vice president who is the focus of

2

the obstruction of Congress count in BP's guilty plea and, therefore, of the United States' motion.  As described below, documents not involving Mr. Rainey ought not be disclosed because they ought not be considered communications "in furtherance of" a crime or fraud.

Finally, and as also described below, the United States has not established a *prima facie* case for any privileged communications that do not relate to the May 24 and June 25 letters to Congressman Markey, or the May 19 note—either by BP's guilty plea, its allocution, or otherwise.  Hence, those documents too are not properly subject to disclosure.

## <u>BACKGROUND</u>

Following the tragic April 20, 2010 explosion on the *Deepwater Horizon*, BP engaged in extensive efforts to stop and contain the flow of oil from the reservoir, as well as efforts to calculate the rate at which oil was flowing into the Gulf.  In May and June 2010 alone—while the oil was still flowing and while BP's energies were principally focused elsewhere—BP received multiple requests for information and testimony from Congress.  Some of those came from Congressman Edward Markey, then a chairman of a subcommittee of the Committee on Energy and Commerce.   Most relevant here, and among BP's many communications with Congress during this period, are the following:

- On May 4, 2010, David Rainey attended an off-the-record, non-public congressional briefing on behalf of BP.

- On May 19, 2010, unrelated to any congressional request, BP provided Admiral Landry and Admiral Allen of the Unified Command with a note that David Rainey had prepared regarding certain flow rate information.

- On May 24, 2010, BP submitted a letter to Congressman Markey in response to his May 14, 2010 letter requesting additional information regarding flow rate. This letter included the May 19 note as an attachment.

- On June 25, 2010, BP submitted another letter to Congressman Markey in response to his June 20, 2010 press release, which also released certain pages from the May 24 submission.

Separately, on April 29, BP filed a Form 6-K with the SEC providing certain financial information related to the end of the first financial quarter.  (Ex. 2.)  Also, on April 30 and May 4, 2010 BP filed as Forms 6-K two press releases issued in the United States, one entitled "BP Steps Up Shoreline Protection Plans on US Gulf Coast" and another entitled, "Work Begins to Drill Relief Well To Stop Oil Spill."  (Exs. 3, 4.)  These three SEC submissions, together with the congressional communications listed above, form the basis of the United States' motion.

A.      **BP's Guilty Plea and Allocution**

On November 15, 2012, BP pleaded guilty to certain post-spill conduct related to the specific May 24 letter to Congressman Markey.  BP's allocution, which was attached to the Plea Agreement as Exhibit A, sets forth the factual basis for BP's guilty plea and also admits BP's former vice president (namely, Mr. Rainey) inserted a misstatement in a June 25 letter to Congressman Markey.  *See United States v. BP Exploration and Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La.), Rec. Docs. 1, 2, 65.  This allocution is separate and distinct from the United States' assertions in the charging document (which BP has not adopted).  (*Compare* Ex. 1 *with* Ex. 5.)  BP admitted no more and no less than the specific conduct described in BP's allocution.

As relevant here, the obstruction-related charges and BP's allocution both center on conduct by Mr. Rainey—who separately has been charged by the United States; has pleaded not guilty; and is awaiting trial.  The allocution states as follows:

1. BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

4

2.  BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3.  BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.  At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4.  BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5.  BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

Similarly, as to the June 25 communication, the allocution states that: "On or about June 25, 2010" the same former vice president "inserted language [in a letter to Congressman Markey] that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.'" *Id.* ¶ 6.  The allocution further states as regards the June 25 letter, "[a]t the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010." *Id.*

While BP's allocution admits Mr. Rainey acted with criminal intent with respect to specific statements described therein, it makes no similar admissions as to any other individuals.

### B.      BP's Stipulated Consent with the SEC

Separately, on November 15, 2012, BP and the Securities and Exchange Commission stipulated to a Consent Decree.  (Ex. 6.)  Just like BP's guilty plea allocution and the United States charging documents are separate and distinct, so too the stipulated SEC Consent Decree is separate and distinct from the allegations contained in the SEC's Complaint.  (*Compare* Ex. 6 *with* Ex. 7.)  This is important because the United States' motion quotes both the SEC Consent Decree and the associated SEC Complaint at length.  The passages of the Consent Decree quoted by the United States, however, do not include a sentence that expressly reserves BP's "right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party."  *SEC v. BP p.l.c.*, No. 2:12-cv-02774 (E.D. La.), Rec. Doc. 2-1 at ¶ 13.

### SUMMARY OF ARGUMENT

The United States' motion is overbroad and fails for multiple reasons.

***First***, the United States improperly seeks to pierce BP's privilege based on conduct other than what is fairly encompassed by BP's guilty plea allocution.  As explained below, the United States nowhere satisfies its burden of establishing a *prima facie* case that such conduct involves a crime or fraud.  (**Part I.A**, *infra*.)

