UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | JUDGE BARBIER |
| | MAGISTRATE SHUSHAN |
| This Document applies to: *All Transocean Answers as Set Forth on the Attached Exhibit "A"* | |

**TRANSOCEAN'S SUPPLEMENTAL ANSWER AND AFFIRMATIVE DEFENSES**

Defendants Transocean Offshore Deepwater Drilling, Inc. ("TODDI"), Transocean Deepwater Inc. ("TDI"), Transocean Holdings LLC ("TH") and Triton Asset Leasing GmbH ("Triton") (collectively "Transocean" or "Transocean Defendants") and, pursuant to Rule 15(d) of the FEDERAL RULES OF CIVIL PROCEDURE, files this its Supplemental Answer; this Supplemental Answer adds to and/or supplements Transocean's answers listed on Exhibit "A"; and does hereby supplement Transocean's Answers listed on Exhibit "A" as follows:

I.

To add a separate defense of "**Intervening and Superseding Cause**" and paragraphs 1-157, set forth below:

**"Intervening and Superseding Cause**

1. The injuries and resulting damages alleged to have been sustained by the Plaintiff and/or Claimant resulted from a superseding or intervening cause for which the Transocean Defendants are not responsible.

2. On January 29, 2013, U.S. District Judge Sarah S. Vance accepted BP's plea of guilty to a violation of 18 U.S.C. § 1505 (Obstruction of Congress). (Ex. A ("BP Plea Agreement").) BP's guilty plea confirmed that BP made misrepresentations to the United States Government regarding the flow rate from the Macondo well. BP's admission that it misrepresented the flow rate constitutes not only criminal conduct, but tortious conduct as well. As more fully described below, BP fraudulently misrepresented and concealed flow rate and source control information from those who were working to stop the flow of oil from the Macondo well. Because BP's misconduct with respect to flow rate impeded efforts to contain and cap the Macondo well, BP's tortious acts constitute the superseding and intervening cause of oil flowing from the well for 87 days instead of a much shorter period of time.

3. The Securities and Exchange Commission ("SEC") also filed a complaint against BP based on BP's misrepresentations about the flow rate. (Ex. B (*SEC v. BP p.l.c.*, Civil Action No. 12-2774 (E.D. La.) (filed Nov. 15, 2012)) ("SEC Complaint").) BP has agreed "to comply with the Commission's policy 'not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint . . . .'" (Ex. C (Civil Action No. 12-2774, Rec. Doc. 2-1 ¶ 13).) BP accordingly agreed "not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint . . . ." (*Id.*) In the same paragraph in which BP agrees not to deny or make public statements denying the allegations in the SEC Complaint, it is also stated that: "Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party." (*Id.*)

4. BP's criminal acts were also extraordinarily negligent. BP's negligence here constitutes an intervening and superseding cause of the alleged harm.

5. Transocean did not, could not, and should not have realized that BP would act negligently with respect to the source control efforts and its flow rate representations. Additionally, a reasonable person knowing the situation that existed when BP acted negligently would consider it highly extraordinary that BP acted in this manner. BP's negligent source control effort and flow rate representations were not a normal consequence of a situation created by any negligence of Transocean. Moreover, the manner in which BP conducted the source control effort and represented the flow rate rises to the level of extraordinary negligence.

6. BP's acts of fraud, misrepresentation, omission, and its crimes in connection with efforts to estimate the flow rate and control the source of the flow also were a superseding and intervening cause of the alleged harms.

7. On or before April 22, 2010, Transocean did not realize, could not have realized, and should not have realized the likelihood that any negligence by Transocean would create a situation that would afford BP an opportunity to commit intentional torts and crimes. Transocean also did not realize at the time, nor should it have realized that BP might avail itself of the opportunity to commit intentional torts and crimes. As described below, BP's criminal and fraudulent acts were extraordinary and unforeseeable.

8. Transocean alleges intervening and superseding cause as an affirmative defense. The burden of proving causation is on the Plaintiff and/or Claimant. The Plaintiff's and/or Claimant's causation burden includes the burden of showing that the conduct of other parties (aside from Transocean) was not an intervening or superseding cause of the Plaintiff's and/or Claimant's alleged damages. By setting forth this affirmative defense, Transocean does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to the Plaintiff and/or Claimant.

9. Moreover, Transocean below pleads fraud with particularity. By pleading fraud with particularity, Transocean does not concede that it is Transocean's burden to allege or prove fraud.

***BP Misrepresented And Concealed Material Flow Rate Information***

*BP's April 2010 Misrepresentations*

10. In April 2010, Doug Suttles was the Chief Operating Officer of BP's Exploration & Production business, BP's lead representative at Unified Command, and the leader of BP's overall response to the Macondo spill. Suttles is referred to as "Former Senior Executive B" in the SEC Complaint.

11. In April 2010, Admiral Mary Landry was the United States Government's Federal On Scene Coordinator. In that role, Admiral Landry was the lead federal official for response operations in connection with the Macondo spill. As detailed below, Admiral Landry relied on BP to, among other things, provide her with its flow rate modeling and its best estimates of the flow rate.

12. On April 28, 2010, Suttles represented to Admiral Landry in a meeting at Unified Command that BP's internal flow rate estimate was between 1,000 and 5,000 barrels of oil per day ("bopd"), with 2,500 bopd being the most likely flow rate number. (Ex. B (SEC Complaint) ¶ 20; [redacted])

13. The following day – April 29, 2010 – BP's Suttles appeared on ABC's "Good Morning America," CBS's "Early Show," and NBC's "Today Show." Suttles stated that BP's

best estimate of the flow rate was between 1,000-5,000 bopd. (Ex. B (SEC Complaint) ¶ 32.A. (quoting Suttles as stating on "Good Morning America": "So I think something between one and 5,000 barrels a day is a reasonable estimate."); Ryan Owen, Sarah Netter, and Ned Potter, *Oil Leak in Gulf Worse Than Estimated, BP Takes Some Responsibility*, abcnews.com (April 29, 2010), http://abcnews.go.com/GMA/Eco/oil-spill-gulf-mexico-severe-estimated-bp-confirms/story?id=10506409 (last visited Feb. 26, 2013) ("Suttles told 'Good Morning America' he still believes it to be between 1,000 barrels -- the company's original estimate -- and 5,000."); Ex. B (SEC Complaint) ¶ 32.B. (quoting Suttles on the "Early Show": "So, I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today."); *BP Exec: We'll Accept Military Help to Stem Leak*, cbsnews.com (April 29, 2010), http://www.cbsnews.com/8301-500202_162-6443358.html (last visited Feb. 26, 2013); Ex. B (SEC Complaint) ¶ 32.C. (quoting Suttles on the "Today Show": "I would say the range is 1,000 to 5,000 barrels a day."); *BP welcomes military help for oil leak*, neworleanscitybuisness.com (April 29, 2010), http://neworleanscitybusiness.com/blog/2010/04/29/bp-welcomes-military-help-for-larger-gulf-oil-leak/ (last visited Feb. 26, 2013) (quoting Suttles on the "Today Show" stating "we can now say it looks like it's more than a thousand. It's a range" and placing the upper end of the range at 5,000 bopd).)

