01-40968
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) | MDL NO. 2179 |
| | ) | SECTION: J |
| | ) | JUDGE BARBIER |
| | ) | MAG. JUDGE SHUSHAN |

**CONFIDENTIAL**

***WorldwideVIEW™***

**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Rear Admiral Mary Ellen Landry

**VOLUME 1**

OCTOBER 22, 2012

***COPY***




*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

that.

Did you describe for Mr. Henry anything else that you recalled with respect to how the 5,000 barrel estimate was arrived at?

A. Yes. There was -- there was a really -- I have a vivid recollection of a discussion when Doug Suttles described to us what the folks in -- a woman in particular -- and I don't know her name -- in Houston had given him an estimate of flow rate, and Doug Suttles had prepared an easel and he had written on the bottom of the easel a range and had his description of how he described that, and I vividly remember the range. And I remember right where he was standing, and I remember Charlie standing to my right, in the doorway of BP's offices.

Q. Okay. What was the range that you recall Mr. Suttles having provided you or put on this easel?

A. 1,000 to 5,000 with 2500 in the middle and a line.

Q. Okay. And when do you recall Mr. Suttles giving you that information?

A. The afternoon of the day that we announced going to 5,000. So it would be

approximately the 29th of April, I think.

Q. The 28th, perhaps?

A. It could be the 28th.

Q. Okay. The announcement, I'll represent to you, was made on the 28th.

A. Then it would be the 28th.

Q. Okay. And we'll get into a lot more detail about the announcement.

A. (Nodding.)

Q. What -- you said Mr. Henry had a different recollection, or a slightly different recollection than you did?

A. Yes.

Q. What was Mr. Henry's recollection that he communicated to you as you were preparing to testify as a Corporate Representative?

A. He doesn't remember standing in -- being in the doorway during that discussion.

Q. Does he recall you having a discussion with him -- strike that.

Did he indicate whether he recalled you having a discussion with him and Mr. Suttles prior to the announcement of the 5,000 barrel estimate?

A. I'm sorry. Could you repeat the

Q. -- in amongst everything else? You're doing a much better job than me.

And, Admiral, along those lines, would you agree that in your role as the FOSC and your role with the U.S. -- United States Government, you were the reviewers, but not the creators of the Source Control Plans?

A. Yes.

Q. Thank you. Admiral, ma'am, are you familiar with the principle that the polluter pays and the polluter cleans up, or insert "Responsible Party"?

A. Yes.

Q. Okay. And then also is it your understanding that. Ultimately, certain environmental penalty calculations for this disaster would be based on the barrels per day of oil released into the Gulf of Mexico?

A. Yes.

Q. The more barrels per day released would then result in higher penalties for the Responsible Party?

A. Yes.

Q. Admiral, was the Coast Guard aware and you, as the FOSC, aware that if the flow rate was

over 15,000 barrels per day, that the top kill method would not work?

MR. FLYNN: Object as to form.

A. No.

Q. (By Ms. Patty) Admiral, this morning you testified that your new/current position was created based on "Lessons Learned" from the DEEPWATER HORIZON disaster?

A. Yes.

Q. Would you be willing to share the lessons that were learned by the Federal Government with regard to the BP DEEPWATER HORIZON disaster?

MR. FLYNN: Ob -- objection as to form. There -- there's been hundreds and hundreds of pages written about this.

Q. (By Ms. Patty) If you could just summarize.

A. It would take me more than -- time than anyone in this room has to summarize the "Lessons Learned." In general terms, the position was created to institutionalize and apply the "Lessons Learned" from the DEEPWATER HORIZON, and there are just all sorts of information out there that can provide you with some background on, you know, what we will take forward.

if the -- if the method won't work with a flow rate of X, and the flow rate is X plus, you know, 15,000 barrels or something like that, you might want to -- not want to try that particular "ser" -- Source Control method, correct?

MR. FLYNN: Objection as to form.

A. You would want to know all the details you could, going into Source Control.

Q. (By Mr. Li) Okay. To control the risks?

A. To manage the risks, yes.

Q. And -- and to prevent things like a subsea blowout?

A. Yes.

Q. To choose the meth -- methods that would be most likely to succeed, correct?

A. Yes.

Q. Understanding that there's no guarantee that -- that any particular method will succeed, you -- you do want to choose the methods that will most likely succeed, correct?

A. Yes.

Q. And Source -- strike that.

And the flow rate, you want to know as close and most accurate of an estimate as you can about the flow rate, in the process of choosing

what Source Control methods you want to use?

MS. KARIS: Objection, form.

A. You want to know as accurate as possible the flow rate, in executing Source Control operations.

Q. (By Mr. Li) Thank you.

And as the Federal On-Scene Coordinator, did you expect BP to use its best estimates of flow rate when making Source Control decisions?

A. Yes.

Q. And did you expect that BP would do everything in its power to calculate an accurate flow rate, so it could make good Source Control decisions?

