01-40977
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### WorldwideVIEW™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Thomas O. Hunter, Ph.D.

**VOLUME 2**

OCTOBER 31, 2012

# COPY



Systems Technology for the Litigation World

Litigation Group ♦ Court Reporting ♦ Video Production ♦ Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1   tell the Labs to instead assume a flow rate of
 2   30,000 barrels of oil per day?
 3        A.   For that particular assessment, it -- it
 4   wasn't about flow rate, so he -- the answer is
 5   "No," he never came back.
 6        Q.   Okay.
 7        A.   That was a flow path analysis.
 8        Q.   Could we please look at Tab 144.  We're
 9   now moving into a -- a different timeframe --
10        A.   Okay.
11        Q.   -- which is immediately after the top
12   kill --
13        A.   Top kill, yeah.
14        Q.   -- had been attempted.
15        A.   Right.
16             MR. CHAKERES:  (Indicating.)
17        A.   Yes.
18        Q.   (By Mr. Davis-Denny) And Tab 144 has
19   previously been marked as Exhibit 9163.
20        A.   Yes.
21        Q.   This is an E-mail from Ruban Chandran to
22   you sent on May 29th; is that correct?
23        A.   That's correct.
24        Q.   And it's copying Kent Wells?
25        A.   That's also correct.
```

```
 1        Q.  And Kent Wells was one of your main
 2   points of contact at BP; is that correct?
 3        A.  Yes.  That's also correct, yes.
 4        Q.  Okay.  And it says:  "Tom, please find
 5   attached the presentation for the 1pm...call
 6   today."
 7            Is that right?
 8        A.  Yes.
 9        Q.  Okay.  Do you recognize the attached
10   presentation?
11        A.  I do, yes.
12        Q.  Okay.  This is a presentation that BP
13   made to you and others from the Government on
14   May 29th of 2010; is that correct?
15        A.  I can't -- I can't be sure of that
16   because there were two.  One presentation was
17   with me alone --
18        Q.  Oh, okay.
19        A.  -- and this could be that.  And then
20   subsequently, the same day, the -- virtually the
21   same information was transmitted to the broader
22   Science Team.
23        Q.  Okay.
24        A.  So I don't know which this is, but I -- I
25   remember the presentation.
```

```
 1        Q.  I understand.
 2        A.  It was shared with me first.
 3        Q.  Okay.  And the purpose of the
 4   presentation was -- as -- as you understood it,
 5   was for BP to communicate its analysis of why the
 6   top kill had failed; is that correct?
 7        A.  And to provide the basis for the decision
 8   of continuing or not.
 9        Q.  Okay.  Now, BP presented three scenarios
10   in -- in your meeting with them; is that
11   correct --
12        A.  That's corr --
13        Q.  -- for why the top kill had failed?
14        A.  That's correct, yeah.
15        Q.  Okay.  And if you turn to Scenario 1,
16   which begins on the Bates number that ends in
17   447, and it carries over to the Bates number that
18   ends on 448.
19        A.  Got it.  Yes, I have it.
20        Q.  Scenario 1 was:  "HC" -- which I assume
21   stands for hydrocarbons?
22        A.  M-h'm.
23        Q.  -- "and dominant mud flow up drill pipe
24   and bypass through rams."
25            Is that correct?
```

1   it -- the -- do you see that slide?
2       A.  I -- if it's No. 12, I see it.
3       Q.  Yes, it is.  Thank you.
4           Second bullet point is:  "If there is a
5   path open to formation then containment is the
6   preferred option."
7           Does that essentially mean -- did you
8   understand BP to be saying that if the flow was
9   out the burst disk, then containment on the
10  surface was the preferred path forward?
11      A.  If -- if there was a flow out the burst
12  disk and then subsequently out through the shoe,
13  the 18-inch shoe, then that -- that's exactly
14  what they said.
15      Q.  Okay.  And then the third bullet point
16  says:  "Shutting the well in (via BOP on BOP) is
17  likely to lead to broaching."
18          Is that correct?
19      A.  That's what it says.
20      Q.  That's what it says?
21      A.  Yeah.
22      Q.  And -- and by that, you understood BP to
23  be saying that if the well was shut in using a
24  BOP-on-BOP, it could lead to flow going out the
25  burst disk and broaching into the seabed; is that

