01-41920
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

# CONFIDENTIAL

## WorldwideVIEW™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Clifton Michael Mason

### VOLUME 1

JANUARY 24, 2013

# *COPY*



Systems Technology for the Litigation World

Litigation Group◆Court Reporting◆Video Production◆Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1            So you sent your E-mail that is in
 2   Exhibit 3220, early in the morning hours of
 3   Saturday, May 15th, 2010, correct?
 4       A.   I -- and I'm pretty sure that was a
 5   Saturday, yes.
 6       Q.   Okay.  And you received the phone call
 7   from Jasper Peijs on the morning of Saturday, May
 8   15th?
 9       A.   Yes, later that -- later, after this --
10   well, much later after this time.
11       Q.   Okay.  And then after you received
12   Mr. Peijs's phone call, you went into BP's
13   offices again on the morning of Saturday May
14   15th?
15       A.   Correct.
16       Q.   Okay.  And then you had a meeting with
17   Mr. Peijs on the morning of Saturday, May 15th --
18       A.   Yes.
19       Q.   -- is that correct?
20       A.   Yes, it is.
21       Q.   What do you recall being discussed during
22   that meeting with Mr. Peijs on the morning of
23   Saturday, May 15th?
24       A.   Two things:  One, he said:  "We've got
25   some new pressure data that we would like for you
```

```
 1    to review, the 3100 psi."  And he also said:
 2    "Next time you have an idea or a thought like
 3    this E-mail note, we would appreciate it if you
 4    would walk over and discuss it with us."
 5         Q.   Did he describe to you what he meant by
 6    an "idea or a thought like this"?
 7         A.   Well, I asked him what the problem
 8    with -- was with this note a number of times, and
 9    he said:  "It's the big number."
10         Q.   And by the "big number," you're referring
11    to the 100,000 barrel per day number?
12         A.   Yes.
13         Q.   And did he tell you why writing about a
14    100,000 barrel per day number was problematic?
15         A.   No.
16              MS. BROWNE:  Objection, form.
17         A.   Not that I recall.
18         Q.   (By Mr. Davis-Denny) Did you have an
19    understanding of why he thought writing about the
20    100,000 barrel per day number was problematic?
21         A.   He didn't explain to me why.
22         Q.   Okay.
23         A.   So, no.
24         Q.   Okay.  When he said that writing about
25    the 100,000 barrel per day number was
```

1  problematic, did he say that, by the way, that
2  "writing about the 100,000 barrel per day number,
3  that's problematic"?
4      A.  No, he didn't say that.  He said what I
5  said earlier.  He said:  "It's the big number."
6  That's exactly what he said.
7      Q.  Did you say anything in response?
8      A.  Yes, I did.  I asked if I could speak to
9  Andy Inglis directly.
10     Q.  What did Mr. Peijs say in response to
11 your question?
12     A.  He said he would check.
13     Q.  Did you speak with Andy Inglis directly?
14     A.  No.  Not about this, I didn't.
15     Q.  Did Mr. Peijs ever come back to you about
16 your request to speak with Andy Inglis directly?
17     A.  I believe he did.  I --
18     Q.  And what did Mr. Peijs say when he came
19 back?
20     A.  He said that if I bumped into Andy in the
21 hallway, that I could speak to him, but that they
22 weren't going to set up a -- a specific meeting
23 related to this topic.
24     Q.  Did he explain why they were not going to
25 set up a meeting related to that topic?

1  A. Not to my memory, I can't recall that he
2  did.
3  Q. Okay. When did Mr. Peijs come back to
4  you and tell you that you -- they were not going
5  to set up a meeting on the topic of your E-mail?
6  A. I -- I believe that it was the same day.
7  It may have been the next day, but it was -- it
8  was fairly soon after I made the request.
9  Q. Okay. Did you have any further
10 conversations with Mr. Peijs about the standing
11 behind the 5,000 barrel per day estimate?
12            MS. BROWNE: Objection, form.
13 A. Not specifically related to -- no. No, I
14 didn't.
15 Q. (By Mr. Davis-Denny) Did you have any
16 further conversations with Mr. Peijs about your
17 May 15th E-mail?
18 A. Yes. I told him if -- I asked him if I
19 couldn't speak to Andy Inglis, if I could speak
20 to our Chief of Staff.
21 Q. Who was your Chief of Staff?
22 A. I can't remember her name right now. I
23 think it was Christina Verchere.
24 Q. Why did you want to speak to --
25 A. I wanted to --

1  Q. Okay. And that certainty, you did not
2  have, correct?
3  A. I didn't feel comfortable with it.
4  Q. And as far as you knew, BP didn't have
5  that certainty that standing behind 5,000 barrels
6  per day conveyed, correct?
7      MS. BROWNE: Objection, form.
8  Foundation.
9  A. I -- I -- I'll just speak for myself.
10 I -- I didn't feel comfortable with standing
11 behind 5,000 barrels per day.
12 Q. (By Mr. Davis-Denny) Are there any other
13 conversations that you had with Mr. Peijs that
14 you haven't described to us so far about the
15 5,000 barrel per day estimate?
16 A. Ah --
17     MS. BROWNE: Objection, form.
18 A. So could you ask your question again,
19 please?
20 Q. (By Mr. Davis-Denny) Are there any other
21 conversations that you had with Mr. Peijs about
22 the 5,000 barrel per day estimate, other than
23 those you've already told us about?
24 A. Yes, because it -- at least one other
25 one. I -- I -- he did come back and tell me that

