01-40954
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Lars Herbst
**VOLUME 1**

OCTOBER 10, 2012

# COPY



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

```
  1    was not going to be a BOP on BOP attempt?

  2         MR. BARR:  Objection; form.

  3         MR. KRAUS:  Objection; form.

  4         MR. SINCLAIR:  Objection; form.

  5         MR. DAVIS-DENNY:  Objection; form.

  6         MS. RICHARD:  Objection; form.

  7         A.    As I recall, the presentation

  8    that was eventually made by BP on -- on its

  9    analysis of -- of top kill was that that was

 10    the most plausible situation, is that they

 11    were pumping down the backside, potentially

 12    pumping out a rupture disk or the shoe of the

 13    casing.  I do recall at that particular

 14    meeting that I did not necessarily concur

 15    with that -- that assessment, but ultimately

 16    all other parties, science team, and others

 17    up the line had agreed with that assessment.

 18         Q.    (BY MR. FENDLER)  Had you and --

 19    and others in the government decided they

 20    disagreed with that assessment, you would

 21    have kept the option of using the BOP from

 22    the DDII available, perhaps even try to

 23    utilize it, wouldn't you?

 24         MR. KRAUS:  Objection; form.

 25         MR. BARR:  Objection.
```

1   can -- I can remember one case that I was

2   personally involved with where I didn't

3   believe that the information -- the analysis

4   of information was provided as timely as I

04:00   5   would like, but that was a rare case.

6          MR. FENDLER:  Okay.  I think that's all

7   I have, Mr. Herbst.  Thank you very much for

8   your patience.

9          MR. FLYNN:  Thank you.

04:00   10          THE VIDEOGRAPHER:  The time is

11   4:00 p.m., and we're off the record.

12          (Recess from 4:00 p.m. to 4:08 p.m.)

13          THE VIDEOGRAPHER:  The time is

14   4:08 p.m.  We're back on the record.

04:08   15                E X A M I N A T I O N

16   BY MR. KRAUS:

17          Q.    Mr. Herbst, I previously

18   introduced myself.  I'm Doug Kraus.  I'm here

19   on behalf of the State of Louisiana.  I'm

04:08   20   going to try not to take up too much time of

21   your -- of your time today, but I do have

22   some questions.  First, I need to follow up

23   on an answer you gave to counsel for BP.  You

24   mentioned that you were involved in an

04:09   25   instance of the source control efforts where

1    BP was not as forthcoming with information as

2    quickly as you would have like.  Can you tell

3    me, No. 1, what that pertained to?

4         A.    In particular that -- that one

04:09  5    incident -- and, really, that's the only

6    incident I can -- I can recall -- was

7    following top kill.  It made -- it made a

8    request to participate in some other the

9    discussion and ongoing analysis occurred

04:09  10   immediately following those attempts.  I

11   thought it would -- it would have been better

12   to be in the same room hearing the discussion

13   as it occurred.  They -- they had had the

14   data -- we had access to data realtime as it

04:09  15   was coming -- coming through, but as far as

16   having the data to go back and -- and

17   analyze, we didn't have that, and so I

18   thought it would be better to participate

19   with -- with them in that analysis or at

04:10  20   least hear their -- their viewpoints as they

21   were deliberating on that, and we were not

22   allowed to participate in that -- in that

23   particular meeting.

24        Q.    Okay.  And you said "they had

04:10  25   the data."  Are you referring to BP?

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.     BP and its contractors that were

2   involved with top kill.

3      Q.     When did you initially make that

4   request to be involved in those discussions?

04:10   5      A.     I can't recall the exact time,

6   but I do recall that top kill was -- was

7   finished up the last attempt which involved

8   the junk shots as well, it would have been

9   shortly after that completion of that that --

04:10  10   that both Admiral Cook and myself attempted

11   to talk to BP to see if we could sit in on

12   those discussions I recall that at the time

13   the answer was no.  I had pretty much gone

14   back to my office there in Houston in BP's

04:11  15   office and worked with staff members and

16   didn't get an invite beyond that point to

17   participate.

18      Q.     You said yourself and

19   Admiral Cook made that request; is that

04:11  20   correct?

21      A.     We attempted to sit in on a

22   meeting that BP was having, and at that time

23   we were -- we were not allowed to -- to enter

24   that meeting.  I don't know exactly what was

04:11  25   going on in that meeting at that time.  They

```
 1   may have been on a teleconference or
 2   whatever, but at that particular time they
 3   said no, we need -- we need to discuss the
 4   information and -- and that's really the last
 5   I heard of it until we -- we sat down at a
 6   briefing regarding their -- their results and
 7   their analysis of the results.
 8          Q.    Who -- well, No. 1, where did
 9   the meeting take place?
10          MR. FLYNN:  Objection as to form.
11                Which meeting?  He's talking
12   about two.
13          Q.    (BY MR. KRAUS)  I'm sorry, the
14   meeting in which you asked to sit -- sit in
15   on and weren't allowed to.
16          A.    That was at BP's headquarters'
17   office in Houston.  It was a room set aside,
18   a conference room set aside from the main
19   room where the witnessing of the top kill
20   operation was taking place.
21          Q.    Do you recall -- tell me
22   everybody that you recall that was in that
23   meeting.
24          A.    I can't really recall all the
25   members.  I do recall Andy Inglis with BP, I
```

1    believe James Dupree was also in that

2    meeting.  Beyond that I -- I don't have a

3    recollection.

