01-40971
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Marcia Kemper McNutt, Ph.D.
**VOLUME 2**

OCTOBER 25.  2012

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

```
 1    analysis to determine or try to quantify the

 2    impact on a flow rate of the erosion?

 3                MS. CHANG:  Object to form and

 4    scope.

 5        A.  Me, personally?  Absolutely not.

 6                MR. FIELDS:  Okay.  Okay.  I'll

 7    reserve my remaining time.

 8                THE VIDEOGRAPHER:  The time is

 9    9:55 a.m.  We're off the record, ending Tape 11.

10            (Recess from 9:55 a.m. to 10:01 a.m.)

11                MR. DAVIS-DENNY:  I'm ready.

12                THE VIDEOGRAPHER:  All set?

13            The time is 10:01 a.m.  We're back on the

14    record, beginning Tape 12.

15                        EXAMINATION

16    QUESTIONS BY MR. DAVIS-DENNY:

17        Q.  Good morning, Dr. McNutt.  As I mentioned

18    at the break, my name is Grant Davis-Denny, and I

19    represent Transocean.

20            I want to take you back to yesterday and

21    some testimony that you had yesterday.  You were

22    testifying about a comment that you received from

23    a BP Manager in the week leading up to the top

24    kill, do you recall this?  It was about the --

25    whether the top kill was dependent on the flow
```

1    rate or not.

2              MS. CHANG:  Object to scope.

3        A.  Yes.

4        Q.  (By Mr. Davis-Denny) Okay.  And the BP

5    Manager, in essence, told you that the top kill

6    was not dependent on the flow rate; is that

7    correct?

8              THE VIDEOGRAPHER:  Move your

9    microphone up, please.

10              MS. CHANG:  Object to scope.

11        A.  Yes.

12        Q.  (By Mr. Davis-Denny) I'm handing you

13    exhibit -- previously marked Exhibit 8553.

14              THE COURT REPORTER:  Tab number?

15        Q.  (By Mr. Davis-Denny) And it's at --

16              MR. APPLEMAN:  This was a hard copy.

17              MR. DAVIS-DENNY:  This one was

18    handed out as a hard copy.

19              MR. APPLEMAN:  It's on our CD.

20              MR. DAVIS-DENNY:  Yeah, but it's on

21    the CD?

22          Hand them the CD.

23          (Discussion off the record.)

24        Q.  (By Mr. Davis-Denny) Okay.  It's

25    referenced as 8553 on the -- on the CD.  This

1    exhibit has the title "Summary points from the

2    Kill the Well on Paper Discussion 18 May, 2010."

3         Did the BP Manager who told you that flow

4    rate did not matter to the likelihood of success

5    of the top kill share this document with you,

6    Dr. McNutt?

7              MS. CHANG:  Object to scope.

8       A.  No.

9       Q.  (By Mr. Davis-Denny) Did anyone from BP

10   share this document with you?

11             MS. CHANG:  Scope.

12      A.  This is the first time I've ever seen

13   this document.

14      Q.  (By Mr. Davis-Denny) Okay.  If you'll

15   look at the third bullet point under "Summary

16   Points" --

17      A.  Yes.

18      Q.  -- it says:  "Modeling indicates that a

19   dynamic kill cannot be successfully executed if

20   the oil flow rate is 15000" stock tank barrels

21   per day.

22         Did the BP Manager tell you that modeling

23   had put an upper limit of 15,000 stock tank

24   barrels per day on the dynamic kill?

25             MS. CHANG:  Scope.

1          MR. FIELDS:  Object to form.

2     A.  No.

3     Q.  (By Mr. Davis-Denny) Wouldn't you have

4  liked to have known that fact going into the top

5  kill?

6          MR. FIELDS:  Objection, form.

7          MS. CHANG:  Scope.

8     A.  I think that would have been helpful.

9     Q.  (By Mr. Davis-Denny) Yeah.  Wouldn't you

10  have expected BP to -- BP to share that fact with

11  you going into the top kill?

12          MR. FIELDS:  Objection, form.

13          MS. CHANG:  Scope.

14     A.  Yes.  But I will say that it was only the

15  day before top kill that the Flow Rate Team

16  estimates started approaching this number; so

17  whether there would have been enough impetus to

18  have stopped top kill at that time I think is

19  questionable.

20          The flow rates we had at that time were

21  only lower bounds, from my Team anyway.  I don't

22  know if there was other evidence that might have

23  suggested higher flow rates, but we had lower

24  bounds on flow rates from 12 to 25,000 barrels

25  per day, which would have thrown some question

1    Q.  (By Mr. Davis-Denny) And there were also

2    delays that the Plume Team experienced; is that

3    correct?

