01-40977
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) | MDL NO. 2179 |
| | ) | SECTION: J |
| | ) | JUDGE BARBIER |
| | ) | MAG. JUDGE SHUSHAN |

***CONFIDENTIAL***

***WorldwideVIEW™***
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Thomas O. Hunter, Ph.D.

**VOLUME 2**

OCTOBER 31, 2012

***COPY***




*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

tell the Labs to instead assume a flow rate of 30,000 barrels of oil per day?

A. For that particular assessment, it -- it wasn't about flow rate, so he -- the answer is "No," he never came back.

Q. Okay.

A. That was a flow path analysis.

Q. Could we please look at Tab 144. We're now moving into a -- a different timeframe --

A. Okay.

Q. -- which is immediately after the top kill --

A. Top kill, yeah.

Q. -- had been attempted.

A. Right.

MR. CHAKERES: (Indicating.)

A. Yes.

Q. (By Mr. Davis-Denny) And Tab 144 has previously been marked as Exhibit 9163.

A. Yes.

Q. This is an E-mail from Ruban Chandran to you sent on May 29th; is that correct?

A. That's correct.

Q. And it's copying Kent Wells?

A. That's also correct.

Q. And Kent Wells was one of your main points of contact at BP; is that correct?
A. Yes. That's also correct, yes.
Q. Okay. And it says: "Tom, please find attached the presentation for the 1pm...call today."
Is that right?
A. Yes.
Q. Okay. Do you recognize the attached presentation?
A. I do, yes.
Q. Okay. This is a presentation that BP made to you and others from the Government on May 29th of 2010; is that correct?
A. I can't -- I can't be sure of that because there were two. One presentation was with me alone --
Q. Oh, okay.
A. -- and this could be that. And then subsequently, the same day, the -- virtually the same information was transmitted to the broader Science Team.
Q. Okay.
A. So I don't know which this is, but I -- I remember the presentation.

Q. I understand.

A. It was shared with me first.

Q. Okay. And the purpose of the presentation was -- as -- as you understood it, was for BP to communicate its analysis of why the top kill had failed; is that correct?

A. And to provide the basis for the decision of continuing or not.

Q. Okay. Now, BP presented three scenarios in -- in your meeting with them; is that correct --

A. That's corr --

Q. -- for why the top kill had failed?

A. That's correct, yeah.

Q. Okay. And if you turn to Scenario 1, which begins on the Bates number that ends in 447, and it carries over to the Bates number that ends on 448.

A. Got it. Yes, I have it.

Q. Scenario 1 was: "HC" -- which I assume stands for hydrocarbons?

A. M-h'm.

Q. -- "and dominant mud flow up drill pipe and bypass through rams."

Is that correct?

it -- the -- do you see that slide?

A. I -- if it's No. 12, I see it.

Q. Yes, it is. Thank you.

Second bullet point is: "If there is a path open to formation then containment is the preferred option."

Does that essentially mean -- did you understand BP to be saying that if the flow was out the burst disk, then containment on the surface was the preferred path forward?

A. If -- if there was a flow out the burst disk and then subsequently out through the shoe, the 18-inch shoe, then that -- that's exactly what they said.

Q. Okay. And then the third bullet point says: "Shutting the well in (via BOP on BOP) is likely to lead to broaching."

Is that correct?

A. That's what it says.

Q. That's what it says?

A. Yeah.

Q. And -- and by that, you understood BP to be saying that if the well was shut in using a BOP-on-BOP, it could lead to flow going out the burst disk and broaching into the seabed; is that

correct?

A. And it -- and the statement is independent of whether its BOP-on-BOP. They just basically shut-in the well would lead likely to broaching. That's what they said.

Q. Okay. And after this, the decision was made to turn away from the BOP-on-BOP option; is that correct?

A. If you define that option as pulling the LMRP, putting the BOP on at the lower connect, it was -- it was not considered after that.

Q. And it had been carefully considered before this; is that correct?

A. It had.

Q. Okay.

A. It -- yes.

Q. I'd like to you turn to Tab 143 --

A. H'm.

Q. -- which is Exhibit 9160.

A. Yes.

Q. And I'll represent to you that this is a text message that BP's Kurt Mix sent to BP's Jon Sprague on May 27th of 2010.

A. I'm sorry, would you repeat the date? It's very hard to read.

Q. Sure. May 27th, 2010.

A. Okay.

Q. It says that in between the text time stamp.

A. I -- I -- I see it, yes.

Q. And then the text reads: "Too much flowrate - over 15000 and too large an orifice."

Do you see that?

