UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| ALL CASES | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

**UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR ADMISSION OF NINE TRIAL EXHIBITS (PHASE TWO)**

On February 15, 2013, the United States filed a motion seeking the admission of nine deposition exhibits related to the flow rate from the Macondo Well ("Sample Exhibits") for use at the Phase Two trial.  Doc. # 8587.  Three of the Sample Exhibits were opposed by BP and remain at issue.  As described below, each of these documents helps fill in the flow rate picture by showing what BP, its contractors, or the United States believed at different times during the response:

- In mid-May, a BP vice president warned that the flow rate could be as high as 100,000 barrels per day ("BPD") – 20 times BP's public estimate at the time;
- In mid-June, BP's contractor concluded that the company's collection plans indicated BP believed the spill was more than 50,000 BPD; and
- At the beginning of August, between well shut-in and the final well kill, the government estimated that the flow rate just before shut-in was 53,000 BPD and the total discharge 4.9 million barrels.

Each of the Sample Exhibits that BP objects to is admissible as either a party admission or a public record.  No party objected to the admission of the other six Sample Exhibits, and they should be admitted as well.

- 1 -

## I. Documents Showing BP's Internal Flow Rate Understanding During the Spill: Exhibits 3220 and 10468

### A. Admissibility as Party Admissions

*Exhibit 3220*

BP objects to Exhibit 3220 – the email in which BP Vice President Mike Mason warned BP executive Andy Inglis not to "stand[] behind" the 5,000 BPD estimate that was the company's public assertion at the time. BP claims that the exhibit should not be admitted because it contains inner hearsay. In a footnote, BP also implies that Mr. Mason's statement is not a party admission because there is no evidence that it was part of his employment to "review and analyze internet news articles discussing third-party research about the spill." BP Brief (Doc. # 8712) at 2 n.2. Neither objection supports excluding Exhibit 3220.[1]

First, any inner hearsay in Exhibit 3220 is also admissible. The first sentence of Mr. Mason's email references a CNN report. That sentence need not be admitted for the truth of the matter – the United States is not seeking to prove flow rate based on what CNN broadcast in May 2010. Instead, the sentence is admissible to show that it was made and the impact of the CNN report on the recipient, Mr. Mason. *See, e.g.*, *Mota v. University of Texas Houston Health Science Center*, 261 F.3d 512, 527 n.46 (5th Cir. 2001). Upon hearing the CNN broadcast, Mr. Mason responded by sending a warning to the head of BP not to stand behind the 5,000 BPD figure. Because Mr. Mason's statement is a party admission, and any inner hearsay is admissible for reasons other than for the truth, Exhibit 3220 is admissible. *See* Fed. R. Evid. 805; *see also United States v. Brown*, 459 F.3d 509, 528 n.17 (5th Cir. 2006) (admitting under Rule 801(d)(2) an email by defendant in which he described conversation between two other people); *Brauninger v.*

---

[1] In the meet and confer process, BP also objected to Exhibit 3220 based on Rules 401, 402, and 403. BP does not address the relevance objections in its brief, so we do not belabor the exhibit's relevance.

*Motes*, 260 Fed. Appx. 634, 636-637 (5th Cir. 2007) (affirming admission of notes as business records where they included inner hearsay statements not offered for truth).

Second, as described in the United States' initial brief, Mr. Mason was a company vice president who led response work related to flow modeling.  His statement was well within the scope of his job duties.  From near the beginning of the spill, Mr. Mason's team was performing flow rate calculations under various scenarios to determine which source control options were feasible.  Michael Mason Deposition (Att. 4 to U.S. Initial Brief) at 45:11-47:6, 47:21-48:7.  As Mr. Mason said in his deposition: "[W]e were trying to figure out that first week what the flow rate was from that well, and that was sort – the sort of a thing that Petroleum Engineers do." *Id.*  In fact, Exhibit 3320 specifically links his warning to his superiors with the work he oversaw: "*[O]ur modelling shows* that this well could be making anything up to ~ 100,000 bopd depending on a number of unknown variables[.]"  Exhibit 3220 (emphasis added).  To say that Mr. Mason's warning was outside the scope of his employment is to restrict the party admission doctrine so severely that it would become a nullity.  The case law makes clear such an approach is incorrect. *See, e.g.*, *Corley v. Burger King Corp.*, 56 F.3d 709, 710 (5th Cir. 1995) (explaining that statements do not have to be made strictly within declarant's scope of employment, but instead must concern matters related to declarant's scope of employment); *United States v. Saks*, 964 F.2d 1514, 1524 (5th Cir. 1992) ("we should not be hyper-technical in construing the agency relationship of Rule 801").[2]

---

[2] *See also, Aliotta v. AMTRAK*, 315 F.3d 756, 762 (7th Cir. 2003) (to qualify an admission, an employee need only be performing the duties of employment when he contacts particular facts at issue); *Hoppowit v. Ray*, 682 F.2d 1237, 1262 (9th Cir. 1982) (explaining that the statement itself need not be squarely "within the scope of the declarant's agency.  Rather, it need only be shown that the statement be related to a matter within the scope of the agency.").

