# Attachment 24

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL          )  MDL NO. 2179

BY THE OIL RIG             )

"DEEPWATER HORIZON" IN )  SECTION "J"

THE GULF OF MEXICO, ON )

APRIL 20, 2010             )  JUDGE BARBIER

                           )  MAG. JUDGE SHUSHAN


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VOLUME 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


        30(b)(6) Deposition of Albert Jeremiah
"Bud" DeCoste, Jr., Schlumberger, Limited, taken
at the Pan-American Building, 601 Poydras Street,
11th Floor, New Orleans, Louisiana, 70130, on the
5th day of December, 2012.

```
 1        Q.   (By Ms. André) Do you have any medical
 2   conditions, or are you taking any medications
 3   that would --
 4        A.   No.
 5        Q.   -- affect your memory or ability to
 6   answer questions today?
 7        A.   No.
 8        Q.   Okay.  Have you been told that you are
 9   here as Schlumberger's 30(b)(6) representative?
10        A.   I have been told.
11        Q.   And do you know that, in that role,
12   you're responsible for testifying today generally
13   about the PVT analysis, the pressure volume
14   temperature analysis that Schlumberger did on
15   Macondo Well samples?
16        A.   Yes.
17        Q.   And also about the work that Schlumberger
18   did on the collection vessels that were working
19   to collect oil from the DEEPWATER HORIZON and
20   Macondo Well?
21        A.   Yes.
22        Q.   Okay.  Did anyone tell you why you were
23   selected to be Schlumberger's 30(b)(6)
24   Representative?
25        A.   Yes.
```

1      Q.  Why were you selected?

2      A.  It was due to my role during the Summer

3  of 2010 where I was acting largely as the

4  communication point with our Senior Management on

5  all of the activities we were performing

6  associated with the -- with both the blowout and

7  the implications in our business from the

8  moratorium.

9      Q.  Okay.  So because you have personal

10  knowledge but have also been designated as an

11  Official Representative of Schlumberger, I'm

12  going to be asking you questions today both based

13  on your personal knowledge and Schlumberger's

14  position.

15      A.  (Nodding.)

16      Q.  If it's ever unclear which I'm soliciting

17  from you, just ask, and I'll clarify.  Okay?

18      A.  Okay.

19      Q.  How did you prepare for today's

20  deposition?

21      A.  I spent six full days with our Counsel.

22      Q.  Okay.

23      A.  I met with about a dozen of my colleagues

24  that were either directly involved or had

25  technical knowledge that I needed to fill some

1              THE WITNESS:   Sorry.   Yes.

2        Q.   (By Ms. André) What position did you hold

3     at that time?

4        A.   My title was Marketing Manager for the

5     Gulf of Mexico.

6        Q.   Okay.  And what were your job duties

7     related to the Macondo Well?

8        A.   So, on a daily basis, I wrote a Report to

9     our Senior Management, including the Chief

10    Executive Officer of the Company, on our -- our

11    activities in the field, generally what was in

12    the press locally about Macondo, and then as --

13    also about, as I said earlier, about the

14    moratorium and the impact that the moratorium was

15    going to have on our business in the near term

16    and longer term.

17       Q.   Okay.  So you weren't directly involved

18    in the technical side of Schlumberger's response

19    to the Macondo spill?

20       A.   I was not.

21       Q.   Okay.  Okay.  What was Schlumberger hired

22    to do on what I'm going to call the Macondo

23    Project?

24       A.   M-h'm.  So we were -- we were hired --

25    the -- the -- the primary message that was given

1   to us was to mobilize the -- the well testing

2   equipment that would be used to contain and

3   either capture or burn the maximum amount of oil

4   possible with the vessels that were put at our

5   disposal.

6        Q.   Okay.  Were those the ENTERPRISE and the

7   Q4000?

8        A.   Yes.

9        Q.   Any other vessels?

10       A.   Later, we began to mobilize for the

11  DISCOVERER CLEAR LEADER, but that was never

12  actually put into operation.

13       Q.   Okay.  What about the HELIX PRODUCER?

14       A.   We didn't have any -- anything to do with

15  that, other than some PVT samples that came in

16  much later.

17       Q.   Okay.  So in addition to the well testing

18  work, what else did Schlumberger do related to

19  the Macondo Project?

20       A.   So we had the wireline logging contract

21  on the -- on the DEEPWATER HORIZON, which

22  involved doing the -- the formation evaluation

23  services.

24            We did PVT work associated with both the

25  wireline logging and the well testing work, or

1    the -- the containment work we were doing.

