```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
    IN RE:  OIL SPILL          MDL NO. 2179
 4  BY THE OIL RIG
    "DEEPWATER HORIZON"        SECTION:  J
 5  IN THE GULF OF
    MEXICO, ON APRIL           JUDGE BARBIER
 6  20, 2010                   MAG. JUDGE SHUSHAN
 7
 8
 9
```

Volume 1

Deposition of **KEVIN DENNIS LACY**, P.O. Box 7888, The Woodlands, Texas 77387, taken in the Pan American Life Center, Mardi Gras Room, 11th Floor, 601 Poydras Street, New Orleans, Louisiana 70130, reported on Wednesday, June 1st, 2011.

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED  FEB 2 7 2013
LORETTA G. WHYTE
CLERK

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                Reported By:
KEVIN DENNIS LACY                        June 1, 2011    DIANE TEWIS CLARK, RPR, RMR, CRR

Page 13

| 1 | Exhibit No. 2945.........................301 |
|---|---|
| | E-Mail - From: Employee |
| 2 | Communications Sent: Tue Jan 12 |
| | 14:00:07 2010 - Subject: Staff |
| 3 | Announcement - Kevin Lacy |
| | BP-HZN-2179MDL01153257 |
| 4 | |
| | Exhibit No. 2946.........................302 |
| 5 | E-Mail - From: Longo, Susan G Sent: |
| | Wed Jan 27 22:13:33 2010 - Subject: |
| 6 | FW: Email for scanned docs |
| | BP-HZN-2179MDL01158014 - |
| 7 | BP-HZN-2179MDL01158015 |
| 8 | Exhibit No. 2947.........................312 |
| | The BP Operating Management System |
| 9 | Framework - Part 1 An overview of OMS |
| | BP-HZN-2179MDL00333196 - |
| 10 | BP-HZN-2179MDL00333154 |
| 11 | Exhibit No. 2948.........................397 |
| | E-Mail - From: Shaw, Neil Sent: Thu |
| 12 | Jun 04 11:44:41 2009 - Subject: RE: |
| | Transocean Marianas Traveling Block / |
| 13 | Crown Collision HIPO Investigation |
| | Report |
| 14 | BP-HZN-CEC063970 - BP-HZN-CEC0 |

Page 14

 1              STIPULATION
 2
 3         It is stipulated and agreed by and
 4  between counsel for the parties hereto that
 5  the deposition of the aforementioned witness
 6  is hereby being taken pursuant to the Federal
 7  Rules of Civil Procedure;
 8
 9         All formalities, with the
10  exception of the reading and signing of the
11  transcript by the witness, are hereby waived;
12
13         All objections, except those as to
14  the form of the question and the
15  responsiveness of the answer, are hereby
16  reserved until such time as this deposition,
17  or any part thereof, may be used or sought to
18  be used in evidence.
19
20                  * * *
21
22         DIANE TEWIS CLARK, RPR, RMR, CRR,
23  Certified Court Reporter, State of Louisiana,
24  officiated in administering the oath to the
25  witness.

Page 15

 1         THE VIDEOGRAPHER:
 2              This is the videotaped
 3  deposition of Kevin Lacy.  This deposition is
 4  taken in the matter of the oil spill by the
 5  Oil Rig DEEPWATER HORIZON in the Gulf of
 6  Mexico on April 20th, 2010.  This deposition
 7  is being held at 601 Poydras Street,
 8  New Orleans, Louisiana on June 1st, 2011 at
 9  the time indicated on the video screen which
10  is 8:31.
11              Will the court reporter please
12  swear in the witness.
13                   * * *
14              KEVIN DENNIS LACY,
15              After having been first duly
16  sworn by the above-mentioned court reporter,
17  Did testify as follows:
18  EXAMINATION BY MR. WATTS:
19         Q.   What is your name, please?
20         A.   My name is Kevin Dennis Lacy.
21         Q.   Mr. Lacy, my name is Mikal
22  Watts.  I'm a lawyer from San Antonio, Texas.
23  I'm here to ask you -- I would like to ask
24  you a few questions, but it's going to be a
25  while.

