IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA         :

          v.                  :         CRIMINAL NO.

BP EXPLORATION & PRODUCTION, INC.    :

## GUILTY PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in compliance with the holding of Bryan v. United States, 492 F.2d 775 (5th Cir. 1974), the Department, the defendant, and the defendant's counsel enter into the following guilty plea agreement. Any reference to the Department in this agreement shall mean the United States Department of Justice, including, but not limited to, the *Deepwater Horizon* Task Force, the Criminal Division of the Department of Justice and all of the Criminal Division's sections, and all of the United States Attorney's Offices for each judicial district of the United States.

1. The defendant agrees to waive prosecution by indictment and plead guilty to an information charging it with: eleven counts of violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), one count of a violation of 18 U.S.C. § 1505 (Obstruction of Congress), one misdemeanor count of a violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act), and one misdemeanor count of a violation of the 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), all arising from the defendant's conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and response. The defendant agrees to the factual allocution contained in Exhibit A to this plea agreement.

2.      The defendant, BP plc and any other BP plc entity, including but not limited to any former, present or future parent, affiliate, division and subsidiary (collectively, "any other BP plc entity" or "the other BP plc entities"), and all predecessors, successors and assigns of any of the above, agree to cooperate fully and truthfully with the *Deepwater Horizon* Task Force in any criminal investigation related to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and response.   Cooperation shall include but not be limited to (a) promptly disclosing any and all related criminal or potentially criminal conduct of which the defendant, BP plc or any other BP plc entity are currently aware, (b) promptly producing documents to the *Deepwater Horizon* Task Force upon request, (c) promptly making employees and agents available to the *Deepwater Horizon* Task Force upon request for interview or for testimony in any proceeding, subject to those employees' and agents' own legal rights, and (d) making reasonable efforts to ensure its employees and agents provide full and truthful information; provided, however, that compliance with this paragraph shall not be construed as requiring or effecting a waiver of the attorney-client privilege or work product protections.

3.      The defendant understands, agrees, and has had explained to it by counsel that the Court may impose the following statutory maximum sentences:

(a)      Counts One through Eleven, 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), for each count:

(i)      A fine of $500,000 or twice the gross gain or loss, whichever is greater;

(ii)      Five years of probation; and

(iii)      A $400 special assessment;

2

     (b)     Count Twelve, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act):

          (i)     A fine of $200,000, or $25,000 per day of the violation, or twice the gross gain or loss, whichever is greater;

          (ii)     Five years of probation; and

          (iii)     A $125 special assessment;

     (c)     Count Thirteen, 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act):

          (i)     A fine of $15,000 or twice the gross gain or loss, whichever is greater;

          (ii)     Five years of probation; and

          (iii)     A $50 special assessment;

     (d)     Count Fourteen, 18 U.S.C. § 1505 (Obstruction of Congress):

          (i)     A $500,000 fine;

          (ii)     Five years of probation; and

          (iii)     A $400 special assessment;

4.     The parties agree that this plea agreement is made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and that the following specific sentence is the appropriate disposition of this case. If the Court rejects this plea agreement, it is further agreed that the defendant may withdraw its plea. If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Fed. R. Crim. P. 32(c), and to request that the

defendant be sentenced at the time the guilty plea is entered.    The agreed-upon sentence pursuant to Rule 11(c)(1)(C) is as follows:

    (a)    Payment of criminal recoveries totaling $4 billion ($4,000,000,000), as set forth below in paragraphs 4(b) and 4(c)(viii).

    (b)    Payment of criminal fines totaling $1.256 billion ($1,256,000,000), as follows:

        (i)    <u>Fine allocation</u>.  The fine payments shall be allocated as follows:

            (A)    As to Counts One through Eleven, the maximum statutory fine pursuant to 18 U.S.C. § 3571(c) of $500,000 per count shall be paid, totaling $5.5 million.

            (B)    As to Count Twelve, a total of $1.15 billion ($1,150,000,000) shall be paid to the Oil Spill Liability Trust Fund, pursuant to 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3), 18 U.S.C. § 3571(d) and 26 U.S.C. § 9509(b)(8).

            (C)    As to Count Thirteen, a total of $100 million ($100,000,000) shall be paid to the North American Wetlands Conservation Fund, pursuant to 16 U.S.C. §§ 703, 707 and 4406(b) and 18 U.S.C. § 3571(d), for

the purpose of wetlands restoration and conservation projects located in States bordering the Gulf of Mexico or otherwise designed to benefit migratory bird species and other wildlife and habitat affected by the Macondo oil spill.

(D) As to Count Fourteen, the maximum statutory fine of $500,000, pursuant to 18 U.S.C. § 3571(c), shall be paid.

(ii) <u>Schedule</u>. The fines shall be paid according to the following schedule:

(A) As to Counts One through Eleven and Fourteen, all fines shall be paid within 60 days of sentencing.

(B) As to Counts Twelve and Thirteen, fines shall be paid on a pro rata basis as follows: $250 million to be paid within 60 days of sentencing; an additional $250 million to be paid within one year of sentencing; an additional $250 million to be paid within two years of sentencing; an additional $150 million to be paid within three years of sentencing; an additional $150 million to be paid within four years of sentencing; and the remainder to be paid within five years of sentencing.

5

(c)     A statutory-maximum term of five years of probation.   Probation

shall include the following mandatory and discretionary special conditions, pursuant to 18

U.S.C. §§ 3563(a) and (b):

(i)     The defendant shall not commit another federal, state, or

local crime.

(ii)    The defendant shall notify the probation officer within

seventy-two hours of any criminal prosecution against the

defendant.

(iii)   The defendant shall answer truthfully all inquires by the

probation officer.

(iv)    The defendant shall provide to the probation officer full

access to any of the defendant's business operating locations.

(v)     The defendant shall give ten days' prior notice to the

probation officer of any intended change in principal business

location or mailing address.

(vi)    The defendant shall notify the Court and the probation officer

of any material change in the defendant's economic

circumstances that might affect the defendant's ability to pay

the fines and other financial obligations set forth herein.

(vii)   The defendant shall pay the fines set forth in paragraph 4(b)

above.

(viii)  Pursuant to 18 U.S.C. § 3563(b)(22), an order, attached

6

hereto as Exhibit B, shall be entered. The terms of the order shall be enforceable as additional special conditions of probation.

The parties agree and stipulate that the specific discretionary terms of probation enumerated herein are appropriate, and further agree that no additional discretionary terms of probation should be imposed. The defendant, BP plc and any other BP plc entity shall not capitalize into inventory or basis or take as a tax deduction, in the United States or elsewhere, any portion of the monetary payments made pursuant to this plea agreement. The defendant, BP plc and any other BP plc entity shall not reference this plea agreement and any payments pursuant hereto or other compliance herewith in any public relations, marketing or advertising; provided, however, that the defendant, BP plc and any other BP plc entity shall be permitted to make required disclosures under applicable securities laws. The defendant further agrees that payments made pursuant to paragraph 4(c)(viii) above shall have no effect on, and shall not be argued by the defendant, BP plc or any other BP plc entity, to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, including but not limited to natural resource damage claims.

(d)     The defendant further agrees to pay the special assessments, totaling $4,975, before the time of sentencing and shall provide a receipt from the Clerk to the Department before sentencing as proof of this payment.

(e)     The defendant shall pay any mandatory restitution specified in 18 U.S.C. § 3663A(b)(3), to the extent applicable, to the Clerk of the Court for the benefit of

7

the families or other designated representatives of the eleven men who died onboard the *Deepwater Horizon*. Restitution is not otherwise authorized for certain offenses in the plea agreement and, pursuant to 18 U.S.C. § 3663(a)(1)(B)(ii), is not otherwise appropriate because (i) restitution need not be addressed in this matter given that compensation for victims has been or is being addressed in other proceedings, including in MDL-2179 and (ii) fashioning of any restitution order would unduly complicate and prolong the sentencing process.

5. The defendant stipulates that there is a factual basis for the imposition of a criminal fine in the amount of $1,256,000,000 pursuant to 18 U.S.C. § 3571(d) and that the payments made pursuant to paragraphs 4(b) and 4(c)(viii) do not together exceed the statutory-maximum fine available under that statute. The defendant hereby waives any right to jury or bench trial as to those payments.

6. The defendant will acknowledge acceptance of this plea agreement by the signature of its counsel and shall provide to the Department, as Exhibit C hereto, a certified resolution of the Board of Directors of BP Exploration and Production, Inc. authorizing the defendant to enter a plea of guilty and authorizing an agent to execute this agreement. The defendant will further provide to the Department, as Exhibit D hereto, a certified resolution of the Board of Directors of BP plc providing as follows:

(a) BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities. BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this

8

agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA. BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees. Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

(b) The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

7. The Department agrees that, subject to paragraph 2 of this agreement, the Department shall not further prosecute the defendant, BP plc or any other BP plc entity, including all predecessors, successors and assigns of any of the above, for any conduct regarding any matters under investigation by the *Deepwater Horizon* Task Force relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response. This agreement shall not apply to individuals. Should a court determine that the defendant has breached this agreement, the defendant will not be entitled to withdraw its plea of guilty, and the Department may prosecute the defendant, BP plc and any other BP plc entity, and any predecessors, successors and assigns of any

of the above, for any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, notwithstanding the expiration of any applicable statute of limitations following the signing of this plea agreement.   In any such prosecution, the Department may use the defendant's admissions of guilt as admissible evidence against the defendant, BP plc and any other BP plc entity.

        8.     The Department agrees that, if requested to do so, it will advise any appropriate suspension or debarment authority that, in the Department's view, the defendant has accepted criminal responsibility for its conduct relating to the Deepwater Horizon blowout, explosion, oil spill and response by virtue of this guilty plea, and that BP is obligated pursuant to this agreement to cooperate in any ongoing criminal investigation by the Department relating to the Deepwater Horizon blowout, explosion, oil spill and response.   Nothing in this agreement limits the rights and authority of the United States of America to take further civil or administrative action against the defendant including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans and benefits from United States government agencies.

        9.     In exchange for the undertakings made by the Department in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

10.     The defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

11.     The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the criminal investigation or prosecution of this criminal case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

12.     The defendant is satisfied with the legal representation provided by the defendant's lawyer; the defendant and its lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that it is guilty.

13.     Both parties agree that the parties' guilty plea agreement contains no additional promises, agreements, or understandings other than those set forth in this written guilty

plea agreement, and that no additional promises, agreements, or understandings will be entered into

unless in writing and signed by all parties.

JIM LETTEN                              LANNY A. BREUER
United States Attorney                  Assistant Attorney General
Eastern District of Louisiana           Criminal Division

JOHN D. BURETTA, Director
DEREK A. COHEN, Deputy Director
Deepwater Horizon Task Force

BP EXPLORATION AND PRODUCTION, INC., BP plc and BP Corporation
North America Inc.

BY:   MARK FILIP and JOSEPH WARIN, PC
      Counsel for BP Exploration and Production, Inc., BP plc and BP Corporation North
      America Inc.

Date:   November 15, 2012

Exhibit A

<u>Exhibit A</u>

Defendant BP Exploration & Production, Inc. ("BP") agrees that, if the case were to proceed to trial, the Government could establish beyond a reasonable doubt that:

At all relevant times, BP resided in, and engaged in regular business throughout, the states bordering the Gulf of Mexico, including in the Eastern District of Louisiana. On or about April 20, 2010, BP was the leaseholder and operator of the Macondo Well located off the coast of Louisiana. In this capacity, BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment. BP hired Transocean, Ltd., the owner of the drilling rig *Deepwater Horizon*, a vessel, to provide the rig and drilling crew to implement BP's drilling plan for the Macondo Well. Transocean was also responsible for conducting safe operations and for protecting personnel onboard. At all times relevant to the Information, the *Deepwater Horizon* was temporarily attached to and erected on the seabed of the Outer Continental Shelf in the Gulf of Mexico to explore and develop resources from the Outer Continental Shelf, to wit: oil and natural gas.

BP's responsibility as the leaseholder and operator of the Macondo Well and Transocean's responsibility as the rig owner imposed on each a duty to insure that the negative pressure test performed prior to temporarily abandoning the well was done safely, in accordance with the standard of care applicable in the deepwater oil exploration industry. On the night of the explosion, BP had two Well Site Leaders on the *Deepwater Horizon*, who were BP's employees, agents, and highest-ranking representatives on the rig. The Well Site Leaders were responsible for supervising the negative pressure test conducted by Transocean.

On or about April 20, 2010, between approximately 5:00 and 8:00 p.m. Central Daylight Time, the negative pressure test performed on the Macondo Well provided multiple indications that the wellbore was not secure. BP's Well Site Leaders negligently supervised the negative pressure test during this time, failed to alert engineers on the shore of these indications, and, along with others, ultimately deemed the negative pressure test a success, all in violation of the applicable duty of care. The negligent conduct of BP's Well Site Leaders is attributable to BP.

BP's negligent conduct, among others, was a proximate cause of the deaths of eleven men and pollution resulting from the Macondo Well blowout. As a result of this negligent supervision and decision-making, BP and the Transocean rig crew proceeded with removing drilling mud from the Macondo well until it became so underbalanced that natural gas and oil migrated through the well, up through the riser, and onto the rig floor. This migration of natural gas and oil in turn caused multiple explosions and a fire which burned for two days, and resulted in the *Deepwater Horizon* sinking on or about April 22, 2010.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP, being a charterer of a vessel, to wit: the *Deepwater Horizon*, engaged in neglect through which the lives of the following persons were destroyed: Jason Christopher Anderson; Aaron Dale Burkeen; Donald Neal Clark; Stephen Ray Curtis; Gordon Lewis Jones; Roy Wyatt Kemp; Karl Dale Kleppinger Jr.; Keith Blair Manuel; Dewey Allen Revette; Shane Michael Roshto; and Adam Taylor Weise, in violation of Title 18, United States Code, Section 1115.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP did negligently discharge and cause to be discharged oil in connection with activities under the Outer Continental Shelf Lands Act and which may have affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, in such

quantities as may be harmful in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3).

On or about and between April 20, 2010, and December 31, 2010, in the Eastern District of Louisiana and elsewhere, BP did unlawfully kill and cause to be killed one or more migratory birds, including Brown Pelicans, Laughing Gulls, Northern Gannets, and other protected species, when defendant negligently discharged and caused to be discharged oil from the Macondo well.

All in violation of Title 16, United States Code, Sections 703 and 707(a).

On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

1.  BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

2.  BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology. At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD. At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5. BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results." In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6. On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack." At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after

subsequent pressure data had been obtained, but instead, he had been aware of a

100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

BP's former vice president's knowledge and actions are attributable to BP.

All in violation of Title 18, United States Code, Section 1505.

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA     *
                                  *
         v.                 *
                                    *    Case No. _____
BP EXPLORATION &            *
PRODUCTION, INC.            *
                                    *
                              *   *   *

## ORDER

Pursuant to 18 U.S.C. § 3563(b)(22), IT IS HEREBY ORDERED:

### Monitors

1. <u>Retention of Monitors and Duties</u>:

     a.   *Process Safety Monitor*: The defendant shall retain, subject to approval by the

         Assistant Attorney General, Criminal Division, Department of Justice ("DOJ"), or

         his/her designee, a process safety monitor who shall be experienced in process safety

         and risk management and familiar with complex industrial operations such as

         deepwater oil and gas drilling (hereinafter the "Process Safety Monitor"). The

         Process Safety Monitor's duties will be to review, evaluate and provide

         recommendations for the improvement of defendant's process safety and risk

         management procedures, including, but not limited to, the defendant's major

         accident/hazard risk review of drilling-related process safety barriers and mitigations,

         for the purpose of preventing future harm to persons, property and the environment

         resulting from deepwater drilling in the Gulf of Mexico by the defendant and its

         Affiliates. For the purposes of this Order, the term "Affiliates" shall mean any entity

- 1 -

controlled, directly or indirectly, by BP plc that participates in deepwater drilling in the Gulf of Mexico, whether such entity is in existence now or in the future. The Process Safety Monitor shall among other things participate in defendant's major accident/hazard risk review for drilling, intervention, and completion, including: reviewing of relevant materials, participating in meetings and other deliberations, and making suggestions on the strength and effectiveness of the risk mitigation and prevention measures, and changes in such measures.

b. *Ethics Monitor:* The defendant shall retain, subject to approval by the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, an ethics monitor who shall be familiar with best practices with respect to corporate codes of conduct, including implementation, training and enforcement thereof (hereinafter the "Ethics Monitor"). The Ethics Monitor's duties will be to review and provide recommendations for improvement of BP plc's Code of Conduct and its implementation and enforcement for the purpose of preventing future criminal and ethical violations with respect to dealings with regulatory and enforcement authorities by the defendant and Affiliates, including, but not limited to, violations related to the conduct giving rise to the Information filed in this matter. In the event that any federal suspension and debarment authority requires a monitor with responsibilities related to ethics and compliance in any agreement with a suspension and debarment authority, the defendant may petition DOJ to have the Ethics Monitor replaced by (or have the duties combined with that of) such other monitor.

2. <u>Monitorship Scheduling and Compensation</u>:

    a. Within 60 calendar days after the Court imposes sentence (the "Effective Date"), the defendant shall forward to the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, the names of no more than five proposed monitors ranked in order of preference as to each of the two categories of monitorships. DOJ will promptly review and assess the defendant's proposals. The defendant shall retain each monitor as soon as possible, but not later than 60 calendar days after the date that DOJ approves each such proposed monitor.

    b. The monitorships shall exist for a period of four years from the date of the monitor's engagement unless earlier terminated pursuant to paragraph 4(f) herein.

    c. Each monitor shall have the authority to employ personnel reasonably necessary, and with appropriate professional qualifications, to assist in the proper discharge of the monitor's duties, as specified herein. The defendant shall have the opportunity to perform routine conflict checks on individuals or entities the monitor proposes to engage, and within two weeks of a proposed engagement, the defendant shall advise the monitor if any conflict exists. Any disputes in this respect shall be decided by DOJ in its sole discretion.

    d. The reasonable compensation and expenses of each monitor, and any persons hired by each monitor pursuant to his/her authority hereunder, shall be paid by the defendant. Each monitor, and any persons hired by each monitor, shall be compensated in accordance with their typical hourly rates or a reasonable fee determined by the monitor based on applicable market rates.

3. Powers of the Monitors:

    a. Each monitor shall have the authority to take such reasonable steps as, in the monitor's view, may be necessary to be fully informed with respect to the monitor's duties.

    b. The defendant, BP plc and Affiliates shall cooperate fully with the monitors to allow each monitor to fulfill his or her respective duties under this Order, including providing each monitor with access to all information, documents, records, facilities and/or employees, as reasonably requested by the monitor.

    c. Each monitor shall maintain as confidential all non-public information, documents and records it receives from the defendant, subject to the monitor's reporting requirements herein. Each monitor shall take appropriate steps to ensure that any of his/her consultants or employees shall also maintain the confidentiality of all such non-public information.

    d. Should any monitor, or staff assisting any monitor in fulfilling his or her responsibilities, be provided access to materials ("Subject Materials") that may be protected by the attorney-client privilege or work product doctrine (or any other legally cognizable privilege or protection), the following conditions shall apply:

        i. Any provision of Subject Materials to a monitor pursuant to this order will not constitute waiver of any applicable privilege.

        ii. In the event the monitors or DOJ seeks disclosure of Subject Materials for any reason, the monitor shall provide the defendant with timely notice of its intention to do so.

      iii. Each monitor shall return all Subject Materials to defendant, BP plc, and Affiliates upon the date the respective monitor is finished using Subject Materials for the purpose of fulfilling his or her responsibilities.

4. <u>Monitors' Reviews and Reports</u>:

    a. Each monitor shall conduct an initial review and prepare an initial report, followed by up to three follow-up reviews and reports as described below. With respect to each review, whether initial or follow-up, after consultation with the defendant and DOJ, each monitor shall prepare a written work plan, which shall be submitted to the defendant and DOJ for review and comment no fewer than 60 calendar days prior to commencing each review. The defendant and DOJ shall provide comment no later than 30 calendar days after receipt of the written work plan. The monitors' work plans for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review. In developing each work plan and in carrying out the reviews pursuant to such plans, the monitors are encouraged to coordinate with the defendant. Any disputes between the defendant and the monitors with respect to the work plan shall be decided by DOJ in its sole discretion.

    b. Each monitor's initial review shall commence no later than 120 calendar days from the date of the engagement of the monitor, unless otherwise agreed between the defendant, the respective monitor and DOJ.

    c. Each monitor shall issue a written report within 120 calendar days of completing the initial review setting forth the monitor's assessment and making recommendations reasonably designed to improve the effectiveness of the defendant's process safety and risk management as to deepwater drilling. Each written report shall set forth the

monitor's assessments, recommendations, and the reasons for the recommendations. The monitors are encouraged to consult with the defendant concerning the monitors' findings and recommendations on an ongoing basis. If a monitor identifies a potential violation of the law, the monitor shall promptly report the potential violation to the Probation Office, DOJ and the defendant. The monitors shall provide the written report to the Probation Officer, the Assistant Attorney General, Criminal Division, Department of Justice, or his/her designee, the Board of Directors of the defendant and the Board of Directors of BP plc. After consultation with the defendant, the monitors may extend the time period for issuance of the written report for up to 60 calendar days with prior written approval of DOJ.

d.  Within 120 calendar days after receiving the monitor(s)' report, the defendant, and to the extent set forth in the report, BP plc and Affiliates, shall adopt all recommendations in the report; provided, however, that within 30 calendar days after receiving the report, the defendant shall notify the monitor and DOJ in writing of any recommendations that the defendant, BP plc or Affiliates considers inconsistent with applicable law or regulation or otherwise inadvisable. As to any recommendation on which the defendant and the monitor do not agree, the defendant and the monitor shall attempt in good faith to reach an agreement within 45 calendar days after the defendant serves the written notice. In the event the defendant and the monitor are unable to agree on an acceptable alternative proposal, the defendant shall promptly consult with DOJ, and may request that DOJ consult with the Bureau of Safety and Environmental Enforcement ("BSEE") regarding the dispute. DOJ will submit a written opinion to the defendant as to whether the defendant should adopt the

monitor's recommendation or an alternative proposal, and the defendant shall abide by that determination. Pending such determination, the defendant shall not be required to adopt any contested recommendation(s). With respect to any recommendation that the monitor determines cannot reasonably be adopted within 120 calendar days after receiving DOJ's report, the monitor may extend the time period for adoption with prior written approval of DOJ.

e.   Each monitor shall undertake up to three follow-up reviews. Within 120 calendar days of initiating each follow-up review, the monitors shall complete the review and report on the monitors' findings in the same fashion as set forth above with respect to the initial review. The first follow-up review shall commence one year after the initial review was completed. The second follow-up review shall commence one year after the first follow-up review was completed. The third follow-up review shall commence one year after the second follow-up review was completed. After consultation with the defendant, the monitor(s) may extend the time period for these follow-up reviews for up to 60 calendar days with prior written approval of DOJ.

f.   If, reasonably promptly after completing two follow-up reviews, a monitor and the defendant mutually agree that the defendant's applicable policies and procedures, and implementation and enforcement thereof, are appropriate, and that further monitoring and review is not warranted, then the monitor may apply to DOJ for permission to forego the third follow-up review. If DOJ approves, then DOJ shall make a recommendation to the Probation Officer and the Court to forego the third follow-up review, and, upon approval by the Probation Officer and the Court, the engagement of the monitorship shall terminate.

## Safety and Environmental Management Systems Audits

5. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of at least three but less than six years as of the Effective Date, the defendant shall conduct at least one Safety and Environmental Management System ("SEMS") audit as described in 30 C.F.R. Part 250 during the remaining contract term. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of six years or more as of the Effective Date, the defendant shall conduct at least two SEMS audits during the remaining contract term under applicable BSEE regulations. For drilling rigs that are contracted after the Effective Date, the defendant shall comply with applicable BSEE regulations concerning SEMS audits.

6. For its current contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall request that its rig contractors join the Center for Offshore Safety ("COS"), which requires its members to conduct SEMS audits. For new contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall require rig contractors to join COS. The defendant may choose to conduct joint SEMS audits with its contractors for contracted deepwater drilling rigs.

7. The defendant shall conduct one SEMS audit for each of its operated platforms, including BP-owned platform rigs, within five years of the Effective Date.

8. With respect to defendant-operated platforms, the defendant shall follow Third Party SEMS Auditing and Certification of Deepwater Operations Requirements as specified by COS.

## Operational Oversight

9. Third Party Verification of Blowout Preventers. Each time the defendant or its contractors brings a subsea blowout preventer system as referenced in 30 CFR 250.440 ("BOP") into service on a moored or dynamically positioned drilling rig, and each time a subsea BOP from

a moored or dynamically positioned drilling rig is brought to the surface, the defendant or its
contractors, through a third party, will verify that all required and recommended testing and
maintenance of the BOP were performed in accordance with manufacturer recommendations
and API Recommended Practice 53 (and Standard 53 when it becomes final).

