01-41920
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )     MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on )     SECTION: J
APRIL 20, 2010 )
)     JUDGE BARBIER
)
)     MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW* ™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Clifton Michael Mason

## VOLUME 1

JANUARY 24, 2013

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1              So you sent your E-mail that is in
 2   Exhibit 3220, early in the morning hours of
 3   Saturday, May 15th, 2010, correct?
 4       A.  I -- and I'm pretty sure that was a
 5   Saturday, yes.
 6       Q.  Okay.  And you received the phone call
 7   from Jasper Peijs on the morning of Saturday, May
 8   15th?
 9       A.  Yes, later that -- later, after this --
10   well, much later after this time.
11       Q.  Okay.  And then after you received
12   Mr. Peijs's phone call, you went into BP's
13   offices again on the morning of Saturday May
14   15th?
15       A.  Correct.
16       Q.  Okay.  And then you had a meeting with
17   Mr. Peijs on the morning of Saturday, May 15th --
18       A.  Yes.
19       Q.  -- is that correct?
20       A.  Yes, it is.
21       Q.  What do you recall being discussed during
22   that meeting with Mr. Peijs on the morning of
23   Saturday, May 15th?
24       A.  Two things:  One, he said:  "We've got
25   some new pressure data that we would like for you
```

1   to review, the 3100 psi."  And he also said:

2   "Next time you have an idea or a thought like

3   this E-mail note, we would appreciate it if you

4   would walk over and discuss it with us."

5        Q.  Did he describe to you what he meant by

6   an "idea or a thought like this"?

7        A.  Well, I asked him what the problem

8   with -- was with this note a number of times, and

9   he said:  "It's the big number."

10        Q.  And by the "big number," you're referring

11   to the 100,000 barrel per day number?

12        A.  Yes.

13        Q.  And did he tell you why writing about a

14   100,000 barrel per day number was problematic?

15        A.  No.

16             MS. BROWNE:  Objection, form.

17        A.  Not that I recall.

18        Q.  (By Mr. Davis-Denny) Did you have an

19   understanding of why he thought writing about the

20   100,000 barrel per day number was problematic?

21        A.  He didn't explain to me why.

22        Q.  Okay.

23        A.  So, no.

24        Q.  Okay.  When he said that writing about

25   the 100,000 barrel per day number was

1    problematic, did he say that, by the way, that

2    "writing about the 100,000 barrel per day number,

3    that's problematic"?

4        A.   No, he didn't say that.  He said what I

5    said earlier.  He said:  "It's the big number."

6    That's exactly what he said.

7        Q.   Did you say anything in response?

8        A.   Yes, I did.  I asked if I could speak to

9    Andy Inglis directly.

10       Q.   What did Mr. Peijs say in response to

11   your question?

12       A.   He said he would check.

13       Q.   Did you speak with Andy Inglis directly?

14       A.   No.  Not about this, I didn't.

15       Q.   Did Mr. Peijs ever come back to you about

16   your request to speak with Andy Inglis directly?

17       A.   I believe he did.  I --

18       Q.   And what did Mr. Peijs say when he came

19   back?

20       A.   He said that if I bumped into Andy in the

21   hallway, that I could speak to him, but that they

22   weren't going to set up a -- a specific meeting

23   related to this topic.

24       Q.   Did he explain why they were not going to

25   set up a meeting related to that topic?

1    A.   Not to my memory, I can't recall that he
2   did.
3        Q.   Okay.   When did Mr. Peijs come back to
4   you and tell you that you -- they were not going
5   to set up a meeting on the topic of your E-mail?
6        A.   I -- I believe that it was the same day.
7   It may have been the next day, but it was -- it
8   was fairly soon after I made the request.
9        Q.   Okay.   Did you have any further
10  conversations with Mr. Peijs about the standing
11  behind the 5,000 barrel per day estimate?
12             MS. BROWNE:   Objection, form.
13       A.   Not specifically related to -- no.  No, I
14  didn't.
15       Q.   (By Mr. Davis-Denny) Did you have any
16  further conversations with Mr. Peijs about your
17  May 15th E-mail?
18       A.   Yes.   I told him if -- I asked him if I
19  couldn't speak to Andy Inglis, if I could speak
20  to our Chief of Staff.
21       Q.   Who was your Chief of Staff?
22       A.   I can't remember her name right now.   I
23  think it was Christina Verchere.
24       Q.   Why did you want to speak to --
25       A.   I wanted to --

```
1        Q.  Okay.  And that certainty, you did not
2    have, correct?
3        A.  I didn't feel comfortable with it.
4        Q.  And as far as you knew, BP didn't have
5    that certainty that standing behind 5,000 barrels
6    per day conveyed, correct?
7             MS. BROWNE:  Objection, form.
8    Foundation.
9        A.  I -- I -- I'll just speak for myself.
10   I -- I didn't feel comfortable with standing
11   behind 5,000 barrels per day.
12       Q.  (By Mr. Davis-Denny) Are there any other
13   conversations that you had with Mr. Peijs that
14   you haven't described to us so far about the
15   5,000 barrel per day estimate?
16       A.  Ah --
17             MS. BROWNE:  Objection, form.
18       A.  So could you ask your question again,
19   please?
20       Q.  (By Mr. Davis-Denny) Are there any other
21   conversations that you had with Mr. Peijs about
22   the 5,000 barrel per day estimate, other than
23   those you've already told us about?
24       A.  Yes, because it -- at least one other
25   one.  I -- I -- he did come back and tell me that
```

1    our Chief of Staff didn't want to talk about
2    this, and told me it was time to move on with
3    respect to this letter, this E-mail note.  And
4    we -- Jasper helped -- helped us pull together a
5    Slide Pack for Andy Inglis, and I'm sure we
6    talked about 5,000 barrels of oil per day in that
7    preparation.  So, yes, there was another
8    conversation at that time.
9        Q.  Okay.
10       A.  I can't recall any other conversations.
11       Q.  Did Mr. Peijs tell you why the Chief of
12   Staff did not want to talk about your E-mail?
13       A.  No.
14       Q.  Were you disappointed when you learned
15   that the Chief of Staff had told Mr. Peijs that
16   she did not want to talk with you about your
17   E-mail?
18            MS. BROWNE:  Objection, form.
19       A.  She told Jasper to move on, and I was
20   disappointed.
21       Q.  (By Mr. Davis-Denny) Did you have
22   conversations with anyone else at BP about the
23   series of interactions you had with Mr. Peijs
24   around May 15th regarding the 5,000 barrel per
25   day estimate?

1    barrel per day rate?

2        A.   I don't recall.  I'd point out, though,

3    at Point 12, here, Sheldon, from the National

4    Laboratories, which is Sheldon Tiezen, agreed

5    with Chris, in this document, that they would use

6    that.

7        Q.   Sir, I'm not asking you about that now

8    so --

9        A.   Well, that's a real -- a real per day

10   number, as we had requested originally.

11              MR. DAVIS-DENNY:  Move to strike

12   everything after "I don't recall" as

13   nonresponsive.

14       Q.   (By Mr. Davis-Denny) So you don't have

15   any recollection of talking with Chris Cecil

16   about his statement, at this May 13th meeting,

17   that BP could not provide a case which supported

18   a 72,000 barrel per day rate for the annular flow

19   cases?

20       A.   I don't recall --

21              MS. BROWNE:  Objection, form,

22   foundation.

23       A.   -- if I did or not.

24       Q.   (By Mr. Davis-Denny) You would agree with

25   me, that if you deleted the last five words of

```
 1      that sentence, in other words, the words that say
 2      "for the annular flow cases," that that sentence
 3      would then become inaccurate.  Correct?
 4                  MS. BROWNE:  Objection, form,
 5      foundation.
 6          A.  Yes.  We've -- we could have provided a
 7      case up the tubing string --
 8          Q.  (By Mr. Davis-Denny) Okay.
 9          A.  -- for 70,000, or roughly 70,000 barrels
10      a day.
11          Q.  Sir, could you turn to Tab 14 in the
12      notebook that's in front of you, or -- I'm sorry.
13      Could you give -- is that from the notebook with
14      the --
15                  MR. ALDEN:  Yes.
16          A.  Is it this one?
17          Q.  (By Mr. Davis-Denny) Tab 14, uh-huh.
18                  MR. DAVIS-DENNY:  Should I go back?
19                  THE COURT REPORTER:  Yes.
20                  MR. DAVIS-DENNY:  And I'm going to
21      ask you to mark Tab 14 as Exhibit 10793.
22              (Exhibit No. 10793 marked.)
23                  THE COURT REPORTER:  We're filling
24      in that gap, Maureen.  We -- we missed 93.  We're
25      filling in that gap.
```

```
 1          A.   Yes, I do.
 2          Q.   You were the one who suggested inserting
 3     "for the annular flow case," correct?
 4          A.   I -- I believe that's correct.
 5          Q.   And you were not at the meeting where
 6     Mr. Cecil made this statement; is that correct?
 7          A.   I don't believe I was.
 8          Q.   So you don't know whether, when Mr. Cecil
 9     made this statement to the National Lab, he
10     limited his response to an annular flow case,
11     right?
12               MS. BROWNE:  Objection, form.
13          A.   No, but we believed it would -- it was an
14     annular case, at that time.
15               MR. DAVIS-DENNY:  Move to strike as
16     nonresponsive.
17          Q.   (By Mr. Davis-Denny) You don't know,
18     whether when Mr. Cecil made this statement to the
19     National Lab, he limited his response to an
20     annular flow case.
21          A.   I don't --
22          Q.   Is that correct?
23          A.   I don't -- I don't know.
24          Q.   Okay.  But you did know, at the time that
25     you suggested this edit, that BP could provide a
```

1    casing flow case that supported this 72,000

2    barrel per day estimate.  Correct?

3        A.   Yes.

4        Q.   And so you wanted to change BP's record

5    from the meeting to make Mr. Cecil's statement

6    seem accurate, correct?

7                MS. BROWNE:  Objection, form,

8    foundation.

9        A.   I can't remember why I made these

10   comments.

11               MR. DAVIS-DENNY:  I think this is a

12   good place to stop.

13               THE VIDEOGRAPHER:  The time is

14   6:10 p.m.  We're off the record, ending Tape 11.

15           (Deposition recessed at 6:10 p.m.,

16   resuming on Friday, January 25, 2013, at

17   8:30 a.m.)

18

19

20

21

22

23

24

25

1       A.   Okay.

2       Q.   Is that correct?

3       A.   Yes.

4       Q.   Okay.  I want to ask you about the very

5  last phrase in this E-mail, where you say

6  "...therefore unless pushed I am holding off with

7  any other data until afterwards."

8            When you said "unless pushed," who were

9  you referring to that might be doing the pushing?

10              MS. BROWNE:  Objection, form.

11  Foundation.

12       A.   (Reviewing document.)  I -- I can't

13  recall the reason I put that phrase in there.

14       Q.   (By Mr. Davis-Denny) You meant the

15  National Labs personnel, right?

16              MS. BROWNE:  Objection, form.

17  Foundation.

18       A.   I may have meant data from the National

19  Labs to -- to Jasper.  I don't know.

20       Q.   (By Mr. Davis-Denny) May 13th was the

21  first day of your meetings with the National

22  Labs, correct?

23       A.   I don't know if it was the first day or

24  not.

25       Q.   Okay.  If you need to, you can look back

488

1    at those meeting notes.

2         A.   Yeah.

3         Q.   They -- they're for meetings that

4    occurred between May 13th and May 16th of 2010,

5    correct?

6         A.   Yes, but I don't believe that those are

7    all the meetings we had with the National Labs.

8         Q.   Okay.   You did meet with the National

9    Labs on May 13th of 2010, correct?

10        A.   Correct.

11        Q.   Okay.   And Chris Cecil sent them an

12   information package on May 13th of 2010, correct?

13        A.   I believe that's correct.

14        Q.   Okay.   And then you wrote to your

15   Superior, Jasper Peijs, that same day:

16   "...therefore unless pushed I'm holding off with

17   any other data until afterwards," correct?

18        A.   That's what it says here, yes.

19        Q.   Okay.   And when you wrote "holding off,"

20   you meant you were not going to provide the Labs

21   with any further data at that time, right?

22        A.   I don't know --

23             MS. BROWNE:   Objection, form.

24   Foundation.

25        A.   I don't know what I meant.   Today, as I

