UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| Applies to: *All Cases* | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

**ORDER**

**[Regarding the Motion of the U.S. for a Ruling on Sample of 9 Phase Two Documents (Rec. doc. 8587)]**

On November 14, 2012, an order regarding Phase Two exhibit lists and evidentiary objections was entered. Rec. doc. 7888. It provided for service of exhibit lists, objections, informal resolution of objections, and an option to seek rulings as to a sample of documents in two installments. The U.S. seeks a ruling on a sample of 9 documents. Rec. doc. 8587. There is agreement that Judge Barbier's July 15, 2011 order as to the admissibility of the Boots & Coots report (Rec. doc. 3346) is applicable to 4 of the documents. BP noted its objections to them for preservation purposes.[1] There are no substantive objections to 2 of the documents.[2] That leaves 3 documents for resolution.

1.  TREX-003220.

The exhibit begins with a May 15, 2010 email from Mike Mason to Andy Inglis with a copy to Jasper Peijs regarding the "Macondo Oil Rate." Mason states:

> I just read an article in CNN . . . stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd

---

[1] TREX 8865, TREX 10346, TREX 10518 and TREX 10622. See Rec. doc. 8712 at 8.

[2] TREX 9453 and TREX 9455. See Rec. doc. 8733 at 9.

> figure.  With the data and knowledge we currently have available we can not definitively state the oil rate from this well.  We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to – 100,000 bopd depending on a number of unknown variables, such as:  flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera.  We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

Rec. doc. 8587 (Attachment 6).  On May 16, 2010, Peijs forwarded Mason's email to Jack Lynch. On that same day, Lynch forwarded the email to David Rainey with a copy to Doug Suttles.

Mason was employed by BP as a petroleum engineer.  His title was Vice President, Base Management.  He worked on a variety of tasks related to the spill response and headed up efforts looking at potential well and reservoir performance and flow path scenario modeling.  Rec. doc. 8587 (Memorandum at 4-5).

BP argues that:  (1) Exhibit 3220 is inadmissible because it contains hearsay (the unidentified CNN article) and hearsay-within-hearsay (the unidentified researcher at Purdue); (2) the document contains a third level of hearsay (Mason's statements); (3) if Mason's statements are party admissions, only one of the three levels is removed; and (4) because two levels of hearsay remain, the document is inadmissible.  Rec. doc. 8712 at 2.

The U.S. responds that: (1) while the CNN statement is hearsay, it is admissible to demonstrate its impact on Mason; (2) Mason's statements are party admissions because they were well within the scope of his job duties; and (3) inasmuch as Mason's statements are party admissions and the inner hearsay statements are admissible for reasons other than for their truth, Exhibit 3220 is admissible.

If Mason's statements are hearsay, Exhibit 3220 is not admissible.[3] Fed. R. Evd. 801(d)(2)(D) provides that,

> A statement that meets the following conditions is not hearsay: . . . [t]he statement is offered against the opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed. . . .

Id. In Corley v. Burger King Corporation, 56 F.3d 709 (5th Cir. 1995), the Fifth Circuit determined that the statement need only be made "concerning a matter within the scope of the agency or employment. . . ." Id. at 710 (emphasis added). One authority citing Corley states:

> Under Rule 801(d)(2)(D), so long as the agent's or servant's statement is made during the existence of the employment relationship and concerns a matter within the scope of the employment, it is admissible against the principal, even though the employee had no authority to speak for the principal.

Federal Practice and Procedure, Evidence Rules, Quick Reference Guide (West 2009) at 293 (emphasis added).

In his deposition, Mason described how he became involved in the Macondo well incident, who he worked with, and what they were trying to do. Rec. doc. 8587 (Attachment 4 at 44-45). He explained they were trying to figure out the flow rate and predict it under certain conditions, for example if the kinked riser was taken off of the well. Id. at 45-47. BP contends that there is no evidence that BP executives asked Mason to review and analyze internet news articles discussing

---

[3] Both BP and the U.S. refer to whether Mason's statements are "party admissions." The Advisory Committee notes for the 2011 amendments provide that:

> Statements falling under the hearsay exclusion provided by Rule 801(d)(2) are no longer referred to as "admissions" in the title to the subject. The term "admissions" is confusing because not all statements covered by the exclusion are admissions in the colloquial sense. . . .

Fed. R. Evid. 801(d)(2) Advisory Committee's Note, 2011 amendments.

3

third-party research about the spill. Rec. doc. 8712 at 2, n. 2. Mason's statements in Exhibit 3220 concern a matter within the scope of his employment with BP. Pursuant to Fed. R. Evid. 801(d)(2)(D), Mason's statements are not hearsay.

This does not resolve the admissibility of Exhibit 3220. BP contends that even if Mason's statements are not hearsay, two levels of hearsay remain. BP cites Fed. R. Evid. 805 and Judge Barbier's January 11, 2012 order and reasons concerning email strings (Rec. doc 5143).[4] The U.S. responds that it is not offering Exhibit 3220 to prove the flow rate based on the CNN article or the statement of the unidentified Purdue researcher. Instead, it contends that the statement in Mason's email describing the CNN article is only offered to present Mason's responses to it. Rec. doc. 8733. "Hearsay is any statement made out of court and offered in evidence to prove the truth of the matter asserted." January 11, 2012 Order and Reasons citing Fed. R. Evid. 801(c) (Rec. doc. 5143 at 4). Because the U.S. is not offering Mason's description of the CNN article for the truth of the matter asserted, it is not hearsay.

