01-37517
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG ) MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on ) SECTION: J
APRIL 20, 2010 )
) JUDGE BARBIER
)
) MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF



U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    MAR – 6 2013

LORETTA G. WHYTE
CLERK

# Michael Keith Williams
## *Damages*

### VOLUME 1

JULY 20, 2011

# *COPY*



**WORLDWIDE**

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

3   IN RE:  OIL SPILL        )   MDL NO. 2179
    BY THE OIL RIG           )
4   "DEEPWATER HORIZON" IN )   SECTION "J"
    THE GULF OF MEXICO, ON )
5   APRIL 20, 2010           )   JUDGE BARBIER
                             )   MAG. JUDGE SHUSHAN
6

7

8

9

10

11

12

13

14

15

16

17              * * * * * * * * * * * * * * * * *
                       VOLUME 1
18              * * * * * * * * * * * * * * * * *

19

20

         Deposition of Michael Keith Williams,
21   taken at Pan-American Building, 601 Poydras
     Street, 11th Floor, New Orleans, Louisiana,
22   70130, on the 20th day of July, 2011.

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

```
1              A P P E A R A N C E S
2

3

4   APPEARING FOR THE PLAINTIFFS' STEERING COMMITTEE:
        Mr. William W. Dills
5       WILLIAMSON & RUSNAK
        4310 Yoakum Boulevard
6       Houston, Texas  77006-5818
7

    APPEARING FOR MICHAEL KEITH WILLIAMS:
8       Mr. Ronnie G. Penton
        LAW OFFICES OF RONNIE G. PENTON
9       209 Hoppen Place
        Bogalusa, Louisiana  70427-3827
10

11  APPEARING FOR BP, INC.:
        Mr. David W. Leefe
12      Mr. Devin C. Reid
        LISKOW & LEWIS
13      One Shell Square
        701 Poydras Street, Suite 5000
14      New Orleans, Louisiana  70139-5099
15

    APPEARING FOR TRANSOCEAN:
16      Mr. Edward F. Kohnke
        PREIS & ROY
17      Pan American Life Center
        601 Poydras Street, Suite 1700
18      New Orleans, Louisiana  70130
19      Mr. Daniel O. Goforth
        GOFORTH GEREN EASTERLING
20      4900 Woodway, Suite 750
        Houston, Texas  77056
21

22  APPEARING FOR ANADARKO PETROLEUM COMPANY:
        Ms. Marilee J. Allan
23      Ms. Jennifer S. Rosen
        BINGHAM MCCUTCHEN
24      Three Embarcadero Center
        San Francisco, California 94111-4067
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1   APPEARING FOR CAMERON INTERNATIONAL CORPORATION:
          Mr. Alex Roberts
 2        BECK, REDDEN & SECREST
          One Houston Center
 3        1221 McKinney Street, Suite 4500
          Houston, Texas  77010-2010
 4
 5   APPEARING FOR WEATHERFORD:
          Mr. William C. Baldwin
 6        JONES, WALKER, WAECHTER, POITEVENT,
          CARRERE & DENEGRE, LLP
 7        201 St. Charles Avenue
          New Orleans, Louisiana  70170-5100
 8
 9   APPEARING FOR DRIL-QUIP, INC.:
          Ms. Wendy Ware Bishop
10        WARE, JACKSON, LEE & CHAMBERS
          America Tower, 42nd Floor
11        2929 Allen Parkway
          Houston, Texas  77019-7101
12
13   APPEARING FOR M-I SWACO:
          Mr. Patrick Elkins
14        MORGAN, LEWIS & BOCKIUS, LLP
          1000 Louisiana Street, Suite 4200
15        Houston, Texas 77002-5006
16
     APPEARING FOR HALLIBURTON:
17        Mr. Sean W. Fleming
          Mr. Israel R. Silvas
18        GODWIN RONQUILLO
          1201 Elm Street, Suite 1700
19        Dallas, Texas 75270-2041
20
     APPEARING AS OBSERVER FOR THE
21   U.S. DEPARTMENT OF THE INTERIOR:
          Mr. Lance C. Wenger
22        OFFICE OF THE SOLICITOR
          ROCKY MOUNTAIN REGION
23        U.S. DEPARTMENT OF THE INTERIOR
          755 Parfet Street, Suite 151
24        Lakewood, Colorado  80215
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

4

1   APPEARING FOR THE UNITED STATES:

        Mr. David J. Pfeffer

2       U.S. DEPARTMENT OF JUSTICE

        TORT BRANCH, CIVIL DIVISION

3       1425 New York Avenue, N.W.

        Suite 10100

4       Washington, D.C.   20005

5

    ALSO PRESENT:

6       Mr. Mark Hendrix, Videographer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PURSUANT TO CONFIDENTIALITY ORDER**

1  get through the entire question before you start

2  answering, and, likewise, while you're finishing

3  your answer to one of my questions, I'll do my

4  best not to jump in and interrupt you.  That's

5  just a matter of courtesy and also to help the

6  court reporter make sure that the record is

7  clear.  Do you understand that?

8      A.  Yes, sir, I do.

9      Q.  Okay.  And, you know, given the -- the

10  nature of this case, we will probably talk about

11  some things that are a little bit difficult.  If

12  you, at any time, need to take a break, you just

13  let me know and -- and we can make that happen,

14  okay?

15      A.  I understand.

16      Q.  All right.  As of April 20th, 2010, what

17  was your employment?

18      A.  I was employed by Transocean as a Chief

19  Electronics Technician.

20      Q.  And how long had you been in that

