**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF LOUISIANA**

**C CUP OYSTERS, LLC**
  **Claimant**

**CLAIMANT ID: 100001754**

**CLAIM ID: 8721**

**CLAIM TYPE: VoO CHARTER PAY**

**MDL NO. 2179**

**SECTION J**

**JUDGE CARL J. BARBIER**

**MAG. JUDGE SALLY SHUSHAN**

<u>**OBJECTIONS TO THE APPEAL PANEL DETERMINATION**</u>
<u>**AND NOTICE OF APPEAL OF APPEAL PANEL DECISION**</u>

NOW INTO COURT through the undersigned counsel comes Claimant, C Cup Oysters, LLC, who Objects to the determinations of the Appeal Panel and provides Notice as follows:

**I.**  **OBJECTIONS TO APPEAL PANEL DECISION**

Claimant, C Cup Oysters, LLC, objects to the Appeal Panel Decision pursuant to *Rule 22* of the Rules Governing the Appeals Process effective February 4, 2013, and pursuant to Paragraph 6.6 of the Settlement to the Post-Appeal Eligibility Notice filed on February 26, 2013, and the Appeal Panel Decision dated February 19, 2013, by the Appeal Panel of the Deepwater Horizon Claims Center in the Claim of C Cup Oysters, LLC bearing Claimant Identification Number 100001754 and Claim Identification Number 8721.

No formal rules were promulgated relating to appeals of Appeal Panel decisions to the District Court other than the provision in *Rule 22* of the Rules Governing the Appeals Process and Paragraph 6.6 of the Settlement Agreement. In both Rule 22 and Paragraph 6.6, it provides that "the Court shall treat the Appeal determination as if it were a recommendation by a Magistrate Judge."

Pursuant to *28 U.S.C. §636(b)(1)(C)*, objections to Magistrate Judge recommendations may be filed by any party within fourteen days after being served with proposed findings and recommendations. Claimant therefore files the objections to the Appeal Panel Decision and respectfully requests a de novo review of the Appeal Panel decision for the reasons that follow:

### A.   FACTS

C Cup Oysters LLC, is a closely owned limited liability company held by Ivan J. Popich and Wanda K. Popich.[1] On behalf of C Cup Oysters, LLC, Ivan J. Popich contracted with BP America Production Company on April 30, 2010, for the use of the vessel Lil Nick, LA 9234 FK, registered to the limited liability company for work in the Vessels of Opportunity (VoO) Program.[2] In the Master Vessel Charter Agreement (MVCA) with BP America documented with HOU 505, it was agreed by the parties that the Lil Nick was 39' in length.[3] Following the charter with BP, a separate charter was signed by Ivan J. Popich on behalf of C Cup Oysters, LLC for the use of the vessel Lil Nick.[4]

Mr. Popich completed all of the requisite training to participate in the VoO Program. The Maritime, Fire and Industrial Training Facility at Delgado Community College issued a certificate of completion of training on April 30, 2010, to Ivan Popich.[5] He also received a certificate for training in the 40 hour Hazardous Waste Operations and Emergency Response course which was

---

[1]   Please see attached Sworn Statement Regarding Vessel of Opportunity by Ivan J. Popich.

[2]   Exhibit J- Vessel Registration.

[3]   Exhibit A- MVCA with BP America .

[4]   Exhibit C- MVCA with BEF Construction, LLC.

[5]   Exhibit B- Delgado Certificate.

issued on June 24, 2010.[6] For completion of the course, a card was issued from PEC Premier which verifies the necessary training was provided to Ivan J. Popich for the MC252-Post Emergency Response.[7]

Following the completion of the required courses, Ivan Popich deployed the Lil Nick for use in the clean-up operations for BEF Construction, LLC (BEF). BEF was a subcontractor in the Vessels of Opportunity Program which was deployed "skimming oil collected in boomed off areas with automated approved coast guard (sic) skimmers".[8] BEF also vacuumed oil from within marsh grasses and hauled re-conditioned oil boom to containment areas designated by BP. BEF Construction was retained as a subcontractor for USES and an identification card verifying the work performed by Ivan Popich for USES was issued.[9] C Cup Oysters, LLC earned $195,250 as evidenced by the 1099-MISC issued by BEF.[10]

### B.   APPLICABLE SETTLEMENT PROVISIONS AND ARGUMENT

In error, C Cup Oysters, LLC's submissions to the Deepwater Horizon Claims Center were not considered by the Administrator or the Appeal Panel. It was unrefuted that Claimant was a working member of the Vessels of Opportunity Program. All factual evidence supported the C Cup Oysters, LLC's contentions, and no evidence was supplied by BP that in any way contested the Claimant's proof of active participation in VoO.

In the proposed settlement agreement, BP agreed to pay a VoO Charter Payment settlement

---

[6]     Exhibit D- HAZWOPR Certificate.

[7]     Exhibit E- PEC Card.

[8]     Exhibit G- BEF Construction LLC web page, see page 2.

[9]     Exhibit F- USES Identification Card.

[10]    Exhibit H- 1099-MISC by BEF.

to any natural person or entity who participated in BP's Vessels of Opportunity Program and executed a VoO MVCA. *Page 9 of 123, Para. 1.3.1.4 of Doc. 6430-1, filed in Case 2:10-md-02179-CJB-SS*. The participant needed only to sign a charter agreement with "BP, Lawson, USMS, **USES**, DRC **or any other BP subcontractor**" as the charterer and complete the initial VoO training program.(**emphasis added**) *Id*. It was agreed that the working VoO participants with a "Boat Size" of "30 feet-45 feet" would be compensated through the settlement in the amount of $49,400.00. *Page 35 of 123, Para. 5.5.2 of Doc. 6430-1, filed in Case 2:10-md-02179-CJB-SS.*

Ivan Popich, within his authority as the representative of C Cup Oysters, LLC, contracted with both BP America and BEF for use of the 39' long vessel Lil Nick for service in the VoO Program.[11] Ivan Popich received all of the required "initial VoO training" and both BP America and BEF/USES received the benefit of the services of the Lil Nick with Ivan Popich as the captain of the vessel. For the services of the vessel, C Cup Oysters, LLC was issued payment. All of the unrefuted facts prove that C Cup Oysters, LLC's vessel Lil Nick was deployed as a working participant for a BP contractor/subcontractor and should be appropriately compensated pursuant to *Paragraph 5.5.2* of the settlement agreement. The Deepwater Horizon Claims Center and the Appeal Panel both failed to give any consideration to the unrefuted sworn statement submitted by the Claimant and all of the supporting documentation submitted to the Claims Center which is being again submitted to this Court for *de novo* review.

## C.  CONCLUSION

Applying all of the uncontested facts to the settlement provisions, there is no question that

---

[11]       Exhibit I- LA Sec. Of State Page for C Cup Oysters, LLC.

C Cup Oysters, LLC is owed payment in the amount $49,400 pursuant to the settlement as a working participant in the VoO program. It was error for the Administrator and the Appeal Panel to award payment to C Cup Oysters, LLC for the services of the vessel, Lil Nick, in the amount of $5,700, and Claimant requests a determination that it receive payment as a working participant and be awarded an additional 5% payment should the Appeal be decided in C Cup Oysters, LLC's favor.

## II.     NOTICE OF APPEAL

**NOTICE IS GIVEN** by Claimant, C Cup Oysters, LLC, who hereby appeals to the United States District Court for the Eastern District of Louisiana pursuant *Rule 22* of the Rules Governing the Appeals Process effective February 4, 2013, and pursuant to Paragraph 6.6 of the Settlement to the Post-Appeal Eligibility Notice filed on February 26, 2013, and the Appeal Panel Decision dated February 19, 2013, by the Appeal Panel of the Deepwater Horizon Claims Center in the Claim of C Cup Oysters, LLC bearing Claimant Identification Number 100001754 and Claim Identification Number 8721.

The parties to the decision and notice appealed from and the names, addresses of their respective counsel are as follows:

1).   V. Jacob Garbin, Law Offices of William S. Vincent, Jr., 2018 Prytania Street, New Orleans, LA 70130, jacob@wsvjr.com, Counsel for Claimant;

2).   Richard C. Godfrey, Kirkland & Ellis, LLP, 300 North LaSalle Blvd., Chicago, IL 60654, rgodfrey@kirkland.com, Counsel for BP;

3).   R. Keith Jarrett, Liskow & Lewis, Suite 5000, One Shell Square, 701 Poydras Street, New Orleans, LA 70139, rkjarrett@liskow.com, Counsel for BP;

4).   Stephen J. Herman, Herman Herman & Katz, 820 O'Keefe Avenue, New Orleans,

LA 70130, sherman@hhkc.com, Lead Class Counsel;

5).    James P. Roy, Domengeaux, Wright, Roy & Edwards, 556 Jefferson Street, Lafayette, LA 70502, jimr@wrightroy.com, Lead Class Counsel; and

6).    Deepwater Horizon Economic Claims Center, P.O. Box 1439, Hammond, LA 70404-1439, claimforms@deepwaterhorizoneconomicsettlement.com.

