UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL No. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| ALL CASES | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

.................................................................................................................................................

**UNITED STATES' REPLY TO BP'S OPPOSITION TO THE UNITED STATES'
MOTION TO COMPEL PRODUCTION OF PREVIOUSLY-WITHHELD DOCUMENTS
PURSUANT TO THE CRIME-FRAUD EXCEPTION
<u>TO THE ATTORNEY-CLIENT PRIVILEGE</u>**

# TABLE OF CONTENTS

I.     BP CANNOT LIMIT THE CRIME-FRAUD APPLICATION TO DOCUMENTS AUTHORED BY MR. RAINEY…………………………………………………………...- 2 -

II.    THE UNITED STATES' MOTION SEEKS DOCUMENTS THAT FALL WITHIN THE SCOPE OF THE CRIME-FRAUD EXCEPTION ..........................................................- 4 -

    A.    Documents Sought by the United States Are Reasonably Related to the Furtherance of Ongoing or Future Crime or Fraud.............................................- 4 -

    B.    The United States' Production Request is Tailored to BP's Preparation of Fraudulent and Criminal Communications.........................................................- 7 -

III.   THE UNITED STATES HAS MADE THE REQUIRED *PRIMA FACIE* SHOWING - 9 -

    A.    The United States Has Met Its Burden with Respect to Communications Related to Preparation of BP's Presentation to a House Subcommittee on May 4........- 11 -

    B.    The United States Has Met Its Burden with Respect to Communications Related to Preparation of BP's SEC filings in late April and early May 2010..............- 12 -

IV.   ADDITIONAL PROCESS IS NOT WARRANTED FOR BP ....................................- 14 -

V.    NO REVIEW BY THE COURT OF BP'S PROPOSED PRIVILEGE LOG IS NECESSARY ...........................................................................................................- 15 -

VI.   CONCLUSION..........................................................................................................- 17 -

# TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

*Haensel v. Chrysler Corp.*, No. Civ. A. 96-1103, 1997 WL 537687 (E.D. La. Aug. 22, 1997) . 16

*Haines v. Liggett Group Inc.* 975 F.2d 81 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*In re Burlington Northern, Inc.*, 822 F.2d 518 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d 199 (5th Cir. Unit A 1981) . . . . . 6, 7

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*In re Grand Jury Subpoenas*, 561 F.3d 408 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

*In re International Systems & Controls Corp. Securities Litigation*, 693 F.2d 1235
  (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12, 13

*In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 15

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Turner v. Pleasant*, No. 10-1823, 2012 WL 3270373 (E.D. La. Aug. 10, 2012) . . . . . . . . . . . 7

*United States v. Bauer*, 132 F.3d 504 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Bi-Co Pavers, Inc.*, 741 F.2d 730 (5th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078 (5th Cir. 1978),
  cert. denied, 437 U.S. 903 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Inv. Enters., Inc.*, 10 F.3d 263 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir.1966) . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Stewart*, No. 03 CR. 717, 2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003). . . . 6

*United States v. Tupelo Flite Center, Inc.*, 12 F.3d 1099, 1993 WL 543421
  (5th Cir. Dec. 20, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

<u>FEDERAL RULES</u>

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 26(b)(5)(A)(ii)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Local Rule 5.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>TREATISES</u>

Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence*, § 6.13.2.d(2) at 987-990.

**TABLE OF EXHIBITS**

<u>Ex. #</u>          <u>Description</u>

1            Well Control Simulation Results – April 22, 2010 (BP-HZN-
             2179MDL00443041-BP-HZN-2179MDL00443043) (*Confidential*)

2            Email chain from Kelly McAughan, Bryan Ritchie, and Jonathan Bellow, dated
             April 23-24, 2010, Subject: Re: Flow rate and production profile (Depo. Ex.
             2409) (*Confidential*)

3            Timothy Lockett Deposition at pp. 29:22-30:1; 89:22-91:24; 155:4-156:16;
             425:23-428:24

4            Email from Tim Lockett to Farah Saidi, cc: Trevor Hill, Ian Stillwell, dated
             April 27, 2010, Subject: Horizon pipesim model (Depo. Ex. 9445) (*Confidential*)

5            Email from Tim Lockett to Trevor Hill, dated May 3, 2010, Subject:  Best
             estimate (Depo. Ex. 9446) (*Confidential*)

6            May 14, 2010 Letter E. Markey to L. Mackay

7            March 1, 2013 T. Benson Letter to D. Haycraft

8            March 5, 2013 T. Benson Email to Judge Shushan

BP essentially concedes that the crime-fraud exception applies when it states "BP therefore would fully understand, and has prepared itself promptly to implement, a court order requiring the production of" a subset of the documents requested by the United States.  BP Opposition at 2.[1]  Since BP cannot credibly argue that the crime-fraud exception is inapplicable, it focuses instead on which documents requested by the United States must be produced.  BP employs a variety of strategies in an effort to prevent disclosure of documents related to preparation of BP's criminal and fraudulent communications.  When fully considered, BP's elaborate arguments resemble a house built of cards—the arguments have a rigid, self-referential structure that collapses when probed.

