# EXHIBIT A

<u>**EXHIBIT A:**</u>
<u>**BP's Specific Objections to Adverse Inferences Sought By Requesting Parties**</u>

<u>**INTERROGATORY NO. 1**</u>**:**

On April 20, 2010, you were one of two BP Well Site Leaders aboard the Deepwater Horizon?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**[1]

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

No response is required because no specific inference has been requested in connection with this interrogatory.

<u>**INTERROGATORY NO. 2**</u>**:**

On April 20, 2010, the other BP Well Site Leader aboard the Deepwater Horizon was Robert Kaluza?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

No response is required because no specific inference has been requested in connection with this interrogatory.

<u>**INTERROGATORY NO. 3**</u>**:**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU formal training on how to perform a NEGATIVE PRESSURE TEST?

---

[1]   The PSC, US and Transocean did not specify the specific adverse inferences that they seek in their motions nor supply corroborating evidence.  Halliburton specified the inferences it seeks, but did not seek inferences for interrogatories 1-2, 24, 26-28, 41, and 49-50.  Therefore, in this Exhibit, BP has responded to Halliburton's inferences (and corroborating evidence.)  Where Halliburton did not seek an inference, BP has noted that the Requesting Parties have not specified the adverse inference sought, but nevertheless responded to the interrogatory.

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Before the Negative Pressure Testing, BP had not given Vidrine formal training on how to perform a Negative Pressure Test.

**BP'S RESPONSE:**

BP objects to the requested inference because the term "formal training" is vague, ambiguous and undefined.  BP further objects to the requested inference because it is counter to the evidence in the record, and Mr. Vidrine is not the only source of the information. Mr. Vidrine was sent to and completed well control courses, which involve the understanding of pressure testing. (05/10/2011 A. Guide Dep. at 765:23-766:21.) "The training that the wellsite leaders receive in estimating pressures in wellbore where there are different fluids present is applicable to negative-pressure testing." (09/28/2011 T. Emmerson Dep. at 124:24-125:23.) Moreover, *Deepwater Horizon* well site leader Murry Sepulvado indicated that through training on the rig, a BP well site leader would know how to conduct a negative pressure test. (05/11/2011 M. Sepulvado Dep. at 201:14-205:14. *See also* TREX 41498 (10/31/2009 Daily Operations Report showing Donald Vidrine as well site leader on the Transocean Marianas at the Macondo well conducting a negative pressure test); TREX 47706 (10/31/2009 Daily  Drilling Report signed by Donald Vidrine listing negative test); TREX 3465; 7652 (01/28/2010 and 01/29/2010 Deepwater Horizon Daily Drilling Reports showing Donald Vidrine as well site leader conducting negative pressure test at Kodiak well).)

Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010 (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

**INTERROGATORY NO. 4:**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU formal training on how to interpret a NEGATIVE PRESSURE TEST?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Before the Negative Pressure Testing, BP had not given Vidrine formal training on how to interpret a Negative Pressure Test.

**BP'S RESPONSE:**

BP objects to the requested inference because the term "formal training" is vague, ambiguous and undefined.  BP further objects to the requested inference because it is counter to the evidence in the record, and Mr. Vidrine is not the only source of the information. Mr. Vidrine was sent to and completed well control courses, which involve the understanding of pressure testing. (05/10/2011 A. Guide Dep. at 765:23-766:21.) "The training that the wellsite leaders receive in estimating pressures in wellbore where there are different fluids present is applicable to negative-pressure testing." (09/28/2011 T. Emmerson Dep. at 124:24-125:23.) Moreover, *Deepwater Horizon* well site leader Murry Sepulvado indicated that through training on the rig, a BP well site leader would know how to conduct a negative pressure test. (05/11/2011 M. Sepulvado Dep. at 201:14-205:14. *See also* TREX 41498 (10/31/2009 Daily Operations Report showing Donald Vidrine as well site leader on the Transocean Marianas at the Macondo well conducting a negative pressure test); TREX 47706 (10/31/2009 Daily  Drilling Report signed by Donald Vidrine listing negative test); TREX 3465; 7652 (01/28/2010 and 01/29/2010 Deepwater Horizon Daily Drilling Reports showing Donald Vidrine as well site leader conducting negative pressure test at Kodiak well).)

Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010. (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)


**INTERROGATORY NO. 5:**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU a written procedure detailing how to conduct a NEGATIVE PRESSURE TEST?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Before the Negative Pressure Testing, BP had not given Vidrine a written procedure on how to conduct a Negative Pressure Test.  (TREX-4; TREX-192; TREX-303.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is counter to the evidence in the record, and Mr. Vidrine is not the only source of the information.  Instructions regarding the negative pressure test are contained in both the temporary abandonment procedures contained in the April 15, 2010 drilling program (TREX-00545), the April 16, 2010 Application for Permit to Modify (TREX-00570), as well as the April 20, 2010 "Ops Note" email (TREX-00566) that BP engineer, Brian Morel sent to Mr. Vidrine and others on the rig. Transocean's senior toolpusher

testified that he believed the negative test procedures were "clearly communicated" to the driller. (4/28/2011 M. Ezell Dep. at 379:20-380:12.)   There was "a procedure for running and performing the test" in the Ops Note which "gave sufficient information for running the test," which was "common practice in the industry and on the rigs…" (04/21/2011 G. Walz Dep. at 238:19-242:8; 4/20/2011 Burgess Dep. at 379:5 - 381:14 ("Q: If you were asked to perform a negative test, would you know what to do?  A: Yes.  Sure would.  If I had, had any questions I'd ask, wouldn't be afraid to ask.").)

Similarly, Transocean had protocols and instructions for negative pressure tests on the *Deepwater Horizon*. (TREX-004640.) Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)  Copies of the Transocean Well Control Handbook were available in numerous locations aboard the *Deepwater Horizon*.(04/27/2011 M. Ezell Dep. at 290:8-20.) The Transocean rig crew also had the ability to obtain procedures or documents for guidance on how to conduct or interpret a negative pressure test via the rig's email system. (*See e.g.*, 07/27/2011 W. Sannan Dep. at 227:1-6, 227:14-18.)

The requested inference is also inappropriate because in addition to the testimony of other witnesses regarding the temporary abandonment procedure submitted to and approved by the MMS and the temporary abandonment operations actually performed on the Macondo well, the documents reflecting the MMS-approved procedure and the procedures followed on the rig speak for themselves. (*See e.g.*, TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS), and TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

To the extent that the requested inference purports to suggest that there was a single prescribed method of conducting or interpreting a negative pressure test at the time of the accident that should have been provided to Mr. Vidrine, it conflicts with the record evidence, which shows that in April 2010, there was no MMS requirement that operators conduct negative pressure tests, and, consequently, no specific requirements regarding how such tests should be performed. (*See e.g.*, 07/13/2011 F. Patton Dep. at 243-44, 298 (as of 4/16/2010 MMS did not have any regulations that applied to NPT procedures); 11/21/2011 R. Heenan Dep. at 149 ("Q: Okay. Are you aware of any law that sets forth a provision for conducting negative pressure tests? A: I'm not aware of one in Canada or the United States."); 11/29/2011 C. Barnhill Dep. at 120:9-24 (indicating that there is "no MMS requirement to do a negative test" and that BP "could have fulfilled the MMS requirement without doing a negative test.").)

**INTERROGATORY NO. 6:**

Before the NEGATIVE PRESSURE TESTING, BP had not given YOU a written procedure detailing how to interpret a NEGATIVE PRESSURE TEST?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Before the Negative Pressure Testing, BP had not given Vidrine a written procedure detailing how to interpret a Negative Pressure Test.  (TREX-4; TREX-192; TREX-303).

