# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C.  20005

Robert R. Gasaway
To Call Writer Directly:
(202) 879-5175
robert.gasaway@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

March 8, 2013

**By Electronic Mail**

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     MDL 2179 – BP's Request for Production of Dr. Leifer Voice Notes
        Responsive to June 2012 Document Subpoena of UCSB

Dear Judge Shushan:

BP writes in reply to the University of California, Santa Barbara's ("UCSB") March 6, 2013 letter ("UCSB Letter") opposing BP's request for the production of Dr. Ira Leifer's contemporaneously maintained "voice notes" concerning his work for the Flow Rate Technical Group ("FRTG").

As explained below, the voice notes are both squarely within the scope of BP's subpoena and highly relevant to this litigation.

## 1.     THE "VOICE NOTES" WERE TIMELY SOUGHT AND ARE HIGHLY RELEVANT.

BP is highly sympathetic to claims that Phase 2 written discovery is in the can and should not be reopened.  Here, however, BP is not seeking to open new avenues and new vistas of Phase 2 written discovery.

Instead, as the discussion between the Court and parties that preceded the Court's preliminary ruling acknowledged, *see* Dkt. 8787, the documents BP seeks should have been produced long ago.  Indeed, perhaps no other discovery in this case has been the source of so many orders and so much court attention — all of it premised on the relevance of the UCSB documents subpoenaed by BP.  (*See* June 27, 2012 Order [Dkt. 6808]; Nov. 15, 2012 Order [Dkt. 7907]; Dec. 13, 2012 Order [Dkt. 8093]; Dec. 14, 2012 Order [Dkt. 8095]; Jan. 3, 2013 Order [Dkt. 8161]; Jan. 11, 2013 Order [Dkt. 8211]; Jan. 17, 2013 Order [Dkt. 8263]; Jan. 25, 2013 Order [Dkt. 8344]; Jan. 28, 2013 Order [Dkt. 8372]; Feb. 1, 2013 Order [Dkt. 8455].)

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2013
Page 2

But if more were needed, one can hardly imagine a better indication of relevance than Dr. Leifer's statement describing these notes as daily recordings of daily events and "critical to the legal defense of [his] work." (*See* Attachment B, at UCSB00249939.)  If these acknowledgments do not establish relevance, we hardly see what statements could.

Dr. Liefer's contemporaneous notes regarding his FRTG work are particularly important in light of his testimony that ███████████████████████████████████████████ ████████████████████████████████ (*see* Attachment E, Leifer Dep. Transcript at 79:7-81:15; 277: 2-6); that ████████████████████████ (*see id.* at 163:3–166:25; 174:21–177:23); that ██████████████████████████████████████ (*see id.* at 167:14–168:19); that ███████████████████████████████████████████████████████ (*see id.* at 98:14-101:24); and that ██████████████████████████ ███████████████████████████████████████████████████████ (*see id.* at 244:3-246:6).

In short, the notes very likely will further the Court and parties' understanding of Dr. Leifer's contemporaneous thoughts on the scientific reliability of his and his teams' *Deepwater Horizon* work for the FRTG.

## 2.    THE "VOICE NOTES" ARE RESPONSIVE AND NOT PRIVILEGED.

As the discussion between the Court and parties accompanying the Court's preliminary ruling also acknowledged, (*see* Mar. 4, 2013 Minute Order [Dkt. 8787]), BP's June 2012 subpoena clearly requires the production of the voice notes and the notes are not privileged.

Specifically, BP's subpoena calls for production of "any and all documents, data, and communications related to" Dr. Leifer's work concerning the flow of hydrocarbons resulting from the *Deepwater Horizon* incident.  (June 29, 2012 Subpoena to UCSB.)  Despite UCSB's efforts to re-characterize the notes as something other than "FRTG documents," BP's subpoena does not call exclusively for "FRTG documents" or even for documents used for flow rate calculations.  The subpoena instead broadly calls for documents related to Dr. Leifer's work concerning the flow of hydrocarbons, and the notes clearly fall within this description.  Indeed, as UCSB ████████████ acknowledge, the notes were recorded and maintained throughout Dr. Leifer's work for the FRTG Plume Calculation Team and Mass Balance Team relating to the *Deepwater Horizon* incident.  (*See* UCSB Letter, at 2; ████████████████████████████████.)

Moreover, the document referred to above (produced only over UCSB's objection after *in camera* review) was earlier described by UCSB counsel as "a lengthy description of the totality

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2013
Page 3

of Dr. Leifer's *academic work, which [Dr. Leifer] prepared in connection with his employment personnel review at the Santa Barbara campus*." (Attachment A, Jan. 31, 2013 UCSB Objs. to and Appeal from the Seventh Supplemental Order by MJ Shushan, at 2 (emphasis added).)

Dr. Leifer confirms in this document, which he himself prepared, his unmistakably professional purposes creating the voice notes:

> Unfortunately, the [FRTG Plume] team's efforts were highly political, with our work having significant future legal implications. As a result, when official press releases began to distort the [FRTG Plume] Team's work, it became necessary to communicate the [FRTG Plume] Team's efforts to the media to ensure that the [FRTG Plume] Team's work was correctly represented. *Avoiding mis-interpretation (i.e., a strong defense of the quality of the [FRTG Plume] Team's work) would be critical to future legal defense of my work. Although I initially kept a hand-written log of my efforts during the NASA effort, this rapidly became overwhelming and I began to keep voice notes of each days [sic] events, a practice that I have maintained to date.*"

(Attachment B, at UCSB00249939 (emphasis added).)

UCSB's belated attempts to distinguish between Dr. Leifer's "private" and "university" documents (a distinction not raised prior to this particular dispute) are simply not persuasive. As noted in our initial letter, this supposed private-versus-university distinction has not prevented the UCSB from appropriately producing other documents with an equally arguable "personal purpose." (*See* Attachments C and D.)

Furthermore, as UCSB acknowledges, the University of California's Electronic Communications Policy provides that these voice notes are subject to civil discovery via subpoena. (*See* UCSB Letter, at 5 ("University policy states that records may be subject to subpoena . . . ."); *see also* University of California Electronic Communications Policy, at 11-12.) Hence, under his employer's employment policies, Dr. Leifer cannot have a reasonable expectation of privacy.

