

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP
ATTORNEYS AT LAW

101 WEST BROADWAY, NINTH FLOOR · SAN DIEGO, CALIFORNIA 92101
PHONE 619·237·5200 I FAX 619·615·0700 I WWW.PAULPLEVIN.COM

MATTHEW J. SCHENCK          (619) 237-5200      mschenck@paulplevin.com

March 6, 2013

Hon. Sally Shushan
Magistrate Judge
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room B345
New Orleans, LA  70130

Re:   *The Regents of the University of California's Opposition to*
      *BP's Request for Production of Dr. Leifer's Audio Journal*

Dear Judge Shushan:

As outside counsel for The Regents of the University of California (the "University"), I
appreciate the opportunity to more fully articulate the University's position with regard to
the BP request to produce the voice notes of Dr. Leifer.  I also want to acknowledge, and
express the University's appreciation for the Court's comprehensive and continued
attention to resolving the issues in connection with the University's response given the
challenging and complex issues relating to the nonparty subpoena served on the
University.

I have not yet mastered all the privileges and complexities inherent in Dr. Leifer's work,
but I understand that, with the Court's assistance, the parties have devised a robust process
for review and production of the University's documents.  If the audio recordings at issue
in the current dispute are responsive to the subpoena, my firm will do everything it can to
cooperate with the parties' counsel to expedite the review and production to prevent
further delays, and proactively report as necessary to the discovery referee or the Court,
problems that cannot be resolved informally.  Our intent, of course, is to avoid further
Court involvement.

Contrary to how BP framed the issue, the University did not withhold a clearly-responsive
University document.  Rather, the document in question – Dr. Leifer's audio journal – is a
private diary and not a University document.  BP's argument is informed by the result; it
must characterize the audio journal as a University record in order for it to be responsive to
its subpoena to the University.  In contrast, the University's determination that the audio
journal is not a University document was based on the available information and evidence,
which demonstrate the personal and proprietary nature of Dr. Leifer's diary.

This is a narrow dispute over a single issue, *i.e.*, whether Dr. Leifer's audio journal was
responsive to BP's subpoena to the University.  The complex and sometimes contested

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

Hon. Sally Shushan
March 6, 2013
Page Two

method of review and production was successful – among the tens of thousands of documents painstakingly reviewed and produced by the University, the audio journal is the _only_ post-deposition dispute BP has raised.  Nor does BP argue that the University failed to comply with its obligation to designate a properly prepared person most qualified on the enumerated issues (not a single question at the deposition challenged the adequacy of Dr. Leifer's preparation).

A.      **Relevant Background**

Dr. Leifer is employed by the University as a research scientist, but he also does work for many other government and private entities and groups through his private company and individually.  (Declaration of Ira Leifer ("Leifer Decl."), ¶ 1; Deposition of Ira Leifer ("Leifer Depo.") 58:16-60:8.)[1]

From approximately Spring 2010 to Fall 2012, Dr. Leifer kept an audio journal to record his daily thoughts and impressions.  (Leifer Decl. ¶¶ 3, 4; Leifer Depo. 34:5-19, [date range and frequency uncertain.])  On his own time, during his afternoon commute on his personally-owned recorder, he recorded whatever was on his mind.  (Leifer Decl. ¶¶ 3, 4.)  He did so because he thought he might one day write a book about his experiences, but also as a cathartic release from the stresses of the day.  (Leifer Decl. ¶ 5; Leifer Depo. 33:18-34:4.)  He recorded his thoughts about work, whether it was his work for the University, NASA, the FRTG, private companies, ██████ other federal government work, or his work for foreign companies and governments.  (Leifer Decl. ¶ 4; Leifer Depo. 392:18-393:7.)  He also recorded personal thoughts – thoughts about attorney-client communications and other privileged or confidential issues.[2]  (Leifer Decl. ¶ 4.)

Dr. Leifer would occasionally download the audio files from his digital recorder to his personal laptop, never to be used again.  (Leifer Decl. ¶ 8.)  Significantly, Dr. Leifer did not listen to, rely on, or use the audio journal in any way, including his work on the FRTG.  (Leifer Decl. ¶¶ 6, 7; Leifer Depo. 33:18-34:4.)  The journal was purely an individual's private diary.

Seeking production of the audio notes, BP erroneously characterizes them as having been created and maintained as part of Dr. Leifer's University duties.  (See, BP's Request for Dr. Leifer's Voice Notes, p. 2.)  BP supports that argument by selectively quoting Dr. Leifer's deposition testimony out of context.  (_Id._)  The testimony actually demonstrates that the notes "were never reviewed for use in flow calculation" (Leifer Depo. 33:21-22),

---

[1] Attached hereto are Exhibit 1 (the Declaration of Ira Leifer, Ph.D., in Support of Opposition to BP's Request for Production) and Exhibit 2 (excerpts from Ira Leifer's deposition transcripts, volumes 1 and 2).

[2] The University does not dispute that parts of Dr. Leifer's audio journal contain information that may be relevant in this lawsuit.  Rather, the University's position is that Dr. Leifer's journal is not a University document subject to production.

