```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3    IN RE:  OIL SPILL        )   MDL NO. 2179
      by the OIL RIG,          )
 4    DEEPWATER HORIZON in     )   SECTION "J"
      the GULF OF MEXICO,      )
 5    April 20, 2010           )   JUDGE BARBIER
                               )
 6                             )   MAG. JUDGE
                               )   SHUSHAN
 7

 8

 9




14
                   Deposition of WALTER GUILLOT,
15    taken at Pan-American Building, 601 Poydras
      Street, 11th Floor, New Orleans, Louisiana,
16    70130, on the 8th of February, 2011.

17

18
      APPEARANCES:
19
20    Mr. Paul Sterbcow
      LEWIS, KULLMAN, STERBCOW & ABRAMSON
21    601 Poydras Street, Suite 2615
      New Orleans, Louisiana 70130
22    Phone:  504-588-1500

23    Mr. Robert Cunningham
      CUNNINGHAM BOUNDS, LLC
24    1601 Dauphin Street
      Mobile, Alabama 36604
25    Phone:  251-471-6191 Fax:  251-479-1031
```

Case 2:10-md-02179-CJB-DPC   Document 8882-2   Filed 03/12/13   Page 2 of 9

IN RE:  OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO April 20, 2010                                Reported by:
**WALTER GUILLOT          February 8, 2011      THU BUI, CCR, RPR**

Page 9

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 111 | Supplement to Outline of Key Questions for Transocean Interviews | 238 |
| 112 | Walter Guillot's handwritten notes | 242 |
| 113 | Off Duty Well Site Leader Interview Questions | 243 |
| 114 | Jim Wetherbee's handwritten notes of Ronnie Sepuvaldo | 255 |
| 115 | Typewritten notes, dated May 12, 2010 | 262 |
| 116 | Jim Wetherbee's handwritten notes of Don Vidrine's interview | 265 |
| 117 | Analysis 5D - The blowout preventer did not seal the well | 297 |
| 118 | Horizon's Total BOP Functions Cycles on MC 252 #1 | 312 |

Page 10

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, Pre Trial Order Number 17, for all purposes, in accordance with law;

That the formalities of reading, signing, sealing, certification, and filing are specifically not waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

THU BUI, CCR, RPR, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath to the witness.

Page 11

VIDEOGRAPHER:
This is the videotaped deposition of Walter Guillot. This deposition is being held today at 601 Poydras Street in New Orleans, Louisiana on February the 8th, 2011. The time is 8:34 a.m.

This case is being taken in the Oil Spill by The Oil Rig Deepwater Horizon in the Gulf of Mexico on April the 20th, 2010, taken in the United States District Court, Eastern District of Louisiana.

Will the court reporter please swear in the witness.

==WALTER GUILLOT, having been first duly sworn, testified as follows:==
==EXAMINATION BY MR. CUNNINGHAM:==
==Q.   State your name, please.==
==A.   Walter Guillot.==
Q.   Mr. Guillot, on April the 20th of 2010, what was BP's standard published written procedure for conducting a negative

Page 12

test?
A.   BP doesn't have one.
Q.   On April the 20th of 2010, what was BP's standard published written procedure for interpreting a negative test?
A.   There isn't one.
Q.   Now, as I understand the term "negative pressure test" means zero pressure, no pressure.  Is that what the negative stands for?
A.   The purpose of the negative test is to -- you're going to reduce the hydrostatic pressure of the well, yes, sir.
Q.   So the word "negative" and the term "negative pressure test" means no pressure, zero pressure, right?
A.   Yeah.  I guess -- yes.
Q.   And if it's not zero, that's a problem, isn't it?
MR. COLLIER:
Objection to form.
A.   It depends on what the -- what the situation is.
Q.   Well, is there -- if you're conducting a negative test and you're

3 (Pages 9 to 12)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029       Board-Certified Court Reporters    Facsimile:(504) 525-9109

Case 2:10-md-02179-CJB-DPC   Document 8882-2   Filed 03/12/13   Page 3 of 9

IN RE: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO April 20, 2010                                   Reported by:
**WALTER GUILLOT**        **February 8, 2011**        **THU BUI, CCR, RPR**

