IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to all actions. | * * * * * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., *et al.*, individually and on behalf of themselves and all others similarly situated,       Plaintiffs, v. BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,       Defendants. | * * * * * * * * * * * * * | Civil Action No. 12-970 SECTION J HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

**BP'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION
AGAINST THE CLAIMS ADMINISTRATOR AND SETTLEMENT PROGRAM
TO ENJOIN PAYMENTS AND AWARDS FOR BUSINESS ECONOMIC LOSS
CLAIMS BASED ON FICTITIOUS "LOSSES"**

Plaintiffs BP Exploration & Production Inc. and BP America Production Company (collectively, "BP") move this Court for a preliminary injunction against the January 15, 2013 policy decisions regarding business economic loss claims (the "BEL Policy Decisions") issued by the Claims Administrator of the Economic and Property Damages Settlement Agreement, and the issuance or payment by the Settlement Program of determinations for such claims where the

amount of the determination depends, in whole or in part, on the BEL Policy Decisions. In support of this motion, BP states as follows:

1. On January 15, 2013, at the urging of Class Counsel, the Claims Administrator for the Economic and Property Damages Settlement Agreement ("Settlement Agreement" or "Agreement") announced the BEL Policy Decisions which breach the Agreement's Business Economic Loss ("BEL") Framework.[1] The BEL Policy Decisions rewrite the Agreement's express terms, and contradict its purpose, plain text, and underlying principles by authorizing compensation awards for claimants seeking to recover for non-existent "losses." In particular, the Claims Administrator is failing to comply with the Agreement's requirement that variable profit be calculated by determining the monthly revenue earned by providing goods or services and subtracting the corresponding variable expenses incurred to generate that revenue. As a result of the Claims Administrator's BEL Policy Decisions, BP is already exposed to hundreds of millions of dollars in fictitious "losses" that were never contemplated by the Agreement. Although the ultimate exposure is at this time inestimable, it grows daily and could cost BP billions. Through the BEL Policy Decisions, the Claims Administrator has breached his obligation to faithfully implement and administer the Agreement according to its terms and consistent with its stated purpose. *See* Agreement, Ex. 4C; Sider Decl. (Ex. 14) ¶¶ 5, 10, 13, 18, 33, 35; Sider Supp. Decl. (Ex. 15) ¶¶ 18-29; Polinsky Decl. (Ex. 12) ¶¶ 22-35; Weil Decl. (Ex. 16) at 6:229-7:252.

---

[1] Unless otherwise defined, all capitalized terms have the definitions assigned to them in the Economic and Property Damages Settlement Agreement. *See* Rec. Doc. 6430-1. All "Rec. Doc." numbers refer to MDL 2179. All citations to exhibits refer to the exhibits attached to the Declaration Of Andrew T. Karron In Support Of BP's Motion For Preliminary Injunction.

2. To correct this erroneous implementation and breach of the Agreement, BP requested this Court's review of the Claims Administrator's BEL Policy Decisions pursuant to the terms of the Agreement. On March 5, 2013, however, the Court entered the Order on Review of Issue from Panel affirming the BEL Policy Decisions. Rec. Doc. 8812.

3. The BEL Policy Decisions rupture the basic bargain between BP and the Class. BP did not agree to pay what is already hundreds of millions of dollars, and potentially billions, to claimants with "losses" that do not exist in reality, but result solely from the Claims Administrator's rewriting of the Agreement. Instead, BP settled this matter for the purpose of compensating those with legitimate claims who were injured by the *Deepwater Horizon* oil spill. *See* Agreement, Ex. 4C; Agreement ¶¶ 1.3.1.2, 38.57; Rec. Doc. 8138 at 31, 60, 86, 87; Rec. Doc. 6266-2.

4. BP seeks to preserve the ability of the Courts to render an effective remedy. If the Settlement Program pays BEL claimants for non-existent losses, then BP will be unable to recover those payments from claimants even if BP ultimately prevails. *See Janvey v. Alguire*, 647 F.3d 585, 599-600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934)); *FSLIC v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987) (citing *Lynch Corp. v. Omaha Nat'l Bank*, 666 F.2d 1208, 1212 (8th Cir. 1981)); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 629 (2nd Cir. 1991).

