# Exhibit 10

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | * | |
| GULF OF MEXICO, on | * | |
| APRIL 20, 2010 | * | SECTION J |
| | * | |
| | * | |
| | * | JUDGE BARBIER |
| | * | MAG. JUDGE SHUSHAN |

**********************************************

## DECLARATION OF XAVIER OUSTALNIOL

### I.     Qualifications & Scope of Services

1.  I am a Managing Director with Alvarez & Marsal and head of the San Francisco Global Forensic and Dispute Services practice.  I am a Certified Public Accountant ("CPA") in California and New York. I am also Certified in Financial Forensics by the American Institute of Certified Public Accountants. I have provided auditing, forensic accounting and litigation consulting services to companies and individuals for more than 20 years.  Appendix A contains a more complete statement of my background and qualifications.

2.  I have been asked by BP to address accounting and economic issues raised by Class Counsel's proposed implementation and interpretation of the Business Economic Loss ("BEL") framework in the Economic and Property Damages Settlement Agreement, specifically in regard to claims submitted by professional services firms to the Court Supervised Settlement Program (the "Settlement Program").  I was involved in developing the approaches for matching monthly revenue to corresponding expenses for professional services firms proposed in Tab 1 of the BP Response to Class Counsel's December 16, 2012 Request for Policy Determination.   I also was involved in developing the triggers to determine when additional review is needed to ensure proper matching of revenue to corresponding expenses that BP proposed in a supplemental submission to the Claims

Administrator.   In reaching my opinions, I relied on my CPA experience, including my familiarity with accounting for professional services firms.  Appendix B lists the documents I relied on.

## II.     Opinions

3.  I conclude that Class Counsel's proposed implementation and interpretation of the BEL framework, as it relates to the use of financial records provided by professional services firms, results in an economically unreasonable and unreliable measurement of the financial performance of such claimants, often leading to overstated BEL compensation to professional services firm claimants.

4.  The financial statements (reporting historical monthly revenues and expenses) provided by professional services firms to the Settlement Program typically are prepared under a non-accrual basis of accounting and do not provide a reliable basis for comparing a firm's financial performance at different points in time because (1) revenues are recognized when cash is collected as opposed to earned; and (2) the timing of the use of resources (expenses) and benefits derived from the use of such resources (revenues) are not properly matched in any given time period.  The accounting literature provides ample support for this view.

5.  Class Counsel's proposed implementation and interpretation of the Settlement Agreement, including reliance on cash-based financial statements for many claims, fails to address these issues and distorts compensation determinations under the BEL framework.   Failure to recognize revenues when earned also affects evaluation under the revenue pattern tests of the BEL framework, potentially leading to compensation being paid to firms that would not pass the revenue pattern tests if revenues were recognized correctly.

6.  The relevant financial data needed to align revenue with corresponding expenses should be available and easily accessible to professional services firm claimants.  The proper data has to be used when implementing the BEL framework to reliably assess changes in the financial performance of a professional services firm.   BP has proposed metrics that can be used to identify whether financial data from professional services firm claims will require further scrutiny and has suggested a simple and workable multi-step approach that will remedy

problems resulting from Class Counsel's approach.   BP's proposals will result in an economically reasonable identification of when revenue was earned by professional services firms and an economically reasonable matching of revenue to the corresponding variable costs.

## III.    Overview of Professional Services Firms

7. The term "professional services firms" generally refers to firms with a high knowledge professional work force (human capital) and low capital intensity and that often bill their clients based on output as measured in terms of hours, hourly fees, and defined-scope projects. Professional services firms including, among others, accounting firms, architectural firms, engineering firms, human resources firms, consulting firms (in various fields), appraisal firms, actuarial firms, and advertising agencies.

8. Frequently, the earnings cycle of professional services firms depends on the duration of projects, which may span months or sometimes years.  Payment may be made on a variety of schedules, including upfront, in milestones, on a monthly basis, or at the end of a project, and will include a profit margin built into the price of the services. The expenses incurred involve mostly the cost of the work force (or subcontractors) and office space costs.

9. In the case of accounting firms, for example, the timing of revenues and expenses depends on the level of diversification. If the firm performs audits, it may have periods of intense work after a client's books are closed. Accounting firms that provide tax services will observe spikes in activity around tax filing deadlines.  Likewise, human resources firms may incur expenses to place candidates and receive a one-time payment when the candidate is placed, often only after many months of effort.

10. For law firms, the timing of when payment is received is highly dependent on the nature of the work performed. For example, law practices specializing in mergers and acquisitions may receive fees based on the closing of a deal or have an agreement to get paid on busted deals worked for a private equity firm once a new deal goes through; bankruptcy law practices may be subject to holdbacks on their fees that get released at the will of the court or success fees

paid once a plan is filed; and other law firms may receive contingent fees based on settlements or the outcome of a case.

11. In each of these cases, the timing of when payment is received is not closely tied to when the effort is expended in generating that revenue.

12. On the expense side, some professional services firms have expense items reported in one period that may be incurred in other accounting periods, or multiple periods. For example, professional service firms pay bonuses at year-end which are only recorded when paid even if they are based on the number of hours worked throughout the year. In addition, items such as expert fees, which are typically passed through to clients, may appear as large revenues and expenses, although these items may not be reported in the same accounting period.

13. For these reasons, when professional services firms maintain their books and records on a cash basis or modified cash basis of accounting, they will not reflect revenues when they were earned, or properly associate the corresponding expenses with those revenues. Consequently, the portrayal of the monthly financial performance will be inaccurate.

14. In order to evaluate such performance with financial statements prepared under a cash or modified cash basis of accounting, the information needs to be evaluated so as to synchronize the revenues earned with the corresponding expenses incurred. In my experience as an auditor and accountant, I have observed that lenders to law firms receive reports of the inventory of hours in work-in-progress as well as receivables, which typically collateralize part of their loans or lines of credit, because they know that these fees have been earned, even though the financial statements in any given month do not reflect this value until the cash comes in.

15. Similarly, in order to properly implement the BEL framework, which requires a comparison of a firm's monthly variable profits and revenue before and after the spill, a firm's actual historical financial performance in the relevant time periods must be assessed. In contrast, the approach of Class Counsel would capture variances caused by the timing of recognition of cash receipts and disbursements leading to an economically unreasonable and unreliable assessment of such financial performance.

**IV.** **Financial Statements Using Modified Cash Basis of Accounting Do Not Accurately Reflect a Firm's Financial Performance Over Limited Reporting Periods**

16. Evaluating changes in a firm's financial performance over a given time period, as called for in the BEL framework, requires properly identifying the period(s) in which revenue is earned and matching the corresponding costs incurred to generate such revenue in the same period. As a general matter, these requirements will not be met by simply considering modified cash basis of accounting[1] financial statements. Cash basis financial statements are maintained for purposes of monitoring a firm's current cash position or facilitating tax reporting, but not for measuring financial performance.

