# Exhibit 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179** **SECTION J** |
| **This document relates to all actions.** | * * * | **HONORABLE CARL J. BARBIER** |
| | * * * | **MAGISTRATE JUDGE SHUSHAN** |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, | * * * | **Civil Action No. 12-970** **SECTION J** |
| Plaintiffs, | * * | |
| v. | * * | **HONORABLE CARL J. BARBIER** |
| **BP Exploration & Production Inc.; BP America Production Company; BP p.l.c.,** | * * * | **MAGISTRATE JUDGE SHUSHAN** |
| Defendants. | * * | |

## DECLARATION OF PROFESSOR A. MITCHELL POLINSKY

### FEBRUARY 18, 2013

## I.    QUALIFICATIONS

1.    I am the Josephine Scott Crocker Professor of Law and Economics and the Director of the John M. Olin Program in Law and Economics at Stanford Law School, where I have been a faculty member since 1979.  I was previously on the faculties of the Department of Economics and School of Law at Harvard University.  I earned an A.B. in Economics from Harvard University, a Ph.D. in Economics from M.I.T., and a Master of Studies in Law from Yale Law School.

2.    I am a founder and past president of the American Law and Economics Association, and currently serve as co-editor of *Law and Economics Abstracts* and as a member of the editorial boards of several professional journals in economics and law.  I received a Guggenheim Fellowship and have been a fellow at the Center for Advanced Study of the Behavioral Sciences at Stanford University.  I have published more than sixty articles in professional journals and a textbook titled *An Introduction to Law and Economics*.  I also am co-editor of the *Handbook of Law and Economics*, a compendium of articles for graduate students and faculty in economics.  The focus of my scholarly work is the economic analysis of legal issues, including the economics of damages.  My curriculum vitae is attached as Exhibit 1 to this Declaration.

3.    I have presented lectures on the economic analysis of law in educational programs for state court judges and United States District Court judges.  I have applied economic analysis in consulting work for private plaintiffs and defendants and have testified as an expert economist in state and federal courts.  Several of my consulting assignments have been concerned with calculating economic losses.

## II.    ASSIGNMENT

4.    I have been asked to comment on the implementation of the *Deepwater Horizon* Economic and Property Damages Settlement, as amended on May 2, 2012 ("Settlement Agreement").  Specifically, I have been asked to consider the economic consequences of

the implementation of the Business Economic Loss Framework ("BEL Framework")[1] that has been proposed by Class Counsel and adopted by the Claims Administrator.[2]  My focus is on whether this approach to implementing the BEL Framework will result in claimants being excessively compensated for their economic losses.

## III.   SUMMARY OF OPINIONS

5.   The general purpose of the Business Economic Loss Framework is to make claimants whole for the economic losses they suffered.

6.   If compensation is based on losses in *economic profits*, claimants will be made whole. Economic profits due to a period of business activity are the revenues that are generated by the activity — whenever they are received — minus the expenses associated with the activity — whenever they are incurred.  The BEL Framework is designed to measure losses in economic profits.

7.   If instead compensation is based on *net cash received* over a period of business activity — cash actually received during the period minus cash actually expended during the period — then claimants might not be accurately compensated for their economic losses.  One reason for such inaccuracy is that revenues or costs associated with a period of business activity could be realized outside of the period.   Another reason is that revenues or costs attributable to a different period could be realized during the period in question.

8.   In the circumstances of this matter, the problem of overcompensation of claimants due to reliance on net cash received in determining compensation is potentially great and can result in gross windfalls to them.  There are reasons to believe that this problem is likely to

---

[1]  Settlement Agreement, Exhibits 4A through 4E.

[2]  Class Counsel Memorandum, "Request for Formal Policy Statement: Monthly Revenue," December 16, 2012. See also Memorandum from BP to Claims Administrator, "BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination," January 8, 2013; Memorandum from BP to Claims Administrator, "BP's Second Submission to Claims Administrator," January 11, 2013; and Memorandum from Patrick A. Juneau to Class Counsel and BP, "Announcement of Policy Decision Regarding Claims Administration," January 15, 2013.

apply systematically to some industries — such as construction and agriculture — but not to other industries — such as retailing.

9.     When it is likely that reliance on net cash received in determining compensation would lead to significant windfalls, compensation should be based on a methodology for estimating declines in economic profits.  In particular, the BEL Framework should be interpreted so as to accomplish this end.

