# *IN CAMERA* SUBMISSION

**To:** Honorable Carl J. Barbier

**From:** Class Counsel

**Matter:** In re: *Deepwater Horizon*
MDL No. 2179

**Subject:** Monthly Costs and Revenue

**Date:** February 18, 2013

---

### OPPOSITION TO BP'S MOTION FOR RECONSIDERATION [1]

While the precise issue before the Court is a relatively narrow issue of contract interpretation, two inherent and unchanging dynamics permeate BP's ever-shifting positions regarding the proper determination of compensation that is owed to business claimants under the Settlement Agreement.

First, BP continues to attempt to overlay and inject a subjective *post hoc* evaluation of causation into the carefully negotiated objective formula which the Parties agreed would dictate which losses would (and would not) be deemed to have been caused by the Spill.  After embracing this concept in its approval papers, and confirming it to the Claims Administrator, BP then challenged the Claims Administrator's Supplemental Information Program message on the basis that it was somehow "misleading" to encourage businesses to make "fraudulent" claims for damages which BP has agreed would be compensable.  When raised before the Court (at the time of the hearing on non-profit revenue), BP confirmed that once a business satisfied the Causation requirements, all damages set forth in the Compensation Framework would be deemed to be

---

[1] Class Counsel respond herein to the Draft *In Camera* Motion for Reconsideration and Exhibits provided to Judge Shushan and Class Counsel by BP on February 3, 2013.

caused by the Spill, without any inquiry into potential alternative causation; which agreement was memorialized in a formal Policy Statement issued by the Court.[2] Before the ink was dry, however, BP continued to argue to Appeal Panelists that Class Members should not be compensated under the Compensation Framework where such losses were not (in BP's view) caused by the Spill. BP was also pushing for an audience with the Program Accountants, so that BP could urge them to alter the Compensation Framework where there were "spikes" in revenue; where product lines had allegedly been discontinued; or in other circumstances where BP could make the pitch that the compensation reflected under the framework was not, in fact, caused by the Spill.[3] The Claims Administrator's Policy Statement, on reconsideration now before the Court, simply reconfirms BP's carefully negotiated and prior agreement that, once a business passed Causation, all compensation captured by the objective Compensation Framework would be deemed to have been caused by the Spill.

Second, BP's current interpretation of the Settlement Agreement would require the Program to make inquiries and determinations that cannot be done objectively (or otherwise) based on the documents and other information called for in the Settlement Agreement. Realizing that its proffered interpretation is unworkable, (or, stated another way, conceding that the Settlement Agreement was never intended to mean what BP now contends that it means), BP has offered a number of shifting compromise "solutions" which violate GAAP and completely re-write the Settlement Agreement. Such compromises call for a "smoothing" or "averaging" of costs and revenue – an approach that BP, just a few months ago, diametrically and vehemently opposed. Such proposed compromises would also raise significant Rule 23, Due Process and

---

[2] *See* E-MAIL FROM JUDGE BARBIER RE "MEETING TODAY RE NON-PROFITS AND SIP" (Dec. 12, 2012).

[3] *See, e.g.,* E-MAIL FROM DAN CANTOR TO MIKE JUNEAU RE "ACCOUNTANT QUESTIONS" (Dec. 11 2012).

Notice issues, and are particularly suspect as they would apply to only some, but not all, businesses within the Class.[4]

The re-packaged arguments in BP's February 3rd Draft Motion for Reconsideration rest on basic flaws and fallacies:

- **The interpretation at issue is _not_ "Class Counsel's" interpretation.**  It is the independent, neutral and correct interpretation of the Claims Administrator.[5]  It is the interpretation espoused and promoted by both Parties, and BP's own experts, during the approval process.[6]  It is the interpretation drawn, and relied upon, by Class Members, and their attorneys and CPAs.[7]

- **The Settlement Agreement does _not_ result in payments to businesses that are not Class Members.**  The Class includes businesses located within the Gulf Coast Area who "meet the description" of the Business Economic Loss Damage Category Framework,[8] as objectively spelled out in Exhibits 4A-4C.  All of the entities at issue are located within the Gulf Coast Area (as defined by BP in the Settlement Agreement) and meet the description of those businesses entitled to compensation under Exhibits 4A–4C.

- **The Settlement Agreement _defines_ businesses who lost profits, income and/or earnings "as a result of" the Spill as those businesses who meet the objective Causation requirements set forth in Exhibit 4B.**  And all losses set forth in Exhibit 4C

---

[4] BP advised, for the first time, on February 15, 2013, that it was now pushing to have its latest proposal applied to *all* types of Business Economic Loss claims, (not just professional service, construction and agricultural claims). However, as we understand it, the "matching" of costs and/or "smoothing" of revenue would only apply to those claims that set off a certain "trigger".

[5] *See* Claims Administrator's ANNOUNCEMENT OF POLICY DECISIONS (Jan. 15, 2013).

[6] *See, e.g.,* JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at ¶126, p.39; BP's MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], at p.33; *quoting,* DECLARATION OF HOLLY SHARP [Doc 7441-18], p.10, ¶17; *see also,* HENLEY DECLARATION [Doc 7114-11], pp.24-25, ¶31; FISHKIND DECLARATION [Doc 7441-5], p.10, ¶31.

[7] *See, e.g.,* AFFIDAVIT OF HAROLD ASHER (Jan. 15, 2013) ¶¶ 4-5, 9-10, 17; DECLARATION OF RICK STUTES (Jan. 17, 2013) ¶¶ 4-6, 8-9, 13-14; SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Feb. 18, 2013), ¶¶ 2, 4; DECLARATION OF GEORGE PANZECA (Feb. 18, 2013), ¶¶ 3, 12, 23, 26; DECLARATION OF ROBERT WALLACE (Feb. 18, 2013), ¶¶ 1, 9-12; *see also, e.g.,* E-MAIL FROM MARY BETH MANTIPLY (Feb. 16, 2013).

[8] *See* SETTLEMENT AGREEMENT, Sections 1.3 and 1.3.1.

are then conclusively presumed to be caused by the Spill, without any inquiry into possible alternative causes.[9]

- **The Settlement Agreement specifically contemplates that entities who made more money in 2010 than in 2007-2009 might be entitled to compensation.** Indeed, the Step Two Compensation element is specifically designed to compensate the business for what *would have been earned* but-for the Spill, irrespective of the actual comparison of 2010 to 2007-2009 earnings.[10]

- **The Settlement Agreement does _not_ make arbitrary or unfair distinctions between similarly situated Class Members.** The Settlement Agreement takes all Class Members as it finds them, and subjects them to the same uniform class-wide objective formula, based on the same set of documentation requirements. As a practical matter, businesses of the same size and nature will generally maintain their books in the same way.  But, in any event, the "disparate treatment" (if any) to which BP alludes is not found anywhere in the Settlement Agreement; rather, it is the result of a current administrative interpretation advanced by BP.

- **BP completely ignores its own express agreement that the Claims Administrator is required to interpret the Class Member's financials in a way that _maximizes_ the Claimant's recovery.**  BP expressly agreed that: "The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce *the greatest* Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework."[11]

---

[9] *See* LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program); JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at ¶126, p.39; BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], at p.33; DECLARATION OF HOLLY SHARP [Doc 7441-18], p.10, ¶17; ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2; E-MAIL FROM JUDGE BARBIER RE "MEETING TODAY RE NON-PROFITS AND SIP" (Dec. 12, 2012).

[10] *See generally,* SETTLEMENT AGREEMENT, Compensation Framework, Step 2 (Exhibit 4C).

[11] SETTLEMENT AGREEMENT, Section 4.3.8 (emphasis supplied).

BP could have, but did not, limit the class geography.  BP could have, but did not, insist upon the exclusion of agriculture, construction and professional service industries.  BP could have, but did not, attempt to place a limit or cap on the total BEL payouts. BP could have, but did not, insist (or even suggest) that underlying cash basis monthly financials could not be submitted.[12]  BP could have, but did not, insist (or even suggest) that Causation not be extended to businesses with greater variable profit in 2010 than in 2007-2009.  BP could have, but did not, insist (or even suggest) that an alternative framework be applied to agriculture, construction and professional service industries.

This Motion for Reconsideration is nothing more than another *post hoc* attempt by BP to introduce a *subjective* causation element that would deny recovery to Class Members whom BP had previously agreed had, by objective criteria, been injured as a result of the Spill.

For these reasons, and for the reasons further outlined below, BP's Motion for Reconsideration should be denied.

---

[12] Indeed, BP emphasized the importance of relying on monthly profit and loss statements (and/or other financial records) as they were prepared and maintained in the ordinary course of business.  *See, e.g.,* SETTLEMENT AGREEMENT, Exhibit 4A; *see also, e.g.,* LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), p.2 (Monthly P&Ls or alternate source documents establishing monthly revenues and expenses "are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on the actual monthly financial experience of claimants").

