# Exhibit 10B

**(1)**

# MEMORANDUM

**To:** Patrick A. Juneau, Esq.
    Claims Administrator

**From:** Class Counsel

**Matter:** In re: Deepwater Horizon
    MDL No. 2179

**Re:** Request for Formal Policy Statement: Monthly Revenue

**Date:** December 16, 2012


Despite the focus of the Settlement Agreement negotiated, agreed to, noticed, and submitted for approval by BP, on monthly revenue, and the insistence by BP on the submission of month-by-month profit and loss statements, (or alternate source documents), BP has now questioned the Program,[1] and argued in numerous Appeals,[2] that some Claimants should have their Monthly Revenue averaged out over a number of months, or even years. Further, BP suggests that Costs incurred either before or after the Compensation Period be "matched" to Revenue received during the Compensation Period. And, finally, BP attempts to resurrect its suggestions of an inquiry into potential alternative causation.

Class Counsel therefore respectfully request a formal Policy Statement.

Specifically:

1. When a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed.

2. When a business keeps its books on an accrual basis, and/or has prepared and submitted its monthly P&Ls on an accrual basis to the Settlement Program, revenue is earned during the month that such revenue is both earned and is realized or realizable.

   For example, if a construction firm receives and books a lump sum payment in Month 1 to cover work performed in Months 1-3, the entire lump sum payment is treated as revenue during Month 1for purposes of the BEL Causation and Compensation Frameworks.

3. The "corresponding variable expenses" associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question.

---

[1] *See, e.g.,* E-Mail from Dan Cantor to Mike Juneau, re: "Accountant Questions" (Dec. 11, 2012).

[2] *See, e.g.,*

For example: If August is a Benchmark / Compensation month for either Causation and/or Compensation Purposes, the variable expenses are the variable expenses that are incurred and booked in August, even if they might arguably relate to revenue that is not received and booked until November.

For example: Where a claimant retail establishment purchases large amounts of inventory during Month 1, the inventory (Costs of Goods Sold) that was incurred / expended and booked in Month 1 is treated as Month 1 costs, even if the inventory was sold during Months 2-4.

For example: Claimant is a construction company that maintains its books on a cash basis and purchases $40 in materials in June, and then performs half of the job in July and half in August, incurring $20 dollars in labor costs in each month, and gets paid $100 for the job in September. For purposes of the BEL framework, the $100 revenue is earned in September, while the $40 costs are incurred in June.

For example: Claimant is a law firm representing a personal injury plaintiff on a contingency fee basis. Attorneys spend $250 to file the case in June, 20 hours and $150 in computer research costs submitting briefs in July, and 30 hours and $500 taking depositions in August. In September, a settlement is reached, and the Firm receives a $10,000 contingency fee payment, plus reimbursement of the $900 in expenses. For purposes of the BEL framework, $250 in costs would be incurred in June; $150 in costs would be incurred in July; $500 in costs would be incurred in August; and $10,900 in revenue would be earned in September.

For example: Claimant is a farmer who plants his crop in April and books associated labor and material costs of $100 getting the crop in the ground. Between May and September the farmer books $40 in monthly expenses maintaining and nurturing the crop ($200 total for the 5 months), and then incurs and books $100 in labor costs for October when the crop is harvested. The harvested crop is taken to market and sold for $1,000 on November 27 with all revenue recorded in that month against $100 in selling costs. For purposes of the BEL framework, there would be costs of $100 in April; costs of $40 in May, June, July, August and September; costs of $100 in October; costs of $100 in November; and revenue of $1,000 in November.

4.  Where a Claimant ceases a line of business during the Benchmark Period, such revenue from the terminated line of business is included in the BEL calculation.

    For example: Claimant rented commercial properties in 2007 but sold those properties at the beginning of 2008, for the purposes of the BEL Framework, the 2007 revenue from the properties would be included in the Causation and/or Compensation calculation(s).

## Discussion

Averaging the revenue; attempting to correlate specific revenue to specific expenditures in previous or subsequent months; and/or eliminating revenue based on changes in the Class Member's business:

- Was not suggested by BP during negotiations;

- Is not supported by the terms of the Settlement Agreement;

- Would require substantial documentation and other information beyond what is contemplated or provided for in the Settlement Agreement's Documentation requirements;

- Violates the established Policy precluding an inquiry by the Program into potential "alternative causes"; [3]

- Is impractical and unworkable;

- Is inconsistent with BP's prior focus and insistence on Monthly Profit & Loss statements;

- Is inconsistent with the Claims Administrator's Policy regarding the use and restatement of Profit & Loss statements; [4]

- Assumes and/or implies that attorneys only work on one case at a time; that construction firms only work on one project at a time; and that retailers only purchase and sell one batch of inventory at one time; [5]

---

[3] *See* E-MAIL FROM JUDGE BARBIER, RE "MEETING TODAY RE NON-PROFITS AND SIP" Dec. 12, 2012; ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION, Oct. 10, 2012, No.2; LETTER FROM MARK HOLSTEIN TO PAT JUNEAU, Sept. 28, 2012.

[4] *See* ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION, Sept. 25, 2012, No.1(c) (If the claimant's profit and loss statements for a year were prepared on a Cash Basis, the claimant may be permitted – but is in no way required – to restate such statements on an Accrual Basis in connection with the submission of a Business Economic Loss claim).

