# Exhibit 11D

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

```
***************************************************
                                            *
IN RE: OIL SPILL by the OIL RIG             *    MDL No. 2179
"DEEPWATER HORIZON" in the                  *    SECTION J
GULF OF MEXICO, on                          *    JUDGE BARBIER
APRIL 20, 2010                              *    MAG. JUDGE SHUSHAN
                                            *
******************************************************************
```

## DECLARATION OF CHARLES E. FINCH

1. I am a Managing Director with Alvarez & Marsal and co-head of the Environmental Advisory Services practice. I hold a Bachelor of Arts in Mathematics and a Master of Business Administration from the University of Missouri and a Master of Arts in Economics from the University of Kansas in which I did graduate research in agribusiness.

2. My professional experience includes over 30 years in agribusiness as a corporate director of operations, as CEO of the grain company I founded, and as an economics expert. I have extensive experience analyzing financial and economic information in lost profits claims in various industries, including farming. I teach economics in the MBA program at Avila University in Kansas City. Additionally, my experience includes owning and operating a 160 acre farm in southeast Kansas growing soybeans, milo, wheat and hay. My experience is summarized in Appendix A.

3. I have analyzed 210 farm claims submitted to the Settlement Program and the financial information included in the 64 offers made to those claimants. I was involved in developing the approach for implementing the BEL framework for farming claims proposed in Tab 1 of BP's Response to Class Counsel's Request for Policy Determination, and in developing the triggers/thresholds proposed in BP's supplemental submission to the Claims Administrator.

### SUMMARY OF OPINIONS

4. My opinions are based on my review of the Settlement Agreement, Business Economic Loss (BEL) claims filed by farmers, my 30 years of agribusiness experience, and the independent research I conducted. Appendix B lists documents I reviewed.

5. My principal opinions are as follows:

    a. The farming industry has a revenue and expense cycle with certain significant characteristics that must be taken into account to accurately measure the claimant's pre- and post-spill financial performance in order to implement the BEL framework. Farmers spend their most concentrated efforts in the spring, don't harvest until the fall, and then may sell their crops in late fall or even into the next calendar year. This practice, coupled with farmers' tendency to use cash basis accounting, means that special care must be given to matching revenues with corresponding expenses within a year and to matching comparable periods among years in order to generate realistic and accurate comparisons.

    b. The BEL framework requires that (i) revenue be reflected in the month earned; (ii) revenue be matched with the corresponding expenses incurred in generating that revenue; and (iii) comparable months be employed in the compensation and benchmark periods so as to be consistent with basic accounting, financial and economic principles. This methodology is essential to properly evaluate a farmer's monthly financial performance.

    c. Specific to farming, the interpretation of the BEL framework proposed by Class Counsel to calculate offers based upon the timing of when payment for crops is received and the timing of when an expense is paid would lead to significant distortions as compared to true financial performance. While farmers may receive payment for their crop in a lump sum, they earn that revenue over the period of the year in which the crop is produced, and while a farmer may pay for seed and fertilizer in one month, they incur the costs of those materials when they are actually planted and applied.

    d. My review of offers made to farming claimants indicates that the requirements of the BEL framework are often not being met, leading to offers to farm claimants who did not experience any decline in financial performance in 2010.

    e. The steps BP proposed for farm claims in Tab 1 of its submission to the Claims Administrator will result in reliable calculations of 2010 actual revenues and variable profits under the BEL framework and comparisons of 2010 to previous years. The approach BP has proposed is simple and workable, and often can be implemented with

Page 2

data already available to the Settlement Program.

f.  The triggers or thresholds that BP proposed in its supplemental submission to the
    Claims Administrator are simple and workable approaches that the Settlement Program
    could employ to identify claims for which a farmer's monthly P&L's reflect simply
    when cash was paid or received, not when efforts/expenses were incurred and
    accomplishments/revenues were generated. The latter is necessary to determine the
    actual financial performance of a farm in order to produce accurate results under the
    BEL framework.

### A. A general overview of the revenue and expense cycle for farming

6.  Farmers typically incur the bulk of their expenses in the spring and then harvest the crop in
    the fall. Spring expenses include preparing the soil (plowing and disking, e.g.), fertilizing,
    pre-emergent pest applications and seeding. Throughout the summer there may be other
    expenses such as tilling, irrigating and pest and weed management. Finally, the crop is
    mature and harvested in the fall, so more expenses are incurred.

7.  The month in which farmers actually pay the expenses incurred to produce a crop can vary
    by farmer and by year. Depending on the weather and choice of crop in any given year, a
    farmer may plant in April, May or June and then harvest in any month or months from
    August through November. Farmers also have the ability to store the harvest and not sell or
    receive payment for months after harvest. Soybeans, for example, are harvested in the
    September to November time period. The farmer may have on-farm storage for his crop
    and elect to hold the crop for sale until for example January, February or March of the
    following year. Alternatively, the farmer could take his/her crop to a grain elevator and pay
    to have the crop stored by a third party who would eventually become the buyer. Farmers'
    decisions in this regard in any given year are based on current market conditions, their
    expectations as to future prices, their individual cash flow needs and tax considerations.

