# Exhibit 11E

UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
LOUISIANA

```
**************************************************
                                       *
    IN RE: OIL SPILL by the OIL RIG    *    MDLNo.2179
    "DEEPWATER HORIZON" in the         *    SECTION J
    GULF OF MEXICO, on                 *    JUDGE BARBIER
    APRIL 20, 2010                     *    MAG. JUDGE SHUSHAN
                                       *
**************************************************
```

## DECLARATION OF DAVID A. HALL

1.      I am a Managing Director with Alvarez & Marsal.  My practice specializes in matters involving the determination and measurement of economic damages in a variety of industries including the construction industry.  I hold a Masters Degree in Business Administration from the University of Texas and a Bachelor of Arts Degree from the University of Michigan.  I am a Certified Management Accountant and a Certified Fraud Examiner.

2.      During the past 24 years, I have evaluated project accounting and damages issues in a number of construction matters for a variety of projects.  I have extensive experience with contractors' accounting systems including reviewing and analyzing contractors' project job costs accounts, compliance reviews and fraud investigations.  **Appendix A** of this declaration contains a more detailed overview of my qualifications and professional experience.

## ASSIGNMENT AND SUMMARY OF OPINIONS

3.      I have been asked by BP to address Class Counsel's proposed approach to implementing the Business Economic Loss (BEL) framework of the Economic and Property Damages Settlement, with a focus on claims from businesses in construction-related industries.  I was involved in developing the approach for matching monthly revenue to corresponding expenses for construction companies proposed in Tab 1 of the BP Response to Class Counsel's December 16, 2012 Request for Policy Determination.  I was also involved in developing the triggers/thresholds to determine whether further matching of revenue to corresponding expenses, which BP proposed in a supplemental submission to the Claims Administrator, is needed.

4.      My opinions are based on my review of the Settlement Agreement, construction company claims submitted to the Settlement Program, offers made by the Settlement Program to those claimants, some of the supporting information provided by those claimants, and related analysis that I have performed.  A list of the documents that I have reviewed in preparing this declaration is attached as **Appendix B**.  My principal opinions are summarized below:

(1) The BEL framework requires comparison of a claimant's financial performance before and after the *Deepwater Horizon* spill.  Class Counsel's proposed interpretation and implementation of the BEL framework in many cases will result in an inaccurate picture of the financial performance of construction-related businesses.  In contrast, BP's proposed interpretation and implementation of the BEL framework to account for revenue when it is earned and to match revenue to corresponding costs is consistent with basic accounting principles and yields a realistic picture of a claimant's financial performance.

(2) Construction companies primarily use percentage-of-completion methods of accounting, methodologies designed to track the profit (or loss) of the companies' active projects.  While profit and loss ("P&L") schedules of Construction claimants using this accounting method have reasonably matched revenues and expenses on an annual basis, often the financial statements do not accomplish that objective on a monthly basis.

(3) Based on the dramatic month-to-month fluctuations in the variable profit margin that I see in the financial statements of construction company claim files I reviewed, it appears that the claimants do not consistently record when revenue is earned and have not consistently matched monthly revenues with the corresponding expenses incurred to generate that revenue.  Where these factors are present, the Settlement Program's compensation offers, which are based on simple transcriptions of monthly entries from contractors' P&L schedules into BEL computation spreadsheets, provide an distorted and inaccurate assessment of the pre- and post-spill financial performance of these construction firms.

(4) The approach proposed for construction claims in Tab 1 of BP's response to Class Counsel's request for a policy determination by the Claims Administrator is simple and workable, and will result in a reliable assessment of the pre- and post-spill financial performance of construction firm claimants.

(5) The triggers or thresholds proposed in BP's supplemental submission to the Claims Administrator are simple and workable approaches that the Settlement Program can adopt to identify claims where the claimant-provided financial data will require further matching of revenue to corresponding variable expenses in order to meet the requirements in the BEL framework.

## OVERVIEW OF CONSTRUCTION INDUSTRY ACCOUNTING

5.      Due to the complex nature of construction projects, contractors build expertise in their chosen specialty.  Whether it is road construction, underground sewer and water, electrical, rehab or dozens of other specialties, contractors focus their experience and skills on specific markets and projects.

6.      Contractors are typically chosen through unique processes.  For example, municipal projects, and virtually all larger private projects, undergo a "bid process" by which competing construction companies submit estimates for work described in a formal proposal request.  Most bids call for construction companies to identify time frames, project schedules and detailed financial estimates.  Given that most jobs will last at least several months, and many can last for years, successful contractors require expertise in developing bids and estimating costs, and have the ability to effectively execute those bid estimates consistently in the field.

7.      This is why most geographic areas in the U.S. have well-established companies that compete regularly for projects within their specialty.  For most medium and large construction projects, bid auctions are generally held many months before a project begins to allow proper planning and preparation.  As a result, construction companies will measure their success based on their "backlog" (or the number of jobs they have in the pipeline for the coming year).

8.      Due to the competitive bid process, long lead times and long projects, the profit margins earned by contractors tend to change slowly over time and successful construction companies generally display stable margins on a year-to-year basis.  At any point in time, construction companies will have multiple projects in process and the company's financial results are a weighted average of the results of its projects.  This further limits the variation in profits and profit margins from year to year because the

weighted average limits the financial impact of a single successful or unsuccessful project.

9.      Accounting guidance and requirements for construction contractors are different than for other industries.  Generally, construction companies generate revenue and earn profits (or suffer losses) over long periods of time and in various phases as projects progress.  Some projects may be continuous while other projects may have periods of dormancy during which others aspects of the work are performed by different specialists.

