# Exhibit 12A

# IN CAMERA SUBMISSION

**To:** Honorable Carl J. Barbier

**From:** Class Counsel

**Matter:** In re: *Deepwater Horizon*
       MDL No. 2179

**Subject:** Monthly Costs and Revenue

**Date:** January 23, 2013

---

The entire structure of the Business Economic Loss Framework is tailored to an examination of the revenue received and the variable costs expended during the relevant Benchmark and Compensation Periods.  As noted by the Claims Administrator in his Policy Statement of January 15, 2013, Exhibit 4C of the Settlement Agreement sets forth the following methodology:

> (1) Sum the monthly revenue over the period.

> (2) Subtract the corresponding variable expenses from revenue over the same time period.

The term "corresponding variable expenses" refers to the variable expenses that correspond to "*the same time period*", (not the variable expenses that might or might not "correspond" to the revenue).  As set forth in Exhibit 4A, the documentation required is:

> Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents, establishing *monthly revenue and expenses for the claimed Benchmark Period, 2010, and, if applicable, 2011*.

It is clear from both the structure of the Framework and these Documentation requirements that the Claims Administrator is looking to "monthly revenue" and "monthly … expenses" during the Benchmark Period and the Compensation Period.

If, by contrast, as BP now seems to suggest (with respect to some types of businesses, but not others), the Program Vendors were supposed to try to figure out which expenditures arguably relate to which revenue, the financial records – both past *and future* – that the Program's accountants would have to review would be potentially infinite.

BP and BP's own experts have agreed and expressly represented to the Class in submissions to the Court that:

> Once the causation tests are satisfied, **all revenue and variable profit declines _during the_ _Compensation_ _Period_ are presumed to be caused _entirely_ by the spill, with no analysis of whether such declines were also traceable to other factors related to the spill**.[1]

As Mr. Holstein recognized in previous correspondence to Mr. Juneau (in which BP was arguing *against* the ability of Class Members and/or the Program to average quarterly, semi-annual or annual financials to derive monthly costs and revenue) dated September 28, 2012:

> One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements. These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.

If, as BP now seems to suggest (with respect to some types of businesses, but not others), the Program Accountants were to attempt to figure out when revenue received during the Compensation Period (and/or the Benchmark Period) had arguably been "earned", and/or when

---

[1] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at ¶126, p.39; *see also,* BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], at p.33 ("Once a business meets the causation requirements, for purposes of quantifying causation, all revenue and variable profit declines *during the claimant-selected compensation period* are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes") (emphasis supplied); *quoting,* DECLARATION OF HOLLY SHARP [Doc 7441-18], p.10, ¶17.

the variable costs that "correspond" to those revenues may have arguably been incurred (or in the future may be incurred), the existing objective and transparent Court-Approved Class Action Settlement will have been transformed into an uncertain process, with different rules for different types of businesses, heavily dependent on accounting judgments that are not transparent.

BP could have, but did not, suggest during negotiations that a different economic loss framework should be applied to lawyers, doctors, farmers or construction companies.

BP could have, but did not, insist that these types of businesses be excluded from the Settlement Class.

BP could have, but did not, insist that all claims be processed under an accrual (and not cash basis) accounting method.  Indeed, the Settlement Agreement calls for business claimants to submit – and for the Claims Administrator to rely upon – the monthly profit & loss statements that were actually prepared in the ordinary course of business, where they exist. *See* Settlement Agreement, Exhibit 4A.  Where, therefore, a Class Member kept its books on a cash basis, the Settlement Agreement allows (if not requires) both the Claimant and the Program Vendors to look to the monthly cash expenditures and receipts.[2]

The fact that the Settlement Frameworks agreed to by BP "could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received"[3] is a risk that BP accepted in negotiating and agreeing to the terms of the Settlement. Just as Plaintiffs accepted the risk that losses related to the Spill might go uncompensated, or undercompensated, under the terms of the Settlement Agreement.

---

[2] *See, e.g.,* Announcement of Policy Decisions Regarding Claims Administration, Sept. 25, 2012, No.1(c) (If the claimant's profit and loss statements for a year were prepared on a Cash Basis, the claimant may be permitted – but is in no way required – to restate such statements on an Accrual Basis in connection with the submission of a Business Economic Loss claim).

