# Exhibit 18A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179** |
| | * | **SECTION J** |
| This document relates to all actions. | * * | |
| | * * | **Honorable CARL J. BARBIER** |
| | * * | **Magistrate Judge SHUSHAN** |
| | * | |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., individually and on behalf of themselves and all others similarly situated, | * * * * | **Civil Action No. 12-970** |
| | * | **SECTION J** |
| Plaintiffs, | * * | |
| v. | * * * | **Honorable CARL J. BARBIER** |
| | * * | **Magistrate Judge SHUSHAN** |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * | |
| Defendants. | * * | |

**BP'S *IN CAMERA* MOTION TO REVERSE AND SET ASIDE THE
CLAIMS ADMINISTRATOR'S JANUARY 15, 2013 POLICY DECISION
<u>CONCERNING THE BUSINESS ECONOMIC LOSS FRAMEWORK</u>**

*COUNSEL FOR SUBMITTING PARTIES ARE LISTED AT END OF MOTION*

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION AND OVERVIEW ..........................................................................1

BACKGROUND ........................................................................................................2

SUMMARY OF ARGUMENT ......................................................................................4

BP's DETAILED POSITION AND ARGUMENT......................................................7

I.   Class Counsel's Interpretation Of The Business Economic Loss Framework Contradicts The Settlement Agreement's Unambiguous Text. ....................................7

    A.   "Revenue" Has Meaning; It Does Not Simply Mean Cash Received Or Recorded.  Instead, As The Settlement Agreement Reflects, Revenue Must Be Attributed To The Months When It Is Earned. ........................................................................................8

    B.   Variable Profit Must Be Calculated As Revenue Reduced By "Corresponding" Variable Expenses Used To Generate That Revenue, Not Based On The Happenstance Of When Cash Payments Are Recorded. ....................................................11

    C.   Awards Must Be Based On A Comparison Of Variable Profit In The Compensation Period To Variable Profit In "Comparable" Months Of The Benchmark Period — Not Necessarily The "Same" Months. ..........................................................................15

II.  Class Counsel's Interpretation Frustrates And Defeats The Settlement Agreement's Purpose And Produces Absurd Results, As The Claims Administrator Himself Has Recognized. ........................................................................17

    A.   Class Counsel's Interpretation Violates The Settlement Agreement's Purpose And Produces Absurd Results.............................................18

    B.   The Claims Administrator And Settlement Program Accountants Have Recognized The Need For Accurate Data To Process BEL Claims Properly And Thus Avoid Absurdity.........................................21

    C.   The Failure To Apply The BEL Framework Using Accurate Data Produces Absurd Results That Impose Upon BP Significant, Unbargained-For, Unagreed-To, And Unwarranted Settlement Liability......................................................................23

    D.   The Absurdity Resulting From Class Counsel's Settlement Agreement Interpretation Uniquely Prejudices BP.........................24

    E.   The Absurdity Also Creates A Risk To Class Certification. .................25

III. BP's Implementation Approach Is Necessary, Readily Accomplished, And Consistent With Standard Accounting Principles and Practice...............................27

A. Accounting Principles Mandate The Correct Matching Of Revenue And Expenses.................................................................................28

B. BP's Implementation Approach Is Easily Administered And Consistent With Accounting Principles; It Does Not Invite Subjective Analysis........................................................................29

**IV.   Class Counsel's Other Arguments Lack Merit And Do Not Withstand Scrutiny...............................................................................32**

A. BP's Position Is Consistent With The Text Of The Settlement Agreement..............................................................................32

B. Class Counsel Contradict Themselves In Claiming That The Existence Of Allegedly Undefined Terms In The Agreement Somehow Support The Position That Matching Of Revenues And Expenses Is Not Required.........................................................34

C. BP Remains Free To Refer To The Central Purpose Of The Settlement Agreement To Compensate Only For Spill-Related Losses When It Offers Interpretations Of The Settlement Agreement's Compensation Criteria..................................................35

D. BP's Position Is Consistent With The Class Notice. .............................36

E. BP Timely Raised Its Objections To The Non-Matching Approach...................36

F. Class Counsel's Attempt To Argue That Conducting This Proceeding *In Camera* Violates The Settlement Agreement Is Incorrect And Contradictory. ................................................37

**V.   Requested Relief...........................................................................38**

**CONCLUSION .....................................................................................39**

**APPENDIX A ..................................................................................... A-1**

**APPENDIX B .....................................................................................B-1**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barnhart v. Thomas*,
  540 U.S. 20 (2003) ........................................................................................ 33

*Beth Israel Hosp. v. NLRB*, 437 U.S. 483 (1978) ........................................ 31

*Colo. Interstate Gas Co. v. FERC*,
  850 F.2d 769 (D.C. Cir. 1988) ...................................................................... 21

*Coury v. Moss*,
  529 F.3d 579 (5th Cir. 2008) .......................................................................... 18

*Due v. Due*,
  342 So. 2d. 161 (La. 1977) ............................................................................... 9

*E*Trade Fin. Corp. v. Deutsche Bank AG*,
  374 F. App'x. 119 (2d Cir. 2010) .................................................................. 34

*Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*,
  --- F.3d ---, 2013 WL 237567 (5th Cir. Jan. 22, 2013) ............................... 35

*Frozen Food Express, Inc. v. United States*,
  535 F.2d 877 (5th Cir. 1976) .......................................................................... 21

*Gates v. Rohm & Haas Co.*,
  No. 06-1743, 2008 WL 4078456 (E.D. Pa. Aug. 22, 2008) ........................ 26

*Hawthorne Land Co. v. Equilon Pipeline Co.*,
  309 F.3d 888 (5th Cir. 2002) .......................................................................... 15

*In re Liljeberg Enters., Inc.*,
  304 F.3d 410 (5th Cir. 2002) .......................................................................... 18

*In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*,
  148 F.3d 283, 323 (3d Cir. 1998) .................................................................. 26

*Int'l Indus. Park, Inc. v. United States*,
  100 Fed. Cl. 638 (2011) .................................................................................. 37

*Ramirez v. Decoster*,
  142 F. Supp. 2d 104 (D. Me. 2001) ............................................................... 38

*Texaco Exploration & Prod., Inc. v. AmClyde Eng'rd Prods. Co.*,
  448 F.3d 760 (5th Cir. 2006) .......................................................................... 15

*Westar Energy, Inc. v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007) ............................................................. 21

*Westfed Holdings, Inc. v. United States*,
  407 F.3d 1352 (Fed. Cir. 2005) ............................................................. 37

**Secondary Sources**

2 THE OXFORD ENGLISH DICTIONARY (1933) ......................................... 14, 15

ELEMENTS OF FIN. STATEMENTS, Fin. Accounting Standards Bd. Concepts Statement No. 6 (Fin. Accounting Standards Bd. 1985) .................................................. 8, 19

DONALD E. KIESO ET AL., INTERMEDIATE ACCOUNTING (10th ed. 2000) ..................................... 13

WILLIAM M. LANDES & RICHARD A. POSNER,
  THE ECONOMIC STRUCTURE OF TORT LAW (1987) .................................. 17

M.W. MAHER ET AL., MANAGERIAL ACCOUNTING (11th ed. 2012).............................................. 12

Steven Shavell,
  *Suit, Settlement, and Trial: A Theoretical Analysis Under Alternative Methods for the Allocation of Legal Costs*, 11 J. LEGAL STUDIES 55 (1982) ....................................................... 24

J.D. SPICELAND ET AL., INTERMEDIATE ACCOUNTING (7th ed. 2013) .......................................... 12

C.P. STICKNEY, FINANCIAL REPORTING AND STATEMENT ANALYSIS (4th ed.) .............................. 8

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (Philip Babcock Gove, ed., 1976) ...................................................... 14, 15

R.L. WEIL & M.W. MAHER, HANDBOOK OF COST MANAGEMENT (2d ed. 2005) ........................... 9

R.L. WEIL ET AL., FINANCIAL ACCOUNTING: INTRODUCTION TO CONCEPTS, METHODS, AND USES (14th ed. 2012) .................................................................. 9

## INTRODUCTION AND OVERVIEW

BP submits this *in camera* Motion to support its request that the Court exercise its supervisory power under Section 4.3.4 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") to correct a serious interpretive error by the Court-Supervised Settlement Program ("Settlement Program") that defeats the core purpose of the Agreement — which is to compensate only claimants who suffered ***actual*** economic losses because of the *Deepwater Horizon* spill. *See, e.g.*, Settlement Agreement ¶¶ 1.3.1.2, 38.57 (Rec. Doc. 6430-1). As BP explains below, the Settlement Program's implementation of the Settlement Agreement's Business Economic Loss ("BEL") Framework, as memorialized in the January 15, 2013 decision of the Claims Administrator (and issued at the request of Class Counsel), misreads and rewrites the plain text of the Settlement Agreement, ignores its goals, and violates universally accepted principles of accounting and economics.

The January 15 decision is currently stayed based on the February 6, 2013 *in camera* decision of this Court. But without permanent relief against the Claims Administrator's decision, BP will be exposed to hundreds of millions of dollars of payouts that it never agreed to fund. Indeed, the aggregate total of such payouts could climb even higher. The claims involved are being made for artificially inflated or non-existent "losses" that arise solely because of a misapplication of the BEL Framework that abides and indeed effectively encourages the use of incorrect and/or erroneous data — specifically, these unauthorized awards are the result of uncorrected accounting errors that fail to record accurately monthly revenues and match them to corresponding variable expenses. Such artificial claims cannot, even loosely, be termed a type of "legal liability" — because the resulting payouts will go to those who suffered no losses whatsoever from the spill or any form of loss. Failure to make the remedy blocking the payment of such claims by the Settlement Program permanent would thus rupture the basic fairness of the

1

Settlement by bestowing *economic windfalls* on a collection of claimants — predominantly, though not exclusively, in the agriculture, construction, and professional services fields. Equally troublesome, the favorable reputations of the Settlement Program and of the entire administration of claims payments in MDL 2179 will be seriously tarnished unless the Court puts a halt to Class Counsel's reading of the Settlement Agreement as endorsed by the Settlement Program. Settlements in the tort system are designed to provide recompense, not to hand out windfalls to those who have no losses at all, or whose losses are a fraction of the amounts mistakenly being paid.

The festering problem described in the balance of this Motion not only threatens the core integrity of the Settlement, but also represents a significant and growing financial problem. Based on BP's analysis to date, between *82% and 98%* of payments to claimants in the agriculture, construction, and professional services industries appear to be infected by the Settlement Program's improper methodology. And because the Claims Administrator's decision grossly inflates the compensation available to claimants in those fields, such claims have proliferated, even as the number of other types of claim has held steady or fallen. *See* Sider Decl. (Ex. 11) ¶¶ 17-20. BP has even been forced to disclose the Claims Administrator's decision in its corporate filings and to provision an additional $400 million for claims already decided, as well as to disclose an additional ongoing contingent liability. This serious misinterpretation of the Settlement Agreement must be called to a permanent halt by this Court.

## BACKGROUND

The parties began from the shared premise that the Settlement Agreement was designed to compensate business claimants only for their "*loss of profits, income and/or earnings*" sustained *"as a result"* of the *Deepwater Horizon* spill. *See, e.g.*, Settlement Agreement ¶¶ 1.3.1.2, 38.57 (emphasis added). The disagreement that has come before the Court stems

from a memorandum submitted by Class Counsel to the Claims Administrator on December 16, 2012, which asked the Claims Administrator to rule that "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, *irrespective of when the contract was entered or services were performed*," and that the "'corresponding variable expenses' associated with monthly revenue are the expenses that are expended or incurred *during the Benchmark and Compensation months in question*."   Dec. 16 Class Counsel Memo (Ex. A) at 1 (emphasis added).

Notwithstanding BP's demonstrations that Class Counsel's position would (1) contravene the terms of the Settlement Agreement, (2) violate universally accepted principles of economics and accounting, and (3) lead to awards untethered to any actual losses a claimant could have experienced, on January 15, 2013, the Claims Administrator surprisingly announced that he felt bound to agree with Class Counsel and reject BP's position.  *See* Cover E-Mail to Jan. 15 Policy Decision (Ex. B) ("Though the Claims Administrator acknowledges that the type approach proposed by BP is a reasonable one, he does not believe it within his authority to implement such an approach absent agreement of the parties or express direction from the Court.").

BP exercised its rights under the Settlement Agreement and asked the Court to review the Claims Administrator's determination.  And on February 6, 2013, the Court entered a stay of the Claims Administrator's decision and directed the parties to enter mediation with the assistance of Daniel Balhoff, Esq.  In compliance with the Court's order, the parties engaged in a day-long mediation session on February 14, 2013.  The mediation proved unsuccessful.  Because of both the critical importance of this issue to the fairness of the Settlement and the additional unbargained-for liability that the interpretation of Class Counsel and the Settlement Program imposes upon BP, BP has no choice but to file this Motion.

Accordingly, BP respectfully requests that the Court direct the Claims Administrator to issue a new policy statement that rescinds his January 15, 2013 decision and orders the Claims Administrator to announce that business economic loss claims will be assessed based on proper economic and accounting matching of revenues and expenses, in accord with the language of the Settlement Agreement.  And to implement such a decision, BP also requests that the Court issue a directive to the Claims Administrator to adopt BP's suggested implementation approach and/or to consult with the parties to develop and put in place the appropriate implementation steps that recognize revenue when earned, accurately assess corresponding variable expenses, and evaluate the differences in variable profits using comparable periods — all as required by the Settlement Agreement's plain terms.

## SUMMARY OF ARGUMENT

As explained in the argument sections below, the Court should adopt BP's position for four principal reasons:

*1.  **_BP's interpretation of the Settlement Agreement is compelled by its clear text._***  In referring to "revenue" and "expenses," the Settlement Agreement uses terms with widely understood meaning in the accounting field.  As the experts establish based on their respective disciplines, "revenue" is conceptually distinct from receipt of cash, just as "expenses" are conceptually distinct from expenditures of cash.  *See, e.g.*, Weil Decl.[1] (Ex. 12) at 4:138-145; *id.* at 4:150-151; Finch Decl. (Ex. 3) ¶ 10; Dietrich Decl. (Ex. 2) ¶¶ 16-17.  Thus, these standard accounting terms require the Claims Administrator to assess when assets are earned or liabilities are incurred, and not simply when cash moves into or out of a business claimant's coffers.  By

---

[1] Roman Weil is the V. Duane Rath Professor Emeritus of Accounting at the Chicago Booth School of Business of the University of Chicago.  Weil Decl. (Ex. 12) at 1:12-13.  He has co-edited four professional reference books, authored over a dozen textbooks, and published over 80 articles in academic and professional journals.  *See id.* at 2:18-24.

referring to "corresponding" variable expenses, moreover, the Settlement Agreement makes clear that it means to incorporate the matching principle that accountants agree is necessary to reach an accurate, real-world assessment of a business's financial performance.  *See, e.g.*, Hall Decl. (Ex. 5) ¶ 14; Oustalniol Decl. (Ex. 7) ¶ 14.  Finally, by providing that the Compensation Period is to be compared to the "comparable months" of the Benchmark Period, the Agreement makes clear that the Claims Administrator must put side by side months in which economically comparable activity occurred, not simply use the same months on the calendar.  *See* Finch Decl. (Ex. 3) ¶ 31; Dietrich Decl. (Ex. 2) ¶ 31.

       *2.  **Only BP's interpretation achieves the goals of the Settlement Agreement.***   The Settlement Agreement was carefully designed to make class members whole for their actual economic losses.  *See, e.g.*, Settlement Agreement ¶¶ 1.3.1.2, 38.57; *see also* Polinsky Decl. (Ex. 9) ¶¶ 13-13.  Yet under the interpretation of the Settlement Agreement successfully advanced by Class Counsel, many claimants — particularly, though not exclusively, in the agriculture, professional services, and construction industries — will receive immense windfalls disconnected from their losses, if any.  *See* Finch Decl. (Ex. 3) ¶ 30; Oustalniol Decl. (Ex. 7) ¶ 39; Hall Supp. Decl. (Ex. 6) ¶ 8; Sider Decl. (Ex. 11) ¶ 33.  These absurdities are no small matter, totaling already hundreds of millions of dollars.  And because claimants can select the Benchmark and Compensation periods most advantageous to them, the ensuing artificial results uniquely and overwhelmingly prejudice BP.  *See* Finch Supp. Decl. (Ex. 4) ¶ 9; Sider Decl. (Ex. 11) ¶ 23; Weil Decl. (Ex. 12) at 8:297-303.  The Claims Administrator has himself previously recognized the possibility for absurd windfalls when revenues and expenses are not properly matched, and in other contexts has taken steps to avoid such windfalls, but he has declined to do the same here.  By allowing awards to large collections of claimants to be unnaturally inflated,

the Claims Administrator creates a disconnect between loss and remedy that calls the very fairness of the Settlement into question.  There is no rational or legal basis for a set of outcomes where identical or similarly situated businesses could obtain wildly divergent offers from the Settlement Program based solely on the way in which they chose to keep their accounting books.

> **3.    *The correct interpretation of the Settlement is easily implementable by the Claims Administrator's staff of professional accountants.***  *See* Alexander Decl. (Ex. 1) ¶ 32; Hall Decl. (Ex. 5) ¶ 29; Finch Decl. (Ex. 3) ¶¶ 5(e), 33; Finch Supp. Decl. (Ex. 4) ¶ 16; Oustalniol Decl. (Ex. 7) ¶ 6; Sider Decl. (Ex. 11) ¶¶ 29-47; Weil Decl. (Ex. 12) at 9:341-11:389; Dietrich Decl. (Ex. 2) ¶ 34.  Indeed, in other contexts, the Claims Administrator has not hesitated to implement the Settlement Agreement in a manner that requires his accounting staff to use their professional accounting skills to assess claimants' financial submissions.

> **4.    *Class Counsel's rebuttal points lack merit.***  Class Counsel's arguments as to why non-matching of revenues and expenses should be permitted wither upon scrutiny.  BP is not seeking to rewrite the Settlement Agreement; it is instead seeking to enforce it and ensure that the Settlement Agreement's carefully negotiated tests are applied according to their plain text using meaningful data, lest results untethered from economic reality be produced.  Unlike Class Counsel, BP does not contend that the Claims Administrator should simply define or redefine undefined terms at will; rather, BP contends that the Settlement Agreement's terms should be interpreted using their well-established accounting and economic definitions.  BP's positions are also entirely consistent with the class notice, which informed class members that they could obtain compensation only if they had incurred an actual loss.   In fact, it is Class Counsel who seek an outcome that cannot be squared with the notice provided to the class, as nowhere in the notice did Class Counsel inform the class that identically situated claimants will be treated

differently simply because of the manner in which they kept their financial books and records.

**BP's DETAILED POSITION AND ARGUMENT**

**I.     Class Counsel's Interpretation Of The Business Economic Loss Framework Contradicts The Settlement Agreement's Unambiguous Text.**

BP's position regarding how the Settlement Agreement's BEL Framework must be implemented is the only interpretation of the text that faithfully follows its plain meaning and properly reflects the intent of the parties to provide compensation for actual losses incurred in the post-spill period of 2010.  The declared purpose of the BEL Framework is to compensate eligible claimants by "compar[ing] the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010."  Settlement Agreement Ex. 4C at 1.[2]  The critical metric of the BEL Framework is "**Variable Profit**," which is explicitly defined as the sum of **Revenue** over a period, less the **Corresponding Variable Expenses** incurred in connection with earning such **Revenue** over the same time period.  Settlement Agreement Ex. 4C at 2 (emphasis added).  The BEL Framework then compensates claimants for "reduction in profit between the 2010 Compensation Period selected by the claimant and the **comparable months** of the Benchmark Period."  *Id.* at 1 (emphasis added).

Thus, to reach a calculation of loss that comports with both the Settlement Agreement's text and its core purpose of compensating for actual economic losses caused by the spill, *see* Polinsky Decl. (Ex. 9) ¶¶ 12-21, the Settlement Program must perform three calculations:

(1)     It must determine the claimant's **Revenue** during the Compensation Period and

---

[2] *See also* Settlement Agreement at 1 ("The purpose of this Agreement is to settle all and only the RELEASED CLAIMS of the Economic Class, PLAINTIFFS, and ECONOMIC CLASS MEMBERS against all and only the RELEASED PARTIES."); *id.* Ex. 26, Section 1(q) (Individual Release) ("'Economic Damage' means *loss of profits, income, and/or earnings* arising in the Gulf Coast Areas or Specified Gulf Waters allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident . . . .") (emphasis added).

the Benchmark Period;

(2) To calculate **Variable Profit** in each period, the Settlement Program must subtract from the claimant's **Revenue** its **Corresponding Variable Expenses**; and

(3) To determine the overall award, it must compare the **Variable Profit** during the Compensation Period to the **Comparable Months** of the Benchmark Period.

These express terms of the heavily negotiated Settlement Agreement — "revenue," "expense," "corresponding" and "profit" — have specific, well-recognized meanings in the accounting, economics, and finance fields and their associated literature.  Such learning necessarily formed an important backdrop to the negotiations among sophisticated counsel, in which both sides were advised by accountants and other financial professionals.  Class Counsel's interpretation errs at each of the three defined and agreed-upon steps by rewriting the Agreement.  The predictable result is to produce economically irrational awards for a large number of BEL claimants that bear no relationship to losses — if any — incurred on account of the spill.

> **A.**    **"Revenue" Has Meaning; It Does Not Simply Mean Cash Received Or Recorded.  Instead, As The Settlement Agreement Reflects, Revenue Must Be Attributed To The Months When It Is Earned.**

Class Counsel's first error is their incorrect conception of "revenue."  Under widely accepted accounting literature, revenue "measure the inflows of net assets from selling goods and providing services (that is, assets less liabilities)."  Weil. Decl. (Ex. 12) App'x D, *quoting* C.P. STICKNEY & PAUL R. BROWN, FINANCIAL REPORTING AND STATEMENT ANALYSIS, A STRATEGIC PERSPECTIVE 22 (4th ed. 1999); *accord, e.g.*, ELEMENTS OF FIN. STATEMENTS, Fin. Accounting Standards Bd. Concepts Statement No. 6, ¶ 78 (Fin. Accounting Standards Bd. 1985) ("Revenues are inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities

that constitute the entity's ongoing major or central operations.").

"Revenue" is universally understood by accountants, economists, and other financial professionals to be conceptually distinct from receipt of cash. Revenue "occurs when we deliver goods or render services and get some asset, perhaps not cash, in return" while receipts refer to the "inflow of cash." Weil Decl. (Ex. 12) at 4:138-140; *accord, e.g.*, *id.* at 3:121-4:123 ("Accountants '[d]o not confuse [revenue] with receipt of funds, which may occur before [or] when or after revenue is recognized.'") (quoting R.L. WEIL ET AL., FINANCIAL ACCOUNTING: INTRODUCTION TO CONCEPTS, METHODS, AND USES 814 (14th ed. 2012)); Dietrich Decl. (Ex. 2) ¶ 16 ("Cash receipts in a period can be the collection of revenues from an earlier or later period."); *see also* M.W. MAHER ET AL., MANAGERIAL ACCOUNTING 588 (11th ed. 2012); R.L. WEIL & M.W. MAHER, HANDBOOK OF COST MANAGEMENT 126 (2d ed. 2005).[3]  Indeed, Class Counsel recognize and have admitted that the relevant question is when ***revenue*** is "earned" — in other words, ***not*** necessarily when payment is received. *See* Dec. 16 Class Counsel Memo (Ex. A) at 1. That admission is fatal to their interpretation.

In limited cases, the conceptual error being advanced by Class Counsel — treating "revenue" as synonymous with "cash received" — can be harmless, because some businesses receive payment at the same time that goods are exchanged or services are rendered. *See, e.g.*, Weil Decl. (Ex. 12) at 5:193-6:209. But for many BEL claimants — particularly, though not exclusively, those in the construction, agriculture, and professional service industries — there can often be a significant lag between when the business ***earns*** the revenue by delivering goods or services, and when the business ***receives*** payment and records that payment on its financial

---

[3] *Cf. Due v. Due*, 342 So. 2d. 161, 165-66 (La. 1977) (holding in the divorce context that an "attorney's interest in pending contingent fee contracts" constitutes a marital asset and therefore requires an investigation into whether work by the attorney spouse on contingent fee cases occurred during the marriage, even if the fees themselves were not collected until after divorce proceedings had begun).

statements.  *See* Hall Decl. (Ex. 5) ¶ 4(3) (construction industry); Oustalniol Decl. (Ex. 7) ¶¶ 8-11 (professional services industry); Finch Decl. (Ex. 3) ¶ 5(c) (agricultural industry).[4]  Such businesses may receive prepayments for goods or services to be delivered later, or payment in arrears, substantially later than the goods or services were delivered.  *See id.*  That certain claimants elect to record on their financial statements payments when received, however, does not change the relevant question under the Settlement Agreement — when is revenue *earned* by delivering goods or rendering services?  *See* Weil Decl. (Ex. 12) at 4:138-145.

If "monthly revenues . . . earned over the relevant period are not properly measured, then the resulting calculation will only reflect *the timing of the recording of cash outflows and inflows* rather than the firm's actual financial performance."  Oustalniol Decl. (Ex. 7) ¶ 25 (emphasis added); *see also* Weil Decl. (Ex. 12) at 6:217-221.  "In order to properly calculate variable profits as required in Step 1 of the BEL compensation formula, it is necessary that revenues be recorded in the months when earned, *not when cash is received*."  Finch Decl. (Ex. 3) ¶ 10 (emphasis added).

Yet for reasons having nothing to do with the Settlement Agreement, Class Counsel effectively argue that the Settlement Program must unquestioningly use cash-basis accounting — refusing to match revenues and expenses — including in situations where that methodology produces distorted claims awards that make no economic sense.  Their position seeks to override the express and contrary terms of the Settlement Agreement — even in cases where such a methodology is patently inadequate to perform the economic compensation tests mandated in the Agreement and even where the outcomes are economically irrational.  *See* Hall Supp. Decl. (Ex.

---

[4] Critically, the problem described is much broader than the subsets of the mismatching error reflected in payouts in these three industries alone.  *See* Polinsky Decl. (Ex. 9) ¶¶ 22-35; Weil Decl. (Ex. 12) at 6:229-7:252; Sider Decl. (Ex. 11) ¶ 5.

6) ¶ 4; Rose Decl. (Ex. 10) ¶ 6 ("Cash flow can be monitored through cash based statements but profitability cannot be monitored through cash based statements because cash based statements fail to recognize revenues and expenses when incurred.  Cash basis financial statements are maintained for purposes of monitoring a firm's current cash position not for determining profitability."); Weil Decl. (Ex. 12) at 5:182-183 ("The BEL Framework invokes profit; profit means revenues minus expenses, not receipts minus expenditures."); Dietrich Decl. (Ex. 2) ¶¶ 22-25.  And assessing Variable *Profit* is the touchstone of the BEL Framework.  *See* Settlement Agreement Ex. 4C at 1.

In sum, Class Counsel and the Settlement Program have substituted the term "revenue" for the term "cash receipts," and treated those two different terms identically — even though they are fundamentally different in both the Settlement Agreement itself, as well as in accounting.  As a result, not only has the Settlement Agreement been rewritten, the Agreement's Variable Profits calculation cannot be performed, and the compensation awards being produced under the Settlement are illogical and absurd, having nothing to do with any actual losses.

**B.     Variable  Profit  Must  Be  Calculated  As  Revenue  Reduced  By "Corresponding" Variable Expenses Used To Generate That Revenue, Not Based On The Happenstance Of When Cash Payments Are Recorded**.

The requirement that "corresponding" variable expenses be subtracted from revenue in order to generate profit also is critical if the Settlement Program is to adhere to the Agreement's plain text, core function, and purpose, which is to objectively assess reductions in real economic profit caused by the *Deepwater Horizon* oil spill.  The reduction in "**profit**" cannot be calculated without accurately matching revenue to the "**corresponding**" variable "**expenses**."  Each of those three terms has an established meaning, and each has been misinterpreted by Class Counsel and the Settlement Program in a way that produces absurd results.

1.   ***Expenses Are Actual Or Expected Outflows of Assets, Not Cash Expenditures Or Disbursements***.  The need to properly match corresponding variable expenses to the revenues that they are incurred to generate is further underscored by the correct understanding of what "expenses" are.  Under widely accepted literature, "expenses" are "outflows or other using up of assets or incurrences of liabilities during a period from delivering or producing good[s], rendering services, or other activities that constitute the entity's ongoing major, or central operations."  J.D. SPICELAND ET AL., INTERMEDIATE ACCOUNTING G-2 (7th ed. 2013).  But just as ***revenue*** must be distinguished from cash receipts, so must ***expenses*** be distinguished from expenditures, or spent cash.  *See, e.g.*, Weil Decl. (Ex. 12) at 4:150-152 ("Accountants distinguish between an *expense* (a gone asset) with an *expenditure* (gone cash).  That is, we can have gone cash without having gone assets.") (footnote omitted); Dietrich Decl. (Ex. 2) ¶ 17 ("Cash disbursements in a period can be the payment of expenses from an earlier or later period."); M.W. MAHER ET AL., MANAGERIAL ACCOUNTING 542 (11th ed. 2012) ("Measure *expense* as the cost of the (net) assets used.  Do not confuse with *expenditure* or *disbursement*, which may occur before, when, or after the *firm recognizes* the related expense.").  Class Counsel's approach and that of the Settlement Program rewrites the BEL Framework definition of Variable Profit to substitute into the Agreement the phrase "variable expenditures," a concept unknown to accounting, rather than "variable expenses."  Weil Decl. (Ex. 12) at 5:171-180.

2.   ***Corresponding Variable Expenses Are Expenses Incurred To Generate Revenue.***  "[I]t is widely understood and accepted that . . . matching between revenue and expenses is required in order to understand a business's financial performance for a given accounting period."  Hall Decl.  (Ex. 5) ¶ 14; *see also* Oustalniol Decl. (Ex. 7) ¶ 14 ("[I]nformation needs to be evaluated so as to synchronize the revenues earned with the corresponding expenses

incurred."); Weil Decl. (Ex. 12) at 5:185-187 ("Accountants say that we have not properly measured income as revenues less expenses unless the expenses measure the assets used to generate the revenues."); Polinsky Decl. (Ex. 9) ¶ 7 ("If instead compensation is based on net cash received over a period of business activity . . . then claimants might not be accurately compensated for their economic losses. One reason for such inaccuracy is that revenues or costs associated with a period of business activity could be realized outside of the period. Another reason is that revenues or costs attributable to a different period could be realized during the period in question."); DONALD E. KIESO ET AL., INTERMEDIATE ACCOUNTING 46 (10th ed. 2000) (matching principle "dictates that efforts (expenses) be matched with accomplishment (revenues) whenever it is reasonable and practicable to do so"). The simple reason is that failure to do so will produce a result untethered from the business's actual performance.

The approach of Class Counsel (and the Settlement Program) misapplies the text of the Settlement Agreement by considering only "revenues and expenses in the periods in which those revenues and expenses were recorded at the time." Jan. 15 Policy Decision (Ex. C) at 2. To begin with, Class Counsel misuse the terms "revenue" and "expenses." Instead, what they are referring to are cash inflows (receipts) and outflows (expenditures), ignoring the meaning of the terms "revenue" and "expenses." *See* Weil Decl. (Ex. 12) at 4:160-5:162 ("Class counsel's interpretation of the BEL Framework confuses revenues with receipts and expenses with expenditures.").[5]

---

[5] Class Counsel's experts are incorrect to contend otherwise. *See* Finch Supp. Decl. (Ex. 4) ¶ 26 ("Allen Carroll states, 'This type of matching is absolutely inappropriate because it would require the recognition of revenue which could be highly uncertain and contingent on a future event.' This is incorrect. The revenues and expenses for farming claims are already known, thus, there are no projections. He confuses the BEL lost profits analysis, which looks at historical data relating to farming activity in 2010 and benchmark years, with accounting in P&Ls, which is done on a current or prospective basis. The months in which expenses were incurred and revenues earned for farming activity that took place in 2007-2010 are known now, and have been known for some time. There is, therefore, no uncertainty or contingency.").

Moreover, to read the Settlement Agreement as Class Counsel do is to rewrite it.  To "correspond" means to "be parallel," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 511 (Philip Babcock Gove, ed., 1976), "be the counterpart," *id.*, or "to answer to, agree with, suit."  2 THE OXFORD ENGLISH DICTIONARY 1017 (1933).  Interpreted in light of the word's common meaning, as well as the economic purpose that undergirds the Settlement Agreement, the variable expenses that "correspond" to revenue are those variable expenses that were incurred to generate that revenue.

The problem is acute in the construction industry, among others.  "While accurate year-end percentage-of-completion calculations are critical for reporting to third parties as well as the Internal Revenue Service, monthly P&L schedules which accurately match revenues and expenses ***are not commonly maintained by contractors in the ordinary course of business***."  Hall Decl. (Ex. 5) ¶ 17 (emphasis added).  "While it is common for construction companies, in the normal course of their operations, to maintain their monthly P&L statements without matching monthly revenues with the corresponding variable expenses incurred to generate those revenues, ***it is not appropriate to measure lost profits damages from P&L statements that do not match revenues and expenses***."  Hall Supp. Decl. (Ex. 6) ¶ 4 (emphasis added).  Farming suffers from similar mismatching of revenues and expenses in monthly financial statements.  *See* Finch Supp. Decl. (Ex. 4) ¶ 7 ("Looking at artificial snapshots of cash received and expenditures paid in monthly farming financial statements instead of cross-checking against the annual financial statements and going back to match revenues to when they were earned and to corresponding variable expenses ignores the economic reality of the way in which farms operate . . . .").

**3.     *Profit Is Properly Calculated Only When Revenues Are Matched With Corresponding Variable Expenses*.**  "Accountants typically use the word *profit* to mean 'the excess of all revenues and gains for a period over all expenses and losses of the period,' where they 'measure revenue as the expected net present value of the net asserts the firm will receive.'" Weil Decl. (Ex. 12) at 2:85-89; Dietrich Decl. (Ex. 2) ¶ 12.  But if revenues are not properly matched to their corresponding variable expenses, the result is a gimmick or accounting gibberish — not "profit."

**C.     Awards Must Be Based On A Comparison Of Variable Profit In The Compensation Period To Variable Profit In "Comparable" Months Of The Benchmark Period — Not Necessarily The "Same" Months.**

Finally, the Settlement Agreement requires that the Claims Administrator compare the claimant's Variable Profit during a claimant-selected three-month or more Compensation Period with the "comparable" months of the Benchmark Period.  Yet Class Counsel would substitute the word "same" where a different word, "comparable," appears in the Agreement.

"Comparable" and "same" are not synonyms.  Rather, the "comparable" months are the months that "hav[e] enough like characteristics or qualities to make comparison ***appropriate***," that are "***suitable*** for matching, coordinating, or contrasting."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 461 (Philip Babcock Gove, ed., 1976) (emphasis added).  They are the months that are "***worthy*** of comparison; ***proper*** or ***fit*** to be compared."  2 THE OXFORD ENGLISH DICTIONARY 708 (1933) (emphasis added). Reading the word "comparable" to mean "same" effectively deletes the word "comparable" from the Agreement, contrary to the principle that all words in a contract must be given effect.  *See, e.g., Texaco Exploration & Prod., Inc. v. AmClyde Eng'rd Prods. Co.*, 448 F.3d 760, 778 (5th Cir. 2006); *Hawthorne Land Co. v. Equilon Pipeline Co.*, 309 F.3d 888, 892-93 (5th Cir. 2002).

To be sure, in many cases the "same" months are the "comparable" months; a beachside

restaurant might predictably see increased business and thus incur increased costs in June, July, and August — year after year after year.  But for some other businesses, the "same" months may not be the "comparable" months, especially when the issue is a divergence in timing in the receipt of revenues and the paying out of expenses.  For example, in the farming industry, the months in which the farmer buys seeds, incurs expenses, and harvests and later sells his crop may vary as a result of market or weather conditions.  *See* Finch Decl. (Ex. 3) ¶ 7 ("Depending on the weather and choice of crop in any given year, a farmer may plant in April, May, or June and then harvest in any month or months from August through November.  Farmers also have the ability to store the harvest and not sell or receive payment for months after harvest.").

In such cases, the "comparable" months are those in which the farmer engaged in comparable activity.  It is neither "appropriate," "suitable," "worthy," "proper," nor "fit" to compare August 2009 to August 2010 if the farmer sold his entire 2009 harvest in August and his entire 2010 harvest in September.[6]  Such an approach — which would suggest that the farmer lost his entire crop as a result of the *Deepwater Horizon* spill and compensate him accordingly — invites chaos, inequity, and illogical and downright absurd results.  *See* Finch Decl. (Ex. 3) ¶ 31; *see also* Weil Decl. (Ex. 12) at 6:217-221.   There are repeated examples where the Settlement Program's failure to use data from comparable months has generated fictional losses where in reality the Claimant had no loss whatsoever.  *See infra* Section II.A.

*   *   *

In sum, Class Counsel's interpretation of the Settlement Agreement — adopted by the Settlement Program — results in rewriting or excising the following seven provisions of the

---

[6] *Cf.* Dietrich Decl. (Ex. 2) ¶ 31 ("For example, Mardi Gras occurred on February 16, 2010, but on March 8, 2011.  The comparable months for a business that derives earnings from Mardi Gras-related activities would end in February 2010 but in March 2011.").

Settlement Agreement, among others:

> (1) Section 1.3.1.2, which requires that a Class Member have a "[l]oss of income, earnings or profits suffered . . . as a result of the DEEPWATER HORIZON INCIDENT";

> (2) Section 38.57, which defines "Economic Damage" as "loss of profits, income and/or earnings arising in the Gulf Coast Areas or Specified Gulf Waters allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident";

> (3) Section 38.61, which requires that the "Economic Damage Compensation Amount" be calculated "pursuant to the terms of the Agreement and the Economic Damage Claim Frameworks";

> (4) Exhibits 4B and 4C, each of which requires that economic performance be measured by considering "revenue" earned over a selected "period" of "months";

> (5) Exhibit 4C at 2, which requires that "corresponding variable expenses" be subtracted from monthly revenue for the Compensation Period and the comparable Benchmark Period;

> (6) Exhibit 4C at 2, which requires a true "Variable Profit" calculation to be made — a step that is ignored by the Claims Administrator's approach; and

> (7) Exhibit 4C at 1 and 3, which requires that Variable Profit in the Compensation Period be compared to the "comparable months" during the Benchmark Period.

## II.  Class Counsel's Interpretation Frustrates And Defeats The Settlement Agreement's Purpose And Produces Absurd Results, As The Claims Administrator Himself Has Recognized.

That Class Counsel's interpretation of the Settlement Agreement is contrary to the Settlement Agreement's plain text is reason enough to reject it.  Nevertheless, the Claims Administrator adopted it notwithstanding his recognition that it yields absurd results.  Proper interpretation of the BEL Framework, like economic analysis itself, demands a focus on "actual earnings," since the function of the tort system is to make those who are impacted whole.  *See* WILLIAM M. LANDES & RICHARD A. POSNER, THE ECONOMIC STRUCTURE OF TORT LAW 185-86 (1987).  Settlements negotiated in the tort law's shadow are no different — particularly given the express terms of the Settlement Agreement, which defines the Economic Damage for which compensation is available as "loss of profits, income and/or earnings . . .  allegedly arising out of,

due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident."   Settlement Agreement ¶ 38.57; *see also* Polinsky Decl. (Ex. 9) ¶¶ 13-14 ("[I]f the parties settle, they would tend to settle for an amount that is not much different from the amount that the plaintiff would obtain in court. . . .   The amount that courts generally award for losses in tort is that which would make the plaintiff whole, namely, that would restore the plaintiff to the position he would have enjoyed if the tort had not occurred.").

A.      **Class Counsel's Interpretation Violates The Settlement Agreement's Purpose And Produces Absurd Results.**

A contract should be interpreted in accordance with its purpose, rather than in a manner that produces absurd results.  *See, e.g.*, *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 443 (5th Cir. 2002); *Coury v. Moss*, 529 F.3d 579, 585 (5th Cir. 2008).  Here, the Court has recognized that the BEL Framework was meant to use "recognized and accepted methodologies" to assess losses stemming from the spill in a manner that comports with economic reality.  *See* Rec. Doc. 8138 at 10.  The BEL Framework is silent on the use of any particular set of accounting conventions, and that is because the Framework is an economic damage methodology not designed to be trumped or overtaken by a cash-accounting approach.  Instead, the Framework is designed as a practicable "damages model" for which the data kept in a claimant business's books embody ***an input***, but where the ledger entries for particular months must not be allowed to cut short or circumvent the analysis necessary to apply the BEL Framework in a sensible way, as spelled out in the Agreement.  *See* Polinsky Decl. (Ex. 9) ¶¶ 12-16; Weil Decl. (Ex. 12) at 3:97-98 ("The BEL Framework focuses on revenues and expenses, ***not receipts and expenditures*** . . . .") (emphasis added).

Under Class's Counsel's interpretation, the Settlement Agreement will produce meaningless numbers bearing no relationship to actual economic losses in a significant number

of cases. *See, e.g.*, Hall Decl. (Ex. 5) ¶ 22 (Class Counsel's approach yields a "fictitious reduction in variable profit and thus an inflated award"); Finch Decl. (Ex. 3) ¶ 14 (this "fallacy results in farming claimants being compensated for payment timing differences as opposed to actual economic damages"); Oustalniol Decl. (Ex. 7) ¶ 32 ("economically irrational and . . . overcompensates such claimants"); Sider Decl. (Ex. 11) ¶ 12 ("impact of errors in CSSP's measurement of variable profit on BEL offers is large and systematic, and often results in windfalls to many BEL claimants unrelated to actual harm due to the spill"); Polinsky Decl. (Ex. 9) ¶ 8 ("potentially great and can result in gross windfalls"); Weil Decl. (Ex. 12) at 6:220-221 ("leads to nonsense"); Dietrich Decl. (Ex. 2) ¶ 13 ("'A [financial] report showing cash receipts and cash outlays of an enterprise for a short [time] period cannot . . . indicate whether or to what extent an enterprise is successful or unsuccessful.'" (quoting ELEMENTS OF FIN. STATEMENTS, Fin. Accounting Standards Bd. Concepts Statement No. 6, ¶ 144 (Fin. Accounting Standards Bd. 1985))).   A related absurdity is that under Class Counsel's interpretation, claimants whose variable profits are identical over a period of time will receive wildly different awards, depending upon whether their monthly performance is fairly consistent or varies greatly from month to month.  *See* Sider Decl. (Ex. 11) ¶¶ 25-28; Weil Decl. (Ex. 12) at 7:254-259.

Although these economically irrational results afflict BEL claims across a wide variety of industries, these results inure primarily to claimants in three industries — construction, farming, and professional services, particularly in Zones B, C, and D — that are unlikely to have suffered major losses after the spill, fall into the less-impacted zones, and have never been a focus of this litigation or the ensuing settlement.   Sider Decl. (Ex. 11) ¶¶ 5-20.   None of the class representatives named in the *Bon Secour* complaint came from these industries; nor did claimants from such industries (despite the monitions deadline incentivizing all claimants to file

their claims in MDL 2179 or lose them against Transocean under the Limitation Act) file very many short-form joinders.  Claims from such industries only accelerated *after* it became clear that the Claims Administrator would process BEL claims in a manner that does not comport with the Settlement Agreement.  *See id.* ¶ 18.

Appendix A to this Motion includes a representative, yet non-exhaustive listing of the many illogical, absurd awards that have been produced by the Settlement Program's erroneous implementation of the Settlement Agreement.  Among the claimants benefiting from absurd awards described in Appendix A are the following:

- A Zone B rice mill located ███████████████ which the Settlement Program awarded more than $9.3 million in pre-RTP lost profit ($21 million post-RTP) despite the fact that its 2010 revenue exceeded its Benchmark Period 2008-2009 revenue.

- A Zone D general contractor ███████████████, which the Settlement Program awarded more than $3.8 million in pre-RTP lost profit ($4.8 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years.

- A Zone D rice farm ██████████████████████ which the Settlement Program awarded more than $2.4 million in pre-RTP lost profit (more than $3 million post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 214% over actual variable profit in the Benchmark Period.

- A Zone D steel manufacturer in ██████████████████████ ███████████, which the Settlement Program awarded Claimant $1.96 million in pre-RTP lost profit ($2.46 million post-RTP) notwithstanding that Claimant's 2010 variable profit was more than $1 million higher than its 2009 variable profit. This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 59% over actual variable profit in the Benchmark Period.

- A Zone D catfish farm in ██████████████████████ ████, which the Settlement Program awarded Claimant $772,000 in pre-RTP lost profit ($968,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its 2009 (Benchmark Period) annual variable profit by more than 5000%.

**B.**    **The Claims Administrator And Settlement Program Accountants Have Recognized The Need For Accurate Data To Process BEL Claims Properly And Thus Avoid Absurdity.**

The Claims Administrator has himself recognized the problems created by Class Counsel's interpretation of the Settlement Agreement.   *First*, in October 2012, the Claims Administrator properly ruled — rejecting Class Counsel's request for another, equally absurd interpretation — that financial records kept on an accrual basis may not be converted to a cash basis for purposes of filing a claim, because such a conversion "***could result in a loss or a greater loss*** [*that is*] ***not related to the Spill but instead is a result only of the timing of cash received.***"  Oct. 8, 2012 Policy Statement (Ex. D) at 2 (emphasis added).  The logic of this determination — that financial or accounting data that do not accurately match revenues and expenses can produce spurious losses — applies whether the records ***are converted*** to create such a defect (as the Claims Administrator has rightly prohibited) or ***are originally prepared*** with that defect (as the Claims Administrator has erroneously permitted in the decision under review).  Yet Class Counsel cannot explain how the Claims Administrator's October 8 Policy Statement is logically consistent with his January 15 Policy Statement.  *Cf. Frozen Food Express, Inc. v. United States*, 535 F.2d 877, 880 (5th Cir. 1976) ("But law does not permit an agency to grant to one person the right to do that which it denies to another similarly situated. There may not be a rule for Monday, and another for Tuesday, a rule for general application, but denied outright in a specific case."); *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988) ("[T]he Commission's dissimilar treatment of evidently identical cases . . . seems the quintessence of arbitrariness and caprice.").[7]

---

[7] *Accord Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike.  If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases."). The Court Supervised Settlement Program ("CSSP") operates here in a fashion analogous to an agency.

*Second*, in the decision now under review, the Claims Administrator again recognized that applying the Settlement Agreement's methodology to financial data that do not record revenues when earned and match them to corresponding expenses incurred to generate those revenues will produce distorted and unreasonable results:

> This is an issue that has particular relevance to claimants who are attorneys, construction companies or farming enterprises. The Claims Administrator recognizes that the straightforward application of the Settlement Agreement's compensation formula to claimants in these industries can result in awards that appear disproportionate when compared to award amounts for claimants in other industries.

Cover E-Mail to Jan. 15 Policy Decision (Ex. B).  Of course, it is an improper application of the Settlement Agreement's compensation formula that is leading to these absurd results; the Claims Administrator's "application" of the BEL Compensation Framework is neither "straightforward" nor textually permitted.   Indeed, the Settlement Program's interpretation deletes from and completely rewrites the BEL Compensation Framework terms of the Settlement Agreement, as discussed above.

*Third*, in that same decision, the Claims Administrator specifically recognized both the importance of using accurate accounting data and his authority under the Settlement Agreement to correct errors in claimant-submitted financial statements to ensure that only accurate data is used in Settlement Program claim processing:

> The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

Jan. 15 Policy Decision at 2.  Yet, the Administrator has declined to use that rightfully asserted authority here and, as a result, the Settlement Program is processing BEL claims using claimant data that contain known errors, inaccuracies, and irregularities.  The workpapers of Settlement

Program accountants indicate that they have indentified but not corrected similar errors prior to inputting the data into the BEL framework.  *See* Alexander Decl. (Ex. 1) ¶¶ 19, 30; Sider Decl. (Ex. 11) ¶ 41.  The result is awards of hundreds of millions of dollars for nonexistent "losses" reflecting nothing more than readily avoidable accounting errors.

C.     **The Failure To Apply The BEL Framework Using Accurate Data Produces Absurd Results That Impose Upon BP Significant, Unbargained-For, Unagreed-To, And Unwarranted Settlement Liability.**

BP has continued to pursue this issue because it is a matter of fundamental fairness, unbargained-for and unagreed-to consequences, having enormous financial implications.  As the accounting experts explain, the problem of misdefining revenue and failing to match revenue to corresponding variable expenses over comparable periods is widespread among certain categories of claims, including those from the farming, construction, and professional services industries.  *See* Finch Decl. (Ex. 3) ¶ 30 (error infected "almost every farming claim I reviewed"); Oustalniol Decl. (Ex. 7) ¶ 39 ("all" professional services claims he reviewed "will not reflect the actual profit earned or provide a reasonable economic measure of the business"); Oustalniol Supp. Decl. (Ex. 8) ¶ 20; Hall Supp. Decl. (Ex. 6) ¶ 8 ("[It] is not an isolated or rare problem.  To the contrary, I found such mismatching and resulting artificial 'losses' and windfall awards in most of the 28 construction firm BEL claims I reviewed."); Sider Decl. (Ex. 11) ¶ 33 (error affects between 82% and 98% of the largest Business Economic Loss awards).  Indeed, offers by the Settlement Program in the agriculture, construction, and professional services industries — which are particularly affected by the settlement implementation problem described herein — total nearly $415 million, and together represent 40% of the dollar value of BEL offers to date.  *See* Sider Decl. (Ex. 11) ¶ 13.  Moreover, the available claims data indicate that the problem also affects a significant number of claims in other industries.  *Id.* ¶ 5.

Put simply, if the Settlement Agreement were actually written as Class Counsel interpret

it, BP would never have agreed to it.  The economic rationality of settlements is presumed; agreements to pay economic windfalls are not.  *See* Polinsky Decl. (Ex. 9) ¶ 15 ("I would not expect the BEL Framework to provide compensation that would result in substantial windfalls to claimants — it would have been economically irrational for BP to have consented to such an outcome."); *see also* Steven Shavell, *Suit, Settlement, and Trial: A Theoretical Analysis Under Alternative Methods for the Allocation of Legal Costs*, 11 J. LEGAL STUDIES 55, 56-57 (1982) ("If the plaintiff does decide to bring suit . . . he and the defendant will reach a settlement if and only if there exists some settlement amount that both he and the defendant would prefer to going to trial.").

> **D.    The Absurdity Resulting From Class Counsel's Settlement Agreement Interpretation Uniquely Prejudices BP.**

Class Counsel have suggested that the absurdity identified by BP is capable of producing errors in both directions, rather than errors that overwhelmingly and materially prejudice BP alone.  Even if as a matter of law errors overcompensating certain class members could be "offset" by errors undercompensating other class members (a proposition objectors would surely question and that would likely surprise the Fifth Circuit), the fact is that all or the overwhelmingly majority of errors prejudice only BP.  Several points are important to note:

***First***, Class Counsel has not identified a single example of a claimant being disadvantaged by mismatched revenues and expenses. And with good reason — the Settlement Program's interpretation can only hurt BP because it creates losses where none exist.  *See* Hall Supp. Decl. (Ex. 6) ¶ 8 ("I did not see any indication that a single construction claim offer by the Settlement Program understated actual losses."); Finch Supp. Decl. (Ex. 4) ¶ 9 ("[A]nomalies in farm claim determinations by the Settlement Program decidedly do not go 'in either direction' evenly and will be significantly biased in favor of claimants.").

*Second*, the claimants alone have great flexibility in deciding their Compensation Periods and Benchmark Periods, and thus can avoid mismatched revenues and expenses that disadvantage them.  *See* Finch Supp. Decl. (Ex. 4) ¶ 9 ("Since claimants then have the option for Step 1 of the BEL compensation framework to choose from 63 combinations of compensation months and benchmark periods in order to maximize their award, by definition the overwhelming direction for anomalies to go is in favor of the claimant.");[8] Sider Decl. (Ex. 11) ¶ 23 ("The distortions will (almost) always work to increase compensation for a simple reason – any period in which measurement error decreases estimates of lost variable profit will not be selected in determining compensation, while periods in which measurement error increases estimates of lost variable profit become the prime candidates for determining compensation."); Weil Decl. (Ex. 12) at 8:299-303 ("any sensible claimant" will select a Benchmark Period and Compensation Period to exploit the Class Counsel position).

## E.     The Absurdity Also Creates A Risk To Class Certification.

Unfortunately, the absurdity identified here does not merely harm BP; it puts the Settlement itself at risk.  As the Court is aware, numerous objectors challenged the settlement by asserting that it unfairly treated certain class members more favorably than others.  BP and Class Counsel contended, and the Court found, that the settlement was fair because the benefits available to class members were accurately calibrated to the strength of their claims.  As the Court ruled, "[i]t is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims."  Rec. Doc. 8138 at 87.

---

[8] "The BEL framework requires claimants to choose 'comparable months'.  While CSSP does not appear to consider this requirement, its application may affect the number of options available to claimants under the Settlement Agreement in determining Step 1 compensation."  Sider Decl. (Ex. 11) ¶ 2 n.5.

If the interpretation advanced by Class Counsel were to continue to be applied by the Settlement Program, however, the propriety of class certification and the fairness of the Settlement would be placed in jeopardy.  As the Court has previously found:  "'A class action settlement is not objectionable merely because it draws lines, *as long as the distinctions made reflect an informed effort to allocate settlement benefits across class members in reasonable proportion to their damages and the strength of their claims*."  Rec. Doc. 8138 at 87 (emphasis added) (quoting Professor Miller).  But if similarly situated members of the class receive materially different compensation solely as a result of the method by which they maintain their financial records, then a powerful disparity in treatment saps the rationale for the class and raises serious issues about the Settlement's fairness.  *See In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 323 n.73 (3d Cir. 1998) (recognizing that among factors to be considered in approving class settlement is "[w]hether persons with similar claims will receive similar treatment"); *Gates v. Rohm & Haas Co.*, No. 06-1743, 2008 WL 4078456, at *3 (E.D. Pa. Aug. 22, 2008) (same).  This disparity in treatment goes to the core of the class — all businesses with economic loss — and cannot be dismissed as a peripheral issue.  For example, two businesses (which in the real world had the same magnitude of diminution in profits from the spill) submit claims: one has used an accrual method of presenting its financials, and the other uses a cash basis and has done nothing to align its revenue and expenses.  The first company gets an award from the Administrator that fairly approximates its spill-related losses, while the second entity receives an award several times larger that is in no way reflective of its actual injury.  That type of irrational result is precisely what fair class treatment is intended to avoid.  *See* Sider Decl. (Ex. 11) ¶ 24; Dietrich Decl. (Ex. 2) ¶ 21.

26

**III.    BP's Implementation Approach Is Necessary, Readily Accomplished, And Consistent With Standard Accounting Principles and Practice.**

To avoid the absurd results that stem from Class Counsel's misinterpretation of the Settlement Agreement, BP has suggested a three-step process.  ***First***, the CSSP accountants should review all claims for certain inaccuracies that can affect the correct calculation of variable profit, including year-end adjustments, year-end bad debt expenses, year-end bonus expenses, and other irregularities.  *See* Sider Decl. (Ex. 11) ¶¶ 40-41.

***Second***, BP has described three triggers that the Claims Administrator could implement to identify those cases in which claimants have failed to engage in the matching required by the Settlement Agreement.  The Claims Administrator could screen claims for further review where:

> (1)  The claimant's monthly P&L statements report a "revenue spike," that is, revenue in one month (or a small number of months) that exceeds a specified percentage of the claimant's annual total revenue for 2010 and/or any of the Benchmark Period years;

> (2) The claimant's monthly P&L statements report a negative variable profit in any month in 2010 and/or the Benchmark Period year(s); or

> (3)  The claimant's reported data reflect a wide variation in the monthly variable profit margin (expressed as a percentage of revenue) within a given year, such that the difference between the variable profit margin for the months with the highest and lowest variable profit margins exceeds a specified range.

*See* Sider Decl. (Ex. 11) ¶¶ 42-43.

***Third***, where failure to record monthly revenue and corresponding variable expenses properly is found, the Settlement Program should correct the data to reflect the matching required by the Settlement Agreement to calculate variable profit.  Claimants may have provided sufficient information to correct the mismatch, such as specifying the period over which a large inventory purchase was used.  *See* Sider Decl. (Ex. 11) ¶ 44.  When claimants do not provide sufficient information to provide a specific basis for matching revenue and corresponding costs, standard matching methodologies can be applied.  *See id*. ¶ 45.  The two basic approaches are

estimating monthly revenue based on a claimant's annual revenue and the pattern of its monthly expenses, or estimating monthly expenses based on a claimant's annual expenses and the pattern of its monthly revenue.  *See id.*  Neither of those approaches amounts to an arbitrary "spreading" of revenue or expense, as Class Counsel asserts.  We understand that the Settlement Program accountants concur that these approaches are reasonable and can be readily implemented.  And the Claims Administrator has himself confirmed that BP's proposal is reasonable.  *See* Cover E-Mail to Jan. 15 Policy Decision (Ex. B).

BP is not wedded to the specific triggers described here; there may be other equally effective, appropriate, and tested methods that the Settlement Program could use to identify cases in which revenue has not been properly calculated, corresponding variable expenses have not been properly matched, or comparable periods have not been compared.  The salient points are simply that (1) the ultimate goal BP seeks to achieve — properly determining variable profit — comports with the principles of accounting and economics (and is demanded by the Settlement Agreement itself), as is extensively explained in the declaration of Hal Sider (Ex. 11); (2) accountants regularly engage in the type of analysis that BP proposes; and (3) Class Counsel have offered no alternatives of their own, so the Claims Administrator and thus the Court are not faced with a choice between two practicable implementation solutions but only a choice between BP's tested and workable solution on the one hand and Class Counsel's unadorned recalcitrance on the other.

A.     **Accounting Principles Mandate The Correct Matching Of Revenue And Expenses.**

As the accounting and financial experts have made clear, correct calculation of profit "***requires*** that revenue is attributed to periods in which it is earned."  Finch Decl. (Ex. 3) ¶ 26 (emphasis added); *accord id.* ¶ 29 ("[T]he accounting literature recognizes that evaluation of a

firm's financial performance *requires* that revenue be aligned with the costs incurred in generating that revenue.") (emphasis added); Oustalniol Decl. (Ex. 7) ¶ 18 ("It is broadly recognized by the accounting literature and accounting professionals that one of the *pillars of reliable financial reporting* is the 'matching' concept . . . .") (emphasis added); Rose Decl. (Ex. 10) ¶ 4 ("The matching of revenues and expenses is *fundamental to the analysis* of financial statements for profitability because profitability *cannot be determined on a cash basis*.") (emphasis added); Weil Decl. (Ex. 12) 5:185-187 ("[W]e have not properly measured income as revenues less expenses unless the expenses measure the assets used to generate the revenues."). *See also supra* Section I.B. (explaining why the *text* of the Settlement Agreement also requires matching).

Class Counsel are simply incorrect to suggest otherwise.  Rather, it is the interpretation urged by Class Counsel — which yields absurd results that do not reflect economic reality — that does not comport with economics and accounting principles.  *See* Finch Supp. Decl. (Ex. 4) ¶¶ 17-26 (explaining in detail why the opinions offered by Class Counsel's declarants are incorrect and inconsistent with accounting and economic principles); Oustalniol Supp. Decl. (Ex. 8) ¶¶ 5-17 (same); Hall Decl. (Ex. 5) ¶ 14 ("[I]t is widely understood and accepted that such matching between revenue and expenses is required in order to understand a business's financial performance for a given accounting period.").

    **B.**    **BP's Implementation Approach Is Easily Administered And Consistent With Accounting Principles; It Does Not Invite Subjective Analysis.**

*__Implementation Would Not Be Burdensome.__*  Contrary to Class Counsel's argument, the implementation solutions BP has outlined for the purpose of complying with the Settlement Agreement and to determine when basic accounting principles have not been followed are easily implementable by the Settlement Program's staff of professional accountants.  Indeed, the

accounting experts agree that BP's implementation solution involves "reasonable and objective methods." Hall Decl. (Ex. 5) ¶ 29; *see also id.* ¶ 4(4) ("simple and workable"); Finch Decl. (Ex. 3) ¶¶ 5(e), 33; Oustalniol Decl. (Ex. 7) ¶ 6; Oustalniol Supp. Decl. (Ex. 8) ¶¶ 26-33; Hall Supp. Decl. (Ex. 6) ¶¶ 16-17; Finch Supp. Decl. (Ex. 4) ¶ 16; Sider Decl. (Ex. 11) ¶ 82; Weil Decl. (Ex. 12) at 9:341-361 (explaining that the allocation of revenues and expenses is a core function of accountants); Dietrich Decl. (Ex. 2) ¶ 35 ("Major public accounting firms possess substantial expertise in many areas of accounting; both PricewaterhouseCoopers and Postlethwaite & Netterville have many partners and staff members who are well-versed in the accounting procedures required to implement the BEL Framework's calculations."); Alexander Decl. (Ex. 1) ¶ 32.  Moreover, as noted above, the Claims Administrator has previously concluded that the metrics and implementation approach proposed by BP are reasonable and implementable.

### *Claims Administrator Has Conceded Faithful Implementation of the Settlement Sometimes Requires Data Adjustment.*    Nor would the implementation approach that BP proposes be unusual.  Indeed, the Settlement Program itself has consistently recognized that, to meet its duty to "faithfully implement and administer the Settlement, according to its terms and procedures," Settlement Agreement ¶ 4.3.1, it is (or may be) necessary to adjust the data provided by a claimant to produce accurate monthly revenue and corresponding variable expense data to input into the BEL calculation.  *Cf.* Dietrich Decl. (Ex. 2) ¶ 28 (BP approach "avoids the unfaithful and inaccurate representations of Variable Profit that result from Class Counsel's interpretation.").  For example:

- For claimants with 13-month financial reporting periods, the Program's accountants have "the ability to convert the 13-period revenue and expense statements into a twelve month year by allocating each period's revenue and expense items into their respective months."  Aug. 2, 2012 Memo From L. Greer to P. Juneau (Ex. E) at 8.

- In his January 15, 2013 Policy Announcement under review, the Claims Administrator specifically reserved to himself the authority to adjust data provided by claimants where that data do not accurately reflect monthly revenues earned and corresponding expenses incurred:

> The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

Jan. 15 Policy Decision (Ex. C) at 2.

When the Claims Administrator acts in this fashion to operationalize provisions in the Settlement Agreement, he is acting akin to an administrative agency. "Because it is to the [relevant agency] that Congress entrusted the task of applying the Act . . . in the light of the infinite combinations of events which might be charged as violative of its terms, that body, if it is to accomplish the task which Congress set for it, necessarily must have authority to formulate rules to fill the interstices of the broad statutory provisions." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 500-501 (1978).

Class Counsel charge that any attempt to carry out the Settlement Agreement's strong focus on correct application of the economic concepts of "Variable Profit," "revenues," and "expenses" is adding new material not present in the contract's text. This is wrong; operationalizing those terms only enforces and carries out that contract. As in any case where an agency decision is tested for its fidelity to a statute, there are interstitial decisions an agency makes that carry out the letter and spirit of the law that it is applying and there are decisions the agency makes that are legally flawed and *ultra vires*. The January 15, 2013 policy decision falls into the latter category — it is flatly incorrect. The triggers and approaches BP suggests to ensure that revenue and expense matching occurs promotes the text and purpose of the Agreement.

Indeed, accountants regularly engage in the type of analysis that BP has identified as a necessary (and required) step to obtaining the corrected data needed to produce economically valid results, and the Claims Administrator has repeatedly recognized his authority to apply standard accounting principles even though the Settlement Agreement does not recite *in haec verba* every principle of accounting.  There is no "subjectivity" in ensuring that accurate data is used for the Settlement Agreement's objective economic tests.  It is Class Counsel's approach, not BP's, that ignores the accounting discipline's (and, indeed, economic science's) recognition of the need to match revenues and expenses when doing an analysis of variable profit.  *See* Finch Supp. Decl. (Ex. 4) ¶¶ 17-26.  There simply is no reason to accept a reading of the Settlement Agreement that produces enormous windfalls when eliminating such windfalls is not a complex, costly, or overly time-consuming task.  This is particularly true given that BP's interpretation of variable-profit analysis in the Settlement Agreement is compelled by the Agreement's plain terms and does not deprive any claimant who has injuries caused by the spill of any compensation.

## IV.   Class Counsel's Other Arguments Lack Merit And Do Not Withstand Scrutiny.

Class Counsel have suggested other reasons to reject a proper interpretation and implementation of the Settlement's BEL Compensation Framework.  None has merit.

### A.   BP's Position Is Consistent With The Text Of The Settlement Agreement.

Class Counsel have argued that BP proposes to rewrite the Settlement Agreement to achieve its goals.  But as explained above, that is simply not so; BP only seeks to have the carefully negotiated express terms of that Agreement implemented, as well as the Agreement's fundamental purpose of channeling benefits to those actually harmed by the *Deepwater Horizon* spill.  It is Class Counsel, not BP, that violate the terms of the Settlement Agreement and put the

future of the Settlement at risk — all in furtherance of their dubious goal of extracting payouts from BP for businesses that had **nonexistent losses**, let alone losses caused by the spill.

Nonetheless, Class Counsel has suggested that BP's position that revenue must be matched with "corresponding" variable expenses is inconsistent with Exhibit 4C, which, they argue, instructs the Claims Administrator to "[s]um the monthly revenue over the period" and then "[s]ubtract the corresponding variable expenses from revenue over the same time period" to determine variable profit.  Settlement Agreement Ex. 4C at 2.  According to Class Counsel, the phrase "over the same time period" means that the Claims Administrator may not match revenues with corresponding variable expenses incurred in a different period.  But in reality, the phrase "over the same time period" is meant to modify **revenue**, not "corresponding variable expenses."  Properly understood, the phrase "over the same time period" makes clear that the same time period is to be used for revenue in both steps of calculating variable profit — not that the Claims Administrator may not match that revenue to corresponding variable expenses incurred in other time periods.  Only BP's position is consistent with the "rule of the last antecedent," which provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Only BP's position is consistent with the underlying economic purpose of the Settlement Agreement; and only BP's position is consistent with the obligation to determine Variable Profit.

Nor is BP seeking to undermine the Settlement Agreement's carefully negotiated causation tests.  BP is not suggesting that the Claims Administrator should subjectively analyze whether, in his view, claimants who satisfy the Settlement Agreement's causation tests "actually" suffered losses after the spill.  Rather, BP's position is simply that the Settlement

Agreement's entirely objective causation (and compensation) tests cannot work if they are applied to incorrect and thus useless data.  The core problem here is that the Settlement Program is using incorrect and/or erroneous data, and thus as has been observed before:  "[G]arbage in, garbage out."  *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 374 F. App'x. 119, 121 (2d Cir. 2010) (approvingly noting district court finding that an accounting audit was inadequate and overstated a balance sheet based in part on erroneous inputs).[9]

> **B.** **Class Counsel Contradict Themselves In Claiming That The Existence Of Allegedly Undefined Terms In The Agreement Somehow Support The Position That Matching Of Revenues And Expenses Is Not Required.**

Class Counsel have implausibly suggested that because several basic economic terms were not specifically defined by the Settlement Agreement, the Claims Administrator was entitled to define them as he saw fit.  Yet putting aside the fact that each of the controlling terms in the Settlement Agreement here has a well-established meaning, as discussed above, Class Counsel themselves have previously asserted that the Claims Administrator is ***not free*** to define terms as he pleases simply because they were not specifically defined by the Settlement Agreement.  *See* Memorandum from Class Counsel to C. Reitano, Feb. 7, 2013 (Ex. F) at 4 n.4 ("Class Counsel also ***objects*** to the contention . . . that in the absence of a term being defined, authority vests in the Claims Administrator to determine the meaning of the term.") (emphasis added).  Just so.  The proper method of interpreting the terms in dispute here is by application of their well-understood and uncontroversial meanings in the economics and accounting

---

[9] Nor can Class Counsel argue that BP's implementation rewrites the Settlement Agreement, and in particular Exhibit 4A ("Documentation Requirements for Business Economic Loss Claims"), because in some cases BP's implementation may require financial data from years prior to and after the Benchmark Years, 2010 and 2011, that are expressly referenced in Exhibit 4. Footnote 1 of Exhibit 4A expressly provides that the requirements are typical but not exhaustive: "Other provisions of the settlement agreement might require additional documentation for specific business types." Moreover, paragraph 4 expressly provides that the Claims Administrator may "request source documents for profit and loss statements." Since the annual and monthly financial statements must start with and contain beginning balances derived from the prior period, such "source documents" necessarily include original transaction documents from that prior period. *See* Alexander Decl. (Ex. 1) ¶ 26.

professions.  If Class Counsel wanted to alter those default meanings, they could have sought to do so in negotiations.  Class Counsel did not do so and the Claims Administrator cannot proceed (as his January 15 decision does) as if Class Counsel had secured provisions in the Settlement Agreement to give basic economic and accounting terms non-standard, idiosyncratic, and illogical meanings.

      **C.**    **BP Remains Free To Refer To The Central Purpose Of The Settlement Agreement To Compensate Only For Spill-Related Losses When It Offers Interpretations Of The Settlement Agreement's Compensation Criteria.**

Class Counsel have argued that BP's references to language in the Settlement Agreement that "losses" be "sustained" "as a result" of the *Deepwater Horizon* oil spill somehow embody an attempt to relitigate issues surrounding the Settlement Program's October 10, 2012 policy statement.  Not so, as that policy statement provides only that the "Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond the criteria specifically set out in the Settlement Agreement."  Policy Decision Issued by the Court on Causation, *available at* http://tinyurl.com/Oct10Policy (Oct. 10, 2012).

BP's position here — that the key Settlement Agreement terms of "Variable Profit," "revenue," "expenses," "corresponding," and "comparable," etc. control BEL claims processing — denotes nothing more or less than following the compensation "criteria specifically set out in the Settlement Agreement," which is the approach specifically mandated by the October 10 policy statement.  BP references the fact that the Settlement Agreement was intended only to compensate for losses occurring as a result of the spill merely to explain the purpose of those "criteria."  Consulting the purpose of a contract is a basic and traditional tool in its interpretation, and nothing in the October 10 policy statement purports to make that tool of contractual interpretation unavailable.  *See, e.g.*, *Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*, --- F.3d ---, 2013 WL 237567, at *4 (5th Cir. Jan. 22, 2013).

### D. BP's Position Is Consistent With The Class Notice.

Contrary to Class Counsel's argument, BP's position is also consistent with the class notice, which certainly did not say that the Settlement Program would mechanically accept hand-picked claimant financial records without applying any scrutiny based on economic and accounting analysis, or that the Settlement Agreement incorporated and would inflexibly apply cash-based accounting. What the class notice did say was that "[c]laims for economic damage can be made by Individuals and Entities in certain industries or geographic zones that *lost profits or earnings as a result of the Deepwater Horizon Incident*." *See* Class Notice 12 (emphasis added), *available at* http://tinyurl.com/DetailedNotice. By contending that claimants should be able to receive payment under the Settlement Agreement for nonexistent "losses," it is Class Counsel — not BP — who would contradict the notice.

### E. BP Timely Raised Its Objections To The Non-Matching Approach.

Notwithstanding Class Counsel's suggestions to the contrary, in no way has BP been slow in responding to the revenue and matching issues. As the Settlement Program began issuing BEL awards during the fall of 2012, BP closely monitored such awards. When it became clear that there was a significant problem, BP began appealing problematic awards. Perhaps the best evidence that BP has fully engaged on these issues is that fact that it has filed more than 100 appeals on the revenue and matching issues alone (including appeals stayed by this Court on February 6, 2013, and that remain pending). BP also sought to engage with the Claims Administrator and the accounting vendors on this subject.

Contrary to Class Counsel's position, BP's participation in a quality assurance testing of the Settlement Program's model for processing BEL claims did not "endorse" the Program's failure to assess accurately when revenue was earned or to match properly revenue and corresponding variable expenses. The assurance testing did not raise or involve the matching

issue.  *See* Sider Decl. (Ex. 11) ¶¶ 89-92.  Rather, Class Counsel's knowledge of this issue inherently predates BP's because they represent claimants who formulated claims by gathering supporting documentation and launched them into the system.[10]

Finally, Class Counsel's argument is irrelevant. Setting aside the fact that BP promptly acted once it figured out what Class Counsel and the Settlement Program were doing, the Agreement expressly overrides the ordinary operation of waiver doctrine.  "The waiver by any Party of any breach of this Agreement by another Party shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, to this Agreement." Settlement Agreement ¶ 35.1.  In other words, BP could have, but, of course, did not, let hundreds of claims payouts failing to match revenues and expenses go by unappealed.  But that would not have precluded its ability to take later appeals or to raise the Settlement Program's misinterpretation to this Court under the plain terms of Section 35.1.

## F.     Class Counsel's Attempt To Argue That Conducting This Proceeding *In Camera* Violates The Settlement Agreement Is Incorrect And Contradictory.

Although Class Counsel did not argue in January 2013 when this dispute arose that an *in camera* process is improper as a means to resolve it at this stage in the District Court proceedings, they have made that suggestion in response to the Court's February 6, 2013 stay order.  Class Counsel relies on Section 18.1 of the Settlement Agreement, which provides in relevant part that, "Any disputes or controversies arising out of or related to the interpretation, enforcement or implementation of the Agreement and the Release shall be made by motion to the Court." *Id.*  The process the Court has employed to date and at this stage of the proceedings has

---

[10] Waivers demand prior knowledge among numerous other requirements.  *See, e.g., Int'l Indus. Park, Inc. v. United States*, 100 Fed. Cl. 638, 655 (2011) ("Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit.") (internal quotation marks omitted).  The burden of proof on waiver issues in the contractual setting also rests on the breaching party, i.e., Class Counsel.  *See, e.g., Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1360 (Fed. Cir. 2005).

not violated this provision.  Motions can be made orally, and the January 24, 2013 hearing the Court held on this matter clearly was convened in order to adjudicate such a motion. Additionally, there is nothing that precludes the "motion" referred to in Section 18.1 of the Settlement Agreement from being filed *in camera*.  Motions *in camera* are a well-recognized mode of procedure and have been used in the class settlement context before.  *See Ramirez v. Decoster*, 142 F. Supp. 2d 104, 108 & n.4., 109 n.6, 110 (D. Me. 2001).

Class Counsel's positions are also rife with internal contradictions.  For instance, the process that resolved the non-profits disagreement last December was also conducted *in camera* — at Class Counsel's suggestion that resolution of any Panel disputes by the parties should proceed in such a manner.  In addition, the January 24 hearing on this BEL issue was *in camera*, as well as the in-Chambers status from two weeks ago.

Finally, Class Counsel jettison another provision of the Settlement.  *See* Settlement Agreement, Section 4.3.4 ("Issues or disagreements that cannot be unanimously resolved by the Claims Administration Panel will be referred to the Court for resolution.").  This provision does not handcuff the Court in its choice of a mode of procedure to resolve such disputes, *see, e.g.,* Fed. R. Civ. P. 16(a)(5), given the current stage of the proceedings thus far and the requests as framed and made to the Court.

## V.    Requested Relief

Accordingly, BP respectfully requests that the Court issue an *in camera* decision directing that:

1.    The Claims Administrator shall immediately rescind his January 15, 2013 Policy Statement regarding BEL Claims.

2.    The Claims Administrator shall acknowledge that under the BEL Framework, (a) "revenue" is recognized when it is earned by delivering goods or rendering services, and not

simply when cash is received or a claimant records revenue on its financial statements; (b) "corresponding variable expenses" are those variable expenses incurred to generate revenue over a period, and not simply expenses incurred or expenditures made during the period when that revenue is earned; (c) and "comparable months" are the months that are economically appropriate for comparison, and not simply the same months.

3.      The Claims Administrator and Settlement Program shall (a) identify and correct inaccuracies in monthly profit and loss entries submitted by BEL claimants; (b) apply triggers to identify potential matching problems with BEL claims; (c) apply matching techniques for problems identified by the trigger analysis; and (d) apply the BEL Framework using corrected data and estimates of matched revenue and variable expenses.

4.      In implementing the requirements of paragraph 3, the Claims Administrator and Settlement Program shall use the procedures and methodologies set forth in the Declaration of Hal Sider (Ex. 11) at Section VI, ¶¶ 37-47 with examples illustrating the procedures and methodologies in ¶¶ 48-80 (Section VI is also attached as Appendix B), unless the Parties and the Claims Administrator unanimously agree to different or additional procedures.[11]

5.      The Claims Administrator shall develop and present for the Court's review by no later than March 11, 2013, a Policy Statement incorporating the interpretations, procedures, and requirements of paragraphs 2 through 4.

**CONCLUSION**

BP is committed to paying all legitimate claims for economic loss and property damage

---

[11] The procedures, methodologies, and examples in Section VI of Hal Sider's Declaration were presented to Class Counsel, the Claims Administrator, and the Settlement Program's senior accountants during the February 14, 2013 mediation and are an elaboration of BP's approach described to Class Counsel and the Claims Administrator in early January 2013.

that arose as a result of the *Deepwater Horizon* spill, and it continues to believe that — properly implemented and interpreted — the Settlement Agreement is a fair and reasonable resolution for both BP and the Class.   But BP remains steadfast in its legal view that the Settlement Program's January 15 Policy Decision is a serious distortion of the Settlement Agreement's clear text and expressly stated rationale — and is also contrary to basic rules and principles of economics and accounting.   Having tried and failed to mediate this issue with Class Counsel, BP has no choice but to again seek the Court's intervention and to request the proper implementation of the Settlement Agreement's BEL Compensation Framework.   BP accordingly requests that the Court direct the Settlement Program to adopt the BEL implementation steps BP has outlined. Only such an instruction to the Settlement Program will achieve the Settlement's goal of compensating businesses actually harmed by the *Deepwater Horizon* spill.

Dated:  February 18, 2013                     Respectfully submitted,


                                              __/s/ Richard C. Godfrey, P.C._____
James J. Neath                                Richard C. Godfrey, P.C.
Mark Holstein                                 J. Andrew Langan, P.C.
BP AMERICA INC.                               Wendy L. Bloom
501 Westlake Park Boulevard                   Andrew B. Bloomer, P.C.
Houston, TX  77079                            R. Christopher Heck
Telephone:  (281) 366-2000                    KIRKLAND & ELLIS LLP
Telefax:  (312) 862-2200                      300 North LaSalle Street
                                              Chicago, IL 60654
                                              Telephone:  (312) 862-2000
                                              Telefax:  (312) 862-2200


Daniel A. Cantor                              Jeffrey Bossert Clark
Andrew T. Karron                              Steven A. Myers
ARNOLD & PORTER LLP                           KIRKLAND & ELLIS LLP
555 Twelfth Street, NW                        655 Fifteenth Street, N.W.
Washington, DC 20004                          Washington, D.C. 20005
Telephone:  (202) 942-5000                    Telephone:  (202) 879-5000
Telefax:  (202) 942-5999                      Telefax:  (202) 879-5200


Jeffrey Lennard                               __/s/ Don K. Haycraft_____
Keith Moskowitz                               Don K. Haycraft (Bar #14361)
SNR DENTON US LLP                             R. Keith Jarrett (Bar #16984)
233 South Wacker Drive                        LISKOW & LEWIS
Suite 7800                                    701 Poydras Street, Suite 5000
Chicago, IL  60606                            New Orleans, Louisiana 70139
Telephone:  (312) 876-8000                    Telephone:  (504) 581-7979
Telefax:  (312) 876-7934                      Telefax:  (504) 556-4108


*OF COUNSEL*                                  Robert C. "Mike" Brock
                                              COVINGTON & BURLING LLP
                                              1201 Pennsylvania Avenue, NW
                                              Washington, DC 20004
                                              Telephone:  (202) 662-5985
                                              Telefax:  (202) 662-6291


**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**APPENDIX A**

**NON-EXHAUSTIVE EXAMPLES OF CLAIMS AFFECTED BY MISAPPLICATION OF BUSINESS ECONOMIC LOSS FRAMEWORK[*]**

<u>Awards to Construction Industry Claimants</u>

- Claim  Claimant is a Zone D housing construction company _____ _____ The Settlement Program awarded Claimant $10.1 million in pre-RTP lost profit ($12.7 million post-RTP[**]). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 103% over actual variable profit in the Benchmark Period.[***]

- Claim _____ Claimant is a Zone D highway, street and bridge construction company _____ The Settlement Program awarded Claimant $7.7 million in pre-RTP lost profit ($9.7 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 21%.

- Claim _____ Claimant is a Zone D general contractor _____ The Settlement Program awarded Claimant more than $3.8 million in pre-RTP lost profit ($4.8 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years.

- Claim _____ Claimant is a Zone D construction company _____ The Settlement Program awarded Claimant $3.8 million in pre-RTP lost Profit ($4.8 million post-RTP), notwithstanding that Claimant's financial data record negative revenue resulting in a over-statement of Benchmark Period profit by more than $1 million.

- Claim _____ Claimant is a Zone C commercial building construction company _____ The Settlement Program awarded Claimant $1.7 million pre-RTP lost profit ($2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 7%.

---

[*] Additional examples are discussed in the declarations and/or supplemental declarations of David A. Hall, Charles E. Finch, Xavier Oustalniol, and Hal Sider.

[**] All post-RTP awards listed include reimbursement for accounting support and offsets of any prior Spill-related payments.

[***] Unless otherwise noted, the comparison made in these examples compares the claimant's May-December (post-Spill period) 2010 variable profit to its average May-December variable profit in the Benchmark year or years. Where data and percentages are based on annual performance, rather than performance in just the May-December period, the description notes that the information is based on annual performance.

- Claim ███████   Claimant is a Zone D construction contractor ███████ The Settlement Program awarded Claimant more than $1.6 million in pre-RTP lost profit (more than $2 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ███████   Claimant is a Zone D construction company ███████ ███████ The Settlement Program awarded Claimant $1 million in pre-RTP lost profit ($1.4 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 7%.

- Claim ███████   Claimant is a Zone D commercial building construction company ███████ ███████ The Settlement Program awarded Claimant $952,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit. Claimant was unprofitable in the Benchmark years, losing an average of $121,000 in variable profit per year, and became profitable in 2010, earning $71,000 in variable profit.

- Claim ███████   Claimant is a Zone D housing construction company ███████ ███████ The Settlement Program awarded Claimant $942,000 in pre-RTP lost profit ($1.2 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 155% over actual variable profit in the Benchmark Period.

- Claim ███████   Claimant is a Zone D construction company ███████ ███████ The Settlement Program awarded Claimant $939,000 in pre-RTP lost profit ($1.18 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 61%.

- Claim ███████   Claimant is a Zone D construction company ███████. The Settlement Program awarded Claimant $863,000 in pre-RTP lost profit (more than $1 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 103% over actual variable profit in the Benchmark Period.

- Claim ███████   Claimant is a Zone D construction company ███████ ███████ The Settlement Program awarded Claimant $775,000 in pre-RTP lost profit ($972,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual 2009 variable profit by 25%.

- Claim ███████   Claimant is a Zone D housing construction company ███████ ███████ The Settlement Program awarded Claimant $740,000 in pre-RTP lost profit ($927,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 119% over actual variable profit in the Benchmark Period.

A-3

- Claim ▮▮▮▮  Claimant is a Zone D construction company ▮▮▮▮▮▮▮▮▮  The Settlement Program awarded Claimant $711,000 in pre-RTP lost profit (more than $899,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 70% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮  Claimant is a Zone D single-family housing construction company ▮▮▮▮ ▮▮▮▮▮▮▮  The Settlement Program awarded Claimant $680,000 in pre-RTP lost profit ($850,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 variable profit.  Claimant was unprofitable in the Benchmark year, losing $6,000 in variable profit, and became profitable in 2010, earning $17,000 in variable profit.

- Claim ▮▮▮▮  Claimant is a Zone D construction company ▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $666,000 in pre-RTP lost profit (more than $837,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 50% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮  Claimant is a Zone C electrical contractor ▮▮▮▮▮▮▮▮  The Settlement Program awarded Claimant $641,000 in pre-RTP lost profit ($769,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 7%.

- Claim ▮▮▮▮  Claimant is a Zone B construction company ▮▮▮▮▮▮▮▮  The Settlement Program awarded Claimant $567,000 in pre-RTP lost profit ($1.28 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ▮▮▮▮  Claimant is a Zone C construction company ▮▮▮▮▮▮▮▮  The Settlement Program awarded Claimant $502,000 in pre-RTP lost profit ($635,000 post-RTP), notwithstanding that its 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit.

- Claim ▮▮▮▮  Claimant is a Zone D landscaping company ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮  The Settlement Program awarded Claimant $478,000 in pre-RTP lost profit ($599,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 50% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮  Claimant is a Zone D construction company ▮▮▮▮▮▮▮▮  The Settlement Program awarded Claimant $439,000 in pre-RTP lost profit (more than $549,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 101% over actual variable profit in the Benchmark Period.

- Claim ████   Claimant is a Zone C construction company in Pensacola, Florida.  The Settlement Program awarded Claimant $406,000 in pre-RTP lost profit ($507,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 83%.

- Claim ████:  Claimant is a Zone B single-family house construction company ████ ████████.   The Settlement Program awarded Claimant $329,000 in pre-RTP lost profit ($743,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 71%.

- Claim ████   Claimant is a Zone B housing construction company ████████ ████████.   The Settlement Program awarded Claimant $303,000 in pre-RTP lost profit ($686,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 78% over actual variable profit in the Benchmark Period.

- Claim ████   Claimant is a Zone C construction company ████████.   The Settlement Program awarded Claimant $154,000 in pre-RTP lost profit ($194,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 75%.

- Claim ████   Claimant is a Zone D construction company ████████ ████████.   The Settlement Program awarded Claimant $126,000 in pre-RTP lost profit ($159,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 190% over actual variable profit in the Benchmark Period.

- Claim ████   Claimant is a Zone D construction company ████████.   The Settlement Program awarded Claimant $103,000 in pre-RTP lost profit ($131,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 57%.

- Claim ████   Claimant is a Zone D residential remodeling company ████████, ████████.   The Settlement Program awarded Claimant $92,803 in pre-RTP lost profit ($116,004 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 27%.

- Claim ████   Claimant is a Zone D construction contractor ████████.   The Settlement Program awarded Claimant $83,000 in pre-RTP lost profit (more than $103,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 59% over actual variable profit in the Benchmark Period.

- Claim ████   Claimant is a Zone D drywall and insulation construction contractor ████████████████████████.   The Settlement

A-5

Program awarded Claimant $75,000 in pre-RTP lost profit ($94,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 103%.

- Claim ██████████ Claimant is a Zone D plumbing, heating, and air-conditioning contractor ██████████████████████████████ The Settlement Program awarded Claimant $63,286 in pre-RTP lost profit ($79,108 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 710%.

- Claim ██████ Claimant is a Zone D construction company ████████████████ The Settlement Program awarded Claimant $54,738 in pre-RTP lost profit ($69,517 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 59%.

- Claim ██████ Claimant is a Zone D roofing contractor ████████████ The Settlement Program awarded Claimant $51,963 in pre-RTP lost profit ($64,954 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 128%.

- Claim ██████ Claimant is a Zone D construction company ████████████ The Settlement Program awarded Claimant $30,424 in pre-RTP lost profit ($38,030 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 45%.

Awards to Agricultural Industry Claimants

- Claim ██████ Claimant is a Zone B rice mill located ████████████████ The Settlement Program awarded Claimant $9.3 million in pre-RTP lost profit ($21 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 variable profit, and its 2010 revenue exceeded its revenue in all Benchmark years.

- Claim ██████ Claimant is a Zone B alligator farm ████████████████ Settlement Program awarded Claimant $7.3 million in pre-RTP lost profit ($16.5 million post-RTP). This pre-RTP award assumes that in the absence of the Spill Claimant's annual 2010 variable profit would have more than doubled over its variable profit in prior years.

- Claim ██████ Claimant is a Zone D rice farm ████████████████████ The Settlement Program awarded Claimant more than $2.4 million in pre-RTP lost profit (more than $3 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 214% over actual variable profit in the Benchmark Period.

- Claim ██████ Claimant is a Zone D fish farm ████████████████ The Settlement Program awarded Claimant $1.25 million in pre-RTP lost profit ($1.57 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill,

Claimant could have expected its 2010 variable profit to increase by 342% over actual variable profit in the Benchmark Period.

- Claim ████████ Claimant is a Zone D crop farmer ████████████████████n ████████████████. The Settlement Program awarded Claimant $938,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 5%.

- Claim ████████ Claimant is a Zone C alligator farm████████████████ The Settlement Program awarded Claimant $917,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit. Claimant was unprofitable in the Benchmark years, losing an average of $289,000 in variable profit per year, and became profitable in 2010, earning $1,565,000 in variable profit.

- Claim████████ Claimant is a Zone D fish farm in█████████████████████████ ████████████. The Settlement Program awarded Claimant $872,000 in pre-RTP lost profit (more than $1 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 68% over actual variable profit in the Benchmark Period.

- Claim████████ Claimant is a Zone D catfish farm ██████████████████████ ████████████████████. The Settlement Program awarded Claimant $772,000 in pre-RTP lost profit ($968,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its 2009 (Benchmark Period) annual variable profit by 521%.

- Claim ████████ Claimant is a Zone D farm ████████████████████ ████████████. The Settlement Program awarded Claimant $744,000 in pre-RTP lost profit (945,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark Period by 14%.

- Claim████████ Claimant is a Zone D cotton farmer ████████████████ ████████████████. The Settlement Program awarded Claimant $680,000 in pre-RTP lost profit ($856,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 variable profit by 17%.

- Claim████████ Claimant is a Zone D farmer ████████████████████████ ████████████████. The Settlement Program awarded Claimant $635,000 in pre-RTP lost profit ($796,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 68% over actual variable profit in the Benchmark Period.

- Claim████████ Claimant is a Zone D rice farmer ████████████████████ ████████████████. The Settlement Program awarded Claimant $555,000 in pre-RTP lost profit ($697,000 post-RTP). This pre-RTP award assumes that, in the absence of the

A-7

Spill, Claimant could have expected its 2010 variable profit to increase by 102% over actual variable profit in the Benchmark Period.

- Claim  Claimant is a Zone D corn farm ▮▮▮▮ ▮▮▮▮ The Settlement Program awarded Claimant $497,000 in pre-RTP lost profit ($624,000 post-RTP), notwithstanding that its 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 55%.

- Claim ▮▮▮▮ Claimant is a Zone D soybean farmer ▮▮▮▮ The Settlement Program awarded Claimant $447,000 in pre-RTP lost profit ($561,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 16%.

- Claim ▮▮▮▮ Claimant is a Zone D cotton, corn, soybean and wheat farm ▮▮▮▮ The Settlement Program awarded Claimant $441,000 in pre-RTP lost profit ($550,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 42%.

- Claim ▮▮▮▮ Claimant is a Zone D soybean farm located ▮▮▮▮ The Settlement Program awarded Claimant $413,000 in pre-RTP lost profit ($518,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 44%.

- Claim ▮▮▮▮ Claimant is a Zone D cotton farmer ▮▮▮▮ The Settlement Program awarded Claimant $411,000 in pre-RTP lost profit ($515,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 108% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮ Claimant is a Zone D corn farmer ▮▮▮▮ The Settlement Program awarded Claimant $396,000 in pre-RTP lost profit ($499,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 62% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮ Claimant is a Zone D oilseed and grain farm ▮▮▮▮ The Settlement Program awarded Claimant $383,000 in pre-RTP lost profit ($480,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 190%.

- Claim ▮▮▮▮ Claimant is a Zone D oilseed and grain farm ▮▮▮▮ The Settlement Program awarded Claimant $370,000 in pre-RTP lost profit ($462,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 822%.

A-8

- Claim ████ . Claimant is a Zone D farm and feed supply store ████ ████████ The Settlement Program awarded Claimant $361,000 in pre-RTP lost profit ($450,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual 2009 variable profit by 9%.

- Claim ████ Claimant is a Zone D cotton farm in ██████████ The Settlement Program awarded Claimant $348,000 in pre-RTP lost profit ($435,00 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit. Claimant was unprofitable in 2009, losing $408,000 in variable profit, and became profitable in 2010, earning $1,347,000 in variable profit.

- Claim ████ Claimant is a Zone B farmer ████████ The Settlement Program awarded Claimant $311,000 in pre-RTP lost profit ($699,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 18%.

- Claim ████ Claimant is a Zone D oilseed and grain farm ████████ The Settlement Program awarded Claimant $268,000 in pre-RTP lost profit ($337,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 67%.

- Claim ████ Claimant is a Zone D oilseed and grain farm ████████ The Settlement Program awarded Claimant $184,000 in pre-RTP lost profit ($234,000 post-RTP). Claimant was unprofitable in the Benchmark Period, losing an average of $44,000 in variable profit per year. This award assumes that, in the absence of the Spill, Claimant could have expected to reverse this trend and earn $184,000 in variable profit.

- Claim ████ Claimant is a Zone D farmer ████████ The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($180,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 131% over actual variable profit in the Benchmark Period.

- Claim ████ Claimant is a Zone D cotton farmer located ████████ The Settlement Program awarded Claimant $137,000 in pre-RTP lost profit ($174,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████ Claimant is a Zone D cotton farm ████████ The Settlement Program awarded Claimant $106,000 in pre-RTP lost profit ($134,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit. Claimant was unprofitable in 2009, losing $265,000 in variable profit, and became profitable in 2010, earning $131,000 in variable profit.

A-9

- Claim ███████ Claimant is a Zone D soil preparation and cultivation company █ ███████████████████████████████████ The Settlement Program awarded Claimant $95,158 in pre-RTP lost profit ($119,383 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 99%.

<u>Awards to Professional Services Industry Claimants</u>

- Claim ██████ Claimant is a Zone C law office located ████████████████ The Settlement Program awarded Claimant $2.7 million in pre-RTP lost profit ($3.3 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 variable profit by 26%. Claimant represents claimants in at least 43 claims brought under the Settlement Agreement.

- Claim ██████ Claimant is a Zone B law office ████████████ The Settlement Program awarded Claimant $1.6 million in pre-RTP lost profit ($3.6 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit. Claimant represents claimants in at least 47 claims brought under the Settlement Agreement.

- Claim ████ Claimant is a Zone C engineering services business ████████ The Settlement Program awarded Claimant $1.3 million in pre-RTP lost profit ($2.4 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit.

- Claim ██████ Claimant is a Zone D law office █████████████ ███████████████ The Settlement Program awarded Claimant $1.25 million in pre-RTP lost profit ($1.57 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 9%.

- Claim ██████ Claimant is a Zone B landscape architect ████████ The Settlement Program awarded Claimant more than $1.17 million in pre-RTP lost profit ($1.47 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 23%.

- Claim ██████: Claimant is a Zone B law office ████████████████ The Settlement Program awarded Claimant $1.15 million in pre-RTP lost profit ($2.6 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ██████ Claimant is a Zone C healthcare facility ████████ The Settlement Program awarded Claimant $880,000 in pre-RTP lost profit ($1.1 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years.



- Claim ███████ Claimant is a Zone B law firm ██████████████████ The Settlement Program awarded Claimant $813,00 in pre-RTP lost profit ($1.8 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 7%. Claimant represents claimants in at least 61 claims brought under the Settlement Agreement.

- Claim ███████ Claimant is a Zone D architectural services firm ███████████████ ████████████████████████████ The Settlement Program awarded Claimant $802,000 in pre-RTP lost profit (more than $1 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 64% over actual variable profit in the Benchmark Period.

- Claim ███████ Claimant is a Zone C law firm ███████████████ The Settlement Program awarded Claimant $699,000 in pre-RTP lost profit ($875,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 14%.

- Claim ████████ Claimant is a Zone B law office ████████████████████ The Settlement Program awarded Claimant $656,000 in pre-RTP lost profit ($1.48 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ████████ Claimant is a Zone C law office █████████████████████ The Settlement Program awarded Claimant $641,000 in pre-RTP lost profit ($808,000 post-RTP), notwithstanding that Claimant's annual variable profit in 2010 exceeded its annual variable profit in the Benchmark years by 14%.

- Claim ███████ Claimant is a Zone B law firm ████████████████ The Settlement Program awarded Claimant $638,000 in pre-RTP lost profit ($1.3 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit.

- Claim ████████ Claimant is a Zone C physician's office █████████████████ The Settlement Program awarded Claimant $504,000 in pre-RTP lost profit ($632,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit.

- Claim ████████ Claimant is a Zone B dental office ██████████████████ The Settlement Program awarded Claimant $504,000 in pre-RTP lost profit ($1.14 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period.

- Claim ████████ Claimant is a Zone C health care office ████████████ The Settlement Program awarded Claimant $458,000 in pre-RTP lost profit ($572,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 6%.

- Claim ██████ Claimant is a Zone C architectural firm ████████████████ The Settlement Program awarded Claimant $436,000 in pre-RTP lost profit ($554,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period by 7%.

- Claim ██████ Claimant is a Zone C law office ████████████████ The Settlement Program awarded Claimant $403,000 in pre-RTP lost profit ($505,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ██████ Claimant is a Zone B law office ████████████████ The Settlement Program awarded Claimant $328,000 in pre-RTP lost profit ($379,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 14%.

- Claim ██████ Claimant is a Zone D law office ████████████████ The Settlement Program awarded Claimant $296,000 in pre-RTP lost profit ($376,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 84%. Claimant represents claimants in at least 57 claims brought under the Settlement Agreement.

- Claim ██████ Claimant is a Zone B law office ████████████████ The Settlement Program awarded Claimant $293,000 in pre-RTP lost profit ($659,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 46%.

- Claim ██████ Claimant is a Zone B law firm ████████████████ The Settlement Program awarded Claimant $277,000 in pre-RTP lost profit ($623,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 18%.

- Claim ██████ Claimant is a Zone D event planning company ████████████████ The Settlement Program awarded Claimant $273,000 in pre-RTP lost profit (more than $619,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 156% over actual variable profit in the Benchmark Period.

- Claim ██████ Claimant is a Zone D architectural services firm ████████████████ The Settlement Program awarded Claimant $241,000 in pre-RTP lost profit ($305,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 55%.

- Claim ██████ Claimant is a Zone D advertising agency ████████████████ The Settlement Program awarded Claimant $216,000 in pre-RTP lost profit ($269,000 post-

A-12

RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 7%.

- Claim ████ Claimant is a Zone C law office ████████████ The Settlement Program awarded Claimant $200,000 in pre-RTP lost profit ($251,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 176%. Claimant represents claimants in at least 33 claims brought under the Settlement Agreement.

- Claim ████ Claimant is a Zone D physician's office ████████ The Settlement Program awarded Claimant $132,000 in pre-RTP lost profit ($168,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceed its 2009 (Benchmark Period) variable profit.

- Claim ████ Claimant is a Zone C physician's office ████████ The Settlement Program awarded Claimant $128,000 in pre-RTP lost profit ($162,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 8%.

- Claim ████ Claimant is a Zone C physician's office ████████████ The Settlement Program awarded Claimant $98,358 in pre-RTP lost profit ($124,012 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 13%.

- Claim ████ Claimant is a Zone C architect ████████████ The Settlement Program awarded Claimant $74,000 in pre-RTP lost profit ($92,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 34%.

- Claim ██████ Claimant is a Zone D tourism guide provider ████████████ ████████████ The Settlement Program awarded Claimant $62,000 in pre-RTP lost profit ($140,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 54%.

- Claim ████ Claimant is a Zone C physician ████████████ The Settlement Program awarded Claimant $50,462 in pre-RTP lost profit ($63,078 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 24%.

- Claim ████ Claimant is a Zone D computer programming company ████████ ████████████ The Settlement Program awarded Claimant $50,000 in pre-RTP lost profit ($63,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 62% over actual variable profit in the Benchmark Period.





- Claim ████ Claimant is a Zone C environmental consulting business located ████ ████ The Settlement Program awarded Claimant $44,000 in pre-RTP lost profit ($56,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 4%.

- Claim ████ Claimant is a Zone C real estate agent ████████████ The Settlement Program awarded Claimant $40,210 in pre-RTP lost profit ($50,263 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit.

- Claim ████ Claimant is a Zone D accounting firm ████████ The Settlement Program awarded Claimant $38,045 in pre-RTP lost profit ($72,789 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit.

- Claim ████ Claimant is a Zone D law firm ████████████████ The Settlement Program awarded Claimant $34,000 in pre-RTP lost profit ($44,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 18%.

- Claim ████ Claimant is a Zone C technology consultant ████████ The Settlement Program awarded Claimant $29,939 in pre-RTP lost profit ($38,354 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 92%.

Awards to Claimants in Other Industries

- Claim ████ Claimant is a Zone D manufacturer ████████ The Settlement Program awarded Claimant $3.3 million in pre-RTP lost profit ($4.2 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 66% over actual variable profit in the Benchmark Period.

- Claim ████ Claimant is a Zone C Digital Printing Business ████████ The Settlement Program awarded Claimant $2.9 million in pre-RTP lost profit ($3.7 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 14%.

- Claim ████: Claimant is a Zone D steel manufacturer ████████████ The Settlement Program awarded Claimant $1.96 million in pre-RTP lost profit ($2.46 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 59% over actual variable profit in the Benchmark Period.

- Claim ████ Claimant is a Zone D used car dealer ████████████ The Settlement Program awarded Claimant $1.14 million in pre-

RTP lost profit ($1.45 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period by 28%.

- Claim ███ Claimant is a Zone D electrical equipment supplier ███ The Settlement Program awarded Claimant $828,000 in pre-RTP lost profit ($1 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit. Claimant was unprofitable in 2009, losing $29,000, and became profitable in 2010, earning $133,000 in variable profit.

- Claim ███ Claimant is a Zone C business███ The Settlement Program awarded Claimant $759,000 in pre-RTP lost profit ($2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit.

- Claim ███ Claimant is a Zone B meat wholesaler ███ The Settlement Program awarded Claimant $634,000 in pre-RTP lost profit ($1.4 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 58% over actual variable profit in the Benchmark Period.

- Claim ███ Claimant is a Zone D manufacturer ███ The Settlement Program awarded Claimant $634,000 in pre-RTP lost profit (more than $805,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 231% over actual variable profit in the Benchmark Period.

- Claim ███ Claimant is a Zone D manufacturer███ The Settlement Program awarded Claimant $516,000 in pre-RTP lost profit ($656,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 65% over actual variable profit in the Benchmark Period.

- Claim ███ Claimant is a Zone B retail business ███ The Settlement Program awarded Claimant $496,000 in pre-RTP lost profit ($1.5 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit.

- Claim ███ Claimant is a Zone B building materials dealer ███. The Settlement Program awarded Claimant $468,000 in pre-RTP lost profit ($1.05 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ███ Claimant is a Zone C car dealership███ The Settlement Program awarded Claimant $441,000 in pre-RTP lost profit ($552,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 13%.

A-15

- Claim ███ █████ Claimant is a Zone D heating and air-conditioning business██████, ████████ The Settlement Program awarded Claimant $415,000 in pre-RTP lost profit ($528,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 27%.

- Claim █████ Claimant is a Zone D caterer █████████████ The Settlement Program awarded Claimant $411,000 in pre-RTP lost profit ($1.3 million post-RTP), notwithstanding that its 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 16%.

- Claim ███████ Claimant is a Zone D plumbing and heating equipment supply company█ ███████████████████ The Settlement Program awarded Claimant $410,000 in pre-RTP lost profit ($513,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 15%.

- Claim ██████ Claimant is a Zone D motor vehicle body manufacturing firm██ █████████████ The Settlement Program awarded Claimant $408,000 in pre-RTP lost profit ($518,00 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ██████ Claimant is a Zone D mobile home dealer████████████ ██████████ The Settlement Program awarded Claimant $370,000 in pre-RTP lost variable profit ($464,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 339%.

- Claim █████ Claimant is a Zone C construction and mining machinery company██ ███████████ The Settlement Program awarded Claimant $307,000 in pre-RTP lost profit ($390,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 97%.

- Claim ██████ Claimant is a Zone D truss manufacturing business███████████ ████████████████ The Settlement Program awarded Claimant $289,000 in pre-RTP lost profit ($363,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit.

- Claim ███████ Claimant is a Zone D gas station █████████████ ███████████ The Settlement Program awarded Claimant $276,000 in pre-RTP lost profit ($618,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit.

- Claim █████ Claimant is a Zone D scenic transportation company█████████████ The Settlement Program awarded Claimant $271,000 in pre-RTP lost profit ($616,000 post-

RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years.

- Claim  Claimant is a Zone D metal manufacturer          The Settlement Program awarded Claimant $256,000 in pre-RTP lost profit (more than $325,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 21%.

- Claim        Claimant is a Zone D manufacturer         The Settlement Program awarded Claimant $249,000 in pre-RTP lost profit ($313,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 107% over actual variable profit in the Benchmark Period.

- Claim        Claimant is a Zone D air conditioning and heating equipment manufacturer        The Settlement Program awarded Claimant $240,000 in pre-RTP lost profit ($300,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded 2009 (Benchmark Period) variable profit. Claimant was unprofitable in 2009, losing $68,000 in variable profit, and became profitable in 2010, earning $129,000 in variable profit.

- Claim        Claimant is a Zone B durable goods merchant        The Settlement Program awarded Claimant $234,000 in pre-RTP lost profit ($530,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 9%.

- Claim        Claimant is a Zone D amusement park        The Settlement Program awarded Claimant $227,000 in pre-RTP lost profit ($511,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 25%.

- Claim        Claimant is a Zone C wholesale trade agent        The Settlement Program awarded Claimant $205,000 in pre-RTP lost profit ($595,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 37%.

- Claim        Claimant is a Zone D swimming pool equipment retailer        The Settlement Program awarded Claimant $204,000 in pre-RTP lost profit ($259,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 4%.

- Claim        Claimant is a Zone B gas station chain        The Settlement Program awarded Claimant $198,000 in pre-RTP lost profit (more than $594,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill,

Claimant could have expected its 2010 variable profit to increase by 93% over actual variable profit in the Benchmark Period.

- Claim  Claimant is a Zone C sporting goods store ███████████. The Settlement Program awarded Claimant $185,000 in pre-RTP lost profit ($522,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 17%.

- Claim ██████ Claimant is a Zone D stone product manufacturer ███████████ The Settlement Program awarded Claimant $182,000 in pre-RTP lost profit ($229,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 30%.

- Claim ███████ Claimant is a Zone C dealer of building materials ███████ ██████ The Settlement Program awarded Claimant $182,000 in pre-RTP lost profit (more than $230,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 129% over actual variable profit in the Benchmark Period.

- Claim ██████ Claimant is a Zone C building materials dealer ████████████ The Settlement Program awarded Claimant $175,000 in pre-RTP lost profit ($221,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 16%.

- Claim ██████ Claimant is a Zone B wholesaler ███████████ The Settlement Program awarded Claimant $171,000 in pre-RTP lost profit ($389,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 60% over actual variable profit in the Benchmark Period.

- Claim ██████ Claimant is a Zone C gas station chain ███████████ The Settlement Program awarded Claimant $162,000 in pre-RTP lost profit (more than $459,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 86% over actual variable profit in the Benchmark Period.

- Claim ██████ Claimant is a Zone C medical software company ███████████ The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($181,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 16%.

- Claim ██████ Claimant is a Zone D sporting goods store ███████████ ██████████████████ The Settlement Program awarded Claimant $130,000 in pre-RTP lost profit ($294,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit.

A-18

- Claim ████ Claimant is a Zone C manufacturer ███████████████ The Settlement Program awarded Claimant $85,000 in pre-RTP lost profit ($108,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 58% over actual variable profit in the Benchmark Period.

- Claim ████ Claimant is a Zone C electrical equipment supplier ██████████████ The Settlement Program awarded Claimant $80,418 in pre-RTP lost profit ($100,522 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 8%.

- Claim ████ Claimant is a Zone D security service provider ██████████ ████████ The Settlement Program awarded Claimant $75,826 in pre-RTP lost profit ($94,783 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit.

- Claim ████ Claimant is a Zone D gas station chain ███████████████ The Settlement Program awarded Claimant $73,000 in pre-RTP lost profit ($123,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 134% over actual variable profit in the Benchmark Period.

- Claim ████ Claimant is a Zone D durable goods store ████████████ The Settlement Program awarded Claimant $60,000 in pre-RTP lost profit ($76,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████ Claimant is a Zone D prosthetics manufacturer located ██████████ ████████ The Settlement Program awarded Claimant $60,000 in pre-RTP lost profit ($76,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████ Claimant is a Zone C real estate appraiser ██████████████ The Settlement Program awarded Claimant $56,801 in pre-RTP lost profit ($72,137 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 5%.

- Claim ████ Claimant is a Zone D gas station ██████████████████ ██████████████ The Settlement Program awarded Claimant $53,075 in pre-RTP lost profit ($119,418 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit by 12%.

- Claim ████ Claimant is a Zone D stone products manufacturer ██████████ ████████ The Settlement Program awarded Claimant $53,000 in pre-RTP lost profit ($67,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 15%.

A-19

- Claim        Claimant is a Zone C new car dealer                       The Settlement Program awarded Claimant $47,763 in pre-RTP lost profit ($59,704 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) variable profit by 9%.

- Claim            Claimant is a Zone C gas station                    The Settlement Program awarded Claimant $46,941 in pre-RTP lost profit ($141,824 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit.

- Claim            Claimant is a Zone C limousine service                    The Settlement Program awarded Claimant $45,635 in pre-RTP lost profit ($57,043 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 (Benchmark Period) average variable profit.  Claimant was unprofitable in 2008-2009, losing $7,000 in variable profit, and became profitable in 2010, earning $6,000 in variable profit.

- Claim            Claimant is a Zone C restaurant                    The Settlement Program awarded Claimant $40,000 in pre-RTP lost profit ($119,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 1,368% over actual variable profit in the Benchmark Period.

- Claim            Claimant is a Zone C commercial landlord                    The Settlement Program awarded Claimant $38,040 in pre-RTP lost profit ($48,530 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit.

- Claim            Claimant is a Zone B bookstore                    The Settlement Program awarded Claimant $35,693 in pre-RTP lost profit ($59,287 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit.

- Claim            Claimant is a Zone B gas station                    The Settlement Program awarded Claimant $33,0000 ($100,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 10%.

- Claim            Claimant is a Zone C trucking company                    The Settlement Program awarded Claimant $32,000 in pre-RTP lost profit  ($41,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 113% over actual variable profit in the Benchmark Period.

- Claim ▆▆▆▆  Claimant is a Zone C safety equipment manufacturer ▆▆▆▆▆ ▆▆▆▆▆  The Settlement Program awarded Claimant $31,000 in pre-RTP lost profit ($40,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 (Benchmark Period) average variable profit by 35%.

**APPENDIX B:  EXCERPTS OF DECLARATION OF HAL SIDER**

VI.     **APPLICATION OF A STANDARDIZED APPROACH TO IDENTIFYING AND REMEDYING DATA INACCURACIES AND MATCHING PROBLEMS IN BEL CLAIMS.**

37.     This section presents an approach for identifying data in financial statements that reflect inaccuracies and that fail to match monthly revenues with corresponding variable expenses. Correcting these problems is essential to obtaining reliable calculations of revenue, corresponding variable expenses, and variable profit and, thus, to properly implement the BEL framework.  I describe BP's standardized approach to identify and correct these problems, with the remedy tailored to the specific pattern of data inaccuracies and matching problems observed for the claimant.  This section also implements BP's approach for five actual BEL claimants with financial statements.  Each of these examples present patterns of data irregularities that are observed across a variety of claims.

   A.   **Description of BP's General Approach to Proper Implementation of the BEL Framework**

38.     The section outlines a four-step approach to assure that the BEL framework is applied to data that properly reflect monthly revenue and corresponding variable expenses.  This four-step approach incorporates and further elaborates on the approach described in (i) BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination on January 9, 2013 and (ii) BP's Further Submission in Response to Class Counsel's December 16, 2012 Request for Policy Determination on January 11, 2013.  I also described in detail BP's approach outlined here (¶¶38-46) on February 14, 2013, in the presence of the court-appointed mediator Dan Balhoff, to the Claims Administrator and lead accountants for the Settlement Program and to Class Counsel and accountants working with Class Counsel in a mediation session.  At that session, I presented four of the five examples described below (¶¶47-79).

   - **Step 1  -- Identify and Correct Inaccuracies in Monthly P&L Entries:**  This step, which would be applied to all BEL claims, involves a line-item review of the monthly profit and loss statements submitted by claimants for potential line item inaccuracies and the implementation of appropriate corrections.

23

- **Step 2 -- Apply Triggers to Identify Potential Matching Problems**:  Claims in which matching problems are likely to exist are identified through the trigger/thresholds analysis detailed in Section V above.  These include:

  o   Months with revenue "spikes" as reported by claimants;

  o   Months with negative variable profit margin as reported by claimants; and

  o   Wide month-to-month swings in variable profit margin as reported by claimants.

- **Step 3 -- Apply Matching Strategies for Problems Identified In Trigger Analysis:**  This step involves a review of the source of potential mismatches between revenue and corresponding variable expenses identified in the trigger analysis.  Any matching problems identified through this review are then addressed though (i) discussions with claimants and/or (ii) application of standard matching methodologies, such as those outlined in Tab 1 of BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination, and described further in the context of the specific examples below.

- **Step 4 -- Apply BEL framework using corrected data and estimates of matched revenue and variable expenses:**  The final step in the analysis applies the BEL framework for causation and compensation as outlined in the Settlement Agreement in Sections 4B and 4C based on financial information that more accurately matches revenue and corresponding expenses, pursuant to Steps 1 and 3 above.

39.     Each of these four steps is described in more detail below.

**Step 1:  Identify and Correct Inaccuracies in Monthly P&L Entries**

40.     A necessary first step in evaluating a claimant's monthly variable profit, which is the foundation of the BEL framework, is identification of inaccuracies in line-item entries in the claimant's

24

P&L.  This review is to be applied to all claims.  While examples of such inaccuracies are identified below, CSSP accountants that process claims may be aware of additional examples:

- **"True up" or year-end adjustments:**  Financial statements submitted by many BEL claimants include monthly entries that appear to reflect cumulative adjustments that reflect "true ups" to correct for errors in prior months or other year-end or irregularly reported line item entries, and thus may not simply reflect activity in the month for which the data are reported.[7]  For example, including cumulative "true up" corrections in a single month yields erroneous measures of month-specific variable profit for two reasons.  First the "true up" reports more than one month's activity.  Second, the "true up" leaves in place the errors in prior months that necessitate the year-end adjustment. Examples of "true up" or year-end adjustments reported in CSSP BEL workbooks include, but are not limited to:

  - o **"Bad debt" expenses**:  Many firms will recognize bad debt expenses at the end of the calendar or fiscal year, or at other irregular intervals, resulting in large and episodic reported expenses that in fact relate to bad debts incurred over longer periods of time.

  - o **Year-end bonus or payroll expenses**:  Many firms pay bonuses at the end of the calendar or fiscal year, resulting in large and irregular payroll expenses.  Again, these expenses reflect compensation to employees for work performed over longer periods of time.

---

[7] Such year-end adjustments may occur at the end of fiscal years that do not coincide with calendar years.

- o **Inventory valuation adjustments**:  Like bad debt and bonus expenses, inventory valuation adjustments are often taken at year end or at other irregular intervals but relate to gains or expenses incurred over longer periods of time.

- o Other line item entries that are populated only at year end, such as profit-sharing contributions and accrual adjustments.

- **Negative or zero variable expenses:**  Such entries generally reflect corrections to entries from prior months.  Thus, such entries typically imply that data for multiple months may be misreported, not just information for the month with the negative entry.

- **Negative revenues**:  Such entries may reflect corrections to revenue reported in prior months.

41.     My on-going review of claim files indicates that CSSP accountants often identify these types of inaccuracies and communicate with claimants in an attempt to understand them.[8]  Frequently, these explanations could be directly incorporated into the claim evaluation process but this does not appear to be done.  In cases in which the source of inaccuracies cannot be identified based on communication with the claimant, it may be possible to apply corrections that more accurately reflect when the expenses reported by claimants were incurred and when revenue was generated.  For example, for bonus payments, CSSP accountants can allocate reported year-end expenses to individual months based on the monthly share of non-bonus payroll expense.  Similarly, bad debt expenses reported by claimants might be allocated based on measures of monthly revenue.

**Step 2:  Apply Triggers to Identify Potential Matching Problems**

42.     Step 2 in implementation of a standardized approach to identifying and correcting data inaccuracies and matching problems in data submitted by claimants is the application of the trigger

---

[8] Many claim files include email correspondence that discusses such issues.  In addition, the "Global Notes" section of CSSP claim-specific portals often includes notes from discussions between CSSP accountants and claimants.

analysis discussed in Section V above.  The trigger analysis identifies circumstances in which revenue and variable expenses as reported in claimant-submitted financial statements may not be properly aligned. The trigger analysis is applied to all claims and to all months in 2010 and the Benchmark Period.   As discussed above, potential matching concerns are identified by the following triggers:

- **Months with revenue "spikes" as reported by claimants:**  The presence of reported revenue spikes suggests that revenue may not be recorded when it was earned, perhaps instead reflecting when payment is received.  Additionally, where the revenue of a business is concentrated in one (or a few) months on an inconsistent annual basis, it is likely that the revenue reported for the month was earned over a longer period of time. The threshold would be set in a manner that ensures that normal seasonal variations in revenue would not trigger a supplemental review.[9]

- **Months with negative variable profit margin as reported by claimants**:  Negative variable profits reported in claimant financial data is an indicator that revenues and expenses may be mismatched because firms typically would not operate when variable profit is negative.  Negative variable profit occurs when revenue fails to cover variable costs.  The existence of a negative variable profit in a month suggests that reported revenue is not properly matched to corresponding variable costs because a business would not be expected to undertake activities that fail to cover their variable costs.[10]

- **Wide month-to-month swings in variable profit margin as reported by claimants**: Large month-to-month swings in measures of variable profit reported by claimants also

---

[9] My analysis in Section V identifies a claimant as meeting the "revenue spike" trigger in any month in which revenue exceeds 17% of the annual total.  This level reflects two times a month's pro-rata share of annual revenue, which is 8.3%.

[10] The "negative margin" trigger applied in Section V identifies claimants that have negative margin in any month which accounts for 2% or more of annual revenue.  This threshold is applied to avoid review of negative margin when it would have only an incidental effect on measures of financial performance.

suggest that revenue is not reported when it is earned and/or are not properly matched with the expenses incurred in generating that revenue.  Such measurement errors can result either from irregular monthly patterns in revenue or expenditures, or both.[11]

43.     After identifying such potential problems, CSSP accountants should attempt to obtain additional information from claimants that would enable them to determine whether revenue is properly matched with corresponding variable costs or instead reflect changes in the claimant's financial performance.  Where a matching problem is found to exist, revenue and corresponding variable expenses would be matched based on procedures outlined in Step 3.

**Step 3:  Apply Objective Strategies to Correct Matching Problems Identified In Trigger Analysis**

44.     Step 3 of the analysis involves matching revenue and corresponding variable expenses for claims where problems are identified in Step 2.  There are two general approaches to matching revenue and corresponding expenses:  (i) use of information provided by claimants; and (ii) application of standardized matching methodologies to financial data submitted by claimants that result in improved matching of revenue and corresponding variable expenses.

***Matching based on information provided by claimants:***

45.     Certain matching problems identified through the trigger analysis can be remedied based on information provided by claimants.  For example:

- Claimants that submit data characterized by spikes in reported expenses, perhaps due to expenditures for bulk purchases of inventory, may be able to identify the time period over which the inventory is used.  This would allow CSSP accountants to more accurately

---

[11] The "margin variability" trigger applied in Section V identifies claimants for which at least one month's share of annual revenue deviates from the same month's share of annual variable expenses by more than 7.5 percentage points.  This threshold is selected to focus reviews on periods in which there is a material deviation between revenue and expense shares for a given month.

determine variable expenses by assigning expenditures to the months in which

inventory was used.

- Claims for which claimants submit data that identifies revenue spikes, such as those

  associated with receipt of periodic payments on long term projects, may be remedied by

  claimant's provision of information on the term of the project that generated the large

  cash receipt and/or expenses incurred each month for the project.   This information, in

  turn, can be used to estimate monthly revenue by reference to the months in which

  expenses were incurred to generate revenue, rather than incorrectly equating cash

  received in a month with revenue.

***Application of Standardized Matching Methodologies:***

46.     When claimants do not provide sufficient information to provide a specific basis for

matching revenue and corresponding variable expenses, standard matching methodologies should be

applied.  Two basic approaches can be implemented, depending on the circumstances that give rise to

the matching problem.  In the first approach, matching is achieved by estimating monthly revenue

earned based on a claimant's annual revenue and the pattern of its monthly expenses; in the second

approach, matching is achieved by estimating monthly expenses incurred based on a claimant's annual

expenses and the pattern of its monthly revenue.

- For claimants, such as those in the construction industry, for which claimants may

  reliably report monthly expenses incurred but are less likely to reliably report monthly

  revenue earned, matching is achieved as follows[12]:  First, calculate on an annual basis

  the ratio of revenue to variable expenses.  Second, estimate matched monthly revenue

  by multiplying (i) reported monthly expenses and (ii) the annual ratio of revenue to

---

[12] Declaration of David Hall, January 23, 2013.

expenses. These calculations would be made after incorporating any corrections identified in Step 1 and after any matching based on information provided by claimants.[13]

- For claimants, such as those in service, distribution and certain manufacturing industries, which reliably record their revenue when it is earned but do not reliably report when expenses are incurred (due perhaps to large inventory purchases), matching is achieved as follows: First, calculate on an annual basis the ratio of variable expenses to revenue. Second, estimate matched monthly expenses by multiplying reported monthly revenue by the annual ratio of variable expenses to revenue. These calculations would be made after incorporating any corrections identified in Step 1 and after any matching based on information provided by claimants.

**Step 4 -- Apply BEL framework using corrected and matched revenue and variable expenses**

47.    Step 4 of the analysis involves application of the BEL framework using the corrected data on revenue and corresponding variable expenses. The corrected data are used both for determining causation based on changes in revenue as described in Exhibit 4B of the Settlement Agreement and to determine compensation based on changes in variable profit as described in Exhibit 4C of the Settlement Agreement. Nothing in the matching approach changes the BEL causation or compensation frameworks specified in the Settlement Agreement. Instead, the matching approach helps ensure that the BEL framework is applied to more reliable financial information.

---

[13] In the construction industry, job-specific progress reports can be applied on a job-specific basis to match revenue and corresponding variable expenses. In the absence of job-specific data, the matching approach can be applied based on aggregate information which may yield less reliable results.

**B.   Application of General Approach to Sample BEL Claims**

48.       As mentioned above, I have applied this approach in evaluating five sample BEL claims:

- ███████████ a rice farm ███████████

- ███████████████ a road paving contractor in ██████████

- █████████████, a catfish farm in ██████████

- ███████████ a law firm █████████████

- ██████████████, a furniture distributor ████████████

49.       This section provides a brief and high level overview of each claim and the approach applied to identify and remedy matching issues they present.  A more detailed description of the steps involved in the evaluation of these claims and the implementation of the remedies to account for the matching problems is presented in Exhibit C.  The empirical application of the matching methodology and calculation of Step 1 compensation for each claim is then presented in Exhibit D.

50.       These examples demonstrate how BP's approach to BEL implementation should be applied to specific claims.  However, in order to demonstrate BP's approach to BEL implementation, it is necessary to make certain assumptions about the sources of data inaccuracies that would be available to CSSP accountants, who can contact claimants directly.  My analysis focuses on Step 1 of the BEL compensation calculation only, which reflects the change in variable profit between the benchmark and compensation periods, because matching issues do not directly affect Step 2 of the BEL compensation calculation (which reflects the loss of potential growth over the benchmark period) or the Risk Transfer Premium.



51.        ███████████ is a rice farm ██████████ which is in Zone D.  CSSP's BEL calculations, which do not attempt to correct for data inaccuracies or irregularities, indicate that ██████ variable profit fell by roughly $90,000 in 2010 relative to the benchmark year of 2009.  ██████ was offered BEL Step 1 compensation of $2.4 million, which is nearly 90% of its benchmark revenue of $2.7 million.

***Step 1:  Identify Data Inaccuracies***

52.        No P&L line item inaccuracies were identified for ██████

***Step 2:  Apply Triggers***

53.        ██████ financial data exhibit large revenue spikes and many months of negative variable profit, which indicate the presence of matching problems.

***Step 3:  Matching Revenue and Corresponding Variable Expenses***

54.        Matching problems are remedied by first identifying the revenue generated by the claimant's 2009 and 2010 farming activities. Given the nature of rice farming, revenue generated by the 2009's crop can be realized in late 2009 or early 2010.  That is, revenue was earned from 2009 farming activities may generate payments in early 2010.  Identification of when revenue was earned by ██████ is accomplished by attempting to associate the "crop year" revenue (which includes sales of the 2009 crop in early 2010) with the expenses incurred in growing the crop (which typically are incurred in 2009 for the crop grown in 2009).  For example, ██████ 2009 crop year revenues would reflect all revenue received from July 2009 through June 2010.[15]

---

[14] A more detailed description of the steps involved in the evaluation of ████████████ and the calculation of Step 1 compensation are presented in Exhibits C.1 and D.1.  Tab 1 of BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination also provides an overview of the general approach to matching revenue and corresponding variable costs for farming claims.

[15] This time period reflects the USDA crop year for rice.  Declaration of Charles E. Finch, January 23, 2013, Appendix D.

55.     For ▮▮ matched revenue is determined on a monthly basis based on the claimant's

effort over the production cycle, as reflected in its monthly variable expenses.  More specifically, I

calculate the ratio of the claimant's annual (crop year) revenue to the its annual (production year)

variable expenses, and then calculate monthly matched revenue by multiplying (i) monthly expenses

and (ii) the ratio of annual revenue and variable expenses as described above.

### Step 4:  Apply BEL framework

56.     Based on the matching approach, the Step 1 compensation formula is directly applied to

the adjusted financial data as described by the Settlement Agreement and the months that permit the

highest claimant compensation are identified.  Step 1 compensation based on matched revenue and

variable expense information is $151,000, a reduction of 94% from the CSSP's calculation. ▮▮ would

pass the Zone D V-test based on the adjusted revenue data.



57.     ▮▮▮▮ is a paving contractor in ▮▮▮▮▮▮ which is in Zone D.  CSSP calculations,

which do not attempt to correct for data inaccuracies or irregularities, indicate that ▮▮▮▮ variable

profit was $3.5 million higher in the May-December 2010 compared to the same months for benchmark

period 2007-09.  ▮▮▮▮ was offered BEL Step 1 compensation of $6.1 million.

### Step 1:  Identify Data Inaccuracies

58.     Review of ▮▮▮▮ financial information as compiled by CSSP show that bad debt

expenses were recorded in December of each year and also exhibit certain negative expense entries.

For current purposes, no corrections for these inaccuracies were incorporated into the analysis.

---

[16] A more detailed description of the steps involved in the evaluation o ▮▮▮▮ and the calculation of Step 1
compensation are presented in Exhibit C.2 and D.2.  Tab 1 of BP's Response To Class Counsel's December 16, 2012
Request for Policy Determination also provides an overview of the general approach to matching revenue and
corresponding variable costs for construction claims.

However, CSSP accountants may be able to obtain information to determine when, for example, bad debt expenses were incurred (as opposed to when they were recorded for recordkeeping purposes).

### Step 2: Apply triggers

59.      ████████ financial data exhibit a revenue spike in June 2010 (18.5% of annual revenue) accompanied with negative variable profits in other various months, which provide evidence of matching problems in these periods.

### Step 3: Match Revenue and Corresponding Variable Expenses

60.      Monthly matched revenue is estimated based on the claimant's measured effort, as reflected in monthly variable expenses reported in its financial statements.[17]  I calculate the ratio of the claimant's annual revenue to the its annual variable expenses, and then estimate monthly matched revenue by multiplying (i) monthly expenses and (ii) the ratio of annual revenue and variable expenses.

### Step 4: Apply BEL Framework

61.      Based on this matching approach, the Step 1 compensation formula is directly applied to the adjusted financial data as described by the Settlement Agreement and the months that permit the highest claimant compensation are identified.  For ██████, the resulting Step 1 compensation is $2.42 million, a reduction of 61% from the CSSP's calculation.  ████████ would pass the Zone D V-test based on adjusted revenue data.



62.      ██████████████ is a catfish (aquaculture) farm located in ████████, which is in Zone D.  CSSP calculations, which do not attempt to correct for data inaccuracies or irregularities, indicate that ████████ earned only $14,000 in variable profit in the benchmark year of 2009 but

---

[17] ██████ job-specific percent-of-completion reports are not available for this analysis, but could be readily applied and would likely result in more accurate matching of revenue to the corresponding variable expenses.
[18] A more detailed description of the steps involved in the evaluation of ████████ and the calculation of Step 1 compensation are presented in Exhibit C.3 and D.3.

earned $720,000 in variable profit in 2010.  CSSP's calculations indicate that variable profit rose by $1.4 million in January-April 2010 relative to 2009, but fell by roughly $700,000 in May-December 2010 relative to the benchmark period.  CSSP offered ███████ BEL Step 1 compensation of $676,000.

### Step 1:  Identify Data Inaccuracies

63.    Review of ███████ financial statements identified negative fuel expenses in one month, which reflects a potential line-item inaccuracy and might be addressed by communications between CSSP accountants and the claimant.  Correction of this inaccuracy was not incorporated into the analysis.

### Step 2:  Apply Triggers

64.    ███████ financial data exhibit evidence of a mismatch between revenue and corresponding expenses, including revenue spikes in November 2009 (32% of annual revenue) and April 2010 (28% of annual revenue).  In addition, CSSP calculations indicate that the claimant had negative variable profit of $907,000 in April 2009.

### Step 3:  Match Revenue and Corresponding Variable Expenses

65.    Review of ███████ financial statements available at the CSSP portal indicate that the negative variable profit calculated by CSSP for April 2009 was due to a large bulk feed purchase which, presumably, was used over an extended number of months.  In this case, feed expense should be recognized when feed was used in production, not the month in which the cash outlay was made to purchase feed inventory.  Communications between CSSP accountants and the claimant should be able to establish the period over which the bulk feed purchase was consumed in production.  For the purpose of implementing this example, I assume that the April 2009 feed purchased is $900,000 and that it is consumed over a 12 month period, and assign it on a pro-rata basis over each of these months.

66.    Matching revenue to corresponding expenses for ███████ is addressed in a manner analogous to that used in the ███████ and ███████.  Specifically, revenue and

35

corresponding expenses are matched by (i) calculating the annual ratio of revenue to variable expenses; and (ii) multiplying this ratio to corrected estimates of monthly variable expenses, which reflect the months in which fish feed expenses were incurred, not the month in which fish feed was purchased.

### Step 4:  Apply BEL Framework

67.    Based on this matching approach, the Step 1 compensation formula is directly applied to the adjusted financial data as described by the Settlement Agreement and the months that permit the highest claimant compensation are identified.  For the ████████ claim, the Step 1 compensation is $6,000, a 99% reduction from the CSSP calculation. [19]    ████████ would pass the V-test based on adjusted revenue data.



68.    ████████ is a law firm located in ████████ which is located in Zone D.  CSSP calculations, which do not attempt to correct for data inaccuracies or irregularities, indicate that ████ ████ earned variable profit of $3.4 million in 2008, which fell to $1.0 million in 2009 and rose to $1.5 million in 2010.  ████████ was offered BEL Step 1 compensation of $1.3 million.

### Step 1:  Identify Data Inaccuracies

69.    Review of ████████ financial statements identified zero variable expenses in June and July of 2010.  Communication between CSSP accountants and the claimant should be able to establish the source of this apparent inaccuracy.  For the purpose of this BEL implementation example, no attempt has been made to account for this apparent inaccuracy.

---

[19] As shown in the middle panel of Exhibit D.3, correction of the bulk fish feed purchase alone (without accounting for the revenue spike) would result in Step 1 compensation of $397,000, a 40% reduction from the CSSP Step 1 offer.

[20] A more detailed description of the steps involved in the evaluation o ████████ and the calculation of Step 1 compensation are presented in Exhibit C.4 and D.4.  Tab 1 of BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination also provides an overview of the general approach to matching revenue and corresponding variable costs for professional service claims.

***Step 2:  Apply Triggers***

70.　　█████████ financial data provide evidence of a mismatch between revenue and corresponding expenses, including revenue spikes in December 2008 (71% of annual revenue), January 2010 (32% of annual revenue) and May-June 2011 (combined 48% of annual revenue).  In addition, the financial statements reveal smaller revenue spikes in December of 2009 (22% of annual revenue) and 2010 (18%).

***Step 3:  Match Revenue and Corresponding Variable Expenses***

71.　　Discussions between CSSP accountants and the claimants may be able to ascertain the reasons for the revenue spikes, which are likely due in part to the receipt of payments associated with the resolution of contingent fee matters.  While the receipt of contingency fee payments may be received in a lump sum, this payment reflects revenue earned over an extended period of time.  As a result, for the purposes of matching revenue and corresponding expenses, revenue is appropriately considered to have been earned when the effort generating the revenue was expended, as opposed to when payment was received. In addition, the smaller year-end revenue spikes are assumed to reflect year-end collections efforts by law firms for work performed in prior months.  For the purposes of matching revenue and corresponding expenses, such year-end collections are appropriately considered revenue earned in prior months.

72.　　If information on a law firm's effort associated with contingent fee matters is available, this information can be used to allocate the lump sum revenue generated from contingency fee cases to the periods in which effort was expended to generate this revenue.  Here, no such information is available so for implementation purposes revenue is assigned on a pro-rata basis to the months during which the matter was active, which is assumed to be in the 36 months prior to the December 2008 revenue spike and in the prior 12 months for the other revenue spikes assumed to be associated with resolution of contingent fee cases.  For implementation purposes I also assume that $200,000 in

37

December revenue (assumed to result from increased collection of outstanding receivables at year end) was earned in equal amounts in each month of the calendar year.

73.     Finally, because revenue earned on contingent fee matters is appropriately considered to be earned based on the effort expended, not when cash received, law firms with open (unresolved) contingent matters are appropriately considered to have earned revenue that has not yet been realized. Implementation of BP's approach for matching revenue and expenses for law firms with open contingent cases takes account of this by imputing revenue associated with these cases.  This imputation is based on (i) the number of contingent fee cases worked on by law firm claimant during the benchmark period, 2010 and 2011 that remain open at the time of the claim review; and (ii) an estimate of the average revenue generated per month of effort from the law firms on contingency fee cases.

74.     The average monthly revenue generated on closed contingent fee cases is based on the firm's historical experience, based on (i) the number of closed contingency cases the claimant had in prior years; (ii) the aggregate number of months the firm worked on these cases; and (iii) the aggregate recoveries from these cases (including those that generated no revenue).  An example of how the average historical value of a law firm's closed contingent cases is determined is shown on page 2 of Exhibit D.4.  Monthly revenue calculated in this way is imputed to each month in which the open contingent fee cases were active during the benchmark and compensation period.[21]  As a result, the imputation would result in higher matched revenue in any month in the benchmark period, 2010 and 2011 for a claimant with open matters.  The higher 2011 revenue would increase the claimant's ability to pass the V-test for causation; while the higher 2010 revenue would lower compensation available under the BEL formula.

---

[21] As an alternative, standard valuation tools used in valuing contingent fee litigation in cases of partnership dissolutions or divorces could be applied.  In such cases, the imputation of revenue for open contingent fee cases would account for the typical duration of such cases (e.g., a case valued at $200,000 and expected to have a four-year period between initiation and resolution would result in imputed revenue of $50,000 per year).

### *Step 4:  Apply BEL Framework*

75.    Application of the matched revenue and variable expenses in the BEL framework for ███████, including matching of revenue generated in open and closed contingent fee cases, results in corrected BEL Step 1 compensation of $220,000, an 83% reduction from the CSSP offer.  ██████ ████ would pass the Zone D V-test based on adjusted revenue data.

██████████  █████████

76.    ████████████ is a school and office furniture distributor in ██████ which is in Zone D.  CSSP calculations, which do not attempt to correct for data inaccuracies, indicate that ████████████ earned variable profit of $456,000 in 2008, $163,000 in 2009 and $174,000 in 2010.  ████████████ was offered BEL Step 1 compensation of $676,000.

### *Step 1:  Identify Data Inaccuracies*

77.    Review of ████████████ financial statements identified negative revenue of $708,000 in February 2008.  This entry likely reflects a correction from misreported revenue in prior months.  CSSP accountants should be able to identify the nature of this inaccuracy and implement an appropriate correction based on conversations with the claimant.  However, for current purposes I assume that revenue in the prior month (January 2008) was overstated by $1 million and re-assign this sum to February 2008, thus maintaining the same two-month total revenue as reported in the P&L statement.

### *Step 2:  Apply Triggers*

78.    ████████████ also exhibits evidence of matching problems, including revenue spikes in July and August 2008 (which account for 22% and 19% of annual revenue respectively) as well as negative variable profit in multiple months.  This includes negative variable profit of -$407,000

---

[22] A more detailed description of the steps involved in the evaluation of ████████████ and the calculation of Step 1 compensation are presented in Exhibit C.5 and D.5.

reported in August 2010.  Review of ███████████ financial statements indicates that this is the

result of $1 million in "purchases" in August 2010, a line item within cost of goods sold.

### Step 3:  Match Revenue and Corresponding Variable Expenses

79.     Given the wide range in variable expenses, which is characteristic of distributors like

███████████ that hold large amounts of inventory that are then sold over ensuring months, I

match revenue to corresponding expenses incurred as follows:  (i) determine the annual ratio of variable

expenses to revenue for each calendar year; (ii) calculate matched expenses as the product of this ratio

and the monthly revenue, reflecting adjustment for the inaccuracy discussed above.

### Step 4:  Apply BEL Framework

80.     Application of the matched revenue and variable expenses in the BEL framework for

███████████ yields corrected BEL Step 1 compensation of $112,000, an 81% reduction from

the CSSP offer.  ███████████ would pass the Zone D V-test based on adjusted revenue data.

40

B-19