# Exhibit 18E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

************************************************** 
| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG | **MDL No. 2179** |
| "DEEPWATER HORIZON" in the | **SECTION J** |
| GULF OF MEXICO, on | **JUDGE BARBIER** |
| APRIL 20, 2010 | **MAG. JUDGE SHUSHAN** |

**************************************************************

## SUPPLEMENTAL DECLARATION OF CHARLES E. FINCH

1.  I am a Managing Director with Alvarez & Marsal and co-head of the Environmental Advisory Services practice.  My experience includes over 30 years in agribusiness as a corporate director of operations, as CEO of the grain company I founded, as a farmer and as an economics expert. I have extensive experience analyzing financial and economic information in lost profits claims in various industries, including farming.  I teach economics in the MBA program at Avila University in Kansas City.  My education and experience are summarized in Appendix A to my original declaration dated January 23, 2013.

2.  I joined Coopers & Lybrand's Financial Advisory Services (FAS) practice in 1992.  Coopers & Lybrand merged with Price Waterhouse in 1998 to form PricewaterhouseCoopers (PwC).  I served as a partner/principal and FAS practice leader for PwC until I left in 2000, and I am knowledgeable about the qualifications of PwC advisory partners and professionals.

3.  I have reviewed 210 farm claims submitted to the Settlement Program and the financial information included in 64 offers made to those claimants.  I was involved in developing the approach for implementing the BEL framework for farming claims outlined in Tab 1 of BP's Response to Class Counsel's Request for Policy Determination, and in developing the triggers/thresholds outlined in BP's supplemental submission to the Claims Administrator.  I previously filed a Declaration on January 23, 2013, and this is an addendum to that Declaration.

4.  This addendum is in further response to Class Counsel's Request for Policy Determination, and Class Counsel's January 23, 2013 Submission on Monthly Costs and Revenue, including Exhibit A (Carroll Declaration), Exhibit B (Asher Affidavit), and Exhibit C (Stutes

Declaration).

## SUMMARY OF OPINIONS

5. My opinions are based on my review of Class Counsel's Submission with Exhibits, the Settlement Agreement, Business Economic Loss (BEL) claims filed by farmers, my 30 years of agribusiness experience, and the independent research I conducted.

6. A summary of my opinions is as follows:

   a. There are substantial anomalies in farm claim awards which consistently recognize fictitious damages and the anomalies are not trivial. To date, there are over 90 agricultural claims with awards totaling over $50 million with over 400 more pending review. The anomalies resulting from the failure to follow the BEL compensation framework and terms of the Agreement that I have seen cut in one direction -- awards of arbitrary, windfall compensation amounts.

   b. The anomalies in Settlement Program farm claim awards are caused by use of inaccurate inputs into the BEL compensation formula which thus fails to calculate lost variable profit.

   c. In my opinion, BP's interpretation of the BEL framework is consistent with accounting and economic principles for determining lost profits while the interpretation of Class Counsel, adopted by the Settlement Program, is not.

   d. The accountant declarations submitted by Class Counsel fail to address farm claims and contain several inaccurate opinions.

   e. BP's approach for properly implementing the Settlement Agreement's BEL Compensation Framework with respect to farming claims included in Tab 1 of the BP Response to Class Counsel's Request for Policy Determination and the triggers/thresholds outlined in BP's supplemental submission to the Claims Administrator is something that accountants, in particular PwC accountants, can readily implement.

**A. The Anomalies Are Substantial and Are Biased Toward Claimants.**

7. I disagree with Class Counsel's position that the anomalies in the Settlement Program farm claim

awards are the result of proper application of the Settlement Agreement.  Rather, the anomalies are caused by not complying with the Settlement Agreement.  The nature of farming operations necessitates a realistic look at the farming year in order to be in compliance with the Settlement Agreement's stated purpose to settle Class Claims for economic damages caused by the oil spill. Looking at artificial snapshots of cash received and cash expenditures paid in monthly farming financial statements instead of cross-checking against the annual financial statements and going back to match revenues to when they were earned and to corresponding variable expenses ignores the economic reality of the way in which farms operate.  Farms incur up front, seasonal expenses which vary by month according to weather and crop, and payment in respect of revenue earned is subject to not only those same seasonal variations but additionally the farmer's ability to time their sales and receipt of cash by delaying sales for reasons of anticipated crop prices, tax purposes and/or cash flow needs.  Ignoring these fundamental farming economic facts regarding timing of expenses and revenues absolutely leads to awarding arbitrary windfall payments rather than compensating real economic loss.

8.  This inequity is borne out by my review of 64 of the Settlement Program offers for BEL farming claims (these 64 were the population of offers at the time I originally had access to the claims in late December of 2012, and there are now over 30 additional awards currently under my review).  I note further that the farm claims I have reviewed are generally hundreds of miles away from the Gulf Coast and all are in either Zones C or D, with most actually in Zone D.  It is important to note that this is not a trivial matter.  To date, there are over 90 agricultural claims with awards totaling over $50 million with over 400 more pending review.  In the 64 claims I have reviewed, I have seen clear evidence of awards issued in error or inflated, specifically when 2010 revenues are higher than the Benchmark period and when awards pre-RTP inflate 2010 variable profits significantly higher than the Benchmark Period, and in some instances even higher than Benchmark Period revenues.

9.  Further, my analysis of the 210 farming claims, the claimants' ability to choose which periods are included in the Benchmark and Compensation Periods, and my 30 years of agribusiness experience indicate that the anomalies in farm claim determinations by the Settlement Program decidedly do not go "in either direction" evenly and will instead be significantly biased in favor of claimants. Because farm expenses paid and cash received vary significantly from month to month without necessarily impacting the overall economic performance of the farm and revenues can be deferred

for months, simply summing the difference between the cash received and cash paid for expenses will create arbitrary swings in net cash per month that bear no relation to lost profit.  Since claimants then have the option for Step 1 of the BEL compensation framework to choose from 63 combinations of compensation months and benchmark periods in order to maximize their award, by definition the overwhelming direction for anomalies to go is in favor of the claimant[1].  This again is borne out by my review of the claims[2].

10. Since my previous Declaration, I analyzed in more detail a subset of the financial information available in native Excel format for 21 additional claims (Finch Declaration ¶21-23 and Appendix C) and my analysis of claims is ongoing.  Nine further examples of the biased anomalies are contained in Appendix 1, which identifies the triggers hit with each claim and revenue and/or expense timing issues distorting the calculation of alleged diminished variable profits.

**B.  The anomalies in Settlement Program farm claim awards are caused by use of inaccurate inputs into the BEL Framework which thus fails to calculate lost variable profit.**

11. The BEL Framework is in effect a lost profits exercise, and BP's interpretation of the BEL framework implements this objective.  The definition of lost profits is lost revenue minus the costs that would be incurred to achieve those revenues,[3] and "…the plaintiff should not be able to recover lost revenues without taking into account the level of expenditures plaintiff would have had to incur in order to generate those lost revenues.  Thus, ***incremental costs associated with the foregone revenues*** must be subtracted from the lost revenues to arrive at 'lost profits.'"[4] (emphasis added).  I have done lost profit analyses for over 20 years, and no court would uphold a lost profits analysis done based on the financial information as Class Counsel has suggested, i.e., on a cash basis allowing revenue associated with one year or period's expenses to be deferred to a subsequent year or period.  Lost profits analyses have to consider the allegedly lost revenue in light of the

---

[1] I note that PwC automatically chooses the one time period out of the 63 possible options which maximizes the claim amount.

[2] My analysis of the claims is further supported by 30 years of agribusiness experience, my understanding of the crops being raised by claimants, their distance from the Gulf Coast and the effects of the spill on farms hundreds of miles from the Gulf Coast.  In order for there to be a legitimate BEL farming claim the claimant must have either experienced increased costs, decreased revenues or both ***as a result of the spill.***  I have seen nothing that would indicate either costs or revenues moved in an adverse direction for the farmers in 2010 resulting from the spill.  Indeed, the Secretary of Agriculture has made no pronouncements regarding any agribusiness losses related to the spill as occurs regularly with other natural disasters.  In my opinion the farming claims, especially from zones C and D, have no credible evidence of loss related to the spill.

[3] Litigation Services Handbook, The Role of the Financial Expert, Fourth Edition, Roman L. Weil, et al., section 3.4.

[4] "Losses in Commercial Litigation", Journal of Forensic Economics 6(3), 1993, Foster, Trout & Gaughan, p. 181.

expenses necessary to generate that revenue or the analysis is worthless.

12. Specifically related to farming, "The measure of damages for lost crops is the market value of the crops, less the expenses of cultivating and bringing the crops to market…Generally, the difference between the value of the probable crop in the market and the ***expenses associated with the crop*** will give the value of the growing crop with reasonable certainty."[5]

13. Adjustments to a farmer's cash-basis financial data in order to compute lost profits is a common practice:

> "Line 11 of Schedule F reports gross income (more commonly referred to as gross profits). There are at least two problems associated with this calculation of gross income. The first stems from the failure to account for inventories. Farmers can and do manipulate inventories to minimize taxes. Over a number of years, these inventory fluctuations tend to offset, but if the lost profit calculation is based on only a few years of historical data from Schedule F, an inquiry into inventory changes should be made. Farmers also may take advantage of cash basis accounting and manipulate taxable income by effectively transferring a product but not recognizing income because cash has not been received (i.e., accounts receivable are not used). For example, a farmer may sell his wheat December 20, 1996 but not recognize income until cash is received the following year. This artificially reduces reported profit for 1996 and increases it for 1997."[6]

**C. BP's interpretation of the BEL framework is consistent with accounting and economic principles for determining lost profits while the interpretation of Class Counsel is not.**

14. The BEL analysis is an economic lost profits analysis consistent with well-recognized principles of accounting (see below). I note that the phrase "generally accepted accounting principles" goes by the acronym "GAAP" and is a term of art referring to accrual accounting: "Because a firm's operating cycle usually extends over several accounting periods, the cash basis of accounting provides a poor measure of economic performance for specific periods of time because it provides a poor matching of resources earned (revenues) with resources used (expenses). To overcome this deficiency of the cash basis, both U.S. GAAP and IFRS require that firms use the accrual basis of

---

[5] <u>Recovery of Damages For Lost Profits, Volume</u> 1, Sixth Edition, Robert L. Dunn, P. 219.

[6] "Tax Returns as the Basis for Lost Profit Appraisals: Possible Adjustments," Tyler J. Bowles and W. Cris Lewis, p. 115.

accounting in measuring performance."[7] and "cash basis financial statements are not in conformity with generally accepted accounting principles."[8]  In fact, BP's approach to properly implement the Settlement Agreement incorporates the well-recognized matching principle of GAAP, i.e., "matching revenues with corresponding expenses within a year and…matching comparable periods among years in order to generate realistic and accurate comparisons" (Finch Declaration page 1) as required under the BEL Framework.  By implementing this well-recognized matching principle, BP's approach to properly implement the Settlement Agreement is based on economic reality of the farm's lost variable profit, a basis which is appropriate if an accurate accounting of farm claims to settle Class Claims for economic damages **caused by the oil spill** is the end goal.

15. Unlike BP's implementation approach which is consistent with GAAP's matching principle, Class Counsel's interpretation of the BEL Framework as currently being implemented by the Settlement Program is not consistent in any respect with GAAP because cash-basis accounting is not GAAP. Moreover, *unadjusted* cash-basis accounting does not reflect the economic reality of a farm's actual variable profit and cannot be utilized to measure economic performance, and thus cannot be used to measure economic loss – the entire purpose of the BEL Framework.  (Finch Declaration ¶18, 26-29)

16. Finally, BP's interpretation of the Settlement Agreement does not add complexity or subjectivity to the BEL analysis.   BP's implementation approach is based on a relatively simple adjusted cash basis which can be easily implemented while in most cases using only the financial data already available to the Claims Administrator.  The straight-forward mechanism of aligning a farming claimant's revenues to the relevant crop year[9] is the most effective and objective step in measuring a claimant's economic loss given the nature of the farming industry.  "The issue of seasonality may not be relevant when constructing projections of annual values.  However, when there is a need to forecast values within a given year, it may become necessary to make adjustments to take into account the fact that businesses often experience seasonal variation.  Some businesses have a very

---

[7] Whalen, et al., *Financial Reporting, Financial Statement Analysis and Valuation: A Strategic Perspective* 7th edition, 2008

[8] Kieso & Weygandt, *Intermediate Accounting* 9th edition, 1998.

[9] The farming industry has a well-developed federally administered crop insurance program.  In the Federal Crop Insurance Corporation (FCIC) programs the farmer can get revenue or yield insurance by establishing the Actual Production History (APH) over time.  This APH includes all crops harvested in a crop year which is defined as the year in which the crop is planted.  (USDA Risk Management Agency, http://www.rma.usda.gov/fcic/)  A crop insurance claim which did not include the entire production from a given crop year would obviously not be allowed.

distinct and significant pattern of seasonal variation…The seasonally adjusted revenue values are then used to construct a smoothed forecast. The economist can then reintroduce the seasonal pattern to obtain revenue values that pertain to each seasonal period."[10]  I understand that the Settlement Program has a staff of accountants from two preeminent accounting firms, PwC and Postelwaite, on hand to compute BEL claims. Correctly computing variable profit is something accountants are trained to do; they can properly implement the BEL compensation calculation. Further, this is a procedure commonly done by forensic accountants and economists in order to accurately compute lost profits.

**D. The accountant declarations submitted by Class Counsel fail to address farm claims and contain several inaccurate opinions.**

17. None of these Class Counsel-sponsored declarations provide any data, examples or other facts contradicting the fact that the current treatment of farming claims in the BEL Framework produces illogical and absurd results. Indeed, they do not address farm claims at all.

18. None of the declarations state a reason why BP's implementation approach methodology would be inappropriate for farming claims.

19. None of the declarations indicate that any actual analysis of farm claims submitted to the Settlement Program was done by any one of the three accountants.

20. Both Harold Asher and Rick Stutes state that "BP's accounting methodology proposed in their Response is inconsistent with the cash basis of accounting, the accrual basis of accounting using Generally Accepted Accounting Principles or any other accounting model…"  This is incorrect. BP's methodology is consistent with lost profits models, which calculate economic loss. And, as noted above, BP's interpretation is consistent with GAAP's matching principle. Asher and Stutes are silent on the matching principle of GAAP and provide no explanation for why they ignore GAAP's matching principle, especially as outlined by BP.

21. Both Harold Asher and Rick Stutes are incorrect in stating that "BP's methodology proposed in their Response is not objective but requires both the Claimants and the Program Vendors to make subjective determinations or 'guesstimates' relying, in many cases, on nonexistent or fictional support…"

---

[10] *Measuring Commercial Damages* by Patrick A. Gaughan, ©2000, pp. 149-150.

  a. The determination and allocation of crop year revenue is objective and based on objective data.

  b. The exercise of such a seasonality adjustment is a recognized practice in calculating damages.

  c. The implementation of such is straight-forward and mechanical.

22. Both Harold Asher and Rick Stutes are incorrect in stating that "Claims processed using the methodology currently proposed by BP for which adequate support does not exist, uses an arbitrary and contrived accounting methodology based upon 'make believe' formulas and impossibly determined timing and amount allocations and 'crystal ball' projections about future revenues and expenses."

  a. The claimant's financial data already provided (or accessible) in the claims process exists and is adequate.

  b. The exercise of such a seasonality adjustment is a recognized practice in calculating damages.

  c. The revenues and expenses for farming claims are known, thus, there are no "crystal ball" projections.

23. Both Harold Asher and Rick Stutes state that changing the method by which BEL is implemented is unfair to BEL Claimants who already signed releases because BP's approach may result in higher compensation that was not available to claimants who signed releases. As a practical matter, this is  not an issue because experience to date does not support the proposition that BEL Claimants who already have signed releases could have received higher awards under BP's approach to properly implement the Settlement Agreement; to the contrary, Class Counsel's interpretation is resulting in many cases of awarding arbitrary windfall payments benefitting the claimant.

24. Asher claims BP's approach is "non-sensical" because "there is no ability to determine the appropriate revenue or variable expenses on a monthly basis."  If this were so, there is no basis for ANY implementation of the BEL framework.  These are fundamental requirements of BEL.

25. Allen Carroll implies that BP's approach for implementing the BEL Framework would entail claimant's having to convert their books to another method of accounting.  This is incorrect.  BP's methodology does not require claimants to convert their books.  Rather, the claimant's financial data already provided in the claims process is adequate, and the methodology can be easily and

consistently applied across claims.

26. Allen Carroll states, "This type of matching is absolutely inappropriate because it would require the recognition of revenue which could be highly uncertain and contingent on a future event."  This is incorrect.  The revenues and expenses for farming claims are already known, thus, there are no projections.  He confuses the BEL lost profits analysis, which looks at historical data relating to farming activity in 2010 and benchmark years, with accounting in P&Ls, which is done on a current or prospective basis.  The months in which expenses were incurred and revenues earned for farming activity that took place in 2007-2010 are known now, and have been known for some time.  There is, therefore, no uncertainty or contingency.

**E. BP's BEL implementation approach and objective criteria to identify claims subject to further review is something that accountants, in particular PwC accountants, can readily implement.**

27. I am very familiar with the practices of the PwC accountants.  I joined Coopers & Lybrand's Financial Advisory Services (FAS) practice in 1992.  Coopers & Lybrand merged with Price Waterhouse in 1998 to form PricewaterhouseCoopers (PwC).  I served as a partner/principal and FAS practice leader for PwC until I left in 2000.

28. PwC furnishes accounting and advisory services to the Claims Administrator.  Charles R. Hacker, Jr., an Advisory services partner for PwC, serves as the PwC team leader.  Mr. Hacker is assisted by a team of around 172 PwC professionals in addition to the 223 Postlethwait & Netterville accounting professionals, totaling some 395 accounting professionals at the Claims Administrator's disposal[11].

29. Mr. Hacker is a CPA and carries the Certified Financial Forensic (CFF) designation with the American Institute of Certified Public Accountants.  The CFF is for CPAs who specialize in forensic accounting.  Mr. Hacker has experience in "quantification of damages, (and) lost profit claims"[12].

30. The criteria or triggers for identifying claims outlined by BP in their supplemental submission to the Claims Administrator are summarized as follows:

---

[11] PwC invoice # 113012 and P&N invoice #826558

[12] Practising Law Institute web site Faculty/Author Profile http://www.pli.edu/Content/_/N-1z137ljZ4o?Ns=sort_title%7C0

    a. Claims where more than a certain percent of revenue is claimed for a single month;

    b. Claims where the variable margin is negative for a given month in either the benchmark or compensation periods; and

    c. Claims with a monthly variable profit percentage that deviates from the annual average by more than a certain percentage.

31. PwC already has the information necessary, or has access to it, to determine whether a claim hits one or more of the triggers.

32. The approach to improving implementation of the BEL framework identified by BP in Tab 1 of their Response to Class Counsel's request for Policy Determination includes the following:

    a. Determine 2010 and Benchmark year revenues, total annual variable expenses, variable expenses by month and the ratio of each year's annual revenue to total annual variable expenses (i.e., just divide annual revenue by annual variable expenses to get a percentage);

    b. Approximate monthly revenue by multiplying the variable expenses recorded for a given month *times* the ratio of annual revenue to annual variable expenses;

    c. If expense patterns are irregular or extraordinary, adjustments should be made to cash-based expense entries to better match when inputs are consumed on a monthly basis; and,

    d. After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula can proceed as usual.

33. PwC already has the information necessary to make these improvements to the implementation of the BEL framework.

34. As a former partner at PwC, I know PwC is more than qualified to determine if a claim hits one or more of the triggers.

35. As a former partner at PwC, I know PwC is more than qualified to make these improvements to the

implementation of the BEL framework.

36. As stated previously, the BEL Framework is a lost profits exercise, and BP's interpretation of the BEL framework implements this objective.  PwC partners skilled in "quantification of damages, (and) lost profit claims" are more than qualified to both determine whether a claim hits one or more of the triggers and to make the improvements to the implementation of the BEL framework.

37. Neither the complexity (or lack thereof) nor the availability of financial information should be a barrier to accurately and fairly carry out the correct implementation of the BEL framework and the PwC professionals have the necessary information, experience and expertise to do so.

38. I  declare under penalty of perjury that the foregoing is a  true and correct statement of my opinions and analysis.

Dated:  February 18, 2013

# Appendix 1

**Farm Claimant** ███████

- Zone D█████████████████████████
- Claim Award $1,542,626
- Soybean and rice farm
- Variable expenses were recorded in nine months with $0 revenue from 2007 to 2011
- Negative variable profit for 31 of the 60 months from 2007 to 2011
- Significant swings in monthly variable profit margin as reflected in the below table:

| Year | Annual | High | Low |
|------|--------|------|------|
| 2007 | 56% | 99% | -353% |
| 2008 | 26% | 97% | -1383% |
| 2009 | 41% | 97% | -1824% |
| 2010 | -48% | 95% | -3579% |
| 2011 | 37% | 100% | -4112% |

- The claimant passed the V-Test because the cash-basis financial data makes it appear that 2009 revenues were greater than 2010 during the May-August months.  However, as reflected in the below chart, this appears to be simply a matter of timing.



1

- 2010's revenues were greater than 2009's during the months May-November, and 2010's crop year revenues of $1,116,470 were greater than 2009's crop year revenues of $1,107,578

- Additional timing differences also affect the compensation calculation as late 2010 crop revenues are recorded in January 2011

|      | Jan       | Dec       |
|------|-----------|-----------|
| 2009 | $3,693    | $303,973  |
| 2010 | $0        | $606      |
| 2011 | $338,851  | $8,451    |

Late 2010's sales reflected in January 2011

- Chemical & Fertilizer expense averaged 19.5% of gross revenues in the Benchmark Period but more than doubled in the Compensation Period before declining to within the Benchmark Period range in 2011

|                        | 2007 % of Gross Revenue | 2008 % of Gross Revenue | 2009 % of Gross Revenue | 2010 % of Gross Revenue | 2011 % of Gross Revenue |
|------------------------|-------------------------|-------------------------|-------------------------|-------------------------|-------------------------|
| Chemicals & Fertilizer | 9.2%                    | 29.7%                   | 19.5%                   | 45.0%                   | 27.0%                   |

- Further review revealed an anomaly regarding this expense in November 2010 that did not occur in the same time-frame in either the Benchmark Period or in 2011 – this timing difference inflates the non-existent "loss"

**Farm Claimant** ▮▮▮▮▮▮

- Zone D, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- Claim award $114,784
- Variable expenses before payroll were recorded in 26 months with $0 revenue from 2007 to 2011
- Negative variable profit (before payroll) for 33 of the 60 months from 2007 to 2011
- Significant swings in monthly variable profit margin (before payroll) as reflected in the below table:

|      | Annual | High | Low |
|------|--------|------|-----|
| 2007 | 40%    | 97%  | -981% |
| 2008 | 47%    | 106% | -6527% |
| 2009 | 21%    | 64%  | -5097% |
| 2010 | 34%    | 98%  | -102% |
| 2011 | 30%    | 88%  | -535% |

- Based on the above, it is clear that revenues and corresponding expenses are not properly matched
- 95 percent of 2009's revenues occurred in October and November whereas 98 percent of 2010's total sales occurred in September and October and minimal sales in November – this timing difference likely impacted both the Causation and Compensation calculations

**Farm Claimant** ▮▮▮▮▮▮▮

- Zone D ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- Claim Award $244,365
- Variable expenses before payroll were recorded in 19 months with $0 revenue from 2007 to 2011
- Negative variable profit (before payroll) for 35 of the 60 months from 2007 to 2011
- Significant swings in monthly variable profit margin (before payroll) as reflected in the below table:

|      | Annual | High | Low |
|------|--------|------|-----|
| 2007 | 41%    | 97%  | -2616% |
| 2008 | 42%    | 99%  | -2466% |
| 2009 | 21%    | 99%  | -905% |
| 2010 | 47%    | 99%  | -897% |
| 2011 | 35%    | 99%  | -7612% |

- Based on the above, it is clear that revenues and corresponding expenses are not

3

properly matched
- 2010's revenues on both a calendar year and crop year basis were higher than 2009
- 70 percent of 2010's revenues are reflected in August and September, whereas only 32 percent of 2009's revenues are reflected in the same months – this timing difference likely impacted both the Causation and Compensation calculations

**Farm Claimant** ████████

- Zone D, ████████████████████████████
- Claim Award $850,461
- Variable expenses before payroll were recorded in 23 months with $0 revenue from 2007 to 2011
- Negative variable profit (before payroll) for 40 of the 60 months from 2007 to 2011
- Significant swings in monthly variable profit margin (before payroll) as reflected in the below table:

|      | Annual | High | Low |
|------|--------|------|-------|
| 2007 | 50%    | 99%  | -3397% |
| 2008 | 44%    | 96%  | -10%  |
| 2009 | 37%    | 91%  | -829% |
| 2010 | 34%    | 93%  | -212% |
| 2011 | 42%    | 90%  | -267% |

- Based on the above, it is clear that revenues and corresponding expenses are not properly matched
- 2010's revenues on both a calendar year and crop year basis were higher than 2009
- A majority of 2010's revenues are reflected two months earlier than the majority of 2009's revenues, as reflected in the below chart  – this timing difference likely impacted both the Causation and Compensation calculations

4



**Farm Claimant** ▮▮▮▮▮▮

- Zone D, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- Claim Award $144,124
- Negative variable profit (before payroll) for 39 of the 60 months from 2007 to 2011
- Significant swings in monthly variable profit margin (before payroll) as reflected in the below table:

|      | Annual | High | Low |
|------|--------|------|-----|
| 2007 | 35%    | 95%  | -116% |
| 2008 | 43%    | 97%  | -754% |
| 2009 | 35%    | 95%  | -1062% |
| 2010 | 43%    | 96%  | -6834400% |
| 2011 | 41%    | 96%  | -11370% |

- Based on the above, it is clear that revenues and corresponding expenses are not properly matched
- 2010's revenues on both a calendar year and crop year basis were higher than 2009 – the claimant appears to have passed the V-Test because there were some revenues reflected in the May-July or June-August months in prior years, and only $882 in revenues in 2010 over these same periods

**Farm Claimant** ████████

- Zone D, ██████████████████████████
- Claim Award $793,861
- Variable expenses were recorded in 13 months with $0 revenue from 2007 to 2011
- Negative variable profit for 31 of the 60 months from 2007 to 2011
- Significant swings in monthly variable profit margin as reflected in the below table:

|      | Total | high | low |
|------|-------|------|-----|
| 2007 | 53%   | 98%  | -178985% |
| 2008 | 32%   | 96%  | -617% |
| 2009 | 45%   | 98%  | -2207% |
| 2010 | 42%   | 97%  | -2591% |
| 2011 | 39%   | 97%  | -5743% |

- Based on the above, it is clear that revenues and corresponding expenses are not properly matched
- Rice, soybean and wheat farm
- Earliest active harvest for any of their crops begins July 1st, so sales related to the current year's crop would not begin before July 1st
- 2010's crop year revenues were higher than 2009
- As reflected in the chart below, nearly half of 2009's revenues are reflected in the three-month period September to November, whereas the majority of revenues for 2010 and 2011 are reflected prior to September – this timing difference likely impacted both the Causation and Compensation calculations



**Additional Claims Examples**

- There are additional claims that have not yet been through the Settlement Program's review, but we have examined the financial data submitted with the claim and have noted all exhibit one or more of the following:

  a. Months with variable expenses recorded yet $0 in revenues

  b. Negative monthly variable profits

  c. Large swings in the monthly variable profit margins compared to the annual variable profit margin

  d. Timing differences in revenues that will affect both the causation and compensation calculations

  e. Timing differences in variable expenses that will affect the compensation calculation

- A sample set of these claims include the following:

| Claimant Number | Distance in statute miles to coastal in-state port per NOAA |
|---|---|
| ■ | 213 |
| ■ | 224 |
| ■ | 159 |
| ■ | 240 |
| ■ | 218 |
| ■ | 292 |
| ■ | 286 |
| ■ | 275 |
| ■ | 275 |
| ■ | 280 |
| ■ | 266 |
| ■ | 269 |
| ■ | 255 |
| ■ | 279 |
| ■ | 255 |