# Exhibit 18G

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA

```
*************************************************
                                                *
IN RE: OIL SPILL by the OIL RIG                 *   MDL No. 2179
"DEEPWATER HORIZON" in the                      *   SECTION J
GULF OF MEXICO, on                              *   JUDGE BARBIER
APRIL 20, 2010                                  *   MAG. JUDGE SHUSHAN
                                                *
*****************************************************************
```

# SUPPLEMENTAL DECLARATION OF DAVID A. HALL

## INTRODUCTION

1. I am a Managing Director with Alvarez & Marsal. My practice specializes in matters involving the determination and measurement of economic damages in a variety of industries including the construction industry. My qualifications and experience are summarized in my prior declaration dated January 23, 2013 ("First Hall Decl.") and are incorporated herein by reference.

2. I have been asked by BP to address certain issues presented in the three accounting-related declarations submitted by Class Counsel's accounting experts. My focus is on claims from businesses in construction-related industries. My opinions are based on my review of the information included in **Appendix B** and are set forth below.

## OPINIONS

**Opinion 1)   Any calculation of variable profit requires the proper matching of revenues with the corresponding variable expenses incurred to generate that revenue.**

3. As set forth in more detail in my prior declaration, the interpretation and application of the Settlement Agreement's BEL methodology advocated by Class Counsel and implemented by the Settlement Program has resulted in construction claimants receiving compensation awards that do not compensate just for actual lost profits or economic damages (to the extent experienced), but instead provide a windfall payment for nonexistent "losses"

generated by using data that does not accurately record the firm's monthly revenues earned and corresponding variable expenses. In particular, the monthly P&L data as recorded by construction claimants is often inaccurate. Many construction firms "true up" using large lump sum entries to correct errors in prior months' financial statements. Also, some construction firms may maintain their records on a cash basis during the year, and so do not match revenue earned to corresponding expenses in those months. The basis for this conclusion is explained in more detail below and in my prior declaration. *See* First Hall Decl. ¶¶ 5-12, 19.

4. Class Counsel's interpretation of the BEL framework results in computations of lost variable profit that is inconsistent with Generally Accepted Accounting Principles. Matching revenues and expenses is a cornerstone of Generally Accepted Accounting Principles.[1] While it is common for construction companies, in the normal course of their operations, to maintain their monthly P&L statements without matching monthly revenues with the corresponding variable expenses incurred to generate those revenues, it is not appropriate to measure lost profits damages from P&L statements that do not match revenues and expenses.

5. Systematically, construction firm claim offers are being overstated (in some cases, dramatically) because the monthly financial statements do not accurately reflect variable profit. This is due to distortions in the calculation of monthly variable profit that are caused by simply inputting data from monthly financial statements in which revenues are not being recorded when earned and matched with the corresponding variable expenses incurred to generate those revenues. The resulting distorted variable profit calculations may be artificially high or low from one month to the next. The claimant then benefits from these distortions, because the BEL framework allows claimants to measure lost profits by selecting a combination of months between May and December that maximize the difference in variable profits between the Benchmark year(s) and the corresponding months during the 2010 Compensation Period. Because a claimant is allowed to select the period of months that maximize its claim, months in which variable profit distortions would reduce the claim amount will be excluded by the claimant or by the Settlement Program accountants, which use an excel workbook set up to select the combination of Benchmark year(s) and Compensation period that awards the claimant the highest compensation.[2] As a result, this issue does not cut both ways. Class Counsel's approach

---

[1] FASB CON 6, "Recognition, Matching and Allocation," ¶ 144.
[2] I have observed this systematic ranking by the Settlement Program of various combinations of Benchmark year(s) and Compensation period options from most to least favorable in my review of construction claims (discussed in more detail below) and the PwC excel workbooks included as part of those files.

does not yield a calculation of variable profit in a manner that I understand the Settlement Agreement requires.

6.   To evaluate the reasonableness of the offers by the Settlement Program, I compared 28 construction firms' May to December variable profit in each of their Benchmark year(s) with their variable profit in May to December 2010 plus the BEL base compensation offer awarded by the Settlement Program to the claimant.  By comparing the full May to December 2010 period to that same period in the Benchmark year(s) selected by the claimant, a reasonable approximation of lost profit, if any, can be measured using the data as recorded in the claimant's monthly P&Ls because it is less susceptible to the distorted volatility that occurs when the data is taken directly from the monthly P&Ls for a shorter time period.  By comparing variable profit in May to December 2010 plus the total BEL base compensation offered to the claimant to variable profit for the same period of the Benchmark year(s), one can approximate whether a claimant has been compensated for what it might have expected to earn in 2010 absent the Spill. The $55.6 million of total BEL base offers associated with these 28 claimants represent 44% of the total $126.2 million base offers from the 524 total construction claimants.[3]

7.   **Appendix A** summarizes the results of this analysis.  It reflects that, of the 28 construction firm BEL claims I examined, the Settlement Program consistently awarded BEL base compensation amounts that give most of the claimants 2010 total profits (actual variable profit plus the base offer from Settlement Program) that are substantially higher than the claimants' eight-month (May through December) variable profit during the Benchmark year(s). Further, the average claimant received an award reflecting the May through December 2010 variable profit equal to 145%[4] of variable profit in May-Dec of the Benchmark year(s).  Certain claimants even received awards implying variable profits more than double the Benchmark year(s).  This implies the unreasonable conclusion that in 2010 the average claimant would have been significantly *more* profitable in contrast to their past experience upon which the offer is based.  This analysis does not include the RTP multiplier, which when applied, compounds the distortion and the windfall award.

8.   As demonstrated in **Appendix A** and summarized above, overstated awards are systemic and not isolated anomalies.  Contrary to the suggestions of Class Counsel's

---

[3] We selected 28 construction firm claims that appeared to illustrate the need for accurate monthly P&L statements reflecting revenues earned and corresponding variable expenses.  These claims include those with high dollar value compensation offers and construction claim offers appealed by BP.
[4] The weighted average of the 28 contractors is 128%.

accountants, the issue of nonexistent artificial "losses" and windfall compensation awards resulting from failure to use accurate monthly revenue and corresponding variable expense data is not an isolated or rare problem.  To the contrary, I found such mismatching and resulting artificial "losses" and windfall awards in most of the 28 construction firm BEL claims I reviewed.  As discussed above, the impact of the Settlement Program's use of incorrect data does not cut both ways due to the BEL framework's flexibility.  This is demonstrated to be true for the 28 construction contractors I have reviewed.   Specifically, I did not see any indication that a single construction claim offer by the Settlement Program understated actual losses.  This is evident in **Appendix A**:  each claimant's May through December variable profit in 2010 plus base offer is at least 100% or more of the claimant's variable profit during the Benchmark year(s), including one at 290% and ten over 140%.[5]

        9. As an example, an analysis of Claimant No. ▮▮▮▮▮▮ (a claimant on **Appendix A**) reported monthly revenue demonstrates the economic unreasonableness of Class Counsel's approach.  I analyzed Claimant ▮▮▮▮▮▮ monthly financial statements and identified adjusting entries to claimant's monthly construction revenues and noted this claimant's revenues and expenses incurred to earn that revenue, do not match on a monthly basis.

        10. As part of its year-end accounting procedures, Claimant ▮▮▮▮▮▮ records journal entries to correct construction revenues that were overstated throughout the year.  For example, in December 2007, the Claimant's monthly construction revenues before any adjusting journal entries were $273,312.[6]  However, the Claimant had overstated construction revenues by $2,184,371 over the course of the year.[7]  Rather than correct each month that contained overbillings, Claimant instead made a single adjustment in December 2007 to correct all overbillings throughout the year.  As a result of this approach, instead of reporting December 2007 construction revenues of $273,312, Claimant reported *negative* construction revenue of ($1,911,509) in that one month and, as importantly, the previous months containing overbillings remained incorrect.  Claimant ▮▮▮▮▮▮ made a similar adjusting entry in November 2009.  Its monthly construction revenues before adjustment were $1,253,908.  However, after an adjusting entry of $2,002,787 to correct for overbillings that accumulated throughout the year, Claimant reported *negative* monthly construction revenues of ($748,878) in November 2009 while all

---

[5] See columns titled Compared to Benchmark Year(s) Average and Percentage of Benchmark Year(s) Average.
[6] October 31, 2012 letter from ▮▮▮▮▮▮
[7] Reconciliation schedule and supporting journal entry documentation attached to October 31, 2012 letter from ▮▮▮▮▮▮

other months during the year containing overbillings remained overstated in the CSSP calculation.

11.     Claimant ███████ process of overstating contractor billings in months early in the year and making a single adjustment at the end of the year causes monthly revenues to fluctuate significantly, including *negative* monthly revenue. The following is a graph of this claimant's monthly revenue.



12.     In months where claimant's monthly revenues are overstated, Claimant's variable profit margin will also be overstated, and in the month of the cumulative correction the variable profit margins will be understated. This is not an accurate reflection of the Claimant's monthly operating results.

13.     The economic unreasonableness of Class Counsel's approach also is reflected in the wild swings in monthly variable profit for these construction claimants, even while the annual variable profit margins for these claimants remain stable for the claims I have reviewed. For example, one of the claimant's monthly variable profit swung wildly in the four-month period late in 2008 and early 2009: November 2008 *negative* 41%; December 2008 *positive* 47%; January 2009 *negative* 1,236%; and then in February 2009 *positive* 1%. In contrast to

these large swings in monthly profitability, this claimant's annual variable profit margin for 2008 and 2009 was a stable 21% and 19%, respectively.  *See* First Hall Decl. App. Table C.3 for this example and Tables C.2 and C.4 through C.6 for additional examples.  *See also* App. C page 3 for comparing construction firms' range of monthly variable profit margins compared to annual profit margin.

> **Opinion 2)    The assertion by Class Counsel's experts that BP's interpretation of the BEL framework is inconsistent with accounting principles is simply wrong.[8]**

14.     BP's interpretation of the BEL to "match" revenues with the corresponding expenses incurred in earning that revenue is entirely consistent with Generally Accepted Accounting Principles, which include the "matching" of revenues and expenses as a core concept. It is a widely accepted accounting principle "that efforts (expenses) be matched with accomplishment (revenues) whenever it is reasonable and practicable to do so."[9]  It is also widely understood and accepted that such matching between revenue and expenses is required in order to understand a business's financial performance for a given accounting period. Accounting literature defines Variable Profit as requiring that variable expenses be deducted from the revenues they were incurred to generate:  "The contribution of a given segment of sales to cover fixed costs and provide a profit is known by various names as marginal income, *variable profit* or contribution margin.  *It is obtained by deducting from sales revenue for a particular segment of the business the variable costs that relate to that revenue.*"[10] (emphasis added).  And, "Matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from *the same transactions or other events*."[11] (emphasis added).  More practically, it is a simple matter of common sense that profits must be evaluated by comparing selling price with the costs associated with the item actually being sold.

---

[8] *See*  Asher Affidavit ¶7: ("BP's accounting methodology proposed in their Response is inconsistent with the cash basis of accounting, the accrual basis of accounting using Generally Accepted Accounting Principles or any other accounting model."); Stutes Affidavit ¶6 ("BP's accounting methodology proposed in their response is inconsistent with the cash basis of accounting, the accrual basis of accounting using Generally Accepted Accounting Principles or any other accounting model…"); Carroll Affidavit page 2 ("BP is advocating a method of accounting which is contrary to the accrual accounting rules by advocating an additional form of "matching" using some non-defined method.").

[9] Intermediate Accounting, Tenth Edition, Kieso, Weygandt, and Warfield, p. 46.

[10] Manash Dutta, Cost Accounting: Principles and Practice, Pearson, 2003.  P. 15.4.

[11] FASB CON 6, "Recognition, Matching and Allocation," ¶ 144.

15. Class Counsel's experts are correct that BP's interpretation is not consistent with cash accounting. But nowhere in the Settlement Agreement is there a requirement that cash accounting be used. To the contrary, the references to "revenue" that is "earned" and "variable profit," are inconsistent with cash accounting. Cash accounting also does not always adhere to the matching principle.

**Opinion 3)  BP's methodology for correcting observed errors would be consistently applied using objective data supplied by the claimant and techniques familiar to any financial professional.**

16. BP's method does not require subjectivity because it is based on two objective sources of data supplied by the construction claimants— monthly expenses as submitted to the Settlement Program and annual variable profit margins based on construction claimants' monthly P&Ls and annual tax returns. Further, BP's method is easy for accountants to implement and is the type of an analysis that accountants routinely perform to better measure the true and accurate financial performance of businesses.

17. Further, such matching is a fundamental, well-accepted, and required part of any lost profit damage analysis.[12] Matching also is a fundamental, well-accepted principle of accounting. See **Appendix C** for further discussion. As currently calculated, however, many of the construction company claims are clearly based on mismatched revenues and expenses-- contrary to my understanding of the Settlement Agreement, general principles of accounting, and common sense. The current approach does not determine lost profits, and to the contrary, creates fictitious losses where none in fact exist. In fact, as currently calculated, many of the construction company claims result in significant payments when in fact no loss occurred.

18. I declare under penalties of perjury that the foregoing is true and correct.

*[signature: David A. Hall]*

David A. Hall

Dated: February 18, 2013

---

[12] See **Appendix C** and the following: "Losses In Commercial Litigation", Carroll B. Foster, Robert R. Trout, and Patrick A. Gaughan., *Journal of Forensic Economics*, 6(3), 1993, p. 181. Submission to the *Journal of Business Valuation and Economic Loss Analysis*, "Computing Lost Profits in Business Interruption Litigation: A General Model," Stanley Stephenson, David A. Macpherson, Manuscript 1118, Gauri Prakash-Canjels, p. 5. Litigation Services Handbook: The Role of the Financial Expert, Roman L Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, 4th Edition, 2007, Chapter 3-8. Recovery of Damages for Lost Profits – 6th Edition, Robert L. Dunn, Lawpress Corporation, 2005, §5.3.

**Analysis of 28 Construction Claims Reviewed To Date**    Appendix A

| Claimant ID | Average Variable Profit for May-Dec. Benchmark Year(s) | Average Variable Profit May-Dec. 2010 *Plus* BEL Base Compensation Offer (pre-RTP) | 2010 Compared to Benchmark Year(s) |
|---|---:|---:|---:|
| | $       36,338 | $       105,462 | 290% |
| | 1,054,707 | 2,972,156 | 282% |
| | 282,826 | 741,979 | 262% |
| | 432,200 | 1,036,217 | 240% |
| | 1,461,845 | 2,583,780 | 177% |
| | 16,571,300 | 27,902,772 | 168% |
| | 631,438 | 1,058,977 | 168% |
| | 766,635 | 1,137,072 | 148% |
| | 4,277,144 | 6,272,784 | 147% |
| | 1,236,077 | 1,785,028 | 144% |
| | 672,921 | 940,020 | 140% |
| | 1,420,429 | 1,931,609 | 136% |
| | 4,105,851 | 5,555,921 | 135% |
| | 4,856,064 | 6,342,433 | 131% |
| | 2,472,458 | 3,140,338 | 127% |
| | 2,258,747 | 2,743,152 | 121% |
| | 560,522 | 629,891 | 112% |
| | 3,385,530 | 3,791,818 | 112% |
| | 2,653,160 | 2,847,668 | 107% |
| | 3,368,940 | 3,596,574 | 107% |
| | 6,001,491 | 6,161,104 | 103% |
| | 527,231 | 534,891 | 101% |
| | 5,818,786 | 5,899,213 | 101% |
| | 3,512,387 | 3,554,840 | 101% |
| | 11,192,497 | 11,267,047 | 101% |
| | 2,525,475 | 2,533,388 | 100% |
| | 697,530 | 697,662 | 100% |
| | 6,056,097 | 6,056,097 | 100% |
| Total | $   88,836,622 | $   113,819,893 | 128% |

Average 2010 percentage compared to Benchmark Year(s):    145%

Note:
(1) Percentage of Benchmark Year(s) Average would be larger by including the relevant RTP, which could increase the award by as much as 2.5 times the base offer (or a 150% increase).

Sources:
(a) Monthly P&Ls included in PwC workbook for each claimant
(b) Step 1 and Step 2 lost variable profit presented in Total

**Appendix B**

**Documents Reviewed**

**Legal Filings**

1. THE PLAINTIFFS' STEERING COMMITTEE'S AND BP DEFENDANTS' JOINT MOTION FOR (1) PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, (2) SCHEDULING A FAIRNESS HEARING, (3) APPROVING AND ISSUING PROPOSED CLASS ACTION SETTLEMENT NOTICE, AND (4) BP'S MOTION FOR ADJOURNING THE LIMITATION AND LIABILITY TRIAL, April 18, 2012

2. *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012
    a) Exhibit 4A
    b) Exhibit 4B
    c) Exhibit 4C
    d) Exhibit 4D
    e) Exhibit 4E

3. ORDER AND REASONS Granting Final Approval of the Economic and Property Damages Settlement Agreement, December 21, 2012

**Correspondence Regarding Monthly Revenue**

4. December 16, 2012 memo from class counsel to claims administrator re: Request for Formal Policy Statement: Monthly Revenue

5. BP's response to December 16, 2012 memo from class counsel to claims administrator re: monthly revenue

6. BP's memo with suggested triggers for selected industries

7. Affidavit of Harold A. Asher (Class Counsel), dated January 15, 2013

8. Declaration of Rick Stutes, dated January 17, 2013

9. Declaration of Allen Carroll, undated

10. Announcement from Patrick A. Juneau, Claims Administrator, to class counsel and BP, dated January 15, containing 2 page response memorandum

**Appendix B**

**Documents Reviewed**

**<u>Claimants' Financial Information</u>**

11. PwC Workbooks

12. Claimants' tax returns

13. Claimants' annual and monthly financial statements

14. October 31, 2012 letter from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

15. Reconciliation schedule and supporting journal entry documentation attached to October 31, 2012 letter from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**<u>Research/Accounting Literature</u>**

16. Accounting Standards 605 Revenue Recognition, 35 Construction-Type and Production-Type Contracts

17. Financial Accounting Standards Board Concept Statement 1 (As Amended): Objectives of Financial Reporting by Business Enterprises

18. Financial Accounting Standards Board Concept Statement 5 (As Amended): Recognition and Measurement in Financial Statements of Business Enterprises

19. Financial Accounting Standards Board Concept Statement 6 (As Amended): Elements of Financial Statements

20. Donald E. Kieso, Jerry J. Weygandt, and Terry D. Warfield, *Intermediate Accounting*, Tenth Edition, John Wiley & Sons, 2000.

21. Manash Dutta, *Cost Accounting: Principles and Practice,* Pearson, 2003, p. 15.4 [excerpt]

22. Internal Revenue Bulletin 2003-41, dated October 14, 2003

**<u>Research/Lost Profits Literature</u>**

23. Losses In Commercial Litigation, Carroll B. Foster, Robert R. Trout, and Patrick A. Gaughan., Journal of Forensic Economics, 6(3), 1993,

24. Submission to the Journal of Business Valuation and Economic Loss Analysis, "Computing Lost Profits in Business Interruption Litigation: A General Model," Stanley Stephenson, David A. Macpherson, Manuscript 1118, Gauri Prakash-Canjels

**Appendix B**

**Documents Reviewed**

25. Litigation Services Handbook: The Role of the Financial Expert, Roman L Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, 4th Edition, 2007

26. Recovery of Damages for Lost Profits – 6th Edition, Robert L. Dunn, Lawpress Corporation, 2005.

27. "The Accuracy and Manipulability of Lost Profits Damages Calculations: Should The Trier of Fact Be 'Reasonably Certain?'" Transactions: The Tennessee Journal of Business Law, Jonathan T. Tomlin and David R. Merrell, 7(2), Spring 2006, p. 12.

1. The matching of revenues and expenses is essential to accurately calculate lost profits. According to the *Journal of Forensic Economics*:

> Lost profits damages are usually defined as lost net profits; all costs must be deducted.  For breach of contract, this means the contract price less cost of performance, or cost of completion, or, as it is sometimes put, "expenses saved" as a result of plaintiffs being excused from performance by the other party's breach.  The idea here is that the plaintiff should not be able to recover lost revenues without taking into account the level of expenditures *plaintiff would have had to incur in order to generate those lost revenues.*  Thus, incremental costs associated with the foregone revenues must be subtracted from the lost revenues to arrive at "lost profits."[1]  (emphasis added)

The italicized language in the above quotation is in essence describing the matching of revenues and expenses.

2. Another commonly cited damages treatise is the Litigation Services Handbook which provides discussion of lost profits:

> **Measurement of Lost Profits**.  Whether the plaintiff has identified the cause of action as breach of contract, copyright or patent infringement, or violation of antitrust laws, damages usually equal the difference between the profits that the plaintiff would have realized but for the defendant's actions and the plaintiff's actual profits.  In other words, the *general damages measure equals incremental sales (or revenues) less incremental costs.*  Although one can measure lost profits in many ways, most measures combine the knowledge of business and financial records with economic assumptions about the relevant industry.[2]  (emphasis added)

This sources use of the phrases incremental sales and incremental costs necessarily *presumes* that there is a matching and consistency between these two components of lost profits—revenues and expenses incurred to earn the revenue.  In the calculation of lost profits, when there is a failure to match expenses to revenues any lost profits calculated from this mismatch will inherit its flaws and be inaccurate.

---

[1] *Losses In Commercial Litigation*, Carroll B. Foster, Robert R. Trout, and Patrick A. Gaughan*., Journal of Forensic Economics*, 6(3), 1993, p. 181.

[2] Litigation Services Handbook:  The Role of the Financial Expert, Roman L Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, 4th Edition, 2007, Chapter 3-8.