# Exhibit 18I

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | * | |
| GULF OF MEXICO, on | * | |
| APRIL 20, 2010 | * | SECTION J |
| | * | |
| | * | |
| | * | JUDGE BARBIER |
| | * | MAG. JUDGE SHUSHAN |

*******************************************

<u>SUPPLEMENTAL DECLARATION OF XAVIER OUSTALNIOL</u>

**I.     Qualifications & Scope of Services**

1.  I prepared this declaration to supplement my January 23, 2013 declaration (the "Initial Declaration") that related to claims submitted by professional service firms to the Court Supervised Settlement Program. Appendix A to my earlier declaration contains a complete statement of my background and qualifications.

2.  I was involved in developing BP's approach for matching monthly revenue to corresponding expenses for professional service firms, (as well as other aspects of the approach) provided in Tab 1 of the BP Response to Class Counsel's December 16, 2012 Request for Policy Determination (the "BP Approach"). I was also involved in developing the triggers to determine when additional review is needed to ensure proper matching of revenue to corresponding expenses that BP proposed in a supplemental submission to the Claims Administrator.

3.  I have been asked by BP to address accounting and other issues raised by Class Counsel's submission to the Court on January 23, 2013, specifically in regard to the methodology included in the January 8, 2013 "BP's Response to Class Counsel's December 16, 2012 Request for Policy Determination" and BP's supplemental

submission of January 23, which included the declarations or affidavits of three declarants, Allen Carroll, Harold A. Asher and Rick Stutes.

4.  In reaching my opinions listed below, I relied on my certified public accountant's experience, including my familiarity with accounting for professional services firms. Appendix A lists the documents I relied on.

## II.  Plaintiffs' Accountants' Declarations Are Misguided.

5.  Class Counsel and their experts' characterization of BP's Approach as a subjective restatement of the claimants' financial statements under a different basis of accounting is misleading and incorrect. BP's Approach does not subjectively restate the financial statements of a claimant on a different basis of accounting or alter the Business Economic Loss ("BEL") framework calculation. In fact, the BP Approach uses the financial information provided by claimants to accurately capture the actual economic performance of the firms, and eliminates the distortions inherent to certain monthly financial statements whether prepared under the accrual basis of accounting, or under a cash basis of accounting. I address each declaration in turn below.

### A.  Carroll Declaration

6.  Mr. Carroll essentially makes the following statements in his declaration:

- Verifiable data is not available for businesses that use cash basis to convert their books to any other method of accounting.

- BP is advocating a "matching" method that is "not a known or used method of accounting" as it is requires the recognition of contingent revenue.

- The requirement of matching as proposed by BP would mean that the formula published in the settlement agreement could no longer be applied on a uniform and consistent basis for all claimants.

7.  Mr. Carroll confuses two different issues: (1) the method of accounting under which a claimant submits financial statements, and (2) what must be done to implement the BEL framework and provide economically meaningful financial information to measure losses. BP's Approach does not equate to the claimants having to restate

their financial statements. BP's Approach is to properly determine Variable Profit based on the financial data provided by claimants, by matching revenues earned to expenses incurred in the proper months.

8. Mr. Carroll focused his discussion on contingent revenue and specifically on the realizability of revenue. Although Financial Statement Concept 5 ("FASCON") is an applicable accounting reference to consider for the purpose of evaluating revenues, financial statements prepared under a modified cash basis of accounting, would not comply with GAAP.. Further, BP is not suggesting to recognize revenues that have not been or will not be received by the claimant.[1] The revenues a claimant earned in 2010 or the benchmark period years have been realized for the most part by 2013.[2] Given how the Settlement Agreement operates, FASCON 5 which focuses upon contingent revenue generally has no role here, as the revenue at issue in most instances already has been realized, earned and is known.

9. For the purpose of applying the BEL framework, there is little or no uncertainty for the contingent revenues recorded in the Benchmark Periods. In fact, now that we are in 2013, they are no longer contingent and can be matched to measure the performance of the claimant. Exceptions are likely to be rare.

10. Mr. Carroll has not addressed how Variable Profit is calculated under the terms of the BEL compensation framework and the distortions created by failing to address cash based reporting issues and other classification issues (such as pass through expenses included as revenues). He has not commented on the distortions I have observed from my review of professional service claimant files. In fact, Mr. Carroll ignores the Variable Profit calculation altogether from the Settlement Agreement.

---

[1] FASCON 5 states in part: "Further guidance for recognition of revenues and gains is intended to provide an acceptable level of assurance of the existence and amounts of revenues and gains before they are recognized. Revenues and gains of an enterprise during a period are generally measured by the exchange values of the assets (goods or services) or liabilities involved, and recognition involves consideration of two factors (a) being realized or realizable and (b) being earned, with sometimes one and sometimes the other being the more important consideration." (See FASCON 5 at par. 83)
[2] Incidentally, BP is not suggesting as Mr. Carroll implies that revenues that were never collected be matched to expenses incurred.

**B.**        **Asher Affidavit and Stutes Declaration**

11. Mr. Asher raises the following issues in his affidavit:

- BP's accounting methodology is not objective and requires claimants and program vendors to make subjective determinations or "guesstimates," relying, in many cases, on nonexistent or fictional support.

- BP's accounting methodology is impractical, unworkable and inconsistent with the terms of the Agreement.

- BP's accounting methodology creates two separate evaluation models – those with adequate documentary support and those for which adequate support does not exist.

12. Mr. Stutes' expresses opinions in his declaration that are very similar to Mr. Asher's. I am addressing them together in this section. Messrs. Asher and Stutes make other statements in their affidavits that I am not addressing because they are legal issues, which I am not qualified to address. Even so, I do not agree with their statements.

13. Their description of the BP Approach as an "accounting methodology" is inaccurate and misleading. There is no requirement concerning which basis of accounting should be used to provide the financial statements of the claimants. However, there is a requirement that the financial information represent the actual historical financial performance of the claimant.[3] BP is not trying to have the Settlement Program restate financial statements of the claimants from one method of accounting to another. Instead, BP is asking that the Settlement Program properly implement the Settlement Agreement by using the information provided (or accessible) in the manner required under the Agreement so that it actually allows for the reasonable measurement of monthly Variable Profit.

14. In that light, Messrs. Asher's and Stutes' discussions concerning the realizability of revenues, and whether contingent revenue should be recognized if unknown, is misplaced because now, several years after the Benchmark years of 2007-2009 and

---

[3] See Exhibit 4C to the the to the Settlement Agreement "Compensation Framework for Business Economic Loss Claims."

the spill year of 2010, in most cases, the revenues earned in 2010 and the benchmark period year(s) are known. There is no need to estimate the realizability of such revenues; in most cases, as well as the expenses related to such revenues and the historical performance of the claimant can now be measured.

15. Without using BP's approach to properly implement the Settlement Agreement, as suggested by Messrs. Asher and Stutes, theoretically a claimant could record only one large accounting entry in December to record all of the activity of the entity for the entire year. The <u>annual</u> financial statements would still be prepared under a recognized method of accounting (generally accepted accounting principles ("GAAP") or modified cash basis) but there would be no profits or losses incurred during 11 months. In that example, the monthly financial statements would not reflect any economic activity until December. The Variable Profits during these months would be nil. Still, revenues in any of the preceding months could be used in the Benchmark period, as if they were representative of the performance of the claimant. That result is not economically reasonable and cannot allow the mechanisms of the BEL framework to be properly applied.

16. Contrary to Messrs. Asher's and Stutes' statements, BP's approach to properly implement the Settlement Agreement  is designed to enable the measurement of Variable Profit based on objective claimant-specific data, which includes hours worked for professional services firms or a measurement of the effort made.  This is, in my view, what is required by the Settlement Agreement. In the case where there is no method of tracking hours for a professional service firm, then the best approximation is variable expenses reported in the month.

17. Finally, I note that Messrs. Asher and Stutes have not made any comment in regard to the proper matching of pass-through costs or how the non-matching of revenues earned and corresponding expenses affects the measure of damages based on the Variable Profit calculation provided for in the Settlement Agreement.

III.    **The Current BEL Framework Methodology Yields Pervasive Irrational Results for Professional Services Firms.**

18. Based on my review of claims submitted by professional services firms, I found frequently abnormal results when Class Counsel's current interpretation was applied, mostly to the detriment of BP.[4] The distorted awards reflect the incorrect use of the data provided by the claimants in applying the BEL methodology, not a flaw in the methodology itself.

19. The measurement of the losses under the BEL framework depends on the proper determination of Variable Profit. Variable Profit is a widely accepted financial metric used to evaluate lost profits and can only be properly calculated for a given period by matching revenues earned to expenses incurred to generate those same revenues.[5] The matching principle is a basic financial accounting concept, which the accounting literature recognizes will provide the best outcome for the purpose of measuring the economic performance of an entity. The current interpretation of the Settlement Program, however, is inconsistent with this fundamental accounting concept because it allows the calculation of Variable Profit by comparing revenues with totally unrelated costs. Consequently, the monthly calculation of Variable Profit is flawed in many cases.

20. My review of a number of professional services firms claimants' files has shown that the anomalies in claim determination are not just occasional but, on the contrary, pervasive. In addition, I have found that the anomalies consistently indicate an overstatement[6] for the benefit of claimants and to the detriment of BP. I describe my observations in more detail below.

21. I selected 37 BEL claims of professional service firms from 335 professional service firm claims filed as of late December 2012.  From these firms, I selected claims for

---

[4] See discussion of criteria at par. 23.
[5] For instance in regard to the concept in cost accounting:  "The contribution of a given segment of sales to cover fixed costs and provide a profit is known by various names as marginal income, *variable profit* or contribution margin.  *It is obtained by deducting from sales revenue for a particular segment of the business the variable costs that relate to that revenue.*"   Manash Dutta, *Cost Accounting: Principles and Practice*, Pearson, 2003.  P. 15.4 (emphasis added).
[6] See discussion at par. 23.

my review which were large relative to others on the list (sorted in decreasing claim amount) and some smaller claims submitted by claimants located in various Zones. I analyzed the claims by applying the triggers proposed by BP to the 37 claims in order to identify unusual or unexpected Variable Profit or revenue variances, and then reviewed the PwC Excel files supporting the calculation of offers and other files available on the CSSP portal. Seven of the claims were not responsive to any of the triggers.[7] Of the 30 responsive claims, 8 were discussed and analyzed in my Initial Declaration (at Appendix G) and 22 additional claims are listed in a table describing which trigger criteria they were responsive to, at Appendix C to this Declaration. These 22 additional professional services firm BEL claims are discussed in Appendix B to this Declaration.

22. My analysis of the 30 professional services firm claims revealed that these professional services firms displayed unusual and unexpected monthly variances in Variable Profits and revenues because the revenues generated were not matched to corresponding variable expenses incurred in the proper period.

23. My analysis also revealed that the anomalies or distortions observed in BEL compensation offers to professional services firms consistently result in an overstatement of the offers. This is measured by the fact that for many of the 30 claimants their 2010 Variable Profit (May - December) plus BEL base compensation offer to the claimant exceeds their average Variable Profit for May - December of the Benchmark year(s). For a good number of claimants their 2010 Variable Profit (May - December) plus BEL base compensation offer exceeds their revenues during 2009 or the average of the benchmark years or 2010 (for the same period). This result does not make economic sense because profits are, by definition, revenues *less* expenses. Revenues should be greater than profits. The Claims Administrator's interpretation as currently applied cannot address this issue without properly evaluating the data provided by claimants and making appropriate correcting adjustments to correct the mismatching.

---

[7] See Appendix G to my Initial Declaration explaining how the triggers operate.

24. The distortions which I have observed in the 30 BEL claim offers to professional services firm claimants include, but are not limited to:

- Offers to claimants whose revenues from May - December 2010 exceed 2009 revenues in the same period: 6 claimants, by more than 92%, 23%, 12%, 10%, 9% and 2%.[8]

- Offers which when added to actual Variable Profits (May-December) in 2010 lead to 2010 Variable Profits in excess of *revenues* for 2009 or the benchmark period and/or 2010: 21 claimants.[9]

- Offers which when added to actual Variable Profits in 2010 (May-December) exceed 2009 (Benchmark) Variable Profits: 27 claimants.[10]

- Variable Profit margins with extreme variances:  22 claimants displayed variable profit margins ranging from -530% to 98% in the benchmark period or -279% to 40%, -1,414% to 100% (claimants 3, 7 and 1, respectively), -6,275% to -32%,[11] and -8,800% to -18%,[12] etc.

25. These distortions emanate from the data provided by claimants which on a monthly basis does not allow Variable Profits to be calculated appropriately. When the BEL formula is applied, this results in pervasive distortions, which are frequent and material because the amount of the offers seem overstated in absolute dollars or in percentage.[13]

---

[8] Claimant ▮▮▮▮▮ in Initial Declaration and Claimants 1 through 5 in Appendix B to Supplemental Declaration.
[9] Claimants 1 through 11 and 18 through 20 at Appendix B to Supplemental Declaration and others in my Initial Declaration.
[10] All 8 claimants in my Initial Declaration and 19 claimants in my Supplemental Declaration (1-11, 13-17, and 19-21 at Appendix B).
[11] See Initial Declaration at p. 11.
[12] See Claimant 5 in Initial Declaration at Appendix E.
[13] See discussion at par. 23, above.

IV.     **BP's Approach Is Based on Commonly Applied and Widely Recognized Accounting Concepts and Methods to Measure Variable Profit.**

26. While variable profit is not specifically defined in generally accepted accounting principles, it is a well understood and widely utilized financial measure of performance that provides for marginal income measurement and is frequently used to measure damages. It is calculated by deducting from revenues the variable costs that relate to that revenue and were incurred to generate it. Consequently, the proper measure of Variable Profit is entirely dependent upon accurately identifying revenues earned and corresponding expenses incurred during each month, that is, matching them, which itself is a widely accepted accounting concept. The finance literature, which describes typical methods to measure damages, supports the view that methodologies used by economists and accountants require that revenues[14] must be matched[15] to the expenses[16] incurred to generate such incremental revenues in order to calculate lost profits.[17]

---

[14] Revenue is defined in the accounting literature as "… inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations." Financial Accounting Standards Board Concept Statement 6 (As Amended):  Elements of Financial Statements, p. 30, Par. 78.

Other authors define revenue as a "… measure inflows of net assets (that is, assets less liabilities) from selling goods and providing services." Stickney, C.P. Financial Reporting and Statement Analysis, A Strategic Perspective, 3rd Edition. 1996. p. 14.

Also, "[r]evenues represent actual or expected cash inflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations."  Financial Accounting Standards Board Concept Statement 6 (As Amended):  Elements of Financial Statements, p. 30, Par. 79.

[15] The matching principle concept, as described in par. 19 above, can be found in various accounting literature, such as the following: "**Matching Principle** [r]equires that expenses be recorded when incurred in earning revenue." Libby, R, P. Libby and D.G. Short, *Financial Accounting*, McGraw-Hill Irwin, 7th Edition. 2011.  G-3 [emphasis in original]. Or, "[**M**]**atching convention** [is] [t]he concept of recognizing *cost* expirations (*expenses*) in the same *accounting period* during which the firm recognizes related *revenues*; combining or simultaneously recognizing the revenues and expenses that jointly result from the same *transactions* or other events."  Maher, M.W., C.P. Stickney, and R.L. Weil, *Managerial Accounting*, South-Western Cengage Learning, 11th Edition. 2012. p. 564 [Italics in original; bold emphasis added].

[16] Expense is defined as "…outflows or other using up of assets or incurrences of liabilities (or a combination of both) from delivering or producing goods,  rendering services, or carrying out other activities that constitute the entity's ongoing major or central operations." Financial Accounting Standards Board Concept Statement 6 (As Amended):  Elements of Financial Statements, p. 31, Par. 80.

Similarly, other authors define expenses as "[d]ecreases in assets or increases in liabilities from ongoing operations incurred to generate revenues during the period."  Libby, R, P. and D.G. Short, Financial Accounting, 7th Edition. 2011. G-2. Also, "[e]xpenses represent actual or expected cash outflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations."  Financial Accounting Standards Board Concept Statement 6 (As Amended):  Elements of Financial Statements, p. 31, Par. 8.

[17] For example, in the Litigation Services Handbook – The Role of the Financial Expert, the authors describe the process as: "(i) *Incremental Sales or Revenues*. In a lost profits study, the analyst must first compute the amount of

27. The source of the data used to calculate variable profit is based on existing financial and operational records (external financial records and/or internal financial records and other data). When measuring variable profit, revenues earned are matched against the expenses related to those revenues earned over the period of reference, which could be quarters, years, or, in this case, months.

28. BP's Approach is founded on basic financial accounting concepts and specifically the concept of matching revenues earned to corresponding expenses incurred, as I explained in my Initial Declaration,[18] which is consistent with the calculation of variable profit.

29. If, as explained above, and as is the case in many of the professional services firm claimant files I have reviewed, the monthly P&L data is not prepared by matching revenues earned to their corresponding expenses, the resulting Variable Profit calculation is flawed as a basis to measure damages. Class Counsel's interpretation of the "corresponding" language as reflected in these files is inherently incorrect as it compares revenues and expenses which are not connected with each other and therefore bear no relationship to each other or the actual performance of the company. It is for those reasons that these monthly financial statements will not accurately measure variable profit on a monthly basis, and will yield irrational results when compared across years.

## V.   BP's Approach to Properly Implement the Settlement Agreement Allows the CSSP to Accurately Determine Lost Profits in an Objective and Straightforward Manner

30. The submission to the Court by the Claims Administrator, Mr. Juneau, acknowledges that irregularities in claim determinations will occur using the Claims Administrator's interpretation of the BEL framework, However, BP's interpretation of the settlement agreement is the accurate, indeed, best way to properly calculate variable profit, and the approach outlined by BP is both objective and straightforward to implement.

---

lost revenues […] that the defendant's actions have caused: […]", and "(ii) *Incremental Costs*. After estimating the amount of lost sales, the expert must subtract the costs the firm would have incurred to achieve these revenues […]" (at pp.8 and 11).

BP's approach that the revenues and expenses be assigned to the proper period when earned and incurred, respectively, would yield a proper measurement of Variable Profit for the purpose of evaluating lost profits based on objective data provided by the claimants. BP's Approach does not subjectively restate the financial statements of a claimant on a different basis of accounting or alter the BEL methodology in any way.

31. In fact, the BP Approach uses financial information provided by claimants and specific to their business to accurately capture the actual economic performance of the firms and eliminate the distortions inherent in certain monthly financial statements whether prepared under the accrual basis of accounting, or under a cash basis of accounting. In many cases, companies do not close their books *monthly* consistent with GAAP or any other comprehensive basis of accounting. They make a number of adjustments only at year-end to comply with tax or GAAP requirements. As a result, monthly P&Ls are subject to the timing of cash inflows and outflows, and often will not accurately reflect operating performance (especially when following a cash-based accounting method). Thus, as it stands currently, a claimant's particular *monthly financial P&L* often does not accurately reflect revenue earned during the period and corresponding variable expenses, even where the annual financial statements are accurately prepared.[19] Consequently, without any alignment of revenues to corresponding expenses, mechanically, the monthly Variable Profit is distorted and does not provide a reasonable basis to measure claimant's performance and the resulting calculations will not measure damages.

32. The BP Approach does not change the mechanism or terms described in the Settlement Agreement. BP's Approach seeks to assure that accurate monthly financial inputs are used to be able to properly apply the "objective, straight forward mechanism" provided by the BEL framework. The result is an economically

---

[19] Even if monthly P&Ls were prepared in accordance with GAAP, the P&Ls, which contain the basis for measuring Variable Profit, include line items which have to be classified between fixed and variable costs (see Exhibit 4D) and I noted a number of classification issues between various line item as explained in my Initial Declaration (at pp. 5-7.)

reasonable evaluation of historical performance of the claimant that can support the calculation of Variable Profit in compliance with the BEL framework.

33. I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.


Xavier  Oustalniol

Dated:  February 18, 2013

**Appendix A**
**Documents Relied Upon**

| No. | Description |
|---|---|
| 1 | Claim ID No ███ |
| 2 | Claim ID No ███ |
| 3 | Claim ID No ███ |
| 4 | Weil, Frank, Hughes, and Wagner. The Litigation Services Handbook - The Role of the Financial Expert, Wiley, 4th Edition. 2007. |
| 5 | In Camera Submission to Judge Carl J. Barbier - Monthly Costs and Revenue 1-23-2013 includes Ex A- Declaration of Allen Carroll 1-16-2013, Ex B - Affidavit of Harold Asher 1-15-2013, Ex C - Declaration of Rick Stutes 1-17-2013 |
| 6 | Cost Accounting: Principles and Practice, Author: Dutta. Pearson Education, 2003. |
| 7 | Financial Accounting Standards Board Concept Statement 6 (As Amended):  Elements of Financial Statements, pp. 30-31. |
| 8 | Libby, R, P. Libby and D.G. Short, Financial Accounting, McGraw-Hill Irwin, 7th Edition. 2011.  G-3 |
| 9 | Maher, M.W., C.P. Stickney, and R.L. Weil, Managerial Accounting, South-Western Cengage Learning, 11th Edition. 2012. p. 564 |
| 10 | Libby, R, P. and D.G. Short, Financial Accounting, 7th Edition. 2011. G-2 |
| 11 | Stickney, C.P. Financial Reporting and Statement Analysis, A Strategic Perspective, 3rd Edition. 1996. p. 14. |

**Appendix B**

**Additional Examples of Claims That Result in Distorted Compensation**

**1. Claimant ID** ███████  *Overcompensation caused by distorted December revenue in benchmark period and mismatch of revenues to expenses; variable profit in May to December 2010 is 277% higher than same period in 2009 and 50% higher than 2009 revenue in the same period. 2010 revenue exceeds 2009 revenue in the same period.*

This claimant provides legal services in personal injury and maritime accidents. The firm is located ███████████████ (Zone D).[1]  As shown in the chart below, the Settlement Program's Base Offer of $296,000 implies that, in the absence of the spill, claimant's 2010 variable profit for May to December should have been $577,000. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $577,000 for May to December 2010 would exceed the firm's variable profit in the same period in 2009 by 277%, but would also exceed the firm's revenue for the same period in 2009 by 80%.



This distortion is being driven by the timing of expense payments and cash receipts in September through November in the benchmark and compensation years. As shown in

---

[1] See website [Reference to website omitted]

the chart below, 56% of annual revenues in 2010 were recorded in August, which was outside of the compensation months.



**2. Claimant ID** ▮▮▮▮▮ *Overcompensation caused by distorted August revenue in benchmark period; variable profit in May to December 2010 is 110% higher than same period in 2009 and about 96% higher than 2009 revenue in the same period. Revenue in 2010 is greater than 2009 by 23%.*

This claimant provides services related to tax law, estate planning, wills and trusts.[2]  Its office is located in ▮▮▮▮▮▮▮▮ Zone A. The claimant's 2010 revenues for May to December are 23% greater than its 2009 revenues for May to December. The BEL compensation offer to this claimant of $220,000 implies that the claimant's 2010 variable profit from May through December should have been $528,000, an amount in excess of the claimant's total revenue in the May to December 2009 benchmark year and in May to December 2010. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $528,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2009 by 110%, but would also nearly double the firm's revenue for the same period.



This distortion is being driven by the timing of expense payments and cash receipts from August through November in the benchmark and compensation years.  These months

---

[2] See website [Reference to website omitted].

accounted for 67% of 2009 revenues but only 5% of 2010 revenues, which demonstrates only timing differences in claimant's cash receipts between 2009 and 2010. For example, 65% of annual revenues in 2010 were recorded in July and December, which were outside of the Compensation months.



**3. Claimant ID** ███████ *Overcompensation caused by mismatch of revenues to expenses in benchmark period; includes negative profit margin of 530% in the compensation months. 2010 revenue exceeds revenue in the same period in 2009 by 92%. The Base Offer causes Variable Profit to exceed 2009 revenue by 108%.*

This claimant provides legal services in civil litigation, legal malpractice, workers compensation and insurance coverage litigation.[3]  Its office is located ███████ ███████ in Zone B. The claimant's 2010 revenues for May through December are 92% greater than its 2009 revenues for the same months. The BEL compensation offer to this claimant of $12,000 implies that the claimant's 2010 variable profit from May through December should have been $54,000, an amount in excess of total revenue in May through December of the claimant's 2009 benchmark year and in the same post-spill months of 2010. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $54,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2009 by 135%, but would also more than double the firm's revenue for the same periods.



Claimant ID: ███████
Benchmark Year: 2009 / Compensation Months: May-Jul

---

[3] See website [Reference to website omitted].

This distortion is being driven by the timing of expense payments and cash receipts in May to July of the benchmark and compensation period. The fluctuation in variable profit margin in 2008/2009 and 2010 is an indicator that revenues were not properly matched to costs incurred. As shown in the chart below, claimant recorded a variable profit margin of *negative* 530% in May 2010, as compared to a variable profit margin of 98% in the same month in 2009.



**4. Claimant ID** ▇▇▇▇ *Overcompensation caused by distorted June revenue in benchmark period; variable profit in May to December 2010 is 85% higher than same period in 2009 and higher than revenues in 2009 and 2010. Revenue in 2010 is greater than 2009 by 9%.*

This claimant provides legal services related to criminal defense and personal injury litigation.[4] Its office is located ▇▇▇▇ in Zone C. The claimant's 2010 revenues for May to December are 9% greater than its 2009 revenues for May to December. The BEL compensation offer to this claimant of $77,000 implies that the claimant's 2010 variable profit from May through December should have been $194,000, an amount in excess of the claimant's total revenue in the May to December 2009 benchmark year and also in the same period in 2010. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $194,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2009 by 85%, but would also be 44% higher the firm's revenue in 2009.



Claimant ID: ▇▇▇▇
Benchmark Year: 2009 / Compensation Months: Jun-Oct

This distortion is being driven by the timing of expense payments and cash receipts from June through October in the benchmark and compensation years. By selecting a compensation period of June through October, the claimant's compensation period

---

[4] See website [Reference to website omitted].

includes the large spike in June 2009 but *excludes a similar spike in December 2010*, both having the effect of increasing the compensation amount.



The fluctuation in variable profit margin in 2009 and 2010 is an indicator that revenues were not properly matched to costs incurred.  As shown in the chart below, claimant recorded a variable profit margin of *negative 118%* in October 2010, as compared to a variable profit margin of 78% in the same month in 2009.



**5.    Claimant ID** ███████ *Overcompensation caused by distorted revenue in December of benchmark period; variable profit in May to December 2010 is 27% higher than same period in 2009 and exceeds revenue in May to December 2009 and 2010. Revenue in 2010 greater than 2009 by 10%.*

This claimant provides accounting, tax, and payroll services.[5] Its office is located ███ ███████ in Zone D. The claimant's 2010 revenue for May to December are 10% greater than its 2009 revenues for May to December. The BEL compensation offer to this claimant of $40,000 implies that the claimant's 2010 variable profit from May through December should have been $173,000, an amount in excess of the claimant's total revenue in the May to December 2009 benchmark year and also in the same period in 2010. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $173,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2009 by 27%, but would also be 16% greater than the firm's revenue in 2009.



This distortion is being driven by the timing of expense payments and cash receipts from October through December in the benchmark and compensation years. As shown in chart

---

[5] See website [Reference to website omitted].

below, by selecting a compensation period of October through December, the claimant's compensation period includes the large spike in December 2009.



**6. Claimant ID** ▮▮▮▮ *Overcompensation caused by distorted May revenue in benchmark period and mismatch of revenues to expenses. The Base Offer and Variable Profit in May to December 2010 exceed revenue in 2009 by 32% and revenue in 2010 in the same period.*

This claimant provides legal services in bankruptcy and commercial litigation. Claimant is located ▮▮▮▮ in Zone B. The BEL base compensation offer of $201,000 implies that the claimant's 2010 variable profit from May to December should have been $390,000. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $390,000 for May to December 2010 would not only exceed the firm's variable profit in the same period in 2007/2008/2009 by 46%, but also exceed the firm's revenue in the same period by 32%.



This distortion is being driven by the timing of expense payments and cash receipts in May to September in the benchmark and compensation years. By selecting a compensation period of May through September, the claimant's compensation period includes the large spike in May 2007/2008/2009 but *excludes the similar spike in October 2010*, both having the effect of increasing the compensation amount. Additionally, the claimant recorded revenues of $441,000 in July 2011 which were likely earned in prior months or even years, and against which the related expenses are not matched.

Page 11



**7. Claimant ID** ███████ *Overcompensation caused by distorted August revenue in benchmark period and mismatch of revenues to expenses; includes negative profit margin of 279% in the compensation months. The Base Offer and Variable Profit in May to December 2010 exceeds revenue in the same period in 2009 by 29% in 2009..*

This claimant provides legal services in tax, estate planning and probate. The firm is located in ███████████ (Zone B).[6] As shown in the chart below, the Settlement Program's Base Offer of $656,000 implies that, in the absence of the spill, claimant's 2010 variable profit for May to December should have been $1,470,000. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $1,470,000 for May to December 2010 would exceed the firm's variable profit in the same period in 2009 by 55%, and would also exceed the firm's revenue for May to December of 2009 by 29%.



This distortion is being driven by the timing of expense payments and cash receipts in August through December in the benchmark and compensation years. These months accounted for 59% of 2009 revenues but only 23% of 2010 revenue, which demonstrates timing differences in claimant's cash receipts between 2009 and 2010. For example, 19% of annual revenues in 2010 were recorded in July, which was outside of the compensation months. Additionally, the claimant recorded revenues of $533,000 in March 2011 which

---

[6] See website [Reference to website omitted]

were likely earned in prior months or even years, and against which the related expenses are not matched.



The fluctuation in variable profit margin in 2009 and 2010 is also an indicator that revenues were not properly matched to costs incurred. For example, in December 2010, claimant recorded a variable profit margin of *negative* 279% compared to a variable profit margin of 40% on revenue of $157,000 in the same month in 2009.



**8. Claimant ID** ▇▇▇▇ *Overcompensation caused by mismatch of revenues to expense in benchmark period; Base Offer and Variable Profit in May to December 2010 is 24% higher than same period in 2008/2009 and 15% higher than revenue in benchmark period, and same period in 2010.*

This claimant provides legal services in divorce litigation.[7]  Its office is located ▇ ▇▇▇▇▇▇▇ in Zone C.  The BEL compensation offer to this claimant of $151,000 implies that the claimant's 2010 variable profit from May through December should have been $536,000, an amount in excess of the claimant's total revenue in the May to December 2008/2009 benchmark year and also in the same period in 2010. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $536,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2008/2009 by 24%, but would also be 15% higher than the firm's revenue in 2008/2009.



This distortion is being driven by the timing of expense payments and cash receipts in July through November in the benchmark and compensation years.  The fluctuation in variable profit margin in 2008/2009 and 2010 is an indicator that revenues were not properly matched to costs incurred.  As shown in the chart below, claimant recorded a

---

[7] See website [Reference to website omitted].

variable profit margin of *negative 10*% in September 2010, as compared to a variable profit margin of 96% in the same month in 2008/2009.



**9.  Claimant ID** ▮▮▮▮▮▮ *Overcompensation caused by a June revenue spike in benchmark period and mismatch of revenues to expenses. Base Offer and Variable Profit in May to December 2010 exceed revenues in the same period in 2008/2009 by 12%, and 71% in 2010.*

This claimant provides legal services in personal injury litigation, including automobile and trucking accidents, wrongful death, malpractice claims, civil rights, nursing home abuse, discrimination and sexual harassment, and employment law claims.[8]  Claimant's cash receipts are largely dependent on settlement as evident from its website, which states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Claimant is located in ▮▮▮▮▮▮ (Zone C).  As shown in the chart below, the Settlement Program's Base Offer of $522,000 implies that the claimant's 2010 variable profit for May to December should have been $1,092,000. This is not an accurate depiction of the firm's actual financial performance.   A variable profit of $1,092,000 for May to December 2010 would exceed the firm's variable profit in the same period in 2008/2009 by 37%, but would also exceed the firm's revenue for May to December of 2008/2009 by 12%.



This distortion is being driven by the timing of expense payments and cash receipts in May through September in the benchmark and compensation years. Claimant collected 59% of its 2008/2009 annual revenue in June and September 2008/2009, which skews the measurement of the compensation calculation. In 2010, 39% of annual revenues were recorded in April and December, which were outside of the compensation months. By selecting a compensation period of May through September, the claimant's compensation period includes the large spike in 2008/2009 but excludes the similar spike in 2010, both having the effect of increasing the compensation amount.

The fluctuation in variable profit margin in 2008/2009 and 2010 is also an indicator that revenues were not properly matched to costs incurred. For example, in June 2010, claimant recorded a variable profit margin of 7% on revenue of $19,000 compared to a variable profit margin of 88% on revenue of $456,000 in the same month in 2008/2009.



**10.  Claimant ID** ▮▮▮▮▮ *Variable profit is distorted when revenues earned over many periods are recorded in a single month. Variable Profit and Base Offer in May to December of 2010 exceeds 2009 revenues by 7%, 2010 revenue by 67% and 2009 Variable Profit by 27% during the same period.*

This claimant is a personal injury law firm specializes in railroad injuries and maritime accidents.  The firm is located in ▮▮▮▮▮▮▮ (Zone B).[9]  The Settlement Program's Base Offer as currently calculated of $644,000 implies that, in the absence of the spill, claimant's 2010 variable profit for May to December should have been $1,365,000. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $1,365,000 for May to December 2010 would exceed the firm's variable profit in the same period in 2009 by 27% and exceed the revenue from the Benchmark period from May through December in 2009 by 7%.



This distortion is being driven by the timing of expense payments and cash receipts in July through September in the benchmark and compensation years.  By selecting a compensation period of July through September, the claimant's compensation period includes the large spike in September 2009, which has the effect of dramatically overstating the lost profits and compensation award. Additionally, the claimant recorded

---

[9] See website [Reference to website omitted]

revenues of $317,000 in July 2011 and $336,000 in November 2011 which were likely earned in prior months or even years and against which the related expenses are not matched.



**11.  Claimant ID** ▮▮▮▮▮▮▮  *Variable profit is distorted when revenues earned over many periods are recorded in a single month. Base Offer and Variable Profit for May to December 2010 is 5% higher than 2009 revenue in the same period.*

This claimant provides legal services in medical malpractice and personal injury.[10]  Its office is located ▮▮▮▮▮▮▮▮▮▮ in Zone A.  The compensation of $592,000 implies that the claimant's 2010 variable profit from May through December should have been $770,000, an amount in excess of total revenue in the benchmark period. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $770,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2009 by 16%.  The distortion is caused by a large spike in revenue in October 2009, which was earned over many periods.



Inclusion of reimbursed disbursements as revenues also distorted compensation.  Client reimbursed disbursements are pass-through expenses that should not be included as revenue to affect revenue trends.  As shown in the chart below, the reimbursed expenses represent as much as 8% and 7% of total revenues in 2009 and 2010, respectively.

---

[10] See website [Reference to website omitted].



**12.   Claimant ID** ▮▮▮▮▮▮  *Variable profit is distorted when revenues earned over many periods are recorded in a single month. December 2008/2009 revenue accounts for 59% of 2008/2009 benchmark period revenue.*

This claimant provides legal services in civil litigation.   Its office is located ▮▮▮▮▮▮ ▮▮▮▮▮ in Zone D ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The compensation may be distorted due to the timing of expense payments and cash receipts and inclusion of reimbursed expenses as revenues in May through December in the benchmark and compensation years. The claimant's compensation period includes a large revenue spike in 2008/2009, which has the effect of increasing the compensation amount. For example, the claimant collected 59% of its 2008/2009 annual revenue in December.



**13.   Claimant ID** ███████████  *Overcompensation caused by August and September revenue spikes in benchmark period; Base Offer and Variable Profit in May to December 2010 is 140% higher than same period in 2008/2009.*

This claimant provides legal services related to personal injury, mass torts, real estate, maritime law, wrongful death and agricultural law.[11]  Its office is located ███████ ███████ in Zone D.  The BEL compensation offer to this claimant of $328,000 implies that the claimant's 2010 variable profit from May through December should have been $415,000, an amount in excess of the claimant's total revenue in May to December 2010. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $415,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2008/2009 by 140%.



This distortion is being driven by the timing of expense payments and cash receipts from May through October in the benchmark and compensation years.   By selecting a compensation period of May through October, the claimant's compensation period includes large spikes in August and September 2008/2009 having the effect of increasing the compensation amount.

---

[11] See website [Reference to website omitted].



**14. Claimant ID** ▮▮▮▮▮▮▮ *Overcompensation caused by mismatch of revenues to expenses in benchmark period; includes negative profit margin of 19% in the compensation months. Base Offer causes Variable Profit in May to December 2010 to be 37% higher than same period in benchmark year.*

This claimant is a full service multi-discipline engineering firm specializing in control system, instrumentation and electrical design services.  Its office is located ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ in Zone C.  The BEL compensation offer to this claimant of $1,305,000 implies that the claimant's 2010 variable profit from May through December should have been $5,612,000, an amount in excess of the firm's variable profit in the same period in 2007/2008/2009 benchmark year by 37%. This is not an accurate depiction of the firm's actual financial performance.



This distortion is being driven by the timing of expense payments and cash receipts in May through November in the benchmark and compensation years.



The fluctuation in variable profit margin in 2007/2008/2009 and 2010 is an indicator that revenues were not properly matched to costs incurred.  As shown in the chart below, claimant recorded a variable profit margin of *negative 19%* in December 2010, as compared to a variable profit margin of 73% in the same month in 2007/2008/2009.



**15.  Claimant ID** ███████ *Overcompensation caused by mismatch of revenues to expenses in benchmark period; Base Offer and Variable Profit in May to December 2010 exceeds 2009 Variable Profit by 19% during the same period.*

This claimant provides legal services in personal injury litigation.[12]  Its office is located ██████████████ in Zone D. The BEL compensation offer to this claimant of $73,000 implies that the claimant's 2010 variable profit from May through December should have been $259,000, an amount in excess of the claimant's total revenue in May to December 2010. This is not an accurate depiction of the firm's actual financial performance. A variable profit of $259,000 for May through December 2010 would exceed the firm's variable profit in the same period in 2008/2009 by 19%, but would also be close to the firm's revenue for the same period in benchmark year.



This distortion is being driven by the timing of expense payments and cash receipts in May through September in the benchmark and compensation years.  By selecting a compensation period of May through September, the claimant's compensation period includes the large spikes in May 2007/2008/2009 but *excludes the similar spike in October 2010*, both having the effect of increasing the compensation amount.

---

[12] See website [Reference to website omitted].



**16.   Claimant ID** ███████   *Overcompensation caused by receiving 15% more Variable Profit and Base Offer than in 2009 based on an August revenue spike in benchmark period and mismatch of revenues to expenses. Base Offer and Actual Variable Profit in May to December 2010 exceeds 2009 Variable Profit by 15% during the same period.*

This claimant provides legal services in serious personal injury, wrongful death, product liability and commercial litigation.[13]   Its office is located ███████████ in Zone A.  Under the Settlement Program, the claimant received 15% more in variable profit in 2010 than in benchmark year. This was primarily based on an August revenue spike in the benchmark period and the correction of error in December 2010.



---

**17. Claimant ID** ██████████ *Overcompensation caused by a September revenue spike in benchmark period; Base Offer and Variable Profit in May to December 2010 exceeds Variable profit by 14% during the same period in 2009.*

This claimant is a title company that provides title examinations, closings, escrow management, and insurance for residential and commercial real estate transactions.[14] Its office is located ████████████████ in Zone A. The BEL compensation offer to this claimant of $154,000 implies that the claimant's 2010 variable profit from May through December should have been $332,000, an amount in excess of the claimant's variable profit in the same period in the benchmark year by 14%. This is not an accurate depiction of the firm's actual financial performance.



This overcompensation is being driven by the timing of expense payments and cash receipts from May through November in the benchmark and compensation years.  By selecting a compensation period of May through November, the claimant's compensation period includes the large revenue spike in September 2009, which has the effect of increasing the compensation amount.

---

[14] See website [Reference to website omitted].



**18. Claimant** ▇▇▇▇▇ Overcompensation is caused by a *mismatch of revenues and expenses and a negative 74% profit margin in the compensation months. A revenue spike in May accounts for 66% of 2008/2009 annual revenues.*

This claimant provides legal services in personal injury and criminal defense.[15]  Its office is located ▇▇▇▇▇▇▇▇ in Zone A.  The compensation may be distorted due to the timing of expense payments and cash receipts in May through October in the benchmark and compensation years. The claimant's compensation period includes a large revenue spike in May 2008/2009, which has the effect of increasing the compensation amount.



The fluctuation in variable profit margin in 2008/2009 and 2010 is also an indicator that revenues were not properly matched to costs incurred.  As shown in the chart below, in June 2010, claimant recorded a variable profit margin of *negative* 74% compared to a variable profit margin of 20% in the same month in 2008/2009.

---

[15] See website [Reference to website omitted].



**19.  Claimant ID** ███████  *Mismatch of revenues to expenses distorted compensation. The Base Offer causes Variable Profit in May to December 2010 to be 12% higher than during the same period in the benchmark year.*

This claimant is a personal injury law firm specializes in auto accidents, defective products, nursing home injury, slip & fall injury, railroad accidents and maritime accidents.  Claimant's cash receipts are largely dependent on settlement as evident from its website, which states that ████████████████   The firm is located in ██████ ██████ (Zone C).   As shown in the chart below, the Settlement Program's Base Offer of $425,000 implies that, in the absence of the spill, claimant's 2010 variable profit for May to December should have been $815,000. This is not an accurate depiction of the firm's actual financial performance.  A variable profit of $815,000 for May to December 2010 would exceed the firm's variable profit in the same period in 2007/2008/2009 by 12%.



Claimant ID: ██████
Benchmark Year: 2007/2008/2009 / Compensation Months: May-Dec

This distortion is being driven by the timing of expense payments and cash receipts in May through December in the benchmark and compensation years.  For example, 48% of annual revenues in 2010 were recorded in March and April 2010, which were outside of the Compensation months.  Additionally, the claimant recorded significant revenues of

$198,000 in May 2011 which were likely earned in prior months or even years and against which the related expenses are not matched.



**20. Claimant ID** ▮▮▮▮▮▮ *Overcompensation caused by a September revenue spike in benchmark period and a mismatch of revenues to expenses. September revenue accounts for 30% of 2007/2008/2009 benchmark period revenues.*

This claimant provides legal services in personal injury, hurricane related claims, insurance bad faith, contract law, probate litigation and white collar criminal defense. The firm is located ▮▮▮▮▮▮▮▮▮ in Zone A.[16] The compensation may be distorted due to the timing of expense payments and cash receipts and inclusion of reimbursed expenses as revenues in May through December in the benchmark and compensation years. The claimant's compensation period includes a large revenue spike in September of the benchmark year, despite those amounts being earned over longer periods.



Inclusion of reimbursed expenses as revenues also distorted the compensation. Reimbursed disbursements are pass-through expenses and should not affect revenue trends.   As shown in the chart below, reimbursed disbursements represent as much as 13% and 19% of total revenues in 2007/2008/2009 and 2010.

---

[16] See website [Reference to website omitted]



**21. Claimant ID** ▮▮▮▮▮ *Overcompensation caused by a December revenue spike in benchmark period and a mismatch of revenues to expenses. Base Offer and Variable Profit from May to December 2010 exceeds revenues in 2010 for the same period.*

This claimant provides legal services in civil litigation, creation of business entities, drafting of contracts and wills and trusts.   Its office is located ▮▮▮▮▮▮ in Zone A.  The compensation may be distorted due to the timing of expense payments and cash receipts and inclusion of reimbursed expenses as revenues in May through December in the benchmark and compensation years. The claimant's compensation period includes a large revenue spike in December 2008/2009, which was likely earned over many periods.



Inclusion of reimbursed expenses as revenues also distorts the compensation. Reimbursed disbursements are pass-through expenses and should not affect revenue trends.   As shown in the chart below, reimbursed disbursements represent as much as 16% and 7% of total revenues in 2008/2009 and 2010.



**22. Claimant ID** ▇▇▇▇▇▇ *Compensation awarded makes the Variable Loss for May to December 2010 equal to the same period in benchmark year. Compensation may be distorted due to extreme fluctuations in the Variable Profit margin percentage in 2010.*

This claimant provides legal services related to family law.[17]  Its office is located in ▇▇▇▇▇▇▇▇▇▇▇ Zone C. The BEL compensation offer to this claimant of $51,000 implies that the claimant's 2010 variable loss from May through December should have been negative $139,000, an amount equal to the claimant's variable loss in the benchmark year.



Although compensation appears to be comparable with benchmark year, there may be distortion that is being driven by the timing of expense payments and cash receipts in May through December in the benchmark and compensation years.

---

[17] See website [Reference to website omitted].



The fluctuation in variable profit margin in 2007/2008/2009 and 2010 is an indicator that revenues were not properly matched to costs incurred.  As shown in the chart below, claimant recorded a variable profit margin of *negative 405*% in June 2010, as compared to a variable profit margin of *negative 122%* in the same month in 2007/2008/2009.



**Appendix C**

**BP's Proposed Triggers or Thresholds**

BP has proposed three indicators or thresholds that would trigger a further review of a claimant's financial data. These triggers are as follows:

- *Trigger 1 (Revenue Spike):* is a test designed to capture unusual and non seasonal variance in the monthly financial revenue of a claimant when material cash is collected as opposed to earned.

- *Trigger 2 (Months with Negative Margin):* evaluates whether negative variable profit was recorded in any given month of the Benchmark period or 2010. The premise of the test is that the occurrence of negative variable profit indicates a potential mismatch between revenue and corresponding expenses as opposed to the failure of the firm to perform.

- *Trigger 3 (Range of Variable Profit Percentages):* seeks to capture unusual economic swings in variable profit margin (as a percentage of revenue) on a month-to-month basis during the Benchmark period or 2010. This trigger identifies potential distortions where the variable profit margin is affected by the timing of the payment of expenses and receipt of revenues.

These triggers detect those claimants with financial statements that are not representative of their financial performance as illustrated in the chart below:

| No. | Claimant ID. | Claim ID. | Benchmark Year | Compensation Months | Revenue Spike | Months with Negative Margin | Range of Variable Profit Percentages |
|---|---|---|---|---|---|---|---|
| 1 | | 89271 | 2009 | Sept - Nov | 51% of 2009 annual revenue in Sept 2009 | 1 month in 2009 | (1,414%) in Dec 2009 to 100% in Feb, May 2009 |
| 2 | | 23333 | 2009 | Aug - Nov | 41% of 2009 annual revenue in Aug 2009 | 0 months in 2009 | 44% in Dec 2009 to 100% in Mar 2009 |
| 3 | | 45022 | 2009 | May - Jul | 28% of 2009 annual revenue in Apr 2009 | 1 month in 2009 | (125%) in Jan 2009 to 100% in Feb, Jul, Aug, Oct, Nov 2009 |
| 4 | | 53500 | 2009 | Jun-Oct | 23% of 2009 annual revenue in Jun 2009 | 3 months in 2009 | (118%) in Oct 2009 to 198% in Dec 2009 |
| 5 | | 20275 | 2009 | Oct-Dec | 18% of 2009 annual revenue in Dec 2009 | 1 month in 2009 | (170%) in Jun 2009 to 100% in Mar 2009 |
| 6 | | 89512 | 2007/2008/2009 | May - Sept | 50% of 2007/2008/2009 annual revenue in May | 0 months in 2007/2008/2009 | 37% in Dec 2007/2008/2009 to 98% in April 2007/2008/2009 |
| 7 | | 48472 | 2009 | Aug - Dec | 26% of 2009 annual revenue in Aug 2009 | 0 months in 2009 | 40% in Dec 2009 to 98% in Sept 2009 |
| 8 | | 81524 | 2008/2009 | Jul-Nov | 12% of 2008/2009 annual revenue in Aug 2008/2009 | 0 month in 2008/2009 | (10%) in Sept 2008/2009 to 99% in Jan 2008/2009 |
| 9 | | 26771 | 2008/2009 | May - Sept | 34% of 2008/2009 annual revenue in June 2008/2009 | 0 months in 2008/2009 | 22% in Aug 2008/2009 to 95% in Jan 2008/2009 |
| 10 | | 18039 | 2009 | Jul - Sept | 40% of 2009 annual revenue in Sept 2009 | 2 months in 2009 | (131%) in May 2009 to 99% in Mar 2009 |
| 11 | | 56361 | 2009 | Sept - Nov | 58% of 2009 annual revenue in Oct 2009 | 2 months in 2009 | (319%) in Dec 2009 to 95% in Nov 2009 |
| 12 | | 29669 | 2008/2009 | May - Dec | 59% of 2008/2009 annual revenue in Dec 2008/2009 | 0 months in 2008/2009 | 64% in Sept 2008/2009 to 100% in Apr 2008/2009 |
| 13 | | 89943 | 2008/2009 | May-Oct | 17% of 2008/2009 annual revenue in Aug 2008/2009 | 1 month in 2008/2009 | (323%) in Dec 2008/2009 to 109% in May 2008/2009 |
| 14 | | 1237 | 2007/2008/2009 | May-Nov | 13% of 2007/2008/2009 annual revenue in Oct 2007/2008/2009 | 1 month in 2007/2008/2009 | (19%) in Dec 2007/2008/2009 to 84% in May 2007/2008/2009 |
| 15 | | 73016 | 2007/2008/2009 | May-Sept | 12% of 2007/2008/2009 annual revenue in May 2007/2008/2009 | 0 month in 2007/2008/2009 | 62% in Dec 2007/2008/2009 to 96% in Jan 2007/2008/2009 |
| 16 | | 31909 | 2009 | Aug - Dec | 66% of 2009 annual revenue in Aug 2009 | 3 months in 2009 | (899%) in Dec 2009 to 1,541% in Jun 2009 |
| 17 | | 45443 | 2009 | May-Nov | 21% of 2009 annual revenue in Sept 2009 | 0 months in 2009 | 58% in Dec 2009 to 99% in Sept 2009 |
| 18 | | 25040 | 2008/2009 | May - Oct | 66% of 2008/2009 annual revenue in May 2008/2009 | 0 months in 2008/2009 | 20% in Jun 2008/2009 to 96% in May 2008/2009 |
| 19 | | 102577 | 2007/2008/2009 | May - Dec | 14% of 2007/2008/2009 annual revenue in Aug 2007/2008/2009 | 0 months in 2007/2008/2009 | 72% in Dec 2007/2008/2009 to 99% in Jan 2007/2008/2009 |
| 20 | | 51901 | 2007/2008/2009 | May - Dec | 30% of 2007/2008/2009 annual revenue in Sept | 0 months in 2007/2008/2009 | 27% in Nov 2007/2008/2009 to 96% in Jan 2007/2008/2009 |
| 21 | | 46320 | 2008/2009 | May - Dec | 18% of 2008/2009 annual revenue in Dec 2008/2009 | 0 months in 2008/2009 | 64% in Jul 2008/2009 to 94% in Feb 2008/2009 |
| 22 | | 92597 | 2007/2008/2009 | May-Dec | 11% of 2007/2008/2009 annual revenue in Aug 2007/2008/2009 | 7 month in 2007/2008/2009 | (122%) in Jun 2007/2008/2009 to 97% in Mar 2007/2008/2009 |

Page 2