# Exhibit 18L

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

*********************************************

DECLARATION OF HAL SIDER

I.      QUALIFICATIONS

1.      I am a Senior Vice-President of Compass Lexecon.  I received a Ph.D. in Economics from the University of Wisconsin (Madison).  I have been with Compass Lexecon (formerly Lexecon) since 1985, having previously worked in several U.S. government positions.  I specialize in applied microeconomic analysis and have performed a wide variety of economic and econometric studies relating to damages, competition, and antitrust.  I have published a variety of articles in professional journals including several that evaluate the impact of measurement error on economic analysis.  A copy of my curriculum vita is attached as Exhibit A to this declaration.

2.      I led a Compass Lexecon team that advised BP during the negotiation of the Economic Damage Claim Frameworks, including the Business Economic Loss (BEL) damage framework, of the Economic and Property Damages Settlement Agreement in MDL 2179.  Since that time I have continued to assist BP in evaluating issues related to implementation of the BEL damage framework.  Members of my team at various times have been involved in discussions with PwC and Brown Greer, two of the Claims Administration Vendors for the Court-Supervised Settlement Program (CSSP), on technical issues relating to implementation of the BEL damage framework in MDS 2179.  We also assist BP in determining which offers made by CSSP to BEL claimants to appeal.  As part of our on-going responsibilities, I have reviewed numerous CSSP offers and claim files of BEL claimants, including workbooks prepared by PwC and related data.  I also monitor general trends in CSSP offers to BEL

claimants and BEL claim activity, as reflected both in reports posted by the Claims Administrator to the CSSP portal, and in claim-specific computer data files posted by CSSP each week that identify the status of all claims, including claimant characteristics and the size of offers made to BEL claimants.

3.     The Claims Administrator has observed that CSSP's current approach to calculating monthly revenue and variable profit "can result in awards that appear disproportionate". This declaration evaluates the source and empirical importance of distortions in BEL claim determinations as well as their impact on BEL claims activity.  I also have evaluated Class Counsel's claim that distortions in calculation of BEL awards do not systematically favor BEL claimants, and often reduce compensation offered to claimants.

This declaration also describes BP's approach to implementing the BEL framework consistent with its terms, and provides examples of how matching of revenues and corresponding expenses for claimants would be undertaken for actual BEL claimants.  These examples highlight the absurd and disproportionate results of CSSP's current approach, and show that BP's approach is straightforward and workable.

A list of the materials I relied upon to conduct my evaluations is attached as Exhibit B.

## II.     SUMMARY OF OPINIONS

4.     Based on my analysis of CSSP BEL claims and trends in CSSP BEL claim activity, and involvement in the implementation of the BEL framework, my principal conclusions are as follows:

- Available CSSP data indicate that the consequences of CSSP's failure to align revenue with the corresponding expenses incurred in evaluating BEL claims are large and are growing.

  - BEL claimants in industries which have been identified as being subject to significant errors in the measurement of variable profit, including construction, professional services, and agriculture account for more than half of the 100 largest BEL offers by CSSP and for more than 40% of the total value of CSSP BEL offers to date.  Many other large offers have been made to firms located far from the Gulf in industries

such as manufacturing (and others) which are typically not considered to have suffered spill-related harm, again indicating that errors in the measurement of variable profit distort offers under CSSP's implementation of the BEL framework. (¶¶10-13)

o   Few BEL claimants in the construction, professional services and agriculture sectors that have received large offers from CSSP had previously claimed that they had suffered spill-related harm by submitting Short Form Joinders (SFJs) to the MDL 2179 Court.  Similarly, few manufacturing firms had submitted SFJs.  Along with other evidence presented here, this indicates that many large CSSP offers to these claimants are a result of measurement errors resulting in a windfall payment unrelated to the spill. (¶¶14-16)

o   While the number of new BEL claims from tourism-based industries has been declining, the number of new BEL claims is increasing from sectors such as construction, professional services, agriculture and others that are subject to significant error in the measurement of variable profit by the CSSP.  This indicates that CSSP's actions are attracting new claimants that are likely to generate inflated offers due to CSSP's reliance on flawed financial data to compute BEL claims. (¶¶17-20)

- CSSP's failure to properly identify when revenue was earned and failure to match revenue with the corresponding variable expenses incurred to generate that revenue results in systematic overcompensation for BEL claimants.  Distortions systematically increase BEL compensation offers because the months in which the CSSP's measurement error increase estimates of the claimant's lost variable profit are then selected from among the many options available for the compensation and benchmark periods for determining BEL

3

compensation.  This problem is avoided simply by utilizing financial data that properly identifies when revenue is earned and properly aligns revenue with the corresponding expenses incurred in generating that revenue. (¶¶ 21-28)

- Irregularities in financial data submitted by claimants to CSSP are common and can be readily identified.[1]  I have used data from CSSP claims files for BEL claimants and I have implemented the "triggers" identified by BP in its second submission to the Claims Administrator.  This analysis requires no information other than that contained in the BEL claims workbooks of the Settlement Program's accounting vendors.  My analysis of BEL claims indicates that many claims in the construction, agriculture, professional services and other sectors are identified by empirical trigger tests that indicate the presence of errors in the measurement of when revenue is earned and failure to align revenue with the corresponding variable expenses.  Application of the same triggers to BEL claims in other industries also indicates that such measurement problems by the CSSP are widespread, albeit somewhat less frequently than in the construction, agriculture, and professional services industries. (¶¶29-36)

- BP's four-step approach to identifying and correcting data inaccuracies and matching problems is workable and can be readily implemented across a wide range of industries. The four-step approach described in Section VI incorporates and further elaborates on the approach described in (i) BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination on January 9, 2013 and (ii) BP's Further Submission in Response to Class Counsel's December 16, 2012 Request for Policy Determination on January 11, 2013.

---

[1] By "irregularities" I mean failure of financial statements to record accurately revenue when earned and to match it with corresponding variable expenses incurred to generate that revenue.  That may be the simple result of how a firm records cash payments and receipts in the normal course of business and, for purposes of this analysis, irregularities is not intended to imply any intentional misrepresentation or error by the claimant.

This four-step approach is implemented for five claims that exhibit patterns of data inaccuracies and irregularities common to other claims. These inaccuracies can be readily identified and corrections can be readily implemented. (¶¶37-79)

- Application of BP's approach to match revenue and corresponding variable expenses for a broader sample of agriculture claims and construction claims indicates that CSSP's reliance on unadjusted data submitted by claimants systematically leads to substantially inflated offers, and contradicts Class Counsel's claims that errors by CSSP in measuring variable profit work both for and against BEL claimants. The analysis also confirms that matching techniques described by BP to correct these errors can be readily applied across a broad set of BEL claims. (¶¶80-87)

- Class Counsel has incorrectly suggested that BP's participation in quality assurance (QA) testing of CSSP's Excel spreadsheet model for processing BEL claims effectively endorsed CSSP's use of data that do not accurately reflect when revenue was earned and do not properly match it to corresponding variable expenses. The exercise mentioned by Class Counsel was designed solely to test the reliability of the computer programs used by CSSP in evaluating BEL claims. The exercise did not consider data quality issues because the accuracy of CSSP's program was tested based on the assumption that the underlying data were accurate. (¶¶88-91)

## III.   CSSP'S BEL IMPLEMENTATION IS RESULTING IN WINDFALL PAYMENTS TO LARGE GROUPS OF CLAIMANTS SUBMITTING FLAWED AND INCOMPLETE FINANCIAL DATA.

5.      Prior BP filings to the Claims Administrator and the Court and declarations from BP's accounting experts have highlighted problems resulting from CSSP's reliance in computing BEL claims on financial data, such as cash-basis financial statements, that fail to align revenue with the corresponding expenses incurred to generate that revenue. Much of this discussion has focused on BEL claimants in

the construction, professional services, and agricultural sectors.[2]  Analysis of claims from a wider set of industries shows that matching issues are not unique to claims from the construction, professional services and agriculture sectors, but instead are widespread.  Nonetheless, distortions in CSSP offers to claimants in these three sectors are pervasive and have been the focus of much prior discussion and are the focus of the analysis presented in this section.

6.        Under the Settlement Agreement, the compensation for BEL claims is based on whether the claimant experienced a decline in variable profit in the post-spill time period of 2010 compared to a pre-spill benchmark period.  However, as discussed in the declarations of Roman Weil and Richard Dietrich, evaluation of variable profits requires properly identifying when revenue is generated as well as matching (or aligning) revenue and corresponding variable expenses incurred to generate that revenue.[3]  As a result, application of the BEL compensation and causation formulas using financial information, such as that based on cash basis financial statements (or other financial statements that do not properly align revenue and corresponding variable expenses), does not reliably measure revenue, variable expenses, or variable profit.

7.        More generally, offers generated by application of the BEL compensation formula as Class Counsel proposes (and as currently implemented by the CSSP) using data that do not properly align revenue and variable expenses will be driven by factors such as the timing of financial data entries and measurement errors that are unrelated to changes in a firm's variable profit.  Under these circumstances, the BEL compensation offer is likely to differ dramatically for two otherwise identical firms that happen to keep their financial records in a different manner.  For example, a manufacturing

---

[2] Declaration of David Hall, January 23, 2013; Declaration of Xavier Oustalniol, January 23, 2013; Declaration of Charles E. Finch, January 23, 2013; Supplemental Declaration of David Hall, February 18, 2013; Supplemental Declaration of Xavier Oustalniol, February 18, 2013; Supplemental Declaration of Charles E. Finch, February 18, 2013.

[3] Declaration of Roman L. Weil, February 18, 2013; Declaration of J. Richard Dietrich, February 18, 2013.

firm that documents its claim using cash-based financial statements would be likely to generate a substantially higher offer than an otherwise identical firm that used accrual basis accounting.

8. As explained further in Section IV below, measurement errors can raise or lower calculations of changes in variable profit over time. However, the ability of claimants to be compensated based on the set of months that generates the largest award means that the impact of these BEL measurement errors by the CSSP will systematically result in windfalls for claimants (since periods for which measurement errors reduces compensation results will not be selected as the compensation period).

9. The remainder of this section shows that the failure to match revenue and corresponding variable expenses affects a large number of BEL claims, resulting in payments that overstate spill-related losses suffered by BEL claimants, and risks overpayment of a large number of future BEL claims. This section also shows that the problems in CSSP's implementation of the BEL framework is attracting a growing number of new BEL claims from claimants in industries with financial data that suffer from the "matching" problems identified by BP, including many from industries with no connection to tourism or seafood and from locations remote from the Gulf Coast.

**A. Most large CSSP offers have been made to claimants in industries characterized by flawed financial data.**

10. To highlight the magnitude of the impact on BEL offers from errors by CSSP in measurement of variable profit, I have reviewed the 100 largest BEL offers made by CSSP to date, which are listed in Table 1. Fully 54 of the 100 largest claims have been made to BEL claimants from the construction, agriculture and professional services sectors that were the focus of BP's prior submissions.

11. While it is possible that some of these firms were adversely affected by the spill, the large size of many of the BEL claims in these industries, which have been identified by BP accounting experts as often providing irregular financial data, likely reflects distortions due to CSSP's reliance on financial data that fail to properly identify when revenue was earned and fails to properly match

7

revenue with the corresponding expenses incurred.  Table 1 also shows that many of these claimants

are also located far from the Gulf coast, suggesting that measurement error, rather than spill impact

alone, has an important impact on CSSP's offer.

12.     Together with other data presented in this report, Table 1 indicates that the impact of

errors in CSSP's measurement of variable profit on BEL offers is large and systematic, and often results in

windfalls to many BEL claimants unrelated to actual harm due to the spill.  The presence of

manufacturing firms (such as ███████████████████████ and others) on this list also

indicates that problems resulting from errors in calculating variable profit are not necessarily limited to

the construction, agriculture and professional services industries that have been the focus of discussion

to this point.

Table 1

## Top 100 CSSP Business Economic Loss Offers

| Business Name | Zone | Industry | Miles to Coast | Offer ($) | Business Name | Zone | Industry | Miles to Coast | Offer ($) |
|---|---|---|---|---|---|---|---|---|---|
|  | B | Rice Milling | 45 | $21 079 364 |  | B | Offices of Lawyers | 13 | $2 297 984 |
|  | B | Other Aquaculture | 26 | $16 571 427 |  | D | Metal Manufacturing | 200 | $2 280 241 |
|  | D | Housing Construction | 212 | $12,679,064 |  | A | Museums | 14 | $2,252,239 |
|  | D | Road Construction | 196 | $9 679 557 |  | D | Recyclable Wholesalers | 12 | $2 229 906 |
|  | A | Housing Construction | 10 | $7,036,079 |  | D | Psychiatric Hospitals | 34 | $2,229,857 |
|  | A | Commercial Construction | 0 | $2,190,724 |  | A | Amusement and Theme Parks | 0 | $2,190,774 |
|  | D | Rolled Steel Manufacturing | 135 | $5 592 073 |  | D | Plumbing/HVAC Contractors | 215 | $2 143 646 |
|  | B | Housing Construction | 65 | $5,477,321 |  | B | Seafood Processing | 4 | $2,134,142 |
|  | B | Offices of Lawyers | 14 | $5 097 291 |  | D | Offices of Lawyers | 214 | $2 129 757 |
|  | A | Television Broadcasting | 138 | $4 805 779 |  | D | Electrical Contractors | 233 | $2 116 620 |
|  | D | Commercial Construction | 66 | $4,792,519 |  | C | Seafood Markets | 78 | $2,108,051 |
|  | D | Commercial Construction | 26 | $4 787 022 |  | D | Computer Services | 207 | $2 106 984 |
|  | D | Commercial Construction | 87 | $4,522,554 |  | C | Commercial Construction | 43 | $2,091,905 |
|  | A | Offices of Lawyers | 1 | $4,449,128 |  | C | Commercial Construction | 9 | $2,080,697 |
|  | A | Services to Buildings | 0 | $4 283 272 |  | B | Home Centers | 6 | $2 072 447 |
|  | D | Machinery Manufacturing | 18 | $4,187,865 |  | A | Temporary Help Services | 14 | $2,061,143 |
|  | B | Movie Theaters | 0 | $3 996 447 |  | D | Specialty Trade Contractors | 192 | $2,057 130 |
|  | B | Seafood Processing | 25 | $3 989 619 |  | D | Glass and Glazing Contractors | 65 | $2,049 492 |
|  | B | Seafood Wholesalers | 25 | $3,978,251 |  | C | Unkwnown | 20 | $2,019,123 |
|  | A | Offices of Lawyers | 1 | $3 922 135 |  | D | Plumbing/HVAC Contractors | 7 | $1 996 331 |
|  | D | Metal Manufacturing | 138 | $3 889 870 |  | D | Electrical Contractors | 18 | $1 968 050 |
|  | B | Transportation Equipment Sales | 14 | $3,822,376 |  | B | Site Preparation Contractors | 13 | $1,954,285 |
|  | C | Digital Printing | 23 | $3 661 056 |  | A | Clothing Accessories Stores | 0 | $1 953 247 |
|  | D | Concrete Block and Brick Manufacturi | 167 | $3,599,468 |  | C | Seafood Wholesalers | 17 | $1,927,726 |
|  | B | Offices of Lawyers | 5 | $3 591 826 |  | B | Offices of Lawyers | 13 | $1 910 255 |
|  | D | Offices of Lawyers | 18 | $3 477 414 |  | C | Seafood Processing | 19 | $1 891 839 |
|  | D | Commercial Construction | 19 | $3,472,660 |  | A | Commercial Construction | 3 | $1,872,754 |
|  | B | Real Estate Agents/Brokers | 14 | $3 470 021 |  | D | Offices of Lawyers | 213 | $1 870 014 |
|  | D | Specialty Trade Contractors | 149 | $3 355 129 |  | B | Offices of Lawyers | 13 | $1 830 903 |
|  | C | Offices of Lawyers | 59 | $3,323,198 |  | B | Offices of Lawyers | 13 | $1,829,365 |
|  | C | Seafood Wholesalers | 4 | $3 243 726 |  | A | Outpatient Care Centers | 0 | $1 824 752 |
|  | A | Plumbing/HVAC Contractors | 22 | $3,150,000 |  | A | Other Clothing Stores | 129 | $1,810,573 |
|  | D | Commercial Construction | 19 | $3 020 959 |  | A | Real Estate Agents/Brokers | 1 | $1 790 531 |
|  | D | Rice Farming | 199 | $3 018 962 |  | A | Other Clothing Stores | 129 | $1 786 210 |
|  | D | Truck Rental and Leasing | 102 | $2,978,595 |  | D | Offices of Lawyers | 62 | $1,728,702 |
|  | C | Commercial Construction | 15 | $2 880 207 |  | A | Offices of Lawyers | 14 | $1 724 306 |
|  | B | Offices of Lawyers | 24 | $2 872 977 |  | B | Home Health Care Services | 15 | $1 717 613 |
|  | B | Seafood Wholesalers | 26 | $2,869,483 |  | D | Iron Foundries | 91 | $1,716,311 |
|  | A | Offices of Lawyers | 1 | $2,817 780 |  | A | Seafood Wholesalers | 3 | $1 701 467 |
|  | B | Offices of Lawyers | 26 | $2,751,400 |  | C | Plumbing/HVAC Contractors | 22 | $1,673,057 |
|  | D | Architectural Services | 195 | $2 726 023 |  | D | Metal Wholesalers | 207 | $1 662 817 |
|  | B | Landscape Architectural Services | 16 | $2 641 092 |  | D | Hardware Merchant Wholesalers | 153 | $1 659 742 |
|  | D | Road Construction | 24 | $2,614,028 |  | C | Offices of Lawyers | 14 | $1,658,236 |
|  | B | Offices of Lawyers | 14 | $2 599 456 |  | A | Sightseeing Transit Water | 1 | $1 650 637 |
|  | D | Rolled Steel Manufacturing | 207 | $2,456 172 |  | C | Industrial Supplies Wholesalers | 55 | $1 650 177 |
|  | C | Electrical Contractors | 7 | $2,422,343 |  | A | Marinas | 0 | $1,588,261 |
|  | A | Hotels and Motels | 0 | $2 421 782 |  | D | Fish Farming and Hatcheries | 308 | $1 570 270 |
|  | C | Hotels and Motels | 41 | $2,408,556 |  | D | Offices of Lawyers | 214 | $1,567,613 |
|  | D | Seafood Processing | 15 | $2 302 809 |  | D | Misc. Crop Farming | 251 | $1 544 759 |
|  | D | Multifamily Housing Construction | 211 | $2 301 962 |  | D | Brick Wholesalers | 111 | $1 536 297 |

Note: The highlighted claims are in Agriculture, Construction, Professional Services, or Manufacturing.

13.     In addition to accounting for the majority of the largest CSSP offers to BEL claimants, claimants in the construction, agriculture and professional services sectors make up a large share of all BEL offers made by CSSP to date.  Table 2 reports the total number of BEL claims and total dollar value of BEL claim offers made by CSSP in these three industries as well those from other sectors.  As of February 11, 2013, CSSP had offered $414.8 million to BEL claimants in these three sectors, which reflects over 40% of the total amount offered to BEL claimants to date.  Table 2 also highlights the potential future impact of errors in the measurement of variable profit on BEL offers if the CSSP's process is not corrected.  While that potential future impact cannot reliably be quantified and estimated from current data, the fact that more than 80 percent of claims received by CSSP remain outstanding (e.g., have not received an eligibility or a denial notice) indicates that the future impact could be enormous.  Furthermore, as discussed below, the inflow of new claims submitted to CSSP continues unabated.

**Table 2**

### CSSP BEL Submitted Claims and Offers as of February 11, 2013

| Industry | Number of Offers | Total Amount Offered ($M) | Percent of Total Offers | Percent of Total Amount Offered | Number of Outstanding Claims | Outsanding Claims as Percent of Category Total |
|---|---|---|---|---|---|---|
| Agriculture | 103 | $54.2 | 2% | 5% | 920 | 84% |
| Construction | 593 | $208.8 | 14% | 20% | 3,275 | 79% |
| Professional Services | 540 | $151.7 | 13% | 15% | 1,813 | 73% |
| Total for Selected Industries | 1,236 | $414.8 | 29% | 40% | 6,008 | 78% |
| Total for All Industries | 4,288 | $1,028.4 | 100% | 100% | 29,372 | 81% |

Source: CSSP data through 2/11/2013.

Notes:   Outstanding claims include those that have not yet received an eligibility notice or a denial notice.
Outstanding claims includes 6,960 claims which cannot be classified into industry type due to missing data.

**B. Few recipients of large CSSP offers from the farming, construction and professional services sectors signed SFJs.**

14.     The large majority of claimants in the construction, agriculture and professional services industries that received large BEL offers did not submit SFJs which identify their intent to participate in MDL 2179.  While participation in the Economic and Property Damages Settlement is not restricted to entities that signed SFJs, the fact that few of these BEL claimants with large offers had previously claimed harm from the spill strongly suggests that other factors, including errors in the measurement of lost variable profit, contribute to the large offers they receive.  This view is reinforced by the fact that claimants that wanted to seek damages against Transocean faced the "monitions deadline" to file their claims on or before April 20, 2011.[4]  Presumably, claimants that thought they had spill related claims would not have wanted to risk being unable to recover damages from Transocean and those who filed on or before the monitions deadline clearly preserved their ability to recover potential damages from all defendants named in the economic damages master complaint, and thus would also have been expected to file SFJs.

15.     I have examined the 471 BEL claims generating offers that exceed $500,000 through February 11, 2013, and I have identified which of these claimants had filed an SFJ.  As shown in Table 3, only 5.5% of construction claimants that received large BEL offers had signed SFJs.  Similarly, only 2.7% of the professional service claimants that received large BEL offers had signed SFJs; and less than 4% of claimants in agriculture and manufacturing claimants receiving large awards had signed SFJs.  In contrast, 70.8% of seafood processors and wholesalers that received large BEL offers had signed SFJs, and substantial percentages are also observed among retail claimants (41.4%), real estate claimants (30.4%), and other claimants in tourism-related industries.

---

[4] *See* MDL 2179 Rec. Doc. 569 (Oct. 19, 2010)

16.    The low levels of participation in the SFJ process by claimants in the construction, professional services, agriculture and manufacturing sectors indicate that many such claimants did not believe that they suffered any significant loss related to the spill and thus implies that large CSSP offers to such claimants are the likely product of errors in the measurement of lost variable profit that result in windfall payments unrelated to the impact of the DWH spill.

**Table 3**

### Large CSSP BEL Offers Matched to SFJ Data

| Industry | All Large CSSP BEL Offers | Large CSSP BEL Offers Matched to SFJ | % of Total |
|---|---|---|---|
| Professional Services | 73 | 2 | 2.7% |
| Manufacturing | 29 | 1 | 3.4% |
| Agriculture | 26 | 1 | 3.8% |
| Construction | 91 | 5 | 5.5% |
| Health Care | 20 | 2 | 10.0% |
| All Other Industries | 67 | 13 | 19.4% |
| Real Estate | 23 | 7 | 30.4% |
| Bars and Restaurants | 32 | 11 | 34.4% |
| Hotels and Motels | 28 | 10 | 35.7% |
| Retail Trade | 58 | 24 | 41.4% |
| Seafood Processors and Wholesalers | 24 | 17 | 70.8% |
| All Large CSSP BEL Offers | 471 | 93 | 19.7% |

Sources: CSSP data as of February 11, 2013; SFJ data as of March 16, 2012.
Notes: Based on CSSP BEL offers above $500,000.

**C.  CSSP is attracting many new BEL claims from industries characterized by flawed financial data and from businesses that have not previously claimed to have suffered spill-related harm.**

17.    Trends in the number of new BEL claims submitted to CSSP further suggest that CSSP's use of flawed financial data to determine BEL compensation is attracting both new claimants with flawed financial data as well as claimants that had not previously claimed harm from the DWH spill.  As a starting point, Figure 1 shows that the weekly number of newly submitted BEL claims varies from week to week (due in part to holidays) but follows no discernible trend up or down.

**Figure 1**



**New BEL Claims by Week**

Note: Based on CSSP weekly data as of February 11, 2013.

18.     However, as shown in Figure 2, this overall trend masks trends among subgroups of claimants that suggest that CSSP's implementation of the BEL framework is attracting an increasing number of claimants from industries such as agriculture, construction, and  professional services located in zones C and D with no apparent direct tie to the spill, or even the Gulf Coast.  As discussed above (and further below) claimants in these industries often have financial data that fail to properly recognize when revenue is earned and fail to properly align revenue and corresponding variable expenses. Nonetheless, in recent weeks claims from these three industries in zones C and D alone have come to account for more than 25% of all new BEL claims.

**Figure 2**



Note: Based on CSSP weekly data as of February 4, 2013.  Data since February 4, 2013 are excluded as almost 90% of these claims are missing industry information.

19.      In addition, as shown in Figure 3, the share of new claimants that previously claimed economic loss from the DWH spill by participating in GCCF has fallen steadily in recent months while the share of new claims accounted for by claimants that did not participate in GCCF has grown.  This in turn suggests that CSSP is attracting many claimants that did not previously claim to have suffered spill-related harm.

**Figure 3**



Note: Based on CSSP weekly data as of February 11, 2013.

20.    In sum, the increasing frequency of these types of claims indicates that CSSP application of data that fails to properly measure variable profit is attracting claimants that did not previously assert, and that were not previously considered to have suffered, spill related losses, and that the impact of these errors on BEL activity is increasing.

## IV.    FAILURE TO PROPERLY MATCH REVENUE AND EXPENSES RESULTS IN SYSTEMATIC OVERCOMPENSATION FOR BEL CLAIMANTS.

21.    CSSP's use of financial data that fail to recognize when revenue was earned and fail to align revenue with expenses incurred leads to errors in measurement of variable profit, which is the cornerstone of the BEL framework.  While Class Counsel does not dispute that errors in the measurement of variable profit lead to anomalous BEL offers, Class Counsel claims (incorrectly) that such errors are occasional and do not systematically benefit claimants.  This section refutes that assertion and briefly explains how the failure to properly match revenue and corresponding expenses

incurred to generate that revenue systematically results in overcompensation of claimants, often by large amounts.

22.     The BEL framework is designed to be "claimant friendly" in the sense that it offers 63 different combinations of compensation months and benchmark periods that can be used in determining "Step 1" compensation alone, with the BEL compensation offer based on the alternative that yields the highest award.[5]   The flexibility provided to BEL claimants in selecting damage periods under the Settlement Agreement was designed recognizing that not all claimants adversely affected by the spill were harmed over the same time period.

23.     However, errors in the measurement of variable profit resulting from CSSP's reliance on financial data that fail to identify when revenue was earned and fail to properly match revenue and corresponding expenses incurred can be greatly magnified by the ability of claimants to be compensated based on the most generous among multiple compensation periods and benchmark years.  The distortions will (almost) always work to increase compensation for a simple reason – any period in which measurement error decreases estimates of lost variable profit will not be selected in determining compensation, while periods in which measurement error increases estimates of lost variable profit become the prime candidates for determining compensation.

24.     Thus, a feature of the Settlement Agreement negotiated to provide BEL claimants with flexibility in choosing the appropriate damage period has become a mechanism by which some BEL claimants receive windfalls based upon errors in the measurement of variable profit, not on the economic impact of the spill.  Perversely, the greater the errors in the measurement of variable profit, the greater the artificial inflation of BEL compensation offers (relative to the correctly measured loss in variable profits).  The resulting measures of compensation often bear no relation to a claimant's

---

[5] The BEL framework requires claimants to choose "comparable months".  While CSSP does not appear to consider this requirement, its application may affect the number of options available to claimants under the Settlement Agreement in determining Step 1 compensation.

(properly measured) loss in variable profits.   This problem, however, can be avoided simply by the use of financial data that properly identifies and matches monthly revenue with the corresponding expenses incurred to generate that revenue.

25.     The following example helps illustrate that greater measurement error systematically results in greater compensation for BEL claimants.  Table 4 compares the compensation awarded to a hypothetical claimant when 2009 variable profit is (i) measured without error, (ii) measured with some error, and (iii) measured with a higher degree of error.

**Table 4**

**Example: Variability in Financial Data Increases Potential Compensation**

|  | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | MAY-DEC |
|---|---|---|---|---|---|---|---|---|---|
| *No Error in Measuring 2009 Variable Profit:* | | | | | | | | | |
| 2009 Variable Profit | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 240 |
| 2010 Variable Profit | 30 | 30 | 10 | 10 | 10 | 30 | 30 | 30 | 180 |
| Change | 0 | 0 | 20 | 20 | 20 | 0 | 0 | 0 | 60 |
| JUL-SEP Compensation Period: | | | | 60 | | | | | |
| | | | | | | | | | |
| *Small Error  in Measuring 2009 Variable Profit:* | | | | | | | | | |
| 2009 Variable Profit | 15 | 45 | 15 | 45 | 15 | 45 | 15 | 45 | 240 |
| 2010 Variable Profit | 30 | 30 | 10 | 10 | 10 | 30 | 30 | 30 | 180 |
| Change | (15) | 15 | 5 | 35 | 5 | 15 | (15) | 15 | 60 |
| JUN-OCT Compensation Period: | | | | 75 | | | | | |
| | | | | | | | | | |
| *Large Error  in Measuring 2009 Variable Profit:* | | | | | | | | | |
| 2009 Variable Profit | 0 | 60 | 0 | 60 | 0 | 60 | 0 | 60 | 240 |
| 2010 Variable Profit | 30 | 30 | 10 | 10 | 10 | 30 | 30 | 30 | 180 |
| Change | (30) | 30 | (10) | 50 | (10) | 30 | (30) | 30 | 60 |
| JUN-OCT Compensation Period: | | | | 90 | | | | | |

26.     The three panels represent three scenarios which differ only with respect to how monthly variable profit is measured in 2009.  In the top panel, variable profit is assumed to be correctly measured, and the claimant is assumed to earn variable profit of $30 in each month in 2009.  In the second panel, measurement error is assumed to affect variable profits reported on a monthly basis in 2009, resulting in reported variable profit that rotates between $15 and $45 from month to month in 2009, while maintaining the average variable profit of $30 per month over the full period.  In the third

panel, a higher degree of measurement error is assumed to affect variable profits reported on a monthly basis in 2009, resulting in reported variable profit that rotates between $0 and $60 from month to month in 2009, again maintaining the $30 per month average.[6]  In all three scenarios, the claimant's variable profit earned in May-December 2009 is the same.  In each case, the claimant is assumed to earn $30 per month in 2010 for all months except for post-spill months of July, August and September, for which the claimant is assumed to earn only $10 per month.  And in each scenario, the claimant is assumed to have the same variable profit in May-December 2009 ($240) and May-December 2010 ($180), and the same loss in variable profit from 2009 to 2010.

27.     As the top panel shows, when variable profit is measured without error, July-September is the BEL compensation period which generates the highest award -- $60.  When the smaller error in measurement of variable profit is introduced, June-October is selected as the compensation period, resulting in a higher level of compensation -- $75.  When the larger error in measurement of variable profit is introduced, June-October is selected as the compensation period and compensation again increases, this time to $90.

28.     While this example is just an illustration, it accurately reflects the general principle that errors in the measurement of variable profit typically result in higher compensation under the BEL framework.  The implications of this example are confirmed using data from real claims in Section VII below, contradicting Class Counsel's claim that errors in financial data have no systematic impact on BEL offers.

---

[6] In this analysis, I assume that the economic activity in each month is identical, so that the same months in the benchmark period and the compensation period are "comparable" as required by the Settlement Agreement BEL framework.

**V.    IRREGULARITIES IN FINANCIAL DATA SUBMITTED BY CLAIMANTS TO CSSP ARE COMMON AND CAN BE READILY IDENTIFIED.**

29.    As discussed by BP's accounting experts, monthly financial data submitted by many claimants to CSSP often fail to properly identify when revenue was earned and fail to properly measure variable profit and changes in variable profit.  In declarations focusing on construction, professional services and agricultural claimants, BP's accounting experts have identified metrics that can be used to identify claims subject to potential measurement error for which further review should be undertaken. These metrics, or "triggers", can be used to identify claimant financial data that reflect accounting irregularities that can distort estimates of variable profit and thus BEL compensation.  The metrics identified by the BP experts include:

- **Months with revenue "spikes" as reported by claimants:**  The presence of reported revenue spikes suggests that revenue may not be recorded when it was earned, perhaps instead reflecting when payment is received.  Additionally, where the revenue of a business is concentrated in one (or a few) months on an inconsistent annual basis, it is likely that the revenue reported for the month was earned over a longer period of time. The threshold would be set in a manner that ensures that normal seasonal variations in revenue would not trigger a supplemental review.  Below we refer to this as the "revenue spike" trigger.

- **Months with negative variable profit margins reported by claimants**:  Negative variable profit as calculated under the Settlement Agreement based on claimant financial data is an indicator that revenues and expenses may be mismatched.  Negative variable profit occurs when revenue fails to cover variable expenses.  The existence of a negative variable profit in a month suggests that reported revenue is not properly matched to corresponding variable expenses because a business would not be expected to

19

undertake activities that fail to cover their variable costs.  Below we refer to this as the "negative margin" trigger.

- **Wide month-to-month swings in variable profit margin as reported by claimants**:

    Large month-to-month swings in measures of variable profit reported by claimants also suggest that revenue is not reported when it is earned and/or are not properly matched with the expenses incurred in generating that revenue.  Such measurement errors can result either from irregular monthly patterns in revenue or expenditures, or both.  Below we refer to this as the "margin variability" trigger.

30.    I have evaluated these triggers for identifying likely matching problems and other errors in measurement of revenue and expenses for a sample of BEL claims.  The triggers and thresholds I have applied should be considered preliminary and are subject to refinement based on further analysis.  For present purposes, I use the following thresholds for the triggers and apply the triggers to 2009 only.

- The "revenue spike" trigger identifies claimants for which revenue in any given month exceeds 17% of the annual total.  This level reflects two times a month's pro-rata share of annual revenue, which is 8.3%.

- The "negative margin" trigger identifies claimants that have negative margin in any month which accounts for 2% or more of annual revenue.  This threshold is applied to avoid review of negative margin when it would have only an incidental effect on measures of financial performance.

- The "margin variability" trigger identifies claimants for which at least one month's share of annual revenue deviates from the same month's share of annual variable expenses by more than 7.5 percentage points.  Thus, if a given month accounts for a pro-rata share of annual variable expenses (8.3%), this trigger would identify a claimant only if the same month accounts for 15.8% or more of annual revenue.  This threshold is selected

20

to focus reviews on periods in which there is a material deviation between revenue and expense shares for a given month.

31.     While the specification of these triggers is preliminary, they provide a reasonable starting point for evaluating the frequencies with which financial data provided by claimants to CSSP fail to properly match revenue with corresponding expenses incurred.   Specification of the appropriate triggers may differ by industry.  These triggers can be easily applied as they are based on the uncorrected measures of revenue, variable expenses or variable profits reported in standard CSSP excel workbook constructed for each claim.  No new information is required and implementation of these triggers would require only simple calculations based on these data.

32.     I have evaluated triggers for more than 1,500 claims that have received BEL offers from CSSP.  This includes 454 BEL offers of more than $500,000 for which CSSP workbooks are available as well as more than 1,000 additional randomly selected BEL claims for which CSSP has made offers and BEL computation workbooks are available.  For each of these BEL claims, I have extracted monthly data on revenue, variable expenses and variable profits from CSSP's workbooks.

33.     Analysis of these BEL claims is summarized in Table 5 and indicates that based on 2009 data:

- 98% of agricultural claims reviewed meet at least one trigger;

- 82%  of construction claims reviewed meet at least one trigger;

- 85% of professional claims reviewed meet at least one trigger.

34.     In contrast, only 23% of bar/restaurant claimants and 56% of hotel/motel claimants meet at least one trigger in 2009.  I would not expect matching issues would arise to the same degree in the hotel/motel and bar/restaurant sectors because payment in these industries is typically received when service is provided and variable expenses are dominated by labor expenses that would not be expected to exhibit large "spikes".

21

35.     Notably, the percentage of claimants in other industries presented in the table indicates that the problem of inaccurate or irregular financial data is present across all industries.  As noted above, these results are based on data for 2009 and thus provide an estimate of the frequency with which individual years of data would require additional review for potential matching issues by CSSP. Since claimants are required to submit information for 2010 and may also submit financial information for additional benchmark years, the percentage of claims that require any review will exceed the number that require a review for any given year.

**Table 5**

### Percent of Claims that Meet Triggers Based on 2009 Data

| Industry | Claims | Negative Margin | Revenue Spike | Share Spike | Any Trigger |
|---|---|---|---|---|---|
| Agriculture | 52 | 50% | 96% | 96% | 98% |
| Professional Services | 198 | 25% | 58% | 75% | 85% |
| Construction | 229 | 65% | 48% | 50% | 82% |
| Seafood Processors and Wholesalers | 32 | 78% | 28% | 16% | 81% |
| Real Estate | 189 | 15% | 52% | 62% | 80% |
| Other Industries | 282 | 32% | 39% | 50% | 69% |
| Retail Trade | 180 | 42% | 34% | 27% | 64% |
| Manufacturing | 83 | 46% | 30% | 31% | 58% |
| Hotels and Motels | 61 | 10% | 20% | 49% | 56% |
| Health Care | 79 | 9% | 6% | 56% | 56% |
| Bars and Restaurants | 119 | 6% | 15% | 11% | 23% |
| **Total** | **1504** | **33%** | **41%** | **49%** | **70%** |

Notes:
1. Negative margin trigger is evaluated in months with at least 2 percent of annual revenue.
2. A revenue spike is a month with at least 17 percent of annual revenue.
3. A share spike occurs when the monthly share of annual revenues differs from the monthly share of annual expenses by 7.5 percentage points.

36.     In sum, my review of more than 1,500 BEL offers indicates that potential matching concerns are pervasive in construction, professional services and agricultural claims, but also are widespread among claims from other industries.

**VI.    APPLICATION OF A STANDARDIZED APPROACH TO IDENTIFYING AND REMEDYING DATA INACCURACIES AND MATCHING PROBLEMS IN BEL CLAIMS.**

37.    This section presents an approach for identifying data in financial statements that reflect inaccuracies and that fail to match monthly revenues with corresponding variable expenses. Correcting these problems is essential to obtaining reliable calculations of revenue, corresponding variable expenses, and variable profit and, thus, to properly implement the BEL framework.  I describe BP's standardized approach to identify and correct these problems, with the remedy tailored to the specific pattern of data inaccuracies and matching problems observed for the claimant.  This section also implements BP's approach for five actual BEL claimants with financial statements.  Each of these examples present patterns of data irregularities that are observed across a variety of claims.

**A.   Description of BP's General Approach to Proper Implementation of the BEL Framework**

38.    The section outlines a four-step approach to assure that the BEL framework is applied to data that properly reflect monthly revenue and corresponding variable expenses.  This four-step approach incorporates and further elaborates on the approach described in (i) BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination on January 9, 2013 and (ii) BP's Further Submission in Response to Class Counsel's December 16, 2012 Request for Policy Determination on January 11, 2013.  I also described in detail BP's approach outlined here (¶¶38-46) on February 14, 2013, in the presence of the court-appointed mediator Dan Balhoff, to the Claims Administrator and lead accountants for the Settlement Program and to Class Counsel and accountants working with Class Counsel in a mediation session.  At that session, I presented four of the five examples described below (¶¶47-79).

- **Step 1  -- Identify and Correct Inaccuracies in Monthly P&L Entries:**  This step, which would be applied to all BEL claims, involves a line-item review of the monthly profit and loss statements submitted by claimants for potential line item inaccuracies and the implementation of appropriate corrections.

23

- **Step 2 -- Apply Triggers to Identify Potential Matching Problems**:   Claims in which matching problems are likely to exist are identified through the trigger/thresholds analysis detailed in Section V above.  These include:

    o   Months with revenue "spikes" as reported by claimants;

    o   Months with negative variable profit margin as reported by claimants; and

    o   Wide month-to-month swings in variable profit margin as reported by claimants.

- **Step 3 -- Apply Matching Strategies for Problems Identified In Trigger Analysis:**  This step involves a review of the source of potential mismatches between revenue and corresponding variable expenses identified in the trigger analysis.  Any matching problems identified through this review are then addressed though (i) discussions with claimants and/or (ii) application of standard matching methodologies, such as those outlined in Tab 1 of BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination, and described further in the context of the specific examples below.

- **Step 4 -- Apply BEL framework using corrected data and estimates of matched revenue and variable expenses:**  The final step in the analysis applies the BEL framework for causation and compensation as outlined in the Settlement Agreement in Sections 4B and 4C based on financial information that more accurately matches revenue and corresponding expenses, pursuant to Steps 1 and 3 above.

39.     Each of these four steps is described in more detail below.

**Step 1:  Identify and Correct Inaccuracies in Monthly P&L Entries**

40.     A necessary first step in evaluating a claimant's monthly variable profit, which is the foundation of the BEL framework, is identification of inaccuracies in line-item entries in the claimant's

24

P&L.  This review is to be applied to all claims.  While examples of such inaccuracies are identified below, CSSP accountants that process claims may be aware of additional examples:

- **"True up" or year-end adjustments:**  Financial statements submitted by many BEL claimants include monthly entries that appear to reflect cumulative adjustments that reflect "true ups" to correct for errors in prior months or other year-end or irregularly reported line item entries, and thus may not simply reflect activity in the month for which the data are reported.[7]  For example, including cumulative "true up" corrections in a single month yields erroneous measures of month-specific variable profit for two reasons.  First the "true up" reports more than one month's activity.  Second, the "true up" leaves in place the errors in prior months that necessitate the year-end adjustment.  Examples of "true up" or year-end adjustments reported in CSSP BEL workbooks include, but are not limited to:

  - **"Bad debt" expenses**:  Many firms will recognize bad debt expenses at the end of the calendar or fiscal year, or at other irregular intervals, resulting in large and episodic reported expenses that in fact relate to bad debts incurred over longer periods of time.

  - **Year-end bonus or payroll expenses**:  Many firms pay bonuses at the end of the calendar or fiscal year, resulting in large and irregular payroll expenses.  Again, these expenses reflect compensation to employees for work performed over longer periods of time.

---

[7] Such year-end adjustments may occur at the end of fiscal years that do not coincide with calendar years.

- **Inventory valuation adjustments**:  Like bad debt and bonus expenses, inventory valuation adjustments are often taken at year end or at other irregular intervals but relate to gains or expenses incurred over longer periods of time.

    o  Other line item entries that are populated only at year end, such as profit-sharing contributions and accrual adjustments.

- **Negative or zero variable expenses:**  Such entries generally reflect corrections to entries from prior months.  Thus, such entries typically imply that data for multiple months may be misreported, not just information for the month with the negative entry.

- **Negative revenues**:  Such entries may reflect corrections to revenue reported in prior months.

41.      My on-going review of claim files indicates that CSSP accountants often identify these types of inaccuracies and communicate with claimants in an attempt to understand them.[8]  Frequently, these explanations could be directly incorporated into the claim evaluation process but this does not appear to be done.  In cases in which the source of inaccuracies cannot be identified based on communication with the claimant, it may be possible to apply corrections that more accurately reflect when the expenses reported by claimants were incurred and when revenue was generated.  For example, for bonus payments, CSSP accountants can allocate reported year-end expenses to individual months based on the monthly share of non-bonus payroll expense.  Similarly, bad debt expenses reported by claimants might be allocated based on measures of monthly revenue.

### Step 2:  Apply Triggers to Identify Potential Matching Problems

42.      Step 2 in implementation of a standardized approach to identifying and correcting data inaccuracies and matching problems in data submitted by claimants is the application of the trigger

---

[8] Many claim files include email correspondence that discusses such issues.  In addition, the "Global Notes" section of CSSP claim-specific portals often includes notes from discussions between CSSP accountants and claimants.

analysis discussed in Section V above.  The trigger analysis identifies circumstances in which revenue and variable expenses as reported in claimant-submitted financial statements may not be properly aligned. The trigger analysis is applied to all claims and to all months in 2010 and the Benchmark Period.   As discussed above, potential matching concerns are identified by the following triggers:

- **Months with revenue "spikes" as reported by claimants:**  The presence of reported revenue spikes suggests that revenue may not be recorded when it was earned, perhaps instead reflecting when payment is received.  Additionally, where the revenue of a business is concentrated in one (or a few) months on an inconsistent annual basis, it is likely that the revenue reported for the month was earned over a longer period of time. The threshold would be set in a manner that ensures that normal seasonal variations in revenue would not trigger a supplemental review.[9]

- **Months with negative variable profit margin as reported by claimants**:  Negative variable profits reported in claimant financial data is an indicator that revenues and expenses may be mismatched because firms typically would not operate when variable profit is negative.  Negative variable profit occurs when revenue fails to cover variable costs.  The existence of a negative variable profit in a month suggests that reported revenue is not properly matched to corresponding variable costs because a business would not be expected to undertake activities that fail to cover their variable costs.[10]

- **Wide month-to-month swings in variable profit margin as reported by claimants**: Large month-to-month swings in measures of variable profit reported by claimants also

---

[9] My analysis in Section V identifies a claimant as meeting the "revenue spike" trigger in any month in which revenue exceeds 17% of the annual total.  This level reflects two times a month's pro-rata share of annual revenue, which is 8.3%.

[10] The "negative margin" trigger applied in Section V identifies claimants that have negative margin in any month which accounts for 2% or more of annual revenue.  This threshold is applied to avoid review of negative margin when it would have only an incidental effect on measures of financial performance.

suggest that revenue is not reported when it is earned and/or are not properly matched with the expenses incurred in generating that revenue.  Such measurement errors can result either from irregular monthly patterns in revenue or expenditures, or both.[11]

43.     After identifying such potential problems, CSSP accountants should attempt to obtain additional information from claimants that would enable them to determine whether revenue is properly matched with corresponding variable costs or instead reflect changes in the claimant's financial performance.  Where a matching problem is found to exist, revenue and corresponding variable expenses would be matched based on procedures outlined in Step 3.

**Step 3:  Apply Objective Strategies to Correct Matching Problems Identified In Trigger Analysis**

44.     Step 3 of the analysis involves matching revenue and corresponding variable expenses for claims where problems are identified in Step 2.  There are two general approaches to matching revenue and corresponding expenses:  (i) use of information provided by claimants; and (ii) application of standardized matching methodologies to financial data submitted by claimants that result in improved matching of revenue and corresponding variable expenses.

***Matching based on information provided by claimants:***

45.     Certain matching problems identified through the trigger analysis can be remedied based on information provided by claimants.  For example:

- Claimants that submit data characterized by spikes in reported expenses, perhaps due to expenditures for bulk purchases of inventory, may be able to identify the time period over which the inventory is used.  This would allow CSSP accountants to more accurately

---

[11] The "margin variability" trigger applied in Section V identifies claimants for which at least one month's share of annual revenue deviates from the same month's share of annual variable expenses by more than 7.5 percentage points.  This threshold is selected to focus reviews on periods in which there is a material deviation between revenue and expense shares for a given month.

determine variable expenses by assigning expenditures to the months in which inventory was used.

- Claims for which claimants submit data that identifies revenue spikes, such as those associated with receipt of periodic payments on long term projects, may be remedied by claimant's provision of information on the term of the project that generated the large cash receipt and/or expenses incurred each month for the project.   This information, in turn, can be used to estimate monthly revenue by reference to the months in which expenses were incurred to generate revenue, rather than incorrectly equating cash received in a month with revenue.

***Application of Standardized Matching Methodologies:***

46.     When claimants do not provide sufficient information to provide a specific basis for matching revenue and corresponding variable expenses, standard matching methodologies should be applied.  Two basic approaches can be implemented, depending on the circumstances that give rise to the matching problem.  In the first approach, matching is achieved by estimating monthly revenue earned based on a claimant's annual revenue and the pattern of its monthly expenses; in the second approach, matching is achieved by estimating monthly expenses incurred based on a claimant's annual expenses and the pattern of its monthly revenue.

- For claimants, such as those in the construction industry, for which claimants may reliably report monthly expenses incurred but are less likely to reliably report monthly revenue earned, matching is achieved as follows[12]:  First, calculate on an annual basis the ratio of revenue to variable expenses.  Second, estimate matched monthly revenue by multiplying (i) reported monthly expenses and (ii) the annual ratio of revenue to

---

[12] Declaration of David Hall, January 23, 2013.

expenses.  These calculations would be made after incorporating any corrections identified in Step 1 and after any matching based on information provided by claimants.[13]

- For claimants, such as those in service, distribution and certain manufacturing industries, which reliably record their revenue when it is earned but do not reliably report when expenses are incurred (due perhaps to large inventory purchases), matching is achieved as follows:   First, calculate on an annual basis the ratio of variable expenses to revenue.  Second, estimate matched monthly expenses by multiplying reported monthly revenue by the annual ratio of variable expenses to revenue.  These calculations would be made after incorporating any corrections identified in Step 1 and after any matching based on information provided by claimants.

**Step 4 -- Apply BEL framework using corrected and matched revenue and variable expenses**

47.     Step 4 of the analysis involves application of the BEL framework using the corrected data on revenue and corresponding variable expenses.  The corrected data are used both for determining causation based on changes in revenue as described in Exhibit 4B of the Settlement Agreement and to determine compensation based on changes in variable profit as described in Exhibit 4C of the Settlement Agreement.  Nothing in the matching approach changes the BEL causation or compensation frameworks specified in the Settlement Agreement.  Instead, the matching approach helps ensure that the BEL framework is applied to more reliable financial information.

---

[13] In the construction industry, job-specific progress reports can be applied on a job-specific basis to match revenue and corresponding variable expenses.  In the absence of job-specific data, the matching approach can be applied based on aggregate information which may yield less reliable results.



**B.   Application of General Approach to Sample BEL Claims**

48.       As mentioned above, I have applied this approach in evaluating five sample BEL claims:

- ██████████████ a rice farm ████████████

- ████████████████████ a road paving contractor ████████████████

- ████████████████ a catfish farm ████████████████

- ██████████ a law firm ████████████████

- ████████████████ a furniture distributor ████████████

49.       This section provides a brief and high level overview of each claim and the approach applied to identify and remedy matching issues they present.  A more detailed description of the steps involved in the evaluation of these claims and the implementation of the remedies to account for the matching problems is presented in Exhibit C.  The empirical application of the matching methodology and calculation of Step 1 compensation for each claim is then presented in Exhibit D.

50.       These examples demonstrate how BP's approach to BEL implementation should be applied to specific claims.  However, in order to demonstrate BP's approach to BEL implementation, it is necessary to make certain assumptions about the sources of data inaccuracies that would be available to CSSP accountants, who can contact claimants directly.  My analysis focuses on Step 1 of the BEL compensation calculation only, which reflects the change in variable profit between the benchmark and compensation periods, because matching issues do not directly affect Step 2 of the BEL compensation calculation (which reflects the loss of potential growth over the benchmark period) or the Risk Transfer Premium.



51.     ███████████ is a rice farm ███████ which is in Zone D.  CSSP's BEL calculations, which do not attempt to correct for data inaccuracies or irregularities, indicate that ███ variable profit fell by roughly $90,000 in 2010 relative to the benchmark year of 2009.  ███ was offered BEL Step 1 compensation of $2.4 million, which is nearly 90% of its benchmark revenue of $2.7 million.

***Step 1:  Identify Data Inaccuracies***

52.     No P&L line item inaccuracies were identified for ███████

***Step 2:  Apply Triggers***

53.     ██████ financial data exhibit large revenue spikes and many months of negative variable profit, which indicate the presence of matching problems.

***Step 3:  Matching Revenue and Corresponding Variable Expenses***

54.     Matching problems are remedied by first identifying the revenue generated by the claimant's 2009 and 2010 farming activities. Given the nature of rice farming, revenue generated by the 2009's crop can be realized in late 2009 or early 2010.  That is, revenue was earned from 2009 farming activities may generate payments in early 2010.  Identification of when revenue was earned by ███ is accomplished by attempting to associate the "crop year" revenue (which includes sales of the 2009 crop in early 2010) with the expenses incurred in growing the crop (which typically are incurred in 2009 for the crop grown in 2009).  For example, ██████ 2009 crop year revenues would reflect all revenue received from July 2009 through June 2010.[15]

---

[14] A more detailed description of the steps involved in the evaluation of ███████████ and the calculation of Step 1 compensation are presented in Exhibits C.1 and D.1.  Tab 1 of BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination also provides an overview of the general approach to matching revenue and corresponding variable costs for farming claims.

[15] This time period reflects the USDA crop year for rice.  Declaration of Charles E. Finch, January 23, 2013, Appendix D.

55.     For ▮▮ matched revenue is determined on a monthly basis based on the claimant's effort over the production cycle, as reflected in its monthly variable expenses.  More specifically, I calculate the ratio of the claimant's annual (crop year) revenue to the its annual (production year) variable expenses, and then calculate monthly matched revenue by multiplying (i) monthly expenses and (ii) the ratio of annual revenue and variable expenses as described above.

### Step 4:  Apply BEL framework

56.     Based on the matching approach, the Step 1 compensation formula is directly applied to the adjusted financial data as described by the Settlement Agreement and the months that permit the highest claimant compensation are identified.  Step 1 compensation based on matched revenue and variable expense information is $151,000, a reduction of 94% from the CSSP's calculation. ▮▮ would pass the Zone D V-test based on the adjusted revenue data.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

57.     ▮▮▮ is a paving contractor ▮▮▮▮▮▮ which is in Zone D.  CSSP calculations, which do not attempt to correct for data inaccuracies or irregularities, indicate that ▮▮▮ variable profit was $3.5 million higher in the May-December 2010 compared to the same months for benchmark period 2007-09. ▮▮▮ was offered BEL Step 1 compensation of $6.1 million.

### Step 1:  Identify Data Inaccuracies

58.     Review of ▮▮▮ financial information as compiled by CSSP show that bad debt expenses were recorded in December of each year and also exhibit certain negative expense entries. For current purposes, no corrections for these inaccuracies were incorporated into the analysis.

---

[16] A more detailed description of the steps involved in the evaluation of ▮▮▮ and the calculation of Step 1 compensation are presented in Exhibit C.2 and D.2.  Tab 1 of BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination also provides an overview of the general approach to matching revenue and corresponding variable costs for construction claims.

However, CSSP accountants may be able to obtain information to determine when, for example, bad

debt expenses were incurred (as opposed to when they were recorded for recordkeeping purposes).

### Step 2:  Apply triggers

59.      ███████ financial data exhibit a revenue spike in June 2010 (18.5% of annual

revenue) accompanied with negative variable profits in other various months, which provide evidence of

matching problems in these periods.

### Step 3:  Match Revenue and Corresponding Variable Expenses

60.      Monthly matched revenue is estimated based on the claimant's measured effort, as

reflected in monthly variable expenses reported in its financial statements.[17]  I calculate the ratio of the

claimant's annual revenue to the its annual variable expenses, and then estimate monthly matched

revenue by multiplying (i) monthly expenses and (ii) the ratio of annual revenue and variable expenses.

### Step 4:  Apply BEL Framework

61.      Based on this matching approach, the Step 1 compensation formula is directly applied to

the adjusted financial data as described by the Settlement Agreement and the months that permit the

highest claimant compensation are identified.  For ███████ the resulting Step 1 compensation is $2.42

million, a reduction of 61% from the CSSP's calculation.  ███████ would pass the Zone D V-test based

on adjusted revenue data.



62.      ███████████████ is a catfish (aquaculture) farm located ███████ which is in

Zone D.  CSSP calculations, which do not attempt to correct for data inaccuracies or irregularities,

indicate that ███████ earned only $14,000 in variable profit in the benchmark year of 2009 but

---

[17] ███████ job-specific percent-of-completion reports are not available for this analysis, but could be readily
applied and would likely result in more accurate matching of revenue to the corresponding variable expenses.
[18] A more detailed description of the steps involved in the evaluation of ███████ and the calculation of Step 1
compensation are presented in Exhibit C.3 and D.3.

earned $720,000 in variable profit in 2010.  CSSP's calculations indicate that variable profit rose by $1.4 million in January-April 2010 relative to 2009, but fell by roughly $700,000 in May-December 2010 relative to the benchmark period.  CSSP offered ███████ BEL Step 1 compensation of $676,000.

### Step 1:  Identify Data Inaccuracies

63.     Review of ████████ financial statements identified negative fuel expenses in one month, which reflects a potential line-item inaccuracy and might be addressed by communications between CSSP accountants and the claimant.  Correction of this inaccuracy was not incorporated into the analysis.

### Step 2:  Apply Triggers

64.     ████████ financial data exhibit evidence of a mismatch between revenue and corresponding expenses, including revenue spikes in November 2009 (32% of annual revenue) and April 2010 (28% of annual revenue).  In addition, CSSP calculations indicate that the claimant had negative variable profit of $907,000 in April 2009.

### Step 3:  Match Revenue and Corresponding Variable Expenses

65.     Review of ████████ financial statements available at the CSSP portal indicate that the negative variable profit calculated by CSSP for April 2009 was due to a large bulk feed purchase which, presumably, was used over an extended number of months.  In this case, feed expense should be recognized when feed was used in production, not the month in which the cash outlay was made to purchase feed inventory.  Communications between CSSP accountants and the claimant should be able to establish the period over which the bulk feed purchase was consumed in production.  For the purpose of implementing this example, I assume that the April 2009 feed purchased is $900,000 and that it is consumed over a 12 month period, and assign it on a pro-rata basis over each of these months.

66.     Matching revenue to corresponding expenses for ███████ is addressed in a manner analogous to that used in the ████████ and ██████ claims.  Specifically, revenue and

corresponding expenses are matched by (i) calculating the annual ratio of revenue to variable expenses; and (ii) multiplying this ratio to corrected estimates of monthly variable expenses, which reflect the months in which fish feed expenses were incurred, not the month in which fish feed was purchased.

### Step 4:  Apply BEL Framework

67.    Based on this matching approach, the Step 1 compensation formula is directly applied to the adjusted financial data as described by the Settlement Agreement and the months that permit the highest claimant compensation are identified.  For the ███████████ claim, the Step 1 compensation is $6,000, a 99% reduction from the CSSP calculation. [19]  ███████████ would pass the V-test based on adjusted revenue data.

███████ ████

68.    ███████████ is a law firm located ███████████ which is located in Zone D.  CSSP calculations, which do not attempt to correct for data inaccuracies or irregularities, indicate that ████ ████ earned variable profit of $3.4 million in 2008, which fell to $1.0 million in 2009 and rose to $1.5 million in 2010.  ███████████ was offered BEL Step 1 compensation of $1.3 million.

### Step 1:  Identify Data Inaccuracies

69.    Review of ███████████ financial statements identified zero variable expenses in June and July of 2010.  Communication between CSSP accountants and the claimant should be able to establish the source of this apparent inaccuracy.  For the purpose of this BEL implementation example, no attempt has been made to account for this apparent inaccuracy.



---

[19] As shown in the middle panel of Exhibit D.3, correction of the bulk fish feed purchase alone (without accounting for the revenue spike) would result in Step 1 compensation of $397,000, a 40% reduction from the CSSP Step 1 offer.

[20] A more detailed description of the steps involved in the evaluation of ███████████ and the calculation of Step 1 compensation are presented in Exhibit C.4 and D.4.  Tab 1 of BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination also provides an overview of the general approach to matching revenue and corresponding variable costs for professional service claims.

***Step 2: Apply Triggers***

70.　　　████████ financial data provide evidence of a mismatch between revenue and corresponding expenses, including revenue spikes in December 2008 (71% of annual revenue), January 2010 (32% of annual revenue) and May-June 2011 (combined 48% of annual revenue).  In addition, the financial statements reveal smaller revenue spikes in December of 2009 (22% of annual revenue) and 2010 (18%).

***Step 3: Match Revenue and Corresponding Variable Expenses***

71.　　　Discussions between CSSP accountants and the claimants may be able to ascertain the reasons for the revenue spikes, which are likely due in part to the receipt of payments associated with the resolution of contingent fee matters.  While the receipt of contingency fee payments may be received in a lump sum, this payment reflects revenue earned over an extended period of time.  As a result, for the purposes of matching revenue and corresponding expenses, revenue is appropriately considered to have been earned when the effort generating the revenue was expended, as opposed to when payment was received. In addition, the smaller year-end revenue spikes are assumed to reflect year-end collections efforts by law firms for work performed in prior months.  For the purposes of matching revenue and corresponding expenses, such year-end collections are appropriately considered revenue earned in prior months.

72.　　　If information on a law firm's effort associated with contingent fee matters is available, this information can be used to allocate the lump sum revenue generated from contingency fee cases to the periods in which effort was expended to generate this revenue.  Here, no such information is available so for implementation purposes revenue is assigned on a pro-rata basis to the months during which the matter was active, which is assumed to be in the 36 months prior to the December 2008 revenue spike and in the prior 12 months for the other revenue spikes assumed to be associated with resolution of contingent fee cases.  For implementation purposes I also assume that $200,000 in

December revenue (assumed to result from increased collection of outstanding receivables at year end) was earned in equal amounts in each month of the calendar year.

73.     Finally, because revenue earned on contingent fee matters is appropriately considered to be earned based on the effort expended, not when cash received, law firms with open (unresolved) contingent matters are appropriately considered to have earned revenue that has not yet been realized. Implementation of BP's approach for matching revenue and expenses for law firms with open contingent cases takes account of this by imputing revenue associated with these cases.  This imputation is based on (i) the number of contingent fee cases worked on by law firm claimant during the benchmark period, 2010 and 2011 that remain open at the time of the claim review; and (ii) an estimate of the average revenue generated per month of effort from the law firms on contingency fee cases.

74.     The average monthly revenue generated on closed contingent fee cases is based on the firm's historical experience, based on (i) the number of closed contingency cases the claimant had in prior years; (ii) the aggregate number of months the firm worked on these cases; and (iii) the aggregate recoveries from these cases (including those that generated no revenue).  An example of how the average historical value of a law firm's closed contingent cases is determined is shown on page 2 of Exhibit D.4.  Monthly revenue calculated in this way is imputed to each month in which the open contingent fee cases were active during the benchmark and compensation period.[21]  As a result, the imputation would result in higher matched revenue in any month in the benchmark period, 2010 and 2011 for a claimant with open matters.  The higher 2011 revenue would increase the claimant's ability to pass the V-test for causation; while the higher 2010 revenue would lower compensation available under the BEL formula.

---

[21] As an alternative, standard valuation tools used in valuing contingent fee litigation in cases of partnership dissolutions or divorces could be applied.  In such cases, the imputation of revenue for open contingent fee cases would account for the typical duration of such cases (e.g., a case valued at $200,000 and expected to have a four-year period between initiation and resolution would result in imputed revenue of $50,000 per year).

***Step 4:  Apply BEL Framework***

75.      Application of the matched revenue and variable expenses in the BEL framework for  including matching of revenue generated in open and closed contingent fee cases, results in corrected BEL Step 1 compensation of $220,000, an 83% reduction from the CSSP offer. ███████ ████ would pass the Zone D V-test based on adjusted revenue data.

76.      ███████████████ is a school and office furniture distributor ██████████ which is in Zone D.  CSSP calculations, which do not attempt to correct for data inaccuracies, indicate that ██████████████ earned variable profit of $456,000 in 2008, $163,000 in 2009 and $174,000 in 2010.  ████████████ was offered BEL Step 1 compensation of $676,000.

***Step 1:  Identify Data Inaccuracies***

77.      Review of ████████████ financial statements identified negative revenue of $708,000 in February 2008.  This entry likely reflects a correction from misreported revenue in prior months.  CSSP accountants should be able to identify the nature of this inaccuracy and implement an appropriate correction based on conversations with the claimant.  However, for current purposes I assume that revenue in the prior month (January 2008) was overstated by $1 million and re-assign this sum to February 2008, thus maintaining the same two-month total revenue as reported in the P&L statement.

***Step 2:  Apply Triggers***

78.      ████████████ also exhibits evidence of matching problems, including revenue spikes in July and August 2008 (which account for 22% and 19% of annual revenue respectively) as well as negative variable profit in multiple months.  This includes negative variable profit of -$407,000

---

[22] A more detailed description of the steps involved in the evaluation of ████████████ and the calculation of Step 1 compensation are presented in Exhibit C.5 and D.5.

reported in August 2010.  Review of ▮▮▮▮▮▮▮▮▮▮ financial statements indicates that this is the result of $1 million in "purchases" in August 2010, a line item within cost of goods sold.

### Step 3:  Match Revenue and Corresponding Variable Expenses

79.     Given the wide range in variable expenses, which is characteristic of distributors like ▮▮▮▮▮▮▮▮▮▮ that hold large amounts of inventory that are then sold over ensuring months, I match revenue to corresponding expenses incurred as follows:  (i) determine the annual ratio of variable expenses to revenue for each calendar year; (ii) calculate matched expenses as the product of this ratio and the monthly revenue, reflecting adjustment for the inaccuracy discussed above.

### Step 4:  Apply BEL Framework

80.     Application of the matched revenue and variable expenses in the BEL framework for ▮▮▮▮▮▮▮▮▮▮ yields corrected BEL Step 1 compensation of $112,000, an 81% reduction from the CSSP offer.  ▮▮▮▮▮▮▮▮ would pass the Zone D V-test based on adjusted revenue data.

**VII.    BP'S APPROACHES TO IDENTIFYING WHEN REVENUE IS EARNED AND MATCHING REVENUE WITH CORRESPONDING EXPENSES ARE READILY IMPLEMENTED AND CONFIRM THAT MANY LARGE BEL CLAIMS ARE INFLATED UNDER CSSP'S CURRENT APPROACH.**

81.     Under my direction, the Compass Lexecon team has implemented a preliminary version of BP's approach for evaluating BEL claims from agricultural and construction claimants that generated large offers from CSSP.  The analysis is based on financial data reported in CSSP workbooks for each claimant.

82.     The analysis shows (i) that BP's matching approach can be readily implemented on a broad scale; and (ii) that the failure to identify when revenue was earned and the failure to match revenue to corresponding expenses results in BEL base compensation offers that systematically overstate claimants' lost variable profits.  Thus, this analysis refutes Class Counsel's assertion that BP's approaches are unworkable as well as Class Counsel's assertion that the distortions resulting from CSSP's current implementation of BEL work both for and against claimants.

83.     The analysis is based on a sample of 16 farming offers and 91 construction offers, all of which are among BEL offers of more than $500,000 as of February 11, 2013.[23]  The analysis is based on agricultural and construction claims from this group that meet one or more of the "trigger" criteria identified in Table 5 above.  We use data from CSSP spreadsheets to (i) reproduce CSSP's base compensation offer; and (ii) apply the preliminary version of the BP approach and then re-calculate the base compensation offer.

84.     In brief, implementation of the BP methodology involves the following steps:

- For construction claims identified by the triggers described in Section V as having potential matching problems, revenue was aligned with corresponding variable expenses by multiplying (i) the ratio of revenue to variable expenses defined for a given year, and (ii) the monthly variable expenses reported by the claimant.  The resulting estimates of monthly revenue earned and monthly variable profits are then used in implementing the BEL formulas.  BP's strategy for construction claims recognizes that additional adjustments may be necessary to account for unusual one-time cost entries in claimants' financial statements, which is likely to require communication with claimants.[24]  Thus, we have not implemented this aspect of BP's approach and instead exclude from the analysis claims with large spikes in variable expenses.  Out of the 91 construction claims among the large CSSP offers, 29 were excluded due to large spikes in variable expenses.  Of the remaining 62 claims, we have implemented BP's approach to matching revenue and expenses for the 46 claims which met one or more of the

---

[23] Analysis of agriculture claims excludes aquaculture claimants such as alligator farms, which raise financial reporting issues that are distinct from those raised by crop farming claims.

[24] This is contemplated in the Settlement Agreement Ex. 4A ¶ 4, which states that "The Claims Administrator may, in his discretion, request source documents for profit and loss statements." and note 1, which states that additional documentation may be required for specific business types.

triggers described in Section V.  Four of those 46 claims clearly would fail the V-test
(which is the mathematical test used in the BEL causation requirements for certain
claimants) after implementing BP's approach, leaving 42 claims on which we calculated
compensation.[25]  As described above, a preferred approach to evaluation of
construction claim would apply the general methodology based on job-specific
schedules.  However, such schedules are not available in CSSP worksheets so the
analysis of construction claims is based on each claimant's aggregate activity.

- For agriculture claims identified by the triggers described in Section V as having
  potential matching problems, we first identify crop year revenue and production year
  expenses.[26]  We approximate monthly revenue earned by multiplying (ii) the ratio of
  crop year revenue to production year variable expenses and (ii) monthly variable
  expenses incurred.  The resulting estimates of monthly revenue and variable expenses
  are then used in implementing the BEL formulas.  Because all 16 of the farming claims
  among the large CSSP offers with available data meet one or more of the triggers, we
  have implemented BP's approach on all 16 claims.

85.    BP's approaches to matching revenue and corresponding expenses have been
implemented for both agriculture claims and construction claims using both a spreadsheet framework
like that used by CSSP as well as SAS, a standard computing and statistical software package.  While
additional claim-specific review of claimants' financial records by CSSP would be necessary to resolve
data inaccuracies and help match revenue and expenses, our analysis demonstrates that the

---

[25] With respect to these 42 claims, further refinement of the preliminary approach to account for irregular
expenses in estimating when revenue was earned would be expected to result in identification of other claimants
that would not pass the V-test.  However, for present purposes, I have assumed that they would pass the V-test.
[26] For example, in my application the crop year 2009 is defined as July 2009 through June 2010, and the 2009
production year is equivalent to January through December 2009.

implementation of BP's strategies, even in the absence of this information, is workable and straightforward.

86.     The results of our analysis indicate that CSSP's failure to match revenue with variable expenses incurred leads to base compensation offers that substantially overstate the claimant's loss in variable profits.  When using the term "base compensation offer," I mean the BEL compensation offer amount computed under the BEL compensation formula from adding together Step 1 compensation and Step 2 compensation, and does not include the RTP.  As shown in Table 6, CSSP overstated base compensation offers relative to offers based on BP's approach for 34 of the 42 (81%) construction claims analyzed and CSSP overstated offers based on BP's approach for 100% of the agriculture claims analyzed.[27]

**Table 6**

### CSSP Offers and Offers Based on BP Proposal

| Industry | Analyzed Claims | Number with CSSP Offer Overstated | | CSSP Overstatement Relative to BP Proposal | |
|---|---|---|---|---|---|
| | | # | % | Overall | Median |
| Construction | 42 | 34 | 81% | 47% | 51% |
| Agriculture | 16 | 16 | 100% | 170% | 154% |

87.     Among the construction claims, CSSP's base compensation estimate overstates that based on BP's approach by 47% overall, with a median overstatement of 51%.  Among agricultural claimants, CSSP's base compensation estimate overstates that based on BP's approach by 170% overall (e.g., CSSP offers are almost triple than that based on data that match revenue with the corresponding expenses).  For agriculture claims, the median overstatement was 154%.

---

[27] For the construction claims in which the BP methodology yielded a higher base compensation offer, the differences range from 0.2% to 34%.

88.     In sum, this analysis both shows that BP's approaches are workable and indicate that CSSP's failure to identify when revenue was earned and its failure to match revenue with corresponding expenses systematically and substantially overstates offers made to claimants.  However, it is also important to stress again that our implementation of BP's approach is preliminary.  As noted above, we have not fully evaluated irregularities in variable expenses.  Further, our analysis is not able to take advantage of claimant-specific information of the type regularly obtained by CSSP in conversations with claimants about their financial statements.  Incorporating such information into the analysis would likely result in improved estimates of when revenue is earned.  That would also result in improved matching of revenue to variable expenses incurred and also would result in more reliable application of the V-test in the BEL causation requirements for certain claimants.

**VIII.    QUALITY ASSURANCE TESTING OF CSSP'S SPREADSHEET MODEL DID NOT ADDRESS THE RELIABILITY OF THE UNDERLYING DATA.**

89.     Class Counsel has incorrectly suggested that BP's participation in a quality assurance testing of CSSP's Excel spreadsheet model for processing BEL claims effectively endorsed the CSSP's use of data to validate the model that do not accurately reflect when revenue is earned or that do not accurately match revenue to the corresponding variable expenses.  Compass Lexecon staff participated in the exercise mentioned by Class Counsel under my general direction.

90.     The exercise mentioned by Class Counsel was designed to test the reliability of the computer programs used by CSSP in evaluating BEL claims, and involved testing whether the use of the same data in different computer models generated the same computational results.  Specifically, the exercise compared results calculated in CSSP's Excel spreadsheet to results calculated by Compass Lexecon using SAS programs.  SAS is an industry standard data processing and statistical software package regularly used at Compass Lexecon.

91.     Data for the 62 test claims were provided by Class Counsel and did not identify the name of the claimant.  In some cases the claimant's industry was not identified.  Based on claimants for

which industry was known, the largest industry categories were hotels, restaurants, retail, and seafood

processors/wholesalers.  Two claimants were identified as construction firms and no claimant was

identified as a farm or law firm.

92.     The test simply ran the same data through two computer programs to see if they

produced similar results.  The test did not address the quality or reliability of the data used in the

analysis.  More specifically, there was no reference to year-end financial statements, tax returns, or

other documents that the CSSP might use (or could request under Settlement Agreement Ex. 4A ¶ 4) in

evaluating the accuracy of the data.  The exercise did not focus on the data quality for the simple reason

that determination of the accuracy of the computer program only depended on the use of a common

data set, not the accuracy of the underlying data.

I declare under penalties of perjury that the foregoing is a true and correct statement of my analysis and
opinions.

_____

Hal Sider

Dated:  February 18, 2013

# EXHIBIT A

**HAL SIDER**                                                   **January 2013**
Senior Vice President

Business Address:      Compass Lexecon
                       332 S. Michigan Ave.
                       Suite 1300
                       Chicago, IL  60604                        (312) 322-0229
                       hsider@compasslexecon.com

Home Address:          385 Ramsay Road
                       Deerfield, IL  60015                       (847) 405-0153

## EDUCATION

Ph.D., UNIVERSITY OF WISCONSIN, Madison, Wisconsin:  Economics, 1980.

M.A., UNIVERSITY OF WISCONSIN, Madison, Wisconsin:  Economics, 1978.

B.A., UNIVERSITY OF ILLINOIS, Urbana, Illinois:  Economics, 1976.

## EMPLOYMENT

COMPASS LEXECON (formerly Lexecon), Chicago, Illinois (October 1985 - present):
        1985-90: Economist; 1990-1999: Vice President; 1999-current: Senior Vice
        President.

U.S. COMMISSION ON CIVIL RIGHTS, Washington, D.C., (August 1984 - October
        1985):  Co-Director:  Project on Minority Income Trends.

OFFICE OF POLICY: U.S. DEPARTMENT OF LABOR, Washington, D.C., (May 1982 -
        August 1984):  Economist.

PRESIDENT'S TASK FORCE ON FOOD ASSISTANCE (on leave from U.S. Department
        of Labor), Washington, D.C., (September 1983 - February 1984):  Research
        Associate.

OFFICE OF RESEARCH AND EVALUATION; BUREAU OF LABOR STATISTICS,
        Washington, D.C., (September 1980 - May 1982):  Economist.

UNIVERSITY OF WISCONSIN, Madison, Wisconsin (1978 - 79):  Teaching Assistant.

UNIVERSITY OF WISCONSIN, Madison, Wisconsin (1976 - 78):  Science Writer.

-2-

FIELDS OF SPECIALIZATION

Applied Microeconomics
Damages
Econometrics
Industrial Organization
Telecommunications

ARTICLES

"Net Neutrality and Consumer Welfare," Journal of Competition Law and Economics
(2010) (with Gary Becker and Dennis Carlton).

"Regulation, Antitrust and *Trinko*," in The Antitrust Revolution: Economics, Competition
and Policy, J. Kwoka and L.White, eds. (2009) with Dennis W. Carlton

"The Telecom Boom and Bust," Milken Institute Review, October 2007 (with Allan
Shampine).

"Have Mergers of Large Local Exchange Carriers Led to Discrimination Against Rivals?
An Empirical Investigation" July 2002 in Econometrics: Legal, Practical and
Technical Issues, American Bar Association Section on Antitrust Law (2005) (with
Dennis Carlton and Tom Stemwedel).

"Recent Developments in U.S. Antitrust Enforcement," The United States Antitrust Review,
October 1999 (with Gustavo Bamberger).

"Market Power and Vertical Restraints in Retailing:  An Analysis of FTC v. Toys 'R' Us,"
in The Role of the Academic Economist in Litigation Support, edited by Daniel
Slottje (1999), with Dennis Carlton.

"The Competitive Effects of Line-of-Business Restrictions in Telecommunications,"
Managerial and Decision Economics (1995), with Kenneth Arrow and Dennis
Carlton.  (Reprinted in R. Higgins and P. Rubin, eds., Deregulating
Telecommunications:  The Baby Bells' Case for Deregulation, Wiley Series in
Managerial Economics, 1995.)

"Applications of Economic Theory and Econometric Methods to Merger Review in the
United States," (paper presented to European Commission Merger Task Force,
1992), with A. Rosenfield and W. Bishop.

"Unemployment Incidence and Duration:  1968-1982," American Economic Review (June
1985).

"The Pay Gap and Occupational Segregation:  Implications for Comparable Worth,"
Proceedings of the Industrial Relations Research Association (1985), with June
O'Neill.

"Work-Related Accidents and the Production Process," <u>Journal of Human Resources</u>
(Winter 1985).

"Labor Force Participation and the Relative Earnings of Black and White Males:  1940-80,"
with Andy Sparks, (paper presented at the World Congress of the Econometric
Society, 1985).

"Comment on McIntyre:  Estimating Long-Term Labor Market Flows from CPS Data,"
<u>Proceedings:  Conference on Applications of Gross Flow Data, U.S. Bureau of the
Census</u> (1985).

"The Changing Makeup of the Military and the Effect on Labor Force Data," <u>Monthly Labor
Review</u> (July 1984), with Cheryl Cole.

"Accuracy of Response in Labor Market Surveys:  Evidence and Implications," <u>Journal of
Labor Economics</u> (October 1983), with Wesley Mellow.

"Safety and Productivity in Underground Coal Mining," <u>Review of Economics and Statistics</u>
(May 1983).

"Economic Incentives and Safety Regulation,"  <u>American Economist</u> (Summer 1983).

"Consumers and Product Safety:  Market Processes and Imperfections," <u>Policy Studies
Journal</u> (February 1983), with Eugene Smolensky.


## <u>REPORTS</u>

The Economic Progress of Black Men in America, U.S. Commission on Civil Rights (1986).

Economic Status of Americans of Eastern and Southern European Ancestry, U.S.
Commission on Civil Rights (1986).

Report of the President's Task Force on Food Assistance, Curran Press, Alexandria, Virginia
(1984).

## <u>MISCELLANEOUS</u>

University-Industry Dissertation Fellowship, University of Wisconsin, 1979-80.

<u>Referee for</u>:

| | |
|---|---|
| Journal of Human Resources | National Science Foundation |
| Journal of Industrial Economics | Policy Studies Journal |
| Journal of Labor Economics | Review of Economics and Statistics |
| Journal of Law and Economics | Social Science Research Council |
| Journal of Legal Studies | U.S. Department of Health and Human Services |
| National Commission on Employment Policy | Antitrust Law Journal |

## TESTIMONIAL EXPERIENCE

In the Matter of the Proposed Transfer of Control of T-Mobile USA, Inc. and its subsidiaries from Deutsche Telekom AG to AT&T Inc., Federal Communications Commission, WT Docket No. 11-65, Declaration (April 20, 2011), (with Dennis Carlton and Allan Shampine), on behalf of AT&T Inc.

American Hotline, LLC, Rauckman Utility Products, LLC, and James (Jim) Rauckman vs. Hubbell Incorporated, Hubbell Power Systems, Inc., et al, Case No. 08-L-454. Report (November 29, 2010), Supplemental Report (December 21, 2010), on behalf of Hubbell Incorporated, et al.

In the Matter of Special Access Rates for Price Cap Local Exchange Carriers, Federal Communications Commission, WC Docket No. 05-25. Declaration (January 19, 2010), (with Dennis Carlton), Reply Declaration (February 24, 2010), (with Dennis Carlton and Allan Shampine), on behalf of AT&T Inc.

In the Matter of Verizon Wireless and ALLTEL Holdings LLC, Federal Communications Commission, WT Docket 08-95. Declaration (June 13, 2008), Reply Declaration (August 19, 2008), on behalf of Verizon Wireless, (with Dennis Carlton and Allan Shampine).

Alaska Interstate Construction, L.L.C., et al. v. Pacific Diversified Investments Inc., et al., Superior Court of the State of Alaska, Third Judicial District at Anchorage, Case No. 3AN-05-7921 CI.  Expert Report (October 9, 2006), on behalf of Alaska Interstate Construction, L.L.C., et al.

In the Matter of AT&T Corporation and BellSouth Corporation., Application for Approval of Transfer of Control, Federal Communications Commission, WC Docket 06-74. Declaration (March 29, 2006), Reply Declaration (June 19, 2006), Declaration (August 21, 2006) on behalf of AT&T and BellSouth, (with Dennis Carlton).

In the Matter of Arbitration of Nextel Partners, Inc. and Nextel Partners Operating Corp., against Nextel Communications, Inc. and Nextel WIP Corporation, International Institute for Conflict Prevention and Resolution, CPR No. G-05-33H.  Declaration (August 8, 2005), Supplemental Declaration (August 22, 2005), on behalf of Nextel Partners, Inc. and Nextel Partners Operating Corp.

Joint Application of SBC Communications Inc., AT&T Corporation, and its Certified Pennsylvania Subsidiaries, AT&T Communications of Pennsylvania, LLC, TCG Pittsburgh, and TCG Delaware Valley, Inc., for Approval of Merger, Pennsylvania Public Utility Commission Docket No. A-311163F0006, A-310213F0008, A-310258F0005.  Direct Testimony (May 11, 2005), Rebuttal Testimony (July 15, 2005), Rejoinder Testimony (July 18, 2005), on behalf of SBC and AT&T, (with Dennis Carlton).

-5-

In the Matter of Proposed Merger of SBC Communications and AT&T Corp., New Jersey
Board of Public Utilities.  Direct Testimony (May 4, 2005), Rebuttal Testimony
(June 5, 2005), on behalf of SBC and AT&T, (with Dennis Carlton).

In the Matter of SBC Communications Inc. and AT&T Corp., Application for Approval of
Transfer of Control, Federal Communications Commission, WC Docket No. 05-65.
Declaration (February 21, 2005), Reply Declaration (May 10, 2005), Ex Parte
Presentations (June 28, 2005, July 6-7, 2005, and July 18, 2005), on behalf of SBC
and AT&T, (with Dennis Carlton).

In the Matter of AT&T Corp. v. BellSouth Telecommunications, Inc., Federal
Communications Commission, File No. EB-04-MD-010.  Declaration (July 20,
2004), on behalf of BellSouth Telecommunications, Inc., (with Dennis Carlton).

FoodComm International v. Patrick James Barry et al., United States District Court for the
Northern District of Illinois.  Expert Report (December 2003), Deposition (January
28, 2004), Supplemental Expert Report (January 2007), on behalf of FoodComm
International, (with David Gross).

In the Matter of Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related
Requirements, Federal Communications Commission, WC Docket No. 02-
112 and CC Docket 00-175, 2000 Biennial Regulatory Review of Separate
Affiliate Requirements of Section 64.1903 of the Commission's Rules.
Declaration (June 30, 2003), Reply Declaration (July 28, 2003), on behalf of
Qwest, Verizon and SBC, (with Dennis Carlton and Allan Shampine).

Report to the Civil Rights Division of the U.S. Department of Justice, Racial Differences in
Citations for Traffic Violations in Cleveland, Ohio, (June 27, 2003) on behalf of the
U.S. Department of Justice, (with David Gross).

Sunrise International Leasing Corporation v. Sun Microsystems, Inc., United States District
Court for the District of Minnesota, No. 01-CV-1057 (JMR/FLN).  Affidavit
(January 2003, relating to discovery issues), Affidavit (March 2003, relating to
damage issues, with Dennis Carlton), on behalf of Sun Microsystems.

Mesler v. Prudential Insurance, et al., Circuit Court of Cook County, Illinois, No. 99 L 37.
Expert Report (November 2002), Deposition Testimony (January 30, 2003 and
March 6, 2003), on behalf of Prudential Insurance, et al.

MHC Financing Limited Partnership v. City of San Rafael, United States District Court for
The Northern District of California.  Expert Report (September 13, 2002),
Supplemental Report (September 30, 2002), on behalf of MHC, (with Daniel R.
Fischel).

In the Matter of Inquiry Concerning High-Speed Access to Internet over Cable and Other
Facilities, Federal Communications Commission, Docket GN No. 00-185.  Joint
Declaration (May 2002), on behalf of Verizon, (with K. Arrow, G. Becker, D.
Carlton, R. Gertner, D. Fischel, J. Kalt, and G. Bamberger).

In the Matter of Review of Regulatory Requirements for Incumbent LEC Broadband
Telecommunications Services,  Federal Communications Commission, CC Docket
No. 01-337, FCC 01-360.  Declaration (March 2002), (with Dennis Carlton), (May
2002, and July 2003), on behalf of Verizon, (with Dennis Carlton and Gustavo
Bamberger).

White-Janes v. Chicago Board of Education, U.S. District Court for the Northern District of
Illinois, Eastern Division, CA No. 00C-6128.  Expert Report (March 2002),
Supplemental Report (April 2002), Deposition Testimony (May 2002), and
Supplemental Report (November 2002), on behalf of White-Janes.

Dean Foods, Kraft Foods, Ralston Purina Company, Nabisco, Inc. and McKee Foods v.
Eastman Chemical, et al., United States District Court, Northern District of
California, San Francisco Branch.  Declaration (February 2002), Reply Declaration
(May 2002), Supplemental Declaration (June 2002), on behalf of Dean Foods, et al.

Forest Laboratories, Inc. v. G.D. Searle and Co., U.S. District Court for the Northern District
of Illinois, Eastern Division, CA No. 98C-5170.  Expert Report (April 2001), on
behalf of Forest Laboratories, (with David Gross).

In the Matter of Auction Houses Antitrust Litigation. United States District Court Southern
District of New York, Master File No. 00 Civ 0648 (LAK).  Declaration (February
2001), on behalf of Sotheby's Holdings Inc., (with William Landes).

In the Matter of Joint Application of Northpoint Communications and Verizon
Communications for Authority to Transfer Control of Blanket Authorization to
Provide Domestic Interstate Telecommunications Services as a Non-Dominant
Carrier, Federal Communications Commission, CC Docket No. 00-157.  Reply
Declaration (October 2000), on behalf of Verizon and Northpoint, (with Dennis
Carlton).

Gray et al. v. Monarch Luggage Company, Inc., 99 C 04345.  Expert Report (August 2000),
on behalf of Howard Cassandra Gray.

Erickson v. Alpha Therapeutic, et. al., USDC for the Northern District of Illinois Eastern
Division - 99C 0426.  Expert Report (July 2000), on behalf of Alpha Therapeutic, et.
al.

Vitamin Antitrust Litigation, United States District Court for the District of Columbia, MDL
No. 1285.  Expert Report (June 2000) (with William M. Landes relating to
discovery issues), Expert Report (May 2002) (with William M. Landes and Gustavo
Bamberger relating to damages), Reply Expert Report (July 2002) (with William M.
Landes and Gustavo Bamberger relating to damages), Declaration (August 2002)
(with William M. Landes and Gustavo Bamberger relating to present value
calculation), Deposition Testimony (August 7-8, 2002 and August 27, 2002),
Declaration (November 2002) (with William Landes and Gustavo Bamberger
relating to niacin damage issues), on behalf of opt-out plaintiffs.

<u>Gas City, Ltd. v. Indiana Department of Transportation</u>, Circuit Court of St. Joseph County, Indiana.  Affidavit (March 2000), on behalf of Gas City.

<u>In the Matter of Joint Application of MCI WorldCom and Sprint for Consent to Transfer Control,</u> Federal Communications Commission, CC Docket No. 99-333. Declaration (February 2000), Ex Parte Declaration (May 2000), on behalf of SBC, (with Dennis Carlton).

<u>In the Matter of Merger of Qwest Communications International Inc. and U S WEST, Inc.,</u> Federal Communications Commission, CC Docket No. 99-272.  Declaration (October 18, 1999), Ex Parte Comments (February 2000), on behalf of Qwest and U S WEST, (with Dennis Carlton).

<u>In the Matter of the Merger of SBC Communications Inc. with Ameritech Corporation.</u> Federal Communications Commission, CC Docket No. 98-141.  Affidavit and Report (July 1998), Reply Affidavit and Reply Report (April 1999) Ex Parte Report (April 1999), on behalf of SBC and Ameritech, (with Dennis Carlton).

<u>Riverside Pipeline Co., v. Panhandle Eastern Pipeline Co.,</u> United States District Court for the Western District of Missouri, Case No. 97-0642-CV-W-4.  Expert Report (September 1998) on behalf of Panhandle Eastern Pipeline Co., (with Dennis Carlton).

<u>Lemon, Myer, Duncan et al. v. International Union of Operating Engineers, et al.,</u> United States District Court for the Eastern District of Wisconsin, Case No. 97-C-0857. Affidavit (September 1998),  Affidavit (December 1999), Deposition (February 2000), Supplemental Report (March 2000), on behalf of International Union of Operating Engineers.

<u>In the Matter of Application of WorldCom, Inc., Corp., for Approval to Transfer Control of MCI Communication to WorldCom, Inc</u>., Department of Public Service of the State of West Virginia.  Testimony (June 17, 1998), Oral Testimony (July 2, 1998), on behalf of WorldCom.

<u>In the Matter of the Application of WorldCom, Inc. and MCI Communications Corporation for Approval to Transfer Control of MCI Communications Corporation to WorldCom, Inc.,</u> Department of Public Service Regulation, Public Service Commission of the State of Montana, Docket No. D97.10.191. Testimony (May 12, 1998), on behalf of WorldCom.

<u>Application of WorldCom, Inc. for Approval to Transfer Control of MCI Communications Corporation to WorldCom, Inc.,</u> Public Utilities Commission of the State of Colorado, in re Docket No. 97A-494T.  Testimony (March 26, 1998), Cross-Examination (April 2, 1998), on behalf of WorldCom.

<u>Petition of WorldCom, Inc. for Approval to Transfer Control of MCI Communications Corporation to WorldCom, Inc.,</u> Florida Public Service Commission, Docket No. 971375-TP.  Affidavit (February 27, 1998), on behalf of WorldCom, (with Dennis Carlton).

In the Matter of Application of WorldCom, Inc. for Approval to Transfer Control of MCI
    Communications Corporation to WorldCom, Inc., New York State Public Service
    Commission, Case 97-C-1804.  Affidavit (February 16, 1998), on behalf of
    WorldCom, (with Dennis Carlton).

In the Matter of Applications of WorldCom, Inc. and MCI Communications Corporation for
    Transfer of Control of MCI Communications to WorldCom, Inc., Federal
    Communication Commission, CC Docket No. 97-211.  Declaration (January 25,
    1998), Second Declaration (March 19, 1998), on behalf of WorldCom and MCI,
    (with Dennis Carlton).

Shuller v. United States, U.S. District Court for the Eastern District of Pennsylvania, Civil
    Action No. 97-3820.  Expert Report (February 1998), on behalf of U.S. Department
    of Justice.

Smith v. Amtrak, Circuit Court of Cook County, IL, Case 92 L 10525.  Deposition
    (November 1997), Trial Testimony (January 1998), on behalf of Smith.

Johnson and Lehl v. City Colleges of Chicago, U.S. District Court for the Northern District
    of Illinois Eastern Division Case No. 96 C 0862.  Expert Report (July 1997),
    Deposition Testimony (October 1997), on behalf of City Colleges of Chicago.

Gelumbauskas v. Precision Gear, U.S. District Court, Northern District of Illinois Eastern
    Division, Case No. 96 C 0862.  Expert Report (April 1997), on behalf of
    Gelumbauskas.

Galvan v. U.S. Industries, Deposition Testimony (January 1997), Expert Report (December
    27, 1996), on behalf of U.S. Industries.

Sprint Communications Company L.P. v. Network 2000 Communications Corporation,
    Expert Report (July 15, 1996), Deposition Testimony (July and August 1996),
    Affidavit (November 9, 1996), on behalf of Sprint, (with Dennis Carlton).

Beazer East v. CSX Transportation, Inc., U.S. District Court for the Western District of
    Pennsylvania, Case No. 93 0861.  Expert Report (May 1996), Deposition Testimony
    (June 1996), on behalf of CSX.

Report to National Association of Independent Insurers, Response to the National
    Association of Insurance Commissions Staff: Analyses of the Availability and
    Affordability of Urban Insurance, (May 1996).

Carbon Dioxide Industry Litigation, U.S. District Court for Central District of Florida
    MDL940.  Expert Report (October 1994) (with William M. Landes), Supplemental
    Report (May 1995) (with William M. Landes and Richard Leftwich), Deposition
    Testimony (July 1995), on behalf of opt-out plaintiffs.

AVR, Inc. v. Cemstone Products Corp., U.S. District Court, District of Minnesota, Third
    Division, File CIV 3-92-551.  Expert Report (October 1994), Supplemental
    Affidavits (December 1994 and January 1995), on behalf of Cemstone.

W. Borysiewicz v. M. Gilblair, Circuit Court of Cook County, Illinois.  Deposition
Testimony (August 1994), and Trial Testimony (September 1994) on behalf of
Borysiewicz.

NAACP et al. v. American Family Mutual Insurance Co., U.S. District Court, Eastern
District of Wisconsin, Civil Action No. 90-C-0759.  Deposition Testimony (July
1994 and November 1994), on behalf of American Family.

G. Bowan v. The Sales Force Companies, U.S. District Court for The Western District of
Missouri, Case No. 92-0496-CV-W-2.  Affidavit (February 1993), on behalf of
Sales Force.

Wisconsin Central Transportation Corporation -- Continuance in Control -- Fox Valley and
Western Ltd., Finance Docket 32036, Interstate Commerce Commission.  Expert
Report (September 1992), on behalf of Wisconsin Central, (with Andrew M.
Rosenfield).

Castaneda v. Baron Wire and Steel Inc., Circuit Court of Cook County, Illinois, Municipal
Department, Second District.  Deposition Testimony (February 1992), on behalf of
Castaneda.

Morgan v. ServiceMaster, U.S. District Court for the Northern District of Illinois, Case No.
89-C-0581.  Report (September 1991), on behalf of ServiceMaster, (with Sherwin
Rosen).

Sepich v. Mueller, U.S. District Court for the Central District of Illinois, U.S. District Court,
Case No. 88-2353.  Report (March 1991), on behalf of Mueller, (with Sherwin
Rosen).

N. Savakis v. Beatrice Company, U.S. District Court for the N.E. District of Illinois Eastern
Division, No. 89 C5790.  Expert Report (June 1990), on behalf of Beatrice.

Times Herald Printing Company v. A.H. Belo Corp. and Dallas Morning News Company,
District Court of Harris County Texas, 280th Judicial District.  Deposition
Testimony (April 1990), on behalf of Dallas Morning News.

Turner v. IDS Financial Services, Inc., U.S. District Court for the District of Minnesota, File
No. 88-521.  Report (November 1989), on behalf of IDS.

McLendon et al. v. Continental Group et al., U.S. District Court for the District of New
Jersey, Civil Action No. 83-1340 (SA).  Trial Testimony (February 1989),
Testimony before Special Master (February 1990), Testimony before Special Master
(August 1990), on behalf of Continental Group, (with Sherwin Rosen).

Application of Illini Carrier L.P. to provide natural gas transportation services, Testimony
(April 1988), on behalf of Illini Carrier.

# EXHIBIT B

**Materials Relied Upon**

**Documents**

*Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended on May 2, 2012

Class Counsel's Request for Formal Policy Statement: Monthly Revenue, December 16, 2012

BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination, January 9, 2013

BP's Further Submission in Response to Class Counsel's December 16, 2012 Request for Policy Determination, January 11, 2013

BP's *In Camera* Submission dated January 23, 2013, including letter from Richard C. Godfrey, PowerPoint slides "Economic And Property Damages Settlement – Business Economic Loss ("BEL") Compensation Issue", Declaration of David Hall, Declaration of Xavier Oustalniol, and Declaration of Charles E. Finch

Class Counsel's *In Camera* Submission "Monthly Costs and Revenue" and attachments, January 23, 2013

MDL 2179 Rec. Doc. 569 (Oct. 19, 2010)

Declaration of Roman L. Weil, February 18, 2013

Declaration of L. Richard Dietrich, February 18, 2013

Declaration of J. Lester Alexander, III, February 18, 2013

Supplemental Declaration of David Hall, February 18, 201.

Supplemental Declaration of Xavier Oustalniol, February 18, 2013

Supplemental Declaration of Charles E. Finch, February 18, 2013

**Data**

CSSP claim-level data as of February 11, 2013 (CSSP data field request - Priority items_130211.xlsx)

CSSP event-level data as of February 11, 2013 (Payment & Notice History Report_130211.xlsx)

GCCF payment data as of September 20, 2012 (payment_09_20_2012.xlsx)

GCCF Phase II status data as of May 31, 2012 (unpaid_not_denied_vs_denied_05_31_2012.xlsx)

GCCF EAP status data as of December 23, 2010 (GCCF_EAP_Claimants_Report_12_23_2010_with_Business_Type_and_Geography)

1

Deepwater Horizon MDL Litigation Short Form Joinder data transcribed by Edox (SFJComplete03-16-2012Update1.xlsx)

US Census NAICS descriptions (naics07.xlsx)

GIS mapping data from ESRI ArcGIS Desktop 10 (used to calculate miles to the coast reported in Table 1)



CSSP BEL Claim Files Processed or Evaluated







Note: * Indicates claim is included in Table 6.

# EXHIBIT C

**Exhibit C.1**

███████████

**Background and Summary**
- Rice farm ███████████ (Zone D).
- Benchmark year:  2009; Compensation months:  September-November 2010
- Uncorrected variable profit reported by CSSP was $90,000 lower in 2010 compared to 2009.
- BEL Step 1 compensation offered by CSSP (pre-RTP):  $2.4 million.

**Step 1:  Identify Data Inaccuracies**
- None for this claimant.

**Step 2:  Apply Triggers**
- Revenue spike – November 2009 (99% of annual revenue) and December 2010 (91% of 2010 revenue).
- Negative variable profit – observed in 17 of 24 months from 2009-2010
- Wide variation in monthly variable profit margin – between negative margin in multiple months and 100% in November 2009

**Step 3:  Matching Revenue and Corresponding Variable Expenses**
- Correct any errors or irregularities in expenses flagged by the triggers
    - None for this claimant
- Determine crop year revenue (e.g., 2009:  July 2009-June 2010)
- Match crop year revenue to variable expenses in production year:
    - Determine annual ratio of crop revenue to production year variable expenses; for 2009 = 1.41 and 2010 = 1.49
    - Match crop year revenue to production year variable expenses; for each month in 2009 and 2010, multiply (i) annual ratio of revenue to variable expenses and (ii) variable expenses reported for that month.
- Calculate monthly matched variable profit by subtracting from revenue the corresponding variable expenses.

**Step 4:  Apply BEL framework**
- Determine claimant-friendly compensation period and calculate Step 1 compensation.
- July-December yields the highest Corrected BEL Step 1 Compensation:  $151,000, a 94% reduction from the CSSP offer.

**Exhibit C.2**

██████████████████

**Background and Summary**
- Paving contractor ████████████ (Zone D)
- Benchmark years:  2007-09; Compensation months:  August-November 2010
- Uncorrected variable profit reported by CSSP is $1.5 million higher in 2010 than in 2007-2009 ($3.5 million higher measured May-December basis)
- BEL Step 1 compensation offered by CSSP (pre-RTP):  $6.07 million

**Step 1:  Identify Data Inaccuracies**
- Annual bad debt expense recorded in December each year and should be assigned to period when revenue related to the bad debt expense was earned
- Negative expense for "supplies" reported in June 2009 should be corrected.
- Proposed remedies to line item inaccuracies:
  - CSSP accountants should discuss with claimant and attempt to resolve based on appropriate information.  In the absence of appropriate information, assign on a pro rata basis throughout the year.
- For the purposes of the BEL implementation example, corrections to the bad debt expense and supply inaccuracies are not incorporated into the implementation example.

**Step 2:  Apply Triggers**
- Revenue spike – June 2010 (18.5% of annual revenue)
- Negative variable profit – December 2007-09 and January 2010

**Step 3:  Matching Revenue and Corresponding Variable Expenses**
- Correct any errors or irregularities in expenses flagged by the triggers
  - None for this claimant
- Match revenue to variable expenses reflected in claimant's monthly financial statements:
  - If available, obtain job schedules and match revenue to corresponding variable expenses on a job-specific basis.
  - Where job-specific schedules are not available:
    - Determine annual ratio of revenue to variable expenses; for Benchmark Period = 1.59 and for 2010 = 1.57
    - Match revenue to variable expenses; for each month in Benchmark Period and 2010, multiply (i) annual ratio of revenue to variable expenses and (ii) variable expenses reported for that month.
- Calculate monthly matched variable profit by subtracting from revenue the corresponding variable expenses.

**Step 4:  Apply BEL framework**
- Determine claimant-friendly compensation period and calculate Step 1 compensation.
- August-December period yields highest Corrected BEL Step 1 Compensation:  $2.42 million, a 60% reduction from the CSSP offer.

**Exhibit C.3**

████████████████

**Background and Summary**
- Catfish farm ████████████ (Zone D).[1]
- Benchmark year:  2009; Compensation months:  May-December 2010
- Uncorrected variable profit reported by CSSP was higher in 2010 than 2009 by $720,000, an increase of more than three thousand percent (3,000%)
- BEL Step 1 compensation offered  by CSSP (pre-RTP):  $676,000

**Step 1:  Identify Data Inaccuracies**
- Negative "Fuel Expenses" in March 2009 should be corrected
- Proposed remedies to this line item inaccuracy:
  - CSSP accountants should discuss with claimant and attempt to resolve based on appropriate information.  In the absence of appropriate information, assign on a pro rata basis throughout the year.
- For the purposes of the BEL implementation example, corrections to the fuel expense inaccuracy are not incorporated into the implementation example.

**Step 2:  Apply Triggers**
- Revenue spike - Claimant has large revenue spikes in November 2009 (32% of annual revenue) and April 2010 (28% of annual revenue).
- Negative variable profit - Uncorrected variable profit measured by CSSP is negative in multiple months.  April 2009 uncorrected variable profit is negative $907,000, driven by roughly $1.0 million feed expense and only $34,000 in uncorrected revenue.
- Wide variation in monthly variable profit - One month before the compensation period begins, the April 2010 uncorrected variable profit spiked by more than $500,000.

**Step 3:  Matching Revenue and Corresponding Variable Expenses**
- Claimant financial statements indicate that a large bulk feed purchase is the source of negative variable profit in April 2009.
  - CSSP accountants to discuss with claimant and attempt to understand the time period over which purchased feed would be consumed, with expenses matched to the appropriate time period.  For the implementation example, we assume that feed is consumed over the following 12 months.
- Match revenue to variable expenses reflected in claimant's monthly financial statements:
  - Determine annual ratio of revenue to variable expenses; for 2009 = 1.14 and for 2010 = 1.33
  - Match revenue to variable expenses; for each month in 2009 and 2010, multiply (i) annual ratio of revenue to variable expenses and (ii) adjusted variable expenses reported for each month, after assigning feed expenses over the (assumed) 12-month consumption period.
- Calculate monthly variable profit as matched revenue less variable expenses.

---

[1] This business is a catfish farm and its operations differ from those of a traditional farm that grows row crops and harvests them on a crop year.  Therefore, there is no need to consider crop year sales.

**Step 4:  Apply BEL framework**
- Determine claimant-friendly compensation period and calculate Step 1 compensation.
- Correcting for the bulk feed purchase (but not matching revenue spikes to expenses incurred):
  - October-December yields the highest Corrected BEL Step 1 Compensation:  $397,000, a 40% reduction from the CSSP calculation.
- Correcting for both the bulk feed purchase and matching revenue spikes to expenses incurred:
  - October-December yields the highest Corrected BEL Step 1 Compensation:  $6,000, a 99% reduction from CSSP calculation.

**Exhibit C.4**

██████████

**Background and Summary**
- Law firm ████████████ (Zone D)
- Benchmark year:  2008-2009; Compensation months:  May-December 2010
- Uncorrected variable profit reported by CSSP on a calendar year basis fell from $3.4 million in 2008 to $1.0 million in 2009, and rose to $1.5 million in 2010.
- BEL Step 1 compensation offered by CSSP (pre-RTP):  $1.3 million.

**Step 1:  Identify Data Inaccuracies**
- Claimant has zero reported variable expenses in June and July of 2010.
- Proposed remedy to line item inaccuracies:
  - CSSP accountants should discuss with claimant and attempt to resolve based on appropriate information.
- For the purposes of the BEL implementation example, corrections to these inaccuracies are not incorporated into the implementation example.

**Step 2:  Apply Triggers**
- Revenue spike
  - Large revenue spikes which appear to reflect resolution of contingent fee litigation
    - December 2008 (71% of annual revenue)
    - January 2010 (32% of annual revenue)
    - May-June 2011 (combined 48% of annual revenue)
  - Smaller regular spikes in December 2009 (22% annual revenue) and December 2010 (18% of annual revenue) consistent with year-end collection of outstanding receivables generated in prior months.

**Step 3:  Matching Revenue and Corresponding Variable Expenses**
- Match year-end revenue spikes to periods in which earned.[2]
  - CSSP accountants to discuss with claimant.
  - For implementation example, we assume December revenue contains collections of $200,000 per year, and that these were generated pro-rata over the relevant calendar year.
- Match revenue spikes attributable to resolution of contingent fee matters to the period of activity on the matter.
  - CSSP accountants to discuss with claimant and determine when the case was initiated and resolved.
    - If available, hours worked on matter can be used in attributing revenue.
    - If hours worked are unavailable, revenue can be attributed pro rata during the life of the matter.

---

[2] Although this does not appear to be an issue in ████████████ claim, as a general matter CSSP accountants should identify pass-through or reimbursable disbursements (e.g., expert fees, referral fees, travel, etc.).  If these expenses are passed through to clients, they should be removed from both revenue and expenses in evaluating compensation.  If not, they should be assigned over the life of the relevant matter.

- o For implementation example, we assume hours worked are not available and have attributed revenue evenly over the life the matter.  For implementation example, we also assume that:
  - December 2008 fee was for a matter with a 3-year life
  - January 2010 fee was for a matter with a 1-year life
  - May-June 2011 fee was for a matter with a 1-year life
- Impute revenue for contingent fee matters open as of the time of claim review
  - o Obtain a list from the claimant of all open contingency fee matters worked on during each of the years of the Benchmark Period, 2010 and 2011 and the date each matter was opened.
  - o Method 1:
    - Value open contingent fee matters based on average value of claimant's closed contingent fee matters (including those that generated zero revenue) for at least 2007-2009.
    - Determine the average duration of claimant's closed contingent fee matters
    - Calculate average monthly revenue per matter by dividing the sum of contingent fee awards (if any) by the sum of the number of months matters were open.
    - Determine the number of claimant's contingent fee matters that remain open at the time of the claim review that were open in each of the years for the Benchmark Period, 2010, and 2011 (e.g., if the claimant's benchmark year is 2009, determine the number of open contingent matters in each year 2009-11).
    - Multiply the average monthly revenue per matter by the number of open contingent matters in each month of the Benchmark Period, 2010, and 2011.
  - o Method 2
    - Similar to Method 1 except value open contingent fee matters using standard methods as applied in partnership dissolutions and divorce proceedings, using a court-appointed valuation expert(s).
  - o For implementation example, we assume ▮▮▮▮▮▮▮ had one contingent fee matter in 2010 and two cases in 2011 that remain open at the time of the claim review. We use an assumed average monthy value for these matters of $18,000 (see supplemental calculation).

**Determine variable profit and Step 1 compensation[3]**

- Calculate matched monthly revenue as the sum of:  (i) standard (non-spike) revenue in each month; (ii) revenue assigned from year-end collections; (iii) revenue assigned from closed contingent fee matters; and (iv) revenue imputed from open contingent fee matters.
- Calculate monthly variable profit as matched revenue less variable expenses.

**Step 4:  Apply BEL framework**

- Determine claimant-friendly compensation period and calculate Step 1 compensation.
- May-October period yields highest Corrected BEL Step 1 Compensation:  $220,000, a 83% reduction from the CSSP offer.

---

[3] Matched data will be used to calculate V-test (including matched data for 2011).

**Exhibit C.5**

████████████

**Background and Summary**
- School and office furniture distributor ████████ (Zone D).
- Benchmark period:  2008-2009; Compensation months:  August-November 2010
- Uncorrected variable profit reported by CSSP fell from $455,000 in 2008 to $163,000 in 2009 before recovering to $174,000 in 2010
- BEL Step 1 compensation offered  by CSSP (pre-RTP):  $598,000

**Step 1:  Identify Data Inaccuracies**
- Negative revenue of $708,000 in February 2008 should be corrected
- Proposed remedies to this line item inaccuracy:
    o CSSP accountants should discuss with claimant and attempt to resolve based on appropriate information.  In the absence of appropriate information, assign on a pro rata basis throughout the year.
- For the purposes of the BEL implementation example, we assume that revenue in the prior month of January 2008 was overstated by $1.0 million and have corrected revenue in both months based on this assumption.
- Spike in salaries expense in December of each year may reflect bonus payments
    o CSSP accountants should discuss with claimant and attempt to resolve based on appropriate information.
- Negative expense in travel and promotion expense in December 2008
    o CSSP accountants should discuss with claimant and attempt to resolve based on appropriate information.
- For the purposes of the BEL implementation example, corrections to the salaries and travel and promotion inaccuracies are not incorporated into the implementation example.

**Step 2:  Apply Triggers**
- Revenue spike - July and August 2008 (22% and 18% of annual revenue) and July 2010 (24% of annual revenue).
- Expense spikes – July and August 2008 purchases (21% and 20% of annual purchases) and August 2010 purchases (28% of annual purchases).  July 2008 Freight expense (26% of annual freight)
- Negative variable profit - Uncorrected variable profit measured by CSSP is negative in multiple months.  August 2010 uncorrected variable profit is negative $407,000, driven by over $1.0 million in "purchases" within COGS and only $642,000 in revenue.
- Wide variation in monthly variable profit – positive 72% margin in July 2010 surrounded by negative margin in months immediately before and after.

**Step 3:  Matching Revenue and Corresponding Variable Expenses**
- Match variable expenses to revenue reflected in claimant's monthly financial statements:
    o Determine annual ratio of variable expenses to revenue; for 2008 = 0.92 and for both 2009 and 2010 = 0.96

- o   Match variable expenses to revenue; for each month in Benchmark Period and 2010, multiply (i) annual ratio of variable expenses to revenue and (ii) adjusted revenue reported for each month.
- Calculate monthly variable profit as matched revenue less variable expenses.

**Step 4:  Apply BEL framework**
- Determine claimant-friendly compensation period and calculate Step 1 compensation.
- May-October period yields highest Corrected BEL Step 1 Compensation:  $112,000, an 81% reduction from the CSSP offer.

# EXHIBIT D

**Exhibit D.1**

## Approach for Implementation of BEL for ███████

$ thousands

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual | Revenue / Expenses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Per CSSP Calculation:** | | | | | | | | | | | | | | |
| 2009 Uncorrected Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,649 | 22 | 2,671 | |
| Uncorrected Variable Expenses | 0 | 0 | 0 | 291 | 329 | 363 | 227 | 376 | 136 | 47 | 0 | 126 | 1,894 | |
| Uncorrected Variable Profit | 0 | 0 | 0 | (291) | (329) | (363) | (227) | (376) | (136) | (47) | 2,649 | (104) | 777 | |
| | | | | | | | | | | | | | | |
| 2010 Uncorrected Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 184 | 1,910 | 2,094 | |
| Uncorrected Variable Expenses | 0 | 19 | 0 | 226 | 383 | 322 | 186 | 128 | 63 | 41 | 8 | 30 | 1,405 | |
| Uncorrected Variable Profit | 0 | (19) | (0) | (226) | (383) | (322) | (186) | (128) | (63) | (41) | 176 | 1,880 | 689 | |
| | | | | | | | | | | | | | | |
| Change in Uncorrected Variable Profit (2010-2009) | | | | | (54) | 41 | 42 | 248 | 73 | 6 | (2,473) | 1,984 | | |
| BEL Step 1 Compensation (per CSSP) | | | | | | | | | (2,393) | | | | | |
| | | | | | | | | | | | | | | |
| 2009 Crop Year Revenue — Received in 2009 | | | | | | | 0 | 0 | 0 | 0 | 2,649 | 22 | 2,671 | 1.41 |
| Received in 2010 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | |
| 2010 Crop Year Revenue — Received in 2010 | | | | | | | 0 | 0 | 0 | 0 | 184 | 1,910 | 2,095 | 1.49 |
| Received in 2011 | 0 | 1 | 0 | 0 | 0 | 0 | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Implementation:** | | | | | | | | | | | | | | |
| 2009 Matched Revenue | 0 | 0 | 0 | 410 | 464 | 511 | 320 | 530 | 192 | 66 | 0 | 178 | 2,671 | |
| Matched Variable Expenses | 0 | 0 | 0 | 291 | 329 | 363 | 227 | 376 | 136 | 47 | 0 | 126 | 1,894 | |
| Matched Variable Profit | 0 | 0 | 0 | 119 | 135 | 149 | 93 | 154 | 56 | 19 | 0 | 52 | 777 | |
| | | | | | | | | | | | | | | |
| 2010 Matched Revenue | 0 | 29 | 0 | 337 | 571 | 480 | 277 | 191 | 94 | 61 | 12 | 44 | 2,095 | |
| Matched Variable Expenses | 0 | 19 | 0 | 226 | 383 | 322 | 186 | 128 | 63 | 41 | 8 | 30 | 1,405 | |
| Matched Variable Profit | 0 | 9 | 0 | 111 | 188 | 158 | 91 | 63 | 31 | 20 | 4 | 15 | 690 | |
| | | | | | | | | | | | | | | |
| Change in Corrected Variable Profit (2010-2009) | | | | | 53 | 9 | (2) | (91) | (25) | 1 | 4 | (37) | | |
| Corrected BEL Step 1 Compensation | | | | | | | | | (151) | | | | | |

**Exhibit D.2**

**Approach for Implementation of BEL for** ██████████████

$ millions

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | May-Dec | Annual | Revenue / Expenses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Per CSSP Calculation: | | | | | | | | | | | | | | | | |
| 2007-09 Average | Uncorrected Revenue | 2.48 | 2.94 | 3.82 | 4.01 | 4.66 | 5.96 | 3.70 | 8.91 | 6.91 | 5.80 | 5.76 | 2.63 | 44.34 | 57.59 | 1.59 |
| | Uncorrected Variable Expense | 1.90 | 1.74 | 2.11 | 2.87 | 2.74 | 3.48 | 3.40 | 4.41 | 3.70 | 3.45 | 3.67 | 2.85 | 27.69 | 36.30 | |
| | Uncorrected Variable Profit | 0.58 | 1.21 | 1.71 | 1.15 | 1.92 | 2.48 | 0.30 | 4.50 | 3.21 | 2.34 | 2.10 | (0.22) | 16.65 | 21.29 | |
| | | | | | | | | | | | | | | | | |
| 2010 | Uncorrected Revenue | 1.20 | 3.21 | 3.51 | 7.19 | 5.32 | 11.61 | 7.88 | 6.26 | 6.45 | 3.62 | 2.56 | 3.79 | 47.49 | 62.59 | 1.57 |
| | Uncorrected Variable Expenses | 2.21 | 1.59 | 2.85 | 5.82 | 4.01 | 4.46 | 4.58 | 4.03 | 3.93 | 3.01 | 1.84 | 1.48 | 27.33 | 39.81 | |
| | Uncorrected Variable Profit | (1.02) | 1.62 | 0.66 | 1.36 | 1.32 | 7.14 | 3.30 | 2.23 | 2.52 | 0.62 | 0.72 | 2.32 | 20.16 | 22.79 | |
| | | | | | | | | | | | | | | | | |
| | Change in Uncorrected Variable Profit (2010-2007/09 Average) | | | | | (0.60) | 4.66 | 3.00 | (2.27) | (0.69) | (1.73) | (1.38) | 2.53 | 3.51 | | |
| | BEL Step 1 Compensation (per CSSP) | | | | | | | | | | (6.07) | | | | | |
| Implementation: | | | | | | | | | | | | | | | | |
| 2007-09 Average | Matched Revenue | 3.01 | 2.75 | 3.34 | 4.55 | 4.35 | 5.52 | 5.40 | 6.99 | 5.86 | 5.48 | 5.82 | 4.51 | 43.94 | 57.59 | |
| | Corrected Variable Expense | 1.90 | 1.74 | 2.11 | 2.87 | 2.74 | 3.48 | 3.40 | 4.41 | 3.70 | 3.45 | 3.67 | 2.85 | 27.69 | 36.30 | |
| | Matched Variable Profit | 1.11 | 1.02 | 1.24 | 1.68 | 1.61 | 2.04 | 1.99 | 2.59 | 2.17 | 2.02 | 2.15 | 1.67 | 16.24 | 21.29 | |
| | | | | | | | | | | | | | | | | |
| 2010 | Matched Revenue | 3.48 | 2.49 | 4.48 | 9.16 | 6.30 | 7.02 | 7.20 | 6.34 | 6.18 | 4.73 | 2.89 | 2.32 | 42.98 | 62.59 | |
| | Corrected Variable Expenses | 2.21 | 1.59 | 2.85 | 5.82 | 4.01 | 4.46 | 4.58 | 4.03 | 3.93 | 3.01 | 1.84 | 1.48 | 27.33 | 39.81 | |
| | Matched Variable Profit | 1.27 | 0.91 | 1.63 | 3.33 | 2.29 | 2.56 | 2.62 | 2.31 | 2.25 | 1.72 | 1.05 | 0.84 | 15.65 | 22.79 | |
| | | | | | | | | | | | | | | | | |
| | Change in Corrected Variable Profit (2010-2007/09 Average) | | | | | 0.68 | 0.51 | 0.63 | (0.28) | 0.08 | (0.30) | (1.10) | (0.82) | (0.60) | | |
| | Corrected BEL Step 1 Compensation | | | | | | | | | | (2.42) | | | | | |

Note:  Corrected BEL Step 1 Compensation does not account for inaccuracies identified in initial line item review.

**Exhibit D.3**

### Approach for Implementation of BEL for ▮▮▮▮▮▮▮▮
$ thousands

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | May-Dec | Annual | Revenue / Expenses |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Per CSSP Calculation:** | | | | | | | | | | | | | | | |
| 2009  Uncorrected Revenue | 0 | 0 | 125 | 34 | 147 | 357 | 163 | 77 | 85 | 158 | 634 | 211 | 1,833 | 1,992 | |
| Uncorrected Variable Expenses | 12 | 8 | (10) | 942 | 143 | 248 | 115 | 136 | 182 | 89 | 75 | 39 | 1,027 | 1,978 | |
| Uncorrected Variable Profit | (12) | (8) | 135 | (907) | 4 | 110 | 48 | (59) | (96) | 69 | 559 | 172 | 806 | 14 | |
| | | | | | | | | | | | | | | | |
| 2010  Uncorrected Revenue | 97 | 70 | 16 | 584 | 167 | 5 | 293 | 272 | 241 | 162 | 112 | 62 | 1,314 | 2,082 | |
| Uncorrected Variable Expenses | 9 | 7 | 14 | 125 | 175 | 235 | 245 | 192 | 179 | 85 | 28 | 45 | 1,184 | 1,339 | |
| Uncorrected Variable Profit | 88 | 63 | 3 | 459 | (8) | (230) | 48 | 80 | 62 | 77 | 84 | 17 | 131 | 743 | |
| | | | | | | | | | | | | | | | |
| Change in Uncorrected Variable Profit (2010-2009) | | | | | (12) | (340) | (0) | 139 | 158 | 8 | (475) | (154) | | | |
| BEL Step 1 Compensation (per CSSP) | | | | | | | | | (676) | | | | | | |
| | | | | | | | | | | | | | | | |
| April 2009 Cost Spike | 900 | | | Bulk Purchase - Distribute to Next Twelve Months Pro Rata | | | | | | | | | | | |
| 2009 | 0 | 0 | 0 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | | 900 | |
| 2010 | 75 | 75 | 75 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |
| | | | | | | | | | | | | | | | |
| **Implementation Correcting for Bulk Purchase Only:** | | | | | | | | | | | | | | | |
| 2009  Uncorrected Revenue | 0 | 0 | 125 | 34 | 147 | 357 | 163 | 77 | 85 | 158 | 634 | 211 | 1,833 | 1,992 | 1.14 |
| Matched Variable Expenses | 12 | 8 | (10) | 117 | 218 | 323 | 190 | 211 | 257 | 164 | 150 | 114 | 1,627 | 1,753 | |
| Variable Profit (partial correction) | (12) | (8) | 135 | (82) | (71) | 35 | (27) | (134) | (171) | (6) | 484 | 97 | 206 | 239 | |
| | | | | | | | | | | | | | | | |
| 2010  Uncorrected Revenue | 97 | 70 | 16 | 584 | 167 | 5 | 293 | 272 | 241 | 162 | 112 | 62 | 1,314 | 2,082 | 1.33 |
| Matched Variable Expenses | 84 | 82 | 89 | 125 | 175 | 235 | 245 | 192 | 179 | 85 | 28 | 45 | 1,184 | 1,564 | |
| Variable Profit (partial correction) | 13 | (12) | (72) | 459 | (8) | (230) | 48 | 80 | 62 | 77 | 84 | 17 | 131 | 518 | |
| | | | | | | | | | | | | | | | |
| Change in Variable Profit (Partial Correction) (2010-2009) | | | | | 63 | (265) | 75 | 214 | 233 | 83 | (400) | (79) | | | |
| BEL Step 1 Compensation (Partial Correction) | | | | | | | | | (397) | | | | | | |
| | | | | | | | | | | | | | | | |
| **Implementation Correcting for Bulk Purchase and Revenue Matching:** | | | | | | | | | | | | | | | |
| 2009  Matched Revenue | 13 | 9 | (11) | 133 | 247 | 367 | 216 | 240 | 292 | 187 | 170 | 129 | 1,848 | 1,992 | |
| Matched Variable Expenses | 12 | 8 | (10) | 117 | 218 | 323 | 190 | 211 | 257 | 164 | 150 | 114 | 1,627 | 1,753 | |
| Matched Variable Profit | 2 | 1 | (1) | 16 | 30 | 44 | 26 | 29 | 35 | 22 | 20 | 16 | 222 | 239 | |
| | | | | | | | | | | | | | | | |
| 2010  Matched Revenue | 112 | 110 | 118 | 166 | 233 | 313 | 326 | 256 | 238 | 113 | 37 | 59 | 1,576 | 2,082 | |
| Matched Variable Expenses | 84 | 82 | 89 | 125 | 175 | 235 | 245 | 192 | 179 | 85 | 28 | 45 | 1,184 | 1,564 | |
| Matched Variable Profit | 28 | 27 | 29 | 41 | 58 | 78 | 81 | 64 | 59 | 28 | 9 | 15 | 392 | 518 | |
| | | | | | | | | | | | | | | | |
| Change in Corrected Variable Profit (2010-2009) | | | | | 28 | 34 | 55 | 35 | 24 | 6 | (11) | (1) | | | |
| Corrected BEL Step 1 Compensation | | | | | | | | | (6) | | | | | | |

3

Exhibit D.4

## Approach for Implementation of BEL for ███████

$ thousands

| Per CSSP Calculation: | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Uncorrected Revenue | 72 | 38 | 24 | 238 | 319 | 65 | 107 | 60 | 14 | 55 | 66 | 2,627 | 3,684 |
| | Uncorrected Variable Expenses | 32 | 19 | 17 | 18 | 16 | 18 | 12 | 14 | 15 | 16 | 15 | 136 | 327 |
| | Uncorrected Variable Profit | 40 | 19 | 7 | 219 | 302 | 47 | 95 | 46 | 0 | 39 | 51 | 2,491 | 3,357 |
| | | | | | | | | | | | | | | |
| 2009 | Uncorrected Revenue | 148 | 147 | 29 | 49 | 9 | 39 | 105 | 90 | 110 | 169 | 25 | 255 | 1,175 |
| | Uncorrected Variable Expenses | 17 | 16 | 18 | 16 | 17 | 17 | 19 | 19 | 30 | 6 | 17 | 26 | 216 |
| | Uncorrected Variable Profit | 132 | 130 | 11 | 33 | -8 | 22 | 86 | 71 | 80 | 163 | 8 | 229 | 958 |
| | | | | | | | | | | | | | | |
| 2010 | Uncorrected Revenue | 500 | 114 | 229 | 88 | 56 | 64 | 25 | 21 | 24 | 91 | 70 | 283 | 1,565 |
| | Uncorrected Variable Expenses | 22 | 11 | 14 | 10 | 9 | 0 | 0 | 4 | 10 | 3 | 4 | 13 | 101 |
| | Uncorrected Variable Profit | 478 | 104 | 215 | 78 | 47 | 64 | 25 | 17 | 13 | 88 | 65 | 269 | 1,464 |
| | | | | | | | | | | | | | | |
| | Change in Uncorrected Variable Profit (2010-2008/09 Average) | | | | | (100) | 29 | (66) | (42) | (26) | (13) | 36 | ######### | |
| | BEL Step 1 Compensation (per CSSP) | | | | | | | (1,273) | | | | | | |
| | | | | | | | | | | | | | | |
| 2011 | Revenue | 122 | 92 | 93 | 54 | 315 | 241 | 18 | 23 | 87 | 27 | 46 | 47 | 1,165 |

| End of Year Revenue Adjustments - Distributed Evenly by Month | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 Adjustment | 200 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 200 |
| 2009 Adjustment | 200 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 200 |
| 2010 Adjustment | 200 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 200 |

| December 2008 Spike: | $2,300 | contingency fee award | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Matched Revenue | 2006 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | |
| | 2007 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | |
| | 2008 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 2,300 |

| January 2010 Spike: | $400 | contingency fee award | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Matched Revenue | 2009 | 0 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | |
| | 2010 | 33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400 |

| May-June 2011 Spike | $400 | contingency fee award | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Matched Revenue | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | 33 | 33 | 33 | 33 | 33 | |
| | 2011 | 33 | 33 | 33 | 33 | 33 | 33 | 0 | 0 | 0 | 0 | 0 | 0 | 400 |

| Imputed Revenue for Contingent Matters Outstanding at Claim Review | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 211 |
| | 2011 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 423 |

| Implementation - Sum Components from Six Prior Panels: | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 Matched Revenue | 136 | 102 | 88 | 302 | 383 | 129 | 171 | 124 | 78 | 119 | 130 | 191 | 1,951 |
| Corrected Variable Expenses | 32 | 19 | 17 | 18 | 16 | 18 | 12 | 14 | 15 | 16 | 15 | 136 | 327 |
| Matched Variable Profit | 104 | 83 | 71 | 283 | 366 | 111 | 159 | 110 | 64 | 103 | 115 | 55 | 1,624 |
| | | | | | | | | | | | | | |
| 2009 Matched Revenue | 165 | 197 | 79 | 99 | 59 | 89 | 155 | 140 | 160 | 219 | 75 | 105 | 1,541 |
| Corrected Variable Expenses | 17 | 16 | 18 | 16 | 17 | 17 | 19 | 19 | 30 | 6 | 17 | 26 | 216 |
| Matched Variable Profit | 148 | 180 | 61 | 83 | 42 | 72 | 136 | 121 | 130 | 213 | 58 | 79 | 1,325 |
| | | | | | | | | | | | | | |
| 2010 Matched Revenue | 168 | 149 | 263 | 123 | 91 | 98 | 93 | 89 | 91 | 159 | 137 | 150 | 1,610 |
| Corrected Variable Expenses | 22 | 11 | 14 | 10 | 9 | 0 | 0 | 4 | 10 | 3 | 4 | 13 | 101 |
| Matched Variable Profit | 146 | 138 | 249 | 113 | 81 | 98 | 93 | 84 | 81 | 156 | 133 | 137 | 1,509 |
| | | | | | | | | | | | | | |
| Change in Corrected Variable Profit (2010-2008/09 Average) | | | | | (123) | 6 | (55) | (31) | (16) | (2) | 46 | 70 | |
| Corrected BEL Step 1 Compensation | | | | | | | (220) | | | | | | |

| 2011 Matched Revenue | 191 | 161 | 162 | 123 | 183 | 110 | 53 | 58 | 122 | 62 | 82 | 82 | 1,388 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| V-Test Results | | | | May-Jul 2010 vs. 2008-2009 | -43% Pass | | | | | | | | |
| | | | | May-Jul 2011 vs. 2010 | 23% Pass | | | | | | | | |

**Exhibit D.4 (continued)**

### Calculation of Average Monthly Revenue from Contingent Fee Matters
### Hypothetical Example for ██████ Implementation

| Matter | Start Month | Resolution Month | Status at Claim Review | Months Active | Years Active | Total Revenue | Average Revenue per Year | Average Revenue per Month |
|---|---|---|---|---|---|---|---|---|
| A | Jan-06 | Dec-08 | Closed | 24 | 2 | 1,533 | 767 | 64 |
| B | Feb-09 | Jan-10 | Closed | 12 | 2 | 400 | 200 | 33 |
| C | Jul-10 | Jun-11 | Closed | 12 | 2 | 400 | 200 | 33 |
| D | Jan-07 | Dec-08 | Closed | 24 | 2 | 0 | 0 | 0 |
| E | Jan-07 | Dec-07 | Closed | 12 | 1 | 0 | 0 | 0 |
| F | Jan-08 | Dec-09 | Closed | 24 | 2 | 0 | 0 | 0 |
| G | Jan-09 | Dec-09 | Closed | 12 | 1 | 0 | 0 | 0 |
| H | Jul-09 | Jun-10 | Closed | 12 | 2 | 0 | 0 | 0 |
| Total | | | | 132 | 14 | 2,333 | 167 | 18 |

Note:      Implementation for ██████ assumes the claimant had one active matter in 2010 and 2 active matters in 2011.

**Exhibit D.5**

## Approach for Implementation of BEL for ▮▮▮▮▮▮

$ thousands

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | May-Dec | Annual | Expenses / Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Per CSSP Calculation:** | | | | | | | | | | | | | | | |
| 2008 Uncorrected Revenue | 1,235.5 | (708.3) | 205.5 | 232.3 | 404.6 | 406.8 | 1,283.8 | 1,065.6 | 968.4 | 621.4 | 204.8 | 27.5 | 4,982.9 | 5,947.9 | |
| Uncorrected Variable Expense | 188.2 | 166.0 | 295.2 | 141.9 | 314.0 | 376.4 | 1,208.4 | 999.3 | 777.5 | 441.9 | 184.7 | 399.5 | 4,701.8 | 5,493.1 | |
| Uncorrected Variable Profit | 1,047.3 | (874.3) | (89.7) | 90.4 | 90.6 | 30.4 | 75.4 | 66.3 | 190.9 | 179.4 | 20.1 | (372.0) | 281.2 | 454.9 | |
| | | | | | | | | | | | | | | | |
| 2009 Uncorrected Revenue | 326.0 | 504.4 | 115.0 | 273.3 | 452.8 | 217.2 | 289.4 | 653.5 | 465.9 | 337.5 | 201.1 | 153.1 | 2,770.6 | 3,989.4 | |
| Uncorrected Variable Expense | 353.0 | 398.8 | 103.6 | 297.9 | 431.8 | 165.0 | 325.1 | 569.6 | 388.4 | 318.0 | 192.3 | 282.3 | 2,672.6 | 3,825.8 | |
| Uncorrected Variable Profit | (26.9) | 105.6 | 11.4 | (24.6) | 21.0 | 52.2 | (35.7) | 84.0 | 77.5 | 19.5 | 8.8 | (129.2) | 98.0 | 163.6 | |
| | | | | | | | | | | | | | | | |
| 2010 Uncorrected Revenue | 330.0 | 196.7 | 148.5 | 96.8 | 119.7 | 151.0 | 1,070.8 | 641.8 | 823.3 | 266.9 | 413.1 | 234.0 | 3,720.6 | 4,492.6 | |
| Uncorrected Variable Expenses | 323.4 | 145.5 | 174.4 | 113.0 | 115.2 | 252.1 | 295.4 | 1,048.9 | 649.2 | 274.6 | 447.5 | 479.8 | 3,562.7 | 4,319.1 | |
| Uncorrected Variable Profit | 6.6 | 51.2 | (25.9) | (16.2) | 4.5 | (101.2) | 775.4 | (407.0) | 174.1 | (7.7) | (34.4) | (245.8) | 157.9 | 173.6 | |
| | | | | | | | | | | | | | | | |
| Change in Uncorrected Variable Profit (2010-2008/09 Average) | | | | | (51.3) | (142.5) | 755.6 | (482.2) | 39.9 | (107.1) | (48.9) | 4.8 | (31.7) | | |
| BEL Step 1 Compensation (per CSSP) | | | | | | | | | (598.3) | | | | | | |
| | | | | | | | | | | | | | | | |
| **February 2008 Negative Revenue** | (1,000.0) | Revision of prior month's revenue | | | | | | | | | | | | | |
| 2009 | (1,000.0) | 1,000.0 | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | |
| | | | | | | | | | | | | | | | |
| **Implementation Correcting for Negative Revenue Only:** | | | | | | | | | | | | | | | |
| 2008 Corrected Revenue | 235.5 | 291.7 | 205.5 | 232.3 | 404.6 | 406.8 | 1,283.8 | 1,065.6 | 968.4 | 621.4 | 204.8 | 27.5 | 4,982.9 | 5,947.9 | |
| Uncorrected Variable Expense | 188.2 | 166.0 | 295.2 | 141.9 | 314.0 | 376.4 | 1,208.4 | 999.3 | 777.5 | 441.9 | 184.7 | 399.5 | 4,701.8 | 5,493.1 | 0.92 |
| Variable Profit (partial correction) | 47.3 | 125.7 | (89.7) | 90.4 | 90.6 | 30.4 | 75.4 | 66.3 | 190.9 | 179.4 | 20.1 | (372.0) | 281.2 | 454.9 | |
| | | | | | | | | | | | | | | | |
| 2009 Corrected Revenue | 326.0 | 504.4 | 115.0 | 273.3 | 452.8 | 217.2 | 289.4 | 653.5 | 465.9 | 337.5 | 201.1 | 153.1 | 2,770.6 | 3,989.4 | |
| Uncorrected Variable Expense | 353.0 | 398.8 | 103.6 | 297.9 | 431.8 | 165.0 | 325.1 | 569.6 | 388.4 | 318.0 | 192.3 | 282.3 | 2,672.6 | 3,825.8 | 0.96 |
| Variable Profit (partial correction) | (26.9) | 105.6 | 11.4 | (24.6) | 21.0 | 52.2 | (35.7) | 84.0 | 77.5 | 19.5 | 8.8 | (129.2) | 98.0 | 163.6 | |
| | | | | | | | | | | | | | | | |
| 2010 Corrected Revenue | 330.0 | 196.7 | 148.5 | 96.8 | 119.7 | 151.0 | 1,070.8 | 641.8 | 823.3 | 266.9 | 413.1 | 234.0 | 3,720.6 | 4,492.6 | |
| Uncorrected Variable Expenses | 323.4 | 145.5 | 174.4 | 113.0 | 115.2 | 252.1 | 295.4 | 1,048.9 | 649.2 | 274.6 | 447.5 | 479.8 | 3,562.7 | 4,319.1 | 0.96 |
| Variable Profit (partial correction) | 6.6 | 51.2 | (25.9) | (16.2) | 4.5 | (101.2) | 775.4 | (407.0) | 174.1 | (7.7) | (34.4) | (245.8) | 157.9 | 173.6 | |
| | | | | | | | | | | | | | | | |
| **Implementation:** | | | | | | | | | | | | | | | |
| 2008 Corrected Revenue | 235.5 | 291.7 | 205.5 | 232.3 | 404.6 | 406.8 | 1,283.8 | 1,065.6 | 968.4 | 621.4 | 204.8 | 27.5 | 4,982.9 | 5,947.9 | |
| Matched Variable Expense | 217.5 | 269.4 | 189.8 | 214.5 | 373.7 | 375.7 | 1,185.6 | 984.1 | 894.4 | 573.9 | 189.2 | 25.4 | 4,601.9 | 5,493.1 | |
| Matched Variable Profit | 18.0 | 22.3 | 15.7 | 17.8 | 30.9 | 31.1 | 98.2 | 81.5 | 74.1 | 47.5 | 15.7 | 2.1 | 381.1 | 454.9 | |
| | | | | | | | | | | | | | | | |
| 2009 Corrected Revenue | 326.0 | 504.4 | 115.0 | 273.3 | 452.8 | 217.2 | 289.4 | 653.5 | 465.9 | 337.5 | 201.1 | 153.1 | 2,770.6 | 3,989.4 | |
| Matched Variable Expense | 312.7 | 483.7 | 110.3 | 262.1 | 434.2 | 208.3 | 277.5 | 626.8 | 446.8 | 323.7 | 192.8 | 146.9 | 2,657.0 | 3,825.8 | |
| Matched Variable Profit | 13.4 | 20.7 | 4.7 | 11.2 | 18.6 | 8.9 | 11.9 | 26.8 | 19.1 | 13.8 | 8.2 | 6.3 | 113.6 | 163.6 | |
| | | | | | | | | | | | | | | | |
| 2010 Corrected Revenue | 330.0 | 196.7 | 148.5 | 96.8 | 119.7 | 151.0 | 1,070.8 | 641.8 | 823.3 | 266.9 | 413.1 | 234.0 | 3,720.6 | 4,492.6 | |
| Matched Variable Expense | 317.3 | 189.1 | 142.8 | 93.0 | 115.1 | 145.1 | 1,029.5 | 617.0 | 791.5 | 256.6 | 397.1 | 225.0 | 3,576.9 | 4,319.1 | |
| Matched Variable Profit | 12.8 | 7.6 | 5.7 | 3.7 | 4.6 | 5.8 | 41.4 | 24.8 | 31.8 | 10.3 | 16.0 | 9.0 | 143.8 | 173.6 | |
| | | | | | | | | | | | | | | | |
| Change in Corrected Variable Profit (2010-2008/09 Average) | | | | | (20.1) | (14.2) | (13.6) | (29.3) | (14.8) | (20.4) | 4.0 | 4.8 | (103.6) | | |
| Corrected BEL Step 1 Compensation | | | | | | | | (112.4) | | | | | | | |