# Exhibit 19R



# MEMORANDUM

TO:  Class Counsel
     BP

FROM:  Patrick A. Juneau, Claims Administrator

DATE:  October 10, 2012

RE:  Announcement of Policy Decisions Regarding Claims Administration

---

Under the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

In furtherance of these responsibilities, the Claims Administrator advises the Parties of the following interpretations of the Settlement Agreement and procedures or policies to be implemented to promote the efficient and timely administration of claims in compliance with the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement. In each instance, the Claims Administrator has already received input from the Parties as to their positions on the issue, or has determined that such input was not necessary to the analysis of the issue.

1. *Reimbursement of Claimant Accounting Support.*

    (a) **Benefit Available.** Section 4.4.13 of the Settlement Agreement authorizes the Claims Administrator to reimburse claimants for reasonable and necessary accounting fees relating to claim preparation.

    (b) ***Rates and Limits for Claims by Individual Claimants.*** Under Sections 4.4.13.6 and 4.4.13.7 of the Settlement Agreement, Individual Claimants with claims over $10,000 may receive up to 2% of their Economic Damage Compensation Amount

1



  (excluding the Risk Transfer Premium) as reimbursement for Claimant Accounting Support, up to a maximum of $6,000. All other claims of Individual Claimants are limited to $200 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $85 and Supervision and Review hours at rates of up to $130 for Individual Claimants.

  **(c)** *Rates and Limits for Claims by Business Claimants.* Under Sections 4.4.13.6 and 4.4.13.8 of the Settlement Agreement, Business claimants with claims over $50,000 may receive up to 2% of their Economic Damage Compensation Amount excluding the Risk Transfer Premium as reimbursement for Claimant Accounting Support, up to a maximum of $50,000. All other claims of Business Claimants are limited to $1,000 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $110 and Supervision and Review hours at rates of up to $160 for Business claimants.

  **(d)** *Review and Supervision Hours.* Section 4.4.13.6 of the Settlement Agreement limits reimbursement for Review and Supervision hours to 25% of the total time spent on the claim. The Claims Administrator calculates the 25% limit for Review and Supervision hours using the following formula:

$$.25 \geq \frac{\text{Supervision and Review Hours}}{\text{Supervision and Review Hours} + \text{Preparation Hours}}$$

  **(e)** *Awards.* Claimants will receive reimbursement for all Preparation hours and up to the allowed 25% limit for Review and Supervision hours up to the rates provided by Sections 4.4.13.7 and 4.4.13.8. The Claims Administrator calculates the total hours expended by the accountants on the claim and then determines whether the Review and Supervision hours exceed the 25% limit. The Claims Administrator will not reimburse for Review and Supervision hours in excess of the 25% limit, regardless of whether the award has reached the overall limits on accounting reimbursements.

  **2.**  *No Analysis of Alternative Causes of Economic Losses.* The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement. The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or

414889
10/10/12



may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

      3.    *Zone Classification for Businesses in the Class But Not Located in the Gulf Coast Areas*. Under the definition of the Class in Section 1.2 of the Settlement Agreement, a business that is physically located outside of the Eligibility Zone is a member of the Class if it engaged in certain activities during the Class Period in the Gulf Coast Areas or Specified Gulf Waters. Such a business has no physical location in any one of the Economic Loss Zones A through D. For purposes of the assignment of a Risk Transfer Premium and the Causation review process required under the Settlement Agreement, the Claims Administrator will place such a business in Zone D. This approach will replicate the rule applied to businesses that are located in Zone A, B, C, or D, but have activities that cross zones. Under that rule, such a business is classified in the Zone of the primary physical location of the business. Allowing businesses with no physical location in the Gulf Coast Areas to use the Zone where the activities occurred that placed them in the Class would treat them more favorably that businesses with physical locations in the Gulf Coast Areas in Zones less favorable that the Zones in which certain activities of the business occurred. In order to apply the zone considerations in the most consistent and equitable manner, the Claims Administrator will default to Zone D for businesses in the Class but with no physical location in any Zone.

      4.    *Seafood Distribution Chain Definitions*. The Claims Administrator has encountered claims relating to these businesses that do not expressly fit in any of the definitions of the Seafood Distribution Chain in Exhibit 3. These businesses play a necessary role in the distribution of Seafood, but they are not listed in Exhibit 3:

    (a) **Seafood Brokers**: These companies facilitate the bulk purchase of seafood from Commercial Wholesalers and the subsequent sale to Retailers and end users, but do not purchase, sell, take possession of or title to the seafood product. Because Seafood Wholesaler or Distributor most accurately describes the activities of a Seafood Broker, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain.

    (b) **Seafood Transportation/Trucking/Hauling:** These are transportation businesses that deal exclusively with seafood. They take possession of the seafood, but do not purchase or take title to the seafood transported and do not also operate a Landing Site. Like Seafood Brokers, Seafood Transportation Businesses are third party intermediaries necessary to facilitate the purchase of bulk seafood and resale to the next step in the Distribution Chain. Accordingly, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain.

      5.    *Definition of "Landings" in Seafood Program*. Certain claimants have contended that the term "landings" or "landed" in the Seafood Program in Exhibit 10 to the

414889
10/10/12



Settlement Agreement should be construed to include the act of harvesting the seafood and placing it in a vessel while on any of the Specified Gulf Waters.  The term "landings" is not expressly defined in the Settlement Agreement.  The term "Landing Site," is defined as "a business at which boats first *land* their catch, including facilities for unloading and handling Seafood."  Ex. 3 at § 2.a. (*emphasis added*.)  The use of "land" in this definition informs the meaning of "landings," as vessels "land" their catch at a physical, shore-side location for handling and sale.  The definition of a "Seafood Dockside Worker" as "a Natural Person performing services for a Landing Site" further indicates that fishermen "land" their catch at shore-side docks.  In addition, the Settlement Agreement defines Gulf Coast Areas" separately from "Specified Gulf Waters," which suggests that "landings" made in the "Gulf Coast Areas" mean those made on shore and not the act of loading catch onto a vessel when out on the water.  Accordingly, the Claims Administrator interprets the term "landings" or "landing" in the Settlement Agreement to mean solely landing seafood at dockside, and not the act of placing catch into a vessel while out on the water.

6. ***Oral Lease Agreements Relating to Seafood Program Oyster Leasehold Claims.***  Section 2.2.B of the Oyster Leaseholder Compensation Plan in Exhibit 10 of the Settlement Agreement requires that, in addition to tax returns, financial statements, or business documents, an Oyster Leaseholder Lost Income Compensation claimant must provide "[c]ontracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map."  Certain Oyster Leaseholder Lost Income claimants have informed the Claims Administrator that while they had oral agreements with oyster harvesters to harvest oysters off of the claimant's oyster leases, they had no written agreements and thus have no documents to submit in response to this requirement.   The Claims Administrator has determined that this language of Exhibit 10 does not require that such contracts or agreements be in writing.  The Claims Administrator will permit such claimants to satisfy this requirement by submitting a document that memorializes the terms of the oral agreements that existed at the relevant time.  The Claims Administrator will require submission of a writing prepared at any time that describes the terms of the oral agreement and that is signed by the claimant and the oyster harvester that is a party to the oral agreement.

7. ***Deduction of Prior Spill-Related Payments from Oyster Leaseholder Compensation Payments.***  The Claims Administrator has reviewed with the Parties and the Seafood Neutral the contention presented by certain claimants that payments to Oyster Leaseholder Lost Income claimants under the Seafood Program in Exhibit 10 to the Settlement Agreement should not be offset by prior Spill-Related Payments to the claimant, on the ground that the prior payments represented compensation for lost income, while the Seafood Program payments represent compensation for property damages. The Seafood Neutral, BP and Class Counsel agreed that Prior Spill-Related Payments relating to Seafood must be deducted from payments to Oyster Leaseholder claimants under the Oyster Leaseholder Compensation Plan.  Exhibit 10 at p. 2 provides that "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document."  Footnote 3 defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, the GCCF, or through the Transition Facility for economic

4


loss claims relating to Seafood." All Oyster Leaseholder claims are covered by the Seafood Program and are Seafood interests. The Settlement Agreement does not delineate between property and other characterizations of the prior payments. Instead, the only distinction between the types of offsets under the Seafood Spill Related Payment Reduction Procedures is that between Seafood and. non-Seafood related prior payments.

8. *Submission of Consolidated Tax Returns*. The Claims Administrator hasencountered the question of whether a business entity with its own profit and loss statements but with federal tax returns that are filed as part of a consolidated return with other related but separate corporate entities must file the complete consolidated tax return when filing a claim. Section 3 of Exhibit 4A to the Settlement Agreement requires the submission of complete federal tax returns. The Claims Administrator interprets this provision such that it does *not* necessarily require the production of the complete consolidated returns in this instance. When a claimant business entity does not file a separate federal income tax return, but rather is included in the consolidated return of its parent or affiliate, the Claims Administrator will work with the claimant to ensure that adequate returns and information are provided such that the Claims Administrator is sufficiently satisfied that the books and records used in preparing the financial statements are the same books and records that were used in the preparation of the income tax return. The required documents and information will typically include: (a) face page / main page of the consolidated return, (b) statement / schedule of entities and their respective Employer Identification Numbers (EIN's) covered by the return, (c) consolidating schedule setting forth a breakdown of the covered entities, revenues, expenses, etc., (d) complete portions of all aspects of the return dealing with the claimant entity, and (e) for partnerships, schedule of partnership entities and their respective K-1's. The Claims Administrator reserves the right to require submission of additional documents, and if appropriate, even the full return if deemed necessary for accurate review of the claim. It is the Claims Administrator's intent to work cooperatively with claimants to reasonably accommodate privacy concerns regarding unrelated entities and yet also require adequate documentation to ensure that such claims are properly reviewed in accord with the terms of the Settlement Agreement.

9. *Costs Associated with Producing Hard Copies of Claim Files to Claimants or Third Parties*. The Claims Administrator regularly received requests from claimants for copies of the documents in the claimant's claim file. Claimants and claimants' attorneys may view, save, or download their Claims Information through a secure web-based Portal created by the Claims Administrator (the "DWH Portal"). Claimants and lawyers not using a DWH Portal have asked that the contents of the claim file be copied and sent to them. In addition, the Claims Administrator receives from third parties and law enforcement agents and officials who cannot access a DWH Portal and must be given hard copies of Claims Information, where permitted under the terms of the Order Regarding the Confidentiality of Claims Information of the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Confidentiality Order"), issued on June 29, 2012. The Claims Administrator has determined it appropriate to have the Settlement Program pay the expenses of assembling, copying and shipping such hard copies to these claimants or third parties, rather than attempting to invoice the claimants or third parties for such costs.

5

414889
10/10/12



10. ***No "Double Recovery" for Compensation of Owners or Officers of Business Entities.***  It is the view of the Claims Administrator that the Settlement Agreement does not contemplate that a claimant may recover for the same damages twice.  The accounting methodology being used for calculation of Business Economic Loss claims, pursuant to Exhibit 4C of the Settlement Agreement, treats owner/officer payroll costs as a fixed cost.  All fixed costs, including owner/officer compensation, are inherently included in the compensation amount calculated under the Business Economic Loss framework.  As a result, a claim made for the same owner/officer compensation amount under the Individual Economic Loss ("IEL") framework would constitute duplicate recovery.  Such a duplicate claim /duplicate recovery will not be allowed.

414889
10/10/12