# Exhibit 19ZZE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010

MDL No. 2179

SECTION: J
JUDGE BARBIER
MAGISTRATE JUDGE SHUSHAN

## DECLARATION OF ROBERT MICHAEL WALLACE

1. My Name in Robert Michael Wallace and my qualifications are as follows: Business Owner, Accountant and Software Developer for approximately 35 years; BSBA with Accounting Major, University of North Carolina, Chapel Hill; CPA in Florida and North Carolina; US Air Force, Accounting Specialist; founder of specialized international software company, Financial Audit Systems, Inc.; Senior VP of Product Development for Prentice-Hall Professional Software; Co-Founder of technology based real estate appraisal company, Premier Appraisals, Inc.; Co-Founder of Homes Your Way Realty, Inc.; and I currently own a consulting company for CPA firms. Since 2010 I have been engaged with the accounting firm of Carr, Riggs Ingram in Panama City, Florida, to assist with business loss calculations and model development related to the DWH Oil Spill. Since 2011, I have been engaged by the Plaintiffs Steering Committee providing technical services required to test, evaluate and consider business loss calculations including negotiations between the Plaintiffs Steering Committee and BP on the Business Economic Loss portion of the Economic and Property Damages Class Settlement Agreement.

2. I was a participant on behalf of the PSC/class counsel in hundreds of hours of meetings with BP's economic, accounting and legal representatives to work through issues and examples raised by the attorneys in the Business Economic Loss portion of the Economic and Property Damages Class Settlement Agreement (Settlement Agreement). As a result, I have first hand knowledge of the discussions that took place over several months and that were formalized in the Settlement Agreement.

3. At no time during the many hours of meetings and discussions that I participated in, as well as any document exchanges during the meetings/discussions I participated in, did any of the BP representatives propose or discuss the topics of: Averaging revenue; attempting to correlate specific revenue to specific expenditures in previous or subsequent months; and/or Eliminating revenue based on changes in a Class Member's business.

4. In addition, it was clear from my meetings and discussions with BP's economic, accounting and legal representatives that the Settlement Agreement was and is a result of arms length negotiations between the attorneys and was never intended to be in accordance with GAAP (Generally Accepted Accounting Principles) or to define terms such as "revenue" or "variable profit" by GAAP or other sources that were outside the written terms of the Settlement Agreement. In fact, the Settlement Agreement oftentimes intentionally and as a result of deliberate purpose departs from GAAP due to certain issues that called for compromises between the attorneys. Specifically, this is evidenced by special lists/formulas/tests that were negotiated with BP representatives in order to finalize the business economic loss calculation frameworks. These include, but are not limited to, the following:
   a. The classification of specific operating expense items as either fixed or variable (Not GAAP).
   b. Causation Test revenue decline and increase requirements and Customer Mix Tests (Not GAAP)
   c. Monthly Payroll Analysis and Calculation rules/formula (Not GAAP)
   d. Benchmark Period and monthly loss comparison selection rules (Not GAAP)
   e. Claimant-Specific Lost Growth factor minimum and maximum limits.(Not GAAP)

5. I spent months in meetings and discussions with BP's economic, accounting and legal representatives regarding the details and intricacies of these special lists/formulas/tests as well as other negotiated terms of the settlement. Throughout this process both parties conducted many test cases and analyses to ascertain the impact to the respective parties. During these meetings/discussions, BP representatives were provided test case data which was used to apply the negotiated methodology. Again, the "matching of revenue and expenses" was not a test performed, nor was this topic ever discussed during the any sessions I participated in.

6. Setting aside the fact that such an approach was never contemplated during our meetings and discussions with BP representatives the "smoothing and matching " argument that BP now proposes is flawed in several ways and inconsistent with the Settlement Agreement.

7. BP's proposal assumes all revenue and associated expenses occur within the same fiscal year, which often times is not the case. BP's proposal also assumes that all annual variable expenses relate only to the revenue spike being reallocated.

8. Despite BP's sudden preoccupation now with GAAP, the Settlement Agreement does not state the financial data provided or used in applying the methodology must be in accordance with GAAP. Financial data under the Settlement Agreement is to be contemporaneously prepared. Shifting revenue to different periods is not in keeping with

     this requirement of the Settlement Agreement. In fact the reallocation of revenue as proposed by BP is **manipulating the data.**

9. BP refers to Exhibit 4C and the calculation of variable profit and the definition of "corresponding variable expenses". The corresponding variable expenses refers to, pursuant to the Settlement Agreement, the expenses reported in the same time period as the time period chosen for revenue in calculation of the benchmark period and compensation period, **not** the period revenue was earned.

10. In essence, the approach BP proposes now destroys the opportunity for a claimant to be able to select specific months in the May - December time period where they were affected by the spill. Instead, a specific claimant would be, in many if not all cases (inconsistent with the Settlement Agreement) forced into a mandatory 8- month compensation period. This completely eliminates the opportunity for a business to take only its loss months by smoothing into the overall time period gains which thereby significantly reduces or eliminates the loss compensation of the claimant.

11. The smoothing out process BP proposes actually neuters the Settlement Agreement in that a major negotiating point for the PSC was for the claimant to be able to identify more specifically the months (3 or more consecutive month periods) within the 8-month loss period they experienced losses due to the spill. This new argument/proposal by BP eliminates that opportunity in totality for certain claimants and is contrary to the spirit and intent of the Settlement Agreement which was vigorously negotiated at arms length by the attorneys for both parties. Furthermore, what BP proposes would not only impact the compensation calculation, but also the causation testing process for many claimants.

12. In light of the intricate and inter-related tests, formulae and calculations already agreed to by the parties in the Settlement Agreement, for BP to propose a revenue smoothing and matching formula after the Settlement Agreement has been finalized would essentially result in a completely new agreement which, in my opinion, would be detrimental to many class plaintiffs. Had BP introduced the revenue smoothing formula and related trigger points during the meetings and discussions before the Settlement Agreement was finalized, I would have recommended that the attorneys for the PSC approach all aspects of the BEL causation and compensation framework process much differently.

     I declare under penalty of perjury that the foregoing is a true and correct statement of my analysis and opinions.

                                          R. Michael Wallace, CPA

                                           Dated: February 18, 2013