**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| BP EXPLORATION & PRODUCTION INC. and BP AMERICA PRODUCTION COMPANY, | * * * * | **Civil Action No. 13-492** |
| | * | **SECTION __** |
| *Plaintiffs*, | * * | |
| | * | **JUDGE _____** |
| v. | * * | **MAGISTRATE JUDGE _____** |
| *DEEPWATER HORIZON* COURT SUPERVISED SETTLEMENT PROGRAM; and PATRICK A. JUNEAU, in his official capacity as Claims Administrator of the *Deepwater Horizon* Court Supervised Settlement Program administering the *Deepwater Horizon* Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the *Deepwater Horizon* Economic and Property Damages Settlement Trust, | * * * * * * * * * * * | |
| *Defendants*. | * * | |

**BP'S MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR A
PRELIMINARY INJUNCTION AGAINST THE CLAIMS ADMINISTRATOR AND
SETTLEMENT PROGRAM TO ENJOIN PAYMENTS AND AWARDS FOR BUSINESS
ECONOMIC LOSS CLAIMS BASED ON FICTITIOUS "LOSSES"**

*COUNSEL FOR MOVING PARTIES ARE LISTED AT END OF MEMORANDUM*

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**.................................................................................................1

**BACKGROUND** ..................................................................................................4

    A.    The BEL Framework Provides Compensation For Actual Lost Profits. ................4

    B.    The Claims Administrator Misinterpreted The BEL Framework Without First Seeking Input From BP. ................................................................5

    C.    Despite Recognizing That It Creates Fictitious Losses, The Claims Administrator Adopted Class Counsel's Erroneous Interpretation. ......................7

    D.    The Settlement Program Has Awarded Hundreds Of Millions For Fictitious Losses With The Amount Increasing Daily.............................7

**ARGUMENT** ......................................................................................................9

**I.**    **BP HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**.......................................................................................................9

    A.    The Settlement's Purpose Is To Compensate Only For Actual Losses. ...............10

    B.    The Settlement's Plain Language Requires That Monthly Revenues And Variable Expenses Correspond. ...........................................................11

        1.    The Word "Revenue" Is Not Simply "Cash Received."............................12

        2.    "Variable Profits" Must Be Calculated As Revenue Minus The "Corresponding Variable Expenses" That Generated That Revenue..................................................................................15

            a.    Expenses Are Actual Or Expected Outflows of Assets, Not Cash Expenditures Or Disbursements. ...........................................15

            b.    Corresponding Variable Expenses Are Expenses Incurred To Generate Revenue..................................................................16

            c.    Profit Is Properly Calculated Only When Revenues And Expenses Correspond..................................................................21

        3.    Awards Must Be Based On A Comparison Of Variable Profit In "Comparable" Months, Not Necessarily The "Same" Months.................22

    C.    The BEL Policy Decisions Violate Fundamental Principles Of Economics And Accounting, Systematically Leading To Absurd Results. .............................24

i

1.      Misinterpreting The Agreement To Pay Substantial Amounts To Claimants For Non-Existent Losses Produces Absurd Results. ................24

2.      The Claims Administrator Cannot Be Allowed To Use Inaccurate Financial Data To Calculate Compensation Awards. ...............................26

3.      Under The BEL Policy Decisions, Claimants With The Same Economic Performance Receive Vastly Different Treatment. .................27

D.      BP's Interpretation Can Be Implemented Easily. ...................................29

II.     **BP WILL BE IRREPARABLY HARMED ABSENT A PRELIMINARY INJUNCTION. ........................................................................................30**

A.      Because The Ultimate Relief BP Seeks Is Equitable, A Preliminary Injunction Is Appropriate Now. ............................................................30

B.      BP Has No Remedy For Funds That Are Improperly Paid To Claimants............31

C.      A Preliminary Injunction Is Necessary To Prevent Assets From Dissipating. ............................................................................................31

III.    **THE THREATENED PERMANENT INJURY TO BP OUTWEIGHS ANY TEMPORARY ALLEGED HARM TO BEL CLAIMANTS. ....................................32**

IV.     **A PRELIMINARY INJUNCTION WILL PROMOTE THE PUBLIC INTEREST. ...............................................................................................34**

**CONCLUSION ........................................................................................34**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Home Mortg. Corp. v. Donovan*,
　830 F. Supp. 2d 223 (S.D. Tex. 2011) .............................................................................. 9

*Am. Booksellers Ass'n, Inc. v. Webb*,
　590 F. Supp. 677 (N.D. Ga. 1984) ................................................................................. 33

*Anthony v. Texaco, Inc.*,
　803 F.2d 593 (10th Cir. 1986) ........................................................................................ 32

*AT&T Corp. v. Microsoft Corp.*,
　No. 01 Civ. 4872(WHP), 2003 WL 21459573 (S.D.N.Y. June 24, 2003) ...................... 17

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
　456 Fed. App'x 184 (3d Cir. 2012)................................................................................. 33

*Barnhart v. Thomas*,
　540 U.S. 20 (2003)........................................................................................................... 18

*Beanstalk Grp., Inc. v. AM Gen. Corp.*,
　283 F.3d 856 (7th Cir. 2002)........................................................................................... 25

*Becker v. Tidewater, Inc.*,
　586 F.3d 358 (5th Cir. 2009) ................................................................................ 11, 18, 23

*Breaux v. Halliburton Energy Servs.*,
　562 F.3d 358 (5th Cir. 2009) .......................................................................................... 11

*Broad v. Rockwell Int'l Corp.*,
　642 F.2d 929 (5th Cir. 1981) .......................................................................................... 10

*Butcher Co. v. Bouthot*,
　No. CIV 00-139-P-H, 2001 WL 263313 (D. Me. Mar. 16, 2001)................................... 22

*Carpa, Inc. v. Ward Foods, Inc.*,
　536 F.2d 39 (5th Cir. 1976) ............................................................................................ 27

*Chambers v. Coventry Health Care of La., Inc.*,
　318 F. Supp. 2d 382 (E.D. La. 2004)............................................................................... 10

*Condrey v. SunTrust Bank of Ga.*,
　429 F.3d 556 (5th Cir. 2005) .......................................................................................... 23

*De Beers Consol. Mines v. United States*,
　325 U.S. 212 (1945)........................................................................................................ 30

iii

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981) ............................................................. 31, 33, 34

*E\*Trade Fin. Corp. v. Deutsche Bank AG*,
    374 F. App'x. 119 (2d Cir. 2010) ..................................................................... 21

*E. Air Lines, Inc v. McDonnell Douglas Corp.*,
    532 F.2d 957 (5th Cir. 1976) ............................................................................ 24

*Esperanza Aviation 2007-Sky King, LLC v. City Skies, Inc.*,
    No. 09 C 5086, 2009 WL 2947228 (N.D. Ill. Sept. 14, 2009)......................... 33

*FDIC v. Garner*,
    125 F.3d 1272 (9th Cir. 1997) .......................................................................... 32

*Finlan v. City of Dallas*,
    888 F. Supp. 779 (N.D. Tex. 1995) .................................................................... 9

*Foltz v. U.S. News & World Report*,
    760 F.2d 1300 (D.C. Cir. 1985) ....................................................................... 32

*Franklin v. Laughlin*,
    No. SA-10-CV-1027 XR, 2011 WL 672328 (W.D. Tex. Feb. 15, 2011)......... 33

*FSLIC v. Dixon*,
    835 F.2d 554 (5th Cir. 1987) .................................................................... passim

*Gulf Shores Leasing Corp. v. Avis Rent-A-Car Sys., Inc.*,
    441 F.2d 1385 (5th Cir. 1971) .......................................................................... 24

*Hughes Training Inc. v. Cook*,
    254 F.3d 588 (5th Cir. 2001) ............................................................................ 12

*In re Deepwater Horizon*,
    __ F.3d __, 2013 WL 776354 (5th Cir. Mar. 1, 2013)................... 10, 11, 18, 23

*In re Fredeman Litig.*,
    843 F.2d 821 (5th Cir. 1988) ...................................................................... 30, 31

*In re Liljeberg Enters., Inc.*,
    304 F.3d 410 (5th Cir. 2002) ...................................................................... 25, 27

*In re MPF Holdings US LLC*,
    701 F.3d 449 (5th Cir. 2012) ............................................................................ 12

*In re Patriot's Point Assocs., Ltd.*,
    902 F.2d 1566 (4th Cir. 1990) .......................................................................... 33

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) ........................ 31

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ........................ passim

*Koch Bus. Holdings, LLC v. Amoco Pipeline Holding Co.*,
    554 F.3d 1334 (11th Cir. 2009) ........................ 25

*Kona Tech. Corp. v. S. Pac. Transp. Co.*,
    225 F.3d 595 (5th Cir. 2000) ........................ 13

*La.-Nev. Transit Co. v. Woods*,
    393 F. Supp. 177 (W.D. Ark. 1975)........................ 22

*Lee v. Bickell*,
    292 U.S. 415 (1934)........................ 31

*Lynch Corp. v. Omaha Nat'l Bank*,
    666 F.2d 1208 (8th Cir. 1981) ........................ 31, 32

*Makofsky v. Cunningham*,
    576 F.2d 1223 (5th Cir. 1978) ........................ 25

*Meaux Surface Prot., Inc. v. Fogleman*,
    607 F.3d 161 (5th Cir. 2010) ........................ 27

*Meis v. Sanitas Serv. Corp.*,
    511 F.2d 655 (5th Cir. 1975) ........................ 30

*Merchs. Capital Res., Inc. v. W. Gravel, Inc.*,
    No. 10-CV-01807 (DSD/JJK), 2010 WL 2814325 (D. Minn. July 16, 2010)................ 33

*Mid-Am. Real Estate Co. v. Iowa Realty Co.*,
    406 F.3d 969 (8th Cir. 2005) ........................ 12

*Moorehead v. Dep't. of Prof'l Regulation, Bd. of Psychological Exam'rs*,
    550 So. 2d 521 (Fla. Ct. App. 1989)........................ 22

*Mortg. Elec. Registration Sys., Inc. v. Brosnan*,
    No. C 09-3600 SBA, 2009 WL 3647125  (N.D. Cal. Sept. 4, 2009)................ 33

*N. Border Pipeline Co. v. 64.111 Acres of Land*,
    125 F. Supp. 2d 299 (N.D. Ill. 2000) ........................ 33

*N. German Lloyd v. Guar. Trust Co. of N.Y.*,
    244 U.S. 12 (1917)........................ 24

*Nat Harrison Assocs., Inc. v. Gulf States Utils. Co.*,
   491 F.2d 578 (5th Cir. 1974) ............................................................................ 27

*Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*,
   267 F.3d 1190 (11th Cir. 2001) ........................................................................ 12

*O'Connor v. Smith*,
   No. C-10-77, 2010 WL 4366914 (S.D. Tex. Oct. 28, 2010) ........................... 33

*Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*,
   264 F. Supp. 2d 990 (W.D. Okla. 2003) .......................................................... 33

*Olson v. Wing*,
   281 F. Supp. 2d 476 (E.D.N.Y. 2003) ............................................................. 33

*Omnitech Int'l, Inc. v. Clorox Co.*,
   11 F.3d 1316 (5th Cir. 1994) ............................................................................ 24

*Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*,
   428 F.3d 1285 (10th Cir. 2005) ........................................................................ 22

*People v. Crews*,
   No. 305830, 2013 WL 440545 (Mich. Ct. App. Feb. 5, 2013) (per curiam)................... 17

*Pers. Preference Video, Inc. v. HBO, Inc.*,
   986 F.2d 110 (5th Cir. 1993) ............................................................................ 13

*Placid Oil Co. v. United States Dep't. of Interior*,
   491 F. Supp. 895 (N.D. Tex. 1980) .................................................................. 33

*Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*,
   179 F.3d 169 (5th Cir. 1999) ............................................................................ 10

*Publicker Chem. Corp. v. Belcher Oil Co.*,
   792 F.2d 482 (5th Cir. 1986) ............................................................................ 25

*Resolution Trust Corp. v. Elman*,
   949 F.2d 624 (2nd Cir. 1991)............................................................................ 31

*Rodriguez v. VIA Metro. Transit Sys.*,
   802 F.2d 126 (5th Cir. 1986) ............................................................................ 30

*Rosas v. United States Small Business Admin.*,
   964 F.2d 351 (5th Cir. 1992) ............................................................................ 23

*S. Cent. Bell Tel. Co. v. Canal Place Ltd. P'ship*,
   927 F.2d 867 (5th Cir. 1991) ............................................................................ 25

*Shelby Cnty. Comm'n v. Smith,*
　　372 So. 2d 1092 (Ala. 1979) ........................................................................ 22

*Strouse Greenberg Props. VI Ltd. P'ship v. CW Capital Asset Mgmt. LLC,*
　　442 F. Supp. 2d 313 (E.D. La. 2006) ............................................... 30, 31, 32, 34

*Sun Microsystems, Inc. v. Microsoft Corp.,*
　　999 F. Supp. 1301 (N.D. Cal. 1998) ............................................................ 33

*United States v. Elashyi,*
　　554 F.3d 480 (5th Cir. 2008) ..................................................................... 23

*United States. v. Gen. Petroleum Corp. of Cal.,*
　　73 F. Supp. 225 (S.D. Cal. 1947) ................................................................ 22

*Voss v. Dupaco, Inc.,*
　　No. SA-01-CA-51-OG, 2001 WL 34360815 (W.D. Tex. Dec. 6, 2001) ......................... 17

*Young v. Merrill Lynch & Co.,*
　　658 F.3d 436 (5th Cir. 2011) ................................................................ 11, 17

**Statutes**

28 U.S.C. § 1292(b) ..................................................................................... 10

**Rules Secondary Sources**

Federal Rule of Appellate Procedure 8(a) ................................................................ 10

**Other Authorities Other Auth**

16 WILLISTON ON CONTRACTS (4th ed. 1993) ................................................................ 25

2 THE OXFORD ENGLISH DICTIONARY (1933) ............................................................. 17, 22

C. STICKNEY & P. BROWN,
　　FINANCIAL REPORTING AND STATEMENT ANALYSIS: A STRATEGIC
　　PERSPECTIVE (4th ed. 1999) ................................................................... 12, 15

FINANCIAL ACCOUNTING STANDARDS BOARD,
　　ACCOUNTING STANDARDS CODIFICATION AT TOPIC 605 "REVENUE
　　RECOGNITION" ASC 605-10-25-1 ................................................................... 12

FINANCIAL ACCOUNTING STANDARDS BOARD,
　　CONCEPTS STATEMENT NO. 6: ELEMENTS OF FINANCIAL STATEMENTS (1985) ...................... 12

J.D. SPICELAND ET AL.,
　　INTERMEDIATE ACCOUNTING (7th ed. 2013) .......................................................... 15

M. MAHER ET AL.,
  MANAGERIAL ACCOUNTING (11th ed. 2012) ............................................................ passim

R. WEIL & M. MAHER,
  HANDBOOK OF COST MANAGEMENT (2d ed. 2005) ................................................... passim

R. WEIL ET AL.,
  FINANCIAL ACCOUNTING:  INTRODUCTION TO CONCEPTS,
  METHODS AND USES (14th ed. 2012) .................................................................. 13, 16, 19

SEC STAFF ACCOUNTING BULLETIN 101 – REVENUE RECOGNITION
  IN FINANCIAL STATEMENTS (1999) .................................................................................. 12

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH
  LANGUAGE UNABRIDGED
  (Philip Babcock Gove, ed., 1976) .............................................................................. 16, 22

WILLIAM M. LANDES & RICHARD A. POSNER,
  THE ECONOMIC STRUCTURE OF TORT LAW (1987) .......................................................... 24

WRIGHT & MILLER,
  11A FEDERAL PRACTICE & PROCEDURE (2d ed. 1995) ....................................................... 9

## INTRODUCTION

BP seeks a preliminary injunction to prevent the Claims Administrator's "BEL Policy Decisions"[1] from rewriting the Settlement to pay claims for non-existent, artificially calculated "losses."  The Settlement's business economic loss ("BEL") framework uses a recognized and accepted damages methodology to calculate lost profits due to the *Deepwater Horizon* spill.  It determines the difference between a claimant's **variable profit** (defined as **revenue** minus **corresponding** variable **expenses**) in a specified post-spill period and comparable pre-spill period.  Properly performing these calculations using the correct understanding of the terms is the cornerstone for determining whether and how much to compensate BEL claimants.

But the Claims Administrator has decided to re-define "revenue" into cash "receipts" divorced from when the revenue was earned; turn "corresponding variable expenses" into "expenditures" that are not "corresponding" with the revenue earned; and replace "comparable" with "same."  This rewriting — shown in Appendix A — transforms the Agreement's compensation calculation from a traditional determination of lost profits into an irrelevant measurement of unrelated cash flows during limited time periods.  Respectfully, BP submits that the Court's March 5, 2013 Order on Review of Issue from Panel, Rec. Doc. 8812 ("March 5 Order"), does not correct these errors.

Specifically, the Claims Administrator has ruled that he will not measure revenue when earned but instead will simply use the date cash was received.  Consider a construction

---

[1]  Unless otherwise defined, all capitalized terms are defined in the Economic and Property Damages Settlement Agreement.  *See* Rec. Doc. 6430-1.  "BP" means BP Exploration & Production Inc. and BP America Production Company.  "BEL Policy Decisions" means the Claims Administrator's January 15, 2013 Policy Decisions regarding BEL claims.  All "Rec. Doc." numbers refer to MDL 2179.  All citations to exhibits refer to the exhibits attached to the Declaration Of Andrew T. Karron In Support Of BP's Motion For Preliminary Injunction.

contractor that performed the same job in May-August of 2009 and 2010, for the same $1 million lump sum payment in both years, with payment in 2009 coming in July and payment in 2010 coming in August.  Under the BEL Policy Decisions, the contractor would have a fictitious $1 million "decline" in "revenue" during May-July 2010, even though it earned the same amount for the same job performed one year earlier, solely because of the timing of cash received.

Similarly, the Claims Administrator refuses to subtract the expenses the claimant incurred in generating revenue — referred to in the Agreement as "corresponding variable expenses" — from that revenue, instead only taking into account the expenditures recorded in the period. Under the Administrator's approach, a claimant that earns the same $200,000 in revenue in May-July 2010 as it did in May-July 2009, but happened to pay for its $100,000 in materials in May 2010 as opposed to April in prior years, would be found to have a $100,000 "loss" — notwithstanding that its revenue, expenses, and profit were the exact same in both years.

The Claims Administrator also has changed the requirement that the lost profits analysis use "comparable" pre- and post-spill periods to instead use only the "same" periods.  The effect of this error is most pronounced in, but by no means limited to, the farming industry.  By using the same periods, the Administrator is contrasting months in pre-spill years in which a claimant earned the majority of its revenue to months after the spill when it earned no revenue because, for example, the farmer moved the harvest month for business or weather reasons.

The BEL Policy Decisions are not generating mere outliers or false positives, but instead are systematically producing awards for fictitious losses.  Two-thirds of all BEL awards over $75,000 are based on flawed data.  Over 1,200 awards have been made to claimants in the agriculture, construction, and professional services industries alone — where compensation for non-existent losses is pervasive — with a total value of over $400 million.  These awards

include:

- $21 million to a Zone B[2] rice mill in Louisiana (approximately 40 miles from the coast) even though in 2010 (the year of the spill) the rice mill earned more revenue than in 2007, 2008, or 2009;

- $9.7 million to a Zone D highway, street and bridge construction company in northern Alabama (almost 200 miles from the Gulf) that does no business in the Gulf region even though 2010 was its best year on record with variable profit exceeding its benchmark year variable profit by 21%;

- $3.7 million to a Zone C digital printing business in Alabama even though it had a banner year in 2010, earning 14% more profit in the post-spill period of 2010 than it did in the same period during the benchmark years; and

- $3.3 million to a Zone C law office located in central Louisiana, even though its profit in the year of the spill exceeded its benchmark period profits by 10%.

Although the ultimate cost is inestimable, once all current claims are processed the fictitious awards could cost billions of dollars.  The number of BEL claims based on non-existent injuries grows daily, as claimants far from the Gulf Coast who have never before alleged injury seek to take advantage of the BEL Policy Decisions.  A preliminary injunction is necessary so that the Administrator's errors can be addressed before BP is required to pay out substantial, unrecoverable sums to BEL claimants for fictitious "losses."

BP satisfies the requirements for immediate injunctive relief.  *First*, BP has a substantial likelihood of showing that the BEL Policy Decisions violate the Agreement.  The Decisions contravene the Settlement's express purpose, rewrite its plain language, violate economic and accounting principles, and force BP to pay absurd windfalls.  *Second*, BP will be irreparably harmed.  Hundreds of millions of dollars already have been improperly awarded, and the BEL Policy Decisions could cost BP billions.  BP cannot recoup the funds from the thousands of

---

[2]  BEL claimants are categorized into four economic loss zones that "reasonably reflect the likelihood that a given class member suffered economic damage as a result of the spill," Rec. Doc. 8138 at 86, with those in Zone A being most likely to have experienced a spill-related loss and those in Zone D least likely.

business claimants, who will spend the awards if paid. *Third*, claimants will not be harmed if the preliminary injunction is granted because they have no legitimate interest in receiving payments for non-existent losses. *And last*, the public interest is served by properly interpreting the Agreement and paying only those claimants who have suffered losses — not those whose alleged injury is fictitious. Indeed, such disparate treatment of class members is inconsistent with the basis upon which a class was certified.

## BACKGROUND

The Settlement is intended to resolve claims brought by businesses within the Class for Economic Damages they suffered arising out of the *Deepwater Horizon* oil spill. Agreement ¶ 1.3.1.2; *id.* ¶ 38.57 ("Economic Damage"); *see also* Final Approval Order, Rec. Doc. 8138 at 31. The Agreement's BEL Framework, Exhibits 4A-4E, determines whether a business claimant is to be compensated and, if so, in what amount. As this Court has held, the BEL "framework is derived from recognized and accepted methodologies applied in evaluating business economic loss claims," Rec. Doc. 8138 at 10, and thus should be used in a common sense manner to determine lost profits, if any.

### A.     The BEL Framework Provides Compensation For Actual Lost Profits.

The BEL Framework "[c]ompensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period." Agreement, Ex. 4C at 1; *see also* Polinsky Decl. (Ex. 12) ¶ 12. The Compensation Period is three or more consecutive months from May–December 2010 chosen by the claimant. *Id.* For the Benchmark Period, the Class Member claimant may choose (i) 2009; (ii) the average of 2008 and 2009; or (iii) the average of 2007, 2008, and 2009. *Id.* at 1-2.

The BEL Framework's critical metric is "**Variable Profit**," which the Settlement calculates as follows: "1. Sum the monthly **revenue** over the period. 2. Subtract the

4

**corresponding variable expenses** from **revenue** over the same time period." *Id.* at 2 (emphasis added). The BEL Framework then compensates claimants for the "reduction in profit between the 2010 Compensation Period selected by the claimant and the **comparable months** of the Benchmark Period." *Id.* at 1 (emphasis added).

    **B.**    **The Claims Administrator Misinterpreted The BEL Framework Without First Seeking Input From BP.**

The Claims Administrator's misapplication of the BEL Framework started with the Administrator not using the standard process for resolving issues regarding the Agreement, and then rapidly escalated. Whenever the Administrator has a question about the Settlement, he routinely makes a written Request for Input from BP and Class Counsel. Only after receiving the Parties' input does the Administrator issue a Policy Decision or Announcement. Based upon that Policy, the Settlement Program then begins processing substantial numbers of claims impacted by the question. This process has resolved a significant number of the over *340* questions that have been presented to the Parties, involving matters large and small, related to the Settlement — with one critical exception. Moskowitz Decl. (Ex. 9) ¶¶ 4-6.

The Claims Administrator began making compensation determinations based on the misapplication of the BEL Compensation Framework without notifying BP, making a Request for Input, or otherwise issuing a Policy Statement or Announcement. Instead, BP learned of the Administrator's misinterpretation after awards for fictitious losses were made. In late September 2012, BP raised a few questions to the Settlement Program related to how revenue and expenses were being used to calculate compensation in several BEL claim determinations BP had reviewed. Class Counsel objected, arguing that BP should not be allowed such inquiries. *Id.* ¶ 7.

The Claims Administrator separately determined that claimants who prepared P&Ls on an accrual basis would not be allowed to restate them on a cash basis to submit claims. 10-8-12

Policy Statement (Ex. 20) at 2.   In reaching this decision, the Administrator followed the Request-for-Input process.  Moskowitz Decl. (Ex. 9) ¶ 6 n.2.  The Administrator explained that "such restatement could result in a loss or a greater loss not related to the Spill, but instead as a result only of the timing of cash received."  10-8-12 Policy Statement (Ex. 20) at 2.  Yet the Administrator did not tell BP that he was already systematically awarding compensation to BEL claimants based on the time when cash was received or spent.  Moskowitz Decl. (Ex. 9) ¶ 8.

In the period leading up to the November 8, 2012 Fairness Hearing, the number of BEL claim determinations significantly accelerated:   from October 1 to November 8, 2012, BEL awards increased from 414 to 1,558.  This trend continued after the Hearing.  On December 5, 2012, BP again requested a meeting with the Settlement Program and raised questions to determine whether it was processing BEL claims properly.   In response, Class Counsel again argued that BP should not be allowed to ask the Settlement Program these questions.  *Id.*  ¶¶ 8-9.

On December 16, 2012, Class Counsel formally requested the Settlement Program to issue a policy decision that "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed."  12-16-12 Class Counsel Memo (Ex. 17) at 1.  Similarly, Class Counsel asked the Program to declare that "'corresponding variable expenses' associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question."  *Id.*  Only then, after months of processing substantial numbers of claims and making awards for fictitious "losses," did the Claims Administrator undertake the process of obtaining input from the Parties.  Moskowitz Decl. (Ex. 9) ¶¶ 9, 12.

### C.   Despite Recognizing That It Creates Fictitious Losses, The Claims Administrator Adopted Class Counsel's Erroneous Interpretation.

On January 15, 2013, the Claims Administrator formally adopted Class Counsel's misinterpretation of the Agreement in the BEL Policy Decisions.  The Administrator did so despite acknowledging that "the result can be disproportionate awards for certain types of claims."  Cover E-Mail to BEL Policy Decisions (Ex. 18).  Yet the Administrator ignored his prior policy statement that sought to prevent fictitious losses as "a result only of the timing of cash received," 10-8-12 Policy Statement (Ex. 20) at 2, in issuing the BEL Policy Decisions. Redefining or deleting the Agreement's terms, he decided that "the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time," and "will not typically re-allocate such revenues or expenses to different periods."  BEL Policy Decisions (Ex. 19) at 2.  Unlike other issues where the Administrator sought input before processing a substantial number of claims, approximately $764 million had been awarded to BEL claims by the time the BEL Policy Decisions were issued.  Moskowitz Decl. (Ex. 9) ¶12.

Following the Settlement's procedures, BP requested that the Court correct the BEL Policy Decisions' misinterpretation of the Settlement.  Rec. Doc. 8812 at 1 n.1.  On March 5, 2013, however, the Court issued its Order affirming the Claims Administrator.

### D.   The Settlement Program Has Awarded Hundreds Of Millions For Fictitious Losses With The Amount Increasing Daily.

Based on the BEL Policy Decisions, the Settlement Program has awarded — and will continue to award — substantial sums of money for non-existent "losses."  The failure to identify monthly revenues and subtract from them the corresponding variable expenses as well as to use comparable months systematically produces fictitious "losses" for many BEL claimants.  *See* Sider Supp. Decl. (Ex. 15) ¶¶ 15-17 & n.7; Weil Decl. (Ex. 16) at 6:229-7:252.  Over two-thirds

of BEL offers of $75,000 or more are very likely based on improperly recorded revenues and expenses or other data flaws. *See* Sider Supp. Decl. (Ex. 15) ¶¶ 8-10 & Table 1. More than one-third of BEL offers are premised on a claimant's 2010 variable profit (absent the spill) exceeding its Benchmark Period profit by more than 25%, *id.* ¶¶ 11-13 & Table 1. Both of these are powerful indicators that claimants are receiving awards for fictitious losses.

These problems are pervasive in agriculture, construction, and professional services (which includes law firms). Finch Supp. Decl. (Ex. 4) ¶¶ 6-9; Hall Supp. Decl. (Ex. 7) ¶¶ 6-9; Oustalniol Supp. Decl. (Ex. 11) ¶¶ 18-22. They also are prevalent in real estate, wholesale trade, manufacturing, and retail trade. Sider Supp. Decl. (Ex. 15) ¶¶ 10, 13, 16.

The Claims Administrator's misinterpretation of the Agreement is spuriously businesses far from the Gulf that experienced little or no spill impact. The industries receiving the most value from the BEL Framework are not Gulf hotels and restaurants, but rather the construction industry (18% of the value of total BEL awards) and professional services such as law firms (13% of the total value). *Id.* ¶ 20 & Table 4. Under the BEL Policy Decisions, over $415 million has been awarded to agriculture, construction, and professional services claimants, with another $370 million going to real estate, wholesale trade, manufacturing, and retail trade. *Id.* ¶ 20. With current BEL awards totaling approximately $1.16 billion, almost 70% of the value of awards is going to these seven sectors. *Id.*

Even worse, these amounts are based on claims processed to date, which are approximately 20% of the submitted claims. *Id.* ¶ 21. Although the ultimate cost is inestimable, when all claims are processed the cost could be billions in awards for fictitious losses. *Id.*

Finally, the BEL Policy Decisions encourage claims from businesses remote from the Gulf and that have not previously claimed any harm. *Id.* ¶¶ 22-29. Claims by businesses in

zones C and D that did not file submissions with the GCCF have risen dramatically from less than 15% of claims in June 2012 to more than 60% in February 2013.  *Id.* ¶ 28.  Tellingly, attorneys and accounting firms have begun advertising to solicit claims from such businesses.  *See* Advertisements Soliciting Claims (Ex. 24).

## ARGUMENT

## I.      BP HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

To obtain a preliminary injunction, "'[a]ll courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.'"  *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting WRIGHT & MILLER, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995)).[3]  "To assess the likelihood of success on the merits, [courts] look to standards provided by the substantive law."  *Id.* at 596.

The key question is whether the BEL Policy Decisions violate the Agreement.  The Agreement's plain language requires that variable profit be calculated using accurate monthly revenues from which corresponding variable expenses are subtracted, and that losses be determined by subtracting variable profits in the Compensation Period from comparable months in the Benchmark Period.  The BEL Policy Decisions ignore these requirements, rewrite the Agreement's terms, create absurd results, and contradict established economic and accounting principles — fundamentally breaching the Agreement.

BP understands that the Court has disagreed with BP's contract interpretation.  As *Janvey* and similar cases explain, however, a party need not prevail on the merits for a preliminary injunction, but instead need only make a prima facie case.  "It is enough that the [movant] raises

---

[3]  *See also Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011); *Finlan v. City of Dallas*, 888 F. Supp. 779, 791 (N.D. Tex. 1995).

legal questions that are sufficiently serious and substantial that a more thorough investigation is appropriate." *Chambers v. Coventry Health Care of La., Inc.*, 318 F. Supp. 2d 382, 389 (E.D. La. 2004). BP's request also can be compared to circumstances where a court rules against a party but grants another form of relief because the party has made a sufficient showing on the merits, such as a stay pending appeal under Fed. R. App. P. 8(a) or certifying an order for appeal under 28 U.S.C. § 1292(b). BP has made more than a prima facie case.

### A.      The Settlement's Purpose Is To Compensate Only For Actual Losses.

"Discerning the parties' true intent, as expressed in the language of the [contract], is the court's primary concern." *In re Deepwater Horizon*, __ F.3d __, 2013 WL 776354, *3 (5th Cir. Mar. 1, 2013). Accordingly, a contract is interpreted in light of its purposes. *E.g.*, *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 175 (5th Cir. 1999); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 946 (5th Cir. 1981).

The Settlement's express purpose is compensating for actual losses. BEL claimants are compensated under the "Economic Damage Category" for "*[l]oss of income, earnings or profits suffered* ... as a result of the DEEPWATER HORIZON INCIDENT." Agreement ¶ 1.3.1.2 (emphasis added). "Economic Damage" is defined as "*loss of profits, income and/or earnings …* allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident ..." *Id.* ¶ 38.57 (emphasis added). The BEL Framework compensates claimants for "reduction in profit." *Id.*, Ex. 4C at 1.

At no time during the Settlement approval process did Class Counsel or anyone else suggest that a business could recover for fictitious losses. Likewise, in approving the Settlement, the Court spoke of compensation for actual losses. In rejecting an objection to the zones, the Court explained that zone location "only determines whether [the claimant] will receive an enhanced opportunity for recovery, including … additional recovery *beyond actual compensable*

10

*losses* in the form of a larger RTP." Rec. Doc. 8138 at 87 (emphasis added). The Court likewise ruled that the "proposed class in this case consists *exclusively* of individuals and businesses *that have already suffered economic loss* and property damage." *Id.* at 31 (emphasis added); *see also id.* at 60, 86. Making substantial payments to uninjured claimants not only is contrary to the Agreement's purpose but effectively (and improperly) redefines the class — *sub silentio*.

Finally, the Settlement's purpose was explicitly communicated to Class Members. The short-form Class Notice told Class Members they could receive compensation "*[i]f you have economic loss* or property damage because of the Deepwater Horizon oil spill … .*" Rec. Doc. 6266-2, Publication Notice (emphasis added). The detailed Class Notice emphasized that "you may receive money *if you have been damaged* by the Deepwater Horizon oil spill," and "[c]laims for economic damage can be made by" Class Members "*that lost profits or earnings* as a result of the Deepwater Horizon Incident." *Id.*, Detailed Notice at 1, 12 (emphasis added).

### B. The Settlement's Plain Language Requires That Monthly Revenues And Variable Expenses Correspond.

The BEL Framework's words must be given their plain and ordinary meaning. *See Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009); *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009). "Courts should consider contracts as a whole, affording each part of the contract effect." *Deepwater Horizon*, 2013 WL 776354, at *3; *see also Becker*, 586 F.3d at 369. Every word is given meaning if possible and not treated as mere surplusage. *See Deepwater Horizon*, 2013 WL 776354, at *3; *Becker*, 586 F.3d at 369. The Settlement cannot be rewritten. *See Young v. Merrill Lynch & Co.*, 658 F.3d 436, 448 (5th Cir. 2011) (per curiam).

The BEL Framework's key terms — "revenue," "expense," "corresponding," "comparable," and "profit" — have recognized meanings. Each must be read in the context of

11

measuring "reduction in profit" using established methodologies, as well as their definitions in economics and accounting.  Agreement, Ex. 4C at 1; Rec. Doc. 8138 at 10.  *See Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005); *Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1193 (11th Cir. 2001).  Yet the Claims Administrator either deletes or redefines these terms so that they measure periodic changes in net cash flow, not economic losses or "reduction in profit."

### 1.     The Word "Revenue" Is Not Simply "Cash Received."

The first question of contract interpretation is:  What does the Agreement mean by "revenue"?  The Claims Administrator equated "revenue" with "cash received," which was his first error.  In affirming the Claims Administrator's policy decision, the Court's March 5 Order does not address the definition of the key term "revenue."

"Revenues measure the inflows of net assets from selling goods and providing services (that is, assets less liabilities)."  C. STICKNEY & P. BROWN, FINANCIAL REPORTING AND STATEMENT ANALYSIS: A STRATEGIC PERSPECTIVE 22 (4th ed. 1999).[4]  This means the Claims Administrator must determine revenue attributable to the income generating activity for a period in order to properly evaluate Variable Profit.  This is the only reasonable interpretation consistent with determining Variable Profits and lost profits under the Agreement.  *See In re MPF Holdings US LLC*, 701 F.3d 449, 457 (5th Cir. 2012); *Hughes Training Inc. v. Cook*, 254 F.3d 588, 593 (5th Cir. 2001).  While cash receipts are not ignored, and can be highly relevant for certain businesses, revenue for the period must be related to the effort of providing goods and rendering

---

[4]   *See also* FINANCIAL ACCOUNTING STANDARDS BOARD ("FASB"), CONCEPTS STATEMENT NO. 6: ELEMENTS OF FINANCIAL STATEMENTS ¶¶ 78-79 (1985); FASB, ACCOUNTING STANDARDS CODIFICATION ("ASC") AT TOPIC 605 "REVENUE RECOGNITION" ASC 605-10-25-1; SEC STAFF ACCOUNTING BULLETIN 101 – REVENUE RECOGNITION IN FINANCIAL STATEMENTS (1999); Weil Decl. (Ex. 16) App'x D (compiling accounting literature defining "revenue").

services or there can be no "corresponding variable expenses" to subtract to yield "variable profit."  Agreement, Ex. 4C at 2.

Contrary to the Claims Administrator's decision, "revenue" does not just mean receipt of cash in a period or the happenstance of when cash was (or was not) recorded.  Revenue measures the "*net assets* increase caused by selling *goods* or rendering *services*" and should "not [be] confuse[d] with *receipt* of *funds*."  R. WEIL ET AL., FINANCIAL ACCOUNTING:  INTRODUCTION TO CONCEPTS, METHODS AND USES 814 (14th ed. 2012); M. MAHER ET AL., MANAGERIAL ACCOUNTING 588 (11th ed. 2012); R. WEIL & M. MAHER, HANDBOOK OF COST MANAGEMENT 126 (2d ed. 2005); *see also* Weil. Decl. (Ex. 16) at 3:121-4:123, 4:147-48; Alexander Decl. (Ex. 1) ¶ 8; Dietrich Decl. (Ex. 2) ¶ 16.[5]  Because "revenue" is earned through delivering goods and rendering services, the Settlement Program must determine when that occurred.  Indeed, even Class Counsel has admitted that the relevant question is when revenue is "earned."[6]  *See* Dec. 16 Class Counsel Memo (Ex. 17) at 1.

Both Class Counsel and the Claims Administrator equate "revenue" with "receipt."  The Claims Administrator adopted Class Counsel's argument that "[w]hen a business keeps its books on a cash basis, *revenue is earned* during the month of receipt, *irrespective of when the contract was entered or services were performed*."  *See* Dec. 16 Class Counsel Memo (Ex. 17) at 1 (emphasis added).  But this collapses the definitional differences between "receipts" and "revenue," treating the two words as identical when they are not.

---

[5]  Expert testimony is appropriate to understand the meaning of terms in a contract.  *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000); *see also Pers. Preference Video, Inc. v.HBO, Inc.*, 986 F.2d 110, 112-14 (5th Cir. 1993).

[6]  Properly recording revenues when earned has nothing to do with "smoothing" revenues, and BP has never asked the Claims Administrator to "smooth" revenues. March 5 Order at 1.

Why are the different definitions of "revenue" and "receipt" so important?  Because if "monthly revenues ... earned over the relevant period are not properly measured, then the resulting calculation will only reflect the timing of the recording of cash outflows and inflows rather than the firm's actual financial performance."  Oustalniol Decl. (Ex. 10) ¶ 25; *see also* Weil Decl. (Ex. 16) at 6:217-221.  If one equates receipts with revenue, then one cannot possibly calculate "reduction in profit" as the BEL Framework requires.  Agreement, Ex. 4C at 1; *see also* WEIL & MAHER, HANDBOOK OF COST MANAGEMENT at 112 (profit is the "[e]xcess of revenues over expenses for a transaction"); MAHER ET AL., MANAGERIAL ACCOUNTING at 579 (same).  "In order to properly calculate variable profits as required in Step 1 of the BEL compensation formula, it is necessary that revenues be recorded in the months when earned, not when cash is received."  Finch Decl. (Ex. 3) ¶ 10; *see also* Weil Decl. (Ex. 16) at 5:182-83.

This distinction between "receipts" and "revenues" is critically important for industries where the business model and long earnings cycle result in differences between when cash is *received* and *recorded*, and when the business actually *earned* the revenue.  *See* Finch Decl. (Ex. 3) ¶¶ 6-8; Hall Decl. (Ex. 6) ¶¶ 17-21; Oustalniol Decl. (Ex. 10) ¶¶ 7-15; *see also* Sider Supp. Decl. (Ex. 15) ¶ 16 n.7.  For such businesses, payment can be made long before or after the work is done.  Relying solely on what the business recorded in its monthly records is an erroneous definition of "revenue" inconsistent with measuring "profit" in general, or Variable Profit as required by the Agreement.  Agreement, Ex. 4C at 1-2; *see also* WEIL & MAHER, HANDBOOK OF COST MANAGEMENT at 112; MAHER ET AL., MANAGERIAL ACCOUNTING at 579; Weil Decl. (Ex. 16) at 6:217-9:323; Polinsky Decl. (Ex. 12) ¶¶ 22-30.

One point should be dispositive:  the Administrator's definition of "revenue" to mean cash "receipts" reported at the time does not comport with any accepted accounting or economic

definition and, for many businesses, cannot result in the measurement of "lost profits" required by the BEL framework consistent with well-established methodologies for determining business economic loss.  *See* Polinsky Decl. (Ex. 12) ¶ 30; Fishkind Decl. (Ex. 5) ¶¶ 11-14, 18-21; s*ee also* Rec. Doc. 8138 at 10.  Accordingly, that erroneous interpretation must be rejected.  BP's definition of "revenue", which fully comports with the language of the Agreement and the relevant literature, is the only reasonable definition.[7]

2. **"Variable Profits" Must Be Calculated As Revenue Minus The "Corresponding Variable Expenses" That Generated That Revenue.**

The second question of contract interpretation is:  What does "variable profits" mean in the BEL Framework?  Does it mean receipts minus expenditures in specific months, as Class Counsel argued and the Claims Administrator concluded?  Or does "variable profits" follow the conventional and well understood meaning of profits as revenue minus the expenses incurred to generate that revenue?  The Claims Administrator's receipts-minus-expenditures interpretation does not calculate "variable profit," and indeed, is not a profits calculation at all.  Only BP's interpretation comports with the meaning of "profit" by calculating "variable profits" as revenue earned minus the corresponding variable expenses incurred to generate that revenue.

a. **Expenses Are Actual Or Expected Outflows of Assets, Not Cash Expenditures Or Disbursements.**

Contrary to the Claims Administrator's misunderstanding, "[e]xpenses measure the outflows of net assets that a firm uses, or consumes, in the process of generating revenues." STICKNEY & BROWN, FINANCIAL REPORTING at 22; J.D. SPICELAND ET AL., INTERMEDIATE ACCOUNTING G-2 (7th ed. 2013); *see* Alexander Decl. (Ex. 1) ¶ 9; Dietrich Decl. (Ex. 2) ¶ 17.

---

[7]  "Revenue" also appears in Exhibit 4B concerning causation, which sets forth alternative "revenue pattern" tests for claimants in zones B, C and D.  Applying Exhibit 4B likewise requires the Settlement Program to use the correct definition of revenue.

15

Just as *revenue* must be distinguished from *receipts*, so must *expenses* be distinguished from *expenditures*, or spent cash. WEIL ET AL., FINANCIAL ACCOUNTING at 772; MAHER ET AL., MANAGERIAL ACCOUNTING at 542; WEIL & MAHER, HANDBOOK OF COST MANAGEMENT at 60; *see also* Weil Decl. (Ex. 16) at 4:150-152; Dietrich Decl. (Ex. 2) ¶ 17.

The Claims Administrator adopted Class Counsel's position that "'corresponding variable expenses' associated with monthly revenue are the *expenses that are expended or incurred during the Benchmark and Compensation months in question*." Dec. 16 Class Counsel Memo (Ex. 17) at 1 (emphasis added). Talking of "expenses that are expended" rewrites the Agreement to replace the term "expenses" with the word "expenditures." Such rewriting is legally improper and creates "variable expenditures," a term that is unknown to accounting and cannot determine profits. Weil Decl. (Ex. 16) at 5:171-180.

"Expenses" must be correctly defined for the BEL Framework to work. If "expenses" are redefined as "expenditures," then one cannot calculate profit or any other probative measure of economic loss. *See* WEIL & MAHER, HANDBOOK OF COST MANAGEMENT at 112; MAHER ET AL., MANAGERIAL ACCOUNTING at 579; *see also* Weil Decl. (Ex. 16) at 6:217-221; Dietrich Decl. (Ex. 2) ¶¶ 11, 13, 21-25. Yet the Court's March 5 Order does not address how the word "expenses" should be interpreted and applied.

> **b.** **Corresponding Variable Expenses Are Expenses Incurred To Generate Revenue.**

Dictionaries define "correspond" as to "be parallel," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 511 (Philip Babcock Gove, ed., 1976), "be the counterpart," *id.*, or "answer to, agree with, suit." 2 THE OXFORD

16

ENGLISH DICTIONARY 1017 (1933).[8]  The only meaning that "corresponding" can have in the sentence at issue – "subtract the corresponding variable expenses from revenue over the same time period" – is that the variable expenses must "be parallel" to "counterpart" to the revenue. Although it notes BP's argument, the Court's March 5 Order does not give meaning to "corresponding."  March 5 Order at 3-4.

The need for revenues to correspond with expenses is critical in many industries.  For example, while "it is common for construction companies … to maintain their monthly P&L statements without matching monthly revenues with the corresponding variable expenses incurred to generate those revenues, it is not appropriate to measure lost profits damages from P&L statements that do not match revenues and expenses."  Hall Supp. Decl. (Ex. 7) ¶ 4. Farming suffers from a similar failure of revenues and expenses to correspond in monthly statements, see Finch Supp. Decl. (Ex. 4) ¶ 7, as do other industries.  See Sider Decl. (Ex. 14) ¶¶ 5, 12; Weil Decl. (Ex. 16) at 6:223-7:259; Alexander Decl. (Ex. 1) ¶ 15.

The BEL Policy Decisions misinterpret the Agreement by considering only "revenues and expenses in the periods in which those revenues and expenses were recorded at the time." BEL Policy Decisions (Ex. 19) at 2 (emphasis added).  But what the Claims Administrator actually is referring to are cash inflows (receipts) and outflows (expenditures).   He deletes the Agreement's terms, "revenue" and "expenses," and replaces them with completely different words, "receipts" and "expenditures."  See Weil Decl. (Ex. 16) at 4:160-5:162.  If the Parties had intended the sentence to require subtracting cash payments recorded during the month from cash receipts recorded during the same month, they would have said that.  See Young, 658 F.3d at 448.

---

[8]  E.g., People v. Crews, No. 305830, 2013 WL 440545 (Mich. Ct. App. Feb. 5, 2013) (per curiam); AT&T Corp. v. Microsoft Corp., No. 01 Civ. 4872(WHP), 2003 WL 21459573, *23 (S.D.N.Y. June 24, 2003); Voss v. Dupaco, Inc., No. SA-01-CA-51-OG, 2001 WL 34360815, *10 (W.D. Tex. Dec. 6, 2001).

In addition, the Claims Administrator's misinterpretation equates "corresponding" with "over the same time period." That latter phrase already appears in the sentence, and so the BEL Policy Decisions strip all meaning from the term "corresponding," violating the interpretative canon against treating words as mere surplusage. *See Deepwater Horizon*, 2013 WL 776354, at *3; *Becker*, 586 F.3d at 369.

Class Counsel have argued that BP's interpretation is inconsistent with Exhibit 4C, asserting that the phrase "over the same time period" means that the Administrator may not have "revenues" correspond with variable "expenses" recorded in a different period. This argument misses the point. What is the "revenue" from which "corresponding variable expenses" must be subtracted? Only by redefining or deleting those terms can Class Counsel read the Agreement as they do.

Moreover, the plain language of the text establishes that "over the same time period" modifies "*revenue*," not "corresponding variable expenses." Properly understood, "over the same time period" makes clear that the same time period is to be used for revenue in both steps of calculating variable profit — not that the Administrator may avoid having revenue correspond to variable expenses incurred in other time periods. Only BP's position is consistent with the "rule of the last antecedent," which provides that "a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). And only BP's position gives meaning to both "corresponding" and "over the same time period."

Settlement Agreement Ex. 4D, which defines fixed and variable costs for BEL claims, also supports BP. Several Variable Costs make clear that the expenses must correspond to the revenue earned. An obvious example is the Cost of Goods Sold ("COGS"). Agreement, Ex. 4D.

COGS relates costs to those goods that were sold to generate revenue.  *See* WEIL ET AL., FINANCIAL ACCOUNTING at 757 ("**cost of goods sold**:  Inventoriable costs that firms expense because they sold the units; equals beginning inventory plus cost of goods purchased or manufactured minus ending inventory.").  Ex. 4C confirms this matching requirement, providing that "Variable expenses include:  … [v]ariable portion of COGS."  Agreement, Ex. 4C at 2.  The Agreement explicitly requires the Claims Administrator to match the direct costs of selling goods with the associated revenue to determine Variable Profit, thus confirming that the Parties did not mean simply to match cash paid and received in a month, which does not measure profit.

In addition, under the Settlement, the use of "corresponding" expressly incorporates the matching principle from accounting.  Weil Decl. (Ex. 16) at 5:183-185; Dietrich Decl. (Ex. 2) ¶ 19.  Matching means that "revenue [must] be aligned with the costs incurred in generating that revenue" and "efforts/expenses must be matched to accomplishments/revenues."  Finch Decl. (Ex. 3) ¶ 29; *see also* WEIL & MAHER, HANDBOOK OF COST MANAGEMENT at 92; MAHER ET AL., MANAGERIAL ACCOUNTING at 564; Weil Decl. (Ex. 12) at 5:182-190; Dietrich Decl. (Ex. 2) ¶ 19.  "It is widely understood and accepted that such matching between revenue and expenses is required in order to understand a business's financial performance for a given accounting period."  Hall Decl.  (Ex. 6) ¶ 14; *accord* Rose Decl. (Ex. 13) ¶ 4; Weil Decl. (Ex. 16) at 5:185-187; Polinsky Decl. (Ex. 12) ¶ 7.

Given the word's common meaning, the fundamental accounting principle of matching, and the Settlement's express purpose of calculating lost profits, the variable expenses that "correspond" to revenue can only rationally be understood to mean those variable expenses that were incurred to generate that revenue.  *See* Weil Decl. (Ex. 16) at 4:129-131; Dietrich Decl. (Ex. 2) ¶ 19; Alexander Decl. (Ex. 1) ¶ 13.

The Court's March 5 Order observes that the Agreement does not use the word "matched" or matching.  March 5 Order at 1.  As leading accountants have explained: "The BEL Framework uses the word *corresponding*.  The more conventional accounting word is *matching*, but these mean the same thing."  Weil Decl. (Ex. 16) at 5:183-185; *see also* Dietrich Decl. (Ex. 2) ¶ 19.  This equivalency makes sense, for otherwise the framework simply does not calculate variable profit.  *See* Alexander Decl. (Ex. 1) ¶ 13; Dietrich Decl. (Ex. 2) ¶¶ 20-21.

The three examples in Exhibit 4C's addendum do not support the Claims Administrator's position.  March 5 Order at 4.  They show that, for determining compensation, a claimant must use the same years it used in satisfying causation, but need not use the same months.  Agreement, Ex. 4C Addendum.  As their introduction plainly states, the examples "illustrate these rules," *i.e.*, how proof of compensation limits the benchmark *years* that can be used but not the *months*.  Nothing in the BEL Framework suggests that the examples are relevant to any other purpose.  Moreover, they do not address how to calculate variable profit using revenues and expenses.

Nor is Exhibit 4A, which concerns documentation requirements, inconsistent with the plain language of Exhibit 4C regarding compensation.  *See* March 5 Order at 4.  Exhibit 4A requires claimants to provide "federal tax returns" and "[m]onthly and annual profit and loss statements (which identify individual expense line items and revenue categories)" for 2010 and the Benchmark Period, as well as 2011 for claimants that must prove causation.  Agreement, Ex. 4A at 1.  To the extent additional information might be required, Exhibit 4A expressly provides that the Claims Administrator may "request source documents for profit and loss statements" at any time.  *Id.* at 2.  He also has the power to request "additional information or documentation" when there are discrepancies between tax returns and comparable items in a profit and loss statement.  *Id.*  The failure to properly record revenues and expenses, or have them correspond,

are discrepancies that call for additional information.[9]

### c. Profit Is Properly Calculated Only When Revenues And Expenses Correspond.

Economists explain that "[e]conomic profits due to a period of business activity are the revenues that are generated by the activity — whenever they are received — minus the expenses associated with the activity — whenever they are incurred."  Polinsky Decl. (Ex. 12) ¶ 6. "Accountants typically use the word *profit* to mean 'the excess of all revenues and gains for a period over all expenses and losses of the period,' where they 'measure revenue as the expected net present value of the net assets the firm will receive.'"  Weil Decl. (Ex. 16) at 2:86-89; Dietrich Decl. (Ex. 2) ¶ 12; WEIL & MAHER, HANDBOOK OF COST MANAGEMENT at 112; MAHER ET AL., MANAGERIAL ACCOUNTING at 579; *see also* Alexander Decl. (Ex. 1) ¶ 13.

Ignoring this common understanding, the Claims Administrator decided to use receipts minus expenditures, which does not calculate profit but instead net cash flow.  *See* Polinsky Decl. (Ex. 12) ¶¶ 7-9; Weil Decl. (Ex. 16) at 3:97-101.  The term "net cash flow" neither appears in the BEL Framework nor measures profit.  *See* Hall Supp. Decl. (Ex. 7) ¶ 4; Rose Decl. (Ex. 13) ¶ 6; Dietrich Decl. (Ex. 2) ¶ 22.  The BEL Policy Decisions thus fail to fulfill the most basic calculation of the BEL Framework — determining variable profit.  Fishkind Decl. (Ex. 5) ¶¶ 5-8, 11-14, 18-21; Henley Decl. (Ex. 8) ¶¶ 9-12; Richardson Decl. (Ex. 30) ¶¶ 10-18, 22; Sharp Decl. (Ex. 31) ¶¶ 1-3, 6, 9.

---

[9]  Class Counsel have argued, and the Court's March 5 Order suggests, that BP's interpretation introduces alternative causation into the Settlement, but this is not so.  *See* March 5 Order at 6.  The Agreement provides that only businesses that lost profits, income, and/or earnings "as a result of" the spill can satisfy the causation requirement by meeting the simplified causation requirements set forth in Exhibit 4B. Agreement ¶¶ 1.3.1.2, 38.57.  BP is not seeking to undermine these causation tests.  Rather, the Agreement's objective causation and compensation tests cannot work if they are misinterpreted and applied to incorrect data.  The BEL Policy Decisions exemplify the problem of "garbage in, garbage out." *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 374 F. App'x. 119, 121 (2d Cir. 2010).

### 3.      Awards Must Be Based On A Comparison Of Variable Profit In "Comparable" Months, Not Necessarily The "Same" Months.

The Agreement requires the Claims Administrator to determine the difference between the claimant's Variable Profit in the Compensation Period with the "comparable" months of the Benchmark Period.    Thus, the third question of contract interpretation is:    What does "comparable" mean in the BEL Framework?  Does it mean only "the same" as the BEL Policy Decisions conclude?  Or does "comparable" mean what the dictionary and people commonly understand it to mean — *i.e.*, appropriate and fit for comparison?

The "comparable" months are those that "hav[e] enough like characteristics or qualities to make comparison *appropriate,"* and are "*suitable* for matching, coordinating, or contrasting." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 461 (Philip Babcock Gove, ed., 1976) (emphasis added).   They are the months "*worthy* of comparison; *proper* or *fit* to be compared."  2 THE OXFORD ENGLISH DICTIONARY 708 (1933) (emphasis added).   The "plain meaning of the word 'comparable'" is "'capable of being compared; . . . having enough like characteristics or qualities to make comparison appropriate.'" *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1293 (10th Cir. 2005).[10]

"There is no basis for the . . . determination that 'comparable' only means equivalent or the same."  *Moorehead v. Dep't. of Prof'l Regulation, Bd. of Psychological Exam'rs*, 550 So. 2d 521, 522 (Fla. Ct. App. 1989).   Reading "comparable" to mean "same" deletes "comparable" from the Agreement, contrary to the basic principle that all words in a contract must be given

---

[10]   *See also Shelby Cnty. Comm'n v. Smith*, 372 So. 2d 1092, 1096 (Ala. 1979); *Butcher Co. v. Bouthot*, No. CIV 00-139-P-H, 2001 WL 263313, at *1 & n.1 (D. Me. Mar. 16, 2001); *United States. v. Gen. Petroleum Corp. of Cal.*, 73 F. Supp. 225, 244 n.35 (S.D. Cal. 1947); *La.-Nev. Transit Co. v. Woods*, 393 F. Supp. 177, 184 (W.D. Ark. 1975).

effect.  *See Deepwater Horizon*, 2013 WL 776354, at *3; *Becker*, 586 F.3d at 369.  The plain meaning of "comparable" months under the Agreement is the months during which the claimant engaged in comparable economic activities.

To be sure, in many cases the "same" months can also be the "comparable" months; a beachside restaurant might predictably see increased business in June, July, and August every year.  But for other businesses, the "same" months are not "comparable" months, especially when there is a timing divergence in revenues and expenses.  For example, the months in which a farmer buys seeds, incurs expenses, harvests the crop, and sells it may vary solely as a result of market or weather conditions.  *See* Finch Decl. (Ex. 3) ¶ 7.  It is neither "appropriate," "suitable," "worthy," "proper," nor "fit" to compare August 2009 to August 2010 if the farmer sold his entire 2009 harvest in August but sold his entire 2010 harvest in September.

The three examples in Exhibit 4C's addendum do not support the Claims Administrator's position.  *See* March 5 Order at 2-3.  Those examples simply illustrate that one set of months can be used for determining causation and another for determining compensation.  None state that the claimant can use the same months in the Compensation Period and Benchmark Period if its economic activities take place at one time during 2010 but another in the Benchmark Period.

Nor can the BEL Policy Decisions be supported by 3 lines of a 9 page, 249 line e-mail from BP's counsel during negotiations.  *See* March 5 Order at 3, *citing* 2-17-12 E-mail from R. Godfrey to J. Rice (Ex. 25).  *First*, parol evidence cannot be used to vary the Agreement's terms.  *See United States v. Elashyi*, 554 F.3d 480, 502 (5th Cir. 2008); *Rosas v. United States Small Business Admin.*, 964 F.2d 351, 355 (5th Cir. 1992).  *Second*, the Agreement "supersedes all prior proposals, negotiations, agreements, and understandings," Agreement ¶ 26.1.  *See Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 563-64 (5th Cir. 2005); *Omnitech Int'l, Inc. v. Clorox*

*Co.*, 11 F.3d 1316, 1328 (5th Cir. 1994).   *Third*, the e-mail did not address whether "comparable" always means "same," but rather Class Counsel's position that, to determine incremental profit under the second step of the compensation calculations, 3 months of financial data should be compared to 8 months of data — an entirely different issue.   *Finally*, in the e-mail, BP rejected Class Counsel's position because it made "no sense economically, *as it will create fictitious losses that do not exist*."   2-17-12 E-mail from R. Godfrey to J. Rice (Ex. 25) ¶ H-1 (emphasis added).

### C.   The BEL Policy Decisions Violate Fundamental Principles Of Economics And Accounting, Systematically Leading To Absurd Results.

Contracts should be interpreted to make sense, having been agreed to by rational people. *See N. German Lloyd v. Guar. Trust Co. of N.Y.*, 244 U.S. 12, 24 (1917) ("Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs."), *quoted by E. Air Lines, Inc v. McDonnell Douglas Corp.*, 532 F.2d 957, 996 (5th Cir. 1976) *and Gulf Shores Leasing Corp. v. Avis Rent-A-Car Sys., Inc.*, 441 F.2d 1385, 1390 n.5 (5th Cir. 1971).   The stated, rational purpose of the Settlement is compensating claimants for actual losses caused by the spill.   *See* Polinsky Decl. (Ex. 12) ¶¶ 12-16.   Economic reality demands a focus on "actual earnings," since the tort system's function is to make those who are impacted whole.   *See* WILLIAM M. LANDES & RICHARD A. POSNER, THE ECONOMIC STRUCTURE OF TORT LAW 185-86 (1987).   The "BEL Framework would be designed to make claimants whole," not to "result in substantial windfalls to claimants."   Polinsky Decl. (Ex. 12) ¶ 15.

### 1.   Misinterpreting The Agreement To Pay Substantial Amounts To Claimants For Non-Existent Losses Produces Absurd Results.

Violating the legal principle that a contract must be interpreted to achieve rational goals, the BEL Policy Decisions systematically create awards for fictitious "losses."   *See* Sider Supp. Decl. (Ex. 15) ¶¶ 4-14.   The amount of fictitious awards is already hundreds of millions of

dollars and could cost billions.  *Id.* ¶¶ 20-21.  Appendix B to this Memorandum includes a representative listing of irrational awards resulting from the Administrator's misinterpretation, including awards to claimants with greater revenues and variable profits in the 2010 spill year than any other year on record.

The Settlement should be interpreted to avoid illogical or absurd results.  *See In re Liljeberg Enters., Inc.*, 304 F.3d 410, 442-43 (5th Cir. 2002); *S. Cent. Bell Tel. Co. v. Canal Place Ltd. P'ship*, 927 F.2d 867, 869 (5th Cir. 1991); *Publicker Chem. Corp. v. Belcher Oil Co.*, 792 F.2d 482, 487 (5th Cir. 1986); *Makofsky v. Cunningham*, 576 F.2d 1223, 1229-30 (5th Cir. 1978); *Koch Bus. Holdings, LLC v. Amoco Pipeline Holding Co.*, 554 F.3d 1334, 1338 (11th Cir. 2009); 16 WILLISTON ON CONTRACTS § 49:14 (4th ed. 1993 & supp.).  Indeed, "courts will not interpret the words of a contract literally when this leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit." *Makofsky*, 576 F.2d at 1229-30; *see also Liljeberg*, 304 F.3d at 442-43; *Koch*, 554 F.3d at 1338; *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002).  So, even if the Parties had written a different agreement compelling these absurd results — such as the Claims Administrator's rewritten version set out in Appendix A — that literal reading could not stand, and instead the Settlement would be read to require rational ends.

BP never accepted the risk of such absurd awards.  The Court quotes a letter from BP counsel Mark Holstein saying that "false positives" will necessarily exist.  March 5 Order at 5. But Mr. Holstein was discussing Exhibit 4B's objective requirements for establishing causation, not the compensation terms of Exhibit 4C.  Thus, he referred to false positives where claimants have *actual* losses caused by both spill and non-spill factors, not where claimants had no (or inflated) losses.  In the next sentence Mr. Holstein explains that such false positives "should be

relatively rare."  9-28-12 Ltr. from M. Holstein to P. Juneau (Ex. 26) at 3.  He also emphasized that the Settlement Program must scrutinize data for errors or "recording of revenues or expenses in the wrong period," and that where such results are noted the Settlement Program must review the data and additional supporting documents to ensure accuracy.  *Id.*[11]

BP is not facing rare or anomalous false positives that "sometimes occur."  March 5 Order at 5.  To the contrary, the BEL Policy Decisions *systematically* award claimants for fictitious losses, and will continue to do so if not reversed.  *See supra* Background, Section D.

Finally, the March 5 Order suggests that the three-month Compensation and Benchmark Periods should protect BP against anomalous results.  March 5 Order at 4-5.  The three-month periods are an appropriate means of identifying downward trends in performance suggesting injury due to the spill, as opposed to normal monthly variations that might not reflect any real trend.  Rec. Doc. 7114-5, Fishkind Decl. ¶ 87; Rec. Doc. 7114-11, Henley Decl. ¶ 30(b).  But nothing in the record suggests that they were intended, or could be expected, to ensure that revenues or expenses were recorded accurately or properly correspond to one another.

### 2.     The Claims Administrator Cannot Be Allowed To Use Inaccurate Financial Data To Calculate Compensation Awards.

The Settlement Program routinely discovers — but does not correct — major errors in monthly financial records submitted by BEL claimants.  *See* Alexander Decl. (Ex. 1) ¶¶ 30-31. Nothing in the Agreement justifies using incorrect financial data to calculate compensation awards.  By failing to correct obvious, indisputable errors, the BEL Policy Decisions create substantial compensation awards for fictitious losses.   Two examples illustrate this problem:

---

[11]  Similarly, the March 5 Order cites BP's expert Mr. Polinsky, but his full quote states "that in a class action payments to claimants would not perfectly match economic losses in every instance.  Yet a settlement of a class action *would not be expected to result in gross overpayments or windfalls* to certain claimants."  Polinsky Decl. (Ex. 12) ¶ 16 n. 8 (emphasis added).

- A claimant's attorney explained to the Program that $253,659 in income during September 2008 was recorded as a negative expense in October 2008 even though it was revenue. But no correction was made by the Program, leading to an overstatement of October 2008 variable profit and an understatement of September 2008 variable profit. Selecting a benchmark period including the erroneously recorded financial data resulted in an award for fictitious losses of several hundred thousand dollars. *See* Alexander Decl. (Ex. 1) ¶¶ 30-31 & Exs. 4, 4.6; 7-10-12 claimant counsel ltr. to Mr. Juneau (Ex. 27); and

- The Program identified a law firm including client revenues and expenses in the firm's own monthly P&Ls. "Litigation Expense" items recorded in the firm's P&L were not expenses at all, but instead costs reimbursed to the law firm by its clients. Despite learning that these expenses did not exist, the Program included reimbursements of $155,037 in August of 2009 as revenue. This created an artificial loss compared to August of 2010 that was included in the compensation awarded to the law firm. *See* Alexander Decl. (Ex. 1) ¶¶ 30-31 & Exs. 4, 4.3; Program Global Notes Screen entries dated 10-11-12 and 10-16-12 (Ex. 28); 10-17-12 ltr. from claimant's counsel to Program accountant (Ex. 29).

Many similar examples exist, and in the construction industry, inaccurate and erroneous monthly financials are routine. Alexander Decl. (Ex. 1) ¶¶ 30-31; Hall Decl. (Ex. 6) ¶¶ 17-21; Hall Supp. Decl. (Ex. 7) ¶¶ 6-13. Making awards based on obviously erroneous data violates the requirements of the contract, law, and common sense to use accurate data to determine damages.[12]

### 3. Under The BEL Policy Decisions, Claimants With The Same Economic Performance Receive Vastly Different Treatment.

Although this Court recognized that the BEL Framework "is derived from recognized and accepted methodologies," Rec. Doc. 8138 at 10, the Claims Administrator's implementation contradicts any accepted methodology for economic loss claims. No methodology would systematically award more compensation to those with no injuries than those who have genuine losses. Any reasonable methodology treats those with similar economic losses alike. As the

---

[12]  *See, e.g., Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 170-71 (5th Cir. 2010); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 52 & n.4 (5th Cir. 1976); *Nat Harrison Assocs., Inc. v. Gulf States Utils. Co.*, 491 F.2d 578, 587 (5th Cir. 1974), *quoted in Liljeberg*, 304 F.3d at 447-48 & nn.97-98.

Claims Administrator explained during the Fairness Hearing: "the concept was … to get things so we get some standardization in what we are doing.  So if we have ten people who have ten identical claims, they should get the identical amount of money."  11-8-12 Hr'g Tr. at 83:6-10. Similarly, according to a legal expert for Class Counsel, "one of the great benefits of a comprehensive class action settlement" is "assur[ance] that similarly situated persons are being treated in like fashion."   Rec. Doc. 7101-6, Issacharoff Decl. ¶ 33.   But the BEL Policy Decisions preclude this similar or like treatment, which is inconsistent with the basis on which a proper settlement class was certified.

*First*, under the BEL Policy Decisions, whether claimants receive any compensation at all depends upon when receipts and expenditures are recorded — not upon actual economic performance.  A claimant recording receipts just one day later in 2010 than in 2009 — such as on October 1 rather than September 30 — will create a claim for fictitious losses by using a Compensation Period of May to September, while a claimant with the exact same profits who records receipts on September 30 in 2010 would have no such claim.

*Second*, claimants with accurate financial records are receiving awards that reflect their economic damages, but claimants with obvious inaccuracies in their financial records are receiving awards much larger than their economic damages, if any, based on fictitious "losses." *See* Sider Decl. (Ex. 14) ¶ 24.

*Third*, under the BEL Policy Decisions, whether and how much compensation is awarded depends on the accounting method selected by the claimants, such as accrual versus cash basis accounting.  Awarding claimants money based solely on whether their accounting methodology generates non-existent losses is irrational.  *See* Dietrich Decl. (Ex. 2) ¶ 21.

*Last,* these irrational bases for awarding compensation under the Settlement were

28

nowhere disclosed to the Class in the Court-approved Class Notice.  This is yet another reason why the BEL Policy Decisions are legally erroneous.

> **D.**      **BP's Interpretation Can Be Implemented Easily.**

The Claims Administrator has confirmed that BP's interpretation of the BEL Framework can reasonably be implemented.  Cover E-Mail to BEL Policy Decisions (Ex. 18).  BP also understands that the Settlement Program accountants agree on this point.  Accounting experts have confirmed that BP's contract interpretation can be readily implemented and is what accountants routinely do in practicing their profession.  *See also* Alexander Decl. (Ex. 1) ¶ 32; Dietrich Decl. (Ex. 2) ¶¶32-35; Weil Decl. (Ex. 16) at 9:341-11:389.  The BEL Policy Decisions' misinterpretation, in contrast, does "not require the skills of a professional accountant, only those of a data entry clerk."  Weil Decl. (Ex. 16) at 10:373-74.

In addition, the Settlement Program itself has recognized that, to "faithfully implement and administer the Settlement, according to its terms and procedures," Agreement ¶ 4.3.1, adjusting data provided by a claimant may be necessary.  For example, for claimants with 13-month financial reporting periods, the Program's accountants have "the ability to convert the 13-period revenue and expense statements into a twelve month year by allocating each period's revenue and expense items into their respective months."  8-2-12 Memo From L. Greer to P. Juneau (Ex. 21) at 8.

Finally, there is no "subjectivity" in ensuring that accurate data is used for the Settlement's objective economic tests.  March 5 Order at 6.  Although claimants are allowed to keep their records in any way they want, the Settlement Program must use the data specified by the Agreement, including making adjustments to claimant-submitted data where necessary, in applying the BEL Framework's compensation formula.  The BEL Policy Decisions, in contrast, eliminate the Agreement's requirements to use objective data in the compensation formula and

instead allow each claimant's subjective choices to determine the data used, even when that data has nothing to do with the claimant's actual economic performance.

## II.   BP WILL BE IRREPARABLY HARMED ABSENT A PRELIMINARY INJUNCTION.

The "generally accepted notion" is "that the purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *FSLIC v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987) (quoting *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975)).  BP seeks to preserve the status quo by preventing the Settlement Program from imminently paying out compensation for fictitious losses.  The amount at stake is extraordinary, already totaling hundreds of millions of dollars and could rise to billions.  *See* Sider Supp. Decl. (Ex. 15) ¶¶ 18-29; Sider Decl. (Ex. 14) ¶ 14.  This substantial, impending harm to BP is irreparable.

### A.   Because The Ultimate Relief BP Seeks Is Equitable, A Preliminary Injunction Is Appropriate Now.

"A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."  *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945); *see also In re Fredeman Litig.*, 843 F.2d 821, 825 (5th Cir. 1988); *Dixon*, 835 F.2d at 560-61; *Strouse Greenberg Props. VI Ltd. P'ship v. CW Capital Asset Mgmt. LLC*, 442 F. Supp. 2d 313, 320 (E.D. La. 2006) (same).

BP seeks exclusively equitable remedies.  BP does not, and as explained below cannot feasibly, seek money damages or other legal remedies.  *See Janvey*, 647 F.3d at 600 (irreparable harm where plaintiff "does not seek damages for breach of contract or tort").  Instead, BP seeks to have the Claims Administrator comply with the express terms of the Agreement, which is a request for "specific performance [that] is equitable in nature."  *Rodriguez v. VIA Metro. Transit Sys.*, 802 F.2d 126, 131-32 (5th Cir. 1986).  Similarly, BP seeks to retain, or to have the Claims

Administrator and Settlement Program retain and not spend, the money that would otherwise be paid for fictitious losses.  This is a request for relief similar to a "[c]onstructive trust, accounting and restitution [which] are all equitable tools."   *Dixon*, 835 F.2d at 560-61.  A preliminary injunction is appropriate now to preserve BP's ability to seek final equitable relief.

### B.        BP Has No Remedy For Funds That Are Improperly Paid To Claimants.

An injury is irreparable if it cannot be undone through monetary remedies.  *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *see also Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 629 (2nd Cir. 1991).  Even where money damages are available in theory, if they cannot be recovered as a practical matter, then harm is irreparable.  *See Janvey*, 647 F.3d at 599 (rejecting argument that "difficulty securing economic damages is insufficient to demonstrate irreparable harm").

BP has no adequate monetary remedies.  Seeking to recover damages from the Settlement Program is futile.  It has no money of its own and is funded entirely by BP.  *See* Agreement § 5.  The Claims Administrator would not have the funds to satisfy a judgment, and is able to seek indemnity from BPXP.  *See* Undertaking of Patrick Juneau (Ex. 23) ¶ 4.  Nor can BP feasibly sue the claimants who will receive payment for fictitious losses.  Even if BP could recover from Class Members, the need to file such a large number of actions itself demonstrates irreparable harm.  *See Janvey*, 647 F.3d at 600 (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934)); *Dixon*, 835 F.2d at 561 (citing *Lynch Corp. v. Omaha Nat'l Bank*, 666 F.2d 1208, 1212 (8th Cir. 1981)).

### C.        A Preliminary Injunction Is Necessary To Prevent Assets From Dissipating.

"[A]n injunction may issue to protect assets that are the subject of the dispute." *Fredeman*, 843 F.2d at 827; *Strouse Greenberg*, 442 F. Supp. 2d at 320.  "[C]ase law provides several examples of courts properly freezing assets prior to a final determination on the merits." *Dixon*, 835 F.2d at 561.  If assets would be dissipated if paid to others, a preliminary injunction

is appropriate to preserve those assets.  *See Janvey*, 647 F.3d at 601.[13]

BP seeks to retain the assets in dispute that the Settlement Program would otherwise improperly pay out for fictitious losses.  Paying out those assets to Class Members will dissipate them, leaving BP with no meaningful ability to recover them.  Irreparable harm exists in such circumstances because, if plaintiffs "had to chase assets disbursed to these people, the plaintiffs might never recover."  *Dixon*, 835 F.2d at 561 (summarizing *Lynch*, 666 F.2d 1208).  BP need not prove that Class Members who receive invalid rewards will spend them; such spending may be presumed.  *See Janvey*, 647 F.3d at 600-01; *Dixon*, 835 F.2d at 561.

## III.  THE THREATENED PERMANENT INJURY TO BP OUTWEIGHS ANY TEMPORARY ALLEGED HARM TO BEL CLAIMANTS.

The failure to identify monthly revenues, to subtract from those revenues their corresponding variable expenses, and to use comparable months is widespread across BEL claims.  To prevent irreparable harm, BP is seeking an injunction against all BEL awards based on the BEL Policy Decisions.  In the alternative, BP seeks to enjoin all BEL claims in industries where these problems are most prevalent, namely, agriculture, construction, professional services, real estate, manufacturing, wholesale trade, and retail trade.  *See* Sider Supp. Decl. (Ex. 15) ¶ 16.

Even if BP's requested injunction is granted, the Settlement Program will continue to pay the vast majority of claimants.  In addition to many BEL claimants, claimants seeking recovery for seafood, individual economic loss, property damage, subsistence, vessels of opportunity, and vessel physical damage will continue to have their claims processed and, if appropriate, paid by

---

[13]   *See also FDIC v. Garner*, 125 F.3d 1272 (9th Cir. 1997); *Anthony v. Texaco, Inc.*, 803 F.2d 593, 597 (10th Cir. 1986); *Dixon*, 835 F.2d at 561; *Foltz v. U.S. News & World Report*, 760 F.2d 1300, 1308-09 (D.C. Cir. 1985); *Lynch Corp.*, 666 F.2d at 1212; *Strouse Greenberg*, 442 F. Supp. 2d at 320.

the Settlement Program. *Cf. Janvey*, 647 F.3d at 601 (finding that plaintiff reaching agreements to allow defendants to use "all but certain discrete categories of compensation" supported balance of harms favoring preliminary injunction).[14]

As for claimants affected by the injunction, they will not be harmed because they have no legitimate interest in receiving payments for fictitious, non-existent losses. *See Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 Fed. App'x 184, 188-89 (3d Cir. 2012).[15] *Cf. Dixon*, 835 F.2d at 563 (preliminary injunction was appropriate to preserve right to restitution of unjustified payments to bank officers, "regardless of whether these officers knew that [their] compensation was not justified"); *Deerfield*, 661 F.2d at 338-39. To the extent they might have compensable claims, any alleged injury is temporary and simply a delay in receiving money as contrasted to the injury to BP from denying the motion, which would be permanent. Notably, in many class action settlements, claimants do not receive payment until the settlement is approved by a final, non-appealable order. *See* Rec. Doc. 6418 at 31-32; Rec. Doc. 7110-4 ¶¶ 8-9. Under these circumstances, it is "abundantly clear that the greater burden [injury] would rest upon" BP. *See Placid Oil Co. v. United States Dep't. of Interior*, 491 F. Supp. 895, 907 (N.D. Tex. 1980).[16]

---

[14]  *Cf. Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 264 F. Supp. 2d 990, 996 (W.D. Okla. 2003); *Olson v. Wing*, 281 F. Supp. 2d 476, 489 (E.D.N.Y. 2003); *Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301, 1307-1308 (N.D. Cal. 1998); *Am. Booksellers Ass'n, Inc. v. Webb*, 590 F. Supp. 677, 692 (N.D. Ga. 1984).

[15]  *See also Franklin v. Laughlin*, No. SA-10-CV-1027 XR, 2011 WL 598489, at *27 (W.D. Tex. Jan. 13, 2011) (magistrate's report), *adopted by Franklin v. Laughlin*, No. SA-10-CV-1027 XR, 2011 WL 672328 (W.D. Tex. Feb. 15, 2011); *O'Connor v. Smith*, No. C-10-77, 2010 WL 4366914, at *7 (S.D. Tex. Oct. 28, 2010); *Merchs. Capital Res., Inc. v. W. Gravel, Inc.*, No. 10-CV-01807 (DSD/JJK), 2010 WL 2814325, at *2 (D. Minn. July 16, 2010); *Esperanza Aviation 2007-Sky King, LLC v. City Skies, Inc.*, No. 09 C 5086, 2009 WL 2947228, at *2 (N.D. Ill. Sept. 14, 2009); *Mortg. Elec. Registration Sys., Inc. v. Brosnan*, No. C 09-3600 SBA, 2009 WL 3647125, at *9 (N.D. Cal. Sept. 4, 2009).

[16]  *See also In re Patriot's Point Assocs., Ltd.*, 902 F.2d 1566 (4th Cir. 1990) (table); *N. Border Pipeline Co. v. 64.111 Acres of Land*, 125 F. Supp. 2d 299, 301 (N.D. Ill. 2000).

## IV.    A PRELIMINARY INJUNCTION WILL PROMOTE THE PUBLIC INTEREST.

The public interest is served by correctly interpreting and applying the Settlement.  There is no public interest in paying claimants for non-existent losses created only by misinterpreting the Agreement's BEL Framework.  *Cf. Dixon*, 835 F.2d at 563; *Deerfield*, 661 F.2d at 338-39.

By contrast, there is a strong public interest in ensuring that funds remain available so that the courts can grant relief if they reject the BEL Policy Decisions and agree with BP on the Agreement's plain meaning.  *See Strouse Greenberg*, 442 F. Supp. 2d at 321 (concluding that "there is a greater public interest in granting injunctive relief to assure that the funds remain available to enforce" a contract than in allowing the funds to be used for other efforts).

Finally, even if the preliminary injunction is issued, BP will continue to pay the many other types of claims, serving the public interest by providing compensation for actual losses to those who were injured by the *Deepwater Horizon* spill.  *Cf. Janvey*, 647 F.3d at 601.

## CONCLUSION

Paying significant and increasing sums of money to thousands of claimants for fictitious losses violates the terms of the Settlement and is absurd.  It simply is not the bargain that the Parties negotiated or this Court approved.  Accordingly, BP seeks a preliminary injunction against the Claims Administrator and Settlement Program to enjoin the BEL Policy Decisions and awards and payments of BEL claims based on the BEL Policy Decisions — or in the alternative against awards and payments to BEL claimants in the agriculture, construction, professional services, real estate, manufacturing, wholesale trade, and retail trade industries — pending conclusion of the claims administration process.

Dated:  March  15, 2013

Respectfully submitted,

   */s/ R. Keith Jarrett*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

**OF COUNSEL:**

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
SNR DENTON US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Christopher Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**APPENDIX A**

**SETTLEMENT AGREEMENT AS REWRITTEN BY THE CLAIMS
ADMINISTRATOR'S POLICY DECISIONS**

---

**Excerpts from Body of Settlement Agreement**

**Section 1.3.1.2:**  Economic ~~Damage~~ <u>Compensation</u> Category. ~~Loss of income, earnings or profits~~ <u>Difference in net cash flow as measured by the construct in Exhibit 4C for</u> … Entities ~~as a result of the DEEPWATER HORIZON INCIDENT~~, subject to certain Exclusions. (Exhibits 16-19)

**Section 38.57:**  Economic ~~Damage~~ <u>Compensation</u> shall mean ~~loss of profits, income and/or earnings~~ <u>difference in net cash flow as measured by the construct in Exhibit 4C</u> arising in the Gulf Coast Areas or Specified Gulf Waters ~~allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident~~; …

**Section 38.61:**  Economic ~~Damage~~ Compensation Amount shall mean the compensation amount calculated for an Economic ~~Damage~~ <u>Compensation</u> Claimant pursuant to the <u>rewritten</u> terms of the Agreement and the Economic ~~Damage~~ Claim Frameworks, as applicable.

**Excerpts from Exhibit 4B**

[Delete the word "~~revenue~~" from the numerous places where it appears and replace with "<u>receipts</u>."]

**Excerpts from Exhibit 4C**

The compensation framework for business claimants compares the actual ~~profit~~ <u>net cash flow</u> of a business during a defined post-spill period in 2010 to the ~~profit~~ <u>net cash flow</u> that the claimant might have expected to ~~earn~~ <u>generate</u> ~~in the comparable post-spill period~~ <u>in the same months</u> of 2010.  The calculation is divided into two steps:

> **Step 1** – Compensates claimants for any reduction in ~~profit~~ <u>net cash flow</u> between the 2010 Compensation Period selected by the claimant and the <u>same</u> ~~comparable~~ months of the Benchmark Period.  Step 1 compensation reflects the reduction in ~~Variable Profit~~ <u>Net Cash Flow</u> (which reflects the claimant's ~~revenue~~ <u>receipts</u> less its variable ~~costs~~ <u>expenditures</u>) over this period.

> \*        \*        \*

~~**Variable Profit**~~ **<u>Net Cash Flow</u>**:  This is calculated for both the Benchmark Period and the Compensation Period as follows:

> 1.  Sum the monthly ~~revenue~~ <u>receipts</u> over the period.

A-1

2.  Subtract the ~~corresponding~~ variable ~~expenses~~ <u>expenditures</u> ~~from revenue~~ over the same time period.  …

             *          *          *

## I.    Description of Compensation Calculation

### <u>Step 1 Compensation</u>

Step 1 of the compensation calculation is determined as the difference in ~~Variable Profit~~ <u>Net Cash Flow</u> between the 2010 Compensation Period selected by the claimant and the ~~Variable Profit~~ <u>Net Cash Flow</u> over the ~~comparable~~ <u>same</u> months of the Benchmark Period.

<u>The Settlement Program is to determine Net Cash Flow based only on the monthly financial records submitted by the claimant, without making any corrections or adjustments whatsoever to the monthly financial records, or any reconciliations between the monthly financial records and the claimant's annual financial records.  Even where the Settlement Program determines that the monthly financial records presented by a claimant contain recordation errors, mistakes, or are otherwise inaccurate and include incorrect data, the Settlement Program must use such inaccurate, erroneous, and incorrect data in calculating compensation under the Settlement Agreement.</u>

# APPENDIX B

# NON-EXHAUSTIVE EXAMPLES OF CLAIMS AFFECTED BY MISAPPLICATION OF BUSINESS ECONOMIC LOSS FRAMEWORK[*]

## <u>Awards to Construction Industry Claimants</u>



- Claim ▮▮▮▮:  Claimant is a Zone D housing construction company ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $10.1 million in pre-RTP lost profit ($12.7 million post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 103% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone D highway, street and bridge construction company ▮ ▮▮▮▮▮▮▮▮▮▮▮ (almost 200 miles from the Gulf).  The Settlement Program awarded Claimant $7.7 million in pre-RTP lost profit ($9.7 million post-RTP) notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark years (2007-2009) average variable profit by 21%.

- Claim ▮▮▮▮:  Claimant is a Zone D general contractor ▮▮▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant more than $3.8 million in pre-RTP lost profit ($4.8 million post-RTP) notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 20%.

- Claim ▮▮▮▮: Claimant is a Zone C commercial building construction company located ▮▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $1.7 million pre-RTP lost profit ($2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its benchmark years (2008-2009) average variable profit by 7%.

- Claim ▮▮▮▮:  Claimant is a Zone D glass and glazing contractor ▮▮▮▮▮▮▮ ▮▮▮▮▮.  The Settlement Program awarded Claimant more than $1.6 million in pre-RTP lost profit (more than $2 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

---

[*] Unless otherwise noted, the comparison made in these examples compares the claimant's May-December (post-Spill period) 2010 variable profit to its average May-December variable profit in the benchmark year or years.  Where data and percentages are based on annual performance, rather than performance in just the May-December period, the description notes that the information is based on annual performance.  Further, for any comparison of claimant's variable profit to prior years described in this Appendix, the reported years are the benchmark period even if not specifically indicated.  Finally, where noted, the post-RTP award amount is Claimant's final award amount, post-RTP, plus claimant accounting support, less prior Spill-related payments.

- Claim ███████: Claimant is a Zone D construction company ██████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $1 million in pre-RTP lost profit ($1.4 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 7%.

- Claim ████████: Claimant is a Zone D commercial building construction company █ ████████████ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $952,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual Benchmark variable profit by 45%.

- Claim ███████: Claimant is a Zone D housing construction company ███████████ ████████. The Settlement Program awarded Claimant $942,000 in pre-RTP lost profit ($1.2 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 155% over actual variable profit in the Benchmark Period.

- Claim ███████: Claimant is a Zone D residential remodeling company ██████████ ████████████ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $939,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 61%.

- Claim ████████: Claimant is a Zone D housing construction company ██████████████ ████████. The Settlement Program awarded Claimant $863,000 in pre-RTP lost profit (more than $1 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 103% over actual variable profit in the Benchmark Period.

- Claim ███████: Claimant is a Zone D housing construction company ██████████████ ████████ (more than 150 miles from Gulf Coast). The Settlement Program awarded Claimant $775,000 in pre-RTP lost profit ($972,000 post-RTP). This award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 48%.

- Claim ███████: Claimant is a Zone D housing construction company ██████████████ ████████████ (more than 138 miles from the Gulf). The Settlement Program awarded Claimant $740,000 in pre-RTP lost profit ($927,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 162% over actual variable profit in the Benchmark Period.

- Claim ███████: Claimant is a Zone D plumbing, heating and air-conditioning contractor █ ██████████████. The Settlement Program awarded Claimant $711,000 in pre-RTP lost profit (more than $899,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 70% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone D single-family housing construction company located ▮▮▮▮▮▮▮▮▮▮ (almost 100 miles from the Gulf). The Settlement Program awarded Claimant $680,000 in pre-RTP lost profit ($850,000 in post-RTP). This award implies that, in the absence of the Spill, Claimant could have expected its 2010 annual variable profit to increase by 625% over actual annual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone D drywall and insulation contractor ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $666,000 in pre-RTP lost profit (more than $837,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 50% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone C electrical contractor ▮▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $616,000 in pre-RTP lost profit ($769,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 7%.

- Claim ▮▮▮▮: Claimant is a Zone B residential construction company ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $567,000 in pre-RTP lost profit ($1.28 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ▮▮▮▮: Claimant is a Zone C housing construction company ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $502,000 in pre-RTP lost variable profit ($635,000 post-RTP) notwithstanding its 2010 variable profit exceeded its 2007-2009 average variable profit.

- Claim ▮▮▮▮: Claimant is a Zone D landscaping company ▮▮▮▮▮▮▮▮▮▮ (more than 200 miles from the Spill). The Settlement Program awarded Claimant $478,000 in pre-RTP lost profit ($599,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 50% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone C building materials dealer ▮▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $462,000 in pre-RTP lost profit ($584,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ▮▮▮▮: Claimant is a Zone D housing construction company ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $439,000 in pre-RTP lost profit (more than $549,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 101% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D asbestos remediation contractor ███████. The Settlement Program awarded Claimant $392,000 in pre-RTP lost profit ($492,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 9%.

- Claim ███: Claimant is a Zone D single-family housing construction company █ ████████. The Settlement Program awarded Claimant $379,000 in pre-RTP lost-profit ($477,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 136%.

- Claim ███: Claimant is a Zone D single-family housing construction company ████████. The Settlement Program awarded Claimant $345,000 in pre-RTP lost profit ($432,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ███: Claimant is a Zone D site preparation contractor ██████████. The Settlement Program awarded Claimant $337,000 in pre-RTP lost profit ($425,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim ███: Claimant is a Zone B single-family house construction company ████████. The Settlement Program awarded Claimant $329,000 in pre-RTP lost profit ($743,000 in post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 71%.

- Claim ███: Claimant is a Zone D commercial and institutional building construction company ██████████. The Settlement Program awarded Claimant $328,000 in pre-RTP lost profit ($413,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 253%.

- Claim ███: Claimant is a Zone B housing construction company ████████. The Settlement Program awarded Claimant $303,000 in pre-RTP lost profit ($686,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 78% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone C single-family housing construction company █ ████████ The Settlement Program awarded Claimant $294,000 in pre-RTP lost profit ($370,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ███: Claimant is a Zone D residential remodeling construction company ████ ████████ The Settlement Program awarded Claimant $271,000 in pre-RTP lost profit ($340,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

B-4

- Claim  :  Claimant is a Zone C single-family housing construction company ▮ ▮▮▮▮ .  The Settlement Program awarded Claimant $264,000 in pre-RTP lost profit, notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim ▮▮▮ :  Claimant is a Zone D construction material wholesaler ▮▮▮▮▮ ▮▮▮▮ .  The Settlement Program awarded Claimant $240,000 in pre-RTP lost profit ($305,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ▮▮▮ :  Claimant is a Zone D construction company ▮▮▮▮▮▮ (more than 100 miles from the Gulf).  The Settlement Program awarded Claimant $212,000 in pre-RTP lost profit ($269,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 22%.

- Claim ▮▮▮ :  Claimant is a Zone D single-family housing construction company ▮▮▮ ▮▮▮▮▮ .  The Settlement Program awarded Claimant $190,000 in pre-RTP lost profit ($241,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 47%.

- Claim ▮▮▮ :  Claimant is a Zone B single-family housing construction company ▮ ▮▮▮▮ .  The Settlement Program awarded Claimant $165,000 in pre-RTP lost profit ($375,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.  Claimant was unprofitable in the Benchmark years, losing $119,000 in variable profit that year, and became profitable in 2010, earning $384,000 in variable profit.

- Claim ▮▮▮ : Claimant is a Zone C construction company ▮▮▮▮▮▮▮ .  The Settlement Program awarded Claimant $154,000 in pre-RTP lost profit ($194,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 average variable profit by 75%.

- Claim ▮▮▮ :  Claimant is a Zone C electrical contractor ▮▮▮▮▮▮▮ .  The Settlement Program awarded Claimant $135,000 in pre-RTP lost profit ($171,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ▮▮▮ :  Claimant is a Zone D residential remodeler ▮▮▮▮▮▮ (more than 180 miles from the Gulf).  The Settlement Program awarded Claimant $135,000 in pre-RTP lost profit ($171,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 84%.

- Claim ▮▮▮ :  Claimant is a Zone C plumbing contractor ▮▮▮▮▮▮ .  The Settlement Program awarded Claimant $133,000 in pre-RTP lost profit ($107,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 6%.

- Claim :  Claimant is a Zone D housing construction company _____ _____.  The Settlement Program awarded Claimant $127,000 in pre-RTP lost profits ($70,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim _____:  Claimant is a Zone D construction company _____ (more than 150 miles from the Gulf).  The Settlement Program awarded Claimant $126,000 in pre-RTP lost profit ($159,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 190% over actual variable profit in the Benchmark Period.

- Claim _____:  Claimant is a Zone C heating and air-conditioning contractor _____ _____.  The Settlement Program awarded Claimant $122,000 in pre-RTP lost profits ($155,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 7%.

- Claim _____:  Claimant is a Zone D housing construction company _____ _____.  The Settlement Program awarded Claimant $119,000 in pre-RTP lost profits ($150,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 15%.

- Claim _____:  Claimant is a Zone C residential remodeler _____.  The Settlement Program awarded Claimant $117,000 in pre-RTP lost profits ($147,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 13%.

- Claim _____:  Claimant is a Zone D building finishing contractor _____ (more than 150 miles from the Gulf).  The Settlement Program awarded Claimant $114,000 in pre-RTP lost profits ($145,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 12%.

- Claim _____:  Claimant is a Zone C housing construction company _____.  The Settlement Program awarded Claimant $107,000 in pre-RTP lost profits ($134,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 1226%.

- Claim _____:  Claimant is a Zone D construction company _____.  The Settlement Program awarded Claimant $103,000 in pre-RTP lost profit ($131,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 average variable profit by 57%.

- Claim _____:  Claimant is a Zone D construction contractor _____.  The Settlement Program awarded Claimant $83,000 in pre-RTP lost profit (more than $103,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill,

Claimant could have expected its 2010 variable profit to increase by 59% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D drywall and insulation construction contractor ████████████████████ (more than 300 miles from the Gulf). The Settlement Program awarded Claimant $75,000 in pre-RTP lost profit ($94,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 103%.

- Claim ████: Claimant is a Zone D plumbing, heating, and air-conditioning contractor █ ████████ (more than 100 miles from the Gulf). The Settlement Program awarded Claimant $63,286 in pre-RTP lost profit ($79,108 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 710%.

- Claim ████: Claimant is a Zone D housing construction company ████████ ██████. The Settlement Program awarded Claimant $55,000 in pre-RTP lost profit ($70,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 59%.

- Claim ████: Claimant is a Zone D roofing contractor ████████████. The Settlement Program awarded Claimant $52,000 in pre-RTP lost profit ($65,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 128%.

- Claim ████: Claimant is a Zone C safety equipment contractor ████████████. The Settlement Program awarded Claimant $31,000 in pre-RTP lost profit ($40,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 35%.

- Claim ████: Claimant is a Zone D construction company ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $30,000 in pre-RTP lost profit ($39,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 45%.

## Awards to Agricultural Industry Claimants

- Claim ████: Claimant is a Zone B rice mill ████████████. The Settlement Program awarded Claimant $9.4 million in pre-RTP lost profit ($21 million in post-RTP), notwithstanding that Claimant's 2010 annual revenue exceeded its annual revenue in all benchmark years. This award implies that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to exceed its Benchmark variable profit by 59%.

- Claim ████: Claimant is a Zone B alligator farm ████████████. The Settlement Program awarded Claimant $7.4 million in pre-RTP lost profit ($16.6 million

post-RTP). This pre-RTP award assumes that in absence of spill Claimant's annual 2010 variable profit would have more than tripled its variable profit in the Benchmark year.

- Claim : Claimant is a Zone D rice farm ███████████ (nearly 200 miles from the Gulf).  The Settlement Program awarded Claimant $2.4 million in pre-RTP lost profit ($3 million post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 214% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D fish farm ████████████ (more than 300 miles from the Gulf).  The Settlement Program awarded Claimant $1.25 million in pre-RTP lost profit ($1.57 million post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 342% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D peanut farm ████████████.  The Settlement Program awarded Claimant $1,047,000 in pre-RTP lost profit ($1,313,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 12%.

- Claim ████: Claimant is a Zone D crop farmer ████████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $938,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 5%.

- Claim ████: Claimant is a Zone C gator farm ████████████  The Settlement Program awarded Claimant $917,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 average variable profit.  Claimant was unprofitable in the Benchmark years, losing an average of $289,000 in variable profit per year, and became profitable in 2010, earning $1,565,000 in variable profit.

- Claim ████: Claimant is a Zone D fish farm ████████████ (almost 200 miles from the Gulf).  The Settlement Program awarded Claimant $872,000 in pre-RTP lost profit (more than $1 million post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 68% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D catfish farm ████████████ (more than 300 miles from Gulf).  The Settlement Program awarded Claimant $772,000 in pre-RTP lost profit ($968,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its Benchmark (2009) annual variable profit by 5204%.

- Claim ████: Claimant is a Zone D cotton farmer located ████████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $680,000 in pre-RTP lost profit ($857,000 in post-RTP).  This award implies that, in the absence of



the Spill, Claimant could have expected its 2010 variable profit to have increased by 120% over Benchmark variable profit.

- Claim ▆▆▆▆: Claimant is a Zone D farmer ▆▆▆▆▆▆▆▆▆▆▆ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $635,000 in pre-RTP lost profit ($796,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 68% over actual variable profit in the Benchmark Period.

- Claim ▆▆▆▆: Claimant is a Zone D rice farmer ▆▆▆▆▆▆▆▆▆▆ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $555,000 in pre-RTP lost profit ($697,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 102% over actual variable profit in the Benchmark Period.

- Claim ▆▆▆▆: Claimant is a Zone D corn farm ▆▆▆▆▆▆▆▆▆▆ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $497,000 in pre-RTP lost profit ($624,000 post-RTP), notwithstanding that its 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 55%.

- Claim ▆▆▆▆: Claimant is a Zone D soybean farmer ▆▆▆▆▆▆▆▆▆▆ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $447,000 in pre-RTP lost profit ($561,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 16%.

- Claim ▆▆▆▆: Claimant is a Zone D cotton, corn, soybean and wheat farm ▆▆▆▆▆ ▆▆▆▆▆ (more than 300 miles from Gulf Coast). The Settlement Program awarded claimant $441,000 in pre-RTP lost profit ($553,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 42%.

- Claim ▆▆▆▆: Claimant is a Zone D soybean farm ▆▆▆▆▆▆▆▆▆▆▆ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $413,000 in pre-RTP lost profit ($518,000 in post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable in the Benchmark years by 44%.

- Claim ▆▆▆▆: Claimant is a Zone D cotton farmer ▆▆▆▆▆▆▆▆▆ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $411,000 in pre-RTP lost profit ($515,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 108% over actual variable profit in the Benchmark Period.

- Claim ▆▆▆▆: Claimant is a Zone D corn farmer ▆▆▆▆▆▆▆▆▆ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $396,000 in pre-RTP lost profit ($499,000 post-RTP). This pre-RTP award assumes that, in the absence of the

Spill, Claimant could have expected its 2010 variable profit to increase by 62% over actual variable profit in the Benchmark Period.

- Claim : Claimant is a Zone D oilseed and grain farm            (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $383,000 in pre-RTP lost profit ($480,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark Period (2009) variable profit by 191%.

- Claim ▮▮▮▮: Claimant is a Zone D oilseed and grain farm ▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $370,000 in pre-RTP lost profit ($462,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 822%.

- Claim ▮▮▮▮: Claimant is a Zone D farm supplies wholesaler ▮▮▮▮▮▮▮▮ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $361,000 in pre-RTP lost profit ($451,00 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 12%.

- Claim ▮▮▮▮: Claimant is a Zone D cotton farm ▮▮▮▮▮▮▮▮ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $348,000 in pre-RTP lost profit ($435,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit. Claimant was unprofitable in 2009, losing $408,000 in variable profit, and became profitable in 2010, earning $1,347,000 in variable profit.

- Claim ▮▮▮▮: Claimant is a Zone D timber harvesting business ▮▮▮▮▮▮▮▮ (more than 100 miles from the Gulf). The Settlement Program awarded Claimant $318,000 in pre-RTP lost profit ($397,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 82%.

- Claim ▮▮▮▮: Claimant is a Zone B gator farmer ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $311,000 in pre-RTP lost profit ($699,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 18%.

- Claim ▮▮▮▮: Claimant is a Zone D soybean farmer ▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $284,000 in pre-RTP lost profit ($356,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 27%.

- Claim ▮▮▮▮: Claimant is a Zone D oilseed and grain farm ▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $268,000 in pre-RTP lost profit ($337,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 67%.

- Claim ▮▮▮▮:  Claimant is a Zone D oilseed and grain farm ▮▮▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $262,000 in pre-RTP lost profit ($330,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 20%.

- Claim ▮▮▮▮: Claimant is a Zone D soybean farm ▮▮▮▮▮▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $219,000 in pre-RTP lost profit ($275,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 21%.

- Claim ▮▮▮▮:  Claimant is a Zone D cotton farmer ▮▮▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $195,000 in pre-RTP lost profit ($245,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 81%.

- Claim ▮▮▮▮: Claimant is a Zone D oilseed and grain farm ▮▮▮▮▮▮▮▮▮▮i (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $184,000 in pre-RTP lost profit ($234,000 post-RTP).  Claimant was unprofitable in the Benchmark Period, losing an average of $44,000 in variable profit per year.  This award assumes that, in the absence of the Spill, Claimant could have expected to reverse this trend and earn $72,000 in variable profit in 2010.

- Claim ▮▮▮▮:  Claimant is a Zone D farmer ▮▮▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($180,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 131% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone D cotton farmer located ▮▮▮▮▮▮▮▮▮▮ (more than 300 miles from the Gulf).  The Settlement Program awarded Claimant $137,000 in pre-RTP lost profit ($174,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ▮▮▮▮:  Claimant is a Zone D agricultural business ▮▮▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $123,000 in pre-RTP lost profit ($155,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ▮▮▮▮:  Claimant is a Zone D oilseed and grain farmer ▮▮▮▮▮▮▮▮▮▮ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $115,000 in pre-RTP lost profits ($146,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 55%.

- Claim ▮▮▮▮:  Claimant is a Zone D agricultural company engaged in postharvest crop activities ▮▮▮▮▮▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $110,000 in pre-RTP lost profits ($138,000 post-

RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 9%.

- Claim ████: Claimant is a Zone D cotton farm ████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $106,000 in pre-RTP lost profit ($134,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit. Claimant was unprofitable in 2009, losing $265,000 in variable profit, and became profitable in 2010, earning $131,000 in variable profit.

- Claim ████: Claimant is a Zone D soil preparation and cultivation company ██ ████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $95,158 in pre-RTP lost profit ($119,383 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 99%.

**Awards to Professional Services Industry Claimants**

- Claim ████: Claimant is a Zone C law office located ████████████. The Settlement Program awarded Claimant $2.7 million in pre-RTP lost profit ($3.3 million in post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark period by 10%. Claimant represents claimants in at least 43 claims brought under the Settlement Agreement.

- Claim ████: Claimant is a Zone B law office ████████████. The Settlement Program awarded Claimant $1.6 million in pre-RTP lost profit ($3.6 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit. Claimant represents claimants in at least 47 claims brought under the Settlement Agreement.

- Claim ████: Claimant is a Zone C engineering services business ████████████. The Settlement Program awarded Claimant $1.3 million in pre-RTP lost profit, notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) average variable profit.

- Claim ████: Claimant is a Zone D law office ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $1.25 million in pre-RTP lost profit ($1.57 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 9%.

- Claim ████: Claimant is a Zone D architectural services firm ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $802,000 in pre-RTP lost profit (more than $1 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 64% over actual variable profit in the Benchmark Period.

- Claim : Claimant is a Zone C law firm ████████████. The Settlement Program awarded Claimant $699,000 in pre-RTP lost profit ($875,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 14%.

- Claim ████: Claimant is a Zone B law office ████████████████. The Settlement Program awarded Claimant $656,000 in pre-RTP lost profit ($1.48 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ████: Claimant is a Zone C law office ████████████████. The Settlement Program awarded Claimant $641,000 in pre-RTP lost profit ($808,000 post-RTP), notwithstanding that Claimant's annual variable profit in 2010 exceeded its annual variable profit in the Benchmark years by 14%.

- Claim ████: Claimant is a Zone B dental office ████████████████. The Settlement Program awarded Claimant $504,000 in pre-RTP lost profit ($1.14 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period.

- Claim ████: Claimant is a Zone C health care office ████████████████. The Settlement Program awarded Claimant $458,000 in pre-RTP lost profit ($572,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 6%.

- Claim ████: Claimant is a Zone C architectural firm ████████████████. The Settlement Program awarded Claimant $436,000 in pre-RTP lost profit ($554,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period by 7%.

- Claim ████: Claimant is a Zone C law office ████████████████. The Settlement Program awarded Claimant $403,000 in pre-RTP lost profit ($505,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ████:  Claimant is a Zone D landscape and architectural services firm ████████████ ████. The Settlement Program awarded Claimant $358,000 in pre-RTP lost profit ($450,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 9%.

- Claim ████: Claimant is a Zone B law office ████████████████. The Settlement Program awarded Claimant $328,000 in pre-RTP lost profit ($739,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 14%.

- Claim ▬▬: Claimant is a Zone D law office ▬▬▬▬▬▬. The Settlement Program awarded Claimant $296,000 in pre-RTP lost profit ($376,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 84%. Claimant represents claimants in at least 57 claims brought under the Settlement Agreement.

- Claim ▬▬: Claimant is a Zone B law office ▬▬▬▬▬▬. The Settlement Program awarded Claimant $293,000 in pre-RTP lost profit ($659,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 46%.

- Claim ▬▬: Claimant is a Zone C scientific and technical professional services firm ▬▬▬▬▬▬. The Settlement Program awarded Claimant $290,000 pre-RTP lost profit ($365,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 17%.

- Claim ▬▬: Claimant is a Zone B law firm ▬▬▬▬▬▬. The Settlement Program awarded Claimant $277,000 in pre-RTP lost profit ($623,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 18%.

- Claim ▬▬: Claimant is a Zone D event planning company ▬▬▬▬▬▬. The Settlement Program awarded Claimant $273,000 in pre-RTP lost profit (more than $619,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 156% over actual variable profit in the Benchmark Period.

- Claim ▬▬: Claimant is a Zone D architectural services firm ▬▬▬▬▬▬. The Settlement Program awarded Claimant $241,000 in pre-RTP lost profit ($305,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 55%.

- Claim ▬▬: Claimant is a Zone D advertising agency ▬▬▬▬▬▬. The Settlement Program awarded Claimant $216,000 in pre-RTP lost profit ($269,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 7%.

- Claim ▬▬: Claimant is a Zone C law office ▬▬▬▬▬▬. The Settlement Program awarded Claimant $200,000 in pre-RTP lost profit ($251,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 176%. Claimant represents claimants in at least 33 claims brought under the Settlement Agreement.

- Claim ▬▬: Claimant is a Zone D law firm ▬▬▬▬▬▬. The Settlement Program awarded Claimant $193,000 in pre-RTP lost profit ($245,000 post-RTP),

notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 6%.

- Claim ▮▮▮: Claimant is a Zone C law firm ▮▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $177,000 in pre-RTP lost profit ($222,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 8%.

- Claim ▮▮▮: Claimant is a Zone C law firm ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $174,000 in pre-RTP lost profit ($220,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 48%.

- Claim ▮▮▮: Claimant is a Zone D real estate company ▮▮▮▮▮▮▮▮ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $149,000 in pre-RTP lost profit ($189,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 59%.

- Claim ▮▮▮: Claimant is a Zone D real estate agency ▮▮▮▮▮▮▮▮ (more than 275 miles from the Gulf. The Settlement Program awarded Claimant $148,000 in pre-RTP lost profit ($188,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 17%.

- Claim ▮▮▮: Claimant is a Zone B law office ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $141,000 in pre-RTP lost profit ($319,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 19%.

- Claim ▮▮▮: Claimant is a Zone B architectural services company ▮▮▮▮▮▮▮ ▮▮▮. The Settlement Program awarded Claimant $140,000 in pre-RTP lost profit ($317,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 32%.

- Claim ▮▮▮: Claimant is a Zone D real estate office ▮▮▮▮▮▮▮▮ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $132,000 in pre-RTP lost profits ($167,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 16%.

- Claim ▮▮▮: Claimant is a Zone C physician's office ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $128,000 in pre-RTP lost profit ($162,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 8%.

- Claim ▮▮▮: Claimant is a Zone C physicians' office ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $128,000 in pre-RTP lost profits ($162,000 post-RTP),

notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 12%.

- Claim ████: Claimant is a Zone C physicians' office ████████████. The Settlement Program awarded Claimant $125,000 in pre-RTP lost profits ($159,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 24%.

- Claim ████: Claimant is a Zone B physicians' office ████████████. The Settlement Program awarded Claimant $125,000 in pre-RTP lost profits ($282,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 219%.

- Claim ████: Claimant is a Zone C physicians' office ████████████. The Settlement Program awarded Claimant $118,000 in pre-RTP lost profit ($149,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████: Claimant is a Zone C real estate agency ████████████. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profit ($67,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 19%.

- Claim ████: Claimant is a Zone D law firm ████████████. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profits ($148,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 13%.

- Claim ████: Claimant is a Zone D real estate office ████████████. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profits ($147,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 23%.

- Claim ████: Claimant is a Zone B real estate office ████████████. The Settlement Program awarded Claimant $115,000 in pre-RTP lost profits ($262,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 10%.

- Claim: ████: Claimant is a Zone C architectural services company ████████████ ████. The Settlement Program awarded Claimant $109,000 in pre-RTP lost profits ($138,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 10%.

- Claim ████: Claimant is a Zone C real estate agency ████████████. The Settlement Program awarded Claimant $107,000 in pre-RTP lost profit ($135,000 post-

RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 13%.

- Claim ███: Claimant is a Zone C physician's office ████████████. The Settlement Program awarded Claimant $98,000 in pre-RTP lost profit ($124,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 13%.

- Claim ███: Claimant is a Zone C architect ████████████. The Settlement Program awarded Claimant $74,000 in pre-RTP lost profit ($92,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 34%.

- Claim ███:  Claimant is a Zone D tourism guide provider ████████████ (more than 120 miles from the Gulf).  The Settlement Program awarded Claimant $62,000 in pre-RTP lost profit ($140,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 54%.

- Claim ███: Claimant is a Zone C physician ████████████. The Settlement Program awarded Claimant $50,000 in pre-RTP lost profit ($63,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 24%.

- Claim ███:  Claimant is a Zone D computer programming company ████████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $50,000 in pre-RTP lost profit ($63,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 62% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone C environmental consulting business ████████████ ████████████  The Settlement Program awarded Claimant $44,000 in pre-RTP lost profit ($56,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 4%.

- Claim ███: Claimant is a Zone C real estate agent ████████████. The Settlement Program awarded Claimant $40,000 in pre-RTP lost profit ($50,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit.

- Claim ███: Claimant is a Zone C technology consultant ████████████. The Settlement Program awarded Claimant $30,000 in pre-RTP lost profit ($38,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 92%.

**Awards to Claimants in Other Industries**

- Claim ▮▮▮▮:  Claimant is a Zone D manufacturer ▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $3.3 million in pre-RTP lost profit ($4.2 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 66% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone C Digital Printing Business ▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $2.9 million in pre-RTP lost profit ($3.7 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 14%.

- Claim ▮▮▮▮:  Claimant is a Zone D steel manufacturer ▮▮▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $1.96 million in pre-RTP lost profit ($2.46 million post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 59% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮: Claimant is a Zone D used car dealer ▮▮▮▮▮▮▮ (almost 100 miles from the Gulf).  The Settlement Program awarded Claimant $1.14 million in pre-RTP lost profit ($1.45 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period by 28%.

- Claim ▮▮▮▮: Claimant is a Zone D electrical equipment supplier ▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $829,000 in pre-RTP lost profit ($1 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit.  Claimant was unprofitable in 2009, losing $29,000, and became profitable in 2010, earning $133,000 in variable profit.

- Claim ▮▮▮▮:  Claimant is a Zone C business ▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $759,000 in pre-RTP lost profit ($2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit.

- Claim ▮▮▮▮:  Claimant is a Zone B meat wholesaler ▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $634,000 in pre-RTP lost profit ($1.4 million post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 56% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮:  Claimant is a Zone D plastics manufacturer ▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $634,000 in pre-RTP lost profit (more than $805,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 231% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮:  Claimant is a Zone D manufacturer ▮▮▮▮▮▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $516,000 in pre-RTP lost profit ($656,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 65% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone D apparel accessories manufacturer ▮▮▮▮▮▮ ▮▮▮▮.  The Settlement Program awarded Claimant $497,000 in pre-RTP lost profit, notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 6%.

- Claim ▮▮▮▮: Claimant is a Zone B retail business ▮▮▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $496,000 in pre-RTP lost profit ($1.5 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit.

- Claim ▮▮▮▮: Claimant is a Zone B building materials dealer ▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $468,000 in pre-RTP lost profit ($1.05 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ▮▮▮▮: Claimant is a Zone C car dealership ▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $441,000 in pre-RTP lost profit ($552,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 13%.

- Claim ▮▮▮▮: Claimant is a Zone D heating and air-conditioning business ▮▮▮▮▮▮ ▮▮▮▮.  The Settlement Program awarded Claimant $415,000 in pre-RTP lost profit ($528,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 27%.

- Claim ▮▮▮▮: Claimant is a Zone D caterer ▮▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $411,000 in pre-RTP lost profit ($1.3 million post-RTP), notwithstanding that its 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 16%.

- Claim ▮▮▮▮: Claimant is a Zone D plumbing and heating equipment supply company ▮ ▮▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $410,000 in pre-RTP lost profit ($513,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 15%.

- Claim ▮▮▮▮: Claimant is a Zone D motor vehicle body manufacturing firm ▮ ▮▮▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $408,000 in pre-RTP lost profit ($518,000 post-RTP), notwithstanding

that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ██████: Claimant is a Zone D mobile home dealer i██████████████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $370,000 in pre-RTP lost variable profit ($464,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 339%.

- Claim ██████: Claimant is a Zone C construction and mining machinery company ██ ██████████████.  The Settlement Program awarded Claimant $307,000 in pre-RTP lost profit ($390,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 97%.

- Claim ██████: Claimant is a Zone C boat dealer ██████████████.  The Settlement Program awarded Claimant $260,000 in pre-RTP lost profit ($331,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 5%.

- Claim ██████:  Claimant is a Zone D metal manufacturer ██████████████.  The Settlement Program awarded Claimant $256,000 in pre-RTP lost profit (more than $325,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 21%.

- Claim ██████:  Claimant is a Zone D metals manufacturer ██████████████.  The Settlement Program awarded Claimant $249,000 in pre-RTP lost profit ($313,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 116% over actual variable profit in the Benchmark Period.

- Claim ██████: Claimant is a Zone D air-conditioning and heating equipment manufacturer ██████████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $240,000 in pre-RTP lost profit ($300,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit. Claimant was unprofitable in 2009, losing $68,000 in variable profit, and became profitable in 2010, earning $129,000 in variable profit.

- Claim ██████: Claimant is a Zone B durable goods merchant ██████████████.  The Settlement Program awarded Claimant $234,000 in pre-RTP lost profit ($530,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 9%.

- Claim ██████: Claimant is a Zone D amusement park ██████████████.  The Settlement Program awarded Claimant $227,000 in pre-RTP lost profit ($511,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 25%.

- Claim :  Claimant is a Zone D fabricated metal company (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $217,000 in pre-RTP lost profit ($275,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim :  Claimant is a Zone C wholesale trade agent .  The Settlement Program awarded Claimant $205,000 in pre-RTP lost profit ($595,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 37%.

- Claim :  Claimant is a Zone D swimming pool equipment retailer (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $204,000 in pre-RTP lost profit ($259,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 4%.

- Claim :  Claimant is a Zone D electrical apparatus and equipment company .  The Settlement Program awarded Claimant $202,000 in pre-RTP lost profit ($257,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 8%.

- Claim :  Claimant is a Zone B gas station chain .  The Settlement Program awarded Claimant $198,000 in pre-RTP lost profit (more than $594,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 93% over actual variable profit in the Benchmark Period.

- Claim :  Claimant is a Zone C sporting goods store .  The Settlement Program awarded Claimant $185,000 in pre-RTP lost profit ($522,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 17%.

- Claim :  Claimant is a Zone D stone product manufacturer .  The Settlement Program awarded Claimant $183,000 in pre-RTP lost profit ($229,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 30%.

- Claim :  Claimant is a Zone C dealer of building materials .  The Settlement Program awarded Claimant $182,000 in pre-RTP lost profit ($230,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 129% over actual variable profit in the Benchmark Period.

- Claim :  Claimant is a Zone D gas station .  The Settlement Program awarded Claimant $182,000 in pre-RTP lost profit ($411,000 post-RTP),

notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 16%.

- Claim ████: Claimant is a Zone C building materials dealer ████████████. The Settlement Program awarded Claimant $175,000 in pre-RTP lost profit ($221,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 16%.

- Claim ████: Claimant is a Zone B wholesaler ████████████. The Settlement Program awarded Claimant $171,000 in pre-RTP lost profit ($389,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 60% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone C gas station chain ████████████. The Settlement Program awarded Claimant $162,000 in pre-RTP lost profit ($459,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 86% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D beauty salon ████████████ (more than 210 miles from the Gulf). The Settlement Program awarded Claimant $145,000 in pre-RTP lost profit ($184,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████: Claimant is a Zone D car dealer ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($181,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 41%.

- Claim ████: Claimant is a Zone C medical software company ████████████. The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($181,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 16%.

- Claim ████: Claimant is a Zone D motor vehicle dealer ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $140,000 in pre-RTP lost profit ($178,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 35%.

- Claim ████: Claimant is a Zone D sporting goods store ████████████ (more than 120 miles from the Gulf). The Settlement Program awarded Claimant $130,000 in pre-RTP lost profit ($294,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit.

B-22

- Claim ████: Claimant is a Zone D sheet metal manufacturer ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $126,000 in pre-RTP lost profit ($160,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 11%.

- Claim ████: Claimant is a Zone D commercial equipment wholesaler ████████ ████████ (more than 100 miles from the Gulf). The Settlement Program awarded Claimant $125,000 in pre-RTP lost profit ($159,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 23%.

- Claim ████: Claimant is a Zone B commercial leasing company ████████████. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profit ($267,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 23%.

- Claim ████: Claimant is a Zone D sporting goods store ████████████. The Settlement Program awarded Claimant $114,000 in pre-RTP lost profits ($257,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 48%.

- Claim ████: Claimant is a Zone C specialized freight trucking company ████████ ████. The Settlement Program awarded Claimant $108,000 in pre-RTP lost profits ($137,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 14%.

- Claim ████: Claimant is a Zone B snack and nonalcoholic beverage bar ████ ████████. The Settlement Program awarded Claimant $102,000 in pre-RTP lost profits ($281,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 298%.

- Claim ████: Claimant is a Zone D general freight trucking company ████████ ████. The Settlement Program awarded Claimant $100,000 in pre-RTP lost-profits ($127,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 16%.

- Claim ████: Claimant is a Zone C manufacturer ████████████. The Settlement Program awarded Claimant $85,000 in pre-RTP lost profit ($108,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 58% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone C electrical equipment supplier ████████████. The Settlement Program awarded Claimant $80,000 in pre-RTP lost profit ($101,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its Benchmark (2009) variable profit by 8%.

B-23

- Claim ____: Claimant is a Zone D security service provider _____. The Settlement Program awarded Claimant $76,000 in pre-RTP lost profit ($95,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit.

- Claim ____:  Claimant is a Zone D gas station chain _____.  The Settlement Program awarded Claimant $73,000 in pre-RTP lost profit ($123,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 134% over actual variable profit in the Benchmark Period.

- Claim ____: Claimant is a Zone D prosthetics manufacturer _____. The Settlement Program awarded Claimant $60,000 in pre-RTP lost profit ($76,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ____: Claimant is a Zone C real estate appraiser _____.  The Settlement Program awarded Claimant $57,000 in pre-RTP lost profit ($72,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 5%.

- Claim ____: Claimant is a Zone D gas station _____ (more than 130 miles from the Gulf).  The Settlement Program awarded Claimant $53,000 in pre-RTP lost profit ($119,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 12%.

- Claim ____: Claimant is a Zone D stone products manufacturer _____  The Settlement Program awarded Claimant $53,000 in pre-RTP lost profit ($67,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 15%.

- Claim ____: Claimant is a Zone C new car dealer _____.  The Settlement Program awarded Claimant $48,000 in pre-RTP lost profit ($60,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 9%.

- Claim ____: Claimant is a Zone C limousine service _____.  The Settlement Program awarded Claimant $46,000 in pre-RTP lost profit ($138,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit.  Claimant was unprofitable in 2008-2009, losing $14,000 in variable profit, and became profitable in 2010, earning $6,000 in variable profit.

- Claim ____:  Claimant is a Zone C restaurant _____.  The Settlement Program awarded Claimant $40,000 in pre-RTP lost profit ($119,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected

its 2010 variable profit to increase by 1,368% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone C trucking company ██████████████. The Settlement Program awarded Claimant $32,000 in pre-RTP lost profit ($41,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 113% over actual variable profit in the Benchmark Period.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on March 15, 2013, a copy of the above and foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system.

<u>/s/ R. Keith Jarrett</u>
R. Keith Jarrett