# Exhibit 05

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## DECLARATION OF HENRY H. FISHKIND, Ph.D.

I, Henry H. Fishkind, submit this declaration in support of the BP Defendants' interpretation of the Business Economic Loss framework of the Economic and Property Damages Settlement Agreement with respect to the meaning of "revenue" and proper calculation of "Variable Profit."  This declaration is based upon my own personal experience, expertise, and analysis, except where otherwise indicated; and if called to testify I could testify to the opinions, conclusions, and analysis I set forth in this declaration.  The opinions, statements, and conclusions expressed in this declaration are my own.

## INTRODUCTION

1. I am an economist with over 30 years of experience in economic analysis and forecasting who has regularly monitored economic conditions in and reviewed economic data related to the entire Gulf Coast region.  I submitted a declaration on August 13, 2012 attached as Exhibit 5 in support of final approval of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement (the "Settlement")

("August Declaration"). (Rec. Doc. 7114-5) I also submitted a declaration on October 22, 2012 addressing various objections to the Settlement ("October Declaration"). (Rec. Doc. 7731-2).

2. I began my career as an economist and associate professor at the University of Florida from 1975 to 1983. In 1987, I formed Fishkind & Associates, an economic and financial consulting firm. We provide regular economic forecasts for all 67 Florida counties, and we manage three large-scale, master planned Florida communities, including the 8,000 acre Tradition project in Port St. Lucie. My firm provides economic advice to local governments, redevelopment agencies, real estate developers and Visitor & Convention Bureaus located in the Gulf Coast. My professional qualifications as an economist and my additional relevant experience are more fully set forth in the August Declaration I submitted. (Rec. Doc. 7114-5 at Pars. 1-21 and Ex. A) A copy of my resume is attached as Exhibit A.

3. In this declaration, I address the Claims Administrator's January 15, 2013 policy decision regarding implementation of the Business Economic Loss ("BEL") framework, the Court's Review of Issue from Panel (Matching of Revenue and Expenses) dated March 5, 2013, and submissions by BP and Class Counsel regarding the Claims Administrator's policy decision. As discussed below, the Claims Administrator has adopted a policy, now affirmed by the Court, which fails to accurately measure the monthly revenue and variable profits of BEL claimants.

4. In connection with preparing this declaration, I have reviewed and considered the documents listed in Exhibit B.

## THE BUSINESS ECONOMIC LOSS FRAMEWORK IS BASED ON ECONOMIC PRINCIPLES CONSISTENT WITH STANDARD PRACTICES FOR MEASURING LOST PROFITS

5. The overarching purpose of the Settlement is to compensate Claimants for their actual economic losses and property damage suffered because of the Deepwater Horizon spill (Rec. Doc. 6430-1: Settlement Agreement paragraphs 1.3.1.2, 38.57). In Exhibit 4C of the Settlement, which describes the compensation framework for business economic loss claims, the parties agreed that "The compensation framework for business claimants compares the actual profit of a business during the defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010." (Settlement Agreement Ex. 4C, page 1)

6. Therefore, it is crystal clear that the compensation framework for BEL claims compares a firm's actual economic performance in the post-spill period to what it might have been expected to earn based on its actual economic performance in the pre-spill period. The name of this Settlement framework itself reflects this: it is the framework for "Business Economic Loss" claims.

7. As Judge Barbier noted in his Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement, "With respect to the general Business Economic Loss (Exhibits 4A-4E of the Settlement Agreement), that framework is derived from recognized and accepted methodologies applied in evaluation of business economic loss claims." (Document 8138, page 10). Indeed, I too explained in my declaration in support of final approval of the Settlement that the BEL framework "applies standard economic principles of damage analysis in establishing compensation" for businesses and is consistent with "well-established models for

establishing economic loss damages" to by comparing profits on a "before and after" basis. (August Declaration, Rec. Doc. 7114-5, Pars. 66, 68) These methods, widely used in both the economics and accounting professions and widely accepted by courts, are economic measures of profits.

8. Because the BEL framework focuses on economic performance measured by changes in variable profit, accounting practices are relevant insofar as they affect the accuracy and quality of the data used to perform the variable profit calculations. To the extent the financial data as recorded in a claimant's monthly profit and loss statements do not accurately match revenues earned during the month with corresponding variable expenses incurred to earn those revenues, variable profit for the compensation and benchmark periods cannot accurately be determined. It is, therefore, essential -- and typical in lost profits analysis -- to evaluate the data reported on a claimant's profit and loss statements to determine whether it accurately reflects these amounts. If it does not, adjustments must be made to produce accurate data that will permit an economically meaningful and correct calculation of variable profit. Such normalizing adjustments are standard professional practice in estimating lost profits.

9. In my opinion, BP's interpretation of the BEL framework outlined in BP's In Camera Motion To Reverse And Set Aside The Claims Administrator's January 15, 2013 Policy Decision Concerning The Business Economic Loss Framework is consistent with: (a) the purpose of the BEL framework to compensate business claimants for their actual economic losses, (b) economic principles, and (c) standard practices used by economists to measure lost profits. I have reviewed and concur with the opinions of the expert declarations attached as exhibits to BP's In Camera Motion.

10. In contrast, the interpretation of the BEL framework adopted in the January 15, 2013 Policy Decision of the Claims Administrator, as affirmed by the Court, deviates from: (a) the stated purpose of the BEL framework, (b) economic principles, and (c) standard practices used by accountants and economists to measure lost profits. This is because the decision does not measure economic loss, but instead it allows windfall payments for BEL claimants flowing from inaccurate measurement of revenue and expense.

## ECONOMIC AND ACCOUNTING CONCEPTS OF PROFITS, REVENUE AND EXPENSES ARE NOT THE SAME AS CASH RECEIPTS AND CASH DISBURSEMENTS

11. The BEL framework can only work properly, as it was designed and as it was intended to work, if economic principles governing what is revenue and what is corresponding expense are employed. If instead pure cash accounting procedures are used, or no attempt is made to identify when revenue was earned or to match revenue with corresponding expenses as the Claims Administrator has done by implementing his January 15, 2013 policy decision, the BEL framework will not produce reliable Compensation Amount[s] that make BEL Claimants economically whole for economic losses. Instead, if the decision of the Claims Administrator is allowed to, it will produce arbitrary and artificial windfall payments to BEL claimants.

12. In forensic applications economists calculate lost profits by measuring the impact of the wrongful act on sales or revenue and deducting the incremental cost associated with that loss of revenue. "After estimating the amount of lost sales, the expert must subtract the costs the firm would have incurred to achieve these

revenues."[1] The result is lost profit. In the case of the BEL framework, because only variable costs are deducted from revenue, the result is lost variable profit.

13. In describing this procedure in more detail Dunn notes, "The two steps in the analysis are: *Step 1* – measuring the loss of revenue that was caused by the event giving rise to the claim . . . . *Step 2* – deriving an "Incremental Lost Profit Margin" to multiply times the lost revenue to obtain the estimate of lost profits . . . . The case law is very clear that "lost profit" is the change in net profits (before income taxes) caused by the event giving rise to the claim. This can lead the unwary to conclude that the accounting concept of the net profit margin is the appropriate way to measure lost profits. It is not. . . . Both the accounting profession and the economics profession have settled on the label "Incremental Lost Profit Margin" (ILPM) to describe the appropriate ratio between marginal profit and marginal revenue."[2] ILPM recognizes that when revenues rise and fall, not all costs will rise and fall proportionately since some costs are fixed. Therefore, ILPM focuses on the variable costs directly associated with the changes in revenues to properly estimate lost variable profit.

14. The BEL framework compares variable profit in a Compensation Period with variable profit in comparable months of the Benchmark Year(s) to determine compensation for spill-related losses. For that analysis to be economically meaningful, the calculations of variable profit must be based on accurate monthly data, and the periods compared must involve comparable economic activity. Otherwise, the

---

[1] Weil, Roman L. et al. (2001), Litigation Services Handbook: The Role of the Financial Expert, John Wiley & Sons: NY, NY, pages 3.8-3.10.

[2] Dunn, Robert L. (2005), Recovery of Damages for Lost Profits Volume 2, John Wiley & Sons: NY, NY, pages 749-750.

comparison will not reliably measure compensation for losses caused by the incident. Instead, it will generate results that reflect either: (a) data inaccuracies, (b) timing differences in cash flow, or both. None of these is a recognized measure of economic loss.

15. Accrual based accounting systems are designed to be consistent with the economic principles of revenue, costs, and net profits. Cash based accounting systems may be generally consistent with these economic principles as well when measured on an annual basis or other basis equal to the revenue cycle for a business. For example, for a point of sale business such as a restaurant, revenue is typically earned at the same time cash is received and corresponding variable expenses (labor and ingredients) are incurred within the same month as the revenue is earned. However, cash based accounting systems typically will not generate reliable measures of net profits over shorter periods of time for certain businesses in which cash receipts are not matched to cash expenditures necessary to produce those same receipts.

16. For example, consider the case of a professional services firm that receives a $10,000 retainer February 28, 2010 to initiate work on a project. In a cash accounting system this cash receipt would be booked as revenue in February 2010. However, it is not revenue in an economic sense, but instead it is a cash receipt that has not yet been earned in any economic sense (and in an accrual accounting system it would not be recognized as revenue until it is earned).

17. Importantly for this controversy, the cash-based account system fails to correctly measure profit for the firm not only in the month of February, but also in all subsequent months until the work is completed.

18. The accounting profession recognizes these same frailties in cash-based accounting systems and has carefully defined "revenues" and "expenses" for the purpose of accurately measuring profits. For example, the Financial Accounting Standards Board ("FASB"), Statement of Financial Accounting Concepts No. 6, *Elements of Financial Statements 2008*, page 30 states, "Revenues represent actual or expected cash inflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations." In other words revenues are inflows earned from delivering goods and services during the period presented. Revenues are distinguished from cash receipts, because revenues include all income earned from providing goods and services while cash receipts simply represent the cash inflow during the current accounting period without regard to when or even if the goods or services were provided and revenue was earned.

19. Similarly, FASB also carefully defines expenses as outflows (of cash or other assets) from delivering goods and services that gave rise to the revenues.[3] Expenses are distinguished from cash disbursements, because expenses include all obligations incurred to provide goods and services while cash disbursements simply represent the cash outflow during the current accounting period without regard to when or even if the cash outflow in the current period was associated with the goods and services produced and delivered which gave rise to the expenses.

20. The IRS recognizes that cash based accounting systems may not always correctly measure earnings, expenditures and profits. "The use of cash method can result in the deferral of income and the acceleration of deductions, such as through the

---

[3] FASB, Op. Cit., page 31.

build-up of receivables or pre-paying expenses. Under the cash method, there is no need to maintain inventories. As a result, the IRS views the cash method as not clearly reflecting income whenever its results differ materially from the accrual method." (*Austin v. Commissioner*, T.C. Memo 1997-157.)

21. These facts point to situations when cash based accounting methods will not produce reliable measures of earnings, corresponding variable expenses, and variable profit that can be used to compare economic performance in two periods to calculate "lost profits" (which are the measure of economic damages under BEL). Instead, such cash-based accounting will reflect only cash flow during the relevant months, so that a comparison of the two periods will compare cash flow, not profit. That is not a recognized measure of "lost profits" damages in any literature I am aware of. Furthermore, it is not consistent with professional practice in calculating lost profits in a legal dispute. Nor is it consistent with the BEL compensation framework, which measures lost profits -- not changes in cash flow. Regardless of the accounting system in use, it must produce accurate data for revenue and corresponding variable expenses or reliable measures of profit and economic loss under BEL would be impossible.

22. Moreover, Class Counsel's insistence that the Settlement Program must simply unquestioningly apply the BEL framework to financial data supplied by the claimant ignores the problems posed by other potential errors in that data. For example, even businesses that use accrual accounting on a yearly or quarterly basis often make cumulative corrections at quarter-end or year end. Use of monthly financial data that has not been adjusted to reflect those corrections, or which reflects the corrections for several months in one month, will not accurately measure the monthly

revenue, corresponding variable expenses and profit of a firm on a monthly basis. Instead, use of inaccurate data will produce inaccurate, unreliable measures of economic performance.

23. Therefore, Class Counsel's interpretation of the BEL framework, as adopted by the Claims Administrator and affirmed by the Court, to require or permit use of claimant-supplied financial statements, even if they do not accurately reflect monthly revenues earned and corresponding variable expenses, is: (a) inconsistent with standard economic and accounting methods for measuring lost profits; (b) contrary to the Settlement Agreement's BEL framework, which is based on this standard methodology; and (c) opposite the outcome espoused by the IRS for when cash-based accounting produces results materially different from accrual accounting..

## THE BEL MINIMUM THREE-MONTH COMPENSATION PERIOD CANNOT RECTIFY THE DISTORTIONS CREATED BY THE CLAIMS ADMINISTRATOR'S MISINTERPRETATION OF THE BEL TERMS "REVENUE" AND "VARIABLE PROFIT."

24. The Court in its Review of Issue from Panel incorrectly asserts that the three-month minimum requirement for the Compensation and Benchmark Periods is a "method for controlling for" distortions created when cash receipts and expenditures reported on cash basis financials are used to compute variable profit in the BEL framework. (Rec. Doc. 8812, pages 4-5) In reaching this view, the Court incorrectly relies upon a sentence from my August Declaration which states that "the requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring the data reflect

a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any usual event." (Rec. Doc. 8812, page 5, n.3 (quoting Fishkind Decl. Par. 87)

25. Where the Court's analysis goes astray is that cash basis financials do not record "revenues and corresponding variable expenses" as required in the BEL framework for computing "variable profit." Rather, cash basis financials record cash receipts and cash disbursements. While it is true, as I noted in my August Declaration, that a three month trend of revenue or variable profit is reflective of a trend in economic performance, the same cannot be said for a three month trend of net cash flows reported in cash basis financials. To the contrary, use of a three-month period cannot correct for the distortions that a cash based accounting system creates in attempting to measure revenues and expenditures over short periods of time. Particularly for a business with a long earnings cycle of many months or years, and where cash is received many months after payment has been made in respect of the expenses incurred to earn such revenue -- such as a farm or construction firm -- the three-month period would not correct for such distortions in data. Put differently, collating three months of inaccurate data would still result in inaccurate data being used so that variable profit for the period could not be accurately calculated. Thus, the BEL framework would not be implemented according to its terms.

26. I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and conclusions.

*[signature]*
Henry H. Fishkind, Ph.D.

Exhibit A

Resume of Dr. Fishkind



**SELECT CLIENT LIST**
AEGON
Baron Collier
BP
Cemex/CSR/Rinker Materials
Colonial Properties Trust
Collier Enterprises
Falcone Group
Fannie Mae
Florida Power Corporation
Forrest City Enterprises
FPL
King Ranch
Kitson & Partners
Lennar
Major Central FL Attraction Co.
Mosaic
Newland Communities
Perry Capital
Starwood Land Ventures, LLC
State of Florida
State of Pennsylvania
St. Joe
U.S. Department of Justice
The Villages
Waste Management, Inc.

# Henry H. Fishkind, Ph.D.
## President

hankf@fishkind.com 

**PROFESSIONAL SYNOPSIS**
With over 30 years of experience in economic analysis and forecasting, Dr. Henry Fishkind is widely regarded as one of Florida's premier economists and financial advisors. Dr. Fishkind's career began in the public sector where he worked as an economist and associate professor at the University of Florida. In 1980 Dr. Fishkind became the associate director for programs at the University of Florida's Bureau of Economic and Business Research. During his tenure at the university, Dr. Fishkind served from 1979-1981 on the governor's economic advisory board. He began his career as a private sector consultant when he became president of M.G. Lewis Econometrics in Winter Park, Florida. In 1988 Dr. Fishkind formed Fishkind & Associates, Inc. as a full service economic and financial consulting firm.

From 2001-2003 Dr. Fishkind was a member of Governor Bush's Council of Economic Advisors, and also served on the board of directors of Engle Homes and Summit Properties until the companies were sold.

**AREAS OF EXPERTISE**
Economic Analysis
Econometric Modeling
Project Finance & Feasibility
Financial Analysis & Advisory
Fiscal Analysis
Intellectual Property and Fiscal Impact Analysis
Real Estate Economics

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| Chairman, FLSAFE | 2008 - 2011 |
| Managing Partner, Woodbridge Vintage Chips | 1994 - 2007 |
| President, Fishkind & Associates, Inc. | 1988 - Present |
| President, M.G. Lewis Econometrics, Inc. | 1984 - 1987 |
| Associate Director for Programs, Bureau of Economics & Business Research, University of Florida | 1980 - 1983 |
| Economist/Associate Professor, University of Florida | 1975 – 1983 |

**EDUCATION**
Indiana University, Doctor of Philosophy, Economics, 1975
Syracuse University, BA, Economics, 1971



Fishkind & Associates, Inc., 12051 Corporate Blvd., Orlando, FL 32817, 407.382.3256/Office, 407.382.3264/Fax

# Exhibit B
## MATERIALS AND INFORMATION REVIEWED AND CONSIDERED

- *Deepwater Horizon* Economic and Property Damages Settlement As Amended On May 2, 2012 (Rec. Doc. 6430-1) and Exhibits 4A-E (Rec. Doc. 6430-2)

- Declaration of Henry H. Fishkind, Ph.D. dated 8/13/12 (Rec. Doc. 7114-5)

- Supplemental Declaration of Henry H. Fishkind, Ph.D. dated 10/22/12 (Rec. Doc. 7731-2)

- The Court's December 21, 2012 Order and Reasons Granting Final Approval of the Settlement (Rec. Doc. 8138)

- The Claims Administrator's January 15, 2013 policy decision concerning the Business Economic Loss Framework

- Class Counsel's December 16, 2012 Memorandum to the Claims Administrator

- BP's January 8, 2013 Response To Class Counsel's December 16, 2012 Memorandum

- BP's January 11, 2013 Further Submission to the Claims Administrator in Response to Class Counsel's December 16, 2012 Memorandum

- BP's *In Camera* Motion To Reverse And Set Aside The Claims Administrator's January 15, 2013 Policy Decision Concerning The Business Economic Loss Framework dated 2/18/13 and all of its exhibits and declarations

- Class Counsel's Opposition To BP's Motion For Reconsideration dated 2/18/13 and all of its exhibits and declarations

- The Court's Review of Issue from Panel (Matching of Revenue and Expenses) dated 3/5/13 (Rec. Doc. 8812)

- Weil, Roman L. et al. (2001), Litigation Services Handbook: the Role of the Financial Expert, John Wiley & Sons: NY, NY.

- Dunn, Robert L. (2005), Recovery of Damages for Lost Profits Volume 2, John Wiley & Sons: NY, NY, pages 749-750.