# Exhibit 21

**BROWNGREER ‖ PLC**

# MEMORANDUM

**TO:**        **Patrick A. Juneau, Claims Administrator**

**FROM:**     **Lynn C. Greer**

**DATE:**     **August 2, 2012**

**RE:**        **Final Recommendations on Policy Issues**

---

We first circulated this memo on July 30, 2012, to seek input from the Parties on the policy issues it contains.  We have received comments from BP and from Class Counsel to each of the issues raised.  After reviewing these comments and after consultation with the Accountants, our expert review teams, and in our discussions with you, we present final recommendations for your consideration.   This version of the memo restates the original issue and recommendation, inserts comments from BP and Class Counsel, indicates whether the Parties are in agreement, and then presents the "Program's Final Recommendation."  I believe that any unresolved issue may be discussed at the meeting currently scheduled for 4 p.m. CT on Tuesday, August 7, 2012.

1. **Business Economic Loss Claims:  Multi-Facility Businesses.**

    (a) **Accountants' Question:** If under the GCCF a claimant filed a consolidated claim and was paid and the claimant then files individual claims for each facility location under the New Facility, how will those previous payments be applied to these claims? For example, FIFO?

    (1) **Accountant's First Recommendation:**  Assuming all individual claims for each Facility is tracked collectively under the new administration then we will apply the GCCF payments against each specific facility on a one for one basis assuming gains and losses for each location were not offset.  If gains and losses were offset in connection with the GCCF consolidated claim then we will need to allocate the gain on a pro-rata basis.

    (2) ***Accountant's Clarified Recommendation.***  Offsets for prior BP, GCCF, VoO and/or Real Estate Fund Payments will be applied on a First-In, First-Out basis. For example, assume a Multi-Facility business is filing separately for three Claiming Facilities and the aggregate amount of all prior payments to the claimant is $50,000.  The offsets would be applied as follows:

1

**Facility #1**

| | |
|---|---:|
| Calculated Losses Before Offsets: | $20,000 |
| Less:  Offsets Applied: | ($20,000) |
| Total Net Compensation: | $0 |

**Facility #2**

| | |
|---|---:|
| Calculated Losses Before Offsets: | $35,000 |
| Less:  Offsets Applied: | ($30,000) |
| Total Net Compensation: | $5,000 |

**Facility #3**

| | |
|---|---:|
| Calculated Losses Before Offsets: | $20,000 |
| Less:  Offsets Applied: | ($0) |
| Total Net Compensation: | $20,000 |

**Total Compensation for all Three Facilities:  $25,000**

**BP's Response:**  BP agrees that where GCCF previously paid for a consolidated claim that included facilities located both within and without the class geography, and the current claim is for a facility within the class geography, it is appropriate to allocate the GCCF payment so that the offset is only for the portion of that GCCF payment attributable to the in-class facilities. BP believes the Claims Facility should use their best judgment to do that, taking into account the relative share of losses, if that can be determined, or other data.

With respect to situations where GCCF paid for a consolidated claim where all facilities were in the class geography and the claimant now asserts claims on behalf of only some facilities, BP agrees with the Claims Facility's proposed approach of offsetting on a FIFO basis. Presumably the GCCF payment was in respect of losses attributable to those facilities that now are making claims.

**Class Counsel's Response:**  Class Counsel stands by its position. If the individual claimants are class members and have not previously released their claims, they are entitled to file a claim. A claim can only be offset by a prior payment if it was for the same loss. Therefore, before the accountants can apply their presumed FIFO approach, they must determine that the prior payment was for the same loss.

**Do Parties' Comments Provide Resolution?  No**

**Program's Final Recommendation:**  Prior payments (e.g., BP, GCCF, VoO and/or Real Estate Fund Payments) issued to claimants with a consolidated claim in the GCCF will be treated as an advance payment against any calculated losses for a Multi-Facility Business filing consolidated or individual claims for each facility location under the New Facility and will be deducted from the total compensation amount as calculated by the New Facility on a First-in, First-out basis.

2.  **Business Economic Loss Claims:  Start-Up Businesses.**

    (a)  **Accountants' Question:** Are claimants that do not generate revenue prior to April 20, 2010 excluded from the program?

#410697

**(b)** ***Recommendation***:  If a business can establish that it incurred Start-Up expenses prior to the Spill it would qualify for compensation.

**BP's Response:**  The Start-Up Framework requires less than 18 months of "operating history" prior to the spill. "Operating history" reasonably is read to mean open for business and generating revenue. It may be that in some circumstances a business is incurring final start- up expenses that do not generate revenue until one or two months after they are incurred. In such circumstances, BP agrees that the Claims Facility should be able to exercise judgment to identify such circumstances, but believes that in any event revenues should be generated within a short time after the oil spill. Class Counsel's proposal would permit recovery under the Start-Up Framework even for claimants that incurred no startup expenses prior to the spill. See also BP's response to 5 below.

**Class Counsel's Response:**  Class Counsel can accept the recommendation so long as there is an affirmative denial on the specific and express basis that they are not members of the Class.

We have defined the class as any business that "at any time from April 20, 2010 to April 16, 2012 owned, operated or leased a physical facility" in the class geography. A business that opens on August 1, 2010 could be a Start-Up because it has zero (less than 18 months) of operations history before the spill. It is also located in the Gulf Coast Area prior to April 2012. If the business doesn't meet the definition of a Start-Up because it doesn't have expenses prior to April 20, then it can't be a class member. The intent of Section 1.3 was to avoid the situation where Class Members were not provided with any potential avenue for compensation under the Frameworks provided.

**Do Parties' Comments Provide Resolution ? No**

**Program's Final Recommendation:**  If a business can establish that it incurred Start-Up expenses prior to the Spill it will qualify for compensation.

**3. Business Economic Loss Claims:  Economic Loss Zones**

(a) **Question:**  If a BEL Claimant is physically located in one Zone, but the Claimant's business activity, sales or service activity, or revenue source is located in a different, more preferable Zone, which do we apply?

(b) **Examples to Guide Discussion.**

(1) ABC Construction Co., Inc. has an office that is physically located in Birmingham, AL (Zone D).  At the time of the spill, ABC Construction Co., Inc. was performing Construction services at active worksites in Gulf Shores, AL (Zone A), Broussard, LA (Zone B), and Panama City, FL (Zone C).  ABC Construction Co., Inc. does not own or maintain a permanent office in any of these locations.

***Recommendation.***  Apply Zone D.  While the Claimant has business activity in more preferential Zones, all business activity is routed through its Zone D office.

A provision in Exhibit 8A allows an individual claimant to prove a location of loss other than his or her employer's physical location; however, there is no comparable provision for BEL Claimants. **Alternative:** Advise the Claimant to file a Multi-facility Business Claim. If the Claimant provides specific financial data from each worksite, we can review each site as a separate claim and apply the various Zone rules as applicable. If not, the office will be treated as HQ, and we will apply the rules for that Zone.

(2) John Smith is a Taxi Driver contracted through American Cab Company, whose sole office and Dispatch Center is located at 10 Poydras Street, New Orleans, LA 70130 (Zone B). John files a Schedule C with expenses and files a BEL Claim. John's dispatches take him throughout the greater New Orleans Area, but the majority of his calls or fares are to and from New Orleans International Airport in Kenner, LA (Zone D).

*Recommendation:* Use the dispatch office as the location of John's business. All of his business and revenues are routed through this office, and it is the most centralized location.

**BP's Response:** BP agrees with the recommendation for example (1). BP disagrees with the proposed alternative because the Multi-Facility Framework does not apply. That framework requires a separate "facility," which does not exist here. BP agrees with the recommendation for example (2).

**Class Counsel's Response:**

(1) Class Counsel generally agrees with the recommendation with one exception. The recommendation refers to a *permanent* office in any of these locations, and under Section 1.2.1 it is "at any time from April 20, 2010 to April 16, 2012, owned, operated or leased a physical facility . . ." There is no requirement that the facility be "permanent" in order to be an entity within the Class.

(2) Class Counsel would agree with (2) under the facts given. However, if John Smith's dispatch office kept him in the French Quarter, then this should be treated as Zone A.

**Do Parties' Comments Provide Resolution?** Yes

**Program's Final Recommendation:** Use the Economic Loss Zone that applies to where a BEL Claimant is physically located, even if the Claimant's business activity, sales or service activity, or revenue source is located in a different, more preferable Zone.

4. **Business Economic Loss Claims: Loss Location Outside the Zone**

(a) **Question:** If a BEL Claimant is physically located outside the Economic Loss Zones, but the Claimant's business activity, sales or service activity, or revenue source is located within one of the Economic Loss Zones, should we treat that claimant as excluded from the class or use the Zone where the business activities occurred?

4

#410697

**(b) Examples to Guide Discussion.**

(1) XYZ Trucking Co., Inc. has an office and transfer hub in Charlotte, NC (Outside Gulf Coast Area). Drivers who are full-time employees of XYZ Trucking Co., Inc. routinely travel from Charlotte, NC to various locations in all zones of the Gulf Coast Area, as well as various locations outside the Area. These drivers are full-time employees that live in Charlotte but work in the Gulf Coast Areas for part of the time. XYZ Trucking Co., Inc. does not own or maintain any permanent location anywhere outside of Charlotte, NC. It is a service business.

*Recommendation.* Deny the Claim as not compensable. This Claimant is a member of the Class, maintaining full-time employees (including owner-operators) in the Gulf Coast Area, but the Claimant itself is not located in any Eligibility Zone. While this claimant may have suffered a loss due to the spill, such losses cannot be compensated if the Claimant does not maintain any location in the Zone. **Alternative**: Advise the Claimant to file a Multi-facility Business Claim. If the Claimant provides specific financial data from each delivery route, we can review each site as a separate claim and apply the various Zone rules as applicable. If not, the office will be treated as HQ, and the claim will be denied as outside the Zone.

(2) Beach Products Distribution, LLC is an internet-based beach novelty distributor and has an office and distribution center in Memphis, TN (Outside Gulf Coast Area). **All** of Beach Products Distribution's sales are to retailers along the Gulf Coast, in Zone A. Beach Products Distribution does not maintain any physical location or have any full time employees physically located in the Gulf Coast, uses phone and internet sales for all of its ordering, and uses common carriers for delivery. However, the Claimant insists that its loss is directly tied to the Deepwater Horizon incident.

*Recommendation.* This Claimant is not a Member of the Class. All Claimants must be able to demonstrate that they are members of the Class under Section 1.2 of the Settlement Agreement in order to file a Claim, even if Causation is clear.

**BP's Response:** BP agrees with the recommendation for example (1). If employees drive in and out of the Gulf Coast Areas, and to other areas, the business is not within the class, because the employees are not "full time employees who performed their full-time services while physically present in the Gulf Coast Areas." See Settlement Agreement § 1.2.2. Furthermore, BP disagrees with the proposed alternative because the Multi-Facility Framework does not apply. That framework requires a separate "facility," which does not exist here. With respect to example (2), BP agrees with the recommendation.

**Class Counsel's Response:**

(1) Class Counsel does not believe that XYZ Trucking Co. is a Class Member unless the alternative suggested by the Claims Administrator is allowed. If XYZ Trucking Company is not allowed to treat each route as a physical location or physical facility, then it is an entity with its HQ outside of the Gulf Coast Area that does not own,

5

operate, or lease a physical facility in the Gulf, and, treating it as a service business, the operators do not perform their full-time services while physically present in the Gulf because the hypothetical has them going to Charlotte, NC routinely. Therefore, in the absence of the alternative being applied, we do not think XYZ is a Class Member and does not meet the definition of "entity" in Section 1.2.

(2) Class Counsel agrees that Beach Products Distribution, LLC is not a Class Member.

**Do Parties' Comments Provide Resolution? Yes**

**Program's Final Recommendation:** If a BEL Claimant is physically located outside the Economic Loss Zones, that claimant is excluded from the class *unless* that claimant has "full time employees who performed their full-time services while physically present in the Gulf Coast Areas." This rule applies even if the Claimant's business activity, sales or service activity, or revenue source is located within one of the Economic Loss Zones.

**5. Business Economic Loss Claims: Start-Up Businesses**

    **(a) Accountants' Question:** The accounting team requires clarification on how operating history shall be defined.

    **(b) *Recommendation*:** For purposes of inclusion in the Start-Up framework, define operating history as the date that a Start-Up business begins incurring Start-Up expenses or begins bringing in revenues, whichever is most beneficial for the claimant. However, only months in which the business was open for business would be considered compensable months.

**BP's Response:** BP agrees.

**Class Counsel's Response:** See Class Counsel Comments re Issue No. 2.

**Do Parties' Comments Provide Resolution ? Yes**

**Program's Final Recommendation:** For purposes of inclusion in the Start-Up framework, we will define operating history as the date that a Start-Up business begins incurring Start-Up expenses or begins bringing in revenues, whichever is most beneficial for the claimant. However, only months in which the business was open for business will be considered compensable months.

**6. Business Economic Loss Claims: Start-Up Businesses**

    **(a) Accountants' Question:** Will an existing business that was acquired during the Start-Up period be treated as a Start-Up Business?

    **(b) *Recommendation*:** Yes. The use of a previous owner's financial statements to perform the standard BEL calculation would be problematic.

**BP's Response:** BP disagrees with the recommendation. If a business has more than "18 months of operating history," it does not meet the definition of a "Start-Up Business." It should proceed under the Business Economic Loss framework.

#410697

**Class Counsel's Response:**  If a business was in operation and new ownership took over, it should not automatically revert to a start-up. Many businesses in the Gulf are family owned; it could simply be that the new owner is a different family member. If the business doesn't undergo a fundamental change and was operating prior to the spill (*i.e.* was not otherwise a "start-up"), it should generally be considered a standard business under the BEL rules if the claimant can document the claim with financials. The claimant should have the option for whichever available methodology provides the highest compensation.

**Do Parties' Comments Provide Resolution?  No**

**Program's Final Recommendation:**  A newly-acquired business should be considered a standard business under the BEL rules if the claimant can document the claim with financials from prior ownership to establish operating history for a benchmark period, a 2010 compensation period, and 2011 (if needed for causation) as required by the framework. However, if the business undergoes a fundamental change in operating activities in the course of the change of ownership, the Claims Facility will use judgment to determine if the business fits the Start-Up or BEL framework.

7. **Business Economic Loss Claims: Start-Up Businesses**

    **(a) Accountants' Question:** Is the allowable timeframe for projections, May 2010 – April 2011 or May 2011 to April 2012?  The settlement agreement does not specify. What was the intent of not specifically specifying the timeframe?

    **(b) *Recommendation*:** Need guidance on the intent of the settlement agreement.

**BP's Response:**  The projections should be for the period May 2010-April 2011, because they are intended to serve as an alternative benchmark against which to compare actual performance during that period.

**Class Counsel's Response:**  Under Sections 4.3.7-4.3.8 and the other obligations of the Claims Administrator, the Administrator is supposed to allow the Claimant the benefit of the greatest compensable loss and should allow the Claimant to select either projection as its measure.

**Do Parties' Comments Provide Resolution?  No**

**Program's Final Recommendation:**  The projections should be for the period May 2010 through April 2011.

8. **Business Economic Loss Claims: Documentation Requirements**

    **(a) Accountants' Question:** In certain industries it is common for an entity to report revenue and expenses on a periodic basis as opposed to monthly and annual profit and loss statements.  For example in the food service industry it is common for entitles to report on thirteen periods (28 day cycles) in a fiscal year versus twelve months in a calendar year.  The framework requires that a business claimant must provide

#410697

monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenue and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011.  If a claimant in the regular course of business reports on periods other than monthly and annual periods, as required by the framework, how should the fiscal periods be converted to conform to the framework?

(b) *Recommendation*: We recommend that the accountants at the Deepwater Horizon Claims Center have the ability to convert the 13-period revenue and expense statements into a twelve month year by allocating each period's revenue and expense items into their respective months.  For example, if Period 1 starts on 1/1 and ends on 1/28 and Period 2 starts on 1/29 and ends on 2/25, 100% (28 days / 28 days) of the Period 1 revenue and expenses will be included in January as well as 10.71% (3 days / 28 days) of Period 2 revenue and expenses.  The remaining 89.29% (25 days / 28 days) of the Period 2 revenue and expenses will be included in February.

**BP's Response**:  BP agrees with the recommendation.

**Class Counsel's Response**:  Class Counsel defers to the recommendation.

**Do Parties' Comments Provide Resolution?  Yes**

**Program's Final Recommendation**:  The Program's accountants have the ability to convert the 13-period revenue and expense statements into a twelve month year by allocating each period's revenue and expense items into their respective months.  For example, if Period 1 starts on 1/1 and ends on 1/28 and Period 2 starts on 1/29 and ends on 2/25, 100% (28 days / 28 days) of the Period 1 revenue and expenses will be included in January as well as 10.71% (3 days / 28 days) of Period 2 revenue and expenses.  The remaining 89.29% (25 days / 28 days) of the Period 2 revenue and expenses will be included in February.

9. **Business Economic Loss: Failed Businesses**

(a) **Accountants' Question:** How are assets being defined as used in "Liquidation Value of assets"?  Assets meaning both current and/or long term assets e.g., current assets; cash, accounts receivables, marketable securities and/or long term assets; plant, property, equipment? Example: Claimant had a dental practice that commenced operations prior to November 1, 2008 that was closed November 6, 2010.  The dental practice equipment sold for $30,000 while total distributions from closing the dental practice were $110,000. Is "liquidation of value of assets" the proceeds the owner received from the sale of the dental equipment $30,000 or is it the total distributions the owner received from liquidating their business (sale of equipment $30,000 + cash distribution $80,000)?

(b) *Recommendation*: For purposes of inclusion in the Failed Business Compensation framework, define assets in Liquidating Value of assets to mean all assets received from liquidating a failed business both current and long term assets.

8

#410697

**BP's Response:**  BP agrees with the recommendation to define assets in Liquidating Value of assets to mean all assets received from liquidating a failed business, both current and long-term assets.

**Class Counsel's Response:**  Class Counsel disagrees with the Recommendation. It would be inappropriate to take cash received that was in existence prior to the Spill as part of the offset value for the loss. It should only be the value received from liquidating the long-term assets, plant, property and equipment.

**Do Parties' Comments Provide Resolution?  No**

**Program's Final Recommendation:**  For purposes of inclusion in the Failed Business Compensation Framework, define assets in Liquidating Value of assets to mean total net assets received from liquidating a failed business both current and long term assets.  However, an accounting of the cash account may be required to identify cash that may have accumulated (from operations) over time, or received because of liquidating an asset.

**10. Business Economic Loss:  Churches without Tax Returns**

(a) **Question:**  We recently received a question from a law firm that represents a church that is attempting to file a BEL claim.  This church is not required to file a tax return, so the firm is concerned that the church would not be able to satisfy the BEL document requirements.

(b) ***Recommendation*:**  According to the Settlement Agreement and the responses from the Parties on the Framework Questions, Non-Profit Organizations are included in the Class; however, a strict interpretation of Exhibit 4A suggests that a church that does not file Federal tax returns cannot satisfy the document requirements for BEL claims. Exhibit 4A of the Settlement Agreement states that "a business claimant must provide the following … federal tax returns (including all schedules and attachments for the years included in the claimant-selected Benchmark Period, 2010, and, if applicable, 2011."

We verified that churches are exempt from filing an annual Federal tax return (a Form 990) if they have gross income of less than $1,000 for the taxable year from the conduct of any "trade or business, regularly carried on, that is not substantially related to the charitable, educational, or other purpose that is the basis of the organization's exemption."  We also verified with the IRS that they do not issue such churches any sort of documentation to certify that they are not required to file a tax return for a given year.

To address this situation, we recommend that the Program allow churches to satisfy the Federal tax return requirement in Exhibit 4A by providing a Verification of Nonfiling from the IRS, together with the church's organizational documents.  A Verification of Nonfiling is proof from the IRS that the claimant did not file a return for the applicable year.  Claimants can obtain this document free of charge by submitting a Form 4506-T Request for Transcript of Tax Return to the IRS and checking Box 7, by visiting IRS.gov and clicking on "Order a Transcript", or by

9

#410697

calling 1-800-908-9946.  While this document does not certify that the entity was not required to file taxes for a given year, we feel that this document, together with organizational documents indicating that the entity is a Non-Profit organization with a religious purpose, should be sufficient for our purposes as proof that a church was not required to file a Federal tax return.

**BP's Response:**  BP agrees with the recommendation to the extent that the claim involves reimbursement for losses of activity-related revenues reported on lines 2 and 10 of IRS Form 990 and not donations or contributions.

**Class Counsel's Response:**  Class Counsel agrees with the recommendation.

**Do Parties' Comments Provide Resolution?  Yes**

**Program's Final Recommendation:**  We will allow churches to satisfy the Federal tax return requirement in Exhibit 4A by providing a Verification of Nonfiling from the IRS, together with the church's organizational documents.

**11. Review, Reconsideration, and Appeal Questions.  (**See attached memorandum for full discussion of the issues raised by Class Counsel, with the Claims Administrator's Recommendations.)

**BP's Response:**

--Opportunities to Perfect a Claim: BP respectfully disagrees with the recommendation.  The Settlement as drafted is claimant-friendly and provides for multiple opportunities to perfect an appeal. BP does not believe it is appropriate to depart from the agreed upon processes with regard to perfecting claims. BP also believes that the memo's description of the review process for "Fatally Incomplete" claims is incorrect. The Section 6.1.1 "Re-Review" process that the memo discusses on page 2 is the appellate process for claims denied for insufficient documentation, not a separate pre-appeal review.

--Section I.A.2.c: While BP does not believe it was intended by the author of the memo, it is possible to read some of the language in this section of the memo to suggest that additional documentation may be submitted on appeal. That would be incorrect. Section 6.4 of the Settlement Agreements provides for review of the "record" "in the Settlement Program.

--Claimants' Access to Information: BP does not object to the provision of Accountant workbooks provided that access is given to both the claimant and BP.

--Timeframe for BP Appeals: BP agrees with the description in Section II.D.1.

**Class Counsel's Response:**  Class Counsel generally agrees with the *recommendation* in **Section I(B)(2)(c)** of Lynn's Memo.[2] Just to provide additional context / background / support, for the Program's reference, the "up to three times" language in Section 6.1 was intended primarily to address denials. This, however, would depend on the circumstances: If, for example, it were absolutely clear that the person was not a class member or could otherwise never qualify,

10

the Program was not expected to solicit (or even allow, beyond formal Reconsideration) additional chances. If a business, however, was close on a causation test, for example, it would generally get up to three chances to submit additional documentation, etc, to try to establish causation. (Not necessarily that the Claim or the Documentation was "incomplete" but simply that it didn't establish eligibility; although additional documentation, etc, might.) With respect, however, to claims that either required more documentation, or received Determinations at a level that was lower than the Claimant submitted / could have submitted / believed that he or she was entitled to, (while the total number of "attempts" or "communications" would likely be case- / circumstance- / claimant-specific), the 6.1 language was intended to be specifically modified by the introduction: "Subject to and in accordance with 4.3.7 and 4.3.8…."

Class Counsel agree with the *recommendation* in **Section II(C)(2)** of Lynn's Memo. The Claimant, BP and Class Counsel should all be provided with the Program's analysis at the time of the Determination.

Class Counsel strongly disagree with the *Recommended Process* on the flowchart with respect to the issue identified in **Section II(D).** Allowing BP to wait until there is either a formal "acceptance" or the 30-day period lapses before filing an appeal creates unnecessary and unwanted delay. Rather, BP's appeal rights should trigger at the point BP is notified of the Determination. BP doesn't need to know whether the Claimant will ask for Reconsideration in order for BP to determine whether BP believes that the Administrator appropriately applied the terms of the Settlement Agreement.[3]

---

[2] *See* Lynn Greer, POLICY ISSUES AFFECTING CLAIMANTS' ACCESS TO INFORMATION, CHANCES TO PERFECT CLAIMS, AND RECONSIDERATION/APPEAL STEPS, July 30, 2012.

[3] Obviously, if the Determination were revised based upon the Claimant's request for Reconsideration, a Re-Review, or otherwise, the time limit would start again for BP to appeal the revised Determination.

**Do Parties Comments Provide Resolution?**  Yes on access to the Accountants' workbooks, but not on injection of a Re-review step or when BP's Appeal rights are triggered.

**Program's Final Recommendations:**

(a) *When BP's Appeal Rights are Triggered.*  The Claims Administrator has reviewed the Settlement Agreement and has considered the possible delay to a claimant by waiting until the expiration of the 30 day window for Reconsideration to pass before BP's Appeal rights are triggered.  Recognizing that triggering BP's appeal rights from the first Notice of Eligibility may result in the need for the Claimant and BP to exchange information pursuant to the Appeal protocols before the Reconsideration window has passed, the Claims Administrator nevertheless believes that, on balance, the Program should be set up to trigger BP's Appeal rights at the time of the initial Eligibility Notice.

(b) *Re-Review Option for Ineligible and Eligible Claims*.  The Claims Administrator has considered the ripple effects and complications of injecting a formal Re-Review step into the process before the Reconsideration step provided in the Settlement Agreement. Although the Program needs to be flexible enough to work with claimants to ensure that

11

full consideration is given to all of the documentation provided with the claim, we have concluded that injection of a formal Re-Review step will create unnecessary redundancies and complexities.  Accordingly, the following timeline will apply to claimants, depending on whether the Program issues a Notice of Eligibility or a Denial Notice:

**Notice of Eligibility:**

(1) Initial Notice of Eligibility issued, and BP's Appeal rights are triggered.
(2) Within 30 days, Claimant requests Reconsideration and may submit additional documentation. If the Claimant requests Reconsideration, the Appeals process stops.
(3) We re-review the claim and issue a Post-Reconsideration Eligibility Notice.
(4) BP's Appeal rights are triggered anew.
(5) The Claimant's appeal rights are also triggered.  The Claimant may not submit any new documentation on appeal.  After the Claimant submits the appeal and pays the appeal fee, the Program will review the Claimant's submission before sending the claim to the Appeals Panel.  If, during that review, we discover that we made an error or failed to take into consideration a previously submitted document, we will have the flexibility to issue a revised Post-Reconsideration Notice.  At that time, the Program would return the appeal fee paid by the claimant, and BP will have the chance to review the new Determination and note an Appeal from that determination.

**Denial Notice:** If the Program denies a claim for a reason other than Incompleteness, the following timeline will apply:

(1) Denial Notice issued.
(2) Within 30 days, Claimant requests Reconsideration and may submit additional documentation.
(3) We re-review the claim and issue a Post-Reconsideration Notice.
(4) If the Post-Reconsideration Notice is a denial, the claimant's appeal rights are triggered. The Claimant may not submit any new documentation on appeal.  After the Claimant submits the appeal and pays the appeal fee, we will review the Claimant's submission.  If, during that review, we discover that we made an error or failed to take into consideration a previously submitted document, we will have the flexibility to issue a revised Post-Reconsideration Notice.  At that time, the Program would return the appeal fee paid by the claimant.
(5) If the Program, at any time after an initial Denial Notice, issues a Notice of Eligibility, the timeline following the Notice of Eligibility described above will apply.

*(c) Access to Accountants' Workbooks.*  The Program will make the Accountants' workbooks available upon the issuance of the initial Notice of Eligibility.  We should discuss on 8/7/12 whether to make these available only if the claimant requests it, or for everyone.

#410697

**12. VoO Charter Payment:  Presumption of Training.**

    **(a) Claims Administrator Question**.  May we presume the VoO training requirement is satisfied if we can determine the claimant to be a Working VoO Participant based on the VoO Master Database or independent proof of VoO payments or decontamination documentation?

    **(b)** *Recommendation:*  We recommend modifying our VoO claims review process to presume the VoO training requirement is satisfied if we can determine the claimant to be a Working VoO Participant based on the VoO Master Database or independent proof of VoO payments or decontamination documentation.  We still will require proof of training if the claimant is a Non-Working VoO Participant because no presumption can be made about the VoO training if they were never dispatched or placed on-hire.  We recommend this policy change because it:  (1) is logical to presume completion of VoO training if we have proof of VoO payments or decontamination efforts using BP's own database or previously approved payments to VoO participants; and (2) will reduce the number of Incompleteness Notices that are frustrating claimants.

**BP's Response:**  BP respectfully requests that the Claims Administrator reconsider in several respects its recommendation that the VoO claims review process be modified to presume the VoO training requirement is satisfied if there is proof of VoO payments or decontamination documentation.

As  noted in your email, the premise for this CA recommendation is that it "is logical to presume completion of VoO training if we have proof of VoO payments or decontamination efforts using BP's own database or previously approved payments to VoO participants."  As explained below, while such a presumption is logical in certain circumstances, it would be inaccurate to apply this presumption as broadly as proposed by the CA recommendation in light of actual VoO program practices.

As an initial matter, the fact that a VoO Claimant obtained a decontamination document does not mean the Claimant was  dispatched or placed on hire.   It was BP's practice to allow VoO Program participants to take any vessel that participated in the VoO program, regardless of whether or not it was ever put on-hire, to a decontamination station for inspection and decontamination if it was needed based on the inspection,  and such participants would then receive a U.S. Coast Guard Verification of Final Decontamination document.  In practice, vessels never put on-hire did obtain such decontamination documents for at least several reasons.  First, some VoO participants with vessels that participated in the VoO program (by signing an MVCA) but which were never put on-hire were interested in obtaining a document showing that their vessel was clean to show future employers (or others) if the question ever arose.   Second, BP would pay VoO participants that went to decontamination one day's pay to compensate them for their time.   The effect of this was that many vessels that were never put on-hire did go to a decontamination station for inspection and received the Verification of Final Decontamination document from the Coast Guard.  Also, in August and November of 2010, BP

#410697

sent letters terminating the MVCAs.  These letters were titled "Notice of Non-renewal of Master Vessel Charter" and were sent to all VoO participants that signed an MVCA, regardless of whether they were ever put on hire.  This letter states "If you have not had your vessel properly decontaminated and an off-hire survey performed please immediately contact your local Vessel of Opportunity coordinator to schedule your off-hire survey and decontamination as soon as possible."  Based on this request, vessels that were never put on-hire went to get a decontamination inspection.  Moreover, it was the plaintiffs' position in the VoO lawsuits that VoO participants should be paid from the time they signed the MVCA until the time they received a decontamination certificate from the U.S. Coast Guard, regardless of whether or not they were on-hire.  Accordingly, BP understands that some VoO participants may have gone in for decontamination, even if they did not get placed on-hire, to increase their claim for damages. These factors caused an influx of vessels to show up at decontamination stations well after the VoO program had ended.  It is for this reason that the U. S. Coast Guard issued a policy statement in March 2011 stating that once a vessel had been out of the response for 60 days, "all decontamination issues regarding the vessel shall be considered closed and no further investigations or inspections shall be conducted."

Likewise, the fact that a claimant received a VoO payment is not sufficient to establish that the claimant was ever dispatched or placed on-hire and does not necessarily mean the claimant attended VoO training.  VoO participants may have received payment for various reasons – none of which mean they were on-hire.  For example, VoO participants that were never placed on hire may have received payment for i) attending training, ii) going to a decontamination station (even though they never worked in the response), and iii) early on in the VoO program, VoO participants were sometimes reimbursed for gas or other expenses associated with attending training or with attending town hall meetings where the VoO program was discussed even though they were not on-hire.  BP agrees, however, that if a VoO claimant received payment for five days or more (including pay for crew) for one vessel, it is reasonable to assume that the claimant was placed on-hire.  Accordingly, the following table lists the minimum payment, by vessel size, at which it is reasonable to assume that a claimant was placed on-hire.

| Vessel Length | Daily Hire | Five Days of Hire | Number of Crew Members Required Under the MVCA | Daily Payment For Each Crew Member | Total Crew Pay for Five Days | Total Payment for Training Captain and Crew | Amount of Payment For a Vessel at Which On-Hire Status Can Be Reasonably Presumed |
|---|---|---|---|---|---|---|---|
| Greater than 65' | $3,000 | $15,000 | 3 | $200 | $3,000 | $800 | $18,800 |
| 45' - 65' | $2,000 | $10,000 | 3 | $200 | $3,000 | $800 | $13,800 |
| 41' - 45' | $1,500 | $7,500 | 3 | $200 | $3,000 | $800 | $11,300 |
| 30-40' | $1,500 | $7,500 | 2 | $200 | $2,000 | $600 | $10,100 |
| Less than 30' | $1,200 | $6,000 | 2 | $200 | $2,000 | $600 | $8,600 |

14

#410697

BP provided the Settlement Program with a VoO Training Database that contains the names of all  people that attended training.   We do not understand the basis for the CA comment that this database "is incomplete and does not contain all of the VoO participants who completed the necessary training."   We have re-confirmed with the BP personnel responsible for maintaining this database that it is accurate and complete.  As with all manual data entry for large databases, there may be an occasional inadvertent error, which is why the framework allows for a claimant to provide proof of training if the database indicates otherwise.   BP agrees with PSC that if the VoO Training Database shows that a claimant attended VoO training, the Settlement Program should not require the claimant to provide proof that he attended training.  To the extent that a claimant contends the VoO Training Database inaccurately omits his name as a person who received VoO training, the claimant can furnish proof of training.  Every person that attended VoO training was given a card with their name on it showing that they attended training (called the "yellow card").  VoO participants were required to provide the card before being allowed to leave the dock.  Thus, a claimant who is not listed in the VoO Training Database as having completed VoO training but who furnishes a yellow card should be treated by the Settlement Program as having completed training.   Moreover, since all VoO participants that were placed on-hire were required to have completed VoO training.  Accordingly, BP agrees it is reasonable to assume that a VoO claimant that was placed on-hire did attend training even if the claimant's name does not appear in the VoO Training Database.

BP requests that the Claims Administrator consider modifying the proposal to make presumptions regarding the VoO Training requirement to address the considerations we have raised.

**Class Counsel's Response**:  We agree with the recommendation. First, there is no training "requirement" for a Working VoO Participant; the definitional language in Section 38.170 aside, the intent was to compensate anyone with a charter agreement who had been placed on-hire; it was assumed that BP (or its sub-contractors) would not have placed anyone on-hire who had not been thru the training; but if such a person exists, the intent (certainly from our point of view) was that he or she be compensated. Second, there is no Documentation requirement for evidence of training for a Working VoO Participant. Indeed, there are no specific VoO Documentation requirements, as it was contemplated that, in the first instance, most of the determinations could be made according to the "master" Database [*i.e.* "evidence of which shall include Charterers' dispatch logs"]. Finally, this issue implicates the general standard of review / burden of proof in applying the terms of the Settlement Agreement. Particularly where the formal Documentation requirements (if any) are silent on the issue, or would allow for such a reading, the Program can and should make reasonable inferences and conclusions (consistent with Sections 4.3.7 and 4.3.8) from the information provided on the claim form and the documentation provided in support of a claim.

**Do Parties' Comments Provide Resolution?  No**

**Program's Final Recommendation:**  The Program will presume that payment for VoO work equates to training.  Currently, if the database does not contain a definitive finding of Working or Non-Working status, we presume payment for more than one day's pay as proof of Working

#410697

status (pursuant to direction from Chris Esbrook). BP proposes that our threshold should be five working days plus crew costs to presume a vessel was dispatched or placed on hire and thus earned more than a nominal payment amount for training. Because the initial VoO training was only four hours, we recommend maintaining the one-day payment threshold as proof of both "Working" and training status.

### 13. VoO Charter Payment:  Evaluating Multiple Claims for the Same Vessel.

**(a) Claims Administrator Questions**.  We previously received confirmation from the Parties that only one claimant may file a VoO Charter Payment claim on behalf of a vessel, specifically the person who signed the MVCA agreement.  If we receive documentation suggesting that two people signed MVCA agreements for the same vessel, should we just pay one claimant, or both?

*Recommendation*:  We will pay each contract only once.

**(b) Examples to Guide Discussion.** (The real claimant and vessel names have been changed.)

(1) John Smith submitted a claim for the vessel Miss Liberty for work performed under MVCA contract MOB-11111.  In support of his claim, John submitted a hard copy of the MVCA that shows John as the signatory, but no other supporting documents.

John's brother, Robert Smith, submitted a claim for the same vessel and contract. In support of his claim, Robert submitted documents showing that Robert attended the initial VoO training, that Robert owns the vessel in question and a 1099 from Danos & Curole showing VoO payments made to Robert.

The VoO records that BP provided to us list Robert as the MVCA signatory. There is a conflict here as to who is the MVCA signatory.

*Recommendation.*  We will only pay each contract once.  In this example, if we reviewed John's claim first, we would find it incomplete for proof of training under the current protocol.  If we reviewed Robert's claim, which is complete, in the meantime and issued an Eligibility Notice, we would then deny John's claim and issue a Denial Notice with an explanation that we already issued a Payment Notice for this contract.

(2) Michael Jones has one vessel, but signed two MVCAs with two different charterers in the VoO program.  He performed work under MVCA contract MOB-22222, for which BP was the Charterer.  He did not perform work under MVCA contract HOU-12345, for which Lawson was the Charterer.  He submits two claims for the vessel, one for each contract.

16

#410697

*Recommendation.*  We will only pay each vessel once, regardless of the number of MVCAs the claimant signed.  If the Working Status for the contracts differs, with one or more being Working and another being Non-Working, we will issue a Payment Notice with a Working Participant status and payment.  In this example, we would review the claim and issue a payable notice for the Claim Form containing the contract under which the claimant has a Working Participant status.  If we cannot determine which contract is tied to the Claim Form because the claimant does not include the contract numbers, we will issue a Payment Notice for the first claim reviewed and use the Working Participant status, as it is most beneficial to the claimant.

**BP's Response:**  With respect to Example (1), BP agrees that a contract is only paid once and that the payment is to the MVCA signatory. In case of conflict between the portion of the database that lists the MVCA signatory and the actual MVCA, the MVCA governs. In all circumstances, the Claims Administrator has copies of the MVCA and should verify the database entry.

With respect to Example (2), BP agrees with the recommendation to pay each vessel only once.

**Class Counsel's Response:**  Class Counsel defer to the recommendation.[4]

[4] It may be, in the Michael Jones example, that there are actually two different vessels, and the MVCAs have the wrong information. The Program might follow up with the claimant or his attorney to see whether a clarification and/or additional documentation can be provided.

**Do Parties Comments Provide Resolution?  Yes**

**Program's Final Recommendation:**  We will pay each vessel only once, regardless of the number of contracts or signatories.  In the case of an inconsistency between the VoO data and the hard copy MVCA, we will use the hard copy MVCA to determine the appropriate signatory.

**14. VoO Charter Payment:  Confirming Vessel Length.**

    **(a) Claims Administrator Question.**  If the claimant submits a VoO invoice showing a vessel length range rather than a specific length, should we use this document to overrule the VoO data BP provided us?

    **(b) *Recommendation:***  No.

    **(c) Example to Guide Discussion:**  Jane Brown submits a claim for the vessel Miss Cynthia.  In support of her claim, Ms. Brown submits a vessel registration showing a vessel length of 29 feet and an invoice for the VoO program showing that she requested payment for the vessel's work based on the >30 – 45 foot vessel length range.  When we search the VoO records during the review, we find the vessel information, and it lists the vessel length as 29 feet.

> *Recommendation.*  We will not use invoices containing vessel length ranges to determine vessel length.  We will only use official documentation, such as a vessel registration or title, and the VoO records if they list the vessel.  If the submitted documents conflict with the VoO records, we will use the greater length.  We cannot use an invoice because it does not provide a specific length and the invoices are generally filled out by the VoO participants and are not verified by the VoO program.

**BP's Response:**  BP agrees with the recommendation.

**Class Counsel's Response:**  In this specific example, under the facts presented, we defer to the recommendation. However, as a general matter, (and as we believe the Program has already decided), the Claimant should be paid the optimal VoO rate based on the available documentation. If, for example, there was evidence (either in documentation submitted by the claimant or in the BP database) that BP had actually paid Jane Brown the 30-45 foot rate, the claimant should get that rate under the Settlement Program, despite the existence of evidence that the length (according to one measurement) may have only been 29 feet.

**Do Parties' Comments Provide Resolution?  Yes**

**Program's Final Recommendation:**  We will not use VoO invoices containing vessel length ranges to determine vessel length.

**15. VoO Charter Payment:  Using a Notice of Decontamination to Prove Working Status.**

   **(a) Claims Administrator Question.**  If the claimant submits a Notice of Decontamination report, is this sufficient to prove that the claimant was dispatched or placed on hire in the VoO program, or were Non-Working vessels also decontaminated?

   **(b) *Recommendation*.** Yes.

**BP Response:**  BP disagrees with the recommendation. See W. Bloom email attached in response to no. 12 above.

**Class Counsel's Response:**  Generally, see Response to Issue No. 12, above, (and E-Mail from Steve Herman to Christine Reitano, dated Tue 7/31/2012 3:00 PM). But, specifically, if someone claims that he or she was placed on-hire, and has submitted a Notice of Decontamination in support of that – and there is no contrary evidence in BP's database – the Program can and should reasonably conclude that the person was placed on-hire as claimed. Even if, in some cases, Notices of Decontamination might have been sent to "non-working" VoO participants who had never been placed on-hire, a decontamination would only be necessary for a vessel that had been exposed to the oil. If BP has some other evidence or argument to challenge the sufficiency of the Determination, then BP should appeal.

**Do Parties' Comments Provide Resolution?  No**

**Program's Final Recommendation:**  We will not use a Notice of Decontamination to prove a vessel was dispatched or placed on hire.


**16. Proposed FAQs.**

(a) **Claims Administrator Question.**  Are the proposed FAQs circulated by Steve Herman on 7/21/12, approved for posting?  These FAQs are included as an attachment to this memo.

*Recommendation*:  We should post the FAQs, as circulated by Steve Herman, except as follows:

Because the Determination Notice does not use the words "deemed accepted," and we have taken "deemed accepted" off of the Portal, we propose a change to the FAQ on that issue as follows:

If I do not ask for Reconsideration of my offer within 30 days, will I no longer be able to Opt Out of the Settlement?

No.  If you do not seek Reconsideration in 30 days, you will not be able to later appeal or challenge the amount of that offer; however, you will still have the right to Opt-Out until either the expiration of the Opt-Out Deadline or the execution of an Individual Release.

**BP Response:**  BP's comments on the FAQs are as follows:

FAQ 55: BP believes that the following phrase should be added at the beginning of the FAQ: "If you are a Class Member"

New FAQ re Accounting Fees: BP proposes the following clarification to the third sentence: "However, the Settlement Program will only reimburse eligible Class Members…"

New FAQ re "Accepted" In Payment Notice: The question as currently drafted is a bit awkward with a double negative. BP proposes the following change to the question simply for ease of comprehension: "If I do not ask for Reconsideration of my offer within 30 days, does that prevent me from being able to Opt Out of the Settlement?" BP proposes the following clarification to the answer:

"No. If you do not seek Reconsideration, you will not be able to later appeal or challenge the amount of that offer, however, you will have the right to Opt Out until the earlier of either the expiration of the Opt-Out Deadline or the execution of an Individual Release."

FAQ 27-28 (2d priority). BP believes that these FAQs need to await filing and resolution of a motion to amend the hold back order.

#410697

**Class Counsel's Response:**  It is the word "accepted" that was causing the confusion. If that term has been eliminated, then the proposed FAQ makes sense.

As a general matter, the Program should not wait indefinitely for BP to expressly approve of the exact language in a proposed FAQ that is clear and correct on its face and has been circulated for weeks. It is Class Counsel and the Program who are being peppered with questions that need to be answered in a timely basis.

**Do Parties' Comments Provide Resolution?** Yes.

**Program's Final Recommendation:**   We have incorporated BP's clarifications into the FAQs. We need to discuss on 8/7/12 whether to post now FAQ 27 – 28 (2d priority), which deal with the 6% holdback, or await filing and resolution of a motion to amend the holdback Order. [See attached FAQs for final language]

**17. Subsistence. Compensation Formula for Consumption Losses.**

(a)  **Claims Administrator's Question.** What compensation formula should we use to calculate compensation for losses related to consumption?

*Recommendation*: Use BP's compensation formula to calculate compensation for losses related to consumption. Exhibit 9, Section B(2)(c) requires that quantities of lost natural resources do not exceed reasonable consumption rates.  BP's example calculation provided a method for which we could use to calculate reasonable consumption rates.

(b) **7/18/12 Meeting.** BP.  BP agreed with our recommendation.

**BP's Response:**  BP continues to support the Claims Facility's recommended approach. We disagree with Class counsel's characterization of the parties' intent in Class Counsel's 7-31-12 memo.

**Class Counsel's Response:**  The Subsistence framework was not intended to be tethered to calorie counts. The "reasonable consumption" language in the Subsistence framework was intended to mean that a claim amount should be held to a reasonableness standard in the context of Gulf of Mexico subsistence use. The reasonableness standard was not intended to act as a cap or to play any part in the subsistence compensation calculation itself; it is solely a reference point. [Plaintiffs' suggested Calculation is submitted for reference herewith.]

**Do Parties' Comments Provide Resolution ? No**

**Program's Final Recommendation:** The Program will use BP's compensation formula to calculate compensation for losses related to consumption.  Exhibit 9, Section B(2)(c) requires that quantities of lost natural resources do not exceed reasonable consumption rates.  BP's example calculation provided a method for which we could use to calculate reasonable consumption rates.

**18. Subsistence. Verification of Bartering Losses.**

#410697

(a) **Claims Administrator's Question.** May we require third party affidavits to verify bartering losses?

*Recommendation***:** Yes

**BP's Response:** BP agrees with the recommendation. The Subsistence Framework § C.4.a expressly authorizes the Claims Administrator to obtain such affidavits.

**Class Counsel's Response:** The Subsistence framework does not include any requirement that bartering losses be verified separately from consumption losses. The framework focuses (correctly) on the amount of resources the claimant harvested for subsistence use (where "use" includes barter, trade, and consumption); the claimed amount need only be reasonable in the context of other Gulf of Mexico subsistence users. The submission of third-party affidavits from all individuals with whom a claimant barters is (i) not required (not even implicitly) by the Subsistence framework, and (ii) overburdensome and impractical to require claimants to track down and ask for affidavits from every person they may have bartered with during an 18-month period several years ago.

**Do Parties' Comments Provide Resolution? No**

**Program's Final Recommendation:** To verify Subsistence losses related to bartering, we recommend that we require Third Party Affidavits from all individuals with whom a claimant barters.  If a claimant cannot locate the individuals with whom he or she barters, the claimant may submit Third Party Affidavits from other individuals with personal knowledge of the claimant's bartering instead.

**19. Subsistence.  Updated Seafood and Game Retail Price Chart.**

(a) **Claims Administrator's Question.**  What Seafood and Game Retail Price Chart should we use?

(b) *Recommendation***:** We use Class Counsel's updated price chart.

**BP Response:**  BP believes the Claims Facility should adhere to its proposed approach discussed on July 18:

"Our proposed price chart includes BP's values for Seafood and Game from May to December 2010, and May to December 2011, Class Counsel's recommended value for frogs, and our recommendations for alligator and turtle."

This recommendation is supported by the fact that the original price chart provided by Class Counsel was not based on actual retail prices, unlike BP's chart, which reflected 2010 and 2011 retail prices. The new Class Counsel proposed retail price chart circulated on July 18, 2012 purports to provide retail prices as of 2-10-12. First, it does not make sense to base compensation for loss of resources in 2010 and/or 2011 on 2012 price. Second, no source is provided showing that these are actual retail prices; to the contrary, the spreadsheet reflects that Class Counsel have simply purported to list three times the wholesale price as the alleged "retail" price. There is no support for this assumption.

#410697

**Class Counsel's Response:**  Class Counsel is submitting herewith an updated Retail Price Chart, (which we believe was circulated on July 18th). We agree with Brown Greer's approach to identifying current retail pricing in order to update the (out-of-date) GCCF-sourced prices; thus, as discussed at the meeting, this chart should only be used to ensure that all of the species listed on the Class Counsel Chart are also listed on the final Retail Price Chart. Brown Greer was to use their retail pricing method to determine the updated prices for all of the species added to the final Retail Price Chart from plaintiffs' chart.

**Do Parties' Comments Provide Resolution ? No**

**Program's Final Recommendation:** After our 7/18/12 meeting with the Parties, we recommended using an updated version of Class Counsel's chart because it included values for specific Seafood and Game species, and it was to include post-Spill retail values.  However, after reviewing Class Counsel's updated chart, we observed that it continues to include Worley's 2008 and 2009 retail values for Seafood and Louisiana's restitution values for Game.  Exhibit 9, Section B(3) requires that we use *post*-Spill retail values to calculate the total value of lost Subsistence resources. To comply with the requirements of Exhibit 9, Section B(3), we return to our original recommendation that we use BP's values for Seafood and Game from May to December 2010, and May to December 2011, Class Counsel's recommended value for frogs, and our recommendations for alligator and turtle.

**20. Zone A Mapping Question.**

   **(a)  Question.**  Should Key Largo, FL be included in Zone A? What compensation formula should we use to calculate compensation for losses related to consumption?

   **(b) Outstanding or New Issue?**  Outstanding.  This issue first arose on 7/17 from Plaintiffs' counsel, Brian Barr.

   **(c) *Recommendation.***  Need input from the Parties on the intention of the Settlement Agreement.

**BP Response:**  BP maintains its position. At no point during negotiations did Class Counsel ever propose North Key Largo as part of Zone A. BP is providing to Class Counsel and can share with the Claims Facility the emails and KML maps supplied by Class Counsel during the negotiation. The zones were negotiated through exchange of maps and descriptions were agreed upon after the maps were agreed upon and finalized. The map accurately reflects that North Key Largo is not in Zone A. Class Counsel's interpretation of the description would make it inconsistent with the map. The description intends that "Key Largo" refer to the city of Key Largo, not the entire key.

**Class Counsel's Response:**  Exhibit 1B, (at Bates Page 028276), Section A-28, sets out the following language in describing Zone A for the Florida Keys: "This zone consists of the **entirety of the series of islands** off the south coast of Florida stretching from Key West [an island] in the south/west to Key Largo [an island] in the north/east" (emphasis added). The Settlement Agreement defines this zone through the use of islands – not cities. There is simply

#410697

no other way for this language to be interpreted if we are going to give meaning to the words "entirety of the series of islands." BP is attempting to change the description to a description of municipalities by taking the position that the city of North Key Largo, which is on the eastern end of the island of Key Largo, is not included in Zone A. However, the zone is not described in terms of municipalities. If the parties had desired to split the island of Key Largo into Zone A and Zone D, the parties knew how to do that. All zones in Exhibit 1B are defined precisely. There are exact geographical boundaries described. The position taken by BP that Zone A ends somewhere "just north of U.S. Highway 1" is not described anywhere in the settlement agreement. That interpretation would be completely inconsistent with every other zone described. Given that there is no description in the settlement of an eastern boundary of Zone A somewhere east of Highway 1A prior to North Key Largo, it should be clear that the parties intended that the entire island of Key Largo be included in Zone A. Otherwise, the inclusion of the phrase "entirety of the series of islands" is meaningless.

**Do Parties' Comments Provide Resolution?  No.**

**Program's Final Recommendation:** The Program cannot decide this issue, because it rests on what the Parties' negotiated and what the Settlement Agreement means.  We encourage the Parties to be prepared to discuss this fully at the 8/7/12 meeting.

#410697

~~**4. What happened to the $20 billion BP set aside in August 2010 to pay for damage caused by the Deepwater Horizon Incident?**~~

[PARTIES AGREE THIS FAQ IS UNNECESSARY]

**11. Are any Individuals or Entities excluded from the Economic Class?**

Yes.  The following Individuals and Entities are excluded from the Economic Class:

- Those who choose to exclude themselves from ("Opt Out" of) the Economic Class (Click Here to jump to Section III for more information on Opting Out)

- Those who received a payment from the GCCF <u>and</u> executed a GCCF Release and Covenant Not to Sue (*except* those who seek a VoO Charter Payment Claim or Vessel Physical Damage Claim or those who signed a release that only covered bodily injury)

- Defendants in MDL 2179 and current employees of BP and other Defendants in MDL 2179

- Former Employees of BP and other Defendants in MDL 2179 who were employed by BP and other Defendants during the Class Period

- Any sitting Judges of the United States District Court for the Eastern District of Louisiana and their immediate families

- Law clerks who served in the United States District Court for the Eastern District of Louisiana during the pendency of MDL 2179 and their immediate families

The following Entities and their employees (to the extent they allege economic damage based on their employment by such entity during the Class Period) are excluded, subject to certain exceptions:

- Certain Financial Institutions [link to Ex. 18]

- Certain Funds, Financial Trusts, and Other Financial Vehicles [link to Ex. 18]

- Certain Gaming Entities [link to Ex. 18]

- Certain Insurance Entities [link to Ex. 18]

- Certain Oil and Gas Industry Entities [link to Ex. 17]

- Certain Defense Contractors/Subcontractors

- Entities selling or marketing BP-branded fuel, including jobbers and branded dealers

- Certain Real Estate Developers, including those that develop commercial, residential, or industrial properties, (except that these Entities can make claims for Coastal Real Property Damage, Wetlands Real Property, and Real Property Sales Damage);

- Governmental Organizations

More detail on the exceptions to the exclusion of Entities in these industries and their employees can be found in Sections 2 and 5.10 of the Settlement Agreement. [link to Section 2 and 5.10].

[SA 2 and **5.10**]

**22. If I qualify as an Economic Class Member, am I required to participate in the Settlement?**

No.  If you do not want to participate in this Settlement you have the right to Opt Out (i.e., exclude yourself from the Economic Class).  The Economic Class Action Settlement Notice provides instructions regarding the procedures that must be followed to Opt Out of the Economic Class.

In the event you decide to Opt Out of the Class, the Settlement Program will not continue to process any claim you have submitted, or thereafter submit, to the Program.

To validly exclude yourself from the Economic Class, you must submit a written request stating "I wish to be excluded from the Economic Class."  The request must include your printed name, address and phone number and must be postmarked no later than October 1, 2012.  The written request must be signed by the Natural Person or Entity seeking to exclude himself, herself or itself from the Economic Class, even if they are represented by an attorney.  Electronic signatures will not be accepted.  The request should be mailed to:

> Deepwater Horizon Court-Supervised Settlement Program
> Exclusions Department
> P.O. Box 222
> Hammond, LA 70404-0222

> [SA 8.2.1]

**28. If I'm an Economic Class Member and I Opt Out, may I sue BP or file a claim with the federal Oil Spill Liability Trust Fund?**

Yes, provided you do so in a timely manner and have satisfied the applicable legal requirements including the presentment requirement of the Oil Pollution Act of 1990, 33 U.S.C. § 2713.

If you have questions about filing a lawsuit, you should contact an attorney of your choice.  You (or your attorney) may also consult with Class Counsel at (855) 359-2327 or classcounseloffice@mdl2179psc.com.

For more information about how to file an OPA claim with BP visit www.bp.com/claims or call 1-855-687-2631.

For more information about how to file a claim with the federal Oil Spill Liability Trust Fund, visit http://www.uscg.mil/npfc/Claims/default.asp. If you choose to file with the Federal Oil Spill Liability Trust Fund instead of filing suit, you must strictly comply with the Federal Regulations pertaining to such.


**29. If I am not an Economic Class Member, can I still sue BP for alleged damages arising out of the Deepwater Horizon incident or file a claim with the federal Oil Spill Liability Trust Fund?**

Yes, provided you do so in a timely manner and have satisfied the applicable legal requirements including the presentment requirement of the Oil Pollution Act of 1990, 33 U.S.C. § 2713.

If you have questions about filing a lawsuit, you should contact an attorney of your choice.  You (or your attorney) may also consult with Class Counsel at (855) 359-2327 or classcounseloffice@mdl2179psc.com.

For more information about how to file an OPA claim with BP visit www.bp.com/claims or call 1-855-687-2631.

For more information about how to file a claim with the federal Oil Spill Liability Trust Fund, visit http://www.uscg.mil/npfc/Claims/default.asp. If you choose to file with the Federal

Oil Spill Liability Trust Fund instead of filing suit, you must strictly comply with the Federal Regulations pertaining to such.

**55. I had a pending offer from the GCCF when the Transition Process opened and I accepted the 60% payment that the Transition Process offered.  What do I need to do now?**

If you are a Class Member, you may now file a claim with the Settlement Program.  All of your claims-related information, files, and data that you previously submitted to the GCCF or the Transition Process have been transferred to the Settlement Program, but the Settlement Program will not begin to review your file unless and until you file a claim with the Settlement Program.  (Click Here to jump to FAQs about how to file a claim.)

Once the Settlement Program has reviewed your claim, you will receive your Settlement Payment less any amounts paid during the Transition Process or the remaining 40% of your GCCF offer, whichever is larger, in exchange for executing a release.

If you do not wish to file a claim in the Settlement Program, you may choose to receive the remaining 40% of your GCCF offer in exchange for executing a release. (***NOTE –* You will be giving up your right to any and all additional claims.**)

If you Opt Out of the Settlement, or if you are not an Economic Class Member, you can choose to receive the remaining 40% of your GCCF offer in exchange for a release, or you can also choose to forego the remaining 40% and pursue any rights available to you outside of the Settlement.  [SA 4.2.3.1, 4.4.2, 4.4.5]

~~2d ½ Priority FAQ 17: If I opt out of the Settlement, how do I elect to receive the remaining 40% of my Transition Process Offer?~~

[PARTIES AGREED TO DELETE AS DUPLICATIVE]

**2d ½ Priority FAQ 27: I had 6% withheld from my Transition Process payment.  Will I get that money back?**

If you are an Economic Class Member and you choose to participate in the Settlement Program, yes.  If you are not an Economic Class Member, or if you Opt Out of the Settlement, then the funds will be held in trust.  Once the Court has determined what, if any, common benefit fees may be awarded, any excess will be returned to you.

**2d ½ Priority FAQ 28: I had 6% withheld from a GCCF payment I received before February 26, 2012.  Will I get that money back?**

These funds are being held in trust.  After the Court has determined what, if any, common benefit fees may be awarded, any excess will be returned to you.

NEW FAQ RE ACCOUNTING FEES

**The Claimant Accounting Support section of the Settlement Agreement says that the reasonable and necessary time for accounting services will only be reimbursed up to certain specific standard hourly rates (Click Here to see those hourly rates).   Can I hire an accountant at rates or fees that are greater than what is spelled out in the Settlement Agreement?**

Yes.  You are free to hire the accountant of your choice.  However, the Settlement Program will only reimburse eligible Class Members for reasonable and necessary accounting fees as set forth in the Settlement (Click Here [FAQ 101]).  In addition, the total amount of reimbursable accounting fees are subject to specific limits based on the type of claim you submit (Click Here to read more about those limits).  As a result, if you hire an accountant who charges

an hourly rate or other fees that are greater than what is provided under the Settlement

Agreement, you (and not the Settlement Program or BP) will be responsible for the difference.

NEW FAQ RE CONFIDENTIALITY

**Will information that I submit to the Settlement Program be treated as confidential?**

Yes.  The Court has entered an Order that addresses the confidential treatment of

information submitted by a claimant to the Settlement Program. (Click Here to see a copy of the

Order)

NEW FAQ RE NON-PROFITS

**Are non-profit entities eligible to participate in the Settlement Program?**

Yes, non-profit entities are generally eligible to participate in the Settlement Program

unless they are excluded as Governmental Organizations [link to definition] (or some other

Exclusion).

NEW FAQ RE "ACCEPTED" IN PAYMENT NOTICE  [Edits proposed by BrownGreer]

**If I do not ask for Reconsideration of my offer within 30 days, does that prevent me from**

**being able to Opt Out of the Settlement?**

**No.**  If you do not seek Reconsideration, you will not be able to later

appeal or challenge the amount of that offer; however, you will  have the right to

Opt Out until the earlier of eitherthe expiration of Opt-Out Deadline or the

execution of an Individual Release.

<u>NEW FAQ RE SIX-MONTH PERIOD UNDER SECTION 4.4.8</u>

**Section 4.4.8 of the Settlement Agreement (and Section 18 of the Individual Release) afford Class Members six months from the date of the "initial payment" to file additional Claims with the Settlement Program.  How do I determine the date of initial payment?**

The Settlement Program interprets "initial payment" to mean the date of the first check (even if, for some reason, the check needs to be reissued) or the date of the wire transfer. For ease of implementation and tracking, we will calculate "six months" as 180 days.