# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION: J |
| THIS DOCUMENT RELATES TO ALL CASES | * | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## BP'S MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS RESULTING FROM HALLIBURTON'S DESTRUCTION AND SPOLIATION OF EVIDENCE

The Court will never see certain critical evidence relating to the failure of Halliburton's cement at the Macondo well on April 20, 2010.  As confirmed by Halliburton's own employees and documents, Halliburton has destroyed and spoliated that evidence.  Halliburton's conduct has undermined the integrity of these proceedings and severely prejudiced BP and the other parties. This prejudice has been reaffirmed and magnified by events during the trial, including Halliburton's recent disclosure that it has just "discovered" a cement sample taken from the *Deepwater Horizon* rig from the same batch used to cement the Macondo well.

Under well-established case law, Halliburton's preservation and discovery duties—like those of all other parties—extend beyond issuing a litigation hold to its employees.  Halliburton has a duty to take appropriate affirmative steps to monitor the preservation and production of evidence. Halliburton has failed to do so here.  Indeed, this rig sample was responsive to subpoenas and Halliburton should have produced it years ago so that it could have been tested on a timely basis for use at trial and before it deteriorated further.

This is BP's second motion for sanctions relating to Halliburton's destruction of evidence in this case.  In 2012, the Court granted-in-part BP's initial motion, ordering forensic testing and

modeling but denying BP's request for an adverse inference based on Halliburton's destruction of

the results of post-incident cement testing.  In denying BP's request for an adverse inference at that

time, the Court found "[f]or the reasons presented by Halliburton, BP has not demonstrated that it

has been prejudiced."  (Order at 1, Jan. 20, 2012, Rec. Doc. 5307 ("Rec. Doc. 5307").)  One of the

"reasons presented by Halliburton" in opposing BP's adverse inference request was that the test

results Halliburton destroyed were not critical because they were done on a cement sample made

using ingredients from a lab ("lab stock") and not a sample actually taken from the rig ("rig stock"

or "rig blend") and, thus, the destroyed test results could be replicated using additional available

lab stock.  (Halliburton Energy Services, Inc.'s Surreply in Opp'n to Mot. for Spoliation Sanctions

at 4, Jan. 5, 2012, Rec. Doc. 5082 ("The lab stock that was used for the post-incident tests was not

used in either the final pre-incident testing or in the Macondo well itself.  And because the lab

stock differed in composition from the rig stock, tests using lab stock cannot evidence how the

slurry pumped on April 19, 2010, performed downhole.").)[1]

Notably, in opposing BP's prior sanctions motion in December 2011, Halliburton assured

the Court that the actual rig samples that it contends are critical were preserved:  "Shortly after the

Incident, HESI also ***secured all sample cement ingredients received from the Deepwater Horizon

under lock and key***." (Halliburton Energy Services, Inc.'s Resp. in Opp'n to Mot. for Spoliation

Sanctions at 9, Dec. 19, 2011, Rec. Doc. 4961 ("Rec. Doc. 4961") (emphasis added).)  However, as

has now been revealed in the midst of trial, Halliburton did not disclose until March 13, 2013 that a

---

[1] According to Halliburton, "Halliburton's position is that [rig stock is] the ***most relevant*** for testing purposes." (Tr. 3172:23-24) (emphasis added).  But, even if Halliburton were correct that rig stock is the most relevant, that certainly does not mean that lab stock is irrelevant.  BP's position is that the lab stock testing is highly probative evidence.  Indeed, Halliburton employee Tommy Roth testified that results of lab stock testing "would be good information to know."  (Tr. 3266:4).

significant amount of the "sample cement ingredients received from the Deepwater Horizon" had in fact **not** been produced.

Since BP's first sanctions motion, the prejudice to BP from Halliburton's conduct has been reaffirmed and magnified by subsequent events, including:

**First**, on March 13, 2013—nearly three years after the blowout and three weeks into the Phase One trial—Halliburton disclosed that it had "discovered" a sample of cement taken from the *Deepwater Horizon* rig, which it referred to as "Kodiak well cement." (Exhibit 2, E-mail from D. Godwin to J. Shushan (Mar. 13, 2013).) Five days later, on March 18, 2013, in an unsigned and unverified "update," Halliburton disclosed that this "Kodiak well cement" (Sample #63981) was, in fact, a sample of the cement blend used at the Macondo well that had traveled with the *Deepwater Horizon* from the Kodiak well to the Macondo well on January 31, 2010.[2] (Exhibit 3, E-Mail from Jenny Martinez to J. Shushan (Mar. 18, 2013) ("HESI Update Regarding Kodiak Materials").) Sample #63981 was then sent to the Halliburton laboratory on February 23, 2010. *Id.* A photograph produced with the "update" shows that the 5-gallon bucket of undisclosed cement was labeled "From DW Horizon." (Exhibit 4, D-3257 (TREX-023056).) Compounding the significance of this disclosure, Halliburton has asserted since 2010 that "the Cementing Components **deteriorate over time**." (Rec. Doc. 494 at 5) (emphasis added). Needless to say, the newly disclosed Sample #63981 likely has been "deteriorating over time" according to Halliburton.

The importance of Halliburton's disclosure is heightened by the fact that, in its Opening Statement and throughout the trial, Halliburton has contended that "Non-Rig Samples Are Not Representative of Rig Cement Testing." (Exhibit 1, D-8008.1; *see also* Tr. 183:21-184:2). In other

---

[2]   As discussed below, Halliburton's March 18, 2013 disclosure incorrectly asserts that the *Deepwater Horizon* arrived at the Macondo well on February 20, 2010.

words, Halliburton has used the availability of rig samples for testing as both a sword and a shield: while contending that only testing on rig samples is relevant, Halliburton has prevented testing of the undisclosed and "deteriorating" rig blend through an affirmative decision to exclude those materials from the materials that were produced to the United States Government.  (Tr. 4920-4922.)

Moreover, Sample #63981 was by far the largest (over 3.75 gallon) rig sample available for testing in 2010—more than twice the size of the identical (1.5 gallon) sample Halliburton turned over in November 2010 to the USCG/BOEM Joint Investigation Team ("JIT") for testing (Sample #67314) by Oilfield Testing & Consulting ("OT&C").  Because the volume of Sample #67314 was "very limited," it severely restricted post-incident testing on and investigation of the rig blend. (*See, e.g.,* E-mail from Sarah Himmelhoch, DOJ, to Rob Gasaway (May 31, 2011), Rec. Doc. 2830-9 ("You are asking us to choose BP's proposed 60% gas content testing over the JIT's choice of tests for use on a ***very limited amount of sample***—approx. 1.5 gallons of Rig Sample . . . .") (emphasis added).)  If the newly disclosed sample of rig stock had been available, the testing requested by BP and other additional testing could have been conducted for use at trial.

***Second***, Tommy Roth, Halliburton's Vice-President of the Cementing Product Service Line at the time of the incident, provided new information at trial about post-incident tests that Halliburton failed to disclose to Congress and other investigative bodies during the May-September 2010 period.  (Tr. 3250-3264).  Roth testified that his notes of those tests, documenting "WHEN ATTEMPT WAS MADE TO FOAM THE CEMENT, SLURRY WOULD NOT FOAM," were created in ***October 2010*** and provided to Halliburton's attorneys by at least March 2011.  (Tr. 3279:8-20; 3281:1-2.)  Yet Halliburton waited to produce Roth's notes until ***October 17, 2011***—

after the July 2011 deposition of Roth and those of other Halliburton fact witnesses knowledgeable about testing issues.  (Exhibit 5, E-mail from S. Kena Lopez to Anthony Irpino (Oct. 17, 2011).)

*Third*, as the Court is aware, Halliburton conducted Displace 3D modeling of the cement job in May 2010, to determine if the spacer was sufficient to sweep the channel.  After Halliburton evaluated the results of the Displace 3D Modeling, it deleted them.  (Rec. Doc. 4961 at 9).  When BP asked Halliburton for the Displace 3D modeling, Halliburton simply responded that it was "gone."  (Letter from Barbara Harding to Jenny Martinez (Nov. 11, 2011), Rec. Doc. 4799-12.)  In its January 20, 2012 order, the Court granted BP's request for forensic examination of the computer hard drives used in the modeling.  (Rec. Doc. 5307 at 2-3.)  Since then, it has become clear that Halliburton's deletions left no remaining evidence: forensic examination of the hard drives yielded no trace of the Displace 3D modeling that Halliburton deleted.  (Order [Regarding Jan. 20, 2012 Order on BP's Mot. for Spoliation Sanctions (Rec. Doc. 5307)], Rec. Doc. 7127 ("Rec. Doc. 7127").)

The cumulative effect of Halliburton's pattern of destruction and spoliation of evidence has been to deprive the Court and the parties of significant post-incident evidence relevant to the inherent quality and performance of the cement Halliburton provided for the job at the Macondo well, and the role of that Halliburton slurry design as a cause of the events of April 20, 2010.  Accordingly, for the reasons explained further below, BP seeks appropriate sanctions including an order finding that:

- Halliburton's final cement design was unstable and caused hydrocarbons to enter the wellbore on April 20, 2010;

- The post-incident tests conducted by Rickey Morgan and Tim Quirk in April/May 2010— the results of which were destroyed by Halliburton—establish that the cement used on the Macondo well on April 20, 2010 was not stable; and

- The opinion deposition testimony of Chevron and OT&C witnesses regarding their post-incident testing that Halliburton moved to exclude should now be admitted in light of the gap in cement testing evidence created by Halliburton's conduct.

I.    **BACKGROUND**

    A.    **Events Leading Up To The Court's January 2012 Ruling On BP's December 2011 Spoliation Motion.**

On April 29, 2010, BP requested that Halliburton provide "Halliburton Cement samples and data . . . Cement and additive samples used in the 9-7/8" x 7" casing string. (These are required for laboratory testing of the cement slurry.)"  (Exhibit 6, E-mail from James Lucari to James Ferguson, Rec. Doc. 8878-1.)  Halliburton declined.  (Letter from Stephanie Bragg to James Lucari (July 15, 2010), Rec. Doc. 8757-4.)  BP then sought the JIT's assistance.  On August 24, 2010, at a JIT hearing, BP's counsel asked whether the rig stock being held could degrade over time and Jesse Gagliano responded:  "Yes, they could potentially degrade over time, yes."  (Exhibit 7, Gagliano MBI Testimony at 300:10-16.)  BP then appealed to the JIT panel:  "I think the witness has given me the answer that the sooner the test is run, the better, since it has the possibility of degrading . . . over time."  (*Id.* at 301:14-17.)

The JIT issued a subpoena to Halliburton for the cement on August 12, 2010.  The JIT subpoena requested materials identified in Attachment C to Halliburton's Response to a U.S. Chemical Safety & Hazard Investigation Board subpoena.  In Attachment C, Halliburton stated that "HESI has secured the following physical samples from the *Deepwater Horizon* project," but Halliburton failed to identify *Deepwater Horizon* Sample #63981 (the sample Halliburton recently disclosed).  On August 30, 2010, Halliburton received a separate subpoena from the United States Office of the Inspector General, which requested "all cement or cement samples or fragments from the Block 252 Lease *or the Deepwater Horizon*."  (Exhibit 8) (emphasis added).

After numerous delays (detailed in BP's March 12, 2013 timeline submission (Rec. Doc. 8878)), Halliburton on November 16, 2010 provided Sample #67314 (approximately 1.5 gallons) to the United States. But Halliburton did not provide the United States with Sample #63981 (approximately 3.75 gallons), even though it also was from the *Deepwater Horizon* and taken from the same batch of cement blend as Sample #67314.

In December 2011, BP brought to the Court's attention that Halliburton had destroyed evidence of various post-incident cement tests.

- *First*, in late April or early May 2010, Halliburton manager Ronnie Faul contacted Rickey Morgan in Halliburton's Duncan facility, and asked him to test the Macondo well cement design. (Exhibit 9, Morgan Dep. 15-16.) Roth's notes describing this testing contradict Halliburton's litigation position that the cement slurry design used at the Macondo well formed a stable foam: "WHEN ATTEMPT WAS MADE TO FOAM THE CEMENT, SLURRY WOULD NOT FOAM." (TREX-007718). Morgan did not document the test and threw out the slurry afterward. Morgan admitted that "part of the reason" for doing so "was because [he was] worried about it being misinterpreted in the litigation." (Exhibit 9, Morgan Dep. 101:9-23.)

- *Second*, after hearing of the failed test in Duncan, Faul contacted Tim Quirk at Halliburton's Broussard Lab to request further testing on the Macondo well cement design. (*See* Tr. 4757:7-4758:9; Exhibit 10, Faul Dep. 263:12-265:6.) Faul instructed Quirk to conduct the tests "off the side," which Quirk found "a little unusual." *See* Tr. 4769-70; (Exhibit 10, Faul Dep. 387:1-388:8). Although Quirk made notes of his testing, he "threw" the notes "in the trash" after reporting the testing results to Faul over the phone. (*See* Tr. 4767.) Likewise, Quirk discarded the physical cement test samples after the tests. (*Id.* at 4769:8-11.)

- *Third*, in May 2010, Tommy Roth requested that Mark Savery conduct Displace 3D modeling of the Macondo well cement job. (Tr. 3169:20-22.) After Halliburton ran the Displace 3D modeling, it deleted the results. When BP requested the documents, Halliburton's attorney reported that they were "gone." (Rec. Doc. 4799-12).

BP's initial sanctions motion requested an adverse inference as well as forensic testing. In January 2012, the Court granted-in-part BP's motion, ordering the forensic testing but not the adverse inference. (*See* Rec. Doc. 5307.) To the extent the Court denied BP's motion, it relied on

7

"the reasons presented by Halliburton." (*Id.* at 1.)  As discussed above, in opposing BP's motion, Halliburton repeatedly stressed that the testing performed by both Morgan and Quirk was on "lab stock" not on "rig stock":

> [T]he post-incident tests were performed on lab samples, not the actual ingredients contained in the slurry that was tested before the incident or that was pumped in the Macondo well. . . . The lab samples differ in composition from the rig stock that was tested pre-incident and pumped into the well.  Therefore, as in *Zubulake*, the materials BP complains of are not "direct evidence" of the main claims in this suit, and sanctions are not warranted.

(Rec. Doc. 5082 at 5.)  Although Halliburton had contended in its December 2011 response that only rig stock matters, it did not disclose that it had failed to produce the largest sample of that rig stock (Sample #63981) to the JIT for testing.  Halliburton instead stated exactly the opposite: that it had "secured all sample cement ingredients received from the *Deepwater Horizon* under lock and key." (Rec. Doc. 4961 at 4.)  Halliburton neither identified nor provided all samples for testing, and instead left critical rig stock from the *Deepwater Horizon* "deteriorating" in Halliburton's possession in contravention of the Court's preservation order.  (Pretrial Order #1, Setting Initial Conference, Rec. Doc. 2 at 9-11 ("PTO No. 1").)

**B.      Events Since BP's First Motion Reaffirm The Significant Prejudice to BP.**

Since the Court ruled on BP's sanctions motion in January 2012, events have reaffirmed the significant prejudice to BP and the other parties from Halliburton's destruction and spoliation of evidence.

**1.      On March 13, 2013, Following Questions By Judge Barbier, Halliburton Announced the "Discovery" Of A Sample Taken From The *Deepwater Horizon*.**

**a.      Halliburton's "Discovery" Of The Additional Rig Sample**

After Halliburton continued to stress during trial the importance of rig stock, Judge Barbier asked Halliburton's counsel on March 12, 2013:  "What happened to the sample from the rig, the

rig sample itself?"  (Tr. 3172:16-17.)  Halliburton's counsel responded:  "It is in the possession of the U.S. government."  (Tr. 3173:3-4.)

One day later, at 10:53 p.m. on March 13, 2013, Halliburton announced by email that it had "discovered" a rig sample from the *Deepwater Horizon* (Sample #63981) that was not "in the possession of the U.S. government," contrary to what Halliburton had told the Court only a day earlier.  Rather, Sample #63981 was still in Halliburton's possession.  Halliburton represented, however, that this rig sample was "Kodiak well cement."  (Exhibit 2.)

On March 14, 2013, Judge Barbier questioned Halliburton's counsel about "the significance of that in relation to the trial," noting that "we know from the prior testimony that there was, quote, leftover cement from the Kodiak well that was ultimately used to create the slurry for the Macondo well."  (Tr. 3861:12-21.)  Halliburton's counsel responded that "our judgment is they have nothing to do with this trial."  (Tr. 3862:11-13.)

On March 18, 2013, Halliburton disclosed that the so-called "Kodiak well cement" in fact had the same chemical composition as the cement blend used on the Macondo well.  (Exhibit 3.) Halliburton also admitted that the "Kodiak well cement" had in fact been brought onshore from the *Deepwater Horizon* when the rig was ***at the Macondo well***.  (*Id.* at 2.)  But Halliburton's March 18 disclosure was still inaccurate:  Halliburton claimed that the "Kodiak well cement" was only at the Macondo well for three days (February 20-23, 2010) when, in fact, Sample #63981 was at the Macondo well for over three weeks (January 31, 2010-February 23, 2010).  *See* discussion *infra*.

Halliburton's nearly three-year delay in disclosing Sample #63981 has been profoundly prejudicial to BP and the other parties.  As discussed above, Halliburton has contended since 2010 that "the Cementing Components deteriorate over time."  (Rec. Doc. 494 at 5; *see also* Exhibit 7, Gagliano MBI Tr. at 300:10-16.)  By Halliburton's own assessment, the harm to BP and this

proceeding from Halliburton's failure to disclose this sample when it was first requested is irreparable.

Further, the amount of newly "discovered" material is significant.  According to Halliburton, Sample #63891 consists of approximately three-quarters of a five gallon bucket, equating to approximately 3.75 gallons.  (Exhibit 3 at 1.)  By comparison, the total amount of rig sample that Halliburton previously produced for testing was only 1.5 gallons.  In other words, over 70% of the rig sample available for post-incident testing was withheld by Halliburton for over three years.  The small amount of the previously available sample was significant:  because Sample #67314 was "a very limited amount of sample," the U.S. Government declined to run certain tests requested by BP.  (*See, e.g.,* Rec. Doc. 2830-9.)

> **b.**      **Halliburton's Explanation For Failing To Produce This Critical Evidence Is Inadequate.**

On March 14, 2013, BP asked the Court to require Halliburton to respond to questions about the newly identified "materials."  (Exhibit 11 at 2, Letter from Andrew Langan to J. Shushan (Mar. 14, 2013).)  The Court granted BP's request, and Halliburton agreed to respond by Monday, March 18.[3]

Halliburton did not respond to several of BP's questions.  For example, BP's March 14 letter asked:  "Why were these 'materials' not produced in response to subpoenas and discovery requests or at least identified?"  (Exhibit 11 at 2.)  Halliburton's March 18 disclosure states:  "It is HESI's understanding that Sample I.D. #63981 was not identified as being responsive to discovery requests or the DOJ's subpoena due to it having been labeled as '#2 Kodiak Appraisal' material as opposed to 'Macondo' material."  (Exhibit 3 at 3.)

---

[3]      (Exhibit 14, March 15, 2013 Working Group Conf. Tr. at 10:21-24 ("THE COURT: And in addition, I assume you are, but would you take a look at and answer the specific questions contained in that March 14th letter from BP? MR. GODWIN: Yes, your Honor, we will.").)

Halliburton's response is a non-answer.  As Tommy Roth testified, and is well known, "[t]he cement that was used in the [Macondo] production casing was actually transferred from a prior well, the Kodiak well."[4]  (Tr. 3052:20-21.)  In fact, the Court has aptly observed:  "we know from the prior testimony that there was, quote, leftover cement from the Kodiak well that was ultimately used to create the slurry for the Macondo well."  (Tr. 3861:12-15.)  Given that Halliburton knew from the outset that cement from the Kodiak well was used for the Macondo well, one of Halliburton's first priorities after April 20, 2010 should have been to ensure the relevant cement from the Kodiak well was made available for testing.  Here, Sample #63981 was from the same batch and had the same composition as the cement used on the Macondo well.  Furthermore, Sample #63981 had gone with the *Deepwater Horizon* to the Macondo well and remained there for three weeks before being sent to Halliburton's lab.

More importantly, Tim Quirk testified at trial that, following the incident, Halliburton Operations Manager Tony Angelle instructed him to gather materials "from the *Horizon* rig."  (Tr. 4756.)  Quirk inventoried these materials—including Sample #63981—and stored them in his office.  (*Id.* at 4757.)  After Quirk provided Angelle with "a list of everything that [he] had inventoried," (TREX-048002), Angelle told Quirk "we just need to secure the Macondo well samples."  (Tr. 4805.)  So Quirk "made a new list with just the Macondo well samples and put those samples into the locker and secured it.  Everything else I put back into the storage area in our storage warehouse."  (*Id.*)  Only the materials in the "locker" were provided to the United States in response to its subpoenas; the materials in the storage warehouse (including Sample #63981) were not provided.  (Exhibit 12, D-4611 (BP Hand-Drawn Demonstrative Used During Quirk Cross-

---

[4]    The cement batch used on the Kodiak and Macondo wells was created in 2009.  (Tr. 3128:15-25).

Examination).)  This occurred at the express direction of Mr. Angelle, who had received the

original list.  (*See* TREX-048002.)

Halliburton failed to take necessary and appropriate steps to monitor compliance with its

preservation duties and production obligations.  Quirk was not shown the subpoenas issued to

Halliburton.  (Tr. 4922-25.)  He was not provided clear guidance on what to preserve and testified

that he "misunderstood" Angelle's instructions.  (Tr. 4801-02.)  In fact, Quirk was not even told

that the Kodiak cement was used at the Macondo well.  (Tr. 4787.)  Quirk does not recall seeing

any Halliburton attorneys involved in or supervising the gathering or preservation of evidence.  (Tr.

4919-22; 4925-26.)  Instead, he followed the directions of senior management.  When Angelle

asked Quirk "to secure the Macondo samples," Quirk separated Sample #63981 (the newly-

disclosed sample) from the other bucket of identical Kodiak cement used at the Macondo well.

When Quirk was told to turn over the contents of the secure locker, he turned over those contents.

(Tr. 4919-22, 4925-27.)  A photo that Halliburton produced on March 18, 2013 shows that the 5-

gallon bucket of missing content was clearly labeled "From DW Horizon."  (Exhibit 4, D-3257

(TREX-023056).)  It also had the date of February 23, 2010 on it.  And it was used for testing in

the Halliburton lab on March 7, 2010.  (TREX-005595.)  Had Halliburton's lawyers or

management undertaken a reasonable search of the lab or consulted appropriately with Quirk, this

rig sample would have been located and disclosed to the parties years ago.

Whether Halliburton's failure to provide Sample #63981 for testing was intentional or

unintentional, Halliburton's conduct in an accident of this magnitude is unconscionable.  It is well

established that "[i]t is *not* sufficient to notify all employees of a litigation hold and expect that the

party will then retain and produce all relevant information.  Counsel must take affirmative steps to

monitor compliance so that all sources of discoverable information are identified and searched."

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004); *see also Yelton v. PHI, Inc.*, 279 F.R.D. 377, 387 (E.D. La. 2011) ("Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents.") (quoting *Zubulake*). There is no evidence that Halliburton's counsel took such "affirmative steps" here—indeed, nobody (counsel or otherwise) even told Quirk "that the samples of cement that were from Kodiak were used for Macondo." (Tr. 4787.)

> ### c. Halliburton Has Failed To Identify The Individuals Who Knew About Sample #63981.

BP's March 14 letter also requested that "a list should be provided of the individuals at HESI who were aware of the existence of these 'materials.' That list should indicate when each of those individuals became aware of the materials." (Exhibit 11 at 2.) Halliburton's March 18 submission disclosed Quirk and Richard DuBois as individuals who were aware of Sample #63981, but did not provide a comprehensive list of individuals with knowledge or state when they became aware. The inadequacy of Halliburton's March 18 disclosure became clear on March 19 when, during his trial testimony, Quirk identified Angelle as having knowledge of Sample #63981. (Tr. 4839-40; *see also* TREX-048002 (email transmitting list to Angelle).) Angelle was not disclosed in Halliburton's March 18 submission. At present, it remains unknown who else knew about the existence of Sample #63981.

> ### d. Halliburton's March 18 Disclosure Contains Numerous Other Deficiencies.

Halliburton's March 18 "update" was not signed or verified in any way. It contains virtually no citations or documentary support.[5] Instead, Halliburton's March 18 update contains

---

[5]  Halliburton's March 18 submission also does not directly answer a separate question posed in BP's March 14 letter: "When did HESI notify any representative of the United States of the existence of these materials?" (Exhibit 11.) Halliburton's disclosure states only that on March 13, 2013 "HESI's

lawyerly phrases such as "it is HESI's understanding that . . . ." (Exhibit 3 at 3.)  The March 18

update also contains statements that are contradictory or contrary to the evidence:

- Halliburton asserts that the *Deepwater Horizon* (carrying Sample #63981) arrived at the Macondo well on "February 20, 2010."  In fact the *Deepwater Horizon* and Sample #63981 arrived at the Macondo well on January 31, 2010, meaning that Sample #63981 was at the Macondo well for over three weeks (through February 23, 2010).  (*See* TREX-041072 at 2.)  The accurate dates make clear that the sample left the *Deepwater Horizon* when the *Deepwater Horizon* was drilling at the Macondo well, as confirmed by the March 7 Weigh-Up Sheet.  (TREX-005595 at 1.)

- The lab documents relating to the tests on newly disclosed Sample #63981 bear the name "Macondo."  (TREX-005595 at 1).  On page 4 of its March 18 "update," Halliburton claims the March 2010 tests were marked "Macondo" because Jesse Gagliano "used the Macondo pilot tests lab requests as a template." (Exhibit 3 at 4.)  This assertion is unsupported and unverified.

- On page one of Halliburton's update, the 5-gallon bucket containing the D-AIR blend is listed as being "approximately 3/4 full," whereas TREX-048002 (used at trial) lists it as "approximately 1/2 remaining."  (Exhibit 3 at 1; TREX-048002 at 2.)

Rather than answering the concerns arising out of Halliburton's disclosure of Sample #63981,

Halliburton's March 18 submission raises more questions.

### 2.    Tommy Roth's Testimony At Trial Confirms That Halliburton Improperly Withheld His Notes Of The Morgan Cement Testing.

As discussed in BP's initial sanctions motion, in late April or early May 2010, Ronnie Faul

contacted Rickey Morgan and asked him to prepare a cement slurry with the same composition as

the slurry pumped at the Macondo well.  (Tr. 3059:6-12.)  Roth's notes describing this testing state:

"WHEN ATTEMPT WAS MADE TO FOAM THE CEMENT, SLURRY WOULD NOT FOAM."

(TREX-007718 at 1.)

---

counsel informed Mike Underhill (DOJ) that Sample ID #63981 is located in HESI's Broussard lab."
(Exhibit 3 at 3.)

At trial, Roth testified that he did not know about Morgan's tests when he made presentations to Congress and other investigative bodies between May and September 2010.  (Tr. 3249:5-3252:1.)  Thus, Roth represented to these investigative bodies that "a stable foam cement system was designed, tested, delivered and quality assured."  (TREX-000982 at 3.)  At trial, Roth testified that was "surprised" in October 2010 when he learned of the discarded tests:

> **Q.** When you wrote that ["SLURRY WOULD NOT FOAM"] down in October 2010, you must have been surprised?
>
> **A.** Yes, sir.
>
> **Q.** You had spent six months going to Congressional investigators, going to the National Academy of Engineering, going to the Presidential Commission, talking to them about this accident, and no one had ever told you this?
>
> **A.** That is correct.
>
> **Q.** This indicated to you that there is a problem with the slurry, didn't it?
>
> **A.** This would not be in keeping with best practice.

(Tr. 3253:9-19.)

Several Halliburton employees who knew about the Morgan cement testing—including Ronnie Faul, the person who asked for the "off the side" testing to be done—helped Roth prepare for his May-September 2010 Congressional testimony and presentations.  But Roth testified—for the first time at trial—that no one told him about the Morgan tests at any time between May and September 2010.  (Tr. 3162:4-13; 3249:5-3252:1.)

When Roth learned in October 2010 about this problem—arising from the difference between what he had represented to Congress and others and what Halliburton's secret internal tests showed—Roth did not keep it to himself.  Roth shared the issue with Halliburton's "legal team," whom he trusted to take appropriate steps to rectify those errors:

**Q.** Now, in October, when you first received the weigh-up sheets, did you request the opportunity to go back and make new presentations to the NAE or Congressional investigators or other bodies to provide that information?

**A.** I did not.

**Q.** Did you feel like you had been set up?

**A.** In October, once I learned that, I was working with our legal team. I had confidence in our legal team to be able to make those declarations.

(Tr. 3263:22-3264:5.)

Remarkably, at the time of Roth's deposition in July 2011, Halliburton still had not produced, and thus BP did not have, Roth's October 2010 notes regarding the Morgan test and its failed foam stability result. (TREX-007718.) Thus, when BP filed its initial sanctions motion in December 2011, BP did not know when Roth had provided his notes to Halliburton's attorneys. At trial, Roth testified that he, in fact, prepared his notes in October 2010, and provided them to Halliburton's attorneys "at least" four or five months before his July 2011 deposition (*i.e.*, at least by March 2011) and "possibly" in 2010. (Tr. 3280:11-3281:10.) By that point (no later than March 2011), when Roth was "working with [Halliburton's] legal team," alarm bells should have been going off at all levels of Halliburton to produce Roth's notes. Those alarm bells should have been particularly loud given that Roth was "surprised" by the information he learned in October 2010 and was working directly with the legal team, who he trusted to notify the investigative bodies. (Tr. 3253:4-11.)

Despite all this, Halliburton failed to produce the Roth notes until October 17, 2011, one year ***after*** Roth prepared the notes and anywhere from six months to a year after Roth provided them to Halliburton's attorneys. Between March 2011 (the latest possible date that Roth provided the notes to Halliburton's attorneys) and October 17, 2011 (the date the notes were produced), numerous depositions relating to cement testing were taken in this case. These included the March

21, 2011 deposition of Tim Quirk, the June 29-30, 2011 deposition of Faul, and the July 25-26, 2011 deposition of Roth, among others.

### 3. Since BP's Initial Sanctions Motion, The Parties Have Learned That The Displace 3D Modeling Halliburton Deleted Is Unrecoverable.

As the Court is aware, the evidence regarding Halliburton's Displace 3D modeling has changed significantly since BP filed its initial sanctions motion in December 2011. By way of background, Roth testified at trial that he asked Halliburton employee Mark Savery to run Displace 3D cement modeling in May 2010. (Tr. 3168:22-3169:22.) The purpose of the modeling was "to be able to determine did the fluids space out and was there sufficient spacer to prevent the—displace the base oil and the cement from coming into contact." (Tr. 3168:22-3169:19; *see* Rec. Doc. 7127 at 2.) After Roth and Savery viewed the results, someone at Halliburton deleted them. (Tr. 3171:13-19.) Halliburton has never disclosed the identity of the person(s) who deleted the Displace 3D modeling results, or who was aware of the deletion.

At trial, Roth testified about his conclusions based on the Displace 3D results:

> So my statement here, spacer volume was sufficient to sweep the entire annulus of volume, as such -- and I probably could have used a more demonstrative to say spacer would be more than sufficient to sweep the channel that was in place in the well. This would be what we saw in the Displace 3D. I make the statement, subsequent testing with 3D confirmed statement that spacer was sufficient.

(Tr. 3176:5-25.)

Because Halliburton deleted the results of the modeling, no one will ever know whether the results support or disprove Halliburton's litigation positions. Nor can BP confirm or challenge Roth's testimony by reviewing the modeling. When BP filed its initial sanctions motion, the parties hoped that forensic testing would recover the remnants of the Displace 3D modeling on

17

Savery's computer.  But the forensic testing ordered by the Court failed to locate any traces of the

3D modeling; all of the evidence had been deleted.[6]  (Rec. Doc. 7127 at 2.)

## II.    ARGUMENT

### A.    Sanctions Are Warranted Based On Halliburton's Destruction And Spoliation of Evidence.

A party's duty to preserve evidence "arises when the party has notice that the evidence is

relevant to litigation or when a party should have known that the evidence may be relevant to

future litigation."  *In re Enron Corp. Sec. Derivatives & ERISA Litig.*, 762 F. Supp. 2d 942, 963

(S.D. Tex. 2010) (internal quotations and citations omitted).

Halliburton has long known that evidence relevant to determining the cause of the

incident—and in particular to assessing whether failures of Halliburton's cement contributed to the

*Deepwater Horizon* explosion—would be relevant to issues in pending litigation.  Halliburton also

knew quite well that such evidence included samples from the Kodiak well.  (*See* Tr. 3191; Exhibit

13, Quirk Dep. 549:23-550:4.)  And no later than April 30, 2010, Halliburton claimed the cement

slurry design was "consistent with that utilized in other similar applications."  (TREX-002013.)

Against this backdrop, the Court's remedial authority derives from two sources.  As an

initial matter, Halliburton's conduct violates Pretrial Order No. 1, which directs all parties to "take

reasonable steps to preserve all documents, data and tangible things containing information

potentially relevant to the subject matter of this litigation," and warns that"[f]ailure to comply

---

[6]    In its initial sanctions order, the Court also instructed the parties to meet and confer to determine
whether Halliburton's modeling could be replicated.  (Rec. Doc. 5307 at 2-3).  That effort was also
unsuccessful.  After it became clear that Halliburton was attempting to turn its sanctionable
conduct—destruction of evidence—into a tactical advantage by generating self-serving evidence after
the close of discovery, BP sought further relief from the Court:  (a) an order deeming the "evidence" of
the attempted recreation of the missing modeling inadmissible at trial, and (b) an order requiring
Halliburton to bear 100% of the costs of the forensic examination and attempted replication.  (Rec. Doc.
7127 at 1-2).  On August 16, 2012, the Court granted BP's requested relief.  (Rec. Doc. 7127 at 2).

18

[could] lead to dismissal of claims, striking of defenses, ***imposition of adverse inferences or other dire consequences***." (PTO No. 1 at ¶ 14 (emphasis added).) Where, as here, a party has destroyed evidence in violation of a specific court order, the court may impose sanctions under Rule 37(b).[7] *See* FED. R. CIV. P. 37(b)(2)(A). Such civil sanctions may include (among others) barring the disobedient party from introducing evidence or directing that certain facts shall "be taken as established for purposes of the action." FED. R. CIV. P. 37(b)(2)(A)(i). Such sanctions may also include striking the disobedient party's pleadings, dismissing the action, and "rendering a default judgment against the disobedient party". FED. R. CIV. P. 37(b)(2)(A)(i)-(vi). "Rule 37(b)(2) contains two standards—one general and one specific—that limit a district court's discretion. First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

In addition, discovery sanctions may be based on the Court's inherent power to control the judicial process and prevent its abuse. *See generally Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (inherent power to sanction not displaced by federal statute or rules of procedure); *Yelton v. PHI, Inc.*, 279 F.R.D. 377 (E.D. La. 2011). "In order for this Court to impose sanctions under its inherent power, however, it must find bad faith—which is not required under Rule 37." *Yelton v. PHI, Inc.*, 278 F.R.D. 377, 387 (E.D. La. 2011).

In *Yelton*, for example, this Court concluded that "the evidence submitted leans toward a finding of a significant degree of culpability." *Id.* at 391. Like Halliburton, the defendant in *Yelton* was far from forthcoming with respect to post-litigation tests:

---

[7]     The relief that BP requests is also authorized under Rule 37(c)(1)(C), which expressly permits the Court to impose any sanctions available under Rule 37(b)(2)(A)(i)-(vi).

> The simulation results also raise[] the specter that Sikorsky did not want the findings, or the data used, to be readily available.  Dr. Kim's deposition testimony underscores the point, as he testified that, on more than one instance, Mr. Potts requested that he delete reference to the S92 data used in his bird strike simulation analysis, and that he complied.

*Id. Yelton* was affirmed in pertinent part by this Court.  *See Yelton v. PHI, Inc.* 284 F.R.D. 374 (E.D. La. 2012) (Barbier, J.).

The sanctions requested below are authorized under both Rule 37 and the Court's inherent power.  Halliburton has repeatedly violated PTO 1, and, as required by Rule 37, the sanctions are just and related to the particular claim that was the subject of the discovery violations.  The sanctions also are authorized under the Court's inherent power.  *See, e.g., Yelton v. PHI, Inc.*, 279 F.R.D. 377, 392-94 (E.D. La. 2011).

## B.     The Court Should Order Appropriate Remedies For Halliburton's Conduct.

According to Halliburton, rig samples—not lab stock—are what matter.  (Rec. Doc. 4961 at 12, 18).  But, based on Halliburton's failure to disclose Sample #63981 for nearly three years and Halliburton's own position concerning the "deterioration" of cement over time, most of the available rig sample was not produced for testing before trial.  Through its conduct, Halliburton is solely responsible for the "deterioration" of what it claims is the most important piece of evidence concerning the role of the Halliburton cement slurry design in the events of April 20, 2010.  The prejudice to BP and the other parties is beyond dispute.

Halliburton engaged in a pattern of destruction, spoliation, and withholding of critical evidence, including the following illustrative examples:

> (1) Halliburton withheld the rig sample (Sample #63981) from April 2010 to March 2013, during which time it "deteriorated" according to Halliburton;

> (2) Halliburton destroyed the Morgan testing sample that showed a failure to foam in April/May 2010;

(3) Halliburton withheld the Roth notes regarding the failure of the Morgan testing from October 2010 through October 2011, after Roth's deposition;

(4) Halliburton destroyed the testing sample used in connection with the Quirk tests in April/May 2010;

(5) Halliburton destroyed the notes taken by Quirk documenting the results of his testing in April/May 2010; and

(6) Halliburton deleted the Displace 3D modeling from Savery's computer, which was irretrievable notwithstanding the forensic testing ordered by the Court.

Viewed cumulatively, Halliburton's bad-faith conduct significantly limited the parties' ability to present evidence of post-incident cement analysis. In light of Halliburton's destruction and spoliation of critical evidence, BP requests the sanctions set forth below.

*First,* as permitted by Rule 37(b)(2)(A)(i) and the Court's inherent authority, the Court should make an adverse factual finding that Halliburton's final cement design was unstable and caused hydrocarbons to enter the wellbore. No one will ever know whether the undisclosed and missing evidence would have further supported a conclusion that Halliburton's cement caused the April 20, 2010 blowout. But, given Halliburton's conduct here, it should not be permitted to argue that the missing evidence would have been helpful to its case. To the contrary, the law is clear in these circumstances that the presumptions and inferences go against the spoliator. As the Court explained in *Yelton*:

> Unfortunately, it is impossible to know the extent of the prejudice suffered by PHI as a result of the loss of Dr. Kim's data files, because they have been permanently lost due to Sikorsky's conduct. . . .
> Dr. Kim's data files may have been helpful to PHI, or of no value to any party. As a result of Sikorsky's misconduct and intentional destruction of the data files, however, the Court will never know. However, given the facts and circumstances presented here, the Court finds that PHI has carried its limited burden of demonstrating that the lost documents would have been relevant . . . .
> [B]ased on the record in this case, the Court makes the preliminary findings necessary for the spoliation evidence to be submitted, and an adverse inference instruction given to the jury.

279 F.R.D. at 392-94.

Accordingly, the Court should make an adverse factual finding that Halliburton's final cement design was unstable and caused hydrocarbons to enter the wellbore.  This sanction is merited both by the individual instances of Halliburton's misconduct cited above, and by the cumulative effect of that misconduct.  *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 112-13 (2d Cir. 2002); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 436 (S.D.N.Y. 2004).

**Second**, in light of the recent information that the majority of the available rig sample has been spoliated (according to Halliburton's documents and witnesses), the other cement testing data in the case becomes far more relevant and critical.  This includes the lab testing by Morgan and Quirk.  Accordingly, the Court should find that the post-incident tests conducted by Rickey Morgan and Tim Quirk in April/May 2010—the results of which were destroyed by Halliburton—establish that the cement used on the Macondo well on April 20, 2010 was not stable.

**Third**, and also to fill the cement testing evidentiary gap created by Halliburton's conduct, the Court should permit the deposition "opinion testimony" of the Chevron and OT&C witnesses (Gardner and Garrison) regarding their post-incident testing.[8]  Gardner (Chevron) performed post-incident cement testing using lab stock from Halliburton for the Presidential Commission, while Garrison (OT&C) performed post-incident testing using lab stock from Halliburton and rig stock for the JIT.  The testing-related deposition opinion testimony of Gardner and Garrison is relevant and should be allowed at trial.

---

[8]   BP requests this relief to the extent that Halliburton's use of Chevron and OT&C testimony has not already "opened the door" to such evidence over the Court's ruling in Rec. Doc. 5810.  (*See* Tr. 2542-43 (the Court overruled Halliburton's objection to use of OT&C testimony)).

22

### III.    CONCLUSION

The preservation of evidence is crucial to a fair and just proceeding, and accordingly a court may impose severe sanctions against a party that engages in spoliation.  Halliburton has destroyed and failed to produce the very cement samples and documentary evidence at the heart of the parties' claims in this case.  "[T]he Court will never know" what this evidence would have showed had it been preserved.  *Yelton*, 279 F.R.D. at 392-94.  The prejudice in terms of BP's ability to defend itself is severe, and appropriate sanctions are warranted.

For the foregoing reasons, BP respectfully requests that the Court enter an order: (1) finding that Halliburton's final cement design was unstable and caused hydrocarbons to enter the wellbore; (2) finding that the "off the side" tests conducted by Rickey Morgan and Tim Quirk in April/May 2010 establish that the cement used on the Macondo well on April 20, 2010 was not stable; and (3) allowing opinion testimony by deposition designations of Chevron and Oilfield Testing & Consulting witnesses (Gardner and Garrison) regarding their post-incident testing.

Dated:  March 21, 2013                    Respectfully submitted,


                                          /s/ Don K. Haycraft
                                          Don K. Haycraft (Bar #14361)
                                          R. Keith Jarrett (Bar #16984)
                                          LISKOW & LEWIS
                                          701 Poydras Street, Suite 5000
                                          New Orleans, Louisiana 70139-5099
                                          Telephone: (504) 581-7979
                                          Facsimile: (504) 556-4108

                                          J. Andrew Langan, P.C.
                                          Matthew T. Regan, P.C.
                                          Hariklia Karis, P.C.
                                          KIRKLAND & ELLIS LLP
                                          300 North LaSalle Street
                                          Chicago, IL 60654
                                          312-862-2000 (Tel)
                                          312-862-2200 (Fax)

                                          Robert C. "Mike" Brock
                                          COVINGTON & BURLING LLP
                                          1201 Pennsylvania Avenue, NW
                                          Washington, DC 20004-2401
                                          202-662-5985

                                          *Attorneys for Defendants BP Exploration &
                                          Production Inc. and BP America Production
                                          Company*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of March, 2013.



/s/ Don K. Haycraft