# EXHIBIT 10

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3       IN RE: OIL SPILL        )   MDL NO. 2179
         by the OIL RIG          )
 4       "DEEPWATER HORIZON" in  )   SECTION "J"
         the GULF OF MEXICO, ON  )
 5       APRIL 20, 2010          )   JUDGE BARBIER
                                 )
 6                               )   MAG. JUDGE
                                 )   SHUSHAN
 7
 ...
20                    VOLUME 1 OF 2
21
22         Deposition of RONALD RAY FAUL, taken
23       at Pan American Life Center, 601 Poydras
24       Street, Ponchartrain Room, New Orleans,
25       Louisiana, on the 29th of June, 2011.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1  Q. Uh-huh.
2  A. -- and repeat the test that was on
3  the final BP Macondo production liner,
4  production casing report, repeat the
5  stability test specifically.
6  Q. Yeah. Yeah. Now -- now, you did
7  that, as I understand it, because somebody
8  in Duncan had told you that they had
9  attempted a duplication of the test, and
10 they found that the cement settled, right?
11 A. Yes.
12 Q. All right. So when you called
13 Mr. Quirk, it was probably within a week
14 or two after the blowout had started,
15 right?
16 A. It would have been in May
17 sometime.
18 Q. In May?
19 A. Yes.
20 Q. The blowout's April 20, so in
21 early May you were calling and saying --
22 A. Probably --
23 Q. -- let's --
24 A. Probably a little later in May.
25 Q. Now --

**PURSUANT TO CONFIDENTIALITY ORDER**

1   A.   After the 15th.
2   Q.   Okay.  You had from Duncan a
3   report that the cement was settling,
4   and -- I got that right, correct, you --
5   that they -- they told you the cement
6   samples that they tested that they thought
7   were samples similar to the Macondo job,
8   they -- they were settling, right?
9   A.   Yes.  He called me and said that
10  the sample he mixed up was showing some
11  signs of settling.
12  Q.   Had you guys sent up to Duncan
13  some of the samples that you had on hand
14  at that time so that they could perform
15  the tests?
16  A.   We had sent up lab stock.
17  Q.   That'd be some of the same samples
18  you and I just went over in tab 60, right?
19  A.   No.  Tab 60, I believe, was
20  samples from the Macondo well specific to
21  the Macondo well, and those were isolated.
22  So lab stock would have been samples in
23  the lab that -- that had -- we -- we
24  didn't touch the -- those were under lock
25  and key.

```
 1          Q.  Okay.  Now, when you say lab
 2     stock, though, for Duncan to test the
 3     cement blends similar to what was used in
 4     the Macondo production casing job, you
 5     know, the 7-inch job --
 6          A.  Yes.
 7          Q.  -- they would have needed to have
 8     blended into the cement essentially the
 9     same materials that were blended into the
10     cement for the Macondo 7-inch production
11     job?
12          A.  We could have sent them samples of
13     Lafarge cement and samples of materials
14     from the lot numbers that we had in the
15     lab, but we didn't send them any of the
16     material from the -- from the rig --
17          Q.  Okay.
18          A.  -- Macondo.
19          Q.  Okay.  All right.  So you sent
20     them the cement -- the Lafarge cement.
21     Did --
22          A.  Yeah.
23          Q.  -- you take that out of the bin
24     down in Port Fourchon?
25          A.  I don't know where they got it.
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          Q.  And I know you were asked earlier
 2   today whether or not you told Mr. Quirk to
 3   destroy his -- his notes or any results
 4   that he had gotten.  You testified that
 5   you didn't instruct him to do that at all.
 6          A.  I don't remember instructing him
 7   to destroy any -- any work that he had
 8   done.  I did ask him not to put it in the
 9   Viking system because it was not
10   associated with a customer need.  It was
11   internal Halliburton information.
12          Q.  Okay.  So you told him not to put
13   it into the Viking system --
14          A.  That's correct.
15          Q.  -- which is an -- that's an
16   electronic sort of process, isn't it?
17          A.  Yes.
18          Q.  Did you also instruct him not to
19   generate a report in connection with the
20   testing he was conducting?
21          A.  He gave me all the information
22   that I wanted when -- over the phone call.
23   I didn't tell him to -- to generate a
24   report.
25          Q.  Okay.  But that -- I appreciate
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   that. But my question is, did you
2   specifically tell Mr. Quirk not to
3   generate a report in connection with the
4   foam stability test he was running for you
5   after the blowout?
6       A.  He would have had to put it in
7   Viking to do that, and I asked him not to
8   put it in Viking.
9       Q.  And I know today you've talked
10  about -- and just so I understand, you've
11  talked quite a bit about information
12  gathering, that you -- you were -- you
13  were conducting these tests after the fact
14  so you could gather facts and information,
15  and you used some of that information to
16  brief and educate some of the -- the other
17  people at Halliburton about what had
18  happened on Macondo; is that right?
19      A.  To give information to them so
20  that they could build -- we could build
21  presentations and they could go to
22  Washington and -- and present that
23  information.
24              We specifically did not do any
25  investigation. We didn't look into how it