UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010 | : : : : | MDL NO. 2179  SECTION J |
| THIS DOCUMENT RELATES TO: | : : | JUDGE BARBIER |
| ALL CASES | : : | MAGISTRATE JUDGE SHUSHAN |

**RESPONSE OF THE UNITED STATES TO BP'S MOTION FOR SANCTIONS AGAINST HALLIBURTON [REC. DOC. 8977]**

The United States believes that the question of sanctions under the Court's inherent authority and under Fed.R.Civ.P. 37 rests with the sound discretion of the Court. We also believe, however, that BP's Motion for Sanctions seeks inferences that are factually incorrect and prejudice – for BP's benefit – parties other than Halliburton, including the United States, the States, and private plaintiffs. BP's proposal seeks to resolve questions of law and fact without the benefit of the full record already before the Court (and yet to be presented), all to the detriment of parties not subject to the motion for sanctions. This result should be rejected.

For example, the first adverse inference sought by BP asserts, "Halliburton's final cement design was unstable and caused hydrocarbons to enter the wellbore on April 20, 2010." The proposed inference incorporates at least three inaccuracies or misstatements. First, the cement design was a product of Halliburton's *and* BP's collaborative work, and not merely that of Halliburton. This evidence of BP's and Halliburton's collaborative relationship in the cement design is not only contained in the report and testimony of the United States' cement expert,

- 1 -

Glen Benge, but also was highlighted during the trial testimony of BP's own cement expert, David G. Calvert.[1] The proposed inference suggests absolution for BP, thereby causing prejudice to the private plaintiffs, the United States, the States, and even other non-Halliburton defendants.

Second, the same proposed adverse inference also fails to acknowledge the operational decisions made by BP, either on its own or in concert with Halliburton, that led to the failure of the cement job. Specifically, BP used a leftover cement blend, incorporated base oil into the cement slurry design, utilized foamed cement in a synthetic oil-based mud environment, inadequately centralized the production casing, limited pre-job circulation, utilized low cement volumes and pump rates, pumped the cement before it was sufficiently tested, and underbalanced the well before the cement was set, all of which contributed to the failure of the cement job.

Third, by now the uncontroverted evidence in the trial establishes that the cement pumped into the Macondo Well's production casing on April 19th and 20th failed to serve as a barrier to hydrocarbons and thus *allowed* hydrocarbons initially to enter the wellbore (a) when the well went underbalanced during the April 20th negative pressure test, and (b) commencing thereafter when the well went underbalanced as a result of the Temporary Abandonment Procedure and the displacement of the riser from mud to seawater. Thus, while BP and

---

[1] *See*, trial testimony of BP's cement expert, David G. Calvert, Tr. 2617:16 - 2619:3, including the question posed by the Court and answered by the witness at Tr. 2618:9 - 2619:3. *See also,* trial testimony of Glen Benge, *e.g.*, describing the iterative process between the BP and Halliburton, with the operator ultimately responsible for approving the job  (Tr. 2245:13-2246:17); decision to use foam was shared between BP and Halliburton (Tr. 2283:20-24); both BP and Halliburton were involved in the decision not to run a full suite of tests on the slurry before pumping it (Tr. 2372:1-9); BP controls the physics of the cement job, and was responsible for reducing the number of centralizers to be run, the pump rate and not properly conditioning the mud at the bottom of the hole (Tr. 2409:14-2410:9);  Halliburton's designs are the product of an iterative effort between the operator and Halliburton (Tr. 2548:12-20); did not absolve itself of responsibility for the cement job by relying on Halliburton's services (Tr. 2580:21-2581:3); even if the cement was unstable, the cement could have provided a barrier in the well if set (Tr. 2579:17-2580:8); with respect to BP's demonstrative D4375, the slurry design and testing and job design are not linear, but rather simultaneous and iterative steps (Tr. 2583:5-2584:10).  See also, trial testimony of Mark Bly regarding pumping the cement job without BP first having received and reviewed lab tests (Tr. 1080–1086).

Halliburton *share* responsibility for the cement design and some of the multiple failures associated with it, the negative pressure test and Temporary Abandonment Procedures were decisions made by BP.

Likewise, BP's proposed second inference suffers from the same problems described above in the first and second points, *i.e*., at the very least, it suggests that the failure of the cement job rests solely with Halliburton.

BP's proposed third inference, which seeks the admission of "opinion" testimony of Messrs. Greg Garrison and Craig Gardner, suffers from a different problem. With respect to the opinion testimony of Greg Garrison, who was retained to perform cement testing by the Joint Investigative Team ("JIT"), the Court's prior exclusion of his testimony was based upon the express statutory exclusion in 46 U.S.C. 6308. [*See*, Rec. Doc. 5448 (Excluding the JIT Report); Rec. Doc. 5618 (excluding Garrison's testimony).] The relevant section of the statute provides:

> 6308. Information barred in legal proceedings
>
> (a) Notwithstanding any other provision of law, no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

Likewise, the Court excluded the National Commission Report and Chief Counsel's Report that were part of the President's Oil Spill Commission ("OSC"). [Rec. Doc. 5635.] One of the subjects of BP's third proposed adverse inference, Chevron's Craig Gardner, performed testing of cement samples on behalf of the OSC. The Court later issued its Order [Rec. Doc. 5810], clarifying that "fact" testimony – but not "opinion" testimony – of Messrs. Garrison and Gardner would be admissible so as to provide context and direct observations concerning their respective cement testing data and results.

The Court therefore struck a proper balance between test data and the testing results themselves (admissible) versus "opinions" concerning the results (inadmissible).  BP's proposed inference would upset the balance crafted by the Court and, like its first two proposed adverse inferences, do so to the prejudice of parties other than Halliburton.  Moreover, the opinion testimony of Garrison and Gardner bears no relationship to the acts and/or omissions of Halliburton that are the subject of BP's sanctions motion.  We therefore respectfully believe that the Court's previous rulings concerning JIT and OSC opinion testimony should not be set aside.

## CONCLUSION

The United States believes that the issue of sanctions rests within the sound discretion of the Court, as informed by applicable law.  If the Court imposes sanctions upon Halliburton, they should be crafted in a way that cause no prejudice to other parties.  We respectfully believe that the adverse inferences proposed by BP potentially could cause such prejudice and therefore should be rejected.

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

JAMES NICOLL
Senior Counsel
NANCY FLICKINGER
Senior Attorney
SARAH HIMMELHOCH
Senior Litigation Counsel
DEANNA CHANG
SCOTT CERNICH
A. NATHANIEL CHAKERES
JUDY HARVEY
ABIGAIL ANDRE
RACHEL HANKEY
BETHANY ENGEL
THOMAS BENSON
Trial Attorneys

-5-

| | |
|---|---|
| /s/ R. Michael Underhill | /s/ Steven O'Rourke |
| R. MICHAEL UNDERHILL, T.A. | STEVEN O'ROURKE |
| Attorney in Charge, West Coast Office | Senior Attorney |
| Torts Branch, Civil Division | Environmental Enforcement Section |
| U.S. Department of Justice | U.S. Department of Justice |
| 7-5395 Federal Bldg., Box 36028 | P.O. Box 7611 |
| 450 Golden Gate Avenue | Washington, D.C. 20044 |
| San Francisco, CA 94102-3463 | Telephone:  202-514-2779 |
| Telephone:  415-436-6648 | Facsimile:  202-514-2583 |
| Facsimile:  415-436-6632 | E-mail:  steve.o'rourke@usdoj.gov |
| E-mail:  mike.underhill@usdoj.gov | |

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA  70130
Telephone:  (504) 680-3000
Facsimile:  (504) 680-3184
E-mail:  sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

-6-

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:  March 23, 2013.                         /s/  R. Michael Underhill
                                               U.S. Department of Justice