# Exhibit 23

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL BY THE OIL RIG     *     Docket 10-MD-2179
DEEPWATER HORIZON IN THE             *
GULF OF MEXICO ON APRIL 20, 2010     *     Section J
                                     *
Applies to:                          *     New Orleans, Louisiana
                                     *
Docket 10-CV-02771,                  *     March 7, 2013
IN RE:  THE COMPLAINT AND            *
PETITION OF TRITON ASSET             *
LEASING GmbH, et al                  *
                                     *
Docket 10-CV-4536,                   *
UNITED STATES OF AMERICA v.          *
BP EXPLORATION & PRODUCTION,         *
INC., et al                          *
                                     *

* * * * * * * * * * * * * * * * * *


DAY 8, AFTERNOON SESSION
TRANSCRIPT OF NONJURY TRIAL
BEFORE THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE


Appearances:


For the Plaintiffs:          Domengeaux Wright Roy
                                & Edwards, LLC
                             BY:  JAMES P. ROY, ESQ.
                             556 Jefferson Street, Suite 500
                             Post Office Box 3668
                             Lafayette, Louisiana 70502


For the Plaintiffs:          Herman Herman & Katz, LLC
                             BY:  STEPHEN J. HERMAN, ESQ.
                             820 O'Keefe Avenue
                             New Orleans, Louisiana 70113


OFFICIAL TRANSCRIPT

DAVID CALVERT - DIRECT

Page 2617

1   the base slurry.  Did you see things in that slurry that were

2   helpful or harmful to manage this risk during the transition?

3   A.    Can I have that question again, please?

4   Q.    On page 18 of your report, you mention the composition of

5   the base slurry.  Did you see things in your review of this

6   base slurry that were either helpful or harmful to manage this

7   risk during the transition period?

8   A.    In looking at the slurry design that was used on this

9   particular well, it had a base slurry, it had a foam system --

10  in the base slurry cap, a foam system, and then a base slurry

11  shoe track cement.

12  Q.    And where did that base slurry in the shoe track cement

13  sit?

14  A.    That base slurry in the shoe track is in the shoe track

15  itself.

16  Q.    And what steps could or should have been taken by

17  Halliburton to make that shoe track cement able to withstand

18  hydrocarbon influx?

19  A.    The steps that could have been taken was to add an

20  additive of some type that controls hydrocarbon influx.

21  Q.    Did you look at the design of this particular shoe track

22  cement slurry to see whether any additives were present?

23  A.    My observation of the shoe track cement slurry, which was

24  the base slurry, I did not see additives in there that would

25  control the influx of hydrocarbons.

OFFICIAL TRANSCRIPT

DAVID CALVERT - DIRECT

Page 2618

1   Q.   And would that have been the contractor, Halliburton's,

2   responsibility to design a slurry with those types of

3   additives?

4   A.   That would have been a cumulative, as we've been talking.

5   Q.   Yes, sir.

6        Now, one of the issues you raised in your report with

7   regard to hydrocarbon migration through the shoe track cement

8   was resulted either through the reduced hydrostatic head --

9        THE COURT:  Wait a second.  I didn't understand that

10  last answer.  You said that would have been a what?

11       You asked -- the question was:  Would that have

12  been the contractor, Halliburton's, responsibility to design a

13  slurry with those types of additives?

14       What was your answer?

15       THE WITNESS:  I said that would have been cumulative

16  between Halliburton and the operator to --

17  BY MR. BREIT:

18  Q.   I think we're having trouble with the word that begins

19  with C-U-M.

20  A.   It would be an action between both the contractor and the

21  operator.

22       THE COURT:  Okay.  What was the word you answered?

23       THE WITNESS:  "Cumulative."

24       MR. BREIT:  Cumulative?

25       THE WITNESS:  That's Oklahoma.

OFFICIAL TRANSCRIPT

DAVID CALVERT - DIRECT

Page 2619

1              THE COURT:  I think we have a different word for it

2     down here.  That means they have to work together; right?

3              THE WITNESS:  Yes, sir.

4              MR. BREIT:  We'll add it to the cement words we've

5     got.

6              THE COURT:  Okay.

7     BY MR. BREIT:

8     Q.   Now, one of the issues you raised in your expert report

9     with regard to the hydrocarbon migration through the shoe track

10    cement was, one, it could have resulted from the hydrostatic

11    head transitioning and, two, from mud contamination.  And I

12    want to address briefly that mud contamination.

13             Is your opinion relative to the mud contamination

14    related to the cement in the shoe track?

15    A.   Yes.  That would be one place that we could have mud

16    contamination.

17    Q.   Are you familiar with the drilling term "swapping" or

18    "inversion"?

19    A.   Yes, sir.

20    Q.   And where does that take place?

21             MR. BREIT:  And if I could have TREX-001.025, which

22    is Demonstrative 2024.

23    BY MR. BREIT:

24    Q.   Feel free to explain to the Court in using this diagram,

25    if it would help you to discuss it, where swapping or inversion
                       OFFICIAL TRANSCRIPT