# Exhibit 24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
IN RE:  OIL SPILL BY THE OIL RIG    *    Docket 10-MD-2179
DEEPWATER HORIZON IN THE            *
GULF OF MEXICO ON APRIL 20, 2010    *    Section J
                                    *
Applies to:                         *    New Orleans, Louisiana
                                    *
Docket 10-CV-02771,                 *    March 6, 2013
IN RE:  THE COMPLAINT AND           *
PETITION OF TRITON ASSET            *
LEASING GmbH, et al                 *
                                    *
Docket 10-CV-4536,                  *
UNITED STATES OF AMERICA v.         *
BP EXPLORATION & PRODUCTION,        *
INC., et al                         *
                                    *
* * * * * * * * * * * * * * * * * *
```

DAY 7, AFTERNOON SESSION
TRANSCRIPT OF NONJURY TRIAL
BEFORE THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

Appearances:

For the Plaintiffs:        Domengeaux Wright Roy
                              & Edwards, LLC
                           BY:  JAMES P. ROY, ESQ.
                           556 Jefferson Street, Suite 500
                           Post Office Box 3668
                           Lafayette, Louisiana 70502


For the Plaintiffs:        Herman Herman & Katz, LLC
                           BY:  STEPHEN J. HERMAN, ESQ.
                           820 O'Keefe Avenue
                           New Orleans, Louisiana 70113


OFFICIAL TRANSCRIPT

OFFICIAL TRANSCRIPT

1   the placement of the cement itself.
2          I found there was a failure in both of those.  The
3   Macondo well used a leftover cement blend.  It was not
4   originally intended -- originally designed as a foam cement.
5   And so because of that, it puts more onus on lab testing to
6   make sure that all of the testing was done and completed.
7          I also found that there was a failure to really
8   mitigate several acknowledged risks to the job itself.
9          And then, finally, there was a failure to evaluate
10  the cumulative risks that were acknowledged.  So it wasn't just
11  one risk that happened, but the cumulative risks that caused
12  that failure.
13  Q.  How does the cement design process work?  What's the
14  relationship between the operator and the cement service
15  provider?
16  A.  It's a very iterative process.  The operator will -- they
17  set the boundary conditions, they set the limits, what's the
18  objectives of the well.  So what do I want the cement job to
19  do?
20         And once I've set those goals and I understand those
21  goals, then what's my operating window?  What's the well doing?
22  How deep is it?  What's the size of everything?  What's my pore
23  pressure, frac gradient, what have you?  They give that to the
24  cementing service company.
25         And with their portfolio of materials, they go and,

OFFICIAL TRANSCRIPT

1  within the limits or the constraints of that well, design the
2  chemistry, if you will, the cement slurry itself.
3          Also involved with that and in concert with that are
4  the design of the physics. What's the constraints? How fast
5  can we pump? What are fluid densities? What's the well look
6  like? So it's a very iterative technique.
7          And then, once all that's come together, you bring
8  that back together and the operator then reviews that and then
9  it's ultimately approved by the operator before it's used on
10 the well.
11 Q.  Is the operator ultimately responsible for cementing the
12 well?
13 A.  Yes.
14 Q.  Who has the ultimate authority on the cement job? Is that
15 also the operator?
16 A.  Yes, sir. You can't pump anything in that well that the
17 operator doesn't approve.
18 Q.  I'd like you to talk about -- a bit more about the
19 chemistry and the physics that you mentioned.
20         MR. CERNICH: If we could go to the next slide,
21 please.
22 BY MR. CERNICH:
23 Q.  Can you tell the Court a little bit more about the
24 chemistry and physics?
25 A.  Well, the chemistry is -- it's the cake mix. It's what's

OFFICIAL TRANSCRIPT

1   cement was feasible and was a better option in his opinion.  So
2   this well did not require the use of foam cement.
3   Q.   Was unfoamed cement feasible here?
4   A.   Yes, sir, it was.
5   Q.   What would have been required to use unfoamed cement?
6   A.   You would have designed a 14.5 pound per gallon standard
7   cement system.  Pretty generic.  You would have had to have
8   designed it, blended it, sent it out to the rig.  You would
9   have not used the leftover cement.  You would have had a new
10  cement plan.
11  Q.   And in the next section from the April 14th, 8:30 a.m.
12  meeting, it says:  Concerns about frac gradients and pore
13  pressure and what was the most representative scenario.
14       So does this indicate that the team was concerned
15  about the frac gradients and pore pressure at this meeting?
16  A.   Well, again, this echos what we've seen throughout the
17  design of the cement job, the ECD control was driven by pore
18  pressure and frac gradient and that remained a concern
19  throughout the design process.
20  Q.   Okay.  Thank you.
21       Was it ultimately BP's decision to use foam cement?
22  A.   I don't know.  I think it was a shared -- it was
23  recommended it was done; but in order to put it in the well, BP
24  had to approve it.
25  Q.   And that was despite a challenge from Mr. Cunningham, BP's

OFFICIAL TRANSCRIPT

1  Q.   And the decision not to run those tests on the Macondo
2  slurry were made by the BP wells team; correct?  The ultimate
3  decision --
4  A.   The ultimate decision, yes, sir.
5          Well, that's a bit difficult because those tests are
6  requested by the engineer, by Mr. Gagliano, as well.  So
7  it's -- again, I started out that this is an iterative
8  technique or iterative response where both parties would be
9  involved.
10 Q.   But you're not saying that BP was not obligated under its
11 own internal documents, under industry best practices, to make
12 sure those tests were run; correct?
13 A.   That's not what I'm saying, no, sir.
14 Q.   BP was required to make sure those tests were run;
15 correct?
16 A.   Yes, sir.
17 Q.   And now what you're saying is perhaps Halliburton was also
18 obligated, but that wasn't the question I asked you.
19 A.   I apologize.  Thank you, sir.
20          UNIDENTIFIED SPEAKER:  You can ask him.
21          MR. MILLER:  I'll let Mr. Godwin ask you that
22 question.
23          THE WITNESS:  Yeah.
24          MR. MILLER:  He's dying to ask you that.
25

OFFICIAL TRANSCRIPT