UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in | : | |
| the GULF OF MEXICO, on | : | SECTION:  J |
| APRIL 20, 2010 | : | JUDGE BARBIER |
| | : | MAG. JUDGE SHUSHAN |
| | : | |
| | : | JURY TRIAL DEMANDED |

. . .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ..

**THIS DOCUMENT RELATES TO ALL CASES, including No. 10-2771**

## BRIEF OF CAMERON INTERNATIONAL CORPORATION IN SUPPORT OF JUDGMENT ON PARTIAL FINDINGS DENYING LIABILITY CLAIMS AGAINST CAMERON

Cameron International Corporation ("Cameron") submits this brief in support of its motion under FED. R. CIV. P. 52(c) for judgment on partial findings denying any recovery against Cameron in this proceeding.

### SUMMARY OF ARGUMENT

Cameron's liability to Plaintiffs and Claimants (hereinafter "Plaintiffs") under maritime law requires findings supporting the conclusion that Cameron is either responsible as a product manufacturer or committed actionable negligence, and that Cameron's misconduct was a proximate cause of the losses suffered by Plaintiffs.  Based on the evidence adduced during the Plaintiffs' case, Cameron respectfully requests this Court to make partial findings and conclude that Cameron is not liable either in product

liability or negligence and that no Cameron misconduct is the proximate cause of any loss suffered by any Plaintiff.

Plaintiffs here, as is typical in a product liability case, asserted a theory related to the design of the *Deepwater Horizon* blowout preventer ("BOP").  But unlike a typical product liability case, Plaintiffs' claims are directed not at Cameron as the seller.  Rather, in their case, Plaintiffs challenged the conduct of BP and Transocean – the *customer* – in the maintenance of the BOP and certain components, the arrangement of certain BOP components, and the subsequent failure to "upgrade" the BOP with later-developed components.  To the extent that Plaintiffs' claims can be construed as questioning Cameron's original design, Plaintiffs failed to prove that the design was defective in any way at the time the products left the possession of Cameron.

**THE LIABILITY CLAIMS AGAINST CAMERON ADDRESSED BY THIS MOTION**

With the other issues being tried in the ongoing trial in this limitation proceeding, this Court's orders have joined the liability claims asserted against Cameron under maritime law in the following pleadings:

1.  The First Amended B1 Master Complaint and Third-Party Action [with respect to all Claimants to the extent that they are not members of the certified settling classes or their claims are not governed by the approved class settlements, inasmuch as the approved class settlements release Cameron for all claims that are governed by the settlements], Doc. 1128;

2.  The Local Government Entity Master Complaint and Third-Party Action, Doc. 1510;

3.  Alabama's First Amended Complaint, Doc. 1872; and

4.  Louisiana's First Amended Complaint, Doc. 2031.

On Wednesday, March 20, 2013, the Court granted Cameron's motion for judgment pursuant to Fed. R. Civ. P. 52(c) as to all claims of punitive damages against it.  At that time, Cameron informed the Court that it would submit the present motion as to the remaining claims.  Tr. 5061:10–20.  Through this motion, Cameron seeks judgment with respect to all such remaining claims.

ARGUMENT

"If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  FED. R. CIV. P. 52(c).  Having rested, Plaintiffs have been "fully heard" on the issue of Cameron's liability.

This Court has ruled that general maritime law governs this punitive damage claim.  (Doc. 4845.)[1]  A court resolving maritime law issues exercises "authority to fashion the rule that will best answer the question presented by the case." *McDermott, Inc. v. AmCLYDE*, 511 U.S. 202, 207 (1994).  Under applicable maritime law, this Court should make findings against Plaintiffs and grant judgment in favor of Cameron denying their liability claims.

**I. The Court Should Make Partial Findings and Conclude that Cameron is Not Liable At All to Any Plaintiff or Claimant.**

---

[1] In submitting its motion and this brief based on general maritime law, Cameron does not waive any of its arguments that the claims against Cameron are exclusively governed by other law. (Docs. 1154-1; 1395-1; 1980-1; 2191; 2636-1; 2637-1; 2638-1; 3554.)

The operative pleadings allege that Cameron is liable for negligence and product liability.  But Plaintiffs did not even attempt to present evidence of any negligent conduct *unrelated* to the design of the BOP.   Their case against Cameron is essentially a product liability case alleging a design defect—nothing more.  And they failed to prove it.

### A.  Cameron is Not Liable as Product Manufacturer.

In *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986), the Supreme Court recognized "products liability, including strict liability, as part of the general maritime law."  476 U.S. at 865.  When liability rules are involved, the Supreme Court has "recognized that vindication of maritime policies demand[s] uniform adherence to a federal rule of decision with no leeway for variation or supplementation by state law."  *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 210 (1996) (citations omitted.)  Maritime products liability is a case in which a uniform federal rule of decision is required.  Moreover, this Court has already ruled that state law is not available to supplement maritime law under the facts of this case involving an oil spill from exclusively federal property.  Doc. 3830, pp. 13-14.

Uniform maritime product liability rules are reflected in the work of the American Law Institute in its Restatement of American Law.  *See, e.g.*, *Exxon Shipping Corp. v. Baker*, 128 S. Ct. 2605, 2621-22 (2008) (relying in part on the Restatement (Second) of Torts to establish the basis for punitive damages under general maritime law); *McDermott v. AmCLYDE*, 511 U.S. at 208-09 (choosing among ALI options for settlement credits to implement proportionate fault rule).  To resolve a maritime product liability case, the Fifth Circuit has therefore looked to the RESTATEMENT (THIRD) OF

PRODUCTS LIABILITY (hereafter "Products Restatement").  *Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000).

Under the applicable provision of the Products Restatement, liability is based on the existence of a defect.

2. Specifically, in pertinent part, a product—

*        *        *

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

*        *        *

Products Restatement § 2.

The central inquiries under subsection (b) – e.g., "foreseeable risks of harm" and "reasonable alternative design" – are determined by the facts "at the time of sale or distribution." *Id*.  Post-sale events are immaterial for this purpose.

In product design cases, moreover, an "independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary." *Id*. cmt. a (quoted with approval in *Krummel*).  Accordingly, subsection (b) "adopts a reasonableness ("risk-utility balancing") test as the standard for judging the defectiveness of product designs." *Id*. cmt. d.  Therefore, subsection (b) requires a "risk-utility analysis" as part of the plaintiffs' proof.  *See Krummel*, 206 F.3d at 552.

In their Complaints, Plaintiffs assert claims against Cameron alleging that the *Deepwater Horizon* BOP was defective.  Now that they have presented their case,

however, it is clear that Plaintiffs' complaints are not with Cameron's design.  Rather,

their complaints are directed at the *customer's* maintenance of the BOP and certain

components, the *customer's* selection and arrangement of certain BOP components, and

the *customer's* subsequent failure to "upgrade" the BOP to include later-developed

components.  To the extent that Plaintiffs' complaints can be construed as questioning

Cameron's original design, any claim against Cameron must fail in the absence of any

proof of the availability of a technologically feasible and practical alternative design at

the time of sale.  Plaintiffs here failed to present such proof.

1.     Plaintiffs failed to prove that Cameron's
SBR blind shear rams are defective.

It is undisputed that the blind shear rams in the *Deepwater Horizon* BOP were the

Cameron SBR model.  SBR rams have been on the market for decades,[2] and they

continue to be used in deepwater drilling even to this day.[3]  Plaintiffs presented no

evidence of any occurrences prior to or after the Macondo incident in which Cameron

SBRs were unable to shear and seal a well due to off-center drill pipe.

Nevertheless, Plaintiffs offered opinions from two proffered BOP experts (Gregg

Perkin retained by the PSC and Rory Davis retained by the United States, both of whom

are the subject of pending *Daubert* motions[4]) to suggest that the SBR rams are defective

because they were unable to seal the well when they were finally activated in the extreme

---

[2]Tr. 2876:15–20.

[3]Tr. 2850:24–2851:23.

[4]*See* Doc Nos. 5411, 5412. Significantly, the United States did not sue Cameron in this matter.

and unprecedented conditions of the Macondo blowout.   According to Mr. Perkin, because SBR rams do not have cutting blades that extend all the way across the wellbore, they were unable to shear the drill pipe and completely seal the well when the drill pipe was forced to side of the wellbore.   In his report, Mr. Perkin opines that the risk of buckled drill pipe preventing the rams from shearing and sealing could have been avoided "by a reasonable alternative design, namely providing a set of BSR cutting blades which extended across the 18 3/4" opening."[5]   Mr. Perkin identifies Cameron "DVS" or "CDVS" blind shear rams as that reasonable alternative design.

More specifically, Mr. Perkin states that "BP management should have upgraded the BOP" by installing "more efficient ram blocks in the BSR, such as Double 'V' Shear ('DVS' or 'CDVS') ram blocks.   Double 'V' Shear Rams shear DP with greater efficiency and can cover the entire 18¾" BSR cavity in the event that DP was off-center."[6]   Similarly, Dr. Davis opines that "BP and Transocean failed to update the specifications with the best available and safest drilling technology."[7]   But these are not complaints about any conduct by Cameron; rather, they are complaints about the conduct of the operator and the drilling contractor.

However, even in the unlikely event this testimony is construed as a challenge to Cameron's SBR design, Plaintiffs' complaints do not establish any basis for liability against Cameron.   A *prima facie* design defect claim requires much more.   It requires

---

[5]TREX 7535 (Perkin Report) at 18.

[6]TREX 7535 (Perkin Report) at 17.

[7]TREX 7660 (Davis Report) at 15.

proof of "the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." RESTATEMENT (THIRD) OF PRODUCTS LIABILITY § 2, cmt. f. In addition, any demonstrably safer alternative must be shown to have been available "at the time of sale" in 2001. *Id.* § 2 & cmt. d. Further, a "risk-utility analysis" must also have been performed to prove the reasonableness of the proffered alternative design. *Id*. § 2, cmts. a & d; *Krummel*, 206 F.3d at 552. Plaintiffs failed to satisfy *any* of these requirements.

First, with respect to the DVS rams, Mr. Perkin confirmed during his testimony that DVS rams—just like SBR rams—*do not* have cutting blades that extend all the way across the wellbore.[8] As such, they have the same design feature—a gap between the edge of the cutting blades and the side of the BOP wellbore—that he contends prevented the SBR rams from shearing the drill pipe and sealing the well.[9] Second, with respect to CDVS rams, Mr. Perkin confirmed that they were *not* available in 2001 when the *Deepwater Horizon* BOP was delivered.[10] Moreover, in both his report and in his testimony at trial, Mr. Perkin provided no engineering analysis, much less any risk-utility analysis, that either the DVS or CDVS rams would have reduced or prevented the Plaintiffs' harm.[11] The same is true with Rory Davis, the expert retained by the United

---

[8]Tr. 3456:22–3457:1.

[9]Tr. 3457:2–6.

[10]Tr. 3457:10–12.

[11]In fact, he testified that even with blades extending all the way across the wellbore, the elastomers (the rubber sealing elements in the BOP) in the blind shear rams would be "horribly damaged" in the conditions following the blowout. (Tr. 3459:9–3462:10.)

States.[12]   Plaintiffs, therefore, failed to present any evidence to establish a reasonable

alternative design at the time of sale.

2.      Plaintiffs failed to prove a defect with the MUX Cables.

In his report, Mr. Perkin opined that "[t]he failure to properly segregate and/or

otherwise protect the MUX cables which provide power to BOP controls so as to

preserve the integrity and redundancy of the BOP controls in case of an explosion" was a

design defect with the BOP.[13]   The placement of the MUX cables provides no basis to

impose liability on Cameron.

First, it is undisputed that the placement of the MUX cables in the moonpool was

established not by Cameron, but by the customer, in the Drilling Contract between Vastar

Resources, Inc. (BP's predecessor) and R&B Falcon Drilling Co. (Transocean's

predecessor).   Specifically, Exhibit B-2 to the Drilling Contract sets forth a Material

---

[12]Dr. Davis confirmed that CDVS rams were not available in 2001.  (Tr. 2890:11–18.)  With
respect to DVS rams, he also confirmed that they do not have blades that go all the way across
the BOP wellbore and, therefore, there is a space in which a portion of the drill pipe can be
trapped and prevent the ram faces from coming together and creating a seal if drill pipe is held to
the side of the wellbore.  (Tr. 2892:17–2893:5.)  Although he performed a two-dimensional
friction paper calculation to conclude "only that the double V rams have a greater tendency to
center than SBR rams" (Tr. 2894:22–24), he readily admitted that his "knowledge of friction is
not good" because "friction in these conditions is difficult to know" (Tr. 2893:19–21), and his
report and his trial testimony were devoid of any discussion of the force that would be holding
the drill pipe to the side of the wellbore at the time of shearing.  In fact, his co-author
acknowledged that because there are "simply too many unknowns," he would "doubt it is
possible to determine precisely what the forces were."   (Tr. 2895:18–2896:10.)   More
importantly, Dr. Davis acknowledged that he did no analysis to determine if the blind shear rams
would have been able to shear *and seal* even if the drill pipe had been in center of the BOP.  (Tr.
2880:20–2884:11.)  He also, like Mr. Perkin, did not perform any risk-utility analysis for using
DVS or CDVS rams over SBR rams.  Finally, Dr. Davis confirmed that the DVS rams were part
of the original quotation for the Deepwater Horizon BOP, but that they were not selected by the
customer.  (Tr. 2891:16–22.)

[13]TREX 7535 (Perkin Report) at 18.  Dr. Davis offered no similar opinion.

9

Equipment List for all equipment, including drilling and subsea equipment to be on the rig.  Section E.11.1 of the Material Equipment List specifies that there will be two MUX cable reels and they will be placed in the moonpool.[14]  Indeed, in his report, Mr. Perkin criticizes the operator, not Cameron, for the placement of those MUX cables, noting that "Vastar, BP predecessor … Specified the location of the MUX cables."[15]

Moreover, to the extent that the placement of the MUX cables could be construed as an allegation against Cameron, no evidence supports such a claim.  Mr. Perkin (who has never configured a BOP to specify where MUX cables should be run[16]) was unable to identify "a BOP anywhere in the world that runs the MUX cables in a location other than the one that we have on the Deepwater Horizon,"[17] and did not himself identify any other possible location to route the MUX cables.

3.      The absence of an acoustic control system is not a design defect.

Mr. Perkin also criticized the failure of the BOP to have a wireless (acoustic) method to activate and control the BOP emergency functions.[18]  As with the placement of the MUX cables, the decision not to include an acoustic system on the BOP was a decision of the customer, not Cameron.  Although acoustic systems are not a regulatory

---

[14]TREX 1356A at 86.

[15]TREX 7536 (Perkin Report Appendices) at 27 (citing the Drilling Contract).

[16]Tr. 3411:22–25.

[17]Tr. 3412:1–5.

[18]*See* TREX 7535 (Perkin Report) at 19.

requirement in the Gulf of Mexico[19], Cameron offers acoustic systems and will quote

them to customers.[20]  It is undisputed, however, that an acoustic system was not included

in the Material Equipment List in the Drilling Contract[21], and there was no evidence

presented that an acoustic system was requested for the *Deepwater Horizon* BOP.  Again,

in his report, Mr. Perkin criticizes the operator, not Cameron, for this decision, noting

that "Vastar, BP predecessor … Decided against equipping the HORIZON with an

acoustic trigger, i.e., a remote control."[22]

> 4.      Plaintiffs' battery and solenoid opinions are
> limited to technology available after 2006.

In his report, Rory Davis opines that "better and safer technology was available

since at least 2006 that, if implemented, would have eliminated malfunctions associated

with a miswired solenoid and/or inadequately charged batteries."[23]  He goes on to

explain:

> Cameron introduced their Mark III control system in 2006.  This system
> implements rechargeable batteries and continuous charging from the rig as
> well as a battery monitoring system that relays battery condition to the rig.
> In addition, pilot valves on this system incorporate a single solenoid coil

---

[19]Tr. 3436:25-3437:4.

[20]Tr. 3349:1–4.

[21]*See* TREX 1356A.

[22]TREX 7536 (Perkin Report Appendices) at 27 (citing testimony of BP 30(b)(6) witness M. Byrd, at 595:4–595:18).  This testimony was submitted in the M. Byrd deposition bundle at the February 28, 2013 marshalling conference.

[23]TREX 7660 (Davis Report) at 11.  PSC has withdrawn Mr. Perkin's similar opinions regarding battery technology.  (Tr. 3462:25–3463:7.)  In any event, his report was devoid of any discussion of when alternative battery technology became available or how it should have been incorporated into the Mark II control system.

design versus the two concentric coils employed on the Mark II control system on the DWH. Had the Mark III control system been installed at the time of the accident, batteries should have been fully charged, allowing the Blue pod to function. The use of a single coil also eliminates the potential for one of the dual coils to be wired incorrectly which precludes proper function. This best available and safest drilling technology should have been implemented.

Like the opinions regarding MUX cables and acoustics, this opinion does implicate Cameron's original design. Rather, it relates to the decision by the customer not to purchase a Mark III control system when it became available years after the BOP was sold. In fact, during his trial testimony, Dr. Davis confirmed that his opinion regarding "better and safer" technology did not address technology that may or may not have been available in 2001 at the time the BOP was sold. Instead, his opinion was limited to the "2006 time period forward, the time at which Cameron began selling the Mark III system."[24] Dr. Davis confirmed that Cameron provided Transocean a quote in 2009 for the Mark III control system that included an option for rechargeable batteries.[25] In the absence of any discussion of feasible technology that may have existed in 2001, this opinion cannot serve as a basis to impose liability on Cameron.[26]

---

[24]Tr. 2875:18–2876:7.

[25] Tr. 2695:10–2696:13; TREX 4277 at 4.

[26]In addition to the fact that Dr. Davis's opinion concerning solenoid technology was limited to the time period after 2006, during his testimony, Dr. Davis confirmed that the dual-coil solenoid valve in the Mark II control system has an advantage over the single-coil solenoid valve in the Mark III system because "the dual coil solenoid idea provides some redundancy, and as long as they're properly maintained, that redundancy is beneficial." (Tr. 2845:6–13.) In fact, he conceded that he is "more concerned about maintenance of it than the solenoid itself." (Tr. 2846:24–2847:3.)

          5.      The specification of a single blind
                  shear ram was a customer decision.

Lastly, in his report, Mr. Perkin opined that "the failure to have redundancy in the

emergency activation systems by relying on a single component for all pipe shearing and

well bore shutting-in and sealing functions, namely the single BSR," was a defect.[27]  As

with his other opinions, however, Mr. Perkin identifies this as a failure by the customer,

noting that "Vastar, BP predecessor … configured a 5-cavity BOP."[28]  Indeed, just like

the placement of the MUX cables, the decision to have one blind shear ram was made by

the customer and set forth in the Drilling Contract.[29]

This selection by the operator is consistent with the policy set forth in BP's Well

Control Manual.  In discussing BOP arrangement for deepwater operations, that Manual

provides:

> For DP [Dynamically Positioned] operations, some operators have two sets
> of blind shear rams in order to have a backup seal in the event of an
> unplanned disconnect.  The thought is to have one set to shear, and a
> second set to seal in the event that the ram packer of the shearing rams is
> damaged.  It also provides redundancy in the event of an unplanned
> disconnect and the subsequent loss of riser margin whilst drilling reservoir.
> *This is a judgment call and is subject to the operator's inhouse philosophy
> and policies*.[30]

---

[27]TREX 7535 (Perkin Report) at 20.

[28]TREX 7536 (Perkin Report Appendices) at 27.

[29]TREX 1356A at 79 (specifying that the BOP will have 5 ram type preventers and that the
number of blind shear rams for the BOP was to be "1 set").

[30]TREX 2390 at 270 (emphasis added).  TREX 2390 was submitted, without objection, in the A.
Frazelle deposition bundle at the February 28, 2013 marshalling conference.

In this case, the operator's in-house philosophy was to have one blind shear ram, as set forth in the September 1, 2000 Technical Position Paper which established the "[o]verall design of the BOP Stack for the Deepwater Horizon."[31]   That Technical Position Paper (which was signed by representatives of the operator and the drilling contractor, *but not Cameron*) states that the BOP would have a single set of Casing Shear Rams ("CSRs") and a single set of Shearing Blind Rams ("SBRs")[32] and that those rams would be arranged as follows:

> The CSR's are located below the SBR's.  The purpose for this arrangement is to protect the sealing capabilities of the SBR.  By first shearing with the CSR's and then raising the tail, the SBR's are able to close in the well with less risk of damaging the seal.[33]

Under these circumstances, Cameron cannot be liable for the decision to include a single blind shear ram as part of the BOP.  *See*, *e.g.*, *Nicor Supply Ship Assocs., Inc. v. General Motors Corp.*, No. 85-1399, 1993 WL 262712 (E.D. La. July 7, 1993) (holding, in maritime products liability case, that manufacturer who constructs specialized product, with significant input from sophisticated buyer, is not subject to liability).

## CONCLUSION

Cameron respectfully requests that the Court make the following partial findings in this proceeding, as further set out in its accompanying Proposed Findings of Fact and Conclusions of Law:

---

[31]TREX 5094 at 1.  TREX 5094 was submitted, without objection, in the E. Gaude deposition bundle at the February 28, 2013 marshalling conference.

[32]*Id.* at 3.

[33]*Id.* at 6.

- That Cameron did not depart from ordinary care in the circumstances;

- That the Cameron BOP had no design defect; and

- That no Cameron misconduct was the proximate cause of the well blowout or oil spill.

On the basis of those partial findings, the Court should grant judgment that Cameron is not liable to any Claimant or Plaintiff.

Respectfully submitted,

/s/ David J. Beck
David J. Beck, T.A.                          Phillip A. Wittmann, 13625
dbeck@brsfirm.com                       pwittmann@stonepigman.com
Joe W. Redden, Jr.                           Carmelite S. Bertaut, 3054
jredden@brsfirm.com                         cbertaut@stonepigman.com
David W. Jones                                 Keith B. Hall, 24444
djones@brsfirm.com                          khall@stonepigman.com
Geoffrey Gannaway                        Jared Davidson, 32419
ggannaway@brsfirm.com                 jdavidson@stonepigman.com
BECK REDDEN LLP                              STONE PIGMAN WALTHER
One Houston Center                         WITTMANN L.L.C.
1221 McKinney St., Suite 4500       456 Carondelet Street
Houston, TX 77010                          New Orleans, Louisiana  70130
Phone: (713) 951-3700                     Phone: (504) 581-3200
Fax: (713) 951-3720                          Fax: (504) 581-3361

**Attorneys for Cameron International Corporation**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of March, 2013.

/s/ David J. Beck
David J. Beck