IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This document relates to all actions. | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., *et al.*, individually and on behalf of themselves and all others similarly situated,<br><br>   Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc.; BP America Production Company; BP p.l.c.,<br><br>   Defendants. | * * * * * * * * * * * * * | Civil Action No. 12-970<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

### AFFIDAVIT OF CHARLES R. HACKER, JR.

STATE OF LOUISIANA

PARISH OF ORLEANS

   **BEFORE ME,** the undersigned authority, duly commissioned in and for the state and parish aforesaid, came and appeared:

**CHARLES R. HACKER, JR.**

who, after being sworn, did depose and state as follows:

1.     I am a person of the full age of majority, and I am competent to make this affidavit. I am a Partner of the PricewaterhouseCoopers LLP accounting firm ("PwC"), located at 300 Madison Avenue, New York, NY 10017. Additionally, I am a Certified Public

1

EXHIBIT C

Accountant, Certified Fraud Examiner and Certified in Financial Forensics with over 27 years of diverse accounting and investigative experience. Along with other PwC Partners and employees, I am personally involved in examining and processing claims pursuant to the Business Economic Loss Framework ("BEL") of the Economic and Property Damages Settlement Agreement at the direction and supervision of Patrick Juneau and other members of the Claims Administrator's Office.

2. At the direction of the Claims Administrator, I have prepared this Affidavit to set forth my recollection with respect to certain communications related to the reporting of revenue and expenses for BEL claimants.

3. Prior to the preliminary approval of the Settlement Agreement, feedback was requested from the accounting team, which included PwC and Postlethwaite & Netterville ("PN"), on the proposed framework for BEL claims. PwC and PN provided Framework questions and observations in a memorandum dated April 4, 2012 that was sent to Joe Rice of the Plaintiff's Steering Committee ("PSC") with a carbon copy sent to Dan Cantor, BP Counsel. A true and correct copy of this memorandum is attached as Exhibit 1.

4. BP and the PSC entered into the Settlement Agreement on April 18, 2012, and it was amended on May 2, 2012.

5. On September 28, 2012, I and other members of the accounting team, the Claims Administrator's Office, and the PSC were advised by counsel to BP that BP had several questions to pose to the Claims Administrator and its accountants. Those questions were as follows:

- For industries with specialized accounting or irregularly received revenue, such as construction businesses which receive progress or milestone payments, how does the Settlement Program determine for purposes of applying the BEL methodology when given revenue and expenses are incurred.

- How does the Settlement Program determine the accounting methodology used in a claimant's financial statements (e.g., cash, accrual, etc.) and whether

2

it has been applied on a consistent basis in the Benchmark Period and Compensation Period?

- Where a claimant has unusually large expense or negative revenue in year-end months (November or December), what does the Settlement Program do to determine whether those amounts relate solely to the period in which they are recorded or are a "true up" of amounts recorded in prior periods? If the latter, what if any adjustments to financial statements does the Program make for purposes of evaluating causation and/or compensation?

- Where a claimant has unusually large revenue or expense in a particular month, particularly where this month appears out of the ordinary compared to the claimant's typical seasonal pattern, what does the Settlement Program do to understand the cause of the spike and ensure the spike is not a function of improper or inconsistent accounting?

6.  A conference call occurred on October 2, 2012 to address the aforementioned questions and the accounting team's current practices in examining and processing claims. Participants included me and other representatives of PwC, PN, PSC, BP Counsel, consultants to BP and the Claims Administrator's Office. In summary, I provided among other things the following information during the October 2 conference call:

- With respect to irregularly received revenue, the accountants' practice was to follow up with claimants to better understand significant outliers. I made clear that the accountants were not auditing claimants' financial information but that the accountants were performing certain procedures to try to analyze the accuracy, validity and authenticity of the outlier items. Additional documentation obtained from the procedures, if any, would be maintained in the claimants' files. To the extent that the procedures indicated that an adjustment was in order, such an adjustment would be discussed with the claimant.

- With respect to accounting methods, I noted that the Settlement Agreement does not specify a prescribed accounting methodology (i.e., cash vs. accrual basis of accounting). I told the participants on the call that a claimant's

3

accounting method needed to be applied on a consistent basis (e.g. if the benchmark monthly P&Ls are prepared on an accrual basis, then the compensation period monthly P&Ls must be prepared on an accrual basis). I also told the participants that restating monthly P&Ls from an accrual basis of accounting to a cash basis of accounting would not be allowed by the Claims Administrator.

- With respect to large expense/negative revenue amounts in year end months, I told the participants that the accountants would continue to inquire of such amounts and would propose adjustments to correct errors. I also said that, absent the identification of errors, if the entries were prepared in the normal course of the year end closing process, or were prepared in connection with the year end federal income tax return, no adjustment would be proposed.

- With respect to large revenue/expenses in a particular month, I told the participants that the accountants would continue to follow up with claimants to better understand relevant transactions and to the extent necessary request additional evidence in support of the accounting for the relevant transactions. The results of our follow up and any additional evidence obtained would be maintained in the claimants' files. To the extent that the procedures indicated that an adjustment was order, such an adjustment would be discussed with the claimant.

I believed that at the time of this October 2 conference call all participants understood that the Claims Administrator had oversight and supervision over the accountants' activities in calculating claims and that the claimants had the right to request a reconsideration of their claim and that, in accordance with the Settlement Agreement, both the claimant and BP had the right to appeal the calculations prepared by the accountants.

7. On January 15, 2013, the Claims Administrator issued a Policy Announcement and transmitted it to PwC, PN, and BrownGreer via email on the same date. The January 15 Policy Announcement instructed, among other things, that:

- In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

8. PwC has prepared the BEL calculations in accordance with the Settlement Agreement, the Claims Administrators' instructions including those contained in the January 15 Policy Announcement, and orders by the United States District Court for the Eastern District Of Louisiana.

*[signature]*
CHARLES R. HACKER, JR.


SWORN TO AND SUBSCRIBED
before me, this 28 day
of March, 2013.

*[signature]*
Notary Public
Name: Lionel H. Sutton III
La. Bar/Notary No.: 20386