**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** **"Deepwater Horizon" in the Gulf** **of Mexico, on April 20, 2010** | **MDL No. 2179** |
| This Document Relates to: | **SECTION: J** |
| **Nos. 12-970** and **13-492** | **JUDGE BARBIER** |
| | **MAGISTRATE SHUSHAN** |

<u>**OPPOSITION TO BP'S MOTIONS FOR PRELIMINARY INJUNCTION**</u>

The Economic Settlement Class, by and thru appointed Class Counsel, respectfully submits the following Opposition to BP's Motions for Preliminary Injunction filed in MDL No. 2179 and *Bon Secour Fisheries, et al vs. BP,* No. 12-970 [Rec. Doc. 8910] and in *BP vs. Deepwater Horizon Court Supervised Settlement Program and Patrick Juneau,* No. 13-492 [Rec. Doc. 4]:

MAY IT PLEASE THE COURT:

On BP's Motion, the Court appointed and ordered Patrick A. Juneau to faithfully administer and apply the Settlement Agreement, and to direct payments adjudicated in accordance therewith.  In the event of any dispute over the interpretation or implementation of the Settlement Agreement, Mr. Juneau is required to follow the terms of the Agreement as interpreted by the Court.  In this case, the Court's interpretation is eminently correct, for all of the reasons stated in the Court's own ruling and the Class' previous submissions on the issue. Nevertheless, even if the Court's interpretation of the Settlement Agreement were arguably "wrong", the Claims Administrator would still be required under the Settlement Agreement, the

Trust Agreement, and Court Order, to implement, apply and administer the Program in conformity with the interpretation of the Court.  To enjoin the Claims Administrator as proposed by BP would itself violate the express terms of the Settlement and Trust Agreements that BP negotiated, agreed to, and supported, and would in effect be asking the Court to enjoin the Claims Administrator from enforcing the Court's own prior instructions. (Or, stated another way: BP effectively asks the Court to enjoin itself.)  For these reasons, for the reasons previously submitted, and for the reasons further outlined below, BP's Motions for Preliminary Injunction should be summarily rejected.

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . 1

Table of Contents . . . . . . . . . 2

Overview and Summary of the Argument . . . . . . 4

    Why the Injunction Should Be Denied . . . . 4

    Why BP Should Lose . . . . . . . . 5

Procedural Background . . . . . . . . 7

    Three Strikes, Two Preliminary Injunction Motions, and One New Complaint 7

    The Ever-Expanding Record . . . . . . . 9

BP's Effective Motion for Reconsideration of the Denial of its Previous Motion for Reconsideration Should be Denied (Again) as Improper . . . . 11

BP's Requested Relief is Impossible to Grant . . . . . 14

There is No Emergency . . . . . . . . 16

BP's Allegations of "Fictitious" Losses are Baseless and Self-Serving . . 16

    The Entire Purpose of the Settlement Was to Reduce Potential Causation and Compensation Disputes to Predictable and Acceptable Resolutions According to Uniform, Transparent and Objective Determinations . . 17

    BP Itself Paid Many of these So-Called "Fictitious" Claims thru GCCF . 18

2

BP Fails to Meet the Requirements For a Preliminary Injunction   .   .   .   20

    After Trying, and Failing, to Re-Write the Settlement Three Times,
    BP Cannot Make Any Showing that it is Likely to Succeed on the Merits   .   22

    There is No Merit to the Proposition that a Claims Administrator and
    Trustee Can Be Enjoined from Fulfilling His Duties under the Controlling
    Instruments as Interpreted and Directed by the Court   .   .   .   23

    Even if this Court Were to Ignore Its Previous Two Rulings
    and the Claims Administrator's Decision, the Language of the
    Settlement Agreement, Industry Standard Accounting Principles,
    and the Parties' Own Intent Unequivocally Demonstrate That
    the Court's Interpretation of the Settlement Agreement is Correct   .   .   24

        The Court's Interpretation of "Variable Profit" is Correct and
        Reflects the Intent of the Parties   .   .   .   .   .   .   24

        BP Clearly Agreed that "Actual Losses" Would be Determined and
        Compensated in Accordance with the Objective Causation and
        Compensation Frameworks, without Any Subjective Inquiry
        Into Potential Alternative Causation   .   .   .   .   .   26

        BP's Strained Effort to Shoehorn Its New Methodology (which Itself is
        Undefined and Undetermined) Into the Language of the Settlement Has
        No Basis In Law or Lexicography   .   .   .   .   .   30

    A Preliminary Injunction Will Not Serve the Public Interest in Promoting
    Court-Approved Settlements   .   .   .   .   .   .   .   31

List of Exhibits   .   .   .   .   .   .   .   .   34

Conclusion   .   .   .   .   .   .   .   .   .   35

Certificate of Service   .   .   .   .   .   .   .   .   37

## OVERVIEW AND SUMMARY OF THE ARGUMENT

**Why the Injunction Should Be Denied**

- On BP's Motion, the Court appointed and ordered Patrick A. Juneau to faithfully administer and apply the Settlement Agreement, and to direct payments adjudicated in accordance therewith.[1]

- In the event of any dispute over the interpretation or implementation of the Settlement Agreement, the Claims Administrator is required to follow the terms of the Agreement as interpreted by this Court.[2]

- The Court's interpretation of "Variable Profit" under the Agreement is correct.[3]

---

[1] *See* PRELIMINARY APPROVAL ORDER (5/2/2012) [Rec. Doc. 6418], ¶23 ("The Court appoints Patrick Juneau as Claims Administrator to oversee the Claims Administration Vendors, who will process the claims in accordance with the Settlement Agreement"); *and,* ¶28 ("The Court approves the Economic and Property Damages Trust Agreement … and the appointment of Patrick Juneau as Trustee"); FINAL APPROVAL ORDER (12/21/2012) [Rec. Doc. 8139], ¶5 ("The Court reconfirms the appointment of Patrick Juneau as Trustee"); ¶17 ("The Court expressly incorporates the terms of the Settlement Agreement in this Order and Judgment and further orders that the Court retains continuing and exclusive jurisdiction over the Parties, the Economic Class Members, the Court Supervised Settlement Program and the Settlement Agreement, to interpret, implement, administer and enforce the Settlement Agreement, in accordance with its terms"); *and,* ¶18 ("The Court also retains continuing jurisdiction over … (2) the Settlement Trust; (3) the Trustee; and (4) the Directed Trustee"); SETTLEMENT AGREEMENT [Rec. Doc. 6276-1], ¶4.3.1 ("The Claims Administrator shall … faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or … as approved by the Court"); *and,* ¶5.12 (Settlement Trust Provisions); TRUST AGREEMENT [Doc. 6114-3], ¶1.6 ("The Trustee shall make distributions from the Funds, and the Directed Trustee shall make distributions as directed by the Claims Administrator from the Economic Settlement Trust Account to … the General Claims Fund … in accordance with the Settlement Agreement or as otherwise may be required by the Court"); ¶2.1 ("The Trustee and the Directed Trustee are and shall act as the fiduciaries of the Settlement Trust in accordance with the provisions of this Trust Agreement, the Settlement Agreement, and the Preliminary Approval Order"), *and,* ¶3.1 ("The Settlement Trust, the Trustee and the Directed Trustee shall be subject to the continuing jurisdiction and supervision of the Court").

[2] *See* SETTLEMENT AGREEMENT, ¶ 4.3.4 ("Issues or disagreements that cannot be unanimously resolved by the Claims Administration Panel will be referred to the Court for resolution"); *see also,* SETTLEMENT AGREEMENT, ¶4.3.1 ("The Claims Administrator shall … be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement … as approved by the Court"); *and,* ¶38.40 (defining "Court" as the "United States District Court for the Eastern District of Louisiana, Judge Carl J. Barbier, presiding").

[3] *See* REVIEW OF ISSUE FROM PANEL (Matching of Revenue and Expenses) (3/5/2013) [Rec. Doc. 8812]; *see also,* CLASS COUNSEL'S REQUEST FOR FORMAL POLICY STATEMENT (12/16/2012) [Rec. Doc. 8963-48]; CLASS COUNSEL'S *IN CAMERA* SUBMISSION (1/23/2013) [Rec. Doc. 8963-26]; CLASS COUNSEL'S *IN CAMERA* SUBMISSION IN OPPOSITION TO BP'S MOTION FOR RECONSIDERATION (2/18/2013) [Rec. Doc. 8963-54]; *and* EXHIBITS [Rec. Docs. 8963-56 thru 8963-87].

- Even if the Court's interpretation were hypothetically "incorrect",  Mr. Juneau would still be *required* to interpret, apply and administer the Settlement Agreement as interpreted by the Court.[4]

- The injunction BP seeks would itself violate the express terms of the Settlement and Trust Agreements that BP negotiated, agreed to, and supported.[5]

- BP is effectively asking the Court to enjoin itself.

**Why BP Should Lose**

- Congress specifically enacted OPA after the *Exxon Valdez* tragedy to expand the law in order to provide compensation to businesses that might be *indirectly,* as well as directly, affected by an oil spill's widespread interruption of a nearby region's economy.[6]

- The GCCF was widely criticized for applying OPA's expansive compensation in a subjective, secretive, and inconsistent way.

- In designing the Court-Supervised Settlement Program, therefore, neither BP nor Class Counsel wanted a claims administrator or other fact-finder to engage in individualized and subjective inquiries.

- Rather, BP intended and agreed that compensation would be provided to a defined set of Class Members in a uniform, transparent, and objective way.

- In particular, BP agreed in the Settlement Agreement to *define* "Actual Losses" under the objective Causation and Compensation Frameworks, *without* any subjective inquiry into possible alternative causes or effects upon a business or industry.[7]

---

[4] *See* PRELIMINARY APPROVAL ORDER, ¶23; FINAL APPROVAL ORDER, ¶17; SETTLEMENT AGREEMENT, ¶¶ 4.3.1, 4.3.4; TRUST AGREEMENT, ¶¶ 1.6, 3.1.

[5] *See, e.g,* JOINT MOTION FOR PRELIMINARY APPROVAL (4/18/2012) [Rec. Doc. 6266]; BP FINAL APPROVAL BRIEF (8/13/2012) [Rec. Doc. 7114-1]; BP REPLY BRIEF IN SUPPORT OF FINAL APPROVAL (10/22/2012) [Rec. Doc. 7731]; JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL (11/19/2012) [Rec. Doc. 7945].

[6] *See, e.g.,* Robertson, OPA 90: Searching for the Line (9th Judge Alvin B. Rubin Conference, May 13, 2011) [Rec. Doc. 2400-1, pp.1-43].

[7] *See* LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU  (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program) [Rec. Doc. 8963-67]; JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Rec. Doc. 7945], at ¶126, p.39; BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Rec. Doc. 7114-1], at p.33; DECLARATION OF HOLLY SHARP [Rec. Doc. 7114-18], p.10, ¶17; ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2 [Rec. Doc. 8963-71]; E-MAIL FROM JUDGE BARBIER RE "MEETING TODAY RE NON-PROFITS AND SIP" (Dec. 12, 2012) [Rec. Doc. 8963-75].

- BP could have, but did not, limit the Class Geography.  Rather, BP sought to obtain, and has obtained, a Classwide Release with respect to the *entire* States of Louisiana, Alabama and Mississippi.[8]

- BP could have, but did not, insist upon the exclusion of construction, agricultural and professional service businesses.

- BP could have, but did not, attempt to place a limit or cap on the total Business Economic Loss payouts.[9]

- BP could have, but did not, insist (or even suggest) that underlying Cash Basis monthly financials could not be submitted.[10]

- BP could have, but did not, insist (or even suggest) that Causation not be extended to businesses with greater total annual profit in 2010 than in 2007-2009.

- BP could have, but did not, insist (or even suggest) that an alternative framework be applied to construction, agricultural or professional service industry claims.

- The members of the Class – *not* BP – are the Beneficiaries of the Settlement Trust and the Settlement Agreement.[11]

- BP expressly agreed that the Claims Administrator would be required to interpret the Class Member's financials in a way that *maximizes* the Claimant's recovery.[12]

---

[8] *See* SETTLEMENT AGREEMENT, Exhibit 22 (Map of Gulf Coast Area) [Rec. Doc. 6276-40].

[9] While it is not clear that Class Counsel would have accepted (or that the Court would have approved) a capped settlement for Business Economic Loss Claims, Class Counsel did agree to (and the Court did approve) guaranteed funding of $2.3 Billion for Seafood Compensation Claims.

[10] Indeed, BP emphasized the importance of relying on monthly profit and loss statements (and/or other financial records) as they were prepared and maintained in the ordinary course of business.  *See, e.g.,* SETTLEMENT AGREEMENT, Exhibit 4A; *see also, e.g.,* LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Sept. 25th Policy Announcements) [Rec. Doc. 8963-68], p.2 (Monthly P&Ls or alternate source documents establishing monthly revenues and expenses "are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on the actual monthly financial experience of claimants").

[11] TRUST AGREEMENT, ¶3.8 ("Any person or entity appointed as Trustee … shall be independent of BP Parties"); SETTLEMENT AGREEMENT, ¶4.3.1 ("The Claims Administrator shall … faithfully implement and administer the Settlement … for the benefit of the Economic Class").

[12] SETTLEMENT AGREEMENT, ¶4.3.8 ("The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce *the greatest* Economic Damage Compensation Amount that such information and supporting documentation allows under the terms of the Economic Damage Claim Framework") (emphasis supplied); *see also,* ¶4.3.7.

- The interpretation that BP is attacking is **_not_** the "Claims Administrator's" interpretation. It is the interpretation of the Court.[13]

I.     **Procedural Background.**

    **A. Three Strikes, Two Preliminary Injunction Motions, and One New Complaint.**

BP has lost all three of its attempts to re-write the definition of "Variable Profit" in the Settlement Agreement.  First, its attempt to re-write the Agreement was rejected by the Claims Administrator.  Specifically, on December 16, 2012, over six months after the Settlement Program began accepting Business Economic Loss ("BEL") claims, Class Counsel requested a broad set of formal Policy Statements from the Claims Administrator that would hopefully lay to rest a number of questionable arguments and appeals that BP was raising. *See* Rec. Doc. 8963-48.[14]  BP submitted, and then supplemented, its written response, arguing that costs should be "matched" and revenue should be "smoothed". *See* Rec. Doc. 8963-19, at pp.9-25.   After meeting with the parties, and considering their respective positions, the Claims Administrator came to an independent and neutral decision on January 15, 2013. *See* Rec. Doc. 8963-50.  The Claims Administrator rejected BP's argument regarding the determination of "corresponding variable expenses" for both Causation and Compensation:

> In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time.  The Claims Administrator will not typically re-allocate such revenues or expenses to different periods.[15]

---

[13] REVIEW OF ISSUE FROM PANEL (Matching of Revenue and Expenses) (3/5/2013) [Rec. Doc. 8812].

[14] *See generally,* SUPPLEMENTAL DECLARATION OF STEPHEN J. HERMAN (April 1, 2013), ¶¶ 9-18.

[15] Rec. Doc. 8963-50.

On January 23, 2013, BP filed an "appeal" with this Court by letter, attaching a power point presentation and numerous expert submissions not previously provided to the Claims Administrator. *See generally,* Rec. Doc. 8963-20 thru 8963-25. BP again attempted to re-write the Settlement Agreement, advancing the same arguments as it did before the Claims Administrator – namely, that the term "corresponding" as used in the definition of "Variable Profit" somehow compels monthly costs to be "matched" and/or monthly income to be "smoothed". *See* Rec. Doc. 8963-21. On January 23, 2013, Class Counsel filed a response. *See* Rec. Doc. 8963-26.

On January 30, 2013, after the respective positions were argued *in camera* to the Court, the Court's decision was communicated to the Claims Administrator and the Parties *via* e-mail. *See* Rec. Doc. 8963-31. The Court agreed with the Claims Administrator's interpretation, as set forth in his January 15, 2013 Memorandum:

> While the Court acknowledges that this may sometimes cause apparent anomalies (in either direction) in claim determinations, this appears to be the result of the objective, straight-forward mechanisms set forth in the Settlement Agreement. BP's proposed remedy does not appear to be based on any generally accepted accounting principle, and might only result in adding another level of complexity and subjective analysis to the BEL calculation.[16]

On February 18, 2013, BP filed its formal motion for reconsideration. *See* Rec. Doc. 8963-35.[17] BP's motion for reconsideration raised the identical arguments as its initial briefing to this Court. (The Court had unilaterally withdrawn its January 30th e-mail ruling and instructed the parties to attempt mediation. Mediation was conducted, but was unsuccessful.[18]) On

---

[16] Rec. Doc. 8963-31.

[17] A Draft Motion for Reconsideration had been previously circulated to Judge Shushan and Class Counsel for their consideration.

[18] *See* <u>March 5, 2013 Order</u> [Rec. Doc. 8812], at 1 n.1.

February 18, 2013, Class Counsel simultaneously submitted its written response. *See* Rec. Doc. 8963-54.

On March 5, 2013, this Court ruled on BP's motion for reconsideration.  The Court followed its previous email ruling and again rejected each of BP's arguments. *See* March 5, 2013 Order [Rec. Doc. 8812], at 2-5.   The Court, citing BP's own experts and emails, found that the Settlement Agreement did not support a reading of "matching" or "smoothing" variable profit; that such a reading would not create absurd results; and that BP's own counsel understood that variable profit would generally not be "matched" or "smoothed".  Id.

Ten days after the Court's second ruling, BP filed a Motion for Preliminary Injunction in the MDL proceeding, [Rec. Doc. 8910], and also filed a second, identical Motion for Preliminary Injunction with a brand new Complaint naming the Settlement program and the Claims Administrator as defendants. *BP Exploration & Production, Inc., v. Deepwater Horizon Court Supervised Settlement Program,* No. 13-492, Complaint [Rec. Doc. 1] and Motion for Preliminary Injunction, [Rec. Doc. 4].  Both Motions and the Complaint argue the exact same issues, and seek the same general relief that was denied in the January 15, 2013 Claims Administrator decision, the Court's January 23, 2013 e-mail ruling, and the March 5, 2013 Court ruling on BP's motion for reconsideration.

### B.  The Ever-Expanding Record.

With every repetitive filing, BP increases the number of declarations, e-mails, memoranda, and other types of (allegedly) "supporting" documentation.  BP has even taken to submitting multiple declarations from the same people in the purported hope of explaining something they forgot to explain – or repudiating their prior declarations.

BP's initial December 2012 submissions to the Claims Administrator included no exhibits. *See* Rec. Doc. 8963-19, at pp.9-25.

With its January 23, 2013 appeal to this Court, BP attached three expert declarations (Finch, Hall, and Oustalniol), a PowerPoint presentation, and an October Memo from the Claims Administrator.  *See* Rec. Doc. Nos. 8963-20 thru 8963-25.

With its February 18, 2013 motion for reconsideration, BP attached 18 total exhibits, including 12 declarations – the three declarations previously submitted with its January 23rd filing; three supplemental declarations from each of those same experts; and 6 new expert declarations (Alexander, Dietrich, Sider, Polinsky, Rose, Weil).  *See* Rec. Doc. Nos. 8963-35 thru 8963-53.

With its fourth and latest filing, BP attached 41 total exhibits, including 20 declarations – the 12 previous declarations, 6 new expert declarations (Sharp, Richardson, Dietrich, Fishkind, Henley, and a supplemental declaration from Sider), and two BP counsel declarations (Moskowitz and Karron). *See* Rec. Doc. 8910.

In all, BP has paid 13 experts to draft 16 declarations.  At least three experts submitted multiple declarations for different submissions.  And some of the experts who supported BP's Motion for Final Approval have now come back to repudiate (or "explain") their prior declarations.  Adding all submissions together, BP has attached 64 exhibits, many duplicative, and the vast majority of which were paid for and created at BP's direction.

While BP (and the Class) should arguably be limited to the clear and express language of the Settlement Agreement itself;  or, perhaps, the documentation that was originally submitted to the Claims Administrator;  Class Counsel will defer to the Court's considerable discretion on this

matter.  At some point, however, it is respectfully suggested, the multiple filings and the growing record should be closed.

## II.   BP's Effective Motion for Reconsideration of the Denial of its Previous Motion for Reconsideration Should be Denied (Again) as Improper.

Procedurally, BP's Motions are a request for an injunction that would itself violate the Settlement Agreement.   As a practical matter, however, this is not really a "Motion for Preliminary Injunction", but a collateral attack on the Court's March 5th Order.  The Court has now rejected twice BP's attempt to re-write the Settlement on the "matching"/"smoothing" issue.  A formal Order has been posted on PACER.  Yet rather than adhere to the Court's resolution as BP agreed per Section 4.3.4 of the Settlement Agreement, (or otherwise address the Court's ruling in a frank and straightforward way), BP has sued the independent Administrator, (whom BP proposed), requesting relief that the Administrator could never give because it would violate the Settlement Agreement, the Trust Agreement, the Final Approval Order, and the March 5th interpretation of the Court.

Cutting through the procedural gamesmanship, this is effectively just a second motion for reconsideration.

Just two months ago, this Court commented on the extraordinary showing that must be made:

> Although a district court has inherent power to reconsider an interlocutory order, reconsideration "must be exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays.  Further, the decision of the district court to grant or deny a motion for reconsideration will only be reviewed for an abuse of discretion." Lightfoot v. Hartford Fire Ins. Co., No. 07–4833, 2012 WL 711842, at *2 (E.D.La. Mar.5, 2012) (citations omitted).  Courts in this district have generally considered four factors in deciding a motion for reconsideration: (1) whether the motion is necessary to correct a manifest error of

law or fact upon which the judgment is based; (2) whether the movant presents newly discovered or previously unavailable evidence; (3) whether the motion is necessary in order to prevent manifest injustice; or (4) whether the motion is justified by an intervening change in controlling law.  Id.

In re Oil Spill by Oil Rig DEEPWATER HORIZON in Gulf of Mexico, on April 20, 2010, MDL 2179, 2013 WL 160339, at *1 (E.D. La. 2013) (Barbier, J.).  To the extent the Court might treat BP's Motions for Preliminary Injunction as a "Motion for Reconsideration" under Federal Rule of Civil Procedure 59(e):

> A court's reconsideration of an earlier order is an extraordinary remedy, which should be granted sparingly.  See Fields v. Pool Offshore, Inc., No. Civ. A. 97-3170, 1998 WL 43217, at *2 (E.D. La. 1998), aff'd, 182 F.3d 353 (5th Cir.1999); Bardwell v. George G. Sharp, Inc., Nos. Civ. A. 93-3590, 93-3591, 1995 WL 517120, at *1 (E.D. La. 1995).  The Court must "strike the proper balance" between the need for finality and "the need to render just decisions on the basis of all the facts."  Edward H. Bohlin Co., 6 F.3d at 355.  To succeed on a motion for reconsideration, a party must " 'clearly establish either a manifest error of law or fact or must present newly discovered evidence.'"  Ross v. Marshall, 426 F.3d 745, 763 (5th Cir. 2005) (quoting Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487, 328 F.3d 818, 820 (5th Cir.2003)).

Kelly v. Bayou Fleet, Inc., No.05-6871, 2007 WL 3275200, at *1-2 (E.D. La. 2007) (Barbier, J.).

BP's Motions are little more than a thinly-veiled challenge to the Court's March 5th Order.[19]  BP's Motions seek essentially the same relief BP requested in its initial appeal to the Court and the second time in its motion for reconsideration – a modification of the Claims Administrator's independent interpretation of "variable profit."  See BP's Memorandum in Support of Emergency Motion for a Preliminary Injunction, at 1

---

[19] BP tries to argue by analogy that such relief is possible by looking to Fed. R. App. Proc. 8(a) and 28 U.S.C. 1292(b) (allowing for permission to appeal).  BP Memorandum in Support, at 10.  However, these two provisions apply in situations where the appellant/movant is transitioning from one court to another.  Here, BP is simply challenging one ruling in the same court by using a different procedural vehicle to get the relief previously denied it.

In fact, BP's motion is a point by point rebuff of the March 5th Order.  *See, e.g.,* <u>BP's Memorandum</u>, at 1 ("[B]P submits that the Court's March 5, 2013 . . . does not correct these errors."); <u>id</u> at 12 ("In affirming the Claims Administrator's policy decision, the Court's March 5 Order does not address the definition of the key term "revenue."); <u>id.</u> at 13 (citing the March 5 Order and arguing "[p]roperly recording revenues when earned has nothing to do with "smoothing" revenues, and BP has never asked the Claims Administrator to "smooth" revenues"); <u>id.</u> at 16 ("Yet the Court's March 5 Order does not address how the word "expenses" should be interpreted and applied."); <u>id.</u> at 17 ("Although it notes BP's argument, the Court's March 5 Order does not give meaning to 'corresponding.'"); <u>id.</u> at 20 ("The Court's March 5 Order observes that the Agreement does not use the word "matched" or matching."); <u>id.</u> (citing the March 5 Order and arguing "[n]or is Exhibit 4A, which concerns documentation requirements, inconsistent with the plain language of Exhibit 4C regarding compensation"); <u>id.</u> at 21 n.9 (citing the March 5 Order and arguing that BP's interpretation does not "introduce alternative causation"); <u>id.</u> at 23 (citing the March 5 Order and arguing that the "three examples in Exhibit 4C's addendum do not support the Claim Administrator's position"); <u>id.</u> (citing the March 5 Order and arguing "nor can BEL Policy Decisions be supported by 3 lines of a 9 page, 249 line e-mail from BP's counsel during negotiations"); <u>id.</u> at 25 (citing the March 5 Order and noting that "the Court quotes a letter from BP counsel Mark Holstein saying that 'false positives' will necessarily exist"); <u>id.</u> at 26 (citing the March 5 Order and arguing that "BP is not facing rare or anomalous false positives that 'sometimes occur'"); <u>id.</u> ("[T]he March 5 Order suggests that the three-month Compensation and Benchmark Periods should protect BP against anomalous results."); <u>id.</u> at 26 n.11 (noting that the March 5 Order cites to a portion of a BP expert declaration); <u>id.</u> at 29 (citing the March 5 Order and arguing that "there is no

'subjectivity' in ensuring that accurate data is used for the Settlement's objective economic tests").

In this case, the Court has already ruled on the "matching"/"smoothing" issue twice. BP has not raised any new arguments since the previous two decisions. BP has not articulated, much less proven, any manifest error of law or fact. BP has not pointed to any new, previously-unavailable evidence. BP has not pointed to any new, intervening change in the law. BP's motion for reconsideration of its motion for reconsideration should be denied. See Rosemond v. AIG Ins., No. 08–1145, 2009 WL 1211020 (E.D. La. 2009) (Barbier, J.) ("A Rule 59(e) motion should not be used to relitigate prior matters that should have been urged earlier or that simply have been resolved to the movant's dissatisfaction.") (quoting SPE FO Holdings, LLC v. Retif Oil & Fuel, LLC, No. 07–3779, 2008 WL 3285907, at *3 (E.D. La. 2008)).

## III.   BP's Requested Relief Is Impossible to Grant.

Putting aside the issue of whether BP dressed up a motion to reconsider in preliminary injunction's clothing, the relief BP has requested is fundamentally backwards and exposes BP's attempted end-run around the Court's March 5th Order. BP is requesting the Court to issue an injunction prohibiting the Claims Administrator from acting in accord with the resolution of the Court. BP frames the relief requested as follows:

> Accordingly, BP seeks a preliminary injunction against the Claims Administrator and Settlement Program to enjoin the BEL Policy Decisions and awards and payments of BEL claims based on the BEL Policy Decisions – or in the alternative against awards and payments to BEL claimants in the agriculture, construction, professional services, real estate, manufacturing, wholesale trade, and retail trade industries – pending conclusion of the claims administration process.

BP's Memorandum, at 34.  BP argues that the relief is justified based upon its twice-rejected arguments concerning the meaning of "variable profit."  Id. at 9-24.

Yet, the March 5th Order definitively settled this issue.  "Accordingly, the Court has re-visited the issue of whether the Claims Administrator has correctly interpreted the terms of the Economic and Property Damage Settlement Agreement as it applies to the calculation of "Variable Profit" for Business Economic Loss Claims."  March 5, 2013 Order, at 1.  As a result, the Operative Order with which the Claims Administrator is processing and paying claims is the March 5th Order – not the Claims Administrator's January 15, 2013 Policy Decision.

BP's requested relief does not make any sense because it requests the Court to issue an order prohibiting the Claims Administrator from following the March 5th Order without asking the Court to vacate the March 5th Order itself.  The Claims Administrator does not have the authority to change, alter, overrule or defy the Court's March 5, 2013 Order.  The Claims Administrator is bound to follow the March 5th Order by the dictates of the Settlement and Trust Agreements, by the Preliminary and Final Approval Orders, and as an officer of the Court.

Granting BP's relief would have the perverse result of issuing an injunction that is without legal effect – i.e. enjoining a Court-appointed Administrator from enforcing a "Policy Decision" that has now been superseded by an Order of the Court.

BP does not facially challenge the March 5th Order.  The "relief" requested would prevent the Claims Administrator from following the Settlement Agreement as interpreted by the Court. It is the Order that would need to be challenged, not the Claims Administrator's dutiful conduct thereunder.  BP is effectively asking the Court to enjoin itself.

**IV.    There is No Emergency.**

BP fictitiously styles its pleading an "emergency" motion.  It was not an "emergency" when the issue was first raised to the Claims Administrator in December 2012.  It was not an "emergency" when BP brought it to the Court for the first time in January 2013.  It was not an "emergency" when BP requested reconsideration in February.  It was not an "emergency" when BP requested mediation.  Apparently, it needs to be denied three times before it becomes an "emergency".

The Settlement Agreement was negotiated over a period of many months.   The Settlement Agreement was filed into the court record almost one year ago on April 18, 2012.  The Settlement Program went into effect on June 4, 2012.  The Settlement Program began paying Business Economic Loss (BEL) claims shortly thereafter.  It is likely that the Settlement Program has paid hundreds of these challenged claims before BP ever raised the issue for the first time with Class Counsel.

BP's motion should not be treated as an "emergency."  It should be treated as an attempt to get a fourth bite at the apple.

**V.    BP's Allegations of "Fictitious" Losses are Baseless and Self-Serving.**

At the heart of BP's motion is its unfounded contention that the Settlement Program is paying claimants who, by some yet undefined and subjective standard, have allegedly not incurred any losses as a result of the largest environmental disaster in this country's history.  BP has even labeled these claims as "fictitious".   Before addressing how BP is just plain wrong on the facts, the general goals of the settlement should be recalled.

### A. The Entire Purpose of the Settlement Was to Reduce Potential Causation and Compensation Disputes to Predictable and Acceptable Resolutions According to Uniform, Transparent and Objective Determinations.

This settlement was and is designed to provide an objective, transparent and structured formula agreed to by the parties. The formula may not necessarily reflect what some might consider to be the most accurate depiction of the losses suffered by each class member. Rather, the "formula" represents an agreed-upon compromise. But, in any event, it is the formula – and not some subjective analysis – that determines causation.[20]

Indeed, the Causation and Compensation Frameworks in this Settlement Agreement for BEL Claims were purposefully negotiated to avoid any subjective inquiry. BP agreed to this objective and uniform framework, in exchange for a classwide release.[21]

The Causation and Compensation Frameworks together provide for an objective compensation model based on as little as three consecutive months' revenue as compared to the same three months of the previous year.[22] This was the product of thoughtful negotiations that were specifically designed and intended to allow for seasonal variances and to account for changing economic conditions. Although just a handful of months were used, the Compensation Amount was intended to compensate *all* damages and losses over the life of the claimant – past, present, and future. Claimants can incur losses indefinitely into the future. Losses can be delayed and not appear on the books for months, or years. There are a myriad of different ways that claimants sustain losses over time.

---

[20] *See, e.g.,* PRELIMINARY APPROVAL PRESENTATION (April 25, 2012) (submitted herewith).

[21] *See, e.g.,* Sullivan v. DB Investments, Inc., 667 F.3d 273, 339 (3d Cir. 2011) (Scirica, J., concurring) ("From a practical standpoint . . . achieving global peace is a valid, and valuable, incentive to class action settlements . . . . [A defendant] may be motivated to pay class members a premium and achieve a global settlement in order to avoid additional lawsuits . . . .").

[22] More specifically, Causation, where not presumed, is determined by the comparison of at least three months of Revenue; Compensation is determined by a comparison of Variable Profit, as defined in the Settlement.

BP, along these lines, ignores the fact that OPA was specifically enacted to expand the scope of available compensation to those businesses and industries which may suffer _indirect_ as well as direct losses as the result of an oil spill.[23]

By singling out three categories of businesses – construction, farming and professional services – (three categories of businesses that BP intentionally decided to include in the Class Settlement) – BP is demonstrating that the problem is not the Settlement Agreement or the BEL Frameworks or any "misapplication" thereof.  Rather, the "problem" for BP is that the objective frameworks apparently yield higher outcomes than what BP had originally projected.   The Frameworks, which provide an objective and uniform measure of compensation to all members of the Economic Class, is apparently fine for the vast majority of the BEL claims.

By definition, there can be no "fictitious losses" under the Causation and Compensation Frameworks.   Rather, BP agreed that "Actual Losses" would be objectively and uniformly defined by the BEL Framework, irrespective of the surrounding circumstances.

To label certain business claims as having "fictitious losses" shows a fundamental misunderstanding (or misrepresentation) of the Settlement Agreement.  It also demonstrates a level of irresponsible disregard for the complexities of the claims and a willingness to use generalizations to achieve a calculated end.  Even a cursory review of BP's purported list of "fictitious loss" claims shows how off base BP really is.

### B.  BP Itself Paid Many of these So-Called "Fictitious" Claimants thru GCCF

It is extremely disingenuous and misleading for BP to contend that claims for compensation that BP agreed would be due as a result of the Spill are somehow "fictitious"

---

[23] _See, e.g._, Robertson, OPA 90: Searching for the Line (9th Judge Alvin B. Rubin Conference, May 13, 2011) [Rec. Doc. 2400-1, pp.1-43].

based on nothing more than cold accounting records.  BP, in this regard, has listed hundreds of such purported "examples" in Appendix B to its Motions and, based on nothing more than a paragraph (without discovery, depositions, or even speaking with the claimants), has irresponsibly portrayed them as "fictitious" claims.

Indeed, many of the claims that BP now points to as allegedly "fictitious" were actually recognized by BP's OPA-designated agent as valid and legitimate.  By comparing the businesses that received emergency or other partial payments from the GCCF to the businesses that are listed by BP on Appendix B, it appears that BP has identified numerous companies that BP itself had previously elected to pay. *See, e.g.,* Claim 40681 (construction company paid by GCCF); Claim 60664 (construction company paid by GCCF); Claim 11533 (construction company paid by GCCF); Claim 79934 (plumbing contractor paid by GCCF); Claim 21791 (construction company paid by GCCF); Claim 1237 (professional services business paid by GCCF); Claim 99124 (professional services business paid by GCCF);Claim 60211 (real estate company paid by GCCF); Claim 14987 (real estate company paid by GCCF); Claim 74180 (other business paid by GCCF); Claim 23951 (manufacturer paid by GCCF); Claim 16606 (building materials dealer paid by GCCF); Claim 84690 (plumbing and heating supplier paid by GCCF); Claim 1195 (metals manufacturer paid by GCCF); Claim 16163 (wholesale trade agent paid by GCCF); Claim 33885 (sporting goods store paid by GCCF); Claim 95807 (building materials dealer paid by GCCF); Claim 23522 (gas station chain paid by GCCF); Claim 43807 (bar paid by GCCF); Claim 64859 (gas station chain paid by GCCF).

And, on the claims in which a cursory review is not enough to determine whether the loss was (directly and/or indirectly) "caused by" or "as a result of" the Spill, it is equally irresponsible to label this compensation which BP agreed to pay as "fictitious".  BP merely

speculates that the identified claimants could not prove causation under some vague and subjective notion if they were called upon to do so.  The Settlement Agreement was specifically drafted to ensure there would be no need for formal discovery related to causation or even a narrative from the claimant explaining how the spill may have directly or indirectly impacted the business.  No proof of causation is required under the Settlement other than as set forth in the Causation Framework and no other "proof" of causation would have been submitted by the Claimant.

BP is somewhat candid about why it filed its Motions:  BP projects that that the Settlement Program may pay billions of dollars in excess of what BP originally estimated it would pay under the settlement.  The uncapped nature of the potential payments was a seminal feature of the Settlement Agreement.  No value was placed on the settlement for good reason, namely, the exceeding difficulty in determining the damage caused by the oil spill on a macro level.  The safest, most responsible manner of addressing different types of claims concerning different types of business was to allow an "organic" objective and uniformly applied formula to take hold.  Simply because the value of the overall payments in certain industries exceeds what BP estimated does not make the individual claims "fictitious".

## VI.    BP Fails to Meet the Requirements For a Preliminary Injunction.

BP's Motions acknowledge that they must, under controlling Fifth Circuit precedent, demonstrate a substantial likelihood of success on the merits, but understates the exacting nature of this requirement.  While it is true, as noted in <u>Janvey v. Alquire</u>, 647 F.3d 585, 590 (5th Cir. 2011) that to obtain a preliminary injunction, the moving party "must present a *prima facie* case but need not show that he is certain to win," this is a far from casual burden.  BP must show more than a mere possibility of relief; rather, BP must make "a strong showing that [it] is likely

to succeed on the merits." <u>Moore v. Tangipahoa Parish Sch. Brd.</u>, ___ F.3d ___, 2013 U.S. App. LEXIS 877, at *8 (5th Cir. Jan. 14, 2013) (citing <u>Niken v. Holder</u>, 556 U.S. 418, 434 (2009)).

As shown above, BP has no basis for the relief for which it prays.  BP has not even attempted to show that it is entitled to an injunction requiring the Settlement Administrator to disregard his responsibilities under the Settlement Agreement, the Trust Agreement, and the Preliminary and Final Approval Orders, in contravention of the Court's March 5, 2013 interpretation.

If, alternatively, the Court treats BP's present Motions as a motion to reconsider the Court's denial of BP's previous motion to reconsider its interpretation of the Settlement Agreement, BP makes no such "strong showing" that its yet-to-be-explained BEL payment system has any basis in, is even remotely consistent with, or can be objectively and predictably derived from, the language of the executed and court-approved Settlement Agreement.

BP's showing fails under any standard the United States Supreme Court or the Fifth Circuit have required for the extraordinary relief of a preliminary injunction.

As the Fifth Circuit reconfirmed in <u>Tex. Med. Providers Performing Abortion Servs. v. Lakey</u>, 667 F.3d 579 (5th Cir. 2012) (vacating preliminary injunction), "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements.'"[24] 667 F.3d at 524 (citing <u>Lake Charles Diesel, Inc. v. Gen. Motors Corp.</u>, 328 F.3d 192, 195-96 (5th Cir. 2003)).  Moreover, an "absence of likelihood of success on the

---

[24] "To be entitled to a preliminary injunction, the applicant(s) must show (1) a substantial likelihood that [they] will prevail on the merits, (2) a substantial threat that [they] will suffer irreparable injury if the injunction is not granted, (3) [their] substantial injury outweighs the threatened harm to the party whom [they] seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest."  667 F.3d at 574 (citing <u>Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.</u>, 577 F.3d 250, 252-53 (5th Cir. 2009)).

merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law." 667 F.3d at 574; Lake Charles Diesel, 328 F.3d at 203.

  **A.**  **After Trying, and Failing, to Re-Write the Settlement Three Times, BP Cannot Make Any Showing that it is Likely to Succeed on the Merits.**

  As noted above, there is nothing pending before the Court which formally seeks reversal of the Court's March 5, 2013 Order that correctly rejected BP's arguments for "matching" and/or "smoothing".  Without changing that ruling, there is literally **<u>no</u>** chance of success on the merits.[25]

  BP has attempted to re-write the Settlement Agreement three times.  BP lost the "matching"/"smoothing" issue once before the Claims Administrator and twice before this Court. As discussed above, BP's motion is a poorly veiled second motion for reconsideration of the denial of its first motion for reconsideration.  The definitive merits-based denial of BP's arguments is contained in the Court's March 5th Order.

  The March 5th Order framed the exact issue that is raised in BP's new motion:  "[T]he Court has re-visited the issue of whether the Claims Administrator has correctly interpreted the Economic and Property Damage Settlement Agreement as it applies to the calculation of 'Variable Profit' for Business Economic Loss Claims."  March 5, 2013 Order, at 1.  This Court denied the same arguments and the same evidentiary support presented here.

  When BP argued that a reading of the Settlement Agreement supported "smoothing" the revenue, the Court cited line and verse of the Settlement Agreement in disagreement.  Id. at 1-3. When BP argued that "corresponding" meant "matching" the variable expenses to the revenue, this Court returned to the clear language of the Settlement Agreement, the examples provided,

---

[25] The "merits" under the Preliminary Injunction analysis could more aptly be described as the legal basis or authority for the enjoining of a Claims Administrator to apply the Settlement Agreement contrary to the way in which the Agreement has been interpreted by the Court.  There is no "merit" to that argument, either;  and **<u>no</u>** likelihood or even chance of success.

and the very purpose of the settlement itself.  Id. at 4-5.

This Court found that BP's evidence supported the Claims Administrator's independent interpretation. In addition to the plain wording of the Settlement Agreement, and in denying BP's first motion for reconsideration, this Court quoted and cited BP's own economic experts Henry Fishkind, James Henley, Jr., and A. Mitchell Polinsky for the proposition that certain anomalies may result from imperfect financial record keeping.  Id. at 4-5.

Lastly, this Court looked to BP's own counsel's statements to determine the meaning of "Variable Profit".  The Court found telling the statements by BP lead counsel Richard Godfrey: "The word 'comparable' and phrase 'comparable months of' is used throughout the document in the context of comparing the months selected by the Claimant in 2010 to compare against the *same months* in the Benchmark Period."  Id. at 3 (emphasis in original) (citing E-Mail from Richard Godfrey to Joe Rice and Calvin Fayard (Feb. 17, 2012) [Rec. Doc. 8963-58], at 1).

In sum, this Court has already denied on the merits the very arguments that BP has put forth in this third attempt at reconsideration.  The Court looked at the Settlement Agreement, the examples, the history of negotiations, and the statements of BP's own counsel and experts.  By losing on the merits twice before, BP can not show that it is likely to succeed on the merits.

**B.  There is No Merit to the Proposition that a Claims Administrator and Trustee Can Be Enjoined from Fulfilling His Duties under the Controlling Instruments as Interpreted and Directed by the Court.**

BP can point to absolutely no legal authority that would support the proposition that a Claims Administrator and Trustee could be enjoined from fulfilling his duties under the controlling Trust and/or Settlement Agreements as interpreted and directed by the Court.

C.  **Even if this Court Were to Ignore Its Previous Two Rulings and the Claims Administrator's Decision, the Language of the Settlement Agreement, Industry Standard Accounting Principles, and the Parties' Own Intent Unequivocally Demonstrate that the Court's Interpretation of the Settlement Agreement is Correct.**

As an initial matter, Class Counsel adopt and incorporate by reference all previous submissions on this issue.[26]  Given the exhaustive briefing that the Court has already been subjected to, Class Counsel offer the following summary:

1.  **The Court's Interpretation of "Variable Profit" is Correct and Reflects the Intent of the Parties.**

The Compensation Framework for Business Economic Loss (BEL) claims found in Exhibit 4C of the Settlement Agreement defines the term "Variable Profit" as follows:

> Variable Profit: This is calculated for both the Benchmark Period and the Compensation Period as follows:
> 1. Sum the monthly revenue over the period
> 2. Subtract the corresponding variable expenses from revenue over the same time period.[27]

The term "corresponding" instructs the Program to subtract the variable expenses that are recorded "**over the same time period**" as the revenue is recorded. This Court's correct interpretation on this point is supported by:

- The language used throughout Exhibit 4C consistently and uniformly "corresponds" – *i.e.* "compares" – revenue and expenses experienced during the same time periods.[28]

---

[26] *See* CLASS COUNSEL'S REQUEST FOR FORMAL POLICY STATEMENT (12/16/2012) [Rec. Doc. 8963-48]; CLASS COUNSEL'S IN CAMERA SUBMISSION (1/23/2013) [Rec. Doc. 8963-26]; CLASS COUNSEL'S IN CAMERA SUBMISSION IN OPPOSITION TO BP'S MOTION FOR RECONSIDERATION (2/18/2013) [Rec. Doc. 8963-54].

[27] Rec. Doc. 8963-56.

[28] Rec. Doc. 8963-56.

- When read together with the Documentation provisions set forth in Exhibit 4A,[29] it is clear that the Program was to focus on monthly revenue and expenses experienced or recorded contemporaneously during the Benchmark Period and Compensation Period.

- The Examples contained within the Settlement Agreement reflect a comparison of the revenue and expenses recorded during the Benchmark Period and the Compensation Period.[30]

- The Expert Declarations and Briefs submitted by BP in support of final approval of the Settlement refer to expenses and revenue over the same comparable time periods.[31]

- A Memorandum prepared by BP's counsel towards the end of the negotiations directs that costs and revenue recorded during the relevant Benchmark and Compensation Period months be compared to one another, without any indication that the Compensation Framework would require the Program to average revenue across the entire time period it might have been "earned" or "match" the variable expenses to the revenue that was earned during the Benchmark or Compensation Period.[32]

- The powerpoint presentation prepared by the Program and presented to the Appeal Panelists in August without objection by BP defines "Variable Profit" as the sum of monthly revenue minus variable expenses from revenue "over the same time period".[33]

- The position taken by BP in response to the Claims Administrator's inquiry regarding the necessity of monthly profit and loss statements emphasized the BEL Frameworks' focus on monthly revenue and expenses actually experienced during the Benchmark and Compensation Periods in question.[34]

- Despite the exchange of numerous Examples during negotiations, BP never suggested that the Compensation Framework be applied in the manner BP is now suggesting.[35]

---

[29] Rec. Doc. 8963-57.

[30] Rec. Doc. 8963-56.

[31] *See* Rec. Docs. 8963-61 and 8963-62.

[32] Rec. Doc. 8963-58.

[33] Rec. Doc. 8963-63.

[34] Rec. Doc. 8963-68.

[35] *See generally,* Rec. Doc. Nos. 8963-84 and 8963-86; *see also,* Supplemental Declaration of John Tomlinson (April 1, 2013).

- With respect to the Test Claims provided by the Parties to the Program, BP never suggested that the Compensation Framework be applied to those Test Cases in the manner BP is now suggesting.[36]

- Although neither BP's current interpretation nor its proposed compromise "solutions" adhere to Generally Accepted Accounting Principles, it is clear that the parties did not intend to incorporate GAAP definitions of "Variable Profit" or other terms, as evidenced by the formal amendment of the Settlement Agreement to eliminate the requirement of CPAs to certify that the claims were submitted in conformity with GAAP in order to qualify for the Accountant Reimbursement Compensation.[37]

- BP's interpretation leads to a moving target of undefined and ever-changing criteria that are impractical, subjective, and inconsistent with prevailing accounting standards and principles.[38]

These points, combined with the Parties' emphasis on uniform and objective application of the Settlement Frameworks, make it clear that the Court's interpretation and application of the Settlement Agreement was and is the correct one.

## 2. BP Clearly Agreed that "Actual Losses" Would be Determined and Compensated in Accordance with the Objective Causation and Compensation Frameworks, without Any Subjective Inquiry Into Potential Alternative Causation.

In support of its Motion for Final Settlement Approval, BP submitted the Declaration of Holly Sharp, in which both BP and its expert confirmed that:

> Once a business meets the causation requirements, for purposes of quantifying causation, *all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other*

---

[36] *See* Rec. Doc. Nos. 8963-84 and 8963-86; *and,* Supplemental Declaration of John Tomlinson (April 1, 2013).

[37] *Compare* Section 4.4.13.4 in the original Settlement Agreement [Rec. Doc. 6276-1] (April 18, 2012), *with* Section 4.4.13.4 within Amendment No. 1 [Rec. Doc. 6414-6] (May 2, 2012).

[38] *See generally,* Rec. Doc. Nos. 8963-77, 8963-78, 8963-79, 8963-80, 8963-81, 8963-82, 8963-84, 8963-85, 8963-87, and Supplemental Declaration of Allen Carroll (March 25, 2013).

*causes.*[39]

Then, BP's Counsel, in a September 28, 2012 letter to the Claims Administrator,

reiterated that:

> *One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements.* These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.
>
> *[T]he Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements . . . .*[40]

Around the same time, Mike Juneau, on behalf of the Claims Administrator, had posed

the following inquiry to the parties:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?
>
> I will give a hypothetical situation to try to illustrate the question we are asking:

---

[39] Declaration of Holly Sharp [Rec. Doc. 7114-18], at 10, ¶17 (quoted in BP's Memorandum in Support of Final Approval [Rec. Doc. 7114-1], at 33, (emphasis supplied)). *See also,* Declaration of Henry Fishkind [Rec. Doc. 7114-5], at 10, ¶31 ("[P]rojected earnings during a Claimant-selected post-DWH spill compensation period are compared to actual earnings during that period and *the difference is deemed a compensable loss*") (emphasis supplied).

[40] Letter from Mark Holstein to Patrick Juneau, (Sept. 28, 2012) (re: Sept. 25th Policy Announcements) [Rec. Doc. 8963-68], at 1 (emphasis supplied).

Hypo: A small accounting corporation / firm is located in Zone B. They meet the "V-shaped curve" causation test.[41] The explanation for the drop in revenue is that one of the three partners went out on medical leave right around the time of the spill. Their work output, and corresponding income, thus went down by about a third. The income went back up 6 months later when the missing partner returned from medical leave. Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss. Is that full loss recoverable?[42]

In response to the question and hypothetical, BP's Counsel confirmed that:

If proper application of the methodology with accurate financial data yields a determination that causation is satisfied, BP agrees with Class Counsel that *all losses calculated in accordance with … Exhibits 4C … of the Settlement Agreement are presumed to be attributable to the Oil Spill.*

\*   \*   \*

[I]f the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-fictional data indicate that the decline was attributable to a factor wholly unrelated to the Oil Spill. *Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.*[43]

Based on BP's response, the Claims Administrator issued a formal Policy Statement on

October 10, 2012, further confirming that there would be no inquiry into potential "alternative

---

[41] *See, e.g.,* Preliminary Approval Hearing Presentation (April 25, 2012) (submitted herewith).

[42] E-Mail from Mike Juneau to Parties (Sept. 25, 2012) [Rec. Doc. 8963-66].

[43] Letter from Mark Holstein to Patrick Juneau, (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program) [Rec. Doc. 8963-67], at 1 & 3 (emphasis supplied).

causes" of the claimant's losses.[44]

> Several weeks later, in the Joint Proposed Findings, the Parties again confirmed that:

>> Once the causation tests are satisfied, *all revenue and variable profit declines during the Compensation Period are presumed to be caused **entirely** by the spill, with no analysis of whether such declines were also traceable to other factors unrelated to the spill.*[45]

> When BP, nevertheless, argued just several days later that Mr. Juneau's Supplemental Information Program spot was "misleading" because claims for losses which (in BP's subjective opinion) were not caused by the Spill are (allegedly) "fraudulent", the Claims Administrator requested the Court to confirm, in a formal Court-Approved Policy Statement, that the Settlement Agreement's Compensation Framework would be applied as written.  The question was posed by the Court to Counsel for BP, and BP's Counsel re-confirmed that it agreed with the Claim's Administrator's October 10th Policy Statement on this issue.[46]

> BP is an extremely sophisticated party, represented throughout the negotiations by preeminent lawyers from distinguished firms such as Kirkland & Ellis, Arnold & Porter, and SRDenton, as well as an army of economic and accounting experts and consultants who were crunching the numbers at every turn.  Despite the Settlement's clear focus on the uniform application of an objective quantitative data-based test, BP's current argument is nothing more than an attempt to reintroduce some vague and subjective notion of "alternative causation".  The "absurdities" that BP complains of are nothing more than the (arguable) "false positives" that

---

[44] Announcement of Policy Decisions Regarding Claims Administration (Oct. 10, 2012) [Rec. Doc. 8963-71], No.2.

[45] Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval [Rec. Doc. 7945], ¶126, at 39 (emphasis supplied).

[46] E-Mail from Judge Barbier re "Meeting Today re Non-Profits and SIP" (Dec. 12, 2012) [Rec. Doc. 8963-75].  *See also,* Supplemental Declaration of Stephen J. Herman (April 1, 2013), ¶¶ 9-11.

were, or certainly should have been, foreseeable to BP and its team from the beginning.

3. **BP's Strained Effort to Shoehorn Its New Methodology (which Itself is Undefined and Undetermined) Into the Language of the Settlement Has No Basis In Law or Lexicography.**

BP resorts, throughout its brief, to strained interpretations of the language of the Settlement Agreement, taking words and phrases out-of-context and hypothesizing new meanings that have no basis in the document.  One particularly glaring example of BP's resort to an alternative lexicographical universe is its selective definition of the word "comparable," devised to escape the Settlement's plain requirement that the claimant-selected months of the Compensation Period are compared with the same months in the Benchmark Period.

To BP, "comparable" no longer means the same, or like:  January is no longer comparable to January, or June to June.  Instead "comparable" now means something indirect, vague, and mysterious.  To support this new meaning, BP cobbles together the following patchwork of partial definitions from multiple dictionaries:

> The "comparable" months are those. that "hav[e] enough like characteristics or qualities to make comparison <u>appropriate</u>," and are "<u>suitable</u> for matching, coordinating, or contrasting." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 461 (Philip Babcock Gove, ed., 1976) (emphasis added).  They are the months "*worthy* of comparison; *proper* or *fit* to be compared." 2 THE OXFORD ENGLISH DICTIONARY 708 (1933) (emphasis added).  The "plain meaning of the word 'comparable'" is "'capable of being compared;  .  .  .  having enough like characteristics or qualities to make comparison appropriate."

However, in the very Webster's edition to which BP cites, BP has cut off the last two words of the definition.  It actually says (missing words in bold):  "suitable for matching, coordinating, or contrasting:  Equivalent; Similar**.**"  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, at 461 (1976) (emphasis supplied).

The very definition BP cites says that comparable = same.

And similarly (or "comparably") in the Oxford dictionary that BP cites, BP has cited the secondary definition; the Primary is "able to be likened to another; similar."

These are not isolated examples. The weight of lexicography is behind the plain meaning of "comparable."  The American Heritage Dictionary defines "comparable" as "similar or equivalent; pianists of comparable ability."  Webster's Collegiate Dictionary defines "comparable" as 'similar, like.'  BP's recourse to case law is likewise unavailing.  When courts are faced with defining comparable," Webster's straightforward meaning is, likewise, their choice. Thus,

> "While the word "comparable" can mean "capable of being compared," such an interpretation would give the word no substantive content in this context.  The other-obviously intended-meaning of "comparable" is "similar."  Thus, in ordinary parlance, if the prices at one store or restaurant are ten times those of a competitor, one would not say that the prices are "comparable," even though they can obviously be compared.  See Merriam-Webster's Collegiate Dictionary 234 (10th ed. 1997) (definitions for "comparable" include "similar, like" as in "fabrics of comparable quality").  United States v. Cinemark USA, Inc., 348 F.3d 569, 575-75 (6th Cir. 2003).[47]

### D. A Preliminary Injunction Will Not Serve the Public Interest in Promoting Court-Approved Settlements.

Of the myriad of cases BP musters in purported support of its novel interpretation of the Settlement Agreement, none has any relation to the type of agreement involved here:  a court-approved settlement agreement.  BP attempts to re-frame the subject of its motion as a mere private contract, a routine business agreement, or other commercial instrument.  But the Settlement Agreement involved here is no mere private contract:  it is a document in which not

---

[47] Other courts agree. "According to Webster's Dictionary, we note that 'comparable' means 'like or equivalent'.  WEBSTER'S II DICTIONARY 289 (1984)." Joseph v. Henry, 958 F.Supp. 238, 242 n.9 (D.V.I. 1997).

only the thousands of class members have an interest, but one in which the public has a stake as well.  There is a long-recognized and "overriding public interest" in the implementation and completion of voluntary settlements, especially class action settlement agreements. Kincade v. General Tire & Rubber Co., 635 F.2d 501, 507 (5th Cir. 1981); *quoting,* Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977).  This policy was recently reaffirmed to enforce a preliminarily approved class settlement about which a settling defendant had second thoughts:

> "A strong public policy exists, which is particularly muscular in class action suits, favoring settlement of disputes, finality of judgments and the termination of litigation." Ehrheart v. Verizon Wireless, 609 F.3d 590, 593 (3d Cir. 2010).

In Ehrheart, Verizon, the settling defendant, unsuccessfully sought to vacate its obligations under a class action settlement agreement, when a change in the law, *via* legislation enacted shortly after preliminary approval, arguably eliminated the plaintiffs' cause of action. The court of appeal refused to allow this escape, invoking "the strong presumption in favor of voluntary settlement agreements." Id. at 594.  "This presumption is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation" . . . an interest which "ties into the strong policy favoring the finality of judgments and the termination of litigation." Id. at 595.  Ehrheart is unequivocal:  "By vacating its preliminary approval of the settlement and by granting Verizon a judgment on the pleadings, the District Court permitted Verizon to void its settlement agreement when it became unpalatable and digressed from the federal policy of encouraging class action settlement agreements." Id.

BP now finds a specific portion of the settlement agreement "unpalatable" for far weaker reasons than those rejected as insufficient in Ehrheart v. Verizon.  There, the defendant had bad timing: a long-negotiated settlement was signed just shortly before the law on which the case

against it was based changed in its favor.  <u>Ehrheart</u> noted Verizon might have seen this coming –
yet it made a "calculated and deliberate" choice, which "hindsight reveals was . . . probably
wrong."  <u>Id.</u> at 596.  The point of <u>Erheart</u> is that settling parties must live with the choices they
make.  "The choice to settle inherently acknowledges calculated risks and, in the end, reflects the
deliberate decision of both parties to opt for certainty in terminating this litigation."  <u>Id.</u> at 595.
Here, no law has changed at any stage of the Settlement approval or implementation process, or
changed the legal landscape against which the parties negotiated, and jointly requested this Court
to approve, their agreement.

Courts should not confound public policy by allowing parties to escape the consequences
of bargains regretted in hindsight; each party must bear "the consequences of its informed,
counseled and voluntary decision to settle."  <u>Ehrheart</u>, 609 F.3d at 595 (citing <u>Coltec Industries,
Inc. v. Hobgood</u>, 280 F.3d 262, 273 (3d Cir. 2002)).  Here again, the consequences do not come
from a change – whether unforeseen or predictable – in the legal landscape, nor from intervening
new facts.  Instead, it is merely dissatisfaction with the calculable consequences of one of the
economic formulae of claims determination; and one that no one overlooked.  Rather, it was part
of the larger, interlocking system of settlement claims determinations and payouts that the parties
negotiated on an intensive, tested, and informed basis over a prolonged negotiation, drafting,
settlement approval, and claims program implementation period.

The provision for determination and payout of Class Member Claims during the
pendency of the settlement approval process is an integral feature and major benefit of the
agreement, as approved by the Court.  A preliminary injunction that halts or hampers the
determination process is at odds with a fundamental term of the agreement, which instead should
be enforced.

# EXHIBITS [48]

1.   From Preliminary Approval Hearing Presentation (April 25, 2012).

2.   Supplemental Declaration of W. Allen Carroll, Jr. (March 25, 2013).

3.   Supplemental Declaration of Stephen J. Herman (April 1, 2013).

4.   Supplemental Declaration of John Tomlinson (April 1, 2013).

5.   Affidavit of David Wolf, on behalf of Wall's Gator Farm (March 26, 2013).

6.   Affidavit of Malcolm Dugas, Jr., on behalf of Chef John D. Folse & Company (March 29, 2013).

7.   BP Appeal of No. 88168 (redacted), dated March 13, 2013.

8.   BP Appeal of No. 88708 (redacted), dated March 23, 2013.

---

[48] Class Counsel respectfully incorporate and adopt all EXHIBITS to Class Counsel's *In Camera* Submission in Opposition to BP's Motion for Reconsideration, which are listed in Rec. Doc. 8963-55 and have been entered into the Record as Rec. Doc. Nos. 8963-56 thru 8963-87.  Class Counsel also respectfully adopt and incorporate CLASS COUNSEL'S REQUEST FOR FORMAL POLICY STATEMENT (12/16/2012) [Rec. Doc. 8963-48]; CLASS COUNSEL'S *IN CAMERA* SUBMISSION (1/23/2013) [Rec. Doc. 8963-26]; CLASS COUNSEL'S *IN CAMERA* SUBMISSION IN OPPOSITION TO BP'S MOTION FOR RECONSIDERATION (2/18/2013) [Rec. Doc. 8963-54]; *and* the Court's REVIEW OF ISSUE FROM PANEL (Matching of Revenue and Expenses) (3/5/2013) [Rec. Doc. 8812].

## Conclusion

For the above and foregoing reasons, for the reasons provided in the Court's March 5, 2013 Review of Issue from Panel, and Class Counsel's previous submissions on the issue, BP's Motions for Preliminary Injunction should be summarily dismissed and denied.

This 1<u>st</u> day of <u>April</u>, <u>2013</u>.

Respectfully submitted,

<table>
<tr>
<td>

   /s/  Stephen J. Herman    <br>
**Stephen J. Herman**, La. Bar No. 23129<br>
**HERMAN HERMAN & KATZ LLC**<br>
820 O'Keefe Avenue<br>
New Orleans, FL Louisiana 70113<br>
Telephone: (504) 581-4892<br>
Fax No. (504) 569-6024<br>
E-Mail: sherman@hhklawfirm.com<br>
*Lead Class Counsel*

</td>
<td>

   /s/ James Parkerson Roy   <br>
**James Parkerson Roy**, La. Bar No.11511<br>
**DOMENGEAUX WRIGHT ROY & EDWARDS LLC**<br>
556 Jefferson Street, Suite 500<br>
Lafayette, Louisiana 70501<br>
Telephone: (337) 233-3033<br>
Fax No. (337) 233-2796<br>
E-Mail: jimr@wrightroy.com<br>
*Lead Class Counsel*

</td>
</tr>
</table>

### ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

<table>
<tr>
<td>

Brian H. Barr<br>
LEVIN, PAPANTONIO<br>
316 South Baylen St., Suite 600<br>
Pensacola, FL 32502-5996<br>
Office:  (850) 435-7045<br>
Telefax: (850) 436-6187<br>
E-Mail: bbarr@levinlaw.com

</td>
<td>

Robin L. Greenwald<br>
WEITZ & LUXENBERG, PC<br>
700 Broadway<br>
New York, NY  10003<br>
Office:  (212) 558-5802<br>
Telefax: (212) 344-5461<br>
E-Mail:  rgreenwald@weitzlux.com

</td>
</tr>
<tr>
<td>

Jeffrey A. Breit<br>
BREIT, DRESCHER & IMPREVENTO<br>
Towne Pavilion Center II<br>
600 22nd Street, Suite 402<br>
Virginia Beach, Virginia 23451<br>
Office:  (757) 670-3888<br>
Telefax: (757) 670-3895<br>
E-Mail: jbreit@bdbmail.com

</td>
<td>

Rhon E. Jones<br>
BEASLEY, ALLEN, CROW, METHVIN, PORTIS<br>
& MILES, P. C.<br>
218 Commerce St., P.O. Box 4160<br>
Montgomery, AL 36104<br>
Office:  (334) 269-2343<br>
Telefax: (334) 954-7555<br>
E-Mail:  rhon.jones@beasleyallen.com

</td>
</tr>
</table>

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 1st day of April, 2013.

/s/ Stephen J. Herman and James Parkerson Roy