UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This Document Relates to:<br><br>Nos. **12-970** and **13-492** | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SHUSHAN |

### DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, recollection, and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. James Parkerson Roy and I have been appointed by the Court to serve as Co-Lead Class Counsel for the Economic & Property Damages Settlement Class.

3. This Declaration is submitted in response to the Declaration of Keith Moscowitz, dated March 15, 2013 [Doc. 8910-13].

4. Mr. Moskowitz's Declaration fails to account for the fact that the process generally described in Paragraphs 4-6 of the Moskowitz Declaration was typically followed where input from the Parties was sought by the Program to address a question raised by the Claims Administrator and/or one of the Program Vendors;  by contrast, the notion that costs should be "matched" and/or that revenue should be "smoothed" originated from and was urged by BP.

**Background**

5. I hereby adopt and incorporate the statements in the Declaration of Stephen J. Herman, dated July 23, 2012 [Doc. 7104-5].

6. Since approximately June of 2012, I, along with other Class Counsel, have participated in numerous in-person and e-mail communications with BP Counsel, the Claims Administrator, and other representatives of the Settlement Program and its Program Vendors regarding the interpretation, implementation and application of the Economic & Property Damages Settlement Agreement and the administration of the Court-Supervised Settlement Program.

7. In conjunction with this effort, a "compendium" generally described by Mr. Moskowitz in Paragraph 6 of his declaration has been created and maintained by the Program. Many of the topics relate to administrative or procedural issues or policies regarding the submission, processing and/or appeal of Class Members' claims. Some of the topics relate to purely internal administrative issues and procedures for the Program Vendors to follow. Some of the topics relate to clarifications by the Seafood Neutral with respect to the interpretation or application of the Seafood Compensation Plan. Finally, there have been clarifications and/or interpretations of the substantive provisions of the Settlement Agreement, which include:
    a. Claims Administrator Interpretations.
    b. Clarifications or Interpretations Agreed to by the Parties.
    c. Court-Approved Interpretations.[1]

---

[1] While Mr. Moskowitz's Declaration refers to a total of approximately 340 issues, many of them, as noted, are purely for internal Program administrative purposes, and many of them overlap. I believe that the Program is currently in the process of attempting to harmonize related issues and revised or superseded policies so that they are current, accurate and complete. I understand that approximately 64 of these interpretations and/or policies have already been finalized and made available to Class Members on the Settlement Program Website, and that the remainder of the relevant "compendium" items will be made available once complete. Of course, many of these policies and/or interpretations were previously made available by the Program to Class Members, in the form of Policy Statements, Alerts, FAQs, Instructions, etc., as well as thru Class Counsel, and *via* individualized communications between the Program Vendors and Claimants (and/or the Claimants' CPAs and/or attorneys).

8. Within this hierarchy, each type of decision is accorded different weight.  A **Claims Administrator Interpretation** is binding on the Program Vendors, and is provided to the Settlement Program Appeal Panelists; however, either a Class Member or BP is free to argue to an Appeal Panelist or Panel that the Claims' Administrator's interpretation is inconsistent with the provisions or intent of the Settlement Agreement, and the Settlement Program Appeal Panelist or Panel is free to apply the Settlement Agreement differently with respect to that individual Claim.  A **Clarification or Interpretation Agreed to by the Parties** is binding, not only on the Program Vendors, but also on the Settlement Program Appeal Panelists and Panels.  Theoretically, the clarification or interpretation could be overruled by the Court, on discretionary review of a Settlement Program Appeal in which the Class Member argues that Class Counsel's agreement does not accurately reflect the provisions or intent of the Settlement Agreement.  Finally, a **Court-Approved Interpretation** is binding on the Program Vendors, the Claims Administrator, and the Settlement Program Appeal Panelists and Panels.[2]

### Events Leading up to Class Counsel's Request for Formal Policy Statement

9. Despite the fact that BP had expressly agreed, not only in the Settlement Agreement itself, but also in direct response to Michael Juneau's inquiry of September 25, 2012,[3] that once a Class Member satisfied Causation, all losses set forth in the Compensation Framework would be deemed to have been caused by the Spill, without any inquiry into potential alternative causation,[4] (thereafter formalized in a Policy Statement of October 10, 2012),[5] BP's Counsel took the position in late November and/or early December of

---

[2] Class Counsel understood, intended and agreed that the Court's interpretation would be final, pursuant to Section 4.3.4 of the Settlement Agreement. *See also,* Section 38.40 (which defines "Court" as "the United States District Court for the Eastern District of Louisiana, Judge Carl Barbier, presiding, in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179").  BP apparently takes the position that the Court's interpretation may be subject to further challenge or review.

[3] *See* Michael Juneau E-Mail to the Parties (Sept. 25, 2012) [Doc. 8963-66].

[4] *See* Letter from Mark Holstein to the Claims Administrator (Sept. 28, 2012) [Doc. 8963-67].

[5] *See* Claims Administrator's Announcement of Policy Decisions (Oct. 10, 2012) [Doc. 8963-71].

2012, in response to television announcements authored and delivered by the Claims Administrator in connection with the Supplemental Information Program,[6] that the submission of a Claim by someone who might have subjective doubts about whether the loss was caused by the Spill was somehow "fraudulent" even though the Claim satisfied the objective Causation Framework set forth in Exhibit 4B of the Settlement Agreement, to which BP agreed.

10. Around this same time, the Parties and the Claims Administrator appeared before the Court in connection with a dispute over the question of whether grants and other donations to non-profits should be considered "revenue" under the Settlement Agreement, pursuant to Section 4.3.4.

11. While in Court, Michael Juneau, on behalf of the Claims Administrator, raised the issue of alternative causation, as revealed through the discussions regarding approval of the Supplemental Information Program, and BP confirmed to the Court (and to the Claims Administrator as well as Class Counsel) that once a Class Member satisfied the Causation Framework, all losses set forth in the Compensation Framework would be deemed to have been caused by the Spill, without any inquiry into potential alternative causation.[7]

12. Nevertheless, Counsel for BP were continuing to make these types of arguments, expressly and/or implicitly, in communications with the Settlement Program and within individual Settlement Program Appeals.

13. Among other things, Counsel for BP, as recounted in Paragraphs 7-9 of the Moskowitz Declaration, repeatedly attempted to question the Program Accountants about why they were not "smoothing" revenue and/or "matching" expenses – and/or otherwise inquiring into potential alternative causation (and/or lack of Causation) – culminating in the E-Mail

---

[6] *See* Settlement Agreement, Section 4.4.15.

[7] *See* E-Mail from Judge Barbier re "Meeting Today re Non-Profits and SIP" (Dec. 12, 2012) [Doc. 8913-24].

from Dan Cantor to Michael Juneau re "Accountant Questions" dated December 11, 2012.[8]

14. Most, if not all, of the "compendium" items referenced in Paragraph 6 of the Moskowitz Declaration involved issues for which the Settlement Program sought input from the Parties due to some question or confusion on the part of the Claims Administrator or Program Vendors.

15. In this case, by contrast, the Program appeared to be interpreting and applying the Settlement Agreement correctly.

16. Indeed, to Class Counsel's knowledge, neither the Claims Administrator nor the Program Accountants had any questions or confusion about how to apply the Business Economic Loss Frameworks [Settlement Agreement Exhibits 4A-4C] in this regard.

17. Rather, BP appeared to be questioning, and implicitly attacking, the Program Accountants' (correct) interpretation and application of the Settlement Agreement.

18. Class Counsel, therefore, submitted the Request for Policy Statement on December 16, 2012,[9] in order to prompt a "Clarification or Interpretation Agreed to by the Parties", or, if necessary, a "Court-Approved Interpretation", with the hope that it would prevent BP from filing what Class Counsel considered to be dilatory and largely frivolous appeals. (Or, at the very least, to prevent any Settlement Program Appeal Panelist or Panel from being persuaded by such baseless or disingenuous arguments by BP.)

## Consideration of BP's Position

19. Prior to the issuance of the Policy Statement by the Claims Administrator on January 15, 2013, BP was afforded the opportunity to submit a lengthy position paper, which was attached as Exhibit 2 to the Claims Administrator's Referral of the Panel Issue to Judge

---

[8] Doc. 8963-74.

[9] Doc. 8963-48.

Barbier.[10] In addition, Class Counsel met with BP, after which time BP Counsel submitted a supplemental position to the Claims Administrator, attached to the Referral as Exhibit 3.[11] There was, to the best of my recollection, at least one in-person meeting with the Claims Administrator and other representatives of the Program, at which time Counsel for BP had the opportunity to further express its views on the issues.

20. In addition, prior to the Court's issuance of its March 5, 2013 REVIEW OF ISSUE FROM PANEL (Matching of Revenue and Expenses) [Doc. 8812], BP had the opportunity to submit further written materials to Judge Barbier; to appear and argue in Court before Judge Barbier; to explore the issues with a Court-appointed mediator; and to make an exhaustive supplemental submission to Judge Barbier in support of its request for reconsideration.

21. Therefore, based on my experience and participation, BP was afforded more than a full and fair opportunity to articulate its positions to the Court and to the Claims Administrator.

## Continued Appeals by BP Contrary to Resolved Policies

22. Despite the Court's ruling of March 5, 2013, on the "matching" / "smoothing" issue, as well as the Court's confirmation of BP's express agreement on December 12, 2012 that there was to be no subjective inquiry beyond the objective Settlement Frameworks into potential alternative causation, BP continues to urge these issues in their Settlement Program Appeal submissions.[12]

Signed, under penalty of perjury, this 1st day of Aptil, 2013, in New Orleans, Louisiana.

Stephen J. Herman

---

[10] Doc. 8963-19, pp.9-21.

[11] Doc. 8963-19, pp.23-25.

[12] *See, e.g.,* BP Appeal of Claim No. 88708, *and,* BP Appeal of Claim No. 88168.