IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to all actions. | * * * * * * * * | HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., *et al.,* individually and on behalf of themselves and all others similarly situated, | * * * * | Civil Action No. 12-970 <br><br> SECTION J |
| Plaintiffs, <br><br> v. <br><br> BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., <br><br> Defendants. | * * * * * * * * * | HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## AFFIDAVIT OF PATRICK A. JUNEAU

STATE OF LOUISIANA
PARISH OF ORLEANS

**BEFORE ME**, the undersigned authority, duly commissioned in and for the state and parish aforesaid, came and appeared:

**PATRICK A. JUNEAU,**

who, after being sworn, did depose and state as follows:

I am a person of the full age of majority, and I am competent to make this affidavit. I am the Claims Administrator of the *Deepwater Horizon* Economic and Property Damages

EXHIBIT A

Settlement Agreement ("Settlement Agreement"), and I serve as the Trustee of the Settlement Trust.  I have extensive experience serving as a special master in many complex and multi-district litigation situations. *See* Exhibit 1, Special Master Experience of Patrick A. Juneau.

## I.     History of the Settlement Structure

1.     A settlement of claims arising from the April 20, 2010 oil spill by the Oil Rig Deepwater Horizon ("Oil Spill") as between BP Exploration & Production Inc., BP America Production Company (collectively, "BP") and Plaintiffs on behalf of the Economic and Property Damages Settlement Class ("Class") was reached on April 18, 2012, which agreement was subsequently amended on May 2, 2012 ("Settlement Agreement").

2.     On May 4, 2012, a Settlement Trust was created to serve as a funding mechanism to administer the terms of the Settlement Agreement.  The trust agreement named me as Trustee of the Settlement Trust and J.P Morgan Trust Company of Delaware as Directed Trustee.

3.     By Order of the Court on March 8, 2012 ("Transition Order"), I was appointed by the Court as Claims Administrator of the Transition Process and the proposed Court Supervised Claims Program ("Program").

4.     The Court's Transition Order also appointed the following vendors who were to perform evaluation and processing of claims during the Transition Process:  Garden City Group, Inc, BrownGreer PLC, PricewaterhouseCoopers LP ("PwC") and other service providers as identified by the Claims Administrator.

5.     By Order of the Court on May 2, 2012 ("Preliminary Approval Order"), the Court granted Preliminary Approval of the Settlement Agreement and appointed me as Claims Administrator to oversee the Claims Administration Vendors. The Preliminary Approval Order also approved the creation of the Settlement Trust and confirmed my appointment as Trustee.

6.      The Preliminary Approval Order further appointed the following as Claims Administration Vendors to process the claims in accordance with the terms of the Settlement Agreement:  Garden City Group, Inc., BrownGreer PLC, PwC, and Postlethwaite & Netterville ("P&N").

7.      Per the terms of the Preliminary Approval Order, the Court ordered the Court Supervised Settlement Program ("Program") to commence operation on June 4, 2012.  The Court retained "ongoing and exclusive jurisdiction over the Claims Administrator and Claims Administration Vendors."

8.      A Fairness Hearing was held before the Honorable Carl J. Barbier on November 8, 2012. Judge Barbier took the fairness issues under advisement at that time.

9.      By Order of the Court on December 21, 2012 ("Final Approval Order"), the Court granted Final Approval of the Settlement Agreement.  The Final Approval Order also confirmed the prior appointments of the Claims Administrator, the Claims Administration Vendors and the Trustee of the Settlement Trust.

**II.      The Settlement Process**

10.     Upon my appointment as Claims Administrator on March 8, 2012, I began efforts to retain the necessary personnel and establish the necessary organization to implement the terms of the Settlement Agreement.   This included assembling a staff for my office as well as coordinating the extensive efforts of the various court-appointed Claims Administration Vendors.

11.     The process for preparing to implement the terms of the Settlement Agreement included digesting the terms of the extensive Settlement Agreement and putting into place the structures necessary to implement those terms.

12.     As part of the implementation process, the Parties (both BP and Class Counsel) provided an all-day tutorial to me, my staff and the Claims Administration Vendors at the PanAmerican Life building in New Orleans, Louisiana on May 8, 2012.  During that tutorial, the Parties made a joint presentation to explain various aspects of the Settlement Agreement.

13.     The process for implementing the Settlement Agreement included creating extensive computer programs that would enable the Program to properly implement the Settlement Agreement in its myriad of aspects.  This involved dedication of a tremendous amount of resources in terms of time, money, personnel and physical assets.  A large part of the summer of 2012 was devoted to getting these frameworks into place so that the terms of the Settlement Agreement could be implemented on a practical level.

14.     I, as the Claims Administrator, was not an author of the Settlement Agreement.  I, as the Claims Administrator, did not devise the criteria to be used in deciding whether a claimant does or does not have losses attributable to the Oil Spill.  Likewise, I, as the Claims Administrator, did not devise the formulas that are used to determine the amount of compensation to be awarded for any given claim.  All of those determinations were made by the Parties and are as set out in the Settlement Agreement.  My role as the Claims Administrator is to implement the terms of the Settlement Agreement as agreed to by the Parties and as set out in the written Settlement Agreement.

15.     The Settlement Agreement provides for twelve (12) different claims types.  One of those twelve is a Business Economic Loss ("BEL") claim.  The frameworks agreed to by the Parties for BEL claims are set out in Exhibits 4A-4E of the Settlement Agreement.

16.     The process for handling of a BEL claim is generally as follows:

        (a)     A claimant submits a claim, either online, in person or via mail.

(b)     An electronic claims file is created by the Program.  Once that is created, the claimant has online access so that he/she can monitor the progress of his/her claim.  The claimant is able to upload additional documents in support on his/her claims directly through the Program's website.

(c)     The Program performs "data capture" – transferring data from the documents submitted by the claimant into formats that enable the Program to evaluate whether the claim satisfies all requirements of the Settlement Agreement.

(d)     BrownGreer makes an initial assessment of eligibility, including whether a claim passes the "causation" test as outlined in Exhibit 4B of the Settlement Agreement.

(e)     Once a claim is determined to have satisfied the causation criteria, it is routed to the Program's accounting team (PwC and P&N) for further evaluation.

(f)     The Program's accounting team analyzes the submitted financial records and calculates the compensation due as per the formulas set out in Exhibit 4C of the Settlement Agreement.

(g)     Assuming a claimant is determined eligible for an award, an Eligibility Notice is issued.  The Eligibility Notice includes a summary of the compensation calculation, including:  (a) the monthly amounts of Variable Profits and Expenses during the Benchmark Period and Compensation Periods used to arrive at the Total Compensation Amount; (b) the breakdown between the Step 1 Compensation Amount and Step 2 Compensation Amount; (c) the Optimum Benchmark Period and Compensation Periods used in the calculation; and (d) a comparison of the Total Compensation calculation using the Optimum Benchmark and Compensation Periods used by the Claims Administrator

versus the Benchmark and Compensation Periods that the claimant selected on its Claim Form.

(h)     Upon the issuance of an Eligibility Notice, the Program accountants' worksheets are then made available online to the claimant, BP and Class Counsel. These worksheets detail all figures used in Program's calculations, including revenues and expenses assigned for each month during both the Benchmark Period and the Compensation Period.

(i)     To the extent that either party disagrees with the Program's decisions or calculations, the Settlement Agreement provides for an appeals process. That process involves the right of appeal to an independent panel of Court-appointed appellate neutrals. The Court retains jurisdiction over those appeal panelists and also retains authority to further review decisions of those panelists.

(j)     With regard to disputes that may arise as between BP and Class Counsel concerning interpretation of the Settlement Agreement or implementation of its terms, Section 4.3.4 of the Settlement Agreement provides for a dispute resolution process. That section provides for a three-person Claims Administration Panel consisting of the Claims Administrator, a representative of BP and a representative of Class Counsel. "Upon the request of any member of the Claims Administration Panel, it shall address and attempt to resolve unanimously any issues or disagreements that arise regarding the Claims Administrator's oversight responsibilities, Settlement administration, or any other issue involving the Settlement program." To the extent that any such issues or disagreements cannot be resolved unanimously, they are then to be referred to the Court for resolution.

III.   **Testing / Disclosure of the Methodology**

17.    In preparation for the implementation of the Program, a member of my staff, Kirk Fisher, Director of Business Processes and Reporting, oversaw a program whereby both Parties (BP and Class Counsel), together with the Claims Administrator's office, undertook extensive efforts to ensure that everyone was in agreement that the Program's extensive computer programs were properly devised and would yield results that were in compliance with the Settlement Agreement.

18.    A series of actual claims previously filed with the GCCF, which I understand to have been sixty-two (62) in number, were selected for this testing. Those claims were then "blinded" and run through the algorithms that had been established by the Program. Simultaneously, both BP and the Program accountants performed their own calculations with the same data. This testing of "blinded" claims was performed through the summer of 2012. Two variances in the way in which the Agreement was being interpreted were reported to me: one regarding the calculation of variable payroll and one regarding the application of payroll expenses. Once those issues were addressed, it was reported to me that all Parties were in agreement that the Program's systems were designed properly and were reaching the "correct" award amounts, and as such, all Parties were in agreement that the actual processing of claims could commence.

19.    The first Notice of Eligibility for a BEL claim was issued on July 27, 2012. Beginning in September 2012, the claimants and the Parties began gaining online access to the Program accountants' workbooks, which included the calculations used in arriving at the award amount.

IV.    **The Issues of "Objective Causation" and "Matching Revenues"**

20.    The issue of the Settlement Agreement's objective test for causation and whether or not the Claims Administrator is called upon to make any subjective assessments as to causation has

been a matter of importance to me in understanding my role in implementing the terms of the Settlement Agreement.

21.      At the tutorial presented jointly by the Parties to me, my staff and the Claims Administration Vendors on May 8, 2012, it was explained to us that it was the joint intent of the Parties to create an *objective* test of causation that should be discernible to anyone by merely reading the Settlement Agreement itself. As explained to us, one of the core principles of the Settlement Agreement was to avoid the type of case-by-case subjective analysis that was being utilized under the previously existing OPA process ("GCCF"). As a result, my role as Claims Administrator was explained to be to simply apply the objective formulas set out in the Settlement Agreement and to avoid applying any additional subjective analysis on causation issues.

22.      As the Program's accounting team started to actually review and evaluate claims, it became apparent that certain situations were being encountered whereby the Settlement Agreement's formulas provided for recovery for a given claimant, and yet a reasonable observer might logically conclude that the claimed losses did not appear to be related to the Oil Spill.  I thus instructed my staff to approach both Parties for clarification – namely, to clarify whether the Parties truly intended as they had explained at the prior tutorial that it was the Settlement Agreement's formulas that defined who would recover and the amount of recovery, even when I might conclude subjectively that such losses were not spill-related.

23.      In this regard, on September 25, 2012, my office presented the Parties with the following query, based on a hypothetical situation:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant

entitled to recovery of all losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?

I will give a hypothetical situation to try to illustrate the question we are asking:

Hypo:   A small accounting corporation / firm is located in Zone B.  They meet the "V-shaped curve" causation test.  The explanation for the drop in revenue is that one of the three partners went out on medical leave right around the time of the spill.  Their work output, and corresponding income, thus went down by about a third.  The income went back up 6 months later when the missing partner returned from medical leave.  Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss.  Is that full loss recoverable?

Exhibit 2, 9/25/12 email from Michael Juneau.

24.     BP responded to this query via two separate communications from two of its attorneys.

*See* Exhibit 3, 09/28/12 email from Keith Moskowitz, and  Exhibit 4, 09/28/12 letter from Mark

Holstein.  BP's response was that the claimant in the presented hypothetical was in fact entitled

to full recovery.  Class Counsel likewise confirmed the same understanding.

25.     Based on what was the confirmed agreement of the Parties on this issue, I, as Claims

Administrator, issued a Policy Announcement on October 10, 2012 as follows:

**2.     No Analysis of Alternative Causes of Economic Losses.**  The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation.  The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation.  Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured.   All such matters are negotiated terms that are an integral part of the Settlement Agreement.  The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement.  Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement.  The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury, other than the analysis required by

9

Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

Exhibit 5, Policy Announcement of 10/10/12, at 2-3.

26.    Neither Party objected to this Policy Announcement nor did either Party request a Claims Administration Panel meeting to address this issue any further.

27.    In applying the terms of the Settlement Agreement, and based on what I have understood to be the agreement of the Parties and as articulated in the above written policy, the Program has not undertaken any subjective analysis of what losses may or may not have been specifically caused by the Oil Spill.   Rather, the Program has applied the objective tests set out in the Settlement Agreement.   For those claimants who meet those objective tests, the Program has made awards without undertaking any subjective analysis and/or more traditional analysis of whether the claimed losses are in fact attributable to the Oil Spill.

28.    The issue of "objective causation" was addressed again in a conference before the Court on December 12, 2012.   At that time, both Parties again confirmed that the Policy Statement of October 10, 2012 was an accurate statement of their agreement on this issue.   This agreement was confirmed in Judge Barbier's email of December 12, 2012 following the conclusion of that conference. Exhibit 6.

29.    With regard to the issue that has been referred to "revenue smoothing" or "matching of revenue and expenses," my staff conducted a conference call with BP, BP's outside accounting firm, Class Counsel and the Program accountants on October 2, 2012.   At that time, the Program accountants explained how the Program was handling these issues.   Neither party requested a Claims Administration Panel meeting to contest any of those issues immediately following that conference.

V.      **The Final Fairness Hearing on November 8, 2012**

30.     The Fairness Hearing was held before Judge Carl Barbier on November 8, 2012. At that hearing, both Parties (both BP and Class Counsel) voiced their approval of the ongoing claims process and the manner in which the Program was being administered.  To my knowledge and recollection, neither party voiced any objection to the Program's handling of claims with respect to either the "objective causation" issue or the "smoothing or revenue / matching of revenue and expenses" issue.

31.     The Court took the issue of final approval of the Settlement under advisement after receiving evidence and arguments at the November 8, 2012 Fairness Hearing.

32.     The Court issued its written ruling granting final approval of the Settlement on December 21, 2012.

VI.     **Events After the Final Fairness Hearing**

33.     With regard to the specific issue of whether the Program should be "matching" revenues to expenses by moving revenues and/or expenses to months other than as recorded in a claimant's contemporaneous financial statements, I was first asked to convene a Claims Administration Panel meeting on that issue on December 5, 2012.  That request came by email from Dan Cantor, counsel for BP. Exhibit 7.  But Mr. Cantor requested that prior to such a Panel meeting, a meeting with the Program accountants be held to more fully discuss those issues.

34.     Michael Juneau of my office undertook efforts to schedule the meeting with the Program accountants as requested by BP.  That meeting was scheduled for December 19, 2012.  BP subsequently advised that it wished to postpone that meeting, and thus, the meeting was cancelled.

35.     On December 16, 2012, Class Counsel requested that a formal Policy Announcement be issued to address this issue.  Simultaneously, Class Counsel submitted its written position on the issue.

36.     I requested that BP submit its written position on this issue to me by December 28, 2012. At BP's request, I extended that deadline an additional ten (10) days to January 8, 2013.

37.     BP submitted its position paper on this issue on January 8, 2013 and then a supplemental position paper on January 11, 2013.

38.     After review of the submissions of both Parties, I issued a formal Policy Announcement on January 15, 2013. Exhibit 8.

39.     The Program's announced policy, based upon its understanding of the formula set out in the Settlement Agreement, is to generally recognize revenues and expenses in the periods in which they were booked in the claimant's contemporaneous records, reserving the right to adjust the financial statements in certain circumstances, including inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transaction and flawed or inconsistent accounting estimates. *See id.*

40.     A Claims Administration Panel meeting was held the following day, January 16, 2013, but the Panel was unable to resolve the subject dispute unanimously.  The matter was thus referred to the Court for resolution.

41.     A conference was held before the Court on January 24, 2013.  At that time, Judge Barbier affirmed the January 15, 2013 Policy Announcement of the Claims Administrator.  *See* Exhibit 9, 01/30/13 email of Judge Barbier.

42.     BP subsequently filed a Motion for Reconsideration.  The Court set a briefing schedule and subsequently issued a written ruling on March 5, 2013, again affirming the interpretation of

the Settlement Agreement as articulated in the Claims Administrator's Policy Announcement of January 15, 2013.

43.     I have instructed the Claims Administration Vendors to implement the Settlement Agreement in accord with the Court's ruling of March 5, 2013, which in turn is in accord with my Policy Announcement of January 15, 2013.   As I appreciate my duty as the Claims Administrator, it is to follow the Orders of the Court, which I have done in good faith, and will continue to do with regard to any Order that may be issued by the Court.

PATRICK A. JUNEAU

SWORN TO AND SUBSCRIBED
before me, this 28ᵗʰ day
of March, 2013.

Notary Public
Name: RICK STANLEY
La. Bar/Notary No.: 8487

13

**SPECIAL MASTER EXPERIENCE**
**OF**
**PATRICK A. JUNEAU**

*In Re: Combustion, Inc.* U.S. District Court, Middle District of Louisiana - MDL; *In Re: New Orleans Train Car Leakage Fire Litigation*, Orleans Parish, Louisiana; *In Re: Silicone Gel Breast Implant Products Liability Litigation*; *In Re: New Iberia Train Leakage Litigation*, U.S. District Court, Western District of Louisiana; *In Re: Chemical Release at Bogalusa*, Washington Parish, Louisiana; *Colonial Pipeline Litigation*, U.S. District Court, Middle District of Louisiana; *Mary Self, et al v. Illinois Central Railroad*, U.S. District Court, Eastern District of Louisiana; *Bryson Adams, et al v. Environmental Purification Advancement Corp.*, U.S. District Court, Western District of Louisiana; *In Re: Propulsid Product Liability Litigation*, U.S. District Court, Eastern District of Louisiana - MDL; *Icon Class Action*, 27th Judicial District Court, St. Landry Parish, Louisiana; *Juanita Thibodeaux, et al v. Conoco Phillips Company, et al*, 14th Judicial District Court, Calcasieu Parish; *In Re: Educational Testing Services Praxis Principles of Learning and Teaching*, U.S. District Court, Eastern District of Louisiana - MDL; *In Re: Guidant Corp. Implantable Defibrillators Product Liability Litigation*, U.S. District Court, District of Minnesota – MDL; *Clark Gunderson, MD, et al. vs. F.A. Richard and Associates*, 14th Judicial District Court, Calcasieu Parish, Louisiana; *Clark Gunderson, MD, et al. vs. Focus*, 14th Judicial District Court, Calcasieu Parish, Louisiana; *Clark Gunderson, MD, et al vs. AIGDC, et al*, 14th Judicial District Court, Calcasieu Parish, Louisiana; *Clark Gunderson, MD, et al vs. Amerisafe Risk Services, Inc. and American Interstate Ins. Co., et al*, 14th Judicial District Court, Calcasieu Parish, Louisiana; *Clark Gunderson, MD, et al vs. Claims Management, Inc. and Wal-Mart Stores, Inc., et al*, 14th Judicial District Court, Calcasieu Parish, Louisiana; *Opelousas Trust Authority, et al vs. Summit Consulting Inc. of Louisiana*, 27th Judicial District Court, St. Landry Parish, Louisiana; *Barbara Pellerin, etc. vs. Our Lady of Lourdes Regional Medical Center*, 15th Judicial District Court, Lafayette Parish, Louisiana; *Mary Gallien, et al vs. Lafayette General Medical Center*, 15th Judicial District Court, Lafayette Parish, Louisiana; *Barbara Pellerin, et al vs. Louisiana Medical Mutual Ins. Co., et al.*, 15th Judicial District Court, Lafayette Parish, Louisiana; *Gwendolyn Guillory, et al vs. Union Pacific Corp., et al*, 14th Judicial District Court, Calcasieu Parish, Louisiana; and *Darcy Guidry, et al vs. American Public Life Ins. Co., et al*, 14th Judicial District Court, Calcasieu Parish, Louisiana; *In Re: Vioxx Products Liability Litigation*, U.S. District Court, Eastern District of Louisiana - MDL; *George Raymond Williams, M.D. vs. SIF Consultants, et al*, 27th Judicial District Court, St. Landry Parish, Louisiana; *George Raymond Williams, M.D. vs. Hammerman Gainer, Inc., et al*, 27th Judicial District Court, St. Landry Parish, Louisiana; *In Re: Kugel Mesh Hernia Repair Patch Litigation*, U.S. District Court, District of Rhode Island - MDL; *In Re: Avandia Marketing, Sales Practices Products Liability Litigation*, U.S. District Court, Eastern District of Pennsylvania - MDL; *Rose Goudeau, et al vs. The Administrators of the Tulane Educational Fund, et al*, Orleans Parish, Louisiana; *Opelousas General Hospital Authority,, et al. vs. FairPay Solutions, Inc.*, 27th Judicial District Court, St. Landry Parish, Louisiana; and *In Re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, U.S. District Court, Central District of California – MDL.

Monday, March 18, 2013 9:51:43 AM Central Daylight Time

**Subject:** RE: Request for Parties' Positions - NO LATER THAN 12:00 NOON, SEPTEMBER 28, 2012

**Date:** Tuesday, September 25, 2012 2:17:00 PM Central Daylight Time

**From:** Michael Juneau

**To:** mark.holstein@bp.com, keith.moskowitz@snrdenton.com, jimr@wrightroy.com, sherman@hhkc.com

**CC:** Christine Reitano, Patrick Juneau

**Priority:** High


Counselors:

Please provide the Claims Administrator's office (copies to all of the above) with your respective interpretations of the Settlement Agreement, providing citations to any *specific* language in the Settlement Agreement that you contend addresses the following issue:

**As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not?  Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?**

I will give a hypothetical situations to try to illustrate the question we are asking:

*Hypo:*  A small accounting corporation / firm is located in Zone B.  They meet the "V-shaped curve" causation test.  The explanation for the drop in revenue is that one of the three partners went out on medical leave right around the time of the spill.  Their work output, and corresponding income, thus went down by about a third.  The income went back up 6 months later when the missing partner returned from medical leave.  Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss.  Is that full loss recoverable?

Please submit any position paper you wish to present on this issue no later than <u>12:00 noon, central time, Friday, September 28, 2012</u>.  Given the ongoing efforts to process the program's claims as expeditiously as possible in light of certain impending court deadlines, we are not in a position to consider any position statements submitted after that deadline.  Thank you.

**Michael J. Juneau**
*Special Counsel*

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS
**504-934-4999**

**935 Gravier Street, Ste. 1905**
**New Orleans, LA  70112**
<u>mjuneau@dheclaims.com</u>

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any

EXHIBIT A(2)

attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

**Subject:** RE: BP Oil - Request for Parties' Positions - NO LATER THAN 12:00 NOON, SEPTEMBER 28, 2012 - (further)

**Date:** Friday, September 28, 2012 11:12:55 AM Central Daylight Time

**From:** Moskowitz, Keith

**To:** 'Steve Herman', Michael Juneau

**CC:** James Roy, Christine Reitano, Orran L. Brown, Lynn Greer, mark.Holstein@bp.com, Moskowitz,

Mike,

BP provides the following response to the question set forth in your email below.

If a claimant has submitted the required documentation under the Business Economic Loss ("BEL") Documentation Requirements (Settlement Agreement Ex. 4A), and those documents and any additional detail information the Settlement Facility has determined is necessary to verify the accuracy of the financial data submitted by the claimant establish that the claim satisfies the requirements of the BEL Causation Framework (Ex. 4B), then Claimant Compensation should be calculated pursuant to the provisions of the BEL Compensation Framework Ex. 4C.   If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Ex. 4C are presumed to be attributable to the Oil Spill.

Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-financial data indicates that the decline was attributable to a factor wholly unrelated to the Oil Spill.  Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.  However, they should be relatively rare.

It is important to emphasize that BP is not saying that the Settlement Program should not scrutinize carefully financial information submitted by claimants for anomalous results that may be due to data entry errors or recording of revenue or expense in the wrong period.  To the contrary, where unusual or surprising results of this sort are noted, the Settlement Program must review the data and additional supporting documents it may deem necessary to determine whether the data are accurate.   The documentation requirements of Ex. 4A, including but not limited to federal income tax returns, certain local hospitality and sales tax documents, and monthly and annual financial statements (see items 3 - 5) all are intended to facilitate such review for accuracy.

Best,

Keith



Keith Moskowitz
SNR Denton US LLP
D +1 312 876 8220
M +1 312 758 9732
F +1 312 876 7934
keith.moskowitz@snrdenton.com
snrdenton.com

233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6306

SNR Denton is the collective trade name for an international legal practice. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see snrdenton.com for Legal Notices, including IRS Circular 230 Notice.

EXHIBIT A(3)

**From:** Steve Herman [mailto:SHERMAN@hhklawfirm.com]
**Sent:** Thursday, September 27, 2012 5:25 PM
**To:** 'Michael Juneau'
**Cc:** James Roy; Christine Reitano; Orran L. Brown; Lynn Greer; mark.Holstein@bp.com; Moskowitz, Keith
**Subject:** BP Oil - Request for Parties' Positions - NO LATER THAN 12:00 NOON, SEPTEMBER 28, 2012 - (further)

Dear Mike,

As a follow-up to the Memo submitted by Class Counsel in response to your E-Mail of September 25th earlier today, we are wondering about the question which is apparently part of the Program's current analysis / evaluation, (see attached and below) ?

Thanks.

---

**From:** Joe Rice
**Sent:** Thursday, September 27, 2012 4:31 PM
**Subject:** Allocation of Losses

In light of the question that Mike sent related to allocation of losses based on alternative cause, I reviewed the recently supplied claimant information form that the evaluators are using.  One of the things that stood out quickly, under facility identification, is the question they ask their claims people to review: "Number 3, Alternate Cause:  Do the documents indicate that the Claimant's Economic Loss more likely than not resulted from some cause other than the Spill?"  (See attached).

Why is this relevant?  Why are they asking this question, and why are they taking the time to do this analysis and at whose suggestion is it being done?  Because it is certainly is not something needed for the Settlement Agreement.

---

CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended
solely for the addressee.  Please do not read, copy, or disseminate it unless
you are the addressee.  If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender.  Also, we would appreciate your forwarding the message back to us and
deleting it from your system.  Thank you.



**bp**

**Mark Holstein**
Managing Attorney
BP Legal – Litigation

BP America Inc.
P.O.Box 3092
Houston, Texas 77253-3092

501 WestLake Park Blvd.
Houston, Texas 77079-2607
Mail Code 17.130

Direct: 281-366-8895
Fax:      281-366-3491
Mark.Holstein@bp.com

**PRIVILEGED & CONFIDENTIAL**
**CONFIDENTIAL SETTLEMENT COMMUNICATION**

September 28, 2012

**Via Electronic Mail**

Patrick Juneau
Claims Administrator
Deepwater Horizon Settlement Program
935 Gravier Street
New Orleans, Louisiana  70130

      Re:  *Issues Raised By Class Counsel or Settlement Program*

Dear Mr. Juneau:

      This letter responds to several issues recently raised by Class Counsel or the Settlement Program.  We first provide a short executive summary of BP's positions, followed by a discussion of each issue.

I.     <u>Executive Summary</u>

- BP agrees with Class Counsel that where a vessel damage claimant files a copy of vessel title but not vessel registration, a prescribed sworn written statement (details of content are set forth in BP's September 21 letter) may be filed in lieu of the registration.

- With regard to Michael Juneau's email inquiry of September 25, the BEL causation methodology set forth in the Settlement Agreement governs the determination of causation for BEL claims.  If proper application of the methodology with accurate financial data yields a determination that causation is satisfied, BP agrees with Class Counsel that all losses calculated in accordance with Section 3.3 and Exhibits 4C and 19 of the Settlement Agreement are presumed to be attributable to the Oil Spill.

- Where an owner/officer (or part owner) of an entity is also a W-2 employee of the entity and the entity has filed a BEL claim, the owner/officer cannot file an IEL claim for alleged lost wages.  The owner/officer's wages are addressed and recovered in the BEL claim, and permitting a separate IEL claim would result in double recovery.

- Where an owner of an entity is also a W-2 employee of the entity and the entity signed a GCCF release, the owner may not file a separate IEL claim in the Settlement Program for alleged lost wages.  Any alleged lost wages of the owner were addressed in the resolution

EXHIBIIT A(4)

Patrick Juneau
Claims Administrator
September 28, 2012
Page 2 of 6

of the GCCF claim.

- With regard to IEL claims, where the Settlement Program is unable independently to verify the claimant's age, the Settlement Program must seek confirmation from the claimant.

- With regard to seafood claims, SWS-1 is not sufficient standing alone to establish allocation of revenue by vessel, landing and catch type.

- BP notes certain clarifications regarding Items 13 and 14 of the Claims Administrator's Report on Policy Changes Affecting Document Requirements filed on September 24.

- BP will submit a letter invoking the Claims Administration Panel with regard to several positions set forth in the September 25 Announcement of Policy Decisions Regarding Claims Administration.

II.     Discussion of Issues

        A.      Item 11 in September 24 Report

        Item 11 of the Claims Administrator's Report on Policy Changes Affecting Document Requirements filed on September 24 provides that claimants making a vessel damage claim who submit a vessel registration but not a vessel title may submit a prescribed sworn written statement in lieu of a copy of the title. As discussed in our email of September 25, we agree with Class Counsel that the converse of this rule also applies, namely that the prescribed sworn written statement may be used where a vessel damage claimant has submitted a copy of vessel title but not vessel registration. Please see our memorandum of September 21 for the required contents of the sworn written statement.

        B.      Response to Causation Question Posed by Michael Juneau on September 25

        On September 25, Michael Juneau posed the following question to the Parties and requested a response by September 28: "As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?"

        BP responded as follows. If a claimant has submitted the required documentation under the Business Economic Loss ("BEL") Documentation Requirements (Ex. 4A), and those documents and any additional detailed information the Settlement Facility has determined is necessary to verify the accuracy of the financial data submitted by the claimant establish that the claim satisfies the requirements of the BEL Causation Framework (Ex. 4B), then Claimant Compensation should be calculated pursuant to the provisions of the BEL Compensation

Patrick Juneau
Claims Administrator
September 28, 2012
Page 3 of 6

Framework (Ex. 4C). If the accurate financial data establish that the claimant satisfies the BEL
causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be
attributable to the Oil Spill.[1]

Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex.
4C) provides for an offset where the claimant firm's revenue decline (and recovery, if
applicable) satisfies the causation test but extraneous non-financial data indicate that the decline
was attributable to a factor wholly unrelated to the Oil Spill. Such "false positives" are an
inevitable concomitant of an objective quantitative, data-based test. However, they should be
relatively rare.

It is important to emphasize that the Settlement Program must still scrutinize carefully
financial information submitted by claimants for anomalous results that may be due to data entry
errors or recording of revenues or expenses in the wrong period. Where unusual or surprising
results of this sort are noted, the Settlement Program must review the data and additional
supporting documents it may deem necessary to determine whether the data are accurate. The
documentation requirements of Exhibit 4A, including but not limited to federal income tax
returns, certain local hospitality and sales tax documents, and monthly and annual financial
statements (see items 3-5) all are intended to facilitate such review for accuracy.

    C.    <u>Prohibition on IEL Claims By Owner/Officer of an Entity That Has Filed BEL
Claim</u>

Where the owner/officer (or part owner) of an entity that has filed a business economic
loss (BEL) claim is also a W-2 employee of the entity, that individual <u>cannot</u> also pursue a claim
for individual economic loss (IEL) due to reduced wages that the claimant and/or other owners
decided to implement in the wake of the Spill. Permitting the claimant to do so would result in
double recovery.

This would result in double recovery because, in calculating compensation for a BEL
claim, owner compensation is <u>excluded</u> from the variable profit calculation that is used to
determine the difference in the business's variable profit between the Benchmark Period and the
Compensation Period. *See* Ex. 4C, p. 2 (definition of Variable Profit); Ex. 4D. *See also* Brown-
Greer Spreadsheet response to item 67 (reflecting the Parties' consensus that the Settlement
Program must segregate owner/officer compensation from other employee compensation in
processing BEL claims). Thus, any reduction in the owner's salary is *not* reflected as a reduction
in expense by the BEL claimant and does *not* reduce the decline in variable profit between the
Benchmark Period and the Compensation Period and calculated Step 1 compensation amount
received by the BEL claimant (which then is affected by the growth factor and multiplied by
RTP). To the extent the individual owner suffered a loss in compensation, that amount would be
included in the award calculated and awarded under the BEL framework. Accordingly, the

---

[1] Moratoria Losses are excluded from recovery under the Settlement, however. *See* Settlement
Agreement § 3.3 & Ex. 19.

Patrick Juneau
Claims Administrator
September 28, 2012
Page 4 of 6

owner/employee must look to the business for the claimant's appropriate share of the BEL award.

D.     Prohibition on IEL Claim By Owner of Business That Executed A GCCF Release

Where the owner of an entity that has signed a GCCF release is also a W-2 employee of the Entity, that individual cannot pursue a claim for individual economic loss (IEL) due to reduced wages that the claimant and/or other owners decided to implement in the wake of the Spill. Permitting the claimant to do so would result in double recovery. It is our understanding that the GCCF similarly took the view that, where an owner submitted a business claim, the owner could not then also submit a separate salary claim and recover twice.

Paragraph 2 of the GCCF Release provides comprehensively that the release is on behalf not only of a business claimant but also the "Claimant's partners, limited partners, members, joint venturers, shareholders . . . ." Thus, any claim by the owner for reduced salary must be asserted against the business. This is consistent with the instruction on the release that a Business Claimant where "the business is a sole proprietorship, and you are the owner and you are married, or if the business is jointly owned by you and your spouse, both you and your spouse must sign the Release." That language, again, makes clear that a release by a business releases its owner's claims related to the business.

E.     Confirmation of Claimant Age for IEL/IPV/IFV Claims

The Claims Administrator's Report on Policy Changes Affecting Document Requirements filed on September 24 omitted the following statement that appeared in the original draft circulated by Lynn Greer: "If the Claims Administrator is not able to confirm the claimant's age, only then will we ask the claimant to verify his/her age." BP assumes this was an oversight and that the claimant will be required to confirm age where the Claims Administrator is unable to do so. Kindly confirm.

F.     Item 6 in September 24 Report

Item 6 of the Claims Administrator's Report on Policy Changes Affecting Document Requirements filed on September 24 may be interpreted to leave the impression that the SWS-1 standing alone is sufficient to establish allocation of revenue by vessel, landing and catch type. BP has not agreed to this interpretation, nor is BP aware that the Seafood Neutral has been consulted regarding such an interpretation. BP noted its objection to such an interpretation in the Excel document attached to an email sent to Mr. Juneau on August 21, 2012 at 11:58 p.m. This email responded to Mr. Juneau's email dated August 16, 2012, which attached a Settlement Program memorandum regarding Incomplete Claims and Possible Workarounds. Each Plan in the Seafood Compensation Program sets forth the documentation requirements to establish a claimant's benchmark revenue--trip tickets or tax documents with "sufficient documentation" to identify what portion of their reported earnings should be allocated by vessel, landing and catch type. (See, e.g., Ex. 10, pg 10, Section B.1(a) and (b)(i)-(iii)). BP agrees it may be helpful to use

Patrick Juneau
Claims Administrator
September 28, 2012
Page 5 of 6

an SWS in conjunction with tax document and additional supporting documents, but not as the sole source for allocating revenue.

    G.    <u>Items 13 and 14 in September 24 Report</u>

    Item 13 of the Claims Administrator's Report on Policy Changes Affecting Document Requirements filed on September 24 refers to "2010 Property Tax Assessment to Prove Value of a Parcel." Claimants are not required to "prove value of a parcel" for the Coastal Real Property framework, or for the wetlands framework. Thus, the description of the document "2010 Property Tax Assessment To Prove Value of Parcel" may be misunderstood. The purpose of the tax assessment is to provide information regarding parcel ownership and parcel boundaries. Also, as previously explained, the Mapping Software does not contain the 2010 Property Tax Assessment, but rather only the tax roll data. There is no pdf of the 2010 tax assessment in the Mapping Software. However, BP has provided the Settlement Program with a list of the web sites from which tax assessments may be obtained directly by the Settlement Program in the event the tax assessment is missing from the claimant's submission. Per Appendix F, a 2010 tax assessment is required for all coastal claimants. It is our understanding that if a claimant has not supplied the 2010 tax assessment, the Claims Administrator will try to locate it in the first instance using the online database links, and only contact the claimant for a copy if the assessment is not located online.

    We do recommend that the Settlement Program consider a similar type of policy change for wetlands real property claims. There is likewise in Appendix F of Exhibit 12 this same requirement of all wetland claimants that they provide the 2010 tax assessment.

    H.    <u>Invocation of Claims Administration Panel</u>

    BP will be submitting today a letter invoking the Claims Administration Panel with regard to several issues raised in the September 25 Announcement of Policy Decisions Regarding Claims Administration.

***

    If you have any questions, we are available to discuss them. Thank you for your attention to this matter.

        Sincerely,

        /s/ Mark Holstein

        Mark Holstein

cc:    Hon. Sally Shushan
       Steven Herman
       James Roy

Patrick Juneau
Claims Administrator
September 28, 2012
Page 6 of 6

Joe Rice
Christine Reitano
Orran Brown
Lynn Greer



**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

# MEMORANDUM

| | |
|---|---|
| **TO:** | **Class Counsel** |
| | **BP** |
| **FROM:** | **Patrick A. Juneau, Claims Administrator** |
| **DATE:** | **October 10, 2012** |
| **RE:** | **Announcement of Policy Decisions Regarding Claims Administration** |

Under the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

In furtherance of these responsibilities, the Claims Administrator advises the Parties of the following interpretations of the Settlement Agreement and procedures or policies to be implemented to promote the efficient and timely administration of claims in compliance with the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement. In each instance, the Claims Administrator has already received input from the Parties as to their positions on the issue, or has determined that such input was not necessary to the analysis of the issue.

1. *Reimbursement of Claimant Accounting Support.*

    (a) **Benefit Available.** Section 4.4.13 of the Settlement Agreement authorizes the Claims Administrator to reimburse claimants for reasonable and necessary accounting fees relating to claim preparation.

    (b) *Rates and Limits for Claims by Individual Claimants.* Under Sections 4.4.13.6 and 4.4.13.7 of the Settlement Agreement, Individual Claimants with claims over $10,000 may receive up to 2% of their Economic Damage Compensation Amount

1

EXHIBIT A(5)

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

(excluding the Risk Transfer Premium) as reimbursement for Claimant Accounting Support, up to a maximum of $6,000. All other claims of Individual Claimants are limited to $200 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $85 and Supervision and Review hours at rates of up to $130 for Individual Claimants.

(c) *Rates and Limits for Claims by Business Claimants.* Under Sections 4.4.13.6 and 4.4.13.8 of the Settlement Agreement, Business claimants with claims over $50,000 may receive up to 2% of their Economic Damage Compensation Amount excluding the Risk Transfer Premium as reimbursement for Claimant Accounting Support, up to a maximum of $50,000. All other claims of Business Claimants are limited to $1,000 in reimbursement. The Claims Administrator will reimburse for Preparation hours at rates of up to $110 and Supervision and Review hours at rates of up to $160 for Business claimants.

(d) *Review and Supervision Hours.* Section 4.4.13.6 of the Settlement Agreement limits reimbursement for Review and Supervision hours to 25% of the total time spent on the claim. The Claims Administrator calculates the 25% limit for Review and Supervision hours using the following formula:

$$.25 \geq \frac{\text{Supervision and Review Hours}}{\text{Supervision and Review Hours + Preparation Hours}}$$

(e) *Awards.* Claimants will receive reimbursement for all Preparation hours and up to the allowed 25% limit for Review and Supervision hours up to the rates provided by Sections 4.4.13.7 and 4.4.13.8. The Claims Administrator calculates the total hours expended by the accountants on the claim and then determines whether the Review and Supervision hours exceed the 25% limit. The Claims Administrator will not reimburse for Review and Supervision hours in excess of the 25% limit, regardless of whether the award has reached the overall limits on accounting reimbursements.

2.     *No Analysis of Alternative Causes of Economic Losses.* The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement. The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or

2

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

3.    *Zone Classification for Businesses in the Class But Not Located in the Gulf Coast Areas.* Under the definition of the Class in Section 1.2 of the Settlement Agreement, a business that is physically located outside of the Eligibility Zone is a member of the Class if it engaged in certain activities during the Class Period in the Gulf Coast Areas or Specified Gulf Waters. Such a business has no physical location in any one of the Economic Loss Zones A through D. For purposes of the assignment of a Risk Transfer Premium and the Causation review process required under the Settlement Agreement, the Claims Administrator will place such a business in Zone D. This approach will replicate the rule applied to businesses that are located in Zone A, B, C, or D, but have activities that cross zones. Under that rule, such a business is classified in the Zone of the primary physical location of the business. Allowing businesses with no physical location in the Gulf Coast Areas to use the Zone where the activities occurred that placed them in the Class would treat them more favorably that businesses with physical locations in the Gulf Coast Areas in Zones less favorable that the Zones in which certain activities of the business occurred. In order to apply the zone considerations in the most consistent and equitable manner, the Claims Administrator will default to Zone D for businesses in the Class but with no physical location in any Zone.

4.    *Seafood Distribution Chain Definitions.* The Claims Administrator has encountered claims relating to these businesses that do not expressly fit in any of the definitions of the Seafood Distribution Chain in Exhibit 3. These businesses play a necessary role in the distribution of Seafood, but they are not listed in Exhibit 3:

  (a) **Seafood Brokers:** These companies facilitate the bulk purchase of seafood from Commercial Wholesalers and the subsequent sale to Retailers and end users, but do not purchase, sell, take possession of or title to the seafood product. Because Seafood Wholesaler or Distributor most accurately describes the activities of a Seafood Broker, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain.

  (b) **Seafood Transportation/Trucking/Hauling:** These are transportation businesses that deal exclusively with seafood. They take possession of the seafood, but do not purchase or take title to the seafood transported and do not also operate a Landing Site. Like Seafood Brokers, Seafood Transportation Businesses are third party intermediaries necessary to facilitate the purchase of bulk seafood and resale to the next step in the Distribution Chain. Accordingly, the Claims Administrator will classify such a company as a Seafood Wholesaler or Distributor under the Seafood Distribution Chain.

5.    *Definition of "Landings" in Seafood Program.* Certain claimants have contended that the term "landings" or "landed" in the Seafood Program in Exhibit 10 to the

414889
10/10/12

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

Settlement Agreement should be construed to include the act of harvesting the seafood and placing it in a vessel while on any of the Specified Gulf Waters. The term "landings" is not expressly defined in the Settlement Agreement. The term "Landing Site," is defined as "a business at which boats first *land* their catch, including facilities for unloading and handling Seafood." Ex. 3 at § 2.a. (*emphasis added.*) The use of "land" in this definition informs the meaning of "landings," as vessels "land" their catch at a physical, shore-side location for handling and sale. The definition of a "Seafood Dockside Worker" as "a Natural Person performing services for a Landing Site" further indicates that fishermen "land" their catch at shore-side docks. In addition, the Settlement Agreement defines Gulf Coast Areas" separately from "Specified Gulf Waters," which suggests that "landings" made in the "Gulf Coast Areas" mean those made on shore and not the act of loading catch onto a vessel when out on the water. Accordingly, the Claims Administrator interprets the term "landings" or "landing" in the Settlement Agreement to mean solely landing seafood at dockside, and not the act of placing catch into a vessel while out on the water.

      6.    *Oral Lease Agreements Relating to Seafood Program Oyster Leasehold Claims.* Section 2.2.B of the Oyster Leaseholder Compensation Plan in Exhibit 10 of the Settlement Agreement requires that, in addition to tax returns, financial statements, or business documents, an Oyster Leaseholder Lost Income Compensation claimant must provide "[c]ontracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map." Certain Oyster Leaseholder Lost Income claimants have informed the Claims Administrator that while they had oral agreements with oyster harvesters to harvest oysters off of the claimant's oyster leases, they had no written agreements and thus have no documents to submit in response to this requirement. The Claims Administrator has determined that this language of Exhibit 10 does not require that such contracts or agreements be in writing. The Claims Administrator will permit such claimants to satisfy this requirement by submitting a document that memorializes the terms of the oral agreements that existed at the relevant time. The Claims Administrator will require submission of a writing prepared at any time that describes the terms of the oral agreement and that is signed by the claimant and the oyster harvester that is a party to the oral agreement.

      7.    *Deduction of Prior Spill-Related Payments from Oyster Leaseholder Compensation Payments.* The Claims Administrator has reviewed with the Parties and the Seafood Neutral the contention presented by certain claimants that payments to Oyster Leaseholder Lost Income claimants under the Seafood Program in Exhibit 10 to the Settlement Agreement should not be offset by prior Spill-Related Payments to the claimant, on the ground that the prior payments represented compensation for lost income, while the Seafood Program payments represent compensation for property damages. The Seafood Neutral, BP and Class Counsel agreed that Prior Spill-Related Payments relating to Seafood must be deducted from payments to Oyster Leaseholder claimants under the Oyster Leaseholder Compensation Plan. Exhibit 10 at p. 2 provides that "[c]ompensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document." Footnote 3 defines Seafood Spill-Related Payments as "compensation paid to a claimant through the OPA Process, the GCCF, or through the Transition Facility for economic

4

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

loss claims relating to Seafood." All Oyster Leaseholder claims are covered by the Seafood Program and are Seafood interests. The Settlement Agreement does not delineate between property and other characterizations of the prior payments. Instead, the only distinction between the types of offsets under the Seafood Spill Related Payment Reduction Procedures is that between Seafood and. non-Seafood related prior payments.

8.      *Submission of Consolidated Tax Returns.* The Claims Administrator hasencountered the question of whether a business entity with its own profit and loss statements but with federal tax returns that are filed as part of a consolidated return with other related but separate corporate entities must file the complete consolidated tax return when filing a claim. Section 3 of Exhibit 4A to the Settlement Agreement requires the submission of complete federal tax returns. The Claims Administrator interprets this provision such that it does *not* necessarily require the production of the complete consolidated returns in this instance. When a claimant business entity does not file a separate federal income tax return, but rather is included in the consolidated return of its parent or affiliate, the Claims Administrator will work with the claimant to ensure that adequate returns and information are provided such that the Claims Administrator is sufficiently satisfied that the books and records used in preparing the financial statements are the same books and records that were used in the preparation of the income tax return. The required documents and information will typically include: (a) face page / main page of the consolidated return, (b) statement / schedule of entities and their respective Employer Identification Numbers (EIN's) covered by the return, (c) consolidating schedule setting forth a breakdown of the covered entities, revenues, expenses, etc., (d) complete portions of all aspects of the return dealing with the claimant entity, and (e) for partnerships, schedule of partnership entities and their respective K-1's. The Claims Administrator reserves the right to require submission of additional documents, and if appropriate, even the full return if deemed necessary for accurate review of the claim. It is the Claims Administrator's intent to work cooperatively with claimants to reasonably accommodate privacy concerns regarding unrelated entities and yet also require adequate documentation to ensure that such claims are properly reviewed in accord with the terms of the Settlement Agreement.

9.      *Costs Associated with Producing Hard Copies of Claim Files to Claimants or Third Parties.* The Claims Administrator regularly received requests from claimants for copies of the documents in the claimant's claim file. Claimants and claimants' attorneys may view, save, or download their Claims Information through a secure web-based Portal created by the Claims Administrator (the "DWH Portal"). Claimants and lawyers not using a DWH Portal have asked that the contents of the claim file be copied and sent to them. In addition, the Claims Administrator receives from third parties and law enforcement agents and officials who cannot access a DWH Portal and must be given hard copies of Claims Information, where permitted under the terms of the Order Regarding the Confidentiality of Claims Information of the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Confidentiality Order"), issued on June 29, 2012. The Claims Administrator has determined it appropriate to have the Settlement Program pay the expenses of assembling, copying and shipping such hard copies to these claimants or third parties, rather than attempting to invoice the claimants or third parties for such costs.

5

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

     **10.**    *No "Double Recovery" for Compensation of Owners or Officers of Business Entities.*  It is the view of the Claims Administrator that the Settlement Agreement does not contemplate that a claimant may recover for the same damages twice.  The accounting methodology being used for calculation of Business Economic Loss claims, pursuant to Exhibit 4C of the Settlement Agreement, treats owner/officer payroll costs as a fixed cost.  All fixed costs, including owner/officer compensation, are inherently included in the compensation amount calculated under the Business Economic Loss framework.  As a result, a claim made for the same owner/officer compensation amount under the Individual Economic Loss ("IEL") framework would constitute duplicate recovery.  Such a duplicate claim /duplicate recovery will not be allowed.

6

**From:** <Carl_Barbier@laed.uscourts.gov>
**Date:** December 12, 2012, 3:22:37 PM CST
**To:** <richard.godfrey@kirkland.com>, <Mark.Holstein@bp.com>, <jimr@wrightroy.com>, <sherman@hhkc.com>, <pjuneau@dheclaims.com>, "Michael Juneau" <mjuneau@dheclaims.com>
**Cc:** <Sally_Shushan@laed.uscourts.gov>, <Ben_Allums@laed.uscourts.gov>
**Subject: Meeting today re non-profits and SIP**

Gentlemen,

This will serve to confirm our discussion this morning.

The Court discussed with counsel for BP, the PSC and the Claims Administrator issues relating to the claims administrator's interpretation of the economic settlement agreement as it relates to non-profit entities. After discussion, the Court upheld the claims administrator's interpretation as set forth in his November 30, 2012 memorandum to the Court ("In Camera Referral of Unresolved Issue #1 - Not-for-Profits)

There was further discussion regarding the proposed Supplemental Information Program.  The Court advised the parties that it agreed with BP that there was no need for a new website, and that the Court would not approve the commencement of this supplemental program until it issues an order of final approval for the settlement.  The Court further instructed the parties to meet and confer to attempt to resolve any remaining issues with respect to the SIP.

Counsel for BP and the PSC agree with the Claims Administrator's objective analysis of causation with respect to his evaluation of economic damage claims, as previously set forth by Mr. Juneau in paragraph 2 of his October 10, 2012 policy announcement.

Thank you for your continued cooperation, and with wishes for a happy holiday season,

Carl Barbier


This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Cantor, Daniel A. <Daniel.Cantor@APORTER.COM> |
| **Sent:** | Wednesday, December 05, 2012 4:30 PM |
| **To:** | Patrick Juneau; Michael Juneau; Christine Reitano; David Odom |
| **Cc:** | Steve Herman; JIMR@wrightroy.com; Holstein, Mark E; Moskowitz, Keith |
| **Subject:** | Request for Panel Meeting--For Settlement Purposes Only |

Dear Mr. Juneau, Mike, and Christine:

BP respectfully requests that the Claims Administration Panel be convened on the issue of the assignment of revenue to the proper months for purposes of the BEL causation framework and the proper matching of revenue and corresponding expenses for purposes of the BEL compensation framework. While these issues are relevant to all BEL claims, we have seen particularly significant problems with their application with regard to (i) construction and other contractor claims and (ii) claims of law firms that earn contingency fees. These are not always easy claims to process. With regard to both construction and law firm claims, there have been a number of instances in which the Settlement Program has received from Claimants and entered into the methodology financial data (i) that does not assign construction firm lump sum payments to the months in which the work was actually performed and (ii) that assigns large contingency fees received by a law firm at the end of a multi-year case to the month of receipt rather than across the time period when it was earned. And determinations have frequently been rendered without matching revenue and corresponding variable expenses, as expressly required by Exhibit 4c. Still further, in the case of law firm claims, it appears that reimbursable costs are being treated as revenue for purposes of the framework. Reimbursable costs are costs that a law firm expends to cover expenses that are ultimately reimbursed by a client. When the firm receives the reimbursements, it is not earning revenue but simply being repaid for amounts previously expended.

As a first step in the Claims Administration Panel dialogue, BP respectfully requests a meeting with you, Class Counsel, and the accounting vendors in which we can have an open discussion of how these issues are currently being handled. We then recommend a prompt exchange of positions, followed by a Panel meeting if necessary. Would it be possible to arrange for the meeting with the accounting vendors for next week? We believe that prompt resolution is in the interest of all parties as the issues discussed in this email implicate a growing number of claims and appeals.

Thank you in advance for your consideration.

Dan

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

EXHIBIT A(7)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Rebecca Foreman on behalf of Patrick Juneau |
| **Sent:** | Tuesday, January 15, 2013 9:33 AM |
| **To:** | Mark Holstein (Mark.Holstein@bp.com); 'keith.moskowitz@snrdenton.com' (keith.moskowitz@snrdenton.com); 'James Roy (jimr@wrightroy.com)' (jimr@wrightroy.com); Steve Herman (SHERMAN@hhklawfirm.com) |
| **Cc:** | Orran L. Brown; Lynn Greer (lgreer@browngreer.com); Michael J. Juneau (MJJ@juneaudavid.com) (MJJ@juneaudavid.com); 'Christine Reitano' |
| **Subject:** | January 15, 2013 Policy Announcement |
| **Attachments:** | BROWNGREER-#418993-v1-CA_Policy_Announcement-1-15-13.DOCX |

Gentlemen:

The Claims Administrator has thoroughly considered the submissions of both Parties regarding the proper measurement of revenue and expenses for those BEL claimants with particularly variable revenues. This is an issue that has particular relevance to claimants who are attorneys, construction companies or farming enterprises. The Claims Administrator recognizes that the straightforward application of the Settlement Agreement's compensation formula to claimants in these industries can result in awards that appear disproportionate when compared to award amounts for claimants in other industries. BP has proposed alternative frameworks whereby claims within these industries would be carved out for additional analysis and/or a revised analysis would be utilized to compute compensation for certain types of claims. The Claims Administrator recognizes that the type frameworks proposed by BP constitute a reasonable approach to evaluating such claims. But the Claims Administrator does not view it within his authority to carve out specific types of claims in this fashion nor to apply a revised formula or analysis for selected types of claimants. The specific charge to the Claims Administrator is to apply the terms of the Settlement Agreement *as written*. When so applied in this instance, the result can be disproportionate awards for certain types of claims. Though the Claims Administrator acknowledges that the type approach proposed by BP is a reasonable one, he does not believe it within his authority to implement such an approach absent agreement of the parties or express direction from the Court.

Attached is the Claims Administrator's Policy Announcement of January 15, 2013, which sets forth my policy decision on this issue.

Thanks,

**Patrick A. Juneau**
*Claims Administrator*

**DEEPWATER HORIZON**
**CLAIMS CENTER**

504-934-4999

935 Gravier Street, Ste. 1905
New Orleans, LA 70112

1

EXHIBIT A(8)



DEEPWATER H  ˈIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## <u>MEMORANDUM</u>

TO:        Class Counsel
           BP

FROM:      Patrick A. Juneau, Claims Administrator

DATE:      January 15, 2013

RE:        Announcement of Policy Decisions Regarding Claims Administration

---

Under the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

In accordance with these provisions, the Claims Administrator has adopted the following policies affecting the administration of claims under the Settlement Agreement. These polices will be the subject of the 1/16/13 session of the Claims Administration Panel and are not to be made public until after those proceedings have been concluded.

1. *Business Economic Loss Claims:  Calculation of Variable Profit.*

Exhibit 4C of the Settlement Agreement sets out the methodology to be used in calculating Variable Profit as a component of determining Step 1 Compensation.

That methodology is as follows:

(1) Sum the monthly revenue over the period.

(2) Subtract corresponding variable expenses from revenue over the same time period. Variable expenses include:

(a) Variable Costs as identified in Attachment A.

**DEEPWATER HC 'IZON**
# CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

    (b) Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.

    (c) Variable portion of COGS, calculated by excluding salary costs . . . and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

### 2.  *Business Economic Loss Claims: Timing of Revenues for Purposes of Causation.*

Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues before the spill vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims Administrator will not typically re-allocate such revenues to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

418993

From: <Carl_Barbier@laed.uscourts.gov>
Date: January 30, 2013, 4:50:21 PM CST
To: <richard.godfrey@kirkland.com>, Andrew Langan <alangan@kirkland.com>, Steve
Herman <SHERMAN@hhkc.com>, <jimr@wrightroy.com>, <pjuneau@dheclaims.com>,
Michael Juneau <mjuneau@dheclaims.com>
Cc: "'Magistrate Sally Shushan (Sally_Shushan@laed.uscourts.gov)'"
<Sally_Shushan@laed.uscourts.gov>, "mark.holstein@bp.com" <mark.holstein@bp.com>,
"keith.moskowitz@snrdenton.com" <keith.moskowitz@snrdenton.com>, "Daniel Cantor
(Daniel.Cantor@aporter.com)" <Daniel.Cantor@aporter.com>, "'James Roy
(jimr@wrightroy.com)'" <jimr@wrightroy.com>, "Steve Herman
(SHERMAN@hhklawfirm.com)" <SHERMAN@hhklawfirm.com>, "'Joseph Rice
(jrice@motleyrice.com)'" <jrice@motleyrice.com>, "'Calvin Fayard
(calvinfayard@fayardlaw.com)'" <calvinfayard@fayardlaw.com>, Christine Reitano
<creitano@dheclaims.com>, Michael Juneau <mjuneau@dheclaims.com>, "Orran L. Brown"
<OBrown@browngreer.com>, "'Lynn Greer (lgreer@browngreer.com)'"
<lgreer@browngreer.com>
Subject: Review of Issue from Panel (Matching of Revenue and Expenses)


Gentlemen:

This will confirm our meeting and discussion which occurred on Thursday,
January 24, 2013.

The Court discussed with counsel for BP, the PSC and the Claims
Administrator issues relating to the claims administrator's January 15,
2013 "Announcement of Policy Decisions Regarding Claims Administration."
The issue raised by counsel for BP is whether the Claims Administrator has
correctly interpreted the terms of the Economic and Property Damage
Settlement Agreement as it applies to the calculation of "Variable Profit"
for Business Economic Loss  Claims.

Following our discussion last week, I have now had the opportunity to fully
review the Settlement Agreement and the materials submitted by the parties.
The Court upholds the Claims Administrator's interpretation as set forth in
his January 15, 2013 memorandum.  While the Court acknowledges that this
may sometimes cause apparent anomalies (in either direction) in claim
determinations, this appears to be the result of the objective,
straight-forward mechanisms set forth in the Settlement Agreement.  BP's
proposed remedy does not appear to be based on any generally accepted
accounting principle, and might only result in adding another level of
complexity and subjective analysis to the BEL calculation.

Thank you for your continued cooperation,

Carl Barbier

EXHIBIT A(9)