IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to all actions. | * * * * * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., *et al.,*  individually and on behalf of themselves and all others similarly situated, | * * * * | Civil Action No. 12-970 SECTION J |
| Plaintiffs, v. | * * * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * | MAGISTRATE JUDGE SHUSHAN |
| Defendants. | | |

### AFFIDAVIT OF MICHAEL J. JUNEAU

STATE OF LOUISIANA
PARISH OF ORLEANS

**BEFORE ME,** the undersigned authority, duly commissioned in and for the state and parish aforesaid, came and appeared:

**MICHAEL J. JUNEAU,**

who, after being sworn, did depose and state as follows:

I am a person of the full age of majority, and I am competent to make this affidavit.  I obtained a B.S., magna cum laude, in Accounting from Louisiana State University in 1984 and a

1

EXHIBIT E

J.D., cum laude, from Harvard Law School in 1987.  I have been engaged in the private practice of law for the past twenty-five years and am admitted to practice before the Louisiana Supreme Court, the U.S. Eastern, Middle and Western Districts of Louisiana, the U.S. 5th Circuit Court of Appeals and the United States Supreme Court.  I serve on the staff of Patrick A. Juneau, Claims Administrator of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement ("Settlement Agreement") in the capacity of Special Counsel.  My duties include coordination of the Settlement Program's efforts to properly implement the terms of the Settlement Agreement with regard to Business Economic Loss ("BEL") claims.  Those duties include coordination of efforts of the Settlement Program's two Court-appointed accounting vendors, PricewaterhouseCoopers LP ("PwC") and Postlethwaite & Netterville, APAC ("P&N").

## I.    **Settlement Program Procedures**

1.    The Settlement Program attempts to perform its duties in an open and transparent way. The Settlement Program's efforts in that regard have included the following.

2.    Before beginning the process of actually evaluating BEL claims, the Settlement Program sought the involvement of both Parties (BP and Class Counsel) with regard to setting up the claims review structures.  This included a program whereby sample "blinded" claims were selected for review and calculation by both Parties as well as the Settlement Program to ensure that all sides agreed that the methodologies to be implemented by the Settlement Program yielded accurate results.  Kirk Fisher was the member of the Claims Administrator's staff who presided over that program during the summer of 2012.

3.    All parties (claimant, BP and Class Counsel) are given access to all source documents (monthly P&L's, tax returns, all financial records, etc.) that are filed in support of a given claim once that claim is filed.  Each party thus has the ability to access and review all records

supporting a claim through the process and computer programs established by the Settlement Program.

4.       Once the Settlement Program has concluded its evaluation of a claim and issues an Eligibility Notice for that claim, the Settlement Program makes the Settlement Program accountants' worksheets available online for review by the claimant, BP and Class Counsel.  The worksheets detail all of the calculations performed by the Settlement Program in reaching a result for that claim.

5.       To the extent that Class Counsel or BP has had questions about the process, the Settlement Program has been more than willing to set up whatever meetings might be requested to allow everyone to have a full understanding of the claims process and the operations of the Settlement Program.  When such meeting requests have been made to me, I have attempted to promptly respond, while at the same time ensuring that both sides have the opportunity to be present so that both sides have access to the process.

6.       From the time when the Settlement Program began processing BEL claims in the summer of 2012, the Settlement Program has generally considered revenues and expenses in the months in which they were booked in the claimant's contemporaneous financial statements, but reserving the right to adjust the financial statements in certain circumstances, including inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions, and flawed or inconsistent accounting estimates.

7.       Thus, though a claimant's financial statements may reflect "spikes" in revenue, the Settlement Program has not attempted to "smooth" that revenue by re-allocating it from the months in which it was recorded to different periods, nor has it re-allocated expenses to different periods to try to "match" the expenses to particular revenue.  This has been how the Settlement

Program has understood the formula set out in Exhibit 4C of the Settlement Agreement and is how that formula has been applied consistently from the commencement of the claims evaluation process. This is also consistent with how I understood that the sample "blinded" claims had been handled under the testing process overseen by Kirk Fisher.

**II.      September / October 2012 Inquiries from BP**

8.      On September 25, 2012, I received a request from Dan Cantor, counsel for BP, to set up a conference call with the Settlement Program accountants for the purpose of obtaining general information about the evaluation process for BEL claims.

9.      In response, I asked that Mr. Cantor provide a list of the issues he wished to discuss so that the Settlement Program accountants could be prepared to discuss them. I also requested that Class Counsel be included on the call so that all Parties had equal access to the same information. The conference call was scheduled for October 2, 2012.

10.      On September 28, 2012, Mr. Cantor provided me with a list of four (4) issues that he wished to discuss in the upcoming conference call. *See* Exhibit 1.

11.      The requested conference call was held on October 2, 2012. The participants on the call included me, Settlement Program Vendors, Mr. Cantor, representatives of BP, and representatives of Class Counsel.

12.      During the call, Mr. Cantor and the other BP representatives addressed questions to the Settlement Program accountants. The questions dealt with the issues outlined in Mr. Cantor's email of September 28, 2012. Those questions dealt largely with issues surrounding "spikes" in income or expenses and how the Settlement Program dealt with such matters when reflected on a claimant's financial statements.

4

13.     The responses given by the Settlement Program accountants were essentially that the Settlement Program considered revenues and expenses as they were booked, saving for the type of limited exceptions outlined above.  The explanation as given by the Settlement Program accountants was consistent with how such claims have been handled from the outset and as later described in the Claims Administrator's Policy Announcement of January 15, 2013.

14.     The conference call ended only after BP indicated that it had no more questions.

**III.    December 2012 / January 2013 Inquiries from BP**

15.     Following the October 2, 2012 conference call, I do not recall receiving any additional requests from BP's counsel to address any of these issues further until December 5, 2012.

16.     On December 5, 2012, I received a request from Dan Cantor, counsel for BP, to schedule a Claims Administration Panel meeting to address what I considered to be essentially this same set of issues (which we have at times referred in shorthand to as the "smoothing of revenue" or the "matching of revenue and expenses" issue).  But the request was also to hold another informational meeting with the Settlement Program accountants before actually convening a Claims Administration Panel meeting.  The following is the sequence of communications that I have been able to reconstruct that followed as a result of this request:

> 12/05/12      Dan Cantor email requesting Panel Meeting and prior informational meeting with Settlement Program accountants. Exhibit 2.
>
> 12/05/12      Michael Juneau email proposing 12/10/12 as a meeting date. Exhibit 3.
>
> 12/05/12      Steve Herman (Class Counsel) email asking for BP to state its position on the issues raised. Exhibit 4.

12/05/12    Michael Juneau email to Dan Cantor agreeing that it is reasonable to ask BP to state its position so that all parties could be prepared for the proposed meeting. Exhibit 5.

12/06/12    Dan Cantor email stating that BP had conflicts in December and requesting that the meeting be delayed until January. Exhibit 6.

12/06/12    Michael Juneau email to both Parties cancelling proposed 12/10/12 meeting due to conflict of BP on that date and proposing schedule for exchange of position papers to streamline the process:  BP by 12/11/12, and Class Counsel by 12/14/12. Exhibit 7.

12/06/12    Dan Cantor email indicating that BP's conflict had resolved and proposing to proceed with an informational meeting on 12/10/12 and thereafter to submit its position paper on 12/13/12. Exhibit 8.

12/06/12    Steve Herman email objecting to BP needing additional time in order to state its position. Exhibit 9.

12/06/12    Michael Juneau email requesting that back-and-forth of emails stop and confirming briefing schedule:  BP – 12/11/12, Class Counsel – 12/14/12. Exhibit 10.

12/10/12    Dan Cantor email withdrawing BP's request for a Claims Administration Panel meeting, reserving its right to re-urge the issue later. Exhibit 11.

12/11/12    Michael Juneau email to Dan Cantor noting that these issues were previously addressed in the prior October conference call but that the Claims Administrator would make the Settlement Program accountants available for additional questions, but asking that BP submit written

questions by 12/11/12 so that the accountants could assemble the necessary information. Exhibit 11.

12/11/12    Dan Cantor email posing additional questions to be presented to the Settlement Program accountants. Exhibit 12.

12/12/12    Michael Juneau email proposing 12/19/12 as a date to allow BP and Class Counsel to meet with the Settlement Program accountants to discuss the newly posed questions. Exhibit 13.

12/12/12    Steve Herman email stating Class Counsel's objection to the proposed meeting as an effort by BP to re-write the Settlement Agreement. Exhibit 14.

12/16/12    Phone call from BP to Patrick Juneau requesting that the 12/19/12 meeting be cancelled and indicating that such a meeting could be rescheduled if and when BP determined to go forward with the issue.

12/16/12    Michael Juneau email cancelling the 12/19/12 meeting as per BP's request to Patrick Juneau. Exhibit 15.

12/16/12    Steve Herman email submitting Class Counsel's written position and requesting that the Claims Administrator issue a formal Policy Announcement to definitively resolve the issue at hand. Exhibit 16.

12/18/12    Michael Juneau email requesting that BP submit a written position by December 28, 2012 in light of Class Counsel's request for a formal Policy Announcement from the Claims Administrator. Exhibit 17.

12/20/12    Michael Juneau email granting BP's request to Patrick Juneau to extend its deadline for submitting a position paper to January 8, 2013. Exhibit 18.

| | |
|---|---|
| 12/21/12 | Judge Barbier's written ruling granting final approval of the settlement (following evidence presented at fairness hearing held on 11/8/12). Rec. Doc. 8138. |
| 01/08/13 | BP's written submission on the issue of "matching of revenues and expenses." Exhibit 19. |
| 01/11/13 | BP's supplemental written submission on the issue of "matching of revenues and expenses." Exhibit 20. |
| 01/15/13 | Claims Administrator's Policy Announcement of January 15, 2013 after review of position papers from both sides. Exhibit 21. |
| 01/16/13 | Claims Administration Panel meeting held to address the pending dispute, which was unable to be resolved unanimously. Exhibit 22. |
| 01/16/13 | Referral of the issue to the Court for resolution after the Parties were unable to resolve the dispute at the Claims Administration Panel meeting. |
| 01/24/13 | Conference with Judge Barbier wherein he affirmed the Claims Administrator's interpretation of the Settlement Agreement as set out in the Policy Announcement of January 15, 2013. Exhibit 23. |
| 03/05/13 | Written Ruling of Judge Barbier upon Motion for Reconsideration filed by BP, again affirming the Claims Administrator's interpretation of the Settlement Agreement as set out in the Policy Announcement of January 15, 2013. Rec. Doc. 8812. |

**MICHAEL J. JUNEAU**

SWORN TO AND SUBSCRIBED
before me, this 27 day
of March, 2013.

Notary Public
Name: Gina M. Palermo
La. Bar/Notary No.: 33307

Gina M. Palermo, Esq.
Notary Public
State of Louisiana
La. Bar Roll No. 33307
La. Notary No. 92682
My Commission is for Life

**Subject:** RE: phone call with accountants / Tuesday, October 2, 2012--Confidential Settlement Communication

**Date:** Friday, September 28, 2012 10:19:07 AM Central Daylight Time

**From:** Cantor, Daniel A.

**To:** Michael Juneau

**CC:** charles.r.hacker@us.pwc.com, mstaley@pncpa.com, Christine Reitano, Patrick Juneau, sherman@hhkc.com, jimr@wrightroy.com

Dear Mike,

Per your request, I have listed below the questions that we would like to discuss with the accountants during the Tuesday call. I have also reprinted below for convenience the previously circulated dial in number. Thanks to all for taking the time out of busy schedules for the call.

Dan

Questions

1.  For industries with specialized accounting or irregularly received revenue, such as construction businesses which receive progress or milestone payments, how does the Settlement Program determine for purposes of applying the BEL methodology when given revenue and expenses are incurred.

2.  How does the Settlement Program determine the accounting methodology used in a claimant's financial statements (e.g., cash, accrual, etc.) and whether it has been applied on a consistent basis in the Benchmark Period and Compensation Period?

3.  Where a claimant has unusually large expense or negative revenue in year-end months (November or December), what does the Settlement Program do to determine whether those amounts relate solely to the period in which they are recorded or are a "true up" of amounts recorded in prior periods? If the latter, what if any adjustments to financial statements does the Program make for purposes of evaluating causation and/or compensation?

4.  Where a claimant has unusually large revenue or expense in a particular month, particularly where this month appears out of the ordinary compared to the claimant's typical seasonal pattern, what does the Settlement Program do to understand the cause of the spike and ensure the spike is not a function of improper or inconsistent accounting?

Dial In Number

(866) 802-1366

Participant Passcode: 77752634#

**From:** Michael Juneau [mailto:mjuneau@dheclaims.com]
**Sent:** Tuesday, September 25, 2012 2:05 PM
**To:** Cantor, Daniel A.
**Cc:** charles.r.hacker@us.pwc.com; mstaley@pncpa.com; Christine Reitano; Patrick Juneau; sherman@hhkc.com; jimr@wrightroy.com
**Subject:** phone call with accountants / Tuesday, October 2, 2012

EXHIBIT E(1)

Dan:

Your request for a phone call with the accountants for the purpose of obtaining general information about the evaluation process for BEL claims has been routed to me. We can do a conference call on Tuesday, October 2, 2012 at 10:15 am central time (11:15 am eastern time). I am copying Steve Herman and Jim Roy on this email so that Class Counsel can have a representative participate in the call if they choose. In advance of that time /date, please copy all of those noted in the "To" and "cc" lines above with the following:

(1)   A call-in number / info that we can all use to access the conference call; and
(2)   A listing of the specific questions that you have.

Thanks.

**Michael J. Juneau**
*Special Counsel*

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS
**504-934-4999**

**935 Gravier Street, Ste. 1905**
**New Orleans, LA  70112**
**mjuneau@dheclaims.com**

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here :

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Cantor, Daniel A. <Daniel.Cantor@APORTER.COM> |
| **Sent:** | Wednesday, December 05, 2012 4:30 PM |
| **To:** | Patrick Juneau; Michael Juneau; Christine Reitano; David Odom |
| **Cc:** | Steve Herman; JIMR@wrightroy.com; Holstein, Mark E; Moskowitz, Keith |
| **Subject:** | Request for Panel Meeting--For Settlement Purposes Only |

Dear Mr. Juneau, Mike, and Christine:

BP respectfully requests that the Claims Administration Panel be convened on the issue of the assignment of revenue to the proper months for purposes of the BEL causation framework and the proper matching of revenue and corresponding expenses for purposes of the BEL compensation framework. While these issues are relevant to all BEL claims, we have seen particularly significant problems with their application with regard to (i) construction and other contractor claims and (ii) claims of law firms that earn contingency fees. These are not always easy claims to process. With regard to both construction and law firm claims, there have been a number of instances in which the Settlement Program has received from Claimants and entered into the methodology financial data (i) that does not assign construction firm lump sum payments to the months in which the work was actually performed and (ii) that assigns large contingency fees received by a law firm at the end of a multi-year case to the month of receipt rather than across the time period when it was earned. And determinations have frequently been rendered without matching revenue and corresponding variable expenses, as expressly required by Exhibit 4c. Still further, in the case of law firm claims, it appears that reimbursable costs are being treated as revenue for purposes of the framework. Reimbursable costs are costs that a law firm expends to cover expenses that are ultimately reimbursed by a client. When the firm receives the reimbursements, it is not earning revenue but simply being repaid for amounts previously expended.

As a first step in the Claims Administration Panel dialogue, BP respectfully requests a meeting with you, Class Counsel, and the accounting vendors in which we can have an open discussion of how these issues are currently being handled. We then recommend a prompt exchange of positions, followed by a Panel meeting if necessary. Would it be possible to arrange for the meeting with the accounting vendors for next week? We believe that prompt resolution is in the interest of all parties as the issues discussed in this email implicate a growing number of claims and appeals.

Thank you in advance for your consideration.

Dan

---

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

---

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

EXHIBIT E(2)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael Juneau |
| **Sent:** | Wednesday, December 05, 2012 4:59 PM |
| **To:** | Cantor, Daniel A. |
| **Cc:** | Patrick Juneau; Christine Reitano; Steve Herman; JIMR@wrightroy.com; Holstein, Mark E; Moskowitz, Keith |
| **Subject:** | Re: Request for Panel Meeting--For Settlement Purposes Only |

All:

BP has asked for a meeting to review issues as outlined in Dan Cantor's email below. Pat Juneau has extremely limited availability. He has asked me to confirm a meeting for Monday, December 10th at 1:30 pm. He and I will both attend, along with representatives of our accounting team. BP and Class Counsel should both obviously attend. Please confirm receipt of this email and your availability for this meeting. Thank you.

Michael J. Juneau

Privileged & Confidential
Sent from my iPhone

On Dec 5, 2012, at 4:30 PM, "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM> wrote:

> Dear Mr. Juneau, Mike, and Christine:
>
> BP respectfully requests that the Claims Administration Panel be convened on the issue of the assignment of revenue to the proper months for purposes of the BEL causation framework and the proper matching of revenue and corresponding expenses for purposes of the BEL compensation framework. While these issues are relevant to all BEL claims, we have seen particularly significant problems with their application with regard to (i) construction and other contractor claims and (ii) claims of law firms that earn contingency fees. These are not always easy claims to process. With regard to both construction and law firm claims, there have been a number of instances in which the Settlement Program has received from Claimants and entered into the methodology financial data (i) that does not assign construction firm lump sum payments to the months in which the work was actually performed and (ii) that assigns large contingency fees received by a law firm at the end of a multi-year case to the month of receipt rather than across the time period when it was earned. And determinations have frequently been rendered without matching revenue and corresponding variable expenses, as expressly required by Exhibit 4c. Still further, in the case of law firm claims, it appears that reimbursable costs are being treated as revenue for purposes of the framework. Reimbursable costs are costs that a law firm expends to cover expenses that are ultimately reimbursed by a client. When the firm receives the reimbursements, it is not earning revenue but simply being repaid for amounts previously expended.
>
> As a first step in the Claims Administration Panel dialogue, BP respectfully requests a meeting with you, Class Counsel, and the accounting vendors in which we can have an open discussion of how these issues are currently being handled. We then recommend a prompt exchange of positions, followed by a Panel meeting if necessary. Would it be possible to arrange for the meeting with the accounting vendors for next week? We believe that prompt resolution is in the interest of all parties as the issues discussed in this email implicate a growing number of claims and appeals.
>
> Thank you in advance for your consideration.

1

EXHIBIT E(3)

Dan

---

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

---

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Steve Herman <SHERMAN@hhklawfirm.com> |
| **Sent:** | Wednesday, December 05, 2012 5:00 PM |
| **To:** | Cantor, Daniel A. |
| **Cc:** | Patrick Juneau; Michael Juneau; Christine Reitano; David Odom; Steve Herman; JIMR@wrightroy.com; Holstein, Mark E; Moskowitz, Keith |
| **Subject:** | Re: Request for Panel Meeting--For Settlement Purposes Only |

What, specifically, is BP's position?

On Dec 5, 2012, at 5:28 PM, "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM> wrote:

Dear Mr. Juneau, Mike, and Christine:

BP respectfully requests that the Claims Administration Panel be convened on the issue of the assignment of revenue to the proper months for purposes of the BEL causation framework and the proper matching of revenue and corresponding expenses for purposes of the BEL compensation framework. While these issues are relevant to all BEL claims, we have seen particularly significant problems with their application with regard to (i) construction and other contractor claims and (ii) claims of law firms that earn contingency fees. These are not always easy claims to process. With regard to both construction and law firm claims, there have been a number of instances in which the Settlement Program has received from Claimants and entered into the methodology financial data (i) that does not assign construction firm lump sum payments to the months in which the work was actually performed and (ii) that assigns large contingency fees received by a law firm at the end of a multi-year case to the month of receipt rather than across the time period when it was earned. And determinations have frequently been rendered without matching revenue and corresponding variable expenses, as expressly required by Exhibit 4c. Still further, in the case of law firm claims, it appears that reimbursable costs are being treated as revenue for purposes of the framework. Reimbursable costs are costs that a law firm expends to cover expenses that are ultimately reimbursed by a client. When the firm receives the reimbursements, it is not earning revenue but simply being repaid for amounts previously expended.

As a first step in the Claims Administration Panel dialogue, BP respectfully requests a meeting with you, Class Counsel, and the accounting vendors in which we can have an open discussion of how these issues are currently being handled. We then recommend a prompt exchange of positions, followed by a Panel meeting if necessary. Would it be possible to arrange for the meeting with the accounting vendors for next week? We believe that prompt resolution is in the interest of all parties as the issues discussed in this email implicate a growing number of claims and appeals.

Thank you in advance for your consideration.

Dan

---

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

---

1

EXHIBIT E(4)

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

----------------------------------------------------------------

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended
solely for the addressee.  Please do not read, copy, or disseminate it unless
you are the addressee.  If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender.  Also, we would appreciate your forwarding the message back to us and
deleting it from your system.  Thank you.

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael Juneau |
| **Sent:** | Wednesday, December 05, 2012 5:05 PM |
| **To:** | Steve Herman |
| **Cc:** | Cantor, Daniel A.; Patrick Juneau; Christine Reitano; David Odom; Steve Herman; JIMR@wrightroy.com; Holstein, Mark E; Moskowitz, Keith |
| **Subject:** | Re: Request for Panel Meeting--For Settlement Purposes Only |

Dan: I think it reasonable that you answer Steve's inquiry now about BP's position do that we are all at least somewhat prepared for the discussion at the meeting proposed for Monday. Thank you.

Michael J. Juneau
Juneau David, APLC
P.O. Box 51268
Lafayette, LA 70505
1018 Harding Street, Suite 202
Lafayette, LA 70503
Phone: 337.269.0052
Fax: 337.269.0061
Email: mjj@juneaudavid.com
Web: www.juneaudavid.com

Privileged & Confidential
Sent from my iPhone

On Dec 5, 2012, at 5:01 PM, "Steve Herman" <SHERMAN@hhklawfirm.com> wrote:

> What, specifically, is BP's position?

> On Dec 5, 2012, at 5:28 PM, "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM> wrote:

>> Dear Mr. Juneau, Mike, and Christine:

>> BP respectfully requests that the Claims Administration Panel be convened on the issue of the assignment of revenue to the proper months for purposes of the BEL causation framework and the proper matching of revenue and corresponding expenses for purposes of the BEL compensation framework. While these issues are relevant to all BEL claims, we have seen particularly significant problems with their application with regard to (i) construction and other contractor claims and (ii) claims of law firms that earn contingency fees. These are not always easy claims to process. With regard to both construction and law firm claims, there have been a number of instances in which the Settlement Program has received from Claimants and entered into the methodology financial data (i) that does not assign construction firm lump sum payments to the months in which the work was actually performed and (ii) that assigns large contingency fees received by a law firm at the end of a multi-year case to the month of receipt rather than across the time period when it was earned. And determinations have frequently been rendered without matching revenue and corresponding variable expenses, as expressly required by Exhibit 4c. Still further, in the case of law firm claims, it appears that reimbursable costs are being treated as revenue for purposes of the framework. Reimbursable costs are costs that a law firm expends to cover expenses

1

EXHIBIT E(5)

that are ultimately reimbursed by a client. When the firm receives the reimbursements, it is not earning revenue but simply being repaid for amounts previously expended.

As a first step in the Claims Administration Panel dialogue, BP respectfully requests a meeting with you, Class Counsel, and the accounting vendors in which we can have an open discussion of how these issues are currently being handled. We then recommend a prompt exchange of positions, followed by a Panel meeting if necessary. Would it be possible to arrange for the meeting with the accounting vendors for next week? We believe that prompt resolution is in the interest of all parties as the issues discussed in this email implicate a growing number of claims and appeals.

Thank you in advance for your consideration.

Dan

---

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

-----------------------------------------------------------------
For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended
solely for the addressee. Please do not read, copy, or disseminate it unless
you are the addressee. If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender. Also, we would appreciate your forwarding the message back to us and
deleting it from your system. Thank you.


This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Cantor, Daniel A. <Daniel.Cantor@APORTER.COM> |
| **Sent:** | Thursday, December 06, 2012 10:23 AM |
| **To:** | Michael Juneau; 'jrice@motleyrice.com' |
| **Cc:** | 'SHERMAN@hhklawfirm.com'; 'JIMR@wrightroy.com'; Patrick Juneau; Christine Reitano; 'Mark.Holstein@bp.com'; 'keith.moskowitz@snrdenton.com' |
| **Subject:** | Re: Request for Panel Meeting--For Settlement Purposes Only |

Mike,

Very much appreciate efforts to schedule a prompt meeting. Monday is proving difficult for bp team as well. Given difficulties of scheduling at this time of year, would it be workable to set now a meeting date for very beginning of January? If so, what would work well?

Dan

Daniel Cantor
Arnold & Porter LLP
555 12th Street, NW
Washington, DC 20004

Telephone: 202.942.5765
Cell Phone: 240.606.4939
Daniel.Cantor@aporter.com

**From:** Michael Juneau [mailto:mjuneau@dheclaims.com]
**Sent:** Thursday, December 06, 2012 11:17 AM
**To:** Rice, Joe <jrice@motleyrice.com>
**Cc:** Steve Herman <SHERMAN@hhklawfirm.com>; James Roy <JIMR@wrightroy.com>; Cantor, Daniel A.; Patrick Juneau <pjuneau@dheclaims.com>; Christine Reitano <creitano@dheclaims.com>; Holstein, Mark E <Mark.Holstein@bp.com>; Moskowitz, Keith <keith.moskowitz@snrdenton.com>
**Subject:** Re: Request for Panel Meeting--For Settlement Purposes Only

All:

I need to get this issue of whether or not a meeting will be held on Monday at 1:30 pm resolved this morning. I have not heard back from BP. It seemed that Class Counsel may have a conflict, but that was not entirely clear to me. I need to have this confirmed for Pat Juneau this morning. Please let me have your "final answer" before noon.

In response to Joe Rice's question, we can make a call-in phone number available.

Michael J. Juneau

Privileged & Confidential
Sent from my iPhone

On Dec 6, 2012, at 10:08 AM, "Rice, Joe" <jrice@motleyrice.com> wrote:

EXHIBIT E(6)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael Juneau |
| **Sent:** | Thursday, December 06, 2012 2:06 PM |
| **To:** | Steve Herman |
| **Cc:** | James Roy; Cantor, Daniel A.; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith; Rice, Joe |
| **Subject:** | Re: BP Oil - Request for Panel Meeting |

All:

A meeting on Monday on this issue will apparently not work. Please allow this to confirm that we will NOT meet on Monday, December 10, on this issue. This issue of spreading out income over different periods other than as booked in the company's financial statements has been the subject of a previous conference call wherein the program accountants were questioned about the procedures we were following. This issue is on appeal on more than one claim now. Given that history, this seems to be something that both sides already have some familiarity with.

To try to streamline the process a bit, we will proceed as follows:

(1). BP shall present its written position detailing its objections to the program's current method of processing these issues and offering whatever support for its alternative it believes appropriate - by the close of business on Tuesday, December 11, 2012.

(2). Class Counsel shall present its own position paper in response to the issues raised by BP - by the noon on Friday, December 14, 2012.

(3). We will select a date for a panel meeting. We will work on this scheduling issue early next week, hopefully to find an available date before Christmas.

I would appreciate both sides sending me a reply ASAP to confirm that you have received this email and have notice of this revised schedule.

Michael J. Juneau

Privileged & Confidential
Sent from my iPhone

On Dec 6, 2012, at 10:28 AM, "Steve Herman" <SHERMAN@hhklawfirm.com> wrote:

> I can attend, but would prefer to do it at a time when Jim and Joe are also available. I am frankly not sure what the issue is. I understand that BP has appealed a number of Eligibility Notices based on the general notion, (which, as we discussed when we were together last week, seems contrary to both BP's opposition to the averaging of annual or semi-annual or quarterly financials and to the general month-by-month focus of the Settlement Agreement), that certain types of monthly revenue or expenses should be averaged out across many months, or years, rather than the month in which it was paid or collected or obtained or

EXHIBIT E(7)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Cantor, Daniel A. <Daniel.Cantor@APORTER.COM> |
| **Sent:** | Thursday, December 06, 2012 2:30 PM |
| **To:** | Michael Juneau; Steve Herman |
| **Cc:** | James Roy; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith; Rice, Joe |
| **Subject:** | RE: BP Oil - Request for Panel Meeting |

Mike,

Thanks. BP believes that it is important to have a full understanding of the approach being implemented by the Settlement Program accountants before submitting position papers. We have been able to rearrange schedules and make next Monday work for such a meeting. May we propose (i) a meeting with the accountants next Monday at 1:30 as originally suggested and (ii) BP position paper to be filed next Thursday. Thanks

Dan

**From:** Michael Juneau [mailto:mjuneau@dheclaims.com]
**Sent:** Thursday, December 06, 2012 3:06 PM
**To:** Steve Herman
**Cc:** James Roy; Cantor, Daniel A.; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith; Rice, Joe
**Subject:** Re: BP Oil - Request for Panel Meeting

All:

A meeting on Monday on this issue will apparently not work. Please allow this to confirm that we will NOT meet on Monday, December 10, on this issue. This issue of spreading out income over different periods other than as booked in the company's financial statements has been the subject of a previous conference call wherein the program accountants were questioned about the procedures we were following. This issue is on appeal on more than one claim now. Given that history, this seems to be something that both sides already have some familiarity with.

To try to streamline the process a bit, we will proceed as follows:

(1). BP shall present its written position detailing its objections to the program's current method of processing these issues and offering whatever support for its alternative it believes appropriate - by the close of business on Tuesday, December 11, 2012.

(2). Class Counsel shall present its own position paper in response to the issues raised by BP - by the noon on Friday, December 14, 2012.

(3). We will select a date for a panel meeting. We will work on this scheduling issue early next week, hopefully to find an available date before Christmas.

I would appreciate both sides sending me a reply ASAP to confirm that you have received this email and have notice of this revised schedule.

Michael J. Juneau

1

EXHIBIT E(8)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Steve Herman <SHERMAN@hhklawfirm.com> |
| **Sent:** | Thursday, December 06, 2012 2:36 PM |
| **To:** | Cantor, Daniel A. |
| **Cc:** | Michael Juneau; James Roy; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith; Rice, Joe |
| **Subject:** | BP Oil - Request for Panel Meeting |

Not to be overly contentious, but you presumably know the approach that was taken in the evaluation and determination of the claims that you have appealed.

On Dec 6, 2012, at 3:29 PM, "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM> wrote:

> Mike,
>
> Thanks.  BP believes that it is important to have a full understanding of the approach being implemented by the Settlement Program accountants before submitting position papers.  We have been able to rearrange schedules and make next Monday work for such a meeting.  May we propose (i) a meeting with the accountants next Monday at 1:30 as originally suggested and (ii) BP position paper to be filed next Thursday.  Thanks
>
> Dan
>
>
> **From:** Michael Juneau [mailto:mjuneau@dheclaims.com]
> **Sent:** Thursday, December 06, 2012 3:06 PM
> **To:** Steve Herman
> **Cc:** James Roy; Cantor, Daniel A.; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith; Rice, Joe
> **Subject:** Re: BP Oil - Request for Panel Meeting
>
> All:
>
> A meeting on Monday on this issue will apparently not work. Please allow this to confirm that we will NOT meet on Monday, December 10, on this issue. This issue of spreading out income over different periods other than as booked in the company's financial statements has been the subject of a previous conference call wherein the program accountants were questioned about the procedures we were following. This issue is on appeal on more than one claim now. Given that history, this seems to be something that both sides already have some familiarity with.
>
> To try to streamline the process a bit, we will proceed as follows:
>
> (1). BP shall present its written position detailing its objections to the program's current method of processing these issues and offering whatever support for its alternative it believes appropriate - by the close of business on Tuesday, December 11, 2012.
>
> (2). Class Counsel shall present its own position paper in response to the issues raised by BP - by the noon on Friday, December 14, 2012.

1

EXHIBIT E(9)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael Juneau |
| **Sent:** | Thursday, December 06, 2012 4:10 PM |
| **To:** | Rice, Joe |
| **Cc:** | Steve Herman; Cantor, Daniel A.; James Roy; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith |
| **Subject:** | Re: BP Oil - Request for Panel Meeting |

All:

I appreciate that we are all lawyers and sometimes feel the need to make one last point. But as to this issue, you need not copy me on any more emails. The Program wants to be transparent in all we do and to provide both sides with every reasonable opportunity to provide input along the way. But as to this issue of whether we should be smoothing out spikes in revenue as reported on the claimant's financials, we are going to stick with this schedule:

Dec 11, 5:00 pm - BP to submit its written position on how it believes such issues should be addressed

Dec 14, 12:00 noon - Class Counsel to submit its written position

Undetermined date - We will work to schedule a panel meeting to see if we can work out a mutually acceptable position, or failing that, determine whether this issue is to be referred to the judge for resolution.

Michael J. Juneau

Privileged & Confidential
Sent from my iPhone

On Dec 6, 2012, at 3:55 PM, "Rice, Joe" <jrice@motleyrice.com> wrote:

> Having attended today's BP requested meeting on the Subsistence policy I want to echo Steve's point. Today was a rehashing of arguments against subsistence claims and attempts to use some national statistics to deal with the claimants. These attempts to interfere and delay the claims process are hurting the Class and need to stop. The appropriate process is as Steve sets out.
>
> **Joseph F. Rice** | Attorney at Law | Motley Rice LLC
> 28 Bridgeside Blvd. | Mt. Pleasant, SC 29464
> **o.** 843.216.9159 | **f.** 843.216.9290 | jrice@motleyrice.com
>
> **From:** Steve Herman [mailto:SHERMAN@hhklawfirm.com]
> **Sent:** Thursday, December 06, 2012 3:59 PM
> **To:** Cantor, Daniel A.
> **Cc:** Michael Juneau; James Roy; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith; Rice, Joe
> **Subject:** BP Oil - Request for Panel Meeting
>
> Not to belabor the point, (particularly in light of Mike's recent email), but Class Counsel and BP do not stand in the same position viz-a-vis these types of inquiries.

EXHIBIT E(10)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael Juneau |
| **Sent:** | Monday, December 10, 2012 8:28 PM |
| **To:** | Cantor, Daniel A. |
| **Cc:** | Steve Herman; James Roy; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith |
| **Subject:** | Re: BP Oil - Request for Panel Meeting |

Dan:

I have discussed your revised position with Pat Juneau. These issues were the subject of a previous conference call wherein BP's counsel and its own accountants questioned the Program accountants about the procedures being followed. Class Counsel participated in that phone conference as well. We understand that you would like another opportunity to ask additional questions on this set of issues. We are willing to accommodate that request. We will thus proceed as follows:

(1) Rather than submitting its "position paper" by the Tuesday, December 11, 5:00 pm deadline, BP will instead submit a list of the additional questions it wishes to propose to the Program accountants by that same deadline.

(2). Our office will provide those questions to the Program accountants so that they can assemble the necessary information to provide accurate responses.

(3). Our office will arrange a date for a conference for a discussion of the issues raised by BP. Participants will be: our office, Program accountants, BP counsel and Class Counsel. We will work on scheduling this conference after we receive BP's list of questions.

Michael J. Juneau
Deepwater Horizon Claims Center
Special Counsel

Privileged & Confidential
Sent from my iPhone

On Dec 10, 2012, at 6:19 PM, "Cantor, Daniel A." <Daniel.Cantor@APORTER.COM> wrote:

> Dear Mike,
>
> Thank you for your efforts in responding to BP's recent request for a Claims Administration Panel meeting regarding the issues identified in our note of December 5. In order to meaningfully address these issues in the Claims Administration Panel, it is really important to first have an opportunity for a transparent discussion with the accounting vendors about their current approach. It is our understanding that present schedules do not permit such a meeting in the next few weeks (if this is incorrect, kindly advise). Accordingly, BP is withdrawing its present request for a Claims Administration Panel meeting, without prejudice to and reserving (i) its positions (including appellate rights) and (ii) its right to request a meeting at a later time when schedules permit the important discussion with the accounting vendors. Thank you.
>
> Dan

1

EXHIBIT E(11)

**Michael Juneau**

| | |
|---|---|
| From: | Cantor, Daniel A. <Daniel.Cantor@APORTER.COM> |
| Sent: | Tuesday, December 11, 2012 11:05 PM |
| To: | Michael Juneau |
| Cc: | Steve Herman; James Roy; Patrick Juneau; Christine Reitano; Holstein, Mark E; Moskowitz, Keith |
| Subject: | Accountant Questions--For Settlement Purposes Only |

Dear Mike,

Thanks to you and the accounting vendors for providing an opportunity to discuss some important accounting issues. Per your request, we have listed below several questions that we would like to discuss with the accounting vendors at the forthcoming, to be scheduled meeting. If you or the accountants need any clarifications, just let us know. Thanks again.

1. How do you determine what month revenue is earned in for purposes of the BEL causation and compensation frameworks?

   a. By way of example, if a construction firm receives a lump sum payment in Month 1 to cover work performed in Months 1-3, what month(s) is the lump sum payment treated as being earned in for purposes of the BEL causation and compensation frameworks?

   b. Is the approach the same for all industries?

2. The BEL compensation framework requires one to (i) sum the monthly revenue over the period and (i) subtract the corresponding variable expenses for revenue over the same time period. Settlement Agreement, Ex. 4C, p.2. How do you identify "corresponding variable expenses" associated with given revenue?

   a. By way of example, if in June and July of a given year a claimant incurs expenses for revenue received in August, how are the corresponding variable expenses for the revenue received in August determined?

3. There are numerous indicators in a P&L that revenue and expenses may not be matched. For example, (i) the presence of negative margins, and (ii) large monthly variances in margins, revenues and/or expenses that are not explained by seasonal or other patterns of the business. When such indicators are present, what steps do you take to determine whether the financial data is accurate?

4. If financial data submitted by a claimant does not accurately assign revenue to the months in which it was earned, what steps do you take to obtain financial data that accurately reflects the earning of revenue by month?

5. Where a claimant retail establishment purchases large amounts of inventory during Month 1 and then sells that inventory during Months 1-4, how is the inventory (Costs of Goods Sold) accounted for? If the financial data submitted by the claimant reports all of the costs of inventory in Month 1, do you accept this designation?

6. If financial data submitted by a claimant does not match revenue with corresponding variable expenses on a monthly basis, what steps do you take to obtain financial data that accurately reflects the matching?

7. It would be helpful to discuss the following hypotheticals:

   a. Claimant is a construction company that purchases $40 in materials in June, and then performs half of the job in July and half in August, incurring $20 dollars in labor costs in each month, and gets paid $100 for the job in September. For purposes of the BEL framework, how would you account for revenue and expenses in June-September?

1

EXHIBIT E(12)

b. Claimant is a law firm representing a personal injury plaintiff on a contingency fee basis. Firm attorneys are paid $10 an hour, and spend 10 hours researching the case in June, 20 hours submitting briefs in July, and 30 hours taking depositions in August. In September a settlement is reached, and the Firm receives a $2,000 contingency fee payment. For purposes of the BEL framework, how would you account for revenue and expenses in June-September?

c. Claimant is a farmer who plants his crop in April and has associated labor and material costs of $100 getting the crop in the ground. Between May and September the farmer has $40 monthly expenses maintaining and nurturing the crop ($200 total for the 5 months), and then incurs $100 in labor costs for October when the crop is harvested. The harvested crop is taken to market and sold for $1,000 on November 27 annually with all revenue recorded in that month against $100 in selling costs. For purposes of the BEL framework, how would you account for revenue and expenses in April-November?

d. Same scenario as C. above except that in 2010 the farmer sells the entire crop on December 2 rather than November 27. How do you compare revenue from the sale of the crop in 2010 and prior years given that the sale happened in a different month in 2010?

8. For construction claims, do you request that the claimant provide year-end job schedules or other information that reports billings and expenses on a project basis? If yes, how do you use this information?

9. For claims by law firms, how do you (i) determine when across the life of a case a contingency fee is earned and (ii) match revenue with variable expenses?

10. Where financial data list "negative revenue", how is such "negative revenue" treated for purposes of the BEL causation and compensation frameworks?

a. If "negative revenue" is input into the causation and compensation frameworks, what is the basis given that revenue cannot be less than zero?

b. If "negative revenue" reflects a one time adjustment due to overstatement of revenue in one or more prior months such that it does not reflect actual economic performance in the month the "negative revenue" is recorded, what steps are taken to accurately measure revenue and expenses in the month in which the negative revenue is recorded as well as in the earlier period that is the subject of the correction?

c. In cases where a law firm backs out a large portion of payroll in December to account for Owner's Compensation, how is this adjustment accounted for in the framework as most times it results in a negative variable payroll?

11. Where financial data list "negative expense", how is such "negative expense" treated for purposes of the BEL compensation framework?

a. If "negative expense" is input into the compensation framework, what is the basis given that an expense cannot be less than zero?

b. If "negative expense" reflects a one time adjustment due to overstatement of expense in one or more prior months such that it does not reflect actual economic performance in the month the "negative expense" is recorded, what steps are taken to accurately measure expenses in the month in which the "negative expense" is recorded as well as in the earlier period that is the subject of the correction?

12. Do you include "other income" in revenue for purposes of the BEL causation and compensation frameworks? If yes, what is the basis? If it depends, under what circumstances?

13. For claims where the claimant is a law firm, do you include "reimbursable costs" as revenue if they are included as revenue in the claimant's P&L? If yes, what is the basis? If it depends, under what circumstances?

14. Where a claimant ceases a line of business during the benchmark period, do you include revenue from the terminated line of business in the BEL calculation? For example, if a claimant rented commercial properties in 2007 but sold those properties at the beginning of 2008, would you include 2007 revenue from the properties in the calculation?

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael Juneau |
| **Sent:** | Wednesday, December 12, 2012 10:19 AM |
| **To:** | aoxenreiter@browngreer.com; charles.r.hacker@us.pwc.com; mstaley@pncpa.com |
| **Cc:** | obrown@browngreer.com; Christine Reitano; Patrick Juneau |
| **Subject:** | FW: Accounting Questions |
| **Importance:** | High |

All:  Per the below, I am trying to get this meeting set for next Wednesday, December 19 at 10:00 am.  If anyone has a particular [problem with this date, please let me know.  I want to get this issue behind us.

MJJ

**From:** Michael Juneau
**Sent:** Wednesday, December 12, 2012 10:16 AM
**To:** daniel_cantor@aporter.com; Daniel.Cantor@aporter.com
**Cc:** Steve Herman (SHERMAN@hhklawfirm.com)
**Subject:** Accounting Questions
**Importance:** High

Dan:

You have asked to meet in person to have the accountants explain how the Program is addressing the type issues you have raised.  I think we can accommodate that request for next <u>Wednesday, December 19, 2012 at 10:00 am</u> (I am waiting on one final confirmation from the accountants on that date).

I ask that both sides please confirm their attendance on this date.

Please note that we will not be able to get into any discussion of any specific claims.  Rather, this meeting is designed only to explain how the Program is addressing issues on a program-wide basis.

**Michael J. Juneau**
*Special Counsel*

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS
**504-934-4999**

**935 Gravier Street, Ste. 1905**
**New Orleans, LA  70112**
**mjuneau@dheclaims.com**

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If

1

EXHIBIT E(13)

you have received this email in error, please immediately notify the sender by reply email or by telephone at
504-934-4999.

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Steve Herman <SHERMAN@hhklawfirm.com> |
| **Sent:** | Wednesday, December 12, 2012 6:18 AM |
| **To:** | Michael Juneau |
| **Cc:** | James Roy; Patrick Juneau; Christine Reitano; David Duval; Holstein, Mark E; Moskowitz, Keith; 'Cantor, Daniel A.' |
| **Subject:** | BP Oil - Accountant Questions |
| **Attachments:** | Smith Appeal Submission.pdf |

BP, with all due respect, already knows the answers to these questions. Just by coincidence, I just happened to review the Smith law firm appeal submission, (attached), on which I was cc:d. While perhaps a bit hyperbolic, it provides a pretty good summary of the way in which BP is now attempting to re-write the Settlement Agreement with respect to these types of claims.

**From:** Cantor, Daniel A. [mailto:Daniel.Cantor@APORTER.COM]
**Sent:** Tuesday, December 11, 2012 11:05 PM
**Subject:** Accountant Questions--For Settlement Purposes Only

Dear Mike,

Thanks to you and the accounting vendors for providing an opportunity to discuss some important accounting issues. Per your request, we have listed below several questions that we would like to discuss with the accounting vendors at the forthcoming, to be scheduled meeting. If you or the accountants need any clarifications, just let us know. Thanks again.

1.  How do you determine what month revenue is earned in for purposes of the BEL causation and compensation frameworks?

    a.  By way of example, if a construction firm receives a lump sum payment in Month 1 to cover work performed in Months 1-3, what month(s) is the lump sum payment treated as being earned in for purposes of the BEL causation and compensation frameworks?

    b.  Is the approach the same for all industries?

2.  The BEL compensation framework requires one to (i) sum the monthly revenue over the period and (i) subtract the corresponding variable expenses for revenue over the same time period. Settlement Agreement, Ex. 4C, p.2. How do you identify "corresponding variable expenses" associated with given revenue?

    a.  By way of example, if in June and July of a given year a claimant incurs expenses for revenue received in August, how are the corresponding variable expenses for the revenue received in August determined?

3.  There are numerous indicators in a P&L that revenue and expenses may not be matched. For example, (i) the presence of negative margins, and (ii) large monthly variances in margins, revenues and/or expenses that are not explained by seasonal or other patterns of the business. When such indicators are present, what steps do you take to determine whether the financial data is accurate?

1

EXHIBIT E(14)

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael J. Juneau <MJJ@juneaudavid.com> |
| **Sent:** | Sunday, December 16, 2012 6:57 AM |
| **To:** | Daniel.Cantor@aporter.com; Keith Moskowitz; Mark E Holstein; Steve Herman; Jim Roy |
| **Cc:** | Mark Staley; Charles Hacker; Christine Reitano; Orran Brown; Andrew Oxenreiter; Rebecca Foreman; Patrick Juneau |
| **Subject:** | CANCELLED - Wednesday 10:00 am meeting -  CANCELLED |

All:

BP has requested that our Wednesday meeting, December 19, 2012, 10:00 am, (to address the accounting questions that Dan Cantor had raised) be postponed. That request will be accommodated. The meeting is therefore CANCELLED. We will NOT be meeting on Wednesday, December 19, 10:00 am, as previously planned.

If and when BP decides that it does in fact wish to have the Program accountants address the previously posed questions, please let me know. And we can consider what sort of arrangements can be made at that time.

In order that I can be assured that all have received this message, please send me a short reply simply to confirm your receipt of this email. Thanks.

Michael J. Juneau
Special Counsel
Deepwater Horizon Claims Center

Privileged & Confidential
Sent from my iPhone

EXHIBIT E(15)

**Subject:** RE: BP Oil - Request for Formal Policy Statement
**Date:** Monday, December 17, 2012 9:14:28 AM Central Standard Time
**From:** Moskowitz, Keith
**To:** 'Steve Herman', Christine Reitano
**CC:** 'James Roy', Michael Juneau, 'Lynn Greer', 'Orran L. Brown', 'mark.Holstein@bp.com'

Christine and Mike,

We are reviewing Class Counsel's memorandum and will be responding.   We would kindly ask that the CSSP refrain from taking any further action on this particular issue until BP has submitted its response.  Please let me know if you have any questions or wish to discuss this further.


Best Regards,


Keith


Keith Moskowitz
SNR Denton US LLP
D +1 312 876 8220
M +1 312 758 9732
F +1 312 876 7934
keith.moskowitz@snrdenton.com
snrdenton.com



233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6306


For more information on our pending combination, please visit www.dentonscombination.com

SNR Denton is the collective trade name for an international legal practice. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see snrdenton.com for Legal Notices, including IRS Circular 230 Notice.

**From:** Steve Herman [mailto:SHERMAN@hhklawfirm.com]
**Sent:** Sunday, December 16, 2012 7:26 PM
**To:** 'Christine Reitano'
**Cc:** 'James Roy'; 'Michael Juneau'; 'Lynn Greer'; 'Orran L. Brown'; 'mark.Holstein@bp.com'; Moskowitz, Keith
**Subject:** BP Oil - Request for Formal Policy Statement

See attached.


Thanks.


Stephen J. Herman, Esq.
Herman Herman & Katz LLP
Office (direct): (504) 680-0554
E-Mail: sherman@hhklawfirm.com
Visit: www.gravierhouse.com


CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended

EXHIBIT E(16)

solely for the addressee.  Please do not read, copy, or disseminate it unless
you are the addressee.  If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender.  Also, we would appreciate your forwarding the message back to us and
deleting it from your system.  Thank you.

# MEMORANDUM

**To:** Patrick A. Juneau, Esq.
    Claims Administrator

**From:** Class Counsel

**Matter:** In re: Deepwater Horizon
    MDL No. 2179

**Re:** Request for Formal Policy Statement: Monthly Revenue

**Date:** December 16, 2012

Despite the focus of the Settlement Agreement negotiated, agreed to, noticed, and submitted for approval by BP, on monthly revenue, and the insistence by BP on the submission of month-by-month profit and loss statements, (or alternate source documents), BP has now questioned the Program,[1] and argued in numerous Appeals,[2] that some Claimants should have their Monthly Revenue averaged out over a number of months, or even years.  Further, BP suggests that Costs incurred either before or after the Compensation Period be "matched" to Revenue received during the Compensation Period.  And, finally, BP attempts to resurrect its suggestions of an inquiry into potential alternative causation.

Class Counsel therefore respectfully request a formal Policy Statement.

Specifically:

1.  When a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed.

2.  When a business keeps its books on an accrual basis, and/or has prepared and submitted its monthly P&Ls on an accrual basis to the Settlement Program, revenue is earned during the month that such revenue is both earned and is realized or realizable.

    For example, if a construction firm receives and books a lump sum payment in Month 1 to cover work performed in Months 1-3, the entire lump sum payment is treated as revenue during Month 1 for purposes of the BEL Causation and Compensation Frameworks.

3.  The "corresponding variable expenses" associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question.

---

[1]*See, e.g.,* E-Mail from Dan Cantor to Mike Juneau, re: "Accountant Questions" (Dec. 11, 2012).

[2]*See, e.g.,* Robert Smith, No. 56361; Randolph Slone, No. 39307; Kahn Swick & Foti, No. 50024.

For example: If August is a Benchmark / Compensation month for either Causation and/or Compensation Purposes, the variable expenses are the variable expenses that are incurred and booked in August, even if they might arguably relate to revenue that is not received and booked until November.

For example: Where a claimant retail establishment purchases large amounts of inventory during Month 1, the inventory (Costs of Goods Sold) that was incurred / expended and booked in Month 1 is treated as Month 1 costs, even if the inventory was sold during Months 2-4.

For example: Claimant is a construction company that maintains its books on a cash basis and purchases $40 in materials in June, and then performs half of the job in July and half in August, incurring $20 dollars in labor costs in each month, and gets paid $100 for the job in September. For purposes of the BEL framework, the $100 revenue is earned in September, while the $40 costs are incurred in June.

For example: Claimant is a law firm representing a personal injury plaintiff on a contingency fee basis. Attorneys spend $250 to file the case in June, 20 hours and $150 in computer research costs submitting briefs in July, and 30 hours and $500 taking depositions in August. In September, a settlement is reached, and the Firm receives a $10,000 contingency fee payment, plus reimbursement of the $900 in expenses. For purposes of the BEL framework, $250 in costs would be incurred in June; $150 in costs would be incurred in July; $500 in costs would be incurred in August; and $10,900 in revenue would be earned in September.

For example: Claimant is a farmer who plants his crop in April and books associated labor and material costs of $100 getting the crop in the ground. Between May and September the farmer books $40 in monthly expenses maintaining and nurturing the crop ($200 total for the 5 months), and then incurs and books $100 in labor costs for October when the crop is harvested. The harvested crop is taken to market and sold for $1,000 on November 27 with all revenue recorded in that month against $100 in selling costs. For purposes of the BEL framework, there would be costs of $100 in April;  costs of $40 in May, June, July, August and September; costs of $100 in October;  costs of $100 in November;  and revenue of $1,000 in November.

4.     Where a Claimant ceases a line of business during the Benchmark Period, such revenue from the terminated line of business is included in the BEL calculation.

For example: Claimant rented commercial properties in 2007 but sold those properties at the beginning of 2008, for the purposes of the BEL Framework, the 2007 revenue from the properties would be included in the Causation and/or Compensation calculation(s).

Page 2

<u>Discussion</u>

Averaging the revenue; attempting to correlate specific revenue to specific expenditures in previous or subsequent months; and/or eliminating revenue based on changes in the Class Member's business:

- Was not suggested by BP during negotiations;

- Is not supported by the terms of the Settlement Agreement;

- Would require substantial documentation and other information beyond what is contemplated or provided for in the Settlement Agreement's Documentation requirements;

- Violates the established Policy precluding an inquiry by the Program into potential "alternative causes";[3]

- Is impractical and unworkable;

- Is inconsistent with BP's prior focus and insistence on Monthly Profit & Loss statements;

- Is inconsistent with the Claims Administrator's Policy regarding the use and restatement of Profit & Loss statements;[4]

- Assumes and/or implies that attorneys only work on one case at a time; that construction firms only work on one project at a time; and that retailers only purchase and sell one batch of inventory at one time;[5]

---

[3] *See* E-MAIL FROM JUDGE BARBIER, RE "MEETING TODAY RE NON-PROFITS AND SIP" Dec. 12, 2012; ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION, Oct. 10, 2012, No.2; LETTER FROM MARK HOLSTEIN TO PAT JUNEAU, Sept. 28, 2012.

[4] *See* ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION, Sept. 25, 2012, No.1(c) (If the claimant's profit and loss statements for a year were prepared on a Cash Basis, the claimant may be permitted – but is in no way required – to restate such statements on an Accrual Basis in connection with the submission of a Business Economic Loss claim).

[5] BP's hypotheticals, which implicitly suggest that it's not "fair" to assign revenue and costs to the months in which such revenue was actually earned and such costs actually incurred, ignore the rest of the claimant's business. For example, the attorney will continue to expend costs during the Compensation Period with respect to other cases on which revenue may not be recognized for years, if ever. A construction company may expend costs for new projects even as it collects for work and materials provided in connection with old projects. A retailer will often continue to stock its shelves with different inventories of different product lines that are purchased and sold at different times.

Page 3

- Doesn't account for the possibility that a business line (and the associated revenue and/or expenses) may have been added by the Claimant prior to or during the Compensation Period;[6] and,

- To the extent unfavorable, is inconsistent with Settlement Agreement Section 4.3.8.

The primary reference to monthly profit and loss statements is in Exhibit 4A to the Agreement, which states that the claimant is required to produce:

> Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. Profit and loss statements shall identify the dates on which they were created. The Claims Administrator may, in his discretion, request source documents for profit and loss statements. If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.[7]

This provision is supplemented by the Definition of "Contemporaneous" which provides that:

> "Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business. *In addition, "contemporaneous" or "contemporaneously" prepared evidence or documentation,* even if not proximate in time to the event or occurrence to which it relates, *shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question,* (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question

---

[6]BP implicitly complains that revenue associated with a line of business that was discontinued during the Benchmark Period should not be included in the BEL calculation. However, it is just as plausible that a claimant may have added a line of business during the Benchmark Period and/or during the Compensation Period, which would result in additional revenue and expenses during the Compensation Period, as compared with the Benchmark Period.

[7]Exhibit 4A, Item 4.

actually occurred.[8]

Nothing in these provisions or elsewhere in the Settlement Agreement specifies the accounting method which must be used to create the monthly profit and loss statements.

While the Settlement Agreement does not necessarily dictate the use of Generally Accepted Accounting Principles, (and, indeed, intentionally departs from GAAP in several respects), it is significant to note in this context that both the cash basis of accounting and the accrual basis of accounting are accepted bases for determining when to book revenue. Both are well recognized methods of accounting. The tax law (Internal Revenue Code) was established essentially under the cash basis, with situations where modified cash or accrual accounting is used. Financial reporting for investors and creditors is primarily accrual based. Under cash basis accounting, revenue is recognized when cash is received. Under accrual accounting, revenue is recognized when it is both (i) earned and is (ii) realized or realizable.

The attempt to "match" expenses to revenue bears resemblance to research and development (R&D) costs. Companies engage in R&D activities (*i.e.* incur expense) knowing that the incidence (and certainly the amount) of future benefit (*i.e.* revenue) is uncertain. Because these expenses cannot be effectively correlated with future revenue, Statement of Financial Accounting Standards No. 2 (1974) – "Accounting for Research and Development Costs" – requires that the R&D expenditures be expensed immediately as incurred.

With respect to attorney contingency fees in particular, the appropriate guidance for such "contingencies" is contained in the source document FASB Statement No. 5 – "Accounting for Contingencies" – as well as in the FASB Accounting Standards Codification (which was implemented in 2009) under FASB ASC 450-10. Contingencies are defined as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur. In accordance with these standards, virtually all plaintiff law firms maintain their books on a cash basis; case costs are booked when incurred (irrespective of whether or when they might be recovered from the client and/or defendant); fees (and case cost reimbursements) are booked as revenue (and taxed as income) in the month in which they are received (irrespective of when the work was performed).[9]

A prime failure of BP's proposal is that there is no way to calculate the revenue that should be reported in the relevant periods for cases in which expenses are incurred, but payment has not yet been received. That is, while BP wants to allocate current revenues to prior periods, the fallacy of that methodology is shown by the impossibility of allocating future revenues to current periods.

---

[8] Section 38.38.

[9] *See, e.g.,* FASB STATEMENT No. 5 (1975), ¶17(a) ("Contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization").

Page 5

**Subject:** FW: BP Oil - Request for Formal Policy Statement

**Date:** Tuesday, December 18, 2012 5:21:56 PM Central Standard Time

**From:** Michael Juneau

**To:** keith.moskowitz@snrdenton.com

**CC:** Christine Reitano, Patrick Juneau, jimr@wrightroy.com, Steve Herman (SHERMAN@hhklawfirm.com), mark.holstein@bp.com

Keith:

As Pat Juneau indicated in your meeting with him today, in light of Class Counsel's request for a formal policy statement as to the issues outlined in Steve Herman's attached memo of December 16, 2012, he wishes to move this set of issues towards resolution so that the rules under which the Program is to operate are clear. Toward that end, he has asked that BP submit its written response to the issues raised by Steve's December 16, 2012  memo no later than **5:00 pm, Friday, December 28, 2012**.

Sincerely,
Michael J. Juneau
Special Counsel
Deepwater Horizon Claims Center

**From:** Steve Herman [mailto:SHERMAN@hhklawfirm.com]
**Sent:** Sunday, December 16, 2012 7:26 PM
**To:** Christine Reitano
**Cc:** 'James Roy'; Michael Juneau; 'Lynn Greer'; 'Orran L. Brown'; 'mark.Holstein@bp.com'; 'Moskowitz, Keith'
**Subject:** BP Oil - Request for Formal Policy Statement

See attached.

Thanks.

Stephen J. Herman, Esq.
Herman Herman & Katz LLP
Office (direct): (504) 680-0554
E-Mail: sherman@hhklawfirm.com
Visit: www.gravierhouse.com

CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended
solely for the addressee.  Please do not read, copy, or disseminate it unless
you are the addressee.  If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender.  Also, we would appreciate your forwarding the message back to us and
deleting it from your system.  Thank you.

This email (and any attachments) is confidential and is intended for use solely by the properly named addressee. If
you are not the intended recipient, any use, dissemination, forwarding, copying or printing of this email without the

EXHIBIT E(17)

consent of the originator is strictly prohibited. Although this email (and any attachments) are believed to be free of any virus or other defect, it is the responsibility of the recipient to ensure that it is virus free, and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this email in error, please immediately notify the sender by reply email or by telephone at 504-934-4999.

**Rebecca Foreman**

| | |
|---|---|
| **From:** | Michael J. Juneau <MJJ@juneaudavid.com> |
| **Sent:** | Thursday, December 20, 2012 12:07 PM |
| **To:** | Keith Moskowitz; Mark E Holstein; Steve Herman; Jim Roy |
| **Cc:** | Christine Reitano; Rebecca Foreman; Patrick Juneau; Orran Brown; Lynn Greer; Chuck Hacker; Mark Staley |
| **Subject:** | DwH - Important Scheduling Issues |

All:

Pat Juneau has asked me to convey to all of you the following revised schedule with respect to the issues raised in Steve Herman's recent memo requesting a policy announcement on smoothing out of revenues and expenses, etc:

January 8, 2013 by 5:00 pm - BP to submit its written position paper

January 16, 2013, 10:00 am - Panel Meeting, 935 Gravier Street, 19th floor- to address this set of issues (assuming the parties have not reached agreement on the issues by then)

If anyone has a significant problem with these dates, please let us know. Otherwise, this is the schedule we will follow. Thank you.

Michael J. Juneau
Special Counsel
Deepwater Horizon Claims Center


Privileged & Confidential
Sent from my iPhone

EXHIBIT E(18)

<u>BP's Response To Class Counsel's</u>
<u>December 16, 2012 Request for Policy Determination</u>

<u>Introduction</u>

Class Counsel's December 16, 2012 Request for Policy Determination seeks to rewrite the Settlement Agreement. The parties negotiated a Settlement Agreement that uses objective tests to make claim determinations, including the amount and magnitude of losses (if any).   As set out in Exhibit 4C, which is the "Compensation Framework for Business Economic Loss Claims," the parties agreed that "[t]he compensation framework for business claimants compares the *actual profit* of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to *earn* in the comparable post-spill period of 2010." Settlement Agreement, Ex. 4C at 1 (emphasis added).

Class Counsel argues that "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." Class Counsel 12-16-12 Memo at 1. Therefore, Class Counsel's position is that it is solely the *timing* of when cash is received that is relevant for purposes of comparing pre- and post-Spill economic performance, which comparison determines whether there was a compensable loss (and the amount of any such loss) under the Settlement Agreement. But this novel position ignores the text of the Settlement Agreement, which instructs that the first step in evaluating financial performance is to measure "revenue" "earn[ed]," not payments received. The use of the terms "revenue" and "earn[ed]" in the Settlement Agreement was negotiated and deliberate. As the Settlement Program itself recognized in its October 8, 2012 Policy Statement prohibiting a claimant that keeps its books on an accrual basis from restating the financial data on a cash basis for purposes of filing a claim, relying solely on the timing of the receipt of cash "could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received." Claims Administrator 10-8-2012 Policy Statement at 2.

Similarly, Class Counsel contends that: "The 'corresponding variable expenses' associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question." Class Counsel 12-16-12 Memo at 1. Again, Class Counsel's position ignores and is incompatible with the express text of the Settlement Agreement, which requires that "corresponding variable expenses" be subtracted from the revenue they generate in order to measure variable profit. Settlement Agreement, Ex. 4C at 2. Accepting Class Counsel's proposal requires ignoring the express text of the Settlement Agreement. And failing to match the corresponding variable expenses incurred to generate revenue presents the mirror image of the problems that arise when one focuses only on the timing of revenue. As the Claims Administrator has already found, such an approach "could result in a loss or a greater loss not related to the Spill." Claims Administrator 10-8-2012 Policy Statement at 2.

Class Counsel's proposed rewrite of the objective compensation tests produces objectively absurd and illogical results. Rather than compare the revenues that correspond to the expenses necessary to earn those same revenues during the relevant time periods, Class Counsel instead seeks to have the Settlement Program in many cases use a year or more worth of

1

EXHIBIT E(19)

revenues compared to only a fraction of the expenses incurred to generate those revenues, thereby artificially inflating pre-Spill profits, and artificially depressing post-Spill profits, solely for the purpose of creating non-existent losses -- an objective fact confirmed by the claimant's own financial data.

The Settlement Agreement's objective compensation tests work when the financial data are used in a manner that permits the calculation and comparison of pre- and post-Spill variable profit -- *i.e.*, that data which match the revenues and the expenses incurred to generate those revenues. But the tests cannot possibly work if the wrong data (data that do not measure revenue earned and that do not match revenue earned and corresponding variable expenses) are used, which is precisely what Class Counsel seeks when they ask the Settlement Program to determine compensation but without considering when revenue is earned and matching the expenses incurred to generate those very same revenues.

Context also is important here. For many types of Business Economic Loss claims, the Settlement Program is being provided with financial data that sufficiently match revenue and corresponding variable expenses, and, as a result, is properly applying the objective compensation test to produce the required and agreed upon outcomes under the terms of the Settlement Agreement. There are, however, a number of claimants -- often in the construction, agriculture, and professional services industries -- for which (i) earning of revenue (the measurement required by the Settlement Agreement) does not always track the receipt of payment (the measurement found in the financial data of many claimants), and/or (ii) corresponding variable expenses are incurred many months ahead of the earning of revenue. In such cases, the terms of the Settlement Agreement require that an accurate evaluation of pre- and post-Spill financial performance be undertaken, including determining when revenue is earned and the matching of corresponding variable expenses to that revenue. This evaluation can be accomplished in a straightforward manner that permits the accurate processing of claims and does not impose unnecessary burdens on claimants or the Settlement Program.

In addition to explaining why Class Counsel's positions are wrong and its proposed policy determinations are prohibited by the Settlement Agreement, we also offer some suggestions and straightforward proposals that will allow the Settlement Program to identify those claims which require further evaluation, and how to perform that further evaluation, in order to properly apply the Settlement Agreement's objective tests.

I.   **Class Counsel's Proposals Violate the Settlement Agreement's Objective Tests**

Class Counsel asks the Class Administrator to jettison the express terms of the Settlement Agreement, which terms require accurate data regarding "earn[ed]" "revenue" and "corresponding variable costs" incurred in earning the revenue in order to measure accurately changes in claimants' pre- and post-Spill economic performance, and thus whether the claimant experienced a compensable loss. In the place of accurate data permitting such a measurement, Class Counsel seeks to have the Claims Administrator focus only on (i) when cash is received and (ii) expenses unconnected to the revenue those expenses generate. Class Counsel's proposed approach violates the Settlement Agreement's objective tests and produces the very type of

inaccurate and illogical results predicted by the Claims Administrator in his October 8, 2012 Policy Statement.

The Business Economic Loss frameworks' objective tests for claim determinations, including the amount and magnitude of losses (if any), compare a claimant's economic performance in defined periods before the Spill to its economic performance in defined periods after the Spill. Two main pieces of data are used to perform this comparison -- "revenue" (income earned or generated during a defined period) and "corresponding variable expenses" (those variable expenses incurred in generating the revenue in question). Using financial data that accurately reflect a claimant's monthly economic performance (its revenue and corresponding variable expenses) is essential to proper application of the Settlement Agreement. Without such data, a meaningful comparison of pre- and post-Spill economic performance, and thus an accurate claim determination, including the amount of magnitude of losses (if any), is impossible.

Exhibit 4C of the Settlement Agreement measures compensation in a logical and objective manner by comparing the claimant's economic performance in a defined pre-Spill period to the claimant's economic performance in a defined post-Spill period. "Variable Profit" is the measuring stick. And the Settlement leaves no question as to how Variable Profit is calculated:

1. Sum the monthly revenue over the period.
2. Subtract the corresponding variable expenses from revenue over the same time period.

Settlement Agreement, Ex. 4C at 2. Thus, to calculate Variable Profit, it is necessary to calculate accurately (1) revenue and (2) the "corresponding variable expenses" incurred in generating that revenue. In addition, because Exhibit 4C instructs that Variable Profit for the compensation period is to be compared to "comparable months of the Benchmark Period," it is necessary to identify the "comparable months."[1]

A.  **Measuring Revenue**

"Revenue" is a well understood and well defined term. "Revenue" means income generated and earned from the sale of goods and services. *See, e.g.,* C. P. Stickney, *Financial Reporting and Statement Analysis* (3d) at 14 ("Revenues measure the inflows of net assets (that is, assets less liabilities) from selling goods and providing services. . . . [r]evenues reflect the services rendered by the firm.").[2] Indeed, Class Counsel themselves admit that the relevant question is when revenue is "earned." Class Counsel 12-16-12 Memo at 1.

---

[1] Independently, the accurate calculation of "revenue" and use of the correct data are also essential to proper application of the test in Exhibit 4B of the Settlement Agreement.

[2] *See also* Accounting Standards Board, Statement of Financial Accounting Concepts 6 ¶ 78 "Revenues are inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."); *id.* ¶ 79 "Revenues

Footnote continued on next page

In most cases, how to measure revenue is straightforward and not in dispute. A restaurant earns revenue when it sells a meal and its customer pays for the meal. A souvenir shop earns revenue when it sells a tee shirt and its customer pays for the tee shirt. Measuring revenue does, however, require an additional step for certain claimants -- for example those in construction, agriculture, and professional services -- because the time where the business earns revenue (the key measurement under the Settlement Agreement) may be different than when the business receives payment (which is sometimes what is reported in the claimant's financial data). The Claims Administrator has recognized that such issues of timing, if unaddressed, *"could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received."* Claims Administrator 10-8-2012 Policy Statement at 2 (emphasis added).

Take for example a construction company that is paid $100 on day 1 of a job as payment for the first four months of work which are to be performed evenly over the four months. Neither the Settlement Agreement nor basic principles of economics nor common sense would say that the construction company earned $100 in revenue on day 1. Rather, the construction company earned $25 dollars in each of the four months in this hypothetical. If the construction company did not do the work, it would have to return the money. Yet, Class Counsel is asking the Claims Administrator to create a fiction, simply because a claimant's financial data may show that the claimant received the lump sum payment on day 1, that the full $100 is revenue earned on day 1, and that the claimant did not earn any revenue from the job in months two - four. Specifically, Class Counsel argues that "[w]hen a business keeps its books on a cash basis, revenue is earned during the month of receipt, irrespective of when the contract was entered or services were performed." Class Counsel 12-16-12 Memo at 1. Equally troubling, and as discussed below, when it comes to expenses to compare to the revenue, Class Counsel would pretend that only the expenses for month 1 apply to the $100 amount, but not the expenses incurred over the four-month period in order to generate or earn that revenue.

As the Claims Administrator concluded in his October 8, 2012 Policy Statement that prohibits the restating of financial data from accrual to cash basis, the fiction proposed by Class Counsel can prevent proper and fair operation of the Settlement Agreement's objective tests. By misstating actual monthly performance, it can create losses where none exist, overstate actual losses, and create false positives in the causation test. Claims Administrator 10-8-2012 Policy Statement at 2 (explaining that using time of payment rather than time when revenue is earned "could result in a loss or a greater loss [that is] not related to the Spill but instead is a result only of the timing of cash received."). The fact that a claimant who uses cash basis accounting may as a clerical function record payments when they are received does not change the meaning of the term "revenue" or the Settlement Agreement's requirement that "revenue" rather than the receipt of payment be measured.

---

Footnote continued from previous page

represent actual or expected cash inflows. . . that have occurred or will eventuate as a result of the entity's ongoing major or central operations . . . the transactions and events from which revenues arise and the revenues themselves and are called by various names -- for example, output, deliveries, sales . . .").

B.    Measuring "Corresponding Variable Expenses"

As with "revenue," Class Counsel once again seeks to rewrite the terms of the Settlement Agreement by ignoring the requirement that "corresponding variable expenses" must be subtracted from revenue. In place of the actual requirements of the Settlement Agreement, Class Counsel argues that the Claims Administrator should simply look to when expenses are incurred without matching such expenses to the revenue they generate.

Reference to Exhibit 4C of the Settlement Agreement shows why Class Counsel's position is untenable as a matter of contract interpretation and basic economics. Once revenue is properly identified, the Settlement Agreement instructs that the "corresponding variable expenses" incurred in generating the revenue must be subtracted from the revenue. Settlement Agreement, Ex. 4C at 2. "Corresponding" means "having or participating in the same relationship" or "related," as in "a test question and its corresponding chapter in the textbook." Merriam-Webster Dictionary < http://www.merriam-webster.com/dictionary/corresponding>.

The requirement that "corresponding variable expenses" be subtracted from revenue ties directly back to the core requirement of the Settlement Agreement -- that loss is objectively measured by accurately comparing pre- and post-Spill economic performance. This cannot be accomplished without matching revenue and corresponding variable expenses. Failure to do so will produce a distorted and completely inaccurate picture of business profit or loss.

Take for example a farm that spends $50 dollars each month in May, June, and July to buy seeds, plant crops, and fertilize the crops, and then generates $200 in revenue when the crop is harvested and sold in August. Once again, neither the terms of the Settlement Agreement nor basic principles of economics nor common sense would say that the farm lost $50 in May, lost another $50 in June, and yet another $50 in July, and then turned a profit of $200 in August. To the contrary, the Settlement Agreement (by instructing to subtract "corresponding variable expenses" from revenue) and basic economics say correctly that this farm earned $50 dollars in variable profit ($200 in revenue minus $150 in variable expenses). Any other result would be truly absurd. Yet, this is what Class Counsel seeks: "The 'corresponding variable expenses' associated with monthly revenue are the expenses that are expended or incurred during the Benchmark and Compensation months in question." Class Counsel 12-16-12 Memo at 1.

Class Counsel goes even one step further in arguing that expenses for which a professional services claimant receives reimbursement from its client should be counted as revenue earned for purposes of the Settlement Agreement's objective tests. Class Counsel 12-16-12 Memo at 2. There is no possible interpretation of the Settlement Agreement or economics under which a professional service firm's receipt of reimbursement for costs constitutes revenue that measures the firm's earnings. When the firm receives the reimbursements, it is not earning revenue but simply being repaid for expenses previously paid.

C.    Measuring Comparable Pre- and Post-Spill Periods

Once economic performance for the Compensation Period is calculated, the Settlement Agreement instructs that it is to be compared against economic performance in "the *comparable months* of the Benchmark Period." Settlement Agreement, Ex. 4C at 1 (emphasis added). The

result of this comparison determines whether the claimant has incurred a loss and, if so, the amount of such loss. Thus, performing the correct comparison using the correct data is critical.

"Comparable months" are months that are "capable of or suitable for comparison," "similar" or "like." Merriam-Webster Dictionaryhttp://www.merriam-webster.com/dictionary/comparable. Applying this definition, for the majority of businesses, with revenue and expense patterns that are generally consistent from year to year, "comparable months" of the Benchmark Period for calculation of Step 1 compensation will be the same months as in the 2010 Compensation Period.

In some special cases, however, using the same months in the Benchmark Period and the Compensation Period will not satisfy the "comparable months" requirement. In particular, in the farming industry, the month in which a farmer actually plants crops, harvests crops, sells the harvested crops or makes major purchases of seed or fertilizer may vary from year to year due to weather or market conditions. Thus, unlike a Gulf Shores hotel whose main season of business occurs in the same months year in and year out, economically "comparable" periods for a farmer may change substantially from year to year.

Take the example of a farmer who normally harvests and sells his crop in November, but in 2010 harvested and sold in December. If September-November is used as both the Compensation Period and the Benchmark Period, then the failure to take account of the one month shift will produce an illusory "loss" of revenue between the two periods -- even if the farmer actually earned more revenue from the harvest and sale in 2010. That mismatch, coupled with the failure to assign revenue to the proper month by matching it to costs incurred to produce it and the effort expended, can produce multi-million dollar awards for illusory "losses." And when we say "illusory," we mean losses that do not exist in fact as shown by the objective financial data.

D.    **The Irrational, Distorted Results That Flow From Failure To Properly Apply The Settlement Agreement's Objective Tests**

As the above discussion demonstrates, and as the Claims Administrator recognized in his October 8, 2012 Policy Statement, failure properly to apply the Settlement Agreement's revenue and corresponding variable expense requirements (in other words, doing exactly what Class Counsel is proposing here) produces absurd results that are inconsistent with the express terms of the Settlement Agreement and its intent and are also inconsistent with and contrary to the objective financial data provided by claimants. Consider the following results of actual claims where unfortunately these requirements were not followed:

- Claimant No. 100002385 is a highway paving contractor. 2010 was a banner year for the company, which earned 2010 gross profits that were $1.3 million greater than any other year in the record. Yet, by failing, as required by the Settlement Agreement, to use monthly revenue matched to corresponding variable expenses, the Settlement Program awarded the claimant $7.7 million in pre-RTP compensation ($9.6 million post-RTP) -- more than the total net income the company earned in any year -- including the $6.61 million in its record-breaking 2010. The result amounts to a finding that in the absence of the spill, Claimant's 2010 net income would have been

more than double any other year going back to 2007 and more than four times what it actually was in 2011 ($3,346,870), and that Claimant's 2010 profit margin would have more than doubled. Claimant's own financial records conclusively preclude such a result and establish that there is simply no basis whatsoever for such a conclusion. One can only get to such a result by using the wrong data when performing the calculations required by the Settlement Agreement.

- Claimant No. 100086370 is an advertising firm that received a $3.6 million award even though it too had a banner year in 2010. As in the first example, the Claimant-reported revenues and expenses produced wild month-to-month gross profit swings, with negative profits as high as *66,701%*, a red flag for accountants that revenue has not been matched to the expenses that generated the revenue. Moreover, the company reported extraordinarily high variable expenses of more than $2 million in August 2010, a month in which the company reported only $30,976 in revenue. These extraordinarily high expenses are associated with a one-time increase in an expense category labeled "Spring-Media Purchased Clients," which only appears in Claimant's financial data for the month of August 2010. It is beyond dispute that the Claimant did not incur more than $2 million in costs to generate $30,976 in revenue (a loss of more than $1.9 million) in August. Yet that is precisely the result that was arrived at when corresponding variable expenses were not matched to the revenues generated by such expenses. *In other words, a fictional, non-existent $1.9 million loss was created for the 2010 post-Spill compensation period solely as a result of the failure to match the large $2 million expense with the revenues it generated.* Failure to match the revenue associated with these August 2010 expenses resulted in the Claimant receiving an award that was six times its actual 2009 net income and 170% of its actual 2011 net income. Again, a non-existent "loss" was created, and then compensation was awarded -- simply by failing to match the revenues with the variable expenses incurred to generate those revenues.

- Claimant No. 100099319 is a law firm. Claimant received a $1.3 million contingency fee in October 2009 for a case that had been litigated for two years. Its expenses in litigating the case were incurred over that two-year period. No similar fee was received in October 2010. Treating the fee awarded in October 2009 as "October 2009 revenue" and failing to relate it to the prior work done and corresponding variable expenses resulted in a $5 million dollar award for a non-existent "loss."

The illogical outcomes in the above examples result from not evaluating the financial data called for by the Settlement Agreement and instead using data that do not permit an accurate measurement of financial performance. But even if there were some possible literal interpretation of the Settlement Agreement that permits such results (and there is not), the above examples and their results violate the well-established rule that contracts are to be read

reasonably, and cannot be interpreted in a manner that produces absurd results.[3]  Yet, this is precisely what Class Counsel seeks.

### E.   Changes in Lines of Business

Class Counsel also requests the following policy determination: "Where a Claimant ceases a line of business during the Benchmark Period, such revenue from the terminated line of business is included in the BEL calculation.  For example: Claimant rented commercial properties in 2007 but sold those properties at the beginning of 2008, for the purposes of the BEL Framework, the 2007 revenue from the properties would be included in the Causation and/or Compensation calculation(s)."  Class Counsel 12-16-12 Memo at 2.

Once again, Class Counsel ignores the terms of the Settlement Agreement, economic reality, and common sense.  The Settlement Agreement's objective compensation test explains in clear terms that it "compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant *might have expected to earn* in the comparable post-spill period of 2010."  Settlement Agreement, Ex. 4C at 1 (emphasis added).  Under no circumstances can Class Counsel credibly say that a claimant who was a landlord in 2007 but sold the buildings at the beginning of 2008 lost profit from the renting of those buildings as a result of the Spill.  It did not own the building for the two years preceding the Spill.  The above-quoted language from the Settlement Agreement does not permit such a construction; nor does economic reality or common sense.

## II.   Recommendations

For the reasons discussed above, Class Counsel's requested policy determinations violate the terms of the Settlement Agreement and cannot be implemented.  The attached Tab 1 summarizes a proposed process for addressing claims that may require further evaluation for purposes of measuring revenue and matching corresponding variable expenses.  For the majority of cases, no special steps are needed because the claim does not present timing and matching issues.  Thus, we propose focusing at this time on three industries where timing and matching issues appear to be prevalent and as to which the failure to address the timing and matching issues prevents proper application of the Settlement Agreement -- construction, agriculture, and professional services.  For claims within these three industries, we recommend the steps outlined and discussed in Tab 1.

---

[3] *In re Liljeberg Enter., Inc.*, 304 F.3d 410, 443 (5th Cir. 2002) (rejecting proposed interpretation of contract that "literally leads to absurd results"); *Makofsky v. Cunningham*, 576 F.2d 1223, 1229-30 (5th Cir. 1978) ("Louisiana courts will not interpret the words of a contract literally when this leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit."); *Cashio v. Shoriak*, 481 So.2d 1013, 1015 (La. 1986) (holding that "it is our duty to refrain from construing [contracts] in such a manner as to lead to absurd consequences.  When a literal interpretation will produce absurd consequences, the court may consider all pertinent facts and circumstances, including the parties' own conclusion of the instrument's meaning, rather than adhere to a forced meaning of the terms used.").

## Conclusion

For the foregoing reasons, Class Counsel's requested policy determinations would violate the terms of the Settlement Agreement and would produce inaccurate and illogical results in violation of standard rules of contract construction. Accordingly, Class Counsel's request should be rejected. Instead, BP suggests that the Settlement Program adopt the recommendations set forth in Tab 1 of this memo.

TAB 1

TAB 1

Although very detailed approaches for matching of monthly revenues to corresponding expenses for each of the three industries identified by Class Counsel would lead to greater accuracy, such approaches impose additional burdens on the Settlement Program. In a good faith effort to implement the BEL framework, BP proposes a simpler and workable approach for each industry that is claimant-friendly and requires limited additional effort by the Settlement Program. However, claimants also should -- if they so choose -- be provided the option to pursue a more detailed approach for aligning revenues with corresponding expenses where they can provide the necessary data.

<u>Construction</u>

For construction claims, an approach to better align revenues with corresponding variable expenses may be implemented often without the need for any additional information from claimants. In overview, the annual financial data submitted by construction firms typically appear to reliably report annual revenue, variable costs and variable profits. However, such firms frequently do not accurately align revenue and the corresponding expenses incurred to generate that revenue on a monthly basis, a problem reflected in variable profit percentages that often vary wildly from month to month. The proposed approach, summarized below, reflects the view supported by industry accounting experts that construction companies generally record their costs reliably on a monthly basis based on actual operating experience, while revenues are less reliable as they utilize estimates which can change significantly from month-to-month.

Alignment of revenue and corresponding variable expenses can be substantially improved in two steps:

First, determine the ratio of claimant's annual revenue to annual variable expenses for 2010 and each of the Benchmark Period years.

Second, match revenue to corresponding variable expenses by multiplying (i) variable expenses reported for a given month and (ii) the ratio of revenue to variable costs calculated on an annual basis.

Last, adjustments should be made for irregular or extraordinary cost entries that can appear in monthly financial statements. For example, Claimant No. 1002385 recorded a full year of bad debt totaling $928,616 solely in December 2008; this cost should be matched to the months in which the corresponding revenue was reported. In such instances, the Settlement Program will need to consult with claimants in order to better identify the nature and timing of the expense. Significantly, we see documentation in the claim files already of such Settlement Program consultations. For example, the claim file for Claimant No. 100127107 includes a response from a CPA firm to the Settlement Program regarding an inquiry about negative revenue amounts recorded in the claimant's December 2007 and November 2009 P&L's.

After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula can proceed as

usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

<u>Farming</u>

The proposed approach to improving the alignment of revenue to corresponding expenses for farm claims generally tracks the two-step approach proposed above for construction firm claims, recognizing the unique timing of expenses and sales in this industry:

First, determine the claimant's total revenue for each crop harvested in 2010 and the Benchmark Period years. This should be based on the published USDA-defined marking year for the particular crop in the state where the farm is located. For example, the 2010 marketing year for rice produced in Louisiana extends from July 1, 2010 to June 30, 2011, recognizing that rice harvested in 2010 might be stored and sold in 2011.

Second, for 2010 and each Benchmark Period year, match the total marketing year revenue to corresponding variable expenses that occurred in the calendar year in which the harvested crop was produced. This matching is accomplished by multiplying (i) variable expenses incurred by the claimant reported for a given month and (ii) the ratio of marketing-year revenue to production-year variable expenses.

In addition, adjustments should be made for irregular or extraordinary cost entries that can appear in monthly financial statements. For example, if unusually large expenses for seed, fertilizer, chemicals or fuel appear in one year compared to others, it may be that the claimant purchased inventory for multiple years or pre-purchased supplies late in a given calendar year for use in the following production year, in which case the relevant costs should be apportioned to the appropriate production year. In such instances, the Settlement Program will need to consult with claimants in order to make such determinations. Such consultation already is taking place. For example, the claim file for Claimant No. 100136040 includes correspondence in which the Settlement Program asks the claimant to clarify the purpose of an inventory adjustment expense recorded on its profit and loss statements in December of each year; this expense varies between minus $600,000 and positive $279,000 between 2007 and 2010.

Last, it is important that the months selected in the Compensation Period and Benchmark Period years are, in fact, comparable. For example, if the Claimant selects months for the Compensation Period in which a primary farming expense was incurred -- planting, land preparation or harvesting, the "comparable months" of the Benchmark Period year must include those same activities.

After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula can proceed as usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

## Professional Services Firms

The proposed approach to align revenue to corresponding expenses for professional services firms generally tracks the two-step approach proposed above for construction and farming claims, recognizing that many professional services firms' financials often report a large share of annual revenue in only a handful of months, or even in only a single month, in any given year. This is due to large, irregularly timed payments for long-term projects or matters, although professional service firms' variable expenses tend to be consistent throughout the year.

First, identify the months in which there is an irregular or extraordinary increase in cash receipts and then obtain from the claimant information on the history of effort and expenses expended on projects or matters that generated the increase in cash payments, as reflected in monthly hours worked by the firm's professionals on the relevant projects or matters, including months in prior years.

Second, match revenue from these projects or matters to the corresponding expenses by multiplying (i) the percentage of total effort that over the history of the project or matter that occurred in a given month, with (ii) the total revenue ultimately generated by the project or matter. For months with no irregular or extraordinary increase in cash receipts, no such matching process need be undertaken.

Third, to properly calculate variable profit in the BEL compensation calculation, claimants should identify their practice for recording pass-through or reimbursable disbursements, such as travel fees, referral fees paid to other firms and fees paid to consultants and experts. Since many firms pass through these disbursements to their clients, they are not appropriately considered to be either revenue or expenses of the claimant. Consequently, they should not be included in calculating the claimant's variable profit.

Last, adjustments should be made for irregular or extraordinary cost entries that appear in monthly financial statements. For example, Claimant No. 100086370 recorded an expense in August 2010 of $2.1 million labeled "Spring Media Purchase Client" which clearly must be associated with revenue generated in other months; this cost should be matched to the months in which the corresponding revenue was reported. In such instances, the Settlement Program will need to consult -- as it already doing -- with claimants in order to better identify when the cost was incurred. For example, the claim file for Claimant No. 100100677 includes correspondence between the Settlement Program and the claimant regarding fees received in settlements as well as costs incurred on behalf of clients.

After undertaking these steps, the variable profit calculation in Step 1 of the BEL compensation formula and the revenue calculations of the causation formula then can be applied as usual with the Settlement Program selecting the Compensation Period months and Benchmark Period year(s) that maximize the claimant's award.

On January 11, 2013, BP met with Class Counsel to discuss the Class Counsels' letter to you of December 16, 2012 and BP's January 9, 2013 response regarding the measurement of revenue and corresponding variable expenses and their comparison in the pre and post-spill periods. BP presented the proposals set forth in its letter of January 9, 2013 (the "Proposals").

As we explained in our January 9, 2013 letter, the plain application of the Settlement Agreement, which is consistent with basic principles of evaluating a firm's performance, dictate that revenues and corresponding expenses be properly determined and matched in order to calculate actual lost profits under Exhibit 4C. BP's Proposals set forth specific methods for an efficient and fair determination to measure any reduction of variable profit. Class Counsel were not willing to accept the Proposals. Notwithstanding the reasonableness and efficiency of these Proposals, in a further effort to facilitate a resolution of this issue, BP outlined in general terms a series of plainly ascertainable triggers/thresholds which would identify the specific claims for which the Settlement Program would apply the Proposals. Essentially, this approach would identify those claims with recorded revenues and/or expenses that are sufficiently irregular such that the further analysis of the claim is warranted. Class Counsel did not express an interest in further exploring the application of these triggers/thresholds to augment the Proposals.

Because the additional application of triggers/thresholds result in reducing the number of claims being subject to further review, we present proposed triggers/thresholds below for the Settlement Program's consideration.[1] Application of the triggers/thresholds in conjunction with the Proposals will further enable the Settlement

---

[1] As noted above, BP only generally outlined these triggers/thresholds for Class Counsel, but did not present the triggers/thresholds below in full.

1

EXHIBIT E(20)

Program to timely and efficiently make claims determinations in accordance with terms of the Settlement Agreement.

BP proposes the Settlement Program utilize three threshold tests to determine whether further matching of revenue to corresponding variable expenses is required:

First, additional scrutiny should occur for claims in which the claimant's monthly P&L statements report revenue in one month (or a small number of months) that is in excess of a specified percentage of the claimant's annual total revenue for 2010 and/or any of the Benchmark Period years. Where the revenue of a business is concentrated in one (or a few) months on an inconsistent annual basis, there is a likelihood the revenue reported for the month was earned over a longer period of time. The threshold would be set in a manner that ensures that normal seasonal variations in revenue would not trigger a supplemental review. This threshold test can readily be implemented by the Settlement Program because the PwC Excel workbook used to process claims already includes entries reporting the claimant's monthly revenue and total revenue for 2010 and the Benchmark Period years.

Second, additional scrutiny should occur for claims in which the claimant's monthly P&L statements report a negative variable profit in any month of 2010 and/or the Benchmark Period years. Negative variable profit occurs when revenue fails to cover variable costs. The existence of a negative variable profit in a month suggests that reported revenue is not properly matched to corresponding variable costs because a business would not be expected to undertake activities that fail to cover their variable costs. However, negative variable profits may occur when firms report corrections to revenue and expenses from prior months or record expenses that are properly considered

2

to be incurred over a longer period. Simply put it is unlikely a firm is going to be selling its product or offering its services at a loss, rather it is likely there is a mismatch of revenues and corresponding variable expenses. This threshold test for further claim review is easy for the Settlement Program to implement. The PwC Excel workbook used to process claims already calculates the variable profit for each month of 2010 and the Benchmark Period years.

Third, additional scrutiny should occur for claims in which there is a wide variation in the monthly variable profit margin (expressed as a percentage of revenue) within a given year. Volatility in a firm's variable profit margin indicate that reported costs vary widely from month-to-month in a manner unrelated to revenue. Dramatic swings in variable profit margin suggest that revenue is not properly matched to corresponding variable costs. Under this test, a claim should be subject to further scrutiny if in 2010 and/or any of the Benchmark Period years the difference between the variable profit margin for the months with the highest and lowest variable profit margin exceeds a specified range. The threshold would be sufficient wide so that typical month-to-month variations in variable profit margins would not trigger a supplemental review. This too is any easy test for the Settlement Program to implement. The PwC Excel workbook used to process claims already reports the variable profit percentage for each month of 2010 and the Benchmark Period years.

## Rebecca Foreman

| | |
|---|---|
| **From:** | Rebecca Foreman on behalf of Patrick Juneau |
| **Sent:** | Tuesday, January 15, 2013 9:33 AM |
| **To:** | Mark Holstein (Mark.Holstein@bp.com); 'keith.moskowitz@snrdenton.com' (keith.moskowitz@snrdenton.com); 'James Roy (jimr@wrightroy.com)' (jimr@wrightroy.com); Steve Herman (SHERMAN@hhklawfirm.com) |
| **Cc:** | Orran L. Brown; Lynn Greer (lgreer@browngreer.com); Michael J. Juneau (MJJ@juneaudavid.com) (MJJ@juneaudavid.com); 'Christine Reitano' |
| **Subject:** | January 15, 2013 Policy Announcement |
| **Attachments:** | BROWNGREER-#418993-v1-CA_Policy_Announcement-1-15-13.DOCX |

Gentlemen:

The Claims Administrator has thoroughly considered the submissions of both Parties regarding the proper measurement of revenue and expenses for those BEL claimants with particularly variable revenues. This is an issue that has particular relevance to claimants who are attorneys, construction companies or farming enterprises. The Claims Administrator recognizes that the straightforward application of the Settlement Agreement's compensation formula to claimants in these industries can result in awards that appear disproportionate when compared to award amounts for claimants in other industries. BP has proposed alternative frameworks whereby claims within these industries would be carved out for additional analysis and/or a revised analysis would be utilized to compute compensation for certain types of claims. The Claims Administrator recognizes that the type frameworks proposed by BP constitute a reasonable approach to evaluating such claims. But the Claims Administrator does not view it within his authority to carve out specific types of claims in this fashion nor to apply a revised formula or analysis for selected types of claimants. The specific charge to the Claims Administrator is to apply the terms of the Settlement Agreement *as written*. When so applied in this instance, the result can be disproportionate awards for certain types of claims. Though the Claims Administrator acknowledges that the type approach proposed by BP is a reasonable one, he does not believe it within his authority to implement such an approach absent agreement of the parties or express direction from the Court.

Attached is the Claims Administrator's Policy Announcement of January 15, 2013, which sets forth my policy decision on this issue.

Thanks,

**Patrick A. Juneau**
*Claims Administrator*

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

504-934-4999

935 Gravier Street, Ste. 1905
New Orleans, LA 70112

1

EXHIBIT E(21)



## MEMORANDUM

TO:        Class Counsel
           BP

FROM:      Patrick A. Juneau, Claims Administrator

DATE:      January 15, 2013

RE:        Announcement of Policy Decisions Regarding Claims Administration

Under the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

In accordance with these provisions, the Claims Administrator has adopted the following policies affecting the administration of claims under the Settlement Agreement. These polices will be the subject of the 1/16/13 session of the Claims Administration Panel and are not to be made public until after those proceedings have been concluded.

1.  *Business Economic Loss Claims: Calculation of Variable Profit.*

Exhibit 4C of the Settlement Agreement sets out the methodology to be used in calculating Variable Profit as a component of determining Step 1 Compensation.

That methodology is as follows:

(1)  Sum the monthly revenue over the period.

(2)  Subtract corresponding variable expenses from revenue over the same time period. Variable expenses include:

(a)  Variable Costs as identified in Attachment A.

418993

(b) Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.

(c) Variable portion of COGS, calculated by excluding salary costs . . . and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

2. *Business Economic Loss Claims: Timing of Revenues for Purposes of Causation.*

Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues before the spill vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims Administrator will not typically re-allocate such revenues to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

418993

**Tracy Steilberg**

| | |
|---|---|
| From: | Tracy Steilberg on behalf of Patrick Juneau |
| Sent: | Wednesday, January 16, 2013 3:27 PM |
| To: | 'carl_barbier@laed.uscourts.gov' |
| Cc: | 'Magistrate Sally Shushan (Sally_Shushan@laed.uscourts.gov)'; mark.holstein@bp.com; keith.moskowitz@snrdenton.com; Daniel Cantor (Daniel.Cantor@aporter.com); 'James Roy (jimr@wrightroy.com)'; Steve Herman (SHERMAN@hhklawfirm.com); 'Joseph Rice (jrice@motleyrice.com)'; 'Calvin Fayard (calvinfayard@fayardlaw.com)'; Christine Reitano; Mike Juneau (mjuneau@dheclaims.com); 'Orran L. Brown'; 'Lynn Greer (lgreer@browngreer.com)' |
| Subject: | DWH - Referral of Issue from Panel (Matching of Revenue and Expenses) |
| Attachments: | Panel Referral - Matching of Revenue & Expenses.pdf |

Dear Judge Barbier:

The Parties have encountered an issue concerning implementation of the Settlement Agreement on which unanimous panel agreement could not be reached, and referral of that issue to the Court has been requested.

Attached you will find the following:

    (1)  Input of Class Counsel on this issue.
    (2)  Input of BP on this issue.
    (3)  Supplemental input of BP on this issue.
    (4)  Email of Claims Administrator to the Parties with attached position of Claims Administrator.

We understand that the Parties will coordinate directly with the Court with regard to a schedule for additional submissions prior to the Court hearing on this issue.

This matter is set to be heard by the Court at 1:30 pm on Thursday, January 24, 2013.

Thanks,
**Patrick A. Juneau**
*Claims Administrator*

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**504-934-4999**

**935 Gravier Street, Ste. 1905**
**New Orleans, LA  70112**
**pjuneau@dheclaims.com**

1

EXHIBIT E(22)

**From:** <Carl_Barbier@laed.uscourts.gov>
**Date:** January 30, 2013, 4:50:21 PM CST
**To:** <richard.godfrey@kirkland.com>, Andrew Langan <alangan@kirkland.com>, Steve
Herman <SHERMAN@hhkc.com>, <jimr@wrightroy.com>, <pjuneau@dheclaims.com>,
Michael Juneau <mjuneau@dheclaims.com>
**Cc:** "'Magistrate Sally Shushan (Sally_Shushan@laed.uscourts.gov)'"
<Sally_Shushan@laed.uscourts.gov>, "mark.holstein@bp.com" <mark.holstein@bp.com>,
"keith.moskowitz@snrdenton.com" <keith.moskowitz@snrdenton.com>, "Daniel Cantor
(Daniel.Cantor@aporter.com)" <Daniel.Cantor@aporter.com>, "'James Roy
(jimr@wrightroy.com)'" <jimr@wrightroy.com>, "Steve Herman
(SHERMAN@hhklawfirm.com)" <SHERMAN@hhklawfirm.com>, "'Joseph Rice
(jrice@motleyrice.com)'" <jrice@motleyrice.com>, "'Calvin Fayard
(calvinfayard@fayardlaw.com)'" <calvinfayard@fayardlaw.com>, Christine Reitano
<creitano@dheclaims.com>, Michael Juneau <mjuneau@dheclaims.com>, "Orran L. Brown"
<OBrown@browngreer.com>, "'Lynn Greer (lgreer@browngreer.com)'"
<lgreer@browngreer.com>
**Subject: Review of Issue from Panel (Matching of Revenue and Expenses)**

Gentlemen:

This will confirm our meeting and discussion which occurred on Thursday,
January 24, 2013.

The Court discussed with counsel for BP, the PSC and the Claims
Administrator issues relating to the claims administrator's January 15,
2013 "Announcement of Policy Decisions Regarding Claims Administration."
The issue raised by counsel for BP is whether the Claims Administrator has
correctly interpreted the terms of the Economic and Property Damage
Settlement Agreement as it applies to the calculation of "Variable Profit"
for Business Economic Loss Claims.

Following our discussion last week, I have now had the opportunity to fully
review the Settlement Agreement and the materials submitted by the parties.
The Court upholds the Claims Administrator's interpretation as set forth in
his January 15, 2013 memorandum.  While the Court acknowledges that this
may sometimes cause apparent anomalies (in either direction) in claim
determinations, this appears to be the result of the objective,
straight-forward mechanisms set forth in the Settlement Agreement.  BP's
proposed remedy does not appear to be based on any generally accepted
accounting principle, and might only result in adding another level of
complexity and subjective analysis to the BEL calculation.

Thank you for your continued cooperation,

Carl Barbier

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to all actions. | * * * * * * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., *et al.,* individually and on behalf of themselves and all others similarly situated, | * * * * | Civil Action No. 12-970 SECTION J |
| Plaintiffs, v. BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., Defendants. | * * * * * * * * | HONORABLE CARL J. BARBIER MAGISTRATE JUDGE SHUSHAN |

## NOTICE OF MANUAL ATTACHMENT

Patrick A. Juneau, Claims Administrator of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement ("Claims Administrator"), and the *Deepwater Horizon* Court Supervised Settlement Program ("Settlement Program"), through their undersigned counsel, will file Exhibits B(1) and C(1) to their Response manually with the Clerk's Office on April 1, 2013. Exhibits B(1) and C(1) are both copies of an April 4, 2012 email from Charles Hacker to Joe Rice, carbon copying others, with the subject: "Business Economic Loss Framework," and an attached memorandum entitled "Business Economic Loss Framework Observations."