**EXHIBIT R1**

## Claimant Information

| | |
|---|---|
| **Claimant ID:** 100011039 | **Name:** BOOTHE JR, HOUSTON |
| **GCCF Claimant ID:** 1028846 | **Business:** HUSTON FREDDIE BOOTHE, JR. ARCHITECT |
| **Taxpayer Type:** Business | **Address:** 14248 HIGHWAY 1077 |
| **SSN/EIN:** *****3794 | FOLSOM LA 70437 |
| **Represented By:** N/A | **Preferred Language:** English |

## Claim Information

| | |
|---|---|
| **Claim ID:** 18654 | **Business Name:** Houston F. Boothe, Jr., Architects |
| **Claim Type:** Business Economic Loss | **Address:** 14248 Highway 1077, Folsom, LA, 70437 |
| **NAICS Code/Desc:** 541310, Architectural Services | |
| **Industry Designation:** Non-Tourism | |
| **Zone:** Zone D | **Headquarters:** Yes |
| **Causation Presumed:** No | |

Review Queue:      Accountant Initial Queue

1. Select Business Entity or Rental Property:      Business
2. Select the Facility associated with this Claim:      80173, Houston F. Boothe, Jr., Architects, 14248 Highway 1077, Folsom, LA, 70437
   Doc ID

| | **Claimant Response** | **Reviewer Override** |
|---|---|---|
| 1. Is the business submitting a consolidated claim for all Facilities located within the Gulf Coast Areas? | Yes | |
| 2. Does the business maintain separate profit and loss statements for each Claiming Facility? | No | Yes |
| **Comments:** There are no profit and loss statements submitted by Claimant in this claim. Claimant indicated in correspondence to the Court Administrator (dated Ocotober 29, 2012) in the next to last paragraph that there are no profit and loss statements. (File ID 17050229, p. 3) | | |
| 3. Is the claimant a non-corporate structured Vacation Rental Property owner that would not have a Headquarters facility? | No | |
| Comments: | | |
| 4. If the claimant has submitted a consolidated claim for all Facilities located within the Gulf Coast Areas, would the claimant's total compensation be optimized if the Program evaluates the business as a consolidated claim or separate claims for each Claiming Facility identified on the Claim Form? | Separate | |
| 5. Select the Claiming Facility that is the Headquarters of the Multi-Facility Business:      Unable to Determine HQ | | |

## Total Revenues

| Month | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| May | | | $6,000.00 | $6,000.00 | $3,500.00 |
| June | | | $15,000.00 | $3,500.00 | $4,000.00 |
| July | | | $5,000.00 | $4,300.00 | $4,550.00 |
| August | | | $40,000.00 | $3,200.00 | $2,000.00 |
| September | | | $3,000.00 | $4,500.00 | $3,875.00 |
| October | | | $13,000.00 | $5,500.00 | $8,000.00 |
| November | | | | | |
| December | | | $20,800.00 | $2,280.00 | $4,240.00 |

## Business Economic Loss – V-Shaped Revenue Pattern

V-Shaped Revenue Pattern:    Incomplete

| Benchmark Period | Result |
|---|---|
| 2009 | Incomplete |

## Benchmark Period: 2007-2009 3 Year

| Benchmark Period 2007-2009 | Result | Three Month Period(s) that Pass |
|---|---|---|
| | | |

| Benchmark Period: 2008-2009 2 Year | | |
| --- | --- | --- |
| Benchmark Period 2008-2009 | Result | Three Month Period(s) that Pass |

| Benchmark Period: 2009 1 Year | | |
| --- | --- | --- |
| Benchmark Period 2009 | Result | Three Month Period(s) that Pass |
| Downturn | Incomplete | September - November; October - December |
| Downturn | Pass | May - July; June - August; July - September; August - October |
| Later Upturn | Fail | May - July; June - August; July - September; August - October |
| Later Upturn | Incomplete | September - November; October - December |

## Business Economic Loss - Modified V-Shaped Revenue Pattern

Modified V-Shaped Revenue Pattern:   Incomplete

| Benchmark Period | Result |
| --- | --- |
| 2009 | Incomplete |

| Benchmark Period: 2007-2009 3 Year | | |
| --- | --- | --- |
| Benchmark Period 2007-2009 | Result | Three Month Period(s) that Pass |

| Benchmark Period: 2008-2009 2 Year | | |
| --- | --- | --- |
| Benchmark Period 2008-2009 | Result | Three Month Period(s) that Pass |

| Benchmark Period: 2009 1 Year | | |
| --- | --- | --- |
| Benchmark Period 2009 | Result | Three Month Period(s) that Pass |
| Downturn | Incomplete | September - November; October - December |
| Downturn | Pass | May - July; June - August; July - September; August - October |
| Later Upturn | Fail | May - July; June - August; July - September; August - October |
| Later Upturn | Incomplete | September - November; October - December |

1. Does the Claimant demonstrate a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by Claimant from the Modified V-Shaped Pattern compared to the same three consecutive month period in 2009?

Document:

2. Does the business have customers in Zones A-C and demonstrate a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of the three consecutive months from May-December 2010 as selected by Claimant for the Modified V-Shaped Revenue Pattern compared to the same three consecutive month period in 2009?

Document:

## Business Economic Loss - Decline Only Revenue Pattern

Decline -Only Revenue Pattern:   Fail

| Benchmark Period | Result |
|---|---|
| 2009 | Pass |

### Benchmark Period: 2007-2009 3 Year

| Benchmark  Period 2007-2009 | Result | Three Month Period(s) that Pass |
|---|---|---|

### Benchmark Period: 2008-2009 2 Year

| Benchmark  Period 2008-2009 | Result | Three Month Period(s) that Pass |
|---|---|---|

### Benchmark Period: 2009 1 Year

| Benchmark  Period 2009 | Result | Three Month Period(s) that Pass |
|---|---|---|
| Downturn | Incomplete | September - November; October - December |
| Downturn | Pass | May – July; June - August; July - September; August - October |

**Claim Form Answer: No**

1. Has the Claimant provided specific documentation identifying factors outside the control of the Claimant prevented the recovery of revenues in 2011?   No

Document:

Specific Documentation:

2. Does the Claimant demonstrate a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by Claimant from the Modified V-Shaped Pattern compared to the same three consecutive month period in 2009?

Document:

3. Does the business have customers in Zones A-C and demonstrate a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of the three consecutive months from May-December 2010 as selected by Claimant for the Modified V-Shaped Revenue Pattern compared to the same three consecutive month period in 2009?

Document:

Review Result: Fail

1. Has the Claimant submitted specific documentation to establish that the Spill results in reservation cancellations that the Claimant's business was unable to rebook?   Claim Form Answer: No

Review Result:   No

(a) Has the Claimant submitted specific documentation to establish that the Spill resulted in reservation cancellations that the Claimant's business was unable to rebook?   No

Document:

If Yes, check the boxes that correspond to the specific documentation provided:

☐ Letters created during the period 4/21/10 – 12/31/10 citing the Spill as the reason for the cancellation  Document:

☐ Emails crated during the period 4/21/10 – 12/31/10 citing the Spill as the reason for the cancellation  Document:

☐ Hotel logs for the relevant time created during the period 4/21/10 – 12/31/10 citing the Spill as the reason for the cancellation  Document:

☐ Sworn Written Statement from an independent third party citing the Spill as the reason for the cancellation  Document:

☐ Written evidence of the original reservation  Document:

(b) Was the reservation in place as of April 20, 2010?  ☐ Unable to Determine

Document:

(c) Enter the date that the reservation was to occur.  ☐ Unable to Determine

(d) Enter the date the reservation was canceled.  ☐ Unable to Determine

(e) Has the Claimant established that he/she/it was unable to rebook on the same or similar terms? If no such documentation exists, has the claimant provided a Sworn Written Statement (1) stating that no such contemporaneous written evidence exists, (2) describing the claimant's efforts to replace the canceled reservations(s), and (3) describing the extent to which the claimant was not able to replace the canceled reservation(s)?

Document:

2. Has the Claimant provided sufficient proof of Spill-related contract cancellations that the Claimant was unable to replace under the same terms?

Claim Form Answer: Yes
Review Result: No

(a) Has the Claimant submitted specified documentation to establish that the Spill resulted in canceled contracts that the Claimant's business was unable to replace?

No

Document: 2411622

If Yes, check the boxes that correspond to the specific documentation provided:

☐ Contemporaneous written evidence of the cancellation of a contract as the direct result of the Spill that the Claimant was not able to replace under the same terms  Document:

☐ Sworn Written Statement from an independent third party citing the Spill as the reason for the cancellation  Document:

☐ A copy of all corresponding contracts  Document:

(b) Was the contract in place as of April 20, 2010?  ☐ Unable to Determine

Document: 2411622

(c ) Enter the date the contract was to be performed  ☐ Unable to Determine

(d) Enter the date the contract was canceled  ☐ Unable to Determine

(e) Has the Claimant established that he/she/it was unable to replace the contract on the same or similar terms between April 21, 2010 and the date the Claimant's claim was filed? If no such documentation exists, has the claimant provided a Sworn Written Statement (1) stating that no such contemporaneous written evidence exists, (2) describing the claimant's efforts to replace the canceled contract(s), and (3) describing the extent to which the claimant was not able to replace the canceled contract(s)?  Doc ID:

Document:  7653474

Review Result: Fail

**Result**   **Evidence**

1. Does the Claimant have annual revenue of $75,000 or below for all of the years 2007 through 2011?      No

| Year: | 2009 |
|---|---|
| Document-Type: | Financial - Income Statements / Profit & Loss |
| Dollar-Amount: | $138,800.00 |

2. Has the Claimant provided a Sworn Written Statement documenting:

   1. Contact information and verification of status in MDL 2179 Settlement of the Causation Proxy Claimant to be used by the Claimant to satisfy causation;
   2. Business linkage between the Claimant and the Causation Proxy Claimant; and
   3. Proximity of the Claimant to the Causation Proxy Claimant is within 100 yards for urban claimants and within one-quarter mile for rural claimants.      No

| Doc ID: |
|---|
| Page#: |

3. Has the Claimant provided a Sworn Written Statement from the Causation Proxy Claimant authorizing the Claimant's use of the Causation Proxy Claimant's documentation to satisfy causation?      No

| Doc ID: |
|---|
| Page#: |

4. Physical address of Causation Proxy Claimant:      Not Provided

5. Distance form Claimant to Causation Proxy Claimant:      0.000000 Miles

6. Is the Claimant located in an area outside an urban area or urban cluster, as defined by the US Census Bureau's classification (i.e., a "Rural Business")?      No

7. Has the Causation Proxy Claimant established Causation?      No      Proxy Claimant:

8. Has the Claimant provided information sufficient to establish that a causal relationship exists between the Claimant's financial performance and the financial performance of the Causation Proxy Claimant?

Document:

---

1. Has the Claimant demonstrated purchases of Gulf of Mexico harvested seafood from Zone A, Zone B, Zone C vendors representing at least 10% of food costs during 2009, as reflected in historical purchase orders and / or invoices?

Document:

2. Has the Claimant demonstrated a decline of 7.5% in gross profit (gross sales less cost of goods sold) over a period of the three consecutive months between May - December 2010 compared to the same months in 2009?

Document:

---

1. Was the result of this causation analysis predominantly driven by inclusion of the moratorium losses in the calculation?

Document:

2. Based on an individual review of the claim file, was the non-moratorium portion of the loss in whole or in part due to or resulting from the Spill?

Document:

---

1. This claim form a non-Seafood-related business directly involving the use of vessel?

2. Select all payments to the vessel on which this claim is based for services performed under the VOO Master Vessel Charter Agreement:

Selected Payment IDs:      ☐ No VoO Earned Income Data Found

| Payment ID | TaxPayer ID | Vessel Name | Hull ID | Federal # | State # | Length of Vessel | MVCA Contract # | MVCA Signatory | Payment Amount |
|---|---|---|---|---|---|---|---|---|---|
| | | Total Payment Selected: | | | | | | | |
| | | Calculated Offset (33% of total Selected): | | | | | | | |

1. Were all part of this claimant's economic losses, if any, caused by or resulting from the Moratorium?

Calculation Method:  ☐  Standard Business Economic Loss calculation (pursuant to Exhibit 4C)

☐  Compensation for spill-Related Cancellations (pursuant to Exhibit 4E)

| Accountant Workbook | | | | |
|---|---|---|---|---|
| | | | | |

| Optimum Periods: | |
|---|---|
| Optimum Benchmark period | |
| Optimum Step 1 Compensation Period | |
| Optimum Step 2 Compensation Period | |

**Step 1 Calculation Results**

**Step 2 Calculation Results**

| Revenue Increase (Decrease) Between 2010 and Benchmark Period | |
|---|---|
| Pre-Loss 4- Month Trend -Total | 0.00% |
| Calculated Claimant Specific Factor | 0.00% |
| Adjusted Claimant Specific Factor (Minimum of -2% and maximum of 10%) | 0.00% |

| | | | |
|---|---|---|---|
| 1 | Step 1 Compensation | $0.00 | $0.00 |
| 2 | Step 2 Compensation | $0.00 | $0.00 |
| 3 | Compensation Amount (sum of Rows 1 and 2) | $0.00 | $0.00 |
| 4 | Risk Transfer Premium | 0.25 | 0.25 |
| 5 | Risk Transfer Premium Amount (Row 3 times Row 4) | $0.00 | $0.00 |
| 6 | Accounting Support Reimbursement | $0.00 | $0.00 |
| 7 | Compensation Prior to Offsets (sum of Rows 3 and 5) | $0.00 | $0.00 |
| 8 | Less Offsets | $0.00 | $0.00 |
| 9 | BP Payments Offset | $0.00 | $0.00 |
| 10 | Real Estate Fund Payments Offset | $0.00 | $0.00 |
| 11 | GCCF Payments Offset | $0.00 | $0.00 |
| 12 | VoO Settlement Payment Offset | $0.00 | $0.00 |
| 13 | VoO Earned Income Offset | $0.00 | $0.00 |
| 14 | MISCELLANEOUS PAYMENTS | $0.00 | $0.00 |
| 15 | Total Compensation Amount | $0.00 | $0.00 |

[1] Accounting support Reimbursement Review for this claim complete?     No

[2] Prior Payment Offser Review for this claim complete?     No

**Incompleteness Reasons**

| Reason Number | Description |
|---|---|
| BEL-I-49 | We cannot evaluate your claim in the way the Settlement Agreement requires us to do unless you submit these documents. |

**Denial Reasons**

| Reason Number | Description |
|---|---|

**Result**

| Claim Result | Compensation Amount |
|---|---|
| Incomplete | |

**EXHIBIT R2**



14248 HIGHWAY 1077
FOLSOM, LOUISIANA 70437
PHONE: 504-473-9502

January 8, 2012

CLAIMANT ID: 100011039
CLAIM No. 5095, 9327, 9328
Business Name     H. Freddie Boothe, Jr., Architect
Claim Type:  Business Economic Loss
NAICS Code/Desc: 541310, Architectural Services

Mr. Patrick Juneau
Court Administrator
Deepwater Horizon Spill
1018 Harding Street
Suite 2012
Lafayette, Louisiana 70503
paj@juneaudavid.com

Stephen J. Herman, Attorney
Herman Herman Katz & Cotlar L.L.P.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Lead Economic and Property Damages Class Council

By virtue of this writing, the claimant first identified above respectfully request an appeal of issues established in the attached "Appeal for Insufficient Documentation"

Thank you,
With regards,

H. Freddie Boothe, Jr., Architect
State License No. 2206
www.freddieboothe.com



© TM



14248 HIGHWAY 1077
FOLSOM, LOUISIANA 70437
PHONE: 504-473-9502

January 8, 2013

CLAIMANT ID: 100011039
CLAIM No. 5095, 9327, 9328
Business Name      H. Freddie Boothe, Jr., Architect
Claim Type:  Business Economic Loss
NAICS Code/Desc: 541310, Architectural Services

## APPEAL FOR INSUFFICIENT DOCUMENTATION

The Claimant[1] files this Appeal for Insufficient Documentation in accordance with the terms and conditions as set forth in Document 6430-1 (6) (6.1.1.1) which correspondingly is subject to and in accordance with Sections 4.3.7 and 4.3.8, to wit:

I     **At Issue:**

A.     Claimant contends the Business Economic Loss claim filed is a valid claim(s) in accordance with the Court Document 6430-12  Exhibit 4E[2], and, in particular, claimant meets the criteria for eligibility as established in Document 6430-12  4E(A)[3] as evidenced by the provision of appropriate documentation tendered with the initial filing of the claim(s).  Claimant further contends the claim as filed meets the criteria established in Document 6430-12, 4E(B)(1) as evidenced by the filing of the "contract"[4] and the notice of "cancellation" with the initial filing of the claim(s).    Claimant contends the compensation method of determination as defined in Document 6430-12, 4E(C)(1)(a)[5] is appropriate for evaluation of the compensation defined within the context of the claim documents

---

1   An Entity which meets the requirements of  Doc. 6430-1: 1, 1.1, 1.2, and 1.3 which defines the Economic and Property Damages Settlement class.
2   Doc 6430-12 4E  Addendum to Compensation for Business Economic Loss Claims: Compensation for Spill-Related Cancellations.
3   Doc 6430-12 4E (A)  Eligibility:  This Addendum sets forth the exclusive compensation methodology for business claimants that provide appropriate documentation and which establish causation by demonstrating (a) a Spill-Related Cancellation pursuant to Causation For Business Economic Loss Claims Section II.D or Section III.D, or (b) the Modified V-Shaped Revenue Pattern *and a* contract cancellation pursuant to Causation for Business Economic Loss Claims Section II.B or Section III.B.
4   Doc 6430-12 Page 1 Footnote 1:  As used in this Addendum, "contracts" shall refer to agreements entered in the normal course of business and shall specifically exclude contracts for the sale of real property, fixed assets, non-operating assets, or for all or a portion of the business itself.
5   Doc 6430-12 4E1(a):   a.  "Lost Contract Revenue" shall be the amount that a claimant would have been paid by a customer between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill.

submitted by the Claimant at the initial filing of the claim(s).  Claimant contends the information and documentation submitted for review is sufficient to meet the criteria established in Document 6430-12 4E(C) (1)[6], and (2)[7] and Doc 6430-12 4E(C)(2)(a)[8].  Claimant contends the information tendered in the initial filing of the claim(s) and subsequent information submitted for review is sufficient to determine the claimants loss(es).  All contracts contained in each of the claims are between the same parties, the architect and the obligatory are identical on each.

B.      Further, Claimant contends The Request for Additional Documentation is erroneous and lacks merit on the following grounds:

1.      Document 6430-9, Exhibit 4B, IIID for causation establishes, "The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace.  Proof of a spill-related contact cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract."

2.      Reviewer continues to request for Tax Returns.  Claimant submitted tax returns for the years 2009 and 2010.  A verbal request for Profit and Loss statements was requested.  Claimant has previously stated and states again, "there are no cost associated with the contract(s) which pass to the claimant.  All contracts include language which establishes parameters for cost to be incurred only by the Owner and no cost shall pass to the claimant.

3.      Claimant contends the nature of the claim(s) as presented as Claim No. 5095, Claim No. 9327 and Claim No. 9328 fall completely within the parameters of Doc.6430, 4E which amends the Doc.6430 and provides procedures for establishing the claim LOSS.  Therein, there is no ideology within the Court Doc. 6430 which requires an accounting analysis based on the any information which would be contained within a Tax Return to establish claimant loss in regards to any particular claim submitted by the claimant.

---

6   Doc 6430-12 4E (1):  1. Determine lost revenue from the Canceled Contract or Canceled Reservation.  a.  "Lost Contract Revenue" shall be the amount that a claimant would have been paid by a customer between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill.

7   Doc 6430-12 4E (2):  Determine lost profit associated with the Canceled Contract or Canceled Reservation. "Lost Contract Profit" shall be the amount that a claimant would have earned between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill.  ..... If (i) the Canceled Contract or Canceled reservation documentation either specifies costs to be incurred by the claimant, or specifies a profit margin in connection with the Canceled Contract or Canceled Reservation, or (ii) the claimant is otherwise able to provide a specific estimate of the profit expected from the Canceled Contract or Canceled Reservation based on specific accounting for prior events that took place after January 1, 2007 and were comparable in terms of type, size, and revenue, the claimant's lost profits associated with the Canceled Contract or Canceled Reservation shall be determined according to (a) below.  Otherwise the claimant's lost profits associated with the Canceled Contract or Canceled Reservation shall be determined according to (b) below.

8   Doc. 6430-12 4E (2)(a):  a.   Canceled Contract or Canceled Reservations with Explicit Cost Information.   For Canceled Contracts and/or Canceled Reservations with explicit cost information, Lost Contract Profit and Lost Reservation Profit shall be determined as follows:
     i. Identify the variable expenses that would have been incurred (but were not actually incurred) by the claimant in carrying out the Canceled Contract or Canceled Reservation according to either (I) the information set forth in the Canceled Contract or Canceled Reservation documentation, or (ii) documentation provided by the claimant regarding variable expenses incurred in connection with prior events which were comparable in terms of type, size and revenue and took place after January 1, 2007.  The total variable expenses shall also include any commissions or bonuses that would have been paid to sales or other staff had the Canceled Contract or Canceled Reservation not been canceled.
     ii. Sum (a) total variable expenses associated with the Canceled Contract or Canceled Reservation and (b) any cancellation fees, non-refundable deposits or other amounts received by the claimant in connection with the Canceled Contract or Canceled reservation and © the liquidation or salvage value of any product which remains unsold as of the claim filing date.
     iii. Subtract the sum of (ii) from the Lost Contract Revenue or Lost Reservation Revenue as applicable.

C.     As evidenced by the information and documents provided through the Deepwater Horizon Claims Center, Economic & Property Damage Claims web portal, and, in particular and inclusive of,but, not necessarily limited to, the following documents:

6175361, 6175413, and 6175429

the reviewer believes the claims as presented are lacking documentation, such as, tax returns for the years 2009, 2010 and 2011.  Claimant believes the reviewer has not carefully studied the contents of the claim(s) and makes the demand for tax returns erroneously.

D.     The claimant contends the zone of each claim is Zone A.  By virtue of the location of the site which forms the basis of the contractual arrangement between the parties.   Had the unfortunate DWH Spill not occurred the and the contracts gone to fruition the result would have created a large employment opportunity for the site and community through the construction of the projects.  As evidenced by the web portal for claimant activity the reviewer has placed the business entity in Zone D, an act the claimant disagrees with for numerous viable reasons.

## II     Facts

A.     Claimant presents the following statements of fact regarding the issues which form the foundation and merits of claims submitted:

## IIA     Claim 5095

A1.     Claim 5095 is located in Zone A as evidenced by Document ID 368540 in numerous locations within the document.

A2.     Claim 5095 is a Business Economic Loss claim with an executed contract which completely delineates the responsibility of the claimant, as evidenced by Document ID 368540 which includes a copy of the contract.

A3.     Claim 5095 contains documents which completely establishes contract cancellation as a direct result of the Deepwater Horizon Spill.  Re: Doc ID 368540.

A4.     Claim 5095 meets causation requirements of 6430-9, 4B(I)(1) as evidenced by Document ID 368540 and meets causation requirements established in 6430-9, 4B, (ii) (d)[9].

A5.     Claim 5095 meets causation requirements of 6430-9, 4B (II)(D) as evidenced by Document ID 368540 which contain a written cancellation stating the Deepwater Horizon Spill is the reason for the cancellation.

---

9   Doc 6430-9, 4B, (ii)(D):  D.  Proof of Spill-Related Cancellations.  Claimant may establish causation by providing contemporaneous written evidence of spill-related reservation cancellations (i.e., letters, emails, hotel logs for the relevant time, or an affidavit from an independent third party citing the spill as the reason for cancellation) that the claimant was unable to rebook. ...... The Claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace.

A6.   Claim 5095 meets the criteria established in Doc 6430-12, Addendum to Compensation for Business Economic Loss Claims; Compensation for Spill-Related Cancellations, as evidenced by Doc ID 368540 which includes a cancellation of contract written and executed.

A7.   Claim 5095 establishes in the Contract the expenses of the claimant are to be paid by the obligatory to the contract.  The Contract provides for additional expenses incurred due to explained events in the contract shall be born by the obligatory to the contract.

A8.   Claim 5095 the Contract sets the cost to the claimant at zero ($0.00) as all expenses incurred are to be paid by the obligatory to the contract.  The claimant invest only knowledge and time normally associated with the practice of architecture to perform contractual services as delineated in the Contract, as evidenced by Doc. 368540.

A9.   Claim 5905 contains no variable expenses which can be borne by the claimant, as evidenced in Doc. 368540

**IIB   Claim 9327**

A1.   Claim 9327 is located in Zone A as evidenced by Document ID 3379159 in numerous locations within the document.

A2.   Claim 9327 is a Business Economic Loss claim with an executed contract which completely delineates the responsibility of the claimant, as evidenced by Document ID 3379159 which includes a copy of the contract.

A3.   Claim 9327 contains documents which completely establishes contract cancellation as a direct result of the Deepwater Horizon Spill.   Re: Doc ID 3379159.

A4.   Claim 9327 meets causation requirements of 6430-9, 4B(I)(1) as evidenced by Document ID 3379159.

A5.   Claim 9327 meets causation requirements of 6430-9, 4B (II)(D) as evidenced by Document ID 3379159.

A6.   Claim 9327 meets the criteria established in Doc 6430-12, Addendum to Compensation for Business Economic Loss Claims; Compensation for Spill-Related Cancellations, as evidenced by Doc ID 3379159 which includes a cancellation of contract written and executed.

A7.   Claim 9327 establishes in the Contract the expenses of the claimant are to be paid by the obligatory to the contract.  The Contract provides for additional expenses incurred due to explained events in the contract shall be born by the

obligatory to the contract.

A8.    Claim 9327 the Contract sets the cost to the claimant at zero ($0.00) as all expenses incurred are to be paid by the obligatory to the contract.  The claimant invest only knowledge and time normally associated with the practice of architecture to perform contractual services as delineated in the Contract, as evidenced by Doc. 3379159 .

A9.    Claim 9327 contains no variable expenses which can be borne by the claimant, as evidenced in Doc.  3379159.

**IIC    Claim 9328**

A1.    Claim 9328 is located in Zone A as evidenced by Document ID 4039418 in numerous locations within the document.

A2.    Claim 9328 is a Business Economic Loss claim with an executed contract which completely delineates the responsibility of the claimant, as evidenced by Document ID 4039418 which includes a copy of the contract.

A3.    Claim 9328 contains documents which completely establishes contract cancellation as a direct result of the Deepwater Horizon Spill.   Re: Doc ID 4039418.

A4.    Claim 9328 meets causation requirements of 6430-9, 4B(I)(1) as evidenced by Document ID 4039418.

A5.    Claim 9328 meets causation requirements of 6430-9, 4B (II)(D) as evidenced by Document ID 4039418.

A6.    Claim 9328 meets the criteria established in Doc 6430-12, Addendum to Compensation for Business Economic Loss Claims; Compensation for Spill-Related Cancellations, as evidenced by Doc ID 4039418 which includes a cancellation of contract written and executed.

A7.    Claim 9328 establishes in the Contract the expenses of the claimant are to be paid by the obligatory to the contract.  The Contract provides for additional expenses incurred due to explained events in the contract shall be born by the obligatory to the contract.

A8.    Claim 9328 the Contract sets the cost to the claimant at zero ($0.00) as all expenses incurred are to be paid by the obligatory to the contract.  The claimant invest only knowledge and time normally associated with the practice of architecture to perform contractual services as delineated in the Contract, as evidenced by Doc. 4039418 .

A9.    Claim 9328 contains no variable expenses which can be borne by the

claimant, as evidenced in Doc. 4039418.

## III    Review of pertinent documents found in Court  Document 6430

A1.    After careful review of the facts as stated above the claims clearly fit within the context of Doc. 6430 4E[10] wherein the business entity was in Zone A, a contract was in place[11] at the time of the Deepwater Horizon Spill, The contract was terminated[12] as a direct result of the DWH Spill, the claim meets appropriately, as defined in Doc. 6430, all causation requirements, the contract sets a value of zero for cost incurred by the claimant, the contract sets a variable cost to claimant of zero, and, consequently, the Court Document 6430 establishes definitive procedures for assessment of the loss incurred to the claimant as a direct result of the Deepwater Horizon Spill.

A2.    Therefore, and in consideration of the foregoing, there is no requirement which can manifest from within Doc. 6430 or alien thereto which would require the claimant to submit for review, analysis, and/or loss determination the business tax returns and/or any other business financial data.

## IV    Calculations

**Claim 5095**

Agreement Between Owner and Architect
(Interiors Contract)

| | | |
|---|---|---|
| Amount of Contract | $ | 958,050.00 |
| Variable expenses | $ | .00 |
| Previous Payments | $ | 40,000.00 |
| Amount of Loss | $ | 918,050.00 |

Agreement Between Owner and Architects
(Shell Contract)

| | | |
|---|---|---|
| Amount of Contract | $ | 669,000.00 |
| Variable expenses | $ | 0.00 |
| Previous Payments | $ | 30,000.00 |
| Amount of Loss | $ | 639,000.00 |

---

10  Doc 6430-12 4E. A. Eligibility.  This Addendum sets forth the exclusive compensation methodology for business claimants that provide appropriate documentation and which establish causation by demonstrating (a) a Spill-Related Cancellation pursuant to Causation for Business Economic Loss Claims Section II.D or Section III. D, or (b) the Modified V-Shaped Revenue Pattern *and* a contract cancellation pursuant to Causation for Business Economic Loss Claims Section II.B or Section III.B.

11  Doc 6430-12 4E, B.  Definitions.  1. A "Canceled Contract" shall be a contract (I) which was in place as of April 20, 2010, (ii) to be performed between April 21, 2010 and December 31, 2010, (iii) which was canceled between April 21, 2010 and December 31, 2010, (iv) which the claimant was unable to replace on the same or similar terms between April 21, 2010 and the date the claimant's claim was filed, and (v) for which causation was established pursuant to the provisions of Causation for Business Economic Loss Claims specified in Addendum Section A above[1].  (footnote 1) As used in this Addendum, "contract" shall refer to agreements entered in the normal course of business and shall specifically exclude contracts for sale of real property, fixed assets, non-operating assets, or for all or a portion of the business itself.

12  A contract termination was included with the filing of the claim.

**Claim 9327**

Agreement Between Owner and Architect
(Interiors Contract)

| | | |
|---|---|---|
| Amount of Contract | $ | 474,546.00 |
| Variable expenses | $ | 0.00 |
| Previous Payments | $ | 50,000.00 |
| Amount of Loss | $ | 424,546.00 |

Agreement Between Owner and Architect
(Shell Contract)

| | | |
|---|---|---|
| Amount of Contract | $ | 418,647.00 |
| Variable expenses | $ | 0.00 |
| Previous Payments | $ | 50,000.00 |
| Amount of Loss | $ | 368,647.00 |

**Claim 9328**

Agreement Between Owner and Architect
(Interiors Contract) (not in place at time of DWH Spill)

| | | |
|---|---|---|
| Amount of Contract | $ | 1,840.000.00 |
| Variable expenses | $ | 0.00 |
| Previous Payments | $ | 0.00 |
| Amount of Loss | $ | 0.00 |

Agreement Between Owner and Architect
(Shell Contract)

| | |
|---|---|
| Amount of Contract | $ 2,720.000.00 |
| Variable expenses | |
| Previous Payments | |
| Amount of Loss | $ 2,720,000.00 |

| | |
|---|---|
| Total Loss to Claimant[13] | $ 5,070,243.00 |

---

13  Doc 6430-12 (5): Calculate Total Compensation Related to the Canceled Contract or Canceled Reservation: "Spill-Related Cancellation Compensation" shall be compensation for the Canceled Contract or Canceled Reservation, net of amounts received in connection with any Replacement Contract(s) or Replacement Reservation(s), as applicable, and shall be calculated as follows: (a) The Claimant's Lost Contract Profit/Lost Reservation Profit (calculated in Step 2), less (b) Any Replacement Contract Profit or Replacement Reservation

(All Claims)

**Industry Multiple Factor** = 5.0
8712 Architectural Services (Gen SIC Code = 87)

The values shown above are net contractual loss representing the amount the architect would have been paid should the Deepwater Horizon Spill not occurred.

**V       Claim Event History**

**Claim 5095**

| | |
|---|---|
| Claim Form Submitted | 06/06/2012 |
| Claim Form Unlocked | 06/11/2012 |
| Claim Form Submitted | 06/11/2012 |
| In Claims Review | 09/12/2012 |
| Incompleteness Notice | 10/27/2012 |
| Response to Incompleteness Notice Received | 11/01/2012 |
| In Claims Review | 11/01/2012 |
| Response to Incompleteness Notice Received | 11/29/2012 |
| In Claims Review | 11/29/2012 |
| Claim Closed | 11/29/2012 |
| Response to Incompleteness Notice Received | 11/30/2012 |
| In Claims Review | 11/30/2012 |
| Claim Status                   In Accountant Review[14] | 11/30/2012 |
| Response to Incompleteness Notice Received | 12/04/2012 |
| In Claims Review | 12/04/1012 |
| Response to Incompleteness Notice Received | 12/06/2012 |
| Claim Closed[15] | 12/17/2012 |

**Claim 9327**

| | |
|---|---|
| Claim Form Submitted | 06/11/2012 |
| In Claims Review | 09/12/2012 |
| Incompleteness Notice | 10/27/2012 |
| Response to Incompleteness Notice Received | 11/01/2012 |
| In Claims Review | 11/01/2012 |
| Claim Closed | 11/28/2012 |
| Response to Incompleteness Notice Received | 11/29/2012 |
| In Claims Review | 11/29/2012 |
| Duplicate Claim Notice | 11/29/2012 |
| Response to Incompleteness Notice Received | 11/30/2012 |

---

Profit (Calculated in Step 4), less (c) Any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process compensating for the loss, as well as VoO Settlement Payment Offset and VoO Earned Income Offset related to the Canceled Contract or Canceled Reservation.   An **RTP** shall apply to claimant's spill-Related Cancellation Compensation consistent with the claimant's industry and/or zone.

14  This claim status is found on the web portal under Notices, Claim Types, as of 11/30/2012, however, on the same page under Current Claim Status the claim shows to be in "Claimant Review Steps".

15  Claimant was informed by telephone from Esther-65955 the three claims were consolidated into one claim.

In Claims Review                                                    11/30/2012
Claim Status                    In Accountant Review[14]            11/30/2012
Response to Incompleteness Notice Received                         12/04/2012
In Claims Review                                                    12/04/1012
Response to Incompleteness Notice Received                         12/06/2012
In Claims Review                                                    12/06/2012

**Claim 932**

Claim Form Submitted                                               06/11/2012
In Claims Review                                                    09/12/2012
Incompleteness Notice                                              10/27/2012
Response to Incompleteness Notice Received                         11/01/2012
In Claims Review                                                    11/01/2012
Claim Closed                                                       11/28/2012
Response to Incompleteness Notice Received                         11/29/2012
In Claims Review                                                    11/29/2012
Duplicate Claim Notice                                             11/29/2012
Response to Incompleteness Notice Received                         11/30/2012
In Claims Review                                                    11/30/2012
Claim Status                    In Accountant Review[14]            11/30/2012
Response to Incompleteness Notice Received                         12/04/2012
In Claims Review                                                    12/04/1012
Response to Incompleteness Notice Received                         12/06/2012
Claim Closed[16]                                                    12/17/2012

**VI    Zone**

Claim 5095

    Address:    16581 Perdido Key Drive
                  Lot or reference #06-4S-32-2850-000-000,
                  Escambia County, Florida
                  State Road 292
    In accordance with Zone Maps provided on the web site for
    Deepwater Horizon Claims Center this property is located in Zone A.

Claim 9327

    Address:    1300 Beach Boulevard
                  Longbeach, Mississippi
    In accordance with Zone Maps provided on the web site for
    Deepwater Horizon Claims Center this property is located in Zone A.

Claim 9328

    Address:    659 East Beach Boulevard

---

16  Claimant was informed by telephone from Esther-65955 the three claims were consolidated into one claim.

Biloxi, Mississippi
In accordance with Zone Maps provided on the web site for
Deepwater Horizon Claims Center this property is located in Zone A.

The address of each claim establishes the business location for the respected claim.  Without the DWH Spill the contracts would have been completed and the result would have been a large employment opportunity for the specific site and surrounding area.  Further, the responsibilities of the claimant and contractual obligations were and would have remained "site specific" should the contracts not been canceled as a result of the DWH Spill.  Each claim includes a satellite image of the specific site and drawings, inclusive of, but, not limited to, site plans which identify the exact location of the business opportunity, as well as, which represents the specific site where the DWH Spill-related economic loss occurred which in turn gives rise to the filing of the subject claims.  The claimant examines the site, conducts meetings at the site, orders specific activities to be executed at the site, such as, surveys, soil borings, soil analysis determinations, site specific utility analysis, habitat inspections and determinations and evaluates the site relationship to the surrounding area to make determinations specific to the contractual obligations of the claimant, consequently, the site locations establishes it's own identity for the purpose of evaluating the zone category for RTP[17] analysis in compliance with the Court documents.  Essentially, everything the claimant/architect does is site specific and is an integral part of the specific site location.



With regards,

H. Freddie Boothe, Jr., Architect
State License No. 2206

---

17  As set forth in the Deepwater Horizon Economic and Property Damages Settlement Agreement, an RTP (risk transfer premium) shall mean the amount paid to a claimant for any and all alleged damage, including potential future injuries,damages or losses not currently known, which may later manifest themselves or develop, arising out of , due to, resulting from, or relating in any way to the Deepwater Horizon Incident, and any other type or category of damages claimed, including claims for punitive damages.  To the extent that an RTP is to be paid to a Claimant, it shall be a factor which is multiplied with those Compensation Amounts which the Exhibits to this Agreement specify are eligible for an RTP to calculate a sum which is added to the Compensation Amount paid to the Claimant.

**EXHIBIT R3**



14248 HIGHWAY 1077
FOLSOM, LOUISIANA 70437
PHONE: 504-473-9502

October 28, 2012

Claimant ID: 10011039
Claim ID 5095,9327 and 9328
Business Name:    H. Freddie Boothe, Jr., Architects
                  14248 Highway 1077
                  Folsom, Louisiana 70437
Claim Type:  Business Economic Loss
NAICS Code/Desc: **541310**
Industry Designation: **Architectural Services**
Zone: **A**
Causation Presumed: **Yes**

Incompleteness Reasons

BEL-I-01        The business filed a claim for Economic Loss, but did not provide its entire federal tax return for 2010. If you do not have copies, you may request a copy of your federal tax return from your accountant. If you do not have an accountant or if your accountant does not have a copy of your federal tax returns, you can go online at IRS.gov and request a free transcript of your 2010 tax return using Form 4506-T by clicking on Order a Return or Transcript under Tools and selecting Form 4506-T. Form 4506-T is available at http://www.irs.gov/pub/irs-pdf/f4506t.pdf. You can send us a copy of those transcripts.

Economic Loss:    The federal tax return does not indicate the billings to clients which were earned in 2010 but, not  paid in 2010. Actually there is no federal tax return in the name of the business.  This is a professional practice of architecture not a hotel.  By law the architect is required to place the word architect behind the name of the licensed person, i.e., H. Freddie Boothe, Jr., Architect.   The billings and/or earnings of claimant is established through the contract amount and the amount paid on the contract with the difference representing the amount the claimant earning and/or billed (invoiced) in the time period.  The economic loss of the business which filed a claim(s) subject to and resulting directly from the DWH Spill is the amount of the contract, which is included in the claim, subject to and reduced by the amount paid on the contract prior to the DWH Spill which is posted on the Invoice to the Owner, which is also included on the claim.  The Court documents specifically define procedures for establishing a loss when a contractual obligation is canceled as a direct result of the DWH Spill.  The income indicated on the federal tax return does not present a true picture of the billings in the time frame established for the claimant, consequently, has no bearing on the loss amount in such cases.   Therefore, the income of the claimant for the year

2010 will have no bearing on the amount of loss establishment.   Hypothetically, should the federal tax return show an income of $5000000 with no attributable expenses or merely $1 of income with $1000000 of expenses this information would have no bearing on the amount of the economic loss of the claimant. Further, the Document 4030-12, Exhibit 4E provides as follows:

**Addendum to Compensation for Business Economic Loss Claims:**
**Compensation for Spill-Related Cancellations**
**A. Eligibility**

This addendum sets forth the exclusive compensation methodology for business claimants that provide appropriate documentation and which establish causation by demonstrating (a) a Spill-Related Cancellation pursuant to Causation for Business Economic Loss Claims Section II.D or Section III.D, or (b) the Modified V-Shaped Revenue Pattern *and* a contract cancellation pursuant to Causation for Business Economic Loss Claims Section II.B or Section III.B.

**B. Definitions**

1. A "Canceled Contract" shall be a contract (i) which was in place as of April 20, 2010, (ii) to be performed between April 21, 2010 and December 31, 2010, (iii) which was canceled between April 21, 2010 and December 31, 2010, (iv) which the claimant was unable to replace on the same or similar terms between April 21, 2010 and the date the claimant's claim is filed, and (v) for which causation was established pursuant to the

provisions of Causation for Business Economic Loss Claims specified in Addendum Section A above.1

> (1 As used in this Addendum, "contracts" shall refer to agreements entered in the normal course of business and shall specifically exclude contracts for the sale of real property, fixed assets, nonoperating assets, or for all or a portion of the business itself.)

**C. Compensation:**

Compensation for the claimants listed in Addendum Section A above shall be calculated as follows:

**1. Determine lost revenue from the Canceled Contract or Canceled Reservation**

a. "Lost Contract Revenue" shall be the amount that a claimant would have been paid by a customer between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill. Lost Contract Revenue shall be determined based on information set forth in the Canceled Contract, and, if necessary, other contemporaneous documentation provided by the claimant, such as purchase orders or shipping schedules. Lost Contract Revenue may include any food, beverage, or other ancillary revenue that the claimant can demonstrate would have been expected in connection with the Canceled Contract.

**2. Determine lost profit associated with the Canceled Contract or Canceled Reservation**

"Lost Contract Profit" shall be the amount of variable profit that a claimant would have earned between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill.

BEL-I-02    The business filed a claim for Economic Loss, but did not provide its entire federal tax return for the claimed Benchmark Period. If you do not have copies, you may request a copy of your federal tax return from your accountant. If you do not have an accountant or if your accountant does not have a copy of your federal tax returns, you can go online at IRS.gov and request a free transcript of your tax return for all years in your claimed Benchmark Period using Form 4506-T by clicking on Order a Return or Transcript under Tools and selecting Form 4506-T. Form 4506-T is available at http://www.irs.gov/pub/irspdf/f4506t.pdf. You can send us a copy of those transcripts.

Refer to BEL-I-01  In addition:  The benchmark period, believed by the claimant

to be 2009, federal tax return does not present the true picture of the earning and/or invoiced amount of the claimant to clients. The claimant invoiced for work performed in 2009 and a portion of the invoice amount was not tendered, therefore, in March of 2010 the claimant filed suit in 22nd Judicial District Court For the Parish of St. Tammany, an excerpt as follows:

22ND JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY
STATE OF LOUISIANA

NO. DIVISION " "

HOUSTON F. BOOTHE, JR.
VERSUS
DAVID ACQUISTAPACE, GARRETT ENTERPRISES, INC.,
AND A & S CHALMETTE, L.L.C.

FILED:_____            _____
                                              DEPUTY CLERK

PETITION ON OPEN ACCOUNT

The Petition of Houston F. Boothe, Jr., a natural person of the age of majority and who is domiciled in the Parish of St. Tammany, with respect, asserts as follows:

1

Made defendants herein are the following:

David Acquistapace, a natural person of the age of majority and who is domiciled in the Parish of St. Tammany, State of Louisiana;

Garrett Enterprises, Inc., a business corporation organized pursuant to the Laws of the State of Mississippi with its principal place of business located in Picayune, Mississippi; and

A & S Chalmette, L.L.C., a limited liability company organized pursuant to the laws of the State of Louisiana and with its principal place of business located in the Parish of St. Tammany, State of Louisiana.

2

This Court has jurisdiction over defendant, Garrett Enterprises, Inc., pursuant to Louisiana Revised Statute § 13:3201(A)(1) because Garrett Enterprises transacted business in this State and also contracted for the performance of service which were rendered by plaintiff in this State.

3

Venue is correct in this Parish pursuant to article 42 of the Louisiana Code of Civil Procedure because David Acquistapace is domiciled in the Parish of St. Tammany, State of Louisiana.

4

Venue is also correct in this Parish pursuant to article 74.4 of the Louisiana Civil Code because the services which form the basis of this suit on open account were performed in the Parish of St. Tammany, State of Louisiana.

5

Defendants are truly and justly indebted to the plaintiff jointly, severally and solidarity for the following reasons, to wit:

**THE ACCOUNTS**

6.

Plaintiff is an architect properly licensed by the State of Louisiana, and, at all times herein, plaintiff's architectural license was in good standing and continues to be in good standing.

7.

Beginning in March, 2006, plaintiff was hired by defendants, and each of them, to perform architectural and consulting services regarding repairs and litigation matters for several properties owned by defendants and/or each of them.

8.

The projects upon which plaintiff performed architectural and/or consultation and/or litigation expert witness services are listed as follows:

Chalmette Center damage evaluation as expert. Fee due and owing: $180,000.00.

Northgate Shopping Center damage evaluation as expert. Fee due and owing $32,000.00.

Drawings for the Pearl River Shopping Center assessment. Fee due and owing $45,000.00.

Design drawings for Highway 59/LA 1088 Shopping Center. Fee due and owing $52,500.00

Professional Services for Picayune interior work addition (shopping center). Fee due and owing $14,000.00.

Picayune building expansion plans. Fee due and owing $35,000.00.

Unpaid work for Picayune project. Fee due and owing $56,000.00; and Work related to change in scope of work for Picayune project. Fee due and owing $56,000.00.

9.

The total amount now due and owing plaintiff is $458,750.00, exclusive of interest and attorneys' fees.

10.

Plaintiff performed all, or the practically all, services in St. Tammany Parish.

(the above is an excerpt from the Court record and a complete document can be provided to establish invoiced work during the benchmark period.)

Claimant stated on the claim form filed the benchmark period invoiced amount was $600,000.00.  The invoiced amount established by the above litigation is $458,750.00 and the difference is the amount received from various clients during the benchmark period.   Consequently, without the invoiced amount established above, the benchmark period would show an erroneous work capacity of the claimant.  Any tax return bearing the name, H. Freddie Boothe, Jr., would be inflated in regards to establishing an income level as the federal tax return may include the income of the spouse, therefore, presenting a level of income higher than the income of the business entity.    The only method is presenting the invoiced amounts for the time period in question.

BEL-I-05      The business filed a claim for Economic Loss, but did not provide its federal tax return for 2011. If you do not have copies, you may request a copy of your federal tax return from your accountant. If you do not have an accountant or if your accountant does not have a copy of your federal tax returns, you can go online at IRS.gov and request a free transcript of your 2011 tax return using Form 4506-T by clicking on Order a Return or Transcript under Tools and selecting Form 4506-T. Form 4506-T is available at http://www.irs.gov/pub/irs-pdf/f4506t.pdf. You can send us a copy of those transcripts.

Refer to BEL-I-01 and BEL-I-02

BEL-I-06      We are unable to determine the monthly revenues and expenses of the business for 2011. The Settlement Agreement requires monthly profit and loss statements detailing revenues and expenses for each month in 2011. If you do not have this information, you may be able to get it: (a) from your financial advisor or accountant; (b) by reviewing your bank account statement; or (c) by reviewing annual or quarterly statements to calculate the missing information.  The Settlement Agreement requires this information in the form of a monthly profit and loss statement, detailing revenue and expenses.

Refer to BEL-I-01 and There is no "loss" involved in the engagement of this business.  The claimant charges a fee, generally by contract, for professional services rendered.  In this case, the claimant/architect works alone, without a staff, incurs no expense other than the $75.00 yearly charge to renew the professional license.  What is hard about this?

BEL-I-07      We are unable to determine the ownership and structure of the business. We need to know who owns the business. If you do not have copies of this information, you may be able to get them from: (a) your company's organizational documents; or (b) your company's website.

Ownership:   The claimant submitted with the claim a copy of the registration to practice architecture issued by the Louisiana State Board of Architectural Examiners.   This document indicates the named party, Huston Freddie Boothe, Jr. is the holder of the license to practice architecture.   Under State Law, RS. 37, Chapter 3, as Amended June, 2012, only a person duly licensed may practice architecture within the State of Louisiana.   This is true for any State within the confines of the United States of America.    To verify this information, if verification is needed, Contact, Ms. Teeny Simmons, Executive Director, Louisiana State Board of Architectural Examiners at 225-925-4802.

Correspondingly:  The **Owner of the business** filing the instant claim(s) is Huston Freddie Boothe, Jr., Architect.

Structure of Business:  The following excerpt from La. RS. 37, Chapter 3 defines the structure of the practice of architecture (the business):

§141.Policy and Definitions

A. In order to safeguard life, health, and property and to promote the public welfare, the practice of architecture in this state is reserved to those persons who have the proper qualifications and have been registered by the board.

B. As used in this chapter:

(1)"Board" means the State Board of Architectural Examiners.

(2)"Architect" means a person who is technically and legally qualified to practice architecture.

(3)"The practice of architecture" is the rendering or offering of the services specified in this Paragraph in connection with the design, construction, enlargement, or alteration of a building, a group of buildings, or the space within and surrounding buildings which have human occupancy or habitation as their principal purpose. Such services shall include the following: planning; providing preliminary studies, designs, drawings, specifications, and other technical submissions; administration of construction contracts; and the coordination of any element of technical submissions prepared by others, including but not limited to engineers and landscape architects, as appropriate. The practice of architecture shall not include the practice of engineering as defined in R.S. 37:682; however, a registered architect may perform such engineering work as is incidental to the practice of architecture.

C.The definition of the practice of architecture set forth in Paragraph (B)(3) of this section may include, but shall not be construed as precluding non-licensed persons from performing the following services: project development; feasibility studies; planning; energy consumption analysis; and interior design.

At no time during the thirty-four year period during which the claimant/architect has practiced architecture has the claimant/architect, Huston Freddie Boothe, Jr. deviated from the law cited above in the practice of architecture, inclusive of the time period leading up to, during and after the DWH Spill.  Therefore, it is safe, logical, and intellectually astute to rely on the fact the "business" structure mimics the laws which regulate the practice of architecture.

Corporation:    No,  this  is  not  an  incorporated  business  entity. Claimant/architect is an individual who practices architecture under the terms and conditions set forth in all laws, rules and regulations having jurisdiction.

Physical Structure:  The claimant/architect has an established office at

14248 Highway 1077, Folsom, Louisiana 70437 with service entrance at 58974 Faucheux Road, Folsom, Louisiana 70437. Telephone: 504-473-9502. There are no employees, no overhead expenses, no land based telephone only the architect and necessary equipment required for the practice of architecture, i.e., computerized workstations; necessary software programs; reference manuals and related written publications, technically data delineating the subject site, and whatever else the architect deems appropriate to insure the intellectual practice of architecture under all laws and regulations having jurisdiction.

BEL-I-12      We are unable to determine the Economic Loss Zone of the business. We cannot evaluate your claim in the way the Settlement Agreement requires us to do unless we know the physical location of your business. The Settlement Agreement does not allow us to use a Post Office box address in order to determine the Economic Loss Zone of your business. If you are unsure of the physical address of your business, you may be able to get this information from: (a) utility bills; (b) your company's website; or (c) your company's state or federal tax returns.

Economic Loss Zone:  Each claim included a site map, address and/or picture of the site which established the exact location of economic loss zone of each claim as submitted.      Each claim includes a graphic delineation prepared by the claimant/architect which firmly locates the site affected by the DWH Spill.  All claims are located on a site where the waters of the Gulf of Mexico collide with, splash upon, and/or caress the sands of the beach defining the limits of the Continental United States of America and, consequently, establish the Economic Loss Zone as "Zone A" in complete accordance with all data and maps prepared and published in the Court Doctrine which regulates these claims resulting from the DWH spill.  Each claim includes a satellite image of the exact site upon which the business entity, "Huston Freddie Boothe, Jr., Architect" was performing the service(s) of the business as established by governing laws and defined as the practice of architecture.

BEL-I-13      We are unable to determine the nature of the business. We cannot evaluate your claim in the way the Settlement Agreement requires us to do unless we know what functions your business performs on a day to day basis. If you are unsure of the nature of your business, you may be able to get this information from: (a) your company's website; (b) your company's mission statement; or (c) your company's NAICS code. You may locate your company's NAICS code by performing a search on-line using www.census.gov/naics. Send us a description of the functions that your company performs.

Nature of Business:      The nature of the business is completely defined in BEL-I-07 above.   What is so difficult about the nature of the practice of architecture?  First, the architect must have a client, a client is a person and/or entity with a problem which deals with the human environment.  Second, the client and the architect agree as to the terms and conditions as set forth in an Agreement Between Owner and Architect under which the architect will set about solving the problems delineated which deal with the relationship of the human environment and the client's desire to   alter the natural environment for the purpose of human habitation.  Third, the architect will prepare contract documents which completely delineate the structure to be placed in the natural environment for the purposed established in the "contract" between the parties to satisfy the desires of the client for human habitation of the subject site.  In performing the duties inherent within the practice of architecture, the architect may be forced to include provisions in the solution to the client's problem which include others

which may inhabit the site with the anticipated "human" habitation.  Such is the case in Claim 5095 for Claimant 100011039.  The subject site was inhabited by a "protected beach mouse" which lived in the root structure of the vegetation which also inhabited the site.  Consequently, the architect was required to design a structure which would have minimal impact on the natural "protected" environment of the protected beach mouse, which solution required US Government approval. Fourth, the architect will secure a price (bid) for another entity to perform the duties required in constructing the facility to be used for human habitation under the terms and conditions established and which meet the parameters of the architectural solution to the client's problem.  Fifth, At the end of construction and acceptance the architects role extinguishes.  Now, this is all good unless, and for whatever reason, there is an oil spill in the Gulf of Mexico which allows a pollutant to encroach upon the shore of the subject site which in turn causes a manifestation of events which bring about the cancellation of the project.  Not to mention, as in the case of Claim 5095, the "spill" inadvertently brings about a series of events which destroys the natural habitat of the few "protected beach mice" which manage to survive being submerged in a deadly pollutant and may take years to re-establish itself on the subject site.

BEL-I-15    We are unable to determine the monthly revenues and expenses of each Facility of the business for 2010. The Settlement Agreement requires profit and loss statements detailing revenues and expenses for each Facility of the business for every month in 2010. If you do not have copies of these documents, you may be able to get them: (a) from your financial advisor or accountant; (b) by reviewing your bank account statement; or (c) by reviewing annual or quarterly statements to calculate the missing information.

Profit and Loss Statement:  Refer to BEL-I-01

BEL-I-16    We are unable to determine the monthly revenues and expenses of each Facility of the business for your Benchmark Period. The Settlement Agreement requires profit and loss statements detailing revenues and expenses for each Facility of the business for each month in the claimed Benchmark Period. If you do not have this information, you may be able to get it: (a) from your financial advisor or accountant; (b) by reviewing your bank account statement; or © by reviewing annual or quarterly statements to calculate the missing information.

Profit and Loss Statement:  Refer to BEL-I-01

---

On October 24, 2012 the claimant posted on the web portal  a letter inadvertently dated October 29,2012, in which a brief explanation of the practice of architect as it relates to the subject claims of the claimant in an attempt to determine if there was a problem with the claim.  On October 28, 2012 the claimant received a detailed notice regarding deficiencies in the claim as presented.  After review of the section Incompleteness Reasons the claimant offers this writing in an effort to clear up some of the issues.  However, the issues presented appear to be nothing more than a forwarding of the issues presented under GCCF claim response.

Further, claimant has made many attempts to contact the Claim Review Office via telephone to no avail.  Why is there no one available, within a reasonable time frame up to an hour of on-hold time,  to discuss matters which involve the claim(s)?  Claimant has recently visited the Claims center in New Orleans East and there is no one there who can do anything more than claimant can do by visiting the web portal.  Why are the questions presented by claimant through the

web portal unanswered?

And, lastly, Why did it take over a month to have the "notice" uploaded for claimant review.?   The notice is dated 9/14/2012 and was received via email on 10/27/2012.

Now, if for some reason, which totally escapes me, we are at an impasse, I would like to know the avenue(s) available to file an appeal on the issues presented and contained herein.

With regards,

H. Freddie Boothe, Jr., Architect
State License No. 2206
www.freddieboothe.com



© TM



14248 HIGHWAY 1077
FOLSOM, LOUISIANA 70437
PHONE: 504-473-9502

November 7, 2012

Claimant ID: 10011039
Claim ID 5095,9327 and 9328
Business Name:       H. Freddie Boothe, Jr., Architects
                     14248 Highway 1077
                     Folsom, Louisiana 70437

Claim Type:   Business Economic Loss
NAICS Code/Desc: **541310**
Industry Designation: **Architectural Services**
Zone:  **A**
Causation Presumed: **Yes**

To the Reviewer;

On the date first appearing above, I received an email exposing an "Incompleteness Notice" which, of course, I logged into my portal to review the document and consequently a review date appear on the portal.

On October 29, 2012 I uploaded through the portal a response to the incompleteness notice I received on October 27, 2012 in regards to the condition of the review and possible shortcomings.  The incompleteness notice I received on November 7, 2012 is dated October 27, 2012, therefore, I am left to ponder if the information I uploaded is not satisfactory.  However, when I read the contents of the response uploaded there are answers to the same questions contained in the notice I received today.

   For Instance:

        1, 2, and 3     Items 1, 2, and 3,  "Tax Returns"  I fully explained in the response dated October 29, 2012.  There is no tax return for "this business entity" as it is not a typical business in the true sense of the meaning.  This business entity is engaged in the practice of architecture under all laws which govern and has jurisdiction. Any and all money earned in this business entity passes straight through to the architect and he then combines these earnings with other earnings from other entities and much to his regret the registered nurse spouse to create an earning amount   which is a composite of entities.  Therefore, an individual return would show a hugely inflated earning for which there would be absolutely no way for a reviewer to separate to give a picture of the

business entity which filed these claims.  Further, I uploaded an excel file which did show a   earnings for the time periods in question as well as billings which were not yet paid to indicate and establish a true picture of what was taking place during the time frames in question.

4.    Item 4,   …. There are no expenses,  this is fully explained in the October 29, 2012 upload.  I work alone, don't have and don't want a land based telephone, office is completely paid for and is on the same property as the residence with an electrical branch which extends from the house panel, so no utility bill.  There is no charge for the cesspool to handle the human waste and the water well pump is on the house meter.  There is no secretary, actually, no employees at all.  I no longer buy paper, pencils, erasers and the like as all the work is done on a workstation which I bought from moneys earned alien to the claim(s).  I even complete my CEU's online for free.  There is no company vehicle to suck down gas and require upkeep and none is required as there is little need to visit the site until the construction process begins, which will not happen in the case reflected by the claims because the projects were canceled because of the little incident (spill).  Now, how is it the reviewer(s) are unable to determine the monthly revenues and expenses of the business entity, as, I uploaded a clear and precise document which attest to the revenue and stated there were no expenses.  Actually, I cannot find a sound reason as to why this claim is reviewed under Exhibit D as Exhibit E is much more appropriate as a contract exist for each claim and a cancellation was included in the claim filling and the Court documents is quite clear on how to determine the loss in such cases.

5.    Item 5,    "Documents reflecting the business structure and ownership of the business, such as Articles of Incorporation, shareholder list(s), or partnership or limited partnership agreements."  I included in the response to deficiencies on October 29, 2012 a copy of a portion of the law which governs and explains the practice of architecture and further stated, I had adhered to the context of the law which has jurisdiction over the practice of architect for the past thirty-four years.  I also included in the claim package a copy of the registration issued by the State of Louisiana attesting to the legal right to practice architect of the party named on the certificate, (H. Freddie Boothe, Jr., Architect).  There are no Articles of Incorporation, no partnership agreements of any type.  I, H. Freddie Boothe, Jr., Architect is the only live human involved in the "business" which has filed these claims.

6.    Item 6, "Documents maintained in the ordinary course of business showing the physical location of the business at the time of the spill."  This information is included in the claim package in several locations, i.e., included in the contract, included in the drawings submitted complete with site plans which identify without question the physical location of the "business", this is true for each claim, satellite  images are included in the claim package which positively locate the business site and establishes a zone – Zone A, for each claim.

7.    Item 7,    "Documents maintained in the ordinary course of business showing the type of business in which the business was engaged at the time of the Spill, including a valid 2007 NAICS code."  The claim(s) contains approximately one hundred drawings which attest to the type of documents maintained in the ordinary course of business which clearly show the type of business the "architect" was engaged in at the time of the little incident (spill).  The response uploaded on October 29, 2012 contained on the first page immediately below the letterhead the NAICS code (**541310**) and industry designation of "Architectural Services."    Again, the response of October 29, 2012 contained an excerpt from the State law which governs the practice to architecture.

There is nothing more I can add to this very detailed and explicit explanation and description of functions undertaken in the course of doing the business of architecture. Further, each claim contained a contract between the Owner and the Architect which completely explains the responsibility of the architect as his work relates to each of the claims.

        8.    Item 8, "Separate profit and loss statements that were prepared and maintained in the normal course of business for each facility during 2010."    This is alien to the practice of architecture and the nature of my business. You will note after "review" of the contracts contained in the claim(s) all of the projects were for one owner and all the work was performed by one person, the architect, H. Freddie Boothe, Jr. Further, in the response of October 29, 2012 I explained there is no profit and loss statements. The only loss I can suffer is if a client doesn't pay me..... this would be my only loss, the amount of money not paid to me for professional services preformed. What is hard about this? However, I suppose I could produce a profit and loss statement which would show the amount of the contract as profit and the number "zero" as a loss factor. I may go a year or more without receiving any payments and then get a nice check at the end of the project, there is no monthly accounting simply because none is required in the normal course of performing my business. I included a spreadsheet which gave testimony to amount of profit for each month for the years 2009, 2010, and 2011 in the upload on October 29, 2012.

Now and in consideration of the foregoing, I take it the response to deficiencies was not accepted and, therefore, if we are at an impasse, as it appears, don't wait until November 26, 2012 to deny the claim(s) just execute a denial upon reading this document and, consequently, allow me an early start on filing an appeal and just maybe the appeal judge will more fully understand the practice of architecture. I really had little hope of this review process going to fruition as I have been told the large claims with a huge mass of documentation get put on the side anyway. And, let's not mention there has not been one answer to any of the questions I have uploaded through the portal.

If the reviewer would go to my website he/she would see several other larger projects which were executed during this same time frame. One has a fee of $14,333,271.00 and another a fee of $115,456,815.00 US dollars. What is this going to do to your little accounting for the business entity? Why is it, when a person tries to be fair, honest and above board it comes back to haunt him?

With regards,

H. Freddie Boothe, Jr., Architect
State License No. 2206



www.freddieboothe.com        TM