# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois  60654

Andrew Langan, P.C.
To Call Writer Directly:
(312) 862-2064
andrew.langan@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

April 10, 2013

**Via E-mail**

The Honorable Carl Barbier
United States District Judge
U.S.D.C. for the Eastern District of Louisiana
500 Poydras Street, Room C256
New Orleans, Louisiana 70130

**RE:     MDL 2179 - *In re: Deepwater Horizon***

Dear Judge Barbier:

BP proposes to play in its case-in-chief a six-minute clip of the videotaped deposition of Mr. Craig Gardner and an eleven-minute clip from the videotaped deposition of Mr. Greg Garrison. As the Court will recall, Mr. Gardner supervised post-incident cement testing that Chevron performed on behalf of the National Commission, and Mr. Garrison supervised post-incident cement testing that Oilfield Testing & Consulting (OTC) performed on behalf of the Joint Investigation Team. BP proposes to play excerpts from Mr. Gardner's and Mr. Garrison's depositions in response to evidence that Halliburton and the United States have offered during the trial.

The United States has objected to portions of BP's proposed designations, arguing that they reflect opinion testimony that should be excluded under this Court's motion *in limine* order relating to Mr. Garrison and Mr. Gardner. (Rec. Doc. 5810.) Halliburton has also objected to portions of the testimony. BP has met and conferred with counsel for Halliburton and the United States, but the parties have been unable to reach an agreement.

As explained below, BP's proposed video designations should be admitted because Halliburton and the United States have opened the door to the designated testimony. Significantly, Halliburton played, without objection, video clips containing opinion testimony from Mr. Garrison's deposition during its opening statement and from both Mr. Garrison (14-minute clip) and Mr. Gardner (10-minute clip) during its case-in-chief. Halliburton also questioned the United States' cement expert Glen Benge about Mr. Garrison's testimony. The United States introduced the entire OTC report prepared by Mr. Garrison's company (OTC), and approved the video clips that Halliburton played during its case-in-chief. In addition, allowing

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

# KIRKLAND & ELLIS LLP

April 10, 2013
Page 2

opinion testimony from Mr. Garrison and Mr. Gardner is appropriate in light of Halliburton's conduct during discovery.

For the Court's convenience, BP's proposed excerpts are attached as Exhibits A (Garrison) and B (Gardner), and the portions to which the United States objects are highlighted in yellow.  Halliburton has objected only to 21 lines of Mr. Garrison's deposition, which are part of the United States' objections.  (Ex. A, 153:22-154:2; 154:5-10; 272:8-18.)    The clips Halliburton played during trial are attached as Exhibits C (trial transcript excerpt from Halliburton's opening statement), D (Halliburton's related opening slides), E (Garrison clip played in case-in-chief), and F (Gardner clip played in case-in-chief).

## I.      Halliburton And The United States Have Opened The Door To Opinion Testimony Of Mr. Garrison And Mr. Gardner.

During trial, Halliburton and the United States have affirmatively offered opinion testimony from Mr. Garrison and Mr. Gardner, including their conclusions about their post-incident cement testing, in support of their case.

*First,* Halliburton repeatedly referenced the opinions of these witnesses during Mr. Godwin's opening statement.  (*See* Ex. C, Trial Tr. 182:10-183:15, 184:3-185:17.)  Halliburton cited their opinions on zonal isolation, the use of defoamers, and the variability of cement.  (*See* Ex. D, D-8023, D-8024.1, D-8008.1.)  Halliburton also played a portion of Mr. Garrison's deposition in its opening statement that included the following opinion testimony on the variability of rig blend:

> Q.  Okay.  And just not to put too fine a point on this, the concern is that if we were going to have a production casing job and we know that there is a blend out on the rig, we would not try to replicate that blend in the lab and test it in the lab and transpose those results to what we expect to happen with the rig blend, would we?
>
> A.  No, we wouldn't.
>
> Q.  There could be differences, increases or decreases in humidity during the transport process, correct?
>
> A.  Yes.
>
> Q.  And each of those things has the effect to alter the chemical characteristics of the actual blend itself, correct?

**KIRKLAND & ELLIS LLP**

April 10, 2013
Page 3

    A. Yes, it can.

(Ex. D, D-8008.2; *see also* Ex. C, Trial Tr. 184:18-185:8.)

    ***Second***, the United States and Halliburton put at issue the opinion testimony of Mr. Garrison and Mr. Gardner during their questioning of Glen Benge, the United States' cement expert. For example, the United States affirmatively offered into evidence the entire OTC testing report, which provides the basis for Mr. Garrison's opinion testimony, and that report has been admitted. (*See* Rec. Doc. 8890-1 at 9; *see also* Trial Tr. 2324:19-2325:15; TREX-005937.) And Halliburton specifically asked Mr. Benge questions about Mr. Garrison's opinion testimony. (*See* Trial Tr. 2436:17-2437:5, attached as Exhibit G.) Halliburton also asked Mr. Benge questions about the Chevron Report, which provides the basis for Mr. Gardner's opinions. (*See* Trial Tr. 2417:10-19; 2424:9-2425:12; TREX-004572.)

    When BP cross-examined Mr. Benge, Halliburton objected to BP's questioning related to Mr. Garrison's deposition. BP responded by noting that Halliburton had opened the door to questions related to Mr. Garrison's opinions, and the Court overruled Halliburton's objection. (*See* Ex. G, Trial Tr. 2540:10-2543:25.) Significantly, neither the United States nor any other party objected when Halliburton used Mr. Garrison's opinion testimony when cross-examining Mr. Benge. And the United States did not object when BP cross-examined Mr. Benge with Mr. Garrison's opinion testimony. (*See* Ex. G, Trial Tr. 2436:17-2437:5, 2540:10-2543:25 ("Q: And Mr. Garrison, he testified that with respect to his testing, that's the OT&C testing, none of the unset foam slurry tests were stable, correct? A: That is correct.").)

    ***Third,*** during its case, Halliburton played 24 minutes of testimony from the videotaped depositions of Mr. Garrison and Mr. Gardner, containing opinion testimony from both witnesses. (*See* Trial Tr. 6563:5-15, attached as Exhibit H.) Among other opinions, Halliburton offered Mr. Garrison's opinions on the signs of foam instability and whether his testing on the Macondo slurry indicated the unset foam was stable:

    Q. And can rheology also be an indication that the slurry is too thin to be used for foam cement?

    A. I don't think you can say it's too thin for foam. If it's stable, you know, and it meets other placement criteria, then there shouldn't be a problem with -- with that particular slurry.

    ****

    Q. So just circling back, there were only two tests performed on the unset -- or on the Macondo slurry, the unset foam stability test,

## KIRKLAND & ELLIS LLP

April 10, 2013
Page 4

> which you say actually indicates that the unset foam was -- was
> stable, right?
>
> A.   Yes.

(Ex. E, Garrison Dep. 156:13-21, 211:12-18.)

Halliburton's video designations played during trial also included several of Mr. Gardner's opinions related to his cement testing, including his opinions on the variability of cement and the instability of the slurries tested:

> Q.  Okay.  So what I'd like to understand is in -- you know, in your
> opinion, this preference for testing rig samples is primarily in
> response to a concern that there could be variability between
> testing rig samples and any other source of -- and -- of the branded
> cement, correct?
>
> A.  True.
>
> ***
>
> Q.  Okay.  And -- and I would just like to ask you, do -- do you
> believe that the test -- the Report, the testing that was reported in
> the -- in this Report that we've been talking about all day, do you
> believe that it proves that the rig cement was unstable?
>
> A.  "Proves" is a strong word.
>
> Q.  Right.
>
> A. It demonstrates this slurry design as tested with these materials
> was not stable.

(Ex. F, Gardner Dep. 291:2-9, 300:22-301:6.)

Notably, the United States did not object when Halliburton offered opinion testimony from Mr. Garrison and Mr. Gardner in the deposition excerpts Halliburton played at the end of its case.  (*See* Ex. H, Trial Tr. 6563:5-15.)  In fact, the United States agreed to Halliburton's use of this opinion testimony, approving of the submitted Garrison videos after a meet-and-confer and never objecting to the Gardner video.  (*See* Email from Alan York to Judge Shushan, et. al, March 25, 2013, attached as Exhibit J.)

At this point in the trial, Halliburton and the United States have affirmatively placed the opinion testimony of Mr. Garrison and Mr. Gardner into the record in multiple places in support

# KIRKLAND & ELLIS LLP

April 10, 2013
Page 5

of their cases.  It is now BP's case-in-chief, and BP also should be permitted to provide the Court with opinion testimony from these witnesses in support of its case.  Indeed, the United States has recognized in this case that a party may open the door on an issue by itself introducing the very type of evidence to which it previously objected.  (*See* 02/22/2013 Working Grp. Conference Tr. 36:21-37:4, attached as Exhibit I.)

**II.     Allowing Opinion Testimony From Garrison And Gardner Is Appropriate Because Of Halliburton's Discovery Conduct.**

As explained further in BP's Motion For Sanctions Resulting From Halliburton's Destruction And Spoliation Of Evidence (Rec. Doc. 8977), Halliburton's repeated failure to comply with its discovery obligations warrants admitting the opinion testimony of Mr. Garrison and Mr. Gardner with respect to their post-incident testing conducted using Halliburton lab and rig stock.

For these reasons, BP respectfully requests that the Court permit it to play and introduce the designations attached as Exhibits A and B during BP's case-in chief.

Sincerely,

*/s/ J. Andrew Langan, P.C.*

JAL/cs

# EXHIBIT A

**Designation Run Report**

# Garrison, Greg - BP

---
**Greg, Garrison 20111104**
---

**Our Designations  00:10:52**
---
**Total Time  00:10:52**



| V54-Garrison, Greg - BP | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

| | | |
| --- | --- | --- |
| 8:11 - 8:13 | **Greg, Garrison 20111104 (00:00:02)** | V54.1 |
| | 8:11   Q. Please state your name for the | |
| | 8:12 record. | |
| | 8:13   A. Greg Garrison. | |
| 11:16 - 12:4 | **Greg, Garrison 20111104 (00:00:30)** | V54.2 |
| | 11:16   Q. And you're a principal in a -- | |
| | 11:17 in a -- in a company, correct? | |
| | 11:18   A. Yes. | |
| | 11:19   Q. And what's that company? | |
| | 11:20   A. It's Oilfield Testing & | |
| | 11:21 Consulting. | |
| | 11:22   Q. And can you briefly describe -- | |
| | 11:23 explain for us what -- what Oilfield Testing | |
| | 11:24 & Consulting is, what they do? | |
| | 11:25   A. We -- we are a third party or an | |
| | 12:1 independent cement testing facility.  We -- | |
| | 12:2 we follow API procedures for the oil field | |
| | 12:3 and oil well applications from shallow, cool, | |
| | 12:4 to hot and deep wells. | |
| 15:6 - 15:20 | **Greg, Garrison 20111104 (00:00:25)** | V54.3 |
| | 15:6   Q. And it appears, sir, that | |
| | 15:7 you were hired at -- your company at least | |
| | 15:8 was hired at some point to do some testing on | |
| | 15:9 behalf of the joint investigation team with | |
| | 15:10 regard to the cement slurries from the | |
| | 15:11 Macondo well; is that correct? | |
| | 15:12   A. Yes. | |
| | 15:13   Q. Okay.  And did your company | |
| | 15:14 actually perform that testing? | |
| | 15:15   A. Yes. | |
| | 15:16   Q. And did it receive certain | |
| | 15:17 slurries and certain additives regarding | |
| | 15:18 the -- the cement from the Macondo well or | |
| | 15:19 representative samples of that? | |
| | 15:20   A. Yes. | |
| 16:10 - 16:17 | **Greg, Garrison 20111104 (00:00:19)** | V54.4 |
| | 16:10   Q. Is this report, sir, first page | |
| | 16:11 dated August 1 of 2011, directed to a | |
| | 16:12 Mrs. Silvia Murphy with the JIT, the joint | |
| | 16:13 investigation team?  Is this the complete | |

| Page/Line | Source | ID |
|---|---|---|

**V54-Garrison, Greg - BP**

16:14 report relative to the cement testing and
16:15 analysis that your company performed on
16:16 behalf of the JIT?
16:17   A. Yes.

17:6 - 17:23   **Greg, Garrison 20111104 (00:00:31)**   V54.5
17:6   Q. Now, were you involved in -- in
17:7 either the testing itself or supervising the
17:8 testing that was performed?
17:9   A. Yes.
17:10   Q. Okay.  And with respect to the
17:11 testing, were there specific protocols, the
17:12 testing protocols, that you followed?
17:13   A. Yes.
17:14   Q. And who provided those protocols
17:15 to you for the tests?
17:16   A. The -- the JIT.
17:17   Q. And if on a given test you were
17:18 going to perform if there was no specific
17:19 protocols within that test, was there any
17:20 other guidelines that you followed when you
17:21 performed those tests?
17:22   A. Yes.  We followed API
17:23 guidelines.

22:9 - 23:19   **Greg, Garrison 20111104 (00:01:33)**   V54.6
22:9   Q. Sir, I'd like to refer
22:10 you to page 34, section 11, the foam
22:11 stability test.
22:12 Now, in this test, sir, you
22:13 tested also a number of different
22:14 compositions of the cement slurry, correct?
22:15   A. Yes.
22:16   Q. Okay.  And you also tested
22:17 something you have listed as MAC4.
22:18 What is that on page 35 in that
22:19 first box?
22:20   A. That -- MAC4 is a specific
22:21 formulation using the cement from the rig.
22:22   Q. Okay.  So this test, the foam
22:23 stability test, not only did you -- not only
22:24 did your company test the different

| V54-Garrison, Greg - BP | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

22:25 compensations as they're -- as is set forth
23:1 in this top box on page 35, you also actually
23:2 tested the cement samples that were provided
23:3 to you from the Macondo well?
23:4   A. Yes.
23:5   Q. Okay.  Basically, the rig
23:6 samples themselves, correct, sir?
23:7   A. The -- the cement, specifically
23:8 the cement.
23:9   Q. Now, with respect to all
23:10 the tests, sir, that -- that you performed
23:11 for foam stability, I'd like to turn you to
23:12 page 38.  You tested both the unset foam and
23:13 on page 39, the set foam, correct, sir?
23:14   A. Yes.
23:15   Q. Okay.  And with respect to the
23:16 testing on page 38 of the unset foam, what --
23:17 what does it mean here, sir, where every
23:18 sample that you tested showed bubble
23:19 breakout?  What does that mean?

| 23:22 - 24:1 | **Greg, Garrison 20111104 (00:00:13)** | V54.7 |

23:22   A. The -- the -- the bubble
23:23 breakout is -- is just saying that once
23:24 the -- the foam is generated, we're seeing
23:25 bubble breakout, which is an indication that
24:1 the -- the foam slurry is not stable.

| 24:20 - 25:1 | **Greg, Garrison 20111104 (00:00:15)** | V54.8 |

24:20   Q. And, sir, would you agree
24:21 that at least for purposes of the testing
24:22 that you did on the unset foam slurry, you
24:23 would interpret the test of all of the
24:24 different compositions of the cement slurry,
24:25 including the Macondo well sample that you've
25:1 described, as not being stable?

| 25:3 - 25:3 | **Greg, Garrison 20111104 (00:00:00)** | V54.9 |

25:3   A. That's correct.

| 106:20 - 107:12 | **Greg, Garrison 20111104 (00:00:51)** | V54.10 |

106:20 And this is the -- the cement
106:21 testing that you did at the -- at the request
106:22 of the JIT, correct?

| V54-Garrison, Greg - BP | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

106:23   A. Correct.
106:24   Q. Now, if you could turn to
106:25 page 38.
107:1   A. Okay.
107:2   Q. Now, 38 sets out, basically,
107:3 the -- the results of your unset foam -- foam
107:4 slurry test?
107:5   A. Yes.
107:6   Q. And then 39 sets out the results
107:7 of your set foam slurry test?
107:8   A. Yes.
107:9   Q. Now, this morning -- and let me
107:10 just ask you again:  On page 38, do any of
107:11 these test results indicate to you that the
107:12 foam cement is stable --

107:14 - 107:23   **Greg, Garrison 20111104 (00:00:23)**                    V54.11
107:14   Q. -- on page 38?
107:15   A. No.
107:16   Q. Okay.  So going down to the last
107:17 row, MAC4, that is the Macondo rig sample,
107:18 correct?
107:19   A. Correct.
107:20   Q. Now, does anything in that row
107:21 indicate to you that that test was somehow
107:22 good as opposed to any of the other tests?
107:23   A. No, same result.

108:6 - 108:11   **Greg, Garrison 20111104 (00:00:16)**                    V54.12
108:6 Is there anything in the row
108:7 labeled MAC4, which is the rig blend,
108:8 correct? --
108:9   A. Correct.
108:10   Q. -- that indicates the unset foam
108:11 slurry test indicated that sample was stable?

108:13 - 108:22   **Greg, Garrison 20111104 (00:00:21)**                    V54.13
108:13   A. No.
108:14   Q. Okay.  And it actually indicates
108:15 that there was bubble breakout on that
108:16 sample?
108:17   A. Yes.
108:18   Q. And what is bubble breakout?

| Page/Line | Source | ID |
|---|---|---|

**V54-Garrison, Greg - BP**

| Page/Line | Source | ID |
|---|---|---|
| | 108:19   A. It just means that I'm -- my -- | |
| | 108:20 my foam was basically falling apart.  When | |
| | 108:21 you say bubble breakout, I'm losing volume | |
| | 108:22 inside my graduated cylinder. | |
| 109:16 - 109:21 | **Greg, Garrison 20111104 (00:00:18)** | V54.14 |
| | 109:16   Q. If you could turn to | |
| | 109:17 page 42. | |
| | 109:18 Figures 17 and 18 show the | |
| | 109:19 Macondo MAC4 sample in the graduated | |
| | 109:20 cylinder, correct? | |
| | 109:21   A. Correct. | |
| 110:16 - 111:8 | **Greg, Garrison 20111104 (00:00:37)** | V54.15 |
| | 110:16   Q. And so you -- did you | |
| | 110:17 personally observe when -- when this sample | |
| | 110:18 was poured? | |
| | 110:19   A. Oh, yes, sir. | |
| | 110:20   Q. Okay.  And -- because, I mean, | |
| | 110:21 this sample is the -- this sample's the key | |
| | 110:22 sample.  I mean, this is the one from the | |
| | 110:23 rig, right?  So you observed it -- | |
| | 110:24   A. Yes. | |
| | 110:25   Q. -- when the test was conducted? | |
| | 111:1 So if we flip back to page 38 | |
| | 111:2 for the Macondo 4 -- MAC4 sample indicates | |
| | 111:3 bubble breakout, that's something you, | |
| | 111:4 Mr. Garrison, observed? | |
| | 111:5   A. Yes. | |
| | 111:6   Q. And whether or not it's depicted | |
| | 111:7 in the picture, you observed that there was | |
| | 111:8 loss in volume and bubble breakout? | |
| 111:10 - 111:15 | **Greg, Garrison 20111104 (00:00:10)** | V54.16 |
| | 111:10   A. That's correct. | |
| | ==111:11   Q. And that is a sign of an== | |
| | ==111:12 unstable foam?== | |
| | ==111:13   A. So it's a parameter that we've== | |
| | ==111:14 followed in the industry for -- for years,== | |
| | ==111:15 yes.== | |
| 27:2 - 27:8 | **Greg, Garrison 20111104 (00:00:09)** | V54.17 |
| | 27:2   Q. And so you tested the set foam | |
| | 27:3 slurry of all the different compositions, | |

| | | |
|---|---|---|
| **V54-Garrison, Greg - BP** | | |

| Page/Line | Source | ID |
|---|---|---|

27:4 correct?

27:5   A. Yes.

27:6   Q. Including the Macondo well

27:7 sample that we've talked about, correct?

27:8   A. Yes.

27:13 - 27:19   **Greg, Garrison 20111104 (00:00:15)**   V54.18

27:13 Were any of the set foam cement

27:14 slurries stable?

27:15   A. On all the samples, we saw a

27:16 segregation from top to bottom.

27:17   Q. Okay.  And what does that mean?

27:18   A. It means that the system is not

27:19 stable.

111:16 - 111:24   **Greg, Garrison 20111104 (00:00:25)**   V54.19

111:16   Q. Okay.  Now, let's turn to

111:17 figure 20, which is on page 43.

111:18   A. Figure 40 -- which page?

111:19   Q. Page 43, figure 20.

111:20   A. I'm sorry.  Yes.

111:21   Q. Now, this -- this picture shows

111:22 the MAC4 Macondo cement that you -- that you

111:23 were curing in the cubes?

111:24   A. Yes.

114:6 - 114:17   **Greg, Garrison 20111104 (00:00:23)**   V54.20

114:6   Q. And the cubes are filled to the

114:7 top when you begin the test?

114:8   A. Yes.

114:9   Q. And so a loss in volume, what

114:10 does that mean?

114:11   A. It -- it depicts an instability

114:12 of the -- of the slurry.

114:13   Q. And you personally,

114:14 Mr. Garrison, observed that?

114:15   A. Yes.  I observed the pouring,

114:16 the mixing and also the -- the pulling of the

114:17 samples.

28:24 - 29:5   **Greg, Garrison 20111104 (00:00:15)**   V54.21

28:24   Q. So if -- am I

28:25 clear, sir, in summarizing the foam stability

29:1 testing of the different compositions of the

| V54-Garrison, Greg - BP | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

29:2 cement slurries that your company tested,
29:3 that none of the cement slurries by way of
29:4 the different compositions indicated that the
29:5 foam was stable?

29:7 - 29:7     **Greg, Garrison 20111104 (00:00:00)**     V54.22

29:7   A. That's correct.

268:18 - 269:6     **Greg, Garrison 20111104 (00:00:32)**     V54.23

268:18   Q. Now, earlier today in -- in
268:19 response to questions I asked you and also in
268:20 response to questions from the attorneys for
268:21 BP, you testified that with respect to all of
268:22 the samples that you -- your lab tested for
268:23 the unset foam cement slurry, none of those
268:24 samples were stable, correct?
268:25   A. That's correct.
269:1   Q. Okay.  Why would you have said
269:2 that, sir, about MAC4?
269:3   A. Well, in -- in our -- in our
269:4 opinion and in what we viewed, it's not a --
269:5 a slurry that we would consider stable or
269:6 recommend --

269:8 - 270:7     **Greg, Garrison 20111104 (00:00:45)**     V54.24

269:8   A. -- as being stable.
269:9   Q. Okay.  Well, I know you went
269:10 through the API, which has previously been
269:11 marked as -- specific, it's 10B-4 -- been
269:12 marked as exhibit 4569 in this case.  And
269:13 Mr. Hill went through a number of different
269:14 signs of stability to try to get you to
269:15 agree, see whether or not you saw those
269:16 different conditions with respect to the
269:17 unset foam slurry test of the MAC4.  Do you
269:18 recall that?
269:19   A. Yes.
269:20   Q. Okay.  Even in light of those
269:21 questions, sir, taking a step back, you were
269:22 present in the lab when MAC4 was tested,
269:23 correct?
269:24   A. Correct.
269:25   Q. And you were present when the

| | | |
|---|---|---|
| **V54-Garrison, Greg - BP** | | |
| **Page/Line** | **Source** | **ID** |

270:1 unset foam cement slurry of MAC4 was tested,
270:2 correct?
270:3   A. Correct.
270:4   Q. Do you still stand by your
270:5 opinion today, sir, that with respect to the
270:6 unset foam cement slurry test of the MAC4,
270:7 that that was not stable?

270:9 - 270:9   **Greg, Garrison 20111104 (00:00:02)**   V54.25
270:9   A. In -- from what we saw, yes.

271:12 - 271:14   **Greg, Garrison 20111104 (00:00:05)**   V54.26
271:12   Q. As a cement tester, sir, you
271:13 would not recommend that an operator pump
271:14 cement like that downhole, would you?

271:16 - 271:20   **Greg, Garrison 20111104 (00:00:06)**   V54.27
271:16   A. I would try to improve the
271:17 stability.
271:18   Q. Okay.  You would not say that
271:19 this is an acceptable slurry to pump
271:20 downhole, correct?

271:22 - 272:18   **Greg, Garrison 20111104 (00:00:43)**   V54.28
271:22   A. Not to say that you couldn't,
271:23 but if -- if you're asking me to pump this, I
271:24 would say, let's -- let's redesign, let's try
271:25 to add more foam or let's do something to
272:1 improve stability.
272:2   Q. Why would you want to do that,
272:3 sir?
272:4   A. Well, again, you don't want to
272:5 have, you know, nitrogen breakout.  You don't
272:6 want a -- you don't want to pump an unstable
272:7 slurry into a wellbore.
272:8   Q. And the consequences of that are
272:9 what you talked about with Mr. Chen earlier
272:10 today on behalf of BP, which is you could
272:11 have flow come through the permeability
272:12 within the foam cement if it has bubble
272:13 breakout, correct?
272:14   A. Yes.  It can.
272:15   Q. And then you would not achieve
272:16 zonal isolation, correct, sir?

| Page/Line | Source | ID |
|---|---|---|

**V54-Garrison, Greg - BP**

272:17   A. That can be a -- that can be a
272:18 result of this, yes.

| | | |
|---|---|---|
| 153:22 - 154:2 | **Greg, Garrison 20111104 (00:00:10)** | V54.29 |

153:22   Q. And, you know, if the
153:23 purpose is to prevent hydrocarbons from
153:24 coming into the pipe and coming up to the
153:25 surface and you pump an unstable foamed
154:1 cement, it's not going to achieve that goal,
154:2 right?

| | | |
|---|---|---|
| 154:5 - 154:7 | **Greg, Garrison 20111104 (00:00:03)** | V54.30 |

154:5   A. That -- that would be the
154:6 assumption, yes.
154:7   Q. So won't that be unsafe?

| | | |
|---|---|---|
| 154:10 - 154:10 | **Greg, Garrison 20111104 (00:00:01)** | V54.31 |

154:10   A. Yes.

Our Designations = 00:10:52
**Total Time = 00:10:52**

# EXHIBIT B

**Designation Run Report**

# Gardner, Craig - BP

**Gardner, Craig 08-17-2011**

**Our Designations  00:06:21**

**Total Time  00:06:21**



| V53-Gardner, Craig - BP | | |
|---|---|---|
| **Page/Line** | **Source** | **ID** |

| 174:21 - 175:1 | **Gardner, Craig 08-17-2011 (00:00:15)**<br>174:21 I'd like to start out with your<br>174:22 background some more.  What is your -- what do<br>174:23 you do in your current role?  And what is your<br>174:24 title, first of all?<br>174:25   A. I'm Team Leader for the Cement Team,<br>175:1 Chevron Energy Technology Company. | V53.1 |
| 16:3 - 16:12 | **Gardner, Craig 08-17-2011 (00:00:21)**<br>16:3   Q. In connection with this matter, I<br>16:4 understand that you received an assignment from<br>16:5 the company as a result of a request from the<br>16:6 National Commission on the BP DEEPWATER HORIZON<br>16:7 Investigation?<br>16:8   A. Correct.<br>16:9   Q. All right.  Did the company ask you to do<br>16:10 work to respond to the request of the National<br>16:11 Commission?<br>16:12   A. Yes, sir. | V53.2 |
| 227:15 - 228:2 | **Gardner, Craig 08-17-2011 (00:00:35)**<br>227:15   Q. Now take a look at the first page of your<br>227:16 letter to Mr. Sankar.  Look at the last sentence<br>227:17 on the second paragraph.<br>227:18   A. Correct.<br>227:19   Q. Can you read that into the record?<br>227:20   A. "To our knowledge, these materials were<br>227:21 supplied by Halliburton as representative of<br>227:22 materials used on the Deepwater Horizon but are<br>227:23 neither bulk plant samples nor rig samples from<br>227:24 the actual job."<br>227:25   Q. So based on everything you understand,<br>228:1 the tests that you -- the material that you did<br>228:2 your testing on was representative -- | V53.3 |
| 228:4 - 228:5 | **Gardner, Craig 08-17-2011 (00:00:01)**<br>228:4   Q. (By Mr. Chen) -- of what was on the<br>228:5 DEEPWATER HORIZON? | V53.4 |
| 228:7 - 228:7 | **Gardner, Craig 08-17-2011 (00:00:01)**<br>228:7   A. To our knowledge. | V53.5 |
| 90:4 - 90:11 | **Gardner, Craig 08-17-2011 (00:00:30)**<br>90:4   Q. Now, let's, if we can,<br>90:5 generally talk about your lab results.  I see in | V53.6 |

| Page/Line | Source | ID |
|---|---|---|

**V53-Gardner, Craig - BP**

90:6 your lab results, several references to the foam
90:7 cement slurry would not mix -- or was not stable,
90:8 let me say that; that it was not stable.  Is --
90:9 is that a fair conclusion from the testing that
90:10 you did?
90:11   A. Yes, sir.

91:1 - 91:7   **Gardner, Craig 08-17-2011 (00:00:19)**     V53.7

91:1   Q. (By Mr. Thornhill)  And I
91:2 know I'm drawing conclusions, so I -- I apologize
91:3 for that, but is it -- is it fair for me to say
91:4 that, when you tested the foam cement design
91:5 provided for the foam cement job -- for the
91:6 production casing job, that is, you, at Chevron,
91:7 concluded that the cement would not be stable?

91:11 - 91:20   **Gardner, Craig 08-17-2011 (00:00:27)**     V53.8

91:11   A. That is the sentence -- the last sentence
91:12 on the second page reflects that we were unable
91:13 to generate a stable foam.
91:14   Q. (By Mr. Thornhill) Okay.  And -- and that
91:15 was true for multiple tests that you ran on
91:16 the -- on the foam cement design, correct?
91:17   A. Correct.
91:18   Q. Just so that the Court will understand,
91:19 what does it mean to you, as a tester, when you
91:20 see a foam cement design that is not stable?

91:22 - 92:3   **Gardner, Craig 08-17-2011 (00:00:26)**     V53.9

91:22   A. The goal in designing a foam cement job
91:23 is to end up with a slurry that, after it has
91:24 set, has a uniform distribution of gas.
91:25 So an unstable system means either the
92:1 solids are settling out of it, and/or the gas is
92:2 breaking out of it, so the resulting density is
92:3 not uniform.

92:10 - 92:12   **Gardner, Craig 08-17-2011 (00:00:12)**     V53.10

92:10 When you find that the cement is
92:11 unstable, does that instability reflect the
92:12 prospective breakout of the gas from the cement?

92:14 - 93:1   **Gardner, Craig 08-17-2011 (00:00:30)**     V53.11

92:14   A. That's what the test is intended to
92:15 indicate.

| V53-Gardner, Craig - BP | | |
| --- | --- | --- |
| **Page/Line** | **Source** | **ID** |

92:16  Q. (By Mr. Thornhill) Okay.  And if you see
92:17 that there is the prospective breakout of the gas
92:18 from the cement, what does that tell you, as a
92:19 tester?
92:20   A. You would redesign the cement slurry to
92:21 prevent that.
92:22   Q. Okay.  Maintaining uniformity of the gas
92:23 mixed in the cement is an objective for purposes
92:24 of making the cement perform its job, fair to
92:25 say?
93:1   A. Yes.

93:25 - 94:4        **Gardner, Craig 08-17-2011 (00:00:11)**        V53.12

93:25  Q. (By Mr. Thornhill) Now, did you have
94:1 available to you any of the testing that was done
94:2 by Halliburton that showed that the cement slurry
94:3 intended for the production casing job was not
94:4 stable?

94:6 - 94:11        **Gardner, Craig 08-17-2011 (00:00:14)**        V53.13

94:6   A. The only Halliburton data we had was what
94:7 was published in the Bly Report, the April 12th,
94:8 the line item indicating the two specific gravity
94:9 values.
94:10   Q. (By Mr. Thornhill) And did that indicate
94:11 to you instability of the foam cement job?

94:13 - 94:21        **Gardner, Craig 08-17-2011 (00:00:26)**        V53.14

94:13   A. The two values were equal, but they were
94:14 higher than the design, than the intended design
94:15 density.  So it was an indicator that it may not,
94:16 even if it was uniform, it was not at 14 and a
94:17 half pound per gallon.
94:18   Q. (By Mr. Thornhill) And did that indicate
94:19 instability to you?
94:20   A. That would -- that could be an indicator
94:21 of instability.

95:18 - 95:23        **Gardner, Craig 08-17-2011 (00:00:13)**        V53.15

95:18   Q. (By Mr. Thornhill) In your practice,
95:19 generally speaking, it would be common under
95:20 those circumstances when there's made a
95:21 determination that the foam cement is not stable
95:22 to redesign the cement slurry before the job is

| Page/Line | Source | ID |
|---|---|---|
| | **V53-Gardner, Craig - BP** | |

95:23 pumped, correct?

95:25 - 95:25 **Gardner, Craig 08-17-2011 (00:00:00)**    V53.16

95:25   A. Yes.

110:7 - 110:19 **Gardner, Craig 08-17-2011 (00:00:36)**    V53.17

110:7   Q. Okay.  Under "Section 9, Foam Mixing and
110:8 Stability," I believe this is the last section of
110:9 your test, and then we're going to need to take a
110:10 little break.  There's a reference to the foam
110:11 mixing and stability.  Already we've identified
110:12 that the -- the foam slurry was not stable, and
110:13 in this particular section you say as follows:
110:14 "API RP10B-4 and ISO 10426-4 are silent on the
110:15 matter of slurry conditioning so several
110:16 conditioning methods were used.  None of the
110:17 tests produced a stable foam."  Did I read that
110:18 correctly?
110:19   A. Yes, sir.

118:7 - 118:13 **Gardner, Craig 08-17-2011 (00:00:17)**    V53.18

118:7   Q. In the section on Test 4, you point out
118:8 that "Settling was observed in the base and
118:9 foamed slurry," correct?  It's like the fourth
118:10 sentence there.
118:11   A. Yes.  Slurry' condition foamed, density
118:12 low, yes, settling is observed in both the base
118:13 and the foam system.  Yes, sir, that's right.

118:20 - 118:21 **Gardner, Craig 08-17-2011 (00:00:05)**    V53.19

118:20   Q. And also settling, did that indicate to
118:21 you potential problems with the design?

118:23 - 118:23 **Gardner, Craig 08-17-2011 (00:00:02)**    V53.20

118:23   A. They are negative indicators.

219:14 - 219:17 **Gardner, Craig 08-17-2011 (00:00:12)**    V53.21

219:14   Q. Now, you ran nine tests here.
219:15 Do -- do you believe that that is sufficient
219:16 facts to reach the opinion that the -- that the
219:17 slurry did not form a stable foam?

219:19 - 219:23 **Gardner, Craig 08-17-2011 (00:00:14)**    V53.22

219:19   A. What we put in the Report was is that we
219:20 were unable to generate a foam in nine instances.
219:21   Q. (By Mr. Chen) M-h'm.  You were unable to
219:22 generate a stable foam in nine instances?

| Page/Line | Source | ID |
|---|---|---|

**V53-Gardner, Craig - BP**

219:23   A. Correct.

Our Designations = 00:06:21
**Total Time = 00:06:21**

# EXHIBIT C

1               UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4   IN RE:  OIL SPILL BY THE OIL RIG   *   Docket 10-MD-2179
    *DEEPWATER HORIZON* IN THE          *
5   GULF OF MEXICO ON APRIL 20, 2010   *   Section J
                                       *
6   Applies to:                        *   New Orleans, Louisiana
                                       *
7   Docket 10-CV-02771,                *   February 25, 2013
    *IN RE:   THE COMPLAINT AND*        *
8   *PETITION OF TRITON ASSET*          *
    *LEASING GmbH, et al*               *
9                                      *
    Docket 10-CV-4536,                 *
10  *UNITED STATES OF AMERICA v.*       *
    *BP EXPLORATION & PRODUCTION,*      *
11  *INC., et al*                       *
                                       *
12  * * * * * * * * * * * * * * * * * *

13

14              DAY 1, AFTERNOON SESSION
              TRANSCRIPT OF NONJURY TRIAL
15       BEFORE THE HONORABLE CARL J. BARBIER
              UNITED STATES DISTRICT JUDGE
16

17  Appearances:

18
    For the Plaintiffs:        Domengeaux Wright Roy
19                               & Edwards, LLC
                               BY:  JAMES P. ROY, ESQ.
20                             556 Jefferson Street, Suite 500
                               Post Office Box 3668
21                             Lafayette, Louisiana 70502

22
    For the Plaintiffs:        Herman Herman & Katz, LLC
23                             BY:  STEPHEN J. HERMAN, ESQ.
                               820 O'Keefe Avenue
24                             New Orleans, Louisiana 70113

25


                    OFFICIAL TRANSCRIPT

02:20  1      you sit here today, do you believe -- do you believe that

02:20  2      the presence of D-AIR 3000 in the -- in cement can be

02:20  3      offset with the appropriate amounts of surfactant being

02:20  4      included in the cement as an additive?

02:20  5          "ANSWER:  It is possible.

02:20  6          "QUESTION:  And you know that for a fact surfactant

02:20  7      can offset D-AIR if appropriate amounts are used?  You

02:20  8      know that, don't you?

02:20  9          "ANSWER:  It is possible, yes, sir."

02:20  10          Judge, let's see what Mr. Greg Garrison said

02:21  11      about it, who performed cement testing post-incident for the

02:21  12      JIT.

02:21  13          "QUESTION:  You indicated that you noticed that there

02:21  14      was D-AIR in the slurry --

02:21  15          "ANSWER:  Yes.

02:21  16          "QUESTION:  -- that Halliburton used to design the

02:21  17      Macondo production casing job, right?

02:21  18          "ANSWER:  Yes.

02:21  19          "QUESTION:  Okay.  As a cement tester, you would

02:21  20      agree with me that there are additives that can counteract

02:21  21      the presence of D-AIR, right?

02:21  22          "ANSWER:  Yes.

02:21  23          "QUESTION:  And, in fact, if you put enough foaming

02:21  24      agent in a slurry, you can counteract the effects of

02:21  25      D-AIR, can't you?

02:21  1          "ANSWER:  Yes, you can.

02:21  2          "QUESTION:  The mere presence of D-AIR in a slurry

02:21  3     intended to be foam for a production casing job does not

02:21  4     automatically say this is an inappropriate slurry for

02:21  5     foaming, does it?

02:21  6          "ANSWER:  No.

02:21  7          "QUESTION:  Okay.  And, in fact, what matters is the

02:21  8     ability to test it to verify that you have enough

02:21  9     surfactant or foaming agent in it to counteract the

02:21  10    effects of D-AIR, correct?

02:21  11         "ANSWER:  Correct."

02:21  12         Judge, let's jump over now, if we can, and talk

02:21  13    about something that is known as the variability of cement.

02:21  14    The PSC and BP's cement test post-incident do not show cement

02:21  15    instability.  Due to the principle of variability of cement,

02:22  16    only foam, stability, and other tests conducted on actual rig

02:22  17    cement have any relevance here.  Recognize -- and this was

02:22  18    recognized, Judge, in the BP/Halliburton contract where it said

02:22  19    that only operational testing would be done with rig samples,

02:22  20    not lab samples.

02:22  21         These other tests that were done post-incident

02:22  22    where they try to say earlier -- show that the cement slurry

02:22  23    was unstable, they were done with lab samples, not rig samples.

02:22  24    Your Honor, it is recognized in the industry of hot-shotting

02:22  25    samples to shore for operational testing and also acknowledged

02:22  1    by non-Halliburton witnesses and third-party labs that
02:22  2    conducted post-incident testing.
02:22  3                Judge, let's see what a couple of folks said
02:22  4    regarding the use of lab samples instead of rig samples and
02:22  5    whether or not that is representative of rig cement testing.
02:22  6    Let's see Mr. Greg Garrison.
02:22  7                "QUESTION:  And so the industry -- the operators in
02:22  8    the industry, for example, incur time and expense to
02:22  9    either use a helicopter or a boat every 20 to 30 days to
02:23  10   go get a refreshed sample from the rig for purposes of
02:23  11   coming back and testing for an operational job; is that
02:23  12   right?
02:23  13               "ANSWER:  Yes.
02:23  14               "QUESTION:  And would you agree with me that the
02:23  15   reason they do that is out of concerns for
02:23  16   representativeness of the testing?"
02:23  17               "ANSWER:  Yes.
02:23  18               "QUESTION:  Okay.  And just not to put too fine a
02:23  19   point on this, the concern is that if we were going to
02:23  20   have a production casing job and we know that there is a
02:23  21   blend out on the rig, we would not try to replicate that
02:23  22   blend in the lab and test it in the lab and transpose
02:23  23   those results to what we expect to happen with the rig
02:23  24   blend, would we?
02:23  25               "ANSWER:  No, we wouldn't.

OFFICIAL TRANSCRIPT

02:23   1          "QUESTION:  There could be differences, increases or
02:23   2      decreases in humidity during the transport process,
02:23   3      correct?
02:23   4          "ANSWER:  Yes.
02:23   5          "QUESTION:  And each of those things has the effect
02:23   6      to alter the chemical characteristics of the actual blend
02:23   7      itself, correct?
02:23   8          "ANSWER:  Yes, it can.
02:23   9          "QUESTION:  Okay.  And to guard against that, the
02:23   10     uncertainty of that, it's one of the reasons the industry
02:23   11     actually goes out and refreshes sampling for operational
02:23   12     testing from the rig, correct?
02:23   13         "ANSWER:  Yes.
02:23   14         "QUESTION:  Okay.  And each of those things we've
02:24   15     talked about introduces a potential or the possibility of
02:24   16     variability in testing, doesn't it?
02:24   17         "ANSWER:  Yes."
02:24   18             Judge, let's see what Mr. Daryl Kellingray said.
02:24   19     He's another internal BP employee who's recognized around the
02:24   20     world as one of the leading cement experts in the world on this
02:24   21     subject -- said about variability of testing and using lab as
02:24   22     opposed to rig samples.
02:24   23         "QUESTION:  But you would not rely upon those tests
02:24   24     to the extent that you would on tests conducted on rig
02:24   25     samples, would you?

# EXHIBIT D

# Lack of Zonal Isolation ≠ Blowout



**Greg Garrison**
OTC; Performed Cement Testing for JIT



**Brett Cocales**
BP's Operations Engineer for the Deepwater Horizon



**Tim Probert**
Halliburton's President of Strategy and Corporate Development



**Barbara Yilmaz**
BP's Technology VP for Drilling & Completions



**Vincent Price**
BP Well Site Leader



**Richard Vargo**
Halliburton's Gulf of Mexico Region Manager for Cementing

**Warren Winters**
BP's Sr. Drilling Engineer

**Gregg Walz**
BP's Drilling Engineering Team Leader for the Macondo Well

**David Bolado**
Halliburton Expert



**Kevin Lacy**
BP's former VP of Drilling & Completions in the Gulf of Mexico

**Doug Suttles**
BP's COO of Exploration & Production

**Richard Heenan**
U.S. Dept. of Justice Expert

**Richard Lynch**
BP's VP of the Global Wells Organization

**Kent Corser**
BP's Drilling Engineering Manager for the North America Gas Division

**Glen Benge**
U.S. Dept. of Justice Expert

D-8023

# A Stable Slurry Can Include a Defoamer
## (D-Air 3000 Is a Defoamer)



**Ronald Crook**
BP Cement Expert



**Greg Garrison**
OTC; Performed
Cement Testing for JIT



**Glen Benge**
U.S. Dept. of Justice
Cement Expert




**Samuel
Lewis, Ph.D.**
Halliburton Expert



**David L. Bolado**
Halliburton Expert



**Ron Faul**
Halliburton's Technology
Manager, Gulf of Mexico
Region, Cementing




**Richard Dubois**
Halliburton's Cement Lab
Manager for the Gulf of
Mexico Fluid Lab



**Jesse Gagliano**
Halliburton's Technical
Advisor



**Dr. Kris Ravi**
Halliburton's Chief
Technical Advisor

D-8024.1

GODWIN LEWIS



# Non-Rig Samples Are Not Representative of Rig Cement Testing



**Craig Gardner**
Chevron; Performed Cement Testing for National Commission



**Ronald Crook**
BP Cement Expert



**Greg Garrison**
OTC; Performed Cement Testing for JIT



**Daryl Kellingray**
BP Cementing Sector Specialist / SETA



**Glen Benge**
U.S. Dept. of Justice Cement Expert





# Greg Garrison

D-8008.2

Q. Okay. And so the industry, the operators in the industry, for example, incur time and expense to either use a helicopter or a boat every 20 to 30 days to go get a refreshed sample from the rig for purposes of coming back and testing for an operational job; is that right?

A. Yes.

Q. And would you agree with me that the reason they do that is out of concerns for representativeness of the testing?

A. Yes.

**Greg Garrison**
OTC; Performed Cement Testing for JIT





Oilfield
Testing & Consulting

Garrison Dep. 178:13-179:12; 180:9-181:3

48

GODWIN LEWIS

# Greg Garrison

**Greg Garrison**
OTC; Performed Cement Testing for JIT

Q.  Okay.  And just not to put too fine a point on this, the concern is that if we were going to have a production casing job and we know that there is a blend out on the rig, we would not try to replicate that blend in the lab and test it in the lab and transpose those results to what we expect to happen with the rig blend, would we?

A.  No, we wouldn't.

Q.  There could be differences, increases or decreases in humidity during the transport process, correct?





Garrison Dep. 178:13-179:12; 180:9-181:3

D-8008.2

49



# Greg Garrison

A. Yes.

Q. And each of those things has the effect to alter the chemical characteristics of the actual blend itself, correct?

A. Yes. It -- it can.

Q. Okay. And to guard against the -- the uncertainty of that, it's one of the reasons the industry actually goes out and refreshes sampling for operational testing from the rig, correct?

A. Yes.

Q. Okay. And each of those things we talked about introduces a potential or the possibility of variability in testing, doesn't it?

A. Yes.

**Greg Garrison**
OTC; Performed Cement Testing for JIT





Garrison Dep. 178:13-179:12; 180:9-181:3

D-8008.2

50

# EXHIBIT E

## MDL 2179 HESI TRIAL

MDC 10-2179 JID

 **Garrison, Greg (Vol. 01) - 11/04/2011**                    1 CLIP  (RUNNING 00:14:47.788)

3-25-13



**GARRISON G V1**                **27 SEGMENTS  (RUNNING 00:14:47.788)**

**1.  PAGE 8:11 TO 8:13  (RUNNING 00:00:02.550)**

```
11        Q.     Please state your name for the
12   record.
13        A.     Greg Garrison.
```

**2.  PAGE 11:16 TO 11:21  (RUNNING 00:00:07.770)**

```
16        Q.     And you're a principal in a --
17   in a -- in a company, correct?
18        A.     Yes.
19        Q.     And what's that company?
20        A.     It's Oilfield Testing &
21   Consulting.
```

**3.  PAGE 15:06 TO 15:12  (RUNNING 00:00:13.160)**

```
06        Q.     Okay.  And it appears, sir, that
07   you were hired at -- your company at least
08   was hired at some point to do some testing on
09   behalf of the joint investigation team with
10   regard to the cement slurries from the
11   Macondo well; is that correct?
12        A.     Yes.
```

**4.  PAGE 17:06 TO 17:16  (RUNNING 00:00:19.450)**

```
06        Q.     Now, were you involved in -- in
07   either the testing itself or supervising the
08   testing that was performed?
09        A.     Yes.
10        Q.     Okay.  And with respect to the
11   testing, were there specific protocols, the
12   testing protocols, that you followed?
13        A.     Yes.
14        Q.     And who provided those protocols
15   to you for the tests?
16        A.     The -- the JIT.
```

**5.  PAGE 176:07 TO 177:25  (RUNNING 00:01:29.440)**

```
07            All right.  I want to start out
08   by following up on some things that you
09   discussed with BP's counsel.  Just to step
10   back a little bit and understand, the report
11   that you prepared at exhibit 5937, it's my
12   understanding that you used, with one
13   exception, and that exception being the MAC4
14   slurry, that all of the other slurries you
15   used were on samples that did not come from
16   the Macondo rig, correct?
17        A.     That's correct.
18        Q.     Okay.  And the MAC4 sample,
19   however, was provided as rig sample that had
20   been sequestered by Halliburton and given by
21   subpoena to the U.S. Government and then
22   provided to you, correct?
23        A.     That's correct.
24        Q.     Okay.  Now, early -- or prior --
```



excerpt played
in Court
3-27-2013 JC

**CONFIDENTIAL**                                                                 **page 1**

**MDL 2179 HESI TRIAL**

```
        25   when you were setting up the samples or the
00177:01   testing that you were going to do for the
        02   JIT, you had originally contemplated to
        03   prepare at least eight Macondo slurry
        04   samples, correct?
        05        A.    Yes.
        06        Q.    Okay.  But in the end, you ended
        07   up just testing an unset foam stability test
        08   with -- with the MAC4 slurry, correct?
        09        A.    Yes.
        10        Q.    And the other one was there was
        11   an attempt to conduct a set foam stability
        12   test that got terminated after 48 hours,
        13   correct?
        14        A.    Yes.
        15        Q.    Other than those two tests, none
        16   of the other testing that you did and
        17   reported in exhibit 5937 were on rig samples
        18   from Macondo, correct?
        19        A.    Yes, that's correct.
        20        Q.    And all the other ones came from
        21   lab stack or stock from Halliburton of
        22   materials that were labeled the same way but
        23   did not actually come from the blend that was
        24   sent out to the rig; is that correct?
        25        A.    That's correct.
```

**6.  PAGE 190:07 TO 190:21  (RUNNING 00:00:43.363)**

```
        07        Q.    All right.  Now, if we could, go
        08   to your -- I'm going to call it your main
        09   test reports, exhibit 5937.  That's the JIT
        10   Macondo well testing document?
        11        A.    Okay.
        12        Q.    Now, sir, if you wouldn't mind
        13   opening to page 34.
        14        A.    34.
        15        Q.    And with some -- a few
        16   exceptions, because the only tests in which
        17   you performed that used actual rig slurries
        18   were the -- were with respect to the MAC4
        19   slurries.  I'm going to focus on those first.
        20   Okay?
        21        A.    Okay.
```

**7.  PAGE 194:04 TO 194:09  (RUNNING 00:00:11.060)**

```
        04        Q.    Okay.  Now, are you familiar
        05   with the weigh-up sheets in this case?  I'm
        06   sorry.  Are you familiar with the weigh-up
        07   sheets that were generated by OTC when
        08   conducting these tests?
        09        A.    Yes.
```

**8.  PAGE 196:10 TO 196:14  (RUNNING 00:00:05.150)**

```
        10        Q.    And your technicians are trained
        11   to write indications of instability on the
        12   weigh-up sheets when they observe them,
        13   right?
        14        A.    Yes.
```

**9.  PAGE 198:16 TO 200:06  (RUNNING 00:00:59.939)**

```
        16        Q.    All right.  I'm going to ask you
        17   to please apply this exhibit sticker,
        18   exhibit 5940, just above that Bates number,
        19   if you don't mind.
```

**CONFIDENTIAL**

## MDL 2179 HESI TRIAL

```
        20          (Exhibit Number 5940 marked.)
        21          A.      Sure.
        22          Q.      Now, can you confirm for me,
        23  based on the slurry design line, that this
        24  is, in fact, the Macondo cement sample, the
        25  MAC4 sample?
00199:01          A.      Yes.
        02          Q.      Okay.  And so this is the
        03  weigh-up sheet that's associated with the
        04  unset foam stability testing that you did on
        05  the MAC4 slurry, right?
        06          A.      Right.
        07          Q.      And do you -- there is a comment
        08  there and I'm going to read it.  You tell me
        09  if I read this correctly.
        10          A.      Go ahead.
        11          Q.      This is a technician comment,
        12  correct, in handwritten form?
        13          A.      Yes.
        14          Q.      It says, no channeling noticed,
        15  right?
        16          A.      Right.
        17          Q.      6 milliliters void space, bubble
        18  breakout, minor?
        19          A.      Okay.
        20          Q.      Right?
        21          A.      Uh-huh.
        22          Q.      Does that indicate to you that
        23  the technician found that there was -- to the
        24  extent there was bubble breakout, that it was
        25  minor?
00200:01          A.      Yes.
        02          MR. CHEN:  Objection, form.
        03          Q.      And it certainly isn't what you
        04  would call excessive, right?
        05          MR. CHEN:  Objection, form.
        06          A.      Correct.
```

**10. PAGE 200:07 TO 200:12 (RUNNING 00:00:11.270)**

```
        07          Q.      Okay.  Are you familiar with the
        08  guidelines in API for determining the
        09  instability of foam slurries, the -- the --
        10  or the qualitative observations, for lack of
        11  a better word?
        12          A.      Yes.
```

**11. PAGE 200:21 TO 202:21 (RUNNING 00:01:14.160)**

```
        21          Q.      Sir, could you please open to
        22  page 10?  It's section 9.3.4 of API 10B-4?
        23          A.      Section 10?
        24          Q.      Right.
        25          A.      Page 10?
00201:01          Q.      Yes, sir.
        02          A.      Okay.
        03          Q.      Down there at the bottom, there
        04  is a section that says, signs of foam
        05  instability, correct?
        06          A.      Yes, sir.
        07          Q.      And it lists, it says, more than
        08  a trace of free fluid, correct?
        09          A.      Yes, sir.
        10          Q.      Now, you indicated on your test
        11  results that you saw no free fluid with
        12  respect to the -- the MAC4 slurry, right?
        13          A.      Yeah.
```

## MDL 2179 HESI TRIAL

```
14    Q.    Okay.
15    A.    That's correct.
16    Q.    And it says, bubble breakout
17 noted by large bubbles on the top of the
18 sample, right?  That's what API says?
19    A.    That's what API says, yes.
20    Q.    And you testified earlier that
21 you didn't see any large bubbles, correct?
22    A.    Right.
23    Q.    It says, excessive gap at the
24 top of the specimen, minor meniscus effects
25 are normal, correct?
00202:01   A.    Yes.
02    Q.    Now, you indicated that you
03 can't see any gap in figure 18 of your
04 report?
05    A.    Right.
06    Q.    But that you thought that there
07 was a gap, a minor gap, right?
08    A.    Right.
09    Q.    And you said that it was a gap
10 that you said certainly wasn't an excessive
11 gap, right?
12    A.    Right.
13    Q.    All right.  You didn't see any
14 signs of density segregation or settling, did
15 you?
16    A.    No.
17    Q.    Okay.  And you didn't see any
18 large variations in density from top to
19 bottom and, of course, that would be set
20 cement?  You can't do that here, right?
21    A.    Not in this particular test.
```

**12.  PAGE 202:22 TO 204:06  (RUNNING 00:00:44.844)**

```
22    Q.    Okay.  In fact, none of the
23 indications of instability that are set forth
24 in 10B-4 did you observe with respect to the
25 unset foam stability test and -- of the MAC4
00203:01 slurry, did you?
02    MR. CHEN:  Objection, form.
03    A.    Could you repeat that one more
04 time, please?
05    Q.    Yeah.  All of these things that
06 we just went through --
07    A.    Yes.
08    Q.    -- these API criteria of what
09 constitutes an unstable foam -- foam -- an
10 unstable foam slurry --
11    A.    Yes.
12    Q.    -- you didn't -- you didn't see
13 any of those, did you?
14    MR. CHEN:  Objection, form.
15    A.    In the -- in the liquid, yes,
16 this is what we saw.
17    Q.    Excuse me?
18    A.    No, in -- in the -- in the foam
19 stability test.
20    Q.    In the unset?
21    A.    Yeah, in the unset.
22    Q.    Foam stability test?
23    A.    That's correct.
24    Q.    You didn't -- you didn't see any
25 of these indicators of instability, did you?
00204:01   A.    That's correct.
02    MR. CHEN:  Objection, form.
```

CONFIDENTIAL                                                                    page 4

## MDL 2179 HESI TRIAL

```
03        Q.      I'm sorry.  You did not see any
04  of the indicators of instability set forth in
05  what we just read in API, did you?
06        A.      Right.  That's correct.
```

**13. PAGE 205:13 TO 207:01  (RUNNING 00:00:50.400)**

```
13        Q.      So you found it was -- it was
14  mixable?
15        A.      Yes.
16        Q.      You found that there -- a vortex
17  was created when you blended it?
18        A.      Correct.
19        Q.      You found that it foamed in 15
20  or less seconds?
21        A.      Correct.
22        Q.      All right.  You found that the
23  density of the slurry after you mixed it
24  was -- or the specific gravity was 1.79,
25  right?
00206:01        A.      Correct.
02        Q.      And you did your calculation and
03  you found out that the -- the density of that
04  slurry was 14.9 ppg, correct?
05        A.      Uh-huh.
06        Q.      And that's what, .4, from
07  target?
08        A.      Yes.
09        Q.      That's .4 ppg away from the
10  target density of 14.5?
11        A.      Uh-huh.
12        Q.      Right?
13        A.      Right.
14        Q.      You found that there was no
15  settling.  You found that there was -- right?
16        A.      Right.
17        Q.      You found that there was no free
18  fluid, right?
19        A.      Right.
20        Q.      And the bubble breakout, even
21  though it just indicated as a yes here, you
22  said was minor and didn't rise to the level
23  of -- of the indications of instability set
24  forth in API 10B-4, right?
25        MR. CHEN:  Objection, form.
00207:01        A.      Correct.
```

**14. PAGE 207:14 TO 208:25  (RUNNING 00:01:02.790)**

```
14        Q.      All right.  Now, let's talk
15  about -- let's talk about the set foam
16  stability test that you conducted.  And I
17  think -- well, there isn't any data because
18  you didn't finish the test.  But I'm looking
19  at page 39 of your report and that's
20  exhibit 5937 still.
21            Now, my understanding is -- just
22  forget about all the foam stability tests
23  above it.  I want to look at the MAC4.
24        A.      Okay.
25        Q.      Foam set -- foam stability test
00208:01  results, you have an NA across, meaning you
02  didn't obtain any data for it, right?
03        A.      Yes, that's correct.
04        Q.      And there's a note at the bottom
05  that says, the MAC4 Macondo samples did not
06  set hard during 48-hour -- during the 48-hour
```

# MDL 2179 HESI TRIAL

```
07   curing period?
08        A.      Uh-huh.
09        Q.      And, therefore, cannot be tested
10   for this particular part of the testing
11   protocol, right?
12        A.      Correct.
13        Q.      Who told you that the curing
14   period or the setting period was 48 hours or
15   was to be 48 hours?
16        A.      The JIT.
17        Q.      Did the JIT tell you that that
18   was contrary to API testing protocols?
19        A.      No.
20        Q.      Okay.  You agree with me that
21   the reason you do a set foam stability test
22   is not to see if something will set up in
23   48 hours, but rather to see after it sets,
24   whether it's stable in the set form?
25        A.      Yes.
```

**15.  PAGE 209:10 TO 210:01  (RUNNING 00:00:35.445)**

```
10        Q.      And, again, for the record, this
11   is API recommended practice 10B-4.  I'd like
12   you to look, sir, at section 9.3.2.  It says,
13   stability of set foam cement slurry.  Tell me
14   when you're there.
15        A.      I'm there.
16        Q.      Can you read, for the record,
17   the first sentence, please?
18        A.      Check the foam cement slurry
19   stability by curing samples until they are
20   set, and then determine the density gradient
21   throughout the sample.
22        Q.      So this instructs that this test
23   is properly conducted by allowing the -- the
24   cement to set not for a 48-hour period, but
25   rather until it's set, correct?
00210:01        A.      Correct.
```

**16.  PAGE 210:08 TO 210:20  (RUNNING 00:00:21.310)**

```
08        Q.      All right.  So if we were
09   following proper API protocol in the set foam
10   stability test, you would have allowed that
11   Macondo 4 slurry to actually set before you
12   could dissect it, trisect it, whatever you
13   do, and determine whether or not there's
14   uniform density on top and bottom, right?
15        MR. CHEN:  Objection, form.
16        A.      That's correct.
17        Q.      Okay.  But that is not the
18   protocol the JIT asked you to follow here,
19   right?
20        A.      That's correct.
```

**17.  PAGE 211:12 TO 212:08  (RUNNING 00:00:41.600)**

```
12        Q.      So just circling back, there
13   were only two tests performed on the unset --
14   or on the Macondo slurry, the unset foam
15   stability test, which you say actually
16   indicates that the unset foam was -- was
17   stable, right? --
18        A.      Yes.
19        Q.      -- and then the set foam
20   stability test, which wasn't run in
21   accordance with API and never actually was
```

## MDL 2179 HESI TRIAL

```
22  allowed to finish as API would have
23  specified, right?
24       A.    Yes.
25       Q.    And so we don't have a stability
00212:01  result -- or we don't have a -- we don't have
02  any data about the stability of the set foam
03  cement because the test was actually
04  prematurely terminated as per API?
05       MR. O'ROURKE:  Objection.
06       MR. CHEN:  Objection, form.
07       Q.    Is that fair?
08       A.    That's fair.
```

**18.  PAGE 183:06 TO 183:10  (RUNNING 00:00:11.750)**

```
06       Q.    Okay.  I wanted to go, if you
07  would -- do you still have a copy of your
08  report?  Is that exhibit 5937?  Actually, I'm
09  sorry.  Before we do that, let's go to
10  exhibit 5939.
```

**19.  PAGE 183:14 TO 185:01  (RUNNING 00:01:02.010)**

```
14       MR. HILL:  It's the 60 percent foam
15  quality foam stability test that BP proposed.
16       A.    Okay.
17       Q.    Okay.  Now, when you -- there
18  was a period of time when you were actually
19  setting up your proposed protocols and there
20  was some communication -- I'm not getting
21  into the contents of the communication with
22  the JIT -- but there was a period of time in
23  which you were actually working on developing
24  the protocols that you would use for testing,
25  right?
00184:01      A.    Correct.
02       Q.    And at anytime during that time
03  did you or the JIT ever propose to do the
04  60 percent foam quality foam stability
05  testing?
06       A.    No.
07       Q.    And I think you indicated
08  earlier that this is not an API test, is it?
09       A.    The --
10       Q.    60 percent foam quality test.
11       A.    No, it's not.
12       Q.    There are no protocols in API
13  for it, right?
14       A.    No.
15       Q.    There are no -- API doesn't
16  endorse it as an acceptable industry test,
17  does it?
18       MR. CHEN:  Objection, form.
19       A.    No.
20       Q.    Okay.  You didn't propose to do
21  this originally, did you?
22       A.    No.
23       Q.    Okay.  Do you know if the JIT
24  proposed it originally?
25       A.    Not in any conversations I had,
00185:01  no.
```

**20.  PAGE 185:09 TO 185:21  (RUNNING 00:00:21.830)**

```
09       Q.    All right.  Now, I want to make
10  sure that the Court understands why that
11  might be the case.  My understanding is even
12  if there is a point at which there is a 60
```

## MDL 2179 HESI TRIAL

```
13   percent nitrogen content at injection, it
14   happens for a very fraction of a second,
15   correct?
16        MR. Chen:  Objection, form.
17        A.    Yes.
18        Q.    And, in fact, it's injected into
19   a -- into a dynamic slurry, correct, not a
20   static slurry?
21        A.    Correct.
```

**21. PAGE 187:03 TO 187:23  (RUNNING 00:00:31.316)**

```
03        Q.    Now, out on the rig in this
04   dynamic slurry, this dynamic slurry is being
05   pumped in a closed system, isn't it?
06        A.    Correct.
07        Q.    And it's being pumped in a
08   closed system that's under pressure, right?
09        A.    Correct.
10        Q.    All right.  So this test doesn't
11   model the dynamic condition, nor does it
12   model the closed system, does it?
13        MR. CHEN:  Objection, form.
14        A.    No, it does not.
15        Q.    And nor does it model the
16   pressure that it would be subjected to after
17   it's been injected, right?
18        A.    That's correct.
19        Q.    Okay.  And I think you indicated
20   earlier that you believe that pressure is one
21   of those things that actually helps entrain
22   and keep the nitrogen in the slurry, correct?
23        A.    Yes.
```

**22. PAGE 188:16 TO 189:07  (RUNNING 00:00:34.066)**

```
16        Q.    Okay.  And just to be clear, the
17   60 percent foam quality test was done in
18   atmospheric, correct?
19        A.    Yes.
20        Q.    And those three things we talked
21   about, the fact that this is a dynamic slurry
22   was subjected to a static test, the fact that
23   this -- the pressure that the slurry has seen
24   is not present in the -- in this test and the
25   fact that it's in a closed system out in the
00189:01  field but not in this test, those are all --
02   those are all different points or those are
03   all differences between what was being done
04   in the lab and what was actually occurring
05   out on -- out on the rig, right?
06        MR. CHEN:  Objection, form.
07        A.    Yes.
```

**23. PAGE 217:03 TO 217:18  (RUNNING 00:00:26.600)**

```
03        Q.    Foam -- I know you've already
04   verified for us that none of the compressive
05   strength tests that were run were done on
06   Macondo rig sample, right?
07        A.    Right.
08        Q.    Are you familiar in the industry
09   that when you run a UCA compressive -- well,
10   obviously, when you run UCA compressive
11   strength, you're running it on the base
12   slurry, right?
13        A.    Right.
14        Q.    And when you run a crush
```

```
      15    compressive, you're running it on a foam
      16    slurry, but one that's not under -- not under
      17    pressure, right?
      18        A.      That's correct.
```

**24. PAGE 225:16 TO 226:10  (RUNNING 00:00:35.670)**

```
      16        Q.      Okay.  So did you ever see any
      17    data from Halliburton where the testing
      18    pressure was 14,458 psi for UCA?
      19        A.      No.
      20        Q.      All right.  And I think you
      21    indicated before, you just use a standard API
      22    3,000 psi, right?
      23        A.      That's correct.
      24        Q.      Now, you're on the API
      25    committees and you understand that that
00226:01    3,000 psi pressure was not really developed
      02    with deepwater in mind, was it?
      03        A.      No, it was not.
      04        Q.      And, in fact, the industry has
      05    kind of moved beyond API in this area and in
      06    this effort, as you say, to try to best
      07    replicate downhole conditions in its testing?
      08    It actually tries to obtain the downhole
      09    pressure and use it in testing, right?
      10        A.      Yes.
```

**25. PAGE 227:06 TO 227:21  (RUNNING 00:00:23.650)**

```
      06        Q.      And that's because you used a
      07    different -- different temperature ramp,
      08    correct?
      09        A.      Yes.
      10        Q.      And that temperature ramp heated
      11    the -- the sample up over a 16-hour period?
      12        A.      Yes.
      13        Q.      Right?  And you used a lower
      14    pressure, right?
      15        A.      Yes.
      16        Q.      Okay.  The lower or the -- the
      17    longer heat-up and the lower pressure, both
      18    of them are going to have the tendency to
      19    increase the time of compressive strength
      20    development, isn't it?
      21        A.      Yes, it can.
```

**26. PAGE 155:20 TO 156:06  (RUNNING 00:00:24.645)**

```
      20        Q.      Okay.  Have you ever heard of
      21    any advice on how to design a base slurry
      22    that will be foamed in terms of rheology and
      23    thickness?
      24        A.      Not so much about rheology.
      25    It's more about settling, you know, a stable
00156:01    slurry.  You can have slurries that are thin
      02    and they're still stable and they don't
      03    settle.
      04        Q.      Okay.
      05        A.      So it's not so much a function
      06    of rheology.
```

**27. PAGE 156:13 TO 156:21  (RUNNING 00:00:22.550)**

```
      13        Q.      And can rheology also be an
      14    indication that the slurry is too thin to be
      15    used for foam cement?
      16        MR. HILL:  Object to form.
```

**CONFIDENTIAL**

**MDL 2179 HESI TRIAL**

```
17        A.      I don't think you can say it's
18   too thin for foam.  If it's stable, you know,
19   and it meets other placement criteria, then
20   there shouldn't be a problem with -- with
21   that particular slurry.
```

> TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:14:47.788)

**CONFIDENTIAL**

# EXHIBIT F

Case 2:10-md-02179-CJB-DPC Document 9043 Filed 03/27/13 Page 49 of 74

**MDL 2179 HESI TRIAL**



MDL 10-2179 JCB

📁 **Gardner, Craig (Vol. 01) - 08/17/2011**          **1 CLIP  (RUNNING 00:10:38.755)**


3-25-13

**GARDNER C V1**          **17 SEGMENTS  (RUNNING 00:10:38.755)**          

**1. PAGE 174:21 TO 175:01  (RUNNING 00:00:15.560)**

```
      21          I'd like to start out with your
      22   background some more.  What is your -- what do
      23   you do in your current role?  And what is your
      24   title, first of all?
      25     A.  I'm Team Leader for the Cement Team,
00175:01   Chevron Energy Technology Company.
```

**2. PAGE 16:03 TO 16:12  (RUNNING 00:00:21.010)**

```
      03     Q.  In connection with this matter, I
      04   understand that you received an assignment from
      05   the company as a result of a request from the
      06   National Commission on the BP DEEPWATER HORIZON
      07   Investigation?
      08     A.  Correct.
      09     Q.  All right.  Did the company ask you to do
      10   work to respond to the request of the National
      11   Commission?
      12     A.  Yes, sir.
```

**3. PAGE 75:12 TO 75:21  (RUNNING 00:00:26.310)**

```
      12     Q.  Okay.  May we turn to Tab 1 in your book,
      13   please.  This is your Report to the National
      14   Commission.  And we'll give it a -- an exhibit
      15   number, which is 4572.
      16          (Exhibit No. 4572 marked.)
      17     Q.  (By Mr. Thornhill) This is the October
      18   26, 2010 letter.  It says on the second page at
      19   the bottom Craig Gardner and has a signature; is
      20   that your name and signature?
      21     A.  Yes, sir.
```

**4. PAGE 75:25 TO 76:03  (RUNNING 00:00:13.470)**

```
      25          Does this Report include all of the
00076:01   information that was considered and used in
      02   performing the tests at Chevron?
      03     A.  Yes.
```

**5. PAGE 78:05 TO 78:11  (RUNNING 00:00:25.300)**

```
      05     Q.  Was it your purpose at Chevron to
      06   evaluate the testing procedures used by
      07   Halliburton at each juncture for each test as
      08   distinguished from the general parameters of the
      09   API 10B-4 documents, which we -- we reviewed?
      10     A.  The purpose was not to evaluate -- was
      11   not to evaluate the Halliburton protocol.
```

**6. PAGE 284:19 TO 285:05  (RUNNING 00:00:24.883)**

```
      19          The first thing I wanted to -- to ask you
      20   is I just want to clarify for the Judge who's
      21   watching, that it's your understanding that the
      22   testing you performed at the request of the
      23   National Commission was done on shelf samples
```

**CONFIDENTIAL**                                                                      **page 1**

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    MAR 27 2013

LORETTA G. WHYTE
CLERK

Except played
in Court
3-27-2013

Case 2:10-md-02179-CJB-DPC   Document 9273   Filed 04/12/13   Page 50 of 74

## MDL 2179 HESI TRIAL

```
        24   essentially, correct, out of the Halliburton
        25   Laboratory?
00285:01        A.   Correct.
        02        Q.   Okay.  And so it -- it also -- what that
        03   means is you did not test the actual cement blend
        04   as it existed on the rig, correct?
        05        A.   Correct.
```

**7.  PAGE 291:02 TO 292:10  (RUNNING 00:01:18.996)**

```
        02        Q.   (By Mr. Hill) Okay.  So what I'd like to
        03   understand is in -- you know, in your opinion,
        04   this preference for testing rig samples is
        05   primarily in response to a concern that there
        06   could be variability between testing rig samples
        07   and any other source of -- and -- of the branded
        08   cement, correct?
        09        A.   True.
        10        Q.   Okay.  Now, it's not just -- indeed when
        11   Operators generally go offshore to get -- to go
        12   to the rigs and bring back their rig samples for
        13   testing, they don't just bring back one, but they
        14   actually update that sample on a -- on a -- on a
        15   20 or 30 calendar day basis, correct?
        16        A.   You -- you can get multiple samples from
        17   the rig, yes.
        18        Q.   Okay.  And -- and I -- I just want to be
        19   clear.  I'm not saying multiple samples.  I'm
        20   talking about multiple successive samples over
        21   time?
        22        A.   Sampled multiple times.
        23        Q.   Right.
        24        A.   Correct.
        25        Q.   And so, for example, if we bring in a rig
00292:01   sample and test it in the lab, and 60 days later,
        02   they want to -- to test again that same cement
        03   blend, they might go out and get rig samples
        04   again or resample the blend on the rig, correct?
        05        A.   Yes.
        06        Q.   And that's in response to a concern that
        07   even with the duration of time, there could be
        08   chemical changes in the characteristics of the
        09   cement, correct?
        10        A.   Yes.
```

**8.  PAGE 225:08 TO 225:14  (RUNNING 00:00:22.325)**

```
        08        Q.   M-h'm.  More specifically, do you believe
        09   that your testing is a reliable indication of
        10   what would have happened if you tested the rig
        11   blend?
        12             MR. HILL:  Objection, form.
        13        A.   I would have to test the rig blend to
        14   answer that.
```

**9.  PAGE 300:22 TO 301:20  (RUNNING 00:00:45.120)**

```
        22        Q.   Okay.  And -- and I would just like to
        23   ask you, do -- do you believe that the test --
        24   the Report, the testing that was reported in
        25   the -- in this Report that we've been talking
00301:01   about all day, do you believe that it proves that
        02   the rig cement was unstable?
        03        A.   "Proves" is a strong word.
        04        Q.   Right.
        05        A.   It demonstrates this slurry design as
        06   tested with these materials was not stable.
        07        Q.   Right.  But the -- we've already
```

**CONFIDENTIAL**

08  established that what you tested was something
09  other than rig cement, right?
10      A.  That's true.
11      Q.  And cement being what it is, something
12  that changes over time, changes based on
13  environmental conditions, has a unique char --
14  has its own unique characteristics?
15      A.  M-h'm.
16      Q.  There's potential for variability in
17  testing between what was on the rig and what you
18  tested in the lab?
19          MR. CHEN:  Objection, form.
20      A.  That's correct.

**10.  PAGE 231:24 TO 232:14  (RUNNING 00:00:55.250)**

24      Q.  (By Mr. Chen) Now, if -- if you -- if
25  your density measurements were uniform, or
00232:01  reasonably uniform, and -- but they were
02  different from your target density, would you
03  consider that to be a stable foam cement?
04      A.  The -- there are other indicators that
05  are also mentioned in 10B-4, bubble breakout,
06  striation, solid sedimentation, free fluid.  In
07  the absence of all of those, and if the numbers
08  were reasonably uniform around the target 14.5
09  value, then you would call it stable.
10      Q.  Okay.  And the Halliburton Lab Report
11  doesn't indicate that there's an -- doesn't have
12  any comments indicating any visual indications of
13  instability, right?
14      A.  Correct.

**11.  PAGE 294:10 TO 294:15  (RUNNING 00:00:11.662)**

10      Q.  (By Mr. Hill) You performed a variety of
11  foam stability tests, and I think it was
12  Section 9 -- 7 -- Section 9, yeah.  Should be
13  easy to remember because it was Section 9 and you
14  did nine tests, right?
15      A.  Yes.

**12.  PAGE 297:04 TO 297:09  (RUNNING 00:00:14.747)**

04      Q.  (By Mr. Hill) Where 8, the only
05  difference is the inclusion of a mill sample from
06  Lafarge, Test 8 is kind of an outlier in terms of
07  the foam stability test results, correct?
08      A.  The reason for running 8 was to make sure
09  that the prior tests were not outliers.

**13.  PAGE 297:12 TO 298:12  (RUNNING 00:00:55.116)**

12      Q.  I understand that.  But I -- my question
13  was:  It's something of an outlier in terms if
14  you compare all four of those test result ranges,
15  correct?
16      A.  In magnitude, the differences are there.
17  The fact that there's variation across the entire
18  sample is the same across all four.
19      Q.  Fair enough.  But that variation is --
20      A.  Large.
21      Q.  -- vastly different in Test 8, correct?
22      A.  It is higher.
23      Q.  Okay.  And would you agree with me that
24  that is -- and -- and I don't mean to cast
25  aspersions.  I'm sure the test was done fine.
00298:01  But doesn't -- isn't this a built-in

# MDL 2179 HESI TRIAL

```
02  demonstration that the source of the cement
03  matters, that you could have different test
04  results or variability in testing based on where
05  the cement blend comes from?
06       A.  Which is the reason why what you read
07  earlier was representative samples.
08       Q.  Right.  So you would agree with my
09  statement?
10       A.  That where -- that you should use
11  representative materials and that -- that
12  different samples could be different, yes.
```

**14.  PAGE 171:03 TO 171:17  (RUNNING 00:00:47.221)**

```
03       Q.  (By Mr. Thornhill) These are the Chevron
04  Bates numbers beginning with 182 and running
05  through 215.  Particularly ask you to look at the
06  chart on Page 189.  All right?  I believe you
07  told me earlier that you looked at the Bly
08  Report, particularly these appendices, J, M, K,
09  correct?
10       A.  We looked over these Appendices.  This is
11  not -- this is the CSI Report, it's not
12  incorporated in -- there was no intention of
13  duplicating this data in the work that we did.
14       Q.  Okay.  Did you look at this data, though,
15  and consider the constituent parts of the blend?
16       A.  No, sir, because this test does not
17  use -- it uses proxy chemicals.
```

**15.  PAGE 217:14 TO 217:25  (RUNNING 00:00:30.061)**

```
14       Q.  Okay.  Did you personally disagree with
15  any of the methodology in the CSI Report?
16       A.  The CSI Report was not tested with --
17  with Halliburton materials.  So we just read it
18  for what they did.
19       Q.  Right.  Separate and apart from their
20  test results, you reviewed their methodology.
21  Did you disagree with any of their methodology?
22       A.  I would say we just didn't give -- we
23  just didn't give it a lot of weight except to
24  read what was -- you know, just to read their
25  Report.
```

**16.  PAGE 310:15 TO 312:07  (RUNNING 00:01:35.904)**

```
15       Q.  I want to talk to you just about
16  conditioning time generally.  Do you -- what --
17  what is the purpose of conditioning a -- a base
18  slurry?
19       A.  The purpose of the conditioning any
20  slurry is to try to replicate downhole conditions
21  as best you can.
22       Q.  And by "downhole conditions," we're
23  talking about --
24       A.  Temperature and pressure.
25       Q.  Temperature and pressure.
00311:01       And so if you do not condition the base
02  slurry, you are essentially not subjecting your
03  slurry to what you think would be the proper
04  down -- or that, you know, exactly as possible to
05  downhole conditions it's going to experience in
06  placement, right?
07       A.  Well, the discussions around that are in
08  the case of foam, it's difficult to completely
09  replicate the downhole.  Because in foam, you
10  generate the foam, of course, on surface, and
```

Case 2:10-md-02179-CJB-DPC   Document 9043   Filed 04/12/13   Page 53 of 74

## MDL 2179 HESI TRIAL

```
11 then subject it to temperature and pressure.
12     Q.  Right.
13     A.  So it's difficult to completely
14 replicate.
15     Q.  And, in fact, API doesn't have any
16 suggestions or recommendations about conditioning
17 foam slurries, does it?
18     A.  It -- as we said in the Report, they're
19 silent on the issue.
20     Q.  And so if a -- if a company service --
21 you know, a -- a cement contractor or Operator
22 wants to condition that slurry, the base slurry
23 before it's actually foam, for -- for example, a
24 foam stability test, that's not prohibited by --
25     A.  It's not --
00312:01     Q.  -- API, is it?
02     A.  -- prohibited.
03     Q.  And, in fact, there are some good reasons
04 you might want to do it, correct?
05         MR. CHEN:  Objection, form.
06     A.  Like I say, it's -- conditioning is -- is
07 generally a good thing.
```

**17.  PAGE 68:25 TO 69:19  (RUNNING 00:00:55.820)**

```
25     Q.  Do you consider in connection with your
00069:01 running the thickening time test and in the
02 compressive strength test the likely increase in
03 temperature from circulating toward static, and
04 the time that it would take for that increase in
05 temperature?
06     A.  Are you asking me whether the temperature
07 ramp on a compressive strength test is based on a
08 modeling of the return from circulating to
09 static?
10     Q.  Yes.
11     A.  We usually -- in the Chevron Lab, we
12 usually use a four-hour heat-up.  That's --
13 that's based on internal work on using just
14 exactly what you're asking, heating it on
15 thickening time, bringing it to schedule, et
16 cetera, et cetera.
17         So over time, the protocols we've
18 developed are a four-hour heat-up and a full
19 bottomhole pressure.
```

> **TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:10:38.755)**

# EXHIBIT G

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3

4    ***************************************************************

5        IN RE:  OIL SPILL BY THE OIL
         RIG *DEEPWATER HORIZON* IN THE
6        GULF OF MEXICO ON APRIL 20,
         2010
7

8                              CIVIL ACTION NO. 10-MD-2179 "J"
                               NEW ORLEANS, LOUISIANA
9                              Thursday, March 7, 2013

10

11       THIS DOCUMENT RELATES TO:

12       CASE NO. 2:10-CV-02771,
         *IN RE:  THE COMPLAINT AND*
13       *PETITION OF TRITON ASSET*
         *LEASING GmbH, ET AL*
14
         CASE NO. 2:10-CV-4536,
15       *UNITED STATES OF AMERICA V.*
         *BP EXPLORATION & PRODUCTION,*
16       *INC., ET AL*

17
     ***************************************************************
18

19

20                    **DAY 8 - MORNING SESSION**

21           TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

22       HEARD BEFORE THE HONORABLE CARL J. BARBIER

23                 UNITED STATES DISTRICT JUDGE

24

25

OFFICIAL TRANSCRIPT

08:44:32  1   either you have a reduction in the volume of your -- a significant

08:44:35  2   reduction in the top of your sample or you got water that goes to

08:44:39  3   the top and creates a void, right?

08:44:42  4   A.  Yes, sir.

08:44:42  5   Q.  Visual signs of density segregation, indicated by streaking or

08:44:48  6   light to dark color change from top to bottom, that's just a visual

08:44:53  7   observation, correct?

08:44:53  8   A.  Yes, sir.

08:44:54  9   Q.  The bottom one, large variations in density from sample top to

08:44:56 10   bottom, that's something we primarily look at in the set test where

08:45:00 11   we measure the specific gravity of the set from top to bottom,

08:45:03 12   correct?

08:45:03 13   A.  Well, actually, you can run a tube and pull a sample, so you

08:45:06 14   can check the unfoamed density -- I'm sorry, the unset density, let

08:45:11 15   me correct myself, of the liquid sample and there's -- so you can

08:45:15 16   do both.

08:45:16 17   Q.  Fair enough.  Now, you understand that the unset foam stability

08:45:20 18   test that was run by OTC, that Mr. Garrison testified that none of

08:45:24 19   these indications of instability were observed in that slurry?

08:45:27 20   A.  That's right, Dr. Garrison did do that.

08:45:30 21   Q.  And you would trust his ability to actually make these physical

08:45:33 22   observations that are either based on physical artifacts you can

08:45:36 23   see or measurements you can physically take, right?

08:45:39 24   A.  Yes, sir.

08:45:39 25   Q.  So, sir, if you would agree that an unset foam stability test

08:45:44  1   on a MAC 4 slurry, even if it was more than a year old, if it did

08:45:51  2   not demonstrate any signs of instability identified at API 10B-4,

08:45:54  3   that it's reasonable to consider that a stable foam stability test?

08:46:02  4   A.  Well, the data shows that the OTC sample was a stable foam

08:46:07  5   stability test.

08:46:08  6   Q.  Thank you.  So let's go to -- let's talk a little bit about the

08:46:23  7   Halliburton testing that you reviewed, okay.  You stated in your

08:46:27  8   report that you thought that the testing was incomplete.

08:46:32  9   A.  Yes, sir.

08:46:33  10  Q.  And you identified some of the tests that you thought should

08:46:38  11  have been run, correct?

08:46:39  12  A.  Yes.  Yes, sir.

08:46:41  13  Q.  And you also looked at Halliburton's contract with BP to

08:46:45  14  identify what tests BP had asked Halliburton to do with respect to

08:46:50  15  different types of cement jobs, right?

08:46:52  16  A.  That's correct.

08:46:52  17  Q.  I want to bring that up, it's TREX 4477, and let's go to page

08:47:01  18  ending Bates 5804.  That's not it.  It ends in 5809.  I gave you

08:47:52  19  the wrong number, my apologies.  5809.  I can't read my own

08:47:57  20  handwriting.  I apologize for the delay.  Can you bring up the box,

08:48:02  21  please, here.

08:48:03  22          You looked at this, and I think in your report, you said

08:48:06  23  that the only test that you found that Halliburton didn't run was a

08:48:10  24  free water test, right?

08:48:11  25  A.  That's correct.

1:14:59 1   that did those tests, found that the slurry that was tested was

1:15:04 2   stable.  Did you say that this morning?

1:15:07 3   A.  I think Dr. Garrison, in his testimony, was looking at bubble

1:15:13 4   breakout in those particular things and didn't -- and I am trying

1:15:19 5   to remember that testimony that he had.

1:15:20 6   Q.  Let me see if I can show it to you and see if you can recall

1:15:23 7   it.  Do you have the Garrison deposition?  If we can go to page

1:15:29 8   268, line 18.

1:15:36 9   A.  I was asked about this in my deposition.

1:15:39 10  Q.  268, line 18.  Again, this is Mr. Garrison's -- bottom

1:15:49 11  question.  "Now, earlier today in response to questions I asked

1:15:52 12  you, and also in response to questions from attorneys for BP, you

1:15:55 13  testified that with respect to all" --

1:15:58 14          MR. HILL:  Your Honor, I have to object.  This is in

1:15:59 15  violation of your Honor's motion -- ruling on a motion in limine,

1:16:02 16  specifically, on this point.

1:16:04 17          MR. REGAN:  Can I respond to that, your Honor?

1:16:06 18          THE COURT:  I am not sure what the point is yet.

1:16:08 19          MR. REGAN:  Well, with respect to counsel's argument,

1:16:10 20  counsel directly asked this witness about Mr. Garrison's opinions

1:16:14 21  about this testing.  He expressly made those questions.  He has

1:16:17 22  opened the door on his motion in limine as wide as anyone could.

1:16:22 23          MR. HILL:  Can I respond?

1:16:23 24          THE COURT:  I frankly I don't recall what the motion in

1:16:25 25  limine was all about.

1:16:26  1          MR. HILL:  Your Honor, may I respond?

1:16:27  2          THE COURT:  Yes.  Come up here so we can hear you.

1:16:30  3          MR. HILL:  Your Honor entered an order that said that

1:16:32  4   Mr. Garrison and Mr. Gardner's factual testimony about what they

1:16:37  5   observed during the test was admissible.  But on the ultimate

1:16:41  6   question of whether or not it was stable or unstable is opinion

1:16:43  7   testimony, that that was not to come in.  I think your actual thing

1:16:48  8   was opinion testimony was not to come in.

1:16:49  9          What I did, I went through and asked him to look at the

1:16:52 10   very factual observations of instability.  I never once broached

1:16:57 11   the subject of what his ultimate question was or what his ultimate

1:17:00 12   opinion was about stability and instability; but frankly, was three

1:17:04 13   different opinions during the deposition.

1:17:08 14          THE COURT:  You know, guys, we had so many motions in

1:17:11 15   limine in this case and I've got a book full of them here, and I

1:17:14 16   have to tell you, I don't recall all of the details of every one of

1:17:17 17   these.

1:17:17 18          MR. HILL:  Your Honor, it's --

1:17:19 19          THE COURT:  I'm trying to reconstruct this.  What was the

1:17:21 20   basis of your motion in limine, Mr. Hill?

1:17:23 21          MR. HILL:  Actually, it was BP's motion.

1:17:26 22          THE COURT:  BP's motion.

1:17:27 23          MR. REGAN:  Your Honor, I'll summarize the order.

1:17:30 24          THE COURT:  What was it?  Do you remember the date of

1:17:31 25   that order?

1    MR. HILL:  Document 5810, February 22nd.

2    THE COURT:  Go ahead.  I am trying to find it.

3    MR. REGAN:  I completely agree that a motion in limine

4  was entered to say we were allowed to talk about what Chevron and

5  OTC observed and what the test results were, but we were not

6  allowed to get into Mr. Garrison or Mr. Gardner's opinions.  But in

7  this trial, since we have begun from opening statement, Mr. Godwin

8  put up testimony from Mr. Garrison, and in the cross-examination

9  this morning by Halliburton, he specifically asked about

10  Mr. Garrison's opinions about the stability of those tests.  I

11  think he has opened the door.

12    MR. HILL:  Your Honor, I respond that I specifically

13  stayed away from asking him --

14    THE COURT:  Wait, wait.  I think I have the order.  It's

15  record Document 5810, correct?

16    MR. HILL:  Yes, your Honor.

17    THE COURT:  Let me glance at this real quickly.  Looks

18  like there was -- the court had previously clarified that, "The OTC

19  test results and data are admissible and that the testimony of Greg

20  Garrison, the head of the OTC laboratory, is not admissible.  This

21  clarifying order granted the United States 'request to exclude

22  Mr. Garrison's expert opinions.

23    "However, the fact that Mr. Garrison -- the fact

24  testimony of Mr. Garrison may be necessary to provide context in

25  his direct observations concerning cement testing results."

2543

1    And it goes on to say, "Additionally, no party has

2  contested BP's assertion that the Chevron cement test results and

3  fact testimony of Craig Gardner exists independently of their

4  reports.  The fact testimony of Mr. Garrison is admissible.  His

5  opinion testimony is inadmissible.  The Chevron cement testing

6  report, Chevron cement testing data and associated fact testimony

7  of Mr. Gardner are not rendered inadmissible by their relationship

8  to exclude a governmental report."

9    Okay.  Let me hear from you, Mr. Regan, again.

10    MR. REGAN:  The question that was asked, again, on

11  cross-examination.  This is notes, so with respect to the

12  transcript.  The witness was asked by counsel for Halliburton about

13  whether Mr. Garrison testified that none of these indications of

14  instability were observed in that slurry.  He was asked about his

15  opinions, about instability, about his testimony.  I think that

16  opens the door.

17    THE COURT:  I am going to overrule the objection.  Let's

18  go.

19  BY MR. REGAN:

20  Q.  Mr. Benge, do you see the testimony on the page?

21  A.  Yes, sir, I do.

22  Q.  And Mr. Garrison, he testified that with respect to his

23  testing, that's the OT&C testing, none of the unset foam slurry

24  tests were stable, correct?

25  A.  That is correct.

# EXHIBIT H

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY THE OIL RIG   *   Docket 10-MD-2179
     *DEEPWATER HORIZON* IN THE          *
5    GULF OF MEXICO ON APRIL 20, 2010   *   Section J
                                        *
6    Applies to:                        *   New Orleans, Louisiana
                                        *
7    Docket 10-CV-02771,                *   March 27, 2013
     *IN RE:   THE COMPLAINT AND*         *
8    *PETITION OF TRITON ASSET*           *
     *LEASING GmbH, et al*                *
9                                        *
     Docket 10-CV-4536,                 *
10   *UNITED STATES OF AMERICA v.*        *
     *BP EXPLORATION & PRODUCTION,*       *
11   *INC., et al*                        *
                                        *
12   * * * * * * * * * * * * * * * * *  *

13

14                   DAY 19, AFTERNOON SESSION
                  TRANSCRIPT OF NONJURY TRIAL
15            BEFORE THE HONORABLE CARL J. BARBIER
                  UNITED STATES DISTRICT JUDGE
16

17   Appearances:

18
     For the Plaintiffs:          Domengeaux Wright Roy
19                                  & Edwards, LLC
                                  BY:  JAMES P. ROY, ESQ.
20                                556 Jefferson Street, Suite 500
                                  Post Office Box 3668
21                                Lafayette, Louisiana 70502

22
     For the Plaintiffs:          Herman Herman & Katz, LLC
23                                BY:   STEPHEN J. HERMAN, ESQ.
                                  820 O'Keefe Avenue
24                                New Orleans, Louisiana 70113

25

                          OFFICIAL TRANSCRIPT

16:15 1   it a day.

16:15 2           **MR. GODWIN:**  Then first thing Tuesday morning, I will

16:15 3   put on Jesse Gagliano, Your Honor.

16:15 4           **THE COURT:**  That sounds good.

16:15 5           **MR. GODWIN:**  Good.  We will start with the videos,

16:15 6   Your Honor.

16:15 7           **THE COURT:**  Yes.  Tell us who the videos are.

16:15 8           **MR. GODWIN:**  Yes, Your Honor.  The first one is

16:15 9   Mr. Greg Garrison with the OTC, Your Honor.

16:15 10          **MR. HILL:**  Your Honor, may I approach to provide

16:15 11  transcripts?

16:15 12          **THE COURT:**  Yes.

16:15 13          **MR. GODWIN:**  When he finishes, Your Honor, then we'll

16:15 14  have Craig Gardner, with Chevron; Ronnie Faul, formerly with

16:15 15  Halliburton; and Rickey Morgan, with Halliburton.  There will

16:15 16  be four of them, for a total of 43 minutes, Judge.

16:15 17          **THE COURT:**  Fair enough.

16:16 18          Stop it for one second.

16:16 19          **MR. BROCK:**  Mike Brock for BP.

16:16 20          We just wanted to note for the record that these

16:16 21  are designations that come out of the bundles.  I don't want to

16:16 22  interrupt the proceedings today and the videotape, but we would

16:16 23  insist on our -- the objections that we have put in the record

16:16 24  on the bundles -- of the depositions that are being played from

16:16 25  the bundles.

| | | |
|---|---|---|
| 16:16 | 1 | **THE COURT:**  Sure.  I understand. |
| 16:16 | 2 | **MR. BROCK:**  That's all. |
| 16:16 | 3 | **THE COURT:**  Thank you. |
| 16:16 | 4 | We can play it. |
| 16:16 | 5 | (Greg Garrison testified by video deposition.) |
| 16:32 | 6 | **THE COURT:**  All right.  Next video? |
| 16:32 | 7 | **MR. GODWIN:**  Your Honor, the next one is Mr. Craig |
| 16:32 | 8 | Gardner, with Chevron. |
| 16:32 | 9 | **THE COURT:**  Do we have his transcripts? |
| 16:32 | 10 | **MR. GODWIN:**  Yes, sir.  We do, Your Honor. |
| 16:32 | 11 | **THE COURT:**  You can give them all to us if you'd |
| 16:32 | 12 | like.  It will be easier. |
| 16:33 | 13 | **MR. HILL:**  Ready? |
| 16:33 | 14 | **THE COURT:**  Yes. |
| 16:33 | 15 | (Craig Gardner testified by video deposition.) |
| 16:44 | 16 | **MR. GODWIN:**  That concludes that one, Your Honor. |
| 16:44 | 17 | The next one, Judge, is Mr. Ronnie Faul, with Halliburton. |
| 16:44 | 18 | **THE COURT:**  All right. |
| 16:44 | 19 | (Ronnie Faul testified by video deposition.) |
| 16:54 | 20 | **MR. GODWIN:**  That concludes Mr. Faul. |
| 16:54 | 21 | The next one and the last one is Mr. Rickey |
| 16:54 | 22 | Morgan with Halliburton. |
| 16:54 | 23 | **THE COURT:**  Very well. |
| 16:54 | 24 | (Rickey Morgan testified by video deposition.) |
| 17:03 | 25 | **MR. GODWIN:**  Your Honor, that concludes the four |

| | | |
|---|---|---|
| 17:03 | 1 | videos and what we have for today. |
| 17:03 | 2 | Tuesday morning, with Your Honor's permission, |
| 17:03 | 3 | we will start with Jesse Gagliano at 8:00, Judge. |
| 17:03 | 4 | THE COURT:  Gagliano will be first on Tuesday? |
| 17:03 | 5 | MR. GODWIN:  Yes, he will, Judge. |
| 17:03 | 6 | THE COURT:  Who is going to be next? |
| 17:03 | 7 | MR. GODWIN:  Next, Your Honor, will be David Bolado, |
| 17:03 | 8 | Your Honor.  David Bolado. |
| 17:03 | 9 | THE COURT:  I had him crossed off.  I thought you |
| 17:03 | 10 | told me you weren't calling him. |
| 17:03 | 11 | MR. GODWIN:  If we had had Ravi, we were not going to |
| 17:03 | 12 | call him, Judge.  And without Ravi we need to call him. |
| 17:03 | 13 | THE COURT:  Okay. |
| 17:03 | 14 | MR. GODWIN:  Then Dr. Glen Stevick. |
| 17:04 | 15 | And the next after that will be Sam Lewis, |
| 17:04 | 16 | Dr. Sam Lewis, and then Gene Beck, Your Honor. |
| 17:04 | 17 | Then there are two more videos if we need next |
| 17:04 | 18 | week.  But we believe that will fill up next week, since we |
| 17:04 | 19 | only have three days of court, Judge: Tuesday, Wednesday, |
| 17:04 | 20 | Thursday.  And we'll push it along as quickly as we can and be |
| 17:04 | 21 | prepared on Wednesday at noon to state who, if anyone, we will |
| 17:04 | 22 | have the following week. |
| 17:04 | 23 | But we are moving along with your direction in |
| 17:04 | 24 | mind, Judge. |
| 17:04 | 25 | THE COURT:  Okay.  Anybody have anything else? |

17:04   1          **MR. GODWIN:**  Thank you, Your Honor.

17:04   2          **MR. UNDERHILL:**  Briefly, Your Honor.

17:04   3          **THE COURT:**  Wait a minute.  Mr. Underhill has

17:04   4   something.

17:04   5          **MR. UNDERHILL:**  Mike Underhill, on behalf of the U.S.

17:04   6              Your Honor, just to put it on the radar

17:04   7   screen -- and it goes to the issue of experts.  I may be

17:04   8   reading too much into what Mr. Godwin says.  But I think

17:05   9   there's a -- it sounds like at least a possibility that next

17:05   10  week, if they don't conclude Halliburton's case, the following

17:05   11  week they will head into the end of their case pretty early,

17:05   12  which means that we then will be heading into BP's case in

17:05   13  chief.

17:05   14             This is partly for selfish reasons for my team,

17:05   15  having to do with hotel issues down the road, especially around

17:05   16  Jazz Fest and going into May.  I'm trying to figure out how

17:05   17  long we're going to be in trial.

17:05   18             I've got a list that I can provide to Ben, if

17:05   19  you want.  But I think I calculate 22 or 23 BP witnesses.

17:05   20  They've got three engineers from the Bly investigation team

17:05   21  that want to talk about the Bly report, despite the fact it's

17:05   22  in.  Mr. Bly was on the stand for two days.

17:05   23         **THE COURT:**  Well, I'm expecting that BP is going to

17:05   24  make a real effort to cut down the number of witnesses, so

17:05   25  we'll see.

# EXHIBIT I

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3

4                                        *

IN RE:   OIL SPILL BY THE OIL RIG      *   Docket 10-MD-2179

5        *DEEPWATER HORIZON* IN THE      *
         GULF OF MEXICO ON              *   Section J

6        APRIL 20, 2010                 *
                                         *   New Orleans, Louisiana

7                                        *
                                         *   February 22, 2013

8                                        *
Applies to:  All Cases                  *   9:30 a.m.

9        * * * * * * * * * * * * * * * * * *

10                   WORKING GROUP CONFERENCE BEFORE

11                    THE HONORABLE SALLY SHUSHAN
                     UNITED STATES MAGISTRATE JUDGE

12

13       APPEARANCES:

14       For the Plaintiffs:         Herman Herman Katz & Cotlar, LLP
                                     BY:  STEPHEN J. HERMAN, ESQ.

15                                   BY:  SOREN GISLESON, ESQ.
                                     820 O'Keefe Avenue

16                                   New Orleans, Louisiana 70113

17

         For the Plaintiffs:         Levin Papantonio Thomas Mitchell

18                                      Rafferty & Proctor, PA
                                     BY:  BRIAN H. BARR, ESQ.

19                                   Post Office Box 12308
                                     316 South Baylen Street

20                                   Suite 600
                                     Pensacola, Florida 32591

21

22       For the Plaintiffs:         Irpino Law Firm
                                     BY:  ANTHONY IRPINO, ESQ.

23                                   BY:  MICHAEL ROBINSON, ESQ.
                                     2216 Magazine Street

24                                   New Orleans, Louisiana 70130

25

1    oh, Mr. Breit, you are our document guru for the PSC; is that

2    correct, sir?

3              **MR. BREIT:**  I'm one of many.  It depends how bad you

4    want to throw something.

5              **THE COURT:**  Would you please do me the favor of

6    looking at the three demonstratives that Andy says have already

7    been the subject of a ruling and the 47 others --

8              **THE DEPUTY CLERK:**  42.

9              **MR. LANGAN:**  42, I think.

10             **THE COURT:**  -- 42 others that he believes are

11   implicated by prior rulings and let him know whether you agree

12   with him or not --

13             **MR. BREIT:**  That, I can do.

14             **THE COURT:**  -- "cc" me on it and we'll get that

15   resolved.

16             **MR. LANGAN:**  Thank you, Your Honor.

17             **THE COURT:**  You're welcome.

18             **MR. UNDERHILL:**  I don't want to get in their

19   crossfire.

20             **THE COURT:**  No, I would suggest you don't.

21             **MR. UNDERHILL:**  But just a clarification question,

22   Your Honor.  Let's assume, for the sake of argument, that the

23   Court rules a demonstrative is inadmissible, let's say because

24   it violates a motion in limine.  If the Court did that, I would

25   assume that the ruling would be without prejudice in the event

1   the party that's objecting opens the door to that type of

2   information through another exhibit or through testimony.  I

3   would hope that would be the case.

4           THE COURT:  I'm sure it is.

5           MR. UNDERHILL:  Thank you, Your Honor.

6           MR. LANGAN:  Do the Rules of Evidence apply?  I

7   mean --

8           THE COURT:  The Rules of Evidence do apply.  And, you

9   know, if you use that demonstrative --

10          MR. LANGAN:  If we use one of their demonstratives,

11  could they then use it?  We agree.

12          MR. UNDERHILL:  You see, that's not quite what I was

13  asking, Andy.  That's a little bit of a shift there.

14              It could be a broader issue:  Another party with

15  another witness introduces an exhibit or testimony that a party

16  says, "Oops, opened the door."  All I'm saying is obviously the

17  Court is going to have to make that decision.

18          THE COURT:  Well, and you know Judge Barbier does

19  know the Rules of Evidence.

20          MR. UNDERHILL:  Well, I don't, but I was hoping for

21  an advanced ruling, an advisory opinion.

22          THE COURT:  You're not getting it from me.

23              Steve, you got something?

24          MR. HERMAN:  Well, I'm just trying to suggest that

25  rather than do this prematurely and in a vacuum, why don't we

# EXHIBIT J

**Scanlon, Chris**

| | |
|---|---|
| **From:** | York, R. Alan [Alan.York@GodwinLewis.com] |
| **Sent:** | Monday, March 25, 2013 8:34 PM |
| **To:** | 'Sally_Shushan@laed.uscourts.gov'; 'Ben_Allums@laed.uscourts.gov'; 'Mike_O'Keefe@laed.uscourts.gov' |
| **Cc:** | *sherman@hhkc.com; 'Jim R'; 'robert cunningham'; 'Paul M. Sterbcow'; *Mike.Underhill@usdoj.gov; *lstrange@ago.state.al.us; *CMaze@ago.state.al.us; 'TerrellM@ag.state.la.us'; 'treyphillipsdwh@ag.state.la.us'; Douglas Kraus; dsc2179 distribution list; 'mdl2179evidence@liskow.com'; Godwin, Donald |
| **Subject:** | Halliburton Trial Video Clips |
| **Attachments:** | Garrison G V1 3-25-13.pdf; Gardner C V1 3-25-13.pdf; Morgan R  3-25-13.pdf; Faul R 3-25-13.pdf; Gisclair J 3-25-13.pdf; Kronenberger K 3-25-13.pdf |

Judge Shushan, Ben, Mike, and counsel:

Halliburton has edited from its previous designations the following six video clips it plans to show during its case-in-chief:

1. Greg Garrison
2. Craig Gardner
3. Rickey Morgan
4. Ronnie Faul
5. John Gisclair
6. Kurt Kronenberger

These six video clips now have a total running time of less than 60 minutes.  Specific designations for these revised clips are attached.  Please note that the video clip of Greg Garrison has been edited to meet objections tendered by the US.

Thank you.

Alan York


Alan  York, Shareholder
Board Certified - Civil Appellate Law
Texas Board of Legal Specialization
In **Houston** Office
Alan.York@GodwinLewis.com

# GODWIN LEWIS PC

**Direct:** 713.595.8301
**Fax:** 713.595.8333

www.GodwinLewis.com
**Toll Free:**  800-662-8393

**Dallas**          **Houston**          **Plano –** By Appointment Only

| 1201 Elm Street | 1331 Lamar | 5700 Granite Parkway |
|---|---|---|
| Suite 1700 | Suite 1665 | Suite 450 |
| Dallas, Texas 75270 | Houston, Texas 77010 | Plano, Texas 75024 |
| 214.939.4400 | 713.595.8300 | 214.939.4500 |

This electronic transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify **Godwin Lewis PC** immediately by telephone (800.662.8393) and destroy the original message.  Messages sent to and from us may be monitored.