

DALLAS  HOUSTON  PLANO

*Attorneys and Counselors*

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041

214.939.4400
800.662.8393
214.760.7332  Fax

www.GodwinLewis.com

DONALD E. GODWIN
BOARD CERTIFIED - CIVIL TRIAL LAW -
TEXAS BOARD OF LEGAL SPECIALIZATION
DIRECT DIAL:      214.939.4412
DIRECT FAX:       214.939.4803
Don.Godwin@GodwinLewis.com

April 11, 2013

**VIA EMAIL**
The Honorable Carl J. Barbier
United States District Judge
500 Poydras Street, Room C-268
New Orleans, Louisiana  70130

      Re:    HESI's Objection to BP's Proposed Admission of Certain Clips from Greg Garrison's Deposition

Dear Judge Barbier:

      BP seeks to play an 11 minute video clip from the deposition of Greg Garrison, who supervised post-incident testing conducted by Oilfield Testing & Consulting ("OTC") for the Joint Investigation Team ("JIT").  HESI objects to only 21 lines of these clips because the testimony reflects opinions that are (1) unrelated to Mr. Garrison's work for the JIT; (2) beyond the scope of and nowhere contained in the OTC Report (TREX 5937); and (3) beyond Mr. Garrison's expertise by his own admission.  HESI agrees that Garrison's opinions regarding or related to his lab testing for OTC should be admissible.  HESI has not objected to those portions of BP's proposed video clips showing such opinions.  Rather, the very limited questions and answers at issue, which appear at the end of BP's proposed video clip, are nothing more than an attempt to elicit impermissible opinion testimony in violation of Rule 702.

      In its Letter Brief of April 10, BP suggests the Court's earlier admission of Mr. Garrison's opinions relating to his testing on behalf of the JIT somehow opened the door to *all* opinion testimony of Mr. Garrison elicited during his deposition.  Specifically, BP proposes to introduce testimony regarding the operational impact of pumping an unstable foam cement into a deepwater well; whether such a cement slurry would be permeable to hydrocarbon flow; and the safety implications of pumping such a slurry.  *See* Exhibit A to BP's Letter Brief, 153:22-154:2; 154:5-10; 272:8-18.  BP fails to point out that Mr. Garrison's already admitted opinions relate to cement testing, which is Mr. Garrison's area of expertise and is the subject of OTC's report, and to general cementing knowledge[1]  For the following

---

[1] HESI introduced Garrison's opinion that a lack of zonal isolation does not equate to a blowout in as part of its Opening Statement and in D-8023.  (*See* Ex. D to BP's Letter Brief).  Along with Mr. Garrison, HESI cites thirteen other witnesses, both expert and non-expert in cementing and oilfield operations, in support of this very general proposition.  The opinions proposed by BP are, by contrast, of a very specific and technical nature and are properly a subject to be addressed only by qualified experts in foam cementing operations.

reasons, the Court should exclude Mr. Garrison's opinion testimony that is unrelated to general cement chemistry and the testing OTC performed for the JIT.

### I. Mr. Garrison Is Not An Expert In Foam Cementing Operations By His Own Admission.

First, the objectionable portions of Mr. Garrison's opinion testimony should be excluded because he is not an expert in foam cementing operations. In his deposition, Mr. Garrison was asked whether he characterizes himself as a cement contractor or a cement tester; he replied that he is a "cement tester." *See* Ex. A, Greg Garrison deposition transcript at 255:22-24. Further, Mr. Garrison acknowledged that he has very little operational experience and would "by no means" consider himself an expert in operations on a rig. *Id*. at 244:20-25; 245:10-15. When asked about the operational consequences of an inability to generate a foam slurry on a rig, Mr. Garrison declined to answer because he had never seen a foam generated on a rig under pressure. *Id*. at 52:8-22.

In fact, when BP attempted to qualify Mr. Garrison broadly as a foam cement expert, Garrison replied "I wouldn't define myself as a foam cement expert." *Id.* at 79:23-80:9. Only after BP excluded the operational aspects of foam cementing, as opposed to foam cement design and testing, did Mr. Garrison agree that he is an expert. *Id*. at 80:10-21.

Because Mr. Garrison acknowledges that he lacks expertise in foam cementing operations and, indeed, has not even been designated by any party as an expert in foam cementing operations, BP should not be permitted to rely on his testimony regarding the operational and safety implications of foam cementing.

### II. HESI Has Opened The Door Only To The Cement Testing, Design and Chemistry Opinion Testimony Of Mr. Garrison.

The opinions of Mr. Garrison referenced earlier in trial by HESI relate directly to his expertise in cement testing, his interpretation of the results he obtained in his lab, and his work for the JIT. *See* Ex. E to BP's Letter Brief. Specifically, the clips played by HESI reflect Garrison's observations of OTC's testing, his understanding of the signs of instability in the context of a foam stability test interpretation as set forth by API 10B-4, and the conclusions he drew from OTC's testing as reflected in the JIT Report (TREX 5937). *See id.* HESI intentionally omitted from its submissions of Mr. Garrison's testimony those portions unrelated to OTC's testing and report and outside of Mr. Garrison's expertise.

In stark contrast, the objectionable testimony relates to the alleged operational consequences of pumping an unstable foam slurry into a deepwater well and the safety implications, if any, of such an operation. Neither of these opinions is contained in the JIT Report. Because these opinions are outside OTC's Report and Mr. Garrison's self-admitted expertise and experience, they should be excluded.

### III. BP Should Not Be Permitted To Introduce The Expert Opinions of Fred Sabins By Reference To The Opinion Testimony Of Mr. Garrison.

Significantly, BP's proposed clips from the deposition of Mr. Garrison represent an obvious, and improper, attempt to resurrect some of the opinions of Fred Sabins, whose expert report has been stricken due to Mr. Sabins' pre-trial misconduct. *See* Dkt. No. 4838. BP should not now be permitted to introduce these improper opinions through an unqualified expert whose own report did not contain anything resembling those opinions.

2

IV.     **Allowing Mr. Garrison to Offer Opinions He Is Not Qualified to Offer Bears No Relation To HESI's Alleged Conduct.**

The measure of an appropriate sanction is whether it restores the prejudiced party to the same position it would have been in absent the wrongful conduct. *Yelton v. PHI, Inc.*, 279 F.R.D. at 393 (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). Even assuming *arguendo* that BP has suffered any prejudice, which it has not, allowing Mr. Garrison to offer opinions regarding alleged operational consequences of pumping an unstable foam slurry into a deepwater well and the safety implications, if any, of such an operation - that he is not qualified to make - has no relation to the turnover of Kodiak Blend or the recent production of a small number of documents. The Kodiak Blend and the small number of documents recently produced have *nothing at all* to do with whether unstable foam cement is sufficiently permeable to permit the flow of hydrocarbons. Allowing unqualified opinion testimony does nothing to "restore" BP to any alleged pre-prejudice position and is contrary to Rule 702. Such a sanction is unwarranted and unsupported under the facts of this case and applicable legal authority.

V.      **HESI Alternatively Requests the Admission of Dr. Strickland's Rebuttal Report.**

To the extent the Court permits BP to play the objectionable portions of Mr. Garrison's opinion testimony, HESI respectfully requests that the Court also permit HESI to enter into evidence the rebuttal report of Dr. Richard Strickland, which specifically addresses the issue of permeable cement and demonstrates that hydrocarbon flow through cement with the permeability alleged by BP is not possible. As the Court will recall, HESI specifically brought to the Court's attention that it would not offer Dr. Strickland's rebuttal report into evidence when he testified at trial, but reserved the right to do so should BP attempt, through Mr. Sabins *or any other witness*, to offer opinion testimony regarding hydrocarbon flow through allegedly unstable foam cement.

Respectfully submitted,

*Donald E. Godwin*

Donald E. Godwin

cc: Liaison Counsel

# Exhibit A

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL         )    MDL NO. 2179
     by the OIL RIG,           )
 4   DEEPWATER HORIZON in      )    SECTION "J"
     the GULF OF MEXICO,       )
 5   April 20, 2010            )    JUDGE BARBIER
                               )
 6                             )    MAG.  JUDGE
                               )    SHUSHAN
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22           Videotaped deposition of GREG
     GARRISON, taken at Pan-American Building, 601
23   Poydras Street, 11th Floor, New Orleans,
     Louisiana, 70130, on the 4th of November,
24   2011.
25
```

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1              MR. HILL:  Object to form.
 2         Q.     60 foam quality.
 3              MR. O'ROURKE:  Objection.
 4              MR. PETOSA:  Form.
 5         Q.     Let me take a step back,
 6   Mr. Garrison.
 7         A.     Okay.
 8         Q.     If the foam doesn't -- if you
 9   can't generate a foam at the top, at the
10   injection, at the nitrogen injection point,
11   will the -- will a foam form as the cement is
12   going down the hole?
13              MR. HILL:  Object to form.
14              MR. PETOSA:  Form.
15         A.     Some believe it will, and
16   there's some people who believe it won't.
17         Q.     And where do you fall?
18              MR. O'ROURKE:  Objection.
19         A.     In my opinion -- I don't know.
20   I can't really answer the question because
21   I've never seen a foam generated under
22   pressure.
23         Q.     Okay.  Now, when -- when you
24   generate foam on the -- when you generate
25   foam, it's done with the nozzle at high
```

```
 1          Q.   Okay.  Let's go back to your
 2     credentials.
 3          A.   Okay.
 4          Q.   Now, have you published any
 5     papers previously on foam cementing?
 6          A.   On foam cementing, no.
 7          Q.   Okay.  And on the general topic
 8     of cementing, have you published any
 9     papers --
10          A.   I've --
11          Q.   -- or articles?
12          A.   I've been part of some
13     publications.
14          Q.   About how many?  Can you
15     estimate?
16          A.   Let's see.  Not that many with
17     Schlumberger.  Internal, maybe half a dozen.
18          Q.   Okay.  In publications such as
19     Oilfield Review, correct?
20          A.   Yes.
21          Q.   And any SPE papers?
22          A.   No.
23          Q.   And is there anything else that
24     you've done in -- in your experience or
25     training that we haven't covered that you
```

1  believe gives you expertise in -- in foam
2  cementing?
3        A.    I wouldn't -- I wouldn't define
4  myself as a foam cement expert.  And when you
5  say, you know, an expert, it's not so much
6  design as it is design and application.  I've
7  been part of, you know, all sides, but I
8  don't have the -- the background that a lot
9  of folks do in foam.
10       Q.    Okay.  Well, I want to break it
11 apart.  I mean, I want to talk first -- I
12 guess right now I'm talking about, do you
13 have expertise in sort of the design and
14 testing of the foam cement, setting aside the
15 actual operation of -- of getting it down
16 in -- in place?
17       A.    Yes.  I -- I have.  And -- but I
18 will say that foam cementing is -- is one of
19 the -- if you look at all the testing that
20 I've ever been a part of, the smallest
21 concentration has been foam cement.
22       Q.    Okay.  Fair enough.  And is that
23 because Schlumberger has its own proprietary
24 lightweight cements that are not foam?
25       A.    That's part of it, yes.

**PURSUANT TO CONFIDENTIALITY ORDER**

Case 2:10-md-02179-CJB-DPC   Document 9275   Filed 04/12/13   Page 9 of 13

244

1      got that from the government, right?
2           A.    I got dry samples from the
3      government.
4           Q.    Okay.  They never gave you any
5      water?
6           A.    I didn't get water, no.
7           Q.    Okay.  Thank you.
8                 And so it could not have been
9      included in your analysis on page 4 of the
10     different waters?
11          A.    That's correct.
12          Q.    All right.  Now, BP's counsel
13     also asked you a whole bunch of questions
14     about operations on a rig and about what the
15     respective roles of cement contractors and
16     operators are.  Do you remember those
17     questions?  There were so many of them I
18     can't tell you all of them.
19          A.    Yes, sir.
20          Q.    Do you have any experience out
21     on a rig operationally?
22          A.    Very little.
23          Q.    How many times have you been on
24     a deepwater rig?
25          A.    Twice.

**PURSUANT TO CONFIDENTIALITY ORDER**

```
 1          Q.    Do you know who -- who those
 2   jobs were for, who owned the wells that those
 3   rigs were drilling?
 4          A.    I can't remember who I was with
 5   at the time, no.
 6          Q.    Do you know --
 7          A.    Schlumberger days.
 8          Q.    Schlumberger days?
 9          A.    Yes, sir.
10          Q.    Okay.  So you have some
11   familiarity -- is it fair to say you have
12   some familiarity of operations on a rig, but
13   perhaps not expert in it?
14          A.    Oh, by no means an expert, no,
15   no.
16          Q.    Let's talk about general rules,
17   okay.  Because I imagine that whether you're
18   on the rig or onshore, there are certain
19   rules that most people working in the cement
20   industry kind of understand, right?
21          A.    Yes, sir.
22          Q.    Is that fair?
23          A.    Yes.
24          Q.    You've actually written papers
25   about the importance of preparing a wellbore
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1   authority or walk off the job because
2   suddenly that raises some big red flag about
3   a safety incident that's on the HORIZON,
4   would you?
5           MR. CHEN:  Objection, form.
6           A.      No.
7           Q.      Okay.  You indicated that you
8   noticed that there was D-Air in the slurry --
9           A.      Yes.
10          Q.      -- that Halliburton used to
11  design the Macondo production casing job,
12  right?
13          A.      Yes.
14          Q.      All right.  Would you agree with
15  me that D-Air, the purpose of D-Air is, at
16  the mixing phase, to take entrained air out?
17          MR. CHEN:  Objection, form.
18          A.      Yes.
19          Q.      And understanding that it may
20  potentially have destabilizing effects on
21  foam, would you agree with me as a cement --
22  you call yourself a cement contractor, or a
23  cement tester?
24          A.      Cement tester.
25          Q.      Okay.  As a cement tester, you

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3   IN RE:  OIL SPILL        )    MDL NO. 2179
     by the OIL RIG,          )
 4   DEEPWATER HORIZON in     )    SECTION "J"
     the GULF OF MEXICO,      )
 5   April 20, 2010           )    JUDGE BARBIER
                              )
 6                            )    MAG. JUDGE
                              )    SHUSHAN
 7
                 REPORTER'S CERTIFICATION
 8             DEPOSITION OF GREG GARRISON
                TAKEN NOVEMBER 4, 2011
 9
          I, Thu Bui, Certified Shorthand Reporter
10   in and for the State of Texas, hereby certify
     to the following:
11
          That the witness, GREG GARRISON, was duly
12   sworn by the officer and that the transcript
     of the oral deposition is a true record of
13   the testimony given by the witness;
          That the deposition transcript was
14   submitted on _____, 2011, to the
     witness or to Attorney _____for
15   examination, signature and return to
     Worldwide Court Reporters, Inc., by
16   _____, 2011.
          That the amount of time used by each
17   party at the deposition is as follows:
18        Mr. Petosa       - 0:34
          Mr. Chen         - 2:19
19        Ms. Easterling   - 0:06
          Mr. Hill         - 1:07
20        Mr. Hart         - 0:02
          Mr. Brennan      - 0:01
21
22        I further certify that I am neither
     counsel for, related to, nor employed by any
23   of the parties in the action in which this
     proceeding was taken, and further that I am
24   not financially or otherwise interested in
     the outcome of the action.
25        SUBSCRIBED AND SWORN to by me this ____ day
```

**PURSUANT TO CONFIDENTIALITY ORDER**

1
2
3    
4    THU BUI, CSR, RPR
     CSR NO. 7618; Expiration Date: 12-31-11
5    Worldwide Court Reporters
     Firm Registration No. 223
6    3000 Weslayan, Suite 235
     Houston, TX 77027
7    (713) 572-2000
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**PURSUANT TO CONFIDENTIALITY ORDER**