# EXHIBIT "A"

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | **MDL NO. 2179** |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, ON APRIL 20, 2010 | * | **SECTION: J** |
| | * | |
| | * | **JUDGE BARBIER** |
| | * | |
| | * | **MAGISTRATE SUSHAN** |
| Pappas Restaurants, Inc. | * | |
|     *Plaintiffs,* | * | |
| | * | |
| v. | * | **CASE NO. 10-4429** |
| | * | |
| BP Exploration & Production, Inc.; | * | |
| BP America Production Company; BP p.l.c.; | * | |
| Anadarko Petroleum Corporation Co.; | * | |
| Anadarko E&P Company LP; | * | |
| Halliburton Energy Services, Inc.; M-I, LLC; | * | |
| Cameron International Corporation; | * | |
| Weatherford U.S. LP | * | |
| MOEX Offshore 2007 LLC; | * | |
| MOEX USA Corporation; | * | |
| Mitsui Oil Exploration Co., Ltd.; | * | |
|     *Defendants.* | * | |

## Plaintiff's First Amended Complaint

Plaintiff, Pappas Restaurants, Inc. complains of Defendants, BP Exploration & Production, Inc., BP America Production Company, BP p.l.c., Anadarko Petroleum Corporation, Anadarko E&P Company LP,  Halliburton Energy Services, Inc.,  M-I, LLC, Cameron International Corporation, Weatherford U.S. LP, MOEX Offshore 2007 LLC, MOEX USA Corporation, and Mitsui Oil Exploration Co., Ltd., and will respectfully show the Court as follows:

# I.

## Jurisdiction

1.      This claim is maintained pursuant to the statutes and common law of the state of Texas in addition to federal law and general maritime law.  As such, the Galveston County, Texas court of origin has subject matter jurisdiction over this matter. The Texas State Court of origin has personal jurisdiction over Defendants because Defendants and/or Defendants' agents/alter-egos are registered to do business in Texas, conduct substantial business in Texas, derive revenues from goods used or consumed or services rendered in Texas, maintain offices in Texas, maintain registered agents in Texas,  and/or have continuous and systematic contacts with Texas. Further, the exercise of jurisdiction by the Texas state court of origin over Defendants will not offend traditional notions of fair play and substantial justice.

# II.

## Venue

2.      Venue is proper in Galveston County, Texas pursuant to Texas Civil Practice and Remedies Code, Section 15.002 because a substantial part of the events giving rise to this action occurred in Galveston County, the residents and citizens of Galveston County have been affected by this tragedy and spill, and Defendants do substantial business in Galveston County, Texas.

# III.

## Discovery Level

3.      Discovery in this matter may be conducted under Level 2 of the Texas Rules of Civil Procedure.

**IV.**

**Parties**

4.      Plaintiff Pappas Restaurants, Inc. is a Texas corporation and is a resident and citizen of Texas.

5.      Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware Corporation with its principal place of business in Warrenville, Illinois. At all relevant times, BP Exploration was registered to do business in Texas, did business in Texas, and had a registered agent in Texas.  BP Exploration may be served with process through its registered agent for service: Prentice Hall Corp. System, 211 E. 7th Street, Ste. 620, Austin, Texas 78701-3218.

6.      Defendant BP America Production Company ("BP America") is a Delaware Corporation with its principal place of business in Houston, Texas. At all relevant times, BP America was registered to do business in Texas, did business in Texas, and had a registered agent in Texas. BP America may be served with process through its registered agent for service: CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas Texas, 75201-4234.

7.      Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c.'s operations are worldwide, including in Texas. BP p.l.c.'s activities in the United States, including Texas, have been continuous and systematic.  BP p.l.c. has purposely availed itself of the protections, benefits, and privileges of Texas law and should have reasonably anticipated being involved in this litigation in Texas and the United States.  BP p.l.c. asserted control over the business, operations and policy decisions of BP Exploration and BP America, such that they were merely the alter egos and/or agents of BP p.l.c.  BP p.l.c. may be served with process at 28100 Torch

- 3 -

Parkway, Warrenville, Illinois 60555 and through BP North America Inc. c/o C T Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, TX 75201-4234.

8.     Defendant Anadarko Petroleum Corporation ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. At all relevant times, Anadarko was registered to do and did business in the State of Texas. Anadarko may be served with process through its registered agent: CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

9.     Defendant Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas.  At all relevant times, Anadarko E&P was registered to do and did business in the State of Texas. Anadarko E&P may be served with process through its registered agent: CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

10.     Defendant Halliburton Energy Services, Inc. ("HESI") is a Delaware corporation, authorized to do and doing business in the State of Texas, with headquarters in Houston, Texas and Dubai, United Arab Emirates. At all relevant times, HESI was registered to do and did business in the State of Texas.  HESI may be served with process through its registered agent for service, CT Corporation System, 350 N. St. Paul St., Ste 2900, Dallas, Texas 75201-4234.

11.     Defendant M-I, LLC ("M-I")is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, which is authorized to do and does business in the State of Texas. At all relevant times, M-I was registered to do and did business in the State of Texas.  M-I may be served with process through its registered agent for service: National Registered Agents, Inc., 350 N. St. Paul St., Ste 2900, Dallas, Texas

75201-4234.

12.     Defendant Cameron International Corporation is a foreign corporation, authorized to do and doing business in the State of Texas under the name Cameron Systems Corporation f/k/a Cooper Cameron Corporation ("Cameron"), with a principal place of business in Texas. At all relevant times, Cameron was registered to do and did business in the State of Texas.  Cameron may be served with process through its registered agent for service: CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

13.     Defendant Weatherford U.S. LP ("Weatherford") is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas. At all relevant times, Weatherford was registered to do and did business in the State of Texas. Weatherford may be served with process through its registered agent for service: CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

14.     Defendant MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore does business in the State of Texas.  MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, which in turn is a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd. ("MOECO").  MOEX Offshore is controlled by its parent company, MOECO.  MOEX Offshore may be served with process through its registered agent: CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

15.     Defendant MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is an entity which was created solely to serve as a holding company for other corporate entities, including MOEX Offshore, and is controlled by its parent company, MOECO.  MOEX USA

- 5 -

may be served with process through its registered agent: CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

16.     Defendant Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan. MOECO wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. MOECO at all relevant times controlled the activities of MOEX Offshore and MOEX USA, such that it is the alter ego of its subsidiaries, MOEX Offshore and MOEX USA.  Alternatively, MOEX Offshore and MOEX USA acted at all relevant times as agents of MOECO.  MOECO's activities in the United States, including Texas, have been continuous and systematic. MOECO has purposely availed itself of the protections, benefits, and privileges of Texas law and should have reasonably anticipated being involved in this litigation in Texas.  At all relevant times, MOECO asserted control over the business, operations and policy decisions of MOEX Offshore and MOEX USA, such that they were merely the alter egos and/or agents of MOECO. MOECO may be served with process through MOEX USA at: Corporation CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

17.     Each of the Defendants named herein are jointly and severally liable under various principles of Texas law, federal, maritime, and/or applicable State tort law, and under the Oil Pollution Act.

## V.

## Nature of the Action

18.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

19.     The Deepwater Horizon was a mobile offshore drilling unit.  BP Exploration leased the Deepwater Horizon to drill wells at the Macondo site in Mississippi Canyon Block 252 in the Gulf of Mexico. BP Exploration was a holder of a lease granted by the former Minerals Management Service allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, where the Oil spill occurred. BP America was a party to the drilling contract relating to the drilling of the well site in question. BP America and BP Exploration are wholly-owned subsidiaries of BP, p.l.c. At all relevant times, BP p.l.c. had direct, joint, and/or assumed responsibility and/or liability for safety and well control both before and after the April 20, 2010 explosion.  BP Exploration, BP America, and BP p.l.c. are referred to collectively herein as "BP".

20.     Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. Halliburton division Sperry Drilling Services was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

21.     M-I provided mud products and mud supervisory personnel to the Deepwater Horizon. M-I employees planned and/or supervised fluid-related activities, such as the mud displacement that was occurring at the time of the April 20, 2010 explosion. Weatherford designed and manufactured, marketed, sold, and/or distributed the casing components such

as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the wellbore at issue in this matter.

22.     Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The BOP in question failed to operate as intended at the time of the explosion on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

23.     At all relevant times, Anadarko was a party to the Macondo Prospect Offshore Deepwater Operating Agreement ("Macondo OA"), and held a 2.5% ownership interest in the lease of the Macondo Prospect site in Mississippi Canyon Block 252 in the Gulf of Mexico (the "Lease").  At all relevant times, Anadarko E&P was a party to the Macondo OA, and held a 22.5% ownership interest in the Lease.  At all relevant times, MOECO through its subsidiary, divisions, agents, and/or alter-egos MOEX USA and MOEX Offshore was a party to the Macondo OA, and held a 10% ownership interest in the Lease.

24.     On April 20, 2010, an explosion occurred on the rig and it caught fire, causing the deaths and injuries of many workers on the rig.  The rig eventually sank on April 22, 2010.  As the vessel burned and sank, the riser attaching the vessel to the wellhead at the seafloor broke and massive quantities of oil flowed into the Gulf of Mexico. Aside from the human losses, Defendants' acts and omissions resulted in one of the largest environmental disasters of record.  The oil spill continued and made landfall on April 30, 2010.  The resulting contamination continued in the subsequent months and has and will continue to

adversely affect the Gulf of Mexico environment and economy.  The incident in question and resulting oil spill caused Plaintiff to suffer extensive damages and has and will continue to devastate individuals, businesses, and  the environment for the foreseeable future.

25.     This catastrophic disaster resulted from the acts and omissions of Defendants. Specifically, the blowout resulted from the failure of mechanical and cements barriers which were designed to prevent the release pressurized contents surrounding the well. Defendants ignored, disregarded, and/or purposively circumvented necessary safety precautions for the sole purpose of reduced expenses and time.  The oil and gas released from the damaged well poured into the Gulf of Mexico for three months causing irreparable damage to the Gulf Coast environment and economy.

26.     At the time of the blowout, the Deepwater Horizon was in the process of preparing the well so that a permanent production platform could be put in place. Defendants were well aware that the risk of a blowout, such as the one that occurred, presented one of the most dangerous and common risks associated with the activities in question.  Defendants were required to adequately plan and prepare so that operations aboard the Deepwater Horizon would be conducted in a safe manner, in conformance with government regulations and sound industry practices, and so as to avoid a catastrophic event such as the one at issue.

27.     Prior to the disaster, BP entered into an operating agreement with Anadarko, Anadarko E&P and MOEX Offshore. The operating agreement delineated each parties roles and responsibilities including, amongst other items, health, safety and environmental concerns with respect to the operation of the Deepwater Horizon and the drilling activities at issue. Anadarko, Anadarko E&P and MOEX Offshore received detailed information regarding these issues and concerns and had the duty and right to request additional

information, inspect the vessel, and/or to demand additional safety precautions be implemented.

28.     Further, Anadarko, Anadarko E&P and MOEX Offshore were required to execute BP's well plan and were required to authorize expenditures relating to drilling activities at the well site. Anadarko, Anadarko E&P and MOEX Offshore had specific and detailed financial and operational knowledge of all relevant information pertaining to proposed and actual activities aboard the Deepwater Horizon. Anadarko, Anadarko E&P and MOEX Offshore had the duty and right to suggest alternative plans, to place their own personal in key positions with respect to safety and operations, and to request and obtain specific data and information regarding operation on an ongoing real-time basis.

29.     Prior to this disaster, BP, Halliburton, and M-I had actual and/or constructive knowledge of defects with the Deepwater Horizon's equipment, maintenance, and/or operability, including but not limited to, the Deepwater Horizon's blowout preventer ("BOP"), alarm systems, ballasts systems, float collar, and/or other defects that presented serious risks to those aboard the vessel, the surrounding environment and economy, and those otherwise effected by the resulting disaster.

30.     Defendants knew or should have known of the significant risk of a blowout given the nature of the activities they were in the process of conducting at or near the time of this disaster. In fact the MMS provided warnings to Defendants and instructed them to exercise caution given the concerns with gas buildup and increased pressure in the well. Defendants failed to heed these warnings and instead elected to proceed with conscious indifference to facilitate faster drilling operations at a lower anticipated cost to Defendants.

31.     BP, Halliburton, and M-I made a number of decisions regarding drilling operations, which increased the risk of a blowout for the purpose of reducing cost and increasing the rate at which they drilling process could be conducted. In doing so, BP, Halliburton, and M-I repeatedly violated industry guidelines, government regulations, their own safety policies and procedures, and disregarded warnings from their employees and contractors in the process.   BP, Halliburton, and M-I made negligent and/or reckless decisions regarding communication, operational implementation, organizational-managerial processes, team interfaces, equipment design, equipment installation, equipment use, equipment maintenance, equipment monitoring, equipment testing, well design, cementing, and well integrity testing.  BP, Halliburton, and M-I's conduct was a proximate cause of the blowout and resulting oil spill.

32.     BP, Halliburton, and M-I chose to implement a well design with minimal safety barriers to protect against the risk of blowout because reasonable alternatives would have taken additional time and expense.  BP, Halliburton, and M-I were aware that the chosen well design presented additional and unnecessary risks and that there were available alternatives that were both feasible and presented limited difficulty in implementing.

33.     In addition, BP, Halliburton, and M-I failed to select and utilize adequate casing pipe materials, in violation of government regulations, industry practices, and/or their own safety policies and design standards.  Further, BP, Halliburton, and M-I utilized an inadequate number of centralizers which are designed to ensure that the casing pipe remains properly centered to allow for a proper and secure cement seal to protect against the pressured materials surrounding the well. BP, Halliburton, and M-I failed to adequately circulate drilling mud through the entire length of the well before beginning the cementing

job that was in progress at the time of the blowout.  Despite the known risks associated with their conduct, BP, Halliburton, and M-I chose cost efficiency over safety.

34.     Prior to the blowout, BP, Halliburton, and M-I knew or should have known that failure to properly conduct the cementing of the well would result in an increased risk of a blowout.  BP and M-I knew or should have known of prior instances in which Halliburton carelessly, ineffectively, negligently, and/or recklessly conducted cementing operations which resulted in a blowout.

35.     Prior to the blowout, Halliburton knew or should of known that the drilling mud had not been properly circulated through the well and that an adequate number of centralizers were not being utilized. The cementing job in question was designed to plug the void between the casing pipe, well, and the well bore to prevent the close off the hydrocarbon-filled formations at the well site. The cement mixture required for this task needed to be properly formulated to allow effective placement and setting, taking into account the operational environment in question. A delicate balance is required to provide a cement mixture that is light enough to avoid fracture of the formations surrounding the well but strong enough to properly seal and resist the pressure from the reservoirs within these formations.

36.     BP, Halliburton, and M-I improperly designed, formulated, and/or selected the cement mixture that was ultimately used and failed to adequately test the mixtures stability taking into account the environmental conditions in question. In fact, tests conducted prior to the blowout indicated that the mixture formulation presented a major instability concern. Despite knowledge of the instability concerns, the inadequacy of the testing performed, and the associated dangers, BP, Halliburton, and M-I took no corrective action and proceeded

with the mixture recommended by Halliburton; a mixture which was unstable and not fit for its intended and necessary purpose. BP, Halliburton, and M-I failed to adequately execute, monitor, and/or control the cementing process to ensure that there were no signs of fluid loss and/or fracturing of the formations surrounding the well.

37. BP made a number of additional choices with contributed to this disaster, including but not limited to circumventing standard testing procedures and failing to use a casing hanger lockdown sleeve. BP elected to circumvent testing that would have verified the integrity of the complete cementing job and to determine if the cement was properly bonded. This choice disregarded BP's drilling plan, industry standards, and/or government regulations. The choice to not use a casing hanger lockdown sleeve was a deviation from industry standards. These decisions were made with conscious indifference to the safety and well-being of those aboard the Deepwater Horizon and those ultimately harmed by this catastrophe for the simple purpose of saving time and money.

38. Further, BP elected to proceed with mud displacement before allowing an adequate time to pass for the cementing job to properly set. Halliburton and M-I did not contest BP's decision to move forward despite having actual or constructive knowledge that the cement job was not properly tested to ensure stability and integrity and BP's decision to rush the job presented considerable and unnecessary risks.

39. As the operation progressed, BP, Halliburton, and M-I conducted improper and/or inadequate pressure tests, utilized and improper volume or formulation of spacer fluid, and/or ignored abnormal test results which called into question the integrity of the cementing job, the well casing, and/or the pipe assembly. BP, Halliburton, and M-I were aware of these

test results but proceeded with conscious indifference and took no steps to rectify the problems indicated by these test results.

40. BP, Halliburton, and M-I ignored numerous warnings of imminent disaster leading to the blowout in question. Specifically, the abnormal displacement, pressure, and flow data from the well in the two hours leading up to the blowout should have put BP, Halliburton, and M-I on notice that hydrocarbons were leaking into the well. BP, Halliburton, and M-I failed to monitor and/or ignored these warnings.

41. On the evening of the blowout, pressurized hydrocarbons leaked through the defective cement and into the casing of the well. These hydrocarbons flowed into the well through the final section of casing pipe, through the BOP, the riser, and up to the surface. BP, Halliburton, and M-I's policies and procedures were, at all relevant times, inadequate with respect to the drilling operation, cementing job, well monitoring, well testing, blowout and/or emergency response, well-shut in protocol.

42. In addition to the conduct set out above, Weatherford designed and manufactured a float collar which was installed on the final section of casing at the well site. Based upon information and believe, the float collar in question may have failed, contributing the blowout in question.

43. At approximately 9:49p.m. the Deepwater Horizon lost power and two explosions occurred. Based upon information and believe the initial explosion which occurred aboard the Deepwater Horizon that evening was caused by an engine on the deck when gas emanating from the blowout came into contact with an ignition source. The carnage that ensued engulfed the vessel, resulting in the deaths of 11 crew members, injuries to many others, and the sinking of the Deepwater Horizon.

44.     The BOP was designed and manufactured by Cameron and was designed to provide a series of methods to activate it in case of emergency. On the date in question, none of the activation methods were effective. Based upon information and belief, poor maintenance prevented the BOP from operating properly.

45.     BP, Halliburton, and M-I knew or should have known of the inadequate BOP maintenance and the risks associated with it.  In fact, maintenance records regarding the BOP and its associated control modules were, at all relevant times, available to BP, Halliburton, and M-I.  The Deepwater Horizon's BOP was not properly certified or inspected and Cameron had not conducted its manufacturer mandated 5 year inspection since 2000.

46.     A number of leaks were discovered in the hydraulic system of the BOP following subsequent investigations and testing.  BP, Halliburton, and M-I knew or should have known of the leaks prior to the disaster, yet did nothing to rectify them.  BP, Halliburton, and M-I knew or should have known of aftermarket modifications made to the BOP which impaired emergency responders' ability to activate the BOP following the initial blowout.  BP, Halliburton, and M-I chose to continue its operation in the face of known maintenance and functional problems with the BOP.  Further, BP, Halliburton, and M-I failed to inform emergency responders of these maintenance problems and modifications which further delayed and/or impaired the response efforts.

47.     BP, Halliburton, and M-I were aware that the BOP itself was not adequate for its intended purposes given the environmental conditions present at the well site. BP, Halliburton, and M-I chose not to use a backup BOP despite these known inadequacies. If the BOP had been functional, properly designed, properly manufactured, and/or properly maintained it could have been manually or automatically activated, stopping the blowout at

the wellhead, and greatly reducing the environmental and economic impact of this catastrophe.

48.     Despite continued efforts by the emergency responders following the initial blowout, they were unable to fully seal the well using the BOP.  Oil and other materials continued to flow out into the Gulf of Mexico. The oil spill and the resulting contamination have caused and will continue to cause loss of revenue and/or profits to individuals and businesses including Plaintiff.  The explosion resulted from Defendants' negligent and reckless conduct, and the attempt to quell the spill and subsequent cleanup efforts were negligent, haphazard, insufficient, and reckless as well.

49.     BP, Cameron, Halliburton, and M-I failed to ensure that the BOP and/or other equipment aboard the Deepwater Horizon provided adequate safeguards to prevent and/or minimize the likelihood and/or severity of a blowout.

50.      BP, Cameron, Halliburton, and M-I failed to ensure that the BOP and/or other equipment aboard the Deepwater Horizon was properly designed, manufactured, maintained, tested, and utilized to prevent and/or minimize the likelihood and/or severity of a blowout.

51.     BP, Cameron, Halliburton, and M-I failed to ensure that all foreseeable repairs and/or modifications to the BOP and/or other equipment aboard the Deepwater Horizon adequately performed, completed, tested to prevent and/or minimize the likelihood and/or severity of a blowout.

52.     Cameron failed to ensure and verify that the BOP it designed, manufactured, marketed, and sold was suitable for the types of drilling conditions, drill pipes, and casing assembly designs that would be foreseeably used during the Deepwater Horizon's drilling and exploration operations. Cameron failed to effectively design the BOP, install sufficiently

independent and redundant emergency activation systems on the BOP, or provide adequate warnings, instructions, and guidelines on permissible uses, modifications, and application of the BOP aboard the Deepwater Horizon.  BP, Cameron, Halliburton, and M-I could have used and/or implemented additional backups, redundancies, and safeguards but chose not to.

53.     At all relevant times, Defendants were required to protect the health, safety, property, and the environment by performing all operations in a safe and workmanlike manner, and maintaining all equipment and work areas in a safe condition. Defendants were required to immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard and use the best available and safest technology on all exploration, development, and production operations.

54.     Defendants conduct was a direct and proximate cause of the blowout, explosions, fire, sinking of the Deepwater Horizon, and subsequent oil spill.  Defendants failed to prevent, prepare for, plan for, monitor, control, contain, and/or mitigate the damage caused by their conduct.   Further, Defendants purposely concealed and fraudulently misrepresented the nature and severity of the spill.

55.     The spill resulted in an unprecedented amount of pollutants, toxic substances, and other materials contaminating the Gulf of Mexico and surrounding areas in a total petroleum discharge amount of approximately 6.9 million barrels. The spill has and will continue to devastate the Gulf Coast environment and economy and has and continues to cause damages to Plaintiff.

56.     Plaintiff is a pillar of the Texas restaurant community.  The Pappas family has built and operated restaurants in Texas for decades.  Much of Plaintiff's business depends on the harvesting of sea life from the Gulf of Mexico.  Plaintiff has made serving gulf seafood at

its restaurants a staple and a trademark of its business.   However, Plaintiff suffered irrevocable damage to their business a result of the senseless Deepwater Horizon explosion on April 20, 2010 and the ensuing oil spill.

57.    As a direct and proximate result of Defendants' conduct and the resulting oil spill, Plaintiff suffered damages including, but not limited to, lost income, lost profits, lost revenues, loss of business, loss of business opportunities, business interruption, harm to reputation, property damage, damage to natural resources, lost rental income, diminution in property value, loss of livelihoods, loss of use, loss of subsistence use, loss of enjoyment of property, inconvenience and associated consequential damages.   Plaintiff has incurred damages in an amount to be determined at trial and is entitled to compensatory and punitive damages.

58.    Defendants are jointly and severally liable to Plaintiff for its damages under applicable state and federal law.

59.    To provide further detail and specificity as to Plaintiff's claims and the incident made the basis of this suit, Plaintiff attaches and incorporates as exhibits:

**Exhibit A:**    The United States Coast Guard, *Report on Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking, and Loss of Eleven Crew Members Aboard the Mobile Offshore Drilling Unit DEEPWATER HORIZON In the Gulf of Mexico April 20-22, 2010*, MISLE Activity Number: 3721503;

**Exhibit B:**    The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling – Report to the President, January 2011;

**Exhibit C:**    United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit D:**    Map of the Macondo Well, MC 252 Lease OCS-G 32306;

- 18 -

**Exhibit E:**     Review of Operational Data Preceding Explosion on the Deepwater Horizon MC252, Final Report Order No. M10PX00294, John Rogers Smith, P.E., July 1, 2010;

**Exhibit F:**     United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Buoyancy Casing Analysis*, September 2010.

**Exhibit G:**     Det Norske Veritas, *Final Report for United States Department of Interior, Bureau of Ocean Energy Management, Regulations, and Enforcement – Forsenic Examination of Deepwater Horizon Blowout Preventer*, Vol. 1 & 2 – Final Report, March 20, 2011.

**Exhibit H:**     Det Norske Veritas, *Addendum to Final Report for United States Department of Interior, Bureau of Ocean Energy Management, Regulations, and Enforcement – Forsenic Examination of Deepwater Horizon Blowout Preventer*, Report No. EP030842, April 30, 2011.

**Exhibit I:**     "9.875" x 7" Foamed Production Casing Post Job Report, April 20, 2010", App. F to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit J:**     "Negative Test Protocols", App. G to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit K:**     "Closing Sequences for the Deepwater Horizon BOP Stack", App. H to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit L:**     "APD Departures at the Macondo Well Granted by MMS" App. I to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit M:**     "Risk Register for the Macondo Well", App. J to United States Department of the Interior – Bureau of Ocean Energy Management,

Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit N:**  "BP RACI Chart", App. K to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit O:**  "Production Casing Cement Job Decision Tree", App. L to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011;

**Exhibit P:**  "Report of Oilfield Testing & Consulting", App. M to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011; and

**Exhibit Q:**  "Information on Transocean's 21-Hitch Policy", App. N to United States Department of the Interior – Bureau of Ocean Energy Management, Regulation and Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout*, September 14, 2011.

60.    As the long-term effects of the oil spill remain uncertain and the details regarding the nature and cause of the blowout and resulting spill continue to come to light, Plaintiff reserves the right to amend this Petition once additional information becomes available.

## VI.

## Conditions Precedent

61.    Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

62.    To the extent required by law, and/or by consent or stipulation by BP, Plaintiff has satisfied, or will have satisfy, all conditions precedent to instituting this lawsuit including

all administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF"), the Court Supervised Settlement Program (the "CSSP"), and/or BP and/or its agents, counsel, or designees.

## VII.

## Causes of Action

### A. The Oil Pollution Act

63.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

64.     The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a responsible party for a  vessel or a facility from which oil is discharged into or upon navigable waters or adjoining shorelines for the damages that result from such incident as well as removal costs.  Defendants are responsible parties as defined by the OPA.

65.     The United States Coast Guard designated Defendants BP, Anadarko E&P, Anadarko, and MOEX, as responsible parties under the OPA.   As such, Defendants BP, Anadarko E&P, Anadarko, and MOEX are strictly liable pursuant to § 2702 of the OPA for all the damages to Plaintiff resulting from the spill.  BP is not entitled to limit their liability under § 2704(a) of the OPA because the spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations.  Further, BP waived the statutory limitation on liability under the OPA.

66.     Anadarko, Anadarko E&P, and MOEX Offshore held interests in the Lease. As such, they are responsible parties pursuant to §§ 2701 (16) and (32) of the OPA and are strictly liable pursuant to § 2702 of the OPA for all Plaintiff's damages resulting from the

spill.  Further, MOECO controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO.  MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA should be imputed to MOECO.  MOECO is therefore a "responsible party" under OPA and liable to Plaintiff for damages.

67.    Plaintiff has suffered compensable damages under the OPA as a result of Defendants' conduct in amounts to be determined by the trier of fact.  Specifically, Plaintiff is entitled to damages pursuant to §§ 2702(b)(2) (B), (C), and (E) in addition to the damages described herein. Section (B) above provides for recovery of damages to real or personal property, including injury to, or economic losses resulting from destruction of real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property.  Section (C) provides for recovery of damages for loss of subsistence use of natural resources without regard to the ownership or management of the resources. Section (E) provides for the recovery of damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources.

68.    As a direct and proximate result of the spill, Plaintiff suffered damages including, but not limited to, lost income, lost profits, lost revenues, loss of business, loss of business opportunities, business interruption, harm to reputation, property damage, damage to natural resources, lost rental income, diminution in property value, loss of livelihoods, loss of use, loss of subsistence use, loss of enjoyment of property, inconvenience and associated

consequential damages.  Plaintiff has incurred damages in an amount to be determined at trial and is entitled to compensatory and punitive damages.

**B. Negligence, Negligence Per Se, and Gross Negligence**

69.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

70.     Pursuant to state statutory and common law, general maritime law, and federal law, Defendants owed duties of care to Plaintiff to design, manufacture, test, navigate, man, possess, manage, control, maintain, and operate the Deepwater Horizon and its equipment and appurtenances with reasonable and ordinary care.  Further, Defendants were required to exercise a higher degree of care given their knowledge of the inherently dangerous nature of the deep water drilling activities in question. Defendants were under a duty to exercise reasonable care while participating in drilling operations to ensure that a disaster such as the one in question and/or resulting oil spill did not occur.  Defendants were negligent, negligent *per se*, grossly negligent, and reckless for the following, non-exclusive acts:

   a.  Failure to properly maintain and/or operate the Deepwater Horizon;

   b.  Failure to properly train their employees and/or agents;

   c.  Failure to provide adequate safety equipment;

   d.  Operating the Deepwater Horizon with an inadequate crew;

   e.  Failure to maintain the Deepwater Horizon and/or its equipment and appurtenances;

   f.  Failure to properly inspect the Deepwater Horizon to assure that all equipment and personnel were fit for their intended purpose;

g.   Vicariously liable for their employees' and agents' negligence, gross negligence;

h.   Violating applicable Coast Guard, MMS, and/or OSHA regulations;

i.   Violating the Oil Pollution Act;

j.   Violating the Clean Water Act;

k.   Violating the Texas Oil spill Prevention and Response Act of 1991;

l.   Violating The Florida Pollutant Discharge Prevention And Control Act;

m.   Failure to provide sufficient personnel to perform operations aboard the Deepwater Horizon;

n.   Failing to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon, which would have prevented or mitigated the disaster;

o.   Failing to implement policies and procedures to safely conduct offshore operations aboard the Deepwater Horizon;

p.   Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

q.   Failing to timely warn of the imminent blowout and likely oil spill;

r.   Failing to timely bring the oil release under control;

s.   Failing to provide appropriate disaster prevention equipment;

t.   Failure to adequately undertake and implement remediation efforts;

u.   Defectively designing and/or manufacturing the Deepwater Horizon and/or its equipment or appurtenances;

    v.  Failure to take appropriate action to avoid or mitigate the blowout and resulting oil spill;

    w.  Failure to avoid the blowout in question and resulting oil spill;

    x.  Failure to exercise due care and caution;

    y.  Acting in a careless and negligent manner; and

    z.  Other acts deemed negligent, negligent per se, and/or grossly negligent

71.    At all relevant times the Deepwater Horizon was unseaworthy.

72.    Defendants' conduct is governed by numerous state and federal laws and permits issued under the authority of these laws.  These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiff, including, but not limited to, those set forth in the OPA, the Clean Water Act, 40 C.F.R. § 300, the Texas Oil spill Prevention and Response Act of 1991, TEX. NAT. RES. CODE §§ 40.001 *et seq.*;  and the International Safety and Management Code as adopted by the International Convention for the Safety of Life at Sea, 26 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250. Defendants' conduct which resulted in the Deepwater Horizon explosion and subsequent oil spill violated these statutory and/or regulatory standards.  Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Federal, Texas, Louisiana, Mississippi, Alabama, and/or Florida law.

73.    BP owed a duty to Plaintiff to exercise reasonable care to design, create, manage, and control the well and the flow of hydrocarbon from the well in safe and prudent manner and to conduct its drilling operations with a reasonable and ordinary care.  As set out in detail herein, BP breached this duty causing damages to Plaintiff.

74.     Halliburton owed a duty to Plaintiff to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the well. As set out in detail herein, Halliburton breached this duty causing damages to Plaintiff.

75.     M-I owed a duty to exercise reasonable care to exercise reasonable care in providing, controlling, and monitoring the drilling mud and spacer solutions used on the Deepwater Horizon. As set out in detail herein, M-I breached this duty causing damages to Plaintiff.

76.     Cameron as the designer, manufacturer, and supplier of the Deepwater Horizon's BOP owed a duty of ordinary and reasonable care to Plaintiff with respect to its design, manufactures, and supply of the BOP. As set out in detail herein, Cameron breached this duty causing damages to Plaintiff.

77.     In addition, Weatherford as the designer, manufacturer, and supplier of the Deepwater Horizon's float owed a duty of ordinary and reasonable care to Plaintiff with respect to its design, manufactures, and supply of the float collar. As set out in detail herein, Weather breached this duty causing damages to Plaintiff.

78.     Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO as parties (or agents/alter-egos) to the Macondo OA had actual or constructive knowledge of the negligent conduct of Defendants as set forth herein and the dangers and risks associated with said conduct which resulted in the blowout and subsequent oil spill.  Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO each had independent and collective duties to identify and take corrective action to rectify the dangerous activities and conduct of BP, Cameron, Halliburton, and M-I and/or the dangerous conditions aboard the Deepwater

Horizon. As set out in detail herein, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO breached this duty causing damages to Plaintiff.

79.     Defendants' joint and concurrent negligence, negligence per se, and/or gross negligence caused the Deepwater Horizon blowout and resulting oil spill. Defendants' are thus jointly and severely liable to Plaintiff for its resulting damages.

80.     Defendants knew or should have known of the risks associated with their conduct and failed to take reasonable and appropriate steps to prevent the incident in question.

81.     Defendants were under a duty to exercise reasonable care while conducting and/or participating in any and all operations aboard the Deepwater Horizon to prevent a blowout or oil spill such as the one that occurred. Defendants breached this duty.

82.     Defendants were under a duty to ensure that any oil or other pollutants were discharged as a result of a blowout or otherwise, that said substances would be contained and remediated in a efficient and reasonable fashion. Defendants breached this duty.

83.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered damages including, but not limited to, lost income, lost profits, lost revenues, loss of business, loss of business opportunities, business interruption, harm to reputation, property damage, damage to natural resources, lost rental income, diminution in property value, loss of livelihoods, loss of use, loss of subsistence use, loss of enjoyment of property, inconvenience, and associated consequential damages.

84.     Further, Defendants acted with reckless, willful, and wanton disregard in the design, manufacture, testing, navigation, manning, possession, management, control, maintenance, and/or operation of the Deepwater Horizon.  Defendants knew or should have

known that their wanton, willful, and reckless misconduct would result in explosion and oil spill, causing damage to Plaintiff.

85.     Plaintiff is entitled to punitive damages because the acts and omissions of Defendants were grossly negligent and reckless.  Defendants' conduct was willful, wanton, arbitrary, and capricious.  Defendants acted with flagrant and malicious disregard of Plaintiff's business.  Defendants were subjectively aware of the extreme risk posed by their respective and/or collective conduct which caused Plaintiff' damages, but did nothing to rectify it.  Defendants' acts and omissions involved an extreme degree of risk considering the probability and magnitude of potential harm to Plaintiff and others. Plaintiff has incurred damages in an amount to be determined at trial, and is entitled to compensatory and punitive damages.

### D. Strict Liability (As to Weatherford)

86.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

87.     Plaintiff is entitled to recover from Weatherford for its defective design and/or manufacture of the float collar on the Deepwater Horizon. Plaintiff seesk relief for damages sustained as result of the defective design and/or manufacture of the float collar pursuant to general maritime law, the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*), the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*), the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine.

88.     Weatherford designed, manufactured, marketed, sold, and/or distributed the float collar appurtenant to and a part of the equipment of the Deepwater Horizon.  The float

collar failed to operate properly at the time of the blowout and this failure caused or contributed to the spill.  The float collar was defectively designed and/or manufactured such that it did not operate as intended, which caused and/or contributed to the spill.  The float collar was in a defective condition and unreasonably dangerous to Plaintiff when it left Weatherford's control.  At all times, Weatherford's float collar was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Weatherford.

89.     At the time the float collar used at the Deepwater Horizon site left Weatherford's control, Weatherford knew or should have known about the unreasonably dangerous conditions noted above.  At the time the float collar used at the Deepwater Horizon site left Weatherford's control, feasible alternative designs existed which would have prevented or mitigated Plaintiff's damages without impairing the utility, usefulness, practicality, or desirability of the float collar.  Plaintiff's damages were a foreseeable consequence of the defects in the Deepwater Horizon's float collar.  Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar that caused or contributed to this incident, which were a proximate cause of Plaintiff's damages, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

90.     As a direct and proximate result of the design and/or manufacturing defects of the float collar in question, Plaintiff suffered damages including, but not limited to, lost income, lost profits, lost revenues, loss of business, loss of business opportunities, business interruption, harm to reputation, property damage, damage to natural resources, lost rental income, diminution in property value, loss of livelihoods, loss of use, loss of subsistence use, loss of enjoyment of property, inconvenience and associated consequential damages.

### E. Strict Liability (As to Cameron)

91.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

92.     Plaintiff is entitled to recover from Cameron for its defective design and/or manufacture of the BOP on the Deepwater Horizon. Plaintiff seeks relief for damages sustained as result of the defective design and/or manufacture of the BOP pursuant to general maritime law, the Texas Products Liability Act of 1993 (Tex. Civ. Prac. & Rem. Code Ann. § 82.002, *et seq.*), the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*), the Mississippi Products Liability Act (Miss. Code Ann. § 11-1-63); and/or the Alabama Extended Manufacturer's Liability Doctrine.

93.     Cameron designed, manufactured, marketed, sold, and/or distributed the BOP appurtenant to and a part of the equipment of the Deepwater Horizon.  The BOP failed to operate properly, or at all, at the time of the blowout and this failure caused or contributed to the spill.  The BOP was defectively designed and/or manufactured such that it did not operate as intended, which a cause and/or contributed to the blowout and/or spill.  The BOP was in a defective condition and unreasonably dangerous to Plaintiff when it left Cameron's control. At all times, the BOP collar was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Cameron.

94.     At the time the BOP in question left Cameron's control, Cameron knew or should have known about the unreasonably dangerous conditions noted above.  At the time the BOP in question left Cameron's control, feasible alternative designs existed which would have prevented or mitigated Plaintiff's damages without impairing the utility, usefulness, practicality, or desirability of the BOP.  Plaintiff's damages were a foreseeable consequence of the defects in the Deepwater Horizon's BOP.  Cameron had actual and/or constructive

knowledge of the facts and circumstances relative to the BOP that caused or contributed to this incident, which were a proximate cause of Plaintiff's damages, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

95.     As a direct and proximate result of the design and/or manufacturing defects of the BOP in question, Plaintiff suffered damages including, but not limited to, lost income, lost profits, lost revenues, loss of business, loss of business opportunities, business interruption, harm to reputation, property damage, damage to natural resources, lost rental income, diminution in property value, loss of livelihoods, loss of use, loss of subsistence use, loss of enjoyment of property, inconvenience and associated consequential damages.

## F. Fraudulent Concealment

96.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

97.     Plaintiff is entitled to recovery against Defendants for their fraudulent concealment of material facts concerning the Deepwater Horizon blowout and resulting spill. Defendants have consistently attempted to conceal the severity of the spill.  Defendants did not provide complete and timely information and/or warnings regarding the cause, severity, and/or nature of the spill or its environmental and/or economic consequences.  Defendant misrepresented its capabilities to respond to the spill.  Further, Defendants knew or should have known of tests and/or other information pertaining to the safety of the drilling operation aboard the Deepwater Horizon and the risks and probability of the blowout in question.  This information constituted material facts that Defendants had a duty to disclose.

98.     As a direct and proximate result of Defendants' fraudulent concealment of the foregoing material facts Plaintiff suffered damages including, but not limited to, lost income,

lost profits, lost revenues, loss of business, loss of business opportunities, business interruption, harm to reputation, property damage, damage to natural resources, lost rental income, diminution in property value, loss of livelihoods, loss of use, loss of subsistence use, loss of enjoyment of property, inconvenience and associated consequential damages.

99.     Plaintiff has been damaged in a sum far in excess of the minimum jurisdictional limits of this Court, for which they now sue. Plaintiff is entitled to recover such economic, compensatory and punitive damages for their past, current, and future harm.

## VIII.

## <u>Jury Trial</u>

100.    Plaintiff hereby requests a trial by jury on all claims.

## IX.

## <u>Prayer</u>

Plaintiff prays that this citation issue and be served upon Defendants in a form and manner prescribed by law, requiring that the Defendants appear and answer, and that upon final hearing, Plaintiff have judgment against Defendants, both jointly and severally, in a total sum in excess of the minimum jurisdictional limits of this Court, plus pre-judgment and post-judgment interests, all costs of Court, attorneys' fees, punitive damages, and all such other and further relief, to which they may show itself justly entitled.

**Dated: April 18, 2013.**

Respectfully submitted,

**ARNOLD & ITKIN LLP**

*/s/ Jason A. Itkin*

Jason A. Itkin
State Bar No. 24032461
Noah M. Wexler
State Bar No. 24060816
1401 McKinney Street, Suite 2550
Houston, Texas 77010
Telephone: (713) 222-3800
Facsimile: (713) 222-3850

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been electronically filed through the Court's CM/ECF system and/or LexisNexis File & Serve, in accordance with Pretrial Order No. 12, which will send a notice of electronic filing to all counsel of record on April 18, 2013.

*/s/ Jason A. Itkin*

Jason A. Itkin