that set the stage for the BP *Deepwater Horizon* disaster. Among the chief actors in that web was the government itself, which played a key role both in setting the policies that shaped offshore oil and gas activities in the Gulf over the course of many decades, and in overseeing responses to the spill once it began.

This chapter presents the Commission's recommendations for addressing the causes and consequences of the spill with a focus on the government's role (recommendations targeted to industry are presented in Chapter 8). The recommendations reflect the government's sweeping sovereign authority as both owner of the seabed and water column and as the regulator of activities, with the overriding responsibility to manage and protect the valuable resources of the Outer Continental Shelf (OCS) on behalf of current and future generations of Americans. They are grouped in seven distinct areas:

A.  Improving the Safety of Offshore Operations
B.  Safeguarding the Environment
C.  Strengthening Oil Spill Response, Planning, and Capacity
D.  Advancing Well-Containment Capabilities
E.  Overcoming the Impacts of the *Deepwater Horizon* Spill and Restoring the Gulf
F.  Ensuring Financial Responsibility
G.  Promoting Congressional Engagement to Ensure Responsible Offshore Drilling

The sections that follow summarize the context and rationale for each of the Commission's specific recommendations. Other chapters of this report, as well as staff working papers published by the Commission and available at www.oilspillcommission.gov,* provide additional detail and further support for the recommendations. Chapter 10 presents additional recommendations concerning the future of offshore drilling, including prospective drilling in the Arctic.


## A. Improving the Safety of Offshore Operations

As detailed in Chapters 3 and 4, and in staff working papers, federal efforts to regulate the offshore oil and gas industry have suffered for years from cross-cutting purposes, pressure from political and industry interests, a deepening deficit of technical expertise, and severely inadequate resources available to the government agencies tasked with the leasing function and regulation. In the aftermath of the *Deepwater Horizon* oil spill, the Department of the Interior has already taken a series of significant and important steps to improve regulatory oversight of offshore drilling. But given the deep-rooted problems that had existed at the Department's Minerals Management Service (MMS) before the spill occurred, and the near certainty that the oil and gas industry will seek to expand into ever more challenging environments in the years ahead, a more comprehensive overhaul of both leasing and the regulatory policies and institutions used to oversee offshore activities is required. The necessary overhaul, to be successful, must address three core issues: (1) reducing and managing risk more effectively using strategies that can keep pace with a technologically

complex and rapidly evolving industry, particularly in high-risk and frontier areas;
(2) assuring the independence and integrity of government institutions charged with
protecting the public interest; and (3) securing the resources needed to provide a robust
capability to execute the leasing function and adequate regulatory oversight.

### 1. The Need for a New Approach to Risk Assessment and Management

As described in Chapter 3 and staff working papers, neither the industry's nor the federal
government's approaches to managing and overseeing the leasing and development of
offshore resources have kept pace with rapid changes in the technology, practices, and
risks associated with the different geological and ocean environments being explored
and developed for oil and gas production. Nor do these approaches reflect the significant
changes that have occurred in the structure of the oil and gas industry itself—especially
the rise of specialized service contractors and the general trend toward outsourcing
multiple functions. When the operator directly regulated by the government does not itself
perform many of the activities critical to well safety, regulators face additional challenges
due to the separation of these functions. However, MMS did not change its regulatory
oversight to respond to these industry changes by making the service companies more
accountable.  In other countries, operators of drilling are required to demonstrate to the
regulators their own fitness and risk management systems.

Also missing has been any systematic updating of the risk assessment and risk
management tools used as the basis for regulation. MMS attempted under several
administrations to promulgate regulations that would have required companies to manage
all of their activities and facilities, and those of their contractors, under a documented
Safety and Environmental Management System (SEMS). But, in the face of industry
opposition, MMS did not adopt such a requirement until September 2010, after the BP
*Deepwater Horizon* disaster. Industry objections also derailed a past MMS proposal
to expand data reporting requirements as part of an effort to track and analyze offshore
incidents and to identify safety trends and lagging and leading indicators. The proposal was
abandoned when the Office of Management and Budget agreed with industry complaints
about compliance cost (industry also complained about the potential for overlap with
Coast Guard reporting requirements). As a result, there has historically been no legal
requirement that industry track or report instances of uncontrolled hydrocarbon releases
or "near misses"—both indicators that could point to a heightened potential for serious
accidents. The United States has the highest reported rate of fatalities in offshore oil and
gas drilling among its international peers, but it has the lowest reporting of injuries. This
striking contrast suggests a significant under-reporting of injuries in the United States and
highlights the need for better data collection to ensure needed attention to worker safety.

Government agencies that regulate offshore activity should reorient their regulatory
approaches to integrate more sophisticated risk assessment and risk management practices
into their oversight of energy developers operating offshore. They should shift their focus
from prescriptive regulations covering only the operator to a foundation of augmented
prescriptive regulations, including those relating to well design and integrity, supplemented
by a proactive, risk-based performance approach that is specific to individual facilities,

operations, and environments. This would be similar to the "safety case"[*] approach that is used in the North Sea, which requires the operator and drilling rig owners to assess the risks associated with a specific operation, develop a coordinated plan to manage those risks, integrate all involved contractors in a safety management system, and take responsibility for developing and managing the risk management process.

To accomplish these goals of creating a new approach to risk assessment and management, the Commission offers the following three recommendations:

## Recommendations

A1: The Department of the Interior should supplement the risk-management program with prescriptive safety and pollution-prevention standards that are developed and selected in consultation with international regulatory peers and that are at least as rigorous as the leasing terms and regulatory requirements in peer oil-producing nations.

A2: The Department of the Interior should develop a proactive, risk-based performance approach specific to individual facilities, operations and environments, similar to the "safety case" approach in the North Sea.

A3: Working with the International Regulators' Forum and other organizations, Congress and the Department of the Interior should identify those drilling, production, and emergency-response standards that best protect offshore workers and the environment, and initiate new standards and revisions to fill gaps and correct deficiencies. These standards should be applied throughout the Gulf of Mexico, in the Arctic, and globally wherever the international industry operates. Standards should be updated at least every five years as under the formal review process of the International Organization for Standardization (ISO).

More specifically, the following actions are needed to truly transition to a proactive, risk-based performance approach:

- Engage a competent, independent engineering consultant to review existing regulations for adequacy and "fit for purpose" as a first step toward benchmarking U.S. regulations against the highest international standards. Following this review, develop and implement regulations for safety and environmental protection that are at least as rigorous as the regulations in peer oil–producing nations. A new regulatory entity for safety and environment (as described below) should ensure that while engaged in petroleum activities all drilling and production platforms are certified and operating at the highest level of international regulatory practice.

- Require operators to develop a comprehensive "safety case" as part of their exploration and production plans—initially for ultra–deepwater (more than 5,000

---

feet) areas, areas with complex geology, and any other frontier or high–risk areas—such as the Arctic.  In addition, for lease sales in those and other areas, prospective lessees should be required to demonstrate competence, based on experience, financial capacity, and expertise, as a prequalification for bidding.

- Expand Safety Environmental Management System requirements to include regular third–party audits at three- to five-year intervals and certification. These plans should be expanded for frontier areas to encompass the full range of risk assessment and management.

- For both new and transferred leases, require the operator to participate in a new safety institute or agree to expert audits, and to contribute to safety and environmental research and development. Approval to transfer leases sold prior to this requirement should be conditioned on the new requirements based on risk factors related to the specific requirements of the lease. The lease stipulation should also include the requirement that the operator possess adequate capability to contain and respond to an oil spill, and sufficient financial capacity to compensate for damages caused by a spill.

- To cultivate and maintain government expertise on offshore drilling safety:

  (1) Establish a process under the auspices of the National Academy of Engineering to identify criteria for high–risk wells and develop methodology to assess those risks. This process should include, to the extent that the National Academy deems appropriate, input from experts in the U.S. Geological Survey, the Department of Energy, NOAA, and academia. Furthermore, the Department of the Interior should develop in–house competence to perform such sophisticated risk assessments. Such evaluations could guide the transition to a system where all operators and contractors are required to demonstrate an integrated, proactive, risk management approach prior to leases being granted or receiving permits for exploration wells and major development projects. As noted above, these efforts should initially focus on areas with complex geology, ultra–deep water, and any other frontier or high–risk areas—such as the Arctic.

  (2) Establish a coordinated, interagency research effort to develop safer systems, equipment, and practices to prevent failures of both design and equipment in the future. The federal government has relevant expertise in areas such as the application of remote sensing and diagnostics, sensors and instrumentation, and command electronics that could and should be transferred to the offshore industry.[*] The Ultra–Deepwater and Unconventional Natural Gas and Other Petroleum Resources Program, an existing research and development program created by statute and managed by the Secretary of Energy, should be refocused toward mitigating the risks of offshore operations.

---

* Secretary of Energy Steven Chu advised the Commission on the capacity within the Department of Energy, the Nuclear Regulatory Commission, the Federal Aviation Administration and elsewhere in the federal government to undertake sophisticated risk and technology assessments. The Department of Energy and the national laboratories have the depth and breadth of research and technical experience in such areas as high-performance computing, image processing, mechanical/structural stress analysis, complex fluid flow simulations, and other areas that proved instrumental in diagnosing the state of the Macondo well blowout preventer and in assessing plans to stop the leak.

- Develop more detailed requirements for incident reporting and data concerning offshore incidents and "near misses." Such data collection would allow for better tracking of incidents and stronger risk assessments and analysis. In particular, such reporting should be publicly available and should apply to all offshore activities, including incidents relating to helicopters and supply vessels, regardless of whether these incidents occur on or at actual drilling rigs or production facilities. In addition, Interior, in cooperation with the International Regulators Forum, should take the lead in developing international standards for incident reporting in order to develop a consistent, global set of data regarding fatalities, injuries, hydrocarbon releases, and other accidents. Sharing information as to what went wrong in offshore operations, regardless of location, is key to avoiding such mistakes.

- Lead in the development and adoption of shared international standards, particularly in the Gulf of Mexico and the Arctic. Transparent information and data sharing within the offshore industry and among international regulators is critical to continuous improvement in standards and risk management practices. The United States shares the waters of the Gulf of Mexico and its sub-surface resources with Cuba and the Republic of Mexico. After many decades of declining investment and production in the Mexican part of the Gulf by PEMEX, the national oil company, a recent Mexican Supreme Court ruling has created the opportunity for U.S. and other foreign oil and gas companies to enter Mexican waters. PEMEX has indicated its intention to auction deepwater contracts beginning in 2012. Separately, Cuba has already leased blocks 50 miles off the coast of Florida with reported plans for seven exploration wells by 2014. Agreement on standards for operations should be part of any negotiation to define the maritime boundary between the United States, Mexico, and Cuba in the eastern Gulf of Mexico. The need for international standards for activities in the Arctic is also unquestioned: the United States has already awarded leases in the region and now it is incumbent on the United States to push for such standards.

- Provide protection for "whistleblowers" who notify authorities about lapses in safety. All offshore workers have a duty to ensure safe operating practices to prevent accidents. To ensure all workers, regardless of employer, will take appropriate action whenever necessary, Congress should amend the Outer Continental Shelf Lands Act or specific safety statutes to provide the same whistleblower protection that workers are guaranteed in other comparable settings.

## 2. The Need for a New, Independent Agency

As described in detail in Chapter 3, primary responsibility for regulating the offshore oil and gas industry prior to the *Deepwater Horizon* accident was consolidated in a single agency, MMS. MMS was not only responsible for offshore leasing and resource management; it also collected and disbursed revenues from offshore leasing, conducted environmental reviews, reviewed plans and issued permits, conducted audits and inspections, and enforced safety and environmental regulations. And though the revenue management and resource management functions of MMS were separated into two distinct divisions, the mingling of distinct statutory responsibilities—each of which

required different skill sets and fostered different institutional cultures—led inevitably to internal tensions and a confusion of goals that weakened the agency's effectiveness and made it more susceptible to outside pressures.

At the core of this tension was a trade-off between, on the one hand, promoting the "expeditious and orderly development" of offshore resources, as mandated by the Outer Continental Lands Act of 1978, while also ensuring, on the other hand, that offshore development proceeded in a manner that protected human health, safety, and the environment. Over the course of many years, political pressure generated by a demand for lease revenues and industry pressure to expand access and expedite permit approvals and other regulatory processes often combined to push MMS toward elevating the former goal over the latter. At the same time, the fact that MMS lacked either a clearly articulated mission or adequate guidance for balancing its different missions led to inefficient management and a tendency to defer to industry, which successfully sought congressional and political intervention to shorten time frames for plan and permit reviews, blocked royalty valuation rulemakings, and advocated to delay and weaken rules aimed at improving the safety management of operations.

All of these problems were compounded by an outdated organizational structure, a chronic shortage of resources, a lack of sufficient technological expertise, and the inherent difficulty of coordinating effectively with all the other government agencies that had statutory responsibility for some aspect of offshore oil and gas activities. Besides MMS, other offices of the Department of the Interior as well as the Departments of Transportation, Commerce, Defense, and Homeland Security, and the Environmental Protection Agency (EPA) were involved in some aspect of the industry and its many-faceted facilities and operations, from workers on production platforms to pipelines, helicopters, drilling rigs, and supply vessels.

Not surprisingly, the Macondo well failure in April 2010 turned a harsh spotlight on all these bureaucratic inadequacies and shortcomings. And shortly after the accident, Interior Secretary Ken Salazar renamed MMS the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) and announced a plan to split its responsibilities into three separate offices.*

Although the proposed reorganization of Interior's offshore leasing, safety, and revenue management program represents a significant improvement, it does not adequately address the deeper problem of fully insulating the Department's safety and environmental protection functions from the pressures to increase production and maximize lease revenues.

---

* The use of "BOEMRE" will be limited here to actions since MMS was renamed.

## Recommendations

**A4: Congress and the Department of the Interior should create an independent agency within the Department of the Interior with enforcement authority to oversee all aspects of offshore drilling safety (operational and occupational), as well as the structural and operational integrity of all offshore energy production facilities, including both oil and gas production and renewable energy production.**

**A5: Congress and the Department of the Interior should provide a mechanism, including the use of lease provisions for the payment of regulatory fees, for adequate, stable, and secure funding to the key regulatory agencies—Interior, Coast Guard, and NOAA—to ensure that they can perform their duties, expedite permits and reviews as needed, and hire experienced engineers, inspectors, scientists, and first responders. (See Recommendation G2.)**

The roles and responsibilities of the former MMS should be separated into three entities with clearly defined statutory authorities. One entity would be responsible for offshore safety and environmental enforcement; another would perform functions related to leasing and environmental science; and the third would manage natural resource revenues. The safety and environment enforcement authority or entity, in particular, should have primary statutory responsibility for overseeing the structural and operational integrity of all offshore energy–related facilities and activities, including both oil and gas offshore drilling and renewable energy facilities.

- A new office of safety should consolidate responsibility for safety—including infrastructure and operational integrity, as well as spill prevention and response—for all offshore fossil fuel and renewable resource development activities, structures, and workers. It should be an independent agency housed at the Department of the Interior to facilitate coordination with a new office for leasing and environmental science. Congress should enact an organic act to establish its authorities and responsibilities, consolidating the various responsibilities now under the Outer Continental Shelf Lands Act, the Pipeline Safety Act, and Coast Guard authorizations. The new office should have primary authority over facilities, structures, and units for offshore oil and gas drilling, production, and renewable energy that are engaged in energy-related activities, including authority to establish and enforce specific safety and environmental protection requirements for these units as well as requirements for operators who may be leasing the facilities.

- Congress should review and consider amending where necessary the governing statutes for all agencies involved in offshore activities to be consistent with the responsibilities functionally assigned to those agencies. The safety–related responsibilities of the new offshore safety agency should be included in a separate statute. (Further specifics regarding the Commission's recommended organizational structure for new offices to regulate safety and leasing are discussed below).

- To ensure that Interior has the ability to provide adequate leasing capabilities and regulatory oversight for the increasingly complex energy–related activities being undertaken on the OCS, budgets for these new offices as well as existing agencies should come directly from fees paid by the offshore industry, akin to how fees charged to the telecommunications industry pay for the expenses of the Federal Communications Commission, which is essentially fully funded by such regulated industry payments. Through this mechanism, Congress, through legislation, and Interior, through lease provisions,[2] could expressly oblige lessees to fund the regulation necessary to allow for private industry access to the energy resources on the OCS, including renewables. Under existing law, the oil and gas industry already pays inspection fees that currently amount to about $10 million per year or about 3 percent of BOEMRE's annual budget, but this amount can and should be increased significantly. (See Recommendation G2.)

Implementing the Commission's recommendation to reorganize the former MMS into three offices and to enhance these offices' technical capacities will require a sustained effort over a period of years.  The President or Interior Secretary should effect this reorganization to the extent possible administratively and request congressional enactment to confirm its permanence and provide for the statutory recognition of a term of office for the director of safety and environmental regulation.

## PROPOSED REORGANIZATION OF THE FORMER MINERALS MANAGEMENT SERVICE

**Offshore Safety Authority:** This office would exercise independent statutory authority over technical and operational safety in all phases of OCS energy resource development projects, including the planning, designing, constructing, operating, and decommissioning of facilities and projects, and will have overall responsibility for fostering safe and environmentally sound offshore energy operations. The new agency would oversee all non-economic aspects of the operations and structures involved in drilling and production of oil and gas, pipelines, and wind towers, wave, tidal, and other renewable technologies located on the federal offshore zone. The new safety and environment authority would also have the lead coordination role in relation to other regulators with independent authority over offshore oil and gas activities, including EPA, NOAA and the Coast Guard.

Key responsibilities include:

- Reviewing and approving (or denying) all permits under exploration, development, and production plans.

- Inspecting all offshore operations by expert teams through scheduled and unannounced inspections.

- Auditing or otherwise requiring certification of operator health, safety, and environmental management systems.

- Evaluating eligibility for lessees based on safety and environmental qualifications.

- Reviewing and approving the safety and feasibility of any environmental mitigation activities prescribed by National Environmental Policy Act (NEPA) documents and other environmental consultations, authorization, or permits in addition to enforcing such requirements over the duration of an operation.

- Collecting and analyzing leading and lagging indicators from all active parties for full risk evaluation.

- Promulgating all structural integrity, process, and workplace safety rules and regulations in order to create a foundation of prescriptive regulations to supplement performance-based ("safety case") regulations.

- Providing technical review and comment on the five-year leasing program and individual lease sales.

- Providing technical review of spill response and containment plans.

- Reviewing and approving all spill response and containment plans and advising the new safety authority on environmental considerations.

- Investigating all accidents and other significant events that could have potentially turned catastrophic.

The organization and staffing composition should be decided during a transition period, when the areas and activities are analyzed and categorized by risk. The director of the new organization should be a qualified executive with a relevant engineering or technical background, and should be appointed by the President for a five- to six-year term and confirmed by the Senate. In addition, the new agency should have classifications and salary scales for engineering and technical staff and inspectors similar to those of the Nuclear Regulatory Commission.

**Leasing and Environmental Science Office:** This office would act as the leasing and resource manager for conventional and renewable energy and other mineral resources on the OCS. Charged with fostering environmentally responsible and efficient development of the OCS, the office would ensure that the American people both receive fair market value for the rights conveyed and that the nation's rich marine environment remains protected. The United States cannot afford a repetition of the kind of contractual drafting mistake that, as described in Chapter 3, is literally costing the nation tens of billions of dollars in lost revenues.

Key responsibilities include:

- Conducting OCS resource planning processes, including the five-year leasing program and individual lease sales.

- Conducting individual lease sales for oil, gas, and renewable energy facilities offshore.

- Promulgating rules and regulations with respect to lease terms, resource access, and use.

- Approving non-engineering or operations aspects of exploration, development, and production plans, subject to review by the new safety authority to ensure no conflicts with permitting requirements for infrastructure and operations.

- Reviewing and approving all spill response and containment plans and advising the new safety authority on environmental considerations.

- Making resource management decisions, such as those related to timing of reservoir abandonment and shared reservoir issues, unitization, commingling, and optimizing oil and gas recovery.

- Reviewing and approving permits for seismic activities.

- Conducting NEPA reviews at all relevant phases and coordinating other environmental reviews when appropriate

- Administering the Environmental Studies Program.

The leasing and environmental science office would include two distinct divisions: a leasing and resource evaluation division and an environmental science division. To provide an important and equitable voice for environmental concerns during the five-year planning process and lease awards, the environmental science division would be structured with a separate line of reporting to the Assistant Secretary overseeing offshore drilling and the environmental science division would be led by a Chief Scientist. The Chief Scientist's responsibilities would include, but not be limited to, conducting all NEPA reviews and coordinating other environmental reviews when appropriate and administering the Environmental Studies Program. The Chief Scientist's expert judgment on environmental protection concerns would be accorded significant weight in the leasing decision-making process, including on questions concerning whether and where leasing should occur and what environmental protection and mitigation conditions should be placed on leases that are issued. The new organization and process would also include enhanced review of environmental decisions and enforcement by the safety authority. It should track all mitigation efforts from NEPA documents and other environmental reviews to assist the new safety authority in its environmental enforcement duties.

**Office of Natural Resources Revenue (ONRR):** Revenue collection and auditing functions would remain with the Assistant Secretary for Policy, Management, and Budget as per the recent re-organization implemented by Secretary Salazar.

# B. Safeguarding the Environment

The adequacy of the existing regulatory regime to assure the environmental safety of offshore drilling (as distinct from worker or occupational safety) has come under a great deal of scrutiny since the *Deepwater Horizon* incident. In its work on this question, the Commission focused on two issues: (1) the application of NEPA requirements to the offshore leasing process and (2) the need for better science and greater interagency consultation to improve decision-making concerning the management of offshore resources.

## 1. The Need to Revise and Strengthen NEPA Policies and Practices in the Offshore Drilling Context

The Commission has reviewed the leasing and permitting processes that MMS followed in the Gulf of Mexico before the *Deepwater Horizon* incident. The results lead the Commission to conclude that the breakdown of the environmental review process for OCS activities was systemic and that Interior's approach to the application of NEPA requirements in the offshore oil and gas context needs significant revision. In particular, the application of tiering, the use of categorical exclusions, the practice of area-wide leasing, and the failure to develop formal NEPA guidance for the agency all contributed to this breakdown.

Tiering. Under MMS, the NEPA process for offshore oil and gas leasing relied heavily on "tiering"—a practice under which a broad environmental impact statement was used to cover "general matters" across a large area, while issues specific to a particular site or smaller area were addressed through "subsequent narrower statements of environmental analyses."[3] Tiering was meant to encourage more thorough reviews at each subsequent stage of the offshore leasing process, and to avoid the duplication of general information that would have been covered in previous environmental reviews. As applied by MMS, however, tiering was not always consistent with its original purpose: instead, it created a system where deeper environmental analysis at more geographically targeted and advanced planning stages did not always take place.

Categorical Exclusions. The Council on Environmental Quality's implementing regulations for NEPA define "categorical exclusions" as "a category of actions which do not individually or cumulatively have a significant effect on the human environment . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required."[4] MMS has historically applied categorical exclusions to both Exploration Plans and Development Operations Coordination Documents[5] in the Gulf of Mexico. Although there are legitimate differences between the Gulf and other regions of the OCS, the basis for such a wide

disparity in the use of categorical exclusions is questionable. And in the aftermath of the BP *Deepwater Horizon* spill, it is difficult to argue that deepwater drilling is an activity that does not present at least some potentially significant risk of harm to the environment of the Gulf. That is no doubt why, prompted by a comprehensive review of MMS's use of categorical exclusions by the Council on Environmental Quality, Interior announced in August 2010 that it would restrict its use of categorical exclusions for offshore oil and gas development "to activities involving limited environmental risk," while it undertakes a comprehensive review of its NEPA process.[6]

**Area–Wide Leasing.** OCS lease sales cover such large geographic areas that meaningful NEPA review is difficult. A decision to dramatically increase the size of lease sales— known as area–wide leasing—was made over 20 years ago at the request of industry; it has necessitated environmental analyses of very large areas at the lease sale stage. For example, the Final Environmental Impact Statement for the 2007–2012 multi–lease sales in the Gulf of Mexico covered more than 87 million acres,[7] while the Final Environmental Impact Statement for Chukchi Sea Lease Sale 193 covered about 34 million acres.[8] Given that 2008 lease sales in the Central Gulf of Mexico and the Chukchi Sea attracted almost $3.7 billion and almost $2.7 billion in high bids, respectively, it is appropriate to conduct environmental reviews on a finer geographic scale before private–sector commitments of this magnitude are made to purchase leases.

**NEPA Guidance.** Though expected to prepare a handbook on NEPA requirements,[9] MMS never developed formal NEPA guidance. As the Government Accountability Office noted in a review of the MMS Alaska Region Office: "The lack of a comprehensive NEPA guidance handbook, combined with high staff turnover, leaves the process for meeting NEPA requirements ill–defined for the analysts charged with developing NEPA documents."[10] BOEMRE is currently in the process of developing an internal NEPA guidance document—a step that should ensure a higher level of NEPA consistency and transparency across regions.

## Recommendation

B1: The Council on Environmental Quality and the Department of the Interior should revise and strengthen the NEPA policies, practices, and procedures to improve the level of environmental analysis, transparency, and consistency at all stages of the OCS planning, leasing, exploration, and development process.

Interior should take the following steps to strengthen NEPA review of the offshore leasing process:

- The new office of leasing and environmental science should, in consultation with the Council on Environmental Quality, develop and make public a formal NEPA handbook within one year. The handbook should address the issue of tiering and provide guidelines for applying NEPA in a consistent, transparent, and appropriate manner to decisions affecting OCS oil and gas activities.

- Interior should require, through this formal NEPA handbook, environmental impact statements for both the Five-Year Plan and for specific lease sales before plans for exploration, development, and production are approved in areas with complex geology, in ultra-deepwater, and in the Arctic and other frontier areas. Exploration plans and development and production plans in all other areas should be subject to NEPA review consistent with the Council on Environmental Quality's implementing regulations.

- In less well-explored areas, Interior should reduce the size of lease sales so their geographic scope allows for a meaningful analysis of potential environmental impacts and identification of areas of ecological significance. A bidder on tracts in these areas and all other areas should be able to demonstrate, in addition to financial prequalification and ability to contain a maximum-size spill, experience operating in similar environments and a record of safe, environmentally responsible operation—either in the United States or as verified by a peer regulator for another country. The distinction between the OCS and less well-explored areas in the Gulf should be defined by the new entity in charge of leasing and environmental science.

- Congress should amend the Outer Continental Shelf Lands Act to extend the 30-day deadline for approving exploration plans to 60 days. In addition, MMS should not consider such plans officially "submitted" until all of the required content, necessary environmental reviews, and other analyses are complete and adequate to provide a sound basis for decision-making. Exploration and development plans would be considered higher-level plans for purposes of agency review and approval under a reorganized regulatory structure. The office of safety and environment, separate from the office (or division) of leasing, would be responsible for permitting and approving well designs, drilling plans, and any structures.

## 2. The Need for Greater Interagency Consultation

Under OCSLA, it is up to the Secretary of the Interior to choose the proper balance between environmental protection and resource development. In making leasing decisions, the Secretary is required to solicit and consider suggestions from any interested agency, but he or she is not required to respond to the comments or accord them any particular weight. Similar issues arise at the individual lease sale stage and at the development and production plan stage. As a result, NOAA—the nation's ocean agency with the most expertise in marine science and the management of living marine resources—effectively has the same limited role as the general public in the decisions on selecting where and when to lease portions of the OCS. A more robust and formal interagency consultation process is needed—with the goal of identifying precise areas that should be excluded from lease sales because of their high ecological importance or sensitivity. In addition to NOAA, other federal agencies that should be involved include the U.S. Fish and Wildlife Service and EPA.

Strengthened interagency coordination on offshore oil and gas activities will also be important in implementing the final recommendations of the Interagency Ocean Policy Task Force. These recommendations, adopted by President Obama by Executive Order on July 19, 2010, mandate a new national ocean policy that includes a framework for coastal

and marine spatial planning, as well as a comprehensive, adaptive, integrated, transparent, ecosystem- and science-based process for analyzing current and anticipated uses of ocean, coastal, and Great Lakes areas.[11] Coastal and marine spatial planning applies a multi-sector approach in an effort to simultaneously reduce user conflicts and environmental impacts associated with ocean and coastal activities. Integrating five-year leasing plans and associated leasing decisions with the coastal and marine spatial planning process will be an important step toward assuring the sustainable use of ocean and coastal ecosystems. It could also reduce uncertainty for industry and provide greater predictability for potential users of different areas.

To ensure that offshore oil and gas development and production proceed in ways that minimize adverse impacts to the natural and human environment, decisions about these activities must be grounded in strong science. With respect to funding the necessary science, the Outer Continental Shelf Lands Act requires Interior to study the "assessment and management of environmental impacts on the outer Continental Shelf and coastal areas that might be affected by oil and gas or other mineral developments. . . ."[12] Initiated in 1973, funding for the Environmental Studies Program at Interior peaked in 1976 at roughly $55 million, but had fallen to less than $20 million during most of the 1990s and 2000s.  It was only recently increased to approximately $30 million.[13]

Future research must be conducted in a systematic way that strategically enhances understanding of the impacts of oil and gas activities and provides regulators with the timely and scale-appropriate information required for sound decisions. Long-term studies that provide critical scientific information on OCS frontier or lesser known areas,[*] or systematic efforts to fill data gaps in areas with existing oil and gas activity, can help ensure that the selection of new leasing areas is informed by a full understanding of potential impacts on important ecological resources. In frontier areas, it will be important to collect data on prevailing environmental conditions on a broad geographic scale, not just at individual lease sites. Additionally, post-development ecological monitoring is critical to understanding the impacts of oil and gas activities and to facilitate an adaptive approach to environmental management. Expanded coordination and cooperation on scientific research efforts with NOAA, the U.S. Geological Survey, and other agencies with relevant expertise can improve the quality of science available for OCS decision-making. Much of this research will also be relevant to other offshore activities, including the development of offshore wind resources.

## Recommendations

B2: The Department of the Interior should reduce risk to the environment from OCS oil and gas activities by strengthening science and interagency consultations in the OCS oil and gas decision-making process.

---

* The term "frontier areas" include areas of the OCS that either have never been leased, or have not been leased in many years. It includes the Arctic (Beaufort and Chukchi Seas) and the Atlantic and portions of the Pacific.

B3: Congress, by enacting legislation, and the Department of the Interior, through its lease provision, should require the oil and gas industry to pay fees that support environmental science and regulatory review related to OCS oil and gas activities to enable cooperating agencies to carry out these responsibilities. (See Recommendation G2.)

Several actions are needed to implement these recommendations:

- Congress should amend the Outer Continental Shelf Lands Act to provide NOAA with a formal consultative role during the development of five-year lease plan and lease sale stages. Consultation should occur no later than 60 days in advance of final Department of the Interior decisions on lease plans and sales. Specifically, NOAA should provide comments and recommendations concerning specific geographic areas that should be excluded from the leasing program or treated in a specific manner due to their ecological sensitivity or for other reasons relevant to NOAA's ocean and coastal science expertise. Interior must adopt NOAA's recommendations unless the Department determines that doing so would be inconsistent with important national policy interests. Moreover, Interior must publish in writing its rationale for rejecting NOAA's recommendation.

- The Department of Energy, NOAA, the U.S. Geological Survey, and other interested agencies should establish a joint research program to systematically collect critical scientific data, fill research gaps, and provide comprehensive, ecosystem-based scientific reviews of OCS areas that are currently or will likely be open for oil and gas leasing, and for offshore areas being considered for the siting of sources of renewable energy such as wind power. This program should build on existing data; should aim to supplement data collected from individual lease sites by industry to develop information for broader geographic areas; and should engage the non-federal scientific community through such mechanisms as the National Oceanographic Partnership Program. The research should outline and develop the necessary data for: (1) decision-making related to future leasing, exploration, and development; (2) measuring and monitoring impacts on ecological resources; and (3) providing necessary data for natural resource damage assessment should an oil spill occur.

- The National Academy of Sciences should regularly evaluate the government's studies program in this area, preferably at five-year intervals.

- Together with NOAA, the new division of environmental science under the direction of the Chief Scientist in the Office of Leasing and Environmental Science should develop an environmental monitoring program or set of protocols to be implemented by oil and gas companies at lease sites once exploration and development and production activities begin. Areas of ecological interest and areas where data gaps exist should be targeted for monitoring programs. In addition, monitoring should be conducted in a way that is independently verifiable and allows for comparisons across individual sites. Companies should provide all monitoring data to the federal government.

- NOAA and other federal agencies with appropriate expertise should be encouraged to act as cooperating agencies in NEPA reviews of offshore energy production activities, including exploration and development plans and drilling permit applications. Federal agencies that submit comments to Interior as part of a NEPA process should receive a written response indicating how the information was applied and if it was not included, why it was not included.

## C. Strengthening Oil Spill Response, Planning, and Capacity

Just as the events of April 20, 2010 exposed a regulatory regime that had not kept up with the industry it was responsible for overseeing, the events that unfolded in subsequent weeks and months made it dismayingly clear that neither BP nor the federal government was prepared to deal with a spill of the magnitude and complexity of the *Deepwater Horizon* disaster. This section discusses the Commission's recommendations in the area of oil spill response and planning. Broadly speaking they address three critical issues or gaps in the government's existing response capacity: (1) the failure to plan effectively for a large-scale, difficult-to-contain spill in the deepwater environment or potentially in the Arctic; (2) the difficulty of coordinating with state and local government officials to deliver an effective response; and (3) a lack of information and understanding concerning the efficacy of specific response measures, such as dispersants and berms.

### 1. The Need for Improved Oil Spill Response Planning

Oil spill response planning and analysis across the government needs to be overhauled in light of the lessons of the *Deepwater Horizon* blowout. A common interagency approach to analyzing oil spill risks and a common understanding of the issues and impacts involved are needed and must be consistently incorporated in environmental reviews, consultations, and authorizations. Environmental review and spill planning currently occurs at different levels within the government and industry, and these reviews and plans have not been sufficiently coordinated to ensure either searching review of industry plans or adequate preparation.

One of the common threads that runs through many of the environmental review documents prepared for Gulf of Mexico oil and gas activities in the years leading up to the *Deepwater Horizon* spill was their reliance on MMS oil spill risk and impact analyses. To the extent that any of these documents contained errors or incomplete information, those gaps and errors carried through to subsequent environmental reviews by other agencies.

The government's spill-response planning occurs largely outside of MMS. The National Contingency Plan, mandated by the Clean Water Act, prescribes the nationwide response structure for spills of oil or releases of hazardous substances and creates a tiered planning process. Regional Response Teams include representation from federal agencies and state governments, and develop Regional Contingency Plans as well as preauthorization protocols for certain response strategies.  The Area Committees, which develop Area

Contingency Plans, similarly include federal and state representatives but are led by the Coast Guard. (The Coast Guard and EPA co–chair the regional teams.)  The Area Contingency Plans are the most specific and the most relied–upon during the response to a spill.

While industry spill response plans must "be consistent with the requirements of the National Contingency Plan and Area Contingency Plans,"[14] those industry plans presently require only the approval of BOEMRE.[15] Its regulations outline what needs to be included in these plans and direct the company to include information about a worst case scenario, including how to calculate the volume of oil, determine its trajectory, and a response strategy.[16] As noted above, MMS oil spill risk and impacts modeling formed the basis of the required analysis.  These response plans were not distributed to any federal agencies for review and comment outside of MMS.  Additionally, only a small number of the plans developed for the Gulf were sent to the existing Office of Leasing and Environment for detailed environmental review within MMS or shared with other federal agencies with relevant expertise, such as NOAA or the Coast Guard.  Finally, no provision was made for any form of public review or comment, and plans were not available to the public after they received MMS approval.

## Recommendation

### C1: The Department of the Interior should create a rigorous, transparent, and meaningful oil spill risk analysis and planning process for the development and implementation of better oil spill response.

Several steps are needed to implement a rigorous, transparent, and meaningful oil spill risk analysis and planning process:

- Interior should review and revise its regulations and guidance for industry oil spill response plans in light of the lessons learned from the *Deepwater Horizon* experience.

- A new process for reviewing spill response plans is needed. This process should ensure that all critical information and spill scenarios are included in the plans, including oil spill containment and control methods to ensure that operators can deliver the capabilities indicated in their response plans. In addition, the new entity within Interior that is charged with overseeing offshore safety and environmental protection will have to verify operator capability to perform according to the plans.

- Interior must ensure that adequate technical expertise exists within the staff responsible for reviewing and approving spill response plans.

- In addition to the Department of the Interior, other agencies with relevant scientific and operational expertise should play a role in evaluating spill response plans to verify that operators can conduct the response and containment operations detailed in their plans. Specifically, oil spill response plans, including source-control measures, should be subject to interagency review and approval by the Coast Guard, EPA,

and NOAA. Other parts of the federal government, such as Department of Energy national laboratories that possess relevant scientific expertise, could be consulted. This would help remedy the past failure to integrate multiple area, regional, and industry response plans, by involving the agencies with primary responsibility for government spill response planning in oversight of industry planning. Plans should also be made available for a public comment period prior to final approval and response plans should be made available to the public following their approval.

- Interior should incorporate the "worst-case scenario" calculations from industry oil spill response plans into NEPA documents and other environmental analyses or reviews. This does not mean that Interior would be required to conduct a "worst-case scenario analysis" under NEPA, but it does mean that Interior would use industry's worst-case estimates for potential oil spill situations in its environmental analyses.

## 2. The Need for a New Approach to Handling Spills of National Significance

The Macondo well blowout caused the largest accidental oil spill in history—one that presented an unprecedented challenge to the response capability of both government and industry. Clearly, neither was adequately equipped: In fact it was quickly evident that even the response capacity indicated in industry's spill response plans did not exist. Though the National Contingency Plan permitted the government to designate the spill as one of "national significance," this designation did not trigger any procedures other than allowing the federal government to name a National Incident Commander.

The spill's magnitude calls into question whether the National Contingency Plan establishes an appropriate relationship between the federal government and the responsible party, as the public demanded in the weeks and months following the *Deepwater Horizon* spill that the government demonstrate control of the response. The responsible party that caused the spill is clearly legally responsible for containing the spill and mitigating its harmful consequences. The federal government, not the responsible party, must be in charge of those efforts. As this spill demonstrated, the government unfortunately lacked both the expertise and the capacity to oversee aspects of the response at the outset of the spill—particularly the effort to control the well. Only as the full scope of the disaster unfolded and the government gathered and focused its resources from a variety of agencies was the government ultimately able to take charge.

## Recommendation

 C2: EPA and the Coast Guard should establish distinct plans and procedures for responding to a "Spill of National Significance."

Under existing law, EPA is the federal agency responsible for developing a National Contingency Plan, which is the federal government's blueprint for responding to both oil spills and hazardous substances releases. In light of the *Deepwater Horizon* oil spill, EPA should amend or issue new guidance on the National Contingency Plan to add distinct plans and procedures for Spills of National Significance. In those amendments, EPA should:

- Increase government oversight of the responsible party, based on the National Contingency Plan's requirement that the government "direct" the response where a spill poses a substantial threat to public health or welfare.[17]

- Augment the National Response Team and Regional Response Team structures to establish additional frameworks for providing interagency scientific and policymaking expertise during a spill. Further, EPA, NOAA, and the Coast Guard should develop procedures to facilitate review and input from the scientific community—for example, by encouraging disclosure of underlying methodologies and data.

- Create a communications protocol that accounts for participation by high-level officials who may be less familiar with the National Contingency Plan structure and create a communications center within the National Incident Command—separate from the joint information center established in partnership with the responsible party—to help transmit consistent and complete information to the public.

### 3. The Need to Strengthen State and Local Involvement

The response to the *Deepwater Horizon* disaster showed that state and local elected officials had not been adequately involved in oil spill contingency planning, though career responders in state government had participated extensively in such planning. Before the *Deepwater Horizon* spill, state and local elected officials were not regular participants in Area Committee meetings or familiar with local Area Contingency Plans. The Coast Guard and Area Committee member agencies had done little to reach out to state and local elected officials. These state and local officials were more familiar with hurricane response under the Stafford Act, in which the federal government provides funding and supports state and local governments, but does not control emergency response operations. As a result, state and local political officials had incorrect expectations about their roles. They understandably wanted to be responsive to citizens who were concerned about the spill and, regardless of the official response plans, sought state and local governmental assistance.

Unfamiliarity with, and lack of trust in, the federal response manifested itself in competing state structures and attempts to control response operations that undercut the efficiency of the response overall. Federal responders improved their relationship with state and local officials as the response progressed—but had better coordination and communication existed sooner, that relationship could have been more productive in the early days of the spill response. Moreover, increased citizen involvement before a spill occurs could create better mechanisms to utilize local citizens in response efforts, provide an additional layer of review to prevent industry and government complacency, and increase public trust in response operations.

## Recommendation

C3: EPA and the Coast Guard should bolster state and local involvement in oil spill contingency planning and training and create a mechanism for local involvement in spill planning and response similar to the Regional Citizens' Advisory Councils mandated by the Oil Pollution Act of 1990.

EPA and the Coast Guard, as the chair and vice-chair of the National Response Team, should issue policies and guidance for increased state and local involvement in oil spill contingency planning and training. This guidance should provide protocols to:

- Include local officials from areas at high risk for oil spills in training exercises.

- Establish liaisons between the Unified Command and affected local communities at the outset of a spill response.

- Add a local on-scene coordinator position to the Unified Command structure.

- Provide additional clarification and guidance to federal, state, and local officials on the differences between emergency response under the Stafford Act and under the National Contingency Plan.

In addition, a mechanism should be created for ongoing local involvement in spill planning and response in the Gulf. In the Oil Pollution Act of 1990, Congress mandated citizens' councils for Prince William Sound and Cook Inlet.  In the Gulf, such a council should broadly represent the citizens' interests in the area, such as fishing and tourism, and possibly include representation from oil and gas workers as ex-officio, non-voting members. The citizens' group could be funded by Gulf lease holders. The Commission further recommends that federal regulators be required to consult with the council on relevant issues, that operators provide the council with access to records and other information, and that entities (either in industry or in government) declining the council's advice submit their reasons to the council in writing.

## 4.  The Need for Increased Research and Development to Improve Spill Response

The technology available for cleaning up oil spills has improved only incrementally since 1990. Federal research and development programs in this area are underfunded: In fact, Congress has never appropriated even half the full amount authorized by the Oil Pollution Act of 1990 for oil spill research and development. In addition, the major oil companies have committed minimal resources to in-house research and development related to spill response technology. Oil spill removal organizations are underfunded in general and dedicate few if any resources to research and development. Though some commentators and industry representatives have argued that more research and development would not have allowed for a more effective spill response because no technology will ever collect more than a fraction of spilled oil, the fact is that neither industry nor government has made significant investments in improving the menu of response options or significantly improved their effectiveness. Thus any argument about the limited potential of response technology is speculative. After the *Deepwater Horizon* spill, agencies, industry, and entrepreneurs focused attention on developing new response technologies for the first time in 20 years, and a number of promising options emerged within a relatively short period of time—including beach-cleaning machines, subsea dispersant delivery systems, and new in situ burning techniques.

## Recommendation

### C4:  Congress should provide mandatory funding for oil spill response research and development and provide incentives for private-sector research and development.

Specifically, Congress should provide mandatory funding (i.e. funding not subject to the annual appropriations process) at a level equal to or greater than the amount authorized by the Oil Pollution Act of 1990 to increase federal funding for oil spill response research by agencies such as Interior, the Coast Guard, EPA, and NOAA—including NOAA's Office of Response and Restoration. To be sure, such mandatory appropriations are rarely done, but they are not unprecedented.  Congress has included such a provision when, as here, Congress seeks to target appropriations to support a discrete category of activities where Congress perceives that the need is high and the concern is great that the desired activity will otherwise go unfunded over a sustained period of time.  For instance, Congress has provided for an annual mandatory appropriation of $100 million for emergency highway repairs for those damaged by natural disasters or catastrophic failures.[18]  Congress also provided for mandatory funding for five years for several farm conservation programs in the Farm Security and Rural Investment Act of 2002.[19] By similarly removing oil spill research and development funding from the ordinary appropriations process, Congress can avoid the experience that followed the *Exxon Valdez* spill, when support for response research and development decreased over time. Moreover, Congress can comply with its pay–as–you–go rules by supporting increased research and development funding with a fee on offshore lessees.  (See Recommendation G2.)

An advisory board, made up of experts from relevant offices of the Department of the Interior, U.S. Geological Survey, Department of Energy, EPA, and NOAA, as well as from professional societies, academia, industry, and non–governmental organizations, should be established to develop a research agenda and roadmap. In addition, to promote increased research investments by industry, the Coast Guard should revise its Effective Daily Recovery Capacity regulations to encourage the development and use of more efficient oil recovery equipment. At the same time, EPA should revise its oiled–water discharge regulations and streamline its permitting process for open–water testing. Finally, Congress and the Administration should encourage private investment in response technology more broadly, including through public–private partnerships and a tax credit for research and development in this area.

### 5.  The Need for New Regulations to Govern the Use of Dispersants

The decision to use dispersants involves difficult tradeoffs: If dispersants are effective, less oil will reach shorelines and fragile marsh environments, but more dispersed oil will be spread throughout the water column. Prior to the *Deepwater Horizon* incident, the federal government had not adequately planned for the use of dispersants to address such a large and sustained oil spill, and did not have sufficient research on the long-term effects of dispersants and dispersed oil to guide its decision–making. Officials had to make decisions about dispersant use without important relevant information or the time to gather such information. Under the circumstances, however, the Commission believes that the National Incident Commander, Federal On–Scene Coordinators, and EPA Administrator

made reasonable decisions regarding the use of dispersants at the surface and in the subsea environment.

## Recommendation

C5:  EPA should update and periodically review its dispersant testing protocols for product listing or pre-approval, and modify the pre-approval process to include temporal duration, spatial reach, and volume of the spill.

EPA should update its dispersant testing protocols and require more comprehensive testing prior to listing or pre-approving dispersant products. The Coast Guard and EPA, as co-chairs of the Regional Response Teams and leaders of the Area Contingency Plan drafting process, should modify pre-approvals of dispersant use under the National Contingency Plan to establish procedures for further consultation based on the temporal duration, spatial reach, or volume of the spill and volume of dispersants that responders are seeking to apply. EPA and NOAA should conduct and encourage further research on dispersants, including research on the impacts of high–volume and subsea use of dispersants, the long–term fate and effects of dispersants and dispersed oil, and the development of less toxic dispersants.

### 6.  The Need to Re-evaluate the Use of Offshore Barrier Berms in Spill Response

Offshore barrier berms generally do not constitute a viable spill response measure for several reasons. These reasons include the time and cost of construction, and the highly variable and dynamic marine environment that limit effectiveness and pose the potential for negative environmental impacts resulting from dredging and filling. Thus, for instance, barrier berms constructed off the shores of Louisiana in response to the *Deepwater Horizon* spill could not be considered a success. Only a fraction of the project (approximately 6 percent) was completed by the time the well was capped, and no estimate of the amount of oil trapped by the berms is much more than 1,000 total barrels. In fact, the Louisiana berms project stands out as the most expensive and perhaps most controversial response measure deployed to fight the *Deepwater Horizon* spill. The decision to approve the project as one of the oil spill response techniques to be funded by the responsible party was based primarily on the demands of local and regional interests rather than on a scientific assessment of its likely efficacy.

## Recommendation

C6: The Coast Guard should issue guidance to establish that offshore barrier berms and similar dredged barriers generally will not be authorized as an oil spill response measure in the National Contingency Plan or any Area Contingency Plan.

## D. Advancing Well-Containment Capabilities

As described in Chapter 5, the most obvious, immediately consequential, and plainly frustrating shortcoming of the oil spill response set in motion by the events of April 20, 2010 was the simple inability—of BP, of the federal government, or of any other potential intervener—to contain the flow of oil from the damaged Macondo well.  Clearly, improving the technologies and methods available to cap or control a failed well in the extreme conditions thousands of feet below the sea is critical to restoring the public's confidence that deepwater oil and gas production can continue, and even expand into new areas, in a manner that does not pose unacceptable risks of another disaster. Better technology and methods are also needed to gather accurate information in the event of an accident or failure. This section discusses the Commission's recommendations for advancing well-containment capabilities in the wake of the Macondo well blowout.

### 1.  The Need for Government to Develop Greater Source-Control Expertise

As described in Chapter 5, at the time of the Macondo well blowout on April 20, the U.S. government was unprepared to oversee a deepwater source–control effort. Though the public expected federal authorities to take charge once the accident occurred, neither MMS nor the Coast Guard had the expertise or resources to supervise BP's well-containment efforts. Once the Secretary of Energy's science team, the U.S. Geological Survey, the national laboratories, and other sources of scientific expertise became involved, the government was able to substantively supervise BP's decision–making, forcing the company to fully consider contingencies and justify its chosen path. The government's oversight effort was assisted by outside industry experts, although their involvement also raised some concerns (about conflicts of interest, sharing of proprietary information, and potential liability for participants) that were never resolved.

## Recommendation

**D1: The National Response Team should develop and maintain expertise within the Federal government to oversee source-control efforts.**

The National Response Team should create an interagency group—including representation from the Department of the Interior, Coast Guard, and the Department of Energy and its national laboratories—to develop and maintain expertise in source control, potentially through public–private partnerships.  The proposed Ocean Energy Safety Institute at the Department of the Interior could play a role in developing such expertise.

In addition, EPA should amend the National Contingency Plan to:

- Define and institutionalize the role of federal agencies and the national laboratories that possess relevant scientific expertise in source–control.

Create a mechanism for involving outside industry experts in source-control design and oversight.

## 2. The Need to Strengthen Industry's Spill Preparedness

Beyond attempting to close the blowout preventer stack, no proven options for rapid source control in deepwater existed when the blowout occurred. BP's Initial Exploration Plan for the area that included the Macondo prospect identified only one response option by name: a relief well, which would take months to drill. Although BP was able to develop new source-control technologies in a compressed timeframe, the containment effort would have benefited from prior preparation and contingency planning.

## Recommendation

D2: The Department of the Interior should require offshore operators to provide detailed plans for source control as part of their oil spill response plans and applications for permits to drill.

Consistent with the enhanced planning process described above in Recommendation C1, oil spill response plans should be required to include detailed plans for source control. These plans should demonstrate that an operator's containment technology is immediately deployable and effective. (BOEMRE has recently issued a Notice to Lessees requiring operators to demonstrate, as part of the spill response planning process, that they have "access to and can deploy surface and subsea containment resources that would be adequate to promptly respond to a blowout or other loss of well control."[20] In enforcing this Notice, BOEMRE must ensure that operators provide detailed descriptions of their technology and demonstrate that it is deployable and effective.)

In applications for permits to drill, the Department of the Interior should require operators to provide a specific source-control analysis for each well. The analysis must demonstrate that an operator's containment technology is compatible with the well. (The Department of the Interior could implement this requirement through amendments to existing regulations[21] or through a Notice to Lessees.[22] The latter option could be implemented more quickly, though the former might be more permanent.)

As with oil spill response plans, source-control plans should be reviewed and approved by agencies with relevant expertise, including the Department of the Interior and the Coast Guard.

### 3. The Need for Improved Capability to Develop Accurate Flow Rate Estimates

As described in Chapter 5, early flow rate estimates were highly variable and difficult to determine accurately.  However, the understated estimates of the amount of oil spilling from the Macondo well appear to have impeded planning for and analysis of source-control efforts like the cofferdam and especially the top kill. U.S. Geological Survey Director Marcia McNutt stated that if a similar blowout occurs in the future, the government will be able to quickly and reliably estimate oil flow using the oceanographic techniques that eventually provided an accurate estimate of the flow rate from the Macondo well.[23]

## Recommendation

**D3: The National Response Team should develop and maintain expertise within the federal government to obtain accurate estimates of flow rate or spill volume early in a source-control effort.**

The National Response Team should create an interagency group—including representation from the Department of the Interior, the Coast Guard, the national laboratories, and NOAA—to develop and maintain expertise in estimating flow rates and spill volumes, potentially through consultation with outside scientists.

In addition, EPA should amend the National Contingency Plan to create a protocol for the government to obtain accurate estimates of flow rate or spill volume from the outset of a spill. This protocol should require the responsible party to provide the government with all data necessary to estimate flow rate or spill volume.

### 4. The Need for a More Robust Well Design and Approval Process

Among the problems that complicated the Macondo well–containment effort was a lack of reliable diagnostic tools. The *Deepwater Horizon* blowout preventer had one pressure gauge accurate to plus or minus 400 pounds per square inch. This meant BP and the government could not get accurate pressure readings, which in turn hampered their ability to estimate the oil flow rate, undertake reservoir modeling, and plan for source control operations. In addition, the blowout preventer lacked a means of indicating whether and to what extent its rams and annular preventers had closed. Without such instruments, the government and BP expended significant resources on basic data–collection such as obtaining gamma–ray images of the blowout preventer and adding pressure sensors to the top hat after it was deployed. Meanwhile, the presence of rupture disks in the Macondo well's 16–inch casing led to concerns about well integrity that further complicated the source–control effort. BP had not considered the impact of these disks on post–blowout containment when it designed the well.[24]

## Recommendation

D4: The Department of the Interior should require offshore operators
seeking its approval of proposed well design to demonstrate that:

- Well components, including blowout preventer stacks, are equipped with
  sensors or other tools to obtain accurate diagnostic information—for example,
  regarding pressures and the position of blowout preventer rams.

- Wells are designed to mitigate risks to well integrity during post-blowout
  containment efforts.

## E. Overcoming the Impacts of the *Deepwater Horizon* Spill and Restoring the Gulf

As described in Chapters 6 and 7, even before the Macondo well was finally capped and
oil stopped flowing, major efforts were underway to mitigate and begin to repair the
environmental and economic harm caused by the spill. Those efforts are continuing—and
likely will for years.  Nevertheless, any effort to draw lessons learned from the *Deepwater
Horizon* spill for the purpose of developing options (as the Commission's charter states) to
"guard against, and mitigate the impact of, any oil spills associated with offshore drilling
in the future" would necessarily be incomplete without an early appraisal of progress
toward longer-term restoration in the Gulf. This section describes the actions and initiatives
that have been launched to assess and overcome the impacts of the spill, and presents the
Commission's recommendations for steps that should be taken to ensure the following
three goals are met:

- The environment and the economy of the Gulf region recovers as completely and as
  quickly as possible, not only from the direct impacts of the spill, but from the decades
  of degradation that preceded it;
- The people of the Gulf are fairly compensated for the direct and indirect impacts of
  the spill; and
- Lessons learned from restoration efforts in the Gulf—including advances in scientific
  understanding, data collection, mitigation technologies and techniques, planning,
  and institutional coordination—result in enhanced capacity to remedy the impacts of
  future offshore oil spills and better manage the myriad economic, environmental, and
  social interests that must be balanced in the Gulf and other critical offshore areas.

### 1. The Need for Improved Understanding of Oil Spill Impacts, Particularly in the Deepwater Environment

A sophisticated understanding of the full range of impacts from a large-scale oil spill is
critical to effective recovery and restoration efforts.  Because, however, the concentration
and toxicity of oil dissipate rapidly within the first few days to weeks of exposure to the
elements, the window of opportunity to collect data in the aftermath of an accident is

narrow. For this reason, advance planning and rapid response mechanisms, are essential to capitalize on research opportunities.

Independent scientists, many of who are long-time scholars of the Gulf ecosystem or have unique capabilities, were eager to study the spill and contribute to the injury assessment. However, the independent science community's ability to participate early on was hampered by a lack of timely access to the response zone. This had the effect of diminishing what was learned from the spill.

## Recommendation
E1: The Coast Guard, through the Federal On-Scene Coordinator, should provide scientists with timely access to the response zone so that they can conduct independent scientific research during an oil spill response and long-term monitoring in the future.

The National Science Foundation, in consultation with the new National Ocean Council, should expand on its RAPID grant program to create a framework under which independent science during a spill can be coordinated, with an emphasis on data-sharing, communication, and timely access within the response zone. By ensuring that independent scientists can receive expedited funding after an oil spill, government will gain a more complete understanding of spill-related environmental impacts. A demonstrated commitment to independent science will also serve to bolster public confidence and trust. The rush to study the impacts of the *Deepwater Horizon* spill put a strain on existing scientific resources in the Gulf. Independent, industry, and government scientists all wrangled for funding, equipment and vessels, often duplicating efforts in the process. A program that effectively coordinates research initiatives and resources will provide a significant added value to the scientific community under exigent conditions.

### 2. The Need for Fair, Transparent Compensatory Restoration Based on Natural Resource Damage Assessments

As described in Chapter 6, the *Deepwater Horizon* spill caused substantial damage to natural resources and habitats across the Gulf coast and in the deepwater offshore environment. Damages to natural resources are formally assessed subject to regulations established under the Natural Resource Damage Assessment provisions of the Oil Pollution Act. The Act requires that the public be compensated for injury to and lost use of public resources. The regulation provides that compensation should be "in-place" and "in-kind" wherever possible, thereby favoring restoration measures with a connection to oil spill impacts. The *Deepwater Horizon* spill is unprecedented in that five Gulf States were affected, each with its own restoration agenda, even though most of the damage occurred in Louisiana. The damage offshore is unprecedented and unknown. The Trustees* responsible for the damage assessment are under pressure to approve projects with an "equitable" (i.e., each state

---

* The Natural Resource Damage Assessment regulation provides for the designation of affected state, federal, and tribal Trustees to conduct the damage assessment of natural resources, achieve agreement on restoration goals, and design and implement restoration projects to meet those goals. In this case, the Trustees comprise designated federal and state officials who are encouraged to work together and achieve consensus on restoration goals and projects though a Trustee Council. While the regulation supports cooperation, it does not explicitly require consensus by the Trustees. If certain Trustees disagree with the direction of the Natural Resource Damage Assessment process, they are free to break away from the Council and seek reimbursement for natural resource damages on their own.

receives an equal portion) allocation of resources that may not be entirely consonant with the "in-place, in-kind" requirement.

Another challenge for the Trustees is assessing and providing compensatory restoration for the potentially significant marine and deepwater impacts associated with this spill. Historically, most applications of the Natural Resource Damage Assessment process have focused on coastal restoration, but the Macondo well, which spilled oil 5,000 feet below the surface, may have damaged organisms in the water column or on the sea floor for which there should be compensation as well.

## Recommendation

E2: The Trustees for Natural Resources should ensure that compensatory restoration under the Natural Resource Damage Assessment process is transparent and appropriate.

Restoration decisions must be transparent, appropriate, and apolitical. The Trustees should appoint an independent scientific auditor to ensure that projects are authorized on the basis of their ability to mitigate actual damages caused by the spill, with special care taken to assess and compensate poorly understood marine impacts. Further, any potential settlement agreement between the responsible party and the Trustees should provide for long-term monitoring of affected resources for a period of at least three to five years, as well as "enhancement"* beyond the baseline. By hewing closely to the "in-place" and "in-kind" principles that underpin Natural Resource Damage Assessment regulations, Trustees will help ensure that injured public resources, and the communities that rely on them, are made whole to the fullest extent possible, regardless of state and federal boundaries. A focus on ocean impacts will provide an invaluable opportunity—missed during the Ixtoc spill of 1979—to assess and remediate damage to marine ecosystems after an oil spill.

### 3.  The Need to Address Human Health Impacts, Especially Among Response Workers and in Affected Communities

As described in Chapter 6, the National Contingency Plan overlooks the need to respond to widespread concerns about human health impacts. For smaller oil spills, the response effort is generally carried out by trained oil spill response technicians, but given the scale of the response to the *Deepwater Horizon* spill and the need to enlist thousands of previously untrained individuals to clean the waters and coastline, many response workers were not screened for pre-existing conditions. This lack of basic medical information, which could have been collected if a short medical questionnaire had been distributed, limits the ability to draw accurate conclusions regarding long-term physical health impacts. Additionally, residents of coastal communities may believe that they suffered adverse health consequences resulting from both chemical exposure from the spill itself and the mental stress occasioned by the spill's assault on their livelihoods.

---

* "Enhancement" is a term coined during settlement negotiations after the *Exxon Valdez* oil spill of 1989. It requires the responsible party to fund restoration beyond that needed merely to return injured resources to baseline conditions. Rather, any funding should be sufficient to ensure that restoration leaves the affected system better off than before a spill.

Adequate funding and resources were not in place to deal with claims of physical and mental illness among Gulf coast residents resulting from, or exacerbated by, the spill, response actions, and the resulting impacts. Whether allegations that the spill created health problems for responders and Gulf Coast residents are warranted does not change the perception among some that government has not been responsive to health concerns.

The National Contingency Plan contains no specific guidance for responding to public health impacts of an oil spill or hazardous substances release. By contrast, the National Response Framework—which provides the structure for a national response to terrorist attacks, major disasters, and other kinds of emergencies—incorporates a protocol for responding to public health exigencies.

## Recommendation

### E3: EPA should develop distinct plans and procedures to address human health impacts during a Spill of National Significance.

EPA should amend the National Contingency Plan to add distinct procedures to address human health impacts during a Spill of National Significance. Spills of this magnitude necessarily require a significant clean-up effort, potentially exposing workers to toxic compounds in oil and dispersants. Additionally, residents of coastal communities may suffer adverse health consequences due to both chemical exposure from the spill itself, and the mental stress occasioned by the assault on their livelihoods or way of life. With respect to worker health and safety, existing authorities[25] should be strengthened to ensure consistent application of medical screening and surveillance procedures for both formal response contractors and ad hoc citizen responders. Regarding public health, a medical services protocol similar to the Public Health and Medical Services Annex of the National Response Framework should be incorporated to ensure emergency medical care, timely dissemination of public health information,[26] and medical monitoring and surveillance.[27]

Furthermore, a public health protocol requiring the collection of adequate baseline data and long-term monitoring would allow researchers to assess the human dimensions of oil spills with greater accuracy. Without sound data on the causal or correlative relationships between chemical (i.e., oil and dispersants) exposure and human health, a number of response methods may be used inappropriately—including the provision of appropriate protective gear for cleanup workers.[28]

### 4.  The Need to Restore Consumer Confidence

As described in Chapter 6, images of spewing oil and oiled beaches in newspapers and on television set the stage for public concern regarding the safety of Gulf seafood. Additional factors contributed to the lingering impression that the public could not trust government assurances that the seafood was safe: the unprecedented volumes of dispersants used, confusion over the flow rate and fate of the oil, frustration about the government's relationship with BP in spill cleanup, and lawsuits filed by fishermen contesting the government's assurance of seafood safety. The economic blow to the Gulf region associated with this loss of consumer confidence is sizable. BP gave Louisiana and Florida $68 million

for seafood testing and marketing, as well as money to assess impacts on tourism and fund promotional activities. As of early December, BP was considering a similar request from Alabama.

In future spills, however, there is no guarantee that a responsible party will have the means or the inclination to compensate such losses. Such indirect financial harms are currently not compensable under the Oil Pollution Act.  Nevertheless, losses in consumer confidence are real and Congress, federal agencies, and responsible parties should consider ways to restore consumer confidence in the aftermath of a Spill of National Significance.

## Recommendation

E4: Congress, federal agencies, and responsible parties should take steps to restore consumer confidence in the aftermath of a Spill of National Significance.

### 5.  The Need for a Long-Term Restoration Effort that Is Well Funded, Scientifically Grounded, and Responsive to Regional Needs and Public Input

As described in Chapter 7, a lack of sustained and predictable funding, together with failed project coordination and long-term planning, have resulted in incomplete and often ineffective efforts to restore the Gulf's natural environment. Currently, no funding source exists to support regional restoration efforts. Estimates of the cost of Gulf restoration vary widely, but according to testimony before the Commission, fully restoring the Gulf will require $15 billion–$20 billion, or a minimum of $500 million per year, over 30 years. While a number of different sources currently provide funding to individual states for restoration, none of these sources provides funds for Gulf-wide coastal and marine restoration and none is sufficient to support the sustained effort required. Most policymakers agree that without a reliable source of long-term funding, it will be impossible to achieve restoration in the Gulf.

Several Gulf States and the federal government have filed or are expected to file suit against BP and other companies involved in the spill, which will likely create opportunities to direct new restoration funds to the region. In some cases, congressional action will be required to ensure that funds are directed to this purpose. Meanwhile, Congress has already begun considering other potential funding sources, including a higher per-barrel tax on oil production, increased royalties or fees, and direct appropriations for Gulf-wide restoration through the normal federal budget process. Although many of these proposals face political hurdles, the fact remains that resources are needed if progress on coastal restoration is to continue. Inaction is a prescription for further degradation: since many Gulf ecosystems were already fragile and deteriorating before the spill, maintaining the status quo amounts to accepting their continued decline, with the longer-term risks and vulnerabilities this entails.

In order for funding to be most efficiently directed at long-term restoration, a decision-making body is needed that has authority to set binding priorities and criteria for project funding. The Gulf Coast Ecosystem Restoration Task Force is now in place; it was recommended by a September 2010 report on restoration from Secretary of the Navy Ray

Mabus to the President and subsequently established by Presidential Executive Order.[29] According to the language of the Executive Order, the job of the Task Force is to begin coordinating the different restoration projects being undertaken by various jurisdictions in the Gulf, coordinating related science activities, and engaging stakeholders. However, as many in Congress and the Administration have suggested, the Task Force lacks some features necessary to effectively direct long-term restoration efforts in the Gulf—most importantly the ability to set binding goals and priorities. A number of critical issues remain to be addressed, including how to allocate funding in a way that addresses the relative restoration needs of individual states; how to balance the roles and interests of the state and federal governments; how to ensure that decisions are made efficiently and quickly; how to incorporate good science without unduly slowing valuable projects; and how to incorporate meaningful public input.

## Recommendations

**E5: Congress should dedicate 80 percent of the Clean Water Act penalties to long-term restoration of the Gulf of Mexico.**

**E6: Congress and federal and state agencies should build the organizational, financial, scientific, and public outreach capacities needed to put the restoration effort on a strong footing.**

The Commission's recommendations share much common ground with those outlined in Secretary Mabus's report this past September. For instance, the Commission recommends that Congress—recognizing that dedicated, sustained funding is necessary to accomplish long-term Gulf of Mexico ecosystem restoration—should direct 80 percent of Clean Water Act penalties to support implementation of a region-wide restoration strategy. Directing such payments to the Gulf could, for the next 10 years, provide significant funding. If litigation arising from the spill results in civil or criminal penalties, a global settlement of litigation should include supplemental environmental projects[*] and community service projects that direct payments to the Gulf. Should Clean Water Act penalties not be redirected toward Gulf ecosystem restoration, Congress should consider other mechanisms for a dedicated funding stream not subject to annual appropriations.

The Commission recommends that Congress establish a joint state–federal Gulf Coast Ecosystem Restoration Council. The structure of the *Exxon Valdez* Oil Spill Trustee Council should inform the structure of the Gulf Coast Council on the question of the relative representation of the federal and state governments on the council. The Gulf Coast Council should implement a restoration strategy for the region that is compatible with existing state restoration goals. This strategy should set short- and long-term goals with criteria for selecting projects for funding. Key criteria should include (1) national significance; (2) contribution to achieving ecosystem resilience; and (3) the extent to which national policies such as related to flood control, oil and gas development, agriculture, and navigation directly contributed to the environmental problem.

---

[*] "Supplemental environmental projects" are projects that a defendant agrees to undertake as part of a settlement with government of an enforcement action and that are above and beyond those necessary to comply with applicable legal requirements.

Experience in major restoration endeavors, including those in the Gulf, has shown that, absent binding goals to drive the process, restoration projects are insufficiently funded, focused, or coordinated. Establishing a region-wide council to coordinate agency activities represents a necessary first step, but without authority to set priorities and resolve conflicts, such a council will be hampered in its ability to achieve environmental goals. The Commission recommends that a region-wide council for the Gulf be given authority to set priorities that will govern the expenditure of funds and resolve any conflicts regarding eligibility of projects. The council should further define specific categories of projects that could meet each of the three criteria listed above. Projects could be categorized in a number of ways—for example, by habitat (key estuaries, sea grass, wetlands, coral reefs); by goal (biological productivity and ecosystem function, improving resilience, restoring fisheries); or by specific project type (river diversion, beach nourishment).

The Commission believes that having a comprehensive, binding strategy to guide the restoration effort is critical to success. By elaborating on the goals set by the governing entity and by providing specific milestones and restoration objectives, such a strategy would focus the overall effort and help ensure that projects are not duplicative.  The strategy could also include a map that ties projects to specific places and provide a useful mechanism for public involvement. Congress should also ensure that the priorities and decisions of the Gulf Coast Council are informed by input from a Citizens Advisory Council that represents diverse stakeholders.

Finally, but essentially, restoration decisions must be rooted in science. An approach that draws heavily on information and advice from scientists will result in project selection and funding allocations that are more likely to lead to an effective region-wide restoration strategy. It will also advance transparency in decision-making and enhance credibility with the public. The Commission accordingly recommends the establishment of a Gulf Coast Ecosystem Restoration Science and Technology Program that would address these issues in three ways: 1) by creating a scientific research and analysis program, supported by the restoration fund, that is designed to support the design of scientifically sound restoration projects; 2) by creating a science panel to evaluate individual projects for technical effectiveness and consistency with the comprehensive strategy; and 3) by supporting adaptive management plans based on monitoring of outcomes scaled both to the strategy itself and to the individual projects or categories of projects included in it.

## 6.  The Need for Better Tools to Balance Economic and Environmental Interests in the Gulf

Federal agencies charged with managing activities within the U.S. Exclusive Economic Zone have tended to work largely in isolation from one another. Responsive to the recommendations of the 2004 U.S. Commission on Ocean Policy, President Obama in June 2009 directed two dozen federal departments and agencies to provide in-depth recommendations about how federal policy can address inefficiencies in the nation's traditionally ad hoc management of its seas. The Interagency Ocean Policy Task Force reported in the summer of 2010; its recommendations were subsequently included in a Presidential Executive Order, issued on July 15, 2010, that created a new National Ocean Council to coordinate federal marine policy.

Prominent recommendations included a requirement that key regional and federal authorities develop and implement coastal and marine spatial planning, for ocean users and the public. This system is designed to optimize marine productivity. More broadly, scientific advice grounded in peer-reviewed empirical research inform strategy and decision-making in ocean management, including for energy, shipping, national defense, sustainable fisheries, and conservation.

## Recommendation

E7:  The appropriate federal agencies, including EPA, Interior, and NOAA, and the Trustees for Natural Resources should better balance the myriad economic and environmental interests concentrated in the Gulf region going forward. This would include improved monitoring and increased use of sophisticated tools like coastal and marine spatial planning. Many of these tools and capacities will also be important to manage areas of the OCS outside the Gulf.

The Commission recommends that as a part of management and restoration efforts in the marine environment greater attention should be given to new tools for managing ocean resources, including monitoring systems and spatial planning. Marine scientists have emerged from the *Deepwater Horizon* incident with more precise questions to investigate and a better sense of monitoring needs in the Gulf of Mexico, which because of its multiple uses and economic value should be a national priority. To that end, the National Ocean Council should work with the responsible federal agencies, industry and the scientific community to expand the Gulf of Mexico Integrated Ocean Observing System, including the installation and maintenance of an in situ network of instruments deployed on selected production platforms. Participation in this system by industry should be regarded as a reasonable part of doing business in nation's waters.

Coastal and marine spatial planning has the potential to improve overall efficiency and reduce conflicts among ocean users. Congress should fund grants for the development of regional planning bodies at the amount requested by the President in the fiscal year 2011 budget submitted to Congress. Ocean management should also include more strategically sited Marine Protected Areas, including but not limited to National Marine Sanctuaries, which can be used as "mitigation banks" to help offset harm to the marine environment. Given the economic and cultural importance of fishing in the Gulf region—and the importance of Gulf seafood to the rest of the country—scientifically valid measures, such as catch share programs, should be adopted to prevent overfishing and ensure the continuity of robust fisheries.

Marine spatial planning was designed to ensure that myriad ocean management decisions are compatible and consistent, that they make sense. In the decades since marine protection began, scientists have developed a much more robust understanding of the Gulf's physical and ecological processes. Now, for example, Marine Protected Areas can be used—and should be used—to ensure the continuity and robustness of fisheries into the future. Rationalizing ocean use around this much improved scientific understanding—for example, by identifying which parts of the ocean are appropriate (or inappropriate) for certain

uses—should serve to maximize the productivity of natural systems and end inefficient or harmful practices that have accumulated over time.

## F. Ensuring Financial Responsibility

As described in Chapter 6, oil spills cause a range of harms, both economic and environmental, to individuals and ecosystems. The Oil Pollution Act makes the party responsible for a spill liable for compensating those who suffered as a result of the spill—through property damage, lost profits, and other economic injuries—and for restoring injured natural resources. The Act also provides an opportunity to make claims for compensation from a dedicated Oil Spill Liability Trust Fund. The Oil Pollution Act, however, imposes limits on both the amount for which the responsible party is liable, and the amount of compensation available through the trust fund. In the case of the *Deepwater Horizon* spill, BP (a responsible party) has placed $20 billion in escrow to compensate private individuals and businesses through the independent Gulf Coast Claims Facility. But if a less well capitalized company had caused the spill, neither a multi-billion dollar compensation fund nor the funds necessary to restore injured resources, would likely have been available.

It is critical that compensation to victims be paid in full, and that the process for receiving compensation is swift and efficient. The Commission offers recommendations that would increase assurances that responsible parties are able to compensate victims (and at the same time strengthens incentives to prevent accidents in the first place), and that the Oil Spill Liability Trust Fund provide any compensation not provided by responsible parties. It also recommends a close review of the Gulf Coast Claims Facility process to determine its effectiveness in adjudicating compensation claims and its value as a model for future Spills of National Significance.

### 1.  The Need to Increase Existing Limitations on Responsible Party Liability

Liability for damages from spills from offshore facilities is capped under the Oil Pollution Act at $75 million, unless it can be shown that the responsible party was guilty of gross negligence or willful misconduct, violated a federal safety regulation, or failed to report the incident or cooperate with removal activities, in which case there is no limit on damages (see Chapter 8). Claims up to $1 billion above the $75 million cap for certain damages can be made to, and paid out of, the Oil Spill Liability Trust Fund, which is currently supported by an 8-cent per-barrel tax on domestic and imported oil.

The Oil Pollution Act also requires responsible parties to "establish and maintain evidence of financial responsibility," generally based on a "worst-case discharge" estimate. In the case of offshore facilities, necessary financial responsibility ranges from $35 million to $150 million. The financial responsibility requirement provides a direct link between the Oil Pollution Act and insurance, as the Act provides that financial responsibility may be "established by any one, or by any combination, of the following methods" if determined by the Secretary of the Interior to be acceptable: "evidence of insurance, surety bond,

guarantee, letter of credit, qualification as a self–insurer, or other evidence of financial responsibility."

There are two main problems with the current liability cap and financial responsibility dollar amounts:

- Lack of Adequate Safety Incentives: A threshold problem with any damages cap that limits liability well below levels that may actually be incurred is that such a cap distorts the incentives of industry participants to adopt cost–effective safety precautions. Decisions regarding safety precautions are made for a variety of reasons, some of which cannot be influenced by policy measures. The relatively modest liability cap and financial responsibility requirements provide little incentive for oil companies to improve safety practices.

- Inadequate Damages Compensation: BP's damages from the *Deepwater Horizon* spill will total in the tens of billions of dollars. The company has already paid claims that measure in the billions, and has waived the statutory $75 million cap. But there is no guarantee that other companies in the future will agree to waive the cap. And if an oil company with more limited financial means than BP had caused the *Deepwater Horizon* spill, that company might well have declared bankruptcy long before paying fully for all damages. In the case of a large spill, the Oil Spill Liability Trust Fund would likely not provide sufficient backup. Thus, a significant portion of the injuries caused to individuals and natural resources, as well as government response costs, could go uncompensated.

Any discussion of increasing liability caps and financial responsibility requirements must balance two competing public policy concerns: first, the goal of ensuring that the risk of major spills is minimized, and in the event of a spill, victims are fully compensated; and second, that increased caps and financial responsibility requirements to do not drive competent independent oil companies out of the market. A realistic policy solution also requires an understanding of the host of complex economic impacts that could result from increases to liability caps and financial responsibility requirements.

## Recommendation

### F1: Congress should significantly increase the liability cap and financial responsibility requirements for offshore facilities.

To address both the incentive and compensation concerns noted above, Congress should significantly raise the liability cap. Financial responsibility limits should also be increased, because if an oil company does not have adequate resources to pay for a spill, the application of increased liability has little effect: Should a company go bankrupt before fully compensating for a spill, its liability is effectively capped. If, however, the level of liability imposed and the level of financial responsibility required are set to levels that bear some relationship to potential damages, firms will have greater incentives to maximize prevention and minimize potential risk of oil spills[30] and also have the financial means to ensure that victims of spills do not go uncompensated.

Legislative attempts to raise the cap and financial responsibility requirements to significantly higher levels have been met with the argument that these changes will cause insurance carriers to drop oil pollution coverage, leading to an exodus of small and independent companies from the offshore drilling market. The counter-argument is that oil companies should bear the social costs of their activities, and if those costs are too large or unpredictable to be insurable, then it is appropriate that these companies exit the market.

There is legitimacy to aspects of both arguments. A company should not be able to cause billions of dollars of damage and walk away, simply because its operations contribute to the economy of the Gulf. Nor should smaller companies that can demonstrate the ability to drill safely and to pay for damages resulting from a large spill be forced out of the market. However, smaller companies that cannot demonstrate financial responsibility and meet risk requirements set and monitored by the Department of the Interior or a third party should not be allowed to make others pay for the costs of their accidents.

One option for keeping competent independents in the market is a mutual insurance pool. Under such an arrangement, individual companies engaged in offshore drilling would pay premiums into a pool, which would pay out damages caused by a company as a result of a spill. A possible downside is that the mutual pool could have the effect of undercutting incentives individual firms might otherwise have to improve safety practices—but this problem could be addressed, for example, by tying premium levels to the financial and safety risk posed by an individual company's activities. This option would allow companies to demonstrate financial responsibility for the cost of spills, at least to the limit paid out by the pool.

Another option would be to phase in increases in the liability cap and financial responsibility requirements, which would allow the insurance industry a period of adjustment. Although any increase in liability limits and financial responsibility requirements would test the capacity of the offshore drilling insurance market, over time such a change would almost certainly stimulate an increase in insurance capacity. A phased-in approach would allow Congress to re-assess any concerns about limited capacity in the insurance industry in light of actual experience.

Finally, regardless of how insurance is provided, smaller firms could be encouraged to partner with firms with greater financial resources. It should be noted that "joint ventures" between larger and smaller companies already exist; thus a policy change may not be necessary to encourage such arrangements.

## 2.  The Need to Increase Limitations on Payments from the Oil Spill Liability Trust Fund

If liability and financial responsibility limits are not set at a level that will ensure payment of all damages for spills, then another source of funding will be required to ensure full compensation. The federal government could cover additional compensation costs, but

this approach requires the taxpayer to foot the bill. Therefore, Congress should raise the Oil Spill Liability Trust Fund per–incident limit because the current limits are clearly inadequate.

## Recommendation

F2: Congress should increase the limit on per-incident payouts from the Oil Spill Liability Trust Fund.

Raising the Oil Spill Liability Trust Fund's per–incident limit will require the Fund to grow through an increase of the per-barrel tax on domestic and imported oil production. An alternative would be to increase the Trust Fund through a surcharge by mandatory provisions in drilling leases triggered in the event that there are inadequate sums available in the Fund. An increase in the Oil Spill Liability Trust Fund's per–incident limit would not provide an incentive to offshore facilities to mitigate risks, because risks are pooled and the Oil Spill Liability Trust Fund is funded by parties other than those who engage in offshore drilling activities. But raising the limit would help ensure that victims have access to compensation without the need to seek further specific funding from Congress, or otherwise burdening the taxpayer.

### 3.  The Need for Better Auditing and Monitoring of Risk

The Interior Department currently determines financial responsibility levels based on potential worst-case discharges, as required by the Oil Pollution Act. Although the agency's analysis to some degree accounts for the risk associated with individual drilling activities, it does not fully account for the range of factors that could affect the cost of a spill, and thus the level of financial responsibility that should be required. Interior should analyze a host of specific, risk–related criteria when determining financial responsibility limits applicable to a particular company, including, but not limited to: geological and environmental considerations, the applicant's experience and expertise, and applicable risk management plans. This increased scrutiny would provide an additional guard against unqualified companies entering the offshore drilling market.

## Recommendation

F3: The Department of the Interior should enhance auditing and evaluation of the risk of offshore drilling activities by individual participants (operator, driller, other service companies). The Department of the Interior, insurance underwriters, or other independent entities should evaluate and monitor the risk of offshore drilling activities to promote enhanced risk management in offshore operations and to discourage unqualified companies from remaining in the market.

If liability and financial responsibility limits are raised, increased liabilities will be borne by insurance carriers, which will have a strong incentive to promote new safety techniques and methods, as well as to monitor risk. Insurance carriers might insist on certification of operators by an independent entity devoted to identifying best safety practices and monitoring risk, such as a self-policing safety organization for the oil and gas industry, as

recommended in Chapter 8. Insurers or a self–policing safety organization for the industry also could provide a guard against unqualified companies entering the offshore drilling market.

### 4.  The Need for Assessment of the Existing Claims Process

The Oil Pollution Act holds the responsible party liable for private claims brought by individuals or businesses for removal costs and certain damages. All claims must first be presented to the responsible party, but if the responsible party denies a claim, the claimant may pursue an in-court action or present an uncompensated claim for payment to the Oil Spill Liability Trust Fund. The Gulf Coast Claims Facility (Claims Facility), which is independently administered on behalf of BP (the responsible party), has established a claims processing mechanism that attempts to resolve claims against the responsible party outside of the courts.[31] Kenneth Feinberg, formerly Special Master for the September 11th Victim Compensation Fund, administers the $20 billion escrow account through the Claims Facility. Eligible claims include: (1) removal and clean-up costs; (2) physical damages to real or personal property; (3) lost profits or impairment of earning capacity; (4) loss of subsistence use of natural resources; and (5) physical injury or death.  The Facility does not pay claims brought by the government, or related to real estate, the moratorium, or the Vessel of Opportunity program.[32]

To date, some claimants have been dissatisfied with decisions to deny certain claims and with the amount and timeliness of compensation received from approved claims, which has required Feinberg to reconsider the rules and processes in place for reimbursement. The United States Department of Justice sent a letter to Feinberg on September 17, 2010, urging expediency.[33]  In response, the Claims Facility noted that the large number of fraudulent and undocumented claims have slowed the process.[34]  Nonetheless, after the September 17 letter, Feinberg made several adjustments to the program including streamlining processing time and removing geographic proximity to the oil spill as bar against payment, Feinberg also extended the timeframe within which claimants could receive interim payments without waiving their right to pursue litigation.[35]  As of December 11, 2010, the Claims Facility has paid more than $2.4 billion in claims to more than 164,000 claimants.[36]  The Commission believes it would be useful to evaluate the effectiveness of the Claims Facility as a means of informing the compensation process in future large spills.

## Recommendation

F4:  The Department of Justice's Office of Dispute Resolution should conduct an evaluation of the Gulf Coast Claims Facility once all claims have been paid out, in order to inform claims processes in future Spills of National Significance. The evaluation should include a review of the process, the guidelines used for compensation, and the success rate for avoiding law suits.

## G. Promoting Congressional Engagement to Ensure Responsible Offshore Drilling

The Commission's recommendations in this report include some directed to Congress for specific legislation, and others directed to various specific federal agencies, responsible parties, and the oil and gas industry in general.  The several recommendations directed to Congress, however, also highlight a further lesson: the need for Congress to engage more systematically in ensuring the safety of drilling in the OCS and environmental protection.  This includes more active congressional oversight, and also includes congressional action to ensure that those in government responsible for safety oversight and environmental protection review have the resources necessary to do their jobs. To that end, this final set of recommendations addresses the need for Congress itself to take affirmative steps to ensure responsible offshore drilling.

### 1. The Need for Congressional Awareness and Engagement

In the years between the *Exxon Valdez* spill and the spring of 2010, Congress, like much of the nation, appears to have developed a false sense of security about the risks of offshore oil and gas development. Congress showed its support for offshore drilling in a number of ways, but did not take any steps to mitigate the increased perils that accompany drilling in ever-deeper water.  Until the *Deepwater Horizon* exploded, 11 rig workers lost their lives, and millions of barrels of oil spilled into the Gulf of Mexico, Congress had not introduced legislation to address the risks of deepwater drilling.

The congressional committee structure makes it much harder to focus on safety and environmental issues associated with offshore oil and gas development. In the 111th Congress, multiple committees in both chambers claimed jurisdiction over offshore energy development. The House Natural Resources Committee, for example, had jurisdiction over "mineral land laws and claims and entries there under" and "mineral resources of public lands." Its Subcommittee on Energy and Mineral Resources was specifically charged with oversight of "conservation and development of oil and gas resources of the Outer Continental Shelf." But the House Committee on Energy and Commerce oversaw "exploration, production, storage, supply, marketing, pricing, and regulation of energy resources, including all fossil fuels," as well "national energy policy generally." Similarly, the jurisdiction of the Senate Committee on Energy and Natural Resources included "extraction of minerals from oceans and Outer Continental Shelf lands," and its Subcommittee on Energy was responsible for oversight of "oil and natural gas regulation" generally. By contrast, the Senate Committee on Environment and Public Works claimed oversight over "environmental aspects of Outer Continental Shelf lands."  Yet, during the 110th and 111th Congresses, none of the subcommittees of environment and public works claimed oversight specifically over OCS lands issues.

In neither the House nor the Senate are any of these committees charged with directly overseeing the safety and environmental impacts of offshore development, separate from the conflicting goal of resource development and royalties. The House Committee on

Education and Labor and the Senate Committee on Health, Education, Labor, and Pensions both emphasize occupational safety and health. But neither committee appears to focus on process safety—the vital approach identified by this Commission's investigation that encompasses procedures for minimizing adverse events such as effective hazard analysis, management of risk, communication, and auditing.  Finally, no oversight of any of these matters has been conducted by any of the several House or Senate committees or subcommittees responsible for the nation's tax policies or overall appropriations process, notwithstanding the significant impact those policies and appropriations have on both the extent of energy industry activities on the OCS and the government's ability to oversee that activity effectively.

After the *Deepwater Horizon* explosion and resulting oil spill, numerous committees took an interest in offshore safety and environmental issues and held hearings. In short, it took a catastrophe to attract congressional attention.

## Recommendation

G1: Increase and maintain congressional awareness of the risks of offshore drilling in two ways.  First, create additional congressional oversight of offshore safety and environmental risks.  Second, require the appropriate congressional committees to hold an annual oversight hearing on the state of technology, application of process safety, and environmental protection to ensure these issues receive continuing congressional attention.

- The House and Senate Rules Committee should each assign a specific committee or subcommittee to oversee process safety and environmental issues related to offshore energy development. These committees should also be given the task of overseeing the Offshore Safety Authority, the creation of which this Commission has separately recommended.

- Congress should require the Secretary of the Interior to submit an annual public report on energy offshore development activities to the applicable congressional committees. This report should focus on the Department's progress in improving its prescriptive safety regulations; steps taken by industry and the Department to improve facility management; the Department's progress in implementing a stronger environmental assessment program, including developing improved NEPA guidelines; and on any other steps taken by industry or the Department to address safety and environmental concerns offshore. The report should also detail the industry's safety and environmental record during the previous 12 months. Finally, the report should highlight any areas in which the Department believes industry is not doing all that it can to promote safety and the environment and any areas where additional legislation could be helpful to the Department's efforts.

- Congress should require the Department of the Interior's Office of Inspector General to submit an independent annual public report to the applicable congressional committees. The report should provide an independent description of the Offshore

Safety Authority's activities over the previous 12 months, including its efforts to improve offshore safety and to investigate accidents and other significant offshore incidents. The report should also include the Inspector General's evaluation of the Authority's efforts and the Inspector General's recommendations for improvement.

### 2. The Need for Adequate Funding for Safety Oversight and Environmental Review

Many of the earlier recommendations require adequate congressional funding in order to be implemented effectively. For instance, the new Offshore Safety Authority at Interior cannot be expected to succeed in meaningfully overseeing the oil and gas industry if Congress does not ensure it has the resources to do so. Agencies cannot conduct the scientific and environmental research necessary to evaluate impacts of offshore development if they do not receive adequate support from Congress. In short, Congress needs to make funding the agencies regulating offshore oil and gas development a priority in order to ensure a safer and more environmentally responsible industry in the future.

BOEMRE currently receives a portion of its funding from offsetting collections from industry. In its Fiscal Year 2011 Budget Justification, it requested that just less than half of its budget—$174.9 million—come from these collections.[37] The oil and gas industry, however, should do significantly more and provide the funds necessary for regulation of offshore oil and gas operations and oil spill preparedness planning. The amount of funding needs to keep pace as industry moves into ever-more challenging depths and geologic formations because the related challenges of regulatory oversight likewise increase. This could be accomplished many different ways.  Congress could, for instance, raise the inspection fees already imposed on facilities operating on the OCS—currently offsetting about three percent of BOEMRE's annual budget—or impose a differently based annual regulatory fee on new and existing leases.  Or Congress could instruct the Department of the Interior to include lease provisions that require the imposition of regulatory fees. Interior already possesses broad authority to include in leases "such rental and other provisions as the Secretary may prescribe at the time of offering the area for lease."[38] No matter the precise mechanism, the oil and gas industry would be required to pay for its regulators, just as fees on the telecommunications industry support the Federal Communications Commission. Regulation of the oil and gas industry would no longer be funded by taxpayers but instead by the industry that is being permitted to have access to a publicly-owned resource. Future Congresses would therefore have less incentive to reduce agency funding.

## Recommendation

G2: Congress should enact legislation creating a mechanism for offshore oil and gas operators to provide ongoing and regular funding of the agencies regulating offshore oil and gas development.

The President asked this Commission to recommend not only "improvements to Federal laws, regulations, and industry practices applicable to offshore drilling," but also "organizational or other reforms of Federal agencies or processes necessary to ensure such improvements are implemented and maintained."  In carrying out this charge, the Commission has been mindful of the dangers of "fighting the last war": that is, addressing the specific failures revealed by the *Deepwater Horizon* disaster, but neglecting to anticipate future problems whose contours are yet unknown.  Our recommendations—for a new approach to risk assessment and management; a new, independent agency responsible for safety and environmental review of offshore drilling; stronger environmental review and enforcement; a reorientation of spill response and containment planning; and a revision of liability rules to better protect victims and provide proper incentives to industry—aim to establish an oversight regime that is sufficiently strong, expert, well-resourced, and flexible to prevent the next disaster, not the last.  The oil and gas industry—remarkable for its technological innovation and productivity—needs government oversight and regulation that can keep pace.



Chapter Ten

# American Energy Policy and the Future of Offshore Drilling

## Introduction

The BP *Deepwater Horizon* disaster undermined public faith in the oil and gas industry, in government regulators, and even in America's ability to respond to crises. The disaster raised serious questions about our nation's ability to manage and protect for current and future generations the invaluable natural resources of the outer continental shelf and the multiple uses they sustain—the patrimony of all Americans.  Based on the Commission's thorough and vigorous accounting of this tragedy, the central lesson to be drawn from the catastrophe is that no less than an overhauling of both current industry practices and government oversight is now required.  The changes necessary will be transformative in their depth and breadth, requiring an unbending commitment to safety by government and industry to displace a culture of complacency. Drilling in deepwater does not have to be abandoned.   It can be done safely.  That is one of the central messages of this report. The reforms proposed herein are intended to do for this industry what new policies and practices have done for other high-risk industries after their disasters.

It was clear sailing for a fleet of oil rigs off Louisiana in April 2009. The *Deepwater Horizon* disaster a year later was a tragic wake-up call. Moving forward, offshore drilling in the Gulf of Mexico or in new U.S. frontiers will require, in the words of the report, "unbending commitment to safety by government and industry."

*< Benjamin Lowy/VII Network/Associated Press*

The potential for such a transformation to ensure productive, safe, and responsible offshore drilling is significant, and provides reason for optimism even in the wake of a disaster.

The significance of the *Deepwater Horizon* disaster, however, is broader than just its relevance to the future of offshore drilling.  The disaster signals the need to consider the broader context of the nation's patterns of energy production and use, now and in the future—the elements of America's energy policy. The explosion at the Macondo well and the ensuing enormous spill—particularly jarring events because of the belief they could never happen—force a reexamination of many widely held assumptions about how to reconcile the risks and benefits of offshore drilling, and a candid reassessment of the nation's policies for the development of a valuable resource. They also support a broader reexamination of the nation's overall energy policy.

Offshore oil and gas will continue to be an important part of the nation's domestic energy supply for many decades.  Offshore wells yield one-third of current U.S. oil production,[1] and in recent decades helped offset declines in production elsewhere in the United States (U.S. production peaked in 1970).[2]  That already-crucial role is likely to increase.  The area of federal jurisdiction, the outer continental shelf, contains an estimated 85 billion barrels of oil in technically recoverable resources[3] —more than all onshore resources and those in the shallower state waters *combined*.[4]  The future of domestic oil production will rely to a substantial extent on current outer continental shelf sources and further development of deposits there—in progressively deeper, more distant waters, and perhaps in such challenging environs as the Alaskan Arctic. Whether we explore for and produce oil and gas from those prospective reserves, and if so, under what conditions, depends crucially on taking to heart the lessons we learn from the *Deepwater Horizon* disaster and the energy policies we put in place.

Important decisions about whether, when, where, and how to engage in offshore drilling cannot be made wisely if they are made in a vacuum. Policies about offshore drilling should be powerfully shaped by economic, security, pace of technology, safety, and environmental concerns.  Offshore drilling will certainly be an important part of any national energy policy. But it is only a part of the picture, and its relative importance today will not, and should not, be the same a half-century from now. The nation must begin a transition to a cleaner, more energy-efficient future. Nonrenewable oil and gas resources are just that—nonrenewable—which means any nation forging an energy policy for the future must develop the technologies that provide maximum energy efficiency and create renewable substitutes. Otherwise, the nation's security and well-being will be increasingly dependent on diminishing supplies of nonrenewable resources, and even more dependent on supplies from foreign sources.

Domestic consumption of oil has exceeded domestic production since the late 1940s, making the country increasingly dependent on imports, which now supply about 52 percent of U.S. needs compared to 42 percent in 1990. In the near term, oil from federal offshore lands helps moderate America's dependence on imported supplies, lessening the current trade deficit and contributing to national security.

The government also reaps significant revenues from the leasing of federal lands and the collection of royalties on production—typically, billions of dollars per year. The development of offshore energy resources contributes substantially to local economies, supporting businesses small and large and employing tens of thousands of workers. But any sensible energy policy must recognize the substantial risks that accompany these real benefits, in addition to the dangers of an economy and national security dependent on nonrenewable energy supplies. The impressive technologies developed for offshore drilling and production have not been accompanied by comparable improvements in safety and environmental protection. As Americans now know, three major companies failed to apply rigorous process safety measures to their drilling operations in the Gulf of Mexico: Halliburton and Transocean, which service drilling operations throughout the Gulf, along with BP —underscoring the systemic nature of the offshore industry's problems.

This Commission has documented and explained these tragic failures, and in this report has recommended a comprehensive, integrated set of reforms required to improve the performance of the offshore oil and gas industry, as appropriately overseen by an effective regulatory authority. A safe offshore oil and gas industry matters—both because the costs of needlessly risky behavior are so high, and because the nation is so dependent on offshore energy supplies. In light of present knowledge, inaction is a policy of dangerous default—of continuing to rely on chance and luck to avoid a "next time." American citizens will demand and will hold the oil and gas industry and government officials responsible for creating the conditions under which a robust offshore oil and gas industry can operate safely and co-exist with human health, environmental protection, and other economic activities.

## Weighing National Security, the Economy, Human Safety, and the Environment

In contemporary America, petroleum is woven into every aspect of our lives. The continuous availability of oil products—gasoline, diesel, and jet fuel—powers the mobility that has become key to a strong economy. Military operations, the movement of food and other commercial products, and personal travel would all grind to a halt without oil—at least as our society is organized today. Yet growing demand for oil around the world, particularly in the huge and rapidly developing economies of Asia, ensures heightened competition for supplies, putting upward pressure on oil prices. That poses a long-term challenge for the United States, which is not and cannot be self-sufficient in oil supply. At the same time, scientific evidence has continued to mount on the interconnections among the use of all carbon-based fuels, including oil and natural gas, the growing concentrations of greenhouse gases, and global climate change.[5] Energy policy thus embraces considerations of national security, the economy, environmental protection, the need to limit climate change, the pace of development of renewable energy sources and nonpetroleum dependent vehicles, human health and safety, and unique regional conditions.

*Security and petroleum resources.* The major American security risk derives from oil's predominant role in transportation: 72 percent of oil consumed in the United States in 2009 was used for transportation—and 94 percent of transportation relied on oil.[6] As the National Academy of Sciences recently concluded, the nation "needs to lower its

dependence on fragile supply chains for some energy sources, particularly petroleum at present and possibly natural gas in the future, and to avoid the impacts of this dependence on our nation's economy and national security."[7]  The good news is that energy–efficient technologies exist today that can in the near term moderate the nation's demand for oil and change the mix of supplies of electricity and energy over time.  But changing existing reliance on oil in general and oil imports in particular will require a major overhaul of our energy and transportation systems, a challenging shift that would require strong public leadership, and would take decades to effect even if we agreed on the course of action tomorrow.

Recent events have made clear the magnitude of the stakes.  The United States has repeatedly been surprised by sudden interruptions in the oil supply from various unexpected events—underscoring the nation's potential vulnerability. These include politically motivated production cuts by oil–exporting countries (the oil embargo of 1973–1974); border wars between oil exporters (between Iraq and Iran in 1980–1988, and Iraq and Kuwait in 1990–1991); strife and unrest within several oil-exporting countries; and severe weather events affecting offshore oil production or coastal refineries (Hurricanes Katrina and Rita in 2005 and Ike in 2008—all in the Gulf of Mexico). Energy planners also worry about the possibility that the Straits of Hormuz—the only sea passage to the open ocean for the bulk of Persian Gulf petroleum exports—could be closed, or that a major oil pipeline somewhere in the world could be ruptured by accident or attack.

Even absent an actual interruption in supplies, our reliance on foreign oil is a national security concern. Hostile exporting nations can use the threat of interrupting supplies to pressure the United States. Money spent on foreign oil can also end up in the hands of terrorists or be used to build nuclear or develop biological weapons in nations flouting the international atomic and biological regulatory regimes.  The ultimate nightmare would be an America depleted of petroleum, which has failed to make a sufficient transition to alternative sources, facing another Pearl Harbor or the aftershocks of 9/11.

Since "Colonel" Drake first struck oil at his Pennsylvania site in 1859, the United States has already extracted over 200 billion barrels of oil from its territory[8]—more than our estimated remaining reserves. The United States did not relinquish its position as the world's leading producer until 1974[9]—but now it finds itself credited with only 1.4 percent of the world's proved oil reserves, while consuming 22 percent of the global supply annually.[10]  (The use of advanced extraction technologies and a relatively favorable investment climate have enabled the United States to remain the world's third-largest oil producer, despite its relatively meager reserves.)

Would the country's security interests be better served by developing domestic oil resources as rapidly as possible—or by reserving some for future generations? President Harry Truman argued that federal offshore oil resources should become part of the naval petroleum reserve system, leaving the oil in the ground for later development (see Chapter 3). In recent decades, the concept of the Naval Petroleum Reserve has been superseded by a more readily accessible Strategic Petroleum Reserve, which currently contains more than 700 million barrels of unrefined crude oil stored in Louisiana and Texas salt caverns along

the Gulf coast where it is available for national emergencies (such as sudden disruptions of supply).[11]  That provides some insurance—but only about 75 days of supply at the current rate of U.S. imports, and clearly not sufficient to displace any long–term decline in domestic production or respond to a spike in demand. The United States has kept some areas of the outer continental shelf off–limits for oil and gas production: to protect their unique and valuable environmental characteristics, to avoid incurring risks to major industries such as fishing and tourism, or to maintain open waters for testing of military armaments and training exercises over the Gulf. One way of viewing these areas where drilling is prohibited—Atlantic Coast, Eastern Gulf of Mexico and Florida coast and the coasts of Northern California, Oregon, and Washington—is as energy sources held in reserve.

National economic implications. The domestic oil and gas sector is a major employer, particularly in fuel–producing regions. Fluctuations in oil and gas prices generally pass quickly through to energy–intensive sectors of the economy: trucking, airlines, agriculture, and petrochemicals such as plastics. Although energy's share of the economy has diminished in recent decades, Americans paid $740 billion for oil and gas products in 2007,[12]  and energy prices still have a major impact on inflation. Because oil and gas behave and are traded as commodities, their prices can undergo large changes even apart from immediate supply and demand factors. This volatility, from all sources, can make it difficult for businesses and individuals to plan and adhere to their budgets for energy costs. Price jolts stemming from undependable supplies can have major, adverse effects on the whole economy. Economists Hillard Huntington and Stephen Brown have found that "Historical experience shows that the Gross Domestic Product (GDP) losses associated with oil supply shocks can be considerable."[13]  Most strikingly, they noted that 10 of the 11 U.S. recessions since World War II were preceded by sharply rising oil prices.

Given Americans' consumption of petroleum products in excess of domestic supply, the country runs a staggering trade imbalance. Between 2004 and 2009, the U.S. trade balance for oil and gas ranged between negative $186 billion and negative $414 billion per year— typically exceeding the much–publicized trade deficit with China.[14]  Economic theories of comparative advantage may suggest that particular trade deficits are not worrisome—but the large, sustained trade deficit incurred to import petroleum, particularly, makes energy a significant factor in America's overall trade, deficit, and financing strategies and challenges.

Environmental and safety challenges. This report has documented in painful detail the far–reaching environmental consequences of catastrophic accidents involving the extraction of oil from offshore sources, and the associated risks to workers' safety from drilling, refinery operations, and the emergency clean–up of spills. Further environmental damage occurs when oil products are used as transportation fuels. Emissions released when fuel is burned are generally controlled under federal law, but can still (in combination with emissions from combustion to generate electricity) create conditions that can cause serious health consequences for the American public and serious ecological consequences for our natural systems, forests, and waters. And the combustion of all fossil–based carbon fuels (oil, gas, and coal) has long–term impacts on the increasing volume of greenhouse gases in the atmosphere and the warming climate. Transportation fuels contribute one-third of U.S.

carbon emissions, making them the nation's second-largest source contributing to climate change.

Criteria for balanced energy policy. Reconciling the multiple, sometimes conflicting aims that underlie any transportation-related American petroleum energy policy depends on six criteria:

- Maintaining a sufficient reserve of petroleum to protect American national security should access to foreign sources be lost or become unreliable;
- Requiring energy-efficient automobiles and other vehicles (among other sources of consumption) to reduce fuel use, and promoting energy-efficient transit alternatives;
- Promoting the development of clean and domestically produced alternative fuels or sources of power for transportation;
- Managing the inherent risks of domestic production of oil and gas—including from offshore areas—while considering the short- and long-term availability of these fuels;
- Requiring safe operations to protect human health; and
- Protecting the natural environment, including steps to limit climate change.

Reasonable people can disagree about the relative importance of these criteria—and have over time. President Truman ordered a postponement of mineral development on the outer continental shelf in order to ensure oil and gas would be there later for strategic purposes. During the 1970s, Congress adopted legislation to maximize environmental protection, and then to expand energy production (as discussed in Chapter 3)—but over the long term, none can be pursued to the exclusion of the others. It is notable, moreover, that various policies *have* had significant effects on U.S. energy use and production. For example, the country has achieved intermittent but sizable increases in automobiles' fuel efficiency; major reductions in tailpipe emissions from gasoline-fueled vehicles; and less reliance on oil to generate electricity.[15] At several points during the past four decades, consumption of oil in the United States actually *declined* for several years (in some cases reflecting adverse economic conditions, and in others successful public policies and adoption of technological advances).[16]

The United States today pursues many discrete policies bearing on all of these issues: vehicle-fuel efficiency standards, subsidies for ethanol production for fuel, research into alternative fuels, varying incentives for production of electricity by wind and solar power, and so on. In the aggregate, they are, de facto, the nation's energy policy. But they do not constitute a comprehensive, coherent strategy—such as recently called for by both the National Research Council[17] and the President's Council of Advisors on Science and Technology[18]—one that encompasses *all* of these elements, identifies tradeoffs and priorities, and implements them through incentives, investments in research and development, regulations, and tax policy. Difficult though it may be to arrive at such a consensus, it would provide guidance on balancing the risks and rewards of oil and gas development in especially challenging or sensitive locations, offshore or elsewhere. It is possible—and imperative—to manage that balance over time for offshore development of oil and gas as part of that overall policy.

### Learning from the Macondo Disaster: The Gulf of Mexico

This report describes in great detail what went wrong on the *Deepwater Horizon* and in the drilling of the Macondo well, and the well blowout's staggering cost. As the nation considers exploring for and producing energy from offshore frontiers, we have a new opportunity to do things right. Some of those frontiers are in deeper waters or unexplored areas of the Gulf of Mexico. Others are at the far extreme of the country, in both distance and climate in Alaska.

Improving safety and environmental integrity immediately. It will take several years to fully implement the stringent new safety regime this Commission has recommended— essential changes from doing business as usual in the Gulf of Mexico. But it is not necessary to put deepwater drilling on hold until all the changes are in place. The national and regional energy and economic imperatives can be reconciled effectively with the equally urgent needs to assure human safety and environmental integrity in the Gulf context, now and in the long term.

Several benchmarks must be met for exploratory drilling to resume on existing leases, and for operations to begin on new ones. Operators must assure that better practices for maintaining well integrity and the isolation of hydrocarbons are used at all times. And they must insist upon heightened vigilance throughout all the steps from the inception of well design to the consideration of changes during drilling operations. Similarly, protocols for testing of blowout preventers must be put in place and enforced.  The industry must also demonstrate that it is deploying readily available and effective systems for containment and response.

As the energy industry works to satisfy these requirements, the Department of the Interior must work promptly to reorganize its divisions, augment its regulatory staff, and enhance their skill. The American public has every reason to insist that Congress provide regulators with adequate resources to do their vital job—and that the industry apply its resources and expertise to improving practices. Both must focus on the substantial challenges of making offshore drilling safe, reliable, and productive. The circumstances demand a shared commitment by government and industry to work for immediate and long–term reforms that allow deepwater exploratory drilling to resume quickly and safely. And, to that end, industry should be ready to pay fees as part of their lease agreements in order to ensure that government overseers have the resources required to get the job done in a rigorous and timely fashion.

Emerging challenges from ultra–deepwater drilling. That shared commitment must extend beyond current conditions. While correcting the many problems revealed at the Macondo well, both industry and government must anticipate and adjust to new challenges arising in the Gulf. Current technology enables drilling in water *twice as deep* as Macondo. Drilling at such depths requires all parties to set their standards still higher for difficult issues such as remote containment systems in water depths with extreme pressures and very limited human access, as well as different geological pressures and formations and mixes of hydrocarbons. Desire to tap resources in deeper waters should be accompanied by equivalent investments in subsea equipment, operator training, research and development

for containment and response technologies, demonstrated financial capacity, and continuous improvement in and communication of industry practices devoted to safety.

The emerging international challenge. Drilling for oil in the Gulf of Mexico is not solely a matter for U.S. consideration. Both Mexico and Cuba have expressed interest in deepwater drilling in the Gulf in the near future. Pemex, Mexico's state-owned petroleum company, and Cuba, through both the Spanish company Repsol and the large Russian oil and gas production company Gazprom, in which the Russian government maintains a controlling stake,[19] have either actually drilled exploratory and production wells or are likely soon to do so.[20] Potential drilling sites are close enough to waters and land within U.S. jurisdiction—Cuba's mainland lies only 90 miles from Florida's coast and the contemplated wells only 50 miles—that if an accident like the *Deepwater Horizon* spill occurs, fisheries, coastal tourism, and other valuable U.S. natural resources could be put at great risk.

It is in our country's national interest to negotiate now with these near neighbors to agree on a common, rigorous set of standards, a system for regulatory oversight, and the same operator adherence to the effective safety culture called for in this report, along with protocols to  cooperate on containment and response strategies and preparedness in case of a spill. Though some precedent exists for a direct agreement between the United States and Cuba, Mexico may prove an important partner in developing such an agreement covering the entire Gulf of Mexico. In any event, the U.S. objectives should be to prevent drilling by companies unwilling or unprepared to meet the high safety standards essential to extracting oil and gas resources responsibly and to have a verification process to ensure compliance.

## Beyond the Gulf of Mexico: Frontier Regions

The nation's demand for domestic oil production will push the boundaries of technology and geography. The industry will develop new exploration and extraction techniques and equipment in new areas in the decades ahead. Drilling safely in the Gulf of Mexico requires a new industry safety culture and significantly improved regulatory oversight. Those reforms, and further heightened vigilance, will be required for oil exploration and production in frontier offshore regions. When the Macondo blowout dumped enormous volumes of oil into the Gulf waters, scientists and policymakers realized how little was known about biological systems, environmental conditions, and even key aquatic and coastal species. Leasing of vast acreage combined with weak policies and limited funding had resulted in inadequate studies of unique habitats and sensitive environmental features where greater caution should be exercised. What information was available was often not shared, or was disregarded, in leasing and permitting decisions. And little, if any, research or policy existed to address human health impacts and the risks to responders from a major spill, or the far-reaching effects of such a disaster on other businesses dependent on the region's resources.

In addition to these challenges, each frontier area presents important differences in implementing any drilling program—different geologies, hydrocarbon formations, coastal communities and environments, and climate conditions, to mention some. Federal waters of the United States other than the central and western Gulf of Mexico, parts of

Southern California, and the Lower Cook Inlet in Alaska would be regarded as frontier territory. In the late 1970s, attention turned briefly to areas off of northern California and Massachusetts (Georges Banks), and in the early 1980s, the potential of the outer continental shelf off Alaska attracted considerable investment (see Chapter 2). In recent years, the focus has turned to exploring in the Atlantic Ocean off the state of Virginia; in the eastern Gulf of Mexico; and, most notably, to taking another serious look at offshore regions in the Alaskan Arctic. Drilling water depths of 10,000 feet or more anywhere in the Gulf of Mexico might also be considered opening a new frontier, given the new technologies required.

In March 2010, President Obama and Interior Secretary Ken Salazar announced a plan to open the eastern Gulf and parts of the Atlantic coast—including offshore Virginia— to oil and gas exploration (subject to studies of the suitability of doing so in each area, and to the lifting of a congressional moratorium restricting drilling in the eastern Gulf). But on December 1, in the wake of the *Deepwater Horizon* experience and the resulting broad restructuring of regulations and the federal oversight capabilities, Secretary Salazar announced that the Administration would not proceed with drilling in areas where there are "no active leases" during the next five-year leasing plan. As a result, exploration and production in certain frontier areas—the eastern Gulf and off of the Atlantic and Pacific coasts—are deferred. The Secretary also indicated that plans for 2011 drilling in Alaska's Beaufort Sea would be subjected to additional environmental assessments.  There will consequently be a continuing examination of the various stages of drilling, if pursued, consistent with national energy policy and with a full awareness of the risks and of the values that must be balanced in each region, and with assurance that operators rigorously adhere to the best practices of a functioning safety culture.

By their very location and nature, these frontier areas differ from the Gulf of Mexico and in important respects from each other.  Environmental and biological conditions are at least as well understood along the Atlantic coast as in the Gulf—and there are also important facilities, such as Coast Guard installations in place; in contrast, equivalently detailed geological and environmental information does not exist for the Arctic exploration areas of greatest interest for energy exploration—and industry and support infrastructures are least developed, or absent, there. In the near term, the Alaskan frontier is likely to attract the greatest attention, and to require the closest scrutiny, given the potential energy resources and the physical and environmental challenges of pursuing them safely.

Large prospects in offshore Alaska. The interest in offshore Alaska reflects the likelihood of finding significant new sources of oil:[21] the Chukchi and Beaufort Sea areas off Alaska's north coast rank behind only the Gulf of Mexico in estimated domestic resources.[22]  The most recent federal lease sales for the Beaufort Sea, from 2003 to 2008, netted $98 million, reflecting high levels of industry interest. And despite its remoteness and harsh conditions, the Chukchi Sea—with vast potential resources—attracted over $2.6 billion in high bids for almost 2.8 million acres, including $2.1 billion from Shell Oil Company, during a 2008 lease sale.[23]

If deemed feasible, new offshore Alaskan oil production may be well-timed to offset the sustained decline in output elsewhere in Alaska. Oil production in the state (primarily from the onshore field at Prudhoe Bay) has decreased by more than two-thirds, from the 1988 peak of 2 million barrels per day to 645,000 barrels per day in 2009.[24] Depending on future prices, this decline could constitute a threat to the state's economy, which is highly dependent on oil and gas revenues and related employment. The Energy Information Administration projects that Alaska's production will continue to decline, to just 420,000 barrels per day by the end of this decade.[25] Such declines could threaten the viability of the Trans-Alaska Pipeline System, which transports oil from the North Slope to the port at Valdez.

Despite the Energy Information Administration's pessimism about long-term production trends in Alaska, other projections show a potential upswing[26] An optimistic scenario developed in 2009 study by Northern Economics for Shell Exploration and Development projects production from multiple Alaska outer continental shelf sites beginning in 2018 and eventually peaking at 1.8 million barrels of oil per day.[27] (New pipelines would need to be built to connect these reservoirs, if brought into production, to the Trans-Alaska Pipeline System.)

But finding and producing those potentially important supplies of oil offshore Arctic Alaska requires the utmost care, given the special challenges and risks associated with this frontier. Many of these challenges also arise elsewhere in the world, as Russia, Norway, Canada, and Denmark (Greenland) evaluate their Arctic oil and gas resources. The Alaskan Arctic is characterized by extreme cold, extended seasons of darkness, hurricane-strength storms, and pervasive fog—all affecting access and working conditions. The Chukchi and Beaufort Seas are covered by varying forms of ice for eight to nine months a year. These conditions limit exploratory drilling and many other activities to the summer months. The icy conditions during the rest of the year pose severe challenges for oil and gas operations and scientific research. And oil-spill response efforts are complicated year-round by the remote location and the presence of ice, at all phases of exploration and possible production.

The geological pressures in hydrocarbon deposits in shallow seas off Alaska are likely to be substantially below those encountered at Macondo, reducing some of the risks of a major blowout and challenges of containment. But oil spilled off Alaska (from blowouts, pipeline or tanker leaks, or other accidents) is likely to degrade more slowly than that found in the Gulf of Mexico because of lower water temperatures, reduced mixing of the oil into the water due to the presence of ice, and the shallower depths through which oil would travel from the wellhead to the surface. Some think the slow weathering could facilitate the skimming and in situ burning of escaped oil under ideal weather conditions, but the slow pace of natural dispersion means that oil would linger much longer in the marine environment. And serious questions remain about how to access spilled oil when the area is iced over or in seasonal slushy conditions.

*The Arctic ecosystem, the need for scientific information and informed decision-making, and Alaska native peoples.* The stakes for drilling in the U.S. Arctic are raised by the richness of its ecosystems.  The marine mammals in the Chukchi and Beaufort are among the most diverse in the world, including seals, cetaceans, whales, walruses, and bears. The Chukchi Sea is home to roughly one-half of America's and one-tenth of the world's polar bears.[28]  In November 2010, the U.S. Fish and Wildlife Service ruled that a large part of the polar bears' "critical habitat" included sea ice in the Beaufort and Chukchi Seas.[29]  The Chukchi and Beaufort Seas also support millions of shorebirds, seabirds, and waterfowl, as well as abundant fish populations.

It is known that these are vibrant living systems, but scientific research on the ecosystems of the Arctic is difficult and expensive. Good information exists for only a few species, and even for those, just for certain times of the year or in certain areas. As a result, the Commission recommends an immediate, comprehensive federal research effort to provide a foundation of scientific information on the Arctic (with periodic review by the National Academy of Sciences), and annual stock assessments for marine mammals, fish, and birds that use the Beaufort and Chukchi Seas. This initiative should be coordinated with the state of Alaska, native organizations, academic institutions, non-governmental organizations, the private sector, and international partners. The information generated should be capable of informing decision-making related to oil and gas leasing, exploration, and development and production in the Arctic; measuring and monitoring impacts of oil and gas development on Arctic ecological resources; natural resource damage assessment should an oil spill occur and protocols in any treaty negotiated among the Arctic nations. The existing gaps in data also support an approach that distinguishes in leasing decisions between those areas where information exists and those where it does not, as well as where response capability may be less and the related environmental risks may therefore be greater.  The need for additional research should not be used as a *de facto* moratorium on activity in the Arctic, but instead should be carried out with specific timeframes in mind in order to inform the decision-making process.

The Inupiat Eskimos of Alaska's remote arctic and subarctic communities rely heavily for their subsistence on resources from the marine environment, particularly bowhead whales. Bowhead whales can reach 60 feet in length and weigh more than 120,000 pounds. They migrate from Russian to Canadian waters and back through the Chukchi and Beaufort Seas.[30]  They are the most important subsistence animal for the coastal communities of northwest and northern Alaska.[31]  Whale hunting and the customs surrounding it are also an important part of their cultural heritage. Oil and gas development has the potential, directly or indirectly, to affect hunting success or the habitats of species important to subsistence. (Of course, offshore oil development could play a positive economic role in the native communities; some Inupiat whaling captains also work in the oil industry, for instance.) An Arctic Regional Citizens Council could help assure the active participation of the people who know this region the best in planning and response.

*Arctic spill response and containment.* The remoteness and weather of the Arctic frontier create special challenges in the event of an oil spill. Successful oil-spill response methods from the Gulf of Mexico, or anywhere else, cannot simply be transferred to the Arctic.

Industry and academic organizations are conducting research on response to oil on ice, but more needs to be done. A comprehensive interagency research program to address oil–spill containment and response issues in the Arctic should be developed, funded, and implemented within the federal government. Spill trajectory and weather models based on Arctic conditions must also be developed. This research should be funded promptly by the Oil Spill Liability Trust Fund, and the resulting analysis should inform when and where leasing occurs.

The National Contingency Plan requires the Coast Guard to oversee oil–spill planning and preparedness, and to supervise an oil–spill response in coastal waters. Current federal emergency response capabilities in the region are very limited: the Coast Guard operations base nearest to the Chukchi region is on Kodiak Island, approximately 1,000 miles from the leasing sites. The Coast Guard does not have sufficient ice–class vessels capable of responding to a spill under Arctic conditions: two of its three polar icebreakers have exceeded their service lives and are non–operational.[32]  In addition to overseeing spill response, the Coast Guard provides search and rescue capabilities in other areas. Without a presence in the Arctic, it would be very difficult for the Coast Guard to conduct any emergency search and rescue operations.

To deal with these serious concerns about Arctic oil–spill response, containment, and search and rescue, the Commission recommends three approaches before the Department of the Interior makes a fully informed determination that drilling in a particular area is appropriate. First, the Department of the Interior should ensure that the containment and response plans proposed by industry are adequate for each stage of development and that the underlying financial and technical capabilities have been satisfactorily demonstrated in the Arctic. Second, the Coast Guard and the oil companies operating in the Arctic should carefully delineate their respective responsibilities in the event of an accident, including search and rescue, and then must build and deploy the necessary capabilities. Third, Congress should provide the resources to establish Coast Guard capabilities in the Arctic, based on the Coast Guard's review of current and projected gaps in its capacity.

International standards for Arctic oil and gas. The Arctic is shared by multiple countries, many of which are considering or conducting oil and gas exploration and development. The extreme weather conditions and infrastructure difficulties are not unique to the U.S. Arctic. The damages caused by an oil spill in one part of the Arctic may not be limited to the waters of the country where it occurred. As a result, the Commission recommends that strong international standards related to Arctic oil and gas activities be established among all the countries of the Arctic. Such standards would require cooperation and coordination of policies and resources. The Arctic Council[33]  has begun work in this direction, updating its voluntary Arctic Offshore Oil and Gas Operation Guidelines in 2009. The International Standards Organization is also developing international standards for Arctic offshore structures that would apply to the activities of petroleum and natural gas industries in Arctic and cold regions. These guidelines are expected to specify requirements and provide recommendations and guidance for the design, construction, transportation, installation, and removal of offshore structures in the Arctic. Additional work is needed to strengthen

these guidelines and standards, ensuring that they are both consistent and mandatory across the entire Arctic, and the United States could pay an important leadership role in securing these vital safeguards.

Bringing the potentially large oil resources of the Arctic outer continental shelf into production safely will require an especially delicate balancing of economic, human, environmental, and technological factors. Both industry and government will have to demonstrate standards and a level of performance higher than they have ever achieved before. One lesson from the *Deepwater Horizon* crisis is the compelling economic, environmental, and indeed human rationale for understanding and addressing the prospective risks comprehensively, before proceeding to drill in such challenging waters.

## Conclusion

Creating and implementing a national energy policy will require enormous political effort and leadership—but it would do much to direct the nation toward a sounder economy and a safer and more sustainable environment in the decades to come. In the meantime, decisions about offshore drilling—one crucial element in any discussion of energy supply—remain controversial. The reaction to the December 1 decision to defer offshore exploration and production in the eastern Gulf of Mexico and along the Atlantic and Pacific coasts illustrates the polarization of opinion. Energy companies, seeking to pursue potential reserves in brand-new frontiers, criticized the announcement for closing off too many areas. Others, more concerned about environmental protection and national security, however, questioned why the Secretary was even considering allowing future drilling in these areas at all. And there were sharp differences in response among public officials in different regions, reflecting their local economies and sources of revenues.

These reactions echo the divided opinions presented to this Commission throughout its work. Though the Commission heard many ideas for improving safety and other aspects of offshore drilling, we also heard from Americans who advocate no future drilling whatsoever; they cited the adverse effects of fossil fuels on the climate, environmental damage, safety, and other factors.

Whether additional offshore drilling proceeds soon, in the longer term, or never depends on evolving public opinion. Given Americans' consumption of oil, finding and producing additional domestic supplies will be required in coming years, no matter what sensible and effective efforts are made to reduce demand—in response to economic, trade, and security considerations, and the rising challenge of climate change.

The extent to which offshore drilling contributes to augmenting that domestic supply depends importantly on rebuilding public faith in existing offshore energy exploration and production. That rebuilding begins with a clear, independent explanation of what happened at the Macondo well in April 2010, and of the reforms required in the wake of that terrible tragedy. That has been the work of this Commission, published in this report; the forthcoming separate report of the Commission's Chief Counsel; and background materials available on the Commission's website. Together, they present a clear, independent,

unvarnished picture of what happened and why—and of the major reforms the nation must adopt.

This Commission proposes in this report a series of recommendations that will enable the country and the oil and gas industry to move forward on this one critical element of U.S. energy policy: continuing, safe, responsible offshore oil drilling to meet our nation's energy demands over the next decade and beyond. Our message is clear: both government and industry must make dramatic changes to establish the high level of safety in drilling operations on the outer continental shelf that the American public has the right to expect and to demand.  It is now incumbent upon the Congress, the executive branch, and the oil and gas industry to take the necessary steps.  Respect for the 11 lives lost on that tragic day last April requires no less.

# ENDNOTES

The Commission has reviewed thousands of pages of documents from dozens of government agencies, private companies, and other entities, and interviewed hundreds of witnesses from these same agencies, companies, and entities. When possible, we include all pertinent details in the following endnote citations for those documents and interviews that have contributed to this report. Many documents and interviews, however, were disclosed or given to the Commission on a confidential basis. For these "non-public" sources, our citations include only as much detail as we can comfortably disclose while still respecting the privacy concerns of the source (e.g., "non-public BP document," "interview with government official," "interview with Coast Guard official").

The vast majority of non-public material that we cite in the endnotes below comes from documents and interviews provided by four government agencies—the Chemical Safety Board, the Coast Guard, the Department of Energy, and the Department of the Interior—and ten companies—BP, Cameron, Chevron, Dril-Quip, ExxonMobil, Halliburton, Schlumberger, Shell, Transocean, and Weatherford. In addition, the Commission participated in the Coast Guard's Incident Specific Preparedness Review of the BP Deepwater Horizon spill, through which dozens of officials from a variety of federal and state agencies, federal, state, and local elected officials, and executives and personnel from private companies and other spill response-related entities have been interviewed. All Coast Guard Incident Specific Preparedness Review interviews are also cited as non-public. Finally, the Commission has interviewed many Gulf Coast residents who wish to remain anonymous. These interviews are cited as non-public as well.

## Chapter One

[1] Internal Halliburton document (HAL_0011208); Testimony of Nathaniel Chaisson, Hearing before the Deepwater Horizon Joint Investigation Team, August 24, 2010, 423. This report cites many "Internal documents" that the Commission received from companies, including BP, Halliburton, and Transocean. Those internal documents are identified by their document production serial numbers when available, which were assigned by the entity that provided them.

[2] Internal BP document (BP, presentation to Commission, August 9, 2010, slides 5 & 12).

[3] Testimony of Nathaniel Chaisson, 411; U.S. Department of Energy, *Well Configuration* (BP document made public by the Department of Energy), http://www.energy.gov/open/documents/3.1_Item_2_Macondo_Well_07_Jun_1900.pdf; Testimony of Natalie Roshto, Hearing before the Deepwater Horizon Joint Investigation Team, July 22, 2010, 15.

[4] Testimony of Michael Williams, Hearing before the Deepwater Horizon Joint Investigation Team, July 23, 2010, 35–36.

[5] Testimony of John Guide, Hearing before the Deepwater Horizon Joint Investigation Team, July 22, 2010, 260–266; Testimony of James Wilson, Hearing before the Deepwater Horizon Joint Investigation Team, October 6, 2010, 176.

[6] Brian Morel, e-mail message to Richard Miller and Mark Hafle, April 14, 2010, 13:31, http://energycommerce.house.gov/documents/20100614/BP-April14.Email.calling.Macondo.a.nightmare.well.pdf.

[7] BP, "GoM Exploration Wells: MC 252 #1—Macondo Prospect Well Information," September 2009, http://bpoilresponse.markimoore.com/blog/bp-media/docs/Macondo.Prospect.Well.Information.pdf.

[8] Testimony of Richard Tink, Hearing before the Deepwater Horizon Joint Investigation Team, May 26, 2010, 392; Deepwater Horizon Joint Investigation Team, *AFE Summary for the Macondo Well*, October 7, 2010, http://www.deepwaterinvestigation.com/external/content/document/3043/914919/1/AFE%20Summary%20for%20the%20Macondo%20Well.pdf.

[9] BP, Deepwater Horizon *Accident Investigation Report* (September 8, 2010), 17.

[10] Transocean, *Our Company*, http://www.deepwater.com/fw/main/Our-Company-2.html.

[11] Press Release, Transocean, Transocean Ltd. Reports Fourth Quarter and Full-Year 2009 Results, February 24, 2010.

[12] Press Release, Transocean, Transocean Inc. and GlobalSantaFe Corporation Agree to Combine, July 23, 2007.

[13] "Contractors ordering offshore rigs on speculation," *Drilling Contractor*, May/June 2002.

[14] "Global 500," CNNMoney.com, July 26, 2010, http://money.cnn.com/magazines/fortune/global500/2010/full_list/index.html.

[15] Internal Transocean documents (TRN-HCJ 93526, 93528).

[16] Internal BP document (BP-HZN-MBI 126338); Internal BP document (BP-HZN-OSC 5378).

[17] "Brazil Pins Hopes on Massive, untapped Oil Fields," NPR, December 1, 2009, http://www.npr.org/templates/story/story.php?storyId=120966523.

[18] Bureau of Ocean Energy Management, Regulation, and Enforcement, *Installations, Removals, and Cumulative Totals of Offshore Production Facilities in Federal Waters; 1959–2010*, February 2010, http://www.boemre.gov/stats/PDFs/OCSPlatformActivity.pdf.; Bureau of Ocean Energy Management, Regulation, and Enforcement, *OCS Incidents/Spills by Category: 1996–2005*, October 19, 2007, http://www.boemre.gov/incidents/Incidents1996–2005.htm; Bureau of Ocean Energy Management, Regulation, and Enforcement, *OCS Incidents/Spills by Category: 2006–2010*, July 10, 2010, http://www.boemre.gov/incidents/IncidentStatisticsSummaries.htm.

[19] Testimony of Ronald Sepulvado, Hearing before the Deepwater Horizon Joint Investigation Team, July 23, 2010, 7, 14, 34.

[20] Testimony of John Guide, 23.

[21] *Ibid.*, 43–44 and 189; Schlumberger, "Oilfield Glossary: cement bond log," accessed November 19, 2010, http://www.glossary.oilfield.slb.com/Display.cfm?Term=cement%20bond%20log.

[22] Testimony of John Guide, 43–44, 189–191.

[23] Testimony of Douglas Brown, Hearing before the Deepwater Horizon Joint Investigation Team, May 26, 2010, 88, 91.

[24] Testimony of Jimmy Harrell, Hearing before the Deepwater Horizon Joint Investigation Team, May 27, 2010, 77; Internal Transocean document (TRN–HCDC 92).

[25] Internal Transocean document (TRN–HCDC 92); BP, Deepwater Horizon *Accident Investigation Report*, 82.

[26] Testimony of Ross Skidmore, Hearing before the Deepwater Horizon Joint Investigation Team, July 20, 2010, 264.

[27] BP, Deepwater Horizon *Accident Investigation Report*, 24.

[28] Testimony of Jimmy Harrell, 38, 113; Testimony of Curt Kuchta, Hearing before the Deepwater Horizon Joint Investigation Team, May 27, 2010, 166, 183, 184.

[29] Testimony of Daun Winslow, Hearing before the Deepwater Horizon Joint Investigation Team, August 24, 2010, 188 and 191.

[30] Testimony of Jimmy Harrell, 113; Testimony of Curt Kuchta, 184.

[31] Testimony of David Sims, Hearing before the Deepwater Horizon Joint Investigation Team, August 26, 2010, 119.

[32] Testimony of Daun Winslow, Hearing before the Deepwater Horizon Joint Investigation Team, August 23, 2010, 442.

[33] Testimony of Stephen Bertone, Hearing before the Deepwater Horizon Joint Investigation Team, July 19, 2010, 29, 33; Testimony of Randy Ezell, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 279.

[34] Testimony of Randy Ezell, 275.

[35] BP, Deepwater Horizon *Accident Investigation Report*, 24.

[36] Testimony of Stephen Bertone, 33.

[37] *Ibid.*; Testimony of Randy Ezell, 280.

[38] Testimony of Daun Winslow, August 23, 2010, 443.

[39] Testimony of Stephen Bertone, 33–34; Testimony of Daun Winslow, August 23, 2010, 443.

[40] Testimony of Randy Ezell, 281.

[41] *Ibid.*

[42] *Ibid.*

[43] *Ibid.*

[44] Testimony of Chris Pleasant, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 115, 281.

[45] *Ibid.*, 116–118; Testimony of Jimmy Harrell, 117.

[46] John R. Smith, *Review of Operational Data Preceding Explosion on Deepwater Horizon in MC252*, July 1, 2010, 11–12.

[47] Testimony of Lee Lambert, Hearing before the Deepwater Horizon Joint Investigation Team, July 20, 2010, 291; Internal BP documents (BP-HZN–CEC 20347, 20178).

[48] Internal BP documents (BP-HZN–CEC 20347, 20178).

[49] Internal BP document (BP-HZN–MBI 21265).

[50] Testimony of Patrick O'Bryan, Hearing before the Deepwater Horizon Joint Investigation Team, August 26, 2010, 364–365, 393.

[51] Brian Morel, e-mail message to Richard Miller and Mark Hafle.

[52] Testimony of Jimmy Harrell, 13.

[53] BP, Deepwater Horizon *Follow Up Rig Audit, Marine Assurance Audit and Out of Service Period*, September 2009, 2, 18–48; Internal BP document (BP-HZN–MBI 136211).

[54] Testimony of Patrick O'Bryan, 364.

[55] Testimony of David Sims, Hearing before the Deepwater Horizon Joint Investigation Team, May 29, 2010, 172, 313.

[56] BP, Deepwater Horizon *Accident Investigation Report*, 25; Internal BP document (BP-HZN–CEC 17621).

57 BP, Deepwater Horizon *Accident Investigation Report*, 33.

58 *Ibid.*, 25; Testimony of Chris Pleasant, 118–119.

59 Testimony of John Gisclair, Hearing before the Deepwater Horizon Joint Investigation Team, October 8, 2010, 131–132.

60 Testimony of Curt Kuchta, 185–186; Testimony of Jimmy Harrell, 12.

61 Testimony of Yancy Keplinger, Hearing before the Deepwater Horizon Joint Investigation Team, October 5, 2010, 128–129.

62 *Ibid.*; Testimony of Andrea Fleytas, Hearing before the Deepwater Horizon Joint Investigation Team, October 5, 2010, 16; Testimony of Daun Winslow, August 23, 2010, 296.

63 Testimony of Daun Winslow, August 23, 2010, 295; Testimony of Pat O'Bryan, 366.

64 Testimony of Daun Winslow, August 23, 2010, 295–296.

65 Testimony of Randy Ezell, 281, 282, 294.

66 *Ibid.*, 282.

67 *Ibid.*, 281–282, 311.

68 Testimony of Patrick O'Bryan, 219–220.

69 Testimony of David Sims, August 26, 2010, 163.

70 *Ibid.*, 317; Testimony of Patrick O'Bryan, 367.

71 Testimony of David Sims, August 26, 2010, 174.

72 *Ibid.*, 367.

73 Testimony of Patrick O'Bryan, 367.

74 Internal BP documents (BP-HZN-MBI 21418, 21420); BP, Deepwater Horizon *Accident Investigation Report*, 150.

75 Testimony of Randy Ezell, 282, 283.

76 *Ibid.*, 283.

77 *Ibid.*, 283–284.

78 Testimony of Micah Sandell, Hearing before the Deepwater Horizon Joint Investigation Team, May 29, 2010, 8, 10, 12.

79 *Ibid.*, 11.

80 Internal BP documents (*Deepwater Horizon* Schematic; BP August 9, 2010 presentation to Oil Spill Commission, slide 5 ).

81 Testimony of Douglas Brown, 88–89, 92–93.

82 Testimony of Paul Meinhart, Hearing before the Deepwater Horizon Joint Investigation Team, May 29, 2010, 28

83 Testimony of Douglas Brown, 93–94.

84 *Ibid.*, 94–95.

85 Testimony of Steve Bertone, Hearing before the Deepwater Horizon Joint Investigation Team, July 19, 2010, 28, 34.

86 Testimony of James Nicholas Wilson, Hearing before the Deepwater Horizon Joint Investigation Team, October 13, 2010, 10; Testimony of Steve Bertone, 35.

87 Testimony of Steve Bertone, 35.

88 Testimony of Gregory Meche, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 198.

89 Testimony of Steve Bertone, 35–36.

90 *Ibid.*

91 Testimony of Andrea Fleytas, 14.

92 Testimony of Gregory Meche, 235.

93 Testimony of Andrea Fleytas, 14.

94 Complaint at 2, Shivers v. BP Plc., No. 10-cv-381 (S.D. Ala. July 20, 2010).

95 *Ibid.*

96 *Ibid.*

97 *Ibid.*

98  *Ibid.*; Tracey Dalzell Walsh, "Forced To Become Emergency Workers, Fishermen Say BP Never Even Said Thanks," *Courthouse News Service*, July 22, 2010.

99  Testimony of Steve Bertone, 37.

100  *Ibid.*, 37–38.

101  *Ibid.*, 38.

102  *Ibid.*, 38–39.

103  Testimony of Randy Ezell, 284–285.

104  *Ibid.*, 285.

105  Testimony of Yancy Keplinger, 165.

106  Testimony of Randy Ezell, 285–286.

107  *Ibid.*, 286.

108  *Ibid.*

109  *Ibid.*, 286–287.

110  *Ibid.*, 287.

111  Testimony of Yancy Keplinger, 152; Testimony of Tyrone Benton, Hearing before the Deepwater Horizon Joint Investigation Team, July 23, 2010, 250.

112  Testimony of Gregory Meche, 209; Testimony of David Young, Hearing before the Deepwater Horizon Joint Investigation Team, May 27, 2010, 327; Testimony of Randy Ezell, 283; Testimony of Jimmy Harrell, 65; Testimony of Yancy Keplinger, 153.

113  Testimony of Micah Sandell, 11–13.

114  Testimony of Capt. Alwin Landry, Hearing before the Deepwater Horizon Joint Investigation Team, May 11, 2010, 98–100.

115  Testimony of Paul Erickson, Hearing before the Deepwater Horizon Joint Investigation Team, May 11, 2010, 231–232.

116  Testimony of Capt. Alwin Landry, 101–102.

117  *Ibid.*, 104–105.

118  Testimony of Gregory Meche, 202, 211, 223.

119  Testimony of Anthony Gervasio, Hearing before the Deepwater Horizon Joint Investigation Team, May 11, 2010, 173, 187–188.

120  *Ibid.*, 187; Testimony of Kevin Robb, Hearing before the Deepwater Horizon Joint Investigation Team, May 11, 2010, 42.

121  Testimony of Anthony Gervasio, 189.

122  *Ibid.*, 105, 190; Testimony of Gergory Meche, 223.

123  Testimony of Daun Winslow, August 23, 2010, 447–448.

124  *Ibid.*, 448–449, 452.

125  Testimony of Mark Hay, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 225.

126  Testimony of Daun Winslow, August 23, 2010, 452; Testimony of Randy Ezell, 287.

127  Testimony of Daun Winslow, August 23, 2010, 452.

128  *Ibid.*, 449–450, 452; Testimony of Randy Ezell, 289; Testimony of Anthony Gervasio, 190, 199.

129  Testimony of Daun Winslow, August 23, 2010, 450; BP, Deepwater Horizon *Accident Investigation Report*, 123.

130  Testimony of Daun Winslow, August 23, 2010, 450; Testimony of Steve Bertone, 39.

131  Testimony of Steve Bertone, 39.

132  *Ibid.*

133  *Ibid.*

134  Testimony of Daun Winslow, August 23, 2010, 451; Testimony of Steve Bertone, 39.

135  Testimony of Steve Bertone, 39.

136  *Ibid.*

137  Testimony of Patrick O'Bryan, 368, 396.

138  Testimony of Daun Winslow, August 23, 2010, 452.

139 Internal BP Document (BP-HZN-MBI 21277).

140 Testimony of Daun Winslow, August 23, 2010, 451–452.

141 Internal BP Document (BP August 9, 2010 presentation to Oil Spill Commission, slide 13).

142 Testimony of Daun Winslow, August 23, 2010, 454.

143 *Ibid.*, 454–455.

144 Testimony of Yancy Keplinger, October 5, 2010, 157.

145 Associated Press, "'The Real Deal': Survivors recall the Deepwater Horizon explosion," *Press–Register*, May 9, 2010.

146 *Ibid.*; BP, Deepwater Horizon *Accident Investigation Report*, 103.

147 Testimony of Steve Bertone, 39–40.

148 *Ibid.*, 40.

149 *Ibid.*, 40–41.

150 *Ibid.*, 41–43.

151 *Ibid.*, 43.

152 *Ibid.*

153 Testimony of Randy Ezell, 288.

154 Testimony of Steve Bertone, 44.

155 *Ibid.*, 44–46.

156 *Ibid.*, 45–46.

157 *Ibid.*, 46–47.

158 *Ibid.*, 47–48.

159 Testimony of Michael Williams, 26.

160 Testimony of Steve Bertone, 48.

161 Testimony of Andrea Fleytas, 15.

162 Testimony of Steve Bertone, 48.

163 *Ibid.*

164 *Ibid.*, 48–49.

165 *Ibid.*, 48.

166 Testimony of Curt Kuchta, 219.

167 Testimony of Daun Winslow, August 28, 2010, 467.

168 Testimony of Steve Bertone, 50.

169 *Ibid.*

170 Testimony of Anthony Gervasio, 197.

171 Testimony of Steve Bertone, 49.

172 Internal Transocean document (TRN–USCG_MMS 30428).

173 Testimony of Anthony Gervasio, 224.

174 Testimony of Steve Bertone, 50.

175 Testimony of Capt. Alwin Landry, 112.

176 Testimony of Steve Bertone, 51.

177 Testimony of Kevin Robb, Hearing before the Deepwater Horizon Joint Investigation Team, May 11, 2010, 44.

178 Ian Urbina and Justin Gillis, "Workers On Oil Rig Recall a Terrible Night of Blasts," *New York Times*, May 7, 2010.

179 Internal BP Document (BP-HZN-MBI 143366).

180 Testimony of Alwin Landry, 115.

181 Urbina and Gillis, "Workers On Oil Rig Recall a Terrible Night of Blasts."

182 Walsh, "Forced to Become Emergency Workers, Fishermen Say BP Never Even Said Thanks."

183 Testimony of Steve Bertone, 52; *Ibid.*, 48–53.

184 Testimony of Randy Ezell, 330.

185 Testimony of Alwin Landry, 120–121.

186 Testimony of Daun Winslow, August 28, 2010, 44–45.

187 Testimony of Capt. Alwin Landry , 121–122.

188 *Ibid.,* 125–126.

189 *Ibid.,* 126.

## Chapter Two

1 Joseph Pratt, Tyler Priest, and Christopher Castaneda, *Offshore Pioneers: Brown & Root and the History of Offshore Oil and Gas* (Houston: Gulf Publishing, 1997), 7–13; "First Well in Gulf of Mexico Was Drilling Just 25 Years Ago," *Offshore* (October 1963): 17–19.

2 Quoted in Tom Zoellner, "Oil and Water: The Adventure of Getting One from Deep Beneath the Other," *Invention and Technology* (Fall 2000): 48.

3 Daniel Yergin, *The Prize: The Epic Quest for Oil, Money, and Power* (New York: Simon and Schuster, 1992), 409.

4 Pratt, Priest, and Castaneda, *Offshore Pioneers*, 15–52, 137–157.

5 *Ibid.,* 21–25.

6 Tyler Priest, "Extraction Not Creation: The History of Offshore Petroleum in the Gulf of Mexico," *Enterprise & Society* 8, no. 2 (June 2007): 240.

7 Alden J. LaBorde, *My Life and Times* (New Orleans: LaBorde Printing Company, 1996), 174.

8 James W. Calvert, "Gulf Offshore Activity Booming," *World Petroleum* (January 1957): 48.

9 Ben C. Belt, "Louisiana and Texas Offshore Prospects," *Drilling* (March 1956): 119.

10 "Special Offshore Report," *World Oil* (May 1957): 118; Calvert, "Gulf Offshore Activity Booming," 48.

11 Pratt, Priest, and Castaneda, Offshore Pioneers, 36–48.

12 Tyler Priest, *The Offshore Imperative: Shell Oil's Search for Petroleum in Postwar America* (College Station: Texas A&M Press, 2007), 81–91.

13 *Ibid.,* 95–98.

14 Tyler Priest, "Auctioning the Ocean: The Creation of the Federal Offshore Leasing Program, 1954–1962," *History of the Offshore Oil and Gas Industry in Southern Louisiana: Vol. 1: Papers on the Evolving Offshore Industry* (Minerals Management Service OCS Study 2004-049, 2008).

15 U.S. Department of Interior, "Petroleum and Sulfur on the U.S. Continental Shelf," internal study, August 1969, box 134, Central Classified Files, 1969–1972, Record Group 48, Records of the Secretary of Interior, National Archives and Records Administration (NARA), College Park, MD.

16 Priest, "Auctioning the Ocean," 113.

17 On Project Mohole and JOIDES, see David K. van Keuren, "Breaking New Ground: The Origins of Scientific Ocean Drilling," in *The Machine in Neptune's Garden: Historical Perspectives on Technology and the Marine Environment,* eds. Helen M. Rozwadowski and David K. van Keuren (Sagamore Beach, MA: Science History Publications, 2004), 183–210. On Shell's *Eureka* project, see Priest, *The Offshore Imperative*, 97, 218.

18 F. P. Dunn, "Deepwater Production: 1950–2000" (Offshore Technology Conference [OTC] Paper 7627, Houston, TX, May 1994).

19 Priest, *The Offshore Imperative,* 127–130.

20 *Ibid.*

21 Cliff Hernandez, interview by Andrew Gardner, May 1, 2001, New Iberia, LA, *History of the Offshore Oil and Gas Industry in Southern Louisiana,* Houston History Archives, M.D. Anderson Library Special Collections, University of Houston, Houston, TX. This interview is one of approximately 450 oral histories conducted for *History of the Offshore Oil and Gas Industry in Southern Louisiana,* Minerals Management Service OCS Study 2004-049 (2008).

22 Ken Arnold, interview with Tyler Priest, May 10, 2004, Houston, TX, *History of the Offshore Oil and Gas Industry in Southern Louisiana,* Houston History Archives, M.D. Anderson Library Special Collections, University of Houston, Houston, TX.

23 Don E. Kash et al., *Energy Under the Oceans: A Technology Assessment of Outer Continental Shelf Oil and Gas Operations* (Norman: University of Oklahoma Press, 1973), 104.

24 U.S. Geological Survey, *Monthly Engineering Reports* Vol. 128 (December 1958) and *Monthly Engineering Reports* Vol. 144 (February 1960), RG 57, Records of the U.S. Geological Survey, NARA.

25 Kash et al., *Energy Under the Oceans*, 105.

26 Neil R. Etson to President Nixon, March 18, 1970, Central Classified Files, 1968–1974, Box 71, RG 57, Records of the

U.S. Geological Survey, NARA.

27 Kash et al., *Energy Under the Oceans*, 104.

28 Robert E. Kallman and Eugene D. Wheeler, *Coastal Crude in a Sea of Conflict* (San Luis Obispo: Blake Printery and Publishing, 1984), 63.

29 Riley E. Dunlap and Angela G. Mertig, *American Environmentalism: The U.S. Environmental Movement, 1970–1990* (Philadelphia: Taylor and Francis, 1992).

30 Russell Wayland, "The New Federal OCS Regulations in the Light of Santa Barbara," (Society of Petroleum Engineers [SPE] Paper 2780, San Francisco, CA, November 1969); Richard B. Krahl and David W. Moody, "Gulf Coast Lease Management Inspection Program" (OTC Paper 1714, Houston, TX, May 1972), 846.

31 M.D. Reifel, "Offshore Blowouts and Fires," in *The Technology of Offshore Drilling, Completion and Production*, ETA Offshore Seminars, Inc. (Tulsa: The Petroleum Publishing Company, 1976), 239–257; "The Wicked Witch is Dead," *Shell News* no. 2 (1978): 2–8; and R.C. Visser, "Offshore Platform Accidents, Regulations, and Industry Standards" (OTC Paper 7118, Houston, TX, May 1993).

32 Krahl and Moody, "Gulf Coast Lease Management Program;" Donald Solanas, "Update—OCS Lease Management Program" (OTC Paper 1754, Houston, TX, April/May, 1973); E.W. Standley to Jack W. Boller, February 15, 1972, Central Classified Files, 1969–1972, Box 136, Part 13, RG 48, Records of the Secretary of Interior, NARA.

33 K. E. Arnold, P. S. Koszela, and J. C. Viles, "Improving Safety of Production Operations in the U.S. OCS" (OTC Paper 6079, Houston, TX, May 1989).

34 Peter Lovie, "Classification and Certification of Offshore Drilling Units," in *The Technology of Offshore Drilling, Completion and Production*, ETA Offshore Seminars, (Tulsa: The Petroleum Publishing Company, 1976), 389–413.

35 Dunn, "Deepwater Production."

36 See data in National Academy of Sciences, Committee on Assessment of Safety of OCS Activities, *Safety and Offshore Oil* (Washington D.C.: National Academy Press, 1981).

37 E. P. Danenberger, "Outer Continental Shelf Drilling Blowouts, 1971-1991" (OTC Paper 7248, Houston, TX, May 1993).

38 U.S. Energy Information Administration (EIA), "Petroleum," Table 5.13.c, in *Annual Energy Review 2009* (Washington, D.C.: U.S. EIA, 2010), http://www.eia.gov/emeu/aer/petro.html.

39 "Bidders Snub Most Deepwater Tracts," *Oil and Gas Journal* (April 8, 1974): 36.

40 Priest, *The Offshore Imperative*, 191–195.

41 Stephen P.J. Cossey, "Celebrations Began with Cognac," *AAPG Explorer* (September 2004), http://www.aapg.org/explorer/2004/09sep/gom_history.cfm.

42 Priest, *The Offshore Imperative*, 196–201.

43 Pratt, Priest, and Castaneda, *Offshore Pioneers*, 83–90.

44 "Gulf Lease Sale Shatters Two Records," *Oil & Gas Journal* (October 6, 1980): 34; Charlie Blackburn, quoted in Priest, *The Offshore Imperative*, 216; D.A. Holmes, "1970–1986 Lookback of Offshore Lease Sales in the Gulf of Mexico Cenozoic," interoffice memorandum, Shell Offshore Inc., August 24, 1987.

45 Priest, *The Offshore Imperative*, 209–215.

46 Juan Carlos Boué with Edgar Jones, *A Question of Rigs, of Rules, or of Rigging the Rules? Upstream Profits and Taxes in U.S. Gulf Offshore Oil and Gas* (Oxford: Oxford University Press, 2007), 17.

47 Rich Sears, "A Brief History of Deepwater" (draft prepared for the National Commission, August 2010).

48 Paul Voosen, "Gulf of Mexico's Deepwater Oil Industry Is Built on Pillars of Salt," *New York Times*, July 28, 2010; Gary Steffens and Neil Braunsdorf, "The Gulf of Mexico Deepwater Play: 50 Years from Concept to Commercial Reality" (AAPG Distinguished Lecture Series, 1997–1998).

49 Priest, *The Offshore Imperative*, 218–220.

50 Juan Carlos Boué and Gerardo Lyando, *U.S. Gulf Offshore Oil: Petroleum Leasing and Taxation and Their Impact on Industry Structure, Competition, Production, and Fiscal Revenues* (Oxford: Oxford Energy Institute, 2002).

51 Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE), "Gulf of Mexico Oil and Gas Leasing Offerings," http://www.gomr.boemre.gov/homepg/lsesale/swiler/swiler.html.

52 Priest, *The Offshore Imperative*, 221–222.

53 "The Time to Start Looking is Now," *Shell News* no. 4 (1984): 16.

54 By 1990, Americans consumed less gasoline on a per capita basis (437 gallons per year) than they did in 1979. U.S. Energy Information Administration (EIA), Annual Energy Review, Petroleum, Table 5.13.c, http://www.eia.gov/emeu/aer/petro.html.

55 On the forgotten victory of energy conservation and efficiency, see Jay Hakes, *A Declaration of Energy Independence: How Freedom from Foreign Oil Can Improve National Security, Our Economy, and the Environment* (Hoboken: John Wiley & Sons, 2008), 41–71.

56 Robert Gramling, *Oil on the Edge: Offshore Development, Conflict, Gridlock* (Albany, NY: SUNY Press, 1996), 118.

57 "Bullwinkle Takes Shape," *Shell News* no. 6 (1987): 2–7; "Rising Above the Crowd," *Shell News* no. 6 (1988): 28–34.

58 "How Conoco Developed the Tension-Leg Platform," *Ocean Industry*, August 1984, 35–46.

59 Tom Curtis, "Lifestyles of the Rich and Bankrupt," *Texas Monthly*, March 1988, 90.

60 Congress of the United States, Office of Technology Assessment, *Oil and Gas Technologies for the Arctic and Deepwater: Summary* (Washington: GPO, 1985), 22–23.

61 On the struggle over Bristol Bay, see Charles Frederick Lester, "The Search for Dialogue in the Administrative State: The Politics, Policy, and Law of Offshore Development" (Ph.D. dissertation, University of California, Berkeley, 1992), 113–146.

62  Priest, *The Offshore Imperative*, 209–215.

63 Steffens and Braunsdorf, "The Gulf of Mexico Deepwater Play."

64 BOEMRE, "Gulf of Mexico Oil and Gas Leasing Offerings," http://www.gomr.boemre.gov/homepg/lsesale/swiler/swiler.html.

65 Priest, *The Offshore Imperative*, 237–251.

66 *Ibid.*, 254–255.

67 *Ibid.*, 253–261; "Launch Pad into the Deep," *Houston Chronicle*, August 17, 1997.

68 Bob Horton quoted in Tom Bower, *Oil: Money, Politics, and Power in the 21ˢᵗ Century* (New York: Grand Central Publishing, 2009), 19.

69 William A. Schneider, "3-D Seismic: A Historical Note," *The Leading Edge* (March 1998): 375; "Looking Ahead in Marine and Land Geophysics—A Conversation with Woody Nestvold and Ian Jack," *The Leading Edge* (October 1995): 1061–1067.

70 "Exploring the Ocean's Frontiers," *Time*, December 17, 1990, 98; "Offshore Oil: How Deep Can They Go?" *Popular Science*, January 1992): 80–97.

71 "Oil and Gas Technology Development," (Topic Paper #26, National Petroleum Council Global Oil & Gas Study, November 22, 2006), 16. This topic paper was one of 38 working documents used to produce the 2007 National Petroleum Council study, *Facing the Hard Truths About Energy* http://www.npchardtruthsreport.org/.

72 Susanne S. Pagano, "Offshore Drilling, Production—New Waves of Technology," *Sea Technology* (April 1991): 19–21; "There's Oil Down There . . . Way Down There," *Texas Shores* 31, no. 1 (Spring 1998): 14–15.

73 Priest, *The Offshore Imperative*, 243–251.

74 "Shell Marks Progress in Deepwater Gulf," *Oil & Gas Journal 93*, no. 46 (November 13, 1995); "Debottlenecking Removes Auger Production Constraints," *Oil & Gas Journal 94*, no. 46 (November 11, 1996).

75 Priest, *The Offshore Imperative*, 251–253.

76 Press Release, Minerals Management Service, Shell to Pay $49 Million in Settlement Agreement with Minerals Management Service, August 5, 2003.

77 Boué and Jones, *A Question of Rigs*, 130.

78 F. Jay Schempf, "New Study Finds Port Fourchon 'Vital' to U.S. Economy," *Offshore* (March 1, 2008).

79 D.G. Godfrey et al., "The Mars Project Overview" (OTC Paper 8368, Houston, TX, May 1997).

80 *Ibid.*

81 David Ernst and Andrew M.J. Steinhubl, "Alliances in Upstream Oil and Gas," *McKinsey Quarterly* 2 (1997).

82 Jeff Ryser, "Hot Play in the Gulf," *Texas Business* (August 1995): 33.

83 "The Cloning of Mars," *Shell News* 64, no. 1 (1996): 8–13; Michael Davis, "Shell Oil Goes Deep in Gulf," *Houston Chronicle*, April 9, 1997; Priest, *The Offshore Imperative*, 260–262.

84 Mary Judice, "Out of the LOOP," *Times Picayune*, September 17, 1995; C.G. Steube, "Addressing Transportation Needs for Deepwater Gulf of Mexico" (OTC Paper 13169, Houston, TX, April/May 2001).

85 Boué and Jones, *A Question of Rigs*, 17.

86 Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE), "Installations, Removals, and Cumulative Totals of Offshore Production Facilities in Federal Waters: 1959–2010," www.boemre.gov/stats/PDFs/OCSPlatformActivity.pdf.

87 Dolly Jorgenson, "An Oasis in a Watery Desert: Discourses on an Industrial Ecosystem in the Gulf of Mexico Rigs-to-Reefs Program," *History and Technology* 25, no. 4 (November 2009): 343–364.

88 Press Release, Minerals Management Service, High Bids Total $307 Million in Central Gulf of Mexico Lease Sale 152, May 10, 1995, http://www.boemre.gov/ooc/press/1995/50037.txt.

89 Voosen, "Gulf of Mexico's Deepwater Oil Industry Is Built on Pillars of Salt"; Helen Thorpe, "Oil and Water," *Texas*

*Monthly* (February 1996): 140–141.

90  Scott L. Montgomery and Dwight Moore, "Subsalt Play, Gulf of Mexico: A Review," *AAPG Bulletin* 81, no. 6 (June 1997): 875–876.

91  Rhonda Duey, "Pioneering a Global Play," *Hart's E&P* (July 1, 2009); Thorpe, "Oil and Water," 142.

92  R.R. Israel et al., "Challenges Evolve for Directional Drilling Through Salt in Deepwater Gulf of Mexico," *Drilling Contractor* (May/June 2008), http://drillingcontractor.org/challenges-evolve-for-directional-drilling-through-salt-in-deepwater-gulf-of-mexico-1622.

93  David Ivanovich, "Gulf is Heart of Deepwater Drilling," *Houston Chronicle*, May 4, 1997.

94  Brian Knowlton, "Oil Growth Boomerangs on Houston," *International Herald Tribune*, April 1, 2002.

95  David Townshend, "Golden Triangle Dominates," *Petroleum Economist*, October 2002.

96  Tim Colton and LaVar Huntziner, *A Brief History of Shipbuilding in Recent Times* (Alexandria, VA: CNA Corporation, 2002); Mike Hunt and Lenny Gary, "Gulf of Mexico Fabrication Yards Built 5,500 Platforms Over 50 Years," *Offshore* (January 2000).

97  Ronald W. Ferrier, *The History of the British Petroleum Company, Vol. 1: The Developing Years, 1901–1932* (Cambridge: Cambridge University Press, 1982); J.H. Bamberg, *The History of British Petroleum, Vol. 2: The Anglo-Iranian Years, 1928–1945* (Cambridge: Cambridge University Press, 1994); and James Bamberg, *British Petroleum and Global Oil, 1950–1975: The Challenge of Nationalism* (Cambridge: Cambridge University Press, 2000).

98  Agis Salpukas, "BP Amoco's Leader Remakes An Oil Giant, Again," *New York Times*, April 1, 1999.

99  Kathy Shirley, "Vision Led to Crazy Horse Find," *AAPG Explorer*, March 2002.

100  *Ibid.*

101  Kristen Hays, "After All of Thunder Horse's Problems, BP Looks Ahead To Seeing A Return On Its Enormous Investment In The Platform, Payoff Is A Long Time in Coming," *Houston Chronicle*, November 18, 2007.

102  *Ibid.*

103  Peter Lehner with Bob Deans, *In Deep Water: The Anatomy of a Disaster, the Fate of the Gulf, and Ending Our Oil Addiction* (New York: The Experiment, 2010), 63.

104  "Deepwater GOM New Focus of BP Growth Strategy," *Oil & Gas Journal* 100, no. 33 (August 19, 2002): 36.

105  Neela Banerjee,"This Oil's Domestic, but It's Deep and It's Risky," *New York Times*, August 11, 2002.

106  "The Jack-2 Perspective," *Oil & Gas Journal* 104, no. 34 (September 11, 2006): 17.

107  B.F. Thurmond, D.B.L. Walker, H.H. Banon, A.B. Luberski, M.W. Jones, and R.R. Peters, "Challenges and Decisions in Developing Multiple Deepwater Fields" (OTC Paper 16573, Houston, TX, May 2004).

108  K.L. Marshall and G.H. Smith, "Inspection Management Experience for a Fleet of Spars in the Gulf of Mexico" (OTC Paper 17619, Houston, TX, May 2005); C. Jim Thibodeaux, R. Don Vardeman, and Charles E. Kindel, "Nansen/ Boomvang Projects: Overview and Project Management" (OTC Paper 14089, Houston, TX, May 2002).

109  Thurmond et al., "Challenges and Decisions in Developing Multiple Deepwater Fields."

110  Bill Kirton, Gary Wulf, and Bill Henderson, "Thunder Horse Drilling Riser Break—The Road to Recovery" (SPE Paper 90628, 2004).

111  Simon Todd and Dan Replogle, "Thunder Horse and Atlantis: The Development and Operation of Twin Giants in the Deepwater Gulf of Mexico" (OTC Paper 20395, Houston, TX, May 2010).

112  *Ibid.*

113  Laurel Brubacker Calkins, "BP Sued by Watchdog Group over Atlantis Platform," Bloomberg, September 13, 2010, http://www.bloomberg.com/news/2010-09-10/bp-sued-over-alleged-safety-gaps-at-atlantis-production-platform.html.

114  Det Norske Veritas, *Pipeline Damage Assessment from Hurricane Ivan in the Gulf of Mexico*, (Minerals Management Service Report No. 440 38570, May 8, 2006). Includes data on damages from hurricanes through 2005.

115  Lesley D. Nixon et al., *Deepwater Gulf of Mexico 2009: Interim Report of 2008 Highlights* (OCS Report, MMS 2009-016, 2009), https://www.gomr.mms.gov/homepg/espis/espisfront.asp.

116  "BP Taps Vast Pool of Crude in Deepest Oil Well," *Associated Press*, September 2, 2009; Brett Clanton, "Shell's Perdido First to Produce in Key Deep Water Gulf Region," *Houston Chronicle*, March 31, 2010; Brett Clanton, "Chevron Plans New Floating City," Houston Chronicle Energy Watch blog, FuelFix, October 21, 2010, http://fuelfix.com/energywatch/2010/10/21/chevron-plans-new-floating-city/.

117  Frank Close, Bob McCavitt, and Brian Smith, "Deepwater Gulf of Mexico Development Challenges Overview," (SPE Paper 113011, 2008), 2.

118  Melvyn Whitby, "Design Evolution of a Subsea BOP: Blowout Preventer Requirements Get Tougher as Drilling Goes Ever Deeper," *Drilling Contractor* (May/June 2007).

119  Mary C. Boatman and Jennifer Peterson, *Oceanic Gas Hydrate Research and Activities Review* (OCS Report MMS

2000–017, U.S. Department of Interior, Minerals Management Service, Gulf of Mexico OCS Region, 2000).

120 Fergus Addison, Kevin Kennelley, and Fikry Botros, "Future Challenges for Deepwater Developments" (OTC Paper 20404, Houston, TX, May 2010).

121 Center for Biological Diversity v. U.S. Department of the Interior, 563 F.3d 466 (D.C. Cir. 2009).

122 The White House, Office of the Press Secretary, Remarks by the President in a Discussion on Jobs and the Economy in Charlotte, North Carolina, April 2, 2010, http://www.whitehouse.gov/the-press-office/remarks-president-a-discussion-jobs-and-economy-charlotte-north-carolina.

123 Gabriel Garcia Marquez, *One Hundred Years of Solitude*, translated by Gregory Rambassa (New York: Avon Books, 1970), 212.

# Chapter Three

1 Press Release, U.S. Department of the Interior, Salazar Launches Safety and Environmental Protection Reforms to Toughen Oversight of Offshore Oil and Gas Operations, May 11, 2010, http://www.doi.gov/news/pressreleases/Salazar-Launches-Safety-and-Environmental-Protection-Reforms-to-Toughen-Oversight-of-Offshore-Oil-and-Gas-Operations.cfm.

2 Press Release, U.S. Department of the Interior, Salazar Divides MMS's Three Conflicting Missions, May 19, 2010, http://www.doi.gov/news/pressreleases/Salazar-Divides-MMSs-Three-Conflicting-Missions.cfm; Secretary of the Interior, Establishment of the Bureau of Ocean Energy Management, the Bureau of Safety and Environmental Enforcement, and the Office of Natural Resources Revenue, No. 3299 (May 19, 2010), http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=32475.

3 Secretary of the Interior, Change of the Name of the Minerals Management Service to the Bureau of Ocean Energy Management, Regulation, and Enforcement, No. 3302 (June 18, 2010), http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=35872.

4 42 U.S.C. § 4331(a).

5 U.S. Department of the Interior, "Statement by Secretary of the Interior James Watt Instituting Changes in the Mineral Royalty Management Program – July 21, 1982," Commission on Fiscal Accountability of the Nation's Energy Resources: Subject Files, 1981–1982, RG 48, Entry 994, Box 1 (National Archives and Records Administration, Washington, DC).

6 U.S. Constitution, Art IV, § 3, cl. 2.

7 Kleppe v. New Mexico, 426 U.S. 529, 539 (1976), quoting United States v. San Francisco, 310 U.S. 16, 29 (1940).

8 Utah Power & Light Co. v. United States, 243 U.S. 389, 405 (1917); Kleppe v. New Mexico, 426 U.S. at 540 ("Congress exercises the powers of both a proprietor and of a legislature over the public domain.").

9 United States v. Midwest Oil, 236 U.S. 459, 466–68, 474–83 (1915). (Upholding authority of the president to withdraw unilaterally from private disposition valuable energy resources located on public lands in order to protect those resources while Congress considers legislation for their retention in national ownership).

10 Outer Continental Shelf Lands Act, 42 U.S.C. §§ 1331–1356a.

11 E.R. Bartley, *The Tidelands Oil Controversy: A Legal and Historical Analysis* (Austin: University of Texas Press, 1953); Tyler Priest, "Claiming the Coastal Sea: The Battle for the Tidelands, 1937–1953," *History of the Offshore Oil and Gas Industry in Southern Louisiana: Vol. 1: Papers on the Evolving Offshore Industry*, MMS OCS Study 2004-049 (New Orleans: U.S. Department of the Interior, Minerals Management Service, 2008), 67–90, https://www.gomr.mms.gov/homepg/espis/espisfront.asp.

12 See United States v. California, 332 U.S. 19, 35 (1947); United States v. Louisiana, 339 U.S. 699 (1950); United States v. Texas, 339 U.S. 707 (1950).

13 Priest, "Claiming the Coastal Sea: The Battle for the Tidelands, 1937–1953."

14 Other states petitioned for the 9-nautical-mile boundary in the federal courts, but failed to prevail.

15 "Oil Shelf Bill Enacted; President Reaffirms U.S. Title to Outer Offshore Deposits," *New York Times*, August 8, 1953, 27.

16 Richard Vietor, *Energy Policy in America since 1945: A Study of Business-Government Relations* (New York: Cambridge University Press, 1984), 19.

17 E.R. Bartley, *The Tidelands Oil Controversy: A Legal and Historical Analysis.*

18 "Interior Expects Big Things from . . . Offshore Lease Sale," *Oil and Gas Journal*, September 13, 1954, 96.

19 Diane Austin et al., *History of the Offshore Oil and Gas Industry in Southern Louisiana, Volume 1: Papers on the Evolving Offshore Industry*, OCS Study MMS 2008-042 (New Orleans: U.S. Department of the Interior, Minerals Management Service, September 2008), 97–98, http://www.gomr.boemre.gov/PI/PDFImages/ESPIS/4/4530.pdf.

20 43 U.S.C § 1334.

21 "Oil and Gas Leases Bow to Rare Wildlife Species," *New York Times*, December 9, 1955.

22 John C. Whitaker, *Striking a Balance: Environment and Natural Resources Policy in the Nixon–Ford Years* (Washington, D.C.: American Enterprise Institute, 1976), 267–268; Russell Wayland, "The New Federal OCS Regulations in the Light of Santa Barbara" (Society of Petroleum Engineers [SPE] Paper 2780, San Francisco, CA, November 1969); Richard B. Krahl and David W. Moody, "Gulf Coast Lease Management Inspection Program," (Offshore Technology Conference [OTC] Paper 1714, 1972), 846.

23 National Environmental Policy Act of 1969, 42 U.S.C. § 4321–4370h.

24 Richard J. Lazarus, *The Making of Environmental Law*, (Chicago: University of Chicago Press, 2004), 70.

25 42 U.S.C. § 4332(c).

26 Calvert Cliffs Coordinating Committee v. Atomic Energy Commission, 449 F.2d 1109 (D.C. Cir. 1971).

27 National Research Council, *Assessment of the U.S. Outer Continental Shelf Environmental Studies Program: III. Social and Economic Studies* (The National Academies Press: Washington, DC, 1992), http://www.nap.edu/catalog.php?record_id=2062.

28 U.S. Department of the Interior, *Leasing Oil and Natural Gas Resources: Outer Continental Shelf* (Washington, D.C.: U.S. Department of the Interior, 2005), 12, http://www.boemre.gov/ld/PDFs/GreenBook-LeasingDocument.pdf.

29 Lazarus, *The Making of Environmental Law*, 70 (listing 18 statutes, and not including several such as the Magnuson Fishery Management and Conservation Act of 1976).

30 The five laws included the Public Utility Regulatory Policies Act, Pub. L. No. 95–617, Energy Tax Act, Pub. L. No. 95–618, National Energy Conservation Policy Act, Pub. L. No. 95–619, Power Plant and Industrial Fuel Use Act, Pub. L. No. 95–620, and Natural Gas Policy Act, Pub. L. No. 95–621.

31 Natural Resources Defense Council v. Morton, 458 F.2d 827 (D.C. Cir. 1972).

32 Outer Continental Shelf Leasing Program: Hearings before the H. Comm. on Appropriations, 93rd Cong., 2d Sess. (1974).

33 Outer Continental Shelf Lands Act, Pub. L. No. 95–372, 92 Stat. 629 (1978).

34 43 U.S.C. § 1801.

35 43 U.S.C. § 1802.

36 43 U.S.C. § 1344.

37 43 U.S.C. § 1340.

38 43 U.S.C. § 1351.

39 43 U.S.C. § 1344(a)(3).

40 43 U.S.C. § 1346.

41 43 U.S.C. § 1347(c).

42 43 U.S.C. § 1347(b).

43 43 U.S.C. § 1347(b)

44 43 U.S.C. § 1351.

45 43 U.S.C. § 1340.

46 43 U.S.C. § 1351(c)(3).

47 43 U.S.C. § 1351(e)(1).

48 43 U.S.C. § 1351(e)(1).

49 43 U.S.C. § 1531(l).

50 See S. Rep. No. 95–285, at 154–5 (reprinting letter from Secretary of the Interior Cecil Andrus).

51 See S. Rep. No. 95–285, at 50, 62, 82, 144–5.

52 Robert Gramling, *Oil on the Edge: Offshore Development, Conflict, Gridlock* (Albany: SUNY Press, 1996), 121.

53 Charles Babcock, "Watt Defies Critics of Plan for Oil Leases," *Washington Post*, July 7, 1981, A3.

54 "Problems with Government," *Ocean Industry* (April 1982): 21.

55 Commission on Fiscal Accountability of the Nation's Energy Resources, *Fiscal Accountability of the Nation's Energy Resources* (Washington, D.C.: January 1982), xv, http://www.onrr.gov/Laws_R_D/frnotices/PDFDocs/linowes-rpt1–5.pdf.

56 Don E. Kash, *Lease Management Activities in the Geological Survey*, Commission on Fiscal Accountability of the Nation's Energy Resources: Technical Reports, 1981–1982, RG 48, Entry 998, Box 10, File 239, National Archives and Records Administration, 8, 9, 27.

57 "Industry Warning Watt Against Transfer of BLM Leasing Functions to MMS," *Inside Energy/with Federal Lands*, November 1, 1982, 11.

58 G. Kevin Jones, "Outer Continental Shelf Oil and Gas Development During the Reagan Administration—Part 1," *Western New England Law Review* 12, 1, (1990):8–13.

59 "Interior Denies Oil Leasing Plan Will Cost $77 Billion," *Associated Press*, September 28, 1982.

60 43 U.S.C. § 1337.

61 Charles Lester, "Contemporary Federalism and New Regimes of Ocean Governance: Lessons from the Case of Outer Continental Shelf Oil Development," *Ocean & Coastal Management* 23 (1994), 14.

62 National Research Council Committee on Marine Area Governance and Management, *Striking a Balance: Improving Stewardship of Marine Areas* (Washington, D.C.: National Academy of Sciences, 1997), 37, http://www.nap.edu/openbook.php?record_id=5797&page=37.

63 President George H.W. Bush, "Statement on Outer Continental Shelf Oil and Gas Development," (June 26, 1990), http://bushlibrary.tamu.edu/research/public_papers.php?id=2035&year=1990&month=6.

64 30 C.F.R. pt. 250.

65 U.S. Department of the Interior, Documents pertaining to offshore inspection types and practices produced to the Oil Spill Commission, August 2010.

66 Jan Erik Vinnem, *Offshore Risk Assessment: Principles, Modelling and Applications of QRA Studies*, 2nd ed. (London: Springer Studies in Reliability Engineering, 2007), 91, 100, 102.

67 Petroleum Safety Authority of Norway, "From Prescription to Performance in Petroleum Supervision," March 12, 2010, http://www.ptil.no/news/from-prescription-to-performance-in-petroleum-supervision-article6696-79.html.

68 Magne Ognedal, interview with Commission staff, November 10, 2010.

69 E.P. Danenberger et al., *Investigation of March 19, 1989 Fire, South Pass Block 60 Platform B, Lease OCS–G 1608*, OCS Report MMS 90–0016 (New Orleans: U.S. Department of the Interior, Minerals Management Service, April 1990): 15, http://www.gomr.boemre.gov/PDFs/1990/90-0016.pdf.

70 Marine Board of the National Research Council Committee on Alternatives for Inspection of Outer Continental Shelf Operations, *Alternatives for Inspecting Outer Continental Shelf Operations* (Washington: National Academy Press, 1990): 3, http://www.nap.edu/openbook.php?record_id=1517&page=1.

71 Minerals Management Service, *Final Report, Findings and Recommendations, MMS Task Force on OCS Inspection and Enforcement* (Washington, D.C.: U.S. Department of the Interior, Minerals Management Service, February 1990), 1–3.

72 Marine Board, *Alternatives for Inspecting Outer Continental Shelf Operations*, 80.

73 *Ibid.*, 82.

74 Exec. Order No. 12,777, 56 Fed. Reg. 54,757 (October 22, 1991).

75 E.P. Danenberger, "Changes in the Minerals Management Service Offshore Regulatory Programs Resulting From the Oil Pollution Act of 1990" (Offshore Technology Conference [OTC] Paper 6823, May 1992), 150.

76 Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 56 Fed. Reg. 30,400 (July 2, 1991).

77 *Ibid.*

78 Salient differences were, as MMS noted, that "Platforms in the GOM are typically smaller, technically less sophisticated, produce fewer hydrocarbons, and operate in less severe environmental conditions [than North Sea platforms]. The number of personnel on OCS platforms is significantly smaller than on North Sea platforms. There is, however, a substantially greater number of OCS platforms in the GOM, over 3,800." Marshall Courtois, William Hauser, and Paul Schneider, "Minerals Management Service Safety and Environmental Management Program: Evolution of the Concept," (Offshore Technology Conference [OTC] Paper 6822, May 1992), 145.

79 Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 56 Fed. Reg. 30,400 (July 2, 1991).

80 Former senior MMS officials, interviews with Commission staff, August and September 2010; Offshore Operators Committee, "Oil, Gas, and Sulphur Operations in the Outer Continental Shelf (OCS)—Safety and Environmental Management Systems," Public Comment (May 22, 2006), http://www.boemre.gov/federalregister/PDFs/AD15-OOCcomments5-22-06.pdf.

81 T.A.F. Powell, "US Voluntary SEMP Initiative: Holy Grail or Poisoned Chalice?" (Offshore Technology Conference [OTC] Paper 8111, May 1996): 828.

82 E.O. Redd, Jean Chevallier, and Ian Paterson, "Preparing a Safety Case: A Drilling Contractor's Experience" (Society of Petroleum Engineers [SPE] Paper 27293, January 1994): 799.

83 L.D. Easley, J.E. Stark, and R.A. Bradford, "Implementing API RP 75 '*Recommended Practice for Development of a Safety and Environmental Program for Outer Continental Shelf (OCS) Operations and Facilities*'" (Offshore Technology Conference [OTC] Paper 7384, May 1994): 130.

84 American Petroleum Institute, Recommended Practices for Development of a Safety and Environmental Management Program for Outer Continental Shelf (OCS) Operations and Facilities, Recommended Practice 75, 1st ed. (Dallas, TX: May 15, 1993).

85 Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 59 Fed. Reg. 33,779 (June 30, 1994).

[86] Safety and Environmental Management Program (SEMP) on the Outer Continental Shelf (OCS), 61 Fed. Reg. 37,493 (July 18, 1996).

[87] *Ibid.*

[88] Patrick Crow, "New slant on safety," *Oil & Gas Journal* (July 22, 1996): 23.

[89] TA.F Powell, "US Voluntary SEMP Initiative: Holy Grail or Poisoned Chalice?" (Offshore Technology Conference [OTC] Paper 8111, 1996).

[90] E.P. Danenberger, interview with Commission staff, September 2, 2010; E.P. Danenberger, e-mail message to Commission staff, October 25, 2010.

[91] Oil and Gas and Sulphur Operations in the Outer Continental Shelf–Incident Reporting Requirements, 68 Fed. Reg. 40,585 (July 8, 2003).

[92] E.P. Danenberger, interview with Commission staff, September 2, 2010; E.P. Danenberger, e-mail message to Commission staff, October 25, 2010.

[93] Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Incident Reporting Requirements, 71 Fed. Reg. 19,640 (April 17, 2006).

[94] Commission staff analysis of Bureau of Ocean Energy Management, Regulation and Enforcement data. See http://www.boemre.gov/adm/budget.html.

[95] Jim Morris, "Lost at Sea/OFFSHORE RISKS/Safety concerns return with rise of oil, gas boom," *Houston Chronicle*, December 22, 1996, http://www.chron.com/CDA/archives/archive.mpl?id=1996_1384981.

[96] Commission staff analysis of Bureau of Ocean Energy Management, Regulation and Enforcement data. See http://www.gomr.boemre.gov/homepg/fastfacts/WaterDepth/wdmaster.asp.

[97] Commission staff analysis of Bureau of Ocean Energy Management, Regulation and Enforcement data; Minerals Management Service, *U.S. Offshore Milestones* (as of August 2006): 5.  See http://www.boemre.gov/stats/PDFs/milestonesAUG2006.pdf.

[98] Commission staff analysis of Bureau of Ocean Energy Management, Regulation and Enforcement and U.S. Energy Information Administration data. See http://www.gomr.boemre.gov/PDFs/2009/2009-016.pdf, 71–72; http://www.eia.gov/oog/info/twip/twiparch/100526/twipprint.html.

[99] Commission staff analysis of MMS yearly budget request and enactments, by nominal and real (2005) dollars.

[100] Tetrahedron, Inc., *Reliability of Blowout Preventers Tested Under Fourteen and Seven Days Time Interval: Study Report, Submitted to Minerals Management Service, Department of the Interior*, MMS Technology Assessment & Research Project 253, "Blowout Preventer Study" (December 20, 1996), http://www.boemre.gov/tarprojects/253/AA.PDF.; Blowout Preventer (BOP) Testing Requirements for Drilling and Completion Operations, 63  Fed. Reg. 29,604 (June 1, 1998).

[101] Per Holand, *Reliability of Subsea BOP Systems for Deepwater Application, Phase II DW, SINTEF* Report STF38 A99426 (November 7, 1999); Per Holand, *Deepwater Kicks and BOP Performance*, SINTEF Report STF38 A01419 (July 24, 2001); WEST Engineering Services, Inc., *Mini Shear Study for U.S. Minerals Management Service*, Requisition No. 2-1011-1003 (December 2002); WEST Engineering Services, Inc., *Shear Ram Capabilities Study for U.S. Minerals Management Service*, Requisition No. 3-4025-1001 (September 2004).

[102] WEST Engineering Services, Inc., "Comments by WEST Engineering Services, Houston, Texas, to The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling" (November 12, 2010): 3.

[103] David Barstow and others, "Regulators Failed to Address Risks in Oil Rig Fail-Safe Device," *New York Times*, June 20, 2010, www.nytimes.com/2010/06/21/us/21blowout.html.

[104] U.S. Department of the Interior, Outer Continental Shelf Safety Oversight Board, *Report to the Secretary of the Interior* (September 1, 2010), 6.

[105] *Ibid.*

[106] *Ibid.*

[107] U.S. Department of the Interior, Office of Inspector General, *Survey Report: Offshore Civil Penalties Program, Minerals Management Service* (March 30, 1999), http://www.doioig.gov/images/stories/reports/pdf/99-I-374.pdf.

[108] Commission staff analysis of Bureau of Ocean Energy Management, Regulation and Enforcement data provided to the Commission by the Department of the Interior of unannounced MMS inspections of MODUs/drilling rigs, 1990 (1,985 inspections) to 2009 (85 inspections). The pivotal change occurs in 1998–1999, as the numbers drop from 864 to 41 in the span of one year.

[109] Yearly MMS Incident Summary Reports are available at http://www.boemre.gov/incidents/IncidentStatisticsSummaries.htm.

[110] "Deepwater Gulf of Mexico production rising," *Oil & Gas Journal* (November 1, 1999): 34 ("In 1999, 11 more deepwater development production projects in the gulf have already begun producing or are on the verge of doing so"); Michael Davis, "LEARNING THE DRILL/The oil patch rebound brought with it a need for drilling companies to find, train and keep people to work the rigs," *Houston Chronicle* (February 1, 1998): 1 ("A shortage of qualified personnel has been a nagging problem since the oil patch has come back in the past year. But over the next two years some 50 new offshore jack-up rigs, semi-submersibles and drill ships currently being built or converted will

go into operation. Finding qualified crews to operate these increasingly high tech drilling rigs is a major worry for drilling companies.").

[111] 33 C.F.R. § 140.1.

[112] 46 C.F.R. pt. 2.

[113] Curry L. Hagerty and Jonathan L. Ramseur, Deepwater Horizon *Oil Spill: Selected Issues for Congress*, (Washington, D.C.: Congressional Research Service, July 15, 2010): 37. The Coast Guard proposed new safety rules in 1999, which triggered significant industry opposition, and has not since made those rules final. Outer Continental Shelf Activities, Notice of Proposed Rulemaking, 64 Fed. Reg. 68,416 (December 7, 1999).

[114] Inspection Under, and Enforcement of, Coast Guard Regulations for Fixed Facilities on the Outer Continental Shelf by the Minerals Management Service, 67 Fed. Reg. 5912 (February 7, 2002).

[115] The MMS and the United States Coast Guard have signed three governing Memoranda of Understanding (in 1989, 1999, and 2004, with supporting Memoranda of Agreement) in order to clarify roles and responsibilities related to workplace safety and the approval of technical systems and equipment that are applicable to both drilling and marine systems on offshore oil and gas facilities. See http://www.boemre.gov/regcompliance/MOU/MOUindex.htm.

[116] S. Elizabeth Birnbaum, interview with Commission staff, August 2010; Randall B. Luthi, interview with Commission staff, August 2010; Thomas R. Kitsos, interview with Commission staff, August 2010.

[117] Deepwater Royalty Relief Act of 1995, Pub. L. 104–58, 109 Stat. 563 (1995).

[118] Press Release, U.S. Department of the Interior, Secretary Salazar Launches Ethics Reform Initiative in Meeting with Minerals Management Service Employees, January 29, 2009, http://www.doi.gov/news/pressreleases/2009_01_29_release.cfm.

[119]  For example, in 2006, Congress responded to Gulf state demands for greater revenues by enacting the Gulf of Mexico Energy Security Act, which provides that Alabama, Louisiana, Mississippi, and Texas and the coastal political subdivisions will receive 37.5 percent of all revenue (bonus bids, rentals, and royalty production) for new leases in the 5 million acres in the Eastern Gulf and the 5.8 million acres in the Central Gulf. See http://www.boemre.gov/ooc/press/2008/FactSheet-MMSGOMSecurityActMARCH202008.htm. The Fiscal Year 2010 allocation to the four Gulf States and their political subdivisions was approximately $866 million. See http://www.boemre.gov/offshore/PDFs/GOMESAFY2010Final.pdf.

[120] U.S. Department of the Interior, Outer Continental Shelf Safety Oversight Board, *Report to the Secretary of the Interior* (September 1, 2010), 11.

[121] U.S. Department of the Interior, Office of the Inspector General, *MMS Oil Marketing Group–Lakewood*, September 10, 2008.

[122] U.S. Department of the Interior, Office of the Inspector General, *MMS Oil Marketing Group–Lakewood*, Report Transmittal Letter, September 9, 2008, 3, http://www.doioig.gov/images/stories/reports/pdf/RIKinvestigation.pdf.

[123] Department of the Interior Office of the Inspector General, Minerals Management Service, *Island Operating Company, et al.,* (May 25, 2010), 7, http://www.doioig.gov/images/stories/reports/pdf/IslandOperatingCo.pdf.

[124] *Ibid.*

[125] Press Release, U.S. Department of the Interior, Secretary Salazar Launches Ethics Reform Initiative in Meeting with Minerals Management Service Employees, January 29, 2009, http://www.doi.gov/news/pressreleases/2009_01_29_release.cfm.

[126] U.S. Department of the Interior, Outer Continental Shelf Safety Oversight Board, *Report to the Secretary of the Interior* (September 1, 2010), 8.

[127] *Ibid.*, 13.

[128] *Ibid.*, 8, 13.

[129] *Ibid.*, 13.

[130] *Ibid.*, 6.

[131] Don E. Kash, *Lease Management Activities in the Geological Survey*, Commission on Fiscal Accountability of the Nation's Energy Resources: Technical Reports, 1981–1982, RG 48, Entry 998, Box 10, File 239, National Archives and Records Administration, 27.

[132] U.S. Department of the Interior, Outer Continental Shelf Safety Oversight Board, *Report to the Secretary of the Interior* (September 1, 2010), 11–12.

[133] Ibid., 11.

[134] 43 U.S.C. § 1344.

[135] 43 U.S.C. § 1344.

[136] 43 U.S.C. § 1344(a)(3).

[137] 42 U.S.C. § 4332.

[138] 40 C.F.R. § 1508.8 ("Effects includes ecological . . ., aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative").

139 16 U.S.C. §§ 1801–1891d.

140 16 U.S.C. §§ 1531–1544.

141 16 U.S.C. §§ 1361–1423h.

142 16 U.S.C. §§ 1431–1445c–1.

143 33 U.S.C. §§ 1251–1387.

144 33 U.S.C. §§ 2701–2762.

145 Exec. Order No. 12,777, 56 Fed. Reg. 54,757 (October 22, 1991).

146 43 U.S.C. §1344.

147 43 U.S.C. §1340(c)(1).

148 It appears to be understood that the meaning of this language is that an environmental impact statement is not required for the Gulf of Mexico, but it should be pointed out that is not the compelled or obvious reading of the language. The provision can also be fairly read to say no more than at least one impact statement has to be prepared for areas outside the Gulf and not address the issue, one way or another, concerning the application of NEPA within the Gulf. That potentially significant nuance, however, is beyond the scope of this report's inquiry.

149 National Environmental Policy Act; Revised Implementing Procedures, 45 Fed. Reg. 75336 (proposed Nov. 14, 1980) (proposed NEPA rules); National Environmental Policy Act; Revised Implementing Procedures, 46 Fed. Reg. 7485 (Jan. 23, 1981) (final NEPA rules); see 516 Departmental Manual, 2.3.A(2) (1980).

150 43 C.F.R. § 46.215

151 U.S. Department of the Interior, Outer Continental Shelf Safety Oversight Board, *Report to the Secretary of the Interior* (September 1, 2010), 20.

152 *Ibid.*

153 516 Departmental Manual 15.4.C (providing for exceptions from categorical exclusion in certain "extraordinary circumstances," including when there are highly uncertain and potentially significant environmental effects).

154 51 Fed. Reg. 15,624 (1986).

155 NOAA Fisheries Service, Southeast Regional Office, letter to MMS dated July 1, 1999 (subsequently updated in 2006, 2007, and 2008).

156 *Essential Fish Habitat Assessment for the Minerals Management Service Programmatic Consultation for Gulf of Mexico Outer Continental Shelf (OCS) Oil and Gas Activities* (June 4, 1999).

157 NOAA Fisheries Service, Southeast Regional Office, letter to MMS dated July 1, 1999 (subsequently updated in 2006, 2007, and 2008).

158 30 C.F.R. § 254.21.

159 30 C.F.R. § 254.23.

160 The Response Group on behalf of ExxonMobil, *Gulf of Mexico Regional Oil Spill Response Plan* (August 2009), Rev. 5; The Response Group on behalf of ConocoPhillips, *Gulf of Mexico Regional Oil Spill Response Plan* (April 2010), Rev. 6; The Response Group on behalf of Chevron, *Gulf of Mexico Regional Oil Spill Response Plan* (February 2010), Version 3; The Response Group on behalf of Shell Offshore Inc., *Gulf of Mexico Regional Oil Spill Response Plan,* (June 2010), Rev. 6.1.

161 The Response Group on behalf of BP, *Regional Oil Spill Response Plan–Gulf of Mexico* (June 30, 2009), App. H: 5, 17, and 32.

## Chapter Four

1 John Guide (BP), interview with Commission staff, September 17, 2010.

2 Internal Transocean document (TRN–HEC 90686). Internal documents are identified by their document production serial numbers when available, which were assigned by the entity that provided them.

3 Internal BP document (BP–HZN–MBI 126338).

4 Internal Transocean document (TRN–USCG–MMS 11597).

5 Internal BP document (BP–HZN–MBI 126338).

6 *Ibid.*

7 *Ibid.* Three companies own the Macondo well. BP has a 65 percent share, Anadarko Petroleum Corporation has a 25 percent share, and MOEX Offshore has a 10 percent share. BP maintained regular contact with Anadarko and MOEX throughout the drilling of the well.

[8] Internal Transocean documents (TRN–USCG–MMS 11600, 11605, 11609, 11613, 11617, 11621, 11625).

[9] Brett Clanton, "New tactic might seal leaking well sooner, BP CEO says," *Houston Chronicle*, May 5, 2010.

[10] Gregory Walz (BP), interview with Commission staff, October 6, 2010.

[11] Testimony of Gregory Walz, Hearing before the Deepwater Horizon Joint Investigation Team, October 7, 2010, 157–59.

[12] Internal BP document (BP-HZN-MBI 143300) (emphasis added).

[13] Internal BP documents (BP-HZN-MBI 136937, 136941).

[14] Internal BP document (BP-HZN-CEC 8848-58).

[15] Internal BP document (BP-HZN-MBI 129238-39).

[16] Guide, interview. Indeed, just days before the running of the long string at Macondo, another well drilled by Transocean's DD3 suffered just such a complication. *Ibid.*

[17] Testimony of Jesse Gagliano, Hearing before the Deepwater Horizon Joint Investigation Team, August 24, 2010, 320.

[18] Internal BP document (BP-HZN-CEC 22433). Walz also noted that the flight carrying centralizers would not increase costs. *Ibid.*

[19] Guide, interview. BP had special one-piece bolt-on centralizers made for the Thunder Horse project. *Ibid.*

[20] Internal BP document (BP-HZN-MBI 128379).

[21] Internal BP document (BP-HZN-CEC 22669).

[22] Internal BP document (BP-HZN-CEC 22433).

[23] Testimony of Steve Lewis, Hearing before the National Commission, November 9, 2010, 93–94; Internal BP document (BP-HZN-MBI 129226). Prior to conversion, a small ball drops from the top of the float valves to block the main path through the auto-fill tube, leaving only two small holes on the side of the tube through which mud can flow. *Ibid.*

[24] The Well Site Leaders—Bob Kaluza and Don Vidrine—would normally have been on the rig. Morel, a relatively junior BP engineer, had flown to the rig out of a professional interest in learning more about the cementing process. Guide, interview.

[25] Bryan Clawson (Weatherford), interview with Commission staff, October 28, 2010; BP, Deepwater Horizon *Accident Investigation Report* (September 8, 2010), 70.

[26] Testimony of Steve Lewis, 96; Internal Transocean document (TRN–USCG_MMS 11638).

[27] Internal BP document (BP-HZN-MBI 137367).

[28] *Ibid.*; Testimony of Nathaniel Chaisson, Hearing before the Deepwater Horizon Joint Investigation Team, August 24, 2010, 432.

[29] Internal BP documents (BP-HZN-MBI 137367, 21304). Since the incident, BP has argued that the M-I SWACO models predicted an erroneously high circulation pressure, and that the readings the crew observed were proper. This may ultimately explain the readings, but it does not explain why the BP Macondo team dismissed them as the result of a broken pressure gauge.

[30] David Izon, E.P. Danenberger, and Melinda Mayes, "Absence of fatalities in blowouts encouraging in MMS study of OCS incidents 1992-2006," *Well Control* July/August (2007), 84.

[31] Testimony of John Guide, Hearing before the Deepwater Horizon Joint Investigation Team, July 22, 2010, 87.

[32] John Gisclair, Sperry Sun data, April 20, 2010 (annotations, September 20, 2010). Commission calculation based on internal Halliburton document (HAL_10994).

[33] Internal BP document (BP-HZN-MBI 127537-39); Internal Halliburton document (HAL_11196).

[34] 30 C.F.R. § 250.421.

[35] Internal BP document (BP-HZN-MBI 193549). BP's internal guidelines further specify that centralization should extend 100 feet above any such hydrocarbon-bearing zones. If either the top of cement or centralization requirements are not met, the guidelines require that the actual top of cement should be confirmed by a "proven cement evaluation technique." *Ibid.*

[36] Internal BP documents (BP-HZN-MBI 143295, BP-HZN-CEC 22663); BP, Deepwater Horizon *Accident Investigation Report*, 34.

[37] Document provided to the Commission by Halliburton entitled "Halliburton GoM Foam Jobs 2002–2010."

[38] S.L. Pickett and S.W. Cole, "Foamed Cementing Technique for Liners Yields Cost-Effective Results" (Society of Petroleum Engineers SPE Paper #27679, Midland, Texas, March 1994), 523–24.

[39] Halliburton had delivered the slurry blend to the *Deepwater Horizon* several months earlier. It had developed the blend to match the temperature and pressure profile of the well that *Deepwater Horizon* had drilled immediately prior to Macondo—another BP well called Kodiak. Jesse Gagliano (Halliburton), interview with Commission staff, September 10, 2010.

[40] At this point, it appears that lab personnel replicated the dry blend recipe that was on the rig using off-the-shelf materials from their lab. For later tests, Halliburton sent samples of the cement that was actually on the *Horizon* back to the lab and directly tested those materials.

[41] Internal BP document (BP-HZN-MBI 109218).

[42] Internal Halliburton document (HAL_DOJ 68).

[43] Internal Halliburton document (HAL_DOJ 36).

[44] Internal Halliburton document (HAL_DOJ 43).

[45] *Ibid.*

[46] Internal BP document (BP-HZN-MBI 136946–47).

[47] Internal BP document (BP-HZN-MBI 171151).

[48] Internal BP document (BP-HZN-MBI 136946–47).

[49] Internal BP document (BP-HZN-CEC 20234).

[50] *Ibid.*

[51] Testimony of Vincent Tabler, Hearing before the Deepwater Horizon Joint Investigation Team, August 25, 2010, 22–23, 36.

[52] Internal Halliburton document (HAL_0011208).

[53] Internal BP document (BP-HZN-MBI 137370).

[54] Internal BP document (BP-HZN-MBI 129141).

[55] Internal Transocean document (TRN-USCG_MMS 30422); Internal Schlumberger document (SLB-EC-2).

[56] Testimony of John Guide, 44–45.

[57] Internal BP document (BP-HZN-MBI 143304).

[58] Testimony of John Guide, 298 (the cement plug was "deeper than normal"); Testimony of Ronald Sepulvado, Hearing before the Deepwater Horizon Joint Investigation Team, July 20, 2010, 145 ("the top of the surface plug is normally at 500 feet below the wellhead").

[59] Internal BP document (BP-HZN-CEC 8574).

[60] Testimony of Jimmy Harrell, Hearing before the Deepwater Horizon Joint Investigation Team, May 27, 2010, 118.

[61] Internal BP document (BP-HZN-CEC 8574).

[62] Internal BP document (BP-HZN-CEC 21260–279).

[63] Internal BP document (BP-HZN-MBI  126928).

[64] Internal BP document (BP-HZN-OSC 1438).

[65] 30 C.F.R. § 250.423.

[66] The blind shear rams closed and sealed as expected during the positive-pressure test. This fact suggests that the rams were capable of sealing the well when the blowout occurred. But the evidence is inconclusive on its own; during the positive-pressure test the crew closed the blind shear rams using a low pressure hydraulic system, rather than the high pressure hydraulic system that would have activated the rams in the event of a blowout.

[67] Internal Transocean document (TRN-HCEC 90).

[68] Testimony of Patrick O'Bryan, Hearing before the Deepwater Horizon Joint Investigation Team, August 26, 2010, 360.

[69] Testimony of David Sims, Hearing before the Deepwater Horizon Joint Investigation Team, August 26, 2010, 204. There were no regulations or industry standards guiding the conduct or interpretation of negative-pressure tests at the time of the Macondo blowout. The absence of any such guidance may have contributed to the failure to conduct and interpret the test correctly here.

[70] This calculation is based on approximate values of the depths and mud weights involved.

[71] Testimony of Leo Lindner, Hearing before the Deepwater Horizon Joint Investigation Team, July 19, 2010, 297; BP, Deepwater Horizon *Accident Investigation Report*, app. Q, 1.

[72] BP, Deepwater Horizon *Accident Investigation Report*, 83.

[73] Testimony of Leo Lindner, 308–11. The exclusion for "[d]rilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas or geothermal energy" is found at 40 C.F.R. § 261.4.

[74] Testimony of Leo Lindner, 276–79, 297, 359–60; Internal BP document (BP-HZN-BLY 47100).

[75] Testimony of Randy Ezell, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 279–81.

[76] Testimony of Daun Winslow, Hearing before the Deepwater Horizon Joint Investigation Team, August 24, 2010, 219;

Testimony of Randy Ezell, 279.

[77]  Testimony of Randy Ezell, 279.

[78]  Testimony of Lee Lambert, Hearing before the Deepwater Horizon Joint Investigation Team, July 20, 2010, 292. Transocean disputes these accounts. It points out that the only individuals who have stated that Anderson advanced the "bladder effect" theory are BP employees.

[79]  Testimony of Lee Lambert, 292.

[80]  Testimony of Jimmy Harrell, 117; Internal BP documents (BP-HZN–MBI 127909, BP-HZN–CEC 20189–90). While that may have been Mr. Vidrine's stated reason for running the test on the kill line, the Commission notes that the negative-pressure test performed at Macondo—whether on the drill pipe or kill line—was different from the negative-pressure test described in the Application for Permit to Modify. Testimony of Mark Bly, Hearing before the National Commission, November 8, 2010, 293–95.

[81]  BP, Deepwater Horizon *Accident Investigation Report*, 86.

[82]  There are several possible explanations for the inconsistent readings on the drill pipe and kill line. One possibility is that the viscous spacer that had leaked through the annular preventer migrated into and clogged the kill line. John Smith, *Review of Operational Data Preceding Explosion on Deepwater Horizon in MC252* (July 1, 2010), 20–21. Another possibility is that a valve was inadvertently closed that should have been open. BP, Deepwater Horizon *Accident Investigation Report*, 87. A third, more remote, possibility is that hydrocarbons coming up the well formed solid hydrates when they hit the cold seawater and those hydrates clogged the kill line. Guide, interview.

[83]  Testimony of Christopher Haire, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 247.

[84]  For example, a bubble of gas, under ideal conditions, would expand approximately 166-fold. This number differs under actual conditions based on fluid properties and flow.

[85]  Mudloggers operate systems that collect and transmit real-time data from sensors on the rig. BP employed mudloggers from Sperry Drilling (a Halliburton subsidiary) on the Deepwater Horizon.

[86]  The driller first sent mud to pits 9 and 10, then switched to pit 7, and then switched to pit 6. Sperry Sun data, April 20, 2010, 20:10–21:18.

[87]  *Ibid.*, 20:28–20:36, 20:58–21:06.

[88]  *Ibid.*, 20:20–21:01.

[89]  *Ibid.*, 21:01.

[90]  *Ibid.*, 21:01–21:08.

[91]  The Commission believes, based on interviews of the mudloggers on the *Horizon*, that the Hitec system may have shown a more obvious trend because it displays numeric values as opposed to trend lines such as those seen in the Sperry data shown in the text. Joseph Keith (Sperry), interview with Commission staff, October 6, 2010; Cathlenia Willis (Sperry), interview with Commission staff, October 21, 2010.

[92]  Testimony of Greg Meche, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 207–09.

[93]  40 C.F.R. §§ 261.4, 435.11.

[94]  Testimony of Greg Meche, 207–09, 219.

[95]  Keith, interview.

[96]  Internal BP document (BP-HZN–MBI 21415).

[97]  Keith, interview. Given what we now know, it is all but impossible that the well was not flowing as of 9:08 p.m. BP, Deepwater Horizon *Accident Investigation Report*, 25; Smith, *Review of Operational Data Preceding Explosion on Deepwater Horizon*, 22–23. Other than faulty memory, the only apparent explanations for Mr. Keith's statement are that the crew had already closed off the portion of the flow line Mr. Keith was watching or that Mr. Keith watched for an inadequate period of time. Keith, interview; Darryl Bourgoyne (LSU), interview with Commission staff, November 23, 2010.

[98]  Testimony of Greg Meche, 207–09.

[99]  *Ibid.*

[100]  Internal BP document (BP-HZN–MBI 21415).

[101]  Sperry Sun data, April 20, 2010, 21:08–21:14.

[102]  *Ibid.*, 21:14–21:15.

[103]  *Ibid.*, 2010, 21:17–21:18.

[104]  Testimony of Chad Murray, Hearing before the Deepwater Horizon Joint Investigation Team, May 27, 2010, 335–36.

[105]  *Ibid.*, 336.

[106]  Testimony of Randy Ezell, 282.

[107]  Testimony of Bill Ambrose, Hearing before the National Commission, November 8, 2010, 381.

108 David Young (Transocean), interview with Commission staff, November 19, 2010.

109 Testimony of David Young, Hearing before the Deepwater Horizon Joint Investigation Team, May 27, 2010, 259.

110 Young, interview.

111 Sperry Sun data, April 20, 2010, 21:08–21:14.

112 Bill Ambrose (Transocean), interview with Commission staff, September 21, 2010.

113 Sperry Sun data, April 20, 2010, 21:38.

114 Young, interview.

115 Sperry Sun data, April 20, 2010, 21:38–21:42.

116 Testimony of Randy Ezell, 283; Young, interview.

117 Testimony of Micah Sandell, Hearing before the Deepwater Horizon Joint Investigation Team, May 29, 2010, 10.

118 Testimony of Christopher Pleasant, Hearing before the Deepwater Horizon Joint Investigation Team, May 28, 2010, 173.

119 Testimony of Randy Ezell, 283.

120 Testimony of Bill Ambrose, 244.

121 Smith, *Review of Operational Data Preceding Explosion on Deepwater Horizon*, 14; Testimony of Bill Ambrose, 252–53; BP, Deepwater Horizon *Accident Investigation Report*, 28.

122 Testimony of Christopher Pleasant, 165.

123 *Ibid.*, 123.

124 *Ibid.*

125 Various parties have suggested other causes for the deadman's failure, including leaks, overdue equipment certification, and improper modifications.

126 Interview with industry expert, September 24, 2010.

127 After the blowout, some industry CEOs testified they would never have used a long string production casing, suggesting there was a causal connection between BP's choice of the long string and the blowout. Hearing Before the Subcomm. on Energy and Environment, 111th Cong. 104 (June 15, 2010) (statements of John Watson, Chairman and Chief Executive Officer, Chevron Corporation; and Rex Tillerson, Chairman and Chief Executive Officer, Exxon-Mobil).

128 First, the long string required the cement to travel through a longer stretch of steel casing—roughly 12,000 feet longer—before reaching its final destination, potentially increasing the risk of cement contamination. Second, because it can require higher cement pumping pressure, a long string design can lead to the selection of lower cement volumes, lower densities, and lower pump rates. Third, the cement job at the bottom of a long string is more difficult to remediate than one at the bottom of a liner.

129 Internal BP document (BP-HZN-MBI 128489); BP, Deepwater Horizon *Accident Investigation Report*, 64 ("the BP Macondo well team did not ask for the OptiCem model to be re-run"). This may have been because of Mr. Guide's distrust of the OptiCem model. Testimony of John Guide, 275 ("it's wrong a lot"). When Halliburton rig personnel eventually informed Gagliano of BP's decision themselves, he responded by e-mailing BP modeling data suggesting again that more centralizers would be needed to prevent channeling. Internal BP document (BP-HZN-MBI 128708).

130 Testimony of Jesse Gagliano, 259; Testimony of Nathaniel Chaisson, 415.

131 BP, Deepwater Horizon *Accident Investigation Report*, 35. Mr. Guide disagreed with the BP report's conclusion in an interview with Commission staff. Guide, interview.

132 Internal BP document (BP-HZN-CEC 22670).

133 Ronald Sepulvado (BP), interview with Commission staff, September 1, 2010.

134 BP, Deepwater Horizon *Accident Investigation Report*, 66.

135 Fred Bartlit, letter to the National Commission, October 28, 2010 (reporting the results of cement testing).

136 If BP were looking, the one February test actually reported to BP could have prompted BP to question the design as well. BP argues that its failure to do so here is understandable given that it had hired one of the world's leading cementers specifically for purposes of designing and testing the cement slurry.

137 To the contrary, Halliburton's selection of conditioning time appears to have been haphazard at best. Lab personnel used different conditioning times (ranging from zero conditioning time to three hours) in each of the four foam stability tests that they conducted.

138 Internal Halliburton document (HAL_DOJ 43).

139 Testimony of Daun Winslow, 209; Guide, interview.

140 Moreover, once the BP Well Site Leaders and crew realized that the annular preventer was leaking, they should have circulated out any spacer that had migrated below the annular preventer prior to continuing with the test. Testi-

mony of John Smith, Hearing before the National Commission, November 9, 2010, 140–41.

[141] The Commission agrees with others that there is no such thing as a "bladder effect" that could account for the pressures the rig crew was observing. There was no apparent explanation for the 1400 psi on the drill pipe other than that the well was flowing.

[142] Transocean asserts that its personnel, including the driller and toolpusher, were not "in any way responsible for interpreting the negative pressure test or making the decision that the well was secure and work could properly proceed." Rachel Clingman, letter to Commission staff, November 16, 2010, 1. As the Commission's staff made clear at the November 8, 2010 hearing, the Commission is not tasked with deciding legal responsibility. Based on available evidence, however, Revette and Anderson agreed the negative-pressure test was a success and did not stop the job before moving on to the remaining temporary abandonment procedures. Testimony of Lee Lambert, 291; Internal BP documents  (BP-HZN-CEC 20347, 20178).

[143] Guide, interview.

[144] Benjamin Powell, "BP Response to Presidential Commission's Preliminary Technical Conclusions," letter to Commission staff, November 22, 2010, att. 1, 3 (citing Hearing Before the Senate Comm. on Energy and Natural Resources, 111th Cong. (May 11, 2010) (statement of Testimony of Tim Probert, Halliburton President, Global Business Lines, Chief Health, Safety and Environmental Officer)).

[145] Testimony of Mark Bly, 213; Testimony of Charlie Williams, Hearing before the National Commission, November 9, 2010, 45.

[146] Testimony of Steve Lewis, 54, 124. BP argues that "[t]he use of additional mechanical plugs would have brought its own additional risks." Powell, letter, att. 1, 6 (citing API, *Recommended Practice 65—Part 2* (May 2010), § 3.1); Guide, interview. However, BP does not present any evidence that the Macondo team in fact evaluated those risks or compared them with the risks of setting a single surface cement plug in seawater 3,300 feet below the mud line.

[147] Merrick Kelley (BP), interview with Commission staff, October 22, 2010; Industry expert, interview.

[148] BP asserts that "[u]sing drill collars would have required unracking the drill pipe on the rig and then locating and re-racking drill collars—a set of additional operations with attendant risks." Powell, letter, att. 1, 5. BP does not provide any evidence to substantiate the extent of such "attendant risks" or whether they outweighed the risks of the procedure BP chose. Most significantly, BP offers no evidence that its Macondo team ever considered such risks or performed a rigorous comparative risk analysis.

[149] Internal BP document (BP-HZN-CEC 8574).

[150] Testimony of Mark Bly, 308. BP has suggested that the float valves provided an additional barrier to flow. BP, Deepwater Horizon Accident Investigation Report, 68. The Commission does not agree that float valves, even when converted, constitute a distinct physical barrier to flow, but instead reinforce the cement in the shoe track. Clawson, interview (indicating that Weatherford does not consider the float collar to be a barrier to hydrocarbons); API, *Recommended Practice 65—Part 2* (May 2010), §§ 3.4, 4.4.3 (float valves not included in the list of subsurface mechanical barriers; float equipment used to prevent cement from flowing back into the casing).

[151] Testimony of Darryl Bourgoyne, Hearing before the National Commission, November 9, 2010, 133.

[152] Testimony of Charlie Williams, 46–53.

[153] Testimony of Bill Ambrose, 380–84.

[154] Between 8:00 and 9:49 p.m., the crew was performing a number of other activities that may have further confounded the data or at least distracted the driller. The crew was emptying various tanks on the rig into the active pit system, including "trip tanks" and "sand traps," which may have masked increased flow out of the well into the active pit system. At 9:18 p.m., a valve on one of the pumps blew, and a number of crew members from the rig floor went to fix it. Finally, the crew was operating one or both of the cranes on the main deck, which could have affected flow-out and volume readings.

[155] Internal BP document (BP-HZN-OSC 5420).

[156] Guide, interview.

[157] *Ibid.*; Internal BP document (BP-HZN-MBI 193529–39).

[158] It appears that the chain of command and responsibilities at BP during the execute phase were not well-understood by the Macondo Engineering Team Leader. When asked during an interview who was responsible for designing or amending the temporary abandonment procedures, the Macondo Engineering Team Leader said he would need to look at the company's chart of roles and responsibilities. Walz, interview.

[159] Internal BP document (BP-HZN-MBI 117603).

[160] Internal BP document (BP-HZN-MBI 128542).

[161] Internal BP document (BP-HZN-OSC 6224).

[162] There is a dispute as to whether BP personnel called back to shore that evening to discuss the data observed during the negative-pressure test. The Commission staff has to date seen no direct evidence of such a call. The staff's investigation is ongoing.

[163] Internal BP document (BP-HZN-BLY 38354).

[164] Internal BP document (BP-HZN-BLY 38355).

165 Internal BP document (BP-HZN-BLY 38354).

166 Internal BP document (BP-HZN-BLY 38361).

167 *Ibid.*

168 Internal BP document (BP-HZN-BLY 38362).

169 Internal Transocean document (TRN-PC 3227).

170 Transocean states that on April 5, 2010, it posted a short, two-page version of this advisory to an internal electronic document platform, which supervisors on the *Deepwater Horizon* had access to. But the advisory was limited to completion operations, and, as of this writing, Transocean has not offered any evidence that anyone on the rig actually saw or reviewed the advisory.

171 The industry and the international community also failed to adequately communicate lessons learned from the Montara blowout, which for ten weeks beginning on August 21, 2009 spewed between 400 and 1500 barrels per day of oil and gas into the Timor Sea approximately 150 miles off the northwest coast of Australia. David Borthwick, *Report of the Montara Commission of Inquiry* (The Montara Commission of Inquiry, Australia, June 2010), 5, 26. According to the *Report of the Montara Commission of Inquiry*, released on November 24, 2010, many of the technical and managerial causes of the Montara blowout track those at Macondo. For instance, the Commission of Inquiry concluded that the cement job in the "9 5/8" casing shoe failed, that there were numerous risk factors surrounding the cement job that went unheeded, and that the cement job was not properly pressure tested. *Ibid.*, 7. According to the Commission of Inquiry:

> The multiple problems in undertaking the cement job—such as the failure of the top and bottom plugs to create a seal after "bumping," the failure of the float valves and an unexpected rush of fluid—should have raised alarm bells. Those problems necessitated a careful evaluation of what happened, the instigation of pressure testing and, most likely, remedial action. No such careful evaluation was undertaken. The problems were not complicated or unsolvable, and the potential remedies were well known and not costly. This was a failure of "sensible oilfield practice 101."

*Ibid.* The Commission of Inquiry went on to conclude that while the "absence of tested barriers was a proximate cause of the Blowout," the deeper failure was a systemic failure of management on the part of the operator, PTTEP Australasia. *Ibid.*, 9.

172 Testimony of Rex Tillerson, Hearing before the National Commission, November 9, 2010, 250–52; Testimony of Marvin Odum, Hearing before the National Commission, November 9, 2010, 278–79.

173 30 C.F.R. § 250.1721(d).

174 30 C.F.R. § 250.141(a).

175 Internal BP document (BP-HZN-OSC 1436).

176 Internal BP document (BP-HZN-MBI 127906). MMS approved a number of other requests by BP for deviations on the Macondo well. None of those other approvals appear to have contributed to the blowout. However, they do suggest that the MMS staff did not spend much time deciding whether to grant the requests, which may have been due to the severe funding and staffing shortages in the New Orleans office.

## Chapter Five

1 Brady Dennis and Shailagh Murray, "GOP Changes Tone on Financial Bill," *Washington Post*, April 21, 2010; Edward Wyatt and David M. Herszenhorn, "Bill on Finance Wins Approval of Senate Panel," *New York Times*, April 22, 2010; Jim Puzzanghera, "In N.Y., Obama to Push for Financial Overhaul," *Los Angeles Times*, April 22, 2010; Adam Liptak, "Justices Reject Ban on Depicting Animal Cruelty," *New York Times*, April 21, 2010; Joan Biskupic, "High Court Negates Animal Cruelty Law as Too Broad, 8-1" *USA Today*, April 21, 2010; Jess Bravin, "Court Voids Law on Animal Cruelty," *Wall Street Journal*, April 21, 2010; Bart Barnes, "A Movement's Matriarch," *Washington Post*, April 21, 2010; Andrew Zajac and Melissa Healy, "FDA Puts the Pinch on Salt," *Los Angeles Times*, April 21, 2010.

2 Neil MacFarquhar, "Routine Flights Become Overland Odysseys, Minus Clean Socks," *New York Times*, April 22, 2010.

3 Campbell Robertson, "11 Remain Missing After Oil Rig Explodes Off Louisiana," *New York Times*, April 22, 2010.

4 Rick Jervis, "Gulf Blast Appears to be 'Blowout'," *USA Today*, April 22, 2010; Ben Casselman, Russell Gold, and Angel Gonzalez, "Blast Jolts Oil World," *Wall Street Journal*, April 22, 2010.

5 Jervis, "Gulf Blast Appears to be 'Blowout.'"

6 Richard Fausset, "Oil Rig Explodes; 11 Missing," *Los Angeles Times*, April 22, 2010.

7 40 C.F.R. § 300, Subpart D.

8 Paul Purpura et al., "Search continues for 11 missing in rig blast," *Times-Picayune*, April 22, 2010.

9 Paul Rioux and Chris Kirkham, "Search for 11 Workers Missing After Oil Rig Explosion Is Expected To Be Called Off Friday," *Times-Picayune*, April 22, 2010.

10 Testimony of Captain James Hanzalik, Hearing Before the Deepwater Joint Investigation Team, October 4, 2010, 29–30.

[11] 40 C.F.R. § 300.305(c).

[12] Press Release, White House, Statement by the Press Secretary on the President's Oval Office Meeting to Discuss the Situation in the Gulf of Mexico, April 22, 2010.

[13] 40 C.F.R. § 300.175(b).

[14] Leslie Kaufman, "Search Ends for Missing Oil Rig Workers," *New York Times*, April 23, 2010.

[15] Press Release, Unified Command, Unified Command Continues to Respond to Deepwater Horizon, April 25, 2010.

[16] Interview with Coast Guard official, August 27, 2010.

[17] BP, *Initial Exploration Plan*, Mississippi Canyon Block 252 (February 23, 2009), § 2.6.

[18] Doug Suttles, interview with Commission staff, October 13, 2010; Interviews with Minerals Management Service officials, October 15, 2010; Interview with well control expert, October 14, 2010.

[19] Press Release, BP, Work Begins To Drill Relief Well To Stop Oil Spill, May 4, 2010; White House, Ongoing Response Timeline, May 17, 2010; David Hayes, memo to Commission staff, November 12, 2010.

[20] Joe Stephens and Mary Pat Flaherty, "Oil Industry Cleanup Organization Swamped by BP Spill," *Washington Post*, June 29, 2010.

[21] The Response Group on behalf of BP, *Regional Oil Spill Response Plan–Gulf of Mexico* (June 30, 2009), App. H: 40.

[22] Jonathan Ramseur, *Oil Spills in U.S. Coastal Waters: Background, Governance, and Issues for Congress* (Congressional Research Service, 2008), 2.

[23] Joint Industry Oil Spill Preparedness and Response Task Force, *Joint Industry Recommendations to Improve Oil Spill Preparedness and Response* (September 3, 2010), V-3, V-5; Henry Fountain, "Advances in Oil Spill Cleanup Lag Since Valdez," *New York Times*, June 24, 2010.

[24] Sarah L. Milton et al., "Obituary Peter L. Lutz," *Journal of Experimental Biology* 208 (2005): 2817–18; *Regional Oil Spill Response Plan–Gulf of Mexico* App. F:19, § 11:7, App. E.

[25] Opening Statement of Chairman Edward Markey, "Drilling Down on America's Energy Future: Safety, Security, and Clean Energy," Hearing Before the House Committee on Energy and Commerce, Subcommittee on Energy and Environment, 111th Congress (June 15, 2010).

[26] Interview with NOAA scientist, August 20, 2010; Interview with NOAA scientist, October 13, 2010.

[27] NOAA Scientist, *Estimation of the Oil Released from Deepwater Horizon Incident*, April 26, 2010; Mark Miller, e-mail to Martha Garcia, June 14, 2010.

[28] Interview with NOAA scientist, August 30, 2010; Interview with NOAA scientist, October 13, 2010.

[29] Press Conference, Admiral Mary Landry and Doug Suttles, New Orleans, LA, April 28, 2010.

[30] Press Release, Deepwater Horizon Incident Joint Information Center Update: The Ongoing Administration-Wide Response to the BP Deepwater Horizon Oil Spill, July 15, 2010.

[31] Paul Purpura, "Guard Troops Going Home," *Times-Picayune*, October 21, 2010.

[32] 40 C.F.R. § 300.322(b).

[33] 40 C.F.R. § 300.305(d).

[34] Clifford Krauss, "Oil Spill's Blow to BP's Image May Eclipse Its Cost," *New York Times*, April 29, 2010.

[35] Office of Science and Technology, *First Report of the President's Panel on Oil Spills* (1969), 9.

[36] Interview with well control expert, October 14, 2010.

[37] Transcript, Office of the Press Secretary, Press Briefing on the BP Oil Spill in the Gulf Coast, April 29, 2010.

[38] Transcript, State of the Union with Candy Crowley, CNN, May 2, 2010.

[39] 40 C.F.R. § 300.323; Campbell Robertson, "White House Takes a Bigger Role in the Oil Spill Cleanup," *New York Times*, April 29, 2010.

[40] 40 C.F.R. § 300.5.

[41] 40 C.F.R. § 300.323(c).

[42] Interview with Coast Guard official, November 12, 2010.

[43] Press Release, Deepwater Horizon Incident Joint Information Center, Coast Guard Commandant Admiral Thad Allen Designated National Incident Commandant For Continued Response To BP Oil Spill, May 1, 2010.

[44] Thom Shanker, "Commander Accustomed to Scrutiny and Crises," *New York Times*, September 10, 2005; Matthew L. Wald, "A New, Experienced Protector for Navy in Home Waters," *New York Times*, November 9, 2001; Elizabeth Bumiller, "Casualty of Firestorm: Outrage, Bush, and FEMA Chief," *New York Times*, September 10, 2005.

[45] Editorial, "Allen Candid About Recovery," *Advocate*, December 11, 2005.

[46] Jim Tankersley, "The Government's 'Rock Star' in Charge of the Oil Spill," *Los Angeles Times*, June 1, 2010.

[47] Testimony of Harry Thierens, Hearing before the Deepwater Horizon Joint Investigation Team, August 25, 2010, 104–5.

[48] Henry Fountain, "Notes from Wake of Blowout Outline Obstacles and Frustration," *New York Times*, June 21, 2010; Non-public BP document, May 6, 2010.

[49] Testimony of Harry Thierens, 106.

[50] Government science advisor, e-mail to Commission staff, October 7, 2010; Testimony of William Stringfellow, Hearing before the Deepwater Horizon Joint Investigation Team, August 25, 2010, 352.

[51] BP, Deepwater Horizon *Accident Investigation Report* (September 8, 2010), 150.

[52] Non-public BP document, May 7, 2010.

[53] David Barstow et al., "Regulators Failed to Address Risks in Oil Rig Fail-Safe Device," *New York Times*, June 20, 2010; Interview with senior administration official, November 8, 2010.

[54] FEMA, "Disasters Declared by Year or State," http://www.fema.gov/news/disaster_totals_annual.fema.

[55] 42 U.S.C. §§ 5121–5206.

[56] 40 C.F.R. § 300.105(c)(3).

[57] Interview with government official, August 24, 2010.

[58] Press Release, Office of the Governor, Governor Jindal Issues State Declaration of Emergency for Oil Leak, April 29, 2010.

[59] Press Release, Governor Barbour Issues State of Emergency for Mississippi Gulf Coast, April 30, 2010; Press Release, Gov. Riley Declares State of Emergency to Prepare for Oil Approaching Alabama Coast, April 30, 2010; State of Florida, Office of the Governor, Executive Order Number 10-99 (Emergency Management—Deepwater Horizon), April 30, 2010.

[60] Interview with government official, August 24, 2010; Interview with government official, September 13, 2010; Interview with government official, September 15, 2010.

[61] Interview with Coast Guard official, August 31, 2010.

[62] Interview with BP official, October 22, 2010; Interview with government official, October 5, 2010; Interview with government official, August 24, 2010; Interview with Coast Guard official, August 25, 2010.

[63] La. Rev. Stat. § 29: 727.

[64] Interview with government official, October 8, 2010.

[65] Interview with Coast Guard official, October 20, 2010.

[66] Interview with government official, October 8, 2010; Interview with government official, October 14, 2010.

[67] Testimony of Admiral Thad Allen, National Incident Commander, Hearing before the National Commission, September 27, 2010.

[68] Press Release, In Precautionary Move, LDWF and DHH Announce Closures Due to Oil Spill, April 30, 2010; Press Release, Alabama Department of Conservation and Natural Resources, Some State Waters Closed to Fishing, June 2, 2010; Press Release, Mississippi Department of Marine Resources, Revised Precautionary Closure: Portions of Mississippi Marine Waters Reopen to Commercial and Recreational Fishing, June 4, 2010; Florida Fish and Wildlife Conservation Commission, Order No. EO 10-29, Emergency Closure of State Waters of the Gulf of Mexico in response to the Deepwater Horizon Oil Spill, June 13, 2010.

[69] NOAA, Office of Response and Restoration, *Oil Forecast Outlook* (April 23, 2010).

[70] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Emergency Fisheries Closure in the Gulf of Mexico Due to the Deepwater Horizon Oil Spill, 75 Fed. Reg. 24,822 (May 6, 2010); NOAA Fisheries Service, *Deepwater Horizon/ BP Oil Spill: Size and Percent Coverage of Fishing Closures Due to BP Oil Spill* (November 15, 2010), http://sero.nmfs.noaa.gov/ClosureSizeandPercentCoverage.htm.

[71] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Amendment to Emergency Fisheries Closure in the Gulf of Mexico Due to the Deepwater Horizon Oil Spill, 75 Fed. Reg. 26,679 (May 12, 2010); NOAA, Deepwater Horizon/BP Oil Spill: Size and Percent Coverage of Fishing Closures Due to BP Oil Spill.

[72] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Emergency Fisheries Closures in the Southeast Region Due to the Deepwater Horizon Oil Spill; Amendment 2, 75 Fed. Reg. 27,217 (May 14, 2010).

[73] NOAA, *Deepwater Horizon/BP Oil Spill: Size and Percent Coverage of Fishing Closures Due to BP Oil Spill.*

[74] Interview with government official, October 12, 2010.

[75] BP, "Factsheet on BP Vessels of Opportunity Program" (July 7, 2010), 4, http://www.bp.com/liveassets/bp_internet/globalbp/globalbp_uk_english/incident_response/STAGING/local_assets/downloads_pdfs/factsheet_bp_vessels_of_opportunity_program.pdf.

[76] National Incident Command, *National Incident Commander Strategy Implementation Plan Version 5.0* (2010), 474–75.

77 BP, Factsheet on BP Vessels of Opportunity Program, 2.

78 Bruce Nolan, "Many Vietnamese fishers isolated by language from oil spill aid," *Times–Picayune*, May 7, 2010; Mireya Navarro, "Spill Takes Toll on Gulf Workers' Psyches," *New York Times*, June 16, 2010; Jessica Ravitz, "Vietnamese Fishermen in Gulf Fight to Not Get Lost in Translation," CNN, June 25, 2010.

79 BP, Factsheet on BP Vessels of Opportunity Program 5.

80 Interview with BP official, October 22, 2010.

81 40 C.F.R. § 300.150.

82 Rebecca Bratspies et al., *From Ship to Shore: Reforming the National Contingency Plan to Improve Protections for Oil Spill Cleanup Workers* (Center for Progressive Reform, September 2010), 8–9.

83 Interview with responder, November 17, 2010; Bryan Walsh, "Assessing the Health Effects of the Oil Spill," *Time*, June 25, 2010.

84 Scott Deitchman, interview with Commission staff, November 29, 2010.

85 Nicole Lurie, interview with Commission staff, October 6, 2010.

86 *Ibid.*

87 Deitchman, interview; Lurie, interview; *Strategy Implementation Plan*, 252.

88 Molly Reid, "Only One Oil-slicked Bird Rescued so far from Gulf of Mexico Oil Spill," *Times–Picayune*, April 30, 2010.

89 U.S. Fish and Wildlife Service, "Cumulative Impacts to Wildlife and Actions to Protect Wildlife in the Gulf of Mexico" (November 25, 2010), http://www.fws.gov/home/dhoilspill/pdfs/CumulativeImpactsBP.pdf.

90 U.S. Fish and Wildlife Service, "Oil Spill Response" (May 2010), http://www.fws.gov/home/dhoilspill/pdfs/OilSpill-FactSheet.pdf.

91 Michele Wilson, "Oil Spill Update: Two More Birds Recovering, BP and Other Execs Point Fingers, and More," *Audubonmagazine.org*, May 12, 2010.

92 Interview with wildlife responder, October 26, 2010; Interview with representatives of wildlife organizations, October 15, 2010.

93 Craig Pittman, "Bird rescue experts kept on sideline after gulf oil spill," *St. Petersburg Times*, September 5, 2010; Interview with wildlife responder, October 26, 2010.

94 Testimony of Kevin Costner, "Deluge of Oil Highlights Research and Technology Needs for Effective Cleanup of Oil Spills," Hearing Before the House Committee on Science and Technology, 111th Congress (June 9, 2010); Fountain, "Advances in Oil Spill Cleanup Lag Since Valdez."

95 Press Release, Deepwater Horizon Joint Information Center, New Effort to Collect; Review Oil Spill Response Solutions Announced, June 4, 2010.

96 Commander Todd Offutt, e-mail to Commission staff, November 17, 2010.

97 Interview with Coast Guard official, September 2, 2010.

98 White House Office of the Press Secretary, Press Briefing by Press Secretary Robert Gibbs and National Incident Commander Thad Allen, July 1, 2010; U.S. Department of State, Deepwater Horizon Oil Spill Response: International Offers of Assistance from Governments and International Bodies Chart, June 18, 2010.

99 46 U.S.C. § 688.

100 Interview with Coast Guard officials, August 3, 2010; API Joint Oil Spill Preparedness and Response Task Force, interview with Commission staff, October 12, 2010; Scott Segal and Kevin Ewing, interview with Commission staff, October 14, 2010; H. Clayton Cook Jr., Letter to the Editor, "Don't Blame Delays on Jones Act," *Wall Street Journal*, July 20, 2010; U.S. Department of Homeland Security, Jones Act Fact Sheet (July 6, 2010), http://www.deepwaterhorizonresponse.com/external/content/document/2931/784459/1/USCG-Jones%20Act.pdf.

101 U.S. Department of Homeland Security, Jones Act Fact Sheet; Press Release, Deepwater Horizon Joint Information Center, Admiral Allen Provides Guidance to Ensure Expedited Jones Act Waiver Processing Should It Be Needed, June 15, 2010.

102 Non-public Coast Guard documents, June 29, 2010, June 30, 2010, and July 9, 2010.

103 Coastal Response Research Center, *Research & Development Needs for Making Decisions Regarding Dispersing Oil* (April 2006), 1.

104 Ramon Antonia Vargas, "Oil is Leaking from Well at Deepwater Horizon Explosion Site," *Times–Picayune*, April 24, 2010.

105 Interview with Coast Guard official, October 29, 2010.

106 National Research Council, Committee on Understanding Oil Spill Dispersants, *Oil Spill Dispersants: Efficacy and Effects* (2005), 2.

107 Coastal Response Research Center, 1.

108 National Research Council, *Oil Spill Dispersants*, 196, 274.

[109] Merv Fingas, *A Review of Literature Related to Oil Spill Dispersants, 1997–2008* (September 2008), 18 http://www.pwsrcac.org/docs/d0053000.pdf.

[110] *Ibid.*, 25.

[111] Non-public Coast Guard document, April 23, 2010.

[112] RRT-6, *FOSC Dispersant Pre-Approval Guidelines And Checklist* (2001), iii–iv, http://www.losco.state.la.us/pdf_docs/RRT6_Dispersant_Preapproval_2001.pdf; Region IV Regional Response Team Response and Technology Committee Dispersant Workgroup, *Use of Dispersants in Region IV* (1996), ii–1, http://www.nrt.org/production/NRT/RRTHome.nsf/Resources/DUP/$file/1-RRT4DISP.PDF.

[113] 40 C.F.R. § 300.910(a).

[114] S.L. Ross Environmental Research, Ltd., *Technology Assessment of the Use of Dispersants on Spills from Drilling and Production Facilities in the Gulf of Mexico Outer Continental Shelf* (December 2000), Summary–1; Robert J. Fiocco and Alun Lewis, "Oil Spill Dispersants," 1 *Pure Applied Chemistry* (1999): 31.

[115] 40 C.F.R. § 300.910(b).

[116] Figures on the volume of dispersant use are either taken directly from, or calculated based on data in, the Operations and Ongoing Response daily reports for the Deepwater Horizon Response, available at www.restorethegulf.gov.

[117] 40 C.F.R. § 300.915 (a)(8).

[118] David Biello, "Is Using Dispersants on the BP Gulf Oil Spill Fighting Pollution with Pollution?" *Scientific American*, June 18, 2010.

[119] 40 C.F.R. § 300.915; 40 C.F.R. Part 300 Appendix C.

[120] National Research Council, *Oil Spill Dispersants*, 68–69; Samuel K. Skinner and William K. Reilly, *The Exxon Valdez Oil Spill: A Report to the President* (May 1989), 17, App. A.

[121] David Hammer, "BP Clashes with Critics on Gulf of Mexico Oil Crisis Response," *Times-Picayune*, May 31, 2010.

[122] Elana Schor, "BP Continues to Use Surface Dispersants in Gulf Despite EPA Directive," *New York Times*, June 24, 2010.

[123] Ernest Scheyder, "Nalco CEO on Gulf Coast to Defend Dispersant," *Reuters*, June 3, 2010.

[124] Interview with NOAA scientist, October, 21, 2010; Testimony of Lisa Jackson, Hearing before the National Commission, September 27, 2010.

[125] Dana Tulis and Mathy Stanislaus, interview with Commission staff, October 1, 2010.

[126] Kenneth Meade, e-mail to Commission staff, September 27, 2010.

[127] Tim Webb, "BP Boss Tony Hayward Admits Job is on the Line Over Deepwater Oil Spill," *The Guardian*, May 14, 2010.

[128] Tulis and Stanislaus, interview.

[129] EPA, *Dispersant Monitoring and Assessment Directive for Subsurface Dispersant Application*, May 10, 2010; EPA, *Dispersant Monitoring and Assessment Directive for Subsurface Dispersant Application—Addendum 1*, May 14, 2010; EPA, *Dispersant Monitoring and Assessment Directive*, May 20, 2010; EPA, *Dispersant Monitoring and Assessment Directive—Addendum 3*, May 26, 2010.

[130] Testimony of Lisa Jackson, September 27, 2010.

[131] Richard Lynch, interview with Commission staff, October 13, 2010; Suttles, interview.

[132] Press Release, BP, Work Begins to Drill Relief Well to Stop Oil Spill, May 4, 2010.

[133] Press Release, White House, The Ongoing Administration-Wide Response to the Deepwater BP Oil Spill, May 6, 2010; "Deepwater Team Attempts To Put 100-Tonne Box over Blown-out Oil Well," *Associated Press*, May 7, 2010; Matthew Bigg, "Oil From Gulf Spill Creeps Ashore in Louisiana," *Reuters*, May 6, 2010.

[134] Ian Urbina, Justin Gillis, and Clifford Krauss, "On Defensive, BP Readies Dome to Contain Spill," *New York Times*, May 3, 2010.

[135] Suttles, interview; Lynch, interview.

[136] Non-public BP document, May 7, 2010.

[137] Interview with well control expert, October 14, 2010; Interview with drilling expert, October 1, 2010.

[138] Lynch, interview.

[139] Campbell Robertson, "New Setback in Attempt to Contain Gulf Oil Spill," *New York Times*, May 8, 2010.

[140] Lynch, interview.

[141] Clifford Krauss, Henry Fountain, and John M. Broder, "Acrimony Behind the Scenes of Gulf Oil Spill," *New York Times*, August 26, 2010.

[142] Interview with U.S. Geological Survey official, October 21, 2010.

143 Suttles, interview.

144 Interview with U.S. Geological Survey official, October 21, 2010; Interview with Minerals Management Service official, October 15, 2010; Interview with well control expert, October 14, 2010.

145 Sam Dolnick and Henry Fountain, "Unable to Stanch Oil, BP Will Try To Gather It," *New York Times*, May 5, 2010.

146 Clifford Krauss and Michael Cooper, "Cap Slows Gulf Oil Leak as Engineers Move Cautiously," *New York Times*, June 5, 2010.

147 Lynch, interview.

148 Jeremy Hsu, "Why Don't We Just Drop a Nuclear Bomb on the Gulf Oil Spill?" *Christian Science Monitor*, May 13, 2010.

149 Testimony of Richard Camilli, "Sizing up the BP Oil Spill: Science and Engineering Measuring Methods," Briefing Before the Subcommittee on Energy and Environment of the House Committee on Energy and Commerce, 111th Congress (May 19, 2010).

150 John Amos, "Gulf Oil Spill Rate Must Be Much Higher Than Stated—6 Million Gallons So Far?", Skytruth.org, April 27, 2010, http://blog.skytruth.org/2010/04/gulf-oil-spill-rate-must-be-much-higher.html; John Amos, "Gulf Oil Spill—Bigger Than Exxon Valdez," Skytruth.org, April 28, 2010, http://blog.skytruth.org/2010/04/gulf-oil-spill-bigger-than-exxon-valdez.html; John Amos, "Gulf Oil Spill—New Spill Calculation—Exxon Valdez Surpassed Today," Skytruth.org, May 1, 2010,http://blog.skytruth.org/2010/05/gulf-oil-spill-new-spill-rate.html.

151 Richard Harris, "Gulf Spill May Far Exceed Official Estimates," National Public Radio, May 14, 2010, http://www.npr.org/templates/story/story.php?storyId=126809525.

152 Testimony of Steven Wereley (Professor, Purdue University), "Sizing up the BP Oil Spill: Science and Engineering Measuring Methods," Briefing Before the Subcommittee on Energy and Environment of the House Committee on Energy and Commerce, 111th Congress (May 19, 2010).

153 Harris, "Gulf Spill May Far Exceed Official Estimates."

154 Transcript, Marcia McNutt, Deepwater Blowout Containment Conference, September 22, 2010.

155 Press Release, Deepwater Horizon Incident Joint Information Center, Flow Rate Group Provides Preliminary Best Estimate of Oil Flowing From BP Oil Well, May 27, 2010.

156 Marcia McNutt, *Summary Preliminary Report from the Flow Rate Technical Group* (June 2, 2010).

157 Admiral Thad Allen, letter to Honorable Edward J. Markey, October 1, 2010, 12.

158 Press Release, U.S Department of Energy, Secretary Salazar and Secretary Chu To Meet with Scientists and Engineers at BP Houston Command Center, May 11, 2010.

159 Interview with U.S. Department of Energy official, November 8, 2010; Interview with government science advisor, October 5, 2010; Interview with government science advisor, October 6, 2010.

160 Kenneth Chang and Andrew Revkin, "At a Sleek Bioenergy Lab, a Lens on a Cabinet Pick," *New York Times*, December 22, 2008.

161 Paul Tooms, interview with Commission staff, October 13, 2010; Interviews with Minerals Management Service officials, October 15, 2010; Interview with Coast Guard official, October 18, 2010.

162 Interview with U.S. Department of Energy official, November 8, 2010; Interview with Coast Guard official, October 18, 2010; Interview with government science advisor, October 5, 2010.

163 Interview with government science advisor, October 1, 2010; Interview with U.S. Department of Energy scientist, October 26, 2010.

164 "Leno: 'Junk Shot,'" *New York Times*, June 1, 2010.

165 Campbell Robertson, Clifford Krauss, and John M. Broder, "Oil Hits Home, Spreading Arc of Frustration," *New York Times*, May 24, 2010.

166 Lynch, interview.

167 Non-public U.S. Department of Energy document, May 17, 2010; Non-public U.S. Department of Energy document, May 19, 2010.

168 Tooms, interview.

169 Interview with U.S. Department of the Interior official, October 21, 2010.

170 Interview with government science advisor, October 6, 2010.

171 Non-public BP document, May 31, 2010.

172 Suttles, interview.

173 Interview with government science advisor, October 6, 2010; Suttles, interview; Tooms, interview.

174 Interview with Minerals Management Service official, October 15, 2010; Interview with well control expert, October 14, 2010.

175 Robertson, Krauss, and Broder, "Oil Hits Home, Spreading Arc of Frustration."

176 Mimi Hall, Rick Jervis, and Allen Levin, "Is Oil Spill Becoming Obama's Katrina?," *USA Today*, May 27, 2010.

177 Matthew Daly, "Month After Oil Spill, Why Is BP Still in Charge?," ABC News, May 21, 2010, http://abcnews.go.com/Business/wireStory?id=10713257.

178 Interview with Coast Guard official, November 12, 2010.

179 Frank McCormack, "Privateer Perfection," *Plaquemines Gazette*, June 7, 2010.

180 Paul Rioux, "President Barack Obama in Grand Isle after Touring Beach in Port Fourchon," *Times-Picayune*, May 28, 2010.

181 Paul Rioux, "President Barack Obama Promises No Retreat from Gulf of Mexico Oil Spill Response," *Times-Picauyne*, May 28, 2010.

182 Interview with Coast Guard official, August 26, 2010; Interview with Coast Guard official, September 2, 2010; Non-public Coast Guard document, June 14, 2010.

183 Jeffrey Ball and Jonathan Weisman, "Slippery Start: U.S. Response to Spill Falters," *Wall Street Journal*, June 16, 2010.

184 Interview with Coast Guard official, November 12, 2010.

185 Executive Order No. 13543, National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, 75 Fed. Reg. 29,397, May 21, 2010.

186 Peter Baker, "Obama Extends Moratorium; Agency Chief Resigns," *New York Times*, May 27, 2010.

187 Gardner Harris, "Minerals Management Service Director Resigns Over Spill," *New York Times*, May 27, 2010.

188 Mike Allen, "Gulf Commander to Begin Solo Briefings," *Politico*, May 31, 2010.

189 Interview with government official, October 8, 2010.

190 Interview with NOAA officials, November 18, 2010.

191 Interview with Coast Guard official, August 24, 2010; Interview with Coast Guard official, August 30, 2010.

192 Interview with Coast Guard official, August 24, 2010; Interview with Coast Guard official, August 31, 2010.

193 Non-public Coast Guard document, October 12, 2010.

194 Holbrook Mohr, Justin Pritchard, and Tamara Lush, "BP's Gulf Oil Spill Response Plan Lists the Walrus as a Local Species. Louisiana Gov. Bobby Jindal Is Furious.," *Christian Science Monitor*, June 9, 2010; Interview with Coast Guard official, Aug. 31, 2010.

195 Campbell Robertson, "Louisiana Officials Threaten Action if Spill Response Proves Inadequate," *New York Times*, May 23, 2010.

196 Craig Pittman and Rebecca Catalanello, "BP Plan to Protect Florida From Oil Spill Inadequate, Officials Say," *St. Petersburg Times*, May 3, 2010.

197 Interview with government official, October 13, 2010.

198 Non-public Coast Guard document, October 12, 2010.

199 Interview with government official, October 12, 2010.

200 Interview with Coast Guard official, August 30, 2010; Interview with government official, August 24, 2010.

201 Liz Robbins and Campbell Robertson, "Tension Among Officials Grows as Storm Nears," *New York Times*, July 23, 2010.

202 Angel Gonzalez, "Locals to BP: Don't Leave Town Yet," *Wall Street Journal*, Aug. 1, 2010; Interview with Coast Guard official, August 26, 2010.

203 Interview with Coast Guard official, August 25, 2010; Interview with Coast Guard official, October 24, 2010; Non-public Coast Guard document, June 14, 2010.

204 U.S. Department of Homeland Security, Summary of Ineligible PWs for Barrier Islands (November 11, 2010); Tod Wells, e-mail to Commission staff, November 8, 2010; Tim Padgett, "Dredge, Baby, Dredge: Can Sand Stop the Oil?," *Time*, June 1, 2010.

205 Van Oord and Deltares, *Save the Delta, The Dutch Perspective*, May 6, 2010; Chris Kirkham, "Gov. Bobby Jindal and Plaquemines Officials Float Plan to Rebuild Barrier Islands to Stop Encroaching Oil," *Times-Picayune*, May 8, 2010.

206 Interview with Coast Guard official, August 30, 2010; Mark Schleifstein, "Barrier Berm Advocates Not Deterred by Environmental Regulators' Misgivings," *Times-Picayune*, September 20, 2010.

207 Kristi Cantu, letter to Pete J. Serio, May 11, 2010.

208 Colonel Alvin Lee, interview with Commission staff, October 28, 2010.

209 Colonel Lee, interview; Press Release, Governor's Office of Homeland Security and Emergency Preparedness, Governor Jindal & Coastal Parish Leaders Meet with Army Corps of Engineers to Stress Importance of Approving Dredg-

ing Plan, May 17, 2010.

[210] Senator Mary Landrieu et al., letter to Colonel Alvin Lee and Admiral Thad Allen, May 20, 2010.

[211] Senator David Vitter, letter to President Barack Obama, May 21, 2010.

[212] Press Release, Army Corps of Louisiana, Corps Decision on State's Emergency Permit Request, May 27, 2010; Army Corps of Engineers, "New Orleans District Emergency Permit Request Action," June 1, 2010, http://www.mvn. usace.army.mil/pao/MVN1PR1June2010Final.pdf.

[213] Agency comments were compiled by the Army Corps of Engineers at http://www.mvn.usace.army.mil/news/ Emergency%20Permit%20Documents%20Compressed%20FINAL.pdf.

[214] Transcript, Press Briefing by National Incident Commander, June 2, 2010.

[215] Press Release, Deepwater Horizon Incident Joint Information Center, Admiral Allen Approves One Section of Louisiana Barrier Island Project Proposal as Part of Federal Oil Spill Response, May 27, 2010.

[216] NIC Decision Support Document Regarding Barrier Island Proposal Based Upon Interagency Solutions Group Discussion and Army Corps of Engineers NOD 20 Permit Discussions, May 17, 2010; Draft, Berm Construction and Spill Response, U.S. Department of Homeland Security, May 19, 2010; Berm Construction and Spill Response, U.S. Department of Homeland Security, May 25, 2010.

[217] Admiral Thad Allen, e-mail to Captain Mike White, May 22, 2010.

[218] Mark Schleifstein, "Sand Berm to Protect Barataria Bay Wetlands Gets Federal OK," *Times–Picayune*, May 27, 2010.

[219] Interview with Coast Guard official, November 12, 2010.

[220] Press Release, Governor's Office of Homeland Security and Emergency Preparedness, Governor Jindal: President Promised Sand-Boom Plan Progress in Days, Need Swift Action, May 28, 2010.

[221] Transcript, Anderson Cooper 360 Degrees, "BP Cleanup Sham; President Obama Visits Louisiana; Oystermen in Jeopardy," CNN, May 28, 2010.

[222] Transcript, Press Briefing by National Incident Commander Admiral Thad Allen, June 2, 2010.

[223] Bigad Shaban, "Upset Nungesser Walks Out on Coast Guard Meeting," www.ltv.com, June 1, 2010.

[224] National Incident Command, Summary of NIC Barrier Island Berm Meeting, June 1, 2010.

[225] Admiral Thad Allen, interview with Commission staff, November 2, 2010; Denise Reed, interview with Commission staff, November 16, 2010; Interview with Coast Guard official, November 12, 2010.

[226] Glenn Thrush, "Carville Doesn't Regret Ripping W.H.," *Politico*, June 2, 2010.

[227] Press Release, National Incident Command, National Incident Commander Admiral Allen Directs BP to Pay for Five Additional Barrier Island Projects in Louisiana, June 2, 2010.

[228] Mark Kaufman, "BP Says More La. Barrier Island Berms Will Cost $360 Million," *Washington Post*, June 3, 2010.

[229] William Grawe, e-mail to Admiral Thad Allen, June 2, 2010.

[230] "Shaw Group Wins Contract to Build Barrier Island Temporary Berms," *Times–Picayune*, June 4, 2010; Jeffrey Ball, "Accusations Fly in Sand-Berm Project," *Wall Street Journal*, October 12, 2010.

[231] Shaw's Environmental & Infrastructure Group, *Shaw Barrier Berm Project—Daily Report Day 43*, July 14, 2010.

[232] Sean Smith, e-mail to Juliette Kayyem, Department of Homeland Security, May 27, 2010.

[233] Tooms, interview.

[234] Interview with Coast Guard official, October 18, 2010; Interview with Minerals Management Service official, October 15, 2010.

[235] Internal BP document (BP-HZN-MBI 143338-50).

[236] Tooms, interview; Non-public BP document, May 31, 2010.

[237] Non-public BP document, May 29, 2010.

[238] Tooms, interview.

[239] Interview with Coast Guard official, October 18, 2010; Interview with U.S. Geological Survey official, October 21, 2010.

[240] Interview with U.S. Geological Survey official, October 21, 2010; Non-public government document, June 1, 2010.

[241] Interview with U.S. Geological Survey official, October 21, 2010; Interview with U.S. Department of Energy official, September 17, 2010.

[242] Non-public BP document, May 23, 2010; Non-public BP document, May 25, 2010; Daniel Squire, letter to Commission staff, November 2, 2010, att. 1, 2.

[243] Non-public BP document, May 31, 2010; Non-public BP document, May 29, 2010.

[244] Non-public BP document, May 31, 2010; Non-public BP document, May 29, 2010.

245 Lynch, interview.

246 Deepwater Horizon Response Joint Information Center, Ongoing Administration-Wide Response to the Deepwater BP Oil Spill, May 29, 2010; Press Release, BP, Update on Gulf of Mexico Oil Spill, May 29, 2010.

247 Helene Cooper and Peter Baker, "U.S. Opens Criminal Inquiry into Oil Spill," *New York Times*, June 1, 2010.

248 "BP Chief Hopes Cap Will Capture Most of Gulf Oil," *Reuters*, June 6, 2010.

249 Doug Suttles, letter to Admiral James Watson, June 9, 2010 (suggesting that with the *Clear Leader* attached to the kill line, BP could collect 5–10,000 barrels per day).

250 Lisa Jackson, EPA Conference Call on Dispersant Use in the Gulf of Mexico with U.S. Coast Guard Rear Admiral Landry, May 24, 2010.

251 EPA, *Dispersant Monitoring and Assessment Directive—Addendum 3*, May 26, 2010.

252 Dana Tulis, e-mail to Admiral James Watson, June 7, 2010.

253 Captain James Hanzalik, e-mail to Captain Anthony Lloyd, June 8, 2010.

254 Admiral James Watson, e-mail to Dana Tulis, et al., June 7, 2010; Dana Tulis, e-mail to Admiral James Watson, June 7, 2010.

255 Captain James Hanzalik, e-mail to Captain Anthony Lloyd, June 8, 2010.

256 Dana Tulis, e-mail to Admiral James Watson, June 8, 2010.

257 Mathy Stanislaus, e-mail to Admiral James Watson, July 9, 2010, att.

258 Stanislaus, interview.

259 Charles Huber, e-mail to Commander William Carter and Captain Roger Laferriere, July 13, 2010.

260 Mathy Stanislaus, e-mail to Admiral Paul Zukunft, July 13, 2010.

261 Admiral Paul Zukunft, e-mail to Mathy Stanislaus, July 14, 2010.

262 EPA, "July 11-14 Dispersant Request Summary," (provided to Commission staff October 21, 2010).

263 Matthew L. Wald, "Despite Directive, BP Used Dispersant Often, Panel Finds," *New York Times*, July 31, 2010; "Allen 'Satisfied' with Dispersant Use in Gulf Oil Disaster," CNN, August 2, 2010.

264 Interview with U.S. Department of Energy official, October 25, 2010; Interview with Coast Guard official, October 18, 2010.

265 Interview with U.S. Geological Survey official, October 21, 2010; Interview with U.S. Department of Energy official, October 25, 2010; Interview with U.S. Department of Energy official, October 26, 2010.

266 Interview with U.S. Department of Energy official, November 8, 2010.

267 Interview with U.S. Geological Survey official, October 21, 2010.

268 Tooms, interview.

269 Interview with U.S. Department of Energy official, November 8, 2010.

270 Interview with industry expert, October 14, 2010.

271 Interview with U.S. Geological Survey official, October 21, 2010.

272 Secretary Steven Chu, e-mail to Arun Majumdar and others, June 18, 2010; Admiral James Watson, letter to Doug Suttles, June 19, 2010.

273 Suttles, interview; Tooms, interview.

274 Daniel Squire, letter to Commission staff, November 2, 2010, att. 3; Lynch, interview; Tooms, interview; Non-public U.S. Department of Energy document, July 6, 2010.

275 Interview with U.S. Geological Survey official, October 20, 2010; Non-public government science advisor document, July 2, 2010; Interview with industry expert, October 14, 2010.

276 Admiral Thad Allen, letter to Bob Dudley, July 9, 2010.

277 Suttles, interview.

278 Admiral Thad Allen, letter to Bob Dudley, July 12, 2010.

279 Interview with U.S. Department of Energy official, October 26, 2010; Interview with industry expert, October 28, 2010.

280 Interview with U.S. Department of Energy official, November 8, 2010; Non-public government science advisor document, July 13, 2010.

281 Statement from National Incident Commander Admiral Thad Allen on Well Integrity Test, July 13, 2010.

282 Interview with U.S. Department of Energy official, November 8, 2010.

283 Admiral Thad Allen, letter to Bob Dudley, July 14, 2010.

284 Interviews with U.S. Geological Survey official, October 20, 2010; Non-public U.S. Department of Energy document, July 11, 2010.

285 Non-public government document, July 11, 2010; Interview with U.S. Department of Energy official, October 25, 2010.

286 Campbell Robertson and Henry Fountain, "BP Says Oil Flow Has Stopped as Cap Is Tested," *New York Times*, July 15, 2010.

287 Interview with U.S. Department of Energy official, November 8, 2010; Non-public U.S. Department of Energy document, July 16, 2010; Non-public government science advisor document, July 15, 2010.

288 Interview with U.S. Department of Energy official, October 26, 2010; Interview with Minerals Management Service official, October 15, 2010; Interview with U.S. Department of Energy official, October 21, 2010; Non-public government science document, July 15, 2010.

289 Interview with U.S. Department of Energy official, October 25, 2010; Interview with U.S. Department of Energy official, October 26, 2010; Interview with U.S. Geological Survey official, October 21, 2010.

290 Interview with Coast Guard official, October, 18, 2010; Interview with U.S. Geological Survey official, October 21, 2010.

291 Non-public U.S. Department of Energy document, June 30, 2010.

292 Interview with U.S. Geological Survey official, October 21, 2010; Interview with U.S. Geological Survey official, October 21, 2010.

293 Tooms, interview; Interview with U.S. Geological Survey official, October 21, 2010; Interview with U.S. Geological Survey official, October 21, 2010.

294 Interview with U.S. Geological Survey official, October 21, 2010.

295 Transcript, Press Briefing by National Incident Commander Admiral Thad Allen and NOAA Administrator Dr. Jane Lubchenco, July 24, 2010.

296 Bob Dudley, letter to Admiral Thad Allen, July 19, 2010.

297 Pat Campbell, letter to Richard Lynch, July 28, 2010; Henry Fountain, "Expert is Confident about Sealing Oil Well," *New York Times*, May 24, 2010; Interview with industry expert, October 14, 2010.

298 Transcript, Press Briefing by National Incident Commander Admiral Thad Allen, August 2, 2010.

299 Press Release, BP, Static Kill Injectivity Testing Commences on MC252 Well, August 3, 2010; Non-public U.S. Department of Energy document, August 3, 2010.

300 Press Release, BP, MC252 Well Reaches Static Condition; Well Monitoring Underway, August 4, 2010.

301 Statement by National Incident Commander Admiral Thad Allen, August, 4 2010.

302 Face the Nation, CBS News, August 8, 2010.

303 *Deepwaer Horizon MC252 Gulf Incident Oil Budget* (August 4, 2010); Jane Lubchenco et al., *BP Deepwater Horizon Oil Budget: What Happened to the Oil?* (August 4, 2010).

304 *Deepwater Horizon MC252 Gulf Incident Oil Budget*, 1.

305 Heather Zichal, e-mail to Jane Lubchenco, July 29, 2010.

306 Jane Lubchenco, e-mail to Sean Smith and others, August 4, 2010.

307 Margaret Spring, e-mail to Heather Zichal and others. July 30, 2010.

308 Transcript, Press Briefing by Press Secretary Robert Gibbs, Admiral Thad Allen, Carol Browner, and Dr. Lubchenco, August 4, 2010.

309 David A. Fahrenthold, "Scientists Question Government Team's Report of Shrinking Gulf Oil Spill," *Washington Post*, August 5, 2010; Katie Howell, "White House, Critics Reach Stalemate in Dispute Over Oil Budget in Gulf," *New York Times*, August 23, 2010.

310 Editorial, "Do the Math on the Spill," *Times-Picayune*, August 6, 2010.

311 Press Conference, Jane Lubchenco Discusses Federal Peer-Reviewed "Oil Budget" Technical Documentation, November 23, 2010.

312 Press Release, NOAA, Federal Interagency Group Issues Peer-Reviewed 'Oil Budget' Technical Documentation, November 23, 2010.

313 Federal Interagency Solutions Group, Oil Budget Science and Engineering Team, *Oil Budget Calculator Technical Documentation* (November 2010).

314 Interview with Coast Guard official, October 24, 2010.

315 Shaw's Environmental & Infrastructure Group, *Shaw Barrier Berm Project—Daily Report Day 44* (July 15, 2010).

316 Padgett, "Dredge, Baby, Dredge: Can Sand Stop the Oil?"

317 Press Release, Office of the Governor, Governor Jindal Announces Agreement with BP for Seafood Safety, Coastal Restoration & Tourism Funding, November 1, 2010.

318 Cain Burdeau, "EPA: Louisiana's Sand Berms Not Stopping Much Oil," *Associated Press*, September 10, 2010; Mark Ballard, "EPA Opposes La. Berms," *Advocate*, September 9, 2010; John Maginnis, "Louisiana's Sand Berms Challenged," *Times-Picayune*, September 15, 2010; Interview with government official, September 22, 2010; Transcript, Meet the Press, November 21, 2010 (Governor Jindal stating "[w]e've collected thousands of pounds of oily debris off these berms"); *Oil Budget Technical Documentation*, 34 ("Based upon past spills, the oil content of collected debris mass is only a few percent.").

319 Bobby Jindal, *Leadership and Crisis* 6 (Washington, D.C.: Regnery Publishing, Inc., 2010).

320 Statement from Admiral Allen on the Successful Completion of the Relief Well, September 19, 2010.

321 Press Release, NOAA, NOAA Reopens One-Third of Closed Gulf Fishing Area, July 22, 2010; Press Release, NOAA, NOAA Reopens More Than 8,000 Square Miles in the Gulf of Mexico to Fishing, November 15, 2010.

322 Kim Murphy, "A Poor Appetite for Gulf Seafood," *Los Angeles Times*, August 26, 2010; Interview with government official, October 15, 2010.

323 Krissah Thompson, "Waste from BP Oil Spill Cleanup Has Gulf Residents Near Landfills Concerned," *Washington Post*, August 16, 2010.

324 40 C.F.R. § 261.4(b)(5).

325 Admiral James Watson and Al Armendariz, *Recovered Oil, Contaminated Materials and Liquid and Solid Wastes Management Directive* (June 29, 2010).

326 Elana Schor, "How Has BP's Oily Waste Escaped 'Hazardous' Label?," *New York Times*, July 20, 2010.

327 Admiral Paul Zukunft, letter to Doug Suttles, July 24, 2010; BP, "Waste and Recoverable Material Tracking," http://www.bp.com/genericarticle.do?categoryId=9034343&contentId=7063466.

328 Schor, "How Has BP's Oily Waste Escaped 'Hazardous' Label?"; EPA, "Waste Sampling Strategy and Results," http://www.epa.gov/bpspill/waste.html#sampling_strategy; Stanislaus, interview.

329 EPA, "Waste Management on the Gulf Coastline," http://www.epa.gov/bpspill/waste.html.

330 Robert Bullard and Al Huang, "Oil's Toxic Legacy Not Erased," *Politico*, August 13, 2010.

331 Lesley Clark and Fred Tasker, "Oil-Soaked Waste Worries Gulf Coast Landfills' Neighbors," *McClatchy Newspapers*, July 30, 2010; Robert Bullard, "Government Allows BP to Dump Oil-Spill Waste on Black Communities," *OpEd-News.com*, July 22, 2010.

332 Stanislaus, interview.

333 Admiral Paul Zukunft, letter to Mike Utsler, August 9, 2010; Stanislaus, interview.

334 "Statement from Admiral Allen on the Transfer of Oversight Responsibilities, October 1, 2010.

## Chapter Six

1 President Barack Obama, "Remarks by the President to the Nation on the BP Oil Spill" (June 15, 2010) http://www.whitehouse.gov/the-press-office/remarks-president-nation-bp-oil-spill).

2 Campbell Robertson and Clifford Krauss, "Gulf Spill Is the Largest of Its Kind, Scientists Say," *New York Times*, August 2, 2010.

3 EPA, *Government Response to the BP Oil Spill: Odors from the BP Spill* (June 2010), http://www.epa.gov/bpspill/reports/odorfactsheet.pdf (announcing help line for residents experiencing oil-related odors); Press Release, NOAA, Administration Launches Dockside Chats to Promote Gulf Seafood Safety Awareness, August 25, 2010, http://www.restorethegulf.gov/release/2010/08/25/administration-launches-dockside-chats-promote-gulf-seafood-safety-awareness; BP, *Claims and Government Payments Gulf of Mexico Oil Spill Public Report* (November 18, 2010).

4 Testimony of Timothy Ragen, Executive Director of the U.S. Marine Mammal Commission, "The Short and Long-Term Impacts of the Deepwater Horizon Oil Spill," Hearing Before the House Subcommittee on Insular Affairs, Oceans, and Wildlife, 111th Congress (June 10, 2010); Kim B. Ritchie and Brian D. Keller, eds., *A Scientific Forum on the Gulf of Mexico: The Islands in the Stream Concept* (NOAA, January 23, 2008), 6–8; Elliott A. Norse and John Amos, "Impacts, Perception, and Policy Implications of the Deepwater Horizon Oil and Gas Disaster," *Environmental Law Reporter* 40, no. 11 (2010): 11071; *Deepwater Horizon Oil Spill: Scientific Symposium Meeting Summary* (Consortium for Ocean Leadership, June 23, 2010), 15–16.

5 Federal Interagency Solutions Group, Oil Budget Science and Engineering Team, *Oil Budget Calculator Technical Documentation* (November 2010).

6 Curtis Morgan, "Another sign of oil spill recovery in the Gulf: Oil in the Gulf has dissipated and degraded into barely detectable concentrations, although federal scientists say it's too soon to say the threat is over," *Miami Herald*,

September 8, 2010.

7 Brian Hamacher, "Wind Keeps Oil From Loop Current & Away From Florida Shores," *Associated Press*, July 19, 2010.

8 Richard Camilli et al., "Tracking Hydrocarbon Plume Transport and Biodegradation at Deepwater Horizon," *Science* 330, no. 6001 (2010): 201–204; David Valentine et al., "Propane Respiration Jump-Starts Microbial Response to a Deep Oil Spill," *Science* 330, no. 6001 (2010): 204–208; Terry Hazen et al., "Deep-Sea Oil Plume Enriches Indigenous Oil-Degrading Bacteria", *Science* 330, no. 6001 (2010): 208–211.

9 Alan Krupnick et al., "A Framework for Understanding the Costs and Benefits of Deepwater Drilling Regulation" (DRAFT) (Resources for the Future, 2010).

10 Leslie Kaufman and Shaila Dewan, "Gulf May Avoid Direst Predictions After Oil Spill," *New York Times*, September 13, 2010.

11 NOAA, *Other Significant Oil Spills in the Gulf of Mexico*, http://sero.nmfs.noaa.gov/sf/deepwater_horizon/1890_HistoricalSpillsGulfofMexico.pdf.

12 Darryl L. Felder and David K. Camp, *Gulf of Mexico Origin, Waters, and Biota: Volume I, Biodiversity* (Corpus Christi, TX: Texas A&M University Press, 2009).

13 *Ibid.*

14 Christine Ribic et al., "Distribution of Seabirds in the Northern Gulf of Mexico in Relation to Mesoscale Features: Initial Observations," *ICES Journal of Marine Science* 54 (1997): 545–551.

15 S. Heileman and N. Rabalais, *Gulf of Mexico: Large Marine Ecosystem Brief #5* (NOAA, 2009), http://www.lme.noaa.gov/index.php?option=com_content&view=article&id=51:lme5&catid=41:briefs&Itemid=72.

16 David Biello, "The BP Spill's Growing Toll on the Sea Life of the Gulf," *Yale Environment* 360, June 9, 2010, http://e360.yale.edu/content/feature.msp?id=2284.

17 Holly K. Ober, Effects of Oil Spills on Marine and Coastal Wildlife (University of Florida, May 2010).

18 International Bird Rescue Research Center, *How Oil Affects Birds: Just a little bit of oil can be deadly* (2010), http://www.ibrrc.org/pdfs/IBRRC-How-oil-affects-birds.pdf.

19 Camilli et al., "Tracking Hydrocarbon Plume Transport," 201–204.

20 *Oil Budget Calculator Technical Documentation.*

21 White House, Ongoing Administration-Wide Response to the Deepwater BP Oil Spill: By the Numbers to Date (August 23, 2010), http://www.restorethegulf.gov/release/2010/08/23/ongoing-administration-wide-response-deepwater-bp-oil-spill.

22 Unified Area Command, *Shoreline Clean-up and Assessment Technique (SCAT) Map -- Maximum Oiling by Zone: Florida*, November 11, 2010.

23 Audubon Society, *Oil and Birds: Too Close for Comfort. Louisiana's Coast Six Months into the BP Disaster* (October 2010).

24 Dr. Holly Bik (University of New Hampshire), interview with Commission staff, October 28, 2010.

25 NOAA, *Environmental Sensitivity Index: Alabama* (August 2007), 1, http://response.restoration.noaa.gov/book_shelf/1458_SampleESI_AL2007.pdf.

26 Joseph Dineen, *Tidal Flat Habitats* (Smithsonian Institution, 2010), http://www.sms.si.edu/irlspec/Tidal_Flats.htm.

27 V. Grossi et al., "Burial, Exportation and Degradation of Acyclic Petroleum Hydrocarbons Following a Simulated Oil Spill in Bioturbated Mediterranean Coastal Sediments," *Chemosphere* 48, no. 9 (2002): 947–954.

28 Qianxin Lin and Irving Mendelssohn, "Evaluation of Tolerance Limits for Restoration and Phytoremediation with *Spartina Alterniflora* in Crude Oil-Contaminated Coastal Salt Marshes," in *Proceedings of the 2008 International Oil Spill Conference* (Washington, D.C.: American Petroleum Institute, 2008), 869–874, http://www.iosc.org/pa-pers/2008%20148.pdf.

29 Jeffrey Ball, "Storm-Tossed Boom Complicates Spill Cleanup," *Wall Street Journal*, July 27, 2010.

30 Dr. Eugene Turner (Professor, Louisiana State University), e-mail to Commission staff, November 24, 2010.

31 Dr. Eugene Turner (Professor, Louisiana State University), interview with Commission staff, November 4, 2010.

32 Bob Marshall, "Oysters are uniquely sensitive to Gulf of Mexico oil spill," *Times-Picayune*, May 25, 2010.

33 NOAA, *MC252 Shoreline Current Oiling Situation Map – LA: As of 8/03/2010*; Louisiana Department of Wildlife and Fisheries, *Oil Spill Response: Closure Maps*, http://www.wlf.louisiana.gov/oilspill.

34 Nicole Santa Cruz and P.J. Huffstutter, "Effort to Keep Oil Spill at Bay Tips Ecological Balance," *Los Angeles Times*, August 3, 2010.

35 L. Scott Mills, Michael E. Soule and Daniel F. Doak, "The keystone-species concept in ecology and conservation," *BioScience* 43, no. 4 (1993): 219–224.

36 Mississippi Department of Marine Resources, *Rebuilding Mississippi's Oyster Reefs* (Fall 2009).

37 Scott McMillion, *The Reef Makers* (Nature Conservancy, 2010).

38 "The effect of the oil spill on Gulf fisheries: An Interview with Harriet Perry," Mississippi Public Broadcasting, August 17, 2010.

39 Harriet Perry, interview with Commission staff, October 28, 2010.

40 *Ibid.*

41 16 U.S.C. § 1802(10).

42 NOAA, *Affected Gulf Resources* (2010), http://www.gulfspillrestoration.noaa.gov/oil-spill/affected-gulf-resources/.

43 NOAA, *Bioaccumulation of Oil Chemicals in Seafood* (May 2010).

44 *Ibid.*

45 Biello, "The BP Spill's Growing Toll On the Sea Life of the Gulf."

46 NOAA, *Affected Gulf Resources;* National Incident Command Joint Analysis Group, *Review of Preliminary Data to Examine Oxygen Levels In the Vicinity of MC252#1: May 8 to August 9, 2010* (August 16, 2010).

47 NOAA, *Mississippi Canyon 252 Incident: Work Plan for the Collection of Data to Determine Impacts of the Deepwater Horizon Mississippi Canyon 252 Incident on Endangered and Protected Marine Mammals in the Northern Gulf* (June 14, 2010); NOAA, *Mississippi Canyon 252 Incident: Preassessment Plan to Determine Potential Exposure and Injuries of Nesting and Hatchling Loggerhead Sea Turtles* (July 28, 2010); NOAA, *Mississippi Canyon 252: Preassessment plan to Determine Potential Exposure and Injuries of Nesting and Hatchling Kemp's Ridley Turtles* (August 31, 2010); Testimony of Steve Murawski (NOAA Director of Scientific Programs), Hearing before the National Commission, September 28, 2010.

48 "Bluefin Tuna Hit Hard by 'Deepwater Horizon' Disaster," *European Space Agency News*, October 18, 2010, http://www.esa.int/esaCP/SEM1K4WO1FG_index_0.html.

49 Mike Soraghan, "As Spill Drifts Toward Gulf Shores, Oil Companies Brace for Political Whirlwind," *New York Times*, April 29, 2010.

50 Unified Area Command, *Deepwater Horizon Response Consolidated Fish and Wildlife Collection Report* (November 1, 2010).

51 Steve Hampton, *Estimating Bird Mortality* (California Department of Fish and Game, November 2004).

52 Testimony of Jane Lyder, Deputy Assistant Secretary Fish and Wildlife and Parks, Hearing before the National Commission, September 28, 2010.

53 Our Natural Resources at Risk: The Short and Long-Term Impacts of the Deepwater Horizon Oil Spill, Before the House Subcommittee on Insular Affairs, Oceans, and Wildlife, 111th Cong. (June 10, 2010) (Statement of Timothy Ragen, Executive Director of the U.S. Marine Mammal Commission).

54 NOAA, *Affected Gulf Resources.*

55 Unified Area Command, *Deepwater Horizon Response Consolidated Fish and Wildlife Collection Report.*

56 NOAA, *Sea Turtles, Dolphins, and Whales and the Gulf of Mexico Oil Spill* (2010), http://www.nmfs.noaa.gov/pr/health/oilspill.htm.

57 Joseph Schuman, "Dead Sperm Whale Found Near BP Oil Spill," *AOL News*, June 17, 2010.

58 NOAA, *Sea Turtles, Dolphins, and Whales and the Gulf of Mexico Oil Spill.*

59 Camilli et al., "Tracking Hydrocarbon Plume Transport"; Valentine et al., "Propane Respiration Jump-Starts Microbial Response to a Deep Oil Spill"; Hazen et al., "Deep-Sea Oil Plume Enriches Indigenous Oil-Degrading Bacteria."

60 National Incident Command Joint Analysis Group, *Review of Preliminary Data to Examine Oxygen Levels In the Vicinity of MC252#1: May 8 to August 9, 2010* (August 16, 2010).

61 *Ibid.*

62 *Ibid.*

63 A. Diercks et al., "Characterization of Subsurface Polycyclic Aromatic Hydrocarbons at the Deepwater Horizon Site," *Geophysical Research Letters* 37 (2010).

64 *Oil Budget Calculator Technical Documentation.*

65 Cain Burdeau and Seth Borenstein, "Where's the oil? On the Gulf floor, scientists say," *Associated Press*, September 13, 2010; Steve Newborn, "Oil Found Deep in Gulf is Toxic to Tiny Marine Life," *WUSF News*, August 17, 2010, http://www.wusf.usf.edu/news/2010/08/17/oil_found_deep_in_gulf_is_toxic_to_tiny_marine_life.

66 Mark Schrope, "Oil spill cruise finds field of dead coral: Scientific Expedition Assesses Deep-Sea Damage in the Gulf of Mexico," *Nature News*, November 5, 2010, http://www.nature.com/news/2010/101105/full/news.2010.589.html.

67 NOAA, "10 Famous Spills" (NOAA Incident News), http://www.incidentnews.gov/famous.

68 Kim B. Ritchie and Brian D. Keller, eds., *A Scientific Forum on the Gulf of Mexico: The Islands in the Stream Concept* (NOAA, January 23, 2008), 6–8; John Farrington and Judith McDowell, "Mixing Oil and Water: Tracking the Sources and Impacts of Oil Pollution in the Marine Environment," *Oceanus Magazine* 42, no. 3 (2004): 1–4, http://www.

whoi.edu/cms/files/dfino/2005/4/v42n3-farrington_2285.pdf; Elliott A. Norse and John Amos, "Impacts, Perception, and Policy Implications of the Deepwater Horizon Oil and Gas Disaster," *Environmental Law Reporter* 40, no. 11 (2010): 11071; *Deepwater Horizon Oil Spill: Scientific Symposium Meeting Summary* (Consortium for Ocean Leadership, June 23, 2010), 15–16.

[69] 33 U.S.C. § 2706.

[70] 15 C.F.R. § 990.30; NOAA, *Injury Assessment: Guidance Document for Natural Resource Damage Assessment Under the Oil Pollution Act of 1990* (August 1996).

[71] NOAA, *Gulf Spill Restoration: Co-Trustees* (2010), http://www.gulfspillrestoration.noaa.gov/about-us/co-trustees/.

[72] Discharge of Oil From Deepwater Horizon/Macondo Well, Gulf of Mexico; Intent to Conduct Restoration Planning, 75 Fed. Reg. 60,800 (Oct. 1, 2010).

[73] NOAA, *Gulf Spill Restoration: Co-Trustees*.

[74] 15 C.F.R. § 990.10.

[75] 15 C.F.R. § 990.30.

[76] Ritchie and Keller, eds., *A Scientific Forum on the Gulf of Mexico: The Islands in the Stream Concept*, 6–8.

[77] 15 C.F.R. § 990.30; NOAA, *Injury Assessment: Guidance Document for Natural Resource Damage Assessment Under the Oil Pollution Act of 1990*.

[78] S.M. Gagliano, "Canals, Dredging, and Land Reclamation in the Louisiana Coastal Zone" in *Hydrologic and Geologic Studies of Coastal Louisiana*, Report no. 14 (Center for Wetland Studies, Louisiana State University, 1973); Robert A. Morton et al., *Rapid Subsidence and Historical Wetland Loss in the Mississippi Delta Plain: Likely Causes and Future Implications* (U.S. Geological Survey, 2005); Testimony of Senator Mary Landrieu, Louisiana, Hearing before the National Commission, September 28, 2010.

[79] NOAA, *Deepwater BP Oil Spill, Natural Resource Damage Assessment: NRDA by the Numbers,* November 1, 2010, http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/2010/11/FINAL-NRDA_by_the_Numbers_11.03.pdf.pdf.

[80] NOAA, *Mississippi Canyon 252 Incident: Work Plan for the Collection of Data to Determine Impacts of the Deepwater Horizon*; NOAA, *Mississippi Canyon 252 Incident on Endangered and Protected Marine Mammals in the Northern Gulf*; NOAA, *Mississippi Canyon 252 Incident: Preassessment Plan to Determine Potential Exposure and Injuries of Nesting and Hatchling Loggerhead Sea Turtles*; NOAA, *Mississippi Canyon 252: Preassessment plan to Determine Potential Exposure and Injuries of Nesting and Hatchling Kemp's Ridley Turtles*; Testimony of Steve Murawski, September 28, 2010.

[81] Shaila Dewan, "The Oil Spill's Money Squeeze," *New York Times*, September 12, 2010.

[82] Press Release, National Science Foundation, Gulf Oil Spill: NSF Awards Grant to Study Effects of Oil and Dispersants on Louisiana Salt Marsh Ecosystem, August 16, 2010.

[83] Phil Taylor (Head, Oceans Section, Division of Ocean Sciences, National Science Foundation), e-mail to Commission staff, December 9, 2010.

[84] Dewan, "The Oil Spill's Money Squeeze."

[85] Press Release, BP, BP and the Gulf of Mexico Alliance Announce Implementation of BP's $500 Million Independent Research Initiative, September 29, 2010, http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7065262.

[86] Sea Grant, *Oil Spill in the Gulf of Mexico: Deepwater Horizon Oil Spill Research and Monitoring Activities Database* (2010), http://gulfseagrant.tamu.edu/oilspill/database.htm.

[87] "Gulf Seafood Industry Works to Wipe Oil Off Image," National Public Radio, August 20, 2010; Louisiana Office of Tourism, *Regional Effects on Perception/BP Oil Spill Survey Wave 1 Results* (June 30, 2010); University of Minnesota Food Industry Center, "Continuous Consumer Confidence in Food Safety/Defense Tracking" (presentation, FDA Symposium, September 16, 2010).

[88] U.S. Census Bureau: 2007 Economic Census, *2007 Summary Tables: Selected Statistics by Economic Sector*.

[89] NOAA, *Deepwater Horizon/BP Oil Spill: Federal Fisheries Closure and Other Information* (2010), http://sero.nmfs.noaa.gov/deepwater_horizon_oil_spill.htm.

[90] Testimony of Timothy Fitzgerald, Environmental Defense Fund, Hearing before the National Commission, September 28, 2010.

[91] Testimony of Lt. Gov. Scott Angelle, Louisiana, Hearing before the National Commission, September 28, 2010.

[92] Campbell Robertson, "As Claims for Spill Losses Shift to Administrator, Queries Follow," *New York Times*, August 23, 2010.

[93] Rob Shaw, "Clearwater BP Office Shells out for Claims," *Tampa Bay Online*, August 8, 2010, http://www2.tbo.com/content/2010/aug/08/na-clearwater-bp-office-shells-out-for-claims/.

[94] David Fahrenthold and Kimberly Kindy, "Six Months After the Spill, BP's Money is Changing the Gulf as Much as the Oil," *Washington Post*, October 20, 2010.

[95] *Inter-Agency Economic Report: Estimating the Economic Effects of the Deepwater Drilling Moratorium on the Gulf*

*Coast Economy* (September 16, 2010), http://www.esa.doc.gov/drilling_moratorium.pdf.

96   Press Release, BP, BP Establishes $20 Billion Claims Fund for Deepwater Horizon Spill and Outlines Dividend Decisions, June 16, 2010, http://www.bp.com/genericarticle.do?categoryId=2012968&contentId=7062966; Steven Mufson, "BP Details Plan for $20 Billion Claim Fund for Oil Spill in the Gulf of Mexico," *Washington Post*," June 17, 2010.

97   Gulf Coast Claims Facility, *GCCF Program Statistics - Overall Summary*, November 23, 2010.

98   Kenneth Feinberg, *Final Report of the Special Master for the September 11th Victim Compensation Fund of 2001, Volume 1* (2010).

99   33 U.S.C. § 2702(b)(2)(E). The Oil Pollution Act recognizes the following categories of damages: (1) injury to natural resources (recoverable by federal or state trustees); (2) loss of real or personal property and any resultant economic losses (recoverable by an owner of that property); (3) loss of subsistence use of natural resources (recoverable by a subsistence user); (4) loss of revenues resulting from destruction of property or natural resource injury (recoverable by a government claimant); (5) loss of profits or impairment of earning capacity resulting from property loss or natural resource injury (recoverable by any claimant); and (6) costs of providing extra public services during or after spill response (recoverable by a government claimant); 33 U.S.C. § 2702(b)(2).

100   David Segal, "Should BP's Money Go Where the Oil Didn't?," *New York Times*, October 23, 2010 (noting that Kenneth Feinberg has "hired one of the country's foremost scholars on torts . . . to write a memorandum about the validity and value of proximity claims.").

101   John Flesher, "Gold Rush On The Gulf: Researchers Clamor For Cash," ABC News, September 29, 2010.

102   Mary Rickard, "Gulf Coast oil spill chills seafood industry," *Reuters*, May 12, 2010; Kat Kinsman and Sarah LeTrent, "Gulf Coast Chefs, Fishermen Fight Tide of Misinformation," CNN, May 12, 2010.

103   NOAA, *NOAA's Oil Spill Response: Fish Stocks in the Gulf of Mexico* (May 12, 2010), http://www.response.restoration.noaa.gov/book_shelf/1886_Fish-Stocks-Gulf-fact-sheetv2.pdf.

104   U.S. Energy Information Administration, *Gulf of Mexico Fact Sheet* (October 2010), http://www.eia.doe.gov/special/gulf_of_mexico/index.cfm.

105   EPA, *General Facts about the Gulf of Mexico*, http://www.epa.gov/gmpo/about/facts.html#resources.

106   NOAA, *The Gulf of Mexico at a Glance: A Tool for the Gulf of Mexico Alliance and the American Public* (June 2008), http://gulfofmexicoalliance.org/pdfs/gulf_glance_1008.pdf.

107   U.S. Census Bureau: 2007 Economic Census, *Statistics by Economic Sector*. Compiled data from Gulf coast counties using the following industry codes: 451110, 487210, 713990, 114210, 721214, 532292, 721110, 721120, 712190, 721199, 114111, 114112, 114119, 311711, 311712, 424490, 445220, 424420, 424460.

108   NOAA, *NOAA's Oil Spill Response: Fish Stocks in the Gulf of Mexico* (May 12, 2010), http://www.response.restoration.noaa.gov/book_shelf/1886_Fish-Stocks-Gulf-fact-sheetv2.pdf.

109   *Ibid*.

110   NOAA, *Deepwater Horizon/BP Oil Spill: Size and Percent Coverage of Fishing Area Closures Due to BP Oil Spill* (2010), http://sero.nmfs.noaa.gov/ClosureSizeandPercentCoverage.htm.

111   NOAA, *Protocol for Interpretation and Use of Sensory Testing and Analytical Chemistry Results for Re-Opening Oil-Impacted Areas Closed to Seafood Harvesting* (June 18, 2010).

112   NOAA, *Deepwater Horizon/BP Oil Spill: Size and Percent Coverage of Fishing Area Closures Due to BP Oil Spill*.

113   Rob Holbert, "Spreading the Word about Gulf Seafood," *Lagniappe* 215, October 5, 2010.

114   Testimony of William Walker, Executive Director Mississippi Department of Marine Resources, Hearing before the National Commission, September 28, 2010.

115   Remarks of Jane Lubchenco, NOAA Administrator, American Bar Association's Section of Environment, Energy, and Resources Law Summit, New Orleans, September 30, 2010, http://www.noaanews.noaa.gov/stories2010/20101001_lubchenco_seer.html.

116   Brad Jacobson, "Is Gulf Seafood Really Safe to Eat? Government Withholding Key Data on Seafood Testing, Scientists Say," AlterNet, October 7, 2010, http://www.alternet.org/food/148433/is_gulf_seafood_really_safe_to_eat_government_withholding_key_data_on_seafood_testing,_scientists_say.

117   Travis Pillow, "Low Ball Spill Estimates May Have Hurt Florida Tourism," *The Florida Independent*, October 7, 2010.

118   Testimony of Timothy Fitzgerald, Environmental Defense Fund, Hearing before the National Commission, September 28, 2010.

119   Jean R. Kinsey et al., "Index of Consumer Confidence in the Safety of the Food System," *American Journal of Agricultural Economics* 91, No. 5 (2009): 1470–1476 (citing H.G. Zucker, "The Variable Nature of News Media Influence," in *Communication Yearbook* 2, ed. B.D. Ruben [New Brunswick, NJ: Transaction Books, 1978], 225–40).

120   Holbert, "Spreading the Word about Gulf Seafood."

121   Wendy Kaufman, "Gulf Seafood Industry Works to Wipe Oil Off Image," National Public Radio, August 20, 2010.

122   Press Release, NOAA, NOAA and FDA Announce Chemical Test for Dispersant in Gulf Seafood; All Samples Test Within Safety Threshold, October 29, 2010, http://www.noaanews.noaa.gov/stories2010/20101029_seafood.html.

123 Press Release, BP, Seafood Safety, Tourism and Coastal Restoration Funding Announced, November 1, 2010, http://www.louisianagulfresponse.com/go/doc/3047/940587/; Press Release, Florida Department of Agriculture and Consumer Services, Bronson Announces That BP Will Pay $20 Million To Fund Seafood Inspections, Marketing Efforts In Wake Of Oil Spill, October 25, 2010. http://www.doacs.state.fl.us/press/2010/10252010_2.html.

124 Paul Quinlan, "Gulf Spill: Ala., La. fighting over potential billions in BP penalties," *Energy & Environment Daily*, November 23, 2010.

125 U.S. Census Bureau: 2007 Economic Census, *Statistics by Economic Sector*. Compiled data from Gulf coast counties using the following industry codes: 451110, 487210, 713990, 114210, 721214, 532292, 721110, 721120, 712190, 721199.

126 *Ibid.*

127 Testimony of Keith Overton, Louisiana Shrimp Association, Hearing before the National Commission, July 12, 2010.

128 Testimony of Michael Hecht, President Greater New Orleans Inc., Hearing before the National Commission, July 12, 2010.

129 Louisiana Office of Tourism, *Effects on Perception/BP Oil Spill Survey Wave 2 Results* (August 16, 2010), http://crt.louisiana.gov/tourism/research/Documents/2010-11/NationalOilSpillReport20100816.pdf.

130 Matthew R. Lee and Troy C. Blanchard, *Health Impacts of Deepwater Horizon Oil Disaster on Coastal Louisiana Residents* (Louisiana State University, July 2010), http://www.lsu.edu/pa/mediacenter/tipsheets/spill/publichealthreport_2.pdf.

131 *Ibid.*

132 Brian Skoloff, "Final Well Sealing Small Comfort to Gulf Residents," ABC News, Sept. 16, 2010.

133 Testimony of Grace Scire, Gulf Coast Regional Director, Boat People SOS, Hearing before the National Commission, July 13, 2010.

134 Administration health officials (Department of Human Health Services, National Institute of Health, National Institute of Environmental Health Sciences, and Occupational Safety and Health Administration), interviews with Commission staff, October 5, 2010.

135 Dan Witters, "Gulf Coast Residents Worse Off Emotionally after BP Oil Spill," Gallup, September 28, 2010, http://www.gallup.com/poll/143240/gulf-coast-residents-worse-off-emotionally-oil-spill.aspx.

136 Jonathan White (Program policy Analyst, Administration for Children & Families), e-mail to Commission staff, November 16, 2010.

137 David Abramson et al., *Impact on Children and Families of the Deepwater Horizon Oil Spill: Preliminary Findings of the Coastal Population Impact Study* (National Center for Disaster Preparedness, August 3, 2010).

138 Matthew Lee et al., *Health Impacts of Deepwater Horizon Oil Disaster on Coastal Louisiana Residents*, (Louisiana State University, July 2010).

139 Abramson et al., *Impact on Children and Families of the Deepwater Horizon Oil Spill.*

140 *Ibid.*,9.

141 *Ibid.*

142 Testimony of Grace Scire.

143 Sharon Cohen, "Vietnamese 'Lost' as Gulf Oil Spill Hits Community Hard," *Associated Press*, July 11, 2010.

144 Hearing on Ensuring Justice for Victims of the Gulf Coast Oil Disaster, Before the Committee on the Judiciary, 111th Cong. (2010) (statement of Kenneth Feinberg, Administrator, Gulf Coast Claims Facility).

145 Hearing before the National Commission, Panel 5: Community and Ecological Impacts, July 13, 2010.

146 Brenda Robichaux (Houma Nation), interview with Commission staff, October 2010.

147 Lawrence Palinkas et al., "Community Patterns of Psychiatric Disorders after the Exxon Valdez Oil Spill," *American Journal of Psychiatry* 150 (1993): 1517–1523.

148 *Ibid.*

149 Catalina Arata et al., "Coping with Technological Disaster: An Application of the Conservation of Resources Model to the Exxon Valdez Oil Spill," *International Society for Traumatic Stress* 13, no. 1 (2000): 23–39.

150 Stephen Braud and Jack Kruse, eds., *Synthesis: Three Decades of Research on Socioeconomic Effects Related to Offshore Petroleum Development in Coastal Alaska* (Minerals Management Service, May 2009), 306.

151 Gina Solomon and Sarah Janssen, "Health Effects of the Gulf Oil Spill," *Journal of the American Medical Association* 304, no. 10 (2010): 1118–1119.

152 Hearing on Ensuring Justice for Victims of the Gulf Coast Oil Disaster, Before the Committee on the Judiciary, 111th Cong. (2010) (statement of Kenneth Feinberg, Administrator, Gulf Coast Claims Facility).

153 SAMSA, "Gulf States Receive $52 Million from BP for Behavioral Health," *SAMSA News* 18, no. 4 (July/August 2010), http://www.samhsa.gov/samhsanewsletter/Volume_18_Number_4/GulfStates.aspx.

[154] National Institutes of Health officials, interviews with Commission staff, October 2010.

[155] Louisiana Office of Public Health, *State Narrative for Louisiana: Maternal and Child Health Title V Block Grant*, *Application for 2008/Annual Report for 2006* (October 4, 2007); See also "Agenda, Interagency Meeting – Gulf Oil Spill Workers' Study" (NIH Campus, Bethesda, Maryland, August 19, 2010), http://www.niehs.nih.gov/about/od/programs/docs/agenda-aug19-2010.pdf.

[156] Editorial, "Ruling in Charity Hospital case is a significant victory: An editorial," *Times–Picayune*, April 4, 2010.

[157] Robin Rudowitz, Diane Rowland, and Adele Shartzer, "Health Care In New Orleans Before and After Hurricane Katrina," *Health Affairs* 25, no. 5 (2006): 393–406.

[158] *Ibid.*

[159] Louisiana Office of Public Health, *State Narrative for Louisiana: Maternal and Child Health Title V Block Grant.*

[160] U.S. Government Accountability Office, *Hurricane Katrina: Federal Grants Have Helped Health Care Organizations Provide Primary Care, but Challenges Remain* (July 2009).

[161] Karen B. DeSalvo, "Community Health Clinics: Bringing Quality Care Closer to New Orleanians," in *The New Orleans Index at Five*, Amy Liu and Allison Plyer, eds. (Brookings Institution, August 2010).

# Chapter Seven

[1] Louisiana Coastal Protection and Restoration Authority, *Fiscal Year 2011 Annual Plan: Integrated Ecosystem Restoration and Hurricane Protection in Coastal Louisiana* (April 2010), 2–3.

[2] U.S. Environmental Protection Agency, Mississippi River Gulf of Mexico Watershed Nutrient Task Force, *Hypoxia 101*, http://www.epa.gov/owow_keep/msbasin/hypoxia101.htm.

[3] Complaint at ¶ 28, Louisiana v. Triton Asset Leasing GmBH al., No. 2:10–cv–03059 (E.D. La. September 14, 2010).

[4] Ray Mabus, *America's Gulf Coast: A Long Term Recovery Plan after the Deepwater Horizon Oil Spill* (September 28, 2010).

[5] Charles Simenstad et al., "When is Restoration Not? Incorporating Landscape-Scale Processes to Restore Self-Sustaining Ecosystems in Coastal Wetland Restoration," *Ecological Engineering* 26, no. 1 (2006): 28, 31.

[6] For background about "resiliency," see C.S. Holling, "Resilience and Stability of Ecological Systems," *Annual Review of Ecology and Systematics* 24 (1973): 1–23.

[7] Mabus, *America's Gulf Coast: A Long Term Recovery Plan after the Deepwater Horizon Oil Spill*, 26.

[8] U.S. Geological Survey, *The Gulf of Mexico Hypoxic Zone*, http://toxics.usgs.gov/hypoxia/hypoxic_zone.html.

[9] Mississippi River/Gulf of Mexico Watershed Nutrient Task Force, *Gulf Hypoxia Action Plan 2008—For Reducing, Mitigating, and Controlling Hypoxia in the Northern Gulf of Mexico and Improving Water Quality in the Mississippi River Basin* (2008).

[10] Bureau of Ocean Energy Management, Regulation and Enforcement, *Leasing*, http://www.gomr.boemre.gov/homepg/lsesale/lsesale.html.

[11] Executive Order 13547, Stewardship of the Ocean, Our Coasts, and the Great Lakes, 75 Fed. Reg. 43023, July 22, 2010.

[12] White House Council on Environmental Quality, *Final Recommendations of the Interagency Ocean Policy Task Force* (July 19, 2010).

[13] For an overview of issues in Gulf of Mexico marine policy, see Linwood Pendleton, Larry Crowder, Daniel Dunn, Clare Fieseler, Morgan Gopnik, Catherine Latanich, Mike Orbach, Steve Roady, Mary Turnipseed, Cindy van Dover, "Marine Protection in the Gulf of Mexico: Current Policy, Future Options, and Ecosystem Outcomes," *Policy Brief*, Nicholas Institute for Environmental Policy Solutions, Duke University (October 2010). Elliott Norse (Marine Conservation Biology Institute), interview with Commission staff, October 18, 2010; Larry McKinney (Harte Institute for Gulf of Mexico Studies), interview with Commission staff, October 18; 2010 Sandra Whitehouse (Ocean Conservancy), interview with Commission staff, October 20, 2010; Deerin Babb–Brott (Massachusetts Office of Coastal Zone Management), interview with Commission staff, October 21, 2010; Barry Gold (Moore Foundation), interview with Commission staff, Sept. 13, 2010.

[14] NOAA, *Coastal and Marine Spatial Planning Examples*, http://www.msp.noaa.gov/examples/index.html.

[15] United Nations Educational, Scientific and Cultural Organization (UNESCO), *Marine Spatial Planning Initiative: Norway*, http://www.unesco-ioc-marinesp.be/spatial_management_practice/norway.

[16] Bureau of Ocean Energy Management, Regulation and Enforcement, Outer Continental Shelf Lands Act, http://www.gomr.boemre.gov/regulate/regs/laws/ocslasht.html.

[17] For geospatial maps on uses of Gulf resources, see NOAA, *Multipurpose Marine Cadastre*, http://csc-s-web-p.csc.noaa.gov/MMC.

[18] Cornelius Hammer et al., "Framework of stock–recovery strategies: analyses of factors affecting success and failure,"

*ICES Journal of Marine Science* 67 (2010): 1849–1855.

[19] For background overview of deltaic science described in this section, see, e.g., Committee on the Restoration and Protection of Coastal Louisiana, *Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana* (National Research Council, 2006), 29–42; James M. Coleman, Harry H. Roberts, and Gregory W. Stone, "Mississippi River Delta: An Overview," *Journal of Coastal Research* 14, no. 3 (1998): 698–716; John W. Day Jr. et al., "Restoration of the Mississippi Delta: Lessons from Hurricanes Katrina and Rita," *Science* 315, no. 5819 (2007): 1679–1684.

[20] "Storm Death Toll at 31 as Floodwaters Recede," CNN, May 6, 2010; Paul Kemp, "Use the Mississippi River to stop the oil," CNN, June 13, 2010. The  approximate travel time of water along the Ohio and then Mississippi Rivers can be estimated by noting the sequence of peak water levels along the river, in the National Weather Service's Lower Mississippi River Forecast Center, particularly the summary data for weeks ending in May 5, 2010, and May 12, 2010. River Summary Archives for these dates and the rest of 2010 can be found here: http://www.srh.noaa.gov/lmrfc/?n=riversummaryarchive.

[21] For description of Atchafalaya diversion, see, e.g., Martin Reuss, *Designing the Bayous: The Control of Water in the Atchafalaya Basin, 1800–1995* (Alexandria, VA: Texas A&M University Press, 2004).

[22] U.S. Geological Survey, *Northern Gulf of Mexico (NGOM) Ecosystem Change and Hazard Susceptibility Project—Overview* (2010), http://ngom.usgs.gov/overview/intro.html.

[23] Kevin Kosar, *Disaster Response and Appointment of a Recovery Czar: The Executive Branch's Response to the Flood of 1927* (Congressional Research Service, 2005).

[24] 33 U.S.C. § 702c (1928).

[25] U.S. Army Corps of Engineers, *The Mississippi River & Tributaries (Mr&T) Project* (2010), http://www.mvn.usace.army.mil/bcarre/missproj.asp.

[26] Testimony of Senator Mary Landrieu, Louisiana, Hearing before the National Commission, September 28, 2010.

[27] *Coastal Wetlands Planning, Protection, And Restoration Act: Summary of Wetland Benefits for Priority List Projects* (2010), http://www.lacoast.gov/reports/wva/CWPPRA%20project%20benefits%202010-06-18.pdf; U.S. Army Corps of Engineers, *Louisiana Coastal Area Ecosystem Restoration Plan* (2010), http://www.lca.gov/.

[28] Robert H. Meade and John A. Moody. "Causes for the decline of suspended-sediment discharge in the Mississippi River system, 1940–2007," *Hydrological Process* 24 (2010): 35–49; Robert B. Jacobson, Dale W. Blevins and Chance J. Bitner, "Sediment Regime Constraints on River Restoration—an Example from the Lower Missouri River," *Geological Society of America Special Papers* 451 (2009): 1–22.

[29] Day et al., "Restoration of the Mississippi Delta: Lessons from Hurricanes Katrina and Rita," 1682.

[30] Robert Morton et al., *Rapid Subsidence and Historical Wetland Loss in the Mississippi Delta Plain: Likely Causes and Future Implications*, (U.S. Geological Survey, 2005).

[31] John Barras et al., *Land Area Change in Coastal Louisiana—a Multidecadal Perspective (from 1956 to 2006)* (U.S. Geological Survey, 2008).

[32] Torbjorn Tornqvist et al., "Mississippi Delta Subsidence Primarily Caused by Compaction of Holocene Strata," *Nature Geoscience* 1 (2008): 173–176.

[33] Roy Dokka, "Modern-Day Tectonic Subsidence in Coastal Louisiana," *Geology* 34, no. 4 (2006): 281–84.

[34] Robert Morton, "Evidence of Regional Subsidence and Associated Interior Wetland Loss Induced by Hydrocarbon Production, Gulf Coast Region, USA," *Environmental Geology* 50 (2006): 261–74.

[35] Committee on the Restoration and Protection of Coastal Louisiana, *Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana* (National Research Council, 2006), 48.

[36] James G. Gosselink, "Comments on 'Wetland Loss in the Northern Gulf of Mexico: Multiple Hardworking Hypotheses,'" *Estuaries* 24, no. 4 (August 2001), 636–651.

[37] James B. Johnston, Donald R. Cahoon and Megan K. La Peyre, *Outer Continental Shelf (OCS)-Related Pipelines and Navigation Canals in the Western and Central Gulf of Mexico: Relative Impacts on Wetland Habitats and Effectiveness of Mitigation* (Minerals Management Service, 2009), 157.

[38] Richard Campanella, *Time and Place in New Orleans: Past Geographies in the Present Day* (Gretna, LA: Pelican Publishing Company, Inc., 2002), 78; Panama Canal Authority, *Frequently asked questions,*  http://www.pancanal.com/eng/general/canal-faqs/index.html.

[39] U.S. Army Corps of Engineers, *Integrated Final Report to Congress and Legislative Environmental Impact Statement for the Mississippi River—Gulf Outlet Deep-Draft De-Authorization Study* (June 2008), 6.

[40] Gary P. Shaffer et al., "The MRGO Navigation Project: A Massive Human-Induced Environmental, Economic, and Storm Disaster," *Journal of Coastal Research,* Special Issue 54 (2009): 206–224; R.H. Caffey and B. Leblanc, *'Closing' the Mississippi River Gulf Outlet: Environmental and Economic Considerations* (LACoast.gov, 2002).

[41] Day et al., "Restoration of the Mississippi Delta: Lessons from Hurricanes Katrina and Rita," 1679–1684.

[42] U.S. Army Corps of Engineers, *MRGO Navigation Channel Closure* (2010), http://www.mrgo.gov/MRGO_Closure.aspx.

[43] James Coleman, "James P. Morgan: Scientific Contributions," *Journal of Coastal Research* 14, no. 3 (1998): 868–69.

[44] Avenal v. United States, 33 Fed. Cl. 778 (1995).

[45] National Research Council, Panel on River Basin and Coastal Systems Planning, Committee to Assess the U.S. Army Corps of Engineers Methods of Analysis and Peer Review for Water Resources Project Planning, *River Basins and Coastal Systems Planning Within the U.S. Army Corps of Engineers* (2004): 104.

[46] S.M. Gagliano, "Canals, Dredging, and Land Reclamation in the Louisiana Coastal Zone" in *Hydrologic and Geologic Studies of Coastal Louisiana*, Report no. 14 (Center for Wetland Studies, Louisiana State University, 1973).

[47] N.J. Craig, R.E. Turner, and J.W. Day Jr., "Land Loss in Coastal Louisiana (U.S.A.)" *Environmental Management* 3, no. 2 (1979): 133–144.

[48] Paul Kemp, Vice–President, National Audobon Society, interview with Commission staff, October 7, 2010.

[49] Denise Reed, "Seeing the Future of the Louisiana Coast," in *After the Storm: Restoring America's Gulf Coast Wetlands, A Special Report of the National Wetlands Newsletter* (Washington, D.C.: Environmental Law Institute, 2006), 45.

[50] Michael Blum and Harry Roberts, "Drowning of the Mississippi Delta due to Insufficient Sediment Supply and Global Sea-Level Rise," *Nature Geoscience* (June 28, 2009): 489–490.

[51] U.S. General Accountability Office, *Coastal Wetlands: Lessons Learned from Past Efforts in Louisiana Could Help Guide Future Restoration and Protection* (December 14, 2007), 10.

[52] U.S. Army Corps of Engineers, *Coastal Wetlands Planning, Protection & Restoration Act* (2010), http://www.mvn. usace.army.mil/pd/cwppra_mission.htm.

[53] Mark Schleifstein, "Breaux Act Anniversary Marks 20 Years of Coastal Restoration Progress," *Times-Picayune*, April 8, 2010; *Caring for Coastal Wetlands: The Coastal Wetlands Planning, Protection and Restoration Act* (LaCoast.gov, November 2007), http://lacoast.gov/new/Pubs/Report_data/Caring.aspx.

[54] Louisiana Wetlands Conservation and Restoration Task Force and the Wetlands Conservation and Restoration Authority, *Coast 2050: Toward a Sustainable Coastal Louisiana, an Executive Summary* (Louisiana Department of Natural Resources, 1998).

[55] Joel Bourne, "Gone with the Water," *National Geographic*, October 2004; Water Resources Development Act of 2007, Pub. L. No. 110–114, Title VII, 121 Stat. 1041, 1270–1283 (2007).

[56] State of Louisiana, *Coastal Protection & Restoration: Funding Sources*, http://www.coastal.la.gov/index.cfm?md=pa gebuilder&tmp=home&nid=123&pnid=79&pid=82&catid=0&elid=0.

[57] Donald T. Resio and Joannes J. Westerink, "Modeling the physics of storm surges," *Physics Today* 61, no. 9 (September 2008): 32–38.

[58] Louisiana Office of Coastal Protection and Restoration, Library, *Coastal Initiatives & Programs*, "http://coastal.la.gov/ index.cfm?md=pagebuilder&tmp=home&nid=82&pnid=76&pid=77&catid=0&elid=0 ("Donaldsonville to the Gulf Panel" and "Morganza to the Gulf Project").

[59] U.S. Army Corps of Engineers, *Mississippi Coastal Improvement Program (MsCIP) Interim Report* (2006).

[60] Supplemental Appropriations Act of 2009, H.R. 2346, Title IV.

[61] U.S. Army Corps of Engineers, *Louisiana Coastal Protection and Restoration (LACPR): Final Technical Report* (June 2009).

[62] Louisiana Coastal Protection and Restoration Authority, *Fiscal Year 2008 Annual Plan: Ecosystem Restoration and Hurricane Protection in Coastal Louisiana* (April 2007); Coastal Protection and Restoration Authority of Louisiana, *Fiscal Year 2011 Annual Plan: Integrated Ecosystem Restoration and Hurricane Protection in Coastal Louisiana*, (Baton Rouge, 2010): xiii.

[63] Bureau of Ocean Energy Management, Regulation and Enforcement, *Coastal Impact Assistance Program (CIAP)*, http://www.boemre.gov/offshore/ciapmain.htm.

[64] Bureau of Ocean Energy Management, Regulation and Enforcement, Gulf of Mexico Energy Security Act (GOMESA), http://www.boemre.gov/offshore/GOMESARevenueSharing.htm.

[65] White House Council on Environmental Quality, *Gulf Coast Ecosystem Restoration*, http://www.whitehouse.gov/ administration/eop/ceq/initiatives/gulfcoast.

[66] Louisiana-Mississippi Gulf Coast Ecosystem Restoration Working Group, *Roadmap for Restoring Ecosystem Resiliency and Sustainability* (March 2010).

[67] Mabus, *America's Gulf Coast: A Long Term Recovery Plan after the Deepwater Horizon Oil Spill.*

[68] Executive Order 13554: Establishing the Gulf Coast Ecosystem Restoration Task Force, 75 Fed. Reg. 62313, October 5, 2010.

[69] Frank Donze, "Gulf Coast Restoration Chief Ray Mabus has no Oil Spill Answers Just Yet," *Times-Picayune*, June 29, 2010.

[70] Estimate based on John Barras, *Land Area Change in Coastal Louisiana—a Multidecadal Perspective (from 1956 to 2006)* (U.S.Geological Survey, 2008).

[71] Louisiana-Mississippi Gulf Coast Ecosystem Restoration Working Group, *Roadmap for Restoring Ecosystem Resiliency and Sustainability*, 2–3.

[72] Testimony of Brian McPeek, Regional Managing Director for North America, The Nature Conservancy, Hearing before the National Commission, September 28, 2010.

[73] Testimony of James T.B. Tripp, Senior Counsel, Environmental Defense Fund, Hearing before the National Commission, Sept 28, 2010; Testimony of Brian McPeek.

[74] Gulf of Mexico Energy Security Act of 2006, Pub. L. 109–432.

[75] 33 U.S.C. § 2706(e).

[76] 33 U.S.C. § 1321(b)(7); 40 C.F.R. § 19.4. According to the current official government estimate, the Macondo well released approximately 4.9 million barrels of oil over the course of the spill (±10 percent), roughly 830,000 barrels of which were captured at the wellhead using the top hat and other devices. *Deepwater Horizon MC252 Gulf Incident Oil Budget* (August 1, 2010), http://www.noaanews.noaa.gov/stories2010/PDFs/DeepwaterHorizonOil-Budget20100801.pdf); Joel Achenbach and David Fahrenthold, "Oil spill dumped 4.9 million barrels into Gulf of Mexico, latest measure shows," *Washington Post*, August 3, 2010 (range is $4.5 billion to $18 billion, based on estimated 4.1 million barrels discharged); Jonathan Tilove, "BP disputes government estimates of volume of Gulf of Mexico oil spill;" *Times-Picayune*, December 3, 2010 (penalties could be as high as $21 billion, based on estimate of 4.9 million barrels discharged). BP has not released its own estimate for the total release from the well, but it disputes the government's figures on the grounds that, among other things, they fail to take into account "significant flow impediments" and "rely on incomplete or inaccurate information, rest in large part on assumptions that have not been validated, and are subject to far greater uncertainties than have been acknowledged." BP, letter to the National Commission, October 21, 2010, 1, 4.

[77] Testimony of Richard Stewart, New York University School of Law, Hearing before the National Commission, September 28, 2010.

[78] 33 U.S.C. § 1319(c)(1).

[79] 33 U.S.C. § 1319(c)(2).

[80] 26 U.S.C. § 9509.

[81] Ray Mabus, *America's Gulf Coast: A Long Term Recovery Plan after the Deepwater Horizon Oil Spill*.

[82] Exxon Valdez Oil Spill Trustee Council, *Science Panel*, http://www.evostc.state.ak.us/people/sp.cfm.

[83] Joe Hunt, *Mission Without a Map: The Politics and Policies of Restoration Following the Exxon Valdez Oil Spill: 1989–2002*, Exxon Valdez Oil Spill Trustee Council (Anchorage, 2009): 156–157.

[84] See, e.g., Testimony of Stanley Senner, Director of Conservation Science, Ocean Conservancy, Hearing before the National Commission, September 28, 2010.

[85] President Barack Obama, "Remarks by the President to the Nation on the BP Oil Spill" (June 15, 2010),  http://www.whitehouse.gov/the-press-office/remarks-president-nation-bp-oil-spill.

[86] Press Release, Office of the Governor, Gov. Jindal Announces "Agenda For Revitalizing Coastal Louisiana," July 15, 2010, http://wwwprd.doa.louisiana.gov/LaNews/PublicPages/Dsp_PressRelease_Display.cfm?PressReleaseID=2550&Rec_ID=1.

[87] NOAA, Damage Assessment, *Remediation, and Restoration Program: Glossary*, http://www.darrp.noaa.gov/glossary/index.htm.

[88] Testimony of Stanley Senner.

# Chapter Eight

1 Magne Ognedal, "Thirty years since Kielland – why are major accidents still happening?" (speech, Petroleum Safety Authority of Norway, August 27, 2010) 3, http://www.ptil.no/major-accidents/safety-lunch-at-ons-risk-of-a-major-accident-is-always-present-article7202-144.html.

[2] BP, *Sustainability Review* (2009), 20–21. http://www.bp.com/assets/bp_internet/globalbp/STAGING/global_assets/e_s_assets/e_s_assets_2009/downloads_pdfs/bp_sustainability_review_2009.pdf.

[3] Health and Safety Executive, *Major Incident Investigation Report, BP Grangemouth Scotland (29th May – 10th June 2000)* (August 18, 2003), 7, http://www.hse.gov.uk/comah/bpgrange/images/bprgrangemouth.pdf.

[4] *Ibid.*

[5] *Ibid.*

[6] Health and Safety Executive, *BP Grangemouth Executive Summary—Findings and Recommendations*, http://www.hse.gov.uk/comah/bpgrange/execsumm/findings.htm.

[7] Andrew B. Wilson, "BP's Disaster: No Surprise to Folks in the Know," CBS, June 22, 2010, http://www.cbsnews.com/stories/2010/06/22/opinion/main6605248.shtml.

[8] Jan Erik Vinnem, *Offshore Risk Assessment: Principles, Modelling and Applications of QRA Studies*, Second Edition (London: Springer Studies in Reliability Engineering, 2007), 91, 100, 102.

[9] Andrew B. Wilson, "BP's Disaster: No Surprise to Folks in the Know," CBS, June 22, 2010, http://www.cbsnews.com/stories/2010/06/22/opinion/main6605248.shtml.

[10] Oberon Houston, email message to Commission staff.

[11] *The Report of the BP US Refineries Independent Safety Review Panel*, (January 2007).

[12] U.S. Chemical Safety and Hazard Investigation Board, *Investigation Report: Refinery Explosion and Fire* (March 2007),145, http://www.csb.gov/assets/document/CSBFinalReportBP.pdf.

[13] Testimony of Carolyn W. Merritt, Chairman and Chief Executive Officer, U.S. Chemical Safety Board, before the U.S. Senate Committee on Environment and Public Works, Subcommittee on Transportation Safety, Infrastructure Security, and Water Quality, July 10, 2007.

[14] *Ibid.*

[15] U.S. Chemical Safety and Hazard Investigation Board, *Investigation Report: Refinery Explosion and Fire*, 19–20.

[16] *Ibid.*

[17] *Ibid.*

[18] *The Report of the BP US Refineries Independent Safety Review Panel.*

[19] *Ibid.*

[20] *Ibid.*, 224.

[21] *Ibid.*, 165

[22] "BP's Alaskan Oil Spill Triggers Lawsuit," 815 *TCE: The Chemical Engineer* (May 2009): 9.

[23] *Ibid.*

[24] *Ibid.*

[25] "BP Faces Lawsuits for 2006 Spills," 32 *Oil Spill Intelligence Report*, no. 17 (April 16, 2009); "BP Settles with Royalty Trust," 32 *Oil Spill Intelligence Report*, no. 22 (May 21, 2009).

[26] *The Report of the BP US Refineries Independent Safety Review Panel*, 1.

[27] *Ibid.*, XVII.

[28] L. Duane Wilson, *Independent Expert Third Annual Report, 2001 covering January–December 2009* (March 2010): 4.

[29] Ibid., 25–26.

[30] Elmer Danenberger, interview with Commission staff, December 9, 2010.

[31] BP, Deepwater Horizon *Accident Investigation Report* (September 8, 2010).

[32] "BP Report Attacked," *New Scientist*, 2 October, 2010, 4.

[33] Richard Sears, e-mail message to Commission staff, November 23, 2010.

[34] Consulting Services Lloyd's Register EMEA Aberdeen Energy, *North American Division Summary Report* (March 2010).

[35] *Ibid.*, App. C, 6.

[36] *Ibid.*, App. C, 8, 11.

[37] *Ibid.*, 10–11.

[38] *Ibid.*, 29.

[39] Halliburton, *History of Halliburton*, http://www.halliburton.com/AboutUs/default.aspx?navid=970&pageid=2312.

[40] *Ibid.*

[41] Russell Gold and Ben Casselman, "Drilling Process Attracts Scrutiny in Rig Explosion," *Wall Street Journal*, April 30, 2010.

[42] Montara Commission of Inquiry, *Report of the Montara Commission of Inquiry*, (June 17, 2010), http://www.ret.gov.au/Department/Documents/MIR/Montara-Report.pdf.

[43] *Ibid.*, 63.

[44] *Ibid.*

[45] Commission staff created this map and associated table using loss of well control data available on BOEMRE's Incident Statistics and Summary webpage. Although efforts were made to accurately capture and illustrate every loss of well control from 1996-2009 in the U.S. Gulf of Mexico, the data presented does not purport to be comprehensive, but instead illustrative of the fact that losses of well control, blowouts, potential catastrophes, and near misses are more frequent than commonly reported and publicized.

[46] Commission staff analysis of International Regulators Forum International Association of Drilling Contractors and International Association of Oil and Gas Producers data. See http://www.irfoffshoresafety.com/country/performance/, http://www.iadc.org/asp/htm, and http://www.ogp.org.uk/index.asp?main=publications/main.asp.

47 Testimony of Eric Milito, Upstream Director, American Petroleum Institute, "The Deepwater Horizon Incident: Are The Minerals Management Service Regulations Doing The Job?" Hearing Before the Subcommittee on Energy and Mineral Resources of the House Committee on Natural Resources, 111th Congress (2010) ("Since 1924, API has developed industry standards and practices that promote reliability and safety through the use of proven engineering practices. . . . API standards are developed through a collaborative effort among industry experts, technical experts from government, and other interested stakeholders. The industry has helped create more than 500 standards, including some 240 exploration and production standards that address offshore operations.")

48 American Petroleum Institute, API 2010 Publics Programs and Services Catalog (March 2010), http://www.api.org/Standards/upload/2010_Catalog_web.pdf.

49 American Petroleum Institute, "Certifications recognized around the world," *Training and Certifications Program brochure* (August 9, 2009), http://www.api.org/certifications/upload/ENGLISH_SUMMARY_BROCH.pdf.

50 Testimony of Eric Milito ("Seventy-eight of these standards are referenced in Minerals Management Service regulations."). For MMS rulemakings that incorporate industry standards into regulations over time, see Oil and Gas and Sulphur Operations in the Outer Continental Shelf, 61 Fed. Reg. 60,019 (November 26, 1996); Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Pipelines and Pipeline Rights-of-Way, 72 Fed. Reg. 56,442 (October 3, 2007); Press Release, Minerals Management Service, Minerals Management Service to Adopt the Latest Edition of Industry  Standard on Fixed Offshore Production Platforms, April 21, 2003, http://www.boemre.gov/ooc/press/2003/press4-21.htm.

51 Letter from Allen Verret, Offshore Operators Committee, and Tim Sampson, American Petroleum Institute, to the U.S. Minerals Management Service (September 15, 2009), http://www.scribd.com/doc/30588089/Joint-API-OOC-Letter-to-MMS; American Petroleum Institute and Offshore Operators Committee, "Safety and Environmental Management Systems for Outer Continental Shelf Oil and Gas Operations," Public Comment (September 15, 2009), http://www.boemre.gov/federalregister/PublicComments/AD15SafetyEnvMgmtSysforOCSOilGasOperations/OOCAPICommentLetter9-15-09.pdf; American Petroleum Institute, "Postlease Operations Safety," Public Comment (July 1, 1998), http://www.boemre.gov/federalregister/PublicComments/Sub_A_Comments/prorule.pdf, http://www.boemre.gov/federalregister/PublicComments/Sub_A_Comments/subacomm.pdf.

52 Commission staff held several meetings during August and September 2010 with representatives of major oil and gas companies during which the role of API in standard setting processing, including the impact of API's broader advocacy role on those standards, was discussed.

53 T.A.F. Powell, "US Voluntary SEMP Initiative: Holy Grail or Poisoned Chalice?" (Offshore Technology Conference [OTC] Paper 8111, May 1996).

54 Letter from Allen Verret, Offshore Operators Committee, and Tim Sampson, American Petroleum Institute, to the U.S. Minerals Management Service (September 15, 2009), http://www.scribd.com/doc/30588089/Joint-API-OOC-Letter-to-MMS; Offshore Operators Committee and American Petroleum Institute, "Oil, Gas, and Sulphur Operations in the Outer Continental Shelf (OCS)—Safety and Environmental Management Systems," Public Comment (May 22, 2006).

55 T.A.F. Powell, "US Voluntary SEMP Initiative: Holy Grail or Poisoned Chalice?"

56 Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Safety and Environmental Management Systems, 75 Fed. Reg. 199 (October 15, 2010).

57 T.A.F. Powell, "US Voluntary SEMP Initiative: Holy Grail or Poisoned Chalice?"

58 Elmer Danenberger, interview with Commission staff, December 9, 2010.

59 Testimony of Tad W. Patzek, "Beneath the Surface of the BP Spill: What's Happening Now, What's Needed Next," Briefing Before the Subcommitee on Energy and Environment of the House Committee on Energy and Commerce, 111th Congess (2010): 4.

60 *Ibid.*

61 *Ibid.*

62 Testimony of James Ellis, Institute of Nuclear Power Operations, Hearing before the National Commission, August 25, 2010.

63 Federal Aviation Administration, "Mission," http://www.faa.gov/about/mission/.

64 Federal Aviation Administration, "Delegation and Designee Background," http://www.faa.gov/about/history/deldes_background/.

65 Federal Aviation Administration, "Designees and Delegations: Designated Engineering Representative (DER)," http://www.faa.gov/other_visit/aviation_industry/designees_delegations/designee_types/der/; Nancy Leveson (MIT), interview with Commission staff, October 13, 2010.

66 Federal Aviation Administration, "Delegation and Designee Background," http://www.faa.gov/about/history/deldes_background/.

67 Leveson, interview.

68 *Ibid.*
69 Nancy Leveson, *Safeware: System Safety and Computers* 556 (Boston: Addison-Wesley, 1995).

70 *Ibid.*

71 Nancy Leveson, *Engineering A Safer World: Systems Thinking Applied To Safety* 376–77 (Cambridge, MA: MIT Press, forthcoming in 2011), http://sunnyday.mit.edu/safer-world.

72 *Ibid.*, 375.

73 *Ibid.*, 376.

74 *Ibid.*, 376, 378.

75 *Ibid.*, 375–6.

76 *Ibid.*, 375–6.

77 *Ibid.*, 378.

78 *Ibid.*, 378.

79 *Ibid.*, 379.

80 *Ibid.*, 380–1.

81 *Ibid.*, 380.

82 *Ibid.*, 380.

83 *Ibid.*, 380.

84 *Ibid.*, 381–2.

85 *Ibid.*, 385.

86 *Ibid.*, 385–6.

87 *Ibid.*, 388.

88 Alaska Oil Spill Commission, *Spill: The Wreck of the Exxon Valdez* (Final Report) (February 1990), 1.

89 Samuel K. Skinner and William K. Reilly, *The Exxon Valdez Oil Spill: A Report to the President* (May 1989), 1.

90 *Ibid.*, 27–8.

91 National Transportation Safety Board, *Safety Recommendation* (September 18, 1990), http://www.ntsb.gov/recs/letters/1990/M90_26_31A.pdf.

92 Exxon Valdez Oil Spill Trustee Council, "Settlement," http://www.evostc.state.ak.us/facts/settlement.cfm; Exxon Valdez Oil Spill Trustee Council, "Questions and Answers," http://www.evostc.state.ak.us/facts/qanda.cfm.

93 Exxon Mobil, *2009 Corporate Citizenship Report*, 15.

94 Testimony of Rex Tillerson, CEO of Exxon Mobil, Hearing before the National Commission, November 9, 2010.

95 *Ibid.*

96 *Ibid.*

97 Exxon Mobil, *2009 Corporate Citizenship Report*, 14.

98 *Ibid.*, 13, 19.

99 "Shell 'Ignored Accident Warning,'" BBC online, June 14, 2006, http://news.bbc.co.uk/2/hi/5077886.stm; Terry Macalister, "Shell Accused Over Oil Rig Safety," *The Guardian*, June 23, 2006.

100 "Shell 'Ignored Accident Warning.'"

101 Shell, *Sustainability Report 2009*, 16–17, http://sustainabilityreport.shell.com/2009/servicepages/downloads/files/all_shell_sr09.pdf.

102 Testimony of Marvin Odum, Shell, Hearing before the National Commission, November 9, 2010.

103 *Ibid.*

104 *Ibid.*

105 *Ibid.*

106 *Ibid.*

107 Responsible Care, Who We Are, http://www.responsiblecare.org/page.asp?p=6406.

108 *Ibid.*

109 Jody Freeman, "Private Parties, Public Functions and the New Administrative Law" in *Recrafting the Rule of Law: The Limits of Legal Order*, ed. David Dyzenhaus (Toronto: Hart Publishing, 1999), 21.

110 *Ibid.*, 33.

111 Press Release, Securities and Exchange Commission, Chairman Cox Announces End of Consolidated Supervised Entities Program, September 26, 2008; Stephen Labaton, "Agency's '04 Rule Let Banks Pile Up New Debt," *New York Times*, October 3, 2008.

112 Press Release, Securities and Exchange Commission, Chairman Cox Announces End of Consolidated Supervised Entities Program.

113 Edward J. Balleisen and Marc Eisner, "The Promise and Pitfalls of Co-Regulation: How Governments Can Draw on Private Governance for Public Purpose," in *New Perspectives on Regulation*, ed. David Moss and John Cisternino, (Cambridge, UK: Cambridge University Press, 2009), 31.

114 *Ibid.*, 130.

115 *Ibid.*

116 *Ibid.*

117 Testimony of Marvin Fertel, President and CEO of Nuclear Energy Institute, "Three Mile Island—Looking Back on Thirty Years of Lessons Learned," Before the Subcommittee on Clean Air and Nuclear Safety, 111th Congress (2009).

118 Testimony of James Ellis, Institute of Nuclear Power Operations, Hearing before the National Commission, August 25, 2010.

119 John G. Kemeny, *Report of The President's Commission on the Accident at Three Mile Island: The Need for Change: The Legacy of TMI* (1979), 68. The full subsection of the recommendation reads, "The industry should establish a program that specifies appropriate safety standards including those for management, quality assurance, and operating procedures and practices, and that conducts independent evaluations. The recently created Institute of Nuclear Power Operations, or some similar organization, may be an appropriate vehicle for establishing and implementing this program."

120 Institute of Nuclear Power Operations, "About Us," http://www.inpo.info/AboutUs.htm.

121 Joseph V. Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island* (Chicago: University of Chicago Press, 1996), 50–51.

122 Lee Gard, interview with Commission staff, November 8, 2010.

123 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 57–58.

124 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 143.

125 Lee Gard, interview.

126 *Ibid.*

127 *Ibid.*

128 *Ibid.*

129 *Ibid.*

130 *Ibid.*

131 Lee Gard, e-mail message to Commission Staff, December 6, 2010.

132 Lee Gard, interview.

133 Testimony of A. C. Tollison Jr., Executive Vice President, Institute of Nuclear Power Operations, "National Energy Policy: Nuclear Energy," Before the Subcommittee on Energy and Air Quality, 107th Congress (2001).

134 *Ibid.*

135 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 76.

136 Alice Camp, "Nuclear: In Pursuit of a Renaissance," *EPRI Journal* (Summer 2007): 20.

137 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 81.

138 *Ibid.*, 53.

139 *Ibid.*, 53

140 *Ibid.*, 53–54.

141 Lee Gard, e-mail message to Commission Staff, December 1, 2010.

142 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 104.

143 Lee Gard, interview.

144 Michael Golay (MIT), interview with Commission Staff, October 27, 2010.

145 Lee Gard, e-mail message to Commission Staff, December 1, 2010.

146 Michael Rencheck (AREVA Inc.), interview with Commission staff, November 1, 2010.

147 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 104.

148 Michael Golay, interview.

149 33 U.S.C. § 2210.

150 Lee Gard, e-mail message to Commission Staff, December 1, 2010.

151 Lee Gard, e-mail message to Commission Staff, November 15, 2010.

152 Lee Gard, e-mail message to Commission Staff, December 13, 2010.

153 "Oil Industry Needs Self-Regulation, Says Alternate Energy Holdings Inc. CEO," *Forbes Magazine*, August 26, 2010.

154 Lee Gard, interview.

155 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 57.

156 Lee Gard, interview.

157 *Ibid.*

158 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 96–97.

159 *Ibid.*, 116.

160 *Ibid.*, 111–117.

161 Testimony of James Ellis, Institute of Nuclear Power Operations, Hearing before the National Commission, August 25, 2010; Institute of Nuclear Power Operations, *2009 Annual Report*; Institute of Nuclear Power Operations, *1994 Annual Report*.

162 Testimony of James Ellis, Institute of Nuclear Power Operations, Hearing before the National Commission, August 25, 2010.

163 Institute of Nuclear Power Operations, *Performance Objectives and Criteria* (May 2005); Institute of Nuclear Power Operations, *Principles for Nuclear Safety Culture* (November 2004).

164 Rees, *Hostages of Each Other: The Transformation of Nuclear Safety Since Three Mile Island*, 44.

165 *Ibid.*, 64.

166 U.S. Department of the Interior, Outer Continental Shelf Safety Oversight Board, *Report to the Secretary of the Interior* (September 1, 2010), 11–13.

167 *Ibid.*, 13–14.

168 10 C.F.R. Parts 1–171.

169 Testimony of Rex Tillerson, Exxon Mobil, Hearing before the National Commission, November 9, 2010.

170 *Ibid.*

171 Testimony of Michael Bromwich, Director, Bureau of Ocean Energy Management, Regulation and Enforcement, Department of the Interior, Hearing before the National Commission, November 9, 2010, 228.

172 Oil and Gas and Sulphur Operations in the Outer Continental Shelf – Safety and Environmental Management Systems, 75 Fed. Reg. 199 (October 15, 2010).

173 National Commission Staff, "Response/Clean-Up Technology Research & Development and the Deepwater Horizon Oil Spill," (staff working paper, 2010)

174 Angel Gonzalez, "Oil Firms Plan Rapid-Response Force," *Wall Street Journal*, July 22, 2010; Daniel Squire, e-mail message to Commission staff, December 1, 2010.

175 Marine Well Containment Company, "Industry Initiatives to Ensure Safe, Protective Drilling Practices in the Deepwater Gulf of Mexico: The Marine Well Containment System" (presentation, Washington, D.C., September 2010).

176 Marine Well Containment Company, "About Us," http://www.marinewellcontainment.com/index.php.

177 Helix Energy Solutions Group, "Spill Containment: Fast Response to GOM Subsea Oil Spills" (unpublished document provided to Commission staff by Helix Energy Solutions Group).

178 Independent Deepwater Exploration Coalition, meeting with Commission staff, November, 29, 2010.

179 "Moody's Offshore drilling insurance rates to jump," *BusinessWeek*, June 4, 2010.

180 Julia Kollewe, "Oil Industry Set for Surge in Insurance Premiums after Deepwater Disaster," *The Guardian*, September 20, 2010, http://www.guardian.co.uk/business/2010/sep/20/deepwater-oil-rigs-insurance-costs.

181 Aspen Re interview with Commission staff, October 19, 2010; Testimony of Dr. Robert Hartwig, President and Economist, Insurance Information Institute, "Liability and Financial Responsibility for Oil Spills under the Oil Pollution Act of 1990 and Related Statutes," Hearing Before the House Committee on Transportation and Infrastructure, 111th Congress (2010).

182 33 U.S.C. § 2702.

183 *Ibid.*

184 33 U.S.C. § 2704.

185 33 U.S.C. § 2704; 33 U.S.C § 1321 (Clean Water Act civil and criminal penalties); Jonathan Ramseur, *Oil Spills in U.S. Coastal Waters: Background, Governance, and Issues for Congress* (Congressional Research Service, updated September 2, 2008), 26 ("A 2003 study identified 16 states that impose unlimited liability for oil spills.").

[186] CLEAR Act, H.R. 3534, 111th Cong. § 702 (2010) (as passed by House); S. 3663, 111th Cong. §102 (2010)("Reid Clean Energy bill"); RESPOND Act, S. 3763, 111th Cong. § 6 (2010)("Landrieu bill"); Big Oil Bailout Prevention Act, H.R. 5214, 111th Cong. § 2 (2010).

[187] Testimony of Charles Anderson, SKULD North America, "Liability and Financial Responsibility for Oil Spills under the Oil Pollution Act of 1990 and Related Statutes," Hearing Before the House Committee on Transportation and Infrastructure, 111th Congress (2010), 9.

[188] Graeme Wearden, "BP oil spill costs to hit $40bn," *The Guardian*, November 2, 2010 ($39.9 billion estimated costs); 33 U.S.C. §2716 (maximum required financial responsibility for offshore facilities is $150 million).

[189] Rawle King, *Deepwater Horizon Oil Spill Disaster: Risk, Recovery, and Insurance Implications* (Congressional Research Service, July 12, 2010), 16–18.

[190] Press Release, Munich Re, Munich Re Develops New Insurance Solution for Oil Catastrophes, September 12, 2010, http://www.munichre.com/en/media_relations/press_releases/2010/2010_09_12_press_release.aspx; Munich Re executives, telephone interview with Commission staff, September 17, 2010.

[191] RESPOND Act, S. 3763, 111th Cong. § 7 (2010).

[192] Graeme Wearden, "BP oil spill costs to hit $40bn," *The Guardian*, November 2, 2010.

# Chapter Nine

[1] Exec. Order No. 13543, 75 Fed. Reg. 29,397 (May 21, 2010).

[2] See 43 U.S.C. § 1337(b)(6) ("An oil and gas lease issued pursuant to this section shall . . . contain such rental and other provisions as the Secretary may prescribe at the time of offering the area for lease.").

[3] These terms are taken directly from the Council on Environmental Quality (CEQ) NEPA implementing regulations. 40 C.F.R. § 1508.28.

[4] 40 C.F.R. §1508.4.

[5] A "Development Operations Coordination Document" in the Gulf of Mexico is functionally the same as a "Development and Production Plan" in other LES regions.

[6] Press Release, Department of the Interior, Categorical Exclusions for Gulf Offshore Activity to be Limited While Interior Reviews NEPA Process and Develops Revised Policy, August 16, 2010,

[7] Minerals Management Service, *MMS 2007–018 Gulf of Mexico OSC Oil and Gas Lease Sales: 2007–2010 Final Environmental Impact Statement* (April 2007), Volume I, 2–3 to 2–5.

[8] Minerals Management Service, *MMS 2007–026 Chukchi Sea Planning Area Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea Final Environmental Impact Statement* (May 2007), Volume I, 1.

[9] Department of Interior, *Department Manual Part 516: National Environmental Policy Act of 1969* (September 2009), 3.4.

[10] Government Accountability Office, *GAO–10–276 Offshore Oil and Gas Development: Additional Guidance Would Help Strengthen the Minerals Management Service's Assessment of Environmental Impacts in the North Aleutian Basin* (March 2010), 21.

[11] Council on Environmental Quality, *Final Recommendations of the Interagency Ocean Policy Task Force* (July 19, 2010), 41.

[12] 43 U.S.C. § 1346.

[13] Commission staff analysis of MMS yearly budget request and enactments, by nominal and real (2005) dollars. Bureau of Ocean Energy Management, *Office of Administration and Budget: Budget Division*, http://www.boemre.gov/adm/budget.html; Herbert Kaufman and Cheryl Anderson, Department of the Interior, *OCS Environmental Studies Contract Projects—Fiscals Years 1973 through 1983* (DOI Minerals Management Service Branch of Environmental Studies, December 1983), II-8.

[14] 33 U.S.C. § 1321(j)(5)(D)(i); 40 C.F.R. § 300.211.

[15] 30 C.F.R. § 254.2(a).

[16] 30 C.F.R. § 254.126

[17] 40 C.F.R. § 300.322

[18] 23 U.S.C. § 125.

[19] Pub. L. No. 107–171,  § 2701,116 Stat. 134, 278–279 (2002).

[20] Department of the Interior, National Notice to Lessees and Operators of Federal Oil and Gas Leases, Outer Continental Shelf No. 2010–N10 (November 8, 2010), http://www.gomr.boemre.gov/homepg/regulate/regs/ntls/2010NTLs/10-n10.pdf.

[21] 30 C.F.R. §§ 250.410–418.

[22] 30 C.F.R. § 250.418(j).

[23] Transcript, Deepwater Blowout Containment Conference (September 22, 2010), http://www.doi.gov/news/video/ Deepwater-Blowout-Containment-Conference.cfm.

[24] Doug Suttles, interview with Commission staff, October 13, 2010.

[25] Response workers generally must be trained pursuant to the Hazardous Waste Operations and Emergency Response ("HAZWOPER") regulation administered by the Occupational Safety and Health Administration. 29 C.F.R. § 1910.120. This regulation requires specific training and medical surveillance and monitoring for workers dealing with hazardous materials. While this regulation presumably applied to formal response contractors after the Deepwater Horizon spill, it was not applied consistently to citizen responders who also require its protections.

[26] Public information should further be provided in languages and formats that are understandable to individuals with limited English proficiency and individuals with disabilities. ESF #8—Public Health and Medical Services Annex at 7.

[27] Indeed, the Public Health and Medical Services Annex provides for long-term monitoring of potentially exposed individuals, requiring the Department of Health and Human Services to "assist[] State, tribal, and local officials in establishing a registry of potentially exposed individuals . . . and conducting long-term monitoring of this population for potential long-term health effects." ESF #8 – Public Health and Medical Services Annex at 9–10; Rebecca Bratspies, et al., *From Ship to Shore: Reforming the National Contingency Plan to Improve Protections for Oil Spill Cleanup Workers* (Center for Progressive Reform, September 2010).

[28] Whether or not respirators should be required for cleanup workers emerged as a major controversy in the response.

[29] Ray Mabus, *America's Gulf Coast: A Long Term Recovery Plan after the Deepwater Horizon Oil Spill* (September 2010); Exec. Order No. 13554, 75 Fed. Reg. 62313–62317 (October 8, 2010).

[30] Federal liability for damages is not the only potential liability that could result from an offshore drilling incident. Under the Oil Pollution Act, drillers are strictly liable for removal costs. Companies can also be subject to federal civil and criminal penalties as well as unlimited liability for damages under some state laws. These liabilities presumably drive business to internalize risk and mitigate safety, though not as fully as they might if damages liability were not capped.

[31] Gulf Coast Claims Facility, *Frequently Asked Questions*, http://www.restorethegulf.gov/sites/default/files/imported_pdfs/library/assets/gccf-faqs.pdf.

[32] Gulf Coast Claims Facility, *Frequently Asked Questions*, http://www.gulfcoastclaimsfacility.com/faq#Q9. Government claims for loss of revenue are being handled by BP: http://www.bp.com/governmentclaims. A $60 million BP fund is in place for real estate claims across the five Gulf states and is being administered by National Catastrophe Adjusters, a claims adjustment firm: www.gulfreclaims.com; Kathy Jumper, "Realtors Tap National Catastrophe Adjusters To Administer Oil Spill Claims," *Press-Register*, August 24, 2010, http://blog.al.com/live/2010/08/realtors_oil_claims.html.  BP has set aside $100 million for rig workers who experience hardship due to the moratorium, to be administered by the Gulf Coast Restoration and Protection Foundation: http://www.gcrpf.org/.  Claims for repairs or damage to vessels involved in the Vessel of Opportunity program are being handled by BP.

[33] Letter from Thomas J. Perrelli, Associate Attorney General, Department of Justice, to Kenneth Feinberg, September 17, 2010.

[34] "Leader on BP Claims Blames Fraud for Slow Payouts", *Associated Press*, October 5, 2010.

[35] Press Release, Gulf Coast Claims Facility, Feinberg Announces Faster and More Generous Payments from GCCF, September 25, 2010, http://www.gulfcoastclaimsfacility.com/press6.php; Press Release, Gulf Coast Claims Facility, Feinberg Announces Clarification Regarding Geographic Proximity, October 4, 2010, http://www.gulfcoastclaims-facility.com/press7.php; Editorial, "Are Victims of the Gulf Oil Spill Getting What They Deserve?," *Washington Post*, November 25, 2010, http://www.gulfcoastclaimsfacility.com/pressA.php; Siobhan Hughes and Ryan December, "Feinberg Softens His Stance on Claims From Spill," *Wall Street Journal*, November 26, 2010.

[36] Gulf Coast Claims Facility, GCCF Program Statistics—Overall Summary, Gulf Coast Claims Facility, December 11, 2010, http://www.gulfcoastclaimsfacility.com/GCCF_Overall_Status_Report.pdf.

[37] Minerals Management Service, Budget Justifications and Performance Information Fiscal Year 2011.

[38] 43 U.S.C. § 1337(b)(6).

## Chapter Ten

[1] Energy Information Administration, *Annual Energy Review 2009* (August 19, 2010), Table 5.2, 131, http://www.eia.doe.gov/emeu/aer/pdf/pages/sec5_7.pdf.

[2] Energy Information Administration, *Annual Energy Outlook 2010* (April, 2010), 75, http://www.eia.doe.gov/oiaf/aeo/pdf/0383(2010).pdf.

[3] Technically recoverable reserves, however, are very different from proven reserves, because the former unlike the latter includes reserves that may well be as a practical manner be too expensive to recover.

[4] Energy Information Administration, *Annual Energy Review 2008* (June 26, 2009), Table 4.1, 99, http://www.eia.

gov/FTPROOT/multifuel/038408.pdf.

5 National Academy of Sciences, *Advancing the Science of Climate Change* (Washington, D.C.: The National Academies Press, 2010).

6 Energy Information Administration, *Annual Energy Review 2009* (August 19, 2010), Figure 2.0, 37, http://www.eia. gov/emeu/aer/pdf/pages/sec2.pdf. (Most of the remaining transportation fuels came from ethanol and natural gas.)

7 National Academy of Sciences, *America's Energy Future: Technology and Transformation* (Washington, D.C.: The National Academies Press, 2010), xi.

8 Energy Information Administration, *Annual Energy Review 2009*, Tables 4.2, 5.1, 101, 129 (calculated from tables) http://www.eia.doe.gov/aer/pdf/aer.pdf.

9 *Ibid.*, Table 11.5, 315.

10 *Ibid.*, Tables 11.4, 11.10, 313, 325 (calculated based on tables). "Proved reserves" represent only a small part of can be ultimately recovered and are estimated by different standards around the world.

11 *Ibid.*, Table 5.17, 167, http://www.eia.gov/emeu/aer/pdf/pages/sec5_43.pdf.

12 *Ibid.*, Table 3.5, 77. http://www.eia.gov/emeu/aer/pdf/pages/sec3_11.pdf

13 Stephen Brown and Hillard Huntington, "Estimating U.S. Oil Security Premiums: EMF OP 68," September 2009.

14 Census Bureau, "Trade in Goods (Imports, Exports and Trade Balance) with China 1985–2010," http://www.census. gov/foreign-trade/balance/c5700.html#2010.

15 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards, 75 Fed. Reg. 25,324 (May 7, 2010). The joint rulemaking in 2010 by the Department of Transportation and EPA establishing light duty vehicle greenhouse gas emission standards and corporate average fuel economy standards promises to significantly increase fuel efficiency and reduce greenhouse gas emissions.

16 Jay Hakes, *A Declaration of Energy Independence: How Freedom from Foreign Oil Can Improve National Security, Our Economy, and the Environment* (Hoboken, New Jersey: John Wiley & Sons, 1978),  68–70, 87–88; Energy Information Administration, *Annual Energy Review 2009* (August 19, 2010), Figure 5.1, 129, http://www.eia.gov/ emeu/aer/pdf/pages/sec5_5.pdf.

17 National Research Council, *America's Energy Future: Technology and Transformation* (Washington D.C.: National Academies Press, 2009); National Research Council, *Limiting the Magnitude of Future Climate Change* (Washington D.C.: National Academies Press, 2010).

18 President's Council of Advisors on Science and Technology, *Report to the President on Accelerating the Pace of Change in Energy Technologies through an Integrated Federal Energy Policy* (Washington D.C.: Executive Office of the President, 2010).

19 "Shares," Gazprom, http://www.gazprom.com/investors/stock/.

20 "The Other Way Out," *Economist*, November 19, 2010; Energy Information Administration, "Country Analysis Briefs: Mexico," June 2010.

21 There are also massive natural gas resources in and off Alaska, but until a pipeline is built to the lower 48 states, the gas cannot be brought to market and used.

22 Department of the Interior, "Estimated Undiscovered, Economically Recoverable Resources," http://www.doi.gov/ whatwedo/energy/ocs/upload/UERR-map-2012-2017-80-NoYear-Note.pdf.

23 Bureau of Ocean Energy Management, "Lease Sales," December 2, 2010, http://alaska.boemre.gov/lease/hlease/ LeasingTables/lease_sales.pdf; Minerals Management Service, "Summary of Company Bids," February 7, 2008, http://alaska.boemre.gov/cproject/Chukchi193/193Saleday/Sale%20193%20Sum%20of%20Co%20Bids%20by%20 Co%20Code.pdf.

24 *Energy Information Administration, Annual Energy Review 2009*, Table 5.2, 131.

25 Energy Information Administration, Annual Energy Outlook 2011, Table A14.

26 Unpublished information provided to the Commission by the Energy Information Administration.

27 Northern Economics, *Economic Analysis of Future Offshore Oil and Gas Development: Beaufort Sea, Chukchi Sea, North Aleutian Basin* (March 2009), ES-7, 9.

28 Audobon Alaska, "Chukchi Sea," http://ak.audubon.org/issues-action/chukchi-sea.

29 Press Release, Department of the Interior, U.S. Fish and Wildlife Service Announces Final Designation of Polar Bear Critical Habitat, November 24, 2010.

30 Lori Quakenbush, "Bowhead Whale," Alaska Department of Fish & Game, September 22, 2010.

31 *Ibid.*

32 Ronald O'Rourke, *Changes in the Arctic: Background and Issues for Congress* (Congressional Research Service, October 15, 2010), 31 ("On June 25, 2010, the Coast Guard announced that Polar Sea had suffered an unexpected engine casualty and consequently will likely be unavailable for operation until at least January 2011.").

33 The Arctic Council is a multinational and intergovernmental group. Members include the governments of Canada,

Denmark (including the Faroe Islands and Greenland), Finland, Iceland, Norway, the Russian Federation, Sweden, and the United States of America. The Permanent Participants of the Arctic Council are: Aleut International Association (AIA), Arctic Athabaskan Council (AAC), Gwich'in Council International (GCI), Inuit Circumpolar Council (ICC), Russian Association of Indigenous Peoples of the North (RAIPON), and the Saami Council.

# Appendix A

## Commission Members



SENATOR BOB GRAHAM, Co–Chair, is the former two–term governor of Florida and served for 18 years in the United States Senate. After retiring from public life in January 2005, Senator Graham served for a year as a senior fellow at the Harvard Kennedy School of Government. There he commenced writing *America, the Owner's Manual*, published in 2009 as a guide to participatory citizenship. From May 2008 to February 2010, he served as chairman of the Commission on the Prevention of Weapons of Mass Destruction Proliferation and Terrorism, and currently serves as a member of the Financial Crisis Inquiry Commission and the CIA's Executive Advisory Board.



WILLIAM K. REILLY, Co–Chair, is a founding partner of Aqua International Partners, LP, a private equity fund dedicated to investing in companies engaged in water and renewable energy, and a senior advisor to TPG Capital, LP, an international investment partnership. He co–chaired the National Commission on Energy Policy. Mr. Reilly served as Administrator of the U.S. Environmental Protection Agency (1989–1993) and president of World Wildlife Fund (1985–1989). He also served as the head of the U.S. delegation to the United Nations Earth Summit at Rio in 1992.

*Mandel Ngan/AFP/Getty Images*



FRANCES G. BEINECKE, Member, is the President of the Natural Resources Defense Council (NRDC), a non–profit corporation that works to advance environmental policy in the United States and across the world. In addition, Ms. Beinecke currently serves on the Board of the World Resources Institute and the steering committees of the U.S. Climate Action Partnership. She is a member of the Aspen Institute's Commission on Arctic Climate Change, and on the advisory boards of the Yale School of Management and the Yale School of Forestry and Environmental Science.



DONALD F. BOESCH, Member, is President of the University of Maryland Center for Environmental Science, where he is also a Professor of Marine Science and Vice Chancellor for Environmental Sustainability for the University System of Maryland. He is a biological oceanographer who has conducted research on coastal ecosystems along the Atlantic Coast, the Gulf of Mexico, Australia and the East China Sea. A native of Louisiana, he has assessed the long–term environmental effects of offshore oil and gas development and multiple environmental problems of the Gulf Coast.



TERRY D. GARCIA, Member, is currently Executive Vice President for Mission Programs for the National Geographic Society, responsible for the Society's core programs that manage more than 400 scientific field research, conservation and exploration projects annually. From 1994 to 1996, he was General Counsel at NOAA and led the implementation of the Exxon Valdez Oil Spill Restoration Plan for Prince William Sound and the Gulf of Alaska. From 1997 to 1999, he was Assistant Secretary of Commerce for Oceans and Atmosphere and Deputy Administrator of NOAA.



CHERRY A. MURRAY, Member, is Dean of the Harvard School of Engineering and Applied Sciences and John A. and Elizabeth S. Armstrong Professor of Engineering and Applied Sciences. She is currently the Past President of the American Physical Society. She was formerly Senior Vice President of Physical Science & Wireless Research at Bell Labs and past Principal Associate Director for Science & Technology at Lawrence Livermore National Laboratory. A member of the National Academy of Engineering and the National Academy of Sciences, she has served on more than 80 national and international scientific advisory committees, governing boards, and National Research Council panels, including chairing the Council's Division of Engineering and Physical Science.



FRAN ULMER, Member, is Chancellor of the University of Alaska Anchorage, Alaska's largest public university. Ms. Ulmer has served as Mayor of Juneau and Lieutenant Governor of Alaska. As a state legislator, she served on the Special Committee on the Exxon Valdez Oil Spill Claims Settlement. She has been a member of the North Pacific Anadromous Fish Commission, the Alaska Coastal Policy Council, the Alaska Nature Conservancy, the National Parks Conservation Association, the Aspen Institute's Commission on Arctic Climate Change, among many others.

# Appendix B

## List of Acronyms

| | |
|---|---|
| API | American Petroleum Institute |
| BOEMRE | Bureau of Ocean Energy Management, Regulation and Enforcement |
| CWA | Clean Water Act |
| DOI | Department of the Interior |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FDA | Food and Drug Administration |
| HPSA | Health Professional Shortage Area |
| IADC | International Association of Drilling Contractors |
| INPO | Institute of Nuclear Power Operations |
| MMS | Minerals Management Service |
| NASA | National Aeronautics and Space Administration |
| NEPA | National Environmental Policy Act |
| NOAA | National Oceanic and Atmospheric Administration |
| NRC | Nuclear Regulatory Commission |
| NRDA | Natural Resource Damage Assessment |
| OPA | Oil Pollution Act of 1990 |
| OPEC | Organization of Petroleum Exporting Countries |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| SEMP | Safety and Environmental Management Program |
| SEMS | Safety and Environmental Management Systems |

# Appendix C

## Executive Order-- National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1.  Establishment.  There is established the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Commission").

Sec. 2.  Membership.  (a)  The Commission shall be composed of not more than 7 members who shall be appointed by the President.  The members shall be drawn from among distinguished individuals, and may include those with experience in or representing the scientific, engineering, and environmental communities, the oil and gas industry, or any other area determined by the President to be of value to the Commission in carrying out its duties.

(b)  The President shall designate from among the Commission members two members to serve as Co Chairs.

Sec. 3.  Mission.  The Commission shall:

(a)  examine the relevant facts and circumstances concerning the root causes of the Deepwater Horizon oil disaster;

(b)  develop options for guarding against, and mitigating the impact of, oil spills associated with offshore drilling, taking into consideration the environmental, public health, and economic effects of such options, including options involving:

(1)  improvements to Federal laws, regulations, and industry practices applicable to offshore drilling that would ensure effective oversight, monitoring, and response capabilities; protect public health and safety, occupational health and safety, and the environment and natural resources; and address affected communities; and

(2)  organizational or other reforms of Federal agencies or processes necessary to ensure such improvements are implemented and maintained.

(c)  submit a final public report to the President with its findings and options for consideration within 6 months of the date of the Commission's first meeting.

Sec. 4.  Administration.  (a)  The Commission shall hold public hearings and shall request information including relevant documents from Federal, State, and local officials, nongovernmental organizations, private entities, scientific institutions, industry and

workforce representatives, communities, and others affected by the Deepwater Horizon oil disaster, as necessary to carry out its mission.

(b)  The heads of executive departments and agencies, to the extent permitted by law and consistent with their ongoing activities in response to the oil spill, shall provide the Commission such information and cooperation as it may require for purposes of carrying out its mission.

(c)  In carrying out its mission, the Commission shall be informed by, and shall strive to avoid duplicating, the analyses and investigations undertaken by other governmental, nongovernmental, and independent entities.

(d)  The Commission shall ensure that it does not interfere with or disrupt any ongoing or anticipated civil or criminal investigation or law enforcement activities or any effort to recover response costs or damages arising out of the Deepwater Horizon explosion, fire, and oil spill.  The Commission shall consult with the Department of Justice concerning the Commission's activities to avoid any risk of such interference or disruption.

(e)  The Commission shall have a staff, headed by an Executive Director.

(f)  The Commission shall terminate 60 days after submitting its final report.

Sec. 5.  General Provisions.  (a)  To the extent permitted by law, and subject to the availability of appropriations, the Secretary of Energy shall provide the Commission with such administrative services, funds, facilities, staff, and other support services as may be necessary to carry out its mission.

(b)  Insofar as the Federal Advisory Committee Act, as amended (5 U.S.C. App.) (the "Act"), may apply to the Commission, any functions of the President under that Act, except for those in section 6 of the Act, shall be performed by the Secretary of Energy in accordance with guidelines issued by the Administrator of General Services.

(c)  Members of the Commission shall serve without any additional compensation for their work on the Commission, but shall be allowed travel expenses, including per diem in lieu of subsistence, to the extent permitted by law for persons serving intermittently in the Government service (5 U.S.C. 5701–5707).

(d)  Nothing in this order shall be construed to impair or otherwise affect:

(1)  authority granted by law to a department, agency, or the head thereof; or

(2)  functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(e)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

THE WHITE HOUSE,
    May 21, 2010.

# Appendix D

## Commission Staff and Consultants

Richard Lazarus, *Executive Director*

Tracy Terry, *Deputy Director*

Fred Bartlit, *Chief Counsel*   Jay Hakes, *Director of Policy & Research*

Priya Aiyar
*Deputy Chief Counsel*

Felicia Barnes
*Analyst*

Adam Benthem
*Analyst*

Gordon Binder
*Senior Policy Advisor*

Paul Bledsoe
*Senior Policy Advisor*

Jed J. Borghei
*Counsel*

C. Hobson Bryan
*Analyst*

Edwin H. Clark, II
*Director of Operations*

Kate Clark
*Senior Analyst*

Dave Cohen
*Press Secretary*

Cindy Drucker
*Director of Public Engagement*

Katherine Duncan
*Analyst*

J. Jackson Eaton
*Counsel*

Michelle Farmer
Executive Legal Assistant

Sean Grimsley
*Deputy Chief Counsel*

David Greenberg
*Senior Policy Advisor*

Brent Harris
*Counsel*

Lisa K. Hemmer
*Senior Legal Advisor*

Joe Hernandez
*Analyst*

Joel Hewett
*Analyst*

Christiana James
*Staff Assistant*

Jill Jonnes
*Senior Researcher*

Nancy Kete
*Senior Analyst*

Caitlin Klevorick
*Policy Advisor*

Emily Lindow
*Senior Analyst*

Claire Luby
*Assistant to the Executive Director*

Bethany Mabee
*Communications Coordinator*

Scott McKee
*Analyst*

Claudia A. McMurray
*Senior Counsel for Congressional and State Relations*

Louise Milkman
*Chief of Staff to the Executive
Director*

Jon Monger
*Counsel*

Shirley Neff
*Senior Analyst*

Pete Nelson
*Director of Communications*

Elena Nikolova
*Analyst*

Jessica O'Neill
*Counsel*

Paul Ortiz
*Senior Legal Advisor*

Tony Padilla
*Analyst*

Tyler Priest
*Senior Analyst*

Sarah Randle
*Analyst*

Irwin Redlener
*Senior Public Health Advisor*

John S. Rosenberg
*Chief Editor*

Eric Roston
*Senior Analyst*

Sara Rubin
*Analyst*

Sambhav N. Sankar
*Deputy Chief Counsel*

Nicole A. Sarrine
*Staff Assistant*

Richard Sears
*Senior Science & Engineering Advisor*

Steven Siger
*Counsel*

Robert Spies
*Senior Environmental Science Advisor*

Danielle Stewart
*Staff Assistant*

Marika Tatsutani
*Editor*

Johnny Tenorio
*Information Technology Officer*

Saritha Komatireddy Tice
*Counsel*

Lloyd Timberlake
*Senior Researcher*

Clara Vondrich
*Counsel*

Jason Weil
*Analyst*

David Weiss
*Counsel*

Stephen M. Willie
*Administrative Officer*

Andrea J. Yank
*Assistant to Co–Chair William K.
Reilly*

Senior Consultants

The Commission would like to thank the following individuals for their contributions to the Commission's work.

Albert Bolea, University of Alaska, *University of Houston*
Darryl A. Bourgoyne, *Louisiana State University*
Robert L. Booth, *National Geographic*
Margaret Caldwell, *Stanford University*
Elmer Peter Danenberger III, *Independent Consultant*
Joann Donnellan, *JD MEDIA, LLC*
Daniel A. Farber, *University of California, Berkley*
Jody Freeman, *Harvard Law School*
Jed Horne, *Freelance Writer*
Mary E. Laur, *University of Chicago Press*
Nancy G. Leveson, *MIT*
Igor Linkov, *US Army Engineer Research and Development Center*
Stephen K. Lewis, *Seldovia Marine Services*
Thomas W. Merrill, *Columbia Law School*
Ishan Nath, *Stanford University*
J.B. Ruhl, *Florida State University College of Law*
John Rogers Smith, *Louisiana State University*
Estes C. Thomas, *Bayou Petrophysics*
Mayank Tyagi, *Louisiana State University*

Organizational Consultants

The Commission would like to thank the following organizations as well as individuals for their contributions to the Commission's work.

**Bipartisan Policy Center:** Jason Grumet, Nate Gorence, Lourdes Long, David Rosner

**Booz Allen Hamilton:** Ken Saenz, Walton Smith, Nader Kalifa Betsy Christie, Randolph Sta. Ana, Bob Murray, Dana Ayers, John Papa, Tom Davis, Elizabeth Chervenak, Andrew Gumbiner, Tom Matta, Carrie Bittman, Bob Blaylock, Barbara McKinnon, Roxanne Bromiley, Gary Leatherman, Daniel Gregoire, Ted Perez, Linna Manomaitis, Marianne Martin, Kersley Joseph, James Lee, Christina Ashcraft, Joshua Guenther

**Merdian Institute:** John Ehrmann, Laura Cantral, Shawn Walker

**Nicholas Institute for Environmental Policy Solutions, Duke University:** Larry Crowder, Daniel Dunn, Clare Fieseler, Morgan Gopnik, Catherine Latanich, Mike Orbach, Tim Profetta, Linwood Pendleton, Steve Roady, Mary Turnipseed, Cindy van Dover

**Resources for the Future:** Bob Anderson, Sarah Campbell, Mark A. Cohen, Roger M. Cooke, Art Fraas, Todd Gerarden, Madeline Gottlieb, Carolyn Kousky, Alan Krupnick, Joshua Linn, Molly Macauley, Richard Morgenstern, Lucija Muehlenbachs, Tim Murphy, Ian Parry, Nathan Richardson, Heather L. Ross, Lynn Scarlett, Adam Stern

**TrialGraphix:** Megan O'Leary, William Lane, Devin Price

# Appendix E

## List of Commission Meetings

1st Meeting:  New Orleans, LA
July 12–13, 2010:  Gulf Region Perspectives

2nd Meeting:  Washington, DC
August 25, 2010:  Regulatory Oversight of Offshore Drilling

3rd Meeting:  Washington, DC
September 27–28, 2010:  Response & Restoration

4th Meeting:  Washington, DC
October 13, 2010:  Commission Deliberations

5th Meeting:  Washington, DC
November 8–9, 2010:  Causes of Macondo Well Blowout & Drilling Safety

6th Meeting:  Washington, DC
December 2–3, 2010:  Commission Deliberations

# Appendix F

## List of Staff Working Papers

Over the past several months, Commission staff prepared a number of working papers for use by Commission members to inform their work and deliberations. Listed below are all of the staff working papers completed as of the date of this report. The Staff Working Papers can be found at www.oilspillcommission.gov.

A Brief History of Offshore Drilling (No. 1)

Decision–Making Within the Unified Command (No. 2)

The Amount and Fate of the Oil (No. 3)

The Use of Surface and Subsea Dispersants During the BP Deepwater Horizon Oil Spill (No. 4)

The Challenges of Oil Spill Response in the Arctic (No. 5)

Stopping the Spill: The Five– Month Effort to Kill the Macondo Well (No. 6)

Response/Clean–Up Technology Research & Development and the BP Deepwater Horizon Oil Spill (No. 7)

The Story of the Louisiana Berms Project (No. 8)

Industry's Role in Supporting Health, Safety, and Environmental Standards: Options and Models for the Offshore Oil and Gas Sector (No. 9)

Liability and Compensation Requirements under the Oil Pollution Act (No. 10)

Scientific Research to Support Oil and Gas Decision Making: Evolution of the Department of the Interior's Environmental Studies Program (No. 11)

The National Environmental Policy Act and Outer Continental Shelf Oil and Gas Activities (No. 12)

Offshore Drilling in the Arctic: Background and Issues for the Future Consideration of Oil and Gas Activities (No. 13)

Unlawful Discharges of Oil: Legal Authorities for Civil and Criminal Enforcement and Damage Recovery (No. 14)

Long–Term Regional Restoration in the Gulf: Funding Sources and Governance Structures (No. 15)

Rebuilding an Appetite for Gulf Seafood after Deepwater Horizon (No. 16)

Natural Resource Damage Assessment: Evolution, Current Practice, and Preliminary Findings Related to the Deepwater Horizon Oil Spill (No. 17)

Continuous Improvement Is Essential: Leveraging Global Data and Consistent Standards for Safe Offshore Operations (No. 18)

A Competent and Nimble Regulator: A New Approach to Risk Assessment and Management (No. 19)

Demonstrating a Comprehensive, Rigorous Management Approach for Deepwater Drilling (No. 20)

Federal Environmental Review of Oil and Gas Activities in the Gulf of Mexico: Environmental Consultations, Permits, and Authorizations (No. 21)

# INDEX

*Page numbers in italics refer to figures and illustrations.*

accidents, offshore drilling. *See* safety, offshore drilling
active pit system, definition of, 109
Adair, Red, 167
Administration for Children and Families, 193
Administrative Procedure Act, 152
Agenda for Revitalizing Coastal Louisiana, 212
Alabama, effects of Macondo oil spill on, 131, 138, 140, 150, 153, 155, *172*, 176–77, 185, 188, 278–79
Alaska, oil and gas industry in: *Exxon Valdez* spill, 36, 70, 130n, 132–33, 144, 189, 194, 211–12, 231–32; future of, 294, 299, 301–5; history of, 2, 31, 35–36, 40, 45, *46*, 52, 63, 67, 78, 220, 301; recommendations for reforms in, 252, 253, 254, 261, 263n, 265
Alaska Natives, 194, 303
*Alexander Kjelland* (rig), 68–69
Allen, Thad, 136–39, *137*, 147, 151, 156–57, 161, 164–67, 169
Alonso, Dan, *142*
Amerada Hess Corporation, *227*
American Chemistry Council, 233
American Exploration Company, *226*
American Petroleum Institute (API), 30, 71, 225, 228-29, 241–42
Amoco, 32, 40, 43, 43, 45, 221, *226–27*. *See also* BP
Anadarko Petroleum, 2, 43, 48, 51, 90, 94, *227*
Anderson, Jason, 5–6, 7–8, 17, 107, 109, 112–14
Andrus, Cecil, 62–63
annular preventers, for Macondo well, 93, 107, *108*, 114, 274, 275
Apache Corporation, *227*
Arco, 43, 45, 70
Arctic, oil and gas industry in, 35–36, 44, 250, 252, 253, 254, 262, 263n, 265, 294, 301–5. *See also* Alaska, oil and gas industry in
Arctic Council, 304
Arctic Offshore Oil and Gas Operation Guidelines, 304
Area Committees, 265-66, 268
Area Contingency Plans, 265–66, 268, 271
Argo, *227*
Army Corps of Engineers, U.S., 154, 156-57, 169, 204, 206–08
Asian immigrant populations, in Gulf of Mexico region, 179, 192, 193
Atchafalaya River, 199, 204
Atlantic Richfield. *See* Arco
Atlantis site, 46–50
ATP Oil & Gas Corporation, *227*
Audrey, Hurricane (1957), 25
Audubon Society, 141
Auger site, *23*, 36, 38–40, *39*, 42
Australia, offshore oil and gas industry in, 44, 224


Baker, James III, 221–22
Baker Hughes, 38, 44
*Bankston* (supply vessel), 8, 9, 12, 13, 14, 16–19, 130
barrier islands, along Gulf of Mexico coast, 154, 193–94, 199, 203, 206–07
beaches, effects of Macondo oil spill on, 155, 175–77, 185–91
Berger, Jonah, 188
berms, use of after Macondo oil spill, 151–57, 169; recommendations for reforms affecting, 265, 271
Bertone, Steve, 5, 9–11, 13–17
Betsy, Hurricane (1965), 27
Bhopal (India), chemical leak in, 231–34
BHP Billiton, 46, 51, *226–27*
Bik, Holly, 177
birds, in Gulf of Mexico region, 141, *142*, 143, 175–77, 181, *183*
Birnbaum, Elizabeth, 151
Blanchard, Dean, 171
blowout preventer (BOP), 92; attempts to seal at Macondo well, 131–32, 137–38, 146, 149–50, 159–67, 159n, 253n, 273; and causes of Macondo well blowout, 115, 120, 121–22; engineering challenges of, 28, 49, 52; on Macondo well, 7, 13, 14, 19, 92–93, 103, 114–15, 121–22; recommendations for reforms affecting, 274–75; safety regulations for, 73–74, 152
*Blue Water 1* (drilling barge), 23, 25
Boeing, 230
Bonnie, Tropical Storm (2010), 154

boom, use of after Macondo oil spill, 132, 140–41, 151–54, *153*, 170, 177, 179
BP: and causes of Macondo well blowout, 90, 115–27, *125*, 221; compensation of victims of Macondo well blowout and
    oil spill, 179, 185–86, 189, 193, 278, 283, 284, 287; containment initiatives after Macondo well blowout and oil spill,
    241–43; corporate revenue of, 2, 284; and drilling of Macondo well, 2–4, 42, 82–85, 89–90, 92–115, 132, 273, 274;
    engineering innovations of, 31–32; expenditures on Macondo well blowout and oil spill response, 135n, 179, 184–85,
    188, 189, 194, 238, 244, 278, 283, 284, 287; history of drilling in Gulf of Mexico, *23*, 36–37, 40–41, 43, 45–53;
    lawsuits against after Macondo well blowout and oil spill, 279; response to Macondo well blowout and oil spill,
    16–17, 130–70, 174, 184–85, 188, 189, 194, 272, 274; risk-management processes of, 216–21; and safety issues, 2,
    6, 216–21, 224–25, 295
*BP Deepwater Horizon Oil Budget: What Happened to the Oil?*, 167–69, 167n, 168n
Brazil, offshore oil and gas industry in, 44
Breaux, John, 207
Breaux Act (1990). *See* Coastal Wetlands, Planning, Protection and Restoration Act (1990).
Brice-O'Hara, Sally, 136
Bromwich, Michael, 241
Brown, Douglas, 4, 9
Brown, Michael, 137
Brown, Stephen, 297
Brown & Root, 21, 24, 32
Browne, John, 45, 47
Browner, Carol, 161, 165, 167–68, 167n
Bullwinkle site, 33, 34, 36–38, 40
Bureau of Indian Affairs, 63
Bureau of Land Management, 26, 63, 76–77
Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE), 55, 131n, 241, 255, 255n, 257, 261,
    266, 273, 290
Burkeen, Dale, 17
burning of surface oil, after Macondo oil spill, 143, 159, 168–69, 168n, *168*
Bush, George H. W., 24, 67
Bush, George W., 52, 137


California, oil and gas industry in, *20*, *23*, 26, 28–29, *29*, 31, 56, 58, 63, 67, 135, 181, 297, 301
Callon Petroleum Operating Company, *227*
Camardelle, David, *151*
Cameron International Corporation, 131
Camille, Hurricane (1969), 27
Campbell, Pat, 167
Canada, offshore oil and gas industry in, 69, 302
capping stack, 162–67
Carden, Stan, 11, 13, 15, 16
Carla, Hurricane (1961), 27
Carter, Jimmy, 59–63
casing, offshore well, 91, *95*; and attempts to seal Macondo well after blowout, 158, 162; in Macondo well, 4, 92–99,
    102–6, 113, 115; safety regulations for, 30, 43, 152
cement evaluation tools, definitions of, 102
cementing, in offshore wells, 91, 99; and attempts to seal Macondo well after blowout, 132, 167, 169; and causes of
    Macondo well blowout, 115–18, *125*; in Macondo well, 1, 3–4, 7, 94, 96, 98–103; safety regulations for, 152, 228
Centers for Disease Control and Prevention, 141
centralizers, offshore well, *96*; in Macondo well, 96–97, 116, 118, 123; safety regulations for, 77
C. F. Bean, 157
CGG Veritas, 44
Chaisson, Nathaniel, 102
chemical industry, safety issues in, 233
Chemical Safety Board, 219, 221–22
Chet Morrison Contractors, 44
Chevron: containment initiatives after Macondo well blowout and oil spill, 243–45; history of drilling in Gulf of Mexico,
    21, 24, 29, 32, 42, 43, 46, 47, 50, 51, 84n; oil-spill response plans of, 133; and safety issues, *226–27*
Chu, Steven, 138, 148–50, *148*, 161–65, 253n
civil aviation, safety issues in, 229
Clark, Donald, 17, 109
Clean Gulf Associates, 30
Clean Water Act, 80, 84, 200, 211, 245, 265, 280
climate change, 295, 298, 300, 305
Coalition to Restore Coastal Louisiana, 207
coastal and marine spatial planning, 201, 262–63, 281–82
Coastal Impact Assistance Program, 208
Coastal Studies Institute (Louisiana State University), 206
Coastal Wetlands, Planning, Protection and Restoration Act (1990), 207
Coast Guard, U.S.: recommendations for reforms in, 251, 256, 257, 266–74, 276; and regulation of offshore drilling,
    62, 68n, 75–76, 301, 304; response to Macondo well blowout and oil spill, 17–19, 129–61, 163, 170
Coast Guard–Bureau of Ocean Energy Management, Regulation, and Enforcement Deepwater Horizon Joint Investigation
    Team, 130n

Coast 2050, 207
Cocales, Brett, 97, 116
cofferdam (containment dome), use of after Macondo oil spill, 145–46, 159
Cognac site, *23*, 31–32
Commerce, Department of, 255
Commission on Fiscal Accountability of the Nation's Energy Resources (1981–82), 63–64
Commission on Ocean Policy, U.S. (2004), 281
Concept Safety Evaluation program (Norway), 71
Congress, role of in regulation of oil and gas industry: history of, 56, 58–60, 62–63, 65–67, 70, 76, 79–82, 85, 269, 298, 301; overlapping committees, 288–89; recommendations for reforms in, 249–91, 299, 304, 306
ConocoPhillips, 31, 34, 40, 42–43, 68–69, 84n, 133, 244–45
Constitution, and environmental protection, 57, 67
contracting, in offshore oil and gas industry: history of, 24, 37–38, 40, 43–44, 74; and liability issues, 245–46; recommendations for reforms in, 251–54; and safety issues, 221–22
Cook, Kevin, 157, 166
Cooper, Anderson, 139, 150, 157, 187
Cooper, George, 149
corals, in Gulf of Mexico, 174–75, 182, *183*
Corexit (dispersant), 144
Costner, Kevin, 142
Council on Environmental Quality, 210, 260–62
Cox, Christopher, 234
crabs, in Gulf of Mexico, 175, 177–78, 186–87
Creole site, 21–22, *23*
Crist, Charlie, 150, *151*
Crone, Timothy, 167n
Cuba, offshore oil and gas industry in, 254, 300
Curtis, Stephen, 8, 17, 109, 113–14


Danciger Oil & Refining Co., 2
dead zone. *See* hypoxia
DeepStar consortium, 38
deepwater drilling: changing definitions of, 25–27, 31, 41–43, *41*, 46, 52–53; engineering challenges of, 2, 24, 26–28, 31–34, 35, 36–38, 46, 52–53, 90–92, 94; future of, 293–306; history of, 21–53, *49*; moratorium on after Macondo well blowout and oil spill, 151–52, 185; recommendations for reforms in, 249–91, 299–300; safety issues with, 35–36, 72–76, 216–45; size of reservoirs, 31–33, 36–45, 46–48, 51, 91; spill containment options for, 135–36, 145–46, 149
*Deepwater Horizon* (rig), *1*; blowout events of April 20, 8–19, *18*, *88*, 102–15; causes of blowout, 90, 115–27, *125*; crew of, 1–6, 191, 198, 223; and drilling of Macondo well, 2–4, 53, 92–115; history of, 1–3, *23*, 44, 51, 53; oil spill, 127, 129–70; safety issues on, 6, 223; sinking of, 55, 130–32. *See also* Macondo well
*Deepwater Horizon MC252 Gulf Incident Oil Budget*, 167–69, 168n
Deepwater Royalty Relief Act, *23*, 42, 76
Defense, Department of, 183, 208, 255. *See also* Army Corps of Engineers, U.S.
Dekle, Scott, 187
Deltares, 154
Dennis, Hurricane (2005), *48*, 50
Denny, Patricia, 189
Department of Defense Appropriation Act of 2006, 208
departments, U.S. *See specific departments under the first key term in their names* (*e.g.*, Interior, Department of the)
Designated Engineering Representatives, 230, 234
Devon Energy, 47, 227
Diamond Offshore, 43
Dickey, Bob, 187
*Discoverer Enterprise*, 46, 49, 145, 159, *159*
*Discoverer Seven Seas*, 33, 37
dispersants, use of: after Macondo oil spill, 133, 143–45, 147, 160–61, 169–70, *168*, 174–76, 180, 181–82, 187; recommendations for reforms affecting, 265, 269, 270–71, 278
diverter system, definition of, 114
Dodd, Mark, *176*
dolphins. *See* marine mammals
Dominion Exploration & Production, 225
Drake, Edwin, 296
Dresser Industries, 44
drilling terminology, definitions of, 91
drill pipe, 74, 91; in Macondo well, 4, 5, 6–7, 92–93, 104–08, 110–14, *111*, *113*, 120–21
Duplessis, Bonnie, 209
Duplessis, Clarence R., 209

East Cameron Partners, 227
economy, effects of Macondo oil spill on, 173–74, 179, 185–91, *200*; compensatory damages related to, 174, 179, 185–86, 189, 193, 278, 283, 284, 287; fishing and seafood industry, 139–41, 163, 170, 171, 179, 185–88, *188*, 193–94, 197, 209; health problems of local population, 191–95; local businesses, 155, 163; oil and gas industry, 151–52, 185–86, 197; ports of, 186, 197; recommendations for reforms related to, 275–82; tourism, 155, 177, 185–86, 188–91, 197
Effective Daily Recovery Capacity regulations, 270
Eisenhower, Dwight, 58
El Paso E&P Company, 227
emergency disconnect system, and Macondo well blowout, 13–15, 114–15
Endangered Species Act, 80, 84, 181
Energy, Department of, 59; recommendations for reforms in, 253, 253n, 264, 267, 270, 272; response to Macondo well blowout and oil spill, 148–50
Energy Information Administration, 302
Energy Partners, Ltd., 227
energy policy: future of, 294–306; goal of energy independence, 56, 59–60, 294
Energy Resource Technology, 227
engineering: contracting for, 24, 44; for deepwater drilling, 2, 31–32, 35, 36–38, 53, 90–92, 94; of Mississippi River, 177, 194, 197, 204, 206, 210; recommendations for reforms in, 243, 269–70, 272–75; and response to Macondo well blowout and oil spill, 135–37, 143–50, 154, 156–62, 164–70
Eni US Operating Co., 227
environment, effects of Macondo oil spill on, *172–73*, 173–95, *175, 176, 196–97, 202*; deepwater oil plumes, 175, 181–82; marine ecosystems, 174–82; Natural Resource Damage Assessment, 182–85, 276; recommendations for reforms related to, 275–82; waste from response effort, 170; wildlife health, 139–43, 153–54, 174–82
Environmental Defense Fund, 187
Environmental Protection Agency (EPA), 235; recommendations for reforms in, 257, 262, 266, 267–72, 274, 278, 282; and regulation of offshore drilling, 68n, 219, 255; response to Macondo well blowout and oil spill, 133, 143–45, 160, 167n, 170, 187
environmental protection movement, 29–30, 33, 56, 58–60, 63, 79–85, 197–213
Environmental Studies Program (Department of the Interior), 59, 259, 263
equivalent circulating density (ECD), definition of, 94
erosion, in Gulf of Mexico region, 197–213, *205*
*Eureka* (drillship), 27
explosions, history of in oil and gas industry, 8–19, 29–30, 69, 102–15, 217–20, *216, 220*
ExxonMobil: containment initiatives after Macondo well blowout and oil spill, 240, 243–45; history of drilling in Gulf of Mexico, 25, 36, 40, 42, 42n, 45, 46, 84n; oil-spill response plans of, 133; Operations Integrity Management System (OIMS), 231-32; role in response to Macondo well blowout and oil spill, 164
*Exxon Valdez* (vessel), oil spill from, 36, 70, 130n, 132–33, 144, 189, 194, 211–12, 230, *232*, 270, 277n, 280, 288
*Exxon Valdez* Oil Spill Trustee Council, 280
*Exxon Valdez* Trustee Council Science Panel, 211
Ezell, Randy, 5–8, 11, 15–16, 18, 112, 114


Fairways Offshore Exploration, Inc., 227
Farm Security and Rural Investment Act (2002), 270
Federal Aviation Administration (FAA), 230, 253n
Federal Communications Commission (FCC), 257, 290
Federal On-Scene Coordinator, 130–31, 134–36, 135n, 138, 142–44, 150, 153, 160–62, 170, 270, 276
Feinberg, Kenneth, 189, 194, 287
Fina Oil & Chemical Company, 45
fish, in Gulf of Mexico, 139–40, 174–75, 178–81, 185–88, 193–94
Fish and Wildlife Service, U.S., 58, 206, 262, 303
fishing and seafood industry, 30; effects of Macondo oil spill on, 139–43, 163, 171, 179, *183*, 185–88, *188*, 193–94, 197, 209, 278–79; overfishing by, 199, 201
Fitzgerald, Timothy, 187
Flex Trend site, 31–32
Fleytas, Andrea, 7, 10, 15, 16
float valves, in Macondo well, 98, 102, 116–19
Flood Control Act (1928), 204
Florida, 208; effects of Macondo oil spill on, 131, 138, 140, 150, 153, 174, 177, 188–89, 191, 278; offshore oil and gas industry in, 67, 67n, 254, 297
Florida Department of Environmental Protection, 153
Florida Restaurant and Lodging Association, 191
flow-rate estimates, Macondo oil spill, 132, 133, 146–47, 149–50, 158, 166, 167, 167n, 274
Flow Rate Technical Group, 147, 167n
Food and Drug Administration (FDA), 170, 187
food safety, concerns about after Macondo oil spill, 170, 185–88, 278–79
Forcenergy, *227*
Ford, Gerald, 63
Forest Oil Corporation, *227*
Formal Safety Assessment program (United Kingdom), 71
Forties Alpha platform (BP), 219

fracture pressure, definition of, 90
Frank's Casing Crew and Rental Tools, 44
Freeport McMoRan, *227*


Gagliano, Jesse, 96–97, 101, 102
García Márquez, Gabriel, 53
Garwin, Richard, 149, 165
Gauthe, Sharon, 192
Gazprom (company), 300
Geological Survey, U.S., 25–26, 28–30, 63–65, 79; recommendations for reforms in, 253, 263, 264, 270, 272, 274;
  response to Macondo well blowout and oil spill, 147, 161, 166, 168n
geology, subsurface, 52–53; Lower Miocene deposits, 47; Lower Tertiary (Paleogene) deposits, 23, 47, 51, 52; at
  Macondo site, 2, 3, 89; Middle Miocene deposits, 3; role of salt in, 22, 24, 32–33, 39, 41–43, 45, 49, 52; technology
  for surveying, 27, 32–34, 37–38; Upper Jurassic deposits, 39
Geophysical Services Inc. (GSI), 37
Gervasio, Antonio, 12
Glasscock Drilling Company, 25
Global Industries, 44
Global Marine, 36, 44
GlobalSantaFe, 2
*Glomar Challenger* (drillship), 27
Gonzalez, Elian, 136
Gordon, Wayne, 163
GovernanceMetrics International, 231, 232n
government, role of in oil and gas industry. *See* regulation of oil and gas industry, federal *and specific departments and
  agencies by name*
Government Accountability Office, 261
Grangemouth Complex (BP), 218–19
Greater New Orleans, 191
Great Flood of 1927, 197, 204
Great Lakes, 263
Green Canyon, oil and gas drilling in, 40, 46–48
Greenland, offshore oil and gas industry in, 302
Guide, John, 4, 96, 97, 98, 99, 102, 116
Gulf Coast Claims Facility, 185–86, 189, 193, 283, 287
Gulf Coast Ecosystem Restoration Council, recommendation for, 280–81
Gulf Coast Ecosystem Restoration Science and Technology Program, recommendation for, 281
Gulf Coast Ecosystem Restoration Task Force, 210, 279
Gulf Island Fabricators, 44
Gulf of Mexico: economic impact of Macondo oil spill on, 139–43, 173–95; environmental impact of Macondo oil spill
  on, 139–43, 173–95; environmental recovery and restoration of, 197–213; future of, 293–306; history of drilling in,
  2, 21–53; recommendations for reforms affecting, 249–91; regulation of drilling in, 55–57, 62, 65–67, 71, 72–76,
  80–85
Gulf of Mexico Alliance, 185
Gulf of Mexico Energy Security Act (2006), 208, 210
Gulf of Mexico Integrated Ocean Observing System, 282
*Guns of Navarone, The*, 162
Gustav, Hurricane (2008), 197–98, 203


Hafle, Mark, 2, 97
Haire, Chris, 109
Hall–Houston Oil Company, *226*
Halliburton Company, 38, 44, 74; and causes of Macondo well blowout, 90, 115–18, 123–25, *125*, 223; and cementing
  of Macondo well, 1, 2–4, 90, 94–103; and safety issues, 222–24, 295
Hanzalik, James, 130
Harrell, Jimmy, 4–5, 11, 13, 17, 92, 107
Hay, Mark, 19
Hayward, Tony, 135, 144, 150, 157, 159
health, effects of Macondo oil spill on human, 141, 144, 170, 174, 185–88, *190, 192*, 191–95, 277–78
Health and Human Services, Department of, 141
Hecht, Michael, 191
Heerema Marine Contractors, 44
Helis Oil & Gas Corporation, 227
Helix Energy Solutions Group, 244–45
Herbst, Lars, 135, 157
Hess Corporation, 51
Hickel, Walter, 29
Hilda, Hurricane (1964), 27
Hitec system, 110, 110n, 112
Holloway, Caleb, 113

Holstein site, 46–49
Homeland Security, Department of, 62, 131, 255. *See also* Coast Guard, U.S.
Hormuz, Straits of, 296
Houston, Oberon, 219
Houston Exploration Company, *226–27*
Hsieh, Paul, 166
Humble Oil, 24, 27
Hunt Oil Company, 227
Hunter, Tom, *148*, 149, 161–62, 165
Huntington, Hillard, 297
hurricanes. *See specific hurricanes by name* (*e.g.*, Katrina, Hurricane)
hypoxia, in Gulf of Mexico, 198–200
Hyundai Heavy Industries, 44

Ida, Hurricane (2009), 2, 92
Ike, Hurricane (2008), 198, 296
Incident Command Posts, 130–31. *See also* Unified Command
Inglis, Andy, 146
injuries, offshore drilling. See safety, offshore drilling
Institute of Nuclear Power Operations (INPO), 234–42, 239n, 240n
Interagency Alternative Technology Assessment Program, 142
Interagency Ocean Policy Task Force, 262, 281
Interior, Department of the, *54;* changes in after Macondo well blowout, 250; and environmental recovery and
    restoration of Gulf of Mexico, 181–83; history of regulation by, 29, 33, 55–85, 228–29, 239–240; recommendations
    for reforms in, 249–91, 299, 304; response to Macondo well blowout and oil spill, 55, 78n, 131, 131n, 143, 145,
    152, 181, 183. *See also* Minerals Management Service (MMS) *and other specific agencies by name*
International Association of Drilling Contractors (IADC), 72
International Organization for Standardization (ISO), 252, 304
International Regulators' Forum, 252, 254
Iran: oil and gas industry in, 36, 45, 296; Revolution of 1979, 31, 63
Iraq, oil and gas industry in, 296
Ivan, Hurricane (2004), 50
Ixtoc oil spill, 225, 244

Jackson, Lisa, 145, 160–61, 167n
Jack 2 site, 23, 47
Jindal, Bobby, 138–39, 150–51, *151*, 153, 154, 156–57, 169, 212
Johnfroe, Donald Jr., 192
Joint Oceanographic Institutions for Deep Earth Sampling project, 27
Jones, Gordon, 17
Jones Act, 142–43
J. Ray McDermott, 24, 31–32, 44
junk shot, 148–49
Justice, Department of, 30, 287

Kaluza, Robert, 3, 6, 14, 98, 105, 107, 124
Kash, Don, 64–65
Katrina, Hurricane (2005), 50, 136–37, 145, 163, 191–93, 195, 198, 203, 206, 208–9, 212, 296
Keith, Joseph, 109, 112
Kelley, Merrick, 120
Kemp, Roy Wyatt, 17, 112
Keplinger, Yancy, 7, 11, 15, 16
Kermac 16 site, *23*, 24
Kerr-McGee Oil Industries, 22, 24, 48, *227*
kick detection, in Macondo well, 91, 109–14, 120-21
Kleppinger, Karl Dale, Jr., 17
Kuchta, Curt, 4–5, 7-8, 13, 14–17
Kuwait, oil fires in during first Gulf War, 149

Lambert, Lee, 107
Landrieu, Mary, 150, 152, 204
Landrieu, Mitch, 150, *151*
Landry, Alwin J., 12, 14

Landry, Mary, 130–31, 133-34, *134*, 143
Lawrence Berkeley National Laboratory, 148
Leasing and Environmental Science Office, recommendation for, 258–59, 261, 262, 264
leasing of offshore drilling sites, federal, *61*; and environmental considerations, 29, 59–63, 79–82; history of, 24, 26, 31, 33, 52–52, 58–63; recommendations for reforms in, 249–91; royalties from, 56, 58, 63–67, *64*, 76–78, 295
Lee, Alvin, 156
Leno, Jay, 149
levees, on Mississippi River, 197, 204, 206, 208, 210
Lili, Hurricane (2002), 50
Lindsay, Sheryl, 155
LLOG Exploration Offshore, Inc., *227*
lockdown sleeve, on Macondo well, 104, 120, 123, 127
Louisiana: effects of Macondo oil spill on, 138–40, 150–54, 156-57, 161, 163, 171, 174–81, 187–88, 191–95, 271, 276, 278; environmental recovery and restoration of, 197–213; oil and gas industry in, 21–53, 58, 60, 78, *292*, 292–93, 297
Louisiana Act 6 (1989), 207
Louisiana Coastal Area Comprehensive Coastwide Ecosystem Restoration report, 207
Louisiana Coastal Area Ecosystem Restoration Program, 207
Louisiana Coastal Protection and Restoration Authority, 208
Louisiana Coastal Protection and Restoration Fund, 208
Louisiana Department of Health and Hospitals, 140
Louisiana Department of Wildlife and Fisheries, 140
Louisiana–Mississippi Gulf Coast Ecosystem Restoration Working Group, 210
Louisiana National Guard, 133
Louisiana Office of Coastal Protection and Restoration, 154
Louisiana State University Charity Hospital, 195
Lubchenco, Jane, 167n, 168–69
Lutz, Peter, 133
Lyder, Jane, 181
Lynch, Richard, 146, 160

Mabus, Ray, 210, 211, 279–80
MacDonald, Ian, 186, 187
Macondo well: attempts to seal after blowout, 131–32, 137–38, 149–50, 159n, 162, 164-67; blowout events of April 20, 8–19, *88*, 102–15; causes of blowout, 89, 115–27, *125*; drilling of, 2–4, *23*, 53, 89–115, *93*; geology of site, 3, 89; naming of, 53 oil spill from, 127, 129–70; Oil Spill Response Plan for, 84, 133; permit process for, 77, 82–84, 104, 108, 127, 132; relief wells, 132, 135, 157, 158, 166–67, 169
Mad Dog site, 46–49
Magnuson-Stevens Fishery Conservation and Management Act, 80, 81, 83–84
mangroves, effects of Macondo oil spill on, 175, 177, 186
Mansfield, Brent, 10–11, 17
Manti Operating Company, *227*
Manuel, Blair, 17
Marathon Oil Corporation, 51
*Marianas* (rig), 2, 92–93
Marine Board (National Research Council), 70–71
marine ecosystems, effects of Macondo oil spill on, 174-78, 180-182
Marine Mammal Commission, 181
Marine Mammal Protection Act, 80
marine mammals: in Arctic oil regions, 303; in Gulf of Mexico, 174–75, 178, 180, 181, *183*
Marine Protected Areas, 282
Mariner Energy, 51, *227*
Marine Spill Response Corporation, 132–33, 243
Marine Well Containment Company (MWCC), 243-45
marshes: effects of Macondo oil spill on, 139, 143, 154, 174–75, 177, 181, 186, 202; and environmental recovery and restoration of Gulf of Mexico, 202, 205–8
Mars site, 36–37, 40, 45, 50
Martinez, Dennis, 17
Massachusetts, coastal and marine spatial planning in, 201
Matrix Oil & Gas, *227*
*Matterhorn* (rig), 19
*Max Chouest* (vessel), 19
McKay, Douglas, 58
McNutt, Marcia, 147–49, 161, 165, 274
Meche, Gregory, 12, 112
media coverage of Macondo well blowout and oil spill: effects of on food safety concerns and tourism, 187–88; initial, 129–30; of response to oil spill, 139, 141, 142–43, 142n, 149, 150, 167–68
Meinhart, Paul, 15
Melancon, Charlie, 150
Merritt, Carolyn W., 219
Meshkati, Najmedin, 223

Mexico, oil and gas industry in, 21, 254, 300
microbes. See oil-degrading microbes
Minerals Management Service (MMS), *54*, 73, 75; and causes of Macondo well blowout, 126–27; corruption and mismanagement in, 77–79, 250, 251, 254–55; creation and early history of, *23*, 33, 36, 38–39, 42, 56, 63–69; environmental protection role of, 55–57, 79–85, 206, 254–55; permit process for Macondo well, 82–85, 126–27, 273; permitting role of, 55–57, 254–55; reorganization of after Macondo well blowout, 55, 131n, 255; response to Macondo well blowout and oil spill, 19, 131, 131n, 133, 135–36, 145, 149–50, 152, 157, 161; revenue collection role of, 55–57, 63–67, *64*, 76–78, 254–55; and safety issues, 67–76, *75*. *See also* Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE)
Mississippi, 208: effects of Macondo oil spill on, 131, 138, 140, 170, 177, 187, 191, 193
Mississippi Canyon, oil and gas drilling in, 2, 3, 31, 42, 46, 47–48, 53, 89
Mississippi Canyon Block 252, 2, 53, 89, 92
Mississippi River: agricultural pollution in, 198–200; effects of Macondo oil spill on, 177, 178; environmental recovery and restoration of, 197–213; geology of, 22, 27, 202, 204; in history of oil and gas industry, 22, 24, 27, 31, 37, 50; re-engineering of, 194, 197, 204, 206, 210
Mississippi River and Tributaries Project, 204
Mississippi River Gulf of Mexico Watershed Nutrient Task Force, 200
Mississippi River Gulf Outlet, 206
M-I SWACO, 3, 98, 106
MMS. See Minerals Management Service (MMS)
mobile drilling, history of, 24–26, 44
Mobil Oil. See ExxonMobil
MOEX, 2, 90, 94
Montara (platform), 224
Monterey Bay Marine Sanctuary, 67
moratoriums, offshore drilling, 36, 52, 58, 67; in response to Macondo well blowout and oil spill, 151–52, 185, 247
Morel, Brian, 2, 3, 4, 96, 97, 98, 102, 104, 116, 123
*Mr. Charlie* (drilling barge), *23*, 24
*Mr. Gus* (drilling barge), 25
mud, use of in offshore wells, 91, 105, *106*; and causes of Macondo well blowout, 115, 120–24, *125*; in Macondo well, 7, 8, 92–94, 96, 98–99, 103–07, 109–14; in top kill and static kill efforts at Macondo well, 149–50, 158, 166–67
mudflats, effects of Macondo oil spill on, 175, 177
Munich Re, 246
Murphy Exploration & Production Company, *227*
Murray, Chad, 11, 13, 15, 16


Na Kika project, 46, 48
Nalco, 144
Napolitano, Janet, 131, 136
National Academy of Engineering, 223, 253
National Academy of Sciences, 264, 296, 303
National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, 151, 192, 225, 249–50, 291, 295, 305–6
National Contingency Plan, 130–32, 134–36, 138–39, 141, 144, 265–69, 271–72, 274, 277–78, 304
National Domestic Violence Hotline, 193
National Energy Act (1978), 59
National Environmental Policy Act (NEPA) (1970), 29, 56, 59, 60, 62, 80–82; and Macondo well blowout, 81n, 82–84, 83n; recommendations for reforms in, 258–62, 265, 267, 289
National Incident Commander, 136–37, 141, 143, 156, 267, 268, 270
National Marine Fisheries Service, 140, 141
National Marine Sanctuaries, 80, 81, 282
National Ocean Council, 201, 276, 281–82
National Oceanic and Atmospheric Administration (NOAA); and environmental recovery and restoration of Gulf of Mexico, 201, 212; recommendations for reforms in, 253, 256, 257, 262–68, 270–71, 274, 282; and regulation of offshore drilling, 68n, 81, 84, 84n; response to Macondo well blowout and oil spill, 131, 133, 140–41, 143, 145, 153, 157, 168–70, 178, 181, 183, 187, 189
National Oceanographic Partnership Program, 264
National Research Council, 298
National Response Framework, 278
National Response Team, 131, 141, 268, 269, 272, 274
National Science Foundation, 28, 184, 276
National Wildlife Federation, 141
Natural Resource Damage Assessment, 182–85, *186,* 264, 276–77, 276n
Natural Resources Revenue, Office of (ONRR), recommendation for, 256–60
Naval Petroleum Reserve, 58, 296
Navy, U.S., 22–24, 58, 228–30, 234
negative-pressure tests, *105*; and causes of Macondo well blowout, 118, 119, 121, 123–24, *125*, 126; on Macondo well, 4–7, 104–09, 112; safety regulations for, 228
Neptune site, *23*, 43
Newfield Exploration Company, 51, *226*
Nguyen, Ve Van, 179

Nigeria, oil and gas industry in, 36, 45
Nixon, Richard M., 29, 31, 59, 63, 135
NOAA. See National Oceanic and Atmospheric Administration (NOAA)
NOAA Catch Share policy (2010), 201
Norcen Explorer, *226*
North Sea, oil and gas industry in, 23, 31, 34, 38, 45, 68–69, 71–72, 124, 218, 225, 252
Norway, offshore oil and gas industry in, 68–69, 71, 201, 218, 302
Nuclear Electric Insurance Limited (NEIL), 237
nuclear power, safety issues in, 229–31, 235–41
Nuclear Regulatory Commission (NRC), 235-37, 239, 253n, 258
Nungesser, Billy, 150–51, *151*, 154, 156–57

Obama, Barack: address on Macondo well blowout and oil spill, 173, 212; commissioning of studies after Macondo well
    blowout and oil spill, 249, 279–80, 291; creation of BP escrow fund, 185; environmental policies of, 201, 210, 212,
    262–63, 281; plan to expand offshore leasing, 53, 84n, 301; response to Macondo well blowout and oil spill, 131,
    136, 148, 150–51, *151*, 156, 162, 191
O'Bryan, Patrick, 5-8, 14, 105
Occidental Petroleum, 69, 219
Occupational Health and Safety Administration (OSHA), 68n, 141, 144, 234
occupational safety, definition of, 218
Oceaneering, 3, 38
*Ocean Endeavor* (rig), 19
Ocean Energy, *226*
Ocean Energy Safety Institute, 272
Ocean Foundation, 181
*Ocean Ranger* (rig), 69
OCS Group, 3
Odum, Marvin, 233
Office of Management and Budget (OMB), 72, 210, 251
Office of Natural Resources Revenue, 55
offshore drilling. *See* deepwater drilling; oil and gas industry, offshore; *and specific aspects of the offshore oil and gas
    industry by name*
Offshore Drilling and Exploration Company, 24
Offshore Operators Committee, 28, 30, 72
Offshore Safety and Anti-Pollution Equipment Committee, 30
Offshore Safety Authority, recommendation for, 256, 257–58, 289–90
Offshore Technology Conference, 30, 52
Ognedal, Magne, 69, 218
oil and gas industry, offshore: corporate safety culture of, 215–47; future of, 293–306; history of, *21*, 21–53, 55–85;
    recommendations for reforms in, 215–16, 239–45, 249–91, 293, 306; regulatory history of, 55–85; and supply and
    demand for oil in U.S. history, 22, 25, 31–33, 34, *46*, 52, 63, 293–306. *See also specific companies and aspects of the
    industry by name*
Oil Budget report, 167–69, 168n
oil-degrading microbes, 174
Oil Pollution Act (1990), 70, 80, 83–84, 130n, 132, 182–85, 191, 212, 232, 245; recommendations for reforms in,
    268–70, 276, 279, 283, 286–87
Oil Spill Liability Trust Fund, 134, 135n, 141, 211, 283–87, 304
Oil Spill Response Plans, 83–84
oil spills: history of, 2, *23*, 28–29, *29*, 31, 36, 53, 56, 58–59, 63, 71, 130n, 132–33, 135, 144, 174, 181, 189, 194,
    211–12, 216–20, 223–25, 230–31, 232, 241, 243, 270, 277n, 280, 288; after Macondo well blowout, 127, 129–70,
    *198*
One Hundred Years of Solitude (García Márquez), 53
OPEC oil embargo (1973), 31, 56, 296
Orca Energy (Dunhill), *227*
Oregon, offshore oil and gas industry in, 26, 67, 297
Oryx Energy, 43, *226*
Outer Continental Shelf Lands Act and Amendments (1953/1978), *23*, 30, 57–64, 79, 80, 84, 254–56, 262–64
Outer Continental Shelf Safety Oversight Board, 78–79, 78n, 82
Overton, Keith, 191
oysters, in Gulf of Mexico, 140, 163, 176, 178–79, 186–87

Paradis, Joseph, 130
Parish Presidents (Louisiana), 139–40, 154
Patzek, Tad, 229
Pemex, 254, 300
Pennsylvania, oil and gas industry in, 296
Pennzoil, 32
Perdido site, 51

Perry, Harriet, 178
Petrobras, 44, 51, *226*
Petroleum Geo–Services, 44
Philadelphia Electric, 238
Phillips Petroleum Company. See ConocoPhillips
Pillow, Travis, 187
pipelines, oil and gas, 25, 30, 35, 49, 296, 302
Pipeline Safety Act, 256
Piper Alpha (platform), 23, 69–70, 217, *227*
Placid Oil, 34
platforms, offshore oil and gas, 22, 24–25, 28, 30, 34–35, *35, 39*, 41–42
Pleasant, Christopher, 6, 13, 19, 114–15
*Pompano* (U.S. Coast Guard cutter), 17, 130
pore pressure, definition of, 90
positive-pressure tests, on Macondo well, 4, 104, 105
President's Council of Advisors in Science and Technology, 298
President's Council on Environmental Quality, 81n, 83, 84n
Price-Anderson Act, 237
Primary Care Access Stabilization Grants, 195
process safety, definition of, 218
Project Independence, 31
Project Mohole, 26
Prudhoe Bay pipeline (BP), 2, 222
Pure Oil, 21


*Q4000* (vessel), 159–60, *159*


R&B Falcon, 44
Ragen, Tim, 181
Rainey, Dave, 45
*Ramblin' Wreck* (boat), 10, 17
rams, in offshore well blowout preventer, 52, 74: and causes of Macondo well blowout, 122; in drilling of Macondo
    well, 92–93, 114; and oil spill after Macondo well blowout, 131, 137–38, 149, 275
Randolph, Charlotte, 150
Rapid Response Research (RAPID) Program, 184
Reagan, Ronald, 63, *66*
Regional Citizens' Advisory Councils, 268–69
Regional Contingency Plans, 265
Regional Response Teams, 143, 145, 265, 268, 271
regulation of oil and gas industry, federal: and causes of Macondo well blowout, 126–27; changes in after Macondo
    well blowout and oil spill, 55, 72, 152, 211–12, 228, 255; compared to other nations, 69–72; compared to other risky
    industries, 229–41; conflicting priorities in, 28, 55–60, 65, 68–76, 80–82, 200–201, 228–29, 254–55; congressional
    role in, 56, 58–60, 62–63, 65–68, 71, 72, 76, 79–82, 85, 269, 298, 299, 301, 304, 306; Constitutional authority for,
    57, 67; definition of lands under federal control, 58, 239; failure to respond to changes in industry, 72–74, 228, 239;
    history of, 29, 55–85; and industry self-policing, 234–35, 237–42; liability issues, 243–46; recommendations for
    reforms in, 215–16, 239–45, 249–91, 293, 299, 306. *See also specific regulatory agencies by name*
relief wells, at Macondo site, 132, 135, 158, 159, 166–67, 169
remotely operated vehicles (ROV), *38*; in drilling of Macondo well, 3, 93; in response to Macondo well blowout, 19,
    131–32, 146, 164
renewable energy sources, 256–59, 264, 294–95
Repsol (company), 300
Resource and Conservation Recovery Act, 106–7
response to Macondo well blowout and oil spill, 129–70; attempts to seal blowout preventer, 131–32, 137–38, 146,
    149–50, 159–67, 159n; boom and berms, 151–57, 169–70; capping stack, 162–67; cofferdam (containment dome),
    145–46, 150, 159; compensation of victims, 179, 185–86, 189, 194, 278, 283, 284, 287; confusion of authority
    in, 130, 135–36, 138–39, 149, 151, 160–61 dispersant use, 133, 143–45, 147, 160–61, 169–70, 174, 180, 181–82,
    187; firefighting, 130–31, 130n; flow-rate estimates, 132, 133, 146–47, 149–50, 158, 166, 167, 167n, 274; local
    population and, 139–43, 152–55, 170; moratorium on offshore deepwater drilling, 151–52, 185; nuclear option, 146;
    oil removal efforts, 132–33, 140–45, 151–57, 168–69; plumes controversy, 181–82; recommendations for reforms
    related to, 249–91; relief wells, 132, 135, 157, 158, 166–67, 169; search and rescue efforts, 12–19, 129–32; top kill
    and junk shot, 148–50, 158–59, 161–62, 166. *See also specific companies, government agencies, and individuals by
    name*
Responsible Care initiative (American Chemistry Council), 233
Revette, Dewey, 5, 17, 107–9, 112–13
Rhode Island, coastal and marine spatial planning in, 201
Rickover, Hyman, 230
Riley, Bob, 150, 153
riser, offshore well: engineering challenges of, 37, 49, 51; and Macondo well, 7, 14, 18, 103–11, 103n, 114, 115, 120,
    121, 124; and oil spill at Macondo well, 132–33, *132*, 145-47, 159, 159n, 164

Riser Insertion Tube Tool, 146
risk management, offshore oil and gas industry, 217–47, 251–54. *See also* safety, offshore drilling
Rita, Hurricane (2005), 50, 136–37, 145, 197–98, 208, 212, 296
Robichaux, Brenda Dardar, 193, 203
Rooster Petroleum, *227*
Roshto, Shane, 17, 112
Royal Dutch Shell. See Shell Oil
rupture disks, in Macondo well, 158–59, 162, 274
Russia, offshore oil and gas industry in, 302


safety, offshore drilling: accident and injury rates, 3, 27–28, 30, 55, 69, 217–28, *226, 228,* 232, 251, 254; changes in
    regulation of after Macondo well blowout and oil spill, 55, 72, *227, 243;* compared to other risky industries, 229–42;
    conflict with revenue generation, 56, 254–55; corporate culture and, 215–47; with deepwater drilling, 35–36, 90–91;
    in hurricanes, 22, 25, 27, 50–51; inspections for, 68–76, 75, 78–79; insurance for, 245–46; recommendations for
    reforms in, 215–17, 239–45, 249–91, 293–95; regulation of, 28–30, 56, 68–76. *See also* explosions; oil spills
Safety and Environmental Enforcement, Bureau of, 55
Safety and Environmental Management Program (SEMP), 71–72, 242
Safety and Environmental Management System (SEMS), 228, 251, 253, 257
safety case approach, 68–69, *227,* 252, 252n, 258
safety culture, definition of, 218
Salazar, Ken, 55, 78, 78n, 131–32, 131n, 136, 147–48, *148,* 151–52, 161, 165, 255, 260, 301
salt, role of in offshore oil and gas reservoirs, 22, 24, 32–33, 39, 41–43, 45, 49, 52
Salvin, Bill, 147
Sandell, Micah, 9, 12
Sandia National Laboratories, 149
Santa Barbara Channel, oil spill in (1969), *23,* 26, 28–29, *29,* 31, 56, 58–59, 63, 135, 181
Saucier, Mike, 135
Saudi Arabia, oil and gas industry in, 21
Schlumberger, 3–4, 38, 44, 103, 118, 129
Scire, Grace, 192
Sears, Richard, 223
Securities and Exchange Commission (SEC), 234
Sedco–Forex, 44
September 11, 2001, terrorist attacks of, 75, 136
September 11th Victim Compensation Fund, 185, 287
Sepulvado, Ronald, 3
Shaw Group, 157
*Shell America* (vessel), 33
Shell Oil, 301–2; containment initiatives after Macondo well blowout and oil spill, 243–45; history of drilling in Gulf of
    Mexico, 21, *23,* 24, 25–26, 30–30, 31–34, 36–41, 45, 48, 51, 84n; oil-spill response plans of, 133; role in response to
    Macondo well blowout and oil spill, 164; and safety issues, *226,* 231–33
Shivers, Bradley, 10
shoe track, in Macondo well, 97–98, *97,* 102, 120, 121
shrimp, in Gulf of Mexico, 140, 144, 175, 179, 186–87
Sierra Club, 65
Sims, David, 4–8, 14, 17, 19, 97
Skidmore, Ross, 4
skimming, use of after Macondo oil spill, *129,* 132, 140, 143, 154, 161, 167n, *168,* 169
Slocum, Alexander, 149
Smit Salvage Americas, 130
Sole, Mike, 153
Sonat Offshore Drilling, 33, 37
spacer, in Macondo well, 7, 7n, 106–9, *106,* 111–12, 119, 121
Sperry Sun, 109–11, 110n, 112, 121
Spill of National Significance designation, 136–37, 155, 267–68, 278–79, 283, 287
Sport Fish Restoration and Boating Trust Fund, 207
Stafford Act (1988), 138, 268–69
Standard Oil of California, 21
Standard Oil of New Jersey, 24
Stanislaus, Mathy, 161
State On-Scene Coordinators, 138
static kill, 166–68
Statoil, 44, 47, 51
Stone Energy Corporation, *227*
Strategic Petroleum Reserve, 296–97
Strickland, Tom, 136
Submerged Lands Act (1953), *23,* 58
SUBSAFE system, 230–31, 234
Substance Abuse and Mental Health Administration, 194
Sunseri, Al, 163
Sunseri, Blake, 163
Sunseri, Sal, 163

Superior Energy Services, 167
Superior Oil, 21
Suttles, Doug, 133, *134*, 145, 146, 159, 164

Tabler, Vincent, 102
Taffaro, Craig, 140
Tana Oil and Gas Corporation, *226*
Taylor, Sharon, *142*
Technip, 44
temporary abandonment procedures, 4n, 77, *103*; at Macondo well, 4, 6, 103–6, 109, 119–20, 123, 126–27
Tenneco, 32
Texaco, 21, 27, 38
Texas: effects of Macondo oil spill on, 177; oil and gas industry in, 2, 21–53, 58, 217–20, 297
Texas City refinery (BP), 2, 218–22
Thierens, Harry, 138
3-D seismic imaging, for offshore drilling, 27, 33, 37–38, 42–45
Three Mile Island meltdown (1979), 229, 235, 239, 240n
Thunder Horse site, *23*, 46-47, *49*
Tiber site, 51
Tillerson, Rex, 232, 240
Tolstoy, Maya, 167n
Tooms, Paul, 150, 161
top kill, 148–50, 158–59, 161–62, 166
Total (oil company), 43, 44, 52
tourism, effects of Macondo oil spill on, 155, 185–86, 188–91, 197
Trahan, Buddy, 5, 7, 11, 13, 17
Trans-Alaska Pipeline, 35, 302
Transocean, 44, 74; and causes of Macondo well blowout, 90, 115–27, *124*, 223; and drilling of Macondo well, 2–4, 90, 92–115 response to Macondo well blowout and oil spill, 130–31, 137–38; and safety issues, 223-23, 295
Transportation, Department of, 68n, 255
tribal communities, in Gulf of Mexico region, 193–94
Tri-Union Development Corporation, *227*
Truman, Harry, 58, 296, 298
Trustees for Natural Resources, 277, 282
tuna, in Gulf of Mexico, 83n, 175, 178, 180
Turner, Eugene, 177
turtles, in Gulf of Mexico, 175, 180–81, *180, 183*, 184

Ultra-Deepwater and Unconventional Natural Gas and Other Petroleum Resources Program, 253
Unified Area Command, 131, 135, 139, 161, 181
Unified Command, 131–33, 135, 138–41, 143–46, 149, 154
Union of Concerned Scientists, 239n
Union Oil Company, 28, 32, 58, *227*
Union Pacific Resources Company, *227*
United Houma Nation, 193–94, 203
United Kingdom, offshore oil and gas industry in, 69–72, 218–19, 228–29
United Kingdom Health and Safety Executive, 218–19
U.S. departments and services. *See specific departments and services under the first key term in their names* (*e.g.*, Coast Guard, U.S.; Interior, Department of the)
*USS Thresher* (submarine), 229, 230, 231
Utilities Solid Wastes Activities Group, 235

*Valdez*, oil spill from *See Exxon Valdez* (vessel), oil spill from
Van Oord, 154
Vastar Resources, *226*
Vessels of Opportunity program, *129*, 140–41, 170, 287
Vidrine, Don, 6, 8, 13, 107–8, 112
Virginia, offshore oil and gas industry in, 301
Vitter, David, 150, 156

W & T Offshore, *227*
Walter Oil & Gas Corporation, *227*

Walz, Gregory, 97
Washington, offshore oil and gas industry in, 26, 67, 297
Water Resources Development Act (2007), 207
Watson, James, 160, 162
Watt, James, 56, 63–67, *66*, 76
Weatherford International, 96, 98
Weise, Adam, 17, 112
Well Integrity Team, 162, 164
Wereley, Steve, 147
West Africa, offshore oil and gas industry in, 44
Western-Geco, 44
wetlands, in Gulf of Mexico region, 173, *175*, 194, 197–208, 210-13
whales. *See* marine mammals
Wheeler, Wyman, 5–6, 11, 15–16, 107
wildlife, in Gulf of Mexico. *See specific types of wildlife by name*
Wild Well Control, 167
Williams, Mike, 9, 10, 15–16
Winslow, Daun, 5, 6, 7, 12–14, 17, 19
Woods Hole Oceanographic Institution, 146–47, 147n
workforce, offshore oil and gas industry: effects of Macondo oil spill on, 152, 185; logistical challenges of, 3, 22, 34;
   and safety issues, 3, 6, 28, 30, 69, 152, 215–29, 232–34, 239–42, 251; whistleblowers in, 254
Worley Parsons, 44
wrack zone, 177

Young, David, 16, 112–13

*Zane Barnes* (vessel), 36
Zapata Offshore Company, 24
Zukunft, Paul, 161, 170

Current Affairs/Environment



On April 20, 2010, the Macondo well blew out, costing the lives of 11 men, and beginning a catastrophe that sank the *Deepwater Horizon* drilling rig and spilled over 4 million barrels of crude oil into the Gulf of Mexico. The spill disrupted an entire region's economy, damaged fisheries and critical habitats, and brought vividly to light the risks of deepwater drilling for oil and gas—the latest frontier in the national energy supply. Soon after, President Barack Obama appointed a seven-member Commission to investigate the disaster, analyze its causes and effects, and recommend the actions necessary to minimize such risks in the future.

The Commission's report offers the American public and policymakers alike the fullest account available of what happened in the Gulf and why, and proposes actions—changes in company behavior, reform of government oversight, and investments in research and technology—required as industry moves forward to meet the nation's energy needs.

Complementary reports, staff background papers, hearing records, and other materials produced by the Commission are available at **www.oilspillcommission.gov.**

ISBN: 978-0-16-087371-3