DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

---

minimum value in API 5D (minimum 145 ksi). The range for the specified minimum yield strength (SMYS) in API 5D (135 to 165 ksi) was met for Coupons 83-C and 83-D.

**Table 25  Summary of Tensile Test Data for 83-Q**

| Specimen ID | Orientation | Diameter | UTS | | 0.7 YS | | Elongation | Reduced Area |
|---|---|---|---|---|---|---|---|---|
| | | (inches) | (ksi) | (MPa) | (ksi) | (MPa) | (%) | (%) |
| 83-C | Longitudinal | 0.354 | 158.2 | 1091 | 135.5 | 934 | 13.8 | 71.2 |
| 83-D | Longitudinal | 0.355 | 155.3 | 1071 | 135.1 | 931 | 13 | 70.4 |
| API 5D[5] | Specification | 0.350 ± 0.007 | | | | | | |
| | min | 0.343 | 145 | 1000 | 135 | 931 | 8.9 | |
| | max | 0.357 | | | 165 | 1138 | | |

### 6.2.8.4.2  Charpy Tests

Table 26 summarizes the results of the Charpy testing for 39-Q. Figure 101 and Figure 102 show the Charpy impact energy and percent shear curves for 39-Q, respectively. The upper shelf impact energy is approximately 72 ft-lbs (¾-size sample). The average Charpy value for the three 73°F temperature tests was 70 ft-lbs. API 5D specifies a minimum average of 32 ft-lbs and a minimum of specimen of 28 ft-lbs. The Charpy results for 39-Q exceeded the API 5D specifications.[5]

**Table 26  Results of Charpy V-Notch Testing for 39-Q**

| Specimen ID | Test Temperature | | Absorbed Energy | | Lateral Expansion | | | Percent Shear |
|---|---|---|---|---|---|---|---|---|
| | (°C) | (°F) | (J) | (ft-lb) | (mm) | (inches) | (mils) | (%) |
| 39-1 | 23 | 73 | 92 | 68.0 | 1.32 | 0.052 | 52 | 81 |
| 39-2 | 0 | 32 | 95 | 70.0 | 1.14 | 0.045 | 45 | 78 |
| 39-3 | 40 | 104 | 95 | 70.0 | 1.40 | 0.055 | 55 | 82 |
| 39-4 | -60 | -76 | 64 | 47.0 | 0.80 | 0.031 | 31 | 77 |
| 39-5 | -90 | -130 | 53 | 39.0 | 0.66 | 0.026 | 26 | 40 |
| 39-6 | 23 | 73 | 98 | 72.0 | 1.43 | 0.056 | 56 | 81 |
| 39-7 | -196 | -321 | 14 | 10.0 | 0.10 | 0.004 | 4 | 18 |
| 39-8 | -160 | -256 | 26 | 19.5 | 0.25 | 0.010 | 10 | 18 |
| 39-9 | -175 | -283 | 19 | 14.0 | 0.17 | 0.007 | 7 | 12 |
| 39-10 | -140 | -220 | 30 | 22.0 | 0.34 | 0.013 | 13 | 12 |
| 39-11 | 100 | 212 | 98 | 72.0 | 1.44 | 0.351 | 351 | 100 |
| 39-12 | 23 | 73 | 96 | 71.0 | 1.35 | 0.053 | 53 | 82 |
| 39-13 | 80 | 176 | 92 | 68.0 | 1.40 | 0.055 | 55 | 100 |

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 101  Charpy V-Notch Impact Energy Plot as a Function of Temperature for
39-Q (Plot of 3/4-size samples)**



**Figure 102  Percent Shear Plot from Charpy V-Notch Tests as a Function of
Temperature for 39-Q**

Table 27 summarizes the results of the Charpy testing for 83-Q. Figure 103 and Figure
104 show the Charpy impact energy and percent shear curves for 83-Q, respectively. The
upper shelf impact energy was approximately 72 ft-lbs (¾-size sample). The average
Charpy value for the three 73°F temperature tests was 72 ft-lbs. API 5D specifies a

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

minimum average of 32 ft-lbs and a minimum of specimen of 28 ft-lbs. The Charpy
results for 83-Q exceeded the API 5D specifications.[5]

### Table 27  Results of Charpy V-Notch Testing for 83-Q

| Specimen ID | Test Temperature | | Absorbed Energy | | Lateral Expansion | | | Percent Shear |
|---|---|---|---|---|---|---|---|---|
| | (°C) | (°F) | (J) | (ft-lb) | (mm) | (inches) | (mils) | (%) |
| 83-1 | 23 | 73 | 98 | 72.0 | 1.05 | 0.041 | 41 | 81 |
| 83-2 | 0 | 32 | 91 | 67.0 | 1.27 | 0.050 | 50 | 77 |
| 83-3 | 40 | 104 | 92 | 68.0 | 1.32 | 0.052 | 52 | 82 |
| 83-4 | -60 | -76 | 71 | 52.0 | 0.82 | 0.032 | 32 | 83 |
| 83-5 | -90 | -130 | 53 | 39.0 | 0.69 | 0.027 | 27 | 54 |
| 83-6 | 23 | 73 | 98 | 72.0 | 1.07 | 0.042 | 42 | 82 |
| 83-7 | -196 | -321 | 2 | 1.5 | 0.10 | 0.004 | 4 | 29 |
| 83-8 | -160 | -256 | 25 | 18.5 | 0.24 | 0.009 | 9 | 30 |
| 83-9 | -175 | -283 | 25 | 18.5 | 0.22 | 0.009 | 9 | 19 |
| 83-10 | -140 | -220 | 27 | 20.0 | 0.28 | 0.011 | 11 | 24 |
| 83-11 | 100 | 212 | 95 | 70.0 | 1.40 | 0.055 | 55 | 100 |
| 83-12 | 23 | 73 | 96 | 71.0 | 1.38 | 0.054 | 54 | 81 |
| 83-13 | 80 | 176 | 95 | 70.0 | 1.45 | 0.057 | 57 | 100 |



**Figure 103  Charpy V-Notch Impact Energy Plot as a Function of Temperature for
83-Q (Plot of 3/4-size samples)**

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 104  Percent Shear Plot from Charpy V-Notch Tests as a Function of Temperature for 83-Q**

### 6.2.8.5    Chemical Analysis of Drill Pipe

Chemical analysis was conducted on coupons removed from 1-A-1-Q, 1-B-2-Q, 39-Q, 83-Q, 93-Q, and 148-Q. The results of the chemical analysis are summarized in Table 28. The results of the analysis indicate that the pipe steel meets the chemical composition specifications for API 5D Grade S135, seamless drill pipe.[5]

Items 1-A-1-G and 39-Q were from a drill pipe joint with an internal coating and 1-B-2-Q, 83-Q, 94-Q, and 148-Q were from a drill pipe joint with no internal coating. Comparing these two groups, there was no discernable difference in the chemistry of the two drill pipe joints.

**Table 28  Results of Chemical Analysis Compared with Specification for API 5D Grade S135, Seamless Drill Pipe**

| Element | 1-A-1-Q | 39-Q | 1-B-2-Q | 83-Q | 94-Q | 148-Q | API 5D |
|---|---|---|---|---|---|---|---|
|  | wt% | wt% | wt% | wt% | wt% | wt% | wt% |
| Aluminum | 0.022 | 0.022 | 0.023 | 0.023 | 0.023 | 0.023 | ----- |
| Boron | 0.0006 | 0.0005 | 0.0006 | 0.0005 | 0.0006 | 0.0006 | ----- |
| Carbon | 0.24 | 0.24 | 0.25 | 0.24 | 0.25 | 0.24 | ----- |
| Cobalt | 0.002 | 0.001 | 0.004 | 0.001 | ----- | 0.001 | ----- |
| Chromium | 1.25 | 1.26 | 1.25 | 1.24 | 1.26 | 1.25 | ----- |
| Copper | 0.10 | 0.10 | 0.10 | 0.10 | 0.10 | 0.10 | ----- |
| Iron | Balance | Balance | Balance | Balance | Balance | Balance | ----- |
| Manganese | 0.74 | 0.73 | 0.73 | 0.73 | 0.74 | 0.73 | ----- |
| Molybdenum | 0.61 | 0.62 | 0.61 | 0.61 | 0.61 | 0.62 | ----- |

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

| Element | 1-A-1-Q | 39-Q | 1-B-2-Q | 83-Q | 94-Q | 148-Q | API 5D |
|---------|---------|------|---------|------|------|-------|--------|
| | wt% | wt% | wt% | wt% | wt% | wt% | wt% |
| Niobium | ----- | ----- | ----- | ----- | ----- | ----- | ----- |
| Nickel | 0.12 | 0.12 | 0.12 | 0.12 | 0.12 | 0.12 | ----- |
| Phosphorus | 0.006 | 0.006 | 0.006 | 0.006 | 0.006 | 0.006 | 0.030 |
| Sulfur | 0.003 | 0.002 | 0.003 | 0.002 | 0.003 | 0.003 | 0.030 |
| Silicon | 0.26 | 0.25 | 0.26 | 0.25 | 0.25 | 0.25 | ----- |
| Tin | 0.054 | 0.042 | 0.050 | 0.050 | 0.041 | 0.039 | ----- |
| Titanium | 0.016 | 0.014 | 0.015 | 0.015 | 0.014 | 0.014 | ----- |
| Vanadium | 0.006 | 0.006 | 0.007 | 0.007 | 0.007 | 0.006 | ----- |
| Zirconium | 0.007 | 0.005 | 0.006 | 0.005 | 0.004 | 0.004 | ----- |

## 6.3    Document Review

The publicly available and Government-provided documents and information, identified within Appendix C, were reviewed for the purpose of capturing and verifying where possible, the time of occurrence and descriptions of events that took place relevant to the BOP, prior to, during, and subsequent to the incident. Event descriptions and corresponding time occurrences were considered verified if derived from multiple sources and substantiated based upon consistent information. In only one case was an event (identified by two information sources and two perspectives) considered non-verifiable. DNV determined the event to be non-critical and conducted no further review.

Captured events were used to populate a comprehensive timeline for the purpose of illustrating the sequence of events. It was organized according to perspective or various original sources of information. The comprehensive timeline is provided within Appendix F. An illustration of the process used to create the comprehensive timeline is shown in Figure 105. The timeline was developed as an initial first step within the forensic investigation process and contains events considered by DNV to represent key data points. ROV footage was utilized to further substantiate and provide clarification for specific events. Findings of the ROV footage review are described in Section 6.4.



DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report

MANAGING RISK



**Figure 105  Timeline Process**

- Maintenance records, inspection results, and audit reports were reviewed as part of the Document Investigation. The events contained within the maintenance records, inspection results, and audit reports were incorporated into the timeline using the process described above. The events were also used to establish, to the extent possible, the condition of the BOP stack at the time of the incident. The information concerning the condition of the BOP stack provided guidance for the BOP Functionality testing and the Materials Evaluation and Damage Assessment.

A series of three secondary timelines were developed to assist with the Failure Cause Analysis:

- Blind Shear Ram Timeline, detailing the time span from the incident on April 20, 2010 until April 29, 2010, when it was concluded that the Blind Shear Rams were closed. See Figure 108.
- Variable Bore Rams Timeline, detailing the time span from February 1, 2010, until May 5, 2010, when a final attempt was made to close the VBRs. See Figure 107.
- Annular Preventer Timeline, detailing the time span from January 31, 2010, when the Deepwater Horizon arrived at the Macondo site, until May 3 2010, when a fourth ROV attempt was made to close the Lower AP. See Figure 106.

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 106  Illustration of the Events Pertaining to BSRs - April 20, 2010 to April 29, 2010**

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report





**Figure 107  Illustration of Events Pertaining to VBRs - April 20, 2010 to May 5, 2010.**

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report





**Figure 108  Illustration of Events from the comprehensive timeline that pertain to the Annular Preventers which occurred between January 31, 2010 to May 5, 2010**

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

## 6.4    Remotely Operated Vehicle Intervention Efforts

Following the incident, there were several attempts to function the rams on the BOP and
to effect repairs to the BOP hydraulic circuits by ROV. In addition, there was continuous
ROV inspection and monitoring of various BOP components. Video footage and still
photographs taken by the ROVs were provided by BOEMRE as part of the incident
investigation documentation. The video footage of particular interest was provided for the
time period from late April 21 to May 4, 2010.

The ROVs were equipped to perform a range of intervention tasks.  Each ROV had
robotic arms and pinchers used to grasp tools, including cutting wheels, wrenches, hot
stabs to transfer pressurized fluid, and hose insertion tools. These tools were lowered to
the seabed by a basket and crane. Each ROV had a hydraulic fluid pump on board to
assist with hot stabbing operations. Hydraulic fluid was supplied by lowering
accumulators to the sea floor. During some intervention efforts the hydraulic fluid was
dyed green for visibility, to assist in identifying leaks in the hydraulic circuit.

Video footage and/or photographic stills were provided from the following ROVs:

- C-Express – C-Innovation,
- Boa Sub C - Millennium 36
- Boa Sub C - Millennium 37
- Skandi Neptune - Hercules 6
- Skandi Neptune - Hercules 14

The ROV video footage was reviewed with two objectives:

- To confirm the times, dates and activities referenced by other sources for the purpose
  of substantiating and illustrating timeline events.
- To provide on going ROV video review support to confirm observations related to the
  BOP condition and the origin of leaks and modifications to the hydraulic circuitry.

The video footage of primary interest was from three ROVs: C-Innovation, Millennium
36 and Millennium 37. These ROVs performed intervention work and monitoring after
the incident. The other ROVs (from which video footage was provided) were generally
involved in monitoring activities. The ROV operators completed dive logs during the
course of their intervention efforts. The logs were provided by BOEMRE as part of the
documentation. The dive logs were reviewed and used as guidelines to navigate the
extensive ROV footage. The relevant ROV intervention times and activities were cross-
referenced to supporting documentation and verified activities were then included in the
primary timeline.

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report

 MANAGING RISK

## 6.4.1 Activation of the Blind Shear Rams

Three different interventions were performed to initiate closure of the BSRs:

- Forced activation of the AMF/Deadman sequence by severing the pressure balance oil filled (PBOF) cables severing the Pressure Balanced Oil Filled cable between the Yellow and Blue Control Pods and the pilot pressure lines from the rigid conduit manifold
- Forced activation of the Autoshear sequence by manually cutting the hydraulic plunger
- Closure of the BSRs by "hot stabbing" directly into the ROV panel located on the lower choke side of the BOP

During the course of these activities there were also efforts to close the Middle VBRs by hot stabbing. It was later determined, on May 3, 2010, that the hydraulic line from the ROV panel Middle VBR close port was incorrectly connected to the Lower VBRs.

Later ROV interventions involved initiating closure of the CSRs and the Annular Preventers.

Intervention efforts related to the closing of the BSRs were reviewed and documented in detail in the primary timeline (Appendix F). Table 29 is a summary of these efforts.

**Table 29  Summary of ROV Interventions for BSRs**

| Date | Time | Activity | Documented Result |
|------|------|----------|-------------------|
| April 21, 2010 | 23:00 | C-Innovation attempted to activate Autoshear | The hydraulic plunger was not cut |
| April 22, 2010 | 01:10 | C-Innovation attempted to close BSR by hot stabbing into the "SHR RAM CLOSE" port on the ROV panel. | Unable to raise pressure. |
| | 02:45 | C-Innovation attempted to simulate the Automatic Mode Function (AMF/Deadman) by cutting rigid piping and the PBOF hydraulic lines | The hydraulic line was severed. Fluid release from the line was minimal and indicated the line was not under high pressure. |
| | 04:40 | Second attempt to activate the Autoshear by cutting the hydraulic plunger | Unable to cut hydraulic plunger |
| | 07:30 | Millennium 37 attempted activate the Autoshear by cutting the hydraulic plunger | Hydraulic plunger was successfully cut. |

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

| Date | Time | Activity | Documented Result |
|---|---|---|---|
| | 08:00 | Millennium 36 attempted to close the BSR by hot stabbing into the "SHR RAM CLOSE" port on the ROV panel | Unable to raise pressure. Flow test on mud indicated fluid is flowing. |
| | 10:22 | Deepwater Horizon sank | |
| April 23, 2010 | | (No active intervention efforts related to BSR) | |
| April 24, 2010 | | (No active intervention efforts related to BSR) | |
| April 25, 2010 | | (No active intervention efforts related to BSR) | |
| April 26, 2010 | 10:45 | Millennium 37 attempted to close the BSR by hot stabbing into the "SHR RAM CLOSE" port on the ROV panel | Pressure reached 4,400 psig, but was not maintained. |
| April 26, 2010 | 21:45 | Millennium 37 attempted to close the BSR by hot stabbing into the "SHR RAM CLOSE" port on the ROV panel | Pressure reached 4,500 psig, but was not maintained. |
| April 27, 2010 | 03:15 | Millennium 37 attempted to close the BSR by hot stabbing into the "SHR RAM CLOSE" port on the ROV panel | Pressurized to 5,000 psig. Appeared to maintain pressure. |
| April 28, 2010 | | (No active intervention efforts related to BSR) | |
| April 29, 2010 | 21:30 | Millennium 36 attempted to close the BSR by hot stabbing into the "SHR RAM CLOSE" port on the ROV panel | Pressurized to 5,500 psig. Appeared to maintain pressure. |
| May 10, 2010 | - | Gamma rays indicated all but one of the ST locks were closed and locked | - |
| May 20, 2010 | - | ROV intervention activities ceased | - |

The first ROV intervention effort related to the closing of the BSRs was an attempt to cut the Autoshear hydraulic plunger. C-Innovation attempted the cut using a circular saw at approximately 23:30 hours on the evening of April 21, 2010. The cut was not successful. Figure 109 shows two images captured from the video footage provided, from before and after the failed attempt.



DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report

MANAGING RISK



**Figure 109  ROV C-Innovation video footage of the failed attempt to cut the Autoshear hydraulic plunger at 23:30 on April 21, 2010**

The first attempt to close the BSRs by hot stabbing was performed by C-Innovation at approximately 01:15 hours on April 22, 2010. The ROV was unable to generate pressure using the on-board hydraulic pump. Figure 110 shows two images captured of the failed attempt. C-Innovation then successfully severed various rigid piping and the PBOF cable between the subsea transducer module (STM) and SEMs on the Control Pods. Figure 111 shows images of the severing of the PBOF cables.



**Figure 110  ROV C-Innovation video footage of the failed attempt to raise pressure during hot stab of the blind shear ram at 01:15 on April 22, 2010**

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 111  ROV C-Innovation video footage of the successful attempt to sever the PBOF cables 02:45 on April 22, 2010. The severed cable is highlighted with a yellow dashed circle.**

The Autoshear hydraulic plunger was successfully cut using a circular saw by Millennium 37 at approximately 07:30 hours on April 22, 2010. Figure 112 shows images of the successful cut. Movement of the plunger (captured by the ROV footage) indicated that the Autoshear sequence was initiated.

Following the Autoshear hydraulic plunger cut, the ROV performed an inspection of the BOP stack. The inspection of the "LATCH/UNLATCH" indicator demonstrated that the LMRP had not unlatched (see Figure 113 and Figure 114).



**Figure 112  ROV Millennium 37 video footage of the successful attempt to cut the Autoshear hydraulic plunger at 07:30 on April 22, 2010**

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report





**Figure 113  ROV Millennium 37 video footage of the LMRP/BOP stack connection
shortly after cutting of the Autoshear hydraulic plunger at 07:30 on April 22, 2010**



**Figure 114  ROV Millennium 37 video footage of the LMRP "LATCH/UNLATCH"
indicator shortly after cutting of the Autoshear hydraulic plunger at 07:30 on April
22, 2010**

Millennium 36 made another unsuccessful attempt to hot stab into the BSR close port on
the ROV panel at approximately 08:00 hours on April 22, 2010. The ROV was unable to
generate pressure. Figure 115 is an image of the failed attempt. The ROV was pulled

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

back as the Deepwater Horizon sank. Figure 116 shows images of the LMRP Flex Joint
before and after the riser kinked on April 22, 2010.



**Figure 115  ROV Millennium 36 video footage of the failed attempt to raise pressure
during hot stab of the blind shear ram at 08:00 on April 22, 2010**



**Figure 116  ROV Millennium 36 video footage of the LMRP Flex Joint before and
after the kinking of the riser at 10:22 on April 22, 2010**

Millennium 37 made two more attempts to hot stab the BSR close port on the ROV
panel, at 10:45 and 21:45 hours on April 26, 2010. During both attempts the pressure was
generated to over 4,000 psig, but could not be maintained. Figure 117 and Figure 118
show ROV images of the two attempts. The loss of pressure was attributed to leaks in the

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 119  ROV Millennium 37 video footage of a successful attempt to maintain
pressure during hot stab of the blind shear ram at 3:15 on April 27, 2010**



**Figure 120  ROV Millennium 36 video footage of a successful attempt to maintain
pressure during the hot stab of the blind shear ram at 21:30 on April 29, 2010**

## 6.4.2    Repair Efforts

Leaks were identified in the hydraulic circuits while hot stabbing the BSRs. ROVs
worked in tandem to identify leaks in the various components. One ROV would hot stab
at the ROV panel, while another ROV monitored hoses and connections for leakage.
Leaks were highlighted by injecting green dye into the hydraulic fluid prior to hot
stabbing.

Intervention efforts related to the closing of the blind shear rams are shown in Figure 121
and Figure 122. Leaks were repaired by ROV using hand tools. Figure 123 and Figure
124 show images of the inspection and repair to the ST Lock shuttle valve above the

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



starboard side of the BSRs. Leaks were also identified in the fittings behind the port side
ST Lock (see Figure 125).



**Figure 121  ROV Millennium 37 video footage of an inspection of a fitting on the
blind shear ram at 08:15 on April 22, 2010**



**Figure 122  ROV Millennium 37 video footage of a repair to a fitting on the blind
shear ram at 08:20 on April 22, 2010**

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 123  ROV Millennium 37 video footage of an inspection of the ST lock shuttle valve on the blind shear ram at 22:20 on April 25, 2010**



**Figure 124  ROV Millennium 37 video footage of a repair of the ST lock shuttle valve on the blind shear ram at 5:45 on April 26, 2010**

Dᴇᴛ Nᴏʀsᴋᴇ Vᴇʀɪᴛᴀs

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 125  ROV Millennium 36 video footage of a leak in the fittings behind the right side ST Lock on the blind shear rams**

## 6.5    Modeling

Based on the examination of the damage to the BSR blocks and the drill pipe segments, the position of the drill pipe at the time of cutting by the BSR was not at the center of the wellbore. The evidence from the markings on the drill pipe indicated that the drill pipe was at the side of the wellbore. To explain the position of the drill pipe within the wellbore at the time of the BSR activation, buckling of the drill pipe within the well-bore between the UA and the Upper VBR was examined. The modeling described below was performed for different combinations of annular preventers and VBRs with only minor variations in results.

The scenario in which forces developed to produce buckling is discussed here. The UA was closed with either the tool joint directly below the element or with the element closing on the top portion of the tool joint (see erosion patterns on the tool joint in Figure 126). The closing force of the UA element restricted the drill pipe from upward movement. Upon closing the Upper VBR, the wellbore flow was directed only through the drill pipe, resulting in the pressure within the drill pipe rapidly increasing. The pressure increase produced an upward force (axial compression load pinned at the UA) on the drill pipe. This upward force provided the forces necessary for the drill pipe to elastically buckle, forcing the drill pipe to the side of the wellbore.

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report





**Figure 126  Laser Scan of Drill Pipe Segment 1-B-1 (Top End)**

## 6.5.1   Buckling Model

Elastic buckling is characterized by a sudden instability of a structure subject to lateral loads or axial compressive loads. In the case of an axially loaded drill pipe, this instability would result in lateral displacement of the pipe within the wellbore. Finite element analysis (FEA) was performed to examine the possibility and effects of elastic buckling of the drill pipe within the wellbore between the UA and the Upper VBR.

Finite element modeling of a buckling event is typically handled as a two part analysis. An initial buckling analysis was run to calculate the critical buckling loads and predict the locations and manner that a structure will fail, and a post-buckling analysis was then run to calculate the pipe deformation response after the buckle initiates. For this model a linear eigenvalue buckling analysis was utilized to calculate the likely buckling modes and their corresponding critical loads.

The eigenvalue method is a numerical modeling technique to calculate the critical buckling loads of a given structure. For a drill pipe under axial load there are numerous ways in which the drill pipe can buckle (known as buckling modes). The buckling modes are affected by the loading conditions and sensitive to any stiffening elements in the structure. The tool joint and drill pipe were modeled in their entirety for the segment between the UA and the Upper VBR.

A three dimensional solid model was developed that included a drill pipe segment (including tool joint) that spanned from the UA down to the Upper VBR, the BSR cavity, and a section of the BOP wellbore, as shown in Figure 127. The drill pipe segment was modeled using the nominal geometry specified in API Specification 5D and API



DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report

MANAGING RISK

Specification 7. The wellbore and the BSR cavity were modeled to simulate the displacement restrictions of the drill pipe within the wellbore.



**Figure 127  General Layout of Drill Pipe and Wellbore Section**

The final drill pipe geometry was modeled with refined mesh of 27,520 elements, connected by 41,400 nodes. The elements used to construct the model were three-dimensional 8-noded hexahedral solid elements. Elements of this type and refinement ensured adequate mesh definition and solution accuracy. The wellbore and BSR cavity were modeled with rigid shell elements. These elements provided contact and displacement control. Elastic material properties were applied to the elements defining the behavior of the drill pipe using results from the mechanical testing (Section 6.2.8.4).

Boundary conditions were applied representing the constraints at the UA and the Upper VBR. An eigenvalue buckling analysis was then run to predict the buckling modes and calculate their respective critical loads. Critical loads were calculated by applying incremental axial loads to the bottom of the drill pipe until the point of instability was reached. The predicted buckling mode data was then utilized as input for the post-buckling deformation analysis.

The axial load components were added in a static Rik's type analysis to approximate the post-buckling deformation of the drill pipe. Rik's method is capable of varying the applied load components as the pipe deforms allowing the analysis to account for the non-linear effects expected as buckling progresses.

The models were solved using ABAQUS$^{TM}$ Standard. The initial buckling analysis predicted a single waveform buckling mode, at a critical axial load of 113,568 lbs. The predicted deformation and resulting stresses are shown in Figure 128 and Figure 129, and the calculated loads are given in Figure 130. The predicted deformation showed the peak curvature of the buckle would contact the wellbore above the BSR cavity, holding the pipe against the side of the wellbore.



**DET NORSKE VERITAS**
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report

MANAGING RISK



**Figure 128  Progression of Pipe Displacement Under Buckling**



**Figure 129  Predicted Deformation and Resulting Stresses Due to Buckling**

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 130  Calculated Loads as a Function of Drill Pipe Displacement**

## 6.5.2    Buckling Considerations

It has been shown by finite element analysis (Section 6.5.1) that a compressive axial load of 113,568 lb on the drill pipe was necessary to cause buckling. The finite element analysis accounted for the specific geometry of the drill-pipe, tool joint and rams.

This result was validated by calculations based on Euler´s equation. The drill pipe was assumed to be fully restricted from upward movement at the closed UA due to a tool joint positioned just below. At the upper VBR, the drill pipe was assumed to be fixed in the radial direction by the rams but unrestricted in the vertical direction (i.e. allowed to slide).

A compressive axial force that led to buckling of the drill pipe at the time the BSR was activated was the result of a combination of several components. These force components depend on the reservoir pressure, the fluid media in the drill pipe, the flow in the drill pipe, the friction between the fluid media and drill pipe and other factors.

The axial compressive force on the drill pipe that can cause buckling has a number of components including but not limited to:

- Upward friction force from the flow inside the drill pipe
- Upward buoyancy force on the drill pipe
- Upward force from reservoir pressure in excess of buoyancy acting on drill pipe
- Downward gravity force on the drill pipe
- Downward friction force on the outside of the drill pipe from seal at the VBR

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



Based on conditions likely present in the wellbore at the time of the incident, calculations indicate that the force needed to buckle the drill pipe was present. Detailed numerical simulations were not performed as part of this investigation.

### 6.5.3   Cutting of the Drill Pipe in the Blind Shear Ram

Physical evidence on the recovered drill pipe segments indicates that the drill pipe was not centered in the wellbore when the BSR was activated. Indications on drill pipe segment ends 94-B and 83-B were matched to the outer corners of the upper BSR block as discussed in (Section 6.2.4.2). These indications were aligned with the upper BSR block features to determine the position of the drill pipe. Figure 131 shows a comparison of the aligned pipe segments with the predicted drill pipe position from the buckling analysis.



**Figure 131  Alignment of Pipe Segments with BSR and Buckled Pipe Displacement Comparison**

The BSR blades are designed with a face rake angle intended to impart tension on the drill pipe as the blades shear through it. Multiple numerical equations exist for approximating the shear forces necessary to shear drill pipe, however these only consider situations where the pipe is completely within the shearing blade surfaces of the BSR. A finite element analysis (FEA) was performed to simulate the effects of a non-centered drill pipe on the ability of the BSR to cut the drill pipe and seal the well.

Fracture of a ductile material is governed by two key mechanisms: ductile fracture due to the nucleation, growth, and coalescence of voids (ductile damage) and shear fracture due to shear band localization (shear damage).[6] These two mechanisms call for different forms of the criteria for the onset of damage. FEA using Abaqus offers several mechanisms to accurately model material damage. For this analysis, ductile damage initiation was specified using the Johnson-Cook damage model and published damage

---

[6] ABAQUS Analysis User's Manual, "21.2.2 Damage Initiation Criteria for Fracture of Metals"; (C) Dassault Systemes, 2010.

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report




MANAGING RISK

parameters for 4340 steel. The shear damage initiation was specified using shear criterion model within Abaqus and published damage parameters. This allowed for the model to consider material failure by ductile damage, shear damage, or a combination thereof.

Validation models were run to determine the forces necessary to cut the drill pipe when it is within the cutting blade surfaces (centered in the wellbore as illustrated in Figure 132). A three dimensional shell model was developed representing the BSR blades, block faces, and a section of 5.5 inch diameter drill pipe as shown in Figure 133. The final geometry was modeled with 20,030 elements connected by 20,183 Nodes. The blade surface models were developed from CAD models of the BSR provided by Cameron. The drill pipe was modeled with shell elements and a specified thickness of 0.386 inches, per measurements of pipe section 83-Q. The ram faces were modeled with rigid shell elements as they were assumed stiff relative to the deformable drill pipe. Elastic and plastic material properties were applied to the model defining the behavior of the drill pipe as determined by mechanical testing.



**Figure 132  BSR Configuration**

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report





**Figure 133  FEA Model of BSR Blade Surfaces and Drill Pipe**

A second model was developed to analyze the effects of the drill pipe being off center in the wellbore (displaced to the far side of the wellbore as illustrated in Figure 134). The upper BSR block had a single "V" blade design, intended to create a progressive shear, thereby reducing the necessary cutting force. As shown in Figure 132, the upper BSR blade does not extend fully across the wellbore. The lateral forces due to buckling would likely have kept the drill pipe off center in the position illustrated in Figure 134.



**Figure 134  FEA Model of BSR Blade Surfaces and Off-Center Drill Pipe**

The dynamic pipe shear models were solved using Abaqus Explicit. The progression of the shear cut for the model with centered drill pipe is shown in Figure 135 and Figure 136. The drill pipe was deformed initially (Frames 2 and 4). Frame 7 shows the step where the blade began to shear and penetrate the drill pipe. This was the point of highest calculated shear force ($RF_{MAX}$). As the shearing progressed and the drill pipe separated, the required force decreased (Frame 8). After full separation, the rams deformed the pipe

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



and folded over the lower sheared section (Frames 10 and 12). Figure 137 shows a BSR cut from Cameron Engineering Report 2613 with a very similar appearance as predicted by the FEA model.



**Figure 135  Progression of Centered BSR Shear Model - Side View**

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 136  Progression of Centered BSR Shear Model - Isometric View**



**(a) Lower pipe with upper BSR block          (b) Lower pipe with lower BSR block**

**Figure 137  Photographs of BSR Shear Samples.[7]**

The model with centered drill pipe calculated a maximum required shear force of 573,018
lbs. Table 2 of Cameron Engineering Bulletin EB-702D provided the effective piston
area for the BSR configuration (238 in²). The model-derived shear force, when divided
by this effective piston area, equated to a maximum ram pressure of 2,408 psig. The FEA

---

[7] Cameron Engineering Report 2613, Mach 3, 1999, 2nd Shear Test, Photo 8 and 9 of 16, p.22.

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

results were compared with shearing pressure results derived from methods proposed by Transocean[8], West Engineering[9], and Cameron[10]. The Transocean and West Engineering calculations were based on a modified distortion energy theory equation, while Cameron used an empirical formula developed from extensive testing. The calculated results for the given conditions are given in Table 30. The FEA model results showed good agreement with the calculated shear pressures.

**Table 30  Comparison of Calculated BSR Pressures**

| Calculation Method | Calculated Shear Force | Shear Pressure |
|---|---|---|
|  | **(lbf$_f$)** | **(psi)** |
| Transocean[8] |  | 2,378 |
| West Engineering[9] | 504,805 | 2,121 |
| Cameron[10] |  | 3,008 |
| FEA Model | 573,018 | 2,408 |

The BSR is designed to fold the end of the lower pipe segment over to prevent damage to the lateral sealing element behind the upper blade as it passes across. Testing has shown that the lower piece can fracture at the fold point (Figure 137). The centered pipe shear analysis calculated a strain concentration of 32% along the inner bend as seen in Figure 138, matching with the fracture area observed on physical tests.

---

[8] TRN-USCG_MMS-00038805 Shear Pressure.xls.
[9] West Engineering Report: Shear Ram Capabilities Study; Req. 3-4025-1001 for U.S. MMS, Sept. 2004.
[10] ED-702 CAMCG 00003247 Page 5 – Table 2.

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 138  Final Deformed Configuration of Shear Cut Showing Strain Concentration at Inner Bend**

The progression of the shear cut for the model with off-centered drill pipe is shown in Figure 139 and Figure 140. With the pipe displaced to the side of the wellbore, the corner of the upper blade made the initial contact with the drill pipe (Frame 2). In Frame 4, the corner of the upper blade has pierced the drill pipe and shearing has initiated. As part of the pipe is outside of the upper BSR blade surface, only 2/3 of the pipe is actually being sheared (Frame 7). Due to the earlier shear initiation at the blade point, and the fact that less of the pipe was sheared, the calculated shearing forces were less than those calculated for the centered pipe model. The remainder of the pipe was deformed outside of the upper blade surface (Frames 8, 10, and 11). This deformed portion was pinched and deformed between opposing side packers (Frames 10 and 11, and Figure 141).

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 139  Progression of Off-Center BSR Shear Model - Side View**



**Figure 140  Progression of Off-Center BSR Shear Model - Isometric View**

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report





**Figure 141  Top View Showing Deformation of Drill Pipe Outside of Shearing Blade Surfaces**

The final deformed configuration of the drill pipe on the upper BSR block is shown in Figure 142 through Figure 144. The comparison between the aligned laser scanned sections with the final configuration predicted by the FEA model showed good agreement. The final deformed configuration of the drill pipe is given in Figure 145. Note that the ram block indentations on both the upper and lower segments of drill pipe were present and agreed with the recovered evidence. The fold over on the recovered lower pipe section was missing. This portion was removed from the center image in Figure 145 for visual comparison with 83-B and 94-B.



**Figure 142  Final Deformed Configuration of Shear Cut Showing Strain Concentration at Inner Bend**

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 143  Final Deformation of the Drill Pipe as Predicted by the Off-Centered Pipe Model; Upper BSR Block Shown on the Right**



**Figure 144  Comparison of Recovered Drill Pipe Segments and Final Model**

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK



**Figure 145  Final Model Deformation Compared with Recovered Drill Pipe Laser Scans - 83-B and 94-B**

The shear model with off-centered drill pipe showed that the required shear force ($RF_{MAX}$) increased as the pipe was pressed between the flat outer faces of the ram blocks. A maximum shear force for the off-centered pipe analysis was calculated as 1,017,040 $lb_f$, which is equivalent to 4,273 psi for this BSR design. Based on this analysis, the BSR would likely stall at this point, if not prior to this, as the required pressure exceeded the available hydraulic system pressure (regulated to 4,000 psig).

With the drill pipe collapsed between the ram faces, the upper and lower BSR blocks were 2 inches from being fully closed (Figure 146). The side packers were 1 inch from making initial contact and sealing.



**Figure 146  Spacing of Upper and Lower BSR Blocks in Partially Closed Position**

Further investigation was performed using the laser scanned models. The models of the upper and lower BSR blocks, and drill pipe segment 94 were assembled with segment 94 contacting the upper block (deformation features aligned - Figure 147). With the blocks spaced 2 inches from fully closed, the lower block fit against segment 94. Figure 148 shows the BSR CAD models (side packers removed) in the same configuration and

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

demonstrates that the lower BSR blade was 1.4 inches from contacting the rear packers and sealing.



**Figure 147  Alignment of Scan Models - 2 Inch Standoff Between Block**



**Figure 148  BSR CAD Models - 2 Inch Standoff Between Blocks**

With the VBRs closed below the BSR, well flow was diverted through the inside of the drill pipe. After the BSR was activated and closed on the off-center drill pipe, the well flow was concentrated through the partially sheared drill pipe on the kill side of the BSR. The kill side of the blocks and wellbore experienced the most erosion damage. This concentrated flow condition remained until the CSRs were activated (April 29, 2010) shearing the drill pipe. This created a new flow condition that was no longer concentrated on the kill side of the BSR. Flow then exited the cut drill pipe below the CSR and impinged upon the bottom of the CSR blocks (evidenced by erosion pattern on recovered blocks). The CSR was intended only to cut tubulars. It was not designed to seal the

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

wellbore. Without a sealing mechanism in the CSRs, flow traveled around the CSR
blocks and continued up the entire wellbore cross-section below the BSRs. Without
contact between the lower blade and rear packer (forming a seal), flow occurred across
the entire face of the blocks. This flow condition existed from April 29, 2010, until the
well was brought under control.

Figure 149 shows the open cavity through the upper BSR block above the cut lower drill
pipe segment. The image on the right shows the scan of the erosion in the wellbore along
the kill side of the BSRs.



*Note the image on the left is viewed from the kill side, while the image on the right is facing the kill side of
the wellbore.*

**Figure 149  Erosion Damage - BSR Blocks and Wellbore**

## 6.6    Failure Cause Analysis

Failure cause analysis was organized and conducted around a single top event and a
secondary chain of events. For the purposes of this investigation the top event was
defined as the failure of the BSRs to close and seal the well and the secondary chain was
defined as the events responsible for the condition and location of the recovered drill pipe
segments.

A fault tree was developed for the top event (Appendix G). Six different means were
identified for initiating closure of the BSRs:

- Manual function via surface control through BSR Close
- Manual function via surface control through HP Shear Close
- Manual function via surface control of EDS
- Automated function via AMF/Deadman
- Manual initiation of Autoshear
- Manual function subsea via ROV

There were functions/components common to all six means:

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



- Port and starboard BSR hydraulic actuators (operators) on the BOP
- Port and starboard BSR Close shuttle valves
- Hydraulic lines

Testing of these components determined that they functioned as intended in the as-received condition. No further failure cause analysis was performed.

Manual function via surface control through BSR close is achieved through the activation of solenoid 66B/Y. However, the high-pressure BSR close function is achieved through solenoid 103 B/Y. High pressure close, EDS and AMF/Deadman all activate through the operation of solenoid 103B/Y. Specifics on solenoid 103 are discussed later in this section.

HP Shear Close, EDS, AMF/Deadman and Autoshear have a common reliance on the accumulator bottles (8 x 80 gallon) located on the BOP. Testing of these accumulators determined that they functioned as intended in the as-received condition. The analysis of the hydraulic fluid collected from the port side close operator of the BSR indicated the fluid was of a composition very similar in characteristics to the samples of Stack Guard and Aqualink provided by the manufacturer. This was the fluid that resided in the BOP accumulators at the time of the incident. This if further indication the BSR's were activated either by the Authoshear or possibly the AMF/Deadman functions.  No further failure cause analysis was performed.

Each of these means are examined and discussed in further detail in the following sections.

## 6.6.1    Manual Function Blind Shear Ram Close and High Pressure Shear Close

Both of these manual functions required deliberate selection using a control interface on the Deepwater Horizon. Eyewitness accounts of the activities carried out during the loss of well control do not record any action carried out to close the BSRs independently using either the BSR Close function or the HP Shear Close function on the control interfaces from the rig. It was ruled as unlikely that either of these functions could have been accidentally pressed (instead of another intended function such as EDS) based on proximity to other functions on the control panel layouts. There was no evidence to support either of these means as possible. No further failure cause analysis was performed.

## 6.6.2    Manual Function of Emergency Disconnect Sequence

Eyewitness accounts record that the EDS function was initiated from the bridge of the Deepwater Horizon just before 21:56 on April 20, 2010. The initiation occurred approximately seven minutes after the first recorded explosion and power loss. There are

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report

MANAGING RISK 

no corroborative eyewitness accounts regarding the status of the lights on the control panel. There is an account of lights flashing, indicating that the EDS function had initiated. There are no accounts of any specific lights going steady, which would have indicated a function had been completed and confirmed by the subsea control pods. The EDS function has two separate command sequences: (1) Blind Shear Ram Close, and (2) Casing Shear Ram Close. The latter sequence is used when casing is being run into the hole; otherwise the Blind Shear Ram Close is used as the default sequence. By design, the Blind Shear Ram Close sequence should have been completed within 25 seconds. Reviewed ROV video indicated no evidence that the sequence had initiated; the LMRP remained latched to the BOP, the Blue and Yellow Control Pod stingers were not retracted. Evidence supports that the EDS function was initiated but not successfully completed. Evidence indicates that the most probable reason for this failure was damage and loss of MUX communication to the BOP Stack due to and immediately after the first recorded explosion and loss of rig power. No further failure cause analysis was performed.

### 6.6.3    Automated Mode Function/Deadman

The AMF/Deadman sequence was designed to initiate from the control pods if electrical power, fiber-optic communication and hydraulic pressure to the control pods from the surface were lost. Regardless of which control pod was active or being used to control the BOP Stack, both the Yellow and Blue Control Pods continuously monitored the status of the power, communication and pressure. Both control pods communicated with each other regarding this status. One control pod had command (active) of the BOP Stack and monitored communication from the surface. The other control pod was on standby but it monitored communications from the active control pod. In the case of loss of all three inputs (power, communication and hydraulic pressure), both control pods required agreement on status in order to initiate the sequence. The AMF/Deadman sequence was required to be armed (command given after BOP Stack was installed) in order to function. At the time of the loss of well control, the Blue Control Pod was in command of the BOP stack.

Two scenarios were analyzed for the AMF/Deadman sequence: initiation after power, communication and hydraulic pressure loss caused by catastrophic failure at the surface, and initiation after ROV intervention.

As previously discussed in Section 6.6.2, evidence indicates that MUX cable transmission (power and communication) was lost due to and immediately after the first recorded explosion and loss of rig power. ROV intervention was completed at 02:45 on April 22, 2010 to remove hydraulic pressure by cutting the pilot lines from the rigid conduit manifold on the LMRP to both control pods and cutting the PBOF cables from the STM to the SEMs on both control pods. This intervention satisfied the three necessary conditions (power, communication and hydraulic pressure loss) for AMF/Deadman initiation.



DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report

MANAGING RISK   DNV

Testing of the AMF/Deadman indicated the hydraulic circuit portion of the system functioned as intended. Testing of the original Solenoid 103Y yielded inconsistent results. Testing on the Blue Control Pod 27V battery bank indicated a low voltage that was incapable of actuating Solenoid 103B and therefore incapable of completing the AMF/Deadman sequence.

Evidence indicates that conditions necessary for AMF/Deadman (loss of power, communication and hydraulic pressure) existed immediately following the first explosion/loss of rig power and prior to ROV intervention. The function testing demonstrated that the AMF circuits within both the Blue and Yellow Control Pod SEMs activated when the loss conditions were simulated. Function testing on the Blue Control Pod proved that the 27V battery bank in the as-received condition could not carry the initiation from the AMF circuit in the SEM to completion. The function testing of the Yellow Control Pod circuits demonstrated that when both coils of original Solenoid 103Y were energized simultaneously, the solenoid functioned as intended. When only one coil was energized, the results were inconsistent.

While the conditions necessary for AMF/Deadman existed immediately following the first explosion/loss of rig power, because of the inconsistent behavior of original Solenoid 103Y and the state of the 27V battery bank on the Blue Control Pod, it is at best questionable whether the sequence was completed.

### 6.6.4   Autoshear

Autoshear is a hydro-mechanical system. Its functioning is not dependent on the state of the Control Pods. Testing of the Autoshear indicated the hydraulic circuit portion of the system functioned as intended. The Autoshear hydraulic plunger was successfully cut at approximately 07:30 hours on April 22, 2010. Movement of the plunger (visible on ROV footage) indicated that hydraulic pressure on the control valve was relieved allowing a spring return to shift the control valve, sending a pilot signal to open a high pressure shear control valve and send hydraulic supply from the high pressure shear circuit to the closing ports of the BSRs. Testing of the system resulted in functioning as intended. The evidence supports successful initiation of BSR close by Autoshear, if not previously by AMF/Deadman.

### 6.6.5   Manual Function via Remotely Operated Vehicle

Testing of the ROV Panel BSR port confirmed the panel functioned as intended. At the start of each test, connecting rod movement occurred at very low pressures for all three-flow rates.  The pressure to the operators did not increase until the connecting rods had fully extended (fully closed).



The first attempt to close the BSRs using the ROV panel hot stab occurred prior to the successful cut of the Autoshear hydraulic plunger. The attempt was considered unsuccessful due to inability to generate pressure. There were continued attempts to close the BSRs following the initiation of Autoshear. The second attempt was similar to the first attempt; unsuccessful due to inability to generate pressure. In two subsequent attempts, pressure was generated to over 4,000 psig, but bled down due to leaks in the hydraulic circuit. In two final attempts, pressure was rapidly generated to over 5,000 psig and maintained.

The ability for the ROV to raise pressure to over 4,000 psig indicates that the reported leaks would have had little or no effect on closing the BSRs. The rapid generation of over 5,000 psig (on April 27, 2010 and again on April 29, 2010) when compared with the results from the function testing, indicated the BSRs were either fully closed or obstructed from closing further. No further failure cause analysis was performed.

## 6.6.6   Recovered Drill Pipe Segments

The recovery and examination of eight drill pipe segments from the BOP, LMRP and Riser was discussed in detail in Sections 6.1.4 and 6.2.3.

From the exercise to match segment ends it was determined that segments 1-B-1, 1-B-2, 84, and 83 (top to bottom) constituted a larger segment and segments 1-A-1 and 39 (top to bottom) constituted another larger segment. Both were located side by side above the UA when the riser kinking occurred. Segments 84 and 83 were nearly separated by the ROV saw cut intervention. Segments 1-A-1 and 39 were separated by the ROV shear cut intervention. Likewise, segments 1-B-2 and 84 were separated by the ROV shear cut. Segments 1-B-1 and 39 were determined to be from the same joint of pipe based on the presence of internal coating in both segments. Their separation was postulated to have been tensile failure based on the fracture surface of 1-B-1-E. Both the BSR shear (between segments 83 and 94) and the tensile failure above the tool joint (between segments 1-B-1 and 39) occurred before the riser kinking.

Two events were considered that were capable of producing sufficient force to part segments 1-B-1 and 39 in tension. The first event (chronologically) was the rig drift which occurred on the morning of April 21, 2010. The second event was the sinking of the Deepwater Horizon which occurred on the morning of April 22, 2010, and resulted in the kinking of the riser. In both events the drill pipe is postulated to have been captured or fixed at the drill floor. Tensile force was imparted to the drill pipe by the offset movement of the rig.

Segments 1-B-1, 1-B-2, 84, and 83 were measured, and their sum matched the distance between the BSRs and the UA. This evidence supports that the tool joint was at the level of the UA element prior to BSR closure.

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

In order to initiate tensile failure, the drill pipe was required to be captured or fixed at a point below the failure. For the second event (rig sinking), the BSR cut had already occurred. The fixed point was postulated to be the closed UA. For the first event (prior to Autoshear initiation), the BSR cut may not have occurred. Two fixed points were possible, the closed UA and one or both closed VBRs (Middle and Upper). Evidence indicates that the first event was the more likely source of tensile force required to part the drill pipe above the tool joint (between segments 1-B-1 and 39). No further failure cause analysis was performed.

Once the tensile failure between segments 1-B-1 and 39 had occurred, segments 1-B-1, 1-B-2, 84, and 83 would have moved upward as one segment after BSR closure, propelled by the force of the flowing well. It was postulated that the closed UA was unable to restrain this larger segment from moving upward and clearing the UA. The deformation on the bottom of segments 39 and 83 was postulated to have occurred when the riser kinked and forced both segments down onto the top of the closed UA.

## 6.6.7   Other Considerations

On trying to pressurize various hydraulic circuits during the ROV interventions, including those to the Blind Shear Rams, leaks were reported. Later interventions were reported to have fixed those leaks. However, DNV's review of the ROV videos raised questions on whether the leaks were on circuits that functioned the BSRs. In the tests of the hydraulic circuits performed at Michoud, other than the high-pressure casing shear regulator, the high-pressure shear circuits did not leak. Initial visual examination of the leak on the casing shear regulator led DNV to conclude that the conditions leading to the leak most likely developed after the time of the incident. Further, later ROV hot stab efforts were able to raise the pressure in one instance to 4,000 psig and then latterly to over 5,000 psig on the high pressure shear circuits. It is DNV's view that the evidence indicates the reported leaks in the hydraulic circuits were not a contributor to the blind shear rams being unable to close completely and seal the well.

In its review of various modifications made to the control logic or BOP stack, it is DNV's view that there is no evidence these modifications were a factor in the ability of the blind shear rams being able to close fully and seal the well.

The various tests of the performance of the solenoid 103Y at Michoud removed from the Yellow Pod in May 2010, gave inconsistent results when a single coil within the solenoid was activated by the PETU. When the Yellow Control Pod was removed from the BOP stack in May 2010 as part of the interventions a series of Factory Acceptance Tests (FATs) were run on the Pod. As part of those investigations the various solenoids mounted on the Pod were tested and it was determined that solenoid 103Y did not activate. The decision was taken on the Q-4000 to remove it and replace the solenoid 103Y with a new solenoid.  The original solenoid 103Y was removed and taken into evidence by the FBI Evidence Response Team and a new solenoid was mounted to the

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

Yellow Pod. The original solenoid was then sent to the NASA-Michoud facility for secure storage. The bench tests and subsequent testing and activation of the solenoid at Michoud yielded inconsistent results, as noted earlier.  When both coils were activated, as would be the case if the solenoid was activated by the AMF/Deadman circuits, the solenoid functioned as intended. However, in other tests when only one of the two coils of the solenoids was energized, the armature of the solenoid failed to activate. Two possible scenarios present themselves for explaining the inconsistent performance of solenoid 103Y. The first being the fact that the solenoid was removed in May 2010 and was not tested until March 2011. As a result it is possible deposits of seawater or hydraulic fluid built-up in the solenoid and were the cause of the inconsistent results. The second scenario is the possibility of a manufacturing defect.  On the evidence to date, DNV is of the opinion that the explanation for the inconsistent results was due to the build-up of deposits or other factors resulting from storage of the solenoid.

DNV did not identify any other issues or evidence that manufacturing defects of one form or another contributed to the blind shear rams not closing completely and sealing the well.

Tests at Michoud of the AMF/Deadman circuits demonstrated that the 27 Volt battery in the Blue Pod had insufficient charge to activate solenoid 103B. Tests of the 27 Volt battery in July when the Blue Pod was raised and examined on the Q-4000 reported the battery level to be out of specification. There are indications that voltage, too, would have been insufficient to activate solenoid 103B. A Factory Acceptance Test and AMF/Deadman test was performed on the Blue Pod in June 2009. There are no records that the AMF/Deadman batteries were checked as part of this test. The review of available records could not confirm the date when the Yellow Pod AMF/Deadman last underwent a Factory Acceptance Test. To discern the state of the AMF/Deadman it is necessary to undertake further examination, investigation and tests of the Subsea Electronic Modules of both the Yellow and Blue Control Pods.



# 7   CONCLUSIONS

## 7.1   The Accident

The Deepwater Horizon was a semi-submersible, dynamically positioned mobile offshore drilling unit (MODU) that could operate in waters up to 8,000 feet deep and drill down to a maximum depth of 30,000 feet. The rig was built in South Korea by Hyundai Heavy Industries. The blowout preventer (BOP) stack, built by Cameron, was in use on the Deepwater Horizon since the commissioning of the rig in 2001.

The rig was owned by Transocean, operated under the Republic of the Marshall Islands flag, and was under lease to BP from March 2008 to September 2013. At the time of the incident, the rig was drilling an exploratory well at a water depth of approximately 5,000 feet in the Macondo Prospect. The well is located in the Mississippi Canyon Block 252 in the Gulf of Mexico.

On the evening of April 20, 2010 control of the well was lost, allowing hydrocarbons to enter the drilling riser and reach the Deepwater Horizon, resulting in explosions and subsequent fires. The fires continued to burn for approximately 36 hours. The rig sank on April 22, 2010. From shortly before the explosions until May 20, 2010, when all ROV intervention ceased, several efforts were made to seal the well. The well was permanently plugged with cement and "killed" on September 19, 2010.

## 7.2   What is Considered to have Happened

Prior to the loss of well control on the evening of April 20, 2010, the UA was closed as part of a series of two negative or leak-off tests. Approximately 30 minutes after the conclusion of the second leak-off (negative pressure) test, fluids from the well began spilling onto the rig floor. At 21:47 the standpipe manifold pressure rapidly increased from 1200 psig to 5730 psig. The first explosion was noted as having occurred at 21:49. At 21:56 the EDS was noted to have been activated from the bridge. This was the final recorded well control attempt from the surface before the rig was abandoned at 22:28.

The Upper VBRs were found in the closed position as-received at the Michoud facility. There was no documented means of ROV intervention to close the Upper VBRs. ROV gamma ray scans on May 10, 2010 confirmed that the ST Lock on the port side Upper VBR was closed. Scans of the starboard side ST Lock on the Upper VBRs were inconclusive. Measurements of the ST Lock positions performed at the Michoud facility confirmed that both ST Locks on the Upper VBRs were closed. Evidence supports that the Upper VBRs were closed prior to the EDS activation at 21:56 on April 20, 2010.

A drill pipe tool joint was located between the UA and the Upper VBRs. With both the UA and the Upper VBRs closed on the drill pipe, forces from the flow of the well pushed

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



the tool joint into the UA element. This created a fixed point arresting further upward
movement of the drill pipe. The drill pipe was then fixed, but able to pivot at the UA, and
horizontally constrained but able to move vertically at the Upper VBRs. Forces from the
flow of the well induced a buckling condition on the portion of drill pipe between the UA
and Upper VBRs. The drill pipe deflected until it contacted the wellbore just above the
BSRs. This condition most likely would have occurred from the moment the well began
flowing and would have remained until either the end conditions changed (change in UA
or Upper VBR state) or the deflected drill pipe was physically altered (sheared). The
portion of the drill pipe located in the between the shearing blade surfaces of the BSRs
was off center and held in this position by buckling forces.

As the BSRs were closed, the drill pipe was positioned such that the outside corner of the
upper BSR blade contacted the drill pipe slightly off center of the drill pipe cross section.
A portion of the drill pipe was outside of the BSR shearing blade surfaces. As the BSRs
closed, this portion of the drill pipe cross became trapped between the ram block faces,
preventing the blocks from fully closing and sealing. The drill pipe most likely deflected
to the side of the well from the moment the well began flowing.  Trapping of the drill
pipe between the ram faces would have taken place regardless of which means initiated
BSR closure (AMF/Deadman or Autoshear).

Of the means available to close the BSRs, evidence indicates that trapping of the drill
pipe occurred when the hydraulic plunger to the Autoshear valve was successfully cut on
the morning of April 22, 2010 initiating activation of the Autoshear circuit. Albeit on the
evidence available, closing of the BSRs through activation of the AMF/Deadman circuits
cannot be ruled out.

In the partially closed position, flow would have continued through the drill pipe trapped
between the ram block faces and subsequently through the gap between the ram blocks.
When the drill pipe was sheared on April 29, 2010, using the CSRs, the well flow pattern
changed to a new exit point through the open drill pipe at the CSRs expanded to flow up
the entire wellbore to the BSRs and through the gap along the entire length of the block
faces.

## 7.3    Discussion of Causes

### 7.3.1    Primary Cause

*The BSRs failed to fully close and seal due to a portion of drill pipe trapped between the
blocks.*

On closure of the BSRs, a portions of the drill pipe cross section was outside of the BSR
shearing surfaces. The portion of the drill pipe cross section outside the shear blade
surfaces became trapped between the ram block faces, preventing the blocks from fully
closing and sealing.

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

### 7.3.2    Contributing Cause

*The BSRs were not able to move the entire pipe cross section completely into the shearing surfaces of the rams.*

The drill pipe within the BOP stack was under a compressive load that elastically buckled the pipe between the Upper VBRs and the UA. This elastic buckling condition forced the drill pipe toward the sidewall of the wellbore and outside of the cutting blade surfaces of the BSRs. When the ram blocks closed they were not able to overcome the buckling forces holding the drill pipe against the sidewall of the wellbore.  The blocks could not reposition the entire circumference of the drill pipe to within the shearing surfaces of the BSRs.

### 7.3.3    Contributing Cause

*Drill pipe in process of shearing was deformed outside the shearing blade surfaces.*

The portion of the drill pipe between the outside edge of the upper blade and wellbore sidewall was not sheared. As the ram blocks closed, a portion of the drill pipe was deformed (flattened) and trapped between the faces of the ram blocks preventing them from closing and sealing.

### 7.3.4    Contributing Cause

*The drill pipe elastically buckled within the wellbore due to formation forces on loss of well control.*

On loss of well control the drill pipe downhole of the UA was subjected to vertical forces from the flow of well fluids. These forces would have caused the drill pipe to move vertically upwards unless it was constrained.

### 7.3.5    Contributing Cause

*The position of the tool joint at or below the closed UA prevented upward movement of the drill pipe.*

The location of the tool joint pushing up against, or partially pushed into the UA element prevented the drill pipe from moving upwards in the BOP stack.  This created a fixed point impeding further upward movement of the drill pipe.

### 7.3.6    Contributing Cause

*The Upper VBRs were closed and sealed on the drill pipe*



After the upper VBRs were closed, the drill pipe was centered at two locations within the BOP stack (at the UA and upper VBRs). In addition, with the upper VBRs closed, the drill pipe was then fixed at the UA (both horizontally and vertically) while being horizontally constrained at the upper VBRs but able to move vertically. The physical conditions and constraints were then in place to provide for the elastic buckling. Further the BSRs were vertically located at a position nearly midway between the UA and VBRs, coinciding with the center of the bow in the drill pipe.

### 7.3.7   Contributing Cause

*Uncontrolled flow from downhole of the Upper VBRs*

Forces from the flow of the well downhole of the VBRs induced a buckling condition on the portion of drill pipe between the fixed point (vertical) of the UA and Upper VBRs (horizontal constraint). The drill pipe bowed until it contacted the sidewall of the wellbore just above the BSRs.

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

# 8   RECOMMENDATIONS

## 8.1   Recommendations for Industry

The primary cause of failure was identified as the BSRs failing to close completely and seal the well due to a portion of drill pipe becoming trapped between the ram blocks. The position of the drill pipe between the Upper Annular and the upper VBRs led to buckling and bowing of the drill pipe within the wellbore. Once buckling occurred the BSRs would not have been able to completely close and seal the well. The buckling most likely occurred on loss of well control.

The recommendations are based on conclusions from the primary and contributing causes or on observations that arose during the course of DNV's investigations.

### 8.1.1   Study of Elastic Buckling

*The elastic buckling of the drill pipe was a direct factor that prevented the BSRs from closing and sealing the well.*

It is recommended the Industry examine and study the potential conditions that could arise in the event of the loss of well control and the effects those conditions would have on the state of any tubulars that might be present in the wellbore.  These studies should examine the following:

- The effects of the flow of the well fluids on BOP components and various tubulars that might be present,
- The effects that could arise from the tubulars being fixed or constrained within the components of a Blowout Preventer,
- The ability of the Blowout Preventer components to complete their intended design or function under these conditions.

The findings of these studies should be considered and addressed in the design of future Blowout Preventers and the need for modifying current Blowout Preventers.

### 8.1.2   Study of the Shear Blade Surfaces of Shear Rams

*The inability of the BSRs to shear the off-center drill pipe contributed to the BSRs being unable to close and seal the well.*

It is recommended the industry examine and study the ability of the shear rams to complete their intended function of completely cutting tubulars regardless of their position within the wellbore, and sealing the well. The findings of these studies should be



considered and addressed in the design of future Blowout Preventers and the need for modifying current Blowout Preventers to address these findings.

### 8.1.3    Study of Well Control Procedures or Practices

*The timing and sequence of closing of the UA and upper VBRs contributed to the drill pipe segment buckling and bowing between the two moving the drill pipe off center.*

It is recommended the industry examine and study the potential effects or results that undertaking certain well control activities (e.g. closing of the annulars, or closing of the VBRs) could have on the BOP Stack. Examination and study should identify conditions, which could adversely affect the ability to regain control of the well (e.g. elastic buckling of tubulars). Industry practices, procedures and training should be reviewed and revised, as necessary, to address the prevention of these conditions.

### 8.1.4    Status of the Back-Up Control Systems

*The BOP functionality testing indicated some back-up control system components did not perform as intended.*

It is recommended the industry review and revise as necessary the practices, procedures and/or requirements for periodic testing and verification of the back-up control systems of a Blowout Preventer to assure they will function throughout the entire period of time the unit is required on a well.

### 8.1.5    Common Mode Failure of Back-Up Control Systems

*The BOP functionality testing indicated not all back-up control systems had built in redundancy.*

It is recommended the industry review and revise as necessary the practices, procedures and/or requirements for evaluating the vulnerability of the back-up control systems of a Blowout Preventer to assure they are not subject to an event or sequence of events that lead to common mode failure.

### 8.1.6    Study the Indication of Functions in an Emergency

*The ROV intervention efforts reviewed indicated the ROVs were not capable of directly and rapidly determining the status of various ROV components.*

It is recommended the industry examine and revise the current requirements for providing a means to verify the operation, state or position of various components of Blowout Preventers in the event of an emergency.  The industry should require that it is possible to confirm positively the state or position of certain components such as the rams, annulars



### 8.1.7   Study of the Effectiveness of Remotely Operated Vehicle Interventions

*The ROV intervention efforts reviewed indicated initial ROV efforts were not capable of performing key intervention functions at a level equivalent to the primary control systems.*

It is recommended the industry examine and study the conditions and equipment necessary for Remotely Operated Vehicles to perform various functions (e.g. the BSRs) at a performance level equivalent to the primary control systems. Make adequate provision to mobilize such equipment in the event of a well control emergency.

### 8.1.8   Stipulating Requirements for Back-Up Control System Performance

*A review of industry standards indicated they do not stipulate performance requirements for back-up systems (e.g. closing response times) as they do for primary control systems.*

It is recommended the industry review and revise the requirements for back-up control system performance to be equivalent to the requirements stipulated for primary control systems.

## 8.2   Recommendations for Further Testing

DNV's forensic examinations and testing were organized and conducted around the top event of the failure of the Blind Shear Rams to close and seal the well.

The recovery and examination of the eight segments of drill pipe and the five sets of rams shifted the focus from the question of whether the blind shear rams were activated to that of identifying the factors that would have caused or contributed to the blind shear rams failing to seal the well.  As described in this report, DNV is of the view that the primary cause for the blind shear rams failing to close arose from conditions that led to the drill pipe being forced to one side of the wellbore at a position immediately above the Blind Shear Rams. DNV has investigated the conditions that could lead to such a buckling scenario developing. However, even here DNV recognizes there are additional studies and tests that could be undertaken to examine this scenario further.

In addition, DNV has identified a number of areas or issues associated with the overall performance of the BOP Stack that should be examined, investigated or tested further. As a result, DNV puts forward the following recommendations.

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report


MANAGING RISK

### 8.2.1   Additional Studies of Conditions Leading to Elastic Buckling

- Supplement the Finite Element Analysis buckling model with a Computational Fluid Dynamic simulation of the flow through the drill pipe.
- Run the Finite Element Analysis drill pipe-cutting model to include the buckling stresses that would have existed in the drill pipe.
- Field test the blind shear rams shearing a section of off-centered (buckled) 5-1/2 inch drill pipe.
- Field test the ability of a closed annular to restrain the upward movement of a 5-1/2 inch drill pipe tool joint at the forces calculated for buckling.
- Field test the conditions required to push a 5-1/2 inch tool-joint through a closed annular element.

### 8.2.2   Additional Tests or Studies of the Performance of the Blowout Preventer Stack

- It is suggested that the static pressure tests undertaken at Michoud on the high-pressure shear hydraulic circuits of the lower section of the BOP be supplemented with additional tests of the circuits of the Casing Shear Rams and the Variable Bore Rams.
- The tests at Michoud performed on the high-pressure blind shear close solenoid removed from the Yellow Pod in May 2010 gave inconsistent results.  It is suggested this solenoid be further tested and possibly disassembled to discern the reason for its performance and whether it was likely to have functioned at the time of the incident.
- On pressuring the high-pressure shear ram circuit, the high-pressure casing shear regulator leaked.  It is suggested the high-pressure casing shear regulator be further tested and disassembled to try and discern its state at the time of the incident.
- It is suggested that the behavior of the elastomeric elements of the rams and annulars be tested to assess their performance when exposed to well fluids at the temperatures that existed at the time of the blowout.
- The tests of the Subsea Electronic Modules (SEMs) undertaken at Michoud should be supplemented by removing the SEMs from the Control Pods, venting and then opening the SEMs to understand better their possible state at the time of the incident.  The following tests or activities are suggested:
  - Collect and analyze samples of the SEMs gas/atmosphere prior to or as part of venting the SEMs.
  - Remove the batteries and record part numbers, serial numbers, date of manufacture and any other pertinent manufacturing data,
  - In place of the batteries connect a voltage generator and conduct a series of tests on the AMF/Deadman circuits at various voltages and record the results.

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume I Final Report



MANAGING RISK

- The lower and upper annulars are well control components of the BOP stack. As a result the following tests or examinations of the lower and upper annulars are suggested:
  - Laser scanning of the upper annular in-situ and "as-is" condition,
  - Remove and examine the upper and lower annular elements,
  - Static pressure tests of the annular operating systems,
  - Function testing of the open and close operating systems of both the upper and lower annulars.
- The evidence from eyewitnesses was that the Emergency Disconnect Sequence was activated approximately seven minutes after the first explosion. It is suggested the hydraulic circuits and functioning of the LMRP HC collet connector and the choke and kill collet connectors be tested as a means to try and assess their state at the time of the incident.
- It is suggested the wellbore pressure-temperature sensor at the base of the lower section of the BOP be removed and its accuracy checked or tested.
- It is suggested the industry perform field tests on the ability of the BSRs to shear and seal a section of 5-1/2 inch drill pipe under internal flow conditions that existed at the time of the incident.

# Det Norske Veritas

Det Norske Veritas (DNV) is a leading, independent provider of services for managing risk with a global presence and a network of 300 offices in 100 different countries. DNV's objective is to safeguard life, property and the environment.

DNV assists its customers in managing risk by providing three categories of service: classification, certification, and consultancy.  Since establishment as an independent foundation in 1864, DNV has become an internationally recognized provider of technical and managerial consultancy services and one of the world's leading classification societies.  This means continuously developing new approaches to health, safety, quality and environmental management, so businesses can run smoothly in a world full of surprises.

Global Impact for a Safe and Sustainable Future



# DET NORSKE VERITAS

Final Report
for

## UNITED STATES DEPARTMENT OF THE INTERIOR

### BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION, AND ENFORCEMENT WASHINGTON, DC 20240

### FORENSIC EXAMINATION OF DEEPWATER HORIZON BLOWOUT PREVENTER

#### CONTRACT AWARD NO. M10PX00335

##### VOLUME II APPENDICES

Report No. EP030842
20 March 2011

The view, opinions, and/or findings contained in this report are those of the author(s) and should not be construed as an official government position, policy or decision, unless so designated by other documentation.

DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume II Appendices



MANAGING RISK

# APPENDIX A

# FORENSIC TESTING PLAN
## [OCTOBER 22, 2010]

# PROTOCOL FOR METALLURGICAL EXAMINATION AND TESTING OF DRILL PIPE
## [February 3, 2011]

# TEST PROCEDURE - FRACTURED/SHEARED RECOVERED DRILL PIPE ENDS VISUAL EXAMINATION OF BLOWOUT PREVENTER RAM BLOCKS
## [February 16, 2011]



# DET NORSKE VERITAS

# Forensic Testing Plan
for the
Forensic Investigation and Testing of the Blowout
Preventer & Lower Marine Riser Package
Ref – M10PS00234

**Joint Investigation Team of the
United States Department of the Interior
and the
United States Department of Homeland Security**

**Bureau of Ocean Energy
Management, Regulation and Enforcement**

DNV Reg. No.: ANEUS815NTHO (1-2SC2OV)

PRIVILEGED & CONFIDENTIAL
CLIENT - ATTORNEY WORK PRODUCT

October 22, 2010

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

| Title:<br><br>Proposed Forensic Investigation Test Plan of the Blowout Preventer and the Lower Marine Riser Package | DNV COLUMBUS, INC.<br>Materials & Corrosion Technology Center<br>5777 Frantz Road<br>Dublin, OH 43017-1386 United States<br>Tel: (614) 761-1214<br>Fax: (614) 761-1633<br>http://www.dnv.com<br>http://www.dnvcolumbus.com |
|---|---|
| Customer: | United States Department of Interior – Bureau of Ocean Energy Management, Regulation and Enforcement |
| Customer Address: | 381 Elden Street<br>Herndon, VA  20170-4879 |
| Customer Reference: | 1-2SC2OV |
| Contact Person: | Olivia Adrian and Warren Williamson |
| | |
| DNV Reference: | ANEUS815NTHO |
| Date of Issue: | |
| Terms and Conditions: | |

| | | |
|---|---|---|
| Prepared by/Contact Person:<br><br>Gary Kenney, Ph.D. | Position:<br><br>Lead Investigator | Signature: |
| Reviewed by:<br><br>Phillip Nidd | Position:<br><br>Deputy Project Manager | Signature: |
| Approved by:<br><br>Neil Thompson, Ph.D. | Position:<br><br>Project Manager | Signature: |

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

## TABLE OF CONTENTS

1   INTRODUCTION.........................................................................................................................2
1.1  General Site Preparations ...................................................................................................2
1.2  Proposed Forensic Testing Plan .........................................................................................2

2   OBJECTIVES ............................................................................................................................2

3   CONSTRAINTS AND PRECONDITIONS................................................................................4

4   SCOPE .......................................................................................................................................6

5   TEST PROTOCOL ....................................................................................................................6
5.1  Safety, Health, and Environmental.....................................................................................8
5.2  Evidence Collection and Control........................................................................................9
5.3  Video and Photo Documentation ......................................................................................11
5.4  Site Access and Information Control.................................................................................11
5.5  Investigative Process ........................................................................................................12
5.6  Visual Examination of the BOP and LMRP.....................................................................13
    5.6.1 General .......................................................................................................................13
    5.6.2 Visual Examination of the External Surfaces ...........................................................13
    5.6.3 Visual Examination of the Internal Wellbores of the LMRP and BOP....................16
5.7  Hydraulic Circuit Static Pressure Test.............................................................................21
    5.7.1 General Preparations..................................................................................................21
    5.7.2 BOP Stack Circuits ...................................................................................................22
    5.7.3 LMRP Circuits ..........................................................................................................22
    5.7.4 ROV Panel Circuits...................................................................................................23
5.8  BOP Function Testing .......................................................................................................24
    5.8.1 General .......................................................................................................................24
    5.8.2 Function testing the BOP Rams and LMRP Elements ..............................................25
5.9  Testing of the Accumulators.............................................................................................30
5.10 Testing of the Control System ..........................................................................................31
5.11 Testing of the Wellhead and Collet Connectors...............................................................34
5.12 Function Testing of the Complete BOP Stack in the Pre-Incident Condition.................34
5.13 Materials Testing and Damage Evaluation.......................................................................36
5.14 Cataloging and Examination of Recovered Evidence ......................................................37

Dᴇᴛ Nᴏʀꜱᴋᴇ Vᴇʀɪᴛᴀꜱ

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

## APPENDICES

Appendix A – Safety and Health Plan
Appendix B – Spill Containment Plan
Appendix C – Hurricane Plan

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

# 1  INTRODUCTION

## 1.1  General Site Preparations

Following recovery from the Macondo Well, and initial preservation efforts undertaken on the barge Q-4000, the Blowout Preventer (BOP) and Lower Marine Riser Package (LMRP) were transported by barge to NASA's Michoud Assembly Facility in New Orleans, LA.  The two assemblies arrived at the Michoud facility on September 11, 2010 and were secured aboard a transport barge tied to the Michoud Assembly's West Dock.

Infrastructure necessary to secure the BOP and LMRP at the Michoud Assembly facility's West Dock was completed and the two packages were moved from the barge and placed on two separate test stands on the West Dock on October 3, 2010.  The current plans are to construct an enclosure to shelter them from the elements.  The schedule for erecting the enclosure will be integrated into the schedule for the forensic investigations.

The proposed Forensic Testing Plan integrates with a number of other activities and or plans under development.  These include:

- A Safety and Health Plan to assure the safety and health of individuals performing the actual tests as well as any personnel or visitors within the proximity of the test site.

- A Spill Containment Plan to protect the surrounding environment from any unintentional releases of fluids or materials into the environment that might result from any of the actual investigations or tests that are planned.

- A Hurricane Plan to secure and prevent the two Units from being damaged in the event of a hurricane.

- A Lifting Plan or plans to cover the major lifts that might be required as part of the investigations and tests.

These plans will be appended to the Forensic Testing Plan as they become available.

## 1.2  Proposed Forensic Testing Plan

As part of its forensic investigations, DNV is required to provide to the Joint Investigation Team (JIT) a proposed Forensic Testing Plan for completing various tests as part of identifying potential contributing factors that might have prevented the BOP Stack as a whole (i.e. both the BOP and the LMRP) from functioning as expected when the incident (blowout associated with the Deepwater Horizon drilling rig failure) occurred.  This document is that proposed plan.

# 2  OBJECTIVES

The Joint Investigation Team's Request for Proposal (JIT-RFP) stated the following objectives for the testing and analysis of the BOP system:

---

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

 MANAGING RISK

*The objectives of the proposed investigation are to determine the performance of the BOP system during the well control event, any failures that may have occurred, the sequence of events leading to failure(s) of the BOP and the effects, if any, of a series of modifications to the BOP Stack that BP and Transocean officials implemented. As part of the foregoing task, the examination is to determine:*

- *If the leaks on the BOP were critical to the non-performance during the blowout and during the ROV intervention attempts.*

- *If any modification(s) made to the control logic and stack inhibited the performance.*

- *If any other relevant factor, including but not limited to manufacturing defects, deferral of necessary repairs affecting functionality, and maintenance history contributed to the BOP's failure to operate as intended.*

In support of those objectives the proposed Forensic Testing Plan will:

- Outline the process for establishing and documenting the condition of the various components and, to the extent possible, identify the state of those components pre- and post-incident.
  - To identify the serial number(s), part numbers or other identification markings and the functionality of various components fitted to the BOP Stack.
  - To identify and establish, to the extent possible, the functionality of various components fitted to the BOP Stack.
  - To identify and characterize degradation, damage, and anomalies of the BOP Stack components.

- Outline the process for establishing the basic functionality of the BOP Stack and whether, at the time of the incident, the BOP Stack functioned in accordance with its intended design.
  - To the extent possible, establish the functionality of the BOP Stack pre and post the actual incident.
  - Where it does not function in accordance with its design, identify the physical cause(s) and contributory factors that led to any failures.

- Evaluate the functionality of the control systems for the BOP Stack.  This includes, to the extent possible, the control systems that would have been located on the Deepwater Horizon semi-submersible and those on the BOP Stack itself and interconnections between the two.

- Characterize the state of the wellbores of the BOP and LMRP and to protect and characterize the condition of any drill pipe, materials or 'fish' found within the central cavity of the BOP and LMRP.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

- Include in the testing plan, necessary items to establish the effect that other relevant factors may have contributed to the BOP not operating as intended, including;

  o Design.
  o Manufacturing defects.
  o Deferral of necessary repairs.
  o Maintenance history.
  o Ejection of cement.
  o Formation fluids.
  o Drilling solids or fluids.
  o Other material from the well through the BOP during the blowout.

# 3   CONSTRAINTS AND PRECONDITIONS

There are several constraints and pre-conditions that complicate or establish limits on achieving the overall goals of this forensic investigation.  These are discussed below.

Immediately following the incident, various interventions were undertaken using Remote Operated Vehicles (ROVs) to try and function various components on the overall assembly; most notably, to try and function the Blind Shear Ram located on the BOP.  It is understood that various control components located on the two control pods to the BOP Stack were replaced as part of those interventions and are stored within the Michoud facility.  In addition, it is understood that not all of the original control components have been recovered.  Therefore, it may not be possible to recreate the exact controls that were in place prior to the incident.

The control system located on the Deepwater Horizon itself and key documents and drawings including as built drawings and management of change (MOC) documents that describe modifications made from time of initial commissioning in year 2001 were lost following the explosions, fires and eventual sinking of the semi-submersible unit.  As a result a substitute control system will have to be used when testing or functioning various components as well as the stack as a whole.  This required approach confounds the ability to recreate the exact situation that existed pre-incident and prevents any contribution to the functioning (or non-functioning) of the BOP Stack related to these control systems to be determined.  Not having a complete set of as-built drawings complicates the process of recreating the BOP Stack to the condition that existed pre-incident.  DNV understands that some, if not all, of the required documentation of the pre-incident design of the DWH-BOP may exist and will request this from appropriate parties.

Pre-incident conditions can be arrived at by two methods: (1) a process of working backwards from the current condition through all interventions in order to recreate the pre-incident condition and (2) development of as-built drawings recreated as based upon a review of original design drawings, available records relating to modifications and maintenance, and pre-incident and initial ROV footage prior to intervention.  In this case, integrating the two approaches should enhance the ability to derive the pre-incident condition.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT



Following the incident various components of the BOP Stack were subjected to the flow of the well fluids escaping from the well until a 'top kill' of the well was completed. DNV understands these flows may have impacted certain parts of the overall BOP Stack. However, at the time of the writing of this plan, DNV has not had the opportunity to verify or assess the extent of such possible damage. As a result it may be necessary to replace certain components on the BOP Stack in order to complete the functional testing of the full BOP Stack. This required replacement of components could be viewed as another factor that must be considered when undertaking the assessment of the state or functionality of the various components, pre-incident versus post-incident.

On recovery of the BOP Stack certain agreed upon actions were taken after the Stack was brought to the surface to preserve and protect various components from degrading on being exposed to air, sun, temperatures and other environmental factors. As a result the condition of various components especially certain components on the BOP section of the Stack may not be reflective of their state pre or even post intervention.

Prior to and continuing concurrent with the Forensic Testing Plan of the BOP, a detailed log is being prepared of all actions undertaken with respect to the BOP during post-incident intervention, top kill efforts, recovery and repair of the BOP control systems, and recovery and preservation of the BOP itself. This log will be used to help determine the pre-incident, post-incident, and as-recovered status of the BOP components.

DNV is aware that the wellbores or central cavities of both the BOP and the LMRP may contain materials or drill pipe that could prove key to the overall investigation into this incident. It is possible that functioning of certain parts of the BOP and LMRP might cause that material to be damaged. Therefore, the sequencing of certain inspections, investigations, and tests will be driven by the priority to retrieve those materials prior to continuing with the function testing. Further, the efforts to recover this evidence could require parts of the BOP and LMRP to undergo some level of disassembly before any function testing is actually undertaken or as the function testing progresses.

As noted above, preservation procedures were planned upon recovery of the BOP Stack to the surface. Not all those planned procedures were completed on the Q-4000 recovery vessel. [1] Since arrival at the Michoud facility, the essential elements of those procedures, notably the flushing of the Yellow and Blue Control Pods that are fitted to the LMRP were performed.

Another constraint and precondition is the fact that debris fell out of the BOP Stack when it was released from the wellhead and pulled to surface. The inability to know what this debris was and where it was located in the BOP prior to falling downhole or to the seafloor is a factor that must be considered when assessing the state or functionality of the BOP Stack pre or post-incident.

---

[1] DNV, Blowout Preventer Preservation Effort Event Log and Observations, BOEMRE, Sept. 26,2010.



DNV recognizes that these preconditions must be considered as it conducts its investigations. To the extent possible, DNV will make all reasonable effort to factor them into both the testing program as well as into any findings or conclusions that will derive out of its investigations.

## 4   SCOPE

The scope of this proposed Forensic Testing Plan includes the following:

- Perform and manage the investigations and tests of the BOP Stack and its components as provided in the Forensic Testing Plan.

- Document and record those investigations and tests and all related and supporting steps and procedures, including the video recording of the examination in its entirety.

- Conform to the protocols established by the JIT for the proper custody and documentation of chain of custody of the BOP Stack and its components.

- Conform to the protocols established by the JIT for the proper protection and preservation of the evidence and, to avoid destructive testing without approval from the JIT unless otherwise provided in the approved Forensic Testing Plan.

## 5   TEST PROTOCOL

The BOP and LMRP can be viewed as being comprised of three major systems or assemblies:

- An electronic and electrical control system that sends and receives commands to the BOP Stack to initiate or undertake various actions.

- A hydraulic system that 'translates' these electronic signals into a form of mechanical energy as part of executing those commands.

- A series of mechanical components such as the ram blocks, ram and annular elastomeric elements, and their related actuators completing the execution of a certain action(s) or command(s).

To meet the above objectives established for this forensic investigation, the condition of each of the above systems will be investigated. The summarized plan below and the detailed plan provided in the remainder of this document outline the planned test activities. In addition, DNV will consult with the members of the Technical Working Group on a regular basis to develop individual testing procedures, as necessary, for specific activities as the forensic investigation work progresses. The following summarizes the overall approach of the Forensic Testing Plan.

1. Adhere to all safety health, and environmental (SHE) practices and procedures as established by DNV Safety Manual and for work conducted on the Michoud NASA Facility.
2. Maintain security and limit site access during investigation.
3. At each stage in the investigation perform the following.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

    a.  Video record all testing and provide photographic evidence where appropriate.

    b.  Examine the condition of each component and characterize any damage, anomalies, or deterioration.

    c.  Collect any evidence that could possibly impact present or future examinations.

4. A visual examination of the exterior and the interior well bores of the BOP Stack, the LMRP and the two Control Pods.

5. Prior to function testing the lower section BOP rams or the LMRP annulars, secure and remove the drill pipe and any other materials or 'fish' that are currently trapped or are contained within the wellbores to prevent them from being damaged.

6. As part of securing and removing the trapped materials (including drill pipe) from the well bores determine the state of the ram blocks and annulars.  Any ram blocks and the annulars in the closed or partially closed position will be retracted during visual examination of the wellbore and removal of the trapped material.

7. Perform a static pressure-leak integrity test of the hydraulic circuits (hoses, piping, valves, actuators) of the BOP Stack, LMRP and ROV Panels.

8. Function test the lower section of the BOP Stack containing the rams.

    a.  Hydraulic supply will be connected via the Control Pod Stinger Receptacle for the BOP Stack using an interface tool to function the open or retract cycle of each of the five rams.  The tests would start with the Upper Blind Shear Rams (the top most rams), then the Casing Shear Rams and on 'down' the BOP finishing with the Test Rams at the bottom of the BOP.

    b.  As each set of rams is opened or retracted, visually examine and record their condition.

    c.  It is possible that one or more sets of rams will not function when hydraulic pressure is applied.  Where this happens some level of disassembly of that set of rams may be required in order to retract or open them as well as to identify the factors that prevented the ram(s) from opening.

    d.  Reassemble the rams where necessary and in a manner that reflects their pre-incident condition, to the extent possible.

    e.  Provision will have to be made to restrain, capture and recover any drill pipe(s) or other materials that remain within the well bore of the BOP or are wedged within any of the rams.

    f.  The process will be reversed and function to close will be executed for all five sets of rams.

    g.  The functionality of the open and close shuttle valves on the BOP Stack (i.e. the next level of control in the ram assemblies) will be tested and their performance recorded.

9. Apply the same general approach to the functioning of the upper and lower annulars on the LMRP.

    a.  Hydraulic supply will be connected via the Control Pod Stinger Receptacle for the LMRP using an interface tool to open or retract the annulars starting with the upper annular.

    b.  Make provision to capture any materials that reside or are trapped in the well bore of the LMRP.

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK



    c.  Where necessary reassemble the annulars to reflect their pre-incident condition.
    d.  Reverse the process and function test to close both annulars.
    e.  The functionality of the open and close shuttle valves on the annulars (i.e. the next level of control in the annular assemblies) will be tested and their performance recorded.
10. Inspect the condition of ram and annular components.
11. Examine the condition of the stack mounted accumulators including determining existing pre-charges and the accumulators ability to hold proper nitrogen and hydraulic charges. (Note numbers, positions, and function use of all Stack accumulators).
12. Examine the state of the two Control Pods (e.g. check for shorts in the electrical systems, condition of connections, identify any and all changes made to the two Control Pods during the ROV Interventions, etc.).
13. Test the functioning of the components of the Control Pods in their as retrieved state.
14. To the extent possible reinstate the components on the two Control Pods to their pre-incident condition.
15. To the extent possible, recreate the surface control assembly as existed on the Deepwater Horizon pre-incident.
16. To the extent possible, reassemble the BOP and the LMRP and function the various components in the pre-incident condition.

## 5.1   Safety, Health, and Environmental

This protocol for BOP Stack investigation will be conducted in accordance with all relevant health, safety and environmental practices as required by NASA and by the DNV Columbus Health, Safety, and Environmental Manual.   The goal of the Safety Manual is to prevent accidents and personal injury by promoting safety awareness and providing reference and instructions whereby personnel may acquire and adhere to safe work practices in the office, laboratory, and in field operations at a client's jobsite.   The Safety Manual addresses requirements that are outlined in the Occupational Safety and Health Act (OSHA) of 1970 that pertains to both general and construction industry standards as given in the Code of Federal Regulations (CFR) Parts 1910 and 1926, respectively.

In addition to the standard policy manuals, site specific plans for safety, spill containment and hurricane emergency are provided.   A site specific Safety and Health Plan to assure the safety and health of individuals performing the actual tests as well as any personnel or visitors within the proximity of the test site will be developed and may be made available as needed.   A Spill Containment Plan to protect the surrounding environment from any unintentional releases of fluids or materials into the environment that might result from any of the actual investigations or tests that are planned will be developed and may be made available as needed.   An emergency plan for the threat of a hurricane will be developed and may be made available as needed.

A cornerstone on the SHE plans will be the daily Tailgate Safety Meeting that involves the following activities.

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

1. Each morning (daily) prior to entering the test site, all personnel that will be working on-site will meet for a discussion of the day's activities and a review of all safety, health, and environmental issues; especially addressing any hazards that are present or that may develop.  Job responsibilities and emergency procedures will be discussed.
2. This meeting will be conducted by the DNV on-site Team Lead.
3. A check list will be developed and everyone will sign-off indicating their participation. Any personnel who missed the day's Tailgate Safety Meeting must first go through a review of the meeting and sign-off that they understand the activities being performed and understand any special SHE concerns prior to entering the test site.

## 5.2   Evidence Collection and Control

Evidence can be in the form of items removed from the wellbore of the BOP and LMRP, components removed from the BOP and LMRP during the investigation, or samples collected in the form of scrapings, particles, scale, coating samples, liquids, etc. All evidence will be handled in accordance with the following ASTM Standard procedures.

- ASTM E860 - 07 Standard Practice for Examining And Preparing Items That Are Or May Become Involved In Criminal or Civil Litigation.

- ASTM E1188 - 05 Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator.

- ASTM E1459 - 92(2005) Standard Guide for Physical Evidence Labeling and Related Documentation.

- ASTM E1492 - 05 Standard Practice for Receiving, Documenting, Storing, and Retrieving Evidence in a Forensic Science Laboratory.

US Coast Guard personnel will take possession of the evidence for secure storage and are the Primary Evidence Controller.  The USCG will work closely with the DNV Project Team personnel (Primary Investigation Lead) who will direct the investigation and make decisions on the samples and other evidence to be collected.  The Deepwater Horizon Criminal Investigation Team (DHCIT) agents and FBI Evidence Response Team (ERT) (Secondary Evidence Controller) will record and document all evidence, tests, and investigations.

The DHCIT and the EPA National Environmental Investigations Center (NEIC) will provide the primary support for all fluid samples collected during the Investigation.  The US Coast Guard personnel will take initial custody of the fluid samples and they will be handled in a similar manner as all other evidence.  The custody of the fluid samples will be transferred from the Coast Guard control to the EPA NEIC for analysis.  In this manner all fluid samples will be analyzed in a similar manner for the entire project.

The following procedures provide an outline of the working relationships among the principals; detailed practices for evidence collection and control will be in accordance with ERT standard practice.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK 

4. Samples collected or other evidence gathered under the supervision of DNV Project Team personnel (Primary Investigation Lead) will be provided directly to the US Coast Guard (Primary Evidence Controller) or representative for evidence logging and Chain of Custody documentation. The FBI ERT will document or log all evidence retrieved.  The samples or other evidence will be transferred from the Coast Guard personnel (Primary Evidence Controller) and transported from the field location to the evidence designated storage facility.  The samples and other evidence shall remain in storage until further examination, preservation, or transfer of the evidence is undertaken.  The evidence shall be kept under the secure control of the Coast Guard during the storage period.
   a. Label the samples at the scene with the following:
      i. Incident ID.
      ii. Date & time of collection.
      iii. Location and orientation where evidence was removed.
      iv. Name of the investigator.
      v. Evidence tracking number.
   b. The sample tracking number should be unique to that individual sample.
   c. All sample information above should be written in the field notebook and later entered into the electronic database.

5. The Primary Evidence Controller shall complete a CHAIN OF CUSTODY FORM; the purpose of which is to describe the evidence and exercise signature control over the transfer and custody of evidence to other facilities or Secondary Evidence Controllers during the evidence testing process.  The CHAIN OF CUSTODY FORM is to be completed for each subsequent custody transfer of evidence.  No evidence will be destroyed or disposed of without the written consent of the JIT.

6. When transferring evidence and evidence ownership to outside parties, the Primary Evidence Controller will complete the appropriate portion of the approved CHAIN OF CUSTODY FORM.  The purpose of which is to describe the evidence under transfer, the name of the outside party and the date of evidence release to the outside party. The Primary or Secondary Evidence Controller shall obtain digital photographs of the evidence prior to release to an outside party.  Whenever evidence is being transferred from one location to another, or between Evidence Controllers, all samples or other physical evidence will be photographed in "as is" condition going into shipping containers and once evidence arrives at its new location it will be photographed in "as received" condition.  No evidence will be packaged and shipped or received without a complete CHAIN OF CUSTODY FORM that is completely and properly filled out.

7. Upon receipt of the evidence, the outside party will complete and return to the Primary or Secondary Evidence Controller the appropriate portion of the approved CHAIN OF CUSTODY FORM, the purpose of which is to provide a detailed summary of evidence received and signatory confirmation of evidence receipt.  At completion of outside party testing, the appropriate portion of the approved CHAIN OF CUSTODY FORM will be completed by the outside party and returned to the attention of the Primary or Secondary Evidence Controller.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK 

## 5.3   Video and Photo Documentation

The forensic investigation as described in this document will be video and photo documented. This documentation will be performed from multiple angles and will include close-up documentation where details of specific activities or of specific component conditions dictate the need.  The overall responsibility for video and photo documentation and the decisions to provide detail documentation of any specific investigation activity will be the responsibility of the DNV Project Team personnel.

Video documentation will be accomplished through two groups: (1) J.A.M. Video Productions and (2) FBI ERT video team.

J.A.M will be using Sony A390 Digital Single Lens Reflex cameras with an aspect ratio of 3:2 and a density of 14 Megapixels per photograph.  Each picture will be recorded in a compressed jpg format in addition to a 'raw' uncompressed format.

A variety of video cameras will be used.  A Sony DSR 570 will be used with an aspect ratio of 16:9 and recording in High Aspect Definition.   Other cameras of various sizes will be required and used for examination and recording of information in areas such as the well-bore.   The need for lighting and enhancement of the lighting conditions will be assessed and the lighting adjusted accordingly as each activity progresses.

8. During the morning toolbox meeting, the testing schedule will be reviewed and the video and photo documentation plan for the day will established for the two video teams.  In addition to the video teams, individual investigators on the DNV Project Team may provide photo documentation of activities on which they are working.
9. All video and photo documentation will be logged on a daily basis.  Any photo documentation collected outside of the two teams listed above will be stored and secured in the DNV site office.

## 5.4   Site Access and Information Control

Site security and access to the BOP Stack Forensic Test Site will be controlled on a multi-level basis.  The Cost Guard representative will approve the final security levels.  The following is a draft of the Security Levels. Level 1 includes the primary security area that is controlled by a fence and entry is through a security gate.  All persons entering the site must enter through Level 1.  Persons entering Level 1 must be on an approved entry list.  Persons not on that list are allowed on an escorted basis only and then only by approved escorts.  Everyone enters into Level 1, but only certain persons will have access to Levels 2 and 3.  Level 1 is primarily for deliveries, workers not involved in the actual testing but require site access, etc.

Level 2 is a designated area for observers for the forensic testing.  This will permit observers to witness the testing at a distance and from a restricted area only.

Level 3 is the primary test area and limited to necessary personnel only.   The necessary personnel will include the following.

ANEUS815NTHO

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT



- DNV Project Team personnel.

- ERT FBI Primary Evidence Control Team.

- ERT FBI Video Documentation Team

- EPA Fluid Collection Team.

- Coast Guard Secondary Evidence Control Team.

- JIT representatives.

- Interested Parties Technical Working Group.

Personnel in the above list have been defined elsewhere except for the Interested Parties Technical Working Group (TWG).  The Interested Parties Working Group will be made up of technical representatives from interested parties. The group will consist of a representative from Transocean, BP, Cameron, and two additional technical representatives from the remaining interested parties.  This working group will be allowed free access to the primary test area, but are limited to observing and technical discussions with the DNV Project Team personnel. The Technical Working Group is a fixed group of members and the individual representatives are not to be rotated on a regular basis.  One alternate representative for each position can be designated, but only one representative is allowed into the primary test area on any given day and that representative must be available at the morning Tailgate meeting. Technical Working Group members will be permitted to substitute individuals for the purpose of providing individuals with the specific expertise required depending on the work being performed. For example, the pressure containment and electrical control systems have different areas of competence required.

## 5.5   Investigative Process

The investigative process is an iterative process that integrates the BOP and LMRP function testing, evidences collection, preservation of evidence (especially the drill pipe (fish) contained in the wellbores of the BOP and LMRP), materials examination and damage assessment, and video and photo documentation.  In addition, as the process proceeds, the findings may dictate the sequence of steps required to balance the processes listed above.  Therefore, these protocols are meant to provide a basis for the overall forensic investigation for examining the BOP Stack components.  These protocols are not meant to be a step-by-step procedure, but provide more of a roadmap with multiple paths to meeting the objectives.  Any procedures that are outside of the expected paths outlined in these protocols will be submitted for approval to the JIT prior to proceeding.

It is expected that more detailed procedures may be required on certain elements (Steps) of the protocols described herein.  These detailed procedures for any Protocol Step will be developed in conjunction with the DNV Project Team and the Working Group. In addition, detailed procedures to accomplish each Protocol Step will be documented through notes, photography, and videography.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

## 5.6   Visual Examination of the BOP and LMRP

### 5.6.1   General

A visual examination will be performed of the external and internal surfaces of both the BOP and the LMRP as they were received at the Michoud facility in New Orleans, LA.   These examinations will be both photo and video documented.

The purpose of these examinations will be to:

- Identify and record any visible damage to the major elements and various components that comprise the two packages.

- Identify and record any variations between the design of the BOP and LMRP as received at the Michoud facility and the original design of the two packages as per various Cameron drawings.

- Record all externally visible serial / identification numbers on all external components of the BOP and LMRP.

- Identify and record the contents or materials that are located within the wellbore or central cavities of the BOP and the LMRP.

- Extract the materials (including drill pipe) located within the wellbore or central cavities of the BOP and the LMRP.

- Assist with planning the sequence of some of the subsequent inspections or tests that will be completed as part of its forensic investigations.

### 5.6.2   Visual Examination of the External Surfaces

#### 5.6.2.1   Preparation of the External Surfaces for visual examinations

BP issued a series of Recovery Procedures for the retrieval of the BOP and LMRP from the seafloor for which Transocean provided the BOP preservation procedures.[2]   Standard decontamination and initial preservation procedures that included washing the exterior surfaces of the two packages after they were landed on the Q-4000 were completed.   From an initial review of the two packages following their arrival at the Michoud facility there does not appear to be a need to undertake further washing of the exterior surfaces to undertake the visual examinations described in this part of the proposed test plan.

On September 28 and 29 the Yellow and Blue Control Pods were removed and flushed.   The procedure followed was the agreed preservation procedures for the Q4000 and fluids were collected as per the preservation procedure.   All work was in accordance with NASA-Michoud Safety and Environmental requirements.

---

[2] Contingency: Recover BOPs with DP Inside; Macondo Plug and Abandonment Project for MC252-1 dated 31-Aug-10.

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

### 5.6.2.2   Visual Examination of the External Surfaces

10. Copy the following pages from the Cameron Operation and Maintenance Manual [3] containing Cameron drawings of the BOP and LMRP packages and the control systems.
    a.   CAMCG 0000012 – 0000021.
    b.   CAMCG 0000024 – 0000031.
11. Copy the following pages from the Cameron RBS-8D Multiplex BOP Control System Operations Manual, containing drawings of the control pods. [4]
    a.   CAMCG 00000329 – 00000337.
    *Note – The drawings referred to above are of a general nature.  At the time of the writing of this proposed procedure DNV was in the process of trying to source original detailed design drawings of the Deepwater Horizon BOP, LMRP and the two Control Pods. Those drawings should be substituted for the above referenced material once received.*
12. Using the drawings and taking into consideration possible access constraints, plan an approach to visually examining each of the four sides, top, and bottom of the two packages.
    [*Note: Make arrangements with NASA's Michoud Assembly staff for any man-lifts, scaffolding, or other means of access to the full height of each of the two components when separated (i.e. approximately 30 feet in height).*]
13. Use of personnel protective equipment including gloves, hardhats, and safety shoes is mandatory.  As many of the components contain hydraulic fluids safety glasses with side shields or wrap around safety glasses is also mandatory.  When working above four-feet all regulatory requirements for working at heights must also be followed.
14. Collect and assemble measuring tapes, calipers, depth gauges, etc. required to assist with characterizing any anomalies or variations to the state and condition of the two packages versus their original design.
15. Make provisions with the videographer for recording the visual examinations as well as taking of any still photographs.

As the Control Pods will be removed from the LMRP and placed in specially fabricated storage vats, it is proposed to complete the visual examinations of those two Pods prior to being placed in the vats.  The component (BOP, LMRP, Pods) order of visual inspection is not critical and can be adjusted based on convenience and timing.  Provisions will be made to assure that the electronics are not subject to electrostatic discharge (ESD) during the inspection and testing of the electronics systems.

16. Identify, characterize the condition where applicable, and record the following on the Yellow Control Pod.
    a.   The components as mounted on the Yellow Control Pod and verify those components against the appropriate Cameron drawing(s).  Note any discrepancies between what is fitted and the drawings.

---

[3] R&B Falcon Deepwater Horizon TL BOP Stack Operation and Maintenance Manual, Rev A, September 2000
[4] Basic Operations Manual RBS 8D Volume 1, R&B Falcon, Deepwater Horizon, June 2000

MANAGING RISK 

b.  The serial number part number or other identification markings of the various components mounted on the Yellow Control Pod along with any damage, anomalies corrosion products, marine growth, etc. Characterize any damage or anomalies using terms such as gouge, scrape, pit, etc. and measure the extent of the damage or anomaly, record, and photo document.

c.  Check all fittings for tightness using gloved hands (<u>no hand tools to be used</u>) and for any damage or anomalies such as cross-threading, gaps, pits, possible leak points or paths, etc., record, and photo document.

d.  Check connecting hoses, tubing, etc. for damage or anomalies such as kinks, dents, gouges, and the condition of their fittings to control components or other terminations.

e.  Identify the condition of all hoses, umbilicals or control cables.  Note the state of cuts or tears and measure the length, if possible where a component has been cut or otherwise separated to where it terminates on the LMRP.  Quantify orientation and location of all cuts and anomalies (relative to some reference point).

f.  Check all fittings used for connecting hoses, control cables, etc. for signs of damage or anomalies (e.g. gouges, signs of excessive wear or force used to make a connection and characterize the damage found if any).

g.  Examine the condition of Pod mounted accumulator bottles (i.e. pilot or supply, surface or subsea function).

17. Repeat steps 15 (a) to (g) with the Blue Control Pod.

18. Continue the visual examinations of the LMRP.

a.  The serial number, part number or other identification markings of the various components mounted on the LMRP along with any damage, anomalies, corrosion products, marine growth, etc. will be recorded.  Characterize any deformations using terms such as gouge, scrape, pit, etc. and where possible measure the extent of the damage or anomaly.

b.  Note numbers, positions and condition of all accumulator bottles.  If and where possible identify and record any identification markings.

c.  Note the condition of all fittings and tubing or hoses between the accumulator bottles and their connections to the LMRP functions.

d.  Check all fittings for tightness using gloved hands (<u>no hand tools to be used</u>) and for any damage or anomalies such as cross-threading, gaps, pits, possible leak points or paths, etc.

e.  Examine the exterior of all major components located on the LMRP.  Note the general condition and any damage or anomalies and measure the extent of the damage or anomaly.

f.  Note the condition of any vents, plugs or other connections to the main components of the LMRP.

i.   Choke and kill hoses and all fittings and connections.

ii.  The exterior surfaces of the annular housings.

iii. Whether any bolts or other fasteners are missing and the general condition or state of the bolts, fasteners, etc.



g.  Check and record the alignment of the 'bull's eye' tilt indicators on the LMRP.

On completion of the visual examinations of the external surfaces of the LMRP, initiate the visual examinations of the external surfaces of the BOP.  The same preparations and precautions as taken for the visual examinations of the LMRP shall be applied to the visual examinations of the external surfaces of the BOP.

19. Identify, characterize the condition where applicable, and record the following on the BOP.
   a.  The serial number, part number or other identification markings of the various components mounted on the BOP along with any damage, anomalies, corrosion products, marine growth, etc.  Characterize any deformations using terms such as gouge, scrape, pit, etc. and where possible measure the extent of the damage or anomaly.
   b.  Note numbers, positions and condition of all accumulator bottles.  If and where possible identify and record any identification markings.
   c.  Note the condition of all fittings, isolation valves, and tubing or hoses between the accumulator bottles and their connections to the BOP components or functions.
   d.  Check all fittings for tightness using gloved hands (no hand tools to be used) and for any damage or anomalies such as cross-threading, gaps, pits, possible leak points or paths, etc.
   e.  Check connecting hoses, tubing, etc. for damage or anomalies such as kinks, dents, gouges, and the state of their fittings to control components or other terminations.
   f.  Identify the state of all hoses, umbilicals or control cables.  Note the state of cuts or tears and measure the length, if possible where a component has been cut or other wise separate to where it terminates on the BOP.  Quantify orientation and location of all cuts and anomalies (relative to some reference point).
   g.  Check all fittings on connecting hoses, cables, etc. for signs of damage or anomalies (e.g. gouges, signs of excessive wear or force used to make a connection and characterize the damage found if any).
   h.  Examine the exterior of all major components located on the BOP.  Note the general condition and any damage or anomalies and measure the extent of the damage or anomaly.
   i.  Note the condition of any vents, plugs, weep holes, or other connections to the main components of the BOP.
      i.  Choke and kill hoses and all fittings and connections,
      ii.  The exterior surfaces of the ram housings, bonnets, etc.
      iii.  Whether any bolts or other fasteners are missing and the general condition or state of the bolts, fasteners, etc.

## 5.6.3   Visual Examination of the Internal Wellbores of the LMRP and BOP

## 5.6.3.1   General Considerations

The primary goals of visual examination of the internal wellbore are:

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK 

- To visually examine the wellbore surfaces.

- To examine the location and condition of the drill pipe and other materials remaining in the wellbore.

- To extract the drill pipe and other materials remaining in the wellbore.

To accomplish these goals functioning of some of the rams (BOP) and annulars (LMRP) in order to retract those rams/annulars that are in the closed or partial closed position may be required. Once retracted the drill pipe and other materials can be removed and the well bore examined. Procedures for ram functioning as included in Section 5.8.2 Function Testing the BOP Rams and LMRP Elements will be followed.

The following information is available concerning the condition of the wellbore.

- The ROV surveillance and interventions, found that the well cavities of the BOP Stack contain drill pipe and other materials. This was confirmed when the BOP Stack was recovered and raised to the deck of the Q-4000.

- The wellbore cavities of both the BOP and the LMRP were filled with stack guard as part of the initial decontamination of the BOP Stack and short-term preservation procedures that were performed on the Q-4000.  The wellbores were visually inspected and the fact that various materials, drill-pipe or 'fish' were located within the well bore cavities was confirmed and documented.  Following these initial inspections, certain preservation measures were not performed in order to try and prevent well bore and drill pipe material from being damaged (e.g. function testing of certain rams and annulars and flushing the control pods).

- Following the Q4000 Preservation procedures, the positions of the ram assemblies of the lower section of the BOP were reported as follows:

  o Blind Shear Rams (the topmost rams): Upper blade [closed] and Lower blade [open].

  o Casing Shear Rams: Both ram blades [open].

  o Upper Variable Bore Rams: Blocks are closed on the wellbore drill pipe.

  o Middle Variable Bore Rams: Ram positions unknown.

  o Test Rams: Ram positions unknown.

- The positions of the annulars in the LMRP were reported as follows:

  o Upper annular: Closed with drill pipe 'wedged' in the annular.

  o Lower annular: Unknown.

Inspection of the internal cavities cannot be undertaken until the cavities are drained of the preservation fluid and possibly washed to remove any residues left behind.  In order to gain access to the full height (depth - approximately 27' deep) of the wellbores, it will be necessary to

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 

MANAGING RISK

function any rams or annulars that are in the closed or partially closed position.  Further, there may be a need to undertake some degree of disassembly of these components if they do not respond to the pressure applied to retract them.  For example, if the Blind Shear Ram will not retract a process of progressive disassembly will be undertaken to identify and if possible, correct the fault.  If necessary, the ram will be mechanically retracted or removed.

Provisions will be made to capture or retrieve the drill pipe and other materials trapped inside the wellbores to prevent them from being damaged as a result of the wellbore inspection and function testing.  Once extracted, these materials will be preserved for future examination.

The visual inspection procedures that follow will be integrated with activities undertaken to assess the functionality of the BOP Stack (Section 5.8.2) and to recover drill pipe and other materials within the wellbore.  Therefore, this investigation will need to provide for a high level of flexibility in the sequence that various activities are undertaken to permit visual examination, to maintain the integrity of the drill pipe and other materials within the wellbore, and to allow the function testing of the rams and annulars.

The initial access to the wellbores is from the tops of the BOP and the LMRP.  The wellbore cavities are 18-3/4" in diameter.  As a result the "visual" inspections will be carried out using remotely operated cameras and borescopes that are lowered into the wellbore cavities.  A 3-D Laser scanner (profilometer) may also be used to assist with dimensioning various features, damage, and anomalies found as part of the visual inspections of the internal wellbores.

### 5.6.3.2   Visual Examination of the Internal Wellbores

20. The visual examinations of the internals will start with the wellbore of the BOP.  The wellbore will be drained of preservative fluid and cleaned of any residues.
21. Inspection of the wellbore internal surfaces, drill pipe or other materials in the wellbore, and ram surfaces will be by a remotely operated camera lowered into the wellbore and the use of a borescope where appropriate.  More detailed characterization may be performed by using the 3-D Laser Profilometer.
22. The position of the rams and the materials trapped in the rams will be noted and logged.  The trapped materials will be examined for identification marks, if any and these marks recorded.  The state of the wellbore cavity to the first set of rams (the Upper Blind Shear Rams) will be examined for signs of wear as a result of drilling activities, possible damage from prior maintenance or repairs and erosion due to the well fluids escaping subsequent to the incident.  The extent of this damage will be characterized and recorded.  [*Note: Complete characterization of any damage may require waiting until the wellbore is cleared of drill pipe and other materials, if any present.*]
23. The condition of the surfaces of the Upper Blind Shear Rams, if visible, will be examined for wear, damage or deformations on the faces of the rams and their upper and lower surfaces.  Damage or anomalies will be characterized and recorded.

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

24. The following Steps demonstrate the iterative nature that is required between the visual examinations and the function testing of the rams.  To examine the wellbores spaces between the rams it will be necessary to retract them.
    a. One blade or side of the blind shear rams remains closed.  Attempts on the Q-4000 to retract the blade were unsuccessful. The examination of the wellbore below the level of the rams may be very difficult even with the use of remote operated cameras.
    b. Also, it will be necessary to function or possibly remove the ram in order to retrieve the materials that currently reside within the wellbore and maybe trapped by the closed rams.  As the visual examination progresses, visual examination will be performed for those surfaces that can be accessed until ram retraction is required.
25. Prior to any Ram intervention, the plug off the ST Lock "open" end caps will be pulled in order to measure the depth of the ST Wedge Piston to verify if the ST Lock position is locked or unlocked [exclude Casing Shear Ram (no ST Lock)].
26. The general approach is as follows:
    a. Examine and characterize the state of the wellbore cavities down to the Upper Blind Shear Rams.  Examine, to the extent possible the blind shear ram faces.
    b. Retract the blind shear rams (See Section 5.8.2.2 Function Testing of the BOP Rams for further details).  If the Blind Shear Rams will not retract, undertake a process of progressive disassembly to try and identify and if possible, correct the fault.  If necessary, completely open or physically remove the Upper Blind Shear Rams. De-energize all systems to the blind shear rams. Examine blind shear rams and characterize any damage and anomalies.
    c. Visually examine and characterize the condition of the wellbore cavity or recesses between the Upper Blind Shear Rams and the Casing Shear Rams for signs of wear as a result of drilling activities, prior maintenance or repairs and erosion due to the well fluids escaping.
    d. Examine the state of the Casing Shear Rams as found (reported as open following Q4000 Preservation procedures).  Make provision to capture the materials trapped in the wellbore cavities.  Leave the Casing Shear Rams in their retracted position.
    e. Continue the provisions to restrain or capture the drill pipe trapped in the lower BOP wellbore.
    f. Retract the Upper Variable Bore Rams.  Examine the faces of the UVBR's as they open.  Examine the state of the wellbore cavity below the UVBR's and the Middle Variable Bore Rams.  If the MVBR's and Test Rams are not holding the drill pipe remove it.
    g. Continue an iterative process of wellbore cavity examinations between the rams and retracting the Upper Variable Bore Rams, the Middle Variable Bore Rams and the Test Rams.  As each set of rams are retracted the rams will be stopped at a point to provide an opportunity to examine their faces before they are fully retracted.
    h. Complete the examination and characterization of the wellbore cavities below the Test Rams.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

27. A detailed visual examination and characterization of all external surfaces of the rams (their faces and upper lower surfaces) will be undertaken for any ram blocks that are removed from the body of the BOP.

28. As noted above, drill pipe and other materials likely extend below the Casing Shear Rams and that it may not be possible to continue the visual examinations of the wellbore cavities below the Casing Shear Rams until they are cleared from the bore.

29. When these materials are recovered, they will be examined for identification marks, and any damage or anomalies (e.g. pitting, gouging, striations, etc.) will be measured.

On completion of the visual examination of the wellbore of the BOP, the wellbore of the LMRP will be examined. The same concerns discussed for the BOP (the presence of drill pipe and other materials within the wellbore of the LMRP) are a concern for the LMRP. The order of visual examination of the wellbores is driven by the order of function testing and can be changed depending on the needs of the function testing.

30. The same general procedure for visually examining the internal wellbore of the BOP will be applied to the visual inspections of the LMRP.  The internal wellbore of the LMRP will be drained of preservation fluids and washed of any residue.

   a. Examine and characterize the state of the wellbore cavities and any trapped drill pipe. Make provision to secure the drill pipe trapped in the upper annular.

   b. Examine and characterize, to the extent possible the condition of the upper element, the elastomeric body and metal inserts.  Characterize to the extent possible the drill pipe trapped within the metal inserts or 'fingers' of the element.  Open, retract or if required mechanically retract the element and recover materials that remain in the wellbore.

   c. Undertake initial visual examinations of the drill pipe and other materials and prepare and preserve the drill pipe and other materials for further examinations and possible testing.  If drill pipe remains captured by lower annular element, then secure the drill pipe from vertical movement and proceed with visual examination

   d. Examine and characterize the accessible faces of the element bore. Completely retract, or if necessary remove, the upper element and de-energize all systems to the upper annular.

   e. Visually examine and characterize the condition of the wellbore cavity between the upper element and the lower element for signs of wear as a result of drilling activities, prior maintenance or repairs or erosion due to the well fluids escaping.

   f. Examine the state of the lower element.  Characterize to the extent possible any drill pipe trapped or that remains within the metal inserts or 'fingers' of the lower element. Make provision to capture the materials trapped in the fingers of the lower element. Retract or if required mechanically remove the lower element and recover materials that remain in the wellbore.

   g. Recover the drill pipe, undertake initial visual examinations and then prepare and preserve the drill pipe for future examinations and possible testing.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

h. Visually examine the surfaces of the lower element, the elastomeric body and the metal inserts.  Examine and characterize the condition of the lower element bore and the wellbore below the lower element to the lower connecting collar.

## 5.7   Hydraulic Circuit Static Pressure Test

The static pressure-test will evaluate the integrity of the hydraulic circuits (hoses, piping, valves, and actuators) of the BOP Stack, LMRP and ROV Panels.  The integrity test will cover the complete hydraulic circuit from the opening pressure port in the Control Pod Stinger Receptacle or ROV Panel through hoses, tubing and valves into the operator assembly (internal porting and piston assemblies), back to the closing pressure port in the Stinger Receptacle.  A special set of tools will be utilized which connects and seals in the opening port and seals and blanks off the closing port to form a static circuit which can be pressurized without causing ram or annular functions.

Installation of additional valves needs to be minimized to protect the integrity of the static tests.  The intention is not to pressure up accumulator units.  Necessary means will be taken to isolate accumulator units from the static testing.  These means will be determined on a case by case basis.

### 5.7.1   General Preparations

31. The hydraulic circuit will be dead-headed so that there is no fluid flow, and hence, no ram function.  As maximum closing pressure can be damaging to rams the Technical Working Group will be consulted with to establish recommended pressures for conducting these tests.
32. Obtain a compatible hydraulic pressure unit (HPU).  Prior to starting the tests, all gauges (pressure, flow, volume, electrical, etc.) will be calibrated and certified to appropriate standards or in accordance with manufacturers' specifications (including pressure, volume, and flow monitoring data recording).
33. Obtain and have available quantities of all fluids as recommended by the manufacturer.  [*Note: Spill response measures are separate but integral to this work and will comply with all NASA, Michoud requirements.*
34. Personal protective equipment and all safety procedures as described in the Visual Examination section of this Plan will be followed during the function testing.  In addition as this work will involve the use of high pressures, procedures for working around high-pressure equipment and especially high-pressure hydraulic hoses will apply.
35. Collect and assemble all hand tools, any pneumatic or power actuated tools, measuring tapes, etc. that might be required to complete these tests.
36. Make provisions with the videographer for recording these tests as well as the taking of any still photographs.
37. Make provisions for containment of any fluid which might leak from the hydraulic circuit during testing.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

### 5.7.2   BOP Stack Circuits

38. The static test will start on the BOP Stack in the following sequence:
    a.  Upper Blind Shear Ram
    b.  Casing Shear
    c.  Upper Pipe Ram
    d.  Middle Pipe Ram
    e.  Lower Pipe Ram
    f.  Wellhead Connector
    g.  Choke and Kill Valves
    h.  Stack Mounted Regulators
    i.  ST-lock system
    j.  High-pressure blind shear ram close (Note that pressuring this circuit will not close the rams. This is a through-pod-receptacle function which activates the high-pressure blind shear control valve panel on the lower BOP. It is very important to verify there are no leaks in this circuit, because it is part of both the EDS and the autoshear.)
    k.  High-pressure casing shear close
    l.  Autoshear arm/disarm
    m.  Stack accumulators charge/discharge
39. Hydraulic pressure is to be applied to the opening or unlatching side port in the BOP Stack Stinger Receptacle. Install the special hydraulic supply tool into the appropriate opening or unlatching port. Install the special blanking tool into the appropriate return or closing port in the Stinger Receptacle. Trace the line from the outside of the receptacle down to the component and back to the receptacle to ensure proper circuit. [*Note: Circuits on both pod receptacles will be tested.*]
40. Apply pressure slowly increasing from zero. Monitor the hydraulic connections for any leaks and de-pressure immediately if leaks are found. Take corrective actions.
41. Continue increasing pressure until the maximum working pressure recommended by Cameron for the specific function is reached. Hold at maximum pressure for 15 minutes after pressure stabilizes while continuing to monitor for any leaks. Document any leaks including the minimum pressure at which the leak initiated. If necessary, de-pressure and re-pressure to validate leak initiation pressures.
42. After a 15 minute pressure hold at rated working pressure is achieved without visible leakage, de-pressure the circuit.
43. Continue static pressure testing (steps 35 through 38) until all hydraulic circuits have been completed in the BOP Stack.

### 5.7.3   LMRP Circuits

44. Static testing will then continue on the LMRP in the following sequence:
    a.  Upper Annular
    b.  Lower Annular
    c.  Mud Boost Valve
    d.  Choke Isolation Valve
    e.  LMRP Connector

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

      f.  Choke & Kill Connectors
      g.  Regulators

45. Follow the same procedure as the BOP Stack static test applying hydraulic pressure to the opening or unlatching side port in the LMRP Stinger Receptacle. Install the special hydraulic supply tool into the appropriate opening or unlatching port. Install the special blanking tool into the appropriate return or closing port in the Stinger Receptacle. Trace the line from the outside of the receptacle down to the component and back to the receptacle to ensure proper circuit.

46. Apply pressure slowly increasing from zero. Monitor the hydraulic connections for any leaks and de-pressure immediately if leaks are found. Take corrective actions.

47. Continue increasing pressure until the maximum working pressure recommended by Cameron for the specific function is reached. Hold at maximum pressure for 15 minutes after pressure stabilizes while continuing to monitor for any leaks. Document any leaks including the minimum pressure at which the leak initiated. If necessary, de-pressure and re-pressure to validate leak initiation pressures.

48. After a 15 minute pressure hold (following pressure stabilization) at rated working pressure is achieved without visible leakage, de-pressure the circuit.

49. Continue static pressure testing (steps 41 through 44) until all hydraulic circuits have been completed in the LMRP.

## 5.7.4   ROV Panel Circuits

50. Static testing will then continue on the ROV Panels located in the BOP Stack and LMRP in the following sequence:
      a.  LMRP Connector Unlatch
      b.  Choke & Kill Connector Unlatch
      c.  Shear Ram Close
      d.  Pipe Ram Close
      e.  Wellhead Connector Unlatch

51. Hydraulic pressure is to be applied via the ROV panel interface. An ROV hot stab will be connected to the hydraulic supply line to provide the necessary function pressure. Manually install and ensure the ROV stab is locked in the ROV panel before applying pressure. Install the special blanking tool into the appropriate return or closing port in the Stinger Receptacle. Trace the line from the ROV panel to the component and back to the receptacle to ensure proper circuit.

52. Apply pressure slowly increasing from zero. Monitor the hydraulic connections for any leaks and de-pressure immediately if leaks are found. Take corrective actions.

53. Continue increasing pressure until the maximum working pressure recommended by Cameron for the specific function is reached. Hold at maximum pressure for 15 minutes after pressure stabilizes while continuing to monitor for any leaks. Document any leaks including the minimum pressure at which the leak initiated. If necessary, de-pressure and re-pressure to validate leak initiation pressures.

54. After a 15 minute pressure hold at rated working pressure is achieved without visible leakage, de-pressure the circuit.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK



55. Continue static pressure testing (steps 47 through 50) until all ROV hydraulic circuits have been completed on both the BOP Stack and the LMRP.

## 5.8   BOP Function Testing

### 5.8.1   General

The function testing will evaluate the functionality of the various components of the BOP and the LMRP, including the following.

- Each of the five sets of rams that comprise the BOP and the systems that drive or actuate those rams.

- The two annulars that comprise the LMRP and the systems that drive or actuate the elements.

- The systems that control the functioning of these components.

Where a component or sub-assembly does not function in accordance with its design, the physical cause(s) and contributory factors that led to the malfunction will be identified.  To the extent possible, those factors that existed pre-incident versus those that were likely caused following the incident will be established.

Two general approaches can be adopted for testing the functioning of the BOP and LMRP as a whole and their individual components.

- One is to start holistically with the BOP Stack assembled (i.e. the BOP and LMRP together) and the control systems as close to their pre-incident state as possible.  Then engage or energize each of the various systems and components and note whether they operate as designed.  This could be viewed as a top-down approach to the function testing.

- The second approach is to start at the individual component level.  Test that component, note its response, then move 'outward' from that component to the next level of the assembly.  Re-energize those two components, note their response, and continue until the various components in that sub-system or sub-assembly is completed.   In simple terms, a bottom-up approach.

Each approach has advantages and disadvantages.  Taking into consideration a number of factors that are discussed within the proposed test plan it was decided to take a 'bottom-up' approach i.e. one that starts at the individual component level and works outward and upward through the various levels of actuation and control.

Function testing of the BOP Stack will begin with testing the operation of the BOP rams.  Once the tests of the BOP rams are complete, function testing will move to the annulars of the LMRP.

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK



### 5.8.2   Function testing the BOP Rams and LMRP Elements

#### 5.8.2.1   General Preparations

Procedures in 5.8.2 will be followed with the understanding that any rams / annulars that had been in the closed or partially closed position will have been retracted in Section 5.6.  During the function testing, rams/annulars will be functioned at the least pressure required to cause the rams to function and never greater than the manufacturer's maximum recommended pressure.  In addition, the rams will not be allowed to close all the way with out an exemplar pipe in the well bore to minimize damage to the surfaces of the rams/annulars.  The plan is to function rams such that the movement is sufficient to suggest complete mobility, but not to close completely so not to damage the ram/annular elements.

56. In addition to a compatible hydraulic pressure unit (HPU), obtain a Portable Electronic Test Unit (PETU) from Cameron (the manufacturer of the BOP and its controls).  Prior to starting the tests, all gauges (pressure, flow, volume, electrical, etc.) will be calibrated and certified to appropriate standards or in accordance with manufacturers' specifications.  Monitor and record dynamic pressure and flow throughout all tests.
57. Obtain and have available quantities of all fluids as recommended by the manufacturer.  Note – spill response measures are separate but integral to this work and will comply with all NASA, Michoud requirements.
58. Personal protective equipment and all safety procedures as described in the Visual Examination section of this Plan will be followed during the function testing.  In addition as this work will involve the use of high pressures, procedures for working around high-pressure equipment and especially high-pressure hydraulic hoses will apply.
59. Collect and assemble all hand tools, any pneumatic or power actuated tools, measuring tapes, etc. that might be required to complete these tests.
60. Make provisions with the videographer for recording these tests as well as the taking of any still photographs.
61. Install a containment or fluid capture system to the return or vent side of the BOP and LMRP prior to the function testing of the units.
    a. As each set of rams or annulars is functioned, make provision to capture any vented hydraulic fluids.

#### 5.8.2.2   Testing the BOP Rams

62. Monitor the position of each ram block prior to any function testing (even for those that have undergone functioning during the ROV interventions and Q4000 preservation).
63. First function test the opening or retract function of the BOP rams.  In instances where specific rams have already been cycled fully open during offshore preservation procedures or prior offshore operations, the procedure will be to validate visually and through applied pressure that the rams are fully retracted.
64. Function testing of the rams will start with the Blind Shear Rams of the BOP.
65. Hydraulic pressure is to be applied to the opening side port in the BOP Stack Stinger Receptacle.  Install the special hydraulic supply tool into the appropriate opening port.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

Install the special hydraulic return tool into the appropriate return or closing port in the Stinger Receptacle and connect to fluid capture system.  Trace the line from the outside of the receptacle down to the component and back to the receptacle to ensure proper circuit.

66. Position the video camera and observers at the top of the BOP to observe the wellbore and the function of the UBSRs.

67. Apply pressure increasing from zero.  Monitor the hydraulic connections for any leaks and de-pressure immediately if leaks are found.  Take corrective actions.  If no leaks are found record minimum pressures required to action rams.  Continue applying pressure until the rams are fully retracted from the wellbore. Stop applying pressure at the maximum pressure recommended by Cameron for actuating the UBSRs.  Record the final pressures and volume counts required to completely retract the rams.  Monitor and record dynamic pressure and flow throughout tests.

   a.  As noted in the visual examination section, the opening of the rams will be staged to examine the faces of the rams prior to being completely retracted.

   b.  Record the applied pressure versus displacement of the ram blocks.

   c.  If there is no ram block movement at maximum recommended pressures, the next step will be to start disassembling the shear ram sub-assembly to discern the cause of the problem.  The possibility exists that a progressive level of disassembly will be required. A minimum level of intrusive effort or disassembly will be taken to identify the cause of a fault or problem having to retract the ram using mechanical or outside means.   It is recognized that there could be various reasons for the ram(s) not functioning. For example, rather than being an issue of a 'stuck ram' due to friction of some nature, it may be faults in the pistons or other parts of the actuating system. As part of this work, it will be examined whether the cause of problem or fault was likely due to a condition that existed pre-incident or the effect of events subsequent to the incident.

   d.  Prior to any ram sub-assembly intervention, pull the plug off the ST Lock "open" end caps and measure the depth of the ST Wedge Piston to verify the ST Lock position is locked or unlocked [exclude Casing Shear Ram (no ST Lock)].

68. De-energize the system.  Label any vented fluids collected during the opening of the rams and install a new collection bottle.

69. Inspect the wellbore and document the condition of and position of the Casing Shear Rams.  Remove and document any loose drill pipe from the wellbore. [*Note: During the Q4000 Preservation, the short fish of drillpipe below the Upper Shear Rams was removed.  The Casing Shear Rams were then opened.*]

70. Make provision, if required, to capture or restrain any drill pipe or fittings wedged in the Casing Shear Rams from falling further into the wellbore when opening the Casing Shear Rams.

71. Following and using the same steps for retracting the upper blind shear rams make the same provisions for opening the Casing Shear Rams.  Install the special hydraulic supply tool into the appropriate opening port.  Install the special hydraulic return tool into the appropriate return or closing port in the Stinger Receptacle and connect to fluid capture

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

system.  Trace the line from the outside of the receptacle down to the component and back to the receptacle to ensure proper circuit.

72. Position the video camera and observers at the top of the BOP to observe the wellbore and the function of the CSR's.

73. Apply pressure and record the minimum pressures required to action the CSR's. Continue applying pressure until the rams are fully retracted from the wellbore.  Stop applying pressure at the maximum pressure recommended by Cameron for actuating the CSRs.  Record the final pressures and volume counts required to completely retract the rams.  Monitor and record dynamic pressure and flow throughout tests.

74. De-energize the system.  Label any vented fluids collected during the opening of the rams and install a new collection bottle.

75. Once the Casing Shear Rams have moved and the drill pipe, fittings or other material within the wellbore is free, remove any material, visually examine, characterize any damage to this material, and prepare it for proper storage and possible future examination.

   a.  Undertake any visual examinations to the wellbore cavities and the faces and surfaces of the Casing Shear Rams that were not previously completed.

76. Document the position and condition of the visible surfaces of the Upper Variable Bore Rams (UVBR) (Upper Pipe Rams).

77. Repeat the above steps for functioning of the:

   a.  Upper Variable Bore Rams (UVBRs)
   b.  Middle Variable Bore Rams (MVBRs)( Middle Pipe Rams), and the
   c.  Test Ram (TR).

   *Note: Ensure the special hydraulic supply and return tools are located in the appropriate ports for rams being functioned.  Trace the line from the outside of the receptacle down to the component and back to the receptacle to ensure proper circuit.*

78. Once all five sets of rams on the BOP have been opened or retracted and all material removed from the wellbore, the function testing will be reversed.  Record the minimum pressure to close the rams and observe the ram to ram interface.  For the blind shear and casing shear rams, allow the ram blocks to completely close against each other. Terminate the function immediately if interfacing appears to be causing mechanical damage.  For the variable bore and test rams, terminate the close function prior to ram to ram contact.  There will be no pipe in the wellbore and functioning close could result in damage to the ram elements.  If at any time any of the rams do not move with 500 psi or less, terminate the function and proceed to forensic investigation of this fault.  Monitor and record dynamic pressure and flow throughout tests.

79. Disconnect the ROV and Control Pod shuttle valves from the BOP body and disconnect the Control Pod and (where applicable) ROV supply lines.

80. For Control Pod only (Blue and Yellow Pod shuttle) connect hydraulic supply to the Blue Pod port, connect vent line to the Yellow Pod port and connect the return line to the BOP body side of the shuttle valve.

81. Pressure the shuttle valve and record the minimum pressure at which the valve shifts.  Do not pressure the valves beyond Cameron specified limits.  Note and record any fluid from

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK 

the vented Yellow Pod port indicating a leak.  [*Note: If the shuttle is already shifted then the procedure will be reversed to begin with the opposite inlet (Yellow Pod port) first as indicated in the following step and the Blue Pod port last.*]

82. Reverse the Yellow and Blue Pod connections and repeat and record the minimum pressure to shift.

83. For shuttle valves associated with ROV intervention, repeat the minimum pressure shift test with hydraulic supply to the ROV panel side.

84. Where a shuttle valve does not function, the next step will be to start disassembling the shuttle valve to discern the cause of the problem.  Where a shuttle valve functions reconnect the shuttle valves to the BOP Stack.

85. Undertake this same procedure with each of the shuttle valves on the BOP Stack.

86. The Yellow and Blue Control Pods that attach to the LMRP were removed from the LMRP as part of a short-term preservation procedure.  It is intended to hold with doing any further testing at the individual component level of the BOP Stack at a point prior to having to refit the Control Pods.  Testing of the Control Pods will be undertaken with the function testing of the control systems.

### 5.8.2.3   Testing the LMRP Annulars

The approach to the function testing of the upper and lower annulars will follow the same approach as with the rams on the BOP.  However, it has been noted that the elastomeric element of the upper annular has been heavily damaged.  It is believed that it is possible to test the functionality of the components that actuate the element without first having to fit a new element.

87. First function test the opening or retract function of the annulars.  In instances where the specific annular has already been cycled fully open during offshore preservation procedures or prior offshore operations, the procedure will be to validate visually and through applied pressure that the annular piston is fully retracted.  Even though the piston is fully retracted, the annular element may not open up fully to clear the wellbore.

88. Start its tests with the Upper Annular of the LMRP.

89. Hydraulic pressure is to be applied to the opening side port in the LMRP Stinger Receptacle.  Install the special hydraulic supply tool into the appropriate opening port. Install the special hydraulic return tool into the appropriate return or closing port in the LMRP Stinger Receptacle and connect to fluid capture system.  Trace the line from the outside of the receptacle to the component and back to the receptacle to ensure proper circuit.

90. Position the video camera and observers at the top of the LMRP to observe the wellbore and the function of the upper annular.

91. Apply pressure increasing from zero.  Monitor the hydraulic connections for any leaks and de-pressure immediately if leaks are found.  Take corrective actions.  If no leaks are found record minimum pressures required to action the element.  Continue applying pressure until the annular piston is fully retracted.  Even thought the piston fully retracts, the element may not open up fully and clear the wellbore.  Stop applying pressure at the

ANEUS815NTHO

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

maximum pressure recommended by Cameron for actuating the annular piston. Record the final pressures and volume counts required to completely retract the piston.  Monitor and record dynamic pressure and flow throughout tests.

   a.  As noted in the visual examination section, the opening of the element will be staged to examine the faces of the element prior to being completely retracted.

92. If there is no movement of the element at the maximum recommended Cameron pressures the next steps will be to start disassembling the annular sub-assembly to discern the cause of the problem. The possibility exists that a progressive level of disassembly will be required.  The minimum level of intrusive effort or disassembly will be taken to identify the cause of a fault or problem having to retract the element using mechanical or outside means.

93. De-energize the system.  Label any vented fluids collected during the opening of the annular and install a new collection bottle.

94. Inspect the wellbore and document the condition of and position of the Lower Annular. Remove and document any loose drill pipe from the wellbore.

95. Make provision, if required, to capture or restrain any drill pipe or fittings wedged in the lower annular from falling further into the wellbore when opening the lower element.

96. Following and using the same steps for retracting the upper element make the same provisions for opening the lower element.  Ensure the special hydraulic supply and return tools are installed in the appropriate ports in the LMRP Stinger Receptacle and connected to a fluid capture system.   Trace the line from the outside of the receptacle to the component and back to the receptacle to ensure proper circuit.

97. Position the video camera and observers at the top of the BOP to observe the wellbore and the function of the lower packer.

98. Apply pressure and record the minimum pressures required to action the lower element. Stop applying pressure at the maximum pressure recommended by Cameron for actuating the element.

   a.  If there is no movement at the maximum recommended pressure, the next steps will be to start disassembling the lower annular sub-assembly to discern the cause of the problem. The possibility exists that a progressive level of disassembly will be required.  The minimum level of intrusive effort or disassembly will be taken to identify the cause of a fault or problem having to retract the element using mechanical or outside means.

99. De-energize the system.  Label any vented fluids collected during the opening of the lower annular.

100. Once the drill pipe, fittings or other material within the wellbore is free; remove any material, visually examine, characterize any damage to this material, and prepare it for proper storage and possible future examination.

   a.   Undertake any visual examinations to the wellbore cavities and the faces and surfaces of the element that were not previously completed.

101. Disconnect the Control Pod shuttle valves from the annulars and disconnect the Control Pod supply lines.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

102. Connect hydraulic supply to the Blue Pod port, connect vent line to the Yellow Pod port and connect the return line to the annular body side of the shuttle valve.

103. Pressure the shuttle valve and record the minimum pressure at which the valve shifts. Do not pressure the valves beyond Cameron specified limits.  Note and record any fluid from the vented Yellow Pod port indicating a leak.  [Note: If the shuttle is already shifted then the procedure will be reversed to begin with the opposite inlet (Yellow Pod port) first as indicated in the following step and the Blue Pod port last.]

104. Reverse the Yellow and Blue Pod connections and repeat and record the minimum pressure to shift.

105. Where a shuttle valve does not function, the next step will be to start disassembling the shuttle valve to discern the cause of the problem. Where a shuttle valve functions reconnect the shuttle valves to the LMRP.

106. Undertake this same procedure with each of the shuttle valves on the LMRP.

## 5.8.2.4   Inspection of Ram and Annular Components

Once all function testing is complete, all ram/annular components will be disassembled for inspection.

107. Open ram bonnets and remove the ram blocks from the cavities and inspect the rams for damage and anomalies as described in 5.13.

108. Inspect the ram cavities measuring damage and anomalies.

109. Remove and inspect the annular elements for damage and anomalies as described in 5.13.

110. Inspect the annular cavities measuring damage and anomalies.

## 5.9   Testing of the Accumulators

There are both piston-type and bladder-type accumulators mounted to the BOP Stack, LMRP, and the Control Pods.  Function testing will consist of first measuring and recording the Nitrogen pre-charge on the accumulators and where necessary reinstating the recommended pre-charge. The intent is to test accumulator bottles as a system (bank) and test individually only if anomalous performance occurs; can alter testing to identify individual bottle performance as need arises.

*Note: the pre-charge will be adjusted for surface conditions (ambient pressure) to match the subsea condition.  Subsea accumulator pre-charged $N_2$ gas pressures (adjusted from surface to subsea hydrostatic pressure and temp) will be roughly 2,500 psi above surface operating (the exact calculation should be made for stack depth, using a $N_2$ volume table method).  This pressure, added to normal surface operation for various accumulators, is the pre-charge to expect at initial inspection.  While this pre-charge was necessary for proper subsea operation, all accumulators will require bleed off to surface operation pressure values for proper operation and function tests during examination.*

111. Note numbers, positions, and function use of all Stack accumulators.

ANEUS815NTHO

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

Date:  October 22, 2010

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK 

112. Install fluid capture, pressure and volume measurement on the hydraulic side of the accumulator before opening and discharging or draining any resident fluid.

113. Collect samples of the pre-charge gases for examination and analysis of composition and moisture content.

114. Install pressure measurement on the pre-charge side of the accumulator.

115. Fully discharge the hydraulic side of the accumulator.  Verify full discharge from both the hydraulic and pre-charge pressure gauges.

116. Measure any remaining pre-charge in the accumulator after hydraulic discharge.

    a. After draining hydraulic fluid from each accumulator, allow sufficient time for pre-charge gas temperature to come to ambient equilibrium (by monitoring pressure until it stops increasing).  Record ambient temperature for "Remaining  pre-charge" datum on each bottle.

117. Where necessary reinstate pre-charge to recommended level.

118. Monitor pre-charge for 5 minutes and document any leak off.  If leak off occurs, the next steps will be to start disassembling the accumulator assembly to discern the cause of the problem and repair as needed before proceeding to hydraulic pressurization.

119. Slowly pressure up the hydraulic side of the accumulator until maximum manufacturer recommended pressure adjusted for surface conditions is achieved.  Verify the pressure from both the hydraulic and pre-charge sides of the accumulator (matching pressures).

120. Hold for a minimum of 5 minutes or until pressure stabilizes within 5 psi, or 30 minutes, whichever is less and record results..

121. Fully discharge the hydraulic side of the accumulator recording the total discharge volume and pressure curve; recording until pressure stabilizes within 5 psi, or 30 minutes, whichever is less.

122. If the accumulator fails to discharge the calculated volume, the next steps will be to start disassembling the accumulator assembly to discern the cause of the problem and repair as needed before proceeding.  *[Note: Full accumulator capacity is not required for operation of the BOP on surface thus repair of accumulators (if any) may not be required.]*

123. Slowly pressure up the hydraulic side of the accumulator until maximum recommended pressure is achieved.  Verify the pressure from both the hydraulic and pre-charge sides of the accumulator (matching pressures) and leave charged for the next tests.

124. Repeat the test protocol (steps 102 through 112) for all accumulators mounted on the BOP Stack and LMRP.

## 5.10   Testing of the Control System

The control system for the BOP consists of the following main units.

- The Hydraulic Power Unit (HPU)

- Diverter Control Unit (DCU)

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

- Offshore Installation Manager's Control Panel[5]

- Drillers Control Panel

- Toolpusher Control Panel

- Cable Reels for connecting the controls from the Subsea Control Pods to the surface.

- Subsea Multiplex Modular Pod (i.e. the Yellow and Blue Pods fitted to the LMRP)

All of the above controls were lost with the sinking of the Deepwater Horizon semisubmersible, except for the subsea control pods (the Yellow and Blue Pods).  In order to recreate the control systems that were in place prior to the incident it would be necessary to source similar control panels from Cameron.  The value of undertaking such an effort is questioned; as any control units that Cameron are likely to be able to supply will be fitted with electronic systems that are of a 2010 'generation' versus the systems that were being used in 1999/2000 when the Deepwater Horizon BOP Stack and its various controls were designed and fabricated.  Any test using such systems will not be representative of the state of the control systems in existence on April 20, 2010.

The approach to examine the two control pods will be to start with undertaking some basic measurements on the electronics or electrical systems including the following.  Provisions will be made to assure that the electronics are not subject to electrostatic discharge during the inspection and testing of the electronics systems.  Depending on the results of the following tests, in consultation with the Technical Working Group, solenoids and possibly even programmable logic controllers may be removed and subjected to further bench tests.

125. Examine the wiring or circuit layouts in the control pods (video and photo document) and compare those to the original electrical line drawings.
    a. Test for electrical faults at each accessible connection.
    b. Examine and record any programmable logic controllers (PLC's) and other electrical components and compare their stated capacity against original design documentation,
126. Document the condition of electrical connections and circuits using photography and stereomicroscopy if or where necessary.
127. Test the charge on the batteries that are built into the control pods.
    a. The batteries will be charged and monitored over a period of time to assess potential current drain.  The drain from any shorts or to ground that are identified will be assessed to determine the potential effect on the batteries over a period of time.
128. The Subsea Electronic Modules (SEM's) will be removed from the Control Pods and inspected for signs of water ingress or other factors that might cause them to malfunction.  Their electronic functions and operations will also be tested.  Take water

---

[5] This is also called the Toolpushers Control Panel and is located on bridge (on the DWH) and Drillers Control Panel is on the Drill Floor.  The DWH had a CCU (main - Central Control Unit).

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

samples where appropriate for future analysis and use field kit for testing pH and chlorides at site.

129. Test for any shorts that might exist in the electrical and electronic systems of the control pods.
   a. Various electrical lines to or on the control pods were cut or severed as part of the ROV interventions.  The potential exists that any shorts identified may result from such activities versus having existed pre-incident.
   b. Specific test procedures will be developed and discussed with the Technical Working Group prior to carrying out these tests.

130. Examine the state of the various electrical connections for damage or excessive wear and tear.

131. The AMF system in each of the two control pods will be examined for electrical shorts or faults and the function tested.
   a. Test various trigger modes (loss of pressure, MX signal combinations).
   b. Test when conditions to initiate the AMF have been met and not re-set by cycling power to the Pod (will the system continue to repeat the cycle?).
   c. Test the AMF/deadman sequence functionality.  Verify that the deadman sequence can be armed and that there is proper feedback to the PETU through the SEM.
   d. Explore whether battery state of charge affects AMF/deadman sequence functionality by using alternate batteries at appropriate states of charge.

132. Where it is possible to identify a certain condition or potential failure mode occurred and was a result of the conditions following the incident, that fault will be corrected.  Again the principal of 'minimal intrusiveness' will be applied. Where it is not possible to identify whether a fault was in existence pre vs. post incident, the fault will not be addressed or corrected. An assessment of all damaged cables and electrical lines will be undertaken as part of the  fault investigations.

133. The solenoid valves currently mounted to the control panels were functioned and flushed as part of the short-term preservation process of flushing the two control pods.  Further as noted earlier a number of the valves and components to the two control pods were replaced during the ROV interventions or during topside maintenance as part of the interventions.  All components that were removed will be identified and cataloged.  They will be visually examined and function tested to evaluate their overall state or condition.

134. The original (pre-incident) components, will then be refitted where possible, following re-inspection, to the Control Pods.  The overall configuration of the control pods being as close to the pre-incident condition will be checked against documentary evidence and the relevant tapes of the ROV interventions.

135. The Control Pods will be connected to a Cameron supplied Portable Electronic Test Unit.  The Pods will be pressurized and energized.  The various components will then be functioned and the results recorded.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335     MANAGING RISK 

## 5.11   Testing of the Wellhead and Collet Connectors

In addition to the Annular and Ram BOP Functions, investigation and function testing of the Wellhead Connector on the BOP and the BOP Stack connector on the LMRP, as well as the Choke and Kill Connectors on the LMRP will be tested.  All unlatch and release functions are accessible from the ROV panels and hydraulic interface will first be conducted via the ROV panels in the same manner as the BOP and Annular function testing.  It is recognized that these functions were not a part of the initial incident function demand, but rather required when the stack was disconnected and retrieved from the sea floor.  Visual examination will be conducted and documented of all connector latches and their corresponding mating surfaces for any signs of damage.  Distance of stroke will be measured and recorded as well as minimum pressure to unlatch collets or release gaskets.  Hydraulic tracing will proceed in the same step by step fashion back to the control interface for determination of any component faults.

## 5.12   Function Testing of the Complete BOP Stack in the Pre-Incident Condition

As discussed above, the ability to establish the pre-incident operation condition of the BOP Stack and Control System will be difficult due to the following.

- Intervention process including maintenance overhaul of the Control Pods and attempted functioning of the rams above recommended maximum operation pressures.

- Wear / erosion due to the oil and gas flow prior to capping.

- Control systems located on the Deepwater Horizon were lost following sinking of the semi-submersible unit.

- Key documents and drawings including certain as built drawings and management of change (MOC) documents that describe modifications made from time of initial commissioning may not be available.

The assumptions made in trying to configure the BOP Stack back to its pre-incident operating condition will be documented.  Because certain as-built drawings may have been lost, the primary process will be to establish the as-retrieved condition of the BOP Stack and work backwards to the pre-incident condition by reviewing all video, logbooks, and maintenance during the intervention period (post-incident).  To further estimate pre-incident condition, design drawings will be used along with the review of pre-incident maintenance, modifications, repairs, and parts replaced.  In addition, previous wells history for proper or problem functional issues will be reviewed where available. Establishing the pre-incident condition of the BOP Stack will require the following to be performed first.

- Visual examination.

- BOP function testing.

- Testing of the Control System and, to the extent possible, establish the pre-incident functionality.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335



MANAGING RISK

- Document review of all intervention procedures.

- Document review of all performance histories, maintenance, repairs, and modifications.

To recreate the surface control system as it existed pre-incident is not expected to be possible. The goal will be to establish its pre-incident functionality, to the extent possible. This will be a combined effort of Cameron, BP, Transocean, and DNV. Part of this effort will be to determine the limitations of the effort in reproducing the functionality and logic of the control system as it existed pre-incident.

In addition, establishing pre-incident operation may require replacing certain parts that were worn or damaged due to post-incident intervention or fluid flow. Those parts damaged or worn due to normal operation pre-incident will be re-used in the construction of the pre-incident BOP Stack. If the pre-incident condition of the BOP Stack cannot be conclusively established, the BOP Stack will be tested under possible alternate pre-incident scenarios that are consistent with the available information.

Once the pre-incident condition(s) of the BOP Stack is established the following will be performed.

136. Compile all data to establish the pre-incident condition of the BOP Stack.
    a. Determine the control system to best simulate pre-incident functioning of the BOP Stack.
137. Refit components of the BOP Stack to the pre-incident condition and re-attach Control Pods to the LMRP.
    a. For example, re-establish the hydraulic hoses or connections, electrical connections, battery charge, etc. to pre-incident conditions.
138. Re-attach the LMRP to the BOP.
139. Verify all accumulators are fully charged to surface operation $N_2$ pressures.
140. The AMF system will be re-established. The BOP stack will be configured with the rams, annulars and the Control Pods in various configurations. The system will then be sequentially triggered and the cause and effects recorded.
141. Fit an exemplar pipe into the wellbore to permit full function testing of the BOP Stack.
142. Perform function testing on most likely scenarios for pre-incident BOP Stack configuration. As part of the scenarios, determine credible sequences regarding the pressure(s) applied to the rams; record the pressures, movement and time to close.
143. Perform function testing on certain fault conditions that may have been present pre-incident.

The specific function tests of the entire stack and the order in which the tests will be performed will be determined after an incident timeline has been established. The intent of fully assembled function tests are to validate root cause findings, component faults and their impact on the overall functionality. To the extent possible, fault conditions will be recreated prior to function tests. Both well control critical functions and BOP Stack/LMRP release functions will be

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

 MANAGING RISK

considered in full function testing.  Certain functions may not be possible with the PETU; for example full function of emergency systems is not possible using the PETU.


## 5.13   Materials Testing and Damage Evaluation

Materials evaluation may include various aspects of the BOP Stack design, damage, or general condition.  One aspect will be to determine, using non-destructive methods, the materials of construction of the BOP and components for comparison to design specifications.  Another aspect of materials evaluation will be inspection for manufacturing defects, post-manufacture shop and/or field repair defects, and damage assessment.  Depending on the findings and type and extent of damage, metallurgical analysis and mechanical testing may be required to provide specific materials properties to enhance the analysis.

Damage to the BOP Stack could have occurred during several possible activities: previous well(s) operation, pre-run maintenance, installation, well blow out, rig failure and riser collapse, intervention and capping, flow of oil and gas through the stack, and removal and transport to the Michoud Assembly facility.  An assessment of any such damage will be part of the visual examinations that may be undertaken.  Where damage is identified, note of the damage will be taken into consideration when reviewing the ROV video-tapes to try and determine when the damage was first apparent and whether it was the result of intervention activities, fluid flow, normal usage, etc.

In addition to components of the BOP, materials recovered from the wellbore (including drill pipe) will be examined to determine their impact on the BOP functionality. For example, the various pieces of drill pipe will be carefully examined to establish how they sheared and in what sequence and the reasons for their locations in the BOP Stack.

144. Damage and anomalies of a dimensional nature (length, width, depth) will be characterized relatively simply with rulers, calipers, micrometers, pit depth gauges, etc.  In addition, the orientation and location of all damage and anomalies will be quantified (relative to some reference point).
145. Crack defects and anomalies are more difficult to characterize. NDE methods such as magnetic particle inspection or dye penetrant testing may be applicable.  In addition, simple grinding away of the crack to measure depth can be effective.  The method used will depend on the cracks observed and the component configuration where cracks are identified.  An NDE certified inspector (certified with the specific tools that will be used) will be used if cracks are identified.
146. NDE testing will be performed wherever possible to minimize the need for disassembly or destructive testing.  Until the condition of the BOP is examined, it is not possible to define the requirements or details of the NDE testing.
    a. Due to the thickness of the BOP walls, standard NDE thickness measurements are not likely to provide reliable measurements.

ANEUS815NTHO

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

Date:  October 22, 2010

DET NORSKE VERITAS

United States Department of Interior
Forensic Investigation of the Blowout Preventer – Ref M10PX00335

MANAGING RISK 

    b.  A method of damage assessment internal to the wellbore that will be used is a laser scanning 3-D camera.  This can provide a high resolution surface topography for dimensioning damage (depth, length, width).   The camera is lowered into the wellbore to the desired depth and the camera is rotated to permit the surface of interest to be scanned.

147.  The materials testing and damage evaluation will be an integrated part of the above described testing plans (Visual Examination and BOP Function Testing). Many of the procedures listed require condition assessments.

148.  Components, parts, and other evidence collected or otherwise removed during the BOP Stack forensic testing (including drill pipe) will be dimensionally measured and the material identified if no part serial number is visible.

    a.  Metallic materials can be further characterized metallurgically or through mechanical testing. The decision to perform these analyses will be made on a piece by piece basis.

    b.  Elastomeric materials will be examined for dimensional stability (requires the original dimensional specifications) and hardness.  The decision to perform these analyses will be made on a piece by piece basis.

## 5.14   Cataloging and Examination of Recovered Evidence

Significant evidence was recovered during the preservation procedures performed on the Q-4000.  This evidence is stored on the Michoud facility in either the "evidence yard" and in other secured storage. In the case of the Q-4000 evidence, the evidence has not been carefully reviewed and preventive measures taken to preserve the evidence.  Other evidence from the BOP Stack was recovered during intervention following the incident.  All evidence recovered form the BOP Stack will be examined as part of this work.  The following procedures will be performed.

149.  Carefully photograph and unpack all evidence bags and containers, inspect the evidence, and determine preservation requirements.  The following applies to non-fluid samples.

    a.  All evidence will be photographed prior to and following inspection, cleaning, measuring, and drying.

        i.  The evidence will be photographed in the bag to document the as-received condition. The photograph identification and the evidence identification will be recorded in DNV Lab Notebook 401.

        ii.  The evidence will be removed from the as-received packaging and placed on top of the packaging.

        iii.  The bag and evidence will be photographed to document the condition of the evidence after removing it from the bag. The photograph identification and the evidence identification will be recorded in DNV Lab Notebook 401.

    b.  Visually inspect for damage or anomalies and the extent of damage or anomalies will be measured.

    c.  Inspect and make a decision on whether to collect any loose particles, scale, etc.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

MANAGING RISK 

    d. Clean metallic evidence using an inert solvent (e.g. acetone or ethyl alcohol) and a soft bristle brush to remove any scales or deposits on the surface of the evidence.

    e. Clean non-metallic evidence with a soft bristle brush without using a solvent (i.e. the solvent may degrade the evidence).

    f. Carefully dry samples as part of performing items a. - d. above.

    g. The evidence will be photographed after cleaning to document the result of the cleaning process. The photograph identification and the evidence identification will be recorded in DNV Lab Notebook 401.

    h. All measurements made on the evidence inspected will be recorded in a dedicated log book for cataloging recovered evidence.

    i. Re-packaged samples on an individual basis to provide a dry environment as necessary to preserve the as-retrieved condition and labeled with the exact same evidence number and label as the original package.

    j. Samples will be inspected to determine if there are any critical surfaces that should have extra protection against corrosion. These surfaces can be protected by putting a layer of petroleum jelly on the surface.

    k. The evidence will then be placed in secure storage either at the USCG evidence yard or DNV's evidence trailer. A logbook detailing the evidence stored in the DNV evidence trailer will be kept inside the evidence trailer at all times. Any removal of evidence from the trailer and addition of evidence to the trailer will require entry in the logbook.

150. All fluid samples will be turned over to the EPA NEIC to provide consistent handling, sample collection (especially from bulk fluid samples), and subsequent testing of the fluids. Detailed procedures and fluid sample handling and testing will be provided by EPA NEIC and appended to this Forensic Testing Plan.

151. All functioning components (e.g. solenoid valves) will be examined for their functionality.

# <u>Appendix A</u>

**Safety and Health Plan for the BOP Stack Investigation Conducted on the East Dock at the NASA Michoud Facility**

**(To Be Provided At A Later Date)**

# <u>Appendix B</u>

**Spill Containment Plan for the BOP Stack Investigation Conducted on the East Dock at the NASA Michoud Facility**

**(To Be Provided At A Later Date)**

# <u>Appendix C</u>

**Hurricane Plan for the BOP Stack Investigation Conducted on the East Dock at the NASA Michoud Facility**

**(To Be Provided At A Later Date)**

# DNV Energy

DNV Energy is a leading professional service provider in safeguarding and improving business performance, assisting energy companies along the entire value chain from concept selection through exploration, production, transportation, refining, and distribution.  Our broad expertise covers Asset Risk & Operations Management, Enterprise Risk Management; IT Risk Management; Offshore Classification; Safety, Health and Environmental Risk Management; Technology Qualification; and Verification.

## DNV Energy Regional Offices:

**Asia and Middle East**
Det Norske Veritas Sdn Bhd
24th Floor, Menara Weld
Jalan Raja Chulan
50200 Kuala Lumpur
Phone: +603 2050 2888

**North America**
Det Norske Veritas (USA), Inc.
1400 Ravello Drive
Katy, TX   77449
United States of America
Phone: +281-396-1000

**Europe and North Africa**
Det Norske Veritas Ltd
Palace House
3 Cathedral Street
London SE1 9DE
United Kingdom
Phone:  +44 20 7357 6080

**Offshore Class and Inspection**
Det Norske Veritas AS
Veritasveien 1
N-1322 Hovik
Norway
Phone: +47 67 57 99 00

**Cleaner Energy & Utilities**
Det Norske Veritas AS
Veritasveien 1
N-1322 Hovik
Norway
Phone: +47 67 57 99 00

**South America and West Africa**
Det Norske Veritas Ltda
Rua Sete de Setembro
111/12 Floor
20050006  Rio de Janeiro Brazil
Phone: +55 21 2517 7232

**Nordic and Eurasia**
Det Norske Veritas AS
Veritasveien 1
N-1322 Hovik
Norway
Phone: +47 67 57 99 00



# DET NORSKE VERITAS

## Protocol for
## Metallurgical Examination and Testing
## of Drill Pipe
### [Modification 4 of Contract M10PX00335]

**Joint Investigation Team of the
United States Department of the Interior
and the
United States Department of Homeland Security**

**Bureau of Ocean Energy
Management, Regulation and Enforcement**

DNV Reg. No.: ANEUS815NTHO (1-2SC2OV)

PRIVILEGED & CONFIDENTIAL
CLIENT - ATTORNEY WORK PRODUCT

February 3, 2011

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe



| Title:<br><br>Protocol for Metallurgical Examination and Testing of Drill Pipe [Modification 4 of Contract M10PX00335] | DNV COLUMBUS, INC.<br>Materials & Corrosion Technology Center<br>5777 Frantz Road<br>Dublin, OH 43017-1386 United States<br>Tel: (614) 761-1214<br>Fax: (614) 761-1633<br>http://www.dnv.com<br>http://www.dnvcolumbus.com |
|---|---|
| Customer: | United States Department of Interior – Bureau of Ocean Energy Management, Regulation and Enforcement |
| Customer Address: | 381 Elden Street<br>Herndon, VA  20170-4879 |
| Customer Reference: | 1-2SC2OV |
| Contact Person: | Olivia Adrian and Warren Williamson |
| | |
| DNV Reference: | ANEUS815NTHO |
| Date of Issue: | February 3, 2011 |
| Terms and Conditions: | |
| | |

| Prepared by/Contact Person:<br><br>Neil Thompson, Ph.D. | Position:<br><br>Project Manager | Signature: |
|---|---|---|
| Reviewed by:<br><br>Gary Kenney, Ph.D. | Position:<br><br>Lead Investigator | Signature: |
| Approved by:<br><br>Phillip Nidd | Position:<br><br>Deputy Project Manager | Signature: |

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe

 

MANAGING RISK

## TABLE OF CONTENTS

1   INTRODUCTION.................................................................................................. 1

2   OBJECTIVES ...................................................................................................... 1

3   SCOPE ................................................................................................................ 2

4   TEST PROTOCOL .............................................................................................. 3
    4.1  Safety, Health, and Environmental ............................................................. 3
    4.2  Evidence Control ........................................................................................ 3
    4.3  Video and Photo Documentation ................................................................ 4
    4.4  Recovery and Removal of Sections of the Work String in the Blowout
         Preventer and Riser ................................................................................... 4
    4.5  Materials Damage Evaluation ..................................................................... 4
         4.5.1 Visual and Non-Destructive Testing ................................................. 4
         4.5.2 Destructive Analysis of Work String Samples ................................. 6

5   SHIPPING AND RECEIVING OF EVIDENCE ................................................... 10
    5.1  Shipping of Evidence ................................................................................. 10
    5.2  Receipt of Evidence Samples .................................................................... 10

APPENDIX A: REMOVAL OF DRILL PIPE FROM THE RISER ........................... 13

APPENDIX B: REMOVAL OF METALLURGICAL AND MECHANICAL
    SAMPLES FROM RECOVERED PIPE SECTIONS ....................................... 19

APPENDIX C - REMOVAL OF METALLURGICAL SAMPLE FROM
    RECOVERED PIPE SECTION 1-B-1 ............................................................ 21

APPENDIX D - REMOVAL OF SHEARED DRILL PIPE ENDS FOR SECTIONS
    83 AND 94. ................................................................................................... 24

## LIST OF FIGURES

Figure 1 - Photograph of Riser showing two pieces of drill pipe at downstream end of
riser and only one piece of drill pipe at upstream end of riser...............................13
Figure 2 – Longitudinal cut on the edge of the riser.................................................15
Figure 3 – Longitudinal cut down center of riser. ....................................................16
Figure 4 – Cuts to remove riser from ends of drill pipe at 90º bend.........................17
Figure 5 – Area to cut Item No. 1-B-1......................................................................22

## LIST OF TABLES

Table 1 – Drill pipes descriptions. ...........................................................................3

Dᴇᴛ Nᴏʀsᴋᴇ Vᴇʀɪᴛᴀs

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe

MANAGING RISK



Table 2 - Location and identification of the types of samples for metallurgical and Mechanical analyses. ...............................................................................................19

Table 3 - Location and identification of the sample for metallurgical analyses for Item No. 1-B-1 ...............................................................................................................21

Table 4 - Location and identification of the sample for fracture / sheared surface analyses. ...............................................................................................................24

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe



## 1   INTRODUCTION

This is a modification to the Forensic Testing Plan to address the scope changes to include removal and analysis of the drill pipe contained within the Riser and the drill pipe removed from the Blow Out Preventer (BOP) Stack (BOP and Lower Marine Riser Package (LMRP)) as requested in the "Revised SOW 14Dec2010 - M10PX00335, Modification 4". This protocol provides an outline of the examination and test protocols recommended for the metallurgical examination and testing work.

The investigative process is an iterative process that integrates evidence collection, materials examination and damage assessment, video and photo documentation, metallurgical examination and other physical testing. In addition, as the process proceeds, the findings may dictate the sequence of steps required to balance the processes. Therefore, these protocols are meant to provide a basis for the overall forensic investigation for examining the drill pipe removed from the BOP Stack components and riser. These protocols are not meant to be a step-by-step procedure, but provide more of a roadmap with multiple paths to meeting the objectives. Any procedures that are outside of the expected paths outlined in these protocols will be submitted for approval to the Joint Investigation Team (JIT) prior to proceeding.

## 2   OBJECTIVES

This investigation will perform a physical examination and metallurgical analysis of the recovered broken and cut pieces of work string (drill pipe) from the BOP Stack and the Riser. The objectives of this investigation are:

- To determine how the recovered drill pipe were originally connected together and their position within the BOP Stack.

- To determine the metallurgical, mechanical, and chemical properties of the drill pipe and how these properties may have affected the functioning of the BOP Stack.

- To examine the sheared and cut ends of the drill pipe and other anomalies along the length of the drill pipe in order to help in establishing the sequence of events directly following the well blow out and subsequent intervention.

Examination of the recovered sections of the work string is expected to provide valuable information to support the primary investigation efforts already underway (see Contract M10PX00335). Specific focus will be put towards determining the original assembly of the work string and identifying if and how the presence of the work string in the BOP Stack and Riser and / or its metallurgical characteristics, may have contributed to the failure of the BOP Stack. All examinations will be performed with a focus on a review and understanding of the original assembly of the work string and the corresponding sequence of events that occurred in the order that the various sections were located as found in the BOP Stack and Riser.

D ET N ORSKE V ERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe


MANAGING RISK

## 3  SCOPE

The scope of the physical examination and metallurgical analysis of the work string includes the
following:

- Photo and video-documentation of the status and assembly of the work string sections as
  presently trapped within the BOP Stack and Riser.

- Manage the recovery and removal of the work string sections within the BOP Stack and
  Riser to ensure protection and control of evidence, including photo and video-
  documentation of activities as necessary.

- Perform evidence collection and control protocols for each section of work string
  recovered or any sample (liquids or scrapings) recovered during the operations.

- Examine work string and photograph and video document the general condition,
  dimensional measurements and orientation to confirm detailed positioning with respect to
  the BOP Stack and Riser.

- After removal of the work string sections from the BOP Stack and Riser, visually
  examine sections, including photo and video-documentation as necessary. Examination
  will include measurements of section dimensions and documentation of features
  observed.

- To the extent possible, reassemble the work string sections to reflect the original
  configuration of the work string and perform detailed photo and video documentation of
  all work string fracture points, deformation and / or other forms of damage.

- Inspect any work string fractures, cuts, and sheared surfaces by means of optical
  magnification; perform macro-photographic documentation of these surfaces.

- Perform microscopic examination of sections of work string recovered, including photo
  and video documentation as necessary. Where necessary to the forensic investigation,
  fractographic examinations will be performed on fracture surfaces identified during
  visual examination.

- Perform hardness measurements on the drill pipe sections in the laboratory.

- Select and remove samples from the work string sections for metallurgical analysis at the
  DNV Materials and Corrosion Technology Center in Dublin, Ohio. Perform evidence
  collection and transfer protocols as necessary for transportation of the samples to Dublin,
  Ohio.

- Perform tensile testing to establish mechanical properties of the materials.

ANEUS815NTHO
PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

Date: February 3, 2011 Revision 1.0

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe



MANAGING RISK

- Perform Charpy V-notch impact testing to establish fracture behavior.

- Perform chemical testing to establish the material composition.

- Where necessary to the forensic investigation, perform microscopic examination of surfaces and/or deposits or scale from samples.

- Compare metallurgical, mechanical, and chemical properties of the drill pipe to applicable standards and specifications.

## 4   TEST PROTOCOL

### 4.1   Safety, Health, and Environmental

This protocol will be conducted in accordance with all relevant health, safety and environmental practices as outlined in "5.1 Safety, Health, and Environmental" of **Forensic Testing Plan for the Forensic Investigation and Testing of the Blowout Preventer & Lower Marine Riser Package Ref – M10PS00234** dated October 22, 2010.

### 4.2   Evidence Control

All evidence control procedures will be followed as outlined in "5.2 Evidence Collection and Control" of **Forensic Testing Plan for the Forensic Investigation and Testing of the Blowout Preventer & Lower Marine Riser Package Ref – M10PS00234** dated October 22, 2010.

The referenced sections of drill pipe to be subjected to metallurgical examination and testing are as follows:

Table 1 – Drill pipes descriptions.

| Item No. | Length (inch) | Description of Sections of Drill Pipe |
|---|---|---|
| 39 | 137.25 | Recovered from LMRP at the Michoud Facility with top end protruding ~6-inches above upper annular |
| 83 | 111.60 | Recovered from LMRP on the Q4000 inside the flex joint with bottom end resting on upper annular |
| 84 | 7.50 | Recovered from LMRP on the Q4000 on top of the upper annular |
| 94 | 42.00 | Recovered from BOP at the Michoud Facility between the blind shear ram and casing shear ram |
| 148 | 142.25 | Recovered from BOP on the Q4000 between the casing shear ram and lower variable bore ram |
| 1-B-1 | 111.72 | Short section of pipe in Riser from the kink downstream (includes tool joint) recovered from the USCG evidence yard. |
| 1-B-2 | 30.48 | Short section of pipe in Riser from the kink upstream to intervention cut, recovered from the USCG evidence yard.. |
| 1-A-1 | 551.16 | Long section of pipe from riser recovered from the USCG evidence yard.. |

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe

 

Removal of select samples from the Michoud Facility and transportation to the DNV Materials &
Corrosion Technology Center in Dublin, Ohio will be necessary for the laboratory metallurgical
analysis. The protocols in place for transfer of evidence control on the site will be extended to
allow for transfer off the site. Chains-of-Custody documentation will be completed to release
evidence control from the Coast Guard personnel on site to DNV personnel. Samples will be
taken to Dublin, Ohio using secure transportation. Chains-of-Custody documentation will be
completed as necessary to ensure evidence control from the Michoud Facility to the DNV
Technology Center. Upon arrival at the DNV Technology Center, samples will be accepted by an
authorized DNV investigator and catalogued within the DNV Quality Assurance (QA) System.

## 4.3   Video and Photo Documentation

All video and photo documentation procedures will be followed as outlined in "5.3 Video and
Photo Documentation" of **Forensic Testing Plan for the Forensic Investigation and Testing of
the Blowout Preventer & Lower Marine Riser Package Ref – M10PS00234** dated October
22, 2010.

## 4.4   Recovery and Removal of Sections of the Work String in the Blowout Preventer and Riser

As part of the **Forensic Testing Plan for the Forensic Investigation and Testing of the
Blowout Preventer & Lower Marine Riser Package Ref – M10PS00234** dated October 22,
2010, recovery of the sections of work string in the blowout preventer were performed.

There also is drill pipe in the Riser which was connected directly above the BOP Stack. The
Riser will be cut open and the drill pipe retrieved. Detailed procedures for the removal of drill
pipe from the riser are given in Appendix A.

## 4.5   Materials Damage Evaluation

The following procedures were developed specifically for the drill pipe and based on sections
"5.13 Materials Testing and Damage Evaluation and 5.14 Cataloging and Examination of
Recovered Evidence" of **Forensic Testing Plan for the Forensic Investigation and Testing of
the Blowout Preventer & Lower Marine Riser Package Ref – M10PS00234** dated October
22, 2010.

### 4.5.1   Visual and Non-Destructive Testing

1. All evidence will be photographed at each step of the evaluation process; prior to and following collection of surface samples, cleaning, and inspection.
2. Photograph the evidence in the as-received condition.
3. Inspect and make a decision on whether to collect any loose particles, scale, deposits, etc.
4. Collect samples of any loose particles, scale, deposits using a scalpel with an uncontaminated blade and each sample shall be placed in a separate, clean, self-

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe



MANAGING RISK

sealing sample bag. All samples shall be entered into evidence. A map of the sample locations shall be produced and supported by high resolution photographs.

5. Clean pipe surfaces using water, detergent and a soft bristle brush.

6. The evidence will be photographed after cleaning.

7. Samples will be inspected to determine if there are any critical surfaces that should have extra protection against corrosion. These surfaces can be protected by putting a layer of petroleum jelly or light oil on the surface.

8. The length of each section of evidence and locations of any identifying marks, welds, etc. shall be measured and recorded. The diameter, wall thickness and circumference of each evidence section shall be measured at several locations along the length of the evidence.
   a. Mark a longitudinal line on the sample external surface.
   b. Mark parallel circumferential lines 12-inches apart on the external surface normal to the longitudinal datum.
   c. Measure the pipe circumference at each of the 12-inch positions.
   d. Measure the distances of the fracture surfaces from the nearest circumferential line.
   e. All recordings shall be mapped in accordance with each sample measurement and the corresponding location on each pipe section; all data shall be recorded by written record with supporting high resolution photographs.

9. Characterize damage and anomalies of a dimensional nature (length, width, depth) by tape, ruler, calipers, micrometer gauge or pit depth gauge, as appropriate. Locate and orient features relative to a reference location on the section (that is from a specified end, joint, or other significant feature).

10. Characterize crack defects and anomalies away from sheared surfaces and those associated with sheared surfaces.
    a. For those crack defects away from sheared surfaces; Non-Destructive Examination (NDE) methods such as magnetic particle inspection or dye penetrant testing may be applicable. In addition, simple grinding away of the crack to measure depth can be effective. The method used will depend on the cracks observed and the component configuration where cracks are identified. An NDE certified inspector (certified with the specific tools that will be used) will be used if cracks are identified.
    b. For those cracks associated with sheared surfaces, characterize length and width of crack and crack location with respect to sheared surface (laser profilometer is one such method).

11. NDE testing will be performed wherever possible to minimize the need for disassembly or destructive testing.

12. Characterize the inside of the drill pipe using a borescope.

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe




13.  Based on information collected, lay out the drill pipe sections in their relative positions with respect to where they were collected in order to establish the overall pattern of damage. Fracture, sheared, cut surfaces MUST NOT be placed into contact with each other. All data shall be recorded by written record with supporting high resolution photographs. A drawing of the pieces should be made showing the orientation and location of the individual pieces.

14. Inspect all fracture surfaces and adjacent material using hand-held magnifying lenses and, where possible, a stereoscopic microscope at up to X50 magnification.

15. Map the fracture morphology (laser scanning profilometer can be used). The fracture surfaces can be cleaned with a soft bristle brush and water with a non-abrasive detergent to see any details on the fracture surface.

16. Field-microscopic examination can be performed on various surfaces of sections of work string recovered from the BOP Stack and Riser as needed. The surfaces selected for detailed examination will be based largely on damage identified during the visual examination. These examinations will be photo-documented. In addition to a field stereo microscope, laser scanning profilometer will be used to characterize sheared surfaces from each end of the pipe sections.

## 4.5.2   Destructive Analysis of Work String Samples

A detailed metallurgical analysis of the sections of work string recovered from the BOP Stack and Riser requires that destructive analysis techniques be used. Destructive analyses are necessary to verify the microstructural morphology of the work string materials and to accurately measure mechanical and chemical properties of the work string materials. Given that materials can vary in strength from sample to sample, it is important to the overall investigation to establish the specific material properties of each of the drill string's components.

In order for the destructive analysis to be performed, it is essential that all necessary non-destructive analysis be complete before any samples are removed. For this phase of the work, samples will be transported to the DNV Materials & Corrosion Technology Center in Dublin, Ohio. Evidence tracking protocols will be followed as necessary, as described above.

### 4.5.2.1   Hardness Measurements

Work string components removed for metallurgical testing will be subjected to material hardness tests.

### 4.5.2.2   Metallographic Analysis

Representative coupons from the drill pipe recovered from the BOP Stack and Riser will be examined for metallographic analysis. The metallurgical ring samples will consist of a 3-inch full circumference cut-out of each drill pipe section. In general, the metallurgical ring samples will be cut from the center of the drill pipe sections away from the sheared surfaces and other damage noted on the drill pipe sections (See Appendices B and C). In addition, borescope viewing of the

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe

 MANAGING RISK DNV

internal surfaces of the drill pipe sections will be performed to make sure that removing the test coupons does not compromise any areas of internal damage that may be of interest to the investigation.

17. Metallographic ring samples will be taken from areas of each drill pipe section from a central location away from the sheared or cut ends and away from any significant damage.
    a. Drill pipe Item Nos. 39, 83, 94, 148, 1-B-2, and 1-A-1 will have metallurgical coupons removed for analysis. No metallurgical ring sample of Item 84 will be tested due to the short length of Item 84 and due to the fact that its attachment to Item 83 can be well established. See Appendix B for locations of 3-inch metallurgical ring samples and Appendix C for location of the one-inch metallurgical ring sample for Item No. 1-B-1.
    b. Cut full circumferential metallurgical ring samples from each of the drill pipe sections.
        i. Use a portable band saw, circular saw with cut-off blade for steel, or an abrasive cut-off blade.
        ii. Make cuts slow to minimize over heating.
    c. Enter the metallurgical ring samples into the evidence log
    d. Ship metallurgical ring samples to DNV Columbus' Technology Center laboratory in Dublin Ohio for Metallurgical Testing.
18. From each 3-inch ring sample, cut ¾-inch metallurgical coupon full circumferential ring from end of 3-inch ring for transverse-section metallurgical analysis.
    a. Use fluid cooled band saw to make cut.
    b. Mount metallurgical coupons to analyze fresh cut surface.
19. From the remaining material from each 3-inch ring sample, cut a longitudinal section approximately ¾-inch wide for longitudinal-section metallurgical analysis.
    a. Use fluid cooled band saw to make cut.
20. Mount metallurgical coupons (transverse-section and longitudinal sections) in epoxy, grind, and polish the mounted sections with successively finer grits to a final polish of 1 micron diamond paste.
21. View the metallurgical sections in the as-polished condition using an optical microscope and document the appearance as needed with digital photo-micrographs.
22. Document the extent of wall loss and/or other visible anomalies, if any, of the metallurgical sections.
23. Etch the polished metallurgical section coupons using an appropriate etching agent (for example Nital for carbon steel). View the coupons in the as-etched condition using an optical microscope and document the microstructural appearance with digital photomicrographs.

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe



24. Record micro-hardness profiles at appropriate locations and orientations. Knoop micro-hardness (ASTM E384) traverses of the base metal will be recorded from the metallographic cross-section coupons, by taking measurements perpendicular to the ID/OD surface.
25. Data collected will be placed in the laboratory notebook. This data will later be entered into the electronic database.
26. Compare metallurgical property data to applicable standards and specifications for drill pipe.

### 4.5.2.3 Mechanical Analysis

Tensile test samples will be machined from selected sections of drill pipe recovered. The mechanical test coupon for mechanical analyses (tensile and impact tests) will consist an 18-inch long full circumference cut-out of the drill pipe sections. The mechanical test coupon will be cut from the center of the drill pipe sections away from the sheared surfaces and other damage noted on the drill pipe sections. In addition, borescope viewing of the internal surfaces of the drill pipe sections will be performed to make sure that removing the test coupons does not compromise any areas of internal damage that may be of interest to the investigation. Mechanical test coupons are not expected to be taken from each drill pipe section. The drill pipe sections to be tested for mechanical properties will be selected following removal and initial inspection of all of the drill pipe sections. Appendix B details the locations from which mechanical test coupons will be removed.

27. Mechanical test coupons will be taken from areas of selected drill pipe sections from a central location away from the sheared or cut ends and away from any significant damage (see Appendix B).
    a. Two or three drill pipe sections will be selected to remove coupons for mechanical property testing.
    b. Cut full circumferential ring coupons, 18-inch in length from each of the selected drill pipe sections.
        i. Utilize a circular saw with cut-off blade for steel or an abrasive cut-off blade.
        ii. Make cuts slow to minimize over heating.
    c. Enter the ring coupons into the evidence log
    d. Ship ring coupon to DNV Columbus' Technology Center laboratory in Dublin Ohio for Metallurgical Testing.
28. From each 18-inch ring sample, appropriate mechanical test specimens will be machined.
29. Tensile testing to be conducted according to ASTM A370.
    a. Dog-bone shaped tensile test specimens will be prepared from the axial direction of the pipe.

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe



MANAGING RISK

    b.  Stress-strain curves will be determined and the yield strength and ultimate tensile strength, and elongation will be determined.

30. Charpy V-notch testing to be conducted according to ASTM E23.

    a.  Sub-sized Charpy – V notch (CVN) impact specimens will be machined from the drill pipe samples.

    b.  Full CVN curves (approximately 6 notched bar specimens per curve) will be determined.

    c.  Notch orientation for CVN specimens.

        i.  Axially direction specimens – through wall notch (crack propagation in transverse direction)

    d.  Data collected will be placed in the laboratory notebook.  This data will later be entered into the electronic database.

31. Compare mechanical property data to applicable standards and specifications for drill pipe.


## 4.5.2.4   Chemical Analysis of Drill Pipe

32. Chemical composition coupons will be taken from remaining metal for each 3-inch ring coupon.

33. Photo-documentation will be done to show where samples were taken from the 3-inch ring coupon.

34. Bulk chemical composition will be measured using optical emission spectroscopy (OES) analysis per ASTM E415.

35. Data collected will be placed in the laboratory notebook. This data will later be entered into the electronic database.

36. Compare chemical property data to applicable standards and specifications for drill pipe.


## 4.5.2.5   Chemical Analysis of Deposits

37. Samples of loose particles, scale, surface deposits, etc. can be analyzed to establish their chemical composition by the following methods:

    a.  SEM using x-ray Energy Dispersive Spectroscopy (EDS) techniques can be performed in order to establish the elemental composition.

    b.  X-ray diffraction (XRD) can be performed to determine the structure of any crystalline compounds.

    c.  MIC indicator kits can be inoculated to determine the likelihood for microbiological activity.


## 4.5.2.6   Analysis of Fracture / Sheared Pipe Ends

38. Samples from four of the pipe section ends selected for analysis of their fracture / sheared surfaces (see Appendix D). Analyses will include:

PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT

DET NORSKE VERITAS

United States Department of Interior
Protocol for Metallurgical Examination and Testing of Drill Pipe


MANAGING RISK

a.  SEM to examine surface features.
b.  EDS to examine semi-quantitative surface chemistries.

### 4.5.2.7   Scanning Electron Microscopy (SEM)

39. Samples selected from metallographic coupons, deposit/scale samples, and samples of debris will be considered for examination using SEM and EDS. Samples will be prepared on a case-by-case basis depending on type  of sample to be tested.

## 5   SHIPPING AND RECEIVING OF EVIDENCE

### 5.1   Shipping of Evidence

40. Samples are to be packed in well-marked containers of sufficient strength to protect the specimens from damage during shipment.
41. Containers are to be filled with foam particles or other approved insulating and protective material to limit movement of the evidence samples within the container and to provide maximum protection in case of shipping incidents.
42. A completed CHAIN OF CUSTODY FORM is to be placed inside each shipping container and the contents of each container is to be photo-documented prior to secure sealing of the container for shipping.
43. Shipping is to be managed and facilitated by Site personnel. The Evidence Controller will provide completed CHAIN OF CUSTODY FORM(S) along with the Master Shipping List summary of all evidence samples.
44. Photo-document the CHAIN OF CUSTODY FORM(S).
45. In the event that a CHAIN OF CUSTODY FORM is unavailable, a form should be made that includes:
   a.  Originating Location.  Identify the person that is responsible for the logistics for getting the material transported.
   b.  Authorization for Transmittal.  Similar to originating location item, but may also be directed by management and/or counsel.
   c.  Itemized Description.  List each sample provided.  Provide a picture of the materials prior to transport, if possible.
   d.  Transporter.  Identify the transporter.
   e.  Destination Location.  Identify the contact person receiving the items.
   f.  Signatures.  The form should be signed by the person responsible for transporting the samples and the person responsible for receiving the samples.

### 5.2   Receipt of Evidence Samples

46. Evidence samples are to be received in accordance with the following.
   a.  The Recipient shall complete a thorough review of the commercial shipping invoice, documentation and packing list and account for all item

ANEUS815NTHO
PRIVILEGED & CONFIDENTIAL: CLIENT – ATTORNEY WORK PRODUCT


package containers defined in the shipping documentation when accepting delivery.

b.  The Recipient shall perform an itemized inventory of all samples against the Master Shipping List to verify the sample identification and physical condition after shipping.

c.  Photo-documentation should be done by the recipient of all samples received while they are still in their containers.  Video-documentation should also be done if possible.

d.  The Recipient shall complete and sign the attached CHAIN OF CUSTODY FORMs, validating the accurate inventory of all evidence samples received.

e.  The Recipient shall forward copies of the completed CHAIN OF CUSTODY FORM for receipt of samples to Sender. Completed CHAIN OF CUSTODY FORMs validating the samples inventory are to be forwarded upon re-shipment of sample(s).

f.  Samples shall be logged into the laboratory log sample book.  Each sample will be given a laboratory reference identification number.   This information will be entered into the electronic database.

# <u>APPENDIX A</u>

## REMOVAL OF DRILL PIPE FROM THE RISER

## APPENDIX A: REMOVAL OF DRILL PIPE FROM THE RISER

Two sections of drill pipe are trapped within a section of the Riser that was connected to the Flex Joint located on top of the LMRP. A part of determining whether the BOP functioned or not will be to try and match the drill pipe recovered from the LMRP and BOP to each other as well as to the sections of pipe that are currently within the Riser.



Riser with one piece of drill pipe

Riser with two pieces of drill pipe



Figure 1 - Photograph of Riser showing two pieces of drill pipe at downstream end of riser and only one piece of drill pipe at upstream end of riser.

A 'window' has already been cut into the side of the Riser to expose the pipe trapped inside. To complete the investigations there is a need to remove the sections of pipe within the Riser and to examine the various failure surfaces on that drill pipe as a means to determine if they match to failure surfaces seen in the drill pipe removed from the LMRP and BOP.

The collapse of the riser along this approximately 30 foot section is almost complete trapping the pipe along its entire length. To retrieve the drill pipe from inside will likely require the Riser to be cut open.

1. The internal surfaces will be examined using a borescope to identify any internal features that may prevent performing the cutting operations as planned. Also to be sure that the planned cutting operations will produce minimal damage to the drill pipe.
2. Adjust cutting plan to account for borescope findings.

3. Clearly mark the riser as to the cuts to be made (see Figure 2, Figure 3, and Figure 4)
4. All cuts will be made with a plasma torch.
5. The first longitudinal cut will be down the middle on the riser top surface from the cut-out nearest the buckle end of the riser down to the flange (see Figure 3).
6. Eyelets will be welded to the top piece of the riser to permit attachment for lifting.
7. The second longitudinal cut will be down the edge of the riser the length of the drill pipe from the cut-out nearest the buckle end of the riser down to the flange (see Figure 2). This cut must be performed carefully to produce a vertical angle directing any metal splatter from the cutting operation to the far side of the internal riser surface and away from the drill pipe.
8. Cut the riser at the 90° buckle and downstream to remove the top (as positioned in the evidence yard) of the riser (see Figure 4).
9. Remove the short piece of drill pipe from the buckle portion of the riser.
10. Remove the long piece of drill pipe from riser by carefully pulling the drill pipe out of the flanged (upstream) portion of the riser (portion not cut).



Figure 2 – Longitudinal cut on the edge of the riser.



Figure 3 – Longitudinal cut down center of riser.



Figure 4 – Cuts to remove riser from ends of drill pipe at 90$^o$ bend.

# APPENDIX B

**REMOVAL OF METALLURGICAL AND MECHANICAL SAMPLES FROM RECOVERED PIPE SECTIONS**

## APPENDIX B: REMOVAL OF METALLURGICAL AND MECHANICAL SAMPLES FROM RECOVERED PIPE SECTIONS

Metallurgical analysis will be conducted on select pipe sections recovered during the forensic analysis. In total, seven sections of drill pipe were recovered.  Metallurgical ring samples will be cut from six of the recovered pipe section. Table 2 details the locations of the samples that will be removed from the various drill pipe sections. Metallurgical sample are in general removed from the center portion of the pipe unless noted in Table 2. Mechanical ring samples (18 inches in length) will be taken from Items No. 83 and 39 (dimensions included in Table 2).

Table 2 - Location and identification of the types of samples for metallurgical and Mechanical analyses.

| Item Number | Length inches | Samples to be removed for metallurgical analyses[1] | Distance from the Downstream end of the pipe section (inches) |
|---|---|---|---|
| 148 [2] | 142.25 | M,C | 114.84 to 117.84 |
| 94 | 42.00 | M,C | 19.25 to 22.25 |
| 83 | 111.60 | M, C, TC | 41.75 to 63.75 |
| 1-B-2[3] | 30.48 | M,C | 15.60 to 18.60 |
| 39 | 137.25 | M, C, TC | 59.19 to 81.19 |
| 1-A-1 | 551.26 | M, C | 341.28 to 344.28 |

(1) M = Metallurgical Samples, C = Chemistry Samples, TC = Tensile and Charpy Samples (Mechanicals)
(2) Sample will be taken toward the end, adjacent to debris to be recovered in the drill pipe.
(3) Sample will be removed toward the end to be away from undeformed end.

Transverse cuts at the locations identified in Table 2 will be completed to remove the necessary samples for metallurgical and mechanical examinations. The internal surfaces of the pipe sections have been examined with a borescope to confirm that the internal surfaces are devoid of any internal features. The parts to be cut have been clearly marked on the external surface of the pipe section. All cuts will be made with a portable band saw (dry cut) or circular saw.

# APPENDIX C

## REMOVAL OF METALLURGICAL SAMPLE FROM RECOVERED PIPE SECTION 1-B-1

# APPENDIX C - REMOVAL OF METALLURGICAL SAMPLE FROM RECOVERED PIPE SECTION 1-B-1

Because of the constraints posed by the fracture / sheared surface and the corresponding friction weld at the pipe joint, a one-inch metallurgical ring sample (as opposed to typical 3-inch sample) will be selected for the downstream end of Item No. 1-B-1 (Table 3). Figure 5 shows the location on Item No. 1-B-1 from which the one-inch metallurgical sample will be removed.

Table 3 - Location and identification of the sample for metallurgical analyses for Item No. 1-B-1 .

| Item Number | Length inches | Samples to be removed for metallurgical analyses[1] | Distance from the Downstream end of the pipe section (inches) |
|---|---|---|---|
| 1-B-1 | 111.72 | M, C | 5.5 to 6.5 |

(1) M = Metallurgical Samples, C = Chemistry Samples, TC = Tensile and Charpy Samples (Mechanicals)

Transverse cuts at the locations identified in Table 3 will be completed to remove the one-inch sample for metallurgical examinations. The internal surfaces of the pipe sections have been examined to confirm that the internal surfaces are devoid of any internal features. The parts to be cut have been clearly marked on the external surface of the pipe section. Cuts will be made with a portable band saw (dry cut) or circular saw.



**Expand**



Figure 5 – Area to cut Item No. 1-B-1.

# APPENDIX D

## REMOVAL OF SHEARED DRILL PIPE ENDS FOR SECTIONS 83 AND 94.

# APPENDIX D - REMOVAL OF SHEARED DRILL PIPE ENDS FOR SECTIONS 83 AND 94.

Four fracture / sheared surfaces will be cut from the ends of Item Nos. 94 (downstream end), 83 (upstream end), 1-B-1 (downstream end), and 39 (upstream end). See Table 4 for details. No new cuts are required for Item No. 1-B-1 because the metallurgical cut (see Appendix C) is near the fracture / sheared surface.

Table 4 - Location and identification of the sample for fracture / sheared surface analyses.

| Item Number | Length inches | Samples to be removed for fracture surface examination | Distance from the end of the pipe section (inches) |
|---|---|---|---|
| 94 | 41.76 | Downstream End | 4" from nearest fracture feature |
| 83 | 111.60 | Upstream End | 4" from nearest fracture feature |
| 39 | 137.25 | Upstream End | 4" from nearest fracture feature |
| 1-B-1 | 111.72 | Downstream End | Remaining section from metallurgical sample cut (Table 3) |

Transverse cuts at the locations identified in Table 4 will be completed to remove the selected fracture / sheared ends of the pipes. The internal surfaces of the pipe sections have been examined to confirm that the internal surfaces are devoid of any internal features. The parts to be cut have been clearly marked on the external surface of the pipe section. Cuts will be made with a portable band saw (dry cut) or circular saw.

# DNV Energy

DNV Energy is a leading professional service provider in safeguarding and improving business performance, assisting energy companies along the entire value chain from concept selection through exploration, production, transportation, refining, and distribution.  Our broad expertise covers Asset Risk & Operations Management, Enterprise Risk Management; IT Risk Management; Offshore Classification; Safety, Health and Environmental Risk Management; Technology Qualification; and Verification.

## DNV Energy Regional Offices:

**Asia and Middle East**
Det Norske Veritas Sdn Bhd
24th Floor, Menara Weld
Jalan Raja Chulan
50200 Kuala Lumpur
Phone: +603 2050 2888

**North America**
Det Norske Veritas (USA), Inc.
1400 Ravello Drive
Katy, TX   77449
United States of America
Phone: +281-396-1000

**Europe and North Africa**
Det Norske Veritas Ltd
Palace House
3 Cathedral Street
London SE1 9DE
United Kingdom
Phone:  +44 20 7357 6080

**Offshore Class and Inspection**
Det Norske Veritas AS
Veritasveien 1
N-1322 Hovik
Norway
Phone: +47 67 57 99 00

**Cleaner Energy & Utilities**
Det Norske Veritas AS
Veritasveien 1
N-1322 Hovik
Norway
Phone: +47 67 57 99 00

**South America and West Africa**
Det Norske Veritas Ltda
Rua Sete de Setembro
111/12 Floor
20050006  Rio de Janeiro Brazil
Phone: +55 21 2517 7232

**Nordic and Eurasia**
Det Norske Veritas AS
Veritasveien 1
N-1322 Hovik
Norway
Phone: +47 67 57 99 00



DET NORSKE VERITAS
DNV

TEST PROCEDURE
METALLURGICAL INVESTIGATION
OF DRILL PIPE

BOP
FORENSIC INVESTIGATION

# TEST PROCEDURE

# FRACTURED / SHEARED RECOVERED DRILL PIPE ENDS

## OVERVIEW

Four fractured / sheared surfaces were cut from the ends of Item Nos. 94 (downstream end), 83 (upstream end), 1-B-1 (downstream end), and 39 (upstream end). See Table 1 for details. Items 94 (downstream end) and 83 (upstream end) are suspected to be mating surfaces as are Items 1-B-1 (downstream end), and 39 (upstream end).

**Table 1 - Location and identification of the sample for fracture / sheared surface analyses.**

| Item Number | Length inches | Samples removed for fracture surface examination | Distance from the end of the pipe section (inches) |
|---|---|---|---|
| 94 | 41.76 | Downstream End | 4" from nearest fracture feature |
| 83 | 111.60 | Upstream End | 4" from nearest fracture feature |
| 39 | 137.25 | Upstream End | 4" from nearest fracture feature |
| 1-B-1 | 111.72 | Downstream End | Remaining section from metallurgical sample cut |

## PURPOSE

The purpose of this testing is to establish the likelihood of the fractured / sheared surfaces being mating surfaces as suggested above.

## TESTING

The examination of the fractured / sheared pipe ends will be performed following the procedures provided below. As the examination progresses, additional items for examination may be identified. These will be discussed with the parties participating in the investigation and approval from the JIT will be requested where appropriate.

1. Photograph Items 94, 83, 39, and 1-B-1 in detail to clearly describe the fractured or sheared surfaces. Attention will be given to the following:

   a. Ends and surfaces that are curled into the ID of the pipe.

   b. Wear / erosion markings.



DET NORSKE VERITAS          TEST PROCEDURE                    BOP
      DNV              METALLURGICAL INVESTIGATION      FORENSIC INVESTIGATION
                              OF DRILL PIPE

2. Examine surfaces using a stereo microscope where appropriate.

3. Cut Item 83-Z to reveal the surfaces that are curled into the ID of the pipe (see Figure 1 and **Error! Not a valid bookmark self-reference.**).

4. Examine and photograph the cut surfaces from both sides of the pipe section Item 83-Z.

5. Cut fracture surface area from Item 1-B-1-Z (see Figure 3 and Figure 4).

6. Prepare cut pieces for insertion into the Scanning Electron Microscope (SEM). This applies to samples cut from both sides of the pipe section Item 83-Z and Item 1-B-1-Z.

   a. The height of the sample is critical for fitting into the SEM.

   b. A second cut for Item 83-Z will likely be required to maintain a maximum height of approximately 0.5-inches. This cut will be made following examination after the initial cuts on both sides of the pipe.

   c. It is expected that the total length of the cut sample will fit into the SEM, but this will be evaluated following the previous cuts.

7. Examine the surfaces in the SEM.

   a. General features of surfaces.

   b. Perform Energy Dispersive Spectroscopy (EDS) on surfaces of interest.



DET NORSKE VERITAS
DNV

TEST PROCEDURE
METALLURGICAL INVESTIGATION
OF DRILL PIPE

BOP
FORENSIC INVESTIGATION



**Figure 1 – Documentation of the proposed cut on Item 83 on the side without the "flat"**



DET NORSKE VERITAS
DNV

TEST PROCEDURE
METALLURGICAL INVESTIGATION
OF DRILL PIPE

BOP
FORENSIC INVESTIGATION



Figure 2 - Documentation of the proposed cut on Item 83 on the side with the "flat"

PRIVILEGED & CONFIDENTIAL – CLIENT ATTORNEY WORK PRODUCT

 DET NORSKE VERITAS
DNV

TEST PROCEDURE
METALLURGICAL INVESTIGATION
OF DRILL PIPE

BOP
FORENSIC INVESTIGATION



**Figure 3 – Top view of Item 1-B-1-Z**

PRIVILEGED & CONFIDENTIAL – CLIENT ATTORNEY WORK PRODUCT

 DET NORSKE VERITAS
DNV

TEST PROCEDURE
METALLURGICAL INVESTIGATION
OF DRILL PIPE

BOP
FORENSIC INVESTIGATION



**Figure 4 – Area to be cut from Item 1-B-1-Z.**

PRIVILEGED & CONFIDENTIAL – CLIENT ATTORNEY WORK PRODUCT

Dᴇᴛ Nᴏʀsᴋᴇ Vᴇʀɪᴛᴀs
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume II Appendices



# APPENDIX B

# SCANNED DRAWINGS



FOIA Exempt: Trade Secret and/or Confidential Business Information - Confidential Treatment Requested

TRN-USCG_MMS-00042587



YELLOW POD MUX CABLE CUT AT POD AND ABOVE LMRP FOR POD REMOVAL PICT. 2404 - 2417

BLUE POD MUX CABLE CUT AT POD AND ABOVE LMRP FOR POD REMOVAL PICT 2404 - 2417

YELLOW POD SUPPLY HOSE CUT AT POD FOR POD REMOVAL PICT. 2387 - 2393

HOSE EN 856 | R13 |3B | 1001

BLUE POD SUPPLY HARD PIPE CUT AND HOSE REMOVED FOR POD REMOVAL PICT 2394 - 2400

YL SHUTTLE VALVE ARRANGEMENT TUBING CUT FROM DEADMAN, ACCUM. DUMP, RIGID CONDUIT FLUSH, RIGID CONDUIT ISOLATOR, LMRP ACCUM. CHARGE FOR ROV INTERVENTION PICT 2508 - 2516

4 X 60 GAL. ACCUMULATORS

LMRP ACC DUMP

HOTLINE

DEADMAN SYSTEM

CONDUIT

YELLOW POD

BLUE POD

CONFIDENTIAL

R & B FALCON Deepwater Horizon

4/23/2010 1:45:52 PM  SAP-CORONADOR  SK-122124-21-05.001.000.000.080.CURRENT.CCP100.TIF

STACK FLOW DIAGRAM

CAMERON CONTROLS

FOIA Exempt: Trade Secret and/or Confidential Business Information - Confidential Treatment Requested

TRN-USCG  MMS-00042588

MODIFICATIONS



YELLOW POD MUX CABLE CUT AT POD AND ABOVE LMRP FOR POD REMOVAL ATA ARMOR TERMINATION ASSY. ADDED PICT 2404- 2417

BLUE POD MUX CABLE CUT AT POD AND ABOVE LMRP FOR POD REMOVAL ATA ARMOR TERMINATION ASSY. ADDED. PICT 2404- 2417

ORIGINAL DEADMAN PANEL REMOVED FOR MODIFICATIONS MADE TO SYSTEM

YU SHUTTLE VALVE ARRANGEMENT TUBING CUT FROM DEADMAN. ACCUM. DUMP. RIGID CONDUIT FLUSH. RIGID CONDUIT ISOLATOR. LMRP ACCUM. CHARGE
PICT 2508-2516 MODIFICATION

R & B FALCON
"DEEPWATER HORIZON"

STACK FLOW DIAGRAM



MISS RAM LOCKS (ST LOCK) FEMALE RECEPTACLE
DUE TO MODIFICATION. DATE UNKNOWN
PICT. 2199

HOSE REMOVED TO
REMOVE FUNCTION
MODIFICATION
PICT 2237-2283

HOSE REMOVED TO
REMOVE FUNCTION
MODIFICATION
PICT. 2237-228



DET NORSKE VERITAS
United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Volume II Appendices

# APPENDIX C

# DOCUMENTS REVIEWED



# DOCUMENTS REVIEWED

| Document Reference Number | Document Title/ Description |
|---|---|
| 1. | BOP Schematics – Flow Diagrams: Shear Ram Kit (TRN-USCG_MMS-00013703) |
| 2. | BOP Schematics – Flow Diagrams: Stack Flow Diagram (TRN-USCG_MMS-00013704) |
| 3. | BOP Schematics – Flow Diagrams: Stack Flow Diagram (TRN-USCG_MMS-00013705) |
| 4. | BOP Schematics – Flow Diagrams: Stack Flow Diagram (TRN-USCG_MMS-00013706) |
| 5. | BOP Schematics – Flow Diagrams: Final Assembly (TRN-USCG_MMS-00014355 - 00014358) |
| 6. | Cameron Subpoena Files (Jul 6 2010): Engineering Report (CAMCG 00003071 – 00003086) |
| 7. | Cameron Subpoena Files (Jul 6 2010): Product Advisory #1005 – Variable Bore Ram Assembly (CAMCG 00003087 – 00003176) |
| 8. | Cameron Subpoena Files (Jul 6 2010): Engineering Errata Sheet: Stripping Recommendations (CAMCG 00003177 – 00003277) |
| 9. | Cameron Subpoena Files (Jul 6 2010): Sequence Valve On Site Inspection Procedure (CAMCG 00003278 – 00003355) |
| 10. | Cameron Subpoena Files (Jul 6 2010): Field Service Order (CAMCG 00003356 – 00003390) |
| 11. | Cameron Subpoena Files: Deep Water Horizon TL BOP Stack Operation and Maintenance Manual (CAMCG 00000001 – 00000235) |
| 12. | Cameron Subpoena Files: Multiplex BOP Control System Vol. I (CAMCG 00000236 – 00000645) |
| 13. | Cameron Subpoena Files: Multiplex BOP Control System Vol. II (CAMCG 00000646 – 00000919) |
| 14. | Cameron Subpoena Files: Multiplex BOP Control System Vol. III (CAMCG 00000920 – 00001123) |
| 15. | Cameron Subpoena Files: Multiplex BOP Control System Vol. IV (CAMCG 00001124 – 00001427) |
| 16. | Cameron Subpoena Files: Multiplex BOP Control System Vol. V (CAMCG 00001428 – 00001620) |
| 17. | Cameron Subpoena Files: Multiplex BOP Control System Vol. VI (CAMCG 00001621 – 00001761) |
| 18. | Cameron Subpoena Files: Multiplex BOP Control System Vol. VII (CAMCG 00001762 – 00002174) |
| 19. | Cameron Subpoena Files: Multiplex BOP Control System Vol. VIII (CAMCG 00002175 – 00002842) |
| 20. | Cameron Subpoena Files: R&B Falcon Drilling Co. PO: BOP Stack Test System (CAMCG 00002843 – 00002989) |

DET NORSKE VERITAS

United States Department of the Interior, Bureau of Ocean Energy
Management, Regulation, and Enforcement
Forensic Examination of Deepwater Horizon Blowout Preventer
Appendix C Documents Reviewed



MANAGING RISK

| Document Reference Number | Document Title/ Description |
|---|---|
| 21. | Cameron Subpoena Files: Assembly Drawing Driller Control Panel (CAMCG 00003025 – 00003070) |
| 22. | Cameron Subpoena Files: Beck, Redden & Secrest Letter (Cameron) – June 25, 2010 |
| 23. | Drawings – Schematics: BOP Detail Drawing |
| 24. | Drawings – Schematics: BOP Subsea Stack drawing |
| 25. | Drawings – Schematics: Horizon BOP Schematic |
| 26. | Drawings – Schematics: BOP Detail Drawing Rev. 4 |
| 27. | Modifications: Amended Response to June 25, 2010 (TRN-USCG_MMS-0039812 – 0039813) |
| 28. | Reference Documents: API RP 53: Recommended Practices for Blow Out Prevention Equipment Systems for Drilling Wells |
| 29. | Reference Documents: API Spec 16D: Specification for Control Systems for Drilling Well Control Equipment and Control Systems for Diverter Equipment |
| 30. | Regulations: 30 CFR § 250 |
| 31. | Secondary Control Info: Notice to Lessees & Operators – Accidental Disconnect of Marine Drilling Risers (June 1, 2009 – May 31, 2014) |
| 32. | Secondary Control Info: Blowout Preventer Back-up Control Systems – Acoustic Systems |
| 33. | Secondary Control Info: MMS Safety Alert – Marine Riser Failure (April 7, 2003) |
| 34. | Slides – Presentation: General Stack Illustrations with Labels (2 copies in file) |
| 35. | Transocean Files – EDS: Emergency Disconnect Activation General Considerations (TRN-USCG_MMS 00013684) |
| 36. | Transocean Files – EDS: Cementing (Hanger Landed in Wellhead) (TRN-USCG_MMS 00013685) |
| 37. | Transocean Files – EDS: Emergency Disconnect Activation Tripping (Drill Pipe in BOP) (TRN-USCG_MMS 00013687) |
| 38. | Transocean Files – EDS: Emergency Disconnect Activation Logging with Wireline (TRN-USCG_MMS 00013689) |
| 39. | Transocean Files – EDS: Emergency Disconnect Procedure General (TRN-USCG_MMS 00013690) |
| 40. | Transocean Files – EDS: Emergency Disconnect Sequences (TRN-USCG_MMS 00013695) |
| 41. | Transocean Files – EDS: Emergency Disconnect Activation Cementing (Setting Plugs) (TRN-USCG_MMS 00013696) |
| 42. | Transocean Files – EDS: Emergency Disconnect Activation Well Control (TRN-USCG_MMS 00013698) |
| 43. | Transocean Files – EDS: Emergency Disconnect Activation Well Testing (TRN-USCG_MMS 00013700) |