## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| R. JACK STRAIN, IN HIS OFFICIAL CAPACITY AS SHERIFF, ST. TAMMANY PARISH | MDL No. 2179 |
| Plaintiff, | |
| v. | SECTION: J |
| BP EXPLORATION & PRODUCTION INC.; BP AMERICA PRODUCTION COMPANY; BP P.L.C.; TRANSOCEAN LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN HOLDINGS, LLC.; HALLIBURTON ENERGY SERVICES, INC.; AND SPERRY DRILLING SERVICES, A DIVISION OF HALLIBURTON ENERGY SERVICES, INC. | JUDGE BARBIER

MAGISTRATE SUSHAN |
| Defendants. | |

## COMPLAINT FOR DAMAGES

### Rule 9 (h)

**NOW COMES PLAINTIFF**, *R. Jack Strain, in his official capacity as Sheriff, St. Tammany Parish*, through undersigned counsel, who does respectfully allege, aver and represent as follows:

### Introduction

On April 20, 2010, a well blowout on the oil rig *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating

- 1 -

environmental disaster in the history of the United States.  The uncontrolled blowout caused explosions and a raging fire aboard the *Deepwater Horizon*;  after burning for two days, the rig sank, commencing an oil spill of unprecedented proportion that interfered with, damaged, depleted, and destroyed offshore, marine and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (the "Spill").  As a direct and foreseeable result of the Spill and its devastating impact on the marine and coastal environments, the oil and gas exploration, production and associated activities in the Gulf of Mexico were significantly interrupted, resulting in economic losses to Plaintiff and other entities and employees similarly situated.  This Complaint asserts claims under the Oil Pollution Act of 1990 ("OPA"), seeking damages arising from the Spill and its environmental devastation and/or the General Maritime Law.

## PARTIES

### A.    Plaintiffs

1.    Plaintiff, R. Jack Strain, in his official capacity as Sheriff, St. Tammany Parish ("Sheriff"), is the tax collector for all State and Parish Sales and Ad Valorem Taxes and such other taxes and license fees, according to Section 27 of Article V of the Louisiana Constitution of 1974, which suffered economic damages as a result of the Oil Spill and due to the Spill's environmental devastation.

### B.    Defendants

2.    Defendant BP Exploration & Production Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil

Spill originated. BP Exploration was designated the "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. §2714. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

3.   Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

4.   Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally. Plaintiff further adopts and incorporates by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*

5.   BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP."

1075146.1

6.      Defendant, Transocean Ltd. is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

7.      Defendant, Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

8.      Defendant, Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

9.      Defendant, Transocean Holdings, LLC is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico.

On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

10.     Transocean Ltd.; Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; and Transocean Holdings, LLC are generally referred to herein collectively as "Transocean."

11.     Defendant, Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  Halliburton is registered to do and does business in the State of Louisiana.  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations.

12.     Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools.  Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.  "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

## JURISDICTION AND VENUE

13.     Plaintiff brings these claims pursuant to Federal general Maritime Law including/and/or the Oil Pollution Act of 1990 ("OPA"), 33 USC §2701, et seq.

14.     Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

15.     The claims presented herein are admiralty or maritime claims within the meaning of

1075146.1

Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff hereby designates this case as an admiralty or maritime case, and requests a non-jury trial, pursuant to Rule 9(h).

16.     Jurisdiction also exists before this Court pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

17.     Under Fed. R. Civ. P. 82, no allegation of venue is required for admiralty or maritime claims.  Moreover, prosecution and venue in this district is proper under 28 U.S.C. §1391 because Defendants do business herein, Plaintiff is located and does business herein, and the events or omissions giving rise to the claims asserted herein occurred in this district.  Venue is also proper pursuant to the OPA, 33 U.S.C. 2717(b), as the discharge occurred in this district. Venue is also appropriate in this district consistent with 28 U.S.C. §1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows plaintiff to directly file its complaints arising out of the Oil Spill in this District.

## FACTUAL ALLEGATIONS

18.     BP, Transocean and Halliburton are the "responsible parties" for the Oil Spill under OPA, 33 U.S.C. §2714.  Because of the strict liability of responsible parties for all damages due to and arising from the Spill and its environmental devastation, Plaintiff does not need to set forth factual allegations to support culpability.  Nonetheless, out of an abundance of caution, the factual background relating to the BP and Transocean Defendants' acts, omissions and failures set forth in Paragraphs 211-516 of the MASTER COMPLAINT, ANSWER, CLAIM, CROSS-CLAIM & 3RD PARTY COMPLAINT by Local Government Entities, Document 1510 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, are adopted and incorporated as if fully restated herein.

19.     Plaintiff further adopts and incorporates as if restated herein all factual allegations information contained in the Direct Filing Short Form/Short Form Joinder, Rec. Doc. No.46, filed by the Sheriff into No. 10-9999.

20.     Plaintiff further adopts and incorporates as if fully restated herein Plaintiffs' Supplemental and Amended Responses to Phase One Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011; and Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012.

21.     St. Tammany Parish is the jurisdiction of the Sheriff, Jack Strain.  St. Tammany Parish borders on the arms of the sea or Gulf of Mexico, the Mississippi Sound, Lake Borgne, Lake Pontchartrain and other bodies of water, the Rigolets, Little Lake, etc., which were directly affected by the BP activity, thereby directly impacting the property in the parish, both short and long term.

22.     BP is directly responsible for the damages sustained by Sheriff Strain in his capacity as tax collector as well as his capacity as law enforcement officer responsible for the health, safety, welfare, and related services dependent on the revenue streams of the Parish.

23.     Sheriff Strain receives on behalf of all governmental entities for which he is the tax collector a large portion of the governmental entities income from the collection of Sales Taxes. The claims of Sheriff Strain are not in conflict with or for the amounts claimed by other governmental subdivisions in St. Tammany Parish.   The collections and payments to other governmental subdivisions by Sheriff Strain are in accordance with state statute(s), local governmental ordinances, local governmental agreements, local fees and commissions, all agreed by the parties and entities participating in government in St. Tammany Parish.  Except as the law

1075146.1

and/or contracts allow collection of fees, commissions and payments for other governmental entities, Sheriff Strain makes claims for the various governmental entities in St. Tammany Parish.

24.     In addition to being the Constitutional Authority with the power and right to collect and disburse all sales and ad valorem taxes for all the Political Subdivisions in the Parish, Sheriff Strain operates under 78 different collection and distribution agreements.  Sheriff Strain receives a percentage of 1.15% for all the Sales Taxes collected; and Sheriff Strain is paid to collect for political subdivisions in the parish of St. Tammany under various other flat fees, commissions, percentages, etc., as shown on the annexed schedules showing the income statements for the Sheriff, some being as much as 7% and others being flat fees of $200 per parcel.  The reduction in taxes caused by the spill has negatively affected St. Tammany Sheriff's budget and impacts its receipts the services to the public. This includes a variety of services, e.g., Security, Safe Neighborhoods, and Police Equipment – all areas essential to government in the Parish. The income for the Sheriff is based on the collection of Ad Valorem Taxes, License Fees and on Sales Taxes. A minute part of the budget comes from Intergovernmental Revenues (Federal Grants and State Revenue Sharing) and some civil and criminal fees.

25.     On and after April 20th of 2010, the oil spill affected all the businesses and individuals in the state, parishes and municipalities of Louisiana. Due to the spill, St. Tammany residents' economic capacity was substantially affected, causing a substantial reduction in sales, ad valorem, and other taxes and fees. The impact was also experienced on the sales of real property and on the value of all the existent real properties in the area - those translated into reduced Ad Valorem taxes.

26.     The Sales also went down as a direct result of the lesser number of tourists in the

area and all the sectors of activity were immensely affected, resulting in great losses particularly to the St. Tammany Parish Sheriff as the collector of those taxes and as a receptor of a 1.15% fee for all Sales Taxes collected.

27.     Plaintiff, St. Tammany Parish Sheriff, lost Sales and Ad Valorem Taxes collection in the St. Tammany Parish due to the severe impact that the Deepwater Horizon catastrophe had on the Parish and its economy and living status after April 20, 2010. Additionally, the operating budget of Sheriff Strain was severely affected due to the decrease in the amount received in connection with his collector fee for Sales Taxes.

28.     In addition to the claim by R. Jack Strain, in his capacity as Sheriff of St. Tammany Parish, as the Constitutionally authorized tax collector for certain other governmental entities in the Parish of St. Tammany who have not presented a separate claim, and considering that Sheriff Strain has standing under the Louisiana Constitution of 1974, as interpreted, to bring the claims of these separate governmental entities on their behalf, Sheriff Strain brings now a claim in his capacity as Sheriff and Tax Collector, on behalf of the following entities:

a)  Town of Pearl River;

b)  Village of Sun;

c)  Village of Folsom;

d)  Town of Madisonville;

e)  Town of Abita Springs;

f)  St. Tammany Parish Recreational Districts;

g)  St. Tammany Parish Fire Protection District No. 2;

h)  St. Tammany Parish Fire Protection District No. 3;

i)  St. Tammany Parish Fire Protection District No.4;

-9-

1075146.1

j)   St. Tammany Parish Fire Protection District No.5;

k)   St. Tammany Parish Fire Protection District No.6;

l)   St. Tammany Parish Fire Protection District No.7;

m)  St. Tammany Parish Fire Protection District No.8;

n)   St. Tammany Parish Fire Protection District No.9;

o)   St. Tammany Parish Fire Protection District No.10;

p)   St. Tammany Parish Fire Protection District No.11;

q)   St. Tammany Parish Fire Protection District No.12;

r)   St. Tammany Parish Fire Protection District No.13;

s)   Florida Parishes Juvenile Justice Commission;

t)   St. Tammany Parish Drainage Districts;

u)   St. Tammany Parish Assessor's Office;

v)   St. Tammany Parish Water Districts;

w)  Sub Road District No.5 of Road District No. 14 of the Parish of St. Tammany;

x)   St. Tammany Parish Hospital Service District;

y)   St. Tammany Parish Lighting Districts;

z)   Council On Aging St. Tammany ("COAST"); and,

aa)  St. Tammany Parish Sewerage Districts.

29.     As a direct and foreseeable consequence of the *Deepwater Horizon* disaster, the Secretary of the U.S. Department of Homeland Security declared the *Deepwater Horizon* incident a Spill of National Significance ("SONS") under the authority of the National Oil and Hazardous Substance Pollution Contingency Plan ("NCP") (40 CFR §300.323).  The SONS declaration triggered the National Response Framework and the ensuing multi-jurisdictional

-10-

response necessarily activated every single Emergency Support Function established by the federal disaster response framework to respond to the Oil Spill.

30.     On April 30, 2010, MMS and the U.S. Coast Guard ("USCG"), as a direct and foreseeable result of the Spill, issued a Joint National Safety Alert to all offshore operators and drilling contractors.  This alert recommended that all operators and contractors: review the condition and operability of well control equipment (both surface and subsea) currently being used to ensure that it was capable of shutting in the well during emergency operations; review all rig drilling/casing/completion practices to ensure that well control contingencies are not compromised at any point while a BOP is installed on the wellhead; review all emergency shutdown and dynamic positioning procedures that interface with emergency well control operations; inspect lifesaving and firefighting equipment for compliance with federal requirements; ensure that all crew members are familiar with emergency/firefighting equipment and that all personnel have been properly trained, drilled and exercised and are capable of performing in an emergency.

31.     Also on April 30, 2010, as a direct and foreseeable result of the Spill, the President of the United States directed the Secretary of the Interior to conduct a 30-day review of the Deepwater Horizon explosion and Oil Spill to determine what other precautionary measures and technologies should be required of the oil and gas industry to improve the safety of industry operations on the OCS.

32.     On May 7, 2010, MMS, as a direct and foreseeable result of the Spill and its environmental devastation, sent suspension letters to operators with active leases notifying them that leases would be suspended (including suspension of lessee payment/royalty requirements) to allow the Department to conduct its 30-day review.

33.     In response to the President's Directive and after reviewing available information about the causes of the Oil Spill, on May 27, 2010, Interior Secretary Salazar issued a report entitled *Increased Safety Measures for Energy Development on the Outer Continental Shelf* ("Safety Report").

34.     In the Safety Report, the Secretary recommended several immediate prescriptive requirements and a number of longer-term performance-related safety measures to be taken to improve the safety of offshore drilling.  In particular, the Safety Report targets the effectiveness of blowout preventers ("BOP"), and also calls for measures to promote the integrity of wells, to enhance well control, and to foster a culture of safety through operational and personnel management.

35.     Among the measures from the Safety Report to take immediate effect was compliance by all operators with the April Joint Safety Alert within 30 days—converting those recommendations to mandates. These measures were taken as a direct and foreseeable result of the Spill and its environmental devastation.

36.     On May 28, 2010, based on the Safety Report and its recommendations, which were the direct and foreseeable consequences of the Spill and its environmental devastation, the Secretary formally concluded in a Decision Memorandum that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."

37.     As a direct and foreseeable result of the Oil Spill and its environmental devastation, the Secretary in the Decision Memorandum, *inter alia*, directed the MMS to suspend

certain well drilling activity in the OCS.  On May 30, 2010, MMS made effective a Notice to Lessees and Operators (NTL No. 2010-N04) that imposed a 6-month moratorium ("May Moratorium") on the drilling of deepwater wells in the Gulf of Mexico and Pacific regions of the OCS, in light of significant risks associated with drilling in deepwater absent implementation of the recommendations from the Safety Report on safety equipment, practices, and procedures

38.     Specifically, NTL No. 2010-N04 directed operators to cease drilling new deepwater wells in the Gulf of Mexico and the Pacific regions of the OCS.  It also prohibited drilling any wellbore sidetracks and bypasses.  Moreover, it halted spudding of any new wells.  It also notified lessees and operators that MMS would not consider any new permits for deepwater wells or related activities for six months.

39.     Consistent with NTL 2010-N04, the MMS, as a direct and foreseeable result of the Spill and its environmental devastation, also issued Suspensions of Operations to lessees and operators pursuant to 30 C.F.R. §250.172. The suspensions affected 33 active deepwater drilling rigs in the Gulf of Mexico.

40.     On the heels of its directive to implement the deepwater moratorium, MMS issued a second Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N05) on June 8, 2010, calling for seven new, increased safety measures for drilling permits on the OCS.  The recommendations applied to all activities (deepwater and shallow water) on the OCS, including the deepwater drilling activity suspended under NTL No. 2010-N04.  These actions were taken as a direct and foreseeable result of the Spill and its environmental devastation.

41.     On June 18, MMS issued a third Notice to Lessees and Operators of Federal Oil and Gas Leases (NTL No. 2010-N06) in direct response to the Oil Spill, BP's abysmal planning for a blowout and worst-case scenario, BP's failure to contain the Oil Spill and limit the Spill's

-13-

environmental devastation, and BP's incapacity to adequately respond to the Spill.  NTL No. 2010-N06 required all operators to adhere to revised information requirements for exploration, development and oil spill response plans to include worst-case discharge and blowout scenarios

42.     On June 22, 2010, Judge Feldman of the United States District Court for the Eastern District of Louisiana, in response to a motion brought by a number of oil and gas drilling service industries, preliminarily enjoined the implementation and enforcement of the May Moratorium effectuated by the Department of Interior through MMS' NTL No. 2010-N04.

43.     In accordance with the Court's order, in June 2010 the Department of the Interior notified lessees and operators that the suspension orders they had received were of no legal force and effect and instructed agency personnel that the first moratorium was unenforceable.

44.     On July 12, 2010, the Secretary of the Interior issued a new decision memorandum finding that, as a direct and foreseeable result of the Oil Spill and its environmental devastation, certain drilling operations should be suspended and approvals of pending or future applications of specific drilling types should be frozen until November 30, 2010 ("July Moratorium").

45.     In particular, the Secretary found that, because the available response vessels, personnel and other resources were consumed with the Macondo Spill response, there was a direct, foreseeable, current, then-existing threat of further environmental devastation produced by exploration and drilling activities in the Gulf of Mexico.

46.     That same day, July 12, 2010, the Department of the Interior issued individual temporary suspension letters to each of the affected operators, implementing the July Moratorium.  The July Moratorium also allowed for the possibility of the July Moratorium being lifted before November 30, 2010.

1075146.1

47.    With certain exceptions, the July Moratorium suspended drilling operations that relied on subsea BOPs or surface BOPs on floating facilities. The July Moratorium had no bearing on production activities; drilling operations that were necessary to conduct emergency activities; drilling operations necessary for completions or workovers; abandonment or intervention operations; or waterflood, gas injection, or disposal wells.

48.    The July Moratorium also instructed MMS to develop and gather information about safety, blowout containment capabilities, and oil spill response capability and provide a report to the Secretary regarding potential conditions for the resumption of drilling by October, 2010.

49.    On October 12, 2010, the U.S. Department of Interior announced that the federal government would lift the July Moratorium. The October announcement indicated an early end to the July Moratorium, which had been scheduled to extend through the month of November 2010.

50.    On October 14, 2010, MMS published an Interim Final Rule (75 Fed. Reg. 63346), "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The Interim Final Rule addressed certain recommendations from the Secretary to the President in the Safety Measures Report. The Interim Final Rule set forth new basic requirements for containment resources in its interim drilling safety rule, which incorporated many of the previously issued requirements contained in NTLs issued during the aftermath of the *Deepwater Horizon* explosion and the protracted Oil Spill response.

51.    In direct and foreseeable response to the Oil Spill and its environmental devastation, on November 8, 2010, Interior issued another Notice to Lessees and Operators, specifically requiring operators engaging in activities using subsea BOPs or surface BOPs on

floating facilities to provide the Department with adequate documentation demonstrating that they have access to and can deploy resources to respond to another blow out or loss of well control, such as the kind experienced in the Oil Spill.

52.      On January 3, 2011, MMS notified 13 oil companies that they could resume previously approved exploration and production activities without submitting revised plans.

53.      The economic impacts of the Oil Spill and its environmental devastation affected individuals, governmental entities and businesses in various industries across the Gulf Coast OCS and the Pacific OCS.

54.      The Oil Spill and the foreseeable governmental response to a disaster of this magnitude, including the Moratoria imposed in direct response to the Oil Spill's devastation of the coastal and marine environments, have caused and will continue to cause a loss of revenue for individuals, governmental entities and other entities that rely on the use of the Outer Continental Shelf and its resources in connection with offshore deepwater drilling activities.

## CLAIM FOR RELIEF

55.      Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

56.      Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints, the Short Form Joinder filed on the same day as this complaint and the previously filed Short Form Joinder No. 46, against the Defendants as responsible parties under the Oil Pollution Act, 33 USC §2701, et seq., which holds responsible parties liable to plaintiffs for removal costs and damages arising out of the following:

a)   Loss of Natural Resources;

b)   Loss or Damage to Real or Personal Property

c)   Subsistence Use;

  d) Loss of Revenues;

  e) Loss of Profits and/or Earning Capacity; and

  f) Loss of Public Services.

57. Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints, the Short Form Joinder filed on the same day as this complaint and the previously filed Short Form Joinder No. 46, against all defendants identifying General Maritime Law causes of action and claims for relief relating to the following:

  a) Negligence; and

  b) Gross Negligence and Willful Misconduct.

58. Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints, the Short Form Joinder filed on the same day as this complaint and the previously filed Short Form Joinder No. 46, against all defendants for Punitive Damages arising out of willful and wanton misconduct and/or gross negligence as alleged and described in the MDL Complaints.

59. The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

60. BP, Transocean and Halliburton are strictly liable pursuant to 33 U.S.C. § 2702 for all damages due to or resulting from the Oil Spill and its environmental devastation.

61. Defendants BP, Transocean and Halliburton are not entitled to limit its liability under 33 U.S.C. § 2704(a) because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33

U.S.C. § 2704(c).

62.     Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

63.     As a direct result of the Spill and its environmental devastation, Plaintiff is entitled to recover from BP, Transocean and Halliburton for such damages in amounts to be determined by the trier of fact.

64.     OPA imposes strict liability for *all* damages due to and/or resulting from the Spill and its environmental devastation.  Therefore, the concepts of "superseding" or "intervening" cause are not applicable. In the alternative, the Moratoria were not "intervening" or "superseding" causes with respect to damages arising from the Oil Spill. The Moratoria, rather, were direct and foreseeable consequences of the environmental havoc wreaked by a spill designated as one of National Significance.

65.     The size, scope, and breadth of the Spill's environmental damage caused foreseeable actions by the federal and state governments, including the closures of massive portions of the Gulf to fishing and shipping.  The spill's destructive and contaminating qualities directly affected all industries in the Gulf and the federal agencies that oversee them.  The Moratoria was enacted by one such federal agency within its authority to ensure the safety by affecting very narrow activities of an industry under its control.

## PRESENTMENT

66.     Although Plaintiff contends Presentment is unnecessary for and inapplicable to these facts for Political Subdivisions, to the extent required by law, and/or by consent and/or stipulation by BP, Plaintiff has satisfied, or will have satisfied, all of the administrative

-18-

requirements of 33 U.S.C. §§ 2713(a) and (b), by the submission of their claims to the BP OPA Claims Program, the Deepwater Horizon Court-Supervised Settlement Program and/or the Gulf Coast Claims Facility ("GCCF"), as BP's agents and/or designees.

67.      In particular, on January 18, 2013, a Claim, fulfilling any applicable requirements for Presentment was submitted, including a "sum certain" and a brief description of the claim as well as some supporting documentation by overnight mail and email to the BP OPA Claims Program in Houston, Texas, Governmentclaims@BP.com and bpclaimsprogram@bp.com, respectively.

68.      BP failed to respond within 90 days of presentment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the BP and Transocean Defendants, jointly, severally, and *in solido,* as follows:

      (a)    economic and compensatory damages for loss of income and/or loss of income opportunities and/or earning capacity in amounts to be determined at trial;

      (b)    punitive damages;

      (c)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

      (d)    reasonable claims preparation expenses;

      (e)    attorneys' fees;[1]

      (f)    the costs of litigation;

---

[1] Although this Court has dismissed similar claims for attorneys' fees asserted by Plaintiffs under general maritime law in the operative B1 Master Complaint. (Rec. Doc. 1128), Plaintiff realleges them here out of an abundance of caution to preserve them for potential reconsideration, appeal, or other resolution.

(g)    such other and further relief as the Court deems just and appropriate.


Dated:  April 19, 2013

Respectfully submitted,

                                   **THORNHILL LAW FIRM, A PLC**

                                   _____/s/ Tom W. Thornhill_____
                                   TOM W. THORNHILL (#12776)
                                   1308 Ninth Street
                                   Slidell, LA 70458
                                   Ph: (985) 641-5010
                                   Fax: (985) 641-5011
                                   Email: tom@thornhilllawfirm.com


**CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that the above the above and foregoing Petition has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 19th day of April, 2013.

                                     _____/s/Tom W. Thornhill, 12776_____
                                      TOM W. THORNHILL

1075146.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MDL No. 2179

DIVISION " J "

R. JACK STRAIN, IN HIS OFFICIAL CAPACITY AS SHERIFF, ST. TAMMANY

VERSUS

BP EXPLORATION & PRODUCTION INC.; BP AMERICA PRODUCTION COMPANY; BP P.L.C.; TRANSOCEAN LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN HOLDINGS, LLC.; HALLIBURTON ENERGY SERVICES, INC.; and SPERRY DRILLING SERVICES, A DIVISION OF HALLIBURTON ENERGY SERVICES, INC.

FILED: _____          _____
                                                      DEPUTY CLERK

## VERIFICATION

Before me, the undersigned notary public in and for the aforesaid jurisdiction, personally came and appeared **Brian Trainor,** Deputy Chief and Legal Advisor for R. Jack Strain, in his official capacity as Sheriff, St. Tammany Parish, who after first being duly sworn, did declare and state:

That he has read all of the allegations of fact contained therein, and that all of the allegations of fact in the Presentment are true and correct to the best of his knowledge, information and belief.

**BRIAN TRAINOR (Deputy Chief and Legal Advisor for R. Jack Strain)**

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _____ DAY
OF _____, 2013.

_____
NOTARY PUBLIC