UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010 | MDL No.:  2179 |
| | Section "J" |
| | Judge Barbier |
| This Document Relates to:  2:12-cv-01485 | Magistrate Judge Shushan |

**PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES**

COMES NOW the Plaintiffs, JOSEPH YERKES, JOSHUA ALLEN BENGSON, AUSTIN NORWOOD and MARGARET NORWOOD, as husband and wife, by and through undersigned counsel, and sue the Defendants, BP EXPLORATION & PRODUCTION, INC., a Delaware corporation, BP AMERICA PRODUCTION COMPANY, a Delaware corporation, BP, PLC., a Foreign corporation, AIRBORNE SUPPORT INTERNATIONAL, INC., a Louisiana corporation, AIRBORNE SUPPORT, INC., a Florida corporation, ANADARKO PETROLEUM CORPORATION, a Delaware corporation, ANADARKO E&P ONSHORE LLC f/k/a ANADARKO E&P COMPANY LP, a Delaware limited partnership, MOEX OFFSHORE 2007 LLC, a Delaware corporation, MOEX USA CORPORATION, a Delaware corporation, MITSUI OIL EXPLORATION CO., LTD., a Foreign corporation, TRANSOCEAN LTD., a Foreign corporation, TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., a Delaware corporation, TRANSOCEAN DEEPWATER INC., a Delaware corporation, TRANSOCEAN HOLDINGS LLC, a Delaware corporation, TRITON ASSET LEASING GMBH, a Foreign corporation, HALLIBURTON ENERGY SERVICES,

INC. a Delaware corporation, M-I L.L.C., a Delaware limited liability company, and CAMERON INTERNATIONAL CORPORATION, a Delaware corporation, and as grounds would therefore state as follows:

## I.  PARTIES

1.     Plaintiff, JOSEPH YERKES, who is a resident citizen of Opelika, Alabama and is over the age of 19.

2.     Plaintiff, JOSHUA ALLEN BENGSON, who is a resident of Destin, Florida and is over the age of 19.

3.     Plaintiff, AUSTIN NORWOOD, who is a resident of Santa Rosa Beach, Florida and is over the age of 19.

4.     At all times material hereto, the Plaintiffs, AUSTIN NORWOOD and MARGARET NORWOOD, his wife, were and are residents of Santa Rosa Beach, Florida.

5.     All parties in this complaint share common issues of law and fact. Each was damaged and injured by exposure to and effects from the subject oil spill and chemical remediation negligence of Defendants.

6.     Each joined Plaintiff has a claim based in Maritime Law since either their real or personal property, and their body, was directly contacted and damaged by the subject polluting chemicals, and/or are fisherman/fishing vessel owners who earn their livelihoods from commercial fishing activities, and/or each was physically exposed to the hydrocarbons and/or dispersant chemicals and injured by the exposure.

7.     Defendant, BP EXPLORATION & PRODUCTION, INC. is a Delaware corporation, at all pertinent times registered to do and doing business in the

State of Florida, and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Blvd., Houston, Texas 77079, and whose agent for service of process is C.T. Corporation, 1200 South Pine Island Road, Plantation, Florida 33324.

8.      BP EXPLORATION & PRODUCTION, INC. was a holder of a lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

9.      The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "block," and then auctions the right to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2012; however, it is referred to as the MMS throughout this Amended Complaint.

10.     BP EXPLORATION & PRODUCTION, INC. was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.   Personal jurisdiction over Defendant BP EXPLORATION & PRODUCTION, INC., is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

11.     Defendant, BP AMERICA PRODUCTION COMPANY, is a Delaware corporation, at all pertinent times registered to do and doing business in the State of Florida, and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Blvd., Houston, Texas 77079, and whose

agent for service of process is C.T. Corporation, 1200 South Pine Island Road, Plantation, Florida.   BP AMERICA PRODUCTION COMPANY was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel.   Personal jurisdiction over Defendant BP AMERICA PRODUCTION COMPANY, is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

12.     Defendant, BP, P.L.C. is a foreign corporation with its corporate headquarters in London, England, at all pertinent times doing business in the State of Florida.   BP, P.L.C. is the global parent company of the worldwide business operating under the "BP" logo.   BP, P.L.C. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.   BP, P.L.C. operates its various business divisions, such as the "Exploration and Production" division in which BP EXPLORATION & PRODUCTION, INC. and BP AMERICA PRODUCTION COMPANY fall, through vertical business arrangements aligned by product or service groups.   BP, P.L.C.'s operations are worldwide, including in the United States. Defendants BP EXPLORATION & PRODUCTION, INC. and BP AMERICA PRODUCTION COMPANY (collectively "BP") are wholly-owned subsidiaries of BP P.L.C. and are sufficiently controlled by BP, P.L.C. so as to be BP, P.L.C.'s agents in Florida and the U.S. more generally.

13.     BP, P.L.C. has submitted to Federal Court jurisdiction by responding to various Plaintiffs' discovery requests in Federal Court.

14.     BP, P.L.C. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP, P.L.C.'s contact with the U.S are as follows: (a) BP, P.L.C.'s American Depository Shares are listed on the New York Stock Exchange and BP, P.L.C. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP, P.L.C. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP, P.L.C.'s fixed assets are located in the U.S. or the European Union; and (e) BP, P.L.C. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

15.     This Court has jurisdiction over BP, P.L.C. pursuant to Florida's long-arm statute (Fla. Stat. § 48.193), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  BP, P.L.C. does business in Florida and has had continuous and systematic contacts with Florida (and with the U.S. more generally).

16.     Alternatively, this Court may exercise personal jurisdiction over BP, P.L.C. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because claims in this action arise under federal law, the exercise of jurisdiction over BP, P.L.C. is consistent with the United States Constitution and laws, and BP, P.L.C. has been served with summonses in individual complaints that allege similar causes of action to those alleged in this Complaint.

17.     Plaintiffs' causes of action arise out of wrongful conduct committed by BP, P.L.C., directly or indirectly by its agents, that caused injury or damage in Florida by an offense or quasi offense committed through an act or omission

inside and outside of Florida.  BP, P.L.C. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Florida.  These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP, P.L.C. after the blowout in attempting to contain the Oil Spill.

18.     In addition, this Court also has personal jurisdiction over BP, P.L.C. under agency and alter ego principles, because BP, P.L.C.'s agents, BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., do business in Florida.  BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC. are both wholly-owned subsidiaries of BP, P.L.C.  In BP, P.L.C's Annual Report for 2009, in which it presents a consolidated financial statement that includes BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., BP, P.L.C. states that it "controls" both BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities…."

19.     Moreover, BP, P.L.C. undertook the duty to pay and/or gratuitously to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

20.     BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY and BP, P.L.C. are generally referred to collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory

approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

21.     Defendant, AIRBORNE SUPPORT INTERNATIONAL, INC., is a Louisiana corporation, whose domicile address in Louisiana is 3626 Thunderbird Rd., Houma, LA 70363 and whose registered agent is Howard Barker, 3626 Thunderbird Rd., Houma, LA 70363 (hereinafter "ASI INTERNATIONAL"). ASI INTERNATIONAL participated in the post-explosion Oil Spill remediation and response efforts including involvement in the negligent spraying or release of chemicals in Florida's Territorial Waters.

22.     Defendant, AIRBORNE SUPPORT, INC., is a Florida corporation, with its principal place of business in Houma, Louisiana, and whose registered agent is Abbie Whidden, 165 Avenue M., Moore Haven, FL 33471 (hereinafter "ASI").  At all pertinent times ASI was doing business in the State of Florida.  ASI participated in the post-explosion Oil Spill remediation and response efforts.  Personal jurisdiction over Defendant ASI is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

23.     Defendant ANADARKO     PETROLEUM     CORPORATION ("ANADARKO") is a Delaware corporation with its principal place of business in The Woodlands, Texas. ANADARKO is an oil and gas exploration and production company that owns 2.5% stake in the Macondo prospect lease where the Oil Spill originated. Personal jurisdiction over Defendant ANADARKO is proper under one or more

provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

24.    Defendant   ANADARKO   E&P   ONSHORE   LLC   f/k/a ANADARKO E&P COMPANY LP ("ANADARKO E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas.  ANADARKO E&P is an oil and gas exploration and production company that owns a 22.5% stake in the Macondo prospect lease where the Oil Spill originated.  Personal jurisdiction over Defendant ANADARKO E&P is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

25.    Defendant,   MOEX   OFFSHORE   2007   LLC   ("MOEX OFFSHORE") is a Delaware corporation with its principal place of business in Houston, Texas. MOEX OFFSHORE does business in the State of Florida and/or in state and/or federal waters off the coast of Louisiana. MOEX OFFSHORE is a wholly-owned subsidiary of MOEX USA Corporation.  MOEX OFFSHORE holds a 10% stake in the Macondo prospect lease where the Oil Spill originated.  Personal jurisdiction over Defendant MOEX OFFSHORE is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

26.    Defendant, MOEX USA CORPORATION ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX OFFSHORE. According to Texas Secretary of State records, the stated business purposes of MOEX USA include the direct

or indirect engagement in the business of "exploration, development and production of hydrocarbons and any business related to the exploration, development and production of hydrocarbons," and the acquisition of "Hydrocarbon Interests by purchase, lease, farm-in, license, exchange or other means or methods. . . ."

27.     Defendant, MITSUI OIL EXPLORATION CO., LTD. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan.  As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX OFFSHORE 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOECO share the same Houston, Texas, address.

28.     MOECO states on its website as follows: "MOEX USA Corporation, a wholly owned subsidiary of MOECO, has a 10% interest in ultra-deepwater Mississippi Canyon 252, located in the U.S. Gulf of Mexico, through its 100% owned subsidiary, MOEX OFFSHORE 2007 LLC."

29.     In a press release dated July 24, 2007, MOECO announced that it had entered into an "Acquisition and Participation Agreement with BP Exploration and Production, Inc. … on the 29th of June 2007 to participate in an ultra-deep gas exploration project in the Gulf of Mexico … which is being actively pursued by BP." According to the release, "MOECO decided to participate in the project based upon its evaluation of the prospect which BP's [Gulf of Mexico] technical team has conducted extensive study and research [sic]." The release also indicates that "Japan Oil, Gas and Metals National Corporation . . . has agreed to provide equity capital finance for

MOECO's share of the drilling costs payable under the Acquisition and Participation Agreement. An exploratory well is scheduled to be drilled from September 2007 by BP as the operator and as a result of the participation and such well interests in the project will be BP (75%), MOECO (15%) and other (10%)." The release concludes with MOECO indicating that its participation in the project "provides an excellent opportunity to further expand its business in the U.S." *See* www.MOECO.co.jp/english/topics/070724.html.

30.     Defendants MOEX OFFSHORE, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

31.     While BP was the sole lease operator of the Deepwater Horizon, ANADARKO, ANADARKO E&P, and MOEX were considered non-operational leaseholders.

32.     As of October 1, 2009, ANADARKO owned a 2.5% stake in the Macondo prospect lease, ANADARKO E&P owned a 22.5% stake, and MOEX owned a 10% stake. According to MMS records, however, effective April 1, 2010, record title interest in the Macondo prospect was held by ANADARKO (25%), BP (65%), and MOEX (10%).

33.     As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants ANADARKO, ANADARKO E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants BP pursuant to the Oil Pollution Act.

34.     Defendant TRANSOCEAN LTD. ("TRANSOCEAN LTD.") is a Swiss corporation that maintains substantial U. S. offices at 4 Greenway Plaza, Houston,

Texas, 77046.    According to its Complaint and Petition for Exoneration from or Limitation of Liability, TRANSOCEAN LTD. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.  Personal jurisdiction over Defendant TRANSOCEAN LTD. is proper under one or more provisions of Fla. Stat. § 48.193 because TRANSOCEAN LTD. has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

35.    Defendant    TRANSOCEAN    OFFSHORE    DEEPWATER DRILLING INC. ("TRANSOCEAN OFFSHORE") is a Delaware corporation with its principal place of business in Houston, Texas.  Defendant, TRANSOCEAN OFFSHORE, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.   Personal jurisdiction over Defendant TRANSOCEAN OFFSHORE is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

36.    Defendant    TRANSOCEAN    DEEPWATER    INC. ("TRANSOCEAN DEEPWATER") is a Delaware corporation with its principal place of business in Houston, Texas.  Defendant, TRANSOCEAN DEEPWATER, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.   Personal jurisdiction over Defendant

TRANSOCEAN DEEPWATER is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

37.     Defendant TRANSOCEAN HOLDINGS LLC ("TRANSOCEAN HOLDINGS") is a Delaware corporation with its principal place of business in Houston, Texas.   Defendant, TRANSOCEAN HOLDINGS is affiliated with TRANSOCEAN LTD. and is a wholly-owned subsidiary of TRANSOCEAN OFFSHORE. TRANSOCEAN HOLDINGS is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, TRANSOCEAN HOLDINGS is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named TRANSOCEAN HOLDINGS as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the explosion aboard the Deepwater Horizon.   Personal jurisdiction over Defendant TRANSOCEAN HOLDINGS is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

38.     Defendant TRITON ASSET LEASING GMBH ("TRITON") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Defendant, TRITON is affiliated with TRANSOCEAN LTD. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

39. Defendants TRANSOCEAN LTD., TRANSOCEAN DEEPWATER, TRANSOCEAN OFFSHORE, TRANSOCEAN HOLDINGS, and TRITON are hereinafter referred to collectively as "TRANSOCEAN." At the Macondo site, TRANSOCEAN provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. TRANSOCEAN also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

40. At all material times, Plaintiffs were ascertainable to TRANSOCEAN identities, as Plaintiffs made written presentment to TRANSOCEAN.

41. Defendant, HALLIBURTON ENERGY SERVICES, INC. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is licensed to do and does business in the State of Florida. HALLIBURTON provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. HALLIBURTON was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, HALLIBURTON was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

42. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the

Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. Throughout this Amended Complaint, "HALLIBURTON" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

43.     Defendant, M-I L.L.C. ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.  M-I, is also known as "M-I SWACO."  It supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well. M-I employees planned and/or supervised key fluid-related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.  Personal jurisdiction over Defendant M-I is proper under one or more provisions of Fla. Stat. § 48.193 as it has, *inter alia*, committed a tort in whole or in part in Florida, and has caused injuries to the Plaintiffs.

44.     BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

45.     Defendant, CAMERON INTERNATIONAL CORPORATION ("Cameron") is a Delaware corporation with its principal place of business in Houston,

Texas. Cameron is registered to do and does business in the State of Florida. Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

46.     Each of these Defendants is jointly, severally, and/or solidarily liable under various principles of federal, maritime and/or applicable State tort law.

## II. JURISDICTION AND VENUE

47.     Plaintiffs incorporate by reference, *verbatim*, the allegations in Paragraphs 1 through 46, above.

48.     This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4), because this matter in controversy exceeds the minimum jurisdictional amount of $75,000.00, exclusive of interest and costs, and this case is between Plaintiff and citizens of a State or of different States.

49.     Jurisdiction is also proper under 28 U.S.C. Section 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of various states which have been declared, pursuant to 43 U.S.C., Section 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated.   Federal question

jurisdiction under 28 U.S.C. §1331 also exists by virtue of Plaintiff's claims brought herein which arise under the Oil Pollution Act of 1990.

50. In addition, this Court has jurisdiction over this action pursuant to the Oil Pollution Act, 33 U.S.C. §2717(b) (the "OPA").

51. Pleading in the alternative, jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C., §30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

## III. FACTUAL ALLEGATIONS

52. These cases arise from the April 20, 2010, loss of control of the Macondo well that was being drilled by the Deepwater Horizon drilling vessel and the related explosions on that vessel which caused it to sink and resulted in the discharge of significant amounts of oil that spread throughout the Gulf of Mexico over a period of more than three months.  They also arise due to subsequent additional negligent acts and failure of reasonable care which occurred in Florida territorial waters.

53. At all times relevant to this action, the Deepwater Horizon, an ultra-deep water semi-submersible drilling rig, was leased to BP.  At the time of its explosion on April 20, 2010, the Deepwater Horizon was being operated by BP for the purposes of drilling an exploratory well at the Macondo prospect on Mississippi Canyon Block 252 on the Outer Continental Shelf, south, west and north of Florida shores and waters.

54.     The Macondo prospect was being explored pursuant to a ten-year lease, OCS-G32306, granted by the Minerals Management Services on June 1, 2008, and owned at the time of the explosion by BP.   The lease allowed BP to drill for hydrocarbons and perform oil production-related operations in the Mississippi Canyon Block 252 area which includes the Macondo prospect.   BP was designated the lease operator.

## THE BLOWOUT

55.     At approximately 10 p.m. on April 20, 2010, following cementing operations aboard the vessel Deepwater Horizon, workers were finishing drilling operations for the Macondo well and displacing the drilling mud in the marine riser at the direction of BP in preparation for completion pursuant to BP's design, when they encountered an uncontrolled influx of highly pressurized hydrocarbons into the wellbore leading to a "blowout" or loss of control of the well.

56.     The combustible gas flowing uncontrolled into the wellbore traveled quickly up to the rig floor where it was ignited leading to a fiery explosion on the Deepwater Horizon.

57.     Defendant, BP was unable to regain control of the well and the fiery explosions onboard the Deepwater Horizon caused the vessel to be destroyed and sink to the bottom of the Gulf of Mexico.

58.     BP did not follow safe procedures, in order to save money, by electing to utilize a risky well design that provided for fewer barriers against hydrocarbon influx into the wellbore relative to well designs typically used in an unknown and

troublesome formation like the Macondo prospect.

59.     Due to the depth of the Macondo well, BP was also negligent in the selection of a casing material that was vulnerable to collapse under high pressure. BP's negligence in well design and casing selection allowed for an increase risk of a blowout.  BP knew or should have known of those risks but chose risk over increased costs.

60.     In addition to the casing-related problems, the float collar installed on the final section of casing likely failed to seal properly, which may have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

61.     A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.

62.     Upon information and belief BP was negligent in operations to install the float collar and/or in neglecting warning signs of a potentially improper installation of the float collar.

63.     BP was negligent in preparing the wellbore for cementing operations which led to an increased likelihood that the cement job would fail and a blowout would occur.

64.     BP was negligent in electing to utilize an unsafe cement job design that was unlikely to create a secure barrier against hydrocarbon influxes into the Macondo wellbore.

65.     BP was negligent in the selection of an improper cement mixture that was susceptible to failure under the high pressures and temperatures typical in the Macondo well.

66.     Negligent cementing operations failed to isolate the well bore from hydrocarbon zones and seal the bottom of the well against an influx of gas.   BP was negligent in failing to identify this bad cement job ignoring numerous warning signs in the process.

67.     Upon information and belief, the defective cement job allowed a pathway for highly pressured gas to enter the Macondo wellbore and travel rapidly from there to the rig floor.

68.     BP was negligent in the monitoring and design of the drilling mud program which failed to prevent hydrocarbons from flowing into the wellbore and up to the Deepwater Horizon.

69.     BP was negligent in the decision and design to displace the drilling mud from the marine riser before allowing time for the cement to fully set.

70.     BP was also negligent in conducting and monitoring the displacement operations, failing to recognize the many signs of trouble.

71.     BP was negligent in failing to utilize a casing hanger lockdown sleeve that would have stopped the hydrocarbons from escaping past the wellhead and reaching the rig floor.

72.     BP was negligent in failing to timely identify that hydrocarbons were entering the wellbore during displacement operations and in failing to initiate well control measures.

73.     After hydrocarbons reached the rig floor, the Blowout Preventers (BOP's) for the Deepwater Horizon, failed to activate as designed to prevent the continued uncontrolled flow of gas from the formation.

74.     The BOP utilized by BP was defective and unreasonably dangerous in their manufacture, design, and/or composition, and/or failed to contain adequate warnings and instructions.

75.     BP failed to ensure that the BOP design used on Deepwater Horizon was sufficient for the drilling conditions and program expected at the Macondo site.

76.     BP was negligent in failing to properly maintain the BOP's for the Deepwater Horizon in accordance with safe practices and federal regulations.

77.     BP failed to ensure that the BOP's possessed the necessary technology to properly function including adequate safeguards and redundant systems to prevent blowouts.

78.     BP failed to ensure that the BOP's and all related systems were properly tested to operational conditions and confirmed to be in good working order.

79.     BP was negligent in failing to properly utilize and maintain emergency systems and equipment on board the Deepwater Horizon or to supervise and/or inspect to assure same.

80.     Defendants' negligent actions and/or omissions caused the blowout of the Macondo well leading to the destruction and sinking of the Deepwater Horizon and subsequent uncontrolled discharge of oil into the Gulf of Mexico.

**UNCONTROLLED DISCHARGE OF OIL INTO THE GULF AND ENVIRONMENTAL IMPLICATIONS**

81.     After the sinking of the Deepwater Horizon, the well began to

release, leak, and/or discharge oil directly into the Gulf of Mexico due to the failure of the well's cement and/or casing and the concurrent failure of the blow-out preventors. These actions also likely caused damage to the seafloor structure surrounding the well, causing unabated and continuing seepage of petroleum into the Gulf of Mexico which likely continues presently.

82.     Defendant, BP, recklessly, willfully and/or wantonly failed to ensure that oil would be quickly and fully contained within the immediate vicinity of the Macondo well in the event of a blowout.

83.     The well discharged an estimated 50,000 to 100,000 barrels of oil into the Gulf of Mexico on a daily basis for at least 87 days.  Discharge likely continues presently.

84.     The United States government has estimated that approximately 5,000,000 barrels (210,000,000 gallons) of oil gushed into the Gulf of Mexico during the months that the well was uncontained with others estimating that the well discharged upwards of 7,000,000 barrels.

85.     Defendant, BP, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled discharge from the Macondo well into the Gulf of Mexico and to prevent injuring Plaintiffs.

86.     This massive release of oil contaminated thousands of square miles of waters in the Gulf as the well flowed uncontained for three months resulting in the ban of recreational and commercial fishing by the government in many areas during that time period.  Contamination continues with fresh crude still flowing from the Macondo site.

Contamination occurs with each tropical weather system's effects.

87.     The oil discharged into the Gulf of Mexico from the Macondo well contained hydrocarbon molecules, carcinogens and other toxic pollutants including heavy metals which are extremely hazardous to the marine ecosystem in the Gulf of Mexico including that found in the territorial waters and shores of Florida.

88.     In addition to the oil that was released by BP's Macondo well, BP directed over two million gallons of chemical dispersants to be sprayed, injected or otherwise released into Gulf waters including Florida territorial waters.  BP had injected at least 770,000 gallons of chemical dispersants directly into the damaged wellhead and otherwise directed its contractors, including Airborne Support (ASI) to apply considerable amounts of chemical dispersants directly onto the territorial waters of Florida.  These negligent, reckless and wanton activities constitute tortious conduct which occurred in the territory of Florida, and created new chemical moieties and physical states of the hazardous mixed chemicals.

89.     Upon information and belief, ASI and ASI INTERNATIONAL, directed by BP, knowingly and willfully released toxic and harmful chemical dispersants and/or other toxic chemicals into the Territorial Waters of Florida, which alone and in combination with the Macondo chemicals began damaging the natural environment and threatening both marine and human life and thereby causing economic loss to the business and industry and to Plaintiffs who are economically dependent on those waters.

90.     The chemical dispersants released into the Gulf and Florida territorial waters and shores at the direction of BP contain hazardous and toxic substances and have been reported to be harmful to both human health and the marine environment.

The chemical dispersants are designed to interact with spilled oil which then sinks below the surface, where these solubilized amalgams are more available for exposure to all marine environments.

91.    The use of chemical dispersants introduces toxic pollutants to a larger portion of the marine environment than when using mechanical oil collection methods, since the dispersant causes oil to become suspended in the water column available to be moved by subsurface currents and tides, and deposited in the seafloor sediment…all places where it is more likely to be encountered and more readily available to be contacted and absorbed by marine life.

92.    To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

93.    On or about May 19, 2010, the U.S. Environmental Protection Agency (EPA) Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than those dispersants that BP had been using.  BP refused to comply and continued using dispersants of its choice.

94.    Defendant BP recklessly, willfully and/or wantonly failed to use ordinary care by electing to use chemical dispersants that are more toxic than others in the response efforts and thereby amplified the toxic effects on the marine environment and the damages to Plaintiffs.

95.    Defendants knew or should have known that the chemical dispersants used would increase toxicity and marine environment exposure of the oil and increase damages to Plaintiffs.

96.    The untested manner and unprecedented scale in which Defendants

used dispersants on such a sheer volume of oil likely caused foreseeable negative consequences.  BP used the dispersants in a manner and quantity for which they were not designed, labeled or tested by injecting chemical dispersants directly at the wellhead approximately 5,000 feet below the surface.

97.     Defendants knew or should have known that injecting dispersants at the wellhead had not previously been tested or used in this manner and had not been tested under similar conditions.  Defendants failed to warn the public or ensure the safe use of these products.

98.     Defendants also failed to ensure the dispersants' design was appropriate for the extreme conditions expected to be encountered during use by BP at the wellhead.

99.     BP's decision to use chemical dispersants in such extreme conditions for which they were not designed likely resulted in the foreseeable negative consequence of preventing the oil from fully rising to the surface resulting in the formation of massive solubilized subsurface toxic plumes of amalgamated dispersed oil droplets and chemical dispersants at varying depths that are extremely slow to degrade due to their combined toxic effect on oil consuming microbes in the marine environment. It also likely caused more toxic chemicals to penetrate into the shores, beaches and marshes of Florida in their dispersant solubilized state.

100.    Upon information and belief, BP knew or should have known, as basic science suggests, that the direct injection of large amounts of chemical dispersants into the damaged wellhead at a depth of 5,000 feet would likely cause the formation of massive, deep water, subsurface oil plumes that would be extremely slow to degrade, and

subject to subsurface current movements to cause much greater exposure to the entire environment but BP continued with the application of dispersants in this manner to prevent the oil from reaching the surface in order to conceal the amount of oil being discharged from the Macondo well and obscure the true extent of the contamination being caused to the Gulf and marine environment.

101.    The number and magnitude of such plumes have been investigated and the severe environmental implications continue to be studied.  Large oil-dispersant plumes were confirmed at depths of 3,280 to 4,265 feet many miles from the wellhead of the Deepwater Horizon.  Studies have shown that these dispersant-hydrocarbon plumes are not degrading as expected and continue their slow movement throughout the environment more than two years after BP's Macondo well was capped.

102.    Since these deep oil-dispersant plumes and other related hydrocarbon accumulations on the seafloor are not degrading and will continue to periodically surface from depth in a difficult to predict manner, and because the fractured Macondo sea floor continues to seep fresh petroleum, it is probable that recurring significant damage to the marine environment and continued oiling of the marshes and estuaries will persist for many years to come.

103.    Such results have resulted in marine life kills and will likely have long term impacts on the commercial and recreational fishing industries.  The full extent of these impacts has not yet been determined and may take years to assess, but preliminary evaluation suggests they will be severe.

104.    The amount of oil spilled, combined with the amount of dispersants applied in the Gulf of Mexico, immediately had significant acute effects on

the entire marine ecosystems of the Gulf on which Plaintiffs are economically dependent, and chronic negative effects are likely to be felt long after the oil and dispersants have degraded.   Likely impacts include direct mortality from the chemicals, and indirect impacts that include reduction in reproduction, genetic disorders, increased susceptibility to disease, and likely enhanced pathogenicity of marine disease organisms.

105.    Rowan Gould, Acting Director of the U.S. Fish & Wildlife Service, has stated that the Deepwater Horizon spill "is significant and in all likelihood will affect fish and wildlife across the Gulf, if not all of North America, for years if not decades . . . ."

106.    The oil and dispersants that were discharged and released are extremely hazardous to marine life in the Gulf of Mexico.  They are especially hazardous to marine life at the bottom of the food chain, including creatures such as plankton, shrimp, and crabs which are food for the finfish sought by fishermen.

107.    These plankton, shrimp, and other marine creatures are vital to the entire marine ecosystem, and the damage already sustained by these tiny marine creatures threatens the entire marine species throughout the Gulf.  The chemicals released into the Gulf have both direct and indirect impact to tourism and on the businesses of the Plaintiffs.

108.    Due to impacts from the oil spill, Plaintiffs have seen greatly reduced business and have suffered loss of income, loss of business value, and loss of value to their real property.

109.    In an effort to stay viable and economically survive this disaster Plaintiffs have been forced to take financial steps to limit the effects of the disaster.

110.    Due to the toxic effect of the oil spill and dispersants on the fisheries of the Gulf of Mexico, now and in the future, the tourism and sales upon which Plaintiffs' businesses are dependent have been diminished, endangering the ability of Plaintiffs to operate or maintain their businesses.

111.    Despite increased business efforts combined with longstanding reputations for business savvy and competency, the stigma and effect of the spill has drawn fewer customers to the Gulf business locations of Plaintiffs.  More than a year after the well was capped Gulf Coast communities and waters proximate to Plaintiffs' businesses and properties continue to be awash in fresh oil with ongoing harmful effects with no end in sight.  Recovery efforts to repair the physical and stigma damages to Gulf waters have been inadequate and incomplete, causing economic loss to these Plaintiffs who are financially dependent on healthy marine environments.

112.    Due to the oil spill disaster, Plaintiffs' customers have taken their business to other non-gulf regions and consequently are unlikely to return to the Gulf Coast.  Formerly regular customers simply do not want to visit and spend their money in the Plaintiffs' Gulf neighborhoods where the natural marine bounty has been and continues to be damaged.

113.    Due to the unprecedented scope of the disaster and the as yet unknown impact on future marine generations of wildlife, it may take years to assess the full extent of the devastation to the marine life in the Gulf and it may be decades before the marine environment is able to completely recover.  Thus far the impact of the oil and other chemicals discharged into the Gulf during the Deepwater Horizon oil spill disaster has been devastating to marine life upon which Plaintiffs' businesses rely.

114.    The discharge of crude oil from the Macondo well and the spraying of dispersants into the Gulf of Mexico and Florida territorial waters has caused and will continue to cause a direct and proximate loss of revenue, profits and/or loss of earning capacity to Plaintiffs.   The fact that the reputation of the geographic areas in which Plaintiffs operate has been severely tainted, Plaintiffs have experienced and continue to experience significant business damage due to a significant decrease in clients and increase in cancellations of business opportunity with the likely long term and possibly permanent loss of customers and potential customers.

115.    Many Plaintiffs are assisting in the effort to prevent oil slicks from reaching the shore, or cleaning oil spill residue from the beaches, marshes and estuaries by participating in the relief effort orchestrated by BP. As part of this effort, Plaintiffs come into contact with crude oil, chemical dispersants and oil/chemical mixtures. Even more disturbing, BP's aerial spray planes have negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and their crews in the vicinity of the spraying.

116.    Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems. Crude oil has many highly toxic chemical ingredients that can damage every system in the body. Dispersant chemicals can affect many of the same organs. These include: respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys, endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, musculoskeletal system, hematopoietic system (blood forming), skin and integumentary system and disruption of normal metabolism.

117.    Damage to these systems can cause a wide range of diseases and conditions. Some of these diseases and conditions may be immediately evident, and others can appear months or years later. The chemicals can impair normal growth and development through a variety of mechanisms, including endocrine disruption and direct fetal damage. They can cause mutations that may lead to cancer and multi-generational birth defects. Some of the chemicals are known carcinogens, such as benzene.

118.    Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm. In addition, the dispersants currently used can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.

119.    Many Plaintiffs have already experienced physical symptoms caused by coming into contact with oil and/or chemical dispersants. Moreover, the odors emanating from the oil and/or the dispersants are foul and the fumes are harmful.

**<u>DEFENDANTS' KNOWLEDGE OF THE RISKS</u>**

120.    OSHA, which promulgates regulations to protect worker safety in certain contexts, including hazardous waste activities and emergency responses, alerted the Coast Guard about its concerns over significant deficiencies in BP's Oil Spill response operations relating to worker safety. OSHA repeatedly raised these concerns with BP as early as May 2010, but remained frustrated that BP did not address the most serious problems.

121.    Commercial fishing vessels and other vessels that make up the majority of the volunteer response vessels are not otherwise subject to inspection by the

Coast Guard, and the captains and crew are not customarily trained to recognize or to avoid health hazards in the context of an oil spill. Using these types of vessels is not unknown in response efforts, but OSHA training is required to properly assess and to avoid risks.

122.    Uninspected fishing vessels being used in response actions without training and inspection subjects the captains and crews to exposure to harmful chemicals found in crude oil and chemical dispersants.

123.    BP and the Dispersant Defendants, aware of the risks that fishing vessels would face, ignored worker safety concerns, even in the face of OSHA warnings and notification by the Department of Health and Human Services that vessels and clean-up workers were complaining of illnesses after being exposed to oil and dispersants.

124.    At all times relevant to this litigation, Defendants knew or should have known that:

a.)    Crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

b.)    chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

c.)    Plaintiffs should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

d.)    Plaintiffs should have been provided with proper protective clothing and respirators.

## IV. DAMAGES AND OTHER RELIEF REQUESTED

125.   As a result of Defendants' acts or omissions, Plaintiffs have suffered the following physical injury damages:

a.)   Exposure to chemicals in crude oil that have caused , or will likely cause, adverse health  effects;

b.)   Exposure to chemicals in weathered crude that have caused, or will cause, adverse health effects;

c.)   Exposure to chemicals in dispersants that have caused, or will likely cause, adverse health effects;

d.)   Exposure to chemicals in oil and dispersant mixtures that have caused, or will likely cause, adverse health effects; and

e.)   Costs incurred and inconvenience sustained by obtaining medical treatment for exposure to chemicals in the past and in the future.

126.   Plaintiffs have suffered a discernible physical injury from exposure to oil, dispersants, and/or oil and dispersant mixtures.

127.   Plaintiffs also demand injunctive and equitable relief and further, that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs.

128.   As a result of Defendants' acts or omissions, Plaintiffs have suffered emotional distress caused by concern over exposure to chemicals and their physical health effects.

## V. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Claims Under General Maritime Law

### NEGLIGENCE, GROSS NEGLIGENCE AND WILLFUL MISCONDUCT OF BP

129.    Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

130.    BP owed and breached duties of reasonable care to ensure the safety of their operations and guard against and prevent the risk of a blowout an oil spill and its effects in the Gulf, in Florida territorial waters and of Florida shores.

131.    BP owed and breached duties of ordinary and reasonable care with respect to the design and manufacture of the BOP and float collar used on the Macondo well.

132.    BP was injecting its dispersants at the wellhead and breached a duty of ordinary and reasonable care with respect to the design, manufacture and use of the chemical dispersants.

133.    At all times BP controlled and directed the response and recovery efforts and failed to exercise reasonable care in the operation, design, implementation and execution of the response efforts, including the injection of dispersants at the wellhead. Additionally, as the chemicals entered Florida territorial waters, BP owed a duty, and failed the duty, to exercise reasonable care in response efforts, including timely mitigating of the damage caused and stopping the spread of the oil onto and around Florida waters, shores and properties.

134.    Defendant BP recklessly, willfully and/or wantonly failed to use reasonably safe chemical dispersants in reasonably safe locations and quantities in response efforts and thereby exacerbated the contamination in the Gulf of Mexico and Florida and resulting injury to Plaintiffs.

135.    The incidents described above that caused damage to Plaintiffs, were a proximate result of the negligence, fault, gross negligence, and/or willful misconduct of BP through their agents, servants, employees, contractors and other persons or entities for whose conduct   Defendant is responsible, which are more particularly described as follows:

   a. Failing to operate the Deepwater Horizon in a safe manner;

   b. Operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

   c. Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

   d. Failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil spill;

e. Failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

f. Failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

g. Failing to take appropriate action to avoid or mitigate the accident;

h. Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

i. Failing to properly train their employees;

j. Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

k. Failing to timely warn; Failing to provide respiratory and dermal protective gear to Plaintiffs;

l. Failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

m. Failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

n.  Failing to timely bring the oil release under control, to prevent the spill from migrating throughout the Gulf of Mexico;

o.  Failing to provide appropriate accident prevention equipment;

p.  Failing to ensure that the casing and float collar were properly designed and installed;

q.  Providing BOP's that failed to properly function;

r.  Failing to ensure that BOP's would work as intended;

s.  Failing to test the BOP's to ensure that they would operate properly;

t.  Recklessly altering the BOP's and failing to use them in a safe manner;

u.  Failing to conduct well cementing operations properly;

v.  Failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

w.  Failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

x.  Failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

y.  Failing to insure that adequate plans, equipment, safeguards resources, and technology were available to prevent or mitigate

the quantity of hazardous chemicals that would enter into and effect Florida territorial waters and Florida real property.

z.   Recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf including Florida territorial waters and real property.

136.   Defendants were aware at all times relevant hereto that their operations and the acts and/or omissions described above created an unreasonable risk of harm and knew that catastrophic environmental destruction and economic loss would occur if the well being serviced by the DEEPWATER HORIZON were to blow out.

137.   Defendants were indifferent to this risk of harm.   Defendants intentionally failed to perform the duties owed to Plaintiffs in reckless disregard of the consequences their actions and/or omissions would have on Plaintiffs.

138.   Moreover, Defendants acted intentionally with knowledge that their acts would probably result in injury or in such a way as to allow an inference of a reckless disregard of the probable consequences of their acts.   Therefore, Defendants are also liable to Plaintiffs for gross negligence and/or willful misconduct.

139.   Plaintiffs have suffered and will continue to suffer significant economic damages and loss of business due to the impacts and the stigma caused by the impacts, on the marine environment, fish and shellfish populations, as well as to the Gulf waters from the oil spill disaster and related response efforts.

140.    The oil spill and subsequent response and recovery efforts that have caused damage and continue to cause damage to Plaintiffs was proximately caused by Defendants' negligence, gross negligence and/or willful misconduct.

141.    Further, upon information and belief, the oil spill was proximately caused by the Defendants' violation of applicable federal safety, construction, or operating regulations and/or by violations of such regulations by an agent or employee of the Defendants and/or a person acting pursuant to a contractual relationship with Defendants.

142.    Defendants had a duty to conform their conduct in such a manner as to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist in case of emergency pursuant to federal and Florida law.

143.    Defendants failed to conform their conduct to the appropriate legal standard, thereby breaching their duty to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist and be properly implemented in case of emergency pursuant to federal and Florida law.

144.    Defendants' substandard conduct in failing to prevent the blowout, the ensuing destruction and sinking of the Deepwater Horizon, and the uncontrolled discharge of oil from the Macondo well into the Gulf of Mexico and Florida waters pursuant to federal and Florida law was the cause-in-fact of the injuries, harm, and damages suffered by the Plaintiffs.

145.    Defendants' substandard conduct in failing to prevent and/or contain the blowout that resulted in the sinking of the Deepwater Horizon and the subsequent oil spill from the Macondo well was the legal cause of the Plaintiffs' injuries, harm, and damage.

146.    In addition, and/or in the alternative, the blowout, fire, explosion, destruction of the Deepwater Horizon and ensuing oil spill were caused by defective equipment and would have been prevented by non-defective equipment, including the BOP and float collar, which were in the care, custody, and control of the Defendants and over which the Defendants had *garde*. Defendants knew or should have known of these defects and Defendants are therefore liable for the defects.

147.    BP has taken responsibility for the oil spill and cleaning up the oil spill, as former BP Chief Executive, Tony Hayward, had issued a statement on the BP website that BP is "… taking full responsibility for the spill and we will clean it up." BP has therefore admitted its liability for the oil spill.

148.    BP's duties are non-delegable.

149.    It was foreseeable that the Defendants' actions and/or omissions, resulting in the blowout of the Macondo well, the sinking and destruction of the Deepwater horizon, and the ensuing uncontrolled oil spill from the Macondo well, would proximately cause the damage, injury, and harm that Plaintiffs did suffer and will continue to suffer, as alleged herein.

150.    The injuries to the Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take reasonably necessary actions to mitigate the dangers associated with their operations.

151.     As a direct and proximate result of the Defendants' negligence and gross negligence, Plaintiffs have each suffered and will continue to suffer significant physical, economic and other damages in excess of $75,000.00 and are entitled to recover monetary damages.

152.     As a direct and proximate result of the negligence of the Defendants, the Plaintiffs' suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition.  These losses are either permanent or continuing in nature and Plaintiffs will continue to suffer these losses in the future.   Plaintiffs' physical injuries required medical care in the past and will likely require on going care in the future. The Defendants are liable jointly and severally for Plaintiffs' damages resulting from Defendants negligence and gross negligence.  As a result of Defendants' gross negligence, Plaintiffs are also entitled to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

**SECOND CLAIM FOR RELIEF**

**Claims Under General Maritime Law**

**A. NEGLIGENCE**

**(All Plaintiffs v. All Defendants)**

153.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

154.    At all times material hereto, Drilling Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

155.    At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

156.    In addition, Cameron as designer, manufacturer, and supplier of the Deepwater Horizon's BOP and float collar, respectively, owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the design, manufacture and supply of the BOP and float collar.

157.    Anadarko, Anadarko E&P, and MOEX Offshore had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the Deepwater Horizon on April 20, 2010 As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to Plaintiffs to warn of the impending disaster in sufficient time to avert it. Anadarko, Anadarko E&P, and MOEX Offshore breached their duties to Plaintiffs by

failing to warn the drilling vessel crew of the imminent blowout so that they could take evasive action.

158.    Anadarko, Anadarko E&P, and MOEX Offshore were not the passive and unknowing investors that they have portrayed themselves to be in the worldwide media.   The Operating Agreement gave Anadarko, Anadarko E&P, and MOEX Offshore rights and information regarding the Macondo well that put them on actual or constructive notice of the potentially disastrous conditions at the well site. Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to HSE information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement. Failure to exercise this role given the known history of specific problems at the well site was negligence.

159.    At all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. Thus, all activities of MOEX Offshore and MOEX USA, including activities surrounding the leasehold interest in the Macondo Prospect, should be imputed to MOECO, rendering MOECO liable to Plaintiffs for negligence.

160.    The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

161.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to Plaintiffs.

162.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs and the Gulf of Mexico's marine and coastal environments and estuarine areas.

163.    Defendants were under a duty to exercise reasonable care while participating in drilling operations on the Deepwater Horizon to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

164.    Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Deepwater Horizon in an expeditious manner.

165.    Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs.

166.    Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiffs.

167.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within

the immediate vicinity of the Deepwater Horizon in the event of a blowout, and thereby breached duties owed to Plaintiffs.

168.     Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiffs.

169.     The conduct of the Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the Deepwater Horizon and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs. One or more of the Drilling Defendants violated these statutory standards.

170.     The violations of these statutory standards constitute negligence per se under Louisiana, Texas, Mississippi, Alabama, Florida, and the general maritime law.

171.     At all times material hereto the Deepwater Horizon was owned, navigated, manned, possessed, managed, and controlled by Transocean.

172.     As the owner and manager of the Deepwater Horizon, Transocean owed duties of care to Plaintiffs to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

173.     Transocean breached its duties to Plaintiffs by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shutdown systems,

and BOP, and in disabling vital alarm systems on the Deepwater Horizon before the blowout.

174.    Transocean also breached its duties to Plaintiffs by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

175.    Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

176.    At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between Transocean and BP. Together, Transocean and BP and other Drilling Defendants were responsible for design and well control.

177.    BP owed duties to Plaintiffs to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

178.    BP breached its duties to Plaintiffs by, *inter alia*:

a.)    choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead

44

of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

b.)   using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

c.)   using too few centralizers to ensure that the casing was centered into the wellbore;

d.)   failing to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

e.)   failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

f.)   cancelling the cement bond log test that would have determined the integrity of the cement job;

g.)   failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

h.)   using an abnormally large quantity of mixed and untested spacer fluid;

i.)   failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon;

j.)   requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore; and,

k.)     causing property damage to the vessels involved in the clean-up and remediation program, and failing to properly administer and provide payment for work, time, and/or property damage to those entities and workers participating in the program.

179.    All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiffs' injuries and damages.

180.    At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

181.    At all times material hereto, Halliburton owed duties to Plaintiffs to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well.

182.    Halliburton breached its duties to Plaintiffs by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Deepwater Horizon's well. Halliburton was negligent by, *inter alia*, failing to use a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective; cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal

from being blown out by pressure from below, all of which proximately caused and/or contributed to Plaintiffs' injuries and damages.

183.    At all times material hereto, M-I was providing the drilling fluids or "mud" for the drilling operations onboard the Deepwater Horizon and was responsible for mud drilling, composition and monitoring, and for the provision of "spacer" solution.

184.    At all times material hereto, M-I owed duties of care to Plaintiffs to, *inter alia*, exercise reasonable care in providing, controlling and monitoring the mud and spacer solutions used on the Deepwater Horizon.

185.    M-I breached its duties to Plaintiffs by, *inter alia*, failing to provide, control, and monitor the mud and spacer solutions used on the Deepwater Horizon in a reasonably safe manner, proximately causing and/or contributing to Plaintiffs' injuries and damages.

186.    At all times relevant hereto, Cameron designed, manufactured and supplied the BOP that was, at all times relevant herein, appurtanant to and a part of the vessel's equipment.

187.    Cameron owed duties to Plaintiffs to, *inter alia*, exercise reasonable and ordinary care in the design and manufacture and supply of the BOP for the Deepwater Horizon.

188.    Cameron breached its duties to Plaintiffs by failing to exercise reasonable care in the design, manufacture and supply of the BOP such that it failed to operate to prevent the blowout,, thereby proximately causing and/or contributing to Plaintiffs' injuries and damages.

189. Cameron breached its duties to Plaintiffs by, *inter alia*, failing to ensure and verify that the BOP it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would foreseeably be used during the Deepwater Horizon's drilling and exploration operations; designing the BOP such that it was vulnerable to a single-point failure; failing to install a backup activation system for the BOP; and failing to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

190. In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiffs were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

191. In addition to the foregoing acts of negligence, Plaintiffs aver that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

a.)  Failing to properly operate the Deepwater Horizon;

b.)  Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

c.)  Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

d.)     Acting in a careless and negligent manner without due regard for the safety of others;

e.)     Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

f.)     Operating the Deepwater Horizon with untrained and unlicensed personnel;

g.)     Negligently hiring, retaining and/or training personnel;

h.)     Failing to take appropriate action to avoid or mitigate the accident;

i.)     Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

j.)     Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

k.)     Failing to warn in a timely manner;

l.)     Failing to timely bring the oil release under control;

m.)     Failing to provide appropriate accident prevention equipment;

n.)     Failing to observe and read gauges that would have indicated excessive pressures in the well;

o.)     Failing to react to danger signs; and

p.)     Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

192.    Plaintiffs are entitled to a judgment finding Defendants liable, jointly, severally, and solidarily, to Plaintiffs for damages suffered as a result of Defendants' negligence and awarding Plaintiffs adequate compensation therefor in amounts determined by the trier of fact.

193.    The injuries to Plaintiffs were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## B.  GROSS NEGLIGENCE AND WILLFUL MISCONDUCT

### (All Plaintiffs v. Drilling Defendants and Cameron)

194.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

195.    Drilling Defendants and Cameron owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Spill. The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

196.    Drilling Defendants and Cameron breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and

wanton disregard in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

197.    Drilling Defendants and Cameron knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

198.    Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, disabling the gas alarm system aboard the Deepwater Horizon.

199.    BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

200.    BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

201.   BP, Transocean, and M-I acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

202.   BP, Transocean, and Cameron acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the Deepwater Horizon.

203.   As a result of Defendants, BP, Transocean and Cameron's gross negligence, willful misconduct, and reckless disregard, Plaintiffs are entitled to a judgment finding Defendants, BP, Transocean and Cameron liable to Plaintiffs for damages suffered in an amount to be determined by the trier of fact, including but not limited to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## C.  STRICT LIABILITY FOR MANUFACTURING AND/OR DESIGN DEFECT

### (All Plaintiffs v. Cameron)

204.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

205.    Plaintiffs are entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the Deepwater Horizon, pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

206.    At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the Deepwater Horizon.

207.    If operating as intended on the night of the disaster, the BOP could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity and thereby sparing Plaintiffs millions of dollars in losses and damage.

208.    Cameron sold and delivered the BOP at the Deepwater Horizon to Defendant Transocean in 2001.

209.    Cameron's BOP failed to operate properly or at all, at the time of or following the blowout and this failure caused and/or contributed to the Spill.

210.    Cameron failed to effectively design the BOP with a backup activation system, or provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP.

211.    The BOP was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the BOP, which rendered the BOP abnormally dangerous. For instance, all of the emergency methods for closing the BOP provide different ways of closing a single blind shear ram, which must seal to isolate the wellbore. As such, if the blind shear ram fails to operate for any reason,

there is nothing the BOP can do to seal the well. In addition, all emergency methods of operating the BOP, other than the autoshear and ROV hot stab, rely on an operational control pod which, if not functioning, renders those methods useless.

212.    In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with the BOP.

213.    Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades. If the shuttle valve fails, the blind shear ram will be unable to seal the well.

214.    Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

215.    Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

216.    Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs when it left Cameron's control.

217.    At all times, Cameron's BOP was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Cameron prior to April 20, 2010.

218.    At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to Plaintiffs in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

a.)    Inadequate, faulty, nonfunctioning and defective battery systems;

b.)    Inadequate, faulty, nonfunctioning and defective dead man switches and related wiring;

c.)    The absence of acoustic triggers;

d.)    Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);

e.)    Improperly sealed, leaky hydraulic systems;

f.)    Improperly designed, manufactured, and installed annular seals;

g.)    Insufficiently robust blind shear rams;

h.)    Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;

i.)    Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and

j.)    In such other particulars as the evidence may show.

219.    At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

220.    At the time the BOP appurtenant to the Deepwater Horizon left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by Plaintiffs without impairing the utility, usefulness, practicality or desirability of the BOP.

221.    At all relevant times, the BOP appurtenant to the Deepwater Horizon was used in an intended and/or reasonably foreseeable manner.

222.    Plaintiffs were foreseeable bystanders and victims of the manifestation of the defects in the Deepwater Horizon's BOP.

223.    Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused Plaintiffs' injuries, and its actions and/or inactions were grossly negligent, reckless, willful, and/or wanton.

224.    As a result of the defective design and/or manufacture of the BOP, Plaintiffs have suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition.  These losses are either permanent or continuing in nature and Plaintiffs will continue to suffer these losses in the future.  Plaintiffs' physical injuries required medical care in the past and will likely require ongoing care in the future.

225.    As a result of the defect(s) in Defendant Cameron's product, Plaintiffs are entitled to a judgment finding Defendant Cameron liable to Plaintiffs for damages suffered in an amount to be determined by the trier of fact, including but not

limited to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

### THIRD CLAIM FOR RELIEF

### Claims Under General Maritime Law

### MEDICAL MONITORING AS AN ELEMENT OF DAMAGES

226.    Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

227.    Plaintiffs have been exposed to greater than normal background levels of the oil, dispersants, and/or other hazardous chemicals used for combating or resulting from the Oil Spill.

228.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

229.    Plaintiffs' exposures are likely to be causing serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

230.    The method and means for diagnosing the Plaintiffs' potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs

may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

231.    As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

232.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

233.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

234.    Plaintiffs have required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement.

235.    Defendants have denied such payment and/or have paid benefits in an insufficient amount.

236.    As a result of Defendants failure to pay and/or delay in timely providing and/or paying the proper amount, Plaintiffs have suffered further injuries and damages.

237.    Defendants failure to provide benefits has been callous, willful, wanton, or otherwise tortuous, for which punitive damages are recoverable.

238.    Defendants are also liable for all reasonable and necessary attorney's fees and costs incurred on Plaintiffs' behalf in seeking to secure proper benefits from Defendants.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## FOURTH CLAIM FOR RELIEF

## Claims Under The Oil Pollution Act

## ECONOMIC LOSS

## (All Plaintiffs v. BP, Transocean, Anadarko, Anadarko E&P, MOEX Offshore, MOEX USA, and MOECO)

239.    Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

240.    Under the Oil Pollution Act, 33 U.S.C. §2701, *et seq* ("OPA"), "each responsible party for a vessel or facility…from which oil is discharged…is liable for removal costs and damages", including "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C. §2702.

241.    A responsible party in the case of a vessel is any person owning, operating, or demise chartering the vessel. 33 U.S.C. §2701(32)(A). A responsible party for an offshore facility is the lessee or permittee of the area in which the facility is located. 33 U.S.C. 33 U.S.C. §2701(32)(C).  A lessee is any "person holding a leasehold

interest in an oil or gas lease on lands beneath navigable waters (as that term is defined in section 1301(a) of Title 43) or on submerged lands of the Outer Continental Shelf, granted or maintained under applicable State law or the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.)."  33 U.S.C. §2701(16).

242.    For purposes of determining the responsible parties for a mobile offshore drilling unit, it is first deemed to be a tank vessel and then treated as an offshore facility for excess liability.  33 U.S.C. §2704(b) (1)&(2).

243.    At all pertinent times herein, BP leased the Deepwater Horizon. Defendants, BP, Anadarko, Anadarko E&P, and MOEX Offshore held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), an oil lease on lands beneath navigable waters, before and/or at the time of the spill.  As such, they were lessees of the area within which the well (an "offshore facility") was located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA.  BP was the designated operator for said lease.  As such, they are strictly liable pursuant to Section 2702 of the OPA for all damages resulting from the spill.

244.    The United States Coast Guard identified BP, ANADARKO E&P, ANADARKO, MOEX, and TRANSOCEAN HOLDINGS as "responsible parties." Therefore, BP, ANADARKO LP, ANADARKO, MOEX, and TRANSOCEAN HOLDINGS are liable pursuant to Section 2702 for all damages that result from the Oil Spill.

245.    At all relevant times, MOECO dominated and controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore and MOEX

USA to such an extent that they were agents and/or alter egos of MOECO. Neither MOEX Offshore nor MOEX USA properly complied with corporate formalities or operated as corporations distinct from MOECO – rather, MOECO conducted its U.S. activities, including its activities regarding the Macondo Prospect lease, through these agent/alter ego entities. All activities of MOEX Offshore and MOEX USA, including the holding of the leasehold interest in the Macondo Prospect in the Mississippi Canyon Block 252, where the Macondo well is located, should be imputed to MOECO. MOECO is therefore a "responsible party" under OPA and liable to Plaintiffs for damages available under that statute

246.    Defendant, BP and Transocean are not entitled to limit their liability under Section 2704(a) of OPA because the oil spill disaster was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations as alleged above.  Additionally, in its "Statement of BP Exploration & Production, Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990" filed on October 19, 20120, BP explicitly waived the right to raise the statutory limitation on liability under OPA.

247.    As a result of the Spill and the resulting damages to natural resources in the Gulf of Mexico, Plaintiffs have sustained and will continue to sustain a loss of profits and/or impairment of earning capacity, as alleged above.  Plaintiffs have not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from BP, Transocean, Anadarko, Anadarko E&P, MOEX

Offshore, MOEX USA, and MOECO for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below.

248.   As a direct and proximate cause and post explosion clean-up efforts from the Oil Spill, Plaintiffs have sustained damage to their real and/or personal property as a result of the post-explosion clean-up activity, and they are entitled to recover from BP, ANADARKO E&P, ANADARKO, MOEX and TRANSOCEAN HOLDINGS for such damages in amounts to be determined by the trier of fact.

249.   Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery for damages to real and/or personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real and/or personal property, which shall be recoverable by a claimant who owns or leases that property."

250.   As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[D]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

251.   As a result of the oil spill and the resulting damage to the marine environment in the Gulf of Mexico, Plaintiffs are entitled to damages pursuant to OPA, Section 2702(b)(2)(E), which allows for "[D]amages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

252.    It was foreseeable that a massive oil spill in the Gulf of Mexico would cause economic harm to Plaintiffs' businesses in Florida.

253.    To the extent required by law, and/or by consent or stipulation by BP, Plaintiffs have satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

254.    Plaintiffs are entitled to recover from Defendants for economic damages occasioned as a result of the oil spill in amounts to be determined by the jury.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## FIFTH CLAIM FOR RELIEF

### (<u>All Plaintiffs v. BP, Halliburton and Transocean</u>)

### <u>FRAUDULENT CONCEALMENT</u>

255.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

256.    To the extent available under state law, Plaintiffs are entitled to recovery against Defendants BP, Halliburton and Transocean for their fraudulent concealment of material facts concerning the Spill.

257.    After the explosions, Defendant BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was

found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

258.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

259.    In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

260.    In fact, BP did not have proven equipment and technology to respond to the Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

261.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

262.    Despite its inability to respond and control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would

have provided a more accurate picture of the amount of oil that was gushing from the well.

263.     BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Spill.

264.     The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to disclose.

265.     In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the Spill, all of which demonstrated that the foam cement used at Macondo was unstable.

266.     The instability of the cement used at the Macondo well and the results of the testing performed before the Spill were material facts that Halliburton had a duty to disclose.

267.     Moreover, BP was aware, before the Spill, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

268.     For its part, Transocean misrepresented and concealed the condition of the Deepwater Horizon and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its BOP.

269.     Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

270.    Transocean misrepresented and concealed the condition of many key components, including, *inter alia*, the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury or environmental damage.

271.    The foregoing known hazards, poor condition, and maintenance and safety issues associated with the Deepwater Horizon and its appurtenances and equipment were material facts that Transocean had a duty to disclose.

272.    Defendants Halliburton, BP, and Transocean failed to disclose or concealed the foregoing material facts, and their failure to do so induced Plaintiffs to act or to refrain from acting to protect their property, businesses, livelihoods and income.

273.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, Plaintiffs suffered damage to their businesses, livelihood, income and damage to and diminution in value of their property, for which they are entitled to compensation.

274.    Moreover, the acts of misrepresentation and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## SIXTH CLAIM FOR RELIEF

### Negligence *Per Se*

### (All Plaintiffs v. All Defendants)

275.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

276.   Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

277.   One or more of Defendants violated these statutory and/or regulatory standards.

278.   Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law.

279.   Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which in turn caused Plaintiffs' injuries and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

280.    As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, Plaintiffs have suffered physical injuries and/or property damage.  Plaintiffs are entitled to a judgment in their favor for damages suffered in an amount to be determined by the trier of fact, including, but not limited to, punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## SEVENTH CLAIM FOR RELIEF

### Nuisance

### (All Plaintiffs v. All Defendants)

281.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

282.    BP's oil disaster has significantly interfered with the public's right to use and enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated pollution.

283.    Prior to the *Deepwater Horizon* disaster, Plaintiffs enjoyed the use of the Gulf of Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

284.    Since the disaster, Plaintiffs have been unable to fish or boat, and many have lost their livelihoods.

285.    As a direct and proximate cause of the oil disaster, and Plaintiffs' work to assist in the relief effort, these Plaintiffs were exposed to harmful chemicals in the crude oil and in the chemical dispersants at levels, amounts, and under conditions different from the general public.

286.    As a result of the oil disaster, Resident Plaintiffs are constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions different from the general public.

287.    Moreover, Plaintiffs were subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants.

288.    Plaintiffs have no adequate remedy at law.

289.    There exists an imminent likelihood of irreparable harm if the injunction is not issued.

290.    The threatened harm to the Plaintiffs and class members outweighs any potential harm to Defendants.

291.    Granting the injunction does not contravene a substantial public interest.

292.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages, including costs of future medical screening and monitoring, for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance.

WHEREFORE, the Plaintiffs, demand judgment for damages against the

Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## EIGHTH CLAIM FOR RELIEF

### Battery

### (All Plaintiffs v. All Defendants)

293.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

294.    Defendants placed Plaintiffs on cleanup and response activities without adequate training, warning of risks, or safety equipment.

295.    Defendants intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of Plaintiffs.

296.    Defendants' spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning or safety equipment has caused Plaintiffs to be exposed to harmful chemicals and resulted in physical symptoms.

297.    Defendants spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning has caused Plaintiffs to be exposed to harmful chemicals and resulted in physical exposure and harm.

298.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages suffered as a result of subjecting Plaintiffs to unwanted, offensive conduct and enjoining Defendants' tortious conduct toward Plaintiffs.  Further, Plaintiffs are entitled to an award of Punitive Damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the

Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## NINTH CLAIM FOR RELIEF

### Florida Medical Monitoring Claim

### (Florida Plaintiffs v. All Defendants)

299.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

300.   Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief set forth herein, and if Defendants are not ordered to create, fund and support a medical monitoring program as set forth herein.

301.   Plaintiffs demand injunctive and equitable relief and that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs in Florida.

302.   Plaintiffs have been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

303.   The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiffs have been exposed.

304.   Plaintiffs' exposures were caused by Defendants' negligence or otherwise tortious conduct.

305.   Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

306.    The method and means for diagnosing Plaintiffs' potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

307.    As a proximate result of Plaintiffs' exposure to oil, dispersants, and/or other hazardous chemicals which have been released from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

308.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

309.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.


## VI. PUNITIVE DAMAGES

310.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

311.    Defendants BP, Transocean, and Halliburton engaged in

conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

312.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

313.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

314.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

315.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous

activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

316.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

317.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

318.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

319.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

320.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

321.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

322.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

323.     BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

324.     BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

325.     BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

326.     BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

327.    Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

328.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

329.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

a.)    failed to properly maintain and/or operate the Deepwater Horizon;

b.)    operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

c.)    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

d.)    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

e.)    violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f.)     failed to take appropriate action to avoid or mitigate the accident;

g.)     failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h.)     failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

i.)     failed to provide appropriate disaster prevention equipment;

j.)     failed to have an appropriate emergency spill response plan or readily available spill response equipment.

330.    BP and Dispersant Defendants recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

331.    BP and Dispersant Defendants recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

332.    Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

333.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

334.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

335.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## VII. NEGLIGENCE

### (Plaintiffs v. Airborne Support International Inc. and Airborne Support, Inc.)

336.    Plaintiffs reallege and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

337.    ASI INTERNATIONAL and ASI owed the Plaintiffs a duty, and failed that duty, to refrain from conduct that causes damage to the Gulf waters and the

marine ecosystem of Florida upon which the Plaintiffs' businesses, properties and incomes are financially and economically dependent.

338.    ASI INTERNATIONAL and ASI owed and breached duties of reasonable care to ensure the safety of their operations and to guard against and prevent injury to the environments, habitats, waters and land into which their activities in spraying chemicals occurred.

339.    ASI INTERNATIONAL and ASI owed a duty and failed in their duty to know what products they were spraying or applying onto the waters of the Gulf of Mexico and Florida territorial waters and real property and to know the likely impact that their activities would have upon the environments on which they were spraying their chemicals. ASI INTERNATIONAL and ASI applied the chemicals and dispersants without regard to the likely short and long term impacts likely to be caused by the quantity and geographic broad scope of their chemical applications onto hydrocarbons.

340.    ASI INTERNATIONAL and ASI owed a duty and breached the duty to spray chemicals onto the waters of the Gulf of Mexico including Florida territorial waters and real property in a way which was consistent with their product labels.

341.    ASI INTERNATIONAL and ASI owed a duty, and breached the duty, to warn of the effects of their spraying activities to Plaintiffs and all those who would be potentially injured or damaged by their activities in a time frame which would have allowed Plaintiffs to attempt to stop or reduce the quantity or location of the spraying activities, or alternatively to devise plans to mitigate or prevent damage to the Gulf waters or properties which affect their properties and or businesses.

342.    ASI INTERNATIONAL and ASI owed a duty to reject spraying huge quantities of dispersants onto the Gulf and Florida territorial waters in order to protect the Gulf ecosystem on which Plaintiffs rely for their economic benefit. ASI INTERNATIONAL and ASI knew or should have known that they would be spraying quantities of chemicals over volumes of water in ways which had never been tested for affect. ASI INTERNATIONAL and ASI breached that duty of reasonable care.

343.    ASI INTERNATIONAL and ASI, in concert with the BP Defendants, committed tortious acts in Florida territorial waters which polluted Florida territorial waters and real property with dispersed and solubilized oil/dispersant molecular amalgams.  Due to the tortuous spraying of dispersants onto hydrocarbons in Florida territorial waters, these molecules were dispersed throughout Florida territorial waters at all levels of the Gulf of Mexico waters, and traveled to the sea floor and into Florida estuaries, tidal flats, bays, and onto and into the soils of Florida real property.  In the physical state caused by the use of the dispersants in Florida territorial waters, the toxic chemical amalgams became more bio-available and caused harmful contact to marine organisms at all levels of that Florida ecosystem.  The harmful contact likely caused, and is causing, injury to the chain of living organisms, both plant and animal, from the sea floor through the water profile to the surface, into tidal regions of Florida territorial waters and onto and into Florida real property. Because of it solubilized state, the oil/dispersant amalgam has penetrated into the sediments and soils of Florida properties such that it has migrated inland above the high water marks of the shores and penetrated many feet deep into those shores and real properties.  Superficial surface clean-up is ineffective in restoration of this type of damage.

344.    ASI INTERNATIONAL and ASI owed a duty and failed in its duty of exercising reasonable care in the use of dispersants repetitiously in the same and contiguous areas, and in the type of the dispersants used.

345.    ASI INTERNATIONAL and ASI owed a duty and failed in that duty to mitigate the damages caused by the negligent activities in order to prevent its harm or to reduce the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico and Florida territorial waters and real property.

346.    As a direct and proximate result of the Defendants' ASI INTERNATIONAL and ASI's negligence, Plaintiffs have each suffered and will continue to suffer significant economic and other damages in excess of $75,000.00 and are entitled to recover monetary damages, including but not limited to, diminution of value to business, diminished value of real and personal property, loss of income and revenue, recoupment of expenses used to mitigate and support their business once injured, loss of business goodwill, stigma damages, loss of customer base, and all other consequential and incidental damages resulting from Defendants' conduct. The Defendants, BP, ASI INTERNATIONAL and ASI are liable jointly and severally for Plaintiffs' damages resulting from Defendants' negligence.  As a result of Defendants' gross negligence, Plaintiffs are also entitled to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## VIII. <u>DERIVATIVE CLAIM OF PLAINTIFF, AUSTIN NORWOOD</u>

347.    Plaintiff realleges and reavers each and every allegation as if fully set forth herein and further states:

348.    At all times material hereto, the Plaintiff, MARGARET NORWOOD, was and is the lawful wife of the Plaintiff, AUSTIN NORWOOD.

349.    As a direct and proximate result of the negligence of the Defendants, Plaintiff, MARGARET NORWOOD, has suffered and will continue to suffer the loss of her husband's services, support, consortium and the care and comfort of his society.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants jointly, severally and solidarily, and demands trial by jury of all issues triable as of right by jury, as follows:

1. Economic and compensatory damages in amounts to be determined at trial;

2. Punitive damages;

3. Damages for medical screening and monitoring;

4. The implementation of medical screening and monitoring program to be funded by the Defendants;

5. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

6. Attorneys' fees and costs of litigation;

7. Injunction to abate the public nuisance created by Defendants;

8. Injunction to abate the unwanted, offensive conduct by Defendants;

9. Injunction to require monitoring of air and water;

10. Any other and further relief available under all applicable state and federal laws; and

11. Any other and further relief the Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Plaintiffs' Amended Complaint for Damages has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 16th day of April 2013.

Respectfully submitted,

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN & McKEE, P.A.


By:  /s/    Robert J. McKee

Robert J. McKee, Esquire
Florida Bar Number:  972614
rmckee@krupnicklaw.com
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301-3426
954-763-8181 telephone
954-763-8292 facsimile

and

Stuart H. Smith, Esquire
Louisiana Bar Number:  17805
ssmith@smithstag.com
SMITH STAG, L.L.C.
One Canal Place, Suite 2850
365 Canal Street
New Orleans, Louisiana  70130
(504) 593-9600 telephone
(504) 593-9601 facsimile

*Attorneys for Plaintiffs*