

**U.S. Department of Justice**

Environment and Natural Resource Division

*P.O. Box 7611*
*Washington, DC 20044*
*202-514-0056*
*Scott.Cernich@usdoj.gov*

April 18, 2013

**BY ELECTRONIC MAIL**

The Honorable Sally Shushan
United States Magistrate Judge
United States District Court for the
Eastern District of Louisiana
Hale Boggs Federal Building
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

>      Re:      MDL 2179: Preliminary Schedule for Phase Two Expert Depositions for Weeks
>               One through Six – Dr. Tom Hunter

Dear Judge Shushan:

We write to respond to BP's April 11, 2013 request for a second two-day deposition of Dr. Tom Hunter.  The United States believes that such a deposition is duplicative and unnecessary because Dr. Hunter already was deposed for two full days (October 30-31, 2012) on the same flow rate calculations – calculations performed during the response and shared with BP - that are the subject of his anticipated expert testimony at trial.  There is no reason, let alone a compelling one, that Dr. Hunter should be deposed for four days on the same material.

**1.  Dr. Hunter Should Not Be Deposed a Second Time on the Same Topic**

Dr. Hunter was co-lead, along with Secretary Steven Chu, of the Government-led Science Team that was assembled to assist with the response. As part of his work, he directed the engineers and scientists from Sandia, Los Alamos, and Lawrence Livermore National Laboratories (the DOE National Nuclear Security Agency ("NNSA") labs) who worked on the response. On October 30-31, 2012 Dr. Hunter was deposed in his personal capacity and as a United States Rule 30(b)(6) designee on a variety of topics related to Source Control and Quantification.  Most importantly, Dr. Hunter was the United States' designee for Topic No. 53 in BP's Rule 30(b)(6) notice to the United States as that topic related to the work of the DOE Science Team:

The methods, calculations, analyses, estimates, factors, data and assumptions considered or employed by the Science Team or any of its members to quantify or estimate the flow of hydrocarbons from the MC252 well.

Dr. Hunter also was the United States' Rule 30(b)(6) designee on a number of other Quantification-related topics including, but not limited to:

Topic No. 42 (for the DOE NNSA work): All communications, data, modeling, calculations and analysis identifying or relating to factors affecting the ability to estimate the flow of hydrocarbons from the MC252 well or the accuracy of any such estimate.

No. 54 (for the DOE Science Team): All communications involving the Science Team or any of its members regarding the difficulty, quality, accuracy or uncertainty associated with any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

No. 55 (for the DOE Science Team): All communications involving the Science Team or any of its members regarding the purpose or timing of any attempt to quantify or estimate the flow of hydrocarbons from the MC252 well.

During his October deposition, BP interrogated Dr. Hunter extensively on the flow rate calculations performed during the response. BP had ample opportunity to explore the universe of calculations on which Dr. Hunter may testify. BP questioned Dr. Hunter extensively on his own Capping Stack flow rate calculations (Ex. 9905), the DOE NNSA labs' Top Hat 4 flow rate calculations (Ex. 9900), as well as other U.S. government calculations. Attachment A to this letter includes a few examples of BP's questioning of Dr. Hunter on flow rate calculations. It is important to note that Anadarko forewent asking Dr. Hunter even a single question during the October 2012 deposition.

On March 22, 2013 the United States disclosed Dr. Hunter as a Rule 26(a)(2)(C) expert witness who "may testify regarding flow rate calculations performed during the response." Since he already has testified for two full days on the same flow rate calculations that are the subject of his anticipated expert testimony, a second deposition is unnecessary.

In essence, Dr. Hunter was proffered as the United States' representative – and deposed for two days – on the flow rate work he performed and reviewed during the response. If he testifies at trial, he would testify on the same subjects.

## 2. BP's Reliance on the Phase 1 Graham ("Pinky") Vinson Situation is Misplaced

BP attempts to analogize to the situation regarding BP Phase 1 witness Graham ("Pinky") Vinson, but Dr. Hunter's situation is entirely different. Mr. Vinson was deposed in Phase 1 as a fact witness (because he had direct involvement with the Macondo well prior to the blowout) and as a Rule 30(b)(6) designee on two discrete topics that were unrelated to his later proposed expert testimony. Mr. Vinson was produced for an expert deposition because his opinions were not the subject of his prior testimony.

BP designated Vinson for the following Phase 1 Rule 30(b)(6) topics related to the Deepwater Horizon blowout preventer ("BOP") and BP policies regarding "pay zones":

> 21.  Any estimates, predictions, and/or analyses of anticipated pressures both static pressure and/or dynamic pressure within the formations of the Macondo Prospect and/or the Macondo Well, including, but not limited to, the information provided to Transocean and the manner in which such information was utilized in selection of or approval of the BOP assembly used by the Deepwater Horizon for the Macondo Well.

> 35.  The existence, nature, scope and contents of any BP guidelines, policies or practices relating to locating and determining pay zones or potential pay zones in a well.

Mr. Vinson's proposed expert opinions, however, dealt with different issues and offered *new* opinions, *i.e.*, whether BP had properly identified the top hydrocarbon bearing zone, that the M57B zone was not likely a hydrocarbon zone, that BP's analysis of the top hydrocarbon zone was complete, accurate, and appropriate, and that indicators available during wireline logging would not cause a reasonable operator to conclude that M57B was a hydrocarbon bearing zone and that the BP team appropriately identified the top hydrocarbon zone.  Accordingly, the parties were given the opportunity to depose Mr. Vinson on this new material.

In contrast, BP simply seeks to retread the same ground covered in Dr. Hunter's prior two-day deposition.  The United States has not disclosed any new opinions or calculations from Dr. Hunter.  If Dr. Hunter testifies at trial, it will be on the calculations he performed and reviewed during the response – the same calculations that were the subject of his prior deposition.

In its April 11, 2013 letter to the Court, BP argues that its Internal Investigation ("Bly") Team members (Corser, Robinson, Cowie) were not required to sit for a second deposition because their testimony was limited to facts and opinions set forth in BP's Bly Report.  In fact, they were not required to be deposed a second time *despite* the fact that BP's October 17, 2011 Rule 26(a)(2)(C) disclosure (see Attachment B to this letter) revealed that Messrs. Corser and Cowie would provide new opinions *in addition to* those tied to the Bly Report.  Specifically, BP disclosed that Mr. Corser was "expected to testify regarding the role and function of a BP Drilling Engineer in well design and execution" and that Mr. Cowie was "expected to testify regarding the roles and responsibilities of BP and rig personnel during operations" in addition to testimony "consistent with the facts and opinions set forth in" the Bly Report.

Here, however, Dr. Hunter is not offering new opinions or calculations and, similar to the Bly Team members, he would testify regarding *documented* flow rate calculations performed during the response – calculations that were the very subject of his prior two-day deposition.

For the foregoing reasons, the United States believes it is unnecessary to provide additional deposition dates for Dr.  Hunter.

Respectfully submitted,

/s/ Scott M. Cernich
Scott M. Cernich

cc:      Liaison & Coordinating Counsel
         Mike O'Keefe

# Attachment A

01-40976
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | ) | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | ) | |
| GULF OF MEXICO, on | ) | SECTION: J |
| APRIL 20, 2010 | ) | |
| | ) | JUDGE BARBIER |
| | ) | |
| | ) | MAG. JUDGE SHUSHAN |

## CONFIDENTIAL

### *WorldwideVIEW* ™
**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# Thomas O. Hunter, Ph.D.

**VOLUME 1**

OCTOBER 30, 2012

# *COPY*



WORLDWIDE

*Systems Technology for the Litigation World*

Litigation Group♦Court Reporting♦Video Production♦Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

142

1    alternative paths?

2         A.  That's correct.

3         Q.  Okay.  And it be -- would it be fair to

4    say that both personally and with respect to the

5    DOE work, in terms of calculating flow rates, the

6    flow path of hydrocarbons was indeterminate in

7    the DOE work in determining flow rate from the

8    well?

9                   MR. CHAKERES:  Object to form and

10   scope.

11        A.  I'd have to quantify that into two

12   periods in which an assessment of flow was made.

13        Q.  (By Mr. Regan) Okay.

14        A.  Beyond that, there could be calculations

15   done by people in the -- in the Science Team who

16   were Members of the DOE laboratories who could

17   have done additional work.

18        Q.  Okay.  To the -- to what you are aware of

19   and prepared to testify to today, what role, if

20   any, did flow path play in the DOE work in

21   determining flow rate from the well?

22        A.  Okay.

23                   MR. CHAKERES:  Object to scope.

24        A.  And I will use those two periods in which

25   an estimate of flow was made.

1          Q.   (By Mr. Regan)  Okay.

2          A.   Is -- is that -- is -- does that satisfy

3     your question?

4          Q.   Yeah.   It's your answer, so, okay, sir.

5          A.   Okay.   Yeah.   In the period in June --

6     June, the Top Hat evaluation, that is, the flow

7     through and around the Top Hat was assessed, and

8     the flow path within the well was not a major

9     factor.

10         Q.   Okay.

11         A.   In the work that ended at the end of

12    July, the principal method that was used was the

13    assessment of the flow through the capping stack,

14    and the release of a capping stack, and the flow

15    path deep within the well was not a major factor.

16         Q.   Are you aware of flow rate conclusions

17    that were reached by you, personally, or the DOE

18    Science Team, outside of what you've identified

19    as those two periods, the June Top Hat period and

20    the July 31st, what I call in the capping stack

21    period?

22              MS. RICHARD:   Objection, form.

23         A.   I -- I will do it for me personally, and

24    then I'll do any knowledge I have beyond.   Is

25    that --

1      Q.  (By Mr. Regan) Yes.

2      A.  Okay.  For me personally, the only other

3  involvement I personally had in looking at the

4  flow was the impact of -- in -- the change in

5  flow, not the flow, the change in flow from the

6  riser removal.

7      Q.  Okay.

8      A.  Beyond that, I had no --

9      Q.  Okay.

10      A.  -- involvement, nothing personal.

11      Q.  So we'll use those as if I could call

12  them three periods --

13      A.  (Nodding.)

14      Q.  -- a June Top Hat period, a July 31st

15  period, and a riser removal period --

16      A.  M-h'm.

17      Q.  -- okay, definitionally.

18      A.  For my personal role.

19      Q.  Okay.  Out -- with respect to the larger

20  DOE or Science Team work, are you aware of any

21  other periods, other than those three?

22      A.  There were no periods beyond that that --

23  there were periods of work, and there are periods

24  of assessment.  There were no periods of reaching

25  a -- a result which became part of the flow rate

1    estimates.

2        Q.   Outside of those three periods?

3        A.   Correct.

4        Q.   Okay.  What was the impact of flow path

5    in the assessment of -- of the riser removal?

6                MR. CHAKERES:  Object to scope.

7        A.   The only way to assess rival removal --

8    the only available way to assess rival removal --

9    riser removal, excuse me, was to use the pressure

10   measurements that were obtained that we could

11   obtain from the BOP stack, and the flow path down

12   in the wellbore had little impact.

13       Q.   (By Mr. Regan) Okay.  So to your

14   knowledge, using the PT-B pressure data, the

15   analysis that was done by Mister -- by

16   Dr. Dykhuizen and others did not require

17   conclusions about whether flow was through the

18   center of the production casing or,

19   alternatively, on the outside of the production

20   casing through ports on a casing hanger seal

21   assembly and into the BOP?

22               MR. CHAKERES:  Object to form.

23       A.   I'd have to divide it into two phases:

24   My -- my role and -- and the role of the Team.

25            In my personal role, it -- it made --

```
 1                    THE VIDEOGRAPHER:  The time is

 2     3:06 p.m.  We're off the record, ending Tape 5.

 3              (Recess from 3:06 p.m. to 3:18 p.m.)

 4                    MR. REGAN:  Okay.  I'm ready when

 5     you are.

 6                    THE VIDEOGRAPHER:  The time is

 7     3:18 p.m.  We're back on the record, beginning

 8     Tape 6.

 9         Q.  (By Mr. Regan) Dr. Hunter, if you could

10     turn to Tab 91 in the notebook in front of you --

11         A.  Yes.

12         Q.  -- and mark that with Exhibit 9905.

13         A.  Yes.

14              (Exhibit No. 9905 marked.)

15         Q.  (By Mr. Regan) What we're marking as 9905

16     is an E-mail from you, dated July 16th, 2010, to

17     Secretary Chu and others, titled "Fluids 101."

18     Do you recognize this document?

19         A.  I do.  I just don't recognize the date.

20         Q.  Okay.  What is it?

21         A.  It's an attached Excel file which

22     describes a calculation I made, I thought on the

23     14th of July.

24         Q.  Okay.  And is this calculation -- in --

25     in your E-mail in Exhibit 9905, you refer to it
```

1    as a "back of the envelope estimate of...flow

2    using pressure differential inside the sealing

3    cap and the sea at two different times when the

4    difference in flow out of the cap was about

5    20,000 barrels per day," correct?

6        A.   That's correct.

7        Q.   And was this the genesis of then what

8    became one of the primary methods of calculating

9    flow by the Department of Energy and Tri-Labs?

10       A.   It was.

11       Q.   Okay.  In your E-mail, you say:  "It does

12   not account for two differences in 2 phase flow

13   conditions."  What does that mean?

14       A.   I think it means differences in two-phase

15   flow conditions.  I don't think it means two

16   differences.  I probably --

17       Q.   Okay.

18       A.   I probably got my "two" and my "two

19   phase" --

20       Q.   Understood, understood.

21            In what respect does your

22   back-of-the-envelope estimate not account for

23   two-phase flow conditions?

24       A.   The method makes the assumption that the

25   fluid characteri -- characteristics are roughly

1    the same for two different periods of time.  So

2    it -- that -- that's the -- that's what I was

3    referring to.

4        Q.  Okay.  And if -- was there a method to

5    actually start to account for two-phase flow

6    conditions in this estimate?  Is there a way that

7    you could have done it?

8                MR. CHAKERES:  Object to form.

9        A.  There's no way I could have done it and

10   done it, looking back.  I didn't choose to do any

11   more with it at that point.  I left that to the

12   rest of the Team.

13       Q.  (By Mr. Regan) Does the failure to

14   account for differences in two-phase flow

15   conditions raise potential error bounds to this

16   style or method of estimation?

17       A.  I --

18                MR. CHAKERES:  Object to the form.

19       A.  My personal view is it doesn't raise much

20   of a difference.

21       Q.  (By Mr. Regan) Well, how much error do

22   you think is -- can be attributed to -- or

23   potential error can be attributed to the absence

24   of this methodology accounting for multiphase

25   flow?

```
 1              MR. CHAKERES:  Object to the form.
 2        A.  I couldn't quantify it, but I don't think
 3   very much.
 4        Q.  (By Mr. Regan) Okay.  Forgive me, but in
 5   terms of your world, "very much" may mean
 6   different than mine.
 7        A.  Thank you.
 8        Q.  Okay.  So in your world, can you ascribe
 9   a percentage to what you believe the failure of
10   your methodology to account for multiphase flow
11   would mean?
12        A.  Yeah.  If I were to try to describe it, I
13   would say in the range of a few percent.
14        Q.  Okay.  You also reference a need to
15   account for "the roughly 400 psi increase upon
16   installing the cap."  Do you see that in your
17   E-mail?
18        A.  Yes.
19        Q.  Okay.  And that's a reference to the fact
20   that when this capping stack was actually
21   installed, it created potential additional
22   backpressure.  Is that right?
23        A.  That is correct.
24        Q.  Is that -- that backpressure was caused
25   by, broadly speaking, there being a more
```

1    restrictive environment for the flow, correct?

2         A.   The insertion of a new restriction.

3         Q.   The insertion of a new restriction.

4         A.   Correct.

5         Q.   Okay.  And that issue -- that is, the

6    impact of the insertion of the capping stack as a

7    restriction -- was one that was carried forward

8    through the end of July, in terms of the

9    cumulative flow estimates that DOA [sic] did,

10   correct?

11        A.   It was accounted for in the cumulative

12   flow estimates --

13        Q.   Okay.

14        A.   -- that the DOE did.

15        Q.   Can you identify any other restrictions

16   that were accounted for from the capping stack

17   down, in the estimate that was done

18   instantaneously -- that is, the 53,000 estimate

19   at the end of July -- or in the extrapolation

20   backwards all the way to Day Zero --

21        A.   I'd ha --

22        Q.   -- other than the additional backpressure

23   caused by the new restriction of the capping

24   stack?

25                    MR. CHAKERES:  Object to form and

1    scope.

2         A.   I -- I'd have to break it into those two

3    periods you suggest, the instantaneous, which was

4    Day 87, and the extrapolation back.

5         Q.   (By Mr. Regan) Okay.

6         A.   On Day 87 estimates, the -- this method

7    is -- is as I described.  The method of looking

8    at the choke closure and the pressure

9    measurements as a function of choke closure were

10   done then, and I would argue that both of these

11   meth -- both of those methods account for every

12   restriction in the well, because they're all --

13   they've all been passed through before the flow

14   goes through this controlling mechanism.

15        Q.   Okay.  For an instantaneous flow rate.

16        A.   For the Day 87 flow rate.

17        Q.   Okay.  But you know that there are

18   potential restrictions below those points in the

19   well, correct?

20        A.   Correct.

21        Q.   And you know those -- the -- the -- the

22   flow that you were then trying to extrapolate

23   backwards from is for 86 days of activity prior

24   to your instantaneous calculation, correct?

25        A.   Correct.

330

 1      Q.  And is it true that the final model done

 2    at the end of July does not in any way account

 3    for those additional restrictions that may have

 4    existed in whatever form in those preceding 86

 5    days?

 6      A.  No.  It's true tho -- that model does not

 7    account for changes in those conditions.

 8      Q.  Okay.  It -- the -- the model assumes

 9    that those restrictions on Day Zero are the same

10    as they are on Day One --

11      A.  Uh --

12      Q.  -- and the same on Day 2, Day 5, Day 10,

13    Day 70, Day 86, correct?

14      A.  Wi -- with the exception of the riser

15    kink --

16      Q.  Okay.

17      A.  -- and -- and in -- installation of the

18    capping stack.

19      Q.  So a fundamental assumption of your flow

20    rate estimates at the end of July 2010 is that

21    the restrictions inside the well did not change

22    at all between Day Zero and Day 86, with one

23    exception; that is, the cutting of the riser?

24              MR. CHAKERES:  Object to form and

25    scope.

```
 1        A.  No, I don't think that's an accurate
 2   statement.
 3        Q.  (By Mr. Regan) Okay.  How is it
 4   inaccurate?
 5        A.  You said the flow rate didn't change
 6   during that period of time.  We explicitly
 7   accounted for the change --
 8        Q.  No --
 9        A.  -- in reservoir pressure.
10        Q.  I said the restrictions in the well.
11        A.  I'm -- thank you.
12        Q.  Okay.
13        A.  Okay?
14        Q.  Let me ask the question.
15        A.  We -- we did not account for any changes
16   in restrictions of the well during that interval.
17        Q.  Okay.
18        A.  Thank you.  I -- sorry.  I misunderstood.
19        Q.  Okay.  So do -- do you believe that that
20   assumption is potentially wrong?
21             MR. CHAKERES:  Object to form and
22   scope.
23        Q.  (By Mr. Regan) Do you believe the
24   assumption that the restrictions in the well did
25   not change between Day Zero and Day 86 could
```

1    potentially have been wrong?

2              MR. CHAKERES:  Object to scope.

3         A.   I'm only struggling with the idea of a

4    wrong assumptions and what that means.

5         Q.   (By Mr. Regan) Okay.

6         A.   That --

7         Q.   Well --

8         A.   -- assumption was the --

9         Q.   -- let me ask --

10        A.   -- best assumption we could make with the

11   data that we had.

12        Q.   Let me ask it this way:  Do you accept

13   the fact that your assumption that there was no

14   change in restrictions in the well from Day Zero,

15   the day the DEEPWATER HORIZON sank -- was on --

16   exploded, through Day 86 -- do you accept that

17   that assumption could be inconsistent with actual

18   fact?

19             MR. CHAKERES:  Object to scope.

20        A.   All assumptions bear that liability.

21        Q.   (By Mr. Regan) Okay.

22        A.   And -- and -- and what -- my statement

23   would be that there was no other assumption that

24   could be made with the data available.

25        Q.   Okay.  So because of the absence of data,

333

1    you felt that you were forced, in essence, to

2    assume that there had been no changes?

3                MR. CHAKERES:  Object to scope.

4        A.   No, there was not an absence of data.  We

5    were able to infer the reservoir pressure at both

6    ends of that time period.  So there was data --

7        Q.   (By Mr. Regan) All right.

8        A.   -- showing that there was a decrease, a

9    depletion of the reservoir, over that time

10   period.

11       Q.   No, but I'm asking about your assumption

12   that the restrictions inside the well did not

13   change.  Those restrictions are independent

14   variables from the reservoir pressure, correct?

15       A.   That's correct.

16       Q.   Right.  The reservoir pressure could

17   change but not actually increase flow because of

18   restrictions in the well, correct?

19                MR. CHAKERES:  Object to scope.

20       A.   Are you asking if that's physically

21   possible?

22       Q.   (By Mr. Regan) Yes, sir.

23       A.   Of course, it's physically possible.

24       Q.   Right.  And your model does not account

25   for that possibility.

 1        A.   The model does not account for any change

 2    in the flow restrictions --

 3        Q.   Okay.

 4        A.   -- during that period of time, except for

 5    the riser cut --

 6        Q.   Right.

 7        A.   -- and the insertion of the --

 8        Q.   Right.

 9        A.   -- capping stack.

10        Q.   So that's a known/unknown, correct?

11    The -- the -- what actual changes took place in

12    restrictions in the well, as of the time that you

13    did this July flow rate estimate, you would say

14    that's a known/unknown?

15              MR. CHAKERES:   Object to form and

16    scope.

17        A.   It is a known/unknown, and its relevance

18    is also unknown.

19        Q.   (By Mr. Regan) Okay.  And when you were

20    faced in this situation with a known/unknown, did

21    you undertake any scientific assessment as how to

22    characterize the impact of that assumption being

23    wrong on your model's output?

24        A.   And I think you asked me that before, and

25    it basically was:  Did we try to account for

1    changes in the flow path in the BOP, for example?

2    And we did not try to do that.

3         Q.   Okay.  I -- I -- I know you factually

4    didn't account for it in the model, but I'm

5    asking a separate question.

6         A.   (Nodding.)

7         Q.   The model is giving you an output --

8         A.   M-h'm.

9         Q.   -- of X, 53,000.  You have a

10   known/unknown, which is:  Could there have been

11   changes in restrictions in the well?  You have a

12   clear assumption.  We're assuming there was no

13   changes in restrictions, right?

14        But did you then say:  Do we need, for

15   decision-makers, to let them know what's the

16   possibility of our assumption being wrong; that

17   is, should we give them an uncertainty bound on

18   that assumption?

19        Do you follow me?

20        A.   I --

21             MR. CHAKERES:  Object to form and

22   scope.

23        A.   I do follow you.

24        Q.   (By Mr. Regan) And was that ever done?

25   Did you ever do an uncertainty analysis as to the

1    impact of your assumption of no change in

2    restrictions being wrong?

3              MR. CHAKERES:   Same objections.

4         A.   Let me answer what we did do.   And you

5    asked me did we ever assess whether it was wrong?

6         Q.   (By Mr. Regan) (Nodding.)   Or the impact

7    of it being wrong.

8         A.   The impact, right.

9              There was, no doubt, discussion among all

10   the analysts of -- of whether or not that factor

11   could be accounted for.   From that discussion --

12   and I wasn't privy to all that discussion.

13             There was no doubt at least mental

14   exercises of trying to sort out whether that

15   would be a big factor.   In -- in -- in the

16   information we used and then passed on to the

17   Government in this case, we did not account for

18   that, but there -- I can't say there weren't

19   discussions of it --

20        Q.   M-h'm.

21        A.   -- and its relevance.   I just know that

22   it was not done.

23        Q.   Okay.   So there is no formal uncertainty

24   analysis that would allow us, today, to be able

25   to look at the work that you did in July of 2010,

1    and say:  "This is how the DOE accounted for the

2    potential of their assumption of no restrictions

3    changing in the well being wrong?

4                    MR. SUMMY:  Objection, form.

5         A.   I -- I can't state what could be done

6    today because I haven't thought about what could

7    be done today, nor have I done anything in recent

8    time.  It is -- it's not impossible to think that

9    one can do further analysis.

10        Q.   (By Mr. Regan) Okay.  In -- in terms of

11   the potential impact of multiphase flow, in your

12   model, is that dependent or independent or

13   possibly both to the assumption of no change in

14   restrictions in the well?

15                   MR. CHAKERES:  Object to form and

16   scope.

17                   MR. SUMMY:  Same objection.

18        A.   Now, that is a complicated question,

19   but -- but I --

20        Q.   (By Mr. Regan) That's why we're here.

21        A.   But I understand it.  Yeah.  The -- it is

22   reasonably believable that one could look at the

23   affect of multiphase flow and ask about the

24   impact on -- on particularly the method that I

25   used of the differential pressure measurement.

1    That, of course, did not account for anything

2    over time.  It was a point estimate.  So the

3    point estimates could be looked at, that over

4    time estimate if one had a method, to look at

5    flow path variation over time, one could also

6    assess, reasonably assess, or bound, what the

7    impact would be of a two-phase flow.  It was not

8    done.

9        Q.  Okay.  And is --

10       A.  And I -- I cannot predict what the likely

11   consequence would be, or whether it would change

12   any uncertainty or confidence that much.

13       Q.  Okay.  Do you think that the potential

14   impact of that analysis is likely to be zero

15   impact on your final product of your model?

16           MR. CHAKERES:  Object to form and

17   scope.

18       A.  Again, for the point estimate and the

19   over time estimate, it's -- it -- if done, I

20   couldn't predict -- any impact would be

21   perceptible.  It would have to pass the test of

22   whether or not it reasonably agreed with the flow

23   out of the Top Hat.

24       Q.  (By Mr. Regan) Okay.  And by flow out of

25   the Top Hat, you mean the model, and it's

 1    inherent assumptions, that was used to come to a

 2    prediction of what the flow was out of the Top

 3    Hat?

 4        A.   No.   I mean, the fact that we were

 5    collecting significant amounts --

 6        Q.   Okay.

 7        A.   -- at the ship.

 8        Q.   All right.

 9        A.   And which was indisputable.

10        Q.   Right.

11        A.   And -- and the fact that the total flow

12    was only a factor of -- order of factor two above

13    that.

14        Q.   All right.  So the -- the -- the actual

15    collections would be a lower -- necessary lower

16    bound to any -- if someone was to actually do

17    further analysis of this model?

18             MR. CHAKERES:   Form.

19        A.   For the Top Hat period.

20        Q.   (By Mr. Regan) Okay.  But you would agree

21    that with the potential for an unknown impact of

22    restrictions in the well, and the potential for

23    unknown impact of multiphase flow, the actual

24    slope of flow does -- is not necessarily linear?

25        A.   That's two factors.  One is the change in

1    flow geometry.  The other is the -- the -- the

2    net result of variations in two-phase flow.  The

3    linearity assumption, and my understanding from

4    Paul Hsieh, is a two-phase assumption about the

5    reservoir, and so that would be accounted for in

6    the linearity assumption.  It -- it -- the -- the

7    change in flow path would -- would -- is -- is an

8    unknown affect that we did not account for.

9        Q.  Okay.  So let me -- let me see if I can

10   ask this in a better way.

11           The DOE and, finally, U.S. Government,

12   July 31st or August 2nd, flow rate estimate, has,

13   as of July 15th, a number of approximately

14   53,000, and as of April 22nd, a number of 62,000,

15   a line drawn between the two, with a small bump

16   for the riser cut of 4 percent and a small bump

17   of 4 percent for the capping stack.  Are you with

18   me?

19       A.  But that's not quite correct.  You said

20   as of July 15th?

21       Q.  Uh-huh.

22       A.  That the -- the capping stack insertion

23   wasn't done by the 15th.

24       Q.  Right.

25       A.  And -- and -- and the projection

1    backwards was not done on the 15th.

2        Q.  I -- I meant to say as of August 2nd, so

3    I miss --

4        A.  August -- August 2nd, I'm -- I'm with

5    you.

6        Q.  Okay.  You're with me.  And with respect

7    to the assumption of linearity, which allows you

8    to draw what's called a straight line, between

9    those two numbers, the initial reservoir pressure

10   and the estimates of -- of shut-in reservoir

11   pressure are -- are key variables, inputs, into

12   being able to actually draw the slope of that

13   line, correct?

14       A.  That's correct.

15       Q.  Okay.  And you would agree with me,

16   though, that that line, both in terms of its

17   reservoir modeling, and in terms of the work you

18   did with the DOE, assumes no changes in

19   restrictions in the well.  Correct?

20       A.  That's correct.

21       Q.  And you would agree with me that

22   restrictions in the well, if able to be captured,

23   could dramatically change, whether that line is

24   straight, or whether it goes up or down, or it

25   goes up and down at different times during the

```
 1    time period, correct?
 2                 MR. CHAKERES:  Objection, form and
 3    scope.
 4                 MR. SUMMY:  Same objection.
 5        A.   I -- I -- I could never agree that
 6    dram -- could dramatically change.  It would have
 7    an impact on it, I would agree with, right.
 8        Q.   (By Mr. Regan) So the inability to
 9    determine the impact of restrictions in the well
10    is a -- a -- a key assumption as to whether the
11    straight line presented in August 2nd is or is
12    not an appropriate representation of flow?
13                 MR. SUMMY:  Objection, form.
14                 MR. CHAKERES:  Object to form.
15        A.   The -- the linear assumption, or the
16    straight line, as you call it, did not account
17    for changes in flow geometry; hence, what you say
18    has to be true.
19        Q.   (By Mr. Regan) Okay.  With respect to
20    this late July time period -- bear with me one
21    second.
22             At what point in time did you realize
23    that you were being asked to do more than just
24    provide a point estimate or instantaneous flow
25    rate estimate and, in fact, being asked to
```

1    provide an estimate of cumulative flow?

2              MR. CHAKERES:  Object to form.

3        A.  It had to be sometime in the latter part

4    of July.  I don't recall the date.  The exhibit

5    we just looked at might establish something about

6    that, but it was in the latter part of July.

7        Q.  (By Mr. Regan) Okay.  And with respect to

8    the process generally, you had three National

9    Labs, Los Alamos, Lawrence Livermore, and Sandia,

10   who were -- who were proceeding upon their own

11   modeling and own -- own assessments.  Is that

12   fair?

13       A.  That's correct.

14       Q.  Was there any attempt to insulate them

15   from one another, so that they would not

16   condition or otherwise unduly influence the

17   independence of the conclusions that they

18   reached?

19              MR. CHAKERES:  Object to form.

20       A.  I wouldn't use the word "insulate," but I

21   will describe that they -- they were -- they

22   maintained their independence, which is their

23   custom and their normal way in which they

24   operate.  You saw exactly that affect when you

25   saw the results of the Top Hat assessment.  You

1    cannot insulate them from it, because they all

2    have to have a reasonably common set of starting

3    parameters.

4         Q.  (By Mr. Regan) Okay.  So they would -- it

5    would be important for them to have a common set

6    of geometries that they were analyzing?

7         A.  Geometries and assumptions about other

8    factors, as well.

9         Q.  Okay.  But there can be -- at some point,

10   if you -- depending on the number of factors that

11   you give them to have in common, you can, in some

12   sense, preordain the result coming out pretty

13   similar, correct?

14             MR. CHAKERES:  Object to form.

15        A.  Not easily done with these three

16   laboratories.

17        Q.  (By Mr. Regan) Fair enough.  In terms of

18   K factors or -- you understand that the

19   laboratories use different techniques to get to

20   the K factors they used?

21        A.  That's my understanding, yeah.

22        Q.  All right.  In terms of dealing with

23   multiphase flow, you understand the laboratories

24   use different methods to deal with multiphase

25   flow effects?

1      A.  They had different equations of state, as

2   we saw earlier.

3      Q.  Okay.  One laboratory in particular,

4   Lawrence Livermore, had a multiphase flow

5   correction factor.  Are you aware of that?

6              MR. CHAKERES:  Object to form and

7   scope.

8      A.  I -- I think I recall seeing that.

9      Q.  (By Mr. Regan) Okay.  Do you know what it

10  was -- what -- what -- what was meant by that, or

11  how it was used?

12     A.  Not in that case, but usually correction

13  factor are used when a model like a linearized

14  model or some -- are used, and they try to

15  account for an effect.

16     Q.  Was it the case, Dr. Hunter, that the

17  correction factor was used in order to bring that

18  laboratory's results more in line with the

19  results that were being seen by the other two

20  laboratories?

21             MR. CHAKERES:  Objection, form and

22  scope.

23     A.  That would be extremely unusual, and I

24  think we would have picked up on that and asked

25  that it not be done.

1      Q.  (By Mr. Regan) Okay.  But do you un -- do

2    you have an understanding, as you sit here today,

3    the timing at which point in time the correction

4    factor was applied to the analysis?

5                MR. CHAKERES:  Objection, form and

6    scope.

7      A.  I don't.

8      Q.  (By Mr. Regan) Okay.

9      A.  I don't.

10      Q.  All right.  With respect to those

11    meetings in late July, you also, then, had

12    presentations made by FRTG -- TG Teams, such as

13    the Plume Team, the Woods Hole Team, et cetera,

14    Nodal Teams?

15      A.  I -- I believe there were presentations

16    on July 30 and July 31.

17      Q.  Okay.

18      A.  (Nodding.)  Right.

19      Q.  All right.  You -- do you understand that

20    FRTG, then, issued a Report in March of 2011,

21    correct?

22      A.  I understand that it -- it was issued,

23    but I don't know its content.

24      Q.  Okay.  Right.  And -- and just to

25    confirm, you can't explain for us changes that

# Attachment B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: OIL SPILL by the OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | : | |
| GULF OF MEXICO, on | : | |
| APRIL 20, 2010 | : | SECTION: J |
| | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| ALL CASES | : | MAG. JUDGE SHUSHAN |
| | : | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   . . . . . . . . . . . . . . . . . . . . . . . . .

## BP's DISCLOSURES OF NON-RETAINED EXPERT WITNESSES NOT REQUIRED TO PROVIDE WRITTEN REPORTS

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), BP hereby respectfully

identifies the following individuals who are BP employees and may be called to provide expert

testimony during Phase One of the February 2012 Limitation and Liability Trial, but who are not

required to provide a written report:

**(1)**        **Kent Corser:**  Mr. Corser is currently the Drilling Engineering Manager for the

Gulf of Mexico Deepwater.  He earned a Bachelor's of Science degree in Mechanical

Engineering from Texas A&M University in 1982.  Mr. Corser has nearly 30 years of experience

as a Drilling Engineer.  Mr. Corser started his professional career as a drilling engineer with

Superior Oil in January 1983.  He then joined ARCO in 1985 as a drilling and completions

engineer.  Mr. Corser has been employed by BP since 1996 when he joined as a Team

Leader/Drilling Superintendent for Gulf of Mexico deepwater exploration.  His responsibilities

included drilling the Crazy Horse, Holstein, and Atlantis exploration wells.  Mr. Corser has

worked as a Drilling Engineer in the Gulf of Mexico and as the Wells Manager for the central

North Sea.  At the time of the *Deepwater Horizon* accident, Mr. Corser was the Drilling

Engineering Manager/Wells Engineering Authority for North American Gas ("NAG").

        Mr. Corser was a member of BP's Internal Investigation Team and the team

leader for the engineering team.  ==Mr. Corser is expected to testify regarding the role and function==

==of a BP Drilling Engineer in well design and execution.==  Mr. Corser is also expected to present

evidence, including opinion testimony, consistent with the facts and opinions set forth in BP's

Internal Investigation Report Chapter 5A, Sections 2.5 (Lost Circulation and Equivalent

Circulating Density), §2.6 (Planning for Temporary Abandonment), §3.1 (Shoe Track), and §3.2

(Casing Hanger Seal Assembly).

**(2)**    **James Cowie:**  Mr. Cowie is currently the Vice President of Wells for the North Sea

Region.  He is accountable for drilling, completion, intervention (rig and non-rig) activities,

including integrity and maintenance of BP's wellstock in the North Sea region.  Mr. Cowie has

been employed by BP since January 1999, in positions including platform wells manager, D&C

operations advisor, wells program manager, wells team leader, and well site leader.  Prior to

joining BP, Mr. Cowie had been employed by Amoco as a drilling supervisor, and by Santa Fe

Drilling Company (which later became Global Santa Fe and then part of Transocean) in various

positions, including OIM, senior drilling foreman, roustabout, roughneck, assistant derrick man,

derrick man, assistant driller, driller, and toolpusher. Mr. Cowie earned a Master of Science

degree with distinction in Field & Well Management from The Robert Gordon University.

        Mr. Cowie was a member of BP's Internal Investigation Team and a member of the

operations team.  ==Mr. Cowie will testify regarding the roles and responsibilities of BP and rig==

==personnel during operations.==  Mr. Cowie will present evidence, including opinion testimony,

consistent with the facts and opinions set forth in BP's Internal Investigation Report Chapter 5B,

specifically, Sections 2.1 (Conducted the Positive-pressure Test); 2.2 (Displaced Mud to Seawater); 2.3 (Opened the Drill Pipe to Bleed Pressure); 2.4 (Conducted the Negative-pressure Test); 2.5 (Continued the Negative-pressure Test on the Kill Line); and 2.6 (Interpreted the Negative-pressure Test).

**(3)**   <u>**Steve Robinson:**</u>       Steve Robinson is the Vice President of Wells, Gulf of Mexico region.  He is accountable for drilling, completion, intervention (rig and non-rig) activities, including integrity and maintenance of BP's wellstock in the Gulf of Mexico.  He joined the Gulf of Mexico business in March 2011 from BP's Alaska business where he managed their well activity (drilling, completions and interventions).

Mr. Robinson holds Bachelor's of Science and Masters of Science degrees in Petroleum Engineering from Louisiana Tech University which he earned in 1985 and 1988, respectively. Mr. Robinson started his professional career with ARCO in 1988 and has worked drilling, completion, and intervention assignments in a variety of locations including Alaska, onshore United States (Rockies, Permian Basin, East Texas, South Louisiana), Gulf of Mexico Deepwater, Algeria, Russia (Sakhalin) and UK North Sea.  At the time of the *Deepwater Horizon* accident, Mr. Robinson was the Director and Vice President of Alaska Drilling and Wells.

Mr. Robinson was a member of BP's Internal Investigation Team and the team leader for the operations team.  Mr. Robinson is expected to present evidence, including opinion testimony, consistent with the facts and opinions set forth in BP's Internal Investigation Report Chapter 5B, Section 3 Operational Activities -- Monitoring the Well, specifically §3.1 (Simultaneous Activities), §3.2 (Conducted the Sheen Test), §3.3 (Prepared to Discharge Fluid Overboard), §3.4 (Resumed Routine Activity Prior to Recognition of the Well Control Event), Section 4 Loss

of Well Control and the Resulting Response, specifically, §4.1 (Drill Pipe Pressure Fluctuations 21:31 Hours to 21:42 Hours, and §4.2 (Well Control Response 21:40 Hours to 21:49 Hours).

BP has made this identification based on the information reviewed and available as of the date of this disclosure.  BP reserves the right to identify additional persons and testimony based on new information as it is discovered.  In addition, this identification does not include topics for rebuttal expert testimony or any persons that may be designated to provide rebuttal expert testimony.  BP reserves the right to identify additional opinions and expert witnesses in rebuttal in accordance with the Court's July 1, 2011 Order.  Moreover, pursuant to the Court's directive on September 30, 2011, BP has not identified every fact witness who may provide opinion testimony at trial.

Dated: October 17, 2011                           Respectfully submitted,

                                                  By: /s/ Don K. Haycraft

                                                  Don K. Haycraft (Bar #14361)
                                                  R. Keith Jarrett (Bar #16984)
                                                  LISKOW & LEWIS
                                                  One Shell Square
                                                  701 Poydras Street, Suite 5000
                                                  New Orleans, Louisiana  70139-5099
                                                  Telephone:  (504) 581-7979
                                                  Facsimile:  (504) 556-4108

                                                  Richard C. Godfrey, P.C.
                                                  (richard.godfrey@kirkland.com)
                                                  J. Andrew Langan, P.C.
                                                  (andrew.langan@kirkland.com)
                                                  Kirkland & Ellis LLP
                                                  300 North LaSalle Street
                                                  Chicago, Illinois  60654
                                                  Telephone: (312) 862-2000

Robert C. "Mike" Brock
(mbrock@cov.com)
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-5985

***Attorneys for BP Exploration & Production Inc. &
BP America Production Company, and BP p.l.c.***