# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| Applies to:  *All Cases* | JUDGE BARBIER<br>MAGISTRATE JUDGE SHUSHAN |

## ORDER

**[Regarding Motions of the U.S. and Transocean to Compel Production of Previously-Withheld Documents Pursuant to the Crime-Fraud Exception to the Attorney-Client Privilege (Rec. docs. 8417 and 8457)][1]**

## Background

On April 20, 2010, there was an explosion on the Deepwater Horizon when the Macondo well blew-out.  The well was capped on July 15, 2010.

On May 4, 2010, BP participated in a briefing for the House Subcommittee on Energy and Environment (the "Subcommittee") chaired by Congressman Markey.  On May 24, 2010, BP submitted a written communication to the Subcommittee.  It provided a further written submission to the Subcommittee on June 25, 2010.  On April 29 and 30 and May 4, 2010, BP provided Reports on Form 6-K ("Forms 6-K")to the Securities and Exchange Commission ("SEC").  On May 19,

---

[1]  The U.S. and Transocean filed motions to compel.  Rec. docs. 8417 and 8457.  BP submitted its opposition.  Rec. doc. 8715.  The U.S. and Transocean replied.  Rec. docs. 8844 and 8868.  BP made an *in camera* submission.  Rec. doc. 9035.  The objections of the U.S. and Transocean to the  *in camera* review were overruled.  Rec. docs. 8974 and 9064.  BP was ordered to produce the Category A documents from the *in camera* submission.  Rec. doc. 9115.

The U.S. and Transocean urge that BP's criteria for selecting documents for *in camera* review are too narrow.  Rec. doc. 8974 at 5.  BP responded.  Rec. doc. 9254.  The U.S. and Transocean replied.  Rec. doc. 9355.  This order rules on the non-Category A documents submitted *in camera*.  It does not resolve the selection criteria issue.  BP shall respond to the U.S./Transocean joint memorandum (Rec. doc. 9355).  The U.S. and Transocean shall submit a joint reply.  The parties shall agree on a briefing schedule.

2010, BP provided information to Admiral Landry, the On-Scene Coordinator for the Deepwater Horizon Unified Command.

During discovery regarding Phase Two of this proceeding (Source Control and Quantification), the U.S., Transocean and others challenged BP's privilege claims. BP submitted documents for *in camera* review. On July 13 and 30, 2012, orders were issued. Rec. docs. 6904 and 7012.

On November 15, 2012, the U.S. brought criminal proceedings against BP and three individuals. BP entered into a Guilty Plea Agreement (the "Agreement") with the U.S. pursuant to which it agreed to a factual allocution and the entry of an Order specifying a variety of remedial measures.[2] The individual defendants, including George Rainey, the former vice president referred

---

[2]  The allocution states:

On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

1.    BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

2.    BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3.    BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology. At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4.    BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD. At the time this false representation was made,

to in the Five Allocation Statements, pled not guilty.[3]  On January 29, 2013, BP's plea agreement

was accepted and a judgment was entered against it.  U.S. v. BP (Rec. docs. 65 and 66).

On January 30, 2013, the U.S. filed a motion to compel production of previously-withheld

documents pursuant to the crime-fraud exception to the attorney-client privilege.  It seeks an order

requiring BP to produce all documents related to the preparation of: (1) BP's statements to Congress

on May 4, 2010, and BP's correspondence with Congress on May 24, 2010 and June 25, 2010; (2)

the May 19, 2010 email from Doug Suttles to Admiral Landry; and (3) the Forms 6-K furnished to

the SEC on April 29 and 30 and May 4, 2010 by BP plc.  Rec. doc. 8417.  Transocean joined in the

motion.  Rec. doc. 8457.

## Arguments of the Parties

**A.**     **United States**.

The arguments of the U.S. may be summarized as follows:

BP pled guilty to the crime of obstructing justice by providing false and misleading flow rate

---

BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5.     BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results." In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

U.S.A. v. BP Exploration and Production, Inc., Criminal No. 12-292 ("U.S. v. BP"), Rec. doc. 2 (Attachment) (sometimes referred to as the "Five Allocation Statements").

[3]  On May 17, Rainey prepared a memorandum purporting to summarize the efforts within the Unified Command to estimate the flow rate (the "Rainey Memo"). See Rec. doc. 8417 (Exhibit 10 - May 24, 2010 letter from R. Kevin Bailey of BP to Congressman Markey) with the Rainey Memo included as an attachment to the letter.  It is Deposition Exhibit 1651 and is marked BP-HZN-2179MDL00000415-419.

information to the federal government during the oil spill response.  Based on its own admissions in settling the criminal and securities charges, BP misled Congress, oil spill responders, shareholders, and the public by presenting flow rate numbers that the company knew were too low.

BP accepted responsibility for certain May 2010 misstatements made to Congress concerning the rate of flow of oil into the Gulf of Mexico.  It pled guilty to obstruction of Congress in relation to the May 24, 2010 letter to Congressman Markey and it admitted that a misstatement was inserted into the June 25, 2010 letter to Congress.

BP affirmatively represented to the Court that its attorneys were involved in the communications that led to the guilty plea and that the drafting of the communications were lawyer-directed.

> BP retained several law firms, including WilmerHale and Kirkland & Ellis, shortly after the incident to assist in various respects with responding to these many lawsuits, investigations, and information requests.  <u>Congressional requests received by the company in this time period were handled through a process organized and directed by lawyers in which information was gathered from personnel within the company. Congressional responses were then drafted in a collaborative process led by WilmerHale and involving both in-house and external lawyers along with appropriate BP personnel</u>.  Although not every communication regarding the effort to collect information and to respond to requests involved the direct participation of an attorney, the overall process was a lawyer-directed effort seeking to ensure that BP received appropriate legal advice with respect to the requests and the company's responses.

Rec. doc. 7009 at 5 (emphasis added).  <u>See</u> also Rec. doc. 8330 at 6.[4]  BP's use of attorneys to aid in its wrongdoing destroys any privilege for communications related to the criminal activity or fraudulent activity.  The crime-fraud exception applies whether the attorneys had knowledge of the

---

[4]  Rec. doc. 7009 is a letter to Judge Shushan from BP (Robert R. Gasaway), dated July 19, 2012, regarding the United States' Challenges to Schedule I Privilege Documents.  Rec. doc. 8330 is a letter to Judge Shushan from BP (Mr. Gasaway), dated January 18, 2013, regarding BP's Limited Motion for Reconsideration on the Court's January 2, 2013 Order Regarding BP Rule 30(b)(6) Witnesses (Rec. doc. 8149).

crime or not.

There are three groups of documents which are subject to the motion to compel.  Some of the documents were identified in connection with the prior ruling on the scope of the attorney-client privilege asserted by BP, and some documents were not previously considered by the Court.  The U.S. contends that it cannot provide a specific list of all documents subject to the motion to compel.

> Group One.   All documents related to preparation of BP's communications with Congress in the spring and early summer of 2010.

Since BP's communications with Congress were intended to further criminal or fraudulent activities, any legal advice obtained by BP for the purpose of preparing those communications was, necessarily, used by BP to further its criminal activity.

> Group Two.   All documents related to preparation of BP's May 19, 2010 email to Admiral Landry and its attachments.

BP's admissions in the Guilty Plea Agreement regarding the Rainey Memo are sufficient to establish a *prima facie* case that the crime-fraud exception applies to documents related to preparation of BP's submission to Admiral Landry.

> Group Three.   All documents related to preparation of BP's Forms 6-K filed with the SEC.

BP agreed not to deny any allegation in the SEC complaint.  The allegations in the SEC Complaint establish that BP's Forms 6-K furnished to the SEC on April 29 and 30 and May 4, 2010 by BP were fraudulent.

Neither an *in camera* inspection of the documents at issue nor any other proceedings are required to mandate BP's production of the documents.  All such documents must be produced.

**B.**     **BP's Opposition**.

BP responds to the U.S.'s arguments as follows:

BP makes three objections to the motions to compel.  First, the U.S. and Transocean improperly seek to pierce BP's privilege based on conduct other than what is fairly encompassed by its plea allocution.  The proper scope of the crime-fraud exception is limited to those attorney-client communications reasonably related to the furtherance of the ongoing or future crime or fraud at issue. The U.S. and Transocean cannot establish that the communications they seek were made in furtherance of a crime or fraud.  Its guilty plea does not establish a *prima facie* case of crime or fraud for communications related to BP's SEC submissions and communications related to the May 4 non-public Congressional briefing - neither of which are encompassed by its plea allocution.

Second, contrary to the assertion by the U.S., a communication may be considered within the scope of the crime-fraud exception only if it is reasonably related to the furtherance of a crime or fraud.  The U.S. is mistaken in seeking disclosure of documents merely because they relate to an actual or alleged crime or fraud.  The U.S. must show that each specific communication was actually used to facilitate unlawful activity.  If Rainey was not an active participant in a communication which relates to one of the five allocution statements, the communication is not a communication in furtherance of a crime or fraud even though it may relate to BP's guilty plea or wrongdoing.

Third, even if the U.S. satisfies its burden of establishing a *prima facie* case, due process and fundamental fairness would still require that BP be allowed the opportunity for presentation of evidence.

For the May 24 and June 25, 2010 letters to Congressman Markey and the May 19, 2010 communication to Admiral Landry, BP identifies five categories of documents:

> **Category A.** Documents in which Rainey is an active participant and that relate to the matters in BP's plea allocution.

BP is ready to produce Category A documents. There is no basis for concluding that communications initiated by anyone other than Rainey were intended to further a crime or fraud.

> **Category B.** Documents in which Rainey is a passive recipient of a communication (either as a recipient or as someone on the "cc" line).

> **Category C.** Documents in which Rainey is an active participant in the communication but that do not relate to the matters in BP's plea allocution.

> **Category D.** Documents in which Rainey is not part of the communication but where the participants refer to or recount a prior interaction with Rainey.

> **Category E.** Documents that relate to a communication as to which BP allocuted but that post-date the communication and/or that concern an aspect of the communication that was not the subject of BP's guilty plea allocution.

An *in camera* review will demonstrate that Categories B-D are outside the crime-fraud exception.

With regard to the SEC statements, the U.S. omitted a passage in the SEC Consent Decree in which BP's right to take legal or factual positions in litigation in which the Commission is not a party was expressly reserved to BP. The allocution does not relate to the SEC filings. The U.S. failed to establish a *prima facie* case that the individuals who drafted, reviewed, and submitted those forms acted with intent to further a crime or fraud. Therefore, BP is not required to produce documents relating to its April 29, April 30 and May 4, 2010 SEC submissions.

The allocution makes no criminal admission regarding statements to Congress on May 4.

The U.S. motion seeks to establish a new crime or fraud.  If the Court is inclined to require production of documents regarding the May 4 briefing, BP is entitled to an evidentiary hearing.

BP provided logs and documents for *in camera* review relating to the May 19, May 24 and June 25, 2010 communications.  It provided logs and documents for the May 4 briefing and the SEC submissions.

**C**.     **Reply by the U.S. and Transocean.**

The reply by the U.S. and Transocean is:

BP cannot limit the documents subject to the crime-fraud exception to the ones in which Rainey was active participant because:  (a) it was BP (not Rainey) that pled guilty; and (b) the communications with Congress were lawyer-led.  Even if Rainey was the agent through which BP obstructed Congress, that does not mean that Rainey was solely responsible for those acts or that all other persons employed by BP must have clean hands.  The scope of the exception does not depend on the fact or extent of Rainey's involvement in a communication.

> While application of the crime-fraud exception does not abolish the application of the attorney-client privilege for *all* documents in a case, the Fifth Circuit has made it plain that the exception applies broadly to communications related to the crime or fraud. . . .

Rec. doc. 8417 at 17 (emphasis in original).  Thus, all documents **related to the preparation** of BP's fraudulent statements regarding flow rate are sought.

BP's five category framework should be rejected.  All of the communications in Categories A through E appear to be documents that relate to the preparation of BP's criminal and fraudulent communications and should be produced.  The key is whether the communication was otherwise part of BP's lawyer-directed process of preparing the criminal and fraudulent communications at issue.

8

With regard to the SEC reports and the May 4 communication, admissions of criminal behavior are not required for the *prima facie* showing.  The exception extends to any communication by BP or its attorneys that is reasonably related to the furtherance of a fraud (not solely acts that were criminal).

### Legal Authorities

In <u>United States v. Zolin</u>, 491 U.S. 554, 109 S.Ct. 2619 (1989), the Supreme Court stated:

We have recognized the attorney-client privilege under federal law, as the oldest of the privileges for confidential communications known to the common law.  Although the underlying rationale for the privilege has changed over time . . . , courts long have viewed its central concern as one to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.  That purpose, of course, requires that clients be free to make full disclosure to their attorneys of past wrongdoings, in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice. . . .

The attorney-client privilege is not without its costs.  Since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose.  The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection-the centrality of open client and attorney communication to the proper functioning of our adversary system of justice-ceases to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing,* but to *future wrongdoing.*  It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy, between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.

491 U.S. at 562-63 (citations, quotation marks and brackets omitted, and emphasis in original).

The most recent Fifth Circuit decision on the crime-fraud exception is <u>In re: Grand Jury Proceeding</u>, 419 F.3d 329 (5th Cir. 2005).  The police arrested the appellant after a search of his girlfriend's apartment revealed a pistol, drugs and other evidence.  The appellant said the gun was his.  The girlfriend testified before a grand jury that she did not know how it came to be in her apartment.  Appellant was indicted for possession of a firearm by a convicted felon and other

charges.  A lawyer ("Former Counsel") was appointed to represent appellant.  About nine months later and just prior to the trial, appellant informed the district court that Former Counsel refused to present a defense in a manner which met with his approval.  He denied the firearm belonged to him. Former Counsel moved to withdraw.  Within a few days, the girlfriend provided the district court with an affidavit stating that she lied to the police and the grand jury when she testified that the firearm did not belong to her.  The Government issued a subpoena to Former Counsel to appear before a grand jury for:

> [H]is testimony and all written statements of Appellant and [Girlfriend] and all notes, records, and recordings of interviews of Appellant and [Girlfriend].

419 F.3d at 332 (quotation marks and brackets omitted).  The girlfriend then informed the government that the affidavit was false and instead said that she and appellant agreed that she would change her initial story that she had no idea where the gun came from to her statement to that it belonged to her.  She admitted discussing with Former Counsel the penalty for perjury and the potential sentence for conviction on the firearm charge.  The government moved for an order compelling Former Counsel to comply with the grand jury subpoena based on the crime-fraud exception.  The district court found that there was a *prima facie* case and the crime-fraud exception applied.  Former Counsel was ordered to comply with the grand jury subpoena.

The Fifth Circuit held that the finding that the crime-fraud exception applied during the course of Former Counsel's representation of appellant was not clearly erroneous.  419 F.3d at 337. On the issue of the scope of the crime-fraud exception, appellant argued that, if the exception applied, the attorney-client privilege was not abrogated with respect to all of the statements by the girlfriend and appellant to Former Counsel.  The government responded that once the *prima facie* showing is made and the exception applies, the attorney-client privilege disappears "as to all

communications relative to the subject of the consultation." 419 F.3d at 338.  Appellant replied that he did not secure Former Counsel's services solely for the purpose of committing a crime or fraud. Id. at 342.

The Fifth Circuit described the history and purpose for the attorney-client privilege and the crime-fraud exception and stated:

> This is the backdrop of "perpetual tension," against which we must answer the instant question-whether the district court has overbroadly interpreted the scope of the crime-fraud exception in applying it to the grand jury subpoena in this case.

419 F.3d at 339.

> Never before has this Court specifically addressed the propriety of the scope of the crime-fraud exception to the attorney-client and work product privileges on a record where the grand jury subpoena compels disclosure of all communications between the attorney and his client and between the attorney and a third party, written, oral, or otherwise, rather than discrete communications related to a particular issue or limited to particular media.  That is, the Supreme Court and Fifth Circuit cases cited by the parties all involve the question of the applicability and/or scope of the crime-fraud exception to specified documents or conversations already limited to a certain time or context, rather than a challenge to a discovery request or a subpoena seeking disclosure *in toto.*

419 F.3d at 340.

> We conclude that the proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct.

419 F.3d at 343.[5]  It acknowledged that its holding did not preclude disclosure of a client's "entire file" upon a proper showing that the client's entire representation was in furtherance of the alleged

---

[5]  The "Appellant argued the government needed to identify each communication and document subject to disclosure and establish how the crime-fraud exception applied to the particular item." 419 F.3d at 334.  The Fifth Circuit did not assess whether the district court needed to examine *in camera* each document, communication or potential grand jury question to Former Counsel to determine if it fell within or outside the attorney-client privilege.  419 F.3d at 343, n. 11.

crime or fraud.  Id. at n. 12.  For the guidance of district courts, it stated:

> After the party seeking disclosure meets its *prima facie* showing that the client
> intended to further an ongoing crime or fraud during the attorney-client relationship
> such that the crime-fraud exception applies, the only attorney-client communications
> and work product materials falling within the scope of the crime-fraud exception are
> those shown to hold some valid relationship to the *prima facie* violation such that
> they reasonably relate to the fraudulent activity.  The exact formulation of a test for
> relatedness is less important than an understanding of what the scope test must
> accomplish; easy differentiation between material for which the law should not
> furnish the protections of a privilege and material for which a privilege should be
> respected.

419 F.3d at 346.

The Fifth Circuit cited its decision in United States v. Dyer, 722 F.2d 174 (1983), regarding
the balancing required to accommodate the government's interest in uncovering ongoing or future
criminal or fraudulent activity without abandoning the client's interest in protecting privileged
information within legitimate representation.

U.S. v. Dyer began in April 1982, when the petition of Guy Olano, a chairman of a bank, to
re-zone the Maison Charles condos for time shares was denied.  Windle Dyer owned an interest in
a separate real estate project.  Throughout the summer of 1982, Olano and Dyer discussed the two
projects.  Olano became a FBI informant and began taping their conversations.  Dyer was appointed
to the Planning Commission and the time share zoning was approved.  On November 1, he received
a 15 day commitment letter from Olano's bank for Dyer's project.  On November 9, Olano paid
Dyer $25,000.

On the evening of November 15, Dyer and his civil lawyer, Steve Dwyer, met with a
criminal lawyer, Arthur Lemann.  On November 16, the civil lawyer delivered a letter to Olano's
office with the $25,000.  The letter was silent about the time shares, but said the money was returned
because of developments at Dyer's project. On November 17, Dyer spoke to Olano on the telephone.

12

The conversation was recorded.

> Dyer stated that he had been conducting an investigation of people who might be corrupting public officials and had tested Olano to see how hesitant he was to pay Dyer to receive zoning approval.  Dyer explained to Olano that he had returned Olano's money because he was satisfied that Olano was not the sought corrupting force.

722 F.2d at 176.  On December 2, Dyer was indicted.  The government subpoenaed Dyer's civil and criminal lawyers.  Dyer sought to quash the subpoenas.  The district judge denied the motion on the basis of the crime-fraud exception.  The government argued that after extracting the $25,000 payment, Dyer became fearful of Olano's true motives and sought to cover up his wrongdoing.  He consulted the civil lawyer and the criminal lawyer, which produced the return of the money, the accompanying letter, and the phone call in which he tried to convince Olano that he was not serious about taking the money.

> The Fifth Circuit stated:

> The tapes support the district court's finding that Dyer consulted with Dwyer for the purpose of obstructing justice by the creation of false evidence; that the government made a prima facie showing that the advice concerned future wrongdoing.  There is no evidence however that the consultation with Lemann on the preceding day was with such a purpose.  It is the letter written the day after consulting with Lemann that creates the prima facie case.  That letter was written by the civil lawyer Dwyer.  There is no evidence of any illegality in connection with Lemann.  For all the record shows Lemann could have given the sound and legal advice to return the money.  That the return was made the next day with a phony explanation of a different lawyer is not enough as to Lemann.  It follows that Dyer's communication with Dwyer concerning the November 16 letter is not privileged, but the communication with Lemann is.

722 F.2d 177.  "Here there was unique proof that Dyer was creating new evidence by the writing and delivery of a letter."  Id. at 178.  In citing Dyer, the Fifth Circuit stated:

> This carving out of the crime-fraud exception to reach only the events in connection with preparation of the letter, which was the basis of the accused's alleged crime or fraud, indicates that the proper scope of the crime-fraud exception must necessarily

13

be limited to those attorney-client communications and work products <u>reasonably</u> related to the furtherance of the ongoing or future crime or fraud at issue. Otherwise, to put it simply, the crime-fraud exception swallows the privilege rule.

<u>In re: Grand Jury</u>, 419 F.3d at 347(emphasis added).[6]

In reversing the decision requiring Lemann to testify, it is implicit that the Fifth Circuit concluded that the communications between Dyer and Lemann were not reasonably related to the furtherance of the ongoing crime or future crime at issue even though Dyer and Dwyer met with Lemann the evening before Dwyer delivered the letter and $25,000 to Olano.

Where a client seeks to use an attorney to further a continuing or future crime or fraud the broader public interest in the administration of justice is being frustrated, not promoted.  Thus, where the government makes a prima facie showing that the attorney-client relationship was intended to further continuing or future criminal or fraudulent activity, the privilege does not exist.

<u>Dyer</u>, 722 F2d at 177 (citations omitted).  The U.S. responds that BP stated that the communications that led to the guilty plea were lawyer-directed.  Assuming this is equivalent to seeking to use the attorneys to further a continuing or future crime, the fact remains that the Fifth Circuit did not require Lemann to testify.  The Fifth Circuit limited the scope of the exception as to the Dyer/Dwyer communications.   It described the concern in "accommodating the government's interest in obtaining the testimony of Dyer's attorneys with Dyer's interest in protecting his relationship with his lawyers."  <u>Id</u>. at 178.  The letter and its delivery, with the background of Dyer's words,

---

[6] At some points, the U.S. omits the adverb "reasonably."  For omissions see: (1) "[t]he Unites States moves for disclosure of all documents [reasonably] related to the preparation of the BP's fraudulent statements. . ." (Rec. doc. 8417 (Memorandum at 2)); (2) "the crime-fraud exception is properly applied to documents [reasonably] related to preparation of that communication." (Rec. doc. 8868 at 5); (3) the crime-fraud exception applies to documents [reasonably] related to the preparation of criminal and fraudulent communications. . ." (<u>Id</u>. at 7); (4) "the United States narrowly tailored its Motion to seek only those documents [reasonably] related to preparation of the fraudulent communications. . ." (<u>Id</u>. at 8); and (5) "order production of all documents [reasonably] related to preparation of BP's . . . fraudulent communications. . ." (<u>Id</u>. at 17).

established a *prima facie* case of obstruction of justice.  Id.

> In sum, Dyer retains his privilege to block the testimony of Dwyer before the grand jury except as to the events <u>immediately</u> surrounding the preparation of the November 16, 1982 letter.  On the present record those events cannot include the consultation with attorney Lemann.

722 F.2d at 179 (emphasis added).

There are two elements in <u>Dyer</u> which are inconsistent with the U.S. position that the crime-fraud exception applies broadly to communications related to the crime or fraud.  Rec. doc. 8868 at 5.  First, the attorney-client privilege between Dyer and Lemann was maintained.  Second, the scope of Dwyer's grand jury testimony was limited to the events <u>immediately</u> surrounding the preparation of the letter.

The U.S. urges that it is not seeking all documents related to the criminal and fraudulent communications.  Rec. doc. 8868 at 7.  It cites <u>U.S. v. Richard Roe, Inc. (Roe I)</u>, 68 F.3d 38 (2nd Cir. 1995), <u>rev'd on appeal after remand</u>, 168 F.3d 69(2nd Cir. 1999)(Roe II), where the appellant corporations, John Doe, Inc. and Richard Roe, Inc., asserted the attorney-client privilege with respect to grand jury subpoenas seeking documents and testimony from the corporations and the attorneys who jointly represented the firms.  The government moved to compel production based on the crime-fraud exception.  The district court applied the "relevant evidence" test and ordered the corporations' joint attorneys to give virtually unlimited testimony concerning: (i) the documents, (ii) an investigation performed by the corporations' counsel, and (iii) opinions rendered by counsel during the time frame of the subpoenaed documents.  68 F.3d at 39.  The Second Circuit stated:

> The "relevant evidence" test departs from the correct "in furtherance" test in two respects. First, the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. If it did, the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of

15

culpability. Instead, the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud.  Second, the crime-fraud exception applies only where there is probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity.  Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception.

68 F.3d at 40-41 (citations omitted and emphasis in original).  The matter was remanded "for an examination of <u>each document</u> under the proper standard."  68 F.3d at 41 (emphasis added).

## **Issues Presented**

For each of the three groups of documents sought by the U.S. and Transocean, the Court must determine whether the *prima facie* showing necessary to establish the crime-fraud exception to the attorney-client privilege has been made.

To make the necessary *prima facie* showing for the application of the crime-fraud exception here, the government must produce evidence such as will suffice until contradicted and overcome by other evidence ... a case which has proceeded upon sufficient proof to that stage where it will support a finding if evidence to the contrary is disregarded.

<u>In re: Grand Jury,</u> 419 F.3d at 336.  Allegations are not sufficient.   <u>In re International Systems and Controls Corporation Securities Litigation</u>, 693 F.2d 1235, 1242 (5th Cir. 1982). "Shady circumstances" are not sufficient where there is no connection between the two events cited by the government.  <u>In re Grand Jury Proceedings in Matter of Fine</u>, 641 F.2d 199, 204-05 (5th Cir. 1981).

The second issue is whether the communications and documents at issue are in furtherance of contemplated or ongoing criminal or fraudulent conduct.

## A.      **Group One**

The U.S. and Transocean seek all documents related to preparation of BP's communications

16

with Congress in the spring and early summer of 2010.

The U.S. alleges that: (1) the Subcommittee began an investigation of the blowout and oil spill, including the amount of oil flowing from the well; (2) the Subcommittee requested a briefing; (3) on May 4, 2010, BP, through Rainey, falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow rate estimate; (4) BP, through Rainey, did not disclose any information that contradicted the estimate, including BP internal information of which BP, through Rainey, was aware indicating that the actual flow was much higher than 5,000 BOPD.[7]

The U.S. alleges that: (1) on May 14, 2010, Congressman Markey sent a letter to BP accusing it of understating the amount of oil leaking from the well and posing fifteen questions relating to flow rate; (2) on May 17, at the request of counsel for BP, Rainey prepared the Rainey Memo to summarize the efforts within the Unified Command to estimate flow rate; (3) Rainey continued to receive information that contradicted the 5,000 BOPD estimate; (4) BP, through Rainey, withheld such information from other BP employees and from BP in-house and outside lawyers working on the response; and (5) on May 24, BP, through Rainey, submitted to the Subcommittee the BP response with the Rainey Memo.  Criminal Information at paras. 47-49, and Rec. doc. 8417 (Memorandum at 5).  On June 25, 2010, BP provided a further response to Congressman Markey.  It addressed an apparent discrepancy between information related to the worst case discharge ("WCD") from the well of 60,000 BOPD provided by BP in the May 4 briefing and statements in the Rainey Memo that the WCD was 100,000 BOPD.

The U.S. describes the criminal charges as relating to the communications from BP to

---

[7]  The allegations are found in paragraphs 45 and 46 of the of the Information filed in U.S. v. BP (Rec. doc. 1 at 13-14) ("Criminal Information").  See also Exhibit 6 to Rec. doc. 8417.

Congress at the May 4, 2010 briefing, in the May 24, 2010 letter with the Rainey memo, and the June 25, 2010 letter.[8]

1.      **May 4, 2010 Congressional Briefing**.

The U.S. contends that BP's admissions in the Agreement establish proof that the crime-fraud exception applies to documents related to the May 4 briefing.  It urges that the statements in the Agreement are more than sufficient to establish that BP's communications with Congress on May 4 were intended to further criminal or fraudulent activity.  Rec. doc. 8417 at 20-21.

BP responds that its allocution makes no criminal admission regarding statements to Congress on May 4 and the U.S. has not proffered support for its contention that the May 4 briefing involved a crime or fraud. It contends that the U.S. seeks to establish a new crime or fraud for statements made at the May 4 hearing.

BP notes that the U.S. addresses two statements made at the May 4 briefing: (1) the 5,000 BOPD flow rate; and (2) the 60,000 WCD.  BP responds that on April 28, 2010, the U.S. announced the same 5,000 BOPD flow rate.  It contends that the U.S. offers no evidence that the May 4 statement concerning the 5,000 BOPD flow rate was a crime or fraud.  It urges that there were many WCD numbers under discussion at the time of the briefing - both within the U.S. and BP.  It contends that there is no evidence that the 60,000 WCD number at the May 4 briefing was a knowing falsehood.

The U.S. replies that BP's internal documents suffice to prove the *prima facie* case.  It cites: (1) reports that, just days after the spill, BP engineers found that flow rates could approach or even

_____

[8] The May 24 response was a letter from R. Kevin Bailey of BP to Congressman Markey.  Rec. doc. 8417 (Exhibit 10).  The June 25 letter was from David C. Nagel, Executive Vice President, BP America, Inc. Rec. doc. 8417 (Exhibit 11).

exceed 100,000 BOPD; (2) an analysis completed by Tim Lockett, BP's discipline lead for flow assurance, for Trevor Hill and others on April 27, 2010 revealed flow rate ranges from 5,000 to 20,000 BOPD; and (3) Lockett's modeling results, titled "best estimate," with flow rates ranging as high as nearly 40,000 BOPD and nearly all runs well above 5,000 BOPD. Rec. doc. 8868 at 10. The U.S. contends that the May 4 briefing was misleading because it presented BP's lowest estimate, 5,000 BOPD, and called it the company's best estimate. It argues that this satisfies the *prima facie* requirement.

The U.S. argues that: (1) the Agreement is not necessarily the complete scope of BP's criminal activity; (2) while a guilty plea may make the application of the crime-fraud exception clearer, a guilty plea is not a prerequisite to its application; (3) the May 4 briefing is inextricably linked to the obstruction to which BP pled guilty; (4) the clear import of the Congressman's letter of May 14 was that BP misled the Subcommittee in the May 4 briefing; and (5) BP does not deny the misleading nature of its May 4 briefing.

Transocean adds that when the government announced the 5,000 BOPD estimate, it did not know what BP knew – that BP's internal flow rate estimates went at least as high as 92,000 BOPD. It urges that the government's announcement of April 28 proves nothing more than that the government relied on BP's false and misleading flow rate estimate.

The allegations in the Criminal Information are not sufficient to establish the necessary *prima facie* showing regarding the May 4 briefing. International Systems Securities Litigation, 693 F.2d at 1242. Instead, "the government must produce evidence such as will suffice until contradicted and overcome by other evidence . . . ." In re: Grand Jury, 419 F.3d at 336. There must be sufficient proof to support a finding if evidence to the contrary is disregarded. Id.

The evidence is that: (1) on May 4, 2010, there was a briefing before the Subcommittee; (2) at the briefing it was reported that BP's current estimate for the oil flowing from the well was 5,000 barrels per day; (3) Rainey indicated that the maximum flow from the well, if uncontrolled, would be approximately 60,000 BOPD; (4) at a hearing on May 11, BP reaffirmed the 5,000 BOPD;[9] (5) Rainey prepared a memo to summarize the various estimates made within the Unified Command;[10] (6) BP sent the May 24 letter to Congressman Markey; (7) BP did corruptly obstruct the Subcommittee's inquiry into the flow rate by certain omissions and false and misleading statements in the May 24, 2010 letter; (8) BP, through Rainey, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD; and (9) BP, through Rainey, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

This evidence presents a *prima facie* case that at the May 4 briefing, BP, through Rainey, was committing a fraud. These are more than "shady circumstances." The events cited by the government are connected.

BP submitted a log for the communications at the May 4, 2010 briefing. On April 3, 2013, it submitted the documents to the undersigned for *in camera* review. Rec. doc. 9469. BP reported

---

[9] These first four points are taken from the first paragraph of Congressman Markey's letter of May 14, 2010, to Lamar McKay. Rec. doc. 8868 (Exhibit 6). The U.S. characterizes the May 14 letter of accusing BP of understating the amount of oil leaking from the well. This is part of the allegations of the Criminal Information. It is not evidence.

[10] See Rainey Memo *supra* note 3.

that there are no Category A documents for the May 4, 2010 Congressional Briefing.

BP revised the privilege log for the May 4 documents to reflect those that involved Rainey or were drawn from his custodial file.  Those documents are shown below with a "Yes."

BP contends that: (1) the "Yes" documents do not fall within Category A because they do not relate to the maters in BP's guilty plea allocution; and (2) none of the May 4 documents relate to the admissions in BP's guilty plea allocution.  The evidence, however, presents a *prima facie* case that at the May 4 briefing, BP, through Rainey, was committing a fraud.

The Court is required to consider whether: (1) these attorney-client communications are shown to hold some valid relationship to the *prima facie* violation such that they reasonably relate to the furtherance of the fraudulent activity (In re: Grand Jury, 419 F.3d at 346-47); and (2) there is probable cause to believe that the particular communication with counsel was intended in some way to facilitate or to conceal the criminal activity (Richard Roe, Inc., 68 F.3d at 40-41).  With the exception of the two documents from the custodial file, the May 4 documents are not subject to the crime-fraud exception.

| Doc. No. | Rainey | Status |
|----------|--------|--------|
| 001.0 | Yes | It is not subject to the crime-fraud exception. |
| 001.1 | Yes | It is not subject to the crime-fraud exception. |
| 002.0 | Yes | It is not subject to the crime-fraud exception. |
| 002.1 | Yes | It is not subject to the crime-fraud exception. |
| 003.0 | Yes | It is not subject to the crime-fraud exception. |
| 003.1 | Yes | It is not subject to the crime-fraud exception. |
| 004.0 | Yes | It is not subject to the crime-fraud exception. |

| 004.1 | Yes | It is not subject to the crime-fraud exception. |
| 005.0 | Yes | Previously produced (or duplicate) non-privileged document. |
| 005.1 | Yes | It is not subject to the crime-fraud exception. |
| 006.0 | No | Previously produced (or duplicate) non-privileged document. |
| 006.1 | No | It is not subject to the crime-fraud exception. |
| 007.0 | Yes | Previously produced (or duplicate) non-privileged document. |
| 007.1 | Yes | It is not subject to the crime-fraud exception. |
| 008.0 | Yes | Previously produced (or duplicate) non-privileged document. |
| 008.1 | Yes | It is not subject to the crime-fraud exception. |
| 009.0 | Yes | Previously produced (or duplicate) non-privileged document. |
| 009.1 | Yes | It is not subject to the crime-fraud exception. |
| 0010.0 | Yes | It is subject to the crime-fraud exception. |
| 0011.0 | Yes | It is subject to the crime-fraud exception. |

### 2. **May 24, 2010 Letter**.

The allocution is a sufficient *prima facie* showing to establish the crime-fraud exception to the attorney-client privilege for the May 24, 2010 letter to Congressman Markey. BP provided a log of withheld documents for the May 24, 2010 letter and submitted the documents for *in camera* review.

| Doc. No. | Cat. | Status |
| --- | --- | --- |
| 001.0 | A | BP agrees to produce. |
| 002.0 | A | BP agrees to produce. |
| 002.1 | A | Previously produced (or duplicate) non-privileged document. |

003.0          A          BP agrees to produce.

003.1          A          BP agrees to produce.

003.2          A          Previously produced (or duplicate) non-privileged document.

003.3          A          Previously produced (or duplicate) non-privileged document.

The 004.0 Family

BP listed the documents by families.  Documents nos. 004.0 and 004.1-6 are identified as one family.

Doc. No. 004.0 is an email string.  It begins with Jeff Morgheim's email of May 21, 2010 to Rainey.  Morgheim requests answers to question nos. 4-14 in Congressman Markey's letter. Rainey replied on May 22 with a draft of answers.  This email is also Doc. No. 003.0 which BP agreed to produce.  On May 23, Morgheim forwarded the exchange with Rainey to Max Easley.

With Doc. No. 003.0, the U.S. will receive everything on the email string, except for the email from Morgheim to Easley.  The Morgheim/Easley May 23 email is not in furtherance of contemplated or ongoing criminal or fraudulent conduct.  Doc. No. 004.0 is not subject to the crime-fraud exception.

Doc. No. 004.1 is an email string.  It too begins with the May 21-22 exchange between Morgheim and Rainey, in which Rainey prepares answers to question nos. 4-14.  Morgheim sent the answers to Kathleen Lucas, who sent them to Susan Friedman (WilmerHale) and Brian Kavanaugh (Kirkland) for their review.  Doc. No. 004.1 is not subject to the crime-fraud exception.

Doc. No. 004.2 is not privileged.

Doc. No. 004.3 is a draft of the Rainey response with notes.  BP's description of the document indicates the notes are attorney drafted.  Doc. No. 004.3 is subject to the crime-fraud

23

exception.

Doc. No. 004.4 is described by BP as follows:

> Attachment to attached email.  Draft document prepared by David Rainey provided to client representatives and attorneys, in response to request made by Jeffrey Morgheim at the direction of counsel for the purpose of providing legal advice regarding a response to Congressman Markey's May 14, 2010 letter.  Apparent duplicate of Document 3.1.

BP describes it as an "apparent duplicate of Document 3.1."  BP agreed to produce Doc. No. 003.1.

Doc. No. 004.4 should be produced as well.  Therefore, it is subject to the crime-fraud exception.

| 004.0 | E | It is not subject to the crime-fraud exception. |
|-------|---|---|
| 004.1 | E | It is not subject to the crime-fraud exception. |
| 004.2 | E | Previously produced (or duplicate) non-privileged document. |
| 004.3 | E | It is subject to the crime-fraud exception. |
| 004.4 | E | It is subject to the crime-fraud exception. |
| 004.5 | E | Previously produced (or duplicate) non-privileged document. |
| 004.6 | E | Previously produced (or duplicate) non-privileged document. |

*   *   *

| 005.0 | A | BP agrees to produce. |
|-------|---|---|
| 006.0 | A | BP agrees to produce. |
| 007.0 | A | BP agrees to produce. |
| 008.0 | A | BP agrees to produce. |
| 008.1 | A | Previously produced (or duplicate) non-privileged document. |
| 008.2 | A | BP agrees to produce. |

<u>The 009.0 Family</u>

On May 23, 2010, Jeff Morgheim sent a draft (Doc. No. 009.1) to Max Easley for his review. The draft was prepared by WilmerHale.  Doc. No. 009.0.  The email and draft are not in furtherance of contemplated or ongoing criminal or fraudulent conduct.  They are not subject to the crime-fraud exception.

| | | |
|---|---|---|
| 009.0 | D | It is not subject to the crime-fraud exception. |
| 009.1 | D | It is not subject to the crime-fraud exception. |

*   *   *

| | | |
|---|---|---|
| 010.0 | A | BP agrees to produce. |
| 010.1 | A | BP agrees to produce. |
| 011.0 | A | BP agrees to produce. |
| 012.0 | A | BP agrees to produce. |
| 013.0 | A | BP agrees to produce. |
| 013.1 | A | BP agrees to produce. |
| 013.2 | A | Previously produced (or duplicate) non-privileged document. |
| 013.3 | A | Previously produced (or duplicate) non-privileged document. |
| 013.3 | A | BP agrees to produce. |

<u>Final Draft of Letter to Congressman Markey</u>

Doc. Nos. 014.0 to 018.0 concern review of the final draft of the letter to Congressman Markey.  On May 24, 2010, Morgheim sent a draft of the response with comments, including a reference to a flow rate of 15,000 under normal conditions.[11]  Tonya Robinson (WilmerHale) and

_____

[11] This refers to the pre-incident production rate for the well.

Brian Kavanaugh (Kirkland) are recipients.  Robinson replied.  Morgheim sent out another draft with a copy to Robinson.  Kevin Bailey, who signed the letter, made small changes.  Doc. No. 018.0.  Bailey requested a clean copy of Rainey's Memo, which was provided by Morgheim.  Doc. No. 017.0.  Kathleen Lucas forwarded the draft to Max Easley and Karen Westall for their review.  Doc. No. 015.0.  Murray Auchincloss forwarded it to Bernard Looney for his review.  Doc. No. 014.0.

Doc. Nos. 014.1, 015.4 and 018.1 are the draft letter prepared by attorneys reflecting legal advice regarding responses to questions from Congressman Markey on May 14, 2010.  These communications and documents are not in furtherance of contemplated or ongoing criminal or fraudulent conduct.  They are not subject to the crime-fraud exception.

| | | |
|---|---|---|
| 014.0 | D | It is not subject to crime-fraud exception. |
| 014.1 | D | It is not subject to crime-fraud exception. |
| 014.2 | D | Previously produced (or duplicate) non-privileged document. |
| 014.3 | D | Previously produced (or duplicate) non-privileged document. |
| 014.4 | D | Previously produced (or duplicate) non-privileged document. |
| 014.5 | D | Previously produced (or duplicate) non-privileged document. |
| 015.0 | E | It is not subject to crime-fraud exception. |
| 015.1 | E | Previously produced (or duplicate) non-privileged document. |
| 015.2 | E | Previously produced (or duplicate) non-privileged document. |
| 015.3 | E | Previously produced (or duplicate) non-privileged document. |
| 015.4 | E | It is not subject to crime-fraud exception. |
| 016.0 | A | BP agrees to produce. |
| 016.1 | A | Previously produced (or duplicate) non-privileged document. |

| 016.2 | A | Previously produced (or duplicate) non-privileged document. |
| 017.0 | D | It is not subject to crime-fraud exception. |
| 017.1 | D | Previously produced (or duplicate) non-privileged document. |
| 017.2 | D | Previously produced (or duplicate) non-privileged document. |
| 018.0 | E | It is not subject to crime-fraud exception. |
| 018.1 | E | It is not subject to crime-fraud exception. |

<u>Pre-incident Production Rates</u>

BP's Category E includes documents that relate to a communication as to which BP allocuted but that post-date the communication and/or that concern an aspect of the communication that was not the subject of BP's guilty plea allocution.  BP's log demonstrates that where the communications concern pre-incident estimates of production and flow, it does not consider the communications as a subject of the allocution.  The Court agrees that pre-incident production rates are not the subject of the allocution.

The problem arises where Rainey was an active participant in the communications concerning the pre-incident production rates.  <u>See</u> Doc. nos. 019.0 to 024.0 below.  Were the communications made for the purpose of obtaining advice for the commission of a fraud or crime?  <u>Zolin</u>, 491 U.S. at 563.  Are such communications reasonably related to the furtherance of the ongoing or future crime or fraud at issue?  <u>In re: Grand Jury Proceeding</u>, 419 F.3d at 347.

Doc. nos. 019.0 to 024.0 concern pre-incident production rates where Rainey was an active participant in the communications.  The issue is whether Rainey's participation in communications concerning pre-incident production rates makes them subject to the crime-fraud exception.

Doc. Nos. 019.0 - 024.0 reveal that Jeff Morgheim pursued pre-incident information from

several sources.  On May 21, 2010, he was provided with information from Xuemei.  The next day, he sought and obtained information from Rainey and others.  An engineer reported that Xuemei's information was what they needed.  Morgheim responded that he would use that information.

On May 21, 2010, Xuemei provided Morgheim with resource estimates for the block, three producing wells and an initial production rate of 15,000 BOPD.  Morgheim asked if there is an underlying document that could be provided to the lawyers.  On May 21, 2010, Xuemei responded with an economic model output.

On May 22, 2010 at 9:22 a.m., Morgheim emailed Rainey with: (a) thanks for the work on the response for Congressman Markey; (b) a request that he be available to discuss the response with WilmerHale attorneys; (c) a question concerning whether the Technical Assurance Memorandum ("TAM") for the Macondo well answered the question of what rate could the well deliver; and (d) a request for assistance in obtaining the TAM.  On May 22, 2010 at 10:14 a.m., Rainey reported that the TAM will have a production profile and Cindy Yeilding could provide it.  Morgheim asked Yeilding for the TAM.  She sought the help of others, including Jay Thorseth.  He directed Yeilding, Rainey and others to a website for the TAM.

On May 22, 2010, at 2:08 p.m., Kelly McAughan, a reservoir engineer, forwarded information from an engineering folder.  Rainey raised the question of whether production and profit from the well should be one third of what was shown on the summary since it summarized a three well development.  McAughan responded to the three well issue.

On May 22, 2010, Morgheim suggested another approach and forwarded Xuemei's economic run.  McAughan replied that was what she was looking for.  Morgheim reported that the economic run would be produced, but he did not believe that the TAM would be needed to respond to

Congressman Markey's questions.

On May 22, 2010, Morgheim asked McAughan, Rainey and others the following: (a) was there a full TAM report (he only had a few chapters); (b) was a well test performed prior to the incident; and (c) if so, could he have the results and what bearing could it have on BP's views of flow rate before the incident.  Thorseth sent him the TAM without commenting on the questions concerning a well test prior to the incident.

With the active involvement of Rainey, these documents reasonably relate to the furtherance of the ongoing crime or fraud at issue.

| 019.0 | E | It is subject to the crime-fraud exception. |
| 019.1 | E | Previously produced (or duplicate) non-privileged document. |
| 019.2 | E | Previously produced (or duplicate) non-privileged document. |
| 020.0 | E | It is subject to the crime-fraud exception. |
| 021.0 | E | It is subject to the crime-fraud exception. |
| 021.1 | E | It is subject to the crime-fraud exception. |
| 022.0 | E | It is subject to the crime-fraud exception. |
| 023.0 | E | It is subject to the crime-fraud exception. |
| 024.0 | E | It is subject to the crime-fraud exception. |
| 024.1 | E | Previously produced (or duplicate) non-privileged document. |
| 024.2 | E | Previously produced (or duplicate) non-privileged document. |
| 024.3 | E | Previously produced (or duplicate) non-privileged document. |

The first question from Congressman Markey concerned BP's estimate of the oil that could be expected to flow from the well under normal conditions.  Mark Nomellini (Kirkland) worked on

29

the language for the response.  Document Nos. 030.0 to 034.0 concern Nomellini's work.  Unlike Document Nos. 019.0 to 024.0, Rainey was not an active participant in Document Nos. 030.0 to 034.0.  While the communications are related to the flow rate after the blow out, they were not a communication in furtherance of contemplated or ongoing criminal or fraudulent conduct.

| | | |
|---|---|---|
| 030.0 | E | It is not subject to the crime-fraud exception. |
| 031.0 | E | It is not subject to the crime-fraud exception. |
| 032.0 | E | It is not subject to the crime-fraud exception. |
| 033.0 | E | It is not subject to the crime-fraud exception. |
| 034.0 | E | It is not subject to the crime-fraud exception. |

<u>Trevor Hill's Response</u>

On May 22, 2010, Jeffrey Morgheim, at the request of counsel, made a rush/urgent request to Trevor Hill for data related to flow rate estimate re question numbers 4-14 in Congressman Markey's letter.  Doc. No. 025.0.  Hill prepared a three page handwritten response.  Doc. Nos. 027.0, 027.1 and 027.2.  This was put into an email to Morgheim.  Doc. No. 026.0.  On May 23, 2010, Morgheim thanked Hill for the information and asked if he had anything related to Hill's assessment of Professor Wereley's estimate.  Doc. No. 028.0.  The Morgheim/Hill email exchange is forwarded to Max Easley by Steven Haden.  Doc. No. 029.0.

The question is whether the Hill notes and memo are subject to the crime-fraud exception. While the notes and memo are related to the flow rate after the blow out, they were not a communication in furtherance of contemplated or ongoing criminal or fraudulent conduct.

| | | |
|---|---|---|
| 025.0 | E | It is not subject to crime-fraud exception. |
| 025.1 | E | Previously produced (or duplicate) non-privileged document. |

| | | |
|---|---|---|
| 026.0 | E | It is not subject to crime-fraud exception. |
| 027.0 | E | It is not subject to crime-fraud exception. |
| 027.1 | E | It is not subject to crime-fraud exception. |
| 027.2 | E | It is not subject to crime-fraud exception. |
| 028.0 | E | It is not subject to crime-fraud exception. |
| 029.0 | E | It is not subject to crime-fraud exception. |

      **3.**    **June 25, 2010 Letter**.

The allocution is sufficient to make the *prima facie* showing necessary to establish the crime-fraud exception to the attorney-client privilege for the June 25, 2010 letter to Congressman Markey. BP provided a log of withheld documents for the June 25, 2010 letter and submitted the documents for *in camera* review.

There are 55 documents (some of which are families) on the log of withheld documents for the June 25, 2010 letter to Congressman Markey.

<u>Doc. Nos. 001.0 to 023.0</u>

On Sunday, June 20, 2010, there was a news release by the Subcommittee with the headline "Internal BP Document Shows Worst Case Scenario for Spill Could be 100,000 barrels per day." In the document BP stated that if the BOP and wellhead are removed the rate could be 100,000 BOPD. Congressman Markey is quoted as saying that "BP should have been more honest about the dangerous condition of the well bore. . ." Doc. No. 001.0. There are email strings which are dated June 20, 2010 and were generated in response to the news release. <u>See</u> Doc. Nos. 001.0 to 023.0. Generally, BP redacted the emails generated following the news release and produced the remaining portions of the documents, primarily the copy of the news release on each email string.

The emails include exchanges with lawyers for BP (Barry Fields at Kirkland and Anne Harkavy at WilmerHale). Rainey is copied on many of the documents, for example Doc. Nos. 005.0-007.0. Eric Nitcher, an in-house lawyer for BP, emailed Toby Odone, public affairs for BP, and Barry Fields. Nitcher noted that Rainey was being copied. He reported his understanding that Rainey's presentation was the source of pages referred to in the Markey news release. He noted that Rainey provided updates to Congressional committees on May 4 and 6. Doc. Nos. 012.0, 013.0 and 015.0. Odone sought clarification from Rainey on the presence of the wellhead. Doc. No. 016.0. Rainey referred him to Mike Mason. Doc. Nos. 018.0-023.0.

The news release emails do not contain communications in furtherance of contemplated or ongoing criminal or fraudulent conduct. They are not subject to the crime-fraud exception.

| Doc. No. | Cat. | Status |
|----------|------|--------|
| 001.0 | D | It is not subject to the crime-fraud exception. |
| 002.0 | D | It is not subject to the crime-fraud exception. |
| 003.0 | D | It is not subject to the crime-fraud exception. |
| 004.0 | D | It is not subject to the crime-fraud exception. |
| 005.0 | B | It is not subject to the crime-fraud exception. |
| 005.1 | B | Previously produced (or duplicate) non-privileged document. |
| 006.0 | B | It is not subject to the crime-fraud exception. |
| 007.0 | D | It is not subject to the crime-fraud exception. |
| 007.1 | D | Previously produced (or duplicate) non-privileged document. |
| 008.0 | D | It is not subject to the crime-fraud exception. |
| 009.0 | D | It is not subject to the crime-fraud exception. |

| | | |
|---|---|---|
| 0010.0 | D | It is not subject to the crime-fraud exception. |
| 0011.0 | D | It is not subject to the crime-fraud exception. |
| 0012.0 | B | It is not subject to the crime-fraud exception. |
| 0012.1 | B | Previously produced (or duplicate) non-privileged document. |
| 0013.0 | B | It is not subject to the crime-fraud exception. |
| 0014.0 | E | It is not subject to the crime-fraud exception. |
| 0015.0 | C | It is not subject to the crime-fraud exception. |
| 0016.0 | C | It is not subject to the crime-fraud exception. |
| 0017.0 | D | It is not subject to the crime-fraud exception. |
| 0017.1 | D | Previously produced (or duplicate) non-privileged document. |
| 0018.0 | C | It is not subject to the crime-fraud exception. |
| 0019.0 | C | It is not subject to the crime-fraud exception. |
| 0020.0 | E | It is not subject to the crime-fraud exception. |
| 0021.0 | E | It is not subject to the crime-fraud exception. |
| 0022.0 | E | It is not subject to the crime-fraud exception. |
| 0023.0 | E | It is not subject to the crime-fraud exception. |

<u>Doc. Nos. 024.0 - 028.0</u>

These emails concern the drafting of the June 25, 2010 letter to Congressman Markey.  <u>See</u>

Doc. Nos. 024.0 - 028.0.  BP placed them in category C - documents in which Rainey was an active

participant in the communication but it does not relate to the matters in BP's guilty plea allocution.

In the discussion of pre-incident production rates in which Rainey was an active participant, it was

determined that the documents were subject to the crime-fraud exception.[12]

Doc. No. 024.0 contains a June 21 draft of the letter to Congressman Markey.  It does not demonstrate any involvement by Rainey.  In Doc. No. 025.0, the only reference to Rainey is in the last email in the string, where Morgheim transmits a draft, notes that further edits are coming, and requests Rainey's participation in a conference call to review the draft.  In Doc. No. 026.0, Susan Friedman (WilmerHale) sends a June 22 draft to Rainey.  Doc. No. 027.0 has the same email string as 026.0 with the addition of an email from Rainey to Michael Leary forwarding the June 22 draft.  Doc. No. 028.0 begins with an email from Susan Friedman (WilmerHale) to Nitcher (house counsel) and outside counsel at Arnold and Porter to transmit a draft of the letter and two documents released by Congressman Markey.  Rainey is not copied.  A second Friedman email notes that she included the wrong attachments on the first email.  Rainey is a recipient of the second email.

These emails reveal either no involvement by Rainey or only minimal involvement in that he is a recipient of drafts of the June 25, 2010 letter to Congressman Markey.  Doc. Nos. 024.0 - 028.0 are not subject to the crime-fraud exception.  They do not contain communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.

| Doc. No. | Cat. | Status |
|----------|------|--------|
| 0024.0 | C | It is not subject to the crime-fraud exception. |
| 0025.0 | C | It is not subject to the crime-fraud exception. |
| 0025.1 | C | It is not subject to the crime-fraud exception. |
| 0026.1 | C | It is not subject to the crime-fraud exception. |
| 0026.2 | C | Previously produced (or duplicate) non-privileged document. |

---

[12] See infra May 24, 2010 Letter - Doc. Nos. 019.0-024.3.

| 0027.0 | C | It is not subject to the crime-fraud exception. |
|--------|---|-------------------------------------------------|
| 0027.1 | C | It is not subject to the crime-fraud exception. |
| 0027.2 | C | Previously produced (or duplicate) non-privileged document. |
| 0028.0 | C | It is not subject to the crime-fraud exception. |
| 0028.1 | C | Previously produced (or duplicate) non-privileged document. |

<u>Doc. Nos. 044.0, 046.0 - 055.0</u>

These documents also concern the drafting of the June 25, 2010 letter to Congressman Markey.  <u>See</u> Doc. Nos. 044.0, 046.0 - 055.0.  BP placed them in category C.

Doc. No. 044.0 contains emails dated June 22 and 23, 2010.  They begin with an email with the latest draft from Susan Friedman (WilmerHale) to house counsel, outside counsel and others (not Rainey).  Friedman notes that the draft includes edits from Rainey.  Nitcher, house counsel, replied and requested the inclusion of a quote from Congressman Markey.  Morgheim concurred with Nitcher's changes.  Tonya Robinson (WilmerHale) reported that they were waiting on Rainey, who was conferring with Mike Leary to confirm certain facts.  Robinson commented on the basis for the 60,000 estimate of the WCD.  In the next email, Robinson thanked everyone for their edits, attached the revised letter, requested any further edits, and reported that the aim was to send the letter that day - June 22.  Rainey was copied.  He responded with two small edits.  Kevin Bailey, who signed the final draft, concurred in Rainey's changes.

Doc. No. 046.0 contains many of the same emails found in Doc. No. 044.0. It also had an email from Elizabeth Reicherts, BP government affairs, who reported that she needed to have a discussion with Rainey concerning the latest draft and walk him through it.

Doc. No. 047.0 contains some of the same emails found in Doc. No. 044.0.  It also has an

email from Rainey to Kevin Bailey and others in which he requested that they not use "measurement" and instead use "estimate" or "calculate" the flow rate because there was no way to measure it.  Doc. No. 048.0 is the same as Doc. No. 047.0 with the addition of an email from Bailey concurring in the change recommended by Rainey.  Doc. Nos. 051.0 and 052.0 are the same as Doc. No. 048.0 with the addition of emails from Kathleen Lucas and Morgheim concurring in Rainey's recommended change regarding the use of "measurement."  Doc. No. 049.0 is the same as Doc. No. 047.0 with "one last change."

Doc. No. 050.0 is same as Doc. No. 048.0 with the addition of an email from Stephen Palmer, a BP house counsel, concerning a June 8 interim flow rate estimate of 25,000 to 30,000 prior to the insertion of the RITT to emphasize the difficulty in estimating flow rates.  Doc. No. 053.0 is the same as Doc. No. 050.0 with a reply from Rainey to Palmer, in which Rainey asked when the RITT was installed.  Rainey recalled it was before June 8.  He added that he did not remember the interim flow rate estimate.  Doc. No. 054.0 is the same as Doc. No. 053.0 with an email from Nitcher reporting that he spoke to Palmer and they recommended that the June 8 interim flow rate estimate not be covered in the letter.  Doc. No. 055.0 is the same as Doc. No. 054 with an email from Rainey to Nitcher, Palmer and others, where Rainey agreed that it not be covered in the letter.

These emails reveal significant involvement by Rainey.  Doc. Nos 044.0, 046.0 - 055.0 are subject to the crime-fraud exception.  They contain communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.

Doc. No.      Cat.            Status

0044.0        C        It is subject to the crime-fraud exception.

                        *    *    *

0046.0      C      It is subject to the crime-fraud exception.

0047.0      C      It is subject to the crime-fraud exception.

0048.0      C      It is subject to the crime-fraud exception.

0049.0      C      It is subject to the crime-fraud exception.

0050.0      C      It is subject to the crime-fraud exception.

0051.0      C      It is subject to the crime-fraud exception.

0052.0      C      It is subject to the crime-fraud exception.

0053.0      C      It is subject to the crime-fraud exception.

0054.0      C      It is subject to the crime-fraud exception.

0055.0      C      It is subject to the crime-fraud exception.

<u>Doc. Nos. 029.0-043.0 and 045.0</u>

BP agreed to produce all of the documents in the fourth group.  <u>See</u> Doc. Nos. 029.0-043.0

and 045.0.  There is no issue as to the fourth group.

<u>Doc. No.</u>     <u>Cat</u>.       <u>Status</u>

0029.0      A      BP agrees to produce.

0030.0      A      BP agrees to produce.

0030.1      A      BP agrees to produce.

0031.0      A      BP agrees to produce.

0031.1      A      BP agrees to produce.

0032.0      A      BP agrees to produce.

0032.1      A      BP agrees to produce.

0033.0      A      BP agrees to produce.

| | | |
|---|---|---|
| 0034.0 | A | BP agrees to produce. |
| 0035.0 | A | BP agrees to produce. |
| 0036.0 | A | BP agrees to produce. |
| 0037.0 | A | BP agrees to produce. |
| 0038.0 | A | BP agrees to produce. |
| 0038.1 | A | BP agrees to produce. |
| 0039.0 | A | BP agrees to produce. |
| 0039.1 | A | BP agrees to produce. |
| 0040.0 | A | BP agrees to produce. |
| 0040.1 | A | BP agrees to produce. |
| 0041.0 | A | BP agrees to produce. |
| 0041.1 | A | BP agrees to produce. |
| 0042.0 | A | BP agrees to produce. |
| 0042.1 | A | BP agrees to produce. |
| 0043.0 | A | BP agrees to produce. |
| | *   *   * | |
| 0045.0 | A | BP agrees to produce. |

**B.     Group Two**

The U.S. and Transocean seek all documents related to preparation of BP's May 19, 2010 email to Admiral Landry.  There are only two documents at issue on the log (Doc. Nos. 005.0 and 006.0).

Doc. No. 005.0 begins with a May 17, 2010 email from Rainey to Jack Lynch, in which

Rainey sought Lynch's advice on whether a flow rate paper should be shared with Marcia McNutt. On May 18, Lynch approved.[13]  Two emails follow on Doc. No. 005.0.  Both were authored by Jack Lynch.  Doc. No. 006.0 is the same as Doc. No. 005.0 with an additional email from Robert Dudley to Eric Nitcher.  The two emails authored by Jack Lynch and the one by Robert Dudley are not communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.

| Doc. No. | Cat. | Status |
|---|---|---|
| 001.0 | A | BP agrees to produce. |
| 002.0 | A | BP agrees to produce. |
| 002.1 | A | Previously produced (or duplicate) non-privileged document. |
| 002.2 | A | Previously produced (or duplicate) non-privileged document. |
| 003.0 | A | BP agrees to produce. |
| 003.1 | A | Previously produced (or duplicate) non-privileged document. |
| 003.2 | A | Previously produced (or duplicate) non-privileged document. |
| 004.0 | A | BP agrees to produce. |
| 004.1 | A | Previously produced (or duplicate) non-privileged document. |
| 004.2 | A | Previously produced (or duplicate) non-privileged document. |
| 005.0 | D | It is not subject to the crime-fraud exception. |
| 005.1 | D | Previously produced (or duplicate) non-privileged document. |
| 005.2 | D | Previously produced (or duplicate) non-privileged document. |
| 006.0 | D | It is not subject to the crime-fraud exception. |

---

[13]  The May 17 and 18 emails between Rainey and Lynch and then Lynch and Rainey are not at issue. They are found on Doc. Nos. 003.0 and 004.0, which BP has agreed to produce.

| | | |
|---|---|---|
| 006.1 | D | Previously produced (or duplicate) non-privileged document. |
| 006.2 | D | Previously produced (or duplicate) non-privileged document. |
| 007.0 | A | BP agrees to produce. |
| 007.1 | A | Previously produced (or duplicate) non-privileged document. |

## C.    Group Three

The U.S. and Transocean seek all documents related to preparation of BP's Forms 6-K filed with the SEC. The first issue is whether the U.S. and Transocean made the *prima facie* showing necessary to establish the crime-fraud exception to the attorney-client privilege.

BP executed a Consent Decree with the SEC. It agreed not to deny the allegations in the SEC complaint. The SEC Complaint alleges that BP's Forms 6-K furnished to the SEC on April 29 and 30 and May 4, 2010 by BP were fraudulent. BP's internal documents demonstrate that its flow rate estimates were several times higher than 5,000 BOPD. The U.S. and Transocean argue that: (1) the statements in the Forms 6-K were at odds with BP's internal estimates; (2) it does not challenge the contention that it misled the SEC; and (3) these circumstances are sufficient to establish a *prima facie* case that BP misled the SEC.

BP responds that the U.S. ignores the statement that nothing in the agreement affects its right to take legal or factual positions in litigation or other proceedings in which the Commission is not a party. The SEC is not a party to MDL, so BP is not barred from raising all of its factual defenses in the MDL. It contends that the guilty plea does not establish a *prima facie* case of crime or fraud for the communications related to BP's SEC submissions.

The Court can conduct an *in camera* review to consider whether the crime-fraud exception applies. To do so, there must be a demonstration of a factual basis adequate to support a good faith

belief by a reasonable person, that an *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies. <u>Zolin</u>, 491 U.S. at 572. Such a factual basis is present. BP was ordered to produce the withheld SEC documents for *in camera* review. Rec. doc. 9064.

After conducting the review, the Court finds that the U.S. and Transocean have not carried their burden of establishing a *prima facie* case that the attorney-client relationship was intended to further criminal or fraudulent activity. <u>In re Grand Jury</u>, 419 F.3d at 335. Assuming that the *prima facie* case was established, the Court finds the attorney-client communications do not reasonably relate to the activity at issue nor is there probable cause to believe that these attorney-client communications were intended in some way to facilitate or to conceal the activity at issue.

| Doc. No. | Status |
|----------|--------|
| 001.0 | It is not subject to the crime-fraud exception. |
| 001.1 | It is not subject to the crime-fraud exception. |
| 002.0 | It is not subject to the crime-fraud exception. |
| 002.1 | It is not subject to the crime-fraud exception. |
| 003.0 | It is not subject to the crime-fraud exception. |
| 003.1 | It is not subject to the crime-fraud exception. |
| 004.0 | It is not subject to the crime-fraud exception. |
| 004.1 | It is not subject to the crime-fraud exception. |
| 005.0 | It is not subject to the crime-fraud exception. |
| 005.1 | It is not subject to the crime-fraud exception. |
| 006.0 | It is not subject to the crime-fraud exception. |

006.1          It is not subject to the crime-fraud exception.

007.0          It is not subject to the crime-fraud exception.

007.1          It is not subject to the crime-fraud exception.

008.0          Previously produced (or duplicate) non-privileged document.

008.1          It is not subject to the crime-fraud exception.

IT IS ORDERED that:

1.     The Motions of the U.S. and Transocean to Compel Production of Previously-Withheld Documents Pursuant to the Crime-Fraud Exception to the Attorney-Client Privilege (Rec. docs. 8417 and 8457) are GRANTED in PART and DENIED in PART as provided herein.

2.     **By Wednesday, May 8, 2013,** BP shall produce all documents which were determined to be subject to the crime-fraud exception.

3.     BP shall respond to the U.S./Transocean joint memorandum (Rec. doc. 9355).  The U.S. and Transocean shall submit a joint reply at which time the selection criteria issue is submitted. The parties shall agree on a briefing schedule.

4.     The deadline for an appeal of this order by BP is **Wednesday, May 8, 2013.**

5.     The deadline for appeal of this order by the U.S. and Transocean is **Wednesday, May 15, 2013.**

New Orleans, Louisiana, this 30th day of April, 2013.

**SALLY SHUSHAN**
**United States Magistrate Judge**

42