```
 1                     UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
 2
     **********************************************************
 3
     IN RE:  OIL SPILL BY THE          Docket No. MDL-2179
 4   OIL RIG DEEPWATER HORIZON         New Orleans, Louisiana
     IN THE GULF OF MEXICO ON          Friday, April 5, 2013
 5   APRIL 20, 2010
 6   **********************************************************
     BON SECOUR FISHERIES, INC.
 7
                                       Docket No. 12-CV-970
 8   VS.                               Section "J"
                                       New Orleans, Louisiana
 9                                     Friday, April 5, 2013
     BP EXPLORATION & PRODUCTION,
10   INC, ET AL
     **********************************************************
11   BP EXPLORATION & PRODUCTION,
     INC, ET AL
12                                     Docket No. 13-CV-492
     VS.                               Section "J"
13                                     New Orleans, Louisiana
                                       Friday, April 5, 2013
14   DEEPWATER HORIZON COURT
     SUPERVISED SETTLEMENT PROGRAM, ET AL
15   **********************************************************
16
                     TRANSCRIPT OF MOTION PROCEEDINGS
17            HEARD BEFORE THE HONORABLE CARL J. BARBIER
                       UNITED STATES DISTRICT JUDGE
18
19   APPEARANCES:
20   FOR THE PLAINTIFFS:              HERMAN, HERMAN, KATZ & COTLAR, LLP
                                      BY:  STEPHEN J. HERMAN, ESQ.
21                                         SOREN GISELSON, ESQ.
                                      820 O'Keefe Avenue
22                                    New Orleans, LA 70113
23                                    DOMENGEAUX, WRIGHT, ROY & EDWARDS
                                      BY:  JAMES P. ROY, ESQ.
24                                    P. O. BOX 3668
                                      556 JEFFERSON ST.
25                                    LAFAYETTE, LA 70502-3668
```

```
 1                    LEWIS KULLMAN STERBCOW & ABRAMSON
                      BY:  PAUL M. STERBCOW, ESQ.
 2                    601 POYDRAS STREET, SUITE 2615
                      NEW ORLEANS, LA 70130
 3
                      IRPINO LAW FIRM
 4                    BY:  ANTHONY IRPINO, ESQ.
                      2216 Magazine St.
 5                    New Orleans, LA 70130

 6                    WILLIAMS LAW GROUP
                      BY:  CONRAD "DUKE" WILLIAMS, ESQ.
 7                    435 Corporate Drive, Suite 101
                      Maison Grand Caillou
 8                    Houma, LA 70360

 9                    BREIT DRESCHER IMPREVENTO & WALKER
                      BY:  JEFFREY A. BREIT, ESQ.
10                    1000 Dominion Tower
                      999 Waterside Drive
11                    Norfolk, VA 23510

12                    CUNNINGHAM BOUNDS, LLC
                      BY:  ROBERT T. CUNNINGHAM, ESQ.
13                    1601 Dauphin St.
                      Mobile, AB 33604
14
                      WILLIAMSON & RUSNAK
15                    BY:  JIMMY WILLIAMSON, ESQ.
                      4310 Yoakum Blvd.
16                    Houston, TX 77006

17                    MOTLEY RICE
                      BY JOSEPH D. RICE, ESQ.
18                    28 Bridgeside Blvd.
                      Mount Pleasant, SC 29464
19
                      BRADLEY, MURCHISON, KELLY & SHEA
20                    BY:  JOEL A. RICE, ESQ.
                      401 Edwards St., 10th Floor
21                    Shreveport, LA 71101

22                    FAYARD & HONEYCUTT
                      BY:  CALVIN C. FAYARD, JR., ESQ.
23                    519 Florida Ave., SW
                      Denham Springs, LA 70726
24

25
```

```
 1                                   LIEFF CABRASER HEIMANN & BERNSTEIN
                                     BY:  ELIZABETH J. CABRASER, ESQ.
 2                                   275 Battery St., 29th Floor
                                     San Francisco, CA 94111
 3

 4   FOR THE STATE OF ALABAMA:       ATTORNEY GENERAL OF ALABAMA
                                     BY:  COREY L. MAZE, ESQ.
 5                                   500 Dexter Ave.
                                     Montgomery, AB 36130
 6

 7   FOR BP EXPLORATION &
     PRODUCTION INC., ET AT:         KIRKLAND & ELLIS
 8                                   BY:  RICHARD C. GODFREY, ESQ.
                                          ANDREW B. BLOOMER, ESQ.
 9                                   300 N. LaSalle
                                     Chicago, IL 60654
10
                                     LISKOW & LEWIS
11                                   BY:  S. GENE FENDLER, ESQ.
                                          R. KEITH JARRETT, ESQ.
12                                   One Shell Square, Suite 5000
                                     701 Poydras St.
13                                   New Orleans, LA 70139

14                                   KIRKLAND & ELLIS
                                     BY:  JEFFREY B. CLARK, ESQ.
15                                   655 Fifteenth St., N.W.
                                     Washington, D.C. 20005
16
                                     DENTONS US
17                                   BY:  JEFFREY LENNARD, ESQ.
                                     7800 Sears Tower
18                                   233 South Wacker Dr.
                                     Chicago, IL 60606
19

20
     FOR PATRICK JUNEAU AND DEEPWATER
21   HORIZON COURT SUPERVISED
     SETTLEMENT PROGRAM:             STANLEY, REUTER, ROSS,
22                                   THORNTON & ALFORD
                                     BY:  RICHARD C. STANLEY, ESQ.
23                                        JENNIFER L. THORNTON, ESQ.
                                     909 Poydras St., Suite 2500
24                                   LL&E Tower
                                     New Orleans, LA 70112
25
```

```
1    OFFICIAL COURT REPORTER:          Karen A. Ibos, CRR, RMR, CCR
                                        500 Poydras St., Room HB-406
2                                       New Orleans, LA 70130
                                        (504) 589-7776
3                                       Karen_ibos@laed.uscourts.gov

4
     Proceedings recorded by mechanical stenography.  Transcript
5    produced by computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S

 2                  (FRIDAY, APRIL 5, 2013)

 3                 (MOTION PROCEEDINGS)

 4

 5       (OPEN COURT.)

 6            THE DEPUTY CLERK:  All rise.

 7            THE COURT:  All right.  Please be seated, everyone.

 8  Okay.  Call this matter, Stephanie.

 9            THE DEPUTY CLERK:  MDL 10-2179, In re:  Oil spill by the

10  oil rig Deepwater Horizon in the Gulf of Mexico on April 20th,

11  2010; Civil Action 12-970, Bon Secour Fisheries, Incorporated,

12  et al., versus BP Exploration and Production, Incorporated, et al.;

13  Civil Action 13-492, BP Exploration and Production, Incorporated

14  et al., versus Deepwater Horizon Court Supervised Settlement

15  Program, et al.

16            THE COURT:  All right.  Counsel, make your appearances,

17  please.

18            MR. GODFREY:  Richard Godfrey on behalf of BP.  With me

19  is Andrew Bloomer, Jeff Clark, Keith Jarrett, Jeff Lennard, and the

20  Gene Fendler.

21            THE COURT:  Are you going to be doing the argument,

22  Mr. Godfrey?

23            MR GODFREY:  Yes, sir.

24            MR. HERMAN:  Steve Herman for the class, and with me is

25  most of the PSC class counsel I believe.
```

09:35:30  1          THE COURT:  And you will be doing the argument,

09:35:31  2  Mr. Herman?

09:35:33  3          MR. HERMAN:  Yes, Your Honor.

09:35:33  4          THE COURT:  Okay.  Thanks.

09:35:34  5          MR STANLEY:  Good morning, Your Honor.  Rick Stanley and

09:35:36  6  Jennifer Thornton here for Pat Juneau and the settlement program.

09:35:40  7          THE COURT:  Okay.  Thank you.

09:35:47  8          All right.  Looks like we have several matters before the

09:35:52  9  Court this morning, but they're all really related.  First, as I

09:35:59 10  see it, there is a motion -- BP filed a motion in the Bon Secour

09:36:10 11  class action case, which is Civil Action 12-970.  BP has filed a

09:36:18 12  motion for preliminary injunction against Mr. Juneau in his

09:36:24 13  official capacity as the claims administrator and against the

09:36:28 14  settlement program itself, seeking to enjoin Mr. Juneau from

09:36:38 15  interpreting the business economic loss claim provisions in the

09:36:55 16  settlement in the manner in which he has interpreted them.

09:37:03 17          Second motion, the second matter is a completely new

09:37:08 18  lawsuit filed by BP, 13-492, which is *BP, et cetera, versus*

09:37:17 19  *Deepwater Horizon Court Supervised Settlement Program, et al.,*

09:37:23 20  which essentially is, as I see, is duplicative of the Motion For

09:37:31 21  Preliminary Injunction.  In fact, it asks for the identical

09:37:34 22  injunctive relief as I see it.  So they're really one and the same,

09:37:38 23  although they're filed in two different matters.

09:37:41 24          And then, thirdly, we have a Motion to Dismiss filed by

09:37:50 25  the defendants in 13-492, motion filed by Mr. Juneau as claims

09:37:57   1    administrator and by the settlement program, a Rule 12(b)(6) Motion

09:38:03   2    to Dismiss for Failure to State a Claim.

09:38:06   3         Finally, the economic and property damage class,

09:38:11   4    represented by class counsel here today, have formally intervened

09:38:19   5    in the new lawsuit as defendants in 13-492 and everyone, obviously,

09:38:28   6    all of those parties, each of those parties have filed pleadings,

09:38:34   7    memoranda, and so forth either in support or opposition to these

09:38:38   8    matters.

09:38:40   9         The Court is very familiar with this issue.  That is

09:38:46   10   probably the biggest understatement I've made in a while.  I have

09:38:49   11   dealt with this issue.  This is at least the third time, fourth

09:38:52   12   time -- I'm losing track of how many times I've dealt with this

09:38:55   13   same identical issue, so I do not want to rehash everything that's

09:38:59   14   been said before.

09:39:02   15        I have gone through what you all have filed, which is

09:39:05   16   voluminous, and that's a grand understatement in itself.  Seems

09:39:11   17   like every time this matter rears its head again, there are more

09:39:16   18   documents, more exhibits, more declarations that are filed, so it's

09:39:20   19   a growing, living thing, it seems.  And I don't know when or what

09:39:29   20   it's going to take to finally resolve it, but I want to finally

09:39:32   21   resolve it here today.

09:39:34   22        So with that said, Mr. Godfrey, I will hear from you.  I

09:39:38   23   would like to talk about the Motion to Dismiss because I think that

09:39:42   24   precedes your Motion For Preliminary Injunction.  I am going to

09:39:45   25   give each side 20 minutes, by the way, so it's now 20 minutes to

```
09:39:51   1   ten, Mr. Godfrey
09:39:52   2           MR GODFREY:  Thank you, Your Honor, and I deeply
09:39:54   3   appreciate the Court's taking the time to visit this issue.  I know
09:39:56   4   the Court has spent a great deal of time on it.  I would like to
09:40:00   5   try to reserve three minutes, but we'll see how it goes.
09:40:01   6           THE COURT:  You can do that if you would like.
09:40:04   7           MR GODFREY:  Thank you.
09:40:04   8           THE COURT:  Just have someone on your side keep count for
09:40:09   9   you.
09:40:09  10           MR GODFREY:  Mr. Lennard will keep the count.
09:40:12  11           THE COURT:  I don't have a clock up here.  It's not like
09:40:14  12   a Court of Appeal.  We are in sequestration.  I doubt they will
09:40:19  13   give me a clock.  The one I have up here, my batteries are dead, I
09:40:24  14   think.
09:40:24  15           MR GODFREY:  I can't solve that problem, Your Honor.
09:40:25  16           The Court knows we have two motions for preliminary
09:40:28  17   injunction.  The Court is intimately familiar with the issue.  I
09:40:30  18   would like to step back and see if we can find common ground, a
09:40:34  19   spot where perhaps we can all agree and then see whether, if we
09:40:36  20   agree on that spot, that has implications for whether or not BP
09:40:41  21   should be granted the relief that we seek.
09:40:44  22           Assume that a business prepares, a business claimant
09:40:48  23   prepares monthly financials in the ordinary course --
09:40:53  24           THE COURT:  Well, Mr. Godfrey, I'm sorry.  I really want
09:40:55  25   you to talk about the Motion to Dismiss first because I think that
```

09:40:59  1    has to precede everything else.

09:41:00  2            MR GODFREY:  Well, that -- the most --

09:41:02  3            THE COURT:  I want to know why I should not -- I want to

09:41:05  4    hear from you why I should not grant the Motion to Dismiss filed by

09:41:10  5    Mr. Juneau and the program.

09:41:14  6            MR GODFREY:  Well, number one, I don't think that he is

09:41:16  7    entitled to judicial immunity.  We laid that out in our brief.  He

09:41:20  8    is not a judicial officer.  He is not a special master.  So the

09:41:23  9    first argument that they raise is there's judicial immunity.  We've

09:41:25 10    laid out in our brief that he is not entitled to judicial immunity,

09:41:29 11    he is not exercising a judicial function.  He is not appointed

09:41:32 12    pursuant to Rule --

09:41:33 13            THE COURT:  Let me ask you about that.  I want to think

09:41:36 14    about the practical implications of what you're saying.  Despite

09:41:41 15    the fact that I know this settlement was negotiated over a long

09:41:46 16    period of time, I think about a year as I recall, and resulted in

09:41:52 17    a, roughly 1,000-page document that spelled out in great detail the

09:42:00 18    settlement agreement program, as with anything that you put in

09:42:04 19    writing, whether it be a statute, a regulation or a contract, there

09:42:16 20    will from time to time be disagreements about how that should be

09:42:19 21    interpreted or applied.  Do you agree with that?

09:42:21 22            MR. GODFREY:  That is correct, Your Honor.

09:42:23 23            THE COURT:  If that's the case, who is it in your view

09:42:30 24    that is empowered in this situation, has authority in the

09:42:33 25    circumstance we're in to interpret and decide how that is

09:42:39  1   interpreted and applied?

09:42:40  2         MR. GODFREY:  Your Honor.  And Your Honor alone is

09:42:45  3   empowered to interpret it because it's a question of law in terms

09:42:45  4   of contract interpretation.  Mr. Juneau is to implement, not

09:42:49  5   interpret.

09:42:50  6         THE COURT:  Okay.  But somebody has to do it in the first

09:42:52  7   instance before it gets -- not every question comes to me

09:42:54  8   immediately.  You agree with that?

09:42:55  9         MR. GODFREY:  I would agree with that, Your Honor.

09:42:57 10         THE COURT:  So it seems to me what happened in this case

09:42:59 11   is pretty clear and pretty simple, not that the issue may not be

09:43:06 12   simple, but the -- procedurally is pretty simple in that there was

09:43:11 13   a disagreement at some point, at some point BP came to the

09:43:18 14   conclusion that they believed Mr. Juneau was and his staff were

09:43:30 15   wrongly interpreting the business economic claim matrix, I'll call

09:43:34 16   it.  Is that accurate?

09:43:35 17         MR. GODFREY:  That is correct.  We reached the conclusion

09:43:37 18   after we started to see awards that we could not reconcile with the

09:43:40 19   data underlying the awards.

09:43:42 20         THE COURT:  Okay.  And you brought that to his attention

09:43:44 21   in some fashion, correct?

09:43:45 22         MR. GODFREY:  We did bring that to his attention.

09:43:47 23         THE COURT:  As a result, he -- actually, and then he

09:43:51 24   heard from both sides in some fashion, invited memoranda, letters,

09:43:56 25   whatever way that was done, correct?

09:43:58  1          MR. GODFREY:  Yes.  By that point in time, hundreds of

09:44:01  2    awards had been made --

09:44:02  3          THE COURT:  That's neither here nor there.  I'm trying to

09:44:05  4    get to procedurally what happened here.

09:44:07  5          MR. GODFREY:  Yes, there was a procedure.  On

09:44:08  6    December 16th, class counsel -- we were engaged in discussions.

09:44:11  7    Class counsel on December the 16th asked for a policy decision, we

09:44:14  8    briefed --

09:44:15  9          THE COURT:  Wait a minute.  You're getting way ahead of

09:44:16 10    me here.

09:44:17 11          MR. GODFREY:  My 20 minutes are short, Your Honor.

09:44:19 12          THE COURT:  So after he heard from both sides where each

09:44:25 13    side could not agree, did not agree on how this should be

09:44:29 14    interpreted or applied, he issued what he calls a policy statement,

09:44:34 15    which apparently there's been a number -- this is not the first

09:44:38 16    "policy statement" issued since the settlement.

09:44:40 17          MR. GODFREY:  That is correct, Your Honor.

09:44:41 18          THE COURT:  BP requested -- or somebody requested -- I

09:44:47 19    don't know if he did it on his own, not that it matters, but

09:44:51 20    somebody requested or invoked the three panel -- three-person panel

09:44:57 21    shortly thereafter, almost immediately thereafter, as I recall.

09:45:00 22          MR. GODFREY:  That is correct, Your Honor.

09:45:01 23          THE COURT:  And the three-person panel is envisioned --

09:45:07 24    designed in the settlement program to be the claims administrator,

09:45:12 25    a representative of class counsel, and a representative of BP,

09:45:16  1    correct?

09:45:16  2         MR. GODFREY:  That is correct, Your Honor.

09:45:17  3         THE COURT:  And the way it's designed to work is they

09:45:19  4    meet, try to see if they can reach consensus, which I know they

09:45:24  5    have in other instances, there have been instances where that has

09:45:27  6    worked in that fashion, correct?

09:45:28  7         MR. GODFREY:  It in general has worked, Your Honor.  It

09:45:31  8    did not in this instance.

09:45:32  9         THE COURT:  Okay.  So after that was done and it didn't

09:45:37 10    result in a consensus, the settlement agreement provides that it

09:45:45 11    then comes up to the Court, whoever is not happy with it can bring

09:45:48 12    it to the attention of the Court, correct?

09:45:50 13         MR. GODFREY:  That is correct, Your Honor.

09:45:51 14         THE COURT:  And you did that?

09:45:52 15         MR. GODFREY:  That is entirely correct, Your Honor.

09:45:54 16         THE COURT:  We had -- this is only the second one we've

09:45:59 17    ever handled like this, that has gotten up to my level at least.

09:46:03 18         MR. GODFREY:  Fortunately, yes, Your Honor.

09:46:05 19         THE COURT:  Although, as I've said, I've now dealt with

09:46:08 20    this multiple times.  But when it comes to me, the procedure that

09:46:12 21    we had used and everyone agreed on is we handled it informally,

09:46:17 22    initially at least.  I met with you all at least twice, right?

09:46:20 23         MR. GODFREY:  The parties --

09:46:21 24         THE COURT:  Once in here and once in my conference room

09:46:23 25    as I recall.

09:46:23    1          MR. GODFREY:  Yes, the parties met with Your Honor twice.

09:46:25    2          THE COURT:  And after the first meeting, I issued an -- I

09:46:29    3    guess I'd call it an informal ruling.  I said I agree with

09:46:33    4    Mr. Juneau's interpretation.  At some point thereafter, you came

09:46:37    5    back and said, "Would you reconsider and vacate your order?"  And I

09:46:44    6    am pretty sure BP -- you or someone, BP, suggested that "We think

09:46:48    7    maybe there is a way to resolve this amicably if you give us time

09:46:53    8    and send us back to talk to a mediator," correct?

09:46:57    9          MR. GODFREY:  Yes.  We went to a mediator and it failed.

09:47:01   10          THE COURT:  So I did that.  I set aside my January 30th,

09:47:05   11    I think it was, informal ruling.  I designated Mr. Dan Balhoff,

09:47:17   12    which both sides as I recall agreed to, who already was a

09:47:21   13    Court-appointed neutral for other purposes, and you all met with

09:47:27   14    him.

09:47:28   15          And at some point within the couple of weeks or so, I got

09:47:31   16    a report from him that he didn't see any way that the parties were

09:47:34   17    going to reach a resolution.  There was no way to amicably resolve

09:47:39   18    it.  Is that fair?

09:47:39   19          MR. GODFREY:  That is a fair statement, Your Honor.

09:47:41   20          THE COURT:  So then it was back in my lap, and I spent, I

09:47:50   21    think, a couple of weeks.  Of course, by this time -- I think I am

09:47:54   22    right -- we had just about started this trial that we've been in

09:47:58   23    now for six weeks, right around that time.

09:48:00   24          MR. GODFREY:  I think the trial started the 25th of

09:48:03   25    February.  I think, yes, that's correct.

09:48:05 1          THE COURT:  Right around that time.  So in the midst of

09:48:08 2     trying to get this trial up and running and doing this, I spent

09:48:13 3     time as I could over the next couple of weeks re-reviewing

09:48:18 4     everything that everybody had submitted, and it, again, was

09:48:21 5     voluminous even back at that time because by this time you all had

09:48:26 6     submitted more documents.

09:48:28 7          Each time this matter has come back up, first in front of

09:48:32 8     Mr. Juneau, then in front of me informally, and then in front of me

09:48:36 9     a second time, the record grows.  So I've reviewed all of that

09:48:41 10    again.  And then I issued my March 5th, 2013, ruling, which is

09:48:50 11    Record Document 8812, where I set out my reasons and my

09:48:58 12    interpretation, my own interpretation of the settlement agreement

09:49:06 13    provisions in question and said that my interpretation agreed with

09:49:12 14    Mr. Juneau's interpretation.

09:49:16 15         So that led us up to -- that's the rough background,

09:49:22 16    quick summary of what has led us to where we are today.  So my

09:49:27 17    question is, I am having a real hard time -- I am just being honest

09:49:34 18    with you, Mr. Godfrey.  I am having a real hard time understanding

09:49:37 19    how BP is now asking me to enjoin Mr. Juneau from following my

09:49:47 20    order.  Basically you're asking me to enjoin myself, it seems to

09:49:53 21    me.

09:49:53 22         MR. GODFREY:  Well, not quite, Your Honor.

09:49:54 23         THE COURT:  Not quite.  I think that would be the effect

09:49:57 24    of it.  How else can I view it?

09:49:59 25         MR. GODFREY:  I think the Court knows we filed a notice

09:50:01   1    of appeal, as I'd indicated in chambers, two weeks ago.

09:50:04   2           THE COURT:  I know that.  Yesterday.

09:50:07   3           MR. GODFREY:  Yes.  And as we've outlined in our papers,

09:50:11   4    the status quo is that awards for large amounts of money to people

09:50:17   5    who had suffered no loss whatsoever --

09:50:20   6           THE COURT:  Well, according to you.

09:50:21   7           MR. GODFREY:  According to --

09:50:23   8           THE COURT:  Not according to the parties who made the

09:50:26   9    claim.

09:50:26  10           MR. GODFREY:  Well, according to the expert declarations

09:50:28  11    on file, they suffered no loss.  What they're getting --

09:50:31  12           THE COURT:  The problem with that argument, as I see it,

09:50:33  13    is whether someone has sustained a loss is defined by the

09:50:38  14    agreement.  And if the plain terms of the agreement says someone

09:50:45  15    has -- passes the causation test and has sustained a loss, then

09:50:49  16    they've sustained a loss, whether you think they sustained a loss

09:50:52  17    in some real sense or other sense, or whether I think.

09:50:55  18           The whole point here, this is not like we're litigating

09:50:59  19    individual claims, and that's what the settlement is intended to

09:51:02  20    avoid.  And it seems to me the fundamental issue -- and I don't

09:51:06  21    want to get too far into the underlying merits today because I

09:51:10  22    don't think we need to go there.  I want to understand:  How is it

09:51:13  23    that you think -- or BP believes that I can enjoin a claims

09:51:20  24    administrator from obeying and following an explicit order of the

09:51:28  25    Court dated March 5th, 2013?

09:51:30  1          MR. GODFREY:  There are two separate bases, Your Honor,

09:51:33  2    and I'll just cover them in the order in which we filed them.

09:51:36  3          As to the preliminary injunction motions themselves --

09:51:39  4    and you're correct that they are seeking identical relief, and I

09:51:42  5    explained in chambers when we went in chambers that it was a

09:51:45  6    belt-and-suspenders based on some guidance that Fifth Circuit

09:51:48  7    precedent had provided.

09:51:49  8          THE COURT:  Seems like this whole exercise is a

09:51:53  9    belt-and-suspenders operation.

09:51:54  10          MR. GODFREY:  Not quite.

09:51:55  11          THE COURT:  Well, what you're really trying to do, it's

09:51:58  12    quite obvious -- there's no subtlety here -- you're trying to get

09:52:03  13    this issue to the Fifth Circuit, and whether you have a right to do

09:52:06  14    that or not and whether they'll review it or not, I have no idea.

09:52:09  15    That's not for me to decide.

09:52:10  16          But I am trying to understand, you know, yesterday you

09:52:14  17    finally, BP filed an appeal from my March 5th order, after 30 days,

09:52:20  18    and now you've asked me to stay my ruling based on your appeal.

09:52:27  19          MR. GODFREY:  That is the second issue, Your Honor.

09:52:28  20          THE COURT:  That's the second issue.  But it's all

09:52:30  21    related because it's essentially the same test that you would have

09:52:34  22    to -- you know, it's essentially an injunction so --

09:52:39  23          MR. GODFREY:  Yes.

09:52:40  24          THE COURT:  -- it's all the same thing.  So we're back --

09:52:42  25    you know, this is all circular here.  We're back to my fundamental

09:52:49  1   problem with what you're doing here, and that is you're either

09:52:52  2   asking me one of two things:  This is either a third motion for me

09:52:55  3   to consider this, second motion for reconsideration, which it

09:53:01  4   essentially is.  That's what you're really asking me to do.  Or if

09:53:05  5   you're not asking me to reconsider and change my mind, then you're

09:53:09  6   asking me to enjoin myself --

09:53:11  7         MR. GODFREY:  No.

09:53:12  8         THE COURT:  -- by enjoining Mr. Juneau.

09:53:14  9         MR. GODFREY:  This is a typical proceeding --

09:53:16 10         THE COURT:  If I enjoin Mr. Juneau, then he is in

09:53:19 11   contempt of my Court order which says he's got to --

09:53:23 12         MR. GODFREY:  No, Your Honor.

09:53:23 13         THE COURT:  And then if I sanction him for that, I think

09:53:26 14   BP would have to pay.  I think you would to have indemnify him,

09:53:30 15   right?

09:53:30 16         MR. GODFREY:  But Your Honor fully understands that we

09:53:33 17   are not asking for that.  What we're doing is we're asking for when

09:53:36 18   a Court rules and a party disagrees with a ruling, it is entitled

09:53:38 19   to seek a preliminary injunction if there is a substantial

09:53:42 20   likelihood of success on the merits that raises a serious question

09:53:44 21   of law according to the *Janus* case in the Fifth Circuit.  That is

09:53:47 22   what we have done.

09:53:48 23         As to the stay motion, that is an independent basis, and

09:53:51 24   it is typical, it is routine in this country in every circuit of

09:53:55 25   this country --

09:53:55  1          THE COURT:  Oh, certainly, you have a right -- well, I'm
09:53:56  2    not going to say you have a right to appeal because I don't know.
09:53:58  3    But if you believe you have a right to appeal, you know, you can
09:54:01  4    take that up with the Circuit.  And then you can ask me to stay my
09:54:05  5    order, and I'll decide whether to stay it or not.  And then if I
09:54:10  6    decide not to stay it, you can take that to the Circuit.  That's
09:54:12  7    how it works.
09:54:13  8          I don't know why we're going through all these other
09:54:16  9    machinations.  It's a pretty simple straightforward way to approach
09:54:16 10    this.
09:54:22 11          MR. GODFREY:  Well, we have asked for a stay and an
09:54:23 12    injunction pending appeal.
09:54:24 13          THE COURT:  I know that.  But that's what not we're here
09:54:27 14    on this morning.  You filed that yesterday.
09:54:29 15          MR. GODFREY:  That's correct, we filed the Notice of
09:54:30 16    Appeal the night before, and here what we were seeking to do is
09:54:32 17    preserve the status quo.  Now, if Your Honor were willing to
09:54:35 18    reconsider it under Rule 62.1, we would embrace that.
09:54:38 19          THE COURT:  Reconsider what?
09:54:39 20          MR. GODFREY:  If you were willing to reconsider.  But we
09:54:42 21    did not see Your Honor as likely to --
09:54:44 22          THE COURT:  Wait.  Reconsider what?
09:54:47 23          MR. GODFREY:  The underlying merits of the dispute.  But
09:54:49 24    we did not see Your Honor as likely --
09:54:49 25          THE COURT:  That would be a second Motion For

09:54:50  1    Reconsideration.

09:54:50  2         MR. GODFREY:  Yes, it would, Your Honor, and we do not

09:54:50  3    see that as likely for Your Honor --

09:54:51  4         THE COURT:  And then you have a tough hurdle there

09:54:53  5    because you have to show the law has changed, the evidence has

09:54:56  6    changed, you have to have not been able to make arguments that

09:54:59  7    you're making now.  And I don't think you can get there under that

09:55:02  8    hurdle.

09:55:02  9         MR. GODFREY:  Well, I understand that, Your Honor, which

09:55:04 10    is why we did not ask that.  I was responding to Your Honor's

09:55:07 11    suggestion about reconsideration.

09:55:07 12         THE COURT:  Okay.

09:55:08 13         MR. GODFREY:  So we narrowly filed this and drafted this

09:55:11 14    based upon our reading that we would be seeking a preliminary

09:55:14 15    injunction, and in addition we -- you know, I indicated in chambers

09:55:18 16    we would probably be filing a notice of appeal.

09:55:20 17         When we sat down for this on emergency hearing, it was

09:55:23 18    with the hope, but we understood that Your Honor obviously had

09:55:26 19    other commitments including the trial in this case, that we would

09:55:29 20    be able to have this heard before that.

09:55:31 21         But we are now here before --

09:55:32 22         THE COURT:  I gave you a pretty expedited hearing

09:55:35 23    considering.

09:55:35 24         MR. GODFREY:  You did.  And I'm not complaining about

09:55:36 25    that, Your Honor.

09:55:37   1          THE COURT:  I mean, I'm going into a seventh week of a

09:55:40   2   trial that you're involved in -- or your client's involved in.

09:55:43   3          MR. GODFREY:  Yes, I am aware of that, Your Honor.  I am

09:55:45   4   across the street every day so I am fully cognizant of that.

09:55:50   5          THE COURT:  All right.

09:55:50   6          MR. GODFREY:  But we are not asking you to enjoin

09:55:52   7   yourself.  What we are asking to is to enjoin the continued

09:55:55   8   implementation of the BEL policy decisions.  We've laid out the

09:55:59   9   irreparable injury, and we do not agree that there are losses as

09:56:03  10   calculated by the agreement.  These are not losses whatsoever.  So

09:56:06  11   Your Honor's indicated you don't want to discuss the merits on that

09:56:09  12   this morning, so...

09:56:09  13          THE COURT:  Well, that may be a dis -- that is a

09:56:12  14   disagreement, obviously.

09:56:13  15          But getting back -- asking a different -- maybe the same

09:56:17  16   question in a different way:  As a matter of law, how can a claims

09:56:24  17   administrator be in breach of his contract if all he is doing is

09:56:32  18   applying it as he believes it should be applied and now as ordered

09:56:37  19   by the Court?  How can that possibly be a breach of contract?

09:56:42  20          MR. GODFREY:  Ultimately, if the Court of Appeals affirms

09:56:44  21   the March 5th order that claims interpretation adopted by the

09:56:52  22   claims administrator and affirmed by this Court that BP is wrong on

09:56:58  23   that, the claims administrator is correct, then it is not a breach

09:57:00  24   of contract and we recognize that.

09:57:02  25          But we are following Fifth Circuit guidance that suggests

09:57:05  1    that when you are seeking to enforce your rights under a settlement

09:57:11  2    agreement, this is a procedure that you should follow.  That's why

09:57:14  3    I said it was a belt-and-suspenders.

09:57:16  4         But you are entirely correct that if the March 5th order

09:57:19  5    is the final word, either by the Court of Appeals or by this Court,

09:57:25  6    that in terms of the BEL policy decisions, then that is the

09:57:29  7    decision which will govern the claims administrator and BP as well.

09:57:33  8         We disagree with the decision respectfully.  We think it

09:57:36  9    rewrites the contract.  We think it awards people who have no

09:57:39  10   losses.  But you're entirely correct, Your Honor, I can't quarrel

09:57:43  11   with the question you've asked.  And we've indicated that in our

09:57:47  12   papers in response.

09:57:48  13        THE COURT:  All right.  Go ahead.  I know I've

09:57:50  14   interrupted you a great deal.  But that's what oral argument is

09:57:55  15   for, for judges to be able to interrupt lawyers.

09:57:57  16        MR. GODFREY:  Your Honor, I actually embrace that because

09:58:00  17   it helps to frame the issue.

09:58:02  18        I would like to ask the question about common ground.  I

09:58:06  19   know Your Honor has considered the merits, but I think, in fairness

09:58:09  20   to the Court, we need to understand what is actually happening in

09:58:14  21   the bowels of the administration.

09:58:15  22        Assume that a business claimant prepares monthly

09:58:20  23   financials that at year-end makes cumulative changes to those

09:58:24  24   financials, finds errors, finds that it had recorded things wrong,

09:58:27  25   makes cumulative errors dated December 31st relating to the earlier

09:58:32   1   periods.  Happens every day.  Nothing wrong about that.

09:58:35   2          Time passes and now that business claimant seeks to make

09:58:38   3   a claim, claim in this settlement.  What financial information

09:58:42   4   should be used to calculate compensation under this agreement?  The

09:58:47   5   correct monthly financials, that is the monthly financials as

09:58:50   6   corrected at year-end, which everyone now knows what those should

09:58:55   7   be, or the monthly financials as prepared originally and as written

09:58:58   8   down, which we now know contained inaccurate, erroneous and even

09:59:01   9   false information?

09:59:02  10          Under the BEL policy decisions at issue, they are using

09:59:07  11   the incorrect data from the monthly financials as recorded, because

09:59:11  12   that's what they're required to do.  So in our declarations we have

09:59:18  13   examples of overbilling that were corrected at year-end.  We have

09:59:24  14   examples of negative revenue that were corrected at year-end.  We

09:59:31  15   have examples of erroneously recorded data that were corrected at

09:59:35  16   quarter or year-end, significant examples of Hall declaration, the

09:59:43  17   Crider declaration, the Finch declaration.

09:59:46  18          On page 26 and 27 of our brief, we outline two specific

09:59:49  19   examples of simple recordation errors where even under the

09:59:54  20   interpretation adopted by the claims administrator, if you use the

09:59:58  21   wrong data, you get the wrong result.  But the administration's

10:00:03  22   interpretation is whatever is recorded at the time is used now,

10:00:08  23   even when claimants point out that it's inaccurate.

10:00:11  24          That's what the declarations before the Courts reflect.

10:00:16  25   It's not a random event.

10:00:18  1          THE COURT:  That's not what we're talking about.  You may

10:00:20  2    have found some cases like that.  I am not saying, you know, when

10:00:23  3    you're talking about tens of thousands of cases.  But I am not

10:00:26  4    talking about the outliers.

10:00:28  5          What you're talking about is not where somebody made

10:00:31  6    mistakes and went back and corrected.  It's a larger issue than

10:00:35  7    that.  You're talking about a -- what this is at bottom is a

10:00:43  8    disagreement over whether revenues -- I am going to call it this,

10:00:46  9    you may have a different term, I know you use a fancy accounting

10:00:49 10    term, but I am calling it you want a smooth revenues and match

10:00:54 11    expenses to revenues, correct?

10:00:55 12          MR. GODFREY:  No.

10:00:56 13          THE COURT:  Well, that's -- I've been dealing with this

10:01:01 14    for months, Mr. Godfrey, and that's the only way I can understand

10:01:03 15    it.

10:01:03 16          MR. GODFREY:  We've never said the word "smooth."

10:01:06 17          THE COURT:  I know you didn't use the word "smoothing,"

10:01:09 18    but that's the effect of it.  You want to smooth out revenues and

10:01:12 19    match revenues -- somehow you want to match expenses.  I mean,

10:01:16 20    somehow you have a theory or a formula -- and I'm not sure what it

10:01:21 21    is because I think it's changed several times, but -- and, in fact,

10:01:24 22    as I recall when we met with you all, you couldn't explain how this

10:01:29 23    would work under BP's proposal.  It was kind of a moving target.

10:01:33 24          But you want to take, somehow take expenses that were

10:01:38 25    incurred in different periods and bring them up and apply it to

10:01:42 1    when the revenue is received under -- would be somewhat similar to

10:01:47 2    accrual accounting, but you're not really using accrual accounting,

10:01:51 3    are you?

10:01:51 4         MR. GODFREY:  Accrual accounting is not required by the

10:01:53 5    agreement, Your Honor.

10:01:54 6         THE COURT:  Right, exactly.  So it's not accrual

10:01:56 7    accounting.  You don't want to use strict cash accounting, which of

10:02:00 8    course a lot of businesses, particularly small businesses, use,

10:02:04 9    including me when I was in business.  You use cash accounting,

10:02:08 10   perfectly legal.  IRS accepts it.

10:02:13 11        So you don't want to use cash accounting -- I mean, you

10:02:16 12   don't want to rely strictly on cash accounting and you don't want

10:02:21 13   to adopt pure accrual or have everybody would have to convert to

10:02:26 14   accrual accounting, and that, as you say, is not required by the

10:02:30 15   agreement.  So there's some animal, I am going to call it, that's

10:02:35 16   somewhere in between there.

10:02:36 17        I don't know what you call it.  I call it smoothing and

10:02:39 18   matching or whatever.  But that's some amorphous standard is what I

10:02:44 19   envision you're proposing.  I know you don't agree with that, but

10:02:47 20   that's the way I am viewing it.

10:02:49 21        So why don't you tell me -- I'm not talking about people

10:02:51 22   that made mistakes and have to correct.  I'm not talking about when

10:02:55 23   people made mistakes.  I'm talking about here's the way they keep

10:02:58 24   the books, here's the way revenues were received, here's the way

10:03:02 25   expenses were incurred or paid, how would you propose to do it?

10:03:07   1          MR. GODFREY:  Your Honor, the language of the contract

10:03:09   2   says, "Sum the monthly revenues over the period and subtract the

10:03:11   3   corresponding variable expenses."  Those terms are well understood

10:03:15   4   by accountants, economists and financial professionals.  Monthly

10:03:18   5   revenue does not equal cash received and recorded in a month.

10:03:21   6          THE COURT:  That's assuming that the agreement called for

10:03:25   7   some standardized, generally accepted accounting methodology such

10:03:29   8   as accrual accounting, but you admit it does not.

10:03:33   9          MR. GODFREY:  No, Your Honor, it does not depend upon

10:03:37  10   accrual accounting.  The treatises all say, "Do not confuse cash

10:03:42  11   receipts with revenue."  If the suggestion is that revenue does not

10:03:46  12   mean what the treatises, the 19 of them that we've put before the

10:03:50  13   Court, the expert declarations mean, it means something else, then

10:03:53  14   it's not defined in the agreement that way.

10:03:55  15          That's a specialized definition that is unknowing to the

10:03:58  16   profession and it leads to absurd results.  You cannot calculate

10:04:02  17   lost profits --

10:04:03  18          THE COURT:  The results are only absurd if -- in your

10:04:08  19   view because you don't agree with how the outcome is coming out and

10:04:15  20   the way it's being interpreted.  But if the program, if the

10:04:20  21   agreement says, "This is how you calculate it," then that's how you

10:04:25  22   calculate it and that's a loss.  It doesn't matter if you would

10:04:28  23   consider it a loss in some other world, in some other sense, to me.

10:04:33  24   That's the way I'm looking at it.

10:04:33  25          MR. GODFREY:  Let me simplify it.

10:04:35  1          THE COURT:  Okay.

10:04:36  2          MR. GODFREY:  This Court found a finding of this Court

10:04:41  3   that the program and the settlement adopts standardized,

10:04:45  4   well-recognized lost profit methodologies.  The terms used in the

10:04:51  5   contract, the five key terms -- revenue, expenses, corresponding,

10:04:59  6   comparable, profits -- have well-recognized and understood

10:05:04  7   definitions.

10:05:04  8          The only way you can determine -- and the stated purpose

10:05:08  9   of the agreement is to determine lost profits.  The only way you

10:05:11 10   can determine lost profits is by recording those terms.  They're

10:05:15 11   recognized and well understood definitions.

10:05:17 12          What the claims administrator has done is adopt unique

10:05:21 13   definitions that are not only rejected by the professions, but

10:05:25 14   cannot possibly meet the stated terms of the contract or satisfy

10:05:29 15   what the Court found in its findings as the parties presented to

10:05:33 16   it, which was standard, well recognized lost profit methodologies.

10:05:37 17          THE COURT:  Well, the claims administrator, Mr. Juneau,

10:05:39 18   is not, you know, is not there by himself in his office.  He has a

10:05:47 19   staff of accountants who works with him and apparently he relies on

10:06:00 20   and has relied on in how he applies this -- these accounting

10:06:11 21   issues, or deals with these accounting issues.

10:06:16 22          And so there are accountants who apparently, just like

10:06:26 23   lawyers, accountants sometimes disagree, amazingly enough, you

10:06:32 24   know.  And, for example, there's a declaration of Mr. Carroll, who

10:06:36 25   I am not sure if he is in Mr. Juneau's office or not, but just for

10:06:41 1   example, but that, you know, disagrees with what you just said.

10:06:53 2   It's not as obvious as what you just said.

10:06:56 3          And secondly, as I recall, there's also something in this

10:07:01 4   record where that this was or should have -- the fact that you

10:07:07 5   would have businesses, certain businesses or professions that would

10:07:12 6   have swings of revenues and expenses up and down from month to

10:07:15 7   month or year to year is not something that would just suddenly be

10:07:20 8   recognized by BP.  That's obvious that that occurs.

10:07:26 9          And this was well-known, this was -- in fact, there's a

10:07:32 10  declaration in here somewhere where that was pointed out while the

10:07:37 11  settlement was being finalized, that this is something that you all

10:07:41 12  might want to look at, and nothing was changed in the settlement

10:07:47 13  agreement apparently.

10:07:47 14         So I have to assume that that is something that was known

10:07:50 15  or should have been known, should have been anticipated.  So that's

10:07:54 16  another question.  But, how is it that BP just came to the

10:07:58 17  realization late last year that this was a problem?

10:08:01 18         MR. GODFREY:  We didn't, Your Honor.  The agreement has a

10:08:03 19  standardized methodology where, depending upon the industry,

10:08:06 20  shouldn't make a difference.  If revenue is properly defined or

10:08:09 21  expenses are properly defined, it shouldn't make a difference.  I

10:08:13 22  am a little bit --

10:08:14 23         THE COURT:  These claims were being -- there was sampling

10:08:19 24  done, there were claims being paid since last summer.  This wasn't

10:08:24 25  raised or pointed out to the Court as a problem when we had our

10:08:27 1   final fairness hearing in November, and it just became a problem in

10:08:32 2   December apparently.

10:08:33 3       MR. GODFREY:  We did not recognize what was taking place

10:08:35 4   in the facility, Your Honor.  The tests that took place in July did

10:08:39 5   not test anything other than assume the data is correct, run it

10:08:43 6   through the systems, and get the same result, as Mr. Crider's

10:08:47 7   declaration, paragraphs 89 through 93.

10:08:50 8       THE COURT:  Well, there are other declarations that

10:08:51 9   disagree with that.

10:08:52 10      MR. GODFREY:  But, Your Honor, let me try to respond to a

10:08:56 11  number of your points.  I've taken up, I think, more than my

10:09:00 12  20 minutes, but I --

10:09:01 13      THE COURT:  I've given you a little extra time.

10:09:03 14      MR. GODFREY:  Thank you.  Point one, the example of the

10:09:07 15  corrections are not outliers.  That is a common, common occurrence

10:09:13 16  in the construction industry in particular.  Those aren't outliers.

10:09:17 17  The failure to adjust or correct for that is a direct result of the

10:09:21 18  wooden adherence to the notion whatever is recorded at the time is

10:09:25 19  used at the time even though we know that the data is incorrect.

10:09:28 20  So that's not an outlier, Your Honor, that's a common occurrence.

10:09:33 21      Number two:  The leading accounting professor in this

10:09:35 22  country, Roman Weil, and we submitted his declaration, he points

10:09:39 23  out that the interpretation that leads to this doesn't produce a

10:09:43 24  variable profit analysis.  And you would say, well,

10:09:46 25  "Mr. Godfrey" --

10:09:46  1          THE COURT:  Is that one of the new declarations that you

10:09:48  2  submitted?

10:09:48  3          MR. GODFREY:  No, that was a prior declaration, but we've

10:09:51  4  had similar declarations before.

10:09:52  5          Mr. Carroll doesn't give grand -- or he has some very

10:09:55  6  general statements, but he doesn't get grand to understand exactly

10:09:59  7  what's going on, and we can file something about that if the Court

10:10:01  8  wanted, but I doubt you want it.

10:10:05  9          THE COURT:  I don't want any more declarations, I can

10:10:05 10  tell you that.

10:10:05 11          MR. GODFREY:  I was going to say, I'm hesitant to even

10:10:05 12  raise the issue.

10:10:07 13          THE COURT:  Or not even another page of brief.

10:10:09 14          MR. GODFREY:  Fair enough.  But you go back to what was

10:10:12 15  the purpose of the agreement, to determine lost profits.  This

10:10:16 16  isn't some unique or bizarre or unknown definition.  The terms here

10:10:21 17  understandably lead to either an absurd result where people are

10:10:26 18  getting money that has nothing to do with the profits they made

10:10:28 19  based on net cash flow differences, or where they're an accrual

10:10:34 20  basis or cash basis taxpayer, but the expenses and the revenue

10:10:38 21  match because of the nature of their business, it's a proper lost

10:10:41 22  profits calculation.

10:10:43 23          One of the examples in the plaintiff's brief used this

10:10:47 24  week, given a lot of press, was the alligator farm.  Read all about

10:10:51 25  it.  Problem is in 2010, it was the most profitable year by almost

| | |
|---|---|
| 10:10:56 1 | five times in its history.  2011 was the second most profitable |
| 10:11:00 2 | year.  And yet it gets an award for alleged lost profit, not based |
| 10:11:04 3 | upon the difference between revenue and corresponding variable |
| 10:11:08 4 | expenses in the two periods, but based upon the difference of |
| 10:11:12 5 | differential cash flows, which is not what the agreement provided. |
| 10:11:17 6 | THE COURT:  What about Chef Folse? |
| 10:11:20 7 | MR. GODFREY:  That's a different issue. |
| 10:11:22 8 | THE COURT:  Is BP seriously saying he's not a seafood |
| 10:11:25 9 | processor and not eligible for an award, or is it a BEL issue? |
| 10:11:30 10 | MR. GODFREY:  It's a different issue, Your Honor.  It's a |
| 10:11:32 11 | causation passing issue, number one, and it's a location of |
| 10:11:34 12 | headquarters issue, number two, as I understand it. |
| 10:11:37 13 | THE COURT:  Well, all I know is what I read in the media, |
| 10:11:40 14 | and that may not be fair to ask you about -- |
| 10:11:40 15 | MR. GODFREY:  There were some -- |
| 10:11:43 16 | THE COURT:  -- but it said he was denied, and he's shown |
| 10:11:45 17 | with his little BP sticker on his chef's vest -- |
| 10:11:45 18 | MR. GODFREY:  I understand what -- |
| 10:11:48 19 | THE COURT:  -- and now he's saying he's not -- he is |
| 10:11:51 20 | being disqualified because he doesn't process seafood, which |
| 10:11:55 21 | doesn't make a lot of sense to most people down here. |
| 10:11:57 22 | MR. GODFREY:  Well, remember the test is a revenue |
| 10:11:59 23 | causation test. |
| 10:12:00 24 | THE COURT:  No, I'm just talking about why he is not a |
| 10:12:03 25 | seafood processor.  That sounds strange to me. |

10:12:05  1      MR. GODFREY:  Well, I have to think about it.  Let me be

10:12:09  2  blunt about something.  I'm caught between the sword and the shield

10:12:12  3  of confidentiality here, the Rule 408 stuff.  There's a lot of

10:12:15  4  stuff I could tell the Court about negotiations otherwise that are

10:12:18  5  quite different than the presentation being made.  But I am bound

10:12:20  6  by the Rules, I think, of the Court in terms of 408 and other

10:12:25  7  things.  The same with the facility.

10:12:26  8      I think I can say this about the chef.  I think I can say

10:12:28  9  that he has designated himself on tax returns something different

10:12:31 10  than what he claims to be now.  I think people can --

10:12:32 11      THE COURT:  I read the declaration of his attorney.

10:12:35 12      MR. GODFREY:  I think I can say that there's a question

10:12:37 13  about where his headquarters is located, which determines about

10:12:40 14  whether or not he can pass the causation test.  I am not an expert

10:12:43 15  on that claim.  I'm a data-driven person, as the Court knows, and I

10:12:47 16  spent time on the alligator farm claim this week.

10:12:49 17      So I don't know all of the answers.  But in terms of what

10:12:51 18  the issue is, it seems to be a little bit unfair to have a

10:12:54 19  confidential process where the claims information is submitted

10:12:57 20  confidentially and then stuff is spread of record selectively, and

10:13:00 21  I am bound by the confidentiality provisions but my colleagues to

10:13:04 22  the left are not.  It's a fundamentally unfair proposition.

10:13:06 23      THE COURT:  I don't know that they spread that to the --

10:13:09 24  Chef Folse, I imagine, spread that.

10:13:12 25      MR. GODFREY:  They put the affidavit in before the Court.

10:13:14   1          THE COURT:  I need to give the other side a chance to

10:13:17   2   respond because I have a time limit to get out of here today.

10:13:20   3          MR. GODFREY:  I appreciate the Court's time.  I would ask

10:13:22   4   that the Court enter the injunction, fictitious awards are being

10:13:24   5   awarded.  And I appreciate the Court's time.  Thank you very much.

10:13:26   6          THE COURT:  All right.  Mr. Stanley.

10:13:37   7          MR. STANLEY:  Good morning, Your Honor.  Rick Stanley

10:13:39   8   here for Pat Juneau and for the settlement program, for what I hope

10:13:43   9   is a cameo appearance in this matter.

10:13:47  10          Let me first talk about the Motion to Dismiss, and I'm

10:13:51  11   not going to spend a whole lot of time on that.  Our position is

10:13:55  12   pretty simple.  First, we don't believe that BP has alleged facts

10:14:00  13   to support a claim for relief in this Court, and I believe that the

10:14:04  14   argument I just heard confirms that.

10:14:06  15          And second, that if there is a possible claim for relief,

10:14:10  16   that judicial immunity would apply.

10:14:14  17          First, if I heard Mr. Godfrey correctly, he stated that

10:14:18  18   it wouldn't be until the Fifth Circuit affirmed -- or, rather,

10:14:21  19   reversed this Court's March 5th ruling that there would be a

10:14:25  20   misinterpretation to the settlement agreement.  The problem is that

10:14:28  21   Mr. Juneau was sued before any appeal was lodged.  Mr. Juneau was

10:14:33  22   not a party to anything on March 5th, 2013.

10:14:39  23          THE COURT:  But you're not arguing the Court doesn't

10:14:41  24   have -- I wouldn't have jurisdiction or authority to enjoin him or

10:14:47  25   if I found he was wrongly interpreting or applying the contract?

10:14:53  1           MR. STANLEY:  No, sir.  I am suggesting that the

10:14:54  2    complaint is unnecessary.  In fact, I am here to say that whatever

10:14:58  3    this Court decides, Mr. Juneau will do.  He doesn't take a position

10:15:03  4    with respect to who is right, who is wrong.  Whatever this Court

10:15:07  5    directs, Mr. Juneau will faithfully follow this Court's directive.

10:15:12  6    But we don't think that a complaint and injunction was the

10:15:15  7    appropriate way to proceed, and we don't believe the facts that

10:15:18  8    have been alleged allege a claim for relief because, essentially,

10:15:22  9    it's as Your Honor pointed out, he is simply accused of following

10:15:27 10    the ultimate process that was provided for in the settlement

10:15:30 11    agreement and the ultimate order of this Court.  We don't think

10:15:33 12    those facts support a claim for a breach of any contract.

10:15:36 13           But second, we're also asking for it to be dismissed on the

10:15:40 14    grounds of immunity.  And here is why we think that matters:

10:15:46 15    Mr. Juneau is engaged in quasi judicial functions trying to

10:15:51 16    administer this settlement agreement.  There is no doubt that as he

10:15:55 17    grants some claims and denies others, someone is going to be

10:15:58 18    displeased.  If there is a precedent that the thing to do is to

10:16:03 19    file a complaint against Mr. Juneau and just sue him every time

10:16:07 20    someone disagrees with a determination that he makes of eligibility

10:16:11 21    or something else, then we have just created an entire new set of

10:16:16 22    litigation against the claims administrator that I don't think has

10:16:21 23    any place anywhere.  And I think the immunity doctrines that we

10:16:26 24    have pointed out in our briefs fully support the fact that

10:16:29 25    Mr. Juneau is immune from those claims because the authority he is

10:16:33  1    acting under is derived from the order of this Court.

10:16:37  2            THE COURT:  Hypothetically, if he was -- let's see how I

10:16:43  3    can put this.  I guess the other side argues that he is not immune

10:16:52  4    because he is just performing a ministerial administrative

10:16:56  5    function, he is not really exercising a judicial function -- quasi

10:17:01  6    judicial function.  And beyond that, there's no judicial immunity

10:17:09  7    for prospective injunctive relief.

10:17:14  8            MR. STANLEY:  We think both of those points are

10:17:17  9    incorrect.  We think, as we pointed out in our reply brief, the

10:17:20 10    authority they have for saying that prospective injunctive relief

10:17:24 11    is not available was a Supreme Court case that was legislatively

10:17:28 12    overruled in the context of 1983 actions.  As the law stands today

10:17:33 13    in Bivens actions and in 1983 actions, injunctive relief is barred

10:17:38 14    by judicial immunity.

10:17:39 15            THE COURT:  We don't have a Bivens action here or a 1983

10:17:42 16    action.

10:17:43 17            MR. STANLEY:  We don't.  And what we have argued by

10:17:45 18    analogy is that the doctrine of judicial immunity which protects

10:17:50 19    decision makers like Mr. Juneau, whether it be a trustee or

10:17:55 20    receiver or anybody of the sort, should apply in this case.  We

10:17:59 21    can't find a case directly on point, Your Honor.  We looked.  But

10:18:04 22    we think that the functions that he is being asked to perform,

10:18:08 23    interpret the agreement when disputes arise, state eligibility for

10:18:14 24    claims, decide whether someone is eligible or not eligible for a

10:18:18 25    claim, handle disputes in the first instance about the agreement to

10:18:23 1   see if some kind of accommodation can be reached, those are all

10:18:29 2   quasi judicial.

10:18:29 3          Whether you call him a special master or don't call him a

10:18:32 4   special master, we don't think is here or there.  We think the

10:18:35 5   function he is performing would entitle him to immunity from the

10:18:41 6   suit.

10:18:41 7          I am going to start and finish by saying that he is

10:18:44 8   absolutely subject to your authority at all times.  If he deviates

10:18:48 9   from what this Court orders him to do, he could be held in

10:18:52 10  contempt, he could be dismissed; but I don't think the remedy is

10:18:55 11  for someone to sue him, whether it be the one party to the

10:18:59 12  agreement or another party to the agreement or a disappointed

10:19:03 13  claimant.

10:19:04 14         And so that's our position on the motion to dismiss.  We

10:19:07 15  do think it matters as a matter of policy.  There are MDLs all over

10:19:11 16  the country that have to use people like Mr. Juneau to adjudicate

10:19:17 17  complicated claims.  We have 150,000 plus claims here.  The Courts

10:19:22 18  would grind to a halt if all of those claims had to be processed

10:19:26 19  through a Court.  So to have a precedent that, gee, the thing to do

10:19:31 20  when your claims process isn't working the way you wanted it to is

10:19:35 21  to sue the claims administrator to get the Court to intervene, we

10:19:42 22  think is the wrong way to go.

10:19:43 23         Let me move quickly to the response to the preliminary

10:19:47 24  injunction, and I will begin and end this argument also by saying

10:19:50 25  all Mr. Juneau wants to do is what this Court directs him to do.

10:19:54  1   He wants to interpret this and move this process forward according

10:19:57  2   to the settlement agreement.  He did not draft it.  He did not

10:20:01  3   participate in the negotiation of it.  He really has no position

10:20:05  4   about the wisdom of the settlement agreement or how it came to be.

10:20:09  5   He just wants to do his job as claims administrator.

10:20:12  6           The only points that I really want to address for the

10:20:16  7   Court are procedural in nature.  There are two procedural points,

10:20:22  8   and I want to be sure the record is clear.  There is a contention

10:20:24  9   that BP claims it had no input on Mr. Juneau's decision.  That is

10:20:29 10   repeated a couple of times in the brief.

10:20:32 11           First of all, Your Honor, we think that the record belies

10:20:35 12   that claim.  There was a blind test of 62 blinded claims in the

10:20:40 13   summer to see how they came out.  On September 25th we put in the

10:20:45 14   record Mr. Juneau -- Mike Juneau sent a hypothetical to both

10:20:49 15   parties saying, "Do you understand that there are instances under

10:20:53 16   the way this settlement program is going to be applied where you

10:20:57 17   could have causation met, even though we all know, looking at it,

10:21:03 18   that it's not caused by the spill?"  And both parties said, "We

10:21:07 19   understand that.  We understand that's going to happen in this

10:21:09 20   settlement agreement."  And so that was asked to BP in a specific

10:21:14 21   hypothetical and a specific response was given.

10:21:17 22           On September 28th, BP sent four questions over saying,

10:21:22 23   "We want to understand how you accountants are looking at these

10:21:25 24   claims.  How are you booking these revenues?  What are you doing

10:21:28 25   with cash basis folks?"  On October 2nd there was a conference call

10:21:33 1    to address those claims.  BP participated, BP's questions were

10:21:38 2    answered.

10:21:40 3              In terms of the right of review, Mr. Juneau's office

10:21:46 4    issues a certificate of eligibility.  At that point, both sides are

10:21:50 5    entitled to look at that and appeal his determination.  And if they

10:21:55 6    feel that there is an erroneous determination, they can argue that

10:22:00 7    to this Court and bring that claim up.  In fact, of the 201 claims

10:22:06 8    listed in Exhibit B to their brief by our count, 70 of those have

10:22:11 9    been appealed.

10:22:12 10             THE COURT:  Actually, I think they'd appeal first to an

10:22:15 11   appeal panel --

10:22:16 12            MR. STANLEY:  Correct.

10:22:17 13            THE COURT:  -- appointed by the Court, and then there's a

10:22:20 14   discretionary appeal to the Court.

10:22:23 15            MR. STANLEY:  There is a review.

10:22:24 16            THE COURT:  Right.

10:22:26 17            MR. STANLEY:  And they have all of the information that

10:22:28 18   they could want to decide whether to appeal those eligibility

10:22:31 19   determinations, so they do have input.

10:22:35 20             And we also want to point out to the Court that, with

10:22:39 21   respect to the process that's being suggested, the first time that

10:22:42 22   process was suggested by BP, that four-step process, was

10:22:47 23   January 8th, 2013.  It was the first time we understood or were

10:22:52 24   told exactly how they were reading the agreement and what they

10:22:56 25   thought that agreement called for in terms of process.  And within

10:22:59  1    one week, Mr. Juneau made his policy announcement and then, as Your

10:23:04  2    Honor is familiar, everything proceeded from there.

10:23:07  3         THE COURT:  Am I correct that Mr. Juneau didn't make this

10:23:15  4    policy, didn't issue this policy announcement solely on his own;

10:23:19  5    that is, without consulting with people that work for him, I'm

10:23:23  6    assuming?

10:23:23  7         MR. STANLEY:  You're absolutely correct.  No, he had the

10:23:26  8    position paper of the PSC from December 16th, BP's response on

10:23:31  9    January 8th, he met with his team, considered all of it, and issued

10:23:35 10    his policy announcement.  And in fact, made a statement in there

10:23:39 11    that there are three instances where they would look at information

10:23:43 12    and ask the claimant to correct it if they thought there was an

10:23:46 13    error.

10:23:47 14         THE COURT:  So there are instances where, under some

10:23:49 15    circumstances, the claims program or claims administrator will ask

10:23:56 16    people to correct misinformation in the financials?  Am I correct

10:24:04 17    about that?

10:24:04 18         MR. STANLEY:  That is correct.  In fact, the policy

10:24:06 19    announcement uses the word "error," and if there is an error and

10:24:09 20    it's identified, they will ask the claimant to correct it.  That's

10:24:13 21    the policy that they use.

10:24:14 22         THE COURT:  Okay.

10:24:15 23         MR. STANLEY:  Also, Your Honor, there is some implication

10:24:19 24    that the claims administrator used some unusual process in this

10:24:24 25    instance and did not follow the pattern that existed for other

10:24:28  1   policy interpretations.  We don't believe that's the case.  The

10:24:32  2   claims administrator simply did not have a question about the way

10:24:37  3   these claims were being viewed because, frankly, the settlement

10:24:42  4   program accountants and Mr. Juneau thought it was fairly clear what

10:24:45  5   the agreement said and how to do it.

10:24:48  6        It was only after BP raised the question about do you

10:24:54  7   think you're doing it the right way, that the question was put

10:24:57  8   forward.  So Mr. Juneau didn't have the question, the question came

10:25:01  9   from one of the parties to the settlement agreement, which is why

10:25:03 10   this didn't -- wasn't initiated in the first instance from

10:25:08 11   Mr. Juneau.

10:25:09 12        And then finally, Your Honor alluded to the fact that, as

10:25:12 13   we discovered as preparing for this hearing, that there is an

10:25:15 14   April 4, 2012, memorandum where the program accountants were asked

10:25:19 15   to review the settlement agreement in advance and alerted both

10:25:24 16   sides to the fact that using a short time period to assess

10:25:29 17   compensation might lead to a matching problem between revenues and

10:25:34 18   expenses; and that was pointed out to both sides.  That was not a

10:25:38 19   memorandum Mr. Juneau even had until responding to the preliminary

10:25:43 20   injunction motion in this matter.

10:25:45 21        Unless Your Honor has any questions, I'll sit down.

10:25:49 22        THE COURT:  Thank you very much.  All right.  Mr. Herman.

10:25:53 23        MR. HERMAN:  Thank you, Your Honor.  Steve Herman for the

10:25:58 24   class.  I have a short presentation, which I think I am going to

10:26:01 25   make a lot shorter in light of the Court's comments.  Provided a

10:26:05  1    couple of copies to Ben and copies to all counsel.

10:26:09  2           Very quickly.  It occurs to me that BP sued the claims

10:26:16  3    administrator claiming *ultra vires*.  Don't even know what that

10:26:19  4    means.  Had to look it up in *Black's Law Dictionary.*  They're

10:26:23  5    saying he's trying to do something the Settlement Agreement doesn't

10:26:26  6    allow.  As I think Your Honor noted, there is a process for issues

10:26:29  7    of disagreements that can't be unanimously resolved by the claims

10:26:33  8    administration will be referred to the Court for resolution.  Which

10:26:36  9    Court?  This Court.  "The Court shall mean the United States

10:26:40 10    District Court for the Eastern District of Louisiana, Judge Carl

10:26:43 11    Barbier presiding."

10:26:45 12           And I thought Mr. Godfrey said Your Honor and Your Honor

10:26:49 13    alone; but as Your Honor pointed out, the whole reason we're here

10:26:53 14    today is to go to the Fifth Circuit.  And I would submit that if

10:26:58 15    anybody is *ultra vires* of the Settlement Agreement it's BP, not the

10:27:02 16    claims administrator.

10:27:03 17           Your Honor has seen a lot of this before, so I won't

10:27:06 18    belabor the points, but there is one thing I do want to address

10:27:10 19    very quickly, about the third bullet point from the bottom because

10:27:14 20    this is something Mr. Godfrey touched upon.  A lot of these claims

10:27:18 21    that they are now attacking are based on annual revenue.  And

10:27:21 22    Mr. Godfrey says -- I think he was talking about the gator farm.

10:27:24 23    Well, their annual profit in 2010 is greater than it was in the

10:27:28 24    past.  Well, BP --

10:27:30 25           First of all, it was known to all of the parties that

10:27:33  1   that might happen, that's why you focused on a three-month period.

10:27:38  2   And this really had a very easy fix.  I don't know necessarily

10:27:42  3   would have agreed to it, but BP never even suggested, "Why don't we

10:27:47  4   say you have the causation test, but as a secondary test, if your

10:27:51  5   annual revenue is bigger in 2010 by some margin than it was in the

10:27:54  6   past, we're just going to say that doesn't pass causation."  That's

10:27:59  7   nowhere in the document, was never discussed, never suggested by

10:28:02  8   BP.  But now, in these claims that they're attacking, that's one of

10:28:06  9   the main arguments that they use.

10:28:09  10              Just very briefly, this is a blown up Louisiana,

10:28:12  11  Mississippi, and Alabama.  Goes all the way to Arkansas --

10:28:17  12              THE COURT:  Let me ask you this.

10:28:20  13              MR. HERMAN:  Yes, sir.

10:28:22  14              THE COURT:  Are the vast majority of the claims that are

10:28:24  15  at issue -- I know, according to what I've understood and the

10:28:29  16  number of times we've dealt with this issue, largely fall within

10:28:35  17  three industries or the three categories.  And those are:

10:28:38  18  Professional services, which would be attorneys, engineers, so

10:28:41  19  forth; professional services, agriculture, and construction.

10:28:48  20  Correct?

10:28:48  21              MR. HERMAN:  Correct, Your Honor.

10:28:49  22              THE COURT:  And some of the examples that I know -- I am

10:28:52  23  not suggesting all of them by any means, but a number of the

10:28:55  24  examples they cite are, like, way up by the Arkansas border.

10:28:59  25              MR. HERMAN:  Right.

10:29:00  1      THE COURT:  But is their argument limited to people that
10:29:04  2  are remote we'd say from the Gulf Coast or would this -- does this
10:29:08  3  issue apply even to people along the Gulf Coast?
10:29:11  4      MR. HERMAN:  Well, as Your Honor mentioned, it's kind of
10:29:14  5  a moving target.  I initially thought it was just limited to those
10:29:17  6  three industries.  They seem to be suggesting at certain points in
10:29:21  7  time that it should apply to everyone across the board.  But the
10:29:24  8  reason I backed up to the previous thing is they never suggested
10:29:28  9  that these three types of services -- these types of industries be
10:29:33 10  excluded from the agreement or that they operate under a different
10:29:35 11  framework.
10:29:36 12      And there was a lot of discussion about construction
10:29:37 13  companies in particular because real estate developers were
10:29:40 14  excluded, and there was a lot of thought to we need to make sure
10:29:43 15  that construction companies, general contractors, subcontractors
10:29:46 16  are included, an intentional decision by BP to put them in the
10:29:50 17  class and include them in the settlement as opposed to real estate
10:29:54 18  developers.
10:29:54 19      THE COURT:  And obviously, both parties intended and did
10:29:58 20  put the entire states of Louisiana, Mississippi, and Alabama in the
10:30:02 21  settlement, in the class.
10:30:04 22      MR. HERMAN:  Correct, Your Honor.  And now they have your
10:30:06 23  final judgment which gives them a class-wide release for this
10:30:10 24  entire area.  I didn't have time to specifically correctly
10:30:13 25  delineate the zones that have presumptions in them, but they're

10:30:16  1    really along I-10.  So everything above I-10, 90 percent probably

10:30:21  2    of this class, is a Zone D claim, what we call a Zone D claim, and

10:30:26  3    that has the exact same causation structure -- the percentages are

10:30:31  4    different, but the causation structure that BP agreed to, the

10:30:35  5    objective criteria how you would decide if there was a loss caused

10:30:39  6    by the spill, is the same structure in Zone D for 90 percent of the

10:30:44  7    cases as it is for the people along the Coast, and that's what they

10:30:47  8    agreed to.

10:30:47  9        THE COURT:  Generally a so-called V test, your revenue

10:31:09 10    goes down and goes back up; or a modified V, and two or three

10:31:14 11    different ways you can prove that.

10:31:15 12        MR. HERMAN:  Correct, Your Honor.

10:31:16 13        THE COURT:  But the difference, as I appreciate it, it's

10:31:19 14    a higher standard the farther you get away from the coast because

10:31:25 15    there has to be a greater deviation in your revenue in other words?

10:31:29 16        MR. HERMAN:  Right.  You have to have a sharper V.  If

10:31:32 17    you're in Monroe, you need to have a V; if you're down south, you

10:31:35 18    maybe only need to have a U.

10:31:37 19        THE COURT:  Okay.

10:31:39 20        MR. HERMAN:  So all of this is set forward in our briefs

10:31:44 21    and I won't belabor it.

10:31:46 22        But there are three kinds of chronologies that sometimes

10:31:49 23    get overlapped, but they're a little bit separate but they kind of

10:31:52 24    mix together.  One chronology is this matching/smoothing issue

10:31:55 25    which I think really is the issue before Your Honor today, or BP

10:32:01 1    wants it to be.  There is also another chronology that went along,

10:32:04 2    and you'll see a lot of this in the briefing, well you already

10:32:07 3    have, on monthly P&Ls.  And the issue there is that with that issue

10:32:12 4    BP took the exact contrary position because they said you shouldn't

10:32:16 5    match or smooth, you should use the actual monthly P&Ls that were

10:32:21 6    created.

10:32:21 7         Then you have this the third issue, this is what we call

10:32:23 8    the alternative causation issue.  And this is something that

10:32:27 9    Mr. Stanley brought up.  There's lots of things in this chronology,

10:32:31 10   and we briefed it extensively, but this is just trying to touch the

10:32:36 11   salient points.  But this is the e-mail from Mr. Juneau to the

10:32:39 12   parties in September.  "As to BEL claims, once a claimant's

10:32:44 13   financial records satisfy the causation standard set out in

10:32:47 14   Exhibit 4B, does the Settlement Agreement mandate and/or allow the

10:32:51 15   claims administrator to separate out losses attributable to the oil

10:32:55 16   spill vs those that are not?"

10:32:57 17        "Stated another way, once a claimant passes the causation

10:33:01 18   threshold, is the claimant entitled to recovery of all losses as

10:33:05 19   per the formula set out in Exhibit 4C, or is some consideration to

10:33:10 20   be given so as to exclude those losses clearly unrelated to the

10:33:14 21   spill?"

10:33:14 22        Now, he puts in a hypothetical.  "A small accounting

10:33:18 23   corporation firm is located in Zone B."  Accounting corporation is

10:33:22 24   a professional services corporation, so he is giving them a hypo

10:33:26 25   for one of the exact industries that BP is now attacking.  "They

10:33:30 1    meet the V-shaped curve causation test.  The explanation for the

10:33:33 2    drop is that one of the three partners went out on medical leave,

10:33:38 3    income went back up six months later when the partner comes back.

10:33:42 4    Applying the compensation formula under Exhibit 4C, the accounting

10:33:45 5    firm can calculate fairly substantial loss.  Is that full loss

10:33:48 6    recoverable?"

10:33:49 7         Here is the answer, response from BP counsel, on their

10:33:53 8    letterhead with the little sundial.  "If proper application of the

10:33:57 9    methodology with accurate financial data yields a determination

10:33:59 10   that causation is satisfied, BP agrees with class counsel that all

10:34:04 11   losses calculated in accordance with Section 3.3 and Exhibits 4C

10:34:09 12   and 19 of the Settlement Agreement are presumed to be attributable

10:34:12 13   to the oil spill."  They kind of restate that.  Then they say,

10:34:16 14   "Nothing, not causation framework or compensation framework,

10:34:19 15   provides for an offset where the claimant firm's revenue declined

10:34:23 16   (and recovery, if applicable) satisfies the causation test, but

10:34:28 17   extraneous non-financial data is indicative that the decline was

10:34:32 18   attributable to a factor wholly unrelated to the oil spill.  Such

10:34:37 19   false positives are inevitable, concomitant of an objective

10:34:41 20   quantitative database test."

10:34:44 21        So then skipping ahead a couple of months, now the claims

10:34:47 22   administrator has issued a formal policy.  BP is coming to the

10:34:51 23   court, along with class counsel, trying to get the release for that

10:34:54 24   whole area that we saw.  And they submit joint proposed statements

10:34:58 25   on November 19th.  "Once the causation tests are satisfied, all

10:35:02  1    revenue and variable profit declines during the compensation period
10:35:06  2    are presumed to be caused entirely by the spill, with no analysis
10:35:12  3    of whether such declines were also traceable to other factors
10:35:15  4    unrelated to the spill."  And they cite two BP experts, Fishkind
10:35:21  5    and Sharp who submitted declarations in support of the settlement.
10:35:25  6    So they're kind of going along, pulling everybody along, trying to
10:35:30  7    get the class approved, some people have called it a "bait and
10:35:34  8    switch" or "laying in wait" or whatever you want to say, but the
10:35:38  9    reality is this is all the way November 19th.

10:35:40  10          Your Honor will recall we appeared here in this very
10:35:43  11   courtroom on December 12th to talk about the nonprofits and this
10:35:46  12   issue came up, this issue of alternative causation.  And Your Honor
10:35:49  13   from that very bench asked BP counsel:  Do you agree with the
10:35:54  14   claims administrator's policy that once you satisfy causation under
10:35:58  15   the objective formula in the Settlement Agreement, all of the
10:36:01  16   losses under the compensation framework are deemed to be caused by
10:36:06  17   the spill and are recoverable?"  And BP's counsel, I think they
10:36:09  18   were over there at the time, said, yes, Your Honor, we agree with
10:36:12  19   that.  And Your Honor confirmed that, confirmed that agreement.

10:36:16  20          Well, now, here we are four months later, or five months
10:36:19  21   later --

10:36:20  22          THE COURT:  Let me ask you this, you may be getting to
10:36:21  23   this.  But when is the first time that you knew, class counsel were
10:36:27  24   alerted that BP believed there was a problem, you know, voiced the
10:36:34  25   complaint that they're voicing now in fact?  Was it after or before

10:36:43  1    the, let's talk about the November 8th fairness hearing, final

10:36:46  2    fairness hearing, for example?

10:36:48  3              MR. HERMAN:  Well, I have to answer this in a couple of

10:36:51  4    ways.  I had some indication of their -- of what happened in

10:36:57  5    October because I think I was on that conference call that

10:37:00  6    Mr. Stanley referred to where they were asking the accountants

10:37:03  7    questions.  As far as I knew for awhile they were okay with that.

10:37:08  8    They weren't raising it.

10:37:09  9              However, around the time of Thanksgiving, about, I don't

10:37:14 10    know, a week or two after this, not on the matching/smoothing issue

10:37:20 11    but on alternative causation, as Your Honor will recall --

10:37:23 12              THE COURT:  Did that deal with the nonprofits?

10:37:26 13              MR. HERMAN:  Well, it came up around that same.  Really

10:37:28 14    didn't have anything to do with it, but just happened to come up at

10:37:31 15    the same time.

10:37:31 16              And the way it came up to me was right around

10:37:34 17    Thanksgiving, I think we had a conference call with BP counsel from

10:37:37 18    Thanksgiving, from home, because they were objecting to the

10:37:43 19    supplemental information program and they were saying that if a

10:37:47 20    claimant subjectively didn't know or believe that they had a loss

10:37:53 21    caused by the spill that it was "fraudulent" to file a claim.  We

10:37:57 22    got in a huge disagreement about that because of things, of

10:38:00 23    statements like they have made here of their answer.

10:38:03 24              So when it came up to Your Honor, I think everybody,

10:38:06 25    well, at least class counsel was appreciative that the claims

10:38:11 1   administrator brought it up because they said, wait, BP keeps

10:38:16 2   saying that you don't look at alternative causation, but now

10:38:20 3   they've objected to this advertisement saying that it's going to

10:38:23 4   encourage "fraudulent" claims.  Now, these are claims that they now

10:38:28 5   say are "fictitious," some other time they said they were "absurd".

10:38:33 6   These are the same claims that they agreed would be compensated

10:38:36 7   under objective formula.

10:38:38 8       So when we were before Your Honor on the nonprofits, we

10:38:39 9   said let's get the alternative causation issue done once and for

10:38:43 10  all, and they agreed and Your Honor confirmed that.  Nevertheless,

10:38:46 11  here we are again a few months later with a slightly different

10:38:51 12  motion for reconsideration, purportedly on matching/smoothing, but

10:38:56 13  what they're really talking about in a lot of these cases is

10:38:59 14  alternative causation.

10:39:00 15       And not only that, the big problem that the class has

10:39:03 16  right now is that BP is now appealing virtually everything.  But

10:39:07 17  what they're saying in their appeal, and these are the appeals that

10:39:10 18  Your Honor mentioned to the appeal panelists within the settlement

10:39:14 19  program, not to the Fifth Circuit.  They're going to these appeal

10:39:17 20  panelists and they're saying, the award is being driven not by a

10:39:21 21  decrease in economic activity after the spill, but rather -- and

10:39:25 22  we've protected the confidentiality, we didn't want to put too much

10:39:29 23  detail -- but the bottom line is by some alternative cause during

10:39:32 24  the post compensation period.  Claimant's own economic data shows

10:39:36 25  that claimant is not a class member and thus may not file a claim

10:39:39  1   or receive compensation under the Settlement Agreement.  This is

10:39:42  2   the position that BP is taking right now.

10:39:44  3           And here is another example.  This is a better example

10:39:48  4   frankly.  I understand, I can't confirm, but I understand that

10:39:51  5   there's hundreds, maybe even thousands of these things being

10:39:55  6   appealed and being held up right now.  But this is what they say.

10:39:58  7   Again, it's unclear what basis this type of company -- I can

10:40:02  8   probably tell you, but I was being overly cautious -- that some

10:40:05  9   type of company can assert a spill related loss, a necessary

10:40:09 10   prerequisite to class membership and recovery.  There's no

10:40:12 11   indication in the record as to what possible basis a, this type of

10:40:15 12   company that's not excluded, that's included, that they now have a

10:40:20 13   class release against, could have any losses associated with the

10:40:23 14   spill class membership and the right to recover are limited to

10:40:26 15   those who had a loss due to the spill.  So that's the position

10:40:29 16   they're talking in all of these appeals right now.

10:40:32 17           The class definition issue I thought was put to rest

10:40:35 18   before.  They continuously cite 1.3.1.2 where it talks about --

10:40:42 19           THE COURT:  As I recall, I haven't looked at that

10:40:45 20   recently, but beyond the geographic category, boundaries, the

10:40:53 21   Settlement Agreement is defined by basically who is excluded.  In

10:41:00 22   other words, there are express exclusions of certain industries,

10:41:06 23   businesses, things like that, I remember casinos, I think financial

10:41:11 24   institutions.  You can probably remind me who else, but BP

10:41:16 25   dealers --

10:41:17  1            MR. HERMAN:  Yes.

10:41:18  2            THE COURT:  -- people like that are expressly excluded.

10:41:21  3    Are you saying that the appeals -- I noticed one of them said this

10:41:32  4    company, whatever it is, is not a member of the class.  Is it that

10:41:34  5    kind of argument they're making that it falls within an excluded

10:41:38  6    category or what is --

10:41:40  7            MR. HERMAN:  I don't believe so, Your Honor.  There are

10:41:42  8    basically three requirements for class membership.  One is that you

10:41:45  9    meet the geographical descriptions.

10:41:47  10            THE COURT:  Right.

10:41:48  11            MR. HERMAN:  The second is that you are not expressly

10:41:51  12    excluded.  And what I think is relevant here is they never said we

10:41:54  13    should exclude agricultural firms, construction firms or special

10:41:58  14    services companies.

10:41:58  15            THE COURT:  And then thirdly that you pass the causation

10:42:00  16    test.

10:42:01  17            MR. HERMAN:  Well, basically.  But the way the class

10:42:03  18    definition works, and I think Your Honor will recall, for Rule 23

10:42:05  19    purposes and they submitted expert reports on this, you have to

10:42:09  20    have objectively ascertainable criteria.  You can't be on some

10:42:12  21    subjective standard where people don't know whether they're in or

10:42:15  22    not based on whether they passed causation.  So what the class

10:42:19  23    definition does is it says:  "The following are summaries," and BP

10:42:22  24    keeps citing the summary without citing what it's summarizing, "of

10:42:27  25    the damage categories which are fully described in the attached

10:42:30  1  exhibits."

10:42:30  2        THE COURT:  And there are about six different categories

10:42:32  3  of business economic claims, property damage, things like that.

10:42:38  4        MR. HERMAN:  Correct.  And the economic damage category

10:42:40  5  is the one we're talking about.  And, yes, the summary says it has

10:42:44  6  to be caused as a result of the incident; but the way that you find

10:42:48  7  out whether it's caused by the incident is you go to the exhibit,

10:42:53  8  which is Exhibit 4B which as Your Honor correctly identified

10:42:58  9  before, is the objective test by which we determine under this

10:43:02 10  settlement whether things are caused by the spill.  And BP is

10:43:05 11  continuing to, as Your Honor noted, just come back and say, well,

10:43:09 12  we don't think that it's caused by the spill, so we don't think

10:43:13 13  they're a class member and they don't have a right to recover.

10:43:16 14  Even though they meet the causation under 4B.

10:43:20 15        THE COURT:  Try to wrap it up because I need to give

10:43:24 16  Mr. Godfrey a few minutes of time.

10:43:26 17        MR. HERMAN:  Yes, Your Honor, just two things very

10:43:27 18  briefly.  They put in this footnote in these appeals, "We're aware

10:43:28 19  of the court's order but respectfully disagree."  Blah, blah, blah.

10:43:32 20  The problem that's created for the class members here is that the

10:43:37 21  March 5th order that Your Honor is I guess here today on for the

10:43:41 22  fifth time, is talking about matching and smoothing.  They're

10:43:45 23  really challenging alternative causation, and alternative causation

10:43:49 24  is not something that is supposed to be still a live issue.  That's

10:43:52 25  something that they agreed to in this very courtroom several months

10:43:55  1    ago.

10:43:56  2             And what is very, I'll just say, offensive is, you know,

10:44:02  3    they put in here:  "Claimant executed a registration form and a

10:44:05  4    claim form, both under penalties of perjury, seeking recovery from

10:44:10  5    business economic losses arising from or due to the spill."  So

10:44:13  6    they're here filing a piece of paper that they agreed wasn't valid

10:44:18  7    several months ago in this courtroom before Your Honor, and they

10:44:21  8    have the nerve to imply or bully or intimidate or threaten class

10:44:29  9    members with "perjury" for filing the claims that they agreed by

10:44:33 10    objective standards would be compensated under the formula.

10:44:37 11             And I know the last thing Your Honor wants is another

10:44:40 12    motion or anything about what to do about this problem, but it's a

10:44:43 13    big problem for the class, and I think it just goes to the

10:44:48 14    disingenuinty with which BP is here today.

10:44:51 15             I'll be happy to answer questions.

10:44:53 16             Also, Your Honor, on the motion to stay that they filed

10:44:55 17    yesterday, I know Your Honor said that you didn't want any more

10:44:59 18    briefing, I've never read it, but I feel pretty comfortable saying

10:45:03 19    that it should be denied for all of the reasons that we've already

10:45:07 20    submitted.

10:45:07 21             THE COURT:  It's really intertwined with what we're

10:45:11 22    talking about here today.

10:45:11 23             MR. HERMAN:  Thank you, Your Honor.

10:45:13 24             THE COURT:  Thank you.  Mr. Godfrey.

10:45:14 25             MR. GODFREY:  Thank you, Your Honor.

10:45:15  1          THE COURT:  I'll give you about three minutes, because I
10:45:17  2     have to be off the bench in about five minutes.
10:45:19  3          MR. GODFREY:  I only need two minutes I think, Your
10:45:22  4     Honor.
10:45:22  5          THE COURT:  Okay.
10:45:23  6          MR. GODFREY:  First, I am not aware of any settlement
10:45:25  7     program accountant who has filed a declaration or affidavit saying
10:45:28  8     that they agree with the interpretation of the claims
10:45:31  9     administrator.  They did file declarations but they studiously
10:45:35 10     avoided that issue.  So unless I missed it, in which case I
10:45:39 11     apologize, but I don't think I did, I am not aware of anyone from
10:45:42 12     Price Waterhouse who said that this is the way you interpret the
10:45:44 13     word revenue or expense or corresponding variable expenses.
10:45:47 14          Second, the April 4 memo, to the extent the Court
10:45:52 15     wants --
10:45:52 16          THE COURT:  Let me ask you this.  Is it correct, I want
10:45:54 17     to make sure I have the sequence, that this came to your attention
10:46:01 18     because long before Mr. Juneau issued his January 15th policy
10:46:05 19     statement on this issue, the program was analyzing and paying these
10:46:13 20     claims in the same manner, and that's what brought it to your
10:46:16 21     attention, correct?
10:46:17 22          MR. GODFREY:  It came to our attention when the portal
10:46:19 23     opened up in September where we had access to the underlying claim
10:46:23 24     data, we started to see some aberrations that led to the
10:46:25 25     October 2nd call.  I would encourage Your Honor to carefully read

10:46:28  1   Mr. Hacker's declaration as compared to the arguments in the

10:46:30  2   briefs.

10:46:31  3          THE COURT:  That's not my question.  My question is, is

10:46:35  4   it correct that it came to your attention, I think it's obvious,

10:46:39  5   that it came to your attention because the claims facility, program

10:46:48  6   was routinely, I guess I would say, that's how they were

10:46:51  7   interpreting and applying the program before -- this wasn't a

10:46:55  8   change in what he did as of January 15th?

10:46:59  9          MR. GODFREY:  That's not quite correct.  We started

10:47:02 10   seeing awards we couldn't understand.  We had a call in October, we

10:47:05 11   thought we understood them, and then we saw more awards in

10:47:08 12   November.  And this issue arose after the fairness hearing --

10:47:12 13          THE COURT:  I still think you're not answering any

10:47:14 14   question, Mr. Godfrey.  It came to your attention because that's

10:47:18 15   how they were applying it and it came to your attention that they

10:47:21 16   were applying it in a manner that you think was wrong, and,

10:47:23 17   therefore, that ultimately led to the January 15, after some back

10:47:27 18   and forth, to the January 15, "official" policy statement.

10:47:30 19          MR. GODFREY:  The chronology is that it came to our

10:47:33 20   attention before January 15th, but we did not understand what he

10:47:37 21   was doing in October if that's the question.

10:47:38 22          THE COURT:  No, that's not my question.

10:47:40 23          MR. GODFREY:  We are ships passing in the night then, I

10:47:43 24   apologize.

10:47:44 25          THE COURT:  I think this could be answered yes or no.  I

10:47:47  1    feel like I am cross-examining a witness with all due respect.  But
10:47:50  2    isn't it true, is it true that it came to your attention because
10:47:53  3    that's how they were applying, they being the program, that's how
10:47:57  4    they were applying the BEL provisions before, long before the
10:48:03  5    January 15 policy statement, and that's what brought it to your
10:48:06  6    attention in the first place?
10:48:07  7              MR. GODFREY:  We discovered that they were --
10:48:08  8              THE COURT:  Can you answer that question?
10:48:09  9              MR. GODFREY:  Yes, Your Honor, before January 15th, we
10:48:11 10    figured this out sometime late November, early December.
10:48:15 11              THE COURT:  Okay.  So I just wanted to understand that it
10:48:17 12    wasn't that Mr. Juneau issues a January 15 policy statement that
10:48:23 13    all of a sudden changed what he and his team accountants and all
10:48:29 14    were doing long before that.
10:48:30 15              MR. GODFREY:  No.  We figured out what they were doing in
10:48:32 16    November, December time frame that led to the December 16th
10:48:36 17    exchange and then the January 15th issue.
10:48:39 18              Second point, the April 4 memo, setting aside the Rule
10:48:44 19    408 problem, I encourage Your Honor to read that.  The accounts
10:48:46 20    there are trying to match, they use the word matching.  They're not
10:48:49 21    saying, oh, you're not matching under the agreement, they're trying
10:48:51 22    to figure out how to do it.  It proves just the opposite of the
10:48:54 23    argument being made.
10:48:55 24              Third:  This court and this district court is the
10:48:58 25    supervisory agent or supervisory power, judicial power over

10:49:02  1    Mr. Juneau.  Obviously this court has an appellate court to which

10:49:06  2    supervises what this court does.  This court, respectfully, we

10:49:10  3    never anticipated this problem coming up, but we have to take an

10:49:15  4    appeal; ultimately the Court of appeals will decide.  But it is not

10:49:18  5    true to say that this court has the final word, it has the final

10:49:22  6    word in the district court sense like every other district court

10:49:25  7    and we respect that, although we disagree with the court in this

10:49:27  8    instance.

10:49:28  9        THE COURT:  You're certainly not suggesting that people

10:49:30 10    are subject to my orders and judgments don't have to follow them

10:49:35 11    unless and until they're affirmed by the Fifth Circuit?

10:49:37 12        MR. GODFREY:  Not at all, Your Honor, not at all.  That

10:49:38 13    decision was decided years ago by the Supreme Court.  I think there

10:49:41 14    was a man from the UAW who took the opposite position and learned

10:49:45 15    the hard way that that is not a proper approach.  So not at all.

10:49:50 16        I am simply saying that in answer to Mr. Herman's point

10:49:52 17    that suggested you have the final word -- you have the final

10:49:53 18    word --

10:49:53 19        THE COURT:  Well, that's an issue I will let you all

10:49:56 20    decide somewhere else.

10:49:57 21        MR. GODFREY:  Correct.  There's no question that once

10:49:58 22    Your Honor has ruled, I am bound by it unless the Fifth Circuit

10:50:01 23    tells me something differently.

10:50:02 24        THE COURT:  Let me ask you this real quick.  I am

10:50:05 25    troubled by something that -- I am troubled by the implications or

10:50:13  1    the potential fallout of something that Mr. Stanley alluded to.  I

10:50:21  2    mean, if you have the right to sue the claims administrator for

10:50:25  3    essentially doing his job, which as I see it he is applying and

10:50:29  4    interpreting a contract, the agreement as he sees and as I've

10:50:34  5    agreed with him at this point.  If you can sue him for that, why

10:50:39  6    can't anybody else sue him that's not happy with what he did?  Any

10:50:43  7    claimant that's turned down can file a suit here and say he is

10:50:46  8    breaching the contract by not honoring my claim?

10:50:48  9            MR. GODFREY:  No --

10:50:49  10           THE COURT:  And say we disagree with his interpretation

10:50:53  11   of how he's applied the contract, the agreement, I mean to my

10:50:56  12   claim?

10:50:56  13           MR. GODFREY:  There are a couple of answers to that, Your

10:50:58  14   Honor.  If the Court were to be concerned about that issue, then

10:51:02  15   the solution is that some courts have done to appoint him as a real

10:51:06  16   special master under Rule 53.  There are consequences though to

10:51:10  17   Mr. Juneau with that appointment, there are benefits and there are

10:51:13  18   certain limitations about who want he can and cannot do.

10:51:16  19           THE COURT:  So unless I appoint him under Rule 53 he is

10:51:19  20   subject to being sued by anybody who wants to sue him?

10:51:23  21           MR. GODFREY:  No, no.  With us he has a direct contract

10:51:25  22   that has to mean something, otherwise the contract means nothing.

10:51:30  23           THE COURT:  What about somebody who is a beneficiary, if

10:51:31  24   the contract says and the program says he is to interpret it, I

10:51:35  25   think for the benefit -- the beneficiaries of the trust are the

10:51:40  1    class members, right?

10:51:41  2            MR. GODFREY:  The beneficiaries of the -- well, the class

10:51:44  3    members have rights under the Settlement Agreement.

10:51:47  4            THE COURT:  Yeah.

10:51:49  5            MR. GODFREY:  I don't think --

10:51:51  6            THE COURT:  They certainly have rights, so I don't know

10:51:53  7    whether we talk about them as third-party beneficiaries or

10:51:57  8    whatever.

10:52:00  9            MR. GODFREY:  I think as a technical matter their rights

10:52:02  10   are to appear before the court seeking relief before this court.

10:52:06  11           THE COURT:  Maybe that's your rights, too, as the other

10:52:08  12   side would say you've done.  But I am having trouble limiting your

10:52:13  13   argument to just you.  It would only apply to BP.

10:52:18  14           What if I had ruled in your favor and they were here

10:52:22  15   telling me I should enjoin the administrator from applying it the

10:52:25  16   way BP wants it applied?  I suspect you might be here saying they

10:52:31  17   don't have a right to do that.

10:52:32  18           MR. GODFREY:  I think class counsel has separate rights

10:52:34  19   that are different from the class in this instance, Your Honor, I

10:52:37  20   don't agree with that proposition.  But I would say that the

10:52:39  21   solution to this issue --

10:52:40  22           THE COURT:  So any time they don't agree they can do the

10:52:43  23   same thing you've done, they can sue Mr. Juneau?

10:52:46  24           MR. GODFREY:  We looked at the case law on this before we

10:52:48  25   actually --

10:52:48  1            THE COURT:  Could they sue Mr. Juneau?

10:52:50  2            MR. GODFREY:  I think if they wanted to seek an

10:52:52  3    enforcement they would have a right to do that, yes.

10:52:53  4            THE COURT:  And who else could sue him?

10:52:54  5            MR. GODFREY:  I think that's it, I think it's limited.

10:52:56  6            THE COURT:  Just BP and the class?

10:52:58  7            MR. GODFREY:  I believe so.

10:52:59  8            THE COURT:  Members of the class, not just class counsel?

10:53:01  9            MR. GODFREY:  No, class members I think are entitled to

10:53:02 10    seek relief from the court.

10:53:04 11            THE COURT:  Why couldn't they see sue him?

10:53:06 12            MR. GODFREY:  I haven't actually looked at that, Your

10:53:08 13    Honor, but I think the answer is --

10:53:08 14            THE COURT:  It's a big problem if he's subject to

10:53:11 15    lawsuits by anybody that's not happy with something he does.

10:53:13 16            MR. GODFREY:  There is no question, Your Honor, that you

10:53:16 17    raise a policy question.  The law does not address this, the law

10:53:19 18    says the solution is if you want to avoid this, appoint him as a

10:53:24 19    special master pursuant to Rule 53, that's why they can't find

10:53:26 20    cases for the motion to dismiss.

10:53:28 21            THE COURT:  Maybe nobody's ever sued them like you have

10:53:32 22    in this case.

10:53:33 23            MR. GODFREY:  I'm not sure about that, Your Honor, but I

10:53:35 24    can tell you that I know what the solution to the issue is if the

10:53:36 25    court would want me to do that, but there are limitations upon

10:53:38  1    Mr. Juneau.

10:53:38  2            THE COURT:  Are you suggesting I should appoint him under

10:53:42  3    Rule 53?

10:53:42  4            MR. GODFREY:  No, I did that to the court.  The

10:53:45  5    supervisor of this settlement in the first instance is the court,

10:53:47  6    this court is the parties and the Court knows.

10:53:50  7            On the Exhibit 4B versus Exhibit 4C.  Class counsel

10:53:55  8    continue to want to talk about causation, and we will set aside

10:53:58  9    some of the argument, maybe that's for a later day; but everything

10:54:01 10    we said, including when we quoted from Mr. Holstein's letter said:

10:54:05 11    Accurate data, monthly revenue, variable expenses.  And that goes

10:54:09 12    back to whether or not the Exhibit 4C, variable profits calculation

10:54:13 13    is being done properly.  We think that the problem here, setting

10:54:16 14    aside causation, is that it as it is not being done properly.  I

10:54:22 15    think the Court knows our position on that.  I would ask the Court

10:54:24 16    to consider that.  There's no reason for me to repeat that.

10:54:28 17            But in answer to your question about where are most of

10:54:31 18    these claims coming from, well, 50 percent of the new claims are

10:54:34 19    now coming from Zone D.  This is a feedback effect, economists call

10:54:38 20    it, where people are making claims from Zone D based upon

10:54:43 21    differential cash flows, not based upon the variable profits

10:54:47 22    analysis that we thought we had agreed to and that we think that

10:54:50 23    the agreement plainly says we did agree to.  And at least the

10:54:54 24    fictitious awards.

10:54:55 25            One final point.  It is true, it is true that in the

10:54:58 1   January 15th BEL policy decisions, Mr. Juneau said we will make

10:55:04 2   some adjustments.  It is not true that the adjustments are being

10:55:08 3   made daily.  Every day they're awarding claimants which have

10:55:13 4   year-end adjustments, whether they have negative revenue or

10:55:15 5   overbilling or errors of any type.  And many times the claimants

10:55:20 6   point them out themselves that they use the monthly financials as

10:55:23 7   submitted.  It is a direct result of the application of the BEL

10:55:26 8   policy decisions, and if the Court thinks that that is incorrect at

10:55:30 9   a minimum, that is a reason for the injunction to stop these

10:55:32 10   fictitious awards from being issued.

10:55:35 11      THE COURT:  Let me ask you one more thing before you sit

10:55:37 12   down.  And I do have to leave.  Mr. Herman mentioned something that

10:55:43 13   I had not heard before that BP is appealing some of these awards

10:55:49 14   not solely on the BEL, not the issue that we're here on today and

10:55:54 15   that's the subject of the March 5th order, but on I'll call it the

10:56:00 16   underlying causation; in other words, arguing that basically the

10:56:06 17   business, the losses must have been caused by something else, not

10:56:11 18   by the oil spill.  Is that accurate?  Is BP now taking that

10:56:16 19   position?

10:56:16 20      MR. GODFREY:  I am not on the appellate side of the

10:56:18 21   house, that's another firm that runs that.  But I can tell you what

10:56:21 22   I know.  There's a definition that the Court affirmed in the class

10:56:26 23   agreement that says people who have suffered damages caused by the

10:56:30 24   spill where the objective data shows that the damage was not caused

10:56:35 25   by the spill.  And some cases the claimants submit it wasn't caused

10:56:39  1    by the spill.  I believe appeals are being taken on that ground.

10:56:42  2         THE COURT:  That's not what I understood Mr. Herman to

10:56:46  3    say, but that's neither here nor there because that's not the issue

10:56:48  4    before the Court, but I just wanted to give you a chance.

10:56:50  5         MR. GODFREY:  I should point out though one point about

10:56:53  6    appeals.  We've appealed as of Monday 2.8 percent of the awards, BP

10:56:57  7    thus far of all appeals that either side has taken has won

10:57:02  8    79 percent of the appeal and a bunch of other appeals and certain

10:57:05  9    percent have been resolved amicably by the parties, more in favor

10:57:08 10    of BP than the other side.  So the notion that somehow the

10:57:11 11    appellate process is being abused, I think the data is really to

10:57:14 12    the contrary.  If the Court wanted the data in the form of a

10:57:18 13    declaration, we'd do it, but I think that's available from the

10:57:19 14    settlement claims administrator as well.

10:57:21 15         With that, Your Honor, I greatly appreciate your time

10:57:24 16    this morning, I know you've visited this issue before.  I think our

10:57:26 17    position is clear on the record, but I also think that we should

10:57:28 18    have an injunction to protect us against us in the interim these

10:57:32 19    continued awards that in our view, based upon hard, cold economic

10:57:37 20    data are fictitious for people who have no actual losses

10:57:41 21    whatsoever.  It's not just they have some loss and it's an

10:57:43 22    exaggerated award, they have no losses whatsoever, however

10:57:46 23    measured.

10:57:46 24         Thank you very much, Your Honor.

10:57:47 25         THE COURT:  Thank you.  The Court has spent, as I said,

10:57:52  1   an enormous amount of time dealing with this issue, not just today
10:57:55  2   and in preparation for this hearing this morning, but in going back
10:57:59  3   to -- I'm not sure when I first got involved, I guess it was in
10:58:03  4   February -- no, must have been January I guess.  And as I said,
10:58:08  5   this is at least the third time that the curt has had to review and
10:58:13  6   look at this issue.

10:58:16  7          And despite the fact that the record has continued to
10:58:20  8   grow, I don't think it changes the fundamental issue before the
10:58:28  9   Court.  And, first of all, I'll say that to the extent this is a
10:58:34  10  motion for reconsideration, which I guess I could construe it as
10:58:38  11  before the Court, of my March 5th, 2013, order where I set forth in
10:58:47  12  some detail the reasons why I interpreted the Settlement Agreement
10:58:52  13  in the same way that the claims administrator had interpreted it in
10:58:56  14  his January 15th policy decision, for those same reasons, I see no
10:59:01  15  basis on which I would consider changing my view of that, of that
10:59:09  16  order.

10:59:10  17         As a consequence of that, what's before the Court this
10:59:15  18  morning as a procedural matter are the following:  As I said, there
10:59:24  19  is a motion to dismiss filed by the defendants in Civil Action
10:59:29  20  13-492, it's filed against the claims administrator Mr. Juneau and
10:59:33  21  the settlement program itself.  I agree essentially with the
10:59:40  22  reasons advanced by counsel for the claims administrator and the
10:59:44  23  settlement program, that the claims alleged by BP in 13-492 do not,
10:59:56  24  that is that they failed to state a claim against either defendant
11:00:04  25  because in essence what is alleged against Mr. Juneau is that he is

11:00:10  1    complying with an order of the court.  As a matter of law, that

11:00:16  2    cannot be a situation where he is breaching the agreement.

11:00:23  3            So I am granting the motion to dismiss 13-492, that

11:00:31  4    lawsuit under Rule 12(b)(6).

11:00:37  5            Second matter before the Court in that same lawsuit there

11:00:40  6    is a motion for preliminary injunction, that is, as I see it, moot

11:00:45  7    because the court's now dismissed that lawsuit.

11:00:52  8            Third matter before the Court is a related practically

11:00:56  9    identical motion for preliminary motion for the *Bon Secour* class

11:01:01 10    action, Civil Action 12-970.  In that case the claims administrator

11:01:10 11    and settlement program are not parties to the lawsuit, but

11:01:14 12    nonetheless they have opposed the preliminary injunction; and so as

11:01:21 13    class counsel and for the reasons I've stated here today, there's

11:01:26 14    no basis on which if I consider the four factors that are required

11:01:33 15    for granting a preliminary injunction:  First of all, likelihood of

11:01:40 16    success on the merits by the moving party, second factor being

11:01:49 17    irreparable harm, and the third and fourth factors deal with

11:01:55 18    weighing the harm or injury to be caused by, in consequence of the

11:02:04 19    court's either granting or denying the request for injunctive

11:02:09 20    relief.  When I consider those factors, I find that BP's motion for

11:02:13 21    preliminary injunction should be denied.

11:02:17 22            In essence, as Mr. Godfrey candidly admitted, this is

11:02:24 23    nothing more than, as he put it, a belt-and-suspenders procedural

11:02:30 24    maneuver by BP to attempt to gain some appellate right that

11:02:38 25    apparently -- appellate rights that apparently is not entirely

11:02:45 1    convinced that it has otherwise because otherwise there would have

11:02:48 2    been no need to file a motion for preliminary injunction.

11:02:56 3            Since they have now appealed my order, filed a notice of

11:03:00 4    appeal and filed a request for a stay, so I am denying the motion

11:03:04 5    for preliminary injunction in *Bon Secour*.

11:03:09 6            And finally, insofar as the request for a stay of my

11:03:12 7    March 5th order, which was filed sometime yesterday I believe, I

11:03:15 8    saw it this morning for the first time, the analysis would be

11:03:21 9    essentially the same for the same reason that I am not revisiting

11:03:27 10   my March 5th order and not granting preliminary injunction, I am

11:03:31 11   also not going to stay my order.

11:03:36 12           So I think that covers everything.  Have a good day.

11:03:40 13           THE DEPUTY CLERK:  All rise.

11:03:41 14       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

15                          *  *  *  *  *  *

16                        REPORTER'S CERTIFICATE

17

18       I, Karen A. Ibos, CCR, Official Court Reporter, United
         States District Court, Eastern District of Louisiana, do hereby
19       certify that the foregoing is a true and correct transcript, to the
         best of my ability and understanding, from the record of the
         proceedings in the above-entitled and numbered matter.

20

21

22       *Karen A Ibos*

23       _____
         Karen A. Ibos, CCR, RPR, CRR, RMR
         Official Court Reporter

24

25