UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | : | |
| OF MEXICO, ON APRIL 20, 2010 | : | SECTION J |
| | : | |
| THIS DOCUMENT RELATES TO: | : | JUDGE BARBIER |
| | : | |
| ALL CASES | : | MAGISTRATE JUDGE SHUSHAN |
| | : | |

.........................................................................................................................................................

**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO APPEAL
DECISION OF THE MAGISTRATE JUDGE REGARDING CRIME-FRAUD
MOTION TO COMPEL (Dkt. No. 9592)**

# **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     I.      The Criminal And Fraudulent Communications At Issue  . . . . . . . . . . . . . . . . . 4

          A.      False and Misleading Statements to the Public
                through SEC Filings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          B.      False and Misleading Statements to Congress  . . . . . . . . . . . . . . . . . . . . 4

               1.      May 4, 2010 presentation to Congressional Subcommittee
                        claiming flow rate was 5,000 BOPD  . . . . . . . . . . . . . . . . . . . . . 4

               2.      May 24, 2010 letter to Congressional Subcommittee
                        claiming flow rate was 5,000 BOPD  . . . . . . . . . . . . . . . . . . . . . 5

               3.      June 25, 2010 letter to Congressional Subcommittee
                        misstating basis for worst case discharge estimate  . . . . . . . . . . 6

          C.      False and Misleading Statements
                 to the National Incident Command  . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     II.     BP Used Attorneys To Direct Its Crime-Fraud Communications  . . . . . . . . . . . 8

     III.     BP's Internal Flow Rate Estimates Were Far Higher
            Than Those Shared With The Government And The Public  . . . . . . . . . . . . . . 8

     IV.     Procedural History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     I.      Applicable Legal Standards  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          A.      Standard for Appeal of a Magistrate Judge Decision  . . . . . . . . . . . . . . 13

          B.      Standard Applicable To The Crime-Fraud Exception  . . . . . . . . . . . . . 13

     II.     The Crime-Fraud Exception Is Triggered
            By BP's Knowingly False Flow Rate Statements  . . . . . . . . . . . . . . . . . . . . . . 15

III.    All Documents Reasonably Related to Preparation of
        the Crime-Fraud Communications Should Be Produced  . . . . . . . . . . . . . . . . . 17

        A.    The Documents Sought by the United States
              Meet the Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        B.    The Magistrate Judge Employed the Incorrect Standard  . . . . . . . . . . . 19

        C.    The Magistrate Judge Erred in Using Mr. Rainey's Involvement to
              Determine whether Individual Documents Must Be Produced  . . . . . . . 21

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Clark v. United States*, 289 U.S. 1 (1933) ....................................................................1, 13

*Coleman v. American Broadcasting Cos.*, 106 F.R.D. 201 (D.D.C. 1985) ......................14

*In re Grand Jury Proceedings*, 43 F.3d 966 (5th Cir. 1994) ...........................................20

*In re Grand Jury Proceedings*, 680 F.2d 1026 (5th Cir. 1982) ....................................1, 20

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) ...................................... passim

*In re International Systems & Controls Corp. Securities Litigation.*,
    693 F.2d 1235 (5th Cir. 1982).......................................................................................18

*In re Richard Roe, Inc.*, 68 F.3d 38 (2nd Cir. 1995).................................................19, 20

*In re Richard Roe, Inc.*, 168 F.3d 69 (2nd Cir. 1999)......................................................20

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982) ..........................................................14

*Matter of Toyota of Jefferson, Inc.*, 14 F.3d 1088 (5th Cir. 1994) ..................................13

*Payne v. United States*, 289 F.3d 377 (5th Cir. 2002) .....................................................13

*Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986) ...........................................................13

*Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 280 (E.D. Va. 2004) .................13

*Sandhu v. Bransom*, 932 F. Supp. 822 (N.D. Tex. 1996) .................................................13

*Securities and Exchange Commission v. BP p.l.c.*,
    Civil Action No. 2:12-cv-02774 (E.D. La.) (Dkt. Nos. 1 & 2) ....................................4

*Southern Scrap Metal Co.. v. Fleming, Number Civ.A. 01-2554*,
    2003 WL 21474479 (E.D.La. June 18, 2003) .............................................................20

*United States v. Ballard*, 779 F.2d 287 (5th Cir. 1987).....................................................14

*United States v. BP Exploration and Production, Inc.*, Criminal Case
    2:12-cr-00292-SSV-DEK (E.D. La.) Dkt. No. 2 ..........................................................5

*United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983) ........................................................18

*United States v. Kaplan,* No. 02 CR. 883(DAB),
2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ....................................................20, 21

*United States v. Zolin*, 491 U.S. 554 (1989) ..............................................................13, 14

**FEDERAL STATUTES**

28 U.S.C. § 636(b)(1)(A) ...............................................................................................13

33 U.S.C. § 1321(b)(7)(D) .................................................................................................4

15 U.S.C. § 78j(b) ...........................................................................................................17

15 U.S.C. § 78m(a) .........................................................................................................17

**FEDERAL REGULATIONS**

17 C.F.R. 240.10b-5 ........................................................................................................17

17 C.F.R. 240.12b-20.......................................................................................................17

17 C.F.R. 240.240.13a-16.................................................................................................17

**FEDERAL RULES**

Fed. R. Civ. P. 72(a) .......................................................................................................13

**OTHER AUTHORITIES**

Deborah F. Buckman, Annotation, *Crime-Fraud Exception Work Product
Privilege in Federal Courts*, 178 A.L.R. Fed. 87, § 2[a] (2002) ...............................14

## <u>TABLE OF EXHIBITS</u>

Ex. 1   July 19, 2012 Letter from R. Gasaway to Judge Shushan, Dkt. No. 7009 ("July 19, 2012 Letter")

Ex. 2   BP Crime Fraud Privilege Logs *(Confidential)*

Ex. 3   Robert Sanders Deposition at 127:20-128:3, 212:10-213:1

Ex. 4   Thad Allen Deposition at 514:16-516:22

Ex. 5   Simon Bishop Deposition at 230:6-12, 242:25-243:9, 486:5-10, 488:24-489:7

Ex. 6   Trevor Hill Deposition at 293:17-294:12

Ex. 7   BP April 29, 2010 Form 6-K

Ex. 8   BP April 30, 2010 Form 6-K

Ex. 9   BP May 4, 2010 Form 6-K

Ex. 10   May 14, 2010 Letter E. Markey to L. Mackay

Ex. 11   May 24, 2010 Letter, K. Bailey to E. Markey

Ex. 12   BP Guilty Plea Agreement in *United States v. BP Exploration and Production, Inc.*, No. 2:12-cr-00292-SSV-DEK [Dkt. 2]

Ex. 13   June 25, 2010, BP Letter from David Nagle to Congressional Subcommittee

Ex. 14   May 17, 2010 Letter from Admiral Landry to D. Suttles

Ex. 15   David Rainey Deposition at 182:4-184:15

Ex. 16   May 16, 2010 Email, R. Lynch Email to D. Rainey *(Confidential)*

Ex. 17   May 18, 2010 Email chain, J. Lynch to D. Suttles, including May 17, 2010 Email, D. Rainey to J. Lynch *(Confidential)*

Ex. 18   May 19, 2010 D. Suttles Email to Admiral Landry (Dep. Ex. 3218)

Ex. 19   May 15, 2010 Email, M. Mason to Andy Inglis, cc: Jasper Peijs, Subject: Macondo Oil Rate (Dep. Ex. 3220)

Ex. 20   BP Powerpoint titled "Well Control Simulation Results" – April 22, 2010 (BP-HZN-2179MDL00443041- BP-HZN-2179MDL00443043) *(Confidential)*

Ex. 21   Email chain from Kelly McAughan, Bryan Ritchie, and Jonathan Bellow, dated April 23-24, 2010, Subject: Re: Flow rate and production profile (Dep. Ex. 2409) *(Confidential)*

Ex. 22   Timothy Lockett Deposition at 29:22-30:1; 89:22-91:24; 155:4-156:16; 425:23-428:24

Ex. 23   Email from Tim Lockett to Farah Saidi, cc: Trevor Hill, Ian Stillwell, dated April 27, 2010 Subject: Horizon pipesim model (Dep. Ex. 9445) *(Confidential)*

Ex. 24   Email from Tim Lockett to Trevor Hill, dated May 3, 2010, Subject:  Best estimate (Dep. Ex. 9466) *(Confidential)*

Ex. 25   Charles Holt Deposition at 261:1-18

Ex. 26   April 30, 2010 Email Exchange (Dep. Ex. 10518)

Ex. 27   May 17, 2010 Email, T. Lockett to T. Hill (Dep. Ex. 8865)

**INTRODUCTION**

As oil gushed from the Macondo 252 well during Spring 2010, BP told Congress, the National Incident Command, and the public that the flow rate was 5,000 barrels of oil per day ("BOPD").   Meanwhile, company engineers were performing internal analyses showing that the flow rate could be up to 20 times greater.

BP pled guilty to the crime of obstructing justice by providing false and misleading flow rate information to Congress during the response.   The company provided that same false information to the National Incident Command by email and to the public through filings with the SEC.   BP's false flow rate statements were developed under the direction of the company's attorneys, as BP itself explained to the Magistrate Judge in multiple filings.   The letters to Congress that formed the basis of BP's guilty plea were the results of "a process organized and directed by lawyers."   Ex. 1, July 19, 2012 Letter from R. Gasaway to Judge Shushan, Dkt. No. 7009 ("July 19, 2012 Letter") at 5.

Under blackletter law, BP's use of attorneys to aid in its wrongdoing destroys any privilege for the communications BP used in its criminal or fraudulent activity.   This bedrock principle of privilege law is known as the crime-fraud exception to the attorney-client privilege. As the Supreme Court has explained, "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. *He must let the truth be told*."   *Clark v. United States*, 289 U.S. 1, 15 (1933) (emphasis added).   The exception applies whether the attorneys had knowledge of the crime or not.   *See e.g., In re Grand Jury Proceedings, 680 F.2d 1026, 1028* (5th Cir. 1982) ("The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose.").

After BP's guilty plea was accepted by Judge Vance, the United States moved to compel production of all documents related to the preparation of BP's fraudulent statements to government officials and the public regarding the flow rate, specifically (1) fraudulent communications to Congress on May 4, 2010 and fraudulent letters to Congressman Markey dated May 24 and June 25, 2010; (2) a fraudulent statement to Federal On-Scene Coordinator Admiral Mary Landry on May 19, 2010; and (3) fraudulent securities statements on April 29 and 30 and May 4, 2010 (collectively referred to here as the "Crime-Fraud Communications").   On April 30, 2013, the Magistrate Judge ruled on the United States' motion by ordering production of 22 documents sought by the United States and finding that 84 additional documents identified by BP as related to the Crime-Fraud Communications did not fall within the crime-fraud exception.[1]

The United States submits that the Magistrate Judge used the incorrect legal standard and applied the standard incorrectly.   A court reviewing a crime-fraud assertion conducts a two-step analysis in the Fifth Circuit.   First, the reviewing court determines whether the party asserting crime-fraud has made a *prima facie* case that its opponent "intended to further an ongoing crime or fraud during the attorney-client relationship."   *In re Grand Jury Subpoena*, 419 F.3d 329, 346 (5th Cir. 2005).   Once that showing is made, "the crime-fraud exception applies."   *Id*. The second step addresses which documents must be produced – those "*reasonably related to the furtherance of the ongoing or future crime or fraud* at issue."   *Id*. at 347.   The United States respectfully submits that the Magistrate Judge made three errors in her opinion.   At the first step of the analysis, she applied the law to the facts incorrectly in concluding that the United States failed to make a *prima facie* showing of a crime or fraud with respect to BP's false statements to

---

[1] BP identified a total of ▮ documents as related to the Crime-Fraud Communications.   BP itself proposed to produce ▮ of those documents, while another ▮ had already been produced.   *See* Ex. 2, BP Crime-Fraud Privilege Logs.   The United States and Transocean contend that BP has addressed only a small subset of the documents responsive to the motion.   The question is still being briefed before the Magistrate Judge.

the SEC.    At the second step of the analysis, she both used an incorrect legal standard not briefed by the Parties and then applied it incorrectly by using the involvement of a particular BP vice president as a proxy for whether the document was reasonably related to the furtherance of the crime or fraud.

The Magistrate Judge's decision was contrary to law, and the United States respectfully requests that the Court overturn that decision and grant the United States' motion to compel in full.    Specifically, the United States requests that the Court order the production of all documents reasonably related to the preparation of the Crime-Fraud Communications.    The Parties would then work with the Magistrate Judge to define the universe of documents affected. We incorporate by reference our filings before the Magistrate Judge.    *See* Dkt. No. 8417 and 8868 (unredacted versions to be provided as Attachments 1 and 2 to the unredacted version of this brief).

## BACKGROUND

The Court is well aware of what happened at the Macondo well, and we will not revisit the basics of the blowout or the response here.    Over the 87 days that followed the blowout, BP attempted to stop the flow of oil under the oversight of the United States.    Most of the "source control" and collection attempts BP employed were dependent in part or in whole on the flow rate from the well.    *See* Ex. 3, Robert Sanders Deposition at 127:20-128:3, 212:10-213:1; Ex. 4, Thad Allen Deposition at 514:16-516:22; Ex. 5, Simon Bishop Deposition at 230:6-12, 242:25-243:9, 486:5-10, 488:24-489:7; Ex. 6, Trevor Hill Deposition at 293:17-294:12.    In order to effectively oversee these flow-dependent response efforts, the United States needed truthful and accurate flow information.    In the legal proceedings that BP knew would follow, substantial civil penalties can be assessed under the Clean Water Act on a per barrel basis for oil

discharged in the Gulf of Mexico in connection with activities under the Outer Continental Shelf Lands Act.   33 U.S.C. § 1321(b)(7)(D).[2]

## I.       The Criminal And Fraudulent Communications At Issue

### A.       False and Misleading Statements to the Public through SEC Filings

One week after the rig exploded, BP submitted a form 6-K to the SEC.   In that filing, BP stated that the oil flow was "currently estimated at *up to 5,000 barrels a day*."   Ex. 7, April 29, 2010 Form 6-K at 6 (emphasis added).   The following day, BP issued a press release as a SEC Form 6-K and included the flow estimate as "up to 5,000 barrels a day."   Ex. 8, April 30, 2010 Form 6-K.   On May 4, 2010, BP issued another press release as a Form 6-K and stated that "current estimates by [NOAA] suggest some 5,000 barrels . . . of oil per day are escaping from the well."   Ex. 9, May 4, 2010 Form 6-K.

The SEC filed a civil complaint against BP that alleged "material misrepresentations and omissions" in the three Form 6-K statements.   *Securities and Exchange Commission v. BP p.l.c.*, Civil Action No. 2:12-cv-02774 (E.D. La.), Complaint, Dkt. No. 1.   BP later agreed to pay $525 million to settle the SEC civil action.   *Id*. Dkt. No. 2-1.

### B.       False and Misleading Statements to Congress

#### 1.       May 4, 2010 presentation to Congressional Subcommittee claiming flow rate was 5,000 BOPD

On May 4, 2010, BP Vice President David Rainey made a presentation to a House Subcommittee ("Subcommittee") in which he stated that 5,000 BOPD was the best estimate of the flow rate, and that the worst case discharge was 60,000 BOPD.   *See* Ex. 10, May 14, 2010 Letter E. Markey to L. Mackay.   Subcommittee Chairman Markey responded by letter on May 14, 2010.

---

[2]By way of example, penalties of up to $4,300 per barrel of oil can be assessed in the event BP is found grossly negligent or to have exercised willful misconduct.   Thus the difference between a spill of 5,000 BOPD and 50,000 BOPD is nearly $200 million in penalty liability *per day.*

Chairman Markey noted that other, public estimates of the spill were greater than BP's alleged worst case discharge figure, and stated, "I am concerned that an underestimation of the flow *may be impeding the ability to solve the leak and handle management of the disaster.   We have already had one estimate that grossly underestimated the amount of oil being released* and we cannot afford to have another."   *Id*. (emphasis added).   The import of Chairman Markey's letter was that BP misled the Subcommittee in the May 4, 2010 briefing.

### 2.   May 24, 2010 letter to Congressional Subcommittee claiming flow rate was 5,000 BOPD

BP responded with a letter signed by BP attorney Kevin Bailey to Chairman Markey on May 24, 2010.   In that letter, BP represented that the 5,000 BOPD flow rate was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."   Ex. 11, May 24, 2010 Letter, K. Bailey to E. Markey, Dep. Ex. 1651.   In fact, BP later admitted that its own *internal* estimates at the time showed the flow rate was as high as 96,000 BOPD.   Ex. 12, *United States v. BP Exploration and Production, Inc.*, Criminal Case 2:12-cr-00292-SSV-DEK (E.D. La.) Dkt. No. 2 ("BP Guilty Plea Agreement") at 16-17. In pleading guilty to obstruction of Congress based in part upon the May 24 letter, BP stated that it "*agree[d]* that if the case were to proceed to trial, *the Government could establish beyond a reasonable doubt*" the following facts related to the May 24 letter:

> On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, *BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry* under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

> 1.   *BP*, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD

2.  *BP*, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3.  *BP*, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.   At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4.  *BP*, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.   At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5.  *BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."   In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.*

Ex. 12, BP Guilty Plea Agreement at 16-17 (emphasis added).

### 3.  June 25, 2010 letter to Congressional Subcommittee misstating basis for BP's worst case discharge estimate

On June 25, 2010, BP sent another letter to the Subcommittee, this time from David Nagle, who at the time led BP's government relations group.   In the June 25 letter, BP attempted to explain why the company had told the Subcommittee on May 4 that the worst case discharge was 60,000 BOPD, while later saying it was 100,000 BOPD.   The June 25 letter stated that the 100,000 BOPD worst case discharge estimate was developed after subsequent "pressure data was obtained from the BOP stack."   Ex. 13, June 25, 2010 Letter, D. Nagle to E. Markey at 1.   This statement too was false, as BP admitted in its plea agreement:

- 6 -

On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."   At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

Ex. 12, BP Guilty Plea Agreement at 17-18.

### C.      False and Misleading Statements to the National Incident Command

In the midst of BP's false statements to Congress, it provided the same false information to the National Incident Command.   On May 17, 2010, then-Rear Admiral Mary Landry, the Federal On-Scene Coordinator ("FOSC") for the Macondo oil spill appealed to Doug Suttles, BP America Inc.'s Chief Operating Officer and BP's representative to the Unified Command, to provide the Unified Command with "full access to all information related to the oil discharge rate as soon as possible," in order to "help us continue to hone our efforts to respond most effectively to the spill and to mitigate the ongoing threat to our environment and coastal communities."   *See* Ex. 14, May 17, 2010 Letter, Admiral Landry to D. Suttles.   Meanwhile, on May 16, 2010, ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████    █████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████    ████████████████████████████████████ ██████████████████████████████████████████████████    ████ ██████████████████████████████████████    Mr. Suttles took the Rainey Memo and sent it to Admiral Landry by email on May 19, 2010.   Ex. 18, May 19, 2010 Email, D. Suttles to Admiral Landry, Dep. Ex. 3218.   The Rainey Memo was also submitted as part of BP's May 24 letter to the Subcommittee.   As described above, BP admitted that it obstructed justice by

- 7 -

omitting relevant internal information and making false representations in the May 24 letter, including the Rainey Memo.

## II.     BP Used Attorneys To Direct Its Crime-Fraud Communications

There can be no doubt that BP's attorneys played a leading role in the Crime-Fraud Communications – BP repeatedly told the Magistrate Judge precisely that.   In defending against earlier privilege challenges before the Magistrate Judge, BP made clear that the company's responses to Congressional inquiries were led and directed by attorneys:

> Congressional requests received by the company in this time period *were handled through a process organized and directed by lawyers* in which information was gathered from personnel within the company.   *Congressional responses were then drafted in a collaborative process led by WilmerHale and involving both in-house and external lawyers along with appropriate BP personnel.* Although not every communication regarding the effort to collect information and to respond to requests involved the direct participation of an attorney, *the overall process was a lawyer-directed effort seeking to ensure that BP received appropriate legal advice with respect to the requests and the company's responses.*

Dkt. No. 7009 at 5 (emphasis added). ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

## III.    BP's Internal Flow Rate Estimates Were Far Higher Than Those Shared With The Government And The Public

At the same time BP was telling Congress, the National Incident Command, and the public that the flow rate was 5,000 BOPD, BP was performing internal modeling showing the flow rate could be as high as 100,000 BOPD.    BP employees recognized the difference between the company's public statements and its private modeling.    On May 15, 2010, then company Vice President Mike Mason, who led various well performance and modeling efforts during the blowout response, wrote an email to BP Chief Executive Andy Inglis warning against "standing behind" the 5,000 BPD estimate.   Ex. 19, May 15, 2010 Email, M. Mason to A. Inglis, Dep. Ex. 3220.   Mason added that "our modelling shows that this well could be making anything up to ~

100,000 bopd depending on a number of unknown variables . . . We can make the case for 5,000 bopd only based on certain assumptions." *Id.*   Mr. Mason's email was forwarded to BP General Counsel John Lynch Jr. *Id.* 

While Mr. Mason's email to the top of the company hierarchy was perhaps the most dramatic internal repudiation of the BP's public 5,000 BOPD flow rate, the company's engineers were conducting work from the very first days of the spill that made clear that the flow rate could be much higher than BP was telling the government or the public.

Ex. 22, Timothy Lockett Deposition at 29:22-30:1; 89:22-91:24; Ex. 23, April 27, 2010 Email, T. Lockett to F. Saidi, Dep. Ex. 9445.

On May 3, 2010 – the day before Mr. Rainey's presentation to the Subcommittee offering 5,000 BOPD as the best estimate –

Ex. 24, May 3, 2010 Email, T. Lockett to T. Hill, Dep. Ex. 9446.

Ex. 22, Lockett Dep. at 155:4-156:16; 425:23-428:24; Ex. 24, May 3, 2010 Email, T. Lockett to T. Hill, Dep. Ex. 9446 at 3.[3]

---

[3] We focus here on estimates predating the SEC 6-Ks and the May 4 presentations.   Further modeling showing similar results continued until the end of the response.   BP has claimed privilege over any flow rate calculations performed after July 17, 2010.

Notably, when BP's source control efforts required a "best estimate" of flow rate for internal modeling work, the company used not 5,000 but 70,000 BOPD.   Early in the response, BP hired Stress Engineering to perform computation fluid dynamics modeling (known as "CFD") in order to consider the potential for the "BOP on BOP" source control option.   Ex. 25, Charles Holt Deposition at 261:1-18.   Stress Engineering needed a flow rate estimate to do the work, and Stress Engineering Principal Christopher Matice stated that the computer runs would take 10-12 hours each.   He added: "*We should start with our best [flow rate] estimate*."   Ex. 26, April 30, 2010 Email Exchange, Dep. Ex. 10518 (emphasis added).   At that point, BP employee Richard Simpson replied: "For the first run, use 70,000 bpd[.] For the second run, 35,000 bpd[.] Third run, 17,500 bpd."   *Id.*   In that April 30, 2010 exchange, BP demonstrates that, when BP needed a flow rate estimate for important work, the company used a much higher flow rate than it was reporting to the public.   As Mr. Lockett said in a May 17 email about Top Kill modeling, the 5,000 BOPD number had "little if no origin. . . . From all the different ways we have looked at flowrate, [5,000 BOPD] would appear to err on the low side."   Ex. 27, May 17, 2010 Email, T. Lockett to T. Hill, Dep. Ex. 8865.

## IV.    Procedural History

BP has previously settled charges related to its misleading statements to Congress and the public.   On October 3, 2013, BP settled a civil complaint filed by the SEC that alleged that BP's April 29, April 30, and May 4 SEC Form 6-K statements included material misrepresentations and omissions.   *Securities and Exchange Commission v. BP p.l.c.*, Civil Action No. 2:12-cv-02774 (E.D. La.), Dkt. No. 2-1.   The United States filed a criminal case against BP on November 15, 2012.   *United States v. BP Exploration and Production, Inc.*, Criminal Case 2:12-cr-00292-SSV-DEK (E.D. La.).   Judge Vance accepted BP's guilty plea on January 29, 2013.

On January 30, 2013, the United States filed the instant motion to compel.   Dkt. No.

8417.   Transocean joined the motion.   In its opposition, BP effectively conceded documents in

which Mr. Rainey played an active role and that related to the communications addressed in BP's

guilty plea (called "Category A" documents) were subject to the crime-fraud exception.   Dkt.

No. 8715 ("BP Opposition") at 1-2.   On April 4, 2013, the Magistrate Judge ordered that subset

of the documents to be produced.   Dkt. No. 9115.   As part of its response, BP also prepared

lists of the withheld documents that the company contends are "related" to each of the

Crime-Fraud Communications, which it provided to the Magistrate Judge and later to the Parties.

After ordering production of the Category A documents, the Magistrate Judge reviewed the

remaining documents on BP's lists *in camera*, and issued a ruling on the motion on April 30,

2013.   Dkt. No. 9592 ("Magistrate Judge Opinion").   The Magistrate Judge ordered BP to

produce 22 documents based on the application of the crime-fraud doctrine, and found another

84 documents remained privileged.   Also in that ruling, the Magistrate Judge directed the

Parties to conduct further briefing on whether BP identified the entire universe of related

documents in the lists it provided to the Court.   The United States and Transocean contend that

BP has vastly underreported the documents potentially responsive to the motion to compel.   For

instance, BP failed to consider any documents in the custodial files of internal or outside counsel

– despite the fact that the very workstreams at issue were organized and directed by counsel.

The briefing on that issue will be complete on May 24, 2013, to be followed by a ruling from the

Magistrate Judge.

The United States' motion to appeal addresses the Magistrate Judge's decision applying

the crime-fraud doctrine to documents identified by BP.   Whether BP identified the full

universe of documents related to the Crime-Fraud Communications is an issue still before the

Magistrate Judge.

**ARGUMENT**

When a party seeks to involve its attorney in an ongoing or future crime or fraud, any privilege is destroyed.   For the crime-fraud exception to apply, the party challenging privilege must show two things: evidence of a crime or fraud and that the underlying communications relate to the illicit activity.   The United States has made that showing here for all documents reasonably related to preparation of the Crime-Fraud Communications, and all such documents should be ordered produced.

The Magistrate Judge found that the United States had demonstrated a crime or fraud for all Crime-Fraud Communications except those made to the SEC.   However, she found that many of the documents identified *by BP* as related to preparation of the Crime-Fraud Communications did not qualify for the exception.   In doing so, the Magistrate Judge made three errors that merit reversal.   First, all of the Crime-Fraud Communications involved BP publically providing a flow rate estimate that bore little relation to the company's best, internal estimates.   All of the Crime-Fraud Communications, including the SEC 6-K statements, should qualify for application of the crime-fraud doctrine.   Second, and even more important, the Magistrate Judge used the wrong standard for determining whether a given document was sufficiently related to the crime or fraud to qualify for the crime-fraud exception.   Finally, she applied the legal standard incorrectly at step two by focusing on Mr. Rainey's involvement with the documents, rather than how they were related to the Crime-Fraud Communications at issue. Evaluated correctly, all documents related to the preparation of the Crime-Fraud Communications should be produced, including all the documents identified by BP and others yet to be identified.

- 12 -

# I.     Applicable Legal Standards

## A.     Standard for Appeal of a Magistrate Judge Decision

The standard of review for this appeal is *de novo*.    Rulings on non-dispositive motions by magistrate judges are reviewed under a "clearly erroneous" or "contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a).    Under that standard, issues of law are reviewed *de novo* and findings of fact under the clearly erroneous standard.   *Matter of Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1090 (5th Cir. 1994).    Mixed questions of law and fact, including the application of the law to the facts, are also reviewed *de novo*.   *Payne v. United States*, 289 F.3d 377, 381 (5th Cir. 2002) (describing standard of review for appellate court reviewing district court decision); *Sandhu v. Bransom*, 932 F. Supp. 822, 826 (N.D. Tex. 1996) (citing *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986)) (describing standard of review for district court reviewing magistrate decision).

The appeal involves questions of law and questions of the application of law to facts. The standard of review for both is *de novo.*

## B.     Standard Applicable To The Crime-Fraud Exception

The crime-fraud exception is a "generally recognized exception" to the attorney-client privilege.   *United States v. Zolin*, 491 U.S. 554, 556 (1989).[4]    Once established, the crime-fraud exception renders communications that otherwise were privileged subject to disclosure – "the privilege takes flight if the relation is abused."   *Clark v. United States*, 289 U.S. 1, 15 (1933).    As the Court noted in *Zolin*, "courts long have viewed [the attorney-client privilege's] central concern as one to encourage full and frank communication between attorneys

---

[4]Although generally referred to as an "exception" to attorney-client privilege and work product doctrine, the crime-fraud exception is not truly an "exception."   Instead, it is an *exclusion* of activity from the protective reach of the privilege given that the attorney-client privilege does not attach *in the first instance* if the legal services are sought for the purpose of committing or furthering a crime or a tort.   *See, e.g., Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 280, 287 (E.D. Va. 2004).   Nevertheless, because most cases use the term "crime-fraud exception," we use that term here.

and their clients and thereby promote broader public interests in the observance of law and administration of justice."   491 U.S. at 562 (internal quotes and citations omitted).   This rationale applies to clients making "full disclosure to their attorneys of *past* wrongdoings."   *Id.* (emphasis added, internal quotes and citations omitted).   However, the reason for the protection of attorney-client communications "ceas[es] to operate at a certain point, namely, where the desired advice refers not to *prior* wrongdoing, but to *future* wrongdoing."   *Id.* at 562-63 (emphasis added, internal quotes and citations omitted).   Where the attorney-client privilege communication relates to "future wrongdoing," the privilege is destroyed.   *See, e.g., United States v. Ballard*, 779 F.2d 287, 292-293 (5th Cir. 1987) ("Once the party seeking disclosure makes a *prima facie* case that the attorney-client relationship was used to promote an intended criminal activity, the confidences within the relationship are no longer shielded.").

Demonstrating that the crime-fraud doctrine applies to a particular communication requires a two-step analysis.   First, the party challenging privilege must make a *prima facie* case "that the client intended to further an ongoing crime or fraud during the attorney-client relationship."[5]   *In re Grand Jury Subpoena*, 419 F.3d 329, 346 (5th Cir. 2005).   Once that showing is made, "the crime-fraud doctrine applies."   *Id.*   The second element establishes which communications must be produced as a result of the crime or fraud shown in the first step. The communications captured by the crime-fraud exception are those that "hold some valid relationship to the prima facie violation such that they reasonably relate to the fraudulent activity."   *Id.* (internal citations and quotation marks omitted). To summarize the analysis, the

---

[5]  The communications need not facilitate a crime *per se* in order to be subject the crime-fraud exception.   The exception applies to the facilitation of "wrongdoing" that is "not specifically criminal or fraudulent."   Deborah F. Buckman, Annotation, *Crime-Fraud Exception Work Product Privilege in Federal Courts*, 178 A.L.R. Fed. 87, § 2[a] (2002).   The exception can include "crime, fraud, or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system," *Coleman v. American Broadcasting Cos.*, 106 F.R.D. 201, 208 (D.D.C. 1985) (quoting *In re Sealed Case*, 676 F.2d 793, 812 (D.C. Cir. 1982)).

first question is whether the crime-fraud doctrine applies at all.    If it does, the second question

addresses what set of communications must be produced.

## II.    The Crime-Fraud Exception Is Triggered By BP's Knowingly False Flow Rate Statements

The initial question is whether the United States has provided *prima facie* evidence that a

crime or fraud occurred.    The Magistrate Judge found that the United States made a *prima facie*

case that the May 4, May 24, and June 25 communications to Congress were criminal or

fraudulent, along with the May 19 email to Admiral Landry.[6]    She found that the United States

did not make a *prima facie* case of crime or fraud for the SEC Form 6-K statements.    Properly

considered, the evidence shows that each of the Crime-Fraud Communications, including the

SEC Form 6-K statements, was in fact a criminal or fraudulent misstatement satisfying the *prima

facie* requirement.

The *prima facie* evidence requirement is not an onerous one.    In order to "make the

necessary *prima facie* showing for the application of the crime-fraud exception . . . , the

government must produce evidence such as will suffice until contradicted and overcome by other

evidence . . . a case which has proceeded upon sufficient proof to that stage where it will support

[a] finding if evidence to the contrary is disregarded."    *Grand Jury Subpoena*, 419 F.3d at

336-37 (upholding application of the crime-fraud exception where, based on "the government's

submitted affidavits and exhibits and the in camera examination of [attorney], the district court

found that the government had made a *prima facie* showing . . . .").

This standard is easily met for most of the Crime-Fraud Communications.    BP admitted

that it committed a crime in the May 24 and June 25 letters to Congress by making false

statements and omitting information.    The May 19 email to Admiral Landry included some of

---

[6] The Magistrate Judge did not explicitly rule that the *prima facie* case of crime or fraud was satisfied for the May 19 email, but her opinion proceeds as though it was.    *See* Magistrate Judge Opinion at 38-39.    The lack of a statement that the *prima facie* requirement was satisfied appears to be an oversight.

the same false statements and omissions and provided them to the National Incident Command. BP's brief opposing the motion to compel essentially conceded that the United States satisfied the *prima facie* requirement for showing the May 24 and June 25 letters to Congress and the May 19 email to Admiral Landry were criminal or fraudulent.   BP Opposition at 1-2 (stating willingness to produce some documents related to preparation of May 19 email and May 24 and June 25 letters).   The Magistrate Judge agreed that the United States met the *prima facie* requirement for those documents.   Magistrate Judge Opinion at 22, 31.

Turning to the communications for which BP challenged application of the crime-fraud doctrine, the May 4 presentation to Congress and the SEC Form 6-Ks, BP's own internal flow rate communications demonstrate that it mislead Congress and the public by presenting numbers flagrantly at odds with its best modeling.   As described above, from the first days of the spill, BP's engineers were calculating that the flow rate could be as high as 100,000 BOPD.   In BP's internal analyses, the 5,000 BOPD estimate was, at best, the very lowest point in a range of potential values.   As BP employee Mr. Lockett said at the time, the 5,000 BOPD number had "little if no origin. . . . From all the different ways we have looked at flowrate, [5,000 BOPD] would appear to err on the low side."   Ex. 27, May 17, 2010 Email, T. Lockett to T. Hill, Dep. Ex. 8865.   But when BP spoke publically about flow rate, the company took its *lowest* estimate and called it the company's *best* estimate.   The Magistrate Judge found that the United States had proved the critical fact: "BP's internal documents demonstrate that its flow rate estimates were several times higher than 5,000 BOPD."   Magistrate Judge Opinion at 40.

The dichotomy between BP's internal flow rate estimates and its public statements satisfies the *prima facie* requirement of showing a crime or fraud.   Just as BP pled guilty to making false statements in and critical omissions from its letters to Congress, it made the same false statements and omissions in its May 4 presentation and SEC Form 6-Ks.   The Magistrate

Judge found that the United States had made its *prima facie* case for the May 4 presentation, but

not the SEC Form 6-Ks.   Magistrate Judge Opinion at 20, 41.   In both cases, the United States

showed that BP's actual knowledge of the flow rate was at odds with its public statements,

misleading Congress and the investing public in violation of law.[7]   In its opposition, BP failed

to provide *any* contrary evidence or explanation for the gulf between its public and internal

estimates.   The Court should find that the *prima facie* requirement of a crime or fraud has been

satisfied for all the Crime-Fraud Communications.

**III.    All Documents Reasonably Related To Preparation of the Crime-Fraud
         Communications Should Be Produced**

Once a *prima facie* showing is made, the question becomes what universe of documents

must be produced.   On this point, the Parties *agreed* on the appropriate standard.   Both BP and

the United States cited the 5th Circuit's formulation:

> [T]he proper scope of the crime-fraud exception must necessarily be limited to
> those attorney-client communications and work products *reasonably related to the
> furtherance of the ongoing or future crime or fraud* at issue.

*Grand Jury Subpoena*, 419 F.3d at 347 (emphasis added); *see* Dkt. No. 8417 at 17 (US Initial

Brief citing *Grand Jury Subpoena*); BP Opposition at 10 (same).   However, the Magistrate

Judge erred by using a *different* standard for determining which documents were related.

**A.      The Documents Sought by the United States Meet the Standard**

The second element of the crime-fraud inquiry takes the fact of a crime or fraud as a

given and establishes what materials must be produced as a result.   As the Fifth Circuit has

explained, once the *prima facie* showing of crime or fraud is made, "the crime-fraud doctrine

applies."   *Grand Jury Subpoena*, 419 F.3d at 346.   The remaining question is simply what

documents it applies to.   A communication is related where there is "some valid relationship"

---

[7] BP pled guilty to obstruction of Congress.   Its misleading statements to the SEC could violate Sections 10(b) and
13(a) of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20, and 13a-6 thereunder.   *See* 15 U.S.C. §§
78j(b) & 78m(a); 17 C.F.R. §§ 240.10b-5, 240.12b-20, & 240.13a-16; *see also Securities and Exchange Commission
v. BP p.l.c.*, Civil Action No. 2:12-cv-02774 (E.D. La.), Complaint, Dkt. No. 1.

between the crime or fraud and the material sought.   *In re International Systems & Controls Corp. Securities Litigation.*, 693 F.2d 1235, 1242 (5th Cir. 1982) (quoted in *Grand Jury Subpoena*, 419 F.3d at 336 n.7).   The Fifth Circuit makes clear that "the exact formulation of a test for relatedness is less important than an understanding of what the [scope] test must accomplish; easy differentiation between material for which the law should not furnish the protections of a privilege and material for which a privilege should be respected."   *Grand Jury Subpoena*, 419 F.3d at 346-47 (internal citations and quotation marks omitted).   The breadth of what qualifies as related must also be considered in light of the alternative before the Fifth Circuit.   In drawing the line that there must be "some valid relationship" between the communication and the illicit act, the Fifth Circuit was responding to the proposal that the *entire* privilege be destroyed.   *Id*. at 346.

The United States is not seeking a broad repudiation of BP's attorney-client privilege. Instead, we seek only documents related[8]  to the preparation of the Crime-Fraud Communications.   This is perfectly consistent with controlling Fifth Circuit precedent.   The court's *United States v. Dyer* case involved the defendant's conversations with two lawyers, and a letter that the district court determined was criminal.   722 F.2d 174, 177-79 (5th Cir. 1983). The *Dyer* court found that the criminal purpose of the letter meant that the communications with the lawyer who helped draft that letter were not privileged, but the communications with a separate lawyer who did not participate in the meeting concerning the criminal letter remained privileged.   *Id.* at 177.   In describing *Dyer*, the Fifth Circuit has since explained that the "events immediately surrounding the *preparation of the letter* at issue" fall within the crime-fraud exception.   *Grand Jury Subpoena*, 419 F.3d at 347 (emphasis added).   That

---

[8]  The Magistrate Judge noted that the United States briefing often said "related" rather than "reasonably related." Magistre Judge Opinion at 14 n.6.   We did simply out of convenience.   To the extent there is a substantive difference by including "reasonably," we agree that "reasonably related" is the standard.

description neatly captures the issue here: BP has numerous privileged communications, only some of which related to the Crime-Fraud Communications.   It is those documents "immediately surrounding the preparation of the [communication] at issue" that the United States seeks here.

For each of the Crime-Fraud Communications, BP deliberately made false statements and omissions regarding flow rate.   Each document that was part of the process of drafting and discussing those Crime-Fraud Communications therefore is in furtherance of the crime or fraud, because those documents were part of the process of preparing the final, fraudulent letter.   Each document related to the preparation of the Crime-Fraud Communications satisfies the Fifth Circuit standard for production.

### B.   The Magistrate Judge Employed the Incorrect Standard

The Magistrate Judge erred at the second step of the crime-fraud analysis by adding a new "intent" requirement, contrary to Fifth Circuit precedent and the Parties' briefing.   *After* addressing whether the *prima facie* case of crime or fraud was made, the Magistrate Judge conducted two additional inquiries for each document: (1) whether it was related to the violation; and (2) whether there is "probable cause to believe that the particular communication with counsel was intended in some way to facilitate or to conceal the criminal activity."   Magistrate Judge Opinion at 21.   In essence, the Magistrate Judge took the inquiry to be made at step 1, and applied it to *each document* at step 2.   This is incorrect as a matter of law.

First, as described above, the Magistrate Judge's standard deviates significantly from *Grand Jury Supoena* and its predecessors.   The Magistrate Judge relied on the Second Circuit's *Richard Roe* case for the intent component of her standard.   But *Richard Roe* appears to be discussing the first step of the crime-fraud analysis: whether there was evidence of a crime or fraud at all.   As the court there explained, "the precise factual basis of the alleged crime or fraud

is unclear." 68 F.3d 38, 41 (2d Cir. 1995).[9]   The Fifth Circuit makes clear that a party need

only show that a crime or fraud was attempted – and not that each document demonstrated

independent intent to further the illicit act.   *Grand Jury Subpoena (2005)*, 419 F.3d at 346 ("in

addition to an initial showing that the client intended to further an ongoing or future crime or

fraud during the attorney-client representation, a secondary showing of some valid relationship

between the work product under subpoena and the prima facie violation" is required) (internal

quotation marks and citations omitted).   As Magistrate Judge Knowles has explained, evidence

of the intent to deceive is part of the *prima facie* case.   *Southern Scrap Metal Co.. v. Fleming*, No.

Civ.A. 01–2554, 2003 WL 21474479, at *2 (E.D.La. June 18, 2003).   Once that showing is made,

the challenging party need only show that the communication "bears a relationship to the alleged

crime or fraud."   *Id*.

    Applying the intent standard to each individual document also proves incompatible with

two fundamental aspects of crime-fraud case law.    First, precedent establishes that attorneys

need not be aware of the crime or fraud for the doctrine to apply.    *See, e.g.*, *In re Grand Jury

Proceedings*, 680 F.2d 1026, 1028 (5th Cir. 1982) ("The crime or fraud exception applies even

where the attorney is completely unaware that his advice is sought in furtherance of such an

improper purpose."); *In re Grand Jury Proceedings*, 43 F.3d 966, 972 (5th Cir. 1994) ("The test

is whether the *client's* purpose is the furtherance of a future fraud or crime.") (emphasis in

original, citations omitted).    Second, case law shows that a judge need not perform an *in

camera* review before ordering production of documents. *United States v. Kaplan*, No. 02 CR.

883(DAB), 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2003) ("Zolin and its progeny make

clear that in camera review is a discretionary alternative to establishing the crime-fraud

---

[9] The *Richard Roe* case is very different from the facts of this matter, as a second appellate opinion makes clear.   In *Richard Roe*, the government had alleged that the defense of the underlying lawsuit itself was fraudulent, the briefs were filed under seal and not even shared with the parties, and portions of the decision itself were redacted.   168 F.3d 69, 71 (2d Cir. 1999).   To the extent the opinion can be read more broadly to encompass the second step of the inquiry, *Richard Roe* would be in conflict with the controlling Fifth Circuit case law described in the text.

exception with independent evidence.").    These principles are incompatible with the standard

employed by the Magistrate Judge here.    The first principle means that documents may not

show a criminal intent because the author might not even know about the crime or fraud, but an

attorney's innocence does not mean the document does not fall within the crime-fraud doctrine.

The second principle means that the document-by-document search for intent cannot be required

because no individual document review is required at all.

### C.      The Magistrate Judge Erred in Using Mr. Rainey's Involvement to Determine whether Individual Documents Must Be Produced

In its brief to the Magistrate Judge, BP attempted to lay the blame for its false statements

and omissions entirely at the feet of Mr. Rainey.    *See, e.g.*, BP Opposition at 4-6.    In an

apparent consequence of using the wrong standard for the second step of the crime-fraud

analysis, the Magistrate Judge relies on Mr. Rainey's involvement in determining whether the

crime-fraud exception applies to individual documents.    Some documents she orders produced

by saying, "With the active involvement of Rainey, these documents reasonably relate to the

furtherance of the ongoing crime or fraud at issue."    Magistrate Judge Opinion at 29.    For

others, she upholds the privilege, saying "Rainey was not an active participant."    *Id*. at 30.

This reliance on Mr. Rainey's involvement reflects two errors: use of the incorrect legal standard

and the misapplication of that standard to the facts.

First, relying on Mr. Rainey's involvement to determine applicability of the exception

only makes sense using the Magistrate Judge's incorrect standard for judging whether individual

documents should be produced.    As described above, the issue for individual documents is

simply whether they are reasonably related to the illicit activity.    Mr. Rainey's involvement is

irrelevant to that question.    In fact, BP's own crime-fraud document logs answer the question

by describing each document on the list as being related to the preparation one of the

Crime-Fraud Communications. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████   Ex. 2, BP Crime-Fraud Privilege Logs.   Under the appropriate

legal test for the second step of the crime-fraud analysis, BP's logs themselves demonstrate that

the documents are sufficiently related to be produced.

Second, Mr. Rainey's involvement cannot serve as a proxy for criminal intent because

the evidence shows that Mr. Rainey is not the sole instrument of the obstruction.   It was BP the

corporation that pled guilty to obstruction of justice, based largely on a letter signed by BP

attorney Kevin Bailey and a process that BP has maintained was managed and led by its lawyers.

BP admitted that the company "did corruptly, that is, with an improper purpose, endeavor to

influence, obstruct, and impede the due and proper exercise of the power of inquiry [into the

flow rate] through the following omissions and false and misleading statements in its May 24,

2010 [letter]."   Ex. 12, BP Guilty Plea Agreement at 16-17.   One of the express misstatements

BP admitted was "falsely suggest[ing]" that the 5,000 BOPD estimate was the "most

scientifically informed judgment" and that subsequent flow rate estimates had "yielded

consistent results."   *Id*.   That statement was in the letter signed by Mr. Bailey, not the attached

Rainey Memo.   Moreover, BP itself has explained that outside counsel from WilmerHale led

the process of responding to Congressional requests and that "the overall process was a

lawyer-directed effort."   Dkt. No. 7009 at 5.

## CONCLUSION

BP made false statements and omissions to Congress, the National Incident Command,

the SEC, and the public regarding the flow rate from the well during the response.   Now that BP

has pled guilty to the crime of obstruction of justice and produced the documents demonstrating

that its internal estimates were several times higher than its public statements, there can be no

privilege for any documents reasonably related to the preparation of those Crime-Fraud Communications.

The United States moved to compel production of all documents reasonably related to the preparation of BP's fraudulent statements and representations to United States government officials, BP's shareholders, and the public regarding the flow rate, specifically (1) fraudulent communications to Congress on May 4, 2010 and fraudulent letters to Congressman Markey dated May 24 and June 25, 2010; (2) a fraudulent statement to Federal On-Scene Coordinator Admiral Mary Landry on May 19, 2010; and (3) fraudulent securities statements on April 29 and 30 and May 4, 2010.   We respectfully request this Court reverse the Magistrate Judge's April 30, 2013 opinion and find that (1) the *prima facie* showing of a crime or fraud has been made for BP's flow rate statements addressed in the motion and (2) that all documents reasonably related to the preparation of those statements should be produced, including all documents identified by BP so far and documents identified after the conclusion of the briefing on scope before the Magistrate Judge.

Respectfully submitted,

BRIAN HAUCK
Deputy Assistant Attorney General
Civil Division

PETER FROST
Directory, Torts Branch, Civil Division
Admiralty and Aviation
STEPHEN G. FLYNN
Assistant Director
MICHELLE DELEMARRE
SHARON SHUTLER
JESSICA SULLIVAN
JESSICA MCCLELLAN
MALINDA LAWRENCE
Trial Attorneys

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

SARAH HIMMELHOCH
Senior Litigation Counsel
NANCY FLICKINGER
SCOTT CERNICH
THOMAS BENSON
Senior Attorneys
DEANNA CHANG
A. NATHANIEL CHAKERES
JUDY HARVEY
ABIGAIL ANDRE
RACHEL HANKEY
BETHANY ENGEL
Trial Attorneys

/s/ R. Michael Underhill

R. MICHAEL UNDERHILL, T.A.
Attorney in Charge, West Coast Office
Torts Branch, Civil Division
U.S. Department of Justice
7-5395 Federal Bldg., Box 36028
450 Golden Gate Avenue
San Francisco, CA 94102-3463
Telephone:   415-436-6648
Facsimile:   415-436-6632
E-mail:   mike.underhill@usdoj.gov

/s/ Steven O'Rourke

STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone:   202-514-2779
Facsimile:   202-514-2583
E-mail:   steve.o'rourke@usdoj.gov

DANA J. BOENTE
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA   70130
Telephone:   (504) 680-3000
Facsimile:   (504) 680-3184
E-mail:   sharon.d.smith@usdoj.gov

Attorneys for the UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date:   May 15, 2013.                                  /s/   Steve O'Rourke_____
                                                       U.S. Department of Justice