# Attachment 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * | MDL No. 2179 |
| | * | Section: J |
| This Pleading Applies to: | * | |
| | * | Judge Barbier |
| | * | |
| All Cases (including Case No. 2:10-cv-04536 (United States v. BP Exploration & Production Inc., et al.)) | * * * | Magistrate Judge Shushan |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## BP EXPLORATION & PRODUCTION INC.'S OPPOSITION TO THE UNITED STATES' MOTION TO COMPEL PRODUCTION OF PREVIOUSLY-WITHHELD DOCUMENTS PURSUANT TO THE CRIME-FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: 202-879-5000
Facsimile: 202-879-5200

Joel M. Gross
Brian Israel
Allison Rumsey
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, D.C. 20004-1206
Telephone: 202-942-5000
Facsimile: 202-942-5999

Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: 504-581-7979
Facsimile: 504-556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: 312-862-2000
Facsimile: 312-862-2200

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone: 202-662-5985
Facsimile: 202-662-6291

Attorneys for BP Exploration & Production Inc.

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................3

    A.    BP's Guilty Plea and Allocution.....................................................4

    B.    BP's Stipulated Consent with the SEC ...........................................6

SUMMARY OF ARGUMENT ....................................................................................6

ARGUMENT ..................................................................................................................8

I.    Under Applicable Legal Standards, the United States Must Demonstrate a
*Prima Facie* Case of Crime or Fraud.......................................................8

    A.    The United States Has the Burden of Demonstrating a *Prima Facie*
Case of Crime or Fraud...................................................................8

    B.    The United States Misstates the Standard for Applying the Crime-
Fraud Exception. ............................................................................9

        1.    The United States' "Reasonably Related to" Standard Misstates the
Law. ......................................................................................9

        2.    A Party Seeking to Invoke the Crime-Fraud Exception Must Show
that the Privileged Communications It Challenges Are in
"Furtherance of" a Crime or Fraud. ...........................................12

    C.    BP Would Be Entitled to Further Process, Including Potentially A
Full Evidentiary Hearing Before Disclosures Are Ordered Based
on Conduct Beyond the Scope of BP's Guilty Plea Allocution............15

II.    Under the Proper Standards, the United States Is Not Entitled to Pierce
BP's Privilege with Respect to Particular Contested Documents....................16

    A.    The United States' Motion to Compel Does Not Establish a *Prima
Facie* Case for BP's SEC Submissions and the May 4 Briefing. ..........17

        1.    The United States Is Not Entitled to Documents Related to
Preparation of BP's Forms 6-K Filed with the SEC. .................17

        2.    The United States Is Not Entitled to Documents Related to the
May 4 Congressional Briefing Session.....................................19

    B.    The United States Is Entitled Only to Documents that Meet the "In
Furtherance" Legal Test..................................................................20

i

        1.      The United States Is Not Entitled to All Documents that Are
                Merely "Related to" Preparation of BP's May 24 Communications
                with Congress........................................................................................20

        2.      The United States Is Not Entitled to All Documents Merely
                "Related to" Preparation of BP's June 25 Communications with
                Congress.................................................................................................22

        3.      The United States Is Not Entitled to All Documents Merely
                "Related to" Preparation of BP's May 19, 2010 Email to Admiral
                Landry and Its Attachments. ...............................................................23

III.    BP Will Cooperatively Provide Logs and Documents for *In Camera*
        Review. ............................................................................................................24

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguinaga v. John Morrell & Co.*,
 112 F.R.D. 671 (D. Kan. 1986) ............................................... 16

*Armoyan v. Armoyan*,
 64 So. 3d 198 (Fla. Ct. App. 2011) ......................................... 16

*Duplan Corp. v. Deering Milliken, Inc.*,
 540 F.2d 1215 (4th Cir. 1976) ................................................. 16

*First Union Nat. Bank v. Turney*,
 824 So. 2d 172 (Fla. Ct. App. 2001) ....................................... 16

*Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*,
 2004 WL 3661433 (E.D. Va. Mar. 31, 2004) ........................ 16

*Haines v. Liggett Group Inc.*,
 975 F.2d 81 (3d Cir. 1992) ...................................................... 15

*In re BankAmerica Corp. Sec. Litig.*,
 270 F.3d 639 (8th Cir. 2001) ................................................... 14

*In re Burlington Northern, Inc.*,
 822 F.2d 518 (5th Cir. 1987) ................................................... 13

*In re GMC Corp.*,
 153 F.3d 714 (8th Cir. 1998) ................................................... 15

*In re Grand Jury Investigation*,
 231 F. App'x 692 (9th Cir. 2007) ............................................ 14

*In re Grand Jury Proceedings in Matter of Fine*,
 641 F.2d 199 (5th Cir. Unit A 1981) ................................ 11, 12

*In re Grand Jury Subpoena*,
 419 F.3d 329 (5th Cir. 2005) .............................. 6, 9, 10, 12, 13, 14, 18

*In re Int'l Sys. & Controls Corp. Sec. Litig.*,
 693 F.2d 1235 (5th Cir. 1982) ................................................. 13

*In re M&L Bus. Mach. Co. v. Bank of Boulder*,
 167 B.R. 937 (D. Colo. 1994) ................................................. 16

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ........................ 18

*In re Murphy*,
   560 F.2d 326 (8th Cir. 1977) ................................................................................ 14

*In re Napster Inc. Copyright Litig.*,
   479 F.3d 1078 (2007) ......................................................................................... 15

*In re Richard Roe, Inc.*,
   68 F.3d 38 (2d Cir. 1995) ................................................................................... 14

*In re Sealed Case*,
   107 F.3d 46 (D.C. Cir. 1997) ............................................................................. 12

*Laser Indus., Ltd. v. Reliance Techs., Inc.*,
   167 F.R.D. 417 (N.D. Cal. 1996) ...................................................................... 16

*LRC Electronics, Inc. v. John Mezzalingua Associates, Inc.*,
   974 F. Supp. 171 (N.D.N.Y. 1997) ................................................................... 24

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2007) ........................................................................................... 15

*Prudential Ins. Co. of Am. v. Massaro*,
   2000 WL 1176541 (D.N.J. Aug. 11, 2000) ....................................................... 16

*RCA Corp. v. Data General Corp.*,
   No. 84–270, 1986 WL 15684 (D. Del. Oct. 27, 1986) ....................................... 18

*Sigma-Tau Industrie Farmaceutiche Riunite, S.p.A. v. Lonza, Ltd.*,
   48 F. Supp. 2d 16 (D.D.C. 1999) ...................................................................... 16

*Swidler & Berlin*,
   524 U.S. 399 (1998) ........................................................................................... 12

*Tindall v. H&S Homes, LLC*,
   757 F. Supp. 2d 1339 (M.D. Ga. 2011) ............................................................ 16

*Turner v. Pleasant*,
   No. 10-1823, 2012 WL 3270373 (E.D. La. Aug. 10, 2012) ............................... 14

*United States v. Bauer*,
   132 F.3d 504 (9th Cir. 1997) ............................................................................. 10

*United States v. Dyer*,
   722 F.2d 174 (5th Cir. 1983) ................................................................. 11, 15, 18

*United States v. Stewart*,
   No. 03 CR. 717, 2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003) ...................... 10

*United States v. White*,
   887 F.2d 267 (D.C. Cir. 1989) ........................................................................... 15

*United States v. Zolin,*
   491 U.S. 554 (1989) ................................................................................. 10

*Upjohn Co. v. United States,*
   449 U.S. 383 (1981) ................................................................................. 12

**Other Authorities**

1 Corporate Counsel Guidelines § 1:26 (2012) ................................................. 15

# INTRODUCTION

In a criminal plea recently submitted to, and accepted by, the Honorable Sarah S. Vance of this District, BP Exploration & Production Inc. ("BP") accepted responsibility for its role in the tragic loss of life that resulted from the *Deepwater Horizon* explosion. BP accepted responsibility for its role in the environmental damage from the resulting oil spill. And BP accepted responsibility for certain May 2010 misstatements made to Congress concerning the rate of flow of oil into the Gulf of Mexico. Specifically, and most important for present purposes, BP pleaded guilty to obstruction of Congress in relation to a letter to Congressman Markey, sent May 24, 2010, that contained communications by "BP, through a former vice president," Mr. David Rainey. (Ex. 1.) Although not charged with the conduct, BP also admitted that the same former vice president inserted a misstatement into a separate letter to Congress, dated June 25, 2010.

In light of its guilty plea, BP will be forthcoming and aid the Court and parties in evaluating the United States' recent motion. Shortly after this filing, BP will submit (under seal) three privilege logs listing documents related to the May 24 and June 25, 2010 letters to Congressman Markey, as well as a preceding May 19, 2010 communication to Admiral Landry that formed an attachment to the May 24 letter. These documents were located through a reasonable, good-faith review of documents previously withheld as privileged as will be further described in BP's upcoming privilege log submission.

For the Court's convenience, all documents appearing on these new logs will be categorized into one of the following five mutually exclusive categories:

- Category A: Documents in which Mr. Rainey is an active participant and that relate to the matters in BP's guilty plea allocution.

- Category B: Documents in which Mr. Rainey is a passive recipient of a communication (either as a recipient or as someone on the "cc" line).

- Category C: Documents in which Mr. Rainey is an active participant in the communication but that do not relate to the matters in BP's guilty plea allocution.

- Category D: Documents in which Mr. Rainey is not part of the communication but where the participants refer to or recount a prior interaction with Mr. Rainey.

- Category E: Documents that relate to a communication as to which BP allocuted but that post-date the communication and/or that concern an aspect of the communication that was not the subject of BP's guilty plea allocution.

BP hereby officially continues to assert privilege over all five categories of documents that will appear on these logs. Nonetheless, without waiver of BP's position that such documents are privileged, BP understands that it may be debatable how to apply the crime-fraud exception to certain of these documents following BP's guilty plea and factual allocution. BP therefore would fully understand, and has prepared itself promptly to implement, a court order requiring the production of documents listed under Category A on these three privilege logs. In fact, had the United States been willing to pursue good faith meet-and-confer discussions regarding this motion, BP expects that agreement may well have been reached as to the status of substantial numbers of these documents.

As an *in camera* review of documents would reveal, however, the United States' request for documents beyond those falling into Category A on BP's new privilege logs exceeds what is justified under the legal standards for the crime-fraud exception and extends into matters far outside the scope of the factual allocution supporting BP's guilty plea. The production of such documents, were it pursued by the United States, would grant the United States unwarranted tactical advantages from BP's acceptance of responsibility. Indeed, as the new privilege logs will demonstrate, a great number of documents being sought by the United States do not even reflect communications involving Mr. Rainey—the former BP vice president who is the focus of

the obstruction of Congress count in BP's guilty plea and, therefore, of the United States' motion. As described below, documents not involving Mr. Rainey ought not be disclosed because they ought not be considered communications "in furtherance of" a crime or fraud.

Finally, and as also described below, the United States has not established a *prima facie* case for any privileged communications that do not relate to the May 24 and June 25 letters to Congressman Markey, or the May 19 note—either by BP's guilty plea, its allocution, or otherwise. Hence, those documents too are not properly subject to disclosure.

## BACKGROUND

Following the tragic April 20, 2010 explosion on the *Deepwater Horizon*, BP engaged in extensive efforts to stop and contain the flow of oil from the reservoir, as well as efforts to calculate the rate at which oil was flowing into the Gulf. In May and June 2010 alone—while the oil was still flowing and while BP's energies were principally focused elsewhere—BP received multiple requests for information and testimony from Congress. Some of those came from Congressman Edward Markey, then a chairman of a subcommittee of the Committee on Energy and Commerce. Most relevant here, and among BP's many communications with Congress during this period, are the following:

- On May 4, 2010, David Rainey attended an off-the-record, non-public congressional briefing on behalf of BP.

- On May 19, 2010, unrelated to any congressional request, BP provided Admiral Landry and Admiral Allen of the Unified Command with a note that David Rainey had prepared regarding certain flow rate information.

- On May 24, 2010, BP submitted a letter to Congressman Markey in response to his May 14, 2010 letter requesting additional information regarding flow rate. This letter included the May 19 note as an attachment.

- On June 25, 2010, BP submitted another letter to Congressman Markey in response to his June 20, 2010 press release, which also released certain pages from the May 24 submission.

Separately, on April 29, BP filed a Form 6-K with the SEC providing certain financial information related to the end of the first financial quarter.  (Ex. 2.)  Also, on April 30 and May 4, 2010 BP filed as Forms 6-K two press releases issued in the United States, one entitled "BP Steps Up Shoreline Protection Plans on US Gulf Coast" and another entitled, "Work Begins to Drill Relief Well To Stop Oil Spill."  (Exs. 3, 4.)  These three SEC submissions, together with the congressional communications listed above, form the basis of the United States' motion.

### A.     BP's Guilty Plea and Allocution

On November 15, 2012, BP pleaded guilty to certain post-spill conduct related to the specific May 24 letter to Congressman Markey.  BP's allocution, which was attached to the Plea Agreement as Exhibit A, sets forth the factual basis for BP's guilty plea and also admits BP's former vice president (namely, Mr. Rainey) inserted a misstatement in a June 25 letter to Congressman Markey.  *See United States v. BP Exploration and Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La.), Rec. Docs. 1, 2, 65.  This allocution is separate and distinct from the United States' assertions in the charging document (which BP has not adopted).  (*Compare* Ex. 1 *with* Ex. 5.)  BP admitted no more and no less than the specific conduct described in BP's allocution.

As relevant here, the obstruction-related charges and BP's allocution both center on conduct by Mr. Rainey—who separately has been charged by the United States; has pleaded not guilty; and is awaiting trial.  The allocution states as follows:

1. BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

2. BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology. At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD. At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5. BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results." In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

Similarly, as to the June 25 communication, the allocution states that: "On or about June 25, 2010" the same former vice president "inserted language [in a letter to Congressman Markey] that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.'" *Id.* ¶ 6. The allocution further states as regards the June 25 letter, "[a]t the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010." *Id.*

5

While BP's allocution admits Mr. Rainey acted with criminal intent with respect to specific statements described therein, it makes no similar admissions as to any other individuals.

### B. BP's Stipulated Consent with the SEC

Separately, on November 15, 2012, BP and the Securities and Exchange Commission stipulated to a Consent Decree. (Ex. 6.) Just like BP's guilty plea allocution and the United States charging documents are separate and distinct, so too the stipulated SEC Consent Decree is separate and distinct from the allegations contained in the SEC's Complaint. (*Compare* Ex. 6 *with* Ex. 7.) This is important because the United States' motion quotes both the SEC Consent Decree and the associated SEC Complaint at length. The passages of the Consent Decree quoted by the United States, however, do not include a sentence that expressly reserves BP's "right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party." *SEC v. BP p.l.c.*, No. 2:12-cv-02774 (E.D. La.), Rec. Doc. 2-1 at ¶ 13.

### <u>SUMMARY OF ARGUMENT</u>

The United States' motion is overbroad and fails for multiple reasons.

*First*, the United States improperly seeks to pierce BP's privilege based on conduct other than what is fairly encompassed by BP's guilty plea allocution. As explained below, the United States nowhere satisfies its burden of establishing a *prima facie* case that such conduct involves a crime or fraud. (**Part I.A**, *infra*.)

*Second*, contrary to the United States' assertions, a communication may be considered within the scope of the crime-fraud exception only if it is "reasonably relat[ed] to the *furtherance* of" a crime or fraud. *In re Grand Jury Subpoena*, 419 F.3d 329, 347 (5th Cir. 2005) (emphasis added). The United States is thus mistaken in seeking disclosure of documents merely because they "relate to" an actual or alleged crime or fraud. *See, e.g.*, U.S. Memo. at 1, 2, 4, 7-8, 12, 14,

17, 20-24.  Under applicable law, the United States must show that BP consciously conferred with counsel in order to further a specific crime or fraud encompassed within BP's guilty plea allocution.  (**Part I.B**, *infra*.)

*Third*, even if the United States had satisfied its burden of establishing a *prima facie* case, due process and fundamental fairness would still require that BP be allowed to request the opportunity for presentation of evidence and argument before the Court compels production of otherwise privileged communications.  (**Part I.C**, *infra*.)

*Finally*, in light of the above legal standards, the United States' attempt to gain broad discovery into BP's privileged communications must be rejected.

For one thing, BP ought not be required to produce documents unrelated to the specific wrongful acts acknowledged in its plea.  Specifically, BP's guilty plea allocution does not acknowledge wrongdoing with regard to the document sets the United States seeks relating to BP's April 29, April 30, and May 4, 2010 SEC submissions, or the May 4 congressional briefing session.  The United States appears to recognize this problem—and to seek to handle it by putting aside BP's guilty plea allocution and focusing instead on the allegations found in the United States' own charging papers and the SEC Complaint.  But BP did not acknowledge everything the United States charged or the SEC alleged, and the United States' and the SEC's own allegations, without more, do not constitute a *prima facie* showing that the crime-fraud exception applies.  (**Part II.A**, *infra*.)

Moreover, even as to the three communications arguably implicated by BP's allocution— the May 24 letter, June 25 letter, and May 19 note—the United States cannot carry its burden. Specifically, the United States cannot establish that the communications it now seeks were made "in furtherance of" of a crime or fraud.  (**Part II.B**, *infra*.)

Notwithstanding all the above, BP wishes to bring the United States' motion to resolution. BP will therefore soon submit privilege logs under seal, together with a submission, made for purposes of *in camera* review, of all documents appearing on the logs relating to May 24 and June 25 letters and May 19 note, respectively. BP respectfully requests that the Court confirm, upon *in camera* review, that documents in these sets do not satisfy the applicable legal tests. (**Part III**, *infra*.)

## ARGUMENT

The United States submitted this motion to compel after the close of the Phase 1 and Phase 2 written discovery and well beyond the deadline for asserting Phase 2 privilege challenges. While BP is prepared to accept that BP's January 2013 guilty plea may justify this one-time, far-out-of-time, set of challenges, it bears emphasizing this acceptance is without prejudice to BP's rights to assert the tardiness of possible future motions presenting similarly timed requests for discovery or privilege reexaminations.

**I.      Under Applicable Legal Standards, the United States Must Demonstrate a *Prima Facie* Case of Crime or Fraud.**

It is the United States' burden to establish a *prima facie* case that a crime or fraud has occurred for each set of documents it seeks. For each crime or fraud, the United States must also establish that specific privilege communications were made "in furtherance of" such a crime or fraud. As an *in camera* review would reveal, the United States' motion falls short in both respects.

**A.      The United States Has the Burden of Demonstrating a *Prima Facie* Case of Crime or Fraud.**

"In order to invoke the crime-fraud exception, the party seeking to breach the walls of privilege must make out a *prima facie* case" involving "evidence 'such as will suffice until

contradicted and overcome by other evidence.'" *In re Grand Jury Subpoena*, 419 F.3d at 336. It is the government, not the holder of the privilege, that "bears 'the burden of establishing a *prima facie* case that the attorney-client relationship was intended to further criminal or fraudulent activity.'" *Id.* at 335. "Allegations in pleadings," moreover, "are not evidence and are not sufficient to make a *prima facie* [case] showing that the crime-fraud exception applies." *Id.* at 336. Here, the United States' motion does not itself present evidence of a crime or fraud; it instead relies on BP's recent guilty plea and the mere allegations mentioned above. As demonstrated below, however, BP's guilty plea does not even arguably establish a *prima facie* case of crime or fraud with respect to communications related to BP's SEC submissions and communications related to the May 4 non-public congressional briefing—neither of which are encompassed by BP's guilty plea allocution. (*See* **Part II.A**, *infra*.)

> **B.    The United States Misstates the Standard for Applying the Crime-Fraud Exception.**

In addition to seeking sets of documents not implicated at all by BP's guilty plea allocution, the United States also puts forth an incorrect standard for testing whether individual documents within those document sets fall within a privilege exception.

> **1.    The United States' "Reasonably Related to" Standard Misstates the Law.**

The United States asserts that it is a "bedrock principle of privilege law" that "BP's use of attorneys to aid in its wrongdoing destroys any privilege for communications *related to* the criminal or fraudulent activity." U.S. Memo. at 1 (emphasis added); *see also id.* at 2, 4, 17. But in fact it is *not* sufficient that an attorney-client communication merely "relates to" the communications to Congress, Admiral Landry, or the SEC filings that the United States would deem fraudulent. Instead, the privilege gives way only "for communications in *furtherance* of

future illegal conduct." *United States v. Zolin*, 491 U.S. 554, 556 (1989) (emphasis added); *In re Grand Jury Subpoena*, 419 F.3d at 347 ("'[T]he crime-fraud exception must necessarily be limited to those attorney-client communications and work products *reasonably related to the furtherance of the ongoing or future crime or fraud* at issue.'") (emphasis added).  Contrary to the United States' contentions, the exception to the privilege does not automatically apply every time a lawyer is involved in a process of providing information to the government that might later turn out to be false in some respect.

In *United States v. Bauer*, 132 F.3d 504 (9th Cir. 1997), for example, an attorney represented a client named Bauer in preparing a bankruptcy petition.  The government indicted Mr. Bauer for filing a false petition and then, pointing to the participation of lawyers in the filing, argued that the crime-fraud exception applied, even though Mr. Bauer's attorney had advised him to be truthful on his petition.  The Ninth Circuit rejected the argument, reasoning, "[T]here is no reasonable basis for concluding that [the lawyer's] legal advice to Bauer was used by Bauer 'in furtherance of' his fraudulent scheme to falsify his bankruptcy petition." *Id.* at 509-10.  Just because a lawyer is part of the process of preparing a report that includes false or fraudulent statements does not mean the attorney's professional services were rendered in furtherance of fraudulent purposes.

Similarly, in *United States v. Stewart*, No. 03 CR. 717, 2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003), a criminal defendant who was represented by counsel allegedly lied to government investigators.  As in *Bauer*, so too in *Stewart* the Government sought to invoke the crime-fraud exception.  But, as in *Bauer*, the *Stewart* court rejected the Government's motion, because the Government had not proved that the communications at issue were "in furtherance of the criminal or fraudulent conduct." *Id.* at *2.

Nor does the crime-fraud exception apply every time a misstatement is made by a client soon after an attorney-client privileged communication occurs.  Under settled Fifth Circuit law a mere proximity in time between a privileged communication and an alleged or actually fraudulent communication is insufficient to pierce the attorney-client privilege.  In *United States v. Dyer*, 722 F.2d 174 (5th Cir. 1983), for example, the Fifth Circuit confronted a situation where the government had made a sufficient *prima facie* showing that a zoning commissioner had sought counsel from two lawyers as part of the Commissioner's effort to obstruct justice.  The Government further established that the Commissioner had met one of the lawyers the day before committing the act that allegedly constituted obstruction.  The Fifth Circuit nonetheless held that this proximity in time—close as it was—was insufficient as a matter of law to form a basis for piercing the privilege: "There is no evidence … that the consultation with [the attorney] on the preceding day was with" the *purpose* of obstructing justice.  *Id.* at 177.

The Fifth Circuit also held mere closeness in time insufficient to establish an exception to the privilege in *In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d 199 (5th Cir. Unit A 1981).  There, the government sought to pierce the attorney-client privilege in order to compel a lawyer to reveal his client's identity.  The government argued that the privilege should be abrogated because the lawyer formed a corporation for the client, and six months later the corporation purchased a yacht used to smuggle drugs.  *Id.* at 203-04.  Among other things, the government contended that this suggestive timing was sufficient to establish a *prima facie* showing of intent to further a crime or fraud.  The Fifth Circuit found, however, that this temporal proximity was insufficient to establish such a *prima facie* showing.  It reasoned that, although such "facts may support a strong suspicion," as a matter of law, they "are inadequate to serve as the basis of a *prima facie* showing that [the corporation] was initially formed to further a

11

criminal enterprise." *Id.* at 204; *see also In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) ("Showing temporal proximity between the communication and a crime is not enough.").

In sum, the United States' "related to" standard threatens to convert the "narrow" crime-fraud doctrine into an exception that swallows a goodly part of the attorney-client-privilege rule each and every time a crime or fraud has been pleaded to or proven. Given that the attorney-client privilege "is one of the oldest recognized privileges for confidential communications," *Swidler & Berlin*, 524 U.S. 399, 403 (1998), and that it "promote[s] broader public interests in the observance of law and administration of justice," *id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)), such a reading is insupportable. If a client's legal privileges were pierced for all documents that merely "related to" a crime or fraud, the privilege would be routinely and ruinously discarded in practically every criminal case successfully pursued by the United States.

## 2. A Party Seeking to Invoke the Crime-Fraud Exception Must Show that the Privileged Communications It Challenges Are in "Furtherance of" a Crime or Fraud.

The correct, black-letter law standard requires that, in order to invoke the crime-fraud exception, a party must show both (1) "that the client intended to further an ongoing or future crime or fraud during the attorney-client relationship" and (2) that the specific "communications … [are] reasonably related to the *furtherance* of the ongoing or future crime or fraud at issue." *In re Grand Jury Subpoena*, 419 F.3d at 346-47 (emphasis added).

The second part of the test—that the communications must be made in "furtherance" of crime or fraud—is of critical importance. The crime-fraud exception applies only to the *specific* communications that would further the crime: "[T]he reach of the crime-fraud exception does not extend to all communications made in the course of the attorney-client relationship, but rather

12

must be limited to those communications made and documents produced in furtherance of the ongoing or future crime or fraud." *Id.* at 344-45. The party invoking the crime-fraud exception therefore must show that each specific communication was actually used to facilitate unlawful conduct. *See, e.g.*, *In re Burlington Northern, Inc.*, 822 F.2d 518, 525 (5th Cir. 1987) ("The focus must be narrowed to the specific purpose of the particular communication or document."). Because the communication itself must be in "furtherance" of a crime, the mere fact that a communication may be "related to" a crime is not enough. *See, e.g.*, *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1243 (5th Cir. 1982) (rejecting the claim that although attorney work product may "clearly have a reasonable relation to [ ] ongoing fraud," it follows that the materials were prepared with a "specific intent" to facilitate that fraud). Although the intent of the attorney may not be a relevant factor in applying the crime-fraud test, whether the document was intended to be "in furtherance" of criminal or fraudulent activity certainly is. Only documents that are "in furtherance of" an alleged crime or fraud are subject to the crime-fraud exception to privilege.

The Fifth Circuit's decision in *In re Grand Jury Subpoena* is instructive. There, the Fifth Circuit vacated as "overly broad" a trial court's crime-fraud order that had required the production of "all" privileged documents while not "in any way" limiting those required disclosures. 419 F.3d at 332-33, 344. As the Fifth Circuit explained, "the proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship," because even where a *prima facie* showing is made, "*no case stands for the proposition* that[] when … a client has consulted with his attorney for the purpose of furthering a crime or fraud, the privilege entirely disappears, subjecting everything in connection with that client's representation with that attorney to disclosure." *Id.* at 343-44

13

(emphasis added). If that were so, the Fifth Circuit explained, the attorney-client privilege would all but cease to exist: "[T]o put it simply, the crime-fraud exception swallows the privilege rule." *Id.* at 347.

The "in furtherance" standard also has been recognized by other federal courts of appeals. For example, the Second Circuit addressed it at length in *In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995), reasoning as follows:

> The "relevant evidence" test departs from the correct "in furtherance" test in two respects. First, the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. If it did, the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of culpability. Instead, the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud. Second, the crime-fraud exception applies only where there is probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity. Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception.

*Id.* at 40-41 (citations omitted); *see also In re Grand Jury Investigation*, 231 F. App'x 692, 695 (9th Cir. 2007) ("[T]he crime-fraud exception applies only to documents and communications that were themselves in furtherance of illegal or fraudulent conduct."); *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001) ("There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud."); *In re Murphy*, 560 F.2d 326, 338 (8th Cir. 1977) (rejecting application of the crime-fraud exception because there must be a "close relationship" between the attorney materials sought and the criminal activity); *see also Turner v. Pleasant*, No. 10-1823, 2012 WL 3270373, at *2 (E.D. La. Aug. 10, 2012) (magistrate opinion) (following *in camera* review, rejecting application of crime-fraud exception where the "litigation files" did not reveal "the purpose or intent" of furthering a crime or fraud); 1 CORPORATE COUNSEL GUIDELINES § 1:26 (2012) ("Not

14

all communications to an attorney that would be relevant to establishing a crime or fraud lose

their privilege; the exception applies only when the court determines that the communication in

question was itself in furtherance of the crime or fraud.").  Finally, and along similar lines, an

opinion for the D.C. Circuit by then-Judge Ruth Bader Ginsburg explains: "It does not suffice

that the communications may be related to a crime.  To subject the attorney-client

communications to disclosure, they must actually have been made *with an intent to further an*

*unlawful act*."  *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (emphasis added).

In sum, not only must the government make a *prima facie* showing that BP acted

illegally, it must separately show that BP conferred with counsel with the intent and that each

communication was "in furtherance" of a continuing or future crime or fraud.  The crime-fraud

exception applies only "[w]here a client *seeks to use an attorney to further* a continuing or future

crime or fraud."  *Dyer*, 722 F.2d at 177 (emphasis added).

### C.  BP Would Be Entitled to Further Process, Including Potentially A Full Evidentiary Hearing Before Disclosures Are Ordered Based on Conduct Beyond the Scope of BP's Guilty Plea Allocution.

It practically goes without saying that due process and fundamental fairness demand that

a "district court may not ... compel production [under the crime-fraud exception] without

permitting the party asserting the privilege, to present evidence and argument."  *In re GMC*

*Corp.*, 153 F.3d 714, 716 (8th Cir. 1998); *In re Napster Inc. Copyright Litig.*, 479 F.3d 1078,

1093 (2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100

(2007); *Haines v. Liggett Group Inc.*, 975 F.2d 81, 97 (3d Cir. 1992) (granting mandamus

because "due process require that the party defending the privilege be given the opportunity to be

15

heard, by evidence and argument, at the hearing seeking an exception to the privilege").[1]

Accordingly, BP must be given the opportunity, should it so choose, to request additional

procedures in advance of any disclosures—including potentially a full hearing with live

testimony.  This is true even and indeed especially as regards privileged BP communications the

United States now pursues based on alleged misconduct BP has not admitted—such as

communications related to BP SEC filings and the May 4 congressional briefing.  (Such a

hearing should not be necessary, however, because as discussed below the United States has not

even attempted to make a *prima facie* showing as to those communications.)

## II.     Under the Proper Standards, the United States Is Not Entitled to Pierce BP's Privilege with Respect to Particular Contested Documents.

BP's guilty plea allocution admits that its former vice president acted with criminal

intent, but it does not contain similar admissions as to the conduct of any other BP personnel.

---

[1]     *See Tindall v. H&S Homes, LLC*, 757 F. Supp. 2d 1339, 1359 (M.D. Ga. 2011) (holding that when the court is considering whether the crime-fraud exception applies, "the party invoking the privilege has the absolute right to be heard by testimony and argument"); *Prudential Ins. Co. of Am. v. Massaro*, 2000 WL 1176541, at *11 (D.N.J. Aug. 11, 2000) (holding that in the crime-fraud context "the party invoking the privilege has the *absolute right* to be heard by testimony and argument." (internal quotation marks omitted); *In re M&L Bus. Mach. Co. v. Bank of Boulder,* 167 B.R. 937, 942 (D. Colo. 1994) (holding that in the context of the crime-fraud exception "the party invoking the privilege has the absolute right to be heard by testimony and argument"); *Armoyan v. Armoyan*, 64 So. 3d 198, 199 (Fla. Ct. App. 2011) ("The trial court departed from the essential requirements of law when it ruled that the crime-fraud exception applied to husband's claim of privilege without holding an evidentiary hearing at which husband was permitted to testify."); *First Union Nat. Bank v. Turney*, 824 So. 2d 172, 183 (Fla. Ct. App. 2001) ("Even if *in camera* inspection makes it appear that the crime[-]fraud exception applies, a full evidentiary hearing is necessary ..., before confidential communications between attorney and client can be disclosed to another party."); *see also Sigma-Tau Industrie Farmaceutiche Riunite, S.p.A. v. Lonza, Ltd.*, 48 F. Supp. 2d 16, 19 (D.D.C. 1999) (denying a motion to compel under the crime-fraud exception after holding a five-day evidentiary hearing that involved "testimony from six witnesses ... [and] 84 exhibits, 58 of which were received into evidence"); *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1222 (4th Cir. 1976) (holding that before ordering the production of privileged documents under the crime-fraud exception the trial court should "see[] the witnesses and hear[] them testify"); *Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*, 2004 WL 3661433, at *1 (E.D. Va. Mar. 31, 2004) (ruling on crime-fraud exception "[a]fter hearing argument and testimony, reviewing deposition testimony, and conducting an *in camera* review"); *Laser Indus., Ltd. v. Reliance Techs., Inc.*, 167 F.R.D. 417, 429-30 (N.D. Cal. 1996) (allowing the "holder of the privilege to submit evidence and argument that tends to rebut an inference of any of the necessary elements of the crime/fraud exception"); *Aguinaga v. John Morrell & Co.*, 112 F.R.D. 671, 682-83 (D. Kan. 1986) (holding that magistrate's application of crime-fraud exception was "clearly erroneous" where the "Magistrate held no evidentiary hearings concerning the crime or fraud exception").

Consequently, absent an affirmative showing to the contrary (which the United States fails to provide), there is no basis for concluding that communications initiated by anyone other than this one particular person were intended to further a crime or fraud. Nor is there a basis for even arguably concluding a crime or fraud was committed, except with regard to the May 24 and June 25 letters, and May 19 note.

### A. The United States' Motion to Compel Does Not Establish a *Prima Facie* Case for BP's SEC Submissions and the May 4 Briefing.

The United States brings its motion based on BP's plea of guilty—and, more specifically, on the allocution accompanying BP's plea. Rather than cite, quote, and limit the present motion to BP conduct encompassed within the allocution, however, the United States attempts to leverage BP's recent guilty plea into a broad disclosure of documents unrelated to the guilty plea allocution and for which the United States has provided no additional evidence of a crime or fraud. As noted above, however, it is the United States' burden to establish a *prima facie* case as to all of the documents it seeks. Accordingly, the United States' motion fails to carry its burden as regards communications related to the three SEC filings at issue and as regards communications related to the non-public May 4 congressional briefing—neither of which are the subject of admissions of criminal behavior by BP.

### 1. The United States Is Not Entitled to Documents Related to Preparation of BP's Forms 6-K Filed with the SEC.

The United States' motion is fatally flawed with regard to all documents requested in connection with BP's April 29, April 30, and May 4 SEC filings. Nothing in BP's guilty plea allocution relates to these submissions. Moreover, these SEC filings largely echo flow rate figures that the United States government itself had publically announced. (*See* Exs. 2-4.) And the United States has failed to establish, at any time, a *prima facie* case that the individuals who

drafted, reviewed, and submitted those forms acted with intent to further a crime or fraud. Because "an erroneous judgment made in good faith does not suffice to establish fraudulent intent," *RCA Corp. v. Data General Corp.*, No. 84–270, 1986 WL 15684, at *2 (D. Del. Oct. 27, 1986), and because the crime-fraud exception applies only "[w]here a client *seeks to use an attorney to further* a continuing or future crime or fraud," *Dyer*, 722 F.2d at 177 (emphasis added), the United States has failed to satisfy its burden as to these SEC filings.

Against this backdrop, the United States grounds its bid to pierce BP's privileges on allegations made in the SEC's Complaint. According to the United States these allegations now preclude BP from contesting the United States' claims of fraud. But the SEC Complaint is an SEC pleading, not a BP admission. Indeed, "[a]llegations in pleadings are not evidence and are *not sufficient* to make a *prima facie* showing that the crime-fraud exception applies." *In re Grand Jury Subpoena*, 419 F.3d at 336 (emphasis added); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *4-5 (S.D.N.Y. Apr. 18, 2006) ("[S]tatements made by the SEC and NASD in the settlement documents are not law; they are rather untested assertions made by litigants."). Significantly, no statement regarding the SEC forms at issue in this motion is contained in BP's separate guilty plea allocution.

In an effort to get around the black-letter rule that statements in an SEC Complaint are mere "untested assertions made by litigant," the United States selectively quotes the SEC Consent itself as saying that BP "'*agrees ... not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint* or creating the impression that the complaint is without factual basis ....'" U.S. Memo. at 11 (quoting *SEC v. BP p.l.c.*, No. 2:12-cv-02774 (E.D. La.), Dkt. No. 2-1 at ¶ 13) (emphasis added by United States). But the United States omits other crucial language appearing in the remainder

18

of this same paragraph, which states: "Nothing in this paragraph affects Defendant's … right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party." SEC Consent at ¶ 13, Ex. 6. Suffice it to say, the SEC is not a party to this multidistrict litigation. Hence, by its plain terms, the SEC Consent does not bar BP from raising all of its factual defenses in this MDL litigation, and the SEC Consent certainly does not transmute mere allegations into evidence of a *prima facie* case.

In sum, the United States has not established a *prima facie* case that, with respect to the three SEC submissions at issue, the BP employees involved sought the advice of counsel for the purpose of committing a crime or fraud. In the absence of such an affirmative showing of a crime or fraud, which the United States fails to make, the crime-fraud exception does not apply.

> ### 2. The United States Is Not Entitled to Documents Related to the May 4 Congressional Briefing Session.

BP's allocution likewise makes no criminal admission regarding statements to Congress on May 4, 2010, and the United States has not otherwise proffered support for its contention that the May 4 briefing involved a crime or fraud. Any motion brought now based on statements made during the May 4, 2010, non-public briefing thus seeks to establish a new crime or fraud via a motion to compel.

To be clear, the United States' brief addresses two statements allegedly made at this off-the-record briefing. *First*, the United States contends, in effect, that statements made about a 5,000 bpd flow rate were knowingly false on May 4—less than a week after the United States publicly announced this very same flow rate on April 28, 2010. But BP's guilty plea allocution contains no statements about providing this official 5,000 bpd flow rate number during the May 4, 2010 non-public briefing, and the United States offers no evidence that this May 4 statement was a crime or fraud.

*Second*, the United States' briefing also claims that providing a 60,000 worst case discharge number on May 4 constitutes a knowingly false statement. But as the United States knows, many Worst Case Discharge numbers were under discussion in the relevant time frame —both within the United States Government and BP. And as the United States also knows, BP's guilty plea allocution does not support the United States' claim that providing the 60,000 worst case discharge number during a non-public hearing that occurred on May 4 constitutes a knowing falsehood. In view of the above, this Court should not allow itself to be diverted into adjudicating questions about the truth or falsity of statements made either in the May 4 briefing or in BP's SEC filings. To the extent the Court were to entertain the United States' new allegations of misconduct, whether rooted in BP's SEC filings or the congressional briefing, BP would have the right to request additional procedures, up to and including an evidentiary hearing.

**B.** **The United States Is Entitled Only to Documents that Meet the "In Furtherance" Legal Test.**

Even as regards to documents potentially implicated by statements in BP's plea allocution, the Court should decline to require any disclosures, unless the United States carries its burden of satisfying the "in furtherance of" test as to each specific document.

**1.** **The United States Is Not Entitled to All Documents that Are Merely "Related to" Preparation of BP's May 24 Communications with Congress.**

The only documents that relate to BP's May 24 letter that arguably fall within the crime-fraud exception are those reflecting communications in which Mr. Rainey was an active participant and which relate to the matters to which BP pleaded guilty. For the May 24, 2010 Markey Response, BP's upcoming submission will place documents fitting these two criteria into Category A. More specifically, documents will be placed into Category A if they

memorialize communications in which Mr. Rainey was an active participant *and* if they also relate to one or more of the following subjects:

- "[M]ultiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD." Exhibit A, ¶ 1.

- "[I]nternal flow-rate estimates prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD" (*id.* ¶ 2.);

- "[F]low-rate estimates included in the Response" and whether they "were the product of the generally-accepted ASTM methodology" (*id.* ¶ 3);

- "[F]low-rate estimates included in the Markey Response" and whether they "had played 'an important part' in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD" (*id.* ¶ 4);

- Whether "the Unified Command's flow rate estimate of 5,000 barrels of oil per day ('BOPD') was the 'most scientifically informed judgment' and that subsequent flow rate estimates had 'yielded consistent results'" (*id.* ¶ 5).

On the other hand, documents falling outside these descriptions (and thus outside Category A), while they may "relate to" the wrongdoing for which BP pleaded guilty, do not constitute communications "in furtherance" of a crime or fraud under applicable legal standards. Documents where Mr. Rainey is merely a passive recipient (or not a participant at all), rather than an active participant, cannot be in "furtherance" of the crime set forth in the plea allocution. (These documents will be placed into Categories B and D). Documents where Mr. Rainey participates, but not on a topic that relates to matters to which BP pleaded guilty, also cannot meet the crime-fraud standard. (These documents will be found in Category C). Documents that post-date the communication to which BP pleaded guilty or that concern an aspect of the communication that was not the subject of BP's guilty plea also cannot meet the crime-fraud standard (Category E).

Accordingly, BP's upcoming submission will provide for purposes of *in camera* review all previously withheld documents logged as relating to the May 24 Markey response and will place each of those documents into one of the five categories (A through E). BP respectfully requests that, before reaching a decision that the crime-fraud exception applies to a particular document, the Court conduct an individualized *in camera* review of the document. BP is especially confident that documents falling within Categories B through E will not be deemed "in furtherance" of any crime or fraud to which BP has pleaded guilty.

> **2.     The United States Is Not Entitled to All Documents Merely "Related to" Preparation of BP's June 25 Communications with Congress.**

With respect to the June 25 letter at issue in BP's allocution, only communications in which Mr. Rainey was an active participant and that relate to matters to which BP allocuted respecting the June 25 letter arguably fall within the crime-fraud exception. As before, these documents will be placed into Category A.

Specifically, with respect to the June 25, 2010 letter, BP documents will be placed into Category A to the extent Mr. Rainey was an active participant in the communication and the document relates to whether "BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.'" *Id.* ¶ 6. On the other hand, documents falling outside this description (hence outside Category A) would not constitute communications "in furtherance" of a crime or fraud under applicable legal standards.

Accordingly, BP's upcoming submission will provide for purposes of review *in camera* all previously withheld documents logged as relating to the June 25, 2010, letter, placed into one of the five Categories A through E. BP respectfully requests that, before reaching a decision that a particular document falls within the crime-fraud exception, the Court conduct an individualized

*in camera* review of that document. Here, again, BP is especially confident that the documents falling within Categories B through E will not be deemed "in furtherance" of any crime or fraud to which BP has pleaded guilty (especially considering that no crime related to the June 25 letter was even charged, let alone formed part of BP's guilty plea).

> **3.** **The United States Is Not Entitled to All Documents Merely "Related to" Preparation of BP's May 19, 2010 Email to Admiral Landry and Its Attachments.**

BP did not plead guilty to any false statements made to Admiral Landry on May 19, 2010. Nonetheless, the email sent to Admiral Landry on May 19 was included as an attachment to the May 24 letter to Congressman Markey. In certain instances, the email might be construed to cover topics that were the subject of BP's guilty plea.

Against this backdrop, BP intends to log and categorize those documents that have a reasonable relation to the preparation of the email to Admiral Landry sent on May 19, 2010. To the extent particular documents in this group include specific statements that (i) formed a basis for BP's guilty plea allocution as regards the May 24, 2010 and June 25, 2010 letters, and (ii) appear in the May 19, 2010 communication to Admiral Landry, these documents will be placed into Category A. To the extent logged documents do not include statements satisfying both of these criteria, they will be placed into Categories B through E, as appropriate.

BP's upcoming submission will provide for purposes of *in camera* review all previously withheld documents logged as relating to the May 19 note, divided into Categories A through E. As before, BP requests *in camera* review before any determination is made that a particular document should be regarded as "in furtherance" of a crime or fraud. And once again, BP is especially confident that documents falling within Categories B through E will not be deemed "in furtherance" of any crime or fraud to which BP has pleaded guilty.

**III.    BP Will Cooperatively Provide Logs and Documents for *In Camera* Review.**

As noted, BP will soon provide the Court with privilege logs for each of the United States' requests for sets of documents.  Three of those logs—namely, the logs listing document sets related to the May 24 letter, June 25 letter, and May 19 note that arguably are implicated by BP's guilty plea allocution—will contain the A-through-E categorization scheme described above.  All documents on these three logs will be submitted for potential *in camera* review in the event that the Court should determine such review is appropriate.  Moreover, in addition to the sets for the May 24 and June 25 letters, and the May 19 note, BP is also in the process of logging communications related to the two sets sought by the United States that are not implicated by the guilty plea allocution; namely, the sets related to SEC filings and the May 4 congressional briefing session.  These two logs will be provided solely to the Court *in camera* as helpful background in view of the fact that the United States has entirely failed to establish a *prima facie* case as to any documents in these final two sets.  Accordingly, the logs relating to these document sets will not reflect the A-through-E categorization scheme, and no documents from these two sets will be submitted for review *in camera*.

BP would emphasize in closing that a careful, document-by-document, *in camera* review is essential before a determination can be made that the crime-fraud exception applies to any particular document.  *LRC Electronics, Inc. v. John Mezzalingua Associates, Inc.*, 974 F. Supp. 171, 180 (N.D.N.Y. 1997) (finding, after "carefully reviewing" documents *in camera* the documents did "not fall within the crime-fraud exception").  It would be remarkable—and noticeably out of step with this Court's patience and practices in similar circumstances—to pierce BP's privilege without first conducting a searching examination.

BP acknowledges that the Court might conclude that the crime-fraud exception applies to some or all documents in Category A. And, without waiving any of its privilege assertions, BP can say that—should the Court so conclude—it would expect not to assert its procedural right to submit further evidence or argument as regards to the privilege status of those particular documents. As for documents logged within Categories B through E, however, BP trusts the Court will conclude (as BP has) that the United States has not carried its burden, and these documents ought not be disclosed. Nevertheless, to the extent the Court were to question the privilege status of one or more documents in Categories B through E, BP would work with the Court to determine appropriate next steps and follow-on procedures, consistent with the due process principles set forth in **Part I.C**, *infra*.

## CONCLUSION

BP hopes its accommodative efforts, along lines similar to what BP had been planning to discuss in meet-and-confer discussions, will be acceptable to the United States and lay to rest the issues raised by the United States' motion. To the extent BP's offer does not resolve the issues presented by the motion, BP respectfully requests that the United States' Motion to Compel Production of Previously-Withheld Documents Pursuant to the Crime-Fraud Exception to the Attorney-Client Privilege be denied as explained herein.

Dated:      February 28, 2013               Respectfully submitted,

                                            /s/ Don K. Haycraft

Robert R. Gasaway                    Don K. Haycraft (Bar #14361)
Jeffrey Bossert Clark                 R. Keith Jarrett (Bar #16984)
Aditya Bamzai                         Liskow & Lewis
Kirkland & Ellis LLP                 701 Poydras Street, Suite 5000
655 Fifteenth Street, N.W.           New Orleans, LA 70139
Washington, D.C. 20005            Telephone:  504 -581-7979
Telephone:  202- 879-5000        Facsimile:  504 -556-4108
Facsimile:  202- 879-5200

Joel M. Gross                       Richard C. Godfrey, P.C.
Brian Israel                         J. Andrew Langan, P.C.
Allison Rumsey                   Kirkland & Ellis LLP
Arnold & Porter LLP                300 North LaSalle Street
555 Twelfth Street, NW            Chicago, IL 60654
Washington, D.C.  20004-1206     Telephone:  312- 862-2000
Telephone:  202- 942-5000        Facsimile:  312- 862-2200
Facsimile:  202- 942-5999

                                              Robert C. "Mike" Brock
                                            Covington & Burling LLP
                                            1201 Pennsylvania Avenue, NW
                                            Washington, D.C. 20004
                                            Telephone:  202-662-5985
                                            Facsimile:  202-662-6291

*Attorneys for BP Exploration & Production Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of February 2013.

/s/ Don K. Haycraft
Don K. Haycraft

# Attachment 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                      :

       v.                                         :        CRIMINAL NO.

BP EXPLORATION & PRODUCTION, INC.            :

### GUILTY PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in compliance with the holding of <u>Bryan v. United States</u>, 492 F.2d 775 (5th Cir. 1974), the Department, the defendant, and the defendant's counsel enter into the following guilty plea agreement.   Any reference to the Department in this agreement shall mean the United States Department of Justice, including, but not limited to, the *Deepwater Horizon* Task Force, the Criminal Division of the Department of Justice and all of the Criminal Division's sections, and all of the United States Attorney's Offices for each judicial district of the United States.

1.      The defendant agrees to waive prosecution by indictment and plead guilty to an information charging it with: eleven counts of violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), one count of a violation of 18 U.S.C. § 1505 (Obstruction of Congress), one misdemeanor count of a violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act), and one misdemeanor count of a violation of the 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), all arising from the defendant's conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and response.   The defendant agrees to the factual allocution contained in Exhibit A to this plea agreement.

1

2.      The defendant, BP plc and any other BP plc entity, including but not limited to any former, present or future parent, affiliate, division and subsidiary (collectively, "any other BP plc entity" or "the other BP plc entities"), and all predecessors, successors and assigns of any of the above, agree to cooperate fully and truthfully with the *Deepwater Horizon* Task Force in any criminal investigation related to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and response.   Cooperation shall include but not be limited to (a) promptly disclosing any and all related criminal or potentially criminal conduct of which the defendant, BP plc or any other BP plc entity are currently aware, (b) promptly producing documents to the *Deepwater Horizon* Task Force upon request, (c) promptly making employees and agents available to the *Deepwater Horizon* Task Force upon request for interview or for testimony in any proceeding, subject to those employees' and agents' own legal rights, and (d) making reasonable efforts to ensure its employees and agents provide full and truthful information; provided, however, that compliance with this paragraph shall not be construed as requiring or effecting a waiver of the attorney-client privilege or work product protections.

3.      The defendant understands, agrees, and has had explained to it by counsel that the Court may impose the following statutory maximum sentences:

(a)      Counts One through Eleven, 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), for each count:

(i)      A fine of $500,000 or twice the gross gain or loss, whichever is greater;

(ii)      Five years of probation; and

(iii)      A $400 special assessment;

2

      (b)      Count Twelve, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act):

            (i)     A fine of $200,000, or $25,000 per day of the violation, or twice the gross gain or loss, whichever is greater;

            (ii)    Five years of probation; and

            (iii)   A $125 special assessment;

      (c)      Count Thirteen, 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act):

            (i)     A fine of $15,000 or twice the gross gain or loss, whichever is greater;

            (ii)    Five years of probation; and

            (iii)   A $50 special assessment;

      (d)      Count Fourteen, 18 U.S.C. § 1505 (Obstruction of Congress):

            (i)     A $500,000 fine;

            (ii)    Five years of probation; and

            (iii)   A $400 special assessment;

4.     The parties agree that this plea agreement is made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and that the following specific sentence is the appropriate disposition of this case.   If the Court rejects this plea agreement, it is further agreed that the defendant may withdraw its plea.   If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Fed. R. Crim. P. 32(c), and to request that the

defendant be sentenced at the time the guilty plea is entered.   The agreed-upon sentence pursuant to Rule 11(c)(1)(C) is as follows:

    (a)    Payment of criminal recoveries totaling $4 billion ($4,000,000,000), as set forth below in paragraphs 4(b) and 4(c)(viii).

    (b)    Payment of criminal fines totaling $1.256 billion ($1,256,000,000), as follows:

        (i)    <u>Fine allocation</u>.   The fine payments shall be allocated as follows:

            (A)    As to Counts One through Eleven, the maximum statutory fine pursuant to 18 U.S.C. § 3571(c) of $500,000 per count shall be paid, totaling $5.5 million.

            (B)    As to Count Twelve, a total of $1.15 billion ($1,150,000,000) shall be paid to the Oil Spill Liability Trust Fund, pursuant to 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3), 18 U.S.C. § 3571(d) and 26 U.S.C. § 9509(b)(8).

            (C)    As to Count Thirteen, a total of $100 million ($100,000,000) shall be paid to the North American Wetlands Conservation Fund, pursuant to 16 U.S.C. §§ 703, 707 and 4406(b) and 18 U.S.C. § 3571(d), for

the purpose of wetlands restoration and conservation projects located in States bordering the Gulf of Mexico or otherwise designed to benefit migratory bird species and other wildlife and habitat affected by the Macondo oil spill.

(D)     As to Count Fourteen, the maximum statutory fine of $500,000, pursuant to 18 U.S.C. § 3571(c), shall be paid.

(ii)   <u>Schedule</u>.  The fines shall be paid according to the following schedule:

(A)     As to Counts One through Eleven and Fourteen, all fines shall be paid within 60 days of sentencing.

(B)     As to Counts Twelve and Thirteen, fines shall be paid on a pro rata basis as follows:   $250 million to be paid within 60 days of sentencing; an additional $250 million to be paid within one year of sentencing; an additional $250 million to be paid within two years of sentencing; an additional $150 million to be paid within three years of sentencing; an additional $150 million to be paid within four years of sentencing; and the remainder to be paid within five years of sentencing.

5

(c)     A statutory-maximum term of five years of probation.   Probation shall include the following mandatory and discretionary special conditions, pursuant to 18 U.S.C. §§ 3563(a) and (b):

(i)     The defendant shall not commit another federal, state, or local crime.

(ii)    The defendant shall notify the probation officer within seventy-two hours of any criminal prosecution against the defendant.

(iii)   The defendant shall answer truthfully all inquires by the probation officer.

(iv)    The defendant shall provide to the probation officer full access to any of the defendant's business operating locations.

(v)     The defendant shall give ten days' prior notice to the probation officer of any intended change in principal business location or mailing address.

(vi)    The defendant shall notify the Court and the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay the fines and other financial obligations set forth herein.

(vii)   The defendant shall pay the fines set forth in paragraph 4(b) above.

(viii)  Pursuant to 18 U.S.C. § 3563(b)(22), an order, attached

6

hereto as Exhibit B, shall be entered.   The terms of the order
shall be enforceable as additional special conditions of
probation.

The parties agree and stipulate that the specific discretionary terms of probation enumerated

herein are appropriate, and further agree that no additional discretionary terms of probation

should be imposed.   The defendant, BP plc and any other BP plc entity shall not capitalize

into inventory or basis or take as a tax deduction, in the United States or elsewhere, any

portion of the monetary payments made pursuant to this plea agreement.   The defendant,

BP plc and any other BP plc entity shall not reference this plea agreement and any payments

pursuant hereto or other compliance herewith in any public relations, marketing or

advertising; provided, however, that the defendant, BP plc and any other BP plc entity shall

be permitted to make required disclosures under applicable securities laws.   The defendant

further agrees that payments made pursuant to paragraph 4(c)(viii) above shall have no

effect on, and shall not be argued by the defendant, BP plc or any other BP plc entity, to

reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon*

blowout, explosion, oil spill and response, including but not limited to natural resource

damage claims.

      (d)     The defendant further agrees to pay the special assessments, totaling

$4,975, before the time of sentencing and shall provide a receipt from the Clerk to the

Department before sentencing as proof of this payment.

      (e)     The defendant shall pay any mandatory restitution specified in 18

U.S.C. § 3663A(b)(3), to the extent applicable, to the Clerk of the Court for the benefit of

the families or other designated representatives of the eleven men who died onboard the *Deepwater Horizon*.   Restitution is not otherwise authorized for certain offenses in the plea agreement and, pursuant to 18 U.S.C. § 3663(a)(1)(B)(ii), is not otherwise appropriate because (i) restitution need not be addressed in this matter given that compensation for victims has been or is being addressed in other proceedings, including in MDL-2179 and (ii) fashioning of any restitution order would unduly complicate and prolong the sentencing process.

5.      The defendant stipulates that there is a factual basis for the imposition of a criminal fine in the amount of $1,256,000,000 pursuant to 18 U.S.C. § 3571(d) and that the payments made pursuant to paragraphs 4(b) and 4(c)(viii) do not together exceed the statutory-maximum fine available under that statute.   The defendant hereby waives any right to jury or bench trial as to those payments.

6.      The defendant will acknowledge acceptance of this plea agreement by the signature of its counsel and shall provide to the Department, as Exhibit C hereto, a certified resolution of the Board of Directors of BP Exploration and Production, Inc. authorizing the defendant to enter a plea of guilty and authorizing an agent to execute this agreement.   The defendant will further provide to the Department, as Exhibit D hereto, a certified resolution of the Board of Directors of BP plc providing as follows:

(a)      BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities.   BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this

8

agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA. BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees. Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

(b) The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

7. The Department agrees that, subject to paragraph 2 of this agreement, the Department shall not further prosecute the defendant, BP plc or any other BP plc entity, including all predecessors, successors and assigns of any of the above, for any conduct regarding any matters under investigation by the *Deepwater Horizon* Task Force relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response. This agreement shall not apply to individuals. Should a court determine that the defendant has breached this agreement, the defendant will not be entitled to withdraw its plea of guilty, and the Department may prosecute the defendant, BP plc and any other BP plc entity, and any predecessors, successors and assigns of any

9

of the above, for any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, notwithstanding the expiration of any applicable statute of limitations following the signing of this plea agreement.   In any such prosecution, the Department may use the defendant's admissions of guilt as admissible evidence against the defendant, BP plc and any other BP plc entity.

8.      The Department agrees that, if requested to do so, it will advise any appropriate suspension or debarment authority that, in the Department's view, the defendant has accepted criminal responsibility for its conduct relating to the Deepwater Horizon blowout, explosion, oil spill and response by virtue of this guilty plea, and that BP is obligated pursuant to this agreement to cooperate in any ongoing criminal investigation by the Department relating to the Deepwater Horizon blowout, explosion, oil spill and response.   Nothing in this agreement limits the rights and authority of the United States of America to take further civil or administrative action against the defendant including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans and benefits from United States government agencies.

9.      In exchange for the undertakings made by the Department in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

10.     The defendant waives any claim under the Hyde Amendment, 18 U.S.C.
§ 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the
investigation or prosecution of this matter.

11.     The defendant waives all rights, whether asserted directly or by a
representative, to request or receive from any department or agency of the United States any
records pertaining to the criminal investigation or prosecution of this criminal case, including
without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C.
§ 552, or the Privacy Act, 5 U.S.C. § 552a.

12.     The defendant is satisfied with the legal representation provided by the
defendant's lawyer; the defendant and its lawyer have fully discussed this plea agreement; and the
defendant is agreeing to plead guilty because the defendant admits that it is guilty.

13.     Both parties agree that the parties' guilty plea agreement contains no
additional promises, agreements, or understandings other than those set forth in this written guilty

plea agreement, and that no additional promises, agreements, or understandings will be entered into

unless in writing and signed by all parties.

JIM LETTEN                          LANNY A. BREUER
United States Attorney              Assistant Attorney General
Eastern District of Louisiana       Criminal Division

JOHN D. BURETTA, Director
DEREK A. COHEN, Deputy Director
Deepwater Horizon Task Force

BP EXPLORATION AND PRODUCTION, INC., BP plc and BP Corporation
North America Inc.

BY:    MARK FILIP and JOSEPH WARIN, PC
       Counsel for BP Exploration and Production, Inc., BP plc and BP Corporation North
       America Inc.

Date:   November __, 2012

12

Exhibit A

<u>Exhibit A</u>

Defendant BP Exploration & Production, Inc. ("BP") agrees that, if the case were to proceed to trial, the Government could establish beyond a reasonable doubt that:

At all relevant times, BP resided in, and engaged in regular business throughout, the states bordering the Gulf of Mexico, including in the Eastern District of Louisiana. On or about April 20, 2010, BP was the leaseholder and operator of the Macondo Well located off the coast of Louisiana. In this capacity, BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment. BP hired Transocean, Ltd., the owner of the drilling rig *Deepwater Horizon*, a vessel, to provide the rig and drilling crew to implement BP's drilling plan for the Macondo Well. Transocean was also responsible for conducting safe operations and for protecting personnel onboard. At all times relevant to the Information, the *Deepwater Horizon* was temporarily attached to and erected on the seabed of the Outer Continental Shelf in the Gulf of Mexico to explore and develop resources from the Outer Continental Shelf, to wit: oil and natural gas.

BP's responsibility as the leaseholder and operator of the Macondo Well and Transocean's responsibility as the rig owner imposed on each a duty to insure that the negative pressure test performed prior to temporarily abandoning the well was done safely, in accordance with the standard of care applicable in the deepwater oil exploration industry. On the night of the explosion, BP had two Well Site Leaders on the *Deepwater Horizon*, who were BP's employees, agents, and highest-ranking representatives on the rig. The Well Site Leaders were responsible for supervising the negative pressure test conducted by Transocean.

On or about April 20, 2010, between approximately 5:00 and 8:00 p.m. Central Daylight Time, the negative pressure test performed on the Macondo Well provided multiple indications that the wellbore was not secure. BP's Well Site Leaders negligently supervised the negative pressure test during this time, failed to alert engineers on the shore of these indications, and, along with others, ultimately deemed the negative pressure test a success, all in violation of the applicable duty of care. The negligent conduct of BP's Well Site Leaders is attributable to BP.

BP's negligent conduct, among others, was a proximate cause of the deaths of eleven men and pollution resulting from the Macondo Well blowout. As a result of this negligent supervision and decision-making, BP and the Transocean rig crew proceeded with removing drilling mud from the Macondo well until it became so underbalanced that natural gas and oil migrated through the well, up through the riser, and onto the rig floor. This migration of natural gas and oil in turn caused multiple explosions and a fire which burned for two days, and resulted in the *Deepwater Horizon* sinking on or about April 22, 2010.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP, being a charterer of a vessel, to wit: the *Deepwater Horizon*, engaged in neglect through which the lives of the following persons were destroyed: Jason Christopher Anderson; Aaron Dale Burkeen; Donald Neal Clark; Stephen Ray Curtis; Gordon Lewis Jones; Roy Wyatt Kemp; Karl Dale Kleppinger Jr.; Keith Blair Manuel; Dewey Allen Revette; Shane Michael Roshto; and Adam Taylor Weise, in violation of Title 18, United States Code, Section 1115.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP did negligently discharge and cause to be discharged oil in connection with activities under the Outer Continental Shelf Lands Act and which may have affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, in such

quantities as may be harmful in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3).

On or about and between April 20, 2010, and December 31, 2010, in the Eastern District of Louisiana and elsewhere, BP did unlawfully kill and cause to be killed one or more migratory birds, including Brown Pelicans, Laughing Gulls, Northern Gannets, and other protected species, when defendant negligently discharged and caused to be discharged oil from the Macondo well.

All in violation of Title 16, United States Code, Sections 703 and 707(a).

On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

1. BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

2. BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology. At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD. At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5. BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results." In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6. On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack." At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after

subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010. BP's former vice president's knowledge and actions are attributable to BP.

All in violation of Title 18, United States Code, Section 1505.

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA     *
    *
v.     *
    *    Case No. _____
BP EXPLORATION &     *
PRODUCTION, INC.     *
    *
   *   *   *

## ORDER

Pursuant to 18 U.S.C. § 3563(b)(22), IT IS HEREBY ORDERED:

## Monitors

1. Retention of Monitors and Duties:

   a. *Process Safety Monitor*: The defendant shall retain, subject to approval by the Assistant Attorney General, Criminal Division, Department of Justice ("DOJ"), or his/her designee, a process safety monitor who shall be experienced in process safety and risk management and familiar with complex industrial operations such as deepwater oil and gas drilling (hereinafter the "Process Safety Monitor").  The Process Safety Monitor's duties will be to review, evaluate and provide recommendations for the improvement of defendant's process safety and risk management procedures, including, but not limited to, the defendant's major accident/hazard risk review of drilling-related process safety barriers and mitigations, for the purpose of preventing future harm to persons, property and the environment resulting from deepwater drilling in the Gulf of Mexico by the defendant and its Affiliates.  For the purposes of this Order, the term "Affiliates" shall mean any entity

controlled, directly or indirectly, by BP plc that participates in deepwater drilling in the Gulf of Mexico, whether such entity is in existence now or in the future.  The Process Safety Monitor shall among other things participate in defendant's major accident/hazard risk review for drilling, intervention, and completion, including: reviewing of relevant materials, participating in meetings and other deliberations, and making suggestions on the strength and effectiveness of the risk mitigation and prevention measures, and changes in such measures.

b. *Ethics Monitor:* The defendant shall retain, subject to approval by the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, an ethics monitor who shall be familiar with best practices with respect to corporate codes of conduct, including implementation, training and enforcement thereof (hereinafter the "Ethics Monitor").  The Ethics Monitor's duties will be to review and provide recommendations for improvement of BP plc's Code of Conduct and its implementation and enforcement for the purpose of preventing future criminal and ethical violations with respect to dealings with regulatory and enforcement authorities by the defendant and Affiliates, including, but not limited to, violations related to the conduct giving rise to the Information filed in this matter.  In the event that any federal suspension and debarment authority requires a monitor with responsibilities related to ethics and compliance in any agreement with a suspension and debarment authority, the defendant may petition DOJ to have the Ethics Monitor replaced by (or have the duties combined with that of) such other monitor.

2. <u>Monitorship Scheduling and Compensation</u>:

   a. Within 60 calendar days after the Court imposes sentence (the "Effective Date"), the defendant shall forward to the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, the names of no more than five proposed monitors ranked in order of preference as to each of the two categories of monitorships. DOJ will promptly review and assess the defendant's proposals. The defendant shall retain each monitor as soon as possible, but not later than 60 calendar days after the date that DOJ approves each such proposed monitor.

   b. The monitorships shall exist for a period of four years from the date of the monitor's engagement unless earlier terminated pursuant to paragraph 4(f) herein.

   c. Each monitor shall have the authority to employ personnel reasonably necessary, and with appropriate professional qualifications, to assist in the proper discharge of the monitor's duties, as specified herein. The defendant shall have the opportunity to perform routine conflict checks on individuals or entities the monitor proposes to engage, and within two weeks of a proposed engagement, the defendant shall advise the monitor if any conflict exists. Any disputes in this respect shall be decided by DOJ in its sole discretion.

   d. The reasonable compensation and expenses of each monitor, and any persons hired by each monitor pursuant to his/her authority hereunder, shall be paid by the defendant. Each monitor, and any persons hired by each monitor, shall be compensated in accordance with their typical hourly rates or a reasonable fee determined by the monitor based on applicable market rates.

3.  Powers of the Monitors:

   a.  Each monitor shall have the authority to take such reasonable steps as, in the monitor's view, may be necessary to be fully informed with respect to the monitor's duties.

   b.  The defendant, BP plc and Affiliates shall cooperate fully with the monitors to allow each monitor to fulfill his or her respective duties under this Order, including providing each monitor with access to all information, documents, records, facilities and/or employees, as reasonably requested by the monitor.

   c.  Each monitor shall maintain as confidential all non-public information, documents and records it receives from the defendant, subject to the monitor's reporting requirements herein.  Each monitor shall take appropriate steps to ensure that any of his/her consultants or employees shall also maintain the confidentiality of all such non-public information.

   d.  Should any monitor, or staff assisting any monitor in fulfilling his or her responsibilities, be provided access to materials ("Subject Materials") that may be protected by the attorney-client privilege or work product doctrine (or any other legally cognizable privilege or protection), the following conditions shall apply:

      i.  Any provision of Subject Materials to a monitor pursuant to this order will not constitute waiver of any applicable privilege.

      ii. In the event the monitors or DOJ seeks disclosure of Subject Materials for any reason, the monitor shall provide the defendant with timely notice of its intention to do so.

iii. Each monitor shall return all Subject Materials to defendant, BP plc, and Affiliates upon the date the respective monitor is finished using Subject Materials for the purpose of fulfilling his or her responsibilities.

4.  Monitors' Reviews and Reports:

a.  Each monitor shall conduct an initial review and prepare an initial report, followed by up to three follow-up reviews and reports as described below.  With respect to each review, whether initial or follow-up, after consultation with the defendant and DOJ, each monitor shall prepare a written work plan, which shall be submitted to the defendant and DOJ for review and comment no fewer than 60 calendar days prior to commencing each review.  The defendant and DOJ shall provide comment no later than 30 calendar days after receipt of the written work plan.  The monitors' work plans for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review.  In developing each work plan and in carrying out the reviews pursuant to such plans, the monitors are encouraged to coordinate with the defendant.  Any disputes between the defendant and the monitors with respect to the work plan shall be decided by DOJ in its sole discretion.

b.  Each monitor's initial review shall commence no later than 120 calendar days from the date of the engagement of the monitor, unless otherwise agreed between the defendant, the respective monitor and DOJ.

c.  Each monitor shall issue a written report within 120 calendar days of completing the initial review setting forth the monitor's assessment and making recommendations reasonably designed to improve the effectiveness of the defendant's process safety and risk management as to deepwater drilling.  Each written report shall set forth the

monitor's assessments, recommendations, and the reasons for the recommendations. The monitors are encouraged to consult with the defendant concerning the monitors' findings and recommendations on an ongoing basis. If a monitor identifies a potential violation of the law, the monitor shall promptly report the potential violation to the Probation Office, DOJ and the defendant. The monitors shall provide the written report to the Probation Officer, the Assistant Attorney General, Criminal Division, Department of Justice, or his/her designee, the Board of Directors of the defendant and the Board of Directors of BP plc. After consultation with the defendant, the monitors may extend the time period for issuance of the written report for up to 60 calendar days with prior written approval of DOJ.

d. Within 120 calendar days after receiving the monitor(s)' report, the defendant, and to the extent set forth in the report, BP plc and Affiliates, shall adopt all recommendations in the report; provided, however, that within 30 calendar days after receiving the report, the defendant shall notify the monitor and DOJ in writing of any recommendations that the defendant, BP plc or Affiliates considers inconsistent with applicable law or regulation or otherwise inadvisable. As to any recommendation on which the defendant and the monitor do not agree, the defendant and the monitor shall attempt in good faith to reach an agreement within 45 calendar days after the defendant serves the written notice. In the event the defendant and the monitor are unable to agree on an acceptable alternative proposal, the defendant shall promptly consult with DOJ, and may request that DOJ consult with the Bureau of Safety and Environmental Enforcement ("BSEE") regarding the dispute. DOJ will submit a written opinion to the defendant as to whether the defendant should adopt the

monitor's recommendation or an alternative proposal, and the defendant shall abide by that determination. Pending such determination, the defendant shall not be required to adopt any contested recommendation(s). With respect to any recommendation that the monitor determines cannot reasonably be adopted within 120 calendar days after receiving DOJ's report, the monitor may extend the time period for adoption with prior written approval of DOJ.

e.  Each monitor shall undertake up to three follow-up reviews. Within 120 calendar days of initiating each follow-up review, the monitors shall complete the review and report on the monitors' findings in the same fashion as set forth above with respect to the initial review. The first follow-up review shall commence one year after the initial review was completed. The second follow-up review shall commence one year after the first follow-up review was completed. The third follow-up review shall commence one year after the second follow-up review was completed. After consultation with the defendant, the monitor(s) may extend the time period for these follow-up reviews for up to 60 calendar days with prior written approval of DOJ.

f.  If, reasonably promptly after completing two follow-up reviews, a monitor and the defendant mutually agree that the defendant's applicable policies and procedures, and implementation and enforcement thereof, are appropriate, and that further monitoring and review is not warranted, then the monitor may apply to DOJ for permission to forego the third follow-up review. If DOJ approves, then DOJ shall make a recommendation to the Probation Officer and the Court to forego the third follow-up review, and, upon approval by the Probation Officer and the Court, the engagement of the monitorship shall terminate.

## Safety and Environmental Management Systems Audits

5. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of at least three but less than six years as of the Effective Date, the defendant shall conduct at least one Safety and Environmental Management System ("SEMS") audit as described in 30 C.F.R. Part 250 during the remaining contract term. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of six years or more as of the Effective Date, the defendant shall conduct at least two SEMS audits during the remaining contract term under applicable BSEE regulations. For drilling rigs that are contracted after the Effective Date, the defendant shall comply with applicable BSEE regulations concerning SEMS audits.

6. For its current contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall request that its rig contractors join the Center for Offshore Safety ("COS"), which requires its members to conduct SEMS audits. For new contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall require rig contractors to join COS. The defendant may choose to conduct joint SEMS audits with its contractors for contracted deepwater drilling rigs.

7. The defendant shall conduct one SEMS audit for each of its operated platforms, including BP-owned platform rigs, within five years of the Effective Date.

8. With respect to defendant-operated platforms, the defendant shall follow Third Party SEMS Auditing and Certification of Deepwater Operations Requirements as specified by COS.

## Operational Oversight

9. Third Party Verification of Blowout Preventers. Each time the defendant or its contractors brings a subsea blowout preventer system as referenced in 30 CFR 250.440 ("BOP") into service on a moored or dynamically positioned drilling rig, and each time a subsea BOP from

a moored or dynamically positioned drilling rig is brought to the surface, the defendant or its contractors, through a third party, will verify that all required and recommended testing and maintenance of the BOP were performed in accordance with manufacturer recommendations and API Recommended Practice 53 (and Standard 53 when it becomes final).

10. <u>Deepwater Well Control Competency Assessments</u>.  The defendant shall implement the following measures to strengthen its well control competencies:

    a.  The defendant shall develop, within 6 months of the Effective Date, a deepwater well control competency assessment plan for the defendant personnel responsible for oversight of deepwater drilling operations on defendant-owned or contracted rigs. The plan shall exceed the competency requirements set forth in 30 CFR §§250.1500-1510 (Subpart O), and shall include, but not be limited to: identifying skill sets and other competencies needed to recognize, evaluate, respond, and remediate well control events; providing for the training, assessment of skills and competencies; and undertaking appropriate corrective actions for personnel who do not demonstrate the identified skills or competencies.

    b.  The defendant shall provide to BSEE, on an annual basis, a summary report regarding competency assessment plan implementation, including the types and aggregate number of people assessed, found competent, found in need of further training, and the number who have completed training and reassessment.

11. <u>Cement Design and Competency.</u>

    a.  The defendant shall require review and approval by subject matter experts of the defendant, BP plc, or the Affiliates of cement designs used for primary cementing of casing and exposed hydrocarbon-bearing zones during drilling operations at deepwater wells.

b. The defendant shall require that lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to drilling operations of deepwater wells be conducted or witnessed by a defendant engineer competent to evaluate such lab testing or a competent third party independent of the cement provider. The defendant shall provide lab results to the applicable BSEE field office within a reasonable period of time.

c. The defendant shall develop and provide to BSEE, within 6 months of the Effective Date, a framework document setting forth the defendant's competency requirements for cement subject matter experts, subject to review and approval at BSEE's option.

12. Houston Monitoring Center ("HMC"). The defendant shall maintain a real-time drilling operations monitoring center at its Houston office or other appropriate location. The well control data to be monitored will include, at a minimum, active pit volume, pump pressure, flow rate out, gas units, and trip displacement. The HMC shall monitor such data for all defendant-owned or contracted rigs conducting drilling with a subsea BOP installed on the wellhead. The defendant shall provide BSEE personnel with reasonable access to the HMC.

13. Incident Reporting. The defendant shall provide to BSEE, on an annual basis, a summary report documenting incidents operators are required to report under 30 CFR 250.188. For each item reported, the defendant shall describe the actions implemented to correct the item and/or to prevent recurrence. This report shall be submitted by March 31st of each year covering incidents during the previous calendar year.

## Oil Spill Response Training and Drills

14. The defendant shall train each Command Officer and Staff, General Section Chiefs, and Staff including the Oil Spill Response Coordinator and alternates of the GoM Incident

Management organization at least once per year and require their participation in at least one table top oil spill response exercise per year.

15. The defendant shall maintain a crisis management organization, including two crisis management centers, consisting of at least 6 crisis management professionals (including a supervisor) to assist in oil spill response training and drills.

16. The defendant shall conduct annual training with the Marine Well Containment Company ("MWCC"), or a similar organization, for its Operations Section chiefs and Source Control Section chiefs in the Gulf of Mexico.

17. The defendant shall participate in MWCC or industry oil spill response drills at least once per year.

18. The defendant shall, at least once per year, conduct or participate in a table top exercise involving activation of MWCC to simulate mobilization of assets and personnel necessary to cap or cap/contain a subsea loss of well control.

19. The defendant shall invite the United States Coast Guard and BSEE to participate in at least one internal oil spill response drill per year.

### Best Practices

20. Oil Spill Response Plan (OSRP).  Within 60 days of entry of this Order, the defendant shall revise its Oil Spill Response Plan as necessary to include:

   a. Provisions to maintain access to a supply of dispersant and fire boom for use in the event of an uncontrolled long-term blowout for the length of time required to drill a relief well;

   b. Contingencies for maintaining an ongoing response for the length of time required to drill a relief well;

    c.  Description of measures and equipment necessary to maximize the effectiveness and efficiency of the response equipment used to recover the discharge on the water's surface, including methods to increase encounter rates;

    d.  Information regarding remote sensing technology and equipment to be used to track oil slicks, including oil spill detection systems and remote thickness detection systems (*e.g.*, X-band/infrared systems);

    e.  Information regarding the use of communication systems between response vessels and spotter personnel;

    f.  Shoreline protection strategy that is consistent with applicable area contingency plans; and

    g.  For operations using a subsea BOP or a surface BOP on a floating facility, a discussion regarding strategies and plans related to source abatement and control for blowouts from drilling.

21. <u>Safety Technology Developed with Industry</u>.  The defendant shall collaborate with industry and academic efforts to develop discrete technologies to enhance operational safety with respect to deepwater drilling.  Within one year of the Effective Date, the defendant shall propose and initiate collaboration on at least two pilot projects to evaluate technology enhancements over the course of the five year period following the Effective Date of this Order.  Upon conclusion of the pilot projects, the defendant will propose to BSEE at least two pilot projects for implementation and implement them unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

22. <u>Other Safety Technology Development</u>.  Over the course of the three years following the Effective Date of this Order defendant will advance to BSEE three proposals in one or more

of the following categories for pilot projects regarding the development of specific new technology in: (1) enhancing functionality, intervention, testing and activation of BOP systems such as acoustics and subsea communications capabilities; (2) enhancing well design; or (3) enhancing real-time monitoring on rig and onshore.  Upon conclusion of the pilot projects, the defendant will implement at least two pilot projects, unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

**Transparency**

23. The defendant will create, within 90 days after the Effective Date, a public website that contains the following information:

    a.  Lessons learned from the Deepwater Horizon incident;

    b.  Annual progress reports on its compliance with the special terms of probation contained in this Order;

    c.  Annual summaries of recordable safety incidents, days away from work, hydrocarbon spills and the volume thereof; and

    d.  An annual list of all incidents of non-compliance with BSEE or BOEM regulations or probation for which the defendant is cited, including corrective actions taken and penalties assessed.

**Rig Equipment: Two Blind Shear Rams**

24. The defendant will use, and require its contractors to use, subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram on all drilling rigs under contract to the defendant for deepwater drilling operations in dynamic positioning mode.  As to moored drilling rigs under contract to the defendant which use subsea BOPs, the defendant will require that each BOP used in deepwater drilling operations be equipped with two shear

rams, including at least one blind shear ram and either an additional blind shear ram or a

casing shear ram.

## Safety Organization

25. The defendant shall maintain a safety organization that has the authority to intervene or stop

any operation that it deems unsafe.

## Third-Party Auditor

26. The defendant will enter into a contract with an independent third-party (referred to herein as

"the Auditor") who shall review and report to the Probation Officer, DOJ, and the defendant

on the defendant's compliance with paragraphs 5 through 25 of this Order. The reasonable

compensation and expenses of the Auditor shall be paid by the defendant. The Auditor shall

be compensated in accordance with its typical hourly rates or a reasonable fee determined by

the Auditor based on applicable market rates

27. The defendant will propose auditor(s) to perform these functions to DOJ within 90 days after

the Effective Date, and the selection shall be subject to DOJ's approval.

28. On an annual basis, the Auditor shall perform his/her responsibilities by reviewing

documentation and taking such other reasonable measures as may be appropriate to sample

or test the defendant's compliance with paragraphs 5 through 25 of this Order. The Auditor

shall identify and report annually its findings on the defendant's compliance with the terms of

this Order to the Probation Officer, DOJ, and the defendant.

29. If the Auditor finds deficiencies in the defendant's compliance with paragraphs 5 through 25

of this Order, the Auditor will provide the Probation Officer, DOJ, and the defendant prompt

notice and the defendant will, within 30 days, provide a plan to address the deficiencies and

an opportunity to cure. In the event DOJ finds the defendant's plan to address the

deficiencies unacceptable, DOJ will submit a written opinion to the defendant identifying its objections and advising the defendant of an acceptable means of addressing the deficiencies. Within 30 days of receiving any such objections from DOJ, the defendant will provide an updated plan to the Auditor and DOJ which either provides for implementation of an option suggested by DOJ or an alternative means which DOJ determines to satisfactorily address its objections.

30. In addition to an annual report, the auditor shall periodically evaluate and report to the Probation Officer, BSEE, DOJ, and the defendant whether the defendant has complied with any plan to address deficiencies identified by the Auditor.

31. In the event the Auditor resigns, the defendant will propose to DOJ replacement auditor(s) to perform these functions promptly after such resignation. Selection of a replacement auditor shall be subject to the same process set forth immediately above.

### Development of Implementation Plan

32. The provisions in Paragraphs 5-31 constitute a framework and outline of the subject areas for the development of more specific measures that the defendant must implement pursuant to this Order. By no later than 60 days after the Effective Date of this Order, the defendant shall submit a detailed implementation plan for approval by the Probation Officer and DOJ. The defendant shall consult with DOJ or its designee in preparing the implementation plan, and the plan shall include among other things, and as necessary and appropriate, interim milestones covering each of the following areas: Safety and Environmental Management Systems Audits (Paragraphs 5-8), Operational Oversight (Paragraphs 9-13), Oil Spill Response Training and Drills (Paragraphs 14-19), Best Practices (Paragraphs 20-22), Transparency (Paragraph 23), Rig Equipment: Two Blind Shear Rams (Paragraph 24), Safety

Organization (Paragraph 25) and Third-Party Auditor (Paragraphs 26-31). Upon approval of the implementation plan by the Probation Officer and DOJ, the defendant shall comply with the plan. After approval of the implementation plan, the defendant may request in writing that the Probation Officer and DOJ approve modifications of the implementation plan for good cause. Upon approval of a modification by the Probation Officer and DOJ, the defendant shall comply with the implementation plan as modified. Compliance with the implementation plan's provisions is a special condition of the defendant's probation. The defendant is required to provide prompt notice to the Probation Officer in the event the defendant fails to comply with any of the provisions of the implementation plan, including meeting any of the interim milestones.

### Gulf of Mexico Research Initiative

33. The defendant will continue to fulfill its commitment to fund the Gulf of Mexico Research Initiative announced by BP on May 24, 2010, at the level established by the Master Research Agreement of March 14, 2011 between BP and the Gulf of Mexico Alliance.

### National Academy of Sciences

34. The defendant shall pay $350 million ($350,000,000.00) to the National Academy of Sciences for the purposes of oil spill prevention and response in the Gulf of Mexico, as provided for in an agreement between the defendant and the National Academy of Sciences attached hereto as Exhibit 1.

### National Fish and Wildlife Foundation

35. The defendant shall pay $2.394 billion ($2,394,000,000.00) to the National Fish and Wildlife Foundation ("NFWF"), a nonprofit organization established pursuant to 16 U.S.C. § 3701-3710. With respect to the work described in paragraph 37 below, the defendant shall assume

no responsibilities or obligations other than making the payments described in paragraphs 35 and 36.

36. The defendant's payments to NFWF shall be made according to the following schedule: (a) $100 million to be paid within 60 days of sentencing; (b) an additional $300 million to be paid within one year of sentencing; (c) an additional $300 million to be paid within two years of sentencing; (d) an additional $300 million to be paid within three years of sentencing; (e) an additional $500 million to be paid within four years of sentencing; and (f) the remainder to be paid within five years of sentencing.  Payments shall be made by certified check payable to the National Fish and Wildlife Foundation and mailed to the attention of its Chief Financial Officer at 1133 15th Street, NW, Suite 1100, Washington, DC 20005, and including a reference to the case number in this proceeding; or by electronic funds transfer in accordance with written instructions to be provided to the defendant by NFWF at the time of transfer.

37. NFWF shall use the money it receives from the defendant pursuant to this Order for the following purposes and subject to the following conditions:

a.  To remedy harm and eliminate or reduce the risk of future harm to Gulf Coast natural resources, NFWF shall use approximately half of the payments to conduct or fund projects to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill.  NFWF shall conduct or fund projects in the following states in approximately the following proportions: (1) Alabama, 28%, (2) Florida, 28%, (3) Mississippi, 28%, and (4) Texas, 16%.  NFWF shall consult with appropriate state resource managers, as well as federal resource managers that have the statutory authority for coordination or

- 17 -

cooperation with private entities, to identify projects and to maximize the environmental benefits of such projects.

b.  To remedy harm and eliminate or reduce the risk of future harm to the State of Louisiana and its natural resources, NFWF will use approximately half of the payments to create or restore barrier islands off the coast of Louisiana and/or to implement river diversion projects on the Mississippi and/or Atchafalaya Rivers for the purpose of creating, preserving and restoring coastal habitat, in order to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill. In conducting or funding these projects, NFWF will consult with State resource managers, as well as federal resource managers that have the statutory authority for coordination or cooperation with private entities regarding management or protection for coastal habitat, to identify the highest priority projects, and to maximize the environmental benefits of such projects. In identifying projects, NFWF shall consider the State's Coastal Master Plan, as well as the Louisiana Coastal Area Mississippi River Hydrodynamic and Delta Management Study, as appropriate.

c.  In identifying and selecting projects to receive funding pursuant to this Order, NFWF shall not incur liability of any nature in connection with any act or omission, made in good faith, in the administration of the funds or otherwise pursuant to this Order, excepting, however, liability resulting from NFWF's gross negligence or willful misconduct. In addition, if and to the extent NFWF grants funds to or contracts with any governmental entity to implement any project under this Order: (a) NFWF shall be deemed to act solely as an administrative agent in contracting for, granting to, and

disbursing funds for any such project, and (b) NFWF shall not be deemed to incur any liability of any nature in connection with the design, engineering, construction, operation, or maintenance of any such project, including, without limitation, any impact or consequences of any such project on fish, wildlife, plant, or other natural resources, personal injury or property damage.

d.   NFWF's use of funds received pursuant to this Order shall be subject to the reporting requirements of 16 U.S.C. § 3706.  In addition, NFWF shall report to the Probation Officer and to the parties regarding the status and disposition of money it has received pursuant to this Order, on at least an annual basis, until all such money has been spent.

### Successors

38. This Order shall be applicable to the defendant, and to the extent specified herein, to BP plc and Affiliates, during the defendant's term of probation.

39. In the event of a sale, assignment or transfer of all of the defendant's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to the defendant and to any successor of the defendant.

40. With respect to the sale, assignment or transfer of some but not all of defendant's assets to an unaffiliated third party pursuant to arm's-length transaction, including but not limited to the transfer of operational control of a jointly owned asset to an unaffiliated third party, such third party shall not be liable for defendant's obligations, and the defendant and, as necessary, BP plc and Affiliates, shall remain obligated to comply with the obligations in this Order with respect to all non-disposed assets, but not with respect to the sold, assigned or transferred assets.

41. With respect to a sale, assignment, or transfer covered in paragraph 39, a third party purchaser may petition the Court to be relieved from one or more terms of this Order upon a showing that (a) the third party purchaser has a SEMS system compliant with current BSEE regulations; and (b) all applicable regulatory approvals for the transaction have been or will be obtained.  The third party purchaser may also petition the Court to be relieved from any particular term in Paragraphs 5 through 25 on the grounds that the particular term creates inconsistent, conflicting, or redundant obligations under the third party purchaser's existing SEMS systems and operational practices and procedures or other reasonable grounds.  Prior to petitioning the Court for such relief, the third party will consult with DOJ regarding the requested relief, and DOJ will advise the Court of its conclusion as to whether the requested relief is appropriate.

42. The requirements of this Order are in addition to all other applicable requirements of law.  This Order does not operate as a permit under federal, state or local regulations, and the defendant remains responsible for complying with all applicable federal, state and local laws, orders and permits.  The defendant may not claim that compliance with this Order is a defense to any action commenced under applicable federal, state or local law.  The government does not warrant that BP's compliance with this Order constitutes compliance with other applicable legal requirements, including but not limited to BSEE audit requirements.

43. The defendant's obligations pursuant to this Order expire five years after the Effective Date except as otherwise provided herein or as modified by the Court.

SO ORDERED this __ day of _____, 2012.

_____

UNITED STATES DISTRICT JUDGE

Exhibit *B-1*

# AGREEMENT BETWEEN
# BP EXPLORATION AND PRODUCTION, INC. AND
# THE NATIONAL ACADEMY OF SCIENCES

This Agreement is entered into by BP Exploration and Production, Inc. (the "Company") and the National Academy of Sciences of the United States of America, a federally chartered private nonprofit corporation, 36 U.S.C. §§ 150301, *et seq*., with its principal place of business in Washington, D.C., acting on behalf of its principal component organizations, the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council (collectively, "NAS"). The effective date of this Agreement is November __, 2012.

WHEREAS the *Deepwater Horizon* blowout and oil spill have demonstrated the need for improvement in offshore oil drilling safety, well monitoring, well design, oil-spill containment, oil-spill response strategies and technologies, and environmental monitoring;

WHEREAS the prevention of blowouts and oil spills resulting in harm to life, property, and the environment in the Gulf of Mexico and on the United States' outer continental shelf is a national priority;

WHEREAS reducing the environmental harm, loss of life or injury, and economic damage caused by any future blowout and discharge of oil associated with offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf is also a national priority;

WHEREAS basic and applied scientific and engineering research are essential to enhancing safety and minimizing the risk of future harm from spills from offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf; and

WHEREAS improved environmental monitoring can contribute to increased protection of the environment, human population, and natural resources in the event of future oil spills;

- 1 -

THEREFORE, the Company and NAS agree to the mutual covenants set forth in this Agreement:

## I.   Payments

1.   The Company shall pay $350 million to NAS according to the following schedule:

      a.   $5 million to be funded within 90 days of the date this Agreement becomes effective;

      b.   $15 million to be funded within one year of the date this Agreement becomes effective;

      c.   $45 million to be funded within two years of the date this Agreement becomes effective;

      d.   $80 million to be funded within three years of the date this Agreement becomes effective;

      e.   $90 million to be funded within four years of the date this Agreement becomes effective; and

      f.   $115 million to be funded within five years of the date this Agreement becomes effective.

2.   The Company shall assume no other responsibilities or obligations under this Agreement other than making the payments described in paragraph 1.

## II.   Purpose

3.   NAS shall use the payments described in paragraph 1 to establish a separate segregated account for a fixed-term endowment (the "Endowment"), the principal and earnings of which will be expended over a period of 30 years, subject to the provisions of paragraphs 28 and 29.

4.   NAS shall use the Endowment to establish a program focused on human health and environmental protection including issues relating to offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf (the "Program"). The Program will carry out studies, projects, and other activities that utilize the scientific, technical, engineering, medical, and health expertise

of the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, the National Research Council, and the nation's scientific, engineering, and health-care communities. The Program will seek to advance scientific and technical understanding with the objective of enhancing the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf. The Program will include the assessment and evaluation of strategies and technologies with the objective of enhancing the protection of human health and environmental resources in the Gulf of Mexico and on the United States' outer continental shelf. The manner in which the studies, projects, and other activities are to be conducted will be determined solely by NAS. In accordance with normal policies and procedures of NAS, the Program will be conducted by NAS based on scientific merit and integrity, with emphasis on freedom of inquiry and independent nonpartisan advice and recommendations.

5.     The Program shall seek to carry out studies, projects, and other activities in the public interest that would not otherwise be adequately funded or supported by private industry.

## III.   Programmatic Objectives

6.     To address the purpose described in paragraph 4, the Program shall fund and carry out studies, projects, and other activities in three basic categories: (a) research and development, (b) education and training, and (c) environmental monitoring. The Program should strive to achieve a balance of studies, projects, and other activities, consistent with paragraphs 4 and 18.

7.     *Research and development.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to research and development related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

8.     *Education and training.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to enhanced education and training for undergraduate, graduate, and professional-school students, private- and public-sector employees, and Gulf Coast regional communities, related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

9.     *Environmental monitoring.*  The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to the development of advanced environmental monitoring systems related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

## IV.    Structure and Organization

10.    NAS shall appoint a Board to provide general oversight for the Program.  The members of the Board shall be scientists, engineers, and other experts whose experience and knowledge can contribute to the oversight of the Program.  No current officer or current employee of the United States Government can serve on the Board.

11.    NAS shall appoint additional committees and panels of volunteer experts and establish or make arrangements with other entities as needed to carry out the Program.  At a minimum, NAS shall appoint committees for the following three topics:  (1) research and development, (2) education and training, and (3) environmental monitoring.  No current officer or current employee of the United States Government can serve on a committee or panel appointed by NAS under this paragraph.

12.    At least once a year, NAS shall seek the recommendations of each of the following entities (or its designees) concerning the administration of the Program, provided that the role of each such entity shall be solely advisory:

a.  In accordance with its statutory responsibilities and as necessary to meet the statutory requirement that it coordinate a comprehensive program "in cooperation and coordination with industry, universities, research institutions, State governments, and other nations, as appropriate," 33 U.S.C. § 2761, the Interagency Coordinating Committee on Oil Pollution Research (ICCOPR), including the Department of the Interior's Bureau of Safety and Environmental Enforcement (BSEE) and Bureau of Ocean Energy Management (BOEM); and

b.  The environmental-protection departments and other coastal natural-resource managers for the States of Alabama, Florida, Louisiana, Mississippi, and Texas.

13.    Appointments to the Board, committees, and panels shall be in accordance with (a) principles similar to those underlying section 15 of the Federal Advisory Committee Act, 5 U.S.C. App. 2; and (b) the implementing procedures of NAS, as applicable, including the

Conflicts of Interest Policy for Committees Used in the Development of Reports, and the Policy on Conflicts of Interest for Institutional Oversight and Non-Advisory Services, adopted by the NAS Council on May 12, 2003, and June 11, 2004, respectively, as may be amended or modified in the future.

14.    NAS shall establish periodic reporting procedures for grant recipients, including a statement of project accomplishments and a report on grant expenditures until project completion, as well as a final report after project completion.  Each final report shall address the original objectives of the project as identified in the approved proposal, describe any changes in objectives, and provide a final project accounting.  The final report of project accomplishments described in this paragraph shall be available to the public.

15.    NAS shall publish an annual report on studies, projects, and other activities funded or carried out by the Program during the preceding year.  The annual reports shall be made available to the public and shall be disseminated in print and on the NAS Web site. Each annual report shall contain financial statements for the Program that are consistent with the audited financial statements of NAS, including a full and complete statement of income, expenditures, and investments.  The report shall also include a list of each recipient of any grant funded by the Endowment, the amount of the grant, and a summary of the purpose of each grant made during the preceding year.

16.    The Company, its officers, and its employees shall not be involved in any decisions regarding the selection of studies, projects, activities, or award recipients.

## V.    Management of Funds

17.    NAS shall manage the Endowment in accordance with the policies established by the NAS Council, in accordance with the laws of the District of Columbia, including the Uniform Prudent Management of Institutional Funds Act of 2007, D.C. Code, Chapter 16A, as it may be amended from time to time, and any successor acts.  NAS will invest the Endowment in a prudent manner for a 30-year fixed-term endowment whose entire principal and earnings will be expended within the 30-year period.  NAS shall have the discretion to determine how to invest the funds in accordance with this standard of prudence, provided that at least half of all funds held in the Endowment shall be invested in United States Government securities, United States Government agency securities, and United States Government-backed securities.

18.    Nothing about the list of three categories of studies, projects, and other activities in paragraph 6 is meant to imply a relative priority or a particular funding allocation.  NAS

should strive to achieve a balance of studies, projects, and other activities that supports the Program's overall purpose and programmatic objectives.

19.     All expenditures of Endowment funds by NAS for Program studies, projects, and other activities shall comply with OMB Circular A-122, 2 C.F.R. Part 230, as it may be revised from time to time, the NAS indirect-cost recovery rates established by the Office of Naval Research and any successor cognizant administrative contracting office, and the NAS disclosure statement on file with that Office (or an equivalent disclosure requirement).

20.     The funds expended from the Endowment for studies, projects, and other activities shall be audited annually by independent accountants in accordance with U.S. generally accepted accounting principles.

21.     NAS may at any time add to the Endowment using other sources of funding.

22.     NAS may not use the Endowment to support any study, project, or other activity that would expend funds for a purpose for which Congress has prohibited funding.

23.     If carrying out the Program's studies, projects, or other activities requires acquisition of real property, the property shall be located in the Gulf Coast region.

24.     NAS shall not use any money from the Endowment for the purpose of lobbying, attempting to influence legislation, participating in a political campaign, or otherwise influencing the outcome of any public election.

## VI.     Access to and Dissemination of Research

25.     The copyrights in all written materials, photographs, drawings, software, and other works subject to copyright protection created or generated under any grant made using the Endowment shall be owned by the recipient of the grant. NAS will encourage the publication and dissemination and other use of these materials. With respect to such copyrighted works, the United States Government and NAS shall have a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use such copyrighted works for Government or NAS purposes. In addition to any other rights it may have, the United States Government shall have the rights provided in paragraph .36(d) of OMB Circular A-110, as it may be revised from time to time, subject to the terms and conditions set forth in that Circular.

26.     With respect to research data, which shall include the recorded factual material commonly accepted in the scientific community as necessary to validate research findings

(but not any preliminary analyses, drafts of scientific papers, plans for future research, peer reviews, or communications with colleagues), the researcher shall retain all rights in said data but shall provide timely and unrestricted access to the data to NAS and the United States Government. Without limitation of the foregoing, the United States Government and NAS shall have the right to (1) obtain, reproduce, publish, or otherwise use the research data first produced under any grant funded by the Endowment, and (2) authorize others to receive, reproduce, publish, or otherwise use such data for Government or NAS purposes.

27.     The policies on patents outlined in 35 U.S.C. §§ 200-211, in 37 C.F.R. § 401, and in the Presidential Memorandum on Government Patent Policy dated February 18, 1983, will serve as basic guidance on patent rights so as to encourage the maximum participation in the Program by a diverse set of research entities. Grantees will have the right to elect title to the patent rights in inventions resulting from work under any grant, subject to the United States Government and NAS each acquiring a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States or NAS, but in the case of NAS, solely in connection with the Program, the invention throughout the world in those inventions for which title is elected, and also subject to the "march-in-rights" of the United States Government as set forth in the above-cited statute and regulation. Without limitation of the foregoing, the license provided herein to NAS shall include the right of NAS to sublicense its rights to contractors and grantees that perform studies, projects, or other activities under the Program, except that NAS shall not have the right to commercialize its rights outside the Program.

## VII.  Modification

28.     NAS shall conduct periodic reviews of the Endowment and Program at five-year intervals, to determine whether there is a continuing need for the Endowment and whether there is a need to modify the Agreement. Any modification of the Agreement will be subject to paragraph 29.

29.     This Agreement may be modified only through application by NAS to the appropriate court in the District of Columbia pursuant to § 44-1635(b) or (c) of the Uniform Prudent Management of Institutional Funds Act, D.C. Code Ann. § 44-1635(b) or (c), as it may be amended from time to time, pursuant to comparable authority under a successor statute, or, in the absence of statutory authority, pursuant to principles of equitable deviation or cy pres. This Agreement cannot be modified in a manner that violates paragraph 1, 2, or 22.

## VIII.  Miscellaneous Provisions

30.     NAS shall comply with all local, State, Federal, and international laws or requirements that apply in connection with the performance of any studies, projects, or other activities of the Program.

31.     This Agreement shall not be construed to create any rights in, or grant any cause of action to, any person not a party to this Agreement.

32.     This Agreement shall be interpreted according to the laws of the District of Columbia.

33.     The provisions governing the Endowment and Program are severable.  Should any portion of the Endowment or Program, or its studies, projects, or other activities, be declared illegal or inoperable, the remaining provisions shall remain in effect so long as there remain valid purposes and continued funding to carry out any study, project, or other activity within the scope of the Program.

34.     This Agreement may be signed in counterparts, each of which shall be an original and all of which together shall constitute the same Agreement.


_____

FOR BP EXPLORATION AND PRODUCTION, INC.

_____11 - 15 - 12_____

Date


_____

FOR THE NATIONAL ACADEMY OF SCIENCES

Exhibit C

CERTIFICATION OF RESOLUTIONS ADOPTED BY
THE BOARD OF DIRECTORS OF BP EXPLORATION & PRODUCTION INC.

I, Mary Jane Stricker, a duly authorized representative of BP Exploration & Production Inc., a
company incorporated under the laws of Delaware, do hereby certify that the following is a true
and correct copy of certain resolutions adopted by the Board of Directors of BP Exploration &
Production Inc. at a meeting held on November 15, 2012, at which a quorum of the Board was
present and that such resolutions remain in full force and effect as of the date hereof.

Dated:  November 15, 2012

Mary Jane Stricker
Assistant Corporate Secretary

WHEREAS, BP Exploration & Production Inc. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Company's board of directors (the "Board") has been advised by executive management and both internal and external counsel on the progress of the Investigations at several meetings;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have been negotiating a resolution of the Investigations;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and both internal and external legal counsel of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships; and

WHEREAS, the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States with respect to all criminal violations identified during the Investigations and that no additional promises or representations have been made to the Company by any officials of the United States or the States in connection with the disposition of the Investigations, other than those set forth in the Plea Agreement.

RESOLVED that:

1.  The Board approves and agrees that it is in the best interest of the Company to enter the guilty plea provided for, and agrees to the other terms provided in the Plea Agreement with the United States Department of Justice in substantially the form and substance set forth in the form of Plea Agreement presented to this Board;

2.  The officers of the Company and the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board with such changes as such officers or legal counsel may approve;

3.  The officers of the Company and both the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing

resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.  All of the actions of the officers of the Company and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.  The Secretary or any Assistant Secretary of the Company are each individually authorized, empowered or directed, to provide to the United States Department of Justice a certified copy of these resolutions.

Exhibit D

**<u>CERTIFICATION OF RESOLUTIONS ADOPTED BY BOARD OF DIRECTORS OF BP</u>**
**<u>p.l.c.</u>**

I, David J. Jackson, a duly authorized representative of BP p.l.c., a company incorporated in England and Wales, do hereby certify that the following is an accurate excerpt of certain resolutions adopted by the Board of Directors of BP p.l.c. at a meeting held on November 15, 2012, and that such resolutions remain in full force and effect.

_15·11·12_
      [DATE]

                               David J. Jackson
                         Company Secretary, BP p.l.c.

**Resolutions of Board of Directors of BP p.l.c.**

WHEREAS, BP p.l.c. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Board has been advised by executive management and both internal and external counsel, and its own independent counsel, on the progress of the Investigations at several meetings, and has received reports at such meetings from the Board's Gulf of Mexico Committee, which has had numerous meetings with respect to the Investigations and the discussions with the United States Department of Justice;

WHEREAS, the Company's executive management and both internal and external legal counsel has been negotiating a resolution of the Investigations;

WHEREAS, executive management and both internal and external counsel, and independent legal counsel for the Board, has reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and by internal and external counsel, and independent legal counsel for the Board, of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships, potentially to be entered into by BP Exploration & Production, Inc. ("BP E&P") and the United States Department of Justice;

WHEREAS, the Company and BP Corporation North America Inc. ("BPCNA") are, by the terms of the Plea Agreement, required to guarantee specified obligations of BP E&P under the Plea Agreement, and the Board of Directors has been briefed on those obligations by executive management, internal and external counsel and by independent legal counsel for the Board;

WHEREAS, the Board has also reviewed the terms of the related civil action against the Company by the United States Securities and Exchange Commission and a consent by the Company to the filing thereof, including certain undertakings set forth in such consent (the "SEC Settlement Agreement");

WHEREAS, the Board has been advised by independent counsel qualified in the applicable laws of the United States and England regarding the satisfaction of its duties prior to approving the Company's entry into the Plea Agreement, its guarantee of the specified obligations of BP E&P as set forth in the Plea Agreement and the execution and delivery by the Company of the SEC Settlement Agreement; and

WHEREAS, the Board has determined it is in the best interest of the Company to enter into the Plea Agreement, to guarantee the specified obligations of BP E&P as set forth in the Plea Agreement and to execute and deliver the SEC Settlement Agreement.

RESOLVED that:

1.   The Company will enter into and, upon the execution of the Plea Agreement, have the guarantees and other obligations set forth in paragraph 6 of the Plea Agreement:

    a.   BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities. BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA. BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees. Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

    b.   The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising

out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

2.    Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement and any guarantee required under the Plea Agreement, and the SEC Settlement Agreement, substantially in such form as reviewed by this Board with such changes as the Group General Counsel of BP p.l.c. may approve;

3.    Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.    All of the actions of the Company's directors, executive management and officers, and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorised by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.    The Company Secretary or the Deputy Company Secretary of the Company are each individually authorised, empowered or directed, to provide to the United States Department of Justice and the United States Securities and Exchange Commission certified copies of these resolutions.

# Attachment 3

May 24, 2010

BY ELECTRONIC DELIVERY

The Honorable Edward J. Markey
Chairman
Subcommittee on Energy and Environment
Committee on Energy and Commerce
U.S. House of Representatives
2125 Rayburn House Office Building
Washington, DC  20515-6115

Re:   Response to Chairman Markey's Correspondence, Dated May 14, 2010, to Mr.
      Lamar McKay, President and CEO of BP America, Inc.

Dear Chairman Markey:

I am writing on behalf of BP America, Inc. ("BPA") in response to your May 14, 2010
letter to Mr. Lamar McKay.  We very much appreciate the importance of providing reliable and
timely information regarding the flow of oil from the damaged wellhead in the Gulf of Mexico.
With that objective in mind and in the spirit of cooperation and transparency that has informed
all of our efforts to date, BPA is providing the responses below to your questions and the
accompanying documents, identified by the Bates-range BP-HZN-CEC 020095 – 020107.

As you know, the estimate of 5,000 barrels per day is a Unified Command estimate, not a
BP estimate.  The primary methods which Unified Command has used to estimate the amount of
oil flowing from the well are summarized below and in the attached materials, identified as BP-
HZN-CEC 020103 - BP-HZN-CEC 020106.  The range varies from about 1,000 barrels per day
to roughly 15,000 barrels per day, with a best scientific guess of roughly 5,000 barrels per day –
the number that Unified Command has used repeatedly and has made clear is only a rough
estimate.

1.     **Prior to the incident, did BP already have an estimate of the maximum amount of
       oil that could be expected to flow from this well under normal conditions?**

Prior to drilling, BP had prepared a production estimate for this well based on expected
overall oil volume in place, expected reservoir properties, and the anticipated development
concept.  This concept included three (3) wells processed through a neighboring oil production
facility.  The rate associated with this initial well was 15,000 barrels per day.

2.     **What was the basis for this estimate?**

Prior to the drilling of the Macondo well, the estimate of the maximum amount of oil that
could be expected to flow from the well under normal conditions was based on interpretation and
modeling from:  (1) production information from other wells in the Mississippi Canyon; (2)
geological information from other wells in the Mississippi Canyon; and (3) seismic data.

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 2

3.    **Please provide all documents that relate to the amount of oil that could be expected to flow from this well, including any estimates of profits that this well was projected to generate.**

We have enclosed a production profile estimate for three development wells, one of which is the Mississippi Canyon 252 #1 exploration well.  [BP-HZN-CEC 020107.]  If you require additional information, please let us know.

4.    **What is the BP method and scientific basis for the estimate of 5,000 barrels per day? Was this estimate based solely on surface monitoring of the size of the spill?**

The estimate of 5,000 barrels per day is a Unified Command estimate, not a BP estimate. The initial work leading to this estimate was carried out by the National Oceanic and Atmospheric Administration ("NOAA").  Two approaches were used – estimation of oil volumes on surface and estimates of velocity of the plume exiting the riser.  The documentation provided by NOAA is shown at BP-HZN-CEC 020102.

- It is our understanding that NOAA estimated, through visual observation, that the volume of oil on the water on April 26 was 10,000 barrels.  Using this information, a daily flow rate can be estimated as follows.
  - For this oil type, 50% of the volume is expected to evaporate or disperse naturally within hours of release.
  - Thus, 10,000 barrels on the water implies 20,000 barrels were released. (At this point in the response, negligible oil had been skimmed or dispersed, and none had been burned.)
  - The spill began when the Deepwater Horizon sank on April 22.  Thus, 20,000 barrels represents four days of flow.
  - 20,000 barrels divided by four days equals 5,000 barrels per day.

- It is our understanding that, by observing the velocity of the plume exiting the end of the riser, NOAA scientists made an estimate of the flow rate at the seabed as follows.
  - Oil leaking from a hole approximately 40 cm in diameter (the Deepwater Horizon riser is 19.5"/49.5 cm ID, and is somewhat crimped at the release point).
  - By visual inspection the velocity of the material in the plume is between 7 and 30 cm per second.
  - The plume contains roughly 50% oil droplets (together with gas bubbles and entrained seawater).
  - Assuming a mid-range velocity of 15 cm per second, NOAA estimated a flow rate of 5,000 barrels per day.  The associated range would be from 2,500 to 10,000 barrels per day.

Subsequent estimates of flow rate have been carried out within Unified Command and have yielded consistent results.

2

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 3

**5.      Were all or any of the latest methods that are available today for estimating the amount of such a spill employed?**

To the best of our knowledge, Unified Command has employed, and is continuing to employ, all viable methods to estimate the volume of oil flowing. We have recently learned that the U.S. Geologic Survey ("USGS") has an aircraft-mounted system known as AVIRIS (Airborne Visible/Infrared Imaging Spectrometer), which can measure the thickness of oil on water. The system has been deployed, and the data are currently being processed.

**6.      Please provide all documents created since the incident occurred that bear on, or relate to, in any way, estimates of the amount of oil being released.**

We are producing documents, which can be found at BP-HZN-CEC 020095 - BP-HZN-CEC 020106, that relate to estimates of the amount of oil being released. If you require additional information, please let us know.

In addition, the federal government created a Flow Rate Technical Group ("FRTG"), comprised of members of the scientific community and government agencies, to provide further specificity on the flow rate. Consistent with its stated commitment to transparency and cooperation, BP has provided the FRTG with data showing release points and amounts of oil and gas currently being collected on the Discoverer Enterprise, as well as subsea video of the oil release to assist with FRTG's efforts.

**7.      What is the basis, if any, for the worst case estimate of approximately 60,000 barrels per day provided to the Energy and Commerce Committee during a May 4th briefing?**

Prior to drilling the Mississippi Canyon 252 exploration well, an estimate of the maximum discharge from the well in the worst case scenario of an uncontrolled flow was provided as part of the permitting process. Predictions of reservoir thickness, quality and pressure were considered, in light of the well design, to develop this scenario. After the sinking of the Deepwater Horizon, that earlier estimate was reviewed in light of new data points and assumptions relating to the then-current situation, which yielded the estimated flow rate, in the worst case, of approximately 60,000 barrels per day.

**8.      Was BP, as has been reported in the press, offered an opportunity to use the latest technology for estimating the volume of oil flowing from the pipe?**

Please see answer to Question 5.

**9.      Did BP accept or refuse any such offers and has BP used the latest technology to estimate the volume of oil flowing from the well?**

As noted above, the Unified Command has developed the estimates regarding the rate of oil flowing from the well. It is our understanding that Unified Command has employed, and is

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 4

continuing to employ, all viable technologies to estimate the volume of oil flow.  We are also assisting FRTG with its efforts to provide further specificity on the flow rate.

**10.    Has BP used any subsurface technology to estimate the amounts of oil flowing from the well?  If so, please provide the results of any such efforts.**

BP is not aware of any technology that reliably estimates the amount of oil flowing from the well, either subsea or subsurface.

**11.    Is it accurate to suggest as BP Vice President Kent Wells did recently that "There's just no way to measure it?"  If so, then does BP stand behind the current estimates of the amount of oil flowing or not?**

Under the current circumstances, it is indeed challenging to determine the rate of oil flow with precision.  No direct measurement of the flow rate at the well is feasible.  That said, one can make scientifically informed estimates regarding the likely flow by observing a range of factors at sea level as well as the limited available subsea information.  BP believes the Unified Command made a reasonable judgment based on the available information.  In addition, BP is currently assisting FRTG with its efforts to provide further specificity on the flow rate.

**12.    Could an increased flow from the riser pipe affect proposed or attempted efforts to stop the flow of oil, such as the failed containment dome strategy, the so called "junk shot" strategy, attempts to place an additional pipe into the riser, and the drilling of relief wells for plugging the well bore?**

Yes.  Flow rates have been considered in connection with all efforts to stop the flow of oil.

**13.    Please indicate for the record BP's current estimate of the amount of oil flowing from the well and provide the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate.**

The primary methods which Unified Command, and in particular NOAA, has used to estimate the amount of oil flowing from the well are summarized above in response to Question 4.  The resulting calculation ranges from about 1,000 barrels per day to roughly 15,000 barrels per day, with the most scientifically-informed judgment suggesting a best guess of roughly 5,000 barrels per day.  Please note that, as the Unified Command has made clear, these are only estimates.

**14.    BP has suggested in press reports that it is focused on closing the leak, rather than in measuring it.  Are efforts to close the leak inconsistent with efforts to measure its volume?  Why wouldn't such efforts actually be complementary?**

BP is committed to stopping the leak, containing the oil offshore as much as possible and taking proactive mitigation to protect the shoreline.  Although no direct measurement of the flow

Hon. Edward J. Markey, Chairman
May 24, 2010
Page 5

rate at the well is feasible, the methodologies and results for inferred estimation are described in the answer to Question 4 above.

15.    **Using estimates of 5,000 barrels per day, 40,000 barrels per day and 70,000 barrels per day, and further assuming that the leak continues for another 60 days, what is the projected extent of the spill in square miles and the amount of Gulf coastline in miles that would potentially be affected by such a spill?**

As the Committee undoubtedly appreciates, the situation in the Gulf of Mexico continues to be highly dynamic, and any estimate regarding the potential geographic reach of the spill or the amount of impacted coastline will depend on a range of factors that are not static, including meteorological forecasts which cannot be predicted with any degree of confidence beyond NOAA's three-day forecast.

* * * * * * * *

Please note that the documents that we are providing in connection with these responses contain confidential business information.  BP respectfully requests that these documents be maintained confidentially and that, if the Committee or Subcommittee is considering releasing any of these documents, BP be given an opportunity to be heard on that question.

Again, thank you for the opportunity to respond to your concerns.  If you have any questions, please feel free to contact me or to have your staff contact Liz Reicherts at (202) 457-6585.

Sincerely,

R. Kevin Bailey

Enclosures

cc (w/o encl.):

        Chairman Henry Waxman
        Ranking Member Joe Barton
        Ranking Member Fred Upton

Using "Standard Guide for Visually Estimating Oil Spill Thickness on Water, ASTM F 2534 - 06."

ATTACHMENT 1

## Oil on Water Estimate - Low

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.5 | 50 | 37500 | 893 |
| Dull oil | 250 | 0.2 | 666 | 33300 | 793 |
| Dark oil | 9 | 0.15 | 3330 | 4495.5 | 107 |
| Total oil on water |  |  |  | 75296 | 1793 |
| x 2 to compensate for evap and disp |  |  |  |  | 3586 |
| recovered |  |  |  |  | 200 |
| chemically dispersed |  |  |  |  | 1000 |
| Total emitted |  |  |  |  | 4786 |
| **Barrels emitted per day** |  |  |  |  | **1063** |

## Oil on Water Estimate - Best Guess

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.66 | 333 | 329670 | 7849 |
| Dull oil | 250 | 0.35 | 1332 | 116550 | 2775 |
| Dark oil | 9 | 0.25 | 6660 | 14985 | 357 |
| Total oil on water |  |  |  | 461205 | 10981 |
| x 2 to compensate for evap and disp |  |  |  |  | 21962 |
| recovered |  |  |  |  | 450 |
| chemically dispersed |  |  |  |  | 3500 |
| Total emitted |  |  |  |  | 25912 |
| **Barrels emitted per day** |  |  |  |  | **5758** |

## Oil on Water Estimate - High

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.75 | 666 | 749250 | 17839 |
| Dull oil | 250 | 0.5 | 3330 | 416250 | 9911 |
| Dark oil | 9 | 0.35 | 13320 | 41958 | 999 |
| Total oil on water |  |  |  | 1E+06 | 28749 |
| x 2 to compensate for evap and disp |  |  |  |  | 57498 |
| recovered |  |  |  |  | 700 |
| chemically dispersed |  |  |  |  | 6000 |
| Total emitted |  |  |  |  | 64198 |
| **Barrels emitted per day** |  |  |  |  | **14266** |

BP Confidential

5/17/2010

4/27/10

BP-HZN-CEC020095

Using 'Standard Guide for Visually Estimating Oil Spill Thickness on Water ASTM F 2534 - 06'

## Oil on Water Estimate - Low

|  | sq mi | Cover Factor | gal/sq m | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1641 | 0.5 | 50 | 41025 | 977 |
| Dull oil | 235 | 0.2 | 666 | 31302 | 745 |
| Dark oil | 21 | 0.15 | 3330 | 10490 | 250 |
| **Total oil on water** |  |  |  | 82817 | 1972 |
| x 2 to compensate for evap and disp |  |  |  |  | 3944 |
| recovered |  |  |  |  | 200 |
| chemically dispersed |  |  |  |  | 1000 |
| **Total emitted** |  |  |  |  | 5144 |
| **Barrels emitted per day** |  |  |  |  | **935** |

## Oil on Water Estimate - Best Guess

|  | sq mi | Cover Factor | gal/sq m | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1641 | 0.66 | 333 | 360659 | 8587 |
| Dull oil | 235 | 0.35 | 1332 | 109557 | 2609 |
| Dark oil | 21 | 0.25 | 6660 | 34965 | 833 |
| **Total oil on water** |  |  |  | 505181 | 12028 |
| x 2 to compensate for evap and disp |  |  |  |  | 24056 |
| recovered |  |  |  |  | 450 |
| chemically dispersed |  |  |  |  | 3500 |
| **Total emitted** |  |  |  |  | 28006 |
| **Barrels emitted per day** |  |  |  |  | **5092** |

## Oil on Water Estimate - High

|  | sq mi | Cover Factor | gal/sq m | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1641 | 0.75 | 666 | 819680 | 19516 |
| Dull oil | 235 | 0.5 | 3330 | 391275 | 9316 |
| Dark oil | 21 | 0.35 | 13320 | 97902 | 2331 |
| **Total oil on water** |  |  |  | 1308857 | 31163 |
| x 2 to compensate for evap and disp |  |  |  |  | 62327 |
| recovered |  |  |  |  | 700 |
| chemically dispersed |  |  |  |  | 6000 |
| **Total emitted** |  |  |  |  | 69027 |
| **Barrels emitted per day** |  |  |  |  | **12550** |

BP Confidential

4/28/2010

Page 1

BP-HZN-CEC020096

Using 'Standard Guide for Visually Estimating Oil Spill Thickness on Water, ASTM F 2534 - 06.'

ATTACHMENT 3

## Oil on Water Estimate - Low

| | sq mi | Cover Factor | gals/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1929 | 0.5 | 50 | 48225 | 1148 |
| Dull oil | 238 | 0.2 | 666 | 31702 | 755 |
| Dark oil | 91 | 0.15 | 3330 | 45455 | 1082 |
| Total oil on water | | | | 125381 | 2985 |
| x 2 to compensate for evap and disp | | | | | 5971 |
| recovered | | | | | 400 |
| chemically dispersed | | | | | 1400 |
| Total emitted | | | | | 7771 |
| **Barrels emitted per day** | | | | | **1195** |

## Oil on Water Estimate - Best Guess

| | sq mi | Cover Factor | gals/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1929 | 0.66 | 333 | 423956 | 10094 |
| Dull oil | 238 | 0.35 | 1332 | 110956 | 2642 |
| Dark oil | 91 | 0.25 | 6660 | 151515 | 3608 |
| Total oil on water | | | | 686426 | 16343 |
| x 2 to compensate for evap and disp | | | | | 32687 |
| recovered | | | | | 1500 |
| chemically dispersed | | | | | 4200 |
| Total emitted | | | | | 38387 |
| **Barrels emitted per day** | | | | | **5906** |

## Oil on Water Estimate - High

| | sq mi | Cover Factor | gals/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1929 | 0.75 | 666 | 963536 | 22941 |
| Dull oil | 238 | 0.5 | 3330 | 398270 | 9435 |
| Dark oil | 91 | 0.35 | 13320 | 424242 | 10101 |
| Total oil on water | | | | 1784048 | 42477 |
| x 2 to compensate for evap and disp | | | | | 84955 |
| recovered | | | | | 3000 |
| chemically dispersed | | | | | 6000 |
| Total emitted | | | | | 93955 |
| **Barrels emitted per day** | | | | | **14455** |

5/17/2010

BP Confidential

BP-HZN-CEC020097

Using 'Standard Guide for Visually Estimating Oil Spill Thickness on Water' ASTM F 2534 - 06

ATTACHMENT 4

4/30/2010

### Oil on Water Estimate - Low

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 2481 | 0.5 | 50 | 62025 | 1477 |
| Dull oil | 160 | 0.2 | 666 | 21312 | 507 |
| Dark oil | 35 | 0.15 | 3330 | 17483 | 416 |
| Total oil on water |  |  |  | 100820 | 2400 |
| x 2 to compensate for evap and disp |  |  |  |  | 4801 |
| recovered |  |  |  |  | 500 |
| chemically dispersed |  |  |  |  | 1600 |
| Total emitted |  |  |  |  | 6901 |
| **Barrels emitted per day** |  |  |  |  | **920** |

### Oil on Water Estimate - Best Guess

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 2481 | 0.66 | 333 | 545274 | 12983 |
| Dull oil | 160 | 0.35 | 1332 | 74592 | 1776 |
| Dark oil | 35 | 0.25 | 6660 | 58275 | 1388 |
| Total oil on water |  |  |  | 678141 | 16146 |
| x 2 to compensate for evap and disp |  |  |  |  | 32292 |
| recovered |  |  |  |  | 2000 |
| chemically dispersed |  |  |  |  | 4900 |
| Total emitted |  |  |  |  | 39192 |
| **Barrels emitted per day** |  |  |  |  | **5226** |

### Oil on Water Estimate - High

|  | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 2481 | 0.75 | 666 | 1239260 | 29506 |
| Dull oil | 160 | 0.5 | 3330 | 266400 | 6343 |
| Dark oil | 35 | 0.35 | 13320 | 163170 | 3885 |
| Total oil on water |  |  |  | 1668830 | 39734 |
| x 2 to compensate for evap and disp |  |  |  |  | 79468 |
| recovered |  |  |  |  | 4000 |
| chemically dispersed |  |  |  |  | 7200 |
| Total emitted |  |  |  |  | 90668 |
| **Barrels emitted per day** |  |  |  |  | **12089** |

BP Confidential

BP-HZN-CEC020098

Using "Standard Guide for Visually Estimating Oil Spill Thickness on Water, ASTM F 2534 - 06 "

Attachment 5

## Oil on Water Estimate - Low

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 5256 | 0.5 | 50 | 131400 | 3129 |
| Dull oil | 597 | 0.2 | 666 | 79520.4 | 1893 |
| Dark oil | 120 | 0.15 | 3330 | 59940 | 1427 |
| Total oil on water | | | | 270860.4 | 6449 |
| x 2 to compensate for evap and disp | | | | | 12898 |
| recovered | | | | | 15838 |
| chemically dispersed | | | | | 16600 |
| burned | | | | | 5821 |
| Total emitted | | | | | 51057 |
| Barrels emitted per day | | | | | 1891 |

## Oil on Water Estimate - Best Guess

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 5256 | 0.66 | 333 | 1155164 | 27504 |
| Dull oil | 597 | 0.36 | 1332 | 278321.4 | 6627 |
| Dark oil | 120 | 0.25 | 6660 | 199800 | 4757 |
| Total oil on water | | | | 1633285 | 38888 |
| x 2 to compensate for evap and disp | | | | | 77775 |
| recovered | | | | | 31676 |
| chemically dispersed | | | | | 33000 |
| burned | | | | | 11642 |
| Total emitted | | | | | 154093 |
| Barrels emitted per day | | | | | 5707 |

## Oil on Water Estimate - High

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 5256 | 0.75 | 666 | 2625372 | 62509 |
| Dull oil | 597 | 0.5 | 3330 | 994006 | 23667 |
| Dark oil | 120 | 0.35 | 13330 | 559440 | 13320 |
| Total oil on water | | | | 4178817 | 99496 |
| x 2 to compensate for evap and disp | | | | | 198991 |
| recovered | | | | | 63352 |
| chemically dispersed | | | | | 66000 |
| burned | | | | | 23284 |
| Total emitted | | | | | 351627 |
| Barrels emitted per day | | | | | 13023 |

BP Confidential

BP-HZN-CEC020099

# Seafloor Exit
## 7" x 9-7/8" Casing Annulus Flow Path

**Worst case theoretical flow assumes:**

- Split 5-1/2" drill pipe at subsea BOP and flow out 6-5/8" drill pipe

- Maximum theoretical flow rate is 60,000 BOPD

**Items that reduce worst case theoretical flow:**

- Crushed and bent riser and drill pipe

- Cement sheath in open hole by casing annulus

- Casing hanger and pack-off restriction

- Sand production (unconsolidated formation)

- Shale collapse

- Water production

- BOP functions activated

- Expected range of possible flow rates is 5,000 to 40,000 BOPD

**NOTE:** Removal of all restrictions (riser, BOP, and drill pipe) adds ~10,000 BOPD to rates above



BP-HZN-CEC020100

# Key Messages

## Expected Case:

In the current state a wellhead pressure decrease from 3800 psi to 2270 psi (pressure seafloor) results in a flow rate increase ranging from 15% to 30%

## Alternate Case:

If fluid flow is only through the drill pipe – and then the drill pipe is unintentionally removed and flows into the sea (2270 psi):

- For flow up the annulus the rate doubles
- For flow inside production casing the rate triples

## Note:

If BOP and wellhead are removed and if we have incorrectly modeled the restrictions – the rate could be as high as ~ 100,000 barrels per day up the casing or 55,000 barrels per day up the annulus (low probability worst cases)

ATTACHMENT 7

BP-HZN-CEC020101

04/26/2010  15:31    9854937606              BP HOLC                                PAGE  01



00 0 000·10·
ATTACHMENT 8

## Estimation of the Oil Released from Deepwater Horizon Incident
### (26 April 2010, 1200hrs PDT)

**1)  Surface Oil volume Estimation**

Estimating oil volume by the visual appearance of the slick is a highly unreliable process. At best, one can calculate an answer to only an order of magnitude. Other estimation methods, if available, are likely to give more accurate answers

Oil spills separate into thick portions that can be as thick as an inch or more and thin sheen that are only as thick as a few visible light wavelengths. Most of the oil volume in a typical crude oil spill is in the thick part (but most of the area is sheen

Much of the oil from the light crude that is being released will evaporate or disperse in the water column. We would expect at least half of the oil released to be accounted for by these mechanisms

The oil that makes it to the surface is showing signs of emulsification. Emulsified oil can contain up to 90% water.

Weathered oil that has formed tar balls are not detectable by satellites or overflights.

Based upon past experiments, published standards, and actual spills, NOAA/ERD defines the range of thickness of slicks as

Sheen thickness – $(10^{-8} m \leftrightarrow 10^{-5} m)$
Dark oil thickness- $(10^{-5} m \leftrightarrow 10^{-2} m)$
                      $1 cm$

Area coverage of slick (4/26/10), based upon satellite images $(1500 km^2 \leftrightarrow 3000 km^2)$

Sheen volume, using average thickness of 0.1 micron, area of 2000 sq. km and 100% coverage yields oil volume of 200 cu. m = 1200 bbl= 50,000 gal

Thick oil volume, using average thickness of 100 microns, 1% average coverage and 50% water content yields an oil volume of 1000 cu. m = 6000 bbl. = 0.25 million gal

To an order of magnitude, we estimate that there are around 10,000 bbl of oil on the water surface, or around a half million gallons

**2)  Estimated Present Volume Release Rate**

*The following assumptions are used to make a release rate calculation. If any of them are changed, the answer could be significantly different.*

The oil is leaking, in a vertical plume from a hole approximately 40 cm. in diameter.

The velocity of the material in the plume is estimated by visual observation to be between 7 cm/sec and 30 cm/sec.

The plume itself contains gas bubbles, oil droplets, and entrained seawater.

Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl/day, (approximately 200,000 gal/day) Other sources would contribute additional oil. This answer will be refined as additional information becomes available.

BP-HZN-CEC020102

# Mississippi Canyon 252 #1
# Flow Rate Calculations

**Context**

A 30 second video clip of hydrocarbons leaking from the broken end of the Deepwater Horizon drilling riser has been released to the public. Various "experts" are challenging Unified Command's best guess estimate of flow rate at the seabed based on this video clip. This note summarizes the various estimates that have been made within Unified Command.

**Mass Balance**

The mass balance calculation involves estimating, through visual inspection, the volume of oil on the surface of the water. Allowances are then made for natural dispersion and evaporation. Estimates of volumes skimmed, burned, and chemically dispersed then allow an estimate of the oil released at the seabed over the duration of the spill. The calculation is repeated each day weather permitting.

In the early days of the spill, the surface expression of the spill was relatively small. Overflights were able to provide fidelity with respect to the character of the oil on the surface. Three descriptors were used

- Sheen
- Dull
- Dark oil

There are two Standards for estimating the thickness of oil on water using visual descriptors.

- US-based ASTM Standard
- European-based Bonn Agreement

The visual descriptors are different in the two standards and the relationships to thickness are also different.

From April 27 through April 30 daily estimates of flow rate were made on the basis of visual description of the oil on the surface. Three estimates were made each day – low, best guess, and high – to allow for differences between the two standards, and uncertainties around the input parameters.

- Low end was always around 1,000 barrels per day
- Best guess was between 5,000 and 6,000 barrels per day
- High end varied from 12,000 to 14,000 barrels per day

The tables associated with these estimates are attached (Attachments 1-4). These estimates played an important part in Unified Command's decision to raise the estimate of flow rate from 1,000 to 5,000 barrels per day.

During the storm which began on May 1, and for several days after, no visual description of the spill was obtained.  From May 8, daily outlines of the spill have been available based on a combination of satellite and aerial overflights. However, because of the size of the spill area, overflights have been unable to provide fidelity on the visual appearance of the oil within the spill area.  During the five days in April for which fidelity was available, the ratios of dark oil to dull oil to sheen remained relatively constant at 2/10/88.  These ratios have been applied to the total area of spill on May 17.  Current estimates of volumes of oil skimmed, burned, and chemically dispersed were then applied to provide an updated range of possible flow rates as follows: 2,000 – 6,000 – 13,000 barrels per day (Attachment 5).

Note that all serious scientists recognize that there are huge uncertainties in estimating oil volumes from visual inspection.  Oil thickness is by far the greatest uncertainty, with both sheen and darker oil thicknesses varying by orders of magnitude.

**Maximum Discharge Calculation**
Prior to drilling the MC 252 exploration well a maximum discharge estimate was provided as part of the permitting process.  Predictions of reservoir thickness, quality, and pressure were convolved with the well design to develop a worse case scenario as follows.
- Optimistic assumptions for reservoir thickness, quality, pressure, and fluid properties.
- Total loss of control of well after drilling through reservoir in largest hole size allowed by the well design – 12 ¼".
- Totally uncontrolled flow from drilling riser at surface.

Using these assumptions, a maximum case discharge of 162,000 barrels per day was estimated.

After the sinking of the Deepwater Horizon, this estimate was reviewed in the light of the actual situation as it was understood at that time.
- Formation evaluation of the reservoir interval.
- 9 7/8" hole size in the reservoir
- 7" production tubing across the reservoir
- Flow to seabed through casing annulus
- Split 5 ½" drill pipe at BOP and flow out 6 5/8" drill pipe
- No restrictions in BOP, riser, or drill pipe (ie well head open to seabed – requires BOP to fall off well head)

An absolute worst case flow rate of 60,000 barrels per day was calculated.  A more reasonable worst case scenario of 40,000 barrels per day recognizes the following.
- BOP is in place and may be partially activated.
- The riser and drill pipe is crushed and kinked.

BP-HZN-CEC020104

- Restrictions provided by cement in the casing annulus, formation collapse, casing hangers, etc., are likely.

This analysis is summarized on Attachment 6.

A more sophisticated version of this calculation has been carried out as more has been learned about pressures at the top and bottom of the well head. This review calculates unconstrained flow rate through the casing as well as up the annulus. Absolute worst cases with wellhead and BOP removed, and no downhole restrictions, are as follows (Attachment 7).

- Annular flow – 55,000 barrels per day
- Casing flow – 100,000 barrels per day

**Fluid Velocity At Seabed**

On April 26, NOAA scientists made an estimate of volume release rate at the seabed as follows.

- Oil leaking from a hole approximately 40 cm in diameter (Deepwater Horizon riser is 19.5"/49.5 cm ID, and is somewhat crimped at release point).
- By visual inspection the velocity of the material in the plume is between 7 and 30 cm per second.
- The plume contains roughly 50% oil droplets (together with gas bubbles and entrained seawater).

The NOAA estimate using these assumptions was roughly 5,000 barrels per day (Attachment 8).

**Evidence Against Extreme Flow Rates At Seabed**

A Professor from Purdue University has calculated a current flow rate at the seabed of 70,000 +/- 14,000 barrels per day. He bases his estimate on the velocity of fluid exiting the drilling riser on the seabed. His estimate is unlikely to allow for the following additional factors required to estimate the flow of oil.

- Drill pipe in riser reducing flow area
- Partial crimping of riser end reducing flow area
- Proportion of gas and entrained water exiting riser with the oil
- Volume reduction of oil as gas escapes en route from seabed to surface
- Flow rate not constant

Finally, there is absolutely no evidence of any floating material being entrained in the plume exiting the broken riser. In a report to the MMS on Oil Spill Containment, Remote Sensing and Tracking For Deepwater Blowouts, PCCI Marine and Environmental Engineering made the following statement.

> *"The blowout plume will make it difficult to approach the well with anything but very massive equipment pieces or ROVs. The operation of ROVs will be difficult around the blowout point. The jet zone will cause vast amounts*

*of water to flow towards the well.  The danger of having lighter equipment sucked into the flow is large.  Many ROVs have been rendered useless by relatively minor blowout plumes"*

ROV video shows neutrally buoyant material passing within inches of the plume without being sucked in.  From this observation alone, the flow must be relatively minor.

# PetroVR Well Production
## *Macondo-PM_90% \Macondo TAM*

**4-way**

BP-HZN-CEC 020107

# Attachment 4

bp



**David C. Nagel**

Executive Vice President
BP America Inc.

June 25, 2010

BP America Inc.
1101 New York Avenue, NW
Suite 700
Washington, DC 20005

Direct (202) 457-6581
Main (202) 785-4888
Fax (202) 457-6597

Honorable Edward J. Markey
Chairman
Subcommittee on Energy and Environment
Committee on Energy and Commerce
U.S. House of Representatives
2125 Rayburn House Office Building
Washington, D.C. 20515-6115

> Re:    **Energy and Environment Subcommittee's Partial Release of Thirteen-Page
> Document**

Dear Chairman Markey:

I am writing on behalf of BP America, Inc. (BPA) in response to the Energy and
Environment Subcommittee's recent release of two pages (Attachments 6 and 7) of a thirteen-
page document, which BPA provided in response to your request regarding flow rate estimates
on May 24, 2010. I am writing to reiterate the facts relating to these documents in order to
clarify any confusion or misunderstanding as to their content.

BPA has responded in good faith to all of your requests regarding flow rate estimates, as
well as provided all information requested by Dr. Marcia McNutt, the leader and designated
coordination point for information sought by the federal government's Flow Rate Technical
Group (FRTG). We will continue to do so, making data, video footage and other resources
available as needed.

That said, we are obliged to clarify the apparent confusion surrounding the "worst case"
information previously provided to your Subcommittee. The "worst case" estimate of 100,000
barrels per day referenced on Attachment 7 was a hypothetical case based on a number of
assumptions that did not reflect the conditions of the well at the time the estimate was made, or
at the time the document was provided to you. Those hypothetical conditions still do not exist
today. As noted in the document itself, that hypothetical case assumed that both the blowout
preventer (BOP) and wellhead were removed, and that there were no downhole flow restrictions.
In fact, the BOP and wellhead have not been removed. Accordingly, because the key
assumptions that informed this "worst case" estimate were not present, it was reasonable to
conclude that the "worst case" scenario was not applicable to the situation as it then existed.

Most importantly, there was no attempt to mislead, as your press statement suggests. A
"worst case" estimate of 60,000 barrels per day was provided orally to Members of the House
Energy and Commerce Committee on May 4 in response to a question during a technical
briefing. That estimate was based on data and assumptions that existed at the time and was
intended, in an effort to be fully transparent, to convey to Congress the worst result that could be
expected under certain circumstances. Later, the estimate of 100,000 barrels per day was derived
after pressure data was obtained from the BOP stack. Again, this subsequent, "worst case"

estimate assumed removal of the BOP stack and wellhead and no restrictions in the well bore –
circumstances that did not exist then and do not exist today.  All of this is laid out in the thirteen-
page document from which the two released pages were extracted.

   Finally, and as the Unified Command has repeatedly made clear, estimates as to flow rate
are necessarily rough and accompanied by a high degree of uncertainty.  Indeed, and to put all
these estimates in context, when the FRTG first reported its preliminary estimates on May 27
(nearly a month after BPA briefed your Subcommittee), it stated that oil flow likely was in the
range of 12,000 to 19,000 barrels of oil per day and only last week increased that estimate to
35,000 to 60,000 barrels, based on updated information and scientific assessments.

   We appreciate your attention to this important matter and the opportunity to correct the
record.  If you have any questions or if we can be of further assistance to you and your staff,
please feel free to contact me directly or Liz Reicherts at (202) 457-6585.


        Sincerely,



        David Nagel


cc:  Chairman Henry Waxman
   Ranking Member Joe Barton
   Ranking Member Fred Upton