***Second***, contrary to the United States' assertions, a communication may be considered within the scope of the crime-fraud exception only if it is "reasonably relat[ed] to the *furtherance of*" a crime or fraud.  *In re Grand Jury Subpoena*, 419 F.3d 329, 347 (5th Cir. 2005) (emphasis added).  The United States is thus mistaken in seeking disclosure of documents merely because they "relate to" an actual or alleged crime or fraud.  *See, e.g.*, U.S. Memo. at 1, 2, 4, 7-8, 12, 14,

17, 20-24.  Under applicable law, the United States must show that BP consciously conferred with counsel in order to further a specific crime or fraud encompassed within BP's guilty plea allocution.  (**Part I.B**, *infra*.)

**Third**, even if the United States had satisfied its burden of establishing a *prima facie* case, due process and fundamental fairness would still require that BP be allowed to request the opportunity for presentation of evidence and argument before the Court compels production of otherwise privileged communications.  (**Part I.C**, *infra*.)

**Finally**, in light of the above legal standards, the United States' attempt to gain broad discovery into BP's privileged communications must be rejected.

For one thing, BP ought not be required to produce documents unrelated to the specific wrongful acts acknowledged in its plea.  Specifically, BP's guilty plea allocution does not acknowledge wrongdoing with regard to the document sets the United States seeks relating to BP's April 29, April 30, and May 4, 2010 SEC submissions, or the May 4 congressional briefing session.  The United States appears to recognize this problem—and to seek to handle it by putting aside BP's guilty plea allocution and focusing instead on the allegations found in the United States' own charging papers and the SEC Complaint.  But BP did not acknowledge everything the United States charged or the SEC alleged, and the United States' and the SEC's own allegations, without more, do not constitute a *prima facie* showing that the crime-fraud exception applies.  (**Part II.A**, *infra*.)

Moreover, even as to the three communications arguably implicated by BP's allocution— the May 24 letter, June 25 letter, and May 19 note—the United States cannot carry its burden. Specifically, the United States cannot establish that the communications it now seeks were made "in furtherance of" of a crime or fraud.  (**Part II.B**, *infra*.)

7

Notwithstanding all the above, BP wishes to bring the United States' motion to resolution. BP will therefore soon submit privilege logs under seal, together with a submission, made for purposes of *in camera* review, of all documents appearing on the logs relating to May 24 and June 25 letters and May 19 note, respectively. BP respectfully requests that the Court confirm, upon *in camera* review, that documents in these sets do not satisfy the applicable legal tests. (**Part III**, *infra*.)

<u>**ARGUMENT**</u>

The United States submitted this motion to compel after the close of the Phase 1 and Phase 2 written discovery and well beyond the deadline for asserting Phase 2 privilege challenges. While BP is prepared to accept that BP's January 2013 guilty plea may justify this one-time, far-out-of-time, set of challenges, it bears emphasizing this acceptance is without prejudice to BP's rights to assert the tardiness of possible future motions presenting similarly timed requests for discovery or privilege reexaminations.

**I.     Under Applicable Legal Standards, the United States Must Demonstrate a *Prima Facie* Case of Crime or Fraud.**

It is the United States' burden to establish a *prima facie* case that a crime or fraud has occurred for each set of documents it seeks. For each crime or fraud, the United States must also establish that specific privilege communications were made "in furtherance of" such a crime or fraud. As an *in camera* review would reveal, the United States' motion falls short in both respects.

**A.     The United States Has the Burden of Demonstrating a *Prima Facie* Case of Crime or Fraud.**

"In order to invoke the crime-fraud exception, the party seeking to breach the walls of privilege must make out a *prima facie* case" involving "evidence 'such as will suffice until

contradicted and overcome by other evidence.'"  *In re Grand Jury Subpoena*, 419 F.3d at 336.  It

is the government, not the holder of the privilege, that "bears 'the burden of establishing a *prima*

*facie* case that the attorney-client relationship was intended to further criminal or fraudulent

activity.'"  *Id.* at 335.  "Allegations in pleadings," moreover, "are not evidence and are not

sufficient to make a *prima facie* [case] showing that the crime-fraud exception applies."  *Id.* at

336.  Here, the United States' motion does not itself present evidence of a crime or fraud; it

instead relies on BP's recent guilty plea and the mere allegations mentioned above.  As

demonstrated below, however, BP's guilty plea does not even arguably establish a *prima facie*

case of crime or fraud with respect to communications related to BP's SEC submissions and

communications related to the May 4 non-public congressional briefing—neither of which are

encompassed by BP's guilty plea allocution.  (*See* **Part II.A**, *infra*.)

> **B.**    **The United States Misstates the Standard for Applying the Crime-Fraud Exception.**

In addition to seeking sets of documents not implicated at all by BP's guilty plea

allocution, the United States also puts forth an incorrect standard for testing whether individual

documents within those document sets fall within a privilege exception.

> **1.**    **The United States' "Reasonably Related to" Standard Misstates the Law.**

The United States asserts that it is a "bedrock principle of privilege law" that "BP's use

of attorneys to aid in its wrongdoing destroys any privilege for communications *related to* the

criminal or fraudulent activity."  U.S. Memo. at 1 (emphasis added); *see also id.* at 2, 4, 17.  But

in fact it is *not* sufficient that an attorney-client communication merely "relates to" the

communications to Congress, Admiral Landry, or the SEC filings that the United States would

deem fraudulent.  Instead, the privilege gives way only "for communications in *furtherance* of

future illegal conduct." *United States v. Zolin*, 491 U.S. 554, 556 (1989) (emphasis added); *In re Grand Jury Subpoena*, 419 F.3d at 347 ("'[T]he crime-fraud exception must necessarily be limited to those attorney-client communications and work products *reasonably related to the furtherance of the ongoing or future crime or fraud* at issue.'") (emphasis added).   Contrary to the United States' contentions, the exception to the privilege does not automatically apply every time a lawyer is involved in a process of providing information to the government that might later turn out to be false in some respect.

In *United States v. Bauer*, 132 F.3d 504 (9th Cir. 1997), for example, an attorney represented a client named Bauer in preparing a bankruptcy petition.  The government indicted Mr. Bauer for filing a false petition and then, pointing to the participation of lawyers in the filing, argued that the crime-fraud exception applied, even though Mr. Bauer's attorney had advised him to be truthful on his petition.  The Ninth Circuit rejected the argument, reasoning, "[T]here is no reasonable basis for concluding that [the lawyer's] legal advice to Bauer was used by Bauer 'in furtherance of' his fraudulent scheme to falsify his bankruptcy petition." *Id.* at 509-10.  Just because a lawyer is part of the process of preparing a report that includes false or fraudulent statements does not mean the attorney's professional services were rendered in furtherance of fraudulent purposes.

Similarly, in *United States v. Stewart*, No. 03 CR. 717, 2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003), a criminal defendant who was represented by counsel allegedly lied to government investigators.  As in *Bauer*, so too in *Stewart* the Government sought to invoke the crime-fraud exception.  But, as in *Bauer*, the *Stewart* court rejected the Government's motion, because the Government had not proved that the communications at issue were "in furtherance of the criminal or fraudulent conduct." *Id.* at *2.

Nor does the crime-fraud exception apply every time a misstatement is made by a client soon after an attorney-client privileged communication occurs.  Under settled Fifth Circuit law a mere proximity in time between a privileged communication and an alleged or actually fraudulent communication is insufficient to pierce the attorney-client privilege.  In *United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983), for example, the Fifth Circuit confronted a situation where the government had made a sufficient *prima facie* showing that a zoning commissioner had sought counsel from two lawyers as part of the Commissioner's effort to obstruct justice.  The Government further established that the Commissioner had met one of the lawyers the day before committing the act that allegedly constituted obstruction.  The Fifth Circuit nonetheless held that this proximity in time—close as it was—was insufficient as a matter of law to form a basis for piercing the privilege: "There is no evidence … that the consultation with [the attorney] on the preceding day was with" the *purpose* of obstructing justice. *Id.* at 177.

The Fifth Circuit also held mere closeness in time insufficient to establish an exception to the privilege in *In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d 199 (5th Cir. Unit A 1981).  There, the government sought to pierce the attorney-client privilege in order to compel a lawyer to reveal his client's identity.  The government argued that the privilege should be abrogated because the lawyer formed a corporation for the client, and six months later the corporation purchased a yacht used to smuggle drugs. *Id.* at 203-04.  Among other things, the government contended that this suggestive timing was sufficient to establish a *prima facie* showing of intent to further a crime or fraud.  The Fifth Circuit found, however, that this temporal proximity was insufficient to establish such a *prima facie* showing.  It reasoned that, although such "facts may support a strong suspicion," as a matter of law, they "are inadequate to serve as the basis of a *prima facie* showing that [the corporation] was initially formed to further a

criminal enterprise." *Id.* at 204; *see also In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) ("Showing temporal proximity between the communication and a crime is not enough.").

In sum, the United States' "related to" standard threatens to convert the "narrow" crime-fraud doctrine into an exception that swallows a goodly part of the attorney-client-privilege rule each and every time a crime or fraud has been pleaded to or proven. Given that the attorney-client privilege "is one of the oldest recognized privileges for confidential communications," *Swidler & Berlin*, 524 U.S. 399, 403 (1998), and that it "promote[s] broader public interests in the observance of law and administration of justice," *id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)), such a reading is insupportable. If a client's legal privileges were pierced for all documents that merely "related to" a crime or fraud, the privilege would be routinely and ruinously discarded in practically every criminal case successfully pursued by the United States.

## 2. A Party Seeking to Invoke the Crime-Fraud Exception Must Show that the Privileged Communications It Challenges Are in "Furtherance of" a Crime or Fraud.

The correct, black-letter law standard requires that, in order to invoke the crime-fraud exception, a party must show both (1) "that the client intended to further an ongoing or future crime or fraud during the attorney-client relationship" and (2) that the specific "communications … [are] reasonably related to the *furtherance* of the ongoing or future crime or fraud at issue." *In re Grand Jury Subpoena*, 419 F.3d at 346-47 (emphasis added).

The second part of the test—that the communications must be made in "furtherance" of crime or fraud—is of critical importance. The crime-fraud exception applies only to the *specific* communications that would further the crime: "[T]he reach of the crime-fraud exception does not extend to all communications made in the course of the attorney-client relationship, but rather

12

must be limited to those communications made and documents produced in furtherance of the ongoing or future crime or fraud." *Id.* at 344-45. The party invoking the crime-fraud exception therefore must show that each specific communication was actually used to facilitate unlawful conduct. *See, e.g.*, *In re Burlington Northern, Inc.*, 822 F.2d 518, 525 (5th Cir. 1987) ("The focus must be narrowed to the specific purpose of the particular communication or document."). Because the communication itself must be in "furtherance" of a crime, the mere fact that a communication may be "related to" a crime is not enough. *See, e.g.*, *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1243 (5th Cir. 1982) (rejecting the claim that although attorney work product may "clearly have a reasonable relation to [ ] ongoing fraud," it follows that the materials were prepared with a "specific intent" to facilitate that fraud). Although the intent of the attorney may not be a relevant factor in applying the crime-fraud test, whether the document was intended to be "in furtherance" of criminal or fraudulent activity certainly is. Only documents that are "in furtherance of" an alleged crime or fraud are subject to the crime-fraud exception to privilege.

The Fifth Circuit's decision in *In re Grand Jury Subpoena* is instructive. There, the Fifth Circuit vacated as "overly broad" a trial court's crime-fraud order that had required the production of "all" privileged documents while not "in any way" limiting those required disclosures. 419 F.3d at 332-33, 344. As the Fifth Circuit explained, "the proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship," because even where a *prima facie* showing is made, "*no case stands for the proposition* that[] when … a client has consulted with his attorney for the purpose of furthering a crime or fraud, the privilege entirely disappears, subjecting everything in connection with that client's representation with that attorney to disclosure." *Id.* at 343-44

(emphasis added).  If that were so, the Fifth Circuit explained, the attorney-client privilege would all but cease to exist: "[T]o put it simply, the crime-fraud exception swallows the privilege rule." *Id.* at 347.

The "in furtherance" standard also has been recognized by other federal courts of appeals. For example, the Second Circuit addressed it at length in *In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995), reasoning as follows:

> The "relevant evidence" test departs from the correct "in furtherance" test in two respects.  First, the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud.  If it did, the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of culpability.  Instead, the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud.  Second, the crime-fraud exception applies only where there is probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity.  Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception.

*Id.* at 40-41 (citations omitted); *see also In re Grand Jury Investigation*, 231 F. App'x 692, 695 (9th Cir. 2007) ("[T]he crime-fraud exception applies only to documents and communications that were themselves in furtherance of illegal or fraudulent conduct."); *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001) ("There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud."); *In re Murphy*, 560 F.2d 326, 338 (8th Cir. 1977) (rejecting application of the crime-fraud exception because there must be a "close relationship" between the attorney materials sought and the criminal activity); *see also Turner v. Pleasant*, No. 10-1823, 2012 WL 3270373, at *2 (E.D. La. Aug. 10, 2012) (magistrate opinion) (following *in camera* review, rejecting application of crime-fraud exception where the "litigation files" did not reveal "the purpose or intent" of furthering a crime or fraud); 1 CORPORATE COUNSEL GUIDELINES § 1:26 (2012) ("Not

14

all communications to an attorney that would be relevant to establishing a crime or fraud lose their privilege; the exception applies only when the court determines that the communication in question was itself in furtherance of the crime or fraud.").  Finally, and along similar lines, an opinion for the D.C. Circuit by then-Judge Ruth Bader Ginsburg explains: "It does not suffice that the communications may be related to a crime.  To subject the attorney-client communications to disclosure, they must actually have been made *with an intent to further an unlawful act*."  *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (emphasis added).

In sum, not only must the government make a *prima facie* showing that BP acted illegally, it must separately show that BP conferred with counsel with the intent and that each communication was "in furtherance" of a continuing or future crime or fraud.  The crime-fraud exception applies only "[w]here a client *seeks to use an attorney to further* a continuing or future crime or fraud."  *Dyer*, 722 F.2d at 177 (emphasis added).

**C.    BP Would Be Entitled to Further Process, Including Potentially A Full Evidentiary Hearing Before Disclosures Are Ordered Based on Conduct Beyond the Scope of BP's Guilty Plea Allocution.**

It practically goes without saying that due process and fundamental fairness demand that a "district court may not ... compel production [under the crime-fraud exception] without permitting the party asserting the privilege, to present evidence and argument."  *In re GMC Corp.*, 153 F.3d 714, 716 (8th Cir. 1998); *In re Napster Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2007); *Haines v. Liggett Group Inc.*, 975 F.2d 81, 97 (3d Cir. 1992) (granting mandamus because "due process require that the party defending the privilege be given the opportunity to be

heard, by evidence and argument, at the hearing seeking an exception to the privilege").[1]

Accordingly, BP must be given the opportunity, should it so choose, to request additional procedures in advance of any disclosures—including potentially a full hearing with live testimony.  This is true even and indeed especially as regards privileged BP communications the United States now pursues based on alleged misconduct BP has not admitted—such as communications related to BP SEC filings and the May 4 congressional briefing.  (Such a hearing should not be necessary, however, because as discussed below the United States has not even attempted to make a *prima facie* showing as to those communications.)

## II.     Under the Proper Standards, the United States Is Not Entitled to Pierce BP's Privilege with Respect to Particular Contested Documents.

BP's guilty plea allocution admits that its former vice president acted with criminal intent, but it does not contain similar admissions as to the conduct of any other BP personnel.

---

[1]     *See Tindall v. H&S Homes, LLC*, 757 F. Supp. 2d 1339, 1359 (M.D. Ga. 2011) (holding that when the court is considering whether the crime-fraud exception applies, "the party invoking the privilege has the absolute right to be heard by testimony and argument"); *Prudential Ins. Co. of Am. v. Massaro*, 2000 WL 1176541, at *11 (D.N.J. Aug. 11, 2000) (holding that in the crime-fraud context "the party invoking the privilege has the *absolute right* to be heard by testimony and argument." (internal quotation marks omitted); *In re M&L Bus. Mach. Co. v. Bank of Boulder,* 167 B.R. 937, 942 (D. Colo. 1994) (holding that in the context of the crime-fraud exception "the party invoking the privilege has the absolute right to be heard by testimony and argument"); *Armoyan v. Armoyan*, 64 So. 3d 198, 199 (Fla. Ct. App. 2011) ("The trial court departed from the essential requirements of law when it ruled that the crime-fraud exception applied to husband's claim of privilege without holding an evidentiary hearing at which husband was permitted to testify."); *First Union Nat. Bank v. Turney*, 824 So. 2d 172, 183 (Fla. Ct. App. 2001) ("Even if *in camera* inspection makes it appear that the crime[-]fraud exception applies, a full evidentiary hearing is necessary ..., before confidential communications between attorney and client can be disclosed to another party."); *see also Sigma-Tau Industrie Farmaceutiche Riunite, S.p.A. v. Lonza, Ltd.*, 48 F. Supp. 2d 16, 19 (D.D.C. 1999) (denying a motion to compel under the crime-fraud exception after holding a five-day evidentiary hearing that involved "testimony from six witnesses ... [and] 84 exhibits, 58 of which were received into evidence"); *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1222 (4th Cir. 1976) (holding that before ordering the production of privileged documents under the crime-fraud exception the trial court should "see[] the witnesses and hear[] them testify"); *Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*, 2004 WL 3661433, at *1 (E.D. Va. Mar. 31, 2004) (ruling on crime-fraud exception "[a]fter hearing argument and testimony, reviewing deposition testimony, and conducting an *in camera* review"); *Laser Indus., Ltd. v. Reliance Techs., Inc.*, 167 F.R.D. 417, 429-30 (N.D. Cal. 1996) (allowing the "holder of the privilege to submit evidence and argument that tends to rebut an inference of any of the necessary elements of the crime/fraud exception"); *Aguinaga v. John Morrell & Co.*, 112 F.R.D. 671, 682-83 (D. Kan. 1986) (holding that magistrate's application of crime-fraud exception was "clearly erroneous" where the "Magistrate held no evidentiary hearings concerning the crime or fraud exception").

Consequently, absent an affirmative showing to the contrary (which the United States fails to provide), there is no basis for concluding that communications initiated by anyone other than this one particular person were intended to further a crime or fraud.  Nor is there a basis for even arguably concluding a crime or fraud was committed, except with regard to the May 24 and June 25 letters, and May 19 note.

> **A.    The United States' Motion to Compel Does Not Establish a *Prima Facie* Case for BP's SEC Submissions and the May 4 Briefing.**

The United States brings its motion based on BP's plea of guilty—and, more specifically, on the allocution accompanying BP's plea.  Rather than cite, quote, and limit the present motion to BP conduct encompassed within the allocution, however, the United States attempts to leverage BP's recent guilty plea into a broad disclosure of documents unrelated to the guilty plea allocution and for which the United States has provided no additional evidence of a crime or fraud.  As noted above, however, it is the United States' burden to establish a *prima facie* case as to all of the documents it seeks.  Accordingly, the United States' motion fails to carry its burden as regards communications related to the three SEC filings at issue and as regards communications related to the non-public May 4 congressional briefing—neither of which are the subject of admissions of criminal behavior by BP.

> **1.    The United States Is Not Entitled to Documents Related to Preparation of BP's Forms 6-K Filed with the SEC.**

The United States' motion is fatally flawed with regard to all documents requested in connection with BP's April 29, April 30, and May 4 SEC filings.  Nothing in BP's guilty plea allocution relates to these submissions.  Moreover, these SEC filings largely echo flow rate figures that the United States government itself had publically announced.  (*See* Exs. 2-4.)  And the United States has failed to establish, at any time, a *prima facie* case that the individuals who

17

drafted, reviewed, and submitted those forms acted with intent to further a crime or fraud. Because "an erroneous judgment made in good faith does not suffice to establish fraudulent intent," *RCA Corp. v. Data General Corp.*, No. 84–270, 1986 WL 15684, at *2 (D. Del. Oct. 27, 1986), and because the crime-fraud exception applies only "[w]here a client *seeks to use an attorney to further* a continuing or future crime or fraud," *Dyer*, 722 F.2d at 177 (emphasis added), the United States has failed to satisfy its burden as to these SEC filings.

Against this backdrop, the United States grounds its bid to pierce BP's privileges on allegations made in the SEC's Complaint. According to the United States these allegations now preclude BP from contesting the United States' claims of fraud. But the SEC Complaint is an SEC pleading, not a BP admission. Indeed, "[a]llegations in pleadings are not evidence and are *not sufficient* to make a *prima facie* showing that the crime-fraud exception applies." *In re Grand Jury Subpoena*, 419 F.3d at 336 (emphasis added); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *4-5 (S.D.N.Y. Apr. 18, 2006) ("[S]tatements made by the SEC and NASD in the settlement documents are not law; they are rather untested assertions made by litigants."). Significantly, no statement regarding the SEC forms at issue in this motion is contained in BP's separate guilty plea allocution.

In an effort to get around the black-letter rule that statements in an SEC Complaint are mere "untested assertions made by litigant," the United States selectively quotes the SEC Consent itself as saying that BP "'*agrees ... not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint* or creating the impression that the complaint is without factual basis ....'" U.S. Memo. at 11 (quoting *SEC v. BP p.l.c.*, No. 2:12-cv-02774 (E.D. La.), Dkt. No. 2-1 at ¶ 13) (emphasis added by United States). But the United States omits other crucial language appearing in the remainder

of this same paragraph, which states: "Nothing in this paragraph affects Defendant's … right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party."   SEC Consent at ¶ 13, Ex. 6.   Suffice it to say, the SEC is not a party to this multidistrict litigation.   Hence, by its plain terms, the SEC Consent does not bar BP from raising all of its factual defenses in this MDL litigation, and the SEC Consent certainly does not transmute mere allegations into evidence of a *prima facie* case.

In sum, the United States has not established a *prima facie* case that, with respect to the three SEC submissions at issue, the BP employees involved sought the advice of counsel for the purpose of committing a crime or fraud.   In the absence of such an affirmative showing of a crime or fraud, which the United States fails to make, the crime-fraud exception does not apply.

### 2. The United States Is Not Entitled to Documents Related to the May 4 Congressional Briefing Session.

BP's allocution likewise makes no criminal admission regarding statements to Congress on May 4, 2010, and the United States has not otherwise proffered support for its contention that the May 4 briefing involved a crime or fraud.   Any motion brought now based on statements made during the May 4, 2010, non-public briefing thus seeks to establish a new crime or fraud via a motion to compel.

To be clear, the United States' brief addresses two statements allegedly made at this off-the-record briefing.   ***First***, the United States contends, in effect, that statements made about a 5,000 bpd flow rate were knowingly false on May 4—less than a week after the United States publicly announced this very same flow rate on April 28, 2010.   But BP's guilty plea allocution contains no statements about providing this official 5,000 bpd flow rate number during the May 4, 2010 non-public briefing, and the United States offers no evidence that this May 4 statement was a crime or fraud.

19

***Second***, the United States' briefing also claims that providing a 60,000 worst case discharge number on May 4 constitutes a knowingly false statement.  But as the United States knows, many Worst Case Discharge numbers were under discussion in the relevant time frame —both within the United States Government and BP.  And as the United States also knows, BP's guilty plea allocution does not support the United States' claim that providing the 60,000 worst case discharge number during a non-public hearing that occurred on May 4 constitutes a knowing falsehood.  In view of the above, this Court should not allow itself to be diverted into adjudicating questions about the truth or falsity of statements made either in the May 4 briefing or in BP's SEC filings.  To the extent the Court were to entertain the United States' new allegations of misconduct, whether rooted in BP's SEC filings or the congressional briefing, BP would have the right to request additional procedures, up to and including an evidentiary hearing.

    **B.**    **The United States Is Entitled Only to Documents that Meet the "In Furtherance" Legal Test.**

Even as regards to documents potentially implicated by statements in BP's plea allocution, the Court should decline to require any disclosures, unless the United States carries its burden of satisfying the "in furtherance of" test as to each specific document.

    **1.**    **The United States Is Not Entitled to All Documents that Are Merely "Related to" Preparation of BP's May 24 Communications with Congress.**

The only documents that relate to BP's May 24 letter that arguably fall within the crime-fraud exception are those reflecting communications in which Mr. Rainey was an active participant and which relate to the matters to which BP pleaded guilty.  For the May 24, 2010 Markey Response, BP's upcoming submission will place documents fitting these two criteria into Category A.  More specifically, documents will be placed into Category A if they

memorialize communications in which Mr. Rainey was an active participant *and* if they also relate to one or more of the following subjects:

- "[M]ultiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD." Exhibit A, ¶ 1.

- "[I]nternal flow-rate estimates prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD" (*id.* ¶ 2.);

- "[F]low-rate estimates included in the Response" and whether they "were the product of the generally-accepted ASTM methodology" (*id.* ¶ 3);

- "[F]low-rate estimates included in the Markey Response" and whether they "had played 'an important part' in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD" (*id.* ¶ 4);

- Whether "the Unified Command's flow rate estimate of 5,000 barrels of oil per day ('BOPD') was the 'most scientifically informed judgment' and that subsequent flow rate estimates had 'yielded consistent results'" (*id.* ¶ 5).

On the other hand, documents falling outside these descriptions (and thus outside Category A), while they may "relate to" the wrongdoing for which BP pleaded guilty, do not constitute communications "in furtherance" of a crime or fraud under applicable legal standards. Documents where Mr. Rainey is merely a passive recipient (or not a participant at all), rather than an active participant, cannot be in "furtherance" of the crime set forth in the plea allocution. (These documents will be placed into Categories B and D). Documents where Mr. Rainey participates, but not on a topic that relates to matters to which BP pleaded guilty, also cannot meet the crime-fraud standard. (These documents will be found in Category C). Documents that post-date the communication to which BP pleaded guilty or that concern an aspect of the communication that was not the subject of BP's guilty plea also cannot meet the crime-fraud standard (Category E).

Accordingly, BP's upcoming submission will provide for purposes of *in camera* review all previously withheld documents logged as relating to the May 24 Markey response and will place each of those documents into one of the five categories (A through E). BP respectfully requests that, before reaching a decision that the crime-fraud exception applies to a particular document, the Court conduct an individualized *in camera* review of the document. BP is especially confident that documents falling within Categories B through E will not be deemed "in furtherance" of any crime or fraud to which BP has pleaded guilty.

      **2.**      **The United States Is Not Entitled to All Documents Merely "Related to" Preparation of BP's June 25 Communications with Congress.**

With respect to the June 25 letter at issue in BP's allocution, only communications in which Mr. Rainey was an active participant and that relate to matters to which BP allocuted respecting the June 25 letter arguably fall within the crime-fraud exception. As before, these documents will be placed into Category A.

Specifically, with respect to the June 25, 2010 letter, BP documents will be placed into Category A to the extent Mr. Rainey was an active participant in the communication and the document relates to whether "BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.'" *Id.* ¶ 6. On the other hand, documents falling outside this description (hence outside Category A) would not constitute communications "in furtherance" of a crime or fraud under applicable legal standards.

Accordingly, BP's upcoming submission will provide for purposes of review *in camera* all previously withheld documents logged as relating to the June 25, 2010, letter, placed into one of the five Categories A through E. BP respectfully requests that, before reaching a decision that a particular document falls within the crime-fraud exception, the Court conduct an individualized

*in camera* review of that document.  Here, again, BP is especially confident that the documents falling within Categories B through E will not be deemed "in furtherance" of any crime or fraud to which BP has pleaded guilty (especially considering that no crime related to the June 25 letter was even charged, let alone formed part of BP's guilty plea).

> **3.     The United States Is Not Entitled to All Documents Merely "Related to" Preparation of BP's May 19, 2010 Email to Admiral Landry and Its Attachments.**

BP did not plead guilty to any false statements made to Admiral Landry on May 19, 2010.  Nonetheless, the email sent to Admiral Landry on May 19 was included as an attachment to the May 24 letter to Congressman Markey.  In certain instances, the email might be construed to cover topics that were the subject of BP's guilty plea.

Against this backdrop, BP intends to log and categorize those documents that have a reasonable relation to the preparation of the email to Admiral Landry sent on May 19, 2010.  To the extent particular documents in this group include specific statements that (i) formed a basis for BP's guilty plea allocution as regards the May 24, 2010 and June 25, 2010 letters, and (ii) appear in the May 19, 2010 communication to Admiral Landry, these documents will be placed into Category A.  To the extent logged documents do not include statements satisfying both of these criteria, they will be placed into Categories B through E, as appropriate.

BP's upcoming submission will provide for purposes of *in camera* review all previously withheld documents logged as relating to the May 19 note, divided into Categories A through E. As before, BP requests *in camera* review before any determination is made that a particular document should be regarded as "in furtherance" of a crime or fraud.  And once again, BP is especially confident that documents falling within Categories B through E will not be deemed "in furtherance" of any crime or fraud to which BP has pleaded guilty.

### III.    BP Will Cooperatively Provide Logs and Documents for *In Camera* Review.

As noted, BP will soon provide the Court with privilege logs for each of the United States' requests for sets of documents.  Three of those logs—namely, the logs listing document sets related to the May 24 letter, June 25 letter, and May 19 note that arguably are implicated by BP's guilty plea allocution—will contain the A-through-E categorization scheme described above.  All documents on these three logs will be submitted for potential *in camera* review in the event that the Court should determine such review is appropriate.  Moreover, in addition to the sets for the May 24 and June 25 letters, and the May 19 note, BP is also in the process of logging communications related to the two sets sought by the United States that are not implicated by the guilty plea allocution; namely, the sets related to SEC filings and the May 4 congressional briefing session.  These two logs will be provided solely to the Court *in camera* as helpful background in view of the fact that the United States has entirely failed to establish a *prima facie* case as to any documents in these final two sets.  Accordingly, the logs relating to these document sets will not reflect the A-through-E categorization scheme, and no documents from these two sets will be submitted for review *in camera*.

BP would emphasize in closing that a careful, document-by-document, *in camera* review is essential before a determination can be made that the crime-fraud exception applies to any particular document.  *LRC Electronics, Inc. v. John Mezzalingua Associates, Inc.*, 974 F. Supp. 171, 180 (N.D.N.Y. 1997) (finding, after "carefully reviewing" documents *in camera* the documents did "not fall within the crime-fraud exception").  It would be remarkable—and noticeably out of step with this Court's patience and practices in similar circumstances—to pierce BP's privilege without first conducting a searching examination.

24

BP acknowledges that the Court might conclude that the crime-fraud exception applies to some or all documents in Category A.  And, without waiving any of its privilege assertions, BP can say that—should the Court so conclude—it would expect not to assert its procedural right to submit further evidence or argument as regards to the privilege status of those particular documents.  As for documents logged within Categories B through E, however, BP trusts the Court will conclude (as BP has) that the United States has not carried its burden, and these documents ought not be disclosed.  Nevertheless, to the extent the Court were to question the privilege status of one or more documents in Categories B through E, BP would work with the Court to determine appropriate next steps and follow-on procedures, consistent with the due process principles set forth in **Part I.C**, *infra*.

## <u>CONCLUSION</u>

BP hopes its accommodative efforts, along lines similar to what BP had been planning to discuss in meet-and-confer discussions, will be acceptable to the United States and lay to rest the issues raised by the United States' motion.  To the extent BP's offer does not resolve the issues presented by the motion, BP respectfully requests that the United States' Motion to Compel Production of Previously-Withheld Documents Pursuant to the Crime-Fraud Exception to the Attorney-Client Privilege be denied as explained herein.

Dated:     February 28, 2013                    Respectfully submitted,


                                                /s/ Don K. Haycraft
Robert R. Gasaway                               Don K. Haycraft (Bar #14361)
Jeffrey Bossert Clark                           R. Keith Jarrett (Bar #16984)
Aditya Bamzai                                   Liskow & Lewis
Kirkland & Ellis LLP                            701 Poydras Street, Suite 5000
655 Fifteenth Street, N.W.                      New Orleans, LA 70139
Washington, D.C. 20005                          Telephone:  504 -581-7979
Telephone:  202- 879-5000                       Facsimile:  504 -556-4108
Facsimile:  202- 879-5200


                                                Richard C. Godfrey, P.C.
Joel M. Gross                                   J. Andrew Langan, P.C.
Brian Israel                                    Kirkland & Ellis LLP
Allison Rumsey                                  300 North LaSalle Street
Arnold & Porter LLP                             Chicago, IL 60654
555 Twelfth Street, NW                          Telephone:  312- 862-2000
Washington, D.C.  20004-1206                    Facsimile:  312- 862-2200
Telephone:  202- 942-5000
Facsimile:  202- 942-5999
                                                Robert C. "Mike" Brock
                                                Covington & Burling LLP
                                                1201 Pennsylvania Avenue, NW
                                                Washington, D.C. 20004
                                                Telephone:  202-662-5985
                                                Facsimile:  202-662-6291


            *Attorneys for BP Exploration & Production Inc.*


                                26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February 2013.


/s/ Don K. Haycraft
Don K. Haycraft