14. On April 29 and again on April 30, 2010, BP submitted Form 6-K's to the Securities and Exchange Commission that stated the flow rate was "currently estimated at up to 5,000 barrels a day." (Ex. B (SEC Complaint) ¶¶ 21-22; Ex. D (BP-HZN-2179MDL06640036 (BP Form 6-K for the period ended 30 April 2010).) On April 30, 2010, BP published this same information on its website. (Ex. B (SEC Complaint) ¶ 23.)

15. BP's April 28-30, 2010 representations that its range of flow rate estimates was between 1,000 and 5,000 bopd were false and misleading and omitted material information within BP's possession.

16. The SEC Complaint alleges the following regarding the flow rate representations BP made in the Form 6-K's and on its website – i.e., the same representations BP made to Admiral Landry on April 28, 2010 and in the press on April 29, 2010:

- The information was "materially false and misleading" (Ex. B (SEC Complaint) ¶ 23.)
- "When BP made the statements [to the SEC and on its website], it knew them to be false or was severely reckless in not knowing them to be false." (*Id.* ¶ 24.)
- "By April 28, 2010, BP possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 bopd." (*Id.*)
- "Given that BP possessed data, estimates, and calculations significantly above the 5,000 bopd figure, to publicly disclose . . . that the flow rate was estimated as 'up to 5,000' bopd was materially false and misleading. Failing to disclose even the existence of data, estimates, and calculations that showed a higher flow rate also constituted omissions of material information regarding the flow rate." (*Id.* ¶ 26.)

17. In short, the SEC Complaint alleges that when BP represented in late April 2010 that the flow rate was between 1,000-5,000 bopd, BP was making statements that were materially false and misleading.

18. As detailed in the following paragraphs, when BP represented between April 28-30, 2010 that the flow rate was 1,000-5,000 bopd, it failed to disclose multiple data, estimates, and calculations that showed flow rates well above 5,000 bopd.

19. On April 21, 2010, BP employee Walt Bozeman emailed a group of BP employees, including BP executive David Rainey, that he had "modeled a flow rate at the sea floor (assuming riser falls) in Prosper [a modeling program] . . . ." As a result of this modeling the group calculated a "worst case discharge" (WCD) number of 100,000 barrels of oil per day. (Exs. 3, 4, 5 (Dep. Exs. 3063, 3372, 5239); *see also* Ex. 6 (Dep. Ex. 10855 (email from [redacted]

on same date to BP employees [REDACTED] attaching slide showing [REDACTED]
[REDACTED]
[REDACTED]).)

20. "By April 22, 2010," as alleged in the SEC complaint, "a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates between 64,000 bopd and 146,000 bopd." (Ex. B (SEC Complaint) ¶ 24.A.)

21. On April 24, 2010, BP employee [REDACTED] sent to BP employees [REDACTED] [REDACTED] and BP contractor [REDACTED] [REDACTED] [REDACTED] (Ex. 7 (BP-HZN-2179MDL04938144).)

22. "On or before April 24, 2010," as the SEC has alleged, "BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of approximately 100,000 bopd." (Ex. B (SEC Complaint) ¶ 24 B.)

23. On April 26, 2010, BP employee [REDACTED] sent an [REDACTED] [REDACTED] [REDACTED] [REDACTED] (Ex. 8 (BP-HZN-2179MDL00445569).)

24. On April 26, 2010, notes from a BP teleconference indicate that [REDACTED] [REDACTED] [REDACTED] [REDACTED] [REDACTED] (Ex. 9 (Dep. Ex. 5063); [REDACTED]

25. In response to this email, on April 28, 2010 BP employee [REDACTED] emailed BP executives [REDACTED] among other BP employees, stating: [REDACTED] He sent an attachment called [REDACTED] (Ex. 9 (Dep. Ex. 5063).)

26. On April 27, 2010, BP meeting notes contained an instruction to "[s]end Doug a summary of flow rate calculations based on well head pressure vs. orifice size." (Exs. 11, 12 (Dep. Exs. 1626, 2416).) On April 27, BP employees [REDACTED] among other BP employees, calculated flow rates based on various orifice sizes. They reported [REDACTED] (Exs. 13, 14, 15 (Dep. Exs. 10180, 9439, 9445).) As alleged in the SEC complaint, "[o]n April 27, 2010, a BP engineer estimated the flow to be approximately 5,000 to 22,000 bopd on the basis of temperature readings along the riser pipe, among other factors." (Ex. B (SEC Complaint) ¶ 24.D.)

27. On April 27, 2010, BP executive [REDACTED] emailed to BP employee [REDACTED] a number of estimated flow rates based on "oil on water" visual estimations. These estimates included [REDACTED] (Ex. 16 (Dep. Ex. 3213).) As BP admitted in the Plea Agreement, BP withheld this information from its May 24, 2010 submission to the United States House of Representatives Committee on Energy and Commerce. (Ex. A (BP Plea Agreement) Ex. A ¶ 2.) BP also withheld these estimates from Admiral Landry, the press,

and the public when it represented that the flow rate was between 1,000-5,000 bopd in late April 2010.

28.  (Ex. 17 (Dep. Ex. 8942); *see infra* at ¶ 30; Ex. 18 (BP-HZN-2179MDL05688699-735) at 700-713.)

29. "By April 28, 2010," according to the SEC Complaint, "Former Senior Executive A's spreadsheets showed a flow rate ranging from 1,000 bopd to over 14,000 bopd." (Ex. B (SEC Complaint) ¶ 24.E.) "Former Senior Executive A" was BP's David Rainey.

30. (Ex. 19 (Dep. Ex. 10489).)

31. As alleged in the SEC complaint, "[o]n April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates from 5,000 bopd to 40,000 bopd." (Ex. B (SEC Complaint) ¶ 27.A.)

32. BP's knowledge of these flow rate estimates, data, calculations, and analysis made its representations between April 28-April 30, 2010 that the flow rate was between 1,000-5,000 bopd false and misleading. By neglecting to disclose this flow rate information, BP also concealed and withheld material information.

*BP's May 10 Misrepresentation That 5,000 BOPD Was Its "Most Likely Model" And "Current Estimate"*

33. On May 10, 2010, BP's Suttles reassured Admiral Landry that 5,000 bopd remained BP's best estimate of the flow rate. In a letter [redacted] (Ex. 20 (Dep. Ex. 9155).) BP thus represented to Admiral Landry, Admiral Allen, and Herbst on May 10, 2010 that 5,000 bopd was BP's current best estimate of the flow rate.

34. When BP represented to Admiral Landry, Admiral Allen, and Herbst on May 10 that 5,000 bopd was BP's [redacted] and was the [redacted] BP was aware of, but failed to disclose, the flow rate information set forth above in paragraphs 19-33 and that BP had in its possession by the end of April 2010.

35. BP also failed to disclose to Admiral Landry, Admiral Allen, and Herbst additional material flow rate information that it had obtained between May 1 and May 10, 2010, including the following.

36. On May 1, 2010, BP employee [redacted] sent to BP employees [redacted] an attachment called [redacted] which contained oil flow rates for nine cases at various reservoir parameters. [redacted]

[redacted] (Ex. 21 (Dep. Ex. 11160); *see also* Ex. 22 (Dep. Ex. 11135).)

37. On May 2, 2010, BP employee [redacted] and BP employee [redacted] calculated flow rates for different simulations that they entitled [redacted] These situations represented different flow paths. Flow rates calculated at [redacted] ranged from [redacted] (Ex. 23 (Dep. Ex. 10185).) On May 7, 2010, [redacted] emailed updated [redacted] to BP employees [redacted] in response to a request [redacted] (Ex. 24 (Dep. Ex. 11136).)

38. On May 3, 2010, BP employee [redacted] sent to BP employee [redacted] an email with the subject [redacted] (Ex. 25 (Dep. Ex. 9446).)

39. On May 6, 2010, BP executive [redacted] requested worst case discharge plots from BP employee [redacted] (via BP employee [redacted]). She provided plots with flow rates at [redacted] (Ex. 26 (Dep. Ex. 9157).)



40. At [redacted] request, [redacted] then ran additional cases at [redacted] She forwarded those to him with the comment, [redacted] (Ex. 27 (Dep. Ex. 9158); *see also* Ex. 28 (Dep. Ex. 9294) [redacted]) [redacted] (*See supra* at ¶ 33.)

41. On May 8, 2010, [redacted] sent to [redacted] a report entitled [redacted] This report purported to [redacted] The report stated that [redacted] (Ex. 29 (Dep. Ex. 9441).)

42. On May 9, 2010, BP contractor [redacted] emailed BP employee [redacted] an email with the subject line [redacted] This email attached a table of blowout rates showing rates [redacted] (Exs. 30, 31, 32 (Dep. Exs. 9266, 9240, 9159); *see also* Ex. B (SEC Complaint) ¶ 27.C.)

43. On May 10, 2010, BP contractor [redacted] emailed to BP employees and contractors [redacted] that [redacted]

[REDACTED] (Exs. 33, 34 (Dep. Exs. 8866, 10798); *see also* Ex. B (SEC Complaint) ¶ 27.D.)

44. BP's knowledge of these flow rate estimates, data, calculations, and analysis obtained by BP on or before May 10, 2010 made its representations on May 10, 2010 that the [REDACTED] of the flow rate and [REDACTED] flow rate was 5,000 bopd false and misleading. By neglecting to disclose this flow rate information to Admiral Landry, Admiral Allen, and Herbst, BP also concealed and withheld material information.

45. The SEC has alleged that in connection with a May 4, 2010 Form 6-K filing, "BP omitted . . . the material fact that, by this date, its own engineers and scientists had generated or received at least six pieces of data, estimates and calculations regarding flow rate estimates that far exceeded 5,000 bopd. BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 bopd was the best estimate of the amount of oil flowing into the Gulf of Mexico." (Ex. B (SEC Complaint) ¶ 31.)

46. Nothing that BP learned between May 4 and May 10, 2010 made Suttles' May 10 representation to Admiral Landry and her colleagues that 5,000 bopd was the [REDACTED] any more true than it was on May 4.

*BP's Misrepresentations And Failure To Disclose Flow Rate Information To The National Labs*

47. On May 13, 2010 at 8:00 a.m., BP employees met with employees of certain National Laboratories ("National Labs") to discuss a BP request for calculations from the National Labs confirming BP's calculations of flowing bottom-hole pressures and flow rates. There is no evidence that BP shared with the National Labs personnel all of the reservoir modeling and visual flow rate calculations BP had performed up until that date.

48. After the 8:00 a.m. meeting, BP's [REDACTED] emailed his supervisor, [REDACTED] about [REDACTED] At the end of his email, [REDACTED] told [REDACTED] [REDACTED] (Ex. 35 (Dep. Ex. 9326).). [REDACTED]

49. That same day, May 13, NPR and CNN reported that a professor from Purdue University, Steve Wereley, had examined videos of the flow and had estimated a flow rate of approximately 70,000 bopd.

50. At about 12:00 p.m. on May 13, BP's [REDACTED] met with National Labs' employees. According to [REDACTED] draft summary from the meeting, [REDACTED] (Ex. 37 (Dep. Ex. 10793).)

51. As BP's Mike Mason has acknowledged, however, BP could provide a scenario which supported Professor Wereley's estimate of 72,000 barrels per day if the assumed flow path was up the inside of the casing rather than up the annular space. [REDACTED] (Ex. 37 (Dep. Ex. 10793) (emphasis added).)

52. BP's [redacted] also recorded in his notes from this meeting that [redacted] (*Id.*)

53. There is no evidence that [redacted] or anyone else from BP advised the National Labs scientists in these meetings that BP had calculated and estimated flow rates far in excess of 5,000 bopd. In particular, [redacted] and BP failed to disclose the flow rate estimates, calculations, data, and analysis obtained by BP through May 10, 2010.

54. In addition, on May 11, 2010, BP contractor [redacted] emailed to BP employee [redacted] slides regarding [redacted] which illustrated three scenarios of flow rates. [redacted] (Ex, 38 (Dep. Ex. 9267).)

55. On May 11, 2010, BP employee [redacted] sent to [redacted] a slide deck summarizing his group's flow rate modeling. [redacted]



(Ex. 39 (Dep. Ex. 9156) at 8.)

56. On May 13, 2010, responded to an inquiry from in which he requested (Ex. 40 (Dep. Ex. 9448).)

57. There is no evidence that BP disclosed these additional flow rate facts that BP learned between May 11, 2010 and May 13, 2010 to the National Labs scientists when In light of what BP knew, BP's representations were false and misleading. By neglecting to disclose this flow rate information to the National Labs, BP also concealed and withheld material information.

*BP Employees' Concerns In Mid-May About The 5,000 BOPD Estimate*

58. On May 14, 2010, BP's Doug Suttles again appeared on the morning talk shows defending the 5,000 bopd estimate. He told "Good Morning America" viewers: "But ourselves and people from NOAA and others believe that something around 5,000, that's actually barrels a day, is the best estimate." Asked if the well might be leaking more than 5,000 bopd on the "Today Show," Suttles responded that he did not believe the actual number was "wildly different" from 5,000 bopd though "it could be a bit above or below." ((Ex. B (SEC Complaint) ¶ 32.D-E; Jeffrey Kofman, *BP Oil Spill Day 25: How Much Is Really Leaking?*, abcnews. com (May 14, 2010), http://abcnews.go.com/GMA/oil-leak-day-25-oil-spilling-gulf-mexico/story?id=10642498

(last visited Feb. 26, 2013); *BP COO: We'll find who's at fault*, today.com (May, 14, 2010), http://www.today.com/video/today/37147007#37147007 (last visited Feb. 26, 2013).) In his appearances, Suttles did not disclose the numerous flow rate estimates, calculations, and analysis in BP's possession that were substantially higher than 5,000 bopd or that 5,000 bopd was in fact not BP's best estimate of the flow rate. Suttles' comments on May 14, 2010 were false, misleading, and omitted material information.

59. By mid-May, BP's [redacted] had reached a very different conclusion from what Suttles was representing to Admiral Landry, Herbst, and the press. [redacted]

[REDACTED]

60. Others within BP were raising doubts about whether BP should be standing behind the 5,000 bopd estimate. On May 15, 2010, BP senior engineer Mike Mason, [REDACTED] read an article on CNN.com in which BP continued to assert publicly that the flow rate estimate was 5,000 bopd, despite Professor Wereley's estimate that the flow rate was approximately 70,000 bopd.

61. After reading the article, Mason wrote the following e-mail to Andy Inglis (the CEO of BP's Exploration & Production business and a member of BP, P.L.C.'s Board of Directors) and Inglis's assistant Jasper Peijs:

> I just read an article in CNN (May 14, 2010 1:00pm) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd figure. With the data and knowledge we currently have available we cannot definitively state the oil rate from this well. We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the [blow out preventer] and sealed by [variable bore] rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

(Ex. 41 (Dep. Ex. 3220 (emphasis added); Ex. B (SEC Compl.) ¶ 33.)

62. The SEC has alleged that Mason's "e-mail failed to spur a discussion regarding whether BP should update or correct the disclosures in its three Reports on Form 6-K." Ex. B (SEC Compl.) ¶ 34.)

63. In fact, rather than Mason's email spurring discussion about whether to correct BP's fraudulent disclosures, BP executives shut down further discussion or investigation, and never conveyed Mason's concerns to the United States.

64. After Mason sent his May 15, 2010 email to Inglis and Peijs warning that BP "should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd," (Ex. 41 (Dep. Ex. 3220)), [REDACTED] (Ex. 36 (Mason Dep.) at 320:1-321:12.)

65. [REDACTED]

66. There is no evidence that Mason's email, his concern about "standing behind a 5,000 bopd figure" or the assumptions that had to be made to support a 5,000 bopd case, or the fact that "modeling shows that this well could be making anything up to ~100,000 bopd" were shared with representatives of the United States Government who were involved in source control decision-making or in attempts to estimate flow rates.

67. On May 16, 2010, BP's [REDACTED] asked BP's [REDACTED] for information regarding the measured rate of oil being collected through the Riser Insertion Tube Tool ("RITT"). [REDACTED] responded: [REDACTED] (Ex. 42 (Dep. Ex. 9474).)

68. The following day, another BP employee, [REDACTED] emailed [REDACTED] and a BP consultant named [REDACTED] seeking information from the RITT effort. [REDACTED] (Ex. 43 (Dep. Ex. 9475).) [REDACTED]

69. [REDACTED] responded on May 17: [REDACTED] (Ex. 43 (Dep. Ex. 9475) at 3.)

70. On May 16, BP contractor [REDACTED] emailed BP's [REDACTED] and [REDACTED] noting that his analysis of recent data [REDACTED] (Ex. 44 (Dep. Ex. 10655) (emphasis added).)

71. [REDACTED] May 16 email was forwarded to BP's [REDACTED] On May 17, [REDACTED] emailed a BP colleague, [REDACTED] expressing his concerns in writing about the 5,000 bopd estimate: [REDACTED]



(Ex. 44 (Dep. Ex. 10655).)

72. As explained above, BP's himself did not believe in the 5,000 bopd estimate and (*Id.*)

73. On May 17, 2010 at a Unified Command press briefing, Doug Suttles was asked if he was "certain how much is actually leaking and that it is about that 5,000-barrel figure we used to hear before." In his response, Suttles once again defended the 5,000 bopd as "our best estimate today." (Ex. B (SEC Complaint) ¶ 32.F.) Suttles did not disclose the numerous flow rate estimates, calculations, and analysis in BP's possession that were substantially higher than 5,000 bopd. He also did not share the concerns that had been expressed by about the 5,000 bopd estimate. Suttles likewise did not disclose Suttles' comments on May 17, 2010 were false, misleading, and omitted material information.

*BP's May 19 Misrepresentation To Admiral Landry*

74. On May 19, 2010, in response to a request from the FOSC and NIC, BP executive Doug Suttles sent Admiral Landry, Admiral Allen, Admiral James Watson, and Admiral Peter Neffenger a memo purporting to summarize "our most recent work on flow rate estimation." The memo stated that using a technique known as "mass balance," BP's "Best guess was between 5,000 and 6,000 barrels per day." The memo provided "an updated range of possible flow rates" that suggested BP had a new best guess estimate of 6,000 barrels per day. This memo was authored by BP executive David Rainey. (Ex. 45 (Dep. Ex. 3218).)



10182228

75. The Rainey memo and the attachments to that memo were also included in BP's May 24, 2010 response to questions issued by Congressman Edward J. Markey, the Chairman of the House Committee on Energy and Commerce's Subcommittee on Energy and Environment ("Markey Response"). (Ex. 46 (Dep. Ex. 1651) at 14.) In its guilty plea, BP admitted to making "omissions and false and misleading statements" in the Markey Response, including:

- "BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD."
- "BP, through a former vice president, withheld information and documents relating to internal flow–rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD."

(Ex. A (Plea Agreement), Ex. A at ¶¶ 1-2.

76. The same facts BP admitted to withholding from Congress when BP sent the Rainey memo to Chairman Markey were also withheld by BP when it transmitted the Rainey memo to Admiral Landry and her colleagues on May 19, 2010.

77. In addition to what BP has admitted to withholding from the Markey Response, BP withheld numerous additional facts when it sent the Rainey memo to Admiral Landry and her colleagues with the representation that it was BP's "most recent work on flow rate estimation," including:

a. In the section describing "Maximum Discharge Calculations," the memo omitted reference to the [REDACTED] [REDACTED] as described *supra* para. 30.

b. In that same section, the memo omitted reference to the [REDACTED] team's analysis as described *supra* paras. 36-37. Instead, it represents only that the "[a]bsolute worst cases with wellhead and BOP removed, and no downhole restrictions," are "[a]nnular flow – 55,000 barrels per day" and "[c]asing flow – 100,000 barrels per day." The memo fails to

report that [REDACTED]

The memo failed to attach the modeling and slides performed by the team and described *supra* at paras. 36-37, 55.

c. The memo omitted reference to [REDACTED] estimations of [REDACTED] that range from [REDACTED] as described *supra* at para. 42.

d. The memo omitted reference to the [REDACTED] and [REDACTED] estimations of flow rates of [REDACTED] described *supra* at para. 25.

e. The memo omitted reference to the [REDACTED] calculations of a [REDACTED] described *supra* at para. 38.

f. The memo omitted reference to [REDACTED] as described *supra* para. 59.

g. The memo omitted reference to [REDACTED] estimate of a flow rate of up to [REDACTED] as described *supra* para. 43.

h. The memo omitted reference to [REDACTED] warnings that reliance on the 5,000 bopd estimate was [REDACTED] as described *supra* para. 71.

i. The memo omitted reference to Mike Mason's concern that BP "should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables," as described *supra* para. 66.

*BP's Flow Rate Misrepresentations In The Week Leading Up To The Top Kill*

78. BP's Doug Suttles appeared on "Good Morning America" on May 21, 2010 and was asked if BP had "deliberately underestimate[d] the size of the spill and mislead the public." In his response, Suttles once again represented that the 5,000 bopd estimate was "not just BP's estimate" and was "the best estimate we have." (Ex. B (SEC Complaint) ¶ 32.G; Lee Ferran, *BP Official: EPA Approved 'Toxic' Dispersant*, abcnew.com (May, 21 2010), http://abcnews.com/GMA/Media/oil-spill-bp-official-epa-approved-toxic-dispersant/story?id=10708060 (last visited Feb. 26, 2013).)

79. Suttles also labeled the 5,000 bopd estimate "our best estimate" at a Unified Command press briefing on May 21, 2010. (Ex. B (SEC Complaint) ¶ 32.H.)

80. Appearing on NPR's "Weekend Edition" on May 22, 2010, Suttles once again referred to 5,000 bopd as a "best estimate." The interviewer asked Suttles: "let's say that it's 30,000 barrels a day that are spilling." In his response, Suttles stated: "we don't think the rate's anywhere near that high." (Ex. B (SEC Complaint) ¶ 32.Q; *BP Head Disputes Oil Estimates*, npr.com (May 22,2010), http://www.npr.org/templates/story/story.php?storyId=127054190 (last visited Feb. 26, 2013).)

81. The representations that BP made through Doug Suttles on May 21 and May 22 were false and incomplete. Once again, BP chose not to share numerous flow rate estimates, calculations, and analysis in BP's possession that were substantially higher than 5,000 bopd. BP

also did not disclose the concerns that had been expressed by [redacted] about the 5,000 bopd estimate.

82. On May 24, 2010, BP provided its Markey Response to Congress. In response to Chairman Markey's request for the "current amount of oil flowing from the well," BP's letter represented that based on calculations performed by Unified Command, "[t]he resulting calculation ranges from about 1,000 barrels per day to roughly 15,000 barrels per day, with the most scientifically-informed judgment suggesting a best guess of roughly 5,000 barrels per day." (Dep. Ex. 1651.) The response also stated that "[s]ubsequent estimates of flow rate have been carried out within Unified Command and have yielded consistent results." (Ex. 46 (Dep. Ex. 1651).) The letter failed to disclose numerous flow rate estimates, calculations, and analysis that yielded results that were inconsistent with and much higher than the 5,000 bopd estimate. BP has pled guilty to misleading Congress in its Markey Response.

83. The SEC Complaint alleges that:

- From "April 30, 2010, until May 24, 2010, BP generated or was aware of eleven additional pieces of data, estimates, and calculations showing a range of flow rates significantly higher than 5,000 bopd." (Ex. B (SEC Complaint) ¶ 27.)

- "These eleven additional pieces of data, estimates, and calculations strongly indicated that the range of flow rate was in excess of 5,000 bopd. None of the additional pieces of data, estimates, and calculations suggested that 5,000 bopd was the current estimate of flow rate or that a flow rate of 5,000 bopd was the best estimate." (*Id.* ¶ 28.)

- Suttles, who repeatedly represented that the best flow rate estimate was 5,000 bopd, "received at least four of the eleven pieces of data, estimates, and calculations." (*Id.* ¶ 29.)

- The author of the Rainey memo had "received at least six of the eleven additional pieces of data, estimates, and calculations." (*Id.* ¶ 31.)

84. When BP understated the flow rate, it did so with an intent to defraud. As shown by the BP plea agreement, the SEC allegations, and the exhibits and testimony cited above, BP knew full well that the flow rate representations it made in April and May 2010 were fraudulent,

false, and misleading. As explained below, BP also knew that its misrepresentations involved information that was material, indeed critical, to source control decision-making. Likewise, BP understood that the flow rate information it failed to disclose would create an erroneous impression that was material to decision-makers.

85. BP had an obvious motive to minimize the flow rate. As alleged in the SEC Complaint, "Information regarding the rate of oil flowing from the well was material to BP's investors. The amount of oil spilled would inform any consideration of the costs of offshore and onshore spill response, claims for natural resource damage under the Oil Pollution Act of 1990 [33 U.S.C. § 2701 et seq.], penalties for strict liability under the Clean Water Act [33 U.S.C. § 1251 et seq.], as well as other potential liability arising from claims, lawsuits, and enforcement actions related to the explosion and the sinking of the Deepwater Horizon." (Ex. B (SEC Complaint) ¶ 6.)

86. In short, beginning in late April and continuing throughout May 2010, BP repeatedly represented to source control decision-makers, Congress, the press, and the public that 5,000 bopd was its best estimate of the flow rate. It withheld numerous documents, analysis, and estimates that would have allowed those outside BP to realize that BP's flow rate claims were misleading and fraudulent. BP's attempt to minimize the scope of the spill has now backfired on BP in the form of a criminal guilty plea and uncontested findings that BP violated federal securities laws. But the fallout from BP's flow rate misrepresentations did not begin, nor end, there. As we explain below, BP's flow rate misrepresentations directly impeded efforts to stop the flow of oil from the well and are therefore a key part of this case.

*BP's Misrepresentations And Omissions Were Relied Upon And Impeded Efforts To Control The Well*

87. The flow rate misrepresentations BP made to, and the flow rate information BP withheld from, source control decision-makers was material to efforts to cap and contain the flow of oil from the Macondo well. These decision-makers actually, reasonably, and justifiably relied on BP's repeated representations that the most likely or best estimate of the flow rate was only 5,000 bopd and on their belief that BP was not withholding material information about the flow rate. The success or failure of multiple source control efforts depended on the flow rate of oil from the Macondo well. Knowing that the top kill effort that ultimately failed at the end of May 2010 could not succeed if the flow rate was above 15,000 bopd, BP nevertheless recommended to the Government in mid-May that the top kill should be prioritized above another strategy that could have succeeded in capping the well. Because BP had misled Government decision-makers about the flow rate, they did not object to BP's flawed source control strategy. Had the alternative source control approach – known as the BOP-on-BOP – been attempted instead of the doomed top kill effort, the well could have been capped in mid-May, rather than in mid-July. In short, BP's tortious and criminal conduct caused the oil spill to last for two months longer than necessary.

88. BP's misrepresentations and omissions regarding the flow rate involved misleading decision-makers about material facts. [REDACTED] understanding the flow rate was important to evaluating numerous source control efforts including the Cofferdam, the top kill, and efforts to collect oil flowing from the well. [REDACTED]



89. Among the harms caused by BP's flow rate misrepresentations and omissions was the prioritization of the top kill and junk shot option – which failed in late May 2010 – over the BOP-on-BOP option – which could have succeeded in closing in the well in May 2010.

90. In early May 2010, two competing source control strategies were emerging as front-runners to become the focus of source control efforts in the middle and latter part of May: (1) a BOP-on-BOP option, and (2) a top kill and junk shot option.

91. The first option involved placing the BOP already onboard the Discoverer Enterprise vessel on top of the Deepwater Horizon BOP. Similar to the capping stack that eventually succeeded in shutting in the well in mid-July 2010, this BOP-on-BOP solution would stop the flow by closing rams in the Enterprise BOP stack.

92. The testimony of BP's corporate representative as well as contemporaneous documents establish that the BOP-on-BOP solution was [REDACTED] early May 2010. [REDACTED]

93. The second option of a top kill and, potentially, a junk shot would involve pumping mud and bridging materials through the Deepwater Horizon's choke and kill lines at a rate high enough to stop the flow of oil from the well.

94. On or about May 9, 2010, [redacted]

95. On or about May 11, 2010, [redacted] the Discover Enterprise vessel was repurposed from the BOP-on-BOP project to efforts to contain the flow of oil. [redacted]

96. When the Discover Enterprise was taken off of the BOP-on-BOP project based on BP's recommendation to prioritize the top kill, the Enterprise's BOP was nearly ready to be deployed on top of the Deepwater Horizon's BOP. (Ex. 54 (Transcript of Deposition of Robert Turlak, Nov. 6-7, 2012 ("Turlak Dep.")) at 360:23-361:8, 367:4-367:15; Ex. 55 (Transcript of Deposition of Geoff Boughton, Jul. 20-21, 2011) at 79:1-13.) BP employee [redacted] the leader of the BOP-on-BOP effort, wrote in a May 12, 2010 email: [redacted] (Ex. 56 (Dep. Ex. 10530).) As [redacted] explained more fully in a post-event email: [redacted] (Ex. 57 (Dep. Ex. 08542); *see also* (Ex. 58 (Dep. Ex. 5385) (timeline for installation of Enterprise BOP showing well being secured on May 11, 2010).)

97. The BOP-on-BOP was a more feasible and more effective alternative than the top kill strategy. [redacted]

10182228

[redacted] (Ex. 61 (ANA-MDL-000230538).) [redacted] Moreover, like the capping stack that eventually succeeded in shutting in the well in mid-July, the BOP-on-BOP option could be designed to vent hydrocarbons to the sea as the rams were being closed thereby mitigating any concerns related to the well's integrity. (Ex. 62 (Dep. Ex. 10528); Ex. 54 (Turlak Dep.) at 532:22-533:7.)

98. The BOP-on-BOP strategy also had the advantage of improving the likelihood of a successful top kill effort, if decision-makers decided not to close in the well right away. As scholars from Louisiana State University's Department of Petroleum Engineering explained, "Before attempting the top kill, responders should have considered installing equipment, like the capping stack, that could be used to contain enough pressure to shut-in the well." (Ex. 63 (Dep. Ex. 10543) at 23.) This advantage of the BOP-on-BOP option was [redacted]

99. BP represented to high-level Government officials that they were confident the top kill would succeed. [redacted] Similarly, just days before the top kill was implemented, [redacted] sent an email to [redacted] copying [redacted] stating: [redacted] (Ex. 66 (Dep. Ex.

10182228

11317).) And on or about May 24, 2010, BP's CEO Tony Hayward publicly stated that the top kill had a 60-70% chance of success. (*See* Ex. 67 (Dep. Ex. 10532); *see also* "BP CEO Rates Leak Plug Success Chance About 70 Percent," Bloomberg News (May 24, 2010), available at http://www.bloomberg.com/news/2010-05-24/bp-gives-top-kill-method-of-containing-spill-up-to-70-chance-of-success.html.)

100. BP knew, however, that the top kill's chances of success were poor or nonexistent. On or about May 6, 2010, a BP presentation summarizing a review of the junk shot strategy – the component of the top kill that involved pumping bridging materials into the BOP – noted that [REDACTED]

101. Although BP had prioritized the top kill over the BOP-on-BOP effort, internally BP employees doubted the wisdom of this decision and believed that the Development Driller II's ("DDII") BOP should be deployed on top of the Horizon BOP before a top kill was attempted. [REDACTED] (Ex. 53 (Dep. Ex. 4405).) An internal top kill evaluation at BP authored on or about May 14, 2010 stated [REDACTED]

[redacted] (Ex. 70 (Dep. Ex. 10507) at 7.) There is no evidence that this document or the view that the BOP-on-BOP should be reprioritized above the top kill was shared with Government decision-makers.

102. The top kill had a fatal flaw that was directly connected to BP's misrepresentations about the flow rate. As BP knew, the dynamic kill could not succeed if the flow rate was above 15,000 bopd. Because BP had numerous estimates, calculations, and analysis prior to the top kill that indicated flow rates well above 15,000 bopd, BP knew full well that the top kill had a low likelihood of success. Unfortunately, because BP withheld critical information from the Government decision-makers providing oversight of BP's source control decisions, BP was able to proceed with its doomed top kill strategy nonetheless.

103. In order to appreciate the top kill's poor chances of success, source control decision-makers needed two key pieces of information in BP's possession: (1) knowledge that the top kill would fail if the flow rate was 15,000 bopd; and (2) an understanding that BP's own modeling, analysis, and visual estimates did not support 5,000 bopd as the most likely estimate and that the actual flow rate could significantly exceed the 15,000 bopd limit.

104. On May 16, BP contractor [redacted] emailed BP's [redacted] noting that his analysis of recent data [redacted] (Ex. 44 (Dep. Ex. 10655).)

105. On May 16, 2010, BP contractor [redacted] sent another email to BP's [redacted] (Ex. 71 (Dep. Ex. 8537).) [redacted]

███████████████████████████████████████████████

██████████████████████████████████████   (Ex. 72

██████████████████████████████████   ) at 205:14-206:2.) Thus, by

May 16, BP understood the importance of flow rate estimates to the likelihood of the dynamic

kill's success. In particular, it knew that if the flow rate was 15,000 bopd or higher, the dynamic

kill could not succeed.

106.   On May 18, 2010, a BP contractor named ██████   authored a memorandum

summarizing a "Kill the Well on Paper Discussion" that BP employees had attended where ███

███   had made a presentation about his top kill modeling. ██████   memorandum included in its

"Summary Points" a bullet point that stated: ████████████████████

███████████████████████████████████████████████

█████████████████████████████████████   (Ex. 73 (Dep.

Ex. 9132).) ██████████████████████████████████

█████████████████

107.   ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

108.   BP affirmatively misrepresented to at least one high-ranking Government official

that the top kill did not depend on the flow rate. ██████████████████████

███████████████████████████████████████████████



109. Before BP proceeded with the top kill, it had to obtain the signatures of two high-level government officials: the Federal On Scene Coordinator Admiral Mary Landry and the MMS Gulf of Mexico Director Lars Herbst. (Ex. 74 (Dep. Ex. 9353).)

110. BP failed to inform Admiral Landry or Herbst of either of the two facts that they needed to know in order to understand the top kill's low likelihood of success – i.e., the top kill upper limit and BP's internal flow rate estimates.

111. First, BP did not inform Admiral Landry or Herbst of the 15,000 bopd limit on the dynamic kill.

112. Second, BP affirmatively misled Landry and Herbst about the strength of the 5,000 bopd estimate and withheld from them critical information about BP's own internal analysis, estimation, and modeling of the flow rate.

113. Admiral Landry justifiably and reasonably relied on BP's misrepresentations and omissions regarding the flow rate. Beginning in late April 2010, BP's Doug Suttles repeatedly represented to Landry that the flow rate was 5,000 bopd or less.

114. Herbst also justifiably and reasonably relied on BP's flow rate misrepresentations.

115.

116. BP witnesses have also acknowledged the importance of accurate flow rate information to decision-making about the top kill.

[redacted]

117. BP's misrepresentations and omissions, along with its policy of not sharing flow rate information internally or externally, also misled employees within BP. By mid-May, [redacted] BP's Mike Mason was advising top BP officials that BP "should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd," and BP had generated and received numerous internal models, analysis, and estimates that showed flow rates well in excess of 5,000 bopd and the 15,000 bopd dynamic kill limit.

118. [redacted]

119. At a May 21, 2010 Unified Command press briefing, BP's Doug Suttles was asked how BP could know the needed pressure, mud rate, and mud volume for the top kill if BP was unaware of the flow rate. In his response, Suttles stated: "And we've said since quite early on in this that our best estimate was around 5,000 barrels a day with a wide range. And actually as we do design for top kill, that same assessment is what we're designing that (job?) off of . . . . So at the moment, that's our best estimate." (Ex. B (SEC Complaint) ¶ 6.)

120. BP's decision to pursue the top kill not only delayed efforts to cap the well, but also increased the flow rate by eroding obstructions in the well. [redacted]

121.   BP's pursuit of the top kill needlessly put the lives, health, and safety of responders at risk. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

122.   On May 28, 2010, the top kill effort ended without success.  Weeks had been wasted preparing for a source control technique that BP knew was doomed to fail while tens of thousands of barrels of oil continued to flow into the Gulf of Mexico.

*BP's Misrepresentations And Omissions Regarding The Reason For The Top Kill's Failure*

123.   On May 27, 2010, BP's ████████ sent an email that stated in part: ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ (Ex. 77 (Dep. Ex. 9164).)

124.   BP's ████████ responded that same day: ████████████████████

████████████  ████████████████████████████████████████

████████████████ (Ex. 77 (Dep. Ex. 9164).)

125.   In a May 27 response, ████ stated: ████████████████████████

████████████████ (Ex. 77 (Dep. Ex. 9164).)

126.   On the night of May 27, BP's ████████ emailed ████████ and BP's

████████████████████████████████████████████████

████████████████ (Ex. 77 (Dep. Ex. 9164).)

127.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[redacted]

128. On May 29, 2010, BP made a presentation to the United States Government about why the top kill failed. BP represented to the Government that the *only* plausible explanation for the top kill's failure was that the top kill mud and hydrocarbons from the well had exited through burst rupture disks into the surrounding rock formation. The rupture disks were 1/8 inch disks that BP had included in the 16" casing and that were designed to burst outward or inward during the production phase of the Macondo project if pressures became too high. BP represented that the only plausible explanation for the top kill's failure was that these rupture disks had indeed burst and that top kill mud and hydrocarbons from the well had flowed into the casing annulus and out the rupture disk orifices. [redacted]

129. BP's representation that flow through the rupture disks was the only plausible explanation for the top kill's failure was material to source control decision-making because, based on that representation, BP told the United States that [redacted]

130. BP's recommendation earlier in May to prioritize the top kill over the BOP-on-BOP had delayed installation of the BOP-on-BOP. BP's post-top kill representation that the BOP-on-BOP presented a risk of broaching caused source control decision-makers to altogether abandon the BOP-on-BOP option. [redacted]



131. BP's representation that flow through the rupture disks was the only plausible explanation for the top kill's failure was false, misleading, and incomplete because one plausible explanation for the failure of the top kill was that the flow rate of hydrocarbons was too high.

132. BP knew that excessive flow rate was a plausible explanation for the top kill's failure because, as explained above, BP was well aware going into the top kill that the dynamic kill could not succeed if flow rates were above 15,000 barrels of oil per day and flow rates likely were above 15,000 barrels per day.

133. BP also knew excessive flow rate was a plausible explanation because on the second day of the top kill effort, BP employee [REDACTED] concluded that the top kill was not succeeding because there was [REDACTED] (Ex. 90 (Dep. Ex. 9160).) [REDACTED] shared this message with fellow BP employee [REDACTED] on May 27, 2010. (*Id.*)

134. BP, however, failed to share [REDACTED] conclusion or his message with the Government. Rather, BP led the Government to believe that [REDACTED] conclusion was implausible.

[redacted]

135. [redacted] conclusion was material information that BP should have transmitted to Government decision-makers because it would have increased the plausibility of the excessive flow rate explanation for the top kill, reduced the plausibility of the rupture disks explanation, and increased the likelihood that the BOP-on-BOP effort could be pursued instead of abandoned.

136. BP's representation that flow through the rupture disks was the only plausible explanation for the top kill's failure was also false, misleading, and incomplete because BP was aware that its source control contractor, [redacted] had concluded that the top kill did not fail due to the rupture disks.

137. [redacted]

138. [redacted] communicated its analysis of why the top kill had failed – i.e., not because of the rupture disks – repeatedly to BP.

139. [redacted]



[redacted]

140. [redacted]

[redacted]

[redacted].

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

141. BP's [redacted] shared [redacted] belief that the data BP was using to support BP's rupture disk theory could be misleading and that it should not form the basis for eliminating capping options like the BOP-on-BOP strategy. In a May 29, 2010 email, [redacted] wrote:



(Ex. 91 (Dep. Ex. 10623).)

142. On May 31, 2010, [REDACTED] provided a lengthy memo to BP's [REDACTED] and [REDACTED] with the subject line: [REDACTED]



143. There is no evidence that BP shared [REDACTED] memo or its consensus view of why the top kill failed with the Government's decision-makers.

144. BP's failure to share [REDACTED] view with the Government was fraudulent, misleading, and an omission of a material fact. Knowledge of [REDACTED] conclusion would have undermined BP's flawed analysis of the reason for the top kill's failure, would have made the excessive-flow-rate explanation more plausible, and would have significantly reduced the risks of capping the well with the BOP-on–BOP.

145. BP's representation that flow through the rupture disks was the only plausible explanation for the top kill's failure was also false, misleading, and incomplete because on May 29, 2010, [REDACTED] (a BP contractor) concluded that the pressure data from the top kill indicated that during the top kill, [REDACTED] [REDACTED] transmitted this conclusion in a May 29, 2010 email to BP's [REDACTED] (Ex. 93 (Dep. Ex. 9265).)

146. [REDACTED] analysis was material to the top-kill failure explanation because [REDACTED] Thus, knowledge of [REDACTED] conclusion would have made BP's chosen explanation for the top kill's failure



10182228

implausible, would have made the excessive-flow-rate explanation more plausible, and would have significantly reduced the risks of capping the well with the BOP on BOP. [redacted] conclusion therefore was material information regarding the reason for the top kill's failure and whether the BOP-on-BOP effort should have been pursued instead of abandoned.

147. BP failed to disclose [redacted] conclusion to Government decision-makers. [redacted]

148. BP's representation that flow through the rupture disks was the only plausible explanation for the top kill's failure was also false, misleading, and incomplete because by May 31, 2010, Morten Emilsen (a BP contractor) had concluded that simulations, evidence, and evaluations indicated that the hydrocarbon flow path was up inside the inner-most casing and not the annulus. (Ex. 94 (Dep. Ex. 7270).)

149. Emilsen's conclusion was material to the top-kill failure analysis. If the flow path was up inside the inner-most casing and not the annulus, the top kill mud and hydrocarbons could not have escaped through the burst disks in the outer 16" casing. Thus, knowledge of Emilsen's conclusion would have undermined BP's explanation for the top kill's failure, would have made the excessive-flow-rate explanation more plausible, and would have significantly reduced the risks of capping the well with the BOP-on-BOP. Emilsen's conclusion therefore was material information regarding the reason for the top kill's failure and whether the BOP-on-BOP effort should have been pursued instead of abandoned.

150. BP failed to disclose Emilsen's report to Government decision-makers in late May or early June 2010. [redacted]

151. When BP made misrepresentations and withheld information about the reason for the top kill's failure, it did so with an intent to defraud. As shown by [redacted] and statements and the analysis BP received from [redacted] and Morton Emilsen, BP was fully aware that its misrepresentation that the burst disks were the only plausible explanation for the top kill's failure was fraudulent, false, and misleading. Likewise, BP knew that the information it withheld from source control decision-makers would create the false impression that the burst disks really were the only plausible explanation, when in fact they were not. Because BP itself recommended not capping the well due to its burst disks explanation for the top kill's failure, BP was also aware that its misrepresentation and its withholding of information involved material information.

152. Moreover, BP had motives for withholding the excessive flow rate explanation from source control decision-makers and leading them to believe instead that the top kill had failed because of the burst disks. Just as with BP's earlier misrepresentations and omissions about the flow rate, BP had cause to be concerned that disclosing that the top kill had failed because the flow rates were too high had the potential to increase BP's liability for damages that were tied to the number of barrels of oil spilled. Worse yet, by disclosing that the top kill failed because the flow rate was too high, BP would potentially alert Government decision-makers that BP had misrepresented the flow rate in the lead up to the top kill and had failed to inform decision-makers like Admiral Landry and the MMS's Lars Herbst about the top kill's 15,000 bopd limit.

153. Source control decision-makers detrimentally relied on BP's misrepresentations that the rupture disks were the only plausible explanation for the top kill's failure and on BP's

failure to disclose material information in its possession related to the reason why the top kill had been unsuccessful. Because of those misrepresentations and omissions, source control decision-makers abandoned the BOP-on-BOP strategy and delayed efforts to cap the well. [redacted]

154. Because BP's misrepresentations and omissions caused decision-makers to abandon the BOP-on-BOP solution and delayed the capping stack effort, they also caused the well to flow for significantly longer than it should have.

155. The capping stack, which in essence is a BOP-on-BOP, did not shut in the well and stop the flow of oil into the Gulf of Mexico until July 15, 2010. By that time, oil had flowed into the Gulf for 87 days.

156. In short, BP's fraud was the proximate, intervening, and superseding cause of the well continuing to flow until mid-July 2010. BP's misrepresentations and concealment of material information about the flow rate caused source control decision-makers to approve proceeding with the top kill over the BOP-on-BOP strategy in mid-May 2010. Because of that, a well that could have been capped in early May 2010 emitted tens of thousands of barrels per day for another two months causing significant environmental pollution.

157. In the event BP's breach of the DWH contract constitutes a core breach that, as a matter of law nullifies BP's defenses and limitations to damages under the contract, TO seeks recovery of its direct damages including but not limited to loss of profits and loss of the vessel and its equipment and reimbursement of settlements paid to or on behalf of its employees."

WHEREFORE, Transocean files this its Supplemental Answer pursuant to Rule 15(d) of the FEDERAL RULES OF CIVIL PROCEDURE.

Respectfully submitted,

/s/ Kerry J. Miller

Kerry J. Miller
Frilot, L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8169
Facsimile: (504) 599-8154
kmiller@frilot.com

Edwin G. Preis, Jr.
Preis & Roy PLC
102 Versailles Boulevard, Suite 400
Lafayette, Louisiana 70501
Telephone: (337) 237-6062
Facsimile: (337) 237-9129

-and-

601 Poydras Street, Suite 1700
New Orleans, Louisiana 70130
Telephone: (504) 581-6062
Facsimile: (504) 522-9129
egp@preisroy.com

Steven L. Roberts
Rachel Giesber Clingman
Sean D. Jordan
Sutherland Asbill & Brennan LLP
1001 Fannin Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 354-1301
steven.roberts@sutherland.com,
rachel.clingman@sutherland.com
sean.jordan@sutherland.com

Brad D. Brian
Michael R. Doyen
Lisa Demsky
Daniel B. Levin
Susan E. Nash
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 683-5180, (213) 683-4018
brad.brian@mto.com,
michael.doyen@mto.com
lisa.demsky@mto.com
daniel.levin@mto.com
susan.nash@mto.com

John M. Elsley
Royston, Rayzor, Vickery & Williams LLP
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
john.elsley@roystonlaw.com

***Counsel for Triton Asset Leasing GmbH., Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc. and Transocean Deepwater Inc.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 1st day of March, 2013, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/ Kerry J. Miller