A. Yes.

Q. And as the Federal On-Scene Coordinator, did you expect that BP would keep you appraised of its best estimates of flow rate?

A. Yes.

Q. And did you -- did you expect that BP would keep you apprised of all of its modeling for flow rate?

MS. KARIS: Object to the form.

A. Yes.

Q. (By Mr. Li) I'd -- I'd like to turn for a

Q. When you received this letter from Mr. Suttles, did you believe that he was providing you a complete answer and not omitting any material information?

A. Yes.

Q. Now, because you did not have all those datapoints that I described, reservoir permeability, et cetera, you, at least at this point, and this is on May 10th, 2010, were not in a position to verify all of the -- the data that he was providing to you; is that correct?

MS. KARIS: Objection, form.

MS. GREENWALD: Objection, form.

A. Yes.

Q. (By Mr. Li) So at this point, while you needed to trust Mr. Suttles, you would have to rely on the Flow Rate Technical Group later on to verify, correct?

A. Yes.

Q. Now, one more point from this letter, you'll see right after the theoretical downside phrase, it says this 55,000 barrels per day estimate "...also assumes the flow is through the annular space and that there is a complete failure of the blow-out-preventer."

(Discussion off the record.)

Q. (By Mr. Li) Now, the annular space is -- in a well is different than the production casing, correct?

A. Yes.

Q. Did BP, in this letter, share with you flow estimations through the casing?

A. Not in this letter.

Q. Now, if you could look at the back page, which is the graph, and you'll see at the top it says: "Macondo Reservoir Model, CONTAINS PROPRIETARY INFORMATION CONFIDENTIAL TREATMENT REQUESTED" et cetera. I get that right?

A. Yes.

Q. Did you understand this to be a graphical representation of what the worst-case model was and what the most likely model was?

A. Yes.

Q. And did you understand this to be a representation by Mr. Suttles of what he and BP believed were the worst-case model -- was the worst-case model?

A. Yes.

Q. And did you understand this to be a representation by Mr. Suttles and BP as what --

as to what they believed the most likely model was on May 10th, 2010?

A. Yes.

Q. Now, you've seen this a number of times, but the red line indicating the worst-case model shows a line that starts at about 55,000 barrels per day, and ends at approximately 42, 43,000 barrels a day, 145 days later, correct?

A. Yes.

Q. And in the little red box underneath "Worst case model," this graph represents to you, does it not, that this model is based on actual reservoir conditions?

A. Yes.

Q. Now if you look at the blue line, above -- below the box that says "Most Likely Model," that blue line is located at approximately 5,000 barrels a day, correct?

A. Yes.

Q. And this is -- also purports to be based on actual reservoir conditions?

A. Yes.

Q. Okay. Did anybody at BP in this timeframe tell you to be very cautious about standing behind a 5,000 barrel a day figure?

A. No.

Q. And, in fact, at this -- in this timeframe, which is the May 10th, 2010 timeframe, BP, through Doug Suttles, was representing to the United States Government that the most likely model predicted that the flow would be 5,000 barrels a day, correct?

MS. KARIS: Object to the form.

A. Yes.

Q. (By Mr. Li) Based on actual well conditions, correct?

MS. KARIS: Object to form.

A. Yes.

Q. (By Mr. Li) If you could turn to Tab 24.

(Discussion off the record.)

MR. LI: Yeah.

Q. (By Mr. Li) So this is an E-mail from -- it's an E-mail string, but I'd like you to focus on the bottom half of the E-mail string, Admiral, from Mike Mason to Andy Inglis dated May 15th. Do you have that in front of you?

A. Yes.

Q. Okay. Do you know who Andy Inglis is?

A. Yes.

Q. Do you know him to be an Executive at BP?

A. "Bopd."

Q. Okay. And did Mr. Suttles share with you that its contractors were suggesting that the -- that it could not be ruled out that the flow out at the seabed was on the order of 40,000 oil -- barrels of oil per day?

A. No.

Q. Admiral, with respect to that May 10th letter from Mr. Suttles to you, do you have any idea where -- how BP generated the information to give you those estimates?

A. No.

Q. Would it surprise you that British Petroleum's Corporate Representative, Adam Ballard, testified that between April 28th and until the capping stack was put on, BP never estimated the flow rate using reservoir modeling?

MS. KARIS: Object to the form.

A. It would surprise me, yes.

Q. (By Mr. Li) And that's because we've just walked through a number of documents that show, or at least purport to show, reservoir modeling, correct?

A. Yes.

Q. Including the May 10th letter that

Q. (By Mr. Li) Fair to say that those other lines on these charts were edited out of your letter from Mr. Suttles to you on May 10th, 2010?

MS. KARIS: Object to the form.

A. No, I can't answer that.

Q. (By Mr. Li) Okay. Would you have expected that BP would not edit out its various flow rate estimates?

MS. KARIS: Objection, form.

A. From the letter they provided me --

Q. (By Mr. Li) Yes.

A. -- I would not expect them to edit out.

Q. You would want everything from BP, wouldn't you?

A. Yes.

Q. You would want all of their modeling, correct?

A. Yes.

Q. You would not want them to edit freely, would you?

A. No.

MR. LI: I think this is a good place to break.

THE VIDEOGRAPHER: The time is 2:46 p.m. We're off the record.

benefits and all of the various issues relating to the top kill operation, correct?

A. I can just -- we had a Team in Houston, and we had a Team in Robert, and we actually positioned Admiral Cook in Houston as the Lead Representative for the Coast Guard during top kill, and I had Pat Little with me in Robert, and MMS had folks, and Department of En -- Energy had folks.

Q. And that was to make sure that the Government could provide sufficient oversight to the top kill operation, correct?

A. That's correct.

Q. And that this top kill operation was essentially being run by BP, correct?

A. Yes.

Q. And it was important that you get full and complete information from BP so that you could serve your oversight function, correct?

A. Yes.

Q. And that would be one of the reasons why you or Admiral Allen, the NIC, sent Admiral Cook to Houston, correct?

A. Yes.

Q. To ensure that the flow of information

between BP was responsible for the top kill operation and the Government was full and complete, correct?

A. Yes.

Q. Now, did -- were there problems in getting full and complete cooperation with BP prior to sending Admiral Cook?

A. Can you -- can you specify what you mean by that?

Q. Were there times where BP was not -- other than the situations that we've gone through right now with all the documents they didn't share with you, were there other instances where BP wasn't sharing information with you?

MS. KARIS: Object to form.

A. Not to my knowledge.

Q. (By Mr. Li) Okay. Now, let's take a look at Exhibit 9132. This is Tab 30. Admiral Landry, this is an E-mail from Kate Baker to a number of folks. And if you could just turn to the second page, and I'm just going to focus you on one point.

So the title is "Summary points..." for "Kill the Well on Paper Discussion, 18 May, 2010."

Correct?

A. That's what the document says, yes.

Q. Okay. If you could read the third bullet point down, which is a Summary Point.

A. "Modeling indicates that a dynamic kill cannot be successfully executed if the oil flow rate is 15000 STBpd."

Q. Standard barrels of oil per day?

Now, were you ever told by any person at BP -- stock tank, sorry. Stock tank barrels of oil per day.

Were you ever told by anybody at BP that modeling indicated that a dynamic kill could not successfully be executed if the oil rate is 15,000 stock tank barrels per day?

MS. KARIS: Objection, form.

A. I don't recall anyone from BP telling me that -- me that.

Q. (By Mr. Li) And, in fact -- strike that.

(Discussion off the record.)

Q. (By Mr. Li) Okay. Ultimately, the -- the top kill procedure did not succeed, right?

A. Yes.

Q. And you all made a nu -- number of efforts to pump material down the well, correct?

A. Point No. 3: "Tony Hayward said he will await your call."

Q. Yeah. And then Tony Hayward says he'll await your call. And then going down, "The way ahead...." 1, 2, and 3?

A. "The way ahead....

"Terminate top kill. Analysis shows that" the "flow path exists (probably thru a rupture disk in the casing) into the formation. Additional pumping could damage the casing further and allow for hydrocarbon to flow into the formation... A scenario which could lead to broaching."

Q. "2. Shift to containment."

A. "Shift to containment. LMRP cap still deemed best interim solution."

Q. And then 3?

A. "BOP on BOP not advisable, now or in the future, because of rupture disk issue..."

Q. And we can -- we can just stop there. Who -- who provided the information and the data relating to all of these various conclusions? It's BP, isn't it?

MS. KARIS: Objection, form.

A. Kevin Cook generated this E-mail.

Q. (By Mr. Li) Right. But all the data --

A. The "Subject" is the "BP Briefing On" the "Way Forward," so that would -- that would mean that Kevin was getting this information from the BP Representatives.

Q. Okay. And at this point, those BP Representatives were suggesting to Admiral Cook, and others, and then that all was forwarded on to you, that the "BOP on BOP option" was "not advisable, now or in the future..." Correct?

MS. KARIS: Objection, form.

A. According to this document.

Q. (By Mr. Li) I'm going to ask you to look at Tab 45, which is being marked as Exhibit --

(Exhibit No. 9634 marked.)

MS. SARGENT: 9634.

Q. (By Mr. Li) This is a letter from the Secretary of Homeland Security, Janet Napolitano, and the Administrator of the Environmental Protection Agency, Lisa P. Jackson, to Tony Hayward, Group Chief Executive of BP, dated May 20th, 2010.

Admiral, at the second -- the very first paragraph, the second sentence it says: "In responding to this oil spill, it is critical that