```
 1    correct?
 2         A.   And it -- and the statement is
 3    independent of whether its BOP-on-BOP.  They just
 4    basically shut-in the well would lead likely to
 5    broaching.  That's what they said.
 6         Q.   Okay.  And after this, the decision was
 7    made to turn away from the BOP-on-BOP option; is
 8    that correct?
 9         A.   If you define that option as pulling the
10    LMRP, putting the BOP on at the lower connect, it
11    was -- it was not considered after that.
12         Q.   And it had been carefully considered
13    before this; is that correct?
14         A.   It had.
15         Q.   Okay.
16         A.   It -- yes.
17         Q.   I'd like to you turn to Tab 143 --
18         A.   H'm.
19         Q.   -- which is Exhibit 9160.
20         A.   Yes.
21         Q.   And I'll represent to you that this is a
22    text message that BP's Kurt Mix sent to BP's Jon
23    Sprague on May 27th of 2010.
24         A.   I'm sorry, would you repeat the date?
25    It's very hard to read.
```

1        Q.  Sure.  May 27th, 2010.
2        A.  Okay.
3        Q.  It says that in between the text time
4    stamp.
5        A.  I -- I -- I see it, yes.
6        Q.  And then the text reads:  "Too much
7    flowrate - over 15000 and too large an orifice."
8            Do you see that?
9        A.  I do.
10       Q.  I take it you never received this text
11   message, correct?
12       A.  I did not receive a text message.
13       Q.  And -- and you would -- would believe
14   that the Labs' personnel would not have received
15   this text message?
16       A.  I believe that also to be true, that they
17   did not receive it.
18       Q.  Okay.  And did BP ever inform you that
19   Mr. Mix had thought that the top kill was failing
20   because it was too much flow rate over 15,000?
21       A.  No ref -- I -- I recall no reference to
22   Mr. Mix's work.
23       Q.  Okay.  You were asked some questions
24   yesterday about top kill data and information
25   that BP may have shared with you.

1              Do you recall those questions?
2         A.   Yeah, I -- yes, I think so.
3         Q.   I take it this is information right here
4    in Mr. Mix's text message that was not shared
5    with you by BP; is that correct?
6              MR. REGAN:  Object to form.
7         A.   Well, it's a fact that it's -- was not
8    shared.  I believe my statements yesterday were
9    about having access to information.
10        Q.   (By Mr. Davis-Denny) Okay.
11        A.   But this one was not shared.
12        Q.   Okay.  And just to clarify, you didn't
13   have access to this text message, did you?
14        A.   I did not.
15        Q.   All right.  I'd like to have you look at
16   Tab 120.
17        A.   120?
18        Q.   Yes.  And it's Exhibit 7270, a document
19   we looked at briefly yesterday afternoon, I think
20   it was.
21        A.   I believe it's that one there.
22        Q.   Yes.
23             MR. CHAKERES:  (Indicating.)
24        Q.   (By Mr. Davis-Denny) That's right.  It's
25   that one right -- right up there.  You're welcome

1  because there would, then, not be a risk that
2  installing a capping stack or any other capping
3  mechanism would lead to flow out the rupture disk
4  and into the seabed; is that correct?
5      A.  That would be a bit of a stretch.  But
6  it's primarily true.  In other words, if -- if
7  you -- we knew the casing hanger was not locked,
8  and you have to account for any subsequent action
9  of the casing hanger if you put a capping stack
10 on.
11     Q.  M-h'm.
12     A.  And -- and so it -- but the first order,
13 if you knew it was central casing flow only, it
14 would -- it would greatly limit the possibility
15 that there was a broaching that initiated with
16 the rupture disks.
17     Q.  Okay.  If you knew it was central casing
18 flow only, it would greatly lower the risk that
19 installing a capping stack would cause flow out
20 the burst disk?
21     A.  That's correct.
22     Q.  Okay.  Okay.  I'd ask you to take a look
23 at Tab 146, which has previously been marked as
24 Exhibit 9265.
25     A.  Yes.

```
1       Q.  This is an E-mail from Thomas Selbekk.
2   I'll represent to you that Mr. Selbekk
3   works with Ole Rygg at Add Energy, so he's a BP
4   Contractor.
5       A.  Okay.
6       Q.  To Kurt Mix --
7       A.  M-h'm.
8       Q.  -- dated May 29th 2010, with the
9   "Subject" line "Final top kill runs."
10      A.  M-h'm.
11      Q.  Do you see that?
12      A.  I do.
13      Q.  And I'm going to move down to the -- the
14  third paragraph.  It says:  "Simulating pumping
15  at 78" barrels per minute "shows a flat pressure
16  curve, fairly low max pressure and hardly any
17  drop in pressure, consistent with" the "situation
18  where basically no mud enters the wellbore."
19      A.  I see that.
20      Q.  "There are other combinations that would
21  give the same outcome, e.g., opening around rams
22  etc., nonetheless, comparing the actual pressure
23  curve with the simulations, there are strong
24  indications that a curve with this shape is the
25  result of a situation where there is not enough
```

1  restriction at surface to create enough pressure
2  to force the mud into the well."  All the -- "all
3  simulations indicate that in order to get mud
4  down, a fairly steep pressure increase must be
5  observed early in the process, followed by a
6  pressure decline as the hydrostatic head
7  increases."
8           Sir, did you receive this E-mail from BP?
9       A.  No, I did not.
10      Q.  Were you informed of Mr. Selbekk's
11  analysis by BP?
12      A.  Not attributed to Mr. Selbekk.
13      Q.  Okay.  Were you informed of -- of this
14  analysis in -- in any other way, even if it
15  wasn't attributed to Mr. Selbekk?
16      A.  I -- I don't recall any way in which it
17  was represented to us that at the highest pumping
18  rate, there was not enough pressure to induce
19  flow down.
20      Q.  Okay.  This would be a piece of
21  information you would have liked to have had
22  around May 29th; is that correct?
23           MR. REGAN:  Object to form.
24      A.  On May 29, we were trying to decide the
25  path forward --

1      Q.   (By Mr. Davis-Denny) M-h'm.
2      A.   -- and the most reasonable path forward.
3  Any information, particularly if strong
4  conclusions could be drawn from that information,
5  would be helpful.
6      Q.   Okay.  And an analysis that took the top
7  kill data and concluded that there were strong
8  indications that the shape is a result of a
9  situation where there is not enough restriction
10 at surface to create enough pressure to force the
11 mud into the well, that would have been an
12 important fact for you to have been informed of;
13 is that correct?
14           MR. REGAN:  Form.
15     A.   I'd have to go back to what you said
16 about the difference between a fact is the actual
17 physical situation versus the fact that someone
18 said it.
19     Q.   (By Mr. Davis-Denny) Okay.
20     A.   But certainly, in either case it would be
21 important information to have.
22     Q.   Okay.  You were -- do you still have BP's
23 binders available, or do you have the exhibits
24 that were introduced yesterday?
25     A.   I don't have them.  I'm sure we can get