```
 1    our Chief of Staff didn't want to talk about
 2    this, and told me it was time to move on with
 3    respect to this letter, this E-mail note.  And
 4    we -- Jasper helped -- helped us pull together a
 5    Slide Pack for Andy Inglis, and I'm sure we
 6    talked about 5,000 barrels of oil per day in that
 7    preparation.  So, yes, there was another
 8    conversation at that time.
 9         Q.   Okay.
10         A.   I can't recall any other conversations.
11         Q.   Did Mr. Peijs tell you why the Chief of
12    Staff did not want to talk about your E-mail?
13         A.   No.
14         Q.   Were you disappointed when you learned
15    that the Chief of Staff had told Mr. Peijs that
16    she did not want to talk with you about your
17    E-mail?
18              MS. BROWNE:  Objection, form.
19         A.   She told Jasper to move on, and I was
20    disappointed.
21         Q.   (By Mr. Davis-Denny) Did you have
22    conversations with anyone else at BP about the
23    series of interactions you had with Mr. Peijs
24    around May 15th regarding the 5,000 barrel per
25    day estimate?
```

1  barrel per day rate?
2     A.  I don't recall.  I'd point out, though,
3  at Point 12, here, Sheldon, from the National
4  Laboratories, which is Sheldon Tiezen, agreed
5  with Chris, in this document, that they would use
6  that.
7     Q.  Sir, I'm not asking you about that now
8  so --
9     A.  Well, that's a real -- a real per day
10 number, as we had requested originally.
11        MR. DAVIS-DENNY:  Move to strike
12 everything after "I don't recall" as
13 nonresponsive.
14    Q.  (By Mr. Davis-Denny) So you don't have
15 any recollection of talking with Chris Cecil
16 about his statement, at this May 13th meeting,
17 that BP could not provide a case which supported
18 a 72,000 barrel per day rate for the annular flow
19 cases?
20    A.  I don't recall --
21        MS. BROWNE:  Objection, form,
22 foundation.
23    A.  -- if I did or not.
24    Q.  (By Mr. Davis-Denny) You would agree with
25 me, that if you deleted the last five words of

```
 1    that sentence, in other words, the words that say
 2    "for the annular flow cases," that that sentence
 3    would then become inaccurate.  Correct?
 4              MS. BROWNE:  Objection, form,
 5    foundation.
 6       A.   Yes.  We've -- we could have provided a
 7    case up the tubing string --
 8       Q.   (By Mr. Davis-Denny) Okay.
 9       A.   -- for 70,000, or roughly 70,000 barrels
10    a day.
11       Q.   Sir, could you turn to Tab 14 in the
12    notebook that's in front of you, or -- I'm sorry.
13    Could you give -- is that from the notebook with
14    the --
15              MR. ALDEN:  Yes.
16       A.   Is it this one?
17       Q.   (By Mr. Davis-Denny) Tab 14, uh-huh.
18              MR. DAVIS-DENNY:  Should I go back?
19              THE COURT REPORTER:  Yes.
20              MR. DAVIS-DENNY:  And I'm going to
21    ask you to mark Tab 14 as Exhibit 10793.
22              (Exhibit No. 10793 marked.)
23              THE COURT REPORTER:  We're filling
24    in that gap, Maureen.  We -- we missed 93.  We're
25    filling in that gap.
```

1       A.  Yes, I do.
2       Q.  You were the one who suggested inserting
3   "for the annular flow case," correct?
4       A.  I -- I believe that's correct.
5       Q.  And you were not at the meeting where
6   Mr. Cecil made this statement; is that correct?
7       A.  I don't believe I was.
8       Q.  So you don't know whether, when Mr. Cecil
9   made this statement to the National Lab, he
10  limited his response to an annular flow case,
11  right?
12              MS. BROWNE:  Objection, form.
13      A.  No, but we believed it would -- it was an
14  annular case, at that time.
15              MR. DAVIS-DENNY:  Move to strike as
16  nonresponsive.
17      Q.  (By Mr. Davis-Denny) You don't know,
18  whether when Mr. Cecil made this statement to the
19  National Lab, he limited his response to an
20  annular flow case.
21      A.  I don't --
22      Q.  Is that correct?
23      A.  I don't -- I don't know.
24      Q.  Okay.  But you did know, at the time that
25  you suggested this edit, that BP could provide a

```
 1   casing flow case that supported this 72,000
 2   barrel per day estimate.  Correct?
 3       A.  Yes.
 4       Q.  And so you wanted to change BP's record
 5   from the meeting to make Mr. Cecil's statement
 6   seem accurate, correct?
 7               MS. BROWNE:  Objection, form,
 8   foundation.
 9       A.  I can't remember why I made these
10   comments.
11               MR. DAVIS-DENNY:  I think this is a
12   good place to stop.
13               THE VIDEOGRAPHER:  The time is
14   6:10 p.m.  We're off the record, ending Tape 11.
15          (Deposition recessed at 6:10 p.m.,
16   resuming on Friday, January 25, 2013, at
17   8:30 a.m.)
18
19
20
21
22
23
24
25
```

1       A.   Okay.
2       Q.   Is that correct?
3       A.   Yes.
4       Q.   Okay.  I want to ask you about the very
5  last phrase in this E-mail, where you say
6  "...therefore unless pushed I am holding off with
7  any other data until afterwards."
8            When you said "unless pushed," who were
9  you referring to that might be doing the pushing?
10              MS. BROWNE:  Objection, form.
11  Foundation.
12       A.   (Reviewing document.)  I -- I can't
13  recall the reason I put that phrase in there.
14       Q.   (By Mr. Davis-Denny) You meant the
15  National Labs personnel, right?
16              MS. BROWNE:  Objection, form.
17  Foundation.
18       A.   I may have meant data from the National
19  Labs to -- to Jasper.  I don't know.
20       Q.   (By Mr. Davis-Denny) May 13th was the
21  first day of your meetings with the National
22  Labs, correct?
23       A.   I don't know if it was the first day or
24  not.
25       Q.   Okay.  If you need to, you can look back

Case 2:10-md-02179-CJB-DPC   Document 8722-42   Filed 03/01/13   Page 13 of 14

488

```
 1    at those meeting notes.
 2         A.   Yeah.
 3         Q.   They -- they're for meetings that
 4    occurred between May 13th and May 16th of 2010,
 5    correct?
 6         A.   Yes, but I don't believe that those are
 7    all the meetings we had with the National Labs.
 8         Q.   Okay.  You did meet with the National
 9    Labs on May 13th of 2010, correct?
10         A.   Correct.
11         Q.   Okay.  And Chris Cecil sent them an
12    information package on May 13th of 2010, correct?
13         A.   I believe that's correct.
14         Q.   Okay.  And then you wrote to your
15    Superior, Jasper Peijs, that same day:
16    "...therefore unless pushed I'm holding off with
17    any other data until afterwards," correct?
18         A.   That's what it says here, yes.
19         Q.   Okay.  And when you wrote "holding off,"
20    you meant you were not going to provide the Labs
21    with any further data at that time, right?
22         A.   I don't know --
23              MS. BROWNE:  Objection, form.
24    Foundation.
25         A.   I don't know what I meant.  Today, as I
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   sit here, I don't know what I meant.
 2       Q.  (By Mr. Davis-Denny) When you referred to
 3   "any other data," you were referring to the flow
 4   rate ranges that you had calculated, correct?
 5       A.  I don't know.
 6              MS. BROWNE:  Objection, form.
 7       Q.  (By Mr. Davis-Denny) When you said
 8   "afterwards," after what were you referring to?
 9       A.  I don't know.  I can't recall.
10       Q.  Why did you not want to provide further
11   data -- any other data until afterwards?
12       A.  I don't --
13              MS. BROWNE:  Objection, form.
14       A.  I can't recall.
15       Q.  (By Mr. Davis-Denny) Having seen this
16   line, does it change your testimony about my
17   question on whether you withheld from the
18   National Labs any flow rate data?
19              MS. BROWNE:  Objection, form.
20   Foundation.
21       A.  I can't recall why I wrote that, and I
22   don't think that it would change my -- what I've
23   stated previously.
24       Q.  (By Mr. Davis-Denny) Okay.  I'm going to
25   ask you to turn to Transocean -- the Transocean
```