4         Q.    Do you have any specific

04:12  5    recollection of anybody outside of BP being

6    in that meeting?

7         A.    I do not other than there may

8    have been contractors.  I'm not -- not aware.

9         Q.    But as you sit here today you're

04:12 10    not aware -- you have no recollection of

11    anybody outside of the three BP individuals

12    that you named being present at that meeting?

13         A.    I don't recall any government

14    participants being in -- in that meeting that

04:12 15    they were having at that time.

16         Q.    And to the best of your

17    recollection what specifically did they say

18    when you asked to participate?

19         A.    Basically, the -- that they

04:13 20    needed their own time to assess the

21    information.

22         Q.    Okay.  Do you have any idea how

23    long that meeting lasted?

24         A.    I -- I don't really know.  I

04:13 25    know that we were not called on to

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

1    participate until the eventual meeting which

2    I believe occurred later that -- that night

3    or the next day.  I'm not sure.

4        Q.    Okay.  And tell me about that

04:13  5    second meeting.

6        A.    That second meeting is where BP

7    presented to all parties.  I believe, the

8    science team folks were there, Coast Guard

9    was there, I was there.  All the members of

04:13  10   my team were there, I believe.  And it went

11   through a PowerPoint presentation on the

12   analysis of the top kill.

13       Q.    Okay.  If you turn to Tab 4 in

14   your binder, and I've already marked that as

04:14  15   Exhibit 9084.  Can you look at that and tell

16   me if that looks familiar to you and if that

17   is the PowerPoint that you're speaking of?

18       A.    That's correct.

19       Q.    So this PowerPoint is dated

04:14  20   May 29th, 2010; is that correct?

21       A.    Yes.

22       Q.    Okay.  So would that likely --

23   based upon the fact that this is dated

24   May 29, 2010, would that mean the meeting

04:14  25   that you requested to sit on -- sit in on and

```
 1                   As you sit here today do you

 2       have any knowledge as to why you may have

 3       underlined that word "may"?

 4              A.     If -- if that was my underline

04:16  5       of that word "may" it's just words like that

 6       generally relate to uncertainty versus some

 7       concrete fact.

 8              Q.     Do you know which uncertainty

 9       you -- you found interesting?

04:16 10              A.     Well, that -- again, some of

11       this -- my analysis of what was being

12       presented was -- was not having all -- all

13       the facts in front of me for a length of time

14       to be able to determine how they came up with

04:16 15       any one of these assumptions of facts as

16       they're presented here.

17              Q.     Okay.

18              A.     So my -- I can't really testify

19       as to what questions I may have asked, if I

04:16 20       asked a follow-up question related to that or

21       not, but it would have been a point that I

22       wanted more information on what was the data

23       that supported that.

24              Q.     Who else from the U.S.

04:17 25       government was present at this meeting on
```

```
 1    May 29th, 2010, if you recall?
 2         A.    All I can recall specifically
 3    from our office was Brian Domangue there
 4    was -- you know, he was working in Houston
 5    most of the time.  I can't recall
 6    specifically who was there from the -- from
 7    the science team.  I believe also that
 8    Admiral Cook was -- was in this meeting.  I
 9    know, he was participating all the way up
10    through -- through this point.
11         Q.    Okay.  Mr. Domangue is with MMS;
12    is that correct?
13         A.    That's correct.
14         Q.    Can you turn to Page 10?  Do you
15    see the handwriting "all six, question mark"?
16         A.    Yes.
17         Q.    Is that your handwriting?
18         A.    Yes.
19         Q.    Okay.  And if you read the
20    bullet point next to it, it says, "Max flow
21    rate through 7/8s-inch rupture disc openings
22    ca. 60 bpm (six discs failed)."  Did I read
23    that correctly?
24         A.    Yes.
25         Q.    Is the all six question mark
```

01-40957
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )    MDL NO.  2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO, on    )    SECTION: J
APRIL 20, 2010    )
   )    JUDGE BARBIER
   )
   )    MAG. JUDGE SHUSHAN

# CONFIDENTIAL

## WorldwideVIEW ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Lars Herbst
## VOLUME 2

OCTOBER 11, 2012

# COPY



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    that these were all approved plans that were

2    identical, correct?

3        A.    I don't specifically recall

4    how -- how it was portrayed, but --

11:49  5        Q.    Well, if you want to look

6    through these, it's 8962 through 8973, you

7    can confirm that none of these at least

8    indicate they've been approved, correct?

9        A.    As -- as the documents are

11:51 10    depicted, that's -- that's correct, these are

11    all repre- -- represented as submitted, not

12    approved documents.

13        Q.    Okay.  Now, very quickly in the

14    last little bit of time I have left with you,

11:51 15    I want to talk to you about the top kill.

16        A.    Okay.

17        Q.    Were you ever told prior to the

18    top kill that there was discussion within BP

19    that the top kill would not work if the flow

11:51 20    was more than 15,000 barrels per day?

21        A.    I do not recall that discussion.

22        Q.    Is that the type of information

23    that you believe you should receive when

24    you're making decisions of whether or not you

11:52 25    would recommend such a procedure?

1          MR. DIAZ:  Object to form.

2          A.     It would be very helpful in --

3     in the discussion.  It wouldn't be the only

4     item that I would look at.  We were looking

11:52   5     at the entirety of -- of that effort.

6          Q.     (BY MR. BARR)  But if I recall

7     correctly, you're the person that signed off

8     on the top kill procedure, correctly?

9          A.     Yes.

11:52  10          Q.     And you were not told that that

11     contingency existed, correct?

12          A.     As far as I know, that's

13     correct.

14          Q.     Let's look at Tab 31 in your

11:52  15     notebook, and this has been previously marked

16     as Exhibit 8537.  Do you see that, sir?

17          A.     Yes, uh-huh.

18          Q.     Okay.  This is an e-mail from

19     Ole Rygg.  Do you know who that gentleman is?

11:53  20          A.     No, I do not.

21          Q.     You didn't have any experience

22     with him?

23          A.     Not that I recall.

24          Q.     Okay.  I'll represent to you he

11:53  25     was a person that was providing information

1      A.      This one looks similar, but --

2      MR. SINCLAIR:  May 29 we're looking

3  for?  9084.

4      MR. BARR:  See if you can find it real

11:58  5  quick, if you don't mind.

6      Q.      (BY MR. BARR)  Let's go ahead

7  and look at this one.  This is attached to an

8  e-mail from Trevor Hill, referencing that

9  this is a -- a PowerPoint intended for

11:58  10  Secretary Salazar, correct?

11      A.      That appears correct.

12      Q.      Okay.  And I think we may have

13  found it.  Here is the one you were actually

14  shown, May 29th, 2010, which is 9084.  The --

11:58  15  the presentation you were given was

16  explaining why the top kill failed, correct?

17      A.      BP's interpretation of why --

18  why it failed, yes.

19      Q.      Okay.  And the primary reason BP

11:59  20  gave for the failure of the top kill in it --

21  in its belief was a failure of rupture disks,

22  correct?

23      MR. DIAZ:  Object to form.

24      A.      That is correct.

11:59  25      Q.      (BY MR. BARR)  Okay.  That was

448

1    the only possibility that BP called likely,

2    right?

3        A.    I think they used the term

4    plaus- -- "plausible."  Their conclusions

12:00  5    were possible and plausible.

6        Q.    Okay.  In all of the other

7    potential that BP set out, it didn't believe

8    they were either possible or plausible --

9    possible or plausible, correct?

12:00  10        A.    In the scenarios that they

11    discussed, Scenarios 1 and 2, which were the

12    other scenarios, they described their

13    conclusion as possible, but not probable --

14    not plausible.

12:00  15        Q.    Okay.  And in those other

16    scenarios, the one that was not given to you

17    was that the well -- the flow rate may be too

18    high, correct?

19        MR. DIAZ:  Object to form.

12:00  20        A.    I do not see where they gave

21    that explanation.

22        Q.    (BY MR. BARR)  The first time

23    you were ever told that was during this

24    deposition, correct?

12:01  25        MR. DIAZ:  Object to the form.

449

```
        1        A.    As far as seeing physical

        2    documentation of it, that'd be correct.

        3        MR. BARR:  Mr. Herbst, I appreciate

        4    your time.  I don't have any other questions.

12:01   5        THE VIDEOGRAPHER:  Time is 12:01 p.m.,

        6    and we're off the record.

        7        (Recess from 12:01 p.m. to 1:04 p.m.)

        8        THE VIDEOGRAPHER:  Time is 1:04 p.m.,

        9    and we're back on the record.

01:04  10                E X A M I N A T I O N

       11    BY MR. DAVIS-DENNY:

       12        Q.    Good afternoon, Mr. Herbst.  As

       13    I told you at the break, my name is Grant

       14    Davis-Denny, and I represent Transocean.  A

01:05  15    question for you to start with --

       16        THE VIDEOGRAPHER:  Excuse me.  We got a

       17    audio.  Something's going on with your mike.

       18        MS. SARGENT:  Can we stop the clock?

       19        THE VIDEOGRAPHER:  Time is 1:05 p.m.,

01:05  20    and we're off the record.

       21        (Recess from 1:05 p.m. to 1:06 p.m.)

       22        THE VIDEOGRAPHER:  Time is 1:06 p.m.,

       23    and we're back on the record.

       24        Q.    (BY MR. DAVIS-DENNY)  Good

01:06  25    afternoon again.  You were asked some
```

```
 1    the top kill itself; is that right?
 2              A.      That's correct.
 3              Q.      After the top kill failed, BP
 4    employees had a meeting by themselves; is
 5    that correct?
 6              A.      Yes.
 7              Q.      You and Admiral Cook were not
 8    invited to that meeting; is that correct?
 9              A.      We were not invited, that's
10    correct.
11              Q.      And you believe based on who was
12    in that meeting and its proximity to the top
13    kill having just finished that that meeting
14    was about the top kill's failure; is that
15    correct?
16              A.      I believe that to be true.
17              Q.      At some point you two decided
18    that it was important that you be part of
19    those discussions that BP was having about
20    the top kill; is that correct?
21              A.      That's correct.
22              Q.      Why was that important?  Why did
23    you feel that was important?
24              A.      Well, there were -- there was a
25    lot of data to be -- to be analyzed and
```

01:45   5
01:45  10
01:46  15
01:46  20
01:46  25

488

```
 1    understood.  I personally thought it would be
 2    helpful to understand the -- any analysis
 3    that was going on with it, get other -- other
 4    people's input and what their understanding
 5    was and not try to just solely do that
 6    independently, but to -- but to listen to any
 7    and all parties that were available and what
 8    their input was.
 9         Q.    You made a comment yesterday
10    about having had access to certain top kill
11    data in realtime, but not having received the
12    data to analyze.  Do you remember that
13    comment?
14         A.    Yes, yes.
15         Q.    Now, what I took you to mean
16    there is that you saw the data flash across
17    the screen as the top kill was going on, but
18    you didn't have the top kill data in some
19    computer file that you could go sit down and
20    analyze; is that correct?
21         A.    Yes, that's correct.
22         Q.    Okay.  So after BP had met by
23    its -- you know, the BP employees had had
24    this private meeting without you and
25    Admiral Cook, the two of you knocked on the
```

01:46  5
01:47 10
01:47 15
01:47 20
01:47 25

489

```
  1   door of this room; is that right?
  2          A.     That's correct.
  3          Q.     And you asked the people inside
  4   if you could join the meeting; is that right?
01:47  5          A.     That's correct.
  6          Q.     But BP did not allow you to
  7   enter that meeting; is that right?
  8          A.     That's correct.
  9          Q.     BP told you to wait?
01:48 10          A.     I don't remember the -- the
 11   exact language, but we -- we were not allowed
 12   entry at that time.
 13          Q.     Did BP give you a reason?
 14          A.     The only thing from my
01:48 15   recollection is, is that they -- they wanted
 16   time to -- to review the operations.
 17          Q.     Did they explain to you why they
 18   couldn't review the operations with you or
 19   Admiral Cook in the room?
01:48 20          A.     I don't recall any explanation.
 21          Q.     There weren't any members of the
 22   government science team in that meeting; is
 23   that correct?
 24          A.     I cannot be certain, but I don't
01:48 25   believe there were.
```

```
          1          Q.      You also didn't see anyone in
          2    that meeting who you recognized to be a
          3    Transocean employee, did you?
          4          A.      I do not recall.
01:48     5          Q.      I'd like to show you
          6    Exhibit 9084.  This was the State of
          7    Louisiana's Tab 4.  This is a May 29th, 2010,
          8    PowerPoint presentation that was entitled
          9    "Top Kill Analysis"; is that correct?
01:49    10          A.      That's correct.
         11          Q.      The presentation has BP's logo
         12    on it?
         13          A.      That's correct.
         14          Q.      And Exhibit 9084, we determined
01:49    15    yesterday, is the copy of the presentation
         16    that was in your files; is that right?
         17          A.      That's correct.
         18          Q.      BP presented this PowerPoint to
         19    you on or about May 29th of 2010; is that --
01:49    20          A.      That's correct.
         21          Q.      And you understood it to be BP's
         22    analysis of why the top kill had failed?
         23          A.      That's correct.
         24          Q.      Did you expect that BP would
01:50    25    share with you all of the facts relevant to
```

491

1    the top kill analysis when it gave you this

2    presentation?

3         A.    I'm not certain of -- of that,

4    no.  It's just -- it was whatever they were

01:50  5    going to present was what we were going to

6    get.

7         Q.    Would you expect that the

8    responsible party would share with you, MMS'

9    representative at the Unified Area Command,

01:50  10    all of the relevant information it had about

11    the top kill's failure?

12         MR. DIAZ:  Object to form.

13         A.    Yes, I would.

14         Q.    (BY MR. DAVIS-DENNY)  If you'll

01:50  15    turn to Slide 6.  BP describes a scenario

16    here where the hydrocarbons and mud flow went

17    up the drill pipe and bypassed through the

18    rams; is that correct?

19         A.    Yes.

01:50  20         Q.    When BP described this scenario,

21    did they mention that one of their

22    contractors had concluded prior to the top

23    kill that the dynamic kill could not succeed

24    if the flow rate was above 15,000 barrels of

01:51  25    oil per day?

492

```
 1            MR. DIAZ:  Object; form.
 2            A.     Are you referencing language in
 3     the --
 4            Q.     (BY MR. DAVIS-DENNY)  I am not
 5     referencing language.
 6            A.     Okay.
 7            Q.     I'm asking if they told you a
 8     particular fact that is not on the
 9     PowerPoint, and that's why I'm asking you
10     that.
11            A.     I do not recall that statement.
12            Q.     When BP described this scenario,
13     did BP mention that one of its own employees
14     had concluded that the top kill was failing
15     because the flow rate was too high; in other
16     words, because it was over 15,000 barrels of
17     oil per day?
18            MR. DIAZ:  Object to form.
19            A.     I do not recall that.
20            Q.     (BY MR. DAVIS-DENNY)  BP said in
21     the last bullet point on this slide about
22     this first scenario that there was an
23     inconsistency with Scenario 1, correct?
24            A.     Yes.
25            Q.     And the inconsistency that BP
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

1    identified was that with massive flow past

2    the rams, you would expect significant

3    erosion; is that right?

4         A.    That's what it states, yes.

01:52  5         Q.    Did BP present any evidence that

6    there had not been significant erosion as a

7    result of the top kill?

8         A.    Not that I recall, no.

9         Q.    BP represented to you that this

01:52 10    first scenario was possible, but not

11    plausible; is that right?

12         A.    That was their conclusion, yes.

13         Q.    If you'll look at Slide 8.  This

14    is the second scenario that BP presented to

01:52 15    you on May 29th, 2010, as a possible scenario

16    to explain the top kill failure; is that

17    right?

18         A.    That's correct.

19         Q.    That scenario was that

01:52 20    hydrocarbon flow would be up the annulus and

21    casing and that dominant mud flow was in the

22    casing; is that right?

23         A.    That's correct.

24         Q.    And BP also labeled this second

01:52 25    scenario possible, but not plausible?

494

```
        1            A.     That's correct.

        2            Q.     Then if you turn to Slides 9 and

        3      10 for me, please.  Here BP identifies the

        4      third scenario, correct?

01:53   5            A.     That's correct.

        6            Q.     Does that third scenario claim

        7      that the dominant mud flow from the top kill

        8      was through failed rupture disks in the

        9      16-inch casing?

01:53  10            A.     That's correct.

       11            Q.     BP presented this failed rupture

       12      disk scenario to you as a plausible scenario

       13      for explaining the top kill's failure; is

       14      that correct?

01:53  15            A.     That's correct.

       16            Q.     In fact, BP presented this

       17      failed rupture disks scenario as the only

       18      plausible scenario for explaining the top

       19      kill's failure; is that right?

01:53  20            A.     From what I recall, that was the

       21      only one, yes.

       22            Q.     And so BP presented this failed

       23      rupture disk scenario as the most likely

       24      scenario for explaining the top kill's

01:53  25      failure; is that right?
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

495

```
      1        A.      I can only go by what -- what
      2   they stated was that it was plausible, the
      3   others were not.  I don't know if the "most
      4   likely" language was used.
01:54 5        Q.      They didn't present any other
      6   scenario that they la- -- labeled even
      7   plausible; is that correct?
      8        A.      That's correct.
      9        Q.      If you'll turn to Slide 12.  Did
01:54 10  BP inform the group that because the top kill
     11   had likely failed because of the rupture
     12   disks that shutting in the well through use
     13   of a BOP on BOP method would likely lead to
     14   broaching?
01:54 15        A.      Yes, that is one of the bullets
     16   here.
     17        Q.      And broaching in that context
     18   meant that oil could flow into the formation
     19   and possibly up through the seafloor; is that
01:54 20  correct?
     21        A.      That's correct.
     22        Q.      This conclusion that BP
     23   presented about the burst disks being
     24   responsible for the top kill's failure caused
01:54 25  decision makers to turn away from the BOP on
```

1    BOP option at the end of May; is that right?

2         A.     I believe that to be correct,

3    yes.

4         Q.     When BP presented this

01:55  5    conclusion to you about the burst disks being

6    responsible for the top kill's failure, had

7    you had an opportunity to analyze the top

8    kill data that might support or detract from

9    that conclusion?

01:55 10        A.     I didn't have the -- the

11   opportunity.  There were other decision

12   makers in- -- involved in the process at that

13   time.  I agreed with the decision, but for a

14   different reason.

01:55 15        Q.     You had not had the opportunity,

16   though, yourself, to analyze the top kill

17   data files at the point of this May 29th

18   presentation; is that right?

19        A.     That's correct.

01:55 20        Q.     Okay.  I'm going to show you a

21   different document now.  This is Tab 33.

22        MS. SARGENT:  It's been marked 9354.

23        Q.     (BY MR. DAVIS-DENNY)  Is the --

24   if you look at the first page of

01:56 25   Exhibit 9354, is this an e-mail that you

1          A.     Yes.

2          Q.     Did anyone from BP share with

3     you the view that the top kill had failed

4     because the flow rate was too high because it

01:59  5     was over 15,000 or words to that effect?

6          MR. DIAZ:  Object; form.

7          A.     I do not recall that.

8          Q.     (BY MR. DAVIS-DENNY)  Would it

9     have been important to the government's

01:59 10     analysis of the top kill's failure and

11     whether to go forward with the BOP on BOP

12     option to have known that a BP employee had

13     concluded the top kill was failing because

14     the flow rate was over 15,000 barrels of oil

01:59 15     per day?

16          MR. DIAZ:  Object; form.

17          A.     I'm sorry, could you repeat that

18     question?

19          Q.     (BY MR. DAVIS-DENNY)  Sure.

01:59 20     Wouldn't it have been important to the

21     government's analysis of whether to go

22     forward with the BOP on BOP option to have

23     known that a BP employee had concluded that

24     the top kill was failing because the flow

01:59 25     rate was over 15,000 barrels of oil per day?

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

500

```
 1          MR. DIAZ:  Same objection.

 2          A.     Yes, that would be important.

 3          Q.     (BY MR. DAVIS-DENNY)  Okay.  I'd

 4    like to show you another document.  This is

 5    Exhibit 9265.

 6          MS. SARGENT:  Our Tab 105.

 7          Q.     (BY MR. DAVIS-DENNY)  It's --

 8    yes, it's our Tab 105.

 9               Do you know someone named Thomas

10    Selbekk in connection with the response?

11          A.     I do not recall that name.

12          Q.     Did you know Ole Rygg?

13          A.     No.

14          Q.     Okay.  I'll represent to you

15    that Mr. Selbekk and Mr. Rygg work for a BP

16    contractor named Add Energy.

17          A.     Okay.

18          Q.     Have you seen this e-mail

19    before?

20          A.     I do not recall seeing it, no.

21          Q.     You're not -- you're not copied

22    on this e-mail?  You're not a recipient of

23    this e-mail, correct?

24          A.     No.

25          Q.     Okay.  Do you see the subject
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

505

1    and the annular space?

2         A.    That appears what he's referring

3    to, is that either one of those scenarios

4    are -- are possible.

02:16    5         Q.    Okay.  So if you had known that

6    the mud had not gone down into the well, that

7    would have been important to the analysis of

8    whether the mud had exited through the burst

9    disks; is that correct?

02:16   10         MR. DIAZ:  Object; form.

11         A.    I'm sorry, I'm going to have to

12    ask you to repeat one more time.

13         Q.    (BY MR. DAVIS-DENNY)  Sure.  If

14    you had known that the mud had not gone down

02:16   15    into the well, that would have been a

16    relevant fact in your analysis of whether the

17    mud had exited through the burst disks; is

18    that correct?

19         MR. DIAZ:  Same objection.

02:17   20         A.    Again, it's important to know

21    where -- where the mud is -- is going,

22    whether it's going down the backside or if

23    it's going down the main casing bore.

24         Q.    (BY MR. DAVIS-DENNY)  But if you

02:17   25    had known that the mud had not gone down into

```
         1    the well at all, that would have been an

         2    important fact to your analysis of whether

         3    the mud had gone out the burst disks; is that

         4    correct?

02:17    5         MR. DIAZ:  Object to form.

         6         A.    Yes, I believe so.

         7         Q.    (BY MR. DAVIS-DENNY)  And if you

         8    had known that the mud had not exited through

         9    the burst disks, that would have been

02:17   10    important to you because it would have

        11    reduced the risk that might have been

        12    associated with the capping stack; is that

        13    correct?

        14         MR. DIAZ:  Object to form.

02:17   15         A.    That's correct.

        16         Q.    (BY MR. DAVIS-DENNY)  And it

        17    might have reduced the risk that could have

        18    been associated with the BOP on BOP option;

        19    is that correct?

02:17   20         MR. DIAZ:  Object; form.

        21         A.    It -- it could have reduced one

        22    of the risks, yes.

        23         Q.    (BY MR. DAVIS-DENNY)  Okay.  I

        24    want to show you a new exhibit.  This is

02:18   25    Exhibit 7270 and it's Tab 129 and it's a
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

508

```
 1    on the simulations, evidence, and evaluations
 2    performed" --
 3          A.    I'm sorry, I must be on the
 4    wrong.  Can you give me the Bates
02:19 5    number again?
 6          Q.    Maybe I gave you the wrong
 7    number.
 8          A.    There are two Bates numbers on
 9    here.
02:20 10    MS. SARGENT:  I believe it's the larger
11    set of Bates numbers.
12          Q.    (BY MR. DAVIS-DENNY)  You know
13    what --
14          A.    That's the smaller one.
02:20 15          Q.    Let me point you to Roman
16    numeral Page VII, if you see the very small
17    numbers up in the top right.  Not -- if you
18    wouldn't mind, could I see that version of
19    the exhibit you have?
02:20 20          A.    Yeah.  I don't see Romans.
21          Q.    I think there may have been a
22    mix-up on our side.
23          MS. SARGENT:  Roman numeral VII
24    BP-HZN-BLY00125340.  Sorry.  Back together.
02:21 25          Q.    (BY MR. DAVIS-DENNY)  Okay.  If
```

1    you'll look at the line at the top of the

2    page that's near your right hand there, it

3    reads, "Based on the simulations, evidence,

4    and evaluations performed it is believed that

02:21    5    the initial flow path was through a leaking

6    casing shoe and up inside the casing."  Did

7    BP inform you in late May or early June of

8    2010 that one of its contractors had

9    concluded that the flow path with -- was up

02:21    10    the inside of the casing?

11         MR. DIAZ:  Object; form.

12         A.    I'm not re- -- sure which casing

13    they're referring to in this sentence, but I

14    don't re- -- I don't recall that statement

02:21    15    being made.

16         Q.    (BY MR. DAVIS-DENNY)  Would

17    knowing that there was evidence that the flow

18    was up the inside of the casing have been

19    important to you in connection with your

02:21    20    analysis of the top kill's failure?

21         MR. DIAZ:  Object; form.

22         A.    I really don't understand the

23    context in which they're saying "up inside

24    the casing," I don't know which casing

02:22    25    they're referring to here.

```
 1          Q.     (BY MR. DAVIS-DENNY)  Assume for
 2     a moment it's the innermost casing rather
 3     than the flow being up the annular space.
 4     Would that have been an important fact for
02:22  5     you to know in connection with your analysis
 6     of the top kill's failure?
 7          MR. DIAZ:  Object to form.
 8          A.     Again, read -- reading this
 9     sentence, I'm uncertain at what they're --
02:22 10     what they're trying to -- what they're trying
11     to state.
12          Q.     (BY MR. DAVIS-DENNY)  If flow
13     was upside -- up the in side of the interior
14     casing, would you agree with me that the top
02:22 15     kill mud could not have exited through the --
16     the first disk in the 16-inch external
17     casing?
18          MR. DIAZ:  Object; form.
19          A.     Okay.  I believe I see what
02:23 20     they're saying.  So they're talking about the
21     flow path of the -- of the -- of the
22     blowout --
23          Q.     (BY MR. DAVIS-DENNY)  I'm
24     sorry --
02:23 25          A.     -- not the pumping.
```

511

          Q.    I'm sorry, I should have

    explained that.  Yes, they're talking about

    the flow path of the hydrocarbons up the well

    being inside the casing.

          A.    And, I'm sorry, I'm going to ask

    you for more time to question now.

          Q.    Yeah, so let me -- with that

    context in mind let me ask you the question I

    was trying to get at initially.  Would

    understanding that fact have been important

    to your -- to you in your analysis of why the

    top kill had failed?

          MR. DIAZ:  Object to form.

          A.    Fully understanding and knowing

    for certain the flow path would be important,

    and if it was confirmed that that was the

    only flow path, it would be important.

          Q.    (BY MR. DAVIS-DENNY)  And the

    reason why it would be important to -- to

    understand that the flow path was up the

    inside of the casing was that that would mean

    that the mud from the top kill could not have

    gone out the burst disks; is that right?

          A.    If -- if it was stated that that

    was the only flow path, in other words, there

1    wasn't a combined flow path, then, yes, that

2    would be correct.

3         Q.    Okay.  Sir, I'm going to ask you

4    about a different topic now.  I'd like to

02:24  5    show you Exhibit 8980, which was Tab 45 in

6    BP's binder.  This is that "Summary points

7    from the Kill the Well on Paper Discussion"

8    that you've been asked about.  Do you recall

9    this?

02:25 10         A.    Yes.

11         Q.    I just wanted to clarify a

12    couple of things.  You -- you testified that

13    you had never seen the "Summary points from

14    the Kill the Well on Paper Discussion"

02:25 15    before; is that correct?

16         A.    I do not recall seeing this

17    exact summary.

18         Q.    Okay.  And there is no one

19    listed on the meeting attendees on the kill

02:25 20    the well on paper discussion who was from the

21    MMS; is that correct?

22         A.    I do not see any names that they

23    have listed here as MMS employees.

24         Q.    And you were pointed to the --

02:25 25    the third bullet point a couple of times.  Do

1    came from an estimate from NOAA?

2         A.     I believe it was actually a

3    number from BP.

4         Q.     A number from BP, okay.  And so

03:10  5    in this letter, BP is again representing to

6    you that 5,000 barrels a day is the most

7    likely model; is that correct?

8         MR. DIAZ:  Object to form.

9         A.     That's correct.

03:11 10         Q.     (BY MS. SARGENT)  And this is a

11    reservoir model, that's what it says at the

12    top, a reservoir model that BP has run using

13    its proprietary information about the well;

14    is that right?

03:11 15         MR. DIAZ:  Object; form.

16         A.     Yes, that appears to be correct.

17         Q.     (BY MS. SARGENT)  Now, did UAC

18    otherwise have access to BP's proprietary

19    well information?

03:11 20         MR. DIAZ:  Object; form.

21         A.     I can't say, per se, at what

22    point we would have -- obviously, I think we

23    did have inputs.  When the flow rate team

24    started working, I'm sure they gathered well

03:12 25    specific information.

```
 1          Q.     (BY MS. SARGENT)  And the -- the
 2    flow rate team was stood up on approximately
 3    May 18th; is that correct?
 4          A.     I believe that's about the
 5    approximate date, yes.
 6          Q.     So before that period of time,
 7    you are not aware that UAC would have access
 8    to BP's proprietary well information?
 9          A.     Certain well information we --
10    we would have.  If you're asking about this
11    specific information that was used in their
12    reservoir model, I would say that no, we did
13    not have that level of detail.
14          Q.     I'd like to turn quickly to our
15    Tab 114.  It's been previously marked as
16    Exhibit 9226.  And this is an e-mail between
17    a person named Ole Rygg -- we've seen his
18    name before -- to Kurt Mix at BP and dated
19    May 9, 2010.  And I'll just ask you to flip
20    to the next page.  And do you see the range
21    of oil rates represented there?
22          A.     Yes, I do.
23          Q.     And they range from
24    approximately 37,000 barrels per day to
25    87,000 barrels per day; do you see that?
```

03:12 (line 5)
03:12 (line 10)
03:12 (line 15)
03:13 (line 20)
03:13 (line 25)

549

```
 1          A.     Yes.
 2          Q.     And this is the day before BP
 3    had sent its May 10th letter to you stating
 4    that the most likely case was 5,000 barrels
03:13  5    per day; is that right?
 6          MR. FLYNN:  Objection as to form.
 7          A.     It appears to be correct, yes.
 8          Q.     (BY MS. SARGENT)  And some of
 9    these cases say "current restrictions
03:13 10    measured" and give a back pressure of
11    3800 psi; do you see that?
12          A.     Yes.
13          Q.     Were you -- are you aware that
14    there was a pressure measurement of 3800 psi
03:14 15    below the BOP test ram?
16          A.     I'm not sure when I became aware
17    of that, but at -- at some point, yes, we
18    were aware of that.
19          Q.     And as we discussed earlier,
03:14 20    that back-pressure reading can give you an
21    idea of the restrictions in the BOP, that's
22    what it says here when it says "current
23    restrictions"?
24          A.     Yes.
03:14 25          Q.     Now, these aren't worst-case
```

550

scenario numbers, then, correct, because they

purport to model current restrictions?

        MR. FLYNN:  Objection as to form.

        A.     It -- it appears that all of

03:14   them have some restrictions, with potentially

the -- the second to last one, it says

unrestricted to -- to seabed, but it looks

like it -- it's taken into account some

back-pressure.  I don't know if that's the

03:15   water column or something in the stack.

        Q.     (BY MS. SARGENT)  So all of

these cases take into account some

restrictions, and so they're, therefore, not

worst-case scenario flow -- discharge rates;

03:15   is that right?

        MR. FLYNN:  Object as to form.

        MR. DIAZ:  Objection; form.

        A.     Actual worst -- worst-case

scenario would have it flowing to surface

03:15   and -- and not just the mud line.

        Q.     (BY MS. SARGENT)  Now, did BP

ever represent to you the data or the ranges

contained in this chart, up to 87,000 barrels

per day?

03:15   A.     I do not recall seeing that.

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

551

1        Q.      Let's look briefly at Tab 93,

2    8865.  This is an internal BP e-mail thread

3    between Ole Rygg and Add Energy, and it's

4    dated May 16 and May 17.  There's a number of

03:16 5    e-mails.

6                And if you flip to the second

7    page, there is an e-mail from Ole Rygg to

8    Trevor Hill on May 16, and it's cop- --

9    carbon copied to Kurt Mix and Thomas Selbekk.

03:16 10   And I'll just represent for you that Dr. Rygg

11   is a BP contractor, as we said before, and

12   he -- he's involved here in modeling for the

13   top kill effort.

14       A.      Okay.

03:16 15       Q.      And about halfway down the page,

16   he says, "Be aware that we are working on the

17   5,000 barrel per day case.  That could be too

18   optimistic."

19                Do you see that line?

03:16 20       A.      Yes.

21       Q.      Did BP ever tell you that its

22   contractor had warned it that a 5,000 barrel

23   per day flow rate could be too optimistic?

24       MR. DIAZ:  Object to form.

03:17 25       A.      Not that I recall.

1      Q.     (BY MS. SARGENT)  And if you go

2  to the front of the document, there is an

3  e-mail from -- just from Tim Lockett to

4  Trevor Hill, and at the -- at the paragraph

03:17  5  labeled 1 it says, "The apparent reliance on

6  Ole's e-mail on the 5 mbd number, which has

7  little if no origin, is concerning.  From all

8  the different ways we have looked at

9  flowrate, 5 mbd would appear to err on the

03:17 10  low side."

11          Do you see that?

12      A.     Yes.

13      Q.     Did BP ever communicate to you

14  that 5,000 barrel a day number had little if

03:17 15  no origin?

16      A.     No, I don't recall that.

17      Q.     Did BP ever tell you that 5,000

18  barrels day -- the 5,000 barrel per day flow

19  rate erred on the low side?

03:18 20      MR. DIAZ:  Object to form.

21      A.     I don't recall him saying that.

22      Q.     (BY MS. SARGENT)  And, in fact,

23  in the May 10th letter that we had just

24  looked at, the official letter, it

03:18 25  represented 5,000 barrels a day to you as the

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**