4    A.  Well, it was primary the -- primarily

5    the -- the Plume Team and the Reservoir Team.

6    Q.  Okay.  Please look at the fourth bullet

7    point on this document.  It says:  "Knowledge of

8    the flow rate is needed to form a view of the

9    probability of success..."

10          Now, that is the exact opposite of what

11   the BP Manager told you prior to the cop -- top

12   kill; is that right?

13               MR. FIELDS:  Object to form.

14               MS. CHANG:  Object to scope.

15   A.  That is true.

16   Q.  (By Mr. Davis-Denny) Did the BP Manager

17   share with you at the May 18th meeting

18   participants at this Kill the Well on Paper

19   discussion had concluded that knowledge of the

20   flow rate was needed to form a view of the

21   probability of success of the dynamic kill

22   effort?

23               MS. CHANG:  Scope.

24               MR. FIELDS:  Objection, form.

25   A.  No.

```
 1    posed a health hazard to hundreds of workers

 2    involved in well intervention, was proportional

 3    to the flow rate."

 4          Do you stand by that statement,

 5    Dr. McNutt?

 6       A.  Yes.

 7       Q.  It then reads:  "The planning for

 8    containment of oil at the sea surface while the

 9    relief wells were being drilled required a

10    realistic assessment of how much oil needed to be

11    accommodated."

12          Do you also stand by that statement?

13       A.  Yes.

14       Q.  Generally speaking, do you agree that an

15    accurate assessment of the flow rate was

16    important to Source Control efforts?

17             MS. CHANG:  Object to scope.

18       A.  Define "important."

19       Q.  (By Mr. Davis-Denny) Well, the cofferdam

20    effort was sensitive to flow rate efforts?

21       A.  Yes.

22       Q.  The top kill effort was sensitive to flow

23    rate efforts?

24       A.  Yes.

25             MS. CHANG:  Scope.
```

1    Q.  (By Mr. Davis-Denny) The containment
2    effort was sensitive to flow rate estimates?
3                MS. CHANG:  Scope.
4    A.  Yes.
5    Q.  (By Mr. Davis-Denny) And what do you
6    mean -- what do you understand the word
7    "sensitive" to mean there?
8                MS. CHANG:  Object to scope.
9    A.  It was a parameter that was one of
10   several that should be accounted for in any
11   engineering design.
12   Q.  (By Mr. Davis-Denny) Okay.  I'd like to
13   show you another document.  I don't believe this
14   one has been previously marked.  It's Tab 139.
15                MR. DAVIS-DENNY:  Oh, I'm sorry,
16   Tom.
17   Q.  (By Mr. Davis-Denny) This will be Exhibit
18   9673.
19                (Exhibit No. 9673 marked.)
20   A.  Okay.
21   Q.  (By Mr. Davis-Denny) Sorry.  (Tendering.)
22   A.  Got it.
23   Q.  Did you send the E-mail that's at the top
24   of the page to Raya Bakalov on September 7th of
25   2010?

```
 1        Q.  (By Mr. Davis-Denny) I'm going to show
 2   you Exhibit 9163, this is at Tab 76.  There you
 3   are.
 4        A.  (Nodding.)
 5        Q.  And if you could look at the -- you're
 6   not on the E-mail, but I -- if you wouldn't mind
 7   looking at the PowerPoint Presentation?
 8        A.  M-h'm.
 9        Q.  Does this PowerPoint Presentation look at
10   all -- once you've had a chance to review it, my
11   question for you will be whether this
12   Presentation looks familiar to you.
13                MS. CHANG:  Object to scope.
14        A.  (Reviewing document.)  Yes, it looks
15   familiar.
16        Q.  (By Mr. Davis-Denny) Okay.  Is -- is this
17   the Presentation that BP presented to you shortly
18   after the top kill?
19                MS. CHANG:  Scope.
20                MR. FIELDS:  Objection, form.
21        A.  Yes.
22        Q.  (By Mr. Davis-Denny) Okay.  And did they
23   present three scenarios for why the top kill
24   might have failed --
25                MS. CHANG:  Objection, scope.
```

1      Q.  (By Mr. Davis-Denny) -- in this

2  Presentation?

3      A.  Yes.

4      Q.  And for the first scenario, the one

5  that's at Page No. 6, am I correct that they

6  labeled that scenario "Possible but not

7  Plausible"?

8              MS. CHANG:  Object to scope.

9      A.  "Possible but not Plausible" is what it

10 says.

11     Q.  (By Mr. Davis-Denny) Okay.  And if you

12 look at the second scenario on Page 8 of the

13 PowerPoint Presentation --

14     A.  M-h'm.

15     Q.  -- did they label this scenario as also

16 being "Possible but not Plausible"?

17     A.  Yes.

18     Q.  Okay.  And then if you look at the third

19 scenario on -- on Page 10, this is the scenario

20 where they describe this theory that mud flow

21 from the top kill had gone through the failed

22 16-inch rupture disk.  Is that correct?

23              MS. CHANG:  Object to scope.

24     A.  Yes.

25     Q.  (By Mr. Davis-Denny) And they labeled

460

1    this conclusion "Possible and Plausible."  Is

2    that right?

3        A.  Yes.

4              MS. CHANG:  Form and scope.

5        Q.  (By Mr. Davis-Denny) And this was the

6    only scenario that they presented in this

7    Presentation as being "Plausible."  Is that

8    right?

9              MS. CHANG:  Object to scope.  Sorry.

10             MR. FIELDS:  Objection, form.

11       A.  You've read that appropriately.  This was

12   their Presentation.

13       Q.  (By Mr. Davis-Denny) Okay.  And this is

14   what they presented to you at that meeting

15   immediately after the top kill; is that correct?

16             MS. CHANG:  Objection, scope.

17             MR. FIELDS:  Objection, form.

18       A.  This was BP's presentation.

19       Q.  (By Mr. Davis-Denny) Okay.

20             (Discussion off the record.)

21       Q.  (By Mr. Davis-Denny) I'd like to hand you

22   what's previously been marked as Exhibit 9160.

23   It's at Tab 75.  And I'll represent to you,

24   Dr. McNutt, that this is a text message that was

25   sent by BP's Kurt Mix to BP's Jon Sprague on May

```
 1    27th of 2010.
 2         A.  M-h'm.
 3         Q.  I take it you didn't receive this text
 4    message from BP; is that correct?
 5                 MS. CHANG:  Objection, scope.
 6         A.  No, I was not on this particular text
 7    message.
 8         Q.  (By Mr. Davis-Denny)  Okay.  And in the
 9    first sentence it reads:  "Too much flowrate -
10    over 15000 and too large an orifice."
11              Do you see that?
12         A.  Yes, I do.
13         Q.  Did anyone from BP share with you that
14    the top kill was failing because the flow rate
15    was too high, it was over 15,000 barrels of oil
16    per day, or words to that effect?
17                 MR. FIELDS:  Objection, form.
18                 MS. CHANG:  Scope.
19         A.  Not in those words.
20         Q.  (By Mr. Davis-Denny) Did they say that to
21    you in -- in words that were at all close to
22    that?
23         A.  Oh, no.
24         Q.  Okay.
25         A.  Oh, no.
```

462

```
 1        Q.  And they didn't -- they certainly did not
 2    raise this with you at the meeting where they
 3    presented the failed rupture disk as being the
 4    only plausible scenario for the top kill's
 5    failure; is that right?
 6               MR. FIELDS:  Objection, form.
 7               MS. CHANG:  Object to scope.
 8        A.  No.
 9        Q.  (By Mr. Davis-Denny) I'd like to --
10               MR. DAVIS-DENNY:  How much time do I
11    have left?
12               THE VIDEOGRAPHER:  (Indicating.)
13        Q.  (By Mr. Davis-Denny) I'd like to show you
14    what's been previously marked as Exhibit 9164.
15           (Discussion off the record.)
16               MR. DAVIS-DENNY:  My apologies to
17    the audience, but this is on the first CD that we
18    had given you.
19        Q.  (By Mr. Davis-Denny) I'm sure you've seen
20    this E-mail before.
21           (Discussion off the record.)
22        Q.  (By Mr. Davis-Denny) If you start at the
23    beginning of the second page, this is E-mail
24    correspondence from a BP employee named Rupen
25    Doshi.
```

1    the well explosion, and that would -- they would

2    not fail during the top kill operation," that

3    certainly would have eliminated some of your

4    concerns about well integrity, correct?

5                    MR. FIELDS:  Objection, form.

6                    MS. CHANG:  Object to form and

7    scope.

8         Q.  (By Mr. Lundy) "Yes"?

9         A.  I -- it would have been reassuring to

10   have known, prior to top kill, that there was

11   already a Well Integrity Test.

12        Q.  All right.  Look at Tab 43.  It's

13   previously marked as Exhibit 9084.  It's called

14   the "Top Kill Analysis."  I think you've briefly

15   looked at it earlier today.

16        A.  H'm.  Okay.  Yes, this is the one we

17   looked at before.

18        Q.  Okay.  And -- and you see it's sort of

19   a -- a postmortem on the top kill procedure,

20   correct?

21                    MS. CHANG:  Object to form and

22   scope.

23        A.  Yes.

24        Q.  (By Mr. Lundy) Okay.

25        A.  That's what it appears to be.

1          Q.  And if you turn to what's Bates-stamped
2     as IMU010-000459, you'll see "Scenario...1:
3     Supporting Evidence HC and dominant mud flow up
4     drill pipe and bypass through rams."  Do you see
5     that?
6          A.  Bypass at rams, yes.
7          Q.  Okay.  And -- and it says that this
8     "Conclusion" is "Possible but not Plausible,"
9     right?
10         A.  That's what it says.
11         Q.  Okay.  And if you turn to the next page,
12    you'll see "Scenario...2:"  And you'll see that
13    scenario contained on actually the next two
14    pages.
15         A.  M-h'm.
16         Q.  And it's this "HC" flow -- hydrocarbon
17    "flow is up" the "annulus and casing, dominant
18    mud flow into casing."  Do you see that?
19         A.  H'm.  Yes.  Dominant -- yes.  Okay.
20         Q.  Okay.
21         A.  Right.
22         Q.  All right.  And then you see where it
23    says:  "Conclusion:  Possible but not Plausible,"
24    right?
25         A.  That's what it says.

```
 1          Q.  Okay.  Then the next scenario, if you

 2     turn the page, is "Scenario...3:"  Where it says:

 3     "HC" or hydrocarbon "flow is up" a nine and seven

 4     inch "casing," and then, in parens, it says:

 5     (and possibly annulus as well) dominant mud flow

 6     through failed 16 inch rupture discs."  Correct?

 7     Did I read that correctly?

 8          A.  You read that correctly.

 9          Q.  And then the next page says:

10     "Conclusion:  Possible and Plausible," right?

11          A.  Yes.

12          Q.  So BP, in this Top Kill Analysis, is

13     opining that a failure of the rupture disk is not

14     only a possible conclusion, but a plausible

15     conclusion, correct?

16                    MR. FIELDS:  Objection, form.

17                    MS. CHANG:  Form and scope.

18          A.  That's what they write in this document.

19          Q.  (By Mr. Lundy) Okay.  And based upon all

20     of the modeling documents that you've seen today,

21     that were performed by Mr. Ole Rygg with Add

22     Energy, would you agree that the failure of the

23     top kill was as likely caused, or -- or actually

24     caused by too high of a flow rate, as opposed to

25     the failure of the rupture disk?
```

```
 1              MR. FIELDS:  Objection, form.

 2              MS. CHANG:  Form and scope.

 3       A.  Well, I had, even before you showed me

 4   documents today, concluded that I did not think

 5   mud flowing out of the rupture disks caused the

 6   failure of top kill.  DOE Engineers had shown

 7   that the rupture disks were too small to

 8   accommodate the mud from top kill, they -- but

 9   they could not rule out that the rupture disks

10   could be opened, but they couldn't explain the

11   failure of top kill.

12       Q.  (By Mr. Lundy) Okay.  Well, based upon

13   the flow rate documents, the -- the flow rate

14   modeling you've seen --

15       A.  Yes.

16       Q.  -- BP should have considered the flow

17   rate as a plausible cause of the top kill

18   failure, along with these other scenarios listed

19   in Exhibit 9084, the "Top Kill Analysis,"

20   shouldn't it?

21              MR. FIELDS:  Objection, form.

22              MS. CHANG:  Form and scope.

23       A.  And perhaps they did.

24       Q.  (By Mr. Lundy) Well, if they did, it

25   should have been contained in this Top Kill
```

```
 1    Analysis, correct?
 2              MR. FIELDS:  Objection, form.
 3              MS. CHANG:  Form and scope.
 4       A.  The documents that I have seen today lead
 5    me to believe that the Government was not to be
 6    shown flow rate information, and that may be one
 7    reason why it was not included in this analysis.
 8       Q.  (By Mr. Lundy) All right.
 9       A.  We were not in the circle of trust.
10              (Discussion off the record.)
11              MR. LUNDY:  I think that may be all
12    I have.  If you'll give me just a few minutes,
13    let me go through my notes, let's take just a
14    quick break, and I may be finished.
15              THE WITNESS:  Okay.
16              THE VIDEOGRAPHER:  The time is 11 --
17    3:11 p.m.  We're off the record.
18              (Recess from 3:11 p.m. to 3:20 p.m.)
19              (On the stenographic record only:)
20              MR. LUNDY:  Kym, I don't have any
21    further questions.
22              THE COURT REPORTER:  Fair enough.
23              (Discussion off the record.)
24              MS. CHANG:  Kym, I don't have any
25    questions.
```