A. I do.

Q. I take it you never received this text message, correct?

A. I did not receive a text message.

Q. And -- and you would -- would believe that the Labs' personnel would not have received this text message?

A. I believe that also to be true, that they did not receive it.

Q. Okay. And did BP ever inform you that Mr. Mix had thought that the top kill was failing because it was too much flow rate over 15,000?

A. No ref -- I -- I recall no reference to Mr. Mix's work.

Q. Okay. You were asked some questions yesterday about top kill data and information that BP may have shared with you.

Do you recall those questions?

A. Yeah, I -- yes, I think so.

Q. I take it this is information right here in Mr. Mix's text message that was not shared with you by BP; is that correct?

MR. REGAN: Object to form.

A. Well, it's a fact that it's -- was not shared. I believe my statements yesterday were about having access to information.

Q. (By Mr. Davis-Denny) Okay.

A. But this one was not shared.

Q. Okay. And just to clarify, you didn't have access to this text message, did you?

A. I did not.

Q. All right. I'd like to have you look at Tab 120.

A. 120?

Q. Yes. And it's Exhibit 7270, a document we looked at briefly yesterday afternoon, I think it was.

A. I believe it's that one there.

Q. Yes.

MR. CHAKERES: (Indicating.)

Q. (By Mr. Davis-Denny) That's right. It's that one right -- right up there. You're welcome

because there would, then, not be a risk that installing a capping stack or any other capping mechanism would lead to flow out the rupture disk and into the seabed; is that correct?

A. That would be a bit of a stretch. But it's primarily true. In other words, if -- if you -- we knew the casing hanger was not locked, and you have to account for any subsequent action of the casing hanger if you put a capping stack on.

Q. M-h'm.

A. And -- and so it -- but the first order, if you knew it was central casing flow only, it would -- it would greatly limit the possibility that there was a broaching that initiated with the rupture disks.

Q. Okay. If you knew it was central casing flow only, it would greatly lower the risk that installing a capping stack would cause flow out the burst disk?

A. That's correct.

Q. Okay. Okay. I'd ask you to take a look at Tab 146, which has previously been marked as Exhibit 9265.

A. Yes.

Q. This is an E-mail from Thomas Selbekk. I'll represent to you that Mr. Selbekk works with Ole Rygg at Add Energy, so he's a BP Contractor.
A. Okay.
Q. To Kurt Mix --
A. M-h'm.
Q. -- dated May 29th 2010, with the "Subject" line "Final top kill runs."
A. M-h'm.
Q. Do you see that?
A. I do.
Q. And I'm going to move down to the -- the third paragraph. It says: "Simulating pumping at 78" barrels per minute "shows a flat pressure curve, fairly low max pressure and hardly any drop in pressure, consistent with" the "situation where basically no mud enters the wellbore."
A. I see that.
Q. "There are other combinations that would give the same outcome, e.g., opening around rams etc., nonetheless, comparing the actual pressure curve with the simulations, there are strong indications that a curve with this shape is the result of a situation where there is not enough

restriction at surface to create enough pressure to force the mud into the well." All the -- "all simulations indicate that in order to get mud down, a fairly steep pressure increase must be observed early in the process, followed by a pressure decline as the hydrostatic head increases."

Sir, did you receive this E-mail from BP?

A. No, I did not.

Q. Were you informed of Mr. Selbekk's analysis by BP?

A. Not attributed to Mr. Selbekk.

Q. Okay. Were you informed of -- of this analysis in -- in any other way, even if it wasn't attributed to Mr. Selbekk?

A. I -- I don't recall any way in which it was represented to us that at the highest pumping rate, there was not enough pressure to induce flow down.

Q. Okay. This would be a piece of information you would have liked to have had around May 29th; is that correct?

MR. REGAN: Object to form.

A. On May 29, we were trying to decide the path forward --

Q. (By Mr. Davis-Denny) M-h'm.

A. -- and the most reasonable path forward. Any information, particularly if strong conclusions could be drawn from that information, would be helpful.

Q. Okay. And an analysis that took the top kill data and concluded that there were strong indications that the shape is a result of a situation where there is not enough restriction at surface to create enough pressure to force the mud into the well, that would have been an important fact for you to have been informed of; is that correct?

MR. REGAN: Form.

A. I'd have to go back to what you said about the difference between a fact is the actual physical situation versus the fact that someone said it.

Q. (By Mr. Davis-Denny) Okay.

A. But certainly, in either case it would be important information to have.

Q. Okay. You were -- do you still have BP's binders available, or do you have the exhibits that were introduced yesterday?

A. I don't have them. I'm sure we can get