*Exhibit 10468*

Exhibit 10468 describes a key BP contractor's conclusions based on BP's plans to collect 40,000 to 53,000 BPD. BP objects to the document as hearsay, arguing that the United States has failed to show Schlumberger employee John Dribus was acting within the scope of his employment and that the underlying news article is hearsay without an exception.

Once again, BP relies on a severely narrow reading of Rule 801(d). BP hired Schlumberger to "mobilize the [] well testing equipment that would be used to *contain and either capture or burn the maximum amount of oil possible*." Albert "Bud" DeCoste Deposition (Att. 24[3]) at 22:21-23:5 (emphasis added). Mr. Dribus was part of Schlumberger's Macondo team. *See, e.g.,* STC-MDL-0032197-STC-MDL-0032199.[4] Given that Schlumberger's role was to help capture or burn the maximum amount of oil, it is clear that the *actual* flow rate was relevant to Schlumberger's work, as shown by how Mr. Dribus's colleagues responded to his email. Mr. Dribus sent Exhibit 10468 to Mr. DeCoste and Robert Drummond. Mr. DeCoste was the primary Schlumberger contact for that company's senior management on the Macondo oil spill, and Mr. Drummond was his manager. DeCoste Dep. (Att. 24) at 15:22-16:15, 167:24-168:13. After receiving Mr. Dribus' email, Mr. DeCoste discussed it with Mr. Drummond because "we were going to have to try and find additional people and equipment if there were going to be more containment vessels." *Id*. at 161:9-163:21. Mr. DeCoste's Rule 30(b)(6) deposition testimony on Schlumberger's behalf establishes that Exhibit 10468 was part of the company's work on the Macondo spill on BP's behalf. As Mr. DeCoste's testimony makes clear, because

---

[3] Attachments 1-23 were included with the United States' initial brief.

[4] This document was marked "Highly Confidential" by Schlumberger and will be provided separately to the Court and the Parties.

Schlumberger's job was to help capture or burn the oil, the applicable flow rate is undeniably "related" to that job.  *Burger King* 56 F.3d at 710.[5]

BP further argues that the inclusion of the Oil & Gas Journal article precludes admission of Exhibit 10468.   This argument fails for two reasons.   First, Mr. Dribus adopts the news article by forwarding it on with his comments.   Contrary to BP's brief, nothing Mr. Dribus said in his message suggests that he doubts the truth of the statement.   To the contrary, he forwarded on his conclusions about what BP actions meant: "That appears to be their admission that this well is flowing at a rate of greater than 50,000 b/d!"   Exhibit 10468.   Mr. Dribus's act of forwarding the news article and commenting on it as though it were true suggests that he indeed adopted its conclusion.   As noted above, his Schlumberger colleagues accepted the truth of the message, and began working to get additional resources.   Second, the Oil & Gas Journal news article can be admitted for the effect it had on Mr. Dribus – it caused him to write the message to his colleagues quoted above.   *See* Fed. R. Evid. 805; *Brown*, 459 F.3d at 528 n.17; *Brauninger*, 260 Fed. Appx. at 636-637.   In the alternative, the Court could admit Mr. Dribus's message without admitting the earlier, Oil & Gas Journal email, as the Court did in a prior ruling parsing out the admissible portions of an email chain.   *See* Doc. # 5615 at 6.

### B.   Admissibility Not for the Truth of the Assertion: Contrary to BP's Argument, BP's Internal Flow Rate Knowledge Is Relevant to Phase Two

As the United States explained in our initial brief, the Sample Exhibits can also be admitted as evidence of what BP and its contractors knew and believed during the spill, rather for their truth.

---

[5] BP also argues that Mr. Dribus's statements were "speculation" and that he had "no way of knowing" the true flow rate.   BP Brief at 6-7.   Such claims are immaterial: the statements were made by a BP agent on an issue related to his work and so qualify as party admissions.   The rule does not inquire into the factual basis for such statements, and BP will be free to challenge the weight due the statement.   In any event, his statement was considered reliable enough for Schlumberger to increase the resources it devoted to its collection work. DeCoste Dep. (Att. 24) at 161:9-163:21.

BP does not dispute the legal proposition, but makes the incredible argument that such knowledge is irrelevant to Phase Two issues. BP Brief at 7-8.

Both documents are relevant to what BP knew during the response – and the extent to which its internal understanding of flow rate differed from its public pronouncements. BP's knowledge during the response, and the divergence of its public and private flow estimates, are relevant to several Phase Two issues, including BP's credibility in its flow rate contentions and BP's source control efforts.[6] For example, BP's knowledge that the true flow rate could be as high as 100,000 is relevant to the estimates that the United States and BP will put forward in the Phase Two expert process. If BP asks its hired experts to criticize the United States' number as too high and present a lower number, the extent to which the company's internal experts reached a different conclusion during the spill – when they had every incentive to get the right number in order to increase their chances of stopping the spill – is highly relevant. Similarly, the extent to which BP proceeded with source control options that the company should have known were unlikely to succeed – based on internal flow rate information that the company chose not to share with the United States – is relevant to evaluating the company's source control efforts.[7] Finally, BP's own discovery efforts demonstrate that it believes that flow estimates made during the response are relevant. BP has sought extensive discovery of every flow rate estimate made by the United States. It cannot equitably now claim that its own estimates are off-limits.

---

[6] These exhibits would also be relevant to later phases issues, including the Clean Water Act penalty factors.

[7] BP argues that the United States has "disclaimed interest in the Source Control portion of Phase Two." BP Brief at 8 (citing March 16, 2012 Working Group Conference Transcript). This is incorrect: the United States made clear in the Spring 2012 discussions that source control was relevant to penalty and other topics. March 16, 2012 WGC Tr. 17:21-18:3; March 23, 2012 WGC Tr. 10:20-11:1.

More importantly, BP forced the source control issue onto the United States by taking extensive discovery of government source control witnesses and attempting to make the United States share the blame for the length of time required to stop the flow of oil. Thus even if the United States had wanted to avoid source control in Phase Two, BP brought to the issue to the fore and required the United States to engage.

When turning to the specific exhibits, BP goes to implausible lengths to minimize the value of the documents. For example, BP characterizes Exhibit 3220 as merely one employee's thoughts about a CNN article. BP Brief at 7. In reality, Mike Mason was not merely some employee: he was a vice president at the heart of BP's flow work during the response. Nor was his email simply providing his thoughts about a CNN article. Mr. Mason was telling a leading executive of the company that he thought BP's public statements were misleading. BP should have taken the statement seriously at the time, and the Court should have the opportunity to receive it in evidence now.

## II.   Document Showing Government Flow Rate Estimates During Response: Exhibit 8804

*Exhibit 8804*

Exhibit 8804 is the March 2011 final report of the Flow Rate Technical Group ("FRTG Report"). BP argues that the FRTG report does not qualify as a public record and contains inner hearsay.[8]

The FRTG Report is a public record. The FRTG was created by the National Incident Command to (1) quickly estimate the flow rate and (2) "use multiple, peer-reviewed methodologies to later generate a final estimate of flow rate and volume of oil released." Exhibit 8804 (Attachment 1) at 6. The Report represents the fulfillment of the second half of the FRTG's mandate. Mark Sogge Deposition (Att. 25) at 80:6-82:5, 256:22-257:18. Rule 803(8) specifically includes "factual findings from a legally authorized investigation." The FRTG Report sets forth the findings the FRTG made, as directed by the National Incident Command, and so qualifies as a public record, just as Judge Barbier has already found for the National Commission Report and the Chief Counsel's Report. Doc. # 5635.

---

[8] Notably, BP wants to use portions of the document *against* the United States as party admissions. BP Brief at 3.

BP presents two reasons that the FRTG Report fails to meet the public record requirements. The company relies on statements from the report itself to say that it is not a "record or statement of a public office" and that it lacks the requisite trustworthiness to satisfy Rule 803(8). BP Brief at 5-6. In essence, BP's argument is that a report can only qualify as a public record if it is the entire government's *final* word on a subject. Here the report was simply the final analysis of the FRTG, fulfilling the group's mandate from the National Incident Command. That suffices for Rule 803(8). The rule does not require finality or perfection in public records. As the Fifth Circuit has found, a party's "complaint that [government] reports are incomplete and inaccurate are matters going to the weight of this evidence and not its admissibility." *Moss v. Ole South Real Estates, Inc.,* 933 F.2d 1300, 1307 (5th Cir. 1991). This approach is particularly appropriate in a bench trial.

Finally, BP argues that the FRTG Report should be excluded because it includes inner hearsay. As an initial matter, the examples of alleged inner hearsay that the company provides illustrate how little there is to fear from admitting the document. BP complains that six sub-reports are inner hearsay, but they are part of the report itself, focusing on particular methodologies used. Thus they are not inner hearsay at all. BP's other examples may qualify as hearsay, but to resort to complaining about comments from peer reviewers buried deep in the appendices of the report demonstrates that inner hearsay is not a significant problem with the FRTG Report. If this level of inner hearsay suffices to exclude a report, it is hard to imagine any lengthy document would ever be admissible.

Comparing the FRTG Report to the National Commission Report and Chief Counsel's Report is instructive. As noted, Judge Barbier already found that those documents qualify as public records, but he excluded them because of the "multiple instances of inner hearsay that would have to be addressed at trial[.]" Doc. 5635 at 2-3. The inner hearsay problem posed by

the National Commission Report and the Chief Counsel's Report is quite different from any hearsay in the FRTG Report.  The former reports provided the results of investigations that involved interviewing scores of witnesses.  In essence, the reports were compilations of what the authors learned from talking to outside experts.  By contrast, the authors of the FRTG Report *were* experts reporting their own work.  While there may be some instances of inner hearsay, they can be treated on an ad hoc basis depending on how the document is used at trial, an approach Judge Barbier has already endorsed for certain non-governmental reports containing inner hearsay: "The Court will address these objections during the trial as needed and will give the reports whatever weight they deserve."  *See* Doc. 5834 (admitting the Bly Report, Transocean's accident investigation report, and the Berkeley Report).  This approach makes the most sense for the FRTG Report as well.

### III.     Exhibits Without Objection: Exhibits 8865, 9453, 9455, 10346, 10518, And 10622

No party objected to the remaining six Sample Exhibits.  BP states that its objections to Exhibits 8865, 10346, 10518, and 10622 are for preservation purposes only, apparently conceding that their admission is law of the case due to the Court's order on the Boots & Coots report.  BP Brief at 8 (citing Doc. # 3346).  Halliburton lodged objections during the meet and confer process to two of the United States Sample Exhibits (Exhibits 9453 and 9455), but did not file any objection to the United States' instant motion.  All of these exhibits should be admitted for lack of a substantive objection.

**CONCLUSION**

Each of the nine Sample Exhibits should be admitted for trial. No Party has presented a substantive objection to Exhibits 8865, 9453, 9455, 10346, 10518, or 10622. The three documents for which BP asserts a substantive objection are admissible as well, either as party admissions or public records, as described above. Therefore the United States respectfully requests a ruling that Exhibits 3220, 8804, 8865, 9453, 9455, 10346, 10468, 10518, and 10622 are admissible.

Respectfully submitted,

| | |
|---|---|
| BRIAN HAUCK<br>Deputy Assistant Attorney General<br>Civil Division | IGNACIA S. MORENO<br>Assistant Attorney General<br>Environment & Natural Resources Division |
| PETER FROST<br>Directory, Torts Branch, Civil Division<br>Admiralty and Aviation<br>STEPHEN G. FLYNN<br>Assistant Director<br>MICHELLE DELEMARRE<br>SHARON SHUTLER<br>JESSICA SULLIVAN<br>JESSICA MCCLELLAN<br>MALINDA LAWRENCE<br>Trial Attorneys | SARAH HIMMELHOCH<br>Senior Litigation Counsel<br>NANCY FLICKINGER<br>SCOTT CERNICH<br>THOMAS BENSON<br>Senior Attorneys<br>DEANNA CHANG<br>A. NATHANIEL CHAKERES<br>JUDY HARVEY<br>ABIGAIL ANDRE<br>RACHEL HANKEY<br>BETHANY ENGEL<br>Trial Attorneys |
| /s/ R. Michael Underhill<br>R. MICHAEL UNDERHILL, T.A.<br>Attorney in Charge, West Coast Office<br>Torts Branch, Civil Division<br>U.S. Department of Justice<br>7-5395 Federal Bldg., Box 36028<br>450 Golden Gate Avenue<br>San Francisco, CA 94102-3463<br>Telephone:   415-436-6648<br>Facsimile:   415-436-6632<br>E-mail:   mike.underhill@usdoj.gov | /s/ Steven O'Rourke<br>STEVEN O'ROURKE<br>Senior Attorney<br>Environmental Enforcement Section<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044<br>Telephone:   202-514-2779<br>Facsimile:   202-514-2583<br>E-mail:   steve.o'rourke@usdoj.gov<br><br>DANA J. BOENTE<br>United States Attorney<br>Eastern District of Louisiana<br>SHARON D. SMITH<br>Assistant United States Attorney<br>Eastern District of Louisiana<br>650 Poydras Street, Suite 1600<br>New Orleans, LA   70130<br>Telephone:   (504) 680-3000<br>Facsimile:   (504) 680-3184<br>E-mail:   sharon.d.smith@usdoj.gov |

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  March 1, 2013.                           /s/   Steve O'Rourke
                                                                            U.S. Department of Justice