2         Q.  And when you say --

3         A.  That's it.

4         Q.  Oh, I'm sorry.  Were you --

5         A.  And I think that was it.

6         Q.  Okay.  When you say that you did "PVT

7    work related to the wireline and the well

8    testing," do you mean that you did PVT work based

9    for reservoir samples and for samples taken from

10   the vessels?

11        A.  Yes.

12        Q.  Okay.  Is there anything else that

13   Schlumberger was responsible for doing related to

14   the Macondo Project?

15              MR. TANNER:  That you're aware of.

16              MS. ANDRÉ:  (Nodding.)

17        A.  The -- the wireline logging, we did one

18   wireline logging job which was related to Macondo

19   on a different rig under the same Contract, which

20   was the isolation scanner job in September --

21        Q.  (By Ms. André) Okay.

22        A.  -- that was -- that was still under the

23   same -- same role.

24        Q.  And as part of the wireline logging

25   duties, Schlumberger took samples from -- of

```
 1    Macondo Reservoir fluid shortly before the
 2    blowout; is that correct?
 3         A.   That is correct.
 4         Q.   Okay.  When was Schlumberger originally
 5    hired to do the well testing work for the Macondo
 6    Project?
 7         A.   We had a long-term Contract on the
 8    ENTERPRISE, and that equipment was -- was
 9    already -- most of that equipment was already
10    onboard the rig.
11         Q.   Okay.
12         A.   And that Contract had been in place since
13    2009 sometime.  Then shortly after the blowout
14    when we started to have discussions about
15    mobilizing the equipment for the Q4000.  I don't
16    know the exact date.
17         Q.   That's just fine.
18              I'm going to walk through a couple of
19    these contracts with you.  I -- I won't be asking
20    you too much detail about them.  I just want to
21    have you identify them for the record.
22         A.   Sure.
23         Q.   So, first, if you could turn to
24    Tab 38.  And we're going to hand you a copy here.
25                   MR. TANNER:  Ms. Abby, you're going
```

```
 1    correct?

 2        A.  Yes.

 3        Q.  Okay.  Roughly how many contracts had

 4    Schlumberger entered into with BP before the

 5    Macondo Incident?

 6        A.  We've been working for BP for, you know,

 7    decades.

 8        Q.  Fair enough.

 9        A.  So that's hard to say, but the two

10    contracts you showed were -- covered a lot of our

11    work.  The underlying Master Service Agreements

12    covered a lot of our work in the --

13        Q.  Okay.

14        A.  -- Gulf of Mexico.

15        Q.  Okay.  Okay.  All right.  So first this

16    morning, I want to talk about the well testing

17    work that Schlumberger did for BP.  Generally,

18    can you describe what well testing services

19    Schlumberger provided to BP for the Macondo

20    Project?

21        A.  So -- so first of all, it's a little bit

22    of a -- of a misnomer to -- to call it "well

23    testing."  We call it "well testing."  We've

24    called it "well testing," but well testing is

25    generally about reservoir evaluation and
```

1    understanding flow properties and -- and pressure

2    buildups and things that describe the reservoir.

3            This was the application of well testing

4    equipment to something that we don't normally do,

5    which is all about trying to capture and contain

6    or burn the maximum amount of oil possible --

7        Q.  Okay.

8        A.  -- which is not a normal well testing

9    operation.

10        Q.  Right.

11        A.  So what we did in the case of Macondo

12    with our well testing equipment was on the

13    ENTERPRISE.  We had what we call two trains of --

14    of well testing equipment to -- going through

15    two -- two identical systems to capture oil and

16    gas there.  And on the ENTERPRISE, the ENTERPRISE

17    itself had a fair bit of capacity for containing

18    or storing the oil, so there was no reason to --

19    to burn it.  It was captured into tanks and then

20    transferred to another vessel for transport into

21    the -- into town --

22        Q.  Okay.

23        A.  -- to the beach.  And then on the Q4000,

24    we had a single train, but because the Q4000 had

25    no built-in means of storing, we employed our

1    EverGreen burner to burn the oil.

2        Q.  And what's EverGreen burner?

3        A.  It's a -- it's -- it's essentially a -- a

4    sophisticated flaring device that with the use of

5    a lot of compressed air, and a special nozzle

6    designs, you can -- you can burn oil without any

7    significant fallout back into the sea.

8        Q.  Okay.

9        A.  So it's -- it's considered a green

10   burner.

11       Q.  And Schlumberger produced to BP a series

12   of Well Testing Services Reports based on these

13   activities, correct?

14       A.  Correct.

15       Q.  What's typically included in a Well

16   Testing Service Report?

17       A.  It's a combination of the sensors that

18   were deployed on the -- on the -- throughout the

19   equipment monitoring pressures and temperatures,

20   most importantly, pressure before and after the

21   choke manifold.

22       Q.  Okay.

23       A.  Then monitoring the -- the pressure and

24   temperature of the separator, and then monitoring

25   the rates of oil and gas that come out of the

1    separator.

2         Q.   Okay.

3         A.   And, of course, based on those rates, the

4    cumulative amount of oil that's captured or

5    burned.

6         Q.   So you said that the burning process that

7    went -- that happened on the Q4000 is not

8    something that Schlumberger typically does?

9         A.   (Shaking head.)

10        Q.   Is that correct?

11        A.   No, that's not what I said.

12        Q.   Please correct me.

13        A.   We -- we -- we use the EverGreen burner

14   throughout the world, but -- and have -- that --

15   that burner was first deployed in the '90s.  It's

16   just that burning of oil in the Gulf of Mexico is

17   not permitted routinely, but it is something that

18   is allowed throughout the world.  We do it in the

19   North Sea, we do it in North Africa, off West

20   Africa.

21        Q.   And it was permitted in this case

22   because --

23        A.   Because --

24        Q.   -- it was an emergency?

25        A.   Exactly.

1          MR. TANNER:  Got to allow her to
2    finish.
3          THE WITNESS:  I've got to let her
4    finish.  I'm sorry.
5          MR. TANNER:  Everybody gets their
6    turn.
7     Q.  (By Ms. André) So you said that -- when
8    you were talking about the well testing label on
9    the Q4000 work being something of a misnomer,
10   that was why I was a little bit confused.  So you
11   weren't saying that the work that Schlumberger
12   did on the Q4000 is not work that Schlumberger
13   typically does?
14         That was confusing.  That was a confusing
15   question.  I can ask it again.
16         So the work that Schlumberger did on the
17   Q4000 it had done before?
18    A.  Yes.  The work we were doing on both the
19   Q4000 and the ENTERPRISE is work that we
20   routinely do.  It was the motivation for it and
21   the -- the drivers for it were different.
22    Q.  Okay.  And providing Reports about the
23   temperatures and pressures before and after the
24   sensors, before and after the choke manifolds
25   accumulated flow rate, those are things that you

1    typically provide your clients in Reports?

2         A.   Yes, that's routine.

3         Q.   Okay.  Okay.  So I want to pull out some

4    copies of the Well Testing Service Reports

5    created by Schlumberger for both the ENTERPRISE

6    and the Q4000.  They're on the second disc that I

7    brought in this morning.

8              And I've previously marked all of them.

9    I'm going to show you an old version of the

10   ENTERPRISE Report and then the new version of the

11   ENTERPRISE Report and enter those in.

12             And then the same thing for the Q4000.

13   And then we'll talk about the Final Reports,

14   okay?

15        A.   (Nodding.)

16        Q.   Okay.  So --

17             (Discussion off the record.)

18                  MS. ENGEL:  That's the first one.

19                  MS. ANDRÉ:  Okay.

20        Q.   (By Ms. André) Okay.  So first I'm going

21   to enter as Exhibit 10438, an ENTERPRISE "Well

22   Testing Services Report," with the Bates ending

23   0908, that the "Print Date" states was created on

24   June 2nd, 2010.

25                  MR. TANNER:  Can I have one of those

```
 1      Flumber -- Schlumberger on the effect of top kill
 2      as it relates to the failed top kill effort?
 3           A.  No, I'm not.
 4           Q.  Okay.  Outside the context of this
 5      E-mail, are you -- is Schlumberger aware of any
 6      effect on the top kill as it relates to flow
 7      rate?
 8           A.  No.
 9           Q.  Okay.  Those are all the questions I have
10      for that.  If you can move to Tab 5, which I've
11      premarked as Exhibit 10468.  There's an E-mail
12      from John Dribus --
13           A.  M-h'm.
14           Q.  -- to Robert Drummond and yourself with
15      cc's to William Coates and Mark Riding, dated
16      June 15, 2010, "Subject:"  "BP plans to collect"
17      50,000 to 53 b slash --
18                 MR. TANNER:  Forty -- 40,000.
19           Q.  (By Mr. Kraus) I'm sorry.  "40,000 to
20      53,000 b/d from" -- "from gulf oil spill."  Is
21      that correct?
22           A.  That's what it says, yes.
23           Q.  Okay.  Who is John Dribus, Dribus?
24           A.  John is actually our Global Geology
25      Advisor.
```

1      Q.   Okay.

2      A.   Sort of the top Geologist in the company.

3      Q.   Okay.  And William Coates?

4      A.   He was, at the time -- well, actually

5   still is, our Worldwide Marketing Manager.

6      Q.   Okay.

7      A.   Based in Paris.

8      Q.   And Mark Riding?

9      A.   Mark Riding worked for Jesus Grande --

10      Q.   Okay.  In --

11      A.   -- as a --

12      Q.   -- in Paris?

13      A.   In Paris.

14      Q.   Okay.  The first paragraph reads:  "All,

15   According to" this is a -- Oil and Gas "Journal"?

16      A.   Yes.

17      Q.   -- "article below, BP PLC has provided

18   the US" coat -- "Coast Guard with plans to

19   collect 40,000-53,000" barrels of oil a day "by

20   June 30" for "the deepwater Macondo blowout well.

21   That appears to be their admission that this well

22   is flowing at a rate greater than 50,000" barrels

23   of oil -- or barrels -- "b/d," that's barrels --

24      A.   Barrels per day.

25      Q.   -- "per day!  Regards, JD."

1          Do you recall receiving this E-mail?

2     A.   I remember the article.

3     Q.   Okay.  Do you have any doubt that you

4     received this E-mail --

5     A.   I --

6     Q.   -- on June 15, 2010?

7     A.   I have no doubt.

8     Q.   And you would have received it in your

9     normal course of your business --

10    A.   Yes.

11    Q.   -- with Schlumberger?

12         Do you recall having any conversations

13    with Mr. Dribus regarding this E-mail or

14    regarding this article?

15    A.   No, not with John.

16    Q.   Okay.  Do you recall having any

17    conversations with Mr. Drummond?

18    A.   Only in the same context as the earlier

19    discussion we had where we were going to have to

20    try and find additional people and equipment if

21    there were going to be more containment vessels.

22    Q.   Okay.  What -- what is your understanding

23    as to what this sentence is referring to?  "That

24    appears to be their admission that this well is

25    flowing at a rate of greater than 50,000" barrels

 1          "Good morning and thanks,

 2          RD."

 3          And then Mr. Schmidt responds:  "Morning

 4     Robert,

 5          "Not sure if anyone else has answered

 6     yet.  They are still shut in but overnight there

 7     was a small leak noticed...basically just a few

 8     bubbles coming from the Capping Stack flange,

 9     then some oil, so the information is still

10     restricted but we might go back on flow again

11     soon.  The morning briefing is upcoming."

12          And you say that you do recall

13     receiving --

14       A.  Yes.

15       Q.  -- this?

16          Do you know what Mr. Schmidt is referring

17     to when -- or what is your understanding as to

18     what Mr. Schmidt is referring to when he states:

19     "...so the information is still restricted"?

20              MR. CRAMER:  Objection, form.

21       A.  Yeah, I don't know what he meant

22     specifically by that.  But I can add some context

23     to the discussion.

24          Mr. Drummond, who was my Manager at the

25     time, was in Paris for a meeting with our CEO and

1    other people, and -- other Executives.  And so at
2    that time, it was right -- just a few days after
3    the well was shut-in, and there was still some
4    question whether or not they were -- they were
5    looking at the well integrity, whether it was
6    going to be able to remain shut-in or if they
7    were going to have to go back to at least flowing
8    something to keep the pressure lower at the
9    wellhead.
10         And that's what this was about.  Robert
11   was interested to know what the decision was
12   going to be whether -- whether they would leave
13   it shut-in or if they would go back to flowing.
14        Q.  (By Mr. Kraus) Okay.  Do you know what
15   the source of Mr. Schmidt's information was as
16   contained in his response to Mr. Drummond's
17   inquiry here?
18        A.  So Mr. Schmidt was the -- as I said
19   earlier, the Project Manager for all of our flow
20   work that was going on offshore, and was in the
21   BP office every -- every day for the daily
22   briefings.  So I'm sure that he would have picked
23   that information up in the BP office.
24        Q.  Okay.  Do you know, does Schlumberger
25   know, how this small leak at the capping stack

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3    IN RE:  OIL SPILL        )   MDL NO. 2179
      BY THE OIL RIG           )
 4    "DEEPWATER HORIZON" IN    )   SECTION "J"
      THE GULF OF MEXICO, ON    )
 5    APRIL 20, 2010            )   JUDGE BARBIER
                               )   MAG. JUDGE SHUSHAN
 6

 7

 8               REPORTER'S CERTIFICATION
          TO THE ORAL AND VIDEOTAPED DEPOSITION OF
 9            ALBERT JEREMIAH "BUD" DECOSTE, JR.,
                SCHLUMBERGER LIMITED 30(b)(6)
10                  DECEMBER 5, 2012
                        VOLUME 1
11

12         I, Emanuel A. Fontana, Jr., Certified
      Shorthand Reporter in and for the State of Texas,
13    hereby certify to the following:

14         That the witness, ALBERT JEREMIAH "BUD"
      DECOSTE, was duly sworn by the officer and that
15    the transcript of the oral deposition is a true
      record of the testimony given by the witness;
16
           That the deposition transcript was submitted
17    on December 6, 2012, to the witness or to
      Attorney Hugh Tanner            for the witness to
18    examine, sign, and return to Worldwide Court
      Reporters, Inc., by January 21       , 2013.
19
           That the amount of time used by each party
20    at the deposition is as follows:

21         Ms. André - 3 Hours, 9 Minutes
           Mr. Kraus - 32 Minutes
22         Ms. Greenwald - 18 Minutes
           Mr. Orr - 7 Minutes
23         Mr. Fleming - 1 Minutes
           Mr. Cramer - 45 Minutes
24

25
```

PURSUANT TO CONFIDENTIALITY ORDER

1    I further certify that I am neither counsel
for, related to, nor employed by any of the
2    parties in the action in which this proceeding
was taken, and further that I am not financially
3    or otherwise interested in the outcome of the
action.

4
     SUBSCRIBED AND SWORN to by me on this 5th
5    day of December, 2012.

6

7

8    _____
     Emanuel A. Fontana, Jr., RPR
9    Texas CSR No. 1232
     Expiration Date: 12/31/12
10   Worldwide Court Reporters
     Firm Registration No. 223
11   3000 Weslayan, Suite 235
     Houston, Texas   77027
12   (713) 572-2000

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

250

```
1
2          I, ALBERT JEREMIAH "BUD" DECOSTE, JR.,
3    have read the foregoing deposition and hereby
4    affix my signature that same is true and correct,
5    except as noted on the attached Amendment Sheet.
6
7                    _____
8                    ALBERT JEREMIAH "BUD" DECOSTE, JR.
9
10   THE STATE OF  Tx        )
     COUNTY OF  HARRIS       )
11
            Before me,  Charlotte A. Sodolak  , on
12   this day personally appeared ALBERT JEREMIAH
     "BUD" DECOSTE, JR., known to me (or proved to me
13   under oath or through
     _____) to be the person
14   whose name is subscribed to the foregoing
     instrument and acknowledged to me that they
15   executed the same for the purposes and
     consideration therein expressed.
16          Given under my hand and seal of office this
     ___15___ day of __JANUARY_____, ~~2012~~ 2013 (CAS)
17                                                      (jd)
18
19              Charlotte A. Sodolak
                _____
20              NOTARY PUBLIC IN AND FOR
                THE STATE OF  Texas
21              COMMISSION EXPIRES:  July 19, 2015
22
23
24
25
```



CHARLOTTE A SODOLAK
My Commission Expires
July 19, 2015

PURSUANT TO CONFIDENTIALITY ORDER

249

# CHANGES AND SIGNATURE

## WITNESS NAME: ALBERT JEREMIAH "BUD" DECOSTE, JR.

## DATE OF DEPOSITION: DECEMBER 5, 2012

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 21 | 21 | Replace "It was--" with "It was not--" | Clarification |
| 30 | 17 | Change "Wong" to "Wang" | Misspelled |
| 57 | 3 | Replace "corrected" with "combined" | Clarification |
| 57 | 4 | Replace "we" with "BP" | Clarification |
| 57 | 5 | Replace "we" with "BP" | Clarification |
| 64 | 23 | Replace "Yeah" with "I don't know" | Clarification |
| 73 | 22 | Replace "Q4000 and the CLEAR LEADER" to "Q4000, the ENTERPRISE, and the CLEAR LEADER" | Clarification |
| 84 | 3 | Replace "Vx fluid ID and ID model" to "Vx fluid ID model" | Clarification |
| 84 | 25 | Replace "we" with "BP" (twice) | Clarification |
| 98 | 5 | Change "Wong" to "Wang" | Misspelled |
| 99 | 16 | Change "0R" to "GOR" | Misspelled |
| 114 | 8 | Replace "they'll" with "there will" | Misspelled |
| 114 | 18 | Replace "we" with "BP" | Clarification |
| 114 | 19 | Replace "we" with "BP" (twice) | Clarification |
| 153 | 9 | Replace "their" with "our" | Clarification |
| 189 | 13 | Replace "No" with "That is correct" | Clarification |
| 213 | 5 | Replace "were the surface" to "were taken at the surface" | Clarification |
| 236 | 13 | Replace "we were" to "BP was" | Clarification |

**PURSUANT TO CONFIDENTIALITY ORDER**