Page 16

 1
 2         A.   Okay.
 3         Q.   Have you ever had your
 4  deposition taken before?
 5         A.   No, sir.
 6         Q.   Let me just tell you a little
 7  bit about what we're doing.  We've got a
 8  video man behind me making a movie of you as
 9  we speak, a court reporter typing down every
10  word that anybody says.  The reason is at the
11  time of the trial of this case, I will either
12  get to read from the deposition transcript or
13  play the video as if you were in court
14  testifying.
15              You understand that, right?
16         A.   Yes, I do.
17         Q.   Because of that, I want to have
18  a couple of little agreements with you.  If
19  for some reason you don't understand one of
20  my questions, either because of a poor Texas
21  accent or it's not a very smart question or
22  it didn't make any sense to you, just tell me
23  that, so that when you answer each one of my
24  questions, we can all safely assume that you
25  fully understood the question that was asked.

4 (Pages 13 to 16)

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010
KEVIN DENNIS LACY   June 1, 2011   DIANE TEWIS CLARK, RPR, RMR, CRR
Reported By:

Page 33

1  referred to as a dotted line relationship
2  back to Barbara Yilmaz.
3      Q.   Okay. How long did you continue
4  in your capacity as the head of discipline
5  drilling and completions for the western
6  hemisphere?
7      A.   So I was in that role from July
8  of 2006 until I fully left the role, first of
9  February 2008.
10     Q.   And in February of 2008, what
11 role did you assume at that point?
12     A.   The vice president of drilling
13 and completions for the Gulf of Mexico
14 business unit for BP.
15     Q.   Was that sort of a lateral
16 transfer or was it kind of a result of a
17 reorganization or how did that work?
18     A.   It was -- I would best describe
19 that as -- it started as leading a review
20 team, a study team in summer/fall of '07.
21     Q.   Right.
22     A.   The business unit was in the
23 process of being reorganized and they wanted
24 to review the drilling completion operations.
25 During that time frame, I made a number of

Page 34

1  presentations to their business unit heads.
2  The predecessor to Neil Shaw, which was Kenny
3  Lang, Neil Shaw and ultimately in early
4  December of 2007, Neil Shaw asked me if I
5  would assume the role that we were describing
6  in the -- for the state, the review state.
7      Q.   What was the genesis of this
8  study of the Gulf of Mexico drilling
9  operations?
10     MS. KARIS:
11         Object to form.
12 EXAMINATION BY MR. WATTS:
13     Q.   Go ahead. Let me tell you what
14 just happened. If any one of these fine
15 lawyers doesn't like one of my questions for
16 any reason, they can object to form and they
17 preserve the ability to make an objection
18 later. If they don't say object to form,
19 then they've got to kind of live with the
20 question that I asked. But you still are
21 able to answer the question. So she's not
22 meaning to interrupt or anything like that,
23 it's just that she's got a job to do and so
24 she's doing it.
25 EXAMINATION BY MR. WATTS:

Page 35

1      Q.   All right. I think the
2  question --
3      A.   Can you restate it?
4      Q.   -- no matter how objectionable
5  it was, was what was the genesis, as you
6  understood it, for this study of the Gulf of
7  Mexico drilling operations?
8  MS. KARIS:
9      Object to form.
10 THE WITNESS:
11     The genesis, as I recall, was
12 that the drilling operations had had variable
13 performance in terms of operation, personal
14 safety, and they were looking as part of the
15 overall Gulf of Mexico reorganization, to
16 find an improved organization, ultimately
17 improved performance for the drilling and
18 completion operations in the deepwater.
19 EXAMINATION BY MR. WATTS:
20     Q.   You mentioned the phrase
21 personal safety. Explain for the finder of
22 fact, whether it's the judge or the jury,
23 what the difference between personal safety
24 is and process safety?
25     A.   Personal safety is a term that I

Page 36

1  would use to refer to injuries to individuals
2  and it could be anything as minor as a
3  first-aid Band-Aid, as serious as a fatality.
4      Process safety has a broad
5  definition in the E&P in the refining and
6  chemical world as it relates to drilling
7  operations. It would primarily be reference
8  to well control in terms of process safety.
9      Q.   When we talk about a process
10 safety review, that's a review of well
11 control procedures?
12     A.   No -- oh, I'm sorry, so if you
13 wanted to do a process safety review within
14 drilling operations, well control would be a
15 major component of that review.
16     Q.   In 2008, when -- or 2007, 2008
17 when you were performing this study of the
18 Gulf of Mexico drilling and completions
19 processes, did that study include a review of
20 the process safety for BP's Gulf of Mexico
21 drilling and completion operations?
22     A.   At that time, I do not recall
23 any significant concern about well
24 control/process safety. I do know that they
25 had had an incident of moving one of the rigs

9 (Pages 33 to 36)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.   Telephone: (504) 525-9100
New Orleans, LA 70130-6009   Board-Certified Court Reporters   Facsimile: (504) 525-9109

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010
KEVIN DENNIS LACY VOL. II                    June 2, 2011      DIANE TEWIS CLARK, RPR, RMR, CRR

Page 698

1  most likely to work on this type of -- these
2  type of issues?
3        MS. KARIS:
4              Object to form.
5        THE WITNESS:
6              This document, which has a
7  reference to plan for April 2008, the
8  individuals I think would be most familiar
9  with the production of the document would
10 have been of Mick Leary, the D&C performance
11 manager who reported to me at the time; and
12 there is a reference to a gentleman by the
13 name of David Porter, who was the drilling
14 completions IM lead.  That meant I --
15 integrity management lead.
16 EXAMINATION BY MR. NICHOLS:
17     Q.    And do you recall this
18 presentation ever being made to you?
19     A.    I vaguely recall this
20 presentation, but I couldn't tell you the
21 date.
22     Q.    Okay.
23     MR. NICHOLS:
24              Thank you.  That's all I have.
25 I appreciate your patience.

Page 699

1        THE WITNESS:
2              Okay.
3        THE VIDEOGRAPHER:
4              Off the record.  The time now is
5  3:20.
6              (Whereupon, a brief recess was
7  taken.)
8        THE VIDEOGRAPHER:
9              Back on the record.  The time is
10 now 3:30.
11 EXAMINATION BY MS. KARIS:
12     Q.    Good afternoon, Mr. Lacy.
13 Carrie Karis for BP.
14              I'm going to ask you some
15 questions.  I'm going to try not to go back
16 over all the subjects that have been
17 previously covered or even the questions, but
18 from time to time we'll have to refer back
19 just to orient ourselves.
20              I want to first begin with
21 discussions relating to the Macondo well
22 itself.
23              Did you have any direct
24 involvement in connection with the Macondo
25 well after November of 2009?

Page 700

1     A.    Well, I didn't depart until
2  December.
3     Q.    Fair enough.
4     A.    So at -- after my departure
5  date, I could say conclusively, no.
6     Q.    Okay.  So let's move that date
7  to December, and I'll ask the question.
8              Did you have -- again, did you
9  have any involvement in connection with
10 decisions made on the Macondo well after
11 December of 2009?
12     A.    After -- not after my departure,
13 no.
14     Q.    At any time from April 20th
15 through today, have you interviewed any BP
16 employees who were involved with the Macondo
17 well?
18     A.    No, I have not.
19     Q.    Have you interviewed any
20 Transocean employees who were involved with
21 the Macondo well?
22     A.    No, I have not.
23     Q.    Have you interviewed any
24 Halliburton employees?
25     A.    No, I have not.

Page 701

1     Q.    Okay.  Have you interviewed any
2  government employees in connection with their
3  approval process or anything else in relation
4  to the --
5     MR. DART:
6              Object to the form.
7  EXAMINATION BY MS. KARIS:
8     Q.    -- in relation to the Macondo
9  well?
10    A.    No, I have not.
11    Q.    Have you reviewed -- have you
12 gone back and reviewed any BP documents that
13 pertain to the Macondo well, other than, of
14 course, what you've been shown here over the
15 last two days in connection with your
16 deposition?
17    A.    I had no access or saved any
18 documents relative to Macondo.
19    Q.    Okay.  And did you go out and do
20 any research of your own to find out -- or to
21 find BP documents from other sources?
22    A.    No.
23    Q.    And is the same true, that is,
24 you haven't reviewed any Halliburton or
25 Transocean documents relating to the Macondo

601 Poydras Street, Suite 1720 GAUDET KAISER, L.L.C.      Telephone: (504) 525-9100
New Orleans, LA 70130-6009      Board-Certified Court Reporters     Facsimile: (504) 525-9109

Case 2:10-md-02179-CJB-DPC Document 8797 Filed 02/27/13 Page 5 of 8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010
KEVIN DENNIS LACY VOL. II        June 2, 2011        DIANE TEWIS CLARK, RPR, RMR, CRR    Reported By:

Page 710

1   Q.   If you have an opinion.
2   A.   I would say the absence of a
3  significant well control event, but that
4  occurs as normal. So all I can say is we had
5  no loss of well control. You can label that
6  as good. I'm not quite sure how to frame
7  that as process safety record.
8   Q.   Fair enough.
9       You were asked about various
10 cost-cutting efforts that were in place in
11 2008 and 2009.
12      Do you recall that early
13 yesterday?
14  A.   I recall that topic coming up,
15 yes.
16  Q.   Okay. Based on all of the
17 involvement that you had in the Gulf of
18 Mexico in 2008, did you ever cut costs at the
19 expense of safety?
20  A.   I did not.
21  Q.   And did anyone in BP's
22 management ever tell you to choose cost over
23 safety in 2008?
24  A.   No, they did not.
25  Q.   In 2009, as the VP of drilling

Page 711

1  and completions, did you ever sacrifice
2  safety for cost?
3   A.   No, I did not.
4   Q.   Did anyone in BP's management
5  ever tell you to choose cost over safety in
6  2009?
7   A.   Not explicitly.
8   Q.   Did you ever direct anyone in
9  your leadership team or your engineering
10 teams to choose riskier activities at the
11 sacrifice of safety?
12  A.   No, absolutely not.
13  Q.   And to your knowledge, did your
14 leadership team practice engineering in a way
15 that chose safety over costs?
16  A.   I had full confidence in my
17 engineer -- in my D&C organization that they
18 were doing proper well design and proper risk
19 assessment commensurate with the risks that
20 we had at the time up until my departure.
21  Q.   And that would include any
22 decisions that were made on the Macondo well
23 up until your departure; correct?
24  A.   Those would have, of course,
25 included anything that -- that happened prior

Page 712

1  to my departure relative to Macondo, yes.
2   Q.   Okay. I'm going to hand you --
3       (Whereupon, an off-the-record
4  discussion was held.)
5  EXAMINATION BY MS. KARIS:
6   Q.   I'm going to hand you what we've
7  marked as Exhibit 2953.
8
9       (Exhibit No. 2953 marked for
10 identification.)
11 EXAMINATION BY MS. KARIS:
12  Q.   And this is a document bearing
13 Bates stamp BPP-HZN-2179MDL01797716 through
14 720, and this is a cover e-mail from you to
15 Mr. Thierens, and an e-mail below from
16 Mr. Shaw to the GoM SPU leadership team. And
17 attached to that is a document entitled "2009
18 GoM D&C Performance Summary, VP D&C, Kevin
19 Lacy." Do you see this?
20  A.   Yes, I do.
21  Q.   Have you seen this document
22 previously?
23  A.   Yes. I prepared this document
24 as a summary of the -- the GoM D&C
25 performance for 2009 to document what had

Page 713

1  been accomplished prior to my departure.
2   Q.   Okay. And so this is a review
3  that you put together yourself, is that
4  accurate?
5   A.   I -- I collated this with
6  assistance from Mick Leary and from a number
7  of other sources and presented that to Neil
8  Shaw, yes.
9   Q.   You were asked yesterday about
10 any staff reductions as a result of any cost
11 cutting.
12      Do you recall those questions
13 generally?
14  A.   There were general questions
15 about staff reductions and cost cutting, yes.
16  Q.   Okay. And under "People," can
17 you read to us what you wrote in your
18 performance summary in 2009. The first two
19 sentences, please.
20  A.   Under People, yes.
21      "Built staff in key areas of
22 completions, projects and well site leaders
23 by 47 net employees, while reducing contract
24 staff by 30 people."
25  Q.   Go ahead. Next sentence, too.

73 (Pages 710 to 713)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.         Telephone: (504) 525-9100
New Orleans, LA 70130-6009       Board-Certified Court Reporters   Facsimile: (504) 525-9109

Case 2:10-md-02179-CJB-DPC   Document 8797   Filed 02/27/13   Page 6 of 8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010
KEVIN DENNIS LACY VOL. II        June 2, 2011      DIANE TEWIS CLARK, RPR, RMR, CRR

Page 766

1    A.   Yes, sir.
2    Q.   Should be about a half an hour.
3    A.   Okay.
4    Q.   Yesterday, you were asked a
5  question, and part of the answer that you
6  gave was, quote, "in matters of process
7  safety, I was," quote, "'concerned about
8  based on things I saw.'"
9         And I wrote that down because I
10 though it was interesting.
11        And my question is:  When you
12 told the lawyer yesterday that there were
13 matters of process safety that you were
14 concerned about based on things that you saw,
15 do you recall what you were referring to in
16 that matter?
17       MS. KARIS:
18            Object to form.
19       THE WITNESS:
20            No, I really don't recall
21 that -- which conversation, which topic in
22 terms of that.  If you wrote that down, I'm
23 sure that's accurate.  If -- the only thing I
24 can say is that under -- in a role such as I
25 had with anywhere from six to ten deepwater

Page 767

1  rigs running simultaneously, daily I was
2  concerned about process safety.  So did I --
3  there are -- so, you know, things that I saw
4  were documents that were years old.  And --
5  EXAMINATION BY MR. WATTS:
6    Q.   And I think the conversation --
7  I'm sorry, I didn't mean --
8    A.   No, go ahead.
9    Q.   I think the conversation that
10 you were describing when I wrote that down
11 was the conversation that you had with
12 Barbara Yilmaz --
13   A.   Uh-huh (indicating
14 affirmatively).
15   Q.   -- when she informed you that
16 there was no longer a position in the
17 company, and there's two things that I wrote
18 down.
19   A.   Uh-huh (indicating
20 affirmatively).
21   Q.   One is that you expressed
22 concerns about process safety, that you were
23 concerned about based on things that I saw;
24 and the next, you had a difference of
25 perspective with respect to the model.  She

Page 768

1  was more of, let business units figure it
2  out.
3    A.   Okay.
4    Q.   Okay?  So that's the
5  conversation that I'm referring to.
6    A.   Okay.
7    Q.   And -- and I guess what I'd like
8  to do is, this conversation that you had with
9  Barbara Yilmaz --
10   A.   Uh-huh (indicating
11 affirmatively).
12   Q.   -- to the extent that my notes
13 are correct -- and I think they are -- that
14 you told her that -- that there were concerns
15 you that you had about process safety based
16 on the things that you saw.
17        What do you recall telling
18 Barbara Yilmaz about that in that
19 conversation?
20   A.   I don't recall in that
21 conversation using the term "process safety."
22   Q.   Okay.
23   A.   So if I had concerns -- well, so
24 the concerns that I had started with the
25 replacement of Harry Thierens with Dave

Page 769

1  Rich --
2    Q.   Right.
3    A.   -- as I indicated earlier today
4  because, Dave's experience was primarily
5  completions.  That decision was taken in
6  spite of objections that I made to a number
7  of people in that decision to replace Harry.
8  It was a known fact that Harry was
9  moving, and I had other candidates I thought
10 were better qualified.
11   Q.   I thought that it was
12 interesting that BP's lawyer took you through
13 some of the achievements that you and
14 Mr. Thierens and Mr. Jackson accomplished in
15 2008 and 2009 in matters of safety.
16   A.   Uh-huh (indicating
17 affirmatively).
18   Q.   When Mr. Thierens was
19 transferred back home, you were told you were
20 leaving the company?
21   A.   Right.
22   Q.   Did that cause you concern that
23 the progress that you all had made in matters
24 of safety might be interrupted or were
25 halted?

87 (Pages 766 to 769)

Case 2:10-md-02179-CJB-DPC   Document 8797   Filed 02/27/13   Page 7 of 8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010
KEVIN DENNIS LACY VOL. II        June 2, 2011    DIANE TEWIS CLARK, RPR, RMR, CRR

**Page 790**

```
 1    answer.
 2        EXAMINATION BY MR. WATTS:
 3    Q.   If you -- if one of your tiger
 4  team geologists is sending out e-mails, we've
 5  got to slow down our rate of drilling because
 6  we don't have enough time to identify the
 7  signs that are preceding these kicks, these
 8  loss returns, because our margins are so
 9  tight, is that something you would have
10  wanted to know about as the vice president of
11  drilling and completions?
12        MS. KARIS:
13            Object to form.
14        EXAMINATION BY MR. WATTS:
15    Q.   If you'd still been there?
16    A.   So if a member of the Tiger team
17  expressed that concern, and it was not
18  responded to, I would want to know about
19  that.
20    Q.   If a member of the Tiger team
21  expressed that concern and it was not
22  responded to, that is not acceptable safety
23  behavior at BP, agree?
24        MS. KARIS:
25            Object to form.
```

**Page 791**

```
 1        THE WITNESS:
 2            Someone would have to explain
 3  their lack of response and the lack of
 4  agreement.  Not everyone agrees at the same
 5  time on a situation.
 6        EXAMINATION BY MR. WATTS:
 7    Q.   Now, when you say somebody
 8  "would have to explain their lack of
 9  response," remember the messages discussion
10  we had about, get rid of your safety team, at
11  the same time you're pushing cost reduction,
12  you're pushing for more production.
13            You answered a question about in
14  2009, were you ever instructed by your
15  management to choose costs over safety, and I
16  noticed you paused for about six seconds, and
17  then you answered to this fine lawyer, "Not
18  explicitly"?
19            Do you remember giving that
20  answer?
21    A.   Yes, I do.
22    Q.   All right.  Now, I want to visit
23  with you about the frame that led to that
24  six-second pause and the words "not
25  explicitly."
```

**Page 792**

```
 1            In 2008 and 2009 while you were
 2  at BP, clearly, you had received management
 3  directive to shed hundreds of millions of
 4  dollars of costs from the operations of
 5  drilling and completions in the Gulf of
 6  Mexico, agree?
 7        MS. KARIS:
 8            Object to form.
 9        THE WITNESS:
10            I was assigned performance
11  targets that indicated we would have to save
12  several hundreds of millions of dollars in
13  order for me to satisfactorily meet my
14  performance targets.
15        EXAMINATION BY MR. WATTS:
16    Q.   You had what was known as an
17  IPC, which is a performance contract that set
18  forth objectives or criteria where you would
19  get exceptional performance, right?
20    A.   Yes.  We -- they had instituted
21  a -- a tiered system where both the
22  individual and the specific business unit,
23  bonuses would be dependent on the individual
24  and business unit performance.
25    Q.   And -- and we're going to get to
```

**Page 793**

```
 1  your sep -- separation agreement here in a
 2  minute, but I notice that you did hit bonuses
 3  in 2008 and in 2009 --
 4    A.   The -- the --
 5    Q.   -- under your IPC contract?
 6    A.   I met all the -- I met or
 7  exceeded all targets.
 8    Q.   Sure.
 9            So in 2008 and again in 2009,
10  you were given management directive through
11  your performance contract that you needed to
12  cut hundreds of millions of dollars of costs
13  from the Gulf of Mexico drilling and
14  completions budget, right?
15        MS. KARIS:
16            Object to form.
17        THE WITNESS:
18            That -- that was an agreed goal,
19  yes.
20        EXAMINATION BY MR. WATTS:
21    Q.   And you met that goal; you shed
22  250 to $300 millions in costs between 2008
23  and 2009?
24        MS. KARIS:
25            Object to form.
```

93 (Pages 790 to 793)

601 Poydras Street, Suite 1720  GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6009   Board-Certified Court Reporters   Facsimile: (504) 525-9109

Case 2:10-md-02179-CJB-DPC   Document 8797   Filed 02/27/13   Page 8 of 8

In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010                                              Reported By:
KEVIN DENNIS LACY VOL. II           June 2, 2011    DIANE TEWIS CLARK, RPR, RMR, CRR

Page 794

1   THE WITNESS:
2       In -- in the -- in the calendar
3   year of 2009, that was my estimate.
4   EXAMINATION BY MR. WATTS:
5       Q.  In same calendar year, we've
6   already talked about documents that showed
7   that your production went up 54 percent?
8       A.  We had an exceptional delivery
9   performance that year in terms of production.
10      Q.  And one of the ways that you
11  increased production is to more successfully
12  and quickly drill productive wells, right?
13      A.  The -- more suc -- in less days
14  with less incidents.
15      Q.  When you said "not explicitly,"
16  there was pressure from the boardroom that
17  you have talked about in your speeches to
18  achieve more successful wells in less time,
19  agreed?
20      MS. KARIS:
21          Object to form.
22      THE WITNESS:
23          My reference, when I said
24  boardroom, was forward looking and taken in
25  the context of all boardrooms are looking to

Page 795

1   achieve that.
2   EXAMINATION BY MR. WATTS:
3       Q.  Sure.  But I want to talk about
4   BP's boardroom.
5       A.  Yes, sir.
6       Q.  What caused your six-second
7   pause in the words, "not explicitly"?
8       MS. KARIS:
9           Object to form.
10      THE WITNESS:
11          I was never given a directive
12  to -- to cut corners or to deliver something
13  not safely.  But there was tremendous
14  pressure on cost.
15  EXAMINATION BY MR. WATTS:
16      Q.  All right.  And let's visit
17  about that for a second.
18          That tremendous pressure on cost
19  was a tremendous pressure to reduce costs,
20  right?
21      A.  That's correct.
22      Q.  That tremendous pressure on cost
23  reduction existed in 2008 while you were at
24  BP?
25      MS. KARIS:

Page 796

1           Object to form.
2       THE WITNESS:
3           In -- in all years, but it was
4   particularly acute in the latter part of 2008
5   and first half of 2009.
6   EXAMINATION BY MR. WATTS:
7       Q.  And it continued through the
8   second half of 2009 and the planning for
9   2010, that there were going to be further
10  cost reductions?
11      MS. KARIS:
12          Object for form.
13      THE WITNESS:
14          They -- I believe I -- I stated
15  earlier, the initial business plans, as is
16  often the case, were sent back for revisions
17  and further reductions.
18  EXAMINATION BY MR. WATTS:
19      Q.  And when you say "further
20  reductions," that meant greater cost
21  reductions?
22      A.  Yeah.
23      MS. KARIS:
24          Object to form.
25      THE WITNESS:

Page 797

1           Yes, that's correct.
2   EXAMINATION BY MR. WATTS:
3       Q.  You all were rushing wells, by
4   your own words?
5       MS. KARIS:
6           Object to form.
7       THE WITNESS:
8           No, not by my words.  We had --
9   we had debates upon -- I particularly
10  remember a lot of discussions on the H2 well
11  in particular.
12  EXAMINATION BY MR. WATTS:
13      Q.  Sure.
14          Go to Tab 14 real quick of the
15  first notebook.  This is an e-mail that you
16  wrote in January of 2009, it's Exhibit 2957.
17          (Exhibit No. 2957 marked for
18  identification.)
19  EXAMINATION BY MR. WATTS:
20      Q.  You write to Andrew Frazelle and
21  Richard Morrison; you see that?
22      A.  Yes, I do.
23      Q.  And third line of this e-mail
24  you say: "All three wells are a rush, which
25  is not good progress" -- or "process"; is

94 (Pages 794 to 797)

601 Poydras Street, Suite 1720    GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6009        Board-Certified Court Reporters   Facsimile: (504) 525-9109