10. <u>Deepwater Well Control Competency Assessments</u>.  The defendant shall implement the
following measures to strengthen its well control competencies:

    a. The defendant shall develop, within 6 months of the Effective Date, a deepwater well
control competency assessment plan for the defendant personnel responsible for
oversight of deepwater drilling operations on defendant-owned or contracted rigs.
The plan shall exceed the competency requirements set forth in 30 CFR §§250.1500-
1510 (Subpart O), and shall include, but not be limited to: identifying skill sets and
other competencies needed to recognize, evaluate, respond, and remediate well
control events; providing for the training, assessment of skills and competencies; and
undertaking appropriate corrective actions for personnel who do not demonstrate the
identified skills or competencies.

    b. The defendant shall provide to BSEE, on an annual basis, a summary report regarding
competency assessment plan implementation, including the types and aggregate
number of people assessed, found competent, found in need of further training, and
the number who have completed training and reassessment.

11. <u>Cement Design and Competency.</u>

    a. The defendant shall require review and approval by subject matter experts of the
defendant, BP plc, or the Affiliates of cement designs used for primary cementing of
casing and exposed hydrocarbon-bearing zones during drilling operations at
deepwater wells.

b. The defendant shall require that lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to drilling operations of deepwater wells be conducted or witnessed by a defendant engineer competent to evaluate such lab testing or a competent third party independent of the cement provider. The defendant shall provide lab results to the applicable BSEE field office within a reasonable period of time.

c. The defendant shall develop and provide to BSEE, within 6 months of the Effective Date, a framework document setting forth the defendant's competency requirements for cement subject matter experts, subject to review and approval at BSEE's option.

12. <u>Houston Monitoring Center ("HMC")</u>. The defendant shall maintain a real-time drilling operations monitoring center at its Houston office or other appropriate location. The well control data to be monitored will include, at a minimum, active pit volume, pump pressure, flow rate out, gas units, and trip displacement. The HMC shall monitor such data for all defendant-owned or contracted rigs conducting drilling with a subsea BOP installed on the wellhead. The defendant shall provide BSEE personnel with reasonable access to the HMC.

13. <u>Incident Reporting</u>. The defendant shall provide to BSEE, on an annual basis, a summary report documenting incidents operators are required to report under 30 CFR 250.188. For each item reported, the defendant shall describe the actions implemented to correct the item and/or to prevent recurrence. This report shall be submitted by March 31st of each year covering incidents during the previous calendar year.

### <u>Oil Spill Response Training and Drills</u>

14. The defendant shall train each Command Officer and Staff, General Section Chiefs, and Staff including the Oil Spill Response Coordinator and alternates of the GoM Incident

Management organization at least once per year and require their participation in at least one table top oil spill response exercise per year.

15. The defendant shall maintain a crisis management organization, including two crisis management centers, consisting of at least 6 crisis management professionals (including a supervisor) to assist in oil spill response training and drills.

16. The defendant shall conduct annual training with the Marine Well Containment Company ("MWCC"), or a similar organization, for its Operations Section chiefs and Source Control Section chiefs in the Gulf of Mexico.

17. The defendant shall participate in MWCC or industry oil spill response drills at least once per year.

18. The defendant shall, at least once per year, conduct or participate in a table top exercise involving activation of MWCC to simulate mobilization of assets and personnel necessary to cap or cap/contain a subsea loss of well control.

19. The defendant shall invite the United States Coast Guard and BSEE to participate in at least one internal oil spill response drill per year.

**Best Practices**

20. <u>Oil Spill Response Plan (OSRP).</u>  Within 60 days of entry of this Order, the defendant shall revise its Oil Spill Response Plan as necessary to include:

   a.  Provisions to maintain access to a supply of dispersant and fire boom for use in the event of an uncontrolled long-term blowout for the length of time required to drill a relief well;

   b.  Contingencies for maintaining an ongoing response for the length of time required to drill a relief well;

- 11 -

    c.   Description of measures and equipment necessary to maximize the effectiveness and efficiency of the response equipment used to recover the discharge on the water's surface, including methods to increase encounter rates;

    d.   Information regarding remote sensing technology and equipment to be used to track oil slicks, including oil spill detection systems and remote thickness detection systems (*e.g.*, X-band/infrared systems);

    e.   Information regarding the use of communication systems between response vessels and spotter personnel;

    f.   Shoreline protection strategy that is consistent with applicable area contingency plans; and

    g.   For operations using a subsea BOP or a surface BOP on a floating facility, a discussion regarding strategies and plans related to source abatement and control for blowouts from drilling.

21.  <u>Safety Technology Developed with Industry</u>.  The defendant shall collaborate with industry and academic efforts to develop discrete technologies to enhance operational safety with respect to deepwater drilling.  Within one year of the Effective Date, the defendant shall propose and initiate collaboration on at least two pilot projects to evaluate technology enhancements over the course of the five year period following the Effective Date of this Order.  Upon conclusion of the pilot projects, the defendant will propose to BSEE at least two pilot projects for implementation and implement them unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

22.  <u>Other Safety Technology Development.</u>  Over the course of the three years following the Effective Date of this Order defendant will advance to BSEE three proposals in one or more

of the following categories for pilot projects regarding the development of specific new technology in: (1) enhancing functionality, intervention, testing and activation of BOP systems such as acoustics and subsea communications capabilities; (2) enhancing well design; or (3) enhancing real-time monitoring on rig and onshore. Upon conclusion of the pilot projects, the defendant will implement at least two pilot projects, unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

## Transparency

23. The defendant will create, within 90 days after the Effective Date, a public website that contains the following information:

    a.  Lessons learned from the Deepwater Horizon incident;

    b.  Annual progress reports on its compliance with the special terms of probation contained in this Order;

    c.  Annual summaries of recordable safety incidents, days away from work, hydrocarbon spills and the volume thereof; and

    d.  An annual list of all incidents of non-compliance with BSEE or BOEM regulations or probation for which the defendant is cited, including corrective actions taken and penalties assessed.

## Rig Equipment: Two Blind Shear Rams

24. The defendant will use, and require its contractors to use, subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram on all drilling rigs under contract to the defendant for deepwater drilling operations in dynamic positioning mode. As to moored drilling rigs under contract to the defendant which use subsea BOPs, the defendant will require that each BOP used in deepwater drilling operations be equipped with two shear

- 13 -

rams, including at least one blind shear ram and either an additional blind shear ram or a casing shear ram.

### Safety Organization

25. The defendant shall maintain a safety organization that has the authority to intervene or stop any operation that it deems unsafe.

### Third-Party Auditor

26. The defendant will enter into a contract with an independent third-party (referred to herein as "the Auditor") who shall review and report to the Probation Officer, DOJ, and the defendant on the defendant's compliance with paragraphs 5 through 25 of this Order. The reasonable compensation and expenses of the Auditor shall be paid by the defendant. The Auditor shall be compensated in accordance with its typical hourly rates or a reasonable fee determined by the Auditor based on applicable market rates

27. The defendant will propose auditor(s) to perform these functions to DOJ within 90 days after the Effective Date, and the selection shall be subject to DOJ's approval.

28. On an annual basis, the Auditor shall perform his/her responsibilities by reviewing documentation and taking such other reasonable measures as may be appropriate to sample or test the defendant's compliance with paragraphs 5 through 25 of this Order. The Auditor shall identify and report annually its findings on the defendant's compliance with the terms of this Order to the Probation Officer, DOJ, and the defendant.

29. If the Auditor finds deficiencies in the defendant's compliance with paragraphs 5 through 25 of this Order, the Auditor will provide the Probation Officer, DOJ, and the defendant prompt notice and the defendant will, within 30 days, provide a plan to address the deficiencies and an opportunity to cure. In the event DOJ finds the defendant's plan to address the

deficiencies unacceptable, DOJ will submit a written opinion to the defendant identifying its objections and advising the defendant of an acceptable means of addressing the deficiencies. Within 30 days of receiving any such objections from DOJ, the defendant will provide an updated plan to the Auditor and DOJ which either provides for implementation of an option suggested by DOJ or an alternative means which DOJ determines to satisfactorily address its objections.

30. In addition to an annual report, the auditor shall periodically evaluate and report to the Probation Officer, BSEE, DOJ, and the defendant whether the defendant has complied with any plan to address deficiencies identified by the Auditor.

31. In the event the Auditor resigns, the defendant will propose to DOJ replacement auditor(s) to perform these functions promptly after such resignation. Selection of a replacement auditor shall be subject to the same process set forth immediately above.

### Development of Implementation Plan

32. The provisions in Paragraphs 5-31 constitute a framework and outline of the subject areas for the development of more specific measures that the defendant must implement pursuant to this Order. By no later than 60 days after the Effective Date of this Order, the defendant shall submit a detailed implementation plan for approval by the Probation Officer and DOJ. The defendant shall consult with DOJ or its designee in preparing the implementation plan, and the plan shall include among other things, and as necessary and appropriate, interim milestones covering each of the following areas: Safety and Environmental Management Systems Audits (Paragraphs 5-8), Operational Oversight (Paragraphs 9-13), Oil Spill Response Training and Drills (Paragraphs 14-19), Best Practices (Paragraphs 20-22), Transparency (Paragraph 23), Rig Equipment: Two Blind Shear Rams (Paragraph 24), Safety

Organization (Paragraph 25) and Third-Party Auditor (Paragraphs 26-31). Upon approval of

the implementation plan by the Probation Officer and DOJ, the defendant shall comply with

the plan. After approval of the implementation plan, the defendant may request in writing

that the Probation Officer and DOJ approve modifications of the implementation plan for

good cause. Upon approval of a modification by the Probation Officer and DOJ, the

defendant shall comply with the implementation plan as modified. Compliance with the

implementation plan's provisions is a special condition of the defendant's probation. The

defendant is required to provide prompt notice to the Probation Officer in the event the

defendant fails to comply with any of the provisions of the implementation plan, including

meeting any of the interim milestones.

### Gulf of Mexico Research Initiative

33. The defendant will continue to fulfill its commitment to fund the Gulf of Mexico Research

Initiative announced by BP on May 24, 2010, at the level established by the Master Research

Agreement of March 14, 2011 between BP and the Gulf of Mexico Alliance.

### National Academy of Sciences

34. The defendant shall pay $350 million ($350,000,000.00) to the National Academy of

Sciences for the purposes of oil spill prevention and response in the Gulf of Mexico, as

provided for in an agreement between the defendant and the National Academy of Sciences

attached hereto as Exhibit 1.

### National Fish and Wildlife Foundation

35. The defendant shall pay $2.394 billion ($2,394,000,000.00) to the National Fish and Wildlife

Foundation ("NFWF"), a nonprofit organization established pursuant to 16 U.S.C. § 3701-

3710. With respect to the work described in paragraph 37 below, the defendant shall assume

no responsibilities or obligations other than making the payments described in paragraphs 35 and 36.

36. The defendant's payments to NFWF shall be made according to the following schedule: (a) $100 million to be paid within 60 days of sentencing; (b) an additional $300 million to be paid within one year of sentencing; (c) an additional $300 million to be paid within two years of sentencing; (d) an additional $300 million to be paid within three years of sentencing; (e) an additional $500 million to be paid within four years of sentencing; and (f) the remainder to be paid within five years of sentencing. Payments shall be made by certified check payable to the National Fish and Wildlife Foundation and mailed to the attention of its Chief Financial Officer at 1133 15th Street, NW, Suite 1100, Washington, DC 20005, and including a reference to the case number in this proceeding; or by electronic funds transfer in accordance with written instructions to be provided to the defendant by NFWF at the time of transfer.

37. NFWF shall use the money it receives from the defendant pursuant to this Order for the following purposes and subject to the following conditions:

   a. To remedy harm and eliminate or reduce the risk of future harm to Gulf Coast natural resources, NFWF shall use approximately half of the payments to conduct or fund projects to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill. NFWF shall conduct or fund projects in the following states in approximately the following proportions: (1) Alabama, 28%, (2) Florida, 28%, (3) Mississippi, 28%, and (4) Texas, 16%. NFWF shall consult with appropriate state resource managers, as well as federal resource managers that have the statutory authority for coordination or

cooperation with private entities, to identify projects and to maximize the environmental benefits of such projects.

b.  To remedy harm and eliminate or reduce the risk of future harm to the State of Louisiana and its natural resources, NFWF will use approximately half of the payments to create or restore barrier islands off the coast of Louisiana and/or to implement river diversion projects on the Mississippi and/or Atchafalaya Rivers for the purpose of creating, preserving and restoring coastal habitat, in order to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill. In conducting or funding these projects, NFWF will consult with State resource managers, as well as federal resource managers that have the statutory authority for coordination or cooperation with private entities regarding management or protection for coastal habitat, to identify the highest priority projects, and to maximize the environmental benefits of such projects. In identifying projects, NFWF shall consider the State's Coastal Master Plan, as well as the Louisiana Coastal Area Mississippi River Hydrodynamic and Delta Management Study, as appropriate.

c.  In identifying and selecting projects to receive funding pursuant to this Order, NFWF shall not incur liability of any nature in connection with any act or omission, made in good faith, in the administration of the funds or otherwise pursuant to this Order, excepting, however, liability resulting from NFWF's gross negligence or willful misconduct. In addition, if and to the extent NFWF grants funds to or contracts with any governmental entity to implement any project under this Order: (a) NFWF shall be deemed to act solely as an administrative agent in contracting for, granting to, and

disbursing funds for any such project, and (b) NFWF shall not be deemed to incur any liability of any nature in connection with the design, engineering, construction, operation, or maintenance of any such project, including, without limitation, any impact or consequences of any such project on fish, wildlife, plant, or other natural resources, personal injury or property damage.

d. NFWF's use of funds received pursuant to this Order shall be subject to the reporting requirements of 16 U.S.C. § 3706. In addition, NFWF shall report to the Probation Officer and to the parties regarding the status and disposition of money it has received pursuant to this Order, on at least an annual basis, until all such money has been spent.

<u>Successors</u>

38. This Order shall be applicable to the defendant, and to the extent specified herein, to BP plc and Affiliates, during the defendant's term of probation.

39. In the event of a sale, assignment or transfer of all of the defendant's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to the defendant and to any successor of the defendant.

40. With respect to the sale, assignment or transfer of some but not all of defendant's assets to an unaffiliated third party pursuant to arm's-length transaction, including but not limited to the transfer of operational control of a jointly owned asset to an unaffiliated third party, such third party shall not be liable for defendant's obligations, and the defendant and, as necessary, BP plc and Affiliates, shall remain obligated to comply with the obligations in this Order with respect to all non-disposed assets, but not with respect to the sold, assigned or transferred assets.

41. With respect to a sale, assignment, or transfer covered in paragraph 39, a third party purchaser may petition the Court to be relieved from one or more terms of this Order upon a showing that (a) the third party purchaser has a SEMS system compliant with current BSEE regulations; and (b) all applicable regulatory approvals for the transaction have been or will be obtained. The third party purchaser may also petition the Court to be relieved from any particular term in Paragraphs 5 through 25 on the grounds that the particular term creates inconsistent, conflicting, or redundant obligations under the third party purchaser's existing SEMS systems and operational practices and procedures or other reasonable grounds. Prior to petitioning the Court for such relief, the third party will consult with DOJ regarding the requested relief, and DOJ will advise the Court of its conclusion as to whether the requested relief is appropriate.

42. The requirements of this Order are in addition to all other applicable requirements of law. This Order does not operate as a permit under federal, state or local regulations, and the defendant remains responsible for complying with all applicable federal, state and local laws, orders and permits. The defendant may not claim that compliance with this Order is a defense to any action commenced under applicable federal, state or local law. The government does not warrant that BP's compliance with this Order constitutes compliance with other applicable legal requirements, including but not limited to BSEE audit requirements.

43. The defendant's obligations pursuant to this Order expire five years after the Effective Date except as otherwise provided herein or as modified by the Court.

SO ORDERED this __ day of _____, 2012.

_____

UNITED STATES DISTRICT JUDGE

Exhibit _B-1_

# AGREEMENT BETWEEN
# BP EXPLORATION AND PRODUCTION, INC. AND
# THE NATIONAL ACADEMY OF SCIENCES

This Agreement is entered into by BP Exploration and Production, Inc. (the "Company") and the National Academy of Sciences of the United States of America, a federally chartered private nonprofit corporation, 36 U.S.C. §§ 150301, *et seq*., with its principal place of business in Washington, D.C., acting on behalf of its principal component organizations, the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council (collectively, "NAS"). The effective date of this Agreement is November __, 2012.

WHEREAS the *Deepwater Horizon* blowout and oil spill have demonstrated the need for improvement in offshore oil drilling safety, well monitoring, well design, oil-spill containment, oil-spill response strategies and technologies, and environmental monitoring;

WHEREAS the prevention of blowouts and oil spills resulting in harm to life, property, and the environment in the Gulf of Mexico and on the United States' outer continental shelf is a national priority;

WHEREAS reducing the environmental harm, loss of life or injury, and economic damage caused by any future blowout and discharge of oil associated with offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf is also a national priority;

WHEREAS basic and applied scientific and engineering research are essential to enhancing safety and minimizing the risk of future harm from spills from offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf; and

WHEREAS improved environmental monitoring can contribute to increased protection of the environment, human population, and natural resources in the event of future oil spills;

THEREFORE, the Company and NAS agree to the mutual covenants set forth in this Agreement:

## I.  Payments

1.  The Company shall pay $350 million to NAS according to the following schedule:

   a.  $5 million to be funded within 90 days of the date this Agreement becomes effective;

   b.  $15 million to be funded within one year of the date this Agreement becomes effective;

   c.  $45 million to be funded within two years of the date this Agreement becomes effective;

   d.  $80 million to be funded within three years of the date this Agreement becomes effective;

   e.  $90 million to be funded within four years of the date this Agreement becomes effective; and

   f.  $115 million to be funded within five years of the date this Agreement becomes effective.

2.  The Company shall assume no other responsibilities or obligations under this Agreement other than making the payments described in paragraph 1.

## II.  Purpose

3.  NAS shall use the payments described in paragraph 1 to establish a separate segregated account for a fixed-term endowment (the "Endowment"), the principal and earnings of which will be expended over a period of 30 years, subject to the provisions of paragraphs 28 and 29.

4.  NAS shall use the Endowment to establish a program focused on human health and environmental protection including issues relating to offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf (the "Program").  The Program will carry out studies, projects, and other activities that utilize the scientific, technical, engineering, medical, and health expertise

of the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, the National Research Council, and the nation's scientific, engineering, and health-care communities. The Program will seek to advance scientific and technical understanding with the objective of enhancing the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf. The Program will include the assessment and evaluation of strategies and technologies with the objective of enhancing the protection of human health and environmental resources in the Gulf of Mexico and on the United States' outer continental shelf. The manner in which the studies, projects, and other activities are to be conducted will be determined solely by NAS. In accordance with normal policies and procedures of NAS, the Program will be conducted by NAS based on scientific merit and integrity, with emphasis on freedom of inquiry and independent nonpartisan advice and recommendations.

5.      The Program shall seek to carry out studies, projects, and other activities in the public interest that would not otherwise be adequately funded or supported by private industry.

## III.  Programmatic Objectives

6.      To address the purpose described in paragraph 4, the Program shall fund and carry out studies, projects, and other activities in three basic categories: (a) research and development, (b) education and training, and (c) environmental monitoring. The Program should strive to achieve a balance of studies, projects, and other activities, consistent with paragraphs 4 and 18.

7.      *Research and development.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to research and development related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

8.      *Education and training.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to enhanced education and training for undergraduate, graduate, and professional-school students, private- and public-sector employees, and Gulf Coast regional communities, related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

- 3 -

9.      *Environmental monitoring*.  The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to the development of advanced environmental monitoring systems related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

## IV.   Structure and Organization

10.      NAS shall appoint a Board to provide general oversight for the Program.  The members of the Board shall be scientists, engineers, and other experts whose experience and knowledge can contribute to the oversight of the Program.  No current officer or current employee of the United States Government can serve on the Board.

11.      NAS shall appoint additional committees and panels of volunteer experts and establish or make arrangements with other entities as needed to carry out the Program.  At a minimum, NAS shall appoint committees for the following three topics:  (1) research and development, (2) education and training, and (3) environmental monitoring.  No current officer or current employee of the United States Government can serve on a committee or panel appointed by NAS under this paragraph.

12.      At least once a year, NAS shall seek the recommendations of each of the following entities (or its designees) concerning the administration of the Program, provided that the role of each such entity shall be solely advisory:

a.  In accordance with its statutory responsibilities and as necessary to meet the statutory requirement that it coordinate a comprehensive program "in cooperation and coordination with industry, universities, research institutions, State governments, and other nations, as appropriate," 33 U.S.C. § 2761, the Interagency Coordinating Committee on Oil Pollution Research (ICCOPR), including the Department of the Interior's Bureau of Safety and Environmental Enforcement (BSEE) and Bureau of Ocean Energy Management (BOEM); and

b.  The environmental-protection departments and other coastal natural-resource managers for the States of Alabama, Florida, Louisiana, Mississippi, and Texas.

13.      Appointments to the Board, committees, and panels shall be in accordance with (a) principles similar to those underlying section 15 of the Federal Advisory Committee Act, 5 U.S.C. App. 2; and (b) the implementing procedures of NAS, as applicable, including the

- 4 -

Conflicts of Interest Policy for Committees Used in the Development of Reports, and the Policy on Conflicts of Interest for Institutional Oversight and Non-Advisory Services, adopted by the NAS Council on May 12, 2003, and June 11, 2004, respectively, as may be amended or modified in the future.

14.    NAS shall establish periodic reporting procedures for grant recipients, including a statement of project accomplishments and a report on grant expenditures until project completion, as well as a final report after project completion. Each final report shall address the original objectives of the project as identified in the approved proposal, describe any changes in objectives, and provide a final project accounting. The final report of project accomplishments described in this paragraph shall be available to the public.

15.    NAS shall publish an annual report on studies, projects, and other activities funded or carried out by the Program during the preceding year. The annual reports shall be made available to the public and shall be disseminated in print and on the NAS Web site. Each annual report shall contain financial statements for the Program that are consistent with the audited financial statements of NAS, including a full and complete statement of income, expenditures, and investments. The report shall also include a list of each recipient of any grant funded by the Endowment, the amount of the grant, and a summary of the purpose of each grant made during the preceding year.

16.    The Company, its officers, and its employees shall not be involved in any decisions regarding the selection of studies, projects, activities, or award recipients.

## V.    Management of Funds

17.    NAS shall manage the Endowment in accordance with the policies established by the NAS Council, in accordance with the laws of the District of Columbia, including the Uniform Prudent Management of Institutional Funds Act of 2007, D.C. Code, Chapter 16A, as it may be amended from time to time, and any successor acts. NAS will invest the Endowment in a prudent manner for a 30-year fixed-term endowment whose entire principal and earnings will be expended within the 30-year period. NAS shall have the discretion to determine how to invest the funds in accordance with this standard of prudence, provided that at least half of all funds held in the Endowment shall be invested in United States Government securities, United States Government agency securities, and United States Government-backed securities.

18.    Nothing about the list of three categories of studies, projects, and other activities in paragraph 6 is meant to imply a relative priority or a particular funding allocation. NAS

should strive to achieve a balance of studies, projects, and other activities that supports the Program's overall purpose and programmatic objectives.

19.     All expenditures of Endowment funds by NAS for Program studies, projects, and other activities shall comply with OMB Circular A-122, 2 C.F.R. Part 230, as it may be revised from time to time, the NAS indirect-cost recovery rates established by the Office of Naval Research and any successor cognizant administrative contracting office, and the NAS disclosure statement on file with that Office (or an equivalent disclosure requirement).

20.     The funds expended from the Endowment for studies, projects, and other activities shall be audited annually by independent accountants in accordance with U.S. generally accepted accounting principles.

21.     NAS may at any time add to the Endowment using other sources of funding.

22.     NAS may not use the Endowment to support any study, project, or other activity that would expend funds for a purpose for which Congress has prohibited funding.

23.     If carrying out the Program's studies, projects, or other activities requires acquisition of real property, the property shall be located in the Gulf Coast region.

24.     NAS shall not use any money from the Endowment for the purpose of lobbying, attempting to influence legislation, participating in a political campaign, or otherwise influencing the outcome of any public election.

## VI.   Access to and Dissemination of Research

25.     The copyrights in all written materials, photographs, drawings, software, and other works subject to copyright protection created or generated under any grant made using the Endowment shall be owned by the recipient of the grant.  NAS will encourage the publication and dissemination and other use of these materials.  With respect to such copyrighted works, the United States Government and NAS shall have a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use such copyrighted works for Government or NAS purposes.  In addition to any other rights it may have, the United States Government shall have the rights provided in paragraph .36(d) of OMB Circular A-110, as it may be revised from time to time, subject to the terms and conditions set forth in that Circular.

26.     With respect to research data, which shall include the recorded factual material commonly accepted in the scientific community as necessary to validate research findings

(but not any preliminary analyses, drafts of scientific papers, plans for future research, peer reviews, or communications with colleagues), the researcher shall retain all rights in said data but shall provide timely and unrestricted access to the data to NAS and the United States Government. Without limitation of the foregoing, the United States Government and NAS shall have the right to (1) obtain, reproduce, publish, or otherwise use the research data first produced under any grant funded by the Endowment, and (2) authorize others to receive, reproduce, publish, or otherwise use such data for Government or NAS purposes.

27. The policies on patents outlined in 35 U.S.C. §§ 200-211, in 37 C.F.R. § 401, and in the Presidential Memorandum on Government Patent Policy dated February 18, 1983, will serve as basic guidance on patent rights so as to encourage the maximum participation in the Program by a diverse set of research entities. Grantees will have the right to elect title to the patent rights in inventions resulting from work under any grant, subject to the United States Government and NAS each acquiring a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States or NAS, but in the case of NAS, solely in connection with the Program, the invention throughout the world in those inventions for which title is elected, and also subject to the "march-in-rights" of the United States Government as set forth in the above-cited statute and regulation. Without limitation of the foregoing, the license provided herein to NAS shall include the right of NAS to sublicense its rights to contractors and grantees that perform studies, projects, or other activities under the Program, except that NAS shall not have the right to commercialize its rights outside the Program.

## VII. Modification

28. NAS shall conduct periodic reviews of the Endowment and Program at five-year intervals, to determine whether there is a continuing need for the Endowment and whether there is a need to modify the Agreement. Any modification of the Agreement will be subject to paragraph 29.

29. This Agreement may be modified only through application by NAS to the appropriate court in the District of Columbia pursuant to § 44-1635(b) or (c) of the Uniform Prudent Management of Institutional Funds Act, D.C. Code Ann. § 44-1635(b) or (c), as it may be amended from time to time, pursuant to comparable authority under a successor statute, or, in the absence of statutory authority, pursuant to principles of equitable deviation or cy pres. This Agreement cannot be modified in a manner that violates paragraph 1, 2, or 22.

## VIII. Miscellaneous Provisions

30.     NAS shall comply with all local, State, Federal, and international laws or requirements that apply in connection with the performance of any studies, projects, or other activities of the Program.

31.     This Agreement shall not be construed to create any rights in, or grant any cause of action to, any person not a party to this Agreement.

32.     This Agreement shall be interpreted according to the laws of the District of Columbia.

33.     The provisions governing the Endowment and Program are severable. Should any portion of the Endowment or Program, or its studies, projects, or other activities, be declared illegal or inoperable, the remaining provisions shall remain in effect so long as there remain valid purposes and continued funding to carry out any study, project, or other activity within the scope of the Program.

34.     This Agreement may be signed in counterparts, each of which shall be an original and all of which together shall constitute the same Agreement.

_____

FOR BP EXPLORATION AND PRODUCTION, INC.

_____11-15-12_____

Date

_____

FOR THE NATIONAL ACADEMY OF SCIENCES

Exhibit C

CERTIFICATION OF RESOLUTIONS ADOPTED BY
THE BOARD OF DIRECTORS OF BP EXPLORATION & PRODUCTION INC.

I, Mary Jane Stricker, a duly authorized representative of BP Exploration & Production Inc., a company incorporated under the laws of Delaware, do hereby certify that the following is a true and correct copy of certain resolutions adopted by the Board of Directors of BP Exploration & Production Inc. at a meeting held on November 15, 2012, at which a quorum of the Board was present and that such resolutions remain in full force and effect as of the date hereof.

Dated: November 15, 2012

Mary Jane Stricker
Assistant Corporate Secretary

WHEREAS, BP Exploration & Production Inc. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Company's board of directors (the "Board") has been advised by executive management and both internal and external counsel on the progress of the Investigations at several meetings;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have been negotiating a resolution of the Investigations;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and both internal and external legal counsel of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships; and

WHEREAS, the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States with respect to all criminal violations identified during the Investigations and that no additional promises or representations have been made to the Company by any officials of the United States or the States in connection with the disposition of the Investigations, other than those set forth in the Plea Agreement.

RESOLVED that:

1.  The Board approves and agrees that it is in the best interest of the Company to enter the guilty plea provided for, and agrees to the other terms provided in the Plea Agreement with the United States Department of Justice in substantially the form and substance set forth in the form of Plea Agreement presented to this Board;

2.  The officers of the Company and the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board with such changes as such officers or legal counsel may approve;

3.  The officers of the Company and both the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing

resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.  All of the actions of the officers of the Company and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.  The Secretary or any Assistant Secretary of the Company are each individually authorized, empowered or directed, to provide to the United States Department of Justice a certified copy of these resolutions.

Exhibit D

## CERTIFICATION OF RESOLUTIONS ADOPTED BY BOARD OF DIRECTORS OF BP p.l.c.

I, David J. Jackson, a duly authorized representative of BP p.l.c., a company incorporated in England and Wales, do hereby certify that the following is an accurate excerpt of certain resolutions adopted by the Board of Directors of BP p.l.c. at a meeting held on November 15, 2012, and that such resolutions remain in full force and effect.

15·11·12
_____
[DATE]

_____
David J. Jackson
Company Secretary, BP p.l.c.

**Resolutions of Board of Directors of BP p.l.c.**

WHEREAS, BP p.l.c. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Board has been advised by executive management and both internal and external counsel, and its own independent counsel, on the progress of the Investigations at several meetings, and has received reports at such meetings from the Board's Gulf of Mexico Committee, which has had numerous meetings with respect to the Investigations and the discussions with the United States Department of Justice;

WHEREAS, the Company's executive management and both internal and external legal counsel has been negotiating a resolution of the Investigations;

WHEREAS, executive management and both internal and external counsel, and independent legal counsel for the Board, has reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and by internal and external counsel, and independent legal counsel for the Board, of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships, potentially to be entered into by BP Exploration & Production, Inc. ("BP E&P") and the United States Department of Justice;

WHEREAS, the Company and BP Corporation North America Inc. ("BPCNA") are, by the terms of the Plea Agreement, required to guarantee specified obligations of BP E&P under the Plea Agreement, and the Board of Directors has been briefed on those obligations by executive management, internal and external counsel and by independent legal counsel for the Board;

WHEREAS, the Board has also reviewed the terms of the related civil action against the Company by the United States Securities and Exchange Commission and a consent by the Company to the filing thereof, including certain undertakings set forth in such consent (the "SEC Settlement Agreement");

WHEREAS, the Board has been advised by independent counsel qualified in the applicable laws of the United States and England regarding the satisfaction of its duties prior to approving the Company's entry into the Plea Agreement, its guarantee of the specified obligations of BP E&P as set forth in the Plea Agreement and the execution and delivery by the Company of the SEC Settlement Agreement; and

WHEREAS, the Board has determined it is in the best interest of the Company to enter into the Plea Agreement, to guarantee the specified obligations of BP E&P as set forth in the Plea Agreement and to execute and deliver the SEC Settlement Agreement.

RESOLVED that:

1. The Company will enter into and, upon the execution of the Plea Agreement, have the guarantees and other obligations set forth in paragraph 6 of the Plea Agreement:

   a. BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities. BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA. BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees. Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

   b. The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising

out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

2.  Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement and any guarantee required under the Plea Agreement, and the SEC Settlement Agreement, substantially in such form as reviewed by this Board with such changes as the Group General Counsel of BP p.l.c. may approve;

3.  Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.  All of the actions of the Company's directors, executive management and officers, and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorised by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.  The Company Secretary or the Deputy Company Secretary of the Company are each individually authorised, empowered or directed, to provide to the United States Department of Justice and the United States Securities and Exchange Commission certified copies of these resolutions.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | CIVIL ACTION |
| ) | |
| Plaintiff, ) | NUMBER: |
| ) | |
| v. ) | SECTION: |
| ) | |
| BP p.l.c., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.      On April 20, 2010, an explosion occurred on the offshore oil rig Deepwater Horizon (the "Deepwater Horizon" or the "rig") leased by a subsidiary of BP p.l.c. ("BP"). Following the explosion, oil soon began spilling into the Gulf of Mexico. In three public filings furnished to the Commission and made available to investors, BP misled investors by misrepresenting and omitting material information known to BP regarding the rate at which oil was flowing into the Gulf and, thus, the resulting liability for the oil spill.

2.      On April 20, 2010, high pressure methane gas was released onto the rig and exploded, engulfing the Deepwater Horizon in flames. The Deepwater Horizon was a nine-year-old semi-submersible mobile offshore drilling unit and dynamically positioned drilling rig that was designed to operate in waters up to 8,000 feet deep and drill down to approximately 30,000 feet. During April 2010, the Deepwater Horizon was located above the Macondo Prospect, in the Mississippi Canyon Block 252 of the Gulf of Mexico in the United States exclusive

economic zone, about forty-one miles off of the Louisiana coast. A BP subsidiary was the operator, principal developer, and sixty-five percent owner of the Macondo Prospect.

3.      As a result of the explosion, eleven crew members died. For approximately thirty-six hours following the explosion, the rig remained on the surface of the water, engulfed in flames. On the morning of April 22, 2010, the rig sank approximately 5,000 feet to the seafloor. As the Deepwater Horizon sank, the riser pipe (the pipe that connected the oil wellhead at the seafloor) disconnected from the rig. The detached end of the riser pipe sank to the seafloor, still connected at the other end to the wellhead. This created a bend, or "kink," in the riser pipe directly above the wellhead.

4.      For a day after the rig sank, no oil was believed to be leaking from the well, and the small oil slick on the surface of the water was thought to be oil that had been in the riser pipe at the time of the explosion. On the evening of April 23, 2010, a video streaming to the BP crisis center from a remotely operated subsea camera revealed that the open end of the riser pipe, which was now lying on the seafloor, was leaking oil into the Gulf of Mexico.

5.      Following the discovery that oil was spilling into the Gulf of Mexico, BP materially misrepresented and understated the estimated range of flow rate of oil leaking from the well in three public filings furnished to the Commission. BP also omitted material information from these three public filings regarding its own internal data, estimates, and calculations indicating that the flow rate estimate contained in these filings was unjustifiably low. BP made these material misrepresentations and omissions in, inter alia, its Reports on Form 6-K furnished to the Commission on April 29 and 30 and May 4, 2010. In these Reports on

Form 6-K, BP stated that the flow rate estimates were "up to 5,000 bopd"[1] or that 5,000 bopd was the current estimate, despite higher internal data, estimates, and calculations. At all relevant times, BP knew or was severely reckless in not knowing that it was making these material misrepresentations and omissions to investors.

6.      Information regarding the rate of oil flowing from the well was material to BP's investors. The amount of oil spilled would inform any consideration of the costs of offshore and onshore spill response, claims for natural resource damage under the Oil Pollution Act of 1990 [33 U.S.C. § 2701 et seq.], penalties for strict liability under the Clean Water Act [33 U.S.C. § 1251 et seq.], as well as other potential liability arising from claims, lawsuits, and enforcement actions related to the explosion and the sinking of the Deepwater Horizon.

7.      As a result of the three materially misleading public filings discussed above, BP violated Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 12b-20, and 13a-16 thereunder. The Commission accordingly seeks a final judgment (a) permanently enjoining BP from violating Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, & 240.13a-16], (b) ordering BP to pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C § 78u(d)], (c) ordering, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, as amended by Section 929B of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, that the amount of civil penalties against and paid by BP be added to and become part of a fund for the benefit of American Depositary Shares ("ADS") holders at the time of the violations alleged in this complaint; and (d) granting such other relief as the Court deems just and appropriate.

---

[1]      The acronym "bopd" stands for "barrels of oil per day." A barrel of oil is equivalent to 42 U.S. gallons.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such transactions, acts, or practices, and to obtain civil penalties and such other and further relief as the Court may deem just and appropriate.

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), & 78aa].

10.     Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, or practices constituting the violations of the federal securities laws alleged herein occurred within the Eastern District of Louisiana. Also, BP transacts business within the Eastern District of Louisiana.

11.     BP, directly and indirectly, has engaged in transactions, acts, or practices that violate Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, & 240.13a-16].

## DEFENDANT

12.     BP p.l.c. ("BP") is an international oil and gas company, headquartered in London, England. BP's U.S. business is based in Houston, Texas. BP's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and, in the United States, listed in the form of American Depositary Shares ("ADS") on the New York Stock Exchange under the ticker symbol "BP." BP's ordinary shares are listed on the London Stock Exchange and the Frankfurt Stock Exchange. One ADS is equal to six ordinary shares. From April 29, 2010, through May 28, 2010, there were approximately 127,500 ADS holders. As a result of the Deepwater Horizon Incident, the closing price for BP ADS shares declined from $52.56 on April 29, 2010 to $36.52 on June 1, 2010, with over 1 billion ADS shares traded

4

during this period.   As of June 25, 2012, BP's price per ADS was $37.66.  BP has

approximately 19 billion shares in issue (excluding Treasury shares) and a market capitalization

of approximately $120 billion.  In 2011, BP had sales and operating revenues of $375.52 billion,

a profit of approximately $25.7 billion, and a replacement cost profit of approximately $23.9

billion.  For the quarter ending March 31, 2012, BP had sales and operating revenues of

approximately $94 billion, a profit of approximately $5.9 billion, and a replacement cost profit of

approximately $4.9 billion.  As a foreign filer, BP is required to file annual reports such as Form

20-F, and to make reports on Form 6-K.

## FACTS

**I.     On April 20, 2010, There Was an Explosion on the Deepwater Horizon, and, in the
Wake of That Incident, the Federal Government Activated a "Unified Command"
to Coordinate Response Efforts.**

13.     On April 20, 2010, there was an explosion on the Deepwater Horizon in the Gulf

of Mexico, which was followed by a massive oil spill that affected, inter alia, commercial and

other interests in the Gulf of Mexico, other nearby waterways, and the coastal areas of Alabama,

Florida, Louisiana, Mississippi, and Texas.

14.     Shortly after the explosion on the Deepwater Horizon, the federal government,

pursuant to statutory authority, activated a "Unified Command" to coordinate activities in

response to the explosion and resultant oil spill.  Ultimately, the Unified Command included

representatives from BP, the U.S. Coast Guard, and the National Oceanic and Atmospheric

Administration ("NOAA"), among other entities.

II.    **A Former BP Senior Executive, with No Experience Estimating Oil Flow Rates, Created Spreadsheets That Showed a Flow Rate Close to That Estimated by NOAA.**

15.    On April 26, 2010, a NOAA senior scientist authored a memorandum in which he estimated the flow rate to be 5,000 bopd. This memorandum was circulated within Unified Command, and was received by at least one Former BP senior executive (hereinafter "Former Senior Executive A") and several BP employees. BP used the 5,000 bopd figure publicly, and understood that it could have the effect of significantly downplaying the severity of the spill and thus BP's strict liability under the Clean Water Act for barrels spilled, liability for claims under the Oil Pollution Act of 1990, and other liability arising from claims, lawsuits, and enforcement actions.

16.    Former Senior Executive A, who was assigned to the Unified Command and who received the NOAA April 26 memorandum, undertook the task to create a BP flow rate estimate. Former Senior Executive A had no prior experience calculating oil spill flow rates.

17.    Beginning on April 26, 2010, Former Senior Executive A created, or caused to be created, several spreadsheets that purported to show a "best guess" of flow rate at 5,000 to 6,000 bopd. In creating this "best guess," Former Senior Executive A – lacking any experience – initially consulted the online encyclopedia "Wikipedia" for guidance, before reviewing more established sources. Ultimately, Former Senior Executive A developed his own methodology for estimating flow rates, which did not comport with established industry standards. Former Senior Executive A's application of his methodology was rife with mathematical and procedural inaccuracies. Despite the inaccuracies and the visual expansion of the spill, the "analysis" in each instance, yielded a desired result: a "best guess" of the range of flow rate that came close to the April 26 NOAA estimate of 5,000 bopd.

18. Although Former Senior Executive A's flawed spreadsheets reflected a range of 5,000 to 6,000 bopd, they also showed a high flow rate estimate of approximately 14,000 bopd.

**III. On April 28, 2010, the Unified Command Raised its Public Estimate to 5,000 bopd Based, in Part, on Information It Received from a BP Senior Executive.**

19. On April 28, 2010, NOAA's representative within the Unified Command told senior members of the Unified Command that sources within NOAA believed that the flow rate was higher than what had been publicly reported by the Unified Command (1,000 bopd). Upon hearing this, a senior member of the Unified Command approached a then BP senior executive, who was BP's highest ranking officer within the Unified Command (hereinafter "Former Senior Executive B"), and asked for BP's flow rate estimate so the Unified Command could update the publicly disclosed flow rate number.

20. According to a senior member of Unified Command, Former Senior Executive B apparently contacted a BP employee or agent and responded to the senior Unified Command member that BP's internal flow rate estimate was between 1,000 bopd and 5,000 bopd, with 2,500 bopd being the most likely flow rate number. No document exists to support this statement.

**IV. Statements in BP's April 29, 2010 and April 30, 2010 Commission Filings that the Flow Rate was "up to 5,000" Barrels Per Day Were False and Misleading.**

21. On April 29, 2010, BP furnished to the Commission a Report on Form 6-K in which it addressed the explosion on and sinking of the Deepwater Horizon. In part, BP stated: "Efforts continue to stem the flow of oil from the well, currently estimated at up to 5,000 barrels a day." (Emphasis added.)

22. On April 30, 2010, BP furnished to the Commission a Report on Form 6-K in which it addressed the response effort and stated in part: "Efforts to stem the flow of oil from

the well, currently estimated at <u>up to 5,000</u> barrels a day, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the blow out preventer (BOP) on the sea bed." (Emphasis added.)

23.    On April 30, 2010, BP published on its website the same materially false and misleading information found in the Report on Form 6-K of that date.

24.    When BP made the statements set forth in paragraphs 21 through 23, <u>supra</u>, it knew them to be false or was severely reckless in not knowing them to be false.  By April 28, 2010, BP possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 bopd:

        A.    By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates between 64,000 bopd and 146,000 bopd.

        B.    On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of approximately 100,000 bopd.

        C.    By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 bopd.

        D.    On April 27, 2010, a BP engineer estimated the flow to be approximately 5,000 to 22,000 bopd on the basis of temperature readings along the riser pipe, among other factors.

        E.    By April 28, 2010, Former Senior Executive A's spreadsheets showed a flow rate ranging from 1,000 bopd to over 14,000 bopd.

25.     On April 28, 2010, BP also learned that there was now oil leaking from the "kink," where the riser pipe had bent before it came to rest on the sea floor. This was an additional separate leak point.

26.     Given that BP possessed data, estimates, and calculations significantly above the 5,000 bopd figure, to publicly disclose (in the two Reports on Form 6-K furnished to the Commission on April 29 and April 30, 2010) that the flow rate was estimated as "up to 5,000" bopd was materially false and misleading. Failing to disclose even the existence of data, estimates, and calculations that showed a higher flow rate also constituted omissions of material information regarding the flow rate.

**V.     BP Obtained Additional Information Showing a Range of Flow Rates Well in Excess of 5,000 bopd but Nonetheless Furnished Another Report on Form 6-K Citing That Incorrect Estimate, and a Former Senior Executive at BP Continued to Present the 5,000 bopd Figure in Statements to the Press.**

27.     Following the fraudulent Report on Form 6-K furnished to the Commission on April 30, 2010, until May 24, 2010, BP generated or was aware of eleven additional pieces of data, estimates, and calculations showing a range of flow rates significantly higher than 5,000 bopd:

A.     On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates from 5,000 bopd to 40,000 bopd.

B.     In early May 2010, a video analysis by a BP engineer resulted in an estimate of 20,000 bopd, attributable just to the riser pipe.

C.     On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates from 37,000 to 87,000 bopd.

D.      On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be "ruled out" that the flow rate was "in the order of 40,000 bopd."

E.      On or about May 10 and 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates from 14,000 bopd to 96,000 bopd.

F.      From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 bopd. The critique identified what the BP engineer stated were potential errors made by the professor that, when corrected for, yielded a revised estimate of 15,000 bopd, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made.

G.      On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer, yielded a flow rate calculation of 86,600 bopd, based on the then-estimated pressure.

H.      From May 19 to 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool (the "RITT") showed average collection rates of approximately 5,000 bopd for a 12-hour period, capturing a portion of the oil leaking from the riser, indicating that the total amount of oil leaking was in excess of 5,000 bopd.

I.      On May 22, 2010, an external surface expression analysis showed a range of estimated flow rate from 6,154 to 11,609 bopd.

J.     On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 bopd.

K.     On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil emanating from the well.

28.     These eleven additional pieces of data, estimates, and calculations strongly indicated that the range of flow rate was in excess of 5,000 bopd. None of the additional pieces of data, estimates, and calculations suggested that 5,000 bopd was the current estimate of flow rate or that a flow rate of 5,000 bopd was the best estimate.

29.     Former Senior Executive B received at least six of the eleven additional pieces of data, estimates, and calculations. Former Senior Executive A received at least four of the eleven additional pieces of data, estimates, and calculations.

30.     On May 4, 2010, BP furnished another Report on Form 6-K to the Commission, which stated in pertinent part: "Accurate estimation of the rate of flow is difficult, but current estimates by the US National Oceanic and Atmospheric Administration (NOAA) suggest some 5,000 barrels (210,000 US gallons) of oil per day are escaping from the well."

31.     BP omitted from its May 4, 2010, Report on Form 6-K the material fact that, by this date, its own engineers and scientists had generated or received at least six pieces of data, estimates, and calculations regarding flow rate estimates that far exceeded 5,000 bopd. BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 bopd was the best estimate of the amount of oil flowing into the Gulf of Mexico. Similarly, as of this date, for the same reasons, it was misleading to use

11

NOAA's 5,000 bopd as the "best estimate" as the basis for any public disclosure when BP had

its own, higher range of flow rate estimates.

32.    Former Senior Executive B made the following public statements during April

and May 2010, all of which continued to set forth, inter alia, the 5,000 bopd estimate:

    A.    On <u>ABC</u>'s "Good Morning America" of April 29, 2010:

> Q: [T]he Coast Guard is now saying that it's more likely
> that 5,000 barrels of oil leaking into the Gulf per
> day. That's five times the original estimation. Is that your
> estimate as well?
>
> Former Senior Executive B: Well, we can say based on
> what's - what we're picking up on the surface, it looks like
> it is more. <u>So I think something between one and 5,000
> barrels a day is a reasonable estimate.</u>

> (Emphasis added.)

    B.    On <u>CBS</u>'s the "Early Show" of April 29, 2010:

> Q: This morning, we're learning that the leak from this
> well is five times worse than originally estimated. Yet, we
> just heard you say in our report that you don't believe this
> will change the amount that's estimated to be released into
> the ocean. I'm not an expert. But how is it possible that
> four thousand additional gallons leaking a day does not
> change the equation?
>
> Former Senior Executive B: . . . I should probably explain
> that on the -- the difference between one and five thousand
> barrels a day and -- and what we tried to explain is that,
> what we're seeing through the remote-operated vehicle
> cameras on the sea floor hasn't actually changed. So,
> physically those images are the same. And that of course is
> horribly difficult to estimate what the flow is. But what we
> can see is the amount of oil on top of the water. And based
> on the fact of what we're seeing on the surface, that's
> actually we can almost measure. We can take these aerial
> views. We think that the range has increased of what the
> estimate has been. <u>So, I think that somewhere between one
> and five thousand barrels a day is probably the best
> estimate we have today.</u>

(Emphasis added.)

C.    On NBC's "Today Show" of April 29, 2010:

Q:  So let's get back to numbers here, though, Mr. [Former Senior Executive B].  What do you think is leaking from that?  And is it possible the truth is somewhere in the middle, which would still be a substantially bigger leak that you're predicting?

Former Senior Executive B:  What it is is that thousand barrels a day was a number that the NOAA scientists, working with our own staff, agreed was the best estimate at the time.  What we can't do is measure the flow at the seabed.  So as time's gone on, what we [can] see is what's on the surface.  And using the satellite imagery and our overflights, we can now say it looks like it's probably more than a thousand.  It's within the range.  So I actually don't think there's a difference between NOAA's view and our view.  I would say the range is 1,000 to 5,000 barrels a day.

(Emphasis added.)

D.    On ABC's "Good Morning America" of May 14, 2010:

Q:  Don't you need to know the amount and the speed in which it is leaving in order to better contain it?  Isn't that fair to say?

Former Senior Executive B:  Well - Robin, I think, you know, as you said, what we're focused on is, you know, stopping the flow and minimizing the impact.  And since the beginning, we've said, you know, it's, it's almost impossible to get a precise number.  But ourselves and people from NOAA and others believe that something around 5,000, that's actually barrels a day, is the best estimate.  And we look at that.  Not only do we, we, look at what's occurring on the seabed, we look at what's occurring on the surface.  And actually we know that on the good weather days when we can apply all of our tools, we can actually shrink the size of this spill.  And those are the, the ways we actually think that that's probably a reasonable number.  But we know it's highly uncertain.

(Emphasis added.)

13

E.    On NBC's "Today Show" of May 14, 2010:

Q: . . . Scientific experts are questioning whether your
company has again underplayed the size of this leak.  Some
suggest it could be up to 26,000 barrels [of oil], five times a
day your current estimate.  Are you guessing?  And if you
don't know the true volume of this leak, how can you stop
it?

Former Senior Executive B:  Well, Ann, since the very
beginning we've said it's highly uncertain.  And the two
things we can do is we can watch what we observe on the
sea floor and we can see what happens on the surface.  And
what we do know is when we get good weather and can
apply all of our techniques, we can actually shrink this
spill.  We've actually done that.  I think the number is
probably reasonable.  But I can tell you, actually, we're
putting every resource against this problem.  It isn't related
to the amount coming out.  We're actually applying
everything we can.  We've mounted the largest response
effort ever done in the world.

Q:  But is it possible that you are actually leaking more
than 5,000 barrels a day?  Yes or no.

Former Senior Executive B:  I think, Ann, it could be
higher or lower.  I don't think it's wildly different than that
number, but it could be – we've said since the beginning it
could be a bit above or below.

(Emphasis added.)

F.    At a Unified Command press briefing on May 17, 2010:

Q:  You said you're hoping that the riser tool could capture
perhaps about half of the oil coming out, which I think you
said is about 2,000 barrels. Does that mean you know –
you're certain how much is actually leaking and that it is
about that 5,000-barrel figure we used to hear before? Or, I
mean, how do you know actually how much might be
captured if you're not sure how much is actually coming
out?

Former Senior Executive B:  Well, how we'll know how
much is captured is, we can actually meter it on board the

14

drill ships. So actually we can measure what's being recovered up there. What we actually don't know is the exact rate on the seabed. We've talked about this a great many times. <u>And that's our best estimate today.</u> Clearly people are constantly asking that question. But I think the thing we always come back to is our response, the Unified Command's response, BP's response to this event, is not dependent upon what that flow rate is. We are responding with everything we have to minimize the impact. And the one thing we will know is the rate that - the amount of oil that comes aboard the drill ship Enterprise that we actually can measure.

(Emphasis added.)

G.    On <u>ABC</u>'s "Good Morning America" of May 21, 2010:

Q: People have really had enough of this. You know, initially, you were saying 5,000 barrels were leaking. Now we can see for ourselves that it's far more than that. Could be - approaching 100,000. Did you deliberately underestimate the size of the spill and mislead the public?

Former Senior Executive B: Robin, you know, from the beginning, we've, we, we've worked with the government on this estimate. In fact, I should actually point out that the 5,000 barrels a day, which we've stated since the beginning, obviously has a lot of uncertainty. That was not just BP's estimate. That was the estimate of the unified command, including NOAA and the Coast Guard. <u>And that's the best estimate we have.</u> We can't put a meter on this thing. We can see what you can see. We can see what's on the surface. But what I can tell you it hasn't impacted what we've done with our response. We've thrown absolutely everything at that. And I think the Coast Guard and others have actually said that.

(Emphasis added.)

H.    At a Unified Command press briefing on May 21, 2010:

Q: . . . And then the second question is, if you don't know the flow rate that's coming from the leak, then how do you know how much material you need to use and at what pressure and what rate you need to jam the well shut using the top kill technique?

15

Former Senior Executive B: . . . [W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times. And we've said since quite early on in this that our best estimate was around 5,000 barrels a day but with a wide range. And actually as we do design for top kill, that same assessment is what we're designing that (job ?) off of and the same assessment as what we designed the application of dispersants off of as well, subsea. So at the moment, that's our best estimate, but I would, once again, stress we've said this since the very beginning, there's a huge amount of uncertainty around that number and it could have a fairly wide range.

(Emphasis added.)

I.      On NPR's "Weekend Edition" of May 22, 2010:

Q: And how much oil is billowing into the Gulf right now?

Former Senior Executive B: Well, Scott, I precisely don't know. We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others. We can monitor what comes out of that pipe, but that's visual. It's very difficult to measure that. There's no meter. But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at that difference. And those are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do, but we've also stressed since the beginning that that number is very uncertain because we can't meter it.

Q: Now, you know there's independent scientists who've made their own estimates at NPR's request, and they've come up with a substantially higher figure than 5,000. They say as much as 70,000 barrels a day.

Former Senior Executive B: I've heard those [70,000 barrels a day] estimates and seen them and I don't believe it's possible that it's anywhere near that number . . . since I can't meter it, I can't actually say it couldn't be. But all of our techniques would say that that's highly unlikely. And I

16

think some of the reasons these estimates may not be able
to accurately calculate is there's a large volume of gas
coming out of the end of that pipe with the oil. And in
addition to that, we, particularly over the last few days,
when we've had very good weather, we've actually seen the
size of the spill and the amount of the oil on the surface go
down. So those are the things that lead me to believe that
those estimates are way too high.

Q: What I'm trying to understand is if, and I will split the
difference, but let's say that it's 30,000 barrels a day that are
spilling - if you try to top kill, as I guess it's called, seal the
leak, cap it off, do you risk using a technique that could
make the spill even worse?

Former Senior Executive B: No, I don't believe that's the
case, Scott, and we don't think the rate's anywhere near that
high.

(Emphasis added.)

## VI.    A Senior BP Engineer Raised Concerns to a Former Senior Executive About Standing by the 5,000 BOPD Estimate.

33.    A BP senior engineer who performed the work that resulted in the estimated range

of flow rates from 14,000 to 96,000 bopd set forth in paragraph 27.E., supra, shared his work

internally with senior executives, during the second week of May 2010. In the early morning

hours of May 15, 2010, the same senior engineer read an article on CNN.com in which BP

continued to assert publicly that the flow rate estimate was 5,000 bopd, despite a Purdue

University professor's estimate that the flow rate was 70,000 bopd. After reading the article, the

senior engineer wrote the following e-mail to a former senior executive within BP's Exploration

& Production business segment and a junior executive tasked to support him:

I just read an article in CNN (May 14, 2010 1:00pm) stating that a
researcher at Purdue believes that the Macondo well is leaking up
to 70,000 bopd and that BP stands by a 5,000 bopd figure. With
the data and knowledge we currently have available we cannot
definitively state the oil rate from this well. We should be very
cautious standing behind a 5,000 bopd figure as our modeling

17

> shows that this well could be making anything up to ~100,000
> bopd depending on a number of unknown variables, such as: flow
> path either through the annulus behind the production casing or
> through the production casing float shoe, the height of reservoir
> exposed, if drill pipe is suspended in the [blow out preventer] and
> sealed by [variable bore] rams, reservoir skin damage, choking
> effects and etcetera. We can make the case for 5,000 bopd only
> based on certain assumptions and in the absence of other
> information, such as a well test.

(Emphasis added.)

34.     This e-mail failed to spur a discussion regarding whether BP should update or

correct the disclosures in its three Reports on Form 6-K.

## VII.   The Flow Rate Technical Group Publicly Released Its Final Estimate of Flow Rate at 52,700 to 62,200 Barrels of Oil Per Day, with the Total Oil Spilled As a Result of the Deepwater Horizon Disaster Being Approximately 4.9 Million Barrels.

35.     On or around May 19, 2010, the Flow Rate Technical Group ("FRTG"), a group

of scientists and engineers from federal agencies and universities charged with creating an

estimate of the oil flow from the Deepwater Horizon incident, was created.

36.     On May 27, 2010, the FRTG issued its first public report and statement, setting

forth flow rate estimates ranging from 11,000 bopd to 25,000 bopd.

37.     On June 10, 2010, the FRTG publicly released a second report, in which the flow

rate was estimated to be between 12,600 bopd and 40,000 bopd.

38.     Five days later, on June 15, 2010, the FRTG publicly released another report

estimating the flow rate to be between 35,000 bopd and 60,000 bopd.

39.     On August 2, 2010, the FRTG publicly released its final estimate of oil flow rate

and amount, concluding that the flow rate ranged from 52,700 bopd to 62,200 bopd during the

course of the leak and that approximately 4.9 million barrels of oil flowed from the well overall.

40.     BP ADS investors suffered substantial losses following BP's fraud.

18

**FIRST CLAIM FOR RELIEF**
**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

41.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 40, inclusive, as if they were fully set forth herein.

42.     Defendant BP, by engaging in the conduct described above, with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above, knowingly or severely recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43.     BP acted knowingly or severely recklessly in connection with the above-described acts and omissions with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above.  BP knew, or was severely reckless in not knowing, that the above-mentioned filings with the Commission and statements to the public contained material misrepresentations and omissions.

44.     By engaging in the foregoing conduct with respect to the Reports on Form 6-K of April 29, and May 4, 2010, discussed above, Defendant BP violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-16 Thereunder**

45.     The Commission realleges and incorporates by reference each and every

allegation in paragraphs 1 through 44, inclusive, as if they were fully set forth herein.

46.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-16

thereunder [17 C.F.R. § 240.13a-16] require, inter alia, a foreign private issuer to make certain

periodic and other reports including Reports on Form 6-K.  Exchange Act Rule 12b-20 [17

C.F.R. § 240.12b-20] provides that in addition to the information expressly required to be

included in a statement or report, there shall be added such further material information, if any,

as may be necessary to make the required statements, in light of the circumstances under which

they are made, not misleading.

47.     By engaging in the foregoing conduct with respect to the Reports on Form 6-K of

April 29, April 30, and May 4, 2010, discussed above, Defendant BP violated, and unless

enjoined and restrained will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C.

§ 78m(a)] and Rules 12b-20 and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20 & 240.13a-16].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final

judgment:

**I.**

Permanently restraining and enjoining Defendant BP from violating Sections 10(b) and

13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16

thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-16];

## II.

Ordering Defendant BP to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

## III.

Ordering, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, as amended by Section 929B of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, that the amount of civil penalties against and paid by Defendant BP be added to and become part of a fund for the benefit of ADS holders at the time of the violations alleged in this complaint; and

## IV.

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Daniel M. Hawke (D.C. Atty. Id. No. 424874)
Elaine C. Greenberg
Colleen K. Lynch
G. Jeffrey Boujoukos
Michael J. Rinaldi, T.A. (Pa. Atty. Id. No. 89693)
Brian P. Thomas
Matthew S. Raalf
Kelly L. Gibson
Michael F. McGraw

Attorneys for Plaintiff

Securities and Exchange Commission
701 Market St., Ste. 2000
Philadelphia, Pa. 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
RinaldiM@sec.gov

Dated: November _15_, 2012.

21

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | CIVIL ACTION |
| ) | |
| Plaintiff, ) | NUMBER: |
| ) | |
| v. ) | SECTION: |
| ) | |
| BP p.l.c., ) | |
| ) | |
| Defendant. ) | |

### CONSENT OF DEFENDANT BP P.L.C.

1.    Defendant BP p.l.c. ("Defendant") acknowledges having been served with the complaint in this action, enters a general appearance, and consents to the Court's jurisdiction over Defendant and over the subject matter of this action.

2.    BP Exploration and Production, Inc., a wholly-owned subsidiary of Defendant, has pleaded guilty to criminal conduct in *United States v. BP Exploration & Production, Inc.*, a matter brought by the United States Department of Justice relating to certain matters alleged in the complaint in this action. This Consent shall remain in full force and effect regardless of the existence or outcome of any criminal proceedings against Defendant.

3.    Defendant hereby consents to the entry of the Final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

> (a)    permanently restrains and enjoins Defendant from violation of Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 12b-20 and 13a-16 thereunder; and

1

    (b)     orders Defendant to pay a civil penalty in the amount of $525 million under Section 21(d)(3) of the Exchange Act to be paid in three lump sum payments of $175 million each, plus post-judgment interest. The total penalty due of $525 million will be paid to the Commission according to the following schedule: (1) $175 million within 14 days of the date of entry of the Final Judgment; (2) $175 million on August 1, 2013; and (3) $175 million on August 1, 2014.

4.     Defendant acknowledges that the civil penalty paid pursuant to the Final Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. Defendant agrees to pay all costs incurred under any plan for the distribution of the civil penalty, including but not limited to all fees and expenses of any Court-appointed distribution agent, Court-appointed tax administrator, and/or experts retained, up to and including an amount not to exceed $25 million. Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant agrees that it shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.

Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

5. Defendant agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

6. Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

7. Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

8. Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

9. Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

10. Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

11. Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

12. Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any

4

disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that it shall not be permitted to contest the factual allegations of the complaint in this action.

13.     Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant acknowledges the guilty plea for related criminal conduct described in paragraph 2 above, and agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

14.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

5

15.     Defendant agrees that the Commission may present the Final Judgment to the

Court for signature and entry without further notice.

16.     Defendant agrees that this Court shall retain jurisdiction over this matter for the

purpose of enforcing the terms of the Final Judgment.

> BP p.l.c.
>
> By: _Rupert Bondy_
>
> Rupert M. Bondy
> Group General Counsel
> BP p.l.c.
> 1 St. James's Square
> London, United Kingdom

On _3 october_ , 2012, _RUPERT M BONDY_ , a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent with full
authority to do so on behalf of _BP PLC_ as its _GENERAL COUNSEL_ .

_____

Notary Public
Commission expires: _with life_ .

Approved as to form:

_Howard M. Shapiro_

Howard M. Shapiro, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6606
Attorney for Defendant

Edward Young - Principal Notary Public
Keben-Smith & Associates LLP
6 Carlos Place, London, W1K 3AP
0207 499 2605
notary@notarypublicinlondon.com



6

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | CIVIL ACTION |
| Plaintiff, | ) | NUMBER: |
|  | ) | SECTION: |
| v. | ) |  |
| BP p.l.c., | ) |  |
| Defendant. | ) |  |

## FINAL JUDGMENT AS TO DEFENDANT BP P.L.C.

The Securities and Exchange Commission having filed a Complaint and Defendant BP p.l.c. having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

### I.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

## II.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active

concert or participation with them who receive actual notice of this Final Judgment by personal

service or otherwise are permanently restrained and enjoined from violating, directly or

indirectly, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-16

thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-16], by:

(a)     failing to file with the Commission factually accurate and complete Forms 6-K as

required by Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-16

thereunder; or by

(b)     omitting to state, or causing another person to omit to state, in addition to the

information expressly required to be included in such Forms 6-K, any such further

material information as may be necessary to make the required statements, in light

of the circumstances under which statements are made, not misleading.

## III.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendant shall pay a civil penalty in the amount of $525 million to the Securities and Exchange

Commission pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]. Defendant shall satisfy this obligation by paying $525 million to the Securities and Exchange Commission pursuant to the terms of the payment schedule set forth in paragraph IV below after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; BP p.l.c. as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission shall hold the funds, together with any interest and income earned (collectively, the "Fund"), pending further order of the Court. The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the

Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund. If the Commission staff determines that the Fund will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

4

## IV.

BP p.l.c. shall pay the total penalty due of $525 million in three installments to the Commission according to the following schedule: (1) $175 million, within 14 days of entry of this Final Judgment; (2) $175 million on August 1, 2013; and (3) $175 million on August 1, 2014. Payments shall be deemed made on the date they are received by the Commission and shall be applied first to post judgment interest, which accrues pursuant to 28 U.S.C. § 1961 on any unpaid amount of the total penalty due after 14 days of the entry of Final Judgment. Prior to making the final payment set forth herein, BP p.l.c. shall contact the staff of the Commission for the amount due for the final payment.

If BP p.l.c. fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Final Judgment, including post-judgment interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Court.

## V.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

## VI.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall

retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.


Dated: _____, 2012


_____

UNITED STATES DISTRICT JUDGE

6

6-K 1 u08838e6vk.htm 6-K

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 6-K

### Report of Foreign Private Issuer
### Pursuant to Rule 13a-16 or 15d-16 of
### the Securities Exchange Act of 1934

**for the period ended 31 March 2010**
**Commission File Number 1-06262**

# BP p.l.c.

(Translation of registrant's name into English)

1 ST JAMES'S SQUARE, LONDON, SW1Y 4PD, ENGLAND
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F þ     Form 40-F o

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1):

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7):

Indicate by check mark whether by furnishing the information contained in this Form, the registrant is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934.

Yes o     No þ

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b): 82-

THIS REPORT ON FORM 6-K SHALL BE DEEMED TO BE INCORPORATED BY REFERENCE IN THE PROSPECTUS INCLUDED IN THE REGISTRATION STATEMENT ON FORM F-3 (FILE NO. 333-157906) OF BP CAPITAL MARKETS p.l.c. AND BP p.l.c.; THE PROSPECTUS INCLUDED IN THE REGISTRATION STATEMENT ON FORM F-3 (FILE NO. 333-155798) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-79399) OF BP p.l.c.,THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-67206) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-103924) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-102583) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-123482) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-123483) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-131583) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-131584) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-132619) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-146868) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-146870) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-146873) OF BP p.l.c., THE REGISTRATION STATEMENT ON FORM S-8 (FILE NO. 333-149778) OF BP p.l.c., AND TO BE A PART THEREOF FROM THE DATE ON WHICH THIS REPORT IS FURNISHED, TO THE EXTENT NOT SUPERSEDED BY DOCUMENTS OR REPORTS SUBSEQUENTLY FILED OR FURNISHED.

**BP p.l.c. AND SUBSIDIARIES**
**FORM 6-K FOR THE PERIOD ENDED 31 MARCH 2010(a)**

| | | Page |
|---|---|---|
| 1. | Management's Discussion and Analysis of Financial Condition and Results of Operations for the period January-March 2010(b) | 3-10, 17-19 |
| 2. | Consolidated Financial Statements including Notes to Consolidated Financial Statements for the period January-March 2010 | 11-16, 20-24 |
| 3. | Signatures | 25 |
| 4. | Exhibit 99.1: Computation of Ratio of Earnings to Fixed Charges | 26 |
| | Exhibit 99.2: Capitalization and Indebtedness | 27 |

(a) In this Form 6-K, references to the first quarter 2010 and first quarter 2009 refer to the three-month periods ended 31 March 2010 and 31 March 2009 respectively.

(b) This discussion should be read in conjunction with the consolidated financial statements and related notes provided elsewhere in this Form 6-K and with the information, including the consolidated financial statements and related notes, in BP's Annual Report on Form 20-F for the year ended 31 December 2009.

EX-99.1
EX-99.2

2

**Table of Contents**

**BP p.l.c.**
**Group results**
**First quarter 2010**



**London 29 April 2010**

| $ million | First quarter | | |
|---|---|---|---|
| | **2010** | **2009** | **2010 vs 2009** |
| Profit for the period(a) | **6,079** | 2,562 | 137% |
| Inventory holding (gains) losses, net of tax | **(481)** | (175) | |
| Replacement cost profit(b) | **5,598** | 2,387 | 135% |
| | | | |
| — Profit per ordinary share (cents) | **32.39** | 13.69 | 137% |
| — Profit per ADS (dollars) | **1.94** | 0.82 | |
| — Replacement cost profit per ordinary share (cents) | **29.82** | 12.75 | 134% |
| — Replacement cost profit per ADS (dollars) | **1.79** | 0.77 | |

- BP's first-quarter replacement cost profit was $5,598 million, compared with $2,387 million a year ago, an increase of 135%. Replacement cost profit for the group is a non-GAAP measure. For further information see pages 4 and 16. BP's profit for the first quarter was $6,079 million, compared with $2,562 million a year ago.

- Non-operating items and fair value accounting effects for the first quarter had a net $49 million unfavourable impact compared with a net $194 million unfavourable impact in the first quarter of 2009. Information on fair value accounting effects is non-GAAP and further details are provided on page 18.

- Finance costs and net finance income or expense relating to pensions and other post-retirement benefits were $228 million for the first quarter, compared with $368 million for the same period last year.

- The effective tax rate on replacement cost profit for the first quarter was 34%, compared with 37.5% a year ago. The effective tax rate on profit for the first quarter was 34%, compared with 37.1% a year ago.

- Net cash provided by operating activities for the first quarter was $7.7 billion, compared with $5.6 billion a year ago.

- Net debt at the end of the first quarter was $25.2 billion. The ratio of net debt to net debt plus equity was 19% compared with 23% a year ago. Net debt information is non-GAAP and is defined on page 5. Gross finance debt at the end of the quarter was $32.2 billion compared to $34.7 billion a year ago. The ratio of gross debt to gross debt plus equity was 23%, compared with 28% a year ago.

- Total capital expenditure, including acquisitions and asset exchanges, for the first quarter was $4.7 billion. Organic capital expenditure(c) in the first quarter was $3.8 billion. Disposal proceeds were $0.1 billion for the first quarter. For 2010 as a whole, we continue to expect organic capital expenditure of around $20 billion and disposal proceeds of $2-3 billion.

- The quarterly dividend, to be paid on 21 June 2010, is 14 cents per share ($0.84 per ADS), the same as a year ago. The corresponding amount in sterling will be announced on 8 June 2010. A scrip dividend alternative is available, allowing shareholders to elect to receive their dividend in the form of new ordinary shares and ADS holders in the form of new ADSs. Details of the scrip dividend programme are available at www.bp.com/scrip.

---

(a)  Profit attributable to BP shareholders.

(b)  Replacement cost profit reflects the replacement cost of supplies and is the measure of profit or loss for each operating segment that is required to be disclosed under International Financial Reporting Standards, as explained in more detail on page 16. The replacement cost profit for the period is arrived at by excluding from profit inventory holding gains and losses and their associated tax effect. Replacement cost profit for the group is not a recognized GAAP measure.

Management believes this information is useful to illustrate to investors the fact that crude oil and product prices can vary significantly from period to period and that the impact on our reported result under IFRS can be significant. Inventory holding gains and losses vary from period to period due principally to changes in oil prices as well as changes to underlying inventory levels. In order for investors to understand the operating performance of the group excluding the impact of oil price changes on the replacement of inventories, and to make comparisons of operating performance between reporting periods, BP's management believes it is helpful to disclose this information.

(c)  Organic capital expenditure excludes acquisitions and asset exchanges and the accounting for our transaction with Value Creation Inc. (see page 15).

---

*The commentaries above and following should be read in conjunction with the cautionary statement on page 10.*

3

Table of Contents

## Analysis of replacement cost profit before interest and tax and reconciliation to profit for the period

| $ million | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| Exploration and Production | **8,292** | 4,320 |
| Refining and Marketing | **729** | 1,090 |
| Other businesses and corporate | **(328)** | (761) |
| Consolidation adjustment | **208** | (405) |
| RC profit before interest and tax(a) | **8,901** | 4,244 |
| | | |
| Finance costs and net finance income or expense relating to pensions and other post-retirement benefits | **(228)** | (368) |
| Taxation on a replacement cost basis | **(2,966)** | (1,454) |
| Minority interest | **(109)** | (35) |
| **Replacement cost profit attributable to BP shareholders** | **5,598** | 2,387 |
| | | |
| Inventory holding gains (losses) | **705** | 254 |
| Taxation (charge) credit on inventory holding gains and losses | **(224)** | (79) |
| **Profit for the period attributable to BP shareholders** | **6,079** | 2,562 |

(a)    Replacement cost profit reflects the replacement cost of supplies. Replacement cost profit for the group is a non-GAAP measure. For further information see page 16.

## Total of non-operating items and fair value accounting effects(a)(b)

| $ million | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| Exploration and Production | **104** | 469 |
| Refining and Marketing | **(60)** | (459) |
| Other businesses and corporate | **(118)** | (321) |
| | **(74)** | (311) |
| Taxation credit (charge)(c) | **25** | 117 |
| | **(49)** | (194) |

(a)    An analysis of non-operating items by type is provided on page 17 and an analysis by region is shown on pages 7, 9 and 10.

(b)    Information on fair value accounting effects is non-GAAP. For further details, see page 18.

(c)    Tax is calculated using the quarter's effective tax rate on replacement cost profit.

4

Table of Contents

**Per share amounts**

|  | First quarter | |
|---|---|---|
|  | **2010** | **2009** |
| **Per ordinary share** (cents)(a) | | |
| Profit for the period | **32.39** | 13.69 |
| RC profit for the period | **29.82** | 12.75 |
| | | |
| **Per ADS** (dollars)(a) | | |
| Profit for the period | **1.94** | 0.82 |
| RC profit for the period | **1.79** | 0.77 |

_____

(a)     See Note 4 on page 22 for details of the calculation of earnings per share.

**Net debt ratio — net debt: net debt + equity**

|  | First quarter | |
|---|---|---|
|  | **2010** | **2009** |
| **$ million** | | |
| Gross debt | **32,153** | 34,698 |
| Less: fair value asset (liability) of hedges related to finance debt | **152** | (323) |
| | **32,001** | 35,021 |
| Cash and cash equivalents | **6,841** | 8,360 |
| Net debt | **25,160** | 26,661 |
| Equity | **104,978** | 91,179 |
| Net debt ratio | **19%** | 23% |

Net debt and net debt ratio are non-GAAP measures. Net debt includes the fair value of associated derivative financial instruments that are used to hedge foreign exchange and interest rate risks relating to finance debt, for which hedge accounting is claimed. The derivatives are reported on the balance sheet within the headings 'Derivative financial instruments'. We believe that net debt and net debt ratio provide useful information to investors. Net debt enables investors to see the economic effect of gross debt, related hedges and cash and cash equivalents in total. The net debt ratio enables investors to see how significant net debt is relative to equity from shareholders.

**Dividends**

**Dividends Payable**

BP has announced a dividend of 14 cents per ordinary share to be paid in June. The corresponding amount in sterling will be announced on 8 June 2010, and calculated from the average of the market exchange rates for the four dealing days commencing on 2 June 2010. Holders of American Depositary Shares (ADSs) will receive $0.84 per ADS. The dividend is payable on 21 June 2010 to shareholders and ADS holders on the register on 7 May 2010. A scrip dividend alternative is available, allowing shareholders to elect to receive their dividend in the form of new ordinary shares and ADS holders in the form of new ADSs. Details of the scrip dividend programme including the first quarter interim dividend and timetable are available at www.bp.com/scrip.

|  | First quarter | |
|---|---|---|
|  | **2010** | **2009** |
| **Dividends Paid** | | |
| **Dividends paid per ordinary share** | | |
| cents | **14.000** | 14.000 |
| pence | **8.679** | 9.818 |
| **Dividends paid per ADS** (cents) | **84.00** | 84.00 |

5

Table of Contents

### Exploration and Production

| $ million | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| **Profit before interest and tax**(a) | **8,316** | 4,286 |
| **Inventory holding (gains) losses** | **(24)** | 34 |
| **Replacement cost profit before interest and tax**(b) | **8,292** | 4,320 |
| | | |
| **By region** | | |
| US | **2,762** | 1,143 |
| Non-US | **5,530** | 3,177 |
| | **8,292** | 4,320 |

(a)    Includes profit after interest and tax of equity-accounted entities.

(b)    See page 16 for information on replacement cost reporting for operating segments.

The replacement cost profit before interest and tax for the first quarter was $8,292 million, an increase of 92% compared with the first quarter of 2009. This increase was primarily due to higher realizations and higher earnings from equity-accounted entities (mainly TNK-BP), partly offset by a lower contribution from the gas marketing and trading business, higher production taxes and higher depreciation. Unit production costs were 3% lower than a year ago after adjusting for restructuring costs, and were 3% higher than a year ago including restructuring costs. Unit production costs after adjusting for restructuring costs is a non-GAAP measure – see page 19 for details.

The net non-operating gain of $41 million in the first quarter primarily relates to fair value gains on embedded derivatives, partly offset by restructuring costs. The corresponding quarter in 2009 included a net non-operating gain of $311 million. Additionally, in the first quarter, fair value accounting effects had a favourable impact of $63 million compared with a favourable impact of $158 million a year ago.

Production for the quarter was 4,010mboe/d, broadly flat with the first quarter of 2009 reflecting continued strong operational performance. After adjusting for entitlement impacts in our production-sharing agreements (PSAs) production was 1% higher. As previously indicated, we expect production in 2010 to be slightly lower than in 2009. The actual outcome will depend on a number of factors including the oil price and its impact on PSAs and OPEC quota restrictions. In the second quarter, we expect a normal seasonal turnaround effect of around 100mboe/d. These turnaround activities are planned for some of our higher-margin areas including the North Sea and the Gulf of Mexico, where activity is currently under way at Thunder Horse. This will impact costs and margins as well as volumes.

Two major projects started up during the first quarter. In the ultra-deepwater Gulf of Mexico, first oil was achieved from the Great White field (BP 33.3%). In Canada, the Noel major project commenced exporting and selling gas.

During the quarter, we announced that BP will pay Devon Energy $7.0 billion for assets in Brazil, Azerbaijan and the US deepwater Gulf of Mexico. These include ten exploration blocks in Brazil; a major portfolio of deepwater exploration acreage and prospects in the US Gulf of Mexico; and an interest in the ACG development in the Caspian Sea. Completion of certain of these transfers is subject to regulatory approvals and other third-party consents. In addition, BP will sell to Devon Energy a 50% stake in our Kirby oil sands interests in Alberta, Canada, for $500 million. The parties have agreed to form a 50:50 joint venture, operated by Devon, to pursue the development of Kirby. Devon will commit to fund an additional $150 million of capital costs on BP's behalf.

Also during the quarter, BP and Value Creation Inc. (VCI) of Calgary agreed to form a partnership to explore and develop the Terre de Grace oil sands acreage, in the Athabasca region of Alberta, Canada, using in-situ techniques. BP will hold a 75% interest and VCI a 25% interest in a newly formed partnership. BP has agreed to pay $900 million for the interest with $500 million paid in cash at closing.

Furthermore, on behalf of our partners, BP announced the first major contracts to support the expansion of production from the Rumaila field in southern Iraq (BP has a 38% working interest).

After the end of the quarter, BP agreed with Total to acquire its 15.7% interest in Valhall and its 25% interest in Hod, both fields located in the southern part of the Norwegian continental shelf, for the sum of $991 million to be paid in cash. The agreement will deepen BP's position as operator by giving BP a 43.8% interest in Valhall and 50% in Hod, subject to third-party consents and government approval. The deal has an effective date of 1 January 2010.

On 20 April 2010, the semi-submersible drilling rig Deepwater Horizon owned and operated by Transocean Limited caught fire in the US Gulf of Mexico and subsequently sank. The rig was drilling an exploration well (Mississippi Canyon 252) in which BP has a 65% interest. As operator under the MC 252 lease, BP is committed to doing everything in its power to contain the environmental consequences of the incident. BP is currently ramping up preparations for a major cleaning effort on the shorelines of Louisiana, Mississippi, Alabama and Florida. Efforts continue to stem the flow of oil from the well, currently estimated at up to 5,000 barrels a day. Preliminary estimates indicate that current efforts to contain the spill and secure the well are costing the MC 252 owners about $6 million per day. This figure is expected to rise as activity increases. It is too early to quantify other potential costs and liabilities associated with the incident.

Table of Contents

## Exploration and Production

| $ million | First quarter 2010 | 2009 |
|---|---|---|
| **Non-operating items** | | |
| US | **(62)** | 71 |
| Non-US | **103** | 240 |
| | **41** | 311 |
| **Fair value accounting effects**(a) | | |
| US | **81** | 208 |
| Non-US | **(18)** | (50) |
| | **63** | 158 |
| **Exploration expense** | | |
| US | **69** | 44 |
| Non-US | **51** | 75 |
| | **120** | 119 |
| **Production** (net of royalties)(b) | | |
| **Liquids** (mb/d) (net of royalties)(c) | | |
| US | **665** | 643 |
| Europe | **215** | 212 |
| Russia | **849** | 822 |
| Rest of World | **798** | 827 |
| | **2,527** | 2,504 |
| Of which equity-accounted entities | **1,132** | 1,116 |
| **Natural gas** (mmcf/d) (net of royalties) | | |
| US | **2,221** | 2,335 |
| Europe | **599** | 838 |
| Russia | **673** | 642 |
| Rest of World | **5,107** | 4,952 |
| | **8,600** | 8,767 |
| Of which equity-accounted entities | **1,093** | 1,072 |
| **Total hydrocarbons** (mboe/d)(d) | | |
| US | **1,048** | 1,046 |
| Europe | **318** | 357 |
| Russia | **965** | 933 |
| Rest of World | **1,679** | 1,680 |
| | **4,010** | 4,016 |
| Of which equity-accounted entities | **1,320** | 1,301 |
| **Average realizations**(e) | | |
| Total liquids ($/bbl) | **71.86** | 41.26 |
| Natural gas ($/mcf) | **4.26** | 3.63 |
| Total hydrocarbons ($/boe) | **49.16** | 31.40 |

(a)   These effects represent the favourable (unfavourable) impact relative to management's measure of performance. Further information on fair value accounting effects is provided on page 18.

(b)   Includes BP's share of production of equity-accounted entities.

(c)   Crude oil and natural gas liquids.

(d)   Natural gas is converted to oil equivalent at 5.8 billion cubic feet = 1 million barrels.

(e)   Based on sales of consolidated subsidiaries only — this excludes equity-accounted entities.

Because of rounding, some totals may not agree exactly with the sum of their component parts.

7

Table of Contents

## Refining and Marketing

| $ million | First quarter 2010 | 2009 |
|---|---|---|
| **Profit before interest and tax**(a) | **1,408** | 1,417 |
| **Inventory holding (gains) losses** | **(679)** | (327) |
| **Replacement cost profit before interest and tax**(b) | **729** | 1,090 |
| | | |
| **By region** | | |
| US | **(63)** | 308 |
| Non-US | **792** | 782 |
| | **729** | 1,090 |

(a)     Includes profit after interest and tax of equity-accounted entities.

(b)     See page 16 for information on replacement cost reporting for operating segments.

The replacement cost profit before interest and tax for the first quarter was $729 million, compared with $1,090 million for the same period last year.

The first quarter's result included a net non-operating charge of $70 million compared with a net charge of $350 million a year ago. Fair value accounting effects had a favourable impact of $10 million in the first quarter compared with an unfavourable impact of $109 million in the first quarter of 2009.

Compared with a year ago, the result reflected a significantly weaker supply and trading contribution in contrast to the particularly strong contribution in the first quarter of last year. The result was also impacted by a weaker refining environment, with the indicator margin at around half the level of the same period in 2009, and marketing margins for some products compressed by rising crude prices. These factors were partially offset by operational improvements and further cost efficiencies in the fuels value chains, and continued strong performance in the international businesses. In addition, BP's actual refining margins fell by less than the indicator would suggest as a result of BP's highly upgraded refining portfolio.

In the fuels value chains, Solomon refining availability was up by three percentage points year on year to 95.3%, the highest level since 2004. Refining throughput increased by over 8% compared with the same quarter last year and by over 5% compared with the previous quarter, principally driven by increased throughputs in our US refineries.

In the international businesses, our petrochemicals business had a particularly strong quarter with production volumes up almost 40% compared with the same period last year and 12% on the previous quarter.

In February, BP announced that it had received an offer from Delek Europe B.V. for the retail fuels and convenience business and selected fuels terminals in France. As a result, BP has agreed a period of exclusivity with Delek Europe B.V. to negotiate the terms for the sale and to allow consultation with the relevant works councils. Any transaction will be subject to regulatory approval and is expected to include a BP brand licence agreement.

In March, BP announced that in sub-Saharan Africa it intends to sell its marketing businesses in Namibia, Malawi, Tanzania, Zambia and Botswana and focus its fuel marketing activities on South Africa and Mozambique.

There has been some improvement in refining margins in the early part of the second quarter although we expect opportunities for further improvement to be limited. BP's refinery turnaround activities are expected to be higher in the second quarter than in the first. Continued low market volatility would limit the supply and trading contribution in the quarter. In the international businesses, we expect the current petrochemicals margins to come under some pressure as new capacity comes onstream.

8

Table of Contents

## Refining and Marketing

| $ million | First quarter | |
| --- | --- | --- |
| | 2010 | 2009 |
| **Non-operating items** | | |
| US | **(3)** | (134) |
| Non-US | **(67)** | (216) |
| | **(70)** | (350) |
| | | |
| **Fair value accounting effects**(a) | | |
| US | **16** | 65 |
| Non-US | **(6)** | (174) |
| | **10** | (109) |
| | | |
| **Refinery throughputs** (mb/d) | | |
| US | **1,366** | 1,164 |
| Europe | **780** | 783 |
| Rest of World | **282** | 299 |
| **Total throughput** | **2,428** | 2,246 |
| **Refining availability** (%)(b) | **95.3** | 92.3 |
| | | |
| **Sales volumes** (mb/d)(c) | | |
| **Marketing sales by region** | | |
| US | **1,418** | 1,402 |
| Europe | **1,428** | 1,529 |
| Rest of World | **629** | 617 |
| **Total marketing sales** | **3,475** | 3,548 |
| **Trading/supply sales** | **2,622** | 2,312 |
| **Total refined product sales** | **6,097** | 5,860 |
| | | |
| **Global Indicator Refining Margin (GIM)** ($/bbl)(d) | | |
| US Gulf Coast | **3.50** | 6.69 |
| US Midwest | **1.86** | 7.03 |
| US West Coast | **3.32** | 9.96 |
| North West Europe | **4.29** | 4.67 |
| Mediterranean | **3.11** | 3.56 |
| Singapore | **0.97** | 2.51 |
| BP Average GIM | **3.08** | 6.20 |
| | | |
| **Chemicals production** (kte) | | |
| US | **940** | 713 |
| Europe | **981** | 788 |
| Rest of World | **1,887** | 1,244 |
| **Total production** | **3,808** | 2,745 |

---

(a)    These effects represent the favourable (unfavourable) impact relative to management's measure of performance. Further information on fair value accounting effects is provided on page 18.

(b)    Refining availability represents Solomon Associates' operational availability, which is defined as the percentage of the year that a unit is available for processing after subtracting the annualized time lost due to turnaround activity and all planned mechanical, process and regulatory maintenance downtime.

(c)    Does not include volumes relating to crude oil.

(d)    The Global Indicator Refining Margin (GIM) is the average of regional indicator margins weighted for BP's crude refining capacity in each region. Each regional indicator margin is based on a single representative crude with product yields characteristic of the typical level of upgrading complexity. The regional indicator margins may not be representative of the margins achieved by BP in any period because of BP's particular refinery configurations and crude and product slate.

9

Table of Contents

## Other businesses and corporate

| $ million | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| Profit (loss) before interest and tax(a) | (326) | (800) |
| Inventory holding (gains) losses | (2) | 39 |
| Replacement cost profit (loss) before interest and tax(b) | (328) | (761) |
| | | |
| **By region** | | |
| US | (231) | (279) |
| Non-US | (97) | (482) |
| | (328) | (761) |
| | | |
| **Results include** | | |
| **Non-operating items** | | |
| US | (106) | (116) |
| Non-US | (12) | (205) |
| | (118) | (321) |

(a)    Includes profit after interest and tax of equity-accounted entities.

(b)    See page 16 for information on replacement cost reporting for operating segments.

Other businesses and corporate comprises the Alternative Energy business, Shipping, the group's aluminium asset, Treasury (which includes interest income on the group's cash and cash equivalents), and corporate activities worldwide.

The replacement cost loss before interest and tax for the first quarter was $328 million, compared with a loss of $761 million a year ago. The net non-operating charge for the first quarter was $118 million, compared with a net charge of $321 million a year ago. In addition, there were favourable foreign exchange effects and lower costs, and improved margins in Alternative Energy.

In Alternative Energy, our solar business achieved sales of 54MW in the first quarter. In March, BP Solar announced the closure of manufacturing at its Frederick facility, in Maryland, US, as it moves its manufacturing to lower-cost locations. BP Solar will maintain its US presence in sales and marketing, research and technology, project development, and key business support activities.

In our US wind business, construction has commenced at the 125MW Goshen North wind farm (BP 50%) in Bonneville County, Idaho. BP's net wind generation capacity(c) at the end of the first quarter was 711MW (1,237MW gross), compared with 678MW (1,113MW gross) at the end of the same period a year ago.

(c)    Net wind capacity is the sum of the rated capacities of the assets/turbines that have entered into commercial operation, including BP's share of equity-accounted entities. The gross data is the equivalent capacity on a gross-JV basis, which includes 100% of the capacity of equity-accounted entities where BP has partial ownership.

> *Cautionary statement regarding forward-looking statements: The foregoing discussion contains forward-looking statements particularly those regarding production and quarterly phasing of production, second quarter seasonal turn-around effect and its impact on costs, margins and volumes; refining and petrochemicals margins; refinery turnaround activities; expected supply and trading contribution in the second quarter; dividend and optional scrip dividend. By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will or may occur in the future. Actual results may differ from those expressed in such statements, depending on a variety of factors including the timing of bringing new fields onstream; future levels of industry product supply; demand and pricing; OPEC quota restrictions; PSA effects; operational problems; general economic conditions; political stability and economic growth in relevant areas of the world; changes in laws and governmental regulations; regulatory or legal actions; exchange rate fluctuations; development and use of new technology; the success or otherwise of partnering; the actions of competitors; natural disasters and adverse weather conditions; changes in public expectations and other changes to business conditions; wars and acts of terrorism or sabotage; and other factors discussed in this Announcement. For more information you should refer to our Annual Report and Accounts 2009 and our 2009 Annual Report on Form 20-F filed with the US Securities and Exchange Commission.*

Table of Contents

**Group income statement**

| $ million | First quarter | |
|---|---|---|
| | **2010** | 2009 |
| Sales and other operating revenues (Note 2) | **73,071** | 47,296 |
| Earnings from jointly controlled entities — after interest and tax | **403** | 220 |
| Earnings from associates — after interest and tax | **763** | 285 |
| Interest and other income | **142** | 203 |
| Gains on sale of businesses and fixed assets | **38** | 81 |
| **Total revenues and other income** | **74,417** | 48,085 |
| | | |
| Purchases | **51,641** | 30,777 |
| Production and manufacturing expenses (Note 3) | **5,740** | 5,894 |
| Production and similar taxes (Note 3) | **1,276** | 674 |
| Depreciation, depletion and amortization | **2,996** | 2,823 |
| Impairment and losses on sale of businesses and fixed assets | **164** | 137 |
| Exploration expense | **120** | 119 |
| Distribution and administration expenses | **3,020** | 3,349 |
| Fair value (gain) loss on embedded derivatives | **(146)** | (186) |
| **Profit before interest and taxation** | **9,606** | 4,498 |
| Finance costs | **238** | 318 |
| Net finance (income) expense relating to pensions and other post-retirement benefits | **(10)** | 50 |
| **Profit before taxation** | **9,378** | 4,130 |
| Taxation | **3,190** | 1,533 |
| **Profit for the period** | **6,188** | 2,597 |
| **Attributable to** | | |
| BP shareholders | **6,079** | 2,562 |
| Minority interest | **109** | 35 |
| | **6,188** | 2,597 |
| | | |
| **Earnings per share — cents (Note 4)** | | |
| Profit for the period attributable to BP shareholders | | |
| Basic | **32.39** | 13.69 |
| Diluted | **31.99** | 13.54 |

11

Table of Contents

## Group statement of comprehensive income

| $ million | First quarter 2010 | 2009 |
|---|---:|---:|
| Profit for the period | **6,188** | 2,597 |
| Currency translation differences | **(526)** | (1,011) |
| Available-for-sale investments marked to market | **(93)** | 74 |
| Available-for-sale investments – recycled to the income statement | **—** | 2 |
| Cash flow hedges marked to market | **(162)** | (211) |
| Cash flow hedges – recycled to the income statement | **(94)** | 239 |
| Cash flow hedges – recycled to the balance sheet | **13** | 71 |
| Taxation | **(119)** | (82) |
| Other comprehensive income | **(981)** | (918) |
| Total comprehensive income | **5,207** | 1,679 |
| Attributable to | | |
| BP shareholders | **5,105** | 1,668 |
| Minority interest | **102** | 11 |
| | **5,207** | 1,679 |

## Group statement of changes in equity

| $ million | BP shareholders' equity | Minority interest | Total equity |
|---|---:|---:|---:|
| At 31 December 2009 | 101,613 | 500 | 102,113 |
| Total comprehensive income | 5,105 | 102 | 5,207 |
| Dividends | (2,626) | (3) | (2,629) |
| Share-based payments (net of tax) | (13) | — | (13) |
| Transactions involving minority interests | — | 300 | 300 |
| **At 31 March 2010** | **104,079** | **899** | **104,978** |

| $ million | BP shareholders' equity | Minority interest | Total equity |
|---|---:|---:|---:|
| At 31 December 2008 | 91,303 | 806 | 92,109 |
| Total comprehensive income | 1,668 | 11 | 1,679 |
| Dividends | (2,619) | (111) | (2,730) |
| Share-based payments (net of tax) | 121 | — | 121 |
| **At 31 March 2009** | **90,473** | **706** | **91,179** |

12

**Table of Contents**

**Group balance sheet**

| $ million | 31 March 2010 | 31 December 2009 |
|---|---|---|
| **Non-current assets** | | |
| Property, plant and equipment | 108,232 | 108,275 |
| Goodwill | 8,409 | 8,620 |
| Intangible assets | 12,675 | 11,548 |
| Investments in jointly controlled entities | 15,484 | 15,296 |
| Investments in associates | 13,396 | 12,963 |
| Other investments | 1,459 | 1,567 |
| **Fixed assets** | **159,655** | 158,269 |
| Loans | 982 | 1,039 |
| Other receivables | 2,216 | 1,729 |
| Derivative financial instruments | 4,770 | 3,965 |
| Prepayments | 1,359 | 1,407 |
| Deferred tax assets | 464 | 516 |
| Defined benefit pension plan surpluses | 1,494 | 1,390 |
| | 170,940 | 168,315 |
| **Current assets** | | |
| Loans | 236 | 249 |
| Inventories | 23,221 | 22,605 |
| Trade and other receivables | 31,159 | 29,531 |
| Derivative financial instruments | 5,355 | 4,967 |
| Prepayments | 2,647 | 1,753 |
| Current tax receivable | 238 | 209 |
| Cash and cash equivalents | 6,841 | 8,339 |
| | 69,697 | 67,653 |
| **Total assets** | **240,637** | 235,968 |
| **Current liabilities** | | |
| Trade and other payables | 38,146 | 35,204 |
| Derivative financial instruments | 5,530 | 4,681 |
| Accruals | 5,482 | 6,202 |
| Finance debt | 8,356 | 9,109 |
| Current tax payable | 2,624 | 2,464 |
| Provisions | 1,646 | 1,660 |
| | 61,784 | 59,320 |
| **Non-current liabilities** | | |
| Other payables | 3,206 | 3,198 |
| Derivative financial instruments | 3,899 | 3,474 |
| Accruals | 656 | 703 |
| Finance debt | 23,797 | 25,518 |
| Deferred tax liabilities | 20,156 | 18,662 |
| Provisions | 12,752 | 12,970 |
| Defined benefit pension plan and other post-retirement benefit plan deficits | 9,409 | 10,010 |
| | 73,875 | 74,535 |
| **Total liabilities** | **135,659** | 133,855 |
| **Net assets** | **104,978** | 102,113 |
| **Equity** | | |
| BP shareholders' equity | 104,079 | 101,613 |
| Minority interest | 899 | 500 |
| | 104,978 | 102,113 |

13

Table of Contents

**Condensed group cash flow statement**

| | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| **$ million** | | |
| **Operating activities** | | |
| Profit before taxation | **9,378** | 4,130 |
| Adjustments to reconcile profit before taxation to net cash provided by operating activities | | |
|   Depreciation, depletion and amortization and exploration expenditure written off | **3,017** | 2,849 |
|   Impairment and (gain) loss on sale of businesses and fixed assets | **126** | 56 |
|   Earnings from equity-accounted entities, less dividends received | **(669)** | (252) |
|   Net charge for interest and other finance expense, less net interest paid | **46** | 89 |
|   Share-based payments | **(146)** | 86 |
|   Net operating charge for pensions and other post-retirement benefits, less contributions and benefit payments for unfunded plans | **(490)** | 26 |
|   Net charge for provisions, less payments | **(48)** | 281 |
|   Movements in inventories and other current and non-current assets and liabilities(a) | **(1,940)** | 32 |
|   Income taxes paid | **(1,581)** | (1,725) |
| **Net cash provided by operating activities** | **7,693** | 5,572 |
| **Investing activities** | | |
| Capital expenditure | **(4,289)** | (4,817) |
| Acquisitions, net of cash acquired | **—** | — |
| Investment in jointly controlled entities | **(82)** | (103) |
| Investment in associates | **(6)** | (47) |
| Proceeds from disposal of fixed assets | **108** | 311 |
| Proceeds from disposal of businesses, net of cash disposed | **—** | — |
| Proceeds from loan repayments | **56** | 117 |
| Other | **—** | 47 |
| **Net cash used in investing activities** | **(4,213)** | (4,492) |
| **Financing activities** | | |
| Net issue of shares | **128** | 35 |
| Proceeds from long-term financing | **342** | 4,619 |
| Repayments of long-term financing | **(2,495)** | (2,580) |
| Net decrease in short-term debt | **(247)** | (182) |
| Dividends paid – BP shareholders | **(2,626)** | (2,619) |
|           – Minority interest | **(3)** | (111) |
| **Net cash used in financing activities** | **(4,901)** | (838) |
| Currency translation differences relating to cash and cash equivalents | **(77)** | (79) |
| **Increase (decrease) in cash and cash equivalents** | **(1,498)** | 163 |
| Cash and cash equivalents at beginning of period | **8,339** | 8,197 |
| Cash and cash equivalents at end of period | **6,841** | 8,360 |

_____

| (a) | Includes | | |
|---|---|---|---|
| | Inventory holding (gains) losses | **(705)** | (254) |
| | Fair value (gain) loss on embedded derivatives | **(146)** | (186) |

Inventory holding gains and losses and fair value gains and losses on embedded derivatives are also included within profit before taxation.

14

Table of Contents

**Capital expenditure and acquisitions**

|  | First quarter | |
|---|---|---|
|  | 2010 | 2009 |
| $ million | | |
| By business | | |
| Exploration and Production | | |
| US | 1,133 | 1,670 |
| Non-US(a) | 2,815 | 2,035 |
|  | 3,948 | 3,705 |
| Refining and Marketing | | |
| US | 528 | 567 |
| Non-US | 144 | 226 |
|  | 672 | 793 |
| Other businesses and corporate | | |
| US | 28 | 56 |
| Non-US | 39 | 41 |
|  | 67 | 97 |
|  | 4,687 | 4,595 |
| By geographical area | | |
| US | 1,689 | 2,293 |
| Non-US(a) | 2,998 | 2,302 |
|  | 4,687 | 4,595 |
| Included above: | | |
| Acquisitions and asset exchanges | — | — |

(a)    First quarter 2010 included capital expenditure of $900 million in Exploration and Production relating to the formation of a partnership with Value Creation Inc. to develop the Terre de Grace oil sands acreage in the Athabasca region of Alberta, Canada.

**Exchange rates**

|  | First quarter | |
|---|---|---|
|  | 2010 | 2009 |
| US dollar/sterling average rate for the period | 1.56 | 1.43 |
| US dollar/sterling period-end rate | 1.51 | 1.42 |
| US dollar/euro average rate for the period | 1.38 | 1.30 |
| US dollar/euro period-end rate | 1.34 | 1.32 |

15

Table of Contents

**Analysis of replacement cost profit before interest and tax and reconciliation to profit before taxation**(a)

| | First quarter | |
|---|---|---|
| $ million | 2010 | 2009 |
| **By business** | | |
| **Exploration and Production** | | |
| US | **2,762** | 1,143 |
| Non-US | **5,530** | 3,177 |
| | **8,292** | 4,320 |
| **Refining and Marketing** | | |
| US | **(63)** | 308 |
| Non-US | **792** | 782 |
| | **729** | 1,090 |
| **Other businesses and corporate** | | |
| US | **(231)** | (279) |
| Non-US | **(97)** | (482) |
| | **(328)** | (761) |
| | **8,693** | 4,649 |
| Consolidation adjustment | **208** | (405) |
| **Replacement cost profit before interest and tax**(b) | **8,901** | 4,244 |
| **Inventory holding gains (losses)**(c) | | |
| Exploration and Production | **24** | (34) |
| Refining and Marketing | **679** | 327 |
| Other businesses and corporate | **2** | (39) |
| Profit before interest and tax | **9,606** | 4,498 |
| Finance costs | **238** | 318 |
| Net finance (income) expense relating to pensions and other post-retirement benefits | **(10)** | 50 |
| **Profit before taxation** | **9,378** | 4,130 |
| | | |
| **Replacement cost profit (loss) before interest and tax** | | |
| **By geographical area** | | |
| US | **2,590** | 854 |
| Non-US | **6,311** | 3,390 |
| | **8,901** | 4,244 |

---

(a) IFRS requires that the measure of profit or loss disclosed for each operating segment is the measure that is provided regularly to the chief operating decision maker for the purposes of performance assessment and resource allocation. For BP, this measure of profit or loss is replacement cost profit before interest and tax. In addition, a reconciliation is required between the total of the operating segments' measures of profit or loss and the group profit or loss before taxation.

(b) Replacement cost profit reflects the replacement cost of supplies. The replacement cost profit for the period is arrived at by excluding from profit inventory holding gains and losses and their associated tax effect. Replacement cost profit for the group is not a recognized GAAP measure.

(c) Inventory holding gains and losses represent the difference between the cost of sales calculated using the average cost to BP of supplies acquired during the period and the cost of sales calculated on the first-in-first-out (FIFO) method after adjusting for any changes in provisions where the net realizable value of the inventory is lower than its cost. Under the FIFO method, which we use for IFRS reporting, the cost of inventory charged to the income statement is based on its historic cost of purchase, or manufacture, rather than its replacement cost. In volatile energy markets, this can have a significant distorting effect on reported income. The amounts disclosed represent the difference between the charge (to the income statement) for inventory on a FIFO basis (after adjusting for any related movements in net realizable value provisions) and the charge that would have arisen if an average cost of supplies was used for the period. For this purpose, the average cost of supplies during the period is principally calculated on a monthly basis by dividing the total cost of inventory acquired in the period by the number of barrels acquired. The amounts disclosed are not separately reflected in the financial statements as a gain or loss. No adjustment is made in respect of the cost of inventories held as part of a trading position and certain other temporary inventory positions.

Management believes this information is useful to illustrate to investors the fact that crude oil and product prices can vary significantly from period to period and that the impact on our reported result under IFRS can be significant. Inventory holding gains and losses vary from period to period due principally to changes in oil prices as well as changes to underlying inventory levels. In order for investors to understand the operating performance of the group excluding the impact of oil price changes on the replacement of inventories, and to make comparisons of operating performance between reporting periods, BP's management believes it is helpful to disclose this information.

16

Table of Contents

Non-operating items(a)

| $ million | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| **Exploration and Production** | | |
| Impairment and gain (loss) on sale of businesses and fixed assets | **(13)** | 73 |
| Environmental and other provisions | **—** | — |
| Restructuring, integration and rationalization costs | **(104)** | (1) |
| Fair value gain (loss) on embedded derivatives | **146** | 243 |
| Other | **12** | (4) |
| | **41** | 311 |
| **Refining and Marketing** | | |
| Impairment and gain (loss) on sale of businesses and fixed assets | **(45)** | (21) |
| Environmental and other provisions | **—** | — |
| Restructuring, integration and rationalization costs | **12** | (263) |
| Fair value gain (loss) on embedded derivatives | **—** | (57) |
| Other | **(37)** | (9) |
| | **(70)** | (350) |
| **Other businesses and corporate** | | |
| Impairment and gain (loss) on sale of businesses and fixed assets | **(68)** | (108) |
| Environmental and other provisions | **—** | (75) |
| Restructuring, integration and rationalization costs | **(38)** | (71) |
| Fair value gain (loss) on embedded derivatives | **—** | — |
| Other | **(12)** | (67) |
| | **(118)** | (321) |
| **Total before taxation** | **(147)** | (360) |
| Taxation credit (charge)(b) | **50** | 135 |
| Total after taxation for period | **(97)** | (225) |

_____

(a)    An analysis of non-operating items by region is shown on pages 7, 9 and 10.

(b)    Tax is calculated using the quarter's effective tax rate on replacement cost profit.

Non-operating items are charges and credits arising in consolidated entities that BP discloses separately because it considers such disclosures to be meaningful and relevant to investors. These disclosures are provided in order to enable investors better to understand and evaluate the group's financial performance.

17

Table of Contents

**Non-GAAP information on fair value accounting effects**

| $ million | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| **Favourable (unfavourable) impact relative to management's measure of performance** | | |
| Exploration and Production | **63** | 158 |
| Refining and Marketing | **10** | (109) |
| | **73** | 49 |
| Taxation charge(a) | **(25)** | (18) |
| | **48** | 31 |

_____

(a)    Tax is calculated using the quarter's effective tax rate on replacement cost profit.

BP uses derivative instruments to manage the economic exposure relating to inventories above normal operating requirements of crude oil, natural gas and petroleum products as well as certain contracts to supply physical volumes at future dates. Under IFRS, these inventories and contracts are recorded at historic cost and on an accruals basis respectively. The related derivative instruments, however, are required to be recorded at fair value with gains and losses recognized in income because hedge accounting is either not permitted or not followed, principally due to the impracticality of effectiveness testing requirements. Therefore, measurement differences in relation to recognition of gains and losses occur. Gains and losses on these inventories and contracts are not recognized until the commodity is sold in a subsequent accounting period. Gains and losses on the related derivative commodity contracts are recognized in the income statement from the time the derivative commodity contract is entered into on a fair value basis using forward prices consistent with the contract maturity.

IFRS requires that inventory held for trading be recorded at its fair value using period end spot prices whereas any related derivative commodity instruments are required to be recorded at values based on forward prices consistent with the contract maturity. Depending on market conditions, these forward prices can be either higher or lower than spot prices resulting in measurement differences.

BP enters into contracts for pipelines and storage capacity that, under IFRS, are recorded on an accruals basis. These contracts are risk-managed using a variety of derivative instruments which are fair valued under IFRS. This results in measurement differences in relation to recognition of gains and losses.

The way that BP manages the economic exposures described above, and measures performance internally, differs from the way these activities are measured under IFRS. BP calculates this difference for consolidated entities by comparing the IFRS result with management's internal measure of performance, under which the inventory and the supply and capacity contracts in question are valued based on fair value using relevant forward prices prevailing at the end of the period. We believe that disclosing management's estimate of this difference provides useful information for investors because it enables investors to see the economic effect of these activities as a whole. The impacts of fair value accounting effects, relative to management's internal measure of performance, are shown in the table above. A reconciliation to GAAP information is set out below.

**Reconciliation of non-GAAP information**

| $ million | First quarter | |
|---|---|---|
| | 2010 | 2009 |
| **Exploration and Production** | | |
| Replacement cost profit before interest and tax adjusted for fair value accounting effects | **8,229** | 4,162 |
| Impact of fair value accounting effects | **63** | 158 |
| Replacement cost profit before interest and tax | **8,292** | 4,320 |
| | | |
| **Refining and Marketing** | | |
| Replacement cost profit before interest and tax adjusted for fair value accounting effects | **719** | 1,199 |
| Impact of fair value accounting effects | **10** | (109) |
| Replacement cost profit before interest and tax | **729** | 1,090 |
| | | |
| **Total group** | | |
| Profit before interest and tax adjusted for fair value accounting effects | **9,533** | 4,449 |
| Impact of fair value accounting effects | **73** | 49 |
| Profit before interest and tax | **9,606** | 4,498 |

18

Table of Contents

**Realizations and marker prices**

| | First quarter | |
| --- | --- | --- |
| | 2010 | 2009 |
| **Average realizations**(a) | | |
| **Liquids** ($/bbl)(b) | | |
| US | **69.77** | 39.47 |
| Europe | **75.71** | 47.59 |
| Rest of World | **72.94** | 40.89 |
| BP Average | **71.86** | 41.26 |
| **Natural gas** ($/mcf) | | |
| US | **4.84** | 3.38 |
| Europe | **4.91** | 5.56 |
| Rest of World | **3.90** | 3.41 |
| BP Average | **4.26** | 3.63 |
| **Total hydrocarbons** ($/boe) | | |
| US | **54.54** | 31.83 |
| Europe | **60.39** | 41.36 |
| Rest of World | **42.20** | 28.35 |
| BP Average | **49.16** | 31.40 |
| **Average oil marker prices** ($/bbl) | | |
| Brent | **76.36** | 44.46 |
| West Texas Intermediate | **78.84** | 43.20 |
| Alaska North Slope | **79.14** | 45.40 |
| Mars | **75.85** | 43.83 |
| Urals (NWE– cif) | **75.31** | 43.65 |
| Russian domestic oil | **35.52** | 19.52 |
| **Average natural gas marker prices** | | |
| Henry Hub gas price ($/mmBtu)(c) | **5.30** | 4.91 |
| UK Gas – National Balancing Point (p/therm) | **35.65** | 46.80 |

(a)   Based on sales of consolidated subsidiaries only – this excludes equity-accounted entities.

(b)   Crude oil and natural gas liquids.

(c)   Henry Hub First of Month Index.

**Non-GAAP information on unit production costs adjusted for restructuring costs**(a)

| | First quarter | |
| --- | --- | --- |
| | 2010 | 2009 |
| **$ million** | | |
| Production costs | **1,524** | 1,499 |
| Restructuring costs included in production costs | **(86)** | – |
| Production costs adjusted for restructuring costs | **1,438** | 1,499 |
| | | |
| **Production** (net of royalties)(b) | | |
| Total hydrocarbons (mboe/d)(c) | **2,690** | 2,715 |
| | | |
| **Unit production costs adjusted for restructuring costs** ($/boe)(d) | **5.94** | 6.13 |

(a)   Production costs are costs incurred by Exploration and Production to operate and maintain wells and related equipment and facilities. Amounts do not include ad valorem and severance taxes. Restructuring costs are included within non-operating items. Further information on non-operating items is provided on page 17.

(b)   Excludes BP's share of production of equity-accounted entities.

(c)   Natural gas is converted to oil equivalent at 5.8 billion cubic feet = 1 million barrels.

(d)   For first quarter 2009, there were no restructuring costs within production costs.

19

**Table of Contents**

**Notes**

**1.   Basis of preparation**

The interim financial information included in this report has been prepared in accordance with IAS 34 'Interim Financial Reporting'.

The results for the interim periods are unaudited and in the opinion of management include all adjustments necessary for a fair presentation of the results for the periods presented. All such adjustments are of a normal recurring nature. This report should be read in conjunction with the consolidated financial statements and related notes for the year ended 31 December 2009 included in *BP Annual Report and Accounts 2009* and in *BP Annual Report on Form 20-F 2009*.

BP prepares its consolidated financial statements included within its Annual Report and Accounts on the basis of International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB), IFRS as adopted by the European Union (EU) and in accordance with the provisions of the UK Companies Act 2006. IFRS as adopted by the EU differs in certain respects from IFRS as issued by the IASB, however, the differences have no impact on the group's consolidated financial statements for the periods presented. The financial information presented herein has been prepared in accordance with the accounting policies expected to be used in preparing the Annual Report and Accounts and the Annual Report on Form 20-F for 2010, which do not differ significantly from those used in the *BP Annual Report and Accounts 2009* or in *BP Annual Report on Form 20-F 2009*.

BP has adopted the revised version of IFRS 3 'Business Combinations', with effect from 1 January 2010. The revised standard still requires the purchase method of accounting to be applied to business combinations but introduces some changes to the accounting treatment. Assets and liabilities arising from business combinations that occurred before 1 January 2010 were not required to be restated and thus there was no effect on the group's reported income or net assets on adoption.

In addition, BP has adopted the amended version of IAS 27, 'Consolidated and Separate Financial Statements', also with effect from 1 January 2010. This requires the effects of all transactions with minority interests to be recorded in equity if there is no change in control. When control is lost, any remaining interest in the entity is remeasured to fair value and a gain or loss recognized in profit or loss. There was no effect on the group's reported income or net assets on adoption.

20

Table of Contents

### Notes

**2. Sales and other operating revenues**

|  | First quarter | |
|---|---|---|
|  | 2010 | 2009 |
| **$ million** | | |
| **By business** | | |
| Exploration and Production | **18,080** | 12,343 |
| Refining and Marketing | **64,286** | 40,573 |
| Other businesses and corporate | **790** | 584 |
|  | **83,156** | 53,500 |
| Less: sales between businesses | | |
| Exploration and Production | **9,746** | 5,800 |
| Refining and Marketing | **135** | 111 |
| Other businesses and corporate | **204** | 293 |
|  | **10,085** | 6,204 |
| Third party sales and other operating revenues | | |
| Exploration and Production | **8,334** | 6,543 |
| Refining and Marketing | **64,151** | 40,462 |
| Other businesses and corporate | **586** | 291 |
| **Total third party sales and other operating revenues** | **73,071** | 47,296 |
| **By geographical area** | | |
| US | **26,108** | 17,580 |
| Non-US | **54,009** | 33,586 |
|  | **80,117** | 51,166 |
| Less: sales between areas | **7,046** | 3,870 |
|  | **73,071** | 47,296 |

**3. Production and similar taxes**

|  | First quarter | |
|---|---|---|
|  | 2010 | 2009 |
| **$ million** | | |
| US | **313** | 79 |
| Non-US | **963** | 595 |
|  | **1,276** | 674 |

Comparative figures have been restated to include amounts previously reported as production and manufacturing expenses amounting to $213 million for the first quarter 2009, which we believe are more appropriately classified as production taxes. There was no effect on the group profit for the period or the group balance sheet.

21

Table of Contents

Notes

**4.  Earnings per share and shares in issue**

Basic earnings per ordinary share (EpS) amounts are calculated by dividing the profit for the period attributable to ordinary shareholders by the weighted average number of ordinary shares outstanding during the period. The calculation of EpS is performed separately for each discrete quarterly period, and for the year-to-date period. As a result, the sum of the discrete quarterly EpS amounts in any particular year-to-date period may not be equal to the EpS amount for the year-to-date period.

For the diluted EpS calculation the weighted average number of shares outstanding during the period is adjusted for the number of shares that are potentially issuable in connection with employee share-based payment plans using the treasury stock method.

|  | First quarter | |
|---|---|---|
|  | 2010 | 2009 |
| **$ million** | | |
| **Results for the period** | | |
| Profit for the period attributable to BP shareholders | **6,079** | 2,562 |
| Less: preference dividend | **—** | — |
| Profit attributable to BP ordinary shareholders | **6,079** | 2,562 |
| Inventory holding (gains) losses, net of tax | **(481)** | (175) |
| RC profit attributable to BP ordinary shareholders | **5,598** | 2,387 |
| | | |
| Basic weighted average number of shares outstanding (thousand)(a) | **18,769,888** | 18,720,354 |
| ADS equivalent (thousand)(a) | **3,128,315** | 3,120,059 |
| | | |
| Weighted average number of shares outstanding used to calculate diluted earnings per share (thousand)(a) | **19,004,740** | 18,920,515 |
| ADS equivalent (thousand)(a) | **3,167,457** | 3,153,419 |
| | | |
| Shares in issue at period-end (thousand)(a) | **18,784,361** | 18,724,785 |
| ADS equivalent (thousand)(a) | **3,130,727** | 3,120,798 |

(a)    Excludes treasury shares and the shares held by the Employee Share Ownership Plans and includes certain shares that will be issuable in the future under employee share plans.

22

Table of Contents

Notes

**5.  Analysis of changes in net debt**

|  | First quarter | |
|---|---|---|
|  | **2010** | 2009 |
| **$ million** | | |
| **Opening balance** | | |
| Finance debt | **34,627** | 33,204 |
| Less: Cash and cash equivalents | **8,339** | 8,197 |
| Less: FV asset (liability) of hedges related to finance debt | **127** | (34) |
| **Opening net debt** | **26,161** | 25,041 |
| | | |
| **Closing balance** | | |
| Finance debt | **32,153** | 34,698 |
| Less: Cash and cash equivalents | **6,841** | 8,360 |
| Less: FV asset (liability) of hedges related to finance debt | **152** | (323) |
| **Closing net debt** | **25,160** | 26,661 |
| **Decrease (increase) in net debt** | **1,001** | (1,620) |
| | | |
| Movement in cash and cash equivalents (excluding exchange adjustments) | **(1,421)** | 242 |
| Net cash outflow (inflow) from financing (excluding share capital) | **2,400** | (1,857) |
| Other movements | **7** | 7 |
| Movement in net debt before exchange effects | **986** | (1,608) |
| Exchange adjustments | **15** | (12) |
| **Decrease (increase) in net debt** | **1,001** | (1,620) |

**6.  TNK-BP operational and financial information**

|  | First quarter | |
|---|---|---|
|  | **2010** | 2009 |
| **Production** (Net of royalties) (BP share) | | |
| Crude oil (mb/d) | **849** | 822 |
| Natural gas (mmcf/d) | **673** | 642 |
| Total hydrocarbons (mboe/d)(a) | **965** | 933 |
| **$ million** | | |
| **Income statement** (BP share) | | |
| **Profit (loss) before interest and tax** | **788** | 419 |
| Finance costs | **(38)** | (68) |
| Taxation | **(168)** | (185) |
| Minority interest | **(39)** | (32) |
| **Net income** | **543** | 134 |
| **Cash flow** | | |
| Dividends received | **256** | — |

|  | **31 March** | 31 December |
|---|---|---|
|  | **2010** | 2009 |
| **Balance sheet** | | |
| **Investments in associates** | **9,428** | 9,141 |

(a)     Natural gas is converted to oil equivalent at 5.8 billion cubic feet = 1 million barrels.

23

Table of Contents

**Notes**

**7.  Inventory valuation**

A provision of $46 million was held at 31 December 2009 to write inventories down to their net realizable value. The net movement in the provision during the first quarter 2010 was a decrease of $22 million (first quarter 2009 was a decrease of $1,163 million).

**8.  Post balance sheet event**

On 20 April 2010, the semi-submersible drilling rig Deepwater Horizon owned and operated by Transocean Limited caught fire in the US Gulf of Mexico and subsequently sank. The rig was drilling an exploration well (Mississippi Canyon 252) in which BP has a 65% interest. As operator under the MC 252 lease, BP is committed to doing everything in its power to contain the environmental consequences of the incident. BP is currently ramping up preparations for a major cleaning effort on the shorelines of Louisiana, Mississippi, Alabama and Florida. Efforts continue to stem the flow of oil from the well, currently estimated at up to 5,000 barrels a day. Preliminary estimates indicate that current efforts to contain the spill and secure the well are costing the MC 252 owners about $6 million per day. This figure is expected to rise as activity increases. It is too early to quantify other potential costs and liabilities associated with the incident.

**9.  Second-quarter results**

BP's second-quarter results will be announced on 27 July 2010.

**10.  Statutory accounts**

The financial information shown in this publication, which was approved by the board of directors on 26 April 2010, is unaudited and does not constitute statutory financial statements.

24

Table of Contents

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |
|---|---|
|  | **BP p.l.c.** |
|  | **(Registrant)** |
| **Dated: 29 April 2010** | /s/ D J Pearl |
|  | **D J PEARL** |
|  | Deputy Company Secretary |

25

01-40968
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO,  on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

# CONFIDENTIAL

## WorldwideVIEW™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Rear Admiral Mary Ellen Landry

**VOLUME 1**

OCTOBER 22,  2012

# COPY



Systems Technology for the Litigation World

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

25

1    that.

2         Did you describe for Mr. Henry anything

3    else that you recalled with respect to how the

4    5,000 barrel estimate was arrived at?

5         A.  Yes.  There was -- there was a really --

6    I have a vivid recollection of a discussion when

7    Doug Suttles described to us what the folks in --

8    a woman in particular -- and I don't know her

9    name -- in Houston had given him an estimate of

10   flow rate, and Doug Suttles had prepared an easel

11   and he had written on the bottom of the easel a

12   range and had his description of how he described

13   that, and I vividly remember the range.  And I

14   remember right where he was standing, and I

15   remember Charlie standing to my right, in the

16   doorway of BP's offices.

17        Q.  Okay.  What was the range that you recall

18   Mr. Suttles having provided you or put on this

19   easel?

20        A.  1,000 to 5,000 with 2500 in the middle

21   and a line.

22        Q.  Okay.  And when do you recall Mr. Suttles

23   giving you that information?

24        A.  The afternoon of the day that we

25   announced going to 5,000.  So it would be

```
 1    approximately the 29th of April, I think.
 2         Q.   The 28th, perhaps?
 3         A.   It could be the 28th.
 4         Q.   Okay.  The announcement, I'll represent
 5    to you, was made on the 28th.
 6         A.   Then it would be the 28th.
 7         Q.   Okay.  And we'll get into a lot more
 8    detail about the announcement.
 9         A.   (Nodding.)
10         Q.   What -- you said Mr. Henry had a
11    different recollection, or a slightly different
12    recollection than you did?
13         A.   Yes.
14         Q.   What was Mr. Henry's recollection that he
15    communicated to you as you were preparing to
16    testify as a Corporate Representative?
17         A.   He doesn't remember standing in -- being
18    in the doorway during that discussion.
19         Q.   Does he recall you having a discussion
20    with him -- strike that.
21              Did he indicate whether he recalled you
22    having a discussion with him and Mr. Suttles
23    prior to the announcement of the 5,000 barrel
24    estimate?
25         A.   I'm sorry.  Could you repeat the
```

446

```
 1          Q.  -- in amongst everything else?  You're
 2     doing a much better job than me.
 3               And, Admiral, along those lines, would
 4     you agree that in your role as the FOSC and your
 5     role with the U.S. -- United States Government,
 6     you were the reviewers, but not the creators of
 7     the Source Control Plans?
 8          A.  Yes.
 9          Q.  Thank you.  Admiral, ma'am, are you
10     familiar with the principle that the polluter
11     pays and the polluter cleans up, or insert
12     "Responsible Party"?
13          A.  Yes.
14          Q.  Okay.  And then also is it your
15     understanding that.  Ultimately, certain
16     environmental penalty calculations for this
17     disaster would be based on the barrels per day of
18     oil released into the Gulf of Mexico?
19          A.  Yes.
20          Q.  The more barrels per day released would
21     then result in higher penalties for the
22     Responsible Party?
23          A.  Yes.
24          Q.  Admiral, was the Coast Guard aware and
25     you, as the FOSC, aware that if the flow rate was
```

447

1    over 15,000 barrels per day, that the top kill

2    method would not work?

3              MR. FLYNN:  Object as to form.

4        A.  No.

5        Q.  (By Ms. Patty) Admiral, this morning you

6    testified that your new/current position was

7    created based on "Lessons Learned" from the

8    DEEPWATER HORIZON disaster?

9        A.  Yes.

10       Q.  Would you be willing to share the lessons

11   that were learned by the Federal Government with

12   regard to the BP DEEPWATER HORIZON disaster?

13             MR. FLYNN:  Ob -- objection as to

14   form.  There -- there's been hundreds and

15   hundreds of pages written about this.

16       Q.  (By Ms. Patty) If you could just

17   summarize.

18       A.  It would take me more than -- time than

19   anyone in this room has to summarize the "Lessons

20   Learned."  In general terms, the position was

21   created to institutionalize and apply the

22   "Lessons Learned" from the DEEPWATER HORIZON, and

23   there are just all sorts of information out there

24   that can provide you with some background on, you

25   know, what we will take forward.

559

1    if the -- if the method won't work with a flow

2    rate of X, and the flow rate is X plus, you know,

3    15,000 barrels or something like that, you might

4    want to -- not want to try that particular

5    "ser" -- Source Control method, correct?

6                    MR. FLYNN:  Objection as to form.

7        A.  You would want to know all the details

8    you could, going into Source Control.

9        Q.  (By Mr. Li) Okay.  To control the risks?

10       A.  To manage the risks, yes.

11       Q.  And -- and to prevent things like a

12   subsea blowout?

13       A.  Yes.

14       Q.  To choose the meth -- methods that would

15   be most likely to succeed, correct?

16       A.  Yes.

17       Q.  Understanding that there's no guarantee

18   that -- that any particular method will succeed,

19   you -- you do want to choose the methods that

20   will most likely succeed, correct?

21       A.  Yes.

22       Q.  And Source -- strike that.

23            And the flow rate, you want to know as

24   close and most accurate of an estimate as you can

25   about the flow rate, in the process of choosing

1     what Source Control methods you want to use?

2                    MS. KARIS:  Objection, form.

3        A.  You want to know as accurate as possible

4     the flow rate, in executing Source Control

5     operations.

6        Q.  (By Mr. Li) Thank you.

7                    And as the Federal On-Scene Coordinator,

8     did you expect BP to use its best estimates of

9     flow rate when making Source Control decisions?

10       A.  Yes.

11       Q.  And did you expect that BP would do

12    everything in its power to calculate an accurate

13    flow rate, so it could make good Source Control

14    decisions?

15       A.  Yes.

16       Q.  And as the Federal On-Scene Coordinator,

17    did you expect that BP would keep you appraised

18    of its best estimates of flow rate?

19       A.  Yes.

20       Q.  And did you -- did you expect that BP

21    would keep you apprised of all of its modeling

22    for flow rate?

23                    MS. KARIS:  Object to the form.

24       A.  Yes.

25       Q.  (By Mr. Li) I'd -- I'd like to turn for a

582

```
 1        Q.  When you received this letter from
 2   Mr. Suttles, did you believe that he was
 3   providing you a complete answer and not omitting
 4   any material information?
 5        A.  Yes.
 6        Q.  Now, because you did not have all those
 7   datapoints that I described, reservoir
 8   permeability, et cetera, you, at least at this
 9   point, and this is on May 10th, 2010, were not in
10   a position to verify all of the -- the data that
11   he was providing to you; is that correct?
12              MS. KARIS:  Objection, form.
13              MS. GREENWALD:  Objection, form.
14        A.  Yes.
15        Q.  (By Mr. Li) So at this point, while you
16   needed to trust Mr. Suttles, you would have to
17   rely on the Flow Rate Technical Group later on to
18   verify, correct?
19        A.  Yes.
20        Q.  Now, one more point from this letter,
21   you'll see right after the theoretical downside
22   phrase, it says this 55,000 barrels per day
23   estimate "...also assumes the flow is through the
24   annular space and that there is a complete
25   failure of the blow-out-preventer."
```

```
1                (Discussion off the record.)
2         Q.  (By Mr. Li) Now, the annular space is --
3    in a well is different than the production
4    casing, correct?
5         A.  Yes.
6         Q.  Did BP, in this letter, share with you
7    flow estimations through the casing?
8         A.  Not in this letter.
9         Q.  Now, if you could look at the back page,
10   which is the graph, and you'll see at the top it
11   says:  "Macondo Reservoir Model, CONTAINS
12   PROPRIETARY INFORMATION CONFIDENTIAL TREATMENT
13   REQUESTED" et cetera.  I get that right?
14        A.  Yes.
15        Q.  Did you understand this to be a graphical
16   representation of what the worst-case model was
17   and what the most likely model was?
18        A.  Yes.
19        Q.  And did you understand this to be a
20   representation by Mr. Suttles of what he and BP
21   believed were the worst-case model -- was the
22   worst-case model?
23        A.  Yes.
24        Q.  And did you understand this to be a
25   representation by Mr. Suttles and BP as what --
```

584

1    as to what they believed the most likely model

2    was on May 10th, 2010?

3         A.  Yes.

4         Q.  Now, you've seen this a number of times,

5    but the red line indicating the worst-case model

6    shows a line that starts at about 55,000 barrels

7    per day, and ends at approximately 42, 43,000

8    barrels a day, 145 days later, correct?

9         A.  Yes.

10        Q.  And in the little red box underneath

11   "Worst case model," this graph represents to you,

12   does it not, that this model is based on actual

13   reservoir conditions?

14        A.  Yes.

15        Q.  Now if you look at the blue line,

16   above -- below the box that says "Most Likely

17   Model," that blue line is located at

18   approximately 5,000 barrels a day, correct?

19        A.  Yes.

20        Q.  And this is -- also purports to be based

21   on actual reservoir conditions?

22        A.  Yes.

23        Q.  Okay.  Did anybody at BP in this

24   timeframe tell you to be very cautious about

25   standing behind a 5,000 barrel a day figure?

585

1      A.  No.

2      Q.  And, in fact, at this -- in this

3   timeframe, which is the May 10th, 2010 timeframe,

4   BP, through Doug Suttles, was representing to the

5   United States Government that the most likely

6   model predicted that the flow would be 5,000

7   barrels a day, correct?

8              MS. KARIS:  Object to the form.

9      A.  Yes.

10     Q.  (By Mr. Li) Based on actual well

11  conditions, correct?

12             MS. KARIS:  Object to form.

13     A.  Yes.

14     Q.  (By Mr. Li) If you could turn to Tab 24.

15         (Discussion off the record.)

16             MR. LI:  Yeah.

17     Q.  (By Mr. Li) So this is an E-mail from --

18  it's an E-mail string, but I'd like you to focus

19  on the bottom half of the E-mail string, Admiral,

20  from Mike Mason to Andy Inglis dated May 15th.

21  Do you have that in front of you?

22     A.  Yes.

23     Q.  Okay.  Do you know who Andy Inglis is?

24     A.  Yes.

25     Q.  Do you know him to be an Executive at BP?

1       A.  "Bopd."

2       Q.  Okay.  And did Mr. Suttles share with you

3   that its contractors were suggesting that the --

4   that it could not be ruled out that the flow out

5   at the seabed was on the order of 40,000 oil --

6   barrels of oil per day?

7       A.  No.

8       Q.  Admiral, with respect to that May 10th

9   letter from Mr. Suttles to you, do you have any

10   idea where -- how BP generated the information to

11   give you those estimates?

12       A.  No.

13       Q.  Would it surprise you that British

14   Petroleum's Corporate Representative, Adam

15   Ballard, testified that between April 28th and

16   until the capping stack was put on, BP never

17   estimated the flow rate using reservoir modeling?

18              MS. KARIS:  Object to the form.

19       A.  It would surprise me, yes.

20       Q.  (By Mr. Li) And that's because we've just

21   walked through a number of documents that show,

22   or at least purport to show, reservoir modeling,

23   correct?

24       A.  Yes.

25       Q.  Including the May 10th letter that

605

1       Q.   (By Mr. Li) Fair to say that those other

2   lines on these charts were edited out of your

3   letter from Mr. Suttles to you on May 10th, 2010?

4            MS. KARIS:  Object to the form.

5       A.   No, I can't answer that.

6       Q.   (By Mr. Li) Okay.  Would you have

7   expected that BP would not edit out its various

8   flow rate estimates?

9            MS. KARIS:  Objection, form.

10       A.   From the letter they provided me --

11       Q.   (By Mr. Li) Yes.

12       A.   -- I would not expect them to edit out.

13       Q.   You would want everything from BP,

14   wouldn't you?

15       A.   Yes.

16       Q.   You would want all of their modeling,

17   correct?

18       A.   Yes.

19       Q.   You would not want them to edit freely,

20   would you?

21       A.   No.

22            MR. LI:  I think this is a good

23   place to break.

24            THE VIDEOGRAPHER:  The time is

25   2:46 p.m.  We're off the record.

618

1    benefits and all of the various issues relating

2    to the top kill operation, correct?

3         A.  I can just -- we had a Team in Houston,

4    and we had a Team in Robert, and we actually

5    positioned Admiral Cook in Houston as the Lead

6    Representative for the Coast Guard during top

7    kill, and I had Pat Little with me in Robert, and

8    MMS had folks, and Department of En -- Energy had

9    folks.

10        Q.  And that was to make sure that the

11   Government could provide sufficient oversight to

12   the top kill operation, correct?

13        A.  That's correct.

14        Q.  And that this top kill operation was

15   essentially being run by BP, correct?

16        A.  Yes.

17        Q.  And it was important that you get full

18   and complete information from BP so that you

19   could serve your oversight function, correct?

20        A.  Yes.

21        Q.  And that would be one of the reasons why

22   you or Admiral Allen, the NIC, sent Admiral Cook

23   to Houston, correct?

24        A.  Yes.

25        Q.  To ensure that the flow of information

 1    between BP was responsible for the top kill

 2    operation and the Government was full and

 3    complete, correct?

 4        A.  Yes.

 5        Q.  Now, did -- were there problems in

 6    getting full and complete cooperation with BP

 7    prior to sending Admiral Cook?

 8        A.  Can you -- can you specify what you mean

 9    by that?

10        Q.  Were there times where BP was not --

11    other than the situations that we've gone through

12    right now with all the documents they didn't

13    share with you, were there other instances where

14    BP wasn't sharing information with you?

15              MS. KARIS:  Object to form.

16        A.  Not to my knowledge.

17        Q.  (By Mr. Li) Okay.  Now, let's take a look

18    at Exhibit 9132.  This is Tab 30.

19    Admiral Landry, this is an E-mail from Kate Baker

20    to a number of folks.  And if you could just turn

21    to the second page, and I'm just going to focus

22    you on one point.

23              So the title is "Summary points..." for

24    "Kill the Well on Paper Discussion, 18 May,

25    2010."

620

1          Correct?

2      A.   That's what the document says, yes.

3      Q.   Okay.  If you could read the third bullet

4  point down, which is a Summary Point.

5      A.   "Modeling indicates that a dynamic kill

6  cannot be successfully executed if the oil flow

7  rate is 15000 STBpd."

8      Q.   Standard barrels of oil per day?

9          Now, were you ever told by any person at

10  BP -- stock tank, sorry.  Stock tank barrels of

11  oil per day.

12          Were you ever told by anybody at BP that

13  modeling indicated that a dynamic kill could not

14  successfully be executed if the oil rate is

15  15,000 stock tank barrels per day?

16          MS. KARIS:  Objection, form.

17      A.   I don't recall anyone from BP telling me

18  that -- me that.

19      Q.   (By Mr. Li) And, in fact -- strike that.

20          (Discussion off the record.)

21      Q.   (By Mr. Li) Okay.  Ultimately, the -- the

22  top kill procedure did not succeed, right?

23      A.   Yes.

24      Q.   And you all made a nu -- number of

25  efforts to pump material down the well, correct?

635

```
 1        A.  Point No. 3:  "Tony Hayward said he will
 2    await your call."
 3        Q.  Yeah.  And then Tony Hayward says he'll
 4    await your call.  And then going down, "The way
 5    ahead...." 1, 2, and 3?
 6        A.  "The way ahead....
 7            "Terminate top kill.  Analysis shows
 8    that" the "flow path exists (probably thru a
 9    rupture disk in the casing) into the formation.
10    Additional pumping could damage the casing
11    further and allow for hydrocarbon to flow into
12    the formation... A scenario which could lead to
13    broaching."
14        Q.  "2.  Shift to containment."
15        A.  "Shift to containment.  LMRP cap still
16    deemed best interim solution."
17        Q.  And then 3?
18        A.  "BOP on BOP not advisable, now or in the
19    future, because of rupture disk issue..."
20        Q.  And we can -- we can just stop there.
21    Who -- who provided the information and the data
22    relating to all of these various conclusions?
23    It's BP, isn't it?
24            MS. KARIS:  Objection, form.
25        A.  Kevin Cook generated this E-mail.
```

636

 1        Q.  (By Mr. Li) Right.  But all the data --

 2        A.  The "Subject" is the "BP Briefing On" the

 3   "Way Forward," so that would -- that would mean

 4   that Kevin was getting this information from the

 5   BP Representatives.

 6        Q.  Okay.  And at this point, those BP

 7   Representatives were suggesting to Admiral Cook,

 8   and others, and then that all was forwarded on to

 9   you, that the "BOP on BOP option" was "not

10   advisable, now or in the future..."  Correct?

11             MS. KARIS:  Objection, form.

12        A.  According to this document.

13        Q.  (By Mr. Li) I'm going to ask you to look

14   at Tab 45, which is being marked as Exhibit --

15             (Exhibit No. 9634 marked.)

16             MS. SARGENT:  9634.

17        Q.  (By Mr. Li) This is a letter from the

18   Secretary of Homeland Security, Janet Napolitano,

19   and the Administrator of the Environmental

20   Protection Agency, Lisa P. Jackson, to Tony

21   Hayward, Group Chief Executive of BP, dated May

22   20th, 2010.

23             Admiral, at the second -- the very first

24   paragraph, the second sentence it says:  "In

25   responding to this oil spill, it is critical that

9628

Exhibit No. _____
Worldwide Court
Reporters, Inc.



1000 bbls          2500 bbls          bbls
                                      5000



Mel
October 23, 2012

From: Bozeman, Walt
Sent: Wed Apr 21 14:15:28 2010
To: Rainey, David I; Ritchie, Bryan; Rooney, Terry C; Vinson, Graham (Pinky); Thorseth, Jay C
Cc: Epps, David S; Kercho, Debbie A; Gansert, Tanner; Skripnikova, Galina
Subject: RE: WCD - Updated
Importance: Normal
Attachments: WCD plots.ppt

Dave,

We have updated the earlier WCD calculation with new subsurface parameters from the Macondo team and modeled a flow rate at the sea floor (assuming riser falls) in Prosper with the latest wellbore configuration. All the REs in GoMX participated in this evaluation along with numerous members of the Macondo team.

We calculate 100,000 BOPD and 300 MMCFPD based on these parameters. This is shown in the attached PowerPoint.

We have identified several items, however that could impact this rate to keep in consideration.

Items to lessen flow - formation skin, formation collapse, partial restrictions in the wellbore or at the wellhead, Items to increase flow - riser doesn't fall to seabed, catastrophic failure of wellhead allowing flow-up 9 7/8 X 16", contributions from up-hole zones,

Please let us know if we need to provide further explanation or analysis.

Regards,

Walt and the GoMX REs

<<...>>

---

From: Bozeman, Walt
Sent: Wednesday, April 21, 2010 6:43 AM
To: Rainey, David I; Ritchie, Bryan; Rooney, Terry C
Subject: WCD

Dave,

We made a preliminary estimate of a new WCD for the wellbore. A rate of 162 mbopd was calculated for the EP. Our new rate (preliminary) is 189 mbopd with the better than expected fluid properties out weighing the post liner setting casing design (this is a smaller well bore configuration than used for the EP calculation).

The calculation is greatly influenced by the permeability and we are still using our pre-drill estimate in the above calculation. Bryan has Galina et.al. tasked with re-assessing this and a couple other key subsurface parameters. On the calculation side, Tanner is coming in to provide a more sophisticated analysis of the calculation with Prosper software (versus a spreadsheet calculator that I used).

We expect to report back in a couple hours with an updated assessment.

Regards,

Walt

PS - I am heading home for a shower, my cell number is 281-870-2065

3063

Exhibit No. _____
Worldwide Court
Reporters, Inc.

BP-HZN-2179MDL02314243





From: Bozeman, Walt
Sent: Wed Apr 21 14:15:28 2010
To: Rainey, David I; Ritchie, Bryan; Rooney, Terry C; Vinson, Graham (Pinky); Thorseth, Jay C
Cc: Epps, David S; Kercho, Debbie A; Gansert, Tanner; Skripnikova, Galina
Subject: RE: WCD - Updated
Importance: Normal
Attachments: WCD plots.ppt

Dave,

We have updated the earlier WCD calculation with new subsurface parameters from the Macondo team and modeled a flow rate at the sea floor (assuming riser falls) in Prosper with the latest wellbore configuration. All the REs in GoMX participated in this evaluation along with numerous members of the Macondo team.

We calculate 100,000 BOPD and 300 MMCFPD based on these parameters. This is shown in the attached PowerPoint.

We have identified several items, however that could impact this rate to keep in consideration.

Items to lessen flow - formation skin, formation collapse, partial restrictions in the wellbore or at the wellhead,
Items to increase flow - riser doesn't fall to seabed, catastrophic failure of wellhead allowing flow-up 9 7/8 X 16", contributions from up-hole zones,

Please let us know if we need to provide further explanation or analysis.

Regards,

Walt and the GoMX REs

<<...>>

---

From: Bozeman, Walt
Sent: Wednesday, April 21, 2010 6:43 AM
To: Rainey, David I; Ritchie, Bryan; Rooney, Terry C
Subject: WCD

Dave,

We made a preliminary estimate of a new WCD for the wellbore. A rate of 162 mbopd was calculated for the EP. Our new rate (preliminary) is 189 mbopd with the better than expected fluid properties out weighing the post liner setting casing design (this is a smaller well bore configuration than used for the EP calculation).

The calculation is greatly influenced by the permeability and we are still using our pre-drill estimate in the above calculation. Bryan has Galina et.al. tasked with re-assessing this and a couple other key subsurface parameters. On the calculation side, Tanner is coming in to provide a more sophisticated analysis of the calculation with Prosper software (versus a spreadsheet calculator that I used).

We expect to report back in a couple hours with an updated assessment.

Regards,

Walt

PS - I am heading home for a shower, my cell number is 281-870-2065

3372

Exhibit No. _____
Worldwide Court
Reporters, Inc.

CONFIDENTIAL

BP-HZN-2179MDL02314243



CONFIDENTIAL

BP-HZN-2179MDL02314244



CONFIDENTIAL

BP-HZN-2179MDL02314245

From: Bozeman, Walt
Sent: Wed Apr 21 14:15:28 2010
To: Rainey, David I; Ritchie, Bryan; Rooney, Terry C; Vinson, Graham (Pinky); Thorseth, Jay C
Cc: Epps, David S; Kercho, Debbie A; Gansert, Tanner; Skripnikova, Galina
Subject: RE: WCD - Updated
Importance: Normal
Attachments: WCD plots.ppt

Dave,

We have updated the earlier WCD calculation with new subsurface parameters from the Macondo team and modeled a flow rate at the sea floor (assuming riser falls) in Prosper with the latest wellbore configuration. All the REs in GoMX participated in this evaluation along with numerous members of the Macondo team.

We calculate 100,000 BOPD and 300 MMCFPD based on these parameters. This is shown in the attached PowerPoint.

We have identified several items, however that could impact this rate to keep in consideration.

Items to lessen flow - formation skin, formation collapse, partial restrictions in the wellbore or at the wellhead,

Items to increase flow - riser doesn't fall to seabed, catastrophic failure of wellhead allowing flow-up 9 7/8 X 16", contributions from up-hole zones,

Please let us know if we need to provide further explanation or analysis.

Regards,

Walt and the GoMX REs

<<...>>

---

From:   Bozeman, Walt
Sent:   Wednesday, April 21, 2010 6:43 AM
To:     Rainey, David I; Ritchie, Bryan; Rooney, Terry C
Subject:   WCD

Dave,

We made a preliminary estimate of a new WCD for the wellbore. A rate of 162 mbopd was calculated for the EP. Our new rate (preliminary) is 189 mbopd with the better than expected fluid properties out weighing the post liner setting casing design (this is a smaller well bore configuration than used for the EP calculation).

The calculation is greatly influenced by the permeability and we are still using our pre-drill estimate in the above calculation. Bryan has Galina et.al. tasked with re-assessing this and a couple other key subsurface parameters. On the calculation side, Tanner is coming in to provide a more sophisticated analysis of the calculation with Prosper software (versus a spreadsheet calculator that I used).

We expect to report back in a couple hours with an updated assessment.

Regards,

Walt

PS - I am heading home for a shower, my cell number is 281-870-2065



5239

Exhibit No.

Worldwide Court
Reporters, Inc.



CONFIDENTIAL

1

BP-HZN-2179MDL02314244



From: Bozeman, Walt
Sent: Mon Apr 26 14:04:28 2010
To: Douglas, Scherie D; Yeilding, Cindy; Thorseth, Jay C; Ritchie, Bryan; Mix, Kurt; Grant, James R
Cc: Epps, David S; Kercho, Debbie A; McAughan, Kelly
Subject: Worst Case Discharge Update for Macondo Relief Well
Importance: Normal
Attachments: WCD plots-Macando2-42610.ZIP


We have calculated a worst case oil discharge (WCD) rate from an uncontrolled blowout of the Macondo relief well of **240,000 bopd and 718 mmcfpd.**

The WCD scenario is a surface oil flow up the riser with drill pipe out of the hole. Flow is from the Macondo M56 sands. Calculation are from a Prosper inflow/outflow model. The model results can be found in the attached file.

The model's assumptions are based on the results of the Macondo well and are:

- Discharge from M56 Sands up the riser without pipe in the well bore. Wellbore casing sizes and depths are shown on attachment.
- 88 ft. of net sand, as encountered in the Macondo exploration well from 18,060 ft. to 18,190 ft. (md)
- Average oil permeability of 300 md (based on Klinkenberg corrected, stressed air permeability measurements from the Macondo sidewall cores, and an assumed relative permeability to oil of 0.85 times the air perm at initial water saturation).
- In situ oil viscosity = 0.17 cp (correlations from initial fluid GOR and API measurements).
- Average reservoir pressure of 11,850 psi.
- Skin = 0
- Casing Roughness = 0.0006


It was assumed that no bridging would occur under these conditions and the rock has " sufficient strength to remain stable, so the bridging tendencies are minimal".

Debbie Kercho, David Epps, and Walt Bozeman,
GoMX Reservoir Engineers

<<...>>

BP-HZN-2179MDL03729645





1

BP-HZN-2179MDL03729646

# Exhibit 6

Depo Ex. No. 10855 –

Robert Merrill

Filed Under Seal

# <u>Exhibit 7</u>

Bates Number

BP-HZN-2179MDL04938144

Filed Under Seal

# Exhibit 8

Bates Number

BP-HZN-2179MDL00445569

Filed Under Seal

# Exhibit 9

Depo Ex. No. 5063 –

Trevor Hill

Filed Under Seal

01-41872
DG/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG     )      MDL NO.  2179
"DEEPWATER HORIZON" in the      )
GULF OF MEXICO,  on             )      SECTION: J
APRIL 20, 2010                 )
                             )      JUDGE BARBIER
                             )
                             )      MAG. JUDGE SHUSHAN

# CONFIDENTIAL

## WorldwideVIEW ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Trevor J. Hill

Volume 2

JANUARY 15, 2013

## COPY



Systems Technology for the Litigation World

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services
800 - 745 - 1101**

394

1    Towards mid-May.

2         Q.  So towards mid -- mid-May, you no longer

3    felt that 5,000 barrels per day was the best

4    estimate of the flow rate?

5         A.  As of that date.

6         Q.  As of that date, yes?

7         A.  Mid-May, yeah.

8         Q.  As of mid-May, what did you feel was the

9    best estimate of the flow rate?

10        A.  That again, in the context of my

11   definitions, I had done a -- a very brief eyeball

12   look at a movement of the fluid, and that had come

13   to an estimate, at that time, of -- of 20 to 25 in

14   the context of a rapid piece of work with no

15   further elaboration of it.

16        Q.  When did you perform the estimate that

17   generated -- let me strike that.

18             When did you perform the analysis

19   that generated an estimate of 20- to 25,000

20   barrels per day?

21        A.  To the best of my recollection, mid-May.

22        Q.  And when you say "20- to 25,000 barrels

23   per day," are you talking about stock tank

24   barrels?

25        A.  Yes.

1      Q.  You came up with this 20,000 to 25,000

2  barrel-per-day estimate in mid-May based on your

3  observations of video from the flowing well; is

4  that correct?

5      A.  One observation of the video.

6      Q.  And your estimate assumed a 10 percent

7  reduction in the diameter of the drill pipe

8  through which the oil was flowing; is that

9  correct?

10      A.  At that stage, it did not.

11      Q.  Did your estimate take into account the

12  best information you had available on the gas/oil

13  ratio?

14      A.  Yes, it did.

15      Q.  Describe for me how you went about

16  calculating in mid-May this estimate of 20,000 to

17  25,000 barrels per day, please.

18      A.  As we said, I looked at a clip of video

19  looking for a feature in the flow that you can see

20  moving out of the end of the riser pipe.  In order

21  to approximate the distance it traveled, I took

22  reference of the view of the end of the pipe --

23  and therefore, its diameter -- to get a distance

24  measurement -- estimate.  And by simple counting,

25  believed it was about a second that it took to --

1    for that feature to make it transition of about a

2    diameter.

3         Q.  A diameter?

4         A.  Yeah.  So the diameter of the pipe was

5    about 20 inches and it's just...

6         Q.  Okay.  Did you inform anyone from the U.S.

7    government of your 20,000 to 25,000 barrel-per-day

8    estimate?

9         A.  I don't recall.

10        Q.  By the point in time when you had

11   developed your 20- to 25,000 barrel-per-day

12   estimate, had you been in contact with scientists

13   from the national labs?

14        A.  I believe so, yes.

15        Q.  And you have no memory of sharing your 20-

16   to 25,000 barrel-per-day estimate with the

17   scientists from the national labs; is that

18   correct?

19        A.  That's correct.

20        Q.  You have no memory of sharing your 20- to

21   25,000 barrel-per-day estimate with any member of

22   the flow rate technical group; is that correct?

23                 MS. AVERGUN:  Object to form.

24        A.  I don't recall doing so, no.

25        Q.  (BY MR. DAVIS-DENNY)  In any of the

1    critiques that you wrote up of Professor Wereley's

2    analysis, did you disclose your 20,000 to 25,000

3    barrel-per-day estimate?

4         A.   In the document, no.

5         Q.   Did you disclose it in some other form,

6    other than in a document?

7         A.   I had spoken with Mr. Tooms about it.

8         Q.   When did you share your 20,000 to 25,000

9    barrel-per-day estimate with Mr. Tooms?

10        A.   I don't recall specifically.

11        Q.   Was it shortly after you had formulated

12   the estimate?

13             MS. AVERGUN:   Objection to form.

14        A.   Yeah, I can't recall specifically.  But...

15        Q.   (BY MR. DAVIS-DENNY)  Was it less than a

16   week after you had formulated the 20,000 to 25,000

17   barrel-per-day estimate that you shared that

18   estimate with Mr. Tooms?

19        A.   I don't have a specific recollection.

20        Q.   Do you believe that you shared it with

21   Mr. Tooms before the Top Kill was implemented?

22             MS. KARIS:   Object to form.

23        A.   Yes, I do.

24        Q.   (BY MR. DAVIS-DENNY)  Did you share it

25   with Mr. Tooms orally?

1       A.   Yes.

2       Q.   Did you share it with Mr. Tooms in a

3   face-to-face meeting?

4       A.   To the extent, yeah, face to face; not a

5   formal meeting, but yes, not a call.

6       Q.   How did Mr. Tooms respond when you told

7   him that you had formulated a 20,000 to 25,000

8   barrel-per-day estimate?

9       A.   I don't recall.

10      Q.   Did you tell Mr. Tooms in this meeting

11  that 20,000 to 25,000 barrels per day was your

12  best estimate at that time of the flow rate?

13              MS. KARIS:   Object to the form.

14      A.   I -- I don't believe I would have called

15  it a "best estimate."

16      Q.   (BY MR. DAVIS-DENNY)  But it was your best

17  estimate of the flow rate at the time; is that

18  correct?

19      A.   It was a -- it was a piece of data, one --

20  one -- say one time of flight.  I don't believe I

21  would have called it a "best estimate."

22      Q.   At that point in time in mid-May, what was

23  your best estimate of the flow rate?

24      A.   I had made that measurement, and from that

25  measurement, come up with 20 to 25.

1          Q.  And so was 20- to 25,000 your best

2     estimate of the flow rate at that time?

3                    MS. AVERGUN:  Objection, asked and

4     answered.

5          A.  All I can say is I don't believe I would

6     have called it that.

7          Q.  (BY MR. DAVIS-DENNY)  Did you share your

8     20,000 to 25,000 barrel-per-day estimate with

9     anyone else besides Mr. Tooms?

10         A.  I believe so, but I don't have a specific

11     recollection of -- of who.  But in -- around his

12     team.

13         Q.  So other BP employees on Mr. Tooms' team?

14         A.  I believe so, yes.

15         Q.  Do you believe you shared it with Robbie

16     Goudamata?

17         A.  Not sure to what extent I described it,

18     but the number, yes.

19         Q.  Did you share the 20,000 to 25,000

20     barrel-per-day estimate with Adam Ballard?

21         A.  I don't recall specifically, no.

22         Q.  Don't you think the 20,000 to 25,000

23     barrel-per-day estimate is a piece of information

24     that the national lab scientists would have liked

25     to have known?

1      A.  I don't believe I do, no.

2      Q.  Did anyone at BP critique your 20- to

3  25,000 barrel-per-day estimate that you know of?

4      A.  No, I don't believe so.

5      Q.  By -- in mid-May 2010, did you know of

6  anyone within BP who believed that the best

7  estimate of the flow rate was 5,000 barrels per

8  day?

9              MS. AVERGUN:  Objection to form.

10      A.  Personally, no, I didn't.

11      Q.  (BY MR. DAVIS-DENNY)  Okay.  Let's first

12  look at an exhibit that you saw yesterday.  I'll

13  show you Exhibit 9459.  It was U.S. Tab 114 and

14  it's TransOcean Tab 87 if that's easier.

15              I'd like to look at the second E-mail

16  on the page first.

17      A.  Second in chronology?

18      Q.  Second one going down the page.

19      A.  Down the page, right.

20      Q.  Yes.  This is an E-mail that you sent to

21  Gordon Birrell, Paul Tooms, and Cheryl Grounds in

22  July 2010; is that correct?

23      A.  That's correct.

24      Q.  And you sent it in the normal course of

25  your work for BP; is that correct?

 1    of area, yes.

 2        Q.  (BY MR. DAVIS-DENNY)  And what did that --

 3    what estimate did that generate?

 4        A.  It generated a number of 15- to 20,000.

 5        Q.  Do you recall exactly when in May you

 6    determined that the -- you determined this flow

 7    rate estimate of 15- to 20,000 barrels per day?

 8        A.  Not the exact date.

 9        Q.  Did you communicate your estimate of

10    15,000 to 20,000 barrels per day to anyone?

11        A.  I believe in discussions with Mr. Tooms.

12        Q.  Did you communicate your estimate of

13    15,000 to 20,000 barrels per day with any employee

14    or official of the United States Government?

15        A.  I don't recall.

16        Q.  You have no memory of doing so?

17        A.  I don't remember doing so or specifically

18    not doing so, no.

19        Q.  Doesn't it stand to reason that if you

20    have a memory of communicating it to Mr. Tooms, if

21    you had, in fact, communicated it to a United

22    States Government employee or official, that you

23    would also remember that communication?

24            MS. KARIS:  Object to form.

25            MS. AVERGUN:  Objection; form.

1        A.   Okay.

2        Q.   And the first E-mail I'm going to focus on

3   is the second E-mail down on Page 1.  This is an

4   E-mail that you received from Julian Austin on

5   April 28th of 2010; is that correct?

6        A.   Yes, it is.  But I'll just follow up

7   through the trail to that E-mail, please.

8        Q.   Well, actually, I'm glad you said that.  I

9   want to start someplace else, which is -- let's

10  start at the bottom, since that's where you're

11  reading right now.

12            Do you see the bottom E-mail is an

13  E-mail from David Petruska, on April 26th of 2010.

14  Do you know David Petruska?

15       A.   Yes, I do.

16       Q.   Who is he?

17       A.   He's a BP employee, riser engineer.

18       Q.   Okay.  And do you see next to Paragraph 1

19  in Mr. Petruska's E-mail, it says:  "Andy had

20  concern if flow rates are wrong and are really

21  much higher."

22            Do you think the "Andy" there is Andy

23  Inglis?

24       A.   That's my understanding.

25       Q.   Why would that be your understanding?

497

```
 1              Is that consistent with your
 2   recollection of what Ole Rygg told you?
 3        A.  Yes, it is.
 4        Q.  And by May 18th, 2010, you had calculated
 5   that the flow rate could be 15- to 20,000 barrels
 6   per day, correct?
 7              MS. AVERGUN:  Objection to form
 8   misstates the testimony.
 9        A.  Yeah, I had made one preliminary
10   measurement that was interpreted as 15- to 20,000.
11        Q.  (BY MR. DAVIS-DENNY)  If you look at the
12   fourth bullet point, it says:  "Knowledge of the
13   flow rate is needed to form a view of the
14   probability of success as is knowledge of the
15   position of flow restrictions."
16              It was consistent with your
17   understanding that knowledge of the flow rate was
18   needed to form a view of the probability of
19   success of the Top Kill, right?
20              MS. KARIS:  Object to form.
21        A.  Yeah, I can't recall the exact timing of
22   when my knowledge was, but sitting here, that's
23   correct.
24        Q.  (BY MR. DAVIS-DENNY)  Did you understand
25   in May of 2010 that understanding the flow rate
```

498

```
 1    was needed to form a view of the probability of

 2    success of the Top Kill?

 3         A.  In May, yes.

 4         Q.  Okay.  You just don't remember when in

 5    May?

 6         A.  Correct.

 7         Q.  Okay.  Do -- you reached that conclusion

 8    after you spoke with Ole Rygg; is that correct?

 9         A.  I -- I can't recall the exact sequence of

10    receiving, speaking, and being in the UK and

11    forming any conclusion.

12         Q.  Okay.  I'm going to hand you a new

13    exhibit, Exhibit 11209.

14                   (Marked Exhibit No. 11209.)

15         Q.  (BY MR. DAVIS-DENNY)  Which is TransOcean

16    Tab 24.

17              MS. KARIS:  What tab is it?

18              MR. DAVIS-DENNY:  24.

19              MS. KARIS:  Thank you.

20         Q.  (BY MR. DAVIS-DENNY)  This is an E-mail

21    that you received from your colleague at BP, W.

22    Lee McDonald, on May 14th, 2010; is that correct?

23         A.  That's correct.

24         Q.  And the subject of the E-mail was

25    "Observations on Flow Coming From the Macondo
```

518

1    Rygg sent on May 29th of 2010 and you're not a

2    named recipient on this E-mail, but my question

3    is:  Have you seen Exhibit 9265 before?

4        A.  I can't state explicitly one way or the

5    other whether I've -- I've seen this document in

6    its entirety.  I do recall seeing something

7    presented like this that's -- that's similar, at

8    least, to that form.

9        Q.  Do you recall receiving the analysis

10   that's contained in Mr. Selbekk's E-mail?

11       A.  Again, whether it was specifically that

12   there or the general analysis, I do recall

13   discussions about the general work he was doing,

14   yes.

15       Q.  Okay.  If you look at the paragraph that's

16   just below the bullet points, it reads:

17   "Simulating pumping at 78 bpm shows a flat

18   pressure curve, fairly low max pressure, and

19   hardly any drop in pressure consistent with a

20   situation where basically no mud enters the

21   wellbore."

22              If no mud had entered the wellbore,

23   the mud could not have escaped through the burst

24   disks; is that correct?

25       A.  In terms of that statement, that's

```
 1    correct.

 2         Q.  Okay.  And this statement that I've just

 3    read to you, do you recall having seen this

 4    analysis in late May or early June of 2010?

 5         A.  No, I don't.

 6         Q.  Okay.  He continues in the last paragraph

 7    saying:  "There are other combinations that would

 8    give the same outcome; e.g., opening around rams,

 9    etc..  nonetheless, comparing the actual pressure

10    curve with the simulations, there are strong

11    indications that a curve with this shape is the

12    result of a situation where there is not enough

13    restriction at surface to create enough pressure

14    to force the mud into the well."

15              Do you recall seeing that analysis in

16    late May or early June of 2010?

17         A.  I don't recall seeing that statement.

18         Q.  Mr. Selbekk's analysis here would support

19    the plausibility of the view that the Top Kill

20    failed because the flow rate was too high and the

21    restrictions were too large in the BOP; is that

22    correct?

23              MS. AVERGUN:  Objection; form.

24              MS. KARIS:  Object to form and

25    foundation.
```

1    you that the likely case was that flow was up the

2    casing rather than up the annulus?

3         A.  Yes.  I believe that's the -- that's the

4    recollection.

5         Q.  When did Mr. Tooms tell you that the

6    likely case was that the flow was at the casing

7    rather than up the annulus?

8         A.  I don't recall dates.

9         Q.  Do you recall approximately when it was?

10        A.  No, I don't.

11        Q.  Was it shortly after the Top Kill failed?

12             MS. KARIS:  Object to form.

13        A.  I don't recall.

14        Q.  (BY MR. DAVIS-DENNY)  Do you think it was

15   within a week of the Top Kill failing?

16        A.  I don't recall.

17             MR. DAVIS-DENNY:  We can take a

18   break.  Thank you.

19             THE VIDEOGRAPHER:  The time is

20   3:12 p.m.  We're off the record.

21             (Break from 3:12 p.m. to 3:31 p.m.)

22             THE VIDEOGRAPHER:  The time is

23   3:31 p.m.  We're back on the record, beginning

24   Tape 14.

25        Q.  (BY MR. DAVIS-DENNY)  Welcome back from

523

```
 1    the break.  We're handing you an exhibit that's
 2    been previously marked as Exhibit 10622.  This is
 3    a memo dated May 31st of 2010, from D. Barnett of
 4    Wild Well Control to Mark Mazzella and Mark
 5    Patteson.  My question for you is just if you have
 6    seen this memo before.
 7         A.  I don't believe so, no.
 8         Q.  Okay.  If you can look at the third
 9    paragraph from the bottom of the second page --
10    sorry, turn to Page 2 first.  And if you go up
11    three paragraphs from the bottom, that one that
12    begins, "Given the lack of," it says:  "Given the
13    lack of response while pumping very large bridging
14    material (as large as 2-1/2 inch diameter), it is
15    apparent that the geometry of the pathway(s)
16    inside the BOP is quite large.  One of the most
17    discouraging signs was the reappearance of oil in
18    the flow stream at the riser kink within only a
19    few minutes of pumping several thousand barrels of
20    mud at very high rates.  This is a strong
21    indication that the mud is either being expelled
22    from the top of the BOP, or at least not being
23    injected into and moving downward through any of
24    the flow paths between the BOP and the flowing
25    reservoir."
```

524

```
 1              Now I'm unquoting and asking you this
 2   question:  Is this an analysis that you would have
 3   liked to have had in connection with your work on
 4   the Top Kill?
 5              MS. KARIS:  Object to form.
 6        A.  So if I can just clarify.  You said about
 7   my work on the Top Kill.
 8        Q.  (BY MR. DAVIS-DENNY)  Uh-huh.
 9        A.  There was some reflections on Top Kill
10   undertaken with Mr. Tooms, not -- not necessarily
11   an in-depth analysis, that was not in the Top Kill
12   team.
13        Q.  In terms of your, as you describe them,
14   reflections --
15        A.  Yeah.
16        Q.  -- with Mr. Tooms on Top Kill, would you
17   have liked to have had this analysis from Wild
18   Well Control when you had your discussions with
19   Paul Tooms about why the Top Kill failed?
20        A.  With hindsight from now, yes.
21        Q.  And that's because this analysis here
22   would suggest that the mud was not going out the
23   burst disks, but rather it was going up and out of
24   the BOP and the riser; is that right?
25        A.  It -- it doesn't compare those
```

1    possibilities in the way I'm -- I'm reading it.

2    It describes one -- one scenario.

3         Q.  Okay.  And the scenario that it describes

4    here is consistent with a scenario in which the

5    mud was simply being pushed out the riser?

6         A.  That's my understanding of what it says.

7         Q.  I'm going to hand you another exhibit,

8    Exhibit 9450, Tab 71 in TransOcean's binder.  This

9    is an E-mail that you received from Douglas Wood

10   on June 11th of 2010; is that correct?

11        A.  Yes.

12        Q.  And the only other person who received

13   this E-mail was Paul Tooms, your colleague at BP,

14   right?

15                  MS. AVERGUN:  Object to form.

16        A.  This -- this version, yes, is Paul Tooms,

17   yeah.

18        Q.  (BY MR. DAVIS-DENNY)  Okay.  And the

19   subject is "Well Kill Analysis Technical

20   Note.doc."

21                  Do you see that?

22        A.  Yes.

23        Q.  And the cover E-mail says:  "Trevor, Paul,

24   my technical note approaching its final draft

25   before I leave, Doug."

From: Caldwell, Jason
Sent: Tue Apr 27 19:18:11 2010
To: Caldwell, Jason; Suttles, Doug J; Morrison, Richard; Rainey, David I; Dupree, James H; Wells, Kent; Thierens, Harry H; Birrell, Gordon Y; Clarkson, David; Lynch, Richard; O'Bryan, Patrick L; Patteson, Mark R; Cavanagh, Ian; Byrd, Michael L.; Imm, Gary R; Hohle, Jeff W; Lynch, John E Jr. (Jack); McKay, Lamar
Cc: Maguire, Niall J; Verchere, Christina C; Price, Bruce; Munn, Chrysanthe; Nitcher, Eric L
Subject: Notes from 4/27 Morning Interface Meeting
Importance: Normal
Attachments: Interface Meeting_4_27 am Notes.doc; Forward plan 26th.ppt

Enclosed are the notes and handout from the call this morning.
Jason Caldwell
Executive Assistant to James Dupree
BP Gulf of Mexico SPU
281-366-1982 (O)
281-366-4300 (F)
713-249-1732 (M)
<<...>> <<...>>



EXHIBIT # 1626
WIT:

CONFIDENTIAL

BP-HZN-2179MDL00574169

06:30 4/27/10

BOP
- 5000 psi was applied to blind shear rams on 9 occasions last night. No substantial change in the leak rate at either discharge point was observed. The lock is engaged on one side of the rams, indicating that this side should be fully closed. Status of the other side of the rams is unknown.
- ACTION (Harry): Determine possible scenarios that may have led to blind shear rams not stopping or limiting flow.
- ACTION (Gordon): Send Doug a summary of flowrate calculations based on wellhead pressure vs orifice size.
- Next step is to close the super shear rams followed by the upper annular and the lower stripping annular rams. These rams will be hydraulically locked closed.
- ACTION (Harry): Investigate if either annular ram was activated during the incident.
- ACTION (Doug): Once procedures for closing annulars are available, arrange for Charlie to get into room to brief the MMS as a proactive measure, well ahead of procedure execution.
- Mark Patteson to work with wild well control to develop plan for pumping junk shot into choke or kill line to help control well – Mud Line Top Kill work flow.
- ACTION (Executive): Need to develop an internal global communication concerning BOP testing procedures to ensure learnings from incident are shared and incorporated into testing procedures.

Crimped Pipe
- There is a low probability that we can affect the formation of hydrates.
- Based on finite element modeling it is possible that if the riser is subjected to full wellhead pressure it is likely to burst.
- A sample section of riser is in route to a testing facility to be bent and tested. Estimate commencement of testing by the weekend.
- Work stream underway to design and fabricate a clamp for the crimp.
- Work stream underway to design "corks" for both leak points.
- ACTION (Gordon): Provide pipe pressure rating calculations to Doug.

Subsea Collection
- Modifications to the first cofferdam will be completed at 10:00 pm on 4/27. Modifications on the second cofferdam will start immediately afterwards. Expect 72 hours of work needed to complete modifications. A third cofferdam has been located and is in inventory.
- Soil data indicates that installing equipment directly on the seabed may lead to equipment instability. Therefore, the team is working mud mat requirements.
- ACTION (Richard Lynch): Send photographs of modifications to Doug. Action Complete
- Enterprise high pressure flare system is capable of 75 mmscfd.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00574170

- ACTION (Richard Lynch):  Identify permit waivers that are needed and communicate to Doug so he can work them from his end.
- ACTION (Richard Lynch): Send Gant chart to Doug so that progress can be reviewed at each meeting.
- ACTION (Richard Lynch): Send Morning Status report to Doug.
- ACTION (Doug):  Determine permitting needed from MMS for collection equipment.

Relief Wells
- Pat met with Lars (MMS) and discussed the relief well design.  There are a couple of issues being worked this morning.  Anticipate approval by as early as this afternoon.
- Received MMS approval of exploration plan yesterday.
- DD3 arrived at MC511 staging area last night.
- MMS will witness the deadman and hot stab testing on the DD3 BOP before it splashes.
- Enterprise will be ready to move to MC511 on Thursday, anticipate 24 hours transit time.
- DD2 is an option for the second relief well.  SIMOPS feasibility for 3 drilling rigs (DDII, DDIII, Enterprise) in close proximity will need to be worked.
- Doug needs to lead on the positioning of the relief well drilling plan, second rig best used for oil recovery, potential SIMOPS issues with third rig in the field.
- ACTION: James to provide update on time required for seismic processing - a potential critical path item.  Action Complete – seismic processing should be complete by the morning of 4/28.
- ACTION (Pat):  Provide gant chart to Charlie.  Action Complete

HIGHLY CONFIDENTIAL

BOP Stack Forward Plan
April 26, 4:00



| Ready | | Procedure |
|---|---|---|
| 5 – 6 pm 26th | Intensifier Blind Shear Closure ·Cat pump to 4,000 psi ·Intensifier to 5,000 psi+ | ready |
| 8 -10 hrs | Coil Tbg Super Shear Ram Closure ·Cut hydraulic 1" hose ·Tie-in w/coil tbg ·Oceaneering tool on location | working |
| 24 - 36 hrs | Upper Annular Closure (10K) ·Cut hydraulic 1.5" hose ·Tie-in w/coil tbg ·Fittings being fabricated | working |
| 30 - 36 hrs | Lower Stripping Annular Closure (5K) ·Cut hydraulic 1.5" hose ·Tie-in w/coil tbg ·Fittings being fabricated | working |
| 30 - 36 hrs | Other VBR Ram Closure ·Cut hydraulic 1" hose ·Tie-in w/coil tbg ·Fittings being fabricated | planning |
| 36+ hrs | Inverted Test Ram Closure ·Cut hydraulic 1" hose ·Tie-in w/coil tbg ·Fittings being fabricated | planning |

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00574172



**From:** Caldwell, Jason
**Sent:** Tue Apr 27 19:18:11 2010
**To:** Caldwell, Jason; Suttles, Doug J; Morrison, Richard; Rainey, David I; Dupree, James H; Wells, Kent; Thierens, Harry H; Birrell, Gordon Y; Clarkson, David; Lynch, Richard; O'Bryan, Patrick L; Patteson, Mark R; Cavanagh, Ian; Byrd, Michael L.; Imm, Gary R; Hohle, Jeff W; Lynch, John E Jr. (Jack); McKay, Lamar
**Cc:** Maguire, Niall J; Verchere, Christina C; Price, Bruce; Munn, Chrysanthe; Nitcher, Eric L
**Subject:** Notes from 4/27 Morning Interface Meeting
**Importance:** Normal
**Attachments:** Interface Meeting_4_27 am Notes.doc; Forward plan 26th.ppt

Enclosed are the notes and handout from the call this morning.

Jason Caldwell
Executive Assistant to James Dupree
BP Gulf of Mexico SPU
281-366-1982 (O)
281-366-4300 (F)
713-249-1732 (M)
<<...>> <<...>>

CONFIDENTIAL

BP-HZN-2179MDL00574169

BPD122-165831

06:30 4/27/10

BOP

- 5000 psi was applied to blind shear rams on 9 occasions last night.  No substantial change in the leak rate at either discharge point was observed.  The lock is engaged on one side of the rams, indicating that this side should be fully closed.  Status of the other side of the rams is unknown.
- ACTION (Harry): Determine possible scenarios that may have led to blind shear rams not stopping or limiting flow.
- ACTION (Gordon): Send Doug a summary of flowrate calculations based on wellhead pressure vs orifice size.
- Next step is to close the super shear rams followed by the upper annular and the lower stripping annular rams.  These rams will be hydraulically locked closed.
- ACTION (Harry): Investigate if either annular ram was activated during the incident.
- ACTION (Doug): Once procedures for closing annulars are available, arrange for Charlie to get into room to brief the MMS as a proactive measure, well ahead of procedure execution.
- Mark Patteson to work with wild well control to develop plan for pumping junk shot into choke or kill line to help control well – Mud Line Top Kill work flow.
- ACTION (Executive):  Need to develop an internal global communication concerning BOP testing procedures to ensure learnings from incident are shared and incorporated into testing procedures.

Crimped Pipe

- There is a low probability that we can affect the formation of hydrates.
- Based on finite element modeling it is possible that if the riser is subjected to full wellhead pressure it is likely to burst.
- A sample section of riser is in route to a testing facility to be bent and tested.  Estimate commencement of testing by the weekend.
- Work stream underway to design and fabricate a clamp for the crimp.
- Work stream underway to design "corks" for both leak points.
- ACTION (Gordon): Provide pipe pressure rating calculations to Doug.

Subsea Collection

- Modifications to the first cofferdam will be completed at 10:00 pm on 4/27.  Modifications on the second cofferdam will start immediately afterwards.  Expect 72 hours of work needed to complete modifications.  A third cofferdam has been located and is in inventory.
- Soil data indicates that installing equipment directly on the seabed may lead to equipment instability.  Therefore, the team is working mud mat requirements.
- ACTION (Richard Lynch): Send photographs of modifications to Doug.  Action Complete
- Enterprise high pressure flare system is capable of 75 mmscfd.

HIGHLY CONFIDENTIAL

BP-HZN-2179MDL00574170
BPD122-165832

# Exhibit 13

Depo Ex. No. 10180 -

Ronald Dykhuizen

Filed Under Seal

# Exhibit 14

Depo Ex. No. 9439 -

Trevor Hill

Filed Under Seal

# Exhibit 15

Depo Ex. No. 9445 -

Trevor Hill

Filed Under Seal

# Exhibit 16

Depo Ex. No. 3213 -

David Rainey

Filed Under Seal

# Exhibit 17

Depo Ex. No. 8942 -

Charles Henry

Filed Under Seal

# Exhibit 18

Bates Number

BP-HZN-2179MDL05688699

Filed Under Seal

# Exhibit 19

Depo Ex. No. 10489 -

David Barnett

Filed Under Seal

# Exhibit 20

Depo Ex. No. 9155 -

Trevor Hill

Filed Under Seal

# Exhibit 21

Depo Ex. No. 11160 -

Tony Liao

Filed Under Seal

# Exhibit 22

Depo Ex. No. 11135 -

Tony Liao

Filed Under Seal

# Exhibit 23

Depo Ex. No. 10185 -

Farah Saidi

Filed Under Seal

# Exhibit 24

Depo Ex. No. 11136 -

Tony Liao

Filed Under Seal

# Exhibit 25

Depo Ex. No. 9446 -

Tim Lockett

Filed Under Seal

# Exhibit 26

Depo Ex. No. 9157 -

William Lehr

Filed Under Seal

# Exhibit 27

Depo Ex. No. 9158 -

William Lehr

Filed Under Seal

# Exhibit 28

Depo Ex. No. 9294 -

Bryan Ritchie

Filed Under Seal

# Exhibit 29

Depo Ex. No. 9441 -

Adam Ballard

Filed Under Seal

# Exhibit 30

Depo Ex. No. 9266 -

Ole Rygg

Filed Under Seal

# Exhibit 31

Depo Ex. No. 9240 -

Ole Rygg

Filed Under Seal

# Exhibit 32

Depo Ex. No. 9159 -

Clifton Mason

Filed Under Seal

# Exhibit 33

Depo Ex. No. 8866 -

William Lehr

Filed Under Seal

# Exhibit 34

Depo Ex. No. 10798 -

Clifton Mason

Filed Under Seal

# Exhibit 35

Depo Ex. No. 9326 -

Clifton Mason

Filed Under Seal