```
 1    sit here, I don't know what I meant.
 2         Q.  (By Mr. Davis-Denny) When you referred to
 3    "any other data," you were referring to the flow
 4    rate ranges that you had calculated, correct?
 5         A.  I don't know.
 6              MS. BROWNE:  Objection, form.
 7         Q.  (By Mr. Davis-Denny) When you said
 8    "afterwards," after what were you referring to?
 9         A.  I don't know.  I can't recall.
10         Q.  Why did you not want to provide further
11    data -- any other data until afterwards?
12         A.  I don't --
13              MS. BROWNE:  Objection, form.
14         A.  I can't recall.
15         Q.  (By Mr. Davis-Denny) Having seen this
16    line, does it change your testimony about my
17    question on whether you withheld from the
18    National Labs any flow rate data?
19              MS. BROWNE:  Objection, form.
20    Foundation.
21         A.  I can't recall why I wrote that, and I
22    don't think that it would change my -- what I've
23    stated previously.
24         Q.  (By Mr. Davis-Denny) Okay.  I'm going to
25    ask you to turn to Transocean -- the Transocean
```

<u>Exhibit 37</u>

Depo Ex. No. 10793 -

Clifton Mason

Filed Under Seal

# Exhibit 38

Depo Ex. No. 9267 -

Ole Rygg

Filed Under Seal

# Exhibit 39

Depo Ex. No. 9156 -

Clifton Mason

Filed Under Seal

# Exhibit 40

Depo Ex. No. 9448 -

Adam Ballard

Filed Under Seal



From: Lynch, John E Jr. (Jack)
Sent: Sun May 16 20:08:10 2010
To: Rainey, David I
Cc: Suttles, Doug J

REDACTED

Privileged, Redacted

Regards,

Jack

**John E. (Jack) Lynch Jr.**
Global Exploration and Production
Global Supply and Trading
US General Counsel
501 WestLake Park Boulevard
Houston, TX 77079
Tel: +1 281 366 1500
Fax: +1 281 366 4505
Mobile: +1 713 417 0744

---

From: Prijs, Jasper
Sent: Sunday, May 16, 2010 3:12 PM
To: Lynch, John E Jr. (Jack)
Subject: FW: Macondo Oil Rate

---

From: Mason, Mike C
Sent: 15 May 2010 07:08
To: Inglis, Andy G (UPSTREAM)
Cc: Prijs, Jasper
Subject: Macondo Oil Rate

I just read an article in CNN (May 14, 2010 1:00pm) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000bopd and that BP stands by a 5,000bopd figure. With the data and knowledge we currently have available we can not definitively state the oil rate from this well. We should be very cautious standing behind a 5,000 bopd figure as our modelling shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000bopd only based on certain assumptions and in the absence of other information, such as a well test.

Mike Mason PE
Vice President, Basin Management

CONFIDENTIAL

BP-HZN-2179MDL01458008
BPD185-024676

BP Exploration & Production Technology
Contact Details
Office - 281 504 2227
Cell - 713 301 3745

CONFIDENTIAL

BP-HZN-2179MDL01458009

BPD183-024677

# Exhibit 42

Depo Ex. No. 9474 –

Trevor Hill

Filed Under Seal

# Exhibit 43

Depo Ex. No. 9475 -

Adam Ballard

Filed Under Seal

# Exhibit 44

Depo Ex. No. 10655 -

Tim Lockett

Filed Under Seal



From: Suttles, Doug J
Sent: Wed May 19 16:43:10 2010
To: Lynch, John E Jr. (Jack); Inglis, Andy G (UPSTREAM)
Subject: FW: Flow rate note?
Importance: Normal
Attachments: rate summary.doc; rate summary attachments.pdf

FYI

Doug

Doug Suttles
Chief Operating Officer
Exploration & Production
BP

---

From: Suttles, Doug J
Sent: Wednesday, May 19, 2010 11:42 AM
To: Admiral Mary Landry (mary.e.landry@uscg.mil); Admiral Thad Allen (Thad.W.Allen@uscg.mil)
Cc: James A. Watson IV (james.a.watson@uscg.mil); Admiral Neffinger (peter.v.neffinger@uscg.mil)
Subject: FW: Flow rate note?

Admiral Allen and Admiral Landry,
Attached below is our most recent work on flow rate estimation. Don't hesitate to contact me if you would like to discuss.
Doug

Doug Suttles
Chief Operating Officer
Exploration & Production
BP

---

From: Rainey, David I
Sent: Wednesday, May 19, 2010 12:17 AM
To: Suttles, Doug J
Subject: RE: Flow rate note?
<<_>> <<_>>

Apologies Doug - had to run for plane. Initial info was meeting 1:00 pm Wed.. At 4:00 pm got word mtg was 9:00 am!
Dave

---

From: Suttles, Doug J
Sent: Tuesday, May 18, 2010 11:43 PM
To: Rainey, David I
Subject: Flow rate note?

Doug Suttles

CONFIDENTIAL

Chief Operating Officer
Exploration & Production
BP

CONFIDENTIAL

# Mississippi Canyon 252 #1
## Flow Rate Calculations

## Context

A 30 second video clip of hydrocarbons leaking from the broken end of the Deepwater Horizon drilling riser has been released to the public. Various "experts" are challenging Unified Command's best guess estimate of flow rate at the seabed based on this video clip. This note summarizes the various estimates that have been made within Unified Command.

## Mass Balance

The mass balance calculation involves estimating, through visual inspection, the volume of oil on the surface of the water. Allowances are then made for natural dispersion and evaporation. Estimates of volumes skimmed, burned, and chemically dispersed then allow an estimate of the oil released at the seabed over the duration of the spill. The calculation is repeated each day weather permitting.

In the early days of the spill, the surface expression of the spill was relatively small. Overflights were able to provide fidelity with respect to the character of the oil on the surface. Three descriptors were used

- Sheen
- Dull
- Dark oil

There are two Standards for estimating the thickness of oil on water using visual descriptors.

- US-based ASTM Standard
- European-based Bonn Agreement

The visual descriptors are different in the two standards and the relationships to thickness are also different.

From April 27 through April 30 daily estimates of flow rate were made on the basis of visual description of the oil on the surface. Three estimates were made each day – low, best guess, and high – to allow for differences between the two standards, and uncertainties around the input parameters.

CONFIDENTIAL

BP-HZN-2179MDL01446219
BPD163-012887

- Low end was always around 1,000 barrels per day
- Best guess was between 5,000 and 6,000 barrels per day
- High end varied from 12,000 to 14,000 barrels per day

The tables associated with these estimates are attached (Attachments 1-4). These estimates played an important part in Unified Command's decision to raise the estimate of flow rate from 1,000 to 5,000 barrels per day.

During the storm which began on May 1, and for several days after, no visual description of the spill was obtained. From May 8, daily outlines of the spill have been available based on a combination of satellite and aerial overflights. However, because of the size of the spill area, overflights have been unable to provide fidelity on the visual appearance of the oil within the spill area. During the five days in April for which fidelity was available, the ratios of dark oil to dull oil to sheen remained relatively constant at 2/10/88. These ratios have been applied to the total area of spill on May 17. Current estimates of volumes of oil skimmed, burned, and chemically dispersed were then applied to provide an updated range of possible flow rates as follows: 2,000 – 6,000 – 13,000 barrels per day (Attachment 5).

Note that all serious scientists recognize that there are huge uncertainties in estimating oil volumes from visual inspection. Oil thickness is by far the greatest uncertainty, with both sheen and darker oil thicknesses varying by orders of magnitude.

**Maximum Discharge Calculation**
Prior to drilling the MC 252 exploration well a maximum discharge estimate was provided as part of the permitting process. Predictions of reservoir thickness, quality, and pressure were convolved with the well design to develop a worse case scenario as follows.

- Optimistic assumptions for reservoir thickness, quality, pressure, and fluid properties.
- Total loss of control of well after drilling through reservoir in largest hole size allowed by the well design – 12 ¼".
- Totally uncontrolled flow from drilling riser at surface.

Using these assumptions, a maximum case discharge of 162,000 barrels per day was estimated.

After the sinking of the Deepwater Horizon, this estimate was reviewed in the light of the actual situation as it was understood at that time.

BP-HZN-2179MDL 11446220

IO183-012888

- Formation evaluation of the reservoir interval.
- 9 7/8" hole size in the reservoir
- 7" production tubing across the reservoir
- Flow to seabed through casing annulus
- Split 5 ½" drill pipe at BOP and flow out 6 5/8" drill pipe
- No restrictions in BOP, riser, or drill pipe (ie well head open to seabed – requires BOP to fall off well head)

An absolute worst case flow rate of 60,000 barrels per day was calculated.  A more reasonable worst case scenario of 40,000 barrels per day recognizes the following.

- BOP is in place and may be partially activated.
- The riser and drill pipe is crushed and kinked.
- Restrictions provided by cement in the casing annulus, formation collapse, casing hangers, etc., are likely.

This analysis is summarized on Attachment 6.

A more sophisticated version of this calculation has been carried out as more has been learned about pressures at the top and bottom of the well head.  This review calculates unconstrained flow rate through the casing as well as up the annulus. Absolute worst cases with wellhead and BOP removed, and no downhole restrictions, are as follows (Attachment 7).

- Annular flow – 55,000 barrels per day
- Casing flow – 100, 000 barrels per day

**Fluid Velocity At Seabed**
On April 26, NOAA scientists made an estimate of volume release rate at the seabed as follows.

- Oil leaking from a hole approximately 40 cm in diameter (Deepwater Horizon riser is 19.5"/49.5 cm ID, and is somewhat crimped at release point).
- By visual inspection the velocity of the material in the plume is between 7 and 30 cm per second.
- The plume contains roughly 50% oil droplets (together with gas bubbles and entrained seawater).

The NOAA estimate using these assumptions was roughly 5,000 barrels per day (Attachment 8).

CONFIDENTIAL

BP-HZN-2179MDL01446221
BP0183-012869

## Evidence Against Extreme Flow Rates At Seabed

A Professor from Purdue University has calculated a current flow rate at the seabed of 70,000 +/- 14,000 barrels per day. He bases his estimate on the velocity of fluid exiting the drilling riser on the seabed. His estimate is unlikely to allow for the following additional factors required to estimate the flow of oil.

- Drill pipe in riser reducing flow area
- Partial crimping of riser end reducing flow area
- Proportion of gas and entrained water exiting riser with the oil
- Volume reduction of oil as gas escapes en route from seabed to surface
- Flow rate not constant

Finally, there is absolutely no evidence of any floating material being entrained in the plume exiting the broken riser. In a report to the MMS on Oil Spill Containment, Remote Sensing and Tracking For Deepwater Blowouts, PCCI Marine and Environmental Engineering made the following statement.

*"The blowout plume will make it difficult to approach the well with anything but very massive equipment pieces or ROVs. The operation of ROVs will be difficult around the blowout point. The jet zone will cause vast amounts of water to flow towards the well. The danger of having lighter equipment sucked into the flow is large. Many ROVs have been rendered useless by relatively minor blowout plumes"*

ROV video shows neutrally buoyant material passing within inches of the plume without being sucked in. From this observation alone, the flow velocity must be relatively low.

BP-HZN-2179MDL 01446222

PCI183-012990

CONFIDENTIAL

Using 'Standard Guide for Visually Estimating Oil Spill Thickness on Water, ASTM F 2534-06.'

## Oil on Water Estimate - Low

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.15 | 3330 | 4495.5 | 107 |
| Dull oil | 850 | 0.2 | 666 | 27500 | 793 |
| Dark oil | 0 | | | | |
| Total oil on water | | | | 75286 | 1793 |
| x 2 to compensate for evap and disp | | | | | 3585 |
| recovered | | | | | 800 |
| chemically dispersed | | | | | 1000 |
| Total emitted | | | | | 4785 |
| Barrels emitted per day | | | | | 1063 |

## Oil on Water Estimate - Best Guess

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.25 | 666 | 333 | 2775 |
| Dull oil | 2500 | 0.35 | 1332 | 249000 | 7849 |
| Dark oil | 0 | 0.5 | 13312 | 14995 | 357 |
| Total oil on water | | | | 461205 | 10981 |
| x 2 to compensate for evap and disp | | | | | 21962 |
| recovered | | | | | 450 |
| chemically dispersed | | | | | 3500 |
| Total emitted | | | | | 25912 |
| Barrels emitted per day | | | | | 5756 |

## Oil on Water Estimate - High

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.35 | 3330 | 41950 | 999 |
| Dull oil | 2500 | 0.5 | 666 | 748250 | 17820 |
| Dark oil | 0 | 0.75 | 13312 | 418250 | 9911 |
| Total oil on water | | | | 1E+06 | 287+9 |
| x 2 to compensate for evap and disp | | | | | 57488 |
| recovered | | | | | 700 |
| chemically dispersed | | | | | 6000 |
| Total emitted | | | | | 64109 |
| Barrels emitted per day | | | | | 14265 |

BP Confidential

Page 1

CONFIDENTIAL

BP-HZN-2179MDL01446223
BPD183-012891

Using "Standard Guide for Visually Estimating Oil Spill thickness on Water ASTM F 2534 -06"

## Oil on Water Estimate - Low

| | sq m | Cover Factor | μm/sq m | g/m | kl/h |
|---|---|---|---|---|---|
| Sheen | 1841 | 0.5 | 98 | 41025 | 977 |
| Dull oil | 259 | 0.2 | 98 | 31262 | 745 |
| Dark oil | 21 | 0.16 | 3338 | 16460 | 255 |
| Total oil on water | | | | 82917 | 1972 |
| + 2 to compensate for mid and end | | | | | 3944 |
| recovered | | | | | 200 |
| chemically dispersed | | | | | 1000 |
| Total emitted | | | | | 5144 |
| **Barrels emitted per day** | | | | | **925** |

## Oil on Water Estimate - Best Guess

| | sq m | Cover Factor | μm/sq m | g/m | kl/h |
|---|---|---|---|---|---|
| Sheen | 1841 | 0.5 | 223 | 209938 | 6997 |
| Dull oil | 259 | 2.35 | 1333 | 199157 | 2609 |
| Dark oil | 21 | 2.35 | 6660 | 34985 | 823 |
| Total oil on water | | | | 595181 | 12818 |
| + 2 to compensate for mid and end | | | | | 24764 |
| recovered | | | | | 450 |
| chemically dispersed | | | | | 3000 |
| Total emitted | | | | | 28205 |
| **Barrels emitted per day** | | | | | **5092** |

## Oil on Water Estimate - High

| | sq m | Cover Factor | μm/sq m | g/m | kl/h |
|---|---|---|---|---|---|
| Sheen | 1841 | 0.5 | 888 | 816680 | 19818 |
| Dull oil | 259 | 0.75 | 3330 | 391775 | 9318 |
| Dark oil | 21 | 0.35 | 12326 | 99909 | 2334 |
| Total oil on water | | | | 1308357 | 31182 |
| + 2 to compensate for mid and end | | | | | 65367 |
| recovered | | | | | 700 |
| chemically dispersed | | | | | 6000 |
| Total emitted | | | | | 69827 |
| **Barrels emitted per day** | | | | | **12550** |

BP Confidential

4-26-0715

Page 1

CONFIDENTIAL

BP-HZN-2179MDL01446224
BPD183-012892

Using "Stranded Gushler Standby Estimate Oil Spot Thickness on Sheen, ASTM F 2534 - 06"

## Oil on Water Estimate - Low

| | | sq mi | Conv Factor | gal/sq m | | g/in | bbls |
|---|---|---|---|---|---|---|---|
| Dresu | | 1009 | 3.0 | 668 | 31500 | | 1149 |
| Dull oil | | 206 | 9.2 | | | | |
| Dark oil | 91 | 0.15 | 3350 | 47481 | | 759 | |
| Total oil on water | | | | 121581 | 2085 | | |
| x 2 to compensate for evap and disp | | | | | | | 1071 |
| recovered | | | | | | | 470 |
| chemically dispersed | | | | | | | 1400 |
| Total resting | | | | | | | 3771 |
| Barrels emitted per day | | | | | | | 1196 |

## Oil on Water Estimate - Best Guess

| | | sq mi | Conv Factor | gal/sq m | | g/in | bbls |
|---|---|---|---|---|---|---|---|
| Dresu | | 1009 | 7.93 | 331 | 142956 | | 3405 |
| Dull oil | | 206 | 1.76 | | | | |
| Dark oil | 91 | 4.25 | 6550 | 151015 | | 2645 | |
| Total oil on water | | | | 695438 | 16545 | | |
| x 2 to compensate for evap and disp | | | | | | | 33049 |
| recovered | | | | | | | 1616 |
| chemically dispersed | | | | | | | 4210 |
| Total emitted | | | | | | | 38387 |
| Barrels emitted per day | | | | | | | 5505 |

## Oil on Water Estimate - High

| | | sq mi | Conv Factor | gal/sq m | | g/in | bbls |
|---|---|---|---|---|---|---|---|
| Dresu | | 1009 | 0.79 | 206 | 398259 | | 22911 |
| Dull oil | | 206 | 0.8 | | | | |
| Dark oil | 91 | 0.50 | 13300 | 659236 | | 8105 | |
| Total oil on water | | | | 1781048 | 42477 | | |
| x 2 to compensate for evap and disp | | | | | | | 84955 |
| recovered | | | | | | | 7388 |
| chemically dispersed | | | | | | | 8203 |
| Total emitted | | | | | | | 99893 |
| Barrels emitted per day | | | | | | | 14855 |

BP Confidential

Page 1

CONFIDENTIAL

BP-HZN-2179MDL01446225
BPD183-012893

Using Standard Guide to Visually Estimating Oil Spill Thickness in Water 4/30/10 # 2531-03

## Oil on Water Estimate - Low

| | sq mi | Cover Factor | joining sf | gal/s | bbls |
|---|---|---|---|---|---|
| Sheen | 2481 | 0.16 | 8.6 | 9b | 693036 | 1677 |
| Dull oil | 160 | 0.2 | 50 | 533 | 17683 | 418 |

| | | |
|---|---|---|
| Total oil on water: | | 2105 |
| x 2 to compensate for evap and disp | | 4801 |
| recovered | | 550 |
| chemically dispersed | | 1600 |
| Total emitted | | 8501 |
| **Barrels emitted per day** | | **920** |

## Oil on Water Estimate - Best Guess

| | sq mi | Cover Factor | joining sf | gal/s | bbls |
|---|---|---|---|---|---|
| Sheen | 2481 | 0.25 | 9.60 | 930 | 549274 | 2278 |
| Dull oil | 25 | 0.25 | 1332 | 393 | 74932 | 1388 |

| | | |
|---|---|---|
| Total oil on water: | | 16146 |
| x 2 to compensate for evap and disp | | 32090 |
| recovered | | 2620 |
| chemically dispersed | | 4600 |
| Total emitted | | 39100 |
| **Barrels emitted per day** | | **5220** |

## Oil on Water Estimate - High

| | sq mi | Cover Factor | joining sf | gal/s | bbls |
|---|---|---|---|---|---|
| Sheen | 2481 | 0.75 | 908 | 1250600 | 21506 |
| Dull oil | 160 | 5.5 | 3300 | 360100 | 6343 |
| Date oil | 25 | 0.25 | 13320 | 183170 | 2995 |

| | | |
|---|---|---|
| Total oil on water: | | 30724 |
| x 2 to compensate for evap and disp | | 79488 |
| recovered | | 4800 |
| chemically dispersed | | 7395 |
| Total emitted | | 91888 |
| **Barrels emitted per day** | | **12089** |

BP Confidential

CONFIDENTIAL

BP-HZN-2179MDL01446226
BPD183-012694

BP Confidential

Using libraries of spills by viscosity class using NOAA thickness codes(Wang, ISPRY 2014, etc.)

### Oil on Water Estimate - Low

| | kg/m | Conv Factor | g/cm² | grn | bbl |
|---|---|---|---|---|---|
| Dark as | | | | | |
| Dull sh | | | | | |
| Sheen | | | | | |
| Total on water | | | | | |
| x # as components for emap and drop | | | | | |
| removed | | | | | |
| chemically dispersed | | | | | |
| burned | | | | | |
| Total emitted | | | | | |
| Barrels emitted per day | | | | | |

### Oil on Water Estimate - Best Guess

| | kg/m | Conv Factor | g/cm² | grn | bbl |
|---|---|---|---|---|---|
| Dark as | | | | | |
| Sheen | | | | | |
| Total oil on water | | | | | |
| x # as components for emap and drop | | | | | |
| removed | | | | | |
| chemically dispersed | | | | | |
| burned | | | | | |
| Total emitted | | | | | |
| Barrels emitted per day | | | | | |

### Oil on Water Estimate - High

| | kg/m | Conv Factor | g/cm² | grn | bbl |
|---|---|---|---|---|---|
| Dark as | | | | | |
| Sheen | | | | | |
| Total oil on water | | | | | |
| x # as components for emap and drop | | | | | |
| removed | | | | | |
| chemically dispersed | | | | | |
| burned | | | | | |
| Total emitted | | | | | |
| Barrels emitted per day | | | | | |

Page 1

CONFIDENTIAL

BP-HZN-2179MDL01446227
BPD183-012895

## Seafloor Exit
## 7" x 9-7/8" Casing Annulus Flow Path

**Worst case theoretical flow assumes:**

- Split 5-1/2" drill pipe at subsea BOP and flow out 6-5/8" drill pipe

- Maximum theoretical flow rate is 60,000 BOPD

**Items that reduce worst case theoretical flow:**

- Crushed and bent riser and drill pipe

- Cement sheath in open hole by casing annulus

- Casing hanger and pack-off restriction

- Sand production (unconsolidated formation)

- Shale collapse

- Water production

- BOP functions activated

- Expected range of possible flow rates is 5,300 to 40,000 BOPD

**NOTE:** Removal of all restrictions (riser, BOP, and drill pipe) adds ~10,000 BOPD to rates above



CONFIDENTIAL

## Key Messages

### Expected Case:

In the current state a wellhead pressure decrease from 3800 psi to 2270 psi (pressure seafloor) results in a flow rate increase ranging from 15% to 30%

### Alternate Case:

If fluid flow is only through the drill pipe – and then the drill pipe is unintentionally removed and flows into the sea (2270 psi):

- For flow up the annulus the rate doubles
- For flow inside production casing the rate triples

### Note:

If BOP and wellhead are removed and if we have incorrectly modeled the restrictions – the rate could be as high as ~ 100,000 barrels per day up the casing or 55,000 barrels per day up the annulus (low probability worst cases)

CONFIDENTIAL

BP-HZN-2179MDL01446229
BPD183-012897

# Estimation of the Oil Released from Deepwater Horizon Incident
## (26 April 2010, 1200hrs PDT)

### 1) Surface Oil Volume Estimation

Estimating oil volume by the visual appearance of the slick is a highly unreliable process. At best, one can calculate an answer in only an order of magnitudes. Other estimation methods, if available, are likely to give more accurate answers.

Oil spills separate into thick portions that can be as thick as an inch or more and thin sheets that are only as thick as a few visible light wavelengths. Most of the oil volume in a typical crude oil spill is in the thick part (but most of the area is in sheen).

Much of the oil from the light crude that is being released will evaporate or disperse in the water column. We would expect at least half of the oil released to be accounted for by these mechanisms.

The oil that makes it to the surface is showing signs of emulsification. Emulsified oil can contain up to 90% water.

Weathered oil that has formed tar balls are not detectable by satellites or overflights.

Based upon past experiments, published standards, and actual spills, NOAA/ERD defines the range of thickness of slicks as

Sheen thickness – ($10^{-6}$ m ↔ $10^{-7}$ m)

Dark Oil thickness – ($10^{-4}$ m ↔ $10^{-5}$ m)

Area coverage of slick [4/25/10], based upon satellite images ($1500 \text{km}^2$ ↔ $3000 \text{km}^2$)

Sheen volume, using average thickness of 0.1 micron, area of 2000 sq. km and 100% coverage yields oil volume of 200 cu.m = 1200 bbls 50,000 gal

Thick oil volume, using average thickness of 100 microns, 1% average coverage and 50% water content yields an oil volume of 1000 cu.m = 6000 bbls = 0.25 million gal

To an order of magnitude, we estimate that there are around 10,000 bbl of oil on the water surface, or around a half million gallons

### 2) Estimated Present Volume Release Rate

The following assumptions are used to make a release rate calculation. If any of them are changed, the answer could be significantly different.

The oil is leaking, in a vertical plume from a hole approximately 40 cm. in diameter.

The velocity of the material in the plume is estimated by visual observation to be between 7 cm/sec and 30 cm/sec.

The plume itself contains gas bubbles, oil droplets, and entrained seawater.

Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl/day. (approximately 200,000 gal/day) Other sources would contribute additional oil. This answer will be refined as additional information becomes available.

CONFIDENTIAL

BP-HZN-2179MDL01446230

BPD183-012896

bp



May 24, 2010

BY ELECTRONIC DELIVERY

The Honorable Edward J. Markey
Chairman
Subcommittee on Energy and Environment
Committee on Energy and Commerce
U.S. House of Representatives
2125 Rayburn House Office Building
Washington, DC 20515-6115

Re:   Response to Chairman Markey's Correspondence, Dated May 14, 2010, to Mr.
      Lamar McKay, President and CEO of BP America, Inc.

Dear Chairman Markey:

I am writing on behalf of BP America, Inc. ("BPA") in response to your May 14, 2010
letter to Mr. Lamar McKay. We very much appreciate the importance of providing reliable and
timely information regarding the flow of oil from the damaged wellhead in the Gulf of Mexico.
With that objective in mind and in the spirit of cooperation and transparency that has informed
all of our efforts to date, BPA is providing the responses below to your questions and the
accompanying documents, identified by the Bates-range BP-HZN-CEC 020095 – 020107.

As you know, the estimate of 5,000 barrels per day is a Unified Command estimate, not a
BP estimate. The primary methods which Unified Command has used to estimate the amount of
oil flowing from the well are summarized below and in the attached materials, identified as BP-
HZN-CEC 020103 - BP-HZN-CEC 020106. The range varies from about 1,000 barrels per day
to roughly 15,000 barrels per day, with a best scientific guess of roughly 5,000 barrels per day –
the number that Unified Command has used repeatedly and has made clear is only a rough
estimate.

1.   Prior to the incident, did BP already have an estimate of the maximum amount of
     oil that could be expected to flow from this well under normal conditions?

Prior to drilling, BP had prepared a production estimate for this well based on expected
overall oil volume in place, expected reservoir properties, and the anticipated development
concept. This concept included three (3) wells processed through a neighboring oil production
facility. The rate associated with this initial well was 15,000 barrels per day.

2.   What was the basis for this estimate?

Prior to the drilling of the Macondo well, the estimate of the maximum amount of oil that
could be expected to flow from the well under normal conditions was based on interpretation and
modeling from: (1) production information from other wells in the Mississippi Canyon; (2)
geological information from other wells in the Mississippi Canyon; and (3) seismic data.

EXHIBIT # 1651

WIT:

CONFIDENTIAL

BP-HZN-2179MDL00000415

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 2

3.    **Please provide all documents that relate to the amount of oil that could be expected to flow from this well, including any estimates of profits that this well was projected to generate.**

We have enclosed a production profile estimate for three development wells, one of which is the Mississippi Canyon 252 #1 exploration well. [BP-HZN-CEC 020107.] If you require additional information, please let us know.

4.    **What is the BP method and scientific basis for the estimate of 5,000 barrels per day? Was this estimate based solely on surface monitoring of the size of the spill?**

The estimate of 5,000 barrels per day is a Unified Command estimate, not a BP estimate. The initial work leading to this estimate was carried out by the National Oceanic and Atmospheric Administration ("NOAA"). Two approaches were used – estimation of oil volumes on surface and estimates of velocity of the plume exiting the riser. The documentation provided by NOAA is shown at BP-HZN-CEC 020102.

- It is our understanding that NOAA estimated, through visual observation, that the volume of oil on the water on April 26 was 10,000 barrels. Using this information, a daily flow rate can be estimated as follows.
    - o   For this oil type, 50% of the volume is expected to evaporate or disperse naturally within hours of release.
    - o   Thus, 10,000 barrels on the water implies 20,000 barrels were released. (At this point in the response, negligible oil had been skimmed or dispersed, and none had been burned.)
    - o   The spill began when the Deepwater Horizon sank on April 22. Thus, 20,000 barrels represents four days of flow.
    - o   20,000 barrels divided by four days equals 5,000 barrels per day.

- It is our understanding that, by observing the velocity of the plume exiting the end of the riser, NOAA scientists made an estimate of the flow rate at the seabed as follows.
    - o   Oil leaking from a hole approximately 40 cm in diameter (the Deepwater Horizon riser is 19.5"/49.5 cm ID, and is somewhat crimped at the release point).
    - o   By visual inspection the velocity of the material in the plume is between 7 and 30 cm per second.
    - o   The plume contains roughly 50% oil droplets (together with gas bubbles and entrained seawater).
    - o   Assuming a mid-range velocity of 15 cm per second, NOAA estimated a flow rate of 5,000 barrels per day. The associated range would be from 2,500 to 10,000 barrels per day.

Subsequent estimates of flow rate have been carried out within Unified Command and have yielded consistent results.

2

CONFIDENTIAL

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 3

5.    Were all or any of the latest methods that are available today for estimating the
amount of such a spill employed?

To the best of our knowledge, Unified Command has employed, and is continuing to
employ, all viable methods to estimate the volume of oil flowing. We have recently learned that
the U.S. Geologic Survey ("USGS") has an aircraft-mounted system known as AVIRIS
(Airborne Visible/Infrared Imaging Spectrometer), which can measure the thickness of oil on
water. The system has been deployed, and the data are currently being processed.

6.    Please provide all documents created since the incident occurred that bear on, or
relate to, in any way, estimates of the amount of oil being released.

We are producing documents, which can be found at BP-HZN-CEC 020095 - BP-HZN-
CEC 020106, that relate to estimates of the amount of oil being released. If you require
additional information, please let us know.

In addition, the federal government created a Flow Rate Technical Group ("FRTG"),
comprised of members of the scientific community and government agencies, to provide further
specificity on the flow rate. Consistent with its stated commitment to transparency and
cooperation, BP has provided the FRTG with data showing release points and amounts of oil and
gas currently being collected on the Discoverer Enterprise, as well as subsea video of the oil
release to assist with FRTG's efforts.

7.    What is the basis, if any, for the worst case estimate of approximately 60,000 barrels
per day provided to the Energy and Commerce Committee during a May 4th
briefing?

Prior to drilling the Mississippi Canyon 252 exploration well, an estimate of the
maximum discharge from the well in the worst case scenario of an uncontrolled flow was
provided as part of the permitting process. Predictions of reservoir thickness, quality and
pressure were considered, in light of the well design, to develop this scenario. After the sinking
of the Deepwater Horizon, that earlier estimate was reviewed in light of new data points and
assumptions relating to the then-current situation, which yielded the estimated flow rate, in the
worst case, of approximately 60,000 barrels per day.

8.    Was BP, as has been reported in the press, offered an opportunity to use the latest
technology for estimating the volume of oil flowing from the pipe?

Please see answer to Question 5.

9.    Did BP accept or refuse any such offers and has BP used the latest technology to
estimate the volume of oil flowing from the well?

As noted above, the Unified Command has developed the estimates regarding the rate of
oil flowing from the well. It is our understanding that Unified Command has employed, and is

3

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 4

continuing to employ, all viable technologies to estimate the volume of oil flow. We are also
assisting FRTG with its efforts to provide further specificity on the flow rate.

10.    **Has BP used any subsurface technology to estimate the amounts of oil flowing from
the well? If so, please provide the results of any such efforts.**

       BP is not aware of any technology that reliably estimates the amount of oil flowing from
the well, either subsea or subsurface.

11.    **Is it accurate to suggest as BP Vice President Kent Wells did recently that "There's
just no way to measure it?" If so, then does BP stand behind the current estimates
of the amount of oil flowing or not?**

       Under the current circumstances, it is indeed challenging to determine the rate of oil flow
with precision. No direct measurement of the flow rate at the well is feasible. That said, one can
make scientifically informed estimates regarding the likely flow by observing a range of factors
at sea level as well as the limited available subsea information. BP believes the Unified
Command made a reasonable judgment based on the available information. In addition, BP is
currently assisting FRTG with its efforts to provide further specificity on the flow rate.

12.    **Could an increased flow from the riser pipe affect proposed or attempted efforts to
~~stop the flow of oil, such as the failed containment dome strategy, the so called "junk~~
shot" strategy, attempts to place an additional pipe into the riser, and the drilling of
relief wells for plugging the well bore?**

       Yes. Flow rates have been considered in connection with all efforts to stop the flow of
oil.

13.    **Please indicate for the record BP's current estimate of the amount of oil flowing
from the well and provide the basis and methodology for that estimate, along with
any uncertainty or error ranges for the estimate.**

       The primary methods which Unified Command, and in particular NOAA, has used to
estimate the amount of oil flowing from the well are summarized above in response to Question
4. The resulting calculation ranges from about 1,000 barrels per day to roughly 15,000 barrels
per day, with the most scientifically-informed judgment suggesting a best guess of roughly 5,000
barrels per day. Please note that, as the Unified Command has made clear, these are only
estimates.

14.    **BP has suggested in press reports that it is focused on closing the leak, rather than
in measuring it. Are efforts to close the leak inconsistent with efforts to measure its
volume? Why wouldn't such efforts actually be complementary?**

       BP is committed to stopping the leak, containing the oil offshore as much as possible and
taking proactive mitigation to protect the shoreline. Although no direct measurement of the flow

CONFIDENTIAL

BP-HZN-2179MDL00000418

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 5

rate at the well is feasible, the methodologies and results for inferred estimation are described in
the answer to Question 4 above.

15.  **Using estimates of 5,000 barrels per day, 40,000 barrels per day and 70,000 barrels
     per day, and further assuming that the leak continues for another 60 days, what is
     the projected extent of the spill in square miles and the amount of Gulf coastline in
     miles that would potentially be affected by such a spill?**

     As the Committee undoubtedly appreciates, the situation in the Gulf of Mexico continues
to be highly dynamic, and any estimate regarding the potential geographic reach of the spill or
the amount of impacted coastline will depend on a range of factors that are not static, including
meteorological forecasts which cannot be predicted with any degree of confidence beyond
NOAA's three-day forecast.


                              * * * * * * * *

     Please note that the documents that we are providing in connection with these responses
contain confidential business information. BP respectfully requests that these documents be
maintained confidentially and that, if the Committee or Subcommittee is considering releasing
any of these documents, BP be given an opportunity to be heard on that question.

     Again, thank you for the opportunity to respond to your concerns. If you have any
questions, please feel free to contact me or to have your staff contact Liz Reicherts at (202) 457-
6585.

                                        Sincerely,

                                        R. Kevin Bailey

Enclosures

cc (w/o encl.):

          Chairman Henry Waxman
          Ranking Member Joe Barton
          Ranking Member Fred Upton

CONFIDENTIAL                                        BP-HZN-2179MDL00000419

CONFIDENTIAL

BP-HZN-2179MDL00000420
BP-HZN-CEC020095

Using Standard Guide to Visually Estimating Oil Spill Thickness on Water. ASTM F 2534 - 03.

### Oil on Water Estimate - Low

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.5 | 50 | 37500 | 893 |
| Dull oil | 250 | 0.2 | 660 | 33350 | 793 |
| Dark oil | 9 | 0.15 | 3300 | 4495.5 | 107 |
| Total oil on water |  |  |  | 75296 | 1793 |
| x 2 to compensate for evap and disp |  |  |  |  | 3585 |
| recovered |  |  |  |  | 800 |
| chemically dispersed |  |  |  |  | 1000 |
| Total emitted |  |  |  |  | 4785 |
| Barrels emitted per day |  |  |  |  | 1063 |

### Oil on Water Estimate - Best Guess

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.66 | 333 | 329870 | 7849 |
| Dull oil | 250 | 0.55 | 1332 | 116550 | 2775 |
| Dark oil | 9 | 0.25 | 6667 | 10985 | 267 |
| Total oil on water |  |  |  | 441205 | 10991 |
| x 2 to compensate for evap and disp |  |  |  |  | 21982 |
| recovered |  |  |  |  | 480 |
| chemically dispersed |  |  |  |  | 3500 |
| Total emitted |  |  |  |  | 23912 |
| Barrels emitted per day |  |  |  |  | 5758 |

### Oil on Water Estimate - High

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.75 | 686 | 749350 | 17839 |
| Dull oil | 250 | 0.5 | 3310 | 416350 | 9911 |
| Dark oil | 9 | 0.35 | 13320 | 41958 | 966 |
| Total oil on water |  |  |  | 1E-05 | 29740 |
| x 2 to compensate for evap and disp |  |  |  |  | 57498 |
| recovered |  |  |  |  | 700 |
| chemically dispersed |  |  |  |  | 6000 |
| Total emitted |  |  |  |  | 64198 |
| Barrels emitted per day |  |  |  |  | 14266 |

BP Confidential

Oil on Water Estimate - Low

Oil on Water Estimate - Best Guess

Oil on Water Estimate - High

BP Confidential

CONFIDENTIAL

BP-HZN-CEC020096

BP-HZN-2179MDL00000421

BP Confidential

Using Discover Rate to Verify Estimate Of Spill Volume on Water, Attire F 2534 -01 -

## Oil on Water Estimate - Low

| | | | sq m | Cover Factor | unit | | | |
|---|---|---|---|---|---|---|---|---|
| Oil on | Sheen | 1929 | 0.5 | 50 | 966 | sq km | 35% | |
| Oil on | | 21k | 0.3 ol | 30% | 2930 | sq km | 55% | 1148 |
| | | 31 | | | | | | 155 |

| Total oil on water | | 2965 |
| # tonnes/hectare for rang and disp | | 5597 |
| recovered | | 421 |
| chemically dispersed | | 1406 |
| Total emitted | | 7371 |
| **Barrels emitted per day** | | **1195** |

## Oil on Water Estimate - Best Guess

| | | | sq m | Cover Factor | units | | | |
|---|---|---|---|---|---|---|---|---|
| Oil on | Sheen | 1929 | | 166 | 30256 sq m | 80% | 85% | |
| Oil on | | 21k | | 335 | 1330 47596 | 90% | | 854 |
| | | 1 | | | | | 2600 | |

| Total oil on water | | 50036 | 5263 |
| # tonnes/hectare for exp and disp | | 2480 |
| recovered | | 1100 |
| chemically dispersed | | 4900 |
| Total emitted | | 3030 |
| **Barrels emitted per day** | | **5256** |

## Oil on Water Estimate - High

| | | | sq m | Cover Factor | units | | | |
|---|---|---|---|---|---|---|---|---|
| Oil on | Sheen | 1929 | 0.76 | 166 | 20956 sq m | 80% | | |
| Oil on | | 21k | 0.1 | 3141 | 29421 | 90% | | 854 |
| | | 1 | | | | | 2600 | |

| Total oil on water | | 109326 | 42671 |
| # tonnes/hectare for exp and disp | | 4493 |
| recovered | | 1500 |
| chemically dispersed | | 6400 |
| Total emitted | | 2355 |
| **Barrels emitted per day** | | **16455** |

CONFIDENTIAL

Using Standard Code for Visually Estimating Oil Spill Thickness on Gulf: ASTM F 2534-06

## Oil on Water Estimate - Low

| | | sq m | Cover Factor | gals/sq m | gals | bbls |
|---|---|---|---|---|---|---|
| Sheen | | 2481 | 0.5 | 30 | 40282 | 1877 |
| Dark oil | | 100 | 3.2 | 844 | 25312 | 1877 |
| Dark oil | | 28 | 6.13 | 3330 | 17493 | 418 |
| **Total oil on water** | | | | | 100952 | 7450 |
| < 3 in components for evap and clae | | | | | 4851 | 820 |
| recovered | | | | | 928 | |
| chemically dispersed | | | | | 1806 | |
| **Total emitted** | | | | | 6632 | |
| **Barrels emitted per day** | | | | | **830** | |

## Oil on Water Estimate - Best Guess

| | | sq m | Cover Factor | gals/sq m | gals | bbls |
|---|---|---|---|---|---|---|
| Sheen | | 2481 | 0.25 | 8.66 | 3331.5=3371 | 12933 |
| Dark oil | | 100 | 6.25 | 3332 | 74940 | 1778 |
| Dark oil | | 25 | 6.13 | 9880 | 38072 | 1395 |
| **Total oil on water** | | | | | 629141 | 15110 |
| < 3 in components for evap and clae | | | | | 32292 | |
| recovered | | | | | 3500 | |
| chemically dispersed | | | | | 4900 | |
| **Total emitted** | | | | | 31192 | |
| **Barrels emitted per day** | | | | | **5226** | |

## Oil on Water Estimate - High

| | | sq m | Cover Factor | gals/sq m | gals | bbls |
|---|---|---|---|---|---|---|
| Sheen | | 2481 | 0.75 | 800 | 123930 | 31130 |
| Dark oil | | 100 | 0.4 | 3300 | 264480 | 6312 |
| Dark oil | | 25 | 6.13 | 13200 | 101170 | 3380 |
| **Total oil on water** | | | | | 1624413 | 38726 |
| < 3 in components for evap and clae | | | | | 74900 | |
| recovered | | | | | 4300 | |
| chemically dispersed | | | | | 7350 | |
| **Total emitted** | | | | | 30668 | |
| **Barrels emitted per day** | | | | | **12088** | |

BP Confidential

BOOKING

Page 1

CONFIDENTIAL

BP-HZN-CEC020098

BP-HZN-2179MDL00000423

Oil on Water Estimate - Low

Oil on Water Estimate - Best Case

Oil on Water Estimate - High

BP Confidential

CONFIDENTIAL

BP-HZN-CEC020099

BP-HZN-2179MDL00000424

CONFIDENTIAL

BP-HZN-2179MDL00000425
BP-HZN-CEC020100

## Seafloor Exit
### 7" x 9-7/8" Casing Annulus Flow Path



**Worst case theoretical flow assumes:**

- Split 5-1/2" drill pipe at subsea BOP and flow out 6-5/8" drill pipe
- Maximum theoretical flow rate is 60,000 BOPD

**Items that reduce worst case theoretical flow:**

- Crushed and bent riser and drill pipe
- Cement sheath in open hole by casing annulus
- Casing hanger and pack-off restriction
- Sand production (unconsolidated formation)
- Shale collapse
- Water production
- BOP functions activated
- Expected range of possible flow rates is 5,000 to 40,000 BOPD

**NOTE:** Removal of all restrictions (riser, BOP, and drill pipe) adds ~10,000 BOPD to rates above

BP-HZN-2179MDL00000426
BP-HZN-CEC020101

CONFIDENTIAL

*Approved at various* 7

# Key Messages

## Expected Case:

In the current state a wellhead pressure decrease from 3800 psi to 2270 psi (pressure seafloor) results in a flow rate increase ranging from 15% to 30%

## Alternate Case:

If fluid flow is only through the drill pipe – and then the drill pipe is unintentionally removed and flows into the sea (2270 psi):

- For flow up the annulus the rate doubles
- For flow inside production casing the rate triples

## Note:

If BOP and wellhead are removed and if we have incorrectly modeled the restrictions – the rate could be as high as ~ 100,000 barrels per day up the casing or 55,000 barrels per day up the annulus (low probability worst cases)

PB-8-HOS-132+

ATTACHMENT 8

## Estimation of the Oil Released from Deepwater Horizon Incident
## (26 April 2010, 1200hrs PDT)

1) **Surface Oil volume Estimation**

Estimating oil volume by the visual appearance of the slick is a highly unreliable process. At best, one can calculate an answer to only an order of magnitude. Other estimation methods, if available, are likely to give more accurate answers

Oil spills separate into thick portions that can be as thick as in inch or more and thin sheen that are only as thick as a few visible light wavelengths. Most of the oil volume in a typical crude oil spill is in the thick part (but most of the area is sheen)

Much of the oil from the light crude that is being released will evaporate or disperse in the water column. We would expect at least half of the oil released to be accounted for by these mechanisms

The oil that makes it to the surface is showing signs of emulsification. Emulsified oil can contain up to 90% water.

Weathered oil that has formed tar balls are not detectable by satellites or overflights.

Based upon past experiments, published standards, and actual spills, NOAA/ERD defines the range of thickness of slicks as

Sheen thickness – $(10^{-8} \, m \leftrightarrow 10^{-5} \, m)$
Dark oil thickness - $(10^{-5} \, m \leftrightarrow 10^{-4} \, m)$

Area coverage of slick (4/26/'10), based upon satellite images $(1500 km^2 \leftrightarrow 3000 km^2)$

→ Sheen volume, using average thickness of 0.1 micron, area of 2000 sq. km and 100% coverage yields oil volume of 200 cu. m = 1260 bbl= 50,060 gal

→ Thick oil volume, using average thickness of 100 microns, 1% average coverage and 50% water content yields an oil volume of 1000 cu. m = 6000 bbl = 0.25 million gal

→ To an order of magnitude, we estimate that there are around 10,000 bbl of oil on the water surface, or around a half million gallons

2) **Estimated Present Volume Release Rate**

*The following assumptions are used to make a release rate calculation. If any of them are changed, the answer could be significantly different.*

The oil is leaking, in a vertical plume from a hole approximately 40 cm. in diameter.

The velocity of the material in the plume is estimated by visual observation to be between 7 cm/sec and 30 cm/sec

The plume itself contains gas bubbles, oil droplets, and entrained seawater.

Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl /day. (approximately 200,000 gal/day) Other sources would contribute additional oil. This answer will be revised as additional information becomes available.

CONFIDENTIAL

BP-HZN-CEC020102
BP-HZN-2179MDL00000427

## Mississippi Canyon 252 #1
## Flow Rate Calculations

### Context

A 30 second video clip of hydrocarbons leaking from the broken end of the Deepwater Horizon drilling riser has been released to the public. Various "experts" are challenging Unified Command's best guess estimate of flow rate at the seabed based on this video clip. This note summarizes the various estimates that have been made within Unified Command.

### Mass Balance

The mass balance calculation involves estimating, through visual inspection, the volume of oil on the surface of the water. Allowances are then made for natural dispersion and evaporation. Estimates of volumes skimmed, burned, and chemically dispersed then allow an estimate of the oil released at the seabed over the duration of the spill. The calculation is repeated each day weather permitting.

In the early days of the spill, the surface expression of the spill was relatively small. Overflights were able to provide fidelity with respect to the character of the oil on the surface. Three descriptors were used

- Sheen
- Dull
- Dark oil

There are two Standards for estimating the thickness of oil on water using visual descriptors.

- US-based ASTM Standard
- European-based Bonn Agreement

The visual descriptors are different in the two standards and the relationships to thickness are also different.

From April 27 through April 30 daily estimates of flow rate were made on the basis of visual description of the oil on the surface. Three estimates were made each day – low, best guess, and high – to allow for differences between the two standards, and uncertainties around the input parameters.

- Low end was always around 1,000 barrels per day
- Best guess was between 5,000 and 6,000 barrels per day
- High end varied from 12,000 to 14,000 barrels per day

The tables associated with these estimates are attached (Attachments 1-4). These estimates played an important part in Unified Command's decision to raise the estimate of flow rate from 1,000 to 5,000 barrels per day.

BP-HZN-CEC020103

BP-HZN-2179MDL00000428

CONFIDENTIAL

During the storm which began on May 1, and for several days after, no visual description of the spill was obtained. From May 8, daily outlines of the spill have been available based on a combination of satellite and aerial overflights. However, because of the size of the spill area, overflights have been unable to provide fidelity on the visual appearance of the oil within the spill area. During the five days in April for which fidelity was available, the ratios of dark oil to dull oil to sheen remained relatively constant at 2/10/88. These ratios have been applied to the total area of spill on May 17. Current estimates of volumes of oil skimmed, burned, and chemically dispersed were then applied to provide an updated range of possible flow rates as follows: 2,000 – 6,000 – 13,000 barrels per day (Attachment 5).

Note that all serious scientists recognize that there are huge uncertainties in estimating oil volumes from visual inspection. Oil thickness is by far the greatest uncertainty, with both sheen and darker oil thicknesses varying by orders of magnitude.

## Maximum Discharge Calculation

Prior to drilling the MC 252 exploration well a maximum discharge estimate was provided as part of the permitting process. Predictions of reservoir thickness, quality, and pressure were convolved with the well design to develop a worse case scenario as follows.

- Optimistic assumptions for reservoir thickness, quality, pressure, and fluid properties.
- Total loss of control of well after drilling through reservoir in largest hole size allowed by the well design – 12 ¼".
- Totally uncontrolled flow from drilling riser at surface.

Using these assumptions, a maximum case discharge of 162,000 barrels per day was estimated.

After the sinking of the Deepwater Horizon, this estimate was reviewed in the light of the actual situation as it was understood at that time.

- Formation evaluation of the reservoir interval.
- 9 7/8" hole size in the reservoir
- 7" production tubing across the reservoir
- Flow to seabed through casing annulus
- Split 5 ½" drill pipe at BOP and flow out 6 5/8" drill pipe
- No restrictions in BOP, riser, or drill pipe (ie well head open to seabed – requires BOP to fall off well head)

An absolute worst case flow rate of 60,000 barrels per day was calculated. A more reasonable worst case scenario of 40,000 barrels per day recognizes the following.

- BOP is in place and may be partially activated.
- The riser and drill pipe is crushed and kinked.

BP-HZN-CEC020104

BP-HZN-2179MDL00000429

CONFIDENTIAL

- Restrictions provided by cement in the casing annulus, formation collapse, casing hangers, etc., are likely.

This analysis is summarized on Attachment 6.

A more sophisticated version of this calculation has been carried out as more has been learned about pressures at the top and bottom of the well head. This review calculates unconstrained flow rate through the casing as well as up the annulus. Absolute worst cases with wellhead and BOP removed, and no downhole restrictions, are as follows (Attachment 7).

- Annular flow – 55,000 barrels per day
- Casing flow – 100, 000 barrels per day

**Fluid Velocity At Seabed**

On April 26, NOAA scientists made an estimate of volume release rate at the seabed as follows.

- Oil leaking from a hole approximately 40 cm in diameter (Deepwater Horizon riser is 19.5"/49.5 cm ID, and is somewhat crimped at release point).
- By visual inspection the velocity of the material in the plume is between 7 and 30 cm per second.
- The plume contains roughly 50% oil droplets (together with gas bubbles and entrained seawater).

The NOAA estimate using these assumptions was roughly 5,000 barrels per day (Attachment 8).

**Evidence Against Extreme Flow Rates At Seabed**

A Professor from Purdue University has calculated a current flow rate at the seabed of 70,000 +/- 14,000 barrels per day. He bases his estimate on the velocity of fluid exiting the drilling riser on the seabed. His estimate is unlikely to allow for the following additional factors required to estimate the flow of oil.

- Drill pipe in riser reducing flow area
- Partial crimping of riser end reducing flow area
- Proportion of gas and entrained water exiting riser with the oil
- Volume reduction of oil as gas escapes en route from seabed to surface
- Flow rate not constant

Finally, there is absolutely no evidence of any floating material being entrained in the plume exiting the broken riser. In a report to the MMS on Oil Spill Containment, Remote Sensing and Tracking For Deepwater Blowouts, PCCI Marine and Environmental Engineering made the following statement.

> "The blowout plume will make it difficult to approach the well with anything but very massive equipment pieces or ROVs. The operation of ROVs will be difficult around the blowout point. The jet zone will cause vast amounts

CONFIDENTIAL

*of water to flow towards the well.  The danger of having lighter equipment sucked into the flow is large.  Many ROVs have been rendered useless by relatively minor blowout plumes"*

ROV video shows neutrally buoyant material passing within inches of the plume without being sucked in.  From this observation alone, the flow must be relatively minor.

BP-HZN-CEC020106

BP-HZN-2179MDL00000431

CONFIDENTIAL



PetroVR Well Production

CONFIDENTIAL

BP-HZN-2179MDL00000432

01-40971
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG          )          MDL NO.  2179
"DEEPWATER HORIZON" in the               )
GULF OF MEXICO,  on                      )          SECTION: J
APRIL 20, 2010                           )
                                         )          JUDGE BARBIER
                                         )
                                         )          MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW* ™
### **Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Marcia Kemper McNutt, Ph.D.
### VOLUME 2

OCTOBER 25.  2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
 1      analysis to determine or try to quantify the
 2      impact on a flow rate of the erosion?
 3                  MS. CHANG:  Object to form and
 4      scope.
 5          A.  Me, personally?  Absolutely not.
 6                  MR. FIELDS:  Okay.  Okay.  I'll
 7      reserve my remaining time.
 8                  THE VIDEOGRAPHER:  The time is
 9      9:55 a.m.  We're off the record, ending Tape 11.
10              (Recess from 9:55 a.m. to 10:01 a.m.)
11                  MR. DAVIS-DENNY:  I'm ready.
12                  THE VIDEOGRAPHER:  All set?
13              The time is 10:01 a.m.  We're back on the
14      record, beginning Tape 12.
15                          EXAMINATION
16      QUESTIONS BY MR. DAVIS-DENNY:
17          Q.  Good morning, Dr. McNutt.  As I mentioned
18      at the break, my name is Grant Davis-Denny, and I
19      represent Transocean.
20              I want to take you back to yesterday and
21      some testimony that you had yesterday.  You were
22      testifying about a comment that you received from
23      a BP Manager in the week leading up to the top
24      kill, do you recall this?  It was about the --
25      whether the top kill was dependent on the flow
```

```
 1    rate or not.
 2                MS. CHANG:  Object to scope.
 3         A.  Yes.
 4         Q.  (By Mr. Davis-Denny) Okay.  And the BP
 5    Manager, in essence, told you that the top kill
 6    was not dependent on the flow rate; is that
 7    correct?
 8                THE VIDEOGRAPHER:  Move your
 9    microphone up, please.
10                MS. CHANG:  Object to scope.
11         A.  Yes.
12         Q.  (By Mr. Davis-Denny) I'm handing you
13    exhibit -- previously marked Exhibit 8553.
14                THE COURT REPORTER:  Tab number?
15         Q.  (By Mr. Davis-Denny) And it's at --
16                MR. APPLEMAN:  This was a hard copy.
17                MR. DAVIS-DENNY:  This one was
18    handed out as a hard copy.
19                MR. APPLEMAN:  It's on our CD.
20                MR. DAVIS-DENNY:  Yeah, but it's on
21    the CD?
22           Hand them the CD.
23           (Discussion off the record.)
24         Q.  (By Mr. Davis-Denny) Okay.  It's
25    referenced as 8553 on the -- on the CD.  This
```

414

```
 1    exhibit has the title "Summary points from the
 2    Kill the Well on Paper Discussion 18 May, 2010."
 3              Did the BP Manager who told you that flow
 4    rate did not matter to the likelihood of success
 5    of the top kill share this document with you,
 6    Dr. McNutt?
 7                   MS. CHANG:  Object to scope.
 8         A.  No.
 9         Q.  (By Mr. Davis-Denny) Did anyone from BP
10    share this document with you?
11                   MS. CHANG:  Scope.
12         A.  This is the first time I've ever seen
13    this document.
14         Q.  (By Mr. Davis-Denny) Okay.  If you'll
15    look at the third bullet point under "Summary
16    Points" --
17         A.  Yes.
18         Q.  -- it says:  "Modeling indicates that a
19    dynamic kill cannot be successfully executed if
20    the oil flow rate is 15000" stock tank barrels
21    per day.
22              Did the BP Manager tell you that modeling
23    had put an upper limit of 15,000 stock tank
24    barrels per day on the dynamic kill?
25                   MS. CHANG:  Scope.
```

```
 1              MR. FIELDS:  Object to form.
 2         A.  No.
 3         Q.  (By Mr. Davis-Denny) Wouldn't you have
 4    liked to have known that fact going into the top
 5    kill?
 6              MR. FIELDS:  Objection, form.
 7              MS. CHANG:  Scope.
 8         A.  I think that would have been helpful.
 9         Q.  (By Mr. Davis-Denny) Yeah.  Wouldn't you
10    have expected BP to -- BP to share that fact with
11    you going into the top kill?
12              MR. FIELDS:  Objection, form.
13              MS. CHANG:  Scope.
14         A.  Yes.  But I will say that it was only the
15    day before top kill that the Flow Rate Team
16    estimates started approaching this number; so
17    whether there would have been enough impetus to
18    have stopped top kill at that time I think is
19    questionable.
20              The flow rates we had at that time were
21    only lower bounds, from my Team anyway.  I don't
22    know if there was other evidence that might have
23    suggested higher flow rates, but we had lower
24    bounds on flow rates from 12 to 25,000 barrels
25    per day, which would have thrown some question
```

```
 1        Q.   (By Mr. Davis-Denny) And there were also
 2   delays that the Plume Team experienced; is that
 3   correct?
 4        A.   Well, it was primary the -- primarily
 5   the -- the Plume Team and the Reservoir Team.
 6        Q.   Okay.  Please look at the fourth bullet
 7   point on this document.  It says:  "Knowledge of
 8   the flow rate is needed to form a view of the
 9   probability of success..."
10           Now, that is the exact opposite of what
11   the BP Manager told you prior to the cop -- top
12   kill; is that right?
13               MR. FIELDS:  Object to form.
14               MS. CHANG:  Object to scope.
15        A.   That is true.
16        Q.   (By Mr. Davis-Denny) Did the BP Manager
17   share with you at the May 18th meeting
18   participants at this Kill the Well on Paper
19   discussion had concluded that knowledge of the
20   flow rate was needed to form a view of the
21   probability of success of the dynamic kill
22   effort?
23               MS. CHANG:  Scope.
24               MR. FIELDS:  Objection, form.
25        A.   No.
```

1    posed a health hazard to hundreds of workers

2    involved in well intervention, was proportional

3    to the flow rate."

4         Do you stand by that statement,

5    Dr. McNutt?

6         A.   Yes.

7         Q.   It then reads:   "The planning for

8    containment of oil at the sea surface while the

9    relief wells were being drilled required a

10   realistic assessment of how much oil needed to be

11   accommodated."

12        Do you also stand by that statement?

13        A.   Yes.

14        Q.   Generally speaking, do you agree that an

15   accurate assessment of the flow rate was

16   important to Source Control efforts?

17             MS. CHANG:   Object to scope.

18        A.   Define "important."

19        Q.   (By Mr. Davis-Denny) Well, the cofferdam

20   effort was sensitive to flow rate efforts?

21        A.   Yes.

22        Q.   The top kill effort was sensitive to flow

23   rate efforts?

24        A.   Yes.

25             MS. CHANG:   Scope.

1        Q.   (By Mr. Davis-Denny) The containment
2    effort was sensitive to flow rate estimates?
3              MS. CHANG:  Scope.
4        A.   Yes.
5        Q.   (By Mr. Davis-Denny) And what do you
6    mean -- what do you understand the word
7    "sensitive" to mean there?
8              MS. CHANG:  Object to scope.
9        A.   It was a parameter that was one of
10   several that should be accounted for in any
11   engineering design.
12       Q.   (By Mr. Davis-Denny) Okay.  I'd like to
13   show you another document.  I don't believe this
14   one has been previously marked.  It's Tab 139.
15             MR. DAVIS-DENNY:  Oh, I'm sorry,
16   Tom.
17       Q.   (By Mr. Davis-Denny) This will be Exhibit
18   9673.
19             (Exhibit No. 9673 marked.)
20       A.   Okay.
21       Q.   (By Mr. Davis-Denny) Sorry.  (Tendering.)
22       A.   Got it.
23       Q.   Did you send the E-mail that's at the top
24   of the page to Raya Bakalov on September 7th of
25   2010?

458

```
 1        Q.   (By Mr. Davis-Denny) I'm going to show
 2    you Exhibit 9163, this is at Tab 76.  There you
 3    are.
 4        A.   (Nodding.)
 5        Q.   And if you could look at the -- you're
 6    not on the E-mail, but I -- if you wouldn't mind
 7    looking at the PowerPoint Presentation?
 8        A.   M-h'm.
 9        Q.   Does this PowerPoint Presentation look at
10    all -- once you've had a chance to review it, my
11    question for you will be whether this
12    Presentation looks familiar to you.
13                  MS. CHANG:  Object to scope.
14        A.   (Reviewing document.)  Yes, it looks
15    familiar.
16        Q.   (By Mr. Davis-Denny) Okay.  Is -- is this
17    the Presentation that BP presented to you shortly
18    after the top kill?
19                  MS. CHANG:  Scope.
20                  MR. FIELDS:  Objection, form.
21        A.   Yes.
22        Q.   (By Mr. Davis-Denny) Okay.  And did they
23    present three scenarios for why the top kill
24    might have failed --
25                  MS. CHANG:  Objection, scope.
```

459

1        Q.   (By Mr. Davis-Denny) -- in this

2   Presentation?

3        A.   Yes.

4        Q.   And for the first scenario, the one

5   that's at Page No. 6, am I correct that they

6   labeled that scenario "Possible but not

7   Plausible"?

8               MS. CHANG:  Object to scope.

9        A.   "Possible but not Plausible" is what it

10  says.

11       Q.   (By Mr. Davis-Denny) Okay.  And if you

12  look at the second scenario on Page 8 of the

13  PowerPoint Presentation --

14       A.   M-h'm.

15       Q.   -- did they label this scenario as also

16  being "Possible but not Plausible"?

17       A.   Yes.

18       Q.   Okay.  And then if you look at the third

19  scenario on -- on Page 10, this is the scenario

20  where they describe this theory that mud flow

21  from the top kill had gone through the failed

22  16-inch rupture disk.  Is that correct?

23               MS. CHANG:  Object to scope.

24       A.   Yes.

25       Q.   (By Mr. Davis-Denny) And they labeled

```
 1      this conclusion "Possible and Plausible."  Is
 2      that right?
 3          A.  Yes.
 4              MS. CHANG:  Form and scope.
 5          Q.  (By Mr. Davis-Denny) And this was the
 6      only scenario that they presented in this
 7      Presentation as being "Plausible."  Is that
 8      right?
 9              MS. CHANG:  Object to scope.  Sorry.
10              MR. FIELDS:  Objection, form.
11          A.  You've read that appropriately.  This was
12      their Presentation.
13          Q.  (By Mr. Davis-Denny) Okay.  And this is
14      what they presented to you at that meeting
15      immediately after the top kill; is that correct?
16              MS. CHANG:  Objection, scope.
17              MR. FIELDS:  Objection, form.
18          A.  This was BP's presentation.
19          Q.  (By Mr. Davis-Denny) Okay.
20              (Discussion off the record.)
21          Q.  (By Mr. Davis-Denny) I'd like to hand you
22      what's previously been marked as Exhibit 9160.
23      It's at Tab 75.  And I'll represent to you,
24      Dr. McNutt, that this is a text message that was
25      sent by BP's Kurt Mix to BP's Jon Sprague on May
```

```
 1    27th of 2010.
 2         A.  M-h'm.
 3         Q.  I take it you didn't receive this text
 4    message from BP; is that correct?
 5              MS. CHANG:  Objection, scope.
 6         A.  No, I was not on this particular text
 7    message.
 8         Q.  (By Mr. Davis-Denny) Okay.  And in the
 9    first sentence it reads:  "Too much flowrate -
10    over 15000 and too large an orifice."
11              Do you see that?
12         A.  Yes, I do.
13         Q.  Did anyone from BP share with you that
14    the top kill was failing because the flow rate
15    was too high, it was over 15,000 barrels of oil
16    per day, or words to that effect?
17              MR. FIELDS:  Objection, form.
18              MS. CHANG:  Scope.
19         A.  Not in those words.
20         Q.  (By Mr. Davis-Denny) Did they say that to
21    you in -- in words that were at all close to
22    that?
23         A.  Oh, no.
24         Q.  Okay.
25         A.  Oh, no.
```

```
 1        Q.   And they didn't -- they certainly did not
 2   raise this with you at the meeting where they
 3   presented the failed rupture disk as being the
 4   only plausible scenario for the top kill's
 5   failure; is that right?
 6                  MR. FIELDS:  Objection, form.
 7                  MS. CHANG:  Object to scope.
 8        A.   No.
 9        Q.   (By Mr. Davis-Denny) I'd like to --
10                  MR. DAVIS-DENNY:  How much time do I
11   have left?
12                  THE VIDEOGRAPHER:  (Indicating.)
13        Q.   (By Mr. Davis-Denny) I'd like to show you
14   what's been previously marked as Exhibit 9164.
15                  (Discussion off the record.)
16                  MR. DAVIS-DENNY:  My apologies to
17   the audience, but this is on the first CD that we
18   had given you.
19        Q.   (By Mr. Davis-Denny) I'm sure you've seen
20   this E-mail before.
21                  (Discussion off the record.)
22        Q.   (By Mr. Davis-Denny) If you start at the
23   beginning of the second page, this is E-mail
24   correspondence from a BP employee named Rupen
25   Doshi.
```

1    the well explosion, and that would -- they would

2    not fail during the top kill operation," that

3    certainly would have eliminated some of your

4    concerns about well integrity, correct?

5                   MR. FIELDS:  Objection, form.

6                   MS. CHANG:  Object to form and

7    scope.

8         Q.  (By Mr. Lundy) "Yes"?

9         A.  I -- it would have been reassuring to

10   have known, prior to top kill, that there was

11   already a Well Integrity Test.

12        Q.  All right.  Look at Tab 43.  It's

13   previously marked as Exhibit 9084.  It's called

14   the "Top Kill Analysis."  I think you've briefly

15   looked at it earlier today.

16        A.  H'm.  Okay.  Yes, this is the one we

17   looked at before.

18        Q.  Okay.  And -- and you see it's sort of

19   a -- a postmortem on the top kill procedure,

20   correct?

21                   MS. CHANG:  Object to form and

22   scope.

23        A.  Yes.

24        Q.  (By Mr. Lundy) Okay.

25        A.  That's what it appears to be.

```
 1          Q.  And if you turn to what's Bates-stamped
 2    as IMU010-000459, you'll see "Scenario...1:
 3    Supporting Evidence HC and dominant mud flow up
 4    drill pipe and bypass through rams."  Do you see
 5    that?
 6          A.  Bypass at rams, yes.
 7          Q.  Okay.  And -- and it says that this
 8    "Conclusion" is "Possible but not Plausible,"
 9    right?
10          A.  That's what it says.
11          Q.  Okay.  And if you turn to the next page,
12    you'll see "Scenario...2:"  And you'll see that
13    scenario contained on actually the next two
14    pages.
15          A.  M-h'm.
16          Q.  And it's this "HC" flow -- hydrocarbon
17    "flow is up" the "annulus and casing, dominant
18    mud flow into casing."  Do you see that?
19          A.  H'm.  Yes.  Dominant -- yes.  Okay.
20          Q.  Okay.
21          A.  Right.
22          Q.  All right.  And then you see where it
23    says:  "Conclusion:  Possible but not Plausible,"
24    right?
25          A.  That's what it says.
```

1     Q.  Okay.  Then the next scenario, if you
2   turn the page, is "Scenario...3:"  Where it says:
3   "HC" or hydrocarbon "flow is up" a nine and seven
4   inch "casing," and then, in parens, it says:
5   (and possibly annulus as well) dominant mud flow
6   through failed 16 inch rupture discs."  Correct?
7   Did I read that correctly?
8     A.  You read that correctly.
9     Q.  And then the next page says:
10   "Conclusion:  Possible and Plausible," right?
11     A.  Yes.
12     Q.  So BP, in this Top Kill Analysis, is
13   opining that a failure of the rupture disk is not
14   only a possible conclusion, but a plausible
15   conclusion, correct?
16             MR. FIELDS:  Objection, form.
17             MS. CHANG:  Form and scope.
18     A.  That's what they write in this document.
19     Q.  (By Mr. Lundy) Okay.  And based upon all
20   of the modeling documents that you've seen today,
21   that were performed by Mr. Ole Rygg with Add
22   Energy, would you agree that the failure of the
23   top kill was as likely caused, or -- or actually
24   caused by too high of a flow rate, as opposed to
25   the failure of the rupture disk?

1          MR. FIELDS:  Objection, form.

2          MS. CHANG:  Form and scope.

3      A.  Well, I had, even before you showed me

4  documents today, concluded that I did not think

5  mud flowing out of the rupture disks caused the

6  failure of top kill.  DOE Engineers had shown

7  that the rupture disks were too small to

8  accommodate the mud from top kill, they -- but

9  they could not rule out that the rupture disks

10  could be opened, but they couldn't explain the

11  failure of top kill.

12      Q.  (By Mr. Lundy) Okay.  Well, based upon

13  the flow rate documents, the -- the flow rate

14  modeling you've seen --

15      A.  Yes.

16      Q.  -- BP should have considered the flow

17  rate as a plausible cause of the top kill

18  failure, along with these other scenarios listed

19  in Exhibit 9084, the "Top Kill Analysis,"

20  shouldn't it?

21          MR. FIELDS:  Objection, form.

22          MS. CHANG:  Form and scope.

23      A.  And perhaps they did.

24      Q.  (By Mr. Lundy) Well, if they did, it

25  should have been contained in this Top Kill

```
 1    Analysis, correct?
 2                 MR. FIELDS:  Objection, form.
 3                 MS. CHANG:  Form and scope.
 4         A.   The documents that I have seen today lead
 5    me to believe that the Government was not to be
 6    shown flow rate information, and that may be one
 7    reason why it was not included in this analysis.
 8         Q.   (By Mr. Lundy) All right.
 9         A.   We were not in the circle of trust.
10              (Discussion off the record.)
11                 MR. LUNDY:  I think that may be all
12    I have.  If you'll give me just a few minutes,
13    let me go through my notes, let's take just a
14    quick break, and I may be finished.
15                 THE WITNESS:  Okay.
16                 THE VIDEOGRAPHER:  The time is 11 --
17    3:11 p.m.  We're off the record.
18              (Recess from 3:11 p.m. to 3:20 p.m.)
19              (On the stenographic record only:)
20                 MR. LUNDY:  Kym, I don't have any
21    further questions.
22                 THE COURT REPORTER:  Fair enough.
23              (Discussion off the record.)
24                 MS. CHANG:  Kym, I don't have any
25    questions.
```

01-41894
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG            )        MDL NO. 2179
"DEEPWATER HORIZON" in the                 )
GULF OF MEXICO, on                         )        SECTION: J
APRIL 20, 2010                             )
                                           )        JUDGE BARBIER
                                           )
                                           )        MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Timothy James Lockett, Ph.D.

## VOLUME 2

DECEMBER 19, 2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

404

1        MR. DAVIS-DENNY:  I am.

2        Q.  (By Mr. Davis-Denny) We can limit your

3   view to during the response.

4        A.  Based on my analysis of Top Kill prior to

5   the events happening, I was ta -- I -- I had

6   developed the view that the Top Kill procedure

7   could be successful or could fail, depending on

8   the flow rate from the well that it was exposed

9   to.

10       Q.  (By Mr. Davis-Denny) Did you form the

11  view in May of 2010 that knowledge of the flow

12  rate was needed to form a view of the probability

13  of success of the dynamic kill?

14       A.  I did not.

15       Q.  Did you form the view in May of 2010 that

16  the Top Kill was sensitive to flow rate?

17            MR. DRAKE:  Objection, form.

18       A.  I formed the view in May 2010 that Top

19  Kill could be deployed and be either successful

20  in killing the well or not successful in killing

21  the well, depending on the flow rate from the

22  well.

23       Q.  (By Mr. Davis-Denny) So it was important

24  for decision-makers evaluating whether to go

25  forward with the Top Kill, to have the best

1    information available about the flow rate, right?

2            MR. DRAKE:  Objection, form.

3        A.  Sitting here today, I would not disagree

4    with that statement.

5        Q.  (By Mr. Davis-Denny) I'd like to show you

6    what's previously been marked as Exhibit 10651.

7            MR. DRAKE:  See mark 3.

8        Q.  (By Mr. Davis-Denny) This was Tab 32 in

9    the United States binder.  Just to reorient

10   ourselves, this is an E-mail that you sent to

11   Mr. Hill on May 21st, 2010, with the "Subject"

12   line "Thoughts on the top kill option."  Correct?

13       A.  Yes, that's correct.

14       Q.  And for purposes of this analysis, you

15   made a number of assumptions; is that correct?

16       A.  Yes, that's correct.

17       Q.  Okay.  All right.  Your first assumption

18   was that the "Fluid density needs to be above

19   1730" kilograms per meter cubed.  Did I interpret

20   that correctly?

21       A.  You interpreted the number correctly, but

22   I don't believe that's an assumption.

23       Q.  Okay.  I'm sorry.  If I look at the end

24   of that paragraph, you say:  "...I have used

25   1800" kilograms per meters cubed.

```
 1    my Counsel on a matter of privilege?
 2         Q.   (By Mr. Davis-Denny) Yes.
 3              MR. DAVIS-DENNY:  Can we please stop
 4    the clock, though.
 5              THE VIDEOGRAPHER:  The time
 6    is two -- going off the record?
 7              MR. DAVIS-DENNY:  Yes.
 8              THE VIDEOGRAPHER:  It's 2:49 p.m.
 9    We're off the record.
10         (Recess from 2:49 p.m. to 2:54 p.m.)
11              MR. DAVIS-DENNY:  Ready.
12              THE VIDEOGRAPHER:  All set?
13         The time is 2:54 p.m.  We're back on the
14    record, beginning Tape 15.
15         A.   Can you repeat the question?
16         Q.   (By Mr. Davis-Denny) Your analysis was
17    that the flow rate had increased during the
18    course of the Top Kill, correct?
19         A.   The opinion I formed at that time, based
20    on the work I had conducted at that time, was
21    that the flow rate had increased between the
22    start of Top Kill 1 and the end of Top Kill 3.
23         Q.   Okay.  Could you please go back to U.S.
24    Tab 13, Exhibit 9446?  This was the one we
25    started to look at earlier.
```

# Exhibit 49

Depo Ex. No. 11186 -

Trevor Hill

Filed Under Seal

01-41294
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG            )        MDL NO.  2179
"DEEPWATER HORIZON" in the                 )
GULF OF MEXICO,  on                        )        SECTION: J
APRIL 20, 2010                             )
                                           )        JUDGE BARBIER
                                           )
                                           )        MAG. JUDGE SHUSHAN

## CONFIDENTIAL

### WorldwideVIEW ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Charles Holt
**VOLUME 1**

NOVEMBER 28, 2012

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
      1   operation, broaching would have a consequence
      2   of hydrocarbons coming out in multiple areas
      3   up to and including potentially impacting
      4   relief well efforts.
11:24 5          Q.    Is that a high consequence?
      6          A.    In this operation that would be
      7   a high consequence.
      8          Q.    No. 3, "Junk shots are often not
      9   successful," is that what that says?
11:24 10         A.    That's what those words say.
      11         Q.    So as of May 6th or when this
      12  document was written on May 7th BP was aware
      13  that junk shots are often not successful,
      14  right?
11:24 15         A.    That's -- that's what was
      16  concluded here, yes.
      17         Q.    So we're -- we're implementing a
      18  procedure that has high consequence risks
      19  that we know is often not successful?
11:24 20         MR. DRAKE:  Objection; form.
      21         Q.    (BY MR. BARR)  Right?
      22         MR. DRAKE:  Objection; form.
      23         A.    I was in the -- the review.  I
      24  may not have been in the actual team that
11:25 25  discussed this, but as a result of this the
```

1    document.
2        MR. BARR:  He's the one saying who they
3    work for.
4        A.    Okay.
11:51  5        Q.    (BY MR. BARR)  Whose
6    responsibility was it to provide this
7    information to Admiral Allen?
8        MR. CASEY:  Objection to form and
9    scope.
11:51  10       MR. DRAKE:  Same objections.
11       Q.    (BY MR. BARR)  Was BP not the
12   responsible party?
13       A.    BP was the responsible party.
14       Q.    Okay.  So who -- BP had a
11:51  15   responsibility to inform Admiral Allen of a
16   flow limit on the top kill, right?
17       MR. DRAKE:  Objection; form; objection,
18   scope.
19       A.    BP had a responsibility to
11:52  20   inform Admiral Allen, yes.
21       Q.    (BY MR. BARR)  BP also had a
22   responsibility to inform Admiral Landry; did
23   they not?
24       MR. DRAKE:  Objection; form.
11:52  25       A.    They did.

```
 1    that?
 2            MS. GRIEF:   Object to the form.
 3            MR. CASEY:  Same objection.
 4            A.    I'm not aware of that, no, sir.
 5    I don't recall that.
 6            Q.    (BY MR. BARR)  Okay.  Then -- so
 7    you don't recall BP putting together a
 8    presentation and then presented it after they
 9    had met on the reasons why the top kill
10    failed to explain the failure?
11            MR. CASEY:  Object to form.
12            A.    What I don't recall is a meeting
13    that took place where the government was not
14    included, no, sir.
15            Q.    (BY MR. BARR)  Okay.  So you're
16    not saying that Mr. Herbst is wrong about
17    that; you're just saying you don't remember
18    that?
19            A.    I just don't remember that.
20            MR. DRAKE:  Objection; foundation.
21            Q.    (BY MR. BARR)  Now, is this
22    PowerPoint that I have in front of you, is
23    this the presentation that was given by BP to
24    explain the failure of the top kill?
25            MR. CASEY:  Objection to form.
```

01:03 — line 5
01:03 — line 10
01:03 — line 15
01:04 — line 20
01:04 — line 25

```
  1          A.      Yes, this document was created
  2    to identify the various scenarios -- there
  3    was an engineering team that worked on
  4    this -- as to why the top kill did not work.
  5          Q.      (BY MR. BARR)  Were you
  6    personally part of the team that evaluated
  7    the data from the top kill and created this
  8    presentation to explain why it failed?
  9          A.      No, I was not personally
 10    involved in creating the document.
 11          Q.      Okay.
 12          A.      There was an engineering team
 13    that did that.
 14          Q.      Did you offer any input?
 15          MR. CASEY:  Objection to form.
 16          A.      I -- I don't recall having
 17    offered input to this.
 18          Q.      (BY MR. BARR)  Okay.  So --
 19          A.      Could have, but I don't recall
 20    such.
 21          Q.      From the best of your memory,
 22    this presentation, when it was presented to
 23    you -- well, strike that.
 24                  Was this presentation presented
 25    to you?
```

01:04  5
01:04 10
01:04 15
01:05 20
01:05 25

187

```
      1           A.      I remember seeing this
      2    presentation and -- around this time, and so,
      3    yes, I've seen this presentation.  Was it
      4    presented to me?  I was not in the room
01:05 5    when -- when this was presented to the larger
      6    group, the larger group the like the Command
      7    and others.
      8           Q.      Okay.  So when did you see this
      9    presentation?
01:05 10          MR. CASEY:  Objection; form.
      11          A.      I don't recall, sir.  That --
      12   it -- it would have been within a day or so
      13   of this time frame, but I don't recall.
      14          Q.      (BY MR. BARR)  Okay.  So it
01:05 15   would have been in the late May time frame?
      16   This isn't the first time you were seeing
      17   this in preparing for this deposition?
      18          A.      I've seen it, yes, during that
      19   late May time frame.
01:05 20          Q.      Okay.  But the information
      21   presented in this presentation, when you
      22   heard it that was the first time you heard
      23   it, correct?
      24          MR. DRAKE:  Objection; form.
01:06 25          A.      Yes, the -- the -- the -- the
```

```
 1   presentation itself, that would have been the
 2   first time that I saw all this put together
 3   in -- in one place.
 4          Q.    (BY MR. BARR)  Okay.  And do you
 5   recall who gave the presentation?
 6          A.    As I recall, Paul Tooms was --
 7   was one of the engineers that actually
 8   prepared this, and I believe that he
 9   presented the presentation.
10          Q.    And for the record, Mr. Tooms
11   works for BP, correct?
12          A.    Yes, he does.
13          Q.    All right.  So let's look at
14   this.  First you have -- first slide is
15   "Summary of Operations," correct?
16          A.    Summary of Operations.
17          Q.    And it talks about "3 separate
18   attempts over 3 days," right?
19          A.    Yes, it does.
20          Q.    And it talks about firing the 16
21   different bridging materials, right?
22          A.    Yes, "16 different bridging
23   material shots."
24          Q.    So between -- if you look on the
25   right hand side you see, top kill No. 1,
```

01:06 (line 5), 01:06 (line 10), 01:06 (line 15), 01:06 (line 20), 01:07 (line 25)

```
 1    No. 2, and No. 3, correct?
 2          A.    Yes.
 3          Q.    Okay.  So we attempted, sorry,
 4    BP attempted this on the 26th, 27th, and
 5    28th, right?
 6          A.    Three different attempts on
 7    three different days.
 8          Q.    Right, one attempt per day?
 9          A.    Uh-huh.
10          Q.    Okay.  Go to the -- it's the
11    fourth slide, if you look on the -- you'll
12    see the 457 Bates number.
13          A.    457, yeah.  It's backwards here.
14          Q.    Sorry.
15          A.    All right.
16          Q.    It says, "Scenarios to Explain
17    Top Kill Results," right?
18          A.    Yes.
19          Q.    And it lists some observations,
20    right?
21          A.    There are five observations
22    listed here.
23          Q.    Okay.  And then it goes on the
24    next slide, starts talking about the
25    scenarios, right?
```

```
          1            A.      It says scenario 1.

          2            Q.      And you remembered three

          3    scenarios being presented, right?

          4            MR. CASEY:  Objection to the form.

01:07     5            MR. DRAKE:  Same objection.

          6            A.      Yeah, to my recollection there

          7    was -- there was three scenarios.

          8            Q.      (BY MR. BARR)  And that's what's

          9    presented in this PowerPoint, right?

01:08    10            MR. DRAKE:  Objection; form.  You can

         11    read the whole slide.

         12            A.      This has three slides -- this

         13    has three scenarios in it, yes.

         14            Q.      (BY MR. BARR)  Okay.  So you've

01:08    15    now had a chance to look at the PowerPoint,

         16    and there's three scenarios in it, right?

         17            A.      Uh-huh.

         18            Q.      You don't recall any other

         19    scenarios other than these three being

01:08    20    presented as a reason for why the top kill

         21    failed, do you?

         22            MR. CASEY:  Objection to form.

         23            MR. DRAKE:  Same objection.

         24            A.      I don't recall any other than

01:08    25    this presentation.
```

```
 1        Q.    (BY MR. BARR)  Okay.  So if
 2   there was some other reasons to why the top
 3   kill failed, that explanation, as far as you
 4   are aware, was not given -- I don't want to
01:08  5   say publicly, but was not given to Unified
 6   Command?
 7        MR. DRAKE:  Objection; form.
 8        MR. CASEY:  Objection to form.
 9        A.    To my recollection, this
01:08 10   presentation was the summary --
11        Q.    (BY MR. BARR)  Okay.
12        A.    -- that was provided as to
13   the -- the top kill outcome.
14        Q.    Okay.  And so the first scenario
01:09 15   is hydrocarbons and dominant mud flow up
16   drill pipe and bypass through rams, right?
17        A.    Yes, it does.
18        Q.    Do you know what that scenario
19   is describing?
01:09 20        A.    That's describing the drill pipe
21   that was in the BOP stack still existed and
22   that the flow of the hydrocarbons was coming
23   through that drill pipe and the rams had not
24   severed or sealed around that -- not around,
01:09 25   but across the drill pipe in the BOP stack.
```

```
         1          Q.     Okay.  And -- and the conclusion

         2    for that was that -- if you go to the next

         3    page -- it was "Possible but not Plausible,"

         4    right?

01:09    5          A.     The evidence presented,

         6    that's -- that's what was concluded.

         7          Q.     So BP did not believe that was

         8    the reason why the top kill failed?

         9          MR. CASEY:  Objection to form.

01:09   10          MR. DRAKE:  Same objection.

        11          Q.     (BY MR. BARR)  Let me -- let me

        12    state it a little differently.  BP did not

        13    believe that was the most likely reason why

        14    the top kill failed?

01:10   15          MR. DRAKE:  At the -- at -- objection;

        16    form.  At this point in time, Counsel?

        17          MR. BARR:  I'll restate it one more

        18    time --

        19          MR. DRAKE:  Okay.

01:10   20          MR. BARR:   -- to cure that objection.

        21          Q.     (BY MR. BARR)  BP did not

        22    believe that scenario No. 1 was the most

        23    likely reason why the top kill failed at the

        24    point in time in which this presentation was

01:10   25    given?
```

```
 1        A.      As these three scenarios were
 2   evaluated, this scenario was -- was not the
 3   leading candidate as to why it failed.
 4        Q.      Okay.  So then you have scenario
01:10 5   No. 2.  Hydrocarbon flow was up annulus and
 6   casing and dominant mud flow into casing,
 7   correct?
 8        A.      That's what scenario 2 was
 9   described as.
01:10 10       Q.      Okay.  And could you provide
11   some background as to what that -- what that
12   is describing?
13        MR. CASEY:  Objection to form.
14        A.      This is describing that the
01:11 15   hydrocarbons are flowing through the 9 and
16   7/8s casing and then also between the 9 and
17   7/8s and the 16-inch casing.
18        Q.      (BY MR. BARR)  Okay.  And why
19   would that cause the top kill to fail?
01:11 20        A.      This has to do with the flow
21   path by having multiple annuli open to where
22   that we may have been able to move fluid into
23   one annuli, but not both annuli.
24        Q.      And if you go to the conclusion,
01:11 25   that's also listed as "Possible but not
```

```
         1    Plausible," right?
         2          A.     That's -- that's what's written
         3    here, yes.
         4          Q.     Okay.  So scenario No. 2, like
01:11    5    scenario No. 1, BP did not believe was the
         6    most likely reason why the top kill failed at
         7    the point in time it gave this presentation,
         8    correct?
         9          A.     That's correct.
01:11   10          Q.     Then we go to scenario No. 3.
        11    Hydrocarbon flow was up the 9 and 7/8s casing
        12    (and possibly annulus as well) dominant mud
        13    flow through failed 16-inch rupture disks,
        14    correct?
01:12   15          A.     That's what it says here.
        16          Q.     Okay.  And could you describe
        17    what that scenario is -- is -- is about?
        18          A.     Well, that scenario was
        19    describing that there has been a lost
01:12   20    wellbore integrity and that the -- as stated
        21    here, that -- that the rupture disks could
        22    have possibly failed.
        23          Q.     Okay.  That was one of the risks
        24    we had talked about of the top kill, right?
01:12   25          MR. DRAKE:  Objection; form.
```

```
        1        A.      It was one of the risks, yes.
        2        Q.      (BY MR. BARR)  And BP's ultimate
        3   conclusion for the scenario No. 3 was that it
        4   was possible and plausible, correct?
01:12   5        MR. DRAKE:  Objection; form.
        6        A.      Yes, that's what's here.
        7        Q.      (BY MR. BARR)  Okay.  So of the
        8   three scenarios, at the point in time this
        9   presentation was given BP believed that a
01:13  10   failure of the rupture disks was the most
       11   likely reason why the top kill failed,
       12   correct?
       13        MR. CASEY:  Objection to form.
       14        A.      Of these three scenarios, this
01:13  15   was the possible and plausible scenario.
       16        Q.      (BY MR. BARR)  So it's the most
       17   likely reason, correct?
       18        MR. DRAKE:  Objection; form.
       19        A.      Comparing these three, the most
01:13  20   likely, yes.
       21        Q.      (BY MR. BARR)  Okay.  Well,
       22   there weren't any other scenarios other than
       23   these three offered, right?
       24        MR. DRAKE:  Objection; form.
01:13  25        A.      That's correct.
```

```
 1          Q.      (BY MR. BARR)  So of the only

 2     scenarios offered, the one that was most

 3     likely was a rupture of the burst disks,

 4     correct?

 5          MR. DRAKE:  Objection; form.

 6          A.      That's correct.

 7          Q.      (BY MR. BARR)  We know today

 8     that the rupture disks did not fail, right?

 9          A.      We believed that we had wellbore

10     integrity whenever we did eventually use a

11     bullhead to kill the well.

12          Q.      You would agree with me -- well,

13     strike that.

14               BP would agree with me that

15     you -- that it knows today that failure of

16     the rupture disks was most likely not the

17     reason why the top kill failed, correct?

18          MR. DRAKE:  Objection; form and scope.

19          A.      In knowledge of the wellbore

20     integrity that we had with the eventual kill,

21     the rupture disks did not contribute to the

22     failure of the top kill effort.

23          Q.      (BY MR. BARR)  Okay.  So --

24          A.      What we know today, not on May

25     the 28th.
```

```
 1        Q.     What does BP believe today is
 2   the reason why the top kill failed?
 3        MR. DRAKE:  Objection; scope.
 4        A.     At the time of the -- the -- the
 5   effort we were using a momentum kill combined
 6   with -- with bridging material to bridge this
 7   off, and so today one would say that the --
 8   the top kill was unsuccessful because we
 9   couldn't restrict the size of the -- the leak
10   path --
11        Q.     (BY MR. BARR)  Does it --
12        A.     -- during that operation.
13        Q.     Does --
14        MR. DRAKE:  Let him finish his answers.
15        MR. BARR:  No, I was.  I didn't mean to
16   cut him off there.
17        Q.     (BY MR. BARR)  Does BP believe
18   today that the top kill failed because the
19   flow from the well was too high?
20        MR. DRAKE:  Objection; scope.
21        A.     That is a possible scenario as
22   to why it -- it did fail at that time.
23        Q.     (BY MR. BARR)  Sitting here
24   today as BP, do you know if BP believes that
25   is the most likely reason why the top kill
```

01:14  5
01:15 10
01:15 15
01:15 20
01:15 25

1   failed?

2           MR. DRAKE:  Same objection, scope.

3           MR. CASEY:  And form.

4           A.      The -- the -- the flow rate,

01:16   5   although not known at the time that all this

6   was occurring, as we have described

7   previously, anything above 15,000 barrels a

8   day in the modeling that had been done, said

9   that -- that it was going to be very

01:16  10   difficult, if not impossible, to use the

11   dynamic kill to kill this well.  And so the

12   answer to your question is is that flow rate

13   contributed to the success or the lack of

14   success for the top kill.

01:16  15           MR. BARR:  Okay.  Could I have one

16   second off the record?  We can keep the

17   videotape rolling.

18           (Off the record.)

19           Q.      (BY MR. BARR)  All right.  Would

01:17  20   you turn in your notebook to Tab 61?

21           MR. CASEY:  60 what?  Sorry.

22           MR. BARR:  61.

23           Q.      (BY MR. BARR)  I'm going to hand

24   you what's been previously marked as

01:17  25   Exhibit 9160.

203

```
         1              A.      Mr. Sprague was too.
         2              Q.      Did Mr. Sprague ever tell you,
         3      hey, one of the reasons top kill may not have
         4      worked is the well's flowing at too high a
01:21    5      rate?
         6              MR. CASEY:  Objection; form.
         7              A.      I don't recall Mr. Sprague
         8      telling me that.
         9              Q.      (BY MR. BARR)  Sitting here
01:21   10      today, if BP was ranking -- well, strike
        11      that.
        12              Let me ask you this way:  If BP
        13      was evaluating the most likely reason why the
        14      top kill failed today as compared to the
01:21   15      three scenarios offered and the 15,000 flow
        16      rate was the fourth scenario, which is
        17      more -- most likely?
        18              MR. DRAKE:  Objection; form.
        19              MR. CASEY:  Objection; form and scope.
01:22   20              A.      Today, knowing more that we
        21      know -- we know a lot today.  We know about
        22      the wellbore integrity.  We know from later
        23      production that came from the well that --
        24      that the production from the well was in
01:22   25      excess of -- of these numbers that were being
```

```
          1    estimated at that time.  And so a flow rate
          2    was a large contributing factor to the top
          3    kill and the ability of the top kill to be
          4    successful, yes, knowing that today.
01:22     5         Q.    (BY MR. BARR)  Today flow rate
          6    is much more likely to be the reason top kill
          7    failed than any of the three scenarios
          8    offered, correct?
          9         MR. CASEY:  Objection; form.
01:22    10         MR. DRAKE:  Objection to scope.
         11         MR. CASEY:  Form, scope.
         12         A.    The information that we have
         13    today, flow rate would have been a -- or is a
         14    most likely reason why top kill didn't --
01:23    15    wasn't successful.
         16         Q.    (BY MR. BARR)  And there are --
         17    you've seen now at least one communication
         18    where people within BP believed that at the
         19    time the top kill was ongoing, correct?
01:23    20         MR. CASEY:  Objection to form.
         21         MR. DRAKE:  Same objection.
         22         A.    What I know is -- is an opinion
         23    of an individual working on the team
         24    communicated to another individual working on
01:23    25    the team that he believed that flow rate was
```

|       |    |                                                |
|-------|----|------------------------------------------------|
|       | 1  | too high.  That's what I gather out of this    |
|       | 2  | text.                                          |
|       | 3  | Q.    (BY MR. BARR)  Okay.  So                  |
|       | 4  | certainly some people within BP at the time    |
| 01:23 | 5  | these three scenarios were presented believed  |
|       | 6  | that there is actually a fourth scenario that  |
|       | 7  | meant -- that said flow rate's too high,        |
|       | 8  | right?                                          |
|       | 9  | MR. DRAKE:  Objection; form.                    |
| 01:23 | 10 | MR. CASEY:  Objection to the form of            |
|       | 11 | that question.                                  |
|       | 12 | A.    What I know is is that an                 |
|       | 13 | engineer had an opinion, and his opinion was    |
|       | 14 | is is that the flow rate was too high and       |
| 01:24 | 15 | that that was stated on the 27th of May.        |
|       | 16 | Q.    (BY MR. BARR)  And he used the            |
|       | 17 | same 15,000, that Dr. Rygg offered to say the   |
|       | 18 | top kill cannot -- well, I'm sorry, the         |
|       | 19 | dynamic kill cannot work if the flow is more    |
| 01:24 | 20 | than 15,000, right?                             |
|       | 21 | MR. DRAKE:  Objection; form.                    |
|       | 22 | A.    He's quoting the same number,             |
|       | 23 | the 15,000.  Those numbers were simply flow     |
|       | 24 | analysis that was being done to determine the   |
| 01:24 | 25 | effectiveness of the -- the top kill.  And      |

```
 1    remember -- remember, when we say top kill,
 2    there's two pieces.  Two pieces is is the
 3    dynamic or momentum kill and then the
 4    bridging material.  And by getting bridging
 5    material in place you can affect that flow
 6    area and you can affect the ability to be
 7    able to kill the well.
 8         Q.    (BY MR. BARR)  Okay.  Did
 9    Mr. Mix talk about bridging material in his
10    text message?
11         A.    Three separate bridging material
12    pills.
13         Q.    So he's talking about that
14    infor- -- that -- he's talking about a junk
15    shot as well, isn't he?
16         MR. CASEY:  Objection to the form.
17         A.    He's referencing the --
18         MR. CASEY:  Objection to the form of
19    that question.
20         A.    (Continuing)  He's referencing
21    the bridging pills, yes.
22         Q.    (BY MR. BARR)  Okay.  So he's
23    considering that when he's making -- when
24    he's offering this text message, correct?
25         MR. DRAKE:  Objection; form.
```

01:25 appears at lines 5, 10, 15, 20, 25

207

```
         1              MR. CASEY:  Objection to form.
         2         A.    I don't know what Mr. Mix -- you
         3   know, this is a text between Mr. Mix and
         4   Mr. Sprague that I hadn't seen until today,
01:25    5   and so the words are is that we've pumped
         6   five separate bridging pills.
         7         Q.    (BY MR. BARR)  Okay.  But these
         8   are both employees of BP at the time of the
         9   top kill, right?
01:25   10         A.    They were both employees of BP.
        11         Q.    And so you as BP should be aware
        12   of what they're discussing, correct?
        13              MR. DRAKE:  Objection to form and
        14   scope.
01:25   15         A.    I -- I'm not aware of all the
        16   things that everybody writes down there, that
        17   everybody sends to everybody via text message
        18   or an e-mail.  I don't think BP expects for
        19   me to know all of the things that are texted
01:26   20   or that are e-mailed.
        21         Q.    (BY MR. BARR)  You don't think
        22   BP should be expected to know the most likely
        23   reason why the top kill failed?
        24              MR. CASEY:  Objection to form.
01:26   25              MR. DRAKE:  And objection to scope.
```

```
        1            A.    An engineering team of -- of --
        2   that was led by Paul Tooms looked at all the
        3   data and analyzed the data and prepared the
        4   presentation that we were reviewing here as
01:26   5   to the most likely reasons for failure.
        6            Q.    (BY MR. BARR)  And just missed
        7   the actual most likely reason?
        8            MR. CASEY:  Objection to form.
        9            MR. DRAKE:  And scope.
01:26  10            A.    Knowing where we are today, more
       11   information coming in, then they did miss;
       12   but at the time this occurred they believed
       13   that to be true.
       14            Q.    (BY MR. BARR)  But they were
01:26  15   told prior to the top kill that it won't --
       16   the dynamic kill won't work at more than
       17   15,000.  That's not new information, is it?
       18            MR. DRAKE:  Objection; form.
       19            MR. CASEY:  Yeah, objection to form.
01:27  20            A.    No, that's not new information.
       21   But you didn't know what the flow rate was.
       22            Q.    (BY MR. BARR)  So BP just didn't
       23   account for that in the scenarios?
       24            MR. DRAKE:  Objection; form.
01:27  25            A.    Yeah, the -- that was not
```

```
         1    included in the scenarios.
         2         Q.    (BY MR. BARR)  And as a result
         3    of what BP offered at the time as the most
         4    likely reason, the BOP on BOP option was
01:27    5    removed as an option, correct?
         6         MR. DRAKE:  Objection; form.
         7         A.    Yes, that was -- that's correct.
         8         Q.    (BY MR. BARR)  If BP had said
         9    the most likely reason is the flow of oil
01:27   10    from the well, do you believe as BP today
        11    that the BOP on BOP option would have still
        12    been available?
        13         MR. DRAKE:  Objection; form and scope.
        14         A.    We didn't know that at the time.
01:28   15    We were still concerned about the maximum
        16    shut-in pressures and the impact on the --
        17    the integrity of the well with the BOP on
        18    BOP, and the concern being that we could
        19    create broaching with that.
01:28   20         Q.    (BY MR. BARR)  Okay.  But you
        21    could create broaching with the dynamic kill
        22    as well, correct?
        23         A.    The dynamic kill, when
        24    implemented, by managing the pressures, which
01:28   25    were managed as -- as we were doing the
```

01-41295
PW/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG          )          MDL NO.  2179
"DEEPWATER HORIZON" in the               )
GULF OF MEXICO, on                       )          SECTION: J
APRIL 20, 2010                           )
                                         )          JUDGE BARBIER
                                         )
                                         )          MAG. JUDGE SHUSHAN

## *CONFIDENTIAL*

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



## Charles Holt
### VOLUME 2

NOVEMBER 29, 2012

## *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

|     |                                                      |
|-----|------------------------------------------------------|
| 1   | didn't end up working, did it?                       |
| 2   | A.    No, the bridging material did                  |
| 3   | not have a large impact on the -- on the --          |
| 4   | where we placed it on the -- in the flow.            |
| 02:21 5 | Q.    So theoretically that could                |
| 6   | work, but in this given situation wouldn't           |
| 7   | knowing the flow rate be helpful to designing        |
| 8   | the top kill?  That's all I'm asking.                |
| 9   | MR. CASEY:  Objection to form.                       |
| 02:21 10 | MR. DRAKE:  Same objection.                     |
| 11  | A.    The -- the flow rate is a --                   |
| 12  | a -- a -- what potentially is coming out of          |
| 13  | the well.  The knowledge of that would --            |
| 14  | would contribute to the -- the -- the success        |
| 02:21 15 | or how effective that would be.  We --  but      |
| 16  | again, we always -- we always looked at it --        |
| 17  | we said, yes, the bridging material did not          |
| 18  | work, but we didn't know that to begin with.         |
| 19  | What we didn't know is is you'll see a term          |
| 02:21 20 | also in documents called an orifice size.        |
| 21  | But what we didn't know is is how big the            |
| 22  | area this was flowing through.  And so by            |
| 23  | using bridge material, we could shrink the          |
| 24  | size of that.                                        |
| 02:22 25 | Q.    (BY MS. STRIPPOLI)  So would you           |

248

```
 1    agree with me that flow rate does impact top
 2    kill?
 3          A.    Yeah, flow rate does impact top
 4    kill.
 5          Q.    And that flow rate is relevant
 6    to top kill?
 7          MR. CASEY:  Objection to form.
 8          MR. DRAKE:  Same objection.
 9          A.    Flow rate is relative to top
10    kill from a dynamic kill scenario.
11          Q.    (BY MS. STRIPPOLI)  So you're
12    saying that flow rate isn't relevant to top
13    kill?
14          MR. CASEY:  Objection to form.
15          MR. DRAKE:  Same objection.  I'm just
16    stuck on the word "relevant," I think.
17          A.    Yeah, I'm in a place where
18    it's -- you know, if you can impact that flow
19    rate, then the flow rate doesn't have the
20    same relevance.  Now, we were not able to do
21    that.  That was -- that's not what occurred.
22    But our -- in our efforts that was what our
23    plan was.  And I say "our plan."  Our plan
24    was to be able to go bridge some of the flow
25    area, if necessary, because we didn't know
```

```
         1    e-mail with some context in it.
         2            Q.      (BY MS. STRIPPOLI)  If you turn
         3    back to the page that says, "Source Control -
         4    Forward Plan" - 9th of May, do you see that?
02:35    5            A.      I do.
         6            Q.      And the second bullet point down
         7    with the first dash, it says, "Reprioritises
         8    'Junk Shot/Top Kill/Cement option."  Do you
         9    see that?
02:35   10            A.      I do.
        11            Q.      Does that refresh your
        12    recollection of when top kill was
        13    re-prioritized over BOP on BOP?
        14            A.      It appears here that on May the
02:35   15    9th that was when at least this group was --
        16    was re-prioritizing that, yes.
        17            Q.      Okay.  And then can you go down
        18    to point 2, it says, "Junk Shot/Top
        19    Kill/Cement - Preferred Option"; do you see
02:35   20    that?
        21            A.      I see that, yes.
        22            Q.      And then the bullet beneath that
        23    says, "Preferred Option - plan prioritised
        24    accordingly"?
02:36   25            A.      Uh-huh, I see that.
```

```
 1              MR. CASEY:  Objection to form.
 2              MR. DRAKE:  Same objection.
 3         A.       No, sir, the exact date with the
 4    documents that are here was generally in this
04:10 5    time frame, but the exact date and that
 6    conversation, I don't have recollection of.
 7         Q.       (BY MR. MAZE)  Was that decision
 8    made by Doug Suttles?
 9              MR. DRAKE:  Objection; form.
04:11 10         A.       All the decisions that were made
11    before we move things forward -- and I say
12    "decisions" -- before we moved anything
13    forward was reviewed with and -- and approved
14    by the Unified Command, and so Doug Suttles
04:11 15    would have been included in that along with
16    Admiral Landry and others, in a conversation
17    of some sort.  I was not party to those
18    conversations.
19         Q.       (BY MR. MAZE)  But it was BP who
04:11 20    made the primary recommendation to choose top
21    kill over BOP on BOP, correct?
22         A.       The engineering was being worked
23    by BP and then brought forth as
24    recommendations to Unified Command.
04:11 25         Q.       Did you speak with Mark Patteson
```

```
        1    don't know.  I don't know what the -- all of
        2    those that were there.  But those gentlemen
        3    were a part of the leadership of BP that were
        4    reviewing recommendations that were coming
08:42   5    from -- from the teams.
        6         Q.     And it's your understanding,
        7    though, that the BOP on BOP option at that
        8    time was discontinued because of the risk of
        9    breach of formation, right?
08:42  10         MR. DRAKE:  Objection; form.
       11         A.     Yes, sir, my -- my -- my
       12    understanding of that was that we were
       13    concerned about the integrity of the --
       14    the -- the wellbore and that based upon data
08:43  15    analyzed from the top kill, that we did not
       16    have full integrity and that BOP on BOP could
       17    make the situation worse.
       18         Q.     (BY MR. BAAY)  Mr. Holt, you
       19    understand and agree that the risk of breach
08:43  20    to the formation existed not only with the
       21    BOP on BOP, but existed with the 3 ram
       22    capping stack, didn't it?
       23         MR. CASEY:  Objection to form.
       24         MR. DRAKE:  Objection to form and
08:43  25    scope.
```

```
        1   I said.  I didn't write these words, but,
        2   yes, sir.
        3          Q.     Right.  Someone was taking
        4   notes.  You spoke some words and -- and
08:59   5   they -- they shorthanded what you were
        6   saying?
        7          A.     That's what it appears, yes.
        8          Q.     What you and others in the
        9   meeting were saying; is that right?
08:59  10          A.     Yes, sir.
       11          Q.     Okay.  And you made the comment
       12   here that "the 'BOP on BOP' story should gain
       13   traction and exposure...may become Critical
       14   Path soon."  Do you recall making those
08:59  15   statements?
       16          A.     Yes, sir, we were considering a
       17   number of options during that time frame and
       18   as we were considering those, BOP on BOP
       19   was -- was in that mix.
08:59  20          Q.     So it's fair to say that as of
       21   May 5th, 2010 you felt optimistic about the
       22   BOP on BOP option?
       23          MR. DRAKE:  Objection; form.
       24          A.     Yes, sir, in that time frame and
08:59  25   with the information that we had, that was
```

1    one of the -- as I've identified here, one of

2    the front runner options.

3         Q.    (BY MR. BAAY)  If you remember,

4    what at the time was giving you a sense of

09:00  5    encouragement about that as an option to

6    accomplish your mission of stopping the flow?

7         MR. DRAKE:  Objection; form.

8         A.    Well, at that time we -- we were

9    still early in trying to figure out where --

09:00 10    which -- which option was -- was -- was going

11    to be a front runner and -- and at that time,

12    we were -- we were still analyzing and

13    identifying, you know, what would we do that

14    wouldn't make it worse.

09:00 15         Q.    (BY MR. BAAY)  Right.  My

16    question, though, is specifically what gave

17    you a sense of encouragement about the BOP on

18    BOP as an option?

19         A.    Sir, I don't --

09:00 20         MR. DRAKE:  Objection; form.

21         A.    (Continuing)  Sir, I don't

22    recall that at that time as to what that was.

23    That was -- that was just a communication to

24    the team that, hey, guess what, guys, you

09:00 25    know, we need to continue to -- to work this

1    testified yesterday that the Enterprise was

2    pulled for containment options.

3         A.    Yes, it was.  But I'm just --

4    I'm saying with this e-mail here, because in

09:07   5    the conversation with -- with the -- as

6    options were being looked at, because the

7    Enterprise was the only vessel in the field

8    that was handy at that time, "handy," meaning

9    immediately on location to be able to produce

09:07  10    hydrocarbons, a decision was made to use it

11    to capture initially with the RIT tool, later

12    with the top hats.

13         Q.    Okay.  So if Andy Inglis made

14    the decision or someone else within BP,

09:08  15    you're not disputing the fact that as of

16    May 11th, the Enterprise was pulled and was

17    no longer used for the BOP on BOP option?

18         MR. CASEY:  Objection to form.

19         A.    In that time frame, which --

09:08  20    which -- which is -- is indicated by this

21    e-mail, decisions were being made where --

22    where vessels were going to be used, yes,

23    sir.

24         Q.    (BY MR. BAAY)  I'm asking you

09:08  25    specifically about the decision for the

```
         1   Enterprise, Mr. Holt.  Was the decision made
         2   as of May 11th for the Enterprise BOP on --
         3   for the Enterprise rig to be used for
         4   containment?
09:08    5         MR. DRAKE:  Objection; scope.
         6         A.    In that time frame, I -- this
         7   e-mail from Jim Wellings indicates that, yes.
         8         Q.    (BY MR. BAAY)  And because it
         9   was pulled for containment, it's fair to
09:08   10   assume that it was no longer available to be
        11   sourced for the BOP on BO -- BOP option?
        12         A.    Yes, sir, that's correct.
        13         Q.    And you would agree that that
        14   decision obviously delayed how quickly the
09:09   15   BOP on BOP could have been deployed, didn't
        16   it?
        17         MR. DRAKE:  Objection; form.
        18         A.    I -- with regard to the -- the
        19   preparedness of the Enterprise BOP stack, as
09:09   20   I recall sitting here today, when we were
        21   working up the Enterprise BOP stack, there
        22   were still a number of -- of maintenance and
        23   tests that still needed to be done with that
        24   stack.  We were not ready to splash that
09:09   25   stack during this time.
```

```
       1    was applied as to what those risks would
       2    imply.
       3           Q.      (BY MR. BAAY)  Did you testify
       4    yesterday, Mr. Holt, that BP determined that
09:50  5    the risk of broach was greater with the BOP
       6    on BOP option than it was with top kill?
       7           A.      I believe my words yesterday
       8    were that -- that we were going to be able to
       9    manage the pressures, which would reduce the
09:51 10    risk to broach with the top kill versus the
      11    BOP on BOP is what I said.
      12           Q.      Does BP believe that the risk of
      13    broach pre-top kill was greater with the BOP
      14    on BOP option than it was for the top kill?
09:51 15           MR. DRAKE:  Objection; form.
      16           A.      Yes, as I recall, that would
      17    have been part of the conversation and -- and
      18    the discussion.
      19           Q.      (BY MR. BAAY)  What analysis is
09:51 20    that based on?
      21           A.      That's based upon the surface
      22    pressures or the pressures at the BOP stack
      23    and how those pressures are being managed.
      24           Q.      Okay.  What document did you see
09:51 25    that drew the conclusion that the BOP on BOP
```

```
       1    option presented a greater risk of broach
       2    than did top kill?
       3            MR. CASEY:  Objection to form.
       4            MR. DRAKE:  Same objection.
09:52  5            Q.     (BY MR. BAAY)  Or who did you
       6    talk to that said that?
       7            MR. CASEY:  Same objection.
       8            MR. DRAKE:  Same objection.
       9            A.     There were engineering teams
09:52 10    that were generating shut-in numbers, that
      11    were generating modeled values for in the
      12    event that the well was -- was shut-in, what
      13    the surface pressures might be depending upon
      14    the various scenarios.  And -- and so those
09:52 15    analysis -- and I don't recall which ones
      16    where, by who were being incorporated into
      17    the decision-making.
      18            Q.     (BY MR. BAAY)  So if I'm
      19    understanding, you can't recall any specific
09:52 20    document or conversation that confirmed that
      21    the BOP on BOP option presented a greater
      22    risk of broach than did top kill?
      23            MR. DRAKE:  Objection; form.
      24            A.     Can I go to my reference
09:53 25    material here?
```

481

```
 1    was a number that was on the order of 5,000
 2    barrels a day that Unified Command had
 3    communicated, is what I recall.
 4         Q.    (BY MR. BAAY)  Mr. Holt, didn't
10:34   5    you just tell me that flow rate was
 6    considered by BP when engaging in the first
 7    dynamic kill?
 8         MR. DRAKE:  Objection; form.
 9         MR. CASEY:  Objection to form.
10:34  10         Q.    (BY MR. BAAY)  Did you say that
11    or not?
12         A.    Some estimations of flow rate
13    based upon various scenarios were generated
14    by Add Energy.
10:35  15         Q.    And what estimates was BP
16    relying on?  What was the number?
17         MR. DRAKE:  Objection; form.
18         A.    5,000 barrels a day.
19         Q.    (BY MR. BAAY)  And that was
10:35  20    based off whose model?
21         MR. CASEY:  Objection; form.
22         MR. DRAKE:  Objection; form.
23         Q.    (BY MR. BAAY)  Or whose
24    estimate?
10:35  25         MR. DRAKE:  Objection to form.
```

```
 1              MR. DRAKE:  Objection; form.
 2         A.      The concepts of these are -- are
 3     the same.
 4         Q.      (BY MR. BARR)  Okay.  Do you
 5     know why BP elected not to do that?
 6              MR. CASEY:  Object to form.
 7              MR. DRAKE:  Objection; form.
 8         A.      At the time that this was all
 9     taking place all ideas and suggestions were
10     being considered and discussed and reviewed,
11     and the decision at the time of during the
12     middle of May was that the -- the next option
13     for us was to go with the top kill.
14              MR. KRAUS:  Objection; responsiveness.
15              MR. PRESCOTT SMITH:  Same.
16         Q.      (BY MR. BARR)  I asked why -- do
17     you know why BP elected not to pursue what
18     Mr. Fleece was proposing?
19         A.      And I responded, as I will
20     respond again, that all considerations were
21     brought into the room and -- and -- and
22     discussed and -- and -- and this -- this
23     recommendation wasn't taken forward because
24     of -- and I don't recall what all the reasons
25     were at that time.
```

# Exhibit 51

Depo Ex. No. 8522 –

Charles Holt

Filed Under Seal

# Exhibit 52

Depo Ex. No. 10516 -

Charles Holt

Filed Under Seal

# Exhibit 53

Depo Ex. No. 4405

Charles Holt

Under Seal

01-40982
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG          )          MDL NO.  2179
"DEEPWATER HORIZON" in the               )
GULF OF MEXICO, on                       )          SECTION: J
APRIL 20, 2010                           )
                                         )          JUDGE BARBIER
                                         )
                                         )          MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW* ™
### **Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# **Robert Joseph Turlak**
## **VOLUME 2**

NOVEMBER 7, 2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1          Q.  And Eddy Redd was copied on that E-mail,

2     correct?

3          A.  Yes, sir.

4          Q.  And that E-mail is dated Monday, May 3rd,

5     and the "Subject" line is "Plumbing error on the

6     Horizon stack (!?)"  Do you see that, sir?

7          A.  Yes, sir.

8          Q.  And I'll just read the E-mail out loud:

9     "Adrian, Larry,

10              "Just tried to get hold of you on your

11    respective mobiles: no success.  FYI, it seems

12    that we may have the ROV stab" (supposed to be

13    lined-up" with -- "(supposed to be lined-up to

14    the pipe rams) lined" -- "lined-up to the test

15    rams.  We are trying to confirm, but it looks

16    like it is really plumbed wrong.

17              "BP is ballistic....  Rightly so...  I am

18    flabbergasted.  Asked Eddy to urgently talk" to

19    "one of our" Hous -- excuse me -- "one of our

20    Horizon subseas, and" have him help -- "have him

21    coming to help us understanding this troubling

22    situation.  Gary Leach is trying to work on a

23    confirmation of the situation.

24              "Best regards, Arnaud."

25              Did I read all of that correctly?

```
 1        A.  Yes, sir.
 2        Q.  And is that -- is that consistent with
 3   what you testified to yesterday, that -- that
 4   there was a plumbing error that -- that existed
 5   on the BOP that didn't show up in the schematic
 6   drawing?
 7        A.  Yes, sir.
 8        Q.  Still on the topic of the BOP, but not
 9   looking at that particular exhibit -- and we're
10   going to go back to the Notice and look at Topic
11   No. 5 to make sure we're on the same page with
12   this subject matter.  Topic 5 of Exhibit 9986,
13   Binder Ex -- Tab No. 2.
14        A.  Oh.
15        Q.  Okay.  Topic 5, if you could read through
16   that:  "Your...condition" of the kno --
17   "condition and plumbing of the Deepwater Horizon
18   blow-out preventer prior to the incident on April
19   20, 2010..." and I'll -- I'll stop there.  So
20   we're talking about the condition and plumbing of
21   the DEEPWATER HORIZON blowout preventer.
22             What is -- on -- on a BOP or LMRP, do you
23   know what a pressure transmitter's function is, a
24   PT?
25        A.  Pressure transmitter?
```

```
 1        Q.   (By Mr. Haycraft) Okay.  And would you --
 2   would you -- wou -- would Transocean agree that
 3   both John MacKay and Iain Sneddon were working as
 4   a Team with Jim Wellings and the other folks to
 5   implement a solution that had both contingency
 6   and redundancy at that point in time?
 7             MR. BAAY:  Object to form.
 8             And I'll just state on the record that
 9   he's not here to answer as Transocean on those
10   kind of questions.  He's here to answer on
11   Transocean's knowledge and information related to
12   the Topics that he's designated for.
13             MR. HAYCRAFT:  What kind of
14   question?
15             MR. BAAY:  The question you just
16   asked.
17             MR. HAYCRAFT:  I just -- for my own
18   benefit, I was wondering what kind of a
19   question --
20             MR. BAAY:  Well, you asked --
21             MR. HAYCRAFT:  -- it was.
22             MR. BAAY:  -- him a question about a
23   May 11th Meeting Minutes, and you said:  "Is
24   Transocean's -- would Transocean agree that both
25   John MacKay and Iain Sneddon were working?"
```

```
 1    concerned with information they received from

 2    the -- from the top kill that the rupture disk

 3    was going to rupture, and then a period of time

 4    later, we actually landing -- landed a capping

 5    stack on that actually sealed the well, I

 6    don't -- don't know what changed between then,

 7    those two times.

 8         I mean, they -- they said based on the

 9    information they received, that we'll never put a

10    BOP on top of it, and then sometimes later, we

11    wound up -- wound up closing the well in.

12         Q.  (By Mr. Baay) Have you since learned

13    whether or not it was accurate to say that the

14    top kill procedure ruptured the burst disks?

15              MR. HAYCRAFT:  Same.

16              MS. HANKEY:  Objection, form.

17         A.  Well, it didn't, because we wound up

18    using a BOP on a -- on -- on the -- on the well

19    and shut it in, pressure increased, and the

20    rupture disks didn't cause an underground

21    blowout.

22         Q.  (By Mr. Baay) Do you know, in your

23    personal capacity, whether the BOP-on-BOP

24    presented the same risks of broaching the

25    formation as did the three-ram capping stack?
```

```
1                 MR. HAYCRAFT:  Objection, form.
2                 MS. HANKEY:  Objection, form.
3           A.  Well, the same opportunity for venting
4      for in -- in the event it -- there was concern
5      about shutting in the BOP, the same opportunity
6      for venting could have been used on the
7      BOP-on-BOP as the capping stack.
8           Q.  (By Mr. Baay) Did both devices, both
9      source -- Source Control methods, present the
10     same risk of potentially broaching the formation?
11                MR. HAYCRAFT:  Objection, form.
12                MS. HANKEY:  Objection, form.
13          A.  Yes.
14          Q.  (By Mr. Baay) Did it -- does it make
15     sense to you that the BOP-on-BOP was abandoned in
16     place of the capping stack, considering that they
17     both -- they both present the same risk?
18                MR. HAYCRAFT:  Objection, form.
19                MS. HANKEY:  Objection, form.
20          A.  Ask that question again, please.
21          Q.  (By Mr. Baay) Sure.  You've agreed that
22     the BOP-on-BOP presents the same risk of
23     broaching the formation as does a three-ram
24     capping stack?
25                MR. HAYCRAFT:  Same.
```

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG    )    MDL NO. 2179
"DEEPWATER HORIZON" in the    )
GULF OF MEXICO, on    )    SECTION: J
APRIL 20, 2010    )
    )    JUDGE BARBIER
    )
    )    MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW*™
### **Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# **Geoff Boughton**

**VOLUME 1**

JULY 20, 2011

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing
**For U.S. & International Services**
**800 - 745 - 1101**

1          Q.   For the Enterprise.   What do you

2    mean by that?

3          A.   All the equipment was ready.   The

4    connector was on and tested.   We could

5    have had the BOP down there the middle of

6    May, 15th of May.   The slings and the

7    things we needed to recover the LMRP --

8    because that was the plan, to pull off the

9    LMRP and set it on the seabed.   That --

10   that was all ready -- ready to go.

11         Q.   And so you think you could have

12   capped the -- the well mid-May?

13         A.   Yes.

14         Q.   You mentioned a capping team?

15         A.   Yes.

16         Q.   Who was on the capping team?

17         A.   From our guys, it was Ian Sneddon

18   and John Macay, who I mentioned John a

19   minute ago.   He's -- and later, a fellow

20   named Dave Cameron.

21              Dave came to relieve Ian and

22   John, who had been over for like six weeks

23   before they went back home for a rest,

24   because it was very stressful during that

25   time.

# Exhibit 56

Depo Ex. No. 10530 –

Charles Holt

Filed Under Seal

# Exhibit 57

Depo Ex. No. 8542 –

Charles Holt

Filed Under Seal

# Sub Sea Capping Stack

## April 28, 2010



5385

Exhibit No. ____
Worldwide Court
Reporters, Inc.

CONFIDENTIAL

# Timeline – SubSea Capping Stack

| Activity | BP Approved? | April 29 | 30 | 1 | 2 | 3 | May 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capping | No | | | | | | | | | | | | | | | | | | |
| Prepare procedure | | | | | | | | | | | | | | | | | | | |
| HAZID | | | | | | | | | | | | | | | | | | | |
| Approve procedure | | | | | | | | | | | | | | | | | | | |
| Locate and secure equipment | | | | | | | | | | | | | | | | | | | |
| Modify Enterprise BOP | | | | | | | | | | | | | | | | | | | |
| Modify Enterprise Riser joint | | | | | | | | | | | | | | | | | | | |
| *Execute Job* | | | | | | | | | | | | | | | | | | | |
| Move Enterprise to location | | | | | | | | | | | | | | | | | | | |
| Cut riser | | | | | | | | | | | | | | | | | | | |
| Remove LMRP | | | | | | | | | | | | | | | | | | | |
| Run BOP and riser | | | | | | | | | | | | | | | | | | | |
| Latch up to Horizon BOP | | | | | | | | | | | | | | | | | | | |
| Close Rams.  Well secure. | | | | | | | | | | | | | | | | | | | |

pending equipment availability

2

CONFIDENTIAL

3

# Initial conditions

- Cut Riser above existing LMRP

- Disconnect LMRP from the Horizon BOP stack with ROV



Cut line #1

Disconnect

Existing LMRP

Existing BOP

CONFIDENTIAL

# Deploying Stack



CONFIDENTIAL

# Deploying Stack

- Enterprise BOP and LMRP with perforated riser joint and **blanked off** riser to surface.



CONFIDENTIAL

TRN-MDL-00799224

6

# Deploying Stack

- Enterprise BOP and LMRP with perforated riser joint and **blanked off** riser to surface.

- Blind flange diverts all flow out of the riser,

- **No wellbore fluids will be taken to the Enterprise**



21" Riser

Blind

Perforated
Riser Joint

Enterprise
LMRP

Enterprise
BOP

Existing
BOP

CONFIDENTIAL

TRN-MDL-00799225

# Deploying Stack

- Enterprise BOP and LMRP with perforated riser joint and **blanked off** riser to surface.

- Blind flange diverts all flow out of the riser,

- **No wellbore fluids will be taken to the Enterprise**



21" Riser

Blind

Perforated Riser Joint

Enterprise LMRP

Enterprise BOP

Existing BOP

7

CONFIDENTIAL



# Deploying Stack

Peforation above the blind flange to allow riser to fill while running, and drain while pulling

21" Riser

Blind

Perforated Riser Joint

Enterprise LMRP

Enterprise BOP

Existing BOP

8

CONFIDENTIAL

9

# Deploying Stack

- The internal area of the riser is 283.5 sq in

- 91, 2" OD holes drilled into 30' of riser provides the same flow area

- Removes ~1.5% of the surface area from the 30' section of riser

- 2" holes are 16" center-to-center
  - 23 rows, 4 holes per row



21" Riser

Blind

Perforated Riser Joint

Enterprise LMRP

Enterprise BOP

Existing BOP

CONFIDENTIAL

# Concerns

- Stack analysis:
  - Will the Horizon stack support the additional weight of the Enterprise BOP?
  - Address this by minimizing the watch circle.
  - Disconnect at 2 degrees lower ball joint angle
- Surface Plume
  - Do not want to move over the well if the plume is directed straight up
  - Wait for current to take the flow away

10

CONFIDENTIAL

TRN-MDL-00799229



## Stack Comparison

Enterprise Stack – 42.48' to top of LMRP

Horizon Stack – 52.63' to top of LMRP; ~22.57' to top of BOP

CONFIDENTIAL



CONFIDENTIAL

TRN-MDL-00799231

13

~4.5'
SHORTER
than existing
hook up

Combined Stack ~ 48.28' to top of BOP

Horizon Stack ~ 52.63' to top of LMRP

~22.57' to top of BOP

Enterprise Stack ~ 23.71' to top of BOP



CONFIDENTIAL

TRN-MDL-00799232

# Procedure

- Land stack.  Close Enterprise blind shear rams.

- Release LMRP.  Leave shut in while drilling relief wells.

OR

- Pump kill fluids down choke and kill into well.
  Bullhead kill the well.

*Never allow open riser above the Horizon BOP.*
*Keep blind flange in place.*

14

CONFIDENTIAL

TRN-MDL-00799233

# Why not kill immediately?

- Well is secured and pollution stopped, kill operations may result in broaching

- DP event mid-way through kill (unlikely)

15

CONFIDENTIAL

16

# Backup

CONFIDENTIAL

TRN-MDL-00799235

17

- Path illustrating flow line kill



TRN-MDL-00799236

# Watch Circle – Relative to Lower Ball Joint Angle



Green: 0 to 2 degrees
Good to operate

Yellow: 2 to 4 degrees
Caution – prepare to disconnect

Red: Greater than 4 degrees
Need to disconnect prior to damaging subsea equipment

18

CONFIDENTIAL

TRN-MDL-00799237

# Watch Circle – Relative to Lower Ball Joint Angle



Green: 0 to 2 degrees
Good to operate

Yellow: 2 to 4 degrees
Caution – prepare to
disconnect

Red: Greater than 4 degrees
Need to disconnect prior to
damaging subsea equipment

Waterline

Seafloor

19

CONFIDENTIAL

TRN-MDL-00799238

# Watch Circle Size Relative to Water Depth



Waterline

Green in 6,000' of water:
0 to 2 degrees
419' across

Green in 3,000' of water: 0
to 2 degrees
208' across

Seafloor

20

CONFIDENTIAL

TRN-MDL-00799239

# Exhibit 59

Depo Ex. No. 10505 -

Charles Holt

Filed Under Seal

01-41513
TB/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG      )        MDL NO.  2179
"DEEPWATER HORIZON" in the           )
GULF OF MEXICO, on                   )        SECTION: J
APRIL 20, 2010                       )
                                     )        JUDGE BARBIER
                                     )
                                     )        MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW* ™
### **Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# **David McWhorter**
**VOLUME 2**

NOVEMBER 16,  2012

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

```
1              A.      Absolutely.

2              Q.      -- part of what BP did?

3              A.      That's right.

4              Q.      Okay.  If we can turn to the --

5      the Bates label BP-HZN-2179MDL01793909.  It's

6      about three pages in.  And I'm looking at the

7      second bullet point on that page, which is

8      titled Overall Feedback, BOP on BOP and Ram

9      Valve on Flex Joint.

10                       Do you see that?

11             A.      I do.

12             Q.      And the second bullet point

13     states, key risks had all been identified - no

14     significant additional risks identified by

15     review team.

16                       Do you see that?

17             A.      I do.

18             Q.      And the fourth bullet states,

19     review team believes that the BOP-on-BOP

20     operation is feasible and can be managed

21     safely.

22                       Do you see that?

23             A.      I do.

24             Q.      Does Cameron agree that as of the

25     middle of May 2010, the BOP-on-BOP operation
```

```
1        was feasible and could be managed safely?
2                    MR. COLLIER:  Objection, form.
3              A.    We -- we -- we definitely believe
4        it was feasible because for the -- the reasons
5        I mentioned earlier.  It's a -- it's a matter
6        of a simple connection, simple physics, as far
7        as connecting the BOP on top of the -- the
8        HORIZON BOP.
9              Q.    Sure.
10             A.    And assuming that the BOP that you
11       latch up is a fully-functioning BOP, you
12       should be -- you should be in good shape to
13       control the well, all other things considered.
14             Q.    Who is Stuart Nelson?
15             A.    Stuart Nelson at the time, I
16       believe, was the president of the flow control
17       division for Cameron, flow control division
18       being the division that manufactures chokes,
19       choke manifolds.
20             Q.    What does the flow control
21       division do other than manufacturing choke
22       valves?
23             A.    Well, that's their -- that's their
24       primary product, as the name would imply, flow
25       control, so any -- any products that have to
```

1          Q.     Transocean sourced equipment, we

2      mentioned that, and provided some equipment to

3      Cameron to get the capping stack ready,

4      correct?

5          A.     They did.

6          Q.     And do you have any knowledge of

7      whether Transocean was involved in the design

8      of the capping stack?

9          A.     I -- I believe they were, yes.

10         Q.     And was that something that was

11     off the shelf, or was -- did that take time

12     and effort of, you know, Transocean to get

13     that ready?

14         A.     The design of the stack, I

15     think -- I think it took some -- some time and

16     effort.

17         Q.     But as far as you know, Transocean

18     had the same commitment that Cameron did to

19     get this ready to go?

20         A.     Absolutely.

21         Q.     The -- the BOP on BOP, is it fair

22     to say that from Cameron's perspective that

23     could have been implemented May 2010?

24             MR. COLLIER:  Objection, form.

25         A.     I think that -- that if you're

1    talking about just the time to execute an

2    option, that it would -- it was our opinion at

3    the time, that that was the -- that was the

4    quickest option.  That was the quickest.  The

5    equipment was -- was there.  It was on

6    station.  The modification was -- was minimal.

7                    But there were some

8    significant logistical issues to overcome as,

9    well.  Had to remove the LMRP, had to remove

10   the riser.  Once again, from our perspective,

11   from an equipment perspective, it was all

12   there.  There are other considerations,

13   undoubtedly, some of which we talked about

14   yesterday, that -- that -- you know, that are

15   outside of our knowledge and scope.

16        Q.    Sure.

17                    And in terms of a -- a

18   capping stack, once you had the equipment,

19   that was something Cameron could have put

20   together quickly?

21            MR. COLLIER:  Objection, form.

22        A.    It can and did, yes.

23        Q.    Had -- had BP not elected to go

24   with a top kill, a capping stack could have

25   been deployed in May, as well?

# Exhibit 61

Bates Number

ANA-MDL-000230538Filed
Under Seal

# Exhibit 62

Depo Ex. No. 10528 -

Charles Holt

Filed Under Seal

# ANALYSIS OF WELL CONTAINMENT AND CONTROL ATTEMPTS IN THE AFTERMATH OF THE DEEPWATER BLOWOUT IN MC252

## FINAL REPORT

Submitted to: The National Commission on the BP
Deepwater Horizon Oil Spill and Offshore Drilling

Submitted by:

Mayank Tyagi, PhD.
John Rogers Smith, PhD., P.E.
Darryl A. Bourgoyne, MS.
Craft & Hawkins Department of Petroleum Engineering
Louisiana State University
Baton Rouge, LA 70803

January 11, 2011

*10543*

Exhibit No. ———
Worldwide Court
Reporters, Inc.

All findings, opinions, statements, and recommendations contained in this report are solely those of its authors. The report has been submitted to the staff of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, but the report is not the work product of the Commission or its staff, and should not be construed in any respect as the official or unofficial findings, opinions, statements, or recommendations of the Commission or its staff.

## EXECUTIVE SUMMARY

An analysis of the following well containment and control attempts in response to the Macondo blowout is performed in chronological order: containment dome, top kill, capping stack, and static kill. This report's primary objective is to document and critique the actions taken and their results and to identify the key lessons learned from this landmark experience that are relevant to minimizing the impact of any future deepwater blowouts. Secondary objectives are to explain the successes and failures or mistakes, identify additional alternatives or adaptations that might have been relevant, and consider possible improvements in the methods used or decisions made.

Identification of strengths, weaknesses, opportunities, and threats is attempted for each containment option. The following questions are considered in identifying these factors:

1. *How effective was the containment attempt in terms of rate of capture and percentage captured, or success in stopping or sealing the blowout?*
2. *What risks were imposed?*
3. *What opportunities were potentially offered by a containment option beyond its intended purpose?*
4. *What threats to the operation were created by a particular response?*

Major findings of this report are as follows:

1. *The cofferdam failed due to buoyancy from lighter hydrocarbons trapped inside the dome after hydrates plugged the flow path. As designed, it would not have worked even absent hydrate blockage given the well's flow rate and fluid properties. The cofferdam approach requires further development for application to irregular leak sources that preclude use of a sealing connection.*
2. *The top kill apparently failed due to the limited flow-rate capacity design of the mud pumping system. There would have been a reasonable chance of success if the kill fluid was pumped at rates higher than 109 barrels per minute; albeit, such rates would have increased risks to blowout preventer stack integrity.*
3. *Removal of the riser to allow a sealed connection for collecting and/or stopping the flow should have been given stronger consideration for early implementation versus the non-sealing attempts at collection from the riser leaks.*
4. *A capping stack with direct vertical access well intervention capabilities is the most desirable containment mechanism when the potential exists to latch and seal it to the well.*
5. *The post bullhead (static) kill cement job should have been deferred until more certain control of the flow path, cement placement, and cement evaluation were possible. Use of a bridge plug or storm packer to allow blowout preventer replacement before cementing would have been more pragmatic.*
6. *The current practices for intermediate casing design, which do not require accounting for the maximum loads corresponding to shutting-in a blowout, should be re-evaluated in light of the risks involved in each particular case.*

1

## INTRODUCTION

An analysis of selected Macondo well containment and control attempts is performed: The containment dome, top kill, capping stack, and static kill operations are reviewed in chronological order. Appendix A provides the Macondo well schematic used for the calculations involved in this study. This analysis aims to identify the key lessons learned that may be relevant to minimizing the impact of any future deepwater blowouts. Apart from explaining the successes and failures (or mistakes) and documenting relevant alternative methods, this report identifies possible improvements in the methods used and decisions made.

Four attempts to contain and control the Macondo well are presented in chronological order to capture an engineering-based rationale for their selection and application. Analysis of each attempt is made using the available data provided by Commission staff and found in the news media. Identification of strengths (S), weaknesses (W), opportunities (O), and threats (T) is undertaken for each containment option. The following questions are considered in identifying these factors:

1. How effective was the containment attempt in terms of rate of capture and percentage captured, or success in stopping or sealing the blowout?
2. What risks were imposed?
3. What opportunities were potentially offered by a containment option beyond its intended purpose?
4. What threats to the operation were created by a particular response?

Some of the threats that are specifically analyzed include:

1. Could implementing this option cause the well's flow rate to the seafloor to increase?
2. Could implementing this option cause an underground blowout resulting in oil broaching to the seafloor, e.g. due to a casing or rupture disk failure?
3. Was there a reasonable risk: 1) of interference with other responses, 2) to the integrity of the blowout preventer (BOP) stack or wellhead, 3) to personnel on the rigs and work vessels, and 4) associated with surface handling of flammable hydrocarbons under pressure on the rigs and work vessels?
4. What impact would weather conditions such as tropical storms and hurricanes have and how did uncertainty regarding these conditions play a critical role in the decisions made?

Additional factors addressed are:

1. What was the apparent intent of the response?
2. What were the critical failure points in the designs?
3. Were assumptions about the threats posed by various well control options reasonably founded?
4. Did the well casing design play a critical role in determining the success or failure of these attempts?

<u>ANALYSIS OF FOUR WELL CONTAINMENT & CONTROL ATTEMPTS IN CHRONOLOGICAL ORDER</u>

## MAY 6-8, 2010: COFFERDAM CONTAINMENT DOME

The intent of the cofferdam operation (see Figure 1) was to implement a readily deployable containment method with known risks (associated with surface handling of flammable hydrocarbons under pressure on floating vessels). Further, it posed no additional risks to well integrity or the BOP stack. The operation failed primarily due to poor provisions for handling hydrates. There was a high probability of hydrate formation at the prevailing seafloor conditions, and the absence of effective hydrate dissociation mechanisms led to critical failure. If successful, it could have captured more oil than the Riser Insertion Tube Tool.



Figure 1: Cofferdam containment dome operation (Source: The New York Times).

A simple design analysis of the cofferdam is presented to evaluate and understand its flow-capture potential. The dimensions of the cofferdam were 24 ft × 14 ft × 40 ft. Thus, the volume of the containment dome was approximately 3,440 ft³ (≈ 2,394 barrels). It was to be connected to the *Discoverer Enterprise* drillship, which had a

maximum capture rate of 15,000 barrels per day (bbls/day), using a 6 5/8-in drillpipe. One risk of the dome's large volume was the likelihood of hydrocarbons mixing with seawater to form hydrates, which in fact did end up collecting in and plugging the opening at the top of the dome. However, if the system had been filled with a synthetic base drilling fluid or methanol before being lowered over the hydrocarbon plume, it should have been possible to inhibit hydrate formation and allow production to the surface within the limits of the *Enterprise*. From available data, it seems that there was a top door vent that was kept open during the lowering of the cofferdam, and it had only a limited provision (circulating hot water in the riser once connected) for hydrate dissociation.

A separate issue is the volumetric size, weight, and related buoyancy of the cofferdam. The reported weight was approximately 100 tons. To understand the forces on the cofferdam when filled with lighter hydrocarbons, the following calculations are presented. Assume the weight of dome is W lbs, its volume is V ft$^3$, it is filled with fluids of specific gravity $\gamma$, the density of seawater is $\rho_w$, the density of free gas is $\rho_g$, and the cofferdam's steel is $\rho_s$ lb/ft$^3$. Buoyancy force = Density of the displaced fluid * Volume displaced.

Weight (buoyed) of cofferdam = $100 \left(1 - \dfrac{\rho_w}{\rho_s}\right)$ tons = 87 tons = 173,740 lbs

$$V\rho_w(1-\gamma) \leq W\left(1 - \frac{\rho_w}{\rho_s}\right) \quad \text{Condition for dome to be buoyant}$$

$$\therefore \gamma \leq 1 - \frac{W}{V\rho_w}\left(1 - \frac{\rho_w}{\rho_s}\right)$$

The cofferdam's volume that can be filled with lower density fluids is limited by the vent on its side, which reduces its effective height to about 25 ft. Consequently, the estimated effective volume is about 8,400 ft$^3$. Our calculations indicate that the cofferdam would become buoyant if filled with a fluid with a specific gravity less than 0.68. The specific gravity of methane hydrate $(CH_4)_8 (H_2O)_{46}$ is approximately 0.9. Thus, if the cofferdam were filled with hydrates alone it would not become buoyant. Yet, filling the dome with Macondo well fluids (which had a specific gravity equivalent to 0.577 per BP's 0.25 psi/ft gradient) would have made the system buoyant. Further, the collection rate of *Enterprise* (15,000 bbls/day) was lower than the now-known flow rate, which implies that even if the cofferdam had not plugged with hydrates, it would have eventually become buoyant after filling with hydrocarbons. The formula explaining this relationship is:

| *Rate of accumulation of low specific gravity hydrocarbons inside the cofferdam* | = | *Inflow rate of the hydrocarbons from the riser into the cofferdam* | - | *Outflow rate of hydrocarbons through the hole at the top of the cofferdam* |
|---|---|---|---|---|

4

The rate at which hydrates form within the cofferdam could reduce, or even stop, the outflow of hydrocarbons. However, that would only affect how fast the cofferdam filled with hydrocarbons and became buoyant. The cofferdam could only avoid buoyancy if the amount of hydrocarbons within it were not increasing over time, i.e. if hydrocarbons were leaving the dome at the same or a faster rate than they were entering it.

BP's later "top hat" was smaller in volume, thereby increasing the ratio of weight to volume to keep the top hat non-buoyant when filled with low specific gravity fluids. It also had vents so that it would not fill with excess hydrocarbons.

Amount of recovered oil: The cofferdam plugged up with hydrates and did not recover any leaked oil.

S: Available; deployable; no additional burden on well integrity or BOP stack.

W: Away from the leak source (cannot capture all of the leakage); temporary; no vents; no or limited provision for hydrate dissociation; volume of chamber increases risks of hydrate formation; cumbersome to handle; inability to seal the dome to the leak point; limited by surface handling capacity; depends on continued connection to surface vessels (weather sensitivity).

O: Could potentially collect most of the leaked oil from the end of the broken riser on the seafloor or another large or irregular leak source.

T: Surface handling of flammable hydrocarbons (under pressure) on surface vessels.

Opportunities for improved application:

The risk of almost immediate formation of hydrates could have been reduced by filling the cofferdam with a synthetic base fluid or methanol before lowering it over the leak. Not lowering directly over the leak (area of high hydrate concentration) would definitely increase the chances of installing the dome effectively. These recommendations, however, do not reduce the likelihood of failure in the event that free gas becomes trapped inside the dome. The dome's potential is also limited by the fact that the collection rates of surface vessels to which it connects must be higher than the flow rate of the low-density hydrocarbons from the leak source. If the cofferdam had worked as anticipated, because the flow rate was higher than the 15,000 bbls/day the *Enterprise* could process, the cofferdam would have filled with hydrocarbons, become buoyant, and failed even absent the hydrate issues. It is therefore important to design cofferdams or any collection dome/caps with vents to regulate the volume of hydrocarbons inside them. This strategy was adopted in the design of the top hat.

### MAY 26-28, 2010: TOP KILL

The "top kill" procedure (see Figure 2) involved pumping heavy drilling mud into the well with the objective that the pressure imposed by pumping additional fluid

through the leak path would stop flow from the well, force mud into the well, and ultimately overcome the pressure in the kick zone with the hydrostatic pressure of the injected fluid.  It should be noted that this approach is not considered a regular well control method.   Robert D. Grace, in <u>Advanced Blowout and Well Control</u> (1994), describes a similar approach as a "momentum kill."   A more accurate description by Victor Gerardo Vallejo-Arrieta, in a LSU PhD dissertation (2002), is "simultaneous dynamic seal and bullheading."   In another associated technique called the "junk shot," objects including golf balls and pieces of rubber were injected into the BOP in an attempt to restrict or plug the leak path within the stack.

Some of the uncertainties during the top kill procedures were: the flow rate of hydrocarbons at the wellhead, location of the open end of the drillpipe inside the production casing relative to the level of the injected mud, the existing and potential flow paths within the well, and the size of the leaks in the BOP stack to be packed off or plugged by the junk shot.

Both the top kill and junk shot failed to stop/plug the blowout.



Figure 2:  The top kill and junk shot effort (Source: The New York Times).

S: At the wellhead; potential for well control.

W: Potential to create excessive stress on well casings and the BOP stack; unknown flow path; required pumping rate to achieve kill unknown; use of junk shot could plug unintended paths (e.g. choke and/or kill lines, casing hanger, or BOP elements) preventing further pumping of mud into the well, but not necessarily subsequent hydrocarbon flow out; pumping capacity of surface equipment.

O: Could potentially stop the flow completely and achieve a hydrostatic kill; use of junk shot could restrict leakage rate and increase likelihood of achieving kill.

T: Casing failure; BOP stack failure; erosion of BOP elements and the riser kink allowing an increased hydrocarbon flow rate; possibility that failed rupture disks in the 16" casing (either from the excessive pressure during the kill or from the initial phase of the blowout) could provide a flow path leading to underground blowout at the 18" casing shoe and, therefore, potential for hydrocarbons to broach to the seafloor.

If we approximate the flow through the BOP stack as a choke restriction during the top kill operation, then a simple choke pressure drop and flow-rate relationship can be calculated as follows:

$$\Delta p_{bop} = C q_{leak}^2$$

$$q_{leak} = \alpha q_{mud} + \beta q_{HC} \qquad (0 \le \alpha, \beta \le 1)$$

Before top kill : $\alpha = 0, \beta = 1$

$$\Delta p_{bop}^0 = C q_{HC}^2$$

For successful top kill : $\alpha = 1, \beta = 0$

$$\Delta p_{bop}^1 = C q_{mud}^2$$

Assuming no erosion (change in C), we can estimate leak rate as

$$q_{HC} = q_{mud} \sqrt{\frac{\Delta p_{bop}^0}{\Delta p_{bop}^1}}$$

Note that we have ignored fluid density effects, mixing, and leak path erosion phenomena in generating this rough estimate. Using the boost line pressure of approximately 2,600 pounds per square inch (psi) for both cases, an average choke line pressure of 6,000 psi for a mud pumping rate of 80 barrels per minute (bpm) (Figure 5) and lower stack pressure of 3,400 psi before the mud injection, we can estimate flow rate for oil as follows:

$$q_{HC} = 80 \sqrt{\frac{(3400 - 2600)}{(6000 - 2600)}} = 38.8 \text{ bpm}$$

This hydrocarbon flow rate corresponds to approximately 55,880 bbls/day. It also assumes that at a 6,000 psi choke line pressure, only mud was flowing through the BOP and, therefore, the flow of oil stopped temporarily during the kill attempt. It is noteworthy that the above estimates, based on choke-performance relationship and using simultaneous measurements of pressure and mud pumping rates during the top kill, can yield a reasonable value for the flow rate. If this calculation had been made following the top kill's failure, it could have informed a redesign of the operation.

7

<u>Explanation of the top-kill's failure:</u>

BP apparently underestimated the blowout flow rate and, therefore, the mud delivery rate required from the surface equipment and piping to the injection point on the BOP. Consequently, as shown in the graph in Figure 3, the pressure required to stop the flow from the well was never achieved. The main limitation identified was the mud pumping rate. This was confirmed by BP not having attempted a higher rate after the BOP pressure declined from 6,300 psi to 5,600 psi at 80 bpm (see Figure 5) and by 80 bpm being the maximum pump rate available from the surface vessels.



Figure 3:   "Flat-lining" of the pressure at the wellhead during the top kill procedure
(Source: BP/U.S. Department of Energy).

Deploying higher capacity pumps and using casing with a larger diameter than the drillpipe to deliver mud down to the seafloor could have overcome some of these limitations. Choke lines themselves can also be a significant contributor to the friction pressure drop. We are assuming that the total run-off length of the choke ($L_{CL}$) could possibly be reduced if needed. However, the length of drillpipe ($L_{DP}$) needed to deliver mud to the sea floor, or the casing if used to replace the drillpipe, would have remained at around 5,000 ft (water depth). Further, the diameter of the piping going into the choke/kill lines was chosen to match the BOP connections. With these given constraints, it seems reasonable to attempt to control the friction pressure drop in the drillpipe by replacing it with a larger diameter casing string:

8

$$p_{rp} = \rho g L_{DP} + \left(\frac{dp}{dl}\right)^f_{DP} L_{DP} + \left(\frac{dp}{dl}\right)^f_{CL} L_{CL} + p_{wh}$$

$$\left(\frac{dp}{dl}\right)^f = \frac{\rho^{0.75} \mu^{0.25} q^{1.75}}{8624 d^{4.75}} \qquad \text{Pressure drop (field units) for turbulent flow regime}$$

BP's initial interpretation of the "flat-line" observed during the top kill also proved incorrect. BP inferred that the mud column length in the well may have been limited due to flow out into the formation at the 18" casing shoe through "failed" rupture disks, which then prevented the attainment of hydrostatic control. Moreover, BP thought these rupture disks might have failed during the initial phase of the blowout (due to collapse loads resulting from an annular flow path to the seafloor when the riser was connected to the rig on the surface). Further, in such an event, there was high likelihood of broaching at the 18" casing shoe, and BP apparently concluded at that time that valve stacking (cap or BOP on BOP) strategies should not be implemented. Obviously, this conclusion was later corrected.

The observed phenomena of a flat-line can also be explained by the following two scenarios, which are both plausible and more straightforward than BP's interpretation, though maybe not as common:

a) The mixing of mud and hydrocarbons below the injection point, until a steady-state length (see Figure 4) was achieved, created additional hydrostatic in the well resulting in the observed flat-line. A heavy liquid tends to fall through a light liquid, especially when the fluids are immiscible (as is the case of heavy water-based mud falling through oil). This tendency is strongest when there is no other flow in the system, but can occur to a degree even when the light fluid is moving upwards. This is the same effect that caused the heavy spacer to fall back through the seawater when BP was displacing the well to seawater before the negative test prior to the blowout. It typically results in some steady-state distribution of the fraction of the heavy fluid suspended in the lighter fluid column in the well below the point where the heavy fluid is being injected. When this occurs in a gas-liquid system, that fraction is called the "zero net liquid flow (ZNLF) holdup."

$$\rho_{mix} = \alpha \rho_{mud} + (1-\alpha)\rho_{HC}$$

$$\Rightarrow L_{mix} = \frac{\Delta p_{WH}}{\rho_{mix} g}$$

The observed pressures of 6,300 to 5,600 psi during the top kill (i.e. 700 psi pressure drop) correspond to only 821 ft of a 16.4 pounds per gallon (ppg) mud column. The length of the actual column would necessarily be longer because hydrocarbons were flowing upward past the "held up" mud.

9



Figure 4:  Schematic to explain hydrostatic pressure due to a zero net flow liquid
           holdup mixing column.

b) Increased flow rate through leaks in the BOP and riser kink may have caused
   a washout (increase in the flow leak area) that reduced the pressure drop
   (see Figure 5).



Figure 5:  Pressure vs. mud flow rate during top kill (Source: BP/U.S. Department of
           Energy).

Assuming that stopping the formation flow required a boost line pressure of 2,600
psi, an average lower stack pressure value of 6,000 psi at 80 bpm, and a stack
pressure of 8,900 psi, the required top kill mud pump rate ($q_{req}$) we obtain is:

$$q_{req} = 80\sqrt{\frac{(8900-2600)}{(6000-2600)}} = 108.9 \text{ bpm}$$

10

The 8,900 psi value used in this calculation is based on documents from BP indicating that this pressure would be adequate to stop flow from the M56A and M56E sands (according to information available at the time of the top kill attempt). The higher pressured M56A sand had a formation pressure gradient of 13.1 lb/gal equivalent, measured at a depth of 17,788 feet with a Modular Formation Dynamics Tester (MDT) tool and an assumed average formation fluid density of 5.18 lb/gal. The calculated shut-in pressure at the BOP stack for these conditions is 8,690 psi. Consequently, a wellhead pressure of 8,900 psi should have stopped flow from these sands. The actual shut-pressure recorded after closing the capping stack in July was only 7,100 psi, which is much lower than this estimate, probably due to pressure depletion of the formations. However, at the time that the top kill was being attempted, the best estimate would have been based on the MDT data and the assumption of no pressure depletion. It is also notable that this pressure exceeds the 8,000 psi limit shown in Figure 3. The authors are not certain about the basis for that limit. It is presumably related to the pressure capabilities of the 16" casing, the rupture disks, and/or the riser flex joint in the lower marine riser package (LMRP).

Using the limited information provided about the top kill attempt, it is likely that a top kill using a mud pump rate of 109 bpm to generate 8,900 psi below the BOP stack for a prolonged period could have been successful. It is clear that the likelihood of success for this approach would have been high, because it is now known that the bullhead (static) kill used with the capping stack was successful.

In hindsight, the failure of the top kill was not a definite indicator that there was any higher risk in using a sealing option to control the well versus using loose-fitting collection-only devices. Based on the evidence available to the response team when the top kill pumping system was designed, an under-estimation of the most likely hydrocarbon flow rate may have been reasonable because there was considerable uncertainty regarding the actual figure. However, top kill contingencies for much higher flow rates should have been considered or, at least, reconsidered after the initial failure. It is very likely that if the top kill had been designed to deliver more than 109 bpm of 16.4 ppg drilling fluid below the BOP stack for a sustained period, the Macondo blowout could have been stopped between May 26-28, 2010. Given that the well was successfully shut-in with the capping stack in July, and that the subsequent bullhead (static) kill was successful, certainly a higher rate top kill would have been successful at that time. The actual pressure that would have been required in late May, and the actual limits on that pressure due to the risk of having a well integrity (e.g. rupture disk) failure are not known, but a higher pump rate could have been attempted without exceeding the established 8,000 psi limitation. Another unknown about the potential success of the un-tried high-rate top kill is how fast the BOP stack restrictions and the choke and kill lines would have eroded. Alternative diagnostic methods for analyzing the pressure response curve during the top kill should have been investigated, such as the pressure-rate relationship while pumping.

### JULY 10-12, 2010: CAPPING STACK

From July 10-12, 2010, a sealing cap was bolted on the top of the original BOP stack through a connector flange on top of the flex joint (see Figure 6). The cap had three blind shear rams that could be closed to completely stop the flow from the well. The risks associated with the sealing cap were primarily related to the wellhead, the well's casing integrity, and the BOP stack's integrity. The capping stack arrangement, with only blind shear rams, limited its versatility for routing flow or allowing direct vertical access into the well. However, side choke and kill outlets allowed it to vent flow and could potentially have been used to route flow for recovery at the surface. Similarly, additional components could potentially have been built into the top of the capping stack, such as an annular preventer, to allow for vertical intervention into the well below the capping stack to conduct diagnostic and remedial operations, such as logs to confirm the flow path or a dynamic kill to stop the flow without closing the capping stack's blind shear rams. Additional examples are provided below.

S: Common response technique for surface blowouts; successfully stopped flow from the well by shutting it in; had provisions for directing flow to the surface through existing choke and kill lines and/or allowing a controlled rate of flow into the sea through a choked outlet.

W: Required time-consuming assembly and fabrication of a customized capping stack; required removal of the riser and the resulting potential for increased hydrocarbon flow while preparing for installation; installation required establishing a pressure containing connection at the top flange on the flex joint, which was time-consuming; did not provide for vertical access into the well absent the addition of more components; if the well could not be shut in, relied on existing choke and kill line connections, with limited flow-rate capacity, to route hydrocarbons to the surface for collection.

O: Could be adapted to provide a means for vertical intervention directly into the well, which would have provided a safer approach than replacing the BOP stack, as well as a more conclusive means of killing, cementing, and evaluating the well (as described in subsequent sections).

T: The shut-in imposed significant pressure on well components and could have resulted in an equipment failure or underground blowout.

*Why was capping stack used so late in the sequence of operations?*: The concern that increased pressure on the well could cause an underground blowout when applying a sealing option was raised immediately following the top kill attempt. There was also an earlier concern that cutting the riser to remove the kink, which would be necessary to install a capping stack, would result in significantly increased flow from the well. It is possible that installation of a capping stack might have been delayed either due to concerns about these risks or due to the unavailability of required components for the system. When the capping stack was eventually

installed, the well's integrity had almost certainly been reduced by erosion caused by the months of high flow. The available documentation indicates both that the risk of initiating underground flow due to a rupture disk failure was a major concern and that the pressures measured after shutting-in the well with the capping stack were considered to be low enough to minimize this risk and, upon analysis, not so low as to indicate that a rupture disk failure had already occurred. Certainly, the moderate but building pressures measured after the capping stack was installed were a major consideration in leaving it closed.

*Why was there no intervention capability in the capping stack (all three were blind shear rams)?:* A sealing cap with an annular preventer would have been beneficial as a means to provide vertical access into the wellbore for intervention. Capping stacks have often been used in controlling blowouts from surface wellheads. A difference is that a surface capping stack would typically allow a conventional BOP stack with pipe rams and an annular preventer to be added on top of it to provide direct vertical intervention access into the well. Examples of the types of possible intervention include: 1) running coil tubing, stripping, or snubbing pipe into the well to achieve a conventional circulating kill or dynamic kill; 2) running wireline into the well to set a mechanical plug; 3) perforating the production casing to gain access to a flow path outside the casing; or 4) running logs to identify a flow path or confirm that a flow path has been sealed successfully.



Figure 6: The capping stack (Source: The New York Times).

<u>Opportunity for improved application</u>:

A sealing cap with at least one annular preventer and a side outlet with piping to the surface could have provided better collection and intervention capabilities. It is unknown why such an intervention option was not provided for. The choke and kill lines in the original BOP provided a connection to the surface. The ability to directly enter the well with pipe during the blowout would have been a tremendous advantage if the well had indeed been leaking into formations below the seafloor. For example, if a large leak through a rupture disk were present, the bullhead (static) kill would have been unsuccessful. A bottom kill using pipe lowered directly into the well itself could have been used to fill the well with kill mud from the bottom and stop the flow of hydrocarbons, even if there had been a significant leak in the well above. Furthermore, once the flow of hydrocarbons was stopped with kill mud, mechanical and/or smaller cement plugs could have been placed through the capping stack near the bottom of the well, and tools could have been used to evaluate the condition of the annular flow path outside of the production casing. It is also conceivable that, once well integrity was evaluated and confirmed, operations to evaluate the primary cement job could have been conducted. As explained in more detail later, a sealing cap option should be emphasized as the first strategy to be implemented in any future Macondo type deepwater blowout where a direct seal to the well is feasible.

### AUGUST 3-5, 2010: STATIC KILL

A "static kill" (more commonly referred to as "bullheading" within the industry) was used to successfully regain hydrostatic control of the Macondo well. It was followed by the bullheading of cement to seal the well and prevent further flow. The cementing operation was declared successful on August 8, 2010. In the authors' opinion, neither of these methods should be expected to generally achieve such success in future situations. However, bullheading mud with an appropriate density was specifically applicable in this situation, and could have provided a second barrier to supplement the capping stack if the mud weight had included a riser margin. Nevertheless, bullheading mud is primarily applicable to cased holes, and its utility for wells where a significant interval of open hole is exposed is generally restricted to reducing surface pressures rather than regaining hydrostatic control. Bullheading cement can often be a successful means to seal a well as an alternative to placing a cement plug. Yet, bullheading cement carries risks and creates complications that the authors believe were inappropriate in this situation. These conclusions are explained in the following paragraphs. The explanations include a discussion of the main points of contention raised by Pat Campbell of Superior Energy Services, Inc. and Robert D. Grace of GSM, Inc. regarding the use of these methods. Alternatives for improving the reliability of techniques to create hydrostatic control and achieve a seal inside the well, with lower risk, are also described.



Figure 7: The bullhead (static) kill operation (Source: The New York Times).

Description of bullheading:

Prior to bullheading, the flow had already been stopped by the closing of the capping stack atop the well. Therefore, achieving a high mud injection rate was no longer necessary, as it would have been for a successful top kill. After ensuring that the well was hydrostatically controlled by bullheading mud, cement was pumped in to permanently seal the well. On August 8, 2010, National Incident Commander Admiral Thad Allen declared that this operation had been successful. Later, an "ambient test" was conducted, which demonstrated that the Macondo well would not leak if opened to the sea, confirming that the cement had in fact sealed the well.

Introduction to discussion:

The following review of the static kill will provide an assessment of the contrasting perspectives on this operation submitted by Pat Campbell and Robert D. Grace. In summary, Mr. Campbell considered this technique only applicable "when no relief well" or "other alternative means of entering the wellbore . . . was available or timely." He recommended against the static kill's use because it was a higher risk alternative as compared to utilizing the relief well or some other circulating kill method. Conversely, Mr. Grace claimed that the static kill was the "logical primary well control option" with "as close to 100 percent" probability of success "as any

15

operation in the oilfield" and stated that "in most instances . . . , the mud is then displaced by cement to permanently control the formation." These two perspectives will be considered and critiqued in the following analysis.

Effectiveness of bullheading as a method to regain well control:

The International Association of Drilling Contractors (IADC) has defined appropriate well control training requirements, accredits training (WellCAP) programs meeting those requirements, and issues certificates to successful graduates of those programs at over 100 providers worldwide. It has also published guidelines for deepwater well control that are widely recognized and utilized. The IADC does not recognize bullheading as a primary method of well control for a "drilling well," i.e. a well where there is significant open hole or multiple open zones. Although bullheading is a common and standard approach for killing a cased well, where fluids can be forced into the producing zone, IADC considers bullheading an "other well control method." Also, no mention is made of dynamic (top) kills, which are a rare, special form of bullheading. Nevertheless, IADC does require training for subsea wells on the subject of "when bullheading should be used in lieu of constant bottom hole pressure methods" and on the bullheading method itself. Similarly, the IADC deepwater guidelines state that "[b]ullheading may be a viable alternative unless the open hole section is lengthy. Forcing influx fluids down the wellbore may induce underground interzonal flow."

In general, in wells with a significant span of open hole exposed, such as Macondo, bullheading is only useful for displacing kick fluids from the cased hole and reducing surface pressures; it is not reliable for achieving a kill, and on multiple occasions, has resulted in a well experiencing underground flow (e.g. interzonal transfers or an underground blowout). If the pressure in the well at the zone accepting the bullheaded fluids (the loss zone) is not greater than the reservoir pressure would be when flow from it has stopped, bullheading cannot increase the well pressure enough to stop formation flow. These conditions often exist when the loss zone is a significant distance above the kick zone, which is why the IADC raises a caution about using this method when there is a lengthy open hole. This is because the dense mud being bullheaded can end up flowing into a loss zone above the kick zone and never completely fill the well. The general case is that, if a significant length (sometimes less than 1,000 feet) of open hole exists above a kick zone, there will be a weak zone that will accept all of the bullheaded fluids, and this weak zone will be far enough above the kick zone such that the kick zone will remain underbalanced during and following the bullheading attempt.

However, a contrasting condition was known to exist in the Macondo well. A known lost circulation zone, weaker than the zones above the kick zone but supporting a mud weight that would control the kick zone, existed below the kick zone. Thus, it was logical to expect that bullheading would be a successful kill method, because kill density fluid could be displaced from the surface to a depth below the kick zone. Hydrostatic control could therefore be regained despite almost 900 feet of open hole

above the kick zone. In summary, bullheading mud was logical and effective because the Macondo's loss zone was below its kick zone.

Risks associated with bullheading mud:

The contention by Mr. Campbell that bullheading mud creates a higher risk of loss of well and equipment integrity than circulating kill methods is widely recognized by the industry and, in the opinion of the authors, was well understood to be relevant in this case. Apparently, a decision was made that the risks associated with having the capping stack as the only barrier—e.g. of leaks, damage, or loss of component control—were greater than the risks that a casing rupture disk would burst or loss of pressure containment in some other well component would occur during the short term, slightly higher pressures (reportedly only about 35 psi higher) imposed during bullheading. It was reasonable to expect that bullheading mud could be achieved at pressures only slightly greater than the shut-in pressure because the formation flow capacity was very high, and therefore injectivity would likely also be very high. The judgment that the well system had adequate integrity to withstand 8,000 psi wellhead pressure has not been reviewed in this study. Nevertheless, the primary pressure risk had already occurred weeks earlier when the well had been shut-in with the capping stack.

Risks associated with bullheading cement:

Bullheading cement into the well raised more critical concerns. As Mr. Campbell stated, no action should be undertaken that could "make final P&A [plug and abandonment] more problematic or create a situation in which all possible control and means of killing the well is eliminated." The authors of this report expect that all responsible parties would agree with this statement.

The principal consideration as stated by Mr. Campbell was that the flow path(s) of fluids in the well were unknown (i.e. whether the flow was through the production casing, the annulus, or both). Also, it was unknown where the connection, or connections, between the annulus and the inside of the well were (e.g. shoe track or parted casing) and whether it might be different for different flow directions, (e.g. casing hanger sealing from above but not below). Therefore, the flow path and ultimate position of the cement pumped into the well could not be known. The position of the drillpipe in the well was also unknown, and it would likely be cemented into the well. These factors could have substantially complicated proper plug and abandonment of the Macondo well, and would have prevented use of the wellbore for a kill if later complications, such as a delay or problems in the relief well, occurred. Bullheading cement would also prevent use of diagnostics within the wellbore (e.g. bond, temperature, and noise logs or pressure tests through perforations) to confirm that the annulus had been properly killed and sealed. These concerns were explicitly provided to the Department of Energy science team that was advising Secretary of Energy Steven Chu. Specifically, the team was notified that "[t]he final position of any cement volume pumped is uncertain unless flow path and fluid swapping/fingering tendencies between the cement and the

17

other fluids in the well are well known.  Cement around drillpipe or cement between the 9-7/8 x 7" and the other casings would significantly complicate proper [plug and abandonment] of the well" and related "revisions in plans that result in a less than rigorous [plug and abandonment], e.g. drillstring cemented in the well and some partially tested plugs" in the Macondo annulus would not represent actions in the best public interest.

A more serious concern was that the cement could have only partially blocked the flow path to the surface.  This can occur when the set cement has permeability or leaks due to small channels, cracks, or microannuli.  These small leaks cannot be filled with mud because they become temporarily plugged with the solids in mud but will allow gas or oil to flow up from below.  It should be noted that liner top cement jobs that leak but are difficult to successfully repair due to the small flow paths through the cement are a widely recognized example of this type of problem.  A long cement column in the well with this kind of leak would have prevented later attempts to fill the well with mud and use its hydrostatic pressure, i.e. with a riser margin as explained below, to inhibit resumption of the blowout if control with the capping stack was lost.

S: Common technique; successfully killed the well hydrostatically; multiple attempts possible with mud; cement successfully sealed well.

W: Does not guarantee a successful hydrostatic kill; bullheading cement can only be tried once unless intentionally overdisplaced; effectiveness of seal in annulus (if any) cannot be tested directly; does not provide any protection for leakage past the casing hanger seals.

O: Could be adapted to provide a means for hydrostatic control using a "riser margin" even if the BOP or capping stack were removed; potentially provides means for permanent cementing of the well.

T: Imposes maximum pressure on well components and may result in equipment failure or an underground blowout; cement placement is uncertain and may preclude more effective cementing.

Results of bullheading cement:

Bullheading cement was successful in preventing flow from the Macondo well into the sea as evidenced by the "ambient test."  The impact of this cement on the utility of the relief well and wellbore for plug and abandonment of the Macondo well and for providing the means to verify the effectiveness of that plugging have not been assessed.  However, access to the inside of the Macondo well would be necessary to allow for a bond log of cement placement in the annulus and, if desired, perforating to conduct pressure tests on the seal in the annulus.  Those would be conclusive methods to confirm that the well was sealed properly.  It is the authors' impression that the Macondo well was essentially "junked" by cementing the drillstring inside the well, which precluded those kinds of conclusive tests.   In the authors'

experience, such tests were conducted prior to the final abandonment of other wells in comparable situations.

<u>Alternative procedures available</u>:

Multiple existing alternatives to bullheading cement could have provided more reliable barriers in the Macondo well until a relief well kill or other circulating kill was achieved. A specific recommendation that was provided to the Department of Energy team was to bullhead a denser mud into the well to provide a "riser margin," i.e. an overbalance even in the event that the capping stack was removed or leaked. This would not have compromised future use of the wellbore in the ways described above.

A highly preferable alternative to cementing the well would have been to allow replacement of the Deepwater Horizon BOP stack by placing a bridge plug or storm packer in the wellhead housing. This could have been used in conjunction with the mud providing a riser margin to regain a second barrier. Note that no second barrier (in addition to cement) was present when the BOP was actually replaced. If the capping stack had been designed to include an annular preventer, i.e. a second barrier that would seal on pipe or wireline, rather than only blind shear rams, this barrier would have been in place during installation of the bridge plug or storm packer. Installation of a bridge plug or storm packer through a BOP stack has been a widely used approach for creating a second barrier before replacing the BOP stack.

### COMMENTS ON SEVERAL KEY DECISIONS

#### *Cutting the Riser Kink*

It was very likely that the kink in the riser would ultimately become the location of the highest leak rate due to the significant pressure drop across the kink and the resulting heavy erosion which occurred at that location. It is the authors' opinion that cutting the riser and starting with containment at the wellhead should be the first choice in a decision tree for blowout responses. An explanation for this conclusion follows, including reasons why containment efforts at locations further away from the wellhead are likely to be less effective.

Assume that the minimum leak rate with the riser kink intact is $Q_{min}$ and the maximum rate without the kink is $Q_{max}$ (i.e. the riser is removed or the kink has eroded to the point that it provides no resistance to flow). Also, assume the kink's erosion is a linear deterioration process that happens over n days (see Figure 8). The shaded areas correspond to the cumulative oil volume leaked under two different scenarios (blue for riser erosion, green for cutting the riser and installing a positive flow connector). The key issue is that even if one option appears "worse" for a small duration, it could still be a desired solution in the overall strategy (in this case, minimizing the cumulative volume of leaked oil).



Days after blowout

Figure 8: Schematic of flow rate over time to demonstrate the benefit of quickly establishing a positive flow connector at the wellhead. The blue shaded area represents flow volume if the riser remains and erodes; the green area represents flow volume if the riser is removed and a positive flow connector is installed.

If the riser remains and erodes, the total volume leaked during the n days would be $(n/2)(Q_{min} + Q_{max})$. Now consider the scenario of cutting the riser and attaching a positive flow connector with diversion capabilities upstream of the location of the kink (i.e. directly above the BOP stack). Assume that the process of cutting and installing the connector takes m days during which the leak flow rate is $Q_{max}$. Yet, once installed, any such connector can always provide similar backpressure to that exerted by the riser kink if the connector has controlled venting capabilities. The amount of total volume leaked during n days in this situation is $((n-m) Q_{min} +m Q_{max})$. A simple comparison of these rates demonstrates that if $m < n/2$ then removing the riser decreases the amount of oil released. That is, if the riser will erode in two weeks, but it takes less than a week to cut the riser and install a flow diverter, the riser should not be left in place for longer than two weeks. Note that after n days, the riser kink, due to erosion, has a flow rate corresponding to $Q_{max}$ while the positive connector could potentially bring the flow rate back to $Q_{min}$. The advantages offered by installation of a positive connector/diverter or capping stack far outweigh the risks of cutting the kinked riser, unless it is not possible to effectively connect the diverter or capping stack. Further, using the restriction from a capping stack or other positive connector with controlled venting capabilities could have helped a subsequent top kill procedure by providing greater back pressure (as was the intent of the junk shot).

Justification of assumed linear erosion rate:

Erosion is highly likely with large flow rates and reservoir drawdown (particularly if sand is present). Two extreme scenarios are: 1) the kink eroded very quickly due to high sand production shortly after the blowout (likely); and 2) kink erosion was slow due to little or no sand production (improbable). It is reasonable to use a linear erosion rate to approximate the average of these two scenarios.

### *Intermediate Casing Design Criterion*

The currently accepted intermediate casing design criterion for "worst case" burst loads does not necessarily anticipate the scenario of shutting-in a well during a blowout. Partial "evacuation" with gas or an annulus filled with seawater after shut-in are common burst design considerations for intermediate casing. During the Macondo blowout, flow of hydrocarbons in the annular space between the production and intermediate casings was considered plausible. The shut-in pressure required to stop this flow was a critical factor in selecting well control and containment strategies. The intermediate (16") casing design used in the Macondo well had a 6,920 psi burst rating, which was only slightly higher than the burst load of 6,668 psi that would be imposed by the anticipated shut-in wellhead pressure of 8,900 psi. Although this design rating posed problems during the effort to control the Macondo blowout, it satisfied the typical industry criterion for an intermediate casing design. It is therefore the current design criterion itself that does not anticipate post-blowout related burst loads being brought to bear on intermediate casings.

Most of the strategies for shutting-in the blowout were apparently considered to pose a serious risk of either damage to the 16" intermediate casing itself or a rupture disk failure. Either of these would have allowed hydrocarbons from the reservoir to flow into shallower formations and potentially broach to the seafloor. The risk of such an occurrence would have been much lower if the 16" casing and its associated rupture disks had been rated for a burst pressure sufficiently greater than the maximum pressure that might exist if one were to bullhead mud down the well after shutting-in a blowout. This would essentially involve making the design criterion for intermediate casing equivalent to the criterion for surface casing. Under this approach, intermediate casing would have a significantly higher burst pressure design (i.e. more conservative) than is currently used by many Gulf of Mexico operators.

Use of a more conservative design criterion for intermediate casing strings (including drilling liners) warrants further investigation (especially for wells where the impact of a casing failure could be more significant than in a typical shelf well). The specific question arising from the Deepwater Horizon accident is: Are there situations in which well conditions justify using intermediate casing designs based upon blowout burst loads?

### Alternate "What-if" Analysis with the Benefit of Hindsight

The information developed through BP's eventually-successful shut-in of the Macondo well provides an opportunity to evaluate, using hindsight, what would have been the most logical course of action. This section of the report attempts to use this information not to criticize the steps taken, but to illuminate the role alternate decisions might have played.

**What-if Scenario #1: Intermediate Casing Designed for Shutting-in a Blowout**

Throughout the Macondo blowout response, there were key concerns that the rupture disks in the intermediate 16" casing had failed during the initial blowout or that they could fail due to the pressure imposed by shutting-in the well or other kill operations. If the intermediate casing string (specifically the 16" section) had been designed to contain the maximum possible burst load for shutting-in a blowout, this concern would have been less significant. Apparently, many key decisions were driven at least in part by this concern. These most likely include: 1) the selection of the maximum allowable wellhead pressure during top kill efforts; 2) the apparent reluctance in May and June to use a "shut-in" option, possibly because of concerns over failed rupture disks; and 3) the decision to bullhead cement from the surface once the bullhead (static) mud kill had apparently succeeded.

If the response team had confidence in the intermediate casing's burst load capability, higher pump rates (resulting in higher pressures below the leaking BOP stack) may have been considered feasible during the top kill. Using the limited information provided about the top kill attempt, it is likely that a top kill using a pump rate of 109 bpm to generate 8,900 psi below the BOP stack for a prolonged period could have been successful. High pump rates do increase the risk of erosion in choke and kill lines. However, the integrity of these lines only had to be maintained for the duration that mud was pumped during the kill. Similarly, greater confidence in the intermediate casing's capability to resist burst loads might have encouraged earlier use of a capping stack. It is clear that the likelihood of success for either of these approaches would have been high, because it is now known that the bullhead (static) kill used with the capping stack was successful.

**What-if Scenario #2: Top Kill Failed Due to BOP Restriction Erosion**

Before attempting the top kill, responders should have considered installing equipment, like the capping stack, that could be used to contain enough pressure to shut-in the well. In this scenario, the only reason for using loose-fitting oil capture and collection methods that do not seal the well is to reduce the amount of hydrocarbons released while tight-sealing equipment is prepared and installed.

The main weakness of a top kill approach is that it depends on a partially closed BOP stack to act as a flow restriction. If this restriction erodes due to the blowout flow and the mud pumped during the top kill, the operation might fail because sufficient pressure below the BOP stack cannot be generated no matter how fast the mud is pumped. If a top kill fails for this reason, the hydrocarbon flow rate after the attempt would most likely be higher than before. If the BOP stack were not providing a significant restriction to flow, there would be little advantage to leaving it in place. Some viable options to therefore consider would be: 1) rapidly installing a capping stack similar to the one that was used successfully; 2) unlatching the Deepwater Horizon's LMRP and installing a BOP stack in its place; and 3) unlatching the entire Deepwater Horizon BOP stack and replacing it with a new BOP stack. It is now known that the capping stack approach (option 1) was successful, but it may

not have been as effective if the pressures required to shut-in the well were significantly higher than those observed. The capping stack was installed on the top of the Deepwater Horizon LMRP, which reduced the system's allowable pressure limits. In addition, the capping stack apparently took a substantial amount of time to design, construct, and deploy since it was a custom-fabricated stack with a flanged type connection. The sole advantage to installing the capping stack above the LMRP was that only the back pressure provided by the riser kink had to be removed. That is to say that any back pressure provided by the BOP stack while the well was blowing out could remain in place while the capping stack was installed.

Because it is now known that the BOP latching system worked (as evidenced by the successful replacement of the BOP stack after the well was cemented), strong arguments can now be made for either unlatching the LMRP connection and replacing the LMRP with a new BOP stack (option 2) or completely replacing the BOP stack (option 3). Both of these options have significant advantages over the capping stack approach. These advantages are: 1) the BOP connections below the LMRP are rated to considerably higher pressures; 2) BOP stacks are designed to allow pipe and other tools to enter the well; and 3) replacement BOP stacks are more readily available than a custom made capping stack.

It is conceivable that if the equipment were on hand immediately after the failed top kill, and there was confidence in the BOP latching system, a replacement BOP could have been installed well before the capping stack was available. If this were done, the well could then have been shut-in and re-entered with pipe to circulate kill mud and run tools to evaluate wellbore integrity.

## CONCLUSIONS

The authors of this report would like to point out that the engineering approaches used by BP and the supervising government teams to successfully bring the Macondo blowout under control appear to be sound and should be recognized as such. In particular, the approach of pursuing multiple independent strategies in parallel and allocating monumental resources to stop the blowout should be acknowledged.

The major findings of this report are as follows:

1.   *The cofferdam failed due to buoyancy from lighter hydrocarbons trapped inside the dome after hydrates plugged the flow path. As designed, it would not have worked even absent hydrate blockage given the well's flow rate and fluid properties. The cofferdam approach requires further development for application to irregular leak sources that preclude use of a sealing connection.*

Hydrates plugged the flow path at the top of the dome causing it to fill with light hydrocarbons and rendering it buoyant. Filling the cofferdam with a synthetic base drilling fluid or methanol before lowering it over the leak could have reduced the risk of almost immediate hydrate formation.

23

The ratio of the cofferdam's weight to its volume was a critical design factor. In fact, the weight-volume ratio was not large enough to overcome the buoyancy force if the dome was completely filled with hydrocarbons. This is significant because the flow rate out of the riser most likely exceeded the collection capability of the *Enterprise* to which the dome was attached, thus ensuring that the cofferdam would fill with hydrocarbons and become buoyant even absent hydrate problems.

2.   *Top kill attempts failed due to the limited flow-rate capacity design of the mud pumping system. There would have been a reasonable chance of success if the kill fluid were pumped at rates higher than 109 bpm; albeit, such rates would have increased risks to BOP stack integrity.*

There were two key reasons the top kill attempt proved to be unsuccessful and failed to bring the blowout under control. The first and perhaps most decisive reason was the 80 bpm pumping rate limitation for the system that was deployed. The response team did not appear to consider that the blowout rate could be greater than 13,000 bbls/day. Because of this, the pumps and piping deployed to pump mud into the BOP stack was under-sized. Second, the failed top kill attempt supplied useful data about the hydrocarbon flow rate and the flow restriction then being provided by the BOP stack. Modeling the BOP stack restriction using a choke-performance relationship for pressure drop and flow rate can provide a reasonable estimate of 55,880 bbls/day for the well flow rate at the time of the top kill. Further, similar calculations can generate an estimate for the required pumping rate for top kill to have been successful given that flow rate (109 bpm in order to generate a wellhead pressure value of 8,900 psi).

It is likely that a higher pump rate top kill option was not considered due to concerns about the BOP stack and well casing integrity. There was considerable uncertainty regarding the actual flow rate. Therefore, top kill contingencies for much higher flow rates should have been considered, or at least reconsidered, after the initial failure.

3.   *Removal of the riser to allow a sealed connection for collecting and/or stopping the flow should have been given stronger consideration for early implementation versus the non-sealing attempts at collection from the riser leaks.*

A key guiding principle for the response teams throughout the containment effort was "don't make it worse." It appears as though this principle caused the teams to eliminate from further consideration any option that temporarily increased the flow rate. One option that there is no evidence was even considered was re-entering the well and performing a bottom kill. A positive connector with flow diversion capability and an annular preventer (as described in Conclusion 4 below) would have been able to provide flow resistance similar to the riser kink and would have allowed for several different well intervention strategies. The cumulative amount of leaking oil would have been reduced if the riser could have been removed and another positive connector installed in half of the time in which the riser would have eroded to the point that it no longer exerted any back pressure.

It is possible that, if the BOP stack had been removed and replaced with a new BOP stack immediately after the unsuccessful top kill attempts, the well could have been brought under control within the first weeks of June. This argument is supported by the fact that the BOP stack was successfully unlatched and replaced after the Macondo well was cemented. Flow-rate modeling would be required to determine if less oil would have been discharged into the sea if the BOP stack had been removed and replaced prior to the bullhead (static) kill, but the simple analysis included herein demonstrates the potential reduction, rather than increase, in leak volumes if a sealing response is rapidly deployed.

4.    *A capping stack with direct vertical access well intervention capabilities is the most desirable containment mechanism when the potential exists to latch and seal it to the well.*

The capping stack that was attached to the Deepwater Horizon BOP stack both stopped the flow from the well and contained its pressure. The stack was comprised of three blind shear rams. Provisions were also in place to allow hydrocarbon collection through the choke and kill lines in the event that the well could not be capped because of concerns about its integrity. It is significant to note that no provisions were made to allow direct vertical access into the BOP and wellbore through the capping stack. Additional equipment, such as an annular preventer, could have been added to the top portion of the capping stack to allow tools to be lowered from the ocean's surface through the stack, the BOP, and into the well. Direct access could have made it possible to clear obstructions in the BOP stack and lower pipe and tools into the well. These tools could have then been used to determine if there were leaks in the well below the seabed while the well was shut-in. Running pipe through the capping stack into the well would have allowed kill mud to be circulated to the bottom of the well for a conclusive bottom kill.

5.    *The post bullhead (static) kill cement job should have been deferred until more certain control of the flow path, cement placement, and cement evaluation were possible. Use of a bridge plug or storm packer to allow BOP replacement before cementing would have been more pragmatic.*

Following the bullhead (static) mud kill, cement was then bullheaded into the well. This operation was successful in preventing flow from the Macondo well into the sea as evidenced by the subsequent "ambient test." However, the impact of this cement on the utility of the relief well and the Macondo wellbore for plug and abandonment and for providing the means to verify the effectiveness of that plugging are unknown. The conclusive pressure tests and methods to verify cement placement in the Macondo annulus that would have otherwise been possible were apparently prevented by this bullhead cement job.

There are several alternatives to bullheading cement that could have provided reliable barriers in the Macondo well until a relief well kill or other circulating kill was achieved. One possibility would have been to follow the initial bullhead (static) mud kill with a denser mud to provide a "riser margin," i.e. an overbalance in the event that the capping stack was removed or leaked. This option would not have

compromised future use of the wellbore, as bullheading cement did. Another, preferable alternative to bullheading cement would have been placing a bridge plug or storm packer into the wellhead housing. This could have been used in conjunction with the mud providing a riser margin to regain a second barrier. Further, if the capping stack had been designed to include an annular preventer, all operations conducted on the well after pumping the mud with a riser margin could have been conducted with two barriers in place (i.e. the capping stack and riser margin). Replacement of the BOP stack could then have been performed after installing a bridge plug or storm packer. This would have both been safer than the approach used and would have subsequently allowed full utility of the Macondo well itself for relief well killing, cementing, and then conclusively evaluating the seals in the well.

6.   *The current practices for intermediate casing design, which do not require accounting for the maximum pressures corresponding to shutting-in a blowout, should be re-evaluated in light of the risks involved in each particular case.*

Most of the strategies for shutting-in the blowout were apparently considered to pose a serious risk of damage to the 16″ intermediate casing or to rupture disks in that casing. Either would allow hydrocarbons to flow from the well into shallower formations and potentially broach to the seafloor. If the intermediate casing string had been designed to contain the maximum possible burst load for shutting-in a blowout, this concern would not have had the significance that it did. Therefore, use of a more conservative design criterion for intermediate casing strings (including drilling liners) warrants further investigation, especially for wells where the impact of a casing failure could be more significant than in a typical shelf well.

## GLOSSARY

**Bridge Plug**  A mechanical plug that can be installed inside a well, typically in the casing, to seal off the portion of the well below the bridge plug. The plug is typically placed, run in the well, and set using drillpipe or an electric wireline. The plug may be left permanently in the well or may be retrieved or drilled out.

**Cased Hole**  The portion of a well that has had casing run and cemented in place to protect and isolate the wellbore and formations behind the casing from continued operations inside the well.

**Cement Bond Log**  "A representation of the integrity of the cement job, especially whether the cement is adhering solidly to the outside of the casing. The log is typically obtained from one of a variety of sonic-type tools. The newer versions, called cement evaluation logs, along with their processing software, can give detailed, 360-degree representations of the integrity of the cement job, whereas older versions may display a single line representing the integrated integrity around the casing." (http://www.glossary.oilfield.slb.com/)

**Circulating Kill**  A circulating kill requires two flow paths down to and up from a depth in close proximity to or below the kicking/flowing formation. A common example of a circulating kill is using pipe positioned near the bottom of a well to pump kill mud into the wellbore while returns are taken up the annular flow path. Another less common example of a circulating kill is using a relief well to pump kill mud into a blowout well in close proximity to the flowing formation with the return flow path being the blowout well itself.

**Flow Rate**  Flow rate is a generic term that describes the volumetric rate of flow of a fluid anywhere in a hydraulic system (pipe, well, choke, pump).

**Hysteresis**  "Phenomenon in which the response of a physical system to an external influence depends not only on the present magnitude of that influence but also on the previous history of the system. Expressed mathematically, the response to the external influence is a doubled-valued function; one value applies when the influence is increasing, the other applies when the influence is decreasing (*Path-dependent states*)." (http://www.reference.com/browse/hysteresis)

**IADC Wellcap**  The International Association of Drilling Contractors Well Control Accreditation Program is called WellCAP. (http://www.iadc.org/wellcap.htm)

27

**Kick Zone**     The kick zone is a permeable formation that is allowing, or has allowed, fluids from the formation (a kick) to enter the well due to the hydrostatic pressure in the well being less than the formation pressure.

**Open Hole**     The portion of a well where the hole that has been drilled has not been covered with casing, i.e. the uncased portion of the well. This is typically the portion of the well currently being drilled below a previously set casing string.

**Perforation**     Any hole penetrating a pipe or the wall of the well-hole. Most often, a hole penetrating through the production casing or liner and the cement into a productive formation to allow flow only from that formation into a well. Most perforating is done with shaped charges, called jet perforating guns, but other methods can be used, especially when it is only necessary to make a hole in the pipe.

**Riser Margin**     The increase in mud weight that is necessary to overbalance formation pressures if the riser is removed, which reduces the hydrostatic pressure in the well.

**Storm Packer**     "A heavy-duty retrievable packer assembly that can be run in to isolate the wellbore of a new well in the event of suspended activities, for example, during a severe storm. An on-off disconnect feature enables the storm packer to be set at a safe depth while using the weight of the string below the packer to maintain the set and hang off the drill string to avoid pulling all the way out of the hole." (http://www.glossary.oilfield.slb.com/)

**Washout**     A hole, typically caused by erosion, in a pressure-containing component of a well or hydraulic flow system. A leak in the drillpipe or drill collars is typically referred to as a washout.

**Zero Net Liquid Flow Holdup**     "The phenomenon of accumulation of liquid in the well until a constant fraction of the well is occupied by liquid with gas flowing through it and no liquid is being carried over to the surface is known as Zero Net Liquid Flow (ZNLF) holdup." (http://etd.lsu.edu/docs/available/etd-0418102-111522/unrestricted/Flores-Avila_dis.pdf)

## APPENDIX A: MACONDO WELL SCHEMATIC



29

# Exhibit 64

Depo Ex. No. 10542 –

Charles Holt

Filed Under Seal