**TREX 3220 is admissible.**

2.  TREX-010468.

On June 15, 2010, John Dribus received a general email distribution from the Oil & Gas

---

[4] Fed. R. Evid. 805 provides that, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Id. At page 9 of the January 11, 2012 order, Judge Barbier addressed "double hearsay." He stated,

> Although the "outer hearsay" of the email at issue may be admissible under the business records exception, the "inner hearsay" of information provided by an outsider to the business preparing the record must likewise fall under a hearsay exception—the business records exception or some other exception—to be admissible.

Rec. doc. 5143 at 9.

4

Journal with ten headlines followed by brief statements. Four of the headlines concerned the spill. The first was "BP plans to collect 40,000-53,000 b/d from gulf oil spill." The statement following the headline was:

> BP PLC has provided the US Coast Guard with plans to collect 40,000 to 53,000 b/d of oil by June 30 from the deepwater Macondo blowout well on Mississippi Canyon Block 252 in the Gulf of Mexico.

Rec. doc. 8587 (Attachment 13 at 1). Dribus forwarded the Oil & Gas Journal report to Robert Drummond and Bud DeCoste with the statement that:

> All, According to this O&G Journal article below, BP PLC has provided the U.S. Coast Guard with plans to collect 40,000-53,000 b/d of oil by June 30 from the deepwater Macondo blowout well. That appears to be their admission that this well is flowing at a rate of greater than 50,000 b/d!

Id. DeCoste and Drummond were employed by Schlumberger. DeCoste was the primary Schlumberger contact for its senior management on the spill. Rec. doc. 8733 (Attachment 24 ["DeCoste"] at 16). Drummond was DeCoste's manager. Id. at 167.

The U.S. contends that: (1) the Dribus statement is admissible pursuant to Fed. R. Evid. 801(d)(2)(D); and (2) the O&G Journal headline and statement are admissible pursuant to Fed. R. Evid. 801(d)(2)(B).[5] Rec. doc. 8587 (Memorandum at 8-9). BP responds that: (1) the O&G Journal report is hearsay; (2) Exhibit 10468 does not contain an adoptive admission because it is not clear

---

[5] Rule 801(d)(2)(B) provides that,

> A statement that meets the following conditions is not hearsay: . . . [t]he statement is offered against the opposing party and . . . is one the party manifested that it adopted or believed to be true.

Id.

5

that Dribus believed the truth of the content of O&G Journal report or adopted it;[6] (3) the U.S. has not demonstrated that the scope of Dribus' Schlumberger employment involved work on the spill and that the statement was made within the scope of Schlumberger's work for BP. Rec. doc. 8712 at 6-7.

The U.S. replies that: (1) BP's reading of Rule 801(d)(2)(D) is too narrow; and (2) the flow rate was related to Schlumberger's job to help capture or burn the oil. It urges that the inclusion of the O&G Journal headline and statement do not preclude admission because: (1) Dribus adopted the headline and statement (Fed. R. Evid. 801(d)(2)(B)); (2) the headline and statement can be admitted for the effect they had on Dribus - he wrote to Decoste and Drummond; and (3) in the alternative, Dribus' statement can be admitted without the headline and statement from the O&G Journal.

The first issue is whether flow rate concerned a matter within the scope of Schlumberger's employment by BP. Schlumberger was responsible for pressure, volume and temperature analysis on Macondo well samples. Decoste at 15. It also worked on the vessels that were used to collect oil from the Deepwater Horizon and Macondo well. Id. It was asked by BP to mobilize the well testing equipment that was to be used to contain and either capture or burn the maximum amount

---

[6] In his January 11, 2012 order and reasons regarding email strings, Judge Barbier stated that:

> A statement is not hearsay if it was made by a party and is offered against that party. FED. R. EVID. 801(d)(2). A party can make a statement in one of several ways: for example, through its employee, directly, or by adoption of another person's statement. The PSC argues that many of the emails that were forwarded by employees of the parties are adoptive admissions. This is a plausible argument under Rule 801(d)(2)(B), which makes admissible statements of which a party manifested its adoption or belief. However, the fact that a party's employee forwarded an email originating from outside his employer does not necessarily constitute an adoption of the contents of the forwarded email. . . . Therefore, <u>a forwarded email is only an adoptive admission if it is clear that the forwarder adopted the content or believed in the truth of the content.</u>

Rec. doc. 5143 at 9-10 (emphasis added and citation omitted).

6

of oil possible with the vessels put at its disposal. Id. at 22-23. Given Schlumberger's responsibilities for BP in the wake of the spill, flow rate was a matter within the scope of Schlumberger's employment by BP.

The second issue is whether flow rate concerned a matter within the scope of Dribus' employment by Schlumberger. Dribus was the Global Geology Advisor for Schlumberger - its top geologist. DeCoste at 161-62. Given Dribus' position at Schlumberger, and its to work to contain and either capture or burn the maximum amount of oil possible, flow rate concerned a matter within the scope of Dribus' employment with Schlumberger. The Dribus statement is not hearsay under Rule 801(d)(2)(D).

The third issue is whether the O&J Journal headline and statement are not hearsay under Rule 801(d)(2)(B). A forwarded statement "is only an adoptive admission if it is clear that the forwarder adopted the content or believed in the truth of the content." Rec. doc. 5143 at 10. The U.S. did not submit any testimony from Dribus. DeCoste described the Dribus statement as speculation. He testified that Schlumberger had no way of knowing what the flow rate was on June 15, 2010. DeCoste at 163-64. Dribus' statement is prefaced by the word "appears." It is not clear that Dribus either adopted the content of the O&G Journal headline and statement or believed in the truth of their content. The O&J Journal headline and statement are hearsay and are not admissible.

The last issue is whether the Dribus' statement can be admitted without the headline and content from the O&G Journal. Because of the conclusion that the O&G Journal statement is excluded as hearsay, DeCoste's description of Dribus' statement as speculation, and his statement

that Schlumberger had no way of knowing what the flow rate was on June 15, 2010, Exhibit 10468 is excluded under Rule 403.[7]

**TREX 10468 is inadmissible.**

3.  TREX-008804.

On February 9, 2012, Judge Barbier issued an order and reasons regarding motions *in limine* to exclude other government reports and Congressional testimony. Rec. doc. 5635. Citing U.S. v. Central Gulf Lines, Inc., 747 F.2d 315, 319 (5th Cir. 1984), he found that the Report of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "National Commission Report") appeared to be a public record because it was authorized by the President and the Commission had a duty to report to the President. Rec. doc. 5635 at 2. Although it was exempt from the hearsay rule as a public record, he found that it contained "multiple instances of inner hearsay that would have to be addressed at trial when a party seeks to introduce a portion of the report." Id. at 3. Judge Barbier declined "to sort the wheat from the chaff" at the trial and excluded the National Commission Report from Phase One. Id.

On March 10, 2011, the Flow Rate Technical Group ("FRTG") released its assessment of flow rate estimates for the Deepwater Horizon/Macondo Well Oil Spill ("FRTG Assessment") Rec. doc. 8587 (Attachment 1-TREX 008804). The U.S. argues that: (1) pursuant to Fed. R. Evid.

---

[7] The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403.

803(8)(A)(iii),[8] the FRTG Assessment is a public record; and (2) the level of inner hearsay in the report does not require that it be excluded. Rec. doc. 8733 at 7-9. BP disputes both of these contentions. Rec. doc. 8712 at 3-6.

> The National Incident Command established the FRTG.
>
> The purpose of . . . [the March 10, 2011 report] is to describe the relative advantages of the different methods that were used to measure flow rate from the Macondo well, so that if this process needs to be used again in an emergency situation, quick decisions can be made to mobilize the techniques most appropriate to that future emergency.

Rec. doc. 8587 (Attachment 1).

BP argues that the FRTG Assessment does not meet the requirements of Rule 803(8) for a "record or statement of a public office" because it states that the views and opinions of the authors expressed therein do not necessarily state or reflect those of the U.S. Government or any of its agencies. Rec. doc. 8712 at 5. The U.S. stresses that the FRTG Assessment includes factual findings of a legally authorized investigation. For the reasons presented by the U.S., the FRTG Assessment is a public record under Rule 803(8).

BP cites the 6 sub-reports as hearsay within the FRTG Assessment. See Appendices A to F beginning at page 21 of the FRTG Assessment (Rec. doc. 8587-Attachment). The U.S. responds that the 6 appendices are part of the report and not hearsay within the FRTG Assessment. The

---

[8] Rule 803(8)(A)(iii) provides that:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . . [a] record or statement of a public office if . . . it sets out in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation. . . .; and neither the source of information nor other circumstances indicate a lack of trustworthiness.

Id.

Court agrees that the 6 appendices are not hearsay within the FRTG Assessment.

BP also cites three examples of hearsay within Appendices B and D to the FRTG Assessment. The U.S. concedes that they may qualify as hearsay, but argues they do not rise to a level sufficient to warrant exclusion of the FRTG Assessment. In the February 9, 2012 order, Judge Barbier was concerned about the inner hearsay of other entities that provided information to the National Commission and the need to conduct in-depth examinations to sift out the inner hearsay. Rec. doc. 5635 at 3. The FRTG Assessment does not present the magnitude of inner hearsay found in the National Commission Report.

**TREX-008804 is admissible.**

IT IS ORDERED that:

1. The motion of the U.S. for ruling on a sample of 9 Phase Two documents (Rec. doc. 8587) is GRANTED in PART and DENIED in PART as provided herein.

2. **The deadline for an appeal of this order is March 21, 2013.**

New Orleans, Louisiana, this 7th day of March, 2013.

	SALLY SHUSHAN
	**United States Magistrate Judge**