21  position up to that time?

22      A.  Less than one year.

23      Q.  All right.  Let's go through your history

24  with Transocean, if you could.  When did you

25  start working with Transocean?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  When did you come onboard the DEEPWATER

2  HORIZON for the first time?

3    A.  July of '08, if I recall correctly.

4    Q.  Did you work on any other rigs after you

5  came onboard in July of 2008?

6    A.  No, sir, I did not.

7    Q.  And you mentioned that one of the -- one

8  of the reasons that you moved from a Roustabout

9  position to an Electronic Technician was because

10  of some of your background?

11    A.  Correct.

12    Q.  Okay.  Can you just generally describe

13  your background with electronics for me?

14    A.  All four years of high school, I took an

15  electronics elective, versus PE, or whatever.

16    Q.  M-h'm.

17    A.  And after graduating from high school, I

18  joined the Marine Corps as an Avionics

19  Technician.

20    Q.  And how were -- how long were you in the

21  Marine Corps?

22    A.  A little over four years.

23    Q.  Did you work as an Avionics Technician

24  for that entire period?

25    A.  No, sir, I did not.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Do you have -- what other positions did
2  you hold?
3    A.   Approximately two years -- let me
4  rephrase that.  I spent approximately the first
5  two years in training, from boot camp, through
6  avionics training, through aircraft training.
7  Once I got to the fleet, less than four months in
8  the fleet at my assigned unit before I was then
9  temporarily assigned to a different unit through
10  a program called Fleet Assistance.  Basically
11  wherever -- and whatever MOS they're short on the
12  base, they send out requests, and it's usually
13  less-than-desired jobs that they can't fill from
14  new recruits, so they take other employees and
15  place them in those positions.  I was assigned to
16  the Provost Marshal's Office.
17    Q.   In between your time in the Marine Corps
18  and Transocean, did you have any other periods of
19  employment?
20    A.   Yes, I did.
21    Q.   Okay.  Did you work in electronics in
22  those positions?
23    A.   No, I did not.
24    Q.   Okay.  Let's walk through the
25  responsibilities of -- or the position you had as

**PURSUANT TO CONFIDENTIALITY ORDER**

1  of April 20th of Chief Electronics Engineer.  Can

2  you just tell me a little bit about the

3  responsibilities that your position required of

4  you?

5     A.  Yes.  I -- well, we need to say Chief

6  Electronics Technician.  I don't --

7     Q.  My apologies.  I'll probably get that

8  wrong a couple of times today.

9     A.  I do not hold an Engineering degree.

10        That -- that's a very broad question.  As

11  I've explained, in the past, I worked on

12  everything from the prop to the top.  If it had a

13  wire and a signal, sending to a computer or a

14  database, basically, we were responsible for it.

15     Q.  Okay.

16     A.  From phone systems to safety systems.

17     Q.  Okay.  Did you work on -- well, did you

18  have any responsibilities with respect to the BOP

19  or its control systems?

20     A.  I had zero responsibility when it comes

21  to the BOP.

22     Q.  Okay.  Did you work on any of the BOP

23  panels?

24     A.  I worked on the BOP purge panel, yes,

25  sir, I did.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   At a -- at some point before the blowout,

2   yes, I had placed the equipment in automatic mode

3   and ordered the -- the parts that were required

4   to get it to reset itself versus having to be

5   manually reset using a trick with my mouth, a

6   piece of hose, and a piece of bubble gum.

7    Q.   And there are multiple BOP panels on the

8   rig, correct?

9    A.   Yes, sir.   There's two.

10    Q.   And this particular BOP panel that we're

11   talking about, where was that located?

12    A.   That was actually located in the

13   Driller's shack.

14    Q.   Okay.   Did you have anything to do with

15   the other BOP panel?

16    A.   No, sir.   It did not have a purge on it.

17    Q.   Okay.

18    A.   It was in a safe location.

19    Q.   Do you happen to know if that purge panel

20   remained in the automatic setting that you placed

21   it in up to April 20th?

22    A.   The -- the last time that I was called

23   for that panel, it had gone down.   Someone had

24   left the back door open to the Driller's shack

25   too long.   The Driller's shack itself was also a

**PURSUANT TO CONFIDENTIALITY ORDER**

1  purged environment.  Someone had stood with the

2  back door open too long.  They had lost purge in

3  that room.  The alarm for the Driller was

4  received at his station, and at the same time,

5  someone had opened the doors to the BOP control

6  panel, which it's designed to leak some air out.

7       You -- you can't have -- it can't be a

8  completely sealed environment, because you

9  pressurize a vessel, it becomes dangerous.  So

10  that when they opened the doors, with the lack of

11  positive pressure in the shack and the lack of

12  now seals from the glass doors, the BOP panel did

13  power itself down.

14      Q.  Was the setting --

15      A.  In automatic.

16      Q.  -- changed?

17          Was the setting changed after that, or

18  did it remain in automatic?

19      A.  My part of -- of that issue was they

20  called me.  The Assistant Driller Don Clark

21  called me in my office, said that the panel was

22  dead, I needed to get up to the rig floor

23  immediately.  By the time I had arrived at the

24  rig floor, Mark Hay, Senior Subsea Supervisor,

25  had al -- had beaten me up there -- apparently he

**PURSUANT TO CONFIDENTIALITY ORDER**

1   was called, as well -- and he had flipped the key

2   switch from "Automatic" to "Manual."  The panel

3   powered itself back up.

4       Q.   Did you have any discussion about why it

5   was placed in that setting at that time?

6       A.   Yes, I did.  With the BP Company Man that

7   was present.

8       Q.   Okay.  And do you know the name of the

9   Company Man at that time?

10      A.   Yes, I do.  It was Mr. Donald Vidrine.

11      Q.   Okay.  What -- can you just describe this

12  conversation for me?

13      A.   He asked -- I asked Mr. Vidrine if he

14  would like me to place that panel back in

15  automatic.  At that time, Mr. Hay reported that,

16  "The entire fleet runs on the bypass.  Leave it

17  the hell alone."

18          I -- Mr. Vidrine looked at me and asked

19  me do I know how to repair the system.  I said,

20  "Yes, I know how to put the system in automatic,

21  but a permanent repair is going to require a part

22  which I have on order," and had been on order for

23  some period of time.

24          The decision was made that we would not

25  flip that switch from "Manual," or bypass, to

**PURSUANT TO CONFIDENTIALITY ORDER**

1    "Automatic" until the next rig move.

2        Q.   So the expectation was that it would be

3    placed back in automatic at some point?

4        A.   Yes.

5        Q.   Okay.  You mentioned some of the other

6    systems that you work with, and I believe you

7    said safety systems.  Did I hear you correctly?

8        A.   Yes, sir.

9        Q.   What would be encompassed within the

10   safety systems category?

11       A.   Fire and gas system; ESD Systems; all the

12   IACS, Integrated Automatic Control Systems; PAGA,

13   which would be our loud speaker system.  Anything

14   associated with those.

15       Q.   With respect to the fire and gas system,

16   does that -- does that system work in conjunction

17   with any other safety systems?

18       A.   It does.  It works in conjunction with

19   the IACS, which is the Integrated Automatic

20   Control System.  There are several pieces of --

21   of the Simrad Safety System that -- that are

22   comprised of a -- of a fire and gas, an ESD

23   vessel control, thruster control.  There -- it's

24   a -- a very large series of subsystems that all

25   report back to a central system.

**PURSUANT TO CONFIDENTIALITY ORDER**

24

1    Q.  How about the -- the emergency shutdown

2  system, does that have any interaction with the

3  fire and gas system?

4    A.  Yes, sir, it does.  It is in the Cause

5  and Effect Matrix.

6    Q.  Okay.  If fire and gas is detected on the

7  rig, what is the response of the emergency

8  shutdown system?

9    A.  It depends on where the gas or fire is

10  located and depending on what mode the outputs of

11  those sensors are placed in.

12    Q.  What are the different modes that the

13  sensors could be placed in?

14    A.  There are, off the top of my head, at

15  least four modes.  There's a -- just your normal

16  active mode.  There would be a passive mode.

17  There would be an inhibited mode, and there would

18  also be an override mode.

19    Q.  So what happens in active mode?

20    A.  In active mode, the -- the sensor's data

21  is used by the entire IACS system and would

22  follow the flow chart of the Cause and Effect

23  Matrix.

24    Q.  Would the emergency shutdown system

25  automatically activate the dampers and close off

**PURSUANT TO CONFIDENTIALITY ORDER**

1  airways if it's set in automatic -- in active

2  mode?

3      A.  In some instances, yes.

4      Q.  Okay.  Are you aware of where the fire

5  and gas sensors are located with respect to any

6  air intakes near the engine room?

7      A.  Every one of them, yes, sir.

8      Q.  Okay.  Let's walk through those air

9  intakes.  Can you tell me where the -- the air

10  intakes that include fire and gas sensors near

11  the engine room are located?

12      A.  There are -- all the sensors are on the

13  aft side of centerline of the rig.  The first air

14  intake would be on the port side.  There's a

15  combustible and toxic sensor there.  Underneath

16  the riser skate there's another two sets of

17  intakes that would each have a fire -- or a toxic

18  and combustible.  And then on the starboard side

19  there's also another air intake that would have a

20  toxic and combustible sensor.

21      Q.  Four total air intakes to the engine

22  room?

23      A.  That I'm aware of, yes, sir.

24      Q.  Do you know -- first, do you know what

25  setting that those ESD functions related to these

1    Q.  Okay.

2    A.  Other than that, it was a very effective

3   way for us to track our -- our work.

4    Q.  Did the RMS system assist in keeping the

5   maintenance up to date?

6    A.  You'll have to rephrase that.

7    Q.  All right.  Did the RMS system assist

8   with making sure that maintenance was timely

9   conducted in -- in accordance with the level of

10  need that any particular piece of equipment

11  required?

12   A.  I would have to assume that was its

13  intent.  However, Operations dictated otherwise.

14   Q.  And what do you mean by that?

15   A.  Say, for instance, a pipe racker PM, we

16  had one that came out every 30 days that required

17  going in a man rider or a basket and going from

18  the very bottom of this thing to the top of it,

19  inspecting every J box, every cable tray, every

20  landing.  If we were in the middle of drilling,

21  their -- the drill floor is not going to let you

22  up there to conduct that operation, so it would

23  have to be put off.

24   Q.  All right.  Were -- was preventative

25  maintenance on the rig something that was

**PURSUANT TO CONFIDENTIALITY ORDER**

1  generally behind schedule?

2     A.  Continuously behind schedule.

3     Q.  All right.  How far behind schedule?

4     A.  H'm, that's subjective.  I mean, it's --

5  some systems were way behind, others were not

6  behind.  I mean, it's -- just depends.

7     Q.  Okay.  Was equipment on the rig well

8  maintained?

9     A.  Some equipment, yes.  Not all.

10     Q.  What equipment springs to mind that was

11  not well maintained?

12     A.  The pipe rackers.

13     Q.  Okay.  Anything else?

14     A.  Yeah, the Driller Chairs, A, B, and

15  C-Chair.

16     Q.  Is that simply a function of the fact

17  that if that equipment's in use for a drilling

18  operation, you can't get in there to do

19  maintenance?

20     A.  Yes and no.

21     Q.  Okay.  Why not?

22     A.  They're -- BP wouldn't allow the down

23  time to change out the computers that needed to

24  be -- desperately needed to be changed.  We were

25  given opportunities to change out hard drives,

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.   Okay.   You don't have any specific

2  knowledge about the way it works?

3    A.   No, sir, I do not.

4           MR. PFEFFER:   Okay.   Since we're

5  close to the end of the tape, let's go ahead and

6  take a break now.

7           THE WITNESS:   Okay.

8           THE VIDEOGRAPHER:   We're off the

9  record at 9:33, end Tape 1.

10       (Recess from 9:33 a.m. to 9:48 a.m.)

11           MR. PFEFFER:   I'm ready.

12           THE VIDEOGRAPHER:   All set?

13       We're on the record at 9:48, start

14  Tape 2.

15    Q.   (By Mr. Pfeffer) Mr. Williams, do you

16  happen to know if you were on the rig on March

17  8th, 2010?   Does that ring a bell to you?

18    A.   I'd have to look at a calendar.

19    Q.   Okay.   Prior to April 20th, were you on

20  the DEEPWATER HORIZON when -- on the Macondo Well

21  when the rig took a kick?

22    A.   Yes, I was.

23    Q.   Okay.   What were you working on when that

24  happened?

25    A.   We were having issues with the -- with

**PURSUANT TO CONFIDENTIALITY ORDER**

1    the Chairs.

2        Q.   Okay.   And where specifically on the rig

3    was -- did this -- did the work you were doing

4    happen?

5            Str -- strike that.   That was a terrible

6    question.

7        A.   Thank you.

8        Q.   When you say you're "working on the

9    Chairs," where -- where were the Chairs?

10       A.   In the Driller's shack, the CyberChairs,

11   A, B, and C.

12       Q.   Okay.   So you're in the Driller's shack

13   working on the Chairs.   What specific work were

14   you doing?

15       A.   They were having issues with the software

16   locking up and a -- what -- what we termed or

17   coined "the blue screen of death," where the

18   Driller would -- would be looking at two -- two

19   monitors side by side, looking at all of his

20   parameters, and all of a sudden just the screens

21   would turn blue, and he would lose all of his

22   data.

23       Q.   So that had happened, and you had been

24   called to the Driller's shack; is that correct?

25       A.   Yes.   Numerous times.

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Operations and Maintenance Manuals, because

2   sometimes we needed to understand how the

3   interfaces worked, how operations would affect

4   maintenance.

5       Q.   All right.   And you -- you felt like it

6   was very important in your position that you have

7   an understanding of how the system worked?

8       A.   "Very important" is subjective.   It -- it

9   was important enough that I read it, yes.

10      Q.   All right.   Well, to you, personally, did

11  you feel like it was critical to you to perform

12  your job functions that you understood how the

13  system worked?   Fair enough?

14      A.   Fair enough.

15      Q.   Okay.   And as of April 20, 2010, did you

16  feel as though you did have a good understanding

17  of how the Safety System worked?

18      A.   I -- I was comfortable in the maintaining

19  and repairing of that system.

20      Q.   Okay.   Now, as I -- as I understand the

21  system, it -- it is designed to detect three

22  things:   Fire, toxic gas, and combustible gas.

23      A.   Actually, four things.

24      Q.   What's --

25      A.   Smoke.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    "hazardous area"?

2        A.   Correct.

3        Q.   All right.

4        A.   Hazardous areas are well-defined.

5        Q.   All right.  Well, I appreciate you

6    telling me that.

7             So, then, it was determined that it was

8    important, at least for the folks that set up

9    that system, to have gas -- combustible gas

10   sensors located at -- at the air intakes to the

11   engine rooms?

12       A.   Correct.

13       Q.   And other locations on the rig, the air

14   intakes?

15       A.   Correct.

16       Q.   Do you have any idea how many combustible

17   gas sensors there were all total on the rig?

18       A.   70, 80, maybe.

19       Q.   Now, as I -- as I appreciate the system,

20   and -- and I know you'll correct me if -- if

21   I'm -- if I say this wrong, the system was

22   capable of automatically making certain things

23   happen.

24       A.   Correct, the integrated automatic --

25   integrated automated control systems, yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  All right.  And one of the things that it

2  was capable of automatically -- making

3  automatically happen was activation of -- I think

4  I've seen the term "panel alarm"?

5    A.  Correct.

6    Q.  And that's -- that's a -- that's an alarm

7  that's located on a panel in a -- in a control

8  room?

9    A.  Correct.

10    Q.  All right.  And that's a -- that's an

11  audible alarm, beep, beep, beep?

12    A.  Correct.

13    Q.  And also a visual alarm, a light?

14    A.  Not necessarily a light on that -- well,

15  it would be on a separate panel, but the panel I

16  would be per -- referring to would be an OS, an

17  Operator Station, and there wouldn't be a light.

18  There would be a banner that would pop up on

19  their list of issues.

20    Q.  Okay.

21    A.  It would be highlighted.

22    Q.  So that would be the visual component,

23  the banner?

24    A.  Where someone would normally be.

25        Now, this other panel on the wall, which

**PURSUANT TO CONFIDENTIALITY ORDER**

1    is stand-alone isolated, it would have a light

2    that would flash, yes.

3         Q.  Right.  And where would the beep, beep,

4    beep, come from?

5         A.  Both places, actually.

6         Q.  Okay.  And then the system was also

7    capable of automatically sounding the general

8    alarm on the rig?

9         A.  Correct.

10        Q.  And it was also capable of automatically

11   closing fire dampers?

12        A.  Correct.

13        Q.  Okay.  Now, what is a fire damper?

14        A.  A fire damper is a -- a very broad term

15   for any condition that -- where we do not want

16   the atmosphere around the intake to enter the

17   space that that intake is feeding.  We want to

18   cut that off.  We want to stop that.  We're going

19   to, number one, stop the electricity to the fan

20   that's pulling the air down, and we're going to

21   shut the fire damper.  The fire damper would be

22   the, you know, a gate, a -- a valve, some way to

23   prevent fire from moving from space to space.

24        Q.  And -- and gas, too?

25        A.  Well, and gas, what -- yeah --

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  Yeah.

2    A.  -- whatever it is.  It's just a -- a -- a

3  gate, it's a door.

4    Q.  So -- so the idea is to com -- you --

5  you -- you all are drilling a well, and -- and

6  there's gas downhole, right?

7    A.  Correct.

8    Q.  Okay.  And that -- and that gas is

9  combustible gas?

10    A.  Sometimes.

11    Q.  Well --

12    A.  Sometimes it's toxic.

13    Q.  Okay.  Could be -- could be either toxic

14  or combustible?

15    A.  Correct.

16    Q.  All right.  And you don't want

17  combustible gas to come into contact with an

18  ignition source, true?

19    A.  Correct.

20    Q.  And that's one of the things the Safety

21  System on the HORIZON is designed to prevent?

22    A.  Correct.

23    Q.  Okay.  And -- and -- and the automatic

24  closing of air dampers on in -- intake locations,

25  is designed to prevent combustible gas from

**PURSUANT TO CONFIDENTIALITY ORDER**

1    coming into contact with ignition sources?

2        A.   Correct.

3        Q.   That -- that automatic closing of the

4    fire damper, that's a part of the -- the Fire and

5    Gas Safety System?

6        A.   Correct.

7        Q.   All right.

8        A.   Fire dampers and another term below decks

9    would be watertight dampers.

10       Q.   Okay.  Now, the system -- the Safety

11   System was also capable of automatically stopping

12   ventilation fans?

13       A.   Correct.

14       Q.   And it was also automatic -- capable of

15   automatically stopping engines?

16       A.   H'm, not to my knowledge.  There is no

17   direct link between fire and gas and an engine.

18       Q.   All right.  Are you sure of that?

19       A.   To my knowledge, there's no direct link

20   between the engine --

21       Q.   Now --

22       A.   -- and the fire and gas panel.

23       Q.   And -- and what about was the system --

24   the Safety System automatically capable of

25   stopping -- of -- of shutting down, let's say,

**PURSUANT TO CONFIDENTIALITY ORDER**

1  other types of equipment?

2      A.   Sure.

3      Q.   What types of equipment?

4      A.   They could have closed the fire dampers,

5  they could have closed doors, there are

6  magnetically held doors that would release.

7      Q.   M-h'm.

8      A.   It would shut down any pumps, any

9  equipment that's operating in that space that's

10  using electricity, it would shut all of that

11  down.   The breakers for that equipment would --

12      Q.   Generators?

13      A.   Generators.

14      Q.   Okay.

15      A.   "Generators" is a -- a very broad term,

16  now.   Are you talking about main engine

17  generators or other generators?

18      Q.   Are you --

19      A.   There's several different types of --

20      Q.   -- well --

21      A.   -- generators.

22      Q.   -- you -- you tell me in the context of

23  my question, what -- what sorts of generators was

24  the Safety System capab -- capable of

25  automatically stopping?

**PURSUANT TO CONFIDENTIALITY ORDER**

1    me -- let me start over here.  I apologize.

2         Let's assume -- well, that -- we'll call

3    it Zone 1, okay?  Engine Room No. 3 is in Zone 1.

4    It takes -- it takes two high high-level sensors

5    within Zone 1 -- anywhere within Zone 1 to close

6    all the air dampers in Zone 1?

7       A.  Correct.

8            MR. KOHNKE:  David, let me -- let me

9    note my objection only to the fact that this is

10   an assumption, and we're in never-never land.  I

11   think I'm reading it, and I don't mean to make a

12   speaking objection, but I -- I wanted to stop

13   you.

14           MR. LEEFE:  But -- but you are.

15           MR. KOHNKE:  I know, but I want you

16   to understand why I'm objecting.

17           MR. LEEFE:  All right.  I -- I think

18   I do, but I think it's not really a valid

19   objection, because my -- I'm just assuming -- I

20   could call it -- I could call it Zone A, B, C, if

21   I wanted to.  You know, I mean, I just --

22   whatever --

23       Q.  (By Mr. Leefe) Let me just ask it again

24   to make Mr. Kohnke happy.

25           Whatever zone Engine Room No. 3 is in, as

PURSUANT TO CONFIDENTIALITY ORDER

1   long as there are two gas sensors detecting high

2   high levels within that zone, all the air dampers

3   in that zone are going to close?

4       A.   Correct.

5       Q.   All right.   And theoretically, that

6   should prevent gas from getting to whatever is

7   inside Engine Room No. 3?

8       A.   Correct.

9       Q.   And -- and that -- and that requires that

10  the system -- the sensors be set in the active

11  mode?

12      A.   Correct.

13      Q.   And in your -- it's your belief, as the

14  Chief Electrical Technician -- Electronics

15  Technician --

16      A.   You got it.

17      Q.   You were going to catch me, too -- on the

18  HORIZON, that the -- the gas sensors, apart from

19  maintenance activities, should always be in the

20  active mode?

21      A.   Correct.

22      Q.   Now, another thing that will happen when

23  you have this two -- these two high high levels

24  of sensors in a particular zone activated, is the

25  general alarm will sound?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   Correct.

2     Q.   If you're in the active mode?

3     A.   Correct.

4     Q.   Okay.  And another thing that will happen

5  is the panel alarms will sound?

6     A.   Correct.

7     Q.   And the visual banner, or whatever it is

8  associated with -- with the panels will -- will

9  light up?

10     A.   Correct.

11     Q.   Now, was it -- was it always the case on

12  the HORIZON that -- that all of the gas detection

13  sensors, the combustible gas detect -- detection

14  sensors were -- were maintained in the active

15  mode?

16     A.   Mostly, yes.

17     Q.   All right.  Now, I -- had you ever seen

18  that -- situations where gas detection sensors

19  were in a mode that you -- I think you used the

20  term "inhibited" before as one of the options?

21     A.   Correct.

22     Q.   All right.  You've seen -- you've seen

23  the -- in your time on the DEEPWATER HORIZON, had

24  you seen gas detection sensors put in the

25  inhibited mode?

**PURSUANT TO CONFIDENTIALITY ORDER**

1     A.   Yes, I've seen them put in inhibited

2 mode.

3     Q.   Okay.  And had you seen the inhibited

4 mode used, separate and apart from maintenance

5 activities?

6     A.   Yes.

7     Q.   Okay.  Now, at one point prior to the --

8 to the April 2010 blowout, you -- you discovered

9 that -- that some of the sensors had been set to

10 the inhibited mode, and you actually had some

11 discussions with your Superiors about that?

12     A.   They -- I think you're confusing two

13 different -- two different things there.

14     Q.   Okay.  Help me out.

15     A.   What I discovered was that the general

16 alarm itself was in an inhibited mode.

17     Q.   Okay.

18     A.   That the response, which would be from

19 the field devices, which were in active mode,

20 that their response would be cut off at that

21 panel, because -- because the -- the general

22 alarm would not sound without a person walking

23 over and physically pushing the button.

24     Q.   Okay.  So then -- so then what -- what

25 we're talking about here is not the -- not a

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.   Whether it be a minute or three minutes

2  or something, there's some value of time that it

3  allows an Operator to interject before it

4  automatically completes its functions --

5    Q.  M-h'm.

6    A.  -- and follows the coll -- the matrix.

7    Q.  And -- and I'm skipping ahead, but on

8  the -- on the night of the April 20, 2010

9  blowout, am I correct you never heard the general

10  alarm go off?

11    A.  Not one time, no.

12    Q.  Okay.  Does that tell you that it was set

13  on "inhibited"?

14    A.  It tells me no one pressed the button.

15    Q.  Yeah.  Well, did it also tell you that it

16  was -- it was set on "inhibited" as opposed to

17  "active"?

18          MR. KOHNKE:  Objection, form.

19    A.  Yeah.  That's kind of a --

20    Q.  (By Mr. Leefe) Well --

21    A.  -- tricky way to ask it.

22    Q.  -- the standard way that Transocean kept

23  the general alarm on the rig was in the inhibited

24  mode?

25    A.  Correct.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  All right.  So any reason to think that

2   on April 20, 2010, it was in something other than

3   the inhibited mode?

4              MR. PENTON:   Objection, form.

5    A.  No.

6    Q.  (By Mr. Leefe) And -- and, again, you --

7   you strongly disagreed with that practice that

8   Transocean used of keeping the general alarm in

9   the inhibited mode?

10   A.  Initially, yes.

11   Q.  And am I correct that the reasons you

12  were given to do that was that -- that they kept

13  it in the inhibited mode was because they didn't

14  want to wake people up at night with false

15  alarms?

16   A.  Correct.  They listed their

17  justifications.

18   Q.  And one of them was they didn't want to

19  wake people up at night?

20   A.  Correct.

21   Q.  What would cause a false alarm?

22   A.  Any number of things.  Be more specific.

23   Q.  Well, what would cause the general alarm

24  system to go off in a -- in a nonemergency?

25   A.  Catastrophic system failure could cause

**PURSUANT TO CONFIDENTIALITY ORDER**

1    Q.  All right.  So is the system -- the

2 Safety System capable of automatically activating

3 the ESDs?

4    A.  Absolutely.

5    Q.  All right.  And is -- so if in the active

6 mode with two high high combustible sensors being

7 activated, will the ESD -- the ESDs in that

8 particular zone automatically activate?

9    A.  Yes.

10    Q.  All right.  And we've already been over

11 that that closes the vent intakes?

12    A.  Shuts down power.

13    Q.  Shuts down power.  All right.

14        Now, one of the -- one of the reasons

15 that Transocean gave you for inhibiting automatic

16 activation was that the Control Stations were

17 manned?

18    A.  Correct.

19    Q.  All right.  Now, they're manned by whom,

20 DP -- DP Operators?

21    A.  A DPO and a Senior DPO are always on

22 tour.

23    Q.  All right.  So then the system when

24 inhibited relies on the DPO or -- or -- did you

25 say Assistant DPO?  No.

**PURSUANT TO CONFIDENTIALITY ORDER**

1       A.   DPO or a Senior DPO.

2       Q.   Okay.  All right.  When inhibited, the

3  system relies on the -- either the DPO or the

4  Senior DPO being in the vicinity of, aware of the

5  panel alarm going off?

6       A.   Correct.

7       Q.   And it's dependent upon the Senior DPO

8  and the DPO not being preoccupied with other --

9  in the event of an emergency, emergency

10 activities, true?

11      A.   True, to an extent.  There is another

12 timer that says if they don't go to that panel

13 and silence, acknowledge, and reset the alarms

14 they're receiving it will eventually take back

15 over for them, and it will start.  It's cause and

16 effect matrix.

17      Q.   Now, is there a way to -- to inhibit the

18 ESD function and leave the general alarm audio

19 and visual --

20      A.   If there is.

21      Q.   -- in the active mode?

22      A.   I -- I never researched how to do it.

23 I -- I wouldn't know.  I had no reason to put

24 ESDs in override or whatever mode you'd want them

25 in.

**PURSUANT TO CONFIDENTIALITY ORDER**

1   Q.  All right.  When you got to the door, you
2   had a second explosion go off?
3       A.  Second, equally violent explosion, yes.
4       Q.  Any idea where that was coming from?
5       A.  The only thing I can think of was No. 6
6   engine.
7       Q.  Okay.  Why No. 6?
8       A.  Because it was also online.
9       Q.  So the two engines that were online
10  were 3 and 6?
11      A.  Correct.
12      Q.  And I -- I guess this is a little
13  redundant, but at that point, you had not heard a
14  general alarm?
15      A.  No, I did not.
16      Q.  And, in fact, you never heard a general
17  alarm the entire night?
18      A.  No, I did not.
19      Q.  And when you got outside, did you see any
20  visual light column alarms for the combustible
21  gas?
22      A.  I looked at -- at least two different
23  light standards, and neither one of them were
24  blinking.
25      Q.  Okay.  And, of course, the general alarm

1  wouldn't sound, and the lights -- the light

2  alarms wouldn't activate automatically because

3  it -- or if the fire and gas system alarms was

4  inhibited?

5      A.  Correct.

6      Q.  Okay.  And it's your belief that the

7  system was inhibited?

8      A.  Yes, it was.

9      Q.  You know it was?

10      A.  I had no reason to believe they had ever

11  taken it out.

12      Q.  I think you said you next managed to get

13  your -- to get to the bridge.  You made your way

14  to the bridge after you left your shop, right?

15      A.  Yes, sir.

16      Q.  All right.  And -- and then in the

17  bridge, you encountered the Captain?

18      A.  I did.

19      Q.  His name is?

20      A.  Captain -- I called him Captain Curt.

21      Q.  All right.  And I've seen where you've

22  described the Captain as having a "deer in the

23  headlights" look?

24      A.  Yes, he did.

25      Q.  Would that be accurate?

**PURSUANT TO CONFIDENTIALITY ORDER**

1      A.   Yes.

2      Q.   What -- what do you mean by that

3    description?

4      A.   He was overwhelmed.

5      Q.   All right.   I've also seen -- I think you

6    said he was dazed and confused?

7      A.   Yes.

8      Q.   Would that -- that be accurate?

9      A.   Yes.   He didn't know what was happening

10   and why.

11     Q.   Okay.   Did he -- did he -- did he impress

12   you with his command of the situation?

13          MR. KOHNKE:   Objection, form.

14     A.   I don't really have anything to compare

15   it to.   I've never been in a situation like this

16   before.

17     Q.   (By Mr. Leefe) All right.   Well, if he's

18   a deer in the headlights, and he's dazed and

19   confused, I wouldn't think that would impress

20   you.

21     A.   Well, that was the first --

22     Q.   Fair to say?

23          MR. KOHNKE:   Objection, form.

24     A.   That's the first impression.   Some time

25   passed while I was in the bridge.

**PURSUANT TO CONFIDENTIALITY ORDER**

1    A.  Yes, I did.

2    Q.  Tell me about those.  How did you hear

3  about that term?

4    A.  A lot of the conditions of that well were

5  similar to the conditions of the previous well we

6  had drilled, which was in the vicinity of Devil's

7  Tower.  That well exhibited a lot of the same

8  nasty habits.  It had a lot of gas in it, we got

9  stuck, it had -- we had issues.  We did not

10  receive a -- a well bonus from the one near

11  Devil's Tower, nor were we going to receive a

12  bonus from this well.  The other well was dubbed

13  the "well from hell."  This became the new "well

14  from hell."

15    Q.  Okay.  Was the previous "well from hell"

16  that -- was it, I'm sorry, Devil's Tower?

17    A.  It was close to Devil's Tower.  I don't

18  know the exact block or -- or name of it.

19    Q.  That well, was -- was that well

20  successfully completed?

21    A.  No, it was abandoned.

22    Q.  Okay.  What other wells were you involved

23  in on the HORIZON prior to the Macondo and the

24  one near Devil's Tower?

25    A.  I'm not sure.  Maybe three or four.

**PURSUANT TO CONFIDENTIALITY ORDER**