Respectfully submitted,

LAW OFFICES OF WILLIAM S. VINCENT, JR.

/s/ V. Jacob Garbin
V. JACOB GARBIN, LA BAR # 27808
2018 PRYTANIA STREET
NEW ORLEANS, LOUISIANA  70130
TELEPHONE NO.:  (504) 522-3220
jacob@wsvjr.com

## CERTIFICATION

I hereby certify that a copy of the above and foregoing objections and notice has been served on All Counsel by electronically uploading the same to the File & Serve in accordance with Pretrial Order #12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this  8th day of March, 2013.

/s/ V. Jacob Garbin
V. JACOB GARBIN

UNITED STATES OF AMERICA

STATE OF LOUISIANA

PARISH OF ORLEANS

## SWORN STATEMENT REGARDING

## VESSELS OF OPPORTUNITY CHARTER PROGRAM

BEFORE ME, the undersigned Notary Public personally came and appeared Ivan Popich (Affiant), who after being sworn stated as follows:

1. I, Ivan Popich, am the co-owner and a member of C Cup Oysters, L.L.C., a Louisiana corporation.

2. In my capacity as a co-owner and a member of C Cup Oysters, I am able to sign and enter into contracts and other agreements in the name of the corporation.

3. C Cup Oysters, L.L.C. is the registered owner of the vessel Lil Nick bearing the Louisiana registration number LA-9234-FK.

4. On April 30, 2010, on behalf of C Cup Oysters, I signed a Master Vessel Charter Agreement with BP America to use the Lil Nick, which was registered as HOU 505, during the Vessels of Opportunity Program. A copy of the Master Vessel Charter Agreement is attached as Exhibit A.

5. On April 30, 2010, I also completed a "4-Hour Basic Oil Spill Response Awareness" course offered by Delgado Community College as a pre-requisite to working in the BP Deepwater Horizon Oil Spill response efforts. A copy of the course certificate is attached as Exhibit B.

6. On June 23, 2010, on behalf of C Cup Oysters, I entered into a Bareboat Charter Agreement with BEF Construction chartering the Lil Nick for use during oil skimming services. A copy of the Bareboat Charter Agreement is attached as Exhibit C.

7. On June 24, 2010, I completed a 4-day training course and received a training certificate in "40 Hr. Hazardous Waste Operations and Emergency Response". A copy of the Training Certificate is attached as Exhibit D.

8. I was issued a PEC card certifying that I had received the requisite safety training. A copy of my PEC card is attached as Exhibit E.

9. Although I had signed a Bareboat Charter Agreement with BEF Construction, orders were given by USES, a company which had hired BEF as a subcontractor for the Vessels of Opportunity program.

10. During the Vessels of Opportunity program, the Lil Nick was employed in oil skimming operations for USES/BEF Construction.

11. The employee identification card I was issued reads "USES/BEF – Contractor". A copy of my employee identification card is attached as Exhibit F.

THUS SWORN AND SIGNED on December 13TH, 2012, by:

IVAN J. POPICH

 **bp**

**BP America Production Company**
200 Westlake Park Boulevard
Houston, Texas 77079

May 24, 2010

## A LETTER TO HOLDERS OF THE VESSEL OF OPPORTUNITY PROGRAM, MASTER VESSEL CHARTER AGREEMENT

Dear Vessel Owner,

As the result of a lawsuit filed by George Barisich and on behalf of the United Commercial Fisherman's Association in the United States District Court for the Eastern District of Louisiana (Civil Action No. 10-0316), early forms used by BP as a MASTER VESSEL CHARTER AGREEMENT (known as the "Earlier Forms") have been revised to make the CHARTER more favorable to the Vessel Owner. The Earlier Forms can be identified by comparing Articles 13 and 22 in your CHARTER to the changes below. Your CHARTER may already have all of these changes, in which case this letter is inapplicable to you.

The changes to the Earlier Forms are as follows:

(a) Article 2, EMPLOYMENT AND SERVICES OF VESSEL, paragraph A is modified as reflected in Attachment 1 to this letter.

(b) A former Sub Article 13 (F) INSURANCE, which began with the words "VESSEL OWNER will defend, indemnify ..." is deleted in its entirety, and is null and void. {The letters of subsequent, surviving subparagraphs are reordered accordingly. In other words, the old Article 13 (G) (beginning with "VESSEL OWNER warrants...") still applies, but now is lettered 13 (F); and the old 13 (I) (beginning with "In the event VESSEL OWNER's cost for insurance...") still applies, but now is lettered 13 (H).}

(c) The old Sub Article 13 (I) (1) INSURANCE, which began with the words: "Pay all premiums to keep such insurance...", is deleted in its entirety, and is null and void. {The former subparagraph 2 (beginning with "VESSEL OWNER will exercise good faith...") is now numbered 1.}

(d) The old paragraph 5 of Exhibit C (Agreement Regarding Proprietary and Confidential Information) is deleted in its entirety, and is null and void. (That paragraph began with the words: "It

Page 1 of 3

will keep confidential and not disclose to others....") {Subsequent paragraphs in the Earlier Forms are renumbered accordingly. In other words, now there are only six, instead of seven, paragraphs. The second to last paragraph, numbered 6 in Earlier Forms, is now numbered 5; and the last paragraph, formerly number 7, is now number 6.}

(e) Article 22 PUBLICITY, RELEASES AND MARKETING is deleted in its entirety, and is null and void. {Subsequent articles are renumbered accordingly. In other words, the article titled "WAIVER", formerly Article 23, is now Article 22, and so on down the line to the final article (PRIORITY OF TERMS), formerly Article 26, but now Article 25.}

(f) Most of Article 13(A) INSURANCE of the CHARTER is deleted, and is null and void. All that remains is the beginning of the first sentence: "VESSEL OWNER confirms that it will maintain in place any insurance policies it is carrying as of the date immediately prior to entering into this CHARTER or that it routinely carries for its usual operations."

(g) The beginning of the second to last article (ENTIRE AGREMENT; SUCCESSORS), now Article 24, is modified to explicitly identify Exhibits A, B and C as parts of the CHARTER. More specifically, the article now begins with the words: "This CHARTER includes Exhibits A, B, and C attached hereto and constitutes the entire agreement between the Parties...." The rest of the article remains unchanged.

All of the other provisions in the Earlier Forms remain unchanged.

Thank you for your consideration and willingness to assist BP in our oil spill recovery and response efforts.

Sincerely,

Tommy G. Mayet
On Behalf of BP America
Production Company

Enclosures

**EXHIBIT A TOTAL PAGES 19          PAGE                    2**

## ATTACHMENT 1

<u>ARTICLE 2.</u>        <u>EMPLOYMENT AND SERVICES OF VESSEL</u>

A.        During each CHARTER TERM, the VESSEL shall be employed exclusively for CHARTERER'S use as a vessel of opportunity in the carriage of CHARTERER'S employees, contractors, business invitees, equipment and provisions and in the performance of various tasks associated with oil spill response and containment efforts as directed by CHARTERER (hereinafter referred to as SERVICES). Such SERVICES shall include, but not be limited to, tending or deploying boom and skimming equipment, skimming operations, recovering oiled debris, collecting garbage, assistance with wildlife operations and towing equipment.  BP, in cooperation with OSHA and the U.S. Coast Guard, has developed a training and safety program ("HORIZON Response Program" or "HRP") for VESSELS and VESSEL crews engaged in oil spill response activities under this CHARTER.  The HRP was approved by OSHA on May 7, 2010 and received approval from the U.S. Coast Guard on May 8, 2010.  Per OSHA and U.S. Coast Guard directives, the HRP is subject to continuous improvement processes.  As of May 10, 2010, BP will ensure that all VESSEL crews engaged in oil spill response activities (1) receive all necessary training for such activities as per the HRP, (2) receive all necessary credentials for such activities as per the HRP, and (3) receive all necessary protective equipment for such activities as per the HRP.  The VESSEL shall be available and at CHARTERER's disposal for operation twenty-four (24) hours per day. The VESSEL shall not be used for any purpose other than performance of SERVICES during the CHARTER TERM.



HOU-0504 ✓
HOU-0505

## MASTER VESSEL CHARTER AGREEMENT

This Master Vessel Charter Agreement (hereinafter referred to as CHARTER) is made effective as of_____
_____, 2010 by and between BP America Production Company (hereinafter referred to as CHARTERER), and [Insert Name of Vessel Owner] hereafter referred to as VESSEL OWNER).

### ARTICLE 1.   TERM OF CHARTER

A. Subject to the availability (as mutually agreed upon between CHARTERER and VESSEL OWNER) of the vessel described in Exhibit "A" (hereinafter referred to as VESSEL), VESSEL OWNER agrees to let and CHARTERER agrees to hire the VESSEL from time to time as may be requested by CHARTERER. VESSEL OWNER shall deliver or otherwise make available the VESSEL to CHARTERER and place the VESSEL at CHARTERER'S disposal at a mutually agreed location,. The term of the CHARTER shall commence on the date of the departure of the Vessel from the mutually agreed location of delivery into the service of Charterer, and shall be referred to as the "CHARTER TERM." CHARTERER may terminate the CHARTER at any time and the CHARTER TERM will terminate as set out in Paragraph B of this Article 1.

B. The VESSEL shall be delivered at the commencement of the CHARTER TERM, fully tanked with fuel, hydraulic fluid, lubricated, manned, provisioned and ready in all respects to perform SERVICES as required by this CHARTER. The VESSEL shall be redelivered to VESSEL OWNER at the close of each CHARTER TERM to the original point of delivery by CHARTERER, as determined by off-hire dispatch notification, unless VESSEL OWNER elects not to return directly to the point of dispatch, in which case, the CHARTER TERM shall cease immediately upon such election.

### ARTICLE 2.   EMPLOYMENT AND SERVICES OF VESSEL

A. During each CHARTER TERM, the VESSEL shall be employed exclusively for CHARTERER'S use as a vessel of opportunity in the carriage of CHARTERER'S employees, contractors, business invitees, equipment and provisions and in the performance of various tasks associated with oil spill response and containment efforts as directed by CHARTERER (hereinafter referred to as SERVICES).   Such SERVICES shall include, but not be limited to, tending or deploying boom and skimming equipment, skimming operations, recovering oiled debris, collecting garbage, assistance with wildlife operations and towing equipment.  The VESSEL shall be required to attend training, participate in training exercises and drill to receive the necessary oil spill clean up credentials  as appropriate  to develop skills and procedures for oil spill response and containment. The VESSEL shall be available and at CHARTERER's disposal for operation twenty-four (24) hours per day.  The VESSEL shall not be used for any purpose other than performance of SERVICES during the CHARTER TERM.

B. The whole reach of the VESSEL's deck and accommodation spaces shall be at CHARTERER's disposal, reserving only proper and sufficient space for VESSEL OWNER's crew.

### ARTICLE 3.   PERFORMANCE OF VOYAGES

During the employment under this CHARTER, the VESSEL OWNER or its designated master shall perform all voyages without delay.  VESSEL OWNER or its designated master shall load, stow, and trim the VESSEL.  The decision to proceed on a trip in the face of adverse or changing weather or sea conditions shall be the sole decision of the VESSEL OWNER or the designated master.

### ARTICLE 4.   OPERATION IN COMPLIANCE WITH LAW

A. VESSEL OWNER warrants (i) that it has the right to CHARTER the VESSEL to CHARTERER, (ii) that the VESSEL is entitled to perform the SERVICES under all applicable law (including having all endorsements on its documentation that may be required to perform the SERVICES in accordance with applicable law)

1

EXHIBIT A TOTAL PAGES 19                    PAGE

and (iii) that the same is free of all encumbrances which might disturb CHARTERER'S full right to SERVICES described in this CHARTER. The VESSEL OWNER shall exercise due diligence to deliver and maintain the VESSEL in a seaworthy condition. The VESSEL must display a current United States Coast Guard Safety Examination decal, unless otherwise approved by the CHARTERER. The VESSEL shall be operated, manned and maintained by VESSEL OWNER at all times during the term of this CHARTER in accordance with all applicable state and federal laws, rules and regulations, including (but not limited to) life saving requirements. The VESSEL OWNER warrants to exercise good faith in the performance of each and every obligation under this CHARTER.

B.  VESSEL OWNER shall be responsible for paying any civil, criminal, or administrative fines, citations, or penalties that VESSEL OWNER may incur as a result of VESSEL OWNER'S violation of any laws, rules, or regulations during the term of this CHARTER.

C.  VESSEL OWNER shall indemnify and hold CHARTERER harmless from any liability for personal injury, death, or property damage attributable to VESSEL OWNER'S intentional misconduct constituting a violation of state or federal criminal law.

## ARTICLE 5.   DESCRIPTION OF VESSEL

The VESSEL and its capabilities and capacities are described in Exhibit "A". VESSEL OWNER warrants, in good faith, the accuracy of all information set forth in Exhibit "A" and that the VESSEL has the capabilities and capacities as set forth in Exhibit "A" and that it shall be seaworthy (Fit for Purpose) at the time of delivery to CHARTERER.

## ARTICLE 6.   MANNING REQUIREMENTS

A.  VESSEL OWNER shall at all times man the VESSEL with a sufficient number of competent and properly licensed crew and/or deckhands trained and experienced in the operation of the VESSEL in the waters in which the VESSEL is to operate under this CHARTER. The specific number of crew shall be two (2) crew members (captain and one crew) for vessels under 41 feet in length, and three (3) crew members (captain and 2 crew) for vessels 41 feet or greater in length, unless otherwise approved by CHARTERER. VESSEL OWNER shall cause the crew of the VESSEL to carry out their duties with due care and workmanship and the utmost dispatch and diligence. VESSEL OWNER shall be responsible for properly receiving and stowing all cargo, including maintenance of the proper trim and draft of the VESSEL. Cargo loading and unloading operations shall be under the supervision and control of VESSEL OWNER. VESSEL OWNER and crew shall operate the VESSEL in such a way as to not cause unreasonable risk or avoidable damage to any personnel or cargo. Through notification to the Fishing Vessel Administrator and upon advance approval by CHARTERER, VESSEL OWNER may provide additional crew members.

B.  VESSEL OWNER warrants that the crew to be provided by VESSEL OWNER shall meet legal manning requirements in accordance with all applicable law for uses and purposes of the VESSEL required hereunder and as more particularly stated in ARTICLE 2 - EMPLOYMENT AND SERVICES OF VESSEL. The VESSEL'S crew shall be VESSEL OWNER'S employees at all times. VESSEL OWNER shall pay all wages, fringe benefits, applicable taxes, expenses, applicable fees/taxes, and transportation costs required for the VESSEL'S crew.

## ARTICLE 7.   RADIO COMMUNICATIONS

VESSEL OWNER shall have, as a minimum, the following radio equipment in a functional and working condition at all times on VESSEL: one (1) VHF marine radio, and may maintain one (1) HF SSB marine radio. Except when outside of communication range, VESSEL OWNER may be required to maintain constant communications on an hourly basis with the assigned Group Supervisor (GS) and/or CHARTERER designated dispatcher by monitoring the VHF marine radio and providing VESSEL'S position as directed by FCP and/or dispatcher. If VESSEL OWNER fails to comply with the provisions of this Article, CHARTERER may terminate this CHARTER upon twenty-four (24) hours written notice.

2

EXHIBIT A TOTAL PAGES 19                    PAGE

## ARTICLE 8.    VESSEL PROVISIONS

VESSEL OWNER shall provide and pay for any other supplies necessary for the VESSEL'S mechanical functioning, except as provided in Exhibit "B". VESSEL OWNER shall provide and pay for all expenses necessary for the maintenance of the crew including, but not limited to, provisions (except as otherwise provided by CHARTERER as described in this ARTICLE), commissary, water, laundry and any necessary lodging. At the start of any CHARTER TERM, VESSEL OWNER shall provide a minimum of three (3) days of such provisions required for the maintenance of the crew. After three (3) days, during an actual oil spill, CHARTERER shall provision the VESSEL for the remainder of each CHARTER TERM. The fixed rate per day set forth in Exhibit "B" shall be increased (as stated in Exhibit "B") per day per the most recent published rate schedule for every meal provided to a CHARTERER employee or business invitee while aboard the VESSEL.

## ARTICLE 9.    MAINTENANCE OF VESSEL

VESSEL OWNER shall maintain the VESSEL'S hull and machinery in a seaworthy condition (Surveyor designation of "Fit for Purpose"). CHARTERER shall provide or otherwise reimburse VESSEL OWNER'S actual cost of hull and gear cleaning and decontamination if VESSEL requires such cleaning as a direct result of SERVICES under this CHARTER.

## ARTICLE 10.    HIRE

A.  CHARTERER will pay VESSEL OWNER for each CHARTER TERM or SERVICES satisfactorily performed and accepted by the CHARTERER in accordance with Exhibit "B". Any amendment or modification of this CHARTER must be in writing and duly executed by both parties in order to be binding. Provided, however, that CHARTERER shall be entitled at any time during the term of this CHARTER to revise Exhibit "B", by submitting or making available for viewing to VESSEL OWNER, a new Exhibit "B".

B.  CHARTERER shall pay Hire for the VESSEL and the SERVICES to be provided by the VESSEL OWNER, for each CHARTER TERM in accordance with the following provisions. For the purposes of ARTICLE 10 - HIRE, a day shall be deemed to be any portion of a twenty-four (24) hour period beginning at 12:00 midnight and ending at 11:59 pm. For the purposes of vessel length, all vessels will be rated on the generally accepted term of L.O.A., (Length Over All).

1.  For a CHARTER TERM during an actual oil spill, the fixed rate per foot of vessel length (as stated in Exhibit "A") per day plus a day rate.

2.  For a CHARTER TERM during an oil spill drill including but not limited to the requirement for deployment of boom a fixed rate per foot of VESSEL length (as stated in Exhibit "A") per day plus a day rate.

3.  For any CHARTER TERM described in ARTICLE 10, Paragraph A, in the event VESSEL OWNER may be requested to provide a skiff in addition to the VESSEL when approved in advance by CHARTERER'S through notification to the FVA. For the purpose of payment, the skiff length shall be based on the L.O.A. of the skiff provided.

5.  Training may consist of any of the following:

a.  Classroom training will be defined and approved in advance by the CHARTERER. A fixed rate per crew member in attendance, per day, will be paid to the VESSEL OWNER . During periods such as classroom training, Workers Compensation Insurance will be provided. The VESSEL shall not be considered under HIRE for insurance purposes, therefore insurance shall not be provided during these times.

6.  Compensation for CHARTERER requested additional crew members will be paid to the VESSEL OWNER.

3

EXHIBIT A TOTAL PAGES 19              PAGE

7. CHARTERER may request that the VESSEL OWNER perform SERVICES within the capabilities of the VESSEL not identified above. SERVICES are to be performed by VESSEL OWNER only upon a receipt of a written WORK ORDER signed by the CHARTERER, except that a verbal order will suffice in an emergency; such verbal order to be confirmed by written WORK ORDER after issuance of the verbal order. Compensation will be negotiated for each specific WORK ORDER. No payment will be made for SERVICES or items not authorized by a written WORK ORDER.

D. Only with CHARTERER'S prior written approval, CHARTERER shall reimburse VESSEL OWNER'S reasonable costs incurred and paid for by VESSEL OWNER and designated crew for travel, meals and lodging when attending CHARTERER provided or approved training or meetings unless otherwise provided by CHARTERER. Reimbursable costs will be stated in Exhibit "B".

E. The termination of the CHARTE TERM (termination of dispatch) is determined by the time the VESSEL is secure in its moorings at the original point of delivery during drills and exercises, and secure at its mooring after final decontamination after an oil spill response (which process shall be promptly undertaken without delay). If termination is by VESSEL OWNER, termination of dispatch shall be as mutually agreed by CHARTERER'S Group Supervisor and VESSEL OWNER. VESSEL OWNER must ensure FVA is notified of release time.

F. VESSEL OWNER shall be compensated at the end of the CHARTER TERM, and if the CHARTER TERM is longer than fourteen (14) days then invoices may be submitted every fourteen (14) days. The VESSEL OWNER shall provide all necessary information to the appropriate Fishing Vessel Administrator, who shall in turn submit an invoice to CHARTERER. Payment of all sums due shall be made within fifteen (15) days of receipt of an invoice by CHARTERER.

## ARTICLE 11.   PORT FEES, MOORAGE, TAXES

A. CHARTERER shall pay for all port fees and moorage that may be incurred as a direct result of this CHARTER while the VESSEL is away from its home port. VESSEL OWNER shall pay all taxes incidental to use of the VESSEL.

B. The VESSEL shall be loaded and unloaded at any dock, berth, or place that CHARTERER may direct, as approved by VESSEL OWNER, which approval shall not be unreasonably withheld. VESSEL OWNER shall assist CHARTERER in locating and selecting the docks and landings suitable to accomplish the safe loading and unloading of passengers and cargo.

## ARTICLE 12.   BREAKDOWN: DEFICIENCY OF CREWING OR STORES

A. In the event of any loss of time, not due to fault of CHARTERER, on account of: dry-docking or other necessary measures to maintain the efficiency of the VESSEL; deficiency of crewing or stores; breakdown of machinery, gear or equipment, damage to hull; collision; breach of orders; neglect of duty of master, officer or crew; strike or other labor stoppages of master, officers or crew; refusal to sail; stranding; fire; difficulties to the VESSEL'S flag, ownership or previous ports of call; requisition of title or use of the VESSEL; failure to comply with rules, regulations or laws of ports of call; interference by authorities; detention of VESSEL or master or officers; or any other similar accident or event whatsoever either hindering or preventing the full working of the VESSEL, then no HIRE is to be paid for any time loss until the VESSEL is again in sufficient state to fully resume SERVICES and, has regained a position equivalent to the position occupied at the time just prior to the accident or occurrence.

B. In the case of the VESSEL taken off-HIRE while on a voyage by reason of an accident or occurrence described in 12A above, the hire shall be suspended from the time of the accident or occurrence until the VESSEL is again in the same position as before the accident or occurrence and the VESSEL returns to an equivalent position or a substitute voyage directed by CHARTERER.

C. During the period of off-HIRE all reimbursable items identified in ARTICLE 10 – HIRE and ARTICLE 11 – PORT FEES, MOORAGE, TAXES that would otherwise be for CHARTERER'S account under this CHARTER shall be for the VESSEL OWNER'S account.

4

EXHIBIT A TOTAL PAGES 19           PAGE

D. It is understood that the VESSEL shall use due diligence to comply with all applicable federal, state and local environmental protection and safety laws, regulations, and stipulations when performing SERVICES in effect at all ports within the trading limits. If the VESSEL is found not to comply with any such rule, regulation or law, VESSEL OWNER shall take immediate measures to comply, and all expenses incurred as a result of such failure to comply shall be for VESSEL OWNER'S account under the off-HIRE provisions of ARTICLE 12.

E. If the VESSEL is lost or becomes a constructive total loss, HIRE shall cease at 11:59 PM of the day of VESSEL loss or constructive total loss. If the VESSEL is missing, HIRE shall be suspended as of 11:59 PM on the day when the VESSEL was last heard from and until the VESSEL'S safety has been established, unless loss of contact is deemed to have occurred through no fault of VESSEL OWNER.

F. Any HIRE paid for in advance is to be adjusted by refund or deduction from future payments for any off-HIRE or suspension during the period for which payment was made.

G. If the VESSEL is off-HIRE for a period of time exceeding twenty-four (24) hours for any of the events referred to in ARTICLE 12, CHARTERER may terminate this CHARTER at its sole option if VESSEL OWNER is not making best efforts to return to a safe harbor.

## ARTICLE 13.   INSURANCE

A. VESSEL OWNER confirms that it will maintain in place any insurance policies it is carrying as of the date immediately prior to entering into this CHARTER or that it routinely carries for its usual operations and to the extent it has such coverage, it will either specifically name or shall be deemed to have specifically named CHARTERER as an additional assured to the extent that underwriters are prepared to do so. The types and terms of insurance that VESSEL OWNER may have in place are set forth in the policies but may include the following type policies/coverages:

   1. Protection and Indemnity Coverage

   2. Hull and Machinery Coverage

      Values Insured Agreed Value                    Same limit VESSEL
                                                     OWNER'S current policy
                                                     carries or 80% of
                                                     actual cash value.

   3. Workers Compensation Insurance

      Statutory Requirements as required by applicable law.

B. The insurance coverage referred to in Paragraph A above shall remain in effect during the CHARTER TERM, when the VESSEL is on HIRE for training as directed by CHARTERER, or the VESSEL is on HIRE for oil spill response. The time of coverage shall be from dispatch until termination of dispatch by either the VESSEL OWNER or CHARTERER.

C. Insurance coverage may be activated for VESSELS that choose to travel to a remote site the day prior to an exercise or drill with prior approval by the CHARTERER. The VESSEL will only be considered on-HIRE for the purpose of insurance and will not receive any compensation.

D. In the event of any happening that may result in a claim against the coverage afforded in Paragraph A, prompt notice thereof shall be given to the party first aware of such claim in order to afford both parties an immediate opportunity to investigate the facts and circumstances giving rise to the potential claim.

E. The parties understand and agree that the insurance coverage summarized in Paragraph A is more

5

EXHIBIT A TOTAL PAGES 19          PAGE          8

particularly described in the insurance policies, the terms, conditions and exclusions of which shall control..

Note: Copies of the insurance policies summarized in Paragraph A are available upon request.

F.   VESSEL OWNER will defend, indemnify and hold CHARTERER and its respective agents and employees harmless from all claims, losses, actions, liabilities, and expenses for, or related to, any loss of or damage to any property or any injury to or death of any person in connection with or relating in any way to VESSEL OWNER'S performance under the CHARTER or the SERVICES provided to the extent attributable to any willful misconduct, gross negligence or negligence by VESSEL OWNER or its crew in the operation of the VESSEL during this CHARTER of the VESSEL.,.  G.  VESSEL OWNER warrants that during the term of this CHARTER that as to the insurance described in Paragraph A of this Clause 13, it shall:

   1.  Pay all premiums to keep such insurance policies in full force and effect on the terms and conditions more particularly described in such policies.

   2.  Will not modify, amend or otherwise agree to any reduction in coverage afforded under the policies.

I.   If VESSEL OWNER has a claim against CHARTERER or has Notice of any claim(s) for which CHARTERER is or could be accountable;

   1.  VESSEL OWNER will provide full written Notice to CHARTERER within thirty (30) days of the date VESSEL OWNER learns of the claim.

   2.  VESSEL OWNER will exercise good faith and prudent management of all claims, including third party claims, and will not defend or settle third-party claims without CHARTERER'S knowledge and prior written consent.

H.   In the event VESSEL OWNER's cost for insurance as provided for hereunder is, by virtue of the SERVICES being provided hereunder, in excess of that normally paid by VESSEL OWNER for its standard coverage, then CHARTERER agrees to pay the cost over and above that normally incurred by VESSEL OWNER for its standard coverage.  VESSEL OWNER shall advise CHARTERER of such excess cost before incurring same and shall document the amount of such cost it is claiming for.  Nothing herein shall prevent CHARTERER from taking out insurance for any risks it may deem appropriate but nothing herein shall require CHARTERER to do so.

## ARTICLE 14.   SALVAGE

All derelicts and salvage shall be for VESSEL OWNER'S and CHARTERER'S equal benefit, after deducting VESSEL OWNER'S and CHARTERER'S expenses and crew portion.

## ARTICLE 15.   CHARTER NOT A DEMISE

Nothing stated in this CHARTER is to be construed as demise of the VESSEL to CHARTERER.  VESSEL OWNER shall at all times remain responsible for the navigation of the VESSEL, acts of pilots, tug vessels, crew, and all other similar matters as if trading for its own account.

## ARTICLE 16.   CHARTERER'S USE OF VESSEL

During the CHARTER TERM the VESSEL OWNER shall not make any other use of the VESSEL without CHARTERER's prior authorization.  In addition, the VESSEL OWNER shall not allow on board the VESSEL any non-crew member who would interfere with the VESSEL OWNER'S performance of SERVICES under this CHARTER.  If the VESSEL OWNER allows on board the VESSEL any persons who are not crew members, or CHARTERER employees, or business invitees, the VESSEL OWNER shall be solely responsible for any liability for any injury to or death to any such person attributable to that person's presence on board the VESSEL.  In no event shall CHARTERER be liable for any expenses

8

resulting from the injury to or death of any such person allowed on board without CHARTERER'S prior authorization.

## ARTICLE 17.   VESSEL OWNER IS INDEPENDENT

A. VESSEL OWNER and its employees and any approved Subcontractors and their employees are independent contractors and are not employees, partners, or joint ventures with CHARTERER. VESSEL OWNER and Subcontractors and their respective employees will not represent CHARTERER in performance of SERVICES under this CHARTER, or engage in any conduct that would imply that VESSEL OWNER and Subcontractors and their respective employees are other than independent contractors.

B. VESSEL OWNER is responsible for the manner, means and methods of performing SERVICES under this CHARTER.

C. VESSEL OWNER shall pay all federal and state taxes, contributions and/or assessments associated with the performance of SERVICES, including, but not limited to, income taxes and self-employment taxes, and shall be responsible for providing its own employee benefit plans.

D. VESSEL OWNER acknowledges and understands that as an independent contractor, VESSEL OWNER and its employees and Subcontractors and their employees are not eligible for any employee benefits under any plans maintained by CHARTERER, including, but not limited to, the CHARTERER Savings and Investment Plan, Pension Plan, Sick Pay Plan, Long Term Disability Insurance Plan, Voluntary Personal Accident Insurance Plan, Severance Plan, Group Life Insurance Plan, Dental Plan, Occupational Death Plan, Business Travel Plan and Medical Plan.

E. VESSEL OWNER will indemnify, defend and hold CHARTERER and its respective employees and agents harmless from and against any and all claims, demands, actions, losses, expenses and/or liabilities resulting from or related to:

1. Any claim, demand, and/or determination that VESSEL OWNER, its employees and/or Subcontractors and their employees are not independent contractors in connection with the performance of SERVICES under this CHARTER, including, but not limited to, any claims or liabilities for regular or overtime wages, salaries, taxes, contributions, and/or assessments; and/or

2. Any claim, demand, and/or determination that VESSEL OWNER, its employees and/or Subcontractors and their employees are entitled to benefits in connection with the performances of SERVICES under this CHARTER under any employee benefit plans maintained by CHARTERER; and/or

3. Any claim, demand, and/or determination that VESSEL OWNER'S employees or Subcontractors' employees are entitled to additional compensation or benefits as a result of VESSEL OWNER'S employment policies and practices; and/or

4. Any claim, demand, and/or determination that VESSEL OWNER'S employees or Subcontractors' employees are entitled to additional compensation or benefits, of whatever kind or character, or damages, of whatever kind or character, based on whole or in part upon theories that they are direct, dual, loaned, borrowed, and/or co- employees of CHARTERER, in addition to being employees of VESSEL OWNER or Subcontractor.

F. Should VESSEL OWNER or Subcontractor assume the defense of CHARTERER pursuant to Paragraph E, CHARTERER shall also be entitled to separate defense and representation of its interests through counsel acceptable to CHARTERER.

## ARTICLE 18.   NOTICES

All notices and communications from VESSEL OWNER to CHARTERER and from CHARTERER to

7

VESSEL OWNER shall be addressed as follows:

CHARTERER
BP America Production Company
Attn: Contract Manager
Telephone:

[Insert Co. name in recitals]
[[ContractorCoName]]
[[ContractorAddress]]
[[ContractorCity]], [[ContractorState]]  [[ContractorZip]]
Attn: _IVAN PAPICH_
Telephone: _504 - 879 - 7141_
Facsimile: _____
Email: _____

## ARTICLE 19.  CHOICE OF LAW AND FORUM

The rights and obligations of the Parties to this CHARTER including all matters of construction, validity and performance, shall in all respects be governed and enforced in accordance with the general maritime laws of the United States.  In the event, but only in the event, the maritime laws of the United States do not apply, the laws of the State of Louisiana shall govern.  Any litigation arising out of or relating to the CHARTER may be brought in a court of competent jurisdiction in New Orleans, Louisiana or Houston, Texas.

## ARTICLE 20.  AUDIT AND TERMINATION

At any time during the term of this CHARTER, CHARTERER shall have the right to audit logs, books, payrolls, and records relating to any of the services performed hereunder.  In addition to any other right of termination herein, VESSEL OWNER may terminate this CHARTER or any company listed in Exhibit "A" at any time for any reason whatsoever by giving the said party twenty-four (24) hours advance written notice of such termination, and any company listed in Exhibit "A" may terminate its obligations upon (24) hours advance written notice to CHARTERER.

## ARTICLE 21.  ASSIGNMENT/SUBCONTRACTING

A.  VESSEL OWNER will not assign any of its rights or delegate any of its obligations under this CHARTER without prior written approval from CHARTERER.  CHARTERER'S approval of any assignment, subcontract or delegation will not relieve VESSEL OWNER of any responsibility under this CHARTER.

B.  VESSEL OWNER shall not assign any rights or delegate any obligations hereunder without CHARTERER'S prior written approval, which shall not be unreasonably withheld.  Any such unauthorized assignment shall be void.  CHARTERER may assign this CHARTER to third parties specifically including any of its respective affiliates or a response action contractor..

## ARTICLE 22.  PUBLICITY RELEASES AND MARKETING

VESSEL OWNER and employees will not make news releases, marketing presentation, or any other public statements this CHARTER, CHARTERER, or the SERVICES performed under this CHARTER without CHARTERER'S prior written approval.  VESSEL OWNER agrees that such approval is at the sole discretion of CHARTERER.

## ARTICLE 23.  WAIVER

If CHARTERER fails to enforce any right or remedy available under this CHARTER, that failure will not be construed as a waiver of any right or remedy.  A waiver of any claim, demand, right or remedy based on

8

the breach of any provision of this CHARTER will not be construed as a waiver of any other claim, demand, right or remedy based on a subsequent breach of the same or any other provision.

## ARTICLE 24.   SEVERABILITY

If any part, term or provision of this CHARTER is determined by a court of competent jurisdiction to be unlawful or unenforceable, the validity and enforceability of the remaining parts, terms and provisions will not be affected.

## ARTICLE 25.   ENTIRE AGREEMENT; SUCCESSORS

A. This CHARTER includes any and all Exhibits referenced in this CHARTER and constitutes the entire agreement between the Parties with respect to this CHARTER. This CHARTER cancels and supersedes all prior negotiations, representations or agreements, both written and oral, including any proposals submitted by VESSEL OWNER. The Parties have not been induced by any representation, statements or agreements other than those expressed in this CHARTER. No changes, alterations, or modifications to this CHARTER will be effective unless made in writing and signed by both Parties.

B. This CHARTER will benefit and bind the successors, representatives and assignees of both Parties.

## ARTICLE 26.   PRIORITY OF TERMS

In the event of any conflict or inconsistency between the various parts of this CHARTER, the Articles will take precedence over all other parts of this CHARTER, including any Exhibits, Attachments and Addenda, unless specifically stated otherwise.

9

THE PARTIES HAVE EXECUTED THIS CHARTER, in duplicate originals, by their respective authorized representatives, as of the date first written above.

[[ContractorCoName]]

By: _Ivan J. Popich_
(Signature)                    (Date)

_IVAN  J.  POPICH_
(Print or Type Name)

_OWNER_
(Print or Type Title)

CHARTERER : BP America Production Company

By: _____  _4/30/10_
(Signature)                    (Date)

_D. KINNARD_
(Print or Type Name)

_BP_
(Print or Type Title)

**10**

**EXHIBIT A**

**COMPENSATION PROVISIONS/PUBLISHED RATE SCHEDULE**

## PARAGRAPH 1 - COMPENSATION

As full and complete compensation to VESSEL OWNER for SERVICES satisfactorily performed and for assuming obligations hereunder, CHARTERER, for and on behalf of OWNERS, will pay VESSEL OWNER on the basis of the fixed rates (FIXED RATES), set forth below in PARAGRAPH 2 - FIXED RATES, and will reimburse VESSEL OWNER for the costs of specific items set forth below in PARAGRAPH 3 - REIMBURSABLE COSTS.  CHARTERER shall be entitled at any time during the term of this CHARTER to revise EXHIBIT A -- COMPENSATION PROVISIONS/PUBLISHED RATE SCHEDULE, by submitting or making available for viewing to VESSEL OWNER, a new EXHIBIT A -- COMPENSATION PROVISIONS/PUBLISHED RATE SCHEDULE.

## PARAGRAPH 2 - FIXED RATES

VESSEL OWNER's FIXED RATES (hereinafter FIXED RATES) are agreed to be VESSEL OWNER's sole, complete, and exclusive compensation for performing and completing SERVICES under CHARTER, except as noted in PARAGRAPH 3 - REIMBURSABLE COSTS below, including, without limitation, all management, labor, supervision, salaries, wages, taxes of all kinds, insurance premiums, contributions, equipment, equipment maintenance, materials (not provided by CHARTERER), support facilities, transportation (if not provided by CHARTERER), tools, overhead and profit.  FIXED RATES are not subject to renegotiation or retroactive adjustments based on actual experience and are not subject to escalation.

### FIXED RATES FOR SERVICES:

| SERVICES | FIXED RATES |
|---|---|

A.  Vessel Services:

   1.  Actual Spill Response:
      As defined in ARTICLE 10 - HIRE, Paragraph B1

| | |
|---|---|
| Vessels > 45' | $2000/12 hour day |
| Vessels >30' - 45' | $1500/12 hour day |

      Plus:
      Specialized equipment required by BP reimbursable at cost +10%
      PPEs will be provided by CHARTERER

B.  Crew Services:

   1.  Classroom Training, Table Top Activities, or Meetings:
      As defined in ARTICLE 10 -- HIRE, Paragraph B5       $200.00/8 hour day/
                                                      crewmember

   2.  Meals for provided by Vessel Owner

## PARAGRAPH 3 - REIMBURSABLE COSTS

A.  CHARTERER shall provide or otherwise compensate VESSEL OWNER at the current commercially available rate per HP/100 x 3 x Hrs. dispatched x current fuel rate for diesel, gas and auxiliary fuels (as

specified in EXHIBIT B - CHARTER VESSEL INFORMATION) or fraction thereof while VESSEL is on HIRE for the cost of all the fuel, hydraulic oil and lube oil. CHARTERER's CONTRACT REPRESENTATIVE may make adjustments to formula as warranted.

<u>NOTE</u>:  Current rate of all commercially available fuel as of the dispatch off-HIRE date in the VESSEL's home port.

B.  In addition to payment of FIXED RATES as set forth above, VESSEL OWNER shall be reimbursed for the following actual costs incurred and paid by VESSEL OWNER.  Said costs in 1 and 2 below shall be those net costs incurred and paid by VESSEL OWNER and shall be invoiced to CHARTERER at net cost.

1.  When approved in advance by CHARTERER's CONTRACT REPRESENTATIVE reasonable and actual airline travel while on travel away from VESSEL OWNER's home port shall be tourist/economy class unless otherwise approved in writing in advance by CHARTERER's CONTRACT REPRESENTATIVE.

2.  When approved in advance by CHARTERER's CONTRACT REPRESENTATIVE, vehicle rental while on travel status away from VESSEL OWNER's home port shall be mid-size or smaller unless approved in writing in advance by CHARTERER's CONTRACT REPRESENTATIVE.

EXHIBIT A TOTAL PAGES 19          PAGE                    15

**EXHIBIT B**

**VESSEL INFORMATION**

**A.  General Information**

Vessel Name: _LA-9234-FK_          2ND BOAT NATASHA MARIE

FVA Port: _EMPIRE_                ~~EMPIRE~~ NEW ORLEANS

Call Sign: _____

USCG Decal No.: _____

Expiration Date: _11-9-2010_          10-7-2011

ADF&G No.: _____

AK/Doc No.: _____

Vessel Type: _OYSTER  BOAT_          OYSTER BOAT

Vessel Length: _39'_               45'

Berth Capacity: _2_                4

Manning Requirement: _2_             2

**B.  VESSEL OWNER Contact Information**

Company Name: _C CUP OYSTERS LLC_      IVAN J. POPICH

Contact Name: _IVAN  J. POPICH_       IVAN J. POPICH

Email Address: _____

Mailing Address: _169 SARAH VICTORIA DR._  169 SARAH VICTORIA DR.

Physical Address: _BELLE CHASSE LA 70037_  BELLE CHASSE LA 70037

Home Phone: _504-656-7298_          504-656-7298

Cell Phone: _504-874-7142_          504-874-7142

Facsimile Phone: _____

**C.  Vessel Survey/Insurance Information**

Date of Survey: _____ NONE _____          NO

Insured? (Yes/No) _____          NO

Contract Number                                              Page 1 of 2

EXHIBIT A TOTAL PAGES 19          PAGE                16

D. **Vessel Engine Information**                NATASHA MARIE

Make: _CUMMINS_                     | _DETROIT_

Model: _6BT_                        | _V671_

Total HP: _278_                     | _180_

Number of Engines: _1_             | _1_

Drive Type: _DIESEL — INBOARD_     | _INBOARD - DIESEL_

Fuel Capacity: _320_               | _400_

Burn Rate (GPH): _6 + 2_           | _9 + 1_

Fuel Type: _DIESEL_                | _DIESEL_

Aux. Engine? (Yes/No) _            | _YES_

Aux. HP: _58_                      | _22_

Aux. Fuel Type: _DIESEL_           | _DIESEL_

E. **Skiff Information**

Type: _____

Length: _____

HP: _____

Fuel Type: _____

F. **Comments**

_____

_____

_____

_____

_____

_____

_____

_____

_____

**EXHIBIT C**

## AGREEMENT REGARDING PROPRIETARY AND CONFIDENTIAL INFORMATION

WHEREAS, BP America Production Company (hereinafter referred to as CHARTERER) and [[ContractorCoName]] (hereinafter referred to as VESSEL OWNER) have entered into CONTRACT [[ContractNumber]] (hereinafter referred to as CHARTER) effective as of [[ContStartDt]] whereunder VESSEL OWNER, its subcontractors, and their respective employees will be performing certain services with respect to the tending or deploying boom and skimming equipment, skimming operations, recovering oiled debris, collecting garbage, assistance with wildlife operations and towing equipment operation in connection with the Deepwater Horizon Incident (hereinafter referred to as OIL SPILL RESPONSE AND CONTAINMENT) and VESSEL OWNER, its subcontractors, and their respective employees are being paid by OWNERS, either directly or indirectly, for their services thereunder; and

WHEREAS, it is the desire of CHARTERER and OWNERS to secure the benefit of, protect and maintain as confidential all technology and information developed or disclosed in connection with OIL SPILL RESPONSE AND CONTAINMENT;

NOW THEREFORE, the undersigned hereby agree that:

1. This Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana. Any litigation arising out of or relating to the CHARTER may be brought in a court of competent jurisdiction in New Orleans, Louisiana or Houston, Texas.

2. The obligations of the undersigned and the rights of CHARTERER and OWNERS under this Agreement are continuing obligations and rights, and the termination or expiration of CHARTER shall not terminate such obligations and rights.

3. It will not perform services for others during the life of CHARTER which might conflict with the work to be performed in connection with the aforesaid SERVICES; otherwise, consistent with the terms hereof, the undersigned is free to perform services for others.

4. All Data, patent applications and patents arising out of performance of SERVICES under CHARTER or relating to OIL SPILL RESPONSE AND CONTAINMENT are the property of OWNERS and the undersigned will take all necessary steps to secure OWNERS' rights and title thereto.

5. It will keep confidential and not disclose to others, except CHARTERER, without the prior written consent of CHARTERER, all Data developed, discovered, found or learned by it or disclosed to it in the course of performance of SERVICES under CHARTER. "Data" means all plans, designs, maps, drawings, sketches, field notes, photographs, specifications, reports, information, improvements, inventions, discoveries, technology, know-how, etc., whether conceived, made, developed or disclosed by CHARTERER, OWNERS, their contractors, subcontractors or consultants or their respective officers, employees, agents, or representatives, or by the undersigned. The obligations of the undersigned under this paragraph shall not, however, extend to information which is or becomes part of the public domain by publication or otherwise through no fault of the undersigned and shall not extend to information which is in its possession at the time it begins rendering the aforesaid services and which it can show was not obtained, directly or indirectly, from CHARTERER, OWNERS, or OWNERS' affiliates or to information thereafter received by it from a third party who did not acquire it, directly or indirectly, from CHARTERER, OWNERS, or OWNERS' affiliates.

6. It will promptly disclose in writing to CHARTERER all inventions, discoveries, or improvements which are conceived or made by it, solely or jointly, which arise out of or relate to the performance of SERVICES under the CHARTER or to the Data defined above. It further agrees to assign and, on request by CHARTERER or OWNERS, will assign to CHARTERER's or OWNERS' designee(s) all such inventions, discoveries, and improvements, and all applications for patent and patents which may result therefrom, and cooperate with CHARTERER or OWNERS and their designee(s) in the preparation and execution of all papers required to secure Letters Patent thereon.

7. It will not use Data for any purpose other than as required by CHARTERER for the purpose of performing SERVICES under CHARTER without the prior written permission of CHARTERER.

The undersigned has signed this Agreement as of the date written below.

[[ContractorCoName]]

By: _Ivan J. Popich_                    _4-30-2010_
(Signature)                             (Date)

_IVAN J.  POPICH_
(Print or Type Name)

_OWNER_
(Print or Type Title)

# Delgado Community College

## MARITIME, FIRE AND INDUSTRIAL TRAINING FACILITY

New Orleans, Louisiana

*acknowledges that*

## Ivan J. Popich

*has completed a course of instruction in*

## 4-Hour Basic Oil Spill Response Awareness

*Given this 30th day of April, 2010.*

_____
Authorized Signature

*June 23, 2010*

## Bareboat Charter Agreement

Between BEF Construction, herein referred to as "Charterer" and ___Ivan J Poruly___ "Vessel ID" , herein referred to as "Charter", for BEF Construction of the following custom self- propelled barge.  The description is as follows:

Boat Name   _LIL NICK — CUP OYSTERS LLC_
Vessel ID#   _LA 9234 FK_
Gross Tons   _5 TONS_
Horsepower   _220_
Boat Size   _39.6 × 16_
BEF Equip#   _SB1123_

Vessel is USCG approved.

**The Charter for these vessels will be for a period of 30 days each and will automatically renew itself unless canceled by either party in writing.  A minimum of 10 days prior to the 30 day leasing periods is required for cancellation.  This charter agreement will continue in full force and effect under the same terms and conditions for each additional 30 day periods.  It is understood that after the first 30 day lease period, this agreement applies to the vessel and can only be modified in writing at the time of each renewal.**

 **Fee**: The charter rate per vessel is $1600.00 per day which is payable on each Friday; however, the first Friday weekly payment will be held and will be timely thereafter.   The charter rate per vessel is $1750.00 per day after the renewal of the second thirty day contract.

EXHIBIT C TOTAL PAGES 3          PAGE

**Delivery**: Delivery of the vessels will be at location selected by Charterer on "as is where is" basis.

Under a BEF Construction basis, the vessels may be modified to accomplish the oil skimming services for which it was chartered.

Under this Bareboat Charter agreement, it is understood that all costs such as insurance and maintenance will be provided for by the Charterer.  It is accepted by the Charter that each vessel is valued at a maximum of $200,000.00 and will be covered under Charterer's blanket insurance policy.

**Drugs and Aliens:** Federal and State laws prohibit the use of any vessel for the transportation of drugs or any controlled substance, or the carrying or passage of any illegal aliens.  In addition to possible criminal and civil penalties against the violators, the law permits forfeiture of any vessel which is used in the transport of such a substance or people.

**Laws Governing and Attorneys Fees:** This contract is governed by the laws of the State of Louisiana and any action accruing under this contract will be adjudicated in the State of Louisiana. The Charterer agrees that if legal action or any intervention by an attorney, to collect any sums due becomes necessary to enforce any portion of this contract, the Charterer shall be liable for all attorneys' fees and costs.

EXHIBIT C TOTAL PAGES 3          PAGE          2

Should this document need to be revised by the parties, the basic conditions of a Bareboat Charter agreement will prevail until the parties can agree.

_____     6-24-10
BEF Construction                     Date


_____     _____
Vessel ID#                           Date

*Ivan J Pozich*     6-24-10
BOAT OWNER          DATE

EXHIBIT C TOTAL PAGES 3          PAGE                    3

# TRAINING CERTIFICATE

## 40 HR. HAZARDOUS WASTE OPERATIONS AND EMERGENCY RESPONSE

THIS CERTIFICATE IS AWARDED TO

## IVAN J. POPICH

who has successfully completed the 40 hour Initial Training HAZWOPER Course in accordance with the OSHA Hazardous Waste Operations and Emergency Response Standard 29 CFR 1910.120. Key areas included Hazard Classification, Pollutants in the Environment, Regulatory Compliance, Toxicology, Medical Surveillance, Principles of Industrial Hygiene, Site Safety Plans, Monitoring, Personal Protective Equipment, Decontamination, Site Control, Engineering/Administration Controls, and Risk Reduction.

**National Safety**

169 Chesterfield Business Parkway
Chesterfield, MO 63005
1-866-447-3561

June 21, 22, 23, 24, 2010
*Dates of Instruction*

June 24, 2011
*Expiration Date*

1045
*Certificate No.*

Walt Tallaferro
Training Director

Bill Turfage
Instructor



EXHIBIT D TOTAL PAGES 1          PAGE





**EXHIBIT E TOTAL PAGES 1        PAGE**

# USES/BEF - Contractor

## Ivan

### Popich (venice)

Operations Section
Boat C



*227-477276PI*

# BEF Construction
## Completed Projects

Home

Services

Projects

References

About Us

Contact

All projects were completed on time, budget matched and excellent safety records.

### Orleans Parish Catch Basin Cleaning Project
**Parish Catch Basin Cleaning Project**

Administrative and Field project management overseeing Storm Drain Debris Removal after Hurricanes Katrina and Rita. Coordinated over 100 Vac/ Jet Trucks maintaining daily totals, footage, dump tickets and all documentation. Oversaw safety meetings and work distribution daily.

### Jefferson Parish Catch Basin Cleaning Project

Administrative and Field project management overseeing Storm Drain Debris Removal after Hurricanes Katrina and Rita. Coordinated over 100 Vac/ Jet Trucks maintaining daily totals, footage, dump tickets and all documentation. Oversaw safety meetings and work distribution daily.

### Orleans Parish Sanitary Sewer Cleaning Project

Administrative and Field project management overseeing Sanitary Sewer Debris Removal and CCTV visuals after Hurricanes Katrina and Rita. Coordinated Vac/ Jet Trucks and CCTV crews maintaining daily totals, footage, dump tickets and all documentation. Oversaw safety meetings and work distribution daily.

### St. Bernard DRAVO Wastewater Treatment Plant Cleaning Project

Managed De-watering, cleaning, and debris removal of Wastewater Plant moving over 3 million gallons of water. Coordinated tanker trucks and Vac Trucks routing water.

### St. Bernard Parish (ACTI) Wastewater

**Removal**

Coordinated Vac Trucks moving wastewater in St. Bernard Parish until Treatment Plants were back on line.

## City of Mandeville Ditch Debris Removal Process

Managed project to clean outfall ditch waterways removing debris. Coordinated all equipment, tracked dump tickets and all documentation.

## Orleans Parish Catch Basin Repair Project

Managed all crews repairing over 4,000 Catch Basins.

## Orleans Parish & Kenner, LA Sidewalk Repair Project

Coordinated crews in both cities to demo, from and pour concrete. Managed scheduling for demo trucks, sand delivery and concrete trucks. Over 400 sites repaired due to storm damage and general maintance repairs.

## Jefferson Parish Restoration Contract

Maintenance contract for removal and repair of sidewalks and driveways for Eastbank and Westbank locations.

## St. Bernard Roadway Restoration Project

Removal and repair of sidewalks, driveways. curb and gutter, and street panels.

## B.P. Deepwater Horizon Oil Spill Clean Up

Skimming oil collected in boomed off areas with automated approved coast guard skimmers; Vacuum oil from within marsh grasses and canes with Weir Skimmers; Haul re-conditioned oil boom to various B.P. boom containment areas designated by B.P.

☐ CORRECTED (if checked)

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| BEF Construction, LLC<br>158 Enterprise Drive<br>Gretna, LA 70056 | | $ 0.00 | **2010** | **Miscellaneous Income** |
| | | 2 Royalties | | |
| | | $ 0.00 | Form **1099-MISC** | |
| | | 3 Other income | 4 Federal income tax withheld | **Copy B** |
| | | $ 0.00 | $ 0.00 | **For Recipient** |
| PAYER'S federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | |
| | | $ 0.00 | $ 0.00 | |
| RECIPIENT'S name, address, and ZIP code | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| C Cup Oysters, LLC | | | | |
| | | $ 195250.00 | $ 0.00 | |
| 169 Sarah Victoria Dr. | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| | | | $ 0.00 | |
| Belle Chasse, LA 70037 | | 11 | 12 | |
| Account number (see instructions) | | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney | |
| | | $ 0.00 | $ 0.00 | |
| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
| $ | $ | $ 0.00 | | $ |
| | | $ | | $ |

Form **1099-MISC**                    (keep for your records)                    Department of the Treasury - Internal Revenue Service

38-2099803

NTF 2374465

BMISREC

| | | | |
|---|---|---|---|
| **Tom Schedler**<br>**Secretary of State** | **State of Louisiana**<br>**Secretary of State** | **COMMERCIAL DIVISION**<br>**225.925.4704** | |
| | | **Fax Numbers**<br>225.932.5317 (Admin. Services)<br>225.932.5314 (Corporations)<br>225.932.5318 (UCC) | |



| Name | Type | City | Status |
|---|---|---|---|
| C CUP OYSTERS, L.L.C. | Limited Liability Company | BELLE CHASSE | Active |

| | |
|---|---|
| **Business:** | C CUP OYSTERS, L.L.C. |
| **Charter Number:** | 35741475K |
| **Registration Date:** | 7/14/2004 |
| **State Of Origin:** | |
| **Domicile Address** | |
| | 169 SARAH VICTORIA DRIVE |
| | BELLE CHASSE, LA 70037 |
| **Mailing Address** | |
| | C/O IVAN J. POPICH |
| | 169 SARAH VICTORIA DRIVE |
| | BELLE CHASSE, LA 70037 |

## Status

| | |
|---|---|
| **Status:** | **Active** |
| **Annual Report Status:** | **In Good Standing** |
| **File Date:** | 7/14/2004 |
| **Last Report Filed:** | 6/25/2012 |
| **Type:** | Limited Liability Company |

## Registered Agent(s)

| | |
|---|---|
| **Agent:** | IVAN J. POPICH |
| **Address 1:** | 169 SARAH VICTORIA DRIVE |
| **City, State, Zip:** | BELLE CHASSE, LA 70037 |
| **Appointment Date:** | 7/14/2004 |

| | |
|---|---|
| **Agent:** | WANDA K. POPICH |
| **Address 1:** | 169 SARAH VICTORIA DRIVE |
| **City, State, Zip:** | BELLE CHASSE, LA 70037 |
| **Appointment Date:** | 7/14/2004 |

## Officer(s)
Additional Officers: No

| | |
|---|---|
| **Officer:** | IVAN J. POPICH |
| **Title:** | Member |
| **Address 1:** | 169 SARAH VICTORIA DRIVE |
| **City, State, Zip:** | BELLE CHASSE, LA 70037 |

| | |
|---|---|
| **Officer:** | WANDA K. POPICH |
| **Title:** | Member |
| **Address 1:** | 169 SARAH VICTORIA DRIVE |
| **City, State, Zip:** | BELLE CHASSE, LA 70037 |

EXHIBIT I TOTAL PAGES 2          PAGE

1

## Amendments on File
**No Amendments on file**

Print

EXHIBIT I TOTAL PAGES 2            PAGE                          2



**OFFICIAL BOAT REGISTRATION CERTIFICATE**

Reg. No. LA-9234-FK   Expires 11/09/2010

C CUP OYSTERS LLC
169 SARAH VICTORIA DR
BELLE CHASSE LA 70037-4145

| YrBlt | Hull ID No. | Length | Make | | Decal No. |
|-------|-------------|--------|------|--|-----------|
| 2004 | TQY00033L004 | 39'06" | TWI | | 110027 - 10 |

| Use | Hull | Propulsion | | Fuel | Type |
|-----|------|------------|--|------|------|
| COMM. FISHING | ALUMINUM | INBOARD | | DIESEL | CABIN |

**SIGNATURE REQUIRED ON REVERSE SIDE**

---

**OFFICIAL LICENSE**

DOB:
LIC#:  26754   EXP: 12-31-2010

IVAN J POPICH
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES COMMERCIAL FISHERMAN

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

DOB:
LIC#: 341295   EXP: 12-31-2010

C CUP OYSTERS LLC
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES VESSEL LICENSE
LA9234FK   39 FT.

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

DOB:
LIC#:  36031   EXP: 12-31-2010

IVAN J POPICH
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES OYSTER HARVESTER

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

DOB:
LIC#: 234626   EXP: 12-31-2010

IVAN J POPICH
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

2 RES OYSTER DREDGE

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

LIC#: 394800   EXP: 12-31-2010

C CUP OYSTERS LLC
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES-OYSTER SEED GRD VES PERMI
LA9234FK

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

EXHIBIT J TOTAL PAGES 2       PAGE       1



**OFFICIAL BOAT REGISTRATION CERTIFICATE**

Reg. No. LA-9234-FK  Expires 11/09/2010

C CUP OYSTERS LLC
169 SARAH VICTORIA DR
BELLE CHASSE LA 70037-4145

| YrBlt | Hull ID No. | Length | Make | Decal No. |
|---|---|---|---|---|
| 2004 | TQY000033L004 | 39'06" | TWI | 110027 - 10 |

| Use | Hull | Propulsion | Fuel | Type |
|---|---|---|---|---|
| COMM. FISHING | ALUMINUM | INBOARD | DIESEL | CABIN |

**SIGNATURE REQUIRED ON REVERSE SIDE**

---

**OFFICIAL LICENSE**

DOB:                    5
LIC#:   26754    EXP: 12-31-2010

IVAN J POPICH
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES COMMERCIAL FISHERMAN

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

LIC#: 341295    EXP: 12-31-2010

C CUP OYSTERS LLC
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES VESSEL LICENSE
LA9234FK    39 FT.

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

DOB:
LIC#:  36031    EXP: 12-31-2010

IVAN J POPICH
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES OYSTER HARVESTER

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

DOB:
LIC#: 234626    EXP: 12-31-2010

IVAN J POPICH
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

2 RES OYSTER DREDGE

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

**OFFICIAL LICENSE**

LIC#: 394800    EXP: 12-31-2010

C CUP OYSTERS LLC
169 SARAH VICTORIA DRIVE
BELLE CHASSE LA 70037

1 RES-OYSTER SEED GRD VES PERMI
LA9234FK

*NOT VALID UNLESS SIGNED ON REVERSE SIDE*

---

EXHIBIT J TOTAL PAGES 2          PAGE                    2

UNITED STATES OF AMERICA

STATE OF LOUISIANA

PARISH OF ORLEANS

### SWORN STATEMENT REGARDING

### VESSELS OF OPPORTUNITY CHARTER PROGRAM

BEFORE ME, the undersigned Notary Public personally came and appeared Ivan Popich (Affiant), who after being sworn stated as follows:

1. I, Ivan Popich, am the co-owner and a member of C Cup Oysters, L.L.C., a Louisiana corporation.

2. In my capacity as a co-owner and a member of C Cup Oysters, I am able to sign and enter into contracts and other agreements in the name of the corporation.

3. C Cup Oysters, L.L.C. is the registered owner of the vessel Lil Nick bearing the Louisiana registration number LA-9234-FK.

4. On April 30, 2010, on behalf of C Cup Oysters, I signed a Master Vessel Charter Agreement with BP America to use the Lil Nick, which was registered as HOU 505, during the Vessels of Opportunity Program. A copy of the Master Vessel Charter Agreement is attached as Exhibit A.

5. On April 30, 2010, I also completed a "4-Hour Basic Oil Spill Response Awareness" course offered by Delgado Community College as a pre-requisite to working in the BP Deepwater Horizon Oil Spill response efforts. A copy of the course certificate is attached as Exhibit B.

6. On June 23, 2010, on behalf of C Cup Oysters, I entered into a Bareboat Charter Agreement with BEF Construction chartering the Lil Nick for use during oil skimming services. A copy of the Bareboat Charter Agreement is attached as Exhibit C.

7. On June 24, 2010, I completed a 4-day training course and received a training certificate in "40 Hr. Hazardous Waste Operations and Emergency Response". A copy of the Training Certificate is attached as Exhibit D.

8. I was issued a PEC card certifying that I had received the requisite safety training. A copy of my PEC card is attached as Exhibit E.

9. Although I had signed a Bareboat Charter Agreement with BEF Construction, orders were given by USES, a company which had hired BEF as a subcontractor for the Vessels of Opportunity program.

10. During the Vessels of Opportunity program, the Lil Nick was employed in oil skimming operations for USES/BEF Construction.

11. The employee identification card I was issued reads "USES/BEF – Contractor". A copy of my employee identification card is attached as Exhibit F.

THUS SWORN AND SIGNED on December 13TH, 2012, by:

**IVAN J. POPICH**

SWORN AND SUBSCRIBED to on
the _13th_ day of December, 2012, before me:

MATTHEW M. LIVACCARI
LA Bar No. 32560

1