Once that house of fallen cards is swept aside, the essential facts are these:  In the Guilty Plea Agreement, BP admitted to obstructing Congress by making false and misleading statements.  BP's prior assertions to this Court state expressly that the drafting of its communications with Congress was lawyer-led.  In its Opposition, BP does not dispute that it in fact misled Congress, the National Incident Command, and the public in its flow rate statements during the response.  In its Initial Brief, the United States made a *prima facie* case for application of the crime-fraud exception, and nothing in BP's Opposition rebuts that showing.

Despite effectively conceding that the crime-fraud exception applies to documents related to preparation its written communications with Congress, BP nonetheless seeks to limit production to those documents in which Mr. Rainey was "an active participant."  As discussed herein, these efforts are fruitless because it was *BP not Mr. Rainey* that pled guilty to the crime and because the company has repeatedly told the Court that BP's Congressional communications were not masterminded by Mr. Rainey, but the result of "a process organized and directed by

---

[1] BP's suggestion that agreement "as to the status of substantial numbers" of responsive documents was thwarted when the United States was not "willing to pursue good faith meet-and-confer discussions regarding this motion" (Opposition at 2) is both patently false (as demonstrated by the written record of those communications) and irrelevant to consideration of this motion.

lawyers." July 19, 2012 Letter from R. Gasaway to Judge Shushan, Dkt. No. 7009 at 5.

Notably, BP never addresses the impact on its arguments of its own prior statements to the Court

and Parties emphasizing the centrality of its attorneys in developing the communications at issue.

BP's efforts to cherry-pick what documents must be turned over should be rejected, and the

Court should order production of all documents related to preparation of BP's (1) fraudulent

communications to Congress on May 4, 2010 and fraudulent letters to Congressman Markey

dated May 24 and June 25, 2010; (2) fraudulent statement to Federal On-Scene Coordinator

Admiral Mary Landry on May 19, 2010; and (3) fraudulent securities statements on April 29 and

30 and May 4, 2010.

## I.     BP CANNOT LIMIT THE CRIME-FRAUD APPLICATION TO DOCUMENTS AUTHORED BY MR. RAINEY

With regard to the document referred to by the United States as the "Guilty Plea

Agreement" and by BP as the "Allocution," BP cannot dispute that "[a]s part of the Guilty Plea

Agreement, BP agreed that the Government could establish beyond a reasonable doubt that BP

'withheld information and documents relating to multiple flow rate estimates prepared by BP

engineers' and that BP 'falsely represented' various information regarding the flow rate from the

Macondo Well." U.S. Initial Brief at 7. Indeed, BP opens its brief by stating that it "accepted

responsibility for its role in the tragic loss of life that resulted from the *Deepwater Horizon*

explosion." BP Opposition at 1. In the next breath, however, the company turns to one of its

recurring themes – blaming Mr. Rainey for the actions that BP pleaded guilty to. BP makes a

bold but unsupported statement that:

> While **BP's allocution admits Mr. Rainey acted** with criminal intent with
> respect to specific statements described therein, it makes **no similar admissions
> as to any other individuals**.

BP Opposition at 6 (emphasis added). BP then proceeds from this premise to certain key

conclusions. On the one hand, BP states that it "would fully understand . . . a court order

- 2 -

requiring the production of documents it designates in its proposed privilege logs under Category A" (*i.e.* documents in which Mr. Rainey is an active participant and that relate to the matters in BP's guilty plea allocution."). *Id.* at 2. On the other hand, BP also notes that "a great number of documents being sought by the United States do not even reflect communications involving Mr. Rainey . . . ." and that "documents not involving Mr. Rainey ought not to be disclosed." *Id.* at 2-3.

BP's reasoning collapses because the initial premise is false—it was BP, not Mr. Rainey, that pled guilty.[2] Five of the six specific paragraphs in the plea state "BP, through a former vice president," took certain actions. Grammatically, the subject of these sentences is "BP," not the "former vice-president." The remaining paragraph states "BP falsely suggested . . . ." with no reference whatsoever to acting through a former vice-president. Regardless of the particular phrasing, each paragraph references actions by BP. Furthermore, BP's logic is flawed. Even if Mr. Rainey was the agent through which BP obstructed Congress, that does not mean Mr. Rainey was solely responsible for those acts or that all other persons employed by BP must have clean hands. Nothing in the criminal plea suggests that the scope of the crime-fraud exception in this case should hinge on the nature of Mr. Rainey's involvement in a communication or exclude communications between other BP personnel and/or counsel.

---

[2]*See U.S. v. Inv. Enters., Inc.*, 10 F.3d 263, 266 (5th Cir. 1993) ("[A] corporation is criminally liable for the unlawful acts of its agents, provided that the conduct is within the scope of the agent's authority, whether actual or apparent."); *U.S. v. Tupelo Flite Center, Inc.*, 12 F.3d 1099, 1993 WL 543421, at *6 (5th Cir. Dec. 20, 1993) (upholding conviction of corporation and its officer where there was "ample evidence that . . . employees were acting within the scope of their employment, and for the benefit of [the corporation . . . ."); *United States v. Bi-Co Pavers, Inc.*, 741 F.2d 730, 737 (5th Cir.1984) ("a corporation is criminally liable for the unlawful acts of its agents, provided that such conduct is within the scope of the agent's authority, actual or apparent"); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1090 (5th Cir. 1978) (a corporation is criminally liable under the Sherman Act for the acts of its agents in the scope of their employment, even though such acts are contrary to general corporate policy and expressed instructions to the agents), *cert. denied*, 437 U.S. 903 (1978); *United States v. Ridglea State Bank*, 357 F.2d 495, 498 (5th Cir.1966) (corporation may be liable for violations of the False Claims Act if its employees were acting within the scope of their authority, for a purpose that benefited the corporation).

Finally, BP made up its own categories of the documents demanded (designated Categories A through E) and proposes to wall-off documents from production based on this categorization.  BP Opposition at 2-3.  The United States disputes that the categories defined by BP have any utility.  With the exception of documents "that relate to a communication as to which BP allocuted but that post-date the communication" (which were never sought by the United States), all of the documents that fall within Categories A through E appear to be documents that relate to the preparation of BP's criminal and fraudulent communications and should be produced to the United States.  In particular, the United States notes that Categories A through D all center on the manner in which Mr. Rainey was involved in the underlying communication.  For the reasons set forth above, whether and in what manner Mr. Rainey participated in a particular communication has no relevance, so long as the communication was otherwise part of BP's lawyer-directed process of preparing the criminal and fraudulent communications at issue.  To the extent the Court elects to review any of the privilege logs or other materials that BP proposed to submit in its brief, the United States respectfully requests that the Court simply disregard the categorization system proposed by BP.

## II.     THE UNITED STATES' MOTION SEEKS DOCUMENTS THAT FALL WITHIN THE SCOPE OF THE CRIME-FRAUD EXCEPTION

### A.     Documents Sought by the United States Are Reasonably Related to the Furtherance of Ongoing or Future Crime or Fraud

Consistent with caselaw governing application of the crime-fraud exception, the United States moved "for disclosure of all documents **related to the preparation of** BP's fraudulent statements and representation to United States' government officials, BP's shareholders, and the public regarding the flow rate . . . ."   U.S. Initial Brief at 2 (emphasis added).  BP claims that the United States misstated the applicable standard.  BP Opposition at 9.  In fact, both the United States and BP cite the controlling Fifth Circuit precedent regarding the crime-fraud exception:

> [T]he proper scope of the crime-fraud exception must necessarily be limited to
> those attorney-client communications and work products *reasonably related to
> the furtherance of the ongoing or future crime or fraud* at issue.

*In re Grand Jury Subpoena*, 419 F.3d 329, 347 (5th Cir. 2005) (emphasis added).[3]  *See* U.S.

Initial Brief at 17 & BP Opposition at 10.  This 2005 Fifth Circuit opinion cited by both parties

provides clear guidance on the application of this principle when it cites as an example of proper

application of the crime-fraud exception its previous decision in *U.S. v. Dyer*, 722 F.2d 174, 179

(5th Cir. 1983).  As noted in the 2005 decision, the *Dyer* court found that "events immediately

surrounding the **preparation of the letter** at issue" fall within the crime-fraud exception.  *Id.* at

347 (emphasis added, internal quotations and citations omitted).  Thus, where, as here, a

communication serves a criminal or fraudulent purpose, the crime-fraud exception is properly

applied to documents related to preparation of that communication.

 BP spends considerable effort arguing that the crime-fraud "exception to the privilege

does not automatically apply every time a lawyer is involved in a process of providing

information to the government that might later turn out to be false in some respect" or "every

time a misstatement is made by a client soon after an attorney-client privileged communication

occurs."  BP Opposition at 10-11.  Discussion of this issue is a red herring since the United

States has not advanced these arguments in support of its motion.  Moreover, as discussed below,

the cases cited by BP do not support a finding that the crime-fraud exception is inapplicable to

the documents at issue in this Motion.

---

[3] This case involved an appeal from a district court order requiring a criminal defendant's former counsel ("Former Counsel") to comply with a grand jury subpoena.  *Id.* at 331.  The defendant and his girlfriend met with Former Counsel and sought legal advice regarding "the penalty for committing perjury and of the potential sentence [Defendant] could receive if he were convicted of a firearm charge."  *Id.* at 333.  After this consultation, the girlfriend executed an affidavit, that she later admitted was false, stating that she owned the firearm.  Id. at 332-33.  The Fifth Circuit upheld the District Court's finding that the crime-fraud exception applied but found "[t]he Court's application of the crime-fraud exception was overly broad because it lacked the requisite specificity to reach only communications and documents no longer protected" by applicable privileges. *Id.* at 337, 344.  The Fifth Circuit noted that "[t]his case does not present a situation where [defendant]'s entire criminal representation by Former Counsel was based upon or sought for the sole purpose of perpetuating a crime or fraud."  *Id.* at 343.  Here, the United States has avoided the overbreadth issue presented in the 2005 Fifth Circuit decision by seeking only documents related to preparation of the criminal and fraudulent documents.

On the issue of involvement by counsel in a false or fraudulent communication, BP points to *U.S. v. Bauer*, 132 F.3d 504 (9th Cir. 1997). *Bauer* involved an attempt by prosecutors to elicit testimony from an attorney regarding communications with his client about a bankruptcy filing in which the client was alleged to have provided false information. The Ninth Circuit found the crime-fraud exception inapplicable because the legal advice at issue had been ignored, rather than relied upon, by the client. *Id*. at 509-11. This 1997 Ninth Circuit decision involves facts obviously different from the present case since, as BP's counsel has emphasized, preparation of the communications at issue was an attorney-led process. *See* U.S. Initial Brief § II(C). [4]

On the issue of temporal proximity, BP points to the Fifth Circuit's *Dyer* decision. The *Dyer* court examined potential application of the crime-fraud exception to defendant's discussions with two attorneys—Lehmann and Dwyer. 722 F.2d at 176. The Court found the exception inapplicable to defendant's discussions with Lehmann because the Court found no evidence that defendants used the legal advice received to obstruct justice. *Id*. at 177. By contrast, the *Dyer* court found that defendant's discussions with Dwyer did relate to preparation of the letter at issue and were subject to the crime-fraud exception. *Id*. Here, as demonstrated in Section II(C) of the United States' Initial Brief, counsel for BP were directly involved in preparation of the communications at issue.

On the issue of temporal proximity, BP also points to *In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d 199 (5th Cir. Unit A 1981). This case involved an effort to compel an attorney to disclose the identity of the client on whose behalf he had formed an off-shore corporation that six months later purchased a vessel that was used in drug smuggling. *Id*. at 200-

---

[4] BP also points to *U.S. v. Stewart*, No. 03 CR. 717, 2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003). This decision addresses an argument— not at issue in this case—that "the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." *Id*. at *2 (internal quotations and citations omitted).

01.  The Fifth Circuit noted that, while counsel established the business, "[h]e knew nothing of the purchase of the [vessel] or its subsequent uses . . . ."  *Id*. at 203.  The Fifth Circuit ultimately found insufficient evidence to find that the offshore corporation "was initially formed to further a criminal enterprise."  *Id*. at 204.  This 1981 decision stands in stark contrast to the instant Motion where the United States presented affirmative evidence that the communications that counsel helped BP prepare were themselves criminal or fraudulent.[5]

**B.**      **The United States' Production Request is Tailored to BP's Preparation of Fraudulent and Criminal Communications**

BP's arguments miss their mark in significant part because they fail to distinguish between the United States' position in this case—that the crime-fraud exception applies to documents **related to the preparation of** criminal and fraudulent communications—and a different issue—whether the crime-fraud exception applies to all documents **related to** the criminal and fraudulent communications.  The distinction is important.  As discussed above, the Fifth Circuit has found that documents related to the preparation of criminal and fraudulent communications are "reasonably related to the furtherance of the ongoing or future crime or fraud at issue."  *In re Grand Subpoena*, 419 F.3d at 347 (citing *Dyer*, 722 F.2d at 179).[6]  By contrast, other courts have found that, "[b]ecause a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception."  *In re Richard Roe, Inc.*, 68 F.3d 38, 40-41 (2d Cir. 1995).  Consistent with the Fifth Circuit's teachings

---

[5] BP also references *In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997).  In this case, a company official consulted with counsel then, weeks later, violated campaign finance laws; the D.C. Circuit found that temporal proximity was not sufficient to show "that the Company sought the legal advice with the intent to further its illegal conduct."  *Id*. at 50.  On balance, the D.C. Circuit's decision supports the United States' position in this case—that where counsel are indisputably deeply involved in the preparation of a communication, then the crime-fraud exception will apply.

[6] *Turner v. Pleasant*, No. 10-1823, 2012 WL 3270373, at *2 (E.D. La. Aug. 10, 2012) (magistrate judge opinion) addresses a different issue.  This case involved the question of whether defendants' had selected a particular attorney and a particular expert witness based on their potential ability to fraudulently influence the District Court Judge.  *Id*. After *in camera* review, the court found no evidence of such a purpose in the litigation files.  *Id*.  This decision turned on the contents of the litigation folder because plaintiffs lacked independent evidence of the commission of a crime or fraud.  By contrast, in the instant case BP has pled guilty and made other admissions establishing its criminal and fraudulent conduct—therefore no *in camera* review of the underlying documents is required here.

- 7 -

regarding the scope of the crime-fraud exception, the United States narrowly tailored its Motion to seek only those documents **related to preparation of** the fraudulent communications at issue.[7]

Since the United States' Motion does not rely upon "a simple finding of relevance" as the basis for applying the crime-fraud exception and it has restricted the scope of its Motion to the much narrower category of documents related to the preparation of the criminal and fraudulent communications, caselaw cited by BP suggesting that mere relevance is insufficient is not pertinent to the issues now before this Court.

BP points to *In re Burlington Northern, Inc.*, 822 F.2d 518, 525 (5th Cir. 1987), as an example of a case holding that "[t]he party invoking the crime-fraud exception . . . must show that each specific communication was actually used to facilitate unlawful conduct."  BP Opposition at 13.  *Burlington* does not so hold.  In *Burlington*, plaintiffs alleged that defendant railroads conspired to accomplish an anticompetitive goal through filing and defending two groups of lawsuits, and plaintiffs sought discovery of documents related to those lawsuits.  *Id*. at 520.  The Fifth Circuit held that the district court erred when it allowed discovery of these documents under the crime-fraud exception because it had not made a finding that the underlying lawsuits "were illegitimate."  *Id*. at 525.  The decision simply does not hold that "each specific communication" must be individually scrutinized.

BP cites *In re International Systems & Controls Corp. Securities Litigation.*, 693 F.2d 1235, 1243 (5th Cir. 1982), as an example of a case holding that "[b]ecause a communication itself must be in 'furtherance' of a crime, the mere fact that a communication may be 'related to' a crime is not enough."  BP Opposition at 13.  *International Systems* involved allegations that

---

[7] As part of its effort to narrow application of the crime-fraud exception, BP proposes to exclude from Category A any documents that relate to preparation of BP's criminal and fraudulent communications but that do not relate to certain specified subjects.  Opposition at 21.  BP's suggestion that any documents related to preparation of the criminal and fraudulent communications are beyond the scope of the crime-fraud exception is at odds with Fifth Circuit case law.  Moreover, as discussed in Section V below, this Court need not review BP's privilege logs.

defendant corporation had paid bribes to foreign nationals.  *Id*. at 1237.  Plaintiff sought

discovery into "binders" containing an internal investigation (termed a "special review") by the

corporation into the allegation of bribery.  *Id*. at 1238.  The Fifth Circuit noted that, while "[t]he

special review binders clearly have a reasonable relation to" the plaintiffs' allegations, "it may

well be that the [corporation's] purpose in commencing the special review was entirely pure."

*Id*. at 1243.  The court was particularly concerned that "[a]n attempt by the management to

investigate past and present questionable practices should not be discouraged by guaranteed

disclosure."  *Id*.  The facts underlying the *International Systems* decision stand in marked

contrast to the present case, where BP has pled guilty to crimes, where the underlying

communications were themselves criminal and fraudulent, and there is no issue of discouraging

good faith attempts by management to investigate questionable practices.

## III.   THE UNITED STATES HAS MADE THE REQUIRED *PRIMA FACIE* SHOWING

In its Opposition, BP essentially concedes that the United States has demonstrated that

the crime-fraud exception applies to the May 24, 2010 and June 25, 2010 letters to Congress, and

the May 19, 2010 communication to Admiral Landry.  *See, e.g.*, BP Opposition at 8.  BP then

argues that the United States failed to make a *prima facie* showing regarding documents related

to preparation of BP's presentation to a House Subcommittee on May 4, 2010 and BP's SEC

filings in late April and early May 2010.  As described below, the United States did in fact make

a *prima facie* showing.  Moreover, BP has failed to rebut that showing.  Quite simply, BP does

not even challenge the claim that it misled the Subcommittee, the SEC, and the public in these

communications.  That failure to dispute the government's case confirms that the *prima facie*

showing has been made.

Moreover, BP's own internal documents suffice to prove the *prima facie* case.  BP does

not deny misleading the government and the public ███████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ BP-HZN-2179MDL00443041 (Ex. 1); Dep. Ex. 2409 (Ex. 2). ███████

████████████████████████████████████████████████

████████████████████████████████████ Timothy Lockett

Deposition (Ex. 3) at 29:22-30:1; 89:22-91:24; Dep. Ex. 9445 (Ex. 4). ███████████

████████████████████████████████████████████████

████████████████████████████████████ however, the

April 29, 2010 Form 6-K told the SEC and the public that the oil flow was "currently estimated

at *up to 5,000 barrels a day*."  BP Opposition Ex. 2 (emphasis added) at 6.  BP repeated that

estimate the following day.  BP Opposition Ex. 3.  These public statements were sharply at odds

with the company's internal estimates, sufficient to establish a *prima facie* case that BP misled

the SEC and the public.

On May 3, 2010 – the day before Mr. Rainey's presentation to the Subcommittee offering

5,000 BOPD as the best estimate – █████████████████████████████████████████

███████ Ex. 9446.  █████████████████████████████████████████

████████████████████████████████ Lockett Dep. (Ex. 3) at 155:4-156:16; 425:23-

428:24; Dep. Ex. 9446 (Ex. 5) at 3.  The May 4 presentation was, in fact, misleading to Congress

because █████████████████████████████████ and called it the company's best

estimate.  That satisfies the *prima facie* requirement.

A.    **The United States Has Met Its Burden with Respect to Communications Related to Preparation of BP's Presentation to a House Subcommittee on May 4**

As discussed above, BP's own internal analyses prove that its May 4, 2010 presentation to the Subcommittee was, in fact, misleading.  In answer, BP simply argues that the May 4 presentation was not part of its guilty plea.  That argument suffers from at least two fatal flaws.

First, the Guilty Plea Agreement, while definitive evidence that BP obstructed Congress, is not necessarily the complete scope of the company's criminal or fraudulent activities.  In other words, a guilty plea is not a prerequisite to application of the crime-fraud exception.  Having a guilty plea makes the claim that much clearer, but the vast majority of crime-fraud decisions are based simply on allegations and evidence, rather than admissions.

Second, the May 4, 2010 Congressional briefing is inextricably linked to the very obstruction of Congress to which BP admitted.  As described in our initial brief, David Rainey made a presentation to a House Subcommittee ("Subcommittee") on May 4, 2010.  He told the subcommittee that 5,000 BOPD was the best estimate of the flow rate, and that the worst case discharge was 60,000 BOPD.  The then-Chairman of the Subcommittee responded on May 14, 2010.  May 14, 2010 Letter E. Markey to L. Mackay (Ex. 6).  In that letter, Chairman Markey noted both the 5,000 BOPD flow estimate and the 60,000 BOPD worst case discharge.  After noting that other, public estimates of the spill were greater than BP's alleged worst case discharge figure, Chairman Markey stated, "I am concerned that an underestimation of the flow *may be impeding the ability to solve the leak and handle management of the disaster.  We have already had one estimate that grossly underestimated the amount of oil being released* and we cannot afford to have another."  *Id.* (emphasis added).  The clear import of Chairman Markey's letter was that BP misled the Subcommittee in the May 4, 2010 briefing.  In response to Chairman Markey's letter, Mr. Rainey prepared the Rainey Memo, which was then sent to

Congressman Markey as part of BP's May 24 letter.  The chain of events is clear: The misleading presentation Mr. Rainey gave to the Subcommittee led to Congressman Markey's May 14 letter, which in turn led to the Rainey Memo and BP's May 24 letter, the company statements at the heart of the obstruction of Congress plea.

Finally, we note that BP has had the opportunity to deny the misleading nature of its May 4 briefing.  BP has not done so.  Moreover, BP's internal analyses demonstrate that the company had information that was directly at odds with its statement to Congress, satisfying the *prima facie* standard.

**B.    The United States Has Met Its Burden with Respect to Communications Related to Preparation of BP's SEC filings in late April and early May 2010**

With regard to documents related to preparation of BP's Forms 6-K filed on April 29 and 30 and May 4, 2010, the United States' Initial Brief cites to a Consent between BP's parent company and the SEC.  As set forth in the United States' Initial Brief (§ IV(C)), in the Consent BP agreed "not to deny, directly or indirectly, any allegation" in the SEC's Complaint.  The United States then demonstrated that the allegations in the SEC Complaint, which BP had agreed not to deny, were sufficient to establish a *prima facie* case for application of the crime-fraud exception.  In its Opposition, BP does not (indeed cannot) deny that these allegations, if accepted, establish a *prima facie* case.  Instead, BP makes two arguments.

First, BP argues that mere "allegations in pleadings" are insufficient to make the required showing and that "no statement regarding the SEC forms at issue in this motion is contained in BP's separate guilty plea allocution."  BP Opposition at 18.  However, the United States has not relied upon mere "allegations in pleadings."  Instead the United States has relied upon "allegations in pleadings" which BP specifically agreed in the Consent not to deny.  In support of its contention, BP cites the Fifth Circuit's 2005 decision in *In re Grand Jury Subpoena*, 419 F.3d. at 336 (citing *International Systems*, 693 F.2d at 1242).  In the underlying *International*

*Systems.* decision, the Fifth Circuit found that defendants had failed to make the required *prima*

*facie* case of fraud where it found "nothing in the record . . . of fraud except the plaintiff's

*allegations*."  693 F.2d at 1242 (emphasis in original).  The Consent executed by BP

distinguishes the facts of this case from the Fifth Circuit holding cited by BP (along with BP's

payment of $525 million to resolve the action brought by SEC enforcement authorities).

Second, BP argues that the import of the Consent cannot be understood without also

considering an additional sentence in the paragraph cited by the United States which states

"Nothing in this paragraph affects Defendant's . . . right to take legal or factual positions in

litigation or other legal proceedings in which the Commission is not a party."  What is important

here is that, while BP points to this sentence, it goes no farther.  While emphasizing language

that might preserve any right BP might otherwise hold to deny some allegations in the SEC

Complaint, BP does not actually deny any of those allegations.  Why?  BP would need a legally

cognizable basis-in-fact to do so.  Thus, the Court need not attempt to reconcile the sentence to

which BP points with its broad commitment not to deny the allegations in the Complaint.  As set

forth in the United States' Initial Brief, BP's execution of the Consent in which it agreed not to

deny the allegations in the SEC Complaint are sufficient to establish a *prima facie* case for

application of the crime-fraud exception.  Even if the Court were to accept BP's argument that it

has a right to deny those allegations, the simple fact is that it has not made any such denial.

What is relevant to our crime-fraud inquiry is whether BP can contradict the inference that flows

from its execution of the Consent—that the information submitted in its SEC filings was false

and misleading to shareholders.  Whether BP chooses to leave these allegations unanswered

because they are prohibited from denying them by the terms of the Consent or because the

allegations in the SEC Complaint were accurate and not misleading, the fact remains that the

United States has made the requisite showing and BP has made no rebuttal.

Finally, BP's internal analyses demonstrate that the company had information that was directly at odds with its statements to the SEC and the public, satisfying the *prima facie* standard.

## IV.     ADDITIONAL PROCESS IS NOT WARRANTED FOR BP

BP argues that *if* the Court is prepared to grant the United States' motion, BP deserves a new round of proceedings.  BP Opposition at 15-16.  In essence, BP asks the Court to make an advisory ruling based on the record before it, and then allow BP to start the process anew for any documents the Court orders to be produced.  This two-tiered process makes no sense and is not countenanced by the case law.  *See In re Grand Jury Subpoenas,* 561 F.3d 408, 413 (5th Cir. 2009) (process requirements met where non-moving party had opportunity to "present a substantial brief").  If anything, the case law makes clear that BP has already been provided ample process through the briefing schedule set by the Court with BP counsel's consent.

BP has already filed a 25-page brief on the schedule agreed to by BP counsel.  At the February 15, 2013 Working Group Conference, the Court announced that it would set the briefing schedule and asked if February 26 worked for BP's Opposition.  Feb. 15, 2013 WGC at 59:24-60:5.  BP counsel asked for February 28 instead, and the Court agreed.  *Id*.  BP never said that its February 28 brief would simply be a trial run, with a further brief and other "additional procedures" to follow if it felt the Court was on the wrong track.  Indeed, the Court made clear that the United States' and Transocean's reply briefs would be the end of the matter – announcing, "No sur replies."  *Id*.

The schedule set by the Court, with agreement by the Parties, is perfectly consistent with the existing case law, as the very cases cited by BP in its brief confirm.  BP's cases state that the party claiming privilege should be heard from, just as BP has been heard from here, not for the proposition that the privilege-asserting party gets two bites at the apple.  For instance, in *Haines v. Liggett Group Inc.* the Third Circuit stated that a district court may consider *only* the

presentation made by the party challenging privilege in deciding whether to perform an *in camera* inspection.  975 F.2d 81, 96 (3d Cir. 1992) (cited by BP at 15).  In that circumstance, the Third Circuit found that, after the *in camera* inspection, the documents could not be ordered released without the trial court also hearing from the privilege-asserting party.  Similarly, the *Napster* case cited by BP stands only for the proposition that "the party seeking to preserve the privilege has the right to introduce countervailing evidence."  *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (9th Cir. 2007) (cited by BP at 15).[8]

Nothing in the case law suggests BP should get twice the process allowed in every other circumstance for discovery or merits briefing.  How to implement the briefing in this instance is within the Court's discretion.  *See Napster*, 479 F.3d at 1093 ("We are not convinced that in all cases it is necessary for the district court to conduct a live hearing with oral argument; in appropriate cases, the court may decide the matter on the papers.").

BP had the opportunity to present argument and evidence in its brief, and the Court has the discretion to ask for oral argument.  The cases BP cites stand only for the thoroughly unremarkable principle that BP should be heard before the Court orders documents produced.  With this brief, the schedule set by the Court and agreed by the Parties has been completed, and the matter is now before the Court.  The company deserves nothing more.

## V.   NO REVIEW BY THE COURT OF BP'S PROPOSED PRIVILEGE LOG IS NECESSARY

In its Opposition, BP proposed to submit privilege logs listing documents "related to" the criminal and fraudulent communications by BP that are the subject of the United States' Motion.  BP Opposition at 1 & 24.  BP stated that some of the privilege logs would be submitted *in camera*.  Despite the United States' objection to BP's proposal, BP went ahead and served a

---

[8] That it is necessary to make such holdings at all comes from a "prevailing practice" in which the party asserting the privilege has *no* right to present contrary evidence, particularly in criminal cases.  *See* Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence*, § 6.13.2.d(2) at 987-990.

letter on the Court reiterating the arguments in its opposition and providing privilege logs and

documents for *in camera* review.  While preparation of these logs would be helpful in managing

production by BP to the United States of the listed documents, the United States would

emphasize three points.

First, as set forth in a March 1, 2013 letter to counsel for BP, and reiterated to the Parties

and the Court after BP ignored our initial letter, "to the extent BP decides to provide privilege

logs to the Court, those logs should be served on all counsel rather than filed under seal with the

Court."  March 1, 2013 T. Benson Letter to D. Haycraft (Ex. 7); March 5, 2013 T. Benson Email

to Judge Shushan (Ex. 8).  Privilege logs are not themselves privileged[9] and should not be filed

*in camera*.

Second, as set forth in its Initial Brief, it is the United States' position that no *in camera*

review of the underlying documents is required.  *See* U.S. Initial Brief § III(C).  Consistent with

this, it is the United States' position that the Court need not review any privilege log.  In its

Initial Brief, the United States established that certain categories of documents are subject to the

crime-fraud exception.  To the extent that BP concedes that particular documents fall within

those categories, those documents should be produced—no purpose remains to be served by

judicial review of a privilege log, the underlying documents themselves, or any other items

included in BP's "*in camera*" submission.

---

[9] Fed. R. Civ. P. 26(b)(5)(A)(ii) requires that a party claiming a privilege "**must**" provide information about the material withheld "in a manner that . . . will enable the other parties to assess the claim."  (Emphasis added.)  The purpose of a privilege log, of course, is to allow the parties and the Court to assess whether the privilege claim is applicable.  *See, e.g., Haensel v. Chrysler Corp.*, No. Civ. A. 96-1103, 1997 WL 537687 (E.D. La. Aug. 22, 1997) (Vance, J.) ("These requirements are entirely reasonable because the log's purpose is to provide information to the court and to opposing counsel to determine whether the privilege asserted applies to the requested document.").  Thus filing logs only with the Court defeats the purpose of Rule 26 by precluding the Parties from reviewing the claims.  BP's proposal here is especially bizarre because it appears to suggest it will share some of its proposed privilege logs with the Parties, while filing others in camera based on the company's opinion on what materials are properly within the scope of the United States' motion.  BP Opposition at 24.  It is not up to BP to decide the line between what documents are implicated by the crime-fraud exception and what are not.  If any logs are served, they must be served upon all Parties.

Finally, BP's privilege log submission makes a number of assumptions about the merits of the United States' motion and thus the nature of the submission that would be helpful to the Court. Once the Court rules on the motion, to the extent the Court wants to review privilege logs and/or documents, the United States will want a chance to respond to BP's submission. Overall, BP's unilateral decision to submit privilege logs to the Court *ex parte*, done in open violation of LR 5.6, was and remains highly improper.

## VI.   CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that the Court grant its Motion to Compel and order production of all documents related to preparation of BP's (1) fraudulent communications to Congress on May 4, 2010 and fraudulent letters to Congressman Markey dated May 24 and June 25, 2010; (2) fraudulent statement to Federal On-Scene Coordinator Admiral Mary Landry on May 19, 2010; and (3) fraudulent securities statements on April 29 and 30 and May 4, 2010.

Respectfully Submitted

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys


/s/ R. Michael Underhill
R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:  415-436-6648
Facsimile:  415-436-6632
E-mail:  mike.underhill@usdoj.gov

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JAMES NICOLL
Senior Counsel
NANCY FLICKINGER
Senior Attorney
SARAH HIMMELHOCH
Senior Litigation Counsel
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
ABIGAIL ANDRE
RACHEL HANKEY
BETHANY ENGEL
THOMAS BENSON
Trial Attorneys


/s/ Steven O'Rourke
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:  202-514-2779
Facsimile:  202-514-2583
E-mail:  steve.o'rourke@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA  70130
Telephone:  (504) 680-3000
Facsimile:  (504) 680-3184
E-mail:  sharon.d.smith@usdoj.gov


Attorneys for the UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  March 11, 2013.                                  /s/  Steve O'Rourke
                                                         U.S. Department of Justice