**BP'S RESPONSE:**

BP objects to the requested inference because it is counter to the evidence in the record, and Mr. Vidrine is not the only source of the information.  Instructions regarding the negative pressure test are contained in both the temporary abandonment procedures contained in the April 15, 2010 drilling program (TREX-00545), the April 16, 2010 Application for Permit to Modify (TREX-00570), as well as the April 20, 2010 "Ops Note" email (TREX-00566) that BP engineer, Brian Morel sent to Mr. Vidrine and others on the rig. Transocean's senior toolpusher testified that he believed the negative test procedures were "clearly communicated" to the driller. (4/28/2011 M. Ezell Dep. at 379:20-380:12.)   There was "a procedure for running and performing the test" in the Ops Note which "gave sufficient information for running the test," which was "common practice in the industry and on the rigs…" (04/21/2011 G. Walz Dep. at 238:19-242:8; 4/20/2011 Burgess Dep. at 379:5 - 381:14 ("Q: If you were asked to perform a negative test, would you know what to do?  A: Yes.  Sure would.  If I had, had any questions I'd ask, wouldn't be afraid to ask.").)

Similarly, Transocean had protocols and instructions for negative pressure tests on the *Deepwater Horizon*.  (TREX-004640.) Specifically, both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.) Copies of the Transocean Well Control Handbook were available in numerous locations aboard the *Deepwater Horizon.* (04/27/2011 M. Ezell Dep. at 290:8-20.) The Transocean rig crew also had the ability to obtain procedures or documents for guidance on how to conduct or interpret a negative pressure test via the rig's email system.  (*See e.g.*, 07/27/2011 W. Sannan Dep. at 227:1-6, 227:14-18.)

The requested inference is also inappropriate because in addition to the testimony of other witnesses regarding the temporary abandonment procedure submitted to and approved by the MMS and the temporary abandonment operations actually performed on the Macondo well, the documents reflecting the MMS-approved procedure and the procedures followed on the rig speak for themselves. (*See e.g.*, TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS), and TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

To the extent that the requested inference purports to suggest that there was a single prescribed method of conducting or interpreting a negative pressure test at the time of the accident that should have been provided to Mr. Vidrine, it conflicts with the record evidence, which shows that in April 2010, there was no MMS requirement that operators conduct negative pressure tests, and, consequently, no specific requirements regarding how such tests should be performed. (*See e.g.*, 07/13/2011 F. Patton Dep. at 243-44, 298 (as of 4/16/2010 MMS did not have any regulations that applied to NPT procedures); 11/21/2011 R. Heenan Dep. at 149 ("Q: Okay. Are you aware of any law that sets forth a provision for conducting negative pressure tests? A: I'm not aware of one in Canada or the United States."); 11/29/2011 C. Barnhill Dep. at 120:9-24 (indicating that there is "no MMS requirement to do a negative test" and that BP "could have fulfilled the MMS requirement without doing a negative test.").)

**INTERROGATORY NO. 7:**

Before April 20, 2010, YOU had previously performed a NEGATIVE PRESSURE TEST on the Deepwater Horizon by monitoring for pressure and/or flow on the drill pipe?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Before April 20, 2010, Vidrine had previously performed a Negative Pressure Test on the *Deepwater Horizon* by monitoring for pressure and/or flow on the drill pipe.

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the evidence to the extent that it suggests that before April 20, 2010 Donald Vidrine had only performed a negative pressure test on the Deepwater Horizon by monitoring for pressure and/or flow on the drill pipe. (*See* TREX 3465; 7652 (01/28/2010 and 01/29/2010 DWH Daily Drilling Reports); *see also* TREX 41498 (10/31/2009 Daily Operations Report) ("performed negative test on 18 casing pumped 60 bbls base oil down kill line to achieve 500 psi of differential pressure. Bled back to mini-trip tank and monitored for 30 minutes.  Good test"); TREX 47706 (10/31/2009 Daily Drilling Report signed by Donald Vidrine) (listing same negative test).)

**INTERROGATORY NO. 8:**

Before April 20, 2010, YOU had not previously performed a NEGATIVE PRESSURE TEST on the Deepwater Horizon by monitoring for pressure and/or flow on the kill line?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Before April 20, 2010, Vidrine had not previously performed a Negative Pressure Test on the Deepwater Horizon by monitoring for pressure and/or flow on the kill line.

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the evidence to the extent it suggests that Mr. Vidrine had not previously performed a negative pressure test on a Transocean drilling rig at the Macondo well by monitoring for pressure and/or flow on the kill line or that he had not performed a negative pressure test on the Deepwater Horizon. Mr. Vidrine was the Well Site Leader on duty on the Transocean Marianas located at the Macondo well when the crew "performed negative test on 18 casing pumped 60 bbls base oil down kill line to achieve 500 psi of differential pressure. Bled back to mini-trip tank and monitored for 30 minutes.  Good test." (TREX 41498 (10/31/2009 Daily Operations Report); *see also* TREX 47706 (10/31/2009 Daily Drilling Report signed by Donald Vidrine) (listing same negative test).) Mr. Vidrine has also conducted a negative pressure test on the Deepwater Horizon.  (TREX 3465; 7652 (01/28/2010 and 01/29/2010 DWH Daily Drilling Reports).)


**INTERROGATORY NO. 9:**

Prior to conducting the NEGATIVE PRESSURE TESTING, you read the NEGATIVE PRESSURE TEST procedure outlined in the APM?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Prior to conducting the Negative Pressure Testing, Vidrine read the Negative Pressure Test procedure outlined in the APM.  (TREX-3576.)

**BP'S RESPONSE:**

No objection.


**INTERROGATORY NO. 10:**

The APM required that a NEGATIVE PRESSURE TEST be conducted prior to displacing the well to seawater down to a depth of 8367'?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The APM required that a Negative Pressure Test be conducted prior to displacing the well to seawater down to a depth of 8367'.  (TREX-570.)

**BP'S RESPONSE:**

BP objects to the requested inference because the document speaks for itself, and it—not an adverse inference based on a self-serving question posed to Mr. Vidrine—is the Best Evidence of what the APM required.  The requested inference is also inappropriate because it is contrary to the record evidence.  In addition to the testimony of other witnesses regarding the temporary abandonment procedure submitted to and approved by the MMS and the temporary abandonment operations actually performed on the Macondo well, the documents reflecting the MMS-approved procedure and the procedures followed on the rig speak for themselves.  (*See e.g.*, TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS); TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)  The APM stated that a negative pressure test be conducted, and stated "TIH with a 3-1/2" stinger to 8367'."  (TREX-570. *See also* TREX-000566 (April 20, 2010 Ops Note from Brian Morel to D. Vidrine, R. Kaluza, L. Lambert, J. Guide, M. Hafle, B. Cocales, G. Walz provided more specific details to the crew as to how that negative pressure test would be conducted).)

To the extent the requested inference suggests that the negative test conducted on April 20, 2010 was contrary to that described in the APM, the record evidence reveals that the temporary abandonment procedures performed at the Macondo well were the procedures that were described in the April 16, 2010 Application for Permit to Modify that was submitted to and approved by the MMS.  (TREX-002236.)  Mr. Guide testified that the temporary abandonment procedure which was submitted to and approved by the MMS on April 16, 2010 (TREX-000570) represented the same procedure as outlined in the "Ops Note" email of April 20, 2010 (TREX-000566): "Q. So as you see it, they're exactly the same? A. The, you know, the wording is slightly different. But the, the procedure is the same thing." (05/09/2011 A. Guide Dep. at 386:15-19.) Mr. Guide also indicated that both documents required displacement to seawater prior to the negative pressure test, and that he did not view the procedure outlined in the "Ops Note" email April 20, 2010 as a change or deviation from the procedure that was submitted to and approved by the MMS on April 16, 2010.  (05/09/2011 A. Guide Dep. at 285:23-286:22 ("Q. . . . But really my only question to you, you know, isn't it true, that on April the 20th at 10:43 Brian Morel, or someone at BP changed the order of the seawater displacement . . . A. My answer is no, that I was always under the impression that we were going to do the negative test with seawater at 8367 feet and that is, indeed, what this said, what the MMS approved.").) Likewise, Mr. Walz testified that he "always told folks that the negative test that we needed to perform was running at 8300 feet and displacing it." (04/22/2011 G. Walz Dep. at 785:14-786:8, 788:10-13.  *See also* 09/27/2011 A. Frazelle Dep. at 505:2-15 (indicating that steps 2 and 3 on the April 16, 2010 temporary abandonment procedure that was submitted to and approved by the MMS, were actually subparts of 1, rather than sequential steps in the procedure).)

**INTERROGATORY NO. 11:**

The APM required that a second NEGATIVE PRESSURE TEST be conducted after displacing the well to seawater to a depth of 8367'?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The APM required that a second Negative Pressure Test be conducted after displacing the well to seawater to a depth of 8367'.  (TREX-570.)

**BP'S RESPONSE:**

BP objects to the requested inference because the document speaks for itself, and it—not an adverse inference based on a self-serving question posed to Mr. Vidrine—is the Best Evidence of what the APM required.  The requested inference is also inappropriate because it is contrary to the record evidence.  In addition to the testimony of other witnesses regarding the temporary abandonment procedure submitted to and approved by the MMS and the temporary abandonment operations actually performed on the Macondo well, the documents reflecting the MMS-approved procedure and the procedures followed on the rig speak for themselves.  (*See e.g.*, TREX-002236 (April 16, 2010 email from B. Morel attaching temporary abandonment procedure as submitted to and approved by the MMS); TREX-000566 (April 20, 2010 email from B. Morel providing a "[q]uick ops note for the next few days" including a high-level description of the temporary abandonment procedure).)

The APM stated that a single negative pressure test be conducted ("Negative test casing to seawater gradient equivalent for 30 min. with kill line.), and stated "TIH with a 3-1/2" stinger to 8367'."  (TREX-570.)  The April 20, 2010 Ops Note from Brian Morel to to D. Vidrine, R. Kaluza, L. Lambert, J. Guide, M. Hafle, B. Cocales, G. Walz provided more specific details to the crew as to how that negative pressure test would be conducted, including "RIH to 8367'" and "[d]isplace to seawater from there to above the wellhead." (TREX-000566.)


**INTERROGATORY NO. 12:**

On April 20, 2010, YOU instructed the TRANSOCEAN DRILL CREW in words or substance to conduct the SECOND NEGATIVE PRESSURE TEST by monitoring the kill line for pressure and/or flow?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, Vidrine instructed the Transocean Drill Crew in words or substance to conduct the Second Negative Pressure Test by monitoring the kill line for pressure and/or flow. (TREX-4; TREX-5; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-3806; TREX-7327.)

**BP'S RESPONSE:**

BP objects to the requested inference because Mr. Vidrine is not the only source of information and the requested inference is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See, e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test. Specifically, the requested inference incorrectly suggests that Mr. Vidrine "instructed the Drill Crew" to conduct the second negative test, but Transocean's senior toolpusher on the rig, Randy Ezell, testified that Mr. Ezell instructed the Transocean rig crew to stop the job on the first negative test and line it up as as described in the APM procedure that was approved by the MMS.  (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)  Moreover, the record evidence also demonstrates that the BP well site leaders did not "instruct" the Transocean drill crew to do anything; rather, the Transocean drill crew took its instructions from the Transocean supervisors on the rig -- specifically, the toolpushers and the OIM.  (*See* 04/20/2011 Burgess Dep. at 35:8-19; 364:8-365:6.)

**INTERROGATORY NO. 13:**

On April 20, 2010, prior to the start of the SECOND NEGATIVE PRESSURE TEST, you communicated with Robert Kaluza about a call to the on-shore BP engineers in Houston to tell them a second NEGATIVE PRESSURE TEST would be conducted?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, prior to the start of the second Negative Pressure Test, Vidrine communicated with Robert Kaluza about a call to the on-shore BP engineers in Houston to tell them a second Negative Pressure Test would be conducted.  (TREX-3575; Deposition of Christopher Pleasant at 99:23-100:18; 254:2-256:19; 511:7-19; 512:7-21.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence and Mr. Vidrine is not the only source of the information at issue. Specifically, Mr. Guide testified that he was *not* contacted on the evening of April 20, 2010 by anyone on the rig regarding the results of the negative pressure test.  (05/10/11 A. Guide Dep. at 759:17-761:15, 785:8-22.)   The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.)   Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Kaluza and Mr. Vidrine, confirmed the accuracy of

the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.)  Furthermore, the requested inference is contrary to the very evidence cited in support of the inference sought.   The record of calls between the rig and onshore personnel establishes that there were no outgoing calls from the rig to the on-shore BP engineers during the conduct of the negative pressure test (TREX-3575.  *See also* TREX-7318.)  Likewise, Mr. Pleasant testified that he did not witness Mr. Kaluza make a call to on-shore personnel. (3/15/2011 C. Pleasant Dep. at 429:6-13; 544:18-545:5.)

## INTERROGATORY NO. 14:

You were aware that Robert Kaluza in fact called the BP on-shore engineers in Houston to advise them that a second NEGATIVE PRESSURE TEST would be conducted?

## INFERENCE SOUGHT BY REQUESTING PARTIES:

Vidrine was aware that Robert Kaluza in fact called the BP on-shore engineers in Houston to advise them that a second Negative Pressure Test would be conducted.  (TREX-3575; Deposition of Christopher Pleasant at 99:23-100:18; 254:2-256:19; 511:7-19; 512:7-21.)

## BP'S RESPONSE:

BP objects to the requested inference because it is contrary to the record evidence and Mr. Vidrine is not the only source of the information at issue. Specifically, Mr. Guide testified that he was *not* contacted on the evening of April 20, 2010 by anyone on the rig regarding the results of the negative pressure test.  (05/10/11 A. Guide Dep. at 759:17-761:15, 785:8-22.)   The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.)   Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Kaluza and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.)  Furthermore, the requested inference is contrary to the very evidence cited in support of the inference sought.   The record of calls between the rig and onshore personnel establishes that there were no outgoing calls from the rig to the on-shore BP engineers during the conduct of the negative pressure test (TREX-3575.  *See also* TREX-7318.) Likewise, Mr. Pleasant testified that he did not witness Mr. Kaluza make a call to on-shore personnel.  (3/15/2011 C. Pleasant Dep. at 429:6-13; 544:18-545:5.)

## INTERROGATORY NO. 15:

On April 20, 2010, before the BLOWOUT, YOU observed pressure on the drill pipe during the NEGATIVE PRESSURE TESTING?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the blowout, Vidrine observed pressure on the drill pipe during the Negative Pressure Testing.  (TREX-4; TREX -5; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-3576; TREX-4447; TREX-7327.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful. The record evidence shows that Mr. Vidrine is not the only source of information, further demonstrating that the requested inference is inappropriate.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.)  Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/27/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement.  (TREX-000001 at BP-HZN-BLY00000025.)

**INTERROGATORY NO. 16:**

The Company Man for BP has the responsibility for calculating or estimating the volume of fluid expected to bleed back during NEGATIVE PRESSURE TESTING?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Company Man for BP has the responsibility for calculating or estimating the volume of fluid expected to bleed back during Negative Pressure Testing.

**BP'S RESPONSE:**

BP objects to the requested inference because the interrogatory is overly broad and not limited to the Macondo well or even the *Deepwater Horizon*; Requesting Parties have not laid any foundation that Mr. Vidrine has knowledge to testify about the responsibilities of a BP Company Man globally and without regard for time period. The requested inference is also inappropriate because it is unsupported by record evidence. It is also inappropriate because it is contradicted by the record evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010 (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.) Similarly, Transocean's drill crew was involved with the preparation and interpretation of the Macondo NPT and would have understood its general principle. (09/30/2011 S. Newman Dep. at 286:1-287:14.)

In addition, the M-I SWACO displacement procedure, TREX-003196, was drafted by the MI-Swaco mud engineer, Leo Lindner, and Mr. Lindner testified that coming up with the displacement procedure is "part of . . . M-I's job . . . the Displacement Procedure is within our purview." (09/14/2011 L. Lindner Dep. at 234:16-235:24, 236:13-21.) Mr. Lindner calculated the pump strokes needed for each step of the displacement, including calculating the volume to pump to land the spacer above the BOP. (*Id.* at 144:1-9; 09/15/2011 L. Lindner Dep. at 622:5-24.) Transocean personnel were similarly involved in calculating fluid volumes in connection with the temporary abandonment procedure, and Halliburton personnel were involved in the bleed back during the negative pressure test. (*See e.g.*, TREX-7532 ("Bob asked Wyman 'who

13

calculates the displacement figures?' Wyman said 'we all do…the AD, the driller, I do, and everyone agrees.'  Bob asked if the differential pressure was bled to the trip tank when they closed the annular.  Wyman said 'no, Halliburton was bleeding back.'").)

## INTERROGATORY NO. 17:

Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, YOU did not calculate the volume of fluid expected to bleed back to the cement unit during any NEGATIVE PRESSURE TESTING?

## INFERENCE SOUGHT BY REQUESTING PARTIES:

Prior to conducting the Negative Pressure Testing on April 20, 2010, Vidrine did not calculate the volume of fluid expected to bleed back to the cement unit during any Negative Pressure Testing.  (Deposition of Lee Lambert at 452:4-23; 453:1-2.)

## BP'S RESPONSE:

BP objects to the requested inference because Mr. Vidrine is not the only source of information on this topic.  The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test.

Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.).   Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010.  (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.)  Similarly, Transocean's drill crew was involved with the preparation and interpretation of the Macondo NPT and would have understood its general principle.  (09/30/2011 S. Newman Dep. at 286:1-287:14.)

In addition, the M-I SWACO displacement procedure (TREX-003196) was drafted by the MI-Swaco mud engineer, Leo Lindner, and Mr. Lindner testified that coming up with the displacement procedure is "part of . . . M-I's job . . . the Displacement Procedure is within our purview." (09/14/2011 L. Lindner Dep. at 234:16-235:24, 236:13-21.) Mr. Lindner calculated the pump strokes needed for each step of the displacement, including calculating the volume to pump to land the spacer above the BOP.  (*Id.* at 144:1-9; 09/15/2011 L. Lindner Dep. at 622:5-

24.)  Mr. Lindner also reviewed the entire displacement procedure with BP, Transocean, and Sperry-Sun personnel at the pre-job meeting on the afternoon of April 20, 2010 and was comfortable everyone understood the planned activity.  (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21; TREX-000326.)  Lindner also testified that no one raised any concerns about the accuracy of the pump stroke calculations, the order of the steps, or the actual operations proposed.   (09/14/2011 L. Lindner Dep. at 253:2-255:16,  343:11-346:21.) Transocean personnel were similarly involved in calculating fluid volumes in connection with the temporary abandonment procedure, and Halliburton personnel were involved in the bleed back during the negative pressure test.  (*See e.g.*, TREX-7532 ("Bob asked Wyman 'who calculates the displacement figures?'  Wyman said 'we all do…the AD, the driller, I do, and everyone agrees.'  Bob asked if the differential pressure was bled to the trip tank when they closed the annular.  Wyman said 'no, Halliburton was bleeding back.'").)


**INTERROGATORY NO. 18:**

Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, no BP personnel on the rig calculated the volume of fluid expected to bleed back to the cement unit during any NEGATIVE PRESSURE TESTING?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Prior to conducting the Negative Pressure Testing on April 20, 2010, no BP personnel on the rig calculated the volume of fluid expected to bleed back to the cement unit during any Negative Pressure Testing.  (Deposition of Lee Lambert at 452:4-23; 453:1-2.)

**BP'S RESPONSE:**

BP objects to the requested inference because Mr. Vidrine is not the only source of information on this topic.  The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test.

Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)  Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.).   Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010.  (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.)  Similarly, Transocean's drill crew was involved

15

with the preparation and interpretation of the Macondo NPT and would have understood its general principle.  (09/30/2011 S. Newman Dep. at 286:1-287:14.)

In addition, the M-I SWACO displacement procedure, TREX-003196, was drafted by the MI-Swaco mud engineer, Leo Lindner, and Mr. Lindner testified that coming up with the displacement procedure is "part of . . . M-I's job . . . the Displacement Procedure is within our purview."  (09/14/2011 L. Lindner Dep. at 234:16-235:24, 236:13-21.)  Mr. Lindner calculated the pump strokes needed for each step of the displacement, including calculating the volume to pump to land the spacer above the BOP.  (*Id.* at 144:1-9; 09/15/2011 L. Lindner Dep. at 622:5-24.)  Mr. Lindner also reviewed the entire displacement procedure with BP, Transocean, and Sperry-Sun personnel at the pre-job meeting on the afternoon of April 20, 2010 and was comfortable everyone understood the planned activity.  (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21; TREX-000326.)  Lindner also testified that no one raised any concerns about the accuracy of the pump stroke calculations, the order of the steps, or the actual operations proposed.   (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21.) Transocean personnel were similarly involved in calculating fluid volumes in connection with the temporary abandonment procedure, and Halliburton personnel were involved in the bleed back during the negative pressure test.  (*See e.g.*, TREX-7532 ("Bob asked Wyman 'who calculates the displacement figures?' Wyman said 'we all do…the AD, the driller, I do, and everyone agrees.'  Bob asked if the differential pressure was bled to the trip tank when they closed the annular.  Wyman said 'no, Halliburton was bleeding back.'").)


**INTERROGATORY NO. 19:**

Prior to conducting the NEGATIVE PRESSURE TESTING on April 20, 2010, YOU did not communicate to any TRANSOCEAN DRILL CREW member or HESI personnel manning the cement unit the volume of fluid calculated or expected to bleed back during any NEGATIVE PRESSURE TESTING?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Prior to conducting the Negative Pressure Testing on April 20, 2010, Vidrine did not communicate to any Transocean Drill Crew member or HESI personnel manning the cement unit the volume of fluid calculated or expected to bleed back during any Negative Pressure Testing. (Deposition of Lee Lambert at 452:4-23; 453:1-2.)

**BP'S RESPONSE:**

BP objects to the requested inference because Mr. Vidrine is not the only source of information on this topic.  The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test.

Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S.

16

Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)   Both the Transocean drill crew and BP well site leaders received training in conducting pressure tests, and had experience with conducting negative pressure tests prior to conducting the negative pressure test at Macondo on April 20, 2010 (*See e.g.*, 05/12/2011 A. Guide Dep. at 890:20-893:11.) Similarly, Transocean's drill crew was involved with the preparation and interpretation of the Macondo NPT and would have understood its general principle.  (09/30/2011 S. Newman Dep. at 286:1-287:14.)

In addition, the M-I SWACO displacement procedure, TREX-003196, was drafted by the MI-Swaco mud engineer, Leo Lindner, and Mr. Lindner testified that coming up with the displacement procedure is "part of . . . M-I's job . . . the Displacement Procedure is within our purview." (09/14/2011 L. Lindner Dep. at 234:16-235:24, 236:13-21.)  Mr. Lindner calculated the pump strokes needed for each step of the displacement, including calculating the volume to pump to land the spacer above the BOP.  (*Id.* at 144:1-9; 09/15/2011 L. Lindner Dep. at 622:5-24.) Mr. Lindner also reviewed the entire displacement procedure with BP, Transocean, and Sperry-Sun personnel at the pre-job meeting on the afternoon of April 20, 2010 and was comfortable everyone understood the planned activity.  (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21; TREX-000326.) Lindner also testified that no one raised any concerns about the accuracy of the pump stroke calculations, the order of the steps, or the actual operations proposed.    (09/14/2011 L. Lindner Dep. at 253:2-255:16, 343:11-346:21.) Transocean personnel were similarly involved in calculating fluid volumes in connection with the temporary abandonment procedure, and Halliburton personnel were involved in the bleed back during the negative pressure test.   (*See e.g.*, TREX-7532 ("Bob asked Wyman 'who calculates the displacement figures?' Wyman said 'we all do…the AD, the driller, I do, and everyone agrees.'  Bob asked if the differential pressure was bled to the trip tank when they closed the annular.  Wyman said 'no, Halliburton was bleeding back.'").)

## INTERROGATORY NO. 20:

On April 20, 2010, YOU instructed the TRANSOCEAN DRILL CREW in words or substance to conduct the SECOND NEGATIVE PRESSURE TEST by monitoring the kill line for pressure and/or flow because the APM required that the test be monitored on the kill line?

## INFERENCE SOUGHT BY REQUESTING PARTIES:

On April 20, 2010, Vidrine instructed the Transocean Drill Crew in words or substance to conduct the Second Negative Pressure Test by monitoring the kill line for pressure and/or flow because the APM required that the test be monitored on the kill line.  (TREX-4; TREX-49; TREX-303; TREX-3573; TREX-3576.)

**BP'S RESPONSE:**

BP objects to the requested inference because  Mr. Vidrine is not the only source of information, and the requested inference is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test. Specifically, the requested inference incorrectly suggests that Mr. Vidrine "instructed the Drill Crew" to conduct the second negative test, but Transocean's senior toolpusher on the rig, Randy Ezell, testified that Mr. Ezell instructed the Transocean rig crew to stop the job on the first negative test and line it up as as described in the APM procedure that was approved by the MMS.  (04/27/2011 M. Ezell Dep. at 209:12-210:4; 04/28/2011 M. Ezell Dep. at 534:17-536:11.)  Moreover, the record evidence also demonstrates that the BP well site leaders did not "instruct" the Transocean drill crew to do anything; rather, the Transocean drill crew took its instructions from the Transocean supervisors on the rig -- specifically, the toolpushers and the OIM.  *See* 04/20/2011 Burgess Dep. at 35:8-19; 364:8-365:6.

## INTERROGATORY NO. 21:

On April 20, 2010, before the BLOWOUT, YOU believed that the pressure on the drill pipe during the NEGATIVE PRESSURE TESTING was caused by a "bladder effect"?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Vidrine believed that the pressure on the drill pipe during the Negative Pressure Testing was caused by a "bladder effect."  (TREX-192.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is not supported by the evidence cited. (*See* TREX-192.)  Specifically, the exhibit cited in support of this requested evidence provides only that Mr. Vidrine, "was told by the team in the drillers doghouse that this was annular compression," not that Mr. Vidrine "believed that the pressure on the drill pipe during the Negative Pressure Testing was caused by a 'bladder effect'" as the requested inference states. The requested inference is also contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

**INTERROGATORY NO. 22:**

On April 20, 2010, before the BLOWOUT, YOU believed that the pressure on the drill pipe during the NEGATIVE PRESSURE TESTING was caused by "annular compression"?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Vidrine believed that the pressure on the drill pipe during the Negative Pressure Testing was caused by "annular compression." (TREX-4; TREX-49; TREX-192; TREX-303; TREX-3576; TREX-7327.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is not supported by the evidence cited. *See* TREX-192. Specifically, the exhibit cited in support of this requested evidence provides only that Mr. Vidrine, "was told by the team in the drillers doghouse that this was annular compression," not that Mr. Vidrine "believed that the pressure on the drill pipe during the Negative Pressure Testing was caused by 'annular compression'" as the requested inference states. The requested inference is also contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

**INTERROGATORY NO. 23:**

On April 20, 2010, YOU were present on the drill floor at the time the SECOND NEGATIVE PRESSURE TEST was completed?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, Vidrine was present on the drill floor at the time the Second Negative Pressure Test was completed. (TREX-4; TREX-5; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-7327.)

**BP'S RESPONSE:**

No objection.

**INTERROGATORY NO. 24:**

On April 20, 2010, during the SECOND NEGATIVE PRESSURE TEST, you observed no fluid flowing from the kill line for a period of 30 minutes?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

No response is required because no specific inference has been requested in connection with this interrogatory.

**INTERROGATORY NO. 25:**

On April 20, 2010, before the BLOWOUT, YOU believed the SECOND NEGATIVE PRESSURE TEST was successful?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Vidrine believed the Second Negative Pressure Test was successful.  (TREX-4; TREX-49; TREX-192; TREX-303; TREX-3573; TREX-3806; Deposition of Christopher Pleasant at 433:20-23; 434:3-5.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.) Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21.  *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)

Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had

previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

**INTERROGATORY NO. 26:**

On April 20, 2010, before the BLOWOUT, YOU told Jimmy Harrell in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

BP objects to the requested inference because it is unsupported by the record evidence.

The requested inference is also inappropriate because it is contrary to the record evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM. (TREX-000001 at BP-HZN-BLY00000025.) Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/27/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

## INTERROGATORY NO. 27:

On April 20, 2010, before the BLOWOUT, YOU told Jason Anderson in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

BP objects to the requested inference because because it is unsupported by the record evidence.

The requested inference is also inappropriate because it is contrary to the record evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.) Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was

22

successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)
Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.
(04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that
Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted
successful inflow test pressure tests").)

## INTERROGATORY NO. 28:

On April 20, 2010, before the BLOWOUT, YOU told Dewey Revette in words or
substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

BP objects to the requested inference because it is unsupported by the record evidence.

The requested inference is also inappropriate because it is contrary to the record evidence
in that it ignores the role of the multiple parties who were involved in the conduct and
interpretation of the negative pressure test, and who observed the results of the negative pressure
test and reached agreement in determining that the negative pressure test was successful.

The negative pressure test was concluded and considered a good test at approximately
7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.) Both Transocean and BP personnel were
involved in setting up and conducting the negative pressure test and concluded that it was a
successful negative pressure test. Various Transocean employees participated in discussions
concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an
assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also*
09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the
preparation and interpretation of the negative pressure test and would have understood its general
principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined
how to set up the negative pressure test and what criteria would indicate a successful test).)
Transocean personnel were experienced in conducting and interpreting negative pressure tests.
(*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously
conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465;
TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was
successful. Specifically, the Transocean senior toolpusher testified that he talked with
Transocean toolpusher Jason Anderson who told him that the second negative pressure test was
successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)
Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.
(04/27/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that

Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

## INTERROGATORY NO. 29:

On April 20, 2010, before the BLOWOUT, YOU told Vincent Tabler in words or substance that YOU believed the NEGATIVE PRESSURE TESTING was successful?

## INFERENCE SOUGHT BY REQUESTING PARTIES:

On April 20, 2010, before the Blowout, Vidrine told Vincent Tabler in words or substance that he believed the Negative Pressure Testing was successful.  (Deposition of Vincent Tabler at 637:1-13.)

## BP'S RESPONSE:

BP objects to the requested inference because it is unsupported by and contrary to the record evidence.

Vincent Tabler testified that he did not talk to Mr. Vidrine.  (06/14/2011 V. Tabler Dep. at 492:18-24.)  Mr. Tabler testified that Transocean Driller Dewey Revette told him "they were calling [the negative test] successful because of the bladder effect" and "they" referred Transocean and BP personnel, including Driller Dewey Revette.  (06/14/2011 V. Tabler Dep. at 492:2-10; 492:18-493:8.)

The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test and reached agreement in determining that the negative pressure test was successful.  The negative pressure test was concluded and considered a good test at approximately 7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.) Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests.  (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was

successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)
Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.
(04/27/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that
Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted
successful inflow test pressure tests").)


**INTERROGATORY NO. 30:**

On April 20, 2010, before the BLOWOUT and after the SECOND NEGATIVE
PRESSURE TEST, YOU spoke to Mark Hafle via telephone?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout and after the Second Negative Pressure Test,
Vidrine spoke to Mark Hafle via telephone.  (TREX-4; TREX-192; TREX-303; TREX-3575;
TREX-3576; TREX-4447; TREX-4453.)

**BP'S RESPONSE:**

No objection.


**INTERROGATORY NO. 31:**

On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance
that there was pressure on the drill pipe during the NEGATIVE PRESSURE TESTING?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Vidrine told Mark Hafle in words or substance
that there was pressure on the drill pipe during the Negative Pressure Testing.  (TREX-49;
TREX-192; TREX-3576; TREX-4447; TREX-4448.)

**BP'S RESPONSE:**

BP objects to the requested inference because it seeks to establish adverse inferences
regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April
20, 2010. The requested inference is inappropriate because it is contrary to the record evidence
establishing that the interview notes—on which the requested inferences are based—were
drafted by members of BP's Internal Investigation Team and represent the mental impressions of
the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*,
01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim
record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (Id. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (Id. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (Id. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)

By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) Furthermore, the interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.) In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; see also TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted

successful inflow test pressure tests").) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement.  (TREX-000001 at BP-HZNBLY00000025.)

**INTERROGATORY NO. 32:**

On April 20, 2010, before the BLOWOUT and after the SECOND NEGATIVE PRESSURE TEST, YOU told Mark Hafle that the NEGATIVE PRESSURE TESTING was "squirrelly"?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout and after the Second Negative Pressure Test, Vidrine told Mark Hafle that the Negative Pressure Testing was "squirrelly."  (TREX-49.)

**BP'S RESPONSE:**

BP objects to the requested inference because it seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality."  (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM,

nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began.  (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)  As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)

By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour.  (TREX-000001 at BP-HZN-BLY00000025.)  Furthermore, the interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.)  In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)  Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.  (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

**INTERROGATORY NO. 33:**

On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that there was zero pressure on the kill line during the NEGATIVE PRESSURE TESTING?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Vidrine told Mark Hafle in words or substance that there was zero pressure on the kill line during the Negative Pressure Testing.  (TREX-4447; TREX-4448; TREX-4453.)

**BP'S RESPONSE:**

BP objects to the requested inference because it seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*,

28

01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)

By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) Furthermore, the interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.)  In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful.

(04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

## INTERROGATORY NO. 34:

On April 20, 2010, before the BLOWOUT, Mark Hafle told YOU in words or substance that you cannot have pressure on the drill pipe and zero pressure on the kill line in a NEGATIVE PRESSURE TEST that is properly lined up?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Mark Hafle told Vidrine in words or substance that you cannot have pressure on the drill pipe and zero pressure on the kill line in a Negative Pressure Test that is properly lined up.  (TREX-4447.)

**BP'S RESPONSE:**

BP objects to the requested inference because it seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.) By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.) The interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.) In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

**INTERROGATORY NO. 35:**

On April 20, 2010, before the BLOWOUT, YOU told Mark Hafle in words or substance that if there had been a kick in the hole YOU would have seen it?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Vidrine told Mark Hafle in words or substance that if there had been a kick in the hole Vidrine would have seen it. (TREX-192.)

**BP'S RESPONSE:**

BP objects to the requested inference because it seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews. (*See e.g.,*

01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)  By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)  The interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.)  In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that

Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

**INTERROGATORY NO. 36:**

On April 20, 2010, before the BLOWOUT, Mark Hafle told YOU in words or substance that if there had been a kick in the hole we would have seen it?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, before the Blowout, Mark Hafle told Vidrine in words or substance that if there had been a kick in the hole we would have seen it.  (TREX-192.)

**BP'S RESPONSE:**

BP objects to the requested inference because it seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty

minutes after the displacement operations began.  (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)  By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour.  (TREX-000001 at BP-HZN-BLY00000025.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)  The interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.)  In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.)  Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests")).

## INTERROGATORY NO. 37:

On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, Mark Hafle did not instruct YOU to conduct another NEGATIVE PRESSURE TEST?

### INFERENCE SOUGHT BY REQUESTING PARTIES:

On April 20, 2010, after completion of the Second Negative Pressure Test, Mark Hafle did not instruct Vidrine to conduct another Negative Pressure Test.

### BP'S RESPONSE:

BP objects to the requested inference because it seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began.  (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)  By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour.  (TREX-000001 at BP-HZN-BLY00000025.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.)  The interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.)  In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

35

**INTERROGATORY NO. 38:**

On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, YOU did not tell any member of the TRANSOCEAN DRILL CREW to conduct another NEGATIVE PRESSURE TEST?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, after completion of the Second Negative Pressure Test, Vidrine did not tell any member of the Transocean Drill Crew to conduct another Negative Pressure Test.

**BP'S RESPONSE:**

BP objects to the requested inference because it is unsupported by the record evidence.

The requested inference is also inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful. The record evidence shows that Mr. Vidrine is not the only source of information, further demonstrating that the requested inference is inappropriate.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.) Both Transocean and BP personnel were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors.  (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).)) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement.  (TREX-000001 at BP-HZN-BLY00000025.)

**INTERROGATORY NO. 39:**

On April 20, 2010, after completion of the SECOND NEGATIVE TEST, Mark Hafle did not tell YOU to stop the displacement?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, after completion of the Second Negative Test, Mark Hafle did not tell Vidrine to stop the displacement.

**BP'S RESPONSE:**

BP objects to the requested inference because it is unsupported by the record evidence.

The requested inference seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews. (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZNBLY00144213;

TREX-000296.)   By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour.  (TREX-000001 at BP-HZN-BLY00000025.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-ZNBLY00144213; TREX-000296.)   The interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.)   In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well.  (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").)

## INTERROGATORY NO. 40:

On April 20, 2010, after speaking with Mark Hafle, YOU did not tell the TRANSOCEAN DRILL CREW to stop the displacement?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, after speaking with Mark Hafle, Vidrine did not tell the Transocean Drill Crew to stop the displacement.

**BP'S RESPONSE:**

BP objects to the requested inference because it is unsupported by the record evidence.

The requested inference is inappropriate because it is contrary to the evidence in that it ignores the role of the multiple parties who were involved in the conduct and interpretation of the negative pressure test, and who observed the results of the negative pressure test and reached agreement in determining that the negative pressure test was successful. The record evidence shows that Mr. Vidrine is not the only source of information, further demonstrating that the requested inference is inappropriate.

The negative pressure test was concluded and considered a good test at approximately 7:55 PM.  (TREX-000001 at BP-HZN-BLY00000025.)   Both Transocean and BP personnel

38

were involved in setting up and conducting the negative pressure test and concluded that it was a successful negative pressure test. Various Transocean employees participated in discussions concerning the negative pressure tests, including Mr. Ezell, the OIM, toolpushers, the driller, an assistant driller, and subsea supervisors. (04/27/2011 M. Ezell Dep. at 194:25-195:21. *See also* 09/30/2011 S. Newman Dep. at 286:1-287:14 (Transocean's drill crew was involved with the preparation and interpretation of the negative pressure test and would have understood its general principle); 05/10/2011 A. Guide Dep. at 502:18-503:12 (both Transocean and BP determined how to set up the negative pressure test and what criteria would indicate a successful test).) Transocean personnel were experienced in conducting and interpreting negative pressure tests. (*See e.g.*, 11/29/2011 C. Barnhill Dep. at 120:25-121:15 (Transocean personnel had previously conducted negative pressure tests on the *Deepwater Horizon*); TREX-003326; TREX-003465; TREX-004640; and TREX-007652.)

Both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 M. Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests").) At approximately 8:00 PM, the annular preventer was opened and the rig crew proceeded to displacement. (TREX-000001 at BP-HZN-BLY00000025.)


## INTERROGATORY NO. 41:

On April 20, 2010, after completion of the SECOND NEGATIVE PRESSURE TEST, Mark Hafle told YOU in words or substance that he was watching the Insite data from the Macondo well?

### INFERENCE SOUGHT BY REQUESTING PARTIES:

The Requesting Parties have not specified the adverse inference sought.

### BP'S RESPONSE:

BP objects to the requested inference because it is unsupported by the record evidence.

The requested inference seeks to establish adverse inferences regarding specific details of a telephone conversation between Mssrs. Vidrine and Hafle on April 20, 2010. The requested inference is inappropriate because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews. (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the record evidence to the extent that it purports to suggest that Mr. Vidrine consulted Mr. Hafle or anyone else during or after the negative pressure tests conducted at the Macondo well on April 20, 2010 for the purpose of interpreting the negative pressure test results after the completion of the test, as discussed below.

The record demonstrates that the BP Internal Investigation team "found no evidence that the rig crew or well site leaders consulted anyone outside their team about the pressure abnormality." (TREX-000001 at p. BP-HZN-BLY00000089.) Steve Robinson, one of the BP Internal Investigation Team members who interviewed both Mr. Hafle and Mr. Vidrine, confirmed the accuracy of the BP Internal Investigation Team finding of "no evidence that the rig crew or well-site leaders consulted anyone outside their team about the pressure abnormality." (01/27/2011 S. Robinson Dep. at 293:17-294:7.) Mr. Robinson further explained that based on his understanding of the information provided during the interviews, the discussion between Mr. Hafle and Mr. Vidrine "occurred well after the negative test" (*Id*. at 426:20-427:4), did not go into detail regarding the pressures observed during the negative pressure test (*Id*. at 282:7-283:2), and did not necessarily provide a detailed understanding "of what the pressure was or what the source of the pressure was." (*Id*. at 284:8-285:1.)

According to notes of the BP Internal Investigation Team's interview with Mr. Hafle, on which the requested inferences rely, Mr. Vidrine called Mr. Hafle at approximately 8:52 PM, nearly an hour after the negative pressure test was concluded by the crew and more than fifty minutes after the displacement operations began. (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.) By the time the telephone discussion between Mr. Vidrine and Mr. Hafle occurred, the rig teams were already satisfied that they had achieved a successful result on the negative pressure test, and had already been conducting continued displacement operations for almost an hour. (TREX-000001 at BP-HZN-BLY00000025.) As the interview notes make clear, the primary purpose of the call was not to discuss the negative pressure test but rather "to talk about how to test the surface plug and whether they should apply a pressure test or weight test." (TREX-00004447 at BP-HZNBLY00144213; TREX-000296.) The interview notes indicate that although Vidrine told Hafle that "the crew had zero pressure on the kill line," Hafle "didn't have the full context for what had transpired during the tests and it wasn't clear to him whether Don was talking about the first or second negative tests." (TREX-004447 at BP-HZNBLY00144213; TREX-000296.) In addition to this potential confusion, the interview notes also indicate that "Don [Vidrine] told Mark that he was fully satisfied that the rig crew had performed a successful negative test."

Moreover, both BP and Transocean personnel concluded that the negative pressure test was successful. Specifically, the Transocean senior toolpusher testified that he talked with Transocean toolpusher Jason Anderson who told him that the second negative pressure test was successful and that operations were going well. (04/27/2011 Ezell Dep. at 224:20-226:4.) Transocean OIM Jimmy Harrell also believed the negative pressure test was successful. (04/28/2011 M. Ezell Dep. at 625:9-21; *see also* TREX-001472 (Email indicating that Transocean senior toolpusher informed the Transocean OIM that the rig crew "had conducted successful inflow test pressure tests")).)

**INTERROGATORY NO. 42:**

On April 20, 2010, at approximately 9:00 p.m., you were in the drill shack at the time the sheen test was conducted?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, at approximately 9:00 p.m., Vidrine was in the drill shack at the time the sheen test was conducted.  (TREX-4; TREX-49; TREX-192; TREX-303.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).

The requested inference is also inappropriate because it is unsupported by and contrary to the record evidence.  The evidence cited merely states that "[a]fter sheen test, went back to office…" (TREX-00004) and "watched sheen test (approved it), then to office." (TREX-00049) and does not indicate where Mr. Vidrine was during the sheen test. TREX-00192 and TREX-00303 both contain notes that Mr. Vidrine "went to the rig floor" but do not suggest he was "in the drill shack," as the requested inference purports.  The MI-SWACO mud engineer who conducted the sheen test testified that he did not inform Mr. Vidrine or call the Driller, Dewey Revette, to tell him that the sheen test passed.  (*See* 10/06/2011 Meche Dep. at 166:8-18.)


**INTERROGATORY NO. 43:**

On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., YOU believed everything regarding the Macondo well looked fine?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., Vidrine believed everything regarding the Macondo well looked fine.  (TREX-192; TREX-303; TREX-3576.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*,

01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the evidence cited to support the inference sought. The interview notes upon which the inference purportedly rely demonstrate that Mr. Vidrine relied upon others to monitor for flow and was told by the mud engineer that the spacer came back on the right number of strokes. (TREX-303 (Vidrine "realized at that point to check flow - was not flowing as far as he knows, shaker hand and mud eng monitoring…mud eng said it came back on right strokes, strokes looked ok to Don on panel (didn't know exact #).").) TREX-3576 does not include any discussion of Mr. Vidrine and the flow check conducted at approximately 9:00 p.m. on April 20, 2010.

Furthermore, the requested inference is inappropriate because it is contrary to the evidence in that it ignores the role of other parties who were responsible for monitoring for and identifying flow from the well and taking necessary well control measures. Transocean was responsible for well control. (*See* TREX 7651 ("Well Control - one of the more important aspects of our business and one that we are 100% responsible/accountable for when the sh*t hits the fan….Not an area where we wait to see what the Company man wants to do."); *see also* 04/27/2011 M. Ezell Dep. at 55:3-6; 501:19-25 ("the driller is trained to shut the well in if he has any indication that something is wrong" and driller had the responsibility for detecting a hydrocarbon influx or kick); 11/21/2011 R. Heenan Dep. at 115:14-22 ("The early recognition of the warning signals and rapid shut in [of the well] is certainly a key responsibility for the driller.").) Transocean's Well Control Handbook recognizes that the driller is "responsible for monitoring the well at all times, identifying when the well is to be shut-in and shutting-in the well quickly and safely." (TREX 1454.) In the drilling contract between BP and Transocean, Transocean expressly agreed to be responsible for well control. (*See* TREX 4271 at ¶¶ 15.1, 15.2, and 15.6.) Transocean recognized its well control responsibilities in its procedures when it warned its personnel that "[e]ven after a successful test, the integrity of barriers must continue to be monitored at all times. Tested barriers can and have failed. … Well control during displacements must be maintained and closely monitored. Do not be complacent because a reservoir has been isolated or a plug has been set and tested. There are too many examples of 'barriers' failing when displacing during completion operations or during well suspension or abandonment. … If in doubt, shut in the well." (TREX 7534 (TRN-INV-01128907 - 909, at TRN-INV- 01128909).)

Similarly, the Sperry Sun mud loggers are also responsible for monitoring the well for flow in order to determine if a hydrocarbon influx has occurred or is in progress. Halliburton's SDL Field Procedures dictate that its mud loggers "should be aware of the well status at ALL times," and "[a]larms are to be set at such a level that any changes in the well status will be immediately noticed." (TREX 609 at HAL 0468843.) Halliburton mud logger on duty at the time, Joe Keith, testified that he watched and monitored the well and that it was his job duty to "watch everything." (03/28/2011 J. Keith Dep. at 174:16-175:4.) Keith had 12 monitoring screens arranged in two rows of six which displayed both Transocean's HITEC data as well as Sperry Sun data. (04/15/2011 K. Gray Dep at 468-81; 03/28/2011 J. Keith Dep. at 11:19-12:5.)

**INTERROGATORY NO. 44:**

On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., YOU believed that the well was not flowing?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

On April 20, 2010, after the flow check conducted at approximately 9:00 p.m., Vidrine believed that the well was not flowing.  (TREX-4; TREX-303.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)

The requested inference is also inappropriate because it is contrary to the evidence cited to support the inference sought.  The interview notes upon which the inference purportedly rely demonstrate that Mr. Vidrine relied upon others to monitor for flow and was told by the mud engineer that the spacer came back on the right number of strokes.  (TREX-303 (Vidrine "realized at that point to check flow - was not flowing as far as he knows, shaker hand and mud eng monitoring…mud eng said it came back on right strokes, strokes looked ok to Don on panel (didn't know exact #).").)  TREX-3576 does not include any discussion of Mr. Vidrine and the flow check conducted at approximately 9:00 p.m. on April 20, 2010.

Furthermore, the requested inference is inappropriate because it is contrary to the evidence in that it ignores the role of other parties who were responsible for monitoring for and identifying flow from the well and taking necessary well control measures.  Transocean was responsible for well control.  (*See* TREX 7651 ("Well Control - one of the more important aspects of our business and one that we are 100% responsible/accountable for when the sh*t hits the fan….Not an area where we wait to see what the Company man wants to do."); *see also* 04/27/2011 M. Ezell Dep. at 55:3-6; 501:19-25 ("the driller is trained to shut the well in if he has any indication that something is wrong" and driller had the responsibility for detecting a hydrocarbon influx or kick); 11/21/2011 R. Heenan Dep. at 115:14-22 ("The early recognition of the warning signals and rapid shut in [of the well] is certainly a key responsibility for the driller.").)  Transocean's Well Control Handbook recognizes that the driller is "responsible for monitoring the well at all times, identifying when the well is to be shut-in and shutting-in the well quickly and safely." (TREX 1454.)  In the drilling contract between BP and Transocean, Transocean expressly agreed to be responsible for well control.  (*See* TREX 4271 at ¶¶ 15.1, 15.2, and 15.6.) Transocean recognized its well control responsibilities in its procedures when it warned its personnel that "[e]ven after a successful test, the integrity of barriers must continue to be monitored at all times.  Tested barriers can and have failed. … Well control during displacements must be maintained and closely monitored.  Do not be complacent because a reservoir has been isolated or a plug has been set and tested.  There are too many examples of

'barriers' failing when displacing during completion operations or during well suspension or abandonment. … If in doubt, shut in the well." (TREX 7534 (TRN-INV-01128907 - 909, at TRN-INV- 01128909).)

Similarly, the Sperry Sun mud loggers are also responsible for monitoring the well for flow in order to determine if a hydrocarbon influx has occurred or is in progress.  Halliburton's SDL Field Procedures dictate that its mud loggers "should be aware of the well status at ALL times," and "[a]larms are to be set at such a level that any changes in the well status will be immediately noticed." TREX 609 at HAL 0468843.  Halliburton mud logger on duty at the time, Joe Keith, testified that he watched and monitored the well and that it was his job duty to "watch everything."  (03/28/2011 J. Keith Dep. at 174:16-175:4.)  Keith had 12 monitoring screens arranged in two rows of six which displayed both Transocean's HITEC data as well as Sperry Sun data.  (04/15/2011 K. Gray Dep at 468-81; 03/28/2011 J. Keith Dep. at 11:19-12:5.)

## INTERROGATORY NO. 45:

After 9:30 p.m. on April 20, 2010, YOU received a call from Jason Anderson?

### INFERENCE SOUGHT BY REQUESTING PARTIES:

After 9:30 p.m. on April 20, 2010, Vidrine received a call from Jason Anderson.  (TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576.)

### BP'S RESPONSE:

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)  To the extent the requested inference is premised on the acceptance of other requested inferences, it is inappropriate and should not be allowed.

## INTERROGATORY NO. 46:

After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were getting mud back?

### INFERENCE SOUGHT BY REQUESTING PARTIES:

After 9:30 p.m. on April 20, 2010, Jason Anderson told Vidrine that they were getting mud back.  (TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)  To the extent the requested inference is premised on the acceptance of other requested inferences, it is inappropriate and should not be allowed.

**INTERROGATORY NO. 47:**

After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were closing the annular?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

After 9:30 p.m. on April 20, 2010, Jason Anderson told Vidrine that they were closing the annular.  (TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)  To the extent the requested inference is premised on the acceptance of other requested inferences, it is inappropriate and should not be allowed.

**INTERROGATORY NO. 48:**

After 9:30 p.m. on April 20, 2010, Jason Anderson told YOU that they were diverting returns to the gas buster?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

After 9:30 p.m. on April 20, 2010, Jason Anderson told Vidrine that they were diverting returns to the gas buster.  (TREX-4; TREX-192; TEX-303; TREX-3573; TREX-3576.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is contrary to the record evidence establishing that the interview notes—on which the requested inferences are based—were

drafted by members of BP's Internal Investigation Team and represent the mental impressions of the interviewers and were not intended to be verbatim records of the interviews.  (*See e.g.*, 01/27/2011 S. Robinson Dep. at 408:13-19 (indicating that interview notes were not a verbatim record of the interviewee's exact words).)  To the extent the requested inference is premised on the acceptance of other requested inferences, it is inappropriate and should not be allowed.  The record evidence shows that Mr. Vidrine is not the only source of information, further demonstrating that the requested inference is inappropriate.

**INTERROGATORY NO. 49:**

After 9:30 p.m. on April 20, 2010, YOU attempted to go to the drill floor?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

BP objects to the requested inference because it is unsupported by the record evidence.

**INTERROGATORY NO. 50:**

After 9:30 p.m. on April 20, 2010, YOU saw mud and/or seawater blowing out of the rotary?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

The Requesting Parties have not specified the adverse inference sought.

**BP'S RESPONSE:**

BP objects to the requested inference because it is unsupported by the record evidence.

**INTERROGATORY NO. 51:**

Despite Vincent Tabler's recommendation of a full bottoms up circulation prior to the production casing cement job, YOU conveyed to Vincent Tabler that BP was not going to do a full bottoms up circulation?

**INFERENCE SOUGHT BY REQUESTING PARTIES:**

Despite Vincent Tabler's recommendation of a full bottoms up circulation prior to the production casing cement job, Vidrine conveyed to Vincent Tabler that BP was not going to do a

full bottoms up circulation.  (Deposition of Vincent Tabler at 411:18-412:5, 412:21-23; 413:1-7, 415:4-25.)

**BP'S RESPONSE:**

BP objects to the requested inference because it is counter to the evidence in the record, and Mr. Vidrine is not the only source of the information. The decision to circulate less than bottoms up was based on the concern that the additional circulation may fracture the well. (06/13/2011 V. Tabler Dep. at 192:17-193:6; 04/22/2011 G. Walz Dep. 545:23-547:23.) The decision was discussed with Halliburton personnel, and Halliburton cementer Vincent Tabler agreed that the decision to conduct only a partial circulation immediately prior to the cementing job due to the concern over losses made sense.  (06/14/2011 V. Tabler Dep. 415:4-416:4.) Concern for specific hole conditions of a given well was the rationale for not running a complete bottoms up on prior cement jobs Mr. Tabler had worked on with other operators besides BP. (06/14/2011 V. Tabler Dep. 415:19-416:11.)  Moreover, a complete bottoms up circulation was performed prior to logging, on April 16, 2010.  (TREX-041069 Daily Drilling Report, Apr. 16, 2010. The April 16, 2010 procedure should have removed any cuttings that were left in the hole at that time, and none of the operations conducted from April 16 until the final production string cement job would have created additional cuttings.  (11/29/2011 C. Barnhill Dep. at 84:24-85:5; 06/14/2011 V. Tabler Dep. 419:1-14.) And due to the depth of the well, the final cementing operations themselves resulted in significant circulation of the pay zone area that was to be cemented.  (11/29/2011 C. Barnhill Dep. at 90:1-15, 91:24-92:8.)