Tellingly, when BP employee Brian Morel objected on similar grounds to the production of communications over BP's email system between himself and his wife, the Court overruled the objection. The Court reasoned that no spousal privilege applied because BP policy notified

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2013
Page 4

Mr. Morel that emails over the BP system would be subject to production by civil subpoena. (*See* Rec. Doc. 1777.)  The same logic applies here.

Nor are the cases UCSB cites helpful in the situation at hand.  UCSB cites *United States v. Slanina*, 283 F.3d 670 (5th Cir. 2002), and *Muick v. Glenayre Electronics*, 280 F.3d 741 (7th Cir. 2002), but both of these cases pertain to Fourth Amendment searches in a criminal context and hence involve much different legal standards than the standards that apply here.  UCSB also cites *United States v. Etkin*, 2008 WL 482281 (S.D.N.Y. Feb. 20, 2008), but that case concerns exceptions to the marital communication privilege, and of course no marital communications are now at issue.

In summary, Dr. Leifer's voice notes are responsive to the June 2012 subpoena and cannot be withheld due to flimsy distinctions between private and University documents or to feeble assertions of privileges and expectations of privacy.

3.      UCSB SHOULD BEAR THE COSTS OF THIS PRODUCTION.

UCSB overlooks the truly extraordinary efforts by this Court and its Special Master (as well as by BP) in helping to secure USCB's compliance with the June 2012 subpoena.  (*See* UCSB Letter, at 2 (mistakenly referring to UCSB's "successful" document production to date).)  In light of UCSB's many discovery lapses, BP respectfully requests that UCSB bear its own costs for production of Dr. Leifer's voice notes.  BP is not asking for anything beyond what should have been produced long ago, and in any event, "[u]sually, absent an order compelling document production, a non-party bears its own production cost."  *See Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008).

UCSB cites Rule 45 and *In re First American Corp.*, 184 F.R.D. 234, 240 (S.D.N.Y. 1998), for the proposition that any order to compel production "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  But "[p]rotection from significant expense *does not* mean that the requesting party necessarily must bear the entire cost of compliance."  *In re First Am. Corp.*, 184 F.R.D. at 241 (emphasis added).  If, in fashioning an equitable allocation of costs, this Court should determine that cost sharing is appropriate, BP submits that the most equitable allocation would take into account UCSB's well known lapses in complying with its discovery obligations.

*       *       *       *

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
March 8, 2013
Page 5


For the foregoing reasons, BP respectfully requests the immediate production of Dr. Leifer's voice notes relating to his work on the FRTG Plume Calculation and Mass Balance Teams.

Respectfully submitted,

Robert R. Gasaway

Attachments

cc (via electronic mail):

Michael O'Keefe
Matthew Schenk
Nancy Hamill
Michael Goldstein
United States' MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel
Joel M. Gross

# Attachment A

CHARLES F. ROBINSON #113197
charles.robinson@ucop.edu
KAREN J. PETRULAKIS #168732
karen.petrulakis@ucop.edu
MARGARET L. WU #184167
margaret.wu@ucop.edu
MICHAEL R. GOLDSTEIN #129848
michael.goldstein@ucop.edu
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA  94607-5200
Telephone:     510-987-9800
Facsimile:      510-987-9757

Attorneys for Non-Party
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| Applies to:  *All Cases* | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA'S OBJECTIONS TO AND APPEAL FROM THE SEVENTH SUPPLEMENTAL ORDER BY MAGISTRATE JUDGE SHUSHAN REGARDING THE UNIVERSITY OF CALIFORNIA – SANTA BARBARA'S DOCUMENT PRODUCTION**

By this appeal, The Regents objects to, and appeals from, Magistrate Judge Shushan's Seventh Supplemental Order regarding four documents (two of which are duplicates so, in effect, only three rulings are challenged here).  The Regents withheld seventy-four documents (or redacted excerpts from those documents) on the grounds that they contained

- 1 -

"confidential and private" information.  In her order, Magistrate Judge Shushan overruled that claim on five of those documents (see Order [Rec. doc. 8393] and Attachment to Order [Rec. doc. 8393-1].  The Regents objects to, and appeals from, her ruling on items 2, 11 (and 69, which is an identical duplicate of item 11), and 13.

Document 2 (UCSB00249925-UCSB00249941) is a lengthy description of the totality of Dr. Leifer's academic work, which he prepared in connection with his employment personnel review at the Santa Barbara campus.  During an appearance with Magistrate Judge Shushan concerning BP's subpoena to The Regents, Magistrate Judge Shushan indicated that BP was not entitled to, and would not receive, non-responsive documents and, where responsive, privileged or private documents (or portions of documents).  Most of Dr. Leifer's employment personnel submission is non-responsive.  Only pages UCSB00249937-UCSB00249941 relate to a brief summary of his work on the Deepwater Horizon spill.  The remainder relates to other work, all of which is non-responsive and private and confidential, and some of which is highly sensitive (the sensitive information is chiefly on pages UCSB00249927-UCSB00249928 and it is sensitive because it describes work Dr. Leifer has not yet published and wishes to keep confidential until he does publish it and, accordingly, Dr. Lefier had redacted it when he reviewed this document in Edox's Relativity document viewer).  The Regents' privilege logs, including the Fourth Privilege Log, stated that the information was a "Word document containing private information related to UCSB employment".  (Fourth Privilege Log, Entry No. 2)  Because the information, except the information on pages UCSB00249937-UCSB00249941, are non-responsive and because, even if some of it were deemed responsive, it is private information and, as to pages UCSB00249927-UCSB00249928, highly sensitive, The Regents respectfully requests that, as to this portion of the Order, the Order be reversed and the claim of privacy sustained.

Beyond this, The Regents wishes to bring to the Court's attention that certain information in this document may be subject to the Congressional Privilege, which is the subject of the Court's Eighth Supplemental Order (Rec. doc. 8422), in the event Magistrate Judge

Shushan did not notice the brief reference (bottom of UCSB00249939 to top of UCSB00249940) buried toward the end of this lengthy document.

**Document 11** (UCSB00311659, as well as its identical duplicate, document 69, UCSB00412792) is an email communication containing Dr. Leifer's personal mobile phone number, which is the only information The Regents sought to redact and protect. (Fourth Privilege Log, Entry 60; as to the identical duplicate, UCSB00412792, please see Fourth Privilege Log, Entry 132) In footnote 2 of the Order, Magistrate Judge Shushan indicates an understanding that The Regents sought to protect the entire document. As the Fourth Privilege Log makes clear, however, The Regents only meant to protect Dr. Leifer's mobile phone number. These two documents were included on the privilege log because The Regents redacted Dr. Leifer's mobile phone number. They were marked as redacted on the privilege log (rather than withheld) and were intended to be released in redacted form, not completely withheld. For this reason, The Regents respectfully requests that, as to this portion of the Order (**for both Document 11 and Document 69**), the Order be reversed and the claim of privacy sustained.

Finally, **Document 13** (UCSB00316752) contains, on the top of page 1, Dr. Leifer's mobile telephone number. As with Documents 11 and 69, this document was logged solely to indicate that The Regents redacted Dr. Leifer's personal information (the mobile phone number), and not that the document be completely withheld. (See Fourth Privilege Log, Entry 67) For this reason, The Regents respectfully requests that, as to this portion of the Order, the Order be reversed and the claim of privacy sustained.

Dated: January 31, 2013   CHARLES F. ROBINSON
             KAREN J. PETRULAKIS
             MARGARET L. WU
             MICHAEL R. GOLDSTEIN

            By: s/Michael R. Goldstein
               Michael R. Goldstein

            Attorneys for Non-Party
            THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

4821-5305-3970.1

# Attachment B

10972

Exhibit No. _____

**Worldwide Court
Reporters, Inc.**

UCSB00249925

These study results have played a strong role in ensuring continuing support from MMS. The current MMS project (72k) includes USGS as co-investigators, and although ending February 2011, a renewal proposal is planned.

## 14. Atmospheric Trace Gas Measurements

To ground-reference atmospheric remote sensing data, a four-channel, field gas chromatograph (GC) was developed in conjunction with a fast equilibrator under NASA support and more recently under the DOE hydrate observatory through the University of Mississippi. Two GC channels are configured for THC with a 0.5 s time scale, whereas two channels allow speciation and can measure methane with 30 ppb sensitivity at 30 s time scales. One speciation channel has a pre-concentrator, allowing measurements of propane to heptane at global background levels as low as 30 ppt concentrations. The system can be configured to measure n-alkanes simultaneously in the atmosphere and ocean, or to make high frequency methane measurements and higher n-alkanes at sub-hourly rates. Further field analytic capabilities are planned to include ring compounds like benzene and toluene.

Continued support from the DOE hydrate observatory was secured to observe methane in the atmosphere above seepage from the Hydrate observatory (MC118) at 1000 m. This support was based on observations of elevated atmospheric methane levels at the MC118 site in Summer 2009. A combination of weather and shipboard power instabilities prevented successful GC calibration during a summer 2010 Gulf of Mexico cruise.

For the Gulf of Mexico research cruise, a Cruise/America Recreation Vehicle was rented to transport equipment safely to Cocodrie, Louisiana. Post cruise, the RV was driven to a NSF conference in St Petersburg, Florida, and then California while making continuous GC methane measurements of air samples from a sample pumps collected to an air ram. This mission, *Expedition Methane America!!*, collected thousands of methane measurements crossing the US with special focus on Fossil Fuel Industrial sources, as well as reservoirs, wetlands, forest fire plumes, agricultural lands, and loading ports. GC methane measurement at highway speeds exhibited significant noise, which was addressed by efforts to reduce vibration noises, to reduce electrical noise from power lines and radiative sources such as high power lines and industrial power transformers. Further data quality improvements were through development of custom GC peak analysis curve fitting routines. These algorithms allow faster sampling rates by enhancing peak separation.

## BP Oil Spill Related Research Activities

Several of my research efforts have focused on oily bubble behavior in the shallow and deepsea, sonar observation of shallow and deepsea bubbles, bubble plume behavior on small-scale and large-scale, oil slick weathering and modeling, and more recently, remote sensing of oil slicks (based on addressing their interference with methane remote sensing). Moreover, several aspects are unique capabilities, with the overall set of research experiences uncannily aligned with needs of the

UCSB00249937

response to the deepsea blowout BP Oil Spill, for which oil spill preparedness was demonstrated sadly to be lacking due to the magnitude, depth, and persistence of the spill. Furthermore, because of my oil spill research over the last decade, which has been closely communicated with response agencies such as scientists at the NOAA Office of Response and Restoration (NOAA-ORR), particularly Bill Lehr. NOAA-ORR is tasked with leading the modeling response in the event of an oil spill.

My long-term collaboration with NOAA-ORR led to my being invited to participate in authoring a summary of knowledge on Pacific seepage (#61, Valentine, D., J. Payne, and I. Leifer, Chemical Oceanography (Resources), Ch. 3., in *Updated Summary of Knowledge: Selected Areas of the Pacific Coast*. Eds. B. Kaplan, C.J. Beegle-Krause, D.F. McCay, A. Copping, S. Geerlofs, #62, Valentine, D., J. Payne, R. Sweetman, I. Leifer and C.J. Beegle-Krause, Chemical Oceanography (Impacts), Ch. 17. In *Updated Summary of Knowledge: Selected Areas of the Pacific Coast*. Eds. B. Kaplan, C.J. Beegle-Krause, D.F. McCay, A. Copping, and S. Geerlofs). This MMS task overlapped directly with an invitation from Merv Fingas (Environment Canada) to write a chapter in a book explaining how knowledge of natural hydrocarbon seepage has improved our knowledge of oil spill processes (#66, Leifer, I., Marine oil seepage overview – Evolution, dynamics, and weathering).

Furthermore, due in part to having reviewed a paper for the AMOP conference at the request of Bill Lehr, and having discussed the remote sensing efforts from the SEBASS overflights in early April, I became involved with the official response to the BP oil spill. Specifically, through coordination with Bill Lehr (NOAA), NASA, and USGS, I became the chief mission coordinating scientist for the NASA airborne response to the Gulf of Mexico oil spill, playing a critical role in overseeing logistics for collecting data with the AVIRIS instrument on the ER2 stratospheric flight, ensuring data was transferred to JPL for calibration, and then to USGS for processing, and then to NOAA for use in the response. For normal ER2 data collections, calibration and analysis usually requires several months, the NASA team managed to reduce this to 36 hours. Aside from coordination, I had key responsibility to ensure that the remote sensing results were consistent with our knowledge of oil behavior in the marine environment. The NASA effort involved using C-H stretch spectral features in the short wave infrared that penetrated the oil, and using the skew in these features to derive oil thickness for oil in the thickness ranges of 0.1 mm to 2 cm (#56, Clark, R.N., G.A. Swayze, I. Leifer, K.E. Livo, S. Lundeen, M. Eastwood, R.O. Green, R. Kokaly, T. Hoefen, C. Sarture, I. McCubbin, D. Roberts, D. Steele, T. Ryan, R. Dominguez, N. Pearson, and the Airborne Visible Infrared Imaging Spectrometer (AVIRIS) Team. A method for qualitative mapping of thick oil spills using imaging spectroscopy, #57, Clark, R.N., G.A. Swayze, I. Leifer, K.E. Livo, R. Kokaly, T. Hoefen, S. Lundeen, M. Eastwood, R.O. Green, N. Pearson, C. Sarture, I. McCubbin, D. Roberts, E. Bradley, D. Steele, T. Ryan, R. Dominguez, and the Airborne Visible Infrared Imaging Spectrometer (AVIRIS) Team. A method for quantitative mapping of thick oil spills using imaging spectroscopy). Development of this technology is the first-ever remote sensing approach that derives oil thickness and promises to revolutionize oil spill science as it will allow calculation of oil mass fluxes. This is a critical development to quantifying oil slick evolution processes for slicks thicker than sub-micrometer sheens (which can be observed by other remote sensing approaches, such as synthetic aperture radar or visual images such as from

UCSB00249938

the MODIS satellite). However, because sheens contain virtually none of the oil slick's mass (#59, Leifer, I., Appendix 6: Riser Pipe Flow Estimate. In *Deepwater Horizon Release Estimate of Rate by PIV. Ed.* Bill Lehr), such approaches are useless for addressing oil slick processes (outside of sheens) or for directing response.

ER2 flights were out of Edwards Airforce Base, near Houston, Texas and thus traversed the Gulf of Mexico to reach the spill site each day, raising the potential for numerous platform observations to look for methane emissions from platform flaring. RAPID funding was secured from NSF to support an Aerospace Corporation SEBASS Twin Otter deployment with the goal of using tactical analysis of methane to guide aerial sampling, in collaboration with Don Blake (UC Irvine) for trace gas analysis. Thus, for a period, I was supervising and coordinating two contemporaneous airborne missions.

During this time period, the Technical Flow Rate Group (TFRG) Team was formed to derive an estimate of the seabed flow rate. The team was formed by negotiation between industry, congress, and the administration. I was tasked by Bill Lehr to join the team as the only member with deep sea marine experience (#60, Lehr, B., S. Bristol, A. Possolo, A. Allen, M. Boufadel, T. Coolbaugh, P. Daling, M. Fingas, D.F. McCay, R. Goodman, R. Jones, A. Khelifa, P. Lambert, K. Lee, I. Leifer, A. Mearns, E. Overton, and J. Payne, Oil Budget Calculator Deepwater Horizon Technical Document). Unfortunately, the team's efforts were highly political, with our work having significant future legal implications. As a result, when official press releases began to distort the TFRG Team's work, it became necessary to communicate the TFRG Team's efforts to the media to ensure that the TFRG Team's work was correctly represented. Avoiding mis-interpretation (i.e., a strong defense of the quality of the TFRG Team's work) would be critical to future legal defenses of my work. Although I initially I kept a hand-written log of my efforts during the NASA effort, this rapidly became overwhelming and I began to keep voice notes of each days events, a practice that I have maintained to date.

As our contributions to the TFRG report were being finalized, the USGS open file report on quantifying surface oil slicks (#57, Clark, R.N., G.A. Swayze, I. Leifer, K.E. Livo, R. Kokaly, T. Hoefen, S. Lundeen, M. Eastwood, R.O. Green, N. Pearson, C. Sarture, I. McCubbin, D. Roberts, E. Bradley, D. Steele, T. Ryan, R. Dominguez, and the Airborne Visible Infrared Imaging Spectrometer (AVIRIS) Team. A method for quantitative mapping of thick oil spills using imaging spectroscopy) was stuck in review, preventing publication, due to a single reviewer who did not respond after several weeks. Because of the importance of the USGS, I decided to incorporate a mass balance estimate of oil emissions in my calculations for the TFRG report, which was based on the remote sensing mapping in the USGS calculations. The morning after the TFRG report was published, the final reviewer responded with only a single grammatical change, and the USGS open file report was released.

As part of the spill response, I observed that specific safety measures were not being undertaken to ensure that the well casing did not lead to seabed leakage, and my messages to the Joint Incident Command had no effect. As a result, I began working

UCSB00249939

with Congressman Markey, Chairman of the House Select Committee on Energy and Commerce, which was investigating the BP Oil Spill. Specifically, I began writing briefing papers on current topics of investigation, including citations, copies of relevant articles, etc. As a result of my contribution, Congressman Markey's questions became far better-crafted and thus far more difficult to evade by poorly prepared administration officials who often appeared more interested in diverting public attention than providing information to congress and the public. I also briefed Congresswoman Lois Capps, who was a member of Congressman Markey's Select committee. Because my congressional communications are necessarily a reflection on the University of California, Santa Barbara, I was careful to forward copies of briefing papers to Vice Chancellor Michael Witherell. I also worked closely with the University public affairs office, where appropriate. Furthermore, I have continued working with congress in this manner to date, although less intensively.

The morning after the TFRG was released publically, a summary of the "Mass Balance Calculator" was released to the public and the claim made by Asst. to the President for Energy, Carol Browner, made that almost all the oil was gone. In reality, the summary said the vast majority of the oil was not recoverable by current technology, there was no underlying report, nor had said non-existent report been peer reviewed, as announced to the public at the time. I was asked by Bill Lehr to participate in the NOAA Mass Balance Calculator Team effort to write the underlying report. I contributed writing on the effect of hydrates on the subsurface oil.

Although the TFRG Team report was officially finalized several months earlier, in November, it virtually still was impossible to find on the internet. Although there have been numerous reports on the oil emissions from the well, few addressed the natural gas emissions, which are part of the total hydrocarbon emissions for which BP is responsible. I was invited to participate in a manuscript to Nature Geosciences with several colleagues with whom I have worked over the years (#64, Joye, S.M., I.R. MacDonald, I. Leifer, and V. Asper, Magnitude and oxidation potential of hydrocarbon gases released from the BP oil well blowout). This paper suggests that BPs fine, based on including natural gas hydrocarbons, should be significantly larger.

More recently, I have been asked to participate in a NOAA team to define needed improvements in numerical simulations of a deepsea blowout. As noted in the numerical modeling section (Section 9), I am working on improving a numerical simulation of the blowout plume based on the available (but highly insufficient) data and the best current understanding of deepsea plume processes. Initial results were presented at Fall 2010 AGU meeting, with a manuscript planned for early 2011, and show that there were several critical processes which are currently not understood.

A new research area developed out of vicarious ground reference samples collected near the incident site and analyzed by Don Blake. Specifically, data showed exceptionally high atmospheric concentrations of volatile organics. Furthermore, based on our findings, the NOAA P3 aircraft was diverted from its participation in the California CalNex study to the Gulf of Mexico and performed detailed airborne

UCSB00249940

sampling of the plume of volatile hydrocarbons under the lead of Tom Ryerson, with analysis by Don Blake. Results showed airborne compositions were in reservoir ratios for molecules larger than hexane, i.e., molecules that cannot fit in methane hydrate cages, indicating negligible dissolution for larger, less soluble molecules.

For the Fall 2010 AGU meeting, I calculated a volatile flux rate based on the TFRG Team's work, and used a simple Gaussian model to calculate concentrations for coastal lands. Although exposure rates were significantly lower than OSHA safety levels, modeling the BP Oil Spill volatile organics as chronic gasoline exposure suggested reason for concern. Chronic gasoline exposure is a reasonable model for the BP Oil Spill hydrocarbons, because unlike a typical oil spill where the volatilization phase lasts at most a few days, this spill lasted order 100 days. Moreover, the atmospheric plume peaked for compounds of about C8-C10, because the larger compounds are generally less toxic, thus, chronic gasoline exposure is a reasonable first model of the spill's volatile health impacts on coastal communities. Fortunately, there has been a number of studies of chronic gasoline exposure.

If one considers a general population (elderly, pregnant women, infants, infirm, etc.) rather than cleanup workers (healthy young male) and calculates exposure dosages, then comparison with some literature values indicates that ambient concentrations were sufficiently high to raise concern regarding chronic health problems for adults, and greater by three orders of magnitude than levels considered problematic for infants. Thus, an important research goal is the further development of the exposure model and to develop collaborations with health care professionals, particularly those related to toxic volatile exposure.

- - - -

Bonini, M. (2007), Interrelations of mud volcanism, fluid venting, and thrust-anticline folding: Examples from the external northern Apennines (Emilia-Romagna, Italy), *Journal of Geophysical Research, 112*(B8), doi:10.1029/2006JB004859.

Hornafius, J. S., D. C. Quigley, and B. P. Luyendyk (1999), The world's most spectacular marine hydrocarbons seeps (Coal Oil Point, Santa Barbara Channel, California): Quantification of emissions, *Journal Geophysical Research - Oceans, 104*(C9), 20703-20711,

UCSB00249941

# Attachment C

## *Filed Under Seal*

# Attachment D

# A Proposal for a Documentary Movie
## to cover
## The Deep Spill 2 Scientific Mission

Written by Ira Leifer and BRI, LLC.

July 3, 2010



11371

Exhibit No. ——————

**Worldwide Court Reporters, Inc.**

UCSB00273619

## BRIEF LOGLINE:

Dr. Ira Leifer is racing to the Gulf of Mexico to see if the Gulf can be rescued from BP's catastrophic accident and response mismanagement at the Macondo well.

- WILL the damaged Macondo well crack up and cause the formation of a sub-sea oil swamp – creating a geologically-defined disaster in the Gulf that will provide enough oil to contaminate seas beyond the Gulf?
- OR, have the oils and gases from the Macondo well and the chemical dispersants used on those fluids already killed or damaged the bottom of the food chain algae to the point where almost all marine life in the Northern Gulf of Mexico (or further) will die, even if the well is capped soon?

Dr. Leifer's efforts to perform the necessary science are blocked at every turn by BP. Can he overcome BP's obstacles? Even if he can, will he then be able to steward the scientific mission to success? Can he bring new technologies and team members together under an emergency deadline? Finally, can Dr. Leifer's team find a way to get the truth of subsea hydrocarbon exploration and development to the public? *Can they save the oceans in time?*

## SUMMARY OF TOPIC:

The documentary is about the ocean, the risks of hydrocarbon exploration in the deep seas, how scientists struggle to get access to learn more, and about how scientists struggle in general to achieve really valuable public goods for everyone. The documentary's pulse is quickened by a nightmare oil well spill event that threatens to destroy the Gulf of Mexico ecosystem if not those of additional seas as well.

There are two real dangers. First, will the well collapse into a far worse condition of uncontrollable geologically leakage at the bottom of the deep sea? The second potential disaster is if the toxic crude oils, natural gases, and dispersants have damaged algae to the point that it is collapsing, and in turn placing the whole food chain at catastrophic risk.

Dr. Leifer is leading a team of expert ocean scientists to find out the truth before it's too late; but BP is blocking them repeatedly. Dr. Leifer has to keep certain aspects of the scientific mission secret, or risk losing the access to the well site to do the experiments. Dr. Leifer has prepared back-up scenarios to enable the science mission to achieve the needed results even if BP blocks access at the last moment. Who will prevail, BP and their attorneys, or science and truth? And when science wins, everyone wins.

The modern industrial world is challenged to find more energy to sustain a growing level of industrialization. Offshore, and particularly deep offshore, oil and gas resource are often suggested as the next best energy source. However, offshore drilling carries great risks, and many of those risks are poorly understood. Meanwhile, newer forms of hydrocarbon energy are even riskier.

The public needs to understand how the oceans, marine life, and indeed all life, are placed at very high risk with offshore drilling. BP has told Congress that there may be hundreds more wells

drilled and cased just like the Macondo well in the Gulf of Mexico. In international waters, such as Nigeria, oil spills are routine and environmentally devastating. The Macondo well is not a unique *slash* one time accident, it is a bellweather to the developed world of the reality of offshore drilling. This movie should awaken the public to the risks that offshore drilling poses to the American dream, and how they can support safer laws and practices to minimize that risk.

Dr. Ira Leifer is one of the leading environmental scientists who has focused on hydrocarbons in natural settings such as the ocean. He is an expert on many aspects of this broad field of study. He is an expert in remote sensing, being involved in environmental satellite programs in the U.S, European, and Japanese space programs.

As the Deepwater Horizon drill ship was sinking, NASA asked Dr. Leifer to lead and coordinate its airborne efforts to document the early days of the spill. Specifically, NASA asked him to coordinate it in part due to his behind the scenes network of scientists, which enables him to build teams and activate them quicker than other similar scientists, and because of his relevant knowledge in this field. Dr. Leifer coordinated satellite and ER2 (stratospheric) photography on a daily basis, and spent a significant amount of time on 'secured' locations.

Dr. Leifer also is a leading researcher in natural ocean oil and methane vents, such as are located off Santa Barbara. Dr. Leifer also is an innovator in SONAR research, and recently Reson Inc. offered to fund a SONAR research foundation at UCSB due to Dr. Leifer's research. Dr. Leifer is also an expert at alternative oil clean up technologies, and has a long established relationship with the Norwegian government to research such technologies.

Dr. Leifer also has been involved in many volunteer activities for broader environmental causes, such as the Mangrove Action Network.

Dr. Leifer also is noted for his ability to relate science to the 'guy in the street', and has been the focus of numerous interviews with American news outlets such as CNN and NPR, but also in documentaries produced by the BBC, the Discovery Network, and the History channel.

## NARRATIVE SYNOPSIS

The movie opens with an anxious Ira, wondering if his research mission will reach its destination in time. The movie give a background discussion of the Macondo disaster, the loss of lives, the volume of oil spilt. Dr Leifer reminds the viewer that much worse may yet be on the horizon, we have to go and find out if there is still time to save the Gulf of Mexico.

The team's mission is introduced. We see the research vessels, we see the team of researchers, we see technology and ROVs being loaded. We visit with the researchers at their home labs, a la Olympic athletes training at home. We get a sense of how important this mission is.

Example - Ira Leifer lives in a garage of his house that he doesn't have the money to finish, worring about losing it to the bank. Most of his research, although supercritical to environmental planning, is either not funded or underfunded. Even his current efforts to address the Macondo oil spill, such as his role on the USGS Technical Flow Rate Team, were on a volunteer basis. That's how America values its scientists. Everyone on the team can relate. Poorly funded studies lead to low salaries, and everyone is bright enough to make a high salary on Wall Street. These

UCSB00273621

people are here because they care about the environment. Because they know how important it is to our survival as a species.

*(Perhaps there is a side story on how many environmental researchers wind up working for Big Oil and industry just to make ends meet, to keep their house. Most of the few people who get through the academic and financial rigors of graduate school, wind up working for Big Oil anyways. They are our friends, and we know they do what they can from inside, but seriously; they would be on the environmental side if there was a budget for environmental science. This is an aspect of American society that needs fixing.)*

Ira delivers background of the science missions up to the time of the Deep Spill 2 mission. How Ira initiated the NASA effort to capture the Gulf shores before the oil changed them forever. How various teams estimated the oil flow, how BP failed to cooperate with science. A sense of deep frustration with how hard it is to get the right things done. Time is ticking, and BP continues to play time games. Top hat is going to work any day now. Oops, no. Well, top kill is surely going to work next week. Oops, no. Well, the junk shot should get it done, oops, maybe the well was a little bit damaged, so we'll use a containment system next week. We're getting all the oil. Oops, except for most of it. And now it wobbles. Its as if BP think this is one long sad joke to keep the scientists at bay until the well is capped so nothing is known. BP is delaying until it's too late to learn so that they can argue and argue in court instead of cleaning up their mess. Could show a succession of press announcements from Thad Allen or others.

Maybe animation might help. Ira can describe how reservoirs work, how seeps exist in nature. He can explain the role of methane in global warming, and how natural gas and methane hydrates contribute to global warming. He can explain how there are extensize areas of the Northern with seeps and hydrates, and how little is known about the whole situation due to tiny financing. Again, frustration at how hard it is to get science done, especially in comparison and opposition to international oil and gas corporate interests.

We then could take a panorama through oil spills around the world. The public thinks they are rare, and limited to boat spills. Thus, ruptured tanks of little vastness. Yet, Nigeria has many open seeps and a long history of spills. Very graphic images can be found. Indonesia lost a whole village due to a natural gas well ruining its casing; the entire village was turned into a lake of boiling mud. Offshore events such as the recent Australian rig fires, and their explosive relief wells(!), should be used to flesh out the narrative. Also some of the small US operators who are always in regulatory trouble due to small spills, but who never clean up their act nor are shut down. We also can show some natural seeps that exist around the world, such as Santa Barbara and Azerbaijan's mud volcanoes. We need to impress that oil spills are not limited to tankers, that they happen a lot more often than API materials suggest, and that we need to think twice before encouraging more of it anywhere. And that if it exploration and production are to continue (instead of ramping down as part of a transition to an alternative energy future), much more efforts need to be taken to research and understand the risks involved, and that rescue and clean-up equipment need to be much more advanced to avoid repeating the Macondo nightmare.

We could take a pause to cover positive efforts. Norwegian efforts to coordinate fisheries with oil industry, and the strong safeguards that they have in place. Visit with folks developing alternative safety equipment to prevent such leakage from re-occurring. Visit with people who have other visions of non-hydrocarbon energy from the seas. Visit with people trying to keep the world informed.

Prior to the launch of the science mission, film crews should be at Ira's lab and visit the nearby seeps with Ira.

On board the research mission, Ira will be able to present a long list of experiments, please see the Scientific Plan previously submitted. There will be a lot of reality in working with and interacting with the many research teams on this mission. There is a lot of work to go on, and a lot of pressure to get things right. Interviews of team members before, during, and after experiments, and on-going access throughout the research cruise. There will be many opportunities for beautiful ocean filming, both at great depths and at shallow depths. We will be able to model and interpret results on the boats, and we'll have a pretty diverse crew as well.

Grand moments:
- Will the DS2 team get access to the well site as promised, or be turned away by BP?
- Will the seabed reveal more sub-surface damage, will there be evidence of oil and gas migration from outside of the well?
- Will signs of algae death be found?
- Will efforts to replicate the Macondo event at a nearby deep sea natural oil seep vent with artifical methane enhancement be successful? What will it reveal about what BP is hiding?
- When equipment or people go dysfunctional, how does the team address the issue? Tensions and deadlines are tight, and everyone is only human.
- Will we find out that the Gulf air is really dangerous and carcinogenic to breathe? Are warnings for the public critical?
- Will we find that major fisheries are now toxic?
- What will the team do when it finds heavily oiled _____? (fill in the blank – whale, sea turtle, birds)

There will be at least two boats, one to be positioned at the well site, and one to do research at a distance from the well site. Also, there are plans to repeat certain tests under more controlled and BP-independent locations nearby. Even if BP denies access, the DS2 team will be able to gather enough technical data to address the critical research needs, and to discover key truths.

The good news event would be that all is in fact okay.

That the well will not collapse and that algae will survive and support the food chain. This still leaves the gaping question of why BP made it so hard to do basic science. Why were these critical issues pushed aside, or, did BP know and refuse to tell anyone? This is still disturbing and compelling, for how can a democracy function and handle complex issues like global warming if corporate interests are allowed to hide whatever they choose from science and public discussion? Dr. Leifer could explain further the great risks, and economic potential, of current research into exploiting the natural gas hydrates. If you think exploring for natural gas in the deep sea is fraught with risk, it's much safer and better understood than the extraction of gas hydrates. Gas hydrates are a huge natural resource base, potentially dwarfing current natural gas reserves. North America, for example, is estimated to have a 30-century supply of gas from natural hydrates, if North America continued at its current energy consumption rates. The basic hazard is that natural gas hydrates are basically a physically unstable version of natural gas, and its extraction could lead to great accidental emissions. Methane emissions are much more dangerous for global warming than carbon dioxide, yet few realize the vast volumes of methane hydrates just offshore. We need improved science and regulatory oversight if we continue down this path.

UCSB00273623

On the other hand, if Deep Spill 2 discovers the catastrophic concerns are valid, that the well will collapse or that algae is failing, then there will be plenty of emotions and energies to work with. A whole lot of excitement and panic will ensue.


## BUDGET:

We expect the scientific budget of Deep Spill 2 to be $8,400,000 including vessels.  This is based on budgets submitted from the sub-teams and contingency planning.  This does not take into account film costs.


## TIME FRAME:

This is a time critical production, because the narrative arc and the scientific research are both best done on the actual Macondo well flow.

However, the overall arc of the movie **could still be presented as planned** with **Macondo already capped**.  The drama of BP denial of access is moved off-camera, or rather to a news filing or public announcement – the overall effect remains the same.  It would convert the mission into a scientific inquiry of what happened at Macondo.  The two secret missions would still be in place.  We will still need to investigate if the well did ruin the subsurface to the point of enabling other, evolving oil and gas transport to the sea bed from the reservoir.  Also, the fundamental question on the algae will remain in place until checked by Deep Spill 2.  And finally, the open mission to learn about oil and gas leaks from deep sea wells can be performed with other Gulf or Caribbean oil seep vents with support from artificial natural gas release.

How fast from go to Gulf?
- If we are operating with a **urgency to beat the capping of the well**, we can go from unfunded to well site in **about 8 days**.
- If we are operating **without that urgency**, we would prefer to perform 'wet run' practice offshore Santa Barbara in the seep fields.  That would reach closer to **15 days** from funding to reaching the deep seas in the Gulf.

Once at sea, we would stay at sea for several weeks and accomplish a long list of experiments and filming.

All told, the active period of readying the research mission and performing the research mission is about 3 to 5 weeks.

**This should all be completed prior to September, 2010.**

UCSB00273624

### IRA'S STORY: WHY IRA LEIFER IS UNIQUELY QUALIFIED FOR THIS MISSION

My earliest memory is of watching an astronaut floating in space on a black and white television set. I must have been about 2 years old, *i.e* close to 1965, yet it made an indelible mark. Growing up in the suburbs of NYC, I was fascinated with NASA, space exploration, and science fiction. Oh I loved and dreamed Star Trek and Star Wars and Japanese space anime. But I wasn't just a sci-fi fan, I also really enjoyed outdoor exercise. My father was an environmental scientist at the DOE Environmental Measurement Laboratory (now retired) focused on the atmosphere, and there were microscopes and chemistry kits around the house for experimenting with. So, the idea of combing science with the environment was a pretty natural path for me.

By the time I was in college, an undergraduate at SUNY Stony Brook, I was studying Astronomy and Physics, although I started my first year in Geology. Aside from classes, in my spare time I would take century-length bike rides. And I was heavily involved in dormitory politics, running the coffee house/bagel shop, and other social activities. Learning about life. I took five years and received a minor in psychology, worked some in a low temperature physics laboratory, and almost could have finished a minor in neuropsychology. I also was involved in the Astronomy club and learned how difficult jobs were to come by in the Astronomy field. Thus, I resolved to pursue a Masters degree closer to home.

During a several month hiatus prior to starting at the University of Michigan, I resolved to take a several week, fall-bicycle/camping trip around New England (I recall my mom begging me to take a car). I visited a friend in Boston where we watched *Nausicaa : Tani no Kaze* (*Valley of the Winds*) by *Mizutani*, whose environmental themes made a strong impression on me during the trip and for years afterwards. After the trip, I wrote a narrative and then manually pasted in photos into a hand-bound book. I also passed late nights talking with my grandfather whose sleep patterns were off kilter with daylight.

Closer to home, meant the planets (Planetary Atmospheres) rather than the stars, in a Masters of Science program at the University of Michigan. However, this was a time period when NASA was experiencing wrenching budget cuts and it started to seem like a poor career strategy to focus on an area where jobs were only through NASA and NASA was being downsized. One summer, I took time and went to Japan, staying at a friend's family home and developing a taste for living abroad.

Examining my University of Michigan experience, I realized that my greatest interest was in the area of atmospheric pollution. Thus, when I started in the Ph.D. program at the Georgia Institute of Technology, I focused on atmospheric chemistry, modeling in particular, which didn't work out very well. I also tried working on atmospheric measurements of very low concentration trace gases. After a lost year, I was desperate and reached out to a professor in Washington looking at bubble air-sea gas exchange. This was the topic of our class's Ph.D. entry exams, and I had become excited by research in this area.

So off to Washington state for two years of numerical bubble model development, helping with experiments to measure bubbles, and backpacking and mountain climbing (accompanied by my doggie, Kitsuneko, a coyote-huskie mix/stray I took on). Almost every weekend I was off to recharge in Nature – my favorite hiking path was to an old growth grove of giant pines along the Wolf River at ~2000 ft, which was always so peaceful. Here I was at Batelle PNL/MSL, and the

UCSB00273625

change to a corporate environment was somewhere wrenching. Upon returning to Georgia Tech, I finally got the model to work (had to go back to basics with pencil and paper), frequent trail runs with Kitsuneko, and thesis writing under a kindly Professor Dr. Roper, who took me on and provided guidance.

Graduating from GATech, I had two choices – to pursue further modeling studies and likely be segregated scientifically in a fluorescent-lit room for the rest of my career, or to re-invent myself as an experimentalist. I took the harder route, re-invention, which led to Ireland. I left my beloved Kitsuneko with my parents (Ireland has a 6 month imprisonment (i.e., quarenteen) rule).

While in Ireland I would meet my Italian soon-to-be wife, fall in love with Guiness beer, and adopt a young Irish border collie, DiAuggie. I also learned how to make video bubble measurements for an experiment in south France. The experiment was a struggle, I had been unprepared by my advisor, and I realized that either I needed to work harder than everyone else, or I would have his poor reputation. I was always the last to leave and the first to arrive and my health declined, until the chief scientist called my Ireland boss and said get down here NOW, Ira is collapsing. Once he arrived he took the flack from the rest of the team and I was able to catch up and get ahead. After the experiment, I traveled about Italy, and resolved to learn Italian, just because it was a musical sounding language (this was before I met my wife to be). I had already picked up French, by hanging out with the technical staff and grad students. Although grammatically horrendous, my French allowed me to communicate and tell jokes.

When the money ran out in Ireland a year too soon, the team leader took me on and I spent a year in The Hague as a visiting scientist at a NATO laboratory, sporadically travelling to Italy, and writing and reading papers, and doing small experiments. For years thereafter, I would visit Holland almost annually to work on papers from the experiment in France. The team leader and my sponsor, Gerrit De Leeuw, was the best man at my wedding in Italy.

I also learned about and wrote a thorough review paper on bubbles from the seabed, which were attractive to me because there were just bubbles. In the air-sea gas exchange community there were two opposing camps – turbulence and bubbles. Members of one camp or the other would attack the other camps efforts on general principle, or so it seemed to me, and I did not want to be involved. I had an offer to return to the states to study air-water interaction in the lab by turbulence (*the other camp!!!*) at Santa Barbara where there also was a small group studying the science of seeps on shoe-string funding. Here was an opportunity to broaden my understanding of bubbles and how they formed from winds, i.e., to bridge the two communities at the point where bubbles begin forming, and also to become involved in oceanographic research. After several years I had a number of publications in the seep field.

There were many advantages of Santa Barbara for seep research, easy access meant when things didn't work, and that is nature of marine research on shoe-string budgets, one can return the next week, rather than the next year. However, our work generally was not taken seriously by the larger community because it was too shallow.

So I actively reached out and developed collaborations with deep-sea research scientists, participating in cruises in the Gulf of Mexico with submarines and modeling studies. Little of my participation on these research cruises was funded at all, it was largely passion driven. Of course the analysis and manuscript writing had to be done on weekends and evenings after other salary paying efforts were completed.

UCSB00273626

In 2003, during an effort to measure the flow of water driven by the bubbles (this is why bubbles do not sink ships), we experienced and video'd a natural gas blowout. I knew I had witnessed a special event, and resolved to try and understand what had happened and its significance rather than rush to publication. This took three years, and in the process I returned to atmospheric studies, learning how to make measurements of methane.

Again, there was no funding, so research was done on the fly with instruments borrowed from a friend/colleague at the local Gas company. I also was introduced to looking at methane with remote sensing by a colleague, Dar Roberts. We tried for NASA funding and failed, went through the entire process of analyzing and publishing, and tried again and succeeded!

Over the next years I became heavily involved, too, in atmospheric methane measurements (greenhouse warming concerns), airplane coordination, and the development of tools for very precise field methane measurements. In the process I re-established contact with many of my Georgia Tech colleagues, who had shifted to NASA long ago when they graduated.

Meanwhile, in 2005, there were horrible rains and flooding in California, which were at the same time as massive oil slicks offshore and bird oilings. I came up with the hypothesis that the two were connected through geology and water pressure in aquifers. At the time I managed to get $5,000 of funding and leveraged it to equate a $50,000 project through the kind contributions of many people. I began using sonar to study the seeps, a technique pioneered in the mid 1990s by my colleague Bruce Luyendyk. However, what "sonar" sees is not easy to understand, and it took the next five years of thought and experimentation and research before we published. I also used these years to become an "accidental geologist," trying to understand the spatial and temporal patterns in the seepage in terms of the underlying and controlling geology.

I also remembered and was strongly influenced by the words of Keith Kvenvolden, one of the founding fathers of the field of seepage studies, while walking on a Santa Barbara beach on a cloudy day, "It's the oil that people care about, not the natural gas." As a result, I actively included oil studies in my research efforts, using the natural laboratory of the seeps to learn about how oil changes and is affected by currents and wind and sun and how it affects bubbles.

Although my deep-sea work had been focused on the threat to climate from hydrates, I could see that the biggest hydrate threat to climate would arise from Arctic hydrates, and began a concerted effort to expand my research in that direction. This has continued to pick up steam, and includes measurements last fall in the Russian Siberian Arctic of methane emissions from the seabed. Even this very important (for global climate) Arctic effort has been largely unfunded.

Thus, by the time that the oil spill occurred, I had been learning and researching and conducting measurements and publishing on hydrocarbon migration from the reservoir through the rock and mud to the seabed, through the water column, at the sea surface and into the atmosphere right up to satellite observations. It was as if my entire career had been guided to be ready for the spill. This was the moment of my calling.

UCSB00273627

# Attachment E

## *Filed Under Seal*