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

Hon. Sally Shushan
March 6, 2013
Page Three

but rather were "a cathartic way of describing [his] day for posterity, rather than playing any role in [his] work in terms of trying to evaluate the flow." (Leifer Depo. 34:2-4.) BP's counsel also does not disclose to the Court the fact that she specifically asked Dr. Leifer whether he was "maintaining those notes as part of the work that you were doing for the FRTG," and was unequivocally told, "No." (Leifer Depo. 392:9-17.)

The only connection between Dr. Leifer's audio journal and the University is that Dr. Leifer occasionally made a compressed archive (*i.e.*, a zip file) to back-up his journal and placed this archived file on his University computer for safe keeping.[3] (Leifer Decl. ¶ 8.) Consistent with the University's written policy allowing personal use without waiving a University employee's expectation of privacy, the University determined that the archive file was not a University record and not responsive to the subpoena.[4]

**B.   The Audio Journal Is Not Responsive to the Subpoena**

> *1.   The Audio Journal Is a Private Document, Not a Work Document*

The circumstances in which the journal was recorded and maintained demonstrate that Dr. Leifer's audio journal is his personal diary. It was not made for any work purpose and, critically, it was not the source of any information or used in connection with Dr. Leifer's work at all, whether for the FRTG, for the University, or any other work. (Leifer Decl. ¶¶ 6, 7; Leifer Depo. 33:18-34:4.) It was recorded on Dr. Leifer's personal time, recorded on his personal digital recorder, and kept on his personal (non-University) computer. (Leifer Decl. ¶¶ 3, 8.) (The only connection the recordings had to any University computing resources was the incidental use in storing a secured copy on his University desktop computer.)

At deposition, Dr. Leifer explained that the audio journal was not used for his work, but for his own private purposes:

> Q. (BY MS. DeSANTIS) Why were the voice notes not produced pursuant to the request in the subpoena?

---

[3] The zip file is the document at issue here. It is approximately 4.83 GB, and contains 215 data files. The archived files are dated between June 26, 2010 and March 28, 2011. It thus appears that the zip file archived on Dr. Leifer's University desktop computer does not archive any recordings after March 28, 2011. If each data file represents a one hour recording, the archive contains approximately 215 hours of audio. Counsel is informed and believes that an hour of audio equates to about 40 to 50 pages of double-spaced transcript. If correct, 215 hours of audio could generate around 8,600 to 10,750 pages of transcript.

[4] Analytically, the scenario here is no different than a University employee maintaining a bound paper journal and keeping it for safekeeping in a file cabinet at the employee's office at the University. If, in response to a subpoena, the University comes across a personal journal in that file cabinet, it must determine whether the journal is a University record and therefore potentially responsive, or whether the journal is the personal property of the University employee.

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

Hon. Sally Shushan
March 6, 2013
Page Four

> A. The voice notes were kept for use sometime in the future when I thought I might like to write a book, and the voice notes were never reviewed by me after I kept them. They were never reviewed for use in flow calculation. They were a historical archive. I decided that the time in the future would be after all litigation and whatever other type of things had ended in a decade or more. And so for me, the voice notes were simply a -- **a cathartic way of describing my day for posterity, rather than playing any role in my work** in terms of trying to evaluate the flow.

(Leifer Depo. 33:18-34:4.) (Emphasis added.) Dr. Leifer did not ever intend to rely on his audio journal even for purposes of refreshing his recollection for any litigation relating to this project.

BP also did not reveal to the Court, in arguing that Dr. Leifer "maintained the voice notes" as part of his work for FRTG, that counsel specifically asked whether he maintained his audio recordings in connection with FRTG:

> Q. (BY MS. DeSANTIS) Dr. Leifer, when you were maintaining those notes, were you maintaining those notes as part of the work that you were doing for the FRTG Plume Team?
>
> A. No.
>
> Q. All right. Were you maintaining those notes as part of the work that you were doing for the FRTG?
>
> A. No.

(Leifer Depo. 392:9-17.)

Thus, while the audio recordings contain entries that "pertain to" and are "related to work," that does not make them FRTG documents.

> 2.     *The Audio Journal Is Not a University Record*

Moreover, even if the audio journal was an FRTG work document, the FRTG is not a part of the University, is not a University project, and is not funded by the University. (Leifer Decl. ¶ 9.) The University is not entitled to control FRTG's mandate, agenda or work product. Dr. Leifer's work for the FRTG is not inconsistent with his University appointment, but that does not transform his FRTG work into a University sponsored project or make its records University records.[5]

---

[5] Eventually, Dr. Leifer's company, Bubbleology Research International, was compensated for some of Dr. Leifer's efforts on FRTG. (Leifer Depo. 393:20-394:7, 395:2-15, Exh. 11370.)

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

Hon. Sally Shushan
March 6, 2013
Page Five

Indeed the only nexus between the audio journal and the University (other than it having been recorded by a University appointee who also wears several other hats) is the fact that Dr. Leifer saved a back-up archive on his University computer. (Leifer Decl. ¶ 8.) He did not do so, however, for University purposes, but rather for his own personal reasons. (Leifer Decl. ¶ 7.) The University of California Electronic Communications Policy allows use of University computers for "incidental personal use." (See Electronic Communications Policy III. D. 8 [Allowable Use, Personal Use].)[6]  The Policy also grants employees a reasonable expectation of privacy:

> The University respects the privacy of electronic communications in the same way that it respects the privacy of paper correspondence and telephone conversations, while seeking to ensure that University administrative records are accessible for the conduct of the University's business.

> The University does not examine or disclose electronic communications records without the holder's consent.  Nonetheless, subject to the requirements for authorization, notification, and other conditions specified in this Policy, the University may examine or disclose electronic communications under very limited circumstances. . . .

(Electronic Communications Policy, IV.A. (Privacy and Confidentiality).)

The issue presented with Dr. Leifer's incidental personal use of his University computer to archive his audio journal is similar to an earlier discovery matter concerning a BP employee asserting objections to his deposition and requesting return of electronic documents under assertion of the marital privilege.  Relying on *U.S. v. Slanina*, 283 F.3d 670 (5th Cir. 2002); *Muick v. Glenayre Electronics*, 280 F.3d 741 (7th Cir. 2002); *U.S. v. Etkin* (S.D.N.Y.) 2008 WL 482281; and *Sims v. Westlake School* (W.D. Wash.) 2007 WL 2745367, *1, this Court ruled that the employee had no reasonable expectation of privacy because BP's policy notified him that his emails were not private, could be monitored and accessed by BP, and are subject to production by subpoena.  (Order, MDL No. 2179, 3/28/11, Document 1777.)  See also, *Miller v. Blatt*, 676 F. Supp.2d, 485, 497 (E.D. LA 2009).  Here, in contrast, although University policy states that records may be subject to subpoena, Dr. Leifer had a reasonable expectation of privacy such that he was not on notice that his private journals could be transformed into a University record.

---

[6] A copy of relevant portions of the policy is attached hereto as Exhibit 3.  A full copy of the policy is publicly available at http://policy.ucop.edu/doc/7000470/ElectronicCommunications.

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

Hon. Sally Shushan
March 6, 2013
Page Six

Moreover, Dr. Leifer's archived journal was not in the University's possession, custody, or control simply by being placed by Dr. Leifer on his University computer.[7] "Control," for purposes of federal discovery, is defined as the legal right, authority or ability to obtain documents upon demand. *US Intern. Trade Comm'n. v. ASAT Inc.*, 411 F.3d 245 (D.C. Cir. 2005). The fact that a party could obtain a document if it tried hard enough does not mean that the document is in its possession, custody or control within the meaning of the Rule. *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (C.A.7 Ill. 1993).

In *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 558-59 (S.D.N.Y. 1994), a corporate party to a lawsuit was compelled to produce tape recordings in possession of one of its officers. The district court held that because a corporate officer creates or handles records in a representative capacity, not on his own behalf, the tape recordings belong to the organization and must be produced in response to a Rule 34(a) document request. *Id. at 559* (citing *In re Grand Jury Subpoenas Duces Tecum Dated June 13, 1983 and June 22, 1983*, 722 F.2d 981, 984 (2d Cir. 1983).) Here, in contrast, Dr. Leifer is not an officer, or even a high level official of the University, and the recordings were *not* made in furtherance of his University work. The same rationale that required the tape recording's production in *Brooks* dictates that Dr. Leifer's audio journals are not the University's records.

**C.      BP Has Not Sustained Its Burden of Showing the Benefit of Production Outweighs the Burden**

As noted by counsel for the Department of Justice in the March 4 conference call, the burden of transcribing, reviewing and producing the audio journal may outweigh the benefits of the discovery. See FRCP 45(d)(1)(D); FRCP 26(b)(2)(C)(iii); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998) (Discovery may be refused where the burden of the proposed discovery outweighs its likely benefits . . . taking into account such factors as the needs of the case, the parties' resources, the importance of the issues at stake, and the role of proposed discovery.)

Here, Dr. Leifer is one of 13 members of 5 teams that make up the FRTG. In its request for production, BP does not show how the needs of the case require production of the audio journal or otherwise show that the benefits of disclosure outweigh the burden.

The nature of the audio journal itself demonstrates that it has considerably less probative value than written documents and correspondence. Dr. Leifer recorded a stream of consciousness, without any kind of consideration or review. Unlike a written journal, Dr.

---

[7] As here, a subpoena for documents to which a nonparty has "access" is overbroad and must be limited to documents within his or her possession, custody or control. *Wiwa v. Royal Dutch Petroleum*, 392 F.3d 812, 820 (5th Cir. 2004) (Rule 45 uses same standard as a Rule 34 request for documents.)

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

Hon. Sally Shushan
March 6, 2013
Page Seven

Leifer did not even have the benefit of reading his words to ensure they reflected his intention.

Critically, the audio journal was not reviewed by anyone and was not used in Dr. Leifer's work product on any issue relevant to this case. Indeed, as previously noted, he did not even contemplate opening the journal until the dust had long settled on any litigation related to these events. (Leifer Depo 33:18-34:4.) Therefore, the recordings have limited probative value even as a way of refreshing recollection.

The burden of production, in contrast, is high. Dr. Leifer estimates that he recorded 500 hours of audio over approximately 28 months. (Leifer Decl. ¶ 3; Leifer Depo. 34:5-19.) The compressed archive contains 215 data files ending March 2011 and is 4.83 gigabytes. The audio would have to be transcribed (a step not previously required), reviewed by DW Legal Solutions, and checked by Dr. Leifer to ensure the protections and privileges were correctly identified and only responsive information was produced.[8]

## D.     If Production Is Required, BP Should Bear the Cost

To date, the Court has required BP as the party seeking discovery to bear the extra costs of production, including costs associated with Edox and DW Legal Solutions. This cost shifting is entirely consistent with applicable law. See FRCP 45(c)(2)(B) (ii) (any order to compel production "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance;" see also *In re First American Corp.*, 184 FRD 234, 240 (S.D. NY 1998) (The party benefited by the discovery may be ordered to pay all or part of the legal fees or other expenses reasonably incurred by a nonparty in complying with a subpoena to produce documents or other materials.).

In determining that Dr. Leifer's audio journal was not a University record subject to the Rule 45 subpoena, the University made a reasoned judgment. Even if the Court disagrees with that judgment, it should still recognize that the University acted in good faith and not impose a cost that would amount to a sanction against a nonparty. If the University were to bear the additional costs of production of the audio journal (an amount that could easily reach six figures), it would benefit BP at the expense of the education and research missions of a public institution in the midst of a budget crisis.

Finally, the University has now incurred the additional expense of retaining outside counsel to assist with this issue. The University has previously relied solely on in-house

---

[8] Because the determination of confidentiality, privilege and, especially responsiveness, involves an understanding of the different projects that are beyond the qualifications of a lay person, Dr. Leifer is the only person qualified to review the audio journal to verify DW Legal Solutions' work. The consequences of Dr. Leifer breaching his nondisclosure agreements or disclosing information subject to ▮▮▮▮▮▮▮▮ attorney-client, or other privileges would have serious repercussions to all concerned and could lead to liability against the University or Dr. Leifer.

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

Hon. Sally Shushan
March 6, 2013
Page Eight

counsel, with the limited resources commensurate with a public agency that has suffered
serious budget cuts over recent years.

Respectfully submitted,

**PAUL, PLEVIN, SULLIVAN
& CONNAUGHTON** LLP

By: _____
            Matthew J. Schenck

Attachments

CC (by electronic mail)

Michael O'Keefe
Robert R. Gasaway
Karen DeSantis
Nancy Hamill
Michael Goldstein
United States MDL Counsel
Plaintiffs' Liaison Counsel
Defense Liaison Counsel

# EXHIBIT 1

**DECLARATION OF IRA LEIFER, Ph.D., IN SUPPORT OF OPPOSITION TO BP'S REQUEST FOR PRODUCTION OF AUDIO JOURNAL**

I, Dr. Ira Leifer, declare and state as follows:

1.      I am an Associate Researcher III at the University of California, Santa Barbara ("UCSB"), one of the campuses administered by The Regents of the University of California.  This declaration is provided in support of the University of California's opposition to BP Exploration & Production Inc. and BP America Production Company's ("BP") request for production of my audio journal in connection with Federal Rule of Civil Procedure 45 Subpoena.  I have personal knowledge of the following facts and, if called as a witness, could and would testify competently thereto.

2.      I was designated by the University of California as the person most qualified to testify on the matters set forth on the subpoena to testify issued by counsel for BP in the pending civil action.  In the course of deposition, BP's counsel inquired about certain audio recordings that I made ("audio journal").

3.      I maintained this audio journal from approximately Spring 2010 to Fall 2012.  I recorded the entries on my own time, almost always on my 40 to 60 minute commute from work after the work day was over.  I made the recordings on digital recorders that I personally own.  During this time period, I estimate that I have recorded approximately 500 recordings.  My recollection of the number of recordings and time frame in which I made the recordings is an estimate and is not based on any review of these documents.

4.      The audio journal contains my thoughts of the day, as I recorded whatever was on my mind.  The recordings pertain to all the projects on which I may have been working, including my work for the FRTG, NASA, other federal government projects, ███████████████████████ work for foreign governments, and work for companies that are subject to nondisclosure agreements that I have signed.  I am informed and believe that the recordings also memorialize

my discussions with my attorneys on various matters, as well as my discussions ███████████████████████. I am also informed and believe that some of the entries record personal information about me or my family.

5.     As I explained in my deposition at pages 33 and 34, I kept my audio journal as a cathartic way of decompressing from my daily stress and to memorialize my experiences in case I ever wanted to write a book about them.

6.     I never reviewed my audio journal in connection with any of my work. In fact, other than to occasionally confirm the integrity of one of the sound files and to back-up the files, I never used or reviewed the audio journal for any purpose.

7.     I consider the recordings in my audio journal to be personal. It was my idea to create this audio journal. There was no requirement to create this audio journal as part of my job duties as a University of California employee or as part of my work for the FRTG.

8.     After recording the audio journal, I would move the audio files to my personal computer every few days. In order to have a back-up of the audio journal, I would occasionally compress the files into a zip file and copy the zip file onto the desktop computer at UCSB so that a back-up copy would exist in case my audio journal became lost or unreadable. I do not recall the last time I did this. It is my understanding that the University of California has a policy allowing employees to use University computers for limited personal use. I consider the audio journal to be my personal private property. If the Court orders that the zip file be produced, I will fully cooperate and hope that the mechanism in place whereby documents are reviewed will protect confidential and privileged interests.

9.     The FRTG was not a University project or University-funded project. However, I consider my effort on the FRTG projects to be consistent with my University appointment, which encourages researchers such as me to be active in, and contribute to, the public. Doing so also contributes to my advancement at the University. I tried to explain how this unfunded "pro bono" work for FRTG was

consistent with, but not part of, my duties at UCSB in my deposition at pages 393 and 395 through 397 of my deposition transcript.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of March 2013, at Santa Barbara, California.

IRA LEIFER, Ph.D.

State of California

County of SANTA BARBARA }

On 3/6/13 before me, MARK CAMPOS (NOTARY)
<sub>Date</sub>          Here Insert Name and Title of the Officer

personally appeared IRA LEIFER
                     Name(s) of Signer(s)

MARK CAMPOS
Commission # 1963874
Notary Public - California
Santa Barbara County
My Comm. Expires Dec 16, 2015

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____
                     Signature of Notary Public

Place Notary Seal Above

——————————— OPTIONAL ———————————
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

EXHIBIT 2

01-42186
DG/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG )    MDL NO. 2179
"DEEPWATER HORIZON" in the )
GULF OF MEXICO, on )     SECTION: J
APRIL 20, 2010 )
                       )    JUDGE BARBIER
                       )
                       )    MAG. JUDGE SHUSHAN

# *CONFIDENTIAL*

## *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Dr. Ira Leifer
## VOLUME 1

FEBRUARY 21, 2013

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

1    A.   The voice notes are at -- yes.

2    Q.   Okay.  And how are those voice notes

3   maintained?  Are they on a tape or are they on a

4   computer drive?

5    A.   They are on an archive, a compressed

6   archive.

7    Q.   And why were those -- those voice notes

8   not produced pursuant to the subpoena?

9         MR. GOLDSTEIN:  In answering this

10   question, I don't want you to disclose the -- any

11   communications that you and UC lawyers have had on

12   the subject, okay?

13         THE WITNESS:  Okay.

14    A.   Please ask your question again.

15    Q.   (BY MS. DeSANTIS)  Why were the voice

16   notes not produced pursuant to the request in the

17   subpoena?

18    A.   The voice notes were kept for use sometime

19   in the future when I thought I might like to write

20   a book, and the voice notes were never reviewed by

21   me after I kept them.  They were never reviewed

22   for use in flow calculation.  They were a

23   historical archive.  I decided that the time in

24   the future would be after all litigation and

25   whatever other type of things had ended in a

34

1    decade or more.  And so for me, the voice notes

2    were simply a -- a cathartic way of describing my

3    day for posterity, rather than playing any role in

4    my work in terms of trying to evaluate the flow.

5        Q.  When did you begin recording these voice

6    notes?

7        A.  Approximately -- and I have not reviewed

8    them, so I do not recall precisely.  But

9    approximately when I became involved in the

10   technical flow rate group.

11       Q.  And when did you stop recording these

12   voice notes?

13       A.  Again, approximately three to five months

14   ago.

15       Q.  All right.  So for some time in the spring

16   of 2010 until four or five months ago, you were

17   keeping voice notes related to your work on

18   DEEPWATER HORIZON, correct?

19       A.  Yes, and other things as well.

20       Q.  Okay.  And where specifically are the

21   voice notes located now?

22       A.  One copy is on my computer and one copy

23   rests -- resides with UC.

24       Q.  All right.  Are the notes complete?

25       A.  I have no knowledge -- or if you could

58

1   for the Mass Balance Team?

2       A.  Oh.  In the other way.

3       Q.  There was additional work that you did for

4   NASA and NOAA?

5       A.  Correct.

6           MS. DeSANTIS:  All right.  We'll take

7   a break, and then we'll get back to that.

8           THE WITNESS:  Okay.

9           THE VIDEOGRAPHER:  The time is

10  10:02 a.m.  We're going off the record, ending

11  Tape 1.

12          (Break from 10:02 a.m. to 10:20 a.m.)

13          THE VIDEOGRAPHER:  The time is

14  10:20 a.m.  We're back on the record, beginning

15  Tape 2.

16      Q.  (BY MS. DeSANTIS)  All right.  Dr. Leifer,

17  we were talking off the record about your updated

18  CV.  And we greatly appreciate your and counsel's

19  offer to try to provide that to us on the lunch

20  break.  With respect to updates to that CV, is it

21  correct that you still remain a researcher at the

22  University of California, Santa Barbara?

23      A.  Yes.

24      Q.  All right.  And you're not a professor at

25  the University of California at Santa Barbara, are

59

1      you?

2          A.   Correct.

3          Q.   All right.   Have you ever been a tenured

4      professor at any university or institution of

5      higher learning?

6          A.   No.

7          Q.   All right.   So your position is

8      researcher, and it remains that today, correct?

9          A.   Today I am a -- still a researcher.

10         Q.   All right.   And then, we will hope that on

11     our lunch break that we are able to get the

12     updated copy of the CV --

13         A.   Yes.

14         Q.   -- and we can all have a copy.

15              MR. GOLDSTEIN:   And I think he was in

16     the middle of finishing his answer.

17         A.   Oh, associate researcher.

18         Q.   (BY MS. DeSANTIS)   Associate researcher is

19     your formal title?

20         A.   Associate Researcher III and -- yes.

21         Q.   At UCSB?

22         A.   Correct, at U -- at UCSB.

23         Q.   All right.   Okay.   Dr. Leifer, when we

24     took a break, we were talking about work that you

25     were doing in providing data to the Mass Balance

1    Team and then editing sections of the Mass Balance

2    Team report.  We were also talking about work that

3    you did for NASA and NOAA in terms of remote

4    sensing efforts.  You indicated that there was

5    work that you did for NASA that was independent of

6    your work for the Mass Balance Team; is that

7    correct?

8         A.   Correct.

9         Q.   And what was the nature of that work?

10        A.   It was primarily -- well, two aspects:

11   One was related to ecosystem, remote sensing, in

12   which my work was to ensure data quality.  And the

13   second was in relationship to remote sensing in

14   support of the response -- surface response, which

15   was in collaboration or with NOAA.  Those are the

16   two areas.

17        Q.   All right.  And the remote sensing work

18   that was done in support of the response in

19   conjunction with NOAA, is that also done in

20   conjunction with NASA?

21        A.   NOAA and NASA.

22        Q.   All right.

23        A.   Or NASA and NOAA.

24        Q.   All right.  Thank you.

25             And when did you begin this

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

348

1   THE STATE OF TEXAS      )
2   COUNTY OF HARRIS        )
3
4          I, Donna L. Garza, Certified Shorthand
    Reporter in and for the State of Texas, do hereby
5   certify that the above and foregoing contains a
    true and correct transcription of all portions of
6   evidence and other proceedings in the above-styled
    and numbered cause, all of which occurred and were
7   reported by me.
           I further certify that I am neither
8   counsel for, related to, nor employed by any of
    the parties or attorneys in the action in which
9   this proceeding was taken, and further that I am
    not financially or otherwise interested in the
10  outcome of the action.
           GIVEN UNDER MY HAND AND SEAL OF OFFICE,
11  on this, the _____ day of February, 2013.
12
13

14          DONNA L. GARZA
            TEXAS CSR NO. 4785
15          Expiration Date:
            12-31-13
16
17
18  WORLDWIDE COURT REPORTERS, INC.
    Firm Registration No. 223
19  3000 Weslayan, Suite 235
    Houston, Texas  77027
20  (800) 745-1101
21
22
23
24
25

01-42187
DG/comp

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO.  2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

# CONFIDENTIAL

## *WorldwideVIEW*™
### Interactive Deposition Digital Display

ORAL AND VIDEOTAPED DEPOSITION OF:



# Dr. Ira Leifer
## VOLUME 2

FEBRUARY 22, 2013

# *COPY*



*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 – 745 – 1101**

392

1    position of the University of California at Santa

2    Barbara that that -- those voice notes are in the

3    possession and control of Dr. Leifer?

4              MR. GOLDSTEIN:  Yes, in his

5    individual capacity and not as a regental employee

6    and in the course and scope of any work he did as

7    a university employee.

8              MS. DeSANTIS:  All right.

9         Q.  (BY MS. DeSANTIS)  Dr. Leifer, when you

10   were maintaining those notes, were you maintaining

11   those notes as part of the work that you were

12   doing for the FRTG Plume Team?

13        A.  No.

14        Q.  All right.  Were you maintaining those

15   notes as part of the work that you were doing for

16   the FRTG?

17        A.  No.

18        Q.  You testified yesterday that some of those

19   voice notes concerned the work that you were doing

20   for the FRTG Plume Team; is that accurate?

21        A.  Yes.

22        Q.  You also testified yesterday that some of

23   those notes concerned the work that you were doing

24   for the FRTG Mass Balance Team; is that correct?

25        A.  Yes.

1     Q.   And you also testified yesterday that some

2   of those work -- some of those notes concerned the

3   work that you were doing for NOAA and for NASA; is

4   that correct?

5     A.   Yes.   Those notes contained -- or the

6   notes were -- included commentary on work for NOAA

7   and NASA.

8     Q.   Okay.   Was some of your work for the FRTG

9   then being done in a personal capacity rather than

10  as an employee of the University of California at

11  Santa Barbara?

12    A.   At the time when I was working on the

13  FRTG, my salary was completely University of

14  California, Santa Barbara; and I was not under

15  contract for any privileged work.   And it is my

16  view that the work I did for FRTG was part of the,

17  if you will, pro bono type of scientific work that

18  the university expects or would like for its

19  researchers to do in service to the nation.

20        MS. DeSANTIS:   We have an exhibit

21  that we are going to distribute that is not in the

22  binder.   We'll distribute it to everyone around

23  the table.   It's just a one-page document.

24        (Marked Exhibit No. 11370.)

25    Q.   (BY MS. DeSANTIS)   Dr. Leifer, I'm going

394

1   mark this document that we're distributing to all
2   counsel around the table as Exhibit 11370.  It
3   appears to be an invoice from Bubbleology Research
4   directed to NOAA; is that correct?
5        A.  Correct.
6        Q.  Do you recognize this invoice?
7        A.  I do.
8        Q.  All right.  This appears to be an invoice
9   that you directed to NOAA for different pieces of
10  work, including "Oil Spill Consulting Services";
11  is that right?
12       A.  Correct.
13       Q.  You've also included Technical Flow Rate
14  Team work; is that correct?
15       A.  Correct.
16       Q.  You've included Mass Balance Team work; is
17  that correct?
18       A.  Correct.
19       Q.  You've included working on the Mass
20  Balance Calculator Report, which I assume means
21  the oil budget calculator; is that correct?
22       A.  Correct.
23       Q.  And then you've also included invoicing
24  for some Mass Calculator Team work; is that
25  correct?

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

395

1    A.   Correct.

2    Q.   And the total of this invoice is for

3  $27,440; is that correct?

4    A.   Correct.

5    Q.   All right.  So then you did, in fact,

6  invoice NOAA for work that you did for the FRTG;

7  is that correct?

8    A.   In October 31st.  I did many months after

9  the FRTG work was completed.

10   Q.   All right.  So it is still your position

11 that, despite the fact that you invoiced NOAA,

12 your work for the FRTG was all done pro bono?

13            MR. ROBERS:  Object to form.

14   A.   At the time that I did the work, the work

15 was done with no understanding of compensation.

16   Q.   (BY MS. DeSANTIS)  All right.  And because

17 the work was done with no understanding of

18 compensation, is it your position that all of the

19 work that you did for the FRTG was done in your

20 personal capacity?

21            MR. ROBERS:  Object to form.

22   A.   My understanding at the time I did the

23 work, under which I kept the notes at that time,

24 was that I was doing this work pro bono for -- for

25 the spill response as part of my duties as a

559

```
 1   THE STATE OF TEXAS    )
 2   COUNTY OF HARRIS      )
 3
 4           I, Donna L. Garza, Certified Shorthand
     Reporter in and for the State of Texas, do hereby
 5   certify that the above and foregoing contains a
     true and correct transcription of all portions of
 6   evidence and other proceedings in the above-styled
     and numbered cause, all of which occurred and were
 7   reported by me.
             I further certify that I am neither
 8   counsel for, related to, nor employed by any of
     the parties or attorneys in the action in which
 9   this proceeding was taken, and further that I am
     not finandially or otherwise interested in the
10   outcome of the action.
             GIVEN UNDER MY HAND AND SEAL OF OFFICE,
11   on this, the _____ day of February, 2013.
12
13
14   DONNA L. GARZA
     TEXAS CSR NO. 4785
15   Expiration Date:
     12-31-13
16
17
18   WORLDWIDE COURT REPORTERS, INC.
     Firm Registration No. 223
19   3000 Weslayan, Suite 235
     Houston, Texas   77027
20   (800) 745-1101
21
22
23
24
25
```

**Worldwide Court Reporters, Inc.**
**PURSUANT TO CONFIDENTIALITY ORDER**

# *B*ubbleology
# *R*esearch
# *I*nternational, LLC

## Make Payable to:

Bubbleology Research International
1642 Elm Ave
Solvang CA 93463 US
Phone/Fax: 805-686-1209

# Invoice
## 10058b

**Customer:** NOAA OR&R. Building 3, Room 2012
600 Sand Point Way NE.
Seattle, WA 98115

| Date of Invoice<br>Oct. 31, 2010 | | Exchange Rate<br>- | Invoice Currency<br>$ | Total Invoice | 27,440.00 |
|---|---|---|---|---|---|

| Item # | Qty | Description | | Amount | Total Amount |
|---|---|---|---|---|---|
| 1 | | Oil Spill Consulting Services | | | |
| | | 57 hrs at $70/hr (Apr 25-May 1) | | | |
| | | (Coordinating NASA-NOAA Collaboration) | $ | | 3990.00 |
| | | 220 hrs at $70/hr (May - Aug) | | | |
| | | (Technical Flow Rate Team Work) | | | 15400.00 |
| | | 70 hrs at $70/hr (Mass Balance Team, May) | | | |
| | | (Assessing Remote Sensing Data, Report Editing) | | | 4900.00 |
| | | 45 hrs at $70/hr (Sept-Oct) | | | |
| | | (Working on Mass Balance Calculator Report) | | | 3150.00 |
| | | 35 hrs at $70/hr (Mass Calculator Team work) | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | Total | $ | | |
| | | Total | $ | | 27,440.00 |
| | | **Total** | $ | | 27,440.00 |

*Accounts payable 30 days upon receipt*

11370

Exhibit No. _____
Worldwide Court
Reporters, Inc.

UCSB00254193

# EXHIBIT 3

# Electronic Communications Policy

University of California
Office of the President

Issued November 17, 2000
Revised August 18, 2005

**Electronic Communications Policy**                    **Section III: Allowable Use**

electronic communications address, number, account, or other identifier
associated with the University or any unit of the University or assigned by the
University to individuals, units, or functions.

## C. ALLOWABLE USERS

1. **University Users.** University students, faculty, staff, and others affiliated with
   the University (including those in program, contract, or license relationships
   with the University) may, as authorized by the Chancellor, be eligible to use
   University electronic communications resources and services for purposes in
   accordance with Sections III.D, Allowable Use.

2. **Public Users.** Persons and organizations that are not University Users may
   only access University electronic communications resources or services under
   programs sponsored by the University, as authorized by the Chancellor, or for
   the Office of the President, the Senior Vice President, Business and Finance,
   for purposes of such public access in accordance with Section III.D,
   Allowable Use.

3. **Transient Users.** Users whose electronic communications merely transit
   University facilities as a result of network routing protocols are not
   considered "Users" for the purposes of this Policy.

## D.    ALLOWABLE USES

Use of University electronic communications resources is allowable subject to the
following conditions:

1. **Purpose.** Electronic communications resources may be provided by
   University units or sub-units in support of the teaching, research, and public
   service mission of the University, and of the administrative functions that
   support this mission.

2. **Non-Competition.** University electronic communications resources shall not
   be provided to individual consumers or organizations outside the University
   except by approval of the Chancellor. Such services shall support the mission
   of the University and not be in competition with commercial providers.

3. **Restrictions.** University electronic communications resources may not be
   used for:

Campus guidelines and procedures may further restrict the circumstances under which pseudonyms and anonymous electronic communications are permitted.

7. **Interference**. University electronic communications resources shall not be used for purposes that could reasonably be expected to cause excessive strain on any electronic communications resources, or to cause interference with others' use of electronic communications resources.

Users of electronic communications services shall not: (i) send or forward chain letters or their equivalents in other services; (ii) "spam," that is, exploit electronic communications systems for purposes beyond their intended scope to amplify the widespread distribution of unsolicited electronic messages; (iii) "letter-bomb," that is, send an extremely large message or send multiple electronic messages to one or more recipients and so interfere with the recipients' use of electronic communications systems and services; or (iv) intentionally engage in other practices such as "denial of service attacks" that impede the availability of electronic communications services.

8. **Personal Use.** University users of a University electronic communications facility or service may use that facility or service for incidental personal purposes provided that, in addition to the foregoing constraints and conditions, such use does not: (i) interfere with the University's operation of electronic communications resources; (ii) interfere with the user's employment or other obligations to the University, or (iii) burden the University with noticeable incremental costs. When noticeable incremental costs for personal use are incurred, users shall follow campus guidelines and procedures for reimbursement to the University.

The California Public Records Act requires the University to disclose specified public records. In response to requests for such disclosure, it may be necessary to examine electronic communications records that users consider to be personal to determine whether they are public records that are subject to disclosure (see the presumption in Appendix A, Definitions, of a University Electronic Communications Record).

The University is not responsible for any loss or damage incurred by an individual as a result of personal use of University electronic communications resources.

9. **Accessibility**. All electronic communications intended to accomplish the academic and administrative tasks of the University shall be accessible to allowable users with disabilities in compliance with law and University policies. Alternate accommodations shall conform to law and University policies and guidelines.

## IV. PRIVACY AND CONFIDENTIALITY

### A. INTRODUCTION

The University recognizes that principles of academic freedom and shared governance, freedom of speech, and privacy hold important implications for the use of electronic communications. This Policy reflects these firmly-held principles within the context of the University's legal and other obligations. The University respects the privacy of electronic communications in the same way that it respects the privacy of paper correspondence and telephone conversations, while seeking to ensure that University administrative records are accessible for the conduct of the University's business.

The University does not examine or disclose electronic communications records without the holder's consent. Nonetheless, subject to the requirements for authorization, notification, and other conditions specified in this Policy, the University may examine or disclose electronic communications under very limited circumstances as described in Section IV.B, Access Without Consent.

University employees are prohibited from seeking out, using, or disclosing personal information in electronic communications without authorization (see Business and Finance Bulletin RMP-8, Legal Requirements on Privacy of and Access to Information). University policy requires that its employees take necessary precautions to protect the confidentiality of personal information encountered either in the performance of their duties or otherwise (see Business and Finance Bulletin IS-3, Electronic Information Security).

University contracts with outside vendors for electronic communications services shall explicitly reflect and be consistent with this Policy and other University policies related to privacy.

### B. ACCESS WITHOUT CONSENT

An electronic communications holder's consent shall be obtained by the University prior to any access for the purpose of examination or disclosure of the contents of University electronic communications records in the holder's possession, except as provided for below.

The University shall permit the examination or disclosure of electronic communications records without the consent of the holder of such records only: (i) when required by and consistent with law; (ii) when there is substantiated reason (as defined in Appendix A, Definitions) to believe that violations of law or of University policies listed in Appendix C, Policies Relating to Access Without