Page 21

1  room to take your final exam and you asked
2  the professor what the criteria was for a
3  pass/fail, and he said, I don't know; what
4  would you think?
5      MR. COLLIER:
6          Objection to form.
7      A.  I really wouldn't know what to
8  think if a professor told me that.
9      Q.  You'd think he was nuts,
10 wouldn't you?
11     A.  No. No.
12     Q.  And BP has a test, the results
13 of which can mean life or death to people
14 on the rig, and they have no criteria at
15 all in writing anywhere for a pass or fail;
16 is that right?
17     MR. COLLIER:
18         Objection to form.
19     A.  I don't know if there's one, no.
20     Q.  Well, you know there isn't one,
21 don't you?
22     A.  I've never seen one.
23     Q.  And you looked, didn't you?
24     A.  Yes, I did.
25     Q.  You are a well site leader,

Page 22

1  correct?
2      A.  Yes, sir.
3      Q.  You're the company man on the
4  rig, right?
5      A.  Yes.
6      Q.  And you've been in the Gulf of
7  Mexico as a well site leader, haven't you?
8      A.  Yes, I have.
9      Q.  You're now in Alaska, correct?
10     A.  Yes.
11     Q.  You're the top BP authority on
12 the rig, aren't you?
13     A.  When we're drilling, yes.
14     Q.  Okay.  And as a well site
15 leader, you comply with the safety policies
16 and practices of BP, don't you?
17     A.  Yes, I do.
18     Q.  You don't write them but you
19 comply with them, right?
20     A.  Right.
21     Q.  If there is a standard written
22 procedure for conducting and interpreting a
23 negative test that existed, you would
24 follow that, wouldn't you?
25     MR. COLLIER:

Page 23

1          Objection to form.
2      A.  I would -- once again, speaking
3  for me and myself.  If there was a written
4  procedure, I'd follow -- I'll look at the
5  procedure, but rig specific has to come
6  into play into too.
7      Q.  Sure.  But as a general rule, as
8  a well site leader, you follow BP's
9  policies and procedures, don't you?
10     A.  Yes, I do.
11     MR. COLLIER:
12         Objection to form.
13     Q.  And if they had a policy and
14 procedure, a standard written established
15 policy and procedure for a negative test,
16 you would make it a practice to follow
17 that, wouldn't you?
18     MR. COLLIER:
19         Objection to form.
20     A.  It would be part of my procedure
21 for putting together a negative test.
22     Q.  Okay.  And every well site
23 leader at BP would be expected to do the
24 same thing, wouldn't they?
25     MR. COLLIER:

Page 24

1          Objection to form.
2      A.  I can't answer for every other
3  well site leader for BP.
4      Q.  So you think BP has rules and
5  regulations that -- that some well site
6  leaders follow and some don't?
7      A.  I don't know.
8      Q.  Given the fact that we've agreed
9  that it's a safety critical test, wouldn't
10 you expect a competent, qualified BP well
11 site leader to follow the procedures and
12 standards set forth by BP to do the test?
13     MR. COLLIER:
14         Objection to form.
15     A.  I can only answer for what I
16 would do.
17     Q.  You would, right?
18     A.  I would.
19     Q.  All right.  And you know that
20 Mr. Vidrine and Mr. Kaluza were the well
21 site leaders on the Deepwater Horizon on
22 April 20th, 2010, right?
23     A.  Yes, sir, I do.
24     Q.  And you know they were charged
25 with supervising the negative test,

6 (Pages 21 to 24)

Case 2:10-md-02179-CJB-DPC   Document 8882-2   Filed 03/12/13   Page 4 of 9

IN RE: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO April 20, 2010
WALTER GUILLOT    February 8, 2011    Reported by: THU BUI, CCR, RPR

Page 41

1  Q.  'Cause that would be inviting
2  disaster, wouldn't it?
3      MR. COLLIER:
4         Objection to form.
5  A.  Could be.
6  Q.  Not could be.  Would be,
7  wouldn't it?  It would be inviting disaster
8  to displace mud with seawater after a
9  failed negative test?
10 A.  Could be.
11 Q.  So you won't say it would be?
12 A.  No, sir, I won't.
13 Q.  Now, when you joined the
14 investigation of this disaster, you were
15 unaware that there were no written
16 standards and procedures for the negative
17 test, weren't you?
18 A.  It's true.
19 Q.  You thought there had to be some
20 somewhere, didn't you?
21 A.  I went looking for them.
22 Q.  You went looking for them.  The
23 reason you went looking for them is because
24 you thought there had to be some somewhere,
25 didn't you?

Page 42

1  A.  I was asked to look.
2  Q.  I'll show you an exhibit I'm
3  marking as 92.  Would you look that over,
4  please.
5      (Exhibit Number 92 marked.)
6  Q.  You've seen that before, haven't
7  you?
8  A.  Yes, sir.  I wrote it.
9  Q.  You wrote it and Mr. Jim Cowie
10 wrote part of it, too, didn't he?
11 A.  Yes, he did.  He asked me to
12 gather some information for him.
13 Q.  All right.  And the subject is
14 negative testing, right?
15 A.  Right.
16 Q.  When did you first get involved
17 in the investigation?
18 A.  Early May, when they called me.
19 Q.  Early May?
20 A.  Yeah.
21 Q.  Do you remember how early in
22 May?
23 A.  Probably the first, around
24 there.  I really don't know for sure.
25 Q.  And this is the 14th of May,

Page 43

1  correct?
2  A.  Yes.
3  Q.  And if you look at the bottom of
4  this exhibit, it's an e-mail from Mr. Cowie
5  to you related to negative testing,
6  correct?
7  A.  Yeah.
8  Q.  And he asked you two
9  questions -- or he asked you to do two
10 things, right?
11 A.  Uh-huh.  Yes, sir.
12 Q.  First, he says, Determine if we
13 have a negative testing procedure or design
14 standard contained within any of our
15 policy, procedure, or ETP documents.
16     ETP is engineering
17 technical practices, right?
18 A.  Yes, it is.
19 Q.  Or anywhere else you think it
20 may be.
21     That's the first thing he
22 asked you to do, correct?
23 A.  Yeah.
24 Q.  The second thing he asked you to
25 do is list what reports the Transocean

Page 44

1  offshore team sent in on a daily basis,
2  right?
3  A.  Yes.
4  Q.  And within 24 hours, we see your
5  response right above, correct?
6  A.  Yes.
7  Q.  And you answered Question 2,
8  didn't you?
9  A.  Right.
10 Q.  You gave him the list?
11 A.  Yes.
12 Q.  But you didn't answer
13 Question 1, did you?
14 A.  Couldn't.
15 Q.  And -- well, at that point in
16 time, you thought there had to be some
17 somewhere, didn't you?
18 A.  Yeah.  I really didn't know.
19 Q.  You knew that you didn't know
20 there were no standards.  Can we agree to
21 that?
22     MR. COLLIER:
23         Objection to form.
24 A.  Yes, we can agree to that.
25 Q.  Yeah.  Because if you had, when

11 (Pages 41 to 44)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029   Board-Certified Court Reporters    Facsimile: (504) 525-9109

IN RE: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO April 20, 2010
**WALTER GUILLOT**   February 8, 2011   Reported by: THU BUI, CCR, RPR

Page 45

1  you sent the e-mail back the next day, you
2  would have said, there aren't any written
3  standards related to the negative test, and
4  then you would answer Question 2, right?
5       A.   Yes.
6       Q.   You thought there had to be
7  some, didn't you?
8            MR. COLLIER:
9                Objection to form.
10      A.   I wasn't sure but I thought
11 there was some somewhere.
12      Q.   You figured there was some
13 somewhere, and that was a reasonable thing
14 to figure since we're talking about a
15 safety critical test, right?
16           MR. COLLIER:
17               Objection to form.
18      A.   Talking about a critical test,
19 yes.
20      Q.   Yeah.  So you started looking.
21 And how long did you look?
22      A.   A couple of days.
23      Q.   Couldn't find any though, right?
24      A.   No, sir.
25      Q.   You looked in the drilling and

Page 46

1  welling -- drilling and well operation
2  procedure manual?
3       A.   Drilling and wells, well
4  control, ETPs.
5       Q.   All the logical places you would
6  look for that procedure, correct?
7       A.   Yes, sir.
8       Q.   And you couldn't find any?
9       A.   No, sir.
10      Q.   And there's no e-mail where you
11 responded to Mr. Cowie, is there?
12      A.   No, there's not.
13      Q.   But you responded to him, didn't
14 you?
15      A.   I talked to him.
16      Q.   And what did you tell him when
17 you talked to him?
18      A.   I couldn't find anything.
19      Q.   Did he say, well, you got to be
20 wrong, Walter.  Go keep looking?
21      A.   No.
22      Q.   Did you tell him, you ain't
23 going to believe this, but I can't find
24 any?
25           MR. COLLIER:

Page 47

1                Objection to form.
2       A.   No.  I just -- I just told him I
3  couldn't find anything for the negative
4  test procedures.
5       Q.   What did he say?
6       A.   He asked me if I was sure.  I
7  said, yeah.  I believe we went back and
8  looked some more.
9       Q.   He asked you if you were sure
10 and then told you to go back to look some
11 more to be sure you were sure?
12      A.   No.  He asked me if I was sure,
13 and I said yeah, and I went back to look
14 some more.
15      Q.   He couldn't believe it, could
16 he?
17           MR. COLLIER:
18               Objection to form.
19      A.   I don't know what he was
20 thinking.
21      Q.   Did you start asking around and
22 consult other people?
23      A.   No, I didn't.
24      Q.   You didn't ask anybody else to
25 look or help you look?

Page 48

1       A.   No.
2       Q.   Is there a library you went to,
3  to look in?
4       A.   All our procedures are on the
5  Internet, on BP website.
6       Q.   So how long did you look before
7  you realize that you weren't going to find
8  it and just gave up?
9       A.   After I talked to Jim probably
10 three more days, on and off.
11      Q.   So a total of five days?
12      A.   Not solid but yes.
13      Q.   Both of you knew that was a big,
14 big problem, didn't you?
15           MR. COLLIER:
16               Objection to form.
17      A.   I found it kind of strange.  I
18 didn't know it was going to be a big
19 problem.
20      Q.   Excuse me?
21      A.   I found it kind of strange, but
22 I didn't know it was going to be a big
23 problem.
24      Q.   Found it kind of strange.
25 Right.

12 (Pages 45 to 48)

Case 2:10-md-02179-CJB-DPC   Document 8882-2   Filed 03/12/13   Page 6 of 9

IN RE: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO April 20, 2010
WALTER GUILLOT    February 8, 2011    Reported by: THU BUI, CCR, RPR

Page 89

```
 1  sir.
 2      Q.   The office, okay.
 3              (Exhibit Number 96 marked.)
 4      Q.   I'm handing you what I've marked
 5  as Exhibit 96.  Look at the second page, if
 6  you would.
 7              Do you know who John Guide
 8  is?
 9      A.   Yes, sir, I do.
10      Q.   Did you meet him and talk to him
11  during the course of this investigation?
12      A.   No, sir, I didn't.
13      Q.   How do you know him?
14      A.   He's been around BP for a long
15  time.  He's been in well site leader
16  meetings around the rigs.
17      Q.   All right.  At well site leader
18  meetings around the rigs?
19      A.   At well site leader meetings in
20  town, and he's been some on the rig.
21      Q.   All right.  And what is his
22  position; do you know?  Or what was it in
23  April of 2010?
24      A.   I think he was the drilling
25  superintendent over the Horizon.
```

Page 90

```
 1      Q.   Well, he was a wells team
 2  leader.  Is that the same as the drilling
 3  superintendent?
 4      A.   I think so.
 5      Q.   But he's onshore, right?
 6      A.   Yes, sir.
 7      Q.   And then he would have people
 8  above him or -- or at the same level as him
 9  that are drilling engineers?
10      A.   Yes, he would.
11      Q.   Okay.  All right.  I want you to
12  take a second and look at this e-mail from
13  John Guide, sent on April 17th, to David
14  Sims.
15              Do you know David Sims?
16      A.   I know the name.
17      Q.   If he is a drilling and
18  completion operational manager, he would be
19  Mr. Guide's boss, right?
20      A.   Yes, sir, he would.
21      Q.   Another executive in Houston,
22  correct?
23      A.   Yes, sir.
24      Q.   All right.  Take a minute and
25  look at this e-mail, then I want to ask you
```

Page 91

```
 1  some questions.
 2              Have you read it?
 3      A.   Yes, sir.
 4      Q.   All right.  The first sentence
 5  says, David, over the past four days -- and
 6  he's -- it's to David Sims -- there has
 7  been so many last minute changes to the
 8  operations that the well site leaders have
 9  finally come to their wits' end.
10              Do you see that?
11      A.   Yes, sir, I do.
12      Q.   Now, this is three days before
13  the blowout, isn't it?
14      A.   Yes, sir.
15      Q.   And the well site leader he's
16  talking about are Mr. Vidrine and
17  Mr. Kaluza, aren't they?
18              MR. COLLIER:
19                  Objection to form.
20      A.   I don't know who was out there
21  at that time, but yeah.
22      Q.   And the quote is, flying by the
23  seat of our pants.
24              Do you see that?
25      A.   Yes, sir, I do.
```

Page 92

```
 1      Q.   Do you know that deepwater
 2  drilling has been compared by Tony Hayward
 3  to traveling into outer space?
 4              MR. COLLIER:
 5                  Objection to form.
 6      A.   I've never heard of that, no.
 7      Q.   You've never heard of that?
 8      A.   No.
 9      Q.   Did you meet Captain Wetherbee
10  when you were on the investigative team?
11      A.   Yes, sir, I did.
12      Q.   The astronaut?
13      A.   Yes, sir, I did.
14      Q.   And do you know that he says
15  that, in fact, the pressures are even
16  greater, at deeper depths than in outer
17  space.
18              Did you know that?
19      A.   Well, yeah.
20      Q.   You knew that?
21      A.   Uh-huh.
22              What -- refer back to
23  pressure, 'cause I may be thinking of
24  something different.
25      Q.   Capital Wetherbee said the
```

23 (Pages 89 to 92)

601 Poydras Street, Suite 1720    GAUDET KAISER, L.L.C.    Telephone: (504) 525-9100
New Orleans, LA 70130-6029    Board-Certified Court Reporters    Facsimile:(504) 525-9109

IN RE: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO April 20, 2010
**WALTER GUILLOT**          February 8, 2011          Reported by: THU BUI, CCR, RPR

Page 93

```
 1   pressures were even greater at depths than
 2   they are in outer space?
 3           MR. COLLIER:
 4                Objection to form.
 5       A.  Pressure as far as?
 6       Q.  Pressure differentials.
 7       A.  Oh, okay.  Yeah.  That's what I
 8   was thinking.
 9       Q.  Okay.  And he goes onto state,
10   Moreover, we have made a special boat or
11   helicopter run every day.  Everybody wants
12   to do the right thing, but this huge level
13   of paranoia from engineering leadership --
14   and that's people on the beach, right?  In
15   town at the office, right?
16       A.  I guess so.
17       Q.  -- is driving chaos.
18           Do you see that?
19       A.  Yes, sir.
20       Q.  The operation is not -- this
21   operation is not Thunder Horse.  Brian has
22   called me numerous times.
23           That's Brian Morel.  Do you
24   know who Brian Morel is?
25           MR. COLLIER:
```

Page 94

```
 1                Objection to form.
 2       A.  No, sir, I don't.
 3       Q.  You've never met him?
 4       A.  I never met him.
 5       Q.  Did you talk to him during the
 6   investigation?
 7       A.  No, sir, I didn't.
 8       Q.  Do you know that he's a drilling
 9   engineer?
10       A.  I know what his title was.
11       Q.  Okay.  Brian has called me
12   numerous times trying to make sense of all
13   the insanity.  Last night's emergency
14   evolved around 30 barrels of cement spacer
15   behind the top plug and how it would affect
16   any bond logging.  (I do not agree with
17   putting the spacer above the plug to begin
18   with.)  This morning Brian called me and
19   asked my advice about exploring
20   opportunities both inside or outside the
21   company.
22           Do you see that?
23       A.  Yes, sir, I do.
24       Q.  In other words, the drilling
25   engineer is telling Mr. Guide, who is the
```

Page 95

```
 1   wells team leader, that he's thinking about
 2   quitting.
 3           Do you see that?
 4           MR. COLLIER:
 5                Objection to form.
 6       A.  I see it, but I'm not sure what
 7   it means, but.
 8       Q.  You know what that means, don't
 9   you, when he's looking for opportunities
10   outside -- inside and outside -- outside
11   the company means quitting, right?
12       A.  That could be.  I don't know
13   though.
14       Q.  Then he says, What is my
15   authority?  With the separation of
16   engineering and operations, I do not know
17   what I can and can't do.
18           And then the final
19   sentence, The operation is not going to
20   succeed if we continue in this manner.
21           Were you aware that three
22   days before the blowout that John Guide,
23   the wells team leader, told his boss that
24   the operation was not going to succeed if
25   it continued in that manner?
```

Page 96

```
 1       A.  I wasn't aware of it, no.
 2       Q.  And it didn't succeed, did it?
 3           MR. COLLIER:
 4                Objection to form.
 5       Q.  We all know that, don't we?
 6       A.  The end result.
 7       Q.  So he predicted it three days
 8   before and told his boss, didn't he?
 9           MR. COLLIER:
10                Objection to form.
11       A.  I don't know if he's predicting
12   the type of failure like we had, but there
13   were some issues going on, it sound likes.
14       Q.  Well, they weren't just out
15   there.  They were on the beach, too,
16   weren't they, when you got the drilling
17   engineer talking about quitting?
18           MR. COLLIER:
19                Objection to form.
20       Q.  That's a problem, isn't it?
21       A.  I don't know the circumstance
22   behind the whole thing, so.
23       Q.  Well, if you have the people
24   that you need to turn to when you want
25   advice back at the beach, talking about
```

24 (Pages 93 to 96)

Page 97

1  being in a level of paranoia, talking about
2  chaos and talking about insanity, those
3  aren't the kind of folks that you think
4  you're going to get sound advice from, are
5  they?
6        MR. COLLIER:
7           Objection to form.
8     A.  Once again, I wasn't part of
9  this -- it's just words on a page to me.
10    Q.  Just words on a page?
11    A.  Yes, sir. I wasn't part of this
12 conversation, so. I don't know what was
13 going on.
14    Q.  You don't have to be part of the
15 conversation to read the words and
16 understand them though, do you?
17       MR. COLLIER:
18          Objection to form.
19    A.  The context of it.
20    Q.  You can read words like
21 paranoia, chaos, insanity, and thinking
22 about quitting and know there's a problem
23 without being there, can't you?
24       MR. COLLIER:
25          Objection to form.

Page 98

1     A.  I'm not going to speculate on
2  it, no.
3     Q.  I'm not asking you to speculate.
4  I'm asking you whether or not, when you
5  read that they're at wits' end, flying by
6  the seat of their pants, huge level of
7  paranoia, driving chaos, and exploring
8  other job opportunities, you don't have to
9  speculate to know that's a problem, do you?
10       MR. COLLIER:
11          Objection to form.
12    A.  Once again, I wasn't part of
13 this, so.
14    Q.  I didn't ask if you were part of
15 it.
16       That's a problem when the
17 command center, when the leadership, when
18 the drilling engineers are in that state of
19 mind, isn't it?
20       MR. COLLIER:
21          Objection to form.
22    A.  I don't know.
23    Q.  Turn over to the next page.
24       This is Mr. Sims, the boss,
25 responding to Mr. Guide. And you can read

Page 99

1  this to yourself, and I'll ask you a couple
2  of questions.
3     Q.  You read it?
4     A.  Yes, sir.
5     Q.  And the first sentence of this
6  e-mail proves Mr. Guide's point when he
7  talked about insanity, doesn't it?
8        MR. COLLIER:
9           Objection to form.
10    Q.  You got -- you got a boss being
11 told that the operation isn't going to
12 succeed, being told it's in chaos, being
13 told they're flying by the seat of his
14 pants, and he says he's got to go to dance
15 practice. That proves -- proves
16 Mr. Guide's original point that there's
17 insanity around, doesn't it?
18       MR. COLLIER:
19          Objection to form.
20    A.  I don't know.
21    Q.  You don't know?
22    A.  No.
23    Q.  Do you see where it says in the
24 next paragraph, We need to remind him that
25 this is a great learning opportunity.

Page 100

1        Remind, remind the drilling
2  engineer -- Mr. Morel is who they're
3  talking about, right?
4     A.  Yes.
5     Q.  -- that this is a great learning
6  opportunity.
7        The drilling engineer for a
8  deepwater rig like the Macondo isn't
9  supposed to be engaged in OJT, is he?
10       MR. COLLIER:
11          Objection to form.
12    A.  I don't know what his role was
13 in the well, if he was lead or not, but,
14 yeah, he shouldn't be engaged in it.
15    Q.  He shouldn't be engaged in
16 learning on a deepwater drilling rig. He's
17 the guy that's supposed to know what to do,
18 isn't he?
19       MR. COLLIER:
20          Objection to form.
21    A.  Well, I got to admit. I've been
22 doing it for a long time. I learn
23 something new every day.
24    Q.  Right. But you don't
25 characterize your work as a great learning

25 (Pages 97 to 100)

601 Poydras Street, Suite 1720   GAUDET KAISER, L.L.C.        Telephone: (504) 525-9100
New Orleans, LA 70130-6029       Board-Certified Court Reporters   Facsimile:(504) 525-9109

Case 2:10-md-02179-CJB-DPC   Document 8882-2   Filed 03/12/13   Page 9 of 9

IN RE: OIL SPILL by the OIL RIG, DEEPWATER HORIZON in the GULF OF MEXICO April 20, 2010
WALTER GUILLOT    February 8, 2011    Reported by: THU BUI, CCR, RPR

Page 101

```
 1   opportunity, do you?
 2       A.   I think every learning is a
 3   great opportunity.
 4       Q.   Okay.  So just to be clear.  You
 5   agree that OJT on a well like this for the
 6   drilling engineer is less than desirable.
 7   You'll agree with that, wouldn't you?
 8       A.   Yes, sir.
 9            MR. COLLIER:
10                Objection to form.
11       Q.   Then he says, It will be over
12   soon and that the same issues -- or
13   worse -- exist anywhere else.
14            And the issues he's talking
15   about are insanity and chaos and flying by
16   the seat of the pants.  And he says those
17   same issues exist anywhere else.
18            Do you see that?
19       A.   I see it.
20       Q.   And do you know that BP is
21   taking the position that the Macondo was
22   just an aberration, that the blowout was
23   just an aberration?  But here you have the
24   boss onshore saying the same things are
25   occurring elsewhere, the same conditions
```

Page 102

```
 1   exist elsewhere?
 2            MR. COLLIER:
 3                Objection to form.
 4       A.   I see where he's saying it, but
 5   I don't...
 6       Q.   You don't want to be on a rig
 7   where those same conditions exist, do you?
 8            MR. COLLIER:
 9                Objection to form.
10       A.   For myself personally?
11       Q.   Yeah.
12       A.   On a rig like this, you just
13   shut operations down if you have to.
14       Q.   Exactly.  Exactly.
15       A.   That's what I would do.  I can't
16   speak for anybody else.
17       Q.   Exactly.
18            There is a rule that we've
19   heard about over and over at the Coast
20   Guard hearing.  Anybody can shut the job
21   down, can't they --
22       A.   That's right.
23       Q.   -- if they think it's unsafe?
24            That's from the rig worker
25   all the way up to the top, right?
```

Page 103

```
 1       A.   Right.
 2       Q.   And here you have bosses, you
 3   have John Guide and David Sims.  And
 4   instead of shutting the rig down, like he
 5   should have done, he says he's going to
 6   dance practice.
 7            MR. COLLIER:
 8                Objection to form.
 9       Q.   Isn't that what you see right
10   here?
11       A.   That's what it says.
12            MR. COLLIER:
13                Objection to form.
14       Q.   He should have shut the rig down
15   until they straighten this mess out,
16   shouldn't he?
17            MR. COLLIER:
18                Objection to form.
19       Q.   Shouldn't he?
20       A.   If John had these concerns,
21   which I -- I don't know the full statement
22   of it, but probably so.
23            (Exhibit Number 97 marked.)
24       Q.   Let me show you what I've marked
25   as Exhibit 97.  This is an e-mail.
```

Page 104

```
 1            Have you seen this before?
 2       A.   No, sir, I haven't.
 3       Q.   It is from Brian Morel and it's
 4   dated April the 20th.  And this is the
 5   Brian Morel drilling engineer from the site
 6   we just discussed, who authors the
 7   temporary abandonment procedure and the
 8   negative test procedure, right?  Do you see
 9   that?
10       A.   Yes, sir, I do.
11       Q.   It's the same guy?
12       A.   Uh-huh.
13       Q.   And if you look at four, that's
14   the sum and substance of what he has to say
15   about the negative test in this procedure,
16   isn't it?
17       A.   That's what it looks like.
18       Q.   Do a negative test.
19       A.   Yes, sir.
20       Q.   And although he didn't write it
21   here, it -- it is more than obvious to even
22   somebody who knows a little bit about
23   drilling, that if the negative test fails,
24   if the well fails the negative test, you
25   don't go to step five, correct?
```

26 (Pages 101 to 104)