5. Therefore, BP moves for a preliminary injunction against the Claims Administrator and Settlement Program to enjoin them from implementing the BEL Policy Decisions and from issuing or paying to claimants any determinations for BEL claims where the amount of the determination depends, in whole or in part, on the BEL Policy Decisions. In the

alternative, BP seeks to enjoin the Claims Administrator and Settlement Program from issuing or paying to claimants in the agriculture, construction, professional services, real estate, manufacturing, wholesale trade, and retail trade industries any determinations for BEL claims.[2] Although the BEL Policy Decisions create fictitious losses across broad swathes of BEL claimants, non-existent losses are most prevalent among these industries.  Sider Supp. Decl. (Ex. 15) ¶ 16.  Thus, to the extent that all determinations on claims affected by the BEL Policy Decisions cannot be enjoined, all determinations for claims in these specified industries should be enjoined instead.  BP requests that the preliminary injunction remain in effect pending conclusion of the claims administration process.

6. This Court has jurisdiction over both the Claims Administrator and the Settlement Program to enter BP's requested injunction.  As the Court explained in approving the Agreement, the "Settlement Program and Claims Administrator are subject to this Court's continuing and exclusive jurisdiction."  Rec. Doc. 8138 at 9.  Mr. Patrick Juneau was appointed by the Court to be Claims Administrator of the Settlement Program.  Rec. Doc. 6418 ¶ 23 (appointing Claims Administrator).  Moreover, under the Agreement as entered by the Court, the "Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, [and] serve as directed by the Court …"  Agreement ¶ 4.3.1.  The Claims Administrator is thus before the Court and acting under the Court's supervision as administrator of the Agreement.  Accordingly, this motion is directed toward Mr. Patrick Juneau in his official

---

[2] The specific industries are identified by North American Industry Classification System ("NAICS") codes. These codes are used by federal agencies for classifying business establishments and by the Settlement Program in classifying the business activity of BEL claimants.  BP's alternative requested relief would apply to all industries with NAICS codes starting with 11 (except 114111, 114112, 114119, and 114210), 23, 31 (except 311711 and 311712), 32, 33, 42 (except 424460), 44, 45, 53, or 54.  Sider Supp. Dec. (Ex. 15) ¶ 6 & App'x 2.

capacity as Claims Administrator of the Settlement Program.  Rec. Doc. 6418 ¶ 23; Rec. Doc. 8139 ¶ 4 (confirming the Claims Administrator's appointment).  Similarly, the Agreement provides that the "Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court."  Agreement ¶ 4.3.2

7. A preliminary injunction should be granted where a movant establishes "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey*, 647 F.3d at 595.  BP's request for a preliminary injunction satisfies each of these elements.

8. **The Merits:**  BP has a substantial likelihood of succeeding on the merits.  To obtain a preliminary injunction, "'[a]ll courts agree that [movant] must present a prima facie case but need not show that he is certain to win.'" *Janvey*, 647 F.3d at 596 (quoting Wright & Miller, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995)).  Where a movant raises "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation," that is sufficient. *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011); *see also Finlan v. City of Dallas*, 888 F. Supp. 779, 791 (N.D. Tex. 1995).

9. By choosing to issue the BEL Policy Decisions, the Claims Administrator has breached his obligations under the Agreement and rewritten its plain terms.  The BEL Policy Decisions breach the Claims Administrator's obligation to "faithfully implement and administer the Settlement, according to its terms and procedures …" Agreement ¶ 4.3.1.  The Claims

5

Administrator also signed a contract with BP in which he "agree[d] to undertake the responsibilities of Claims Administrator as set forth in: … a final settlement agreement among the parties … ." Undertaking of Patrick Juneau in Furtherance of Court Order Appointing Him Claims Administrator (Ex. 22) ¶ 1; *see also* Supplement and Amendment to Undertaking (Ex. 23). The "Settlement Program, under the supervision and direction of the Claims Administrator" also is breaching its obligation to "implement the terms of the Agreement." Agreement ¶ 4.3.10.

10.     *First*, the BEL Policy Decisions are contrary to the Agreement's express purpose, which is to compensate claimants for actual loss of income, earnings, or profits caused by the *Deepwater Horizon* oil spill, Agreement ¶¶ 1.3.1.2, 38.57 — not to award compensation for purely fictitious "losses" the claimant did not actually experience. Likewise, the declared purpose of the BEL Framework is to compensate eligible claimants "for any reduction in profit" between the 2010 period and the comparable months of a benchmark period. Agreement, Ex. 4C at 1. The Court's opinion approving the Agreement recognized that it was intended to compensate for actual losses suffered by class members. Rec. Doc. 8138 at 31, 60, 87-88. Notice to Class Members informed them that they could file claims *if* they had losses because of the *Deepwater Horizon* spill. Rec. Doc. 6266-2. *See, e.g.*, *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 175 (5th Cir. 1999); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 946 (5th Cir. 1981); *Makofsky v. Cunningham*, 576 F.2d 1223, 1230-31 (5th Cir. 1978).

11.     *Second*, the BEL Policy Decisions contradict and rewrite the plain language of the Agreement. The BEL Framework specifically uses and depends upon words such as "revenue," "expenses," "corresponding," "comparable," and "profit," all of which have established meanings in ordinary language and under basic principles of accounting and economics, and must be interpreted in light of the BEL Framework's purpose of compensating a "reduction in

profit." *Id.* The Claims Administrator's BEL Policy Decisions delete or rewrite each of these contract terms. *See* Agreement, Exs. 4A, 4C, 4D; Rec. Doc. 8138 at 10; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 461, 511 (Philip Babcock Gove, ed., 1976); THE OXFORD ENGLISH DICTIONARY 708, 1017 (1933); FASB, CONCEPTS STATEMENT NO. 6: ELEMENTS OF FINANCIAL STATEMENTS ¶¶ 78-79 (1985); FASB, ACCOUNTING STANDARDS CODIFICATION ("ASC") AT TOPIC 605 "REVENUE RECOGNITION," ASC 605-10-25-1; J.D. SPICELAND ET AL., INTERMEDIATE ACCOUNTING G-2 (7th ed. 2013); C.P. STICKNEY & PAUL R. BROWN, FINANCIAL REPORTING AND STATEMENT ANALYSIS, A STRATEGIC PERSPECTIVE 22 (4th ed. 1999); M.W. MAHER ET AL., MANAGERIAL ACCOUNTING 542, 579 (11th ed. 2012); R. WEIL ET AL., FINANCIAL ACCOUNTING: INTRODUCTION TO CONCEPTS, METHODS AND USES 772, 814 (14th ed. 2012); R. WEIL & M. MAHER, HANDBOOK OF COST MANAGEMENT 60, 112, 126 (2d ed. 2005); Weil. Decl. (Ex. 16) at 2:86-89, 4:129-131, 4:150-152, 4:160-5:162, 5:171-190, 6:217-7:259 & App'x D; Alexander Decl. (Ex. 1) ¶¶ 8-9, 13, 15; Dietrich Decl. (Ex. 2) ¶¶ 11-13, 16-17, 19, 21-25; Sider Decl. (Ex. 14) ¶¶ 5, 12; Sider Supp. Decl. (Ex. 15) ¶¶ 16 & n.6; Polinsky Decl. (Ex. 12) ¶¶ 6, 30; Fishkind Decl. (Ex. 5) ¶¶ 5-8, 11-14, 18-21; Henley Decl. (Ex. 8) ¶¶ 9-12; Richardson Decl. (Ex. 30) ¶¶ 10-18, 22; Sharp Decl. (Ex. 31) ¶¶ 1-3, 6, 9; Hall Supp. Decl. (Ex. 7) ¶ 4; Finch Supp. Decl. (Ex. 4) ¶ 7; Rose Decl. (Ex. 13) ¶ 6; Dec. 16 Class Counsel Memo (Ex. 17) at 1; *In re Deepwater Horizon*, No. 12-30230, slip op. at 8 (5th Cir. Mar. 1, 2013); *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009); *Texaco Exploration & Prod., Inc. v. AmClyde Eng'rd Prods. Co.*, 448 F.3d 760, 778 (5th Cir. 2006), *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006); *Young v. Merrill Lynch & Co.*, 658 F.3d 436, 448 (5th Cir. 2011) (per curiam); *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005); *Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1193 (11th Cir. 2001);

*Moorehead v. Dep't of Prof'l Regulation, Bd. of Psychological Exam'rs*, 550 So. 2d 521, 522 (Fla. Ct. App. 1989); *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1293 (10th Cir. 2005).

12.     *Third*, the BEL Framework's language incorporates basic principles of accounting and economics to achieve a rational purpose: paying for lost profits as measured by accurate statements of revenue and corresponding variable expenses. The BEL Policy Decisions contradict and impose on BP the irrational obligation of compensating for fictitious losses. The law does not permit this. *See* Rec. Doc. 8138 at 10; WILLIAM M. LANDES & RICHARD A. POSNER, THE ECONOMIC STRUCTURE OF TORT LAW 185-86 (1987); Polinsky Decl. (Ex. 12) ¶¶ 12-16; Sider Decl. (Ex. 14) ¶¶ 5, 24-28; Sider Supp. Decl. (Ex. 15) ¶¶ 4-14; Weil Decl. (Ex. 16) at 7:254-259; Dietrich Decl. (Ex. 2) ¶ 21; Finch Decl. (Ex. 3) ¶ 30; Oustalniol Decl. (Ex. 10) ¶ 39; Oustalniol Supp. Decl. (Ex. 11) ¶ 20; Hall Decl. (Ex. 6) ¶¶ 17-21; Hall Supp. Decl. (Ex. 7) ¶¶ 6-13; Sider Decl. (Ex. 14) ¶ 33; Alexander Decl. (Ex. 1) ¶¶ 30-31 & Ex. 4.; *see N. German Lloyd v. Guar. Trust Co. of N.Y.*, 244 U.S. 12, 24 (1917), *quoted by E. Air Lines, Inc v. McDonnell Douglas Corp.*, 532 F.2d 957, 996 (5th Cir. 1976) *and Gulf Shores Leasing Corp. v. Avis Rent-A-Car Sys., Inc.*, 441 F.2d 1385, 1390 n.5 (5th Cir. 1971).

13.     *Fourth*, the Claims Administrator's erroneous interpretation and misapplication of the BEL Framework systematically produces illogical and absurd compensation awards to BEL claimants, such as awarding millions to claimants who had record profits in 2010. Two-thirds of all BEL awards over $75,000 are based on flawed data. To date, over 1,200 awards have been made to claimants in the agriculture, construction, and professional services industries — where compensation for non-existent losses is pervasive — with a total value of over $400 million. Consider just four representative absurd awards:

- $21 million to a Zone B[3] rice mill in Louisiana (approximately 40 miles from the coast) even though in 2010 (the year of the spill) the rice mill earned more revenue than in 2007, 2008, or 2009;

- $9.7 million to a Zone D highway, street and bridge construction company in northern Alabama (almost 200 miles from the Gulf) that does no business in the Gulf region even though 2010 was its best year on record with variable profit exceeding its benchmark year variable profit by 21%;

- $3.7 million to a Zone C digital printing business in Alabama even though it had a banner year in 2010, earning 14% more profit in the post-spill period of 2010 than it did in the same period during the benchmark years; and

- $3.3 million to a Zone C law office located in central Louisiana, even though its profit in the year of the spill exceeded its benchmark period profits by 10%.

Sider Supp. Decl. (Ex. 15) ¶ 14 & App'x 3.

14. In sum, BP has a substantial likelihood of success on the merits, as a general rule of contracts is that they should not be interpreted to produce illogical and absurd results — which is precisely what the Claims Administrator's BEL Policy Decisions do. *See In re Liljeberg Enters., Inc.*, 304 F.3d 410, 442-43 (5th Cir. 2002); *S. Cent. Bell Tel. Co. v. Canal Place Ltd. P'ship*, 927 F.2d 867, 869 (5th Cir. 1991); *Publicker Chem. Corp. v. Belcher Oil Co.*, 792 F.2d 482, 487 (5th Cir. 1986); *Makofsky*, 576 F.2d at 1229-30; *Koch Bus. Holdings, LLC v. Amoco Pipeline Holding Co.*, 554 F.3d 1334, 1338 (11th Cir. 2009); 16 WILLISTON ON CONTRACTS § 49:14 (4th ed. 1993 & supp.).

15. **Irreparable Harm to BP:** BP will suffer irreparable injury unless this Court acts now to preserve the *status quo* concerning payments that have not yet been made and enters the requested preliminary injunction. Unless enjoined, the Claims Administrator and Settlement Program will imminently begin paying out compensation for BEL claims based on non-existent

---

[3] BEL claimants are categorized into four economic loss zones that "reasonably reflect the likelihood that a given class member suffered economic damage as a result of the spill," Rec. Doc. 8138 at 86, with those in Zone A being most likely to have experienced a spill-related loss and those in Zone D least likely.

and artificially created losses under the BEL Policy Decisions. While the ultimate amount at stake is at present inestimable, awards for fictitious losses already are hundreds of millions of dollars and could reach billions. *See* Sider Decl. (Ex. 11) ¶ 33; Sider Supp. Decl. (Ex. 29) ¶¶ 18-30.

16. This significant, impending harm will be irreparable to BP. The ultimate relief BP seeks is equitable in nature, and injunctive relief may issue to preserve final remedies that also are equitable. *See De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945); *In re Fredeman Litig.*, 843 F.2d 821, 825 (5th Cir. 1988); *Dixon*, 835 F.2d at 560-61. In addition, BP has no money damages remedy, much less an adequate one, because it cannot feasibly recover damages from the Settlement Program, the Claims Administrator, or individual claimants to whom the money is wrongfully paid. *See Deerfield*, 661 F.2d at 338; *see also Iowa Utils.*, 109 F.3d at 426; *Elman*, 949 F.2d at 629. Moreover, the monies that the Claims Administrator would pay to BEL claimants for non-existent "losses" constitute assets in dispute that would be dissipated if paid to BEL claimants, and injunctive relief is proper to preserve those assets. *See Janvey* 647 F.3d at 601; *Fredeman*, 843 F.2d at 827; *Dixon*, 835 F.2d at 561.

17. **Threatened Injury To BP Vastly Outweighs Any Risk of Comparative Harm To Others:** The threatened permanent injury to BP outweighs any harm that the injunction might cause to claimants. The Settlement Program will continue to pay the vast majority of claimants. In addition to many BEL claimants, claimants seeking settlement recovery under the seafood compensation fund or for individual economic loss, property damage, subsistence, vessels of opportunity, and vessel physical damage will continue to have their claims processed and, if legitimate, paid by the Settlement Program.

18. As for BEL claimants affected by the preliminary injunction, they will not be harmed because they have no legitimate interest in receiving payments for fictitious, non-existent losses. *See Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 Fed. App'x 184, 188-89 (3d Cir. 2012); *Franklin v. Laughlin*, No. SA-10-CV-1027 XR, 2011 WL 598489, at *27 (W.D. Tex. Jan. 13, 2011) (magistrate's report), *report and recommendation adopted by Franklin v. Laughlin*, No. SA-10-CV-1027 XR, 2011 WL 672328 (W.D. Tex. Feb. 15, 2011); *O'Connor v. Smith*, No. C-10-77, 2010 WL 4366914, at *7 (S.D. Tex. Oct. 28, 2010), *aff'd*, 427 Fed. App'x 359 (5th Cir. 2011). Likewise, the Claims Administrator and Settlement Program will not be injured by the injunction, as their duty is to comply with the terms of the Agreement, not pay out monies based upon fictitious losses.

19. Moreover, even if BP were not successful in correcting the BEL Policy Decisions, affected BEL claimants would then be paid promptly. Notably, in many class action settlements payments are not made until the settlement is approved by a final order that is no longer appealable. *See* Rec. Doc. 6418 at 31-32; Rec. Doc. 7110-4 ¶¶ 8-9. As order approving the Settlement is currently on appeal, any delay experienced by claimants is merely the same waiting that the typical class action member would experience. By contrast, if the injunction is denied and payments are made, BP has no way of recovering the monies wrongfully paid to BEL claimants if and when its position on how the Agreement must be interpreted is vindicated. *See Placid Oil Co. v. U.S. Dep't of Interior*, 491 F. Supp. 895, 907 (N.D. Tex. 1980).

20. **The Public Interest Supports An Injunction:** The interest of the public will best be served by entry of the requested preliminary injunction. There is no public interest in compensating businesses for non-existent injuries. *See Bancroft Life*, 456 Fed. App'x at 188-89; *Franklin*, 2011 WL 598489, at *27; *O'Connor*, 2010 WL 4366914, at *7. Nor is there any

public interest in treating claimants with the same economic losses differently, as the BEL Policy Decisions do. By contrast, there is a strong public interest in having class settlements administered according to their terms and consistent with their objectives, and in ensuring that funds remain available so that the Courts can grant effective relief if they agree with BP that the plain meaning of the Agreement compels rejection of the BEL Policy Decisions.

WHEREFORE, for the reasons set forth above, and elaborated on more fully in BP's supporting Memorandum, declarations and other exhibits, and considering such other arguments and evidence as may properly come before the Court, BP respectfully requests that the Court enter an order enjoining the Claims Administrator and Settlement Program from implementing the BEL Policy Decisions and from issuing or paying to claimants any determinations for BEL claims where the amount of the determination depends, in whole or in part, on the BEL Policy Decisions. In the alternative, BP seeks to enjoin the Claims Administrator and Settlement Program from issuing or paying to claimants in the agriculture, construction, professional services, real estate, manufacturing, wholesale trade, and retail trade industries any determinations for BEL claims. BP requests that the preliminary injunction remain in effect pending conclusion of the claims administration process.

March 15, 2013                              Respectfully submitted,

                                                                                                                              */s/ Richard C. Godfrey, P.C.*

| | |
|---|---|
| James J. Neath | Richard C. Godfrey, P.C. |
| Mark Holstein | J. Andrew Langan, P.C. |
| BP AMERICA INC. | Wendy L. Bloom |
| 501 Westlake Park Boulevard | Andrew B. Bloomer, P.C. |
| Houston, TX  77079 | R. Chris Heck |
| Telephone:  (281) 366-2000 | KIRKLAND & ELLIS LLP |
| Telefax:  (312) 862-2200 | 300 North LaSalle Street |
| | Chicago, IL 60654 |
| Daniel A. Cantor | Telephone:  (312) 862-2000 |
| Andrew T. Karron | Telefax:  (312) 862-2200 |
| ARNOLD & PORTER LLP | |
| 555 Twelfth Street, NW | Jeffrey Bossert Clark |
| Washington, DC 20004 | Steven A. Myers |
| Telephone:  (202) 942-5000 | KIRKLAND & ELLIS LLP |
| Telefax:  (202) 942-5999 | 655 Fifteenth Street, N.W. |
| | Washington, D.C. 20005 |
| Jeffrey Lennard | Telephone:  (202) 879-5000 |
| Keith Moskowitz | Telefax:  (202) 879-5200 |
| SNR DENTON | |
| 233 South Wacker Drive | */s/ Don K. Haycraft* |
| Suite 7800 | S. Gene Fendler (Bar #05510) |
| Chicago, IL  60606 | Don K. Haycraft (Bar #14361) |
| Telephone:  (312) 876-8000 | R. Keith Jarrett (Bar #16984) |
| Telefax:  (312) 876-7934 | LISKOW & LEWIS |
| | 701 Poydras Street, Suite 5000 |
| *OF COUNSEL* | New Orleans, Louisiana 70139 |
| | Telephone:  (504) 581-7979 |
| | Telefax:  (504) 556-4108 |
| | |
| | Robert C. "Mike" Brock |
| | COVINGTON & BURLING LLP |
| | 1201 Pennsylvania Avenue, NW |
| | Washington, DC 20004 |
| | Telephone:  (202) 662-5985 |
| | Telefax:  (202) 662-6291 |

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY***

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of March 2013.

                                                      /s/ Don K. Haycraft
                                                      Don K. Haycraft