**A. Professional Services Firms Typically Use Modified Cash Basis of Accounting Financial Statements**

17. Most professional services firms maintain their books and records and present their financial statements under a modified cash basis of accounting. My review of the Claimants' profit and loss ("P&L") statements indicated that most of them were prepared using such a basis of accounting. (See discussion in Section V). Non-accrual bases of accounting are referred to in the auditing standards as "other comprehensive basis of accounting" ("OCBOA").[2]

18. It is broadly recognized by the accounting literature and accounting professionals that one of the pillars of reliable financial reporting is the "matching" concept, which requires that events and transactions be recorded and presented (or recognized) in such a way that revenues earned and the related[3] expenses incurred, are recorded in the same period. In fact, PriceWaterhouseCoopers ("PwC"), which publishes a "Law Firm Accounting and Financial Management" manual, states that:

---

[1] For simplicity I use cash basis and modified cash basis interchangeably, because it does not change my conclusions whether professional service firms prepare their financials under one cash-based method of accounting or the other.
[2] Accounting Review (AR) Section 60 defines OCBOA as: "A definite set of criteria, other than accounting principles generally accepted in the United States of America or International Financial Reporting Standards (IFRSs), having substantial support underlying the preparation of financial statements prepared pursuant to that basis." See AR Section 60 (Used in the Statements on Standards for Accounting & Review Services (SSARS) & issued by the Accounting & Review Services Committee (ARSC)), Framework for Performing and Reporting on Compilation and Review Engagements, P. 2593. SSARS are codified as AR followed by a section number. Auditing Standards are codified as AU followed by a section number.
[3] The accounting literature uses "corresponding" or "related" to describe how revenues are matched to expenses.

"…a few firms, for various reasons, prepare their financial statements on the accrual basis because it presents a more realistic (and economic) picture of the firm for the reporting period. GAAP concepts are predicated on the accrual basis of accounting. Accrual accounting recognizes revenue and the related assets when earned rather than when received and recognizes expenses when the obligation is incurred rather than when paid."[4]

19. Although OCBOA serves a variety of purposes, it does not attempt to match revenues to corresponding expenses in the same reporting period. In fact, PwC noted that the OCBOA generally used by law firms distorts the measurement of their operating results:

"…*cash basis accounting* may produce acceptable financial information over the life cycle of a business; however, it *tends to distort a firm's operating results when they are reported on an annual or other periodic basis...*"[5] [Emphasis added]

and,

"While the modified cash basis of accounting more closely parallels a partnership's reporting for income tax purposes, the accrual basis of accounting usually provides a better reflection of a law firm's financial status. This is because, during a single accounting period, the *accrual basis*: (1) *achieves a better matching of revenue with related costs*, and (2) *provides for a more comprehensive inclusion of all assets and liabilities relevant in determining the partners' or shareholders' equity in the firm*."[6] [Emphasis added]

20. Evaluating a claimant firm's variable profit requires data reflecting reliable historical financial performance. The BEL framework recognizes this fact when it defines a Benchmark Period as a baseline for "measuring [the Claimants'] historical financial performance."[7]

### B. The Concepts of the Matching Principle and the Objective of Comparability in the Accounting Literature

21. As explained, OCBOA methods yield financial statements that do not, standing alone, permit an economically reasonable evaluation of a firm's financial performance. The financial statements may not be comparable from year to year but are even less likely to provide a

---

[4] See Law Firm Accounting and Financial Management, Fifth Edition, 2012. *1.04 Accrual Basis vs. Cash Basis*. P. 1-5.
[5] See *Id*. at *2.01 Modified Cash basis of Accounting for Law Firms*. P. 2-1.
[6] See *Id*. at *3.01 Accrual Basis Accounting for Law Firms*, P. 3-1.
[7] See Exhibit 4C to the Settlement Agreement "Compensation Framework for Business Economic Loss Claims."

reliable basis for analysis over shorter periods of time (months or quarters). The accounting literature is unambiguous about these conclusions. The Financial Accounting Standards Board ("FASB") has issued Statements of Financial Accounting Concepts ("FASCON"), to provide the framework for accounting pronouncements and Generally Accepted Accounting Principles ("GAAP") and introduce basic accounting concepts. This is where relevant accounting literature describes critical information about the concepts that lead to the preparation and presentation of reliable and meaningful financial statements. (I discuss the literature further in Appendix C.)

22. Simply put, the concept of matching revenues and corresponding expenses is required if one is to achieve comparability not only between enterprises, but also for the same entity from period to period. Professional services firm claimants' P&L statements that do not do so typically do not meet this objective.

## V.    Overview of the Business Economic Loss Framework

23. Using financial statements prepared by professional services firms using OCBOA methods without taking the additional step to match revenues with corresponding expenses will produce economically unreasonable results when implementing the Settlement Agreement's methodology.

### A.  BEL Compensation Calculation

24. Pursuant to Exhibit 4C, the BEL methodology used to calculate compensation compares "…actual profits of a business during a defined post-Spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-Spill period of 2010."[8] The calculation is performed in two steps. Step 1 reflects the reduction in Variable Profit between the Compensation Period selected by the Claimant in 2010 and the comparable months of the Benchmark Period. Step 2 is intended to "…compensate claimants for incremental profits or losses the claimant might have expected to generate in the absence of the Spill relative to the sales from the Benchmark Period."[9]

---

[8] See Exhibit 4C to the Settlement Agreement.
[9] Id.

### 1. Impact of the Timing of Recognition of Revenues and Expenses on the BEL Compensation Calculation

*a)*     *Step 1 Compensation*

25. Step 1 measures variable profit as the sum of monthly revenue over a period less corresponding variable expenses incurred to generate that revenue. However, if monthly revenues or variable expenses earned over the relevant period are not properly measured, then the resulting calculation will only reflect the timing of the recording of cash outflows and inflows rather than the firm's actual financial performance. As a result, variable profit may be overstated in a month when cash was collected and no corresponding expenses were paid; conversely, it may be understated for periods when expenses were recorded and no corresponding revenue was recognized because no cash payments were received. When revenues and expenses are not matched, the variable profit will not reflect the "actual profit" of the business or provide a reasonable economic measure of the Claimant's "historical financial performance."[10] This can lead to severely distorted results because under the BEL framework, claimants are entitled to be compensated based on the time period (of 3 months or more) which yields the greatest loss in variable profit for the claimant.

26. The example below illustrates how using financial statements prepared using the modified cash basis of accounting will create a distorted calculation of variable profit in the post-Spill period, unless such statements are analyzed to identify when revenues were earned and corresponding expenses incurred. The distortions that result from the failure to match revenues to the related expenses get amplified by the application of the RTP to the base compensation amount. [11]

---

[10] See Exhibit 4C to the Settlement Agreement at P.1.
[11] RTP is described at Par. 38.126 of the Settlement Agreement.

Original Data Provided - Revenue Collected in July 2009 and December 2010

|  | 2009 | | | 2010 | | | Lost Profit |  |
|---|---|---|---|---|---|---|---|---|
|  | Revenue | Var. Cost. | Var. Profit | Revenue | Var. Cost. | Var. Profit |  |  |
| Jan | $ - | $ 50 | $ (50) | $ - | $ 50 | $ (50) |  |  |
| Feb | - | 50 | (50) | - | 50 | (50) |  |  |
| Mar | - | 50 | (50) | - | 50 | (50) |  |  |
| Apr | - | 50 | (50) | - | 50 | (50) |  |  |
| May | - | 50 | (50) | - | 50 | (50) | - | Compensation Period |
| Jun | - | 50 | (50) | - | 50 | (50) | - |  |
| Jul | 1,800 | 50 | 1,750 | - | 50 | (50) | 1,800 |  |
| Aug | - | 50 | (50) | - | 50 | (50) | - |  |
| Sep | - | 50 | (50) | - | 50 | (50) | - |  |
| Oct | - | 50 | (50) | - | 50 | (50) | - |  |
| Nov | - | 50 | (50) | - | 50 | (50) | - |  |
| Dec | - | 50 | (50) | 2,250 | 50 | 2,200 | (2,250) |  |
| Total | $ 1,800 | $ 600 | $ 1,200 | $ 2,250 | $ 600 | $ 1,650 | $ (450) |  |

27. In the table above, the firm records $1,800 in revenue in July 2009 and $2,250 in December 2010. Each of these large entries are payments for work carried out over the prior 18 months. To assess financial performance as required by the BEL framework, the firm's revenue should be recorded as it is earned over an 18-month period with some of the December 2010 revenue recorded in earlier months of 2010 and 2009 (when it was earned) and some of the July 2009 revenue to be allocated to prior months. Due to the distortions in the recording of revenue and expenses, the data in the table would generate $1,800 in Step 1 Compensation, even though the firm actually generated larger revenue and variable profit in 2010 than 2009. If revenues were recorded when earned, the claimant would not receive any compensation. By properly matching revenue and corresponding expenses and removing these distortions, certain claimants should not receive any Step 1 Compensation.

    b)    *Step 2 Compensation*

28. Step 2 Compensation is "…intended to compensate claimants for the additional variable profits the claimant might have been expected to generate in 2010 in the absence of the Spill."[12] The methodology compares the revenue growth in January through April 2010 to the Benchmark Period. It is likely that when revenues are properly recognized when earned as opposed to when collected, some claimants would benefit from a greater Claimant-Specific Factor under Step 2 because the January through April 2010 revenues may be

---

[12] See Exhibit 4C to the Settlement Agreement at P.1.

greater than the revenues in the same period during the Benchmark Period. Appendix D provides an example along these lines.

### B. Revenue Pattern Tests of the Causation Requirements for BEL Claims

29. Defining revenue when cash is received, as occurs in monthly financials prepared using OCBOA methods rather than when revenue was earned, creates "false positives" in implementing the revenue pattern tests of the causation requirements for BEL claims.

30. The "V-Shaped Revenue Pattern," "Modified V-Shaped Revenue Pattern" and "Decline-Only Revenue Pattern" tests evaluate for claimants whether total revenues declined over a period of three consecutive months between May to December 2010 as compared to the Benchmark Period and, for two of the tests, whether revenues recovered subsequently. Therefore, it is critical that revenue be defined and measured appropriately as when it was earned rather than when it was collected in order to reflect the economic reality of the firm's historical financial performance.

31. For professional services firms with monthly P&Ls prepared under an OCBOA method, monthly revenues reported will be volatile (because they depend on the timing of collections, not on work performed to earn the revenues) from year to year and month to month. Timing of payment may be affected by any number of factors  as discussed in Section III, above. Thus, it is likely that, simply equating cash receipts with "revenue" will produce distorted results that yield a "false positive" indication that a claimant passes the V-shaped revenue pattern test, even where the claimant suffered no decline in actual financial performance.

### VI.    Review of Offers Made to Date Indicates that Class Counsel's Proposed BEL Interpretation Will Overcompensate Professional Services Claimants

32. My review of professional services firm claimants' files reveals that the use of cash-based financial data can result in compensation which is economically irrational and overcompensates such claimants. I describe two claimant offers below. Additional claimant offers are discussed in Appendix E.

**A.     Example of Claims That Result in Distorted Compensation**

33. Claimant No. ▮▮▮▮▮ is an advertising company that specializes in printing, producing and distributing custom inserts in ▮▮▮▮▮ (Zone C).[13] As shown in Chart A, revenue in May through December of 2010, actually increased by approximately $1.7 million (from $14,355,000 to $16,061,000) over the same period in 2009, the Benchmark Year, The claimant's May to December variable profit, measured using the firm's cash-based financial data as given, increased from $4,052,000 in 2009 to $4,617,000 in 2010, or more than 13%. This claimant was offered $2,926,000 which implies that claimant's variable profit from May to December 2010 would have been $7,543,000 or 1.9 times variable profits earned in the same period in the 2009 Benchmark Year.



CHART A: Claimant ID ▮▮▮▮▮
Benchmark Year: 2009 / Compensation Months:Jun-Aug

34. The distortion in the Settlement Program's offer is driven by differences in the timing of expenses payments in August of the compensation and benchmark years. The calculation of a multi-million dollar loss that did not in reality occur was caused by a $2.1 million one-time expense ("Spring Media Purchased Clients") recorded in August 2010 that was not offset against revenues when earned. This caused the variable profit margin in 2010 to drop to <u>negative</u> 6,725% in August whereas the annual variable profit margin was 32.46%.

---

[13] Per the claimant's website, its clients are located all over the country.

35. Claimant No. ▊▊▊ provides legal services in securities litigation, corporate governance and derivative litigation, consumer protection and shareholder mergers and acquisitions class actions. It is located in Zone B with its office in ▊▊▊▊ it also has an office in ▊▊▊▊ [14] As shown in Chart B, recorded revenue for the period May through December decreased from approximately $2,754,000 in 2009 (the benchmark year) to $1,067,000 in May through December of 2010. The claimant's May to December variable profit, measured using the firm's cash-based financial data, declined from approximately $1,999,000 in 2009 to $541,000 in 2010. The Settlement Program's base offer of $2,261,000 implies that the claimant's 2010 variable profit for May to December should have been $2,802,000.



**CHART B: Claimant ID ▊▊▊**
Benchmark Year: 2009 / Compensation Months: May-Oct

36. On its face, this result yields a highly distorted picture of the firm's expected financial performance in the absence of the spill. A variable profit of $2,802,000 for May to December 2010 not only would exceed the firm's variable profit in the same period in 2009 by 40%, but also would exceed the firm's revenue for May to December of the 2009.

37. The firm collected $1.6 million in October 2009, or 46.7% of its 2009 annual revenue, which skews the measurement of the compensation calculation because the cash was not matched to

the months in which it was earned to determine revenue in those months for use in computing Step 1. The firm did not have such large revenue collection in May to October 2010 but rather collected $5.3 million in January 2011 or 70% of its 2011 annual revenue. The January 2011 revenues were likely earned in prior periods (including May to October 2010) and should have been matched accordingly to compute Step 1 compensation. This would have substantially increased the firm's variable profit in May to October 2010 and reduced the offer amount.

38. These results indicate that use of the claimant's cash-based financial data without attempting to conform to the requirements of the BEL framework leads to an offer that greatly overstates the variable profit that the law firm might have expected to earn in the post-Spill period of 2010. The offer is driven by the timing of cash payments the firm received in May to October, as the months used for the compensation and benchmark periods.

### B.    Issues To Address in Computing BEL Compensation for Professional Services Firms

39. Based on the available P&L data in the Settlement Program workbooks I reviewed, it seems that all 34 professional service claimants used an OCBOA method. I explain the basis for my conclusion in Appendix E. When revenues and expenses are not matched as occurs with cash or modified cash basis accounting, the variable profit will not reflect the actual profit earned or provide a reasonable economic measure of the business.

40. The distortions created by OCBOA-based P&L's of professional services firms can be grouped in two categories:

- Timing: Revenues are reported when cash is received, and do not reflect the period in which revenue is earned. This has the effect of both overstating and understating the actual variable profit that was economically realized for at least some months of 2010 and of the benchmark period year(s).

- Classification: There are cost classification issues in the P&Ls. An amount may be presented in the proper period, but not properly categorized. For example, certain costs are improperly categorized as variable expenses, fixed costs or revenue because even though they have similar names, they are of a different nature for accounting purposes in professional service firms. Failing to address

these issues can result in a misstatement of actual revenues, variable expenses and variable profit. These costs include consulting costs (sometimes called expert fees), client reimbursements, litigation expenses, salaries & wages, and owners' compensation.

41. I discuss these timing and classification issues in further detail in Appendix F.

## VII.   Proper Implementation of BEL Formulas for Professional Services Firms

42. Because many professional services firms prepare their monthly P&Ls using OCBOA methods, the BEL formula will compensate for losses that did not occur and will artificially inflate losses due to timing of when expenses are made and cash received if interpreted and implemented as Class Counsel suggests.  BP's proposal to flag claims where the mismatch between revenue earned and expenses appears to be significant and to perform the BEL calculation to align revenues earned to corresponding variable expenses incurred to generate those revenues is simple and workable and will provide a reliable measure of a firm's financial performance and any loss it experienced in the post-spill period of 2010.

### A.   BP's Proposed Triggers or Thresholds

43. BP has proposed three indicators or thresholds that would trigger a further review of a claimant's financial data. I was involved in the development and selection of these indicators or triggers. Each is designed to capture unusual variances in revenues or expenses that reveal that the claimants' P&Ls are under a cash-based accounting method. When professional services firm claimants' financials are responsive to these triggers, the use of their financial statements as reported can result in distorted measures of BEL compensation or even affect the determination of causation.  In Appendix G, I discuss these triggers further and illustrate in a chart how the triggers will work effectively for professional services firms.

44. These triggers are applied easily on already available financial data and using calculations currently performed by the Claims Administrator.

### B.    BP's Proposed Process To Implement BEL Formulas

45. For claims that meet one or more of the triggers, the process for professional services firms provided in Tab 1 attached to BP's January 8, 2013 Response to Class Counsel's December 16, 2012 Request for Policy Determination, if implemented, will (i) identify when revenue was earned and (ii) match revenue earned to the corresponding expenses incurred.  I was involved in developing BP's proposed process.  It is simple and workable, and will provide economically reasonable and reliable measures of the financial performance of these claimants, including estimates of revenues earned by month.

46. Professional services firm claimants should have available additional contemporaneous information that would allow the Claims Administrator to match revenues and expenses.  In particular, additional information may be requested when the triggers above are met. In my experience, this type of information would be readily available to the large majority of professional services firms.

47. I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Xavier Oustalniol

Dated:  January 23, 2013

### *LIST OF APPENDICES*

**Appendix A:**   Curriculum Vitae of  Xavier Oustalniol

**Appendix B:**   Documents Relied Upon

**Appendix C:**   The Concepts of the Matching Principle and the Objective of
Comparability in the Accounting Literature

**Appendix D:**   Claimants may be better compensated under the Step 2 calculation

**Appendix E:**   Additional Examples of Claims That Result in Distorted Compensation

**Appendix F:**   Mismatch and Reclassification Issues

**Appendix G:**   BP's Proposed Triggers or Thresholds

**Appendix A**

**<u>Curriculum Vitae of Xavier Oustalniol</u>**





100 Pine Street, Suite 900
San Francisco, CA 94111
Tel: (415) 490-2297
Cell: (415) 488-3599

**Professional Certifications**

Certified Public Accountant (CA, NY)
Certified in Financial Forensics (CFF)
Certified Insolvency and Restructuring
Advisor (CIRA)

**Professional History**

Aon Consulting, San Francisco
(2/2005 – 4/2008)
 *Financial Advisory & Litigation
 Consulting Services*

Kroll Zolfo Cooper, San Francisco, Los
Angeles, New York
(9/2002 – 1/2005)
 *Forensic & Litigation Consulting
 Services*

Deloitte & Touche, New York
(10/1993 – 8/2002)
 *Dispute Consulting Services
 Audit and Assurance*

Deloitte & Touche, Paris
(9/1990 – 9/1993)
 *Audit Services*

**Professional Affiliations**

- American Institute of Certified Public
 Accountants
- Association of Insolvency and
 Restructuring Advisors

**Education**

Université Paris IX "Dauphine", Paris
-*"Maîtrise" in financial and accounting
 techniques (MSTCF), B.A /Masters*
 (1990)
-*Economic Sciences, Associate Degree
 (DEUG Sciences Economiques)*
 (1988)

**Language** French (Native)

## Xavier Oustalniol, CPA, CFF, CIRA

Managing Director – Global Forensic & Dispute Services

Xavier Oustalniol is a Managing Director with Alvarez & Marsal Global Forensic & Dispute Services in San Francisco. Mr. Oustalniol focuses on forensic accounting, fraud investigations, fraud prevention, due diligence and compliance assessments, and provides consulting services including securities litigation, damages analysis, international arbitrations, accountant malpractice, and purchase price disputes.

With more than 20 years of experience as an auditor, a forensic accountant and a litigation consultant, Mr. Oustalniol has worked with clients across a wide range of industries, including financial services such as professional services firms (including law firms), hedge funds, banks, insurance companies, investment companies, securities broker-dealers (online, retail, government bonds, primary and clearing), mortgage banks, aviation, real estate, technology, electronic components, telecom, broadcasting, leasing, consumer products, agricultural, manufacturing, transportation, energy, automotive, food, luxury apparel, and chemicals.

For a number of years Mr. Oustalniol audited the financial statements of professional services firms, including law firms, under various accounting principles such as other comprehensive bases of accounting other than US GAAP. He has performed M&A due diligence services and post-merger integration accounting audits for law firms, participated in peer-review of law firm audits and developed technical memos on auditing law firm revenues.

He has testified as an accounting expert on the application of Generally Accepted Accounting Principles and other financial issues at trial, deposition and in arbitration. He has authored expert reports and assisted with the preparation of experts for deposition and testimony. He also assisted counsel with deposition preparation of opposing experts and fact witnesses, and responses to Wells submissions.

He has assisted clients (debtors and creditors) in a number of bankruptcy related litigations (Enron, Lehman, Washington Mutual) and other accounting investigations including during settlement negotiations and mediation.

He has led and assisted with, complex forensic accounting investigations (where regulators such as SEC and DOJ were involved) and other cross-border disputes (before the ICSID, AAA, ICC) involving companies in France, Belgium, the United Kingdom, the Netherlands, the Slovak Republic, Mexico, Uruguay and Japan. He has also assisted companies with anti-corruption and compliance assessment and investigations (related to the FCPA or other similar regulations).

1

Xavier Oustalniol, CPA (CFF), CIRA

---

**Selected areas of experience**

- Antitrust
- Asset Diversion and Tracing
- Accountant Malpractice
- Bankruptcy Fraud and Litigation
- Breach of Contract Claims
- Corporate Veil / Alter Ego
- Economic Damages
- Expert Witness Testimony
- Financial Reporting (US and French GAAP)

- Fraud Investigations, FCPA/Fraud Prevention Assessments
- International / Domestic Arbitrations
- Investigation of Accounting Irregularities
- Purchase Price Disputes
- Shareholder Class Actions
- White Collar Crime / Criminal Allegations
- Wage and Hour

**Selected industry experience**

- Accounting/Auditing
- Aerospace/Aviation
- Agri-business
- Automotive
- Beverage
- Broker Dealers (Securities, Prime, Online Retail)
- Cable and TV Satellite
- Chemical
- Commodities Trading
- Computer Hardware and Software
- Consumer Goods
- Document Management
- Electronic Components
- Energy
- Financial Institutions/Banks
- Food Distribution
- Government Contracting

- Hedge Funds
- Hospitality
- Insurance (P&C/Title)
- Investment Management
- Jewelry (Retail)
- Manufacturing
- Medical Products and Devices
- Mining (Copper)
- Professional Services (Law Firms)
- Real Estate (REITS, hotels, brokerage, investments and other)
- Subprime Mortgage Financing
- Semi-Conductors
- Retail (clothing, luxury)
- Transportation( Maritime and Trucking)
- Telecommunications/Television
- Waste Management

Xavier Oustalniol, CPA (CFF), CIRA

**Expert Testimony Experience**

**Trial/Arbitration**

- In re: Vivendi Universal, S.A. Securities litigation (Case No. 02 Civ. 5571 (RJH/HBP)) – *November 2009 (Federal Court - Jury trial)*
- Livermore Auto Group v. Chrysler – *May 2010 (AAA Arbitration)*
- Southlake Dodge v. Chrysler – *June 2010 (AAA Arbitration*
- Larson Automotive Holdings v. Chrysler – *June 2010 [designated expert in attendance] (AAA Arbitration)*

**Deposition**

- In re: Vivendi Universal, S.A. Securities litigation (Case No. 02 Civ. 5571 (RJH/HBP)) – *March 2008 – Report Submitted*
- Liberty Media Corporation et al. v. Vivendi Universal, S.A. Jean-Marie Messier, Guillaume Hannezo, and Universal Studios, Inc. (Case No. 03 CV 2175 (RJH/HBP)) – *March 2008  – Report Submitted*

**Expert Designations**

- William G. Stewart and Nancy Stewart v. BAC Home Loans Servicing, LP (Case No. CV 3:10-cv-01225-SI) Northern District of California – *Report Submitted - 2012*
- In re: Alstom, S.A. Securities litigation (Case No. 03 CV 6595(VM)) –*Report Submitted - 2009*

**Publications**

- "Earnings Management: Without Borders" (Alvarez & Marsal Newsletter "Raising the Bar" – *September 2010)*
- "When the Bubble Pops, Fraud Rears its Ugly Head: How to Avoid Getting Caught in the Next Wave" (Alvarez & Marsal Newsletter "Raising the Bar" – *July 2009)*

**Recent Presentations**

- "How to Work with/against an Expert - an Expert Perspective" – (Reed Smith LLP – San Francisco – *November 5, 2012*)
- "Unifying Compliance, Audit and Risk and Eliminating Silos" – Panel Discussion (Governance, Risk &  Compliance Forums: Chicago - *September 2012* and Dallas - *October 2012*)
- "Leveraging Your Existing Compliance Program to Address Specific Anti-Corruption and AML Requirements" - (Governance, Risk &  Compliance Forums: Chicago - *September 2012* and Dallas - *October 2012*)
- "Fraud Risk Readiness in Financial Institutions – Designing a Risk Framework that Works and … Executing" (The Compliance Conversation: AML & Anti-Corruption Event: Thomson Reuters – San Francisco – *June 2012)*
- "What You Need to Know About FRCP 26 and the UK Bribery Act" (Nixon Peabody – San Francisco  – *May 2011)*

**Appendix B**
**Documents Relied Upon**

| No. | Description |
|-----|-------------|
| 1 | 2012-05-03 Amended Economic and Property Damages Settlement Agreement |
| 2 | 2012-12-21 Order and Reasons Granting Final Approval of the E&PD Settlement |
| 3 | Exhibit 1A - Map of Economic Loss Zones |
| 4 | Exhibit 02 - Tourism Definition |
| 5 | Exhibit 03 - Seafood Distribution Chain Definitions |
| 6 | Exhibit 04 - Henry Fishkind Declaration |
| 7 | Exhibit 4A - Documentation Requirements for Business Economic Loss Claims |
| 8 | Exhibit 4B - Causation Requirements for Business Economic Loss Claims |
| 9 | Exhibit 4C - Compensation Framework for Business Economic Loss Claims |
| 10 | Exhibit 4D - Attachment A - Compensation Framework for Business Economic Loss Claims |
| 11 | Exhibit 4E - Addendum to Compensation for Business Economic Loss Claims: Compensation for Spill-Related Cancellations |
| 12 | Exhibit 15 - RTP Chart (Risk Transfer Premium) |
| 13 | Law Firms Filing Claims with the CSSP |
| 14 | Business Economic Loss Claim Form |
| 15 | 2012-12-16 Memorandum to Request for Formal Policy Statement: Monthly Revenue |
| 16 | 2012-10-8 Revisions or Clarifications of Selected Policy Decisions Following the October 1, 2012 Panel Meeting |
| 17 | PTO13 Order Protecting Confidentiality |
| 18 | PTO38 Order Relating to Confidentiality of Settlement Communications |
| 19 | Settlement Discussion Confidentiality Agreement |
| 20 | Claim ID No. |
| 21 | Claim ID No. |
| 22 | Claim ID No. |
| 23 | Claim ID No. |
| 24 | Claim ID No. |
| 25 | Claim ID No. |
| 26 | Claim ID No. |
| 27 | Claim ID No. |
| 28 | Claim ID No. |
| 29 | Claim ID No. |
| 30 | Claim ID No. |
| 31 | Claim ID No. |
| 32 | Claim ID No. |
| 33 | Claim ID No. |
| 34 | Claim ID No. |
| 35 | Claim ID No. |
| 36 | Claim ID No. |
| 37 | Claim ID No. |
| 38 | Claim ID No. |
| 39 | Claim ID No. |
| 40 | Claim ID No. |

**Appendix B**
**Documents Relied Upon**

| No. | Description |
|-----|-------------|
| 41 | Claim ID No. ████ |
| 42 | Claim ID No. ████ |
| 43 | Claim ID No. ████ |
| 44 | Claim ID No. ████ |
| 45 | Claim ID No. ████ |
| 46 | Claim ID No. ████ |
| 47 | Claim ID No. ████ |
| 48 | Claim ID No. ████ |
| 49 | Claim ID No. ████ |
| 50 | Claim ID No. ████ |
| 51 | Claim ID No. ████ |
| 52 | Claim ID No. ████ |
| 53 | Claim ID No. ████ |
| 54 | AR Section 60, Framework for Performing and Reporting on Compilation and Review Engagements, December 2009 (AICPA) |
| 55 | Law Firm Accounting and Financial Management, Fifth Edition. Authors:  Kolodziejczak and Gaulin. PricewaterhouseCoopers, 2012. |
| 56 | Financial Reporting and Statement Analysis, A Strategic Perspective, Third Edition. (Textbook) Author: Stickney. Harcourt Brace & Company, 1996. |
| 57 | Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprise, December 1984 (Financial Accounting Standards Board) |
| 58 | Statement of Financial Accounting Concepts No. 6, Elements of Financial Statements, December 1985 (Financial Accounting Standards Board) |
| 59 | Statement of Financial Accounting Concepts No. 8, Conceptual Framework for Financial Reporting, September 2010 (Financial Accounting Standards Board) |
| 60 | BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination (1/9/2013) |
| 61 | BP Further Submission in Response To Class Counsel's December 16, 2012 Request for Policy Determination (1/11/2013) |
| 62 | Announcement of Policy Decisions Regarding Claims Administration (1/15/2013) |

**Appendix C**

**The Concepts of the Matching Principle and the Objective of Comparability in the Accounting Literature**

The requirement in Step 1 of the BEL compensation formula that revenue be matched to corresponding variable expenses is supported in the accounting literature as a methodology designed to produce a reliable measure of a firm's actual financial performance.

The Financial Accounting Standards Board ("FASB") has issued Statements of Financial Accounting Concepts ("FASCON"), to provide the framework for accounting pronouncements and Generally Accepted Accounting Principles ("GAAP") and introduce basic accounting concepts.   Among such concepts, the matching of revenues to corresponding expenses is explained in FASCON 8 and the accrual basis of accounting is introduced as follows:

> "Accrual accounting depicts the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period. *This is important because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period*."[1] [Emphasis added]

The matching principle, which does not exist under the modified cash basis of accounting, is rooted in FASCON 6 and FASCON 5:

> "Matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events."[2]

> and,

---

[1] See Statement of Financial Accounting Concepts No. 8, September 2010, Par. OB17.
[2] See Statement of Financial Accounting Concepts No. 6, Elements of Financial Statements, December 1985, Par. 146.

"[…] Revenues and gains of an enterprise during a period are generally measured by the exchange values of the assets (goods or services) or liabilities involved, and recognition involves consideration of two factors (a) being realized or realizable and (b) being earned, with sometimes one and sometimes the other being the more important consideration."[3]

The accounting literature uses interchangeably the terms corresponding or related to describe how revenues are tied.

Further, FASCON 6 supports that the distortion created by ignoring the matching concept is greater when the reporting periods are shorter. Since most of the Compensation Periods used are less than one year under the BEL framework, financial statements prepared using OCBOA methods will create a distorted picture of actual financial performance absent subsequent work by the Settlement Program to match revenues to corresponding variable expenses. FASCON 6 states:.

"Accrual accounting recognizes numerous noncash assets, liabilities, and transactions and other events that affect them (paragraphs 139–141). Thus, a major difference between accrual accounting and accounting based on cash receipts and outlays is timing of recognition of revenues, expenses, gains, and losses…*A report showing cash receipts and cash outlays of an enterprise for a short period cannot indicate how much of the cash received is return of investment and how much is return on investment and thus cannot indicate whether or to what extent an enterprise is successful or unsuccessful.*"[4] [Emphasis added]

Finally, a key issue created by failing to match revenues and related expenses is the lack of comparability of the financial statements over time. In that regard, FASCON No.8 explains:

"Users' decisions involve choosing between alternatives, for example, selling or holding an investment, or investing in one reporting entity or another. Consequently, *information about a reporting entity is more useful if it can be* compared with similar information about other entities and *with similar*

---

[3] See Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprise, December 1984, Par. 83.
[4] See Statement of Financial Accounting Concepts No. 6, Elements of Financial Statements, December 1985, Par. 144.

*information about the same entity for another period* or another date."5 [Emphasis added]

---

5 See Statement of Financial Accounting Concepts No. 8, Conceptual Framework for Financial Reporting, September 2010, Par. QC20.

## Appendix D

### Claimants may be better compensated under the Step 2 calculation

If revenues were recognized when earned as opposed to when collected, some professional services firm Claimants may benefit from a greater Claimant-Specific Factor ("CSF").[1]

| | Revenue Jan - Apr | | | | Revenue May-December | | | |
|---|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | Change | Growth Factor | 2009 | Incremen-tal | Var. Profit Margin | Step 2 Comp. |
| Original Data | $0 | $0 | 0% | 2% | $1,800 | $36 | 78% | $28 |
| Matched Data | $400 | $500 | 25% | 12% | $900 | $108 | 56% | $60 |
| Benefit to Claimant | | | | | | | | $32 |

In the above example, without properly matching revenue earned to expenses incurred in the correct period, all of the revenues in 2009 and 2010 are recorded in May through December and no revenues are recorded in the first four months of each year.  As a result, there is no change in revenue growth from 2009 to 2010.  The CSF is therefore 0% and the total growth factor is only 2% for Step 2 calculation leading to a $28 Step 2 compensation amount.

When revenues are properly matched to the appropriate periods, Step 2 Compensation can be favorably impacted.  In the above example, $900 of the $1,800 is reallocated ($400 to January through April 2009 and $500 to the same period in 2010).   After revenue is properly matched to the periods they were earned, the revenue growth for January through April increased from 0% to 25%. Per Exhibit 4C of the Settlement Agreement, if the calculated CSF exceeds 10%, it will be set at 10%.  Therefore, adding 10% to the general adjustment factor of 2% yields a growth factor of 12%. The higher

---

[1] The method calculates a growth factor (the Claimant Specific Factor, or "CSF"), which divides by the revenues recognized from January through April of the Benchmark Period, the difference between revenues from January through April of the Benchmark Period and the same period in 2010. The CSF, capped at 10% is applied to six months (at least) of revenues from the Benchmark Period to determine Incremental Revenues. A Variable Margin percentage is then applied to the Incremental Revenues obtained to calculate the lost profits in Step 2 Compensation.

growth factor applied to May through December 2009 revenues leads to higher incremental revenue of $108.  Assuming that variable costs stayed unchanged at $400, the decline in May through December 2009 revenues after reallocation would decrease variable profit margin from 78% to 56%.  However, Step 2 Compensation amount increases by $32 as a result recording revenue when it is earned.

**Appendix E**

**Additional Examples of Claims That Result in Distorted Compensation**

1.  **Claimant ID** ████████

This claimant provides legal services in general litigation, catastrophic and personal injury claims, business torts, product liability cases, commercial litigation, and class action suits litigation.[1]  Its office is located ████████████████████████ ██████ in Zone D.  As shown in the chart below, revenues as reported by the claimant for the period May through December of 2009 (Benchmark Year) were approximately $1,358,000 and decreased to $309,000 in the same period in 2010. While the claimant's May to December variable profit, measured using the firm's cash-based financial data, declined from approximately $1,249,000 in 2009 to $250,000 in 2010, the Settlement Program's base offer as currently calculated of $1,250,000 implies that, the claimant's 2010 variable profit for May to December should have been $1,500,000. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $1,500,000 for May to December 2010 exceeds the firm's variable profits the claimant earned in the same period in 2009 by 20%, and also exceeds the firm's revenue for May to December of 2009.



Claimant ID: ████████
Benchmark Year: 2009 / Compensation Months: May - Nov

---

[1] See website [Reference to website omitted].

This distortion is being driven by the timing of expense payments and cash receipts in May through November in the benchmark and compensation years.   The claimant's compensation period includes the large revenue spike in 2009 but excludes the similar revenue spike in 2010, both having the effect of increasing the compensation amount. For example, the Claimant collected $815,000 in June 2009 or 43% of its 2009 annual revenue, but 70% of annual 2010 revenue was recorded in April, which was outside of the Compensation months.



### 2.  Claimant ID ███

This claimant is a personal injury firm located ████████████████████ ████████████ (Zone D).[2] Claimant's cash receipts are largely dependent on settlement as evident from its website, which states that "[t]here is no cost to you until we collect." As shown in the chart below, revenues from May through December of 2009 (Benchmark Year) were approximately $2,753,000 and fell to $1,967,000 in the same period in 2010. While the claimant's May to December variable profit, measured on a cash basis, declined from $1,890,000 in 2009 to $1,167,000 in 2010, the compensation of $1,379,000 implies that claimant's 2010 variable profit from May through December should have been $2,546,000. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $2,546,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2009 by 35%.



Claimant ID: ███
Benchmark Year: 2009 / Compensation Months: Oct-Dec

This distortion is being driven by the timing of expense payments and cash receipts in October to December of the benchmark and compensation years. These months accounted for 74% of 2009 revenues but only 21% of 2010 revenue, which demonstrates only timing differences in Claimant's cash receipts between 2009 and 2010. For example, 44% of 2009 annual revenue was recorded in November and 22% of annual revenue in

---

[2] See website [Reference to website omitted]

2010 was recorded in August 2010.  By selecting a compensation period of October through December, the claimant's compensation period includes the large spike in 2009 but excludes the similar spike in 2010, both having the effect of increasing the compensation amount. Additionally, the Claimant recorded revenues of $2.2 million in September 2011 and $5.5 million in November 2011 which were likely earned in prior months or even years and against which the related expenses are not matched.



**3. Claimant ID** ███████

This claimant is full-service design firm offering a ████████████████████
████████████████████████ Claimant is located in ██████████, which
is in Zone D, ████████████████████ As shown in the chart below,
revenues as reported by the claimant for the period May through December of 2009
(Benchmark Year) were approximately $2,825,000 and decreased to $2,101,000 in the
same period in 2010. The claimant's May to December variable profit, measured on a
modified cash basis, declined by 10% from approximately $1,082,000 in 2009 to
$976,000 in 2010. The base offer of $802,000 implies that the Claimant's 2010 variable
profit from May to December should have been $1,778,000. This is not an accurate
depiction of the firm's actual financial performance. A variable profit of $1,778,000 for
May to December 2010 would exceed the firm's variable profit in the same period in
2009 by 1.6 times or 65%.



This distortion is being driven by the timing of expense payments and cash receipts in
June to August in the benchmark and compensation years. These months accounted for
36% of 2009 revenues but only 8% of 2010 revenue, which skews the measurement of

---

[3] See website [Reference to website omitted]

the Compensation calculation. In 2010, 42% of annual revenue was recorded in January ($814,000) and March ($833,000), outside of the Compensation months.  The fluctuation in variable profit margin in 2009 and 2010 is also an indicator that revenues were not properly matched to costs incurred.  For example, in March 2009, Claimant recorded a variable profit margin of *negative* 75,864% on revenue of $453 compared to a variable profit margin of 66% on revenue of $833,000 in the same month in 2010.



**4. Claimant ID ▇▇▇▇▇**

This claimant is a personal injury law firm located in ▇▇▇▇▇▇▇▇ (Zone D).[4]  As shown in the chart below, revenues as reported by the claimant for the period May through December of 2009 (Benchmark Year) were approximately $1,036,000 and decreased to $297,000 in the same period in 2010. While the claimant's May to December variable profit, measured using the firm's cash-based financial data, declined from approximately $814,000 in 2009 to $149,000 in 2010, the Settlement Program's base offer as currently calculated of $827,000 implies that, in the absence of the spill, claimant's 2010 variable profit for May to December should have been $976,000. This is not an accurate depiction of the firm's actual financial performance.  A variable profit of $976,000 for May to December 2010 would exceed the firm's variable profit in the same period in 2009 by 20%.



This distortion is being driven by the timing of expense payments and cash receipts in May through November in the benchmark and compensation years.  Claimant collected $686,000 in November 2009 or 57% of its 2009 annual revenue, which skews the measurement of the Compensation calculation. In 2010, 32% of annual revenue was recorded in December, which was outside of the Compensation months. The December

---

[4] See website [Reference to website omitted]

2010 revenue was earned in prior periods (in 2010 during the compensation period) and should have been reallocated accordingly which would have substantially increased its variable profit and reduced the offer amount.

The fluctuation in variable profit margin in 2009 and 2010 is also an indicator that revenues were not properly matched to costs incurred. For example, in September 2010, claimant recorded a variable profit margin of *negative* 2,200% on revenue of $1,000 compared to a variable profit margin of 69% on revenue of $74,000 in the same month in 2009.



**5.  Claimant ID** ██████████

This claimant provides legal services in auto accident, personal injury, and mineral rights litigation.[5]  Claimant ████████████████████████████████████████ ████████████████████████████████████████ (Zone D).  As shown in the chart below, revenues as reported by the claimant for the period May through December of 2009 (Benchmark Year) were approximately $898,000 and decreased to $258,000 in the same period in 2010.  While the claimant's May to December variable profit, measured using the firm's cash-based financial data, declined from approximately $809,000 in 2009 to $286,000 in 2010, the Settlement Program's base offer as currently calculated of $710,000 implies that the claimant's 2010 variable profit for May to December should have been $996,000.  This is not an accurate depiction of the firm's actual financial performance.  A variable profit of $996,000 for May to December 2010 would exceed the firm's variable profit in the same period in 2009 by 23%, but would also exceed the firm's revenue for May to December of 2009.



This distortion is being driven by the timing of expense payments and cash receipts in May through November in the benchmark and compensation years.  Claimant collected 55% of its 2009 annual revenue in May and October 2009, which skews the measurement of the Compensation calculation. Claimant did not have such large revenue collection in

---

[5] See website [Reference to website omitted]

2010 during the same period but rather collected $1.6 million in September 2011 or 70% of its 2011 annual revenue. These revenues were earned in prior periods (in 2010 during the compensation period) and should have been reallocated accordingly which would have substantially increased its variable profit and reduced the offer amount.

The fluctuation in variable profit margin in 2009 and 2010 is also an indicator that revenues were not properly matched to costs incurred.   For example, in July 2010, Claimant recorded a variable profit margin of *negative* 8,800% on revenue of $600 compared to a variable profit margin of *negative* 18% on revenue of $7,600 in the same month in 2010.



## Appendix F

## Mismatch and Reclassification Issues

**I.     Examples of Mismatch between Revenues and Expenses - Timing**

Law firm claimant No. ███████ reported variable profit of more than $1.5 million (83% variable margin) in August 2009, but variable profit of approximately negative $392,000 (-899% variable margin) in December 2009.  Similarly, law firm claimant No. ███████ reported variable profit of more than $777,000 (on a margin of more than 95%) in June 2009 followed by variable profit of only $3 thousand (and margin of less than 25%) in August 2009.    Law firm claimant ███████ reported variable profit of just under $1 million (66% variable margin) in November 2009 followed by variable profit of approximately negative $13,000 (-92% variable margin), in the very next month.

**II.     Examples of Reclassification of Costs Specific to Professional Services Claimants**

*a)  Disbursements*

In relation to professional services firms, incurred cost disbursements appear to be handled inconsistently by claimants and not corrected by the Settlement Program, which can result in a misstatement of both revenues and expenses.  For example, law firms often charge their clients for expert fees, travel expenses, filing fees, court costs and other external disbursements to third parties that the law firm incurs on behalf of the clients. Costs that are "passed through" to clients should not impact revenues, expenses or net income of the firm.[1] Additionally, the timing of the reimbursement for these costs may differ from the timing of the payment of the expense, which will affect compensation as currently calculated.   As a result, such costs should be excluded from any analysis of variable profit under the Settlement Agreement, and my review indicates this is not always done.  These costs can be material.

---

[1] See Law Firm Accounting and Financial Management, Fifth Edition, 2012, *4.05 Cost Recoveries,* P. 4-11

For example, a law firm claimant No. ███████ recorded $830,000 reimbursed expenses as revenues in 2008, whereas the firm recorded approximately $370,000 in "client cost advanced" the same year. Because of the timing of collections and disbursement, the variable profit will be overstated and result in overstated compensation unless these costs are excluded from the calculation of variable profit.

### b) Owners' Compensation / Payroll Costs

Under the BEL framework, payroll costs can be classified as fixed or variable. However, owners and officers compensation is (properly) considered a fixed expense. In some professional services firm claimants' files I noted that throughout the year owner compensation may be recorded as a variable expense and reclassified in fixed cost at the end of the year, which has the effect of understating variable profit throughout the year and artificially depressing the performance of the firms. For example, in reviewing law firm claimant No. ███████, I observe that in October of 2009 the firm recorded a negative $731,000 in salaries (Variable Expense) and appeared to have reallocated a portion amounting to $218,000 to owners and officers compensation (a fixed expense) within the same month. Given that the Compensation period is from May to November, it results in an inaccurate calculation of variable profit, and consequently the Compensation for claimant. Likewise, law firm claimant No ███████ includes in 2009 payroll cost of the owner as a variable cost for most of the year and reverses such cost in December of each year for about $90,000 in 2009 and 2010 and $45,000 in 2008. Because of the compensation period being May through December, the calculation is inaccurate.

Page 2

**Appendix G**

**BP's Proposed Triggers or Thresholds**

BP has proposed three indicators or thresholds that would trigger a further review of a claimant's financial data. These triggers are as follows:

- *Trigger 1 (Revenue Spike):* is a test designed to capture unusual and non seasonal variance in the monthly financial revenue of a claimant when material cash is collected as opposed to earned.

- *Trigger 2 (Months with Negative Margin):* evaluates whether negative variable profit was recorded in any given month of the Benchmark period or 2010. The premise of the test is that the occurrence of negative variable profit indicates a potential mismatch between revenue and corresponding expenses as opposed to the failure of the firm to perform.

- *Trigger 3 (Range of Variable Profit Percentages):* seeks to capture unusual economic swings in variable profit margin (as a percentage of revenue) on a month-to-month basis during the Benchmark period or 2010. This trigger identifies potential distortions where the variable profit margin is affected by the timing of the payment of expenses and receipt of revenues.

These triggers detect those professional service firms with financial statements that are not representative of their financial performance as illustrated in the chart below:

| No. | Claimant ID. | Compensation Months | Revenue Spike | Months with Negative Margin | Range of Variable Profit Percentages |
|---|---|---|---|---|---|
| 1 | | May - Nov | 43% of 2009 annual revenue in Jun 2009 | 0 months in 2009 | 24% in Aug 2009 to 100% in Oct 2009 |
| 2 | | Oct - Dec | 44% of annual revenue in Nov 2009 | 1 months in 2009 | (92%) in Dec 2009 to 93% in Aug 2009 |
| 3 | | May - Nov | 30% of 2009 annual revenue in Oct 2009 | 3 months in 2009 | (1,015%) in Dec 2009 to 134% in Jan 2009 |
| 4 | | May - Oct | 47% of 2009 annual revenue in Oct 2009 | 3 months in 2009 | (281)% in Dec 2009 to 98% in Mar 2009 |
| 5 | | Jun - Aug | 21% of 2009 annual revenue in Jan 2009 | 5 months in 2009 | (75,864%)% in Mar 2009 to 80% in Jan 2009 |
| 6 | | May - Nov | 57% of 2009 annual revenue in Nov 2009 | 3 months in 2009 | (114%) in May 2009 to 1,648% in Dec 2009 |
| 7 | | Jun - Aug | 26% of 2009 annual revenue in Oct 2009 | 6 months in 2009 | (704)% in Jul 2009 to 81% in May 2009 |
| 8 | | May - Nov | 73% of 2008/2009 annual revenue in Nov 2008/2009 | 0 months in 2008/2009 | 5% in Feb 2008/2009 to 94% in Nov 2008/2009 |