## IV.   BACKGROUND

10.    The methodology for calculating compensation for business claimants is set out in the Business Economic Loss Framework of the Settlement Agreement.[3]  This process involves comparing "the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010."[4]  The compensation amount bridges the difference between the measure of actual profits and the measure of profits that might have been expected.

11.    The BEL Framework requires a claimant to submit financial data regarding its operations, including information on revenue earned each month as well as on the corresponding costs incurred in generating that revenue.[5]

## V.   ANALYSIS

### A.   The Purpose of the Business Economic Loss Framework is to Make Claimants Whole

12.    The central feature of the BEL Framework of the Settlement Agreement is, as mentioned, that it compensates a claimant for the difference between the claimant's actual profits during a relevant post-spill period and an estimate of what the claimant's profits would

---

[3] Settlement Agreement, Exhibit 4C.

[4] Settlement Agreement, Exhibit 4C, page 1.

[5] Settlement Agreement, Exhibit 4A.

have been in that period had the spill not occurred.  Hence, use of the BEL Framework is designed to make claimants whole.

13.   Consideration of the economic analysis of settlement[6] also supports the view that the compensation provisions of the BEL Framework should be interpreted in terms of making claimants whole.  To elaborate, suppose that a plaintiff would obtain approximately $1 million in damages if he were to go to trial.  Then if the plaintiff were to demand substantially more than this amount in settlement — say he demanded $2 million — the defendant would refuse to settle since the defendant would expect to pay much less at trial.[7]  Similarly, if the defendant offered significantly less than the amount that the plaintiff would expect to obtain at trial, the plaintiff would refuse the offer.  In other words, if the parties settle, they would tend to settle for an amount that is not much different from the amount that the plaintiff would obtain in court.

14.   The amount that courts generally award for losses in tort is that which would make the plaintiff whole, namely, the amount that would restore the plaintiff to the position he would have enjoyed if the tort had not occurred.

15.   Hence, in this matter, I would expect that the BEL Framework would be designed to make claimants whole.  That is, I would not expect the BEL Framework to provide compensation that would result in substantial windfalls to claimants — it would have been economically irrational for BP to have consented to such an outcome.

16.   In sum, (a) the basic design of the BEL Framework supports the view that it is intended to make claimants whole, and (b) settlement agreements would generally be expected to reflect court awards, which are premised on the principle of making plaintiffs whole.

---

[6]  Steven Shavell, *Foundations of Economic Analysis of Law* (Harvard University Press, 2004), pages 401-02, and Kathryn E. Spier, Litigation, in A. Mitchell Polinsky and Steven Shavell (Editors), *Handbook of Law and Economics*, Volume 1 (Amsterdam: North-Holland, 2007), pages 268-69.

[7]  For simplicity, I abstract here from several complicating factors, including that the parties would bear litigation costs if they went to trial.

Hence, it is reasonable to conclude that the main objective of the BEL Framework is to compensate claimants so as to make them whole.[8]

### B.  Compensation Based on Losses of Economic Profits Will Make Claimants Whole

17.    I illustrate the basic point here that if compensation is based on losses of economic profits, claimants will be made whole.

18.    *Economic profits* due to a specified period of business activity are the revenues that are generated by the activity — whenever they are received — minus the expenses associated with the activity — whenever they are incurred.

19.    Suppose, for example, that a business ABC was engaged in a commercial activity during a defined oil-spill period of July through September of 2010 and that the activity over this period ultimately generated revenues of $10,000 and led to expenses of $6,000.  Then ABC's economic profits from its activity during July-September 2010 are $4,000.

20.    Suppose too that it is known from past financial records that ABC typically makes economic profits of $15,000 from its business activity during the July-September period. It is thus assumed that ABC would have made profits of $15,000 during July-September 2010 if the oil spill had not occurred.

21.    Then it is patent that compensating ABC for the difference between its economic profits had the spill not occurred, $15,000, and its actual economic profits, $4,000, will make it whole.  This difference of $11,000 is ABC's economic loss as a result of the spill; and adding $11,000 to the $4,000 of economic profits that ABC did make would restore its profitability to $15,000.

---

[8]  I recognize, of course, that in a class action payments to claimants would not perfectly match economic losses in every instance.  Yet a settlement of a class action would not be expected to result in gross overpayments or windfalls to certain claimants.

### C.   Compensation Based on Losses in Net Cash Received Will Often Be Inaccurate

22.   If compensation for an adverse event is based on losses in net cash received, then the compensation claimants receive will not necessarily equal their economic losses.

23.   *Net cash received* during a specified period of business activity is the cash actually obtained during the period minus the cash actually paid during the period.

24.   For example, suppose that ABC's business activity during the July-September 2010 oil-spill period results in $10,000 in revenues that are not received until October and $6,000 in expenses that are incurred in the July-September period.  Then ABC's net cash received during this period would be negative, –$6,000, because ABC did not obtain its revenues during the period.

25.   Conversely, suppose ABC obtains its $10,000 in revenues during the July-September 2010 period, but did not have to pay its $6,000 in expenses until after the period.  Then ABC's net cash received during the July-September period would be $10,000, because it did not incur its costs during the period.

26.   If losses from a tortious event are calculated based on net cash received, the injured party may be overcompensated — may receive a windfall.  Consider the case in which ABC's net cash received during the July-September 2010 oil-spill period was negative, –$6,000, because it did not obtain its $10,000 in revenues until October but it did incur its expenses. Then if economic losses are calculated on the basis of net cash received, ABC would appear to have suffered a $21,000 loss — the difference between its normal net cash received of $15,000 in years prior to the spill (assume its receipt of revenues was not delayed in the past) and its net cash received of –$6,000 in July-September 2010 after the spill.[9]

---

[9]  In this example the reason for the windfall is that net cash received during the oil-spill period is inaccurate, unequal to economic profits due to ABC's activity during that period.  Another important reason for a windfall is that net cash received during a period *before* the oil spill could be inaccurate (for instance, because expenses generated by the activity in that period are delayed).  For expositional convenience, I will not further mention the

27.   Clearly, however, $10,000 of this apparent $21,000 loss is due to the delay in ABC's receipt of revenues.  If ABC were awarded $21,000 in compensation, because compensation is based on net cash received, ABC would receive a windfall of $10,000. This is because, as explained in ¶21 above, ABC actually suffered only an economic loss of $11,000.

28.   For parallel reasons, ABC would receive a windfall if, during the July-September 2010 period, it incurred expenses that were attributable to its activities at an earlier time, say in January 2010.  Suppose, for instance, that ABC incurred expenses of $16,000 in July-September that were associated with its activities in January, and $10,000 of revenues in July-September due to its activities in July-September.  Then ABC's net cash received would again be –$6,000 and it would receive a windfall of $10,000.[10]

29.   Finally, compensation based on net cash received could result in ABC being undercompensated.  This could happen if ABC received its revenues during the July-September 2010 period but did not incur its expenses until afterwards.

30.   The root of the explanation for why basing compensation on net cash received might be inaccurate is straightforward: *net cash received over a particular period of business activity might not include all of the revenues and costs attributable to the activity over that period; and net cash received might include some of the revenues or costs attributable to business activity in other periods.*

   **D.    Under the BEL Framework, Compensation Based on Losses in Net Cash Received Results in Excessive Compensation**

31.   It is my understanding that the recommendation advocated by Class Counsel and employed by the Claims Administrator is, in effect, to base compensation for economic losses on net

---

possibility of inaccurate measurement of economic profit in periods before the oil-spill periods when compensation is based on net cash received.

[10] In this example, ABC would be awarded compensation of $21,000, the difference between its normal net cash received of $15,000 in comparable periods in prior years and its net cash received of –$6,000 in July-September 2010.  Yet, as we explained in ¶21 above, its reduction in economic profit is only $11,000.

cash received when, as often happens, claimants employ cash accounting in generating their financial records.  Hence, as I explained in the previous section, the determination of compensation for economic losses might be inaccurate.

32.  Furthermore, the problem of windfalls when compensation is based on net cash receipts appears to be substantial.  According to the declaration of Dr. Hal Sider, [11] on which I rely, numerous claimants have obtained large windfalls, whereas few have been undercompensated.  Three major categories of claimants for which a serious problem of windfalls has been found by Dr. Sider are construction, agriculture, and professional services.[12]

33.  The explanation for such windfalls, recall, is that net cash received over a designated oil-spill period may be less than economic profits over that period.  That possibility can arise, for example, due to a delay in the receipt of revenues until a time after the oil-spill period.  It is plausible that delays in the receipt of revenues frequently occur in certain industries.  For instance, in farming, crops are often sold long after the expense of planting has been incurred, so that sales revenue might not be received until after a spill period.

34.  When net cash received might differ from economic profits, the optionality features of the BEL Framework exacerbate the windfall problem.  The Framework permits claimants to choose various short time periods — three to eight months between May and December of 2010 — on which to base their calculation of compensation.[13]  It also allows for flexibility in the selection of the benchmark years.[14]  As a consequence, a claimant can base its

---

[11]  Declaration of Hal Sider, February 18, 2013.

[12]  Declaration of Hal Sider, February 18, 2013, Section V and Table 6.

[13]  Settlement Agreement, Exhibit 4C, page 1 ("Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.").

[14]  Settlement Agreement, Exhibit 4C, pages 1-2 ("The Benchmark Period is the pre-DWH Spill time period which the claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.").

compensation on a time period for which it would receive the highest amount given the pattern of its receipt of revenues and its outlays. Indeed, my understanding is that claimants will always benefit from such opportunities because the claims administrators' methodology is designed to maximize the possible compensation of claimants.[15]

35.    Finally, I observe that the windfall problem will not exist if net cash received reflects all revenues and expenses generated by business activities during the applicable oil-spill time periods. Hence, for many claimants, such as retail establishments that are paid contemporaneously with the provision of goods and services, there may be little problem of excessive compensation associated with the use of net cash received.

## VI.    CONCLUSION

36.    I have explained why there is a potential for — and the actual existence of — seriously exaggerated levels of compensation of claimants when their compensation is based on net cash received. I have also explained why claimants will be made whole when compensation is based on losses of economic profits. Therefore, because making claimants whole is the main objective of the Business Economic Loss Framework of the Settlement Agreement, compensation should be based on losses of economic profits.

I declare under penalties of perjury that the foregoing is true and correct.

Date:  February 18, 2013

_____

A. Mitchell Polinsky

---

[15]    Exemplar PwC workbook for Claimant No. █████████████████████ The PwC workbooks demonstrate that the Claims Administrator's process selects the combination of benchmark and compensation periods to maximize claimants' compensation.

# Exhibit 1

*Curriculum Vitae*

**A. Mitchell Polinsky**

Home:                          Office:                          Born: February 6, 1948
900 Cottrell Way               Stanford Law School             Married: Joan Roberts, June 29,
Stanford, CA 94305             Stanford, CA 94305              1975; two children

(650) 856-6019 voice           (650) 723-0886 voice            polinsky@stanford.edu
(650) 855-9966 fax             (650) 723-3557 fax

## I.  EDUCATION

1966-1970    A.B. (Economics), Harvard University

— *magna cum laude* with Highest Honors in Economics

— *Phi Beta Kappa*

— Allyn A. Young Prize in Economics

1970-1973    Ph.D. (Economics), Massachusetts Institute of Technology

— Woodrow Wilson Foundation Honorary Fellow

— National Science Foundation Graduate Fellow

— Honorable Mention, National Tax Association-Tax Institute of
   America Outstanding Doctoral Dissertation Awards Program

1975-1976    M.S.L. (Master of Studies in Law), Yale Law School

## II.  EMPLOYMENT

1984-        Josephine Scott Crocker Professor of Law and Economics (Law School)
             and Professor of Economics, by courtesy (Economics Department),
             Stanford University

1979-        Director, John M. Olin Program in Law and Economics, Stanford Law
             School

| | |
|---|---|
| 1997-1998 | Fellow, Center for Advanced Study in the Behavioral Sciences, Stanford, California |
| 1992-1993 | Visiting Professor of Law and Economics (Law School), Harvard University |
| 1985-1986 | National Fellow, Domestic Studies Program, The Hoover Institution, Stanford University |
| 1979-1984 | Professor of Law (Law School) and Associate Professor of Economics (Economics Department), Stanford University |
| 1977-1979 | Assistant Professor of Economics (Economics Department) and of Economics and Law (Law School), Harvard University |
| 1975-1977 | Russell Sage Foundation Resident in Law and Social Science, Yale Law School (1975-76) and Harvard Law School (1976-77) |
| 1973-1975 | Assistant Professor of Economics (Economics Department), Harvard University (on leave 1975-77) |

## III.  ADDITIONAL PROFESSIONAL ACTIVITIES (selected)

| | |
|---|---|
| 2001- | Member, Editorial Board, *B.E. Journals of Economic Analysis & Policy* |
| 1999-2006 | Member, Editorial Board, *Journal of Public Economics* |
| 1995- | Co-Editor, *Law and Economics Abstracts*, Social Science Research Network |
| 1987- | Member, Editorial Board, *International Review of Law and Economics* |
| 1987- | Advisory Editor, *Journal of Risk and Uncertainty* |
| 1983- | Member, Editorial Board, *Journal of Law, Economics, & Organization* |
| 1978- | Research Associate, Law and Economics Program, National Bureau of Economic Research |
| 1993-1994 | Fellow, John Simon Guggenheim Memorial Foundation |
| 1991-1994 | Member, Board of Directors (1991-93), Secretary-Treasurer (1991-92), Vice President (1992-93), and President (1993-94), American Law and |

|  | Economics Association |
|---|---|
| 1985-1986 | Principal Investigator, Grant No. SES-8510638 ("The Economic Theory of Punitive Damages"), National Science Foundation |
| 1981-1985 | Member, Editorial Advisory Board, *Supreme Court Economic Review* |
| 1980-1982 | Member, Law and Social Sciences Advisory Subcommittee, National Science Foundation |
| 1978-1981 | Principal Investigator, Grant No. SOC-78-20159 ("Legal Approaches to the Control of Externalities"), National Science Foundation |

## IV.  PUBLICATIONS AND WORKING PAPERS

"Revenue Sharing — A Critical View" (with Richard A. Musgrave), in *Financing State and Local Governments* (Boston: The Federal Reserve Bank, 1970), pp. 17-51 (also published as "Revenue Sharing: A Critical View," *Harvard Journal on Legislation*, Vol. 8 (1971), pp. 197-219).

"Shortsightedness and Nonmarginal Pareto Optimal Redistribution," *American Economic Review*, Vol. 61, No. 5 (December 1971), pp. 972-979.

"Probabilistic Compensation Criteria," *Quarterly Journal of Economics*, Vol. 86, No. 3 (August 1971), pp. 407-425.

"A Note on the Measurement of Incidence," *Public Finance Quarterly*, Vol. 1, No. 2 (April 1973), pp. 219-230.

"Collective Consumption Goods and Local Public Finance Theory: A Suggested Analytic Framework," in International Institute of Public Finance, *Issues in Urban Public Finance* (Saarbrucken, West Germany: I.I.P.F., 1973), pp. 166-181.

"Economic Analysis as a Potentially Defective Product: A Buyer's Guide to Posner's *Economic Analysis of Law*," *Harvard Law Review*, Vol. 87, No. 8 (June 1974), pp. 1655-1681.

"Imperfect Capital Markets, Intertemporal Redistribution, and Progressive Taxation," in Harold M. Hochman and George E. Peterson (Eds.), *Redistribution Through Public Choice* (New York: Columbia University Press, 1974) pp. 229-258.

"Essays in Public Sector Economics: Central and Local," in National Tax Association--Tax Institute of America, *Proceedings of the Sixty-Sixth Annual Conference on Taxation* (Columbus, Ohio: N.T.A.-T.I.A., 1974), pp. 507-522.

"The Air Pollution and Property Value Debate" (with Steven Shavell), *Review of Economics and Statistics*, Vol. 57, No. 1 (February 1975), pp. 100-104.

"Amenities and Property Values in a Model of an Urban Area" (with Steven Shavell), *Journal of Public Economics*, Vol. 5, No. 1-2 (January-February 1976), pp. 119-129.

"The Demand for Housing: A Study in Specification and Grouping," *Econometrica*, Vol. 45, No. 2 (March 1977), pp. 447-461.

"Property Values and the Benefits of Environmental Improvements: Theory and Measurement" (with Daniel L. Rubinfeld), in Lowdon Wingo and Alan Evans (Eds.), *Public Economics and the Quality of Life* (Baltimore: The Johns Hopkins University Press, 1977), pp. 154-180.

"Amenities and Property Values in a Model of an Urban Area: A Reply" (with Steven Shavell), *Journal of Public Economics*, Vol. 9, No. 1 (February 1978), pp. 111-112.

"The Long-Run Effects of a Residential Property Tax and Local Public Services" (with Daniel L. Rubinfeld), *Journal of Urban Economics*, Vol. 5, No. 2 (April 1978), pp. 241-262.

"[Economics and Law:] Discussion," *American Economic Review: Papers and Proceedings*, Vol. 68, No. 2 (May 1978), pp. 435-436.

"Controlling Externalities and Protecting Entitlements: Property Right, Liability Rule, and Tax-Subsidy Approaches," *Journal of Legal Studies*, Vol. 8, No. 1 (January 1979), pp. 1-48.

"Notes on the Symmetry of Taxes and Subsidies in Pollution Control," *Canadian Journal of Economics*, Vol. 12, No. 1 (February 1979), pp. 75-83.

"The Demand for Housing: An Empirical Postscript," *Econometrica*, Vol. 47, No. 2 (March 1979), pp. 521-523.

"An Empirical Reconciliation of Micro and Grouped Estimates of the Demand for Housing" (with David T. Ellwood), *Review of Economics and Statistics*, Vol. 61, No. 2 (May 1979), pp. 199-205.

"The Optimal Tradeoff Between the Probability and Magnitude of Fines" (with Steven Shavell), *American Economic Review*, Vol. 69, No. 5 (December 1979), pp. 880-891.

"Private Versus Public Enforcement of Fines," *Journal of Legal Studies*, Vol. 9, No. 1 (January 1980), pp. 105-127.

"On the Choice Between Property Rules and Liability Rules," *Economic Inquiry*, Vol. 18, No. 2 (April 1980), pp. 233-246.

"Strict Liability vs. Negligence in a Market Setting," *American Economic Review: Papers and Proceedings*, Vol. 70, No. 2 (May 1980), pp. 363-367.

"The Efficiency of Paying Compensation in the Pigovian Solution to Externality Problems," *Journal of Environmental Economics and Management*, Vol. 7, No. 2 (June 1980), pp. 142-148.

"Resolving Nuisance Disputes:  The Simple Economics of Injunctive and Damage Remedies," *Stanford Law Review*, Vol. 32, No. 6 (July 1980), pp. 1075-1112.

"Contribution and Claim Reduction Among Antitrust Defendants: An Economic Analysis" (with Steven Shavell), *Stanford Law Review*, Vol. 33, No. 3 (February 1981), pp. 447-471.

"Pigovian Taxation with Administrative Costs" (with Steven Shavell), *Journal of Public Economics*, Vol. 19, No. 3 (December 1982), pp. 385-394.

*An Introduction to Law and Economics* (Boston: Little, Brown and Company, 1983). 138 pp.

"Risk Sharing through Breach of Contract Remedies," *Journal of Legal Studies*, Vol. 12, No. 2 (June 1983), pp. 427-444.

"Products Liability, Consumer Misperceptions, and Market Power" (with William P. Rogerson), *Bell Journal of Economics*, Vol. 14, No. 2 (Autumn 1983), pp. 581-589.

"The Optimal Use of Fines and Imprisonment" (with Steven Shavell), *Journal of Public Economics*, Vol. 24, No. 1 (June 1984), pp. 89-99.

"Detrebling versus Decoupling Antitrust Damages: Lessons from the Theory of Enforcement," *Georgetown Law Journal*, Vol. 74, No. 4 (April 1986), pp. 1231-1236.

"Fixed Price versus Spot Price Contracts: A Study in Risk Allocation," *Journal of Law, Economics, & Organization*, Vol. 3, No. 1 (Spring 1987), pp. 27-46.

"Optimal Liability When the Injurer's Information about the Victim's Loss is Imperfect," *International Review of Law and Economics*, Vol. 7, No. 2 (December 1987), pp. 139-147.

"The Welfare Implications of Costly Litigation for the Level of Liability" (with Daniel L. Rubinfeld), *Journal of Legal Studies*, Vol. 17, No. 1 (January 1988), pp. 151-164.

"The Deterrent Effects of Settlements and Trials" (with Daniel L. Rubinfeld), *International Review of Law and Economics*, Vol. 8, No. 1 (June 1988), pp. 109-116.

"Legal Error, Litigation, and the Incentive to Obey the Law" (with Steven Shavell), *Journal of Law, Economics, & Organization*, Vol. 5, No. 1 (Spring 1989), pp. 99-108.

*An Introduction to Law and Economics* (Boston: Little, Brown and Company, Second Edition, 1989).  153 pp.

"A Note on Optimal Public Enforcement with Settlements and Litigation Costs" (with Daniel L. Rubinfeld), *Research in Law and Economics*, Vol. 12 (1989), pp. 1-8.

"A Note on Optimal Fines When Wealth Varies Among Individuals" (with Steven Shavell), *American Economic Review*, Vol. 81, No. 3 (June 1991), pp. 618-621.

"A Model of Optimal Fines for Repeat Offenders" (with Daniel L. Rubinfeld), *Journal of Public Economics*, Vol. 46, No. 3 (December 1991), pp. 291-306.

"Decoupling Liability: Optimal Incentives for Care and Litigation" (with Yeon-Koo Che), *RAND Journal of Economics*, Vol. 22, No. 4 (Winter 1991), pp. 562-570.

"Enforcement Costs and the Optimal Magnitude and Probability of Fines" (with Steven Shavell), *Journal of Law and Economics*, Vol. 35, No. 1 (April 1992), pp. 133-148.

"Should Employees Be Subject to Fines and Imprisonment Given the Existence of Corporate Liability?" (with Steven Shavell), *International Review of Law and Economics*, Vol. 13, No. 3 (September 1993), pp. 239-257.

"Sanctioning Frivolous Suits: An Economic Analysis" (with Daniel L. Rubinfeld), *Georgetown Law Journal*, Vol. 82, No. 2 (December 1993), pp. 397-435.

"A Note on Optimal Cleanup and Liability After Environmentally Harmful Discharges" (with Steven Shavell), *Research in Law and Economics*, Vol. 16 (1994), pp. 17-24.

"Should Liability be Based on the Harm to the Victim or the Gain to the Injurer?" (with Steven Shavell), *Journal of Law, Economics, & Organization*, Vol. 10, No. 2 (October 1994), pp. 427-437.

"Punitive Damages from the Economist's Perspective," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank (Eds.), *Litigation Services Handbook: The Role of the Accountant as Expert* (New York: John Wiley & Sons, Inc., Second Edition, 1996 Supplement), Chapter 36A, pp. 1-9.

"Optimal Awards and Penalties When the Probability of Prevailing Varies Among Plaintiffs" (with Daniel  L. Rubinfeld), *RAND Journal of Economics*, Vol. 27, No. 2 (Summer 1996), pp. 269-280.

"Are Punitive Damages Really Insignificant, Predictable, and Rational?  A Comment on Eisenberg et al.," *Journal of Legal Studies*, Vol. 26, No. 2 (June 1997), pp. 663-677.

"Punitive Damages: An Economic Analysis" (with Steven Shavell), *Harvard Law Review*, Vol. 111, No. 4 (February 1998), pp. 869-962.

"Does the English Rule Discourage Low-Probability-of-Prevailing Plaintiffs?" (with Daniel L. Rubinfeld), *Journal of Legal Studies*, Vol. 27, No. 2 (Part 1)  (June 1998), pp. 519-535.

"Public Enforcement of Law" (with Steven Shavell), in Peter Newman (Ed.), *The New Palgrave Dictionary of Economics and The Law*, Vol. 3 (London: Macmillan Reference Limited, 1998), pp. 178-188.

"Punitive Damages" (with Steven Shavell), in Peter Newman (Ed.), *The New Palgrave Dictionary of Economics and The Law*, Vol. 3 (London: Macmillan Reference Limited, 1998), pp. 192-198.

"On Offense History and the Theory of Deterrence" (with Steven Shavell), *International Review of Law and Economics*, Vol. 18, No. 3 (September 1998), pp. 305-324.

"On the Disutility and Discounting of Imprisonment and the Theory of Deterrence" (with Steven Shavell), *Journal of Legal Studies*, Vol. 28, No. 1 (January 1999), pp. 1-16.

"The Economic Theory of Public Enforcement of Law" (with Steven Shavell), *Journal of Economic Literature*, Vol. 38, No. 1 (March 2000), pp. 45-76.

"Punitive Damages" (with Steven Shavell), in Boudewijn Bouckaert & Gerrit De Geest (Eds.), *Encyclopedia of Law and Economics* (Cheltenham, UK: Edward Elgar, 2000), Volume II, pp. 764-781.

"Public Enforcement of Law" (with Steven Shavell), in Boudewijn Bouckaert & Gerrit De Geest (Eds.), *Encyclopedia of Law and Economics* (Cheltenham, UK: Edward Elgar, 2000), Volume V, pp. 307-344.

"The Fairness of Sanctions: Some Implications for Optimal Enforcement Policy" (with Steven Shavell), *American Law and Economics Review*, Vol. 2, No. 2 (Fall 2000), pp. 223-237.

"Corruption and Optimal Law Enforcement" (with Steven Shavell), *Journal of Public Economics*, Vol. 81, No. 1 (July 2001), pp. 1-24.

"Law: Economics of its Public Enforcement" (with Steven Shavell), in Neil J. Smelser and Paul B. Baltes (Eds.), *International Encyclopedia of the Social & Behavioral Sciences* (New York: Elsevier, 2001), Vol. 12, pp. 8510-8517.

"A Note on Settlements under the Contingent Fee Method of Compensating Lawyers" (with Daniel L. Rubinfeld), *International Review of Law and Economics*, Vol. 22, No. 2 (August 2002), pp. 217-225.

"Aligning the Interests of Lawyers and Clients" (with Daniel L. Rubinfeld), *American Law and Economics Review*, Vol. 5, No. 1 (Spring 2003), pp. 165-188.

*An Introduction to Law and Economics* (Aspen Publishers, Third Edition, 2003).

"The Optimal Use of Fines and Imprisonment When Wealth is Unobservable," *Journal of Public Economics*, Vol. 90, Nos. 4-5 (May 2006), pp. 823-835.

"Optimal Fines and Auditing When Wealth is Costly to Observe," *International Review of Law and Economics*, Vol. 26, No. 3 (September 2006), pp. 323-335.

"A Damage-Revelation Rationale for Coupon Remedies" (with Daniel L. Rubinfeld), *Journal of Law, Economics, & Organization*, Vol. 23, No. 3 (October 2007), pp. 653-661.

Co-editor (with Steven Shavell), *Handbook of Law and Economics* (Elsevier, 2007), two volumes, 1,738 pages.

"The Theory of Public Enforcement of Law" (with Steven Shavell), in A. Mitchell Polinsky and Steven Shavell (Eds.), *Handbook of Law and Economics*, Volume 1 (Elsevier Science, 2007), pp. 403-454.

"The Deadweight Loss of Coupon Remedies for Price Overcharges" (with Daniel L. Rubinfeld), *Journal of Industrial Economics*, Vol. 56, No. 2 (June 2008), pp. 402-417.

"law, public enforcement of" (with Steven Shavell), in Steven N. Durlauf  and Lawrence E. Blume (Eds.), *The New Palgrave Dictionary of Economics* (London: Macmillan Publishers, Second Edition, 2008), pp. 1-15.  <http://www.dictionaryofeconomics.com/article?id=pde2008_P000316>

"law, economic analyis of" (with Steven Shavell), in Steven N. Durlauf  and Lawrence E. Blume (Eds.), *The New Palgrave Dictionary of Economics* (London: Macmillan Publishers, Second Edition, 2008), pp. 1-22.  <http://www.dictionaryofeconomics.com/article?id=pde2008_L000038>

"Punitive Damages" (with Steven Shavell), in Michael G. Faure (Ed.), *Tort Law and Economics* (Edward Elgar, 2009), pp. 228-246.

"Public Enforcement of Law" (with Steven Shavell), in Nuno Garoupa (Ed.), *Criminal Law and Economics* (Edward Elgar, 2009).

"The Uneasy Case for Product Liability" (with Steven Shavell), *Harvard Law Review*, Vol. 123, No. 6 (April 2010), pp. 1437-1492.

"A Skeptical Attitude About Product Liability *Is* Justified: A Reply to Professors Goldberg and Zipursky" (with Steven Shavell), *Harvard Law Review*, Vol. 123, No. 8 (June 2010), pp. 1949-68.

*An Introduction to Law and Economics* (Wolters Kluwer, Fourth Edition, 2011).

"Mandatory Versus Voluntary Disclosure of Product Risks" (with Steven Shavell), *Journal of Law, Economics, & Organization*, Vol. 28, No. 2 (June 2012), pp. 360-379.


"Costly Litigation and Optimal Damages" (with Steven Shavell), Working Paper No. 436, John M. Olin Program in Law and Economics, Stanford Law School, Stanford, California, November 2012 (available at <http://papers.ssrn.com/abstract_id=2173597>).


"Deterrence and the Optimality of Rewarding Prisoners for Good Behavior," preliminary draft, November 2012.


"Litigation Costs and the Superiority of Market-Determined Liability to Product Liability" (with Steven Shavell), in progress.


December 2012