## TABLE OF CONTENTS

Introduction  .  .  .  .  .  .  .  .  .  .  .  1

Table of Contents  .  .  .  .  .  .  .  .  .  .  6

BP's Motion for Reconsideration Presents Nothing New  .  .  .  .  7

The Four Corners of the Settlement Agreement Confirm that the Claims Administrator's
Interpretation of "Variable Profit" is Correct and Reflects the Intent of the Parties .  7

    General Rules of Maritime Contract Interpretation  .  .  .  .  9

    The Variable Profit Definition and Other Terms of the BEL Compensation
    Framework Are Clear and Unambiguous  .  .  .  .  .  10

    The Agreement, Read as Whole, Confirms that Claims Administrator's
    Interpretation of the BEL Compensation Framework is Correct and Reflects
    the Intent of the Parties  .  .  .  .  .  .  .  13

What BP Did Not Do and What the Settlement Agreement Does Not Say  .  .  17

There Are No "Absurd" Results from the Straightforward Application of the
Agreement Previously Upheld by the Court  .  .  .  .  .  .  18

BP Clearly Agreed that Businesses Who Met Causation Would Recover the Full
Compensation Outlined in the Settlement Agreement, as Presumed to Arise From
the DWH Incident, Without Any Inquiry Into Potential Alternative Causation  .  20

To the Extent the Settlement Agreement Could be Considered Ambiguous,
the Extrinsic Evidence Supports the Claims Administrator's Interpretation .  .  23

BP Takes the Claim's Administrator's Prior Statement Regarding Cash Basis
Profit and Loss Statements Out of Context  .  .  .  .  .  .  26

The Claims Administrator's Interpretation Does Not Cause the Settlement
Agreement to "Discriminate" Between Similarly Situated Class Members Solely
Based on Whether they Kept their Books on a Cash or Accrual Basis  .  .  28

Neither BP's Interpretation of the Settlement Agreement Nor BP's Proposed
Compromise "Solutions" Are Supported by General Accounting Principles  .  29

    The Accounting Textbook that BP Relies on Has Been Revised to
    Delete the Section on "Matching"  .  .  .  .  .  .  32

BP's Proposed Compromise "Solutions" Make Clear That the Parties Never
Intended the Settlement Agreement to be Interpreted as BP Now Suggests .  .  33

    Where Are BP's Experts Who Supported Approval of the Settlement?  .  35

BP Offered No Viable Workable Framework (either Consistent with the
Settlement Agreement or Otherwise) during the Court-Ordered Mediation .  .  35

**BP's Motion for Reconsideration Presents Nothing New**

There is nothing new in BP's Motion for Reconsideration.  Rather, BP continues to push for subjective inquiries into alternative causation, (despite the Court's formal Policy Statement of December 12, 2012), essentially re-hashing the same arguments it made to the Claims Administrator in its original submission of January 8, 2013.   On the eve of the Hearing before Your Honor, (despite indication from the Court that it did not require additional briefing), BP submitted hundreds of pages of additional materials, including three declarations from experts (who BP did not rely upon in support of settlement approval), as well as a lengthy powerpoint, premised on the very same arguments.  Now, BP submits five new expert declarations which, again, simply re-hash or expand upon the same arguments that were made by BP to the Claims Administrator.[13]  All of the arguments and other information presented have been available to BP, who has had a full and fair opportunity to try to convince the Claims Administrator and/or the Court to re-write the Settlement Agreement based on consequences that were, or certainly should have been, foreseeable to BP from the outset.[14]

**The Four Corners of the Settlement Agreement Confirm that the Claims Administrator's Interpretation of "Variable Profit" is Correct and Reflects the Intent of the Parties**

The Compensation Framework for Business Economic Loss (BEL) claims found in Exhibit 4C of the Settlement Agreement defines the term "Variable Profit" as follows:

> Variable Profit: This is calculated for both the Benchmark Period and the
> Compensation Period as follows:
> 1. Sum the monthly revenue over the period
> 2. Subtract the corresponding variable expenses from revenue over the same
>    time period.

---

[13] Class Counsel refer to the Draft *In Camera* Motion for Reconsideration and Exhibits provided to Judge Shushan and Class Counsel by BP on February 3, 2013.

[14] As noted by BP in a letter to the Claims Administrator dated September 28, 2012: "'false positives' are an inevitable concomitant of an objective quantitative data-based test."

The fundamental question for the Court is whether the term "corresponding" instructs (as the Claims Administrator found) the Program to subtract the variable expenses that are recorded "over the same time period" as the revenue is recorded;  or, on the other hand, instructs (as BP contends) the Program to attempt to "match" the variable expenses (whenever incurred) to the revenue that is "earned" over the same time period (based on when the relevant work was performed or "business activity" conducted).

The Claims Administrator's correct interpretation is supported by:

1. The language used throughout Exhibit 4C consistently and uniformly "corresponds" – *i.e.* "compares" – revenue and expenses experienced during the same time periods.

2. When read together with the Documentation provisions set forth in Exhibit 4A, it is clear that the Program was to focus on monthly revenue and expenses experienced or recorded contemporaneously during the Benchmark Period and Compensation Period.

3. The Examples contained within the Settlement Agreement reflect a comparison of the revenue and expenses recorded during the Benchmark Period and the Compensation Period.

4. The Expert Declarations and Briefs submitted by BP in support of final approval of the Settlement refer to expenses and revenue over the same comparable time periods.

5. A Memorandum prepared by BP's counsel towards the end of the negotiations directs that costs and revenue recorded during the relevant Benchmark and Compensation Period months be compared to one another, without any indication that the Compensation Framework would require the Program to average revenue across the entire time period it might have been "earned" or "match" the variable expenses to the revenue that was earned during the Benchmark or Compensation Period.

6. The powerpoint presentation prepared by the Program and presented to the Appeal Panelists in August without objection by BP defines "Variable Profit" as the sum of monthly revenue minus variable expenses from revenue "over the same time period".

7. The position taken by BP in response to the Claims Administrator's inquiry regarding the necessity of monthly profit and loss statements emphasized the BEL Frameworks' focus on monthly revenue and expenses actually experienced during the Benchmark and Compensation Periods in question.

8

8. Despite the exchange of numerous Examples during negotiations, BP never suggested that the Compensation Framework be applied in the manner BP is now suggesting.

9. With respect to the Test Claims provided by the Parties to the Program, BP never suggested that the Compensation Framework be applied to those Test Cases in the manner BP is now suggesting.

10. Although neither BP's current interpretation nor its proposed compromise "solutions" adhere to Generally Accepted Accounting Principles, it is clear that the parties did not intend to incorporate GAAP definitions of "Variable Profit" or other terms, as evidenced by the formal amendment of the Settlement Agreement to eliminate the requirement of CPAs to certify that the claims were submitted in conformity with GAAP in order to qualify for the Accountant Reimbursement Compensation.

These points, combined with the Parties' emphasis on uniform and objective application of the Settlement Frameworks, make it clear that the Claims Administrator's interpretation and application of the Settlement Agreement was and is the correct one.

**General Rules of Maritime Contract Interpretation** [15]

Interpretation of maritime contracts generally follows the same principles applied to other contracts under the common law of the various states. *See Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1241 (5th Cir. 1986). One difference from Louisiana law, however, is that "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981); *see also Spectrum Communication Specialists, L.L.C. v. KMJ Servs., Inc.*, No. 09-159, 2011 U.S. Dist. LEXIS 135348 (E.D. La. (Nov. 23, 2011) (quoting *Atl. Lines, Ltd. v. Narwhal Ltd.*, 514 F.2d 726, 730 (5th Cir. 1975)).

---

[15] Section 36.1 of the Settlement Agreement provides that "this Agreement . . . shall be interpreted in accordance with General Maritime Law," but none of the cases BP cited in its Jan. 24, 2013 *in camera* PowerPoint involved admiralty contracts. The two cases cited in BP's February 3, 2013 Draft Motion for Reconsideration are also decided under Louisiana law.

A maritime contract "should be read as a whole," *Fontenot,* 791 F.2d at 1214, and "[w]ords should be given their plain meaning unless the provision is ambiguous," *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984).  Further, the Court should "interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.,* 393 F.3d 550, 555 (5th Cir.2004); *see also Am. Roll-On Roll-Off Carrier, LLC v. P & O Ports Baltimore, Inc.*, 479 F.3d 288, 293 (4th Cir. 2007); RESTATEMENT (Second) OF CONTRACTS §203(a) & Comment b.

If a contract "is found to be ambiguous, the determination of the parties' intent through extrinsic evidence is a question of fact, and deference is due the determination of the district court."  *Butterfly Transp. Corp. v. Bertucci Indus. Services LLC*, 243 F. App'x 16, 19 (5th Cir. 2007); *Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1048 (5th Cir.1998).

**The Variable Profit Definition and Other Terms of the BEL Compensation Framework Are Clear and Unambiguous.**

The term "corresponding variable expenses" as used in the definition of "Variable Profit" within Exhibit 4C clearly refers to the variable expenses that correspond to "*the same time period*", (not to the variable expenses that might or might not "correspond" to the revenue).

Throughout the Compensation Framework, the Program is directed to "correspond" or compare the revenue and expenses experienced during the relevant Benchmark and Compensation Periods:

> **Step 1** – Compensates claimants for *any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.* Step 1 compensation reflects *the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period*.
>
> **Step 2** – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales

from the Benchmark Period.[16] This calculation reflects a Claimant-Specific Factor that *captures growth or decline in the prespill months of 2010* *compared* *to* *the* *comparable* *months* of the Benchmark Period and a General Adjustment Factor.

*   *   *

**Variable Profit:** This is calculated *for both the Benchmark Period and the Compensation Period* as follows:
1. Sum the monthly revenue *over the period*
2. Subtract the corresponding variable expenses from revenue *over* *the* *same* *time* *period*.

*   *   *

**Fixed and Variable Payroll Expenses:** Fixed and Variable Payroll Expenses are calculated based on the understanding that every business must operate with a minimum core staff and are *defined using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims, for May through December 2010...*

*   *   *

**Incremental Revenue**: Incremental revenue *shall be calculated as* (i) *the claimant's revenue in a claimant-selected period of six, seven or eight consecutive months* (as set forth in Step 2 below) *between May and December of the years selected by the claimant to be included in the Benchmark Period,* multiplied by (ii) the Claimant-Specific Factor and the General Adjustment Factor.

Similarly, in the Addendum to Exhibit 4C, which explains the relationship between the selected Benchmark Periods for Causation and/versus Compensation purposes, the focus is on the revenue and expenses experienced during the months within the Claimant-selected Benchmark and Compensation Periods:

…a claimant is not required to use the same **months** in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B and determining compensation pursuant to Ex. 4C.

---

[16] BP exaggerates the import of this sentence and takes it out of context. The language describes what the calculation is intended and agreed to have accomplished for purposes of the Agreement, not an invitation to debate what profit "might have been" absent the spill. Indeed, such a subjective analysis would render the remainder of the Framework meaningless. BP's attempt to use this language is also contrary to the principle that "specific terms and exact terms are given greater weight than general language." RESTATEMENT (Second) OF CONTRACTS §203(c).

\*     \*     \*

…. After establishing causation, however, the claimant may select a different 3 or more consecutive <u>months</u> between May and December 2010 in determining compensation….

Finally, the specific Examples contained within the Addendum to the Compensation Framework, Exhibit 4C, further confirm that the Program is to "compare" the revenue and costs experienced during the relevant months within Benchmark and Compensation Periods:

<u>Scenario 1</u>:
 ….
2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 *as compared to the months* of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

<u>Scenario 2</u>:
 ….
2) In determining compensation, Claimant could select the months of May-September 2010 *as compared to the months* of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

<u>Scenario 3</u>:
 ….
2) In determining compensation, Claimant could select the months of May-December 2010 *as compared to the months* of May-December in either 2009 or 2007-2009 – whichever provides the highest compensation.

Nowhere in these Examples – nor anywhere within the Compensation Framework – is there any suggestion that the Program Vendors should undertake any effort to "match" revenue received during the Benchmark or Compensation Periods to variable expenses incurred outside of those time periods;  nor to determine when such revenue, and/or other revenue recorded

outside of those time periods, was or was not "earned" by the claimant;[17]  nor to "average" or

"smooth" any "spikes" in revenue into or out of those time periods.[18]

It should also be noted that the Compensation Framework requires that the Benchmark

and Compensation Periods be a minimum of three months duration.  This demonstrates that the

parties considered the potential for "anomalies" from too short a snapshot and agreed on how to

approach that possibility.[19]

### The Agreement, Read as Whole, Confirms that Claims Administrator's Interpretation of the BEL Compensation Framework is Correct and Reflects the Intent of the Parties.

The Documentation provisions contained within Exhibit 4A make it clear that the

Program's analysis is to be based on revenue and expenses during the relevant periods chosen by

the claimant, as reflected in historical business records.  Specifically, the Framework requires:

> Monthly and annual profit and loss statements (which identify individual expense
> line items and revenue categories), or alternate source documents *establishing
> monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if
> applicable, 2011.*[20]

---

[17] Note that the definition of Variable Profit does not include the word "earned";  rather, the Agreement speaks of revenue "over the [same time] period".  BP does not dispute that all revenue earned (or booked or experienced or recorded or received) during the Benchmark and Compensation Periods must be considered; it merely seeks to redefine "revenue" and "earned" in novel ways that are not recognized under any accounting methodology.

[18] BP attempts to fundamentally change the agreement from inputting "revenue over" the relevant period to instead making a subjective analysis of the economic value of the "business activity" occurring during that period. *See* POLINSKY DECLARATION (Feb. 2, 2013).

[19] *See, e.g.,* FISHKIND DECLARATION (submitted by BP in support of Final Approval) [Doc 7114-5], p.31, ¶87 ("the requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring that the data reflect a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any unusual event"); HENLEY DECLARATION (submitted by BP in support of Final Approval) [Doc 7114-11], p.22, ¶30(b) ("The three month minimum period is a reasonable requirement because it eliminates the risk that normal month-to-month variations in business performance are not mistaken for a trend of declining performance due to the DWH Spill").

[20] SETTLEMENT AGREEMENT, Exhibit 4A, ¶4 (emphasis supplied).  *See also,* SETTLEMENT AGREEMENT, Section 38.38 ("'Contemporaneous' or 'Contemporaneously prepared' records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business. In addition, 'contemporaneous' or 'contemporaneously' prepared

If, as BP now suggests, the Program were intended to consider when the "business activity" related to the contemporaneously recorded monthly revenue may or may not have been conducted (*i.e.* when, under BP's proffered interpretation and/or proposed compromises, the revenue may have been "earned"), and/or when the variable expenses "matched" to the revenue may have been and/or might in the future be incurred, the Program would potentially need to consider financials that pre-date the Benchmark Period and/or post-date the Compensation Period, and even 2011. The Program would also have to solicit potentially infinite explanations and/or documents from the Claimant – well beyond the agreed-to BEL Claims Form and Exhibit 4A – to attempt to determine when such revenue contemporaneously recorded during the Benchmark and/or Compensation Periods was actually (according to BP) "earned" and/or the variable expenses to which the revenue (according to BP) "matches" or "corresponds".

Where the Parties intended certain revenues to be excluded, they said so explicitly. For example, the framework expressly excludes VoO revenue from the Step 2 (growth factor) calculation, and specifically explains how to address VoO payments if they are not separately broken out in the documentation submitted.[21]

Not only does BP's current interpretation logically lead to an inquiry into pre-Benchmark and post-2011 documentation, but BP's proposed "solution" contemplates smoothing not only

---

evidence or documentation, even if not proximate in time to the event or occurrence to which it relates, shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question, (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred").

[21] SETTLEMENT AGREEMENT, Exhibit 4C, at p.4.

across months of one year but across several years, indicating that documents for additional years would be required.[22]

Moreover, it should be noted that Exhibit 4A does provide that additional documents are required for certain industries, showing that the Parties knew how to do that where it was contemplated.

If "matching" revenue and expenses were required to properly determine causation for purposes of the Agreement, the Causation Framework would take expenses into account.  It does not.[23]

The Claims Administrator's interpretation is further supported by:

> **Section 5.3.2.1** (and **Exhibits 5-7**):  Specialized Business Frameworks developed to account for particular types of business claims. This demonstrates that the Parties knew how to do that, and, where appropriate to employ a different methodology, negotiated one.

> **Section 4.4.7**:  Within each claim category, documentation, proof, and compensation requirements were intended to apply equally to all parties. BP's current proposal would result in two different methods of calculating the BEL compensation amount.

> **Sections 4.3.7** and **4.3.8**: Claimant-friendly provisions, which are intended to ensure that the business is awarded the highest level of compensation dictated by the Benchmark and Compensation Period documentation.

Finally, the Settlement Agreement was specifically amended to delete the requirement that accounting professionals seeking reimbursement for their services sign and attest that they have submitted information "in compliance with generally accepted accounting principles."[24]

---

[22] *See, e.g.*, OUSTALNIOL SUPPLEMENTAL DECLARATION (Feb. 2, 2013), ¶9 (stating that BP's approach would not require recognition of contingent revenue because "we are in 2013" so the revenue would be "no longer contingent and can be reallocated to measure performance"; yet also noting that there will be "exceptions").

[23] *See* SETTLEMENT AGREEMENT, Exhibit 4B.

[24] *Compare* Section 4.4.13.4 in the original Settlement Agreement [Doc 6276-1] (April 18, 2012), *with*, Section 4.4.13.4 within AMENDMENT NO. 1 [Doc 6414-6] (May 2, 2012).

After the initial filing of the Agreement, numerous CPAs advised the Parties that they could not make such a certification, as the Settlement Agreement Frameworks specifically called for deviations from GAAP, and, acknowledging this, BP agreed to revise the certification.[25]

With respect to the Class Definition, BP takes loss of income, earnings or profits suffered "as a result of the Deepwater Horizon Incident" (Section 1.3.1.2) out of context, without due regard for the preface that their claims only "meet the description" of such "Damage Category" (Section 1.3), which incorporates the specific BEL Compensation Frameworks "described in the attached Exhibits 1A-15" (Section 1.3.1).

The Class Definition, in this way, is *not* intended to include only those people or businesses who, by some vague and subjective standard, might be able to prove losses arising from the Spill at trial.

Rather, it is intended to objectively describe damage categories (including business economic loss) which meet the descriptions of objective Frameworks, such as Exhibits 4B and 4C. Indeed, the Settlement Agreement itself *defines* those businesses who lost profits, income and/or earnings "as a result of" the Spill as those businesses who meet the objective Causation requirements set forth in Exhibit 4B. And then further defines those losses "as a result of" the Spill in terms of the Compensation that is set forth in Exhibit 4C.

The definition of "Economic Damage" includes "loss of profits, income and/or earnings arising in the Gulf Coast Areas or Specified Gulf Waters *allegedly* arising out of, due to,

---

[25] Of course, BP's current expert, Mr. Oustalniol, concedes that there is no specific definition of "variable profit" in GAAP. *See* OUSTALNIOL SUPPLEMENTAL DECLARATION (Feb. 2, 2013), at ¶26. Moreover, the "matching" that BP alludes to has been called into question, and is in no way required with respect to books maintained on a Cash Basis. Nor are the proposed compromise "solutions" set forth by BP GAAP compliant; in fact, (to the extent we understand their ever-changing proposals), applying BP's current suggestion to books maintained (in compliance with GAAP) on an Accrual Basis would be modified in such a way that they would no longer be GAAP compliant.

resulting from or relating in any way to, directly or indirectly, the Deepwater Horizon Incident."[26]

"Claim" is defined as simply "any demand or request for compensation (other than Bodily Injury Claims or Expressly Reserved Claims), together with any properly completed form and accompanying required documentation, submitted by a claimant to the Settlement Program."[27]

All of the contractual provisions, when read together, dictate that the Claims Administrator's focus on revenue and expenses actually recorded during the relevant Benchmark and Compensation Periods is correct and reflects the intent of the Parties.

**What BP Did Not Do and What the Settlement Agreement Does Not Say**

BP could have, but did not, limit the class geography.[28]

BP could have, but did not, attempt to place a limit or cap on total BEL recoveries.[29]

BP could have, but did not, seek to exclude agriculture, construction or professional service industries.[30]

BP could have, but did not, insist (or even suggest) that an alternative framework be applied to agriculture, construction or professional service industries.

---

[26] *See* SETTLEMENT AGREEMENT, Section 38.57 (emphasis added).

[27] SETTLEMENT AGREEMENT, Section 38.19.

[28] *See* SETTLEMENT AGREEMENT, Sections 1.1, 1.2 and 38.80 (defining "Gulf Coast Area").

[29] *See, e.g.,* SETTLEMENT AGREEMENT, Sections 5.2.1 and 38.130 (defining the "Seafood Compensation Program Amount" as $2.3 billion).

[30] *See, e.g.,* SETTLEMENT AGREEMENT, Section 2.2.4 (excluding Banks, Casinos, Real Estate Developers, and other types of businesses and industries).

The Settlement Agreement does not prohibit the submission or consideration of Cash Basis monthly profit and loss statements, nor does the Settlement Agreement require the submission of financial statements that are prepared on an Accrual Basis.[31]

The Settlement Agreement's Causation Framework does not deny eligibility to businesses that made more money in 2010 than they did in 2007-2009.[32]

The Settlement Agreement's Compensation Framework does not say anything about "matching" profit to revenue, nor "smoothing" revenue, nor inquiring into when revenue was "earned" based on work performed or other "business activity".

**There Are No "Absurd" Results from the Straightforward Application of the Agreement Previously Upheld by the Court.**

BP claims "absurd" results in the form of "fictitious" losses or losses not resulting from the spill.  As Polinsky acknowledges in his declaration on BP's behalf, "in a class action payments to claimants would not perfectly match economic losses in every instance."[33]  BP agreed to make the Settlement Payments to buy peace through a global classwide settlement.  The settlement of business economic claims is uncapped, and BP went into it knowing that there would be some element of uncertainty regarding what it might ultimately be obligated to pay.

BP's prime complaint appears to be that application of the Compensation Framework that BP agreed to produces "anomalies" that only inure to the Claimant's favor.  Even assuming

---

[31] *See* SETTLEMENT AGREEMENT, Exhibit 4A and Section 38.38; *see also,* Claims Administrator's REVIEW AND CLARIFICATION OF SELECTED POLICY STATEMENTS (Oct. 8, 2012).  Indeed, BP took the position that every Claimant *must* provide contemporaneously prepared monthly P&Ls, (even where re-stating to accrual). *See* LETTER FROM HOLSTEIN TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) (re Sept 25th Announcement of Policy Decisions), at p.3.

[3232] *See generally,* SETTLEMENT AGREEMENT, Causation Framework (Exhibit 4B); *see also,* Compensation Framework (Exhibit 4C).

[33] POLINSKY DECLARATION (Feb. 2, 2013), p.5 n.8.  *See also,* LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program) ("'false positives' are an inevitable concomitant of an objective quantitative data-based test").

*arguendo* that this is the case, the real issue is not accounting methodology, but the Claimant's right to choose the Compensation and Benchmark Periods.   It's this choice that's generally cited as the reason anomalies would be one-sided.  Yet there can be no dispute that such flexibility was intended.  Indeed, BP expressly agreed that if the Claimant made the wrong choice, (or no choice), the Settlement Program would maximize the claim.[34]  BP's proposal seems geared to take away the benefit of those provisions, not to apply any recognized or legitimate accounting method.

Moreover, BP's examples appear cherry picked, and the proponents of the declarations typically stop short of saying that even these examples "definitely" exhibit the flaws they describe.  Instead, the opinions are couched in terms of what "likely" happened.

Any sampling of submitted claims will be skewed since those claimants who fail to pass causation or receive only nominal compensation will have opted out of the Class Settlement or simply not waste their time submitting a claim.

One way that BP benefits from the Frameworks is that spill-related revenues, (even those that could have been earned on top of normal business activity had it not been interrupted), are included in the Causation Framework (Exhibit 4B) and the Step 1 Compensation Calculation (Exhibit 4C).  For  example, a restaurant that bought additional equipment and paid additional staff to do catering for clean-up workers, without reducing its regular business efforts, may have been negatively affected under the Settlement Frameworks by the short-term influx of BP capital such that it might not pass causation.

At the end of the day, all of BP's examples and complaints are predicated on the argument that, according to some type of vague and subjective notions, the business in question did not suffer losses caused by the Spill.  Irrespective of how painted, such an "alternative cause"

---

[34] SETTLEMENT AGREEMENT, Section 4.3.8.

inquiry is foreclosed by the entire nature and structure of the objective, mechanical, class-wide

Settlement Agreement.

**BP Clearly Agreed that Businesses Who Met Causation Would Recover the Full Compensation Outlined in the Settlement Agreement as Deemed and Presumed to Arise From the Deepwater Horizon Incident, and without Any Inquiry Into Potential Alternative Causation**

In support of its Motion for Final Settlement Approval, BP submitted the Declaration of

Holly Sharp, in which both BP and its expert confirmed that:

> Once a business meets the causation requirements, for purposes of quantifying causation, *all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill*, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.[35]

BP, at that time, also submitted the Declaration of Henry Fishkind, who similarly noted

that:

> …projected earnings during a Claimant-selected post-DWH spill compensation period are compared to actual earnings during that period and *the difference is deemed a compensable loss.*[36]

Then BP's Counsel, in a letter to the Claims Administrator dated September 28, 2012,

reiterated that:

> *One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements.* These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.

---

[35] DECLARATION OF HOLLY SHARP [Doc 7441-18], p.10, ¶17; *quoted in,* BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], at p.33, (emphasis supplied).

[36] DECLARATION OF HENRY FISHKIND [Doc 7441-5], p.10, ¶31 (emphasis supplied).

> ....*The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements*....[37]

Around the same time, Mike Juneau, on behalf of the Claims Administrator, had posed the following inquiry to the parties:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?
>
> I will give a hypothetical situation to try to illustrate the question we are asking:
>
> *Hypo:* A small accounting corporation / firm is located in Zone B. They meet the "V-shaped curve" causation test. The explanation for the drop in revenue is that one of the three partners went out on medical leave right around the time of the spill. Their work output, and corresponding income, thus went down by about a third. The income went back up 6 months later when the missing partner returned from medical leave. Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss. Is that full loss recoverable?[38]

In response to the question and hypothetical, BP confirmed that:

> If proper application of the methodology with accurate financial data yields a determination that causation is satisfied, BP agrees with Class Counsel that all losses calculated in accordance with … Exhibits 4C … of the Settlement Agreement are presumed to be attributable to the Oil Spill.
>
> \*   \*   \*
>
> ....If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

---

[37] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), p.1.

[38] E-MAIL FROM MIKE JUNEAU TO PARTIES (Sept. 25, 2012).

> *Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-fictional data indicate that the decline was attributable to a factor wholly unrelated to the Oil Spill. <u>Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test</u>.[39]*

Based on BP's response, the Claims Administrator issued a formal Policy Statement on October 10, 2012, further confirming that there would be no inquiry into potential "alternative causes" of the claimant's losses.[40]

Several weeks later, in the Joint Proposed Findings, the Parties again confirmed that:

> Once the causation tests are satisfied, *all revenue and variable profit declines during the Compensation Period <u>are presumed to be caused **entirely** by the spill</u>, with no analysis of whether such declines were also traceable to other factors unrelated to the spill.*[41]

When BP, nevertheless, came back and argued that Mr. Juneau's Supplemental Information Program spot was "misleading" because claims for losses which (in BP's subjective opinion) were not caused by the Spill were (allegedly) "fraudulent", the Claims Administrator requested the Court to confirm, in a formal Court-Approved Policy Statement, that the Settlement Agreement's Compensation Framework would be applied as written.[42]

BP is an extremely sophisticated party, represented throughout the negotiations by preeminent lawyers from distinguished firms such as Kirkland & Ellis, Arnold & Porter, and SRDenton, as well as an army of economic and accounting experts and consultants who were crunching the numbers at every turn.  Despite the Settlement's clear focus on the uniform

---

[39] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program), at pp.1,3 (emphasis supplied).

[40] ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2.

[41] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at ¶126, p.39 (emphasis supplied).

[42] E-MAIL FROM JUDGE BARBIER re "MEETING TODAY re NON-PROFITS AND SIP" (Dec. 12, 2012).

application of an objective quantitative data-based test, BP's current argument is nothing more

than an attempt to reintroduce some vague and subjective notion of "alternative causation".  The

"absurdities" that BP complains of are nothing more than the (arguable) "false positives" that

were, or certainly should have been, foreseeable to BP and its team from the beginning.

**<u>To the Extent the Settlement Agreement Could be Considered Ambiguous, the Extrinsic</u>**
**<u>Evidence Supports the Claims Administrator's Interpretation</u>**

> The Expert Declarations and Briefs submitted by BP in support of final approval of the

Settlement refer to expenses and revenue over the same comparable time periods.  For example,

BP submitted the Declaration of Holly Sharp with its Memorandum in Support of Final

Approval, in which BP confirmed that:

> > Once a business meets the causation requirements, for purposes of quantifying
> > causation, *all revenue and variable profit declines <u>during the</u> <u>claimant-selected</u>*
> > *<u>compensation</u> <u>period</u>* are presumed to be caused by the spill, with no analysis
> > required to determine whether the declines might have been due, at least in part,
> > to other causes.[43]

Similarly, BP's expert James Henley explained that:

> > In addition to *compensation for lost profits <u>during the</u> <u>Compensation</u> <u>Period</u>,* ...
> > claimants also receive an RTP multiplier....[44]

And BP's expert Henry Fishkind similarly noted that:

> > *…projected earnings <u>during a</u> <u>Claimant</u>-selected post-<u>DWH</u> spill <u>compensation</u>*
> > *<u>period</u> are <u>compared</u> to <u>actual</u> <u>earnings</u> <u>during</u> <u>that</u> <u>period</u>* and the difference is
> > deemed a compensable loss.[45]

In the Joint Proposed Findings, the Parties again confirmed that:

> > Once the causation tests are satisfied, *all revenue and variable profit declines*
> > *<u>during the</u> <u>Compensation</u> <u>Period</u>* are presumed to be caused entirely by the spill,

---

[43] DECLARATION OF HOLLY SHARP [Doc 7441-18], p.10, ¶17; *quoted in,* BP'S MEMORANDUM IN SUPPORT
OF FINAL APPROVAL [Doc 7114-1], at p.33, (emphasis supplied).

[44] HENLEY DECLARATION [Doc 7114-11], pp.24-25 ¶31 (emphasis supplied).

[45] FISHKIND DECLARATION [Doc 7441-5], p.10, ¶31 (emphasis supplied).

with no analysis of whether such declines were also traceable to other factors unrelated to the spill.[46]

Additionally, in his letter to the Claims Administrator of September 28, 2012, in which BP strenuously _objected_ to the averaging of either revenue or expenses from annual, semi-annual or quarterly financial statements, Mr. Holstein, for BP, stated as follows:

> These documents [*i.e.* monthly profit and loss statements or alternate source documents establishing monthly revenue and expenses] are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on the actual monthly financial experience of the claimants….

> \*     \*     \*

> …. The entire BEL framework depends on the input of accurate monthly financial data -- ….  *Because the claimant's actual monthly results are the foundation for the causation and compensation evaluations under the BEL framework, use of allocated proxy rather than actual data could severely distort the resulting outcomes.*[47]

Perhaps the best support for the Claims Administrator's interpretation is found in an e-mail memorandum authored by BP's counsel during the negotiations.   In February 2012, after much of the Compensation Framework had been reduced to what is now found in Exhibit 4C, a dispute regarding the appropriate correlation of the Benchmark Period to the Compensation Period threatened to sidetrack the deal.   BP's counsel authored a comprehensive memo which traced the entire negotiating history.  This memo consistently references the actual monthly cost and revenue experienced in the Benchmark Period as compared to the actual monthly cost and revenue experienced during the Compensation Period. Specifically, BP's Counsel states that:

> The economics or accounting for determining a compensation amount for a post-spill loss is, in simplest terms, to compare the *actual financial results* during the

---

[46] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [DOC 7945], at ¶126, p.39 (emphasis supplied).

[47] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), at p.2 (emphasis supplied).

defined loss period measured against the profit that the claimant *might have or should have been expected to earn* in the comparable post-spill period of 2010.[48]

The memo further notes that: "The word *'comparable'* and the phrase *'comparable months'* is used throughout the document in the context of comparing the months selected by the Claimant in 2010 to compare against the same months in the Benchmark Period,"[49] which further supports the notion that the term "corresponding" within the definition of "Variable Profit" refers to a comparable time period. Nowhere in the memo is there any suggestion that the determination would be made by looking outside of the comparable time periods to "business activities" from which such revenues may have been "earned" or to variable expenses which might "match" with or "correspond" to the revenue.[50]

In a powerpoint prepared by the Program and presented to the Appeal Panelists in August without objection by BP defines "Variable Profit" – not in terms of "matching" or "corresponding" the expenses to the revenue, when "earned", but – as the sum of monthly revenue minus variable expenses from revenue "over the same time period".[51]

Despite the exchange of numerous Examples during negotiations, BP never suggested that the Compensation Framework be applied in the manner BP is now suggesting.[52]

---

[48] MEMO VIA E-MAIL FROM ROCK GODFREY TO RICE AND FAYARD (Feb. 17, 2012), No.3 (emphasis in original).

[49] MEMO VIA E-MAIL FROM ROCK GODFREY TO RICE AND FAYARD (Feb. 17, 2012), No.10(a) (emphasis in original).

[50] *See also, generally,* DECLARATION OF ROBERT WALLACE (Feb. 18, 2013).

[51] *Deepwater Horizon* Claims Center, APPEAL PANEL TRAINING, "General BEL" (Aug. 20, 2012).

[52] BP claims that none of the Test Cases presented the types of "spikes" in revenue that BP is now observing in, for example, construction, agriculture and professional claims. This, however, is not correct. For example, Test Case No. 72 was a construction claim, which was correctly processed at $191,733 in accordance with the Claims Administrator's interpretation. Not only did BP not suggest during the testing period that the Settlement Agreement had been mis-applied, but BP did not appeal the actual award and payment made by the Settlement Program. *See* DECLARATION OF JOHN TOMLINSON (Feb. 18, 2013) (with summaries of TEST CASES NOS. 13, 20, 71 and 72); *see also,* WALLACE DECLARATION, ¶5.

Similarly, a number of Test Claims were provided by the Parties to the Program, who ran them thru the algorithms that had been established by the Program to implement and apply the Settlement Agreement.  BP confirmed that these Test Cases were processed correctly, and never suggested that the Program was mis-interpreting the Compensation Framework nor that the process needed to be adjusted.

**BP Takes the Claims Administrator's Prior Statement regarding Cash Basis Profit and Loss Statements Out of Context**

On or around September 16, 2012, Class Counsel suggested to the Claims Administrator that smaller businesses who had not maintained monthly profit & loss statements in the ordinary course of business should be able to average their monthly costs and expenses from quarterly, annual or semi-annual profit & loss statements.[53]

BP, as noted *supra,* strenuously opposed this.

When the Claims Administrator issued his initial Policy Statement on September 25, 2012, he issued an associated policy that claimants who had kept their books on an Accrual Basis in the ordinary course of business would not be able to re-state their books to create monthly P&Ls under a Cash Basis method of accounting.[54]

Notably, the Claims Administrator did not in any way suggest that a company who kept monthly P&Ls on a Cash Basis in the ordinary course of business could not or should not submit those Cash Basis P&Ls to the Program.

---

[53] MEMO FROM CLASS COUNSEL TO CLAIMS ADMINISTRATOR RE MONTHLY PROFIT & LOSS DOCUMENTATION (Sept. 19, 2012).

[54] *See* Claims Administrator's ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Sept. 25, 2012), ¶1(c).

Nevertheless, and in any event, Class Counsel took the position that the Claims Administrator had erred, and that the Settlement Agreement generally allowed the claimant to submit their monthly costs and revenue on either a Cash or Accrual basis, whichever was more favorable.[55]

BP, by contrast, agreed "with the Claims Administrator that a claimant that maintained P&Ls on an accrual basis is not permitted to restate them to cash-basis financial statements."[56]

Therefore, the Claims Administrator's comment that "restatement could result in a loss or a greater loss not related to the Spill but instead as a result only of the timing of cash received" in the final Policy Statement of October 8, 2012,[57] was made in the context of prohibiting the _restatement_ of contemporaneously prepared P&Ls into financials created solely for the purposes of the Settlement.  Such policy did not, as noted, suggest that either the Claimant or the Program would be prohibited from relying on financials contemporaneously prepared on a Cash Basis.

Nor did BP, at that time, argue that Claimants should be prevented from submitting Cash Basis P&Ls prepared in the ordinary course of business.[58]  Nor that companies with Cash Basis financials should be evaluated under a different framework or methodology.

The Settlement Agreement, as currently interpreted, takes all Class Members as it finds them, and applies a uniform and objective set of frameworks to determine causation and compensation of losses that are deemed to be caused by the Spill.

---

[55] *See* MEMO FROM CLASS COUNSEL TO THE CLAIMS ADMINISTRATOR (Sept. 28, 2012), at pp.1-4.

[56] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), at p.3.

[57] Claims Administrator's REVIEW AND CLARIFICATION OF SELECTED POLICY STATEMENTS (Oct. 8, 2012), ¶1(c), at p.2.

[58] Indeed, BP insisted that if a claimant were to re-state from Cash to Accrual, it would still have to "(1) provide a copy of the original cash-basis financial statements and (2) briefly describe the methodology used to prepare the restated financial statements." LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), at p.3.

**The Claims Administrator's Interpretation Does Not Cause the Settlement Agreement to "Discriminate" Between Similarly Situated Class Members Solely Based on Whether they Kept their Books on a Cash or Accrual Basis**

Contrary to BP's contention that the Claims Administrator's current interpretation somehow creates some type of "discrimination" among similarly situated Class Members based solely upon whether they kept their books on a Cash or Accrual basis:

1. The BEL Frameworks take all businesses as they find them, and uniformly applies the objective methodologies to all members of the Settlement Class;[59]

2. As a practical matter, businesses that are similar in size and nature will generally keep their books in the same way;[60] and

3. The potential "discrimination" (if any) is not found in the Settlement Agreement, but in an administrative interpretation. (And, indeed, an administrative interpretation that was supported by BP, over Class Counsel's objection.)

The Claims Administrator's previous comment regarding the potential re-statement of Accrual to Cash financials does not in any way compel the interpretation of "Variable Profit" within the Compensation Framework that BP is suggesting, nor dictate the adoption of one or more of the compromise "solutions" that BP advances.

---

[59] Similarly situated Class Members may ultimately recover different amounts under the Settlement because they were better able to document their losses, (which is also likely true in litigation). But the entire Class was provided with a common and uniform set of objective and transparent requirements and criteria under which – assuming they decided to remain in the Class – their claims would be evaluated and paid.

[60] For example, most plaintiff law firms, and other professional service companies, are going to keep their books on a Cash Basis. Similarly, most similarly situated construction companies, depending on their size, (and/or the size of their projects), are going to keep their books on either a Cash or a Percentage-of-Completion basis.

**Neither BP's Interpretation of the Settlement Agreement Nor BP's Proposed Compromise "Solutions" Are Supported by General Accounting Principles**

Class Counsel address the accounting issues raised by BP in the expert Declarations of Dr. Mark Kohlbeck and George Panzeca, as well as Robert Wallace, who was present during the negotiations, and the previously submitted Affidavits of Allen Carroll, Harold Asher and Rick Stutes.[61]

As noted *supra,* BP's own expert concedes that there is no specific definition of "variable profit" in GAAP.[62]

Moreover, it is clear that the Parties did not intend to incorporate GAAP definitions of "Variable Profit" or other terms, as evidenced by the formal amendment of the Settlement Agreement to eliminate the requirement of CPAs to certify that the claims were submitted in conformity with GAAP in order to qualify for the Accountant Reimbursement Compensation.[63] Specifically, for example:

  o  The Settlement Agreement's definition of operating expense items as either "Fixed" or "Variable" were negotiated by the Parties, independent of how such expense items would be classified under GAAP;

  o  The Settlement Agreement's treatment of Payroll Expenses was negotiated by the Parties, independent of how such expense items would be treated under GAAP; and,

  o  The Settlement Agreement includes negotiated minimum and maximum Growth Factors, which are independent of how projected revenues and expenses would be projected (and limited) under GAAP.

At the same time, the Claimant-friendly process was not envisioned or intended to preclude numerous companies who keep their records on a Cash, Regulatory, Tax or Contractual

---

[61] Mr. Carroll, who was present for the Court-ordered mediation session, has also submitted a Supplemental Declaration.

[62] *See* OUSTALNIOL SUPPLEMENTAL DECLARATION (Feb. 2, 2013), ¶26.

[63] *Compare* Section 4.4.13.4 in the original Settlement Agreement [Doc 6276-1] (April 18, 2012), *with,* Section 4.4.13.4 within AMENDMENT NO. 1 [Doc 6414-6] (May 2, 2012).

Basis from making claims under the Settlement Program, nor to require them to undertake significant, complex, expensive and somewhat subjective efforts to re-state all of their contemporaneously maintained financials.[64]

Quite simply, the quantification of a business' "variable profits" under Generally Accepted  Accounting Principles would not be conducted as set forth in the Business Economic Loss Framework nor as set forth in one or more of BP's proffered compromise "solution" proposals.

Moreover, since matching is generally achieved by employing GAAP rules, if the claimant submitted GAAP-compliant P&Ls, there is certainly no basis to require an additional step of "matching" under the Settlement Framework.  Indeed, to alter either the revenue or "match" expenses on Accrual-Based financials – as BP suggests – would violate GAAP and take such statements out of compliance.  BP, in this regard, has appealed accrual-based claims, and the BP proposed "solutions" would drastically change, at the very least, the claims of construction companies with financials prepared under GAAP in the ordinary course of business.

Significantly, BP's most recent proposed compromise "solutions" make it clear that BP proposes to "smooth" or "average" what BP considers to be "spikes" in revenue based on when BP contends that such revenue may have been "earned" according to the timing of work performed or other "business activity".  This is quite different from the notion that variable expenses should "match" (or "correspond") to the Benchmark or Compensation Period revenue – either under BP's proffered interpretation of the Settlement Agreement or under GAAP.  While GAAP, in some instances, would call for a company to recognize expenses in a different month

---

[64] *See, e.g.,* PANZECA DECLARATION ¶14 ("The vast majority of businesses do not prepare financial statements in accordance with GAAP…. The cash basis and the tax basis methods are the most prevalent in accounting practice"); *see also,* KOHLBECK DECLARATION, ¶2; WALLACE DECLARATION ¶8.

from when such expenses were actually paid, GAAP would not generally require or allow a business to "smooth" or "average" its revenue.

Under GAAP, revenues are generally recognized when two conditions have been met: (1) the revenues are realized or realizable (company has exchanged goods and/or services for cash, receivables, or other assets readily convertible to those); and (2) the revenue has been earned (*i.e.* the company has done what it needs to do to be entitled to the revenue). For companies with manufacturing or selling activities, these two conditions are generally met at the point of sale/delivery. This is the point in time where most uncertainties are removed and the sales price is known. This is basic accrual accounting.

Under this method, expenses generally follow the revenues; not the other way around. Expenses are recognized when obligations are (1) incurred (usually when goods are transferred or services rendered, *e.g.* sold), and (2) offset against recognized revenues, which were generated from those expenses (related on the cause-and-effect basis), no matter when cash is paid out. A retailer who keeps its books on an accrual basis has to use an inventory method which delays the recognition of the cost of goods sold (COGS) expense until the good is sold. It does not move revenue to assume it was "earned" when an inventory item was purchased.

BP's proposal to move *revenue* to "match" expenses (or other "business activity") is backwards and violates GAAP in these respects. The formula would also artificially assign revenue to non-revenue-producing expenses. Assuming, for example, that a claimant had a significant repair expense in a given month, BP would force the Program to assign revenue to that event where none existed.

For construction companies, GAAP requires the recognition of revenue as the project reaches different stages, but only for long-term projects. On a case-by-case basis, the company

would recognize revenue based on the percentage of the project that was complete. Under the percentage-of-completion method, revenue for the period is recognized based on the actual costs incurred as a percentage of the total estimated costs.  This is done on a contract-by-contract, project-by-project basis.  Further, the recognition of revenue only "matches" expenses in a loose sense.  There is no one-to-one matching, and specific expenses do not have revenue artificially assigned to them.

BP advocates the assignment of revenue to *all* expenses incurred, regardless of whether they are job-related, and would apply to same profit percentage to each job.  Assume the contractor self-performs a large part of his work and did not lay off his crew in the initial months following the spill.  BP would assign revenue for the post-spill period where revenue was lacking by moving revenue from pre-spill months to "match" the expenses.  The proposed formula would also move revenue from the pre-spill January-to-April period of 2010 if the contractor had higher profit percentages during that period.  This methodology has no support under GAAP.

**The Accounting Textbook that BP Relies on Has Been Revised to Delete the Section on "Matching"**

BP cites the Tenth Edition of the Kieso textbook on INTERMEDIATE ACCOUNTING for the proposition you have to "synchronize the revenues earned with the corresponding expenses incurred."[65]  This old edition of the textbook has an entire section on matching.  The Thirteenth Edition of the textbook, however, refers to matching only in a footnote, in which the authors acknowledge that "there is some debate about the conceptual validity of the matching principle."[66]

---

[65] *See* BP Draft Motion to Reconsider, at p.6.

[66] Kieso, Weygandt & Warfield, INTERMEDIATE ACCOUNTING (13th Ed.), at p.45 n.13; *see also,* KOHLBECK DECLARATION ¶8 ("In older financial accounting textbooks (*e.g.,* Kieso, Weygandt & Warfield, Intermediate Accounting 10th Ed.), the idea of matching was commonly stated as an accounting principle.  Over a decade ago,

**BP's Proposed Compromise "Solutions" Make Clear That  the Parties never Intended the
Settlement Agreement to be Interpreted as BP Now Suggests** [67]

It is telling that BP is only in the preliminary stages of developing the methodology it
claims was intended all along.  According the Sider Declaration, BP's proposed "triggers" are
preliminary and intended as a "starting point."[68]  Yet, these triggers affect not only agricultural
and professional services claims, but also core tourism businesses that were unquestionably a
focus of the negotiation, including nearly a quarter (22%) of hotel/motel claims and 14% of
bar/restaurant claims.[69]

Similarly, BP has only a "preliminary version" of a methodology for some claims,[70] and
no methodology at all yet for others.[71]

Noticeably absent from BP's submission are any specific examples of how BP's
methodology would be applied, and the Sider Declaration concedes that this is in part because in
many cases the necessary documentation is "not readily available" or unspecified "claim-specific
review" would be needed to determine a compensation amount.[72]

---

the profession's thinking evolved and concluded that matching is not an accounting principle.  More recent editions
of financial accounting textbooks (*e.g.,* Kieso, Weygandt & Warfield, Intermediate Accounting 14th Ed.) emphasize
the conceptual framework as a foundation and do not indicate matching as an accounting principle").

[67] *See generally,* WHAT BP'S EXPERTS WANT: Summary of Declarations Submitted by BP in Support of
BP's February 3, 2013 Motion for Reconsideration.

[68] SIDER DECLARATION (Feb. 2, 2013), at ¶ 27.

[69] *See* SIDER DECLARATION (Feb. 2, 2013), at ¶29.

[70] *See* SIDER DECLARATION (Feb. 2, 2013), at ¶33.

[71] *See* SIDER DECLARATION (Feb. 2, 2013), at ¶34 (methodology not yet available to address "spikes" in
revenue).

[72] *See* SIDER DECLARATION (Feb. 2, 2013), at ¶¶ 35-36.

There are a number of subjective determinations referenced in the Sider declaration, including use of a "crop year" and a "production year" which could conceivable vary, and use of various ratios to "approximate" or "estimate" matched monthly revenues and expenses.  There also appear to be other subjective standards in the works, such as valuing the work performed on particular matters in a given month by businesses that do not keep hourly time logs showing what work was done when.[73]

Although BP claims it has an objective, workable methodology, there is no evidence that's the case, or it would have put examples of the results of its interpretation next to the examples of the results of the current process.

It's notable that one of BP's declarants appears not to have read the Agreement (it's not listed among his materials relied upon and a footnote referencing "classification issues" with fixed and variable costs suggests unfamiliarity), yet is opining on whether BP's proposal changes the Agreement's terms.[74]   He does at least admit, however, that key issues regarding whether BP's approach is subjective, unworkable, and would create two separate evaluation models for BEL claims are legal issues he's not qualified to address.[75]

BP's proposal, if adopted, would also cause significant interruption to the Settlement Program.  In addition to the inquiries that the Program Vendors would have to make of claimants for additional documents and information, the Program would have to go back and re-calculate thousands of claims.  In addition, the Program would also have to go back and apply a different Causation test both with respect to previously Eligible and previously Denied claims.  Before any of that could commence, the entire BEL Causation and Compensation algorithms would

---

[73]  *See* SIDER DECLARATION (Feb. 2, 2013), at ¶¶ 34-39.

[74]  *See* OUSTALNIOL SUPPLEMENTAL DECLARATION (Feb. 2, 2013) ¶¶ 4, 32 n.16, 33 & Appendix A.

[75]  *See* OUSTALNIOL SUPPLEMENTAL DECLARATION (Feb. 2, 2013) ¶¶ 11.

have to be re-programmed and re-tested.  And the Claims Administrator would likely have to hire and train different and additional staff.

Finally, the Court would be flooded with motions, objections and appeals by Class Members who will contend that they relied upon the Class Notice and express terms of the Settlement Agreement, as well as representations by both Class Counsel and BP, which have now, as a result of a *post hoc* change in the Settlement Agreement, resulted in a denial of Due Process.[76]

### Where Are BP's Experts Who Supported Approval of the Settlement?

In support of Settlement Approval, BP submitted the Expert Declarations of James Henley, James Richardson, Holly Sharp and Henry Fishkind, who each opined on the fairness and adequacy of the objective BEL Frameworks.[77]  Where are these experts now?

### BP Offered No Workable Objective Framework (either Consistent with the Settlement Agreement or Otherwise) during the Court-Ordered Mediation

BP has yet to provide any proposal with any objective, quantifiable rules or formulas that would allow class members to determine how their claims would be calculated.  Instead, BP has

---

[76] *See, e.g.,* ORDER AND REASONS GRANTING FINAL APPROVAL OF THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT [Doc 8138] (Dec. 21, 2012), at p.31 ("All class members…are protected by specific, detailed and objective frameworks that were promulgated publicly by  the Court during the preliminary approval process after the parties had negotiated those frameworks"); p.87 ("Any claimant in any zone can recover if the claimant can establish causation and damages according to clearly defined criteria supported by objective economic data"); pp.110-111 ("the Settlement Agreement is designed to be transparent as a claimant or his or her counsel reviews the frameworks relevant to particular circumstances, but also sufficiently detailed to ensure that determinations made by the Settlement Program are objective, consistent, and predictable"); *see generally,* EXCERPTS FROM PRELIMINARY APPROVAL HEARING TRANSCRIPT; EXCERPTS FROM BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL; EXCERPTS FROM DECLARATIONS IN SUPPORT OF BP'S MOTION FOR FINAL APPROVAL; EXCERPTS FROM FINAL APPROVAL HEARING TRANSCRIPT; AFFIDAVIT OF HAROLD ASHER (Jan. 15, 2013) ¶¶ 4-5, 9-10, 17; DECLARATION OF RICK STUTES (Jan. 17, 2013) ¶¶ 4-6, 8-9, 13-14; SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Feb. 18, 2013), ¶¶ 2, 4; DECLARATION OF GEORGE PANZECA (Feb. 18, 2013), ¶¶ 3, 12, 23, 26; DECLARATION OF ROBERT WALLACE (Feb. 18, 2013), ¶¶ 1, 9-12; *see also, e.g.,* E-MAIL TO CLASS COUNSEL FROM MARY BETH MANTIPLY (Feb. 16, 2013).

[77] *See* EXCERPTS FROM DECLARATIONS IN SUPPORT OF BP'S MOTION FOR FINAL APPROVAL.

submitted *ad hoc* examples and hypothetical scenarios reflecting its views on how revenue should be "smoothed" and/or otherwise "matched" to expenses.[78]

Throughout the mediation of this matter, it became apparent that BP was not prepared to offer a defined proposal for the implementation of what it claims was a negotiated term.  Phrases like "refine further" "tweak" and "a work in progress" were consistently used by BP to describe its proposals.  Had a matching process been intended by the Parties, it would have been negotiated and memorialized prior to the submission of  the Settlement Agreement to the Court for approval and the issuance of formal Notice to the Class.  BP's undeveloped and half-baked proposals definitively show that its position is not simply a matter of interpretation but an attempt to negotiate a completely new settlement.

From what Class Counsel can determine, BP's proposal cannot be implemented within the bounds of the Settlement Agreement.  BP's proposal would replace actual objective financial conditions as reflected in contemporaneous records with subjective determinations about when revenue was "earned" and/or with what expenses such revenue should be "matched".  BP's proposal would expand the time period and scope of potentially relevant source documents to an indefinite body of information and records stretching back before the Benchmark Period and right up to the present.

Consider the following examples offered by BP:

Under BP's proposal for a Construction Company, the Claims Administrator would be required to match revenue to expenses by obtaining job schedules so that revenue earned could be spread throughout the time period of the job.  Thus, if a construction company received

---

[78] Two experts appeared with Class Counsel at the Court-ordered mediation session, and have provided the Court with comments regarding the compromise "solutions" proposed by BP during the mediation. *See generally,* SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Feb. 18, 2013); DECLARATION OF GEORGE PANZECA (Feb. 18, 2013).

revenue in 2007 a 3-year job, the program would be required to obtain job schedules, expenses and tax returns dated back to 2004.  Such a requirement is not contemplated anywhere in the agreement.

For professional services firms, BP's proposal goes even further.  If a law firm, for example, received a contingency fee in a six-year-old case 2007, it would be required to provide to the Claims Administrator an accounting dating back to 2001 of the hours worked, by month, on the case.  (It should be noted, in this instance, that BP is not "matching" revenue to expenses, but is instead simply "smoothing" out revenue over the time spent on a mater.)  These types of inquiries go well beyond the BP-approved Claim Form and the Documentation Requirements set forth in the Settlement Agreement.[79]

BP's proposal would also largely eviscerate the Causation Framework, Exhibit 4B.  One of the fundamental principles of the entire Settlement Agreement would be "interpreted" out of the agreement if the Claims Administrator were to apply in the way that BP proposes.  The Causation testing in Exhibit 4B was intended to be measured by Total Revenues.  It was intended to be a simple test through which a Class Member could quickly determine whether he would be eligible for compensation.  Expenses are not, and never have been, considered in the Causation analysis.  BP's current proposals, however, would require the Claims Administrator to "match" revenues to expenses (by "smoothing" out the revenues) before causation testing is performed. In addition to the fact that this was clearly not intended, Causation testing would also become far more complex and expensive from an accounting standpoint.  A class member could not longer

---

[79] The law firm example leads to even more absurd results where a case that was generated during the Benchmark and/or Compensation Period is still ongoing.  The Claims Administrator would be required to place a value on the case so that, in BP's proposal, "revenue earned" could be spread over the life of the case based on effort expended.  Not only is there no basis for such an inherently subjective determination in the Settlement Agreement, but such proposal would clearly violate the applicable accounting standards, and would be ethically questionable for the law firm.

simply determine its total revenue in a the selected three months, but would be required to do the following: 1) run the yet-undetermined analysis to see if it triggers a threshold requiring BP's proposed revenue smoothing; 2) compile expenses, job schedules, hours billed, etc., on each matter on which revenue was earned as far back as may be required; 3) value work performed on which payment has yet to be received; 4) perform the yet-undetermined spreading of revenue over the requisite months; 5) select the three-consecutive months for the causation test; and 6) determine if causation is met.  Not only does this go far beyond what was ever negotiated or agreed to, but it calls for subjective determinations, such that a Class Member could go through that entire process and come to a different conclusion than the Settlement Program.

This is not what was negotiated, agreed, submitted, noticed to the class, nor approved.

## Conclusion

BP's counsel perhaps said it best:

> One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements.  These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements.  Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.

> ….The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements….

> …. Because the claimant's actual monthly results are the foundation for the causation and compensation evaluations under the BEL framework, use of allocated proxy rather than actual data could severely distort the resulting outcomes.[80]

*   *   *

> ….If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

> Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-fictional data indicate that the decline was attributable to a factor wholly unrelated to the Oil Spill. Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.[81]

For these reasons, for the reasons set forth by the Claims Administrator, and for the conclusions previously reached by Your Honor, BP's Motion for Reconsideration should be denied.

---

[80] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), at p.2 (emphasis supplied).

[81] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program), at pp.1,3 (emphasis supplied).

# EXHIBITS

**Submitted by Class Counsel
in Support of the Claims Administrator's Interpretation
and in Opposition to BP's Motion for Reconsideration**

1. SETTLEMENT AGREEMENT, BEL Compensation Framework, Exhibit 4C

2. SETTLEMENT AGREEMENT, BEL Documentation Requirements, Exhibit 4A

3. MEMO *VIA* E-MAIL FROM RICK GODFREY TO RICE AND FAYARD (Feb. 17, 2012).

4. EXCERPTS FROM PRELIMINARY APPROVAL HEARING TRANSCRIPT

5. EXCERPTS FROM BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL

6. EXCERPTS FROM DECLARATIONS IN SUPPORT OF BP'S MOTION FOR FINAL APPROVAL

7. DECLARATION OF HOLLY SHARP [Doc 7441-18], p.10.

8. *Deepwater Horizon* Claims Center, APPEAL PANEL TRAINING, "General BEL" (Aug. 20, 2012)

9. MEMO FROM CLASS COUNSEL TO CLAIMS ADMINISTRATOR re MONTHLY PROFIT & LOSS DOCUMENTATION (Sept. 19, 2012)

10. Claims Administrator's ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Sept. 25, 2012)

11. MIKE JUNEAU E-MAIL TO THE PARTIES re INPUT ON ALTERNATE CAUSATION (Sept. 25, 2012)

12. HOLSTEIN LETTER TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program)

13. HOLSTEIN LETTER TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) (re: Sept. 25th Policy Announcements)

14. MEMO FROM CLASS COUNSEL TO CLAIMS ADMINISTRATOR re SEPT. 25TH POLICY ANNOUNCEMENTS (Sept. 28, 2012)

15. Claims Administrator's REVIEW AND CLARIFICATION OF SELECTED POLICY STATEMENTS (Oct. 8, 2012)

16. Claims Administrator's ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012)

17. EXCERPTS FROM FINAL APPROVAL HEARING TRANSCRIPT

18. JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], p.39.

19. E-MAIL FROM DAN CANTOR TO MIKE JUNEAU RE: "ACCOUNTANT QUESTIONS" (Dec. 11, 2012)

20. E-MAIL FROM JUDGE BARBIER RE "MEETING TODAY RE NON-PROFITS AND SIP" (Dec. 12, 2012)

21. Claims Administrator's ANNOUNCEMENT OF POLICY DECISIONS (Jan. 15, 2013)

22. DECLARATION OF ALLEN CARROLL (Jan. 16, 2013)
    Ex. A - RECOGNITION OF REVENUE AND GAINS, under FASB Statement No. 5
    Ex. B – Wilder and Dickinson, ACCOUNTING RULES FOR CONTINGENT FEE RECOGNITION

23. AFFIDAVIT OF HAROLD ASHER (Jan. 15, 2013)

24. DECLARATION OF RICK STUTES (Jan. 17, 2013)

25. DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013)

26. Kein, Weygandt & Warfield, "Recognition and Measurement Concepts" INTERMEDIATE ACCOUNTING (13th ed.), pp.39-51.

27. WHAT BP'S EXPERTS WANT:  Summary of Declarations Submitted by BP in Support of BP's February 3, 2013 Motion for Reconsideration,

28. E-MAIL TO CLASS COUNSEL FROM MARY BETH MANTIPLY (Feb. 16, 2013)

29. DECLARATION OF ROBERT WALLACE ("Wally") (Feb. 18, 2013)

30. DECLARATION OF GEORGE PANZECA (Feb. 18, 2013)

31. DECLARATION OF JOHN TOMLINSON (Feb. 18, 2013)
    -   Test Case No. 13
    -   Test Case No. 20
    -   Test Case No. 71
    -   Test Case No. 72

32. SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Feb. 18, 2013)