[5] BP's hypotheticals, which implicitly suggest that it's not "fair" to assign revenue and costs to the months in which such revenue was actually earned and such costs actually incurred, ignore the rest of the claimant's business. For example, the attorney will continue to expend costs during the Compensation Period with respect to other cases on which revenue may not be recognized for years, if ever. A construction company may expend costs for new projects even as it collects for work and materials provided in connection with old projects. A retailer will often continue to stock its shelves with different inventories of different product lines that are purchased and sold at different times.

- • Doesn't account for the possibility that a business line (and the associated revenue and/or expenses) may have been added by the Claimant prior to or during the Compensation Period;[6] and,

- • To the extent unfavorable, is inconsistent with Settlement Agreement Section 4.3.8.

The primary reference to monthly profit and loss statements is in Exhibit 4A to the Agreement, which states that the claimant is required to produce:

> Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. Profit and loss statements shall identify the dates on which they were created. The Claims Administrator may, in his discretion, request source documents for profit and loss statements. If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.[7]

This provision is supplemented by the Definition of "Contemporaneous" which provides that:

> "Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business. *In addition, "contemporaneous" or "contemporaneously" prepared evidence or documentation*, even if not proximate in time to the event or occurrence to which it relates, *shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question,* (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question

---

[6]BP implicitly complains that revenue associated with a line of business that was discontinued during the Benchmark Period should not be included in the BEL calculation. However, it is just as plausible that a claimant may have added a line of business during the Benchmark Period and/or during the Compensation Period, which would result in additional revenue and expenses during the Compensation Period, as compared with the Benchmark Period.

[7]Exhibit 4A, Item 4.

actually occurred.[8]

Nothing in these provisions or elsewhere in the Settlement Agreement specifies the accounting method which must be used to create the monthly profit and loss statements.

While the Settlement Agreement does not necessarily dictate the use of Generally Accepted Accounting Principles, (and, indeed, intentionally departs from GAAP in several respects), it is significant to note in this context that both the cash basis of accounting and the accrual basis of accounting are accepted bases for determining when to book revenue. Both are well recognized methods of accounting. The tax law (Internal Revenue Code) was established essentially under the cash basis, with situations where modified cash or accrual accounting is used. Financial reporting for investors and creditors is primarily accrual based. Under cash basis accounting, revenue is recognized when cash is received. Under accrual accounting, revenue is recognized when it is both (i) earned and is (ii) realized or realizable.

The attempt to "match" expenses to revenue bears resemblance to research and development (R&D) costs. Companies engage in R&D activities (*i.e.* incur expense) knowing that the incidence (and certainly the amount) of future benefit (*i.e.* revenue) is uncertain. Because these expenses cannot be effectively correlated with future revenue, Statement of Financial Accounting Standards No. 2 (1974) – "Accounting for Research and Development Costs" – requires that the R&D expenditures be expensed immediately as incurred.

With respect to attorney contingency fees in particular, the appropriate guidance for such "contingencies" is contained in the source document FASB Statement No. 5 – "Accounting for Contingencies" – as well as in the FASB Accounting Standards Codification (which was implemented in 2009) under FASB ASC 450-10. Contingencies are defined as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur. In accordance with these standards, virtually all plaintiff law firms maintain their books on a cash basis; case costs are booked when incurred (irrespective of whether or when they might be recovered from the client and/or defendant); fees (and case cost reimbursements) are booked as revenue (and taxed as income) in the month in which they are received (irrespective of when the work was performed).[9]

A prime failure of BP's proposal is that there is no way to calculate the revenue that should be reported in the relevant periods for cases in which expenses are incurred, but payment has not yet been received. That is, while BP wants to allocate current revenues to prior periods, the fallacy of that methodology is shown by the impossibility of allocating future revenues to current periods.

---

[8] Section 38.38.

[9] *See, e.g.,* FASB STATEMENT NO. 5 (1975), ¶17(a) ("Contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization").

**(2)**

## BP's Response To Class Counsel's
## December 16, 2012 Request for Policy Determination

### Introduction

Class Counsel's December 16, 2012 Request for Policy Determination seeks to rewrite the Settlement Agreement. The parties negotiated a Settlement Agreement that uses objective tests to make claim determinations, including the amount and magnitude of losses (if any). As set out in Exhibit 4C, which is the "Compensation Framework for Business Economic Loss Claims," the parties agreed that "[t]he compensation framework for business claimants compares the *actual profit* of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to *earn* in the comparable post-spill period of 2010." Settlement Agreement, Ex. 4C at 1 (emphasis added).

Class Counsel argues that "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." Class Counsel 12-16-12 Memo at 1. Therefore, Class Counsel's position is that it is solely the *timing* of when cash is received that is relevant for purposes of comparing pre- and post-Spill economic performance, which comparison determines whether there was a compensable loss (and the amount of any such loss) under the Settlement Agreement. But this novel position ignores the text of the Settlement Agreement, which instructs that the first step in evaluating financial performance is to measure "revenue" "earn[ed]," not payments received. The use of the terms "revenue" and "earn[ed]" in the Settlement Agreement was negotiated and deliberate. As the Settlement Program itself recognized in its October 8, 2012 Policy Statement prohibiting a claimant that keeps its books on an accrual basis from restating the financial data on a cash basis for purposes of filing a claim, relying solely on the timing of the receipt of cash "could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received." Claims Administrator 10-8-2012 Policy Statement at 2.

Similarly, Class Counsel contends that: "The 'corresponding variable expenses' associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question." Class Counsel 12-16-12 Memo at 1. Again, Class Counsel's position ignores and is incompatible with the express text of the Settlement Agreement, which requires that "corresponding variable expenses" be subtracted from the revenue they generate in order to measure variable profit. Settlement Agreement, Ex. 4C at 2. Accepting Class Counsel's proposal requires ignoring the express text of the Settlement Agreement. And failing to match the corresponding variable expenses incurred to generate revenue presents the mirror image of the problems that arise when one focuses only on the timing of revenue. As the Claims Administrator has already found, such an approach "could result in a loss or a greater loss not related to the Spill." Claims Administrator 10-8-2012 Policy Statement at 2.

Class Counsel's proposed rewrite of the objective compensation tests produces objectively absurd and illogical results. Rather than compare the revenues that correspond to the expenses necessary to earn those same revenues during the relevant time periods, Class Counsel instead seeks to have the Settlement Program in many cases use a year or more worth of

revenues compared to only a fraction of the expenses incurred to generate those revenues, thereby artificially inflating pre-Spill profits, and artificially depressing post-Spill profits, solely for the purpose of creating non-existent losses -- an objective fact confirmed by the claimant's own financial data.

The Settlement Agreement's objective compensation tests work when the financial data are used in a manner that permits the calculation and comparison of pre- and post-Spill variable profit -- *i.e.*, that data which match the revenues and the expenses incurred to generate those revenues. But the tests cannot possibly work if the wrong data (data that do not measure revenue earned and that do not match revenue earned and corresponding variable expenses) are used, which is precisely what Class Counsel seeks when they ask the Settlement Program to determine compensation but without considering when revenue is earned and matching the expenses incurred to generate those very same revenues.

Context also is important here. For many types of Business Economic Loss claims, the Settlement Program is being provided with financial data that sufficiently match revenue and corresponding variable expenses, and, as a result, is properly applying the objective compensation test to produce the required and agreed upon outcomes under the terms of the Settlement Agreement. There are, however, a number of claimants -- often in the construction, agriculture, and professional services industries -- for which (i) earning of revenue (the measurement required by the Settlement Agreement) does not always track the receipt of payment (the measurement found in the financial data of many claimants), and/or (ii) corresponding variable expenses are incurred many months ahead of the earning of revenue. In such cases, the terms of the Settlement Agreement require that an accurate evaluation of pre- and post-Spill financial performance be undertaken, including determining when revenue is earned and the matching of corresponding variable expenses to that revenue. This evaluation can be accomplished in a straightforward manner that permits the accurate processing of claims and does not impose unnecessary burdens on claimants or the Settlement Program.

In addition to explaining why Class Counsel's positions are wrong and its proposed policy determinations are prohibited by the Settlement Agreement, we also offer some suggestions and straightforward proposals that will allow the Settlement Program to identify those claims which require further evaluation, and how to perform that further evaluation, in order to properly apply the Settlement Agreement's objective tests.

## I. Class Counsel's Proposals Violate the Settlement Agreement's Objective Tests

Class Counsel asks the Class Administrator to jettison the express terms of the Settlement Agreement, which terms require accurate data regarding "earn[ed]" "revenue" and "corresponding variable costs" incurred in earning the revenue in order to measure accurately changes in claimants' pre- and post-Spill economic performance, and thus whether the claimant experienced a compensable loss. In the place of accurate data permitting such a measurement, Class Counsel seeks to have the Claims Administrator focus only on (i) when cash is received and (ii) expenses unconnected to the revenue those expenses generate. Class Counsel's proposed approach violates the Settlement Agreement's objective tests and produces the very type of

inaccurate and illogical results predicted by the Claims Administrator in his October 8, 2012 Policy Statement.

The Business Economic Loss frameworks' objective tests for claim determinations, including the amount and magnitude of losses (if any), compare a claimant's economic performance in defined periods before the Spill to its economic performance in defined periods after the Spill. Two main pieces of data are used to perform this comparison -- "revenue" (income earned or generated during a defined period) and "corresponding variable expenses" (those variable expenses incurred in generating the revenue in question). Using financial data that accurately reflect a claimant's monthly economic performance (its revenue and corresponding variable expenses) is essential to proper application of the Settlement Agreement. Without such data, a meaningful comparison of pre- and post-Spill economic performance, and thus an accurate claim determination, including the amount of magnitude of losses (if any), is impossible.

Exhibit 4C of the Settlement Agreement measures compensation in a logical and objective manner by comparing the claimant's economic performance in a defined pre-Spill period to the claimant's economic performance in a defined post-Spill period. "Variable Profit" is the measuring stick. And the Settlement leaves no question as to how Variable Profit is calculated:

> 1. Sum the monthly revenue over the period.
> 2. Subtract the corresponding variable expenses from revenue over the same time period.

Settlement Agreement, Ex. 4C at 2. Thus, to calculate Variable Profit, it is necessary to calculate accurately (1) revenue and (2) the "corresponding variable expenses" incurred in generating that revenue. In addition, because Exhibit 4C instructs that Variable Profit for the compensation period is to be compared to "comparable months of the Benchmark Period," it is necessary to identify the "comparable months."[1]

## A.    Measuring Revenue

"Revenue" is a well understood and well defined term. "Revenue" means income generated and earned from the sale of goods and services. *See, e.g.,* C. P. Stickney, *Financial Reporting and Statement Analysis* (3d) at 14 ("Revenues measure the inflows of net assets (that is, assets less liabilities) from selling goods and providing services. . . . [r]evenues reflect the services rendered by the firm.").[2] Indeed, Class Counsel themselves admit that the relevant question is when revenue is "earned." Class Counsel 12-16-12 Memo at 1.

---

[1] Independently, the accurate calculation of "revenue" and use of the correct data are also essential to proper application of the test in Exhibit 4B of the Settlement Agreement.

[2] *See also* Accounting Standards Board, Statement of Financial Accounting Concepts 6 ¶ 78 "Revenues are inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."); *id.* ¶ 79 "Revenues

Footnote continued on next page

In most cases, how to measure revenue is straightforward and not in dispute. A restaurant earns revenue when it sells a meal and its customer pays for the meal. A souvenir shop earns revenue when it sells a tee shirt and its customer pays for the tee shirt. Measuring revenue does, however, require an additional step for certain claimants -- for example those in construction, agriculture, and professional services -- because the time where the business earns revenue (the key measurement under the Settlement Agreement) may be different than when the business receives payment (which is sometimes what is reported in the claimant's financial data). The Claims Administrator has recognized that such issues of timing, if unaddressed, *"could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received."* Claims Administrator 10-8-2012 Policy Statement at 2 (emphasis added).

Take for example a construction company that is paid $100 on day 1 of a job as payment for the first four months of work which are to be performed evenly over the four months. Neither the Settlement Agreement nor basic principles of economics nor common sense would say that the construction company earned $100 in revenue on day 1. Rather, the construction company earned $25 dollars in each of the four months in this hypothetical. If the construction company did not do the work, it would have to return the money. Yet, Class Counsel is asking the Claims Administrator to create a fiction, simply because a claimant's financial data may show that the claimant received the lump sum payment on day 1, that the full $100 is revenue earned on day 1, and that the claimant did not earn any revenue from the job in months two - four. Specifically, Class Counsel argues that "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." Class Counsel 12-16-12 Memo at 1. Equally troubling, and as discussed below, when it comes to expenses to compare to the revenue, Class Counsel would pretend that only the expenses for month 1 apply to the $100 amount, but not the expenses incurred over the four-month period in order to generate or earn that revenue.

As the Claims Administrator concluded in his October 8, 2012 Policy Statement that prohibits the restating of financial data from accrual to cash basis, the fiction proposed by Class Counsel can prevent proper and fair operation of the Settlement Agreement's objective tests. By misstating actual monthly performance, it can create losses where none exist, overstate actual losses, and create false positives in the causation test. Claims Administrator 10-8-2012 Policy Statement at 2 (explaining that using time of payment rather than time when revenue is earned "could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received."). The fact that a claimant who uses cash basis accounting may as a clerical function record payments when they are received does not change the meaning of the term "revenue" or the Settlement Agreement's requirement that "revenue" rather than the receipt of payment be measured.

Footnote continued from previous page

represent actual or expected cash inflows. . . that have occurred or will eventuate as a result of the entity's ongoing major or central operations . . . the transactions and events from which revenues arise and the revenues themselves and are called by various names -- for example, output, deliveries, sales . . .").

## B. Measuring "Corresponding Variable Expenses"

As with "revenue," Class Counsel once again seeks to rewrite the terms of the Settlement Agreement by ignoring the requirement that "corresponding variable expenses" must be subtracted from revenue. In place of the actual requirements of the Settlement Agreement, Class Counsel argues that the Claims Administrator should simply look to when expenses are incurred without matching such expenses to the revenue they generate.

Reference to Exhibit 4C of the Settlement Agreement shows why Class Counsel's position is untenable as a matter of contract interpretation and basic economics. Once revenue is properly identified, the Settlement Agreement instructs that the "corresponding variable expenses" incurred in generating the revenue must be subtracted from the revenue. Settlement Agreement, Ex. 4C at 2. "Corresponding" means "having or participating in the same relationship" or "related," as in "a test question and its corresponding chapter in the textbook." Merriam-Webster Dictionary < http://www.merriam-webster.com/dictionary/corresponding>.

The requirement that "corresponding variable expenses" be subtracted from revenue ties directly back to the core requirement of the Settlement Agreement -- that loss is objectively measured by accurately comparing pre- and post-Spill economic performance. This cannot be accomplished without matching revenue and corresponding variable expenses. Failure to do so will produce a distorted and completely inaccurate picture of business profit or loss.

Take for example a farm that spends $50 dollars each month in May, June, and July to buy seeds, plant crops, and fertilize the crops, and then generates $200 in revenue when the crop is harvested and sold in August. Once again, neither the terms of the Settlement Agreement nor basic principles of economics nor common sense would say that the farm lost $50 in May, lost another $50 in June, and yet another $50 in July, and then turned a profit of $200 in August. To the contrary, the Settlement Agreement (by instructing to subtract "corresponding variable expenses" from revenue) and basic economics say correctly that this farm earned $50 dollars in variable profit ($200 in revenue minus $150 in variable expenses). Any other result would be truly absurd. Yet, this is what Class Counsel seeks: "The 'corresponding variable expenses' associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question." Class Counsel 12-16-12 Memo at 1.

Class Counsel goes even one step further in arguing that expenses for which a professional services claimant receives reimbursement from its client should be counted as revenue earned for purposes of the Settlement Agreement's objective tests. Class Counsel 12-16-12 Memo at 2. There is no possible interpretation of the Settlement Agreement or economics under which a professional service firm's receipt of reimbursement for costs constitutes revenue that measures the firm's earnings. When the firm receives the reimbursements, it is not earning revenue but simply being repaid for expenses previously paid.

## C. Measuring Comparable Pre- and Post-Spill Periods

Once economic performance for the Compensation Period is calculated, the Settlement Agreement instructs that it is to be compared against economic performance in "the *comparable months* of the Benchmark Period." Settlement Agreement, Ex. 4C at 1 (emphasis added). The

result of this comparison determines whether the claimant has incurred a loss and, if so, the amount of such loss. Thus, performing the correct comparison using the correct data is critical.

"Comparable months" are months that are "capable of or suitable for comparison," "similar" or "like." Merriam-Webster Dictionaryhttp://www.merriam-webster.com/dictionary/comparable. Applying this definition, for the majority of businesses, with revenue and expense patterns that are generally consistent from year to year, "comparable months" of the Benchmark Period for calculation of Step 1 compensation will be the same months as in the 2010 Compensation Period.

In some special cases, however, using the same months in the Benchmark Period and the Compensation Period will not satisfy the "comparable months" requirement. In particular, in the farming industry, the month in which a farmer actually plants crops, harvests crops, sells the harvested crops or makes major purchases of seed or fertilizer may vary from year to year due to weather or market conditions. Thus, unlike a Gulf Shores hotel whose main season of business occurs in the same months year in and year out, economically "comparable" periods for a farmer may change substantially from year to year.

Take the example of a farmer who normally harvests and sells his crop in November, but in 2010 harvested and sold in December. If September-November is used as both the Compensation Period and the Benchmark Period, then the failure to take account of the one month shift will produce an illusory "loss" of revenue between the two periods -- even if the farmer actually earned more revenue from the harvest and sale in 2010. That mismatch, coupled with the failure to assign revenue to the proper month by matching it to costs incurred to produce it and the effort expended, can produce multi-million dollar awards for illusory "losses." And when we say "illusory," we mean losses that do not exist in fact as shown by the objective financial data.

## D. The Irrational, Distorted Results That Flow From Failure To Properly Apply The Settlement Agreement's Objective Tests

As the above discussion demonstrates, and as the Claims Administrator recognized in his October 8, 2012 Policy Statement, failure properly to apply the Settlement Agreement's revenue and corresponding variable expense requirements (in other words, doing exactly what Class Counsel is proposing here) produces absurd results that are inconsistent with the express terms of the Settlement Agreement and its intent and are also inconsistent with and contrary to the objective financial data provided by claimants. Consider the following results of actual claims where unfortunately these requirements were not followed:

- Claimant      is a highway paving contractor. 2010 was a banner year for the company, which earned 2010 gross profits that were $1.3 million greater than any other year in the record. Yet, by failing, as required by the Settlement Agreement, to use monthly revenue matched to corresponding variable expenses, the Settlement Program awarded the claimant $7.7 million in pre-RTP compensation ($9.6 million post-RTP) -- more than the total net income the company earned in any year -- including the $6.61 million in its record-breaking 2010. The result amounts to a finding that in the absence of the spill, Claimant's 2010 net income would have been

6

more than double any other year going back to 2007 and more than four times what it actually was in 2011 ($3,346,870), and that Claimant's 2010 profit margin would have more than doubled. Claimant's own financial records conclusively preclude such a result and establish that there is simply no basis whatsoever for such a conclusion. One can only get to such a result by using the wrong data when performing the calculations required by the Settlement Agreement.

- Claimant ▮▮▮▮▮▮▮▮ is an advertising firm that received a $3.6 million award even though it too had a banner year in 2010. As in the first example, the Claimant-reported revenues and expenses produced wild month-to-month gross profit swings, with negative profits as high as *66,701%*, a red flag for accountants that revenue has not been matched to the expenses that generated the revenue. Moreover, the company reported extraordinarily high variable expenses of more than $2 million in August 2010, a month in which the company reported only $30,976 in revenue. These extraordinarily high expenses are associated with a one-time increase in an expense category labeled "Spring-Media Purchased Clients," which only appears in Claimant's financial data for the month of August 2010. It is beyond dispute that the Claimant did not incur more than $2 million in costs to generate $30,976 in revenue (a loss of more than $1.9 million) in August. Yet that is precisely the result that was arrived at when corresponding variable expenses were not matched to the revenues generated by such expenses. *In other words, a fictional, non-existent $1.9 million loss was created for the 2010 post-Spill compensation period solely as a result of the failure to match the large $2 million expense with the revenues it generated.* Failure to match the revenue associated with these August 2010 expenses resulted in the Claimant receiving an award that was six times its actual 2009 net income and 170% of its actual 2011 net income. Again, a non-existent "loss" was created, and then compensation was awarded -- simply by failing to match the revenues with the variable expenses incurred to generate those revenues.

- Claimant ▮▮▮▮▮▮▮▮ is a law firm. Claimant received a $1.3 million contingency fee in October 2009 for a case that had been litigated for two years. Its expenses in litigating the case were incurred over that two-year period. No similar fee was received in October 2010. Treating the fee awarded in October 2009 as "October 2009 revenue" and failing to relate it to the prior work done and corresponding variable expenses resulted in a $5 million dollar award for a non-existent "loss."

The illogical outcomes in the above examples result from not evaluating the financial data called for by the Settlement Agreement and instead using data that do not permit an accurate measurement of financial performance. But even if there were some possible literal interpretation of the Settlement Agreement that permits such results (and there is not), the above examples and their results violate the well-established rule that contracts are to be read

reasonably, and cannot be interpreted in a manner that produces absurd results.[3] Yet, this is precisely what Class Counsel seeks.

## E.    Changes in Lines of Business

Class Counsel also requests the following policy determination: "Where a Claimant ceases a line of business during the Benchmark Period, such revenue from the terminated line of business is included in the BEL calculation. For example: Claimant rented commercial properties in 2007 but sold those properties at the beginning of 2008, for the purposes of the BEL Framework, the 2007 revenue from the properties would be included in the Causation and/or Compensation calculation(s)." Class Counsel 12-16-12 Memo at 2.

Once again, Class Counsel ignores the terms of the Settlement Agreement, economic reality, and common sense. The Settlement Agreement's objective compensation test explains in clear terms that it "compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant *might have expected to earn* in the comparable post-spill period of 2010." Settlement Agreement, Ex. 4C at 1 (emphasis added). Under no circumstances can Class Counsel credibly say that a claimant who was a landlord in 2007 but sold the buildings at the beginning of 2008 lost profit from the renting of those buildings as a result of the Spill. It did not own the building for the two years preceding the Spill. The above-quoted language from the Settlement Agreement does not permit such a construction; nor does economic reality or common sense.

## II.    Recommendations

For the reasons discussed above, Class Counsel's requested policy determinations violate the terms of the Settlement Agreement and cannot be implemented. The attached Tab 1 summarizes a proposed process for addressing claims that may require further evaluation for purposes of measuring revenue and matching corresponding variable expenses. For the majority of cases, no special steps are needed because the claim does not present timing and matching issues. Thus, we propose focusing at this time on three industries where timing and matching issues appear to be prevalent and as to which the failure to address the timing and matching issues prevents proper application of the Settlement Agreement -- construction, agriculture, and professional services. For claims within these three industries, we recommend the steps outlined and discussed in Tab 1.

---

[3] *In re Liljeberg Enter., Inc.*, 304 F.3d 410, 443 (5th Cir. 2002) (rejecting proposed interpretation of contract that "literally leads to absurd results"); *Makofsky v. Cunningham*, 576 F.2d 1223, 1229-30 (5th Cir. 1978) ("Louisiana courts will not interpret the words of a contract literally when this leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit."); *Cashio v. Shoriak*, 481 So.2d 1013, 1015 (La. 1986) (holding that "it is our duty to refrain from construing [contracts] in such a manner as to lead to absurd consequences. When a literal interpretation will produce absurd consequences, the court may consider all pertinent facts and circumstances, including the parties' own conclusion of the instrument's meaning, rather than adhere to a forced meaning of the terms used.").

8

## Conclusion

For the foregoing reasons, Class Counsel's requested policy determinations would violate the terms of the Settlement Agreement and would produce inaccurate and illogical results in violation of standard rules of contract construction. Accordingly, Class Counsel's request should be rejected. Instead, BP suggests that the Settlement Program adopt the recommendations set forth in Tab 1 of this memo.

TAB 1

## TAB 1

Although very detailed approaches for matching of monthly revenues to corresponding expenses for each of the three industries identified by Class Counsel would lead to greater accuracy, such approaches impose additional burdens on the Settlement Program. In a good faith effort to implement the BEL framework, BP proposes a simpler and workable approach for each industry that is claimant-friendly and requires limited additional effort by the Settlement Program. However, claimants also should -- if they so choose -- be provided the option to pursue a more detailed approach for aligning revenues with corresponding expenses where they can provide the necessary data.

### Construction

For construction claims, an approach to better align revenues with corresponding variable expenses may be implemented often without the need for any additional information from claimants. In overview, the annual financial data submitted by construction firms typically appear to reliably report annual revenue, variable costs and variable profits. However, such firms frequently do not accurately align revenue and the corresponding expenses incurred to generate that revenue on a monthly basis, a problem reflected in variable profit percentages that often vary wildly from month to month. The proposed approach, summarized below, reflects the view supported by industry accounting experts that construction companies generally record their costs reliably on a monthly basis based on actual operating experience, while revenues are less reliable as they utilize estimates which can change significantly from month-to-month.

Alignment of revenue and corresponding variable expenses can be substantially improved in two steps:

First, determine the ratio of claimant's annual revenue to annual variable expenses for 2010 and each of the Benchmark Period years.

Second, match revenue to corresponding variable expenses by multiplying (i) variable expenses reported for a given month and (ii) the ratio of revenue to variable costs calculated on an annual basis.

Last, adjustments should be made for irregular or extraordinary cost entries that can appear in monthly financial statements. For example, Claimant                    recorded a full year of bad debt totaling $928,616 solely in December 2008; this cost should be matched to the months in which the corresponding revenue was reported. In such instances, the Settlement Program will need to consult with claimants in order to better identify the nature and timing of the expense. Significantly, we see documentation in the claim files already of such Settlement Program consultations. For example, the claim file for Claimant                    includes a response from a CPA firm to the Settlement Program regarding an inquiry about negative revenue amounts recorded in the claimant's December 2007 and November 2009 P&L's.

After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula can proceed as

usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

## Farming

The proposed approach to improving the alignment of revenue to corresponding expenses for farm claims generally tracks the two-step approach proposed above for construction firm claims, recognizing the unique timing of expenses and sales in this industry:

First, determine the claimant's total revenue for each crop harvested in 2010 and the Benchmark Period years. This should be based on the published USDA-defined marking year for the particular crop in the state where the farm is located. For example, the 2010 marketing year for rice produced in Louisiana extends from July 1, 2010 to June 30, 2011, recognizing that rice harvested in 2010 might be stored and sold in 2011.

Second, for 2010 and each Benchmark Period year, match the total marketing year revenue to corresponding variable expenses that occurred in the calendar year in which the harvested crop was produced. This matching is accomplished by multiplying (i) variable expenses incurred by the claimant reported for a given month and (ii) the ratio of marketing-year revenue to production-year variable expenses.

In addition, adjustments should be made for irregular or extraordinary cost entries that can appear in monthly financial statements. For example, if unusually large expenses for seed, fertilizer, chemicals or fuel appear in one year compared to others, it may be that the claimant purchased inventory for multiple years or pre-purchased supplies late in a given calendar year for use in the following production year, in which case the relevant costs should be apportioned to the appropriate production year. In such instances, the Settlement Program will need to consult with claimants in order to make such determinations. Such consultation already is taking place. For example, the claim file for Claimant                     includes correspondence in which the Settlement Program asks the claimant to clarify the purpose of an inventory adjustment expense recorded on its profit and loss statements in December of each year; this expense varies between minus $600,000 and positive $279,000 between 2007 and 2010.

Last, it is important that the months selected in the Compensation Period and Benchmark Period years are, in fact, comparable. For example, if the Claimant selects months for the Compensation Period in which a primary farming expense was incurred -- planting, land preparation or harvesting, the "comparable months" of the Benchmark Period year must include those same activities.

After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula can proceed as usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

2

## Professional Services Firms

The proposed approach to align revenue to corresponding expenses for professional services firms generally tracks the two-step approach proposed above for construction and farming claims, recognizing that many professional services firms' financials often report a large share of annual revenue in only a handful of months, or even in only a single month, in any given year. This is due to large, irregularly timed payments for long-term projects or matters, although professional service firms' variable expenses tend to be consistent throughout the year.

First, identify the months in which there is an irregular or extraordinary increase in cash receipts and then obtain from the claimant information on the history of effort and expenses expended on projects or matters that generated the increase in cash payments, as reflected in monthly hours worked by the firm's professionals on the relevant projects or matters, including months in prior years.

Second, match revenue from these projects or matters to the corresponding expenses by multiplying (i) the percentage of total effort that over the history of the project or matter that occurred in a given month, with (ii) the total revenue ultimately generated by the project or matter. For months with no irregular or extraordinary increase in cash receipts, no such matching process need be undertaken.

Third, to properly calculate variable profit in the BEL compensation calculation, claimants should identify their practice for recording pass-through or reimbursable disbursements, such as travel fees, referral fees paid to other firms and fees paid to consultants and experts. Since many firms pass through these disbursements to their clients, they are not appropriately considered to be either revenue or expenses of the claimant. Consequently, they should not be included in calculating the claimant's variable profit.

Last, adjustments should be made for irregular or extraordinary cost entries that appear in monthly financial statements. For example, Claimant recorded an expense in August 2010 of $2.1 million labeled "Spring Media Purchase Client" which clearly must be associated with revenue generated in other months; this cost should be matched to the months in which the corresponding revenue was reported. In such instances, the Settlement Program will need to consult -- as it already doing -- with claimants in order to better identify when the cost was incurred. For example, the claim file for Claimant includes correspondence between the Settlement Program and the claimant regarding fees received in settlements as well as costs incurred on behalf of clients.

After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula then can be applied as usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

3

**(3)**

On January 11, 2013, BP met with Class Counsel to discuss the Class Counsels' letter to you of December 16, 2012 and BP's January 9, 2013 response regarding the measurement of revenue and corresponding variable expenses and their comparison in the pre and post-spill periods. BP presented the proposals set forth in its letter of January 9, 2013 (the "Proposals").

As we explained in our January 9, 2013 letter, the plain application of the Settlement Agreement, which is consistent with basic principles of evaluating a firm's performance, dictate that revenues and corresponding expenses be properly determined and matched in order to calculate actual lost profits under Exhibit 4C. BP's Proposals set forth specific methods for an efficient and fair determination to measure any reduction of variable profit. Class Counsel were not willing to accept the Proposals. Notwithstanding the reasonableness and efficiency of these Proposals, in a further effort to facilitate a resolution of this issue, BP outlined in general terms a series of plainly ascertainable triggers/thresholds which would identify the specific claims for which the Settlement Program would apply the Proposals. Essentially, this approach would identify those claims with recorded revenues and/or expenses that are sufficiently irregular such that the further analysis of the claim is warranted. Class Counsel did not express an interest in further exploring the application of these triggers/thresholds to augment the Proposals.

Because the additional application of triggers/thresholds result in reducing the number of claims being subject to further review, we present proposed triggers/thresholds below for the Settlement Program's consideration.[1] Application of the triggers/thresholds in conjunction with the Proposals will further enable the Settlement

---

[1] As noted above, BP only generally outlined these triggers/thresholds for Class Counsel, but did not present the triggers/thresholds below in full.

Program to timely and efficiently make claims determinations in accordance with terms of the Settlement Agreement.

BP proposes the Settlement Program utilize three threshold tests to determine whether further matching of revenue to corresponding variable expenses is required:

First, additional scrutiny should occur for claims in which the claimant's monthly P&L statements report revenue in one month (or a small number of months) that is in excess of a specified percentage of the claimant's annual total revenue for 2010 and/or any of the Benchmark Period years. Where the revenue of a business is concentrated in one (or a few) months on an inconsistent annual basis, there is a likelihood the revenue reported for the month was earned over a longer period of time. The threshold would be set in a manner that ensures that normal seasonal variations in revenue would not trigger a supplemental review. This threshold test can readily be implemented by the Settlement Program because the PwC Excel workbook used to process claims already includes entries reporting the claimant's monthly revenue and total revenue for 2010 and the Benchmark Period years.

Second, additional scrutiny should occur for claims in which the claimant's monthly P&L statements report a negative variable profit in any month of 2010 and/or the Benchmark Period years. Negative variable profit occurs when revenue fails to cover variable costs. The existence of a negative variable profit in a month suggests that reported revenue is not properly matched to corresponding variable costs because a business would not be expected to undertake activities that fail to cover their variable costs. However, negative variable profits may occur when firms report corrections to revenue and expenses from prior months or record expenses that are properly considered

to be incurred over a longer period. Simply put it is unlikely a firm is going to be selling its product or offering its services at a loss, rather it is likely there is a mismatch of revenues and corresponding variable expenses. This threshold test for further claim review is easy for the Settlement Program to implement. The PwC Excel workbook used to process claims already calculates the variable profit for each month of 2010 and the Benchmark Period years.

Third, additional scrutiny should occur for claims in which there is a wide variation in the monthly variable profit margin (expressed as a percentage of revenue) within a given year. Volatility in a firm's variable profit margin indicate that reported costs vary widely from month-to-month in a manner unrelated to revenue. Dramatic swings in variable profit margin suggest that revenue is not properly matched to corresponding variable costs. Under this test, a claim should be subject to further scrutiny if in 2010 and/or any of the Benchmark Period years the difference between the variable profit margin for the months with the highest and lowest variable profit margin exceeds a specified range. The threshold would be sufficient wide so that typical month-to-month variations in variable profit margins would not trigger a supplemental review. This too is any easy test for the Settlement Program to implement. The PwC Excel workbook used to process claims already reports the variable profit percentage for each month of 2010 and the Benchmark Period years.

(4)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Rebecca Foreman on behalf of Patrick Juneau |
| **Sent:** | Tuesday, January 15, 2013 9:33 AM |
| **To:** | Mark Holstein (Mark.Holstein@bp.com); 'keith.moskowitz@snrdenton.com' (keith.moskowitz@snrdenton.com); 'James Roy (jimr@wrightroy.com)' (jimr@wrightroy.com); Steve Herman (SHERMAN@hhklawfirm.com) |
| **Cc:** | Orran L. Brown; Lynn Greer (lgreer@browngreer.com); Michael J. Juneau (MJJ@juneaudavid.com) (MJJ@juneaudavid.com); 'Christine Reitano' |
| **Subject:** | January 15, 2013 Policy Announcement |
| **Attachments:** | BROWNGREER-#418993-v1-CA_Policy_Announcement-1-15-13.DOCX |

Gentlemen:

The Claims Administrator has thoroughly considered the submissions of both Parties regarding the proper measurement of revenue and expenses for those BEL claimants with particularly variable revenues. This is an issue that has particular relevance to claimants who are attorneys, construction companies or farming enterprises. The Claims Administrator recognizes that the straightforward application of the Settlement Agreement's compensation formula to claimants in these industries can result in awards that appear disproportionate when compared to award amounts for claimants in other industries. BP has proposed alternative frameworks whereby claims within these industries would be carved out for additional analysis and/or a revised analysis would be utilized to compute compensation for certain types of claims. The Claims Administrator recognizes that the type frameworks proposed by BP constitute a reasonable approach to evaluating such claims. But the Claims Administrator does not view it within his authority to carve out specific types of claims in this fashion nor to apply a revised formula or analysis for selected types of claimants. The specific charge to the Claims Administrator is to apply the terms of the Settlement Agreement *as written*. When so applied in this instance, the result can be disproportionate awards for certain types of claims. Though the Claims Administrator acknowledges that the type approach proposed by BP is a reasonable one, he does not believe it within his authority to implement such an approach absent agreement of the parties or express direction from the Court.

Attached is the Claims Administrator's Policy Announcement of January 15, 2013, which sets forth my policy decision on this issue.

Thanks,
**Patrick A. Juneau**
*Claims Administrator*

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**504-934-4999**

**935 Gravier Street, Ste. 1905**
**New Orleans, LA 70112**

1

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## MEMORANDUM

| TO: | **Class Counsel** |
| | **BP** |
| FROM: | **Patrick A. Juneau, Claims Administrator** |
| DATE: | **January 15, 2013** |
| RE: | **Announcement of Policy Decisions Regarding Claims Administration** |

Under the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

In accordance with these provisions, the Claims Administrator has adopted the following policies affecting the administration of claims under the Settlement Agreement. These polices will be the subject of the 1/16/13 session of the Claims Administration Panel and are not to be made public until after those proceedings have been concluded.

### 1. *Business Economic Loss Claims: Calculation of Variable Profit.*

Exhibit 4C of the Settlement Agreement sets out the methodology to be used in calculating Variable Profit as a component of determining Step 1 Compensation.

That methodology is as follows:

(1) Sum the monthly revenue over the period.

(2) Subtract corresponding variable expenses from revenue over the same time period. Variable expenses include:

    (a) Variable Costs as identified in Attachment A.

    (b) Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.

    (c) Variable portion of COGS, calculated by excluding salary costs . . . and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

## 2. *Business Economic Loss Claims: Timing of Revenues for Purposes of Causation.*

Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues before the spill vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims Administrator will not typically re-allocate such revenues to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.