8.  As a result of these industry characteristics, monthly measures of a farm claimant's variable
    profits (revenue less variable costs), taken from cash basis financial statements without
    doing the appropriate work to match revenues and corresponding expenses or identify
    comparable months, would not provide a meaningful indicator of a farm's actual monthly
    profitability. Cash basis financial statements do not fully reflect the results of the grow-

harvest cycle since crop revenues are recorded when received and corresponding expenses are recorded when paid, which will, by definition, not be in the same months and may even cross calendar years. Sales are particularly susceptible to being reflected in the following calendar year since the harvest occurs late in the year and the sale of that harvest can be delayed until the following year for the reasons noted earlier, the timing of which can also change from year to year as further explained herein. For similar reasons, changes in year-to-year monthly cash basis statements will more likely be caused by timing differences rather than actual changes in variable profit earned, which could cause awards to result from timing as opposed to actual economic losses. Cash-based financial statements may serve the farmer well during the year for cash flow and IRS purposes, but are wholly inappropriate and inaccurate for calculating variable profit as required by the BEL compensation formula, and are not used by farmers themselves when evaluating the farm's economic performance.

I.   **The "Corresponding" and "Comparable" Requirements of the BEL Framework are consistent with the basic principles of evaluating a farm's financial performance.**

A.  **Implementing the BEL Framework for Farming Claims**

9.   The BEL Framework requires (i) determining revenue earned by claimants on a monthly basis; (ii) matching revenue with the corresponding costs incurred to generate that revenue to calculate variable profit (defined as revenues minus *corresponding* variable expenses); and (iii) using comparable months of the benchmark year(s) and 2010 in evaluating causation and compensation frameworks specified in the Settlement Agreement as follows: "[t]he compensation framework for business claimants compares the *actual profit* of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to *earn* in the *comparable* post-spill period of 2010." Settlement Agreement, Ex. 4C.

10.  In order to properly calculate variable profits as required in Step 1 of the BEL compensation formula, it is necessary that revenues be recorded in the months when earned, not when cash is received. It is also essential that these revenues be matched to the corresponding expenses incurred in generating these revenues. If no attempt is made to do so, and financial data that do not meet these criteria are applied, then claimants with no losses at all may be determined eligible for compensation and claimants with only minor losses in variable profit could be paid significantly inflated compensation amounts.

11. Consider the following example which is similar to an actual Settlement Program offer to a farm claimant that I reviewed but which has been simplified for explanatory purposes.[1]  In this case, the offer to the farmer was based on incompatible financial data in that the farmer had provided monthly P&Ls that were stated on a cash basis and the Settlement Program accountants in performing the BEL calculation did not match revenues with corresponding expenses or to ensure comparable months were being used when comparing the farm's post-spill 2010 financial performance to its performance in the Benchmark Period.  The unadjusted data indicates that (i) the claimant received payment for its 2009 harvest in October; and (ii) received payment for its 2010 harvest in November.  Also, the claimant incurred costs from May through July in both 2009 and 2010, but no significant costs (for purposes of this example) after July of either year.

|       |                | May   | June  | July  | Aug. | Sept. | Oct.  | Nov.  | Dec. | Total |
|-------|----------------|-------|-------|-------|------|-------|-------|-------|------|-------|
| 2009  | Revenue        | 0     | 0     | 0     | 0    | 0     | 500   | 0     | 0    | 500   |
|       | Var. Cost      | 100   | 100   | 100   | 0    | 0     | 0     | 0     | 0    | 300   |
|       | Var. Profit    | (100) | (100) | (100) | 0    | 0     | 500   | 0     | 0    | 200   |
| 2010  | Revenue        | 0     | 0     | 0     | 0    | 0     | 0     | 500   | 0    | 500   |
|       | Var. Cost      | 100   | 100   | 100   | 0    | 0     | 0     | 0     | 0    | 300   |
|       | Var. Profit    | (100) | (100) | (100) | 0    | 0     | 0     | 500   | 0    | 200   |
| Change in Var. Profit |  | 0 | 0 | 0 | 0 | 0 | -500 | +500 | 0 | 0 |
|       |                |       |       |       | [    | Compensation period |  | ] |      |       |

12. The farm claimant in this example suffered no loss of variable profit in 2010 as compared to the claimant's Benchmark year of 2009 – its total revenue and variable costs were identical in 2009 and 2010.  Given these financial data, defining "comparable" months to mean the same months would mean designating August-October 2010 based on cash payments as the compensation period and comparing those months to August-October 2009, thereby creating a fiction that the claimant experienced a "reduction" in variable profit of ($500).  Such an approach makes no rational economic or business sense.  The issue is not one of two alternative logical methods of interpretation of the BEL framework proposed by Class Counsel and BP (one of which happens to provide the claimant with greater recoveries) but of an interpretation that produces distorted results based solely on  timing differences across years versus an interpretation that reflect the economic reality of the farming industry.

13. Variable profit is further overstated under the approach advocated by Class Counsel because

[1] This example is similar to Farm Claimant ████████, a rice farmer ████████████.  The Settlement Program's offer to this claimant was largely the result of the fact that the bulk of claimant's 2009 revenue was received in October and the bulk of its 2010 revenue was received in November.

Page 5

it fails to deduct from the revenue the corresponding variable expenses, since all the corresponding variable expenses were incurred prior to the Compensation period. The result of this approach would be to offer this claimant $500 for three months of 2010 although in fact (i) no loss at all was incurred; and (ii) the farm only earned $200 in variable profit during the entire Benchmark year. Under this interpretation, the claimant would recover an award due solely to the timing difference in the receipt of cash for its 2009 versus 2010 crops and the mismatch between revenue and corresponding expenses.

14. As this example suggests, Class Counsel's approach does not reasonably measure whether a farm claimant experienced an actual loss in May to December 2010 or the amount of any such loss because it (i) fails to appropriately identify when the farmer's revenue was earned; (ii) fails to match revenue with corresponding costs incurred to generate that revenue; and (iii) fails to use comparable months in the benchmark and compensation periods. *First*, Class Counsel's approach focuses on when the claimant received payment for its crop, which depends on the timing of the sale and is not based on when revenue was earned. This fallacy results in farming claimants being compensated for payment timing differences as opposed to actual economic damages. *Second*, the approach proposed by Class Counsel fails to use comparable months in the Benchmark period (when revenue was earned in October) and the Compensation period (when revenue was earned in November). *Third*, the approach fails to align the claimant's revenue, which was earned in the fall months, with the corresponding variable expenses incurred to generate that revenue, which were incurred in the spring.

### B. Use of cash basis financial data will not provide a reliable estimate of a farming claimant's financial performance.

15. Farms typically use cash-based accounting, and this is the basis for the financial data in the Settlement Program farming claim files that I have reviewed. Farmers use the cash basis because it is easy, it complies with IRS regulations for farmers and it serves as a cash flow check. However, as the example above suggests, cash basis financial statements typically fail to accurately measure the profitability of a farm for a given month or set of months. Thus, such financial statements do not measure true financial or economic performance. For instance, cash basis reporting treats inventory, accounts receivable and accounts payable as if they do not exist.

16. For these reasons, farmers themselves do not use the cash basis when evaluating their own financial performance. No farmer would ignore grain in the bin when evaluating the success of the most recent crop year. While cash basis financial statements may serve farmers well during the year, profitability can only be properly evaluated when revenues are matched with corresponding expenses related to that revenue. This is why for farm claims the BEL framework cannot be implemented properly by performing calculations using revenue and expenses as recorded in claimant financial statements that simply equate "revenue" with cash received and "expenses" with cash paid and do not properly match revenues to corresponding expenses or compare months with similar activities. Instead, further review of the data is required to perform the BEL calculation to assure revenue is aligned to months it was earned and expenses to months in which costs were incurred.

17. The well-recognized limitations of cash basis financial statements for analyzing a firm's actual financial performance, particularly over relatively short periods of time where distortions can be significant, are especially acute for farming claims because (i) farmers can have control over when their crop is sold, i.e., it can be sold at harvest or stored for later sale, which can cause wide variations in monthly results from year to year; (ii) the production cycle in agriculture is such that revenue is typically earned at harvest or subsequent months while most costs are incurred earlier in the year; and (iii) farmers have control over when some expenses are incurred, as input such as seed, fertilizer and other chemicals can be purchased and stored for later use, which can further skew year-to-year comparisons if only cash transactions are considered. For these reasons, if the objective is to measure the farm's performance for a set of months in one year to its performance in prior years, it would be nonsensical to use receipts and costs as recorded in a cash basis profit and loss statement ("P&L"). Proper evaluation of changes over time in a farm's financial performance for part of a year requires doing what the BEL framework calls for, i.e., have the Settlement Program do the work of aligning revenue to when earned, costs to when incurred and identifying comparable months of farming activity.

18. The limitations of cash basis accounting for evaluating the financial performance of farmers are well recognized. The lack of reliability of cash basis income statements as a measure of business performance in farming is documented by a research study at the University of Illinois which analyzed income information for 151 cash grain farmers over a six-year

period.  It found an 85 percent average annual difference in net farm income when measured on an accrual adjusted basis versus a cash basis, and in individual cases up to a 400 percent difference.[2]  Accrual accounting differs from cash accounting in that it is based on the principle of  matching revenues with associated expenses in the period earned/expended (much like the BEL framework) as opposed to reflecting expenses when paid and revenues when collected (like the farmers' cash basis).  Additionally, in October 2012 the Claims Administrator ruled that financial records kept on an accrual basis may not be converted to a cash basis for purposes of filing a claim.  The Claims Administrator found that such a conversion "could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received."  10/8/12 Settlement Program Policy Statement at 2.

19. In sum, Class Counsel's approach to implementing the BEL framework for farming claims does not recognize these basic facts about the farming industry and financial data as typically maintained by farmers.  Class Counsel's approach incorrectly implies that a farmer that receives no cash payments in April but incurs significant planting-related costs in April suffers "losses" while a farmer that receives cash in November but incurs little or no cost in the month realizes high variable profit.  This approach incorrectly implies that a farmer that sells his crop in October of 2009 but the following year waits until November to sell suffers a spill-related decline in October revenue in 2010.  As a result, the current implementation of the BEL framework for farming claims makes farmers eligible who experienced no revenue declines and compensates farming claimants for timing differences rather than actual economic losses.

### C. Class Counsel's proposed implementation of the BEL framework has resulted in distorted offers to farm claimants.

20. The calculation of compensation using a farmer's cash basis financial statements without regard to the BEL framework requirements to (i) include revenue in the months earned rather than when received; (ii) align revenue with the corresponding costs used to generate the revenue; and (iii) use comparable months in the benchmark and compensation periods yield offers in many cases to farmers with no decline in financial performance in the post-spill period of 2010.  This section summarizes one Settlement Program offer to a farming

---

[2]  The Farm Financial Standards Council (FFSC) "Financial Guidelines for Agricultural Producers", April 2011, Appendix E

claimant. I summarize Settlement Program offers to more farming claimants in Appendix
C. Like this claim below, it is clear that offers made to these farm claimants are based on
non-existent losses or are artificially inflated because the BEL framework requirement of
matching revenues with corresponding expenses was not followed.

### a. Claimant No. ▮▮▮▮

21. The claimant grows cotton and is located in Zone D, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮▮▮▮▮▮ As shown in the chart below, the claimant's annual revenue measured on
either a calendar year or crop year increased from 2009, the benchmark year, to 2010, and
the claimant's May-December variable profit declined from $345,000 in 2009 to $305,000
in 2010. The Settlement Program's base offer of $411,000 implies that claimant's May-
December 2010 variable profit would have been $716,000, which significantly exceeds the
***total annual revenue*** that the claimant earned in either 2009 or 2010, much less ***variable
profits*** (note that revenues always exceed profits by the amount of expenses, making the
outcome all the more incredulous). These results indicate that the Settlement Program's use
of the claimant's cash basis financial data without attempting to conform to the
requirements of the BEL compensation formula leads to an offer that greatly overstates the
variable profit that the claimant might have expected to earn in the post-spill period of 2010.



**Claimant #** ▮▮▮▮
**Benchmark Year: 2009 / Compensation Months: Sep-Nov**

22. The distortion in this offer is driven by selection of September to November as the

comparable compensation and benchmark period months. The revenues reflected for September 2009 alone account for 71 percent of the farmer's 2009 total revenues, and 99 percent of the farmer's 2009 total revenues are captured in the months September to November. Only 53 percent of 2010's total revenues are captured in this same period, but the remaining revenues are reflected in August and December 2010, the two months surrounding the Compensation Period. Again, total 2010 revenues exceeded 2009 revenues, so if it were not for the timing difference, the claimant would fail the V-Test.



23. Compounding the distortion were large expenses for seed and fertilizer in October and November 2010 but in the benchmark period year of 2009 the farmer purchased his seed and fertilizer at a different time, namely in December 2009. The timing difference in the payment of these variable expenses inflated the non-existent "loss."

## II.   Implementation of the BEL framework can be improved to avoid distortions and more accurately evaluate farmers' financial performance.

24. The BEL framework compares the variable profits actually earned by a claimant in the 2010 post-spill period with the claimant's variable profits actually earned in the benchmark period. However, as the above example indicates, Class Counsel's proposed implementation of the BEL compensation framework for farming claimants often leads to distorted results creating non-existent losses and inflating actual losses.

25. Using commonly understood and utilized accounting practices, the BEL compensation framework can be implemented in a manner that reliably compares variable profits actually

earned pre- and post-spill. In many cases, proper implementation of the BEL framework
can be accomplished with data already available to the Settlement Program.

### A. Proper implementation of the BEL framework requires identifying when revenue is earned.

26. If BEL compensation and causation methodologies are to measure business performance, it must be
the case that the term "revenue" is interpreted consistently with accounting literature and the BEL
framework itself to mean that the revenues are attributed to the month or months in which they were
earned in order to fairly and accurately reflect financial performance. There are many
announcements and guidelines to assist with the recognition of revenue for various situations and
industries, all in an effort to capture the true economic reality of a transaction(s). Specifically, the
accounting literature recognizes that evaluation of a farm's financial performance requires that
revenue is attributed to periods in which it is earned. The Farm Financial Standards Council
(FFSC) is an organization that exists to help farmers by promoting uniform financial reporting and
analysis in agriculture, and they note in their "Financial Guidelines for Agricultural Producers" that
"Cash basis accounting can also delay recognition of profits during periods of business growth and
recovery. Such delay in recognizing profitability problems is due to the length of the business's
cash conversion cycle, i.e., the time from the start of the production process until cash is finally
received from the sale of the output." (Appendix E page E1)

27. In general, there is no way to accurately evaluate a farm's economic performance unless revenues
are matched with corresponding expenses and reflected in the relevant time period, especially over
periods less than a year, and certainly not for any given three month period.

28. As discussed above, while cash basis accounting is fine for IRS tax purposes or for cash
flow reasons, a cash basis approach to calculating monthly variable profit does not yield an
accurate picture of the business performance of a farm and does not yield an accurate
picture of changes in financial performance over time as required in the BEL framework.

**B. Proper implementation of the BEL framework requires matching revenue and the costs incurred in generating that revenue.**

29. Similarly, the accounting literature recognizes that evaluation of a firm's financial performance requires that revenue be aligned with the costs incurred in generating that revenue. This is referred to as the matching principle – efforts/expenses must be matched to accomplishments/revenues. Again, as the FFSC's "Financial Guidelines for Agricultural Producers" notes that "The result of 'matching' the revenues with the expenses incurred to create the revenues is a much more realistic reflection of net income for the period." (Appendix E page E1).

30. As I saw in almost every farming claim I reviewed, use of the cash basis financial data without matching revenue to corresponding variable expenses results in several months of negative variable profit margins. The top eight claims by Final Compensation Award all had negative variable profit every year from 2007-2011, averaging about six months of negative and six months of positive variable profit every year. As a further example, Farm Claimant                has seven months with $0 revenues and $1.8 million in variable costs in 2009, resulting in a negative variable profit margin of ($1.8 million) for the ten months ending October 2009. Likewise, this claimant had nine months with $0 revenues and $1.4 million in variable costs in 2010, resulting in a negative variable profit margin of ($1.4 million) for the ten months ending October 2010. If revenues are not matched with expenses there is no way to accurately measure or compare farming economic performance from a three month period in one year to a three month period in another year.

**C. Proper implementation of the BEL framework requires using months with comparable economic activity in the benchmark and compensation periods.**

31. Evaluating changes in a farm's financial and economic performance necessitates the use of comparable periods. To do otherwise does not achieve comparability and is not how financial performance is measured. For example, it is essential to account for comparable economic activity when analyzing variable expenses, i.e. months in which significant expenses were incurred or paid. To use Farm Claimant                as an example, the timing difference in the payment of the fertilizer and seed expenses between 2009 and 2010 creates a distorted view if simply looking at one month to the next whether it is October 2009 and 2010, November 2009 and 2010, or December 2009 and 2010. Because cash basis financial data does not represent an accurate picture of financial or economic performance, any comparison from month to month or year to year will not be comparable. Instead, some analysis has to be performed to ensure comparable economic activity is being evaluated. Only then will accurate results be obtained.

Page 12

### D. BP's suggested BEL implementation approach for farm claims is workable and can be readily implemented.

32. The Settlement Program implementation of the BEL framework for farming claims can be greatly improved by incorporating the basic principles of accounting summarized above. These improvements often can be accomplished using information already submitted to the Settlement Program and in other cases with additional data that should be readily available to claimants. As noted earlier, I assisted BP in the development of the suggested approach for farming claims included in Tab 1 of the BP Response to Class Counsel's Request for Policy Determination submitted to the Claims Administrator. This approach is consistent with the BEL framework, and consistent with sound, generally accepted economic principles and relatively easy to accomplish. See Appendix D for further discussion. The BEL implementation approach proposed by BP can be readily performed by the staff accountants as the financial data, the revenues and the variable profits, have all been assembled and calculated, so it is only a matter of making a few adjustments to that data. If a claimant could establish that a particular revenue or expense was allocated to the wrong year or month, the claimant could provide documentation supporting that position to be considered by the accountants.

### E. The Settlement Program can use objective criteria to identify claims subject to further review.

33. There are a number of objective criteria the Settlement Program can use to identify claims, including farming claims, which have submitted financial data that will require further work by the Settlement Program to compute compensation consistent with the BEL framework's requirements that (i) revenue be reported based on when it is earned; (ii) revenues are properly matched with the corresponding expenses; and (iii) comparable months are used in evaluating the claim. I assisted in developing these criteria based on my review of hundreds of the farming-related claims. These criteria were presented as triggers/thresholds proposed by BP in a supplemental submission to the Claims Administrator. See Appendix E for further discussion of these triggers/thresholds.

34. As a practical matter, I expect that due to the nature of the agriculture production process, supplemental review would be required for the vast majority of agricultural claims in which claimants have submitted cash basis financial information. See Appendix C for additional farm claim examples and a list of other farm claims which also exhibit large concentrations

of monthly revenue, negative monthly variable profits, and variable profit percentage swings.

35. I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

Dated:   January 23, 2013

# Appendix A



Resume of: **Charles E. Finch, AVA**

Position: Managing Director and Practice Leader
Kansas City
Alvarez & Marsal

Experience
Includes:

Mr. Finch's business experience includes business valuation, statistical analysis, commodities, futures and options trading, acquisition and divestiture, and cash flow analysis. Prior to joining A&M, he was President and co-founder of an agricultural commodities trading and storage company and served as a Partner/Principal and Practice Leader for Grant Thornton and for PricewaterhouseCoopers. He has served as a court-appointed receiver in a JV dispute and has testified on many lost profits matters as an economic expert in State and Federal court in the U.S. and in Bermuda's Supreme Court.

Mr. Finch's commodity experience includes grain, fertilizer, flour and feed operations and trading, operational reviews, commodities, futures and options trading, pesticides/fungicides, acquisition and divestiture, environmental analysis and business valuation. His background in derivatives and commodities includes:

- Agricultural commodity trading, including corn, wheat, soybeans, milo, cottonseed, oats, cattle and various feed products, both in futures/options and the underlying commodity.
- Team leader on Lehman Brothers Holdings, Inc. (LBHI) equity derivatives and hedge funds derivative asset recovery effort, including FX, equity, commodity, rates and credit derivative trades. Over 6,500 contracts and one million trades to be unwound. Currently assisting in the mediation efforts with Lehman counterparties.
- Liaison for U.S. derivatives team with Lehman Brothers Inc. (LBI) SIPC trustee regarding matters including several billion dollars of collateral (cash, treasuries and securities), standing of affiliated counterparties, SIPC's trustee's function as calculation agent, notification agent, etc.
- Responsible for Lehman's futures claim with LBI and the CME's close-out of the $4 billion Lehman commodity position
- Economic expert on behalf of Fortune 100 Company in several class action agricultural fungicide product liability matters involving producers throughout the southern U.S. Testified at deposition and trial regarding farmers' alleged lost profits resulting from use of the fungicide.
- Conducted investigation for largest U.S. ag credit institution on $400 million line regarding short corn option positions and hedging/speculating in commodity futures/options
- Served as expert for Big Bank in defending FINRA claim regarding muni arbitrage repo program and subsequent failure of claimant to make margin calls which led to muni bond liquidation. Matter settled favorably.
- Serving as economic expert for Defendant Big Bank in Tender Offer Bond (TOB) matter in which Plaintiffs (European municipalities) are claiming damages due to TOB investment losses.
- Served as economic expert in stock option matter regarding Plaintiff's claims for damages on London Stock Exchange underlying assets. Defendant client won on summary judgment.
- Serving as economic expert for Defendant $1.4 billion CPA firm in matter involving the bankruptcy of large Future Commission Merchant house and sale of another related to invested collateral losses with Commodity Trading Advisors.
- Assisting municipal clients with interest rate swaps, forward purchase agreements and arbitrage rebate analyses
- Perform Fair Market Value analysis on over $1 billion of agribusiness assets in solvency analysis for national co-operative.
- Graduate research papers on commodities and commodity trading in Masters in Economics studies.



Some representative litigation engagements Mr. Finch has performed include:

- Testified as economic expert in Bermuda Supreme Court matter in which the issue involved over $400 million in bonds borrowed by an Indonesian paper mill concern. Judge's ruling for client, including professional fees.
- Economic expert in two residential mortgage class actions in which defendants had securitized sub-prime second mortgages and were allegedly in violation of state and federal regulations
- Economic expert on behalf of plaintiff in fertilizer pricing matter involving tens of thousands of transactions. Outcome was a $10 million settlement for plaintiff.
- Analyzed thousands of copper transactions over three year period in price-fixing matter on behalf of plaintiffs to provide I/P % (using *Illinois Brick*) and antitrust premium applications to appropriate units of copper traded.
- Economic expert in grain, feed, chemical and fertilizer fraud matter representing international commodity trading firm, including allocation of loss calculations for class settlement purposes. Testified to findings.
- Economic expert in $20 million swine trading and processing dispute on behalf of international agribusiness firm. Testified to findings.

Other litigation matters in which Mr. Finch has testified include bankruptcy, lost profits, product liability, environmental damages, and breach of contract.

Education: University of Kansas
Masters of Economics

University of Missouri-Kansas City
MBA in Finance
Bachelors in Mathematics

Avila University - Kansas City, Missouri
Adjunct instructor of economics, finance and quantitative analysis in the MBA program.

Licenses and Professional Affiliations: Accredited Valuation Analyst (AVA) with the National Association of Certified Valuation Analysts (NACVA).
Associate member of the Government Finance Officers Association (GFOA), former member of the GFOA Standing Committee on Economic Development and Capital Planning.
Former member of National Grain & Feed Association and the Grain Elevator and Processor Society.
Formerly licensed as warehouseman (State and Federal) under Commodity Credit Corporation, licensed under Federal Insecticide Fungicide and Rodenticide Act and licensed as inspector and weigher under the Federal Grain Inspection Service

Presentations: CLE seminars to attorneys on "Environmental PVD Issues," "Environmental Liabilities: What the Future Holds," "Managing Litigation Risk," "Understanding Financial Statements," "Valuations for Business and Loss Claims," "Statistics in Litigation" and "The Cost/Benefit Analysis of Arbitration." Also prepared and presented classes to government finance officers on "Economic Development". Prepared and presented seminar on "Derivatives in Litigation".

Appendix B

For this Declaration I have reviewed the following:

- Exhibits 4 A-E from the Business Economic Loss Claims framework

- 10/8/12 Settlement Program Policy Statement at 2

- Class Counsel 12/16/12 memo re Request for Formal Policy Statement: Monthly Revenue

- BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination

- Individual claim documents for 25 different farmers (see Appendix C), including Farm
  Claimant ███████ discussed in my declaration

- United States Department of Agriculture (USDA), Field Crops - Usual Planting and
  Harvesting Dates, October 2010

- USDA Commodity Costs and Returns, http://www.ers.usda.gov/data-products/commodity-
  costs-and-returns.aspx

- USDA Crop Prices,
  http://usda.mannlib.cornell.edu/MannUsda/viewTaxonomy.do?taxonomyID=25

- USDA Crop Insurance and Government Programs, http://www.rma.usda.gov/policies/

- A list of 561 farming claims filed with the Settlement Program with associated Profit and
  Loss (P&L) claim data where provided in Excel form

- IRS publication 225, Farmer's Tax Guide

- American Institute of Certified Public Accountants (AICPA) Statement of Position ( SOP)
  85-3 Accounting for Agricultural Producers

- The Farm Financial Standards Council (FFSC) "Financial Guidelines for Agricultural
  Producers", April 2011

- Kieso & Weygandt Intermediate Accounting, Tenth Edition

- NOAA distance calculator, http://www.nhc.noaa.gov/gccalc.shtml

- BP Settlement system, http://www.deepwaterhorizoneconomicsettlement.com/maps.php

# Appendix C

1. **Farm Claimant** ███████

   - Zone D, ████████████████████████
   - Claim award $462,011, including RTP
   - Rice, soybeans and corn farm
   - The claimant passed the V-Test because 20 percent of its 2009 annual revenues were recorded in September, whereas these sales were delayed in 2010 until the fourth quarter – failing to evaluate comparable periods between 2010 and 2009 resulted in the appearance of a decline in revenues in 2010



   - As shown in in the chart below, the claimant's revenue measured on a calendar year cash basis declined from $1.4 million in 2009 to $1.3 million in 2010, but when considered on a crop year basis, the farm's revenue increased substantially from $1.1 million in 2009 to $1.5 million in 2010 (note, the cash basis P&Ls actually lists as revenue line items Rice, Corn and Soybean *Prior Year Sales*)



- The claimant's variable profits, if calculated using properly matched entries from the cash basis P&Ls of the farm, increased substantially from $33,000 for May-December 2009 to $301,000 in 2010 for the same time period

- The monthly cash basis P&Ls create distortions such as the appearance that 2009's May-December variable profits were nearly 90% *less* than 2010's May-December variable profits. In fact, the calendar year variable profits for those two years were almost equal (slightly higher in 2010)

- The Settlement Program's base offer of $370,000 implies that claimant would have earned variable profits in May-December 2010 of $671,000 in the absence of the spill, which is 25 percent greater than variable profits for the entire year 2009

- These results indicate that the claimant's cash basis financials produce an offer that greatly overstates the variable profit the claimant might have expected to earn in the absence of the spill

2. **Farm Claimant** ▆▆▆▆

- Zone D, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆
- Claim award $3,018,392, including RTP
- Rice farm
- As shown in the chart below, the claimant's revenue measured on a calendar year or crop year basis fell from the benchmark year of 2009 to 2010. This revenue decline appears to be due to the decline in rice prices between 2009 and 2010
- Evaluated on a cash basis, the claimant earned variable profits of $935,000 from May-December 2010, roughly $100,000 less than in the same period for 2009
- The Settlement Program's base offer of $2.4 million implies that claimant would have earned a variable profit in May-December 2010 of $3.35 million in the absence of the spill, well in excess of claimant's total *revenue* (much less profits) in either 2009 or 2010 (note that revenues are always greater than profits by the amount of expenses that correspond to those revenues which makes this offer even more incredible)



**Claimant** ▆▆▆▆
**Benchmark Year: 2009 / Compensation Months: Sep-Nov**

- These results indicate that the claimant's cash basis financials produce an offer that greatly overstates variable profit the claimant might have expected to earn in

3

the absence of the spill

- The result is driven by the fact that the claimant recorded 99 percent of its 2009 revenue in November, but recorded 91 percent of its 2010 revenue in December. This one month shift in the timing of its cash receipts generated an offer that far exceeds economic reality
- A simple one-month delay in the receipt of 91 percent of the claimant's revenues in 2010 results in an implied 2010 variable profit for May-December that is more than three times greater than 2009 for the same time period

3. **Farm Claimant**
- Zone D,
- Claim Award $694,162, including RTP
- Rice farm
- Between 2007 and 2011, there were 17 months in which variable expenses were recorded but revenue was $0 and 9 additional months in which there was a negative variable profit; this implies that revenues are not matched with corresponding variable expenses
- Significant swings in monthly variable profit margin such as a low of negative 650% in July 2009 to a high of 99.6% in December 2009 likewise imply that revenues are not matched with corresponding variable expenses
- The harvest period for rice in Louisiana is September 28 to October 20. Before 2010, the bulk of annual revenue was recorded in the fourth quarter (October-December). However, in 2010 and 2011, more of the rice harvest was held and sold in the following calendar year, as reflected in the chart below. Failure to account for revenue earned over the 2010 and 2011 crop years results in a distorted picture of the farm's financial performance



- The claimant passes the V-Test under the Class Counsel interpretation of revenue application to the Settlement Framework due to the shift in the timing of crop sales into the following calendar year as reflected in the below chart:



- The change in timing of crop sales impacted both the BEL Causation and Compensation calculations
- 2010's crop year revenues were greater than 2009's crop year revenues. Despite this economic reality that 2010 was a more profitable year, the Settlement Program made a base offer of $555,330 to this claimant. The offer implies that,

in the absence of the spill, the claimant would have earned a variable profit in May-December 2010 of $890,329 which exceeds the total annual revenue that the claimant earned in either 2009 or 2010



**Claimant**
**Benchmark Year: 2009 / Compensation Months: Oct-Dec**

- These results indicate that the claimant's cash basis financial data produce an offer that greatly overstates the variable profit that the claimant might have expected to earn in the absence of the spill

Appendix D

**A suggested approach to improving implementation of the BEL framework for farming claims**

As discussed in my declaration, I assisted BP in the development of the suggested approaches which were included in Tab 1 of the BP Response to Class Counsel's December 16, 2012 Request for Policy Determination submitted to the Claims Administrator. These approaches are consistent with the Settlement Agreement, consistent with sound, generally accepted economic principles and relatively easy to accomplish.

Evaluation of a farm's performance requires recognizing that the "crop year", which reflects the USDA-designated period in which a crop is marketed, differs from the "production year", which reflects that period in which expenses are incurred for growing and harvesting the crop. Evaluating a farm's performance obviously requires that the total revenue derived from a particular crop be counted and does not depend on the precise time at which the farmer decides to sell the harvest.

Per the USDA[1], the earliest month in which active harvest begins in the Gulf Coast region is July for rice, August for soybeans and August for cotton. All sales of these commodities before their earliest harvest month can reasonably be assumed to reflect sales of the crop harvested in the prior calendar year. Since the goal is to measure impacts to revenue post-spill, revenue must be measured using the crop year immediately after the spill, i.e., crop year 2010. The USDA's planting and harvesting dates by crop by geography are publicly available and can easily be accessed by the Settlement Program accountants (see footnote 5).

After the crop year revenue is determined, monthly revenue can be approximated based on crop year revenue and the monthly variable costs incurred by the claimant to produce the crop. In order to approximate *monthly* revenue, it is reasonable to assume that revenue is earned in proportion to the effort expended by the farmer, as reflected in the monthly pattern of variable costs reflected in the claimant's monthly financial data. While not perfect, this approach to identifying when revenue is earned is a substantial improvement over the Settlement Program's current focus on when cash is received and yields a more accurate evaluation of the claimant's monthly performance. Based on this view, monthly revenue can be approximated by multiplying the claimant's (i) crop year revenue; and (ii) the

---

[1] USDA, Field Crops - Usual Planting and Harvesting Dates, October 2010

share of claimant's total production year costs for each given month in the relevant production year. This calculation would be undertaken for each month in each year in the benchmark and compensation periods and is not relatively time consuming or difficult.

If expense patterns are irregular, adjustments should be made to cash-based expense entries to better approximate when inputs are consumed in the production process. For example, if unusually large expenses for seed, fertilizer, chemicals or fuel appear in one year compared to others, it may indicate that the claimant purchased inventory for multiple years or purchased supplies late in one production year for use in the following cycle. In such cases, the Settlement Program can attempt to apportion costs to the appropriate period based on consultation with the claimant.

In implementing the BEL, the months selected in the Compensation Period and Benchmark Period years must reflect comparable periods of economic activity. Often, this can be based on comparison of the same calendar month, which reflects the Settlement Program's current approach. However, periods of comparable economic activity may not occur in the same calendar month each year. As discussed above, this can occur in agriculture if planting and/or harvesting is delayed due to weather conditions or, if crops are rotated and a different commodity was planted and harvested. Such irregular events can be readily identified by the accountants, the claimant and/or public information.

After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula can proceed as usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

# Appendix E

**The Settlement Program can use objective criteria for identifying claims subject to further review**

As discussed in my declaration, I assisted in developing the below criteria based on my review of hundreds of the farming-related claims. These criteria were presented as triggers/thresholds proposed by BP in a supplemental submission to the Claims Administrator.

The criteria are as follows:

1. *Claims where more than a certain percent of revenue is claimed for a single month.* This pattern would suggest that reported revenue reflects cash receipts instead of actual revenue earned in the month. For instance, when the Farm Claimant          reports 99% of total 2009 annual revenue in a two month period, this would indicate a threshold has been reached and revenue needs to be matched with expenses in a more accurate way. It will also help identify timing differences between periods. For example, as noted in the Farm Claimant          example discussed in more detail in my declaration, 71 percent of revenues were reflected in September alone.

2. *Claims where the variable margin is negative for a given month in either the benchmark or compensation periods.* Negative variable profits are unlikely to arise when costs and revenue are properly matched because businesses, including farms, typically do not operate if they cannot cover their properly measured variable costs. As discussed previously, negative variable profit margins occurred in almost every one of the farming claims I reviewed, including every one of the top eight by award size, and those recorded negative variable profits in over half of the months on average.

3. *Claims with a monthly variable profit percentage that deviates from the annual average by more than a certain percentage.* Large deviations from annual variable profit percentages indicate that revenue is not properly matched with corresponding variable expenses. For example, a range of negative 2,591% to a positive 97% variable profit as in 2010 for Farm Claimant          would indicate a need for further review. The table below reflects the average annual variable profit percentage as well as the highest and lowest monthly percentages

in 2009 for a sample set of farms. The large swings in the monthly variable profit margins is indicative of revenue not properly matched with corresponding variable costs, and, thus, the data taken as is does not provide a true or accurate reflection of the economic and financial performances for these farms.

| Claimant # | 2009 | | | | 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Annual | High | Low | Months with negative variable profits | Annual | High | Low | Months with negative variable profits |
| | 45% | 98% | -2207% | 7 | 42% | 97% | -2591% | 4 |
| | 29% | 100% | -476% | 8 | 33% | 98% | 96% | 9 |
| | 38% | 98% | -79% | 6 | 39% | 96% | -6842% | 7 |
| | 66% | 153% | -482% | 9 | 48% | 99% | -92% | 7 |
| | 21% | 99% | -905% | 7 | 47% | 99% | -897% | 6 |
| | 37% | 91% | -829% | 9 | 34% | 93% | -211% | 7 |
| | 35% | 95% | -1062% | 8 | 43% | 96% | -6834400% | 8 |

The above calculations are based on variable expenses before payroll, and if payroll is later included the months with negative variable profits may increase.

I expect that due to the nature of the agriculture production process, supplemental review would be appropriate for the vast majority of agricultural claims in which claimants have submitted cash basis financial information. See Appendix C for additional detailed claim examples, which also exhibit large concentrations of monthly revenue, negative monthly variable profits, and variable profit percentage swings.