10.     As a result of the long term nature of construction projects, construction contractors account for project activity as work is completed.  The method used to account for work completion in stages is called "percentage-of-completion."  Under this method,

> " . . . portions of the total estimated contract revenues and costs are reflected in income each period based on the proportion of the contract work completed in each period.  The profit recognized each period is normally a constant percentage of the revenue recorded for the period, unless the revenue or cost estimates are changed."[1]

11.     Contractors estimate the profits to be earned on a specific project and reflect those profits on their income statement as work is completed.  While there are several different percentage-of-completion methods for calculating revenues and expenses, all are based on the simple assumption that profits are earned in relation to the percentage of the work performed over the contract term.  As a result, a construction company's variable profit margin (expressed in percentage terms) should generally change little on a month to month basis if properly calculated.  Competitively bid contracts are typically priced with similar profit margins, and the margins earned on in-process projects typically change little from month-to-month.  Also, the jobs-in-progress at any point in time, as a group, should exhibit steady weighted average profitability seen on an annual basis.

12.     However, as discussed further below, the financial books and records maintained by construction companies often do not reflect accurate monthly results even where annual results are properly stated.  In part this is due to the significant role of

---

[1] Accounting Standards 605 Revenue Recognition, 35 Construction-Type and Production-Type Contracts, Percentage-of-Completion, U.S.: Recognition of Revenues and Costs, p. 1.

change orders in the industry, which are not reflected in initial estimates and often generate margins for contractors that are higher or lower than work reflected in the original bid.

## ANALYSIS AND DISCUSSION

     1.     **BP's interpretation of the BEL requirements is consistent with basic accounting principles for measuring contractors' financial performance. Failure to adhere to these principles results in distorted estimates of the financial performance of contractors before and after the spill.**

     13.     The BEL framework provides compensation to claimants that experience a post-spill decline in variable profits.   Specifically, to determine the Variable Profit (a key part of the BEL compensation framework), the Settlement Agreement directs the Settlement Program to identify the *monthly* revenues earned by the claimant and to then subtract the corresponding variable expenses incurred in generating that revenue over the same period of time.[2]  In addition, the BEL framework requires that the three-or-more month periods used to compare Benchmark Period and Compensation Period performance should be "comparable."[3]

     14.     The BEL framework requirement that monthly revenue be matched with the "corresponding" variable expenses is consistent with the widely accepted accounting principle which "dictates that efforts (expenses) be matched with accomplishment (revenues) whenever it is reasonable and practicable to do so."[4]  It is widely understood and accepted that such matching between revenue and expenses is required in order to understand a business's financial performance for a given accounting period.

     15.     Variable profit is the amount by which product revenues exceed the variable expenses (the direct costs incurred in producing and selling those products or services).  For purposes of calculating variable profit, therefore, businesses must appropriately match revenues and related expenses incurred in generating those revenues.  Without matching revenues with variable expenses, variable profit figures will not accurately reflect financial performance for the relevant months.  Without this information, the BEL framework will not generate reliable or reasonable Settlement Program offers.

---

[2] Exhibit 4C, page 2.
[3] This aspect of the agreement plays little role in the proposed approach to improve implementation of the BEL framework discussed below and so is not addressed in detail in this declaration.
[4] Intermediate Accounting, Tenth Edition, Kieso, Weygandt, and Warfield, p. 46.

16.     Because construction contracts often include variable payment schedules and require performance stretched over multiple accounting periods, a construction company does not in the ordinary course of business always match its costs and revenues on a monthly basis throughout the year in its monthly P&L schedules.  In my experience construction companies primarily use the percentage-of-completion methods of accounting, methods which track the profit (or loss) of the companies' active projects on a project-by-project basis. Under the percentage-of-completion method,

> "portions of the total estimated contract revenues and costs are reflected in income each period based on the proportion of the contract work completed in each period.  As a result, the profit recognized each period is normally a constant percentage of the revenue recorded for the period, unless the revenue or cost estimates are changed."[5]

It is also my experience that contractors' focus on matching revenues and expenses only for accounting periods that are most relevant for tax and other purposes (generally on an annual basis).  However, the BEL framework requires that revenue be matched to corresponding expenses both on a monthly and annual basis.

2.     **Construction claimants' monthly revenues typically are not properly matched to the corresponding variable expenses in financial statements they are submitting.**

17.     The P&L schedules in the Settlement Program files for construction claims that I have reviewed generally do not appear to properly match revenues and corresponding variable expenses on a monthly basis although revenue and expenses do appear to have been reasonably matched on an annual basis.  This discrepancy between the monthly and annual statements is not unexpected.  As discussed further below, the comprehensive contract reviews (for change orders) and project completion estimates required to properly calculate percentage-of-completion are not needed on a monthly basis for construction contractors to run their businesses.  While accurate year-end percentage-of-completion calculations are critical for reporting to third parties as well as the Internal Revenue Service ("IRS"), monthly P&L schedules which accurately match revenues and expenses are not commonly maintained by contractors in the ordinary course of business.  Further, only annual or year-end P&L statements are subject to audit by outside

---

[5] Accounting Standards 605 Revenue Recognition, 35 Construction-Type and Production-Type Contracts, Percentage-of-Completion, U.S.: Recognition of Revenues and Costs, p. 1.

accounting firms.  Audited financial statements are important to contractors for bonding and/or lending purposes.

18.     My conclusion that revenue and expenses appear to be reasonably well matched on an annual basis is reflected in the fact that variable profit expressed as a percentage of revenue measured on an annual basis appears to be stable for the claims I have reviewed. Appendix Table C.1 demonstrates contractors' stable annual variable profit margins, and is consistent with expectations under a percentage-of-completion method of accounting which matches revenues with the corresponding expenses incurred in generating that revenue during an accounting period.  However, the monthly variable profit margins reflected for most of the Claimants varied dramatically, with swings of more than 100% over consecutive months. Appendix Tables C.2 through C.6 and the graph and chart on page 2 illustrating both the wide range and dramatic changes in claimants' monthly variable profit margin.

19.     Just as the stability of annual profit margins is not unexpected, the volatility in monthly variable profit margins is also not unexpected and is consistently observed across these construction companies.  There are several reasons why the contractors' monthly percentage-of-completion accounting may not match revenue with corresponding expenses including:

- Accurate and up to date percentage-of-completion financial statements involve review of latest cost of completion estimates as well as pending change orders. Many contractors comprehensively calculate and record percentage-of-completion entries only at year end.  This is because they represent to auditors, government (IRS) and lenders only that their annual P&L statements are up to date and accurate and do not have monthly reporting requirements.  In these cases, the contractors' monthly P&L schedules will not at all capture the proper matching of monthly revenues and expenses which distorts monthly variable profit.

- For companies that make some adjustments to the percentage-of-completion accounts during the year, these mid-year adjustments can be incomplete and less accurate than their year-end adjustments.  Significant focus and effort is invested into annual statements used for tax and external audit purposes.  In my experience, contractors -- especially medium and smaller-sized companies -- focus on day-to-day cash balances.  There is little need for such firms to comprehensively calculate percentage-of-completion balances monthly.

- Change orders greatly impact the profitability of specific projects and therefore, contractors' overall profitability.  It is common for contractors to perform informally approved change order work (and therefore earn the revenue) but at the time of performance not include the change order value in the percent complete calculation of earned revenue.  Once formally approved, the contractor immediately recognizes the revenue while not moving the previously incurred

costs to the current month.  Change orders are more often accounted for at project-end or year-end rather than at each month-end.  Change order accounting situations such as these can greatly distort monthly variable profits.

- Cumulative adjustments or outdated/incorrect project completion cost estimates are often recorded cumulatively all in one month as identified.  During the course of the year, existing project cost estimates may become stale as performance on projects can bring unexpected results (and therefore change profitability estimates).  Where cumulative adjustments are recorded in a single month, monthly operating results do not reflect economic reality.

- Non-operating incentive clauses and other terms may not be accurately allocated on a monthly basis, including contract options, price redetermination, penalty clauses, and escalation clauses.[6]

20.     The large monthly fluctuations in the variable profit margin (including negative variable profit margin) of construction claims I reviewed indicate that the monthly P&L schedules submitted to the Settlement Program do not match monthly revenues and corresponding expenses as required for the BEL calculations.  Furthermore, in the monthly P&L schedules of the contractor claims that I reviewed, the contractors' monthly revenues varied more than monthly variable expenses.  This indicates to me that the dramatic fluctuations in monthly variable profit are mostly caused by revenue not being accurately reported in the month it was earned.  Appendix Table C.7 indicates that four of these five contractors had more variability in their monthly revenue compared to monthly expenses.

21.     This result is consistent with my professional experience that most construction contractors record costs into their accounting systems on a timely basis.  This timely recording of costs incurred is necessary for the timely payment of invoices and for project management and forms the basis for the percentage-of-completion accounting method.  The contractor's recording of revenues, however, is subject to estimates and assumptions which are subject to more judgment and potential errors than when costs are recorded.  This is why incurred costs more reliably measure a contractors' effort for a particular month than revenue recorded in monthly profit and loss statements.  Another reason is that recorded costs reflect actual operating effort and progress on a project such has hours worked (for labor costs), materials purchased and installed, etc.

---

[6] Accounting Standards 605 Revenue Recognition, 35 Construction-Type and Production-Type Contracts, Measurement of Contract Revenues and Costs, U.S.: Contract Revenues, p. 1.

**3.      Settlement Program offers to construction claimants indicate that implementation of the BEL framework with monthly P&L schedules that do not match revenues and expenses yields unreasonable and even nonsensical offer amounts.**

22.      Settlement Program offers to construction firm claimants based on mismatched monthly P&L schedules result in a fictitious reduction in variable profit and thus an inflated award for these contractors due simply to differences in the timing of when they record revenue and expenses.  To illustrate this point, consider the following simple example in which a contractor has the same variable profit over the period May-December of 2009 and 2010, and the same variable profit in each individual month during those periods other than August and September.  The contractor earns a variable profit of $300 in August/September of each year. However, in 2009 the contractor records the $300 of variable profit in September, and in 2010 the contractor records the $300 variable profit in August.  For this example, assume this is a mismatching of revenues and costs.  Under Class Counsel's interpretation of the BEL framework, the claimant would be entitled to Step 1 compensation of $300 simply by selecting a September-November compensation period although the claimant experienced no decline in variable profit.

| Table 1 Hypothetical Example:  Reported Variable Profit by Month | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** |
| **2009** | 150 | 150 | 150 | 0 | 300 | 150 | 150 | 150 |
| **2010** | 150 | 150 | 150 | 300 | 0 | 150 | 150 | 150 |
| Difference | 0 | 0 | 0 | 300 | (300) | 0 | 0 | 0 |

Selected Compensation Period

23.      This example illustrates how the BEL formula can yield distorted results when revenues and corresponding expenses are not matched for the period being analyzed. Unreasonable or distorted Step 1 compensation calculated using mismatched or misallocated revenues or expenses is compounded by the RTP component of the offer.

24.    Turning from a hypothetical example to an actual Settlement Program offer to a construction contractor claimant illustrates the impact of mismatched monthly P&L schedules submitted into the BEL framework:

**Claimant N ▮**

25.    Claimant No. ▮ is an industrial asphalt and road pavement contractor in ▮ which is in Zone D.  Claimant N ▮. ▮ May-December 2010 revenues of $47.5 million were more than $3 million **higher** than in the same months of the Benchmark period average of 2007-2009.  Similarly, th contractor's variable profit in May-December 2010 of $20.2 million was more than $3.5 million higher than in the same months of the Benchmark period and reflected an increase in variable profit margin (from 37.4% in the Benchmark period to 42.5% in 2010) as well.  Nevertheless, the Settlement Program has offered the claimant pre-RTP base compensation of more than $7.7 million and a total offer (including RTP) of $9.7 million, far exceeding the variable profit that the claimant could have expected to earn absent the spill.  These inaccurate and fictitious results are driven by large monthly swings in the claimant's variable profit margin, which indicate that revenues are not properly matched to the corresponding variable costs incurred.  For example, in September 2007, this claimant earned a variable profit margin of 62%, compared to a variable profit margin of 17% in October 2010.





**Appendix D** contains additional examples of unreasonable Settlement Program offers to construction claimants resulting from the failure to match revenues with corresponding expenses.

     **4.**     **The steps BP proposed to implement the BEL framework for construction claims will reliably assess the financial performance of construction firm claimants.**

     26.     As discussed above, financial data submitted by construction companies typically reliably report revenue, variable costs and variable profits on an *annual* basis.  However, as reflected in the extreme volatility in monthly variable profit margins for many construction claimants, the monthly revenues in the financial data typically are not matched with the corresponding expenses incurred to generate the revenue.

     27.     I assisted BP in developing the proposal for construction claims in Tab 1 of BP's response to Class Counsel's request for policy determination.  In my view, the steps proposed for construction claims in Tab 1 will allow the Settlement Program to implement the BEL framework in a manner that reliably assesses the firm's financial performance and is consistent with accounting principles.  This typically can be accomplished using data the contractors have already submitted to the Program.  Based on my experience and as discussed above, incurred

costs provide a reliable basis identifying when revenues are earned.  BP's proposal in Tab 1 adopts this approach.

28.    In my experience, accountants regularly perform exercises of the type described in Tab 1 to measure the financial performance of companies.  These steps are easy for accountants to perform and while there are more precise methods of aligning monthly revenues and expenses (such as using historical project-specific revenue, cost and project completion information), this approach is reasonable, practical, and effective.

### 5.    The Settlement Program can use objective criteria for identifying claims subject to further review.

29.    I assisted BP in developing the triggers/thresholds described in BP's supplemental submission to the Claims Administrator.  In developing these triggers and thresholds, I analyzed P&L schedules and other data for several contractor claimants.  I conclude the proposed triggers and thresholds are reasonable and objective methods the Settlement Program can employ to identify claims that potentially fail to adhere to the requirements of the BEL framework. **Appendix E** further describes effective and easy-to-implement metrics for identifying P&L schedules which warrant further review.

30.    Each of the triggers could be implemented using data the contractors have already submitted.  For the contractors who have monthly P&L information that have outliers for these three triggers, then the steps described in Section 4. to align and match monthly revenues and expenses can easily and quickly be applied to those contractors' P&L schedules.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.

David A. Hall

_____
David A. Hall

Dated:  January 23, 2013





## David A. Hall, CMA, CFE, MBA

**Managing Director – Global Forensic and Dispute Services**
dhall@alvarezandmarsal.com

Alvarez & Marsal
707 Seventeenth Street
Suite 2125
Denver, CO 80202

dhall@alvarezandmarsal.com

Mr. Hall has performed financial, economic, and accounting analysis in relation to a wide variety of damage issues. His experience includes construction damages claim preparation, claim review, litigation support and expert testimony in both courts and arbitration. His testimony has covered economic, valuation and damages matters. He is a Certified Management Accountant and Certified Fraud Examiner.

He is a member of the Institute of Management Accountants, National Contract Management Association, Association of Certified Fraud Examiners, and the National Association of Certified Valuation Analysts.

### Education
- M.B.A., University of Texas at Austin
- B.A., University of Michigan, Ann Arbor

### Certifications
- Certified Management Accountant
- Certified Fraud Examiner

### Honors
- Attended the University of Michigan on an Athletic Scholarship
- Treasurer, Michigamua, University Senior Honor Society
- University of Texas Sord Scholar Recipient (academic achievement)
- Darrell K. Royal Scholarship Recipient for coaching and academic achievement
- Century Club Scholarship Recipient for academic achievement
- Graduated from the University of Texas MBA class with highest distinction and received Dean's Award for academic excellence

### Professional Experience

<u>Navigant Consulting, Inc.</u> (2004 -2008), an international business and litigation consulting firm – Managing Director.

<u>Tucker Alan Inc.</u> (1994 -2004), a national business and litigation consulting firm – Vice President.

<u>Peterson Consulting</u> (1988-1994), an international consulting company -- staff consultant, senior and executive consultant.

### Overall Experience Summary

Mr. Hall has analyzed the financial condition of corporations, partnerships, joint ventures, and individuals. He has performed damage studies, analyzed financial statements, disclosures and other representations in a variety of circumstances including in the context of disputes and management consulting. He has analyzed and prepared numerous lost profits, increased costs, business and asset valuations, royalty and other damages claims. His analyses have included study of actual and projected revenues, cost of goods sold, indirect costs, general and administrative expenses, cost of capital, discount rates and assets, liabilities and equity. He has also served as an expert witness testifying in federal and state courts and arbitration.

David A. Hall, CMA, CFE, MBA                                    **APPENDIX A**

## Selected Experience By Industry

### Construction

Mr. Hall has evaluated project accounting and damages issues in many construction matters for a variety of projects.  He has assisted owners, contractors, subcontractors and engineers preparing and analyzing construction accounting  records and claims for economic damages.  He has developed an understanding and expertise of the issues relating to accounting for construction projects, cost and damage measurement.  His experience includes analyzing construction project accounting records including job cost accounts/reports, payment requests, proper accounting for long-term construction projects, damages, change orders, and contract price adjustments.  He has also studied the actual and projected costs and revenues for many construction projects.

His experience includes preparing or rebutting constructive changed work claims including delay and disruption cost claims.  He has extensive experience with termination claims (both for convenience default).  He has also submitted expert reports and provided testimony on the proper accounting treatment of costs under GAAP for long-term contract accounting guidance.

He has extensive experience with contractors' accounting systems including reviewing and analyzing contractors' project job costs accounts, compliance reviews and fraud investigations.  He has also assisted clients with project cost reviews (for contract compliance and fraud) and forensic accounting analyses related to Qui Tam (false claims).  His project experience includes:

- Airport Facilities
- Computer Chip Manufacturing Plant
- City Jail
- Coal Mining Facility
- Education Facilities
- Environmental Laboratories
- Gold Mining Facility

- Highway Bridge

- Hotels
- Multi-Family Housing Developments
- Oil Refineries
- Parking Garage
- Phosphate Plant
- Single Family Residential
- Spent Nuclear Fuel storage facility

- Wind Farms

David A. Hall, CMA, CFE, MBA                                    **APPENDIX A**

**Government Contracts**

Mr. Hall has performed project cost audits, and general business consulting for government and long-term contracting companies.  Analyzed and prepared requests for equitable adjustments, changed work claims, termination claims and false claims disputes in the following areas:

- Aircraft Depot Level Maintenance
- Command Centers – Battlefield
- Command Control and Communications Center – National

- Computer Hardware and Software
- Fighter Aircraft
- Flight Test Simulators
- Fire Station
- Gunship (AC-130)

- Low-level radioactive waste shipments
- Power Plant (Spent Fuel Storage)
- Satellites
- Tank Trailers
- Tank Munitions (120mm)
- Trainer Aircraft
- Transport Aircraft
-

Mr. Hall's false Claims experience includes analyzing accounting issues related to percent complete on long-term contracts and related progress billing issues, value of oil and gas royalties, and reported progress of environmental clean at large DOE site.

He has assisted manufacturing companies with Material Management and Accounting Systems ("MMAS") compliance audits involving review, analysis and corrective actions to companies' Material Requirements Planning ("MRP") systems.

He has also assisted contractor and its counsel with dispute involving the design and development of student loan software.  Analysis included causation and damages related to the substantial increase in development costs and dispute between a state and contractor related to their partnership and joint development effort.

**Mergers and Acquisitions**

Mr. Hall has assisted a Telecommunications Company and its counsel with a post merger class action dispute related to the last declared dividend to shareholders of the non-surviving entity of a telecommunications merger.  Tasks included analyzing and quantifying increases in shareholder value from announcement of merger to the close, quantifying class members' gain on the day that the merger closed through the conversion of the shares to surviving merged entity, and quantifying the value impact to the shareholders and company of a specific dividend payment.

He has also assisted Aerospace Company and its counsel with a post acquisition purchase price dispute related to the sale of a $3 billion satellite company.  Analyses included valuation of individual satellite contracts, proper accounting for long-term

David A. Hall, CMA, CFE, MBA                                    **APPENDIX A**

contracts and comparing the accounting for the closing balance sheet with the selling company's past practices.

He has served as Independent Accountant to determine outcome of post-acquisition dispute between acquiring company and the former shareholders related to the sale of a golf, private club and resort operator.

**Real Estate Experience**

Provided expert witness damages testimony in Denver District Court caused by breach of partnership agreement related to failure to fund in attempted acquisition of apartment complexes.

Provided expert witness damages testimony in Colorado Federal Court for failure to fund matter for a high-rise condominium development project. Determine damages caused by a bank lender's failure to provide funds under a loan agreement the plaintiff alleged had been executed. Damage analysis included additional cost caused by suspended construction activity while alternative financing was obtained as well as the economic impact of less favorable loan terms from new financing.

He has analyzed damages issues in a dispute related to a failed land development partnership in Colorado. Projected partnership cash flows and values over time by forecasting development costs, lot values, take-down schedules, tap fees, partnership operating expenses and financing costs. Developed a complex financial model and drafted an expert report prior to settlement of the case.

Provided expert witness damages testimony in arbitration in a breach of contract dispute between LLC partners involving lifestyle center mixed use. Analyses included assessing the economic impact of the partners from different equity and debt structure for the project.

He has additional experience includes fraud investigations and damages assessments for many low-income housing developments throughout the country.

David A. Hall, CMA, CFE, MBA                          **APPENDIX A**

### Additional Experience

His selected industry experience includes the following:

- Accounting malpractice
- Aerospace & Defense
- Agribusiness
- Airline
- Automotive
- Banking
- Construction
- Consumer Products
- Drilling equipment
- Educational Services
- Energy Laboratories
- Ethanol
- Healthcare and Medical Products
- Legal malpractice
- Mining and processing plants
- Mutual Funds
- Natural Gas and NGLs royalties
- Oil royalties
- Real Estate – Resorts, Hotels, Lifestyle Centers, Condominiums
- Restaurants and retail
- Satellites
- Telecommunications
- Utilities
- Wind Energy

### Testimony and Alternative Dispute Resolution Experience

Mr. Hall has provided expert testimony in over 50 matters in trials (U.S. state and federal courts, Canadian federal court), arbitrations), and depositions involving many types of disputes. The subject matter of his testimony has included economic damages, loss causation, valuation, accounting and financial issues, and fraud investigation results.

Mr. Hall has also consulted with companies on methods to avoid disputes and assisted in resolving existing disputes. These efforts have included participating in settlement negotiations and mediations presenting accounting, economic and business operations analyses and assisting in developing alternative methods to resolve the disputes. Examples include assisting a government contractor in mediating a large and complex claim for increased costs related to the development and production of a Special Forces aircraft. The mediation resulted in a substantial settlement with the United States Air Force.

He has served as Independent Accountant Arbitrator to render opinion on accounting dispute involving past practice and GAAP in a post-acquisition dispute.

David A. Hall, CMA, CFE, MBA                                    **APPENDIX A**

**Professional Associations**

- Institute of Management Accountants
- Association of Certified Fraud Examiners
- National Association of Certified Valuation Analysts
- National Contract Management Association

**Lectures and Seminars and Representative Topics Covered**

- National Contract Management Association -- National Education Seminar Instructor
  - ➢ Contract Costs and Pricing Contract Changes
  - ➢ Preparation and Analysis of Construction Contract Claims
- American Bar Association Annual—Public Contracts Section Annual Meeting
  - ➢ Dealing with a More Active Defense Contract Audit Agency
- Rocky Mountain Intellectual Property & Technology Institute Lecturer
  - ➢ Patent Valuation and Damages Issues
- Various Company and Law Firm lectures
  - ➢ Preparation and Analysis of Economic Damage Claims
  - ➢ Loss Causation Analyses
  - ➢ Preparation and Analysis of Construction and Government Contract Claims

APPENDIX B

**Documents Reviewed**

**Legal Filings**

1.  THE PLAINTIFFS' STEERING COMMITTEE'S AND BP DEFENDANTS' JOINT
    MOTION FOR (1) PRELIMINARY APPROVAL OF CLASS ACTION
    SETTLEMENT, (2) SCHEDULING A FAIRNESS HEARING, (3) APPROVING
    AND ISSUING PROPOSED CLASS ACTION SETTLEMENT NOTICE, AND (4)
    BP'S MOTION FOR ADJOURNING THE LIMITATION AND LIABILITY TRIAL,
    April 18, 2012

2.  *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES
    SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012

    a)  Exhibit 4A

    b)  Exhibit 4B

    c)  Exhibit 4C

    d)  Exhibit 4D

    e)  Exhibit 4E

3.  ORDER AND REASONS Granting Final Approval of the Economic and Property
    Damages Settlement Agreement, December 21, 2012

**Correspondence Regarding Monthly Revenue**

4.  December 16, 2012 memo from class counsel to claims administrator re: Request for
    Formal Policy Statement: Monthly Revenue

5.  BP's response to December 16, 2012 memo from class counsel to claims administrator
    re: monthly revenue

6.  BP's memo with suggested triggers for selected industries

7.  Announcement from Patrick A. Juneau, Claims Administrator, to class counsel and
    BP, dated January 15, containing 2 page response memorandum

APPENDIX B

**Documents Reviewed**

**Claimants' Financial Information**

    8.    PWC Workbooks

    9.    Claimants' tax returns

    10.    Claimants' annual and monthly financial statements

**Research/Accounting Literature**

    11.    Accounting Standards 605 Revenue Recognition, 35 Construction-Type and Production-Type Contracts

    12.    Donald E. Kieso, Jerry J. Weygandt, and Terry D. Warfield, *Intermediate Accounting*, Tenth Edition, John Wiley & Sons, 2000.

    13.    Internal Revenue Bulletin 2003-41, dated October 14, 2003

## Construction Claimants' Monthly Revenue Not Properly Matched To Corresponding Variable Expenses

Table C.1 illustrates contractors' stable annual variable profit margins.

| Appendix Table C.1 Annual Variable Profit Margin | | | | |
|---|---|---|---|---|
| **Claimant Number** | **2007** | **2008** | **2009** | **2010** |
| | 39% | 34% | 38% | 36% |
| | 19% | 21% | 19% | 18% |
| | data not provided | | 42% | 36% |
| | 27% | 35% | 34% | 31% |
| | 33% | 34% | 42% | 41% |

Table C.2 illustrates Claimant No. ▮▮▮▮ wide range and dramatic changes in its monthly variable profit margin compared to its consistent annual profit margin.

| Appendix Table C.2 Annual vs. Monthly Variable Profit Margin Claimant Number ▮▮▮ | | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** |
| **Annual** | **39%** | **34%** | **38%** | **36%** |
| January | 39% | 38% | (29%) | (85%) |
| February | 22% | 38% | 52% | 51% |
| March | 56% | 57% | (3%) | 19% |
| April | 32% | 17% | 36% | 19% |
| May | 38% | 47% | 34% | 25% |
| June | 41% | 16% | 56% | 62% |
| July | 22% | 4% | (2%) | 42% |
| August | 43% | 61% | 46% | 36% |
| September | 62% | 4% | 54% | 39% |
| October | 43% | 42% | 33% | 17% |
| November | 25% | 35% | 44% | 28% |
| December | (32%) | (21%) | 18% | 61% |
| Low Month | (32%) | (21%) | (29%) | (85%) |
| High Month | 62% | 61% | 56% | 62% |

APPENDIX C

**Construction Claimants' Monthly Revenue Not Properly
Matched To Corresponding Variable Expenses**

The graph below illustrates Claimant No. ███████ changes in its monthly revenue.



## Construction Claimants' Monthly Revenue Not Properly Matched To Corresponding Variable Expenses

The chart below summarizes claimants' range of their 2009 monthly variable profit margin (in blue) and the annual variable profit margin (in red):



## Construction Claimants' Monthly Revenue Not Properly Matched To Corresponding Variable Expenses

Tables C.3 through C.6 illustrates claimants' wide range and dramatic changes in their monthly variable profit margin compared to their consistent annual profit margin

| **Appendix Table C.3** Annual vs. Monthly Variable Profit Margin Claimant Number | | | | |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 |
| **Annual** | 19% | 21% | 19% | 18% |
| January | 22% | 41% | (1236%) | 6% |
| February | (78%) | 4% | 1% | 36% |
| March | 59% | 39% | 34% | 10% |
| April | 20% | 42% | n/m | 30% |
| May | 42% | 25% | 15% | 14% |
| June | 34% | 42% | 64% | 16% |
| July | 13% | (6%) | 27% | (67%) |
| August | (16%) | 28% | 19% | 66% |
| September | (1671%) | (33%) | 24% | 48% |
| October | 66% | 15% | (36%) | (47%) |
| November | 54% | (41%) | 59% | 10% |
| December | (4%) | 47% | (47%) | 47% |
| Low Month | (1671%) | (41%) | (1236%) | (67%) |
| High Month | 66% | 47% | 64% | 66% |

Note:
   Claimant's April 2009 variable profit margin is not measurable due to Claimant's reported negative revenue.

## Construction Claimants' Monthly Revenue Not Properly Matched To Corresponding Variable Expenses

**Appendix Table C.4**
**Annual vs. Monthly Variable Profit Margin**
**Claimant Number** ▮▮▮▮

|  | 2009 | 2010 |
|---|---|---|
| Annual | 42% | 36% |
| January | 3% | 57% |
| February | 59% | 18% |
| March | 36% | 32% |
| April | 43% | 24% |
| May | 64% | 68% |
| June | 49% | 58% |
| July | 27% | (1%) |
| August | 77% | (1%) |
| September | 50% | 35% |
| October | 27% | 69% |
| November | 0% | 64% |
| December | 29% | (36%) |
| Low Month | 0% | (36%) |
| High Month | 77% | 69% |

**Appendix Table C.5**
**Annual vs. Monthly Variable Profit Margin**
**Claimant Number** ▮▮▮▮

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Annual | 27% | 35% | 34% | 31% |
| January | 63% | 22% | 29% | (45%) |
| February | 54% | 22% | 35% | 53% |
| March | 1% | 54% | 29% | 49% |
| April | 20% | (67%) | 61% | (25%) |
| May | 21% | 29% | 57% | 48% |
| June | 42% | 47% | 1% | 43% |
| July | (12%) | n/m | (66%) | 59% |
| August | 44% | 55% | 61% | 12% |
| September | 49% | 54% | 44% | 16% |
| October | (6%) | 66% | (62%) | (486%) |
| November | (4%) | 21% | 56% | 41% |
| December | 20% | 32% | 54% | 54% |
| Low Month | (12%) | (67%) | (66%) | (486%) |
| High Month | 63% | 66% | 61% | 59% |

Note:
Claimant's July 2009 variable profit margin is not measurable due to Claimant's reported negative revenue

## Construction Claimants' Monthly Revenue Not Properly Matched To Corresponding Variable Expenses

| Appendix Table C.6 Annual vs. Monthly Variable Profit Margin Claimant Number ▇▇▇ | | | | |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 |
| **Annual** | **33%** | **34%** | **42%** | **41%** |
| January | 34% | 62% | 56% | 78% |
| February | 47% | 55% | 51% | 45% |
| March | 33% | 50% | 34% | 49% |
| April | 38% | 44% | 41% | 34% |
| May | 41% | 31% | 75% | 59% |
| June | 40% | 54% | 48% | 62% |
| July | 1% | 35% | 7% | (0%) |
| August | 40% | 37% | 47% | 24% |
| September | 51% | 33% | 50% | 20% |
| October | 39% | 12% | 19% | 33% |
| November | (31%) | (4%) | 51% | 51% |
| December | (24%) | (210%) | (82%) | 38% |
| Low Month | (31%) | (210%) | (82%) | (0%) |
| High Month | 51% | 62% | 75% | 78% |

Table C.7 indicates that four of the five contractors I reviewed had significantly more variability in their monthly revenue compared to their monthly expenses.

| Appendix Table C.7 Variability of Monthly Revenues & Variable Expenses | | |
|---|---|---|
| | Annual Range / Monthly Average | |
| **Claimant Number** | **Revenue** | **Expenses** |
| ▇▇▇ | 1.64 | 1.10 |
| | 1.51 | 1.28 |
| | 1.04 | 1.17 |
| | 1.68 | 1.53 |
| | 1.24 | 1.14 |

### Additional Examples Of Unreasonable Settlement Program Offers To Construction Claimants

**Claimant No. ▇▇▇**

Claimant No. ▇▇▇ is an electrical contractor located in ▇▇▇ which is Zone C. Claimant's offer is based on a 2009-only benchmark period and the 3-month period July to September. Claimant's revenue increased in the post-spill period—its revenue in May to December of 2010 was more than $150,000 higher than in the same months in 2009. Although the Claimant's variable profit fell by only $66,000 over this period, the Settlement Program offered base compensation (pre-RTP) of $615,546 and total compensation (post-RTP) of $769,433. This offer implies that in the absence of the spill the Claimant would have earned a variable profit of $1,785,028 from May-December 2010, 44% higher than its variable profit in May-December the benchmark years. These results are driven by large monthly swings in the claimant's variable profit margin resulting from monthly revenues not being matched with the costs incurred in generating those revenues. For example, in August, 2010, the claimant recorded revenue of $333,415 and variable expenses of $336,566, for a variable profit margin of -0.9%. The negative variable profit in August 2010 is due to a large material cost in that month that is not being properly matched with the corresponding revenues.





## Additional Examples Of Unreasonable Settlement Program Offers To Construction Claimants



## Additional Examples Of Unreasonable Settlement Program
## Offers To Construction Claimants

**Claimant No.** ███████

Claimant No. ███████ is a commercial and institutional building construction company in ███████ which is in Zone D.  Claimant No. ███████ revenue in May-December 2010 of $15.0 million declined by only $300 thousand (or 2%) from revenue in the same months of the benchmark period of 2009.  Further, annual revenue in 2010 was more than $4 million *higher* in 2010 than 2009.  Nevertheless, the Settlement Program offered the claimant pre-RTP base compensation of $3.8 million and a total offer (including RTP) of $4.8 million. This offer implies that the claimant's variable profit that the claimant could have earned in the absence of the spill would have been nearly 50% above 2009 levels.  These distorted results are driven by large monthly swings in the claimant's variable profit margin, which indicate that revenues are not properly matched to costs incurred.  For example, in June 2009, Claimant No. ███████ earned a variable profit margin of 64%, compared to a variable profit margin of *negative* 67% in July 2010 in which the claimant reported revenue of $1.7 million and variable expenses of more than $2.8 million.




### Additional Examples Of Unreasonable Settlement Program Offers To Construction Claimants



### Additional Examples Of Unreasonable Settlement Program Offers To Construction Claimants

**Claimant No.** ▮▮▮▮▮▮

    Claimant No. ▮▮▮▮▮▮ is a commercial and institutional building construction company based in ▮▮▮▮▮▮ (Zone C). This claimant's offer is based on a 2009 benchmark period and the 5-month period from August to December. The Settlement Program offered base compensation (pre-RTP) of $2,302,625 and total compensation (post-RTP) of $2,878,282. This offer results in claimant having total variable profit in 2010 (before RTP) that is higher than any other year between 2007 and 2011. This offer amount is the result of large swings in Claimant's monthly variable profit. Between 2009 and 2010 Claimant's variable profit ranged from a low of -486% to a high of 61%. In total, Claimant reported negative monthly variable profit five times during this two year period. In each of those five instances, the following month claimant reported variable profit of at least 40%. These dramatic changes from month to month in variable profit are the result of Claimant failing to properly match revenues to corresponding expenses.



## Additional Examples Of Unreasonable Settlement Program
## Offers To Construction Claimants



### Additional Examples Of Unreasonable Settlement Program Offers To Construction Claimants

**Claimant No.** 

Claimant No. ▮▮▮ is an electrical and other wiring installation contractor company based in ▮▮▮ (Zone C).  Claimant No. ▮▮▮ offer is based on a 2007-2009 benchmark period and the 6-month period from May to October.  On average, during its 2007-2009 benchmark period, between May to December this claimant reported variable profit of $1,420,429.  In 2010, between May and December this claimant reported variable profit of $1,328,348.  Despite this decline of less than $100,000, the Settlement Program awarded this claimant base compensation (pre-RTP) of $603,262 and total compensation (post-RTP) of $754,077.  This offer is attributable to the claimant failing to properly match its revenues to its expenses on a monthly basis.  In December of each year during Claimant's benchmark period (2007-2009), the claimant reported negative variable profit.  In each case, the claimant reported variable profit of at least 56% the following month.



### Additional Examples Of Unreasonable Settlement Program
### Offers To Construction Claimants



**Objective Criteria To Identify Claims Subject To Further Review**

1. **Large percentage of annual revenues reported in any month of the Benchmark or Compensation Periods:**  Large "spikes" of revenue in any single month suggest revenue is being recorded either when payments are received or when project owners are formally approving change orders rather than over the period of time that revenues are earned.  In either case, these spikes are an indication that contractors' P&L schedules do not have monthly revenues matched with the monthly variable expenses to earn that month's recorded revenue.

2. **Variable expenses in excess of revenues in any month of the Benchmark or Compensation Periods:**  A negative variable profit in any month indicates that a contractor's is unprofitable on its projects that month even before accounting for fixed costs (such as overhead).  In my experience this is unusual and it is more likely the cause of the negative monthly profit is the result of incorrect matching of monthly revenues and expenses—especially when the next month indicates contractor is now profitable on those same projects.

3. **Large variance in variable profit as a percentage of revenue:**  If variable profit margin (expressed as a percentage of revenue) swings wildly from one month to the next or relative to average variable profit margin over a longer period of time, it is likely the case that revenues are not being properly matched with the costs incurred in generating those revenues.  This is particularly true in construction companies where each month is a weighted average of the jobs in progress, and those jobs generally will be similar from one month to the next.