[3] *See* BP's Response to Class Counsel's December 16, 2012 Request for Policy Determination.

This is the potential price that both parties agreed to pay in exchange for the advantages that come with a Classwide objective formula that can be uniformly and mechanically applied to the costs and revenue that were booked – either on a cash or an accrual basis – during the Benchmark and Compensation Periods.

While the Settlement Agreement does not necessarily dictate the use of Generally Accepted Accounting Principles, (and, indeed, intentionally departs from GAAP in several respects), it is significant to note that BP's position is wholly unsupported by any recognized accounting principles. *See* DECLARATION OF ALLEN CARROLL [attached as Exhibit A]; AFFIDAVIT OF HAROLD ASHER [attached as Exhibit B]; DECLARATION OF RICK STUTES [attached as Exhibit C]; FASB CONCEPTS STATEMENT NO. 5;[4]  *see also,* Wilder and Dickinson, ACCOUNTING RULES FOR CONTINGENT FEE REVENUE RECOGNITION (re Badham & Buck claim).[5]

Either averaging revenue where there are monthly "spikes"; attempting to correlate specific revenue to specific expenditures in previous or subsequent months;  and/or eliminating revenue based on changes in the Class Member's business:

- Is impractical and unworkable;
- Violates the established Policy precluding an inquiry by the Program into potential "alternative causes";[6]
- Assumes and/or implies that attorneys only work on one case at a time;  that construction firms only work on one project at a time;  and that retailers only purchase and sell one batch of inventory at one time;[7]

---

[4] *See* Exhibit A to CARROLL DECLARATION.

[5] Attached as Exhibit B to CARROLL DECLARATION.

[6] *See* E-MAIL FROM JUDGE BARBIER, RE "MEETING TODAY RE NON-PROFITS" Dec. 12, 2012; ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION, Oct. 10, 2012, No.2; LETTER FROM MARK HOLSTEIN TO PAT JUNEAU, Sept. 28, 2012.

[7] BP's hypotheticals, which implicitly suggest that it's not "fair" to assign revenue and costs to the months in which such revenue was actually earned and such costs actually incurred, ignore the rest of the claimant's business.  For example, the attorney will continue to expend costs during the Compensation Period with respect to other cases on which revenue may not be recognized for years, if

- Doesn't account for the possibility that a business line (and the associated revenue and/or expenses) may have been added by the Claimant prior to or during the Compensation Period;[8] and,

- To the extent unfavorable to the Claimant, is inconsistent with Settlement Agreement Section 4.3.8.[9]

Finally, it should be noted that, upon preliminary approval of the settlement, the Claims Administrator held "tutorials" with the Program Vendors to help understand and implement the terms of the Settlement Agreement.  Representatives of BP and Class Counsel were present, and at no time did BP ever suggest that different rules be applied to different types of businesses, or that the Settlement Agreement required (or even allowed) a subjective "matching" of revenue to costs incurred outside of the Benchmark or Compensation Periods.  Similarly, the Program was provided with 62 "pilot cases" to be processed on a test basis.  At no time did BP suggest that some or all of the pilot cases be evaluated in the way that BP advocates today.

For these reasons, for the reasons stated by the Claims Administrator in his E-Mail to the parties and Announcement of Policy Decisions dated January 15, 2013, Class Counsel respectfully suggest that the Claims Administrator's interpretation of the Settlement Agreement is correct, and request that the Court uphold the Claims Administrator's Policy Statement.

---

ever.  A construction company may expend costs for new projects even as it collects for work and materials provided in connection with old projects.  A retailer will often continue to stock its shelves with different inventories of different product lines that are purchased and sold at different times.

[8] BP implicitly complains that revenue associated with a line of business that was discontinued during the Benchmark Period should not be included in the BEL calculation.  However, it is just as plausible that a claimant may have added a line of business during the Benchmark Period and/or during the Compensation Period, which would result in additional revenue and expenses during the Compensation Period, as compared with the Benchmark Period.

[9] "The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce *the greatest* Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework."